basis consisting of Indebtedness for borrowed money, debt obligations evidenced by promissory notes and similar instruments, letters of credit (only to the extent of any unreimbursed drawings thereunder) and Obligations in respect of Capitalized Lease Obligations, plus (2) the aggregate amount of all outstanding Disqualified Stock of the Issuer and all Disqualified Stock and Preferred Stock of its Restricted Subsidiaries on a consolidated basis, with the amount of such Disqualified Stock and Preferred Stock equal to the greater of their respective voluntary or involuntary liquidation preferences and maximum fixed repurchase prices, in each case determined on a consolidated basis in accordance with GAAP, less (3) the aggregate amount of all Unrestricted Cash and less (4) all Deposit L/C Loans and Incremental Deposit L/C Loans outstanding on such date of determination. For purposes hereof, the "*maximum fixed repurchase price*" of any Disqualified Stock or Preferred Stock that does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Stock or Preferred Stock as if such Disqualified Stock or Preferred Stock were purchased on any date on which Consolidated Total Indebtedness shall be required to be determined, and if such price is based upon, or measured by, the fair market value of such Disqualified Stock or Preferred Stock, such fair market value shall be determined reasonably and in good faith by the Issuer.

"*Contingent Obligations*" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("*primary obligations*") of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent,

(1) to purchase any such primary obligation or any property constituting direct or indirect security therefor,

(2) to advance or supply funds

(a) for the purchase or payment of any such primary obligation, or

(b) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, or

(3) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"*Covered Commodity*" means any energy, electricity, generation capacity, power, heat rate, congestion, natural gas, nuclear fuel (including enrichment and conversion), diesel fuel, fuel oil, other petroleum-based liquids, coal, lignite, weather, emissions and other environmental credits, waste by-products renewable energy credit, or any other energy related commodity or service (including ancillary services and related risks (such as location basis)).

"*Credit Facilities*" means, with respect to the Issuer or any of its Restricted Subsidiaries, one or more debt facilities, including the TCEH Senior Secured Facilities or other financing arrangements (including, without limitation, commercial paper facilities or indentures) providing for revolving credit loans, term loans, letters of credit or other long-term indebtedness, including any notes, mortgages, guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements or refundings thereof and any indentures or credit facilities or commercial paper facilities that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount permitted to be borrowed thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted by the covenant described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock") or adds Restricted Subsidiaries as additional borrowers or guarantors thereunder and whether by the same or any other agent, lender or group of lenders.

"*Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

99

EFIHMW00151925

**PX 022
Page 106 of 218**

"*Deposit L/C Loan*" means Deposit L/C Loans under, and as defined in, the TCEH Senior Secured Facilities.

"*Designated Non-cash Consideration*" means the fair market value of non-cash consideration received by the Issuer or a Restricted Subsidiary in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officer's Certificate, setting forth the basis of such valuation, executed by the principal financial officer of the Issuer, less the amount of cash or Cash Equivalents received in connection with a subsequent sale of or collection on such Designated Non-cash Consideration.

"*Designated Preferred Stock*" means Preferred Stock of the Issuer or any parent corporation thereof (in each case other than Disqualified Stock) that is issued for cash (other than to a Restricted Subsidiary or an employee stock ownership plan or trust established by the Issuer or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officer's Certificate executed by the principal financial officer of the Issuer or the applicable parent corporation thereof, as the case may be, on the issuance date thereof, the cash proceeds of which are excluded from the calculation set forth in clause (3) of the first paragraph under "— Certain Covenants — Limitation on Restricted Payments."

"*Discharge of Parity Lien Obligations*" means the occurrence of all of the following:

(1) termination or expiration of all commitments to extend credit that would constitute Parity Lien Debt;

(2) payment in full in cash of the principal of, and interest and premium, if any, on, all Parity Lien Debt (other than any undrawn letters of credit);

(3) discharge or cash collateralization (at the lower of (A) 105% of the aggregate undrawn amount and (B) the percentage of the aggregate undrawn amount required for release of liens under the terms of the applicable Parity Lien Document) of all outstanding letters of credit constituting Parity Lien Debt; and

(4) payment in full in cash of all other Parity Lien Obligations that are outstanding and unpaid at the time the Parity Lien Debt is paid in full in cash (other than any obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities in respect of which no claim or demand for payment has been made at such time).

"*Disqualified Stock*" means, with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely as a result of a change of control or asset sale) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than solely as a result of a change of control or asset sale), in whole or in part, in each case prior to the date 91 days after the earlier of the maturity date of the Notes or the date the Notes are no longer outstanding; *provided, however*, that if such Capital Stock is issued to any plan for the benefit of employees of the Issuer or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Issuer or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"*EBITDA*" means, with respect to any Person for any period, the Consolidated Net Income of such Person for such period

(1) increased (without duplication) by:

(a) provision for taxes based on income or profits or capital gains, including, without limitation, foreign, federal, state, franchise, excise, value-added and similar taxes and foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations) of such Person paid or accrued during such period, deducted (and not added back) in computing Consolidated Net Income; *plus*

100

EFIHMW00151926

(b) Fixed Charges of such Person for such period (including (x) net losses on Hedging Obligations or other derivative instruments entered into for the purpose of hedging interest rate risk and (y) costs of surety bonds in connection with financing activities, in each case, to the extent included in Fixed Charges), together with items excluded from the definition of "Consolidated Interest Expense" pursuant to clauses (1)(u), (v), (w), (x), (y) and (z) of the definition thereof, and, in each such case, to the extent the same were deducted (and not added back) in calculating such Consolidated Net Income; *plus*

(c) Consolidated Depreciation and Amortization Expense of such Person for such period to the extent the same was deducted (and not added back) in computing Consolidated Net Income; *plus*

(d) any fees, expenses or charges (other than depreciation or amortization expense) related to any Equity Offering, Permitted Investment, acquisition, disposition, recapitalization or the incurrence of Indebtedness permitted to be incurred by such Person and its Restricted Subsidiaries by the Indenture (including a refinancing transaction or amendment or other modification of any debt instrument) (whether or not successful), including (i) such fees, expenses or charges related to this offering, the exchange offers pursuant to which the 9.75% Notes and EFIH Notes were issued, the offering of any Additional Notes or Exchange Notes or any additional 9.75% Notes or EFIH Notes, the offerings of the Existing Notes, and any interim bridge facilities related thereto and the TCEH Senior Secured Facilities and any Receivables Facility, (ii) any amendment or other modification of the Notes, (iii) any such transaction consummated prior to the Closing Date and any such transaction undertaken but not completed and (iv) any charges or non-recurring merger costs as a result of any such transaction, in each case, deducted (and not added back) in computing Consolidated Net Income; *plus*

(e) the amount of any restructuring charge or reserve deducted (and not added back) in such period in computing Consolidated Net Income, including any costs incurred in connection with acquisitions after the Closing Date, costs related to the closure and/or consolidation of facilities; *plus*

(f) any other non-cash charges, including any write-offs or write-downs. reducing Consolidated Net Income for such period (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period); *plus*

(g) the amount of any minority interest expense consisting of Subsidiary income attributable to minority equity interests of third parties in any non-Wholly Owned Subsidiary deducted (and not added back) in such period in calculating Consolidated Net Income; *plus*

(h) the amount of management, monitoring, consulting and advisory fees and related indemnities and expenses paid in such period to the Investors to the extent otherwise permitted under "Certain Covenants — Transactions with Affiliates" and deducted (and not added back) in calculating Consolidated Net Income; *plus*

(i) the amount of net cost savings projected by the Issuer in good faith to be realized as a result of specified actions taken or to be taken prior to or during such period (calculated on a *pro forma* basis as though such cost savings had been realized on the first day of such period and added to EBITDA until fully realized), net of the amount of actual benefits realized during such period from such actions; *provided* that (w) such cost savings are reasonably identifiable and factually supportable, (x) such actions have been taken or are to be taken within 12 months after the date of determination to take such action and some portion of the benefit is expected to be realized within 12 months of taking such action, (y) no cost savings shall be added pursuant to this clause (i) to the extent duplicative of any expenses or charges relating to such cost savings that are included in clause (e) above with respect to such period and (z) the aggregate amount of cost savings added pursuant to this clause (i) shall not exceed $150.0 million for any four consecutive quarter period (which adjustments may be incremental to *pro forma* adjustments made pursuant to the second paragraph of the definition of "Fixed Charge Coverage Ratio"); *plus*

101

Confidential

(j) the amount of loss on sales of receivables and related assets to the Receivables Subsidiary in connection with a Receivables Facility deducted (and not added back) in calculating Consolidated Net Income; *plus*

(k) any costs or expense incurred by the Issuer or a Restricted Subsidiary pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such cost or expenses are funded with cash proceeds contributed to the capital of the Issuer or net cash proceeds of an issuance of Equity Interests (other than Disqualified Stock) of the Issuer (or any direct or indirect parent thereof) solely to the extent that such net cash proceeds are excluded from the calculation set forth in clause (3) of the first paragraph under "— Certain Covenants — Limitation on Restricted Payments"; *plus*

(l) Expenses Relating to a Unit Outage; *provided* that the only Expenses Relating to a Unit Outage that may be included in EBITDA shall be, without duplication (i) up to $250.0 million per fiscal year of Expenses Relating to a Unit Outage incurred within the first 12 months after any planned or unplanned outage of any Unit by reason of any action by any regulatory body or other Government Authority or to comply with any applicable law and (ii) up to $100.0 million per fiscal year of Expenses Relating to a Unit Outage incurred within the first 12 months after any planned outage of any Unit for purposes of expanding or upgrading such Unit; *plus*

(m) cash receipts (or any netting arrangements resulting in increased cash receipts) not added in arriving at EBITDA or Consolidated Net Income in any period to the extent the non-cash gains relating to such receipts were deducted in the calculation of EBITDA pursuant to paragraph (2) below for any previous period and not added; and

(2) decreased by (without duplication) (a) non-cash gains increasing Consolidated Net Income of such Person for such period, excluding any non-cash gains to the extent they represent the reversal of an accrual or reserve for a potential cash item that reduced EBITDA in any prior period, (b) cash expenditures (or any netting arrangements resulting in increased cash expenditures) not deducted in arriving at EBITDA or Consolidated Net Income in any period to the extent non-cash losses relating to such expenditures were added in the calculation of EBITDA pursuant to paragraph (1) above for any previous period and not deducted, and (c) the amount of any minority interest income consisting of Subsidiary losses attributable to minority equity interests of third parties in any non-Wholly Owned Subsidiary to the extent such minority interest income is included in Consolidated Net Income.

"*EFH Senior Interim Facility*" means the interim loan agreement, dated as of the Closing Date by and among the Issuer, as borrower, EFCH and EFIH, as guarantors, the lenders party thereto in their capacities as lenders thereunder and Morgan Stanley Senior Funding, Inc., as Administrative Agent, including any guarantees, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications or restatements thereof.

"*EFIH Indenture*" means the Indenture, dated as of November 16, 2009, under which the EFIH Notes were issued.

"*EFIH Notes*" means the 9.75% Senior Secured Notes due 2019 issued by EFIH and EFIH Finance Inc. under the EFIH Indenture, including any guarantees thereof.

"*EMU*" means the economic and monetary union as contemplated in the Treaty on European Union.

"*Environmental CapEx Debt*" means Indebtedness of the Issuer or any of its Restricted Subsidiaries incurred for the purpose of financing Environmental Capital Expenditures.

102

Confidential

"*Environmental Capital Expenditures*" means capital expenditures deemed necessary by the Issuer or its Restricted Subsidiaries to comply with, or in anticipation of having to comply with, Environmental Law or otherwise undertaken voluntarily by the Issuer or any of its Restricted Subsidiaries in connection with environmental matters.

"*Environmental Law*" means any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code and rule of common law now or hereafter in effect and in each case as amended, and any applicable judicial or administrative interpretation thereof, including any applicable judicial or administrative order, consent decree or judgment, relating to the environment, human health or safety or Hazardous Materials.

"*equally and ratably*" means, in reference to sharing of Liens or proceeds thereof as between the holders of Secured Debt Obligations within the same Class after the repayment of amounts payable to the Collateral Trustee under the Collateral Trust Agreement and the Parity Lien Representatives (and in the case of Junior Lien Obligations, Junior Lien Representatives) in accordance with the applicable Secured Debt Document that such Liens or proceeds:

(1) will be allocated and distributed first to the Secured Debt Representative for each outstanding Series of Secured Lien Debt within that Class, for the account of the holders of such Series of Secured Lien Debt, ratably in proportion to the principal of, and interest and premium (if any) and reimbursement obligations (contingent or otherwise) with respect to letters of credit, if any, outstanding (whether or not drawings have been made under such letters of credit) forming part of, and Hedging Obligations to the extent constituting Secured Lien Debt pursuant to the terms of, each outstanding Series of Secured Lien Debt within that Class when the allocation or distribution is made; and thereafter

(2) will be allocated and distributed (if any remain after payment in full of all of the principal of, and interest and premium (if any) and reimbursement obligations (contingent or otherwise) with respect to letters of credit, if any, outstanding (whether or not drawings have been made on such letters of credit) forming part of, and Hedging Obligations to the extent constituting Secured Indebtedness pursuant to the terms of, each outstanding Series of Secured Lien Debt within that Class) to the Secured Debt Representative for each outstanding Series of Secured Lien Debt within that Class, for the account of the holders of any remaining Secured Debt Obligations within that Class, ratably in proportion to the aggregate unpaid amount of such remaining Secured Debt Obligations within that Class due and demanded (with written notice to the applicable Secured Debt Representative and the Collateral Trustee) prior to the date such distribution is made.

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock, but excluding any debt security that is convertible into, or exchangeable for, Capital Stock.

"*Equity Offering*" means any public or private sale of common stock or Preferred Stock of the Issuer or any of its direct or indirect parent companies (excluding Disqualified Stock), other than:

(1) public offerings with respect to the Issuer's or any direct or indirect parent company's common stock registered on Form S-8;

(2) issuances to any Subsidiary of the Issuer; and

(3) any such public or private sale that constitutes an Excluded Contribution.

"*ERCOT*" means the Electric Reliability Council of Texas, Inc. or any entity approved to perform the functions of an independent system operator within the power region that includes approximately 80% of the electric transmission within the State of Texas.

"*euro*" means the single currency of participating member states of the EMU.

"*Event of Default*" has the meaning set forth under "Events of Default and Remedies."

103

EFIHMW00151929

"*Excess Proceeds*" has the meaning set forth in the fourth paragraph under "Repurchase at the Option of Holders — Asset Sales."

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Exchange Notes*" means any notes issued in exchange for the Notes pursuant to the Registration Rights Agreement or similar agreement.

"*Excluded Contribution*" means net cash proceeds, marketable securities or Qualified Proceeds received by the Issuer after the Closing Date from

(1) contributions to its common equity capital, and

(2) the sale (other than to a Subsidiary of the Issuer or to any management equity plan or stock option plan or any other management or employee benefit plan or agreement of the Issuer) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Issuer,

in each case designated as Excluded Contributions pursuant to an Officer's Certificate executed by the principal financial officer of the Issuer on the date such capital contributions are made or the date such Equity Interests are sold, as the case may be, which are excluded from the calculation set forth in clause (3) of the first paragraph under "— Certain Covenants — Limitation on Restricted Payments."

"*Existing Notes*" means

• Energy Future Holdings Corp. 5.55% Fixed Senior Notes Series P due 2014;

• Energy Future Holdings Corp. 6.50% Fixed Senior Notes Series Q due 2024;

• Energy Future Holdings Corp. 6.55% Fixed Senior Notes Series R due 2034;

• Energy Future Holdings Corp. 10.875% Senior Notes due 2017;

• Energy Future Holdings Corp. 11.250%/12.000% Senior Toggle Notes due 2017;

• 9.75% Notes;

• EFIH Notes;

• EFCH Floating Rate Junior Subordinated Debentures, Series D due 2037;

• EFCH 8.175% Fixed Junior Subordinated Debentures, Series E due 2037;

• EFCH 9.580% Fixed Notes due in semi-annual installments to 2019;

• EFCH 8.254% Fixed Notes due in quarterly installments to 2021;

• TCEH Notes;

• TCEH 7.000% Fixed Senior Notes due 2013;

• TCEH 7.460% Fixed Secured Facility Bonds with amortizing payments to 2015;

Pollution Control Revenue Bonds-Brazos River Authority:

• 5.400% Fixed Series 1994A due May 1, 2029;

• 7.700% Fixed Series 1999A due April 1, 2033;

• 6.750% Fixed Series 1999B due September 1, 2034, remarketing date April 1, 2013;

104

Confidential

- 7.700% Fixed Series 1999C due March 1, 2032;

- 8.250% Fixed Series 2001A due October 1, 2030;

- 5.750% Fixed Series 2001C due May 1, 2036, remarketing date November 1, 2011;

- 8.250% Fixed Series 2001D-1 due May 1, 2033.

- Floating Series 2001D-2 due May 1, 2033.

- Floating Taxable Series 2001I due December 1, 2036;

- Floating Series 2002A due May 1, 2037;

- 6.750% Fixed Series 2003A due April 1, 2038, remarketing date April 1, 2013;

- 6.300% Fixed Series 2003B due July 1, 2032;

- 6.750% Fixed Series 2003C due October 1, 2038;

- 5.400% Fixed Series 2003D due October 1, 2029, remarketing date October 1, 2014;

- 5.000% Fixed Series 2006 due March 1, 2041;

Pollution Control Revenue Bonds-Sabine River Authority of Texas:

- 6.450% Fixed Series 2000A due June 1, 2021;

- 5.500% Fixed Series 2001A due May 1, 2022, remarketing date November 1, 2011;

- 5.750% Fixed Series 2001B due May 1, 2030, remarketing date November 1, 2011;

- 5.200% Fixed Series 2001C due May 1, 2028;

- 5.800% Fixed Series 2003A due July 1, 2022;

- 6.150% Fixed Series 2003B due August 1, 2022; and

Pollution Control Revenue Bonds-Trinity River Authority of Texas:

- 6.250% Fixed Series 2000A due May 1, 2028;

in each case to the extent outstanding on the Issue Date.

"*Existing Notes Indentures*" means each of the indentures or other documents containing the terms of the Existing Notes.

"*Expenses Relating to a Unit Outage*" means any expenses or other charges as a result of any outage or shut-down of any Unit, including any expenses or charges relating to (a) restarting any such Unit so that it may be placed back in service after such outage or shut-down, (b) purchases of power, natural gas or heat rate to meet commitments to sell, or offset a short position in, power, natural gas or heat rate that would otherwise have been met or offset from production generated by such Unit during the period of such outage or shut-down, net of the expenses not in fact incurred (including fuel and other operating expenses) that would have been incurred absent such an outage or shut down and (c) starting up, operating, maintaining and shutting down any other Unit that would not otherwise have been operating absent such outage or shut-down, including the fuel and other operating expenses to the extent in excess of the expenses not in fact incurred (including fuel and other operating costs) that would have been incurred absent such outage or shut down, incurred to start-up, operate, maintain and shut-down such Unit and that are required during the period of time that the shut-down or outaged Unit is out of service in order to meet the commitments of such shut-down or outaged Unit to sell, or offset a short position in, power, natural gas or heat rate.

"*Fitch*" means Fitch Ratings Ltd. and any successor to its rating agency business.

105

EFIHMW00151931

"*Fixed Charge Coverage Ratio*" means, with respect to any Person for any period, the ratio of EBITDA of such Person for such period to the Fixed Charges of such Person for such period. In the event that the Issuer or any Restricted Subsidiary incurs, assumes, guarantees, redeems, retires or extinguishes any Indebtedness (other than Indebtedness incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) or issues or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated but prior to or simultaneously with the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "*Fixed Charge Coverage Ratio Calculation Date*"), then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect to such incurrence, assumption, guarantee, redemption, retirement or extinguishment of Indebtedness, or such issuance or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, consolidations and disposed operations (as determined in accordance with GAAP) that have been made by the Issuer or any of its Restricted Subsidiaries during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Fixed Charge Coverage Ratio Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, consolidations and disposed operations (and the change in any associated fixed charge obligations and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If, since the beginning of such period, any Person that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any of its Restricted Subsidiaries since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation or disposed operation that would have required adjustment pursuant to this definition, then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, merger, consolidation or disposed operation had occurred at the beginning of the applicable four-quarter period.

For purposes of this definition, whenever pro forma effect is to be given to a transaction, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Issuer. If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Fixed Charge Coverage Ratio Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Issuer to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP. For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed on a *pro forma* basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period except as set forth in the first paragraph of this definition. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate or other rate shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Issuer may designate.

"*Fixed Charges*" means, with respect to any Person for any period, the sum of:

(1) Consolidated Interest Expense of such Person for such period;

(2) all cash dividends or other distributions paid (excluding items eliminated in consolidation) on any series of Preferred Stock during such period; and

(3) all cash dividends or other distributions paid (excluding items eliminated in consolidation) on any series of Disqualified Stock during such period.

"*Foreign Subsidiary*" means, with respect to any Person, any Restricted Subsidiary of such Person that is not organized or existing under the laws of the United States, any state or territory thereof or the District of Columbia and any Restricted Subsidiary of such Foreign Subsidiary.

106

EFIHMW00151932

**PX 022
Page 113 of 218**

"*GAAP*" means generally accepted accounting principles in the United States which are in effect on the Closing Date.

"*Government Authority*" means any nation or government, any state, province, territory or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including without limitation, ERCOT.

"*Government Securities*" means securities that are:

(1) direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged; or

(2) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America,

which, in either case, are not callable or redeemable at the option of the issuers thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to any such Government Securities or a specific payment of principal of or interest on any such Government Securities held by such custodian for the account of the holder of such depository receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the Government Securities or the specific payment of principal of or interest on the Government Securities evidenced by such depository receipt.

"*guarantee*" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"*Guarantee*" means the guarantee by any Guarantor of the Issuer's Obligations under the Indenture.

"*Guarantor*" means each Restricted Subsidiary that Guarantees the Notes in accordance with the terms of the Indenture.

"*Hazardous Materials*" means (a) any petroleum or petroleum products, radioactive materials, friable asbestos, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing regulated levels of polychlorinated biphenyls and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "toxic substances," "toxic pollutants," "contaminants," or "pollutants" or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, which is prohibited, limited or regulated by any Environmental Law.

"*Hedging Obligations*" means with respect to any Person, the obligations of such Person under (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master

107

EFIHMW00151933

agreement (any such master agreement, together with any related schedules, a "*Master Agreement*"), including any such obligations or liabilities under any Master Agreement and (c) physical or financial commodity contracts or agreements, power purchase or sale agreements, fuel purchase or sale agreements, environmental credit purchase or sale agreements, power transmission agreements, commodity transportation agreements, fuel storage agreements, netting agreements (including Netting Agreements), capacity agreement and commercial or trading agreements, each with respect to, or including the purchase, sale, exchange of (or the option to purchase, sell or exchange), transmission, transportation, storage, distribution, processing, sale, lease or hedge of, any Covered Commodity price or price indices for any such Covered Commodity or services or any other similar derivative agreements, and any other similar agreements.

"*Holder*" means the Person in whose name a Note is registered on the registrar's books.

"*Incremental Deposit L/C Loans*" means Incremental Deposit L/C Loans under, and as defined in, the TCEH Senior Secured Facilities.

"*Indebtedness*" means, with respect to any Person, without duplication:

(1) any indebtedness (including principal and premium) of such Person, whether or not contingent:

(a) in respect of borrowed money;

(b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof);

(c) representing the balance deferred and unpaid of the purchase price of any property (including Capitalized Lease Obligations), except (i) any such balance that constitutes a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business and (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP; or

(d) representing any Hedging Obligations;

if and to the extent that any of the foregoing Indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2) to the extent not otherwise included, any obligation by such Person to be liable for, or to pay, as obligor, guarantor or otherwise on, the obligations of the type referred to in clause (1) of a third Person (whether or not such items would appear upon the balance sheet of the such obligor or guarantor), other than by endorsement of negotiable instruments for collection in the ordinary course of business; and

(3) to the extent not otherwise included, the obligations of the type referred to in clause (1) of a third Person secured by a Lien on any asset owned by such first Person, whether or not such Indebtedness is assumed by such first Person; *provided* that the amount of Indebtedness of such first Person for purposes of this clause (3) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such first Person in good faith;

*provided, however*, that notwithstanding the foregoing, Indebtedness shall be deemed not to include (a) Contingent Obligations incurred in the ordinary course of business or (b) obligations under or in respect of Receivables Facilities or (c) amounts payable by and between the Issuer and its Subsidiaries in connection with retail clawback or other regulatory transition issues.

"*Independent Financial Advisor*" means an accounting, appraisal, investment banking firm or consultant to Persons engaged in Similar Businesses of nationally recognized standing that is, in the good faith judgment of the Issuer, qualified to perform the task for which it has been engaged.

108

EFIHMW00151934
**PX 022**
**Page 115 of 218**

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's, BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency.

"*Investment Grade Securities*" means:

(1) securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents);

(2) debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or instruments constituting loans or advances among the Issuer and its Subsidiaries;

(3) investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment or distribution; and

(4) corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"*Investments*" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit, advances to customers, commissions, travel and similar advances to officers and employees, in each case made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet (excluding the footnotes) of the Issuer in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. For purposes of the definition of "Unrestricted Subsidiary" and the covenant described under "— Certain Covenants — Limitation on Restricted Payments":

(1) "Investments" shall include the portion (proportionate to the Issuer's equity interest in such Subsidiary) of the fair market value of the net assets of a Subsidiary of the Issuer at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided, however,* that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Issuer shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

(a) the Issuer's "Investment" in such Subsidiary at the time of such redesignation; *less*

(b) the portion (proportionate to the Issuer equity interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation; and

(2) any property transferred to or from an Unrestricted Subsidiary shall be valued at its fair market value at the time of such transfer, in each case as determined in good faith by the Issuer.

"*Investors*" means Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P., J.P. Morgan Ventures Corporation, Citigroup Global Markets Inc., Morgan Stanley & Co. Incorporated, Goldman, Sachs & Co. and LB I Group, Inc. and each of their respective Affiliates but not including, however, any portfolio companies of any of the foregoing.

"*Issue Date*" means the first date on which any Notes are issued pursuant to the Indenture.

"*Issuer*" has the meaning set forth in the first paragraph under "General"; *provided* that when used in the context of determining the fair market value of an asset or liability under the Indenture, "Issuer" shall be deemed to mean the board of directors of the Issuer when the fair market value is equal to or in excess of $500.0 million (unless otherwise expressly stated).

"*Junior Lien*" means a Lien granted by a security document to the Collateral Trustee, at any time, upon any Collateral to secure Junior Lien Obligations.

109

EFIHMW00151935

**PX 022**
**Page 116 of 218**

"*Junior Lien Debt*" means:

(1) any Indebtedness (including letters of credit and reimbursement obligations with respect thereto) of the Issuer or any Guarantor that is secured on a subordinated basis to the Parity Lien Debt by a Junior Lien that was permitted to be incurred and so secured under each applicable Secured Debt Document; *provided* that:

(a) on or before the date on which such Indebtedness is incurred by the Issuer or such Guarantor, such Indebtedness is designated by the Issuer, in accordance with the Collateral Trust Agreement, as "Junior Lien Debt" for the purposes of the Secured Debt Documents, including the Collateral Trust Agreement; *provided* that no Series of Secured Lien Debt may be designated as both Junior Lien Debt and Parity Lien Debt;

(b) such Indebtedness is governed by an indenture, credit agreement or other agreement that includes a Lien Sharing and Priority Confirmation; and

(c) all requirements set forth in the Collateral Trust Agreement as to the confirmation, grant or perfection of the Collateral Trustee's Liens to secure such Indebtedness or Obligations in respect thereof are satisfied (and the satisfaction of such requirements will be conclusively established if the Issuer delivers to the Collateral Trustee an officers' certificate stating that such requirements have been satisfied and that such Indebtedness is "Junior Lien Debt"); and

(2) Hedging Obligations of the Issuer or any Guarantor incurred to hedge or manage interest rate risk with respect to Junior Lien Debt; *provided* that, pursuant to the terms of the Junior Lien Documents, such Hedging Obligations are secured by a Junior Lien on all of the assets and properties that secure the Indebtedness in respect of which such Hedging Obligations are incurred.

"*Junior Lien Documents*" means, collectively, any indenture, credit agreement or other agreement governing a Series of Junior Lien Debt and the Security Documents that create or perfect Liens securing Junior Lien Obligations.

"*Junior Lien Obligations*" means Junior Lien Debt and all other Obligations in respect thereof.

"*Junior Lien Representative*" means, in the case of any future Series of Junior Lien Debt, the trustee, agent or representative of the holders of such Series of Junior Lien Debt who (a) is appointed as a Junior Lien Representative (for purposes related to the administration of the Security Documents) pursuant to the indenture, credit agreement or other agreement governing such Series of Junior Lien Debt, together with its successors in such capacity, and (b) has become a party to the Collateral Trust Agreement by executing a joinder in the form required under the Collateral Trust Agreement.

"*Legal Holiday*" means a Saturday, a Sunday or a day on which commercial banking institutions are not required to be open in the State of New York.

"*Lien*" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction; *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"*Lien Sharing and Priority Confirmation*" means:

(1) as to any Series of Parity Lien Debt, the written agreement enforceable against the holders of such Series of Parity Lien Debt, as set forth in the applicable Secured Debt Document:

(a) for the enforceable benefit of all holders of each existing and future Series of Parity Lien Debt and each existing and future Parity Lien Representative, that all Parity Lien Obligations will be and are

110

EFIHMW00151936

secured equally and ratably by all Parity Liens at any time granted by the Issuer or any Guarantor to secure any Obligations in respect of such Series of Parity Lien Debt, and that all such Parity Liens will be enforceable by the Collateral Trustee for the benefit of all holders of Parity Lien Obligations equally and ratably;

(b) for the enforceable benefit of all holders of each existing and future Series of Parity Lien Debt and Series of Junior Lien Debt, and each existing and future Parity Lien Representative and Junior Lien Representative, that the holders of Obligations in respect of such Series of Parity Lien Debt are bound by the provisions of the Collateral Trust Agreement, including the provisions relating to the ranking of Parity Liens and the order of application of proceeds from enforcement of Parity Liens; and

(c) consenting to and directing the Collateral Trustee to perform its obligations under the Collateral Trust Agreement and the other security documents in respect of the Secured Debt Obligations.

(2) as to any Series of Junior Lien Debt, the written agreement enforceable against the holders of such Series of Junior Lien Debt, as set forth in the applicable Secured Debt Document:

(a) for the enforceable benefit of all holders of each existing and future Series of Junior Lien Debt and Series of Parity Lien Debt and each existing and future Parity Lien Representative and Junior Lien Representative, that all Junior Lien Obligations will be and are secured equally and ratably by all Junior Liens at any time granted by the Issuer or any Guarantor to secure any Obligations in respect of such Series of Junior Lien Debt, and that all such Junior Liens will be enforceable by the Collateral Trustee for the benefit of all holders of Junior Lien Obligations equally and ratably;

(b) for the enforceable benefit of all holders of each existing and future Series of Parity Lien Debt and Series of Junior Lien Debt and each existing and future Parity Lien Representative and Junior Lien Representative, that the holders of Obligations in respect of such Series of Junior Lien Debt are bound by the provisions of the Collateral Trust Agreement, including the provisions relating to the ranking of Junior Liens and the order of application of proceeds from the enforcement of Junior Liens; and

(c) consenting to and directing the Collateral Trustee to perform its obligations under the Collateral Trust Agreement and the other security documents in respect of the Secured Debt Obligations.

"*Moody's*" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"*Necessary CapEx Debt*" means Indebtedness of the Issuer or any of its Restricted Subsidiaries incurred for the purpose of financing Necessary Capital Expenditures.

"*Necessary Capital Expenditures*" means capital expenditures by the Issuer and its Restricted Subsidiaries that are required by applicable law (other than Environmental Law) or otherwise undertaken voluntarily for health and safety reasons (other than as required by Environmental Law). The term "Necessary Capital Expenditures" does not include any capital expenditure undertaken primarily to increase the efficiency of, expand or re-power any power generation facility.

"*Net Income*" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"*Net Proceeds*" means the aggregate cash proceeds and Cash Equivalents received by the Issuer or any of its Restricted Subsidiaries in respect of any Asset Sale (including a Casualty Event), including any cash and Cash Equivalents received upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale (including a Casualty Event), net of the direct costs relating to such Asset Sale (including a Casualty Event) and the sale or disposition of such Designated Non-cash Consideration, including legal, accounting and investment banking fees, and brokerage and sales commissions, any relocation expenses incurred

111

EFIHMW00151937

as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), amounts required to be applied using proceeds from Asset Sales (other than Asset Sales of Collateral or other Oncor-related Assets) to the repayment of principal, premium, if any, and interest on other Senior Indebtedness required (other than required by clause (1) of the second paragraph under "— Repurchase at the Option of Holders — Asset Sales") to be paid as a result of such transaction and any deduction of appropriate amounts to be provided by the Issuer or any of its Restricted Subsidiaries as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Issuer or any of its Restricted Subsidiaries after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"*Netting Agreement*" shall mean a netting agreement, master netting agreement or other similar document having the same effect as a netting agreement or master netting agreement and, as applicable, any collateral annex, security agreement or other similar document related to any master netting agreement or Permitted Contract.

"*Note Obligations*" means the Notes, the Guarantees and all other Obligations of any of the Issuer and the Guarantors under the Indenture, the Notes, the Guarantees and the Security Documents.

"*Obligations*" means any principal, interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law), premium, penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities, and guarantees of payment of such principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities, payable under the documentation governing any Indebtedness.

"*Officer*" means the Chairman of the Board, the Chief Executive Officer, the President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of the Issuer or other Person, as the case may be.

"*Officer's Certificate*" means a certificate signed on behalf of the Issuer by an Officer of the Issuer or on behalf of another Person by an Officer of such Person, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Issuer or such Person, as applicable, that meets the requirements set forth in the Indenture.

"*Oncor Electric Delivery Facility*" means the revolving credit agreement entered into as of the Closing Date by and among Oncor Electric Delivery, as borrower, the lenders party thereto in their capacities as lenders thereunder and JPMorgan Chase Bank, N.A., as Administrative Agent, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof.

"*Oncor-related Assets*" means the Equity Interests in EFIH directly or indirectly owned by the Issuer, the Equity Interests of any of the Oncor Subsidiaries or any Successor Oncor Business (including the Collateral) owned by EFIH or any Oncor Subsidiary or any Successor Oncor Business or constituting a primary issuance of such Equity Interests to the extent such issuance would constitute an Asset Sale and any assets owned directly or indirectly by any of the Oncor Subsidiaries or any Successor Oncor Business.

Confidential

"*Oncor Subsidiaries*" means Oncor Holdings and its Subsidiaries, all of which shall be Unrestricted Subsidiaries on the Issue Date.

"*Opinion of Counsel*" means a written opinion from legal counsel who is acceptable to the Trustee. The counsel may be an employee of or counsel to the Issuer or the Trustee.

"*Parity Lien*" means a Lien granted by a security document to the Collateral Trustee, at any time, upon any Collateral to secure Parity Lien Obligations.

"*Parity Lien Debt*" means:

(1) the Guarantee by EFIH of the Notes issued on the Issue Date and any Additional Notes issued under the Indenture and any Exchange Notes related to such Notes or Additional Notes;

(2) the 9.75% Notes and any additional 9.75% Notes, any other Indebtedness (including letters of credit and reimbursement obligations with respect thereto) of EFIH, including the guarantee by EFIH of the 9.75% Notes and any additional 9.75% Notes and the EFIH Notes and any additional EFIH Notes, that is secured equally and ratably with EFIH's Guarantee of the Notes by a Parity Lien that was permitted to be incurred and so secured under each applicable Secured Debt Document; *provided*, in the case of Indebtedness referred to in this clause (2), that, except with respect to the EFIH Notes:

(a) on or before the date on which such Indebtedness is incurred by the Issuer or such Guarantor, such Indebtedness is designated by the Issuer, in accordance with the Collateral Trust Agreement, as "Parity Lien Debt" for the purposes of the Secured Debt Documents; *provided* that no Series of Secured Lien Debt may be designated as both Parity Lien Debt and Junior Lien Debt;

(b) such Indebtedness is governed by an indenture, credit agreement or other agreement that includes a Lien Sharing and Priority Confirmation; and

(c) all requirements set forth in the Collateral Trust Agreement as to the confirmation, grant or perfection of the Collateral Trustee's Lien to secure such Indebtedness or Obligations in respect thereof are satisfied (and the satisfaction of such requirements will be conclusively established if the Issuer delivers to the Collateral Trustee an Officer's Certificate stating that such requirements have been satisfied and that such notes or such Indebtedness is "Parity Lien Debt"); and

(3) Hedging Obligations of the Issuer or any Guarantor incurred to hedge or manage interest rate risk with respect to Parity Lien Debt; *provided* that, pursuant to the terms of the Parity Lien Documents, such Hedging Obligations are secured by a Parity Lien on all of the assets and properties that secure the Indebtedness in respect of which such Hedging Obligations are incurred.

"*Parity Lien Documents*" means the Indenture, the 9.75% Notes Indenture, the EFIH Indenture and any additional indenture, credit agreement or other agreement governing a Series of Parity Lien Debt and the Security Documents that create or perfect Liens securing Parity Lien Obligations.

"*Parity Lien Obligations*" means Parity Lien Debt and all other Obligations in respect thereof.

"*Parity Lien Representative*" means (1) the Trustee, in the case of the Notes, (2) The Bank of New York Mellon Trust Company, N.A., in the case of the EFIH Notes or (3) in the case of any other Series of Parity Lien Debt, the trustee, agent or representative of the holders of such Series of Parity Lien Debt who (a) is appointed as a Parity Lien Representative (for purposes related to the administration of the Security Documents) pursuant to the indenture, credit agreement or other agreement governing such Series of Parity Lien Debt, together with its successors in such capacity, and (b) has become a party to the Collateral Trust Agreement by executing a joinder in the form required under the Collateral Trust Agreement.

113

"*Permitted Asset Swap*" means the concurrent purchase and sale or exchange of Related Business Assets or a combination of Related Business Assets and cash or Cash Equivalents between the Issuer or any of its Restricted Subsidiaries and another Person; *provided*, that any cash or Cash Equivalents received must be applied in accordance with the covenant described under "— Repurchase at the Option of Holders — Asset Sales."

"*Permitted Asset Transfer*" means (1) the direct or indirect sale, assignment, transfer, conveyance or other disposition (including by way of merger, wind-up or consolidation) or spin-off by dividend of the Equity Interests of EFIH such that EFIH is no longer a Subsidiary of the Issuer (including without limitation a merger of EFIH with and into the Issuer) or (2) the sale, assignment, transfer, conveyance or other disposition (other than by way of merger, wind-up or consolidation) of all of the Equity Interests of, and other Investments in, the Oncor Subsidiaries, Successor Oncor Businesses and all other Collateral held by EFIH to a Person (other than an Oncor Subsidiary) that shall continue to hold such Equity Interests, other Investments and any other Collateral, in each case other than any foreclosure on the Collateral.

"*Permitted Holders*" means each of the Investors, members of management (including directors) of the Issuer or any of its Subsidiaries who on the Closing Date were or at any time prior to the first anniversary of the Closing Date were holders of Equity Interests of the Issuer (or any of its direct or indirect parent companies) and any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which any of the foregoing are members; *provided* that, in the case of such group and without giving effect to the existence of such group or any other group, such Investors and members of management, collectively, have beneficial ownership of more than 50% of the total voting power of the Voting Stock of the Issuer or any of its direct or indirect parent companies.

"*Permitted Investments*" means:

(1) any Investment in the Issuer or any of its Restricted Subsidiaries;

(2) any Investment in cash and Cash Equivalents or Investment Grade Securities;

(3) any Investment by the Issuer or any of its Restricted Subsidiaries in a Person that is engaged in a Similar Business if as a result of such Investment:

(a) such Person becomes a Restricted Subsidiary; or

(b) such Person, in one transaction or a series of related transactions, is merged or consolidated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Issuer or a Restricted Subsidiary,

and, in each case, any Investment held by such Person; *provided* that such Investment was not acquired by such Person in contemplation of such acquisition, merger, consolidation or transfer;

(4) any Investment in securities or other assets not constituting cash, Cash Equivalents or Investment Grade Securities and received in connection with an Asset Sale made pursuant to the provisions described under "— Repurchase at the Option of Holders — Asset Sales" or any other disposition of assets not constituting an Asset Sale;

(5) any Investment existing on the Issue Date;

(6) any Investment acquired by the Issuer or any of its Restricted Subsidiaries:

(a) in exchange for any other Investment or accounts receivable held by the Issuer or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable; or

(b) as a result of a foreclosure by the Issuer or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7) Hedging Obligations permitted under clause (10) of the second paragraph of the covenant described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

114

Confidential

EFIHMW00151940

(8) any Investment in a Similar Business having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (8) that are at that time outstanding, not to exceed 3.5% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(9) Investments the payment for which consists of Equity Interests (exclusive of Disqualified Stock) of the Issuer or any of its direct or indirect parent companies; *provided, however*, that such Equity Interests will not increase the amount available for Restricted Payments under clause (3) of the first paragraph under the covenant described under "— Certain Covenants — Limitations on Restricted Payments";

(10) guarantees of Indebtedness of the Issuer or any of its Restricted Subsidiaries permitted under the covenant described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(11) any transaction to the extent it constitutes an Investment that is permitted and made in accordance with the provisions of the second paragraph of the covenant described under "— Certain Covenants — Transactions with Affiliates" (except transactions described in clauses (2), (5) and (9) of such paragraph);

(12) Investments consisting of purchases and acquisitions of inventory, fuel (including all forms of nuclear fuel), supplies, material or equipment;

(13) additional Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (13) that are at that time outstanding (without giving effect to the sale of an Investment to the extent the proceeds of such sale do not consist of cash or marketable securities), not to exceed 3.5% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(14) Investments relating to a Receivables Subsidiary that, in the good faith determination of the Issuer, are necessary or advisable to effect any Receivables Facility for the benefit of the Issuer or any of its Restricted Subsidiaries;

(15) advances to, or guarantees of Indebtedness of, employees not in excess of $25.0 million outstanding at any one time, in the aggregate;

(16) loans and advances to officers, directors and employees for business-related travel expenses, moving expenses and other similar expenses, in each case incurred in the ordinary course of business or consistent with past practices or to fund such Person's purchase of Equity Interests of the Issuer or any direct or indirect parent company thereof;

(17) any Investment in any Subsidiary or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business;

(18) any Investment in Shell Wind or in other wind or other renewable energy projects or in any nuclear power or energy joint venture in an aggregate amount not to exceed $1,500.0 million at any time outstanding;

(19) one or more letters of credit in an aggregate amount not to exceed $170.0 million posted by a Restricted Subsidiary in favor of an Oncor Subsidiary to secure that Restricted Subsidiary's contractual obligations to that Oncor Subsidiary; and

(20) Investments in any nuclear power or energy joint venture in an aggregate amount not to exceed $200.0 million prior to receiving the requisite combined construction and operating license from the U.S. Nuclear Regulatory Commission in respect thereof.

"*Permitted Liens*" means, with respect to any Person:

(1) pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or

115

EFIHMW00151941

**PX 022**
**Page 122 of 218**

statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business (including in connection with the construction or restoration of facilities for the generation, transmission or distribution of electricity) or otherwise constituting Permitted Investments;

(2) Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet overdue for a period of more than 30 days or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(3) Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than 30 days or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(4) Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5) minor survey or title exceptions or irregularities, minor encumbrances, easements or reservations of, or rights of others for, licenses, permits, conditions, covenants, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6) Liens securing Indebtedness permitted to be incurred pursuant to clause (4), (12) or (13) of the second paragraph under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that (a) Liens securing Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (13) relate only to Refinancing Indebtedness that serves to refund or refinance Indebtedness, Disqualified Stock or Preferred Stock incurred under clause (4) or (12) of the second paragraph under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," and (b) Liens securing Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (4) of the second paragraph under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" extend only to the assets so financed, purchased, constructed or improved;

(7) Liens existing on the Issue Date (other than Liens in favor of the lenders under the TCEH Senior Secured Facilities);

(8) Liens on property or shares of stock of a Person at the time such Person becomes a Subsidiary; *provided, however*, such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; *provided, further, however*, that such Liens may not extend to any other property owned by the Issuer or any of its Restricted Subsidiaries;

(9) Liens on property at the time the Issuer or a Restricted Subsidiary acquired the property, including any acquisition by means of a merger or consolidation with or into the Issuer or any of its Restricted Subsidiaries; *provided, however*, that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition; *provided, further, however*, that the Liens may not extend to any other property owned by the Issuer or any of its Restricted Subsidiaries;

116

Confidential

(10) Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Issuer or another Restricted Subsidiary permitted to be incurred in accordance with the covenant described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(11) Liens securing Hedging Obligations, of the Issuer or its Restricted Subsidiaries incurred under clause (10) of the second paragraph under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that such agreements were entered into in the ordinary course of business and not for speculative purposes (as determined by the Issuer in its reasonable discretion acting in good faith) and, in the case of any commodity Hedging Obligations or any Hedging Obligation of the type described in clause (c) of the definition of "Hedging Obligations," entered into in order to hedge against or manage fluctuations in the price or availability of any Covered Commodity;

(12) Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(13) leases, subleases, licenses or sublicenses granted to others in the ordinary course of business which do not materially interfere with the ordinary conduct of the business of the Issuer or any of its Restricted Subsidiaries;

(14) Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Issuer and its Restricted Subsidiaries in the ordinary course of business;

(15) Liens in favor of the Issuer or any Guarantor;

(16) [Intentionally omitted];

(17) Liens on accounts receivable, other Receivables Facility assets, or accounts into which collections or proceeds of Receivables Facility assets are deposited, in each case in connection with a Receivables Facility for the benefit of the Issuer or its Restricted Subsidiaries;

(18) Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8) and (9); *provided, however,* that (a) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property), and (b) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), and (9) at the time the original Lien became a Permitted Lien under the Indenture, and (ii) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement;

(19) deposits made in the ordinary course of business to secure liability to insurance carriers;

(20) other Liens securing obligations incurred in the ordinary course of business which obligations do not exceed $100.0 million at any one time outstanding;

(21) Liens securing judgments for the payment of money not constituting an Event of Default under clause (5) under "— Events of Default and Remedies" so long as such Liens are adequately bonded and any appropriate legal proceedings that may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(22) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(23) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code, or any comparable or successor provision, on items in the course of collection, and (ii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

117

EFIHMW00151943

(24) Liens deemed to exist in connection with Investments in repurchase agreements permitted by the covenant described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreements;

(25) ground leases or subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by the Issuer or any of its Subsidiaries are located;

(26) Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Issuer or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Issuer and its Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Issuer or any of its Restricted Subsidiaries in the ordinary course of business;

(27) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of goods entered into by the Issuer or any Restricted Subsidiary in the ordinary course of business;

(28) rights reserved to or vested in others to take or receive any part of, or royalties related to, the power, gas, oil, coal, lignite or other minerals or timber generated, developed, manufactured or produced by, or grown on, or acquired with, any property of the Issuer or any of its Restricted Subsidiaries and Liens upon the production from property of power, gas, oil, coal, lignite or other minerals or timber, and the by-products and proceeds thereof, to secure the obligations to pay all or a part of the expenses of exploration, drilling, mining or development of such property only out of such production or proceeds;

(29) Liens arising out of all presently existing and future division and transfer orders, advance payment agreements, processing contracts, gas processing plant agreements, operating agreements, gas balancing or deferred production agreements, pooling, unitization or communitization agreements, pipeline, gathering or transportation agreements, platform agreements, drilling contracts, injection or repressuring agreements, cycling agreements, construction agreements, salt water or other disposal agreements, leases or rental agreements, farm-out and farm-in agreements, exploration and development agreements, and any and all other contracts or agreements covering, arising out of, used or useful in connection with or pertaining to the exploration, development, operation, production, sale, use, purchase, exchange, storage, separation, dehydration, treatment, compression, gathering, transportation, processing, improvement, marketing, disposal or handling of any property of the Issuer or any of its Restricted Subsidiaries, *provided* that such agreements are entered into in the ordinary course of business (including in respect of construction and restoration activities);

(30) any restrictions on any stock or stock equivalents or other joint venture interests of the Issuer or any of its Restricted Subsidiaries providing for a breach, termination or default under any owners, participation, shared facility, joint venture, stockholder, membership, limited liability company or partnership agreement between such Person and one or more other holders of such stock or stock equivalents or interest of such Person, if a security interest or other Lien is created on such stock or stock equivalents or interest as a result thereof and other similar Liens;

(31) [Intentionally omitted];

(32) Liens and other exceptions to title, in either case on or in respect of any facilities of the Issuer or any of its Restricted Subsidiaries, arising as a result of any shared facility agreement entered into with respect to such facility, except to the extent that any such Liens or exceptions, individually or in the aggregate, materially adversely affect the value of the relevant property or materially impair the use of the relevant property in the operation of business of the Issuer or any of its Restricted Subsidiaries, taken as a whole;

(33) Liens on cash and Cash Equivalents (i) deposited by the Issuer or any of its Restricted Subsidiaries in margin accounts with or on behalf of brokers, credit clearing organizations, independent system

118

EFIHMW00151944

operators, regional transmission organizations, pipelines, state agencies, federal agencies, futures contract brokers, customers, trading counterparties, or any other parties or issuers of surety bonds or (ii) pledged or deposited as collateral by the Issuer or any of its Restricted Subsidiaries with any of the entities described in clause (i) above to secure their respective obligations, in the case of each of clauses (i) and (ii) above, with respect to: (A) any contracts and transactions for the purchase, sale, exchange of, or the option (whether physical or financial) to purchase, sell or exchange (1) natural gas, (2) electricity, (3) coal and lignite, (4) petroleum-based liquids, (5) oil, (6) nuclear fuel (including enrichment and conversion), (7) emissions or other environmental credits, (8) waste byproducts, (9) weather, (10) power and other generation capacity, (11) heat rate, (12) congestion, (13) renewal energy credit, or (14) any other energy-related commodity or services or derivative (including ancillary services and related risk (such as location basis)); (B) any contracts or transactions for the purchase, processing, transmission, transportation, distribution, sale, lease, hedge or storage of, or any other services related to any commodity or service identified in subparts (1) through (14) above, including any capacity agreement; (C) any financial derivative agreement (including but not limited to swaps, options or swaptions) related to any commodity identified in subparts (1) through (14) above, or to any interest rate or currency rate management activities; (D) any agreement for membership or participation in an organization that facilitates or permits the entering into or clearing of any netting agreement or any agreement described in this clause (33); (E) any agreement combining part or all of a netting agreement or part or all of any of the agreements described in this clause (33); (E) any document relating to any agreement described in this clause (33) that is filed with a Government Authority and any related service agreements; or (F) any commercial or trading agreements, each with respect to, or involving the purchase, transmission, distribution, sale, lease or hedge of, any energy, generation capacity or fuel, or any other energy related commodity or service, price or price indices for any such commodities or services or any other similar derivative agreements, and any other similar agreements (such agreements described in clauses (A) through (F) of this clause (33) being collectively, "*Permitted Contracts*"), Netting Agreements, Hedging Obligations and letters of credit supporting Permitted Contracts, Netting Agreements and Hedging Obligations;

(34) Liens arising under Section 9.343 of the Texas Uniform Commercial Code or similar statutes of states other than Texas;

(35) Liens created in the ordinary course of business in favor of banks and other financial institutions over credit balances of any bank accounts of the Issuer and its Subsidiaries held at such banks or financial institutions, as the case may be, to facilitate the operation of cash pooling and/or interest set-off arrangements in respect of such bank accounts in the ordinary course of business;

(36) any zoning, land use, environmental or similar law or right reserved to or vested in any Government Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Issuer or any of its Restricted Subsidiaries, taken as a whole;

(37) any Lien arising by reason of deposits with or giving of any form of security to any Government Authority for any purpose at any time as required by applicable law as a condition to the transaction of any business or the exercise of any privilege or license, or to enable the Issuer or any of its Restricted Subsidiaries to maintain self-insurance or to participate in any fund for liability on any insurance risks;

(38) Liens, restrictions, regulations, easements, exceptions or reservations of any Government Authority applying particularly to nuclear fuel;

(39) rights reserved to or vested in any Government Authority by the terms of any right, power, franchise, grant, license or permit, or by any provision of applicable law, to terminate or modify such right, power, franchise, grant, license or permit or to purchase or recapture or to designate a purchaser of any of the property of such person;

(40) Liens arising under any obligations or duties affecting any of the property of the Issuer or any of its Restricted Subsidiaries to any Government Authority with respect to any franchise, grant, license or permit which do not materially impair the use of such property for the purposes for which it is held;

119

(41) rights reserved to or vested in any Government Authority to use, control or regulate any property of such person;

(42) any obligations or duties, affecting the property of the Issuer or any of its Restricted Subsidiaries, to any Government Authority with respect to any franchise, grant, license or permit;

(43) a set-off or netting rights granted by the Issuer or any Subsidiary of the Issuer pursuant to any agreements related to Hedging Obligations, Netting Agreements or Permitted Contracts solely in respect of amounts owing under such agreements;

(44) Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment described under the definition of "Permitted Investments" to be applied against the purchase price for such Investment and (ii) consisting of an agreement to sell, transfer, lease or otherwise dispose of any property in a transaction excluded from the definition described under "Asset Sale," in each case, solely to the extent such Investment or sale, disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien;

(45) rights of first refusal and purchase options in favor of Aluminum Company of America ("*Alcoa*") to purchase Sandow Unit 4 and/or the real property related thereto, as described in (i) the Sandow Unit 4 Agreement dated August 13, 1976, as amended, between Alcoa and Texas Power & Light Company ("*TPL*") and (ii) Deeds dated March 14, 1978 and July 21, 1980, as amended, executed by Alcoa conveying to TPL the Sandow Four real property; and

(46) any amounts held by a trustee in the funds and accounts under any indenture securing any revenue bonds issued for the benefit of the Issuer or any of its Restricted Subsidiaries.

For purposes of this definition, the term "Indebtedness" shall be deemed to include interest on such Indebtedness.

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"*Preferred Stock*" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"*Purchase Money Obligations*" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction, repair, restoration, replacement, expansion or improvement of property (real or personal) or assets (other than Capital Stock), and whether acquired through the direct acquisition of such property or assets, or otherwise, incurred in respect of capital expenditures, including Environmental CapEx Debt and Necessary CapEx Debt.

"*Qualified Proceeds*" means assets that are used or useful in, or Capital Stock of any Person engaged in, a Similar Business; *provided* that the fair market value of any such assets or Capital Stock shall be determined by the Issuer in good faith.

"*Rating Agencies*" means each of Moody's, S&P and Fitch, or if any of Moody's, S&P or Fitch shall not make a rating on the Notes or other investment publicly available, a "nationally recognized statistical rating organization" within the meaning of Rule 15c3-1(c)(2)(vi)(F) under the Exchange Act selected by the Issuer which shall be substituted for Moody's, S&P or Fitch, or all of them, as the case may be.

"*Receivables Facility*" means any of one or more receivables financing facilities or programs as amended, supplemented, modified, extended, renewed, restated or refunded from time to time, the Obligations of which are non-recourse (except for customary representations, warranties, covenants and indemnities made in connection with such facilities) to the Issuer or any of its Restricted Subsidiaries (other than a Receivables Subsidiary)

120

EFIHMW00151946

pursuant to which the Issuer or any of its Restricted Subsidiaries purports to sell its accounts receivable to either (a) a Person that is not a Restricted Subsidiary or (b) a Receivables Subsidiary that in turn funds such purchase by purporting to sell its accounts receivable to a Person that is not a Restricted Subsidiary or by borrowing from such a Person or from another Receivables Subsidiary that in turn funds itself by borrowing from such a Person.

"*Receivables Fees*" means distributions or payments made directly or by means of discounts with respect to any accounts receivable or participation interest therein issued or sold in connection with, and other fees paid to a Person that is not a Restricted Subsidiary in connection with any Receivables Facility.

"*Receivables Subsidiary*" means any Subsidiary formed for the purpose of facilitating or entering into one or more Receivables Facilities, and in each case engages only in activities reasonably related or incidental thereto.

"*Redemption Date*" has the meaning set forth under "Optional Redemption."

"*Registration Rights Agreement*" means (1) the Registration Rights Agreement related to the Notes, dated as of the Issue Date, among the Issuer, the Guarantors and the initial purchasers of the Notes issued on the Issue Date, and (2) with respect to any Additional Notes, any registration rights agreement among the Issuer and the other parties thereto relating to the registration by the Issuer of such Additional Notes under the Securities Act.

"*Related Business Assets*" means (A) except in the case of a Permitted Asset Swap of Collateral, assets (other than cash or Cash Equivalents) used or useful in, or securities of, a Similar Business; *provided* that any assets or securities received by the Issuer or a Restricted Subsidiary in exchange for assets or securities transferred by the Issuer or a Restricted Subsidiary will not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Restricted Subsidiary and (B) in the case of a Permitted Asset Swap of Collateral, assets (other than cash or Cash Equivalents) used or useful in, or Capital Stock of, a Similar Oncor Business; *provided* that any Capital Stock received by EFIH in exchange for Collateral will not be deemed to be Related Business Assets, unless upon receipt of the Capital Stock of such Person, such Person would become a Subsidiary of EFIH or a joint venture in which EFIH has a significant equity interest (as determined by the Issuer in good faith).

"*Required Junior Lien Debtholders*" means, at any time, the holders of a majority in aggregate principal amount of all Junior Lien Debt (including outstanding letters of credit whether or not then available or drawn) then outstanding and the aggregate unfunded commitments to extend credit which, when funded, would constitute Junior Lien Debt, calculated in accordance with the provisions described under "— Security for the Notes — Voting." For purposes of this definition, Junior Lien Debt registered in the name of, or beneficially owned by, the Issuer or any Affiliate of the Issuer will be deemed not to be outstanding.

"*Required Parity Lien Debtholders*" means, at any time, the holders of a majority in aggregate principal amount of all Parity Lien Debt (including outstanding letters of credit whether or not then available or drawn) then outstanding and the aggregate unfunded commitments to extend credit which, when funded, would constitute Parity Lien Debt, calculated in accordance with the provisions described under "— Security for the Notes — Voting." For purposes of this definition, Parity Lien Debt registered in the name of, or beneficially owned by, the Issuer or any Affiliate of the Issuer will be deemed not to be outstanding.

"*Restoration Certificate*" shall mean, with respect to any Casualty Event, an Officer's Certificate provided to the Trustee prior to the 365th day after such Casualty Event has occurred certifying (a) that the Issuer or such Restricted Subsidiary intends to use the proceeds received in connection with such Casualty Event to repair, restore or replace the property or assets in respect of which such Casualty Event occurred, (b) the approximate costs of completion of such repair, restoration or replacement and (c) that such repair, restoration or replacement will be completed within the later of (x) 450 days after the date on which cash proceeds with respect to such Casualty Event were received and (y) 180 days after delivery of such Restoration Certificate.

121

EFIHMW00151947

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Payment Coverage Ratio*" means (i) for Restricted Payments (other than payments of cash dividends or distributions on, or in respect of, the Issuer's Capital Stock, purchases for cash or other acquisitions for cash of any Capital Stock of the Issuer or any direct or indirect parent of the Issuer for the purpose of paying any such dividend or distribution to, or acquisitions of Capital Stock of any direct or indirect parent of the Issuer for cash from, the Investors, or guaranteeing any Indebtedness of any Affiliate of the Issuer for the purpose of paying such dividend, making such distribution or so acquiring such Capital Stock to or from the Investors, all such Restricted Payments being referred to as "*Investor Payments*"), the Fixed Charge Coverage Ratio of the Issuer and its Restricted Subsidiaries treating the Oncor Subsidiaries as Restricted Subsidiaries for purposes of such calculation and (ii) for Restricted Payments constituting Investor Payments, the Fixed Charge Coverage Ratio of the Issuer and its Restricted Subsidiaries.

"*Restricted Subsidiary*" means, at any time, any direct or indirect Subsidiary of the Issuer (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; *provided, however*, that upon an Unrestricted Subsidiary's ceasing to be an Unrestricted Subsidiary, such Subsidiary shall be included in the definition of "Restricted Subsidiary."

"*S&P*" means Standard & Poor's, a Standard & Poor's Financial Services LLC business, and any successor to its rating agency business.

"*Sale and Lease-Back Transaction*" means any arrangement providing for the leasing by the Issuer or any of its Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by the Issuer or such Restricted Subsidiary to a third Person in contemplation of such leasing.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Secured Debt Documents*" means the Parity Lien Documents and the Junior Lien Documents.

"*Secured Debt Obligations*" means Parity Lien Obligations and Junior Lien Obligations.

"*Secured Notes Issue Date*" means November 16, 2009.

"*Secured Indebtedness*" means any Indebtedness of the Issuer or any of its Restricted Subsidiaries secured by a Lien.

"*Secured Lien Debt*" means Parity Lien Debt and Junior Lien Debt.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Security Documents*" means the Collateral Trust Agreement, the Pledge Agreement, and all other security agreements, pledge agreements, collateral assignments, mortgages, collateral agency agreements, deed of trust or other grants or transfers for security executed and delivered by the Issuer, a Guarantor or any other obligor under the Notes creating (or purporting to create) a Lien upon Collateral in favor of the Collateral Trustee for the benefit of the holders of the Secured Debt Obligations, in each case, as amended, modified, renewed, restated or replaced, in whole or in part, from time to time, in accordance with its terms.

"*Senior Indebtedness*" means:

(1) all Indebtedness of the Issuer or any Guarantor outstanding under the TCEH Senior Secured Facilities, the TCEH Notes and related guarantees, the 9.75% Notes and the related guarantees, the EFIH Notes and related guarantees, or the Notes and related Guarantees (including interest accruing on or after the filing of any petition in bankruptcy or similar proceeding or for reorganization of the Issuer or any Guarantor (at the rate provided for in the documentation with respect thereto, regardless of whether or not a

122

EFIHMW00151948

claim for post-filing interest is allowed in such proceedings)), and any and all other fees, expense reimbursement obligations, indemnification amounts, penalties, and other amounts (whether existing on the Issue Date or thereafter created or incurred) and all obligations of the Issuer or any Guarantor to reimburse any bank or other Person in respect of amounts paid under letters of credit, acceptances or other similar instruments;

(2) all Hedging Obligations (and guarantees thereof) owing to a Lender (as defined in the TCEH Senior Secured Facilities) or any Affiliate of such Lender (or any Person that was a Lender or an Affiliate of such Lender at the time the applicable agreement giving rise to such Hedging Obligation was entered into); *provided* that such Hedging Obligations are permitted to be incurred under the terms of the Indenture;

(3) any other Indebtedness of the Issuer or any Guarantor permitted to be incurred under the terms of the Indenture, unless the instrument under which such Indebtedness is incurred expressly provides that it is subordinated in right of payment to the Notes or any related Guarantee; and

(4) all Obligations with respect to the items listed in the preceding clauses (1), (2) and (3);

*provided, however*, that Senior Indebtedness shall not include:

(a) any obligation of such Person to the Issuer or any of its Subsidiaries;

(b) any liability for federal, state, local or other taxes owed or owing by such Person;

(c) any accounts payable or other liability to trade creditors arising in the ordinary course of business;

(d) any Indebtedness or other Obligation of such Person which is subordinate or junior in any respect to any other Indebtedness or other Obligation of such Person;

(e) that portion of any Indebtedness which at the time of incurrence is incurred in violation of the Indenture;

(f) EFCH Floating Rate Junior Subordinated Debentures, Series D due 2037; or

(g) EFCH 8.175% Fixed Junior Subordinated Debentures, Series E due 2037.

"*Series of Junior Lien Debt*" means, severally, each issue or series of Junior Lien Debt for which a single transfer register is maintained (*provided* that any Hedging Obligations constituting Junior Lien Debt shall be deemed part of the Series of Junior Lien Debt to which it relates).

"*Series of Parity Lien Debt*" means, severally, the Notes, the 9.75% Notes, the EFIH Notes and any Additional Notes or Exchange Notes or other Indebtedness that constitutes Parity Lien Debt (*provided* that any Hedging Obligations constituting Parity Lien Debt shall be deemed part of the Series of Parity Lien Debt to which it relates).

"*Series of Secured Lien Debt*" means each Series of Parity Lien Debt and each Series of Junior Lien Debt.

"*Shell Wind*" means a joint venture with Shell WindEnergy Inc. (or a similar entity) in which the Issuer and its Restricted Subsidiaries have up to a 50% ownership interest relating to the joint development of a 3,000 megawatt wind project in Texas and other renewable energy projects in Texas.

"*Significant Subsidiary*" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such regulation is in effect on the Closing Date.

"*Similar Business*" means any business conducted or proposed to be conducted by the Issuer and its Subsidiaries on the Closing Date or any business that is similar, reasonably related, incidental or ancillary thereto.

123

EFIHMW00151949

"*Similar Oncor Business*" means any business which is primarily engaged in a regulated electricity or other energy transmission or distribution business in the United States (as determined by the Issuer in good faith).

"*Sponsor Management Agreement*" means the management agreement between certain of the management companies associated with the Investors and the Issuer.

"*Subordinated Indebtedness*" means,

(1) any Indebtedness of the Issuer which is by its terms subordinated in right of payment to the Notes, and

(2) any Indebtedness of any Guarantor which is by its terms subordinated in right of payment to the Guarantee of such entity of the Notes.

"*Subsidiary*" means, with respect to any Person:

(1) any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; and

(2) any partnership, joint venture, limited liability company or similar entity of which

(x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise, and

(y) such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"*Successor Oncor Business*" means any Person the Capital Stock of which is received by EFIH in an Asset Sale, including a Permitted Asset Swap, of Collateral or as a dividend or distribution from an Oncor Subsidiary.

"*TCEH*" means Texas Competitive Electric Holdings Company LLC.

"*TCEH Notes*" means the 10.25% Senior Notes due 2015, the 10.25% Senior Notes due 2015, Series B and the 10.50%/11.25% Senior Toggle Notes due 2016, in each case issued by TCEH and TCEH Finance, Inc., including the guarantees thereof and PIK interest which has been or may be paid with respect thereto.

"*TCEH Senior Interim Facility*" means the interim loan agreement, dated as of the Closing Date by and among EFCH, as guarantor, TCEH, as borrower, the other guarantors parties thereto, the lenders party thereto in their capacities as lenders thereunder and Morgan Stanley Senior Funding, Inc., as Administrative Agent, including any guarantees, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications or restatements thereof.

"*TCEH Senior Secured Facilities*" means the credit agreement dated as of the Closing Date, as amended on August 7, 2009, by and among EFCH, as guarantor, TCEH, as borrower, the lenders party thereto in their capacities as lenders thereunder and Citibank, N.A., as Administrative Agent, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any additional amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" above).

Confidential

EFIHMW00151950

"*TCEH Transfer*" means the sale, transfer, disposition or spin-off (including by way of merger, wind-up or consolidation) of (a) the membership interests or other common Equity Interests of EFCH, TCEH or another Restricted Subsidiary that holds all or substantially all of the assets of TCEH and its Subsidiaries such that EFCH, TCEH or such Restricted Subsidiary ceases to be a Subsidiary of the Issuer or (b) all or substantially all of the assets of TCEH and its Subsidiaries, in each case other than any such transfer to a Restricted Subsidiary of the Issuer.

"*Total Assets*" means the total assets of the Issuer and its Restricted Subsidiaries on a consolidated basis, as shown on the most recent consolidated balance sheet of the Issuer or such other Person as may be expressly stated.

"*Transactions*" means the transactions contemplated by the Transaction Agreement, borrowings under the TCEH Senior Secured Facilities, the EFH Senior Interim Facility, the TCEH Senior Interim Facility, the Oncor Electric Delivery Facility and any Receivables Facility as in effect on the Closing Date, any repayments of indebtedness of the Issuer and its Restricted Subsidiaries in connection therewith, and the issuance of the 10.875% Senior Notes due 2017, 11.250%/12.000% Senior Toggle Notes due 2017, the TCEH Notes and any repayments of Indebtedness of the Issuer and its Restricted Subsidiaries in connection therewith.

"*Transaction Agreement*" means the Agreement and Plan of Merger, dated as of February 25, 2007, among Merger Sub, Texas Energy Future Holdings Limited Partnership and the Issuer.

"*Treasury Rate*" means, as of any Redemption Date, the yield to maturity as of such Redemption Date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the Redemption Date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the Redemption Date to January 15, 2015; *provided, however*, that if the period from the Redemption Date to January 15, 2015 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"*Trust Indenture Act*" means the Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa-77bbbb).

"*Unit*" shall mean an individual power plant generation system comprised of all necessary physically connected generators, reactors, boilers, combustion turbines and other prime movers operated together to independently generate electricity.

"*Unrestricted Cash*" means, as of any date, without duplication, (a) all cash and Cash Equivalents (in each case, free and clear of all Liens, other than nonconsensual Liens permitted by the covenant described under "—Certain Covenants — Liens" and Liens permitted by clause (23), subclauses (i) and (ii) of clause (26) and clause (33) of the definition of Permitted Liens, included in the cash and cash equivalents accounts listed on the consolidated balance sheet of the Issuer and its Restricted Subsidiaries as of such date and (b) all unrestricted margin deposits related to commodity positions listed on the consolidated balance sheet of Issuer and the Restricted Subsidiaries.

"*Unrestricted Subsidiary*" means:

(1) each of the Oncor Subsidiaries, Comanche Peak Nuclear Power Company, Nuclear Energy Future Holdings LLC and Nuclear Energy Future Holdings II LLC;

(2) any Subsidiary of the Issuer other than EFIH or any other Guarantor owning Collateral which at the time of determination is an Unrestricted Subsidiary (as designated by the Issuer, as provided below); and

(3) any Subsidiary of an Unrestricted Subsidiary.

125

EFIHMW00151951

The Issuer may designate any Subsidiary of the Issuer (including any existing Subsidiary and any newly acquired or newly formed Subsidiary) other than EFIH or any other Guarantor owning Collateral to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on, any property of, the Issuer or any Subsidiary of the Issuer (other than solely any Subsidiary of the Subsidiary to be so designated); *provided that*

(1) any Unrestricted Subsidiary must be an entity of which the Equity Interests entitled to cast at least a majority of the votes that may be cast by all Equity Interests having ordinary voting power for the election of directors or Persons performing a similar function are owned, directly or indirectly, by the Issuer;

(2) such designation complies with the covenants described under "— Certain Covenants — Limitation on Restricted Payments"; and

(3) each of:

(a) the Subsidiary to be so designated; and

(b) its Subsidiaries

has not at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness pursuant to which the lender has recourse to any of the assets of the Issuer or any Restricted Subsidiary.

The Issuer may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that, immediately after giving effect to such designation, no Default shall have occurred and be continuing and either:

(1) in the case of any Subsidiary of the Issuer other than TCEH and its Subsidiaries, (A) the Issuer could incur at least $1.00 of additional Indebtedness pursuant to clause (i) of the Fixed Charge Coverage Ratio test described in the first paragraph under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; or (B) the Fixed Charge Coverage Ratio for the Issuer and its Restricted Subsidiaries would be greater than such ratio for the Issuer and its Restricted Subsidiaries immediately prior to such designation, in each case on a *pro forma* basis taking into account such designation; or

(2) in the case of TCEH and any of its Subsidiaries, (A) TCEH could incur at least $1.00 of additional Indebtedness pursuant to clause (ii) of such Fixed Charge Coverage Ratio test or (B) such Fixed Charge Coverage Ratio for TCEH and its Restricted Subsidiaries would be greater than such ratio for TCEH and its Restricted Subsidiaries immediately prior to such designation, in each case on a pro forma basis taking into account such designation.

Any such designation by the Issuer shall be notified by the Issuer to the Trustee by promptly filing with the Trustee a copy of the resolution of the board of directors of the Issuer or any committee thereof giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing provisions.

"*Voting Stock*" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing:

(1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment; by

(2) the sum of all such payments.

Confidential

EFIHMW00151952

"*Wholly-Owned Subsidiary*" of any Person means a Subsidiary of such Person, 100% of the outstanding, Equity Interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

**Exchange Offer; Registration Rights**

The Issuer, the Guarantors and the initial purchasers will enter into the Registration Rights Agreement on the Issue Date. In the Registration Rights Agreement, the Issuer and the Guarantors will agree that they will, at their expense, for the benefit of the Holders of the Notes, (1) file a registration statement on an appropriate registration form (each, an "*exchange offer registration statement*") with respect to a registered offer (the "*exchange offer*") to exchange the Notes for new notes guaranteed by EFCH on a senior unsecured basis and by EFIH on a senior secured basis, with terms substantially identical in all material respects to the Notes (the notes so exchanged, the "*Exchange Notes*") (except that the Exchange Notes will not contain terms with respect to transfer restrictions or payment of Additional Interest) and (2) use their commercially reasonable efforts to cause the exchange offer registration statement to be declared effective under the Securities Act no later than 360 days after the Issue Date. Upon the exchange offer registration statement being declared effective, the Issuer and the Guarantors will offer the Exchange Notes and the related guarantees in exchange for surrender of the Notes. The Issuer and the Guarantors will keep the exchange offer open for not less than 20 business days (or longer if required by applicable law). For each Note surrendered to the Issuer pursuant to the exchange offer, the Holder who surrendered such Note will receive an Exchange Note having a principal amount equal to that of the surrendered Note. Interest on each Exchange Note will accrue (A) from the later of (1) the last interest payment date on which interest was paid on the Note surrendered in exchange therefor or (2) if the Note is surrendered for exchange on a date in a period that includes the record date for an interest payment date to occur on or after the date of such exchange and as to which interest will be paid, the date of such interest payment date or (B) if no interest has been paid on such Note, from the Issue Date.

Under existing interpretations of the SEC contained in several no-action letters to third parties, the Exchange Notes and the related guarantees will be freely transferable by Holders thereof (other than affiliates of the Issuer) after the exchange offer without further registration under the Securities Act; *provided, however*, that each Holder that wishes to exchange its Notes for Exchange Notes will be required to represent (1) that any Exchange Notes to be received by it will be acquired in the ordinary course of its business, (2) that, at the time of the commencement of the exchange offer, it has no arrangement or understanding with any person to participate in the distribution (within the meaning of Securities Act) of the Exchange Notes in violation of the Securities Act, (3) that it is not an "affiliate" (as defined in Rule 405 under the Securities Act) of the Issuer, (4) if such Holder is not a broker-dealer, that it is not engaged in, and does not intend to engage in, the distribution of Exchange Notes and (5) if such Holder is a broker-dealer (a "*participating broker-dealer*") that will receive Exchange Notes for its own account in exchange for Notes that were acquired as a result of market-making or other trading activities, that it will deliver a prospectus in connection with any resale of such Exchange Notes. The Issuer will agree to make available, during the period required by the Securities Act, a prospectus meeting the requirements of the Securities Act for use by participating broker-dealers and other persons, if any, with similar prospectus delivery requirements for use in connection with any resale of Exchange Notes.

If (1) because of any change in law or in currently prevailing interpretations of the staff of the SEC, the Issuer is not permitted to effect an exchange offer, (2) an exchange offer is not consummated within 360 days of the Issue Date, (3) in certain circumstances, certain Holders of unregistered Notes so request, or (4) in the case of any Holder that participates in an exchange offer, such Holder does not receive Exchange Notes on the date of the exchange that may be sold without restriction under state and federal securities laws (other than due solely to the status of such Holder as an affiliate of the Issuer (within the meaning of the Securities Act)), then, in each case, the Issuer and the Guarantors will (x) promptly deliver to the Holders through the Trustee written notice thereof and (y) at the Issuer's sole expense, (a) file a shelf registration statement covering resales of the Notes within 30 days and use its commercially reasonable efforts to cause such shelf registration statement to become effective within 90 days, in each case, after the obligation to file a shelf registration statement arises (but no earlier than 360 days after the Issue Date) and (b) use its commercially reasonable efforts to keep effective such

127

EFIHMW00151953

shelf registration statement until the earliest of (i) two years after the shelf registration statement has become effective or (ii) such time as all of the applicable Notes have been sold thereunder or (iii) the date upon which all Notes covered by such shelf registration statement (a) are freely transferable without restriction by persons that are not affiliates of the Issuer pursuant to Rule 144 under the Securities Act or any successor provision thereto or otherwise where no conditions of Rule 144 are then applicable (other than the holding period requirement in paragraph (d)(1)(ii) of Rule 144 so long as such holding period requirement is satisfied), (b) do not bear any restrictive legends and (c) do not bear a restrictive CUSIP number (the "*shelf registration period*"). The Issuer will, in the event that a shelf registration statement is filed, provide to each Holder whose Notes are registered under such shelf registration statement copies of the prospectus that is a part of such shelf registration statement, notify each such Holder when such shelf registration statement has become effective and take certain other actions as are required to permit unrestricted resales of the Notes. A Holder that sells Notes pursuant to a shelf registration statement will be required to be named as a selling security holder in the related prospectus and to deliver a prospectus to purchasers, will be subject to certain of the civil liability provisions under Securities Act in connection with such sales and will be bound by the provisions of the Registration Rights Agreement that are applicable to such a Holder (including certain indemnification rights and obligations).

The Registration Rights Agreement permits the Issuer to prohibit offers and sales of registrable securities under the shelf registration statement for a period not to exceed an aggregate of 90 days in any 12-month period, if it is determined that there is a valid business purpose for such prohibition. Any such period during which the Issuer may prohibit offers and sales is referred to as a "suspension period."

If (1) the Issuer and the Guarantors have not filed the exchange offer registration statement or shelf registration statement by the deadlines discussed above, (2) the exchange offer registration statement or shelf registration statement has not become or been declared effective by the deadlines discussed above, (3) the exchange offer has not been completed by the earlier of (i) 60 business days after the exchange offer registration statement has become effective or (ii) 360 days after the Issue Date (if the Issuer is then required to make an exchange offer) or (4) a registration statement relating to the Notes has been declared effective and such registration statement ceases to be effective at any time during the shelf registration period (subject to certain exceptions) (each of (1), (2), (3) or (4) above, a "*registration default*"), then additional interest will accrue on the principal amount of the Notes at a rate of 0.25% per annum for the first 90-day period during which a registration default continues, and thereafter the interest rate on the Notes will increase by 0.50% per annum over the interest rate shown on the cover of this offering memorandum for the remaining period during which a registration default continues. If all registration defaults are cured, the interest rate on the Notes will revert to the original level.

Any amounts of additional interest due will be payable on the same original interest payment dates as interest on the Notes is payable.

The Exchange Notes will be accepted for clearance through DTC.

This summary of the provisions of the Registration Rights Agreement does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all the provisions of the Registration Rights Agreement, copies of which will be available from the Issuer upon request.

128

EFIHMW00151954

**PX 022
Page 135 of 218**

**NOTICE TO INVESTORS**

Because the following restrictions will apply to the notes and guarantees unless EFH Corp. completes an exchange offer for the notes and guarantees or otherwise causes a registration statement with respect to the resale of the notes and guarantees to be declared effective under the Securities Act, purchasers are advised to consult legal counsel prior to making any offer, resale, pledge or transfer of any of the notes and guarantees. See "Description of the Notes."

The notes and guarantees have not been registered under the Securities Act and may not be offered or sold in the United States or to, or for the account or benefit of, U.S. persons except in transactions exempt from, or not subject to, the registration requirements of the Securities Act. Accordingly, the notes and guarantees are being offered and sold only (1) to "qualified institutional buyers" under Rule 144A under the Securities Act and (2) outside the United States to non-U.S. persons in reliance upon Regulation S under the Securities Act.

Each purchaser of notes and guarantees, by its acceptance thereof, will be deemed to have acknowledged, represented to and agreed with us and the initial purchasers as follows:

1. It is not an "affiliate" (as defined in Rule 144 under the Securities Act) and is not acting on our behalf, and it is either a:

- "qualified institutional buyer" within the meaning of Rule 144A promulgated under the Securities Act and is aware that any sale of notes and guarantees to it will be made in reliance on Rule 144A, and such acquisition will be for its own account or for the account of another qualified institutional buyer; or

- person that, at the time the buy order for the notes and guarantees was originated, was outside the United States and was not a U.S. person (and was not purchasing for the account or benefit of a U.S. person) within the meaning of Regulation S under the Securities Act.

2. The notes and guarantees are being offered for resale in a transaction not involving any public offering in the United States within the meaning of the Securities Act. The notes and guarantees have not been registered under the Securities Act or any U.S. securities laws, and they are being offered for resale in transactions not requiring registration under the Securities Act. The notes and guarantees may not be reoffered, resold, pledged or otherwise transferred except:

- to a person whom the purchaser reasonably believes is a qualified institutional buyer in a transaction meeting the requirements of Rule 144A;

- in an offshore transaction complying with Rule 903 or Rule 904 of Regulation S;

- pursuant to the exemption from registration under the Securities Act provided by Rule 144 thereunder (if available);

- in accordance with another exemption from the registration requirements of the Securities Act (and based upon an opinion of counsel acceptable to us, if we so request);

- to us; or

- pursuant to an effective registration statement under the Securities Act,

and, in each case, in accordance with all applicable U.S. state securities laws.

The purchaser will, and each subsequent holder is required to, notify any subsequent purchaser from it of the resale restrictions set forth in the preceding sentence. No representation is being made as to the availability of the exemption provided by Rule 144 for resales of the notes.

129

Confidential

3. It is relying on the information contained in this offering memorandum in making its investment decision with respect to the notes and guarantees. It acknowledges that no representation or warranty is made by the initial purchasers as to the accuracy or completeness of such materials. It further acknowledges that neither EFH Corp. nor the initial purchasers, nor any person representing any such party, has made any representation to it with respect to EFH Corp. or the offering or sale of any notes or guarantees other than the information contained in this offering memorandum. It has had access to such financial and other information concerning EFH Corp. and the notes and the guarantors and their respective guarantees as it has deemed necessary in connection with its decision to purchase any of the notes and guarantees, including any opportunity to ask questions of and request information from EFH Corp. and the initial purchasers.

4. It acknowledges that prior to any proposed transfer of notes in certificated form or of beneficial interests in a note in global form (in each case other than pursuant to an effective registration statement), the holder of notes or the holder of beneficial interests in such note in global form, as the case may be, may be required to provide certifications and other documentation relating to the manner of such transfer and submit such certifications and other documentation as provided in the indenture.

5. It understands that all of the notes will bear a legend substantially to the following effect unless otherwise agreed by us and the holder thereof:

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS EXCEPT AS SET FORTH BELOW. BY ITS ACQUISITION HEREOF, THE HOLDER (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) OR (B) IT IS NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT, (2) AGREES THAT IT WILL NOT WITHIN [IN THE CASE OF RULE 144A GLOBAL NOTES: ONE YEAR] [IN THE CASE OF REGULATION S GLOBAL NOTES: 40 DAYS] AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF SUCH NOTE) RESELL OR OTHERWISE TRANSFER THIS NOTE EXCEPT (A) TO THE ISSUER OR ANY SUBSIDIARY THEREOF, (B) INSIDE THE UNITED STATES TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 903 OR RULE 904 UNDER THE SECURITIES ACT, (D) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE), (E) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL IF THE ISSUER SO REQUESTS), OR (F) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (3) AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS NOTE IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANING GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT.

6. It acknowledges that the registrar will not be required to accept for registration of transfer any notes acquired by it, except upon presentation of evidence satisfactory to us and the registrar that the restrictions set forth herein have been complied with.

7. It acknowledges that we, the initial purchasers and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that if any of the acknowledgments, representations or agreements deemed to have been made by its purchase of the notes are no longer accurate, it

130

Confidential

shall promptly notify us and the initial purchasers. If it is acquiring the notes as a fiduciary or agent for one or more investor accounts, it represents that it has sole investment discretion with respect to each such account and it has full power to make the foregoing acknowledgments, representations and agreements on behalf of each account.

8. Each purchaser and subsequent transferee of a note or an exchange note, or any interest therein, will be deemed to have represented and warranted that either (A) no portion of the assets used by such purchaser or transferee to acquire or hold the notes or exchange notes constitutes assets of any employee benefit plan (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) that is subject to Title I of ERISA, individual retirement account or other plan or arrangement that is subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), or any federal, state, local, non-U.S. or other laws, rules or regulations that are similar to such provisions of ERISA or the Code (collectively, "Similar Laws"), or entity whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement or (B) the acquisition and holding of the notes (and the exchange of notes for exchange notes) by such purchaser or transferee are entitled to exemption relief from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code and are otherwise permissible under all applicable Similar Laws.

131

EFIHMW00151957

PX 022
Page 138 of 218

## BOOK ENTRY; DELIVERY AND FORM

The notes are being offered and sold to qualified institutional buyers in reliance on Rule 144A ("Rule 144A Notes"). The notes also may be offered and sold in offshore transactions in reliance on Regulation S ("Regulation S Notes"). Except as set forth below, the notes will be issued in registered, global form in minimum denominations of $2,000 and integral multiples of $1,000 in excess of $2,000. Notes will be issued at the closing of this offering only against payment in immediately available funds.

Rule 144A Notes initially will be represented by one or more global notes in registered form without interest coupons (collectively, the "Rule 144A Global Notes"). Regulation S Notes initially will be represented by one or more global notes in registered form without interest coupons (collectively, the "Regulation S Global Notes" and, together with the Rule 144A Global Notes, the "Global Notes"). The Rule 144A Global Notes and the Regulation S Global Notes will be deposited upon issuance with the applicable registrar as custodian for DTC, and registered in the name of DTC or its nominee, in each case, for credit to an account of a direct or indirect participant in DTC as described below. Through and including the 40th day after the later of the commencement of this offering and the closing of this offering (such period through and including such 40th day, the "Restricted Period"), beneficial interests in the Regulation S Global Notes may be held only through Euroclear Bank S.A./N.V., as operator of the Euroclear System ("Euroclear"), and Clearstream Banking, Société Anonyme ("Clearstream, Luxembourg") (as indirect participants in DTC), unless transferred to a person that takes delivery through a Rule 144A Global Note in accordance with the certification requirements described under "— Exchanges Between Regulation S Notes and Rule 144A Notes" below. Beneficial interests in the Rule 144A Global Notes may not be exchanged for beneficial interests in the Regulation S Global Notes at any time except in the limited circumstances described under "— Exchanges Between Regulation S Notes and Rule 144A Notes" below.

Except as set forth below, the Global Notes may be transferred, in whole and not in part, only to another nominee of DTC or to a successor of DTC or its nominee. Beneficial interests in the Global Notes may not be exchanged for definitive notes in registered certificated form ("Certificated Notes") except in the limited circumstances described below. See "— Exchange of Global Notes for Certificated Notes." Except in the limited circumstances described below, owners of beneficial interests in the Global Notes will not be entitled to receive physical delivery of notes in certificated form.

Rule 144A Notes (including beneficial interests in the Rule 144A Global Notes) will be subject to certain restrictions on transfer and will bear a restrictive legend as described under "Notice to Investors." Regulation S Notes will also be subject to certain restrictions on transfer and will also bear the legend as described under "Notice to Investors." In addition, transfers of beneficial interests in the Global Notes will be subject to the applicable rules and procedures of DTC and its direct or indirect participants (including, if applicable, those of Euroclear and Clearstream, Luxembourg), which may change from time to time.

### Depository Procedures

The following description of the operations and procedures of DTC, Euroclear and Clearstream, Luxembourg is provided solely as a matter of convenience. These operations and procedures are solely within the control of the respective settlement systems and are subject to changes by them. We take no responsibility for these operations and procedures and urge investors to contact the system or their participants directly to discuss these matters.

DTC has advised us that DTC is a limited-purpose trust company organized under the laws of the State of New York, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange

132

Confidential

Act of 1934, as amended (the "Exchange Act"). DTC was created to hold securities for its participating organizations (collectively, the "Participants") and to facilitate the clearance and settlement of transactions in those securities between the Participants through electronic book-entry changes in accounts of its Participants. The Participants include securities brokers and dealers (including the initial purchasers), banks, trust companies, clearing corporations and certain other organizations. Access to DTC's system is also available to other entities such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly (collectively, the "Indirect Participants"). Persons who are not Participants may beneficially own securities held by or on behalf of DTC only through the Participants or the Indirect Participants. The ownership interests in, and transfers of ownership interests in, each security held by or on behalf of DTC are recorded on the records of the Participants and Indirect Participants.

DTC has also advised us that, pursuant to procedures established by it:

- upon deposit of the Global Notes, DTC will credit the accounts of the Participants designated by the initial purchasers with portions of the principal amount of the Global Notes; and

- ownership of these interests in the Global Notes will be shown on, and the transfer of ownership of these interests will be effected only through, records maintained by DTC (with respect to the Participants) or by the Participants and the Indirect Participants (with respect to other owners of beneficial interests in the Global Notes).

Investors in the Rule 144A Global Notes who are Participants may hold their interests therein directly through DTC. Investors in the Rule 144A Global Notes who are not Participants may hold their interests therein indirectly through organizations (including Euroclear and Clearstream, Luxembourg) that are Participants. Investors in the Regulation S Global Notes must initially hold their interests therein through Euroclear or Clearstream, if they are participants in such systems, or indirectly through organizations that are participants. After the expiration of the Restricted Period (but not earlier), investors may also hold interests in the Regulation S Global Notes through Participants in DTC other than Euroclear and Clearstream, Luxembourg. Euroclear and Clearstream, Luxembourg will hold interests in the Regulation S Global Notes on behalf of their participants through customers' securities accounts in their respective names on the books of their respective depositories, which in turn hold such interests in customers' securities accounts in the depositaries' names on the books of DTC. Citibank, N.A. acts as depositary for Clearstream, Luxembourg, and JP Morgan Chase Bank, N.A. acts as depositary for Euroclear. All interests in a Global Note, including those held through Euroclear or Clearstream, Luxembourg, may be subject to the procedures and requirements of DTC. Those interests held through Euroclear or Clearstream, Luxembourg may also be subject to the procedures and requirements of such systems. The laws of some jurisdictions require that certain persons take physical delivery in definitive form of securities that they own. Consequently, the ability to transfer beneficial interests in a Global Note to such persons will be limited to that extent. Because DTC can act only on behalf of Participants, which in turn act on behalf of Indirect Participants, the ability of a person having beneficial interests in a Global Note to pledge such interests to persons that do not participate in the DTC system, or otherwise take actions in respect of such interests, may be affected by the lack of a physical certificate evidencing such interests.

**Except as described below, owners of interests in the Global Notes will not have notes registered in their names, will not receive physical delivery of notes in certificated form and will not be considered the registered owners or "holders" thereof under the indenture governing the notes for any purpose.**

Payments in respect of the principal of, and interest and premium, if any, and additional interest (as described in the registration rights agreement relating to the notes), if any, on a Global Note registered in the name of DTC or its nominee will be payable to DTC in its capacity as the registered holder under the indenture governing the notes. Under the terms of the indenture, we, the trustee, the registrar, the paying agent and the transfer agent (together with the registrar and the paying agent, the "agents") will treat the persons in whose names the notes, including the Global Notes, are registered as the owners of the notes for the purpose of

133

EFIHMW00151959
**PX 022**
**Page 140 of 218**

receiving payments and for all other purposes. Consequently, neither we, the trustee, the agents nor any agent of ours or theirs has or will have any responsibility or liability for:

- any aspect of DTC's records or any Participant's or Indirect Participant's records relating to, or payments made on account of, beneficial ownership interests in the Global Notes or for maintaining, supervising or reviewing any of DTC's records or any Participant's or Indirect Participant's records relating to the beneficial ownership interests in the Global Notes; or

- any other matter relating to the actions and practices of DTC or any of its Participants or Indirect Participants.

DTC has advised us that its current practice, upon receipt of any payment in respect of securities such as the notes (including principal and interest), is to credit the accounts of the relevant Participants with the payment on the payment date unless DTC has reason to believe that it will not receive payment on such payment date. Each relevant Participant is credited with an amount proportionate to its beneficial ownership of an interest in the principal amount of the relevant security as shown on the records of DTC. Payments by the Participants and the Indirect Participants to the beneficial owners of notes will be governed by standing instructions and customary practices and will be the responsibility of the Participants or the Indirect Participants and will not be our responsibility or the responsibility of DTC or either trustee. Neither we, the trustee nor the agents will be liable for any delay by DTC or any of the Participants or the Indirect Participants in identifying the beneficial owners of the notes, and we, the trustee and the agents may conclusively rely on and will be protected in relying on instructions from DTC or its nominee for all purposes.

Except for trades involving only Euroclear and Clearstream, Luxembourg participants, interests in the Global Notes are expected to be eligible to trade in DTC's Same Day Funds Settlement System and secondary market trading activity in such interests will, therefore, settle in immediately available funds, subject in all cases to the rules and procedures of DTC and its Participants. See "— Same Day Settlement and Payment."

Subject to the transfer restrictions set forth under "Notice to Investors," transfers between the Participants will be effected in accordance with DTC's procedures and will be settled in same day funds, and transfers between participants in Euroclear and Clearstream, Luxembourg will be effected in accordance with their respective rules and operating procedures.

Subject to compliance with the transfer restrictions applicable to the notes described herein, cross-market transfers between the Participants, on the one hand, and Euroclear or Clearstream, Luxembourg participants, on the other hand, will be effected through DTC in accordance with DTC's rules on behalf of Euroclear or Clearstream, Luxembourg, as the case may be, by its respective depositary. However, such cross-market transactions will require delivery of instructions to Euroclear or Clearstream, Luxembourg, as the case may be, by the counterparty in such system in accordance with the rules and procedures and within the established deadlines (Brussels time) of such system. Euroclear or Clearstream, Luxembourg, as the case may be, will, if the transaction meets its settlement requirements, deliver instructions to its respective depositary to take action to effect final settlement on its behalf by delivering or receiving interests in the relevant Global Note from DTC, and making or receiving payment in accordance with normal procedures for same day funds settlement applicable to DTC. Euroclear participants and Clearstream, Luxembourg participants may not deliver instructions directly to the depositories for Euroclear or Clearstream, Luxembourg.

DTC has advised us that it will take any action permitted to be taken by a holder of notes only at the direction of one or more Participants to whose account DTC has credited the interests in the Global Notes and only in respect of such portion of the aggregate principal amount of the notes as to which such Participant or Participants has or have given such direction. However, if there is an event of default under the notes, DTC reserves the right to exchange the Global Notes for legended notes in certificated form and to distribute such notes to its Participants.

134

EFIHMW00151960

Although DTC, Euroclear and Clearstream, Luxembourg have agreed to the foregoing procedures to facilitate transfers of interests in the Rule 144A Global Notes and the Regulation S Global Notes among participants in DTC, Euroclear and Clearstream, Luxembourg, they are under no obligation to perform or to continue to perform such procedures, and may discontinue such procedures at any time. Neither we nor the trustee nor any of our or its agents will have any responsibility for the performance by DTC, Euroclear or Clearstream, Luxembourg or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

### Exchange of Global Notes for Certificated Notes

A Global Note is exchangeable for Certificated Notes if:

- DTC (1) notifies us that it is unwilling or unable to continue as depositary for the Global Notes or (2) has ceased to be a clearing agency registered under the Exchange Act and, in either case, we fail to appoint a successor depositary; or

- there has occurred and is continuing an event of default with respect to the notes.

In addition, beneficial interests in a Global Note may be exchanged for Certificated Notes upon prior written notice given to the trustee by or on behalf of DTC in accordance with the indenture governing the notes. In all cases, Certificated Notes delivered in exchange for any Global Note or beneficial interests in Global Notes will be registered in the names, and issued in any approved denominations, requested by or on behalf of the depositary (in accordance with its customary procedures) and will bear the applicable restrictive legend referred to under "Notice to Investors," unless that legend is not required by applicable law.

### Exchange of Certificated Notes for Global Notes

Certificated Notes may not be exchanged for beneficial interests in any Global Note unless the transferor first delivers to the registrar a written certificate (in the form provided in the indenture governing the notes) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such notes. See "Notice to Investors."

### Exchanges Between Regulation S Notes and Rule 144A Notes

Prior to the expiration of the Restricted Period, beneficial interests in the Regulation S Global Notes may be exchanged for beneficial interests in the Rule 144A Global Notes only if:

- such exchange occurs in connection with a transfer of the notes pursuant to Rule 144A; and

- the transferor first delivers to the trustee a written certificate (in the form provided in the indenture governing the notes) to the effect that the notes are being transferred to a person:

  - whom the transferor reasonably believes to be a "qualified institutional buyer" within the meaning of Rule 144A; and

  - who is purchasing for its own account or the account of a "qualified institutional buyer" in a transaction meeting the requirements of Rule 144A; and

- in accordance with all applicable securities laws of the states of the United States and other jurisdictions.

Beneficial interests in a Rule 144A Global Note may be transferred to a person who takes delivery in the form of an interest in the Regulation S Global Notes, whether before or after the expiration of the Restricted Period, only if the transferor first delivers to the trustee a written certificate (in the form provided in the indenture governing the notes) to the effect that such transfer is being made in accordance with Rule 903 or 904 of Regulation S or Rule 144 (if available) and that, if such transfer occurs prior to the expiration of the Restricted Period, the interest transferred will be held immediately thereafter through Euroclear or Clearstream, Luxembourg.

135

Confidential

Transfers involving exchanges of beneficial interests between the Regulation S Global Notes and the Rule 144A Global Notes will be effected by DTC by means of an instruction originated by the registrar through the DTC Deposit/Withdraw at Custodian system. Accordingly, in connection with any such transfer, appropriate adjustments will be made to reflect a decrease in the principal amount of the Regulation S Global Notes and a corresponding increase in the principal amount of the Rule 144A Global Notes or vice versa, as applicable. Any beneficial interest in one of the Global Notes that is transferred to a person who takes delivery in the form of an interest in the other Global Note will, upon transfer, cease to be an interest in such Global Note and will become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in such other Global Note for so long as it remains such an interest. The policies and practices of DTC may prohibit transfers of beneficial interests in the Regulation S Global Notes prior to the expiration of the Restricted Period.

**Same Day Settlement and Payment**

EFH Corp. will make payments in respect of the notes represented by the Global Notes (including principal, premium, if any, interest and additional interest, if any) by wire transfer of immediately available funds to the accounts specified by DTC or its nominee. EFH Corp. will make all payments of principal, interest and premium, if any, and additional interest, if any, with respect to Certificated Notes by wire transfer of immediately available funds to the accounts specified by the holders of the Certificated Notes or, if no such account is specified, by mailing a check to each such holder's registered address. The notes represented by the Global Notes are expected to be eligible to trade in DTC's Same Day Funds Settlement System, and any permitted secondary market trading activity in such notes will, therefore, be required by DTC to be settled in immediately available funds. EFH Corp. expects that secondary trading in any Certificated Notes will also be settled in immediately available funds.

Because of time-zone differences, credits of interests in the Global Notes received in Clearstream, Luxembourg or Euroclear as a result of a transaction with a DTC Participant will be made during subsequent securities settlement processing and dated the business day following the DTC settlement date. Such credits or any transactions involving interests in such Global Notes settled during such processing will be reported to the relevant Clearstream, Luxembourg or Euroclear participants on such business day. Cash received in Clearstream, Luxembourg or Euroclear as a result of sales of interests in the Global Notes by or through a Clearstream, Luxembourg participant or a Euroclear participant to a DTC Participant will be received with value on the DTC settlement date but will be available in the relevant Clearstream, Luxembourg or Euroclear cash account only as of the business day following settlement in DTC.

136

Confidential

## CERTAIN UNITED STATES FEDERAL TAX CONSEQUENCES

**To ensure compliance with Internal Revenue Service Circular 230, you are hereby notified that any discussion of tax matters set forth in this offering memorandum was written in connection with the promotion or marketing of the transactions or matters addressed herein and was not intended or written to be used, and cannot be used, for the purpose of avoiding tax-related penalties under federal, state or local tax law. Each prospective investor should seek advice based on its particular circumstances from an independent tax advisor.**

The following is a summary of certain United States federal income and, in the case of non-U.S. holders (as defined below), estate tax consequences of the purchase, ownership and disposition of the notes as of the date of this offering memorandum. Unless otherwise stated, this summary deals only with notes held as capital assets by persons who purchase the notes for cash upon original issuance at their initial offering price.

As used herein, a "U.S. holder" means a beneficial owner of the notes that is for United States federal income tax purposes any of the following:

- an individual citizen or resident of the United States;

- a corporation (or any other entity treated as a corporation for United States federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to United States federal income taxation regardless of its source; or

- a trust if it (1) is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

The term "non-U.S. holder" means a beneficial owner of the notes (other than a partnership or any other entity treated as a partnership for United States federal income tax purposes) that is not a U.S. holder.

This summary does not represent a detailed description of the United States federal income tax consequences applicable to you if you are a person subject to special tax treatment under the United States federal income tax laws, including, without limitation:

- a dealer in securities or currencies;

- a financial institution;

- a regulated investment company;

- a real estate investment trust;

- a tax-exempt organization;

- an insurance company;

- a person holding the notes as part of a hedging, integrated, conversion or constructive sale transaction or a straddle;

- a trader in securities that has elected the mark-to-market method of accounting for their securities;

- a person liable for alternative minimum tax;

- a partnership or other pass-through entity for United States federal income tax purposes (or an investor in such entities);

137

Confidential

EFIHMW00151963

- a U.S. holder whose "functional currency" is not the U.S. dollar;

- a "controlled foreign corporation";

- a "passive foreign investment company"; or

- a United States expatriate.

This summary is based on the Code, United States Treasury regulations, administrative rulings and judicial decisions as of the date hereof. Those authorities may be changed, possibly on a retroactive basis, so as to result in United States federal income and estate tax consequences different from those summarized below. We have not and will not seek any rulings from the Internal Revenue Service ("IRS") regarding the matters discussed below. There can be no assurance that the IRS will not take positions concerning the tax consequences of the purchase, ownership or disposition of the notes that are different from those discussed below.

If a partnership (including any entity classified as a partnership for United States federal income tax purposes) holds notes, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partnership or a partner in a partnership holding notes, you should consult your own tax advisors.

This summary does not represent a detailed description of the United States federal income and estate tax consequences to you in light of your particular circumstances and does not address the effects of any state, local or non-United States tax laws. It is not intended to be, and should not be construed to be, legal or tax advice to any particular purchaser of notes. **If you are considering the purchase of notes, you should consult your own tax advisors concerning the particular United States federal income and estate tax consequences to you of the ownership of the notes, as well as the consequences to you arising under the laws of any other taxing jurisdiction.**

**Certain Tax Consequences to U.S. Holders**

The following is a summary of certain United States federal income tax consequences that will apply to U.S. holders of the notes.

*Stated Interest.*    Stated interest on the notes generally will be taxable to a U.S. holder as ordinary income at the time it is received or accrued, depending on the holder's method of accounting for United States federal income tax purposes.

*Certain Additional Payments*

In certain circumstances (see "Description of the Notes — Optional Redemption," "Description of the Notes — Repurchase at the Option of Holders" and "Description of the Notes — Exchange Offer; Registration Rights"), we may be obligated to pay amounts on the notes that are in excess of stated interest or principal on the notes. These potential payments may implicate the provisions of the United States Treasury Regulations relating to "contingent payment debt instruments." The possibility of such excess amounts being paid will not cause the notes to be treated as contingent payment debt instruments if there is only a "remote" chance that these contingencies will occur, or if such contingencies are considered "incidental." We intend to take the position that the possibility that any such contingencies will occur is remote and/or that such contingencies are incidental and thus the notes will not be treated as contingent payment debt instruments. Our determination that these contingencies are remote and/or incidental is binding on a holder unless such holder discloses its contrary position to the IRS in the manner that is required by applicable United States Treasury Regulations. Our determination, however, is not binding on the IRS, and it is possible that the IRS may take a different position, in which case a holder might be required to accrue interest income at a higher rate than the stated interest rate, and to treat as ordinary interest income any gain realized on the taxable disposition of the note.

138

Confidential

*Sale, Exchange, Retirement, Redemption or Other Taxable Disposition of Notes.*   Upon the sale, exchange, retirement, redemption, or other taxable disposition of a note, you generally will recognize gain or loss equal to the difference between the amount realized upon the sale, exchange, retirement, redemption or other taxable disposition (less an amount equal to any accrued and unpaid stated interest, which will be taxable as interest income as discussed above) and the adjusted tax basis of the note. Your adjusted tax basis in a note will, in general, be your cost for that note. Any gain or loss will be capital gain or loss. Capital gains of individuals derived in respect of capital assets held for more than one year are eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

## Certain Tax Consequences to Non-U.S. Holders

The following is a summary of certain United States federal income and estate tax consequences that will apply to non-U.S. holders of the notes.

*United States Federal Withholding Tax.*   The 30% United States federal withholding tax will not apply to any payment of interest on the notes under the "portfolio interest rule," provided that:

- interest paid on the notes is not effectively connected with your conduct of a trade or business in the United States;

- you do not actually (or constructively) own 10% or more of the total combined voting power of all classes of our voting stock within the meaning of the Code and applicable United States Treasury regulations;

- you are not a controlled foreign corporation that is related to us actually or constructively through stock ownership;

- you are not a bank whose receipt of interest on the notes is in connection with an extension of credit made pursuant to a loan agreement entered into in the ordinary course of your trade or business; and

- either (a) you provide your name and address on an IRS Form W-8BEN (or other applicable form), and certify, under penalties of perjury, that you are not a United States person as defined under the Code or (b) you hold your notes through certain foreign intermediaries and satisfy the certification requirements of applicable United States Treasury regulations. Special certification rules apply to non-U.S. holders that are pass-through entities rather than corporations or individuals.

If you cannot satisfy the requirements described above, payments of interest made to you will be subject to the 30% United States federal withholding tax, unless you provide us with a properly executed:

- IRS Form W-8BEN (or other applicable form) certifying an exemption from or reduction in withholding under the benefit of an applicable income tax treaty; or

- IRS Form W-8ECI (or other applicable form) certifying interest paid on the notes is not subject to withholding tax because it is effectively connected with your conduct of a trade or business in the United States (as discussed below under "— United States Federal Income Tax").

The 30% United States federal withholding tax generally will not apply to any payment of principal or gain that you realize on the sale, exchange, retirement, redemption or other disposition of a note.

*United States Federal Income Tax.*   If you are engaged in a trade or business in the United States and interest on the notes is effectively connected with the conduct of that trade or business (and, if required by an applicable income tax treaty, is attributable to a United States permanent establishment), then you will be subject to United States federal income tax on that interest on a net income basis in generally the same manner as if you were a United States person as defined under the Code. In addition, if you are a foreign corporation, you may be subject to a branch profits tax equal to 30% (or lower applicable income tax treaty rate) of such interest, subject to adjustments. If interest received with respect to the notes is effectively connected income (whether or not a treaty applies), the 30% withholding tax described above will not apply, provided the certification requirements discussed above under "— United States Federal Withholding Tax" are satisfied.

139

EFIHMW00151965

Subject to the discussion of backup withholding below any gain realized on the disposition of a note generally will not be subject to United States federal income tax unless:

- the gain is effectively connected with your conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a United States permanent establishment); or

- you are an individual who is present in the United States for 183 days or more in the taxable year of that disposition, and certain other conditions are met.

**United States Federal Estate Tax.**    Your estate will not be subject to United States federal estate tax on notes beneficially owned by you at the time of your death, provided that any payment to you on the notes would be eligible for exemption from the 30% United States federal withholding tax under the "portfolio interest rule" described above under "— United States Federal Withholding Tax" without regard to the certification requirement described in the fifth bullet point of that section.

## Information Reporting and Backup Withholding

### U.S. Holders

In general, information reporting requirements will apply to certain payments of principal and interest paid on the notes and to the proceeds of the sale or other disposition (including a retirement or redemption) of a note paid to you (unless you are an exempt recipient such as a corporation). Backup withholding (currently at a rate of 28%) may apply to such payments if you fail to provide a taxpayer identification number or a certification that you are not subject to backup withholding or if you fail to report in full dividend and interest income.

Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against your United States federal income tax liability provided the required information is timely furnished to the IRS.

### Non-U.S. Holders

Generally, we must report to the IRS and to you the amount of interest paid to you and the amount of tax, if any, withheld with respect to those payments. Copies of the information returns reporting such interest payments and any withholding may also be made available to the tax authorities in the country in which you reside under the provisions of an applicable income tax treaty.

In general, you will not be subject to backup withholding with respect to payments of interest on the notes that we make to you provided that we do not have actual knowledge or reason to know that you are a United States person as defined under the Code, and we have received from you the required certification that you are a non-U.S. holder described above in the fifth bullet point under "— Certain Tax Consequences to Non-U.S. Holders — United States Federal Withholding Tax."

Information reporting and, depending on the circumstances, backup withholding will apply to the proceeds of a sale or other disposition (including a retirement or redemption) of notes within the United States or conducted through certain United States-related financial intermediaries, unless you certify to the payer under penalties of perjury that you are a non-U.S. holder (and the payer does not have actual knowledge or reason to know that you are a United States person as defined under the Code), or you otherwise establish an exemption.

Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against your United States federal income tax liability provided the required information is timely furnished to the IRS.

140

Confidential

**Recent Developments Potentially Affecting Taxation of Non-U.S. Holders**

Congress currently is considering proposed legislation that, if enacted, would materially change the requirements for obtaining an exemption from United States withholding tax, particularly for an instrument held through a foreign financial institution or other foreign intermediary. At this time it cannot be predicted with certainty whether or in what form the proposal may ultimately be enacted. Non-U.S. holders should consult their own tax advisors regarding the potential implications of this legislation on their investment in the notes.

Confidential

EFIHMW00151967

**PX 022**
**Page 148 of 218**

## CERTAIN ERISA CONSIDERATIONS

This disclosure was written in connection with the promotion and marketing of the notes by EFH Corp. and the initial purchasers, and it cannot be used by any holder for the purpose of avoiding penalties that may be asserted against the holder under the Code. Prospective purchasers of the notes should consult their own tax advisors with respect to the application of the U.S. federal income tax laws to their particular situations.

The following is a summary of certain considerations associated with the purchase of the notes and exchange notes by employee benefit plans that are subject to Title I of ERISA, individual retirement accounts and other plans and arrangements that are subject to Section 4975 of the Code or Similar Laws, and entities whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each, a "Plan").

### General Fiduciary Matters

ERISA imposes certain duties on persons who are fiduciaries of a Plan subject to Title I of ERISA or Section 4975 of the Code (a "Benefit Plan") and both ERISA and the Code prohibit certain transactions involving the assets of a Benefit Plan and its fiduciaries or other interested parties. Under ERISA and the Code, any person who exercises any discretionary authority or control over the administration of such a Benefit Plan or the management or disposition of the assets of such a Benefit Plan, or who renders investment advice for a fee or other compensation to such a Benefit Plan, is generally considered to be a fiduciary of the Benefit Plan.

In considering an investment in the notes of a portion of the assets of any Plan, a fiduciary should consult with its counsel in order to determine whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA, the Code or any Similar Law. In addition, a fiduciary of a Plan should consult with its counsel in order to determine if the investment satisfies the fiduciary's duties to the Plan including, without limitation, the prudence, diversification, delegation of control and prohibited transaction provisions of ERISA, the Code and any other applicable Similar Laws.

### Prohibited Transaction Issues

Section 406 of ERISA and Section 4975 of the Code prohibit Benefit Plans from engaging in specified transactions involving plan assets with persons or entities who are "parties in interest," within the meaning of ERISA, or "disqualified persons," within the meaning of Section 4975 of the Code, unless an exemption is available. A party in interest or disqualified person who engaged in a nonexempt prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code. In addition, the fiduciary of the Benefit Plan that engaged in such a nonexempt prohibited transaction may be subject to penalties and liabilities under ERISA and the Code. The acquisition and/or holding of notes by a Benefit Plan with respect to which EFH Corp., a guarantor or the initial purchasers are considered a party in interest or disqualified person may constitute or result in a direct or indirect prohibited transaction under Section 406 of ERISA and/or Section 4975 of the Code, unless the investment is acquired and is held in accordance with an applicable statutory, class or individual prohibited transaction exemption. In this regard, the United States Department of Labor has issued prohibited transaction class exemptions ("PTCEs") that may apply to the acquisition and holding of the notes. These class exemptions include, without limitation, PTCE 84-14 respecting transactions determined by independent qualified professional asset managers, PTCE 90-1, respecting insurance company pooled separate accounts, PTCE 91-38, respecting bank collective investment funds, PTCE 95-60, respecting life insurance company general accounts and PTCE 96-23, respecting transactions determined by in-house asset managers.

Each of these PTCEs contains conditions and limitations on its application. Fiduciaries of Plans considering acquiring and/or holding the notes in reliance of these or any other PTCE should carefully review the PTCE to assure it is applicable. There can be no assurance that all of the conditions of any such exemptions will be satisfied.

142

EFIHMW00151968

PX 022
Page 149 of 218

Because of the foregoing, the notes should not be purchased or held by any person investing "plan assets" of any Plan, unless such purchase and holding (and the exchange of notes for exchange notes) are entitled to exemption relief from the prohibited transaction provisions of ERISA and the Code and are otherwise permissible under all applicable Similar Laws.

**Representation**

Accordingly, by acceptance of a note or an exchange note, or any interest therein, each purchaser and subsequent transferee will be deemed to have represented and warranted that either (i) no portion of the assets used by such purchaser or transferee to acquire or hold the notes constitutes assets of any Plan or (ii) the acquisition and holding of the notes (and the exchange of notes for exchange notes) by such purchaser or transferee are entitled to exemptive relief from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code and are otherwise permissible under all applicable Similar Laws.

The foregoing discussion is general in nature and is not intended to be all-inclusive. Due to the complexity of these rules and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is particularly important that fiduciaries or other persons considering acquiring the notes (and holding the notes or exchange notes) on behalf of, or with the assets of, any Plan, consult with their counsel regarding the potential applicability of ERISA, Section 4975 of the Code and any Similar Laws to such investments and whether an exemption would be applicable to the purchase and holding of the notes and the exchange of notes for exchange notes.

Confidential                                                                                    EFIHMW00151969

**PX 022**
**Page 150 of 218**

## PLAN OF DISTRIBUTION

Citigroup Global Markets Inc., Goldman, Sachs & Co., Credit Suisse Securities (USA) LLC and J.P. Morgan Securities Inc. are acting as joint book-running managers and Banc of America Securities LLC and Morgan Stanley & Co. Incorporated are acting as co-managers of this offering, and each is an initial purchaser named in the purchase agreement. Subject to the terms and conditions stated in the purchase agreement dated the date of this offering memorandum, the initial purchasers have agreed to purchase, and we have agreed to sell to the several initial purchasers, the principal amount of the notes set forth therein.

The purchase agreement provides that the obligations of the initial purchasers to purchase the notes are subject to approval of legal matters by counsel and to other conditions. The initial purchasers must purchase all of the notes if they purchase any of the notes.

We have been advised that the initial purchasers propose to resell the notes at the offering price set forth on the cover page of this offering memorandum within the United States to qualified institutional buyers (as defined in Rule 144A) in reliance on Rule 144A and outside the United States in reliance on Regulation S. See "Notice to Investors." The price at which the notes are offered by the initial purchasers may be changed at any time without notice.

The notes have not been registered under the Securities Act or any state securities laws and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons (as defined in Regulation S) except in transactions exempt from, or not subject to, the registration requirements of the Securities Act. See "Notice to Investors."

Accordingly, in connection with sales outside the United States, the initial purchasers have agreed that, except as permitted by the purchase agreement, and set forth in the "Notice to Investors," they will not offer or sell the notes within the United States or to, or for the account or benefit of, U.S. persons (i) as part of their distribution at any time or (ii) otherwise until 40 days after the later of the commencement of this offering and the closing date, and they will have sent to each dealer to which they sell notes during the 40-day distribution compliance period a confirmation or other notice setting forth the restrictions on offers and sales of the notes within the United States or to, or for the account or benefit of, U.S. persons.

In addition, until 40 days after the commencement of this offering, an offer or sale within the United States by a dealer that is not participating in this offering may violate the registration requirements of the Securities Act if that offer or sale is made otherwise than in accordance with Rule 144A. EFH Corp. and the guarantors have agreed that, for a period beginning on the date of the purchase agreement and continuing until the date that is 30 days after the closing of this offering, EFH Corp. and the guarantors will not, without the prior written consent of each initial purchaser named in the purchase agreement, offer, sell, contract to sell or otherwise dispose of, or pledge or grant security interests on, any securities of EFH Corp. that are substantially similar to the notes offered hereby.

Each initial purchaser has represented and agreed that:

- it has only communicated and caused to be communicated and will only communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act 2000 ("FMSA")) received by it in connection with the issue or sale of the notes included in this offering in circumstances in which Section 21(1) of the FMSA does not apply to us; and

- it has complied and will comply with all applicable provisions of the FMSA with respect to anything done by them in relation to the notes included in this offering in, from or otherwise involving the United Kingdom.

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), each initial purchaser has represented and agreed that, with effect

144

from and including the date on which the Prospectus Directive is implemented in that Relevant Member State ("the Relevant Implementation Date"), it has not made and will not make an offer of the notes to the public in that Relevant Member State prior to the publication of a prospectus in relation to the notes which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of the notes to the public in that Relevant Member State at any time:

(a) to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(b) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000; and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts;

(c) to fewer than 100 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) subject to obtaining the prior consent of the representatives for any such offer; or

(d) in any other circumstance which does not require the publication by Hercules Holding or the issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of notes to the public" in relation to any notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the notes to be offered so as to enable an investor to decide to purchase or subscribe to the notes, as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive in that Relevant Member State, and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

The notes will constitute new classes of securities with no established trading market. We do not intend to list the notes on any national securities exchange. We cannot assure you that the prices at which the notes will sell in the market after this offering will not be lower than the initial offering price or that an active trading market for the notes will develop and continue after this offering. The initial purchasers have advised us that they currently intend to make a market in the notes. However, they are not obligated to do so and they may discontinue any market-making activities with respect to the notes at any time without notice. In addition, market-making activity will be subject to the limits imposed by the Securities Act and the Exchange Act and may be limited during a registered offer to exchange the notes for exchange notes and the pendency of any shelf registration statement. Because certain of the initial purchasers are affiliated with the Sponsor Group, they may be required to deliver a "market-making prospectus" when effecting offers or sales of the notes. See "The Transactions — Equity Contributions." Subject to the compliance with applicable laws, the ability of Goldman, Sachs & Co. to make a market in the notes or the exchange notes will be subject to the availability of a current "market-making" prospectus. Accordingly, we cannot assure you as to the liquidity of, or the trading market for, the notes.

In connection with this offering, the initial purchasers may purchase and sell notes in the open market. These transactions may include over-allotment, covering transactions and stabilizing transactions. Over-allotment involves sales of notes in excess of the principal amount of notes to be purchased by the initial purchasers in this offering, which creates a short position for the initial purchasers. Covering transactions involve purchases of the notes in the open market after the distribution has been completed in order to cover short positions. Stabilizing transactions consist of certain bids or purchases of notes made for the purpose of preventing or retarding a decline in the market price of the notes while this offering is in progress. Any of these activities may have the effect of preventing or retarding a decline in the market price of the notes. They may also cause the price of the notes to be higher than the price that otherwise would exist in the open market in the absence of these transactions. The initial purchasers may conduct these transactions in the over-the-counter market or otherwise. If the initial purchasers commence these transactions, they may discontinue them at any time.

145

Confidential

The initial purchasers also may impose a penalty bid. This occurs when a particular initial purchaser repays to the initial purchasers a portion of the initial purchaser discount received by it because the representatives or their affiliates have repurchased notes sold by or for the account of such initial purchaser in stabilizing or short covering transactions.

From time to time, the initial purchasers and their respective affiliates have provided, and may in the future provide from time to time, investment banking and commercial banking services and financial advisory services to us for which they have in the past received, and may in the future receive, customary fees. In addition, affiliates of the initial purchasers are and may from time to time be party to certain commodity and interest rate hedging transactions with EFH Corp. and/or its subsidiaries in the normal course of business and may at any time be creditors of EFH Corp. and/or such subsidiaries.

An affiliate of Goldman, Sachs & Co. is a member of the Sponsor Group and, as such, has an ownership interest in EFH Corp. See "The Transactions — Equity Contributions."

Affiliates of certain other initial purchasers have ownership interests in EFH Corp. See "The Transactions— Equity Contributions."

Lyndon Olson, a member of EFH Corp.'s board of directors, was a Senior Advisor with Citigroup Inc., an affiliate of Citigroup Global Markets Inc. Each of Scott Lebovitz, Kenneth Pontarelli and Thomas D. Ferguson, who are members of EFH Corp.'s board of directors, are employees of Goldman, Sachs & Co. or its affiliates. Mr. Lebovitz is also a member of the board of directors of EFCH. Michael MacDougall, a member of EFH Corp.'s board of directors, is a director of Kraton Polymers Inc., which may be deemed to be an affiliate of J.P. Morgan Securities Inc.

In addition, an affiliate of Citigroup Global Markets Inc. is the administrative agent and collateral agent, an affiliate of J.P. Morgan Securities Inc. is the syndication agent, affiliates of Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co. and Morgan Stanley & Co. Incorporated are co-documentation agents, and certain of the initial purchasers or their respective affiliates are joint lead arrangers and joint lead bookrunners, for TCEH's senior secured credit facilities, and affiliates of certain of the initial purchasers are lenders under TCEH's senior secured credit facilities. An affiliate of Goldman, Sachs & Co. is sole lead arranger, sole bookrunner and posting agent for a senior secured cash posting credit facility of TCEH. An affiliate of J.P. Morgan Securities Inc. is administrative agent, an affiliate of Citigroup Global Markets Inc. is syndication agent, affiliates of Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co. and Morgan Stanley & Co. Incorporated are co-documentation agents, and certain of the initial purchasers or their respective affiliates are joint lead arrangers and joint lead bookrunners for the Oncor Revolving Credit Facility, and affiliates of certain of the initial purchasers are lenders under the Oncor Revolving Credit Facility.

The initial purchasers and their respective affiliates are full service financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and brokerage activities.

In the ordinary course of their various business activities, the initial purchasers and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own accounts and for the accounts of their customers and may at any time hold long or short positions in such securities and instruments. Such investment and securities activities may involve securities and instruments of EFH Corp. and its subsidiaries, including the notes.

We have agreed to indemnify the initial purchasers against certain liabilities, including liabilities under the Securities Act, or to contribute to payments that the initial purchasers may be required to make because of any of these liabilities.

146

EFIHMW00151972

**LEGAL MATTERS**

Certain legal matters in connection with the notes will be passed upon for EFH Corp. and the guarantors by Vinson & Elkins L.L.P., Dallas, Texas, and Simpson Thacher & Bartlett LLP, New York, New York, and NRC regulatory matters will be passed upon for EFH Corp. and the guarantors by Morgan, Lewis & Bockius LLP. Certain legal matters in connection with the notes will be passed upon for the initial purchasers by Shearman & Sterling LLP, New York, New York. An investment vehicle comprised of several partners of Simpson Thacher & Bartlett LLP, members of their families, related persons and others own interests representing less than 1% of the capital commitments of the KKR Millennium Fund, L.P. and KKR 2006 Fund L.P.

Confidential

EFIHMW00151973

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The financial statements as of December 31, 2008 and 2007 (successor), and for the year ended December 31, 2008 (successor), the period from October 11, 2007 through December 31, 2007 (successor), the period from January 1, 2007 through October 10, 2007 (predecessor) and the year ended December 31, 2006 (predecessor) of EFH Corp. incorporated by reference into this offering memorandum from the May 20, 2009 Form 8-K and the effectiveness of EFH Corp.'s internal control over financial reporting incorporated by reference from the Annual Report on Form 10-K for the year ended December 31, 2008, have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports, which are incorporated herein by reference (which reports (1) express an unqualified opinion on the financial statements and includes an explanatory paragraph related to EFH Corp. completing its merger with Texas Energy Future Merger Sub Corp and becoming a subsidiary of Texas Energy Future Holdings Limited Partnership on October 10, 2007, EFH Corp.'s adoption of new accounting guidance related to noncontrolling interests in consolidated financial statements, the provisions of accounting guidance related to the presentation of assets and liabilities with the legal right of offset and reclassification of results of its commodity hedging and trading activities on a retrospective basis and (2) express an unqualified opinion on the effectiveness of internal control over financial reporting). Also, the financial statements as of December 31, 2008 and 2007 (successor balance sheets), and for the year ended December 31, 2008 (successor operations), the period from October 11, 2007 through December 31, 2007 (successor operations) of Oncor Holdings and the financial statements for the period from January 1, 2007 through October 10, 2007 (predecessor operations) and the year ended December 31, 2006 (predecessor operations) of Oncor Electric Delivery Company LLC (as Oncor Holdings' predecessor) included in this offering memorandum, have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report appearing herein (which report expresses an unqualified opinion and includes an explanatory paragraph referring to Oncor Holdings as an indirect subsidiary of EFH Corp., which was merged with Texas Energy Future Merger Sub Corp on October 10, 2007, as well as the adoption of new accounting guidance related to noncontrolling interests in consolidated financial statements, on a retrospective basis).

With respect to the unaudited interim financial information for the periods ended March 31, 2009 and 2008, June 30, 2009 and 2008 and September 30, 2009 and 2008 which is incorporated herein by reference for EFH Corp., Deloitte & Touche LLP, an independent registered public accounting firm, have applied limited procedures in accordance with the standards of the Public Company Accounting Oversight Board (United States) for a review of such information. Also, with respect to the unaudited interim financial information for the periods ended September 30, 2009 and 2008 which is included herein for Oncor Holdings, Deloitte & Touche LLP, independent registered public accounting firm, have applied limited procedures in accordance with the standards of the Public Company Accounting Oversight Board (United States) for a review of such information. However, as stated in their reports included in EFH Corp.'s Quarterly Reports on Form 10-Q for the quarters ended March 31, 2009, June 30, 2009 and September 30, 2009 and incorporated by reference herein for EFH Corp. (which report for the quarter ended March 31, 2009 includes an explanatory paragraph referring to the adoption of new accounting guidance related to noncontrolling interests in consolidated financial statements, on a retrospective basis) and included herein for the three-month and nine-month periods ended September 30, 2009 for Oncor Holdings (which report includes an explanatory paragraph referring to the adoption of new accounting guidance related to noncontrolling interests in consolidated financial statements, on a retrospective basis), they did not audit and they do not express an opinion on that interim financial information. Accordingly, the degree of reliance on their reports on such information should be restricted in light of the limited nature of the review procedures applied.

148

EFIHMW00151974

**PX 022
Page 155 of 218**

## AVAILABLE INFORMATION

EFH Corp. files annual, quarterly and current reports and other information with the SEC. You may read and copy any document EFH Corp. has filed or will file with the SEC at the SEC's public website (*www.sec.gov*) or at the Public Reference Room of the SEC located at 100 F Street, N.E., Washington, DC 20549. Copies of such materials can be obtained from the Public Reference Room of the SEC at prescribed rates. You can call the SEC at 1-800-SEC-0330 to obtain information on the operation of the Public Reference Room.

EFH Corp. has agreed that even if it is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act or otherwise required to report on an annual and quarterly basis on forms provided for such annual and quarterly reporting pursuant to rules and regulations promulgated by the SEC, EFH Corp. will nonetheless file with the SEC and make available to the trustee and to holders of notes the reports specified under "Description of the Notes — Certain Covenants — Reports and Other Information," subject to the provisions described in that section.

## INCORPORATION BY REFERENCE

EFH Corp. incorporates certain information into this offering memorandum by reference to other documents that it files with the SEC. This means that EFH Corp. can disclose important information to you for purposes of this offering memorandum by referring you to other documents that have been filed separately with the SEC. EFH Corp. incorporates into this offering memorandum by reference each of the following reports:

- EFH Corp.'s Annual Report on Form 10-K for the year ended December 31, 2008 that it filed with the SEC on March 3, 2009 (except for items 6, 7 and 8, which have been superseded by EFH Corp.'s Current Report on Form 8-K filed on May 20, 2009 and are not incorporated by reference herein);

- EFH Corp.'s Quarterly Report on Form 10-Q for the quarter ended March 31, 2009 that it filed with the SEC on May 1, 2009;

- EFH Corp.'s Quarterly Report on Form 10-Q for the quarter ended June 30, 2009 that it filed with the SEC on August 4, 2009;

- EFH Corp.'s Quarterly Report on Form 10-Q for the quarter ended September 30, 2009 that it filed with the SEC on October 30, 2009; and

- EFH Corp.'s Current Reports on Form 8-K that it filed with the SEC on January 15, 2009, February 23, 2009, May 20, 2009, July 20, 2009, August 10, 2009, September 1, 2009, October 5, 2009, October 21, 2009, November 20, 2009 and December 28, 2009.

Copies of these filings are available free of charge by writing to Energy Future Holdings Corp., Energy Plaza, 1601 Bryan Street, Dallas, TX 75201-3411, Attention: Investor Relations, or by telephoning us at 214-812-4600.

The information incorporated by reference is an important part of this offering memorandum. You should rely only upon the information provided in this offering memorandum and the information incorporated into this offering memorandum by reference. Neither we nor the initial purchasers have authorized anyone to provide you with different information. You should not assume that the information in this offering memorandum is accurate as of any date other than the date of this offering memorandum. None of our future filings with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Exchange Act will be deemed incorporated into this offering memorandum by reference.

You should not rely on or assume the accuracy of any representation or warranty in any agreement that we have filed as an exhibit to any document that we have publicly filed or that we may otherwise publicly file in the future because such representation or warranty may be subject to exceptions and qualifications contained in separate disclosure schedules, may have been included in such agreement for the purpose of allocating risk between the parties to the particular transaction, and may no longer continue to be true as of any given date.

149

EFIHMW00151975

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

**Audited Consolidated Financial Statements of Oncor Electric Delivery Holdings Company LLC (Successor) and Oncor Electric Delivery Company LLC (Predecessor)**

Glossary .................................................................................. F-2

Report of Independent Registered Public Accounting Firm ....................................... F-6

Statements of Consolidated Income (Loss) for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) ........ F-7

Statements of Consolidated Comprehensive Income (Loss) for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) ................................................................. F-8

Statements of Consolidated Cash Flows for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) ........ F-9

Consolidated Balance Sheets as of December 31, 2008 (Successor) and December 31, 2007 (Successor) ........................................................................... F-10

Statements of Consolidated Membership Interests for the year ended December 31, 2008 (Successor) and the period from October 11, 2007 through December 31, 2007 (Successor) ....................... F-11

Statements of Consolidated Shareholder's Equity for the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) ......................... F-12

Notes to Consolidated Financial Statements ................................................... F-13

**Unaudited Condensed Consolidated Financial Statements of Oncor Electric Delivery Holdings Company LLC**

Glossary .................................................................................. F-43

Report of Independent Registered Public Accounting Firm ....................................... F-45

Condensed Statements of Consolidated Income for the three-month and nine-month periods ended September 30, 2009 and 2008 .......................................................... F-46

Condensed Statements of Consolidated Comprehensive Income for the three-month and nine-month periods ended September 30, 2009 and 2008 ............................................... F-47

Condensed Statements of Consolidated Cash Flows for the nine-month periods ended September 30, 2009 and 2008 ...................................................................... F-48

Condensed Consolidated Balance Sheets as of September 30, 2009 and December 31, 2008 ........... F-49

Notes to Condensed Consolidated Financial Statements .......................................... F-50

Confidential

## GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

**Capgemini** . . . . . . . . . . . . . . . . . . . . . . Capgemini Energy LP, a subsidiary of Cap Gemini North America Inc. that provides business process support services to Oncor

**EFC Holdings** . . . . . . . . . . . . . . . . . . . . Refers to Energy Future Competitive Holdings Company, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of TCEH.

**EFH Corp.** . . . . . . . . . . . . . . . . . . . . . . Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context. Its major subsidiaries include Oncor and TCEH.

**ERCOT** . . . . . . . . . . . . . . . . . . . . . . . . . Electric Reliability Council of Texas, the independent system operator and the regional coordinator of the various electricity systems within Texas

**ERISA** . . . . . . . . . . . . . . . . . . . . . . . . . . Employee Retirement Income Security Act of 1974, as amended

**FASB** . . . . . . . . . . . . . . . . . . . . . . . . . . . Financial Accounting Standards Board, the designated organization in the private sector for establishing standards for financial accounting and reporting

**FERC** . . . . . . . . . . . . . . . . . . . . . . . . . . US Federal Energy Regulatory Commission

**FIN** . . . . . . . . . . . . . . . . . . . . . . . . . . . . Financial Accounting Standards Board Interpretation

**FIN 48** . . . . . . . . . . . . . . . . . . . . . . . . . FIN No. 48 (As Amended), "Accounting for Uncertainty in Income Taxes"

**FSP** . . . . . . . . . . . . . . . . . . . . . . . . . . . . FASB Staff Position

**FSP FIN 48-1** . . . . . . . . . . . . . . . . . . . . FASB Staff Position FIN 48-1, "Definition of Settlement in FASB Interpretation No. 48"

**FSP SFAS 132(R)** . . . . . . . . . . . . . . . . FSP SFAS No. 132(R)-1, "Employers' Disclosures about Postretirement Benefit Plan Assets"

**GAAP** . . . . . . . . . . . . . . . . . . . . . . . . . . generally accepted accounting principles

**Intermediate Holding** . . . . . . . . . . . . . Refers to Energy Future Intermediate Holding Company LLC, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings.

**Investment LLC** . . . . . . . . . . . . . . . . . . Refers to Oncor Management Investment LLC, a Delaware limited liability company and minority interest owner of Oncor, whose managing member is Oncor and whose Class B Interests are owned by officers, directors and key employees of Oncor.

F-2

EFIHMW00151977

**IRS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . US Internal Revenue Service

**kWh** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . kilowatt-hours

**LIBOR** . . . . . . . . . . . . . . . . . . . . . . . . . . London Interbank Offered Rate. An interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market.

**Limited Liability Company Agreement** . . . . . . . . . . . . . . . . . . . . . The Second Amended and Restated Limited Liability Company Agreement of Oncor, dated as of November 5, 2008 by and among Oncor Holdings, Texas Transmission and Investment LLC, as amended.

**Luminant** . . . . . . . . . . . . . . . . . . . . . . . Refers to wholly-owned subsidiaries of TCEH engaged in competitive market activities consisting of electricity generation, development and construction of new generation facilities, wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas.

**Merger** . . . . . . . . . . . . . . . . . . . . . . . . . . The transaction referred to in the Merger Agreement (defined immediately below) that was completed on October 10, 2007.

**Merger Agreement** . . . . . . . . . . . . . . . . Agreement and Plan of Merger, dated February 25, 2007, under which Texas Holdings agreed to acquire EFH Corp.

**Moody's** . . . . . . . . . . . . . . . . . . . . . . . . . Moody's Investors Services, Inc. (a credit rating agency)

**Oncor** . . . . . . . . . . . . . . . . . . . . . . . . . . . Refers to Oncor Electric Delivery Company LLC, a direct, majority owned subsidiary of Oncor Holdings, and/or its wholly-owned consolidated bankruptcy-remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC, depending on context.

**Oncor Holdings** . . . . . . . . . . . . . . . . . . Refers to Oncor Electric Delivery Holdings Company LLC, a direct, wholly-owned subsidiary of Intermediate Holding and the direct majority owner of Oncor.

**Oncor Ring-Fenced Entities** . . . . . . . . . Refers to Oncor Holdings and its direct and indirect subsidiaries.

**OPEB** . . . . . . . . . . . . . . . . . . . . . . . . . . . other postretirement employee benefit

**PUCT** . . . . . . . . . . . . . . . . . . . . . . . . . . . Public Utility Commission of Texas

**PURA** . . . . . . . . . . . . . . . . . . . . . . . . . . . Texas Public Utility Regulatory Act

**Purchase accounting** . . . . . . . . . . . . . . . The purchase method of accounting for a business combination as prescribed by SFAS 141 whereby the cost or "purchase price" of a business combination, including the amount paid for the equity and direct transaction costs are allocated to identifiable assets and liabilities (including intangible assets) based upon their fair values. The excess of the purchase price over the fair values of assets and liabilities is recorded as goodwill.

F-3

EFIHMW00151978

**PX 022
Page 159 of 218**

| | |
|---|---|
| **REP** . . . . . . . . . . . . . . . . . . . . . . . . . | retail electric provider |
| **SARs** . . . . . . . . . . . . . . . . . . . . . . . | Stock Appreciation Rights |
| **SARs Plan** . . . . . . . . . . . . . . . . . . . . . | Refers to the Oncor Electric Delivery Stock Appreciation Rights Plan |
| **SEC** . . . . . . . . . . . . . . . . . . . . . . . . . | US Securities and Exchange Commission |
| **SFAS** . . . . . . . . . . . . . . . . . . . . . . . . | Statement of Financial Accounting Standards issued by the FASB |
| **SFAS 5** . . . . . . . . . . . . . . . . . . . . . . | SFAS No. 5, "Accounting for Contingencies" |
| **SFAS 71** . . . . . . . . . . . . . . . . . . . . . | SFAS No. 71, "Accounting for the Effect of Certain Types of Regulation" |
| **SFAS 87** . . . . . . . . . . . . . . . . . . . . . | SFAS No. 87, "Employers' Accounting for Pensions" |
| **SFAS 106** . . . . . . . . . . . . . . . . . . . . | SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions" |
| **SFAS 109** . . . . . . . . . . . . . . . . . . . . | SFAS No. 109, "Accounting for Income Taxes" |
| **SFAS 123(R)** . . . . . . . . . . . . . . . . . . . | SFAS No. 123 (revised 2004), "Share-Based Payment" |
| **SFAS 132(R)** . . . . . . . . . . . . . . . . . . . | SFAS No. 132 (revised 2003), "Employers' Disclosures About Pensions and Other Postretirement Benefits" |
| **SFAS 133** . . . . . . . . . . . . . . . . . . . . | SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" as amended and interpreted |
| **SFAS 140** . . . . . . . . . . . . . . . . . . . . | SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities, a replacement of FASB Statement No. 125" |
| **SFAS 141** . . . . . . . . . . . . . . . . . . . . | SFAS No. 141, "Business Combinations" |
| **SFAS 142** . . . . . . . . . . . . . . . . . . . . | SFAS No. 142, "Goodwill and Other Intangible Assets" |
| **SFAS 158** . . . . . . . . . . . . . . . . . . . . | SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans" |
| **SFAS 160** . . . . . . . . . . . . . . . . . . . . | SFAS No. 160, "Noncontrolling Interests in Consolidated Financial Statements — an amendment of ARB No. 51" |
| **SFAS 165** . . . . . . . . . . . . . . . . . . . . | SFAS No. 165, "Subsequent Events" |
| **SFAS 168** . . . . . . . . . . . . . . . . . . . . | SFAS No. 168, "The *FASB Accounting Standards Codification*™ and the Hierarchy of Generally Accepted Accounting Principles" |
| **Sponsor Group** . . . . . . . . . . . . . . . . . . | Collectively, the investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P. and GS Capital Partners, an affiliate of Goldman Sachs & Co. (See Texas Holdings below.) |

F-4

EFIHMW00151979

**PX 022
Page 160 of 218**

| | |
|---|---|
| **TCEH** . . . . . . . . . . . . . . . . . . . . . . . . . . | Refers to Texas Competitive Electric Holdings Company LLC, a direct, wholly-owned subsidiary of EFC Holdings and an indirect, wholly-owned subsidiary of EFH Corp., and/or its subsidiaries, depending on context. |
| **Texas Holdings** . . . . . . . . . . . . . . . . . . | Refers to Texas Energy Future Holdings Limited Partnership, a Delaware limited partnership controlled by the Sponsor Group, that owns substantially all of the common stock of EFH Corp. |
| **Texas Holdings Group** . . . . . . . . . . . . | Refers to Texas Holdings and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities. |
| **Texas Transmission** . . . . . . . . . . . . . . . | Refers to Texas Transmission Investment LLC, a Delaware limited liability company that purchased a 19.75% equity interest in Oncor in November 2008. It is not affiliated with EFH Corp., any of EFH Corp.'s subsidiaries or any member of the Sponsor Group. |
| **TXU Energy** . . . . . . . . . . . . . . . . . . . . . . | Refers to TXU Energy Retail Company LLC, a direct, wholly-owned subsidiary of TCEH engaged in the retail sale of electricity to residential and business customers. TXU Energy is a REP in competitive areas of ERCOT. |
| **US** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | United States of America |

This Annual Report occasionally makes references to Intermediate Holding, Oncor Holdings or Oncor when describing actions, rights or obligations of their respective subsidiaries. These references reflect the fact that the subsidiaries are consolidated with their respective parent companies for financial reporting purposes. However, these references should not be interpreted to imply that the parent company is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or that the subsidiary company is undertaking an action or has the rights or obligations of its parent company or any other affiliate.

F-5

EFIHMW00151980

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Member of
Oncor Electric Delivery Holdings Company LLC
Dallas, Texas

We have audited the accompanying consolidated balance sheets of Oncor Electric Delivery Holdings Company LLC and subsidiaries ("Oncor Holdings" or the "Successor") as of December 31, 2008 and 2007 (Successor balance sheets), and the related statements of consolidated income (loss), comprehensive income (loss), cash flows, and membership interests for the year ended December 31, 2008 and the period from October 11, 2007 through December 31, 2007 (Successor operations). We have also audited the accompanying statements of consolidated income (loss), comprehensive income (loss), cash flows, and shareholder's equity of Oncor Electric Delivery Company LLC (the "Predecessor") for the period from January 1, 2007 through October 10, 2007 and the year ended December 31, 2006 (Predecessor operations). These financial statements are the responsibility of Oncor Holdings' management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the auditing standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. Oncor Holdings is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of Oncor Holdings' internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the Successor's consolidated financial statements referred to above present fairly, in all material respects, the financial position of Oncor Electric Delivery Holdings Company LLC and subsidiaries as of December 31, 2008 and 2007, and the results of their operations and their cash flows for the year ended December 31, 2008 and the period from October 11, 2007 through December 31, 2007 in conformity with accounting principles generally accepted in the United States of America. Further, in our opinion, the Predecessor's consolidated financial statements referred to above present fairly, in all material respects, the results of operations and cash flows of Oncor Electric Delivery Company LLC for the period from January 1, 2007 through October 10, 2007 and the year ended December 31, 2006, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1 to the consolidated financial statements, Oncor Holdings is a wholly owned subsidiary of Energy Future Holdings Corp., which was merged with Texas Energy Future Merger Sub Corp on October 10, 2007. As also discussed in Note 1, Oncor Holdings adopted the provisions of FASB Statement No. 160, Noncontrolling Interests in Consolidated Financial Statements — an amendment of ARB No. 51 on a retrospective basis.

/s/ Deloitte & Touche LLP

Dallas, Texas
September 2, 2009

F-6

EFIHMW00151981

**PX 022**
**Page 162 of 218**

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC (SUCCESSOR) AND
ONCOR ELECTRIC DELIVERY COMPANY LLC (PREDECESSOR)**

**STATEMENTS OF CONSOLIDATED INCOME (LOSS)**
**(millions of dollars)**

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | **Year Ended December 31, 2008** | **Period from October 11, 2007 through December 31, 2007** | **Period from January 1, 2007 through October 10, 2007** | **Year Ended December 31, 2006** |
| Operating revenues: | | | | |
| Affiliated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,000 | $209 | $ 823 | $1,139 |
| Nonaffiliated . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,580 | 324 | 1,144 | 1,310 |
| Total operating revenues . . . . . . . . . . . . . . | 2,580 | 533 | 1,967 | 2,449 |
| Operating expenses: | | | | |
| Operation and maintenance . . . . . . . . . . . . . . . . | 852 | 200 | 649 | 804 |
| Depreciation and amortization . . . . . . . . . . . . | 492 | 96 | 366 | 476 |
| Income taxes . . . . . . . . . . . . . . . . . . . . . . . . . . | 191 | 25 | 150 | 156 |
| Taxes other than income taxes . . . . . . . . . . . . . | 391 | 87 | 305 | 402 |
| Total operating expenses . . . . . . . . . . . . . . | 1,926 | 408 | 1,470 | 1,838 |
| Operating income . . . . . . . . . . . . . . . . . . . . . . . . | 654 | 125 | 497 | 611 |
| Other income and deductions: | | | | |
| Impairment of goodwill (Note 3) . . . . . . . . . . | 860 | — | — | — |
| Other income (Note 20) . . . . . . . . . . . . . . . . . . . | 45 | 11 | 3 | 2 |
| Other deductions (Note 20) . . . . . . . . . . . . . . . . | 25 | 8 | 30 | 27 |
| Nonoperating income taxes . . . . . . . . . . . . . . . . | 26 | 6 | 9 | 14 |
| Interest income . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 45 | 12 | 44 | 58 |
| Interest expense and related charges (Note 20) . . . . . | 316 | 70 | 242 | 286 |
| Net income (loss) . . . . . . . . . . . . . . . . . . . . . . . . . | (483) | 64 | 263 | 344 |
| Net loss attributable to noncontrolling interests . . . . | 160 | — | — | — |
| Net income (loss) attributable to Oncor Holdings . . | $ (323) | $ 64 | $ 263 | $ 344 |

See Notes to Financial Statements.

F-7

EFIHMW00151982

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC (SUCCESSOR) AND
ONCOR ELECTRIC DELIVERY COMPANY LLC (PREDECESSOR)**

**STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME (LOSS)**
**(millions of dollars)**

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Net income (loss) .............................. | $(483) | $ 64 | $263 | $344 |
| Other comprehensive income, net of tax effects: | | | | |
| Cash flow hedges: | | | | |
| Net decrease in fair value of derivatives (net of tax benefit of $1, —, — and —) ...... | (2) | — | — | — |
| Cash flow hedges — derivative value net losses related to hedged transactions recognized during the period in net income (net of tax expense of $— in all periods) ........................... | — | — | 1 | 2 |
| Comprehensive income (loss) .................... | (485) | 64 | 264 | 346 |
| Comprehensive loss attributable to noncontrolling interests ................................... | 160 | — | — | — |
| Comprehensive income (loss) attributable to Oncor Holdings ................................. | $(325) | $ 64 | $264 | $346 |

See Notes to Financial Statements.

F-8

EFIHMW00151983

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC (SUCCESSOR) AND
ONCOR ELECTRIC DELIVERY COMPANY LLC (PREDECESSOR)**

**STATEMENTS OF CONSOLIDATED CASH FLOWS**
**(millions of dollars)**

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Cash flows — operating activities: | | | | |
| Net income (loss) | $ (483) | $ 64 | $ 263 | $ 344 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | | |
| Depreciation and amortization | 451 | 95 | 366 | 473 |
| Deferred income taxes and investment tax credits — net | 154 | 70 | 17 | 22 |
| Impairment of goodwill (Note 3) | 860 | — | — | — |
| Net gains on sale of assets | (1) | (1) | (3) | — |
| Bad debt expense | 1 | (2) | 2 | 1 |
| Stock-based incentive compensation expense | — | — | 3 | 4 |
| Recognition of losses on dedesignated cash flow hedges | — | — | 2 | 2 |
| Other, net | 6 | 4 | 2 | 1 |
| Changes in operating assets and liabilities: | | | | |
| Accounts receivable — trade (including affiliates) | (1) | 39 | (47) | 3 |
| Impact of accounts receivable sales program (Note 9) | — | (113) | 27 | (3) |
| Inventories | (12) | 6 | 19 | (22) |
| Accounts payable — trade (including affiliates) | 6 | (3) | 8 | (16) |
| Other — assets | (141) | (32) | (24) | (56) |
| Other — liabilities | (11) | (62) | 47 | (125) |
| Cash provided by operating activities | 829 | 65 | 682 | 628 |
| Cash flows — financing activities: | | | | |
| Issuance of long-term debt | 1,500 | — | 800 | — |
| Repayments of long-term debt | (99) | (832) | (264) | (93) |
| Net increase (decrease) in short-term borrowings | (943) | 895 | (288) | 622 |
| Proceeds from sale of noncontrolling interests, net of transaction costs | 1,253 | — | — | — |
| Distribution to parent of equity sale net proceeds | (1,253) | — | — | — |
| Distributions/dividends | (330) | — | (326) | (340) |
| Net increase (decrease) in advances from parent | — | — | (24) | 2 |
| Decrease in income tax-related note receivable from TCEH | 34 | 9 | 24 | 39 |
| Excess tax benefit on stock-based incentive compensation | 10 | 15 | — | 14 |
| Debt discount, financing and reacquisition expenses — net | (18) | (1) | (10) | (4) |
| Cash provided by (used in) financing activities | 154 | 86 | (88) | 240 |
| Cash flows — investing activities: | | | | |
| Capital expenditures | (882) | (153) | (555) | (840) |
| Costs to remove retired property | (37) | (9) | (25) | (40) |
| Cash settlements related to outsourcing contract termination (Note 16) | 20 | — | — | — |
| Proceeds from sale of assets | 1 | 1 | 4 | — |
| Other | 19 | 15 | (2) | (2) |
| Cash used in investing activities | (879) | (146) | (578) | (882) |
| Net change in cash and cash equivalents | 104 | 5 | 16 | (14) |
| Cash and cash equivalents — beginning balance | 22 | 17 | 1 | 15 |
| Cash and cash equivalents — ending balance | $ 126 | $ 22 | $ 17 | $ 1 |

See Notes to Financial Statements.

F-9

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC (SUCCESSOR)**

**CONSOLIDATED BALANCE SHEETS**
**(millions of dollars)**

| | Successor | |
| --- | --- | --- |
| | December 31, 2008 | December 31, 2007 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $    126 | $    22 |
| Restricted cash (Note 15) | 51 | 56 |
| Trade accounts receivable from nonaffiliates — net (Note 9) | 217 | 208 |
| Trade accounts and other receivables from affiliates | 182 | 181 |
| Advances to Parent | — | 25 |
| Income taxes receivable from parent | 22 | 29 |
| Materials and supplies inventories — at average cost | 63 | 51 |
| Accumulated deferred income taxes (Note 7) | 54 | 45 |
| Prepayments | 75 | 67 |
| Other current assets | 9 | 2 |
| Total current assets | 799 | 686 |
| Restricted cash (Note 15) | 16 | 17 |
| Investments and other property (Note 15) | 72 | 89 |
| Property, plant and equipment — net (Note 20) | 8,606 | 8,069 |
| Goodwill (Note 20) | 4,064 | 4,894 |
| Note receivable due from TCEH (Note 19) | 254 | 289 |
| Regulatory assets — net (Note 8) | 1,892 | 1,305 |
| Other noncurrent assets | 60 | 110 |
| Total assets | $15,763 | $15,459 |
| **LIABILITIES AND MEMBERSHIP INTERESTS** | | |
| Current liabilities: | | |
| Short-term borrowings (Note 10) | $    337 | $ 1,280 |
| Long-term debt due currently (Note 11) | 103 | 99 |
| Trade accounts payable | 124 | 130 |
| Accrued taxes other than income taxes | 141 | 136 |
| Accrued interest | 103 | 72 |
| Other current liabilities | 99 | 98 |
| Total current liabilities | 907 | 1,815 |
| Accumulated deferred income taxes (Note 7) | 1,192 | 1,354 |
| Investment tax credits | 42 | 47 |
| Long-term debt, less amounts due currently (Note 11) | 5,101 | 3,702 |
| Other noncurrent liabilities and deferred credits | 1,720 | 898 |
| Total liabilities | 8,962 | 7,816 |
| Commitments and contingencies (Note 12) | | |
| Membership interests (Note 13): | | |
| Oncor Holdings membership interest | 5,446 | 7,643 |
| Noncontrolling interests in subsidiary | 1,355 | — |
| Total membership interests | 6,801 | 7,643 |
| Total liabilities and membership interests | $15,763 | $15,459 |

See Notes to Financial Statements.

F-10

EFIHMW00151985

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC (SUCCESSOR)**

**STATEMENTS OF CONSOLIDATED MEMBERSHIP INTERESTS**
**(millions of dollars)**

| | Successor | |
|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 |
| Capital account: | | |
| Balance at beginning of period(a) | $ 7,643 | $7,539 |
| Investment by Texas Holdings | — | 12 |
| Distribution of investment in Oncor Communications Holding Company LLC to parent | (24) | — |
| Settlement of incentive compensation plans | — | 28 |
| Effect of sale of noncontrolling interests (Note 14) | (265) | — |
| Distributions paid to parent | (1,583) | — |
| Net income (loss) | (323) | 64 |
| Balance at end of period | 5,448 | 7,643 |
| Accumulated other comprehensive income (loss), net of tax effects: | | |
| Balance at beginning of period | — | — |
| Net effects of cash flow hedges | (2) | — |
| Balance at end of period | (2) | — |
| Oncor Holdings membership interest at end of period | 5,446 | — |
| Noncontrolling interests in subsidiary (Note 14) | | |
| Balance at beginning of period | — | — |
| Net loss | (160) | — |
| Investment | 1,253 | — |
| Effect of sale of noncontrolling interests (Note 14) | 265 | — |
| Distributions to noncontrolling interests | (2) | — |
| Other | (1) | — |
| Noncontrolling interests in subsidiary at end of period | 1,355 | — |
| Total membership interests at end of period | $ 6,801 | $7,643 |

(a)   The beginning equity balance for the period from October 11, 2007 through December 31, 2007 reflects the application of push-down accounting as a result of the Merger.

See Notes to Financial Statements.

F-11

EFIHMW00151986

**ONCOR ELECTRIC DELIVERY COMPANY LLC (PREDECESSOR)**

**STATEMENTS OF CONSOLIDATED SHAREHOLDER'S EQUITY**
**(millions of dollars)**

| | Predecessor | |
| --- | --- | --- |
| | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Common stock without par value (number of authorized shares — 100,000,000): | | |
| Balance at beginning of period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,986 | $1,952 |
| Effects of stock-based incentive compensation plans (Note 13) . . . . . . . . | 18 | 19 |
| Noncash contribution of pension-related assets (Note 13) . . . . . . . . . . . | — | 15 |
| Balance at end of period (number of shares outstanding: October 10, 2007 — 0; 2006 and 2005 — 48,864,775) . . . . . . . . . . . . . . | 2,004 | 1,986 |
| Retained earnings: | | |
| Balance at beginning of period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,008 | 1,004 |
| Net income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 263 | 344 |
| Dividends to parent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (326) | (340) |
| Effect of adoption of FIN 48 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (9) | — |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | — |
| Balance at end of period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 937 | 1,008 |
| Accumulated other comprehensive (loss), net of tax effects: | | |
| Balance at beginning of period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (19) | (21) |
| Net effects of cash flow hedges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | 2 |
| Balance at end of period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (18) | (19) |
| Total shareholder's equity at end of period . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,923 | $2,975 |

See Notes to Financial Statements.

F-12

Confidential

ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC (SUCCESSOR) AND
ONCOR ELECTRIC DELIVERY COMPANY LLC (PREDECESSOR)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 1.  SIGNIFICANT ACCOUNTING POLICIES

### Description of Business

Oncor Holdings is a Dallas, Texas-based holding company whose financial statements reflect almost entirely the operations of its direct, majority (approximately 80%) owned subsidiary, Oncor. Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell power in the north-central, eastern and western parts of Texas. Distribution revenues from TCEH represented 39% of total revenues for the year ended December 31, 2008. Oncor Holdings is a direct, wholly-owned subsidiary of Intermediate Holding, a direct, wholly-owned subsidiary of EFH Corp. With the closing of the Merger on October 10, 2007, EFH Corp. became a subsidiary of Texas Holdings, which is controlled by the Sponsor Group.

References in this report to Oncor Holdings are to Oncor Holdings and/or its direct or indirect subsidiaries as apparent in the context. See "Glossary" for definition of terms and abbreviations.

Oncor Holdings' consolidated financial statements include its indirect, bankruptcy-remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC. This financing subsidiary was organized for the limited purpose of issuing specified transition bonds in 2003 and 2004. Oncor Electric Delivery Transition Bond Company LLC issued $1.3 billion principal amount of securitization (transition) bonds to recover generation-related regulatory asset stranded costs and other qualified costs under an order issued by the PUCT in 2002.

Various "ring-fencing" measures have been taken, in connection with the Merger, to enhance credit quality of Oncor Holdings and Oncor. Such measures include, among other things: Oncor Holdings' sale of a 19.75% equity interest in Oncor to Texas Transmission; TXU Electric Delivery Company's name change to Oncor Electric Delivery Company; the formation of a new special purpose holding company for Oncor, Oncor Holdings, as one of the Oncor Ring-Fenced Entities; the conversion of Oncor from a corporation to a limited liability company; maintenance of separate books and records for the Oncor Ring-Fenced Entities; changes to Oncor's corporate governance provisions; Oncor's board of directors being comprised of a majority of independent directors; physical separation of Oncor's headquarters from Luminant and TXU Energy; amendments to contracts between the Oncor Ring-Fenced Entities and the Texas Holdings Group, and prohibitions on the Oncor Ring-Fenced Entities' providing credit support to, or receiving credit support from, any member of the Texas Holdings Group. The assets and liabilities of the Oncor Ring-Fenced Entities are separate and distinct from those of the Texas Holdings Group, including TXU Energy and Luminant, and none of the assets of the Oncor Ring-Fenced Entities are available to satisfy the debt or other obligations of any member of the Texas Holdings Group. Moreover, Oncor Holdings' operations are conducted, and its cash flows managed, independently from the Texas Holdings Group.

Oncor Holdings' financial statements reflect almost entirely the operations of Oncor; consequently, there are no separate reportable business segments.

See Note 14 for discussion of noncontrolling interests sold by Oncor in November 2008.

### Basis of Presentation

The consolidated financial statements of Oncor Holdings have been prepared in accordance with US GAAP. The accompanying consolidated statements of income (loss), comprehensive income (loss) and cash flows present results of operations and cash flows of Oncor Holdings for periods subsequent to the Merger (Successor)

F-13

EFIHMW00151988

and of Oncor for periods preceding the Merger (Predecessor), since Oncor Holdings did not exist prior to the Merger. The consolidated financial statements of the Successor reflect the application of purchase accounting in accordance with the provisions of SFAS 141 and the adoption of SFAS 160 as discussed in "Changes in Accounting Standards" below. Adoption of SFAS 160 did not affect the periods prior to 2008 as there were no noncontrolling interests in those periods. All intercompany items and transactions have been eliminated in consolidation. All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated.

### Income Taxes

EFH Corp. files a consolidated federal income tax return, and federal income taxes were allocated to subsidiaries, including Oncor Holdings and Oncor, based on their respective taxable income or loss. Effective with the sale of noncontrolling interests in Oncor (see Note 14), Oncor became a partnership for US federal income tax purposes, and subsequently EFH Corp.'s share of partnership income is included in its consolidated federal income tax return. In connection with the Merger, Oncor, Oncor Holdings and EFH Corp. entered into a tax sharing agreement (amended in November 2008 to include Texas Transmission and Investment LLC), that is retroactive to January 1, 2007. The tax sharing agreement provides for the allocation of tax liability to each of Oncor Holdings and Oncor substantially as if these entities filed their own income tax returns and requires tax payments to EFH Corp. and noncontrolling interest holders determined on that basis (without duplication for any income taxes paid by a subsidiary of Oncor Holdings). Deferred income taxes are provided for temporary differences between the book and tax bases of assets and liabilities of Oncor Holdings, which primarily relate to the difference between the book and tax basis of the investment in Oncor.

Amounts of deferred income tax assets and liabilities, as well as current and noncurrent accruals, are determined in accordance with the provisions of SFAS 109 and FIN 48. See Note 7 for additional detail.

Prior to 2007, Oncor generally accounted for uncertainty related to positions taken on tax returns based on the probable liability approach consistent with SFAS 5. Effective January 1, 2007, Oncor Holdings adopted FIN 48 as discussed in Note 6.

### Use of Estimates

Preparation of Oncor Holdings' financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including fair value measurements. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information. No material adjustments, other than those disclosed elsewhere herein, were made to previous estimates or assumptions during the current year.

### Purchase Accounting

The Merger has been accounted for under purchase accounting, whereby the total purchase price of the transaction was allocated to EFH Corp.'s identifiable tangible and intangible assets acquired and liabilities assumed based on their fair values, and the excess of the purchase price over the fair value of net assets acquired was recorded as goodwill. The allocation resulted in a significant amount of goodwill, a portion of which was assigned to Oncor Holdings. See Note 2 for details regarding the effect of purchase accounting.

### Derivative Instruments and Mark-to-Market Accounting

Oncor has from time-to-time entered into derivative instruments, referred to as interest rate swaps, to hedge interest rate risk. If the instrument meets the definition of a derivative under SFAS 133, the fair value of each derivative is required to be recognized on the balance sheet as a derivative asset or liability and changes in the

F-14

Confidential

fair value recognized in net income, unless criteria for certain exceptions are met. This recognition is referred to as "mark-to-market" accounting. Under the exception criteria of SFAS 133, derivatives may be designated as cash flow or fair value hedges.

Because derivative instruments are frequently used as economic hedges, SFAS 133 allows the designation of such instruments as cash flow or fair value hedges provided certain conditions are met. A cash flow hedge mitigates the risk associated with the variability of the future cash flows related to an asset or liability (e.g., debt with variable interest rate payments), while a fair value hedge mitigates risk associated with fixed future cash flows (e.g., debt with fixed interest rate payments). In accounting for cash flow hedges, derivative assets and liabilities are recorded on the balance sheet at fair value with an offset to other comprehensive income to the extent the hedges are effective. Amounts remain in accumulated other comprehensive income, unless the underlying transactions become probable of not occurring, and are reclassified into net income as the related transactions (hedged items) settle and affect net income. Fair value hedges are recorded as derivative assets or liabilities with an offset to net income, and the carrying value of the related asset or liability (hedged item) is adjusted for changes in fair value with an offset to net income. If the fair value hedge is settled prior to the maturity of the hedged item, the cumulative fair value gain or loss associated with the hedge is amortized into income over the remaining life of the hedged item. To qualify for hedge accounting, a hedge must be considered highly effective in offsetting changes in fair value of the hedged item. Assessment of the hedge's effectiveness is tested at least quarterly throughout its term to continue to qualify for hedge accounting. Hedge ineffectiveness, even if the hedge continues to be assessed as effective, is immediately recognized in net income. Ineffectiveness is generally measured as the cumulative excess, if any, of the change in value of the hedging instrument over the change in value of the hedged item.

### Revenue Recognition

Revenues from delivery services are recorded under the accrual method of accounting. Revenues are recognized when delivery services are provided to customers on the basis of periodic cycle meter readings and include an estimate for revenues earned from the meter reading date to the end of the period with an adjustment for the impact of weather and other factors on unmetered deliveries (unbilled revenue).

### Impairment of Goodwill and Other Intangible Assets

Oncor Holdings evaluates goodwill for impairment at least annually (as of October 1) in accordance with SFAS 142. The impairment tests performed are based on determinations of enterprise value using discounted cash flow analyses, comparable company equity values and any relevant transactions indicative of enterprise values. See Note 20 for details of goodwill and other intangible assets and Note 3 for discussion of a goodwill impairment charge recorded in 2008.

### System of Accounts

The accounting records of Oncor Holdings have been maintained in accordance with the FERC Uniform System of Accounts as adopted by the PUCT.

### Defined Benefit Pension Plans and Other Postretirement Employee Benefit (OPEB) Plans

Subsidiaries of Oncor Holdings participate in an EFH Corp. pension plan that offers benefits based on either a traditional defined benefit formula or a cash balance formula and an OPEB plan that offers certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from subsidiaries of Oncor Holdings. Costs of pension and OPEB plans are determined in accordance with SFAS 87 and SFAS 106 and are dependent upon numerous factors, assumptions and estimates. Effective December 31, 2006, Oncor adopted SFAS 158. See Note 17 for additional information regarding pension and OPEB plans.

F-15

### Stock-Based Incentive Compensation

Prior to the Merger, EFH Corp. provided discretionary awards payable in its common stock to qualified managerial employees of Oncor under EFH Corp.'s shareholder-approved long-term incentive plans. Oncor recognized expense for these awards based on the provisions of SFAS 123(R), which provides for the recognition of stock-based compensation expense over the vesting period based on the grant-date fair value of those awards. In November 2008, Oncor implemented a SARs Plan for certain management that purchased equity interests in Oncor indirectly by investing in Investment LLC. SARs have been awarded under the plan and are being accounted for based upon the provisions of SFAS 123(R). See Note 18 for information regarding stock-based compensation.

### Fair Value of Nonderivative Financial Instruments

The carrying amounts for financial assets classified as current assets and the carrying amounts for financial liabilities classified as current liabilities approximate fair value due to the short maturity of such instruments. The fair values of other financial instruments, for which carrying amounts and fair values have not been presented, are not materially different than their related carrying amounts.

### Franchise Taxes

Franchise taxes are assessed to Oncor by local governmental bodies, based on kWh delivered and are the principal component of "taxes other than amounts related to income taxes" as reported in the income statement. Franchise taxes are not a "pass through" item. Rates charged to customers by Oncor are intended to recover the taxes, but Oncor is not acting as an agent to collect the taxes from customers.

### Cash and Cash Equivalents

For purposes of reporting cash and cash equivalents, temporary cash investments purchased with a remaining maturity of three months or less are considered to be cash equivalents. See Note 15 for details regarding restricted cash.

### Property, Plant and Equipment

Properties are stated at original cost. The cost of self-constructed property additions includes materials and both direct and indirect labor and applicable overhead and an allowance for funds used during construction.

Depreciation of property, plant and equipment is calculated on a straight-line basis over the estimated service lives of the properties based on depreciation rates approved by the PUCT. Depreciation rates include plant removal costs as a component of depreciation expense, consistent with regulatory treatment. As is common in the industry, depreciation expense is recorded using composite depreciation rates that reflect blended estimates of the lives of major asset components as compared to depreciation expense calculated on an asset-by-asset basis.

### Allowance For Funds Used During Construction (AFUDC)

AFUDC is a regulatory cost accounting procedure whereby both interest charges on borrowed funds and a return on equity capital used to finance construction are included in the recorded cost of utility plant and equipment being constructed. AFUDC is capitalized on all projects involving construction periods lasting greater than thirty days. The equity portion of capitalized AFUDC is accounted for as other income. See Note 20 for detail of amounts charged to interest expense; there was no equity AFUDC in the years presented.

### Regulatory Assets and Liabilities

The financial statements of Oncor Holdings reflect regulatory assets and liabilities under cost-based rate regulation in accordance with SFAS 71. The assumptions and judgments used by regulatory authorities continue to have an impact on the recovery of costs, the rate earned on invested capital and the timing and amount of assets to be recovered by rates. See Note 8 for details of regulatory assets and liabilities.

F-16

EFIHMW00151991
**PX 022
Page 172 of 218**

*Sale of Noncontrolling Interests*

See Note 14 for discussion of accounting for the sale of noncontrolling interests by Oncor.

*Changes in Accounting Standards*

In December 2007, the FASB issued SFAS 160, "Noncontrolling Interests in Consolidated Financial Statements — an amendment of ARB No. 51." SFAS 160 was effective for fiscal years beginning on or after December 15, 2008 and requires noncontrolling interests in subsidiaries initially to be measured at fair value and classified as a separate component of equity. In accordance with the retrospective reporting requirements of SFAS 160, the financial statements present the noncontrolling interests created as a result of Oncor's November 2008 sale of equity interests (totaling $1.355 billion at December 31, 2008) as a separate component of equity in the balance sheet, consolidated net loss for the year ended December 31, 2008 reflects the net loss attributable to the noncontrolling interests (totaling $160 million) as a line item below net loss and the net proceeds received from Oncor's sale of the noncontrolling interests are reflected in the statement of consolidated cash flows as a financing activity.

In December 2008, the FASB issued FSP SFAS 132(R)-1, "Employers' Disclosures about Postretirement Benefit Plan Assets." This FSP amends SFAS 132(R) to provide enhanced disclosures regarding how investment allocation decisions are made and certain aspects of fair value measurements on plan assets. The disclosures required by this FSP are intended to provide transparency related to the types of assets and associated risks in an employer's defined benefit pension or other postretirement employee benefits plan and events in the economy and markets that could have a significant effect on the value of plan assets. This FSP is effective for fiscal years ending after December 15, 2009. As the FSP provides only disclosure requirements, the adoption of this FSP will not have any effect on Oncor Holdings' reported results of operations, financial condition or cash flows. Oncor Holdings is evaluating the impact of this FSP on its financial statement disclosures.

In May 2009, the FASB issued SFAS 165, "Subsequent Events," which requires disclosure of the date through which Oncor Holdings has evaluated subsequent events related to the financial statements being issued and the basis for that date (either the date the financial statements were issued or the date they were available to be issued). SFAS 165 is effective for interim and annual reporting periods ending after June 15, 2009. The adoption of this rule for the second quarter 2009 financial statements will not affect reported results of operations, financial condition or cash flows.

In June 2009, the FASB issued SFAS 168, "The *FASB Accounting Standards Codification™* and the Hierarchy of Generally Accepted Accounting Principles," which establishes the *FASB Accounting Standards Codification™* (Codification) as the source of authoritative US GAAP recognized by the FASB to be applied to nongovernmental entities. Rules and interpretive releases of the SEC under authority of federal securities laws are also included in the Codification as sources of authoritative US GAAP for SEC registrants. SFAS 168 and the Codification are effective for financial statements issued for interim and annual periods ending after September 15, 2009. The adoption of this rule will not affect reported results of operations, financial condition or cash flows. Oncor Holdings will implement SFAS 168 in the third quarter 2009 by updating the previous FASB references to the Codification.

## 2.    FINANCIAL STATEMENT EFFECTS OF THE MERGER

EFH Corp. accounted for the Merger under purchase accounting in accordance with the provisions of SFAS 141, whereby the total purchase price of the transaction was allocated to EFH Corp.'s identifiable tangible and intangible assets acquired and liabilities assumed based on their fair values as of October 10, 2007. As a result of cost-based regulatory rate-setting processes, the book value of the majority of Oncor's assets and liabilities effectively represents fair value, and no adjustments to the carrying value of those regulated assets or liabilities were recorded. The excess of the purchase price over the fair value of net assets acquired was recorded as goodwill. The purchase price was allocated to TCEH and Oncor. The purchase price amount assigned to Oncor

Confidential

Holdings was based on the relative enterprise value of the business on the closing date of the Merger and resulted in an excess of purchase price over fair value of assets and liabilities of $4.9 billion, which was recorded as goodwill. See Note 20 for disclosures related to goodwill and Note 3 regarding an impairment charge recorded in the fourth quarter of 2008.

The following table summarizes the final purchase price allocation to the estimated fair values of the assets acquired and liabilities assumed (billions of dollars):

| | | |
|---|---:|---:|
| Purchase price assigned to Oncor Holdings | | $7.6 |
| Property, plant and equipment | 7.9 | |
| Regulatory assets — net | 1.3 | |
| Other assets | 1.3 | |
| Total assets acquired | 10.5 | |
| Short-term borrowings and long-term debt | 5.1 | |
| Deferred income tax liabilities | 1.3 | |
| Other liabilities | 1.4 | |
| Total liabilities assumed | 7.8 | |
| Net identifiable assets acquired. | | 2.7 |
| Goodwill. | | $4.9 |

As part of purchase accounting, the carrying value of certain generation-related regulatory assets securitized by transition bonds, which have been reviewed and approved by the PUCT for recovery but without earning a rate of return, was reduced by $213 million. This amount will be accreted to other income over the recovery period remaining as of the closing date of the Merger (approximately nine years). The related securitization (transition) bonds were also fair valued and the resulting discount of $12 million will be amortized to interest expense over the life of the bonds remaining as of the closing date of the Merger (approximately nine years).

The final purchase price allocation includes $16 million in liabilities recorded in connection with the notice of termination of outsourcing arrangements with Capgemini under the change of control provisions of such arrangements (also see Note 16). This amount represents estimated incremental costs to exit and transition the services under the arrangements and is expected to be settled no later than June 30, 2010, the targeted date of completion of transition of outsourced activities back to Oncor or to service providers.

## 3.    GOODWILL IMPAIRMENT

In the fourth quarter of 2008, Oncor Holdings recorded a goodwill impairment charge totaling $860 million, which is not deductible for income tax-related purposes.

Although the annual goodwill impairment test date set by management is October 1, management determined that in consideration of the continuing deterioration of securities values during the fourth quarter of 2008, an impairment testing trigger occurred subsequent to that test date; consequently, the impairment charge is based on estimated fair values at December 31, 2008.

The impairment determination involves significant assumptions and judgments in estimating enterprise values and the fair values of assets and liabilities. The impairment primarily arises from the dislocation in the capital markets that has increased interest rate spreads and the resulting discount rates used in estimating fair values and the effect of recent declines in market values of debt and equity securities of comparable companies.

F-18

EFIHMW00151993

**PX 022**
**Page 174 of 218**

4.    **STIPULATION APPROVED BY THE PUCT**

Oncor and Texas Holdings agreed to the terms of a stipulation, which was conditional upon completion of the Merger, with major interested parties to resolve all outstanding issues in the PUCT review related to the Merger. In February 2008, the PUCT entered an order approving the stipulation. The PUCT issued a final order on rehearing in April 2008 that has been appealed to District Court.

In addition to commitments Oncor made in its filings in the PUCT review, the stipulation included the following provisions, among others:

- Oncor provided a one-time $72 million refund to its REP customers in the September 2008 billing cycle. The refund was in the form of a credit on distribution fee billings. The liability for the refund was recorded as part of purchase accounting.

- Consistent with the 2006 cities rate settlement (see Note 5), Oncor filed a system-wide rate case in June 2008 based on a test-year ended December 31, 2007.

- Oncor agreed not to request recovery of approximately $56 million of regulatory assets related to self-insurance reserve costs and 2002 restructuring expenses. These regulatory assets were eliminated as part of purchase accounting.

- The dividends paid by Oncor will be limited through December 31, 2012, to an amount not to exceed Oncor's net income (determined in accordance with GAAP, subject to certain defined adjustments) for the period beginning October 11, 2007 and ending December 31, 2012 and are further limited by an agreement that Oncor's regulatory capital structure, as determined by the PUCT, will be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.

- Oncor committed to minimum capital spending of $3.6 billion over the five-year period ending December 31, 2012, subject to certain defined conditions.

- Oncor committed to an additional $100 million in spending over the five-year period ending December 31, 2012 on demand-side management or other energy efficiency initiatives. These additional expenditures will not be recoverable in rates, and this amount was recorded as a regulatory liability as part of purchase accounting and consistent with SFAS 71.

- If Oncor's credit rating is below investment grade with two or more rating agencies, TCEH will post a letter of credit in an amount of $170 million to secure TXU Energy's payment obligations to Oncor.

- Oncor agreed not to request recovery of the $4.9 billion of goodwill resulting from purchase accounting or any future impairment of the goodwill in its rates.

5.    **CITIES RATE SETTLEMENT IN 2006**

In January 2006, Oncor agreed with a steering committee representing 108 cities in Texas (Cities) to defer the filing of a system-wide rate case with the PUCT to no later than July 1, 2008 (based on a test year ending December 31, 2007). Oncor filed the rate case with the PUCT in June 2008. Oncor extended the benefits of the agreement to 292 nonlitigant cities. The agreements provided that Oncor would make payments to participating cities totaling approximately $70 million, including incremental franchise taxes.

This amount was recognized in earnings over the period from May 2006 through June 2008. Amounts recognized totaled $23 million in 2008, $8 million for the period October 11, 2007 through December 31, 2007, $25 million for the period January 1, 2007 through October 10, 2007 and $18 million in 2006, of which $13 million, $6 million, $20 million and $13 million, respectively, is reported in other deductions (see Note 20), and the remainder as taxes other than income taxes.

F-19

Confidential

6.    **ACCOUNTING FOR UNCERTAINTY IN INCOME TAXES (FIN 48)**

Effective January 1, 2007, EFH Corp. and its subsidiaries adopted FIN 48. FIN 48 requires that each tax position be reviewed and assessed with recognition and measurement of the tax benefit based on a "more-likely-than-not" standard with respect to the ultimate outcome, regardless of whether this assessment is favorable or unfavorable. Oncor Holdings applied FSP FIN 48-1 to determine if each tax position was effectively settled for the purpose of recognizing previously uncertain tax positions. Oncor Holdings completed its review and assessment of uncertain tax positions and in 2007 recorded a net charge to retained earnings and an increase to noncurrent liabilities of $9 million in accordance with the new accounting rule.

EFH Corp. and its subsidiaries file income tax returns in US federal, state and foreign jurisdictions and are subject to examinations by the IRS and other taxing authorities. Examinations of income tax returns filed by EFH Corp. and any of its subsidiaries for the years ending prior to January 1, 2003 are complete. In the fourth quarter 2008, EFH Corp. was notified of the commencement of the IRS audit of tax years 2003 to 2006. The audit is expected to require two years to complete. Texas franchise tax return periods under examination or still open for examination range from 2003 to 2007.

Oncor Holdings classifies interest and penalties expense related to uncertain tax positions as income tax expense. The amount of interest and penalties included in income tax expense totaled $6 million in 2008, $2 million for the period October 11, 2007 through December 31, 2007 and $3 million for the period January 1, 2007 through October 10, 2007. Noncurrent liabilities included a total of $22 million and $12 million in accrued interest at December 31, 2008 and 2007, respectively. These interest amounts are after-tax.

The following table summarizes the changes to the uncertain tax positions, reported in other noncurrent liabilities in the consolidated balance sheet, during the years ended December 31, 2008 and 2007:

|  | 2008 | 2007 |
|---|---|---|
| Balance at January 1, excluding interest and penalties . . . . . . . . . . . . . . . . . | $111 | $ 80 |
| Additions based on tax positions related to prior years . . . . . . . . . . . . . . . . | 41 | 38 |
| Reductions based on tax positions related to prior years . . . . . . . . . . . . . . . | (30) | (15) |
| Additions based on tax positions related to the current year . . . . . . . . . . . . | — | 8 |
| Balance at December 31, excluding interest and penalties . . . . . . . . . . . . . . | $122 | $111 |

Of the balance at December 31, 2008, $100 million represents tax positions for which the uncertainty relates to the timing of recognition for tax purposes. The disallowance of such positions would not affect the effective tax rate, but would accelerate the payment of cash under the tax sharing agreement to an earlier period.

With respect to tax positions for which the ultimate deductibility is uncertain (permanent items), should EFH Corp. sustain such positions on income tax returns previously filed, Oncor Holdings' liabilities recorded would be reduced by $22 million, resulting in increased net income and a favorable impact on the effective tax rate.

Oncor Holdings does not expect that the total amount of liabilities recorded related to uncertain tax positions will significantly increase or decrease within the next 12 months.

F-20

EFIHMW00151995

7. **INCOME TAXES**

The components of Oncor Holdings' income tax expense are as follows:

| | Successor | | Predecessor | |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
|---|---|---|---|---|
| Reported in operating expenses | | | | |
| Current: | | | | |
| US federal | $ 37 | $(46) | $116 | $127 |
| State | 17 | — | 12 | 6 |
| Deferred: | | | | |
| US federal | 142 | 74 | 26 | 28 |
| State | — | (2) | — | — |
| Amortization of investment tax credits | (5) | (1) | (4) | (5) |
| Total | 191 | 25 | 150 | 156 |
| Reported in other income and deductions: | | | | |
| Current: | | | | |
| US federal | 8 | 7 | 8 | 18 |
| State | 1 | — | 1 | (3) |
| Deferred federal | 17 | (1) | — | (1) |
| Total | 26 | 6 | 9 | 14 |
| Total income tax expense | $217 | $ 31 | $159 | $170 |

Reconciliation of income taxes computed at the US federal statutory rate to income tax expense:

| | Successor | | Predecessor | |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
|---|---|---|---|---|
| Income (loss) before income taxes | $(266) | $ 95 | $ 422 | $ 514 |
| Income taxes at the US federal statutory rate of 35% | $ (93) | $ 33 | $ 148 | $ 180 |
| Goodwill impairment | 301 | — | — | — |
| Amortization of investment tax credits — net of deferred tax effect | (5) | (1) | (4) | (5) |
| Amortization (under regulatory accounting) of statutory tax rate changes | (3) | (1) | (3) | (7) |
| State income taxes, net of federal tax benefit | 11 | (1) | 8 | 4 |
| Medicare subsidy | (5) | (2) | (5) | (6) |
| Nondeductible losses (gains) on employee benefit plan investments | 4 | — | (2) | (2) |
| Other, including audit settlements | 7 | 3 | 17 | 6 |
| Income tax expense | $ 217 | $ 31 | $ 159 | $ 170 |
| Effective rate | — | 32.6% | 37.7% | 33.1% |

F-21

Confidential

EFIHMW00151996

Deferred income taxes provided for temporary differences based on tax laws in effect at the December 31, 2008 and 2007 balance sheet dates are as follows:

| | Successor | | | | | |
| | December 31, 2008 | | | December 31, 2007 | | |
| | Total | Current | Noncurrent | Total | Current | Noncurrent |
|---|---|---|---|---|---|---|
| **Deferred Income Tax Assets** | | | | | | |
| Alternative minimum tax credit carryforwards ..................... | $ 54 | $ 54 | $ — | $ 65 | $ 35 | $ 30 |
| Employee benefit liabilities ............... | — | — | — | 328 | 7 | 321 |
| Regulatory liabilities ..................... | — | — | — | 111 | — | 111 |
| Other ................................... | — | — | — | 7 | 3 | 4 |
| Total ............................ | 54 | 54 | — | 511 | 45 | 466 |
| **Deferred Income Tax Liabilities** | | | | | | |
| Basis difference in Oncor partnership ...... | 1,192 | — | 1,192 | — | — | — |
| Property, plant and equipment ............ | — | — | — | 1,138 | — | 1,138 |
| Regulatory assets ........................ | — | — | — | 680 | — | 680 |
| Other ................................... | — | — | — | 2 | — | 2 |
| Total ............................ | 1,192 | — | 1,192 | 1,820 | — | 1,820 |
| **Net Deferred Income Tax (Asset) Liability** ........................... | $1,138 | $(54) | $1,192 | $1,309 | $(45) | $1,354 |

At December 31, 2008, Oncor Holdings had $54 million of alternative minimum tax (AMT) credit carryforwards available to offset future tax sharing payments. The AMT credit carryforwards have no expiration date.

The component of deferred income tax liabilities referred to as "basis difference in Oncor partnership" arose as a result of the noncontrolling interests sale (see Note 14) at which time Oncor became a partnership for US federal income tax purposes. The amount of this basis difference at the date of the transaction represented Oncor Holdings' interest (approximately 80%) in the net deferred tax liabilities related to Oncor's individual operating assets and liabilities. The remaining net deferred tax liabilities associated with Oncor ($299 million at December 31, 2008) that are attributable to the noncontrolling interests have been reclassified as other noncurrent liabilities.

See Note 6 for discussion regarding accounting for uncertain tax positions (FIN 48).

F-22

EFIHMW00151997

## 8.  REGULATORY ASSETS AND LIABILITIES

|  | Successor | |
| --- | --- | --- |
|  | December 31, | |
|  | 2008 | 2007 |
| **Regulatory assets** | | |
| Generation-related regulatory assets securitized by transition bonds | $ 865 | $ 967 |
| Employee retirement costs | 659 | 265 |
| Self-insurance reserve (primarily storm recovery costs) | 214 | 149 |
| Nuclear decommissioning cost under-recovery | 127 | — |
| Securities reacquisition costs | 97 | 105 |
| Recoverable deferred income taxes — net | 77 | 84 |
| Employee severance costs | 20 | 20 |
| Other | 12 | 3 |
| Total regulatory assets | 2,071 | 1,593 |
| **Regulatory liabilities** | | |
| Committed spending for demand-side management initiatives | 96 | 100 |
| Investment tax credit and protected excess deferred taxes | 49 | 55 |
| Over-collection of securitization (transition) bond revenues | 28 | 34 |
| Credit due REPs under PUCT stipulation | — | 72 |
| Nuclear decommissioning cost over-recovery | — | 13 |
| Other regulatory liabilities | 6 | 14 |
| Total regulatory liabilities | 179 | 288 |
| Net regulatory assets | $1,892 | $1,305 |

Regulatory assets that have been reviewed and approved by the PUCT and are not earning a return totaled $1.021 billion and $997 million at December 31, 2008 and 2007, respectively, including the generation-related regulatory assets securitized by transition bonds that have a remaining recovery period of approximately eight years. See Note 4 for discussion of effects on regulatory assets and liabilities of the stipulation approved by the PUCT.

As of December 31, 2008, regulatory assets totaling $913 million have not been reviewed by the PUCT but are deemed by management to be probable of recovery.

On August 13, 2009, the PUCT voted on Oncor's rate review filed in June 2008. A final order was signed August 31, 2009. The PUCT's findings included denial of recovery of $25 million of certain regulatory assets, which will result in a $16 million after-tax loss being recognized in the third quarter 2009.

See Note 19 for additional information regarding nuclear decommissioning cost recovery.

## 9.  TRADE ACCOUNTS RECEIVABLE AND SALE OF RECEIVABLES PROGRAM

*Trade Accounts Receivable*

|  | Successor | |
| --- | --- | --- |
|  | December 31, | |
|  | 2008 | 2007 |
| Gross trade accounts receivable | $ 359 | $ 361 |
| Trade accounts receivable from TCEH | (135) | (147) |
| Allowance for uncollectible accounts | (7) | (6) |
| Trade accounts receivable from nonaffiliates — net | $ 217 | $ 208 |

F-23

EFIHMW00151998

Gross trade accounts receivable at December 31, 2008 and 2007 included unbilled revenues of $140 million and $137 million, respectively.

### Sale of Receivables

Prior to the Merger, Oncor participated in an accounts receivable securitization program established by EFH Corp. for certain of its subsidiaries, the activity under which was accounted for as a sale of accounts receivable in accordance with SFAS 140. Under the program, Oncor sold trade accounts receivable to TXU Receivables Company, a consolidated wholly-owned bankruptcy-remote direct subsidiary of EFH Corp., which sold undivided interests in those purchased accounts receivable for cash to special purpose entities established by financial institutions (the funding entities). In connection with the Merger, the accounts receivable securitization program was amended. Concurrently, the financial institutions required that Oncor repurchase all of the receivables it had previously sold to TXU Receivables Company, which totaled $254 million. Oncor funded such repurchases through borrowings under its credit facility of $113 million, and the related subordinated note receivable from TXU Receivables Company in the amount of $141 million was canceled. Oncor is no longer a participant in the accounts receivable securitization program.

Under the program, new trade receivables generated by Oncor were continuously purchased by TXU Receivables Company with the proceeds from collections of receivables previously purchased. Changes in the amount of funding under the program, through changes in the amount of undivided interests sold by TXU Receivables Company, reflected seasonal variations in the level of accounts receivable, changes in collection trends as well as other factors such as changes in delivery fees and volumes. TXU Receivables Company issued subordinated notes payable to Oncor for the difference between the face amount of the uncollected accounts receivable purchased, less a discount, and cash paid to Oncor that was funded by the sale of the undivided interests.

The discount from face amount on the purchase of receivables principally funded program fees paid by TXU Receivables Company to the funding entities. The discount also funded a servicing fee paid by TXU Receivables Company to EFH Corporate Services Company, a direct subsidiary of EFH Corp., but the amounts were immaterial. The program fees, referred to as losses on sale of the receivables under SFAS 140, consisted primarily of interest costs on the underlying financing. These fees represented essentially all of the net incremental costs of the program to Oncor and were reported in operation and maintenance expenses. Fee amounts were as follows:

|  | Predecessor | |
| --- | --- | --- |
|  | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Program fees ................................... | $ 6 | $ 6 |
| Program fees as a percentage of average funding (annualized) ................................... | 6.4% | 5.8% |

Funding under the program decreased $86 million to zero in 2007 with Oncor's exit from the program and decreased $3 million to $86 million in 2006. Funding increases or decreases under the program were reflected as operating cash flow activity in the statement of cash flows. The carrying amount of the retained interests in the accounts receivable balance approximated fair value due to the short-term nature of the collection period.

F-24

EFIHMW00151999

Activities of TXU Receivables Company related to Oncor in 2007 and 2006 were as follows:

| | Successor(a) | Predecessor | |
| --- | --- | --- | --- |
| | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Cash collections on accounts receivable ..................... | $— | $ 1,082 | $ 1,229 |
| Face amount of new receivables purchased .................. | — | (1,156) | (1,231) |
| Discount from face amount of purchased receivables .......... | — | 5 | 6 |
| Program fees paid ....................................... | — | (6) | (6) |
| Increase in subordinated notes payable ..................... | — | 48 | 5 |
| Repurchase of receivables previously sold .................. | 113 | — | — |
| Operating cash flows used by (provided to) Oncor under the program ......................................... | $113 | $ (27) | $ 3 |

(a)   Represents final activities related to Oncor's exit from the sale of receivables program.

## 10.  SHORT-TERM FINANCING

At December 31, 2008, Oncor had a $2.0 billion credit facility, expiring October 10, 2013, to be used for its working capital and general corporate purposes, including issuances of commercial paper and letters of credit. Oncor may request increases in the commitments under the facility in any amount up to $500 million, subject to the satisfaction of certain conditions. This facility is a revolving credit facility, which means that amounts borrowed under the facility, once repaid, can be borrowed again by Oncor from time to time. Borrowings are classified as short-term on the balance sheet. In May 2008, Oncor secured this credit facility with a first priority lien on certain of its transmission and distribution assets. Oncor also secured all of its existing long-term debt securities (excluding the transition bonds) with the same lien in accordance with the terms of those securities. The lien contains customary provisions allowing Oncor to use the assets in its business, as well as to replace and/ or release collateral as long as the market value of the aggregate collateral is at least 115% of the aggregate secured debt. The lien may be terminated at Oncor's option upon the termination of Oncor's current credit facility.

At December 31, 2008, Oncor had outstanding borrowings under its credit facility totaling $337 million ($350 million requested draws less $13 million of draws not funded) with an interest rate of 1.98% at the end of the period. At December 31, 2007, Oncor had outstanding borrowings under its credit facility totaling $1.280 billion with an interest rate of 5.70% at the end of the period. The decrease in borrowings was driven by use of the majority of the proceeds from the issuance in September 2008 of $1.5 billion of senior secured notes (as described in Note 11) to repay short-term borrowings, partially offset by funding of ongoing capital investments including the acquisition of broadband over powerline based "Smart Grid" network assets. Availability under the credit facility as of December 31, 2008 was $1.508 billion, which excludes $155 million of undrawn commitments from a subsidiary of Lehman Brothers Holding Inc. (such subsidiary, Lehman) that has filed for bankruptcy under Chapter 11 of the US Bankruptcy Code. In April 2009, a portion of the Lehman commitment was purchased by another entity unrelated to Lehman, effectively increasing availability by $32 million.

Under the terms of Oncor's revolving credit facility, the commitments of the lenders to make loans to Oncor are several and not joint. Accordingly, if any lender fails to make loans to Oncor, Oncor's available liquidity could be reduced by an amount up to the aggregate amount of such lender's commitments under the facility.

Borrowings under this credit facility bear interest at per annum rates equal to, at Oncor's option, (i) adjusted LIBOR plus a spread of 0.275% to 0.800% (depending on the rating assigned to Oncor's senior secured debt) or (ii) a base rate (the higher of (1) the prime rate of JPMorgan Chase Bank, N.A. and (2) the federal funds effective

Confidential

rate plus 0.50%). Under option (i) and based on Oncor's ratings as of December 31, 2008, its LIBOR-based borrowings, which apply to all outstanding borrowings at December 31, 2008, bear interest at LIBOR plus 0.425%.

A facility fee is payable at a rate per annum equal to 0.100% to 0.200% (depending on the rating assigned to Oncor's senior secured debt) of the commitments under the facility. Based on Oncor's ratings as of December 31, 2008, its facility fee is 0.150%. A utilization fee is payable on the average daily amount of borrowings in excess of 50% of the commitments under the facility at a rate per annum equal to 0.125% per annum. The interest rate and facility fee rate per annum declined in June 2009 to LIBOR plus 0.350% and 0.125%, respectively, due to a two notch upgrade in Oncor's credit ratings by Moody's.

The credit facility contains customary covenants for facilities of this type, restricting, subject to certain exceptions, Oncor and its subsidiary from, among other things:

- incurring additional liens;

- entering into mergers and consolidations;

- selling certain assets, and

- making acquisitions and investments in subsidiaries.

In addition, the credit facility requires that Oncor maintain a consolidated senior debt-to-capitalization ratio of no greater than 0.65 to 1.00 and observe certain customary reporting requirements and other affirmative covenants.

The credit facility contains certain customary events of default for facilities of this type, the occurrence of which would allow the lenders to accelerate all outstanding loans and terminate their commitments under the facility.

F-26

Confidential

## 11. LONG-TERM DEBT

At December 31, 2008 and 2007, the long-term debt of Oncor Holdings consisted of the following:

|  | Successor December 31, | |
|  | 2008 | 2007 |
|---|---|---|
| Oncor(a): | | |
| 6.375% Fixed Senior Notes due May 1, 2012 | $ 700 | $ 700 |
| 5.950% Fixed Senior Notes due September 1, 2013 | 650 | — |
| 6.375% Fixed Senior Notes due January 15, 2015 | 500 | 500 |
| 6.800% Fixed Senior Notes due September 1, 2018 | 550 | — |
| 7.000% Fixed Debentures due September 1, 2022 | 800 | 800 |
| 7.000% Fixed Senior Notes due May 1, 2032 | 500 | 500 |
| 7.250% Fixed Senior Notes due January 15, 2033 | 350 | 350 |
| 7.500% Fixed Senior Notes due September 1, 2038 | 300 | — |
| Unamortized discount | (16) | (15) |
| Total Oncor | 4,334 | 2,835 |
| Oncor Electric Delivery Transition Bond Company LLC(b): | | |
| 4.030% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2010 | 54 | 93 |
| 4.950% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2013 | 130 | 130 |
| 5.420% Fixed Series 2003 Bonds due in semiannual installments through August 15, 2015 | 145 | 145 |
| 3.520% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2009 | 39 | 99 |
| 4.810% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2012 | 221 | 221 |
| 5.290% Fixed Series 2004 Bonds due in semiannual installments through May 15, 2016 | 290 | 290 |
| Total Oncor Electric Delivery Transition Bond Company LLC | 879 | 978 |
| Unamortized fair value discount related to transition bonds(c) | (9) | (12) |
| Total consolidated(d) | 5,204 | 3,801 |
| Less amount due currently | (103) | (99) |
| Total long-term debt | $5,101 | $3,702 |

(a) Secured with first priority lien as discussed in Note 10.
(b) The transition bonds are nonrecourse to Oncor and were issued to securitize a regulatory asset.
(c) The transition bonds, which secured regulatory assets not earning a return, were fair valued as of October 10, 2007 as a result of purchase accounting.
(d) According to its organizational documents, Oncor Holdings is prohibited from directly incurring indebtedness for borrowed money.

### Debt Issuances in 2008

In September 2008, Oncor issued and sold senior secured notes with an aggregate principal amount of $1.5 billion consisting of $650 million aggregate principal amount of 5.95% senior secured notes maturing in September 2013, $550 million aggregate principal amount of 6.80% senior secured notes maturing in September 2018 and $300 million aggregate principal amount of 7.50% senior secured notes maturing in September 2038. Oncor used the net proceeds of approximately $1.487 billion from the sale of the notes to repay most of its

F-27

borrowings under its credit facility as well as for general corporate purposes. The notes are initially secured by the first priority lien described in Note 10. The notes are secured equally and ratably with all of Oncor's other secured indebtedness. If the lien is terminated, the notes will cease to be secured obligations of Oncor and will become senior unsecured general obligations of Oncor.

Interest on these notes is payable in cash semiannually in arrears on March 1 and September 1 of each year, and the first interest payment was in March 2009. Oncor may redeem the notes, in whole or in part, at any time, at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make-whole" premium. The notes also contain customary events of default, including failure to pay principal or interest on the notes when due.

### Debt Repayments in 2008

Repayments of long-term debt in 2008 totaled $99 million and represent transition bond principal payments at scheduled maturity dates.

### Debt-Related Activity in 2007

In March 2007, Oncor issued floating rate senior notes with an aggregate principal amount of $800 million with a floating rate based on LIBOR plus 37.5 basis points. The notes were to mature in September 2008, but in accordance with their terms, were redeemed upon closing of the Merger.

Other repayments of debt in 2007 totaling $296 million represented payments at scheduled maturity dates and included $200 million of maturing fixed-rate debentures and $96 million of scheduled transition bond principal payments.

### Fair Value of Long-Term Debt

The estimated fair value of long-term debt (including current maturities) totaled $4.990 billion and $3.948 billion at December 31, 2008 and 2007, respectively, and the carrying amount totaled $5.204 billion and $3.801 billion, respectively. The fair value is estimated at the lesser of either the call price or the market value as determined by quoted market prices.

### Interest Rate Hedges

In September 2008, Oncor entered into interest rate swap transactions hedging the variability of treasury bond rates used to determine the interest rates on an anticipated issuance of an aggregate of $1.0 billion of senior secured notes maturing from 2013 to 2018. The hedges were terminated the same day, and $2 million in after-tax losses were recorded as other comprehensive income. After-tax net losses of $0.4 million will be reclassified into net income during the next twelve months as the related hedged transactions affect net income.

### Maturities

Long-term debt and transition bonds maturities are as follows:

| Year | |
|---|---:|
| 2009 | $ 103 |
| 2010 | 108 |
| 2011 | 113 |
| 2012 | 819 |
| 2013 | 775 |
| Thereafter | 3,311 |
| Unamortized fair value discount | (9) |
| Unamortized discount | (16) |
| Total | $5,204 |

F-28

EFIHMW00152003

## 12.  COMMITMENTS AND CONTINGENCIES

### Leases

As of December 31, 2008, future minimum lease payments under operating leases (with initial or remaining noncancelable lease terms in excess of one year) were as follows:

| Year | |
|------|---|
| 2009 | $ 8 |
| 2010 | 7 |
| 2011 | 7 |
| 2012 | 6 |
| 2013 | 3 |
| Thereafter | 11 |
| Total future minimum lease payments | $42 |

Rent charged to operation and maintenance expense totaled $10 million for the year ended December 31, 2008, $3 million for the period October 11, 2007 through December 31, 2007, $7 million for the period January 1, 2007 through October 10, 2007 and $13 million for the year ended December 31, 2006.

### Legal Proceedings

Oncor Holdings is involved in various legal and administrative proceedings in the normal course of business the ultimate resolution of which, in the opinion of management, should not have a material effect upon its financial position, results of operations or cash flows.

### Capital Expenditures

Oncor and Texas Holdings agreed to the terms of a stipulation with major interested parties to resolve all outstanding issues in the PUCT review related to the Merger. As one of the provisions of this stipulation, Oncor committed to minimum capital spending of $3.6 billion over the five-year period ending December 31, 2012, subject to certain defined conditions.

### Efficiency Spending

Oncor expects to invest $300 million, which includes $100 million in excess of regulatory requirements, over the five years ending in 2012 on programs designed to improve customer electricity demand efficiencies.

### Labor Contracts

Certain Oncor employees are represented by a labor union and covered by a collective bargaining agreement that expired in January 2008. A new three-year labor contract was ratified in February 2008. In April 2008, a group of approximately 50 employees elected to be represented by a labor union. The new labor contract and the representation of this group of additional employees will not have a material effect on Oncor Holdings' financial position, results of operations or cash flows.

### Environmental Contingencies

Oncor must comply with environmental laws and regulations applicable to the handling and disposal of hazardous waste. Oncor is in compliance with all current laws and regulations; however, the impact, if any, of changes to existing regulations or the implementation of new regulations is not determinable. The costs to comply with environmental regulations can be significantly affected by the following external events or conditions:

- changes to existing state or federal regulation by governmental authorities having jurisdiction over control of toxic substances and hazardous and solid wastes, and other environmental matters; and

F-29

EFIHMW00152004

- the identification of additional sites requiring clean-up or the filing of other complaints in which Oncor Holdings may be asserted to be a potential responsible party.

*Guarantees*

Oncor has entered into contracts that contain guarantees to outside parties that could require performance or payment under certain conditions.

Oncor is the lessee under various operating leases that obligate it to guarantee the residual values of the leased assets. At December 31, 2008, both the aggregate maximum amount of residual values guaranteed and the estimated residual recoveries totaled approximately $13 million. These leased assets consist primarily of vehicles used in distribution activities. The average life of the residual value guarantees under the lease portfolio is approximately one year.

### 13. MEMBERSHIP INTERESTS

*Successor*

In connection with the Merger, Oncor Holdings was formed as a new holding company, owning approximately 80% of the membership interests of Oncor as of December 31, 2008. Oncor Holdings is a Delaware limited liability company wholly-owned by Intermediate Holding.

*Effect of Sale of Noncontrolling Interests* — Oncor's sale of noncontrolling interests discussed in Note 14 resulted in a $265 million reduction of Oncor Holdings' membership interest. This amount represents the excess of the carrying value of the interests sold over the proceeds from the transactions, which reflects the fact that Oncor's carrying value after purchase accounting is based on the Merger value, while the noncontrolling interests sale value does not include a control premium.

*Distributions* — The net proceeds of $1.253 billion from Oncor's sale of noncontrolling interests in November 2008 were distributed to Intermediate Holding and ultimately to EFH Corp.

During 2008, Oncor Holdings' board of directors declared and Oncor Holdings paid the following cash distributions to Intermediate Holding:

| Declaration Date | Payment Date | Amount Paid |
|---|---|---|
| November 13, 2008 | November 14, 2008 | $117 |
| August 20, 2008 | August 21, 2008 | $ 78 |
| May 14, 2008 | May 15, 2008 | $ 78 |
| February 20, 2008 | March 31, 2008 | $ 57 |

During 2009, Oncor Holdings' board of directors declared and Oncor Holdings paid the following cash distributions to Intermediate Holding:

| Declaration Date | Payment Date | Amount Paid |
|---|---|---|
| May 19, 2009 | May 20, 2009 | $40 |
| February 18, 2009 | March 3, 2009 | $18 |

*Distribution Restrictions* — While there are no direct restrictions on Oncor Holdings' ability to distribute its net income that are currently material, substantially all of Oncor Holdings' net income is derived from Oncor. The boards of directors of each of Oncor and Oncor Holdings, which are composed of a majority of independent directors, can withhold distributions to the extent the boards determine that it is necessary to retain such amounts to meet expected future requirements of Oncor and/or Oncor Holdings. For the period beginning October 11, 2007 and ending December 31, 2012, distributions paid by Oncor (other than distributions of the proceeds of any

F-30

EFIHMW00152005

issuance of limited liability company units) are limited by the Limited Liability Company Agreement to an amount not to exceed Oncor's net income determined in accordance with GAAP, subject to certain defined adjustments. Such adjustments include deducting the $72 million ($46 million after tax) one-time refund to customers in September 2008 and deducting funds spent as part of the $100 million commitment for additional demand-side management or other energy efficiency initiatives (see Note 4), neither of which impacts net income due to purchase accounting, and removing the effect of the $860 million goodwill impairment charge from fourth quarter 2008 net income available for distribution. Distributions are further limited by Oncor's required regulatory capital structure, as determined by the PUCT, to be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. At December 31, 2008, no material amount of Oncor's net income was restricted from being used to make distributions on its membership interests except for the one-time refund. The net proceeds of $1.253 billion received from the sale of the equity interests to Texas Transmission and certain members of Oncor's management were excluded from these distribution limitations.

*Equity Contributions* — As a result of the Merger, all outstanding unvested stock-based incentive compensation awards previously granted by EFH Corp. to Oncor employees vested and such employees became entitled to receive the $69.25 per share Merger consideration. The settlement of these awards totaled $24 million and was accounted for as an equity contribution from EFH Corp., as was the settlement of $4 million of cash incentive compensation awards. See Note 18 for further discussion of stock-based compensation, including a SARs Plan implemented in November 2008.

In connection with the Merger, Texas Holdings paid a $12 million fee related to Oncor's $2 billion revolving credit facility. Such payment was accounted for as an investment by Texas Holdings.

In March 2008, Oncor Holdings distributed its investment in an entity with telecommunications-related activities that are not part of Oncor's current operations totaling $24 million to Intermediate Holding.

*Predecessor*

No shares of Oncor's common stock were held by or for its own account, nor were any shares of such capital stock reserved for its officers and employees or for options, warrants, conversions and other rights in connection therewith.

Under SFAS 123(R), expense related to EFH Corp.'s stock-based incentive compensation awards granted to Oncor's employees was accounted for as a noncash capital contribution from EFH Corp. Accordingly, Oncor recorded a credit to its common stock account of $3 million in the period January 1, 2007 through October 10, 2007 and $5 million for the year ended December 31, 2006.

Oncor recorded a credit to common stock of $15 million in the period January 1, 2007 through October 10, 2007 and $14 million in the year 2006 arising from the excess tax benefit generated by the distribution date value of the stock-based incentive awards exceeding the reported compensation expense. The $15 million credit (benefit) in 2007 was realized in the Successor period in conjunction with a tax payment to EFH Corp.

Effective January 1, 2005, Oncor and TCEH entered into an agreement whereby Oncor assumed responsibility for pension and OPEB costs for all applicable former employees of the regulated predecessor integrated electric utility that, in addition to its own employees consists largely of active and retired personnel engaged in TCEH's activities, related to service of those additional personnel prior to the deregulation and disaggregation of EFH Corp.'s business. (See Note 17 for additional information related to this agreement.) In connection with this agreement, Oncor recorded a $15 million credit to its common stock account in 2006 for the noncash contribution of pension-related assets and a $146 million charge to common stock in 2005 for the noncash assumption of the pension obligation.

F-31

EFIHMW00152006

In 2006, Oncor distributed its mineral interests in natural gas and oil to EFH Corp. in the form of a dividend. The dividend was recorded at the book value of the interests, which was zero. These mineral interests were acquired as part of land purchases over the years to support the expansion of the transmission and distribution system and not for the mineral development, and no value was attributed to the mineral interests at the time of acquisition.

## 14.   NONCONTROLLING INTERESTS

On November 5, 2008, Oncor issued and sold additional equity interests to Texas Transmission. Texas Transmission is an entity indirectly owned by a private investment group led by OMERS Administration Corporation, acting through its infrastructure investment entity, Borealis Infrastructure Management Inc., and the Government of Singapore Investment Corporation, acting through its private equity and infrastructure arm, GIC Special Investments Pte Ltd.

Texas Transmission acquired the equity interests for $1.254 billion in cash. At the closing of the sale, Oncor also offered and sold additional equity interests to Investment LLC, an entity owned by certain members of Oncor's management team, for a total of $13 million in cash (the same price per unit paid by Texas Transmission). Accordingly, the equity issuances in 2008 resulted in Oncor Holdings (and EFH Corp. indirectly) owning 80.04% of Oncor, certain members of Oncor management indirectly owning 0.21% of Oncor and Texas Transmission owning 19.75% of Oncor.

The proceeds (net of closing costs) of $1.253 billion received by Oncor from Texas Transmission and the members of Oncor management upon completion of these transactions were distributed to Oncor Holdings who distributed the proceeds to Intermediate Holding and ultimately to EFH Corp.

Oncor Holdings recorded the $265 million excess of Oncor Holdings' carrying amount of the noncontrolling interests sold by Oncor over the net proceeds from the transactions as a reduction to additional paid in capital, consistent with the provisions of SAB Topic 5-H, "Accounting for Sales of Stock by a Subsidiary."

The noncontrolling interests balance of $1.355 billion reported in the December 31, 2008 consolidated balance sheet represented the proportional share of Oncor's net assets at the date of the transaction less $160 million representing the noncontrolling interests' share of Oncor's results for the period subsequent to the transaction (including the goodwill impairment charge), net of $2 million in cash distributions. See Note 13.

## 15.   INVESTMENTS

The investments balance consists of the following:

|  | Successor | |
| --- | --- | --- |
|  | December 31, | |
|  | 2008 | 2007 |
| Assets related to employee benefit plans, including employee savings programs, net of distributions | $65 | $77 |
| Investment in unconsolidated affiliates | 5 | 10 |
| Land | 2 | 2 |
| Total investments | $72 | $89 |

### *Assets Related to Employee Benefit Plans*

The majority of these assets represent cash surrender values of life insurance policies that are purchased to fund liabilities under deferred compensation plans. EFH Corp. pays the premiums and is the beneficiary of these

F-32

EFIHMW00152007
**PX 022**
**Page 188 of 218**

life insurance policies. As of December 31, 2008 and 2007, the face amount of these policies totaled $151 million and $168 million, and the net cash surrender values totaled $53 million and $68 million, respectively. Changes in cash surrender value are netted against premiums paid. Other investment assets held to satisfy deferred compensation liabilities are recorded at market value.

*Restricted Cash*

| | Successor | | | |
|---|---|---|---|---|
| | At December 31, 2008 | | At December 31, 2007 | |
| | Current Assets | Noncurrent Assets | Current Assets | Noncurrent Assets |
| Customer collections related to securitization (transition) bonds used only to service debt and pay expenses | $ 51 | $— | $ 56 | $— |
| Reserve for fees associated with transition bonds | — | 10 | — | 10 |
| Reserve for shortfalls of transition bond charges | — | 6 | — | 7 |
| Total restricted cash | $ 51 | $ 16 | $ 56 | $ 17 |

## 16.  NOTICE OF TERMINATION OF OUTSOURCING ARRANGEMENTS

In connection with the closing of the Merger, EFH Corp., Oncor and TCEH commenced a review, under the change of control provision, of certain outsourcing arrangements with Capgemini Energy LP (Capgemini), Capgemini America, Inc. and Capgemini North America, Inc. (collectively, CgE). During the fourth quarter of 2008, Oncor executed a Separation Agreement with CgE. Simultaneous with the execution of that Separation Agreement, EFH Corp. and TCEH entered into a substantially similar Separation Agreement with CgE. The Separation Agreements principally provide for (i) notice of termination of each of the Master Framework Agreements, dated as of May 17, 2004, each as amended, between Capgemini and each of Oncor and TCEH and the related service agreements under each of the Master Framework Agreements and (ii) termination of the joint venture arrangements between EFH Corp. (and its applicable subsidiaries) and CgE. Under the Master Framework Agreements and related services agreements, Capgemini provides to Oncor and EFH Corp. and its other subsidiaries outsourced support services, including information technology, customer care and billing, human resources, procurement and certain finance and accounting activities.

The Separation Agreement acts as a notice of termination under the Master Framework Agreement and the related services agreements. As a result of the "change of control" of EFH Corp. that occurred as a result of the Merger, Oncor had the contractual right to terminate, without penalty, its Master Framework Agreement. Oncor has elected to exercise such right. Consistent with the Master Framework Agreement, to provide for an orderly transition of the services, the Separation Agreement requires that Capgemini provide termination assistance services until the services are transitioned back to Oncor and/or to another service provider. The Separation Agreement provides that the services be transitioned by December 31, 2010 (June 30, 2011, in the case of the information technology services). The Master Framework Agreement will actually terminate when these termination assistance services are completed. Oncor previously provided a termination notice to Capgemini in respect of human resources services.

The Separation Agreements provide for the termination of the joint venture arrangement between EFH Corp. (and its applicable subsidiaries) and CgE. As a result, during the fourth quarter of 2008:

• EFH Corp. received approximately $70 million in cash in exchange for the termination of a purchase option agreement pursuant to which subsidiaries of EFH Corp. had the right to "put" to Capgemini (and Capgemini had the right to "call" from a subsidiary of EFH Corp.) EFH Corp.'s 2.9% limited partnership interest in Capgemini and licensed assets, principally software, upon the expiration of the Master Framework Agreements in 2014 or, in some circumstances, earlier. Oncor received $20 million of such proceeds, reflecting its share of the put option value.

F-33

EFIHMW00152008

- The parties entered into a mutual release of all claims under the Master Framework Agreement and related services agreements, subject to certain defined exceptions, and Oncor received $4 million in cash in settlement of such claims.

The carrying value of Oncor's share of the put option value was $48 million prior to the application of purchase accounting (recorded as a noncurrent asset). The effects of the termination of the outsourcing arrangements, including the accrual of $16 million for incremental costs to exit and transition the services, were included in the final purchase price allocation (see Note 2).

## 17. PENSION AND OTHER POSTRETIREMENT EMPLOYEE BENEFITS

### Pension Plan

Subsidiaries of Oncor Holdings are participating employers in the EFH Retirement Plan (Retirement Plan), a defined benefit pension plan sponsored by EFH Corp. The Retirement Plan is a qualified pension plan under Section 401(a) of the Internal Revenue Code of 1986, as amended (Code) and is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended (ERISA). Employees are eligible to participate in the Retirement Plan upon their completion of one year of service and the attainment of age 21. All benefits are funded by the participating employers. The Retirement Plan provides benefits to participants under one of two formulas: (i) a Cash Balance Formula under which participants earn monthly contribution credits based on their compensation and a combination of their age and years of service, plus monthly interest credits or (ii) a Traditional Retirement Plan Formula based on years of service and the average earnings of the three years of highest earnings. The interest component of the Cash Balance Formula is variable and is determined using the yield on 30-year Treasury bonds.

All eligible employees hired after January 1, 2001 participate under the Cash Balance Formula. Certain employees who, prior to January 1, 2002, participated under the Traditional Retirement Plan Formula, continue their participation under that formula. Under the Cash Balance Formula, future increases in earnings will not apply to prior service costs. It is EFH Corp.'s policy to fund the plans on a current basis to the extent deductible under existing federal tax regulations.

Subsidiaries of Oncor Holdings also participate in EFH Corp.'s supplemental retirement plans for certain employees, whose retirement benefits cannot be fully earned under the qualified Retirement Plan, the information for which is included below.

### Other Postretirement Employee Benefits (OPEB) Plan

Subsidiaries of Oncor Holdings participate with EFH Corp. and certain other affiliated subsidiaries of EFH Corp. to offer certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees. For employees retiring on or after January 1, 2002, the retiree contributions required for such coverage vary based on a formula depending on the retiree's age and years of service.

F-34

Confidential

*Pension and OPEB Costs Recognized as Expense*

The following details net pension and OPEB costs recognized as expense:

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 to December 31, 2007 | Period from January 1, 2007 to October 10, 2007 | Year Ended December 31, 2006 |
| Pension costs under SFAS 87 | $ 15 | $ 3 | $ 21 | $ 41 |
| OPEB costs under SFAS 106 | 44 | 9 | 50 | 61 |
| Total benefit costs | 59 | 12 | 71 | 102 |
| Less amounts deferred principally as a regulatory asset or property | (42) | (8) | (43) | (84) |
| Net amounts recognized as expense | $ 17 | $ 4 | $ 28 | $ 18 |

Consistent with SFAS 87, EFH Corp. uses the calculated value method to determine the market-related value of the assets held in its trust. EFH Corp. includes the realized and unrealized gains or losses in the market-related value of assets over a rolling four-year period. Each year, 25% of such gains and losses for the current year and for each of the preceding three years is included in the market-related value. Each year, the market-related value of assets is increased for contributions to the plan, and investment income and is decreased for benefit payments and expenses for that year.

The pension and OPEB amounts provided represent allocations to Oncor Holdings of amounts related to EFH Corp.'s plans.

*Regulatory Recovery of Pension and OPEB Costs*

In June 2005, an amendment to PURA relating to EFH Corp.'s pension and OPEB costs was enacted by the Texas Legislature. This amendment, which was retroactively effective January 1, 2005, provides for the recovery by Oncor of pension and OPEB costs for all applicable former employees of the regulated predecessor integrated electric utility. In addition to Oncor's active and retired employees, these former employees largely include active and retired personnel engaged in TCEH's activities related to service of those additional personnel prior to the deregulation and disaggregation of EFH Corp.'s businesses effective January 1, 2002. Accordingly, Oncor and TCEH entered into an agreement whereby Oncor assumed responsibility for applicable pension and OPEB costs related to those personnel.

The amendment additionally authorizes Oncor to establish a regulatory asset or liability for the difference between the amounts of pension and OPEB costs approved in current billing rates and the actual amounts that would otherwise have been recorded as charges or credits to earnings. Accordingly, in the second quarter of 2005 Oncor began deferring (principally as a regulatory asset or property) additional pension and OPEB costs as permitted by the amendment. Amounts deferred are ultimately subject to regulatory approval. Amounts recorded as a regulatory asset totaled $15 million and $20 million in 2008 and 2007, respectively.

*Assumed Discount Rate*

The discount rates reflected in net pension and OPEB costs are 6.55% for the year ended December 31, 2008, 6.45% for the period October 11, 2007 through December 31, 2007, 5.90% for the period January 1, 2007 through October 10, 2007, and 5.75% for the year ended December 31, 2006. The expected rate of return on plan assets reflected in the 2008 cost amounts is 8.25% for the pension plan and 7.90% for OPEBs.

F-35

EFIHMW00152010

*Pension and OPEB Plan Cash Contributions*

Contributions to the benefit plans were as follows:

| | December 31, | | |
|---|---|---|---|
| | **2008** | **2007** | **2006** |
| Pension plan contributions | $46 | $ 3 | $ 2 |
| OPEB plan contributions | 31 | 33 | 26 |
| Total contributions | $77 | $36 | $28 |

Estimated funding in 2009 of the pension plan and OPEB plan totals $61 million and $18 million, respectively.

*Thrift Plan*

Employees of subsidiaries of Oncor Holdings may participate in a qualified savings plan, the EFH Thrift Plan (Thrift Plan). This plan is a participant-directed defined contribution plan intended to qualify under Section 401(a) of the Code, and is subject to the provisions of ERISA. Under the terms of the Thrift Plan, employees who do not earn more than the IRS threshold compensation limit used to determine highly compensated employees may contribute, through pre-tax salary deferrals and/or after-tax applicable payroll deductions, the lesser of 75% of their regular salary or wages or the maximum amount permitted under law. Employees who earn more than such threshold may contribute from 1% to 16% of their regular salary or wages. Employer matching contributions are also made in an amount equal to 100% of the first 6% of employee contributions for employees who are covered under the Cash Balance Formula of the Retirement Plan, and 75% of the first 6% of employee contributions for employees who are covered under the Traditional Retirement Plan Formula of the Retirement Plan. As of October 10, 2007, employer matching contributions are made in cash and may be allocated by participants to any of the Thrift Plan's investment options.

## 18. STOCK-BASED COMPENSATION

*Successor*

In 2008, Oncor established the Oncor Electric Delivery Company LLC Stock Appreciation Rights Plan (the SARs Plan) under which certain employees of Oncor may be granted stock appreciation rights (SARs) payable in cash, or in some circumstances, Oncor units. Two types of SARs may be granted under the SARs Plan. Time-based SARs (Time SARs) vest solely based upon continued employment ratably on an annual basis on each of the first five anniversaries of the grant date. Performance-based SARs (Performance SARs) vest based upon both continued employment and the achievement of a predetermined level of Oncor EBITDA over time, generally ratably over five years based upon annual Oncor EBITDA levels, with provisions for vesting if the annual levels are not achieved but cumulative two- or three-year total Oncor EBITDA levels are achieved. Time and Performance SARs may also vest in part or in full upon the occurrence of certain specified liquidity events and are exercisable only upon the occurrence of certain specified liquidity events. Since the exercisability of the Time and Performance SARs is conditioned upon the occurrence of a liquidity event, compensation expense will not be recorded until it is probable that a liquidity event will occur. Generally, awards under the SARs Plan terminate on the tenth anniversary of the grant, unless the participant's employment is terminated earlier under certain circumstances.

In February 2009, Oncor also established the Oncor Electric Delivery Company LLC Director Stock Appreciation Rights Plan (the Director SARs Plan) under which certain non-employee members of Oncor's board of directors and other persons having a relationship with Oncor may be granted SARs payable in cash, or in some circumstances, Oncor units. SARs granted under the Director Plan vest in eight equal quarterly installments over a two-year period and are exercisable only upon the occurrence of certain specified liquidity

F-36

Confidential

events. Since the exercisability of the Director SARs is conditioned upon the occurrence of a liquidity event, expense will not be recorded until it is probable a liquidity event will occur.

SARs under the SARs Plan and the Director SARs Plan are generally payable in cash based on the fair market value of the SAR on the date of exercise. During 2008, Oncor granted 13.9 million SARs under the SARs Plan, of which 1.4 million Time SARS were vested at December 31, 2008. Pursuant to an amendment to the SARs Plan terms in February 2009, a total of 1.4 million Performance SARS related to the period ended December 31, 2008 were declared vested in recognition that the established 2008 EBITDA target was substantially achieved. There were no SARs eligible for exercise at December 31, 2008.

*Predecessor*

Prior to the Merger, Oncor bore the costs of the EFH Corp. shareholder-approved long-term incentive plans for applicable management personnel engaged in Oncor's business activities. EFH Corp. provided discretionary awards of performance units to qualified management employees that were payable in its common stock. The awards generally vested over a three-year period and the number of shares ultimately earned was based on the performance of EFH Corp.'s stock over the vesting period as compared to peer companies and established thresholds. EFH Corp. established restrictions that limited certain employees' opportunities to liquidate vested awards.

EFH Corp. determined the fair value of its stock-based compensation awards utilizing a valuation model that took into account three principal factors: expected volatility of the stock price of EFH Corp. and peer group companies, dividend rate of EFH Corp. and peer group companies and the restrictions limiting liquidation of vested stock awards. Based on the fair values determined under this model, Oncor's reported expense related to the awards totaled $3 million ($2 million after-tax) for the period January 1, 2007 through October 10, 2007 and $4 million ($3 million after-tax) in 2006. The number of awards granted, net of forfeitures, totaled zero and 8 thousand in 2007 and 2006, respectively.

With respect to awards to Oncor's employees, the fair value of awards that vested in the period January 1, 2007 through October 10, 2007 and the year ended December 31, 2006 totaled $84 million and $57 million, respectively, based on the vesting date share prices.

## 19. RELATED-PARTY TRANSACTIONS

The following represent significant related-party transactions of Oncor Holdings:

- Oncor records revenue from TCEH, principally for electricity delivery fees, which totaled $1 billion for the year ended December 31, 2008, $209 million for the period October 11, 2007 through December 31, 2007, $823 million for the period January 1, 2007 through October 10, 2007 and $1.1 billion for the year ended December 31, 2006.

- Oncor records interest income from TCEH with respect to Oncor's generation-related regulatory assets, which have been securitized through the issuance of transition bonds by Oncor's bankruptcy-remote financing subsidiary. The interest income serves to offset Oncor's interest expense on the transition bonds. This interest income totaled $46 million for the year ended December 31, 2008, $11 million for the period October 11, 2007 through December 31, 2007, $38 million for the period January 1, 2007 through October 10, 2007 and $52 million for the year ended December 31, 2006.

- Incremental accrued income taxes incurred by Oncor as a result of delivery fee surcharges to its customers related to transition bonds are reimbursed by TCEH. Oncor Holdings' financial statements reflect a note receivable from TCEH to Oncor of $289 million ($35 million reported as current in trade accounts and other receivables from affiliates) at December 31, 2008 and $323 million ($34 million reported as current in trade accounts and other receivables from affiliates) at December 31, 2007 related to these income taxes.

F-37

EFIHMW00152012

- Short-term advances to parent totaled $25 million at December 31, 2007. These advances were settled in March 2008 as part of Oncor Holdings' distribution of its investment in an entity with telecommunications-related activities that are not part of Oncor's current operations to Intermediate Holding as discussed in Note 13.

- Short-term advances from parent totaled $24 million at December 31, 2006. The average daily balances of short-term advances from parent totaled $42 million and $44 million for the period January 1, 2007 through October 10, 2007 and the year ended December 31, 2006, and the weighted average interest rate for the respective periods was 5.8% and 5.4%. Interest expense incurred on the advances totaled approximately $2 million for the period January 1, 2007 through October 10, 2007 and $2 million for the year ended December 31, 2006. As a result of actions taken at the time of the Merger to further ring-fence Oncor, advances from EFH Corp. to Oncor ceased and outstanding amounts were repaid.

- An EFH Corp. subsidiary charges Oncor for financial and certain other administrative services at cost. These costs, which are reported in operation and maintenance expenses, totaled $24 million for the year ended December 31, 2008, $6 million for the period October 11, 2007 through December 31, 2007, $20 million for the period January 1, 2007 through October 10, 2007 and $36 million for the year ended December 31, 2006.

- Under Texas regulatory provisions, the trust fund for decommissioning the Comanche Peak nuclear generation facility (reported on TCEH's balance sheet) is funded by a delivery fee surcharge collected from REPs by Oncor and remitted to TCEH. These trust fund assets are established with the intent to be sufficient to fund the estimated decommissioning liability (also reported on TCEH's balance sheet). Income and expenses associated with the trust fund and the decommissioning liability recorded by TCEH are offset by a net change in the Oncor and TCEH intercompany receivable/payable, which in turn results in a change in Oncor's reported net regulatory asset/liability. At December 31, 2008, the excess of the decommissioning liability over the trust fund balance resulted in a regulatory asset of $127 million. At December 31, 2007, the excess of the trust fund balance over the estimated net decommissioning liability resulted in a regulatory liability of $13 million.

- Oncor has a 19.5% limited partnership interest, with a carrying value of $5 million and $10 million at December 31, 2008 and 2007, respectively, in an EFH Corp. subsidiary holding principally software-related assets. Equity losses related to this interest are reported in other deductions and totaled $4 million for the year ended December 31, 2008, $1 million for the period October 11, 2007 through December 31, 2007, $2 million for the period January 1, 2007 through October 10, 2007 and $4 million for the year ended December 31, 2006. These losses primarily represent amortization of the assets held by the subsidiary.

- EFH Corp. files a consolidated federal income tax return and allocates income tax liabilities to Oncor Holdings under a tax sharing agreement substantially as if Oncor Holdings was filing its own income tax returns. See discussion in Note 1 under "Income Taxes." Under the terms of this agreement, Oncor Holdings had amounts receivable from EFH Corp. related to income taxes, primarily due to timing of payments, totaling $22 million and $29 million at December 31, 2008 and 2007, respectively.

- Oncor held cash collateral of $15 million on both December 31, 2008 and 2007 from TCEH related to interconnection agreements for three generation units being developed by TCEH. The collateral is reported in the balance sheet in other current liabilities.

- Certain transmission and distribution utilities in Texas have tariffs in place to assure adequate credit worthiness of any REP to support the REP's obligation to collect securitization bond-related (transition) charges on behalf of the utility. Under these tariffs, as a result of TCEH's credit rating being below investment grade, TCEH is required to post collateral support in an amount equal to estimated transition charges over specified time periods. Accordingly, as of December 31, 2008 and 2007, TCEH had posted letters of credit in the amount of $13 million and $14 million, respectively, for the benefit of Oncor.

F-38

EFIHMW00152013

- At the closing of the Merger, Oncor entered into a $2 billion revolving credit facility with a syndicate of financial institutions and other lenders. The syndicate includes affiliates of GS Capital Partners. Affiliates of GS Capital Partners (a member of the Sponsor Group) have from time-to-time engaged in commercial banking transactions with Oncor Holdings or it subsidiaries in the normal course of business.

- Affiliates of the Sponsor Group have, and may, acquire debt or debt securities issued by Oncor Holdings or its subsidiaries in open market transactions or through loan syndications. In addition, affiliates of the Sponsor Group acted as initial purchasers in Oncor's $1.5 billion senior secured notes offering in September 2008.

See Notes 7, 9, 13 and 17 for information regarding the tax sharing agreement, the accounts receivable securitization program, distributions to Intermediate Holding and the allocation of EFH Corp.'s pension and OPEB costs to Oncor Holdings, respectively.

## 20. SUPPLEMENTARY FINANCIAL INFORMATION

### Other Income and Deductions

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Other income: | | | | |
| Net gain on sale of other properties and investment | $ 1 | $ 1 | $ 3 | $ 1 |
| Accretion of adjustment (discount) to regulatory assets due to purchase accounting (Note 2) | 44 | 10 | — | — |
| Other | — | — | — | 1 |
| Total other income | $ 45 | $ 11 | $ 3 | $ 2 |
| Other deductions: | | | | |
| Charges related to 2006 cities rate settlements (Note 5) | $ 13 | $ 6 | $ 20 | $ 13 |
| Expenses related to canceled InfrastruX Energy Services joint venture(a) | — | — | 3 | 7 |
| Equity losses in an unconsolidated affiliate (Note 19) | 4 | 1 | 2 | 4 |
| Other | 8 | 1 | 5 | 3 |
| Total other deductions | $ 25 | $ 8 | $ 30 | $ 27 |

(a) Consists of previously deferred costs arising from operational activities to transition to the joint venture arrangement, which was canceled in connection with the Merger.

### Major Customers

Amounts billed to TCEH represented 39% and amounts billed to one large nonaffiliated REP represented 16% of total operating revenues for the year ended December 31, 2008. No other customer represented 10% or more of total operating revenues.

F-39

EFIHMW00152014

*Interest Expense and Related Charges*

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Interest .................................. | $314 | $ 70 | $242 | $287 |
| Amortization of fair value debt discounts resulting from purchase accounting .......................... | 3 | — | — | — |
| Amortization of debt issuance costs and discounts ..... | 5 | 1 | 7 | 5 |
| Allowance for funds used during construction — capitalized interest portion ...................... | (6) | (1) | (7) | (6) |
| Total interest expense and related charges ........ | $316 | $ 70 | $242 | $286 |

*Property, Plant and Equipment*

| | Successor | |
|---|---|---|
| | December 31, | |
| | 2008 | 2007 |
| Assets in service: | | |
| Distribution ................................................. | $ 8,429 | $ 8,036 |
| Transmission ................................................ | 3,626 | 3,388 |
| Other assets ................................................ | 477 | 388 |
| Total ................................................. | 12,532 | 11,812 |
| Less accumulated depreciation ................................. | 4,158 | 3,932 |
| Net of accumulated depreciation ............................... | 8,374 | 7,880 |
| Construction work in progress .................................. | 213 | 170 |
| Held for future use ........................................... | 19 | 19 |
| Property, plant and equipment — net ........................... | $ 8,606 | $ 8,069 |

Depreciation expense as a percent of average depreciable property approximated 2.8% for 2008, 2007 and 2006.

*Intangible Assets*

Intangible assets other than goodwill reported in the balance sheet are comprised of the following:

| | Successor | | | | | |
|---|---|---|---|---|---|---|
| | As of December 31, 2008 | | | As of December 31, 2007 | | |
| | Gross Carrying Amount | Accumulated Amortization | Net | Gross Carrying Amount | Accumulated Amortization | Net |
| Intangible assets subject to amortization included in property, plant and equipment: | | | | | | |
| Land easements ...................... | $184 | $ 69 | $115 | $179 | $ 67 | $112 |
| Capitalized software ................... | 145 | 80 | 65 | 122 | 63 | 59 |
| Total ........................... | $329 | $149 | $180 | $301 | $130 | $171 |

F-40

EFIHMW00152015

Aggregate amortization expense for intangible assets totaled $19 million for the year ended December 31, 2008, $3 million for the period October 11, 2007 through December 31, 2007, $11 million for the period January 1, 2007 through October 10, 2007, and $20 million for the year ended December 31, 2006. At December 31, 2008, the weighted average remaining useful lives of capitalized land easements and software were 69 years and 10 years, respectively. The estimated aggregate amortization expense for each of the five succeeding fiscal years from December 31, 2008 is as follows:

| Year | Amortization Expense |
|------|---------------------:|
| 2009 | $21 |
| 2010 | 15 |
| 2011 | 12 |
| 2012 | 10 |
| 2013 | 5 |

Goodwill of $4.9 billion was reported on the balance sheet as of December 31, 2007 and represented the portion of the goodwill arising from the Merger under purchase accounting that was assigned to the Regulated Delivery reporting unit of EFH Corp. The balance reported at December 31, 2008 is $4.1 billion. See Note 2 for discussion of financial statement effects of the Merger and Note 3 for discussion of the goodwill impairment. None of this goodwill is being deducted for tax purposes.

### Other Noncurrent Liabilities and Deferred Credits

The balance of other noncurrent liabilities and deferred credits consists of the following:

| | Successor | |
|---|---|---|
| | December 31, 2008 | December 31, 2007 |
| Retirement plan and other employee benefits | $1,115 | $744 |
| Liabilities related to subsidiary tax sharing agreement | 299 | — |
| Uncertain tax positions (including accrued interest) (Note 6) | 144 | 134 |
| Nuclear decommissioning cost under-recovery(a) | 127 | — |
| Other | 35 | 20 |
| Total other noncurrent liabilities and deferred credits | $1,720 | $898 |

(a)  Represents intercompany payable to TCEH offset in Oncor's net reported regulatory asset/liability. See Note 8.

*Liabilities Related to Subsidiary Tax Sharing Agreement* — Amount represents the noncontrolling interests' portion of the previously recorded net deferred tax liabilities of Oncor. Upon the sale of noncontrolling interests in Oncor (see Note 14), Oncor became a partnership for US federal income tax purposes, and the temporary differences which gave rise to the deferred taxes will, over time, become taxable to the noncontrolling interests. Under a tax sharing agreement among Oncor and its equity holders, Oncor reimburses the equity holders for income taxes as the partnership earnings become taxable to the equity holders. Accordingly, as the temporary differences become taxable, the equity holders will be reimbursed by Oncor. In the unlikely event such amounts are not reimbursed under the tax sharing agreement, it is probable they would be refunded to rate payers.

F-41

Confidential

*Supplemental Cash Flow Information*

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | **Year Ended December 31, 2008** | **Period from October 11, 2007 through December 31, 2007** | **Period from January 1, 2007 through October 10, 2007** | **Year Ended December 31, 2006** |
| Cash payments: | | | | |
| Interest paid . . . . . . . . . . . . . . . . . . . . . . . . . . | $284 | $ 72 | $240 | $287 |
| Capitalized interest . . . . . . . . . . . . . . . . . . . . . | (6) | (1) | (7) | (6) |
| Interest (net of amounts capitalized) . . . . . | 278 | 71 | 233 | 281 |
| Income taxes . . . . . . . . . . . . . . . . . . . . . . . . . | 65 | 26 | 106 | 290 |
| Noncash investing and financing activities: | | | | |
| Noncash construction expenditures(a) . . . . . . . | 49 | 70 | 25 | 33 |
| Noncash distribution of investment to parent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 | — | — | — |
| Noncash contribution related to incentive compensation plans . . . . . . . . . . . . . . . . . . . . | — | 28 | — | 5 |
| Noncash capital contribution from Texas Holdings . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 12 | — | — |
| Noncash contribution for pension-related assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | 15 |

(a)   Represents end-of-period accruals.

**** 

F-42

EFIHMW00152017

## GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

**2008 Audited Financial Statements** . . . Oncor Holdings' audited financial statements for the year ended December 31, 2008

**EFC Holdings** . . . . . . . . . . . . . . . . . . . . Refers to Energy Future Competitive Holdings Company, a direct subsidiary of EFH Corp. and the direct parent of TCEH.

**EFH Corp.** . . . . . . . . . . . . . . . . . . . . . . Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context. Its major subsidiaries include Oncor and TCEH.

**ERCOT** . . . . . . . . . . . . . . . . . . . . . . . . Electric Reliability Council of Texas, the independent system operator and the regional coordinator of the various electricity systems within Texas

**FASB** . . . . . . . . . . . . . . . . . . . . . . . . . . Financial Accounting Standards Board, the designated organization in the private sector for establishing standards for financial accounting and reporting

**GAAP** . . . . . . . . . . . . . . . . . . . . . . . . . generally accepted accounting principles

**Intermediate Holding** . . . . . . . . . . . . . Refers to Energy Future Intermediate Holding Company LLC, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings.

**Investment LLC** . . . . . . . . . . . . . . . . . . Refers to Oncor Management Investment LLC, a Delaware limited liability company and noncontrolling interest owner of Oncor, whose managing member is Oncor and whose Class B Interests are owned by officers, directors and key employees of Oncor.

**LIBOR** . . . . . . . . . . . . . . . . . . . . . . . . . London Interbank Offered Rate. An interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market.

**Limited Liability Company**
   **Agreement** . . . . . . . . . . . . . . . . . . . . The Second Amended and Restated Limited Liability Company Agreement of Oncor, dated as of November 5, 2008, by and among Oncor Holdings, Texas Transmission and Investment LLC, as amended.

**Merger** . . . . . . . . . . . . . . . . . . . . . . . . . The transaction referred to in the Merger Agreement (defined immediately below) that was completed on October 10, 2007.

**Merger Agreement** . . . . . . . . . . . . . . . . Agreement and Plan of Merger, dated February 25, 2007, under which Texas Holdings agreed to acquire EFH Corp.

**Moody's** . . . . . . . . . . . . . . . . . . . . . . . . Moody's Investors Services, Inc. (a credit rating agency)

**Oncor** . . . . . . . . . . . . . . . . . . . . . . . . . . Refers to Oncor Electric Delivery Company LLC, a direct, majority-owned subsidiary of Oncor Holdings, and/or its wholly-owned

F-43

EFIHMW00152018

|  |  |
|---|---|
|  | consolidated bankruptcy-remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC, depending on context. |
| **Oncor Holdings** . . . . . . . . . . . . . . . . . . | Refers to Oncor Electric Delivery Holdings Company LLC, a direct, wholly-owned subsidiary of Intermediate Holding and the direct majority owner of Oncor. |
| **Oncor Ring-Fenced Entities** . . . . . . . . . | Refers to Oncor Holdings and its direct and indirect subsidiaries. |
| **OPEB** . . . . . . . . . . . . . . . . . . . . . . . . . . . | other postretirement employee benefits |
| **PUCT** . . . . . . . . . . . . . . . . . . . . . . . . . . | Public Utility Commission of Texas |
| **Purchase accounting** . . . . . . . . . . . . . . | The purchase method of accounting for a business combination as prescribed by GAAP, whereby the cost or "purchase price" of a business combination, including the amount paid for the equity and direct transaction costs are allocated to identifiable assets and liabilities (including intangible assets) based upon their fair values. The excess of the purchase price over the fair values of assets and liabilities is recorded as goodwill. |
| **REP** . . . . . . . . . . . . . . . . . . . . . . . . . . . | retail electric provider |
| **SEC** . . . . . . . . . . . . . . . . . . . . . . . . . . . | US Securities and Exchange Commission |
| **Sponsor Group** . . . . . . . . . . . . . . . . . . . | Collectively, the investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P. (KKR), TPG Capital, L.P. and GS Capital Partners, an affiliate of Goldman Sachs & Co. (See Texas Holdings below.) |
| **TCEH** . . . . . . . . . . . . . . . . . . . . . . . . . . | Refers to Texas Competitive Electric Holdings Company LLC, a direct, wholly-owned subsidiary of EFC Holdings and an indirect subsidiary of EFH Corp., and/or its subsidiaries, depending on context. |
| **Texas Holdings** . . . . . . . . . . . . . . . . . . . | Refers to Texas Energy Future Holdings Limited Partnership, a limited partnership controlled by the Sponsor Group that owns substantially all of the common stock of EFH Corp. |
| **Texas Holdings Group** . . . . . . . . . . . . . | Refers to Texas Holdings and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities. |
| **Texas Transmission** . . . . . . . . . . . . . . . | Refers to Texas Transmission Investment LLC, a limited liability company that owns a 19.75% equity interest in Oncor. Texas Transmission is not affiliated with EFH Corp., any of EFH Corp.'s subsidiaries or any member of the Sponsor Group. |
| **US** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | United States of America |

This quarterly report occasionally makes references to Oncor Holdings or Oncor when describing actions, rights or obligations of their respective subsidiaries. These references reflect the fact that the subsidiaries are consolidated with their respective parent companies for financial reporting purposes. However, these references should not be interpreted to imply that the parent company is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or that the subsidiary company is undertaking an action or has the rights or obligations of its parent company or any other affiliate.

F-44

Confidential

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Member of
Oncor Electric Delivery Holdings Company LLC
Dallas, Texas

We have reviewed the accompanying condensed consolidated balance sheet of Oncor Electric Delivery Holdings Company LLC and subsidiaries ("Oncor Holdings") as of September 30, 2009, and the related condensed statements of consolidated income and comprehensive income for the three-month and nine-month periods ended September 30, 2009 and 2008, and of consolidated cash flows for the nine-month periods ended September 30, 2009 and 2008. These interim financial statements are the responsibility of Oncor Holdings' management.

We conducted our reviews in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and of making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our reviews, we are not aware of any material modifications that should be made to such condensed consolidated interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.

We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of Oncor Electric Delivery Holdings Company LLC and subsidiaries as of December 31, 2008, and the related statements of consolidated income (loss), comprehensive income (loss), cash flows, and membership interests for the year then ended (not presented herein); and in our report dated September 2, 2009 (which report includes an explanatory paragraph related to (1) Oncor Holdings being a wholly owned subsidiary of Energy Future Holdings Corp., which was merged with Texas Energy Future Merger Sub Corp on October 10, 2007 and (2) the retrospective adoption of the provisions of accounting guidance related to noncontrolling interests in consolidated financial statements), we expressed an unqualified opinion on those consolidated financial statements. In our opinion, the information set forth in the accompanying condensed consolidated balance sheet as of December 31, 2008 is fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.

/s/ Deloitte & Touche LLP

Dallas, Texas
October 29, 2009

F-45

EFIHMW00152020

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**

**CONDENSED STATEMENTS OF CONSOLIDATED INCOME**
(Unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| | | (millions of dollars) | | |
| Operating revenues: | | | | |
| Affiliated | $308 | $290 | $ 783 | $ 775 |
| Nonaffiliated | 462 | 438 | 1,254 | 1,194 |
| Total operating revenues | 770 | 728 | 2,037 | 1,969 |
| Operating expenses: | | | | |
| Operation and maintenance | 245 | 221 | 698 | 640 |
| Write off of regulatory assets (Note 2) | 25 | — | 25 | — |
| Depreciation and amortization | 147 | 128 | 405 | 370 |
| Income taxes | 49 | 73 | 122 | 162 |
| Taxes other than income taxes | 99 | 100 | 287 | 289 |
| Total operating expenses | 565 | 522 | 1,537 | 1,461 |
| Operating income | 205 | 206 | 500 | 508 |
| Other income and deductions: | | | | |
| Other income (Note 9) | 10 | 12 | 30 | 34 |
| Other deductions (Note 9) | 5 | 4 | 14 | 21 |
| Nonoperating income taxes | 7 | 7 | 19 | 17 |
| Interest income | 13 | 12 | 32 | 34 |
| Interest expense and related charges (Note 9) | 85 | 80 | 258 | 229 |
| Net income | 131 | 139 | 271 | 309 |
| Net income attributable to noncontrolling interests | 26 | — | 54 | — |
| Net income attributable to Oncor Holdings | $105 | $139 | $ 217 | $ 309 |

See Notes to Financial Statements.

F-46

Confidential

EFIHMW00152021

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**

**CONDENSED STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME**
**(Unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| | | (millions of dollars) | | |
| Net income | $131 | $139 | $271 | $309 |
| Other comprehensive income, net of tax effects: | | | | |
| Cash flow hedges: | | | | |
| Net decrease in fair value of derivatives (net of tax benefit of $—, $1, $— and $1) | — | (2) | — | (2) |
| Comprehensive income | 131 | 137 | 271 | 307 |
| Comprehensive income attributable to noncontrolling interests | 26 | — | 54 | — |
| Comprehensive income attributable to Oncor Holdings | $105 | $137 | $217 | $307 |

See Notes to Financial Statements.

F-47

Confidential

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**

**CONDENSED STATEMENTS OF CONSOLIDATED CASH FLOWS**
**(Unaudited)**

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2009 | 2008 |
| | (millions of dollars) | |
| Cash flows — operating activities: | | |
| Net income | $ 271 | $  309 |
| Adjustments to reconcile net income to cash provided by operating activities: | | |
| Depreciation and amortization | 379 | 340 |
| Write-off of regulatory assets (Note 2) | 25 | — |
| Deferred income taxes — net | 63 | 63 |
| Amortization of investment tax credits | (4) | (4) |
| Other — net | (2) | 4 |
| Changes in operating assets and liabilities: | | |
| Deferred advanced metering system revenues (Note 2) | 51 | — |
| Other operating assets and liabilities | (129) | (122) |
| Cash provided by operating activities | 654 | 590 |
| Cash flows — financing activities: | | |
| Issuance of long-term debt | — | 1,500 |
| Repayments of long-term debt | (70) | (67) |
| Net increase (decrease) in short-term borrowings | 200 | (1,130) |
| Distributions to Parent | (117) | (213) |
| Distributions to noncontrolling interests | (32) | — |
| Decrease in income tax-related note receivable from TCEH | 27 | 24 |
| Debt discount, financing and reacquisition expenses — net | (3) | (15) |
| Cash provided by financing activities | 5 | 99 |
| Cash flows — investing activities: | | |
| Capital expenditures | (728) | (654) |
| Costs to remove retired property | (30) | (26) |
| Other | (4) | 1 |
| Cash used in investing activities | (762) | (679) |
| Net change in cash and cash equivalents | (103) | 10 |
| Cash and cash equivalents — beginning balance | 126 | 22 |
| Cash and cash equivalents — ending balance | $  23 | $  32 |

See Notes to Financial Statements.

F-48

Confidential

## ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC

### CONDENSED CONSOLIDATED BALANCE SHEETS
#### (Unaudited)

| | September 30, 2009 | December 31, 2008 |
|---|---|---|
| | (millions of dollars) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 23 | $ 126 |
| Restricted cash (Note 9) | 64 | 51 |
| Trade accounts receivable from nonaffiliates — net (Note 9) | 253 | 217 |
| Trade accounts and other receivables from affiliates | 211 | 182 |
| Income taxes receivable from parent (Note 8) | — | 22 |
| Materials and supplies inventories — at average cost | 79 | 63 |
| Accumulated deferred income taxes | 7 | 54 |
| Prepayments | 83 | 75 |
| Other current assets | 7 | 9 |
| Total current assets | 727 | 799 |
| Restricted cash (Note 9) | 15 | 16 |
| Investments and other property (Note 9) | 72 | 72 |
| Property, plant and equipment — net (Note 9) | 9,058 | 8,606 |
| Goodwill | 4,064 | 4,064 |
| Note receivable due from TCEH (Note 8) | 227 | 254 |
| Regulatory assets — net (Note 2) | 1,755 | 1,892 |
| Other noncurrent assets | 54 | 60 |
| Total assets | $15,972 | $15,763 |
| **LIABILITIES AND MEMBERSHIP INTERESTS** | | |
| Current liabilities: | | |
| Short-term borrowings (Note 3) | $ 537 | $ 337 |
| Long-term debt due currently (Note 4) | 106 | 103 |
| Trade accounts payable | 128 | 124 |
| Income taxes payable to parent (Note 8) | 2 | — |
| Accrued taxes other than income taxes | 116 | 141 |
| Accrued interest | 74 | 103 |
| Other current liabilities | 116 | 99 |
| Total current liabilities | 1,079 | 907 |
| Accumulated deferred income taxes | 1,225 | 1,192 |
| Investment tax credits | 38 | 42 |
| Long-term debt, less amounts due currently (Note 4) | 5,031 | 5,101 |
| Other noncurrent liabilities and deferred credits | 1,653 | 1,720 |
| Total liabilities | 9,026 | 8,962 |
| Commitments and Contingencies (Note 5) | | |
| Membership interests (Note 6): | | |
| Oncor Holdings membership interest | 5,568 | 5,446 |
| Noncontrolling interests in subsidiary | 1,378 | 1,355 |
| Total membership interests | 6,946 | 6,801 |
| Total liabilities and membership interests | $15,972 | $15,763 |

See Notes to Financial Statements.

F-49

Confidential

## ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC

### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
#### (Unaudited)

## 1.   SIGNIFICANT ACCOUNTING POLICIES AND BUSINESS

### *Description of Business*

Oncor Holdings is a Dallas, Texas-based holding company whose financial statements reflect almost entirely the operations of its direct, majority (approximately 80%) owned subsidiary, Oncor. Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell power in the north-central, eastern and western parts of Texas. Distribution revenues from TCEH represented 38% and 39% of total revenues for the nine months ended September 30, 2009 and 2008, respectively. Oncor Holdings is a direct, wholly-owned subsidiary of Intermediate Holding, a direct, wholly-owned subsidiary of EFH Corp. Oncor Holdings' financial statements reflect almost entirely the operations of Oncor; consequently, there are no separate reportable business segments.

References in this report to Oncor Holdings are to Oncor Holdings and/or its direct or indirect subsidiaries as apparent in the context. See "Glossary" for definition of terms and abbreviations.

Various "ring-fencing" measures have been taken to enhance the credit quality of Oncor Holdings and Oncor. Such measures include, among other things: Oncor Holdings' sale of a 19.75% equity interest in Oncor to Texas Transmission in November 2008; maintenance of separate books and records for the Oncor Ring-Fenced Entities; Oncor's board of directors being comprised of a majority of independent directors, and prohibitions on the Oncor Ring-Fenced Entities' providing credit support to, or receiving credit support from, any member of the Texas Holdings Group. The assets and liabilities of the Oncor Ring-Fenced Entities are separate and distinct from those of the Texas Holdings Group, and none of the assets of the Oncor Ring-Fenced Entities are available to satisfy the debt or other obligations of any member of the Texas Holdings Group. Accordingly, Oncor's operations are conducted, and its cash flows managed, independently from the Texas Holdings Group.

### *Basis of Presentation*

Oncor Holdings' condensed consolidated financial statements have been prepared in accordance with US GAAP and on the same basis as the audited financial statements included in the 2008 Audited Financial Statements. All adjustments (consisting of normal recurring accruals) necessary for a fair presentation of the results of operations and financial position have been included therein. All intercompany items and transactions have been eliminated in consolidation. Certain information and footnote disclosures normally included in annual consolidated financial statements prepared in accordance with US GAAP have been omitted pursuant to the rules and regulations of the SEC. Because the condensed consolidated interim financial statements do not include all of the information and footnotes required by US GAAP, they should be read in conjunction with the audited financial statements and related notes included in the 2008 Audited Financial Statements. The results of operations for an interim period may not give a true indication of results for a full year. All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated. Subsequent events have been evaluated through October 29, 2009, the date these condensed consolidated financial statements were issued.

Effective with reporting for the third quarter 2009, income tax expense related to noncontrolling interests is included in operating income instead of other income and deductions. Such income tax amounts for the year-to-date period ended September 30, 2009 included $8 million related to each of the three months ended March 31 and June 30, 2009.

F-50

Confidential

### Use of Estimates

Preparation of the financial statements requires estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including fair value measurements. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information. No material adjustments, other than those disclosed elsewhere herein, were made to previous estimates or assumptions during the current year.

### Property, Plant and Equipment

Properties are stated at original cost. The cost of self-constructed property additions includes materials and both direct and indirect labor and applicable overhead and an allowance for funds used during construction.

Depreciation of property, plant and equipment is calculated on a straight-line basis over the estimated service lives of the properties based on depreciation rates approved by the PUCT. Depreciation rates include plant removal costs as a component of depreciation expense, consistent with regulatory treatment. As is common in the industry, depreciation expense is recorded using composite depreciation rates that reflect blended estimates of the lives of major asset components as compared to depreciation expense calculated on an asset-by-asset basis.

In accordance with the PUCT's August 2009 order in Oncor's rate review, the remaining net book value and anticipated removal cost of existing meters that are being replaced by advanced meters is being charged (amortized) to expense over an 11-year cost recovery period.

### Changes in Accounting Standards

In June 2009, the FASB issued "The *FASB Accounting Standards Codification*™ and the Hierarchy of Generally Accepted Accounting Principles," which establishes the *FASB Accounting Standards Codification*™ (Codification) as the source of authoritative US GAAP recognized by the FASB to be applied to nongovernmental entities. The Codification was effective for financial statements issued for interim and annual periods ending after September 15, 2009. The adoption of the Codification did not affect reported results of operations, financial condition or cash flows. Oncor Holdings implemented the Codification in this quarterly report.

In May 2009, the FASB issued new guidance related to subsequent events that requires disclosure of the date through which Oncor Holdings has evaluated subsequent events related to the financial statements being issued and the basis for that date (either the date the financial statements were issued or the date they were available to be issued). This guidance was effective for interim and annual reporting periods ending after June 15, 2009. The adoption of this guidance as of April 1, 2009 did not affect reported results of operations, financial condition or cash flows, and the required disclosure is provided above in "Basis of Presentation."

In April 2009, the FASB issued new guidance requiring the disclosure of summarized financial information about the fair value of financial instruments for interim reporting. This new guidance was effective for interim reporting periods ending after June 15, 2009, and Oncor Holdings adopted it as of April 1, 2009. As this new guidance provides only disclosure requirements, the adoption did not have any effect on reported results of operations, financial condition or cash flows. The disclosures are provided in Note 4.

In December 2008, the FASB issued new guidance for employers' disclosures about postretirement benefit plan assets. This new guidance provides enhanced disclosures regarding how investment allocation decisions are made and certain aspects of fair value measurements on plan assets. The required disclosures are intended to provide transparency related to the types of assets and associated risks in an employer's defined benefit pension or other postretirement employee benefits plan and events in the economy and markets that could have a significant effect on the value of plan assets. These new disclosure requirements are effective for fiscal years ending after December 15, 2009. As this new guidance provides only disclosure requirements, the adoption will not have any effect on reported results of operations, financial condition or cash flows.

F-51

EFIHMW00152026

**PX 022**
**Page 207 of 218**

In December 2007, the FASB issued amended guidance for accounting for noncontrolling interests in consolidated financial statements effective for fiscal years beginning on or after December 15, 2008. This amended guidance requires noncontrolling interests in subsidiaries initially to be measured at fair value and classified as a separate component of equity. Effective January 1, 2009, on a retrospective basis, Oncor Holdings classified the noncontrolling interests created as a result of Oncor's November 2008 sale of equity interests ($1.355 billion at December 31, 2008) as a separate component of membership interests in the balance sheet, and reported consolidated net income includes the net income attributable to noncontrolling interests.

## 2. REGULATORY ASSETS AND LIABILITIES

Recognition of regulatory assets and liabilities and the amortization periods over which they are expected to be recovered or refunded through rate regulation reflect the decisions of the PUCT. Components of the regulatory assets and liabilities are provided in the table below. Amounts not earning a return through rate regulation are noted. On August 31, 2009, the PUCT issued a final order on Oncor's rate review filed in June 2008. The rate review included a determination of the recoverability of regulatory assets as of December 31, 2007, including the recoverability period of those assets deemed allowable by the PUCT. The PUCT's findings included denial of recovery of certain regulatory assets primarily related to business restructuring costs and rate case expenses, which resulted in a $25 million charge ($16 million after-tax) in the third quarter 2009 reported as write off of regulatory assets.

| | Remaining Rate Recovery/Amortization Period as of September 30, 2009 | Carrying Amount | |
| --- | --- | --- | --- |
| | | September 30, 2009 | December 31, 2008 |
| Regulatory assets: | | | |
| Generation-related regulatory assets securitized by transition bonds(a) | 7 years | $ 787 | $ 865 |
| Employee retirement costs | 5 years | 84 | — |
| Employee retirement costs to be reviewed(b)(c) | To be determined | 37 | 100 |
| Employee retirement liability(a)(c)(d) | To be determined | 542 | 559 |
| Self-insurance reserve (primarily storm recovery costs) — net | 7 years | 142 | — |
| Self-insurance reserve to be reviewed(b)(c) | To be determined | 109 | 214 |
| Nuclear decommissioning cost under-recovery(a)(c)(e) | Not applicable | 90 | 127 |
| Securities reacquisition costs (pre-industry restructure) | 8 years | 63 | 68 |
| Securities reacquisition costs (post-industry restructure) | Terms of related debt | 28 | 29 |
| Recoverable amounts for/in lieu of deferred income taxes — net | Life of related asset or liability | 76 | 77 |
| Rate case expenses(f) | Largely 3 years | 9 | 10 |
| Rate case expenses to be reviewed(b)(c) | To be determined | 2 | — |
| Advanced meter customer education costs | 10 years | 4 | 2 |
| Deferred conventional meter depreciation | 10 years | 2 | — |
| Business restructuring costs(g) | Not applicable | — | 20 |
| Total regulatory assets | | 1,975 | 2,071 |
| Regulatory liabilities: | | | |
| Committed spending for demand-side management initiatives(a) | 3 years | 87 | 96 |
| Deferred advanced metering system revenues | 10 years | 51 | — |
| Investment tax credit and protected excess deferred taxes | Various | 46 | 49 |
| Over-collection of securitization (transition) bond revenues(a) | 7 years | 32 | 28 |
| Other regulatory liabilities(a) | Various | 4 | 6 |
| Total regulatory liabilities | | 220 | 179 |
| Net regulatory asset | | $1,755 | $1,892 |

Confidential

(a)   Not earning a return in the regulatory rate-setting process.
(b)   Costs incurred since the period covered under the last rate review.
(c)   Recovery is specifically authorized by statute, subject to reasonableness review by the PUCT.
(d)   Represents unfunded liabilities recorded in accordance with pension and OPEB accounting standards.
(e)   Offset by an intercompany payable to TCEH. See Note 8.
(f)   Rate case expenses totaling $4 million were disallowed by the PUCT and written off in the third quarter of 2009.
(g)   All previously recorded business restructuring costs were disallowed by the PUCT and written off in the third quarter of 2009.

As part of purchase accounting, the carrying value of the generation-related regulatory assets was reduced by $213 million, and this amount is being accreted to other income over the approximate nine-year recovery period remaining as of the date of the Merger.

In September 2008, the PUCT approved a settlement for Oncor to recover its estimated future investment for advanced metering deployment. Oncor began billing the advanced metering surcharge in the January 2009 billing month cycle. The surcharge is expected to total $1.023 billion over the 11-year recovery period and includes a cost recovery factor of $2.19 per month per residential retail customer and $2.39 to $5.15 per month for non-residential retail customers. Oncor Holdings accounts for the difference between the surcharge billings for advanced metering facilities and the allowed revenues under the surcharge provisions, which are based on expenditures and an allowed return, as a regulatory asset or liability. Such differences arise principally as a result of timing of expenditures. As indicated in the table above, the regulatory liability at September 30, 2009 totaled $51 million.

See Note 8 for additional information regarding nuclear decommissioning cost recovery.

## 3.   BORROWINGS UNDER CREDIT FACILITIES

At September 30, 2009, Oncor had a $2.0 billion secured revolving credit facility, expiring October 10, 2013, to be used for its working capital and general corporate purposes, including issuances of commercial paper and letters of credit. Increases in the commitments under the facility may be requested in any amount up to $500 million, subject to the satisfaction of certain conditions. Amounts borrowed under the facility, once repaid, can be borrowed again from time to time. Borrowings are classified as short-term on the balance sheet.

At September 30, 2009, Oncor had outstanding borrowings under the credit facility totaling $537 million with an interest rate of 0.60% at the end of the period. At December 31, 2008, outstanding borrowings under the credit facility totaled $337 million with an interest rate of 1.98% at the end of the period. All outstanding borrowings at September 30, 2009 bear interest at LIBOR plus 0.350%, and a facility fee is payable (currently at a rate per annum equal to 0.125%) on the commitments under the facility, each based on Oncor's current credit ratings. The interest rate and facility fee per annum declined in June 2009 from LIBOR plus 0.425% and 0.150%, respectively, due to a two notch upgrade in Oncor's credit ratings by Moody's.

Availability under the credit facility as of September 30, 2009 was $1.341 billion. This availability excludes $122 million of commitments from a subsidiary of Lehman Brothers Holding Inc. (such subsidiary, Lehman) that has filed for bankruptcy under Chapter 11 of the US Bankruptcy Code. Availability under the credit facility as of December 31, 2008 was $1.508 billion, which excluded $155 million of commitments from Lehman. See Note 10 to the 2008 Audited Financial Statements for additional information.

F-53

**PX 022**
**Page 209 of 218**

4.  **LONG-TERM DEBT**

At September 30, 2009 and December 31, 2008, long-term debt consisted of the following:

| | September 30, 2009 | December 31, 2008 |
|---|---|---|
| Oncor(a): | | |
| 6.375% Fixed Senior Notes due May 1, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 700 | $ 700 |
| 5.950% Fixed Senior Notes due September 1, 2013 . . . . . . . . . . . . . . . . . . . . . . . | 650 | 650 |
| 6.375% Fixed Senior Notes due January 15, 2015 . . . . . . . . . . . . . . . . . . . . . . . . | 500 | 500 |
| 6.800% Fixed Senior Notes due September 1, 2018 . . . . . . . . . . . . . . . . . . . . . . . | 550 | 550 |
| 7.000% Fixed Debentures due September 1, 2022 . . . . . . . . . . . . . . . . . . . . . . . . | 800 | 800 |
| 7.000% Fixed Senior Notes due May 1, 2032 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 500 | 500 |
| 7.250% Fixed Senior Notes due January 15, 2033 . . . . . . . . . . . . . . . . . . . . . . . . | 350 | 350 |
| 7.500% Fixed Senior Notes due September 1, 2038 . . . . . . . . . . . . . . . . . . . . . . . | 300 | 300 |
| Unamortized discount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (15) | (16) |
| Total Oncor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,335 | 4,334 |
| Oncor Electric Delivery Transition Bond Company LLC(b): | | |
| 4.030% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 | 54 |
| 4.950% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 130 | 130 |
| 5.420% Fixed Series 2003 Bonds due in semiannual installments through August 15, 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 145 | 145 |
| 3.520% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 | 39 |
| 4.810% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 221 | 221 |
| 5.290% Fixed Series 2004 Bonds due in semiannual installments through May 15, 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 290 | 290 |
| Total Oncor Electric Delivery Transition Bond Company LLC . . . . . . . . . . . | 809 | 879 |
| Unamortized fair value discount related to transition bonds(c) . . . . . . . . . . . . . . | (7) | (9) |
| Total consolidated(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,137 | 5,204 |
| Less amount due currently . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (106) | (103) |
| Total long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $5,031 | $5,101 |

---

(a)  Secured with first priority lien on certain transmission and distribution assets equally and ratably with the credit facility. If the lien is terminated at Oncor's option upon the termination of the current credit facility, the notes will cease to be secured obligations and will become senior unsecured general obligations. See Note 11 to the 2008 Audited Financial Statements for additional information.

(b)  The transition bonds are nonrecourse to Oncor and were issued to securitize a regulatory asset.

(c)  The transition bonds, which secured regulatory assets not earning a return, were fair valued as of October 10, 2007 as a result of purchase accounting.

(d)  According to its organizational documents, Oncor Holdings is prohibited from directly incurring indebtedness for borrowed money.

Confidential

*Debt Repayments in 2009*

Repayments of long-term debt in 2009 totaled $70 million and represent transition bond principal payments at scheduled maturity dates.

*Fair Value of Long-Term Debt*

The estimated fair value of long-term debt (including current maturities) totaled $5.862 billion at September 30, 2009 and $4.990 billion at December 31, 2008, and the carrying amount totaled $5.137 billion and $5.204 billion, respectively. The fair value is estimated at the lesser of either the call price or the market value as determined by quoted market prices.

### 5. COMMITMENTS AND CONTINGENCIES

*Legal Proceedings*

Oncor Holdings is involved in various legal and administrative proceedings in the normal course of business, the ultimate resolution of which, in the opinion of management, should not have a material effect upon its financial position, results of operations or cash flows.

*Guarantees*

Oncor has entered into contracts that contain guarantees to outside parties that could require performance or payment under certain conditions.

Oncor is the lessee under various operating leases that obligate it to guarantee the residual values of the leased assets. At September 30, 2009, both the aggregate maximum amount of residual values guaranteed and the estimated residual recoveries totaled approximately $10 million. These leased assets consist primarily of vehicles used in distribution activities. The average life of the residual value guarantees under the lease portfolio is approximately one year.

### 6. MEMBERSHIP INTERESTS

*Cash Distributions*

During 2009, Oncor Holdings' board of directors declared and Oncor Holdings paid the following cash distributions to Intermediate Holding:

| Declaration Date | Payment Date | Amount Paid |
|---|---|---|
| August 18, 2009 | August 19, 2009 | $59 |
| May 19, 2009 | May 20, 2009 | $40 |
| February 18, 2009 | March 3, 2009 | $18 |

While there are no direct restrictions on Oncor Holdings' ability to distribute its net income that are currently material, substantially all of Oncor Holdings' net income is derived from Oncor. The boards of directors of each of Oncor and Oncor Holdings, which are composed of a majority of independent directors, can withhold distributions to the extent the boards determine that it is necessary to retain such amounts to meet expected future requirements of Oncor and/or Oncor Holdings. For the period beginning October 11, 2007 and ending December 31, 2012, distributions paid by Oncor (other than distributions of the proceeds of any issuance of limited liability company units) are limited by the Limited Liability Company Agreement to an amount not to exceed Oncor's net cumulative income determined in accordance with GAAP, as adjusted by applicable orders of the PUCT. Such adjustments include deducting the $72 million ($46 million after tax) one-time refund to

F-55

Confidential

customers in September 2008 and deducting funds spent as part of the $100 million commitment for additional demand-side management or other energy efficiency initiatives (see Note 4 to the 2008 Audited Financial Statements) of which $13 million ($9 million after tax) has been spent through September 30, 2009, neither of which impacted net income due to purchase accounting, and removing the effect of the $860 million goodwill impairment charge from fourth quarter 2008 net income available for distribution. The refund and goodwill impairment charge are described in the 2008 Audited Financial Statements. Distributions are further limited by Oncor's required regulatory capital structure, as determined by the PUCT, to be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. At September 30, 2009, no material amount of net income was restricted from being used to make distributions on membership interests.

### Noncontrolling Interests

In November 2008, Oncor sold equity interests to Texas Transmission. Oncor also indirectly sold equity interests to certain members of its board of directors and its management team. Accordingly, after giving effect to all equity issuances, as of September 30, 2009, Oncor's ownership was as follows: 80.03% held by Oncor Holdings, 0.22% held indirectly by Oncor's management and board of directors and 19.75% held by Texas Transmission.

### Membership Interests

The following table presents the changes to membership interests during the nine months ended September 30, 2009:

| | Capital Account | Accumulated Other Comprehensive Loss | Noncontrolling Interests | Total Membership Interests |
|---|---|---|---|---|
| Balance at December 31, 2008 | $5,448 | $ (2) | $1,355 | $6,801 |
| Net income | 217 | — | 54 | 271 |
| Distributions | (117) | — | — | (117) |
| Distributions to noncontrolling interests | — | — | (32) | (32) |
| Capital contributions(a) | 22 | — | — | 22 |
| Other | — | — | 1 | 1 |
| Balance at September 30, 2009 | $5,570 | $ (2) | $1,378 | $6,946 |

(a) Reflects noncash settlement of certain income taxes payable arising as a result of the sale of noncontrolling interests in Oncor.

### 7. PENSION AND OTHER POSTRETIREMENT EMPLOYEE BENEFITS (OPEB) COSTS

Subsidiaries of Oncor Holdings are participating employers in the EFH Retirement Plan, a defined benefit pension plan sponsored by EFH Corp., and also participate with EFH Corp. and certain other affiliated subsidiaries of EFH Corp. to offer certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees. The net allocated pension and OPEB costs applicable to Oncor Holdings for the three and nine months ended September 30, 2009 and 2008 are comprised of the following:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Amounts recognized as expense | $ 5 | $ 4 | $14 | $13 |
| Amounts deferred principally as a regulatory asset or property | 18 | 10 | 51 | 32 |
| Net pension and OPEB costs | $23 | $14 | $65 | $45 |

F-56

EFIHMW00152031
PX 022
Page 212 of 218

The discount rates reflected in net pension and OPEB costs in 2009 are 6.90% and 6.85%, respectively. The expected rates of return on pension and OPEB plan assets reflected in the 2009 cost amounts are 8.25% and 7.64%, respectively.

Subsidiaries of Oncor Holdings made contributions to EFH Corp.'s pension and OPEB plans of $41 million and $13 million, respectively, during the nine months ended September 30, 2009, and expect to make additional contributions of $16 million and $4 million, respectively, in the remainder of 2009.

## 8.    RELATED — PARTY TRANSACTIONS

The following represents Oncor Holdings' significant related-party transactions:

- Oncor records revenue from TCEH, principally for electricity delivery fees, which totaled $308 million and $290 million for the three months ended September 30, 2009 and 2008, respectively, and $783 million and $775 million for the nine months ended September 30, 2009 and 2008, respectively.

- Oncor records interest income from TCEH with respect to generation-related regulatory assets, which have been securitized through the issuance of transition bonds by Oncor's bankruptcy-remote financing subsidiary. The interest income serves to offset interest expense on the transition bonds. This interest income totaled $10 million and $11 million for the three months ended September 30, 2009 and 2008, respectively, and $32 million and $35 million for the nine months ended September 30, 2009 and 2008, respectively.

- Incremental amounts payable related to income taxes as a result of delivery fee surcharges to customers related to transition bonds are reimbursed by TCEH. Oncor Holdings' financial statements reflect a note receivable from TCEH to Oncor of $263 million ($36 million reported as current in trade accounts and other receivables from affiliates) at September 30, 2009 and $289 million ($35 million reported as current in trade accounts and other receivables from affiliates) at December 31, 2008 related to these income taxes.

- An EFH Corp. subsidiary charges Oncor for financial and certain other administrative services at cost. These costs, which are reported in operation and maintenance expenses, totaled $6 million and $5 million for the three months ended September 30, 2009 and 2008, respectively, and $19 million and $17 million for the nine months ended September 30, 2009 and 2008, respectively.

- Under Texas regulatory provisions, the trust fund for decommissioning the Comanche Peak nuclear generation facility (reported on TCEH's balance sheet) is funded by a delivery fee surcharge collected from REPs by Oncor and remitted to TCEH. These trust fund assets are established with the intent to be sufficient to fund the estimated decommissioning liability (also reported on TCEH's balance sheet). Income and expenses associated with the trust fund and the decommissioning liability recorded by TCEH are offset by a net change in the Oncor and TCEH intercompany receivable/payable, which in turn results in a change in Oncor's reported net regulatory asset/liability. The regulatory asset of $90 million and $127 million at September 30, 2009 and December 31, 2008, respectively, represents the excess of the net decommissioning liability over the trust fund balance.

- Oncor has a 19.5% limited partnership interest, with carrying values of $4 million and $5 million at September 30, 2009 and December 31, 2008, respectively, in an EFH Corp. subsidiary holding principally software-related assets. Equity losses related to this interest are reported in other deductions and totaled $1 million for both the three months ended September 30, 2009 and 2008 and $1 million and $3 million for the nine months ended September 30, 2009 and 2008, respectively. These losses primarily represent amortization of software assets held by the subsidiary.

- EFH Corp. files a consolidated federal income tax return and allocates income tax liabilities to Oncor Holdings under a tax sharing agreement substantially as if Oncor Holdings was filing its own income tax returns. Oncor Holdings' results are included in the consolidated Texas state margin tax return filed by EFH Corp. Oncor Holdings' amount payable to EFH Corp. related to income taxes totaled $2 million at

F-57

EFIHMW00152032

September 30, 2009, and amount receivable from EFH Corp. related to income taxes, primarily due to timing of payments, totaled $22 million at December 31, 2008. Income tax payments in the nine months ended September 30, 2009 totaled $19 million to EFH Corp., and Oncor made federal income tax payments totaling $9 million to noncontrolling interests.

- Oncor held cash collateral of $15 million on both September 30, 2009 and December 31, 2008 provided by TCEH related to interconnection agreements for three generation units being developed by TCEH. The collateral is reported in the balance sheet in other current liabilities.

- Certain transmission and distribution utilities in Texas have tariffs in place to assure adequate creditworthiness of any REP to support the REP's obligation to collect securitization bond-related (transition) charges on behalf of the utility. Under these tariffs, as a result of TCEH's credit rating being below investment grade, TCEH is required to post collateral support in an amount equal to estimated transition charges over specified time periods. Accordingly, as of September 30, 2009 and December 31, 2008, TCEH had posted letters of credit in the amounts of $16 million and $13 million, respectively, for Oncor's benefit.

- At the closing of the Merger, Oncor entered into its current $2 billion revolving credit facility with a syndicate of financial institutions and other lenders. The syndicate includes affiliates of GS Capital Partners. Affiliates of GS Capital Partners (a member of the Sponsor Group) have from time to time engaged in commercial banking transactions with Oncor Holdings or its subsidiaries in the normal course of business.

- Affiliates of the Sponsor Group have, and may, sell, acquire or participate in the offerings of debt or debt securities issued by Oncor Holdings or its subsidiaries in open market transactions or through loan syndications.

See Notes 6 and 7 for information regarding distributions to Intermediate Holding, capital contributions and the allocation of EFH Corp.'s pension and OPEB costs to Oncor Holdings, respectively.

## 9.    SUPPLEMENTARY FINANCIAL INFORMATION

### Other Income and Deductions

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Other income: | | | | |
| Accretion of adjustment (discount) of regulatory assets resulting from purchase accounting | $ 10 | $ 11 | $ 30 | $33 |
| Net gain on sale of other properties and investments | — | 1 | — | 1 |
| Total other income | $ 10 | $ 12 | $ 30 | $34 |
| Other deductions: | | | | |
| Professional fees | $ 2 | $ 1 | $ 7 | $ 4 |
| Costs related to 2006 cities rate settlement | 1 | — | 2 | 13 |
| Other | 2 | 3 | 5 | 4 |
| Total other deductions | $ 5 | $ 4 | $ 14 | $21 |

### Major Customers

Distribution revenues from TCEH represented 40% of total operating revenues for both the three months ended September 30, 2009 and 2008, and 38% and 39% for the nine months ended September 30, 2009 and 2008, respectively. Revenues from subsidiaries of one nonaffiliated REP collectively represented 13% and 14%

F-58

Confidential

of total operating revenues for the three months ended September 30, 2009 and 2008, respectively, and 14% and 15% for the nine months ended September 30, 2009 and 2008, respectively. No other customer represented 10% or more of total operating revenues.

### Interest Expense and Related Charges

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Interest | $ 84 | $80 | $254 | $226 |
| Amortization of fair value debt discounts resulting from purchase accounting | — | 1 | 2 | 3 |
| Amortization of debt issuance costs and discounts | 2 | 1 | 5 | 4 |
| Allowance for funds used during construction — capitalized interest portion | (1) | (2) | (3) | (4) |
| Total interest expense and related charges | $ 85 | $80 | $258 | $229 |

### Restricted Cash

All restricted cash amounts reported on the balance sheet relate to the securitization (transition) bonds.

### Trade Accounts Receivable

| | September 30, 2009 | December 31, 2008 |
|---|---|---|
| Gross trade accounts receivable | $ 427 | $ 359 |
| Trade accounts receivable from TCEH | (172) | (135) |
| Allowance for uncollectible accounts | (2) | (7) |
| Trade accounts receivable from nonaffiliates — net | $ 253 | $ 217 |

Gross trade accounts receivable at September 30, 2009 and December 31, 2008 included unbilled revenues of $138 million and $140 million, respectively.

In April 2009, the PUCT finalized a new rule relating to the Certification of Retail Electric Providers. Under the new rule, write-offs of uncollectible amounts owed by nonaffiliated REPs are deferred as a regulatory asset. Accordingly, Oncor Holdings recognized a $3 million one-time reversal of bad debt expense in the three months ended June 30, 2009 representing bad debt reserves previously recognized for nonaffiliated REP accounts receivable.

### Investments

| | September 30, 2009 | December 31, 2008 |
|---|---|---|
| Assets related to employee benefit plans, including employee savings programs, net of distributions | $66 | $65 |
| Investments in unconsolidated affiliates | 4 | 5 |
| Land | 2 | 2 |
| Total investments | $72 | $72 |

F-59

*Property, Plant and Equipment*

At September 30, 2009 and December 31, 2008, property, plant and equipment of $9.1 billion and $8.6 billion, respectively, is stated net of accumulated depreciation and amortization of $4.3 and $4.2 billion, respectively.

*Intangible Assets*

Intangible assets other than goodwill reported in the balance sheet are comprised of the following:

| | As of September 30, 2009 | | | As of December 31, 2008 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net | Gross Carrying Amount | Accumulated Amortization | Net |
| Intangible assets subject to amortization included in property, plant and equipment: | | | | | | |
| Land easements ........................ | $184 | $ 71 | $113 | $184 | $ 69 | $115 |
| Capitalized software ................... | 203 | 99 | 104 | 145 | 80 | 65 |
| Total ........................... | $387 | $170 | $217 | $329 | $149 | $180 |

Aggregate amortization expense for intangible assets totaled $9 million and $5 million for the three months ended September 30, 2009 and 2008, respectively, and $21 million and $14 million for the nine months ended September 30, 2009 and 2008, respectively. The estimated aggregate amortization expense for each of the five succeeding fiscal years from December 31, 2008 is as follows:

| Year | Amortization Expense |
|---|---|
| 2009 ..................................................... | $29 |
| 2010 ..................................................... | 25 |
| 2011 ..................................................... | 22 |
| 2012 ..................................................... | 19 |
| 2013 ..................................................... | 13 |

At September 30, 2009 and December 31, 2008, goodwill of $4.1 billion was reported on the balance sheet. None of this goodwill balance is being deducted for tax purposes. This balance is net of the $860 million goodwill impairment charge recorded in the fourth quarter of 2008 (see Note 3 to the 2008 Audited Financial Statements), which is the only goodwill impairment recorded since the Merger.

*Exit Liabilities*

As part of purchase accounting, Oncor accrued $16 million in costs expected to be incurred related to the termination and transition of outsourcing arrangements. Oncor incurred $1 million of the exit liabilities in the nine months ended September 30, 2009, and the remaining accrual is expected to be settled no later than June 30, 2010, the targeted date of completion of transition of outsourced activities.

F-60

EFIHMW00152035

**PX 022
Page 216 of 218**

*Other Noncurrent Liabilities and Deferred Credits*

The balance of other noncurrent liabilities and deferred credits consists of the following:

| | September 30, 2009 | December 31, 2008 |
|---|---|---|
| Retirement plan and other employee benefits | $1,118 | $1,115 |
| Liabilities related to subsidiary tax sharing agreement | 314 | 299 |
| Uncertain tax positions (including accrued interest) | 88 | 144 |
| Nuclear decommissioning cost under-recovery(a) | 90 | 127 |
| Other | 43 | 35 |
| Total other noncurrent liabilities and deferred credits | $1,653 | $1,720 |

(a)  Represents intercompany payable to TCEH offset in Oncor's net reported regulatory asset/liability. See Note 8.

Oncor Holdings does not expect the total amount of liabilities recorded related to uncertain tax positions to significantly increase or decrease within the next 12 months. As of September 30, 2009, the federal income tax benefit on the interest accrued on uncertain tax positions is recorded as accumulated deferred income taxes.

*Liabilities Related to Subsidiary Tax Sharing Agreement* — Amount represents the noncontrolling interests' portion of the previously tax recorded net deferred tax liabilities of Oncor. Upon the sale of noncontrolling interests in Oncor (see Note 6), Oncor became a partnership for US federal income tax purposes, and the temporary differences which gave rise to the deferred taxes will, over time, become taxable to the noncontrolling interests. Under a tax sharing agreement among Oncor and its equity holders, Oncor reimburses its equity holders for federal income taxes as the partnership earnings become taxable to such holders. Accordingly, as the temporary differences become taxable, the equity holders will be reimbursed by Oncor. In the unlikely event such amounts are not reimbursed under the tax sharing agreement, it is probable they would be refunded to rate payers. The net changes in the liability for the nine months ended September 30, 2009 totaling $15 million reflected changes in temporary differences.

*Supplemental Cash Flow Information*

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2009 | 2008 |
| Cash payments: | | |
| Interest paid | $283 | $227 |
| Capitalized interest | (3) | (4) |
| Interest (net of amounts capitalized) | 280 | 223 |
| Income taxes | 28 | 76 |
| Noncash investing and financing activities: | | |
| Noncash construction expenditures(a) | 56 | 24 |
| Noncash capital contribution related to settlement of certain income taxes payable (see Note 6) | 22 | — |

(a)  Represents end-of-period accruals.

**** 

F-61

Confidential

$500,000,000

# ENERGY FUTURE HOLDINGS CORP.

## 10.000% Senior Secured Notes due 2020

———————

**OFFERING MEMORANDUM**

**January 7, 2010**

———————

**Citi**

**Goldman, Sachs & Co.**

**Credit Suisse**

**J.P. Morgan**

———

BofA Merrill Lynch

Morgan Stanley