As filed with the Securities and Exchange Commission on July 16, 2010

Registration No. 333-

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM S-4
## REGISTRATION STATEMENT
### *UNDER*
### *THE SECURITIES ACT OF 1933*

# Energy Future Intermediate Holding Company LLC
# EFIH Finance Inc.
#### (Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| Delaware | 4911 | 26-1191638 |
| Delaware | 4911 | 27-0918038 |
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

1601 Bryan Street
Dallas, Texas 75201-3411
(214) 812-4600
(Address, including zip code, and telephone number, including area code, of registrants' principal executive offices)

Andrew M. Wright
EFH Corporate Services Company
Vice President and Associate General Counsel
1601 Bryan Street
Dallas, Texas 75201
(214) 812-4600
(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| | | |
|---|---|---|
| Keith R. Fullenweider | John D. Lobrano | Andrew R. Schleider |
| Robert B. Little | Edward P. Tolley III | Lona Nallengara |
| Vinson & Elkins L.L.P. | Simpson Thacher & Bartlett LLP | Shearman & Sterling LLP |
| 2001 Ross Avenue, Suite 3700 | 425 Lexington Avenue | 599 Lexington Avenue |
| Dallas, Texas 75201-2975 | New York, New York 10017-3954 | New York, New York 10022-6069 |
| (214) 220-7931 | (212) 455-2000 | (212) 848-4000 |

Approximate date of commencement of proposed sale to the public: The offering of the securities will commence promptly following the filing of this Registration Statement. No tendered securities will be accepted for exchange until after this Registration Statement has been declared effective.

If the securities being registered on this Form are to be offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐        Accelerated filer ☐
Non-accelerated filer ☑ (Do not check if a smaller reporting company)    Smaller reporting company ☐

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Exchange Act Rule 13e-4(i) (Cross-Border Issue Tender Offer) ☐
Exchange Act Rule 14d-1(d) (Cross-Border Third Party Tender Offer) ☐

### CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Amount to be Registered | Proposed Maximum Offering Price per Unit | Proposed Maximum Aggregate Offering Price(1) | Amount of Registration Fee(2) |
|---|---|---|---|---|
| 10.000% Senior Secured Notes due 2020 of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. | $2,280,000,000 | 100% | $2,280,000,000 | $[162,564] |

(1)  Estimated solely for the purpose of calculating the registration fee under Rule 457(f) of the Securities Act of 1933, as amended.
(2)  The registration fee of $162,564 is calculated in accordance with Rule 457(r) of the Securities Act of 1933, as amended. Pursuant to Rule 457(p) under the Securities Act of 1933, as amended, a portion of the $223,200 previously paid and unused registration fee remaining with respect to the proposed offering of unsold securities registered under a Registration Statement on Form S-4 (Registration No. 333-162327) initially filed with the Securities Exchange Commission by Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and Energy Future Competitive Holdings Company on October 5, 2009 is being applied to offset all of the registration fee. Accordingly, no filing fee is being paid at this time.

**The Registrants hereby amend this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrants shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until this Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

The information in this Prospectus is not complete and may be changed. Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. may not complete the exchange offers and the securities being registered may not be exchanged or distributed until the registration statement, of which this Prospectus is a part, is effective. This Prospectus is not an offer to sell and it is not soliciting of an offer to buy these securities in any state where the offer or sale is not permitted.

**PRELIMINARY PROSPECTUS**

**SUBJECT TO COMPLETION, DATED JULY 16, 2010**

# ENERGY FUTURE HOLDINGS CORP.
## ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC
## EFIH FINANCE INC.

Offers to Exchange the Outstanding Notes listed in the Table Below for:
Up to $2.28 Billion of 10.000% Senior Secured Notes due 2020
of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc.
and $400 Million in Cash
and
Solicitation of Consents in Respect of the Notes Listed Below

---

THE EXCHANGE OFFERS FOR THE OLD NOTES (AS DEFINED BELOW) WILL EXPIRE AT MIDNIGHT, NEW YORK CITY TIME, ON AUGUST 12, 2010 (SUCH TIME AND DATE, AS IT MAY BE EXTENDED, THE "EXPIRATION DATE"). HOLDERS WHO VALIDLY TENDER (AND DO NOT VALIDLY WITHDRAW) OLD NOTES AT OR PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON JULY 29, 2010 (SUCH TIME AND DATE, AS IT MAY BE EXTENDED, THE "EARLY TENDER DATE") WILL BE ELIGIBLE TO RECEIVE ADDITIONAL CONSIDERATION AS DESCRIBED BELOW. TENDERS OF OLD NOTES MAY BE VALIDLY WITHDRAWN AT ANY TIME AT OR PRIOR TO THE EXPIRATION DATE.

THE SOLICITATION OF CONSENTS (AS DEFINED BELOW) FOR OLD NOTES WILL EXPIRE AT 5:00 P.M., NEW YORK CITY TIME, ON JULY 29, 2010 (SUCH TIME AND DATE, AS IT MAY BE EXTENDED, THE "CONSENT DATE"). CONSENTS MAY BE REVOKED AT ANY TIME AT OR PRIOR TO THE CONSENT DATE.

---

Upon the terms and subject to the conditions set forth in this prospectus (as it may be supplemented and amended from time to time, and including the annexes hereto, this "Prospectus") and the related consent and letter of transmittal (as it may be supplemented and amended from time to time, the "Consent and Letter of Transmittal"), including the Maximum Exchange Amount (as defined below) and the possible prorations resulting therefrom, Energy Future Intermediate Holding Company LLC ("EFIH") and EFIH Finance Inc. ("EFIH Finance" and, together with EFIH, the "Offeror") are offering to exchange (the "exchange offers") the outstanding notes listed in the table below (the "Old Notes") for up to $2.28 billion aggregate principal amount of 10.000% Senior Secured Notes due 2020 of the Offeror (the "New EFIH Senior Secured Notes") and, for Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date, an aggregate of $400 million in cash. The exchange offers are conditioned on at least a majority of the outstanding aggregate principal amount of Old Notes being validly tendered (and not validly withdrawn) at or prior to the Expiration Date and other conditions.

**You are encouraged to carefully consider all the information included in this Prospectus, including the annexes hereto, in its entirety, in particular "Risk Factors" beginning on page [33].**

**EFIH intends to apply to list the New EFIH Senior Secured Notes on the New York Stock Exchange.**

**None of the Offeror, EFIH Corp., the Dealer Managers (as defined below), the Exchange Agent (as defined below), the Information Agent (as defined below) or any other person is making any recommendation as to whether or not you should tender your Old Notes for exchange in the exchange offers or deliver Consents pursuant to the consent solicitation (as defined below). You must make your own decision whether to tender Old Notes in the exchange offers and to deliver Consents in the consent solicitation and, if so, the amount of Old Notes as to which action is to be taken.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the exchange offers, the New EFIH Senior Secured Notes or the consent solicitation or determined if this Prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

*Lead Dealer Managers and Solicitation Agents*

**[Citi]**                                           **[Goldman Sachs & Company]**

*Co-Dealer Managers and Solicitation Agents*
**[TO COME]**

, 2010

Upon the terms and subject to the conditions of the exchange offers, including the Maximum Exchange Amount and the possible prorations resulting therefrom, participating holders of Old Notes will be eligible to receive, in exchange for each $1,000 principal amount of Old Notes validly tendered (and not validly withdrawn), the following:

(i) for Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date and accepted for exchange, an amount of New EFIH Senior Secured Notes and cash, together referred to as the "Total Consideration" as listed in the table below under "Total Consideration if Tendered at or Prior to the Early Tender Date," with the amount of New EFIH Senior Secured Notes (the "Total Notes Consideration") and the amount of cash (the "Total Cash Consideration") comprising the Total Consideration depending on the aggregate principal amount of Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date, as described below, and

(ii) for Old Notes validly tendered (and not validly withdrawn) after the Early Tender Date and at or prior to the Expiration Date and accepted for exchange, New EFIH Senior Secured Notes, referred to as the "Exchange Consideration" as listed in the table below under "Exchange Consideration if Tendered After the Early Tender Date and at or Prior to the Expiration Date." No cash consideration will be payable with respect to Old Notes that are validly tendered after the Early Tender Date.

| CUSIP/ISN | Outstanding Principal Amount (in millions) | Issuer | Title of Old Notes | Total Consideration if Tendered at or Prior to the Early Tender Date (1)(3)(3) | Exchange Consideration if Tendered After the Early Tender Date and at or Prior to the Expiration Date (1)(3) |
|---|---|---|---|---|---|
| 292680 AD7 / US 292680 AD70 ............... | $  2,733 | Energy Future Holdings Corp. | 11.250%/12.000% Senior Toggle Notes due 2017 | $720.00 | $670.00 |
| 292680 AC9 / US 292680 AC97 292680 AA3 / US 292680 AA32 ............... | $  1,787 | Energy Future Holdings Corp. | 10.875% Senior Notes due 2017 | $785.00 | $735.00 |

(1)    Consideration per $1,000 principal amount of Old Notes. Excludes the consent payment of $2.50 per $1,000 principal amount of Old Notes payable in cash with respect to Consents received at or prior to the Consent Date, subject to the requisite Consents being received in respect of the Old Notes Indenture (as defined below) and a Supplemental Indenture (as defined below) being executed and delivered by the parties thereto.
(2)    The Total Consideration consists of the Total Notes Consideration and the Total Cash Consideration.
(3)    The aggregate principal amount of New EFIH Senior Secured Notes issuable in the exchange offers will not exceed $2.28 billion.

The aggregate amount of cash payable as the aggregate Total Cash Consideration in the exchange offers is $400 million. This aggregate amount of cash will be paid as the Total Cash Consideration pro rata in exchange for Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date and accepted for exchange, and will correspondingly reduce on a dollar basis the amount of the Total Consideration for each issue of Old Notes that is comprised of Total Notes Consideration. For example, if an aggregate of $3.2 billion of Old Notes were validly tendered (and not validly withdrawn) at or prior to the Early Tender Date and accepted for exchange, the Total Cash Consideration with respect to each $1,000 principal amount of tendered Old Notes would be $125.00, and the Total Notes Consideration with respect to each $1,000 principal amount of tendered Old Cash-Pay Notes and Old Toggle Notes would be $595.00 and $660.00, respectively. The definitive amount of the Total Notes Consideration and the Total Cash Consideration per $1,000 principal amount of Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date and accepted for exchange will be announced by press release promptly after the Early Tender Date and in any event at least ten business days prior to (and including) the Expiration Date.

The Offeror will not accept any tender of Old Notes that would result in the issuance of less than $2,000 principal amount of New EFIH Senior Secured Notes to a participating holder. The aggregate principal amount of New EFIH Senior Secured Notes issued to each participating holder for all Old Notes validly tendered (and not validly withdrawn) will be rounded down, if necessary, to $2,000 or the nearest whole multiple of $1,000 in excess thereof. This rounded amount will be the principal amount of New EFIH Senior Secured Notes you will receive, and no additional cash will be paid in lieu of any principal amount of New EFIH Senior Secured Notes not received as a result of such rounding down.

The maximum aggregate principal amount of New EFIH Senior Secured Notes issuable in the exchange offers will not exceed $2.28 billion (the "Maximum Exchange Amount"). The maximum principal amount of each issue of Old Notes that will be accepted for exchange is the outstanding principal amount of such issue validly

Confidential

tendered (and not validly withdrawn), as limited by the Maximum Exchange Amount and the prorations, if necessary, resulting therefrom. Each issue of Old Notes will be prorated on an equal basis, if proration is necessary. Subject to applicable law, the Offeror reserves the right, but is not obligated, to increase or decrease the Maximum Exchange Amount. If a change is made to the amount of securities offered to be exchanged pursuant to the exchange offers, including any change to the Maximum Exchange Amount, the exchange offers will remain open for at least ten business days from (and including) the date of the announcement of such change.

All holders whose 10.875% Senior Notes due 2017 (the "Old Cash-Pay Notes") of Energy Future Holdings Corp. ("EFH Corp.") are accepted for exchange will receive an amount equal to accrued and unpaid interest, if any, in cash, from the last applicable interest payment date to, but not including, the Settlement Date (as defined below). Holders whose 11.250%/12.000% Senior Toggle Notes due 2017 (the "Old Toggle Notes") of EFH Corp. are accepted for exchange will not separately receive any accrued and unpaid payment-in-kind interest with respect to such Old Toggle Notes because the amount of such accrued interest through the anticipated settlement date for the exchange offers has been included in determining the consideration being offered in the exchange offers for the Old Toggle Notes. If the settlement date occurs later than anticipated, then the consideration being offered in the exchange offers for the Old Toggle Notes will be adjusted to account for the additional accrued interest incurred.

Concurrent with the exchange offers, and on the terms and subject to the conditions set forth in this Prospectus and the Consent and Letter of Transmittal, EFH Corp. is soliciting (the "consent solicitation") consents (the "Consents") from holders of Old Notes to certain proposed amendments (the "Proposed Amendments") to the Indenture, dated as of October 31, 2007, by and among EFH Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, pursuant to which the Old Notes were issued, as amended and supplemented (the "Old Notes Indenture").

If the requisite Consents are received and a supplemental indenture for the Old Notes (the "Supplemental Indenture") is executed, EFH Corp. will pay to each holder with respect to such holder's Old Notes as to which Consents are validly delivered and not validly revoked at or prior to the Consent Date, a cash consent payment of $2.50 per $1,000 principal amount of such Old Notes. Such consent payment is in addition to any Total Consideration or Exchange Consideration that may be payable to a holder in respect of its Old Notes accepted for exchange. The consent payments will be made on the Settlement Date (as defined below) or promptly following the termination of the exchange offers, as applicable, assuming that the conditions to such payments are satisfied. EFH Corp.'s obligation to make consent payments is not conditioned upon completion of the exchange offers but is subject to receipt of the requisite Consents and execution and delivery of the Supplemental Indenture by the parties thereto. If the exchange offers are terminated, the Proposed Amendments in any executed Supplemental Indenture will not become operative.

The Proposed Amendments would eliminate substantially all of the restrictive covenants and references thereto contained in the Old Notes Indenture and the Old Notes, eliminate certain events of default, modify covenants regarding mergers and consolidations and modify or eliminate certain other provisions, including certain provisions relating to defeasance contained in the Old Notes Indenture and Old Notes that would otherwise prevent a defeasance without, among other things, delivery of an opinion of counsel confirming such defeasance does not constitute a taxable event. In addition to the foregoing, execution and delivery of the Consent and Letter of Transmittal will constitute an express waiver by a consenting holder of the Old Notes with respect to all claims against EFH Corp., the guarantors of the Old Notes and the Sponsor Group (as defined below) of any breach, default or event of default that may have arisen under the Old Notes Indenture. See "Proposed Amendments" for additional information regarding the Proposed Amendments.

In order to be adopted with respect to the Old Notes, the Proposed Amendments must be consented to by the holders of at least a majority of the outstanding aggregate principal amount of Old Notes (the "requisite Consents"). Holders of the Old Notes (the Old Cash-Pay Notes and the Old Toggle Notes) will vote together as a single class with respect to the Proposed Amendments that are the subject of the consent solicitation.

On July 16, 2010, EFH Corp., EFIH and EFIH Finance entered into exchange agreements with **[certain]** affiliates of **[WAMCO]** and **[Franklin]** that are holders of certain of the Old Notes (the "Exchange Agreements"), pursuant to which such holders agreed to participate in the exchange offers and the consent solicitation. The Offeror expects that such holders will tender and deliver consents with respect to $**[1.7 billion]** of Old Notes, representing approximately **[40]**% of the aggregate amount of outstanding Old Notes, in the exchange offers and consent

iii

EFIHMW00259710

solicitation pursuant to these agreements.  As a result of these agreements to participate in the exchange offers and the consent solicitation, only an additional approximately S**[550 million]** aggregate principal amount of Old Notes would need to be validly tendered (and not validly withdrawn) in the exchange offers in order for the minimum condition to the exchange offers to be satisfied and to obtain the requisite Consents to adopt the Proposed Amendments.

It is expected but not required that the Supplemental Indenture for the Old Notes will be executed and delivered by the parties thereto promptly following the Consent Date assuming receipt of the requisite Consents for the Proposed Amendments. The Supplemental Indenture relating to the Proposed Amendments will become effective immediately upon its execution and delivery by the parties thereto; however, the Proposed Amendments contained therein will not become operative until immediately prior to the acceptance for exchange of Old Notes upon the terms and subject to the conditions set forth in this Prospectus. Old Notes held by members of the Sponsor Group and EFH Corp. and their respective affiliates will not be considered outstanding for the purposes of determining whether the holders of the required outstanding principal amount of the Old Notes have delivered Consents necessary to adopt the Proposed Amendments.

The Proposed Amendments constitute a single proposal for the consent solicitation related to the Old Notes Indenture, and a consenting holder must consent to the Proposed Amendments applicable to all Old Notes tendered by that holder as an entirety and may not consent selectively with respect to certain of the Proposed Amendments.

Old Notes validly tendered pursuant to the exchange offers (and not validly withdrawn) at or prior to the Consent Date will be deemed to include Consents to the Proposed Amendments. The completion, execution and delivery of a Consent and Letter of Transmittal, or transmission of an Agent's Message (as defined below), in connection with a valid tender of Old Notes pursuant to the exchange offers at or prior to the Consent Date will constitute the delivery of Consents with respect to such Old Notes. Holders may not validly tender Old Notes in the exchange offers at or prior to the Consent Date without delivering the related Consents, but holders may tender Old Notes after the Consent Date and at or prior to the Expiration Date without delivering Consents with respect to the Old Notes. However, holders tendering Old Notes after the Early Tender Date will not be eligible to receive the applicable Total Consideration for such Old Notes, including the Total Cash Consideration, or the cash consent payment. Holders may not deliver Consents in the consent solicitation without validly tendering their Old Notes in the exchange offers at or prior to the Consent Date and may only validly revoke Consents by validly withdrawing the previously tendered Old Notes at or prior to the Consent Date or by revoking Consents after the Consent Date and prior to the execution and delivery of the Supplemental Indenture.

**Tendered Old Notes may be validly withdrawn at any time prior to the Expiration Date (and, if not previously accepted for exchange, after the expiration of 40 business days from July 16, 2010). Consents may only be validly revoked by validly withdrawing the previously tendered related Old Notes at or prior to the Consent Date or by revoking Consents after the Consent Date and prior to the execution and delivery of the Supplemental Indenture by the parties thereto. See "Procedures for Tendering Old Notes and Delivering Consents."**

Subject to applicable law, the exchange offers, on one hand, and the consent solicitation, on the other hand, are being made independently of each other, and the Offeror reserves the right to terminate, withdraw or amend the exchange offers, and EFH Corp. reserves the right to terminate, withdraw or amend the consent solicitation, independently of each other at any time and from time to time, as described in this Prospectus.

The exchange offers are conditioned on at least a majority of the outstanding aggregate principal amount of Old Notes being validly tendered (and not validly withdrawn) at or prior to the Expiration Date. The exchange offers and the consent solicitation are also subject to the satisfaction or waiver of a number of other conditions as set forth in this Prospectus, including the condition applicable to the exchange offers that the registration statement, of which this Prospectus forms part, has been declared effective by the Securities and Exchange Commission (the "SEC") (which condition cannot be waived). See "Conditions of the Exchange Offers and the Consent Solicitation." In addition, subject to applicable law, the Offeror has the right to terminate or withdraw the exchange offers and EFH Corp. has the right to terminate or withdraw the consent solicitation if any of the applicable conditions described under the "Conditions of the Exchange Offers and the Consent Solicitation" are not satisfied or waived by the Expiration Date or Consent Date, as applicable.

iv

EFIHMW00259711

## TABLE OF CONTENTS

ABOUT THIS PROSPECTUS..................................................................................................v
INDUSTRY AND MARKET INFORMATION..................................................................vi
AVAILABLE INFORMATION.............................................................................................vi
FORWARD-LOOKING STATEMENTS..............................................................................vii
QUESTIONS AND ANSWERS ABOUT THE EXCHANGE OFFERS AND THE CONSENT
    SOLICITATION...............................................................................................................1
SUMMARY............................................................................................................................10
RISK FACTORS....................................................................................................................33
USE OF PROCEEDS.............................................................................................................71
CAPITALIZATION................................................................................................................72
THE TRANSACTIONS..........................................................................................................74
SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA FOR EFH CORP. AND ITS
    SUBSIDIARIES...............................................................................................................77
SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA FOR EFIH AND ITS
    SUBSIDIARIES...............................................................................................................80
GENERAL TERMS OF THE EXCHANGE OFFERS AND CONSENT SOLICITATION.......83
PROPOSED AMENDMENTS................................................................................................88
ACCEPTANCE OF OLD NOTES; ACCRUAL OF INTEREST..........................................91
PROCEDURES FOR TENDERING OLD NOTES AND DELIVERING CONSENTS.........93
WITHDRAWAL OF TENDERS AND REVOCATION OF CONSENTS.............................97
CONDITIONS OF THE EXCHANGE OFFERS AND THE CONSENT SOLICITATION......99
EXCHANGE AGENT; INFORMATION AGENT; DEALER MANAGERS AND SOLICITATION
    AGENTS; OTHER ADVISORS.....................................................................................101
DESCRIPTION OF THE NOTES..........................................................................................103
COMPARISON OF PRINCIPAL DIFFERENCES BETWEEN OLD NOTES AND NEW EFIH SENIOR
    SECURED NOTES.........................................................................................................194
BOOK-ENTRY, DELIVERY AND FORM.........................................................................208
MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS.................................210
CERTAIN ERISA CONSIDERATIONS..............................................................................220
LEGAL MATTERS..............................................................................................................221
EXPERTS.............................................................................................................................221
INDEX TO CONSOLIDATED FINANCIAL STATEMENTS..........................................F-1
ANNEX A—DEFINITIONS................................................................................................A-1
ANNEX B—INFORMATION RELATING TO EFH CORP...............................................B-1
ANNEX C—INFORMATION RELATING TO EFIH AND EFIH FINANCE...................C-1

---

## ABOUT THIS PROSPECTUS

    This Prospectus is part of a registration statement that we have filed with the SEC. You should read this Prospectus, including the annexes, together with the registration statement, the exhibits thereto and the additional information described under the heading "Available Information." This Prospectus includes the annexes attached hereto. To the extent information or any statement in any annex to this Prospectus is inconsistent with information or statements contained in this Prospectus not included in the annexes, the information or statements in such annex shall be deemed to be modified or superseded by any such information or statements in the Prospectus not included in the annexes.

    **None of the Offeror, EFH Corp., the Dealer Managers, the Exchange Agent or the Information Agent have authorized any person (including any dealer, salesperson or broker) to provide you with any information or to make any representation other than as contained in this Prospectus. The Offeror, EFH Corp. and the Dealer Managers do not take any responsibility for, and can provide no assurance as to the reliability of, any information that others may give you. The information included in this Prospectus is**

v

EFIHMW00259712

**accurate as of the date of this Prospectus. You should not assume that the information included in this Prospectus is accurate as of any other date.**

The exchange offers and consent solicitation are being made on the basis of this Prospectus and the Consent and Letter of Transmittal and are subject to the terms described in this Prospectus and the Consent and Letter of Transmittal and the indenture governing the New EFIH Senior Secured Notes. This Prospectus does not constitute an offer to participate in the exchange offers to any person in any jurisdiction in which it would be unlawful to make such exchange offers. Any decision to participate in the exchange offers and consent solicitation must be based on the information included in this Prospectus. In making an investment decision, prospective investors must rely on their own examination of the Offeror and the terms of the exchange offers and the New EFIH Senior Secured Notes, including the merits and risks involved. Investors should not construe anything in this Prospectus and the Consent and Letter of Transmittal as legal, investment, business or tax advice. Each investor should consult its advisors as needed to make its investment decision and to determine whether it is legally permitted to participate in the exchange offers and consent solicitation under applicable laws or regulations.

This Prospectus contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents themselves for complete information. All such summaries are qualified in their entirety by such reference. Copies of documents referred to in this Prospectus will be made available to holders in the exchange offers and the consent solicitation at no cost. See "Available Information."

You should not rely on or assume the accuracy of any representation or warranty in any agreement that we have filed as an exhibit to any document that we have publicly filed or that we may otherwise publicly file in the future because such representation or warranty may be subject to exceptions and qualifications contained in separate disclosure schedules, may have been included in such agreement for the purpose of allocating risk between the parties to the particular transaction, and may no longer continue to be true as of any given date.

## INDUSTRY AND MARKET INFORMATION

The industry and market data and other statistical information used throughout this Prospectus are based on independent industry publications, government publications, reports by market research firms or other published independent sources, including certain data published by the Electric Reliability Council of Texas ("ERCOT"), the Public Utility Commission of Texas (the "PUCT"), and the New York Mercantile Exchange. We did not commission any of these publications or reports. Some data is also based on good faith estimates, which are derived from our review of internal surveys, as well as the independent sources listed above. Independent industry publications and surveys generally state that they have obtained information from sources believed to be reliable, but do not guarantee the accuracy and completeness of such information. While we believe that each of these studies and publications is reliable, we have not independently verified such data and make no representation as to the accuracy of such information. Forecasts are particularly likely to be inaccurate, especially over long periods of time, and we do not know what assumptions regarding general economic growth are used in preparing the forecasts included in this Prospectus. Similarly, while we believe that such internal and external research is reliable, it has not been verified by any independent sources, and we make no assurances that the predictions contained therein are accurate.

## AVAILABLE INFORMATION

EFH Corp. and EFIH file annual, quarterly and current reports and other information with the SEC. You may read and copy any document EFH Corp. or EFIH has filed or will file with the SEC at the SEC's public website (www.sec.gov) or at the Public Reference Room of the SEC located at 100 F Street, N.E., Washington, DC 20549. Copies of such materials can be obtained from the Public Reference Room of the SEC at prescribed rates. You can call the SEC at 1-800-SEC-0330 to obtain information on the operation of the Public Reference Room. These materials do not form part of this Prospectus.

You may request a copy of any of our filings with the SEC, or any of the agreements or other documents that constitute exhibits to those filings, at no cost, by writing or telephoning us at the following address or phone number:

vi

EFIHMW00259713

Energy Future Intermediate Holding Corp.
1601 Bryan Street
Dallas, Texas 75201-3411
Attention: Investor Relations
Telephone: (214) 812-4600

**FORWARD-LOOKING STATEMENTS**

This Prospectus and other presentations made by us contain "forward-looking statements." All statements, other than statements of historical facts, that are included in this Prospectus, or made in presentations, in response to questions or otherwise, that address activities, events or developments that the Offeror expects or anticipates to occur in the future, including such matters as projections, capital allocation, future capital expenditures, business strategy, competitive strengths, goals, future acquisitions or dispositions, development or operation of power generation assets, market and industry developments and the growth of our businesses and operations (often, but not always, through the use of words or phrases such as "intends," "plans," "will likely result," "are expected to," "will continue," "is anticipated," "estimated," "should," "projection," "target," "goal," "objective" and "outlook"), are forward-looking statements. Although we believe that in making any such forward-looking statement our expectations are based on reasonable assumptions, any such forward-looking statement involves uncertainties and is qualified in its entirety by reference to the discussion of risk factors under "Risk Factors" contained elsewhere in this Prospectus and the following important factors, among others, that could cause our actual results to differ materially from those projected in such forward-looking statements:

- prevailing governmental policies and regulatory actions, including those of the Texas Legislature, the Governor of Texas, the Congress of the United States of America, the United States Federal Energy Regulatory Commission ("FERC"), the North American Electric Reliability Council (the "NERC"), the Texas Regional Entity (the "TRE"), the PUCT, the Railroad Commission of Texas (the "RRC"), the United States Nuclear Regulatory Commission (the "NRC"), the United States Environmental Protection Agency (the "EPA"), the Texas Commission on Environmental Quality (the "TCEQ") and the Commodities Futures Trading Commission (the "CFTC"), with respect to, among other things:

  - allowed prices;

  - allowed rates of return;

  - permitted capital structure;

  - industry, market and rate structure;

  - purchased power and recovery of investments;

  - operations of nuclear generating facilities;

  - operations of fossil-fueled generating facilities;

  - operations of mines;

  - acquisitions and disposal of assets and facilities;

  - development, construction and operation of facilities;

  - decommissioning costs;

  - present or prospective wholesale and retail competition;

vii

EFIHMW00259714

- changes in tax laws and policies;

- changes in and compliance with environmental and safety laws and policies, including climate change initiatives; and

- clearing over the counter derivatives through exchanges and posting of cash collateral therewith;

- legal and administrative proceedings and settlements;

- general industry trends;

- economic conditions, including the current recessionary environment;

- our ability to attract and retain profitable customers;

- our ability to profitably serve our customers;

- restrictions on competitive retail pricing;

- changes in wholesale electricity prices or energy commodity prices;

- changes in prices of transportation of natural gas, coal, crude oil and refined products;

- unanticipated changes in market heat rates in the ERCOT electricity market;

- our ability to effectively hedge against changes in commodity prices, market heat rates and interest rates;

- weather conditions and other natural phenomena, and acts of sabotage, wars or terrorist activities;

- unanticipated population growth or decline, or changes in market demand and demographic patterns;

- changes in business strategy, development plans or vendor relationships;

- access to adequate transmission facilities to meet changing demands;

- unanticipated changes in interest rates, commodity prices, rates of inflation or foreign exchange rates;

- unanticipated changes in operating expenses, liquidity needs and capital expenditures;

- commercial bank market and capital market conditions and the potential impact of disruptions in United States ("U.S.") and international credit markets;

- access to capital, the cost of such capital, and the results of financing and refinancing efforts, including availability of funds in capital markets;

- financial restrictions placed on us by the agreements governing our debt instruments;

- our ability to generate sufficient cash flow to make interest payments on our debt instruments;

viii

EFIHMW00259715

PX 027
Page 9 of 232

- competition for new energy development and other business opportunities;

- inability of various counterparties to meet their obligations with respect to our financial instruments;

- changes in technology used by and services offered by us;

- changes in electricity transmission that allow additional electricity generation to compete with our generation assets;

- significant changes in our relationship with our employees, including the availability of qualified personnel, and the potential adverse effects if labor disputes or grievances were to occur;

- changes in assumptions used to estimate costs of providing employee benefits, including pension benefits and other postretirement employee benefits ("OPEB"), and future funding requirements related thereto;

- changes in assumptions used to estimate future executive compensation payments;

- hazards customary to the industry and the possibility that we may not have adequate insurance to cover losses resulting from such hazards;

- significant changes in critical accounting policies;

- actions by credit rating agencies;

- our ability to effectively execute our operational strategy; and

- our ability to implement cost reduction initiatives.

Any forward-looking statement speaks only as of the date on which it is made, and except as may be required by applicable law, we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which it is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for us to predict all of them; nor can we assess the impact of each such factor or the extent to which any factor, or combination of factors, may cause results to differ materially from those contained in any forward-looking statement. You should not unduly rely on such forward-looking statements.

ix

Confidential

EFIHMW00259716

## QUESTIONS AND ANSWERS ABOUT THE EXCHANGE OFFERS AND THE CONSENT SOLICITATION

*These answers to questions that you may have as a holder of Old Notes are highlights of selected information included elsewhere in this Prospectus. To fully understand the exchange offers and consent solicitation and the considerations that may be important to your decision about whether to participate in the exchange offers and consent solicitation, you should carefully read this Prospectus in its entirety, including the section entitled "Risk Factors."*

**Why are you making the exchange offers?**

The purpose of the exchange offers is to reduce the outstanding principal amount, and extend the weighted average maturity, of the long-term debt of EFH Corp. and its subsidiaries.

**Why are you making the consent solicitation?**

The purpose of the consent solicitation is to adopt the Proposed Amendments, which will provide EFH Corp. and its subsidiaries additional financial and operational flexibility.

**What securities are subject to the exchange offers?**

The Offeror is offering to exchange outstanding 11.250%/12.000% Senior Toggle Notes due 2017 issued by EFH Corp., which are sometimes referred to herein as the "Old Toggle Notes", and 10.875% Senior Notes due 2017 issued by EFH Corp., which are sometimes referred to herein as the "Old Cash-Pay Notes". The Old Toggle Notes and Old Cash-Pay Notes are referred to herein collectively as the "Old Notes".

**What aggregate principal amount of each issue of Old Notes is being sought in the exchange offers?**

Subject to the terms and conditions of the exchange offers, we will accept for exchange a principal amount of each issue of Old Notes such that the maximum aggregate principal amount of New EFIH Senior Secured Notes issuable in the exchange offers will not exceed $2.28 billion, which is referred to in this Prospectus as the "Maximum Exchange Amount". In the event that the Maximum Exchange Amount is exceeded, the Old Notes will be subject to proration as described in "General Terms of the Exchange Offers and Consent Solicitation—Acceptance; Proration." The Old Toggle Notes and the Old Cash-Pay Notes will be prorated on an equal basis if proration is necessary.

**What aggregate principal amount of New EFIH Senior Secured Notes will be issued in the exchange offers?**

The maximum aggregate principal amount of New EFIH Senior Secured Notes issuable in the exchange offers will not exceed $2.28 billion, the Maximum Exchange Amount. The maximum principal amount of each issue of Old Notes that will be accepted for exchange is the outstanding principal amount of such issue validly tendered and not validly withdrawn, as limited by the Maximum Exchange Amount and the prorations, if necessary, resulting therefrom. The Old Toggle Notes and the Old Cash-Pay Notes will be prorated on an equal basis if proration is necessary. Subject to applicable law, the Offeror reserves the right, but is not obligated, to increase or decrease the Maximum Exchange Amount. If a change is made to the amount of securities offered to be exchanged pursuant to any exchange offer, including any change to the Maximum Exchange Amount, such exchange offer will remain open for at least ten business days from (and including) the date of the announcement of such change.

**What securities are subject to the consent solicitation?**

Each issue of the Old Notes is subject to the consent solicitation. Holders of Old Notes will vote together as a single class with respect to the Proposed Amendments that are the subject of the consent solicitation.

1

EFIHMW00259717

**What amendments are you seeking to the Old Notes Indenture?**

The Proposed Amendments would eliminate substantially all of the restrictive covenants and references thereto contained in the Old Notes Indenture and the Old Notes, eliminate certain events of default, modify covenants regarding mergers and consolidations and modify or eliminate certain other provisions, including certain provisions relating to defeasance contained in the Old Notes Indenture and Old Notes which would otherwise prevent a defeasance without, among other things, delivery of an opinion of counsel confirming such defeasance does not constitute a taxable event. See "Proposed Amendments" for additional information regarding the Proposed Amendments.

**What aggregate amount of cash will be paid in the exchange offers?**

The aggregate amount of cash payable in the exchange offers is $400 million. This aggregate amount of cash will be paid pro rata in exchange for Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date and accepted for exchange. The definitive amount of the Total Notes Consideration and the Total Cash Consideration per $1,000 principal amount of Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date and accepted for exchange will be announced by press release promptly after the Early Tender Date and in any event at least ten business days prior to (and including) the Expiration Date.

**What will I receive in the exchange offers if my Old Notes are accepted for exchange?**

Upon the terms and subject to the conditions of the exchange offers, including the Maximum Exchange Amount and the possible prorations resulting therefrom, participating holders of Old Notes will be eligible to receive, in exchange for each $1,000 principal amount of Old Notes validly tendered (and not validly withdrawn), the following:

(i) for Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date and accepted for exchange, an amount of New EFIH Senior Secured Notes and cash, together referred to as the "Total Consideration" as listed in the table on page ii of this Prospectus under "Total Consideration if Tendered at or Prior to the Early Tender Date," (with the amount of New EFIH Senior Secured Notes (the "Total Notes Consideration") and the amount of cash (the "Total Cash Consideration") comprising the Total Consideration depending on the aggregate principal amount of Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date, as described below, and

(ii) for Old Notes validly tendered (and not validly withdrawn) after the Early Tender Date and at or prior to the Expiration Date and accepted for exchange, New EFIH Senior Secured Notes, referred to as the "Exchange Consideration" as listed in the table on page ii of this Prospectus under "Exchange Consideration if Tendered After the Early Tender Date and at or Prior to the Expiration Date." No cash consideration will be payable with respect to Old Notes that are validly tendered after the Early Tender Date.

The aggregate amount of cash payable as the aggregate Total Cash Consideration in the exchange offers is $400 million. This aggregate amount of cash will be paid as the Total Cash Consideration pro rata in exchange for Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date and accepted for exchange, and will correspondingly reduce on a dollar basis the amount of the Total Consideration for each issue of Old Notes that is comprised of Total Notes Consideration. For example, if an aggregate of $3.2 billion of Old Notes were validly tendered (and not validly withdrawn) at or prior to the Early Tender Date, the Total Cash Consideration with respect to each $1,000 principal amount of tendered Old Notes would be $125.00, and the Total Notes Consideration with respect to each $1,000 principal amount of tendered Old Cash-Pay Notes and Old Toggle Notes would be $595.00 and $660.00, respectively. The definitive amount of the Total Notes Consideration and the Total Cash Consideration per $1,000 principal amount of Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date and accepted for exchange will be announced by press release promptly after the Early Tender Date in any event at least ten business days prior to (and including) the Expiration Date.

The minimum Cash Consideration and the maximum Total Notes Consideration payable per $1,000 principal amount of Old Cash-Pay Notes are $[  ] and $[  ], respectively, which amounts would be payable if all of the Old Notes were tendered at or prior to the Early Tender Date. The minimum Total Cash Consideration and the maximum Total Notes Consideration payable per $1,000 principal amount of Old Toggle Notes are $[  ] and $[  ],

2

EFIHMW00259718

respectively, which amounts would be payable if all of the Old Notes were tendered at or prior to the Early Tender Date.

**Will any Old Notes be given a higher acceptance priority in the exchange offers than other Old Notes?**

No. Subject to the terms and conditions of the exchange offers, including the Maximum Exchange Amount and the possible prorations resulting therefrom, all Old Notes validly tendered (and not validly withdrawn) in the exchange offers will be accepted in the exchange offers. In the event that proration of validly tendered (and not validly withdrawn) Old Notes is required, the Old Toggle Notes and the Old Cash-Pay Notes will be treated equally in calculating the proration.

If proration of validly tendered (and not validly withdrawn) Old Notes is required, the Offeror will determine the final proration promptly after the Expiration Date and will promptly announce the results of the final proration by press release. **[To determine the principal amount accepted of each tender subject to proration, the principal amount of such tender will be multiplied by the proration rate and the resultant amount rounded down to the nearest permitted denomination of the Old Notes.]** The Offeror will not be able to determine the final proration prior to the Expiration Date.

**Will I receive any accrued and unpaid interest on my Old Notes tendered for exchange in the exchange offers?**

All holders whose Old Cash-Pay Notes are exchanged will receive an amount equal to accrued and unpaid interest on such Old Cash-Pay Notes, if any, in cash, from the last applicable interest payment date to, but not including, the Settlement Date. Holders whose Old Toggle Notes are accepted for exchange will not separately receive any accrued and unpaid payment-in-kind interest with respect to such Old Toggle Notes because the amount of such accrued interest through the Settlement Date has been included in determining the consideration being offered in the exchange offers for the Old Toggle Notes. If the Settlement Date occurs later than anticipated, then the consideration being offered in the exchange offers for the Old Toggle Notes will be adjusted to account for the additional accrued interest incurred.

**What are the differences between the Old Notes and the New EFIH Senior Secured Notes?**

There are important differences between the Old Notes and the New EFIH Senior Secured Notes, including that (i) the New EFIH Senior Secured Notes will be secured by, equally and ratably with the 9.75% Senior Secured Notes due 2019 of EFIH and EFIH Finance (the "EFIH 9.75% Notes") and EFIH's guarantees of the 9.75% Senior Secured Notes due 2019 of EFH Corp. (the "EFH Corp. 9.75% Notes") and the 10.000% Senior Secured Notes due 2020 of EFH Corp. (the "EFH Corp. 10.000% Notes"), EFIH's pledge of 100% of the membership interests and other investments it owns in Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings") (such membership interests and other investments, the "Collateral"), which currently represents an approximate 80% equity interest in Oncor Electric Delivery Company LLC ("Oncor") and (ii) the New EFIH Senior Secured Notes are not issued by EFH Corp. and are not guaranteed by Energy Future Competitive Holdings Company ("EFCH"), a wholly-owned subsidiary of EFH Corp. that guarantees the EFH Corp. 9.75% Notes and the EFH Corp. 10% Notes, or EFH Corp. and as a result, holders of New EFIH Senior Secured Notes will have no claim on the assets of EFH Corp. its subsidiaries other than EFIH and EFIH Finance. See "Comparison of Principal Differences Between Old Notes and New EFIH Senior Secured Notes" for more information.

**When is the Early Tender Date?**

The Early Tender Date for the exchange offers is 5:00 p.m., New York City time, on July 29, 2010, unless extended. Holders must validly tender (and not validly withdraw) their Old Notes into the exchange offers at or prior to the Early Tender Date in order to be eligible to receive the Total Consideration, including the applicable Total Cash Consideration.

**When do the exchange offers expire?**

The exchange offers will expire at midnight, New York City time, on August 12, 2010, unless extended.

Confidential

EFIHMW00259719

**When does the consent solicitation expire?**

The consent solicitation will expire at 5:00 p.m., New York City time, on July 29, 2010, unless extended.

**Until when may I withdraw Old Notes previously tendered for exchange in the exchange offers?**

Tendered Old Notes may be withdrawn at any time at or prior to the Expiration Date. In addition, if not previously accepted for exchange, Old Notes may be withdrawn after the expiration of 40 business days from July 16, 2010. A withdrawal of Old Notes after the later of the Consent Date and the execution and delivery of the Supplemental Indenture will not revoke any related Consents, and withdrawing holders will be subject to the Proposed Amendments if adopted.

**Until when may I revoke Consents previously delivered in the consent solicitation?**

Consents may be revoked at any time at or prior to the later of the Consent Date and the execution and delivery of the Supplemental Indenture by the parties thereto.

**In what denominations will the New EFIH Senior Secured Notes be issued? What will happen if I am otherwise entitled to New EFIH Senior Secured Notes in a lower principal amount?**

The New EFIH Senior Secured Notes will be issued in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof. Tenders of Old Notes pursuant to the exchange offers will be accepted only in principal amounts equal to permitted denominations for such Old Notes. The Offeror will not accept any tender of Old Notes that would result in the issuance of less than $2,000 principal amount of New EFIH Senior Secured Notes to a participating holder. The aggregate principal amount of New EFIH Senior Secured Notes issued to each participating holder for all Old Notes validly tendered (and not validly withdrawn) will be rounded down, if necessary, to $2,000 or the nearest whole multiple of $1,000 in excess thereof. This rounded amount will be the principal amount of New EFIH Senior Secured Notes you will receive, and no additional cash will be paid in lieu of any principal amount of New EFIH Senior Secured Notes not received as a result of such rounding down.

**Are the exchange offers subject to a minimum condition?**

Yes.  The exchange offers are conditioned on at least a majority of the outstanding aggregate principal amount of Old Notes being validly tendered (and not validly withdrawn) at or prior to the Expiration Date.  The exchange offers and the consent solicitation are also subject to the satisfaction or waiver of a number of other conditions set forth in this Prospectus, including the condition applicable to the exchange offers that the registration statement, of which this Prospectus forms a part, has been declared effective by the SEC (which condition cannot be waived).  See "Conditions of the Exchange Offers and Consent Solicitation."

**Have any holders of Old Notes agreed to participate in the exchange offers and the consent solicitation in advance of the commencement of the exchange offers and the consent solicitation?**

As described above, pursuant to the Exchange Agreements, holders of Old Notes representing approximately **[40]**% of the aggregate principal amount of outstanding Old Notes have agreed to participate in the exchange offers and the consent solicitation.  As a result of the Exchange Agreements, only an additional approximately $**[550 million]** aggregate principal amount of Old Notes would need to be validly tendered (and not validly withdrawn) in the exchange offers in order for the minimum condition to the exchange offers to be satisfied and to obtain the requisite Consents to adopt the Proposed Amendments.

**May I tender only a portion of the Old Notes that I hold?**

Yes. You may tender all or any portion of your Old Notes in the exchange offers and consent solicitation; however, any Old Note tendered at or prior to the Consent Date will be deemed to include Consents to the Proposed Amendments. You should note that the Offeror will not accept any tender of Old Notes that would result in the issuance of less than $2,000 principal amount of New EFIH Senior Secured Notes to a participating holder. The aggregate principal amount of New EFIH Senior Secured Notes issued to each participating holder for all Old Notes

4

EFIHMW00259720

validly tendered (and not validly withdrawn) will be rounded down, if necessary, to $2,000 or the nearest whole multiple of $1,000 in excess thereof. This rounded amount will be the principal amount of New EFIII Senior Secured Notes you will receive, and no additional cash will be paid in lieu of any principal amount of New EFIH Senior Secured Notes not received as a result of rounding down.

**If I want to tender my Old Notes, am I required to deliver the related Consents?**

Old Notes validly tendered pursuant to the exchange offers (and not validly withdrawn) at or prior to the Consent Date will be deemed to include Consents to the Proposed Amendments. The completion, execution and delivery of a Consent and Letter of Transmittal, or transmission of an Agent's Message, in connection with a valid tender of Old Notes pursuant to the exchange offers at or prior to the Consent Date will constitute the delivery of Consents with respect to such Old Notes. Holders may not validly tender Old Notes in the exchange offers at or prior to the Consent Date without delivering the related Consents, but holders may tender Old Notes after the Consent Date and at or prior to the Expiration Date without delivering Consents with respect to such Old Notes. However, holders tendering Old Notes after the Early Tender Date will not be eligible to receive the applicable Total Consideration for such Old Notes, including the Total Cash Consideration, or the cash consent payment. Holders may not deliver Consents in the consent solicitation without validly tendering their Old Notes in the exchange offers at or prior to the Consent Date and may only validly revoke Consents by validly withdrawing the previously tendered related Old Notes at or prior to the Consent Date or by revoking Consents after the Consent Date and prior to the execution and delivery of the Supplemental Indenture by the parties thereto.

**Will I receive a payment if I deliver Consents in the consent solicitation?**

If the requisite Consents are received and a Supplemental Indenture is executed, EFH Corp. will pay to each holder with respect to such holder's Old Notes as to which Consents are validly delivered and not validly revoked prior to the Consent Date, a cash consent payment of $2.50 per $1,000 principal amount of such Old Notes. Such consent payment is in addition to any Total Consideration or Exchange Consideration that may be payable to a holder in respect of its Old Notes accepted for exchange. The consent payments will be made on the Settlement Date or promptly following the termination of the exchange offers, as applicable, assuming that the conditions to such payments are satisfied. EFH Corp.'s obligation to make consent payments is not conditioned upon completion of the exchange offers but is subject to receipt of the requisite Consents and execution and delivery of the Supplemental Indenture. If the exchange offers are terminated, the Proposed Amendments in any executed Supplemental Indenture will not become operative.

**What principal amount of Old Notes must Consent to the Proposed Amendments in order for the Proposed Amendments to be adopted?**

In order to be adopted, the Proposed Amendments must be consented to by the holders of at least a majority of the outstanding aggregate principal amount of the Old Notes. Holders of the Old Notes (both the Old Toggle Notes and the Old Cash-Pay Notes) will vote together as a single class with respect to the Proposed Amendments that are the subject of the consent solicitation. Old Notes held by members of the Sponsor Group, EFH Corp. and their respective affiliates will not be considered outstanding for the purposes of determining whether the holders of the required outstanding principal amount of Old Notes have delivered Consents necessary to adopt the Proposed Amendments.

As described above, pursuant to the Exchange Agreements, holders of Old Notes representing approximately **[40]**% of the aggregate principal amount of outstanding Old Notes have agreed to participate in the exchange offers and the consent solicitation. As a result of the Exchange Agreements, only an additional approximately **$[550 million]** aggregate principal amount of Old Notes would need to be validly delivered (and not validly withdrawn) in the consent solicitation in order for the requisite Consents to be received to adopt the Proposed Amendments.

5

EFIHMW00259721

**If the exchange offers are completed and I do not participate in the exchange offers, or I do not exchange all of my Old Notes in the exchange offers, or some of my Old Notes are not accepted for exchange, how will my rights and obligations under my remaining Old Notes be affected?**

If the Offeror completes the exchange offers, obligations with respect to any Old Notes not tendered by holders or not accepted for exchange or otherwise left outstanding following the completion of the exchange offers will not be secured by the Collateral and will therefore be effectively subordinated to the New EFIH Senior Secured Notes and the $[___] aggregate principal amount of outstanding EFIH 9.75% Notes, EFH Corp. 9.75% Notes and EFH Corp. 10.000% Notes (we collectively refer to the EFIH 9.75% Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes as the "Existing Secured Notes"), to the extent of the value of the Collateral. Further, if the requisite Consents are received with respect to the Old Notes Indenture and the Supplemental Indenture giving effect to the related Proposed Amendments is executed and the Proposed Amendments become operative with respect to the Old Notes Indenture, holders of the Old Notes left outstanding following completion of the exchange offers will no longer be entitled to the benefits of the covenants, events of default and other provisions that are eliminated or modified pursuant to such Proposed Amendments. In addition, to the extent that Old Notes are tendered and accepted in the exchange offers, any existing trading market for the remaining Old Notes may become further limited. The smaller outstanding principal amount may make the trading price of the Old Notes that are not tendered and accepted for payment more volatile. Consequently, the liquidity, market value and price volatility of Old Notes that remain outstanding may be materially and adversely affected. For a description of other consequences of failing to tender your Old Notes pursuant to the exchange offers, see "Risk Factors—Risks to Holders of Old Notes Not Tendered or Not Accepted for Exchange."

**What do you intend to do with the Old Notes that are accepted for exchange in the exchange offers?**

Any Old Notes exchanged in the exchange offers may remain outstanding and held by EFIH, EFH Corp. or another subsidiary of EFH Corp., or be retired and cancelled.

**Are you making a recommendation regarding whether I should participate in the exchange offers and consent solicitation?**

None of the Offeror, EFH Corp., the Sponsor Group, the Dealer Managers, the Exchange Agent, the Information Agent or any other person is making any recommendation as to whether or not you should tender your Old Notes for exchange in the exchange offers or deliver consents pursuant to the consent solicitation. You must make your own decision whether to tender Old Notes in the exchange offers and to deliver Consents in the consent solicitation, and, if so, the amount of Old Notes as to which action is to be taken.

**When will I receive the Total Consideration or Exchange Consideration, as applicable, and in the case of the Old Cash-Pay Notes, any accrued and unpaid interest and, if applicable, consent consideration for my Old Notes that are tendered and accepted for exchange pursuant to the exchange offers?**

The Total Consideration or Exchange Consideration, as applicable, and any accrued and unpaid interest payable will be deposited with the Exchange Agent (or, upon its instruction, The Depository Trust Company ("DTC")), which will act as your agent for purposes of receiving New EFIH Senior Secured Notes and any cash payment, on the Settlement Date. The consent payments will be made on the Settlement Date or promptly following the termination of the exchange offers, as applicable, assuming that the conditions to such payments are satisfied. Subject to the terms and conditions of the exchange offers, the Settlement Date for the exchange offers will occur promptly following the Expiration Date. Assuming that the exchange offers and consent solicitation are not extended, the Offeror expects that the Settlement Date will be on or about the third business day following the Expiration Date.

**Will the New EFIH Senior Secured Notes issued in the exchange offers be freely tradable?**

New EFIH Senior Secured Notes issued in the exchange offers generally may be offered for resale, resold and otherwise transferred without further registration under the Securities Act of 1933, as amended (the "Securities Act"), and without delivery of a prospectus meeting the requirements of Section 10 of the Securities Act if the holder is not an "affiliate" of the Offeror within the meaning of Rule 144(a)(1) under the Securities Act. Any holder

Confidential

who is an affiliate of the Offeror at the time of the exchange must comply with the registration and prospectus delivery requirements of the Securities Act in connection with any resales, unless such sale or transfer is made pursuant to an exemption from such requirements and the requirements under applicable state securities laws. EFIH intends to apply to list the New EFIH Senior Secured Notes on the New York Stock Exchange.

**Do you or any of your affiliates have any current plans to purchase any Old Notes that remain outstanding subsequent to the Expiration Date?**

No. Although we do not currently intend to do so, we may, following the completion, termination or withdrawal of the exchange offers, and subject to applicable law, purchase Old Notes in the open market, in privately negotiated transactions, through subsequent tender or exchange offers or otherwise. Any other purchases may be made on the same terms or on terms which are more or less favorable to holders than the terms of these exchange offers. We also reserve the right to repay any Old Notes not tendered. If we decide to repurchase or repay Old Notes that are not tendered in the exchange offers on terms that are more favorable than the terms of the exchange offers, those holders who decided not to participate in the exchange offers could be better off than those that participated in the exchange offers.

**What are the conditions to the exchange offers and consent solicitation?**

The exchange offers and the consent solicitation are subject to the conditions described under "Conditions of the Exchange Offers and the Consent Solicitation," including the condition applicable to the exchange offers that the registration statement, of which this Prospectus forms a part, has been declared effective by the SEC (which condition cannot be waived). The exchange offers are also conditioned on at least a majority of the outstanding aggregate principal amount of Old Notes being validly tendered (and not validly withdrawn) at or prior to the Expiration Date. The Offeror expects $**[1.7 billion]** of Old Notes, representing approximately **[40]**% of the aggregate principal amount of outstanding Old Notes, will be tendered, and consents delivered with respect thereto, pursuant to the Exchange Agreements.  As a result of such tenders, only an additional approximately $**[550 million]** of the aggregate principal amount of Old Notes would need to be validly tendered (and not validly withdrawn) in the exchange offers in order for the minimum condition to the exchange offers to be satisfied.  Subject to applicable law, the Offeror has the right to terminate or withdraw the exchange offers and EFH Corp. has the right to terminate or withdraw the consent solicitation if any of the applicable conditions described under "Conditions of the Exchange Offers and the Consent Solicitation" are not satisfied or waived by the Expiration Date or Consent Date, as applicable.

**Under what circumstances can the exchange offers and consent solicitation be extended, amended or terminated?**

Subject to applicable law, each of the Offeror and EFH Corp., as applicable, may terminate or withdraw, at its sole discretion, the exchange offers or the consent solicitation if any applicable condition to the exchange offers or the consent solicitation is not satisfied or waived by the Expiration Date or Consent Date, as applicable. Each of the Offeror or EFH Corp., as applicable, reserves the right, subject to applicable law, to (i) waive any and all of the conditions of the exchange offers or the consent solicitation (except for the condition applicable to the exchange offers that the registration statement, of which this Prospectus forms a part, has been declared effective by the SEC (which condition cannot be waived)) at or prior to the Expiration Date and (ii) amend the terms of the exchange offers or the consent solicitation. In the event that the exchange offers are terminated, withdrawn or otherwise not completed at or prior to the Expiration Date, no consideration will be paid or become payable to holders who have tendered their Old Notes pursuant to the exchange offers and delivered their Consents in the consent solicitation, as applicable, other than the consent payments if requisite Consents were received and a Supplemental Indenture was executed and delivered. In any such event, (1) Old Notes previously tendered pursuant to the exchange offers will be promptly returned to the tendering holders and (2) the Proposed Amendments in the executed Supplemental Indenture will not become operative. See "General Terms of the Exchange Offers and Consent Solicitation— Extension, Termination or Amendment."

Confidential

EFIHMW00259723

**How will I be notified if the exchange offers and consent solicitation are extended, amended or terminated?**

Any extension, termination or amendment of the exchange offers or the consent solicitation will be followed as promptly as practicable by announcement thereof. An announcement in the case of an extension will be issued no later than 9:00 a.m., New York City time, on the next business day following the previously scheduled Expiration Date. Without limiting the manner in which the Offeror or EFH Corp., as applicable, may choose to make such announcement, the Offeror or EFH Corp., as applicable, will not, unless otherwise required by applicable law, have any obligation to publish, advertise or otherwise communicate any such announcement other than by making a release to a United States news agency or another means of announcement that the Offeror or EFH Corp., as applicable, deems appropriate.

**How will the exchange offers and consent solicitation affect the trading markets for the Old Notes that are not exchanged?**

To the extent the exchange offers are completed, the aggregate principal amount of outstanding Old Notes will be reduced. A reduction in the aggregate principal amount of outstanding Old Notes of either issue may materially and adversely affect the liquidity of the Old Notes of such issue that remains outstanding after completion of the exchange offers. A series of securities with a small principal amount available for trading, or "float," could command a lower price than does a comparable series of securities with a larger float. Therefore, the market price for an issue of Old Notes that remains outstanding after completion of the exchange offers may be materially and adversely affected. A reduced float may also make the trading prices of an issue of Old Notes that are not exchanged more volatile. Following the completion of the exchange offers, an active trading market in the Old Notes may not exist and the trading price for the Old Notes not tendered by holders or not accepted for exchange may materially decline.

**Will the Offeror or EFH Corp. receive any cash proceeds from the exchange offers or the consent solicitation?**

No. Neither the Offeror, EFH Corp., nor any member of the Sponsor Group will receive any cash proceeds from the exchange offers or the consent solicitation. Any Old Notes exchanged in the exchange offers may remain outstanding and be held by EFIH, EFH Corp. or another subsidiary of EFH Corp., or be retired and cancelled.

**How do I tender my Old Notes for exchange in the exchange offers and deliver Consents in the consent solicitation?**

If a holder wishes to participate in the exchange offers and the consent solicitation, and such holder's Old Notes are held by a custodial entity such as a broker, dealer, commercial bank, trust company or other nominee, such holder must instruct such custodial entity (pursuant to the procedures of the custodial entity) to tender the Old Notes and deliver the related Consents. In order to participate in the consent solicitation, Old Notes must be validly tendered (and not validly withdrawn), thereby delivering the related Consent, at or prior to the Consent Date.

Custodial entities that are participants in DTC must tender Old Notes and deliver Consents through DTC's Automated Tender Offer Program ("ATOP"), by which the custodial entity and the beneficial owner on whose behalf the custodial entity is acting agree to be bound by the Consent and Letter of Transmittal. **A Consent and Letter of Transmittal need not be completed and submitted in connection with tenders effected through ATOP.**

**How do I withdraw Old Notes previously tendered for exchange in the exchange offers and revoke Consents previously delivered in the consent solicitation?**

A holder may withdraw the tender of such holder's Old Notes at any time prior to the Expiration Date (and, if not previously accepted for exchange, after the expiration of 40 business days from July 16, 2010) by submitting a notice of withdrawal to the Exchange Agent using ATOP procedures and/or upon compliance with the other procedures described under "Withdrawal of Tenders and Revocation of Consents." The withdrawal of any Old Notes at or prior to the Consent Date will constitute a revocation of the related Consents. Consents may not be revoked prior to the Consent Date except by withdrawing tendered Old Notes at or prior to the Consent Date.

8

EFIHMW00259724

Consents may be revoked after the Consent Date by revoking such Consents prior to the execution and delivery of the Supplemental Indenture. Because it is expected that the Supplemental Indenture will be executed and delivered promptly following the Consent Date assuming receipt of the requisite Consents for the Proposed Amendments, holders should not expect that they will be able to revoke their Consents after the Consent Date. Any Consents that are not revoked at or prior to the later of the Consent Date and the execution and delivery of the Supplemental Indenture may not be revoked thereafter, as further described under "Withdrawal of Tenders and Revocation of Consents."

**Will I have to pay any fees or commissions if I tender my Old Notes for exchange in the exchange offers?**

You will not be required to pay any fees or commissions to the Offeror, EFH Corp., the Sponsor Group, the Dealer Managers, the Exchange Agent or the Information Agent in connection with the exchange offers. If your Old Notes are held through a broker, dealer, commercial bank, trust company or other nominee that tenders your Old Notes on your behalf, your broker or other nominee may charge you a commission for doing so. You should consult your broker or other nominee to determine whether any charges will apply.

**Are there procedures for guaranteed delivery of Old Notes?**

No. The exchange offers will not provide for guaranteed delivery procedures with respect to any issue of Old Notes.

**What risks should I consider in deciding whether or not to tender my Old Notes in the exchange offers or deliver Consents in the consent solicitation?**

In deciding whether to participate in the exchange offers or consent solicitation, you should carefully consider the discussion of risks and uncertainties that are described in the section of this Prospectus entitled "Risk Factors."

**What are the material U.S. federal income tax considerations of my participating in the exchange offers and consent solicitation?**

Please see the section of this Prospectus entitled "Material U.S. Federal Income Tax Considerations." The tax consequences to you of the exchange offers and the consent solicitation will depend on your individual circumstances. You should consult your own tax advisor for a full understanding of the tax considerations of participating in the exchange offers or consent solicitation.

**With whom may I talk if I have questions about the exchange offers or consent solicitation?**

If you have any questions or need help in tendering your Old Notes, please contact the Information Agent or the Exchange Agent whose addresses and telephone numbers are listed on the back cover of this Prospectus or your broker, dealer, commercial bank, trust company or other nominee through which your Old Notes are held.

Confidential

EFIHMW00259725

**PX 027
Page 19 of 232**

## SUMMARY

*This summary highlights selected information appearing elsewhere in this Prospectus. This summary is not complete and does not contain all of the information that you should consider before investing in the New EFIH Senior Secured Notes or delivering Consents with respect to the Old Notes. You should carefully read this summary together with the entire Prospectus, including the information set forth in the section entitled "Risk Factors."*

*Unless the context otherwise requires or as otherwise indicated: references in this Prospectus to "we," "our" and "us" refer to Energy Future Holdings Corp. and its subsidiaries; references to "EFH Corp.," "TCEH," "EFIH" and "EFIH Finance" refer to Energy Future Holdings Corp., Energy Future Competitive Holdings Company, Texas Competitive Electric Holdings Company LLC, Energy Future Intermediate Holding Company LLC and EFIH Finance Inc., respectively, and not to any of their respective subsidiaries; and references to "Oncor Holdings" and "Oncor" refer to Oncor Electric Delivery Holdings Company LLC and Oncor Electric Delivery Company LLC, respectively, with or without their subsidiaries as indicated in context.*

*Investment funds associated with or designated by Kohlberg Kravis Roberts & Co. ("KKR"), TPG Capital, L.P. ("TPG") and Goldman, Sachs & Co. ("Goldman Sachs" and, together with KKR and TPG, the "Sponsor Group"), and certain other co-investors (collectively with the Sponsor Group, the "Investors"), own EFH Corp. through Texas Energy Future Holdings Limited Partnership ("Texas Holdings"), with the Sponsor Group controlling Texas Holdings' general partner, Texas Energy Future Capital Holdings LLC.*

### Our Businesses

We are a Dallas-based energy company with operations consisting of competitive and regulated energy businesses in Texas. EFH Corp. is a holding company conducting its operations principally through its subsidiaries, TCEH and Oncor. TCEH is wholly-owned, and EFH Corp. holds an approximately 80% interest in Oncor.

TCEH is a holding company for subsidiaries engaged in competitive electricity market activities largely in Texas including electricity generation, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales. EFCH is the parent company of TCEH and a direct subsidiary of EFH Corp.

As of March 31, 2010, TCEH owned or leased 17,519 megawatts ("MW") of generation capacity in Texas, which consists of lignite/coal, nuclear and natural gas-fueled generation facilities. This amount includes two new lignite-fueled units (Sandow 5 and Oak Grove) that achieved substantial completion (as defined in the EPC agreements for the units) in fall of 2009 but does not include one new lignite-fueled unit (Oak Grove) that achieved substantial completion (as defined in the EPC Agreement for the unit) in June 2010. In addition, TCEH is the largest purchaser of wind-generated electricity in Texas and the fifth largest in the United States. TCEH provides competitive electricity and related services to more than two million retail electricity customers in Texas.

EFIH, a direct subsidiary of EFH Corp., is a holding company whose wholly-owned subsidiary, Oncor Holdings, holds a majority interest (approximately 80%) in Oncor. Oncor is a regulated electricity transmission and distribution company, principally engaged in providing delivery services to retail electric providers, including subsidiaries of TCEH, that sell power in the north-central, eastern and western parts of Texas.

Oncor is engaged in regulated electricity transmission and distribution operations in Texas that are primarily regulated by the PUCT. Oncor provides both distribution services to retail electric providers that sell electricity to consumers and transmission services to other electricity distribution companies, cooperatives and municipalities. Oncor operates the largest transmission and distribution system in Texas, delivering electricity to approximately three million homes and businesses and operating more than 117,000 miles of transmission and distribution lines. A significant portion of Oncor's revenues represent fees for delivery services provided to TCEH. Distribution revenues from TCEH represented 38% of Oncor's total revenues for the year ended December 31, 2009 and the three months ended March 31, 2010.

EFH Corp. and Oncor have implemented certain structural and operational "ring-fencing" measures based on commitments made by Texas Holdings and Oncor to the PUCT that are intended to enhance the credit quality of Oncor. These measures serve to mitigate Oncor's and Oncor Holdings' credit exposure to Texas Holdings and its

Confidential

EFIHMW00259726

other subsidiaries (collectively, the "Texas Holdings Group") and to reduce the risk that the assets and liabilities of Oncor or Oncor Holdings would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities.

At March 31, 2010, we had approximately 9,200 full-time employees (including approximately 3,900 at Oncor), including approximately 2,730 employees under collective bargaining agreements (including approximately 690 at Oncor).

**The Sponsor Group**

**KKR**

Established in 1976, KKR is a leading global alternative asset manager. KKR's franchise is sponsoring and managing funds that make investments in private equity, fixed income and other assets in North America, Europe, Asia and the Middle East. Throughout its history, KKR has brought a long-term investment approach, focusing on working in partnership with management teams of its portfolio companies and investing for future competitiveness and growth. KKR has more than $37.5 billion in private equity assets under management and more than $[13.3] billion in credit assets under management as of March 31, 2010 through various private and publicly traded funds and separately managed accounts. KKR also carries out capital markets activities through its broker dealer subsidiaries. KKR has offices in New York, Menlo Park, San Francisco, Houston, Washington D.C., London, Paris, Hong Kong, Tokyo, Beijing, Mumbai, Dubai and Sydney.

**TPG**

TPG manages one of the world's leading private investment firms with approximately $[45] billion of assets under management as of March 31, 2010. The firm was founded in 1992 and is led by David Bonderman and James G. Coulter. Through its global buyout platform, TPG Capital, the firm generally makes significant investments in companies through acquisitions and restructurings across a broad range of industries throughout North America, Europe, Asia and Australia. Notable investments by TPG's energy, power and commodities practice have included Texas Genco, Kraton Polymers and the Vita Group.

**Goldman Sachs**

The Goldman Sachs Group, Inc. is a bank holding company and a leading global investment banking, securities and investment management firm. Established in 1986, the firm's Principal Investment Area ("PIA") is part of the Merchant Banking Division and includes the GS Capital Partners, GS Loan Partners and GS Mezzanine Partners funds. Since 1986, PIA has formed 15 investment vehicles aggregating $80 billion of capital. GS Capital Partners VI, L.P., with $20.3 billion in equity, is the Goldman Sachs Group, Inc.'s current primary investment vehicle for privately negotiated equity investments across the globe.

**Recent Developments**

*Financial Results for Quarterly Period Ended June 30, 2010*

**[Insert disclosure regarding second quarter financial results.]**

*Liability Management Program*

In October 2009, EFH Corp. implemented a liability management program focused on improving its balance sheet by reducing debt and extending debt maturities.

<u>Recent Liability Management Transaction</u>

As part of its liability management program, on July 2, 2010, EFH Corp. consummated a private placement exchange transaction with an institutional investor. In the transaction, EFH Corp. exchanged approximately $412 million aggregate principal amount of EFH Corp. 10.000% Notes plus accrued and unpaid interest on the EFH Corp. Series P Notes (defined below) for approximately $549 million aggregate principal amount of its 5.55% Series P Senior Notes due November 15, 2014 (the "EFH Corp. Series P Notes"). Prior to the transaction, the institutional

11

EFIHMW00259727

investor, who held a majority of the outstanding aggregate principal amount of the EFH Corp. Series P Notes, gave its consent to certain amendments to the Indenture (For Unsecured Debt Securities Series P), dated as of November 1, 2004, between EFH Corp. and Bank of New York Mellon ("BNY"), and related documents (collectively, the "Series P Indenture"). The Series P Indenture governs the EFH Corp. Series P Notes. As a result of the consent, EFH Corp. and BNY, as trustee under the Series P Indenture, entered into a Supplemental Indenture, dated as of July 1, 2010 (the "Series P Supplemental Indenture"), that amended and supplemented the Series P Indenture. The amendments to the Series P Indenture, among other things, modify or eliminate substantially all of the restrictive covenants contained in the Series P Indenture, modify or eliminate certain events of default, modify covenants regarding mergers and consolidations and modify or eliminate certain other provisions of the Series P Indenture, including the limitation on the incurrence of secured indebtedness.

Liability Management Program Since the Start of the Second Quarter

Since the start of the second quarter of 2010, under its liability management program, EFH Corp. has acquired (including the exchange transaction described above but not including the Exchange Offer contemplated in this prospectus), in aggregate, approximately $1.061 billion principal amount of its and TCEH's outstanding debt. As consideration for this acquired debt, EFH Corp. has issued approximately $527 million principal amount of EFH Corp. 10.000% Notes and paid approximately $235 million of cash (excluding accrued interest payments). These transactions have resulted in EFH Corp. capturing approximately $299 million of debt discount and extending the maturities of $762 million of outstanding debt since the start of the second quarter of 2010.

Total Liability Management Program to Date

Since October 2009, when EFH Corp. began its liability management program, including the exchange transaction described above but not including the Exchange Offer contemplated in this prospectus, EFH Corp. (together with EFIH) has acquired, in aggregate, approximately $1.465 billion principal amount of its and TCEH's outstanding debt.  As consideration for this acquired debt, EFH Corp. has issued approximately $561 million principal amount of EFH Corp. 10.000% Notes and $115 million principal amount of EFH Corp. 9.75% Notes and paid approximately $235 million of cash (excluding accrued interest payments) and EFIH has issued approximately $141 million principal amount of EFIH 9.75% Notes. These transactions have resulted in EFH Corp. capturing approximately $413 million of debt discount and extending the maturities of $1.052 billion of outstanding debt under its liability management program.

The following is a summary of the principal amount of debt acquired to date under EFH Corp.'s liability management program:

- approximately $566 million of EFH Corp. Series P Notes;

- approximately $10 million of EFH Corp.'s 6.50% Series Q Senior Notes due 2024;

- approximately $6 million of EFH Corp.'s 6.55% Series R Senior Notes due 2034;

- approximately $213 million of EFH Corp.'s Old Cash-Pay Notes;

- approximately $266 million of EFH Corp.'s Old Toggle Notes;

- approximately $332 million of TCEH's 10.25% Senior Notes due 2015 and 10.25% Senior Notes due 2015, Series B (collectively, the "TCEH Notes");

- approximately $52 million of TCEH's 10.50%/11.25% Senior Toggle Notes due 2016 (the "TCEH Toggle Notes"); and

- approximately $20 million of TCEH's initial term loans under its Senior Secured Credit Facilities.

12

EFIHMW00259728

*PIK Interest Payment on Old Toggle Notes*

In May 2010, EFH Corp. exercised the payment-in-kind option in lieu of a cash interest payment with respect to the May 1, 2010 interest payment on the Old Toggle Notes (the "May 2010 PIK Payment"). Such exercise resulted in the issuance of $162 million principal amount of additional Old Toggle Notes to record holders of the Old Toggle Notes eligible to receive an interest payment.

*Substantial Completion of Oak Grove Generation Facilities*

Oak Grove Management Company LLC, an indirect subsidiary of EFH Corp. and EFCH, is developing a two-unit lignite-fueled generation facility at a site in Robertson County, Texas. Fluor Enterprises, Inc. is constructing the facility pursuant to an engineering, procurement and construction agreement ("EPC Agreement"). On June 1, 2010, the second Oak Grove unit achieved "substantial completion," as defined in the EPC Agreement.

## Exchange Agreements

On July 16, 2010, EFH Corp., EFIH and EFIH Finance entered into exchange agreements with affiliates of **[WAMCO]** and **[Franklin]** that are holders of certain of the Old Notes, which we refer to as the Exchange Agreements, pursuant to which such holders agreed to participate in the exchange offers and the consent solicitation. The Offeror expects, pursuant to the terms of the Exchange Agreements, that such holders will tender and deliver consents with respect to approximately **$[1.7 billion]** of Old Notes, representing approximately **[40]**% of the aggregate principal amount of outstanding Old Notes, in the exchange offers and the consent solicitation. As a result, it is expected that only an additional approximately **$[550 million]** aggregate principal amount of Old Notes would need to be validly tendered (and not validly withdrawn) in the exchange offers in order for the minimum condition to the exchange offers to be satisfied and would need to be validly delivered (and not validly revoked) in the consent solicitation in order for the requisite Consents to be received to adopt the Proposed Amendments.

13

Confidential

**Organizational Structure**

The chart below is a summary of EFH Corp.'s organizational and ownership structure and illustrates our long-term debt as of March 31, 2010, after giving effect to repurchases and exchanges of EFH Corp.'s and its subsidiaries' notes since March 31, 2010, and the May 2010 PIK Payment, as well as the issuance of New EFIH Senior Secured Notes offered by this Prospectus. Please see "Capitalization" for further information regarding our outstanding debt amounts after giving effect to the completion of the exchange offers. The chart below excludes subsidiaries of EFH Corp. that are not subsidiaries of EFIH or EFCH, including TXU Receivables Company. TXU Receivables Company conducts an accounts receivable securitization program.



(1)    Represents Old Notes subject to the exchange offers and consent solicitation. See "Capitalization".
(2)    EFH Corp.'s 5.55% Series P Senior Notes due 2014, 6.50% Series Q Senior Notes due 2024 and 6.55% Series R Senior Notes due 2034 (collectively, the "Legacy Notes"). Principal amount excludes $[____] million held by EFH Corp. and EFIH.
(3)    See "Capitalization". The New EFIH Senior Secured Notes will not be guaranteed by EFH Corp., EFCH or any of EFCH's subsidiaries.
(4)    Ring-fenced entities are all unrestricted under the indenture governing the New EFIH Senior Secured Notes, are not subject to the covenants and events of default thereof and are not guaranteeing the New EFIH Senior Secured Notes.
(5)    Principal amount excludes $[183] million held by EFH Corp. and EFIH.
(6)    Substantially all of the subsidiaries of TCEH are engaged in competitive market activities.

14

EFIHMW00259730

**PX 027
Page 24 of 232**

**Additional Information**

EFH Corp. was incorporated in Texas in 1996. EFIH was formed in Delaware in 2007. EFIH Finance was incorporated in Delaware in 2009. The Offeror's and EFH Corp.'s principal executive offices are located at Energy Plaza, 1601 Bryan Street, Dallas, TX 75201-3411. The telephone number of the Offeror's and EFH Corp.'s principal executive office is (214) 812-4600. The Offeror's and EFH Corp.'s website is *http://www.energyfutureholdings.com*. Information on or connected to the Offeror's and EFH Corp.'s website does not constitute part of this Prospectus.

Confidential

EFIHMW00259731

**PX 027**
**Page 25 of 232**

**Summary of the Terms of the Exchange Offers and the Consent Solicitation**

*The summary below describes the principal terms of the exchange offers and the consent solicitation. Certain of the terms and conditions described below are subject to important limitations and exceptions. For a more complete understanding of the terms and conditions of the exchange offers and the consent solicitation, you should read this entire Prospectus.*

| | |
|---|---|
| The Exchange Offers | Subject to the terms and conditions of the exchange offers, the Offeror is offering to exchange outstanding Old Notes validly tendered and not validly withdrawn for the consideration set forth in this Prospectus. |
| Maximum Exchange Amount | The maximum aggregate principal amount of New EFIH Senior Secured Notes issuable in the exchange offers will not exceed $2.28 billion. The maximum principal amount of New EFIH Senior Secured Notes issuable in the exchange offers is referred to in this Prospectus as the "Maximum Exchange Amount." Subject to applicable law, the Offeror reserves the right, but is not obligated, to increase or decrease the Maximum Exchange Amount. If a change is made to the amount of securities offered to be exchanged pursuant to the exchange offers, including any change to the Maximum Exchange Amount, the exchange offers will remain open for at least ten business days from (and including) the date of the announcement of such change. |
| Acceptance; Proration | Subject to the terms and conditions of the exchange offers, including the Maximum Exchange Amount and the prorations resulting therefrom, if necessary, all Old Notes validly tendered (and not validly withdrawn) in the exchange offers will be accepted in the exchange offers. The maximum principal amount of each issue of Old Notes that will be accepted for exchange is the outstanding principal amount of such issue validly tendered (and not validly withdrawn) as limited by the Maximum Exchange Amount and the resulting prorations, if necessary. In the event that proration of validly tendered (and not validly withdrawn) Old Notes is required, the Old Toggle Notes and the Old Cash-Pay Notes will be treated equally in calculating the proration. |
| | If proration of validly tendered (and not validly withdrawn) Old Notes is required, the Offeror will determine the final proration promptly after the Expiration Date and will announce the results of the final proration by press release. To determine the principal amount accepted of each tender subject to proration, the principal amount of such tender will be multiplied by the proration rate and the resultant amount rounded down to the nearest permitted denomination of the particular issue of Old Notes. The Offeror will not be able to determine the final proration prior to the Expiration Date. |
| Consideration Offered in Exchange Offers | Upon the terms and subject to the conditions of the exchange offers, including the Maximum Exchange Amount and the possible prorations resulting therefrom, participating holders of Old Notes will be eligible to receive, in exchange for each $1,000 principal amount of Old Notes validly tendered (and |

16

EFIHMW00259732

**PX 027**
**Page 26 of 232**

not validly withdrawn), the following:

(i) for Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date and accepted for exchange, an amount of New EFIH Senior Secured Notes and cash, together referred to as the "Total Consideration" as listed in the table on page ii of this Prospectus under "Total Consideration if Tendered at or Prior to the Early Tender Date," with the amount of New EFIH Senior Secured Notes (the "Total Notes Consideration") and the amount of cash (the "Total Cash Consideration") comprising the Total Consideration depending on the aggregate principal amount of Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date, as described below.

(ii) for Old Notes validly tendered (and not validly withdrawn) after the Early Tender Date and at or prior to the Expiration Date and accepted for exchange, New EFIH Senior Secured Notes, referred to as the "Exchange Consideration" as listed in the table on page ii of this Prospectus under "Exchange Consideration if Tendered After the Early Tender Date and at or Prior to the Expiration Date." No cash consideration will be payable with respect to Old Notes that are validly tendered after the Early Tender Date.

The aggregate amount of cash payable as the aggregate Total Cash Consideration in the exchange offers is $400 million. This aggregate amount of cash will be paid as the Cash Consideration pro rata in exchange for Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date, and will correspondingly reduce on a dollar basis the amount of the Total Consideration for each issue of Old Notes that is comprised of Total Notes Consideration. For example, if an aggregate of $3.2 billion of Old Notes were validly tendered (and not validly withdrawn) at or prior to the Early Tender Date, the Total Cash Consideration with respect to each $1,000 principal amount of tendered Old Notes would be $125.00, and the Total Notes Consideration with respect to each $1,000 principal amount of tendered Old Cash-Pay Notes and Old Toggle Notes would be $595.00 and $660.00, respectively. The definitive amount of the Total Notes Consideration and the Total Cash Consideration per $1,000 principal amount of Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date and accepted for exchange will be announced by press release promptly after the Early Tender Date and in any event at least ten business days prior to (and including) the Expiration Date.

Accrued and Unpaid Interest ......................................

All holders whose Old Cash-Pay Notes are accepted for exchange will receive an amount equal to accrued and unpaid interest on such Old Cash-Pay Notes, if any, in cash, from the last applicable interest payment date to, but not including, the Settlement Date. Holders whose Old Toggle Notes are accepted for exchange will not separately receive any accrued and unpaid payment-in-kind interest with respect to such Old Toggle Notes because the amount of such accrued

Confidential

EFIHMW00259733

|  | interest through the Settlement Date has been included in determining the consideration being offered in the exchange offers for the Old Toggle Notes. If the Settlement Date occurs later than anticipated, then the consideration being offered in the exchange offers for the Old Toggle Notes will be adjusted to account for the additional accrued interest incurred. |
|---|---|
| Fractions ................................................... | The Offeror will not accept any tender of Old Notes that would result in the issuance of less than $2,000 principal amount of New EFIH Senior Secured Notes to a participating holder. The aggregate principal amount of New EFIH Senior Secured Notes issued to each participating holder for all Old Notes validly tendered (and not validly withdrawn) will be rounded down, if necessary, to $2,000 or the nearest whole multiple of $1,000 in excess thereof. This rounded amount will be the principal amount of New EFIH Senior Secured Notes you will receive, and no additional cash will be paid in lieu of any principal amount of New EFIH Senior Secured Notes not received as a result of rounding down. |
| Aggregate Cash Payment in Exchange Offers............ | The aggregate amount of cash payable in the exchange offers is $400 million. This aggregate amount of cash will be paid pro rata in exchange for Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date. To the extent paid, any cash consideration will reduce on a dollar basis the amount of the Total Consideration for each issue of Old Notes that is comprised of Total Notes Consideration.

The minimum Cash Consideration and the maximum Total Notes Consideration payable per $1,000 principal amount of Old Cash-Pay Notes are $[   ] and $[   ], respectively, which amounts would be payable if all of the Old Notes were tendered at or prior to the Early Tender Date. The minimum Cash Consideration and maximum Total Notes Consideration payable per $1,000 principal amount of Old Toggle Notes are $[   ] and $[   ], respectively, which amounts would be payable if all of the Old Notes were tendered at or prior to the Early Tender Date. |
| The Consent Solicitation ............................................ | Upon the terms and subject to the conditions described in this Prospectus and the Consent and Letter of Transmittal, EFH Corp. is soliciting Consents in the consent solicitation of holders of the Old Notes to the Proposed Amendments.

The solicitation of consents for the Old Notes will expire on the Consent Date. Old Notes validly tendered pursuant to the exchange offers (and not validly withdrawn) at or prior to the Consent Date will be deemed to include Consents to the Proposed Amendments. The completion, execution and delivery of a Consent and Letter of Transmittal, or transmission of an Agent's Message, in connection with a valid tender of Old Notes pursuant to the exchange offers at or prior to the Consent Date will constitute the delivery of Consents with respect to such Old Notes. Holders may not validly tender Old Notes in the exchange offers at or prior to |

18

EFIHMW00259734

PX 027
Page 28 of 232

the Consent Date without delivering the related Consents in the consent solicitation and may not validly withdraw previously tendered Old Notes at or prior to the Consent Date without revoking the related Consents. Holders may not deliver Consents in the consent solicitation without validly tendering their Old Notes in the exchange offers at or prior to the Consent Date and may only validly revoke Consents by validly withdrawing the previously tendered related Old Notes at or prior to the Consent Date or by revoking Consents after the Consent Date and prior to the execution and delivery of the Supplemental Indenture by the parties thereto. Holders may tender Old Notes after the Consent Date and at or prior to the Expiration Date without delivering Consents. However, holders tendering Old Notes after the Early Tender Date will not be eligible to receive the applicable Total Consideration, including the Total Cash Consideration, or the cash consent payment.

If the requisite Consents are received and a Supplemental Indenture is executed, EFH Corp. will pay to each holder with respect to such holder's Old Notes as to which Consents are validly delivered and not validly revoked at or prior to the Consent Date, a cash consent payment of $2.50 per $1,000 principal amount of such Old Notes.  Such consent payment is in addition to any Total Consideration or Exchange Consideration that may be payable to a holder in respect of its Old Notes accepted for exchange. The consent payments will be made on the Settlement Date or promptly following the termination of the exchange offers, as applicable, assuming that the conditions to such payments are satisfied. EFH Corp.'s obligation to make consent payments is not conditioned upon completion of the exchange offers but is subject to receipt of the requisite Consents and execution and delivery of the Supplemental Indenture. If the exchange offers are terminated, the Proposed Amendments in any executed Supplemental Indenture will not become operative. See "Procedures for Tendering Old Notes and Delivering Consents" for more information.

| The Proposed Amendments ........................................ | The Proposed Amendments would eliminate substantially all of the restrictive covenants contained in the Old Notes Indenture and the Old Notes, eliminate certain events of default, modify covenants regarding mergers and consolidations, and modify or eliminate certain other provisions, including certain provisions relating to defeasance contained in the Old Notes Indenture and Old Notes that would otherwise prevent a defeasance without, among other things, delivery of an opinion of counsel confirming such defeasance does not constitute a taxable event. See "Proposed Amendments" for more information. |

In addition to the foregoing, execution and delivery of the Consent and Letter of Transmittal will constitute an express waiver by a consenting holder of the Old Notes with respect to all claims against EFH Corp., the guarantors of the Old Notes and the Sponsor Group of any breach, default or event

19

EFIHMW00259735

PX 027
Page 29 of 232

| | |
|---|---|
| | of default that may have arisen under the Old Notes Indenture. |
| Requisite Consents ...................................................... | In order to be adopted with respect to the Old Notes, the Proposed Amendments must be consented to by the holders of at least a majority of the outstanding aggregate principal amount of the Old Notes. Holders of Old Notes will vote together as a single class with respect to the Proposed Amendments that are the subject of the consent solicitation. It is expected but not required that the Supplemental Indenture will be executed and delivered promptly following the Consent Date assuming receipt of the requisite Consents for the Proposed Amendments. The Supplemental Indenture relating to the Proposed Amendments will become effective immediately upon its execution and delivery by the parties thereto; however, the Proposed Amendments contained therein will not become operative until immediately prior to the acceptance for exchange of Old Notes upon the terms and subject to the conditions set forth herein. Old Notes held by members of the Sponsor Group and their affiliates will not be considered outstanding for the purposes of determining whether the holders of the required outstanding principal amount of the Old Notes have delivered Consents necessary to adopt the Proposed Amendments. |
| Consent Date ............................................................. | To deliver Consents pursuant to the consent solicitation, holders must validly tender (and not validly withdraw) their Old Notes, and thereby deliver Consents related to such Old Notes, at or prior to 5:00 p.m., New York City time, on July 29, 2010, unless extended by EFH Corp. |
| Early Tender Date........................................................ | To tender by the Early Tender Date, holders must validly tender (and not validly withdraw) their Old Notes at or prior to 5:00 p.m., New York City time, on July 29, 2010, unless extended by the Offeror. |
| Expiration Date .......................................................... | The exchange offers will expire at midnight, New York City time, on August 12, 2010, unless extended by the Offeror. |
| Procedure for Tenders and Delivery of Consents ...................................................................... | If a holder wishes to participate in the exchange offers and the consent solicitation and such holder's Old Notes are held by a custodial entity such as a broker, dealer, commercial bank, trust company or other nominee, such holder must instruct such custodial entity (pursuant to the procedures of the custodial entity) to tender the Old Notes and deliver the related Consents. In order to participate in the consent solicitation, Old Notes must be validly tendered (and not validly withdrawn), thereby delivering the related Consent, at or prior to the Consent Date.

Custodial entities that are participants in DTC must tender Old Notes and deliver Consents through ATOP, by which the custodial entity and the beneficial owner on whose behalf the custodial entity is acting agree to be bound by the Consent and Letter of Transmittal. **A Consent and Letter of** |

20

EFIHMW00259736

**PX 027**
**Page 30 of 232**

| | Transmittal need not be completed and submitted in connection with tenders effected through ATOP. |
|---|---|
| No Guaranteed Delivery .............................................. | The exchange offers will not provide for guaranteed delivery procedures with respect to any issue of Old Notes. |
| Withdrawal of Tenders and Revocation of Consents ..................................................... | A holder may withdraw the tender of such holder's Old Notes at any time prior to the Expiration Date (and, if not previously accepted for exchange, after the expiration of 40 business days from July 16, 2010) by submitting a notice of withdrawal to the Exchange Agent using ATOP procedures and/or upon compliance with the other procedures described under "Withdrawal of Tenders and Revocation of Consents." The withdrawal of any Old Notes at or prior to the Consent Date will constitute a revocation of the related Consents. Consents may not be revoked prior to the Consent Date except by withdrawing tendered Old Notes at or prior to the Consent Date. Consents may be revoked after the Consent Date by revoking such Consents prior to the execution and delivery of the Supplemental Indenture. Any Consents that are not revoked at or prior to the later of the Consent Date and the execution and delivery of the Supplemental Indenture may not be revoked thereafter, as further described under "Withdrawal of Tenders and Revocation of Consents." A withdrawal of Old Notes after the later of the Consent Date and the execution and delivery of the Supplemental Indenture will not revoke any related Consents, and withdrawing holders will be subject to the Proposed Amendments if adopted. |
| Settlement Date ....................................................... | Subject to the terms and conditions of the exchange offers, the settlement date for the exchange offers will occur promptly following the Expiration Date (such date, the "Settlement Date"). Assuming that the exchange offers and consent solicitation are not extended, the Offeror expects that the Settlement Date will be on or about the third business day following the Expiration Date. |
| The New EFIH Senior Secured Notes ........................ | For a description of the terms of the New EFIH Senior Secured Notes, see "—Summary of New EFIH Senior Secured Notes" and "Description of the Notes." For a comparison of the principal differences between the Old Notes and the New EFIH Senior Secured Notes, see "Comparison of Principal Differences Between Old Notes and New EFIH Senior Secured Notes." |
| Collateral ................................................................ | The New EFIH Senior Secured Notes will be secured, equally and ratably with the EFIH 9.75% Notes and EFIH's guarantees of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, by EFIH's pledge of 100% of the membership interests and other investments it owns in Oncor Holdings (which currently represent an approximate 80% equity interest in Oncor). |
| Conditions to the Exchange Offers and the | |

21

EFIHMW00259737

| | |
|---|---|
| Consent Solicitation ................................................. | The exchange offers are conditioned on at least a majority of the outstanding aggregate principal amount of Old Notes being validly tendered (and not validly withdrawn) at or prior to the Expiration Date. The exchange offers and the consent solicitation are also subject to the other conditions described under "Conditions of the Exchange Offers and the Consent Solicitation," including the condition applicable to the exchange offers that the registration statement, of which this Prospectus forms a part, has been declared effective by the SEC (which condition cannot be waived). Subject to applicable law, the Offeror has the right to terminate or withdraw the exchange offers and EFH Corp. has the right to terminate or withdraw the consent solicitation if any of the applicable conditions described under "Conditions of the Exchange Offers and the Consent Solicitation" are not satisfied or waived by the Expiration Date or Consent Date, as applicable. |
| Consequences of Failure to Tender ............................ | If the Offeror completes the exchange offers, obligations with respect to any Old Notes not tendered by holders or not accepted for exchange or otherwise left outstanding following the completion of the exchange offers will not be secured by the Collateral and will therefore be effectively subordinated to the New EFIH Senior Secured Notes and the Existing Secured Notes to the extent of the value of the Collateral. Further, if the requisite Consents are received with respect to the Old Notes Indenture and the Supplemental Indenture giving effect to the related Proposed Amendments is executed and the Proposed Amendments become operative, holders of Old Notes left outstanding following completion of the exchange offers will no longer be entitled to the benefits of the covenants, events of default and other provisions that are eliminated or modified pursuant to such Proposed Amendments. As described above, pursuant to the Exchange Agreements, holders of Old Notes representing approximately **[40]**% of the aggregate principal amount of outstanding Old Notes have agreed to participate in the exchange offers and the consent solicitation.  As a result of the Exchange Agreements, only an additional approximately $**[550 million]** aggregate principal amount of Old Notes would need to be validly delivered (and not validly withdrawn) in the consent solicitation in order for the requisite Consents to be received to adopt the Proposed Amendments.  In addition, to the extent that Old Notes are tendered and accepted in the exchange offers, any existing trading market for the remaining Old Notes may become further limited. The smaller outstanding principal amount may make the trading price of the Old Notes that are not tendered and accepted for payment more volatile. Consequently, the liquidity, market value and price volatility of Old Notes that remain outstanding may be materially and adversely affected.  For a description of other consequences of failing to tender your Old Notes pursuant to the exchange offers, see "Risk Factors—Risks to Holders of Old Notes Not Tendered or Not Accepted for Exchange." |

22

EFIHMW00259738

| | |
|---|---|
| Amendment and Termination ..................................... | Subject to applicable law, the Offeror may terminate or withdraw at its sole discretion the exchange offers and EFII Corp. may terminate or withdraw the consent solicitation if any applicable condition to the exchange offers or the consent solicitation is not satisfied or waived by the Expiration Date or Consent Date, as applicable. Each of the Offeror or EFH Corp., as applicable, reserves the right, subject to applicable law, to (i) waive any and all of the conditions of the exchange offers or the consent solicitation (except for the condition applicable to the exchange offers that the registration statement, of which this Prospectus forms a part, has been declared effective by the SEC (which condition cannot be waived)) at or prior to the Expiration Date or Consent Date, as applicable, and (ii) amend the terms of the exchange offers or the consent solicitation. In the event that the exchange offers are terminated, withdrawn or otherwise not completed at or prior to the Expiration Date, no consideration or consent payment will be paid or become payable to holders who have validly tendered their Old Notes pursuant to the exchange offers and delivered their Consents in the consent solicitation, other than the consent payments of $2.50 per $1,000 principal amount of Old Notes as to which Consents are validly delivered and not validly revoked, subject to the receipt of the requisite Consents and the execution and delivery of the Supplemental Indenture. In any such event, (i) Old Notes previously tendered pursuant to the exchange offers will be promptly returned to the tendering holders and (ii) the Proposed Amendments in the executed Supplemental Indenture will not become operative. See "General Terms of the Exchange Offers and Consent Solicitation—Extension, Termination or Amendment." |
| Use of Proceeds ........................................................ | Neither EFH Corp. nor the Offeror will receive any cash proceeds from the exchange offers or consent solicitation. Any Old Notes exchanged in the exchange offers may remain outstanding and held by EFIH, EFH Corp. or another subsidiary of EFH Corp. or be retired and cancelled. |
| Taxation ................................................................... | For a discussion of material U.S. federal income tax consequences of the exchange offers, see "Material U.S. Federal Income Tax Considerations." |
| Regulatory Approvals ................................................ | Other than the declaration of effectiveness by the SEC of the registration statement, of which this Prospectus forms a part, the Offeror is not aware of any regulatory approvals necessary to complete the exchange offers or the consent solicitation. |
| Dealer Managers and Solicitation Agents .................. | Citigroup Global Markets Inc. and Goldman Sachs & Co. are acting as lead dealer managers and solicitation agents in the United States, and [                    ] are also acting as dealer managers and solicitation agents in the United States (together, the "Dealer Managers") for the exchange offers and consent solicitation. The addresses and telephone numbers of the lead Dealer Managers are listed on |

Confidential

EFIHMW00259739

| | the back cover of this Prospectus. |
|---|---|
| Exchange Agent and Information Agent ..................... | Global Bondholder Services Corporation. The address and telephone numbers of the Exchange Agent and Information Agent are listed on the back cover of this Prospectus. |
| **Risk Factors** .............................................................. | **In addition to the other information included in this Prospectus, you should carefully consider the information set forth in the section entitled "Risk Factors" beginning on page [33] before deciding whether or not to participate in the exchange offers and the consent solicitation.** |

24

Confidential

EFIHMW00259740

**Summary of New EFIH Senior Secured Notes**

The summary below describes the principal terms of the New EFIH Senior Secured Notes and the related indenture. Certain of the terms and conditions described below are subject to important limitations and exceptions. The "Description of the Notes" section of this Prospectus contains more detailed descriptions of the terms and conditions of the New EFIH Senior Secured Notes and the related indenture.

Issuer ......................................................... Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (together, the "Offeror")

Securities Offered ................................................ 10.000% Senior Secured Notes due 2020.

Maturity Date ....................................................... December 1, 2020.

Interest Rate ....................................................... The New EFIH Senior Secured Notes will accrue interest at the rate of 10.00% per annum.

Interest Payment Dates ......................................... Interest on the New EFIH Senior Secured Notes is payable on June 1 and December 1 of each year, commencing on June 1, 2010.

Ranking ............................................................. The New EFIH Senior Secured Notes will:

- be senior obligations of the Offeror and will rank equally in right of payment with all existing and future senior indebtedness of the Offeror (including the EFIH 9.75% Notes and EFIH's guarantees of certain of EFH Corp.'s indebtedness, including the Old Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes);

- will be secured, equally and ratably with the EFIH 9.75% Notes and EFIH's guarantee of the EFH Corp. 10.000% Notes and the EFH Corp. 9.75% Notes, by the pledge of any investments EFIH owns in Oncor Holdings or any of its subsidiaries, which on the date the New EFIH Senior Secured Notes are issued in the exchange offers will consist of all of the membership interests EFIH owns in Oncor Holdings;

- be effectively senior to all unsecured indebtedness of the Offeror and any indebtedness secured by the Collateral on a subordinated basis, to the extent of the value of the Collateral;

- be effectively subordinated to any indebtedness of the Offeror secured by assets of the Offeror other than the Collateral, to the extent of the value of the assets securing such indebtedness;

- be structurally subordinated to all indebtedness and other liabilities of EFIH's subsidiaries (other than EFIH Finance), including Oncor Holdings and its subsidiaries, any of EFIH's future foreign subsidiaries and any other unrestricted subsidiaries; and

25

EFIHMW00259741

> - be senior in right of payment to any future subordinated indebtedness of the Offeror.
>
> As of March 31, 2010, on a pro forma basis after giving effect to the transactions contemplated by this Prospectus, assuming tender and acceptance of all Old Notes on a pro rata basis up to the Maximum Exchange Amount, (1) the Offeror would not have had any senior indebtedness other than the EFIH 9.75% Notes and the New EFIH Senior Secured Notes and the guarantee by EFIH of the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes and any Old Notes remaining outstanding following the exchange offers and (2) the New EFIH Senior Secured Notes would have been structurally subordinated to approximately $5.857 billion principal amount of indebtedness (includes long-term debt, including amounts due currently, and short-term borrowings) of the Offeror's subsidiaries (other than EFIH Finance), including all of Oncor Holdings' and its subsidiaries' indebtedness. As of March 31, 2010, Oncor had approximately $1.122 billion of additional available capacity under its revolving credit facility (excluding $122 million of undrawn commitments from Lehman).

Guarantees .......................................................... The New EFIH Senior Secured Notes will not initially be guaranteed.

Security ............................................................... The New EFIH Senior Secured Notes will be secured, equally and ratably with the EFIH 9.75% Notes and EFIH's guarantees of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, by the Collateral. As of the date of this prospectus, $[___] aggregate principal amount of EFIH 9.75% Notes, EFH Corp. 9.75% Notes and EFH Corp. 10.000% Notes were outstanding. See "Risk Factors—Risks Related to the Exchange Offers and the New EFIH Senior Secured Notes— The indenture governing the New EFIH Senior Secured Notes may not protect holders from all actions that EFIH or the Oncor Subsidiaries may take that would reduce your interest in the Collateral or that may reduce the value of the Collateral, including sales or exchanges of the Collateral or the assets of the Oncor Subsidiaries for other assets or investments."

Optional Redemption ........................................... The Offeror may redeem any of the New EFIH Senior Secured Notes on and after December 1, 2015 at the redemption prices set forth in this Prospectus. The Offeror may also redeem any of the New EFIH Senior Secured Notes at any time prior to December 1, 2015 at a price equal to 100% of their principal amount, plus accrued interest and a "make-whole" premium. In addition, before December 1, 2013, the Offeror may redeem up to 35% of the aggregate principal amount of the New EFIH Senior Secured Notes, using the proceeds from certain equity offerings at the redemption price set forth in this Prospectus. See "Description of the Notes—Optional Redemption."

Change of Control Offer ....................................... Upon the occurrence of certain transactions meeting the definition of "change of control," holders of the New EFIH Senior Secured Notes will have the right to require the Offeror to repurchase some or all of the New EFIH Senior Secured

26

EFIHMW00259742

**PX 027
Page 36 of 232**

Notes at 101% of their principal amount, plus accrued and unpaid interest to the repurchase date. This right is subject to important limitations. For example, this right will not apply to a transaction that would otherwise be a "change of control" if the transaction meets certain requirements. See "Description of the Notes—Repurchase at the Option of Holders—Change of Control" and the definition of "Change of Control" under "Description of the Notes."

The Offeror may not be able to pay holders the required price for New EFIH Senior Secured Notes they present to it at the time of a change of control, because the Offeror may not have enough funds at that time, or the terms of the Offeror's other indebtedness or any of its subsidiaries' indebtedness, including Oncor's revolving credit facility, may prevent the Offeror from making such payment or receiving funds from its subsidiaries in an amount sufficient to fund such payment.

See "Risk Factors—Risks Related to the Exchange Offers and the New EFIH Senior Secured Notes—The Offeror may not be able to repurchase the New EFIH Senior Secured Notes upon a change of control" and "Risk Factors—Risks Related to the Exchange Offers and the New EFIH Senior Secured Notes— We may transfer or dispose of our interests in Oncor Holdings to a third party in a manner that would result in such third party becoming the obligor under the New EFIH Senior Secured Notes, without EFIH being required to offer to repurchase the New EFIH Senior Secured Notes. The risks of an investment in the New EFIH Senior Secured Notes may increase further following such a transaction."

Important Covenants ............................................

The indenture governing the New EFIH Senior Secured Notes will contain covenants limiting EFIH's ability and the ability of its restricted subsidiaries to:

- pay dividends on or make distributions in respect of EFIH's capital stock or make other restricted payments;

- make investments (including investments in Oncor);

- incur additional debt or issue some types of preferred shares;

- create liens on assets to secure debt;

- sell assets;

- consolidate, merge, sell or otherwise dispose of all or substantially all of its assets in certain circumstances;

- enter into certain transactions with its affiliates; and

- designate its subsidiaries as unrestricted subsidiaries.

27

EFIHMW00259743

These covenants are subject to a number of important additional limitations and exceptions. EFIH is a holding company for its subsidiaries, including EFIH Finance, with no material operations of its own and only limited assets. There will initially be no restricted subsidiaries under the indenture (other than EFIH Finance, which has no assets). Oncor Holdings, the immediate parent of Oncor, and its subsidiaries will be Unrestricted Subsidiaries under the indenture and, accordingly, will not be subject to any of the restrictive covenants or events of default in the indenture. See "Description of the Notes."

No Prior Market ....................................................    The New EFIH Senior Secured Notes will be new securities for which there is currently no market. Although the Dealer Managers have informed the Offeror that they intend to make a market in the New EFIH Senior Secured Notes, they are not obligated to do so, and they may discontinue market making activities at any time without notice. Accordingly, a liquid market for the New EFIH Senior Secured Notes may not develop or be maintained. Additionally, certain of the Dealer Managers may be restricted in their market-making activities. See "Risk Factors—Risks Related to the Exchange Offers and the New EFIH Senior Secured Notes—An active trading market may not develop for the New EFIH Senior Secured Notes."

Listing .................................................................    EFIH intends to apply to list the New EFIH Senior Secured Notes on the New York Stock Exchange.

Use of Proceeds ...................................................    Neither EFH Corp. nor the Offeror will receive any cash proceeds from the exchange offers or the consent solicitation. Any Old Notes exchanged in the exchange offers may remain outstanding and held by EFIH, EFH Corp. or another subsidiary of EFH Corp. or be retired and cancelled.

Denominations ....................................................    The New EFIH Senior Secured Notes will be issued in minimum denominations of $2,000 and in integral multiples of $1,000 in excess thereof.

**Risk Factors  .......................................................    In addition to the other information included in this Prospectus, you should carefully consider the information set forth in the section entitled "Risk Factors" beginning on page [33] before deciding whether or not to participate in the exchange offers and the consent solicitation.**

28

EFIHMW00259744

PX 027
Page 38 of 232

**EFH Corp. and its Subsidiaries**
**Summary Historical Consolidated Financial Data**

The following table sets forth our summary historical consolidated financial data as of and for the periods indicated. The historical financial data as of December 31, 2009 and 2008 (Successor) and for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor) and the period from January 1, 2007 through October 10, 2007 (Predecessor) have been derived from our audited historical consolidated financial statements and related notes included elsewhere in this Prospectus. The historical financial data as of December 31, 2007 (Successor), 2006 (Predecessor) and 2005 (Predecessor) and for the years ended December 31, 2006 and 2005 (Predecessor) have been derived from our audited historical consolidated financial statements that are not included in this Prospectus. The "Predecessor" period reflects the period prior to the merger of Texas Energy Future Merger Sub Corp ("Merger Sub") with and into EFH Corp. (the "Merger"), which occurred on October 10, 2007. The historical financial data as of March 31, 2010 and for the three months ended March 31, 2010 and 2009 have been derived from our unaudited historical interim condensed consolidated financial statements and related notes included elsewhere in this Prospectus. In EFH Corp.'s opinion, such unaudited interim financial data reflects all adjustments, consisting of normal recurring accruals, necessary for the fair presentation of the results for those periods. The results of operations for the interim periods, for seasonal and other factors, are not necessarily indicative of the results to be expected for the full year or any future period.

The summary historical consolidated financial data should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009" and "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three Months Ended March 31, 2010," each included in Annex B to this Prospectus, and our historical consolidated financial statements and related notes that are included elsewhere in this Prospectus.

| | Successor | | | Predecessor | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, | |
| | 2009 | 2008 | 2007 | 2007 | 2006 | 2005 |
| | (millions of dollars, except ratios and per share amounts) | | | | | |
| **Statement of Income Data:** | | | | | | |
| Operating revenues | $ 9,546 | $ 11,364 | $ 1,994 | $ 8,044 | $ 10,703 | $ 10,826 |
| Income (loss) from continuing operations before extraordinary loss and cumulative effect of changes in accounting principles | 408 | (9,998) | (1,361) | 699 | 2,465 | 1,775 |
| Income from discontinued operations, net of tax effect | — | — | 1 | 24 | 87 | 5 |
| Extraordinary loss, net of tax effect | — | — | — | — | — | (50) |
| Cumulative effect of changes in accounting principles, net of tax effect | — | — | — | — | — | (8) |
| Preference stock dividends | — | — | — | — | — | 10 |
| Net income (loss) | 408 | (9,998) | (1,360) | 723 | 2,552 | 1,712 |
| Net income (loss) attributable to noncontrolling interests | (64) | 160 | — | — | — | — |
| Net income (loss) attributable to EFH Corp. | 344 | (9,838) | (1,360) | 723 | 2,552 | 1,712 |
| Dividends declared per share | $ — | $ — | $ — | $ 1.30 | $ 1.67 | $ 1.26 |
| Ratio of earnings to fixed charges (a) | 1.24 | — | — | 2.30 | 5.11 | 3.80 |
| Ratio of earnings to combined fixed charges and preference dividends (a) | 1.24 | — | — | 2.30 | 5.11 | 3.74 |
| **Statement of Cash Flows Data:** | | | | | | |
| Cash flows provided by (used in) operating activities from continuing operations | $ 1,711 | $ 1,505 | $ (450) | $ 2,265 | $ 4,954 | $ 2,793 |
| Cash flows provided by (used in) financing activities from continuing operations | 422 | 2,837 | 33,865 | 1,394 | (2,332) | (1,563) |
| Cash flows used in investing activities from continuing operations | (2,633) | (2,934) | (34,563) | (2,283) | (2,664) | (1,038) |
| **Other Financial Data:** | | | | | | |
| Capital expenditures, including nuclear fuel | $ 2,545 | $ 3,015 | $ 716 | $ 2,542 | $ 2,337 | $ 1,148 |

Confidential

EFIHMW00259745

**PX 027**
**Page 39 of 232**

| | 2009 | Successor December 31, 2008 | 2007 | Predecessor December 31, 2006 | 2005 |
|---|---|---|---|---|---|
| | | | (millions of dollars) | | |
| **Balance Sheet Data:** | | | | | |
| Total assets......................................... | $ 59,662 | $ 59,263 | $ 64,804 | $ 27,216 | $ 27,978 |
| Property, plant & equipment—net................ | 30,108 | 29,522 | 28,650 | 18,569 | 17,006 |
| Goodwill and intangible assets.................... | 17,192 | 17,379 | 27,319 | 729 | 728 |
| Total debt (b)....................................... | 43,426 | 42,460 | 40,834 | 12,607 | 13,380 |
| Preferred stock of subsidiaries (c)................ | — | — | — | — | — |
| Total equity......................................... | (1,836) | (2,318) | 6,685 | 2,140 | 475 |

(a)    Fixed charges exceeded "earnings" (net loss) by $10.469 billion and $2.034 billion for the year ended December 31, 2008 and for the period from October 11, 2007 through December 31, 2007, respectively.

(b)    Includes long-term debt, including amounts due currently, and short-term borrowings. Also includes equity-linked debt securities in the amount of $179 million for the year ended December 31, 2005.

(c)    Preferred stock outstanding at the end of 2008, 2007, 2006 and 2005 has a stated amount of $51 thousand.  There was no outstanding preferred stock at the end of 2009.

Although EFH Corp. continued as the same legal entity after the merger in October 2007, its "Summary Historical Consolidated Financial Data" for periods preceding the merger and for periods succeeding the merger are presented as the consolidated financial statements of the "Predecessor" and the "Successor," respectively. See "Basis of Presentation" in Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 included elsewhere in this Prospectus. The consolidated financial statements of the Successor also reflect the application of "purchase accounting."  Results for 2008 were significantly impacted by impairment charges related to goodwill, trade name and emission allowances intangible assets and natural gas-fueled generation plants.

| | Successor | |
|---|---|---|
| | Three Months Ended March 31, 2010 | Three Months Ended March 31, 2009 |
| | (millions of dollars, except ratios) | |
| **Statement of Income Data:** | | |
| Operating revenues ................................................................. | $ 1,999 | $ 2,139 |
| Net income ........................................................................... | 355 | 454 |
| Net income attributable to noncontrolling interests........................... | — | (12) |
| Net income attributable to EFH Corp........................................... | 355 | 442 |
| | | |
| Ratio of earnings to fixed charges................................................. | 1.56 | 2.02 |
| Ratio of earnings to combined fixed charges and preference dividends............. | 1.56 | 2.02 |
| | | |
| **Statement of Cash Flows Data:** | | |
| Cash flows provided by operating activities...................................... | $ 102 | $ 590 |
| Cash flows provided by financing activities...................................... | 57 | 138 |
| Cash flows provided by (used in) investing activities ........................... | 9 | (882) |
| | | |
| **Other Financial Data:** | | |
| Capital expenditures, including nuclear fuel .................................... | $ 372 | $ 646 |

| | Successor |
|---|---|
| | March 31, 2010 |
| | (millions of dollars) |
| **Balance Sheet Data:** | |
| Total assets......................................................................... | $ 52,794 |
| Property, plant & equipment—net ............................................... | 21,173 |
| Goodwill and intangible assets................................................... | 12,820 |
| Total debt (a)....................................................................... | 37,775 |
| Total equity......................................................................... | (2,805) |

_____

(a) Includes long-term debt, including amounts due currently, and short-term borrowings.

Confidential

EFIHMW00259746

**EFIH and its Subsidiaries**
**Summary Historical Consolidated Financial Data**

The following table sets forth EFIH and its subsidiaries' summary historical consolidated financial data as of and for the periods indicated. The historical financial data as of December 31, 2009 and 2008 (Successor) and for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor) and the period from January 1, 2007 through October 10, 2007 (Predecessor) have been derived from EFIH and its subsidiaries' audited historical consolidated financial statements and related notes included elsewhere in this Prospectus. The historical financial data as of December 31, 2007 (Successor) reflects Oncor accounted for under the equity method. The historical financial data as of December 31, 2006 and 2005 (Predecessor) and for the years ended December 31, 2006 and 2005 (Predecessor) reflect Oncor accounted for under the equity method; EFIH was formed at the time of the merger in October 2007, and its predecessor is Oncor. The historical financial data as of March 31, 2010 and for the three months ended March 31, 2010 and 2009 have been derived from EFIH and its subsidiaries' unaudited historical interim condensed consolidated financial statements and related notes included elsewhere in this Prospectus. In EFIH's opinion, such unaudited interim financial data reflects all adjustments, consisting of normal recurring accruals, necessary for the fair presentation of the results for those periods. The results of operations for the interim periods, for seasonal and other factors, are not necessarily indicative of the results to be expected for the full year or any future period.

The summary historical consolidated financial data should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009" and "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three Months Ended March 31, 2010," each included in Annex C to this Prospectus, and EFIH and its subsidiaries' historical consolidated financial statements and related notes that are included elsewhere in this Prospectus.

| | Successor (a) | | | Predecessor (a) | | |
| | Year Ended December 31, | | Period from October 11, 2007 through December 31, | Period from January 1, 2007 through October 10, | Year Ended December 31, | |
| | 2009 | 2008 | 2007 | 2007 | 2006 | 2005 |
| | (millions of dollars, except ratios) | | | | | |
| **Statement of Income Data:** | | | | | | |
| Income (loss) before income taxes and equity in earnings of unconsolidated subsidiary | $ (275) | $ (260) | $ (68) | $ — | $ — | $ — |
| Equity in earnings (losses) of unconsolidated subsidiary (net of tax) (b) | 256 | (323) | 64 | 263 | 344 | 351 |
| Net income (loss) | 74 | (495) | 19 | 263 | 344 | 351 |
| Ratio of earnings to fixed charges (c) | — | 1.27 | — | — | — | — |
| | | | | | | |
| **Statement of Cash Flows Data:** | | | | | | |
| Cash flows provided by operating activities | $ 216 | $ 333 | $ — | $ 326 | $ 340 | $ — |
| Cash flows used in financing activities | (216) | (330) | — | (326) | (340) | — |
| Cash flows used in investing activities | — | (3) | — | — | — | — |

| | Successor (a) | | | Predecessor (a) | |
| | December 31, | | | December 31, | |
| | 2009 | 2008 | 2007 | 2006 | 2005 |
| **Balance Sheet Data:** | | | | | |
| Total assets | $ 5,577 | $ 5,363 | $ 7,732 | $ 2,975 | $ 2,935 |
| Total debt (d) | 2,513 | 2,250 | 2,250 | — | — |
| Total membership interests | 3,010 | 3,069 | 5,439 | 2,975 | 2,935 |

(a) Amounts reflect the retrospective adoption of amended guidance regarding consolidation accounting standards related to variable interest entities that resulted in the deconsolidation of Oncor Holdings and the accounting for EFIH's investment in Oncor Holdings (the carrying value of which totaled $5.936 billion at December 31, 2009) under the equity method. See Note 2 to EFIH and its subsidiaries' audited historical consolidated financial statements as of and for the year ended December 31, 2009 included elsewhere in this prospectus. EFIH was formed at the time of the merger in October 2007; consequently Predecessor data represents Oncor presented under the equity method of accounting. The consolidated financial statements of the Successor reflect the application of purchase accounting to Oncor.

(b) Amount in 2008 includes the effects of Oncor's $860 million goodwill impairment charge.

(c) Fixed charges exceeded earnings (net loss) by $59 million and $68 million for the year ended December 31, 2009 and the period from October 11, 2007, respectively. There were no fixed charges for the predecessor periods.

31

EFIHMW00259747

(d)    Reflects push down of certain EFH Corp. (parent) debt due to EFIH's guarantee of the debt. See Note 5 to EFIH and its subsidiaries' historical consolidated financial statements for the year ended December 31, 2009 included elsewhere in this Prospectus.

|  | Successor (a) | |
|---|---|---|
|  | Three Months Ended March 31, 2010 | Three Months Ended March 31, 2009 |
|  | (millions of dollars, except ratios) | |
| **Statement of Income Data:** | | |
| Loss before income taxes and equity earnings of unconsolidated subsidiary | $ (72) | $(69) |
| Equity earnings of unconsolidated subsidiary (net of tax) | 63 | 47 |
| Net income | 15 | 1 |
| Ratio of earnings to fixed charges (b) | — | — |
| **Statement of Cash Flows Data:** | | |
| Cash flows provided by operating activities | $ 30 | $18 |
| Cash flows used in financing activities | (3) | (18) |
| Cash flows provided by investing activities | 3 | — |

|  | Successor |
|---|---|
|  | March 31, 2010 |
|  | (millions of dollars) |
| **Balance Sheet Data:** | |
| Total assets | $ 5,645 |
| Total debt (c) | 2,520 |
| Total membership interests | 3,003 |

(a)    Amounts reflect the retrospective adoption of amended guidance regarding consolidation accounting standards related to variable interest entities that resulted in the deconsolidation of Oncor Holdings and the accounting for EFIH's investment in Oncor Holdings (the carrying value of which totaled $5.438 billion at March 31, 2010) under the equity method. See Note 2 to EFIH and its subsidiaries' historical condensed consolidated financial statements as of and for the three months ended March 31, 2010 included elsewhere in this Prospectus.

(b)    Fixed charges exceeded earnings by $42 million and $51 million for the three months ended March 31, 2010 and 2009, respectively.

(c)    Reflects push down of certain EFH Corp. (parent) debt due to EFIH's guarantee of the debt. See Note 3 to EFIH's historical condensed consolidated financial statements for the three months ended March 31, 2010 included elsewhere in this Prospectus.

Confidential

EFIHMW00259748

PX 027
Page 42 of 232

# RISK FACTORS

*In addition to the other information included in this Prospectus, you should carefully consider the following risk factors before deciding whether or not to participate in the exchange offers and/or the consent solicitation.*

### Risks to Holders of Old Notes Not Tendered or Not Accepted for Exchange

The following risk factors apply to holders of Old Notes that elect not to tender Old Notes in the exchange offers. There are additional risks relating to ownership of the Old Notes that you should consider before deciding to tender your Old Notes in the exchange offers. Such additional risks are described in this "Risk Factors" section under the headings "—Risks Related to the Exchange Offers and the New EFIH Senior Secured Notes," "—Risks Related to Our Substantial Indebtedness and Debt Agreements," "—Risks Related to Structure," "—Risks Related to Our Businesses" and "—Risks Related to the EFIH Businesses."

> *If the Offeror completes the exchange offers, any Old Notes that remain outstanding will be unsecured obligations and will therefore be effectively subordinated to the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes, the EFIH 9.75% Notes, the New EFIH Senior Secured Notes and to any other debt we may issue that is secured by the Collateral or by any of our other assets.*

The Old Notes are currently, and those that remain outstanding after the completion of the exchange offers will remain, unsecured obligations of EFH Corp. The New EFIH Senior Secured Notes will be secured, equally and ratably with the EFIH 9.75% Notes and EFIH's guarantee of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, by a first-priority lien on all of the Collateral, which on the Settlement Date will initially consist of 100% of the membership interests of Oncor Holdings, which are owned by EFIH. Oncor Holdings owns approximately 80% of Oncor. The indenture under which the New EFIH Senior Secured Notes will be issued will allow EFH Corp. and EFIH together to incur up to an aggregate of $4.0 billion of debt, including the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes, the EFIH 9.75% Notes and the New EFIH Senior Secured Notes, secured by a first-priority security interest on the Collateral, and a substantial amount of additional debt that may be secured by a junior lien on the Collateral or by any of our other assets. If the maximum $2.28 billion aggregate principal amount of New EFIH Senior Secured Notes is issued on the Settlement Date, $[____] billion of the debt secured by a first priority security interest on the Collateral will have been incurred. Therefore, the remaining Old Notes, which are guaranteed by EFIH on an unsecured basis, will be effectively subordinated to the New EFIH Senior Secured Notes, the EFIH 9.75% Notes and EFIH's guarantee of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, and to any future debt secured by the Collateral or by any of our other assets, with respect to, and to the extent of the value of, the Collateral or any other assets securing such debt. In the event of the Offeror's bankruptcy, liquidation or insolvency, the proceeds from any sales of the Collateral or other assets securing any of our future debt will be first applied to satisfy the secured claims of the holders of the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes, the EFIH 9.75% Notes and the New EFIH Senior Secured Notes and other debt secured by the Collateral or such assets, respectively, and there would be fewer assets remaining from which the claims of any Old Notes that remain outstanding after completion of the exchange offers could be satisfied. The unsecured nature of the claims of the Old Notes that remain outstanding after completion of the exchange offers could materially and adversely affect the value of any Old Notes that are not tendered or accepted for exchange in the exchange offers and, in the event of a bankruptcy, liquidation or insolvency of EFH Corp., the extent of such holder's recovery.

> *Following completion of the exchange offers, liquidity of the market for outstanding Old Notes will likely be reduced, and market prices for remaining Old Notes of any issue may materially decline as a result.*

To the extent the exchange offers are completed, the aggregate principal amount of outstanding Old Notes will be reduced. A reduction in the principal amount of outstanding Old Notes of any issue may materially and adversely affect the liquidity of the Old Notes of any such issue that remains outstanding after completion of the exchange offers. A series of securities with a small outstanding principal amount available for trading (referred to as "float") may command a lower price than does a comparable series of securities with a greater float. Therefore, the market price for each issue of Old Notes that remains outstanding after completion of the exchange offers may be

33

EFIHMW00259749

materially and adversely affected. A reduced float may also make the trading prices of any issue of Old Notes that are not exchanged more volatile. Following the completion of the exchange offers, an active trading market in the Old Notes may not exist and the trading price for the Old Notes not tendered by holders or not accepted for exchange may materially decline.

> ***If the Proposed Amendments become operative, holders of the Old Notes will no longer benefit from the protections provided by the existing restrictive covenants, certain events of default and other provisions.***

If the Proposed Amendments become operative, the Old Notes will be subject to the terms of the Old Notes Indenture as modified by the Supplemental Indenture.

If the Proposed Amendments become operative, among other things, substantially all of the restrictive covenants and references thereto and certain events of default contained in the Old Notes Indenture and the Old Notes will be eliminated, covenants regarding mergers and consolidations will be modified and certain other provisions, including certain provisions relating to defeasance contained in the Old Notes Indenture and Old Notes which would otherwise prevent a defeasance without, among other things, delivery of an opinion of counsel confirming such defeasance does not constitute a taxable event, will be modified or eliminated. See "Proposed Amendments" for additional information regarding the Proposed Amendments.

Following the adoption of the Proposed Amendments, holders of Old Notes that remain outstanding after the completion of the exchange offers will no longer be entitled to the benefits of such restrictive covenants, events of default and other provisions. The elimination or modification of these restrictive covenants, events of default and other provisions will permit us to take certain actions previously prohibited that could increase the credit risks with respect to EFH Corp., as well as adversely affect the market price and credit rating of the Old Notes that remain outstanding after completion of the exchange offers. For a description of the Proposed Amendments to the Old Notes Indenture, see "Proposed Amendments" included elsewhere in this Prospectus. If you withdraw your tendered Old Notes after the later of the Consent Date and the execution and delivery of the Supplemental Indenture, your Old Notes will still be subject to the Proposed Amendments if adopted.

Pursuant to the Exchange Agreements, holders of Old Notes representing approximately **[40]**% of the aggregate principal amount of outstanding Old Notes have agreed to participate in the exchange offers and the consent solicitation.  As a result of the Exchange Agreements, additional Consents with respect to only approximately **$[550 million]** aggregate principal amount of Old Notes would need to be validly delivered (and not validly revoked) in the consent solicitation in order for the requisite Consents to be received to adopt the Proposed Amendments.

While the EFIH 9.75% Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes currently contain, and the New EFIH Senior Secured Notes will contain, certain restrictive covenants, events of default and certain other provisions, holders of Old Notes that remain outstanding after the completion of the exchange offers should not rely on the restrictive covenants, events of default and certain other provisions contained in the indentures governing these notes to restrict EFH Corp. or its other subsidiaries from taking actions that would increase the credit risk of EFIH or EFH Corp. or adversely affect the market price and credit rating of the Old Notes that remain outstanding after the completion of the exchange offers. The issuers of these notes may in the future obtain the consent of holders of the applicable notes to amend the indentures governing the applicable notes to eliminate, waive or modify the restrictive covenants, events of default or other provisions contained therein. Additionally, certain strategic transactions with respect to EFIH or EFIH's ownership interest in Oncor Holdings and its subsidiaries, such as the sale, disposition or spin-off of the equity of EFIH such that it is no longer a subsidiary of EFH Corp., or the disposition of all of EFIH's ownership interest in Oncor Holdings and its subsidiaries, are permitted under the indentures governing the EFIH Corp. 9.75% Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes and will be permitted under the indenture governing the New EFIH Senior Secured Notes.

> ***The existing credit ratings for the Old Notes may not be maintained, and the market price of the Old Notes may decrease as a result of negative action with respect to the credit ratings on the Old Notes.***

A credit rating is not a recommendation to buy, sell or hold securities and the credit rating agencies may change or withdraw the ratings assigned to any issue of securities represented by the Old Notes in their sole

Confidential

EFIHMW00259750

discretion at any time. As result of the exchange offers, the consent solicitation or otherwise, one or more rating agencies, including Fitch Ratings, Ltd., S&P or Moody's, may take action to withdraw their rating of any issue of the Old Notes, or further downgrade or take other negative action upon their respective ratings on any issue of Old Notes. Any withdrawal, further downgrade or other negative action with respect to any issue of Old Notes would likely materially and adversely affect the market price of the Old Notes.

**Risks Related to the Exchange Offers and the New EFIH Senior Secured Notes**

The following are some of the risks that apply to you if you elect to participate in the exchange offers and your Old Notes are accepted for exchange in the exchange offers and you receive New EFIH Senior Secured Notes. There are additional risk factors relating to ownership of New EFIH Senior Secured Notes that you should consider before deciding to tender your Old Notes in the exchange offers. These risks are described in this "Risk Factors" section under the headings "—Risks Related to Our Substantial Indebtedness and Debt Agreements," "—Risks Related to Structure" "—Risks Related to Our Businesses" and "—Risks Related to the EFIH Businesses." Additionally, due to the Maximum Exchange Amount and the possible prorations resulting therefrom, following the completion of the exchange offers, a holder may still own Old Notes even though such holder validly tendered (and did not validly withdraw) all of such holder's Old Notes for exchange in the exchange offers. As a result, all holders should also review the risks described above under the heading "—Risks to Holders of Old Notes Not Tendered or Not Accepted for Exchange" whether or not Old Notes are validly tendered (and not validly withdrawn).

> *To the extent that you exchange Old Notes for New EFIH Senior Secured Notes with a later maturity, you may increase your risk that the Offeror will be unable to repay or refinance the New EFIH Senior Secured Notes when they mature.*

The maturity of the New EFIH Senior Secured Notes is later than the maturity of the Old Notes. If you exchange your Old Notes you will be exposed to the risk of nonpayment on the New EFIH Senior Secured Notes for a longer period than if you did not exchange your Old Notes in the exchange offers. For example, following the maturity date of a given issue of Old Notes, but prior to the maturity date of New EFIH Senior Secured Notes, the Offeror may become subject to a bankruptcy or similar proceeding. If such a proceeding were to occur, your Old Notes that were not accepted for exchange may be paid in full at maturity. However, there is a risk that your Old Notes that were accepted for exchange would not be paid in full at maturity of the New EFIH Senior Secured Notes or in connection with any bankruptcy or similar proceeding.

> *The consideration for the exchange offers does not reflect any independent valuation of the Old Notes or the New EFIH Senior Secured Notes.*

The Offeror has not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the consideration or the relative value of the New EFIH Senior Secured Notes as compared to the Old Notes that you would have to tender to participate in any of the exchange offers. If you validly tender your Old Notes, you may or may not receive more or as much value than if you choose to keep them.

> *The New EFIH Senior Secured Notes may trade at a discount to their principal amount.*

Each issue of the Old Notes is currently trading at a discount to the principal amount of such issue. While the market, if any, for the New EFIH Senior Secured Notes will depend upon many factors, including prevailing interest rates, the market for similar securities, general economic conditions and our financial condition, performance and prospects, the New EFIH Senior Secured Notes may trade, at least initially, at a discount to their principal amount and any such discount may be significant. However, for the purposes of establishing the "Total Consideration if Tendered at or Prior to the Early Tender Date" set forth on page ii of this Prospectus, the New EFIH Senior Secured Notes are treated as though they have a value equal to their face amount. There can be no assurance that the New EFIH Senior Secured Notes will be traded at or above the principal amount of such notes in the future.

Confidential

EFIHMW00259751

*Holders that tender Old Notes at or prior to the Early Tender Date will not know the definitive amount of Total Notes Consideration and Total Cash Consideration until after the Early Tender Date.*

While the Total Consideration offered for each series of Old Notes is fixed and set forth on page ii of this Prospectus, the amount of Total Notes Consideration and Total Cash Consideration will depend on the aggregate principal amount of Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date. The definitive amount of the Total Notes Consideration and the Total Cash Consideration will be announced by press release promptly after the Early Tender Date and in any event at least ten business days prior to (and including) the Expiration Date. However, because holders will not be advised of the definitive amount of the Total Notes Consideration and Total Cash Consideration until after 5:00 p.m., New York City time, on the Early Tender Date, holders tendering Old Notes prior to the announcement of the definitive amount of Total Notes Consideration and Total Cash Consideration will not know the Total Notes Consideration and Total Cash Consideration they could receive prior to the time by which they must tender Old Notes to be eligible to receive the Total Consideration.

The minimum Total Cash Consideration and the maximum Total Notes Consideration payable per $1,000 principal amount of Old Cash-Pay Notes are $[ ] and $[ ], respectively, which amounts would be payable if all of the Old Notes were tendered at or prior to the Early Tender Date. The minimum Total Cash Consideration and maximum Total Notes Consideration payable per $1,000 principal amount of Old Toggle Notes are $[ ] and $[ ], respectively, which amounts would be payable if all of the Old Notes were tendered at or prior to the Early Tender Date. There can be no assurance that the Total Cash Consideration will exceed such minimum amounts.

*The exchange offers and the consent solicitation may be cancelled, delayed or changed.*

Subject to applicable law, the Offeror has the right to terminate or withdraw, at its sole discretion, the exchange offers, and EFH Corp. has the right to terminate or withdraw, at its sole discretion, the consent solicitation if any of the applicable conditions described under "Conditions of the Exchange Offers and the Consent Solicitation" are not satisfied or waived by the Expiration Date or Consent Date, as applicable. In addition, the Offeror and EFH Corp. may amend the exchange offers and consent solicitation, as applicable, including in the case of the exchange offers, to increase or decrease the consideration offered or the minimum condition. If a change is made to the amount of securities or cash offered to be exchanged as consideration pursuant to the exchange offers, the exchange offers will remain open for at least ten business days from (and including) the date of the announcement of such change. The Offeror may also decide to commence additional exchange offers to exchange additional debt of EFH Corp. and its subsidiaries for New EFIH Senior Secured Notes. Any such additional offer would remain open for at least twenty business days. Even if the exchange offers and the consent solicitation are completed, they may not be completed on the schedule described in this Prospectus. The exchange offers and consent solicitation may be extended. Accordingly, you may have to wait longer than expected to receive your New EFIH Senior Secured Notes and cash consideration.

*You may not receive New EFIH Senior Secured Notes or cash in the exchange offers if the procedures for the exchange offers are not followed.*

Subject to the terms and conditions of the exchange offers, including the Maximum Exchange Amount and the possible prorations resulting therefrom, the Offeror will issue the New EFIH Senior Secured Notes and, if applicable, cash consideration, in exchange for your Old Notes only if you validly tender the Old Notes and deliver a properly completed and duly executed Consent and Letter of Transmittal, or an Agent's Message in lieu thereof, and other required documents before the Expiration Date. You should allow sufficient time to ensure timely delivery of the necessary documents. None of the Exchange Agent, the Dealer Managers or the Offeror is under any duty to give notification of defects or irregularities with respect to the tenders of Old Notes for exchange. If you are the beneficial owner of Old Notes that are registered in the name of your broker, dealer, commercial bank, trust company or other nominee, and you wish to tender in the exchange offers, you should promptly contact the person in whose name your Old Notes are registered and instruct that person to tender your Old Notes on your behalf.

36

EFIHMW00259752

***The Offeror may not be able to generate sufficient cash to service all of its indebtedness, including the New EFIH Senior Secured Notes, and may be forced to take other actions to satisfy its obligations under its debt agreements, which may not be successful.***

The Offeror's ability to make scheduled payments on or to refinance its debt obligations depends on its and its subsidiaries' financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond its control. The Offeror and its subsidiaries may not be able to maintain a level of cash flows from operating activities or from contributions or loans from EFH Corp. sufficient to permit the Offeror to pay the principal, premium, if any, and interest on its indebtedness, including the New EFIH Senior Secured Notes.

If cash flows and capital resources are insufficient to fund the Offeror's debt service obligations, the Offeror could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance indebtedness, including the New EFIH Senior Secured Notes. These alternative measures may be costly or may not be successful or adequate for the Offeror to meet its debt service obligations then due. Additionally, the Offeror's debt agreements, including the indenture governing the EFIH 9.75% Notes, limit the use of the proceeds from any disposition of assets or operations. As a result, the Offeror may not be allowed, under these documents, to use proceeds from such dispositions to satisfy all current debt service obligations. See "—Risks Related to Our Substantial Indebtedness and Debt Agreements."

***If the Offeror or affiliated entities default on obligations to pay indebtedness, the Offeror may not be able to make payments on the New EFIH Senior Secured Notes.***

Any default under the Offeror's or affiliated entities' debt agreements that is not waived by the required lenders or noteholders, and the remedies sought by the holders of such indebtedness, could prevent the Offeror from paying principal, premium, if any, and interest on the New EFIH Senior Secured Notes, which could substantially decrease the market price of the New EFIH Senior Secured Notes. If the Offeror's subsidiaries or affiliated entities are unable to generate sufficient cash flows and the Offeror is otherwise unable to obtain funds necessary to meet required payments of principal, premium, if any, and interest on its indebtedness, or if the Offeror or its subsidiaries or affiliated entities otherwise fail to comply with the various covenants, including any financial and operating covenants, in the instruments governing their indebtedness, they could be in default under the terms of the agreements governing such indebtedness. In the event of such default, the holders of such indebtedness could elect to declare all the funds borrowed thereunder to be due and payable, together with accrued and unpaid interest, and/or the lenders could elect to terminate their commitments thereunder, cease making further loans and, in the case of the holders of the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes or the EFIH 9.75% Notes, institute foreclosure proceedings against the Collateral, and the Offeror could be forced into bankruptcy, liquidation or insolvency. If EFH Corp.'s subsidiaries breach the covenants under the TCEH Senior Secured Facilities or the indenture governing the TCEH senior notes and seek a waiver, they may not be able to obtain a waiver from the required lenders. If this occurs, such subsidiaries would be in default under the instrument governing that indebtedness, the lenders could exercise their rights, as described above, and such subsidiaries could be forced into bankruptcy, liquidation or insolvency.

***There will be no guarantors of the New EFIH Senior Secured Notes. As a result, the New EFIH Senior Secured Notes will be structurally subordinated to all liabilities of all of EFIH's subsidiaries (other than EFIH Finance) and will have no claim on the assets of EFH Corp. or its subsidiaries.***

The New EFIH Senior Secured Notes will not be guaranteed. EFIH is a holding company. EFIH has no operations, and it relies on distributions from its subsidiaries. EFIH's subsidiaries generated all of its consolidated net income for the year ended December 31, 2009 and for the three months ended March 31, 2010, and as of March 31, 2010, EFIH's investments in its subsidiaries represented 96% of its total assets.

EFIH's subsidiaries (including Oncor Holdings and Oncor and its subsidiaries) are separate and distinct legal entities and have no obligation, contingent or otherwise, to pay any amounts due pursuant to the New EFIH Senior Secured Notes, or to make any funds available therefore, whether by dividends, loans, distributions or other payments. The New EFIH Senior Secured Notes will be structurally subordinated to the indebtedness and other

37

EFIHMW00259753

liabilities of all of EFIH's subsidiaries (including Oncor Holdings and Oncor and its subsidiaries), other than EFIH Finance, and holders of the New EFIH Senior Secured Notes will have no claim on the assets of EFII Corp., EFCH, TCEH or any of TCEH's subsidiaries, none of which is obligated to make payments on the New EFIH Senior Secured Notes.

> ***EFH Corp. and TCEH are not obligated to make payments on the New EFIH Senior Secured Notes, and the Offeror's ability to obtain funds from EFH Corp. and TCEH to pay principal, premium and interest on the New EFIH Senior Secured Notes will be limited in some circumstances.***

None of EFH Corp., EFCH or TCEH and its subsidiaries, are obligated to make any payments on the New EFIH Senior Secured Notes. However, EFH Corp. may choose to, but is not obligated to, loan or contribute cash to the Offeror to make such payments. EFH Corp. is a holding company and substantially all of its consolidated assets are held by its subsidiaries. Therefore, to the extent EFH Corp. chooses to loan or contribute cash to make payments on the New EFIH Senior Secured Notes, EFH Corp. will likely depend on cash generated by or loans from EFCH, TCEH and its subsidiaries to make such contributions. Pursuant to the Indenture, dated as of October 31, 2007, by and among TCEH, TCEH Finance, Inc., The Bank of New York Mellon Trust Company, N.A. and each of the guarantors party thereto (the "TCEH Indenture"), and the TCEH Senior Secured Facilities, as long as TCEH is a subsidiary of EFH Corp., TCEH may provide EFH Corp. with intercompany loans on arm's length terms, in an unlimited amount, to allow EFH Corp. to pay principal, premium and interest on certain indebtedness of EFH Corp. However, the TCEH Indenture limits TCEH's ability to provide such loans for payment of principal, premium and interest on indebtedness of EFH Corp.'s subsidiaries, including the New EFIH Senior Secured Notes. Further, under the terms of TCEH's debt agreements and applicable state law, TCEH is restricted from paying dividends, except in limited circumstances.

> ***The indenture governing the New EFIH Senior Secured Notes will not limit or restrict the activities of Oncor Holdings and its subsidiaries.***

Oncor Holdings and its subsidiaries will not be "restricted subsidiaries" under the indenture governing the New EFIH Senior Secured Notes (except under certain circumstances, such as in connection with the calculation of the "fixed charge coverage ratio" or "consolidated leverage ratio" for purposes of making certain restricted payments; see "Description of the Notes"). As of the date the New EFIH Senior Secured Notes are issued, EFIH's subsidiaries (other than EFIH Finance) will consist only of Oncor Holdings and its subsidiaries, all of which will be unrestricted subsidiaries under the indenture governing the New EFIH Senior Secured Notes. Accordingly, none of EFIH's subsidiaries (other than EFIH Finance) will be subject to the restrictive covenants or the events of default described in "Description of the Notes."

Because Oncor Holdings and its subsidiaries will be unrestricted subsidiaries of EFIH under the indenture governing the New EFIH Senior Secured Notes and will therefore not be subject to any of the restrictive covenants therein, such indenture will not serve to limit or restrict the ability of Oncor Holdings or its subsidiaries to take any actions or enter into any transactions that would impair their ability to dividend funds to EFIH to service the New EFIH Senior Secured Notes and other debt of EFIH, or that would negatively affect the value of EFIH's equity interests in Oncor Holdings that are pledged as Collateral for the New EFIH Senior Secured Notes, such as incurring debt, selling or transferring all or a portion of the assets of Oncor Holdings or its subsidiaries, entering into joint ventures, dividending out assets or engaging in speculative investments. Certain actions that would negatively affect the value of the Collateral may increase the ability of EFIH to make restricted payments.

> ***EFIH has a very limited ability to control activities at Oncor due to structural and operational "ring-fencing" measures.***

EFIH depends upon Oncor for its cash flows and ability to pay its obligations. However, EFIH has a very limited ability to control the activities of Oncor. As part of the "ring-fencing" measures as implemented by EFH Corp. and Oncor, a majority of the members of Oncor's board of directors are required to meet the New York Stock Exchange requirements for independence in all material respects, and the unanimous consent of such directors is required for Oncor to take certain material actions. In addition, any new independent directors are required to be appointed by the nominating committee of Oncor Holdings' board of directors, a majority of whose members are independent directors. No member of EFH Corp.'s management is a member of Oncor's board of directors. Under

38

EFIHMW00259754

Oncor Holdings' and Oncor's organizational documents, EFH Corp. has the right, indirectly, to consent to new issuances of securities by Oncor, material transactions with third parties involving Oncor outside of the ordinary course of business, actions that cause Oncor's assets to increase the level of jurisdiction of the FERC, any changes to the state of formation of Oncor, material changes to accounting methods not required by GAAP, and actions that fail to enforce certain tax sharing obligations between Oncor and EFH Corp. See "The Transactions—Ring-Fencing." There are restrictions on Oncor's ability to make distributions to its members, including indirectly to EFIH. Additionally, the Sponsor Group has committed with the PUCT to hold a majority ownership interest in Oncor through October    , 2012.

> ***We may purchase or repay any Old Notes not tendered in the exchange offers on terms that could be more favorable to holders of Old Notes than the terms of these exchange offers.***

We may, at any time to the extent permitted by applicable law, purchase Old Notes in the open market, in privately negotiated transactions, through subsequent tender or exchange offers or otherwise. Any other purchases may be made on the same terms or on terms which are more or less favorable to holders than the terms of these exchange offers. We also reserve the right to repay any existing notes not tendered. If we decide to repurchase or repay Old Notes that are not tendered in the exchange offers on terms that are more favorable than the terms of the exchange offers, those holders who decided not to participate in the exchange offers could be better off than those that participated in the exchange offers.

> ***The New EFIH Senior Secured Notes will be secured only to the extent of the value of the assets that have been granted as security for the New EFIH Senior Secured Notes.***

The Collateral securing the New EFIH Senior Secured Notes will consist only of the equity and other investments that EFIH holds in Oncor Holdings and its subsidiaries (which will initially consist of 100% of the membership interests of Oncor Holdings, which are owned by EFIH) and any promissory notes or other indebtedness owed by Oncor Holdings or any of its subsidiaries to EFIH, and does not include any assets of Oncor Holdings or its subsidiaries. Oncor Holdings owns approximately 80% of Oncor. No appraisals of any of the Collateral securing the New EFIH Senior Secured Notes have been prepared by or on behalf of the Offeror in connection with the exchange offers. The fair market value of the Collateral may not be sufficient to repay the holders of the New EFIH Senior Secured Notes upon any foreclosure. The fair market value of the membership interests of Oncor Holdings is subject to fluctuations based on factors that include, among other things, the financial results and prospects of Oncor Holdings and its subsidiaries and its ability to implement its business strategy, Oncor's capital structure and the amount of its other existing indebtedness (as to which EFIH has no control), applicable regulatory approvals that may be required to foreclose on the membership interests of Oncor Holdings and subsequently dispose of the membership interests of Oncor Holdings, the ability to sell the membership interests of Oncor Holdings in an orderly sale, general economic conditions, the availability of buyers and similar factors. Furthermore, upon a foreclosure in the Collateral, holders may be limited in their ability to obtain the best price for the Collateral if they are unable to exercise a "drag-along" right to force Texas Transmission Investment LLC ("Texas Transmission"), owner of 19.75% of Oncor's membership interests, to sell its membership interests pursuant to the terms of an investor rights agreement among EFH Corp., Oncor Holdings, Oncor and Texas Transmission. In addition, a court could limit recoverability if it were to apply non-New York law to a proceeding and deem a portion of the interest claim usurious in violation of public policy. The amount to be received upon a sale of any Collateral would be dependent on numerous factors, including but not limited to the actual fair market value of the Collateral at such time, general, market and economic conditions and the timing and the manner of the sale.

The EFIH 9.75% Notes, and EFIH's guarantees of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, are also secured by the Collateral, equally and ratably with the New EFIH Senior Secured Notes.

In the event that a bankruptcy or similar proceeding is commenced by or against the Offeror, if at the time of the filing the value of the membership interests of Oncor Holdings and other Collateral is less than the amount of principal and accrued and unpaid interest on the New EFIH Senior Secured Notes, the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes and the EFIH 9.75% Notes, interest may cease to accrue on the New EFIH Senior Secured Notes thereafter. If at the time of the filing the value of the membership interests of Oncor Holdings and other Collateral is greater than the amount of principal and accrued and unpaid interest on the New EFIH Senior

Confidential

EFIHMW00259755

Secured Notes, the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes and the EFIH 9.75% Notes, interest may nevertheless cease to accrue at a subsequent time if at such time the value ceases to be in excess of the principal and accrued and unpaid interest. It is possible, given the broad discretionary powers of a bankruptcy court, even if at the time of the filing the value of the membership interests of Oncor Holdings and other Collateral is greater than the amount of principal and accrued and unpaid interest on the New EFIH Senior Secured Notes, the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes and the EFIH 9.75% Notes on the date of filing, claims on the membership interests of Oncor Holdings and other Collateral for interest accruing from and after the date the bankruptcy petition is filed might not be allowed. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, the proceeds from any sale of the membership interests of Oncor Holdings and other Collateral may not be sufficient to pay the obligations due under the New EFIH Senior Secured Notes.

To the extent that the claims of the holders of the New EFIH Senior Secured Notes, the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes and the EFIH 9.75% Notes exceed the value of the membership interests of Oncor Holdings and other Collateral, those claims will rank equally with the claims of the holders of the then outstanding Old Notes and EFH Corp.'s other debt. As a result, if the value of the membership interests of Oncor Holdings and other Collateral is less than the value of the claims of the holders of the New EFIH Senior Secured Notes, the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes and the EFIH 9.75% Notes, those claims may not be satisfied in full.

The security interest granted in favor of the collateral trustee is subject to practical problems generally associated with the realization of security interests in collateral. For example, the collateral trustee may need to obtain the consent of a third party to obtain or enforce a security interest in a contract (including, for example, the PUCT and/or Texas Transmission), and we cannot assure you that the collateral trustee will be able to obtain any such consent. The consents of any third parties may not be given when required to facilitate a foreclosure on any particular assets. Accordingly, the collateral trustee may not have the ability to foreclose upon such assets, and the value of the Collateral may significantly decrease.

***Regulatory approvals may be required in order to enforce the security interests against the Collateral and to dispose of an interest in, or operational control of, the Collateral that secures the New EFIH Senior Secured Notes.***

The Collateral securing the New EFIH Senior Secured Notes will include all of the membership interests of Oncor Holdings, which are held by EFIH. Pursuant to the Public Utility Regulatory Act ("PURA"), Texas Utilities Code §§39.262(l) and 39.915, an electric utility must obtain prior PUCT approval of any change in majority ownership, controlling ownership or operational control of Oncor. As a result, prior to any foreclosure on the membership interests of Oncor Holdings, approval of the PUCT may be required for a change in ownership or control of Oncor Holdings. Pursuant to PURA §§39.262(m) and 39.915(b), the PUCT will approve such a transfer if it finds that the transaction is in the public interest. In making its determination, these sections of PURA provide that the PUCT will consider whether the transaction will adversely affect the reliability of service, availability of service or cost of service of Oncor. Therefore, in connection with any action taken to enforce the security against the Collateral, such approval may not be granted and, if it were to be granted, it is not known how long such approval would take to obtain. Even if the approval were granted to foreclose on the Collateral, then additional prior PUCT approval may also be required for any subsequent change in majority ownership, controlling ownership or operational control in the membership interests of Oncor Holdings. Additionally, Texas Holdings has committed to hold a majority ownership interest in Oncor through October 10, 2012. This commitment is incorporated in the Order on Rehearing in PUCT Docket No. 34077.

In addition, pursuant to the terms of an investor rights agreement among EFH Corp., Oncor Holdings, Oncor and Texas Transmission, owner of 19.75% of Oncor's membership interests, any transfer of the equity interests in Oncor Holdings to a third party, including as a result of any enforcement of the lien on the Collateral securing the New EFIH Senior Secured Notes, the EFIH 9.75% Notes and EFIH's guarantees of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, may be limited and give rise to a tag-along right of Texas Transmission to participate in that transfer on a pro rata basis, which may hinder the enforcement of the lien on the Collateral in a timely manner, if at all. See "The Transactions—Sale of Noncontrolling Interest in Oncor" for a description of the investor rights agreement.

Confidential

EFIHMW00259756

*In the event of the Offeror's bankruptcy, your ability to realize upon the Collateral securing the New EFIH Senior Secured Notes will be subject to certain bankruptcy law limitations.*

The right of the trustee for the New EFIH Senior Secured Notes to repossess and dispose of the Collateral, which will secure the New EFIH Senior Secured Notes, upon acceleration is likely to be significantly impaired by federal bankruptcy law if bankruptcy proceedings are commenced by or against the Offeror. This could be true even if bankruptcy proceedings are commenced after the trustee for the New EFIH Senior Secured Notes has repossessed and disposed of the Collateral. Under bankruptcy law, secured creditors, such as the trustee for the New EFIH Senior Secured Notes, are prohibited from repossessing collateral from a debtor in a bankruptcy case, or from disposing of collateral repossessed from a debtor, without bankruptcy court approval. Moreover, bankruptcy law permits the debtor to continue to retain and to use any such collateral, and the proceeds, products, rents or profits of such collateral, even though the debtor is in default under the applicable debt instruments, provided that the secured creditor is given "adequate protection." The meaning of the term "adequate protection" varies according to circumstances, but in general the doctrine of "adequate protection" requires a debtor to protect the value of a secured creditor's interest in the collateral, through cash payments, the granting of an additional security interest or otherwise. It is impossible to predict whether or when payments in respect of the New EFIH Senior Secured Notes might be made following commencement of a bankruptcy case, whether or when the trustee would repossess or dispose of the Collateral, or whether or to what extent you would be compensated for any delay in payment or loss of value of the Collateral through the requirements of "adequate protection." Furthermore, in the event the bankruptcy court determines that the value of the Collateral is not sufficient to repay all amounts due on the New EFIH Senior Secured Notes, you would have unsecured "deficiency claims" as to the difference. Federal bankruptcy laws do not generally permit the payment of interest, costs, or attorneys' fees for unsecured claims during the debtor's bankruptcy case.

*Under the indenture governing the New EFIH Senior Secured Notes, you will agree to not file a bankruptcy proceeding against Oncor Holdings or any of its subsidiaries.*

In connection with the exchange offers and consent solicitation, you will, as part of participation in the exchange offers and consent solicitation, acknowledge and agree that you will not (i) initiate any legal proceeding to procure the appointment of an administrative receiver or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against Oncor Holdings, Oncor or any of their subsidiaries, or against any of the assets of Oncor Holdings, Oncor or any of their subsidiaries. You will further acknowledge and agree that each of Oncor Holdings, Oncor and any of their subsidiaries is a third party beneficiary of the foregoing covenant and has the right to specifically enforce such covenant in any proceeding at law or in equity.

*In the event that EFIH becomes the subject of a bankruptcy proceeding, you will only have a claim for repayment of your New EFIH Senior Secured Notes against EFIH's assets, including the membership interests of Oncor Holdings and any other Collateral.*

You will not benefit from a guarantee of EFH Corp. or any of EFH Corp.'s other subsidiaries. Therefore, in the event that EFIH becomes the subject of a bankruptcy proceeding, you will only have a claim against EFIH's assets, including the membership interests of Oncor Holdings and any other Collateral, to satisfy any outstanding principal, premium and interest on the New EFIH Senior Secured Notes, and will have no claim against the assets of EFH Corp. or any of its subsidiaries (other than EFIH), including EFCH and TCEH.

*The value of the Collateral may be diluted if we issue additional debt that is secured equally and ratably by the same Collateral securing the New EFIH Senior Secured Notes or if the Collateral is sold.*

The New EFIH Senior Secured Notes will be secured by the collateral on a parity lien basis with the EFIH 9.75% Notes and EFIH's guarantee of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes. In addition, the indentures governing the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes and the EFIH 9.75% Notes provide, and the indenture governing the New EFIH Senior Secured Notes will provide, that EFH Corp. and EFIH may incur up to an aggregate of $4.0 billion of debt, including the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes and the EFIH 9.75% Notes and the New EFIH Senior Secured Notes to be issued on the Settlement Date, which would be secured on a parity lien basis by the Collateral. Therefore, because the principal amount of the EFH

41

EFIHMW00259757

Corp. 9.75% Notes, the EFH Corp. 10.000% Notes and the EFIH 9.75% Notes is less than this amount of debt, and even after the issuance of the New EFIII Senior Secured Notes, there will be capacity to incur additional debt up to the $4.0 billion limit, EFH Corp. and EFIH may subsequently incur additional debt secured on a parity lien basis by the Collateral up to the $4.0 billion limit, subject to restrictions on their ability to incur debt and liens under the indenture governing the New EFIH Senior Secured Notes and under other documents governing their indebtedness. To the extent that any of this additional debt is incurred in the future, the interests of holders of the New EFIH Senior Secured Notes in the Collateral will be diluted. Additionally, EFH Corp. and EFIH will not be restricted from issuing additional debt that is secured by a junior lien on the Collateral, subject to restrictions on their ability to incur debt and liens under the indenture governing the New EFIH Senior Secured Notes and under other documents governing their indebtedness.

The collateral trust agreement governing the pledge of Collateral generally provides that the holders of a majority of the debt secured by a first priority lien on the Collateral, including the New EFIH Senior Secured Notes, the EFIH 9.75% Notes, EFIH's guarantee of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, and other future debt incurred by EFH Corp. or EFIH secured by the Collateral equally and ratably, will have, subject to certain limited exceptions, the exclusive right to manage, perform and enforce the terms of the security documents securing the rights of secured debtholders in the Collateral and to exercise and enforce all privileges, rights and remedies thereunder. To the extent that we incur additional secured debt in the future that is secured equally and ratably with the New EFIH Senior Secured Notes and the amount of this additional secured debt, alone or together with any the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes and the EFIH 9.75% Notes, exceeds the amount of outstanding New EFIH Senior Secured Notes, the holders of the new secured debt may be able to exercise control under the collateral trust agreement and other security documents.

We will in most cases have control over the Collateral securing the New EFIH Senior Secured Notes, and to the extent permitted, its sale by us would eliminate the collateral securing such notes and guarantee. The documents governing the pledge of the Collateral permit EFIH to remain in possession of, retain exclusive control over, freely operate and collect, invest and dispose of, any income from, the Collateral, such as cash dividends. In addition, in certain limited circumstances EFIH will have the right to sell the Collateral free and clear of the security interest underlying the New EFIH Senior Secured Notes.

*Rights of holders of the New EFIH Senior Secured Notes in the Collateral may be adversely affected by the failure to perfect security interests in certain Collateral acquired in the future.*

EFIH may acquire assets or investments in the future that would be required to be pledged as Collateral securing the New EFIH Senior Secured Notes. There can be no assurance that the trustee or the collateral trustee will monitor, or that we will inform the trustee or the collateral trustee of, the future acquisition of assets or investments that would be required to be pledged as Collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Collateral. Neither the trustee nor the collateral trustee for the New EFIH Senior Secured Notes has an obligation to monitor the acquisition of additional assets or investments that are required to be pledged as Collateral or the perfection of any security interest in such Collateral. Such failure may result in the loss of the security interest in the Collateral or the priority of the security interest in favor of the New EFIH Senior Secured Notes against third parties.

*We may transfer or dispose of our interests in Oncor Holdings to a third party in a manner that would result in such third party becoming the obligor under the New EFIH Senior Secured Notes, without EFIH being required to offer to repurchase the New EFIH Senior Secured Notes. The risks of an investment in the New EFIH Senior Secured Notes may increase further following such a transaction.*

The indenture governing the New EFIH Senior Secured Notes will provide that EFIH may engage in a "Permitted Asset Transfer" with respect to all of EFIH's equity interests and other investments in Oncor Holdings and its subsidiaries (collectively, the "Oncor Subsidiaries") that would result in the New EFIH Senior Secured Notes no longer being obligations of EFIH. A Permitted Asset Transfer includes the sale, assignment, transfer, conveyance or other disposition (other than by way of merger, wind-up or consolidation) of all of EFIH's equity interests and other investments in the Oncor Subsidiaries or successor Oncor business and all other Collateral held by EFIH.

42

EFIHMW00259758

If a valid Permitted Asset Transfer occurs, the New EFIH Senior Secured Notes would become obligations of the third party transferee of the investments in the Oncor Subsidiaries.

If a Permitted Asset Transfer occurs in accordance with the terms of the indenture governing the New EFIH Senior Secured Notes, the Offeror will not be required to make a change of control offer to repurchase the New EFIH Senior Secured Notes even if a change of control may otherwise have occurred.

The indenture governing the New EFIH Senior Secured Notes will provide that a Permitted Asset Transfer may only occur if certain conditions are met, including a requirement that the ratings of the New EFIH Senior Secured Notes are not lowered by two or more rating agencies (or the only rating agency then rating such New EFIH Senior Secured Notes) during a specified period before or after the proposed Permitted Asset Transfer has been publicly announced. However, these conditions may not protect holders against actions that EFIH or the permitted transferee could take that may negatively impact the credit risk of the New EFIH Senior Secured Notes following a Permitted Asset Transfer, such as removing assets and cash from EFIH or the Oncor Subsidiaries or increasing debt at EFIH before the Permitted Asset Transfer.

There will be no event of default under the indenture governing the New EFIH Senior Secured Notes if the Oncor Subsidiaries take actions or enter into transactions that would impair their ability to dividend funds to EFIH, which could impair EFIH's ability to service the New EFIH Senior Secured Notes, or that would negatively affect the value of the assets that are pledged as Collateral, such as incurring debt, selling or transferring all or a portion of the assets of Oncor, entering into joint ventures, dividending out assets or engaging in speculative investments.

Any of the above actions on the part of EFIH, the third party transferee or subsequent third party transferee or the Oncor Subsidiaries following the completion of a Permitted Asset Transfer may further increase the credit risk of the New EFIH Senior Secured Notes, may result in the rating agencies taking negative action with respect to the New EFIH Senior Secured Notes and may reduce the market price of the New EFIH Senior Secured Notes.

See "Description of the Notes—Certain Covenants—Restrictions on Permitted Asset Transfers," and the definitions of "Change of Control" and "Permitted Asset Transfer" contained in "Description of the Notes" for more information.

*The indenture governing the New EFIH Senior Secured Notes may not protect holders from all actions that EFIH or the Oncor Subsidiaries may take that would reduce your interest in the Collateral or that may reduce the value of the Collateral, including sales or exchanges of the Collateral or the assets of the Oncor Subsidiaries for other assets or investments.*

Under the indenture that will govern the New EFIH Senior Secured Notes, EFIH may dispose of all or a portion of the Collateral for fair market value consideration (including consideration other than cash) that may consist of assets or equity interests in joint ventures. Additionally, there will be no event of default under the indenture if the Oncor subsidiaries sell, transfer or otherwise dispose of their assets or equity interests for any form of consideration.

If EFIH or the Oncor Subsidiaries effect any of these transactions, holders' interest in the Collateral or the value of the Collateral may be materially reduced.

The indenture governing the New EFIH Senior Secured Notes will allow EFIH to transfer any of the Collateral in exchange for an equivalent fair market value of assets other than cash or for investments in businesses that are similar to the businesses of Oncor, including interests in joint ventures in businesses that are not controlled by EFIH. The assets received as consideration and pledged as substitute Collateral may prove to be less valuable than the value of the investments in Oncor that were disposed of in such transfer or exchange. Additionally, if interests in a new business were received in exchange for the Collateral, such new business may, in the future, engage in businesses activities that are different from the business that Oncor presently is in or such new business may not prove to be as creditworthy or valuable as Oncor, and the Offeror may not have any control over such business' activities if a minority interest in the joint venture interests was received in such transfer or exchange. Therefore, such new collateral may negatively alter the risk profile of EFIH or the value of such new collateral may decline relative to the value of the disposed investments in Oncor.

43

EFIHMW00259759

There will be no event of default under the indenture governing the New EFIH Senior Secured Notes if any of the Oncor Subsidiaries sells, transfers or disposes of the assets of Oncor Holdings or investments in or assets of Oncor. The consideration received in exchange for such assets or investments may decline in value as compared to the assets or investments that were so disposed, and, therefore, the value of the Collateral may be less than if such assets and investments had been retained. The Oncor Subsidiaries may transfer their assets and investments in exchange for interests in other businesses or assets, minority interests or interests in joint ventures, in which case the value of the Collateral may be at risk of declining due to the factors described above.

In any joint venture that EFIH or an Oncor Subsidiary has an interest, EFIH or the Oncor Subsidiary may not have the right or power to direct the management and policies of such joint ventures and other participants may take actions contrary to the instructions or requests of EFIH or such Oncor Subsidiary or against its policies and objectives, and any such actions taken by such joint ventures may not be in your best interests. In addition, the other participants to any such joint venture may become bankrupt or have economic or other business interests or goals that are inconsistent with the goals of EFIH or such Oncor Subsidiary and/or you.

The completion of any of the above events may result in the credit risk of the New EFIH Senior Secured Notes increasing, the credit rating agencies taking negative action with respect to the New EFIH Senior Secured Notes or the market price of the New EFIH Senior Secured Notes declining. Additionally, in the event of any foreclosure on the Collateral, you may recover less than if the Collateral still consisted of investments in the Oncor Subsidiaries.

### *You may be required to recognize taxable gain or loss in connection with a Permitted Asset Transfer.*

In connection with a Permitted Asset Transfer, EFIH's obligations under the New EFIH Senior Secured Note may be transferred to, and assumed by, a third party transferee or may be considered, for U.S. federal income tax purposes, to undergo a substitution of obligors even if not transferred to, or assumed by, a third party transferee. Upon any such transfer or deemed substitution of obligors, you may be deemed to have exchanged the New EFIH Senior Secured Notes for new notes for U.S. federal income tax purposes. Upon such deemed exchange, you, under U.S. federal income tax law, may be required to recognize gain or loss equal to the difference between the amount deemed to be realized in connection with the deemed exchange and your adjusted tax basis in the New EFIH Senior Secured Notes on the date of the deemed exchange. For more information, please see "Material U.S. Federal Income Tax Considerations—Ownership of New EFIH Senior Secured Notes—Sale, Exchange or Retirement of New EFIH Senior Secured Notes."

### *The issuance by EFIH of New EFIH Senior Secured Notes or the grant of the pledge of Collateral by EFIH to secure the New EFIH Senior Secured Notes could be wholly or partially voided as a preferential transfer.*

If EFIH becomes the subject of a bankruptcy proceeding within 90 days after the exchange offers are completed (or, with respect to any insiders specified in bankruptcy law who are holders of New EFIH Senior Secured Notes, within one year after completion of the exchange offers), and a court in connection with a bankruptcy proceeding determines EFIH was insolvent at the time of the exchange offers, then the court could find that the issuance of the New EFIH Senior Secured Notes by EFIH or the pledge of the Collateral by EFIH to secure the New EFIH Senior Secured Notes involved a preferential transfer to the holders of Old Notes that are accepted for exchange in the exchange offers. The exchange offers could be an avoidable preference if, among other things, it is determined in a bankruptcy proceeding for EFIH that, at the time of the exchange offers, EFIH was insolvent, and the exchange offers allowed an exchanging holder of Old Notes to recover more from EFIH than such holder would have received had the exchanges not been made and EFIH was liquidated in a bankruptcy proceeding. As described below we cannot assure you that EFIH would satisfy the solvency tests set forth below or what standard a court would apply in determining whether the Offeror would be considered to be insolvent.

Because holders of Old Notes would now become secured creditors when Old Notes are exchanged for New EFIH Senior Secured Notes, such holders could be entitled to receive a greater recovery in bankruptcy proceeding liquidation than the same holders would have been entitled to receive if those holders had not participated in the exchange offers. If the court determined that the pledge of the Collateral by EFIH as security for the New EFIH Senior Secured Notes was a preferential transfer that did not qualify for any defense under

44

EFIHMW00259760

bankruptcy law, then holders of the affected New EFIH Senior Secured Notes could have all or a portion of the value transferred to such holders in the exchange offers voided or such holders could be treated as unsecured creditors with claims that rank pari passu with all other unsubordinated unsecured creditors of the applicable obligor, including trade creditors. In addition, under such circumstances, the value of any consideration holders received with respect to the New EFIH Senior Secured Notes, including upon foreclosure of the Collateral, could also be subject to recovery from such holders and possibly from subsequent transferees, or holders might be returned to the same position they held as holders of the Old Notes.

> ***If a court were to find that EFIH was insolvent before or after giving effect to the exchange offers and did not receive reasonably equivalent value or fair consideration in the exchange offers, the court may void all or a portion of the obligations represented by the New EFIH Senior Secured Notes or the pledge of the Collateral granted by EFIH for such notes as a fraudulent conveyance.***

In a bankruptcy proceeding, a trustee, debtor in possession or another person acting on behalf of the bankruptcy estate may seek to recover all or a portion of transfers made or void obligations incurred prior to the bankruptcy proceeding on the basis that such transfers and obligations constituted fraudulent conveyances. Under certain circumstances, creditors may recover transfers or void obligations under state fraudulent conveyance laws even if the debtor is not in bankruptcy.

Fraudulent conveyances are generally defined to include transfers made or obligations incurred for inadequate consideration when a debtor was insolvent, inadequately capitalized or in similar financial distress, or transfers made or obligations incurred with the intent of hindering, delaying or defrauding current or future creditors. A trustee, debtor in possession or another person acting on behalf of a bankruptcy estate may be able to recover such transfers under the fraudulent conveyance provisions of the bankruptcy law and/or state fraudulent conveyance laws. The fraudulent conveyance provisions of the bankruptcy law allows the trustee, debtor in possession, or other person acting on behalf of a bankruptcy estate to void a fraudulent conveyance made within two years prior to the commencement of a bankruptcy proceeding. Under state fraudulent conveyance laws, transfers made more than two years prior to the commencement of a fraudulent conveyance lawsuit may be subject to avoidance.

If a court were to find that the Offeror issued the New EFIH Senior Secured Notes or EFIH granted its pledge of the Collateral under circumstances constituting a fraudulent conveyance, then a court could void all or a portion of the obligations under the New EFIH Senior Secured Notes or the pledge of Collateral. In addition, under such circumstances, the value of any consideration holders received with respect to the New EFIH Senior Secured Notes and the Collateral, including upon foreclosure of the Collateral, could also be subject to recovery from such holders and, possibly, from subsequent transferees of the New EFIH Senior Secured Notes. If the pledge of Collateral was voided and the issuance of New EFIH Senior Secured Notes were not voided, then holders of New EFIH Senior Secured Notes would become unsecured creditors.

The New EFIH Senior Secured Notes or pledge of Collateral by EFIH could be voided as a fraudulent conveyance, or claims in respect of the notes or pledge could be subordinated to all other debts of the Offeror, if the Offeror, at the time it incurred the indebtedness evidenced by the New EFIH Senior Secured Notes or EFIH at the time it granted the pledge received less than reasonably equivalent value or fair consideration for the issuance of the New EFIH Senior Secured Notes or the grant of the pledge of Collateral, as applicable, and:

- was insolvent or rendered insolvent by reason of such issuance or incurrence or grant;

- was engaged in a business or transaction for which the Offeror's or EFIH's, as applicable, remaining assets constituted unreasonably small capital; or

- intended to incur, or believed that it would incur, debts beyond its ability to pay those debts as they mature.

The measures of insolvency for purposes of these fraudulent transfer laws will vary depending upon the law applied in any proceeding to determine whether a fraudulent transfer has occurred. Generally, however, a debtor would be considered insolvent if:

45

EFIHMW00259761

- the sum of its debts, including contingent liabilities, was greater than the fair saleable value of all of its assets;

- the present fair saleable value of its assets was less than the amount that would be required to pay its probable liability on its existing debts, including contingent liabilities, as they become absolute and mature; or

- it could not pay its debts as they become due.

EFIH's assets currently exceed its liabilities as shown on its balance sheet prepared in accordance with U.S. generally accepted accounting principles as of March 31, 2010. However, the values assigned to assets and liabilities in this balance sheet are not necessarily indicative of the values that a court would assign to such assets and liabilities in making a solvency determination. We have not obtained or prepared an appraisal of the fair saleable value of the assets of EFIH. As a result, we cannot assure you that EFIH would satisfy the solvency tests set forth in the bullet points immediately prior to this paragraph or what standard a court would apply in determining whether the Offeror would be considered to be insolvent. In addition, we cannot assure you that a court would determine that reasonably equivalent value or fair consideration was received by EFIH in connection with the exchange offers.

### The Offeror may not be able to repurchase the New EFIH Senior Secured Notes upon a change of control.

Upon the occurrence of specific kinds of change of control events, the Offeror will be required to offer to repurchase all of the New EFIH Senior Secured Notes at 101% of their principal amount plus accrued and unpaid interest. The source of funds for any purchase of the New EFIH Senior Secured Notes will be the Offeror's available cash or cash generated from the Offeror's subsidiaries' operations or other sources, including borrowings, sales of assets or sales of equity. The Offeror may not be able to repurchase the New EFIH Senior Secured Notes upon a change of control because the Offeror may not have sufficient financial resources to purchase all of the New EFIH Senior Secured Notes that are tendered upon a change of control. Further, EFIH may be restricted under the terms of debt agreements of Oncor from receiving funds from Oncor sufficient to repurchase all of the New EFIH Senior Secured Notes tendered by holders upon a change of control. Accordingly, the Offeror may not be able to satisfy its obligations to purchase the New EFIH Senior Secured Notes unless the Offeror is able to refinance or obtain waivers under the instruments governing its and/or EFH Corp.'s indebtedness. The Offeror's failure to repurchase the New EFIH Senior Secured Notes upon a change of control would cause a default under the applicable indenture and may cause a cross-default under certain of the Offeror's and/or EFH Corp.'s or its subsidiaries' other debt agreements.

### An active trading market may not develop for the New EFIH Senior Secured Notes.

The New EFIH Senior Secured Notes are new issues of securities and will not be fungible with any outstanding securities. There is no established public trading market for the New EFIH Senior Secured Notes, and an active trading market may not develop. Although EFIH intends to apply for the New EFIH Senior Secured Notes to be listed on the New York Stock Exchange, there may, nonetheless, be limited liquidity in the trading market for the New EFIH Senior Secured Notes. In addition, the liquidity of the trading market in the New EFIH Senior Secured Notes and the market prices quoted for the New EFIH Senior Secured Notes may be materially or adversely affected by changes in the overall market for these types of securities and by changes in the Offeror's and/or EFH Corp.'s financial performance or prospects or in the prospects for companies in the Offeror's and/or EFH Corp.'s industry generally. As a consequence, an active trading market may not develop for the New EFIH Senior Secured Notes, you may not be able to sell your New EFIH Senior Secured Notes, or, even if you can sell their New EFIH Senior Secured Notes, you may not be able to sell them at a favorable price.

If the Offeror waives the minimum condition, it is possible that only a small aggregate principal amount of New EFIH Senior Secured Notes may be issued upon completion of the exchange offers, which may adversely affect the liquidity of the New EFIH Senior Secured Notes. A series of securities with a small float generally commands a lower price than does a comparable series of securities with a greater float. A reduced float may also make the trading prices of the New EFIH Senior Secured Notes more volatile. If a small aggregate principal amount of New EFIH Senior Secured Notes is outstanding following the completion of the exchange offers, holders of a small principal amount of the New EFIH Senior Secured Notes may control decisions with respect to the New EFIH

Confidential

EFIHMW00259762

Senior Secured Notes including with respect to amendments, waivers and requests to accelerate upon an event of default, among others.

*[EFH Corp. may incur an income tax liability as a result of the exchange offers.*

**As a result of the exchange offers, EFH Corp. will realize cancellation of indebtedness income for U.S. federal income tax purposes ("COD income"). Under recently enacted legislation, EFH Corp. may elect to postpone the recognition of COD income in certain circumstances. If the election is made, the recognition of COD income incurred as a result of the exchange offers will be deferred until the fourth taxable-year following the closing of the exchange offers and then be recognized ratably over the ensuing five taxable-year period from 2014 to 2018. The amount of COD income incurred by EFH Corp. will depend upon, among other things, the fair market value of the consideration offered in exchange for the Old Notes. As such, EFH Corp. will not be able to calculate the aggregate amount of COD income attributable to the Old Notes accepted for exchange until after the Expiration Date. See "Material U.S. Federal Income Tax Considerations—Tax Consequences to EFH Corp."]**

*[The New EFIH Senior Secured Notes may be issued with original issue discount for U.S. federal income tax purposes.*

**The New EFIH Senior Secured Notes will be treated as issued with original issue discount ("OID") for U.S. federal income tax purposes to the extent that their stated principal amount exceeds their issue price by more than a de minimis amount. A U.S. Holder (as defined in "Material U.S. Federal Income Tax Considerations") of the New EFIH Senior Secured Notes will be required to accrue such OID on a current basis before receiving cash attributable to that income regardless of the U.S. Holder's method of tax accounting. For further discussion of the computation and reporting of OID, see "Material U.S. Federal Income Tax Considerations." Additionally, a bankruptcy court may not allow a claim for all or a portion of any unamortized amount of the OID on the New EFIH Senior Secured Notes.**

**If EFH Corp. chooses to make the election to defer the recognition of COD income described above, EFH Corp. will not be permitted to deduct any OID on the New EFIH Senior Secured Notes to the extent that such OID (i) accrues before 2014 and (ii) does not exceed COD income realized in the exchange offers. EFH Corp. will, however, be allowed to take these disallowed OID deductions ratably over the five-year period from 2014 through 2018.]**

*[If a bankruptcy petition were filed by or against the Offeror, holders of the New EFIH Senior Secured Notes issued in consideration for the Old Notes may have their claims allowed in a lesser amount than the face amount of their claims under the indenture governing the New EFIH Senior Secured Notes.*

**If a bankruptcy petition were filed by or against any of the Offeror or EFCH under the U.S. Bankruptcy Code after the completion of the exchange offers, the allowed claim of any holder of the New EFIH Senior Secured Notes issued as consideration for the Old Notes for the principal amount of the New EFIH Senior Secured Notes may be limited to an amount equal to the sum of:**

- **the original issue price for the New EFIH Senior Secured Notes; and**

- **that portion of the OID that does not constitute "unmatured interest" for purposes of the U.S. Bankruptcy Code.**

**Bankruptcy courts have not developed a uniform method for determining the original issue price of new notes where the consideration for such new notes is not cash. Rather, the facts and circumstances of the particular issuance appear to dictate how the original issue price of such new notes is determined. Measures of the original issue price of new notes where the consideration for such new notes is not cash have included the fair market value of the consideration for such new notes at the time of the issuance of such new notes and the selling price of such new notes on their first day of trading.**

47

EFIHMW00259763

**Any OID that was not amortized as of the date of the bankruptcy filing would constitute unmatured interest. Accordingly, holders of the New EFIH Senior Secured Notes under these circumstances may have their claims allowed in a lesser amount than the face amount of their claims would be under the terms of the indenture governing the New EFIH Senior Secured Notes, even if sufficient funds are available to pay such holders the unamortized portion of any OID as of the bankruptcy filing.]**

*The interests of the Sponsor Group may differ from the interests of the holders of the New EFIH Senior Secured Notes.*

The Sponsor Group indirectly owns approximately 60% of EFH Corp.'s capital stock on a fully diluted basis through their investment in Texas Holdings. As a result of this ownership and the Sponsor Group's ownership in interests of the general partner of Texas Holdings, the Sponsor Group has control over decisions regarding our operations, plans, strategies, finances and structure, including whether to enter into any corporate transaction, and will have the ability to prevent any transaction that requires the approval of EFIH's or EFH Corp.'s shareholders.

The interests of these persons may differ from your interests in material respects. For example, if we encounter financial difficulties or are unable to pay our debts as they mature, the interests of the Sponsor Group, as equity holders, might conflict with your interests as a noteholder. The Sponsor Group may also have an interest in pursuing acquisitions, divestitures, financings or other transactions (including changes to EFH Corp.'s hedging provider) that, in their judgment, could enhance their equity investments, even though such transactions might involve risks to you as a noteholder. Additionally, the indenture governing the New EFIH Senior Secured Notes permits us to pay advisory fees, dividends or make other restricted payments under certain circumstances, and the Sponsor Group may have an interest in our doing so.

**Risks Related to Our and EFH Corp.'s Substantial Indebtedness and Debt Agreements**

*Our and EFH Corp.'s substantial leverage could adversely affect our ability to raise additional capital to fund our operations, limit our ability to react to changes in the economy or our industry, expose us to interest rate risk to the extent of our variable rate debt and prevent us from meeting obligations under the various debt agreements governing our and EFH Corp.'s indebtedness.*

We and EFH Corp. are highly leveraged. As of March 31, 2010, EFH Corp.'s consolidated principal amount of debt (short-term borrowings and long-term debt, including amounts due currently) totaled $37.775 billion (see Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 included elsewhere in this Prospectus and Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three months ended March 31, 2010 included elsewhere in this Prospectus). Our and EFH Corp.'s substantial leverage could have important consequences, including:

- making it more difficult for us to make payments on our indebtedness;

- requiring a substantial portion of cash flow from operations to be dedicated to the payment of principal and interest on indebtedness, therefore reducing our ability to use our cash flow to fund operations, capital expenditures and future business opportunities and execute our strategy;

- increasing our vulnerability to adverse economic, industry or competitive developments;

- exposing us to the risk of increased interest rates because, as of March 31, 2010, taking into consideration interest swap transactions, approximately 11% of EFH Corp.'s long-term borrowings were at variable rates of interest;

- limiting our ability to make strategic acquisitions or causing us to make non-strategic divestitures;

- limiting our ability to obtain additional financing for working capital, capital expenditures, product development, debt service requirements, acquisitions and general corporate or other purposes, or to refinance existing debt;

48

EFIHMW00259764

- limiting our ability to adjust to changing market conditions; and

- placing us at a competitive disadvantage compared to competitors who are less highly leveraged and who therefore, may be able to take advantage of opportunities that we cannot due to our substantial leverage.

A substantial amount of this indebtedness is comprised of EFH Corp.'s indebtedness under the TCEH Senior Secured Facilities, substantially all of which matures in October 2014. EFH Corp. may not be able to refinance the TCEH Senior Secured Facilities or its other existing indebtedness because of its high levels of debt and debt incurrence restrictions under its debt agreements or because of generally adverse conditions in credit markets.

***Despite our current high indebtedness level, we may still be able to incur substantially more indebtedness. This could further exacerbate the risks associated with our substantial indebtedness.***

We may be able to incur additional indebtedness in the future. Although our debt agreements contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of significant qualifications and exceptions, and under certain circumstances, the amount of indebtedness, including secured indebtedness, that could be incurred in compliance with these restrictions could be substantial. The indenture for the New EFIH Senior Secured Notes will allow EFH Corp. and EFIH to incur up to an aggregate of $4.0 billion of debt, including the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes, the EFIH 9.75% Notes and the New EFIH Senior Secured Notes, secured by a first-priority security interest in the Collateral, and a substantial amount of additional indebtedness, which additional indebtedness may be secured by a junior-priority security interest in the Collateral or by assets of EFH Corp. or EFIH other than the Collateral. If new debt is added to our existing debt levels, the related risks that we now face would intensify. See "Description of the Notes."

***Our debt agreements contain restrictions that limit flexibility in operating our businesses.***

Our debt agreements contain various covenants and other restrictions that limit our ability to engage in specified types of transactions and may adversely affect our ability to operate our businesses. These covenants and other restrictions limit our ability to, among other things:

- incur additional indebtedness or issue preferred shares;

- pay dividends on, repurchase or make distributions in respect of capital stock or make other restricted payments;

- make investments;

- sell or transfer assets;

- create liens;

- consolidate, merge, sell or otherwise dispose of all or substantially all of its or their assets;

- enter into transactions with its or their affiliates; and

- repay, repurchase or modify certain subordinated and other material debt.

There are a number of important limitations and exceptions to these covenants and other restrictions. See "Description of the Notes" for a description of these covenants and other restrictions with respect to the New EFIH Senior Secured Notes.

In addition, as described in "The Transactions—Ring-Fencing," EFH Corp. and Oncor have implemented a number of "ring-fencing" measures to enhance the credit quality of Oncor, its immediate parent, Oncor Holdings, and Oncor Holdings' other subsidiaries. Those measures include, among other things:

49

Confidential

- Oncor being treated as an unrestricted subsidiary with respect to EFH Corp.'s and our indebtedness, including the New EFIH Senior Secured Notes;

- Oncor not being restricted from incurring its own indebtedness;

- Oncor not guaranteeing or pledging any of its assets to secure the indebtedness of any member of the Texas Holdings Group; and

- restrictions on dividends, and the right of the independent members of Oncor's board of directors and the primary noncontrolling member of Oncor to block the payment of dividends.

**Risks Related to Structure**

> ***EFIH is a holding company and its obligations are structurally subordinated to existing and future liabilities and preferred stock of its subsidiaries.***

EFIH's cash flows and ability to meet its obligations are largely dependent upon the earnings of its subsidiaries, in particular, Oncor, and the payment of such earnings to EFIH in the form of dividends or distributions. These subsidiaries are separate and distinct legal entities and have no obligation to provide EFIH with funds for its payment obligations. Any decision by a subsidiary to provide EFIH with funds for its payment obligations, whether by dividends or distributions, will depend on, among other things, the subsidiary's results of operations, financial condition, cash requirements, contractual restrictions and other factors. In addition, a subsidiary's ability to pay dividends may be limited by covenants in its existing and future debt agreements or applicable law.

Because EFIH is a holding company, its obligations to its creditors are structurally subordinated to all existing and future liabilities and existing and future preferred stock of its subsidiaries that do not guarantee such obligations. Therefore, EFIH's rights and the rights of its creditors to participate in the assets of any subsidiary in the event that such a subsidiary is liquidated or reorganized are subject to the prior claims of such subsidiary's creditors and holders of such subsidiary's preferred stock. To the extent that EFIH may be a creditor with recognized claims against any such subsidiary, EFIH's claims would still be subject to the prior claims of such subsidiary's creditors to the extent that they are secured or senior to those held by EFIH. Subject to restrictions contained in financing arrangements, EFIH's subsidiaries may incur additional indebtedness and other liabilities.

> ***Oncor may or may not make any distributions to EFIH.***

Upon the consummation of the merger in October 2007, EFH Corp. and Oncor implemented certain structural and operational "ring-fencing" measures based on principles articulated by rating agencies and commitments made by Texas Holdings and Oncor to the PUCT and the FERC and to the PUCT in Docket No. 34077 to further enhance Oncor's credit quality. These measures were put into place to mitigate Oncor's credit exposure to the Texas Holdings Group (including the Offeror) and to reduce the risk that the assets and liabilities of Oncor would be substantively consolidated with the assets and liabilities of the Texas Holdings Group (including the Offeror) in the event of a bankruptcy of one or more of those entities.

As part of the ring-fencing measures, a majority of the members of the board of directors of Oncor are required to be, and are, independent from EFH Corp. Any new independent directors of Oncor are required to be appointed by the nominating committee of Oncor Holdings. The organizational documents of Oncor give these independent directors, acting by majority vote, and, during certain periods, any director designated by Texas Transmission, the express right to prevent distributions from Oncor if they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements. Accordingly, there can be no assurance that Oncor will make any distributions to the Offeror.

In addition, Oncor's organizational documents limit Oncor's distributions to the Offeror through December 31, 2012 to an amount not to exceed Oncor's net income (determined in accordance with U.S. GAAP, subject to certain defined adjustments, including goodwill impairments) and prohibit Oncor from making any distribution to the Offeror so long as and to the extent that such distribution would cause Oncor's regulatory capital structure to

50

EFIHMW00259766

exceed the debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.

In March 2009, the PUCT awarded Oncor the right to construct approximately $1.3 billion of transmission lines and facilities associated with its Competitive Renewable Energy Zones ("CREZ") Transmission Plan (see discussion in "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three Months Ended March 31, 2010—Regulation and Rates" included in Annex B to this Prospectus). With the award, it is likely Oncor will incur additional debt. In addition, Oncor may incur additional debt in connection with other investments in infrastructure or technology, including automated accounting systems. Accordingly, while Oncor is required to maintain a debt to equity ratio of 60% debt to 40% equity, there can be no assurance that Oncor's equity balance will be sufficient to maintain the required debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, thereby restricting Oncor from making any distributions to the Offeror.

**Risks Related to Our and EFH Corp.'s Businesses**

EFH Corp. is a holding company conducting its operations principally through its subsidiaries, TCEH (which is indirectly wholly-owned by EFH Corp.) and Oncor (in which EFH Corp. indirectly holds an approximate 80% ownership interest). As such, the risks described below will apply to EFH Corp. There are additional risks relating to investing in the New EFIH Senior Secured Notes that you should consider before deciding to tender your Old Notes. Such additional risks are described elsewhere in this "Risk Factors" section under the headings "—Risks Related to the Exchange Offers and the New EFIH Senior Secured Notes," "—Risks Related to Our Substantial Indebtedness and Debt Agreements," "—Risks Related to Structure" and "Risks Related to the EFIH Business."

*Our businesses are subject to ongoing complex governmental regulations and legislation that have impacted, and may in the future impact, our businesses and/or results of operations.*

Our businesses operate in changing market environments influenced by various state and federal legislative and regulatory initiatives regarding the restructuring of the energy industry, including competition in the generation and sale of electricity. We will need to continually adapt to these changes.

Our businesses are subject to changes in state and federal laws (including PURA, the Federal Power Act, the Atomic Energy Act, the Public Utility Regulatory Policies Act of 1978, the State and Federal Clean Air Acts and the Energy Policy Act of 2005), changing governmental policy and regulatory actions (including those of the PUCT, the NERC, the Texas Regional Entity, the RRC, the TCEQ, the FERC, the EPA, the NRC and the CFTC) and the rules, guidelines and protocols of ERCOT with respect to matters including, but not limited to, market structure and design, operation of nuclear generation facilities, construction and operation of other generation facilities, construction and operation of transmission facilities, acquisition, disposal, depreciation and amortization of regulated assets and facilities, recovery of costs and investments, decommissioning costs, return on invested capital for regulated businesses, market behavior rules, present or prospective wholesale and retail competition and environmental matters. TCEH, along with other market participants, is subject to electricity pricing constraints and market behavior and other competition-related rules and regulations under PURA that are administered by the PUCT and ERCOT, and, with respect to any wholesale power sales outside the ERCOT market, is subject to market behavior and other competition-related rules and regulations under the Federal Power Act that are administered by the FERC. Changes in, revisions to, or reinterpretations of existing laws and regulations (for example, with respect to prices at which TCEH may sell electricity, the required permits for the three lignite-fueled generation units recently completed or currently under construction or the cost of emitting greenhouse gases) may have an adverse effect on our businesses.

The Texas Legislature meets every two years, and from time to time bills are introduced and considered that could materially affect our businesses. There can be no assurance that future action of the Texas Legislature will not result in legislation that could have a material adverse effect on us and our financial prospects.

*PURA, the PUCT, ERCOT, the RRC, the TCEQ and the Office of Public Utility Council (the "OPC") are subject to a "Sunset" review by the Texas Sunset Advisory Commission. PURA will expire, and the PUCT and the RRC will be abolished, on September 1, 2011 unless extended by the Texas Legislature following such review. If any of PURA, the PUCT, ERCOT, the RRC, the TCEQ or the OPC are not*

51

EFIHMW00259767

*renewed by the Texas Legislature pursuant to Sunset review, it could have a material effect on our business.*

Sunset review is the regular assessment of the continuing need for a state agency to exist, and is grounded in the premise that an agency will be abolished unless legislation is passed to continue its functions. The Texas Sunset Advisory Commission (the "Sunset Commission") closely reviews each agency and recommends action on each agency to the Texas Legislature, which action may include significant changes to applicable laws or modifying or even abolishing the agency. Of the agencies scheduled for Sunset review by the Sunset Commission in 2010 and 2011, the following hold primary interest for us: the TCEQ, the PUCT, the OPC, the RRC and ERCOT, which are subject to a focused, limited scope, or special purpose review. These agencies, for the most part, govern and operate the electricity and mining markets in Texas upon which our business model is based. PURA, which expires September 1, 2011, is also subject to Sunset review. If the Texas Legislature fails to renew PURA or any of these agencies, it could result in a significant restructuring of the Texas electricity market or regulatory regime that could have a material impact on our business. There can be no assurance that future action of the Sunset Commission will not result in legislation that could have a material adverse effect on us and our financial prospects.

*Litigation, legal proceedings, regulatory investigations or other administrative proceedings could expose us to significant liabilities and reputation damage and have a material adverse effect on our results of operations, and the litigation environment in which we operate poses a significant risk to our businesses.*

We are involved in the ordinary course of business in a number of lawsuits involving employment, commercial, environmental and injuries and damages issues, among other matters. We evaluate litigation claims and legal proceedings to assess the likelihood of unfavorable outcomes and to estimate, if possible, the amount of potential losses. Based on these assessments and estimates, we establish reserves and disclose the relevant litigation claims or legal proceedings, as appropriate. These assessments and estimates are based on the information available to management at the time and involve a significant amount of judgment. Actual outcomes or losses may differ materially from current assessments and estimates. The settlement or resolution of such claims or proceedings may have a material adverse effect on our results of operations. In addition, judges and juries in the State of Texas have demonstrated a willingness to grant large verdicts, including punitive damages, to plaintiffs in personal injury, property damage and business tort cases. We use appropriate means to contest litigation threatened or filed against us, but the litigation environment in the State of Texas poses a significant business risk.

We are involved in the ordinary course of business in permit applications and renewals, and we are exposed to the risk that certain of our operating permits may not be granted or renewed on satisfactory terms. Failure to obtain and maintain the necessary permits to conduct our businesses could have a material adverse effect on our results of operations.

We are also involved in the ordinary course of business in regulatory investigations and other administrative proceedings, and we are exposed to the risk that we may become the subject of additional regulatory investigations or administrative proceedings. See Note 4 to EFIH's historical condensed consolidated financial statements for the three months ended March 31, 2010, and Note 7 to EFH Corp.'s historical condensed consolidated financial statements for the three months ended March 31, 2010 included elsewhere in this Prospectus. While we cannot predict the outcome of any regulatory investigation or administrative proceeding, any such regulatory investigation or administrative proceeding could result in us incurring material penalties and/or other costs and have a material adverse effect on our results of operations.

*TXU Energy Retail Company LLC may lose a significant number of retail customers due to competitive marketing activity by other retail electric providers.*

TXU Energy Retail Company LLC ("TXU Energy") faces competition for customers. Competitors may offer lower prices and other incentives, which, despite TXU Energy's long-standing relationship with customers, may attract customers away from TXU Energy.

In some retail electricity markets, TXU Energy's principal competitor may be the incumbent retail electric provider. The incumbent retail electric provider has the advantage of long-standing relationships with its customers, including well-known brand recognition.

52

EFIHMW00259768

In addition to competition from the incumbent retail electric provider, TXU Energy may face competition from a number of other energy service providers, other energy industry participants, or nationally branded providers of consumer products and services who may develop businesses that will compete with TXU Energy. Some of these competitors or potential competitors may be larger or better capitalized than TXU Energy. If there is inadequate potential margin in these retail electricity markets, it may not be profitable for TXU Energy to compete in these markets.

### *TCEH's revenues and results of operations may be negatively impacted by decreases in market prices for power, decreases in natural gas prices, and/or decreases in market heat rates.*

TCEH (EFH Corp.'s largest business) is not guaranteed any rate of return on capital investments in its competitive businesses. We market and trade electricity and natural gas, including electricity from our own generation facilities and generation contracted from third parties, as part of our wholesale markets operation. TCEH's results of operations depend in large part upon market prices for electricity, natural gas, uranium, coal and transportation in its regional market and other competitive markets and upon prevailing retail electricity rates, which may be impacted by actions of regulatory authorities. Market prices may fluctuate substantially over relatively short periods of time. Demand for electricity can fluctuate dramatically, creating periods of substantial under- or over-supply. During periods of over-supply, prices might be depressed. Also, at times there may be political pressure, or pressure from regulatory authorities with jurisdiction over wholesale and retail energy commodity and transportation rates, to impose price limitations, bidding rules and other mechanisms to address volatility and other issues in these markets.

Some of the fuel for our generation facilities is purchased under short-term contracts. Prices of fuel, including diesel, natural gas, coal and nuclear fuel, may also be volatile, and the price we can obtain for electricity sales may not change at the same rate as changes in fuel costs. In addition, we purchase and sell natural gas and other energy related commodities, and volatility in these markets may affect costs incurred in meeting obligations.

Volatility in market prices for fuel and electricity may result from the following:

- volatility in natural gas prices;

- volatility in market heat rates;

- volatility in coal and rail transportation prices;

- severe or unexpected weather conditions;

- seasonality;

- changes in electricity and fuel usage;

- illiquidity in the wholesale power or other markets;

- transmission or transportation constraints, inoperability or inefficiencies;

- availability of competitively-priced alternative energy sources;

- changes in market structure;

- changes in supply and demand for energy commodities, including nuclear fuel and related enrichment and conversion services;

- changes in generation efficiency;

- outages at our generation facilities or those of our competitors;

53

Confidential

- changes in the credit risk or payment practices of market participants;

- changes in production and storage levels of natural gas, lignite, coal, crude oil, diesel and other refined products;

- natural disasters, wars, sabotage, terrorist acts, embargoes and other catastrophic events; and

- federal, state and local energy, environmental and other regulation and legislation.

All of our generation facilities are located in the ERCOT market, a market with limited interconnections to other markets. Wholesale electricity prices in the ERCOT market generally correlate with the price of natural gas because marginal electricity demand is generally supplied by natural gas-fueled generation facilities.

Wholesale electricity prices also correlate with market heat rates (a measure of efficiency of the marginal price-setting generator of electricity), which could fall if demand for electricity were to decrease or if additional generation facilities are built in ERCOT. Accordingly, the contribution to earnings and the value of our baseload (lignite/coal-fueled and nuclear) generation assets, which provided a substantial portion of our supply volumes in 2009 and in 2010 to date, are dependent in significant part upon the price of natural gas and market heat rates. As a result, our baseload generation assets could significantly decrease in profitability and value if natural gas prices or market heat rates fall.

***Our assets or positions cannot be fully hedged against changes in commodity prices and market heat rates, and hedging transactions may not work as planned or hedge counterparties may default on their obligations.***

We cannot fully hedge the risk associated with changes in commodity prices, most notably natural gas prices, or market heat rates because of the expected useful life of our generation assets and the size of our position relative to market liquidity. To the extent we have unhedged positions, fluctuating commodity prices and/or market heat rates can materially impact our results of operations and financial position, either favorably or unfavorably.

To manage our financial exposure related to commodity price fluctuations, we routinely enter into contracts to hedge portions of purchase and sale commitments, fuel requirements and inventories of natural gas, lignite, coal, crude oil, diesel fuel and refined products, and other commodities, within established risk management guidelines. As part of this strategy, we routinely utilize fixed-price forward physical purchase and sale contracts, futures, financial swaps and option contracts traded in over-the-counter markets or on exchanges. Although we devote a considerable amount of time and effort to the establishment of risk management procedures, as well as the ongoing review of the implementation of these procedures, the procedures in place may not always function as planned and cannot eliminate all the risks associated with these activities. For example, we hedge the expected needs of our wholesale and retail customers, but unexpected changes due to weather, natural disasters, market constraints or other factors could cause us to purchase power to meet unexpected demand in periods of high wholesale market prices or resell excess power into the wholesale market in periods of low prices. As a result of these and other factors, we cannot precisely predict the impact that risk management decisions may have on our businesses, results of operations or financial position.

With the tightening of credit markets, there has been some decline in the number of market participants in the wholesale energy commodities markets, resulting in less liquidity, particularly in the ERCOT electricity market. Participation by financial institutions and other intermediaries (including investment banks) has particularly declined. Extended declines in market liquidity could materially affect our ability to hedge our financial exposure to desired levels.

To the extent we engage in hedging and risk management activities, we are exposed to the risk that counterparties that owe us money, energy or other commodities as a result of market transactions will not perform their obligations. Should the counterparties to these arrangements fail to perform, we might be forced to enter into alternative hedging arrangements or honor the underlying commitment at then-current market prices. In such event, we might incur losses in addition to amounts, if any, already paid to the counterparties. ERCOT market participants are also exposed to risks that another ERCOT market participant may default on its obligations to pay ERCOT for

54

EFIHMW00259770