power taken, in which case such costs, to the extent not offset by posted security and other protections available to ERCOT, may be allocated to various non-defaulting ERCOT market participants, including us.

***Our collateral requirements for hedging arrangements could be materially impacted if certain proposed legislation regarding the regulation of over-the-counter financial derivatives were to be enacted and be applicable to us.***

On June 30, 2010, the House of Representatives approved financial reform legislation entitled the "Dodd-Frank Wall Street Reform and Consumer Protection Act". The legislation provides for the regulation of the previously unregulated over-the-counter (OTC) financial derivatives market. Although we cannot predict if or when the legislation will be approved by the Senate, it appears possible that it could be passed by the Senate and signed into law by President Obama by the end of July 2010. While it appears that our existing transactions will be "grandfathered" and that our future transactions that are entered into to hedge our commercial risk will be exempt from the clearing requirements under the legislation, there is still significant uncertainty given the extensive rulemakings that will occur under this Act. To the extent the CFTC enacts any rules or requirements that are not consistent with the legislation as currently expected to be enacted, we could ultimately be subject to the clearing requirements. To the extent we were subject to the clearing requirements, we would not able to use our assets as collateral for our hedging arrangements, but would rather be required to use cash. This could have a material adverse impact on our liquidity and result in increased costs. In addition, it could have a material adverse impact on our long-term hedging program and limit our ability to enter into OTC derivatives and hedge our commodity and interest rate risks.

***We may suffer material losses, costs and liabilities due to ownership and operation of the Comanche Peak nuclear generation facility.***

The ownership and operation of a nuclear generation facility involves certain risks. These risks include:

- unscheduled outages or unexpected costs due to equipment, mechanical, structural or other problems;

- inadequacy or lapses in maintenance protocols;

- the impairment of reactor operation and safety systems due to human error;

- the costs of storage, handling and disposal of nuclear materials, including availability of storage space;

- the costs of procuring nuclear fuel;

- the costs of securing the plant against possible terrorist attacks;

- limitations on the amounts and types of insurance coverage commercially available; and

- uncertainties with respect to the technological and financial aspects of decommissioning nuclear facilities at the end of their useful lives.

The prolonged unavailability of Comanche Peak could materially affect our financial condition and results of operations. The following are among the more significant of these risks:

- Operational Risk—Operations at any nuclear generation facility could degrade to the point where the facility would have to be shut down. If such degradations were to occur, the process of identifying and correcting the causes of the operational downgrade to return the facility to operation could require significant time and expense, resulting in both lost revenue and increased fuel and purchased power expense to meet supply commitments. Furthermore, a shut-down or

55

EFIHMW00259771

failure at any other nuclear generation facility could cause regulators to require a shut-down or reduced availability at Comanche Peak.

- Regulatory Risk—The NRC may modify, suspend or revoke licenses and impose civil penalties for failure to comply with the Atomic Energy Act, the regulations under it or the terms of the licenses of nuclear generation facilities. Unless extended, the NRC operating licenses for Comanche Peak Unit 1 and Unit 2 will expire in 2030 and 2033, respectively. Changes in regulations by the NRC could require a substantial increase in capital expenditures or result in increased operating or decommissioning costs.

- Nuclear Accident Risk—Although the safety record of Comanche Peak and other nuclear generation facilities generally has been very good, accidents and other unforeseen problems have occurred both in the U.S. and elsewhere. The consequences of an accident can be severe and include loss of life, injury, lasting negative health impact and property damage. Any accident, or perceived accident, could result in significant liabilities and damage our reputation. Any such resulting liability from a nuclear accident could exceed our resources, including insurance coverage.

***The operation and maintenance of electricity generation and delivery facilities involves significant risks that could adversely affect our results of operations and financial condition.***

The operation and maintenance of electricity generation and delivery facilities involves many risks, including, as applicable, start-up risks, breakdown or failure of facilities, lack of sufficient capital to maintain the facilities, the dependence on a specific fuel source or the impact of unusual or adverse weather conditions or other natural events, as well as the risk of performance below expected levels of output, efficiency or reliability, the occurrence of any of which could result in lost revenues and/or increased expenses. A significant number of our facilities were constructed many years ago. In particular, older generating equipment and transmission and distribution equipment, even if maintained in accordance with good engineering practices, may require significant capital expenditures to keep operating at peak efficiency or reliability. The risk of increased maintenance and capital expenditures arises from (a) increased starting and stopping of generation equipment due to the volatility of the competitive generation market, (b) any unexpected failure to generate electricity, including failure caused by breakdown or forced outage and (c) damage to facilities due to storms, natural disasters, wars, terrorist acts and other catastrophic events. Further, our ability to successfully and timely complete capital improvements to existing facilities or other capital projects is contingent upon many variables and subject to substantial risks. Should any such efforts be unsuccessful, we could be subject to additional costs and/or the write-off of our investment in the project or improvement.

Insurance, warranties or performance guarantees may not cover all or any of the lost revenues or increased expenses, including the cost of replacement power. Likewise, the ability to obtain insurance, and the cost of and coverage provided by such insurance, could be affected by events outside our control.

***Our cost of compliance with environmental laws and regulations and our commitments, and the cost of compliance with new environmental laws, regulations or commitments could materially adversely affect our results of operations and financial condition.***

We are subject to extensive environmental regulation by governmental authorities. In operating our facilities, we are required to comply with numerous environmental laws and regulations and to obtain numerous governmental permits. We may incur significant additional costs beyond those currently contemplated to comply with these requirements. If we fail to comply with these requirements, we could be subject to administrative, civil or criminal sanctions. Existing environmental regulations could be revised or reinterpreted, new laws and regulations could be adopted or become applicable to us or our facilities, and future changes in environmental laws and regulations could occur, including potential regulatory and enforcement developments related to air emissions, all of which could result in significant additional costs beyond those currently contemplated to comply with existing requirements.

Confidential

EFIHMW00259772

EFH Corp. has committed to reduce emissions of mercury, nitrogen oxide and sulfur dioxide through the installation of emissions control equipment at both the new and existing and lignite-fueled generation units. We may incur significantly greater costs than those contemplated in order to achieve this commitment.

EFH Corp. has formed a Sustainable Energy Advisory Board that advises EFH Corp. in its pursuit of technology development opportunities that, among other things, are designed to reduce our impact on the environment. Any adoption of Sustainable Energy Advisory Board recommendations may cause us to incur significant costs in addition to the costs referenced above.

We may not be able to obtain or maintain all required environmental regulatory approvals. If there is a delay in obtaining any required environmental regulatory approvals or if we fail to obtain, maintain or comply with any such approval, the operation of our facilities could be stopped, curtailed or modified or become subject to additional costs.

In addition, we may be responsible for any on-site liabilities associated with the environmental condition of facilities that we have acquired, leased or developed, regardless of when the liabilities arose, whether they are known or unknown or, in certain circumstances, whether they were caused by a third party such as a former owner or operator. In connection with certain acquisitions and sales of assets, we may obtain, or be required to provide, indemnification against certain environmental liabilities. Another party could, depending on the circumstances, assert an environmental claim against us or fail to meet its indemnification obligations to us.

***Our financial condition and results of operations may be materially adversely affected if new federal and/or state legislation or regulations are adopted to address global climate change.***

In recent years, a growing concern has emerged about global climate change and how greenhouse gas ("GHG") emissions, such as carbon dioxide, contribute to global climate change. Several bills addressing climate change have been introduced in the U.S. Congress or discussed by the Obama Administration that are intended to address climate change using different approaches, including a cap on carbon emissions with emitters allowed to trade unused emission allowances (cap-and-trade), a tax on carbon emissions (carbon-tax), incentives for the development of low-carbon technology and federal renewable portfolio standards. In addition, a number of federal court cases have been recently decided with respect to GHG emissions, including a U.S. Supreme Court case holding that carbon dioxide and other GHG emissions are pollutants subject to regulation under the Clean Air Act. Some commentators believe that the possible outcome from these decisions include future judicial regulation of GHG emissions.

The EPA recently issued a rule, known as the Prevention of Significant Deterioration ("PSD") tailoring rule, that establishes new thresholds for regulating GHG emissions from stationary sources under the Clean Air Act. Beginning in January 2011, the rule will require any source subject to the PSD permitting program due to emissions of non-GHG pollutants that increases its GHG emissions by 75,000 tons per year ("tpy") to have an operating permit under the Title V Operating Permit Program of the Clean Air Act and install the best available control technology in conjunction with construction activities or plant modifications. Beginning in July 2011, PSD permitting requirements will also apply to new projects with GHG emissions of at least 100,000 tpy and modifications to existing facilities that increase GHG emissions by at least 75,000 tpy (even if no non-GHG PSD thresholds are exceeded). The EPA also finalized regulations in 2009 that will require certain categories of GHG emitters to monitor and report their annual GHG emissions beginning in January 2011.

We produce GHG emissions from the combustion of fossil fuels at our generation facilities. For 2009, we estimate that our generation facilities produced 54 million short tons of carbon dioxide based on continuously monitored data reported to and approved by the EPA. The two new lignite-fueled units that achieved substantial completion (as defined in the Engineering, Procurement and Construction Agreement for the units) in fall of 2009 and the one new lignite-fueled unit that achieved substantial completion (as defined in the Engineering, Procurement and Construction Agreement for the unit) in June 2010 will generate additional carbon dioxide emissions. Because a substantial portion of our generation portfolio consists of lignite/coal-fueled generation facilities, our financial condition and results of operations could be materially adversely affected by the enactment of any legislation or regulation that mandates a reduction in GHG emissions or that imposes financial penalties, costs or taxes upon those that produce GHG emissions. For example, to the extent a cap-and-trade program is adopted, we may be required to incur material costs to reduce our GHG emissions or to procure emission allowances or credits to comply with such

57

a program. EPA Regulation of GHGs under the Clean Air Act, or judicially imposed limits on GHG emissions, may require us to make material expenditures to reduce our GHG emissions. If a significant number of our investors, customers or others refuse to do business with us because of our GHG emissions, it could have a material adverse effect on our results of operations, financial position and liquidity.

**Our financial condition and results of operations may be materially adversely affected by the effects of extreme weather conditions.**

We could be subject to the effects of extreme weather. Extreme weather conditions could stress our transmission and distribution system or our generation facilities resulting in increased maintenance and capital expenditures. Extreme weather events, including hurricanes or storms or other natural disasters, could be destructive and result in casualty losses that are not ultimately offset by insurance proceeds or in increased capital expenditures or costs, including supply chain costs.

Moreover, an extreme weather event could cause disruption in service to customers due to downed wires and poles or damage to other operating equipment, which could result in us foregoing sales of electricity and lost revenue. Similarly, an extreme weather event might affect the availability of generation and transmission capacity, limiting our ability to source or deliver electricity to where it is needed. These conditions, which cannot be reliably predicted, could have an adverse consequence by requiring us to seek additional sources of electricity when wholesale market prices are high or to seek to sell excess electricity when those market prices are low.

**The rates of Oncor's electricity delivery business are subject to regulatory review, and may be reduced below current levels, which could adversely impact Oncor's financial condition and results of operations.**

The rates charged by Oncor are regulated by the PUCT and certain cities and are subject to cost-of-service regulation and annual earnings oversight. This regulatory treatment does not provide any assurance as to achievement of earnings levels. Oncor's rates are regulated based on an analysis of Oncor's costs and capital structure, as reviewed and approved in a regulatory proceeding. While rate regulation is premised on the full recovery of prudently incurred costs and a reasonable rate of return on invested capital, there can be no assurance that the PUCT will judge all of Oncor's costs to have been prudently incurred, that the PUCT will not reduce the amount of invested capital included in the capital structure that Oncor's rates are based upon, or that the regulatory process in which rates are determined will always result in rates that will produce full recovery of Oncor's costs, including regulatory assets reported in Oncor's balance sheet, and the return on invested capital allowed by the PUCT.

In addition, in connection with the Merger, Oncor has made several commitments to the PUCT regarding its rates. For example, Oncor committed that it will, in rate cases after its 2008 general rate case through proceedings initiated prior to December 31, 2012, support a cost of debt that will be no greater than the then-current cost of debt of electric utilities with investment grade credit ratings equal to Oncor's ratings as of October 1, 2007. As a result, Oncor may not be able to recover all of its debt costs if they are above those levels.

**Our growth strategy, including investment in three new lignite-fueled generation units and Oncor's capital program, may not be executed as planned, which could adversely impact our financial condition and results of operations.**

There can be no guarantee that the execution of our growth strategy will be successful. As discussed below, our growth strategy is dependent upon many factors. Changes in laws, regulations, markets, costs, the outcome of on-going litigation or other factors could negatively impact the execution of our growth strategy, including causing management to change the strategy. Even if we are able to execute our growth strategy, it may take longer than expected, and costs may be higher than expected.

There can be no guarantee that the execution of the lignite-fueled generation development program will be successful. While we have experience in operating lignite-fueled generation facilities, we have limited recent experience in constructing, commissioning and starting-up such facilities.

Confidential

Our lignite-fueled generation development program is subject to changes in laws, regulations and policies that are beyond our control. Changes in law, regulation or policy regarding commodity prices, power prices, electricity competition or solid-fuel generation facilities or other related matters could adversely impact this program. In recent years, global warming has received significant media attention, which has resulted in legislators focusing on environmental laws, regulations and policies. Changes in environmental law, regulation or policy, such as regulations of emissions of carbon dioxide, could adversely impact this program. Although we have received permits to operate the new units that are a part of the lignite-fueled generation development program, some of these permits are subject to ongoing litigation. See Note 7 to EFH Corp.'s historical condensed consolidated financial statements for the three months ended March 31, 2010 included elsewhere in this Prospectus for further detail regarding such ongoing litigation. An adverse ruling on these matters could materially and adversely effect the implementation of this program.

There can be no guarantee that the execution of Oncor's capital deployment program for its electricity delivery facilities will be successful, and there can be no assurance that the capital investments Oncor intends to make in connection with its electricity delivery business will produce the desired reductions in cost and improvements to service and reliability. Furthermore, there can be no guarantee that Oncor's capital investments, including the investment of approximately $1.3 billion (based on ERCOT cost estimates for CREZ construction projects) to construct CREZ-related transmission lines and facilities, will ultimately be recoverable through rates or, if recovered, that they will be recovered on a timely basis. There can also be no assurance that the PUCT's award of CREZ construction projects will not be delayed, modified or otherwise vacated through judicial or administrative actions. See "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three Months Ended March 31, 2010—Regulation and Rates" included in Annex B to this Prospectus.

***Ongoing performance improvement initiatives may not achieve desired cost reductions and may instead result in significant additional costs if unsuccessful.***

The implementation of performance improvement initiatives identified by management may not produce the desired reduction in costs and if unsuccessful, may instead result in significant additional costs as well as significant disruptions in our operations due to employee displacement and the rapid pace of changes to organizational structure and operating practices and processes. Such additional costs or operational disruptions could have an adverse effect on our businesses and financial prospects.

***TXU Energy's retail business is subject to the risk that sensitive customer data may be compromised, which could result in an adverse impact to its reputation and/or the results of operations of the retail business.***

TXU Energy's retail business requires access to sensitive customer data in the ordinary course of business. Examples of sensitive customer data are names, addresses, account information, historical electricity usage, expected patterns of use, payment history, credit bureau data, credit and debit card account numbers, drivers license numbers, social security numbers and bank account information. TXU Energy's retail business may need to provide sensitive customer data to vendors and service providers who require access to this information in order to provide services, such as call center operations, to the retail business. If a significant breach occurred, the reputation of TXU Energy's retail business may be adversely affected, customer confidence may be diminished, or TXU Energy's retail business may be subject to legal claims, any of which may contribute to the loss of customers and have a negative impact on the business and/or results of operations.

***TXU Energy relies on the infrastructure of local utilities or independent transmission system operators to provide electricity to, and to obtain information about, its customers. Any infrastructure failure could negatively impact customer satisfaction and could have a material negative impact on its business and results of operations.***

TXU Energy depends on transmission and distribution facilities owned and operated by unaffiliated utilities, as well as Oncor's facilities, to deliver the electricity it sells to its customers. If transmission capacity is inadequate, TXU Energy's ability to sell and deliver electricity may be hindered, it may have to forgo sales or it may have to buy more expensive wholesale electricity than is available in the capacity-constrained area. For example, during some periods, transmission access is constrained in some areas of the Dallas-Fort Worth metroplex, where

Confidential

EFIHMW00259775

TXU Energy has a significant number of customers. The cost to provide service to these customers may exceed the cost to provide service to other customers, resulting in lower profits. In addition, any infrastructure failure that interrupts or impairs delivery of electricity to TXU Energy's customers could negatively impact the satisfaction of its customers with its service.

> **TXU Energy offers bundled services to its retail customers, with some bundled services offered at fixed prices and for fixed terms. If TXU Energy's costs for these bundled services exceed the prices paid by its customers, its results of operations could be materially adversely affected.**

TXU Energy offers its customers a bundle of services that include, at a minimum, electricity plus transmission, distribution and related services. The prices TXU Energy charges for its bundle of services or for the various components of the bundle, any of which may be fixed by contract with the customer for a period of time, could fall below TXU Energy's underlying cost to provide the components of such services.

> **TXU Energy's retail electric provider certification is subject to PUCT review.**

The PUCT may at any time initiate an investigation into whether TXU Energy is compliant with PUCT Substantive Rules and whether it has met all of the requirements for retail electric provider certification, including financial requirements. Any removal or revocation of a retail electric provider certification would mean that TXU Energy would no longer be allowed to provide electricity service to retail customers. Such decertification would have an adverse effect on TXU Energy and its financial prospects. See "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three Months Ended March 31, 2010—Regulations and Rates" included in Annex B to this Prospectus for a discussion of the new rules regarding retail electric provider certification.

> **Changes in technology or increased electricity conservation efforts may reduce the value of our generation plants and/or Oncor's electricity delivery facilities and may significantly impact our businesses in other ways as well.**

Research and development activities are ongoing to improve existing and alternative technologies to produce electricity, including gas turbines, fuel cells, microturbines, photovoltaic (solar) cells and concentrated solar thermal devices. It is possible that advances in these or other technologies will reduce the costs of electricity production from these technologies to a level that will enable these technologies to compete effectively with our traditional generation plants. While demand for electricity has been generally increasing throughout the U.S., the rate of construction and development of new, more efficient generation facilities may exceed increases in demand in some regional electric markets. Consequently, where we have facilities, the profitability and market value of our generation assets could be significantly reduced. Changes in technology could also alter the channels through which retail customers buy electricity. To the extent self-generation facilities become a more cost-effective option for certain customers, our revenues could be materially reduced.

Also, electricity demand could be reduced by increased conservation efforts and advances in technology, which could likewise significantly reduce the value of our generation assets and electricity delivery facilities. Certain regulatory and legislative bodies have introduced or are considering requirements and/or incentives to reduce energy consumption by a fixed date. Effective energy conservation by our customers could result in reduced energy demand or significantly slow the growth in demand. Such reduction in demand could materially reduce our revenues. Furthermore, we may incur increased capital expenditures if we are required to invest in conservation measures.

> **Our revenues and results of operations may be adversely impacted by decreases in market prices of power due to the development of wind generation power sources.**

A significant amount of investment in wind generation in the ERCOT market over the past few years has increased overall wind power generation capacity. Generally, the increased capacity has led to lower wholesale electricity prices (driven by lower market heat rates) in the zones at or near wind generation development, especially in, but not exclusive to, the ERCOT West zone where most of the new wind power generation is located. As a result, the profitability of our generation facilities and power purchase contracts, including certain wind generation power

Confidential

purchase contracts, has been impacted and could be further impacted by the effects of the wind power generation, and the value could significantly decrease if wind power generation has a material sustained effect on market heat rates.

**Our revenues and results of operations may be adversely impacted as ERCOT transitions the current zonal market structure to a nodal wholesale market.**

Substantially all of our competitive businesses are located in the ERCOT market, which is currently in the process of transitioning from a zonal market structure with four congestion management zones to a nodal market structure that will directly manage congestion on a localized basis. In a nodal market, the prices received and paid for power will be based on pricing determined at specific interconnection points on the transmission grid (i.e., Locational Marginal Pricing), which could result in lower revenues or higher costs for our competitive businesses. This market structure change could have a significant impact on the profitability and value of our competitive businesses depending on how the Locational Marginal Pricing develops. See "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three Months Ended March 31, 2010— Regulation and Rates—Wholesale Market Design—Nodal Market" included in Annex B to this Prospectus.

**Our future results of operations may be negatively impacted by settlement adjustments determined by ERCOT related to prior periods.**

ERCOT is the independent system operator that is responsible for maintaining reliable operation of the bulk electric power supply system in the ERCOT market. Its responsibilities include the clearing and settlement of electricity volumes and related ancillary services among the various participants in the deregulated Texas market. Settlement information is due from ERCOT within two months after the operating day, and true-up settlements are due from ERCOT within six months after the operating day. Likewise, ERCOT has the ability to resettle any operating day at any time after the six month settlement period, usually the result of a lingering dispute, an alternative dispute resolution process or litigated event. As a result, we are subject to settlement adjustments from ERCOT related to prior periods, which may result in charges or credits impacting our future reported results of operations.

**Our results of operations and financial condition could be negatively impacted by any development or event beyond our control that causes economic weakness in the ERCOT market.**

We derive substantially all of our revenues from operations in the ERCOT market, which covers approximately 75% of the geographical area in the State of Texas. As a result, regardless of the state of the economy in areas outside the ERCOT market, economic weakness in the ERCOT market could lead to reduced demand for electricity in the ERCOT market. Such a reduction could have a material negative impact on our results of operations and financial condition.

**EFH Corp.'s (or any applicable subsidiary's) credit ratings could negatively affect EFH Corp.'s (or the pertinent subsidiary's) ability to access capital and could require EFH Corp. or its subsidiaries to post collateral or repay certain indebtedness.**

Downgrades in EFH Corp.'s or any of its applicable subsidiaries' long-term debt ratings generally cause borrowing costs to increase and the potential pool of investors and funding sources to decrease and could trigger liquidity demands pursuant to the terms of new commodity contracts, leases or other agreements. Future transactions by EFH Corp. or any of its subsidiaries, including the issuance of the New EFH Senior Secured Notes and other additional debt or the consummation of a transaction similar to the November 2009 debt exchanges, could result in temporary or permanent downgrades of EFH Corp.'s or its subsidiaries' credit ratings.

Most of EFH Corp.'s large customers, suppliers and counterparties require an expected level of creditworthiness in order for them to enter into transactions. If EFH Corp.'s (or an applicable subsidiary's) credit ratings decline, the costs to operate its businesses would likely increase because counterparties could require the posting of collateral in the form of cash-related instruments, or counterparties could decline to do business with EFH Corp. (or its applicable subsidiary).

61

EFIHMW00259777

***Continued market volatility may have impacts on our business and financial condition that we currently cannot predict.***

Because our operations are capital intensive, the Offeror expects to rely over the long-term upon access to financial markets (particularly the attainment of liquidity facilities) as a significant source of liquidity for capital requirements not satisfied by cash-on-hand, operating cash flows or our revolving credit facilities. Recently, the capital and credit markets have been experiencing extreme volatility and disruption. Our ability to access the capital or credit markets may be severely restricted at a time when we would like, or need, to access those markets, which could have an impact on our flexibility to react to changing economic and business conditions. In addition, the cost of debt financing may be materially impacted by these market conditions. Accordingly, there can be no assurance that the capital and credit markets will continue to be a reliable or acceptable source of short-term or long-term financing for us. Additionally, disruptions in the capital and credit markets could have a broader impact on the economy in general in ways that could lead to reduced electricity usage, which could have a negative impact on our revenues, or have an impact on our customers, counterparties and/or lenders, causing them to fail to meet their obligations to us.

***Our liquidity needs could be difficult to satisfy, particularly during times of uncertainty in the financial markets and/or during times when there are significant changes in commodity prices. The inability to access liquidity, particularly on favorable terms, could materially adversely affect results of operations and/or financial condition.***

Our businesses are capital intensive. We rely on access to financial markets and liquidity facilities as a significant source of liquidity for capital requirements not satisfied by cash-on-hand or operating cash flows. The inability to raise capital on favorable terms or access liquidity facilities, particularly during times of uncertainty similar to that which has recently been experienced in the financial markets, could impact our ability to sustain and grow our businesses and would likely increase capital costs. Our access to the financial markets and liquidity facilities could be adversely impacted by various factors, such as:

- changes in financial markets that reduce available credit or the ability to obtain or renew liquidity facilities on acceptable terms;

- economic weakness in the ERCOT or general U.S. market;

- changes in interest rates;

- a deterioration of our credit or the credit of our subsidiaries or a reduction in our or our applicable subsidiaries' credit ratings;

- a deterioration of the credit or bankruptcy of one or more lenders or counterparties under our or our applicable subsidiaries' liquidity facilities that affects the ability of such lender(s) to make loans to us or our subsidiaries;

- volatility in commodity prices that increases margin or credit requirements;

- a material breakdown in our risk management procedures; and

- the occurrence of changes in our businesses that restrict our ability to access liquidity facilities.

Although we expect to actively manage the liquidity exposure of existing and future hedging arrangements, given the size of the long-term hedging program, any significant increase in the price of natural gas could result in us being required to provide cash or letter of credit collateral in substantial amounts. While these potential posting obligations are primarily supported by the liquidity facilities, for certain transactions there is a potential for the timing of postings on the commodity contract obligations to vary from the timing of borrowings from the senior secured cash posting credit facility of TCEH. Any perceived reduction in our credit quality could result in clearing agents or other counterparties requesting additional collateral. We have credit concentration risk related to the

Confidential

limited number of lenders that provide liquidity to support our hedging program. A deterioration of the credit quality of such lenders could materially affect our ability to continue such program on acceptable terms. An event of default by one or more of our hedge counterparties could result in termination-related settlement payments that reduce available liquidity if we owe amounts related to commodity contracts or delays in receipts of expected settlements if the hedge counterparties owe amounts to us. These events could have a material negative impact on our financial condition and results of operations.

In the event that the governmental agencies that regulate the activities of our businesses determine that the creditworthiness of any such business is inadequate to support our activities, such agencies could require us to provide additional cash or letter of credit collateral in substantial amounts to qualify to do business.

In the event our liquidity facilities are being used largely to support the long-term hedging program as a result of a significant increase in the price of natural gas or significant reduction in credit quality, we may have to forego certain capital expenditures or other investments in our competitive businesses or other business opportunities.

Further, a lack of available liquidity could adversely impact the evaluation of our creditworthiness by counterparties and rating agencies. In particular, such concerns by existing and potential counterparties could significantly limit TCEH's wholesale markets activities, including its long-term hedging program.

***The costs of providing pension and OPEB and related funding requirements are subject to changes in pension fund values, changing demographics and fluctuating actuarial assumptions and may have a material adverse effect on our results of operations and financial condition.***

We provide pension benefits based on either a traditional defined benefit formula or a cash balance formula and also provide certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from us. Our costs of providing such benefits and related funding requirements are dependent upon numerous factors, assumptions and estimates and are subject to changes in these factors, assumptions and estimates, including the market value of the assets funding our pension and OPEB plans. Fluctuations in financial market returns as well as changes in general interest rates may result in increased or decreased benefit costs in future periods.

The substantial dislocation in the financial markets that began in 2008 caused the value of the investments that fund our pension and OPEB plans to significantly differ from, and may alter the values and actuarial assumptions we use to calculate, our projected future pension plan expense and OPEB costs. A continuation or further decline in the value of these investments could increase the expenses of the pension plan and the costs of the OPEB plans and related funding requirements in the future. Our costs of providing such benefits and related funding requirements are also subject to changing employee demographics (including but not limited to age, compensation levels and years of accredited service), the level of contributions made to retiree plans, expected and actual earnings on plan assets and the discount rates used in determining the projected benefit obligation. Changes made to the provisions of the plans may also impact current and future benefit costs. Fluctuations in financial market returns as well as changes in general interest rates may result in increased or decreased benefit costs in future periods.

***As was the case in the fourth quarter 2008 (as discussed in Notes 1 and 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 included elsewhere in this Prospectus), goodwill and/or other intangible assets not subject to amortization that we have recorded in connection with the Merger are subject to at least annual impairment evaluations, and as a result, we could be required to write off some or all of this goodwill and other intangible assets, which may cause adverse impacts on our financial condition and results of operations.***

In accordance with accounting standards, goodwill and certain other indefinite-lived intangible assets that are not subject to amortization are reviewed annually or more frequently for impairment, if certain conditions exist, and may be impaired. Any reduction in or impairment of the value of goodwill or other intangible assets will result in a charge against earnings, which could cause a material adverse impact on our reported results of operations and financial position.

63

EFIHMW00259779

*The loss of the services of our key management and personnel could adversely affect our ability to operate our businesses.*

Our future success will depend on our ability to continue to attract and retain highly qualified personnel. We compete for such personnel with many other companies, in and outside our industry, government entities and other organizations. We may not be successful in retaining current personnel or in hiring or retaining qualified personnel in the future. Our failure to attract new personnel or retain existing personnel could have a material adverse effect on our businesses.

*The Sponsor Group controls and may have conflicts of interest with us in the future.*

The Sponsor Group indirectly owns approximately 60% of EFH Corp.'s capital stock on a fully-diluted basis through its investment in Texas Holdings. As a result of this ownership and the Sponsor Group's ownership in interests of the general partner of Texas Holdings, the Sponsor Group has control over decisions regarding our operations, plans, strategies, finances and structure, including whether to enter into any corporate transaction, and will have the ability to prevent any transaction that requires the approval of EFH Corp.'s shareholders.

Additionally, each member of the Sponsor Group is in the business of making investments in companies and may from time to time acquire and hold interests in businesses that compete directly or indirectly with us. Members of the Sponsor Group may also pursue acquisition opportunities that may be complementary to our businesses and, as a result, those acquisition opportunities may not be available to us. So long as the members of the Sponsor Group, or other funds controlled by or associated with the members of the Sponsor Group, continue to indirectly own a significant amount of the outstanding shares of EFH Corp.'s common stock, even if such amount is less than 50%, the Sponsor Group will continue to be able to strongly influence or effectively control our decisions.

**Risks Related to the EFIH Businesses**

EFIH is a holding company whose principal asset is an approximate 80% ownership interest in Oncor. As such, the risks described below relating to Oncor's businesses will apply to EFIH. Due to the "ring-fencing" measures that have been implemented by EFH Corp. and Oncor described in "The Transactions—Ring-Fencing," EFIH will have limited ability to mitigate any of the risks described below. There are additional risks relating to investing in the New EFIH Senior Secured Notes that you should consider before deciding to tender your Old Notes. Such additional risks are described elsewhere in this "Risk Factors" section under the headings "—Risks Related to the Exchange Offers and the New EFIH Senior Secured Notes," "—Risks Related to Our Substantial Indebtedness and Debt Agreements," "—Risks Related to Structure" and "—Risks Related to Our Business."

*Oncor's businesses are subject to ongoing complex governmental regulations and legislation that have impacted, and may in the future impact, its business and/or results of operations.*

Oncor's businesses operate in changing market environments influenced by various state and federal legislative and regulatory initiatives regarding the restructuring of the energy industry. Oncor will need to continually adapt to these changes.

Oncor's businesses are subject to changes in state and federal laws (including PURA, the Federal Power Act, the Public Utility Regulatory Policies Act of 1978 and the Energy Policy Act of 2005), changing governmental policy and regulatory actions (including those of the PUCT, the Electric Reliability Organization, the Texas Regional Entity, the TCEQ, the FERC and the EPA) and the rules, guidelines and protocols of ERCOT with respect to matters including, but not limited to, market structure and design, construction and operation of transmission facilities, acquisition, disposal, depreciation and amortization of regulated assets and facilities, recovery of costs and investments, return on invested capital and environmental matters. Changes in, revisions to, or reinterpretations of existing laws and regulations may have an adverse effect on Oncor's businesses.

The Texas Legislature meets every two years, and from time to time bills are introduced and considered that could materially affect Oncor's business. There can be no assurance that future action of the Texas Legislature will not result in legislation that could have a material adverse effect on Oncor and its financial prospects.

Confidential

EFIHMW00259780

**PX 027**
**Page 74 of 232**

*PURA, the PUCT, ERCOT, the TCEQ and the Office of Public Utility Council (OPC) are subject to a "Sunset" review by the Texas Sunset Advisory Commission. PURA will expire, and the PUCT will be abolished, on September 1, 2011 unless extended by the Texas Legislature following such review. If any of PURA, the PUCT, ERCOT, the TCEQ or the OPC are not renewed by the Texas Legislature pursuant to Sunset review, it could have a material effect on Oncor's business.*

Sunset review is the regular assessment of the continuing need for a state agency to exist, and is grounded in the premise that an agency will be abolished unless legislation is passed to continue its functions. The Sunset Commission closely reviews each agency and recommends action on each agency to the Texas Legislature, which action may include modifying or even abolishing the agency. Of the agencies scheduled for Sunset review by the Sunset Commission in 2010 and 2011, the following hold primary interest for Oncor: the PUCT, the TCEQ, the OPC, and ERCOT, which are subject to a focused, limited scope, or special purpose review. These agencies, for the most part, govern and operate the electricity markets in Texas upon which Oncor's business model is based. PURA, which expires September 1, 2011, is also subject to Sunset review. If the Texas Legislature fails to renew PURA or any of these agencies, it could result in a significant restructuring of the Texas electricity market or regulatory regime that could have a material impact on Oncor's business. There can be no assurance that future action of the Sunset Commission will not result in legislation that could have a material adverse effect on Oncor and its financial prospects.

*The rates of Oncor's electricity delivery business are subject to regulatory review, and may be reduced below current levels, which could adversely impact Oncor's financial condition and results of operations.*

The rates charged by Oncor are regulated by the PUCT and certain cities and are subject to cost-of-service regulation and annual earnings oversight. This regulatory treatment does not provide any assurance as to achievement of earnings levels. Oncor's rates are regulated based on an analysis of Oncor's costs and capital structure, as reviewed and approved in a regulatory proceeding. While rate regulation is premised on the full recovery of prudently incurred costs and a reasonable rate of return on invested capital, there can be no assurance that the PUCT will judge all of Oncor's costs to have been prudently incurred, that the PUCT will not reduce the amount of invested capital included in the capital structure that Oncor's rates are based upon, or that the regulatory process in which rates are determined will always result in rates that will produce full recovery of Oncor's costs, including regulatory assets reported in Oncor's balance sheet, and the return on invested capital allowed by the PUCT.

In addition, in connection with the Merger, Oncor has made several commitments to the PUCT regarding its rates. For example, Oncor committed that it will, in rate cases after its 2008 general rate case through proceedings initiated prior to December 31, 2012, support a cost of debt that will be no greater than the then-current cost of debt of electric utilities with credit ratings equal to Oncor's ratings as of October 1, 2007. As a result, Oncor may not be able to recover all of its debt costs if they are above those levels.

Any adverse regulatory ruling, including reductions in rates, could have an adverse effect on Oncor's business and results of operations.

*The operation and maintenance of electricity delivery facilities involves significant risks that could adversely affect Oncor's results of operations and financial condition.*

The operation and maintenance of delivery facilities involves many risks, including breakdown or failure of facilities, lack of sufficient capital to maintain the facilities, impact of unusual or adverse weather conditions or other natural events, as well as the risk of performance below expected levels of efficiency or reliability, the occurrence of any of which could result in lost revenues and/or increased expenses that may not be recoverable through rates. A significant number of Oncor's facilities were constructed many years ago. In particular, older transmission and distribution equipment, even if maintained in accordance with good engineering practices, may require significant capital expenditures to keep operating at peak efficiency or reliability. The risk of increased maintenance and capital expenditures arises from damage to facilities due to storms, natural disasters, wars, terrorist acts and other catastrophic events. Further, Oncor's ability to successfully and timely complete capital improvements to existing facilities or other capital projects is contingent upon many variables and subject to

65

EFIHMW00259781

substantial risks. Should any such efforts be unsuccessful, Oncor could be subject to additional costs that may not be recoverable through rates and/or the write-off of its investment in the project or improvement.

Insurance, warranties or performance guarantees may not cover all or any of the lost revenues or increased expenses. Likewise, Oncor's ability to obtain insurance, and the cost of and coverage provided by such insurance, could be affected by events outside Oncor's control.

### Oncor's capital deployment program may not be executed as planned, which could adversely impact Oncor's financial condition and results of operations.

There can be no guarantee that the execution of Oncor's capital deployment program for its electricity delivery facilities will be successful and there can be no assurance that the capital investments Oncor intends to make in connection with its electricity delivery business will produce the desired reductions in cost and improvements to service and reliability. Furthermore, there can be no guarantee that Oncor's capital investments, including its approximate $1.3 billion investment (based on April 2008 ERCOT cost estimates for CREZ construction projects) associated with projects to construct CREZ-related transmission lines and facilities will ultimately be recoverable through rates or, if recovered, that they will be recovered on a timely basis. With the construction of these projects, it is likely Oncor will incur additional material amounts of debt. In addition, Oncor may incur additional material amounts of debt in connection with other investments in infrastructure or technology. For more information regarding the limitation on recovering the value of investments using rates, see "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009—Key Risks and Challenges" included in Annex C to this Prospectus and EFIH and its subsidiaries' historical consolidated financial statements for the year ended December 31, 2009 and the three months ended March 31, 2010 and related notes that are included elsewhere in this Prospectus. There can also be no assurance that the PUCT's award of CREZ construction projects will not be delayed, modified or otherwise vacated through judicial or administrative actions. Three of the CREZ construction projects awarded to Oncor are located in CREZs that are currently subject to a PUCT proceeding that may, if the PUCT determines there is not sufficient financial commitment from the generators of renewable energy for the projects, result in the PUCT delaying the filing of CREZ Certificates of Convenience and Necessity applications. The estimated cost of these construction projects is $380 million. See "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three Months Ended March 31, 2010—Regulation and Rates" included in Annex C in this Prospectus for more information regarding this proceeding.

### Market volatility may have impacts on Oncor's business and financial condition that Oncor currently cannot predict.

Because its operations are capital intensive, Oncor expects to rely over the long term upon access to financial markets as a significant source of liquidity for capital requirements not satisfied by cash-on-hand, operating cash flows or its revolving credit facility. Recently, the capital and credit markets have experienced extreme volatility and disruption. Oncor's ability to access the capital or credit markets may be severely restricted at a time when Oncor would like, or needs, to access those markets, which could have an impact on Oncor's flexibility to react to changing economic and business conditions. In addition, the cost of debt financing may be materially and adversely impacted by these market conditions. Even if Oncor is able to obtain debt financing, it may be unable to recover in rates some or all of the costs of such debt financing as a result of its agreement with the PUCT that it will, in rate cases initiated prior to December 31, 2012, support a cost of debt that will be based on the then-current cost of debt of electric utilities with investment grade credit ratings equal to Oncor's ratings as of October 1, 2007. Accordingly, there can be no assurance that the capital and credit markets will continue to be a reliable or acceptable source of short-term or long-term financing for Oncor. Additionally, disruptions in the capital and credit markets could have a broader impact on the economy in general in ways that could lead to reduced electricity usage, which could have a negative impact on Oncor's revenues, or could have an impact on Oncor's customers, causing them to fail to meet their obligations to Oncor.

Confidential

*Oncor's revenues are concentrated in a small number of customers, and any delay or default in payment could adversely affect its cash flows, financial condition and results of operations.*

Oncor's revenues from the distribution of electricity are collected from more than 70 retail electric providers, including TXU Energy (a subsidiary of TCEH), that sell the electricity Oncor distributes to their customers. Distribution revenues from TCEH represented 38% of Oncor's total revenues for the year ended December 31, 2009 and the three months ended March 31, 2010. Adverse economic conditions, structural problems in the market served by ERCOT or financial difficulties of one or more retail electric providers could impair the ability of these retail providers to pay for Oncor's services or could cause them to delay such payments. Oncor depends on these retail electric providers to timely remit these revenues to Oncor. Oncor could experience delays or defaults in payment from these retail electric providers, which could adversely affect Oncor's cash flows, financial condition and results of operations. Due to the commitments made to the PUCT in connection with the Merger, Oncor may not recover bad debt expense, or certain other costs and expenses, from rate payers in the event of a default or bankruptcy by an affiliate retail electric provider.

*Oncor's ring-fencing measures may not work as planned.*

As discussed above, to enhance the separateness between Oncor Holdings and its direct and indirect subsidiaries (the "Oncor Ring-Fenced Entities") and the Texas Holdings Group, various legal, financial and contractual provisions were implemented. These enhancements are intended to minimize the risk that a court would order any of the Oncor Ring-Fenced Entities' assets and liabilities to be substantively consolidated with those of any member of the Texas Holdings Group (including the Offeror) in the event that a member of the Texas Holdings Group (including the Offeror) were to become a debtor in a bankruptcy case. Nevertheless, bankruptcy courts have broad equitable powers and, as a result, outcomes in bankruptcy proceedings are inherently difficult to predict. Accordingly, if any member of the Texas Holdings Group (including the Offeror) were to become a debtor in a bankruptcy case, there can be no assurance that a court would not order an Oncor Ring-Fenced Entity's assets and liabilities to be substantively consolidated with those of such member of the Texas Holdings Group. See Note 1 to EFIH and its subsidiaries' historical consolidated financial statements for the year ended December 31, 2009 included elsewhere in this Prospectus.

*Oncor's credit ratings could negatively affect Oncor's ability to access capital.*

Downgrades in Oncor's credit ratings would generally cause borrowing costs to increase and the potential pool of investors and funding sources to decrease. In connection with Oncor's execution of the agreement in November 2008 to sell a 19.75% equity interest as discussed in "The Transactions—Sale of Noncontrolling Interests in Oncor", S&P and Moody's upgraded Oncor's credit ratings for senior unsecured debt and senior secured debt from BBB- to BBB+ and from Ba1 to Baa3, respectively.  In June 2009, Moody's upgraded Oncor's credit rating for senior secured debt by two notches from Baa3 to Baa1.  Oncor's credit ratings are currently substantially higher than those of its affiliates, including the Offeror and EFH Corp.  If credit rating agencies were to change their views of Oncor's independence of such affiliates, Oncor's credit ratings would likely decline. In the event any downgrade occurs and causes Oncor's borrowing costs to increase, Oncor may not be able to recover such increased costs if they exceed Oncor's approved cost of debt determined in its 2008 general rate case or subsequent rate cases.

Most of Oncor's large customers, suppliers and counterparties require an expected level of creditworthiness in order for them to enter into transactions with Oncor. If Oncor's credit ratings decline, the costs to operate Oncor's businesses would likely increase because counterparties could require the posting of collateral in the form of cash-related instruments, or counterparties could decline to do business with Oncor.

*Oncor's results of operations and financial condition could be negatively impacted by any development or event beyond Oncor's control that causes economic weakness in the ERCOT market.*

Oncor derives substantially all of its revenues from operations in the ERCOT market, which covers approximately 75% of the geographical area in the State of Texas. As a result, regardless of the state of the economy in areas outside the ERCOT market, economic weakness in the ERCOT market could lead to reduced demand for electricity in the ERCOT market. Such a reduction could have a material negative impact on Oncor's results of operations and financial condition.

Confidential

***In the future, Oncor could have liquidity needs that could be difficult to satisfy under some circumstances, especially in uncertain financial market conditions.***

Oncor's operations are capital intensive. Oncor relies on access to financial markets and its credit facility as a significant source of liquidity for capital requirements not satisfied by cash-on-hand or operating cash flows. The inability to raise capital on favorable terms or access liquidity facilities, particularly during times of uncertainty similar to that which has recently been experienced in the financial markets, could adversely impact Oncor's ability to sustain and grow its businesses and would likely increase capital costs that may not be recoverable through rates. Oncor's access to the financial markets and its credit facility, and the pricing and terms Oncor receives in the financial markets, could be adversely impacted by various factors, such as:

- changes in financial markets that reduce available credit or the ability to obtain or renew liquidity facilities on acceptable terms;

- economic weakness in the ERCOT market;

- changes in interest rates;

- a deterioration of Oncor's credit or a reduction in Oncor's credit ratings;

- a deterioration of the credit of EFH Corp., the Offeror or their other subsidiaries or a reduction in the credit ratings of EFH Corp., the Offeror or their other subsidiaries that is perceived to potentially have an adverse impact on Oncor despite the ring-fencing of the Oncor Ring-Fenced Entities from the Texas Holdings Group;

- a material breakdown in Oncor's risk management procedures; and

- the occurrence of changes in Oncor's businesses that restrict its ability to access its credit facility or the capital markets.

Oncor's primary source of liquidity aside from operating cash flows is its ability to borrow under its revolving credit facility. The facility contains a debt-to-capital ratio covenant that effectively limits Oncor's ability to incur indebtedness in the future. As of March 31, 2010, Oncor was in compliance with such covenant. The credit facility and the existing senior notes issued by Oncor are secured by a deed of trust which permits Oncor to secure other indebtedness with the lien of the deed of trust up to the amount of the available bond credits. As of March 31, 2010 the available bond credits were $2.120 billion. In connection with the Merger, Oncor also committed to the PUCT that it would maintain a regulatory capital structure at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. As of March 31, 2010, Oncor is in compliance with such commitment.

***The litigation environment in which Oncor operates poses a significant risk to its businesses.***

Oncor is involved in the ordinary course of business in a number of lawsuits involving employment, commercial, environmental and injuries and damages issues, among other matters. Judges and juries in the State of Texas have demonstrated a willingness to grant large verdicts, including punitive damages, to plaintiffs in personal injury, property damage and business tort cases. Oncor uses appropriate means to contest litigation threatened or filed against it, but the litigation environment in the State of Texas poses a significant business risk.

***The allocated costs of providing pension and OPEB and related funding requirements are subject to changes in pension fund values, changing demographics and fluctuating actuarial assumptions and may have a material adverse effect on Oncor's results of operations and financial condition.***

Oncor is a participating employer in the pension plan sponsored by EFH Corp. and offers pension benefits based on either a traditional defined benefit formula or a cash balance formula. Oncor also participates in health care and life insurance benefit plans offered by EFH Corp. to eligible employees and their eligible dependents upon

68

EFIHMW00259784

retirement of such employees from Oncor. Oncor's allocated costs of providing such benefits and related funding requirements are dependent upon numerous factors, assumptions and estimates and are subject to changes in these factors, assumptions and estimates, including the market value of the assets funding EFH Corp.'s pension and OPEB plans. Benefits costs and related funding requirements are also subject to changing employee demographics (including but not limited to age, compensation levels and years of accredited service), the level of contributions made to retiree plans, expected and actual earnings on plan assets and the discount rates used in determining the projected benefit obligation. Changes made to the provisions of the plans may also impact current and future benefit costs. Fluctuations in actual market returns as well as changes in general interest rates may result in increased or decreased benefit costs in future periods.

The substantial dislocation in the financial markets that began in 2008 caused the value of the investments that fund EFH Corp.'s pension and OPEB plans to significantly differ from, and may alter the values and actuarial assumptions EFH Corp. uses to calculate, projected future pension plan expense and OPEB costs allocated to Oncor. A continuation or further decline in the value of these investments could increase the expenses of EFH Corp.'s pension plan and the costs of its OPEB plan allocated to Oncor and related funding requirements in the future.

### *Disruptions at power generation facilities owned by third parties could interrupt Oncor's sales of transmission and distribution services.*

The electricity Oncor transmits and distributes to customers of retail electric providers is obtained by the retail electric providers from electricity generation facilities. Oncor does not own or operate any generation facilities. If generation is disrupted or if generation capacity is inadequate, Oncor's sales of transmission and distribution services may be diminished or interrupted, and its results of operations, financial condition and cash flows may be adversely affected.

### *Changes in technology or increased conservation efforts may reduce the value of Oncor's electricity delivery facilities and may significantly impact Oncor's businesses in other ways as well.*

Research and development activities are ongoing to improve existing and alternative technologies to produce electricity, including gas turbines, fuel cells, microturbines, photovoltaic (solar) cells and concentrated solar thermal devices. It is possible that advances in these or other technologies will reduce the costs of electricity production from these technologies to a level that will enable these technologies to compete effectively with traditional generation plants. Changes in technology could also alter the channels through which retail customers buy electricity. To the extent self-generation facilities become a more cost-effective option for certain customers, Oncor's revenues could be materially reduced.

Also, electricity demand could be reduced by increased conservation efforts and advances in technology, which could likewise significantly reduce the value of Oncor's electricity delivery facilities. Certain regulatory and legislative bodies have introduced or are considering requirements and/or incentives to reduce energy consumption by a fixed date. Effective energy conservation by Oncor's customers could result in reduced energy demand, or significantly slow the growth in demand. Such reduction in demand could materially reduce Oncor's revenues. Furthermore, Oncor may incur increased capital expenditures if it is required to invest in conservation measures.

### *The loss of the services of Oncor's key management and personnel could adversely affect Oncor's ability to operate its businesses.*

Oncor's future success will depend on its ability to continue to attract and retain highly qualified personnel. Oncor competes for such personnel with many other companies, in and outside Oncor's industry, government entities and other organizations. Oncor may not be successful in retaining its current personnel or in hiring or retaining qualified personnel in the future. Oncor's failure to attract new personnel or retain its existing personnel could have a material adverse effect on Oncor's businesses.

### *Oncor's revenues and results of operations are seasonal.*

A significant portion of Oncor's revenues is derived from rates that Oncor collects from each retail electric provider based on the amount of electricity Oncor distributes on behalf of such retail electric provider. Sales of

Confidential

EFIHMW00259785

electricity to residential and commercial customers are influenced by temperature fluctuations. Thus, Oncor's revenues and results of operations are subject to seasonality, weather conditions and other electricity usage drivers, with revenues being highest in the summer.

*As was the case in the fourth quarter 2008 (as discussed in "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009 — Significant Activities and Events" included in Annex C in this Prospectus), goodwill that Oncor has recorded in connection with the Merger is subject to at least annual impairment evaluations and as a result, Oncor could be required to write off some or all of this goodwill, which may cause adverse impacts on Oncor's financial condition and results of operations.*

In accordance with accounting standards, goodwill recorded in connection with the Merger is not amortized but is reviewed annually or more frequently for impairment, if certain conditions exist, and may be impaired. Any reduction in or impairment of the value of goodwill will result in a charge against Oncor's earnings, which could cause a material adverse impact on Oncor's reported results of operations and financial position.

70

Confidential

## USE OF PROCEEDS

Neither the Offeror nor EFH Corp. will receive any cash proceeds from the exchange offers or the consent solicitation. Any Old Notes accepted for exchange in the exchange offers may remain outstanding and held by EFIH, EFH Corp., or another subsidiary of EFH Corp. or be retired and cancelled.

The Offeror intends to fund all cash payable to holders pursuant to the exchange offers with cash on hand and with contributions or loans from EFH Corp.  EFH Corp. intends to fund all cash consent payments payable pursuant to the consent solicitation with cash on hand.

**[Each member of the Sponsor Group has advised us that it, and the affiliates that it controls, in the aggregate, own an insignificant amount of Old Notes, and it and/or such affiliates may participate in the exchange offers and consent solicitation. Such participation, if any, will be on the same terms and subject to the same conditions set forth in this Prospectus applicable to other holders of the respective Old Notes held by the Sponsor Group and such affiliates. Old Notes held by the Sponsor Group and such affiliates will not be considered outstanding for the purposes of determining whether the holders of the required outstanding principal amount of the Old Notes have delivered Consents necessary to adopt the Proposed Amendments.] [Confirm.]**

An affiliate of Goldman Sachs, a member of the Sponsor Group, is acting as a Dealer Manager and will receive compensation for acting as such as described under "Exchange Agent; Information Agent; Dealer Managers and Solicitation Agents; Other Advisors—Dealer Managers and Solicitation Agents."

Confidential

EFIHMW00259787

PX 027
Page 81 of 232

# CAPITALIZATION

**EFH Corp.**

The following table sets forth as of March 31, 2010, EFH Corp.'s cash and cash equivalents and capitalization of EFH Corp. and certain of its subsidiaries:

(1) on an actual basis;

(2) on an as adjusted basis to give effect to the April 2010 Exchanges, the May 2010 Exchange, the May 2010 Note Repurchases, the June 2010 Note Repurchase, the June 2010 Exchanges, the July 2010 Exchanges and the May 2010 PIK Payment; and **[Amounts to be updated when column 3 is completed.]**

(3) on an adjusted basis to give effect to the completion of the exchange offers, assuming **[[____]% participation in the exchange offers at or prior to the Early Tender Date, no subsequent withdrawals and no participation in the exchange offers after the Early Tender Date.]**

| | As of March 31, 2010 | | |
| --- | --- | --- | --- |
| | Actual | As Adjusted | As Further Adjusted (a) |
| | (millions of dollars) | | |
| Cash and cash equivalents ......................................... | $    1,328 | $    [1,263] | $    [____] |
| Debt: | | | |
| EFH Corp.: | | | |
| 5.55% Series P Senior Notes due 2014 .......................... | [983] | [983] | [____] |
| 6.50% Series Q Senior Notes due 2024 .......................... | 740 | 740 | [____] |
| 6.55% Series R Senior Notes due 2034 .......................... | 744 | 744 | [____] |
| 10.875% Senior Notes due 2017 .................................. | 1,831 | 1,819 | [____] |
| 11.250%/12.000% Senior Toggle Notes due 2017 ................ | 2,777 | 2,809 | [____] |
| 9.75% Senior Secured Notes due 2019 ........................... | 115 | 115 | [____] |
| 10.000% Senior Secured Notes due 2020 ......................... | 534 | 606 | [____] |
| Capital lease obligations ......................................... | 6 | 6 | [____] |
| Unamortized fair value discount .................................. | (583) | (583) | [____] |
| Total EFH Corp. debt ............................................. | 7,147 | 7,239 | [____] |
| EFIH: (b) | | | |
| 9.75% Senior Secured Notes due 2019 ........................... | 141 | 141 | [____] |
| 10.000% Senior Secured Notes due 2020 offered hereby .......... | — | — | [____] |
| Unamortized discount on New EFIH Senior Secured Notes ........ | — | — | [____] |
| Total EFIH debt ................................................. | 141 | 141 | [____] |
| EFCH: (c) | | | |
| Secured debt ...................................................... | 89 | 89 | [____] |
| Unsecured debt .................................................... | 9 | 9 | [____] |
| Total EFCH debt ................................................. | 98 | 98 | [____] |
| TCEH: | | | |
| TCEH Senior Secured Facilities ................................... | 21,606 | 21,606 | [____] |
| TCEH Notes ........................................................ | 4,857 | 4,823 | [____] |
| TCEH Toggle Notes ................................................ | 1,925 | 2,016 | [____] |
| Other secured debt (d) ........................................... | 517 | 517 | [____] |
| Other unsecured debt .............................................. | 1,397 | 1,397 | [____] |
| Total TCEH debt ................................................. | 30,302 | 30,359 | [____] |
| Debt of Other Subsidiaries: | | | |
| Secured debt (e) .................................................. | 87 | 87 | [____] |
| Total consolidated debt .......................................... | 37,775 | 37,924 | [____] |
| Total shareholders' equity ....................................... | (2,859) | (2,821) | [____] |
| Noncontrolling interest in subsidiaries .......................... | 54 | 54 | [____] |
| Total capitalization ............................................. | $    34,970 | $    35,157 | $    [____] |

(a)    **[TBD]**
(b)    Excludes EFIH's guarantees of the Old Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes.
(c)    Excludes EFCH's guarantees of the Old Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes.
(d)    Includes $393 million of funding under the accounts receivable securitization program.
(e)    Consists of a building finance lease.

72

EFIHMW00259788

**EFIH**

The following table sets forth as of March 31, 2010, EFIH's cash and cash equivalents and capitalization of EFIH and certain of its subsidiaries:

(1) on an actual basis; and

(2) on an as adjusted basis to give effect to the April 2010 Exchanges, the May 2010 Exchange, the May 2010 Note Repurchases, the June 2010 Note Repurchase, the June 2010 Exchanges, the July 2010 Exchanges and the May 2010 PIK Payment; and **[Amounts to be updated when column 3 is completed.]**

(3) on an adjusted basis to give effect to the completion of the exchange offers, assuming **[|___|]% participation in exchange offers at or prior to the Early Tender Date, no subsequent withdrawals and no participation in the exchange offers after the Early Tender Date.]**

| | As of March 31, 2010 | | |
| --- | --- | --- | --- |
| | Actual | As Adjusted | As Further Adjusted |
| | | (millions of dollars) | |
| Cash and cash equivalents .......................................................... | $    30 | $    30 | $    [       ] |
| Debt: | | | |
| EFIH: | | | |
| 10.875% EFH Corp. Senior Notes due 2017 (a)(b)................................ | 916 | 910 | [       ] |
| 11.250%/12.000% EFH Corp. Senior Toggle Notes due 2017 (a)(b) ........... | 1,389 | 1,405 | [       ] |
| 9.75% EFH Corp. Senior Secured Notes due 2019 (a) .......................... | 57 | 57 | [       ] |
| 10.000% EFH Corp. Senior Secured Notes due 2020 (a)(b)..................... | 17 | 85 | [       ] |
| 9.75% Senior Secured Notes due 2019 ......................................... | 141 | 141 | [       ] |
| 10.000% Senior Secured notes due 2020 offered hereby......................... | — | — | [       ] |
| Unamortized discount on 10.000% Senior Secured Notes due 2020 offered hereby | — | — | [       ] |
| Total consolidated debt ........................................................ | 2,520 | 2,598 | [       ] |
| Total membership interest (b) .................................................. | 3,003 | 3,006 | [       ] |
| Total capitalization............................................................. | $  5,523 | $  5,604 | $    [       ] |

(a)    Represents 50% of the principal amount of EFH Corp. debt guaranteed by EFIH (pushed-down debt), as discussed in Note 3 to EFIH and its subsidiaries' historical condensed consolidated financial statements for the three months ended March 31, 2010 included elsewhere in this Prospectus.

(b)    "As Adjusted" and "As Further Adjusted" amounts include push down effects (arising from the EFIH guarantee) of the retirement of Old Notes and the issuance of EFH Corp. 10.000% Notes.

Confidential

## THE TRANSACTIONS

**The Merger**

On October 10, 2007, the Merger occurred. Upon the effectiveness of the Merger, each share of EFH Corp. common stock outstanding immediately prior to the Merger (other than shares held by EFH Corp. or any of its subsidiaries or Texas Holdings or any of its subsidiaries, including Merger Sub, in each case not held on behalf of third parties, or shares held by holders who properly exercised their rights of dissent and appraisal under Texas law) was cancelled and converted into the right to receive $69.25 in cash, without interest and less any applicable withholding taxes.

**Equity Contributions**

At the closing of the Merger, Texas Holdings received an aggregate equity investment of approximately $8.3 billion. Investment funds affiliated with the Sponsor Group, or their respective assignees, contributed approximately $5.1 billion to Texas Holdings. The Sponsor Group consists of investment funds associated with or designated by KKR, TPG and Goldman Sachs who, along with certain other co-investors, own EFH Corp. through Texas Holdings, with the Sponsor Group controlling Texas Holdings' general partner, Texas Energy Future Capital Holdings LLC. In addition, Citigroup Global Markets Inc., a Dealer Manager with respect to the exchange offers and a solicitation agent with respect to the consent solicitation, and Morgan Stanley & Co. Incorporated, or their respective affiliates, each made equity investments of approximately $250 million in Texas Holdings. The Sponsor Group obtained approximately $2.3 billion in equity investments from other existing investors in KKR's and TPG's private equity funds and other third party investors. Following the closing of the Merger and as of the date of this Prospectus, the Sponsor Group owned approximately 62% of the limited partnership units issued by Texas Holdings in connection with the Merger.

The equity contributions by the Sponsor Group and the Investors are referred to in this Prospectus as the "Equity Contributions."

**Debt Financing**

In connection with the Merger, in addition to the Equity Contributions described above, EFH Corp. and/or its subsidiaries entered into the following debt financing arrangements, in each case, arranged by a consortium of arrangers and bookrunners:

- The TCEH Senior Secured Facilities, which are guaranteed by EFCH and subsidiaries of TCEH;

- a $6.75 billion senior unsecured interim loan facility of TCEH (the "TCEH Senior Interim Facility"), which was used to fund the Merger and related transactions; and

- a $4.5 billion senior unsecured interim loan facility of EFH Corp. (the "EFH Senior Interim Facility"), which was used to fund the Merger and related transactions.

In October and December 2007, TCEH and TCEH Finance, Inc. issued $6.75 billion aggregate principal amount of the TCEH Notes in two private offerings. The proceeds from the offerings of the TCEH Notes, along with cash on hand, were used by TCEH to repay in full the TCEH Senior Interim Facility.

In October 2007, EFH Corp. issued the Old Notes in a private offering. The proceeds from the offering of the Old Notes, along with cash on hand, were used by EFH Corp. to repay in full the EFH Senior Interim Facility.

We refer to the above, collectively, as the "Debt Financing."

Concurrently with the transactions described above, Oncor entered into a $2.0 billion senior revolving credit facility (the "Oncor Revolving Credit Facility"), which may be increased by up to $500 million, subject to certain conditions, which is being used by Oncor for working capital and for other general corporate purposes. No portion of the Oncor Revolving Credit Facility was used to finance the Merger or the debt repayment that occurred in connection with the Merger.

Confidential

EFIHMW00259790

We refer to the transactions listed above, including the Merger and the application of the proceeds of the Equity Contributions and the Debt Financing, as the "Transactions."

**Ring-Fencing**

Upon the consummation of the Merger, EFH Corp. and Oncor implemented several measures that are referred to as "ring-fencing." Such measures included, among others, the following:

- the conversion of Oncor from a Texas corporation to a Delaware limited liability company;

- the inclusion of covenants in Oncor Holdings' and Oncor's limited liability company agreements intended to enhance the separation of Oncor Holdings and its subsidiaries, including Oncor, from Texas Holdings and its other subsidiaries, including EFIH;

- the establishment of boards of directors for Oncor Holdings and Oncor with a majority of members who meet the New York Stock Exchange requirements for independence in all material respects and whose unanimous consent is required to take certain material actions, including (i) to consolidate or merge (A) with EFH Corp. or any of EFH Corp.'s other subsidiaries or (B) with any other entity, if Oncor Holdings or Oncor, as applicable, would not be the surviving entity; (ii) to sell, transfer or dispose of all or substantially all of the assets of Oncor Holdings or Oncor, as applicable, without adequate provision for the payment of all of such entity's creditors; (iii) to institute, or consent to the institution of, bankruptcy or similar proceedings in respect of Oncor Holdings or Oncor, as applicable; or (iv) to the fullest extent permitted by law, to dissolve or liquidate Oncor Holdings or Oncor, as applicable, without adequate provision for the payment of all of such entity's creditors;

- the specific delegation to each of the board of directors and the independent directors of Oncor, each acting by majority vote, of the right to prevent distributions, if it or they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements;

- after the appointment of the initial independent directors, the delegation of the ability to nominate, appoint and fill vacancies in respect of the independent directors of Oncor Holdings and Oncor to a standing nominating committee of Oncor Holdings' board of directors, a majority of whose members are independent directors; and

- the incurrence of new indebtedness, evidenced by the Oncor Revolving Credit Facility, the lenders of which will be specifically relying on the separateness of Oncor Holdings and Oncor, and their assets, from Texas Holdings and its other subsidiaries.

The ring-fencing measures were based on certain principles articulated by rating agencies and certain commitments made by Texas Holdings and Oncor to the PUCT and the FERC intended to further separate Oncor from Texas Holdings and its subsidiaries and to mitigate Oncor's credit exposure to those entities and to reduce the risk that the assets and liabilities of Oncor Holdings or of any of its subsidiaries would be substantively consolidated with the assets and liabilities of Texas Holdings or of any of its other subsidiaries in the event of a bankruptcy of one or more of those entities. A number of ring-fencing measures put in place were incorporated into a PUCT order that is legally binding on Oncor.

None of the ring-fenced entities guarantees or otherwise holds out its credit as being available to support the obligations of EFH Corp., EFIH or any of their subsidiaries (other than the ring-fenced entities), including with respect to the New EFIH Senior Secured Notes offered hereby. In addition, lenders under the TCEH Senior Secured Facilities and the holders of the EFH Corp. 10.000% Notes, the EFH Corp. 9.75% Notes, the EFIH 9.75% Notes, the Old Notes and the TCEH senior notes have acknowledged, and the future holders of such notes will acknowledge, by acceptance of such notes, the legal separateness of Oncor and its subsidiaries from the borrowers and guarantors under such financing documents. Lenders under the TCEH Senior Secured Facilities and the holders of the EFH Corp. 10.000% Notes, the EFH Corp. 9.75% Notes, the EFIH 9.75% Notes, the Old Notes and the TCEH senior notes also agreed, and the future holders of such notes will agree, by acceptance of such notes, that they will not

75

EFIHMW00259791

initiate any bankruptcy or similar proceeding against Oncor Holdings or its subsidiaries and that Oncor Holdings and its subsidiaries are entitled to enforce this non-petition covenant. In addition, holders of New EFIII Senior Secured Notes, by acceptance of such notes, will acknowledge the legal separateness of Oncor and its subsidiaries from the Offeror under such financing documents. Holders of New EFIH Senior Secured Notes, by acceptance of such notes, will also agree that they will not initiate any bankruptcy or similar proceeding against Oncor Holdings or its subsidiaries and that Oncor Holdings and its subsidiaries are entitled to enforce this non-petition covenant.

**Sale of Noncontrolling Interests in Oncor**

In November 2008, Oncor issued and sold additional equity interests to Texas Transmission for $1.254 billion in cash. At the closing of the sale, Oncor also offered and sold additional equity interests to Oncor Management Investment LLC, an entity owned by certain members of Oncor's management, for the same price per unit of equity interest paid by Texas Transmission. Accordingly, the equity issuances resulted in EFH Corp. and EFIH indirectly owning 80.04% of Oncor, certain members of Oncor management indirectly owning 0.21% of Oncor and Texas Transmission owning 19.75% of Oncor.

The investor rights agreement dated as of November 5, 2008, by and among Oncor, Oncor Holdings, Texas Transmission, EFH Corp. and any other persons that subsequently become a party thereto (the "Investor Rights Agreement") governs certain rights of certain members of Oncor and EFH Corp. arising out of their direct or indirect ownership of Oncor membership interests, including, without limitation, transfers of Oncor membership interests and restrictions thereon. Among other transfer restrictions, the Investor Rights Agreement provides that, prior to the earlier of the completion of a qualified initial public offering or seven years from the date of the Investor Rights Agreement, Texas Transmission may transfer its Oncor membership interests only to certain permitted transferees or with the prior approval of Oncor Holdings. Following such time period, Texas Transmission may transfer its Oncor membership interests under a registration statement or pursuant to applicable securities laws. The Investor Rights Agreement also grants Texas Transmission certain "tag-along" rights in relation to certain sales, transfers or pledges of Oncor membership interests by Oncor Holdings or indirectly by EFH Corp. or its subsidiaries. Subject to certain conditions, these "tag-along" rights allow Texas Transmission to transfer a pro-rata portion of its Oncor membership interests in the event of a transfer of Oncor membership interests by Oncor Holdings or indirectly by EFH Corp. or its subsidiaries on the same terms as Oncor Holdings, EFH Corp. or a subsidiary of EFH Corp. would receive for the Oncor membership interests. The agreement further provides that under certain offerings of equity securities occurring before an initial public offering of Oncor, Texas Transmission and Oncor Holdings will receive preemptive rights to purchase their pro-rata share of the equity securities to be sold pursuant to such offerings. The Investor Rights Agreement also provides EFH Corp. with a right of first refusal to purchase any Oncor membership interests to be sold in a permitted sale by Texas Transmission or its permitted transferees.

Additionally, Texas Holdings, EFH Corp., certain of EFH Corp.'s subsidiaries and Oncor Holdings have certain "drag-along" rights in relation to offers from third-parties to purchase their directly or indirectly owned membership interests in Oncor, where the resulting sale would constitute a change of control of Oncor. These "drag-along" rights compel Texas Transmission and all other members of Oncor to sell or otherwise transfer their membership interests in Oncor on substantially the same terms as Texas Holdings, EFH Corp., the EFH Corp. subsidiary or Oncor Holdings (as applicable). Pursuant to the Investor Rights Agreement, all members of Oncor that have entered into such agreement must cooperate with Oncor in connection with an initial public offering of Oncor.

Confidential

EFIHMW00259792

## SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA FOR
## EFH CORP. AND ITS SUBSIDIARIES

The following table sets forth our selected historical consolidated financial data as of and for the periods indicated. The selected historical financial data as of December 31, 2009 and 2008 (Successor) and for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) have been derived from our audited historical consolidated financial statements and related notes included elsewhere in this Prospectus. The historical financial data as of December 31, 2007 (Successor), 2006 (Predecessor) and 2005 (Predecessor) and for the years ended December 31, 2006 and 2005 (Predecessor) have been derived from our audited historical consolidated financial statements that are not included in this Prospectus. The "Predecessor" period reflects the period prior to the Merger, which occurred on October 10, 2007. The historical financial data as of March 31, 2010 and for the three months ended March 31, 2010 and 2009 have been derived from our unaudited historical interim condensed consolidated financial statements and related notes included elsewhere in this Prospectus. In EFH Corp.'s opinion, such unaudited interim financial data reflects all adjustments, consisting of normal recurring accruals, necessary for the fair presentation of the results for those periods. The results of operations for the interim periods, for seasonal and other factors, are not necessarily indicative of the results to be expected for the full year or any future period.

The selected historical consolidated financial data should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009" and "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three Months Ended March 31, 2010," each included in Annex B to this Prospectus, and our historical consolidated financial statements and related notes that are included elsewhere in this Prospectus.

| | Successor | | | | Predecessor | | |
| | Year Ended December 31, | | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, | |
| | 2009 | 2008 | | | 2006 | 2005 |
| | (millions of dollars, except ratios) | | | | | |
| Operating Revenues .......................... | $ 9,546 | $ 11,364 | $ 1,994 | $ 8,044 | $ 10,703 | $ 10,826 |
| Income (loss) from continuing operations before extraordinary loss and cumulative effect of changes in accounting principles ..................... | 408 | (9,998) | (1,361) | 699 | 2,465 | 1,775 |
| Income from discontinued operations, net of tax effect .............................................. | — | — | 1 | 24 | 87 | 5 |
| Extraordinary loss, net of tax effect ................. | — | — | — | — | — | (50) |
| Cumulative effect of changes in accounting principles, net of tax effect ......................... | — | — | — | — | — | (8) |
| Preference stock dividends ......................... | — | — | — | — | — | 10 |
| Net income (loss) .................................... | 408 | (9,998) | (1,360) | 723 | 2,552 | 1,712 |
| Net income (loss) attributable to noncontrolling interests ....................................... | (64) | 160 | — | — | — | — |
| Net income (loss) attributable to EFH Corp. ...... | 344 | (9,838) | (1,360) | 723 | 2,552 | 1,712 |
| Ratio of earnings to fixed charges (a) ............... | 1.24 | — | — | 2.30 | 5.11 | 3.80 |
| Ratio of earnings to combined fixed charges and preference dividends (a) ......................... | 1.24 | — | — | 2.30 | 5.11 | 3.74 |
| Embedded interest cost on long-term debt—end of period (b) ....................................... | 7.2% | 9.2% | 9.5% | 6.5% | 6.6% | 6.3% |
| Capital expenditures, including nuclear fuel ......... | $ 2,545 | $ 3,015 | $ 716 | $2,542 | $2,337 | $1,148 |

Confidential

| | Successor | | | | Predecessor | |
| | December 31, | | | | December 31, | |
| | **2009** | | **2008** | | **2007** | | **2006** | | **2005** |
| | (millions of dollars, except ratios) | | | | | |
| Total assets—end of year | $ | 59,662 | $ | 59,263 | $ | 64,804 | $ | 27,216 | $ | 27,978 |
| Property, plant & equipment—net—end of year | $ | 30,018 | $ | 29,522 | $ | 28,650 | $ | 18,569 | $ | 17,006 |
| Goodwill and intangible assets—end of year | $ | 17,192 | $ | 17,379 | $ | 27,319 | $ | 729 | $ | 728 |
| | | | | | | |
| Capitalization—end of year | | | | | | |
| Equity-linked debt securities | $ | — | $ | — | $ | — | $ | — | $ | 179 |
| All other long-term debt, less amounts due currently | | 41,440 | | 40,838 | | 38,603 | | 10,631 | | 11,153 |
| Preferred stock of subsidiaries (not subject to mandatory redemption) (c) | | — | | — | | — | | — | | — |
| EFH Corp. common stock equity | | (3,247) | | (3,673) | | 6,685 | | 2,140 | | 475 |
| Noncontrolling interests in subsidiaries | | 1,411 | | 1,355 | | — | | — | | — |
| Total | $ | 39,604 | $ | 38,520 | $ | 45,288 | $ | 12,771 | $ | 11,807 |
| | | | | | | |
| Capitalization ratios—end of year | | | | | | |
| Equity-linked debt securities | | — % | | — % | | — % | | — % | | 1.5% |
| All other long-term debt, less amounts due currently | | 104.6 | | 106.0 | | 85.2 | | 83.2 | | 94.5 |
| Preferred stock of subsidiaries (c) | | — | | — | | — | | — | | — |
| EFH Corp. common stock equity | | (8.2) | | (9.5) | | 14.8 | | 16.8 | | 4.0 |
| Noncontrolling interests in subsidiaries | | 3.6 | | 3.5 | | — | | — | | — |
| Total | | 100.0% | | 100.0% | | 100.0% | | 100.0% | | 100.0% |
| | | | | | | |
| Short-term borrowings—end of year | $ | 1,569 | $ | 1,237 | $ | 1,718 | $ | 1,491 | $ | 798 |
| Long-term debt due currently—end of year | $ | 417 | $ | 385 | $ | 513 | $ | 485 | $ | 1,250 |

(a)   Fixed charges exceeded "earnings" (net loss) by $10.469 billion and $2.034 billion for the year ended December 31, 2008 and for the period from October 11, 2007 through December 31, 2007, respectively.

(b)   Represents the annual interest using year-end rates for variable rate debt and reflecting the effects of interest rate swaps (excluding unrealized mark-to-market gains or losses) and amortization of any discounts, premiums, issuance costs and any deferred gains/losses on reacquisitions divided by the carrying value of the debt plus or minus the unamortized balance of any discounts, premiums, issuance costs and gains/losses on reacquisitions at the end of the year.

(c)   Preferred stock outstanding at the end of 2008, 2007, 2006 and 2005 has a stated amount of $51 thousand.  There was no outstanding preferred stock at the end of 2009.

Note:  Although EFH Corp. continued as the same legal entity after the Merger, its "Selected Historical Consolidated Financial Data" for periods preceding the Merger and for periods succeeding the Merger are presented as the consolidated financial statements of the "Predecessor" and the "Successor," respectively.  See "Basis of Presentation in Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009.  The consolidated financial statements of the Successor reflect the application of "purchase accounting."  Results for 2008 were significantly impacted by impairment charges related to goodwill, trade name and emission allowances intangible assets and natural gas-fueled generation facilities.

| | Successor | | | |
| | Three Months Ended March 31, 2010 | | Three Months Ended March 31, 2009 | |
| | (millions of dollars, except ratios) | | | |
| Operating revenues | $ | 1,999 | $ | 2,139 |
| | | | | |
| Net income (loss) | $ | 355 | $ | 454 |
| Net income attributable to noncontrolling interests | $ | — | $ | (12) |
| Net income (loss) attributable to EFH Corp. | $ | 355 | $ | 442 |
| | | | | |
| Ratio of earnings to fixed charges | | 1.56 | | 2.02 |
| Ratio of earnings to combined fixed charges and preference dividends | | 1.56 | | 2.02 |
| | | | | |
| Capital expenditures, including nuclear fuel | $ | 372 | $ | 646 |

Confidential

EFIHMW00259794

**PX 027**
**Page 88 of 232**

| | | Successor |
|---|---|---|
| | | March 31, 2010 |
| | | (millions of dollars, except ratios) |
| Total assets | $ | 52,794 |
| Property, plant & equipment—net | $ | 21,173 |
| Goodwill and intangible assets | $ | 12,820 |
| Capitalization | | |
| Long-term debt, less amounts due currently | $ | 36,879 |
| EFH Corp. shareholders' equity | | (2,859) |
| Noncontrolling interests in subsidiaries | | 54 |
| Total | $ | 34,074 |
| Capitalization ratios | | |
| Long-term debt, less amounts due currently | | 108.2% |
| EFH Corp. shareholders' equity | | (8.4) |
| Noncontrolling interests in subsidiaries | | 0.2 |
| Total | | 100.0% |
| Short-term borrowings | $ | 646 |
| Long-term debt due currently | $ | 250 |
| Embedded interest cost on long-term debt—end of period (a) | | 5.3% |

(a)    Represents the annual interest using end of period rates for variable rate debt and reflecting the effects of interest rate swaps (excluding unrealized mark-to-market gains or losses) and amortization of any discounts, premiums, issuance costs and any deferred gains/losses on reacquisitions divided by the carrying value of the debt plus or minus the unamortized balance of any discounts, premiums, issuance costs and gains/losses on reacquisitions at the end of the period.

### Quarterly Information (unaudited)

Results of operations by quarter are summarized below. In the opinion of EFH Corp., all adjustments (consisting of normal recurring accruals) necessary for a fair statement of such amounts have been made. Quarterly results are not necessarily indicative of a full year's operations because of seasonal and other factors. All amounts are in millions of dollars.

| | | Successor |
|---|---|---|
| | | First Quarter |
| **2010:** | | |
| Operating revenues | $ | 1,999 |
| Net income | | 355 |
| Net income attributable to EFH Corp. | $ | 355 |

| | Successor | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| **2009:** | | | | |
| Operating revenues | $ 2,139 | $ 2,342 | $ 2,885 | $ 2,180 |
| Net income (loss) | 454 | (139) | (54) | 147 |
| Net loss attributable to noncontrolling interests | (12) | (16) | (26) | (10) |
| Net income (loss) attributable to EFH Corp. | $ 442 | $ (155) | $ (80) | $ 137 |

| | Successor | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| **2008:** | | | | |
| Operating revenues | $ 2,354 | $ 2,951 | $ 3,695 | $ 2,364 |
| Net income (loss) | (1,269) | (3,331) | 3,617 | (9,015) |
| Net loss attributable to noncontrolling interests | — | — | — | 160 |
| Net income (loss) attributable to EFH Corp. | $ (1,269) | $ (3,331) | $ 3,617 | $ (8,855) |

Confidential

EFIHMW00259795

## SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA FOR
## EFIH AND ITS SUBSIDIARIES

The following table sets forth EFIH and its subsidiaries' selected historical consolidated financial data as of and for the periods indicated. The selected historical financial data as of December 31, 2009 and 2008 (Successor) and for the years and ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor) and the period from January 1, 2007 through October 10, 2007 (Predecessor) have been derived from EFIH and its subsidiaries' audited historical consolidated financial statements and related notes included elsewhere in this Prospectus. The historical financial data as of December 31, 2009 (Successor) reflects Oncor accounted for under the equity method. The historical financial data as of December 31, 2006 (Predecessor) and 2005 (Predecessor) and for the years ended December 31, 2006 and 2005 (Predecessor) reflect Oncor accounted for under the equity method; EFIH was formed at the time of the Merger, and its predecessor is Oncor. The historical financial data as of March 31, 2010 and for the three months ended March 31, 2010 and 2009 have been derived from EFIH and its subsidiaries' unaudited historical interim condensed consolidated financial statements and related notes included elsewhere in this Prospectus. In EFIH's opinion, such unaudited interim financial data reflects all adjustments, consisting of normal recurring accruals, necessary for the fair presentation of the results for those periods. The results of operations for the interim periods, for seasonal and other factors, are not necessarily indicative of the results to be expected for the full year or any future period.

The selected historical consolidated financial data should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009" and "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three Months Ended March 31, 2010," each included in Annex C to this Prospectus, and our historical consolidated financial statements and related notes that are included elsewhere in this Prospectus.

| | Successor (a) | | | Predecessor (a) | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, | |
| | 2009 | 2008 | | | 2006 | 2005 |
| | (millions of dollars, except ratios) | | | | | |
| Income (loss) before income taxes and equity in earnings of unconsolidated subsidiary | $ (275) | $ (260) | $ (68) | $ — | $ — | $ — |
| Equity in earnings (losses) of unconsolidated subsidiary (net of tax) (b) | 256 | (323) | 64 | 263 | 344 | 351 |
| Net income (loss) | 74 | (495) | 19 | 263 | 344 | 351 |
| Ratio of earnings to fixed charges (c) | — | 1.27 | — | — | — | — |
| Embedded interest cost on long-term debt—end of period (d) | 11.4% | 11.6% | 11.6% | — | — | — |

(a)    EFIH and Oncor Holdings were formed at the time of the Merger; consequently, Predecessor data represents Oncor presented under the equity method of accounting. The consolidated financial statements of the Successor reflect the application of purchase accounting.

(b)    Amount in 2008 includes the effect of Oncor's $860 million goodwill impairment charge.

(c)    Fixed charges exceeded earnings (net loss) by $59 million and $68 million for the year ended December 31, 2009 and for the period from October 11, 2007 through December 31, 2007, respectively.  There were no fixed charges for the predecessor periods.

(d)    Represents the annual interest and amortization of any discounts, premiums, issuance costs and any deferred gains/losses on reacquisitions divided by the carrying value of the debt plus or minus the unamortized balance of any discounts, premiums, issuance costs and gains/losses on reacquisitions at the end of the year and excludes advances from affiliates.

80

Confidential

| | Successor (a) | | | Predecessor (a) | |
| | December 31, | | | December 31, | |
| | **2009** | **2008** | **2007** | **2006** | **2005** |
| | (millions of dollars, except ratios) | | | | |
| Total assets—end of year | $    5,577 | $    5,363 | $    7,732 | $    2,975 | $    2,935 |
| | | | | | |
| Capitalization—end of year | | | | | |
| Long-term debt (b) | $    2,513 | $    2,250 | $    2,250 | $    — | $    — |
| Membership interest | 3,010 | 3,069 | 5,439 | 2,975 | 2,935 |
| Total | $    5,523 | $    5,319 | $    7,689 | $    2,975 | $    2,935 |
| Capitalization ratios—end of year | | | | | |
| Long-term debt (b) | 45.5% | 42.3% | 29.3% | — | — |
| Membership interest | 54.5 | 57.7 | 70.7 | 100.0 | 100.0 |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

(a)    EFIH and Oncor Holdings were formed at the time of the Merger; consequently, Predecessor data represents Oncor presented under the equity method of accounting.  The consolidated financial statements of the Successor reflect the application of purchase accounting.
(b)    Reflects push down of certain EFH Corp. (parent) debt due to EFIH's guarantee of the debt.

| | Successor | |
| | Three Months Ended March 31, 2010 | Three Months Ended March 31, 2009 |
| Loss before income taxes and equity earnings of unconsolidated subsidiary | $                (72) | $                (69) |
| Equity in earnings of unconsolidated subsidiary (net of tax) | 63 | 47 |
| Net income | 15 | 1 |
| | | |
| Ratio of earnings to fixed charges (a) | — | — |

| | Successor |
| | March 31, 2010 |
| | (millions of dollars, except ratios) |
| Total assets | $        5,645 |
| | |
| Capitalization | |
| Long-term debt (b) | $        2,520 |
| Membership interest | 3,003 |
| | |
| Total | $        5,523 |
| | |
| Capitalization ratios | |
| Long-term debt (b) | 45.6% |
| Membership interest | 54.4 |
| | |
| Total | 100.0% |
| Embedded interest cost on long-term debt—end of period | 11.3% |

(a)    Fixed charges exceeded earnings by $42 million and $51 million for the three months ended March 31, 2010 and 2009, respectively.
(b)    Reflects push down of certain EFH Corp. (parent) debt due to EFIH's guarantee of the debt.

81

EFIHMW00259797

**PX 027**
**Page 91 of 232**

**Quarterly Information (unaudited)**

Results of operations by quarter are summarized below. In the opinion of EFIH, all adjustments (consisting of normal recurring accruals) necessary for a fair statement of such amounts have been made. Quarterly results are not necessarily indicative of a full year's operations because of seasonal and other factors. All amounts are in millions of dollars.

| | Successor |
|---|---|
| | First Quarter |
| **2010:** | |
| Loss before income taxes and equity in earnings of unconsolidated subsidiary | $ (72) |
| Equity in earnings of unconsolidated subsidiary (net of tax) | 63 |
| Net income | 15 |

| | Successor | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| **2009:** | | | | |
| Loss before income taxes and equity earnings of unconsolidated subsidiary | $ (69) | $ (69) | $ (69) | $ (68) |
| Equity in earnings of unconsolidated subsidiary (net of tax) | 47 | 66 | 105 | 38 |
| Net income (loss) | 1 | 20 | 59 | (6) |

| | Successor | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter (a) |
| **2008:** | | | | |
| Loss before income taxes and equity earnings of unconsolidated subsidiary | $ (66) | $ (66) | $ (63) | $ (65) |
| Equity in earnings of (losses) of unconsolidated subsidiary (net of tax) | 85 | 85 | 139 | (632) |
| Net income (loss) | 41 | 41 | 96 | (673) |

_____

(a)    Equity in earnings (losses) of unconsolidated subsidiary (net of tax) includes the effects of Oncor's $860 million goodwill impairment charge.

82

## GENERAL TERMS OF THE EXCHANGE OFFERS AND CONSENT SOLICITATION

**Purpose of the Exchange Offers and Consent Solicitation**

The purpose of the exchange offers is to reduce the outstanding principal amount, and extend the weighted average maturity of, the long-term debt of EFH Corp. and its subsidiaries. The purpose of the consent solicitation is to adopt the Proposed Amendments which will provide EFH Corp. and its subsidiaries additional financial and operational flexibility.

**General**

Upon the terms and subject to the conditions set forth in this Prospectus and the Consent and Letter of Transmittal, including the Maximum Exchange Amount and the possible prorations resulting therefrom, the Offeror is offering to exchange outstanding Old Notes validly tendered and not validly withdrawn for New EFIH Senior Secured Notes and, for Old Notes validly tendered at or prior to the Early Tender Date, cash as described below.

All holders whose Old Cash-Pay Notes are accepted for exchange will receive an amount equal to accrued and unpaid interest on such Old Cash-Pay Notes, if any, in cash, from the last applicable interest payment date to, but not including, the Settlement Date. Holders whose Old Toggle Notes are accepted for exchange will not separately receive any accrued and unpaid payment-in-kind interest with respect to such Old Toggle Notes because the amount of such accrued interest through the Settlement Date has been included in determining the consideration being offered in the exchange offers for the Old Toggle Notes. If the Settlement Date occurs later than anticipated, then the consideration being offered in the exchange offers for the Old Toggle Notes will be adjusted to account for the additional accrued interest incurred.

In addition, EFH Corp. is soliciting Consents in the consent solicitation to amend the Old Notes Indenture. The purpose of the consent solicitation is to obtain the Consents required to adopt the Proposed Amendments, which would, among other things, eliminate substantially all of the restrictive covenants contained in the Old Notes Indenture and the Old Notes, eliminate certain events of default, modify covenants regarding mergers and consolidations, and modify or eliminate certain other provisions, including certain provisions relating to defeasance contained in the Old Notes Indenture and Old Notes which would otherwise prevent a defeasance without, among other things, delivery of an opinion of counsel confirming such defeasance does not constitute a taxable event.

Execution and delivery of the Consent and Letter of Transmittal will constitute an express waiver by a consenting holder of the Old Notes with respect to all claims against EFH Corp., the guarantors of the Old Notes and the Sponsor Group of any breach, default or event of default that may have arisen under the Old Notes Indenture.

In order to be adopted, the Proposed Amendments must be consented to by the holders of at least a majority of the outstanding aggregate principal amount of the Old Notes, voting together as a single class. It is expected but not required that the Supplemental Indenture for the Old Notes will be executed and delivered promptly following the Consent Date assuming receipt of the requisite Consents for the Proposed Amendments. The Supplemental Indenture will become effective immediately upon its execution and delivery by the parties thereto; however, the Proposed Amendments contained therein will not become operative until immediately prior to the acceptance for exchange of Old Notes upon the terms and subject to the conditions set forth in this Prospectus. See "Proposed Amendments."

The Proposed Amendments constitute a single proposal and a consenting holder must consent to the Proposed Amendments applicable to all Old Notes tendered by that holder as an entirety and may not consent selectively with respect to certain of the Proposed Amendments.

Old Notes validly tendered pursuant to the exchange offers (and not validly withdrawn) at or prior to the Consent Date will be deemed to include Consents to the Proposed Amendments. The completion, execution and delivery of a Consent and Letter of Transmittal, or transmission of an Agent's Message, in connection with a valid tender of Old Notes pursuant to the exchange offers at or prior to the Consent Date will constitute the delivery of Consents with respect to such Old Notes. Holders may not validly tender Old Notes in the exchange offers at or prior to the Consent Date without delivering the related Consents, but holders may tender Old Notes after the Consent Date and at or prior to the Expiration Date without delivering Consents with respect to such Old Notes.

83

EFIHMW00259799

**PX 027**
**Page 93 of 232**

However, holders tendering Old Notes after the Early Tender Date will not be eligible to receive the applicable Total Consideration for such Old Notes, including the Total Cash Consideration, or the cash consent payment. Holders may not deliver Consents in the consent solicitation without validly tendering their Old Notes in the exchange offers at or prior to the Consent Date and may only validly revoke Consents by validly withdrawing the previously tendered related Old Notes at or prior to the Consent Date or by revoking Consents after the Consent Date and prior to the execution and delivery of the Supplemental Indenture by the parties thereto. Because it is expected that the Supplemental Indenture will be executed and delivered promptly following the Consent Date assuming receipt of the requisite Consents for the Proposed Amendments, holders should not expect that they will be able to revoke their Consents after the Consent Date. A withdrawal of Old Notes after the later of the Consent Date and the execution and delivery of the Supplemental Indenture will not revoke any related Consents, and withdrawing holders will be subject to the Proposed Amendments if adopted.

If the requisite Consents are received and the Supplemental Indenture is executed, EFH Corp. will pay to each holder with respect to such holder's Old Notes to which Consents at or prior to the Consent Date are validly delivered and not validly revoked, a cash consent payment of $2.50 per $1,000 principal amount of such Old Notes. Such consent payment is in addition to any Total Consideration or Exchange Consideration that may be payable to a holder in respect of its Old Notes accepted for exchange. EFH Corp.'s obligation to make consent payments is not conditioned upon completion of the exchange offers but is subject to receipt of the requisite Consents and execution and delivery of the Supplemental Indenture. If the exchange offers are terminated, the Proposed Amendments in any executed Supplemental Indenture will not become operative.

All Old Notes validly tendered in accordance with the procedures set forth under "Procedures for Tendering Old Notes and Delivering Consents" and not validly withdrawn in accordance with the procedures set forth under "Withdrawal of Tenders and Revocation of Consents" at or prior to the Expiration Date, will, upon the terms and subject to the conditions hereof, including those relating to our right to reject tendered Old Notes, be accepted by the Offeror.

**If the requisite Consents are received, the applicable Supplemental Indenture has been executed and the Proposed Amendments have become operative, the Proposed Amendments will be binding on all holders of the Old Notes. Completion of the exchange offers and the adoption of the Proposed Amendments may have adverse consequences with respect to Old Notes that remain outstanding following the completion of the exchange offers. See "Risk Factors" and "Proposed Amendments."**

The Offeror's obligation to accept Old Notes that are validly tendered is subject to, among other things, the satisfaction or waiver of the conditions described under "Conditions of the Exchange Offers and the Consent Solicitation," including the condition applicable to the exchange offers that the registration statement relating to the exchange offers, of which this Prospectus forms a part, has been declared effective by the SEC (which condition cannot be waived).

Following the completion, termination or withdrawal of the exchange offers, and subject to applicable law, the Offeror or its affiliates may acquire any Old Notes that are not validly tendered or accepted in the exchange offers or any New EFIH Senior Secured Notes issued in the exchange offers through open market purchases, privately negotiated transactions, tender offers, exchange offers, redemption or otherwise, upon such terms and at such prices as the Offeror may determine (or as may be provided for in the indentures governing the Old Notes or the New EFIH Senior Secured Notes), which with respect to the Old Notes may be more or less than the consideration to be received by participating holders in the exchange offers and, in either case, could be for cash or other consideration, including the Total Cash Consideration. There can be no assurance as to which, if any, of these alternatives or combinations thereof the Offeror or its affiliates may choose to pursue.

The exchange offers will expire at midnight, New York City time, on August 12, 2010, unless extended by the Offeror. Holders must validly tender and not validly withdraw their Old Notes at or prior to 5:00 p.m., New York City time, on July 29, 2010, unless such Early Tender Date is extended by the Offeror, to be eligible to receive the Total Consideration. Consents must be delivered and not revoked at or prior to 5:00 p.m., New York City time, on July 29, 2010, unless such Consent Date is extended by EFH Corp.

84

EFIHMW00259800

## Consideration

Upon the terms and subject to the conditions of the exchange offers, including the Maximum Exchange Amount and the possible prorations resulting therefrom, participating holders of Old Notes will be eligible to receive, in exchange for each $1,000 principal amount of Old Notes validly tendered (and not validly withdrawn), the following:

(i) for Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date and accepted for exchange, an amount of New EFIH Senior Secured Notes and cash, together referred to as the "Total Consideration" as listed in the table on page ii of this Prospectus under "Total Consideration if Tendered at or Prior to the Early Tender Date," with the amount of New EFIH Senior Secured Notes (the "Total Notes Consideration") and the amount of cash (the "Total Cash Consideration") comprising the Total Consideration depending on the aggregate principal amount of Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date, as described below, and

(ii) for Old Notes validly tendered (and not validly withdrawn) after the Early Tender Date and at or prior to the Expiration Date and accepted for exchange, New EFIH Senior Secured Notes, referred to as the "Exchange Consideration" as listed in the table on page ii of this Prospectus under "Exchange Consideration if Tendered After the Early Tender Date and at or Prior to the Expiration Date." No cash consideration will be payable with respect to Old Notes that are validly tendered after the Early Tender Date.

The aggregate amount of cash payable as the aggregate Total Cash Consideration in the exchange offers is $400 million. This aggregate amount of cash will be paid as the Total Cash Consideration pro rata in exchange for Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date and accepted for exchange, and will correspondingly reduce on a dollar basis the amount of the Total Consideration for each issue of Old Notes that is comprised of Total Notes Consideration. For example, if an aggregate of $3.2 billion of Old Notes were validly tendered (and not validly withdrawn) at or prior to the Early Tender Date, the Total Cash Consideration with respect to each $1,000 principal amount of tendered Old Notes would be $125.00, and the Total Notes Consideration with respect to each $1,000 principal amount of tendered Old Cash-Pay Notes and Old Toggle Notes would be $595.00 and $660.00, respectively. The definitive amount of the Total Notes Consideration and the Total Cash Consideration per $1,000 principal amount of Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date and accepted for exchange (the "Total Consideration") will be announced by press release promptly after the Early Tender Date and in any event at least ten business days prior to (and including) the Expiration Date.

The Offeror will not accept any tender of Old Notes that would result in the issuance of less than $2,000 principal amount of New EFIH Senior Secured Notes to a participating holder. The aggregate principal amount of New EFIH Senior Secured Notes issued to each participating holder for all Old Notes validly tendered (and not validly withdrawn) will be rounded down, if necessary, to $2,000 or the nearest whole multiple of $1,000 in excess thereof. This rounded amount will be the principal amount of New EFIH Senior Secured Notes you will receive, and no additional cash will be paid in lieu of any principal amount of New EFIH Senior Secured Notes not received as a result of such rounding down.

The minimum Total Cash Consideration and the maximum Total Notes Consideration payable per $1,000 principal amount of Old Cash-Pay Notes are $[  ] and $[  ], respectively, which amounts would be payable if all of the Old Notes were tendered at or prior to the Early Tender Date. The minimum Total Cash Consideration and maximum Total Notes Consideration payable per $1,000 principal amount of Old Toggle Notes are $[  ] and $[  ], respectively, which amounts would be payable if all of the Old Notes were tendered at or prior to the Early Tender Date. There can be no assurance that the Total Cash Consideration exceeds such minimum amounts.

## Acceptance; Proration

Subject to the terms and conditions of the exchange offers, including the Maximum Exchange Amount and the prorations resulting therefrom, if necessary, all Old Notes validly tendered (and not validly withdrawn) in the exchange offers will be accepted in the exchange offers. The maximum principal amount of each issue of Old Notes that will be accepted for exchange is the outstanding principal amount of such issue validly tendered (and not validly withdrawn) as limited by the Maximum Exchange Amount and the resulting prorations, if necessary. In the event

85

EFIHMW00259801

that proration of validly tendered (and not validly withdrawn) Old Notes is required, each issue of Old Notes will be treated equally in calculating the proration. For example, if the aggregate principal amount of validly tendered (and not validly withdrawn) Old Notes would require $2.85 billion aggregate principal amount of New EFIH Senior Secured Notes to be issued in the exchange offers, then the principal amount of each tender of Old Notes would be reduced by approximately 20% (and the principal amount of New EFIH Senior Secured Notes to be issued in exchange of each such tender of Old Notes would be reduced accordingly), such that the aggregate principal amount of New EFIH Senior Secured Notes to be issued in the exchange offers would not exceed $2.28 billion.

If proration of validly tendered (and not validly withdrawn) Old Notes is required, the Offeror will determine the final proration promptly after the Expiration Date and will announce the results of the final proration by press release. To determine the principal amount accepted of each tender subject to proration, the principal amount of such tender will be multiplied by the proration rate and the resultant amount rounded down to the nearest permitted denomination of the Old Notes. The Offeror will not be able to determine the final proration prior to the Expiration Date.

**Extension, Termination or Amendment**

Subject to the applicable regulations of the SEC, each of the Offeror and EFH Corp. expressly reserves the right, in its sole discretion, at any time and from time to time, and regardless of whether any events preventing satisfaction of the conditions to the exchange offers or the consent solicitation shall have occurred or shall have been determined by the Offeror or EFH Corp., as applicable to have occurred, to extend the period during which the exchange offers and the consent solicitation are open by giving oral (to be confirmed in writing) or written notice of such extension to the Exchange Agent and by making public disclosure by press release or other appropriate means of such extension to the extent required by law. During any extension of the exchange offers and the consent solicitation, all Old Notes previously validly tendered and not validly withdrawn will remain subject to the exchange offers and all Consents will remain subject to the consent solicitation, and may, subject to the terms and conditions of the exchange offers and the consent solicitation, be accepted by the Offeror. See also "—Announcements."

Subject to applicable law, the exchange offers, on one hand, and the consent solicitation, on the other hand, are being made independently of each other, and the Offeror reserves the right to terminate, withdraw or amend the exchange offers, and EFH Corp. reserves the right to terminate, withdraw or amend the consent solicitation, independently of each other at any time and from time to time, as described in this Prospectus.

Any waiver, amendment or modification of the exchange offers or consent solicitation will apply to all Old Notes validly tendered pursuant to the exchange offers and all Consents delivered pursuant to the consent solicitation. If either the Offeror or EFH Corp., as applicable, makes a change that it determines to be material to any of the terms of the exchange offers or the consent solicitation, or waives any condition of the exchange offers or the consent solicitation that it determines to be material, the Offeror or EFH Corp., as applicable, will give oral (to be confirmed in writing) or written notice of such amendment or such waiver to the Exchange Agent and will disseminate additional exchange offer documents and extend the exchange offers and the consent solicitation and withdrawal and revocation rights as it determines necessary and to the extent required by law. Any such extension, amendment, waiver, decrease or change will not result in the reinstatement of any withdrawal or revocation rights if those rights had previously expired, except to the extent required by applicable law.

There can be no assurance that the Offeror or EFH Corp., as applicable, will exercise its right to extend, terminate or amend the exchange offers or the consent solicitation. During any extension and irrespective of any amendment to the exchange offers or the consent solicitation, all Old Notes previously validly tendered and not validly withdrawn will remain subject to the exchange offers and all related Consents will remain subject to the consent solicitation, and may be accepted thereafter by the Offeror or EFH Corp., as applicable, subject to compliance with the terms of the exchange offers and the consent solicitation and applicable law. In addition, the Offeror and EFH Corp., as applicable, may waive conditions (other than the condition applicable to the exchange offers that the registration statement, of which this Prospectus forms a part, has been declared effective by the SEC (which condition cannot be waived)) without extending the exchange offers or the consent solicitation in accordance with applicable law.

Confidential

EFIHMW00259802

**Announcements**

Any extension, termination or amendment of the exchange offers or the consent solicitation will be followed as promptly as practicable by announcement thereof, such announcement in the case of an extension to be issued no later than 9:00 a.m., New York City time, on the next business day following the previously scheduled Expiration Date. Without limiting the manner in which the Offeror and EFH Corp., as applicable, may choose to make such announcement, the Offeror and EFH Corp., as applicable, will not, unless otherwise required by law, have any obligation to publish, advertise or otherwise communicate any such announcement other than by making a release to a U.S. news agency or another means of announcement that the Offeror deems appropriate. See also "— Extension, Termination or Amendment."

**Accounting Treatment**

On a consolidated EFH Corp. basis, we will record the difference between the fair values of the New EFIH Senior Secured Notes and the carrying values related to the Old Notes received in exchange, including the principal amounts and unamortized debt discounts/premiums and deferred issuance costs, as a gain on early extinguishment of debt. The gain will be reported in the consolidated statement of income as other income. Applicable deferred and current income taxes will also be recorded. See "Material U.S. Federal Income Tax Considerations" for further discussion of the effects of income taxes. Deferrable issuance costs related to the New EFIH Senior Secured Notes, as well as any related debt discount/premium, will be amortized to interest expense over the term of the debt.

**Certain Matters Relating to Compliance with Securities Laws in Non-U.S. Jurisdictions**

Countries outside the United States may have their own legal requirements that govern securities offerings made to persons resident in those countries and may impose requirements about the form, content and process of offers made to the general public. We have not to date taken any action under such non-U.S. regulations. Non-U.S. holders should consult their advisors in considering whether they may participate in the exchange offers in accordance with the laws of their home countries and, if they do participate, whether there are any restrictions or limitations on transactions in the New EFIH Senior Secured Notes that may apply in their home countries or if the participation would result in a requirement for us to make any deliveries, filings or registrations. We and the Dealer Managers cannot provide any assurance about whether such limitations may exist. The Dealer Managers are only acting as dealer managers and solicitation agents for the exchange offers and consent solicitation in the United States. In addition, in some non-U.S. jurisdictions there may be restrictions on the ability of a holder to transfer New EFIH Senior Secured Notes received in the exchange offers. By signing or being deemed to sign the Consent and Letter of Transmittal, you are representing that if you are located outside the United States, the offer to you and your acceptance of it does not contravene the applicable laws where you are located and that your participation in the exchange offers will not impose on us any requirement to make any deliveries, filings or registrations. If we become aware of any jurisdiction where the making of the exchange offers is not in compliance with applicable law or would require us to make any delivery, filing or registration (without any obligation to make any further or ongoing filings), we will make a good faith effort to comply with the applicable law.

**Interests of Related Parties**

Goldman, Sachs & Co. is acting as a Dealer Manager and is an affiliate of a member of the Sponsor Group. Goldman, Sachs & Co. is being compensated by the Offeror for acting as a Dealer Manager, as described elsewhere in this Prospectus under "Exchange Agent; Information Agent; Dealer Managers and Solicitation Agents."

**[Each member of the Sponsor Group has advised us that it, and the affiliates that it controls, in the aggregate, own an insignificant amount of Old Notes, and it and/or such affiliates may participate in the exchange offers and consent solicitation. Such participation, if any, will be on the same terms and subject to the same conditions set forth in this Prospectus applicable to other holders of the respective Old Notes held by the Sponsor Group and such affiliates.]** Old Notes held by the Sponsor Group and such affiliates will not be considered outstanding for the purposes of determining whether the holders of the required outstanding principal amount of any issue of Old Notes have delivered Consents necessary to adopt the Proposed Amendments.

87

EFIHMW00259803

## PROPOSED AMENDMENTS

The Old Notes have been issued pursuant to the Old Notes Indenture.  In general, the Proposed Amendments would delete in their entirety many of the restrictive covenants and references thereto contained in the Old Notes Indenture and the Old Notes as well as certain events of default, modify covenants regarding mergers and consolidations, and modify or eliminate certain other provisions, including certain provisions relating to defeasance contained in the Old Notes Indenture and Old Notes which would otherwise prevent a defeasance without, among other things, delivery of an opinion of counsel confirming such defeasance does not constitute a taxable event.

The Proposed Amendments would delete the covenants and certain other provisions listed below and references thereto in their entirety from the Old Notes Indenture, and delete the defined terms and other references related to any such deleted covenants and provisions made irrelevant as a result of the deletion of such covenants and provisions.

- Section 4.05 (Taxes)

- Section 4.06 (Stay, Extension and Usury Laws)

- Section 4.08 (Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries)

- Section 4.09 (Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock)

- Section 4.10 (Asset Sales)

- Section 4.11 (Transactions with Affiliates)

- Section 4.12 (Liens)

- Section 4.13 (Corporate Existence)

- Section 4.14 (Offer to Repurchase upon Change of Control)

- Section 4.15 (Limitation on Guarantees of Indebtedness by Restricted Subsidiaries)

- Section 5.01 (Merger, Consolidation, or Sale of All or Substantially All Assets)—deleting clauses (a)(3), (a)(4), (a)(6), (c)(1)(C), (c)(1)(D) and (c)(2) specifying certain conditions with which EFH Corp. and the guarantors of the Old Notes must comply in order to consolidate or merge with or into or wind up into, or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets

- Section 6.01 (Events of Default)—deleting clauses (a)(3), (a)(4) and (a)(5) relating to covenant breaches and cross-acceleration rights

- Section 8.04 (Conditions to Legal or Covenant Defeasance)—deleting clauses (2), (3), (4), (5), (6), (7) and (8) specifying certain conditions to Legal and Covenant Defeasance

In addition, the Proposed Amendments would delete the provisions set forth in Section 8 of the Old Notes. These provisions consist of an Offer to Repurchase covenant.

The Proposed Amendments would also amend Section 4.03 (Reports and Other Information) of the Old Notes Indenture by deleting the text of that section in its entirety and substituting in lieu thereof the following text: "Notwithstanding that the Issuer may not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act or otherwise report on an annual and quarterly basis on forms provided for such annual and quarterly

88

EFIHMW00259804

reporting pursuant to rules and regulations promulgated by the SEC, the Issuer shall comply with the reporting obligations set forth under Section 314(a) of the Trust Indenture Act."

The Proposed Amendments would also amend Section 4.07 (Limitation on Restricted Payments) of the Old Notes Indenture by deleting the text of that section in its entirety and substituting in lieu thereof the following text: "The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, pay any cash dividend or make any cash distribution on, or in respect of, the Issuer's Capital Stock or purchase for cash or otherwise acquire for cash any Capital Stock of the Issuer or any direct or indirect parent of the Issuer for the purpose of paying any cash dividend or making any cash distribution to, or acquiring Capital Stock of any direct or indirect parent of the Issuer for cash from, the Investors, or guarantee any Indebtedness of any Affiliate of the Issuer for the purpose of paying such dividend, making such distribution or so acquiring such Capital Stock to or from the Investors unless at the time and after giving effect to such payment, the Consolidated Leverage Ratio of the Issuer would be equal to or less than 7.00 to 1.00."

The Proposed Amendments would also add to the Old Notes Indenture the provision, and related definitions, described below.

- Section 101 (Definitions)—adding the following new definitions in the appropriate alphabetical order:

  "**Permitted Asset Transfer**" means (1) the direct or indirect sale, assignment, transfer, conveyance or other disposition (including by way of merger, wind-up or consolidation) or spin-off by dividend of the Equity Interests of Energy Future Intermediate Holding such that Energy Future Intermediate Holding is no longer a Subsidiary of the Issuer (including without limitation a merger of Energy Future Intermediate Holding with and into the Issuer) or (2) the sale, assignment, transfer, conveyance or other disposition (other than by way of merger, wind-up or consolidation) of all of the Equity Interests of, and other Investments in, Oncor Holdings or another Oncor Subsidiary or successor to Oncor Holdings or an Oncor Subsidiary held by Energy Future Intermediate Holding to a Person (other than an Oncor Subsidiary) that shall continue to hold such Equity Interests and other Investments.

  "**TCEH Transfer**" means the sale, transfer, disposition or spin-off (including by way of merger, wind-up or consolidation) of (a) the membership interests or other common Equity Interests of Energy Future Competitive Holdings, TCEH or another Restricted Subsidiary of the Issuer that holds all or substantially all of the assets of TCEH and its Subsidiaries such that EFCH, TCEH or such Restricted Subsidiary ceases to be a Subsidiary of the Issuer or (b) all or substantially all of the assets of TCEH and its Subsidiaries, in each case other than any such transfer to another Restricted Subsidiary.

- Section 5.01 (Merger, Consolidation, or Sale of All or Substantially All Assets)—adding the following new clause (e) to the end of such Section 5.01:

  "It shall be understood that for purposes of the first sentence of Section 5.01(a) and the first sentence of Section 5.01(c) only, (i) a Permitted Asset Transfer shall not constitute the sale, assignment, transfer, lease, conveyance or disposal of all or substantially all of the assets of the Issuer and, accordingly, the Issuer or any of its Subsidiaries may consummate a Permitted Asset Transfer without being subject to the requirements of this Section 5.01 and (ii) a TCEH Transfer shall constitute the sale, assignment, transfer, lease, conveyance or disposal of all or substantially all of the assets of the Issuer and, accordingly, if the Issuer or any of its Subsidiaries consummates a TCEH Transfer, it must comply with the requirements of this Section 5.01."

The Proposed Amendments would also delete definitions in the Old Notes Indenture if all references to such definitions would be eliminated as a result of the foregoing and make certain other changes of a technical or conforming nature to the Old Notes Indenture and the Old Notes.

89

EFIHMW00259805

In addition to the foregoing, execution and delivery of the Consent and Letter of Transmittal will constitute an express waiver by a consenting holder of the Old Notes with respect to all claims against EFH Corp., the guarantors of the Old Notes and the Sponsor Group of any breach, default or event of default that may have arisen under the Old Notes Indenture.

In order to be adopted with respect to the Old Notes, the Proposed Amendments must be consented to by the holders of at least a majority of the outstanding aggregate principal amount of the Old Notes.  Holders of Old Notes will vote together as a single class with respect to the Proposed Amendments that are the subject of the consent solicitation.  It is expected that the Supplemental Indenture will be executed and delivered promptly following the Consent Date assuming receipt of the requisite Consents for the Proposed Amendments. The Supplemental Indenture relating to the Proposed Amendments will become effective immediately upon its execution and delivery by the parties thereto; however, the Proposed Amendments contained therein will not become operative until immediately prior to the acceptance for exchange of Old Notes upon the terms and subject to the conditions set forth herein.

The Proposed Amendments constitute a single proposal for the consent solicitation related to the Old Notes Indenture, and a consenting holder must consent to the Proposed Amendments applicable to all Old Notes tendered by that holder as an entirety and may not consent selectively with respect to certain of the Proposed Amendments.

If the requisite Consents are received and the Supplemental Indenture is executed and delivered, EFH Corp. will pay to each holder that validly delivers and does not validly revoke Consents at or prior to the Consent Date, in addition to any Total Consideration or Exchange Consideration, as applicable, payable to such holder with respect to such holder's Old Notes as to which Consents are validly delivered and not validly revoked, a cash consent payment of $2.50 per $1,000 principal amount of such Old Notes. EFH Corp.'s obligation to make consent payments is not conditioned upon completion of the exchange offers but is subject to receipt of the requisite Consents and execution and delivery of the Supplemental Indenture.

As discussed above, pursuant to the Exchange Agreements, holders of Old Notes representing approximately **[40]**% of the aggregate principal amount of outstanding Old Notes have agreed to participate in the exchange offers and the consent solicitation.  As a result of the Exchange Agreements, only an additional approximately $**[550 million]** aggregate principal amount of Old Notes would need to be validly tendered (and not validly withdrawn) in the exchange offers in order for the requisite Consents to be received to adopt the Proposed Amendments.

If the exchange offers are terminated, the Proposed Amendments in the executed Supplemental Indenture will not become operative.

90

Confidential

EFIHMW00259806

## ACCEPTANCE OF OLD NOTES; ACCRUAL OF INTEREST

**Acceptance of Old Notes**

If the conditions to the exchange offers are satisfied, or, to the extent permitted, waived, and the Offeror otherwise does not terminate or withdraw the exchange offers for any reason, the Offeror will accept for exchange at the Settlement Date, after it receives validly completed and duly executed Consents and Letters of Transmittal or Agent's Messages with respect to any and all of the Old Notes validly tendered (and not validly withdrawn), the Old Notes to be exchanged by notifying the Exchange Agent of the Offeror's acceptance, subject to the terms and conditions set forth in the exchange offers. The notice may be oral if the Offeror promptly confirms such notice in writing.

The Offeror expressly reserves the right, in its sole discretion but subject to applicable law, to delay acceptance for exchange of, or the exchange of, any of the Old Notes validly tendered (and not validly withdrawn) under the exchange offers (subject to Rule 14e-1(c) under the Exchange Act, which requires that the Offeror issues or pays the offered consideration, as applicable, or return the Old Notes deposited pursuant to the exchange offers promptly after termination or withdrawal of the exchange offers), or to terminate the exchange offers and not accept any Old Notes not previously accepted, (1) if any of the conditions to the exchange offers shall not have been satisfied or validly waived by the Offeror, (2) in order to comply in whole or in part with any applicable law or (3) for any other reason. In addition, if not previously accepted for exchange, Old Notes may be withdrawn after the expiration of 40 business days from July 16, 2010.

In all cases, the Total Consideration or Exchange Consideration for Old Notes validly tendered (and not validly withdrawn) pursuant to the exchange offers will be made only after timely receipt by the Exchange Agent of (1) certificates representing the Old Notes, or timely confirmation of a book-entry transfer (a "Book-Entry Confirmation") of the Old Notes into the Exchange Agent's account, (2) the properly completed and duly executed Consent and Letter of Transmittal (or a facsimile thereof) or an Agent's Message in lieu thereof and (3) any other documents required by the Consent and Letter of Transmittal. The exchange offers are scheduled to expire on the Expiration Date, unless extended by the Offeror.

The Offeror will have accepted validly tendered (and not validly withdrawn) Old Notes, if, as and when EFIH gives oral or written notice to the Exchange Agent of the Offeror's acceptance of the Old Notes for exchange pursuant to the exchange offers. In all cases, exchange of Old Notes pursuant to the exchange offers will be made by the deposit of the Total Consideration or Exchange Consideration and any accrued and unpaid interest payable, with the Exchange Agent (or, upon its instruction, DTC), which will act as your agent for the purposes of receiving New EFIH Senior Secured Notes and payments from the Offeror, and delivering New EFIH Senior Secured Notes and transmitting cash payments to you. If, for any reason whatsoever, acceptance for exchange of, or the exchange of, any Old Notes validly tendered (and not validly withdrawn) pursuant to the exchange offers is delayed (whether before or after the Offeror's acceptance of the Old Notes) or the Offeror or EFH Corp., as applicable, extends the exchange offers and consent solicitation or is unable to accept the Old Notes tendered pursuant to the exchange offers, then, without prejudice to the Offeror's rights set forth herein, the Offeror may instruct the Exchange Agent to retain tendered Old Notes, and those Old Notes may not be withdrawn, subject to the limited circumstances described in "Withdrawal of Tenders and Revocation of Consents."

If any tendered Old Notes are not accepted for exchange for any reason pursuant to the terms and conditions of the exchange offers, or if certificates are submitted evidencing more Old Notes than those that were validly tendered, certificates evidencing the unexchanged Old Notes will be returned, without expense, to the tendering holder, unless otherwise requested by such holder under "Special Delivery Instructions" in the Consent and Letter of Transmittal (or, in the case of any Old Notes tendered by book-entry transfer into the Exchange Agent's account pursuant to the procedures set forth under "Procedures for Tendering Old Notes and Delivering Consents—Book-Entry Transfer," such Old Notes will be credited to the account from which such Old Notes were delivered), promptly following the Expiration Date or the termination of the exchange offers.

**Treatment of Fractions**

Tenders of Old Notes pursuant to the exchange offers will be accepted only in principal amounts equal to permitted denominations for such Old Notes. The Offeror will not accept any tender of Old Notes that would result

91

EFIHMW00259807

in the issuance of less than $2,000 principal amount of New EFIH Senior Secured Notes to a participating holder. The aggregate principal amount of New EFIII Senior Secured Notes issued to each participating holder for all Old Notes validly tendered (and not validly withdrawn) will be rounded down, if necessary, to $2,000 or the nearest whole multiple of $1,000 in excess thereof. This rounded amount will be the principal amount of New EFIH Senior Secured Notes you will receive, and no additional cash will be paid in lieu of any principal amount of New EFIH Senior Secured Notes not received as a result of such rounding down.

**Accrued Interest**

All holders whose Old Cash-Pay Notes are accepted for exchange will receive an amount equal to accrued and unpaid interest on such Old Cash-Pay Notes, if any, in cash, from the last applicable interest payment date to, but not including, the Settlement Date. Holders whose Old Toggle Notes are accepted for exchange will not separately receive any accrued and unpaid payment-in-kind interest with respect to such Old Toggle Notes because the amount of such accrued interest through the Settlement Date has been included in determining the consideration being offered in the exchange offers for the Old Toggle Notes. If the Settlement Date occurs later than anticipated, then the consideration being offered in the exchange offers for the Old Toggle Notes will be adjusted to account for the additional accrued interest incurred.

Under no circumstances will any additional interest be payable because of any delay in the delivery or transmission of New EFIH Senior Secured Notes or funds to any holder of Old Notes as a result in any delay in delivery or transmission by the Exchange Agent, DTC or any holder's nominee.

**Sources of Funds for the Exchange Offers and Consent Solicitation**

The Offeror intends to fund all cash payable to holders pursuant to the exchange offers with cash on hand and with contributions or loans from EFH Corp. EFH Corp. intends to fund all cash consent payments payable pursuant to the consent solicitation with cash on hand.

**Payment of Transfer Taxes, Fees and Expenses**

The Offeror will pay or cause to be paid all transfer taxes with respect to the valid tender of any Old Notes unless the box titled "Special Issuance Instructions" or the box titled "Special Delivery Instructions" on the Consent and Letter of Transmittal has been completed, as described in the Instructions thereto.

92

EFIHMW00259808

## PROCEDURES FOR TENDERING OLD NOTES AND DELIVERING CONSENTS

**General**

In order to participate in the exchange offers and the consent solicitation, you must validly tender (and not validly withdraw) your Old Notes to the Exchange Agent as further described below. It is your responsibility to validly tender your Old Notes. The Offeror has the right to waive any defects. However, the Offeror is not required to waive defects and is not required to notify you of defects in your tender or delivery.

The method of delivery of the Old Notes, the Consent and Letter of Transmittal and all other required documents to the Exchange Agent is at the election and risk of the holder. Holders should use an overnight or hand delivery service, properly insured. In all cases, sufficient time should be allowed to assure delivery to and receipt by the Exchange Agent at or prior to the Expiration Date. Do not send the Consent and Letter of Transmittal or any Old Notes to anyone other than the Exchange Agent.

If you have any questions or need help in tendering your Old Notes, please contact the Information Agent or the Exchange Agent whose addresses and telephone numbers are listed on the back cover of this Prospectus or your broker, dealer, commercial bank, trust company or other nominee through which your Old Notes are held.

The valid tender of Old Notes at or prior to the Consent Date upon the terms and subject to the conditions of the exchange offers and in accordance with the procedures described below will be deemed to constitute delivery of a Consent with respect to the Old Notes tendered.

**Valid Tender of Old Notes and Delivery of Consents**

Except as set forth below with respect to ATOP procedures, for a holder to validly tender Old Notes pursuant to the exchange offers and validly deliver Consents pursuant to the consent solicitation, a properly completed and duly executed Consent and Letter of Transmittal (or a facsimile thereof) together with any signature guarantees and any other documents required by the Instructions to the Consent and Letter of Transmittal, or an Agent's Message in lieu thereof, must be received by the Exchange Agent at the address or facsimile number set forth on the back cover of this Prospectus at or prior to the Expiration Date (or the Early Tender Date, if the holder wishes to be eligible to receive the Total Consideration, or the Consent Date, if the holder wishes to deliver Consents pursuant to the consent solicitation), and either (1) certificates representing the Old Notes must be received by the Exchange Agent at such address, or (2) the Old Notes must be transferred pursuant to the procedures for book-entry transfer described below and a Book-Entry Confirmation must be received by the Exchange Agent, in each case at or prior to the Expiration Date (or the Early Tender Date, if the holder wishes to be eligible to receive the Total Consideration, or the Consent Date, if the holder wishes to deliver Consents pursuant to the consent solicitation).

In all cases, exchange of Old Notes validly tendered (and not validly withdrawn) pursuant to the exchange offers will be made only after timely receipt by the Exchange Agent of:

- certificates representing such Old Notes or a Book-Entry Confirmation with respect to such Old Notes;

- the Consent and Letter of Transmittal (or a facsimile thereof) properly completed and duly executed, or an Agent's Message in lieu thereof; and

- any required signature guarantees and other documents required by the Consent and Letter of Transmittal.

The Offeror has not provided guaranteed delivery procedures in connection with the exchange offers or under any of the exchange offer documents or other exchange offer materials provided therewith. Holders must timely tender their Old Notes in accordance with the procedures set forth in the exchange offer documents.

93

EFIHMW00259809

**Tender of Old Notes Held in Physical Form and Delivery of any Related Consents**

The Offeror does not believe any Old Notes exist in physical form. If you believe you hold Old Notes in physical form, please contact the Exchange Agent regarding procedures for participating in the exchange offers and the consent solicitation. Any Old Notes in physical form must be tendered using a Consent and Letter of Transmittal and such Old Notes must be delivered to the Exchange Agent at its address set forth on the back cover of this Prospectus.

**Tendering and Consenting with Respect to Old Notes Held through a Custodian**

Any holder whose Old Notes are held by a broker, dealer, commercial bank, trust company or other nominee and who wishes to tender Old Notes and deliver Consents should contact such custodial entity promptly and instruct such custodial entity to tender the Old Notes and deliver Consents on such holder's behalf. **A custodial entity cannot tender Old Notes and deliver Consents on behalf of a holder of Old Notes without such holder's instructions.**

**Holders whose Old Notes are held by a custodial entity such as a broker, dealer, commercial bank, trust company or other nominee should be aware that such nominee may have deadlines earlier than the Early Tender Date, the Consent Date and the Expiration Date for such nominees to be advised of the action that you may wish for them to take with respect to your Old Notes and, accordingly, such holders are urged to contact any custodial entity such as a broker, dealer, commercial bank, trust company or other nominee through which they hold their Old Notes as soon as possible in order to learn of the applicable deadlines of such nominees.**

The Offeror will pay brokerage houses and other custodians, nominees and fiduciaries the reasonable out-of-pocket expenses incurred by them in forwarding copies of this Prospectus and related documents to the beneficial owners of the Old Notes. The Offeror will not make any payment to brokers, dealers or others soliciting acceptances of the exchange offers and consent solicitation other than the Dealer Managers, as described herein.

**Book-Entry Transfer**

The Exchange Agent has or will establish an account with respect to the Old Notes at DTC for purposes of the exchange offers and consent solicitation, and any financial institution that is a participant in the DTC system and whose name appears on a security position listing as the record owner of the Old Notes may make book-entry delivery of Old Notes by causing DTC to transfer the Old Notes into the Exchange Agent's account at DTC in accordance with DTC's procedure for transfer. Although delivery of Old Notes may be effected through book-entry transfer into the Exchange Agent's account at DTC, either an Agent's Message or a Consent and Letter of Transmittal (or a facsimile thereof) properly completed and duly executed, along with any required signature guarantees and any other required documents, must be transmitted to and received by the Exchange Agent at one of the addresses set forth on the back cover of this Prospectus at or prior to the Expiration Date (or the Early Tender Date, if the holder wishes to be eligible to receive the Total Consideration, or the Consent Date, if the holder wishes to deliver Consents pursuant to the consent solicitation).

**Tender of Old Notes and Delivery of Consents through ATOP**

In lieu of physically completing and signing the Consent and Letter of Transmittal and delivering it to the Exchange Agent, DTC participants may electronically transmit their acceptance of the exchange offers and, if applicable, deliver consents pursuant to the consent solicitation through ATOP, for which the transaction will be eligible. In accordance with ATOP procedures, DTC will then verify the acceptance of the exchange offers and the delivery of Consents pursuant to the consent solicitation and send an Agent's Message to the Exchange Agent for its acceptance.

An "Agent's Message" is a message transmitted by DTC, received by the Exchange Agent and forming part of the Book-Entry Confirmation, which states that DTC has received an express acknowledgement from you that you have received the exchange offer documents and agree to be bound by the terms of the Consent and Letter of Transmittal, and that the Offeror and EFH Corp. may enforce such agreement against you.

94

EFIHMW00259810

If a holder of Old Notes transmits its acceptance through ATOP, delivery of such tendered Old Notes must be made to the Exchange Agent (either physically or pursuant to the book-entry delivery procedures set forth herein). Unless such holder delivers (either physically or by book-entry delivery) the Old Notes being tendered to the Exchange Agent, the Offeror may, at its option, treat such tender as defective for purposes of delivery of acceptance for exchange, and for the right to receive New EFIH Senior Secured Notes and cash payable. Delivery of documents to DTC (physically or by electronic means) does not constitute delivery to the Exchange Agent. If you desire to tender your Old Notes on the day that the Early Tender Date, the Consent Date or the Expiration Date occurs, you must allow sufficient time for completion of the ATOP procedures during the normal business hours of DTC on such date. The Offeror will have the right, which may be waived, to reject the defective tender of Old Notes as invalid and ineffective.

**Holders whose Old Notes are held by DTC should be aware that DTC may have deadlines earlier than the Early Tender Date, the Consent Date and the Expiration Date for DTC to be advised of the action that you may wish for them to take with respect to your Old Notes and, accordingly, such holders are urged to contact DTC as soon as possible in order to learn of DTC's applicable deadlines.**

**Effect of Consent and Letter of Transmittal**

Subject to and effective upon the acceptance of and the exchange of the Old Notes validly tendered thereby, by executing and delivering a Consent and Letter of Transmittal, a tendering holder, among other things, (1) irrevocably sells, assigns and transfers to or upon the order of the Offeror, all right, title and interest in and to all the Old Notes tendered thereby; and (2) irrevocably appoints the Exchange Agent as its true and lawful agent and attorney-in-fact (with full knowledge that the Exchange Agent also acts as the Offeror's agent with respect to the tendered Old Notes, with full power coupled with an interest) to:

- deliver certificates representing the Old Notes, or transfer ownership of the Old Notes on the account books maintained by DTC, together with all accompanying evidences of transfer and authenticity, to or upon the applicable Offeror's order, as applicable;

- present the Old Notes for transfer on the relevant security register;

- receive all benefits or otherwise exercise all rights of beneficial ownership of the Old Notes (except that the Exchange Agent will have no rights to or control over the Offeror's funds); and

- deliver to EFH Corp. and the trustee the Consent and Letter of Transmittal as evidence of the holders' Consent to the Proposed Amendments with respect to their tendered Old Notes and as certification that validly delivered and not revoked Consents from holders of the requisite aggregate principal amount of Old Notes to adopt the Proposed Amendments, duly executed by holders of such Old Notes, have been received,

all in accordance with the terms and conditions of the exchange offers and the consent solicitation as described in this Prospectus.

The agreement among the Offeror, EFH Corp. and a holder set forth in a Consent and Letter of Transmittal (and any Agent's Message in lieu thereof) will be governed by, and construed in accordance with, the laws of the State of New York.

**Signature Guarantees**

Signatures on all Consents and Letters of Transmittal must be guaranteed by a recognized participant in the Securities Transfer Agents Medallion Program, the New York Stock Exchange, Inc. Medallion Signature Program or the Stock Exchange Medallion Program (each, a "Medallion Signature Guarantor"), unless the Old Notes tendered thereby are tendered (i) by a holder of Old Notes (or by a participant in DTC whose name appears on a security position listing as the owner of such Old Notes) who has not completed the box entitled "Special Delivery Instructions" on the Consent and Letter of Transmittal or (ii) for the account of a member firm of a registered national securities exchange, a member of the Financial Industry Regulatory Authority, Inc. ("FINRA") or a

95

EFIHMW00259811

commercial bank or trust company having an office or correspondent in the United States. If the Old Notes not accepted for exchange are to be returned to a person other than the registered holder, then the signatures on the Consents and Letters of Transmittal accompanying the tendered Old Notes must be guaranteed by a Medallion Signature Guarantor as described above.

**Determination of Validity**

All questions as to the validity, form, eligibility (including time of receipt) and acceptance of any tendered Old Notes (including the delivery of Consents) pursuant to any of the procedures described above, and the form and validity (including time of receipt of notices of withdrawal) of all documents will be determined, as applicable, by the Offeror and EFH Corp. in their sole discretion, which determination will be final and binding absent a finding to the contrary by a court of competent jurisdiction. The Offeror and EFH Corp., as applicable, reserve the absolute right to reject any or all tenders of any Old Notes and delivery of Consents determined by the Offeror and EFH Corp., as applicable, not to be in proper form, or if the acceptance of or exchange of such Old Notes or validation of such Consents may, in the opinion of the Offeror's counsel, be unlawful or result in a breach of contract. A waiver of any defect or irregularity with respect to the tender of one Old Note shall not constitute a waiver of the same or any other defect or irregularity with respect to the tender of any other Old Note. The Offeror also reserves the right to waive any conditions to the exchange offers that the Offeror is legally permitted to waive, and EFH Corp. reserves the right to waive any conditions to the current consent solicitation that EFH Corp. is legally permitted to waive.

Your tender of Old Notes and delivery of Consents will not be deemed to have been validly made until all defects or irregularities in your tender and delivery have been cured or waived. None of the Offeror and EFH Corp., the Dealer Managers, the Exchange Agent, the Information Agent or any other person or entity is under any duty to give notification of any defects or irregularities in any tender or withdrawal of any Old Notes or Consents, or will incur any liability for failure to give any such notification.

**Compliance with "Short-Tendering" Rule**

It is a violation of Rule 14e-4 under the Exchange Act for a person, directly or indirectly, to tender for exchange Old Notes for such person's own account unless the person so tendering the Old Notes:

- has a net long position equal to or greater than the aggregate principal amount of the Old Notes being tendered for exchange; and

- will cause such Old Notes to be delivered in accordance with the terms of the exchange offers.

Rule 14e-4 provides a similar restriction applicable to the tender or guarantee of a tender on behalf of another person.

**Please send all materials to the Exchange Agent and not to the Offeror, EFH Corp., the Dealer Managers or any trustee.**

Confidential

EFIHMW00259812

## WITHDRAWAL OF TENDERS AND REVOCATION OF CONSENTS

Tendered Old Notes may be withdrawn at any time at or prior to the Expiration Date. Tendered Old Notes, if not previously accepted for exchange, may also be withdrawn after the expiration of 40 business days from July 16, 2010. Consents may be revoked at any time at or prior to the later of the Consent Date and the execution and delivery of the Supplemental Indenture. Because it is expected that the Supplemental Indenture will be executed and delivered promptly following the Consent Date assuming receipt of the requisite Consents for the Proposed Amendments, holders should not expect that they will be able to revoke their Consents after the Consent Date.

Each holder of Old Notes that validly tenders (and does not validly withdraw) its Old Notes at or prior to the Consent Date in the exchange offers is deemed to have delivered its Consent in the consent solicitation to the Proposed Amendments. A valid withdrawal of tendered Old Notes at or prior to the Consent Date will be deemed a valid revocation of the related Consent in the consent solicitation. A holder of Old Notes that has validly tendered its Old Notes at or prior to the Consent Date in the exchange offers and consent solicitation may only validly revoke the related Consents by validly withdrawing the previously tendered related Old Notes to which such Consents relate at or prior to the Consent Date or by revoking Consents after the Consent Date and prior to the execution and delivery of the Supplemental Indenture.  A withdrawal of Old Notes after the later of the Consent Date and the execution and delivery of the Supplemental Indenture will not revoke any related Consents, and withdrawing holders will be subject to the Proposed Amendments if adopted. If the exchange offers are terminated without any Old Notes being accepted, the terms of the Proposed Amendments will not become operative.

Subject to applicable regulations of the SEC, if, for any reason whatsoever, acceptance for exchange of any Old Notes validly tendered pursuant to the exchange offers, and any Consents delivered pursuant to the consent solicitation is delayed (whether before or after the Offeror's acceptance for exchange of Old Notes) or the Offeror extends the exchange offers or EFH Corp. extends the consent solicitation or the Offeror is unable to accept for exchange the Old Notes validly tendered pursuant to the exchange offers, as applicable, the Offeror may instruct the Exchange Agent to retain tendered Old Notes, and those Old Notes may not be withdrawn, and all Consents delivered with respect thereto will remain subject to the consent solicitation, except to the extent that you are entitled to the withdrawal rights set forth herein; provided that, if tendered, Old Notes may also be withdrawn after the expiration of 40 business days from July 16, 2010 if previously tendered Old Notes have not been accepted for exchange.

To be effective, a written or facsimile transmission notice of withdrawal of a tender of Old Notes or a revocation of a Consent or a properly transmitted "Request Message" through DTC's ATOP system for a withdrawal of a tender of Old Notes or a revocation of a Consent must:

- be received by the Exchange Agent at one of the addresses specified on the back cover of this Prospectus (i) at or prior to the Expiration Date, in the case of a withdrawal of Old Notes, (ii) at or prior to the Consent Date, in the case of a withdrawal of Old Notes and a revocation of related Consents, or (iii) by the execution and delivery of the Supplemental Indenture, in the case of a revocation of the Consents after the Consent Date;

- specify the name of the holder of the Old Notes and corresponding Consent to be withdrawn or revoked, as applicable;

- contain the description of the Old Notes and the Consent, in each case to be withdrawn or revoked, as the case may be, the certificate numbers shown on the particular certificates representing such Old Notes (or, in the case of Old Notes tendered by book-entry transfer, the number of the account at DTC from which the Old Notes were tendered and the name and number of the account at DTC to be credited with the Old Notes withdrawn) and the aggregate principal amount represented by such Old Notes; and

- in the case of certificated Old Notes, be signed by the holder of the Old Notes in the same manner as the original signature on the Consent and Letter of Transmittal or be accompanied by documents of transfer sufficient to have the trustee register the transfer of the Old Notes into the name of the person withdrawing the Old Notes.

97

EFIHMW00259813

After the Consent Date and prior to the execution and delivery of the Supplemental Indenture, such Consent can only be revoked by delivering written notice to the Exchange Agent on behalf of the applicable trustee in accordance with the terms of the Old Notes Indenture. Because it is expected that the Supplemental Indenture will be executed and delivered promptly following the Consent Date assuming receipt of the requisite Consents for the Proposed Amendments, holders should not expect that they will be able to revoke their Consents after the Consent Date.

If the Old Notes to be withdrawn or the Consents to be revoked have been delivered or otherwise identified to the Exchange Agent, a signed notice of withdrawal or revocation, as applicable, is effective immediately upon receipt by the Exchange Agent of written or facsimile transmission of the notice of withdrawal and/or revocation, as the case may be (or receipt of a Request Message), even if physical release is not yet effected, provided such notice is received at or prior to the Expiration Date. A withdrawal of Old Notes and, if applicable, a revocation of a Consent can only be accomplished in accordance with the foregoing procedures.

If you withdraw Old Notes (and revoke a related Consent), you will have the right to re-tender and/or re-deliver them at or prior to the Expiration Date (or the Early Tender Date, if you wish to be eligible to receive the Total Consideration, or the Consent Date, if you wish to be eligible to receive the consent payment in the consent solicitation) in accordance with the procedures described in "Procedures for Tendering Old Notes and Delivering Consents." If the Offeror amends or modifies the terms of the exchange offers or the consent solicitation, or the information concerning the exchange offers or the consent solicitation, in any case in a manner determined by the Offeror and/or EFH Corp. to constitute a material change to holders of Old Notes, the Offeror and/or EFH Corp. will disseminate additional exchange offer and consent solicitation materials and extend the period of the exchange offers and consent solicitation, including any withdrawal and revocation rights, to the extent required by law and as the Offeror and/or EFH Corp. determines necessary. An extension of the Early Tender Date, the Consent Date or the Expiration Date will not affect a holder's withdrawal and revocation rights unless otherwise provided herein or in any additional exchange offer materials or as required by applicable law.

Confidential

EFIHMW00259814

**PX 027**
**Page 108 of 232**

## CONDITIONS OF THE EXCHANGE OFFERS AND THE CONSENT SOLICITATION

Notwithstanding any other provision of the exchange offers to the contrary, each of the exchange offers is subject to the following conditions that the Offeror cannot waive:

- the registration statement, of which this Prospectus forms a part, will have been declared effective by the SEC;

- no stop order suspending the effectiveness of the registration statement will have been issued; and

- no proceedings for that purpose will have been instituted or be pending, or to the Offeror's knowledge, be contemplated or threatened by the SEC.

The foregoing conditions are referred to in this Prospectus as the "Registration Conditions."

Notwithstanding any other provisions of the exchange offers and the consent solicitation, the Offeror will not be required to accept for exchange or to exchange Old Notes validly tendered (and not validly withdrawn) pursuant to the exchange offers, and the Offeror and/or EFH Corp., as applicable, may, in their sole discretion, terminate, amend or extend any of the exchange offers and consent solicitation as the case may be, or delay or refrain from accepting for exchange or exchanging any of the Old Notes if any of the following "General Conditions" shall occur:

- less than a majority of the outstanding aggregate principal amount of Old Notes shall have been validly tendered (and not validly withdrawn) at or prior to the Expiration Date;

- there shall have been instituted, threatened or be pending any action, proceeding, application, claim counterclaim or investigation (whether formal or informal) (or there shall have been any material adverse development to any action, application, claim, counterclaim or proceeding currently instituted, threatened or pending) before or by any court, governmental, regulatory or administrative agency or instrumentally, domestic or foreign, or by any other person, domestic or foreign, in connection with the exchange offers or the consent solicitation that, in the Offeror's and/or EFH Corp.'s reasonable judgment, as the case may be, either (a) is, or is reasonably likely could be, materially adverse to EFH Corp. and its subsidiaries' business, operations, properties, condition (financial or otherwise), income, assets, liabilities or prospects, (b) could prohibit, prevent, restrict or delay completion of any of the exchange offers or the consent solicitation or (c) could materially impair the contemplated benefits of the exchange offers or consent solicitation to EFH Corp. and its subsidiaries or be material to holders in deciding whether to participate in the exchange offers or consent solicitation;

- an order, statute, rule, regulation, executive order, stay, decree, judgment or injunction shall have been proposed, enacted, entered, issued, promulgated, enforced or deemed applicable by any court or governmental, regulatory or administrative agency or instrumentality that, in the Offeror's and/or EFH Corp's reasonable judgment, as the case may be, either (a) could or might prohibit, prevent, restrict or delay completion of any of the exchange offers or the consent solicitation or (b) is, or reasonably likely could be, materially adverse to EFH Corp. and its subsidiaries' business, operations, properties, condition (financial or otherwise), income, assets, liabilities or prospects;

- there shall have occurred or be likely to occur any event or condition affecting EFH Corp. and its subsidiaries' business or financial affairs that, in the Offeror's and/or EFH Corp's reasonable judgment, as the case may be, either (a) is, or reasonably likely could be, materially adverse to EFH Corp. and its subsidiaries' business, operations, properties, condition (financial or otherwise), income, assets, liabilities or prospects, (b) could prohibit, prevent, restrict or delay completion of the exchange offers or consent solicitation or (c) could materially impair the contemplated benefits of the exchange offers or consent solicitation to EFH Corp. and its subsidiaries or be material to holders in deciding whether to participate in the exchange offers and the consent solicitation;

99

EFIHMW00259815

- the trustee under the indenture governing the Old Notes shall have objected in any respect to or taken action that could, in the Offeror's and/or EFH Corp's reasonable judgment, as the case may be, adversely affect the completion of the exchange offers or the consent solicitation or shall have taken any action that challenges the validity or effectiveness of the procedures used by the Offeror and/or EFH Corp., as applicable, in the making of the exchange offers or consent solicitation or the acceptance of some or all of the Old Notes pursuant to the exchange offers; or

- there has occurred (a) any general suspension of, or limitation on prices for, trading in securities in the U.S. securities or financial markets, (b) any significant adverse change in the price of New EFIH Senior Secured Notes or Old Notes in the United States or other major securities or financial markets, (c) a material impairment in the trading market for debt securities, (d) a declaration of a banking moratorium or any suspension of payments in respect to banks in the United States or other major financial markets, (e) any limitation (whether or not mandatory) by any government or governmental, administrative or regulatory authority or agency, domestic or foreign, or other event that, in the Offeror's and/or EFH Corp's reasonable judgment, might affect the extension of credit by banks or other lending institutions, (f) a commencement of a war, armed hostilities, terrorist acts or other national or international calamity directly or indirectly involving the United States or (g) in the case of any of the foregoing existing on the date hereof, a material acceleration or worsening thereof.

In addition, the Offeror's obligation to transfer any Total Consideration or Exchange Consideration, as applicable, is conditioned upon the Offeror's acceptance of Old Notes for exchange pursuant to the exchange offers. EFH Corp.'s obligation to make any consent payments to consenting holders of Old Notes is also subject to the condition that the requisite Consents are received and a Supplemental Indenture is executed and delivered. EFH Corp.'s obligation to make consent payments is not conditioned upon completion of the exchange offers.

These conditions are for the Offeror's and/or EFH Corp.'s, as applicable, benefit and may be asserted by the Offeror and/or EFH Corp's or may be waived by the Offeror and/or EFH Corp., as applicable (except in the case of the Registration Conditions, which may not be waived), including any action or inaction by the Offeror and/or EFH Corp., as applicable, giving rise to any condition, in whole or in part at any time and from time to time prior to the Expiration Date, in its sole discretion. Under each of the exchange offers and the consent solicitation, if any of these events occur, the Offeror and/or EFH Corp., as applicable, may (i) return Old Notes tendered thereunder to you, (ii) extend the exchange offers or consent solicitation and retain all tendered Old Notes until the expiration of the extended exchange offers or consent solicitation or (iii) amend the exchange offers and the consent solicitation in any respect by giving oral or written notice of such amendment to the Exchange Agent and making public disclosure of such amendment to the extent required by law.

Neither the Offeror nor EFH Corp. has made a decision as to what circumstances would lead the Offeror or EFH Corp. to waive any such condition, and any such waiver would depend on circumstances prevailing at the time of such waiver. Although neither the Offeror nor EFH Corp. has present plans or arrangements to do so, the Offeror reserves the right to amend, at any time, the terms of the exchange offers, and EFH Corp. reserves the right to amend, at any time, the terms of the consent solicitation. The Offeror and/or EFH Corp, as applicable, will give holders notice of such amendments as may be required by applicable law.

As described above, pursuant to the Exchange Agreements, holders of Old Notes representing approximately [40]% of the aggregate principal amount of outstanding Old Notes have agreed to participate in the exchange offers and the consent solicitation. As a result of the Exchange Agreements, only an additional approximately $[550 million] aggregate principal amount of Old Notes would need to be validly tendered (and not validly withdrawn) in the consent solicitation in order for the requisite Consents to be received to adopt the Proposed Amendments.

100

EFIHMW00259816

## EXCHANGE AGENT; INFORMATION AGENT; DEALER MANAGERS AND SOLICITATION AGENTS; OTHER ADVISORS

**Exchange Agent**

Global Bondholder Services Corporation has been appointed the exchange agent (the "Exchange Agent") for the exchange offers and consent solicitation. Consents and Letters of Transmittal and all correspondence in connection with the exchange offers and consent solicitation should be sent or delivered by each holder of Old Notes, or a beneficial owner's custodian bank, depositary, broker, trust company or other nominee, to the Exchange Agent at the addresses and telephone numbers set forth on the back cover of this Prospectus. The Offeror will pay the Exchange Agent reasonable compensation for its services and will reimburse it for certain reasonable expenses in connection therewith. The Offeror and EFH Corp. have agreed to indemnify the Exchange Agent against certain liabilities, including liabilities arising under the federal securities laws.

**Information Agent**

Global Bondholder Services Corporation has also been appointed as the information agent (the "Information Agent") for the exchange offers and consent solicitation, and will receive reasonable compensation for its services. Questions concerning exchange procedures and requests for additional copies of this Prospectus or the Consent and Letter of Transmittal should be directed to the Information Agent at the address and telephone numbers set forth on the back cover of this Prospectus. Holders of Old Notes may also contact their custodian bank, depositary, broker, trust company or other nominee for assistance concerning the exchange offers and consent solicitation. The Offeror will pay the Information Agent reasonable compensation for its services and will reimburse it for certain reasonable expenses in connection therewith. The Offeror and EFH Corp. have agreed to indemnify the Information Agent against certain liabilities, including liabilities arising under federal securities laws.

**Dealer Managers and Solicitation Agents**

[To come.]

From time to time, the Dealer Managers and their respective affiliates have provided, and may in the future provide from time to time, investment banking and commercial banking services and financial advisory services to us for which they have in the past received, and may in the future receive, customary fees. In addition, affiliates of the Dealer Managers are and may from time to time be party to certain commodity and interest rate hedging transactions with EFH Corp. and/or its subsidiaries in the normal course of business and may at any time be creditors of EFH Corp. and/or such subsidiaries.

**[Affiliates of Goldman, Sachs & Co. are members of the Sponsor Group and, as such, have an ownership interest in EFH Corp. See "The Transactions—Equity Contributions." As compensation for their services as Dealer Managers, the Offeror will pay Goldman, Sachs & Co. certain fees, the amount of which is dependent upon the aggregate principal amount of New EFIH Senior Secured Notes issued in the exchange offers. The Offeror will pay Goldman, Sachs & Co. a structuring fee of up to $[____] and an exchange offer agent fee of up to $[____]. In addition, the Offeror will pay Goldman, Sachs & Co. an incentive fee of up to $[____] that will be divided between Goldman, Sachs & Co. and Citigroup Global Markets, Inc., with the amount of the incentive fee to be agreed upon among Goldman, Sachs & Co., Citigroup Global Markets, Inc. and the Offeror at the conclusion of the exchange offers.**

Affiliates of certain other Dealer Managers have ownership interests in EFH Corp. See "The Transactions—Equity Contributions."

[To come.]

In the ordinary course of their respective businesses, the Dealer Managers or their respective affiliates may at any time hold long or short positions, and may trade for their own accounts or the accounts of customers, in securities of the Offeror and its subsidiaries, including any of the Old Notes or the New EFIH Senior Secured Notes and, to the extent that the Dealer Managers or their respective affiliates own Old Notes during the exchange offers

101

EFIHMW00259817

and consent solicitation, they may tender such Old Notes pursuant to the terms of the exchange offers and consent solicitation.

Each of Citigroup Global Markets Inc. and Goldman, Sachs & Co. has advised us that it, and the affiliates that it controls, in the aggregate, own an insignificant amount of Old Notes. Additionally, certain of the other Dealer Managers and affiliates that they control may own Old Notes. Such Dealer Managers and affiliates may participate in the exchange offers and consent solicitation. Such participation, if any, will be on the same terms and subject to the same conditions set forth in this Prospectus applicable to other holders of the respective Old Notes held by such affiliates.

Because each of Goldman, Sachs & Co. is an affiliate of EFH Corp. under the Old Notes Indenture, Old Notes held by Goldman, Sachs & Co. and their respective affiliates will not be considered outstanding for the purposes of determining whether the holders of the required outstanding principal amount of any issue of Old Notes have delivered Consents necessary to adopt the Proposed Amendments.

The Offeror has agreed to make available, during the period required by the Securities Act, a prospectus meeting the requirements of the Securities Act for use by Goldman, Sachs & Co. for use in connection with market-making or other trading activities in connection with any resale of New EFIH Senior Secured Notes.

102

EFIHMW00259818

**PX 027**
**Page 112 of 232**

## DESCRIPTION OF THE NOTES

**General**

Certain terms used in this description are defined under the subheading "Certain Definitions." In this description, (i) the terms "*we*," "*our*" and "*us*" each refer to Energy Future Intermediate Holding Company LLC ("*EFIH*") and its consolidated Subsidiaries; and (ii) the term "*Issuer*" refers only to collectively, EFIH and EFIH Finance Inc. ("*EFIH Finance*"), a Delaware corporation and a direct, wholly-owned subsidiary of EFIH, and not any of EFIH's other Subsidiaries.

The Issuer will issue up to $2.28 billion aggregate principal amount of 10.000% senior secured notes due 2020 (the "*Notes*") under an Indenture to be dated as of the Issue Date (the "*Indenture*") between the Issuer and The Bank of New York Mellon Trust Company, N.A., as trustee (the "*Trustee*"), in the Exchange Offer. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act.

As more particularly described under "The Transactions—Ring-Fencing," upon the consummation of the Merger, Oncor Electric Delivery Company LLC ("*Oncor Electric Delivery*") undertook certain ring-fencing measures to separate itself, its subsidiaries and its immediate parent, Oncor Electric Delivery Holdings Company LLC ("*Oncor Holdings*"), from Energy Future Holdings Corp. ("*EFH Corp.*"), the parent of EFIH, and EFH Corp.'s other Affiliates, including the Issuer. Those measures include the Oncor Subsidiaries being treated as "Unrestricted Subsidiaries" with respect to the EFH Corp. 2017 Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, in each case guaranteed by EFIH and Energy Future Competitive Holdings Company ("*EFCH*") and the EFIH 9.75% Notes. In order to comply with these ring-fencing obligations, the Oncor Subsidiaries will also be Unrestricted Subsidiaries with respect to the Notes. As Unrestricted Subsidiaries, the Oncor Subsidiaries will not be subject to any of the covenants described herein and will not guarantee the Notes.

The Holders of the Notes, by accepting the Notes, acknowledge (i) the legal separateness of the Issuer from the Oncor Subsidiaries, (ii) that the lenders under the Oncor Electric Delivery Facility and the noteholders under Oncor's existing debt instruments have likely advanced funds thereunder in reliance upon the separateness of the Oncor Subsidiaries from the Issuer, (iii) that the Oncor Subsidiaries have assets and liabilities that are separate from those of the Issuer and its other Subsidiaries, (iv) that the obligations owing under the Notes are obligations and liabilities of the Issuer only, and are not the obligations or liabilities of any Oncor Subsidiary, (v) that the Holders of the Notes shall look solely to the Issuer and its assets, and not to any assets, or to the pledge of any assets, owned by any Oncor Subsidiary, for the repayment of any amounts payable pursuant to the Notes and for satisfaction of any other obligations owing to the Holders under the Indenture and any related documents and (vi) that none of the Oncor Subsidiaries shall be personally liable to the Holders of the Notes for any amounts payable, or any other obligation, under the Indenture or any related documents.

The Holders of the Notes, by accepting the Notes, shall acknowledge and agree that the Holders of the Notes shall not (i) initiate any legal proceeding to procure the appointment of an administrative receiver or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against any Oncor Subsidiary, or against any of the Oncor Subsidiaries' assets. The Holders further acknowledge and agree that each of the Oncor Subsidiaries is a third party beneficiary of the forgoing covenant and shall have the right to specifically enforce such covenant in any proceeding at law or in equity. The foregoing acknowledgements and agreements will be contained in the Indenture.

The following description is only a summary of the material provisions of the Indenture and the Security Documents, does not purport to be complete and is qualified in its entirety by reference to the provisions of the Indenture and the Security Documents, including the definitions therein of certain terms used below. We urge you to read the Indenture and the Security Documents because they, and not this description, will define your rights as Holders of the Notes. You may request copies of the Indenture and the Security Documents at our address set forth under the heading "Available Information."

103

Confidential

**No Restricted Subsidiaries**

EFIH is a holding company for its Subsidiaries, including EFIH Finance, with no material operations of its own and only limited assets. EFIH will not have any Restricted Subsidiaries on the Issue Date (other than EFIH Finance). As of the Issue Date, the only Subsidiaries of EFIH will consist of the Oncor Subsidiaries, which are Unrestricted Subsidiaries, and EFH Finance, which will not have any Subsidiaries. Accordingly, none of EFIH's Subsidiaries (other than EFIH Finance) will be subject to the restrictive covenants described herein and none of such Subsidiaries will guarantee the Notes.

**Brief Description of Notes**

The Notes:

- will be senior obligations of the Issuer and will rank equally in right of payment with all existing and future Senior Indebtedness of the Issuer (including EFIH's guarantees of certain of EFH Corp.'s Indebtedness, including the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes and the EFH Corp. 2017 Notes);

- will be secured, equally and ratably with the EFIH 9.75% Notes and EFIH's guarantee of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, by the pledge of any investments EFIH owns in any Oncor Subsidiary (as described below under "—Security for the Notes"), which on the Issue Date will consist of all of the membership interests EFIH owns in Oncor Holdings;

- will be effectively senior to all unsecured Indebtedness of EFIH and any future Junior Lien Debt, to the extent of the value of the Collateral;

- will be effectively subordinated to any Indebtedness of EFIH secured by assets of EFIH other than the Collateral, to the extent of the value of the assets securing such Indebtedness;

- will be structurally subordinated to all Indebtedness and other liabilities of the Subsidiaries of EFIH (other than EFIH Finance), including the Oncor Subsidiaries, any of EFIH's Foreign Subsidiaries and any other Unrestricted Subsidiaries; and

- will be senior in right of payment to any future Subordinated Indebtedness of the Issuer.

See "Risk Factors—Risks Related to the Exchange Offers and the New EFIH Senior Secured Notes—After giving effect to the exchange offers, the liabilities of EFIH may exceed its assets as shown on its most recent balance sheet. If a court were to find that EFIH was insolvent before or after giving effect to the exchange offers and did not receive reasonably equivalent value or fair consideration in the exchange offers, the court may void all or a portion of the obligations represented by the New EFIH Senior Secured Notes or the pledge of the Collateral granted by EFIH for such notes as a fraudulent conveyance."

**Holding Company Structure**

EFIH is a holding company for its Subsidiaries, including EFIH Finance, with no material operations of its own and only limited assets. Accordingly, EFIH is dependent upon the distribution of the earnings of its Subsidiaries, whether in the form of dividends, advances or payments on account of intercompany obligations, and investments into EFIH by its parent company, EFH Corp., to service its debt obligations. EFH Corp. is itself a holding company, and will primarily be dependent upon the distribution of the earnings of its other Subsidiaries (including TCEH and its Subsidiaries), whether in the form of dividends, advances or payments on account of intercompany obligations, and investments into EFH Corp. by its parent company, Texas Energy Future Holdings Limited Partnership, to make such Investments in EFIH. See "Risk Factors—Risks Related to Structure— EFIH is a holding company and its obligations are structurally subordinated to existing and future liabilities and preferred stock of its subsidiaries."

Confidential

EFIHMW00259820

There will be no initial guarantees of the Notes. Therefore, the Notes will be structurally subordinated to all Indebtedness and other liabilities of all the Subsidiaries of EFIH (other than EFIH Finance). In the event of a bankruptcy, liquidation or reorganization of any of the non-guarantor Subsidiaries, the non-guarantor Subsidiaries will pay the holders of their debt and their trade creditors before they will be able to distribute any of their assets to EFIH. For the year ended December 31, 2009 and the three months ended March 31, 2010, the non-guarantor Subsidiaries generated all of the Issuer's net income. In addition, at March 31, 2010, EFIH's investment in the non-guarantor Subsidiaries represented more than 96% of its total assets.

**Paying Agent and Registrar for the Notes**

The Issuer will maintain one or more paying agents for the Notes. The initial paying agent for the Notes will be the Trustee at its offices in Houston, Texas.

The Issuer will also maintain a registrar. The initial registrar will be the Trustee at its offices in Houston, Texas. The registrar will maintain a register reflecting ownership of the Notes outstanding from time to time and will make payments on and facilitate transfer of Notes on behalf of the Issuer.

The Issuer may change the paying agents or the registrars without prior notice to the Holders. The Issuer or any of its Subsidiaries may act as a paying agent or registrar.

**Transfer and Exchange**

A Holder may transfer or exchange Notes in accordance with the Indenture. The registrar and the Trustee may require a Holder to furnish appropriate endorsements and transfer documents in connection with a transfer of Notes. Holders will be required to pay all taxes due on transfer. The Issuer will not be required to transfer or exchange any Note selected for redemption. Also, the Issuer will not be required to transfer or exchange any Note for a period of 15 days before a selection of Notes to be redeemed.

**Principal, Maturity and Interest**

The Issuer will issue up to $2.28 billion in aggregate principal amount of Notes in the Exchange Offer. The Notes will mature on December 1, 2020. Subject to compliance with the covenants described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "—Certain Covenants—Limitation on Liens," the Issuer may issue additional Notes from time to time after the Issue Date under the Indenture (any such Notes, "*Additional Notes*"). The Notes and any Additional Notes subsequently issued under the Indenture will be treated as a single class for all purposes under the Indenture, including waivers, amendments, redemptions and offers to purchase. Unless the context requires otherwise, references to "Notes" for all purposes of the Indenture and this "Description of the Notes" section include any Additional Notes that are actually issued.

Interest on the Notes will accrue at the rate of 10.00% per annum and will be payable semi-annually in arrears on each June 1 and December 1, commencing on December 1, 2010, to the Holders of record on the immediately preceding May 15 and November 15. Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including the Issue Date. Interest on the Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months.

Principal of, premium, if any, and interest on the Notes will be payable at the office or agency of the Issuer maintained for such purpose within the City of Houston and State of Texas or, at the option of the Issuer, payment of interest may be made by check mailed to the Holders of the Notes at their respective addresses set forth in the register of Holders; *provided* that all payments of principal, premium, if any, and interest with respect to the Notes represented by one or more global notes registered in the name of or held by DTC or its nominee will be made by wire transfer of immediately available funds to the accounts specified by the Holder or Holders thereof. Until otherwise designated by the Issuer, the Issuer's office or agency in Houston, Texas will be the office of the Trustee maintained for such purpose.

Confidential

**Mandatory Redemption; Offers to Purchase; Open Market Purchases**

The Issuer will not be required to make any mandatory redemption or sinking fund payments with respect to the Notes. However, under certain circumstances, the Issuer may be required to offer to purchase Notes as described under "—Repurchase at the Option of Holders." The Issuer may at any time and from time to time purchase Notes in the open market or otherwise.

**Optional Redemption**

Except as set forth below, the Issuer will not be entitled to redeem Notes at its option prior to December 1, 2015.

At any time prior to December 1, 2015, the Issuer may redeem all or a part of the Notes, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Notes or otherwise in accordance with the procedures of DTC, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest to, the date of redemption (the "*Redemption Date*"), subject to the rights of Holders of Notes on the relevant record date to receive interest due on the relevant interest payment date.

On and after December 1, 2015, the Issuer may redeem the Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Notes or otherwise in accordance with the procedures of DTC, at the redemption prices (expressed as percentages of principal amount of the Notes to be redeemed) set forth below, plus accrued and unpaid interest to the applicable Redemption Date, subject to the right of Holders of Notes of record on the relevant record date to receive interest due on the relevant interest payment date, if redeemed during the twelve-month period beginning on December 1 of each of the years indicated below:

| Year | Percentage |
|------|-----------|
| 2015 | 105.000% |
| 2016 | 103.333% |
| 2017 | 101.667% |
| 2018 and thereafter | 100.000% |

In addition, until December 1, 2013, the Issuer may, at its option, on one or more occasions redeem up to 35% of the aggregate principal amount of Notes at a redemption price equal to 110.000% of the aggregate principal amount thereof, plus accrued and unpaid interest to the applicable Redemption Date, subject to the right of Holders of Notes of record on the relevant record date to receive interest due on the relevant interest payment date, with the net cash proceeds of one or more Equity Offerings; *provided* that at least 50% of the sum of the original aggregate principal amount of Notes issued under the Indenture and the original principal amount of any Additional Notes issued under the Indenture after the Issue Date remains outstanding immediately after the occurrence of each such redemption; and *provided, further* that each such redemption occurs within 90 days of the date of closing of each such Equity Offering.

Any notice of any redemption may be given prior to the redemption thereof, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of an Equity Offering or other corporate transaction.

If the Issuer redeems less than all of the outstanding Notes, the Trustee shall select the Notes to be redeemed in the manner described under "—Repurchase at the Option of Holders—Selection and Notice."

Confidential

EFIHMW00259822

**Security for the Notes**

*Collateral Trustee*

EFIH has appointed The Bank of New York Mellon Trust Company, N.A. to serve as the collateral trustee (the "Collateral Trustee") for the benefit of the holders of the Secured Debt Obligations outstanding from time to time.

THE SECURITY DOCUMENTS PROVIDE THAT THE COLLATERAL TRUSTEE WILL BE SUBJECT TO SUCH DIRECTIONS AS MAY BE GIVEN IT BY THE TRUSTEE AND BY ANY OTHER PARITY LIEN DEBT REPRESENTATIVES FROM TIME TO TIME AS REQUIRED OR PERMITTED BY THE INDENTURE AND THE OTHER PARITY LIEN DEBT DOCUMENTS. THE RELATIVE RIGHTS WITH RESPECT TO CONTROL OF THE COLLATERAL TRUSTEE ARE SPECIFIED IN THE COLLATERAL TRUST AGREEMENT DATED AS OF NOVEMBER 16, 2009 BY AND AMONG EFIH, THE TRUSTEES FOR THE EFIH 9.75% NOTES, THE EFH CORP. 9.75% NOTES AND THE EFH CORP. 10.000% NOTES, ANY OTHER PARITY LIEN DEBT REPRESENTATIVES, ANY JUNIOR LIEN DEBT REPRESENTATIVES AND THE COLLATERAL TRUSTEE (THE "*COLLATERAL TRUST AGREEMENT*"). ON THE ISSUE DATE, THE COLLATERAL TRUSTEE AND THE TRUSTEE FOR THE BENEFIT OF THE NOTES WILL ENTER INTO A JOINDER TO THE COLLATERAL TRUST AGREEMENT (THE "*JOINDER*") AND THE NOTES WILL BE DESIGNATED AS "PARITY LIEN DEBT." EXCEPT AS PROVIDED IN THE COLLATERAL TRUST AGREEMENT OR AS DIRECTED BY AN ACT OF REQUIRED DEBT HOLDERS, THE COLLATERAL TRUSTEE WILL NOT BE OBLIGATED:

(1)  to act upon directions purported to be delivered to it by any other Person;

(2)  to foreclose upon or otherwise enforce any Lien; or

(3)  to take any other action whatsoever with regard to any or all of the Security Documents, the Liens created thereby or the Collateral.

*Collateral*

THE INDENTURE WILL PROVIDE AND THE SECURITY DOCUMENTS PROVIDE THAT ALL NOTE OBLIGATIONS OF EFIH, TOGETHER WITH ANY OTHER PARITY LIEN DEBT (WHICH ON THE ISSUE DATE WILL INCLUDE THE EFIH 9.75% NOTES AND EFIH'S GUARANTEE OF THE EFH CORP. 9.75% NOTES AND THE EFH CORP. 10.000% NOTES), WILL BE SECURED ON AN EQUAL AND RATABLE BASIS BY FIRST-PRIORITY SECURITY INTERESTS GRANTED TO THE COLLATERAL TRUSTEE, IN ALL OF THE FOLLOWING PROPERTY OF EFIH:

(1)  any Equity Interests it owns as of the Issue Date or may thereafter acquire in any Oncor Subsidiary and any promissory notes or other Indebtedness owed by, or other Investments in, any Oncor Subsidiary that it owns as of the Issue Date or it may thereafter acquire;

(2)  all proceeds of, income and other payments (including, without limitation, dividends and distributions received) now or hereafter due and payable with respect to, and supporting obligations relating to, any and all of the foregoing, which, in the case of cash dividends and distributions received by EFIH from Oncor Holdings may be used by EFIH for any purpose not prohibited by the Indenture so long as no Event of Default and no event of default under any other Parity Lien Debt, including the EFIH 9.75% Notes and EFIH's guarantee of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, shall have occurred and be continuing; and

107

EFIHMW00259823

(3)   **any Asset Sale Cash Collateral Account established pursuant to the Indenture, the EFIH 9.75% Notes Indenture, the EFH Corp. 10.000% Notes Indenture or the EFH Corp. 9.75% Notes Indenture.**

On the Issue Date, the Collateral will consist of a pledge of all of the membership interests EFIH owns in Oncor Holdings. Oncor Holdings owns approximately 80% of Oncor Electric Delivery's outstanding membership interests. On November 16, 2009, EFIH and the Collateral Trustee entered into a pledge agreement (the "*Pledge Agreement*"), whereby the Collateral was pledged in favor of the Collateral Trustee for the benefit of the Collateral Trustee, the trustee for, and the holders of, the EFIH 9.75% Notes and the EFH Corp. 9.75% Notes and any other Secured Debt Obligations that may be issued in accordance with the EFIH 9.75% Notes Indenture and the EFH Corp. 9.75% Notes Indenture (including the Notes and the EFH Corp. 10.000% Notes). As a result of the Joinder, the Trustee and the holders of the Notes issued in the exchange offers will benefit from the pledge of Collateral under the Pledge Agreement.  The Collateral does not consist of any assets of any Oncor Subsidiary. See "Risk Factors—Risks Related to the Exchange Offers and the New EFIH Senior Secured Notes— The New EFIH Senior Secured Notes will be secured only to the extent of the value of the assets that have been granted as security for the New EFIH Senior Secured Notes"; "—Regulatory approvals may be required in order to enforce the security interests against the Collateral and to dispose of an interest in, or operational control of, the Collateral that secures the New EFIH Senior Secured Notes"; "—In the event of the Offeror's bankruptcy, your ability to realize upon the Collateral securing the New EFIH Senior Secured Notes will be subject to certain bankruptcy law limitations"; and "—The value of the Collateral may be diluted if we issue additional debt that is secured equally and ratably by the same Collateral securing the New EFIH Senior Secured Notes or if the Collateral is sold."

No appraisal of the value of the Collateral was made in connection with the issuance of the EFIH 9.75% Notes, the EFH Corp. 9.75% Notes or the EFH Corp. 10.000% Notes, and no such appraisal will be made in connection with the issuance of the Notes. The value of the Collateral in the event of liquidation will depend on many factors. Consequently, liquidating the Collateral may not produce proceeds in an amount sufficient to pay any amounts due on the Secured Debt Obligations, including the Notes.

The fair market value of the Collateral is subject to fluctuations based on factors that include, among others, the ability to sell the Collateral in an orderly sale, general economic conditions, the availability of buyers and similar factors. The amount to be received upon a sale of the Collateral would be dependent on numerous factors, including but not limited to the actual fair market value of the Collateral at such time and the timing and the manner of the sale. By its nature, the Collateral may be illiquid and may have no readily ascertainable market value. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, we cannot assure you that the proceeds from any sale or liquidation of the Collateral will be sufficient to pay the Parity Lien Obligations, including the Note Obligations. Any claim for the difference between the amount, if any, realized by Holders of the Notes from the sale of Collateral securing the Secured Debt Obligations will rank equally in right of payment with all of our other unsecured unsubordinated Indebtedness and other obligations, including trade payables.

So long as no Event of Default and no event of default under any other Parity Lien Debt, including the EFIH 9.75% Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, shall have occurred and be continuing, and subject to certain terms and conditions, EFIH will be entitled to exercise any voting and other consensual rights pertaining to the Collateral (other than as set forth in the Pledge Agreement and the other Security Documents). The Pledge Agreement requires EFIH to deliver to the Collateral Trustee, for the Collateral Trustee to maintain in its possession, certificates, if any, evidencing the Collateral. Upon the occurrence and during the continuance of an Event of Default under the Notes, to the extent permitted by law and subject to the provisions of the Pledge Agreement, all of the rights of EFIH to exercise voting or other consensual rights with respect to the Collateral will cease, and all such rights will become vested in the Collateral Trustee, which, to the extent permitted by law, will have the sole right to exercise such voting and other consensual rights.

*Certain bankruptcy limitations*

The right of the Collateral Trustee to repossess and dispose of the Collateral upon the occurrence of an Event of Default would be significantly impaired by applicable bankruptcy law in the event that a bankruptcy case were to be commenced by or against EFIH prior to the Collateral Trustee having repossessed and disposed of the Collateral. Upon the commencement of a case for relief under Title 11 of the United States Code, as amended (the

EFIHMW00259824

"*Bankruptcy Code*"), a secured creditor such as the Collateral Trustee is prohibited from repossessing its security from a debtor in a bankruptcy case, or from disposing of security repossessed from the debtor, without bankruptcy court approval.

In view of the broad equitable powers of a U.S. bankruptcy court, it is impossible to predict how long payments under the Notes could be delayed following commencement of a bankruptcy case, whether or when the Collateral Trustee could repossess or dispose of the Collateral, the value of the Collateral at the time of the bankruptcy petition or whether or to what extent Holders of the Notes would be compensated for any delay in payment or loss of value of the Collateral. The Bankruptcy Code permits only the payment and/or accrual of post-petition interest, costs and attorneys' fees to a secured creditor during a debtor's bankruptcy case to the extent the value of the Collateral is determined by the bankruptcy court to exceed the aggregate outstanding principal amount at maturity of the obligations secured by the Collateral. There can be no assurance that the value of the Collateral will exceed the outstanding principal amount of the Notes and the other Parity Lien Debt, including the EFIH 9.75% Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes.

Furthermore, in the event a bankruptcy court determines that the value of the Collateral is not sufficient to repay all amounts due on the Notes and the other Parity Lien Obligations, including the EFIH 9.75% Notes and EFIH's guarantee of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, the Holders of the Notes and the holders of the other Parity Lien Debt would hold secured claims to the extent of the value of the Collateral to which the Holders of the Notes and the holders of the other Parity Lien Debt are entitled, and unsecured claims with respect to any such shortfall.

### Additional Parity Lien Debt

On November 16, 2009, $141,083,000 aggregate principal amount of EFIH 9.75% Notes were issued by the Issuer and $115,446,000 aggregate principal amount of EFH Corp. 9.75% Notes were issued by EFH Corp. and, prior to the date of this Prospectus, $1,060,757,000 aggregate principal amount of EFH Corp. 10.000% Notes were issued by EFH Corp., all of which constitutes Parity Lien Debt and is secured by the Collateral on an equal and ratable basis with the Notes. As of the date of this prospectus, $1,317,286,000 aggregate principal amount of Parity Lien Debt was outstanding. In addition, the Indenture will provide and the Security Documents provide that the Issuer may incur additional Parity Lien Debt as permitted by the covenants described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "—Certain Covenants—Limitation on Liens," by issuing Additional Notes under the Indenture or under one or more additional indentures or incurring other Indebtedness secured by Parity Liens on the Collateral. All additional Parity Lien Debt will be secured equally and ratably with the Notes by Liens on the Collateral held by the Collateral Trustee for as long as EFIH's Note Obligations are secured by the Collateral. The Collateral Trustee under the Collateral Trust Agreement will hold all Parity Liens in trust for the benefit of the Holders of the Notes and the holders of the other Parity Lien Debt and the holders of any future Parity Lien Debt and all other Parity Lien Obligations. Additional Parity Lien Debt will be permitted to be secured by the Collateral only if such Parity Lien Debt and the related Parity Liens are permitted to be incurred under the covenants described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "—Certain Covenants—Limitation on Liens." The agent or representative of any additional Parity Lien Debt will become a party to the Collateral Trust Agreement by joinder agreement.

### Future Junior Lien Debt

The Indenture will provide and the Security Documents provide that EFIH may incur Junior Lien Debt in the future by issuing or guaranteeing debt securities under one or more indentures, incurring Indebtedness under Credit Facilities or otherwise issuing or increasing a new Series of Secured Lien Debt secured by Junior Liens on the Collateral. Junior Lien Debt will be permitted to be secured by the Collateral only if such Junior Lien Debt and the related Junior Liens are permitted to be incurred under the covenants described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "—Certain Covenants—Limitation on Liens." The Collateral Trustee under the Collateral Trust Agreement will hold all Junior Liens in trust for the benefit of the holders of any Junior Lien Debt and all other Junior Lien Obligations. The agent or representative of any Junior Lien Obligations will become a party to the Collateral Trust Agreement by joinder agreement.

109

EFIHMW00259825

*Enforcement of Liens*

If the Collateral Trustee at any time receives written notice stating that any event has occurred that constitutes a default under any Secured Debt Document entitling the Collateral Trustee to foreclose upon, collect or otherwise enforce its Liens thereunder, it will promptly deliver written notice thereof to each Secured Debt Representative. Thereafter, the Collateral Trustee will await direction by an Act of Required Debtholders and will act, or decline to act, as directed by an Act of Required Debtholders, in the exercise and enforcement of the Collateral Trustee's interests, rights, powers and remedies in respect of the Collateral or under the Security Documents or applicable law and, following the initiation of such exercise of remedies, the Collateral Trustee will act, or decline to act, with respect to the manner of such exercise of remedies as directed by an Act of Required Debtholders. Unless it has been directed to the contrary by an Act of Required Debtholders, the Collateral Trustee in any event may (but will not be obligated to) take or refrain from taking such action with respect to any default under any Secured Debt Document as it may deem advisable to preserve and protect the value of the Collateral.

**UNTIL THE DISCHARGE OF PARITY LIEN OBLIGATIONS, THE HOLDERS OF THE NOTES AND THE HOLDERS OF OTHER PARITY LIEN OBLIGATIONS WILL HAVE, SUBJECT TO THE EXCEPTIONS SET FORTH BELOW IN CLAUSES (1) THROUGH (4), THE EXCLUSIVE RIGHT TO AUTHORIZE AND DIRECT THE COLLATERAL TRUSTEE WITH RESPECT TO THE SECURITY DOCUMENTS AND THE COLLATERAL (INCLUDING, WITHOUT LIMITATION, THE EXCLUSIVE RIGHT TO AUTHORIZE OR DIRECT THE COLLATERAL TRUSTEE TO ENFORCE, COLLECT OR REALIZE ON ANY COLLATERAL OR EXERCISE ANY OTHER RIGHT OR REMEDY WITH RESPECT TO THE COLLATERAL) AND NEITHER THE PROVISIONS OF THE SECURITY DOCUMENTS RELATING THERETO (OTHER THAN IN ACCORDANCE WITH THE COLLATERAL TRUST AGREEMENT) NOR ANY JUNIOR LIEN REPRESENTATIVE OR HOLDER OF JUNIOR LIEN OBLIGATIONS, IF ANY, MAY AUTHORIZE OR DIRECT THE COLLATERAL TRUSTEE WITH RESPECT TO SUCH MATTERS. NOTWITHSTANDING THE FOREGOING, THE HOLDERS OF JUNIOR LIEN OBLIGATIONS MAY DIRECT THE COLLATERAL TRUSTEE WITH RESPECT TO SUCH MATTERS:**

(1)  **without any condition or restriction whatsoever, at any time after the Discharge of Parity Lien Obligations;**

(2)  **to deliver any notice or demand necessary to enforce (subject to the prior Discharge of Parity Lien Obligations) any right to claim, take or receive proceeds of Collateral remaining after the Discharge of Parity Lien Obligations;**

(3)  **as necessary to perfect or establish the priority (subject to Parity Liens) of the Junior Liens upon any Collateral;** *provided* **that, unless otherwise agreed to by the Collateral Trustee in the Security Documents, the holders of Junior Lien Obligations may not require the Collateral Trustee to take any action to perfect any Collateral through possession or control (other than the Collateral Trustee as agent for the benefit of the Parity Lien Representative and holders of the Parity Lien Obligations agreeing pursuant to the Collateral Trust Agreement to act as bailed for the Collateral Trustee as agent for the benefit of the Junior Lien Representatives and holders of the Junior Lien Obligations); or**

(4)  **as necessary to create, prove, preserve or protect (but not enforce) the Junior Liens upon any Collateral.**

**BOTH BEFORE AND DURING AN INSOLVENCY OR LIQUIDATION PROCEEDING UNTIL THE DISCHARGE OF PARITY LIEN OBLIGATIONS, NONE OF THE HOLDERS OF JUNIOR LIEN OBLIGATIONS, THE COLLATERAL TRUSTEE (UNLESS ACTING PURSUANT TO AN ACT OF REQUIRED DEBTHOLDERS) OR ANY JUNIOR LIEN REPRESENTATIVE WILL BE PERMITTED TO:**

110

EFIHMW00259826

(1)  **request judicial relief, in an insolvency or liquidation proceeding or in any other court, that would hinder, delay, limit or prohibit the lawful exercise or enforcement of any right or remedy otherwise available to the holders of Parity Lien Obligations in respect of the Parity Liens or that would limit, invalidate, avoid or set aside any Parity Lien or subordinate the Parity Liens to the Junior Liens or grant the Junior Liens equal ranking to the Parity Liens;**

(2)  **oppose or otherwise contest any motion for (A) relief from the automatic stay or (B) any injunction against foreclosure or (C) any enforcement of Parity Liens, in each case made by any holder of Parity Lien Obligations or any Parity Lien Representative in any insolvency or liquidation proceeding;**

(3)  **oppose or otherwise contest any lawful exercise by any holder of Parity Lien Obligations or any Parity Lien Representative of the right to credit bid Parity Lien Obligations at any sale of Collateral in the foreclosure of Parity Liens;**

(4)  **oppose or otherwise contest any other request for judicial relief made in any court by any holder of Parity Lien Obligations or any Parity Lien Representative relating to the lawful enforcement of any Parity Lien; or**

(5)  **challenge the validity, enforceability, perfection or priority of the Parity Liens with respect to the Collateral.**

Notwithstanding the foregoing, both before and during an insolvency or liquidation proceeding, the holders of Junior Lien Obligations or Junior Lien Representatives may take any actions and exercise any and all rights that would be available to a holder of unsecured claims, including, without limitation, the commencement of an insolvency or liquidation proceeding against EFIH in accordance with applicable law; *provided* the Collateral Trust Agreement provides that no holder of Junior Lien Obligations or Junior Lien Representative will be permitted to take any of the actions prohibited by clauses (1) through (5) of the preceding paragraph or oppose or contest any order that it has agreed not to oppose or contest under the provisions described under "—Insolvency or Liquidation Proceedings."

At any time prior to the Discharge of Parity Lien Obligations and after (1) the commencement of any insolvency or liquidation proceeding in respect of EFIH or (2) the Collateral Trustee and each Junior Lien Representative have received written notice from any Parity Lien Representative stating that (A) any Series of Parity Lien Debt has become due and payable in full (whether at maturity, upon acceleration or otherwise) or (B) the holders of Parity Liens securing one or more Series of Parity Lien Debt have become entitled under any Parity Lien Document to and desire to enforce any or all of the Parity Liens by reason of a default under such Parity Lien Documents, no payment of money (or the equivalent of money) will be made from the proceeds of Collateral by EFIH to the Collateral Trustee (other than distributions to the Collateral Trustee in respect of its fees under the Collateral Trust Agreement and for the benefit of the holders of Parity Lien Obligations), any Junior Lien Representative or any holder of Junior Lien Obligations (including, without limitation, payments and prepayments made for application to Junior Lien Obligations).

All proceeds of Collateral received by any Junior Lien Representative or any holder of Junior Lien Obligations in violation of the immediately preceding paragraph will be held by such Person in trust for the account of the holders of Parity Lien Obligations and remitted to any Parity Lien Representative upon demand by such Parity Lien Representative. The Junior Liens will remain attached to and, subject to the provisions described under "—Provisions of the Indenture Relating to Security—Ranking of Parity Liens," enforceable against all proceeds so held or remitted. All proceeds of Collateral received by any Junior Lien Representative or any holder of Junior Lien Obligations not in violation of the immediately preceding paragraph will be received by such Person free from the Parity Liens.

Pursuant to the Public Utility Regulatory Act ("*PURA*"), Texas Utilities Code §§39.262(l) and 39.915 and, through October 10, 2012, to the Order on Rehearing in the Public Utility Commission of Texas (the "*PUCT*") Docket No. 34077, the PUCT must approve any change in majority ownership, controlling ownership or operational control of Oncor Electric Delivery. As a result, prior to any foreclosure on the Collateral consisting of membership

111

EFIHMW00259827

interests in Oncor Holdings, approval of the PUCT will be required if such foreclosure consists of a change in majority ownership or control of Oncor Holdings. Pursuant to PURA §§39.262(m) and 39.915(b), the PUCT will approve such a transfer if it finds that the transaction is in the public interest. In making its determination, these sections of PURA provide that the PUCT will consider whether the transaction will adversely affect the reliability of service, availability of service or cost of service of Oncor Electric Delivery. We cannot assure you that such approval will be granted and, if it is not granted, the Collateral Trustee may not be able to liquidate the Collateral consisting of membership interests and, accordingly, the Collateral Trustee may not be able to distribute any proceeds to Holders of the Notes upon such foreclosure. If the approval is granted, then PUCT approval would also be required with respect to any subsequent disposition of a majority or controlling interest in the membership interests of Oncor Holdings.

In addition, pursuant to the terms of an investor rights agreement among EFH Corp., Oncor Holdings, Oncor Electric Delivery and the minority investor in Oncor Electric Delivery, a transfer of the Equity Interests in Oncor Holdings to a third party, including as a result of any enforcement of the Lien on the Collateral consisting of Equity Interests of Oncor Holdings or Oncor Electric Delivery, may give rise to a tag-along right of the minority investor(s) in Oncor Electric Delivery to participate in that transfer on a pro rata basis.

### *Waiver of Right of Marshalling*

The Collateral Trust Agreement provides that, prior to the Discharge of Parity Lien Obligations, the holders of Junior Lien Obligations, each Junior Lien Representative and the Collateral Trustee may not assert or enforce any right of marshalling accorded to a junior lienholder, as against the holders of Parity Lien Obligations and the Parity Lien Representatives (in their capacity as senior or priority lienholders) with respect to the Collateral. Following the Discharge of Parity Lien Obligations, the holders of Junior Lien Obligations and any Junior Lien Representative may assert their right under the Uniform Commercial Code or otherwise to any proceeds remaining following a sale or other disposition of Collateral by, or on behalf of, the holders of Parity Lien Obligations.

### *Insolvency or Liquidation Proceedings*

If in any insolvency or liquidation proceeding and prior to the Discharge of Parity Lien Obligations, the holders of Parity Lien Obligations by an Act of Required Debtholders consent to any order:

(1) for use of cash collateral;

(2) approving a debtor-in-possession financing secured by a Lien that is senior to or on a parity with all Parity Liens upon any property of the estate in such insolvency or liquidation proceeding;

(3) granting any relief on account of Parity Lien Obligations as adequate protection (or its equivalent) for the benefit of the holders of Parity Lien Obligations in the Collateral; or

(4) relating to a sale of assets of EFIH that provides, to the extent the Collateral sold is to be free and clear of Liens, that all Parity Liens and Junior Liens will attach to the proceeds of the sale;

then, the holders of Junior Lien Obligations and the Junior Lien Representatives will not oppose or otherwise contest the entry of such order; *provided*, that the holders of Junior Lien Obligations or a Junior Lien Representative may request the grant to the Collateral Trustee, for the benefit of the holders of Junior Lien Obligations and the Junior Lien Representatives, of a Junior Lien upon any property on which a Lien is (or is to be) granted under such order to secure the Parity Lien Obligations, co-extensive in all respects with, but subordinated, as provided in the provisions described under "—Provisions of the Indenture Relating to Security—Ranking of Parity Liens," to, such Lien and all Parity Liens on such property. The holders of Parity Lien Obligations (including the Holders of the Notes) and the Parity Lien Representatives (including the Trustee) will agree not to oppose or otherwise contest in any respect any request made by the Junior Lien Representatives for a Junior Lien pursuant to the proviso to the preceding sentence.

112

EFIHMW00259828

Notwithstanding the foregoing, both before and during an insolvency or liquidation proceeding, the holders of Junior Lien Obligations and the Junior Lien Representatives may take any actions and exercise any and all rights that would be available to a holder of unsecured claims, including, without limitation, the commencement of insolvency or liquidation proceedings against EFIH in accordance with applicable law; *provided* that the Collateral Trust Agreement provides that no holder of Junior Lien Obligations or Junior Lien Representative will be permitted to take any of the actions prohibited under the third and fourth paragraphs of the provisions described under "—Enforcement of Liens," or oppose or contest any order that it has agreed not to oppose or contest under clauses (1) through (4) of the preceding paragraph.

Neither the holders of Junior Lien Obligations nor any Junior Lien Representative will file or prosecute in any insolvency or liquidation proceeding any motion for adequate protection (or any comparable request for relief) based upon their interest in the Collateral under the Junior Liens, except that:

(1) they may freely seek and obtain relief granting a Junior Lien co-extensive in all respects with, but subordinated, as provided in the provisions described under "—Provisions of the Indenture Relating to Security—Ranking of Parity Liens," to, all Liens granted in such insolvency or liquidation proceeding to, or for the benefit of, the holders of Parity Lien Obligations; and

(2) they may freely seek and obtain any relief upon a motion for adequate protection (or any comparable relief), without any condition or restriction whatsoever, at any time after the Discharge of Parity Lien Obligations.

### Order of Application

The Collateral Trust Agreement provides that if any Collateral is sold or otherwise realized upon by the Collateral Trustee in connection with any foreclosure, collection or other enforcement of Liens granted to the Collateral Trustee in the Security Documents, the proceeds received by the Collateral Trustee from such foreclosure, collection or other enforcement will be distributed by the Collateral Trustee in the following order of application:

FIRST, to the payment of all amounts payable under the Collateral Trust Agreement on account of the Collateral Trustee's fees and any reasonable legal fees, costs and expenses or other liabilities of any kind incurred by the Collateral Trustee or any co-trustee or agent of the Collateral Trustee in connection with any Security Document;

SECOND, ratably to the respective Parity Lien Representatives for application, after payment of any fees and expenses (including but not limited to, attorney's fees and expenses) of such Parity Lien Representative, to the payment of all outstanding Notes and other Parity Lien Debt and any other Parity Lien Obligations that are then due and payable in such order as may be provided in the relevant Parity Lien Documents in an amount sufficient to pay in full in cash all outstanding Notes and other Parity Lien Debt and all other Parity Lien Obligations that are then due and payable (including all interest accrued thereon after the commencement of any insolvency or liquidation proceeding at the rate, including any applicable post-default rate, specified in the relevant Parity Lien Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding, and including the discharge or cash collateralization (at the lower of (1) 105% of the aggregate undrawn amount and (2) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the applicable Parity Lien Document) of all outstanding letters of credit constituting Parity Lien Debt);

THIRD, to the respective Junior Lien Representatives for application to the payment of all outstanding Junior Lien Debt and any other Junior Lien Obligations that are then due and payable in such order as may be provided in the Junior Lien Documents in an amount sufficient to pay in full in cash all outstanding Junior Lien Debt and all other Junior Lien Obligations that are then due and payable (including all interest accrued thereon after the commencement of any insolvency or liquidation proceeding at the rate, including any applicable post-default rate, specified in the Junior Lien Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding, and including the discharge or cash collateralization (at the lower of (1) 105% of the aggregate undrawn amount and (2) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the applicable Junior Lien Document) of all outstanding letters of credit, if any, constituting Junior Lien Debt); and

113

Confidential

FOURTH, any surplus remaining after the payment in full in cash of the amounts described in the preceding clauses will be paid to EFIH, or its successors or assigns, or as a court of competent jurisdiction may direct.

If any Junior Lien Representative or any holder of a Junior Lien Obligation collects or receives any proceeds in respect of any foreclosure, collection or other enforcement to which it was not entitled pursuant to the terms of the immediately preceding paragraphs, whether after the commencement of an insolvency or liquidation proceeding or otherwise, such Junior Lien Representative or such holder of a Junior Lien Obligation, as the case may be, will forthwith deliver the same to the Collateral Trustee to be applied in accordance with the provisions set forth in the immediately preceding paragraphs. Until so delivered, such proceeds will be held by that Junior Lien Representative or that holder of a Junior Lien Obligation, as the case may be, in trust for the benefit of the holders of the Parity Lien Obligations. These provisions will not apply to payments received by any holder of Junior Lien Obligations if such payments are not proceeds of, or the result of a realization upon, Collateral.

The provisions set forth above under this "Order of Application" caption are intended for the benefit of, and will be enforceable as a third party beneficiary by, each present and future holder of Secured Debt Obligations, each present and future Secured Debt Representative and the Collateral Trustee as holder of Parity Liens and Junior Liens. EFIH will be required to cause the Secured Debt Representative of each future Series of Secured Lien Debt to deliver a joinder to the Collateral Trust Agreement, including a Lien Sharing and Priority Confirmation, to the Collateral Trustee and each other Secured Debt Representative at the time of incurrence of such Series of Secured Lien Debt.

In connection with the application of proceeds in accordance with the provisions set forth above under this "Order of Application" caption, except as otherwise directed by an Act of Required Debtholders, the Collateral Trustee may sell any non-cash proceeds for cash prior to the application of the proceeds thereof.

*Release of Security Interests*

The Security Documents provide that the Collateral will be released:

1. in whole, upon (a) payment in full of all outstanding Secured Debt Obligations at the time such debt is paid in full and (b) termination or expiration of all commitments to extend credit under all Secured Debt Documents and the cancellation or termination or cash collateralization in an account maintained by the Collateral Trustee (at the lower of (1) 105% of the aggregate undrawn amount and (2) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the applicable Secured Debt Documents) of all outstanding letters of credit issued pursuant to any Secured Debt Documents; *provided* that the Issuer has delivered an Officer's Certificate to the Collateral Trustee certifying that the conditions described in this paragraph 1. have been met and that such release of the Collateral does not violate the terms of any applicable Secured Debt Document;

2. with respect to the Note Obligations only, upon satisfaction and discharge of the Indenture as set forth under "—Satisfaction and Discharge";

3. with respect to the Note Obligations only, upon a Legal Defeasance or Covenant Defeasance as set forth under "—Legal Defeasance and Covenant Defeasance";

4. with respect to the Note Obligations only, upon payment in full of the Notes and all other Note Obligations that are outstanding, due and payable at the time the Notes are paid in full;

5. with respect to any Secured Debt Obligations (other than Note Obligations) only, upon payment in full of such Secured Lien Debt and all other Secured Debt Obligations in respect thereof that is outstanding, due and payable at the time such Secured Lien Debt is paid in full;

6. as to a release of all or substantially all of the Collateral, if (a) consent to the release of that Collateral has been given by holders of 66⅔% of the aggregate principal amount of Parity Lien Debt at the time outstanding voting together as one class, as provided for in the applicable Secured Debt Documents; *provided* that if an Event of

114

EFIHMW00259830

Default under the Notes or an event of default with respect to any other Secured Lien Debt has occurred and is continuing at the time of the solicitation of any such consent, the consent of holders of 66⅔% of the aggregate principal amount of Secured Lien Debt at the time outstanding voting together as one class shall also be required, and (b) EFIH has delivered an Officer's Certificate to the Collateral Trustee certifying that any such necessary consents have been obtained and that such release of the Collateral does not violate the terms of any applicable Secured Debt Document;

7. as to a release of less than all or substantially all of the Collateral, if (A) consent to the release of all Parity Liens (or, at any time after the Discharge of Parity Lien Obligations, consent to the release of all Junior Liens) on such Collateral has been given by holders of a majority of the aggregate principal amount of Parity Lien Debt at the time outstanding voting as one class, as provided for in the Parity Lien Documents (or, at any time after the Discharge of Parity Lien Obligations, holders of a majority of the aggregate principal amount of the Junior Lien Debt at the time outstanding voting together as one class, as provided for in the Junior Lien Documents) and (B) EFIH has delivered an Officer's Certificate to the Collateral Trustee certifying that any such necessary consents have been obtained and that such release of the Collateral does not violate the terms of any applicable Secured Debt Document;

8. as to any Collateral that is sold, transferred or otherwise disposed of by EFIH in a transaction or other circumstance that is not prohibited by the terms of any applicable Secured Debt Document, at the time of, or immediately prior to, such sale, transfer or other disposition; *provided* that EFIH has delivered an Officer's Certificate to the Collateral Trustee certifying that any such sale, transfer or other disposition does not violate the terms of any applicable Secured Debt Document; or

9. with respect to the Note Obligations only, in whole or in part, with the consent of the Holders of the requisite percentage of Notes in accordance with the provisions described under "—Amendment, Supplement and Waiver," and upon delivery of instructions and any other documentation, in each case as required by the Indenture and the Security Documents, in a form satisfactory to the Collateral Trustee.

Upon compliance by EFIH with the conditions precedent set forth above, the Collateral Trustee will promptly cause to be released and reconveyed to EFIH the released Collateral.

*Amendment*

The Collateral Trust Agreement provides that no amendment or supplement to the provisions of the Collateral Trust Agreement or any other Security Document will be effective without the approval of the Collateral Trustee acting as directed by an Act of Required Debtholders, except that:

(1) any amendment or supplement that has the effect solely of (a) adding or maintaining Collateral, securing additional Secured Lien Debt that was otherwise permitted by the terms of the Secured Debt Documents to be secured by the Collateral or preserving, perfecting or establishing the priority of the Liens thereon or the rights of the Collateral Trustee therein, (b) curing any ambiguity, defect or inconsistency; (c) providing for the assumption of the obligations of EFIH under any Security Document in the case of a merger or consolidation or sale of all or substantially all of the assets of EFIH; or (d) making any change that would provide any additional rights or benefits to the holders of Secured Debt Obligations, the Secured Debt Representatives or the Collateral Trustee or that does not adversely affect the legal rights under any Secured Debt Document of any holder of Secured Debt Obligations, the Secured Debt Representatives or the Collateral Trustee, will, in each case, become effective when executed and delivered by EFIH and the Collateral Trustee;

(2) no amendment or supplement that reduces, impairs or adversely affects the right of any holder of Secured Debt Obligations:

(a) to vote its outstanding Secured Lien Debt as to any matter described as subject to an Act of Required Debtholders or direction by the Required Parity Lien Debtholders or Required Junior Lien Debtholders (or amends the provisions of this clause (2) or the definition of "Act of

115

EFIHMW00259831

Required Debtholders," "Required Parity Lien Debtholders" or "Required Junior Lien Debtholders");

(b) to share in the order of application described under "—Order of Application" in the proceeds of enforcement of or realization on any Collateral that has not been released in accordance with the provisions described under "—Release of Security Interests"; or

(c) to require that Liens securing Secured Debt Obligations be released only as set forth in the provisions described under "—Release of Security Interests"

will become effective without the consent of the requisite percentage or number of holders of each Series of Secured Lien Debt so affected under the applicable Secured Debt Documents; and

(3) no amendment or supplement that imposes any obligation upon the Collateral Trustee or any Secured Debt Representative or adversely affects the rights of the Collateral Trustee, as determined by the Collateral Trustee in its sole discretion, or any Secured Debt Representative, respectively, in its individual capacity as such will become effective without the consent of the Collateral Trustee or such Secured Debt Representative, respectively.

Notwithstanding the foregoing clause (1), but subject to clauses (2) and (3) above:

(1) any Security Document that secures Junior Lien Obligations (but not Parity Lien Obligations) may be amended or supplemented with the approval of the Collateral Trustee acting as directed in writing by the Required Junior Lien Debtholders, unless such amendment or supplement would not be permitted under the terms of the Collateral Trust Agreement or the other Parity Lien Documents; and

(2) any amendment or waiver of, or any consent under, any provision of the Collateral Trust Agreement or any other Security Document that secures Parity Lien Obligations (except any such amendment, waiver or consent that releases Collateral with respect to which any consent of holders of Junior Lien Debt is required pursuant to the Collateral Trust Agreement, which will be governed by the provisions set forth above) will apply automatically to any comparable provision of any comparable Junior Lien Document without the consent of or notice to any holder of Junior Lien Obligations and without any action by EFIH or any Holder of Notes or holder of other Junior Lien Obligations.

*Voting*

In connection with any matter under the Collateral Trust Agreement requiring a vote of holders of Secured Lien Debt, each Series of Secured Lien Debt will cast its votes in accordance with the Secured Debt Documents governing such Series of Secured Lien Debt. The amount of Secured Lien Debt to be voted by a Series of Secured Lien Debt will equal (1) the aggregate outstanding principal amount of Secured Lien Debt held by such Series of Secured Lien Debt (including outstanding letters of credit whether or not then available or drawn), plus (2) the aggregate unfunded commitments to extend credit which, when funded, would constitute Indebtedness of such Series of Secured Lien Debt. Following and in accordance with the outcome of the applicable vote under its Secured Debt Documents, the Secured Debt Representative of each Series of Secured Lien Debt will vote the total amount of Secured Lien Debt under that Series of Secured Lien Debt as a block in respect of any vote under the Collateral Trust Agreement.

**Provisions of the Indenture Relating to Security**

*Equal and Ratable Sharing of Collateral by Holders of Parity Lien Debt*

The Indenture will provide that, notwithstanding:

(1) anything contained in the Collateral Trust Agreement or in any other Security Documents;

116

EFIHMW00259832

(2) the time of incurrence of any Series of Parity Lien Debt;

(3) the order or method of attachment or perfection of any Liens securing any Series of Parity Lien Debt;

(4) the time or order of filing or recording of financing statements or other documents filed or recorded to perfect any Parity Lien upon any Collateral;

(5) the time of taking possession or control over any Collateral;

(6) that any Parity Lien may not have been perfected or may be or have become subordinated, by equitable subordination or otherwise, to any other Lien; or

(7) the rules for determining priority under any law governing relative priorities of Liens,

all Parity Liens granted at any time by EFIH will secure, equally and ratably, all present and future Parity Lien Obligations.

The foregoing section is intended for the benefit of, and will be enforceable as a third party beneficiary by, each present and future holder of Parity Lien Obligations, each present and future Parity Lien Representative and the Collateral Trustee as holder of Parity Liens.

### Ranking of Parity Liens

The Indenture will require the Junior Lien Documents, if any, to provide that, notwithstanding:

(1) anything to the contrary contained in the Security Documents;

(2) the time of incurrence of any Series of Parity Lien Debt;

(3) the order or method of attachment or perfection of any Liens securing any Series of Parity Lien Debt;

(4) the time or order of filing or recording of financing statements or other documents filed or recorded to perfect any Lien upon any Collateral;

(5) the time of taking possession or control over any Collateral;

(6) that any Parity Lien may not have been perfected or may be or have become subordinated, by equitable subordination or otherwise, to any other Lien; or

(7) the rules for determining priority under any law governing relative priorities of Liens,

all Junior Liens at any time granted by EFIH will be subject and subordinate to all Parity Liens securing Parity Lien Obligations.

The Indenture will also require the Junior Lien Documents, if any, to provide that the provisions described in the foregoing clauses (1) through (7) are intended for the benefit of, and will be enforceable as a third party beneficiary by, each present and future holder of Parity Lien Obligations, each present and future Parity Lien Representative and the Collateral Trustee as holder of Parity Liens.

### Relative Rights

The Indenture will require that nothing in the Junior Lien Documents will:

117

EFIHMW00259833

(1) impair, as between EFIH and the Holders of the Notes, the obligation of EFIH to pay principal, premium, if any, and interest on the Notes in accordance with their terms or any other obligation of EFIH under the Indenture;

(2) affect the relative rights of Holders of Notes as against any other creditors of EFIH (other than holders of Junior Liens or other Parity Liens);

(3) restrict the right of any Holder of Notes to sue for payments that are then due and owing (but not enforce any judgment in respect thereof against any Collateral to the extent specifically prohibited by the provisions described under "—Security for the Notes—Enforcement of Liens" or "—Security for the Notes—Insolvency or Liquidation Proceedings");

(4) restrict or prevent any Holder of Notes or holder of other Parity Lien Obligations, the Collateral Trustee or any other Person from exercising any of its rights or remedies upon a Default or Event of Default not specifically restricted or prohibited by the provisions described under "—Security for the Notes—Enforcement of Liens" or "—Security for the Notes—Insolvency or Liquidation Proceedings"; or

(5) restrict or prevent any Holder of Notes or holder of other Parity Lien Obligations, the Trustee, the Collateral Trustee or any other Person from taking any lawful action in an insolvency or liquidation proceeding not specifically restricted or prohibited by the provisions described under "—Security for the Notes—Enforcement of Liens" or "—Security for the Notes—Insolvency or Liquidation Proceedings."

*Further Assurances*

The Indenture will provide and the Security Documents provide that EFIH, at its own expense, will do or cause to be done all acts and things that may be required, or that the Collateral Trustee from time to time may reasonably request, to assure and confirm that the Collateral Trustee holds, for the benefit of the Secured Debt Representatives and holders of Secured Debt Obligations, duly created and enforceable and perfected Liens upon the Collateral (including any property or assets that are acquired or otherwise become Collateral after the Notes are issued), in each case, as contemplated by, and with the Lien priority required under, the Secured Debt Documents.

Upon the reasonable request of the Collateral Trustee or any Secured Debt Representative at any time and from time to time, EFIH, at its own expense, will promptly execute, acknowledge and deliver such security documents, instruments, certificates, notices and other documents, and take such other actions as may be reasonably required, or that the Collateral Trustee may reasonably request, to create, perfect, protect, assure or enforce the Liens and benefits intended to be conferred, in each case as contemplated by the Secured Debt Documents for the benefit of the holders of Secured Debt Obligations.

*Impairment of Security Interest*

The Pledge Agreement provides that EFIH will not take or omit to take any action which would or could reasonably be expected to have the result of materially adversely affecting or impairing the Liens in favor of the Collateral Trustee, the Trustee and the holders of the Notes with respect to the Collateral. EFIH shall not grant to any Person, or permit any Person to retain (other than the Collateral Trustee), any interest whatsoever in the Collateral, other than pursuant to clause (3) of the definition of "Permitted Liens." EFIH and its Restricted Subsidiaries will not enter into any agreement that requires the proceeds received from any sale of Collateral to be applied to repay, redeem, defease or otherwise acquire or retire any Indebtedness of any Person, other than as permitted by the Indenture, the Notes and the Security Documents. EFIH shall, at its sole cost and expense, execute and deliver all such agreements and instruments as necessary, or as the Trustee shall reasonably request, to more fully or accurately describe the assets and property intended to be Collateral or the obligations intended to be secured by the Pledge Agreement or any other Security Document.

Confidential

EFIHMW00259834