(2)  as to any Series of Junior Lien Debt, the written agreement enforceable against the holders of such Series of Junior Lien Debt, as set forth in the applicable Secured Debt Document:

(a)  for the enforceable benefit of all holders of each existing and future Series of Junior Lien Debt and Series of Parity Lien Debt and each existing and future Junior Lien Representative and Parity Lien Representative, that all Junior Lien Obligations will be and are secured equally and ratably by all Junior Liens at any time granted by the Issuer or any Guarantor to secure any Obligations in respect of such Series of Junior Lien Debt, and that all such Junior Liens will be enforceable by the Collateral Trustee for the benefit of all holders of Junior Lien Obligations equally and ratably;

(b)  for the enforceable benefit of all holders of each existing and future Series of Parity Lien Debt and Series of Junior Lien Debt and each existing and future Parity Lien Representative and Junior Lien Representative, that the holders of Obligations in respect of such Series of Junior Lien Debt are bound by the provisions of the Collateral Trust Agreement, including the provisions relating to the ranking of Junior Liens and the order of application of proceeds from the enforcement of Junior Liens; and

(c)  consenting to and directing the Collateral Trustee to perform its obligations under the Collateral Trust Agreement and the other security documents in respect of the Secured Debt Obligations.

"*Moody's*" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"*Necessary CapEx Debt*" means Indebtedness of EFIH or any of its Restricted Subsidiaries incurred for the purpose of financing Necessary Capital Expenditures.

"*Necessary Capital Expenditures*" means capital expenditures by EFIH and its Restricted Subsidiaries that are required by applicable law (other than Environmental Law) or otherwise undertaken voluntarily for health and safety reasons (other than as required by Environmental Law). The term "Necessary Capital Expenditures" does not include any capital expenditure undertaken primarily to increase the efficiency of, expand or re-power any power generation facility.

"*Net Income*" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"*Net Proceeds*" means the aggregate cash proceeds and Cash Equivalents received by EFIH or any of its Restricted Subsidiaries in respect of any Asset Sale (including a Casualty Event), including any cash and Cash Equivalents received upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale (including a Casualty Event), net of the direct costs relating to such Asset Sale (including a Casualty Event) and the sale or disposition of such Designated Non-cash Consideration, including legal, accounting and investment banking fees, and brokerage and sales commissions, any relocation expenses incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), amounts required to be applied using proceeds from Asset Sales (other than Asset Sales of Collateral or other Oncor-related Assets) to the repayment of principal, premium, if any, and interest on other Senior Indebtedness required (other than required by clause (1) of the second paragraph under "—Repurchase at the Option of Holders—Asset Sales") to be paid as a result of such transaction and any deduction of appropriate amounts to be provided by EFIH or any of its Restricted Subsidiaries as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by EFIH or any of its Restricted Subsidiaries after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

178

EFIHMW00259894

"*Netting Agreement*" shall mean a netting agreement, master netting agreement or other similar document having the same effect as a netting agreement or master netting agreement and, as applicable, any collateral annex, security agreement or other similar document related to any master netting agreement or Permitted Contract.

"*Note Obligations*" means the Notes, the Guarantees and all other Obligations of any of the Issuer and any Guarantors under the Indenture, the Notes, the Guarantees and the Security Documents.

"*Obligations*" means any principal, interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law), premium, penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities, and guarantees of payment of such principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities, payable under the documentation governing any Indebtedness.

"*Officer*" means the Chairman of the Board, the Chief Executive Officer, the President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of EFIH or other Person, as the case may be.

"*Officer's Certificate*" means a certificate signed on behalf of EFIH by an Officer of EFIH or on behalf of another Person by an Officer of such Person, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of EFIH or such other Person, as applicable, that meets the requirements set forth in the Indenture.

"*Oncor Electric Delivery Facility*" means the revolving credit agreement entered into as of the Closing Date by and among Oncor Electric Delivery, as borrower, the lenders party thereto in their capacities as lenders thereunder and JPMorgan Chase Bank, N.A., as Administrative Agent, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof.

"*Oncor Holdings*" means Oncor Electric Delivery Holdings Company LLC.

"*Oncor-related Assets*" means the Equity Interests of any of the Oncor Subsidiaries or any Successor Oncor Business (including the Collateral) owned by EFIH or any Oncor Subsidiary or any Successor Oncor Business or constituting a primary issuance of such Equity Interests to the extent such issuance would constitute an Asset Sale and any assets owned directly or indirectly by any of the Oncor Subsidiaries or any Successor Oncor Business.

"*Oncor Subsidiaries*" means Oncor Holdings and its Subsidiaries, all of which shall be Unrestricted Subsidiaries on the Issue Date.

"*Opinion of Counsel*" means a written opinion from legal counsel who is acceptable to the Trustee. The counsel may be an employee of or counsel to the Issuer or the Trustee.

"*Parity Lien*" means a Lien granted by a security document to the Collateral Trustee, at any time, upon any Collateral to secure Parity Lien Obligations.

**"*PARITY LIEN DEBT*" MEANS:**

(1)  the Notes issued by the Issuer under the Indenture on the Issue Date and any Additional Notes, the EFIH 9.75% Notes outstanding on the Issue Date and any additional EFIH 9.75% Notes;

179

EFIHMW00259895

(2)  any other Indebtedness (including letters of credit and reimbursement obligations with respect thereto) of EFIH, including the guarantee by EFIH of any indebtedness of any other Person, including the EFH Corp. 9.75% Notes and any additional EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes and any additional EFH Corp. 10.000% Notes, that is secured equally and ratably with the Notes by a Parity Lien that was permitted to be incurred and so secured under each applicable Secured Debt Document; *provided*, in the case of Indebtedness referred to in this clause (2), that, except with respect to the EFH Corp. 9.75% Notes and any additional EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes and any additional EFH Corp. 10.000% Notes outstanding on the Issue Date:

(a)  on or before the date on which such Indebtedness is incurred by EFIH, such Indebtedness is designated by EFIH, in accordance with the Collateral Trust Agreement, as "Parity Lien Debt" for the purposes of the Secured Debt Documents; *provided* that no Series of Secured Lien Debt may be designated as both Parity Lien Debt and Junior Lien Debt;

(b)  such Indebtedness is governed by an indenture, credit agreement or other agreement that includes a Lien Sharing and Priority Confirmation; and

(c)  all requirements set forth in the Collateral Trust Agreement as to the confirmation, grant or perfection of the Collateral Trustee's Lien to secure such Indebtedness or Obligations in respect thereof are satisfied (and the satisfaction of such requirements will be conclusively established if EFIH delivers to the Collateral Trustee an Officer's Certificate stating that such requirements have been satisfied and that such notes or such Indebtedness is "Parity Lien Debt"); and

(3)  Hedging Obligations of EFIH incurred to hedge or manage interest rate risk with respect to Parity Lien Debt; *provided* that, pursuant to the terms of the Parity Lien Documents, such Hedging Obligations are secured by a Parity Lien on all of the assets and properties that secure the Indebtedness in respect of which such Hedging Obligations are incurred.

"*Parity Lien Documents*" means the Indenture, the EFIH 9.75% Notes Indenture, the EFH Corp. 9.75% Notes Indenture, the EFH Corp. 10.000% Notes Indenture and any additional indenture, credit agreement or other agreement governing a Series of Parity Lien Debt and the Security Documents that create or perfect Liens securing Parity Lien Obligations.

"*Parity Lien Obligations*" means Parity Lien Debt and all other Obligations in respect thereof.

"*Parity Lien Representative*" means (1) the Trustee, in the case of the Notes, (2) The Bank of New York Mellon Trust Company, N.A., in the case of the EFIH 9.75% Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes or (3) in the case of any other Series of Parity Lien Debt, the trustee, agent or representative of the holders of such Series of Parity Lien Debt who (a) is appointed as a Parity Lien Representative (for purposes related to the administration of the Security Documents) pursuant to the indenture, credit agreement or other agreement governing such Series of Parity Lien Debt, together with its successors in such capacity, and (b) has become a party to the Collateral Trust Agreement by executing a joinder in the form required under the Collateral Trust Agreement.

"*Permitted Asset Swap*" means the concurrent purchase and sale or exchange of Related Business Assets or a combination of Related Business Assets and cash or Cash Equivalents between EFIH or any of its Restricted Subsidiaries and another Person; *provided*, that any cash or Cash Equivalents received must be applied in accordance with the covenant described under "—Repurchase at the Option of Holders—Asset Sales."

"*Permitted Asset Transfer*" means (1) the direct or indirect sale, assignment, transfer, conveyance or other disposition (including by way of merger, wind-up or consolidation) or spin-off by dividend of the Equity Interests of EFIH such that EFIH is no longer a Subsidiary of EFH Corp. (including without limitation a merger of EFIH with and into EFH Corp.) or (2) the sale, assignment, transfer, conveyance or other disposition (other than by way of merger, wind-up or consolidation) of all of the Equity Interests of, and other Investments in, the Oncor Subsidiaries,

180

EFIHMW00259896

Successor Oncor Businesses and all other Collateral held by EFIH to a Person (other than an Oncor Subsidiary) that shall continue to hold such Equity Interests, other Investments and any other Collateral, in each case other than any foreclosure on the Collateral.

"*Permitted Holders*" means each of the Investors, members of management (including directors) of EFIH or any of its direct or indirect parent companies or Subsidiaries who on the Closing Date were or at any time prior to the first anniversary of the Closing Date were holders of Equity Interests of EFIH (or any of its direct or indirect parent companies) and any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which any of the foregoing are members; *provided* that, in the case of such group and without giving effect to the existence of such group or any other group, such Investors and members of management, collectively, have beneficial ownership of more than 50% of the total voting power of the Voting Stock of EFIH or any of its direct or indirect parent companies.

## "*PERMITTED INVESTMENTS*" MEANS:

(1)  any Investment in EFIH or any of its Restricted Subsidiaries;

(2)  any Investment in cash and Cash Equivalents or Investment Grade Securities;

(3)  any Investment by EFIH or any of its Restricted Subsidiaries in a Person that is engaged in a Similar Business if as a result of such Investment:

(a)  such Person becomes a Restricted Subsidiary; or

(b)  such Person, in one transaction or a series of related transactions, is merged or consolidated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, EFIH or a Restricted Subsidiary,

and, in each case, any Investment held by such Person; *provided* that such Investment was not acquired by such Person in contemplation of such acquisition, merger, consolidation or transfer;

(4)  any Investment in securities or other assets not constituting cash, Cash Equivalents or Investment Grade Securities and received in connection with an Asset Sale made pursuant to the provisions described under "—Repurchase at the Option of Holders—Asset Sales" or any other disposition of assets not constituting an Asset Sale;

(5)  any Investment existing on the Issue Date;

(6)  any Investment acquired by EFIH or any of its Restricted Subsidiaries:

(a)  in exchange for any other Investment or accounts receivable held by EFIH or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable; or

(b)  as a result of a foreclosure by EFIH or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7)  Hedging Obligations permitted under clause (10) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(8)  any Investment in a Similar Business having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (8) that are at that time outstanding,

181

EFIHMW00259897

not to exceed 3.5% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(9)  Investments the payment for which consists of Equity Interests (exclusive of Disqualified Stock) of EFIH or any of its direct or indirect parent companies; *provided, however,* that such Equity Interests will not increase the amount available for Restricted Payments under clause (3) of the first paragraph under the covenant described under "—Certain Covenants—Limitations on Restricted Payments";

(10) guarantees of Indebtedness of EFIH or any of its Restricted Subsidiaries permitted under the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(11) any transaction to the extent it constitutes an Investment that is permitted and made in accordance with the provisions of the second paragraph of the covenant described under "—Certain Covenants—Transactions with Affiliates" (except transactions described in clauses (2), (5) and (9) of such paragraph);

(12) Investments consisting of purchases and acquisitions of inventory, fuel (including all forms of nuclear fuel), supplies, material or equipment;

(13) additional Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (13) that are at that time outstanding (without giving effect to the sale of an Investment to the extent the proceeds of such sale do not consist of cash or marketable securities), not to exceed 3.5% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(14) Investments relating to a Receivables Subsidiary that, in the good faith determination of EFIH, are necessary or advisable to effect any Receivables Facility for the benefit of EFIH or any of its Restricted Subsidiaries;

(15) advances to, or guarantees of Indebtedness of, employees not in excess of $25.0 million outstanding at any one time, in the aggregate;

(16) loans and advances to officers, directors and employees for business-related travel expenses, moving expenses and other similar expenses, in each case incurred in the ordinary course of business or consistent with past practices or to fund such Person's purchase of Equity Interests of EFIH or any direct or indirect parent company thereof;

(17) any Investment in any Subsidiary or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business; or

(18) (A) Investments in Indebtedness of TCEH or EFH Corp. received by EFIH (i) in exchange for the Notes in the Exchange Offer or (ii) in exchange for Indebtedness of TCEH or EFH Corp. received in exchange for the Notes in the Exchange Offer and (B) Investments in Indebtedness of EFH Corp. or its Subsidiaries received by EFIH in exchange for other Indebtedness of EFIH or any Guarantor incurred under clause (2) under the second paragraph under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" covenant, including in the case of both (A) and (B) above, for the avoidance of doubt, the exchanges of any such Indebtedness, which shall be deemed to be "Permitted Investments" hereunder.

"*PERMITTED LIENS*" MEANS, WITH RESPECT TO ANY PERSON:

182

(1)  pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business (including in connection with the construction or restoration of facilities for the generation, transmission or distribution of electricity) or otherwise constituting Permitted Investments;

(2)  Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet overdue for a period of more than 30 days or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(3)  Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than 30 days or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(4)  Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5)  minor survey or title exceptions or irregularities, minor encumbrances, easements or reservations of, or rights of others for, licenses, permits, conditions, covenants, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6)  Liens securing Indebtedness permitted to be incurred pursuant to clause (4), (12) or (13) of the second paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that (a) Liens securing Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (13) relate only to Refinancing Indebtedness that serves to refund or refinance Indebtedness, Disqualified Stock or Preferred Stock incurred under clause (4) or (12) of the second paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," and (b) Liens securing Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (4) of the second paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" extend only to the assets so financed, purchased, constructed or improved;

(7)  Liens existing on the Issue Date;

(8)  Liens on property or shares of stock of a Person at the time such Person becomes a Subsidiary; *provided, however,* such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; *provided, further, however,* that such Liens may not extend to any other property owned by EFIH or any of its Restricted Subsidiaries;

(9)  Liens on property at the time EFIH or a Restricted Subsidiary acquired the property, including any acquisition by means of a merger or consolidation with or into EFIH or any of its

183

EFIHMW00259899

Restricted Subsidiaries; *provided, however*, that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition; *provided, further, however*, that the Liens may not extend to any other property owned by EFIH or any of its Restricted Subsidiaries;

(10) Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to EFIH or another Restricted Subsidiary permitted to be incurred in accordance with the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(11) Liens securing Hedging Obligations, of EFIH or its Restricted Subsidiaries incurred under clause (10) of the second paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that such agreements were entered into in the ordinary course of business and not for speculative purposes (as determined by EFIH in its reasonable discretion acting in good faith) and, in the case of any commodity Hedging Obligations or any Hedging Obligation of the type described in clause (c) of the definition of "Hedging Obligations," entered into in order to hedge against or manage fluctuations in the price or availability of any Covered Commodity;

(12) Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(13) leases, subleases, licenses or sublicenses granted to others in the ordinary course of business which do not materially interfere with the ordinary conduct of the business of EFIH or any of its Restricted Subsidiaries;

(14) Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by EFIH and its Restricted Subsidiaries in the ordinary course of business;

(15) Liens in favor of EFIH or any Guarantor;

(16) [Intentionally omitted];

(17) Liens on accounts receivable, other Receivables Facility assets, or accounts into which collections or proceeds of Receivables Facility assets are deposited, in each case in connection with a Receivables Facility for the benefit of EFIH or its Restricted Subsidiaries;

(18) Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8) and (9); *provided, however*, that (a) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property), and (b) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), and (9) at the time the original Lien became a Permitted Lien under the Indenture, and (ii) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement;

(19) deposits made in the ordinary course of business to secure liability to insurance carriers;

(20) other Liens securing obligations incurred in the ordinary course of business which obligations do not exceed $100.0 million at any one time outstanding;

184

EFIHMW00259900

(21) Liens securing judgments for the payment of money not constituting an Event of Default under clause (5) under "—Events of Default and Remedies" so long as such Liens are adequately bonded and any appropriate legal proceedings that may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(22) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(23) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code, or any comparable or successor provision, on items in the course of collection, and (ii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(24) Liens deemed to exist in connection with Investments in repurchase agreements permitted by the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreements;

(25) ground leases or subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by EFIH or any of its Subsidiaries are located;

(26) Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of EFIH or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of EFIH and its Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of EFIH or any of its Restricted Subsidiaries in the ordinary course of business;

(27) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of goods entered into by EFIH or any Restricted Subsidiary in the ordinary course of business;

(28) rights reserved to or vested in others to take or receive any part of, or royalties related to, the power, gas, oil, coal, lignite or other minerals or timber generated, developed, manufactured or produced by, or grown on, or acquired with, any property of EFIH or any of its Restricted Subsidiaries and Liens upon the production from property of power, gas, oil, coal, lignite or other minerals or timber, and the by-products and proceeds thereof, to secure the obligations to pay all or a part of the expenses of exploration, drilling, mining or development of such property only out of such production or proceeds;

(29) Liens arising out of all presently existing and future division and transfer orders, advance payment agreements, processing contracts, gas processing plant agreements, operating agreements, gas balancing or deferred production agreements, pooling, unitization or communitization agreements, pipeline, gathering or transportation agreements, platform agreements, drilling contracts, injection or repressuring agreements, cycling agreements, construction agreements, salt water or other disposal agreements, leases or rental agreements, farm-out and farm-in agreements, exploration and development agreements, and any and all other contracts or agreements covering, arising out of, used or useful in connection with or pertaining to the exploration, development, operation, production, sale, use, purchase, exchange, storage, separation, dehydration, treatment, compression, gathering, transportation, processing, improvement, marketing, disposal or handling of any property of EFIH or any of its Restricted Subsidiaries, *provided* that such agreements are entered into in the ordinary course of business (including in respect of construction and restoration activities);

Confidential

EFIHMW00259901

(30) any restrictions on any stock or stock equivalents or other joint venture interests of EFIH or any of its Restricted Subsidiaries providing for a breach, termination or default under any owners, participation, shared facility, joint venture, stockholder, membership, limited liability company or partnership agreement between such Person and one or more other holders of such stock or stock equivalents or interest of such Person, if a security interest or other Lien is created on such stock or stock equivalents or interest as a result thereof and other similar Liens;

(31) [Intentionally omitted];

(32) Liens and other exceptions to title, in either case on or in respect of any facilities of EFIH or any of its Restricted Subsidiaries, arising as a result of any shared facility agreement entered into with respect to such facility, except to the extent that any such Liens or exceptions, individually or in the aggregate, materially adversely affect the value of the relevant property or materially impair the use of the relevant property in the operation of business of EFIH or any of its Restricted Subsidiaries, taken as a whole;

(33) Liens on cash and Cash Equivalents (i) deposited by EFIH or any of its Restricted Subsidiaries in margin accounts with or on behalf of brokers, credit clearing organizations, independent system operators, regional transmission organizations, pipelines, state agencies, federal agencies, futures contract brokers, customers, trading counterparties, or any other parties or issuers of surety bonds or (ii) pledged or deposited as collateral by EFIH or any of its Restricted Subsidiaries with any of the entities described in clause (i) above to secure their respective obligations, in the case of each of clauses (i) and (ii) above, with respect to: (A) any contracts and transactions for the purchase, sale, exchange of, or the option (whether physical or financial) to purchase, sell or exchange (1) natural gas, (2) electricity, (3) coal and lignite, (4) petroleum-based liquids, (5) oil, (6) nuclear fuel (including enrichment and conversion), (7) emissions or other environmental credits, (8) waste byproducts, (9) weather, (10) power and other generation capacity, (11) heat rate, (12) congestion, (13) renewal energy credit, or (14) any other energy-related commodity or services or derivative (including ancillary services and related risk (such as location basis)); (B) any contracts or transactions for the purchase, processing, transmission, transportation, distribution, sale, lease, hedge or storage of, or any other services related to any commodity or service identified in subparts (1) through (14) above, including any capacity agreement; (C) any financial derivative agreement (including but not limited to swaps, options or swaptions) related to any commodity identified in subparts (1) through (14) above, or to any interest rate or currency rate management activities; (D) any agreement for membership or participation in an organization that facilitates or permits the entering into or clearing of any netting agreement or any agreement described in this clause (33); (E) any agreement combining part or all of a netting agreement or part or all of any of the agreements described in this clause (33); (E) any document relating to any agreement described in this clause (33) that is filed with a Government Authority and any related service agreements; or (F) any commercial or trading agreements, each with respect to, or involving the purchase, transmission, distribution, sale, lease or hedge of, any energy, generation capacity or fuel, or any other energy related commodity or service, price or price indices for any such commodities or services or any other similar derivative agreements, and any other similar agreements (such agreements described in clauses (A) through (F) of this clause (33) being collectively, "*Permitted Contracts*"), Netting Agreements, Hedging Obligations and letters of credit supporting Permitted Contracts, Netting Agreements and Hedging Obligations;

(34) Liens arising under Section 9.343 of the Texas Uniform Commercial Code or similar statutes of states other than Texas;

(35) Liens created in the ordinary course of business in favor of banks and other financial institutions over credit balances of any bank accounts of EFIH and its Subsidiaries held at such banks or financial institutions, as the case may be, to facilitate the operation of cash pooling and/or interest set-off arrangements in respect of such bank accounts in the ordinary course of business;

Confidential

EFIHMW00259902

(36) any zoning, land use, environmental or similar law or right reserved to or vested in any Government Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of EFIH or any of its Restricted Subsidiaries, taken as a whole;

(37) any Lien arising by reason of deposits with or giving of any form of security to any Government Authority for any purpose at any time as required by applicable law as a condition to the transaction of any business or the exercise of any privilege or license, or to enable EFIH or any of its Restricted Subsidiaries to maintain self-insurance or to participate in any fund for liability on any insurance risks;

(38) Liens, restrictions, regulations, easements, exceptions or reservations of any Government Authority applying particularly to nuclear fuel;

(39) rights reserved to or vested in any Government Authority by the terms of any right, power, franchise, grant, license or permit, or by any provision of applicable law, to terminate or modify such right, power, franchise, grant, license or permit or to purchase or recapture or to designate a purchaser of any of the property of such person;

(40) Liens arising under any obligations or duties affecting any of the property of EFIH or any of its Restricted Subsidiaries to any Government Authority with respect to any franchise, grant, license or permit which do not materially impair the use of such property for the purposes for which it is held;

(41) rights reserved to or vested in any Government Authority to use, control or regulate any property of such person;

(42) any obligations or duties, affecting the property of EFIH or any of its Restricted Subsidiaries, to any Government Authority with respect to any franchise, grant, license or permit;

(43) a set-off or netting rights granted by EFIH or any Subsidiary of EFIH pursuant to any agreements related to Hedging Obligations, Netting Agreements or Permitted Contracts solely in respect of amounts owing under such agreements;

(44) Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment described under the definition of "Permitted Investments" to be applied against the purchase price for such Investment and (ii) consisting of an agreement to sell, transfer, lease or otherwise dispose of any property in a transaction excluded from the definition described under "Asset Sale," in each case, solely to the extent such Investment or sale, disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien;

(45) [Intentionally omitted]; and

(46) any amounts held by a trustee in the funds and accounts under any indenture securing any revenue bonds issued for the benefit of EFIH or any of its Restricted Subsidiaries.

For purposes of this definition, the term "Indebtedness" shall be deemed to include interest on such Indebtedness.

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"*Preferred Stock*" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

187

EFIHMW00259903

"*Purchase Money Obligations*" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction, repair, restoration, replacement, expansion or improvement of property (real or personal) or assets (other than Capital Stock), and whether acquired through the direct acquisition of such property or assets, or otherwise, incurred in respect of capital expenditures, including Environmental CapEx Debt and Necessary CapEx Debt.

"*Qualified Proceeds*" means assets that are used or useful in, or Capital Stock of any Person engaged in, a Similar Business; provided that the fair market value of any such assets or Capital Stock shall be determined by EFIH in good faith.

"*Rating Agencies*" means each of Moody's, S&P and Fitch, or if any of Moody's, S&P or Fitch shall not make a rating on the Notes or other investment publicly available, a "nationally recognized statistical rating organization" within the meaning of Rule 15c3-1(c)(2)(vi)(F) under the Exchange Act selected by EFIH which shall be substituted for Moody's, S&P or Fitch, or all of them, as the case may be.

"*Receivables Facility*" means any of one or more receivables financing facilities or programs as amended, supplemented, modified, extended, renewed, restated or refunded from time to time, the Obligations of which are non-recourse (except for customary representations, warranties, covenants and indemnities made in connection with such facilities) to EFIH or any of its Restricted Subsidiaries (other than a Receivables Subsidiary) pursuant to which EFIH or any of its Restricted Subsidiaries purports to sell its accounts receivable to either (a) a Person that is not a Restricted Subsidiary or (b) a Receivables Subsidiary that in turn funds such purchase by purporting to sell its accounts receivable to a Person that is not a Restricted Subsidiary or by borrowing from such a Person or from another Receivables Subsidiary that in turn funds itself by borrowing from such a Person.

"*Receivables Fees*" means distributions or payments made directly or by means of discounts with respect to any accounts receivable or participation interest therein issued or sold in connection with, and other fees paid to a Person that is not a Restricted Subsidiary in connection with any Receivables Facility.

"*Receivables Subsidiary*" means any Subsidiary formed for the purpose of facilitating or entering into one or more Receivables Facilities, and in each case engages only in activities reasonably related or incidental thereto.

"*Redemption Date*" has the meaning set forth under "Optional Redemption."

"*Related Business Assets*" means (A) except in the case of a Permitted Asset Swap of Collateral, assets (other than cash or Cash Equivalents) used or useful in, or securities of, a Similar Business; provided that any assets or securities received by EFIH or a Restricted Subsidiary in exchange for assets or securities transferred by EFIH or a Restricted Subsidiary will not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Restricted Subsidiary and (B) in the case of a Permitted Asset Swap of Collateral, assets (other than cash or Cash Equivalents) used or useful in, or Capital Stock of, a Similar Oncor Business; provided that any Capital Stock received by EFIH in exchange for Collateral will not be deemed to be Related Business Assets, unless upon receipt of the Capital Stock of such Person, such Person would become a Subsidiary of EFIH or a joint venture in which EFIH has a significant equity interest (as determined by EFIH in good faith).

"*Required Junior Lien Debtholders*" means, at any time, the holders of a majority in aggregate principal amount of all Junior Lien Debt (including outstanding letters of credit whether or not then available or drawn) then outstanding and the aggregate unfunded commitments to extend credit which, when funded, would constitute Junior Lien Debt, calculated in accordance with the provisions described under "—Security for the Notes—Voting." For purposes of this definition, Junior Lien Debt registered in the name of, or beneficially owned by, the Issuer or any Affiliate of the Issuer will be deemed not to be outstanding.

"*Required Parity Lien Debtholders*" means, at any time, the holders of a majority in aggregate principal amount of all Parity Lien Debt (including outstanding letters of credit whether or not then available or drawn) then outstanding and the aggregate unfunded commitments to extend credit which, when funded, would constitute Parity Lien Debt, calculated in accordance with the provisions described under "—Security for the Notes—Voting." For

188

EFIHMW00259904

purposes of this definition, Parity Lien Debt registered in the name of, or beneficially owned by, the Issuer or any Affiliate of the Issuer will be deemed not to be outstanding.

"*Restoration Certificate*" shall mean, with respect to any Casualty Event, an Officer's Certificate provided to the Trustee prior to the 365th day after such Casualty Event has occurred certifying (a) that EFIH or such Restricted Subsidiary intends to use the proceeds received in connection with such Casualty Event to repair, restore or replace the property or assets in respect of which such Casualty Event occurred, (b) the approximate costs of completion of such repair, restoration or replacement and (c) that such repair, restoration or replacement will be completed within the later of (x) 450 days after the date on which cash proceeds with respect to such Casualty Event were received and (y) 180 days after delivery of such Restoration Certificate.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Payment Coverage Ratio*" means (i) for Restricted Payments (other than payments of cash dividends or distributions to EFH Corp. on, or in respect of, EFIH's Capital Stock, purchases for cash or other acquisitions for cash of any Capital Stock of EFIH or any direct or indirect parent of EFIH for the purpose of paying any such dividend or distribution to, or acquisitions of Capital Stock of any direct or indirect parent of EFIH for cash from, the Investors, or guaranteeing any Indebtedness of any Affiliate of EFIH for the purpose of paying such dividend, making such distribution or so acquiring such Capital Stock to or from the Investors, all such Restricted Payments being referred to as "*Investor Payments*"), the Fixed Charge Coverage Ratio of EFIH and its Restricted Subsidiaries treating the Oncor Subsidiaries as Restricted Subsidiaries for purposes of such calculation and (ii) for Restricted Payments constituting Investor Payments, the Fixed Charge Coverage Ratio of EFIH and its Restricted Subsidiaries.

"*Restricted Subsidiary*" means, at any time, any direct or indirect Subsidiary of EFIH (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; *provided, however*, that upon an Unrestricted Subsidiary's ceasing to be an Unrestricted Subsidiary, such Subsidiary shall be included in the definition of "Restricted Subsidiary."

"*S&P*" means Standard & Poor's, a Standard & Poor's Financial Services LLC business, and any successor to its rating agency business.

"*Sale and Lease-Back Transaction*" means any arrangement providing for the leasing by EFIH or any of its Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by EFIH or such Restricted Subsidiary to a third Person in contemplation of such leasing.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Secured Debt Documents*" means the Parity Lien Documents and the Junior Lien Documents.

"*Secured Debt Obligations*" means Parity Lien Obligations and Junior Lien Obligations.

"*Secured Indebtedness*" means any Indebtedness of EFIH or any of its Restricted Subsidiaries secured by a Lien.

"*Secured Lien Debt*" means Parity Lien Debt and Junior Lien Debt.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Security Documents*" means the Collateral Trust Agreement, the Pledge Agreement, and all other security agreements, pledge agreements, collateral assignments, mortgages, collateral agency agreements, deed of trust or other grants or transfers for security executed and delivered by EFIH, a Guarantor or any other obligor under the Notes creating (or purporting to create) a Lien upon Collateral in favor of the Collateral Trustee for the benefit of the

189

holders of the Secured Debt Obligations, in each case, as amended, modified, renewed, restated or replaced, in whole or in part, from time to time, in accordance with its terms.

"*SENIOR INDEBTEDNESS*" MEANS:

(1) **all Indebtedness of the Issuer or any Guarantor outstanding under EFIH's guarantee of any Existing EFH Corp. Notes, the EFIH 9.75% Notes and the Notes and any related Guarantees (including interest accruing on or after the filing of any petition in bankruptcy or similar proceeding or for reorganization of the Issuer or any Guarantor (at the rate provided for in the documentation with respect thereto, regardless of whether or not a claim for post-filing interest is allowed in such proceedings)), and any and all other fees, expense reimbursement obligations, indemnification amounts, penalties, and other amounts (whether existing on the Issue Date or thereafter created or incurred) and all obligations of the Issuer or any Guarantor to reimburse any bank or other Person in respect of amounts paid under letters of credit, acceptances or other similar instruments;**

(2) **all Hedging Obligations of the Issuer or any Guarantor (and guarantees thereof) owing to a lender or any Affiliate of such lender (or any Person that was a lender or an Affiliate of such lender at the time the applicable agreement giving rise to such Hedging Obligation was entered into);** *provided* **that such Hedging Obligations are permitted to be incurred under the terms of the Indenture;**

(3) **any other Indebtedness of the Issuer or any Guarantor permitted to be incurred under the terms of the Indenture, unless the instrument under which such Indebtedness is incurred expressly provides that it is subordinated in right of payment to the Notes or any related Guarantee; and**

(4) **all Obligations with respect to the items listed in the preceding clauses (1), (2) and (3);**

*provided, however*, that Senior Indebtedness shall not include:

(a) **any obligation of such Person to the Issuer or any of its Subsidiaries;**

(b) **any liability for federal, state, local or other taxes owed or owing by such Person;**

(c) **any accounts payable or other liability to trade creditors arising in the ordinary course of business;**

(d) **any Indebtedness or other Obligation of such Person which is subordinate or junior in any respect to any other Indebtedness or other Obligation of such Person; and**

(e) **that portion of any Indebtedness which at the time of incurrence is incurred in violation of the Indenture.**

"*Series of Junior Lien Debt*" means, severally, each issue or series of Junior Lien Debt for which a single transfer register is maintained (provided that any Hedging Obligations constituting Junior Lien Debt shall be deemed part of the Series of Junior Lien Debt to which it relates).

"*Series of Parity Lien Debt*" means, severally, the Notes, the EFIH 9.75% Notes, the 9.75% EFH Corp. Notes, the EFH Corp. 10.000% Notes and any Additional Notes or other Indebtedness that constitutes Parity Lien Debt (provided that any Hedging Obligations constituting Parity Lien Debt shall be deemed part of the Series of Parity Lien Debt to which it relates).

"*Series of Secured Lien Debt*" means each Series of Parity Lien Debt and each Series of Junior Lien Debt.

190

EFIHMW00259906

"*Significant Subsidiary*" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such regulation is in effect on the Closing Date.

"*Similar Business*" means any business conducted or proposed to be conducted by EFIH and its Subsidiaries on the Closing Date or any business that is similar, reasonably related, incidental or ancillary thereto.

"*Similar Oncor Business*" means any business which is primarily engaged in a regulated electricity or other energy transmission or distribution business in the United States (as determined by EFIH in good faith).

"*Sponsor Management Agreement*" means the management agreement between certain of the management companies associated with the Investors and EFH Corp.

### "*SUBORDINATED INDEBTEDNESS*" MEANS,

(1)  **any Indebtedness of the Issuer which is by its terms subordinated in right of payment to the Notes, and**

(2)  **any Indebtedness of any Guarantor which is by its terms subordinated in right of payment to the Guarantee of such entity of the Notes.**

"*Subsidiary*" means, with respect to any Person:

(1)  **any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; and**

(2)  **any partnership, joint venture, limited liability company or similar entity of which**

(x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise, and

(y) such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"*Successor Oncor Business*" means any Person the Capital Stock of which is received by EFIH in an Asset Sale, including a Permitted Asset Swap, of Collateral or as a dividend or distribution from an Oncor Subsidiary.

"*TCEH*" means Texas Competitive Electric Holdings Company LLC.

"*TCEH Notes*" means the notes previously issued by TCEH to refinance indebtedness under the TCEH Senior Interim Facility.

"*TCEH Senior Interim Facility*" means the interim loan agreement, dated as of the Closing Date by and among Energy Future Competitive Holdings, as guarantor, TCEH, as borrower, the other guarantors parties thereto, the lenders party thereto in their capacities as lenders thereunder and Morgan Stanley Senior Funding, Inc., as Administrative Agent, including any guarantees, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications or restatements thereof.

191

EFIHMW00259907

"*TCEH Senior Secured Facilities*" means the credit agreement dated as of the Closing Date, as amended on August 7, 2009, by and among Energy Future Competitive Holdings, as guarantor, TCEH, as borrower, the lenders party thereto in their capacities as lenders thereunder and Citibank, N.A., as Administrative Agent, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any additional amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock").

"*Total Assets*" means the total assets of EFIH and its Restricted Subsidiaries on a consolidated basis, as shown on the most recent consolidated balance sheet of EFIH or such other Person as may be expressly stated.

"*Transactions*" means the transactions contemplated by the Transaction Agreement, borrowings under the TCEH Senior Secured Facilities, the EFH Senior Interim Facility, the TCEH Senior Interim Facility, the Oncor Electric Delivery Facility and any Receivables Facility as in effect on the Closing Date, any repayments of indebtedness of EFH Corp. and its Subsidiaries in connection therewith, and the issuance of the EFH Corp. 2017 Notes and the TCEH Notes and any repayments of Indebtedness of EFH Corp. and its Subsidiaries in connection therewith.

"*Transaction Agreement*" means the Agreement and Plan of Merger, dated as of February 25, 2007, among Merger Sub, Texas Energy Future Holdings Limited Partnership and EFH Corp.

"*Treasury Rate*" means, as of any Redemption Date, the yield to maturity as of such Redemption Date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the Redemption Date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the Redemption Date to December 1, 2015; *provided, however*, that if the period from the Redemption Date to December 1, 2015 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"*Trust Indenture Act*" means the Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa-77bbbb).

"*Unrestricted Cash*" means, as of any date, without duplication, (a) all cash and Cash Equivalents (in each case, free and clear of all Liens, other than nonconsensual Liens permitted by the covenant described under "—Certain Covenants—Limitation on Liens" and Liens permitted by clause (23), subclauses (i) and (ii) of clause (26) and clause (33) of the definition of Permitted Liens, included in the cash and cash equivalents accounts listed on the consolidated balance sheet of EFIH and its Restricted Subsidiaries as of such date and (b) all unrestricted margin deposits related to commodity positions listed on the consolidated balance sheet of EFIH and the Restricted Subsidiaries.

### "*UNRESTRICTED SUBSIDIARY*" MEANS:

    (1)  **each of the Oncor Subsidiaries;**

    (2)  **any Subsidiary of EFIH other than EFIH Finance or any Guarantor owning Collateral which at the time of determination is an Unrestricted Subsidiary (as designated by EFIH, as provided below); and**

    (3)  **any Subsidiary of an Unrestricted Subsidiary.**

EFIH may designate any Subsidiary of EFIH (including any existing Subsidiary and any newly acquired or newly formed Subsidiary) other than EFIH Finance or any Guarantor owning Collateral to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns

Confidential

or holds any Lien on, any property of, EFIH or any Subsidiary of EFIH (other than solely any Subsidiary of the Subsidiary to be so designated); *provided* that

(1)  **any Unrestricted Subsidiary must be an entity of which the Equity Interests entitled to cast at least a majority of the votes that may be cast by all Equity Interests having ordinary voting power for the election of directors or Persons performing a similar function are owned, directly or indirectly, by EFIH;**

(2)  **such designation complies with the covenants described under "—Certain Covenants—Limitation on Restricted Payments"; and**

(3)  **each of:**

(a)  **the Subsidiary to be so designated; and**

(b)  **its Subsidiaries**

has not at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness pursuant to which the lender has recourse to any of the assets of EFIH or any Restricted Subsidiary.

EFIH may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that, immediately after giving effect to such designation, no Default shall have occurred and be continuing and in the case of any Subsidiary of EFIH, (A) EFIH could incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test described in the first paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; or (B) the Fixed Charge Coverage Ratio for EFIH and its Restricted Subsidiaries would be greater than such ratio for EFIH and its Restricted Subsidiaries immediately prior to such designation, in each case on a *pro forma* basis taking into account such designation.

Any such designation by EFIH shall be notified by EFIH to the Trustee by promptly filing with the Trustee a copy of the resolution of the board of directors of EFIH or any committee thereof giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing provisions.

"*Voting Stock*" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

"*WEIGHTED AVERAGE LIFE TO MATURITY*" MEANS, WHEN APPLIED TO ANY INDEBTEDNESS, DISQUALIFIED STOCK OR PREFERRED STOCK, AS THE CASE MAY BE, AT ANY DATE, THE QUOTIENT OBTAINED BY DIVIDING:

(1)  **the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment; by**

(2)  **the sum of all such payments.**

"*Wholly-Owned Subsidiary*" of any Person means a Subsidiary of such Person, 100% of the outstanding, Equity Interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

193

EFIHMW00259909

## COMPARISON OF PRINCIPAL DIFFERENCES BETWEEN OLD NOTES
## AND NEW EFIH SENIOR SECURED NOTES

The following description is a summary of the principal differences between certain terms and provisions of the Old Notes and the New EFIH Senior Secured Notes. This summary does not purport to be complete and is qualified in its entirety by express reference to the Old Notes Indenture, a copy of which has been filed with the SEC, and the indenture relating to the New EFIH Senior Secured Notes, a copy of which will be filed with the SEC, which, in each case, are or will be available as described under "Available Information."

The following description does not give effect to the Proposed Amendments. For a summary of the changes that will be made to the Old Notes Indenture if the applicable Proposed Amendments become operative with respect to the Old Notes, see "Proposed Amendments."

For more detailed information relating to the terms of the New EFIH Senior Secured Notes, see "Description of the Notes."

Certain capitalized terms used below have the meanings assigned to such terms in the Old Notes Indenture, or the indenture pursuant to which the New EFIH Senior Secured Notes will be issued. See "Description of the Notes—Certain Definitions" for definitions of capitalized terms used, but not defined, in the column below titled "New EFIH Senior Secured Notes." All numbered or lettered items below reflect the numbering or lettering corresponding to such items in the relevant indenture and/or description of the relevant New EFIH Senior Secured Notes included in this Prospectus.

194

EFIHMW00259910

|  | **Old Notes** | **New EFIH Senior Secured Notes** |
|---|---|---|
| **Issuer** | EFH Corp. | EFIH and EFIH Finance |
| **Interest Rate** | *Old Cash-Pay Notes*: 10.875% per annum | 10.00% per annum |
|  | *Old Toggle Notes*: |  |
|  | 11.250%/12.000% per annum; Interest on the Toggle Notes may be paid in additional notes in lieu of cash for any interest payment period prior to November 1, 2012. |  |
| **Maturity** | November 1, 2017 | December 1, 2020 |
| **Collateral** | None | The notes will be secured by Equity Interests in, Indebtedness of, and other Investments in, any Oncor Subsidiary owned by EFIH; and the proceeds, income and other payments therefrom. |
| **Guarantees** | EFCH and EFIH | None |
| **Ranking** | Senior unsecured | Senior secured |
| **Listing** | None | Expected listing on the New York Stock Exchange |
| **Redemption** | Prior to November 1, 2012, optional "make-whole" redemption in whole or in part at any time at 100% of their aggregate principal amount plus a "make-whole" premium, plus accrued and unpaid interest to the redemption date. | Prior to December 1, 2015, optional "make-whole" redemption in whole or in part at any time at 100% of their aggregate principal amount, plus a "make-whole" premium and accrued and unpaid interest to the redemption date. |
|  | Beginning on November 1, 2012, the Issuer may redeem any of the notes at specified redemption prices. | Beginning on December 1, 2015, the Issuer may redeem any of the notes at specified redemption prices. |
|  | Prior to November 1, 2010, the Issuer may redeem up to 35% of the aggregate principal amount of the notes using the proceeds from certain equity offerings at 110.875% (for Old Cash-Pay Notes) or 111.250% (for Old Toggle Notes) of their aggregate principal amount, plus accrued and unpaid interest to | Prior to December 1, 2013, the Issuer may redeem up to 35% of the aggregate principal amount of the notes using the proceeds from certain equity offerings at 110.000% of their aggregate principal amount, plus accrued and unpaid interest to the redemption date. |

195

EFIHMW00259911

|  | **Old Notes** | **New EFIH Senior Secured Notes** |
|---|---|---|
|  | the redemption date. |  |
| **Registration/Transfer Restrictions** | 144A/Reg S with subsequent SEC registration | SEC Registered |
| *Principal Covenants* |  |  |
| **Change of Control** | Upon the occurrence of a Change of Control, holders of the notes have the right to require the Issuer to repurchase some or all of the notes at 101% of their aggregate principal amount, plus accrued and unpaid interest to the repurchase date. | Upon the occurrence of a Change of Control, holders of the notes have the right to require the Issuer to repurchase some or all of the notes at 101% of their aggregate principal amount, plus accrued and unpaid interest to the repurchase date. |
|  | "Change of Control" is generally defined as: (1) the sale, lease or transfer of all or substantially all of the assets of the Issuer and its subsidiaries, taken as a whole, to any person other than a Permitted Holder; or (2) the Issuer becomes aware of the acquisition by any person or group, other than the Permitted Holders, by way of merger, consolidation or other business combination or purchase of beneficial ownership of 50% or more of the total voting power of the Issuer or any of its direct or indirect parent companies. | "Change of Control" is generally defined as: (1) the sale, lease or transfer of all or substantially all of the assets of EFIH and its subsidiaries taken as a whole, or all or substantially all of the Collateral or Oncor-related Assets, to any person other than a Permitted Holder, other than (A) a Permitted Asset Transfer meeting the requirements of the proviso following clause (3) below and (B) any foreclosure on the Collateral, provided that a transaction that would otherwise constitute a Change of Control pursuant to this clause (1) will not constitute a Change of Control if: (a) the consideration received in respect of such transaction (i) is received by EFIH or an Oncor Subsidiary or Successor Oncor Business; (ii) consists of capital stock of a person in a Similar Oncor Business that (A) would become a Subsidiary of EFIH or such Oncor Subsidiary or Successor Oncor Business or (B) is a joint venture in which EFIH or such Oncor Subsidiary or Successor Oncor Business would have a significant Equity Interest; (iii) is at least equal to the fair market value of the assets sold, transferred, conveyed or otherwise disposed of; and (iv) if received by EFIH, is concurrently pledged as Collateral; (b) immediately after such transaction no Default exists; (c) immediately after giving pro forma effect to such |

196

EFIHMW00259912

| Old Notes | New EFIH Senior Secured Notes |
|---|---|
| | transaction, |

either (i) EFIH would be able to incur at least $1 of additional Indebtedness under the Fixed Charge Coverage Ratio test in the limitation on incurrence of Indebtedness covenant or (ii) its Fixed Charge Coverage Ratio would be greater as a result of the transaction; and (d) the rating on the notes is not downgraded within a specified time frame; and (e) each guarantor has by a supplemental indenture confirmed its guarantee; (2) EFIH becomes aware of the acquisition by any person or group, other than the Permitted Holders, by way of merger, consolidation or other business combination or purchase of beneficial ownership of 50% or more of the total voting power of EFIH or any of its direct or indirect parent companies; or (3) at any time, EFH Corp. ceases to own at least a majority of the total voting power of EFIH, provided that certain Permitted Asset Transfers will not constitute a Change of Control if: (a) such Permitted Asset Transfer complies with the merger covenant; (b) the successor company has assumed all the obligations of EFIH under the notes and the related documents, in accordance with the merger covenant; (c) immediately after such transaction no Default exists; (d) immediately after giving pro forma effect to such transaction, either (i) EFIH or the successor company would be able to incur at least $1 of additional Indebtedness under the Fixed Charge Coverage Ratio test in the limitation on incurrence of Indebtedness covenant or (ii) its Fixed Charge Coverage Ratio would be greater as a result of the transaction; (e) the rating on the notes is not downgraded within a specified time frame; and (f) EFIH or the successor company has delivered to the trustee an opinion of counsel relating to the Collateral.

197

EFIHMW00259913

**PX 027
Page 207 of 232**

|  | Old Notes | New EFIH Senior Secured Notes |
|---|---|---|
| **Limitation on Restricted Payments** | The Issuer and its Restricted Subsidiaries are prohibited from (I) declaring or paying any dividend or making any payment or distribution on account of the Issuer's, or any of its Restricted Subsidiaries' Equity Interests; (II) purchasing, redeeming, defeasing or otherwise acquiring or retiring for value any Equity Interests of the Issuer or any direct or indirect parent of the Issuer; (III) making any principal payment on, or redeeming, repurchasing, defeasing or otherwise acquiring or retiring for value, prior to any scheduled repayment, sinking fund payment or maturity, any subordinated Indebtedness; or (IV) making any restricted investment unless: (1) no default has occurred; (2)(A) with respect to any Restricted Payment by the Issuer or any Restricted Subsidiary of the Issuer (other than TCEH and its Restricted Subsidiaries), on a pro forma basis, the Restricted Payment Coverage Ratio would have been at least 2.00 to 1.00 or (B) with respect to a Restricted Payment by TCEH or any Restricted Subsidiary of TCEH, on a pro forma basis, TCEH could incur at least $1 of additional Indebtedness under its Fixed Charge Coverage Ratio test in the limitation on incurrence of Indebtedness covenant; and (3)(A) certain Restricted Payments made by the Issuer and its Restricted Subsidiaries (other than TCEH and its Restricted Subsidiaries) would be less than 50% of the Issuer's Consolidated Net Income from October 1, 2007 and (B) certain Restricted Payments made by TCEH and its Restricted Subsidiaries would be less than 50% of TCEH's Consolidated Net Income from October 1, 2007.

This prohibition is also subject to enumerated exceptions including, among others (using cross-references as set forth in this covenant in the Old Notes Indenture): (7) aggregate | EFIH and its Restricted Subsidiaries are prohibited from (I) declaring or paying any dividend or making any payment or distribution on account of EFIH's, or any of its Restricted Subsidiaries' Equity Interests; (II) purchasing, redeeming, defeasing or otherwise acquiring or retiring for value any Equity Interests of EFIH or any direct or indirect parent of EFIH; (III) making any principal payment on, or redeeming, repurchasing, defeasing or otherwise acquiring or retiring for value, prior to any scheduled repayment, sinking fund payment or maturity, any subordinated Indebtedness; or (IV) making any restricted investment unless: (1) no default has occurred; (2) on a pro forma basis, the Restricted Payment Coverage Ratio would have been at least 2.00 to 1.00; and (3) certain Restricted Payments made by EFIH and its Restricted Subsidiaries would be less than 50% of EFIH's Consolidated Net Income from October 11, 2007. This prohibition is also subject to enumerated exceptions including, among others (using cross-references as set forth in this covenant in the indenture governing the New EFIH Senior Secured Notes (the "EFIH Indenture")): (7) aggregate Investments in Unrestricted Subsidiaries having an aggregate fair market value not to exceed (A) 1.5% of Total Assets at the time of such Investment and (B) to the extent invested in any of the Oncor Subsidiaries, $500.0 million; (11)(A) aggregate Restricted Payments not to exceed $100 million and (B) loans to EFH Corp. in amounts to permit EFH Corp. to pay interest when due on certain of its Indebtedness; (16) Restricted Payments to permit EFH Corp. to allow it to comply with the asset sale covenant under its indenture; and (18) Restricted Payments to permit EFH Corp. to make interest payments on certain of its existing notes and the New EFIH Senior Secured Notes; and (using |

198

EFIHMW00259914

**PX 027**
**Page 208 of 232**

**Old Notes**

Investments in Unrestricted Subsidiaries having an aggregate fair market value not to exceed (A) 1.5% of Total Assets at the time of such Investment and (B) to the extent invested in any of the Oncor Subsidiaries, $500 million; and (11) aggregate Restricted Payments not to exceed 2.0% of Total Assets; and (using cross-references as set forth in the definition of "Permitted Investments" in the Old Notes Indenture): (8) aggregate Investments in a Similar Business having an aggregate fair market value not to exceed 3.5% of Total Assets; (13) additional Investments having an aggregate fair market value not to exceed 3.5% of Total Assets; and (18) aggregate Investments in Shell Wind not to exceed $1,500 million.

In addition, the Issuer and its Restricted Subsidiaries are prohibited from paying cash dividends or distributions (or making repurchases or incurring debt to achieve the same result) to the Investors unless the Consolidated Leverage Ratio of the Issuer would be equal to or less than 7.00 to 1.00.

**New EFIH Senior Secured Notes**

cross-references as set forth in the definition of "Permitted Investments" in the EFIH Indenture): (8) aggregate Investments in a Similar Business having an aggregate fair market value not to exceed 3.5% of Total Assets; and (13) additional Investments having an aggregate fair market value not to exceed 3.5% of Total Assets.

In addition, EFIH and its Restricted Subsidiaries are prohibited from paying cash dividends or distributions (or making repurchases or incurring debt to achieve the same result) to EFH Corp. to permit it to make such payments to the Investors unless the Consolidated Leverage Ratio of EFIH (treating the Oncor Subsidiaries as Restricted Subsidiaries) would be equal to or less than 6.00 to 1.00 prior to a Permitted Asset Transfer and 7.00 to 1.00 after a Permitted Asset Transfer.

199

|  | **Old Notes** | **New EFIH Senior Secured Notes** |
|---|---|---|
| **Limitation on Incurrence of Indebtedness** | The Issuer and its Restricted Subsidiaries are prohibited from incurring Indebtedness and issuing shares of preferred stock and/or disqualified stock unless the Issuer's consolidated Fixed Charge Coverage Ratio is at least 2.00 to 1.00 on a pro forma basis, or, in the case of TCEH and its Restricted Subsidiaries, TCEH's consolidated Fixed Charge Coverage Ratio is at least 2.00 to 1.00 on a pro forma basis, subject to enumerated exceptions including, among others (using cross-references as set forth in this covenant in the Old Notes Indenture): (1) the incurrence of Indebtedness under Credit Facilities up to an aggregate principal amount of $26,500 million and any Collateral Posting Facility; (2) the incurrence (x) by the Issuer and any guarantor of Indebtedness represented by the notes and related guarantees and (y) by EFCH and its subsidiaries of Indebtedness represented by the TCEH notes; (4) capitalized lease obligations and purchase money obligations, subject to certain exceptions; (12)(b) the incurrence of Indebtedness by the Issuer or any Restricted Subsidiary in an aggregate principal amount not to exceed $1,750 million; and (14) the incurrence of certain Indebtedness to finance acquisitions. | EFIH and its Restricted Subsidiaries are prohibited from incurring Indebtedness and issuing shares of preferred stock and/or disqualified stock unless EFIH's consolidated Fixed Charge Coverage Ratio is at least 2.00 to 1.00 on a pro forma basis, subject to enumerated exceptions including, among others (using cross-references as set forth in this covenant in the EFIH Indenture): (1) the incurrence of Indebtedness under Credit Facilities up to an aggregate principal amount of $750 million; (2) the incurrence by the Issuer and any guarantor of up to $4.0 billion in debt to be issued in the exchange offers and certain other Indebtedness (which amount may be reduced in certain circumstances if Parity Lien Debt is repaid with the proceeds of certain Asset Sales); (3) existing guarantees and guarantees of up to $3.0 billion of Indebtedness of EFH Corp.; (4) capitalized lease obligations and purchase money obligations, subject to certain exceptions; (12)(b) the incurrence of Indebtedness by the Issuer or any Restricted Subsidiary in an aggregate principal amount not to exceed $250 million; and (14) the incurrence of certain Indebtedness to finance acquisitions. |
| **Limitation on Liens** | The Issuer and each guarantor are prohibited from incurring liens in respect of Indebtedness unless the notes and guarantees are secured on an equal or senior basis, subject to enumerated exceptions including, among others (using cross-references as set forth in this covenant in the Old Notes Indenture): (a) liens securing the notes and related guarantees; (b) liens securing Indebtedness incurred under the $26,500 million Credit Facilities basket; and (c) liens securing Indebtedness permitted to be incurred under the limitation on incurrence of Indebtedness covenant | EFIH, EFIH Finance and any guarantor that is a Restricted Subsidiary are prohibited from incurring liens in respect of Indebtedness unless the notes and guarantees are secured on an equal or senior basis, subject to enumerated exceptions including, among others (using cross-references as set forth in this covenant in the EFIH Indenture): (a) liens (other than with respect to the Collateral) securing the notes and related guarantees and other Indebtedness permitted to be incurred under the $4.0 billion basket or under the $3.0 billion basket for guarantees of EFH Corp. |

200

EFIHMW00259916

| **Old Notes** | **New EFIH Senior Secured Notes** |
|---|---|
| | if, on a pro forma basis, the Consolidated Secured Debt Ratio would be no greater than 5.0 to 1.0; and (as set forth in the definition of "Permitted Liens" in the Old Notes Indenture): (6) liens securing Indebtedness in respect of the baskets for (i) capitalized lease obligations and purchase money obligations and (ii) $1,750 million in additional Indebtedness, in each case permitted to be incurred under the limitation on incurrence of Indebtedness covenant. | Indebtedness of the limitation on incurrence of Indebtedness covenant, as long as the notes and related guarantees are secured on an equal and ratable basis; (b) liens securing Indebtedness incurred under the $750 million Credit Facilities basket; and (c) liens securing Indebtedness permitted to be incurred under the limitation on incurrence of Indebtedness covenant if, on a pro forma basis, the Consolidated Secured Debt Ratio would be no greater than 5.0 to 1.0; and (using cross-references as set forth in the definition of "Permitted Liens" in the EFIH Indenture): (6) liens securing Indebtedness in respect of the baskets for (i) capitalized lease obligations and purchase money obligations and (ii) $250 million in additional Indebtedness, in each case permitted to be incurred under the limitation on incurrence of Indebtedness covenant. EFIH is prohibited from incurring liens on the Collateral other than liens to secure Indebtedness of up to $4.0 billion on a parity basis with the notes, unlimited junior liens on the Collateral and certain liens for taxes, assessments or other governmental charges. |
| **Limitation on Asset Sales** | Neither the Issuer nor any of its Restricted Subsidiaries may consummate an Asset Sale unless fair market value consideration is received and, except in the case of a Permitted Asset Swap, at least 75% of the consideration is in the form of cash or cash equivalents, except that Designated Non-cash Consideration received by the Issuer or such Restricted Subsidiary having an aggregate fair market value not to exceed 5% of Total Assets is deemed to be cash for these purposes.<br><br>Net proceeds received by the Issuer or a Restricted Subsidiary from an Asset Sale must be used as follows: | Neither EFIH nor any of its Restricted Subsidiaries may consummate an Asset Sale unless fair market value consideration is received and, except in the case of a Permitted Asset Swap, at least 75% of the consideration is in the form of cash or cash equivalents, except that Designated Non-cash Consideration received by EFIH or such Restricted Subsidiary having an aggregate fair market value not to exceed 5% of Total Assets (or $400 million in the case of Asset Sales of Collateral received by EFIH) is deemed to be cash for these purposes, and consideration received from an Asset Sale of Collateral must be pledged for the benefit of the holders of the notes. |

Confidential

**Old Notes**

**New EFIH Senior Secured Notes**

(1) to permanently reduce: (a) senior secured Indebtedness; (b) other senior Indebtedness, as long as the Issuer ratably reduces amounts outstanding under the notes; (c) certain existing notes which have a final maturity date on or prior to October 15, 2017, with net proceeds from Asset Sales equal to an amount up to 3.5% of Total Assets; or (d) Indebtedness of a Restricted Subsidiary that is not a guarantor; (2) to make Investments to acquire Restricted Subsidiaries or certain other Investments in a Similar Business; or (3) to make Investments to acquire Restricted Subsidiaries or certain other Investments to replace the businesses, properties and/or assets that are the subject of the Asset Sale.

If the net proceeds are not so used and the aggregate amount of Excess Proceeds exceeds $200 million, the Issuer must offer to repurchase the notes using such net proceeds.

Net proceeds received by EFIH or a Restricted Subsidiary from an Asset Sale (except an Asset Sale of Collateral or other assets of Oncor) must be used as follows: (1) to repay or prepay Parity Lien Debt of EFIH (other than the notes) on a pro rata basis (including to make Restricted Payments to EFH Corp. to allow it to repay or prepay its Parity Lien Debt (other than Indebtedness owed to a Subsidiary of EFH Corp.) that is guaranteed by EFIH), up to an amount equal to the net proceeds multiplied by a fraction, the numerator of which is the outstanding principal amount of the Parity Lien Debt and the denominator of which is the outstanding principal amount of all Parity Lien Debt (including the notes), as long as EFIH ratably reduces amounts outstanding under the notes; (2) to permanently reduce: (a) senior secured Indebtedness; (b) other senior Indebtedness, as long as EFIH ratably reduces amounts outstanding under the notes; or (c) Indebtedness of a Restricted Subsidiary that is not a guarantor; (3) to make Investments to acquire Restricted Subsidiaries or certain other Investments in Similar Businesses; or (4) to make Investments to acquire Restricted Subsidiaries or certain other Investments to replace the businesses, properties and/ or assets that are the subject of the Asset Sale.

Net proceeds received by EFIH or a Restricted Subsidiary from an Asset Sale of Collateral or other assets of Oncor must be deposited in a cash collateral account for the payment of interest and principal on, and/or to repay, prepay, repurchase or redeem, Parity Lien Debt (including the notes) as described in the following clauses (1) and (2) (unless an Investment described in clause (3) is made): (1) to repay or prepay Parity Lien Debt (other than the notes) on a pro rata basis (including to make Restricted Payments to EFH Corp. to

202

EFIHMW00259918

**PX 027**
**Page 212 of 232**

| **Old Notes** | **New EFIH Senior Secured Notes** |
|---|---|
| | allow it to repay or prepay its Parity Lien Debt that is guaranteed by EFIH), up to an amount equal to the net proceeds multiplied by a fraction, the numerator of which is the outstanding principal amount of the Parity Lien Debt and the denominator of which is the outstanding principal amount of all Parity Lien Debt (including the notes), as long as EFIH ratably reduces amounts outstanding under the notes; (2) to repay, repurchase or redeem the notes; or (3) to make Investments in Oncor Subsidiaries or Successor Oncor Business, so long as such Investment is pledged as Collateral. |
| | If the net proceeds are not so used and the aggregate amount of Excess Proceeds exceeds $200 million, the Issuer must offer to repurchase the notes using such net proceeds. |
| **Merger, Consolidation and Sale of All or Substantially All Assets** | The Issuer may not merge or consolidate into another company or dispose of all or substantially all of its properties or assets, unless the successor company assumes the obligations under the notes, no default has occurred and the successor company would be able to incur at least $1 of additional Indebtedness under the Fixed Charge Coverage Ratio test in the limitation on incurrence of Indebtedness covenant or its Fixed Charge Coverage Ratio would be greater as a result of the transaction. | Except as described above under "Change of Control" and below under "Other Asset Transfer Provisions," EFIH may not merge or consolidate into another company or dispose of all or substantially all of its properties or assets, unless the successor company assumes the obligations under the notes and the Security Documents, no default has occurred, the successor company would be able to incur at least $1 of additional Indebtedness under the Fixed Charge Coverage Ratio test in the limitation on incurrence of Indebtedness covenant or its Fixed Charge Coverage Ratio would be greater as a result of the transaction and, in the case of a Permitted Asset Transfer other than a merger of EFIH with and into EFH Corp., the rating on the notes is not downgraded within a specified time frame. |

203

EFIHMW00259919

| | Old Notes | New EFIH Senior Secured Notes |
|---|---|---|
| | | Notwithstanding the foregoing, EFIH may merge with and into EFH Corp. if such merger is a Permitted Asset Transfer. |
| **Other Asset Transfer Provisions** | None | Restricted Subsidiaries may not hold ownership or other interests in the Oncor Subsidiaries or Successor Oncor Businesses or any other Collateral, and Unrestricted Subsidiaries may not hold ownership or other interests in EFIH or in the Oncor Subsidiaries or any Successor Oncor Businesses except that an Oncor Subsidiary may hold ownership or other interests in another Oncor Subsidiary. |
| **Limitation on Transactions with Affiliates** | The Issuer and its Restricted Subsidiaries are prohibited from making payments, disposing of property to or generally entering into transactions with Affiliates, if the transaction involves consideration of more than $25 million, unless the transaction is not materially less favorable to the Issuer than what would have been obtained on an arm's-length basis or, if the transaction involves consideration of more than $50 million, the board of the Issuer approves the transaction, subject to enumerated exceptions. | EFIH and its Restricted Subsidiaries are prohibited from making payments, disposing of property to or generally entering into transactions with Affiliates, if the transaction involves consideration of more than $25 million, unless the transaction is not materially less favorable to EFIH than what would have been obtained on an arm's-length basis or, if the transaction involves consideration of more than $50 million, the board of EFIH approves the transaction, subject to enumerated exceptions. |
| **Limitation on Guarantees of Indebtedness by Restricted Subsidiaries** | Wholly-owned subsidiaries that are Restricted Subsidiaries, other than guarantors, are prohibited from guaranteeing Indebtedness of the Issuer without guaranteeing the notes, subject to enumerated exceptions. | Wholly-owned subsidiaries that are Restricted Subsidiaries, other than EFIH Finance and any guarantors, are prohibited from guaranteeing Indebtedness of EFIH without guaranteeing the notes, subject to enumerated exceptions. |
| **Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries** | Restricted Subsidiaries of the Issuer that are not guarantors are prohibited from creating consensual encumbrances on their ability to pay dividends, make loans or advances or transfer property or assets, in each case to the Issuer or its Restricted Subsidiaries. | Restricted Subsidiaries of EFIH that are not guarantors are prohibited from creating consensual encumbrances on their ability to pay dividends, make loans or advances or transfer property or assets, in each case to EFIH or its Restricted Subsidiaries. |

204

EFIHMW00259920

**PX 027**
**Page 214 of 232**

|  | **Old Notes** | **New EFIH Senior Secured Notes** |
|---|---|---|
| **Events of Default** | (1) failure to pay principal on the notes; | (1) failure to pay principal on the notes; |
|  | (2) failure for 30 days or more to pay interest on the notes; | (2) failure for 30 days or more to pay interest on the notes; |
|  | (3) failure for 60 days after receipt of written notice given by the trustee or the holders of not less than 30% in principal amount of the notes to comply with any covenants; | (3) failure for 60 days after receipt of written notice given by the trustee or the holders of not less than 30% in principal amount of the notes to comply with any covenants; |
|  | (4) default under other Indebtedness by the Issuer or any of its Restricted Subsidiaries, if both: (a) such default results from the failure to pay any principal of such Indebtedness at its stated final maturity or relates to another obligation and results in the holders of such Indebtedness causing it to become due prior to its stated maturity; and | (4) default under other Indebtedness by EFIH or any of its Restricted Subsidiaries, if both: (a) such default results from the failure to pay any principal of such Indebtedness at its stated final maturity or relates to another obligation and results in the holders of such Indebtedness causing it to become due prior to its stated maturity; and |
|  | (b) the principal amount of such Indebtedness is equal to $250 million or more; | (b) the principal amount of such Indebtedness is equal to $250 million or more; |
|  | (5) failure by the Issuer or any Significant Subsidiary (or any group of Restricted Subsidiaries that together would constitute a Significant Subsidiary) to pay final judgments aggregating in excess of $250 million, which final judgments remain unpaid, undischarged and unstayed for a period of more than 60 days after such judgment becomes final; | (5) failure by the Issuer or any Significant Subsidiary (or any group of Restricted Subsidiaries that together would constitute a Significant Subsidiary) to pay final judgments aggregating in excess of $250 million, which final judgments remain unpaid, undischarged and unstayed for a period of more than 60 days after such judgment becomes final; |
|  | (6) and (7) certain events of bankruptcy or insolvency with respect to the Issuer or any Significant Subsidiary (or any group of Restricted Subsidiaries that together would constitute a Significant Subsidiary); or | (6) and (7) certain events of bankruptcy or insolvency with respect to the Issuer or any Significant Subsidiary (or any group of Restricted Subsidiaries that together would constitute a Significant Subsidiary); |
|  | (8) the guarantee of any Significant Subsidiary (or any group of Restricted Subsidiaries that together would constitute a Significant Subsidiary) for any reason ceases to be in full force and effect or is declared null and void, except as | (8) the guarantee of any Significant Subsidiary (or any group of Restricted Subsidiaries that together would constitute a Significant Subsidiary) for any reason ceases to be in full force and effect or is declared null and void, except as |

Confidential

| **Old Notes** | **New EFIH Senior Secured Notes** |
|---|---|
| | |

| | | |
|---|---|---|
| | permitted by the indenture. | permitted by the indenture; or (9) the lien on Collateral having a fair market value of more than $250 million ceases to be in effect. |
| **Amendment, Supplement and Waiver** | Without the consent of each affected holder of notes, an amendment may not (using cross-references as set forth in the Old Notes Indenture): (1) reduce the principal amount of such notes whose holders must consent to an amendment, supplement or waiver; | Without the consent of each affected holder of notes, an amendment may not (using cross-references as set forth in the EFIH Indenture): (1) reduce the principal amount of such notes whose holders must consent to an amendment, supplement or waiver; |
| | (2) reduce the principal of or change the fixed final maturity of any such note or alter or waive the provisions with respect to the redemption of the notes; | (2) reduce the principal of or change the fixed final maturity of any such note or alter or waive the provisions with respect to the redemption of the notes; |
| | (3) reduce the rate of or change the time for payment of interest on any note; | (3) reduce the rate of or change the time for payment of interest on any note; |
| | (4) waive a default in the payment of principal or interest on the notes; | (4) waive a default in the payment of principal or interest on the notes; |
| | (5) make any note payable in money other than that stated therein; | (5) make any note payable in money other than that stated therein; |
| | (6) make any change in the provisions relating to waivers of past defaults or the rights of holders to receive payments of principal or interest on the notes; | (6) make any change in the provisions relating to waivers of past defaults or the rights of holders to receive payments of principal or interest on the notes; |
| | (7) make any change in the amendment and waiver provisions; | (7) make any change in the amendment and waiver provisions; |
| | (8) impair the right of any holder to receive payment of principal or interest on the notes on or after the due dates or to institute suit for the enforcement of any payment on or with respect to the notes; | (8) impair the right of any holder to receive payment of principal or interest on the notes on or after the due dates or to institute suit for the enforcement of any payment on or with respect to the notes; |
| | (9) make any change to or modify the ranking of the notes; or | (9) make any change to or modify the ranking of the notes; or |

206

EFIHMW00259922

| **Old Notes** | **New EFIH Senior Secured Notes** |
|---|---|
| (10) except as expressly permitted, modify the guarantees of any Significant Subsidiary in a manner adverse to the holders. | (10) except as expressly permitted, modify the guarantees of any Significant Subsidiary in a manner adverse to the holders. |
| Except as set forth above, the indenture and the notes may be amended with the consent of a majority of the outstanding notes. | Except as set forth above, the indenture, the notes and the security documents may be amended with the consent of a majority of the outstanding notes, including amendments that would release less than all or substantially all of the Collateral. However, without the consent of 66-2/3% of the outstanding notes, no amendment, supplement or waiver may modify the security documents to release all or substantially all of the Collateral. |

207

EFIHMW00259923

**PX 027**
**Page 217 of 232**

## BOOK-ENTRY, DELIVERY AND FORM

We will issue the New EFIH Senior Secured Notes in the form of global notes in fully registered form initially in the name of Cede & Co., as nominee of DTC, or such other name as may be requested by an authorized representative of DTC. The global notes will be deposited with the trustee as custodian for DTC and may not be transferred except as a whole by DTC to a nominee of DTC or by a nominee of DTC to DTC or another nominee of DTC or by DTC or any nominee to a successor of DTC or a nominee of such successor.

DTC has advised us as follows:

- DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act.

- DTC holds securities that its participants deposit with DTC and facilitates the settlement among direct participants of securities transactions, such as transfers and pledges, in deposited securities, through electronic computerized book-entry changes in direct participants' accounts, thereby eliminating the need for physical movement of securities certificates.

- Direct participants include securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations.

- DTC is owned by a number of its direct participants and by the New York Stock Exchange, Inc., the American Stock Exchange LLC and FINRA.

- Access to the DTC system is also available to others such as securities brokers and dealers, banks and trust companies that clear through or maintain a custodial relationship with a direct participant, either directly or indirectly.

- The rules applicable to DTC and its direct and indirect participants are on file with the SEC.

So long as DTC or its nominee is the registered owner of a global note, DTC or that nominee will be considered the sole owner or holder of the New EFIH Senior Secured Notes represented by that global note for all purposes under the indenture governing the New EFIH Senior Secured Notes. Beneficial interests in the global notes will be represented through book entry accounts of financial institutions acting on behalf of beneficial owners as direct and indirect participants in DTC. Except as provided below, owners of beneficial interests in a global note will not be entitled to have New EFIH Senior Secured Notes represented by that global note registered in their names, will not receive or be entitled to receive physical delivery of New EFIH Senior Secured Notes in certificated form and will not be considered the owners or holders thereof under the indenture for the New EFIH Senior Secured Notes or under the notes for any purpose, including with respect to the giving of any direction, instruction or approval of the trustee for the New EFIH Senior Secured Notes.

Purchases of New EFIH Senior Secured Notes under the DTC system must be made by or through direct participants, which will receive a credit for the New EFIH Senior Secured Notes on DTC's records. The ownership interest of each actual purchaser of New EFIH Senior Secured Notes is in turn to be recorded on the direct and indirect participants' records. Beneficial owners of the New EFIH Senior Secured Notes will not receive written confirmation from DTC of their purchase, but beneficial owners are expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the direct or indirect participants through which the beneficial owner entered into the transaction. Transfers of ownership interests in the New EFIH Senior Secured Notes are to be accomplished by entries made on the books of direct and indirect participants acting on behalf of beneficial owners. Beneficial owners will not receive certificates representing their ownership interests in the New EFIH Senior Secured Notes, except in the event that use of the book-entry system for the New EFIH Senior Secured Notes is discontinued.

Confidential

EFIHMW00259924

DTC has no knowledge of the actual beneficial owners of the New EFIH Senior Secured Notes; DTC's records reflect only the identity of the direct participants to whose accounts such New EFIH Senior Secured Notes are credited, which may or may not be the beneficial owners. The direct and indirect participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to direct participants, by, direct participants to indirect participants, and by direct participants and indirect participants to beneficial owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the global notes. Under its usual procedures, DTC would mail an omnibus proxy to the issuer of the New EFIH Senior Secured Notes as soon as possible after a record date. The omnibus proxy assigns Cede & Co.'s consenting or voting rights to those direct participants to whose accounts such New EFIH Senior Secured Notes are credited on the record date (identified in the listing attached to the omnibus proxy).

All payments on the global notes will be made to Cede & Co., as holder of record, or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit direct participants' accounts upon DTC's receipt of funds and corresponding detail information from us or the trustee on payment dates in accordance with their respective holdings shown on DTC's records. Payments by participants to beneficial owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such participant and not of DTC, us or the trustee, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) shall be the responsibility of the Offeror or the trustee. Disbursement of such payments to direct participants shall be the responsibility of DTC, and disbursement of such payments to the beneficial owners shall be the responsibility of direct and indirect participants.

DTC may discontinue providing its service as securities depositary with respect to the New EFIH Senior Secured Notes at any time by giving reasonable notice to us or the trustee. In addition, we may decide to discontinue use of the system of book-entry transfers through DTC (or a successor securities depositary). Under such circumstances, in the event that a successor securities depositary is not obtained, certificates representing the New EFIH Senior Secured Notes in fully registered form are required to be printed and delivered to beneficial owners of the New EFIH Senior Secured Notes representing such New EFIH Senior Secured Notes. If this were to occur, neither the Offeror nor the trustee of the New EFIH Senior Secured Notes will be liable for any delay by DTC, its nominee or any direct or indirect participant in identifying the beneficial owners of the New EFIH Senior Secured Notes, and the Offeror and the trustee may conclusively rely on, and will be protected in relying on, instructions from DTC or its nominee for all purposes, including with respect to the registration and delivery, and the respective principal amounts, of the certificates representing the New EFIH Senior Secured Notes to be issued.

Neither we nor the trustee will have any responsibility or obligation to direct or indirect participants, or the persons for whom they act as nominees, with respect to the accuracy of the records of DTC, its nominee or any participant with respect to any ownership interest in the New EFIH Senior Secured Notes, or payments to, or the providing of notice to participants or beneficial owners.

So long as the New EFIH Senior Secured Notes are in DTC's book-entry system, secondary market trading activity in the New EFIH Senior Secured Notes will settle in immediately available funds. All payments on the New EFIH Senior Secured Notes issued as global notes will be made by us in immediately available funds.

The Offeror has provided the descriptions of the operations and procedures of DTC in this Prospectus solely as a matter of convenience. These operations and procedures are solely within the control of DTC and are subject to change by DTC from time to time. None of the Offeror, the Dealer Managers nor the trustee for the New EFIH Senior Secured Notes takes any responsibility for these operations or procedures, and you are urged to contact DTC or their participants directly to discuss these matters.

209

EFIHMW00259925

## MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS

The following discussion summarizes the anticipated material U.S. federal income tax consequences to U.S. Holders and Non-U.S. Holders (each term as defined below and in the aggregate, referred to as "holders") relating to the exchange of Old Notes for New EFIH Senior Secured Notes pursuant to the exchange offers, the consent solicitation and the ownership and disposition of the New EFIH Senior Secured Notes acquired in the exchange offers. This summary is based upon the provisions of the Internal Revenue Code of 1986, as amended (the "Code"), Treasury regulations promulgated under the Code (the "Regulations"), and administrative rulings and judicial decisions, in each case as of the date hereof. These authorities are subject to differing interpretations and may be changed, perhaps retroactively, resulting in U.S. federal income tax consequences materially different from those summarized below. EFH Corp. has not obtained, nor does it intend to obtain, any ruling from the U.S. Internal Revenue Service (the "IRS") with respect to the statements made and the conclusions reached in the following summary, and there can be no assurance that the IRS will agree with such statements and conclusions.

This summary assumes that the Old Notes and the New EFIH Senior Secured Notes are and will be held as capital assets within the meaning of Section 1221 of the Code. This summary does not address the tax considerations arising under the U.S. federal estate and gift tax laws or the laws of any foreign, state or local jurisdiction. In addition, this summary does not purport to address all tax considerations that may be applicable to a particular holder's circumstances or to holders that may be subject to special tax rules, including, without limitation, holders subject to the alternative minimum tax, banks, insurance companies or other financial institutions, tax-exempt organizations, dealers, brokers or traders in securities, currencies or commodities, regulated investment companies, real estate investment trusts, holders that elect to use a mark-to-market method of accounting for their securities holdings, U.S. Holders whose "functional currency" is not the U.S. dollar, controlled foreign corporations, passive foreign investment companies, persons who own or are deemed to own 10% or more of EFH Corp.'s voting stock, former U.S. citizens or long-term residents, partnerships or other pass-through entities for U.S. federal income tax purposes or investors therein, holders holding the Old Notes or the New EFIH Senior Secured Notes as a position in a hedging transaction, "straddle," "conversion transaction," other "synthetic security" or integrated transaction, or other risk reduction transaction, holders deemed to sell the Old Notes or the New EFIH Senior Secured Notes under the constructive sale provisions of the Code, or subsequent purchasers of New EFIH Senior Secured Notes. The legal conclusions with respect to U.S. federal income tax considerations set forth in the following discussion constitute the opinion of Vinson & Elkins L.L.P.

For purposes of this discussion, the term "U.S. Holder" means a beneficial owner of Old Notes or New EFIH Senior Secured Notes that is, for U.S. federal income tax purposes: (i) an individual who is a citizen or resident of the United States; (ii) a corporation, including any entity treated as a corporation for U.S. federal income tax purposes, created or organized in the United States or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust, if its administration is subject to the primary supervision of a U.S. court and one or more U.S. persons have the authority to control all substantial decisions of the trust, or if it has made a valid election in effect under applicable Regulations to be treated as a U.S. person.

For purpose of this discussion, the term "Non-U.S. Holder" means a beneficial owner of Old Notes or New EFIH Senior Secured Notes (other than a partnership or other entity treated as a partnership for U.S. federal income tax purposes) that is not a U.S. Holder.

If a partnership (or other entity treated as a partnership for U.S. federal income tax purposes) holds Old Notes or New EFIH Senior Secured Notes, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. If you are a partnership or a partner of a partnership holding Old Notes or New EFIH Senior Secured Notes, you should consult your tax advisor regarding the tax consequences of the exchange offers, the consent solicitation and the ownership and disposition of New EFIH Senior Secured Notes.

THIS SUMMARY IS FOR GENERAL INFORMATION PURPOSES ONLY, AND IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED TO BE, LEGAL OR TAX ADVICE TO ANY PARTICULAR HOLDER. YOU ARE URGED TO CONSULT YOUR OWN TAX ADVISOR WITH REGARD TO THE APPLICATION OF THE U.S. FEDERAL INCOME TAX LAWS, AS WELL AS THE APPLICATION OF NON-

210

EFIHMW00259926

**PX 027**
**Page 220 of 232**

INCOME TAX LAWS AND THE LAWS OF ANY STATE, LOCAL OR FOREIGN TAXING JURISDICTION, TO YOUR PARTICULAR SITUATION.

**Tax Consequences to Participating U.S. Holders**

*The Exchange of Old Notes Pursuant to the Exchange Offers*

*Recapitalization Treatment.* A U.S. Holder participating in the exchange offers will recognize gain or loss in full upon the exchange of the Old Notes for New EFIH Senior Secured Notes (as described under the subheading "Fully-Taxable Exchange" below) unless such exchange qualifies as a recapitalization.

In order for such exchange to qualify as a recapitalization, the Old Notes and the New EFIH Senior Secured Notes must both be treated as "securities" under the relevant provisions of the Code. Neither the Code nor the Regulations define the term "security." Whether a debt instrument is a security is based on all of the facts and circumstances. Factors evaluated include whether the holder of such debt instrument is subject to a material level of entrepreneurial risk. Most authorities have held that the term to maturity of the debt instrument is one of the most significant factors. In this regard, debt instruments with a term of ten years or more generally have qualified as securities, whereas debt instruments with a term of less than five years generally have not qualified as securities.

Additionally, for an exchange to qualify as a recapitalization, the exchanged securities and the newly issued securities must be issued by the same obligor. For U.S. federal income tax purposes, EFIH is classified as an entity whose existence is disregarded as separate from EFH Corp. Accordingly, for U.S. federal income tax purposes, EFIH is generally treated as a division of EFH Corp., and New EFIH Senior Secured Notes will generally be treated as issued by EFH Corp. However, there is no direct authority regarding whether the exchange of Old Notes issued by EFIH Corp. for New EFIH Senior Secured Notes can qualify as a recapitalization, since EFIH and EFH Corp. are different issuers for non-tax purposes. EFH Corp. intends to take the position that the exchange of Old Notes for New EFIH Senior Secured Notes will qualify as a recapitalization. However, there can be no assurance that the IRS will not take a contrary position.

All of the Old Notes had a term of ten years at the time of issuance, and it is expected that the New EFIH Senior Secured Notes will have a term of approximately ten years. Because the Old Notes will have a remaining term of more than five years but less than ten years at the time of exchange, it is not entirely clear whether they will qualify as securities. EFH Corp. intends to take the position that the Old Notes and the New EFIH Senior Secured Notes will be treated as securities, and, thus, that the exchange of each issue of Old Notes for New EFIH Senior Secured Notes will be treated as a recapitalization. Under such characterization, subject to the discussions under the headings "—Accrued Interest" and "—Early Tender and Consent Consideration" below, a U.S. Holder that receives New EFIH Senior Secured Notes in exchange for Old Notes as a result of participation in the exchange offers will not recognize loss on the exchange and will recognize gain, if any, on the exchange to the extent of any Total Cash Consideration received in the exchange. A U.S. Holder's tax basis in the New EFIH Senior Secured Notes received in the exchange will be equal to the tax basis in the Old Notes exchanged therefor increased by any gain recognized on the exchange and decreased by Total Cash Consideration received in the exchange, and the holding period for such New EFIH Senior Secured Notes will include the period during which the Old Notes surrendered in the exchange were held.

*Fully-Taxable Exchange.* If an exchange of an issue of Old Notes for New EFIH Senior Secured Notes is not treated as a recapitalization, a U.S. Holder of such issue of Old Notes will recognize gain or loss equal to the difference between the amount realized on the exchange and the U.S. Holder's adjusted tax basis in the Old Notes on the date of the exchange. The amount realized on the exchange will equal the sum of (i) the "issue price" (determined as described below under "—Issue Price of New EFIH Senior Secured Notes") of any New EFIH Senior Secured Notes received in the exchange and (ii) any Total Cash Consideration received in the exchange, subject to the discussions under the headings "—Accrued Interest" and "—Early Tender and Consent Consideration" below. A U.S. Holder's adjusted tax basis in the Old Notes exchanged will generally be equal to the amount paid therefor, increased by any accrued OID previously included in such holder's income and any market discount previously taken into income and reduced by any amortizable bond premium previously taken into account and any cash payments other than qualified stated interest (i.e., stated interest unconditionally payable in cash at least annually). The New EFIH Senior Secured Notes will have an adjusted tax basis equal to their issue price (as determined as described below under "—Issue Price of New EFIH Senior Secured Notes") and a new holding period

211

commencing on the day after the exchange. Any gain or loss recognized will generally be capital gain or loss (except to the extent of any accrued market discount not previously included in income as described below under "—Market Discount") and will be long-term capital gain or loss if the Old Notes have been held for more than one year. Long-term capital gain recognized by non-corporate U.S. Holders is generally eligible for a reduced rate of taxation and the deduction of capital losses is subject to significant limitations.

*Issue Price of New EFIH Senior Secured Notes.* For U.S. federal income tax purposes, the "issue price" of the New EFIH Senior Secured Notes depends on whether the New EFIH Senior Secured Notes or the Old Notes are considered to be "publicly traded."

If the New EFIH Senior Secured Notes are considered to be "publicly traded" property, as defined by the Regulations, the "issue price" of the New EFIH Senior Secured Notes will be equal to their fair market value on the date of the exchange. The New EFIH Senior Secured Notes or the Old Notes will generally be considered to be "publicly traded" property if, at any time during the 60-day period ending 30 days after the date of the exchange, (i) they are listed on a national securities exchange, (ii) they appear on a system of general circulation that provides a reasonable basis to determine the fair market value of New EFIH Senior Secured Notes or the Old Notes, respectively, by disseminating either (i) recent price quotations (including rates, yields, or other pricing information) of one or more identified brokers, dealers or traders or (ii) actual prices (including rates, yields, or other pricing information) of recent sales transactions; or (iii) price quotations thereof are readily available from dealers, brokers, or traders.

EFIH intends to apply to list the New EFIH Senior Secured Notes on the New York Stock Exchange. If the New EFIH Senior Secured Notes are listed on the New York Stock Exchange within 30 days after the effective date of the exchange offer, the New EFIH Senior Secured Notes will be considered to be "publicly traded." Further, EFH Corp. believes that each series of the Old Notes are "publicly traded" within the meaning of the Regulations and that, even in the absence of a listing on the New York Stock Exchange, the New EFIH Senior Secured Notes will likely be considered "publicly traded" for these purposes, and, thus, that the issue price of the New EFIH Senior Secured Notes will be their fair market value on the date of the exchange. EFH Corp. cannot predict with certainty, however, what position the IRS may take with regard to whether either the Old Notes or the New EFIH Senior Secured Notes are "publicly traded." If the New EFIH Senior Secured Notes are not "publicly traded" but each series of the Old Notes are "publicly traded," then EFH Corp. intends to take the position that the issue price of the New EFIH Senior Secured Notes issued on the effective date of the exchange will be equal to the excess of (i) the fair market value of all Old Notes exchanged on the effective date of the exchange offers over (ii) the amount of Cash Consideration paid to holders of Old Notes in the exchanges.

If neither the Old Notes nor the New EFIH Senior Secured Notes exchanged therefor are considered to be "publicly traded," then the "issue price" of New EFIH Senior Secured Notes will equal their stated principal amount. The rules regarding the determination of issue price are complex and highly detailed, and a U.S. Holder should consult his, her or its own tax advisor regarding the determination of the issue price of the New EFIH Senior Secured Notes.

*Market Discount.* If a U.S. Holder acquired Old Notes with market discount, any gain recognized on the exchange of Old Notes for New EFIH Senior Secured Notes pursuant to the exchange offers will be treated as ordinary income to the extent of the market discount accrued during such holder's period of ownership, unless such holder previously elected to include market discount in income as it accrued for U.S. federal income tax purposes. For these purposes, market discount is generally the excess, if any, of the stated principal amount or the adjusted issue price (where the Old Note was issued with OID) of an Old Note over such holder's initial tax basis in the Old Note, if such excess exceeds a de minimis amount. In an exchange of Old Notes with market discount for New EFIH Senior Secured Notes that qualifies as a recapitalization, New EFIH Senior Secured Notes that a U.S. Holder receives in exchange for such Old Notes will be treated as acquired at a market discount if the issue price of such New EFIH Senior Secured Notes exceeds the U.S. Holder's initial tax basis for such New EFIH Senior Secured Notes by more than a de minimis amount, and any accrued market discount with respect to such Old Notes not previously included in income will carry over to such New EFIH Senior Secured Notes. U.S. Holders who acquired their Old Notes other than at original issuance should consult their tax advisors regarding the possible application of the market discount rules of the Code to an exchange of the Old Notes for New EFIH Senior Secured Notes pursuant to the exchange offers.

212

EFIHMW00259928

*Accrued Interest.* To the extent that any amount received by a U.S. Holder pursuant to the exchange offers is attributable to accrued and unpaid qualified stated interest on an Old Note, such amount will be includible in gross income as ordinary interest income if such accrued interest has not been included previously in gross income for U.S. federal income tax purposes.

*Early Tender and Consent Consideration.* A U.S. Holder that tenders at or prior to the Early Tender Date will be eligible to receive the Total Consideration amount, which is in excess of the Exchange Consideration amount received by a Holder that tenders after the Early Tender Date (such excess, the "Early Tender Consideration"). A U.S. Holder that validly delivers and does not validly revoke a consent with respect to a Old Note for which requisite Consents are received will receive a cash consent payment (the "Cash Consent Consideration") in addition to the Total Consideration payable to such Holder. Further it is possible that the IRS could take the position that, in addition to the Cash Consent Consideration, all or a portion of the Early Tender Consideration paid to a holder of Old Notes constitutes additional consideration for the holder's Consent to the Proposed Amendments ("Deemed Consent Consideration").

The U.S. federal income tax treatment of any Early Tender Consideration, Cash Consent Consideration or Deemed Consent Consideration is subject to uncertainty because there are no authorities directly on point. The receipt of any Early Tender Consideration, Cash Consent Consideration or Deemed Consent Consideration by a U.S. Holder might be treated, for U.S. federal income tax purposes, as (a) part of the consideration received by a U.S. Holder exchanging Old Notes in exchange for New EFIH Senior Secured Notes, in which case such amount would be taken into account in determining the amount of gain or loss on the exchange in the manner described above, or (b) separate consideration for early acceptance of the exchange offers (in the case of the Early Tender Consideration) or for consenting to the Proposed Amendments (in the case of Cash Consent Consideration or Deemed Consent Consideration), in which case such amount would likely constitute current ordinary income to the U.S. Holder (unless such amount could be properly treated as a return of principal).

EFH Corp. intends to take the position that any Early Tender Consideration is part of the consideration received in exchange for the Old Notes and that there is no Deemed Consent Consideration. However, if any Early Tender Consideration or any Deemed Consent Consideration were to be treated as separate consideration for early acceptance of the exchange offers or consenting to the Proposed Amendments, then such payment would likely constitute current ordinary income to the U.S. Holder rather than sale proceeds.

EFH Corp. intends to take the position that any Cash Consent Consideration payable for Consents is treated as separate consideration received in exchange for consenting to the Proposed Amendments. Under such treatment, any Cash Consent Consideration paid to a U.S. Holder would likely constitute ordinary income to such U.S. Holder rather than exchange consideration. If, instead, the Cash Consent Consideration were treated as additional exchange consideration to a U.S. Holder, such amount would be treated as additional amount realized in determining the amount of gain or loss to such U.S. Holder on the exchange. Furthermore, a U.S. Holder that receives any cash in an exchange qualifying as a recapitalization would generally recognize gain, if any, to the extent of the amount of cash received that is treated as additional exchange consideration, including Cash Consent Consideration.

U.S. Holders are encouraged to consult their tax advisors regarding the U.S. federal income tax treatment of any Early Tender Consideration, Cash Consent Consideration or Deemed Consent Consideration.

### Ownership of New EFIH Senior Secured Notes

*Payments of Stated Interest.* The stated interest payments on the New EFIH Senior Secured Notes will generally be taxed to a U.S. Holder as ordinary income at the time paid or accrued in accordance with such holder's method of accounting for U.S. federal income tax purposes.

*Original Issue Discount.* If the issue price of the New EFIH Senior Secured Notes (as described above under the heading "—Issue Price of New EFIH Senior Secured Notes") is less than their stated principal amount by more than a specified de minimis amount, the New EFIH Senior Secured Notes will be treated as issued with OID in an amount equal to such difference. If the New EFIH Senior Secured Notes are issued with OID, a U.S. Holder must generally include such OID in gross income as it accrues over the term of the New EFIH Senior Secured Notes at a constant yield without regard to its regular method of accounting for U.S. federal income tax purposes and in advance of the receipt of cash payments attributable to that income.

213

EFIHMW00259929

The amount of OID that a U.S. Holder must include in income will generally equal the sum of the "daily portions" of OID with respect to the New EFIII Senior Secured Note for each day during the taxable year or portion of the taxable year in which such New EFIH Senior Secured Note was held ("accrued OID"). The daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID allocable to that accrual period. The "accrual period" for a New EFIH Senior Secured Note may be of any length and may vary in length over the term of the New EFIH Senior Secured Note, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on the first day or the final day of an accrual period. The amount of OID allocable to any accrual period other than the final accrual period is an amount equal to the excess, if any, of (i) the product of the New EFIH Senior Secured Note's adjusted issue price at the beginning of such accrual period and its yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period) over (ii) the aggregate of all stated interest allocable to the accrual period. OID allocable to a final accrual period is the difference between the amount payable at maturity (other than a payment of stated interest) and the adjusted issue price of the New EFIH Senior Secured Note at the beginning of the final accrual period. The "adjusted issue price" of a New EFIH Senior Secured Note at the beginning of any accrual period is equal to its issue price increased by the accrued OID for each prior accrual period (determined without regard to the amortization of any acquisition premium or amortizable bond premium, as discussed below under the subheading "—Acquisition Premium or Amortizable Bond Premium on New EFIH Senior Secured Notes").

If the New EFIH Senior Secured Notes are issued with OID, then a U.S. Holder may elect to treat all interest on a New EFIH Senior Secured Note as OID and calculate the amount includible in gross income under the constant yield method described above. The election is to be made for the taxable year in which the New EFIH Senior Secured Note was acquired, and may not be revoked without the consent of the IRS. U.S. Holders should consult their own tax advisors about this election.

*Certain Additional Payments.* In certain circumstances (see "Description of the Notes—Optional Redemption," and "Description of the Notes—Repurchase at the Option of Holders—Change of Control"), the Offeror may be obligated to pay amounts on the New EFIH Senior Secured Notes that are in excess of stated interest or principal on the New EFIH Senior Secured Notes. The Offeror does not intend to treat the possibility of paying such additional amounts as affecting the determination of the yield to maturity of the New EFIH Senior Secured Notes or giving rise to any additional accrual of OID or recognition of ordinary income upon sale, exchange or retirement of the New EFIH Senior Secured Notes. However, additional income will be recognized if any such additional payment is made. It is possible, however, that the IRS may take a different position, in which case the timing, character, and amount of such income may be different.

*Market Discount.* If the exchange of Old Notes for New EFIH Senior Secured Notes qualifies as a recapitalization, a U.S. Holder may acquire a New EFIH Senior Secured Note at a market discount as described above under "—The Exchange of Old Notes Pursuant to the Exchange Offers—Market Discount." Under the market discount rules, a U.S. Holder will be required to treat any principal payment on, or any gain on the sale, exchange or retirement of, a New EFIH Senior Secured Note as ordinary income to the extent of the market discount that such U.S. Holder has not previously included in income and is treated as having accrued on the New EFIH Senior Secured Note at the time of the payment or disposition.

In addition, a U.S. Holder may be required to defer, until the maturity of the New EFIH Senior Secured Note or its earlier disposition in a taxable transaction, the deduction of all or a portion of the interest expense on any indebtedness attributable to the New EFIH Senior Secured Note. Under certain circumstances, a U.S. Holder may elect, on a note-by-note basis, to deduct the deferred interest expense in a tax year prior to the year of disposition. A U.S. Holder should consult its own tax advisors before making this election.

Any market discount will be considered to accrue ratably during the period from the date of acquisition to the maturity date of the New EFIH Senior Secured Note unless a U.S. Holder elects to accrue on a constant interest method. A U.S. Holder may elect to include market discount in income currently as it accrues, on either a ratable or constant interest method, in which case the rule described above regarding deferral of interest deductions will not apply.

*Acquisition Premium or Amortizable Bond Premium on New EFIH Senior Secured Notes.* If the exchange of Old Notes for New EFIH Senior Secured Notes qualifies as a recapitalization, a U.S. Holder of the New EFIH

214

EFIHMW00259930

Senior Secured Notes may have "acquisition premium" to the extent its initial tax basis in the New EFIH Senior Secured Notes is greater than the issue price of the New EFIH Senior Secured Notes and less than or equal to their stated principal amount. Under the acquisition premium rules, the amount of OID that must be included in gross income with respect to the New EFIH Senior Secured Notes for any taxable year will be reduced by the portion of the acquisition premium properly allocable to that year.

If the exchange of Old Notes for New EFIH Senior Secured Notes qualifies as a recapitalization and the initial tax basis in the New EFIH Senior Secured Notes to a U.S. Holder exceeds their stated principal amount, the U.S. Holder will be considered to have acquired the New EFIH Senior Secured Notes with "amortizable bond premium" and will not be required to include any OID in income. A U.S. Holder may generally elect to amortize the premium over the remaining term of the New EFIH Senior Secured Notes on a constant yield method as an offset to stated interest when includible in income under such holder's regular accounting method. If a U.S. Holder does not elect to amortize the premium, that premium will decrease the gain or increase the loss otherwise recognized on disposition of the New EFIH Senior Secured Notes.

*Sale, Exchange or Retirement of New EFIH Senior Secured Notes.* A U.S. Holder will generally recognize taxable gain or loss upon a sale, exchange or retirement of a New EFIH Senior Secured Note (including potentially upon a Permitted Asset Transfer) in an amount equal to the difference between (i) the amount of cash and the fair market value of any property received (less an amount attributable to any accrued and unpaid stated interest, which will be taxed in the manner described above under the subheading "—Payments of Stated Interest") and (ii) such holder's adjusted tax basis in the New EFIH Senior Secured Note. A U.S. Holder's adjusted tax basis in a New EFIH Senior Secured Note will generally be its initial tax basis in the New EFIH Senior Secured Note, increased by any OID or market discount previously included in income, and reduced by any amortized bond premium.

Any gain or loss on the sale, exchange or retirement of a New EFIH Senior Secured Note will likely be capital gain or loss (although if the exchange of Old Notes for New EFIH Senior Secured Notes qualifies as a recapitalization, any gain recognized on the sale, exchange, retirement or other taxable disposition of a New EFIH Senior Secured Note by a U.S. Holder will be recharacterized as ordinary income to the extent attributable to market discount accrued during the periods that the U.S. Holder held the Old Notes and the New EFIH Senior Secured Notes, as discussed above under the heading "—Market Discount") and will be long-term capital gain or loss if the U.S. Holder has a holding period of more than one year at the time of the sale, exchange or retirement. Long-term capital gain recognized by non-corporate U.S. Holders is generally eligible for a reduced rate of taxation and the deduction of capital losses is subject to significant limitations.

**Tax Consequences to Non-Participating U.S. Holders**

There are no tax consequences to a U.S. Holder of Old Notes that does not participate in the exchange offers, unless the Proposed Amendments become operative. If the Proposed Amendments become operative, the tax treatment of a U.S. Holder of Old Notes that does not participate in the exchange offers (a "Non-Participating U.S. Holder") will depend upon whether the adoption of such Proposed Amendments constitutes a modification to the Old Notes that would result in a "deemed" exchange of such Old Notes for U.S. federal income tax purposes. Generally, the modification of a debt instrument will be treated as a "deemed" exchange of an "old" debt instrument for a "new" debt instrument if such modification is "significant" within the meaning of the Regulations. Under the Regulations, the modification of a debt instrument is a "significant" modification if, based on all the facts and circumstances and taking into account all modifications of the debt instrument collectively, the legal rights or obligations that are altered and the degree to which they are altered are "economically significant." The Regulations further provide that a modification of a debt instrument that adds, deletes or alters customary accounting or financial covenants is not a significant modification. The Regulations do not, however, define "customary accounting or financial covenants." Whether the adoption of the Proposed Amendments would be considered a significant modification under the foregoing rules is not entirely clear.

If the Proposed Amendments adopted with respect to an issue of Old Notes (a) were treated as mere deletions or alterations of customary accounting or financial covenants or (b) were not so treated, but the legal rights and obligations that are altered by such Proposed Amendments and the degree to which they are altered were not viewed as "economically significant," then there would be no tax consequences to the Non-Participating U.S. Holders of such Old Notes except to the extent the Non-Participating U.S. Holder receives Cash Consent Consideration, as described below.

215

EFIHMW00259931

EFH Corp. intends to take the position that adoption of the Proposed Amendments would not cause a "significant modification" of the Old Notes under the Regulations, and therefore would not result in a deemed exchange of the Old Notes for U.S. federal income tax purposes. It is possible, however, that if the Proposed Amendments become operative with respect to the Old Notes, the IRS could treat the adoption of the Proposed Amendments as a significant modification of such Old Notes, resulting in a deemed exchange of such Old Notes held by a U.S. Holder for "new" Old Notes for U.S. federal income tax purposes. If such a position were taken and sustained, the deemed exchange would be fully taxable unless it qualified as a recapitalization for U.S. federal income tax purposes (for which qualification is not entirely clear). In addition, the Non-Participating U.S. Holder could be treated as acquiring the "new" Old Note with OID, which, regardless of such holder's regular method of tax accounting, would be included in income as it accrued, regardless of when any related cash was actually received, and a Non-Participating U.S. Holder could recognize ordinary interest income to the extent that any portion of the "new" Old Notes is attributable to accrued but unpaid qualified stated interest not previously taken into income. U.S. Holders are encouraged to consult their tax advisors regarding the potential tax consequences of not tendering their Old Notes pursuant to the exchange offers and consent solicitation.

A U.S. Holder of Old Notes that validly delivers and does not validly revoke a Consent with respect to such notes and who does not exchange such notes pursuant to an exchange offer because of the operation of the proration provisions of the exchange offers or because such holder validly tenders Old Notes prior to the Consent Date and withdraws the tender after the Consent Date but prior to the Expiration Date will likely recognize ordinary income in the amount of any Cash Consent Consideration received with respect to such notes as described above under the heading "The Exchange of Old Notes Pursuant to the Exchange Offers—Early Tender and Consent Consideration."

**Tax Consequences to Participating Non-U.S. Holders**

*The Exchange of Old Notes Pursuant to the Exchange Offers*

Subject to the discussion below under the subheading "—Early Tender and Consent Consideration," a Non-U.S. Holder generally will not be subject to taxation on any gain that a U.S. Holder would be required to recognize on the exchange of Old Notes for New EFIH Senior Secured Notes as discussed above under "—Tax Consequences to Participating U.S. Holders—The Exchange of Old Notes Pursuant to the Exchange Offers" unless:

- the gain is effectively connected with his, her or its conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains), in which case the gain will be subject to tax in the same manner as effectively connected interest income as described below under the heading "—Ownership of New EFIH Senior Secured Notes—Payments of Interest"; or

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of the exchange, and certain other conditions are met, in which case the gain will generally be subject to 30% tax subject to the reduction of such gain by such Non-U.S. Holder's capital losses from U.S. sources.

Any amount received by a Non-U.S. Holder that is attributable to accrued and unpaid interest (including OID) on an Old Note generally will be taxable in the same manner as described below under "—Ownership of New EFIH Senior Secured Notes—Payments of Interest."

*Early Tender and Consent Consideration.* As discussed above under "—Tax Consequences to Participating U.S. Holders—The Exchange of Old Notes Pursuant to the Exchange Offers—Early Tender and Consent Consideration," under current U.S. federal income tax law, there is uncertainty regarding whether the Early Tender Consideration, Cash Consent Consideration or any Deemed Consent Consideration constitutes a separate fee or instead constitutes part of the consideration received for the Old Notes. In the case of a Non-U.S. Holder, EFH Corp. intends to take the position that the Early Tender Consideration is part of the consideration received in exchange for the tendered Old Notes and that there is no Deemed Consent Consideration, and accordingly, EFH Corp. does not intend to withhold U.S. federal income tax from any Early Tender Consideration or Deemed Consent Consideration paid to a Non-U.S. Holder. However, if any Early Tender Consideration or Deemed Consent Consideration were to

216

be treated as separate consideration for early acceptance of the exchange offers or consenting to the Proposed Amendments, then such a payment could result in a U.S. federal income tax liability to certain Non-U.S. Holders.

EFH Corp. intends to take the position that any Cash Consent Consideration payable to a Non-U.S. Holder constitutes a separate fee paid for consenting to the Proposed Amendments. Accordingly, absent further guidance from the IRS, EFH Corp. intends to withhold from any Cash Consent Consideration paid to a Non-U.S. Holder, U.S. federal income tax at a rate of 30% of such payment, unless (i) the Non-U.S. Holder is engaged in the conduct of a trade or business in the U.S. to which the receipt of the Cash Consent Consideration is effectively connected and provides a properly executed Form W-8ECI, or (ii) a U.S. tax treaty either eliminates or reduces such withholding tax with respect to the Cash Consent Consideration paid to the Non-U.S. Holder and the Non-U.S. Holder provides a properly executed Form W-8BEN. If such withholding results in an overpayment of taxes (because, for example, the Cash Consent Consideration may be treated as interest or as additional consideration received in the exchange), a refund or credit may be obtainable, provided that the required information is timely furnished to the IRS. In addition, EFH Corp. will report any Cash Consent Consideration paid under applicable U.S. information reporting rules.

Non-U.S. Holders are encouraged to consult their tax advisors with respect to the treatment of any Early Tender Consideration, Cash Consent Consideration or Deemed Consent Consideration

### Ownership of New EFIH Senior Secured Notes

*Payments of Interest.* A Non-U.S. Holder will not be subject to tax on any payment of interest (which for purposes of this discussion includes OID) on the New EFIH Senior Secured Notes under the "portfolio interest rule," provided that (i) such interest is not effectively connected with the conduct of a trade or business of the Non-U.S. Holder in the United States (or, if required by an applicable income tax treaty, is not attributable to a U.S. permanent establishment of the Non-U.S. Holder); (ii) the Non-U.S. Holder does not actually or constructively own 10% or more of EFH Corp.'s voting stock within the meaning of the Code and the Regulations; (iii) the Non-U.S. Holder is not a controlled foreign corporation that is related to EFH Corp. actually or constructively through stock ownership; (iv) the Non-U.S. Holder is not a bank receiving interest on a loan agreement entered into in the ordinary course of its trade or business; and (v) the Non-U.S. Holder has provided a validly completed IRS Form W-8BEN (or other applicable form) establishing such Non-U.S. Holder status (or certain documentary evidence requirements for establishing such Non-U.S. Holder status).

If a Non-U.S. Holder cannot satisfy the requirements described above, payments of interest on the New EFIH Senior Secured Notes (including OID) made to such Non-U.S. Holder will be subject to a 30% U.S. federal withholding tax, unless such Non-U.S. Holder provides EFH Corp. (or its paying agent) with a properly executed (i) IRS Form W-8BEN (or other applicable form) claiming an exemption from or reduction in withholding under the benefit of an applicable income tax treaty; or (ii) IRS Form W-8ECI (or other applicable form) certifying that interest paid on the New EFIH Senior Secured Notes is not subject to withholding tax because it is effectively connected with the conduct of a trade or business in the United States.

If a Non-U.S. Holder is engaged in a trade or business in the United States and interest (including OID) on the New EFIH Senior Secured Notes is effectively connected with the conduct of that trade or business (and, if required by an applicable income tax treaty is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains), then such Non-U.S. Holder will be subject to U.S. federal income tax on that interest (including OID) on a net income basis generally in the same manner as if he, she or it were a U.S. Holder unless an applicable income tax treaty provides otherwise (although the Non-U.S. Holder will be exempt from the 30% U.S. federal withholding tax, provided the certification requirements discussed above are satisfied). In addition, if the Non-U.S. Holder is a corporate Non-U.S. Holder, it may be subject to a branch profits tax equal to 30% (or lower applicable income tax treaty rate) of such interest (including OID), subject to adjustments.

*Sale, Exchange or Retirement of New EFIH Senior Secured Notes.* Any gain realized upon the sale, exchange or retirement of a New EFIH Senior Secured Note generally will not be subject to U.S. federal income tax unless certain exceptions apply, as described above under the heading "—The Exchange of Old Notes Pursuant to the Exchange Offers."

217

EFIHMW00259933

**Tax Consequences to Non-Participating Non-U.S. Holders**

Non-U.S. Holders that do not validly tender their Old Notes pursuant to the exchange offers, generally will not be subject to U.S. federal income tax as a result of the adoption of the Proposed Amendments if, as the Offeror believes, the adoption of the Proposed Amendments would not give rise to a deemed exchange of Old Notes for "new" Old Notes. Moreover, even if there were a deemed exchange, such exchange generally would result in tax only if it were not considered a recapitalization and such Non-U.S. Holders were in one of the two categories described in the heading "—Tax Consequences to Participating Non-U.S. Holders—The Exchange of Old Notes Pursuant to the Exchange Offers."

A Non-U.S. Holder of Old Notes that validly delivers and does not validly revoke a consent with respect to such notes and who does not exchange such notes pursuant to an exchange offer because of the operation of the proration provisions of the exchange offers or because such holder validly tenders Old Notes prior to the Consent Date and withdraws the tender after the Consent Date but prior to the Expiration Date will be subject to a 30% U.S. federal income withholding tax with respect to any Cash Consent Consideration received except in the circumstances described in the heading "—Tax Consequences to Participating Non-U.S. Holders—The Exchange of Old Notes Pursuant to the Exchange Offers—Early Tender and Consent Consideration."

**Backup Withholding and Information Reporting**

*U.S. Holders*

In general, information reporting requirements may apply to the exchange of Old Notes for New EFIH Senior Secured Notes and cash, and such requirements will apply to certain payments of interest (and accruals of OID) on, or proceeds from a disposition (including a retirement or redemption) of, New EFIH Senior Secured Notes (unless, in each case, the holder is an exempt recipient such as a corporation).

Backup withholding may apply to the exchange of Old Notes for New EFIH Senior Secured Notes and cash and payments of interest (and accruals of OID) on or proceeds from disposition (including a retirement or redemption) of New EFIH Senior Secured Notes if the holder fails to provide a taxpayer identification number or a certification that he, she or it is not subject to backup withholding. Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against the holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

*Non-U.S. Holders*

Generally, EFH Corp. must report to the IRS and to each Non-U.S. Holder the amount of interest (including OID) paid to such Non-U.S. Holder with respect to the Old Notes or New EFIH Senior Secured Notes, and the amount of tax, if any, withheld with respect to such payments. Copies of the information returns reporting such interest payments and any withholding may also be made available to the tax authorities in the country in which such Non-U.S. Holder resides under the provisions of an applicable income tax treaty.

In general, a Non-U.S. Holder will not be subject to backup withholding with respect to the exchange of Old Notes for New EFIH Senior Secured Notes and cash or interest (including OID) that the applicable Offeror pays to such Non-U.S. Holder on the Old Notes or New EFIH Senior Secured Notes, provided that such Offeror does not have actual knowledge or reason to know that such Non-U.S. Holder is a United States person as defined under the Code, and such Non-U.S. Holder has provided a validly completed IRS Form W-8BEN (or other applicable form) establishing that he, she or it is a Non-U.S. Holder (or such Non-U.S. Holder satisfies certain documentary evidence requirements for establishing that he, she or it is a Non-U.S. Holder).

Information reporting and, depending on the circumstances, backup withholding will apply to the proceeds of a sale or other disposition (including a retirement or redemption) of Old Notes or New EFIH Senior Secured Notes made within the United States or conducted through certain U.S.-related financial intermediaries, unless the Non-U.S. Holder certifies to the payor under penalties of perjury that he, she or it is a Non-U.S. Holder (and the payor does not have actual knowledge or reason to know that such Non-U.S. Holder is a United States person as defined under the Code), or he, she or it otherwise establishes an exemption.

218

EFIHMW00259934

Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against the Non-U.S. Holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

**Tax Consequences to EFH Corp.**

*Cancellation of Indebtedness Income*

To the extent that the issue price of the New EFIH Senior Secured Notes plus Total Cash Consideration paid in the exchanges is less than the adjusted issue price of the Old Notes exchanged, the consolidated group of which EFH Corp. is the common parent will realize cancellation of indebtedness income for U.S. federal income tax purposes ("COD income"). For transactions occurring before 2009, COD income was generally required to be included in gross income in the year of the transaction for U.S. federal income tax purposes. Under the American Recovery and Reinvestment Act of 2009 (the "2009 Law"), EFH Corp. may make an election to defer the recognition of COD income incurred as a result of the exchange offers until the fourth taxable year following the closing of the exchange offers. The COD income will then be recognized ratably over the ensuing five taxable years. At the time of recognition, COD income may be offset in whole or in part by net operating losses ("NOL") and other tax attributes available at such time, although there is no assurance that EFH Corp. will have such attributes at such time. However, even if a corporation might be able to offset all of its taxable income, including COD income, for regular tax purposes by available NOL carryovers, only 90% of a corporation's taxable income for alternative minimum tax ("AMT") purposes may be offset by available NOL carryovers or carrybacks, and therefore the corporation may incur an AMT liability with respect to COD income at the time of the deferred recognition. Pursuant to the 2009 Law, if a corporation elects to defer the recognition of COD income and is subsequently liquidated or sells substantially all of its assets, or similarly undergoes a cessation of business, then any deferred income will be accelerated into the taxable year in which such event occurs.

*Deferral of Deduction for OID*

A corporation is generally allowed to take a deduction for OID as it accrues. However, if EFH Corp. elects to postpone the recognition of COD income, EFH Corp. will be required to defer any deduction for OID that would otherwise accrue before the fourth taxable year following the exchange. In the fourth taxable year following the exchange, deductions for the aggregate amount of the deferred OID will be allowed to be taken ratably over the ensuing period of five taxable years. If the amount of OID that would normally accrue during the deferral period exceeds the amount of deferred COD income, deductions would be allowed for any such excess amount at the time such OID normally would accrue.

Confidential

EFIHMW00259935

## CERTAIN ERISA CONSIDERATIONS

This disclosure was written in connection with the promotion and marketing of the New EFIH Senior Secured Notes by the Offeror and the Dealer Managers, and it cannot be used by any holder for the purpose of avoiding penalties that may be asserted against the holder under the Code. Prospective purchasers of the New EFIH Senior Secured Notes should consult their own tax advisors with respect to the application of the U.S. federal income tax laws to their particular situations.

The following is a summary of certain considerations associated with the exchange of the Old Notes resulting in the acquisition or holding of the New EFIH Senior Secured Notes by employee benefit plans that are subject to Title I of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), individual retirement accounts and other plans and arrangements that are subject to Section 4975 of the Code or provisions under any federal, state, local, non-U.S. or other laws or regulations that are similar to such provisions of ERISA or the Code (collectively, "Similar Laws"), and entities whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each, a "Plan").

This summary is based on the provisions of ERISA and the Code (and related regulations and administrative and judicial interpretations) as of the date of this Prospectus. This summary does not purport to be complete and future legislation, court decisions, administrative regulations, rulings or administrative pronouncements could significantly modify the requirements summarized below. Any of these changes may be retroactive and may thereby apply to transactions entered into prior to the date of their enactment or release.

### General Fiduciary Matters

ERISA imposes certain duties on persons who are fiduciaries of a Plan subject to Title I of ERISA or of a Plan subject to Section 4975 of the Code (each a "Benefit Plan") and both ERISA and the Code prohibit certain transactions involving the assets of a Plan and its fiduciaries or other interested parties.

In considering the exchange of the Old Notes resulting in the acquisition of New EFIH Senior Secured Notes with a portion of the assets of any Plan, a fiduciary should determine whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA, the Code or any Similar Law. In addition, a fiduciary of a Plan should determine if the exchange offers satisfy the fiduciary's duties to the Plan including, without limitation, the prudence, diversification, and prohibited transaction provisions of ERISA, the Code and any other applicable Similar Laws.

### Prohibited Transaction Issues

Section 406 of ERISA and Section 4975 of the Code prohibit Benefit Plans from engaging in specified transactions involving plan assets with persons or entities who are "parties in interest," within the meaning of ERISA, or "disqualified persons," within the meaning of Section 4975 of the Code, unless an exemption is available. A party in interest or disqualified person who engaged in a non-exempt prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code. In addition, the fiduciary of such a Benefit Plan that engaged in such a non-exempt prohibited transaction may be subject to penalties and liabilities under ERISA and the Code.

The exchange of Old Notes and the acquisition and/or holding of New EFIH Senior Secured Notes by a Benefit Plan with respect to which the Offeror, EFH Corp., TCEH, the Sponsor Group, the Dealer Managers, the Information Agent, the Exchange Agent or a guarantor of the Old Notes or any of their affiliates is considered a party in interest or a disqualified person may constitute or result in a direct or indirect prohibited transaction under Section 406 of ERISA and/or Section 4975 of the Code, unless the investment is acquired and is held in accordance with an applicable statutory, class or individual prohibited transaction exemption. In this regard, the U.S. Department of Labor has issued prohibited transaction class exemptions ("PTCEs") that may apply to the exchange of the Old Notes and the acquisition and/or holding of New EFIH Senior Secured Notes. These class exemptions include, without limitation, PTCE 84-14 respecting transactions determined by independent qualified professional asset managers, PTCE 90-1 respecting insurance company pooled separate accounts, PTCE 91-38 respecting bank collective investment funds, PTCE 95-60 respecting life insurance company general accounts and PTCE 96-23 respecting transactions determined by in-house asset managers.

220

EFIHMW00259936

Plans that previously acquired or held Old Notes in reliance on PTCE 84-14 should note that the exchange offers may constitute a renewal under Part V(i) of PTCE 84-14 and any such Plan should consult its counsel to evaluate whether PTCE 84-14 remains applicable.

Each of these PTCEs contains conditions and limitations on its application. Fiduciaries of Plans that consider exchanging Old Notes and acquiring and/or holding New EFIH Senior Secured Notes in reliance on any of these or any other PTCEs should carefully review the PTCE to assure it is applicable. There can be no assurance that all of the conditions of any such exemptions will be satisfied.

Because of the foregoing, the New EFIH Senior Secured Notes should not be acquired or held by any person investing "plan assets" of any Plan, unless such acquisition and holding are entitled to exemptive relief from the prohibited transaction provisions of ERISA and the Code and are otherwise permissible under all applicable Similar Laws.

**Representation**

Accordingly, by acceptance of a New EFIH Senior Secured Note, each purchaser, holder and subsequent transferee will be deemed to have represented and warranted that either (i) no portion of the assets used to acquire or hold the New EFIH Senior Secured Notes constitutes assets of any Plan or (ii) the acquisition and holding of the New EFIH Senior Secured Notes (including the exchange of Old Notes for New EFIH Senior Secured Notes) are entitled to exemptive relief from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code and are otherwise permissible under all applicable Similar Laws.

The foregoing discussion is general in nature and is not intended to be all inclusive. Due to the complexity of these rules and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is particularly important that fiduciaries, or other persons considering acquiring the New EFIH Senior Secured Notes (or exchanging Old Notes for New EFIH Senior Secured Notes) on behalf of, or with the assets of, any Plan, consult with their counsel regarding the potential applicability of ERISA, Section 4975 of the Code and any Similar Laws to such investment and whether an exemption would be applicable to the purchase and holding of the New EFIH Senior Secured Notes.

## LEGAL MATTERS

Certain legal matters with respect to the New EFIH Senior Secured Notes offered in the exchange offers will be passed upon for the Offeror by Vinson & Elkins L.L.P., Dallas, Texas, and Simpson Thacher & Bartlett LLP, New York, New York, and NRC regulatory matters will be passed upon for the Offeror by Morgan, Lewis & Bockius LLP. Certain legal matters with respect to the New EFIH Senior Secured Notes offered in the exchange offers will be passed upon for the Dealer Managers by Shearman & Sterling LLP, New York, New York. An investment vehicle comprised of several partners of Simpson Thacher & Bartlett LLP, members of their families, related persons and others own interests representing less than 1% of the capital commitments of the KKR Millennium Fund, L.P. and KKR 2006 Fund, L.P.

## EXPERTS

The financial statements as of December 31, 2009 and 2008 (successor), and for the years ended December 31, 2009 and 2008 (successor), the period from October 11, 2007 through December 31, 2007 (successor) and the period from January 1, 2007 through October 10, 2007 (predecessor) of EFH Corp. included in this Prospectus have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report appearing herein (which report expresses an unqualified opinion and includes an explanatory paragraph related to EFH Corp. completing its merger with Texas Energy Future Merger Sub Corp and becoming a subsidiary of Texas Energy Future Holdings Limited Partnership on October 10, 2007). The financial statements as of December 31, 2009 and 2008 (successor balance sheets), and for the years ended December 31, 2009 and 2008 (successor operations) and the period from October 11, 2007 through December 31, 2007 (successor operations) of EFIH and the financial statements for the period from January 1, 2007 through October 10, 2007 (predecessor operations) of Oncor (as EFIH's predecessor) included in this Prospectus, have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report appearing herein (which report expresses an unqualified opinion and includes explanatory paragraphs referring to EFIH's adoption of amended

221

EFIHMW00259937

consolidation accounting standards related to variable interest entities effective January 1, 2010, on a retrospective basis, and EFIII as a wholly-owned subsidiary of EFII Corp., which was merged into Texas Energy Future Merger Sub Corp on October 10, 2007).  The financial statements as of December 31, 2009 and 2008 (successor balance sheets), and for the years ended December 31, 2009 and 2008 (successor operations), the period from October 11, 2007 through December 31, 2007 (successor operations) of Oncor Holdings and the financial statements for the period from January 1, 2007 through October 10, 2007 (predecessor operations) of Oncor (as Oncor Holdings' predecessor) included in this Prospectus, have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report appearing herein (which report expresses an unqualified opinion and includes an explanatory paragraph referring to Oncor Holdings as a wholly-owned subsidiary of EFH Corp., which was merged with Texas Energy Future Merger Sub Corp on October 10, 2007).  Such financial statements have been so included in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

Confidential

EFIHMW00259938

**PX 027**
**Page 232 of 232**