Table of Contents

- was engaged in a business or transaction for which the Offeror's or EFIH's, as applicable, remaining assets constituted unreasonably small capital; or

- intended to incur, or believed that it would incur, debts beyond its ability to pay those debts as they mature.

The measures of insolvency for purposes of these fraudulent transfer laws will vary depending upon the law applied in any proceeding to determine whether a fraudulent transfer has occurred. Generally, however, a debtor would be considered insolvent if:

- the sum of its debts, including contingent liabilities, was greater than the fair saleable value of all of its assets;

- the present fair saleable value of its assets was less than the amount that would be required to pay its probable liability on its existing debts, including contingent liabilities, as they become absolute and mature; or

- it could not pay its debts as they become due.

EFIH's assets currently exceed its liabilities as shown on its balance sheet prepared in accordance with U.S. generally accepted accounting principles as of June 30, 2010. However, the values assigned to assets and liabilities in this balance sheet are not necessarily indicative of the values that a court would assign to such assets and liabilities in making a solvency determination. We have not obtained or prepared an appraisal of the fair saleable value of the assets of EFIH. As a result, we cannot assure you that EFIH would satisfy the solvency tests set forth in the bullet points immediately prior to this paragraph or what standard a court would apply in determining whether the Offeror would be considered to be insolvent. In addition, we cannot assure you that a court would determine that reasonably equivalent value or fair consideration was received by EFIH in connection with the exchange offers.

**The Offeror may not be able to repurchase the New EFIH Senior Secured Notes upon a change of control.**

Upon the occurrence of specific kinds of change of control events, the Offeror will be required to offer to repurchase all of the New EFIH Senior Secured Notes at 101% of their principal amount plus accrued and unpaid interest. The source of funds for any purchase of the New EFIH Senior Secured Notes will be the Offeror's available cash or cash generated from the Offeror's subsidiaries' operations or other sources, including borrowings, sales of assets or sales of equity. The Offeror may not be able to repurchase the New EFIH Senior Secured Notes upon a change of control because the Offeror may not have sufficient financial resources to purchase all of the New EFIH Senior Secured Notes that are tendered upon a change of control. Further, EFIH may be restricted under the terms of debt agreements of Oncor from receiving funds from Oncor sufficient to repurchase all of the New EFIH Senior Secured Notes tendered by holders upon a change of control. Accordingly, the Offeror may not be able to satisfy its obligations to purchase the New EFIH Senior Secured Notes unless the Offeror is able to refinance or obtain waivers under the instruments governing its and/or EFH Corp.'s indebtedness. The Offeror's failure to repurchase the New EFIH Senior Secured Notes upon a change of control would cause a default under the applicable indenture and may cause a cross–default under certain of the Offeror's and/or EFH Corp.'s or its subsidiaries' other debt agreements.

**An active trading market may not develop for the New EFIH Senior Secured Notes.**

The New EFIH Senior Secured Notes are new issues of securities and will not be fungible with any outstanding securities. There is no established public trading market for the New EFIH Senior Secured Notes, and an active trading market may not develop. Although EFIH intends to apply for the New EFIH Senior Secured Notes to be listed on the New York Stock Exchange, there may, nonetheless, be limited liquidity in the trading market for the New EFIH Senior Secured Notes. In addition, the liquidity of the trading market in the New EFIH

52

EFIHMW00051997

EFIHMW00051935

Table of Contents

Senior Secured Notes and the market prices quoted for the New EFIH Senior Secured Notes may be materially or adversely affected by changes in the overall market for these types of securities and by changes in the Offeror's and/or EFH Corp.'s financial performance or prospects or in the prospects for companies in the Offeror's and/or EFH Corp.'s industry generally. As a consequence, an active trading market may not develop for the New EFIH Senior Secured Notes, you may not be able to sell your New EFIH Senior Secured Notes, or, even if you can sell their New EFIH Senior Secured Notes, you may not be able to sell them at a favorable price.

If the Offeror waives the minimum condition, it is possible that only a small aggregate principal amount of New EFIH Senior Secured Notes may be issued upon completion of the exchange offers, which may adversely affect the liquidity of the New EFIH Senior Secured Notes. A series of securities with a small float generally commands a lower price than does a comparable series of securities with a greater float. A reduced float may also make the trading prices of the New EFIH Senior Secured Notes more volatile. If a small aggregate principal amount of New EFIH Senior Secured Notes is outstanding following the completion of the exchange offers, holders of a small principal amount of the New EFIH Senior Secured Notes may control decisions with respect to the New EFIH Senior Secured Notes including with respect to amendments, waivers and requests to accelerate upon an event of default, among others.

### EFH Corp. may incur an income tax liability as a result of the exchange offers.

As a result of the exchange offers, EFH Corp. will realize cancellation of indebtedness income for U.S. federal income tax purposes ("COD income"). Under recently enacted legislation, EFH Corp. may elect to postpone the recognition of COD income in certain circumstances. If the election is made, the recognition of COD income incurred as a result of the exchange offers will be deferred until the fourth taxable–year following the closing of the exchange offers and then be recognized ratably over the ensuing five taxable–year period from 2014 to 2018. The amount of COD income incurred by EFH Corp. will depend upon, among other things, the fair market value of the consideration offered in exchange for the Old Notes. As such, EFH Corp. will not be able to calculate the aggregate amount of COD income attributable to the Old Notes accepted for exchange until after the Expiration Date. See "Material U.S. Federal Income Tax Considerations—Tax Consequences to EFH Corp."

### The New EFIH Senior Secured Notes may be issued with original issue discount for U.S. federal income tax purposes.

The New EFIH Senior Secured Notes will be treated as issued with original issue discount ("OID") for U.S. federal income tax purposes to the extent that their stated principal amount exceeds their issue price by more than a de minimis amount. A U.S. Holder (as defined in "Material U.S. Federal Income Tax Considerations") of the New EFIH Senior Secured Notes will be required to accrue such OID on a current basis before receiving cash attributable to that income regardless of the U.S. Holder's method of tax accounting. For further discussion of the computation and reporting of OID, see "Material U.S. Federal Income Tax Considerations." Additionally, a bankruptcy court may not allow a claim for all or a portion of any unamortized amount of the OID on the New EFIH Senior Secured Notes.

If EFH Corp. chooses to make the election to defer the recognition of COD income described above, EFH Corp. will not be permitted to deduct any OID on the New EFIH Senior Secured Notes to the extent that such OID (i) accrues before 2014 and (ii) does not exceed COD income realized in the exchange offers. EFH Corp. will, however, be allowed to take these disallowed OID deductions ratably over the five–year period from 2014 through 2018.

### If a bankruptcy petition were filed by or against the Offeror, holders of the New EFIH Senior Secured Notes issued in consideration for the Old Notes may have their claims allowed in a lesser amount than the face amount of their claims under the indenture governing the New EFIH Senior Secured Notes.

If a bankruptcy petition were filed by or against any of the Offeror or EFCH under the U.S. Bankruptcy Code after the completion of the exchange offers, the allowed claim of any holder of the New EFIH Senior

53

EFIHMW00051998

EFIHMW00051935

**PX 030**
**Page 64 of 734**

**Table of Contents**

Secured Notes issued as consideration for the Old Notes for the principal amount of the New EFIH Senior Secured Notes may be limited to an amount equal to the sum of:

- the original issue price for the New EFIH Senior Secured Notes; and

- that portion of the OID that does not constitute "unmatured interest" for purposes of the U.S. Bankruptcy Code.

Bankruptcy courts have not developed a uniform method for determining the original issue price of new notes where the consideration for such new notes is not cash. Rather, the facts and circumstances of the particular issuance appear to dictate how the original issue price of such new notes is determined. Measures of the original issue price of new notes where the consideration for such new notes is not cash have included the fair market value of the consideration for such new notes at the time of the issuance of such new notes and the selling price of such new notes on their first day of trading.

Any OID that was not amortized as of the date of the bankruptcy filing would constitute unmatured interest. Accordingly, holders of the New EFIH Senior Secured Notes under these circumstances may have their claims allowed in a lesser amount than the face amount of their claims would be under the terms of the indenture governing the New EFIH Senior Secured Notes, even if sufficient funds are available to pay such holders the unamortized portion of any OID as of the bankruptcy filing.

*The interests of the Sponsor Group may differ from the interests of the holders of the New EFIH Senior Secured Notes.*

The Sponsor Group indirectly owns approximately 60% of EFH Corp.'s capital stock on a fully diluted basis through their investment in Texas Holdings. As a result of this ownership and the Sponsor Group's ownership in interests of the general partner of Texas Holdings, the Sponsor Group has control over decisions regarding our operations, plans, strategies, finances and structure, including whether to enter into any corporate transaction, and will have the ability to prevent any transaction that requires the approval of EFIH's or EFH Corp.'s shareholders.

The interests of these persons may differ from your interests in material respects. For example, if we encounter financial difficulties or are unable to pay our debts as they mature, the interests of the Sponsor Group, as equity holders, might conflict with your interests as a noteholder. The Sponsor Group may also have an interest in pursuing acquisitions, divestitures, financings or other transactions (including changes to EFH Corp.'s hedging provider) that, in their judgment, could enhance their equity investments, even though such transactions might involve risks to you as a noteholder. Additionally, the indenture governing the New EFIH Senior Secured Notes permits us to pay advisory fees, dividends or make other restricted payments under certain circumstances, and the Sponsor Group may have an interest in our doing so.

**Risks Related to Our and EFH Corp.'s Substantial Indebtedness and Debt Agreements**

*Our and EFH Corp.'s substantial leverage could adversely affect our ability to raise additional capital to fund our operations, limit our ability to react to changes in the economy or our industry, expose us to interest rate risk to the extent of our variable rate debt and prevent us from meeting obligations under the various debt agreements governing our and EFH Corp.'s indebtedness.*

We and EFH Corp. are highly leveraged. As of June 30, 2010, EFH Corp.'s consolidated principal amount of debt (short-term borrowings and long-term debt, including amounts due currently) totaled $38.620 billion (see Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009

54

EFIHMW00051999

EFIHMW00051935

**PX 030**
**Page 65 of 734**

**Table of Contents**

included elsewhere in this Prospectus and Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and six months ended June 30, 2010 included elsewhere in this Prospectus). Our and EFH Corp.'s substantial leverage could have important consequences, including:

- making it more difficult for us to make payments on our indebtedness;

- requiring a substantial portion of cash flow from operations to be dedicated to the payment of principal and interest on indebtedness, therefore reducing our ability to use our cash flow to fund operations, capital expenditures and future business opportunities and execute our strategy;

- increasing our vulnerability to adverse economic, industry or competitive developments;

- exposing us to the risk of increased interest rates because, as of June 30, 2010, taking into consideration interest swap transactions, approximately 11% of EFH Corp.'s long‑term borrowings were at variable rates of interest;

- limiting our ability to make strategic acquisitions or causing us to make non‑strategic divestitures;

- limiting our ability to obtain additional financing for working capital, capital expenditures, product development, debt service requirements, acquisitions and general corporate or other purposes, or to refinance existing debt;

- limiting our ability to adjust to changing market conditions; and

- placing us at a competitive disadvantage compared to competitors who are less highly leveraged and who therefore, may be able to take advantage of opportunities that we cannot due to our substantial leverage.

A substantial amount of this indebtedness is comprised of EFH Corp.'s indebtedness under the TCEH Senior Secured Facilities, substantially all of which matures in October 2014. EFH Corp. may not be able to refinance the TCEH Senior Secured Facilities or its other existing indebtedness because of its high levels of debt and debt incurrence restrictions under its debt agreements or because of generally adverse conditions in credit markets.

In addition, future transactions and initiatives that we continuously contemplate and may pursue may have significant effects on our business, capital structure, liquidity and/or results of operations. For example, in addition to the exchange offers contemplated hereby, we have and may continue to pursue, from time to time, transactions and initiatives of various types, including, without limitation, other exchange transactions, debt repurchases, equity or debt issuances, asset sales, joint ventures, recapitalizations, business combinations and other strategic transactions. There can be no guarantee that any of such transactions or initiatives would ultimately be successful or produce the desired outcome, which could ultimately affect us in a material and adverse manner. Moreover, the effects of any of these transactions or initiatives could be material and adverse to holders of our debt and could be disproportionate, and directionally different, with respect to one class or type of debt than with respect to others.

***Despite our current high indebtedness level, we may still be able to incur substantially more indebtedness. This could further exacerbate the risks associated with our substantial indebtedness.***

We may be able to incur additional indebtedness in the future. Although our debt agreements contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of significant qualifications and exceptions, and under certain circumstances, the amount of indebtedness, including secured indebtedness, that could be incurred in compliance with these restrictions could be substantial. The indenture for the New EFH Senior Secured Notes will allow EFH Corp. and EFIH to incur up to an aggregate of $4.0 billion of debt, including the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes, the EFIH 9.75% Notes and the New EFIH Senior Secured Notes, secured by a first‑priority security interest in the Collateral, and a substantial amount of additional indebtedness, which additional indebtedness may be secured by a junior‑priority security

55

EFIHMW00052000

EFIHMW00051935

**Table of Contents**

interest in the Collateral or by assets of EFH Corp. or EFIH other than the Collateral. If new debt is added to our existing debt levels, the related risks that we now face would intensify. See "Description of the Notes."

### *Our debt agreements contain restrictions that limit flexibility in operating our businesses.*

Our debt agreements contain various covenants and other restrictions that limit our ability to engage in specified types of transactions and may adversely affect our ability to operate our businesses. These covenants and other restrictions limit our ability to, among other things:

- incur additional indebtedness or issue preferred shares;
- pay dividends on, repurchase or make distributions in respect of capital stock or make other restricted payments;
- make investments;
- sell or transfer assets;
- create liens;
- consolidate, merge, sell or otherwise dispose of all or substantially all of its or their assets;
- enter into transactions with its or their affiliates; and
- repay, repurchase or modify certain subordinated and other material debt.

There are a number of important limitations and exceptions to these covenants and other restrictions. See "Description of the Notes" for a description of these covenants and other restrictions with respect to the New EFIH Senior Secured Notes.

In addition, as described in "The Transactions—Ring-Fencing," EFH Corp. and Oncor have implemented a number of "ring-fencing" measures to enhance the credit quality of Oncor, its immediate parent, Oncor Holdings, and Oncor Holdings' other subsidiaries. Those measures include, among other things:

- Oncor being treated as an unrestricted subsidiary with respect to EFH Corp.'s and our indebtedness, including the New EFIH Senior Secured Notes;
- Oncor not being restricted from incurring its own indebtedness;
- Oncor not guaranteeing or pledging any of its assets to secure the indebtedness of any member of the Texas Holdings Group; and
- restrictions on dividends, and the right of the independent members of Oncor's board of directors and the primary noncontrolling member of Oncor to block the payment of dividends.

## Risks Related to Structure

### *EFIH is a holding company and its obligations are structurally subordinated to existing and future liabilities and preferred stock of its subsidiaries.*

EFIH's cash flows and ability to meet its obligations are largely dependent upon the earnings of its subsidiaries, in particular, Oncor, and the payment of such earnings to EFIH in the form of dividends or distributions. These subsidiaries are separate and distinct legal entities and have no obligation to provide EFIH with funds for its payment obligations. Any decision by a subsidiary to provide EFIH with funds for its payment obligations, whether by dividends or distributions, will depend on, among other things, the subsidiary's results of operations, financial condition, cash requirements, contractual restrictions and other factors. In addition, a subsidiary's ability to pay dividends may be limited by covenants in its existing and future debt agreements or applicable law.

56

EFIHMW00052001

EFIHMW00051935

Table of Contents

Because EFIH is a holding company, its obligations to its creditors are structurally subordinated to all existing and future liabilities and existing and future preferred stock of its subsidiaries that do not guarantee such obligations. Therefore, EFIH's rights and the rights of its creditors to participate in the assets of any subsidiary in the event that such a subsidiary is liquidated or reorganized are subject to the prior claims of such subsidiary's creditors and holders of such subsidiary's preferred stock. To the extent that EFIH may be a creditor with recognized claims against any such subsidiary, EFIH's claims would still be subject to the prior claims of such subsidiary's creditors to the extent that they are secured or senior to those held by EFIH. Subject to restrictions contained in financing arrangements, EFIH's subsidiaries may incur additional indebtedness and other liabilities.

*Oncor may or may not make any distributions to EFIH.*

Upon the consummation of the merger in October 2007, EFH Corp. and Oncor implemented certain structural and operational "ring-fencing" measures based on principles articulated by rating agencies and commitments made by Texas Holdings and Oncor to the PUCT and the FERC and to the PUCT in Docket No. 34077 to further enhance Oncor's credit quality. These measures were put into place to mitigate Oncor's credit exposure to the Texas Holdings Group (including the Offeror) and to reduce the risk that the assets and liabilities of Oncor would be substantively consolidated with the assets and liabilities of the Texas Holdings Group (including the Offeror) in the event of a bankruptcy of one or more of those entities.

As part of the ring-fencing measures, a majority of the members of the board of directors of Oncor are required to be, and are, independent from EFH Corp. Any new independent directors of Oncor are required to be appointed by the nominating committee of Oncor Holdings. The organizational documents of Oncor give these independent directors, acting by majority vote, and, during certain periods, any director designated by Texas Transmission, the express right to prevent distributions from Oncor if they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements. Accordingly, there can be no assurance that Oncor will make any distributions to the Offeror.

In addition, Oncor's organizational documents limit Oncor's distributions to the Offeror through December 31, 2012 to an amount not to exceed Oncor's net income (determined in accordance with U.S. GAAP, subject to certain defined adjustments, including goodwill impairments) and prohibit Oncor from making any distribution to the Offeror so long as and to the extent that such distribution would cause Oncor's regulatory capital structure to exceed the debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.

In March 2009, the PUCT awarded Oncor the right to construct approximately $1.3 billion of transmission lines and facilities associated with its Competitive Renewable Energy Zones ("CREZ") Transmission Plan (see discussion in "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three and Six Months Ended June 30, 2010—Regulation and Rates" included in Annex B to this Prospectus). With the award, it is likely Oncor will incur additional debt. In addition, Oncor may incur additional debt in connection with other investments in infrastructure or technology, including automated accounting systems. Accordingly, while Oncor is required to maintain a debt to equity ratio of 60% debt to 40% equity, there can be no assurance that Oncor's equity balance will be sufficient to maintain the required debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, thereby restricting Oncor from making any distributions to the Offeror.

**Risks Related to Our and EFH Corp.'s Businesses**

EFH Corp. is a holding company conducting its operations principally through its subsidiaries, TCEH (which is indirectly wholly-owned by EFH Corp.) and Oncor (in which EFH Corp. indirectly holds an approximate 80% ownership interest). As such, the risks described below will apply to EFH Corp. There are additional risks relating to investing in the New EFIH Senior Secured Notes that you should consider before deciding to tender your Old Notes. Such additional risks are described elsewhere in this "Risk Factors" section

EFIHMW00052002

EFIHMW00051935

Table of Contents
under the headings "—Risks Related to the Exchange Offers and the New EFIH Senior Secured Notes," "—Risks Related to Our Substantial Indebtedness and Debt Agreements," "—Risks Related to Structure" and "Risks Related to the EFIH Business."

*Our businesses are subject to ongoing complex governmental regulations and legislation that have impacted, and may in the future impact, our businesses and/or results of operations.*

Our businesses operate in changing market environments influenced by various state and federal legislative and regulatory initiatives regarding the restructuring of the energy industry, including competition in the generation and sale of electricity. We will need to continually adapt to these changes.

Our businesses are subject to changes in state and federal laws (including PURA, the Federal Power Act, the Atomic Energy Act, the Public Utility Regulatory Policies Act of 1978, the State and Federal Clean Air Acts and the Energy Policy Act of 2005), changing governmental policy and regulatory actions (including those of the PUCT, the NERC, the Texas Regional Entity, the TCEQ, the FERC, the EPA, the NRC and the CFTC) and the rules, guidelines and protocols of ERCOT with respect to matters including, but not limited to, market structure and design, operation of nuclear generation facilities, construction and operation of other generation facilities, construction and operation of transmission facilities, acquisition, disposal, depreciation and amortization of regulated assets and facilities, recovery of costs and investments, decommissioning costs, return on invested capital for regulated businesses, market behavior rules, present or prospective wholesale and retail competition and environmental matters. TCEH, along with other market participants, is subject to electricity pricing constraints and market behavior and other competition–related rules and regulations under PURA that are administered by the PUCT and ERCOT, and, with respect to any wholesale power sales outside the ERCOT market, is subject to market behavior and other competition–related rules and regulations under the Federal Power Act that are administered by the FERC. Changes in, revisions to, or reinterpretations of existing laws and regulations (for example, with respect to prices at which TCEH may sell electricity, the required permits for the three lignite–fueled generation units recently completed or currently under construction or the cost of emitting greenhouse gases) may have an adverse effect on our businesses.

The Texas Legislature meets every two years, and from time to time bills are introduced and considered that could materially affect our businesses. There can be no assurance that future action of the Texas Legislature will not result in legislation that could have a material adverse effect on us and our financial prospects.

*PURA, the PUCT, ERCOT, the RRC, the TCEQ and the Office of Public Utility Council (the "OPC") are subject to a "Sunset" review by the Texas Sunset Advisory Commission. PURA will expire, and the PUCT and the RRC will be abolished, on September 1, 2011 unless extended by the Texas Legislature following such review. If any of PURA, the PUCT, ERCOT, the RRC, the TCEQ or the OPC are not renewed by the Texas Legislature pursuant to Sunset review, it could have a material effect on our business.*

Sunset review is the regular assessment of the continuing need for a state agency to exist, and is grounded in the premise that an agency will be abolished unless legislation is passed to continue its functions. The Texas Sunset Advisory Commission (the "Sunset Commission") closely reviews each agency and recommends action on each agency to the Texas Legislature, which action may include significant changes to applicable laws or modifying or even abolishing the agency. Of the agencies scheduled for Sunset review by the Sunset Commission in 2010 and 2011, the following hold primary interest for us: the TCEQ, the PUCT, the OPC, the RRC and ERCOT, which are subject to a focused, limited scope, or special purpose review. These agencies, for the most part, govern and operate the electricity and mining markets in Texas upon which our business model is based. PURA, which expires September 1, 2011, is also subject to Sunset review. If the Texas Legislature fails to renew PURA or any of these agencies, it could result in a significant restructuring of the Texas electricity market or regulatory regime that could have a material impact on our business. There can be no assurance that future action of the Sunset Commission will not result in legislation that could have a material adverse effect on us and our financial prospects.

58

EFIHMW00052003

EFIHMW00051935

**PX 030**
**Page 69 of 734**

Table of Contents

*Litigation, legal proceedings, regulatory investigations or other administrative proceedings could expose us to significant liabilities and reputation damage and have a material adverse effect on our results of operations, and the litigation environment in which we operate poses a significant risk to our businesses.*

We are involved in the ordinary course of business in a number of lawsuits involving employment, commercial, environmental and injuries and damages issues, among other matters. We evaluate litigation claims and legal proceedings to assess the likelihood of unfavorable outcomes and to estimate, if possible, the amount of potential losses. Based on these assessments and estimates, we establish reserves and disclose the relevant litigation claims or legal proceedings, as appropriate. These assessments and estimates are based on the information available to management at the time and involve a significant amount of judgment. Actual outcomes or losses may differ materially from current assessments and estimates. The settlement or resolution of such claims or proceedings may have a material adverse effect on our results of operations. In addition, judges and juries in the State of Texas have demonstrated a willingness to grant large verdicts, including punitive damages, to plaintiffs in personal injury, property damage and business tort cases. We use appropriate means to contest litigation threatened or filed against us, but the litigation environment in the State of Texas poses a significant business risk.

We are involved in the ordinary course of business in permit applications and renewals, and we are exposed to the risk that certain of our operating permits may not be granted or renewed on satisfactory terms. Failure to obtain and maintain the necessary permits to conduct our businesses could have a material adverse effect on our results of operations.

We are also involved in the ordinary course of business in regulatory investigations and other administrative proceedings, and we are exposed to the risk that we may become the subject of additional regulatory investigations or administrative proceedings. See Note 4 to EFH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010, and Note 7 to EFH Corp.'s historical condensed consolidated financial statements for the three and six months ended June 30, 2010 included elsewhere in this Prospectus. While we cannot predict the outcome of any regulatory investigation or administrative proceeding, any such regulatory investigation or administrative proceeding could result in us incurring material penalties and/or other costs and have a material adverse effect on our results of operations.

*TXU Energy Retail Company LLC may lose a significant number of retail customers due to competitive marketing activity by other retail electric providers.*

TXU Energy Retail Company LLC ("TXU Energy") faces competition for customers. Competitors may offer lower prices and other incentives, which, despite TXU Energy's long-standing relationship with customers, may attract customers away from TXU Energy.

In some retail electricity markets, TXU Energy's principal competitor may be the incumbent retail electric provider. The incumbent retail electric provider has the advantage of long-standing relationships with its customers, including well-known brand recognition.

In addition to competition from the incumbent retail electric provider, TXU Energy may face competition from a number of other energy service providers, other energy industry participants, or nationally branded providers of consumer products and services who may develop businesses that will compete with TXU Energy. Some of these competitors or potential competitors may be larger or better capitalized than TXU Energy. If there is inadequate potential margin in these retail electricity markets, it may not be profitable for TXU Energy to compete in these markets.

59

EFIHMW00052004

EFIHMW00051935

Table of Contents

*TCEH's revenues and results of operations may be negatively impacted by decreases in market prices for power, decreases in natural gas prices, and/or decreases in market heat rates.*

TCEH (EFH Corp.'s largest business) is not guaranteed any rate of return on capital investments in its competitive businesses. We market and trade electricity and natural gas, including electricity from our own generation facilities and generation contracted from third parties, as part of our wholesale markets operation. TCEH's results of operations depend in large part upon market prices for electricity, natural gas, uranium, coal and transportation in its regional market and other competitive markets and upon prevailing retail electricity rates, which may be impacted by actions of regulatory authorities. Market prices may fluctuate substantially over relatively short periods of time. Demand for electricity can fluctuate dramatically, creating periods of substantial under‑ or over‑supply. During periods of over‑supply, prices might be depressed. Also, at times there may be political pressure, or pressure from regulatory authorities with jurisdiction over wholesale and retail energy commodity and transportation rates, to impose price limitations, bidding rules and other mechanisms to address volatility and other issues in these markets.

Some of the fuel for our generation facilities is purchased under short‑term contracts. Prices of fuel, including diesel, natural gas, coal and nuclear fuel, may also be volatile, and the price we can obtain for electricity sales may not change at the same rate as changes in fuel costs. In addition, we purchase and sell natural gas and other energy related commodities, and volatility in these markets may affect costs incurred in meeting obligations.

Volatility in market prices for fuel and electricity may result from the following:

- volatility in natural gas prices;
- volatility in market heat rates;
- volatility in coal and rail transportation prices;
- severe or unexpected weather conditions;
- seasonality;
- changes in electricity and fuel usage;
- illiquidity in the wholesale power or other markets;
- transmission or transportation constraints, inoperability or inefficiencies;
- availability of competitively‑priced alternative energy sources;
- changes in market structure;
- changes in supply and demand for energy commodities, including nuclear fuel and related enrichment and conversion services;
- changes in generation efficiency;
- outages at our generation facilities or those of our competitors;
- changes in the credit risk or payment practices of market participants;
- changes in production and storage levels of natural gas, lignite, coal, crude oil, diesel and other refined products;
- natural disasters, wars, sabotage, terrorist acts, embargoes and other catastrophic events; and
- federal, state and local energy, environmental and other regulation and legislation.

All of our generation facilities are located in the ERCOT market, a market with limited interconnections to other markets. Wholesale electricity prices in the ERCOT market generally correlate with the price of natural gas because marginal electricity demand is generally supplied by natural gas‑fueled generation facilities.

60

EFIHMW00052005

EFIHMW00051935

Table of Contents

Wholesale electricity prices also correlate with market heat rates (a measure of efficiency of the marginal price–setting generator of electricity), which could fall if demand for electricity were to decrease or if additional generation facilities are built in ERCOT. Accordingly, the contribution to earnings and the value of our baseload (lignite/coal–fueled and nuclear) generation assets, which provided a substantial portion of our supply volumes in 2009 and in 2010 to date, are dependent in significant part upon the price of natural gas and market heat rates. As a result, our baseload generation assets could significantly decrease in profitability and value if natural gas prices or market heat rates fall.

> ***Our assets or positions cannot be fully hedged against changes in commodity prices and market heat rates, and hedging transactions may not work as planned or hedge counterparties may default on their obligations.***

We cannot fully hedge the risk associated with changes in commodity prices, most notably natural gas prices, or market heat rates because of the expected useful life of our generation assets and the size of our position relative to market liquidity. To the extent we have unhedged positions, fluctuating commodity prices and/or market heat rates can materially impact our results of operations and financial position, either favorably or unfavorably.

To manage our financial exposure related to commodity price fluctuations, we routinely enter into contracts to hedge portions of purchase and sale commitments, fuel requirements and inventories of natural gas, lignite, coal, crude oil, diesel fuel and refined products, and other commodities, within established risk management guidelines. As part of this strategy, we routinely utilize fixed–price forward physical purchase and sale contracts, futures, financial swaps and option contracts traded in over–the–counter markets or on exchanges. Although we devote a considerable amount of time and effort to the establishment of risk management procedures, as well as the ongoing review of the implementation of these procedures, the procedures in place may not always function as planned and cannot eliminate all the risks associated with these activities. For example, we hedge the expected needs of our wholesale and retail customers, but unexpected changes due to weather, natural disasters, market constraints or other factors could cause us to purchase power to meet unexpected demand in periods of high wholesale market prices or resell excess power into the wholesale market in periods of low prices. As a result of these and other factors, we cannot precisely predict the impact that risk management decisions may have on our businesses, results of operations or financial position.

With the tightening of credit markets, there has been some decline in the number of market participants in the wholesale energy commodities markets, resulting in less liquidity, particularly in the ERCOT electricity market. Participation by financial institutions and other intermediaries (including investment banks) has particularly declined. Extended declines in market liquidity could materially affect our ability to hedge our financial exposure to desired levels.

To the extent we engage in hedging and risk management activities, we are exposed to the risk that counterparties that owe us money, energy or other commodities as a result of market transactions will not perform their obligations. Should the counterparties to these arrangements fail to perform, we might be forced to enter into alternative hedging arrangements or honor the underlying commitment at then–current market prices. In such event, we might incur losses in addition to amounts, if any, already paid to the counterparties. ERCOT market participants are also exposed to risks that another ERCOT market participant may default on its obligations to pay ERCOT for power taken, in which case such costs, to the extent not offset by posted security and other protections available to ERCOT, may be allocated to various non–defaulting ERCOT market participants, including us.

61

EFIHMW00052006

EFIHMW00051935

Table of Contents

*Our collateral requirements for hedging arrangements could be materially impacted if the rules implementing the Financial Reform Act broaden the scope of the Act's provisions regarding the regulation of over–the–counter financial derivatives and make them applicable to us.*

In July 2010, the US Congress enacted, and President Obama signed, financial reform legislation known as the Dodd–Frank Wall Street Reform and Consumer Protection Act (the "Financial Reform Act"). Title VII of the Financial Reform Act provides for the regulation of the over–the–counter (OTC) derivatives market. While the legislation is broad and detailed, substantial portions of the legislation will require rulemaking by federal governmental agencies to either implement the standards set out in the legislation or to adopt new standards.

The Financial Reform Act generally requires OTC derivatives (including the types of asset-backed OTC derivatives that we use to hedge risks associated with commodity and interest rate exposure) to be cleared by a derivatives clearing organization. However, end–users that are non–financial entities using the swap to hedge or mitigate commercial risk are exempt from these clearing requirements. The type of asset–backed OTC derivatives that we use to hedge commodity and interest rate risk should be exempt from the clearing requirements. In addition, existing swaps are grandfathered from the clearing requirements.

The Financial Reform Act also requires the posting of cash collateral for uncleared swaps. Because these cash collateral requirements are unclear as to whether an end–user or its counterparty (i.e., swap dealer) is required to post cash collateral, there is risk that the cash collateral requirement could be used to effectively negate the end–user clearing exemption. However, the legislative history of the Financial Reform Act suggests that it was not Congress' intent to require end–users (rather that such requirement apply to swap dealers) to post cash collateral with respect to swaps. If we were required to post cash collateral on our swap transactions, our liquidity would likely be materially impacted, and our ability to enter into OTC derivatives to hedge our commodity and interest rate risks would be significantly limited.

We cannot predict the outcome of the rulemaking to implement the OTC derivative market provisions of the Financial Reform Act. This rulemaking could negatively affect our ability to hedge our commodity and interest rate risks. The inability to hedge these risks would likely have a material adverse effect on our results of operations, financial condition or cash flows.

*We may suffer material losses, costs and liabilities due to ownership and operation of the Comanche Peak nuclear generation facility.*

The ownership and operation of a nuclear generation facility involves certain risks. These risks include:

- unscheduled outages or unexpected costs due to equipment, mechanical, structural or other problems;

- inadequacy or lapses in maintenance protocols;

- the impairment of reactor operation and safety systems due to human error;

- the costs of storage, handling and disposal of nuclear materials, including availability of storage space;

- the costs of procuring nuclear fuel;

- the costs of securing the plant against possible terrorist attacks;

- limitations on the amounts and types of insurance coverage commercially available; and

- uncertainties with respect to the technological and financial aspects of decommissioning nuclear facilities at the end of their useful lives.

The prolonged unavailability of Comanche Peak could materially affect our financial condition and results of operations. The following are among the more significant of these risks:

- Operational Risk—Operations at any nuclear generation facility could degrade to the point where the facility would have to be shut down. If such degradations were to occur, the process of identifying and

62

EFIHMW00052007

EFIHMW00051935

**PX 030**
**Page 73 of 734**

Table of Contents

correcting the causes of the operational downgrade to return the facility to operation could require significant time and expense, resulting in both lost revenue and increased fuel and purchased power expense to meet supply commitments. Furthermore, a shut–down or failure at any other nuclear generation facility could cause regulators to require a shut–down or reduced availability at Comanche Peak.

- Regulatory Risk—The NRC may modify, suspend or revoke licenses and impose civil penalties for failure to comply with the Atomic Energy Act, the regulations under it or the terms of the licenses of nuclear generation facilities. Unless extended, the NRC operating licenses for Comanche Peak Unit 1 and Unit 2 will expire in 2030 and 2033, respectively. Changes in regulations by the NRC could require a substantial increase in capital expenditures or result in increased operating or decommissioning costs.

- Nuclear Accident Risk—Although the safety record of Comanche Peak and other nuclear generation facilities generally has been very good, accidents and other unforeseen problems have occurred both in the U.S. and elsewhere. The consequences of an accident can be severe and include loss of life, injury, lasting negative health impact and property damage. Any accident, or perceived accident, could result in significant liabilities and damage our reputation. Any such resulting liability from a nuclear accident could exceed our resources, including insurance coverage.

***The operation and maintenance of electricity generation and delivery facilities involves significant risks that could adversely affect our results of operations and financial condition.***

The operation and maintenance of electricity generation and delivery facilities involves many risks, including, as applicable, start–up risks, breakdown or failure of facilities, lack of sufficient capital to maintain the facilities, the dependence on a specific fuel source or the impact of unusual or adverse weather conditions or other natural events, as well as the risk of performance below expected levels of output, efficiency or reliability, the occurrence of any of which could result in lost revenues and/or increased expenses. A significant number of our facilities were constructed many years ago. In particular, older generating equipment and transmission and distribution equipment, even if maintained in accordance with good engineering practices, may require significant capital expenditures to keep operating at peak efficiency or reliability. The risk of increased maintenance and capital expenditures arises from (a) increased starting and stopping of generation equipment due to the volatility of the competitive generation market, (b) any unexpected failure to generate electricity, including failure caused by breakdown or forced outage and (c) damage to facilities due to storms, natural disasters, wars, terrorist acts and other catastrophic events. Further, our ability to successfully and timely complete capital improvements to existing facilities or other capital projects is contingent upon many variables and subject to substantial risks. Should any such efforts be unsuccessful, we could be subject to additional costs and/or the write–off of our investment in the project or improvement.

Insurance, warranties or performance guarantees may not cover all or any of the lost revenues or increased expenses, including the cost of replacement power. Likewise, the ability to obtain insurance, and the cost of and coverage provided by such insurance, could be affected by events outside our control.

***Our cost of compliance with environmental laws and regulations and our commitments, and the cost of compliance with new environmental laws, regulations or commitments could materially adversely affect our results of operations and financial condition.***

We are subject to extensive environmental regulation by governmental authorities. In operating our facilities, we are required to comply with numerous environmental laws and regulations and to obtain numerous governmental permits. We may incur significant additional costs beyond those currently contemplated to comply with these requirements. If we fail to comply with these requirements, we could be subject to administrative, civil or criminal sanctions. Existing environmental regulations could be revised or reinterpreted, new laws and regulations could be adopted or become applicable to us or our facilities, and future changes in environmental

63

EFIHMW00052008

EFIHMW00051935

**Table of Contents**

laws and regulations could occur, including potential regulatory and enforcement developments related to air emissions, all of which could result in significant additional costs beyond those currently contemplated to comply with existing requirements.

EFH Corp. has committed to reduce emissions of mercury, nitrogen oxide and sulfur dioxide through the installation of emissions control equipment at both the new and existing and lignite−fueled generation units. We may incur significantly greater costs than those contemplated in order to achieve this commitment.

EFH Corp. has formed a Sustainable Energy Advisory Board that advises EFH Corp. in its pursuit of technology development opportunities that, among other things, are designed to reduce our impact on the environment. Any adoption of Sustainable Energy Advisory Board recommendations may cause us to incur significant costs in addition to the costs referenced above.

We may not be able to obtain or maintain all required environmental regulatory approvals. If there is a delay in obtaining any required environmental regulatory approvals or if we fail to obtain, maintain or comply with any such approval, the operation of our facilities could be stopped, curtailed or modified or become subject to additional costs.

In addition, we may be responsible for any on−site liabilities associated with the environmental condition of facilities that we have acquired, leased or developed, regardless of when the liabilities arose, whether they are known or unknown or, in certain circumstances, whether they were caused by a third party such as a former owner or operator. In connection with certain acquisitions and sales of assets, we may obtain, or be required to provide, indemnification against certain environmental liabilities. Another party could, depending on the circumstances, assert an environmental claim against us or fail to meet its indemnification obligations to us.

*Our financial condition and results of operations may be materially adversely affected if new federal and/or state legislation or regulations are adopted to address global climate change.*

In recent years, a growing concern has emerged about global climate change and how greenhouse gas (GHG) emissions, such as carbon dioxide, contribute to global climate change. Several bills addressing climate change have been introduced in the US Congress or discussed by the Obama Administration that are intended to address climate change using different approaches, including a cap on carbon emissions with emitters allowed to trade unused emission allowances (cap−and−trade), incentives for the development of low−carbon technology and federal renewable portfolio standards. In addition, a number of federal court cases have been recently decided that could result in the future judicial regulation of GHG emissions.

The EPA recently issued a rule, known as the Prevention of Significant Deterioration (PSD) tailoring rule, that establishes new thresholds for regulating GHG emissions from stationary sources under the Clean Air Act. Beginning in January 2011, the rule will require any source subject to the PSD permitting program due to emissions of non−GHG pollutants that increases its GHG emissions by 75,000 tons per year (tpy) to have an operating permit under the Title V Operating Permit Program of the Clean Air Act and install the best available control technology in conjunction with construction activities or plant modifications. Beginning in July 2011, PSD permitting requirements will also apply to new projects with GHG emissions of at least 100,000 tpy and modifications to existing facilities that increase GHG emissions by at least 75,000 tpy (even if no non−GHG PSD thresholds are exceeded). The EPA also finalized regulations in 2009 that will require certain categories of GHG emitters to monitor and report their annual GHG emissions beginning in January 2011.

We produce GHG emissions from the combustion of fossil fuels at our generation facilities. For 2009, we estimate that our generation facilities produced 54 million short tons of carbon dioxide based on continuously monitored data reported to and approved by the EPA. The two new lignite−fueled units that achieved substantial completion (as defined in the EPC Agreement for the units) in 2009 and the one new lignite−fueled unit that achieved substantial completion (as defined in the EPC Agreement for the unit) in June 2010 will generate

64

EFIHMW00052009

EFIHMW00051935

**PX 030**
**Page 75 of 734**

**Table of Contents**

additional carbon dioxide emissions. Because a substantial portion of our generation portfolio consists of lignite/coal–fueled generation facilities, our financial condition and results of operations could be materially adversely affected by the enactment of any legislation or regulation that mandates a reduction in GHG emissions or that imposes financial penalties, costs or taxes upon those that produce GHG emissions. For example, to the extent a cap-and-trade program is adopted, we may be required to incur material costs to reduce our GHG emissions or to procure emission allowances or credits to comply with such a program. The EPA regulation of GHGs under the Clean Air Act, or judicially imposed limits on GHG emissions, may require us to make material expenditures to reduce our GHG emissions. If a significant number of our investors, customers or others refuse to do business with us because of our GHG emissions, it could have a material adverse effect on our results of operations, financial condition or cash flows.

*Our financial condition and results of operations may be materially adversely affected by the effects of extreme weather conditions.*

We could be subject to the effects of extreme weather. Extreme weather conditions could stress our transmission and distribution system or our generation facilities resulting in increased maintenance and capital expenditures. Extreme weather events, including hurricanes or storms or other natural disasters, could be destructive and result in casualty losses that are not ultimately offset by insurance proceeds or in increased capital expenditures or costs, including supply chain costs.

Moreover, an extreme weather event could cause disruption in service to customers due to downed wires and poles or damage to other operating equipment, which could result in us foregoing sales of electricity and lost revenue. Similarly, an extreme weather event might affect the availability of generation and transmission capacity, limiting our ability to source or deliver electricity to where it is needed. These conditions, which cannot be reliably predicted, could have an adverse consequence by requiring us to seek additional sources of electricity when wholesale market prices are high or to seek to sell excess electricity when those market prices are low.

*The rates of Oncor's electricity delivery business are subject to regulatory review, and may be reduced below current levels, which could adversely impact Oncor's financial condition and results of operations.*

The rates charged by Oncor are regulated by the PUCT and certain cities and are subject to cost-of-service regulation and annual earnings oversight. This regulatory treatment does not provide any assurance as to achievement of earnings levels. Oncor's rates are regulated based on an analysis of Oncor's costs and capital structure, as reviewed and approved in a regulatory proceeding. While rate regulation is premised on the full recovery of prudently incurred costs and a reasonable rate of return on invested capital, there can be no assurance that the PUCT will judge all of Oncor's costs to have been prudently incurred, that the PUCT will not reduce the amount of invested capital included in the capital structure that Oncor's rates are based upon, or that the regulatory process in which rates are determined will always result in rates that will produce full recovery of Oncor's costs, including regulatory assets reported in Oncor's balance sheet, and the return on invested capital allowed by the PUCT.

In addition, in connection with the Merger, Oncor has made several commitments to the PUCT regarding its rates. For example, Oncor committed that it will, in rate cases after its 2008 general rate case through proceedings initiated prior to December 31, 2012, support a cost of debt that will be no greater than the then–current cost of debt of electric utilities with investment grade credit ratings equal to Oncor's ratings as of October 1, 2007. As a result, Oncor may not be able to recover all of its debt costs if they are above those levels.

*Our growth strategy, including investment in three new lignite–fueled generation units and Oncor's capital program, may not be executed as planned, which could adversely impact our financial condition and results of operations.*

There can be no guarantee that the execution of our growth strategy will be successful. As discussed below, our growth strategy is dependent upon many factors. Changes in laws, regulations, markets, costs, the outcome of

65

EFIHMW00052010

EFIHMW00051935

**Table of Contents**

on–going litigation or other factors could negatively impact the execution of our growth strategy, including causing management to change the strategy. Even if we are able to execute our growth strategy, it may take longer than expected, and costs may be higher than expected.

There can be no guarantee that the execution of the lignite–fueled generation development program will be successful. While we have experience in operating lignite–fueled generation facilities, we have limited recent experience in constructing, commissioning and starting–up such facilities.

Our lignite–fueled generation development program is subject to changes in laws, regulations and policies that are beyond our control. Changes in law, regulation or policy regarding commodity prices, power prices, electricity competition or solid–fuel generation facilities or other related matters could adversely impact this program. In recent years, global warming has received significant media attention, which has resulted in legislators focusing on environmental laws, regulations and policies. Changes in environmental law, regulation or policy, such as regulations of emissions of carbon dioxide, could adversely impact this program. Although we have received permits to operate the new units that are part of the lignite–fueled generation development program, some of these permits are subject to ongoing litigation. See Note 7 to EFH Corp.'s historical condensed consolidated financial statements for the three and six months ended June 30, 2010 included elsewhere in this Prospectus for further detail regarding such ongoing litigation. An adverse ruling on these matters could materially and adversely effect the implementation of this program.

There can be no guarantee that the execution of Oncor's capital deployment program for its electricity delivery facilities will be successful, and there can be no assurance that the capital investments Oncor intends to make in connection with its electricity delivery business will produce the desired reductions in cost and improvements to service and reliability. Furthermore, there can be no guarantee that Oncor's capital investments, including the investment of approximately $1.3 billion (based on ERCOT cost estimates for CREZ construction projects) to construct CREZ–related transmission lines and facilities, will ultimately be recoverable through rates or, if recovered, that they will be recovered on a timely basis. There can also be no assurance that the PUCT's award of CREZ construction projects will not be delayed, modified or otherwise vacated through judicial or administrative actions. See "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three and Six Months Ended June 30, 2010—Regulation and Rates" included in Annex B to this Prospectus.

*Ongoing performance improvement initiatives may not achieve desired cost reductions and may instead result in significant additional costs if unsuccessful.*

The implementation of performance improvement initiatives identified by management may not produce the desired reduction in costs and if unsuccessful, may instead result in significant additional costs as well as significant disruptions in our operations due to employee displacement and the rapid pace of changes to organizational structure and operating practices and processes. Such additional costs or operational disruptions could have an adverse effect on our businesses and financial prospects.

*TXU Energy's retail business is subject to the risk that sensitive customer data may be compromised, which could result in an adverse impact to its reputation and/or the results of operations of the retail business.*

TXU Energy's retail business requires access to sensitive customer data in the ordinary course of business. Examples of sensitive customer data are names, addresses, account information, historical electricity usage, expected patterns of use, payment history, credit bureau data, credit and debit card account numbers, drivers license numbers, social security numbers and bank account information. TXU Energy's retail business may need to provide sensitive customer data to vendors and service providers who require access to this information in order to provide services, such as call center operations, to the retail business. If a significant breach occurred, the reputation of TXU Energy's retail business may be adversely affected, customer confidence may be

66

EFIHMW00052011

EFIHMW00051935

**PX 030**
**Page 77 of 734**

**Table of Contents**
diminished, or TXU Energy's retail business may be subject to legal claims, any of which may contribute to the loss of customers and have a negative impact on the business and/or results of operations.

*TXU Energy relies on the infrastructure of local utilities or independent transmission system operators to provide electricity to, and to obtain information about, its customers. Any infrastructure failure could negatively impact customer satisfaction and could have a material negative impact on its business and results of operations.*

TXU Energy depends on transmission and distribution facilities owned and operated by unaffiliated utilities, as well as Oncor's facilities, to deliver the electricity it sells to its customers. If transmission capacity is inadequate, TXU Energy's ability to sell and deliver electricity may be hindered, it may have to forgo sales or it may have to buy more expensive wholesale electricity than is available in the capacity−constrained area. For example, during some periods, transmission access is constrained in some areas of the Dallas–Fort Worth metroplex, where TXU Energy has a significant number of customers. The cost to provide service to these customers may exceed the cost to provide service to other customers, resulting in lower profits. In addition, any infrastructure failure that interrupts or impairs delivery of electricity to TXU Energy's customers could negatively impact the satisfaction of its customers with its service.

*TXU Energy offers bundled services to its retail customers, with some bundled services offered at fixed prices and for fixed terms. If TXU Energy's costs for these bundled services exceed the prices paid by its customers, its results of operations could be materially adversely affected.*

TXU Energy offers its customers a bundle of services that include, at a minimum, electricity plus transmission, distribution and related services. The prices TXU Energy charges for its bundle of services or for the various components of the bundle, any of which may be fixed by contract with the customer for a period of time, could fall below TXU Energy's underlying cost to provide the components of such services.

*TXU Energy's retail electric provider certification is subject to PUCT review.*

The PUCT may at any time initiate an investigation into whether TXU Energy is compliant with PUCT Substantive Rules and whether it has met all of the requirements for retail electric provider certification, including financial requirements. Any removal or revocation of a retail electric provider certification would mean that TXU Energy would no longer be allowed to provide electricity service to retail customers. Such decertification would have an adverse effect on TXU Energy and its financial prospects. See "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three and Six Months Ended June 30, 2010—Regulations and Rates" included in Annex B to this Prospectus for a discussion of the new rules regarding retail electric provider certification.

*Changes in technology or increased electricity conservation efforts may reduce the value of our generation plants and/or Oncor's electricity delivery facilities and may significantly impact our businesses in other ways as well.*

Research and development activities are ongoing to improve existing and alternative technologies to produce electricity, including gas turbines, fuel cells, microturbines, photovoltaic (solar) cells and concentrated solar thermal devices. It is possible that advances in these or other technologies will reduce the costs of electricity production from these technologies to a level that will enable these technologies to compete effectively with our traditional generation plants. While demand for electricity has been generally increasing throughout the U.S., the rate of construction and development of new, more efficient generation facilities may exceed increases in demand in some regional electric markets. Consequently, where we have facilities, the profitability and market value of our generation assets could be significantly reduced. Changes in technology

67

EFIHMW00052012

EFIHMW00051935

**Table of Contents**

could also alter the channels through which retail customers buy electricity. To the extent self–generation facilities become a more cost–effective option for certain customers, our revenues could be materially reduced.

Also, electricity demand could be reduced by increased conservation efforts and advances in technology, which could likewise significantly reduce the value of our generation assets and electricity delivery facilities. Certain regulatory and legislative bodies have introduced or are considering requirements and/or incentives to reduce energy consumption by a fixed date. Effective energy conservation by our customers could result in reduced energy demand or significantly slow the growth in demand. Such reduction in demand could materially reduce our revenues. Furthermore, we may incur increased capital expenditures if we are required to invest in conservation measures.

*Our revenues and results of operations may be adversely impacted by decreases in market prices of power due to the development of wind generation power sources.*

A significant amount of investment in wind generation in the ERCOT market over the past few years has increased overall wind power generation capacity. Generally, the increased capacity has led to lower wholesale electricity prices (driven by lower market heat rates) in the zones at or near wind generation development, especially in, but not exclusive to, the ERCOT West zone where most of the new wind power generation is located. As a result, the profitability of our generation facilities and power purchase contracts, including certain wind generation power purchase contracts, has been impacted and could be further impacted by the effects of the wind power generation, and the value could significantly decrease if wind power generation has a material sustained effect on market heat rates.

*Our revenues and results of operations may be adversely impacted as ERCOT transitions the current zonal market structure to a nodal wholesale market.*

Substantially all of our competitive businesses are located in the ERCOT market, which is currently in the process of transitioning from a zonal market structure with four congestion management zones to a nodal market structure that will directly manage congestion on a localized basis. In a nodal market, the prices received and paid for power will be based on pricing determined at specific interconnection points on the transmission grid (i.e., Locational Marginal Pricing), which could result in lower revenues or higher costs for our competitive businesses. This market structure change could have a significant impact on the profitability and value of our competitive businesses depending on how the Locational Marginal Pricing develops. See "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three and Six Months Ended June 30, 2010—Regulation and Rates—Wholesale Market Design—Nodal Market" included in Annex B to this Prospectus.

*Our future results of operations may be negatively impacted by settlement adjustments determined by ERCOT related to prior periods.*

ERCOT is the independent system operator that is responsible for maintaining reliable operation of the bulk electric power supply system in the ERCOT market. Its responsibilities include the clearing and settlement of electricity volumes and related ancillary services among the various participants in the deregulated Texas market. Settlement information is due from ERCOT within two months after the operating day, and true–up settlements are due from ERCOT within six months after the operating day. Likewise, ERCOT has the ability to resettle any operating day at any time after the six month settlement period, usually the result of a lingering dispute, an alternative dispute resolution process or litigated event. As a result, we are subject to settlement adjustments from ERCOT related to prior periods, which may result in charges or credits impacting our future reported results of operations.

68

EFIHMW00052013

EFIHMW00051935

**PX 030**
**Page 79 of 734**

Table of Contents

*Our results of operations and financial condition could be negatively impacted by any development or event beyond our control that causes economic weakness in the ERCOT market.*

We derive substantially all of our revenues from operations in the ERCOT market, which covers approximately 75% of the geographical area in the State of Texas. As a result, regardless of the state of the economy in areas outside the ERCOT market, economic weakness in the ERCOT market could lead to reduced demand for electricity in the ERCOT market. Such a reduction could have a material negative impact on our results of operations and financial condition.

*EFH Corp.'s (or any applicable subsidiary's) credit ratings could negatively affect EFH Corp.'s (or the pertinent subsidiary's) ability to access capital and could require EFH Corp. or its subsidiaries to post collateral or repay certain indebtedness.*

Downgrades in EFH Corp.'s or any of its applicable subsidiaries' long–term debt ratings generally cause borrowing costs to increase and the potential pool of investors and funding sources to decrease and could trigger liquidity demands pursuant to the terms of new commodity contracts, leases or other agreements. Future transactions by EFH Corp. or any of its subsidiaries, including the issuance of the New EFH Senior Secured Notes and other additional debt or the consummation of a transaction similar to the November 2009 debt exchanges, could result in temporary or permanent downgrades of EFH Corp.'s or its subsidiaries' credit ratings.

Most of EFH Corp.'s large customers, suppliers and counterparties require an expected level of creditworthiness in order for them to enter into transactions. If EFH Corp.'s (or an applicable subsidiary's) credit ratings decline, the costs to operate its businesses would likely increase because counterparties could require the posting of collateral in the form of cash–related instruments, or counterparties could decline to do business with EFH Corp. (or its applicable subsidiary).

*Continued market volatility may have impacts on our business and financial condition that we currently cannot predict.*

Because our operations are capital intensive, the Offeror expects to rely over the long–term upon access to financial markets (particularly the attainment of liquidity facilities) as a significant source of liquidity for capital requirements not satisfied by cash–on–hand, operating cash flows or our revolving credit facilities. Recently, the capital and credit markets have been experiencing extreme volatility and disruption. Our ability to access the capital or credit markets may be severely restricted at a time when we would like, or need, to access those markets, which could have an impact on our flexibility to react to changing economic and business conditions. In addition, the cost of debt financing may be materially impacted by these market conditions. Accordingly, there can be no assurance that the capital and credit markets will continue to be a reliable or acceptable source of short–term or long–term financing for us. Additionally, disruptions in the capital and credit markets could have a broader impact on the economy in general in ways that could lead to reduced electricity usage, which could have a negative impact on our revenues, or have an impact on our customers, counterparties and/or lenders, causing them to fail to meet their obligations to us.

*Our liquidity needs could be difficult to satisfy, particularly during times of uncertainty in the financial markets and/or during times when there are significant changes in commodity prices. The inability to access liquidity, particularly on favorable terms, could materially adversely affect results of operations and/or financial condition.*

Our businesses are capital intensive. We rely on access to financial markets and liquidity facilities as a significant source of liquidity for capital requirements not satisfied by cash–on–hand or operating cash flows. The inability to raise capital on favorable terms or access liquidity facilities, particularly during times of uncertainty similar to that which has recently been experienced in the financial markets, could impact our ability to sustain

69

EFIHMW00052014

EFIHMW00051935

**PX 030**
**Page 80 of 734**

**Table of Contents**

and grow our businesses and would likely increase capital costs. Our access to the financial markets and liquidity facilities could be adversely impacted by various factors, such as:

- changes in financial markets that reduce available credit or the ability to obtain or renew liquidity facilities on acceptable terms;

- economic weakness in the ERCOT or general U.S. market;

- changes in interest rates;

- a deterioration of our credit or the credit of our subsidiaries or a reduction in our or our applicable subsidiaries' credit ratings;

- a deterioration of the credit or bankruptcy of one or more lenders or counterparties under our or our applicable subsidiaries' liquidity facilities that affects the ability of such lender(s) to make loans to us or our subsidiaries;

- volatility in commodity prices that increases margin or credit requirements;

- a material breakdown in our risk management procedures; and

- the occurrence of changes in our businesses that restrict our ability to access liquidity facilities.

Although we expect to actively manage the liquidity exposure of existing and future hedging arrangements, given the size of the long–term hedging program, any significant increase in the price of natural gas could result in us being required to provide cash or letter of credit collateral in substantial amounts. While these potential posting obligations are primarily supported by the liquidity facilities, for certain transactions there is a potential for the timing of postings on the commodity contract obligations to vary from the timing of borrowings from the senior secured cash posting credit facility of TCEH. Any perceived reduction in our credit quality could result in clearing agents or other counterparties requesting additional collateral. We have credit concentration risk related to the limited number of lenders that provide liquidity to support our hedging program. A deterioration of the credit quality of such lenders could materially affect our ability to continue such program on acceptable terms. An event of default by one or more of our hedge counterparties could result in termination–related settlement payments that reduce available liquidity if we owe amounts related to commodity contracts or delays in receipts of expected settlements if the hedge counterparties owe amounts to us. These events could have a material negative impact on our financial condition and results of operations.

In the event that the governmental agencies that regulate the activities of our businesses determine that the creditworthiness of any such business is inadequate to support our activities, such agencies could require us to provide additional cash or letter of credit collateral in substantial amounts to qualify to do business.

In the event our liquidity facilities are being used largely to support the long–term hedging program as a result of a significant increase in the price of natural gas or significant reduction in credit quality, we may have to forego certain capital expenditures or other investments in our competitive businesses or other business opportunities.

Further, a lack of available liquidity could adversely impact the evaluation of our creditworthiness by counterparties and rating agencies. In particular, such concerns by existing and potential counterparties could significantly limit TCEH's wholesale markets activities, including its long–term hedging program.

***The costs of providing pension and OPEB and related funding requirements are subject to changes in pension fund values, changing demographics and fluctuating actuarial assumptions and may have a material adverse effect on our results of operations and financial condition.***

We provide pension benefits based on either a traditional defined benefit formula or a cash balance formula and also provide certain health care and life insurance benefits to eligible employees and their eligible

70

EFIHMW00052015

EFIHMW00051935

**PX 030**
**Page 81 of 734**

**Table of Contents**

dependents upon the retirement of such employees from us. Our costs of providing such benefits and related funding requirements are dependent upon numerous factors, assumptions and estimates and are subject to changes in these factors, assumptions and estimates, including the market value of the assets funding our pension and OPEB plans. Fluctuations in financial market returns as well as changes in general interest rates may result in increased or decreased benefit costs in future periods.

The substantial dislocation in the financial markets that began in 2008 caused the value of the investments that fund our pension and OPEB plans to significantly differ from, and may alter the values and actuarial assumptions we use to calculate, our projected future pension plan expense and OPEB costs. A continuation or further decline in the value of these investments could increase the expenses of the pension plan and the costs of the OPEB plans and related funding requirements in the future. Our costs of providing such benefits and related funding requirements are also subject to changing employee demographics (including but not limited to age, compensation levels and years of accredited service), the level of contributions made to retiree plans, expected and actual earnings on plan assets and the discount rates used in determining the projected benefit obligation. Changes made to the provisions of the plans may also impact current and future benefit costs. Fluctuations in financial market returns as well as changes in general interest rates may result in increased or decreased benefit costs in future periods.

*As was the case in the fourth quarter 2008 (as discussed in Notes 1 and 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 included elsewhere in this Prospectus), goodwill and/or other intangible assets not subject to amortization that we have recorded in connection with the Merger are subject to at least annual impairment evaluations, and as a result, we could be required to write off some or all of this goodwill and other intangible assets, which may cause adverse impacts on our financial condition and results of operations.*

In accordance with accounting standards, goodwill and certain other indefinite−lived intangible assets that are not subject to amortization are reviewed annually or more frequently for impairment, if certain conditions exist, and may be impaired. Any reduction in or impairment of the value of goodwill or other intangible assets will result in a charge against earnings, which could cause a material adverse impact on our reported results of operations and financial position.

*The loss of the services of our key management and personnel could adversely affect our ability to operate our businesses.*

Our future success will depend on our ability to continue to attract and retain highly qualified personnel. We compete for such personnel with many other companies, in and outside our industry, government entities and other organizations. We may not be successful in retaining current personnel or in hiring or retaining qualified personnel in the future. Our failure to attract new personnel or retain existing personnel could have a material adverse effect on our businesses.

*The Sponsor Group controls and may have conflicts of interest with us in the future.*

The Sponsor Group indirectly owns approximately 60% of EFH Corp.'s capital stock on a fully−diluted basis through its investment in Texas Holdings. As a result of this ownership and the Sponsor Group's ownership in interests of the general partner of Texas Holdings, the Sponsor Group has control over decisions regarding our operations, plans, strategies, finances and structure, including whether to enter into any corporate transaction, and will have the ability to prevent any transaction that requires the approval of EFH Corp.'s shareholders.

Additionally, each member of the Sponsor Group is in the business of making investments in companies and may from time to time acquire and hold interests in businesses that compete directly or indirectly with us. Members of the Sponsor Group may also pursue acquisition opportunities that may be complementary to our businesses and, as a result, those acquisition opportunities may not be available to us. So long as the members of

71

EFIHMW00052016

EFIHMW00051935

**Table of Contents**

the Sponsor Group, or other funds controlled by or associated with the members of the Sponsor Group, continue to indirectly own a significant amount of the outstanding shares of EFH Corp.'s common stock, even if such amount is less than 50%, the Sponsor Group will continue to be able to strongly influence or effectively control our decisions.

**Risks Related to the EFIH Businesses**

EFIH is a holding company whose principal asset is an approximate 80% ownership interest in Oncor. As such, the risks described below relating to Oncor's businesses will apply to EFIH. Due to the "ring-fencing" measures that have been implemented by EFH Corp. and Oncor described in "The Transactions—Ring-Fencing," EFIH will have limited ability to mitigate any of the risks described below. There are additional risks relating to investing in the New EFIH Senior Secured Notes that you should consider before deciding to tender your Old Notes. Such additional risks are described elsewhere in this "Risk Factors" section under the headings "—Risks Related to the Exchange Offers and the New EFIH Senior Secured Notes," "—Risks Related to Our Substantial Indebtedness and Debt Agreements," "—Risks Related to Structure" and "—Risks Related to Our Business."

> *Oncor's businesses are subject to ongoing complex governmental regulations and legislation that have impacted, and may in the future impact, its business and/or results of operations.*

Oncor's businesses operate in changing market environments influenced by various state and federal legislative and regulatory initiatives regarding the restructuring of the energy industry. Oncor will need to continually adapt to these changes.

Oncor's businesses are subject to changes in state and federal laws (including PURA, the Federal Power Act, the Public Utility Regulatory Policies Act of 1978 and the Energy Policy Act of 2005), changing governmental policy and regulatory actions (including those of the PUCT, the Electric Reliability Organization, the Texas Regional Entity, the TCEQ, the FERC and the EPA) and the rules, guidelines and protocols of ERCOT with respect to matters including, but not limited to, market structure and design, construction and operation of transmission facilities, acquisition, disposal, depreciation and amortization of regulated assets and facilities, recovery of costs and investments, return on invested capital and environmental matters. Changes in, revisions to, or reinterpretations of existing laws and regulations may have an adverse effect on Oncor's businesses.

The Texas Legislature meets every two years, and from time to time bills are introduced and considered that could materially affect Oncor's business. There can be no assurance that future action of the Texas Legislature will not result in legislation that could have a material adverse effect on Oncor and its financial prospects.

> *PURA, the PUCT, ERCOT, the TCEQ and the Office of Public Utility Council (OPC) are subject to a "Sunset" review by the Texas Sunset Advisory Commission. PURA will expire, and the PUCT will be abolished, on September 1, 2011 unless extended by the Texas Legislature following such review. If any of PURA, the PUCT, ERCOT, the TCEQ or the OPC are not renewed by the Texas Legislature pursuant to Sunset review, it could have a material effect on Oncor's business.*

Sunset review is the regular assessment of the continuing need for a state agency to exist, and is grounded in the premise that an agency will be abolished unless legislation is passed to continue its functions. The Sunset Commission closely reviews each agency and recommends action on each agency to the Texas Legislature, which action may include modifying or even abolishing the agency. Of the agencies scheduled for Sunset review by the Sunset Commission in 2010 and 2011, the following hold primary interest for Oncor: the PUCT, the TCEQ, the OPC, and ERCOT, which are subject to a focused, limited scope, or special purpose review. These agencies, for the most part, govern and operate the electricity markets in Texas upon which Oncor's business model is based. PURA, which expires September 1, 2011, is also subject to Sunset review. If the Texas Legislature fails to renew PURA or any of these agencies, it could result in a significant restructuring of the Texas electricity market or regulatory regime that could have a material impact on Oncor's business. There can

72

EFIHMW00052017

EFIHMW00051935

**Table of Contents**
be no assurance that future action of the Sunset Commission will not result in legislation that could have a material adverse effect on Oncor and its financial prospects.

*The rates of Oncor's electricity delivery business are subject to regulatory review, and may be reduced below current levels, which could adversely impact Oncor's financial condition and results of operations.*

The rates charged by Oncor are regulated by the PUCT and certain cities and are subject to cost-of-service regulation and annual earnings oversight. This regulatory treatment does not provide any assurance as to achievement of earnings levels. Oncor's rates are regulated based on an analysis of Oncor's costs and capital structure, as reviewed and approved in a regulatory proceeding. While rate regulation is premised on the full recovery of prudently incurred costs and a reasonable rate of return on invested capital, there can be no assurance that the PUCT will judge all of Oncor's costs to have been prudently incurred, that the PUCT will not reduce the amount of invested capital included in the capital structure that Oncor's rates are based upon, or that the regulatory process in which rates are determined will always result in rates that will produce full recovery of Oncor's costs, including regulatory assets reported in Oncor's balance sheet, and the return on invested capital allowed by the PUCT.

In addition, in connection with the Merger, Oncor has made several commitments to the PUCT regarding its rates. For example, Oncor committed that it will, in rate cases after its 2008 general rate case through proceedings initiated prior to December 31, 2012, support a cost of debt that will be no greater than the then-current cost of debt of electric utilities with credit ratings equal to Oncor's ratings as of October 1, 2007. As a result, Oncor may not be able to recover all of its debt costs if they are above those levels.

Any adverse regulatory ruling, including reductions in rates, could have an adverse effect on Oncor's business and results of operations.

*The operation and maintenance of electricity delivery facilities involves significant risks that could adversely affect Oncor's results of operations and financial condition.*

The operation and maintenance of delivery facilities involves many risks, including breakdown or failure of facilities, lack of sufficient capital to maintain the facilities, impact of unusual or adverse weather conditions or other natural events, as well as the risk of performance below expected levels of efficiency or reliability, the occurrence of any of which could result in lost revenues and/or increased expenses that may not be recoverable through rates. A significant number of Oncor's facilities were constructed many years ago. In particular, older transmission and distribution equipment, even if maintained in accordance with good engineering practices, may require significant capital expenditures to keep operating at peak efficiency or reliability. The risk of increased maintenance and capital expenditures arises from damage to facilities due to storms, natural disasters, wars, terrorist acts and other catastrophic events. Further, Oncor's ability to successfully and timely complete capital improvements to existing facilities or other capital projects is contingent upon many variables and subject to substantial risks. Should any such efforts be unsuccessful, Oncor could be subject to additional costs that may not be recoverable through rates and/or the write-off of its investment in the project or improvement.

Insurance, warranties or performance guarantees may not cover all or any of the lost revenues or increased expenses. Likewise, Oncor's ability to obtain insurance, and the cost of and coverage provided by such insurance, could be affected by events outside Oncor's control.

*Oncor's capital deployment program may not be executed as planned, which could adversely impact Oncor's financial condition and results of operations.*

There can be no guarantee that the execution of Oncor's capital deployment program for its electricity delivery facilities will be successful and there can be no assurance that the capital investments Oncor intends to make in connection with its electricity delivery business will produce the desired reductions in cost and

73

EFIHMW00052018

EFIHMW00051935

**PX 030**
**Page 84 of 734**

Table of Contents

improvements to service and reliability. Furthermore, there can be no guarantee that Oncor's capital investments, including its approximate $1.3 billion investment (based on April 2008 ERCOT cost estimates for CREZ construction projects) associated with projects to construct CREZ–related transmission lines and facilities will ultimately be recoverable through rates or, if recovered, that they will be recovered on a timely basis. With the construction of these projects, it is likely Oncor will incur additional material amounts of debt. In addition, Oncor may incur additional material amounts of debt in connection with other investments in infrastructure or technology. For more information regarding the limitation on recovering the value of investments using rates, see "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009—Key Risks and Challenges" included in Annex C to this Prospectus and EFIH and its subsidaries' historical consolidated financial statements for the year ended December 31, 2009 and the three and six months ended June 30, 2010 and related notes that are included elsewhere in this Prospectus. There can also be no assurance that the PUCT's award of CREZ construction projects will not be delayed, modified or otherwise vacated through judicial or administrative actions. Three of the CREZ construction projects awarded to Oncor are located in CREZs that are currently subject to a PUCT proceeding that may, if the PUCT determines there is not sufficient financial commitment from the generators of renewable energy for the projects, result in the PUCT delaying the filing of CREZ Certificates of Convenience and Necessity applications. The estimated cost of these construction projects is $380 million. See "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three and Six Months Ended June 30, 2010—Regulation and Rates" included in Annex C in this Prospectus for more information regarding this proceeding.

*Market volatility may have impacts on Oncor's business and financial condition that Oncor currently cannot predict.*

Because its operations are capital intensive, Oncor expects to rely over the long term upon access to financial markets as a significant source of liquidity for capital requirements not satisfied by cash–on–hand, operating cash flows or its revolving credit facility. Recently, the capital and credit markets have experienced extreme volatility and disruption. Oncor's ability to access the capital or credit markets may be severely restricted at a time when Oncor would like, or needs, to access those markets, which could have an impact on Oncor's flexibility to react to changing economic and business conditions. In addition, the cost of debt financing may be materially and adversely impacted by these market conditions. Even if Oncor is able to obtain debt financing, it may be unable to recover in rates some or all of the costs of such debt financing as a result of its agreement with the PUCT that it will, in rate cases initiated prior to December 31, 2012, support a cost of debt that will be based on the then–current cost of debt of electric utilities with investment grade credit ratings equal to Oncor's ratings as of October 1, 2007. Accordingly, there can be no assurance that the capital and credit markets will continue to be a reliable or acceptable source of short–term or long–term financing for Oncor. Additionally, disruptions in the capital and credit markets could have a broader impact on the economy in general in ways that could lead to reduced electricity usage, which could have a negative impact on Oncor's revenues, or could have an impact on Oncor's customers, causing them to fail to meet their obligations to Oncor.

*Oncor's revenues are concentrated in a small number of customers, and any delay or default in payment could adversely affect its cash flows, financial condition and results of operations.*

Oncor's revenues from the distribution of electricity are collected from 80 retail electric providers, including TXU Energy (a subsidiary of TCEH), that sell the electricity Oncor distributes to their customers. Distribution revenues from TCEH represented and 37% of Oncor's total revenues for the year ended December 31, 2009 and the six months ended June 30, 2010, respectively. Adverse economic conditions, structural problems in the market served by ERCOT or financial difficulties of one or more retail electric providers could impair the ability of these retail providers to pay for Oncor's services or could cause them to delay such payments. Oncor depends on these retail electric providers to timely remit these revenues to Oncor. Oncor could experience delays or defaults in payment from these retail electric providers, which could adversely affect Oncor's cash flows, financial condition and results of operations. Due to the commitments made to the PUCT in connection with the

74

EFIHMW00052019

EFIHMW00051935

**Table of Contents**

Merger, Oncor may not recover bad debt expense, or certain other costs and expenses, from rate payers in the event of a default or bankruptcy by an affiliate retail electric provider.

*Oncor's ring-fencing measures may not work as planned.*

As discussed above, to enhance the separateness between Oncor Holdings and its direct and indirect subsidiaries (the "Oncor Ring-Fenced Entities") and the Texas Holdings Group, various legal, financial and contractual provisions were implemented. These enhancements are intended to minimize the risk that a court would order any of the Oncor Ring-Fenced Entities' assets and liabilities to be substantively consolidated with those of any member of the Texas Holdings Group (including the Offeror) in the event that a member of the Texas Holdings Group (including the Offeror) were to become a debtor in a bankruptcy case. Nevertheless, bankruptcy courts have broad equitable powers and, as a result, outcomes in bankruptcy proceedings are inherently difficult to predict. Accordingly, if any member of the Texas Holdings Group (including the Offeror) were to become a debtor in a bankruptcy case, there can be no assurance that a court would not order an Oncor Ring-Fenced Entity's assets and liabilities to be substantively consolidated with those of such member of the Texas Holdings Group. See Note 1 to EFIH and its subsidiaries' historical consolidated financial statements for the year ended December 31, 2009 included elsewhere in this Prospectus.

*Oncor's credit ratings could negatively affect Oncor's ability to access capital.*

Downgrades in Oncor's credit ratings would generally cause borrowing costs to increase and the potential pool of investors and funding sources to decrease. In the event any downgrade occurs and causes Oncor's borrowing costs to increase, Oncor may not be able to recover such increased costs if they exceed Oncor's approved cost of debt determined in its 2008 general rate case or subsequent rate cases.

Most of Oncor's large customers, suppliers and counterparties require an expected level of creditworthiness in order for them to enter into transactions with Oncor. If Oncor's credit ratings decline, the costs to operate Oncor's businesses would likely increase because counterparties could require the posting of collateral in the form of cash-related instruments, or counterparties could decline to do business with Oncor.

*Oncor's results of operations and financial condition could be negatively impacted by any development or event beyond Oncor's control that causes economic weakness in the ERCOT market.*

Oncor derives substantially all of its revenues from operations in the ERCOT market, which covers approximately 75% of the geographical area in the State of Texas. As a result, regardless of the state of the economy in areas outside the ERCOT market, economic weakness in the ERCOT market could lead to reduced demand for electricity in the ERCOT market. Such a reduction could have a material negative impact on Oncor's results of operations and financial condition.

*In the future, Oncor could have liquidity needs that could be difficult to satisfy under some circumstances, especially in uncertain financial market conditions.*

Oncor's operations are capital intensive. Oncor relies on access to financial markets and its credit facility as a significant source of liquidity for capital requirements not satisfied by cash-on-hand or operating cash flows. The inability to raise capital on favorable terms or access liquidity facilities, particularly during times of uncertainty similar to that which has recently been experienced in the financial markets, could adversely impact Oncor's ability to sustain and grow its businesses and would likely increase capital costs that may not be recoverable through rates. Oncor's access to the financial markets and its credit facility, and the pricing and terms Oncor receives in the financial markets, could be adversely impacted by various factors, such as:

- changes in financial markets that reduce available credit or the ability to obtain or renew liquidity facilities on acceptable terms;

EFIHMW00052020

EFIHMW00051935

**PX 030**
**Page 86 of 734**

Table of Contents

- economic weakness in the ERCOT market;

- changes in interest rates;

- a deterioration of Oncor's credit or a reduction in Oncor's credit ratings;

- a deterioration of the credit of EFH Corp., the Offeror or their other subsidiaries or a reduction in the credit ratings of EFH Corp., the Offeror or their other subsidiaries that is perceived to potentially have an adverse impact on Oncor despite the ring–fencing of the Oncor Ring–Fenced Entities from the Texas Holdings Group;

- a material breakdown in Oncor's risk management procedures; and

- the occurrence of changes in Oncor's businesses that restrict its ability to access its credit facility or the capital markets.

Oncor's primary source of liquidity aside from operating cash flows is its ability to borrow under its revolving credit facility. The facility contains a debt–to–capital ratio covenant that effectively limits Oncor's ability to incur indebtedness in the future. As of June 30, 2010, Oncor was in compliance with such covenant. The credit facility and the senior notes issued by Oncor are secured by a deed of trust, which permits Oncor to secure other indebtedness with the lien of the deed of trust up to the aggregate of (i) the amount of available bond credits, and (ii) 85% of the fair value of certain property additions that could be certified to the deed of trust collateral agent. As of June 30, 2010, the available bond credits were approximately $1.296 billion and the amount of additional potential indebtedness that could be secured by property additions, subject to appraisal and a certification process, was $1.042 billion. In connection with the Merger, Oncor also committed to the PUCT that it would maintain a regulatory capital structure at or below the assumed debt–to–equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. As of June 30, 2010, Oncor is in compliance with such commitment.

*The litigation environment in which Oncor operates poses a significant risk to its businesses.*

Oncor is involved in the ordinary course of business in a number of lawsuits involving employment, commercial, environmental and injuries and damages issues, among other matters. Judges and juries in the State of Texas have demonstrated a willingness to grant large verdicts, including punitive damages, to plaintiffs in personal injury, property damage and business tort cases. Oncor uses appropriate means to contest litigation threatened or filed against it, but the litigation environment in the State of Texas poses a significant business risk.

*The allocated costs of providing pension and OPEB and related funding requirements are subject to changes in pension fund values, changing demographics and fluctuating actuarial assumptions and may have a material adverse effect on Oncor's results of operations and financial condition.*

Oncor is a participating employer in the pension plan sponsored by EFH Corp. and offers pension benefits based on either a traditional defined benefit formula or a cash balance formula. Oncor also participates in health care and life insurance benefit plans offered by EFH Corp. to eligible employees and their eligible dependents upon retirement of such employees from Oncor. Oncor's allocated costs of providing such benefits and related funding requirements are dependent upon numerous factors, assumptions and estimates and are subject to changes in these factors, assumptions and estimates, including the market value of the assets funding EFH Corp.'s pension and OPEB plans. Benefits costs and related funding requirements are also subject to changing employee demographics (including but not limited to age, compensation levels and years of accredited service), the level of contributions made to retiree plans, expected and actual earnings on plan assets and the discount rates used in determining the projected benefit obligation. Changes made to the provisions of the plans may also impact current and future benefit costs. Fluctuations in actual market returns as well as changes in general interest rates may result in increased or decreased benefit costs in future periods.

The substantial dislocation in the financial markets that began in 2008 caused the value of the investments that fund EFH Corp.'s pension and OPEB plans to significantly differ from, and may alter the values and

76

EFIHMW00052021

EFIHMW00051935

Table of Contents

actuarial assumptions EFH Corp. uses to calculate, projected future pension plan expense and OPEB costs allocated to Oncor. A continuation or further decline in the value of these investments could increase the expenses of EFH Corp.'s pension plan and the costs of its OPEB plan allocated to Oncor and related funding requirements in the future.

*Disruptions at power generation facilities owned by third parties could interrupt Oncor's sales of transmission and distribution services.*

The electricity Oncor transmits and distributes to customers of retail electric providers is obtained by the retail electric providers from electricity generation facilities. Oncor does not own or operate any generation facilities. If generation is disrupted or if generation capacity is inadequate, Oncor's sales of transmission and distribution services may be diminished or interrupted, and its results of operations, financial condition and cash flows may be adversely affected.

*Changes in technology or increased conservation efforts may reduce the value of Oncor's electricity delivery facilities and may significantly impact Oncor's businesses in other ways as well.*

Research and development activities are ongoing to improve existing and alternative technologies to produce electricity, including gas turbines, fuel cells, microturbines, photovoltaic (solar) cells and concentrated solar thermal devices. It is possible that advances in these or other technologies will reduce the costs of electricity production from these technologies to a level that will enable these technologies to compete effectively with traditional generation plants. Changes in technology could also alter the channels through which retail customers buy electricity. To the extent self–generation facilities become a more cost–effective option for certain customers, Oncor's revenues could be materially reduced.

Also, electricity demand could be reduced by increased conservation efforts and advances in technology, which could likewise significantly reduce the value of Oncor's electricity delivery facilities. Certain regulatory and legislative bodies have introduced or are considering requirements and/or incentives to reduce energy consumption by a fixed date. Effective energy conservation by Oncor's customers could result in reduced energy demand, or significantly slow the growth in demand. Such reduction in demand could materially reduce Oncor's revenues. Furthermore, Oncor may incur increased capital expenditures if it is required to invest in conservation measures.

*The loss of the services of Oncor's key management and personnel could adversely affect Oncor's ability to operate its businesses.*

Oncor's future success will depend on its ability to continue to attract and retain highly qualified personnel. Oncor competes for such personnel with many other companies, in and outside Oncor's industry, government entities and other organizations. Oncor may not be successful in retaining its current personnel or in hiring or retaining qualified personnel in the future. Oncor's failure to attract new personnel or retain its existing personnel could have a material adverse effect on Oncor's businesses.

*Oncor's revenues and results of operations are seasonal.*

A significant portion of Oncor's revenues is derived from rates that Oncor collects from each retail electric provider based on the amount of electricity Oncor distributes on behalf of such retail electric provider. Sales of electricity to residential and commercial customers are influenced by temperature fluctuations. Thus, Oncor's revenues and results of operations are subject to seasonality, weather conditions and other electricity usage drivers, with revenues being highest in the summer.

EFIHMW00052022

EFIHMW00051935

**PX 030
Page 88 of 734**

**Table of Contents**

*As was the case in the fourth quarter 2008 (as discussed in "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009—Significant Activities and Events" included in Annex C in this Prospectus), goodwill that Oncor has recorded in connection with the Merger is subject to at least annual impairment evaluations and as a result, Oncor could be required to write off some or all of this goodwill, which may cause adverse impacts on Oncor's financial condition and results of operations.*

In accordance with accounting standards, goodwill recorded in connection with the Merger is not amortized but is reviewed annually or more frequently for impairment, if certain conditions exist, and may be impaired. Any reduction in or impairment of the value of goodwill will result in a charge against Oncor's earnings, which could cause a material adverse impact on Oncor's reported results of operations and financial position.

78

EFIHMW00052023

EFIHMW00051935

**PX 030**
**Page 89 of 734**

Table of Contents

USE OF PROCEEDS

Neither the Offeror nor EFH Corp. will receive any cash proceeds from the exchange offers or the consent solicitation. Any Old Notes accepted for exchange in the exchange offers may remain outstanding and held by EFIH or be retired and cancelled.

The Offeror intends to fund all cash payable to holders pursuant to the exchange offers with cash on hand and with contributions or loans from EFH Corp. EFH Corp. intends to fund all cash consent payments payable pursuant to the consent solicitation with cash on hand. Given the amount of Old Notes as to which Consents have been validly delivered (and not validly revoked), the aggregate amount of consent payments payable in relation to the consent solicitation is approximately $11,174,670. If all holders of Old Notes had validly delivered (and not validly revoked) Consents at or prior to the Consent Date, the aggregate maximum amount of consent payments payable would have been approximately $11,230,000.

Each member of the Sponsor Group has advised us that it, and the affiliates that it controls, in the aggregate, either do not own any Old Notes or own an insignificant amount of Old Notes, and, if it and/or the affiliates that it controls own Old Notes, it and/or such affiliates may participate in the exchange offers and consent solicitation. Such participation, if any, will be on the same terms and subject to the same conditions set forth in this Prospectus applicable to other holders of the respective Old Notes held by the Sponsor Group and such affiliates. Old Notes held by the Sponsor Group and such affiliates were not considered outstanding for the purposes of determining whether the holders of the required outstanding principal amount of the Old Notes delivered Consents necessary to adopt the Proposed Amendments.

An affiliate of Goldman Sachs, a member of the Sponsor Group, is acting as a Dealer Manager and will receive compensation for acting as such as described under "Exchange Agent; Information Agent; Dealer Managers and Solicitation Agents; Other Advisors—Dealer Managers and Solicitation Agents."

79

EFIHMW00052024

EFIHMW00051935

**PX 030**
**Page 90 of 734**

Table of Contents

## CAPITALIZATION

**EFH Corp.**

The following table sets forth as of June 30, 2010, EFH Corp.'s cash and cash equivalents and capitalization of EFH Corp. and certain of its subsidiaries:

  (1) on an actual basis;

  (2) on an as adjusted basis to give effect to repurchases and exchanges of EFH Corp.'s and its subsidiaries' notes since June 30, 2010 described in this Prospectus under "Summary—Recent Developments" and under "Debt Related Activity in 2010 – 2010 Debt Exchanges and Repurchases" in Note 6 to EFH Corp.'s unaudited historical interim condensed consolidated financial statements and related notes for the three and six months ended June 30, 2010 included elsewhere in this Prospectus; and

  (3) on an adjusted basis to give effect to the completion of the exchange offers.

| | As of June 30, 2010 | | |
| | Actual | As Adjusted | As Further Adjusted (a) |
| --- | --- | --- | --- |
| | | (millions of dollars) | |
| Cash and cash equivalents | $ 1,211 | $ 1,204 | $ 721 |
| Debt: | | | |
| EFH Corp.: | | | |
| 5.55% Series P Senior Notes due 2014 | 983 | 434 | 434 |
| 6.50% Series Q Senior Notes due 2024 | 740 | 740 | 740 |
| 6.55% Series R Senior Notes due 2034 | 744 | 744 | 744 |
| 10.875% Senior Notes due 2017 | 1,812 | 1,787 | 359 |
| 11.250%/12.000% Senior Toggle Notes due 2017 | 2,758 | 2,705 | 539 |
| 9.75% Senior Secured Notes due 2019 | 115 | 115 | 115 |
| 10.000% Senior Secured Notes due 2020 | 606 | 1,061 | 1,061 |
| Capital lease obligations | 7 | 7 | 7 |
| Unamortized fair value discount | (569) | (493) | (493) |
| Total EFH Corp. debt | 7,196 | 7,100 | 3,506 |
| EFIH: (b) | | | |
| 9.75% Senior Secured Notes due 2019 | 141 | 141 | 141 |
| 10.000% Senior Secured Notes due 2020 offered hereby | — | — | 2,180 |
| Unamortized discount on New EFIH Senior Secured Notes | — | — | — |
| Total EFIH debt | 141 | 141 | 2,321 |
| EFCH: (c) | | | |
| Secured debt | 89 | 89 | 89 |
| Unsecured debt | 9 | 9 | 9 |
| Total EFCH debt | 98 | 98 | 98 |
| TCEH: | | | |
| TCEH Senior Secured Facilities | 22,016 | 22,016 | 22,016 |
| TCEH Notes | 4,689 | 4,668 | 4,668 |
| TCEH Toggle Notes | 2,007 | 2,007 | 2,007 |
| Other secured debt (d) | 280 | 280 | 280 |
| Other unsecured debt | 1,400 | 1,400 | 1,400 |
| Total TCEH debt | 30,392 | 30,371 | 30,371 |
| Debt of Other Subsidiaries: | | | |
| Secured debt (e) | 87 | 87 | 87 |
| Total consolidated debt | 37,914 | 37,797 | 36,383 |
| EFH Corp. shareholders' equity | (3,269) | (3,203) | (2,656) |
| Noncontrolling interest in subsidiaries | 61 | 61 | 61 |
| Total capitalization | $34,706 | $ 34,655 | $ 33,788 |

(a)   The adjustment to cash and cash equivalents reflects the Total Cash Consideration, consent fees and estimated issuance costs related to the transaction as well as a $54 million quarterly cash dividend received from Oncor Holdings on August 3, 2010. EFH Corp. shareholders' equity reflects an estimated $547 million after tax gain on the transaction. Amounts do not reflect accrued and unpaid interest on the Old Cash-Pay Notes, which is expected to total approximately $46 million.
(b)   Excludes the push down effects of EFIH's guarantees of the Old Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes.
(c)   Excludes the push down effects of EFCH's guarantees of the Old Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes.
(d)   Includes $158 million of funding under the accounts receivable securitization program.
(e)   Consists of a building finance lease.

80

EFIHMW00052025

EFIHMW00051935

**PX 030**
**Page 91 of 734**

**Table of Contents**
EFIH

The following table sets forth as of June 30, 2010, EFIH's cash and cash equivalents and capitalization of EFIH and certain of its subsidiaries:

(1) on an actual basis;

(2) on an as adjusted basis to give effect to repurchases and exchanges of EFH Corp.'s and its subsidiaries' notes since June 30, 2010 described in this Prospectus under "Summary—Recent Developments" and under "Debt Related Activity in 2010 – 2010 Debt Exchanges and Repurchases" in Note 3 to EFIH's unaudited historical interim condensed consolidated financial statements and related notes for the three and six months ended June 30, 2010 included elsewhere in this Prospectus; and

(3) on an adjusted basis to give effect to the completion of the exchange offers.

| | As of June 30, 2010 | | |
| | Actual | As Adjusted | As Further Adjusted (a) |
| | | (millions of dollars) | |
| Cash and cash equivalents | $ 83 | $ 83 | $ 51 |
| | | | |
| Debt: | | | |
| EFIH: | | | |
| 10.875% EFH Corp. Senior Notes due 2017 (b) | 906 | 894 | 180 |
| 11.250%/12.000% EFH Corp. Senior Toggle Notes due 2017 (b) | 1,379 | 1,352 | 269 |
| 9.75% EFH Corp. Senior Secured Notes due 2019 (b) | 57 | 57 | 57 |
| 10.000% EFH Corp. Senior Secured Notes due 2020 (b) | 92 | 328 | 328 |
| 9.75% Senior Secured Notes due 2019 | 141 | 141 | 141 |
| 10.000% Senior Secured notes due 2020 offered hereby | — | — | 2,180 |
| Unamortized discount on 10.000% Senior Secured Notes due 2020 offered hereby | — | — | — |
| | | | |
| Total consolidated debt | 2,575 | 2,772 | 3,155 |
| Total membership interest (c) | 3,087 | 2,890 | 5,096 |
| | | | |
| Total capitalization | $5,662 | $ 5,662 | $ 8,251 |

(a)   The adjustment to cash and cash equivalents reflects the Total Cash Consideration and estimated issuance costs related to the transaction as well as an expected $440 million capital contribution from EFH Corp. and a $54 million quarterly cash dividend received from Oncor Holdings on August 3, 2010. Amounts do not reflect accrued and unpaid interest on the Old Cash–Pay Notes, which is expected to total approximately $46 million. The 10.875% EFH Corp. Senior Notes and 11.250%/12.000% EFH Corp. Senior Toggle Notes reflect the push down effects of the acquired debt (50% of book value), which is guaranteed by EFIH. Total membership interest reflects the push down effects of the acquired debt and an expected $440 million cash contribution from EFH Corp. to fund the Total Cash Consideration.

(b)   Represents 50% of the principal amount of EFH Corp. debt guaranteed by EFIH (pushed–down debt), as discussed in Note 3 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010 included elsewhere in this Prospectus.

(c)   "As Adjusted" amount includes push down effects (arising from the EFIH guarantee) of the retirement of Old Notes and the issuance of EFH Corp. 10.000% Notes.

81

EFIHMW00052026

EFIHMW00051935

Table of Contents

# THE TRANSACTIONS

**The Merger**

On October 10, 2007, the Merger occurred. Upon the effectiveness of the Merger, each share of EFH Corp. common stock outstanding immediately prior to the Merger (other than shares held by EFH Corp. or any of its subsidiaries or Texas Holdings or any of its subsidiaries, including Merger Sub, in each case not held on behalf of third parties, or shares held by holders who properly exercised their rights of dissent and appraisal under Texas law) was cancelled and converted into the right to receive $69.25 in cash, without interest and less any applicable withholding taxes.

**Equity Contributions**

At the closing of the Merger, Texas Holdings received an aggregate equity investment of approximately $8.3 billion. Investment funds affiliated with the Sponsor Group, or their respective assignees, contributed approximately $5.1 billion to Texas Holdings. The Sponsor Group consists of investment funds associated with or designated by KKR, TPG and Goldman Sachs who, along with certain other co−investors, own EFH Corp. through Texas Holdings, with the Sponsor Group controlling Texas Holdings' general partner, Texas Energy Future Capital Holdings LLC. In addition, Citigroup Global Markets Inc., a Dealer Manager with respect to the exchange offers and a solicitation agent with respect to the consent solicitation, and Morgan Stanley & Co. Incorporated, or their respective affiliates, each made equity investments of approximately $250 million in Texas Holdings. The Sponsor Group obtained approximately $2.3 billion in equity investments from other existing investors in KKR's and TPG's private equity funds and other third party investors. Following the closing of the Merger and as of the date of this Prospectus, the Sponsor Group owned approximately 62% of the limited partnership units issued by Texas Holdings in connection with the Merger.

The equity contributions by the Sponsor Group and the Investors are referred to in this Prospectus as the "Equity Contributions."

**Debt Financing**

In connection with the Merger, in addition to the Equity Contributions described above, EFH Corp. and/or its subsidiaries entered into the following debt financing arrangements, in each case, arranged by a consortium of arrangers and bookrunners:

- The TCEH Senior Secured Facilities, which are guaranteed by EFCH and subsidiaries of TCEH;

- a $6.75 billion senior unsecured interim loan facility of TCEH (the "TCEH Senior Interim Facility"), which was used to fund the Merger and related transactions; and

- a $4.5 billion senior unsecured interim loan facility of EFH Corp. (the "EFH Senior Interim Facility"), which was used to fund the Merger and related transactions.

In October and December 2007, TCEH and TCEH Finance, Inc. issued $6.75 billion aggregate principal amount of the TCEH Notes in two private offerings. The proceeds from the offerings of the TCEH Notes, along with cash on hand, were used by TCEH to repay in full the TCEH Senior Interim Facility.

In October 2007, EFH Corp. issued the Old Notes in a private offering. The proceeds from the offering of the Old Notes, along with cash on hand, were used by EFH Corp. to repay in full the EFH Senior Interim Facility.

We refer to the above, collectively, as the "Debt Financing."

Concurrently with the transactions described above, Oncor entered into a $2.0 billion senior revolving credit facility (the "Oncor Revolving Credit Facility"), which may be increased by up to $500 million, subject to certain conditions, which is being used by Oncor for working capital and for other general corporate purposes. No

82

EFIHMW00052027

EFIHMW00051935

Table of Contents
portion of the Oncor Revolving Credit Facility was used to finance the Merger or the debt repayment that occurred in connection with the Merger.

We refer to the transactions listed above, including the Merger and the application of the proceeds of the Equity Contributions and the Debt Financing, as the "Transactions."

**Ring−Fencing**

Upon the consummation of the Merger, EFH Corp. and Oncor implemented several measures that are referred to as "ring−fencing." Such measures included, among others, the following:

- the conversion of Oncor from a Texas corporation to a Delaware limited liability company;

- the inclusion of covenants in Oncor Holdings' and Oncor's limited liability company agreements intended to enhance the separation of Oncor Holdings and its subsidiaries, including Oncor, from Texas Holdings and its other subsidiaries, including EFIH;

- the establishment of boards of directors for Oncor Holdings and Oncor with a majority of members who meet the New York Stock Exchange requirements for independence in all material respects and whose unanimous consent is required to take certain material actions, including (i) to consolidate or merge (A) with EFH Corp. or any of EFH Corp.'s other subsidiaries or (B) with any other entity, if Oncor Holdings or Oncor, as applicable, would not be the surviving entity; (ii) to sell, transfer or dispose of all or substantially all of the assets of Oncor Holdings or Oncor, as applicable, without adequate provision for the payment of all of such entity's creditors; (iii) to institute, or consent to the institution of, bankruptcy or similar proceedings in respect of Oncor Holdings or Oncor, as applicable; or (iv) to the fullest extent permitted by law, to dissolve or liquidate Oncor Holdings or Oncor, as applicable, without adequate provision for the payment of all of such entity's creditors;

- the specific delegation to each of the board of directors and the independent directors of Oncor, each acting by majority vote, of the right to prevent distributions, if it or they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements;

- after the appointment of the initial independent directors, the delegation of the ability to nominate, appoint and fill vacancies in respect of the independent directors of Oncor Holdings and Oncor to a standing nominating committee of Oncor Holdings' board of directors, a majority of whose members are independent directors; and

- the incurrence of new indebtedness, evidenced by the Oncor Revolving Credit Facility, the lenders of which will be specifically relying on the separateness of Oncor Holdings and Oncor, and their assets, from Texas Holdings and its other subsidiaries.

The ring−fencing measures were based on certain principles articulated by rating agencies and certain commitments made by Texas Holdings and Oncor to the PUCT and the FERC intended to further separate Oncor from Texas Holdings and its subsidiaries and to mitigate Oncor's credit exposure to those entities and to reduce the risk that the assets and liabilities of Oncor Holdings or of any of its subsidiaries would be substantively consolidated with the assets and liabilities of Texas Holdings or of any of its other subsidiaries in the event of a bankruptcy of one or more of those entities. A number of ring−fencing measures put in place were incorporated into a PUCT order that is legally binding on Oncor.

None of the ring−fenced entities guarantees or otherwise holds out its credit as being available to support the obligations of EFH Corp., EFIH or any of their subsidiaries (other than the ring−fenced entities), including with respect to the New EFIH Senior Secured Notes offered hereby. In addition, lenders under the TCEH Senior Secured Facilities and the holders of the EFH Corp. 10.000% Notes, the EFH Corp. 9.75% Notes, the EFIH 9.75% Notes, the Old Notes and the TCEH senior notes have acknowledged, and the future holders of such notes will acknowledge, by acceptance of such notes, the legal separateness of Oncor and its subsidiaries from the

83

EFIHMW00052028

EFIHMW00051935

Table of Contents

borrowers and guarantors under such financing documents. Lenders under the TCEH Senior Secured Facilities and the holders of the EFH Corp. 10.000% Notes, the EFH Corp. 9.75% Notes, the EFIH 9.75% Notes, the Old Notes and the TCEH senior notes also agreed, and the future holders of such notes will agree, by acceptance of such notes, that they will not initiate any bankruptcy or similar proceeding against Oncor Holdings or its subsidiaries and that Oncor Holdings and its subsidiaries are entitled to enforce this non–petition covenant. In addition, holders of New EFIH Senior Secured Notes, by acceptance of such notes, will acknowledge the legal separateness of Oncor and its subsidiaries from the Offeror under such financing documents. Holders of New EFIH Senior Secured Notes, by acceptance of such notes, will also agree that they will not initiate any bankruptcy or similar proceeding against Oncor Holdings or its subsidiaries and that Oncor Holdings and its subsidiaries are entitled to enforce this non–petition covenant.

**Sale of Noncontrolling Interests in Oncor**

In November 2008, Oncor issued and sold additional equity interests to Texas Transmission for $1.254 billion in cash. At the closing of the sale, Oncor also offered and sold additional equity interests to Oncor Management Investment LLC, an entity owned by certain members of Oncor's management, for the same price per unit of equity interest paid by Texas Transmission. Accordingly, the equity issuances resulted in EFH Corp. and EFIH indirectly owning 80.04% of Oncor, certain members of Oncor management indirectly owning 0.21% of Oncor and Texas Transmission owning 19.75% of Oncor.

The investor rights agreement dated as of November 5, 2008, by and among Oncor, Oncor Holdings, Texas Transmission, EFH Corp. and any other persons that subsequently become a party thereto (the "Investor Rights Agreement") governs certain rights of certain members of Oncor and EFH Corp. arising out of their direct or indirect ownership of Oncor membership interests, including, without limitation, transfers of Oncor membership interests and restrictions thereon. Among other transfer restrictions, the Investor Rights Agreement provides that, prior to the earlier of the completion of a qualified initial public offering or seven years from the date of the Investor Rights Agreement, Texas Transmission may transfer its Oncor membership interests only to certain permitted transferees or with the prior approval of Oncor Holdings. Following such time period, Texas Transmission may transfer its Oncor membership interests under a registration statement or pursuant to applicable securities laws. The Investor Rights Agreement also grants Texas Transmission certain "tag–along" rights in relation to certain sales, transfers or pledges of Oncor membership interests by Oncor Holdings or indirectly by EFH Corp. or its subsidiaries. Subject to certain conditions, these "tag–along" rights allow Texas Transmission to transfer a pro–rata portion of its Oncor membership interests in the event of a transfer of Oncor membership interests by Oncor Holdings or indirectly by EFH Corp. or its subsidiaries on the same terms as Oncor Holdings, EFH Corp. or a subsidiary of EFH Corp. would receive for the Oncor membership interests. The agreement further provides that under certain offerings of equity securities occurring before an initial public offering of Oncor, Texas Transmission and Oncor Holdings will receive preemptive rights to purchase their pro–rata share of the equity securities to be sold pursuant to such offerings. The Investor Rights Agreement also provides EFH Corp. with a right of first refusal to purchase any Oncor membership interests to be sold in a permitted sale by Texas Transmission or its permitted transferees.

Additionally, Texas Holdings, EFH Corp., certain of EFH Corp.'s subsidiaries and Oncor Holdings have certain "drag–along" rights in relation to offers from third–parties to purchase their directly or indirectly owned membership interests in Oncor, where the resulting sale would constitute a change of control of Oncor. These "drag–along" rights compel Texas Transmission and all other members of Oncor to sell or otherwise transfer their membership interests in Oncor on substantially the same terms as Texas Holdings, EFH Corp., the EFH Corp. subsidiary or Oncor Holdings (as applicable). Pursuant to the Investor Rights Agreement, all members of Oncor that have entered into such agreement must cooperate with Oncor in connection with an initial public offering of Oncor.

84

EFIHMW00052029

EFIHMW00051935

Table of Contents

## SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA FOR
## EFH CORP. AND ITS SUBSIDIARIES

The following table sets forth our selected historical consolidated financial data as of and for the periods indicated. The selected historical financial data as of December 31, 2009 and 2008 (Successor) and for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) have been derived from our audited historical consolidated financial statements and related notes included elsewhere in this Prospectus. The historical financial data as of December 31, 2007 (Successor), 2006 (Predecessor) and 2005 (Predecessor) and for the years ended December 31, 2006 and 2005 (Predecessor) have been derived from our audited historical consolidated financial statements that are not included in this Prospectus. The "Predecessor" period reflects the period prior to the Merger, which occurred on October 10, 2007. The historical financial data as of June 30, 2010 and for the six months ended June 30, 2010 and 2009 have been derived from our unaudited historical interim condensed consolidated financial statements and related notes included elsewhere in this Prospectus. In EFH Corp.'s opinion, such unaudited interim financial data reflects all adjustments, consisting of normal recurring accruals, necessary for the fair presentation of the results for those periods. The results of operations for the interim periods, for seasonal and other factors, are not necessarily indicative of the results to be expected for the full year or any future period.

The selected historical consolidated financial data should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009" and "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three and Six Months Ended June 30, 2010," each included in Annex B to this Prospectus, and our historical consolidated financial statements and related notes that are included elsewhere in this Prospectus.

| | Successor | | | Predecessor | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, | |
| | 2009 | 2008 | | | 2006 | 2005 |
| | (millions of dollars, except ratios) | | | | | |
| Operating Revenues | $9,546 | $11,364 | $ 1,994 | $ 8,044 | $ 10,703 | $ 10,826 |
| Income (loss) from continuing operations before extraordinary loss and cumulative effect of changes in accounting principles | 408 | (9,998) | (1,361) | 699 | 2,465 | 1,775 |
| Income from discontinued operations, net of tax effect | — | — | 1 | 24 | 87 | 5 |
| Extraordinary loss, net of tax effect | | | | | | (50) |
| Cumulative effect of changes in accounting principles, net of tax effect | — | — | — | — | — | (8) |
| Preference stock dividends | | | | | | 10 |
| Net income (loss) | 408 | (9,998) | (1,360) | 723 | 2,552 | 1,712 |
| Net income (loss) attributable to noncontrolling interests | (64) | 160 | | | | |
| Net income (loss) attributable to EFH Corp. | 344 | (9,838) | (1,360) | 723 | 2,552 | 1,712 |
| Ratio of earnings to fixed charges (a) | 1.24 | — | | 2.30 | 5.11 | 3.80 |
| Ratio of earnings to combined fixed charges and preference dividends (a) | 1.24 | — | | 2.30 | 5.11 | 3.74 |
| Embedded interest cost on long–term debt—end of period (b) | 7.2% | 9.2% | 9.5% | 6.5% | 6.6% | 6.3% |
| Capital expenditures, including nuclear fuel | $2,545 | $ 3,015 | $ 716 | $ 2,542 | $ 2,337 | $ 1,148 |

85

EFIHMW00052030

EFIHMW00051935

Table of Contents

| | Successor | | | Predecessor | |
| | December 31, | | | December 31, | |
| | 2009 | 2008 | 2007 | 2006 | 2005 |
| --- | --- | --- | --- | --- | --- |
| | (millions of dollars, except ratios) | | | | |
| Total assets—end of year | $59,662 | $59,263 | $64,804 | $27,216 | $27,978 |
| Property, plant & equipment—net—end of year | $30,018 | $29,522 | $28,650 | $18,569 | $17,006 |
| Goodwill and intangible assets—end of year | $17,192 | $17,379 | $27,319 | $   729 | $   728 |
| Capitalization—end of year | | | | | |
| Equity–linked debt securities | $      — | $      — | $      — | $      — | $   179 |
| All other long–term debt, less amounts due currently | 41,440 | 40,838 | 38,603 | 10,631 | 11,153 |
| Preferred stock of subsidiaries (not subject to mandatory redemption) (c) | — | — | — | — | — |
| EFH Corp. common stock equity | (3,247) | (3,673) | 6,685 | 2,140 | 475 |
| Noncontrolling interests in subsidiaries | 1,411 | 1,355 | — | — | — |
| Total | $39,604 | $38,520 | $45,288 | $12,771 | $11,807 |
| Capitalization ratios—end of year | | | | | |
| Equity–linked debt securities | — % | — % | — % | — % | 1.5% |
| All other long–term debt, less amounts due currently | 104.6 | 106.0 | 85.2 | 83.2 | 94.5 |
| Preferred stock of subsidiaries (c) | — | — | — | — | — |
| EFH Corp. common stock equity | (8.2) | (9.5) | 14.8 | 16.8 | 4.0 |
| Noncontrolling interests in subsidiaries | 3.6 | 3.5 | — | — | — |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Short–term borrowings—end of year | $ 1,569 | $ 1,237 | $ 1,718 | $ 1,491 | $   798 |
| Long–term debt due currently—end of year | $   417 | $   385 | $   513 | $   485 | $ 1,250 |

(a)  Fixed charges exceeded "earnings" (net loss) by $10.469 billion and $2.034 billion for the year ended December 31, 2008 and for the period from October 11, 2007 through December 31, 2007, respectively.

(b)  Represents the annual interest using year–end rates for variable rate debt and reflecting the effects of interest rate swaps (excluding unrealized mark–to–market gains or losses) and amortization of any discounts, premiums, issuance costs and any deferred gains/losses on reacquisitions divided by the carrying value of the debt plus or minus the unamortized balance of any discounts, premiums, issuance costs and gains/losses on reacquisitions at the end of the year.

(c)  Preferred stock outstanding at the end of 2008, 2007, 2006 and 2005 has a stated amount of $51 thousand. There was no outstanding preferred stock at the end of 2009.

Note: Although EFH Corp. continued as the same legal entity after the Merger, its "Selected Historical Consolidated Financial Data" for periods preceding the Merger and for periods succeeding the Merger are presented as the consolidated financial statements of the "Predecessor" and the "Successor," respectively. See "Basis of Presentation in Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009. The consolidated financial statements of the Successor reflect the application of "purchase accounting." Results for 2008 were significantly impacted by impairment charges related to goodwill, trade name and emission allowances intangible assets and natural gas–fueled generation facilities. Results for 2010 reflect the prospective adoption of amended guidance regarding consolidation accounting standards related to variable interest entities that resulted in the deconsolidation of Oncor Holdings as discussed in Note 3 to EFH Corp.'s historical condensed consolidated financial statements for the three and six months ended June 30, 2010 included elsewhere in this Prospectus and amended guidance regarding transfers of financial assets that resulted in the accounts receivable securitization program no longer being accounted for as a sale of accounts receivable and the funding under the program now reported as short–term borrowings as discussed in Note 5 to EFH Corp.'s historical condensed consolidated financial statements for the three and six months ended June 30, 2010 included elsewhere in this Prospectus.

86

EFIHMW00052031

EFIHMW00051935

Table of Contents

| | Successor | |
|---|---|---|
| | Six Months Ended June 30, 2010 | Six Months Ended June 30, 2009 |
| | (millions of dollars, except ratios) | |
| Operating revenues | $ 3,992 | $ 4,481 |
| | | |
| Net income (loss) | $ (71) | $ 315 |
| Net income attributable to noncontrolling interests | $ — | $ (28) |
| Net income (loss) attributable to EFH Corp. | $ (71) | $ 287 |
| | | |
| Ratio of earnings to fixed charges (a) | — | 1.47 |
| Ratio of earnings to combined fixed charges and preference dividends (a) | — | 1.47 |
| | | |
| Capital expenditures, including nuclear fuel | $ 637 | $ 1,364 |

| | Successor |
|---|---|
| | June 30, 2010 |
| | (millions of dollars, except ratios) |
| Total assets | $ 51,042 |
| Property, plant & equipment—net | $ 20,770 |
| Goodwill and intangible assets | $ 12,765 |
| Capitalization | |
| Long—term debt, less amounts due currently | $ 36,768 |
| EFH Corp. shareholders' equity | (3,269) |
| Noncontrolling interests in subsidiaries | 61 |
| Total | $ 33,560 |
| Capitalization ratios | |
| Long—term debt, less amounts due currently | 109.5% |
| EFH Corp. shareholders' equity | (9.7) |
| Noncontrolling interests in subsidiaries | 0.2 |
| Total | 100.0% |
| Short—term borrowings | $ 893 |
| Long—term debt due currently | $ 253 |
| Embedded interest cost on long—term debt—end of period (b) | 5.2% |

(a)    Fixed charges exceeded earnings by $141 million for the six months ended June 30, 2010.
(b)    Represents the annual interest using end of period rates for variable rate debt and reflecting the effects of interest rate swaps (excluding unrealized mark—to—market gains or losses) and amortization of any discounts, premiums, issuance costs and any deferred gains/losses on reacquisitions divided by the carrying value of the debt plus or minus the unamortized balance of any discounts, premiums, issuance costs and gains/losses on reacquisitions at the end of the period.

**Quarterly Information (unaudited)**

    Results of operations by quarter are summarized below. In the opinion of EFH Corp., all adjustments (consisting of normal recurring accruals) necessary for a fair statement of such amounts have been made. Quarterly results are not necessarily indicative of a full year's operations because of seasonal and other factors. All amounts are in millions of dollars.

EFIHMW00052032

EFIHMW00051935

PX 030
Page 98 of 734

Table of Contents

| 2010: | Successor | |
|---|---|---|
| | First Quarter | Second Quarter |
| Operating revenues | $1,999 | $1,993 |
| Net income (loss) | 355 | (426) |
| Net income (loss) attributable to EFH Corp. | $ 355 | $ (426) |

| 2009: | Successor | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Operating revenues | $ 2,139 | $ 2,342 | $2,885 | $ 2,180 |
| Net income (loss) | 454 | (139) | (54) | 147 |
| Net loss attributable to noncontrolling interests | (12) | (16) | (26) | (10) |
| Net income (loss) attributable to EFH Corp. | $ 442 | $ (155) | $ (80) | $ 137 |

| 2008: | Successor | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Operating revenues | $ 2,354 | $ 2,951 | $3,695 | $ 2,364 |
| Net income (loss) | (1,269) | (3,331) | 3,617 | (9,015) |
| Net loss attributable to noncontrolling interests | — | — | — | 160 |
| Net income (loss) attributable to EFH Corp. | $(1,269) | $(3,331) | $3,617 | $(8,855) |

88

EFIHMW00052033

EFIHMW00051935

Table of Contents

## SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA FOR
## EFIH AND ITS SUBSIDIARIES

The following table sets forth EFIH and its subsidiaries' selected historical consolidated financial data as of and for the periods indicated. The selected historical financial data as of December 31, 2009 and 2008 (Successor) and for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor) and the period from January 1, 2007 through October 10, 2007 (Predecessor) have been derived from EFIH and its subsidiaries' audited historical consolidated financial statements and related notes included elsewhere in this Prospectus. The historical financial data as of December 31, 2009 (Successor) reflects Oncor accounted for under the equity method. The historical financial data as of December 31, 2006 (Predecessor) and 2005 (Predecessor) and for the years ended December 31, 2006 and 2005 (Predecessor) reflect Oncor accounted for under the equity method; EFIH was formed at the time of the Merger, and its predecessor is Oncor. The historical financial data as of June 30, 2010 and for the six months ended June 30, 2010 and 2009 have been derived from EFIH and its subsidiaries' unaudited historical interim condensed consolidated financial statements and related notes included elsewhere in this Prospectus. In EFIH's opinion, such unaudited interim financial data reflects all adjustments, consisting of normal recurring accruals, necessary for the fair presentation of the results for those periods. The results of operations for the interim periods, for seasonal and other factors, are not necessarily indicative of the results to be expected for the full year or any future period.

The selected historical consolidated financial data should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009" and "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three and Six Months Ended June 30, 2010," each included in Annex C to this Prospectus, and our historical consolidated financial statements and related notes that are included elsewhere in this Prospectus.

| | Successor (a) | | | Predecessor (a) | |
|---|---|---|---|---|---|
| | Year Ended December 31, | | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, |
| | 2009 | 2008 | | | 2006 | 2005 |
| | | | (millions of dollars, except ratios) | | |
| Income (loss) before income taxes and equity in earnings of unconsolidated subsidiary | $(275) | $(260) | $ (68) | $ — | $ — | $ — |
| Equity in earnings (losses) of unconsolidated subsidiary (net of tax) (b) | 256 | (323) | 64 | 263 | 344 | 351 |
| Net income (loss) | 74 | (495) | 19 | 263 | 344 | 351 |
| Ratio of earnings to fixed charges (c) | — | 1.27 | | — | — | — |
| Embedded interest cost on long-term debt—end of period (d) | 11.4% | 11.6% | 11.6% | | | |

(a)   EFIH and Oncor Holdings were formed at the time of the Merger; consequently, Predecessor data represents Oncor presented under the equity method of accounting. The consolidated financial statements of the Successor reflect the application of purchase accounting.

(b)   Amount in 2008 includes the effect of Oncor's $860 million goodwill impairment charge.

(c)   Fixed charges exceeded earnings (net loss) by $59 million and $68 million for the year ended December 31, 2009 and for the period from October 11, 2007 through December 31, 2007, respectively. There were no fixed charges for the predecessor periods. For the year ended December 31, 2009 on a pro forma basis for the effects of the Exchange Offers, fixed charges would have exceeded earnings by $118 million.

(d)   Represents the annual interest and amortization of any discounts, premiums, issuance costs and any deferred gains/losses on reacquisitions divided by the carrying value of the debt plus or minus the unamortized balance of any discounts, premiums, issuance costs and gains/losses on reacquisitions at the end of the year and excludes advances from affiliates.

89

EFIHMW00052034

EFIHMW00051935

**PX 030**
**Page 100 of 734**

**Table of Contents**

| | Successor (a) | | | Predecessor (a) | |
|---|---|---|---|---|---|
| | December 31, | | | December 31, | |
| | 2009 | 2008 | 2007 | 2006 | 2005 |
| | (millions of dollars, except ratios) | | | | |
| Total assets—end of year | $5,577 | $5,363 | $7,732 | $2,975 | $2,935 |
| Capitalization—end of year | | | | | |
|   Long–term debt (b) | $2,513 | $2,250 | $2,250 | $ — | $ — |
|   Membership interest | 3,010 | 3,069 | 5,439 | 2,975 | 2,935 |
|     Total | $5,523 | $5,319 | $7,689 | $2,975 | $2,935 |
| Capitalization ratios—end of year | | | | | |
|   Long–term debt (b) | 45.5% | 42.3% | 29.3% | — | — |
|   Membership interest | 54.5 | 57.7 | 70.7 | 100.0 | 100.0 |
|     Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

_____

(a)    EFIH and Oncor Holdings were formed at the time of the Merger; consequently, Predecessor data represents Oncor presented under the equity method of accounting. The consolidated financial statements of the Successor reflect the application of purchase accounting.

(b)    Reflects push down of certain EFH Corp. (parent) debt due to EFIH's guarantee of the debt.

| | Successor | |
|---|---|---|
| | Six Months Ended June 30, 2010 | Six Months Ended June 30, 2009 |
| Loss before income taxes and equity earnings of unconsolidated subsidiary | $ (146) | $ (137) |
| Equity in earnings of unconsolidated subsidiary (net of tax) | 122 | 112 |
| Net income | 25 | 21 |
| Ratio of earnings to fixed charges (a) | — | — |

| | Successor |
|---|---|
| | June 30, 2010 |
| | (millions of dollars, except ratios) |
| Total assets | $ 5,717 |
| Capitalization | |
|   Long–term debt (b) | $ 2,575 |
|   Membership interest | 3,087 |
|     Total | $ 5,662 |
| Capitalization ratios | |
|   Long–term debt (b) | 45.5% |
|   Membership interest | 54.5 |
|     Total | 100.0% |
| Embedded interest cost on long–term debt—end of period | 10.8% |

_____

(a)    Fixed charges exceeded earnings by $59 million and $79 million for the six months ended June 30, 2010 and 2009, respectively. For the six months ended June 30, 2010 on a pro forma basis for the effects of the Exchange Offers, fixed charges would have exceeded earnings by $79 million.

(b)    Reflects push down of certain EFH Corp. (parent) debt due to EFIH's guarantee of the debt.

90

EFIHMW00052035

EFIHMW00051935

Table of Contents
**Quarterly Information (unaudited)**

Results of operations by quarter are summarized below. In the opinion of EFIH, all adjustments (consisting of normal recurring accruals) necessary for a fair statement of such amounts have been made. Quarterly results are not necessarily indicative of a full year's operations because of seasonal and other factors. All amounts are in millions of dollars.

|  | Successor | |
|---|---|---|
|  | First Quarter | Second Quarter |
| **2010:** | | |
| Loss before income taxes and equity earnings of unconsolidated subsidiary | $ (72) | $ (73) |
| Equity in earnings of unconsolidated subsidiary (net of tax) | 63 | 59 |
| Net income | 15 | 11 |

|  | Successor | | | |
|---|---|---|---|---|
|  | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| **2009:** | | | | |
| Loss before income taxes and equity earnings of unconsolidated subsidiary | $ (69) | $ (69) | $ (69) | $ (68) |
| Equity in earnings of unconsolidated subsidiary (net of tax) | 47 | 66 | 105 | 38 |
| Net income (loss) | 1 | 20 | 59 | (6) |

|  | Successor | | | |
|---|---|---|---|---|
|  | First Quarter | Second Quarter | Third Quarter | Fourth Quarter (a) |
| **2008:** | | | | |
| Loss before income taxes and equity earnings of unconsolidated subsidiary | $ (66) | $ (66) | $ (63) | $ (65) |
| Equity in earnings of (losses) of unconsolidated subsidiary (net of tax) | 85 | 85 | 139 | (632) |
| Net income (loss) | 41 | 41 | 96 | (673) |

(a)    Equity in earnings (losses) of unconsolidated subsidiary (net of tax) includes the effects of Oncor's $860 million goodwill impairment charge.

91

EFIHMW00052036

EFIHMW00051935

**PX 030**
**Page 102 of 734**

Table of Contents

## GENERAL TERMS OF THE EXCHANGE OFFERS AND CONSENT SOLICITATION

**Purpose of the Exchange Offers and Consent Solicitation**

The purpose of the exchange offers is to reduce the outstanding principal amount, and extend the weighted average maturity of, the long‑term debt of EFH Corp. and its subsidiaries. The purpose of the consent solicitation was to adopt the Proposed Amendments which will provide EFH Corp. and its subsidiaries additional financial and operational flexibility.

**General**

Upon the terms and subject to the conditions set forth in this Prospectus and the Consent and Letter of Transmittal, including the Maximum Exchange Amount and the prorations, if necessary, resulting therefrom, the Offeror is offering to exchange outstanding Old Notes validly tendered and not validly withdrawn for New EFIH Senior Secured Notes and, for Old Notes validly tendered at or prior to the Early Tender Date, cash as described below. The exchange offers constitute a single offer for both the Old Cash‑Pay Notes and the Old Toggle Notes.

All holders whose Old Cash‑Pay Notes are accepted for exchange will receive an amount equal to accrued and unpaid interest on such Old Cash‑Pay Notes, if any, in cash, from the last applicable interest payment date to, but not including, the Settlement Date. Holders whose Old Toggle Notes are accepted for exchange will not separately receive any accrued and unpaid payment‑in‑kind interest with respect to such Old Toggle Notes because the amount of such accrued interest through the Settlement Date has been included in determining the consideration being offered in the exchange offers for the Old Toggle Notes. If the Settlement Date occurs later than August 17, 2010, then the consideration being offered in the exchange offers for the Old Toggle Notes will be adjusted to account for the additional interest accrued after such date to, but including, the Settlement Date.

In addition, EFH Corp. solicited Consents in the consent solicitation to amend the Old Notes Indenture. The purpose of the consent solicitation was to obtain the Consents required to adopt the Proposed Amendments, which would, among other things, eliminate substantially all of the restrictive covenants contained in the Old Notes Indenture and the Old Notes, eliminate certain events of default, modify covenants regarding mergers and consolidations, and modify or eliminate certain other provisions, including certain provisions relating to defeasance contained in the Old Notes Indenture and Old Notes which would otherwise prevent a defeasance without, among other things, delivery of an opinion of counsel confirming such defeasance does not constitute a taxable event.

EFH Corp. has received Consents from holders of a majority of the outstanding aggregate principal amount of the Old Notes, voting together as a single class, which constitutes the requisite Consents to adopt the Proposed Amendments. Old Notes held by members of the Sponsor Group and EFH Corp. and their respective affiliates were not considered outstanding for the purposes of determining whether the holders of the required outstanding principal amount of the Old Notes delivered Consents necessary to adopt the Proposed Amendments. The requisite Consents having been received, EFH Corp., the guarantors of the Old Notes and The Bank of New York Mellon Trust Company, N.A., as trustee under the Old Notes Indenture, have executed and delivered the Supplemental Indenture to effectuate the Proposed Amendments. The Supplemental Indenture will not become operative until immediately prior to the acceptance for exchange of Old Notes upon the terms and subject to the conditions set forth in this Prospectus.

Execution and delivery of the Consent and Letter of Transmittal will constitute an express waiver by a consenting holder of the Old Notes with respect to all claims against EFH Corp., the guarantors of the Old Notes and the Sponsor Group of any breach, default or event of default that may have arisen under the Old Notes Indenture. As of the date of this Prospectus, EFH Corp. is not aware of any such breaches, defaults or events of default.

EFIHMW00052037

EFIHMW00051935

**Table of Contents**

Old Notes validly tendered pursuant to the exchange offers (and not validly withdrawn) at or prior to the Consent Date were deemed to include Consents to the Proposed Amendments. The completion, execution and delivery of a Consent and Letter of Transmittal, or transmission of an Agent's Message, in connection with a valid tender of Old Notes pursuant to the exchange offers at or prior to the Consent Date constituted the delivery of Consents with respect to such Old Notes. Holders could not validly tender Old Notes in the exchange offers at or prior to the Consent Date without delivering the related Consents, but holders may tender Old Notes after the Consent Date and at or prior to the Expiration Date without delivering Consents with respect to such Old Notes. However, holders tendering Old Notes after the Early Tender Date will not be eligible to receive the applicable Total Consideration Amount for such Old Notes, including the Total Cash Consideration, or the cash consent payment. Holders could not deliver Consents in the consent solicitation without validly tendering their Old Notes in the exchange offers at or prior to the Consent Date and could only validly revoke Consents by validly withdrawing the previously tendered related Old Notes at or prior to the Consent Date or by revoking Consents after the Consent Date and prior to the execution and delivery of the Supplemental Indenture by the parties thereto. Because it was expected that the Supplemental Indenture would be executed and delivered promptly following the Consent Date assuming receipt of the requisite Consents for the Proposed Amendments, holders were advised that they should not expect to be able to revoke their Consents after the Consent Date. Consents may no longer be revoked because the Consent Date has passed and the Supplemental Indenture has been executed and delivered by the parties thereto. A withdrawal of Old Notes will no longer revoke any related Consents, and withdrawing holders will be subject to the Proposed Amendments if they became operative.

Because the requisite Consents have been received and the Supplemental Indenture has been executed and delivered by the parties thereto, EFH Corp. will pay to each holder, in respect of such holder's Old Notes as to which Consents were validly delivered and not validly revoked at or prior to the Consent Date, a cash consent payment of $2.50 per $1,000 principal amount of such Old Notes. Such consent payment is in addition to any Total Consideration Amount or Exchange Consideration that may be payable to a holder in respect of its Old Notes accepted for exchange. Given the amount of Old Notes as to which Consents have been validly delivered (and not validly revoked), the aggregate amount of consent payments payable in relation to the consent solicitation is approximately $11,174,670. If all holders of Old Notes had validly delivered (and not validly revoked) Consents at or prior to the Consent Date, the aggregate maximum amount of consent payments payable would have been approximately $11,230,000. EFH Corp.'s obligation to make consent payments is not conditioned upon completion of the exchange offers. If the exchange offers are terminated, the Proposed Amendments in the executed Supplemental Indenture will not become operative.

All Old Notes validly tendered in accordance with the procedures set forth under "Procedures for Tendering Old Notes and Delivering Consents" and not validly withdrawn in accordance with the procedures set forth under "Withdrawal of Tenders and Revocation of Consents" at or prior to the Expiration Date, will, upon the terms and subject to the conditions hereof, including those relating to our right to reject tendered Old Notes, be accepted by the Offeror.

**The requisite Consents have been received and the Supplemental Indenture has been executed. If the Proposed Amendments become operative, the Proposed Amendments will be binding on all holders of the Old Notes. Completion of the exchange offers and the adoption of the Proposed Amendments may have adverse consequences with respect to Old Notes that remain outstanding following the completion of the exchange offers. See "Risk Factors" and "Proposed Amendments."**

The Offeror's obligation to accept Old Notes that are validly tendered is subject to, among other things, the satisfaction or waiver of the conditions described under "Conditions of the Exchange Offers and the Consent Solicitation," including the condition that the registration statement relating to the exchange offers, of which this Prospectus forms a part, has been declared effective by the SEC (which condition cannot be waived).

Following the completion, termination or withdrawal of the exchange offers, and subject to applicable law, the Offeror or its affiliates may acquire any Old Notes that are not validly tendered or accepted in the exchange

93

EFIHMW00052038

EFIHMW00051935

**PX 030**
**Page 104 of 734**

**Table of Contents**

offers or any New EFIH Senior Secured Notes issued in the exchange offers through open market purchases, privately negotiated transactions, tender offers, exchange offers, redemption or otherwise, upon such terms and at such prices as the Offeror may determine (or as may be provided for in the indentures governing the Old Notes or the New EFIH Senior Secured Notes), which with respect to the Old Notes may be more or less than the consideration to be received by participating holders in the exchange offers and, in either case, could be for cash or other consideration, including the Total Cash Consideration. There can be no assurance as to which, if any, of these alternatives or combinations thereof the Offeror or its affiliates may choose to pursue.

The exchange offers will expire at midnight, New York City time, on August 12, 2010, unless extended by the Offeror. Holders must have validly tendered and not validly withdrawn their Old Notes at or prior to 5:00 p.m., New York City time, on July 29, 2010, to be eligible to receive the Total Consideration Amount. Consents must have been validly delivered and not validly revoked at or prior to 5:00 p.m., New York City time, on July 29, 2010.

**Consideration**

Upon the terms and subject to the conditions of the exchange offers, including the Maximum Exchange Amount and the prorations, if necessary, resulting therefrom, participating holders of Old Notes will be eligible to receive, in exchange for each $1,000 principal amount of Old Notes validly tendered (and not validly withdrawn), the following:

(i) for Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date and accepted for exchange, a principal amount of New EFIH Senior Secured Notes and cash equal, in the aggregate, to the "Total Consideration Amount" as listed in the table on page ii of this Prospectus under "Total Consideration Amount if Tendered At or Prior to the Early Tender Date," with the amount of New EFIH Senior Secured Notes (the "Total Notes Consideration") and the amount of cash (the "Total Cash Consideration") comprising the Total Consideration Amount depending on the aggregate principal amount of Old Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date, as described below, and

(ii) for Old Notes validly tendered (and not validly withdrawn) after the Early Tender Date and at or prior to the Expiration Date and accepted for exchange, New EFIH Senior Secured Notes, referred to as the "Exchange Consideration" as listed in the table on page ii of this Prospectus under "Exchange Consideration if Tendered After the Early Tender Date and At or Prior to the Expiration Date." No cash consideration will be payable with respect to Old Notes that are validly tendered after the Early Tender Date.

The Offeror was advised by the Exchange Agent that, as of the Early Tender Date, a total of $4,469,868,133 aggregate principal amount of outstanding Old Notes, representing approximately 99.51% of the outstanding Old Notes, were validly tendered (and not validly withdrawn) in the exchange offers. Of the tendered Old Notes, as of the Early Tender Date, $1,776,033,000 aggregate principal amount of the outstanding Old Cash–Pay Notes had been validly tendered and not validly withdrawn and $2,693,835,133 aggregate principal amount of the outstanding Old Toggle Notes had been validly tendered and not validly withdrawn.

Therefore, upon the terms and subject to the conditions of the exchange offers, the Total Consideration Amount payable for each $1,000 principal amount of each issue of Old Notes validly tendered at or prior to the Early Tender Date (and not validly withdrawn prior to the Expiration Date) and accepted for exchange, will consist of:

- in the case of Old Cash–Pay Notes, Total Cash Consideration of $146.46 and Total Notes Consideration of $638.54 principal amount of New EFIH Senior Secured Notes, and

- in the case of Old Toggle Notes, Total Cash Consideration of $134.33 and Total Notes Consideration of $585.67 principal amount of New EFIH Senior Secured Notes.

The Total Cash Consideration and the Total Notes Consideration payable per $1,000 principal amount of Old Notes as set forth above will not be affected by proration. The amount of Total Cash Consideration set forth

94

EFIHMW00052039

EFIHMW00051935

**Table of Contents**

above does not include the cash consent payment separately payable with respect to Consents validly delivered (and not validly revoked) at or prior to the Consent Date or accrued and unpaid interest, if any, payable with respect to the Old Cash-Pay Notes.

The Offeror will not accept any tender of Old Notes that would result in the issuance of less than $2,000 principal amount of New EFIH Senior Secured Notes to a participating holder. The aggregate principal amount of New EFIH Senior Secured Notes issued to each participating holder for all Old Notes validly tendered (and not validly withdrawn) will be rounded down, if necessary, to $2,000 or the nearest whole multiple of $1,000 in excess thereof. This rounded amount will be the principal amount of New EFIH Senior Secured Notes you will receive, and no additional cash will be paid in lieu of any principal amount of New EFIH Senior Secured Notes not received as a result of such rounding down.

**Acceptance; Proration**

Subject to the terms and conditions of the exchange offers, including the Maximum Exchange Amount and the prorations, if necessary, resulting therefrom, if necessary, all Old Notes validly tendered (and not validly withdrawn) in the exchange offers will be accepted in the exchange offers. The maximum principal amount of each issue of Old Notes that will be accepted for exchange is the outstanding principal amount of such issue validly tendered (and not validly withdrawn) as limited by the Maximum Exchange Amount and the resulting prorations, if necessary. The Offeror reserves the right to accept in the exchange offers an additional amount of Old Notes not to exceed two percent of the outstanding Old Notes without extending the Expiration Date, as permitted by Rule 14e-1 under the Exchange Act. In the event that proration of validly tendered (and not validly withdrawn) Old Notes is required, each issue of Old Notes will be treated equally in calculating the proration.

If proration of validly tendered (and not validly withdrawn) Old Notes is required, the Offeror will determine the final proration promptly after the Expiration Date and will announce the results of the final proration by press release. To determine the principal amount accepted of each tender subject to proration, the principal amount of such tender will be multiplied by the proration rate, which will be the same for both issues of Old Notes, and the resultant amount rounded down to the nearest permitted denomination of the Old Notes. The Offeror will not be able to determine the final proration prior to the Expiration Date.

Based on the aggregate principal amount of Old Notes validly tendered (and not validly withdrawn) as of the Early Tender Date, and assuming no tendered Old Notes are validly withdrawn, the amount of Old Notes accepted for exchange will be prorated. Assuming that no additional Old Notes are validly tendered after the Early Tender Date, no Old Notes that were validly tendered at or prior to the Early Tender Date are validly withdrawn prior to the Expiration Date, and the Offeror accepts for exchange the maximum principal amount of Old Notes allowable under the terms and conditions of the exchange offers, the Offeror would accept for exchange in the exchange offers approximately 80.4% of the aggregate principal amount of the Old Cash-Pay Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date and approximately 80.4% of the aggregate principal amount of the Old Toggle Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date.

**Extension, Termination or Amendment**

Subject to the applicable regulations of the SEC, each of the Offeror and EFH Corp. expressly reserves the right, in its sole discretion, at any time and from time to time, and regardless of whether any events preventing satisfaction of the conditions to the exchange offers shall have occurred or shall have been determined by the Offeror to have occurred, to extend the period during which the exchange offers are open by giving oral (to be confirmed in writing) or written notice of such extension to the Exchange Agent and by making public disclosure by press release or other appropriate means of such extension to the extent required by law. During any extension of the exchange offers, all Old Notes previously validly tendered and not validly withdrawn will remain subject

95

EFIHMW00052040

EFIHMW00051935

**PX 030**
**Page 106 of 734**

**Table of Contents**

to the exchange offers, and may, subject to the terms and conditions of the exchange offers, be accepted by the Offeror. See also "—Announcements."

Subject to applicable law, the exchange offers, on one hand, and the consent solicitation, on the other hand, are being made independently of each other, and the Offeror reserves the right to terminate, withdraw or amend the exchange offers independently of the consent solicitation at any time and from time to time, as described in this Prospectus.

Any waiver, amendment or modification of the exchange offers will apply to all Old Notes validly tendered pursuant to the exchange offers. If the Offeror makes a change that it determines to be material to any of the terms of the exchange offers, or waives any condition of the exchange offers that it determines to be material, the Offeror will give oral (to be confirmed in writing) or written notice of such amendment or such waiver to the Exchange Agent and will disseminate additional exchange offer documents and extend the exchange offers and withdrawal rights as it determines necessary and to the extent required by law. Any such extension, amendment, waiver, decrease or change will not result in the reinstatement of any withdrawal rights if those rights had previously expired, except to the extent required by applicable law.

There can be no assurance that the Offeror will exercise its right to extend, terminate or amend the exchange offers. During any extension and irrespective of any amendment to the exchange offers, all Old Notes previously validly tendered and not validly withdrawn will remain subject to the exchange offers, and may be accepted thereafter by the Offeror, subject to compliance with the terms of the exchange offers and applicable law. In addition, the Offeror may waive conditions (other than the condition that the registration statement, of which this Prospectus forms a part, has been declared effective by the SEC (which condition cannot be waived)) without extending the exchange offers in accordance with applicable law. The exchange offers constitute a single offer for both the Old Cash–Pay Notes and the Old Toggle Notes for purposes of Regulation 14E under the Exchange Act. The conditions to the exchange offers will be satisfied or waived with respect to the single offer being made for both issues of Old Notes. Old Notes of both issues will be exchanged in the exchange offers if Old Notes of either issue are exchanged in the exchange offers.

**Announcements**

Any extension, termination or amendment of the exchange offers will be followed as promptly as practicable by announcement thereof, such announcement in the case of an extension to be issued no later than 9:00 a.m., New York City time, on the next business day following the previously scheduled Expiration Date. Without limiting the manner in which the Offeror may choose to make such announcement, the Offeror will not, unless otherwise required by law, have any obligation to publish, advertise or otherwise communicate any such announcement other than by making a release to a U.S. news agency or another means of announcement that the Offeror deems appropriate. See also "—Extension, Termination or Amendment."

**Accounting Treatment**

On a consolidated EFH Corp. basis, we will record the difference between the fair values of the New EFIH Senior Secured Notes plus cash paid and the carrying values related to the Old Notes received in exchange, including the principal amounts and unamortized debt discounts/premiums and deferred issuance costs, as a gain on early extinguishment of debt. The gain will be reported in the consolidated statement of income as other income. Applicable deferred and current income taxes will also be recorded. See "Material U.S. Federal Income Tax Considerations" for further discussion of the effects of income taxes. Deferrable issuance costs related to the New EFIH Senior Secured Notes, as well as any related debt discount/premium, will be amortized to interest expense over the term of the debt.

On an EFIH basis, there will be no gain on the exchange of debt. EFIH will report the principal amount of the New EFIH Senior Secured Notes as long–term debt. Deferrable issuance costs related to the New EFIH

96

EFIHMW00052041

EFIHMW00051935

**PX 030**
**Page 107 of 734**

**Table of Contents**

Senior Secured Notes, as well as any related debt discount/premium, will be amortized to interest expense over the term of the debt. The Old Notes EFIH receives in exchange will be recorded as an representment in affiliate debt at cost, which represents the fair value of the New EFIH Senior Secured Notes exchanged plus cash paid. Because EFIH is a guarantor of the Old Notes, such notes are reported as EFIH debt under push down accounting (at 50% of the principal amount) as described in Note 5 to EFIH's consolidated historical financial statements for the year ended December 31, 2009 included elsewhere in this Prospectus; consequently, amounts related to Old Notes received in exchange will be removed from EFIH's balance sheet at book value with an offsetting amount recorded to equity. For Old Notes acquired that are cancelled or retired by EFH Corp., EFIH will eliminate its investment in such debt with an offsetting amount recorded to equity.

**Certain Matters Relating to Compliance with Securities Laws in Non–U.S. Jurisdictions**

Countries outside the United States may have their own legal requirements that govern securities offerings made to persons resident in those countries and may impose requirements about the form, content and process of offers made to the general public. We have not to date taken any action under such non–U.S. regulations. Non–U.S. holders should consult their advisors in considering whether they may participate in the exchange offers in accordance with the laws of their home countries and, if they do participate, whether there are any restrictions or limitations on transactions in the New EFIH Senior Secured Notes that may apply in their home countries or if the participation would result in a requirement for us to make any deliveries, filings or registrations. We and the Dealer Managers cannot provide any assurance about whether such limitations may exist. The Dealer Managers are only acting as dealer managers and solicitation agents for the exchange offers and consent solicitation in the United States. In addition, in some non–U.S. jurisdictions there may be restrictions on the ability of a holder to transfer New EFIH Senior Secured Notes received in the exchange offers. By signing or being deemed to sign the Consent and Letter of Transmittal, you are representing that if you are located outside the United States, the offer to you and your acceptance of it does not contravene the applicable laws where you are located and that your participation in the exchange offers will not impose on us any requirement to make any deliveries, filings or registrations. If we become aware of any jurisdiction where the making of the exchange offers is not in compliance with applicable law or would require us to make any delivery, filing or registration (without any obligation to make any further or ongoing filings), we will make a good faith effort to comply with the applicable law.

**Interests of Related Parties**

Goldman, Sachs & Co. is acting as a Dealer Manager and is an affiliate of a member of the Sponsor Group. Goldman, Sachs & Co. is being compensated by the Offeror for acting as a Dealer Manager, as described elsewhere in this Prospectus under "Exchange Agent; Information Agent; Dealer Managers and Solicitation Agents."

Each member of the Sponsor Group has advised us that it, and the affiliates that it controls, in the aggregate, own an insignificant amount of Old Notes, and it and/or such affiliates may participate in the exchange offers and consent solicitation. Such participation, if any, will be on the same terms and subject to the same conditions set forth in this Prospectus applicable to other holders of the respective Old Notes held by the Sponsor Group and such affiliates. Old Notes held by the Sponsor Group and such affiliates were not considered outstanding for the purposes of determining whether the holders of the required outstanding principal amount of any issue of Old Notes delivered Consents necessary to adopt the Proposed Amendments.

97

EFIHMW00052042

EFIHMW00051935

**PX 030**
**Page 108 of 734**

Table of Contents

## PROPOSED AMENDMENTS

The Old Notes have been issued pursuant to the Old Notes Indenture. In general, the Proposed Amendments would delete in their entirety substantially all of the restrictive covenants and references thereto contained in the Old Notes Indenture and the Old Notes as well as certain events of default, modify covenants regarding mergers and consolidations, and modify or eliminate certain other provisions, including certain provisions relating to defeasance contained in the Old Notes Indenture and Old Notes which would otherwise prevent a defeasance without, among other things, delivery of an opinion of counsel confirming such defeasance does not constitute a taxable event.

The Proposed Amendments would delete the covenants and certain other provisions listed below and references thereto in their entirety from the Old Notes Indenture, and delete the defined terms and other references related to any such deleted covenants and provisions made irrelevant as a result of the deletion of such covenants and provisions.

- Section 4.05 (Taxes)
- Section 4.06 (Stay, Extension and Usury Laws)
- Section 4.08 (Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries)
- Section 4.09 (Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock)
- Section 4.10 (Asset Sales)
- Section 4.11 (Transactions with Affiliates)
- Section 4.12 (Liens)
- Section 4.13 (Corporate Existence)
- Section 4.14 (Offer to Repurchase upon Change of Control)
- Section 4.15 (Limitation on Guarantees of Indebtedness by Restricted Subsidiaries)
- Section 5.01 (Merger, Consolidation, or Sale of All or Substantially All Assets)—deleting clauses (a)(3), (a)(4), (a)(6), (c)(1)(C), (c)(1)(D) and (c)(2) specifying certain conditions with which EFH Corp. and the guarantors of the Old Notes must comply in order to consolidate or merge with or into or wind up into, or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets
- Section 6.01 (Events of Default)—deleting clauses (a)(3), (a)(4) and (a)(5) relating to covenant breaches and cross-acceleration rights
- Section 8.04 (Conditions to Legal or Covenant Defeasance)—deleting clauses (2), (3), (4), (5), (6), (7) and (8) specifying certain conditions to Legal and Covenant Defeasance

In addition, the Proposed Amendments would delete the provisions set forth in Section 8 of the Old Notes. These provisions consist of an Offer to Repurchase covenant.

The Proposed Amendments would also amend Section 4.03 (Reports and Other Information) of the Old Notes Indenture by deleting the text of that section in its entirety and substituting in lieu thereof the following text: "Notwithstanding that the Issuer may not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act or otherwise report on an annual and quarterly basis on forms provided for such annual and quarterly reporting pursuant to rules and regulations promulgated by the SEC, the Issuer shall comply with the reporting obligations set forth under Section 314(a) of the Trust Indenture Act."

98

EFIHMW00052043

EFIHMW00051935

**Table of Contents**

The Proposed Amendments would also amend Section 4.07 (Limitation on Restricted Payments) of the Old Notes Indenture by deleting the text of that section in its entirety and substituting in lieu thereof the following text: "The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, pay any cash dividend or make any cash distribution on, or in respect of, the Issuer's Capital Stock or purchase for cash or otherwise acquire for cash any Capital Stock of the Issuer or any direct or indirect parent of the Issuer for the purpose of paying any cash dividend or making any cash distribution to, or acquiring Capital Stock of any direct or indirect parent of the Issuer for cash from, the Investors, or guarantee any Indebtedness of any Affiliate of the Issuer for the purpose of paying such dividend, making such distribution or so acquiring such Capital Stock to or from the Investors unless at the time and after giving effect to such payment, the Consolidated Leverage Ratio of the Issuer would be equal to or less than 7.00 to 1.00."

The Proposed Amendments would also add to the Old Notes Indenture the provision, and related definitions, described below.

- Section 101 (Definitions)—adding the following new definitions in the appropriate alphabetical order:

    "**Permitted Asset Transfer**" means (1) the direct or indirect sale, assignment, transfer, conveyance or other disposition (including by way of merger, wind–up or consolidation) or spin–off by dividend of the Equity Interests of Energy Future Intermediate Holding such that Energy Future Intermediate Holding is no longer a Subsidiary of the Issuer (including without limitation a merger of Energy Future Intermediate Holding with and into the Issuer) or (2) the sale, assignment, transfer, conveyance or other disposition (other than by way of merger, wind–up or consolidation) of all of the Equity Interests of, and other Investments in, Oncor Holdings or another Oncor Subsidiary or successor to Oncor Holdings or an Oncor Subsidiary held by Energy Future Intermediate Holding to a Person (other than an Oncor Subsidiary) that shall continue to hold such Equity Interests and other Investments.

    "**TCEH Transfer**" means the sale, transfer, disposition or spin–off (including by way of merger, wind–up or consolidation) of (a) the membership interests or other common Equity Interests of Energy Future Competitive Holdings, TCEH or another Restricted Subsidiary of the Issuer that holds all or substantially all of the assets of TCEH and its Subsidiaries such that EFCH, TCEH or such Restricted Subsidiary ceases to be a Subsidiary of the Issuer or (b) all or substantially all of the assets of TCEH and its Subsidiaries, in each case other than any such transfer to another Restricted Subsidiary.

- Section 5.01 (Merger, Consolidation, or Sale of All or Substantially All Assets)—adding the following new clause (e) to the end of such Section 5.01:

    "It shall be understood that for purposes of the first sentence of Section 5.01(a) and the first sentence of Section 5.01(c) only, (i) a Permitted Asset Transfer shall not constitute the sale, assignment, transfer, lease, conveyance or disposal of all or substantially all of the assets of the Issuer and, accordingly, the Issuer or any of its Subsidiaries may consummate a Permitted Asset Transfer without being subject to the requirements of this Section 5.01 and (ii) a TCEH Transfer shall constitute the sale, assignment, transfer, lease, conveyance or disposal of all or substantially all of the assets of the Issuer and, accordingly, if the Issuer or any of its Subsidiaries consummates a TCEH Transfer, it must comply with the requirements of this Section 5.01."

The Proposed Amendments would also delete definitions in the Old Notes Indenture if all references to such definitions would be eliminated as a result of the foregoing and make certain other changes of a technical or conforming nature to the Old Notes Indenture and the Old Notes.

In addition to the foregoing, execution and delivery of the Consent and Letter of Transmittal will constitute an express waiver by a consenting holder of the Old Notes with respect to all claims against EFH Corp., the guarantors of the Old Notes and the Sponsor Group of any breach, default or event of default that may have arisen under the Old Notes Indenture. As of the date of this Prospectus, EFH Corp. is not aware of any such breaches, defaults or events of default.

99

EFIHMW00052044

EFIHMW00051935

**PX 030
Page 110 of 734**

**Table of Contents**

EFH Corp. has received Consents from holders of a majority of the outstanding aggregate principal amount of the Old Notes, voting together as a single class, which constitutes the requisite Consents to adopt the Proposed Amendments. Old Notes held by members of the Sponsor Group and EFH Corp. and their respective affiliates were not considered outstanding for the purposes of determining whether the holders of the required outstanding principal amount of the Old Notes delivered Consents necessary to adopt the Proposed Amendments. The requisite Consents having been received, EFH Corp., the guarantors of the Old Notes and The Bank of New York Mellon Trust Company, N.A., as trustee under the Old Notes Indenture, have executed and delivered the Supplemental Indenture to effectuate the Proposed Amendments. The Supplemental Indenture will not become operative until immediately prior to the acceptance for exchange of Old Notes upon the terms and subject to the conditions set forth in this Prospectus.

Because the requisite Consents have been received and the Supplemental Indenture has been executed and delivered by the parties thereto, EFH Corp. will pay to each holder that validly delivers and does not validly revoke Consents at or prior to the Consent Date, in addition to any Total Consideration Amount or Exchange Consideration, as applicable, payable to such holder with respect to such holder's Old Notes as to which Consents are validly delivered and not validly revoked, a cash consent payment of $2.50 per $1,000 principal amount of such Old Notes. Given the amount of Old Notes as to which Consents have been validly delivered (and not validly revoked), the aggregate amount of consent payments payable in relation to the consent solicitation is approximately $11,174,670. If all holders of Old Notes had validly delivered (and not validly revoked) Consents at or prior to the Consent Date, the aggregate maximum amount of consent payments payable would have been approximately $11,230,000. EFH Corp.'s obligation to make consent payments is not conditioned upon completion of the exchange offers.

If the exchange offers are terminated, the Proposed Amendments in the executed Supplemental Indenture will not become operative.

100

EFIHMW00052045

EFIHMW00051935

**PX 030**
**Page 111 of 734**

Table of Contents

ACCEPTANCE OF OLD NOTES; ACCRUAL OF INTEREST

**Acceptance of Old Notes**

If the conditions to the exchange offers are satisfied, or, to the extent permitted, waived, and the Offeror otherwise does not terminate or withdraw the exchange offers for any reason, the Offeror will accept for exchange at the Settlement Date, after it receives validly completed and duly executed Consents and Letters of Transmittal or Agent's Messages with respect to any and all of the Old Notes validly tendered (and not validly withdrawn), the Old Notes to be exchanged by notifying the Exchange Agent of the Offeror's acceptance, subject to the terms and conditions set forth in the exchange offers. The notice may be oral if the Offeror promptly confirms such notice in writing.

The Offeror expressly reserves the right, in its sole discretion but subject to applicable law, to delay acceptance for exchange of, or the exchange of, any of the Old Notes validly tendered (and not validly withdrawn) under the exchange offers (subject to Rule 14e−1(c) under the Exchange Act, which requires that the Offeror issues or pays the offered consideration, as applicable, or return the Old Notes deposited pursuant to the exchange offers promptly after termination or withdrawal of the exchange offers), or to terminate the exchange offers and not accept any Old Notes not previously accepted, (1) if any of the conditions to the exchange offers shall not have been satisfied or validly waived by the Offeror, (2) in order to comply in whole or in part with any applicable law or (3) for any other reason. In addition, if not previously accepted for exchange, Old Notes may be withdrawn after the expiration of 40 business days from July 16, 2010.

In all cases, the Total Consideration Amount or Exchange Consideration for Old Notes validly tendered (and not validly withdrawn) pursuant to the exchange offers will be made only after timely receipt by the Exchange Agent of (1) certificates representing the Old Notes, or timely confirmation of a book−entry transfer (a "Book−Entry Confirmation") of the Old Notes into the Exchange Agent's account, (2) the properly completed and duly executed Consent and Letter of Transmittal (or a facsimile thereof) or an Agent's Message in lieu thereof and (3) any other documents required by the Consent and Letter of Transmittal. The exchange offers are scheduled to expire on the Expiration Date, unless extended by the Offeror.

The Offeror will have accepted validly tendered (and not validly withdrawn) Old Notes, if, as and when EFIH gives oral or written notice to the Exchange Agent of the Offeror's acceptance of the Old Notes for exchange pursuant to the exchange offers. In all cases, exchange of Old Notes pursuant to the exchange offers will be made by the deposit of the Total Consideration Amount or Exchange Consideration and any accrued and unpaid interest payable, with the Exchange Agent (or, upon its instruction, DTC), which will act as your agent for the purposes of receiving New EFIH Senior Secured Notes and payments from the Offeror, and delivering New EFIH Senior Secured Notes and transmitting cash payments to you. If, for any reason whatsoever, acceptance for exchange of, or the exchange of, any Old Notes validly tendered (and not validly withdrawn) pursuant to the exchange offers is delayed (whether before or after the Offeror's acceptance of the Old Notes) or the Offeror or EFH Corp., as applicable, extends the exchange offers or is unable to accept the Old Notes tendered pursuant to the exchange offers, then, without prejudice to the Offeror's rights set forth herein, the Offeror may instruct the Exchange Agent to retain tendered Old Notes, and those Old Notes may not be withdrawn, subject to the limited circumstances described in "Withdrawal of Tenders and Revocation of Consents."

If any tendered Old Notes are not accepted for exchange for any reason pursuant to the terms and conditions of the exchange offers, or if certificates are submitted evidencing more Old Notes than those that were validly tendered, certificates evidencing the unexchanged Old Notes will be returned, without expense, to the tendering holder, unless otherwise requested by such holder under "Special Delivery Instructions" in the Consent and Letter of Transmittal (or, in the case of any Old Notes tendered by book−entry transfer into the Exchange Agent's account pursuant to the procedures set forth under "Procedures for Tendering Old Notes and Delivering Consents—Book−Entry Transfer," such Old Notes will be credited to the account from which such Old Notes were delivered), promptly following the Expiration Date or the termination of the exchange offers.

101

EFIHMW00052046

EFIHMW00051935

**PX 030
Page 112 of 734**

**Table of Contents**
**Treatment of Fractions**

Tenders of Old Notes pursuant to the exchange offers will be accepted only in principal amounts equal to permitted denominations for such Old Notes. The Offeror will not accept any tender of Old Notes that would result in the issuance of less than $2,000 principal amount of New EFIH Senior Secured Notes to a participating holder. The aggregate principal amount of New EFIH Senior Secured Notes issued to each participating holder for all Old Notes validly tendered (and not validly withdrawn) will be rounded down, if necessary, to $2,000 or the nearest whole multiple of $1,000 in excess thereof. This rounded amount will be the principal amount of New EFIH Senior Secured Notes you will receive, and no additional cash will be paid in lieu of any principal amount of New EFIH Senior Secured Notes not received as a result of such rounding down.

**Accrued Interest**

All holders whose Old Cash–Pay Notes are accepted for exchange will receive an amount equal to accrued and unpaid interest on such Old Cash–Pay Notes, if any, in cash, from the last applicable interest payment date to, but not including, the Settlement Date. Holders whose Old Toggle Notes are accepted for exchange will not separately receive any accrued and unpaid payment–in–kind interest with respect to such Old Toggle Notes because the amount of such accrued interest through the Settlement Date has been included in determining the consideration being offered in the exchange offers for the Old Toggle Notes. If the Settlement Date occurs later than August 17, 2010, then the consideration being offered in the exchange offers for the Old Toggle Notes will be adjusted to account for the additional interest accrued after such date to, but not including, the Settlement Date.

Under no circumstances will any additional interest be payable because of any delay in the delivery or transmission of New EFIH Senior Secured Notes or funds to any holder of Old Notes as a result in any delay in delivery or transmission by the Exchange Agent, DTC or any holder's nominee.

**Sources of Funds for the Exchange Offers and Consent Solicitation**

The Offeror intends to fund all cash payable to holders pursuant to the exchange offers with cash on hand and with contributions or loans from EFH Corp. EFH Corp. intends to fund all cash consent payments payable pursuant to the consent solicitation with cash on hand. Given the amount of Old Notes as to which Consents have been validly delivered (and not validly revoked), the aggregate amount of consent payments payable in relation to the consent solicitation is approximately $11,174,670. If all holders of Old Notes had validly delivered (and not validly revoked) Consents at or prior to the Consent Date, the aggregate maximum amount of consent payments payable would have been approximately $11,230,000.

**Payment of Transfer Taxes, Fees and Expenses**

The Offeror will pay or cause to be paid all transfer taxes with respect to the valid tender of any Old Notes unless the box titled "Special Issuance Instructions" or the box titled "Special Delivery Instructions" on the Consent and Letter of Transmittal has been completed, as described in the Instructions thereto.

102

EFIHMW00052047

EFIHMW00051935

**PX 030**
**Page 113 of 734**

Table of Contents

### PROCEDURES FOR TENDERING OLD NOTES AND DELIVERING CONSENTS

**General**

In order to participate in the exchange offers and the consent solicitation, you must validly tender (and not validly withdraw) your Old Notes to the Exchange Agent as further described below. It is your responsibility to validly tender your Old Notes. The Offeror has the right to waive any defects. However, the Offeror is not required to waive defects and is not required to notify you of defects in your tender or delivery.

The method of delivery of the Old Notes, the Consent and Letter of Transmittal and all other required documents to the Exchange Agent is at the election and risk of the holder. Holders should use an overnight or hand delivery service, properly insured. In all cases, sufficient time should be allowed to assure delivery to and receipt by the Exchange Agent at or prior to the Expiration Date. Do not send the Consent and Letter of Transmittal or any Old Notes to anyone other than the Exchange Agent.

If you have any questions or need help in tendering your Old Notes, please contact the Information Agent or the Exchange Agent whose addresses and telephone numbers are listed on the back cover of this Prospectus or your broker, dealer, commercial bank, trust company or other nominee through which your Old Notes are held.

The valid tender of Old Notes at or prior to the Consent Date upon the terms and subject to the conditions of the exchange offers and in accordance with the procedures described below was deemed to constitute delivery of a Consent with respect to the Old Notes tendered.

**Valid Tender of Old Notes and Delivery of Consents**

Except as set forth below with respect to ATOP procedures, for a holder to validly tender Old Notes pursuant to the exchange offers and validly deliver Consents pursuant to the consent solicitation, a properly completed and duly executed Consent and Letter of Transmittal (or a facsimile thereof) together with any signature guarantees and any other documents required by the Instructions to the Consent and Letter of Transmittal, or an Agent's Message in lieu thereof, must be received by the Exchange Agent at the address or facsimile number set forth on the back cover of this Prospectus at or prior to the Expiration Date (or the Early Tender Date, if the holder wished to be eligible to receive the Total Consideration Amount, or the Consent Date, if the holder wished to deliver Consents pursuant to the consent solicitation), and either (1) certificates representing the Old Notes must be received by the Exchange Agent at such address, or (2) the Old Notes must be transferred pursuant to the procedures for book–entry transfer described below and a Book–Entry Confirmation must be received by the Exchange Agent, in each case at or prior to the Expiration Date (or the Early Tender Date, if the holder wished to be eligible to receive the Total Consideration Amount, or the Consent Date, if the holder wished to deliver Consents pursuant to the consent solicitation).

In all cases, exchange of Old Notes validly tendered (and not validly withdrawn) pursuant to the exchange offers will be made only after timely receipt by the Exchange Agent of:

- certificates representing such Old Notes or a Book–Entry Confirmation with respect to such Old Notes;

- the Consent and Letter of Transmittal (or a facsimile thereof) properly completed and duly executed, or an Agent's Message in lieu thereof; and

- any required signature guarantees and other documents required by the Consent and Letter of Transmittal.

The Offeror has not provided guaranteed delivery procedures in connection with the exchange offers or under any of the exchange offer documents or other exchange offer materials provided therewith. Holders must timely tender their Old Notes in accordance with the procedures set forth in the exchange offer documents.

103

EFIHMW00052048

EFIHMW00051935

**PX 030**
**Page 114 of 734**

Table of Contents

**Tender of Old Notes Held in Physical Form and Delivery of any Related Consents**

The Offeror does not believe any Old Notes exist in physical form. If you believe you hold Old Notes in physical form, please contact the Exchange Agent regarding procedures for participating in the exchange offers and the consent solicitation. Any Old Notes in physical form must be tendered using a Consent and Letter of Transmittal and such Old Notes must be delivered to the Exchange Agent at its address set forth on the back cover of this Prospectus.

**Tendering and Consenting with Respect to Old Notes Held through a Custodian**

Any holder whose Old Notes are held by a broker, dealer, commercial bank, trust company or other nominee and who wishes to tender Old Notes should contact such custodial entity promptly and instruct such custodial entity to tender the Old Notes on such holder's behalf. **A custodial entity cannot tender Old Notes on behalf of a holder of Old Notes without such holder's instructions.**

**Holders whose Old Notes are held by a custodial entity such as a broker, dealer, commercial bank, trust company or other nominee should be aware that such nominee may have deadlines earlier than the Early Tender Date, the Consent Date and the Expiration Date for such nominees to be advised of the action that you may wish for them to take with respect to your Old Notes and, accordingly, such holders are urged to contact any custodial entity such as a broker, dealer, commercial bank, trust company or other nominee through which they hold their Old Notes as soon as possible in order to learn of the applicable deadlines of such nominees.**

The Offeror will pay brokerage houses and other custodians, nominees and fiduciaries the reasonable out-of-pocket expenses incurred by them in forwarding copies of this Prospectus and related documents to the beneficial owners of the Old Notes. The Offeror will not make any payment to brokers, dealers or others soliciting acceptances of the exchange offers and consent solicitation other than the Dealer Managers, as described herein.

**Book-Entry Transfer**

The Exchange Agent has or will establish an account with respect to the Old Notes at DTC for purposes of the exchange offers and consent solicitation, and any financial institution that is a participant in the DTC system and whose name appears on a security position listing as the record owner of the Old Notes may make book-entry delivery of Old Notes by causing DTC to transfer the Old Notes into the Exchange Agent's account at DTC in accordance with DTC's procedure for transfer. Although delivery of Old Notes may be effected through book-entry transfer into the Exchange Agent's account at DTC, either an Agent's Message or a Consent and Letter of Transmittal (or a facsimile thereof) properly completed and duly executed, along with any required signature guarantees and any other required documents, must be transmitted to and received by the Exchange Agent at one of the addresses set forth on the back cover of this Prospectus at or prior to the Expiration Date (or the Early Tender Date, if the holder wished to be eligible to receive the Total Consideration Amount, or the Consent Date, if the holder wished to deliver Consents pursuant to the consent solicitation).

**Tender of Old Notes and Delivery of Consents through ATOP**

In lieu of physically completing and signing the Consent and Letter of Transmittal and delivering it to the Exchange Agent, DTC participants may electronically transmit their acceptance of the exchange offers and, if applicable, deliver consents pursuant to the consent solicitation through ATOP, for which the transaction will be eligible. In accordance with ATOP procedures, DTC will then verify the acceptance of the exchange offers and the delivery of Consents pursuant to the consent solicitation and send an Agent's Message to the Exchange Agent for its acceptance.

EFIHMW00052049

EFIHMW00051935

**Table of Contents**

An "Agent's Message" is a message transmitted by DTC, received by the Exchange Agent and forming part of the Book–Entry Confirmation, which states that DTC has received an express acknowledgement from you that you have received the exchange offer documents and agree to be bound by the terms of the Consent and Letter of Transmittal, and that the Offeror and EFH Corp. may enforce such agreement against you.

If a holder of Old Notes transmits its acceptance through ATOP, delivery of such tendered Old Notes must be made to the Exchange Agent (either physically or pursuant to the book–entry delivery procedures set forth herein). Unless such holder delivers (either physically or by book–entry delivery) the Old Notes being tendered to the Exchange Agent, the Offeror may, at its option, treat such tender as defective for purposes of delivery of acceptance for exchange, and for the right to receive New EFIH Senior Secured Notes and cash payable. Delivery of documents to DTC (physically or by electronic means) does not constitute delivery to the Exchange Agent. If you desire to tender your Old Notes on the day that the Early Tender Date, the Consent Date or the Expiration Date occurs, you must allow sufficient time for completion of the ATOP procedures during the normal business hours of DTC on such date. The Offeror will have the right, which may be waived, to reject the defective tender of Old Notes as invalid and ineffective.

**Holders whose Old Notes are held by DTC should be aware that DTC may have deadlines earlier than the Early Tender Date, the Consent Date and the Expiration Date for DTC to be advised of the action that you may wish for them to take with respect to your Old Notes and, accordingly, such holders are urged to contact DTC as soon as possible in order to learn of DTC's applicable deadlines.**

**Effect of Consent and Letter of Transmittal**

Subject to and effective upon the acceptance of and the exchange of the Old Notes validly tendered thereby, by executing and delivering a Consent and Letter of Transmittal, a tendering holder, among other things, (1) irrevocably sells, assigns and transfers to or upon the order of the Offeror, all right, title and interest in and to all the Old Notes tendered thereby; and (2) irrevocably appoints the Exchange Agent as its true and lawful agent and attorney–in–fact (with full knowledge that the Exchange Agent also acts as the Offeror's agent with respect to the tendered Old Notes, with full power coupled with an interest) to:

- deliver certificates representing the Old Notes, or transfer ownership of the Old Notes on the account books maintained by DTC, together with all accompanying evidences of transfer and authenticity, to or upon the applicable Offeror's order, as applicable;

- present the Old Notes for transfer on the relevant security register;

- receive all benefits or otherwise exercise all rights of beneficial ownership of the Old Notes (except that the Exchange Agent will have no rights to or control over the Offeror's funds); and

- deliver to EFH Corp. and the trustee the Consent and Letter of Transmittal as evidence of the holders' Consent to the Proposed Amendments with respect to their tendered Old Notes and as certification that validly delivered and not revoked Consents from holders of the requisite aggregate principal amount of Old Notes to adopt the Proposed Amendments, duly executed by holders of such Old Notes, have been received,

all in accordance with the terms and conditions of the exchange offers and the consent solicitation as described in this Prospectus.

The agreement among the Offeror, EFH Corp. and a holder set forth in a Consent and Letter of Transmittal (and any Agent's Message in lieu thereof) will be governed by, and construed in accordance with, the laws of the State of New York.

105

EFIHMW00052050

EFIHMW00051935

Table of Contents

**Signature Guarantees**

Signatures on all Consents and Letters of Transmittal must be guaranteed by a recognized participant in the Securities Transfer Agents Medallion Program, the New York Stock Exchange, Inc. Medallion Signature Program or the Stock Exchange Medallion Program (each, a "Medallion Signature Guarantor"), unless the Old Notes tendered thereby are tendered (i) by a holder of Old Notes (or by a participant in DTC whose name appears on a security position listing as the owner of such Old Notes) who has not completed the box entitled "Special Delivery Instructions" on the Consent and Letter of Transmittal or (ii) for the account of a member firm of a registered national securities exchange, a member of the Financial Industry Regulatory Authority, Inc. ("FINRA") or a commercial bank or trust company having an office or correspondent in the United States. If the Old Notes not accepted for exchange are to be returned to a person other than the registered holder, then the signatures on the Consents and Letters of Transmittal accompanying the tendered Old Notes must be guaranteed by a Medallion Signature Guarantor as described above.

**Determination of Validity**

All questions as to the validity, form, eligibility (including time of receipt) and acceptance of any tendered Old Notes (including the delivery of Consents) pursuant to any of the procedures described above, and the form and validity (including time of receipt of notices of withdrawal) of all documents will be determined, as applicable, by the Offeror and EFH Corp. in their sole discretion, which determination will be final and binding absent a finding to the contrary by a court of competent jurisdiction. The Offeror and EFH Corp., as applicable, reserve the absolute right to reject any or all tenders of any Old Notes and delivery of Consents determined by the Offeror and EFH Corp., as applicable, not to be in proper form, or if the acceptance of or exchange of such Old Notes or validation of such Consents may, in the opinion of the Offeror's counsel, be unlawful or result in a breach of contract. A waiver of any defect or irregularity with respect to the tender of one Old Note shall not constitute a waiver of the same or any other defect or irregularity with respect to the tender of any other Old Note. The Offeror also reserves the right to waive any conditions to the exchange offers that the Offeror is legally permitted to waive, and EFH Corp. reserves the right to waive any conditions to the current consent solicitation that EFH Corp. is legally permitted to waive.

Your tender of Old Notes and delivery of Consents will not be deemed to have been validly made until all defects or irregularities in your tender and delivery have been cured or waived. None of the Offeror and EFH Corp., the Dealer Managers, the Exchange Agent, the Information Agent or any other person or entity is under any duty to give notification of any defects or irregularities in any tender or withdrawal of any Old Notes or Consents, or will incur any liability for failure to give any such notification.

**Compliance with "Short-Tendering" Rule**

It is a violation of Rule 14e-4 under the Exchange Act for a person, directly or indirectly, to tender for exchange Old Notes for such person's own account unless the person so tendering the Old Notes:

- has a net long position equal to or greater than the aggregate principal amount of the Old Notes being tendered for exchange; and

- will cause such Old Notes to be delivered in accordance with the terms of the exchange offers.

Rule 14e-4 provides a similar restriction applicable to the tender or guarantee of a tender on behalf of another person.

**Please send all materials to the Exchange Agent and not to the Offeror, EFH Corp.,
the Dealer Managers or any trustee.**

106

EFIHMW00052051

EFIHMW00051935

**PX 030
Page 117 of 734**