**Table of Contents**

receives any cash in an exchange qualifying as a recapitalization would generally recognize gain, if any, to the extent of the amount of cash received that is treated as additional exchange consideration, including Cash Consent Consideration.

U.S. Holders are encouraged to consult their tax advisors regarding the U.S. federal income tax treatment of any Early Tender Consideration, Cash Consent Consideration or Deemed Consent Consideration.

*Ownership of New EFIH Senior Secured Notes*

*Payments of Stated Interest.* The stated interest payments on the New EFIH Senior Secured Notes will generally be taxed to a U.S. Holder as ordinary income at the time paid or accrued in accordance with such holder's method of accounting for U.S. federal income tax purposes.

*Original Issue Discount.* If the issue price of the New EFIH Senior Secured Notes (as described above under the heading "—Issue Price of New EFIH Senior Secured Notes") is less than their stated principal amount by more than a specified de minimis amount, the New EFIH Senior Secured Notes will be treated as issued with OID in an amount equal to such difference. If the New EFIH Senior Secured Notes are issued with OID, a U.S. Holder must generally include such OID in gross income as it accrues over the term of the New EFIH Senior Secured Notes at a constant yield without regard to its regular method of accounting for U.S. federal income tax purposes and in advance of the receipt of cash payments attributable to that income.

The amount of OID that a U.S. Holder must include in income will generally equal the sum of the "daily portions" of OID with respect to the New EFIH Senior Secured Note for each day during the taxable year or portion of the taxable year in which such New EFIH Senior Secured Note was held ("accrued OID"). The daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID allocable to that accrual period. The "accrual period" for a New EFIH Senior Secured Note may be of any length and may vary in length over the term of the New EFIH Senior Secured Note, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on the first day or the final day of an accrual period. The amount of OID allocable to any accrual period other than the final accrual period is an amount equal to the excess, if any, of (i) the product of the New EFIH Senior Secured Note's adjusted issue price at the beginning of such accrual period and its yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period) over (ii) the aggregate of all stated interest allocable to the accrual period. OID allocable to a final accrual period is the difference between the amount payable at maturity (other than a payment of stated interest) and the adjusted issue price of the New EFIH Senior Secured Note at the beginning of the final accrual period. The "adjusted issue price" of a New EFIH Senior Secured Note at the beginning of any accrual period is equal to its issue price increased by the accrued OID for each prior accrual period (determined without regard to the amortization of any acquisition premium or amortizable bond premium, as discussed below under the subheading "—Acquisition Premium or Amortizable Bond Premium on New EFIH Senior Secured Notes").

If the New EFIH Senior Secured Notes are issued with OID, then a U.S. Holder may elect to treat all interest on a New EFIH Senior Secured Note as OID and calculate the amount includible in gross income under the constant yield method described above. The election is to be made for the taxable year in which the New EFIH Senior Secured Note was acquired, and may not be revoked without the consent of the IRS. U.S. Holders should consult their own tax advisors about this election.

*Certain Additional Payments.* In certain circumstances (see "Description of the Notes—Optional Redemption," and "Description of the Notes—Repurchase at the Option of Holders—Change of Control"), the Offeror may be obligated to pay amounts on the New EFIH Senior Secured Notes that are in excess of stated interest or principal on the New EFIH Senior Secured Notes. The Offeror does not intend to treat the possibility of paying such additional amounts as affecting the determination of the yield to maturity of the New EFIH Senior Secured Notes or giving rise to any additional accrual of OID or recognition of ordinary income upon sale,

219

EFIHMW00052164

EFIHMW00051935

Table of Contents

exchange or retirement of the New EFIH Senior Secured Notes. However, additional income will be recognized if any such additional payment is made. It is possible, however, that the IRS may take a different position, in which case the timing, character, and amount of such income may be different.

*Market Discount.* If the exchange of Old Notes for New EFIH Senior Secured Notes qualifies as a recapitalization, a U.S. Holder may acquire a New EFIH Senior Secured Note at a market discount as described above under "—The Exchange of Old Notes Pursuant to the Exchange Offers—Market Discount." Under the market discount rules, a U.S. Holder will be required to treat any principal payment on, or any gain on the sale, exchange or retirement of, a New EFIH Senior Secured Note as ordinary income to the extent of the market discount that such U.S. Holder has not previously included in income and is treated as having accrued on the New EFIH Senior Secured Note at the time of the payment or disposition.

In addition, a U.S. Holder may be required to defer, until the maturity of the New EFIH Senior Secured Note or its earlier disposition in a taxable transaction, the deduction of all or a portion of the interest expense on any indebtedness attributable to the New EFIH Senior Secured Note. Under certain circumstances, a U.S. Holder may elect, on a note-by-note basis, to deduct the deferred interest expense in a tax year prior to the year of disposition. A U.S. Holder should consult its own tax advisors before making this election.

Any market discount will be considered to accrue ratably during the period from the date of acquisition to the maturity date of the New EFIH Senior Secured Note unless a U.S. Holder elects to accrue on a constant interest method. A U.S. Holder may elect to include market discount in income currently as it accrues, on either a ratable or constant interest method, in which case the rule described above regarding deferral of interest deductions will not apply.

*Acquisition Premium or Amortizable Bond Premium on New EFIH Senior Secured Notes.* If the exchange of Old Notes for New EFIH Senior Secured Notes qualifies as a recapitalization, a U.S. Holder of the New EFIH Senior Secured Notes may have "acquisition premium" to the extent its initial tax basis in the New EFIH Senior Secured Notes is greater than the issue price of the New EFIH Senior Secured Notes and less than or equal to their stated principal amount. Under the acquisition premium rules, the amount of OID that must be included in gross income with respect to the New EFIH Senior Secured Notes for any taxable year will be reduced by the portion of the acquisition premium properly allocable to that year.

If the exchange of Old Notes for New EFIH Senior Secured Notes qualifies as a recapitalization and the initial tax basis in the New EFIH Senior Secured Notes to a U.S. Holder exceeds their stated principal amount, the U.S. Holder will be considered to have acquired the New EFIH Senior Secured Notes with "amortizable bond premium" and will not be required to include any OID in income. A U.S. Holder may generally elect to amortize the premium over the remaining term of the New EFIH Senior Secured Notes on a constant yield method as an offset to stated interest when includible in income under such holder's regular accounting method. If a U.S. Holder does not elect to amortize the premium, that premium will decrease the gain or increase the loss otherwise recognized on disposition of the New EFIH Senior Secured Notes.

*Sale, Exchange or Retirement of New EFIH Senior Secured Notes.* A U.S. Holder will generally recognize taxable gain or loss upon a sale, exchange or retirement of a New EFIH Senior Secured Note (including potentially upon a Permitted Asset Transfer) in an amount equal to the difference between (i) the amount of cash and the fair market value of any property received (less an amount attributable to any accrued and unpaid stated interest, which will be taxed in the manner described above under the subheading "—Payments of Stated Interest") and (ii) such holder's adjusted tax basis in the New EFIH Senior Secured Note. A U.S. Holder's adjusted tax basis in a New EFIH Senior Secured Note will generally be its initial tax basis in the New EFIH Senior Secured Note, increased by any OID or market discount previously included in income, and reduced by any amortized bond premium.

Any gain or loss on the sale, exchange or retirement of a New EFIH Senior Secured Note will likely be capital gain or loss (although if the exchange of Old Notes for New EFIH Senior Secured Notes qualifies as a

Table of Contents
recapitalization, any gain recognized on the sale, exchange, retirement or other taxable disposition of a New EFIH Senior Secured Note by a U.S. Holder will be recharacterized as ordinary income to the extent attributable to market discount accrued during the periods that the U.S. Holder held the Old Notes and the New EFIH Senior Secured Notes, as discussed above under the heading "—Market Discount") and will be long-term capital gain or loss if the U.S. Holder has a holding period of more than one year at the time of the sale, exchange or retirement. Long-term capital gain recognized by non-corporate U.S. Holders is generally eligible for a reduced rate of taxation and the deduction of capital losses is subject to significant limitations.

**Tax Consequences to Non-Participating U.S. Holders**

There are no tax consequences to a U.S. Holder of Old Notes that does not participate in the exchange offers, unless the Proposed Amendments become operative. If the Proposed Amendments become operative, the tax treatment of a U.S. Holder of Old Notes that does not participate in the exchange offers (a "Non-Participating U.S. Holder") will depend upon whether the adoption of such Proposed Amendments constitutes a modification to the Old Notes that would result in a "deemed" exchange of such Old Notes for U.S. federal income tax purposes. Generally, the modification of a debt instrument will be treated as a "deemed" exchange of an "old" debt instrument for a "new" debt instrument if such modification is "significant" within the meaning of the Regulations. Under the Regulations, the modification of a debt instrument is a "significant" modification if, based on all the facts and circumstances and taking into account all modifications of the debt instrument collectively, the legal rights or obligations that are altered and the degree to which they are altered are "economically significant." The Regulations further provide that a modification of a debt instrument that adds, deletes or alters customary accounting or financial covenants is not a significant modification. The Regulations do not, however, define "customary accounting or financial covenants." Whether the adoption of the Proposed Amendments would be considered a significant modification under the foregoing rules is not entirely clear.

If the Proposed Amendments adopted with respect to an issue of Old Notes (a) were treated as mere deletions or alterations of customary accounting or financial covenants or (b) were not so treated, but the legal rights and obligations that are altered by such Proposed Amendments and the degree to which they are altered were not viewed as "economically significant," then there would be no tax consequences to the Non-Participating U.S. Holders of such Old Notes except to the extent the Non-Participating U.S. Holder receives Cash Consent Consideration, as described below.

EFH Corp. intends to take the position that adoption of the Proposed Amendments would not cause a "significant modification" of the Old Notes under the Regulations, and therefore would not result in a deemed exchange of the Old Notes for U.S. federal income tax purposes. It is possible, however, that if the Proposed Amendments become operative with respect to the Old Notes, the IRS could treat the adoption of the Proposed Amendments as a significant modification of such Old Notes, resulting in a deemed exchange of such Old Notes held by a U.S. Holder for "new" Old Notes for U.S. federal income tax purposes. If such a position were taken and sustained, the deemed exchange would be fully taxable unless it qualified as a recapitalization for U.S. federal income tax purposes (for which qualification is not entirely clear). In addition, the Non-Participating U.S. Holder could be treated as acquiring the "new" Old Note with OID, which, regardless of such holder's regular method of tax accounting, would be included in income as it accrued, regardless of when any related cash was actually received, and a Non-Participating U.S. Holder could recognize ordinary interest income to the extent that any portion of the "new" Old Notes is attributable to accrued but unpaid qualified stated interest not previously taken into income. U.S. Holders are encouraged to consult their tax advisors regarding the potential tax consequences of not tendering their Old Notes pursuant to the exchange offers and consent solicitation.

A U.S. Holder of Old Notes that validly delivers and does not validly revoke a Consent with respect to such notes and who does not exchange such notes pursuant to an exchange offer because of the operation of the proration provisions of the exchange offers or because such holder validly tenders Old Notes prior to the Consent Date and withdraws the tender after the Consent Date but prior to the Expiration Date will likely recognize ordinary income in the amount of any Cash Consent Consideration received with respect to such notes as described above under the heading "The Exchange of Old Notes Pursuant to the Exchange Offers—Early Tender and Consent Consideration."

<div align="center">221</div>

EFIHMW00052166

EFIHMW00051935

Table of Contents
**Tax Consequences to Participating Non–U.S. Holders**

*The Exchange of Old Notes Pursuant to the Exchange Offers*

Subject to the discussion below under the subheading "—Early Tender and Consent Consideration," a Non–U.S. Holder generally will not be subject to taxation on any gain that a U.S. Holder would be required to recognize on the exchange of Old Notes for New EFIH Senior Secured Notes as discussed above under "—Tax Consequences to Participating U.S. Holders—The Exchange of Old Notes Pursuant to the Exchange Offers" unless:

- the gain is effectively connected with his, her or its conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non–U.S. Holder maintains), in which case the gain will be subject to tax in the same manner as effectively connected interest income as described below under the heading "—Ownership of New EFIH Senior Secured Notes—Payments of Interest"; or

- such Non–U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of the exchange, and certain other conditions are met, in which case the gain will generally be subject to 30% tax subject to the reduction of such gain by such Non–U.S. Holder's capital losses from U.S. sources.

Any amount received by a Non–U.S. Holder that is attributable to accrued and unpaid interest (including OID) on an Old Note generally will be taxable in the same manner as described below under "—Ownership of New EFIH Senior Secured Notes—Payments of Interest."

*Early Tender and Consent Consideration.* As discussed above under "—Tax Consequences to Participating U.S. Holders—The Exchange of Old Notes Pursuant to the Exchange Offers—Early Tender and Consent Consideration," under current U.S. federal income tax law, there is uncertainty regarding whether the Early Tender Consideration, Cash Consent Consideration or any Deemed Consent Consideration constitutes a separate fee or instead constitutes part of the consideration received for the Old Notes. In the case of a Non–U.S. Holder, EFH Corp. intends to take the position that the Early Tender Consideration is part of the consideration received in exchange for the tendered Old Notes and that there is no Deemed Consent Consideration, and accordingly, EFH Corp. does not intend to withhold U.S. federal income tax from any Early Tender Consideration or Deemed Consent Consideration paid to a Non–U.S. Holder. However, if any Early Tender Consideration or Deemed Consent Consideration were to be treated as separate consideration for early acceptance of the exchange offers or consenting to the Proposed Amendments, then such a payment could result in a U.S. federal income tax liability to certain Non–U.S. Holders.

EFH Corp. intends to take the position that any Cash Consent Consideration payable to a Non–U.S. Holder constitutes a separate fee paid for consenting to the Proposed Amendments. Accordingly, absent further guidance from the IRS, EFH Corp. intends to withhold from any Cash Consent Consideration paid to a Non–U.S. Holder, U.S. federal income tax at a rate of 30% of such payment, unless (i) the Non–U.S. Holder is engaged in the conduct of a trade or business in the U.S. to which the receipt of the Cash Consent Consideration is effectively connected and provides a properly executed IRS Form W–8ECI, or (ii) a U.S. tax treaty either eliminates or reduces such withholding tax with respect to the Cash Consent Consideration paid to the Non–U.S. Holder and the Non–U.S. Holder provides a properly executed IRS Form W–8BEN. If such withholding results in an overpayment of taxes (because, for example, the Cash Consent Consideration may be treated as interest or as additional consideration received in the exchange), a refund or credit may be obtainable, provided that the required information is timely furnished to the IRS. In addition, EFH Corp. will report any Cash Consent Consideration paid under applicable U.S. information reporting rules.

Non–U.S. Holders are encouraged to consult their tax advisors with respect to the treatment of any Early Tender Consideration, Cash Consent Consideration or Deemed Consent Consideration.

222

EFIHMW00052167

EFIHMW00051935

**PX 030**
**Page 233 of 734**

Table of Contents

*Ownership of New EFIH Senior Secured Notes*

*Payments of Interest.* A Non–U.S. Holder will not be subject to tax on any payment of interest (which for purposes of this discussion includes OID) on the New EFIH Senior Secured Notes under the "portfolio interest rule," provided that (i) such interest is not effectively connected with the conduct of a trade or business of the Non–U.S. Holder in the United States (or, if required by an applicable income tax treaty, is not attributable to a U.S. permanent establishment of the Non–U.S. Holder), (ii) the Non–U.S. Holder does not actually or constructively own 10% or more of EFH Corp.'s voting stock within the meaning of the Code and the Regulations, (iii) the Non–U.S. Holder is not a controlled foreign corporation that is related to EFH Corp. actually or constructively through stock ownership, (iv) the Non–U.S. Holder is not a bank receiving interest on a loan agreement entered into in the ordinary course of its trade or business, and (v) the Non–U.S. Holder has provided a validly completed IRS Form W–8BEN (or other applicable form) establishing such Non–U.S. Holder status (or certain documentary evidence requirements for establishing such Non–U.S. Holder status).

If a Non–U.S. Holder cannot satisfy the requirements described above, payments of interest on the New EFIH Senior Secured Notes (including OID) made to such Non–U.S. Holder will be subject to a 30% U.S. federal withholding tax, unless such Non–U.S. Holder provides EFH Corp. (or its paying agent) with a properly executed (i) IRS Form W–8BEN (or other applicable form) claiming an exemption from or reduction in withholding under the benefit of an applicable income tax treaty; or (ii) IRS Form W–8ECI (or other applicable form) certifying that interest paid on the New EFIH Senior Secured Notes is not subject to withholding tax because it is effectively connected with the conduct of a trade or business in the United States.

If a Non–U.S. Holder is engaged in a trade or business in the United States and interest (including OID) on the New EFIH Senior Secured Notes is effectively connected with the conduct of that trade or business (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non–U.S. Holder maintains), then such Non–U.S. Holder will be subject to U.S. federal income tax on that interest (including OID) on a net income basis generally in the same manner as if he, she or it were a U.S. Holder unless an applicable income tax treaty provides otherwise (although the Non–U.S. Holder will be exempt from the 30% U.S. federal withholding tax, provided the certification requirements discussed above are satisfied). In addition, if the Non–U.S. Holder is a corporate Non–U.S. Holder, it may be subject to a branch profits tax equal to 30% (or lower applicable income tax treaty rate) of such interest (including OID), subject to adjustments.

*Sale, Exchange or Retirement of New EFIH Senior Secured Notes.* Any gain realized upon the sale, exchange or retirement of a New EFIH Senior Secured Note generally will not be subject to U.S. federal income tax unless certain exceptions apply, as described above under the heading "—The Exchange of Old Notes Pursuant to the Exchange Offers."

**Tax Consequences to Non–Participating Non–U.S. Holders**

Non–U.S. Holders that do not validly tender their Old Notes pursuant to the exchange offers, generally will not be subject to U.S. federal income tax as a result of the adoption of the Proposed Amendments if, as the Offeror believes, the adoption of the Proposed Amendments would not give rise to a deemed exchange of Old Notes for "new" Old Notes. Moreover, even if there were a deemed exchange, such exchange generally would result in tax only if it were not considered a recapitalization and such Non–U.S. Holders were in one of the two categories described in the heading "—Tax Consequences to Participating Non–U.S. Holders—The Exchange of Old Notes Pursuant to the Exchange Offers."

A Non–U.S. Holder of Old Notes that validly delivers and does not validly revoke a consent with respect to such notes and who does not exchange such notes pursuant to an exchange offer because of the operation of the proration provisions of the exchange offers or because such holder validly tenders Old Notes prior to the Consent Date and withdraws the tender after the Consent Date but prior to the Expiration Date will be subject to a 30% U.S. federal income tax withholding tax with respect to any Cash Consent Consideration received except in the circumstances described in the heading "—Tax Consequences to Participating Non–U.S. Holders—The Exchange of Old Notes Pursuant to the Exchange Offers—Early Tender and Consent Consideration."

223

EFIHMW00052168

EFIHMW00051935

**PX 030
Page 234 of 734**

Table of Contents
**Backup Withholding and Information Reporting**

*U.S. Holders*

In general, information reporting requirements may apply to the exchange of Old Notes for New EFIH Senior Secured Notes and cash, and such requirements will apply to certain payments of interest (and accruals of OID) on, or proceeds from a disposition (including a retirement or redemption) of, New EFIH Senior Secured Notes (unless, in each case, the holder is an exempt recipient such as a corporation).

Backup withholding may apply to the exchange of Old Notes for New EFIH Senior Secured Notes and cash and payments of interest (and accruals of OID) on or proceeds from disposition (including a retirement or redemption) of New EFIH Senior Secured Notes if the holder fails to provide a taxpayer identification number or a certification that he, she or it is not subject to backup withholding. Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against the holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

*Non–U.S. Holders*

Generally, EFH Corp. must report to the IRS and to each Non–U.S. Holder the amount of interest (including OID) paid to such Non–U.S. Holder with respect to the Old Notes or New EFIH Senior Secured Notes, and the amount of tax, if any, withheld with respect to such payments. Copies of the information returns reporting such interest payments and any withholding may also be made available to the tax authorities in the country in which such Non–U.S. Holder resides under the provisions of an applicable income tax treaty.

In general, a Non–U.S. Holder will not be subject to backup withholding with respect to the exchange of Old Notes for New EFIH Senior Secured Notes and cash or interest (including OID) that the Offeror pays to such Non–U.S. Holder on the Old Notes or New EFIH Senior Secured Notes, provided that the Offeror does not have actual knowledge or reason to know that such Non–U.S. Holder is a United States person as defined under the Code, and such Non–U.S. Holder has provided a validly completed IRS Form W–8BEN (or other applicable form) establishing that he, she or it is a Non–U.S. Holder (or such Non–U.S. Holder satisfies certain documentary evidence requirements for establishing that he, she or it is a Non–U.S. Holder).

Information reporting and, depending on the circumstances, backup withholding will apply to the proceeds of a sale or other disposition (including a retirement or redemption) of Old Notes or New EFIH Senior Secured Notes made within the United States or conducted through certain U.S.–related financial intermediaries, unless the Non–U.S. Holder certifies to the payor under penalties of perjury that he, she or it is a Non–U.S. Holder (and the payor does not have actual knowledge or reason to know that such Non–U.S. Holder is a United States person as defined under the Code), or he, she or it otherwise establishes an exemption.

Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against the Non–U.S. Holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

**Tax Consequences to EFH Corp.**

*Cancellation of Indebtedness Income*

To the extent that the issue price of the New EFIH Senior Secured Notes plus Total Cash Consideration paid in the exchanges is less than the adjusted issue price of the Old Notes exchanged, the consolidated group of which EFH Corp. is the common parent will realize cancellation of indebtedness income for U.S. federal income tax purposes ("COD income"). For transactions occurring before 2009, COD income was generally required to be included in gross income in the year of the transaction for U.S. federal income tax purposes. Under the American Recovery and Reinvestment Act of 2009 (the "2009 Law"), EFH Corp. may make an election to defer the recognition of COD income incurred as a result of the exchange offers until the fourth taxable year following

224

EFIHMW00052169

EFIHMW00051935

**Table of Contents**

the closing of the exchange offers. The COD income will then be recognized ratably over the ensuing five taxable years. At the time of recognition, COD income may be offset in whole or in part by net operating losses ("NOL") and other tax attributes available at such time, although there is no assurance that EFH Corp. will have such attributes at such time. However, even if a corporation might be able to offset all of its taxable income, including COD income, for regular tax purposes by available NOL carryovers, only 90% of a corporation's taxable income for alternative minimum tax ("AMT") purposes may be offset by available NOL carryovers or carrybacks, and therefore the corporation may incur an AMT liability with respect to COD income at the time of the deferred recognition. Pursuant to the 2009 Law, if a corporation elects to defer the recognition of COD income and is subsequently liquidated or sells substantially all of its assets, or similarly undergoes a cessation of business, then any deferred income will be accelerated into the taxable year in which such event occurs.

*Deferral of Deduction for OID*

A corporation is generally allowed to take a deduction for OID as it accrues. However, if EFH Corp. elects to postpone the recognition of COD income, EFH Corp. will be required to defer any deduction for OID that would otherwise accrue before the fourth taxable year following the exchange. In the fourth taxable year following the exchange, deductions for the aggregate amount of the deferred OID will be allowed to be taken ratably over the ensuing period of five taxable years. If the amount of OID that would normally accrue during the deferral period exceeds the amount of deferred COD income, deductions would be allowed for any such excess amount at the time such OID normally would accrue.

225

EFIHMW00052170

EFIHMW00051935

**PX 030**
**Page 236 of 734**

Table of Contents

CERTAIN ERISA CONSIDERATIONS

This disclosure was written in connection with the promotion and marketing of the New EFIH Senior Secured Notes by the Offeror and the Dealer Managers, and it cannot be used by any holder for the purpose of avoiding penalties that may be asserted against the holder under the Code. Prospective purchasers of the New EFIH Senior Secured Notes should consult their own tax advisors with respect to the application of the U.S. federal income tax laws to their particular situations.

The following is a summary of certain considerations associated with the exchange of the Old Notes resulting in the acquisition or holding of the New EFIH Senior Secured Notes by employee benefit plans that are subject to Title I of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), individual retirement accounts and other plans and arrangements that are subject to Section 4975 of the Code or provisions under any federal, state, local, non–U.S. or other laws or regulations that are similar to such provisions of ERISA or the Code (collectively, "Similar Laws"), and entities whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each, a "Plan").

This summary is based on the provisions of ERISA and the Code (and related regulations and administrative and judicial interpretations) as of the date of this Prospectus. This summary does not purport to be complete and future legislation, court decisions, administrative regulations, rulings or administrative pronouncements could significantly modify the requirements summarized below. Any of these changes may be retroactive and may thereby apply to transactions entered into prior to the date of their enactment or release.

**General Fiduciary Matters**

ERISA imposes certain duties on persons who are fiduciaries of a Plan subject to Title I of ERISA or of a Plan subject to Section 4975 of the Code (each a "Benefit Plan") and both ERISA and the Code prohibit certain transactions involving the assets of a Plan and its fiduciaries or other interested parties.

In considering the exchange of the Old Notes resulting in the acquisition of New EFIH Senior Secured Notes with a portion of the assets of any Plan, a fiduciary should determine whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA, the Code or any Similar Law. In addition, a fiduciary of a Plan should determine if the exchange offers satisfy the fiduciary's duties to the Plan including, without limitation, the prudence, diversification, and prohibited transaction provisions of ERISA, the Code and any other applicable Similar Laws.

**Prohibited Transaction Issues**

Section 406 of ERISA and Section 4975 of the Code prohibit Benefit Plans from engaging in specified transactions involving plan assets with persons or entities who are "parties in interest," within the meaning of ERISA, or "disqualified persons," within the meaning of Section 4975 of the Code, unless an exemption is available. A party in interest or disqualified person who engaged in a non–exempt prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code. In addition, the fiduciary of such a Benefit Plan that engaged in such a non–exempt prohibited transaction may be subject to penalties and liabilities under ERISA and the Code.

The exchange of Old Notes and the acquisition and/or holding of New EFIH Senior Secured Notes by a Benefit Plan with respect to which the Offeror, EFH Corp., TCEH, the Sponsor Group, the Dealer Managers, the Information Agent, the Exchange Agent or a guarantor of the Old Notes or any of their affiliates is considered a party in interest or a disqualified person may constitute or result in a direct or indirect prohibited transaction under Section 406 of ERISA and/or Section 4975 of the Code, unless the investment is acquired and is held in accordance with an applicable statutory, class or individual prohibited transaction exemption. In this regard, the U.S. Department of Labor has issued prohibited transaction class exemptions ("PTCEs") that may apply to the exchange of the Old Notes and the acquisition and/or holding of New EFIH Senior Secured Notes. These class

226

EFIHMW00052171

EFIHMW00051935

**PX 030**
**Page 237 of 734**

Table of Contents
exemptions include, without limitation, PTCE 84–14 respecting transactions determined by independent qualified professional asset managers, PTCE 90–1 respecting insurance company pooled separate accounts, PTCE 91–38 respecting bank collective investment funds, PTCE 95–60 respecting life insurance company general accounts and PTCE 96–23 respecting transactions determined by in-house asset managers.

Plans that previously acquired or held Old Notes in reliance on PTCE 84–14 should note that the exchange offers may constitute a renewal under Part V(i) of PTCE 84–14 and any such Plan should consult its counsel to evaluate whether PTCE 84–14 remains applicable.

Each of these PTCEs contains conditions and limitations on its application. Fiduciaries of Plans that consider exchanging Old Notes and acquiring and/or holding New EFIH Senior Secured Notes in reliance on any of these or any other PTCEs should carefully review the PTCE to assure it is applicable. There can be no assurance that all of the conditions of any such exemptions will be satisfied.

Because of the foregoing, the New EFIH Senior Secured Notes should not be acquired or held by any person investing "plan assets" of any Plan, unless such acquisition and holding are entitled to exemptive relief from the prohibited transaction provisions of ERISA and the Code and are otherwise permissible under all applicable Similar Laws.

**Representation**

Accordingly, by acceptance of a New EFIH Senior Secured Note, each purchaser, holder and subsequent transferee will be deemed to have represented and warranted that either (i) no portion of the assets used to acquire or hold the New EFIH Senior Secured Notes constitutes assets of any Plan or (ii) the acquisition and holding of the New EFIH Senior Secured Notes (including the exchange of Old Notes for New EFIH Senior Secured Notes) are entitled to exemptive relief from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code and are otherwise permissible under all applicable Similar Laws.

The foregoing discussion is general in nature and is not intended to be all inclusive. Due to the complexity of these rules and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is particularly important that fiduciaries, or other persons considering acquiring the New EFIH Senior Secured Notes (or exchanging Old Notes for New EFIH Senior Secured Notes) on behalf of, or with the assets of, any Plan, consult with their counsel regarding the potential applicability of ERISA, Section 4975 of the Code and any Similar Laws to such investment and whether an exemption would be applicable to the purchase and holding of the New EFIH Senior Secured Notes.

## LEGAL MATTERS

Certain legal matters with respect to the New EFIH Senior Secured Notes offered in the exchange offers will be passed upon for the Offeror by Vinson & Elkins L.L.P., Dallas, Texas, and Simpson Thacher & Bartlett LLP, New York, New York, and NRC regulatory matters will be passed upon for the Offeror by Morgan, Lewis & Bockius LLP. Certain legal matters with respect to the New EFIH Senior Secured Notes offered in the exchange offers will be passed upon for the Dealer Managers by Shearman & Sterling LLP, New York, New York. An investment vehicle comprised of several partners of Simpson Thacher & Bartlett LLP, members of their families, related persons and others own interests representing less than 1% of the capital commitments of the KKR Millennium Fund, L.P. and KKR 2006 Fund, L.P.

227

EFIHMW00052172

EFIHMW00051935

**PX 030**
**Page 238 of 734**

Table of Contents

<div align="center">EXPERTS</div>

The financial statements as of December 31, 2009 and 2008 (successor), and for the years ended December 31, 2009 and 2008 (successor), the period from October 11, 2007 through December 31, 2007 (successor) and the period from January 1, 2007 through October 10, 2007 (predecessor) of EFH Corp. included in this Prospectus have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report appearing herein (which report expresses an unqualified opinion and includes an explanatory paragraph related to EFH Corp. completing its merger with Texas Energy Future Merger Sub Corp and becoming a subsidiary of Texas Energy Future Holdings Limited Partnership on October 10, 2007). The financial statements as of December 31, 2009 and 2008 (successor balance sheets), and for the years ended December 31, 2009 and 2008 (successor operations) and the period from October 11, 2007 through December 31, 2007 (successor operations) of EFIH and the financial statements for the period from January 1, 2007 through October 10, 2007 (predecessor operations) of Oncor (as EFIH's predecessor) included in this Prospectus, have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report appearing herein (which report expresses an unqualified opinion and includes explanatory paragraphs referring to EFIH's adoption of amended consolidation accounting standards related to variable interest entities effective January 1, 2010, on a retrospective basis, and EFIH as a wholly–owned subsidiary of EFH Corp., which was merged into Texas Energy Future Merger Sub Corp on October 10, 2007). The financial statements as of December 31, 2009 and 2008 (successor balance sheets), and for the years ended December 31, 2009 and 2008 (successor operations), the period from October 11, 2007 through December 31, 2007 (successor operations) of Oncor Holdings and the financial statements for the period from January 1, 2007 through October 10, 2007 (predecessor operations) of Oncor (as Oncor Holdings' predecessor) included in this Prospectus, have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report appearing herein (which report expresses an unqualified opinion and includes an explanatory paragraph referring to Oncor Holdings as a wholly–owned subsidiary of EFH Corp., which was merged with Texas Energy Future Merger Sub Corp on October 10, 2007). Such financial statements have been so included in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

<div align="center">228</div>

EFIHMW00052173

EFIHMW00051935

Table of Contents

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Page |
|---|---|
| **Audited Consolidated Financial Statements of Energy Future Holdings Corp.** | |
| Glossary | F–3 |
| Report of Independent Public Registered Accounting Firm | F–8 |
| Statements of Consolidated Income (Loss) for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor) and the period from January 1, 2007 through October 10, 2007 (Predecessor) | F–9 |
| Statements of Consolidated Comprehensive Income (Loss) for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) | F–10 |
| Statements of Consolidated Cash Flows for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) | F–11 |
| Consolidated Balance Sheets as of December 31, 2009 (Successor) and December 31, 2008 (Successor) | F–14 |
| Statements of Consolidated Equity for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) | F–15 |
| Notes to Consolidated Financial Statements | F–16 |
| **Unaudited Condensed Consolidated Financial Statements of Energy Future Holdings Corp.** | |
| Glossary | F–109 |
| Condensed Statements of Consolidated Income for the three and six months ended June 30, 2010 and 2009 | F–113 |
| Condensed Statements of Consolidated Comprehensive Income for the three and six months ended June 30, 2010 and 2009 | F–114 |
| Condensed Statements of Consolidated Cash Flows for the six months ended June 30, 2010 and 2009 | F–115 |
| Condensed Consolidated Balance Sheets as of June 30, 2010 and December 31, 2009 | F–116 |
| Notes to Condensed Consolidated Financial Statements | F–117 |
| **Audited Consolidated Financial Statements of Energy Future Intermediate Holding Company LLC (Successor) and Oncor Electric Delivery Company LLC (Predecessor)** | |
| Glossary | F–166 |
| Report of Independent Registered Public Accounting Firm | F–169 |
| Statements of Consolidated Income (Loss) for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) | F–170 |
| Statements of Consolidated Comprehensive Income (Loss) for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) | F–171 |
| Statements of Consolidated Cash Flows for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) | F–172 |

F–1

**Table of Contents**

| | Page |
|---|---|
| Consolidated Balance Sheets as of December 31, 2009 (Successor) and December 31, 2008 (Successor) | F–173 |
| Statements of Consolidated Membership Interests for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor) and the period from January 1, 2007 through October 10, 2007 (Predecessor) | F–174 |
| Notes to Consolidated Financial Statements | F–175 |
| **Unaudited Condensed Consolidated Financial Statements of Energy Future Intermediate Holding Company LLC** | |
| Glossary | F–192 |
| Condensed Statements of Consolidated Income for the three and six months ended June 30, 2010 and 2009 | F–195 |
| Condensed Statements of Consolidated Cash Flows for the six months ended June 30, 2010 and 2009 | F–196 |
| Condensed Consolidated Balance Sheets as of June 30, 2010 and December 31, 2009 | F–197 |
| Notes to Condensed Consolidated Financial Statements | F–198 |
| **Audited Consolidated Financial Statements of Oncor Electric Delivery Holdings Company LLC (Successor) and Oncor Electric Delivery Company LLC (Predecessor)** | |
| Glossary | F–211 |
| Report of Independent Registered Public Accounting Firm | F–214 |
| Statements of Consolidated Income (Loss) for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) | F–215 |
| Statements of Consolidated Comprehensive Income (Loss) for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) | F–216 |
| Statements of Consolidated Cash Flows for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) | F–217 |
| Consolidated Balance Sheets as of December 31, 2009 and 2008 (Successor) | F–218 |
| Statements of Consolidated Membership Interests for the years ended December 31, 2009 and 2008 (Successor) and the period from October 11, 2007 through December 31, 2007 (Successor) | F–219 |
| Statements of Consolidated Equity for the period from January 1, 2007 through October 10, 2007 (Predecessor) | F–220 |
| Notes to Consolidated Financial Statements | F–221 |
| **Unaudited Condensed Consolidated Financial Statements of Oncor Electric Delivery Holdings Company LLC** | |
| Glossary | F–255 |
| Condensed Statements of Consolidated Income for the three and six months ended June 30, 2010 and 2009 | F–257 |
| Condensed Statements of Consolidated Cash Flows for the six months ended June 30, 2010 and 2009 | F–258 |
| Condensed Consolidated Balance Sheets as of June 30, 2010 and December 31, 2009 | F–259 |
| Notes to Condensed Consolidated Financial Statements | F–260 |

F–2

EFIHMW00052175

EFIHMW00051935

Table of Contents

GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

| | |
|---|---|
| **1999 Restructuring Legislation** | Texas Electric Choice Plan, the legislation that restructured the electric utility industry in Texas to provide for retail competition |
| **2008 Form 10–K** | EFH Corp.'s Annual Report on Form 10–K for the year ended December 31, 2008 as recast in a Current Report on Form 8–K filed on May 20, 2009 to reflect the adoption of new accounting and disclosure guidance related to noncontrolling interests |
| **Adjusted EBITDA** | Adjusted EBITDA means EBITDA adjusted to exclude non–cash items, unusual items and other adjustments allowable under certain of our debt arrangements. See the definition of EBITDA below. Adjusted EBITDA and EBITDA are not recognized terms under GAAP and, thus, are non–GAAP financial measures. We are providing Adjusted EBITDA elsewhere herein (see reconciliation in Annex B) solely because of the important role that Adjusted EBITDA plays in respect of certain covenants contained in our debt arrangements. We do not intend for Adjusted EBITDA (or EBITDA) to be an alternative to net income as a measure of operating performance or an alternative to cash flows from operating activities as a measure of liquidity or an alternative to any other measure of financial performance presented in accordance with GAAP. Additionally, we do not intend for Adjusted EBITDA (or EBITDA) to be used as a measure of free cash flow available for management's discretionary use, as the measure excludes certain cash requirements such as interest payments, tax payments and other debt service requirements. Because not all companies use identical calculations, our presentation of Adjusted EBITDA (and EBITDA) may not be comparable to similarly titled measures of other companies. |
| **Ancillary services** | Refers to services necessary to support the transmission of energy and maintain reliable operations for the entire transmission system. |
| **CAIR** | Clean Air Interstate Rule |
| **Capgemini** | Capgemini Energy LP, a provider of business support services to EFH Corp. and its subsidiaries |
| **$CO_2$** | carbon dioxide |
| **Competitive Electric segment** | Refers to the EFH Corp. business segment that consists principally of TCEH. |
| **CREZ** | Competitive Renewable Energy Zone |
| **DOE** | US Department of Energy |
| **EBITDA** | Refers to earnings (net income) before interest expense, income taxes, depreciation and amortization. See the definition of Adjusted EBITDA above. |

F–3

EFIHMW00052176

EFIHMW00051935

**Table of Contents**

| | |
|---|---|
| **EFC Holdings** | Refers to Energy Future Competitive Holdings Company, a direct subsidiary of EFH Corp. and the direct parent of TCEH. |
| **EFH Corp.** | Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context. Its major subsidiaries include TCEH and Oncor. |
| **EFH Corp. Senior Notes** | Refers collectively to EFH Corp.'s 10.875% Senior Notes due November 1, 2017 (EFH Corp. 10.875% Notes) and EFH Corp.'s 11.25%/12.00% Senior Toggle Notes due November 1, 2017 (EFH Corp. Toggle Notes). |
| **EFH Corp. 9.75% Notes** | Refers to EFH Corp.'s 9.75% Senior Secured Notes due October 15, 2019. |
| **EFIH Finance** | Refers to EFIH Finance Inc., a direct, wholly-owned subsidiary of Intermediate Holding, formed for the sole purpose of serving as co-issuer with Intermediate Holding of certain debt securities. |
| **EFIH 9.75% Notes** | Refers to Intermediate Holding's and EFIH Finance's 9.75% Senior Secured Notes due October 15, 2019. |
| **EPA** | US Environmental Protection Agency |
| **EPC** | engineering, procurement and construction |
| **ERCOT** | Electric Reliability Council of Texas, the independent system operator and the regional coordinator of various electricity systems within Texas |
| **ERISA** | Employee Retirement Income Security Act of 1974, as amended |
| **FASB** | Financial Accounting Standards Board, the designated organization in the private sector for establishing standards for financial accounting and reporting |
| **FERC** | US Federal Energy Regulatory Commission |
| **Fitch** | Fitch Ratings, Ltd. (a credit rating agency) |
| **GAAP** | generally accepted accounting principles |
| **GHG** | greenhouse gas |
| **GWh** | gigawatt-hours |
| **Intermediate Holding** | Refers to Energy Future Intermediate Holding Company LLC, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings. |
| **IRS** | US Internal Revenue Service |
| **kV** | kilovolts |

F-4

EFIHMW00052177

EFIHMW00051935

**PX 030**
**Page 243 of 734**

**Table of Contents**

| | |
|---|---|
| **kWh** | kilowatt–hours |
| **LIBOR** | London Interbank Offered Rate. An interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market. |
| **Luminant** | Refers to subsidiaries of TCEH engaged in competitive market activities consisting of electricity generation and wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas. |
| **Market heat rate** | Heat rate is a measure of the efficiency of converting a fuel source to electricity. Market heat rate is the implied relationship between wholesale electricity prices and natural gas prices and is calculated by dividing the wholesale market price of electricity, which is based on the price offer of the marginal supplier in ERCOT (generally natural gas plants), by the market price of natural gas. Forward wholesale electricity market price quotes in ERCOT are generally limited to two or three years; accordingly, forward market heat rates are generally limited to the same time period. Forecasted market heat rates for time periods for which market price quotes are not available are based on fundamental economic factors and forecasts, including electricity supply, demand growth, capital costs associated with new construction of generation supply, transmission development and other factors. |
| **Merger** | The transaction referred to in "Merger Agreement" (defined immediately below) that was completed on October 10, 2007. |
| **Merger Agreement** | Agreement and Plan of Merger, dated February 25, 2007, under which Texas Holdings agreed to acquire EFH Corp. |
| **Merger Sub** | Texas Energy Future Merger Sub Corp, a Texas corporation and a wholly–owned subsidiary of Texas Holdings that was merged into EFH Corp. on October 10, 2007 |
| **MMBtu** | million British thermal units |
| **Moody's** | Moody's Investors Services, Inc. (a credit rating agency) |
| **MW** | megawatts |
| **MWh** | megawatt–hours |
| **NERC** | North American Electric Reliability Corporation |
| **NOₓ** | nitrogen oxide |
| **NRC** | US Nuclear Regulatory Commission |

F–5

EFIHMW00052178

EFIHMW00051935

**PX 030**
**Page 244 of 734**

Table of Contents

| | |
|---|---|
| **Oncor** | Refers to Oncor Electric Delivery Company LLC, a direct majority–owned subsidiary of Oncor Holdings and an indirect subsidiary of EFH Corp., and/or its consolidated bankruptcy–remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC, depending on context, that is engaged in regulated electricity transmission and distribution activities. |
| **Oncor Holdings** | Refers to Oncor Electric Delivery Holdings Company LLC, a direct wholly–owned subsidiary of Intermediate Holding and the direct majority owner of Oncor, that is consolidated as a variable interest entity under consolidations accounting standards. |
| **Oncor Ring–Fenced Entities** | Refers to Oncor Holdings and its direct and indirect subsidiaries, including Oncor. |
| **OPEB** | other postretirement employee benefits |
| **PUCT** | Public Utility Commission of Texas |
| **PURA** | Texas Public Utility Regulatory Act |
| **Purchase accounting** | The purchase method of accounting for a business combination as prescribed by GAAP, whereby the cost or "purchase price" of a business combination, including the amount paid for the equity and direct transaction costs are allocated to identifiable assets and liabilities (including intangible assets) based upon their fair values. The excess of the purchase price over the fair values of assets and liabilities is recorded as goodwill. |
| **Regulated Delivery segment** | Refers to the EFH Corp. business segment, which consists of the operations of Oncor. |
| **REP** | retail electric provider |
| **RRC** | Railroad Commission of Texas, which among other things, has oversight of lignite mining activity in Texas |
| **S&P** | Standard & Poor's Ratings Services, a division of the McGraw–Hill Companies Inc. (a credit rating agency) |
| **SARs** | Stock Appreciation Rights |
| **SARs Plan** | Refers to the Oncor Electric Delivery Company Stock Appreciation Rights Plan |
| **SEC** | US Securities and Exchange Commission |
| **Securities Act** | Securities Act of 1933, as amended |
| **SG&A** | selling, general and administrative |
| **SO$_2$** | sulfur dioxide |

F–6

EFIHMW00052179

EFIHMW00051935

**PX 030**
**Page 245 of 734**

**Table of Contents**

| | |
|---|---|
| Sponsor Group | Collectively, the investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P. (KKR), TPG Capital, L.P. and GS Capital Partners, an affiliate of Goldman Sachs & Co. (See Texas Holdings below.) |
| TCEH | Refers to Texas Competitive Electric Holdings Company LLC, a direct, wholly-owned subsidiary of EFC Holdings and an indirect subsidiary of EFH Corp., and/or its subsidiaries, depending on context, that are engaged in electricity generation and wholesale and retail energy markets activities. Its major subsidiaries include Luminant and TXU Energy. |
| TCEH Finance | Refers to TCEH Finance, Inc., a direct, wholly-owned subsidiary of TCEH, formed for the sole purpose of serving as co-issuer with TCEH of certain debt securities. |
| TCEH Senior Notes | Refers collectively to TCEH's 10.25% Senior Notes due November 1, 2015 and 10.25% Senior Notes Series B due November 1, 2015 (collectively, TCEH 10.25% Notes) and TCEH's 10.50%/11.25% Senior Toggle Notes due November 1, 2016 (TCEH Toggle Notes). |
| TCEH Senior Secured Facilities | Refers collectively to the TCEH Initial Term Loan Facility, TCEH Delayed Draw Term Loan Facility, TCEH Revolving Credit Facility, TCEH Letter of Credit Facility and TCEH Commodity Collateral Posting Facility. See Note 12 to the Financial Statements for details of these facilities. |
| TCEQ | Texas Commission on Environmental Quality |
| Texas Holdings | Refers to Texas Energy Future Holdings Limited Partnership, a limited partnership controlled by the Sponsor Group that owns substantially all of the common stock of EFH Corp. |
| Texas Holdings Group | Refers to Texas Holdings and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities. |
| Texas Transmission | Refers to Texas Transmission Investment LLC, a limited liability company that owns a 19.75% equity interest in Oncor. Texas Transmission is not affiliated with EFH Corp., any of its subsidiaries or any member of the Sponsor Group. |
| TXU Energy | Refers to TXU Energy Retail Company LLC, a direct, wholly-owned subsidiary of TCEH engaged in the retail sale of electricity to residential and business customers. TXU Energy is a REP in competitive areas of ERCOT. |
| TXU Europe | TXU Europe Limited, a subsidiary of EFH Corp. that is in administration (similar to bankruptcy) in the United Kingdom |
| TXU Fuel | TXU Fuel Company, a former subsidiary of TCEH |
| TXU Gas | TXU Gas Company, a former subsidiary of EFH Corp. |
| US | United States of America |

F-7

EFIHMW00052180

EFIHMW00051935

PX 030
Page 246 of 734

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Shareholders of Energy Future Holdings Corp.
Dallas, Texas

We have audited the accompanying consolidated balance sheets of Energy Future Holdings Corp. and subsidiaries ("EFH Corp.") as of December 31, 2009 and 2008 (successor), and the related statements of consolidated income (loss), comprehensive income (loss), cash flows and equity for the years ended December 31, 2009 and 2008 (successor), the period from October 11, 2007 through December 31, 2007 (successor) and the period from January 1, 2007 through October 10, 2007 (predecessor). These financial statements are the responsibility of EFH Corp.'s management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Energy Future Holdings Corp. and subsidiaries as of December 31, 2009 and 2008 (successor), and the results of their operations and their cash flows for the years ended December 31, 2009 and 2008 (successor), the period from October 11, 2007 through December 31, 2007 (successor) and the period from January 1, 2007 through October 10, 2007 (predecessor), in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1 to the consolidated financial statements, EFH Corp. completed its merger with Texas Energy Future Merger Sub Corp and became a subsidiary of Texas Energy Future Holdings Limited Partnership on October 10, 2007.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), EFH Corp.'s internal control over financial reporting as of December 31, 2009, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 18, 2010 expressed an unqualified opinion on EFH Corp.'s internal control over financial reporting (not represented herein).

/s/ Deloitte & Touche LLP

Dallas, Texas
February 18, 2010

F–8

EFIHMW00052181

EFIHMW00051935

Table of Contents

ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES
STATEMENTS OF CONSOLIDATED INCOME (LOSS)
(Millions of Dollars)

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Operating revenues | $ 9,546 | $ 11,364 | $ 1,994 | $ 8,044 |
| Fuel, purchased power costs and delivery fees | (2,878) | (4,595) | (644) | (2,381) |
| Net gain (loss) from commodity hedging and trading activities | 1,736 | 2,184 | (1,492) | (554) |
| Operating costs | (1,598) | (1,503) | (306) | (1,107) |
| Depreciation and amortization | (1,754) | (1,610) | (415) | (634) |
| Selling, general and administrative expenses | (1,068) | (957) | (216) | (691) |
| Franchise and revenue–based taxes | (359) | (363) | (93) | (282) |
| Impairment of goodwill (Note 3) | (90) | (8,860) | | |
| Other income (Note 10) | 204 | 80 | 14 | 69 |
| Other deductions (Note 10) | (97) | (1,301) | (61) | (841) |
| Interest income | 45 | 27 | 24 | 56 |
| Interest expense and related charges (Note 25) | (2,912) | (4,935) | (839) | (671) |
| Income (loss) from continuing operations before income taxes | 775 | (10,469) | (2,034) | 1,008 |
| Income tax (expense) benefit | (367) | 471 | 673 | (309) |
| Income (loss) from continuing operations | 408 | (9,998) | (1,361) | 699 |
| Income from discontinued operations, net of tax effect (Note 1) | — | — | 1 | 24 |
| Net income (loss) | 408 | (9,998) | (1,360) | 723 |
| Net (income) loss attributable to noncontrolling interests | (64) | 160 | — | — |
| Net income (loss) attributable to EFH Corp. | $ 344 | $ (9,838) | $ (1,360) | $ 723 |

See Notes to Financial Statements.

F–9

EFIHMW00052182

EFIHMW00051935

Table of Contents

ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES
STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME (LOSS)
(Millions of Dollars)

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Net income (loss) | $ 408 | $ (9,998) | $ (1,360) | $ 723 |
| Other comprehensive income (loss), net of tax effects: | | | | |
| Reclassification of pension and other retirement benefit costs (net of tax (expense) benefit of $20, $69, $5, and $(19)) (Note 21) | (40) | (84) | (57) | 49 |
| Cash flow hedges: | | | | |
| Net decrease in fair value of derivatives (net of tax benefit of $10, $99, $97 and $154) | (20) | (183) | (177) | (288) |
| Derivative value net (gains) losses related to hedged transactions recognized during the period and reported in net income (net of tax (expense) benefit of $72, $66, $—and $(48)) | 130 | 122 | — | (89) |
| Total effect of cash flow hedges | 110 | (61) | (177) | (377) |
| Total adjustments to net income (loss) | 70 | (145) | (234) | (328) |
| Comprehensive income (loss) | 478 | (10,143) | (1,594) | 395 |
| Comprehensive (income) loss attributable to noncontrolling interests | (64) | 160 | — | — |
| Comprehensive income (loss) attributable to EFH Corp. | $ 414 | $ (9,983) | $ (1,594) | $ 395 |

See Notes to Financial Statements.

F–10

EFIHMW00052183

EFIHMW00051935

**PX 030**
**Page 249 of 734**

Table of Contents

ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES
STATEMENTS OF CONSOLIDATED CASH FLOWS
(Millions of Dollars)

|  | Successor | | | Predecessor |
|---|---|---|---|---|
|  | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Cash flows—operating activities |  |  |  |  |
| Net income (loss) | $ 408 | $ (9,998) | $ (1,360) | $ 723 |
| Income from discontinued operations, net of tax effect | — | — | (1) | (24) |
| Income (loss) from continuing operations | 408 | (9,998) | (1,361) | 699 |
| Adjustments to reconcile income from continuing operations to cash provided by operating activities |  |  |  |  |
| Depreciation and amortization | 2,172 | 2,070 | 568 | 684 |
| Deferred income tax expense (benefit)—net | 253 | (477) | (736) | (111) |
| Impairment of goodwill (Note 3) | 90 | 8,860 | — | — |
| Impairment of trade name intangible asset (Note 3) | — | 481 | — | — |
| Impairment of emission allowances intangible assets (Note 3) | — | 501 | — | — |
| Impairment of natural gas–fueled generation facilities (Note 5) | 34 | 229 | — | — |
| Impairment of land (Note 10) | — | 26 | — | — |
| Charge related to Lehman bankruptcy (Note 10) | 25 | — | — | — |
| Write off of regulatory assets (Note 25) | 511 | — | — | — |
| Increase of toggle notes in lieu of cash interest (Note 12) | (1,225) | (2,329) | 1,556 | 722 |
| Unrealized net (gains) losses from mark-to-market valuations of commodity positions | (696) | 1,477 | — | — |
| Unrealized net (gains) losses from mark-to-market valuations of interest rate swaps | (87) | — | — | — |
| Net gain on debt exchanges (Note 12) | 113 | 81 | 12 | 46 |
| Bad debt expense (Note 11) | 14 | 30 | — | 27 |
| Stock–based incentive compensation expense | (44) | — | — | — |
| Reversal of reserves recorded in purchase accounting (Note 10) | 184 | 66 | — | 10 |
| Losses on dedesignated cash flow hedges (interest rate swaps) | — | — | 2 | 676 |
| Net charges related to cancelled development of generation facilities (Note 4) | — | — | — | 38 |
| Write–off of deferred transaction costs (Note 10) | — | — | — | (48) |
| Credit related to impaired leases (Note 10) | (5) | (1) | (1) | (40) |
| Net gains on sale of assets, including amortization of deferred gains | (4) | (20) | 5 | 19 |
| Other, net |  |  |  |  |
| Changes in operating assets and liabilities |  |  |  |  |
| Accounts receivable—trade | (125) | (505) | 309 | (200) |
| Impact of accounts receivable sales program (Note 11) | (33) | 53 | (336) | 72 |
| Inventories | (59) | (21) | (5) | (7) |
| Accounts payable—trade | (141) | 385 | (264) | 81 |
| Commodity and other derivative contractual assets and liabilities | (64) | (28) | 18 | (185) |
| Margin deposits—net | 248 | 595 | (614) | (569) |
| Deferred advanced metering system revenues (Note 25) | 57 | — | — | — |
| Other—net assets | (43) | 440 | 284 | (89) |
| Other—net liabilities | 128 | (410) | 113 | 440 |
| Cash provided by (used in) operating activities from continuing operations | $ 1,711 | $ 1,505 | $ (450) | $ 2,265 |

F–11

EFIHMW00052184

EFIHMW00051935

Table of Contents

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**
**STATEMENTS OF CONSOLIDATED CASH FLOWS (CONT.)**
**(Millions of Dollars)**

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Cash flows—financing activities | | | | |
| Issuances of long–term debt/securities (Note 12): | | | | |
| Equity financing from Sponsor Group and other investors | $      — | $      — | $   8,236 | $      — |
| Merger–related debt financing | — | — | 42,732 | 1,800 |
| Pollution control revenue bonds | — | 242 | — | — |
| Oncor long–term debt | — | 1,500 | — | — |
| Other long–term debt | 522 | 1,443 | — | — |
| Common stock | — | 34 | — | 1 |
| Repayments/repurchases of long–term debt/securities (Note 12): | | | | |
| Pollution control revenue bonds | — | (242) | — | (143) |
| Merger–related debt repurchases | — | — | (15,314) | — |
| Other long–term debt | (396) | (925) | (81) | (302) |
| Common stock | — | (3) | — | (13) |
| Increase (decrease) in short–term borrowings (Note 12): | | | | |
| Banks | 332 | (481) | (722) | 2,245 |
| Commercial paper | — | — | — | (1,296) |
| Proceeds from sale of noncontrolling interests, net of transaction costs (Note 15) | — | 1,253 | — | — |
| Contributions from noncontrolling interests | 48 | — | — | — |
| Distributions paid to noncontrolling interests | (56) | (2) | — | (788) |
| Common stock dividends paid | — | — | — | — |
| Settlements of minimum withholding tax liabilities under stock–based compensation plans | — | — | — | (93) |
| Debt discount, financing and reacquisition expenses | (49) | (21) | (986) | (17) |
| Other, net | 21 | 39 | — | — |
| Cash provided by financing activities from continuing operations | $      422 | $   2,837 | $  33,865 | $   1,394 |
| | | | | |
| Cash flows—investing activities | | | | |
| Acquisition of EFH Corp. | — | — | (32,694) | — |
| Capital expenditures | (2,348) | (2,849) | (693) | (2,366) |
| Nuclear fuel purchases | (197) | (166) | (23) | (54) |
| Money market fund redemptions (investments) (Note 1) | 142 | (142) | — | — |
| Investment posted with derivative counterparty (Note 18) | (400) | — | — | — |
| Reduction of (proceeds from) letter of credit facility deposited with trustee (restricted cash) (Note 12) | 115 | — | (1,250) | — |
| Reduction of restricted cash related to pollution control revenue bonds | — | 29 | 13 | 202 |
| Other changes in restricted cash | 9 | 1 | 14 | (16) |
| Purchase of mining–related assets | — | — | — | (122) |
| Proceeds from sale of assets | 2 | 80 | 86 | 71 |
| Proceeds from sale of controlling interest in natural gas gathering pipeline business | 40 | — | — | — |
| Proceeds from sale of environmental allowances and credits | 19 | 39 | — | — |
| Purchases of environmental allowances and credits | (19) | (34) | — | — |
| Cash settlements related to outsourcing contract termination (Note 20) | — | 70 | — | — |
| Settlement of loan (Note 20) | — | 25 | — | — |
| Proceeds from sales of nuclear decommissioning trust fund securities | 3,064 | 1,623 | 831 | 602 |
| Investments in nuclear decommissioning trust fund securities | (3,080) | (1,639) | (835) | (614) |
| Other, net | 20 | 29 | (12) | 14 |
| Cash used in investing activities from continuing operations | $  (2,633) | $  (2,934) | $ (34,563) | $  (2,283) |

F–12

EFIHMW00052185

EFIHMW00051935

Table of Contents

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**
**STATEMENTS OF CONSOLIDATED CASH FLOWS (CONT.)**
**(Millions of Dollars)**

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Discontinued operations: | | | | |
|    Cash provided by (used in) operating activities | — | — | (7) | 35 |
|    Cash used in financing activities | — | — | — | — |
|    Cash provided by (used in) investing activities | — | — | — | — |
|     Cash provided by (used in) discontinued operations | — | — | (7) | 35 |
| Net change in cash and cash equivalents | (500) | 1,408 | (1,155) | 1,411 |
| Cash and cash equivalents—beginning balance | 1,689 | 281 | 1,436 | 25 |
| Cash and cash equivalents—ending balance | $    1,189 | $    1,689 | $    281 | $    1,436 |

See Notes to Financial Statements.

F–13

EFIHMW00052186

EFIHMW00051935

**PX 030**
**Page 252 of 734**

Table of Contents

## ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES
### CONSOLIDATED BALANCE SHEETS
(Millions of Dollars)

|  | Successor | |
|---|---|---|
|  | December 31, 2009 | December 31, 2008 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents (Note 1) | $ 1,189 | $ 1,689 |
| Investment posted with counterparty (Note 18) | 425 | — |
| Investments held in money market fund (Note 1) | | 142 |
| Restricted cash (Note 25) | 48 | 55 |
| Trade accounts receivable—net (Note 11) | 1,260 | 1,219 |
| Income taxes receivable—net | 485 | 42 |
| Inventories (Note 25) | | 426 |
| Commodity and other derivative contractual assets (Note 18) | 2,391 | 2,534 |
| Accumulated deferred income taxes (Note 9) | 5 | 44 |
| Margin deposits related to commodity positions | 187 | 439 |
| Other current assets | 136 | 165 |
| Total current assets | 6,126 | 6,755 |
| Restricted cash (Note 25) | 1,149 | 1,267 |
| Investments (Note 19) | 750 | 645 |
| Property, plant and equipment—net (Note 25) | 30,108 | 29,522 |
| Goodwill (Note 3) | 14,316 | 14,386 |
| Intangible assets—net (Note 3) | 2,876 | 2,993 |
| Regulatory assets—net (Note 25) | 1,959 | 1,892 |
| Commodity and other derivative contractual assets (Note 18) | 1,533 | 962 |
| Other noncurrent assets, principally unamortized debt issuance costs | 845 | 841 |
| Total assets | $ 59,662 | $ 59,263 |
| **LIABILITIES AND EQUITY** | | |
| Current liabilities: | | |
| Short-term borrowings (Note 12) | $ 1,569 | $ 1,237 |
| Long-term debt due currently (Note 12) | 417 | 385 |
| Trade accounts payable | 896 | 1,143 |
| Commodity and other derivative contractual liabilities (Note 18) | 2,392 | 2,908 |
| Margin deposits related to commodity positions | 520 | 525 |
| Accrued interest | 526 | 524 |
| Other current liabilities | 744 | 612 |
| Total current liabilities | 7,064 | 7,334 |
| Accumulated deferred income taxes (Note 9) | 6,131 | 6,067 |
| Investment tax credits | 37 | 42 |
| Commodity and other derivative contractual liabilities (Note 18) | 1,060 | 2,095 |
| Long-term debt, less amounts due currently (Note 12) | 41,440 | 40,838 |
| Other noncurrent liabilities and deferred credits (Note 25) | 5,766 | 5,205 |
| Total liabilities | 61,498 | 61,581 |
| Commitments and Contingencies (Note 13) | | |
| Equity (Note 14): | | |
| EFH Corp. shareholders' equity | (3,247) | (3,673) |
| Noncontrolling interests in subsidiaries | 1,411 | 1,355 |
| Total equity | (1,836) | (2,318) |
| Total liabilities and equity | $ 59,662 | $ 59,263 |

See Notes to Financial Statements.

F-14

EFIHMW00052187

EFIHMW00051935

Table of Contents

ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES
STATEMENTS OF CONSOLIDATED EQUITY
(Millions of Dollars)

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Common stock stated value of $0.001 effective May 2009 (number of authorized shares—Successor—2,000,000,000; Predecessor—1,000,000,000): | | | | |
| Balance at beginning of period | $ — | $ — | $ — | $ 5 |
| Effects of shareholder actions related to stated value of common stock | 2 | — | — | — |
| Balance at end of period (number of shares outstanding: Successor: 2009—1,668,065,133; 2008—1,667,149,663; 2007—1,664,345,953; Predecessor: October 10, 2007—461,152,009) | 2 | — | — | 5 |
| Additional paid-in capital: | | | | |
| Balance at beginning of period | 7,904 | 8,279 | — | 1,104 |
| Investment by Sponsor Group and other investors | — | — | 8,279 | — |
| Effects of stock-based incentive compensation plans | 11 | 29 | — | (66) |
| Effects of shareholder actions related to stated value of common stock | (2) | — | — | — |
| Effect of sale of noncontrolling interests (Note 15) | — | (406) | — | — |
| Common stock repurchases | — | — | — | (13) |
| Excess tax benefit on stock-based compensation | — | — | — | 82 |
| Cost of Thrift Plan shares released by LESOP trustee (Note 21) | — | — | — | 210 |
| Effects of executive deferred compensation plan | — | — | — | 11 |
| Other | 1 | 2 | — | (2) |
| Balance at end of period | 7,914 | 7,904 | 8,279 | 1,326 |
| Retained earnings (deficit): | | | | |
| Balance at beginning of period | (11,198) | (1,360) | — | 622 |
| Net income (loss) attributable to EFH Corp. | 344 | (9,838) | (1,360) | 723 |
| Dividends declared on common stock ($—, $—, $—, and $1.30 per share) | — | — | — | (596) |
| Effect of adoption of accounting guidance related to uncertain tax positions (Note 8) | — | — | — | 33 |
| LESOP dividend deduction tax benefit and other | — | — | — | 3 |
| Balance at end of period | (10,854) | (11,198) | (1,360) | 785 |
| Accumulated other comprehensive gain (loss), net of tax effects: | | | | |
| Pension and other postretirement employee benefit liability adjustments: | | | | |
| Balance at beginning of period | (141) | (57) | — | (2) |
| Change in unrecognized gains (losses) related to pension and other retirement benefit costs | (40) | (84) | (57) | 49 |
| Balance at end of period | (181) | (141) | (57) | 47 |
| Amounts related to cash flow hedges: | | | | |
| Balance at beginning of period | (238) | (177) | — | 411 |
| Change during the period | 110 | (61) | (177) | (377) |
| Balance at end of period | (128) | (238) | (177) | 34 |
| Total accumulated other comprehensive gain (loss) at end of period | (309) | (379) | (234) | 81 |
| EFH Corp. shareholders' equity at end of period (Note 14) | (3,247) | (3,673) | 6,685 | 2,197 |
| Noncontrolling interests in subsidiaries (Note 15): | | | | |
| Balance at beginning of period | 1,355 | — | — | — |
| Net income (loss) attributable to noncontrolling interests | 64 | (160) | — | — |
| Investment | 48 | 1,253 | — | — |
| Effect of sale of noncontrolling interests | — | 265 | — | — |
| Distributions to noncontrolling interests | — | (1) | — | — |
| Other | (56) | (2) | — | — |
| Noncontrolling interests in subsidiaries at end of period | 1,411 | 1,355 | — | — |
| Total equity at end of period | $ (1,836) | $ (2,318) | $ 6,685 | $ 2,197 |

See Notes to Financial Statements.

F-15

EFIHMW00052188

EFIHMW00051935

Table of Contents

ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1.  BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES

*Description of Business*

EFH Corp., a Texas corporation, is a Dallas–based holding company conducting its operations principally through its TCEH and Oncor subsidiaries. TCEH is a holding company for subsidiaries engaged in competitive electricity market activities largely in Texas, including electricity generation, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales. Oncor is a majority (approximately 80%) owned subsidiary engaged in regulated electricity transmission and distribution operations in Texas.

On October 10, 2007, EFH Corp. completed its Merger with Merger Sub. As a result of the Merger, EFH Corp. became a subsidiary of Texas Holdings, which is controlled by the Sponsor Group. See Note 2.

References in this report to "we," "our," "us" and "the company" are to EFH Corp. and/or its subsidiaries, TCEH and/or its subsidiaries, or Oncor and/or its subsidiary as apparent in the context. See "Glossary" for other defined terms.

Various "ring–fencing" measures have been taken to enhance the credit quality of Oncor. Such measures include, among other things: the sale of a 19.75% equity interest in Oncor to Texas Transmission in November 2008; maintenance of separate books and records for the Oncor Ring–Fenced Entities; Oncor's board of directors being comprised of a majority of independent directors, and prohibitions on the Oncor Ring–Fenced Entities providing credit support to, or receiving credit support from, any member of the Texas Holdings Group. The assets and liabilities of the Oncor Ring–Fenced Entities are separate and distinct from those of the Texas Holdings Group and none of the assets of the Oncor Ring–Fenced Entities are available to satisfy the debt or other obligations of any member of the Texas Holdings Group. Moreover, Oncor's operations are conducted, and its cash flows managed, independently from the Texas Holdings Group. Oncor Holdings is consolidated with EFH Corp. as a variable interest entity under consolidations accounting standards.

See Note 15 for discussion of noncontrolling interests sold by Oncor in November 2008.

We have two reportable segments: the Competitive Electric segment, which is comprised principally of TCEH, and the Regulated Delivery segment, which is comprised of Oncor and its wholly–owned bankruptcy–remote financing subsidiary. See Note 24 for further information concerning reportable business segments.

*Basis of Presentation*

The consolidated financial statements have been prepared in accordance with US GAAP. The accompanying consolidated statements of income (loss), comprehensive income (loss), cash flows and equity present results of operations and cash flows for "Successor" and "Predecessor" periods, which relate to periods succeeding and preceding the Merger, respectively. The consolidated financial statements have been prepared on the same basis as the audited financial statements included in the 2008 Form 10–K. The consolidated financial statements of the Successor reflect the application of purchase accounting in accordance with the provisions of accounting standards related to business combinations, include the activities of Merger Sub, all of which related to the acquisition of EFH Corp., and reflect the adoption of accounting standards related to the determination of fair value. Certain reclassifications have been made to conform prior period data to current period presentation. All intercompany items and transactions have been eliminated in consolidation. All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated. Subsequent events have been evaluated through February 18, 2010, the date these consolidated financial statements were issued.

F–16

EFIHMW00052189

EFIHMW00051935

**PX 030**
**Page 255 of 734**

Table of Contents

*Discontinued Businesses*

Results from discontinued businesses, which are reported as discontinued operations, during the period October 11, 2007 to December 31, 2007 totaled $1 million in net income and during the period from January 1, 2007 to October 10, 2007 totaled $24 million in net income and consisted primarily of insurance proceeds related to a 2005 TXU Europe litigation settlement agreement.

*Use of Estimates*

Preparation of financial statements requires estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including fair value measurements. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information. No material adjustments, other than those disclosed elsewhere herein, were made to previous estimates or assumptions during the current year.

*Purchase Accounting*

The Merger was accounted for under purchase accounting, whereby the total purchase price of the transaction was allocated to our identifiable tangible and intangible assets acquired and liabilities assumed based on their fair values, and the excess of the purchase price over the fair value of net assets acquired was recorded as goodwill. The allocation resulted in a significant amount of goodwill, an increase in the carrying value of property, plant and equipment and deferred income tax liabilities as well as new identifiable intangible assets and liabilities. Reported earnings in periods subsequent to the Merger reflect increases in interest, depreciation and amortization expense. See Note 2 for details regarding the effect of purchase accounting.

*Derivative Instruments and Mark–to–Market Accounting*

We enter into contracts for the purchase and sale of electricity, natural gas and other commodities and also enter into other derivative instruments such as options, swaps, futures and forwards primarily to manage commodity price and interest rate risks. If the instrument meets the definition of a derivative under accounting standards related to derivative instruments and hedging activities, changes in the fair value of the derivative are recognized in net income as unrealized gains and losses, unless the criteria for certain exceptions are met, and an offsetting derivative asset or liability is recorded in the balance sheet. This recognition is referred to as "mark–to–market" accounting. The fair values of our unsettled derivative instruments under mark–to–market accounting are reported in the balance sheet as commodity and other derivative contractual assets or liabilities. When derivative instruments are settled and realized gains and losses are recorded, the previously recorded unrealized gains and losses and derivative assets and liabilities are reversed. See Notes 16 and 18 for additional information regarding fair value measurement and commodity and other derivative contractual assets and liabilities. Under the election criteria of accounting standards related to derivative instruments and hedging activities, we may elect the "normal" purchase and sale exemption. A commodity–related derivative contract may be designated as a "normal" purchase or sale if the commodity is to be physically received or delivered for use or sale in the normal course of business. If designated as normal, the derivative contract is accounted for under the accrual method of accounting (not marked–to–market) with no balance sheet or income statement recognition of the contract until settlement.

Because derivative instruments are frequently used as economic hedges, accounting standards related to derivative instruments and hedging activities allow for "hedge accounting," which provides for the designation of such instruments as cash flow or fair value hedges if certain conditions are met. A cash flow hedge mitigates the risk associated with the variability of the future cash flows related to an asset or liability (e.g., a forecasted sale of electricity in the future at market prices or the payment of interest related to variable rate debt), while a fair value hedge mitigates risk associated with fixed future cash flows (e.g., debt with fixed interest rate payments). In

F–17

EFIHMW00052190

EFIHMW00051935

**PX 030**
**Page 256 of 734**

**Table of Contents**

accounting for changes in the fair value of cash flow hedges, derivative assets and liabilities are recorded on the balance sheet with an offset to other comprehensive income or loss to the extent the hedges are effective and the hedged transaction remains probable of occurring. If the hedged transaction becomes probable of not occurring, hedge accounting is discontinued and the amount recorded in other comprehensive income is immediately reclassified into net income. If the relationship between the hedge and the hedged transaction ceases to exist or is dedesignated, hedge accounting is discontinued, and the amounts recorded in other comprehensive income are recognized as the previously hedged transaction impacts earnings. Changes in value of fair value hedges are recorded as derivative assets or liabilities with an offset to net income, and the carrying value of the related asset or liability (hedged item) is adjusted for changes in fair value with an offset to net income. If the fair value hedge is settled prior to the maturity of the hedged item, the cumulative fair value gain or loss associated with the hedge is amortized into income over the remaining life of the hedged item. In the statement of cash flow, the effects of settlements of derivative instruments are classified consistent with the related hedged transactions.

To qualify for hedge accounting, a hedge must be considered highly effective in offsetting changes in fair value of the hedged item. Assessment of the hedge's effectiveness is tested at least quarterly throughout its term to continue to qualify for hedge accounting. Changes in fair value that represent hedge ineffectiveness, even if the hedge continues to be assessed as effective, are immediately recognized in net income. Ineffectiveness is generally measured as the cumulative excess, if any, of the change in value of the hedging instrument over the change in value of the hedged item. See Notes 12 and 18 for additional information concerning hedging activity.

Realized and unrealized gains and losses from transacting in energy−related derivative instruments are primarily reported in the income statement in net gain (loss) from commodity hedging and trading activities. In accordance with accounting rules, upon settlement of physical derivative sales and purchase contracts that are marked−to−market in net income, related wholesale electricity revenues and fuel and purchased power costs are reported at approximated market prices, instead of the contract price. As a result, this noncash difference between market and contract prices is included in the operating revenues and fuel and purchased power costs and delivery fees line items of the income statement, with offsetting amounts included in net gain (loss) from commodity hedging and trading activities.

*Revenue Recognition*

We record revenue from electricity sales and delivery service under the accrual method of accounting. Revenues are recognized when electricity or delivery services are provided to customers on the basis of periodic cycle meter readings and include an estimated accrual for the revenues earned from the meter reading date to the end of the period (unbilled revenue).

Our reported revenues include, on a net basis, ERCOT electricity balancing transactions, which represent wholesale purchases and sales of electricity for real−time balancing purposes as measured in 15−minute intervals. As is industry practice, these purchases and sales with ERCOT, as the balancing energy clearinghouse agent, are reported net in the income statement. Balancing transactions are difficult to predict, with results varying from period to period between net revenues and net expense, and are reported as a component of revenues in the income statement.

*Impairment of Long−Lived Assets*

We evaluate long−lived assets (including intangible assets with finite lives) for impairment whenever indications of impairment exist. The carrying value of such assets is deemed to be impaired if the projected undiscounted cash flows are less than the carrying value. If there is such impairment, a loss would be recognized based on the amount by which the carrying value exceeds the fair value. Fair value is determined primarily by discounted cash flows, supported by available market valuations, if applicable. See Note 5 for details of the impairment of the natural gas−fueled generation facilities recorded in 2008.

F−18

EFIHMW00052191

EFIHMW00051935

**PX 030**
**Page 257 of 734**

Table of Contents

Finite–lived intangibles identified as a result of purchase accounting are amortized over their estimated useful lives based on the expected realization of economic effects. See Note 3 to Financial Statements for additional information.

*Goodwill and Intangible Assets with Indefinite Lives*

We evaluate goodwill and intangible assets with indefinite lives for impairment at least annually. The impairment tests performed are based on discounted cash flow analyses. See Note 3 for details of goodwill and intangible assets with indefinite lives, including discussion of goodwill and trade name intangible assets impairments recorded in 2009 and 2008.

In 2009, we changed the annual test date for goodwill and intangible assets with indefinite lives from October 1 to December 1. Management determined the new annual goodwill test date is preferable because of efficiencies gained by aligning the test with our annual budget and five–year plan processes in the fourth quarter. The change in the annual test date did not delay, accelerate or avoid an impairment charge, and retrospective application of this change in accounting principle did not affect previously reported results.

*Amortization of Nuclear Fuel*

Amortization of nuclear fuel is calculated on the units–of–production method and is reported as fuel costs.

*Major Maintenance*

Major maintenance costs incurred during generation plant outages and the costs of other maintenance activities are charged to expense as incurred and reported as operating costs.

*Defined Benefit Pension Plans and Other Postretirement Employee Benefit Plans*

We offer pension benefits based on either a traditional defined benefit formula or a cash balance formula and also offer certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from the company. Costs of pension and OPEB plans are dependent upon numerous factors, assumptions and estimates. The pension and OPEB accrued benefit obligations reported in the balance sheet are in accordance with accounting standards related to employers' accounting for defined benefit pension and other postretirement plans. See Note 21 for additional information regarding pension and OPEB plans.

*Stock–Based Incentive Compensation*

Prior to the Merger, we provided discretionary awards payable in EFH Corp. common stock to qualified managerial employees under our shareholder–approved long–term incentive plans. In December 2007, our board of directors established our 2007 Stock Incentive Plan, which authorizes discretionary grants to directors, officers and qualified managerial employees of EFH Corp. or its affiliates of non–qualified stock options, stock appreciation rights, restricted shares, shares of common stock, the opportunity to purchase shares of common stock and other stock–based awards. Stock–based compensation expense is recognized over the vesting period based on the grant–date fair value of those awards. See Note 22 for information regarding stock–based incentive compensation.

*Sales and Excise Taxes*

Sales and excise taxes are accounted for as a "pass through" item on the balance sheet; i.e., the tax is billed to customers and recorded as trade accounts receivable with an offsetting amount recorded as a liability to the taxing jurisdiction.

F–19

EFIHMW00052192

EFIHMW00051935

Table of Contents

*Franchise and Revenue−Based Taxes*

Unlike sales and excise taxes, franchise and gross receipt taxes are not a "pass through" item. These taxes are assessed to us by state and local government bodies, based on revenues or kWh delivered, as a cost of doing business and are recorded as an expense. Rates charged to customers by us are intended to recover the franchise and gross receipt taxes, but we are not acting as an agent to collect the taxes from customers.

*Income Taxes*

We file a consolidated federal income tax return, and federal income taxes are calculated for our subsidiaries substantially as if the entities file separate income tax returns. Deferred income taxes are provided for temporary differences between the book and tax basis of assets and liabilities. Effective with the sale of noncontrolling interests in Oncor (see Note 15), Oncor became a partnership for US federal income tax purposes, and we provide deferred income taxes on the difference between the book and tax basis of our investment in Oncor. Previously earned investment tax credits were deferred and amortized as a reduction of income tax expense over the estimated lives of the related properties. In connection with purchase accounting, the remaining unamortized investment tax credit amount related to unregulated businesses of $300 million was eliminated. Investment tax credits related to Oncor's regulated operations will continue to be amortized over the lives of the related properties in accordance with regulatory treatment. Certain provisions of the accounting guidance for income taxes provide that regulated enterprises are permitted to recognize deferred taxes as regulatory tax assets or tax liabilities if it is probable that such amounts will be recovered from, or returned to, customers in future rates.

*Accounting for Contingencies*

Our financial results may be affected by judgments and estimates related to loss contingencies. Accruals for loss contingencies are recorded when management determines that it is probable that an asset has been impaired or a liability has been incurred and that such economic loss can be reasonably estimated. Such determinations are subject to interpretations of current facts and circumstances, forecasts of future events and estimates of the financial impacts of such events. See Note 13 for a discussion of contingencies.

*Cash and Cash Equivalents*

For purposes of reporting cash and cash equivalents, temporary cash investments purchased with a remaining maturity of three months or less are considered to be cash equivalents.

We held an interest in The Reserve's US Government Fund, which began liquidation proceedings in September 2008 due to the credit crisis and withdrawal demands. In September 2008, we attempted to redeem our interest, totaling $242 million, in the US Government Fund, but due to the liquidation process, the funds were not immediately made available; accordingly, such amount was reclassified from cash and cash equivalents to investment held in money market fund. We received $100 million of the funds in November 2008 and the remaining $142 million in January 2009.

*Restricted Cash*

The terms of certain agreements require the restriction of cash for specific purposes. At December 31, 2009, $1.135 billion of cash is restricted to support letters of credit. See Notes 12 and 25 for more details regarding this and other restricted cash.

*Property, Plant and Equipment*

As a result of purchase accounting, carrying amounts of property, plant and equipment related to unregulated businesses on the Merger date were adjusted to estimated fair values. Subsequent additions are

F−20

EFIHMW00052193

EFIHMW00051935

**Table of Contents**

recorded at cost. Regulated properties at Oncor continue to be reported at original cost, which is considered to be fair value due to the cost–based regulated recovery and returns associated with those assets. The cost of self–constructed property additions includes materials and both direct and indirect labor and applicable overhead, including payroll–related costs.

Depreciation of our property, plant and equipment is calculated over the estimated service lives of the properties. As is common in the industry, the Predecessor historically recorded depreciation expense using composite depreciation rates that reflected blended estimates of the lives of major asset groups as compared to depreciation expense calculated on a component asset–by–asset basis. Effective with the Merger, depreciation expense for unregulated properties is calculated on a component asset–by–asset basis. Estimated depreciable lives are based on management's estimates of the assets' economic useful lives. See Note 25.

In accordance with the PUCT's August 2009 order in Oncor's rate review, the remaining net book value and anticipated removal cost of existing meters that are being replaced by advanced meters is being charged (amortized) to expense over an 11–year cost recovery period.

*Capitalized Interest*

Interest related to qualifying construction projects and qualifying software projects are capitalized in accordance with accounting guidance related to capitalization of interest cost. See Note 25.

*Inventories*

All inventories are reported at the lower of cost (on a weighted average basis) or market unless expected to be used in the generation of electricity. Also see discussion immediately below regarding environmental allowances and credits.

*Environmental Allowances and Credits*

Effective with the Merger, we began accounting for all environmental allowances and credits as identifiable intangible assets with finite lives that are subject to amortization. The recorded values of these intangible assets were originally established reflecting fair value determinations as of the date of the Merger under purchase accounting. Amortization expense associated with these intangible assets is recognized on a unit of production basis as the allowances or credits are consumed in generation operations. The environmental allowances and credits are assessed for impairment when conditions or events occur that could affect the carrying value of the assets. See Note 3 for details of impairment amounts recorded in 2008.

*Regulatory Assets and Liabilities*

The financial statements of our regulated electricity delivery operations reflect regulatory assets and liabilities under cost–based rate regulation in accordance with accounting standards related to the effect of certain types of regulation. The assumptions and judgments used by regulatory authorities continue to have an impact on the recovery of costs, the rate earned on invested capital and the timing and amount of assets to be recovered by rates. See Note 25 for details of the regulatory assets and liabilities.

*Investments*

Investments in a nuclear decommissioning trust fund are carried at fair market value in the balance sheet. Investments in unconsolidated business entities over which we have significant influence but do not maintain effective control, generally representing ownership of at least 20% and not more than 50% of common equity, are accounted for under the equity method. Assets related to employee benefit plans represent investments held to satisfy deferred compensation liabilities and are recorded at market value. See Note 19 for details of investments.

F–21

EFIHMW00052194

EFIHMW00051935

**PX 030**
**Page 260 of 734**

Table of Contents
*Noncontrolling Interests*

See Note 15 for discussion of accounting for the noncontrolling interests of Oncor.

*Changes in Accounting Standards*

In January 2010, the FASB issued guidance on disclosure about fair value measurements. The guidance requires new disclosures of transfers in and out of Levels 1 and 2 of the fair value hierarchy and separate disclosure about purchases, sales, issuances and settlements in Level 3 of the fair value hierarchy. The guidance also provides clarification on disclosures related to the level of disaggregation among assets and liabilities and to the inputs and valuation techniques used to measure fair value. This new guidance is effective for periods beginning January 1, 2010, except for the new disclosures about purchases, sales, issuances and settlements in Level 3, which are effective for periods beginning January 1, 2011. As this new guidance provides only disclosure requirements, the adoption will not have any effect on reported results of operations, financial condition or cash flows.

In August 2009, the FASB issued guidance on measuring fair value of liabilities, which provides clarification of fair value measurement when there is limited or no observable data available. The adoption of this guidance, as of October 1, 2009, did not have any effect on reported results of operations, financial condition or cash flows, and did not have any effect on the disclosures of the fair value of our debt provided in Note 17.

In June 2009, the FASB issued "The *FASB Accounting Standards Codification*™ and the Hierarchy of Generally Accepted Accounting Principles," which establishes the *FASB Accounting Standards Codification*™ (Codification) as the source of authoritative US GAAP recognized by the FASB to be applied to nongovernmental entities. The Codification was effective for financial statements issued for interim and annual periods ending after September 15, 2009. The adoption of the Codification did not affect reported results of operations, financial condition or cash flows.

In June 2009, the FASB issued new guidance that requires reconsideration of consolidation conclusions for all variable interest entities and other entities with which we are involved. This new guidance is effective January 1, 2010. The provisions of this guidance could result in different consolidation conclusions than reached under previous guidance, as the emphasis is on the power to direct the activities of the variable interest entity instead of risk and reward. We continue to evaluate the impact of this new guidance on our financial statements. In consideration of the ring–fencing measures in place, as discussed above under "Description of Business," our evaluation may result in the deconsolidation of Oncor Holdings and its subsidiaries, which are the ring–fenced entities.

In June 2009, the FASB issued new guidance regarding accounting for transfers of financial assets that eliminates the concept of a qualifying special purpose entity, changes the requirements for derecognizing financial assets and requires additional disclosures. This new guidance is effective in the first quarter of 2010. We continue to evaluate the impact of this new guidance on our financial statements and footnote disclosures; however, we expect that our accounts receivable securitization program discussed in Note 11 will no longer be accounted for as a sale of accounts receivable as a result of the guidance, and the funding under the program will be reported as short–term borrowings. We do not expect this new guidance to impact the covenant–related ratio calculations in our debt agreements.

In May 2009, the FASB issued new guidance related to subsequent events that requires disclosure of the date through which we have evaluated subsequent events related to the financial statements being issued and the basis for that date. Our adoption of this guidance as of April 1, 2009 did not affect reported results of operations, financial condition or cash flows, and the required disclosure is provided above in "Basis of Presentation."

In April 2009, the FASB issued new guidance regarding determining fair value when the volume and level of activity for the asset or liability have significantly decreased or market transactions are not orderly. We

F–22

EFIHMW00052195

EFIHMW00051935

Table of Contents
adopted this guidance as of April 1, 2009. While this guidance did not change our fair value measurement techniques, it requires disclosures of additional detail of securities held in our nuclear decommissioning trust that are provided in Notes 16 and 19.

In April 2009, the FASB issued new guidance regarding the recognition and presentation of other–than–temporary impairments, which changed the guidance for recording impairment of investments in debt securities. Our adoption as of April 1, 2009 did not affect the accounting for our nuclear decommissioning trust fund because the trust balance has historically been reported at fair value, with changes in fair value of the trust resulting in changes in Oncor's regulatory asset or liability related to the decommissioning cost.

In December 2008, the FASB issued new guidance for employers' disclosures about postretirement benefit plan assets. This new guidance provides enhanced disclosures regarding how investment allocation decisions are made and certain aspects of fair value measurements on plan assets. The required disclosures are intended to provide transparency related to the types of assets and associated risks in an employer's defined benefit pension or other postretirement employee benefits plan and events in the economy and markets that could have a significant effect on the value of plan assets. As this new guidance provides only disclosure requirements, our adoption as of December 31, 2009 did not have any effect on reported results of operations, financial condition or cash flows. The disclosures are provided in Note 21.

In March 2008, the FASB issued amended disclosure guidance for derivative instruments and hedging activities. This amended guidance enhances required disclosures regarding derivatives and hedging activities to enable investors to better understand their effects on an entity's financial position, financial performance and cash flows. As this guidance provides only disclosure requirements, our adoption as of January 1, 2009 did not have any effect on reported results of operations or financial condition. The disclosures are provided in Note 18.

**2.    FINANCIAL STATEMENT EFFECTS OF THE MERGER**

As discussed in Note 1, the Merger was completed on October 10, 2007. The aggregate purchase price paid for the equity securities of EFH Corp. was $31.9 billion, which was financed by a combination of equity invested by the Sponsor Group and certain other investors and by borrowings under a senior secured credit facility and senior unsecured interim facilities. These facilities also funded the repayment and redemption of certain existing credit facilities and debt upon completion of the Merger. See Note 12 for a discussion of our debt.

The statements of consolidated income (loss) and cash flows for 2007 present Predecessor results from January 1 through October 10 and Successor results from October 11 through December 31.

*Sources and Uses*

The sources and uses of the funds for the Merger are summarized in the table below.

| Sources of funds: | | Uses of funds: | |
|---|---|---|---|
| | (billions of dollars) | | |
| Cash and other sources | $ 0.3 | Equity purchase price (c) | $31.9 |
| TCEH credit facilities (Note 12) | 27.0 | Transaction costs (d) | 0.8 |
| EFH Corp. senior unsecured interim facility (a) | 4.5 | Repayment of existing debt | 5.3 |
| Equity contributions (b) | 8.3 | Restricted cash | 1.2 |
| | | Financing fees related to new facilities | 0.9 |
| Total source of funds | $40.1 | Total uses of funds | $40.1 |

(a)    Interim facility that was repaid with the proceeds from the issuance of the EFH Corp. Senior Notes that are discussed in Note 12.

F–23

EFIHMW00052196

EFIHMW00051935

Table of Contents

(b)   Consists of equity contributions by the Sponsor Group and certain other investors.
(c)   Represents 461.2 million outstanding shares of EFH Corp. common stock multiplied by $69.25 per share.
(d)   Represents professional fees incurred by the Sponsor Group that were directly associated with the Merger and accounted for as part of the purchase price.

*Purchase Price Allocation*

   We accounted for the Merger under purchase accounting in accordance with the provisions of accounting standards related to business combinations, whereby the total purchase price of the transaction was allocated to our identifiable tangible and intangible assets acquired and liabilities assumed based on their fair values as of the Merger date as summarized in the table below. The fair values were determined based upon assumptions related to future cash flows, discount rates, and asset lives as well as factors more unique to us, our industry and the competitive wholesale power market that include forward natural gas price curves and market heat rates, retail customer attrition rates, generation plant operating and construction costs, and the effect on generation facility values of lignite fuel reserves and mining capabilities using currently available information. As a result of cost-based regulatory rate-setting processes, the book value of the majority of Oncor's assets and liabilities effectively represent fair value, and no adjustments to those regulated assets or liabilities were recorded. The excess of the purchase price over the fair value of net assets acquired was recorded as goodwill.

   The goodwill amount recorded upon finalization of purchase accounting in 2008 totaled $23.2 billion. Management believes the drivers of the goodwill amount include the incremental value of the future cash flow potential of the baseload generation facilities, including facilities under construction, over the values assigned to those assets under purchase accounting rules, considering the market-pricing mechanisms and growth potential in the ERCOT market, as well as the value derived from the scale of the retail business. Management also believes that the goodwill reflects the value of the relatively stable, long-lived cash flows of the regulated business, considering the constructive regulatory environment and market growth potential. See Note 3 for disclosures related to goodwill, including an impairment recorded in the fourth quarter of 2008 and first quarter of 2009.

   The following table summarizes the components of the final purchase price allocation:

| | |
|---|---:|
| Equity purchase price | $ 31,935 |
| Transaction costs | 759 |
| **Total purchase price** | **32,694** |
| Property, plant and equipment | 28,088 |
| Intangible assets (Note 3) | 4,454 |
| Regulatory assets and deferred debits | 1,445 |
| Other assets | 5,187 |
| **Total assets acquired** | **39,174** |
| Short-term borrowings and long-term debt | 14,183 |
| Deferred tax liabilities | 7,706 |
| Other liabilities | 7,837 |
| **Total liabilities assumed** | **29,726** |
| **Net identifiable assets acquired** | **9,448** |
| Goodwill | $ 23,246 |

F-24

EFIHMW00052197

EFIHMW00051935

**PX 030**
**Page 263 of 734**

**Table of Contents**

The following table summarizes the change in the total amount of goodwill during 2008 as a result of purchase accounting:

| | |
|---|---:|
| Goodwill at December 31, 2007 | $22,954 |
| Property, plant and equipment | 311 |
| Intangible assets | 30 |
| Regulatory assets—net | 2 |
| Other assets | 174 |
| Total assets acquired | 517 |
| Deferred income tax liabilities | (263) |
| Other liabilities | 38 |
| Total liabilities assumed | (225) |
| Net identifiable assets acquired | 292 |
| Goodwill at completion of purchase accounting | $23,246 |

The above changes relate largely to finalization of fair values of natural gas–fueled generation plants and amounts related to the Capgemini outsourcing agreement, as well as the effects on related deferred income tax balances.

Accrued liabilities were recorded in purchase accounting for exit activities resulting from the Merger. Exit liabilities recorded related to the cancellation of the development of coal–fueled generation facilities discussed in Note 4, the exit of certain administrative activities and the termination of outsourcing arrangements with Capgemini under change of control provisions of such arrangements (see Note 20). The following table summarizes the changes to the exit liability:

| | Competitive Electric segment | Regulated Delivery segment | Total |
|---|---:|---:|---:|
| Liability for exit activities as of October 11, 2007 | $ 60 | $ — | $ 60 |
| Liability for exit activities as of December 31, 2007 | 60 | — | 60 |
| Additions to liability (a) | 38 | 16 | 54 |
| Payments recorded against liability | (60) | | (60) |
| Liability for exit activities as of December 31, 2008 | 38 | 16 | 54 |
| Payments recorded against liability | (24) | (4) | (28) |
| Other adjustments to the liability (b) | (11) | (10) | (21) |
| Liability for exit activities as of December 31, 2009 (c) | $ 3 | $ 2 | $ 5 |

(a) Additional amounts recorded upon finalization of purchase accounting.
(b) Represents reversal of exit liabilities due primarily to a shorter than expected outsourcing services transition period.
(c) Remaining accrual is expected to be settled in 2010, the targeted date to complete the transition of outsourced activities back to us or to service providers.

*Unaudited Pro Forma Financial Information*

The following unaudited pro forma financial position and results of operations assume that the Merger–related transactions occurred on January 1, 2007. The unaudited pro forma information is provided for informational purposes only and is not necessarily indicative of what our results of operations would have been if the Merger–related transactions had occurred on that date, or what our results of operations will be for any future periods.

F–25

EFIHMW00052198

EFIHMW00051935

**PX 030**
**Page 264 of 734**

Table of Contents

For the year ended December 31, 2007, unaudited pro forma revenues and net loss were $10.0 billion and $2.3 billion, respectively. Pro forma adjustments for the year ended December 31, 2007 consist of adjustments for the Predecessor period and consist of $473 million in depreciation and amortization expense (including amounts recognized in revenues or fuel and purchased power costs), $2.1 billion in interest expense and a $895 million income tax benefit.

**3.    GOODWILL AND IDENTIFIABLE INTANGIBLE ASSETS**

*Goodwill*

As discussed in Note 2, we accounted for the Merger under purchase accounting. The total goodwill amount recorded as a result of purchase accounting totaled $23.2 billion, representing the excess of the purchase price over the fair value of the tangible and identifiable intangible net assets acquired in the Merger; subsequently, impairment charges were recorded in the fourth quarter of 2008 and the first quarter of 2009 (discussed immediately below). Accounting guidance related to goodwill and other intangible assets requires that goodwill be assigned to "reporting units," which management has determined to be the Competitive Electric segment and the Regulated Delivery segment, which are largely comprised of TCEH and Oncor, respectively. The original goodwill amounts assigned to the Competitive Electric segment of $18.3 billion and the Regulated Delivery segment of $4.9 billion were based on the enterprise values of those businesses at the closing date of the Merger and the completion of purchase accounting.

Reported goodwill as of December 31, 2009 totaled $14.3 billion, with $10.2 billion assigned to the Competitive Electric segment and $4.1 billion to the Regulated Delivery segment. Reported goodwill as of December 31, 2008 totaled $14.4 billion, with $10.3 billion assigned to the Competitive Electric segment and $4.1 billion to the Regulated Delivery segment. None of this goodwill balance is being deducted for tax purposes.

*Goodwill and Trade Name Intangible Asset Impairments*

The 2009 annual impairment testing performed as of October 1, and December 1, 2009 for goodwill and intangible assets with indefinite useful lives in accordance with accounting guidance for a change in annual impairment testing dates resulted in no impairment (see discussion in Note 1 regarding change in the annual impairment test date from October 1 to December 1). The goodwill testing determined that the estimated fair value (enterprise value) of the Regulated Delivery segment exceeded its carrying value by approximately 10% resulting in no additional testing being required and no impairment for the segment. Key assumptions in the valuation of the regulated business include discount rates, growth of the rate base and return on equity allowed by the regulatory authority. Cash flows of the regulated business are relatively stable and more predictable than the competitive business. The Competitive Electric segment carrying value exceeded its estimated enterprise value (by less than 10%), so the estimated enterprise value of the segment was compared to the estimated fair values of its operating assets and liabilities. This additional testing indicated that the implied goodwill amount exceeded the recorded goodwill amount, and thus no goodwill impairment was recorded. The estimated enterprise value of the Competitive Electric segment reflects the impact of the decline in forward natural gas prices on wholesale electricity prices. Because lower wholesale electricity prices also result in lower fair values of our generation assets, calculated implied goodwill was sufficient to support the recorded goodwill amount. Key variables in the tests included forward natural gas prices, electricity prices, market heat rates and discount rates, assumptions regarding each of which could have a significant effect on valuations. Because of the volatility of these factors, we cannot predict the likelihood of any future impairment.

In the first quarter of 2009, we recorded a $90 million goodwill impairment charge largely related to the Competitive Electric segment. This charge resulted from the completion of fair value calculations supporting the initial $8.860 billion goodwill impairment charge that was recorded in the fourth quarter of 2008 and consisted of an impairment of $8.0 billion related to the Competitive Electric segment and $860 million related to the Regulated Delivery segment. The impairment charge primarily reflected the dislocation in the capital markets

F–26

EFIHMW00052199

EFIHMW00051935

**PX 030**
**Page 265 of 734**

Table of Contents

during the fourth quarter of 2008 that increased interest rate spreads and the resulting discount rates used in estimating fair values and the effect of declines in market values of debt and equity securities of comparable companies. The impairment determination involved significant assumptions and judgments in estimating enterprise values of the Competitive Electric and Regulated Delivery segments and the fair values of their assets and liabilities. This cumulative $8.950 billion charge is the only goodwill impairment recorded since the Merger.

Also in the fourth quarter of 2008, we recorded a trade name intangible asset impairment charge totaling $481 million ($310 million after-tax). The impairment primarily arises from the increase in the discount rate used in estimating fair value as discussed above.

Although the annual impairment test date for goodwill and intangible assets with indefinite lives set by management was October 1, management determined that in consideration of the continuing deterioration of securities values during the fourth quarter of 2008, an impairment testing trigger occurred subsequent to that test date; consequently, the impairment charges were based on estimated fair values at December 31, 2008. See Note 1 for discussion of the change of the annual impairment test date to December 1 in 2009.

The calculations supporting the impairment determination utilized models that took into consideration multiple inputs, including commodity prices, debt yields, equity prices of comparable companies and other inputs. Those models were generally used in developing long-term forward price curves for certain commodities and discount rates for determining fair values of our reporting units as well as certain individual assets and liabilities of those businesses. The fair value measurements resulting from such models are classified as Level 3 non-recurring fair value measurements consistent with accounting standards related to the determination of fair value (see Note 16).

*Identifiable Intangible Assets*

Identifiable intangible assets reported in the balance sheet are comprised of the following:

| | Successor | | | | | |
|---|---|---|---|---|---|---|
| | As of December 31, 2009 | | | As of December 31, 2008 | | |
| | Gross Carrying Amount | Accumulated Amortization | Net | Gross Carrying Amount | Accumulated Amortization | Net |
| Retail customer relationship | $ 463 | $ 215 | $ 248 | $ 463 | $ 130 | $ 333 |
| Favorable purchase and sales contracts | 700 | 374 | 326 | 700 | 249 | 451 |
| Capitalized in-service software | 490 | 167 | 323 | 255 | 116 | 139 |
| Environmental allowances and credits | 992 | 212 | 780 | 994 | 121 | 873 |
| Land easements | 188 | 72 | 116 | 184 | 69 | 115 |
| Mining development costs | 32 | 5 | 27 | 19 | 2 | 17 |
| Total intangible assets subject to amortization | $ 2,865 | $ 1,045 | 1,820 | $ 2,615 | $ 687 | 1,928 |
| Trade name (not subject to amortization) | | | 955 | | | 955 |
| Mineral interests (not currently subject to amortization) | | | 101 | | | 110 |
| Total intangible assets | | | $2,876 | | | $2,993 |

F-27

EFIHMW00052200

EFIHMW00051935

Table of Contents

Details of amortization expense related to intangible assets (including income statement line item in which the amortization is included) follows:

| Intangible Asset (Income Statement line) | Segment | Useful lives at December 31, 2009 (weighted average in years) | Successor | | | Predecessor |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Retail customer relationship (Depreciation and amortization) | Competitive Electric | 4 | $ 85 | $ 51 | $ 79 | $ — |
| Favorable purchase and sales contracts (Operating revenues/fuel, purchased power costs and delivery fees) | Competitive Electric | 12 | 125 | 168 | 72 | — |
| Capitalized in-service software (Depreciation and amortization) | All | 5 | 53 | 44 | 8 | 23 |
| Environmental allowances and credits (Fuel, purchased power costs and delivery fees) | Competitive Electric | 28 | 91 | 102 | 20 | — |
| Land easements (Depreciation and amortization) | Regulated Delivery | 67 | 3 | 3 | — | 2 |
| Mining development costs (Depreciation and amortization) | Competitive Electric | 5 | 3 | 1 | — | — |
| Total amortization expense | | | $ 360 | $ 369 | $ 179 | $ 25 |

Separately identifiable and previously unrecognized intangible assets acquired and recorded as part of purchase accounting for the Merger are described as follows:

- *Retail Customer Relationship*—Retail customer relationship intangible asset represents the estimated fair value of the non-contracted customer base and is being amortized using an accelerated method based on customer attrition rates and reflecting the expected pattern in which economic benefits are realized over their estimated useful life.

- *Favorable Purchase and Sales Contracts*—Favorable purchase and sales contracts intangible asset primarily represents the above market value, based on observable prices or estimates, of commodity contracts for which: (i) we have made the "normal" purchase or sale election allowed by accounting standards related to derivative instruments and hedging transactions or (ii) the contracts did not meet the definition of a derivative. The amortization periods of these intangible assets are based on the terms of the contracts. Unfavorable purchase and sales contracts are recorded as other noncurrent liabilities and deferred credits (see Note 25).

- *Trade name*—The trade name intangible asset represents the estimated fair value of the TXU Energy trade name, and was determined to be an indefinite-lived asset not subject to amortization. This intangible asset will be evaluated for impairment at least annually in accordance with accounting guidance related to goodwill and other intangible assets. See above for discussion of an impairment charge recorded in 2008.

F-28

EFIHMW00052201

EFIHMW00051935

Table of Contents

- *Environmental Allowances and Credits*—This intangible asset represents the fair value, based on observable prices or estimates, of environmental credits, substantially all of which were expected to be used in our power generation activities. These credits are amortized utilizing a units–of–production method.

*Impairment of Environmental Allowances and Credits Intangible Assets*

In March 2005, the EPA issued regulations called the Clean Air Interstate Rule (CAIR) for 28 states, including Texas, where our generation facilities are located. CAIR requires reductions of $SO_2$ and $NO_x$ emissions from power generation facilities in these states. The $SO_2$ reductions were beyond the reductions required under the Clean Air Act's existing acid rain cap–and–trade program (the Acid Rain Program). CAIR also established a new regional cap–and–trade program for $NO_x$ emissions reductions.

In July 2008, the US Court of Appeals for the D.C. Circuit (the D.C. Circuit Court) invalidated CAIR. The D.C. Circuit Court did not overturn the existing cap–and–trade program for $SO_2$ reductions under the Acid Rain Program.

Based on the D.C. Circuit Court's ruling, we recorded a noncash impairment charge to earnings in 2008. We impaired $NO_x$ allowances in the amount of $401 million (before deferred income tax benefit). As a result of the D.C. Circuit Court's decision, $NO_x$ allowances would no longer be needed, and thus there would not be an actively traded market for such allowances. Consequently, our $NO_x$ allowances would likely have very little value absent reversal of the D.C. Circuit Court's decision or promulgation of new rules by the EPA. In addition, we impaired $SO_2$ allowances in the amount of $100 million (before deferred income tax benefit). While the D.C. Circuit Court did not invalidate the Acid Rain Program, we would have more $SO_2$ allowances than we would need to comply with the Acid Rain Program. While there continued to be a market for $SO_2$ allowances, the D.C. Circuit Court's decision resulted in a material decrease in the market price of $SO_2$ allowances.

The impairment amounts recorded in 2008 were reported in other deductions and reflected in the results of the Competitive Electric segment.

In December 2008, in response to an EPA petition, the D.C. Circuit Court reversed, in part, its previous ruling. Such reversal confirmed CAIR is not valid, but allowed it to remain in place while the EPA revises CAIR to correct the previously identified shortcomings. Since the D.C. Circuit Court did not prescribe a deadline for this revision, at this time, we cannot predict how or when the EPA may revise CAIR.

*Estimated Amortization of Intangible Assets*—The estimated aggregate amortization expense of intangible assets for each of the next five fiscal years is as follows:

| Year | Amortization Expense |
|------|---------------------|
| 2010 | $ 278 |
| 2011 | 210 |
| 2012 | 166 |
| 2013 | 147 |
| 2014 | 133 |

## 4.   CHARGES RELATED TO CANCELLED DEVELOPMENT OF COAL–FUELED GENERATION FACILITIES

In 2007, we recorded a net charge totaling $757 million ($492 million after–tax), substantially all of which was in the Predecessor period, in connection with the February 2007 suspension of the development of eight coal–fueled generation units. This decision and subsequent terminations of equipment orders required an evaluation of the recoverability of recorded assets associated with the development program. The net charge included $705 million for the impairment of construction work–in–process asset balances (primarily

F–29

EFIHMW00052202

EFIHMW00051935

**PX 030**
**Page 268 of 734**

**Table of Contents**

pre–construction development costs), $79 million for costs arising from terminations of equipment orders, $29 million for the write–off of deferred financing costs and a $57 million gain on sale (in early October 2007) of two in–process boilers. Additional charges totaling $12 million ($8 million after–tax) were recorded in 2008, which primarily represented costs for transportation and storage of materials.

The construction work–in–process asset balances totaled $871 million prior to the writedown and included progress payments made and accruals for amounts due to equipment suppliers, based on percentage of completion estimates, engineering and design services costs, site preparation expenditures, internal salary and related overhead costs for personnel engaged directly in construction management activities and capitalized interest. The remaining carrying value of assets related to the program at December 31, 2009 totaled $77 million and represented estimated recovery amounts, using a probability–weighted methodology, from equipment salvage and potential resale activities. Cumulative net cash proceeds through December 31, 2009 from the sale of the impaired assets totaled $172 million.

We have terminated all of the equipment orders, with the exception of one purchase order for a boiler that we are attempting to sell, and the air permit applications related to the eight units were formally withdrawn from the TCEQ in October 2007 after the close of the Merger. The net charges arising from cancellation of this development program have been classified in other deductions and are reported in the results of the Competitive Electric segment.

**5.    IMPAIRMENT OF NATURAL GAS–FUELED GENERATION FACILITIES**

In 2008, we performed an evaluation of our natural gas–fueled generation facilities for impairment. The impairment test was triggered by a determination that it was more likely than not that certain generation units would be retired or mothballed (idled) earlier than previously expected. The natural gas–fueled generation units are generally operated to meet peak demands for electricity and all such facilities are tested for impairment as an asset group. As a result of the evaluation, it was determined that an impairment existed, and a charge of $229 million ($147 million after–tax) was recorded to write down the assets to fair value of approximately $28 million, which was determined based on discounted estimated future cash flows. The impairment was reported in other deductions in the Competitive Electric segment.

**6.    STIPULATION APPROVED BY THE PUCT**

Oncor and Texas Holdings agreed to the terms of a stipulation, which was conditional upon completion of the Merger, with major interested parties to resolve all outstanding issues in the PUCT review related to the Merger. In February 2008, the PUCT entered an order approving the stipulation. The PUCT issued a final order on rehearing in April 2008 that has been appealed to 200th District Court of Travis County, Texas. The parties to the appeal have agreed to a schedule that would result in a hearing in June 2010.

In addition to commitments Oncor made in its filings in the PUCT review, the stipulation included the following provisions, among others:

- Oncor provided a one–time $72 million refund to its REP customers in the September 2008 billing cycle. The refund was in the form of a credit on distribution fee billings. The liability for the refund was recorded as part of purchase accounting.

- Consistent with the 2006 cities rate settlement (see Note 7), Oncor filed a system–wide rate case in June 2008 based on a test–year ended December 31, 2007. In August 2009, the PUCT issued a final order on this rate case. See Note 25.

- Oncor agreed not to request recovery of approximately $56 million of regulatory assets related to self–insurance reserve costs and 2002 restructuring expenses. These regulatory assets were eliminated as part of purchase accounting.

- The dividends paid by Oncor will be limited through December 31, 2012, to an amount not to exceed Oncor's net income (determined in accordance with GAAP, subject to certain defined adjustments) for

F–30

EFIHMW00052203

EFIHMW00051935

Table of Contents

the period beginning October 11, 2007 and ending December 31, 2012, and are further limited by an agreement that Oncor's regulatory capital structure, as determined by the PUCT, will be at or below the assumed debt–to–equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.

- Oncor committed to minimum capital spending of $3.6 billion over the five–year period ending December 31, 2012, subject to certain defined conditions.

- Oncor committed to an additional $100 million in spending over the five–year period ending December 31, 2012 on demand–side management or other energy efficiency initiatives. These additional expenditures will not be recoverable in rates, and this amount was recorded as a regulatory liability as part of purchase accounting and consistent with accounting standards related to the effect of certain types of regulation.

- If Oncor's credit rating is below investment grade with two or more rating agencies, TCEH will post a letter of credit in an amount of $170 million to secure TXU Energy's payment obligations to Oncor.

- Oncor agreed not to request recovery of the $4.9 billion of goodwill resulting from purchase accounting or any future impairment of the goodwill in its rates.

## 7.    CITIES RATE SETTLEMENT IN 2006

In January 2006, Oncor agreed with a steering committee representing 108 cities in Texas (Cities) to defer the filing of a system–wide rate case with the PUCT to no later than July 1, 2008 (based on a test year ending December 31, 2007). Oncor filed the rate case with the PUCT in June 2008, and the PUCT issued a final order on the case in 2009. Oncor extended the benefits of the agreement to 292 nonlitigant cities. The agreements provided that Oncor would make payments to participating cities totaling approximately $70 million, including incremental franchise taxes.

This amount was recognized in earnings over the period from May 2006 through June 2008. Amounts recognized totaled $11 million in 2009, $23 million in 2008, $8 million for the period October 11, 2007 through December 31, 2007 and $25 million for the period January 1, 2007 through October 10, 2007, of which $2 million, $13 million, $6 million and $20 million, respectively, were reported in other deductions (see Note 10), with the remainder reported in franchise and revenue–based taxes. Amounts recognized in 2009 represented extension of benefits per the agreement related to the timing of completion of the rate case.

## 8.    ACCOUNTING FOR UNCERTAINTY IN INCOME TAXES

Effective January 1, 2007, we adopted accounting guidance related to uncertain tax positions. This guidance requires that all tax positions subject to uncertainty be reviewed and assessed with recognition and measurement of the tax benefit based on a "more–likely–than–not" standard with respect to the ultimate outcome, regardless of whether this assessment is favorable or unfavorable. We applied updated guidance to determine if each tax position was effectively settled for the purpose of recognizing previously uncertain tax positions. We completed our review and assessment of uncertain tax positions and in the 2007 Predecessor period recorded a net benefit to retained earnings and a decrease to noncurrent liabilities of $33 million in accordance with the new accounting rule.

We file income tax returns in US federal, state and foreign jurisdictions and are subject to examinations by the IRS and other taxing authorities. Examinations of our income tax returns for the years ending prior to January 1, 2003 are complete, but the tax years 1997 to 2002 remain in appeals with the IRS. The conclusion of issues contested from the 1997 to 2002 audit, including matters related to TXU Europe, is not expected to occur prior to 2011. In 2008, we were notified of the commencement of an IRS audit of tax years 2003 to 2006. The audit is expected to require two years to complete. Texas franchise and margin tax returns are under examination or still open for examination for tax years beginning after 2002.

F–31

EFIHMW00052204

EFIHMW00051935

**Table of Contents**

In 2008, we participated in negotiations with the IRS regarding the 2002 worthlessness loss associated with our discontinued Europe business, and we reduced the liability for uncertain tax positions in accordance with accounting guidance. The reduction in the liability of approximately $375 million was largely offset by a reduction of deferred tax assets related to alternative minimum tax.

We classify interest and penalties related to uncertain tax positions as current income tax expense. Amounts recorded related to interest and penalties totaled $42 million in 2009, $88 million in 2008, including $29 million recorded as goodwill, $12 million for the period October 11, 2007 through December 31, 2007 and $43 million for the period January 1, 2007 through October 10, 2007 (all amounts after tax).

Noncurrent liabilities included a total of $361 million and $198 million in accrued interest at December 31, 2009 and 2008, respectively. Effective in 2009, the federal income tax benefit on the interest accrued on uncertain tax positions is recorded as accumulated deferred income taxes. Such amounts were previously reported net as a reduction of the liability for uncertain tax positions.

The following table summarizes the changes to the uncertain tax positions, reported in other noncurrent liabilities in the consolidated balance sheet, during the years ended December 31, 2009 and 2008:

|  | 2009 | 2008 |
|---|---|---|
| Balance at January 1, excluding interest and penalties | $1,583 | $1,834 |
| Additions based on tax positions related to prior years | 71 | 124 |
| Reductions based on tax positions related to prior years | (82) | (451) |
| Additions based on tax positions related to the current year | 66 | 33 |
| Settlements with taxing authorities | — | 43 |
| Reductions related to the lapse of the tax statute of limitations | — | — |
| Balance at December 31, excluding interest and penalties | $1,638 | $1,583 |

Of the balance at December 31, 2009, $1,474 billion represents tax positions for which the uncertainty relates to the timing of recognition in tax returns. The disallowance of such positions would not affect the effective tax rate, but would accelerate the payment of cash to the taxing authority to an earlier period.

With respect to tax positions for which the ultimate deductibility is uncertain (permanent items), should we sustain such positions on income tax returns previously filed, liabilities recorded would be reduced by $164 million, resulting in increased income from continuing operations and a favorable impact on the effective tax rate.

We filed a claim in 2006 for refund of income taxes and related interest paid in 2005 associated with IRS audits of 1993 and 1994 tax returns of a discontinued operation. The expected refund was recognized in the adoption of accounting guidance related to uncertain tax positions. We received the refund, totaling $98 million, in February 2009.

We do not expect the total amount of liabilities recorded related to uncertain tax positions will significantly increase or decrease within the next 12 months.

F–32

EFIHMW00052205

EFIHMW00051935

Table of Contents

9.  **INCOME TAXES**

The components of our income tax expense (benefit) applicable to continuing operations are as follows:

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Current: | | | | |
| US Federal | $ 64 | $ (46) | $ 52 | $ 400 |
| State | 51 | 52 | 10 | 20 |
| Total | 115 | 6 | 62 | 420 |
| Deferred: | | | | |
| US Federal | 256 | (482) | (722) | 12 |
| State | 1 | 10 | (12) | (108) |
| Total | 257 | (472) | (734) | (96) |
| Amortization of investment tax credits | (5) | (5) | (1) | (15) |
| Total | $ 367 | $ (471) | $ (673) | $ 309 |

Reconciliation of income taxes computed at the US federal statutory rate to income tax expense:

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Income (loss) from continuing operations before income taxes | $ 775 | $ (10,469) | $ (2,034) | $ 1,008 |
| Income taxes at the US federal statutory rate of 35% | $ 271 | $ (3,664) | $ (712) | $ 353 |
| Nondeductible goodwill impairment | 32 | 3,101 | — | — |
| Lignite depletion allowance | (18) | (29) | (5) | (30) |
| Production activities deduction | — | — | 10 | (10) |
| Amortization of investment tax credits—net of deferred income tax effect | (5) | (5) | (1) | (12) |
| Amortization (under regulatory accounting) of statutory rate changes | 5 | 2 | — | 2 |
| Medicare subsidy—other postretirement employee benefits | (7) | (6) | (2) | (6) |
| Nondeductible interest expense | 13 | 11 | 1 | — |
| Nondeductible losses (earnings) on benefit plans | (1) | 9 | — | (6) |
| Texas margin tax, net of federal tax benefit | 30 | 39 | (3) | 16 |
| Texas margin tax—deferred tax adjustment | — | — | — | (70) |
| Nondeductible merger transaction costs | — | — | 23 | — |
| Deferred tax adjustments | — | — | — | 25 |
| Accrual of interest, net of federal tax benefit | 42 | 59 | 12 | 43 |
| Other, including audit settlements | 5 | 12 | 5 | 4 |
| Income tax expense (benefit) | $ 367 | $ (471) | $ (673) | $ 309 |
| Effective tax rate | 47.4% | 4.5% | 33.1% | 30.7% |

F–33

EFIHMW00052206

EFIHMW00051935

Table of Contents

*Texas Margin Tax*

In May 2006, the Texas legislature enacted a new law that reformed the Texas franchise tax system and replaced it with a new tax system, referred to as the Texas margin tax. The Texas margin tax has been determined to be an income tax for accounting purposes. In June 2007, an amendment to this law was enacted that included clarifications and technical changes to the provisions of the tax calculation. In the 2007 Predecessor period, we recorded a deferred tax benefit of $70 million, essentially all of which related to changes in the rate at which a tax credit is calculated as specified in the new law. Of the total $70 million deferred tax benefit, $32 million was recognized in the Competitive Electric segment results and $38 million was recognized in the Corporate and Other nonsegment results.

*Deferred Income Tax Balances*

Deferred income taxes provided for temporary differences based on tax laws in effect at December 31, 2009 and 2008 balance sheet dates are as follows:

| | Successor | | | | | |
|---|---|---|---|---|---|---|
| | December 31, 2009 | | | December 31, 2008 | | |
| | Total | Current | Noncurrent | Total | Current | Noncurrent |
| **Deferred Income Tax Assets** | | | | | | |
| Alternative minimum tax credit carryforwards | $ 438 | $ — | $ 438 | $ 447 | $ — | $ 447 |
| Employee benefit liabilities | 206 | 22 | 184 | 173 | 33 | 140 |
| Net operating loss (NOL) carryforwards | 422 | — | 422 | 523 | — | 523 |
| Unfavorable purchase and sales contracts | 249 | — | 249 | 259 | — | 259 |
| Accrued interest | 211 | — | 211 | — | — | — |
| Other | 351 | 13 | 338 | 260 | 44 | 216 |
| Total | 1,877 | 35 | 1,842 | 1,662 | 77 | 1,585 |
| **Deferred Income Tax Liabilities** | | | | | | |
| Property, plant and equipment | 4,141 | — | 4,141 | 4,375 | — | 4,375 |
| Basis difference in Oncor partnership (a) | 1,369 | — | 1,369 | 1,333 | — | 1,333 |
| Commodity contracts and interest rate swaps | 1,325 | 30 | 1,295 | 645 | 31 | 614 |
| Identifiable intangible assets | 921 | — | 921 | 1,049 | — | 1,049 |
| Debt fair value discounts | 184 | — | 184 | 257 | — | 257 |
| Other | 63 | — | 63 | 26 | 2 | 24 |
| Total | 8,003 | 30 | 7,973 | 7,685 | 33 | 7,652 |
| **Net Deferred Income Tax (Asset) Liability** | $6,126 | $ (5) | $ 6,131 | $6,023 | $ (44) | $ 6,067 |

_____
(a)   See Note 14.

At December 31, 2009 we had $438 million of alternative minimum tax credit carryforwards (AMT) available to offset future tax payments. The AMT credit carryforwards have no expiration date. At December 31, 2009, we had net operating loss (NOL) carryforwards for federal income tax purposes of $1.206 billion that expire between 2023 and 2028. The NOL carryforwards can be used to offset future taxable income. We expect to utilize all of our NOL carryforwards prior to their expiration dates.

The component of deferred income tax liabilities referred to as "basis difference in Oncor partnership" arose as a result of the sale of noncontrolling interests in Oncor (see Note 15) at which time Oncor became a

F–34

EFIHMW00052207

EFIHMW00051935

**Table of Contents**

partnership for US federal income tax purposes. The amount of this basis difference at the date of the transaction represented our interest (approximately 80%) in the net deferred tax liabilities related to Oncor's individual operating assets and liabilities. The remaining net deferred tax liabilities associated with Oncor ($321 million at December 31, 2009) that are attributable to the noncontrolling interests have been reclassified as other noncurrent liabilities (see Note 25).

The income tax effects of the components included in accumulated other comprehensive income at December 31, 2009 and 2008 totaled a net deferred tax asset of $165 million and $207 million, respectively.

See Note 8 for discussion regarding accounting for uncertain tax positions.

F–35

EFIHMW00052208

EFIHMW00051935

**PX 030**
**Page 274 of 734**

Table of Contents

10.    OTHER INCOME AND DEDUCTIONS

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Other income: | | | | |
| Accretion of adjustment (discount) of regulatory assets resulting from purchase accounting (Note 25) | $ 39 | $ 44 | $ 10 | $ — |
| Amortization of gain on sale of TXU Fuel (a) | — | — | — | 36 |
| Debt extinguishment gain (Note 12) | 87 | — | — | — |
| Reversal of reserves recorded in purchase accounting (b) | 44 | — | — | — |
| Fee received related to interest rate swap/commodity hedge derivative agreement (c) (Note 18) | 6 | — | — | — |
| Insurance recoveries (d) | — | 21 | — | — |
| Net gain on sale of other properties and investments | 4 | 4 | 1 | 4 |
| Reduction of insurance reserves related to discontinued operations | — | — | 1 | 7 |
| Penalty received for nonperformance under a coal transportation agreement | — | — | — | 6 |
| Mineral rights royalty income | 6 | 4 | 1 | 8 |
| Other | 18 | 7 | 1 | 8 |
| Total other income | $ 204 | $ 80 | $ 14 | $ 69 |
| | | | | |
| Other deductions: | | | | |
| Impairment of trade name intangible asset (Note 3) | $ — | $ 481 | $ — | $ — |
| Impairment of emission allowances intangible assets (Note 3) | — | 501 | — | — |
| Charge for impairment of natural gas–fueled generation facilities (Note 5) | — | 229 | — | — |
| Impairment of land (e) | 34 | — | — | — |
| Charge related to Lehman bankruptcy (f) | — | 26 | — | — |
| Write-off of regulatory assets (Note 25) | 25 | — | — | — |
| Professional fees incurred related to the Merger (g) | — | 14 | 51 | 39 |
| Net charges related to cancelled development of generation facilities (Note 4) | 6 | 12 | 2 | 755 |
| Severance charges | 7 | — | — | — |
| Charge related to termination of rail car lease (h) | — | — | — | 10 |
| Other asset writeoffs (i) | 5 | 2 | — | 34 |
| Credit related to impaired leases (j) | — | — | — | (48) |
| Costs related to 2006 cities rate settlement (Note 7) | 2 | 13 | 6 | 20 |
| Litigation/regulatory settlements | 3 | 10 | — | 5 |
| Expenses related to cancelled joint venture at Oncor | — | — | — | 12 |
| Other | 15 | 13 | 2 | 14 |
| Total other deductions | $ 97 | $ 1,301 | $ 61 | $ 841 |

(a)  As part of the 2004 sale of the assets of TXU Fuel, TCEH entered into a transportation agreement with the new owner, intended to be market–price based, to transport natural gas to TCEH's generation plants. Because of the continuing involvement in the business through the transportation agreement, the pretax gain of $375 million related to the sale was deferred and being recognized over the eight–year life of the

F–36

EFIHMW00052209

EFIHMW00051935

**PX 030**
**Page 275 of 734**

Table of Contents

transportation agreement, and the business was not accounted for as a discontinued operation. The remaining $218 million deferred gain was eliminated as part of purchase accounting related to the Merger. Reported in Corporate and Other activities.
(b)    Includes $23 million for reversal of a use tax accrual, related to periods prior to the Merger, due to a state ruling in 2009 (reported in Competitive Electric segment) and $21 million for reversal of excess exit liabilities recorded in connection with the termination of outsourcing arrangements (see Notes 2 and 20) (reported in Competitive Electric ($11 million) and Regulated Delivery segments ($10 million)).
(c)    Reported in Competitive Electric segment.
(d)    Represents insurance recovery for damage to mining equipment. Reported in Competitive Electric segment.
(e)    Impairment of land expected to be sold in the next 12 months. Reported in Competitive Electric segment.
(f)    Represents reserve established against amounts due (excluding termination related costs) from subsidiaries of Lehman Brothers Holdings Inc. (Lehman) arising from commodity hedging and trading activities. There are no open positions with these subsidiaries. Reported in Competitive Electric segment.
(g)    Includes post–Merger consulting expenses related to optimizing business performance. Reported in Corporate and Other activities.
(h)    Represents costs associated with termination and refinancing of a rail car lease. Reported in Competitive Electric segment.
(i)    Predecessor period includes $30 million of previously deferred costs, consisting primarily of professional fees for tax, legal and other advisory services, in connection with certain previously anticipated strategic transactions (including expected financings) that were no longer expected to be consummated as a result of the Merger. Reported in Corporate and Other activities.
(j)    In 2004, we recorded a charge of $157 million for leases of certain natural gas–fueled combustion turbines, net of estimated sublease revenues, that were no longer operated for our own benefit. In the third quarter of 2007, a $48 million reduction in the related liability was recorded to reflect new subleases entered into in October 2007 (reported in the Competitive Electric segment results). The remaining $59 million liability was eliminated as part of purchase accounting as we intend to operate these assets for our own benefit.

**11.    TRADE ACCOUNTS RECEIVABLE AND SALE OF RECEIVABLES PROGRAM**

TXU Energy participates in an accounts receivable securitization program, the activity under which is accounted for as a sale of accounts receivable in accordance with transfers and servicing accounting standards (see Note 1 for discussion of a new accounting standard effective in the first quarter of 2010). Under the program, TXU Energy (originator) sells trade accounts receivable to TXU Receivables Company, which is a special purpose entity created for the purpose of purchasing receivables from the originator and is a consolidated wholly–owned bankruptcy–remote direct subsidiary of EFH Corp. TXU Receivables Company sells undivided interests in the purchased accounts receivable for cash to special purpose entities established by financial institutions (the funding entities). As discussed below, Oncor also participated in the program prior to the Merger.

The maximum amount currently available under the accounts receivable securitization program is $700 million, and program funding totaled $383 million at December 31, 2009. Under the terms of the program, available funding was reduced by the total of $83 million of customer deposits held by the originator at December 31, 2009 because TCEH's credit ratings were lower than Ba3/BB–.

All new trade receivables under the program generated by the originator are continuously purchased by TXU Receivables Company with the proceeds from collections of receivables previously purchased. Changes in the amount of funding under the program, through changes in the amount of undivided interests sold by TXU Receivables Company, reflect seasonal variations in the level of accounts receivable, changes in collection trends and other factors such as changes in sales prices and volumes. TXU Receivables Company has issued subordinated notes payable to the originator for the difference between the face amount of the uncollected accounts receivable purchased, less a discount, and cash paid to the originator that was funded by the sale of the undivided interests. The balance of the subordinated notes payable, which is eliminated in consolidation, totaled $463 million and $268 million at December 31, 2009 and 2008, respectively.

F-37

EFIHMW00052210

EFIHMW00051935

Table of Contents

The discount from face amount on the purchase of receivables from the originator principally funds program fees paid to the funding entities. The program fees, which are also referred to as losses on sale of the receivables under transfers and servicing accounting standards, consist primarily of interest costs on the underlying financing. The discount also funds a servicing fee paid by TXU Receivables Company to EFH Corporate Services Company (Service Co.), a direct wholly–owned subsidiary of EFH Corp., which provides recordkeeping services and is the collection agent for the program.

Program fee amounts, which are reported in SG&A expenses, were as follows:

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Program fees | $ 12 | $ 25 | $ 9 | $ 32 |
| Program fees as a percentage of average funding (annualized) | 2.4% | 5.2% | 9.5% | 6.4% |

The trade accounts receivable balance reported in the December 31, 2009 consolidated balance sheet includes $846 million face amount of retail trade accounts receivable sold net of proceeds from the sale of undivided interests in those receivables totaling $383 million. Funding under the program decreased $33 million in 2009, increased $53 million in 2008 and decreased $264 million in 2007. Funding increases or decreases under the program are reflected as operating cash flow activity in the statement of cash flows. The carrying amount of the retained interests in the accounts receivable balance approximated fair value due to the short–term nature of the collection period.

In connection with the Merger, the accounts receivable securitization program was amended. Concurrently with the amendment, the financial institutions required that Oncor repurchase all of the receivables it had previously sold to TXU Receivables Company, which totaled $254 million. Oncor funded such repurchases through borrowings under its credit facility of $113 million, and a related subordinated note receivable from TXU Receivables Company in the amount of $141 million was canceled. Amounts related to Oncor's trade accounts receivable for the period from January 1, 2007 through October 10, 2007 totaled $6 million in program fees and $27 million in operating cash flows provided, exclusive of the $113 million used by Oncor to repurchase its receivables at the time of the Merger.

Activities of TXU Receivables Company were as follows:

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Cash collections on accounts receivable | $ 6,125 | $ 6,393 | $ 1,538 | $ 6,251 |
| Face amount of new receivables purchased | (6,287) | (6,418) | (1,194) | (6,628) |
| Discount from face amount of purchased receivables | 14 | 29 | 9 | 35 |
| Program fees paid to funding entities | (12) | (25) | (9) | (32) |
| Servicing fees paid to Service Co. for recordkeeping and collection services | (2) | (4) | (1) | (3) |
| Increase (decrease) in subordinated notes payable | 195 | (28) | (120) | 305 |
| Oncor's repurchase of receivables previously sold | — | — | 113 | — |
| Operating cash flows used by (provided to) originators under the program | $ 33 | $ (53) | $ 336 | $ (72) |

F–38

EFIHMW00052211

EFIHMW00051935

PX 030
Page 277 of 734

Table of Contents

The program, which expires in October 2013, may be terminated upon the occurrence of a number of specified events, including if the delinquency ratio (delinquent for 31 days) for the sold receivables, the default ratio (delinquent for 91 days or deemed uncollectible), the dilution ratio (reductions for discounts, disputes and other allowances) or the days collection outstanding ratio exceed stated thresholds, and the funding entities do not waive such event of termination. The thresholds apply to the entire portfolio of sold receivables. In addition, the program may be terminated if TXU Receivables Company or the EFH Corp. subsidiary acting as collection agent defaults in any payment with respect to debt in excess of $50,000 in the aggregate for such entities, or if TCEH, any affiliate of TCEH acting as collection agent other than the EFH Corp. subsidiary, any parent guarantor of the originator or the originator shall default in any payment with respect to debt (other than hedging obligations) in excess of $200 million in the aggregate for such entities. As of December 31, 2009, there were no such events of termination.

Upon termination of the program, liquidity would be reduced as collections of sold receivables would be used by TXU Receivables Company to repurchase the undivided interests from the funding entities instead of purchasing new receivables. The level of cash flows would normalize in approximately 16 to 30 days.

The subordinated notes issued by TXU Receivables Company are subordinated to the undivided interests of the funding entities in the purchased receivables.

*Trade Accounts Receivable*

|  | Successor | |
| --- | --- | --- |
|  | December 31, | |
|  | 2009 | 2008 |
| Gross wholesale and retail trade accounts receivable | $1,726 | $1,705 |
| Undivided interests in retail accounts receivable sold by TXU Receivables Company | (383) | (416) |
| Allowance for uncollectible accounts | (83) | (70) |
| Trade accounts receivable—reported in balance sheet | $1,260 | $1,219 |

Gross trade accounts receivable at December 31, 2009 and 2008 included unbilled revenues of $546 million and $505 million, respectively.

F–39

EFIHMW00052212

EFIHMW00051935

**PX 030
Page 278 of 734**

**Table of Contents**
*Allowance for Uncollectible Accounts Receivable*

| | |
|---|---:|
| Predecessor: | |
| Allowance for uncollectible accounts receivable as of December 31, 2006 | $ 13 |
| Increase for bad debt expense | 46 |
| Decrease for account write-offs | (54) |
| Changes related to receivables sold | 26 |
| Allowance for uncollectible accounts receivable as of October 10, 2007 | 31 |
| Successor: | |
| Allowance for uncollectible accounts receivable as of October 11, 2007 | 31 |
| Increase for bad debt expense | 13 |
| Decrease for account write-offs | (12) |
| Allowance for uncollectible accounts receivable as of December 31, 2007 | 32 |
| Increase for bad debt expense | 81 |
| Decrease for account write-offs | (69) |
| Charge related to Lehman bankruptcy | 26 |
| Allowance for uncollectible accounts receivable as of December 31, 2008 | 70 |
| Increase for bad debt expense | 113 |
| Decrease for account write-offs | (99) |
| Other | (1) |
| Allowance for uncollectible accounts receivable as of December 31, 2009 | $ 83 |

**12.  SHORT-TERM BORROWINGS AND LONG-TERM DEBT**

*Short-Term Borrowings*

At December 31, 2009, we had outstanding short-term borrowings of $1.569 billion at a weighted average interest rate of 2.50%, excluding certain customary fees, at the end of the period. Short-term borrowings under credit facilities totaled $953 million for TCEH and $616 million for Oncor.

At December 31, 2008, we had outstanding short-term borrowings of $1.237 billion at a weighted average interest rate of 3.41%, excluding certain customary fees, at the end of the period. Short-term borrowings under credit facilities totaled $900 million for TCEH and $337 million for Oncor.

*Credit Facilities*

Our credit facilities with cash borrowing and/or letter of credit availability at December 31, 2009 are presented below. The facilities are all senior secured facilities of the authorized borrower.

| Authorized Borrowers and Facility | Maturity Date | Facility Limit | Letters of Credit | Cash Borrowings | Availability |
|---|---|---:|---:|---:|---:|
| TCEH Revolving Credit Facility (a) | October 2013 | $ 2,700 | $ — | $ 953 | $ 1,721 |
| TCEH Letter of Credit Facility (b) | October 2014 | 1,250 | | 1,250 | |
| Subtotal TCEH (c) | | $ 3,950 | $ — | $ 2,203 | $ 1,721 |
| TCEH Commodity Collateral Posting Facility (d) | December 2012 | Unlimited | $ — | $ — | Unlimited |
| Oncor Revolving Credit Facility (e) | October 2013 | $ 2,000 | $ — | $ 616 | $ 1,262 |

F-40

EFIHMW00052213

EFIHMW00051935

**PX 030**
**Page 279 of 734**

Table of Contents

(a)  Facility used for letters of credit and borrowings for general corporate purposes. Borrowings are classified as short–term borrowings. Availability amount includes $141 million of commitments from Lehman that are only available from the fronting banks and the swingline lender and excludes $26 million of requested cash draws that have not been funded by Lehman. All outstanding borrowings under this facility at December 31, 2009 bear interest at LIBOR plus 3.5%, and a commitment fee is payable quarterly in arrears at a rate per annum equal to 0.50% of the average daily unused portion of the facility.

(b)  Facility used for issuing letters of credit for general corporate purposes, including, but not limited to, providing collateral support under hedging arrangements and other commodity transactions that are not eligible for funding under the TCEH Commodity Collateral Posting Facility. The borrowings under this facility were drawn at the inception of the facility, are classified as long–term debt, and except for $115 million related to a letter of credit drawn in June 2009, have been retained as restricted cash. Letters of credit totaling $736 million issued as of December 31, 2009 are supported by the restricted cash, and the remaining letter of credit availability totals $399 million.

(c)  Pursuant to PUCT rules, TCEH is required to maintain available capacity under its credit facilities to assure adequate credit worthiness of TCEH's REP subsidiaries, including the ability to return retail customer deposits, if necessary. As a result, at December 31, 2009, the total availability under the TCEH credit facilities should be further reduced by $228 million.

(d)  Revolving facility used to fund cash collateral posting requirements for specified volumes of natural gas hedges totaling approximately 600 million MMBtu as of December 31, 2009. As of December 31, 2009, there were no borrowings under this facility. See "TCEH Senior Secured Facilities" below for additional information.

(e)  Facility used by Oncor for its general corporate purposes. Borrowings are classified as short–term borrowings. Availability amount excludes $122 million of commitments from Lehman. All outstanding borrowings under this facility at December 31, 2009 bear interest at LIBOR plus 0.350%, and a facility fee is payable (currently at a rate per annum equal to 0.125%) on the commitments under the facility. The interest rate and facility fee rate per annum declined in June 2009 from LIBOR plus 0.425% and 0.150%, respectively, due to a two notch upgrade in Oncor's credit ratings by Moody's.

F–41

EFIHMW00052214

EFIHMW00051935

Table of Contents
*Long−Term Debt*

At December 31, 2009 and 2008, the long−term debt consisted of the following:

| | December 31, 2009 | December 31, 2008 |
|---|---|---|
| **TCEH** | | |
| Pollution Control Revenue Bonds: | | |
| Brazos River Authority: | | |
| 5.400% Fixed Series 1994A due May 1, 2029 | $      39 | $      39 |
| 7.700% Fixed Series 1999A due April 1, 2033 | 111 | 111 |
| 6.750% Fixed Series 1999B due September 1, 2034, remarketing date April 1, 2013 (a) | 16 | 16 |
| 7.700% Fixed Series 1999C due March 1, 2032 | 50 | 50 |
| 8.250% Fixed Series 2001A due October 1, 2030 | 71 | 71 |
| 5.750% Fixed Series 2001C due May 1, 2036, remarketing date November 1, 2011 (a) | 217 | 217 |
| 8.250% Fixed Series 2001D−1 due May 1, 2033 | 171 | 171 |
| 0.264% Floating Series 2001D−2 due May 1, 2033 (b) | 97 | 97 |
| 0.317% Floating Taxable Series 2001I due December 1, 2036 (c) | 62 | 62 |
| 0.264% Floating Series 2002A due May 1, 2037 (b) | 45 | 45 |
| 6.750% Fixed Series 2003A due April 1, 2038, remarketing date April 1, 2013 (a) | 44 | 44 |
| 6.300% Fixed Series 2003B due July 1, 2032 | 39 | 39 |
| 6.750% Fixed Series 2003C due October 1, 2038 | 52 | 52 |
| 5.400% Fixed Series 2003D due October 1, 2029, remarketing date October 1, 2014 (a) | 31 | 31 |
| 5.000% Fixed Series 2006 due March 1, 2041 | 100 | 100 |
| Sabine River Authority of Texas: | | |
| 6.450% Fixed Series 2000A due June 1, 2021 | 51 | 51 |
| 5.500% Fixed Series 2001A due May 1, 2022, remarketing date November 1, 2011 (a) | 91 | 91 |
| 5.750% Fixed Series 2001B due May 1, 2030, remarketing date November 1, 2011 (a) | 107 | 107 |
| 5.200% Fixed Series 2001C due May 1, 2028 | 70 | 70 |
| 5.800% Fixed Series 2003A due July 1, 2022 | 12 | 12 |
| 6.150% Fixed Series 2003B due August 1, 2022 | 45 | 45 |
| Trinity River Authority of Texas: | | |
| 6.250% Fixed Series 2000A due May 1, 2028 | 14 | 14 |
| Unamortized fair value discount related to pollution control revenue bonds (d) | (147) | (161) |
| Senior Secured Facilities: | | |
| 3.743% TCEH Initial Term Loan Facility maturing October 10, 2014 (e)(f) | 16,079 | 16,244 |
| 3.735% TCEH Delayed Draw Term Loan Facility maturing October 10, 2014 (e)(f) | 4,075 | 3,562 |
| 3.731% TCEH Letter of Credit Facility maturing October 10, 2014 (f) | 1,250 | 1,250 |
| 0.215% TCEH Commodity Collateral Posting Facility maturing December 31, 2012 (g) | — | — |

F−42

EFIHMW00052215

EFIHMW00051935

**Table of Contents**

| | December 31, 2009 | December 31, 2008 |
|---|---|---|
| Other: | | |
| 10.25% Fixed Senior Notes due November 1, 2015 (h) | 2,944 | 3,000 |
| 10.25% Fixed Senior Notes Series B due November 1, 2015 (h) | 1,913 | 2,000 |
| 10.50 / 11.25% Senior Toggle Notes due November 1, 2016 | 1,952 | 1,750 |
| 7.000% Fixed Senior Notes due March 15, 2013 | 5 | 5 |
| 7.100% Promissory Note due January 5, 2009 | — | 65 |
| 7.460% Fixed Secured Facility Bonds with amortizing payments through January 2015 | 55 | 67 |
| Capital lease obligations | 153 | 159 |
| Unamortized fair value discount (d) | (4) | (6) |
| **Total TCEH** | $ 29,810 | $ 29,470 |
| **EFC Holdings** | | |
| 9.580% Fixed Notes due in semiannual installments through December 4, 2019 | $ 51 | $ 55 |
| 8.254% Fixed Notes due in quarterly installments through December 31, 2021 | 50 | 53 |
| 1.081% Floating Rate Junior Subordinated Debentures, Series D due January 30, 2037 (f) | 1 | 1 |
| 8.175% Fixed Junior Subordinated Debentures, Series E due January 30, 2037 | 8 | 8 |
| Unamortized fair value discount (d) | (11) | (12) |
| **Total EFC Holdings** | 99 | 105 |
| **EFH Corp. (parent entity)** | | |
| 10.875% Fixed Senior Notes due November 1, 2017 | 1,831 | 2,000 |
| 11.25 / 12.00% Senior Toggle Notes due November 1, 2017 | 2,797 | 2,500 |
| 9.75% Fixed Senior Secured Notes due October 15, 2019 | 115 | — |
| 4.800% Fixed Senior Notes Series O due November 15, 2009 | — | 3 |
| 5.550% Fixed Senior Notes Series P due November 15, 2014 (i) | 983 | 1,000 |
| 6.500% Fixed Senior Notes Series Q due November 15, 2024 (i) | 740 | 750 |
| 6.550% Fixed Senior Notes Series R due November 15, 2034 (i) | 744 | 750 |
| 8.820% Building Financing due semiannually through February 11, 2022 (j) | 75 | 80 |
| Unamortized fair value premium related to Building Financing (d) | 17 | 22 |
| Unamortized fair value discount (d) | (599) | (661) |
| **Total EFH Corp.** | 6,703 | 6,444 |
| **Intermediate Holding** | | |
| 9.75% Fixed Senior Secured Notes due October 15, 2019 | 141 | — |
| **Oncor (k)** | | |
| 6.375% Fixed Senior Notes due May 1, 2012 | 700 | 700 |
| 5.950% Fixed Senior Notes due September 1, 2013 | 650 | 650 |
| 6.375% Fixed Senior Notes due January 15, 2015 | 500 | 500 |
| 6.800% Fixed Senior Notes due September 1, 2018 | 550 | 550 |
| 7.000% Fixed Debentures due September 1, 2022 | 800 | 800 |
| 7.000% Fixed Senior Notes due May 1, 2032 | 500 | 500 |
| 7.250% Fixed Senior Notes due January 15, 2033 | 350 | 350 |
| 7.500% Fixed Senior Notes due September 1, 2038 | 300 | 300 |
| Unamortized discount | (15) | (16) |
| **Total Oncor** | 4,335 | 4,334 |

F–43

EFIHMW00052216

EFIHMW00051935

**Table of Contents**

| | December 31, 2009 | December 31, 2008 |
|---|---|---|
| Oncor Electric Delivery Transition Bond Company LLC (l) | | |
| 4.030% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2010 | 13 | 54 |
| 4.950% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2013 | 130 | 130 |
| 5.420% Fixed Series 2003 Bonds due in semiannual installments through August 15, 2015 | 145 | 145 |
| 3.520% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2009 | — | 39 |
| 4.810% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2012 | 197 | 221 |
| 5.290% Fixed Series 2004 Bonds due in semiannual installments through May 15, 2016 | 290 | 290 |
| | | |
| Total Oncor Electric Delivery Transition Bond Company LLC | 775 | 879 |
| Unamortized fair value discount related to transition bonds (d) | (6) | (9) |
| | | |
| Total Oncor consolidated | 5,104 | 5,204 |
| | | |
| Total EFH Corp. consolidated | 41,857 | 41,223 |
| Less amount due currently (m) | (417) | (385) |
| | | |
| Total long–term debt | $ 41,440 | $ 40,838 |

(a)   These series are in the multiannual interest rate mode and are subject to mandatory tender prior to maturity on the mandatory remarketing date. On such date, the interest rate and interest rate period will be reset for the bonds.

(b)   Interest rates in effect at December 31, 2009. These series are in a daily interest rate mode and are classified as long–term as they are supported by long–term irrevocable letters of credit.

(c)   Interest rate in effect at December 31, 2009. This series is in a weekly interest rate mode and is classified as long–term as it is supported by long–term irrevocable letters of credit.

(d)   Amount represents unamortized fair value adjustments recorded under purchase accounting.

(e)   Interest rate swapped to fixed on $16.30 billion principal amount.

(f)   Interest rates in effect at December 31, 2009.

(g)   Interest rate in effect at December 31, 2009, excluding a quarterly maintenance fee of approximately $11 million. See "Credit Facilities" above for more information.

(h)   2009 amounts exclude $56 million and $87 million of the original and Series B notes, respectively, that are held by EFH Corp. and Intermediate Holding and eliminated in consolidation. See discussion of debt exchanges below.

(i)   2009 amounts exclude $9 million, $6 million and $3 million of the Series P, Series Q and Series R notes, respectively, that are held by Intermediate Holding and eliminated in consolidation. See discussion of debt exchanges below.

(j)   This financing is secured and will be serviced with $115 million in restricted cash drawn in June 2009 by the beneficiary of a letter of credit. The issuer elected not to extend the expiration date of the letter of credit, and TCEH elected to allow the drawing in lieu of reissuing the letter of credit under the TCEH Revolving Credit Facility. The remaining $104 million of the prepayment (net of $11 million of debt service payments) is included in other current assets and other noncurrent assets on the balance sheet.

(k)   Secured with first priority lien as discussed under "Oncor Secured Revolving Credit Facility" below.

(l)   These bonds are nonrecourse to Oncor and were issued to securitize a regulatory asset.

(m)   Includes zero and $3 million at December 31, 2009 and 2008, respectively, representing debt of the EFH Corp. parent entity.

F–44

EFIHMW00052217

EFIHMW00051935

**PX 030**
**Page 283 of 734**

Table of Contents

*EFH Corp. 10% Senior Secured Notes Issued in 2010*—In January 2010, EFH Corp. issued $500 million aggregate principal amount of 10.00% Senior Secured Notes due 2020 (the EFH Corp. 10% Notes). The notes will mature on January 15, 2020, and interest is payable in cash in arrears on January 15 and July 15 of each year at a fixed rate of 10.00% per annum with the first interest payment due on July 15, 2010. Other than interest and maturity date, the notes have the same guarantees and collateral and substantially the same other terms and conditions as the EFH Corp. 9.75% Notes.

Before January 15, 2013, EFH Corp. may redeem, with the net cash proceeds of certain equity offerings, up to 35% of the aggregate principal amount of its EFH Corp. 10% Notes from time to time at a redemption price of 110.000% of the aggregate principal amount of the notes, plus accrued and unpaid interest, if any. EFH Corp. may redeem the notes at any time prior to January 15, 2015 at a price equal to 100% of their principal amount, plus accrued and unpaid interest and the applicable premium as defined in the indenture. EFH Corp. may also redeem the notes, in whole or in part, at any time on or after January 15, 2015, at specified redemption prices, plus accrued and unpaid interest, if any. Upon the occurrence of a change of control (as described in the indenture), EFH Corp. may be required to offer to repurchase the notes at 101% of their principal amount, plus accrued and unpaid interest, if any.

The EFH Corp. 10% Notes were issued in a private placement and have not been registered under the Securities Act. EFH Corp. has agreed to use its commercially reasonable efforts to register with the SEC notes having substantially identical terms as the EFH Corp. 10% Notes (except for provisions relating to the transfer restrictions and payment of additional interest) as part of an offer to exchange freely tradable exchange notes for the EFH Corp. 10% Notes. EFH Corp. has agreed to use commercially reasonable efforts to cause the exchange offer to be completed or, if required under special circumstances, to have one or more shelf registration statements declared effective, within 360 days after the issue date of the notes. If this obligation is not satisfied (a Registration Default), the annual interest rate on the notes will increase by 25 basis points for the first 90-day period during which a Registration Default continues, and thereafter the annual interest rate on the notes will increase by 50 basis points for the remaining period during which the Registration Default continues. If the Registration Default is cured, the interest rate on the notes will revert to the original level.

*Debt-Related Activity in 2009*—Repayments of long-term debt in 2009 totaling $396 million represented principal payments at scheduled maturity dates as well as other repayments totaling $50 million, principally related to capitalized leases. Payments at scheduled amortization or maturity dates included $165 million repaid under the TCEH Initial Term Loan Facility, $104 million of Oncor transition bond principal payments, $65 million repaid under a TCEH promissory note, $9 million repaid under the TCEH Delayed Draw Term Loan Facility and $3 million of EFH Corp. senior notes.

Increases in long-term debt during 2009 totaling $522 million consisted of increased borrowings under the TCEH Delayed Draw Term Loan Facility, which was fully drawn as of July 2009, to fund expenditures related to construction of new generation facilities and environmental upgrades of existing lignite/coal-fueled generation facilities. In addition, long-term debt increased as a result of EFH Corp. increasing, through the payment-in-kind (PIK) election, the principal amount of its 11.25%/12.00% Senior Toggle Notes due November 2017 (EFH Corp. Toggle Notes) by $309 million and TCEH increasing, through the PIK election, the principal amount of its 10.50%/11.25% Senior Toggle Notes due November 2016 (TCEH Toggle Notes) by $202 million, in each case, in lieu of making cash interest payments.

*Debt Exchanges*—In October 2009, EFH Corp., Intermediate Holding and EFIH Finance, a wholly-owned subsidiary of Intermediate Holding, commenced offers to exchange up to approximately $4.9 billion principal amount of EFH Corp. 10.875% Senior Notes due November 2017 (EFH Corp. 10.875% Notes) and EFH Corp. Toggle Notes (collectively with the EFH Corp. 10.875% Notes, the EFH Corp. Senior Notes), EFH Corp. Series P, Q and R Notes and TCEH 10.25% Notes due November 2015 (the TCEH 10.25% Notes and collectively, with the EFH Corp. 10.875% Notes, Toggle Notes and Series P, Q and R Notes, the Old Notes) for up to $3.0 billion of new senior secured notes, with up to $1.35 billion to be issued by EFH Corp. and up to $1.65 billion to be

F-45

EFIHMW00052218

EFIHMW00051935

**PX 030**
**Page 284 of 734**

issued by Intermediate Holding and EFIH Finance (the EFIH Co−Issuers). The purpose of the debt exchanges was to reduce the outstanding principal amount and extend the weighted average maturity of our long−term debt.

The debt exchange transactions, which closed in November 2009, resulted in the tendering of $357 million principal amount of Old Notes in exchange for $115 million principal amount of 9.75% Senior Secured Notes issued by EFH Corp. (the EFH Corp. 9.75% Notes) and $141 million principal amount of 9.75% Senior Secured Notes issued by Intermediate Holding and EFIH Finance (the EFIH Notes). The EFH Corp. 9.75% Notes and EFIH Notes will mature in October 2019, with interest payable in cash semi−annually in arrears on April 15 and October 15.

The EFH Corp. 9.75% Notes are fully and unconditionally guaranteed on a joint and several basis by EFC Holdings and Intermediate Holding. The guarantee from Intermediate Holding is secured by the pledge of all membership interests and other investments Intermediate Holding owns or holds in Oncor Holdings or any of Oncor Holdings' subsidiaries (the Collateral). The guarantee from EFC Holdings is not secured. The EFIH Notes are secured by the Collateral on a parity lien basis with the EFH Corp. 9.75% Notes.

The EFH Corp. 9.75% Notes and EFIH Notes are senior obligations of each issuer and rank equally in right of payment with all senior indebtedness of each issuer and are senior in right of payment to any future subordinated indebtedness of each issuer. The EFH Corp. 9.75% Notes are effectively subordinated to any indebtedness of EFH Corp. secured by assets of EFH Corp. to the extent of the value of the assets securing such indebtedness and structurally subordinated to all indebtedness and other liabilities of EFH Corp.'s non−guarantor subsidiaries. The EFIH Notes are effectively senior to all unsecured indebtedness of the EFIH Co−Issuers, to the extent of the value of the Collateral, and will be effectively subordinated to any indebtedness of the EFIH Co−Issuers secured by assets of the EFIH Co−Issuers other than the Collateral, to the extent of the value of the assets securing such indebtedness. Furthermore, the EFIH Notes will be structurally subordinated to all indebtedness and other liabilities of Intermediate Holding's subsidiaries (other than EFIH Finance), including Oncor Holdings and its subsidiaries.

The guarantees of the EFH Corp. 9.75% Notes are the general senior obligations of each guarantor and rank equally in right of payment with all existing and future senior indebtedness of each guarantor. The guarantee from Intermediate Holding is effectively senior to all unsecured indebtedness of Intermediate Holding to the extent of the value of the Collateral. The guarantee will be effectively subordinated to all secured indebtedness of each guarantor secured by assets other than the Collateral to the extent of the value of the assets securing such indebtedness and will be structurally subordinated to any existing and future indebtedness and liabilities of EFH Corp.'s subsidiaries that are not guarantors.

The EFH Corp. 9.75% Notes and EFIH Notes and indentures governing such notes restrict the issuers and their restricted subsidiaries' ability to, among other things, make restricted payments, incur debt and issue preferred stock, incur liens, permit dividend and other payment restrictions on restricted subsidiaries, merge, consolidate or sell assets and engage in transactions with affiliates. These covenants are subject to a number of limitations and exceptions. The notes and indentures also contain customary events of default, including, among others, failure to pay principal or interest on the notes when due. If certain events of default occur and are continuing under a series of notes and the related indenture, the trustee or the holders of at least 30% in principal amount outstanding of the notes of such series may declare the principal amount of the notes of such series to be due and payable immediately.

There currently are no restricted subsidiaries under the indenture related to the EFIH Notes (other than EFIH Finance, which has no assets). Oncor Holdings, the immediate parent of Oncor, and its subsidiaries are unrestricted subsidiaries under the EFIH indenture and, accordingly, will not be subject to any of the restrictive covenants in the indenture.

The respective issuers may redeem the EFH Corp. 9.75% Notes and EFIH Notes, in whole or in part, at any time on or after October 15, 2014, at specified redemption prices, plus accrued and unpaid interest, if any. In

F−46

EFIHMW00052219

EFIHMW00051935