Table of Contents

addition, before October 15, 2012, the respective issuers may redeem up to 35% of the aggregate principal amount of each series of the notes from time to time at a redemption price of 109.750% of the aggregate principal amount of such series of notes, plus accrued and unpaid interest, if any, with the net cash proceeds of certain equity offerings. The respective issuers may also redeem each series of the notes at any time prior to October 15, 2014 at a price equal to 100% of their principal amount, plus accrued and unpaid interest and the applicable premium as defined in the indenture. Upon the occurrence of a change of control (as described in the indenture), the respective issuers may be required to offer to repurchase each series of the notes at 101% of their principal amount, plus accrued and unpaid interest, if any.

*Debt–Related Activity in 2008*—Repayments of long–term debt in 2008 totaling $1.167 billion represented principal payments at scheduled maturity dates as well as the remarketing of $242 million principal amount of pollution control revenue bonds discussed below, repayment of $413 million of borrowings under the TCEH Commodity Collateral Posting Facility, which fully repaid borrowings under the facility, and other repayments totaling $48 million, principally related to leases. Payments at scheduled maturity dates included $200 million of EFH Corp. senior notes, $165 million repaid under the TCEH Initial Term Loan Facility, and $99 million of Oncor transition bond principal payments.

Increases in long–term debt during 2008 totaling $3.185 billion consisted of issuances of senior secured notes issued by Oncor with an aggregate principal amount of $1.500 billion (see discussion below under "Oncor Senior Secured Notes"), borrowings under the TCEH Delayed Draw Term Loan Facility of $1.412 billion to fund expenditures related to the development of new generation facilities and the environmental retrofit program for existing lignite/coal–fueled generation facilities, the remarketing of $242 million principal amount of pollution control revenue bonds discussed immediately below and $31 million of additional borrowings under the TCEH Commodity Collateral Posting Facility.

In June 2008, TCEH remarketed the Brazos River Authority Pollution Control Revenue Bonds Series 2001A due in October 2030 and Series 2001D–1 due in May 2033 with aggregate principal amounts of $71 million and $171 million, respectively. The bonds were previously in a floating rate mode that reset weekly and were backed by two letters of credit in an aggregate amount of $247 million. As a result of the remarketing, the bonds were fixed to maturity at an interest rate of 8.25%, and the two letters of credit were cancelled. The bonds are redeemable at par beginning July 1, 2018 and are redeemable with a make–whole premium prior to July 1, 2018. These bonds were remarketed with a covenant package similar to the notes discussed below under "TCEH Senior Notes."

*Maturities*—Long–term debt maturities as of December 31, 2009 are as follows (includes Oncor's transition bond semi–annual payments):

| Year | |
|---|---|
| 2010 | $ 340 |
| 2011 | 764 |
| 2012 | 1,056 |
| 2013 | 1,071 |
| 2014 | 21,746 |
| Thereafter (a) | 17,492 |
| Unamortized fair value premium | 17 |
| Unamortized fair value discount (b) | (767) |
| Unamortized discount | (15) |
| Capital lease obligations | 153 |
| Total | $41,857 |

(a)  Long–term debt maturities for EFH Corp. (parent entity) total $7.328 billion, including $18 million held by Intermediate Holding that is not included above.
(b)  Unamortized fair value discount for EFH Corp. (parent entity) totals $(599) million.

F–47

EFIHMW00052220

EFIHMW00051935

**PX 030**
**Page 286 of 734**

**Table of Contents**

*TCEH Senior Secured Facilities*—Borrowings under the TCEH Initial Term Loan Facility, the TCEH Delayed Draw Term Loan Facility, the TCEH Revolving Credit Facility and the TCEH Letter of Credit Facility, which totaled $22.357 billion at December 31, 2009, bear interest at per annum rates equal to, at TCEH's option, (i) adjusted LIBOR plus 3.50% or (ii) a base rate (the higher of (1) the prime rate as announced from time to time by the administrative agent of the facilities and (2) the federal funds effective rate plus 0.50%) plus 2.50%. There is a margin adjustment mechanism in relation to term loans, revolving loans and letter of credit fees under which the applicable margins may be reduced based on the achievement of certain leverage ratio levels; there was no such reduction based upon December 31, 2009 levels. The applicable rate on borrowings under the facilities as of December 31, 2009 is provided in the long–term debt table and in the discussion of short–term borrowings above and reflects LIBOR–based borrowings.

In August 2009, the TCEH Senior Secured Facilities were amended to reduce the existing first lien capacity under the TCEH Senior Secured Facilities by $1.25 billion in exchange for the ability for TCEH to issue up to an additional $4 billion of secured notes or loans ranking junior to TCEH's first lien obligations, provided that:

- such notes or loans mature later than the latest maturity date of any of the initial term loans under the TCEH Senior Secured Facilities, and

- any net cash proceeds from any such issuances are used (i) in exchange for, or to refinance, repay, retire, refund or replace indebtedness of TCEH or (ii) to acquire, directly or indirectly, all or substantially all of the property and assets or business of another person or to finance the purchase price, cost of design, acquisition, construction, repair, restoration, replacement, expansion, installation or improvement of certain fixed or capital assets.

In addition, the amended facilities permit TCEH to, among other things:

- issue new secured notes or loans, which may include, in each case, indebtedness secured on a pari passu basis with the obligations under the TCEH Senior Secured Facilities, so long as, in each case, among other things, the net cash proceeds from any such issuance are used to prepay certain loans under the TCEH Senior Secured Facilities at par;

- agree with individual lenders to extend the maturity of their term loans or extend or refinance their revolving credit commitments under the TCEH Senior Secured Facilities, and pay increased interest rates or otherwise modify the terms of their loans or revolving commitments in connection with such an extension, and

- exclude from the financial maintenance covenant under the TCEH Senior Secured Facilities any new debt issued that ranks junior to TCEH's first lien obligations under the TCEH Senior Secured Facilities.

Under the terms of the TCEH Senior Secured Facilities, the commitments of the lenders to make loans to TCEH are several and not joint. Accordingly, if any lender fails to make loans to TCEH, TCEH's available liquidity could be reduced by an amount up to the aggregate amount of such lender's commitments under the TCEH Senior Secured Facilities.

The TCEH Senior Secured Facilities are unconditionally guaranteed jointly and severally on a senior secured basis by EFC Holdings, and subject to certain exceptions, each existing and future direct or indirect wholly–owned US restricted subsidiary of TCEH. The TCEH Senior Secured Facilities, including the guarantees thereof, certain commodity hedging transactions and the interest rate swaps described under "TCEH Interest Rate Swap Transactions" below are secured by (a) substantially all of the current and future assets of TCEH and TCEH's subsidiaries who are guarantors of such facilities and (b) pledges of the capital stock of TCEH and certain current and future direct or indirect subsidiaries of TCEH.

The TCEH Initial Term Loan Facility is required to be repaid in equal quarterly installments in an aggregate annual amount equal to 1% of the original principal amount of such facility (approximately $41 million

F–48

EFIHMW00052221

EFIHMW00051935

Table of Contents

quarterly), with the balance payable in October 2014. The TCEH Delayed Draw Term Loan Facility is required to be repaid in equal quarterly installments beginning in December 2009 in an aggregate annual amount equal to 1% of the actual principal outstanding under such facility as of such date, with the balance payable in October 2014. Amounts borrowed under the TCEH Revolving Facility may be reborrowed from time to time until October 2013. The TCEH Letter of Credit Facility and TCEH Commodity Collateral Posting Facility will mature in October 2014 and December 2012, respectively.

The TCEH Senior Secured Facilities contain customary negative covenants, restricting, subject to certain exceptions, TCEH and TCEH's restricted subsidiaries from, among other things:

- incurring additional debt;
- incurring additional liens;
- entering into mergers and consolidations;
- selling or otherwise disposing of assets;
- making dividends, redemptions or other distributions in respect of capital stock;
- making acquisitions, investments, loans and advances, and
- paying or modifying certain subordinated and other material debt.

In addition, the TCEH Senior Secured Facilities contain a maintenance covenant that prohibits TCEH and its restricted subsidiaries from exceeding a maximum consolidated secured leverage ratio and to observe certain customary reporting requirements and other affirmative covenants.

The TCEH Senior Secured Facilities contain certain customary events of default for senior leveraged acquisition financings, the occurrence of which would allow the lenders to accelerate all outstanding loans and terminate their commitments.

*TCEH Senior Notes*—The indebtedness under TCEH's and TCEH Finance's 10.25% Senior Notes due November 1, 2015 and 10.25% Senior Notes due November 1, 2015 (Series B) (collectively, TCEH 10.25% Notes) bear interest semiannually in arrears on May 1 and November 1 of each year at a fixed rate of 10.25% per annum payable in cash. The indebtedness under the TCEH Toggle Notes bear interest semiannually in arrears on May 1 and November 1 of each year at a fixed rate of 10.50% per annum for cash interest and at a fixed rate of 11.25% per annum for PIK interest. For any interest periods until November 2012, the issuers may elect to pay interest on the notes (i) entirely in cash; (ii) by increasing the principal amount of the notes or by issuing new TCEH Toggle Notes (PIK Interest); or (iii) 50% in cash and 50% in PIK Interest. TCEH made the PIK election for both interest payments in 2009, increasing the principal amount. Once TCEH makes a PIK election, the election is valid for each succeeding interest payment period until TCEH revokes the election.

The TCEH 10.25% and Toggle Notes (collectively, the TCEH Senior Notes) are fully and unconditionally guaranteed on a joint and several basis by TCEH's direct parent, EFC Holdings (which owns 100% of TCEH and its subsidiary guarantors), and by each subsidiary that guarantees the TCEH Senior Secured Facilities.

Before November 1, 2010, the issuers may redeem with the cash proceeds of certain equity offerings up to 35% of the aggregate principal amount of the TCEH 10.25% and Toggle Notes from time to time at a redemption price of 110.250% and 110.500%, respectively, of their respective aggregate principal amount plus accrued and unpaid interest, if any. The issuers may also redeem the TCEH Senior Notes at any time prior to November 1, 2011 and 2012, respectively, at a price equal to 100% of their principal amount, plus accrued and unpaid interest and the applicable premium as defined in the indenture. The issuers may redeem the TCEH Senior Notes, in whole or in part, at any time on or after November 1, 2011 and 2012, respectively, at specified redemption prices, plus accrued and unpaid interest, if any. Upon the occurrence of a change of control of EFC Holdings or TCEH, the issuers may be required to offer to repurchase the TCEH Senior Notes at 101% of their principal amount, plus accrued and unpaid interest, if any.

F–49

EFIHMW00052222

EFIHMW00051935

**Table of Contents**

The indenture for the TCEH Senior Notes contains a number of covenants that, among other things, restrict, subject to certain exceptions, the Co–Issuers' and their restricted subsidiaries' ability to:

- make restricted payments;

- incur debt and issue preferred stock;

- create liens;

- enter into mergers or consolidations;

- sell or otherwise dispose of certain assets;

- permit dividend and other payment restrictions on restricted subsidiaries, and

- engage in certain transactions with affiliates.

The indenture also contains customary events of default, including failure to pay principal or interest on the notes when due, among others. If certain events of default occur and are continuing under the indenture, the trustee or the holders of at least 30% in principal amount of the notes may declare the principal amount on the notes to be due and payable immediately.

*EFH Corp. Senior Notes*—Borrowings under EFH Corp.'s 10.875% Notes bear interest semiannually in arrears on May 1 and November 1 of each year at a fixed rate of 10.875% per annum payable in cash. Borrowings under EFH Corp.'s 11.250%/12.000% Senior Toggle Notes due November 1, 2017 bear interest semiannually in arrears on May 1 and November 1 of each year at a fixed rate of 11.250% per annum for cash interest and at a fixed rate of 12.000% per annum for PIK Interest. For any interest period until November 1, 2012, EFH Corp. may elect to pay interest on the notes, at EFH Corp.'s option (i) entirely in cash; (ii) by increasing the principal amount of the notes or by issuing new EFH Corp. Toggle Notes (PIK Interest); or (iii) 50% in cash and 50% in PIK Interest. EFH Corp. made the PIK election for both interest payments in 2009, increasing the principal amount of the EFH Corp. Toggle Notes. Once EFH Corp. makes a PIK election, the election is valid for each succeeding interest payment period until EFH Corp. revokes the election.

The EFH Corp. Senior Notes are fully and unconditionally guaranteed on a joint and several basis by EFC Holdings and Intermediate Holding.

Before November 1, 2010, EFH Corp. may redeem, with the net cash proceeds of certain equity offerings, up to 35% of the aggregate principal amount of its 10.875% and Toggle Notes from time to time at a redemption price of 110.875% and 111.250%, respectively, of their respective aggregate principal amounts, plus accrued and unpaid interest, if any. EFH Corp. may redeem the notes at any time prior to November 1, 2012 at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make–whole" premium. EFH Corp. may also redeem the notes, in whole or in part, at any time on or after November 1, 2012, at specified redemption prices, plus accrued and unpaid interest, if any. Upon the occurrence of a change of control of EFH Corp., EFH Corp. must offer to repurchase the notes at 101% of their principal amount, plus accrued and unpaid interest, if any.

The indenture for the EFH Corp. Senior Notes contains a number of covenants that, among other things, restrict, subject to certain exceptions, EFH Corp.'s and its restricted subsidiaries' ability to:

- make restricted payments;

- incur debt and issue preferred stock;

- create liens;

- enter into mergers or consolidations;

- sell or otherwise dispose of certain assets;

F–50

EFIHMW00052223

EFIHMW00051935

**Table of Contents**

- permit dividend and other payment restrictions on restricted subsidiaries, and

- engage in certain transactions with affiliates.

The indenture also contains customary events of default, including failure to pay principal or interest on the notes or the guarantees when due, among others. If an event of default occurs under the indenture, the trustee or the holders of at least 30% in principal amount outstanding of the notes may declare the principal amount on the notes to be due and payable immediately.

*Intercreditor Agreement*—In October 2007, TCEH entered into an intercreditor agreement with Citibank, N.A. and five secured commodity hedge counterparties (the Secured Commodity Hedge Counterparties). In connection with the August 2009 amendment to the TCEH Secured Facilities described above, the intercreditor agreement was amended and restated (as amended and restated, the "Intercreditor Agreement") to take into account, among other things, the possibility that TCEH could issue notes and/or loans secured by collateral (other than the collateral that secures the TCEH Senior Secured Facilities) that ranks on parity with, or junior to, TCEH's existing first lien obligations under the TCEH Senior Secured Facilities. The Intercreditor Agreement provides that the lien granted to the Secured Commodity Hedge Counterparties will rank pari passu with the lien granted with respect to the collateral of the secured parties under the TCEH Senior Secured Facilities. The Intercreditor Agreement also provides that the Secured Commodity Hedge Counterparties will be entitled to share, on a pro rata basis, in the proceeds of any liquidation of such collateral in connection with a foreclosure on such collateral in an amount provided in the TCEH Senior Secured Facilities. The Intercreditor Agreement also provides that the Secured Commodity Hedge Counterparties will have voting rights with respect to any amendment or waiver of any provision of the Intercreditor Agreement that changes the priority of the Secured Commodity Hedge Counterparties' lien on such collateral relative to the priority of lien granted to the secured parties under the TCEH Senior Secured Facilities or the priority of payments to the Secured Commodity Hedge Counterparties upon a foreclosure and liquidation of such collateral relative to the priority of the lien granted to the secured parties under the TCEH Senior Secured Facilities.

*TCEH Interest Rate Swap Transactions*—As of December 31, 2009, TCEH has entered into interest rate swap transactions pursuant to which payment of the floating interest rates on an aggregate of $16.30 billion principal amount of senior secured term loans of TCEH were exchanged for interest payments at fixed rates of between 7.3% and 8.3% on debt maturing from 2010 to 2014. Swaps on $1.25 billion principal amount of senior secured debt expired in 2009. Interest rate swaps on an aggregate of $15.05 billion were being accounted for as cash flow hedges related to variable interest rate cash flows until August 29, 2008, at which time these swaps were dedesignated as cash flow hedges as a result of the intent to change the variable interest rate terms of the hedged debt (from three-month LIBOR to one-month LIBOR) in connection with the planned execution of interest rate basis swaps (discussed immediately below) to further reduce the fixed borrowing costs. Based on the fair value of the positions, the cumulative unrealized mark-to-market net losses related to these interest rate swaps totaled $431 million (pre-tax) at the dedesignation date and was recorded in accumulated other comprehensive income. This balance will be reclassified into net income as interest on the hedged debt is reflected in net income. No ineffectiveness gains or losses were recorded.

As of December 31, 2009, TCEH has entered into interest rate basis swap transactions pursuant to which payments at floating interest rates of three-month LIBOR on an aggregate of $16.25 billion principal amount of senior secured term loans of TCEH were exchanged for floating interest rates of one-month LIBOR plus spreads ranging from 0.0625% to 0.353%. These transactions include swaps entered into in the year ended December 31, 2009 related to an aggregate $9.55 billion principal amount of senior secured term loans of TCEH and reflect the expiration of swaps in the year ended December 31, 2009 that related to an aggregate $6.345 billion principal amount of senior secured term loans of TCEH.

The interest rate swap counterparties are proportionately secured by the same collateral package granted to the lenders under the TCEH Senior Secured Facilities. Subsequent to the dedesignation in August 2008 discussed

F-51

EFIHMW00052224

EFIHMW00051935

**PX 030**
**Page 290 of 734**

Table of Contents

above, changes in the fair value of such swaps are being reported in the income statement in interest expense and related charges, and such unrealized mark–to–market value changes totaled $696 million in net gains in the year ended December 31, 2009 and $1.477 billion in net losses in the year ended December 31, 2008. The cumulative unrealized mark–to–market net liability related to the swaps totaled $1.212 billion at December 31, 2009, of which $194 million (pre–tax) was reported in accumulated other comprehensive income.

See Note 18 for discussion of collateral investments related to certain of these interest rate swaps.

*Oncor Secured Revolving Credit Facility*—Oncor has a $2.0 billion credit facility to be used for its working capital and general corporate purposes, including issuances of commercial paper and letters of credit (Oncor Revolving Credit Facility). Oncor may request increases in the commitments under the facility in any amount up to $500 million, subject to the satisfaction of certain conditions. Amounts borrowed under the facility, once repaid, can be reborrowed by Oncor from time to time until October 10, 2013. Under the terms of this credit facility, the commitments of the lenders to make loans to Oncor are several and not joint. Accordingly, if any lender fails to make loans to Oncor, Oncor's available liquidity could be reduced by an amount up to the aggregate amount of such lender's commitments under the Oncor Revolving Credit Facility. Oncor secured this credit facility with a first priority lien on certain of its transmission and distribution assets. Oncor also secured all of its existing long–term debt securities (excluding the transition bonds) with the same lien in accordance with the terms of those securities. The lien contains customary provisions allowing Oncor to use the assets in its business, as well as to replace and/or release collateral as long as the market value of the aggregate collateral is at least 115% of the aggregate secured debt. The lien may be terminated at Oncor's option upon the termination of Oncor's credit facility. Borrowings under this credit facility totaled $616 million and $337 million at December 31, 2009 and 2008, respectively. The applicable rate on borrowings under this credit facility as of December 31, 2009 was 0.58% (see detail provided in the credit facilities table above).

The credit facility contains customary covenants for facilities of this type, restricting, subject to certain exceptions, Oncor and its subsidiary from, among other things:

- incurring additional liens;
- entering into mergers and consolidations;
- selling certain assets, and
- making acquisitions and investments in subsidiaries.

In addition, the credit facility requires that Oncor maintain a consolidated senior debt–to–capitalization ratio of no greater than 0.65 to 1.00 and observe certain customary reporting requirements and other affirmative covenants.

The credit facility contains certain customary events of default for facilities of this type, the occurrence of which would allow the lenders to accelerate all outstanding loans and terminate their commitments under the facility.

*Oncor Senior Secured Notes*—In September 2008, Oncor issued and sold senior secured notes with an aggregate principal amount of $1.500 billion consisting of $650 million aggregate principal amount of 5.95% senior secured notes maturing in September 2013, $550 million aggregate principal amount of 6.80% senior secured notes maturing in September 2018 and $300 million aggregate principal amount of 7.50% senior secured notes maturing in September 2038. Oncor used the net proceeds of approximately $1.487 billion from the sale of the Oncor notes to repay most of its borrowings under its credit facility as well as for general corporate purposes. The Oncor notes are secured by the first priority lien described above. If the lien is terminated, the notes will cease to be secured obligations of Oncor and will become senior unsecured general obligations of Oncor.

Interest on these notes is payable in cash semiannually in arrears on March 1 and September 1 of each year. Oncor may redeem the notes, in whole or in part, at any time, at a price equal to 100% of their principal amount,

F–52

EFIHMW00052225

EFIHMW00051935

PX 030
Page 291 of 734

Table of Contents
plus accrued and unpaid interest and a "make–whole" premium. The notes also contain customary events of default, including failure to pay principal or interest on the notes when due.

### 13.  COMMITMENTS AND CONTINGENCIES

*Contractual Commitments*

At December 31, 2009, we had noncancellable commitments under energy–related contracts, leases and other agreements as follows:

| | Coal purchase agreements and coal transportation agreements | Pipeline transportation and storage reservation fees | Capacity payments under power purchase agreements (a) | Nuclear Fuel Contracts | Water Rights Contracts |
|---|---|---|---|---|---|
| 2010 | $ 425 | $ 38 | $ 38 | $ 158 | $ 10 |
| 2011 | 404 | 36 | — | 127 | 9 |
| 2012 | 292 | 23 | — | 182 | 9 |
| 2013 | 259 | — | — | 119 | 8 |
| 2014 | 253 | — | — | 102 | 8 |
| Thereafter | — | — | — | 480 | 37 |
| Total | $ 1,633 | $ 97 | $ 38 | $ 1,168 | $ 81 |

(a)   On the basis of current expectations of demand from electricity customers as compared with capacity and take–or–pay payments, management does not consider it likely that any material payments will become due for electricity not taken beyond capacity payments.

At December 31, 2009, future minimum lease payments under both capital leases and operating leases are as follows:

| | Capital Leases | Operating Leases (a) |
|---|---|---|
| 2010 | $ 81 | $ 65 |
| 2011 | 17 | 59 |
| 2012 | 17 | 56 |
| 2013 | 12 | 49 |
| 2014 | 7 | 46 |
| Thereafter | 43 | 286 |
| Total future minimum lease payments | 177 | $ 561 |
| Less amounts representing interest | 24 | |
| Present value of future minimum lease payments | 153 | |
| Less current portion | 76 | |
| Long–term capital lease obligation | $ 77 | |

(a)   Includes operating leases with initial or remaining noncancellable lease terms in excess of one year.

In February 2010, a capital lease related to a mining railroad spur was terminated, and we purchased the related spur for $63 million. At December 31, 2009, the balance of the capital lease liability was $63 million. The assets were recorded at cost as property, plant and equipment and will be depreciated over their remaining useful lives, the weighted average of which is 23 years.

Rent reported as operating costs, fuel costs and SG&A expenses totaled $92 million for both years ended December 31, 2009 and 2008, $26 million for the period October 11, 2007 through December 31, 2007 and $66 million for the Predecessor period January 1, 2007 through October 10, 2007.

F–53

EFIHMW00052226

EFIHMW00051935

**Table of Contents**
*Commitment to Fund Demand Side Management Initiatives*

In connection with the Merger, Texas Holdings committed to spend $100 million over the five–year period ending December 31, 2012 on demand side management or other energy efficiency initiatives. This commitment is expected to be funded by EFH Corp. and/or its subsidiaries other than Oncor. This commitment is in addition to over $300 million to be invested by Oncor for similar initiatives. See Note 6 for other provisions of the stipulation, including a similar commitment made by Oncor.

*Capital Expenditures*

Oncor and Texas Holdings agreed to the terms of a stipulation with major interested parties to resolve all outstanding issues in the PUCT review related to the Merger. As one of the provisions of this stipulation, Oncor committed to minimum capital spending of $3.6 billion over the five–year period ending December 31, 2012, subject to certain defined conditions. See Note 6.

*Guarantees*

We have entered into contracts that contain guarantees to unaffiliated parties that could require performance or payment under certain conditions. Material guarantees are discussed below.

*Disposed TXU Gas operations*—In connection with the sale of TXU Gas in October 2004, EFH Corp. agreed to indemnify Atmos Energy Corporation (Atmos), until October 1, 2014, for up to $500 million for any liability related to assets retained by TXU Gas, including certain inactive gas plant sites not acquired by Atmos, and up to $1.4 billion for contingent liabilities associated with preclosing tax and employee related matters. The maximum aggregate amount under these indemnities that we may be required to pay is $1.9 billion. To date, we have not been required to make any payments to Atmos under any of these indemnity obligations, and no such payments are currently anticipated.

*Residual value guarantees in operating leases*—We are the lessee under various operating leases that guarantee the residual values of the leased assets. At December 31, 2009, the aggregate maximum amount of residual values guaranteed was approximately $45 million with an estimated residual recovery of approximately $49 million. These leased assets consist primarily of mining equipment, rail cars and vehicles. The average life of the residual value guarantees under the lease portfolio is approximately four years.

See Note 12 for discussion of guarantees and security for certain of our indebtedness.

*Letters of Credit*

At December 31, 2009, TCEH had outstanding letters of credit under its credit facilities totaling $736 million as follows:

- $379 million to support risk management and trading margin requirements in the normal course of business, including over–the–counter hedging transactions;

- $208 million to support floating rate pollution control revenue bond debt with an aggregate principal amount of $204 million (the letters of credit are available to fund the payment of such debt obligations and expire in 2014);

- $65 million for collateral funding transactions with counterparties to interest rate swap agreements related to TCEH debt (see Note 18); and

- $84 million for miscellaneous credit support requirements.

F–54

EFIHMW00052227

EFIHMW00051935

**PX 030
Page 293 of 734**

**Table of Contents**

*Litigation Related to Generation Facilities*

In September 2007, an administrative appeal challenging the order of the TCEQ issuing the air permit for construction and operation of the Oak Grove generation facility in Robertson County, Texas was filed in the State District Court of Travis County, Texas. Plaintiffs asked that the District Court reverse the TCEQ's approval of the Oak Grove air permit and the TCEQ's adoption and approval of the TCEQ Executive Director's Response to Comments, and remand the matter back to TCEQ for further proceedings. In addition to this administrative appeal, two other petitions were filed in Travis County District Court by non-parties to the administrative hearing before the TCEQ and the State Office of Administrative Hearings (SOAH) seeking to challenge the TCEQ's issuance of the Oak Grove air permit and asking the District Court to remand the matter to the SOAH for further proceedings. Finally, the plaintiffs in these two additional lawsuits filed a third, joint petition claiming insufficiencies in the Oak Grove application, permit, and process and seeking party status and remand to the SOAH for further proceedings. One of the plaintiffs asked the District Court to consolidate all these proceedings, and the Attorney General of Texas, on behalf of TCEQ, filed pleas to the jurisdiction seeking dismissal of all but the administrative appeal. In May 2009, the District Court dismissed the claims that contest the merits of the TCEQ's permitting decision, but declined to dismiss the claims that contest the process by which the TCEQ handled the permit application. Oak Grove Management Company LLC (a subsidiary of TCEH) has subsequently intervened in these proceedings and has filed its own pleas to the jurisdiction asking the court to dismiss the remaining collateral attack claims. In October 2009, one of the plaintiffs ended its legal challenge to the permit. In December 2009, the Attorney General and Oak Grove Management Company LLC filed pleadings asking the court to dismiss the administrative appeal challenging the permit for want of prosecution by the plaintiffs. In January 2010, the court denied that request and set the case for a hearing on the merits on June 16, 2010. We believe the Oak Grove air permit granted by the TCEQ was issued in accordance with applicable law. There can be no assurance that the outcome of these matters will not adversely impact the Oak Grove project.

In June and September 2008, administrative appeals were filed in the State District Court of Travis County, Texas to challenge the administrative action of the TCEQ Executive Director in issuing an air permit alteration for the previously-permitted construction and operation of the Sandow 5 generation facility in Milam County, Texas, and the failure of the TCEQ to overturn that administrative action. Plaintiffs asked that the District Court reverse the issuance of the permit alteration. The Attorney General of Texas, on behalf of TCEQ, is defending the issuance of the permit alteration. Sandow Power (a subsidiary of TCEH) intervened in support of the TCEQ. The District Court issued its ruling in November 2009 upholding the TCEQ's issuance of the permit alteration. The plaintiffs did not appeal the court's order by the deadline for such appeal. Thus, the matter has concluded favorably for EFH Corp.

In February 2010, the Sierra Club informed Luminant that it may sue Luminant, after the expiration of a 60-day waiting period, for allegedly violating federal Clean Air Act provisions in connection with Luminant's Big Brown generation facility. This notice is similar to the notice that Luminant received in July 2008 with respect to its Martin Lake generation facility. We cannot predict whether the Sierra Club will actually file suit or the outcome of any resulting proceedings.

In July 2008, Alcoa Inc. filed a lawsuit in the State District Court of Milam County, Texas against Luminant Generation and Luminant Mining (wholly-owned subsidiaries of TCEH), later adding EFH Corp., a number of its subsidiaries, Texas Holdings and Texas Energy Future Capital Holdings LLC as parties to the suit. The lawsuit makes various claims concerning the operation of the Sandow Unit 4 generation facility and the Three Oaks lignite mine, including claims for breach of contract, breach of fiduciary duty, fraud, tortious interference, civil conspiracy and conversion. The plaintiff requests money damages of no less than $500 million, declaratory judgment, rescission and other forms of equitable relief. An agreed scheduling order is currently in place setting trial for May 2010. While we are unable to estimate any possible loss or predict the outcome of this litigation, we believe the plaintiff's claims made in this litigation are without merit and, accordingly, intend to vigorously defend this litigation.

F-55

EFIHMW00052228

EFIHMW00051935

**PX 030**
**Page 294 of 734**

Table of Contents
*Regulatory Investigations and Reviews*

In June 2008, the EPA issued a request for information to TCEH under EPA's authority under Section 114 of the Clean Air Act. The stated purpose of the request is to obtain information necessary to determine compliance with the Clean Air Act, including New Source Review Standards and air permits issued by the TCEQ for the Big Brown, Monticello and Martin Lake generation facilities. Historically, as the EPA has pursued its New Source Review enforcement initiative, companies that have received a large and broad request under Section 114, such as the request received by TCEH, have in many instances subsequently received a notice of violation from the EPA, which has in some cases progressed to litigation or settlement. The company is cooperating with the EPA and is responding in good faith to the EPA's request, but is unable to predict the outcome of this matter.

*Other Proceedings*

In addition to the above, we are involved in various other legal and administrative proceedings in the normal course of business, the ultimate resolution of which, in the opinion of management, should not have a material effect on our financial position, results of operations or cash flows.

*Labor Contracts*

Certain personnel engaged in TCEH and Oncor activities are represented by labor unions and covered by collective bargaining agreements with varying expiration dates. In October 2009, new one–year labor agreements were reached covering bargaining unit personnel engaged in the lignite–fueled generation operations, the lignite mining operations and natural gas–fueled generation operations. In August 2008, a new labor agreement effective until August 2010 was reached covering bargaining unit personnel engaged in nuclear generation. In February 2008, a new three–year contract was ratified covering bargaining unit personnel engaged in Oncor's operations. In June 2009, a group of approximately 50 Oncor employees voted to decertify the labor union as their representative. In December 2009, a group of approximately 350 Oncor employees elected to be represented by a labor union. We expect that any changes in collective bargaining agreements will not have a material effect on our financial position, results of operations or cash flows; however, we are unable to predict the ultimate outcome of these labor negotiations.

*Environmental Contingencies*

The federal Clean Air Act, as amended (Clean Air Act) includes provisions which, among other things, place limits on $SO_2$ and $NO_x$ emissions produced by electricity generation plants. The capital requirements of the company have not been significantly affected by the requirements of the Clean Air Act. In addition, all air pollution control provisions of the 1999 Restructuring Legislation have been satisfied.

We must comply with environmental laws and regulations applicable to the handling and disposal of hazardous waste. We believe that we are in compliance with current environmental laws and regulations; however, the impact, if any, of changes to existing regulations or the implementation of new regulations is not determinable.

The costs to comply with environmental regulations can be significantly affected by the following external events or conditions:

- enactment of state or federal regulations regarding $CO_2$ and other greenhouse gas emissions;

- other changes to existing state or federal regulation regarding air quality, water quality, control of toxic substances and hazardous and solid wastes, and other environmental matters, including revisions to CAIR currently being developed by the EPA as a result of court rulings discussed in Note 3, and

- the identification of sites requiring clean–up or the filing of other complaints in which we may be asserted to be potential responsible parties.

F–56

EFIHMW00052229

EFIHMW00051935

**PX 030
Page 295 of 734**

Table of Contents
*Nuclear Insurance*

Nuclear insurance includes liability coverage, property damage, decontamination and premature decommissioning coverage and accidental outage and/or extra expense coverage. The liability coverage is governed by the Price−Anderson Act (Act), while the property damage, decontamination and premature decommissioning coverage are promulgated by the rules and regulations of the NRC. We intend to maintain insurance against nuclear risks as long as such insurance is available. The company is self−insured to the extent that losses (i) are within the policy deductibles, (ii) are not covered per policy exclusions, terms and limitations, (iii) exceed the amount of insurance maintained, or (iv) are not covered due to lack of insurance availability. Such losses could have a material adverse effect on our financial condition and results of operations and cash flows.

With regard to liability coverage, the Act provides financial protection for the public in the event of a significant nuclear generation plant incident. The Act sets the statutory limit of public liability for a single nuclear incident at $12.5 billion and requires nuclear generation plant operators to provide financial protection for this amount. The US Congress could impose revenue−raising measures on the nuclear industry to pay claims exceeding the $12.5 billion limit for a single incident mandated by the Act. As required, the company provides this financial protection for a nuclear incident at Comanche Peak resulting in public bodily injury and property damage through a combination of private insurance and industry−wide retrospective payment plans. As the first layer of financial protection, the company has $375 million of liability insurance from American Nuclear Insurers (ANI), which provides such insurance on behalf of a major stock insurance company pool, Nuclear Energy Liability Insurance Association. The second layer of financial protection is provided under an industry−wide retrospective payment program called Secondary Financial Protection (SFP).

Under the SFP, in the event of an incident at any nuclear generation plant in the US, each operating licensed reactor in the US is subject to an assessment of up to $117.5 million plus a 3% insurance premium tax, subject to increases for inflation every five years. Assessments are limited to $17.5 million per operating licensed reactor per year per incident. The company's maximum potential assessment under the industry retrospective plan would be $235 million (excluding taxes) per incident but no more than $35 million in any one year for each incident. The potential assessment is triggered by a nuclear liability loss in excess of $375 million per accident at any nuclear facility. The SFP and liability coverage are not subject to any deductibles.

With respect to nuclear decontamination and property damage insurance, the NRC requires that nuclear generation plant license−holders maintain at least $1.06 billion of such insurance and require the proceeds thereof to be used to place a plant in a safe and stable condition, to decontaminate it pursuant to a plan submitted to and approved by the NRC before the proceeds can be used for plant repair or restoration or to provide for premature decommissioning. The company maintains nuclear decontamination and property damage insurance for Comanche Peak in the amount of $2.25 billion (subject to $5 million deductible per accident), above which the company is self−insured. This insurance coverage consists of a primary layer of coverage of $500 million provided by Nuclear Electric Insurance Limited (NEIL), a nuclear electric utility industry mutual insurance company and $1.75 billion of premature decommissioning coverage also provided by NEIL.

The company maintains Accidental Outage Insurance through NEIL to cover the additional costs of obtaining replacement electricity from another source if one or both of the units at Comanche Peak are out of service for more than twelve weeks as a result of covered direct physical damage. The coverage provides for weekly payments of $3.5 million for the first fifty−two weeks and $2.8 million for the next 110 weeks for each outage, respectively, after the initial twelve−week waiting period. The total maximum coverage is $490 million per unit. The coverage amounts applicable to each unit will be reduced to 80% if both units are out of service at the same time as a result of the same accident.

If NEIL's losses exceeded its reserves for the applicable coverage, potential assessments in the form of a retrospective premium call could be made up to ten times annual premiums. The company maintains insurance coverage against these potential retrospective premium calls.

EFIHMW00052230

EFIHMW00051935

Table of Contents

Also, under the NEIL policies, if there were multiple terrorism losses occurring within a one–year time frame, NEIL would make available one industry aggregate limit of $3.2 billion plus any amounts it recovers from other sources up to the limits for each claimant. If terrorism losses occurred beyond the one–year period, a new set of limits and resources would apply.

## 14.    SHAREHOLDERS' EQUITY

*Successor*

**Equity Contributions, Issuances and Repurchases**—In connection with the Merger, Texas Holdings made an aggregate cash equity contribution of approximately $8.3 billion to EFH Corp. in exchange for EFH Corp. issuing approximately 1.658 billion shares of its common stock to Texas Holdings. In the year ended December 31, 2008 and the period from October 11, 2007 to December 31, 2007, EFH Corp. issued an aggregate of approximately 5.5 million and 2.0 million shares of its common stock, respectively, to, or for the benefit of, certain of its officers, directors and employees for an aggregate consideration of $27.4 million and $9.8 million, respectively. The 2008 amounts include shares previously subscribed. In addition, in the years ended December 31, 2009 and 2008, EFH Corp. issued an aggregate of 1.5 million and 1.7 million shares, respectively, of its common stock to, or for the benefit of, certain officers, directors and employees as stock–based compensation as discussed in Note 22. In 2008, EFH Corp. repurchased 0.8 million shares of its common stock from employees primarily upon termination of employment or amendment of agreements, for an aggregate consideration of $3.9 million.

**Effect of Sale of Noncontrolling Interests**—The total amount of proceeds from the sale of noncontrolling interests in Oncor discussed in Note 15 was less than the carrying value of the interests sold by $265 million, which reflects the fact that Oncor's carrying value after purchase accounting is based on the Merger value, while the noncontrolling interests sale value does not include a control premium. This difference was accounted for as a reduction of shareholders' equity.

During the preparation of our December 31, 2009 financial statements, we determined that deferred income taxes related to EFH Corp.'s interest in Oncor should have been recorded upon the sale of noncontrolling interests in November 2008. Accordingly, the December 31, 2008 balance of noncurrent accumulated deferred income tax liabilities has been increased by $141 million (from the $5.926 billion previously reported) and shareholders' equity at that date has been decreased by the same amount (from the $3.532 billion deficit previously reported). The recognition of the deferred tax liability is the result of applying rules for income tax accounting related to outside basis differences. This error did not affect net income or cash flows previously reported.

**Dividend Restrictions**—The indentures governing the EFH Corp. Senior Notes, 9.75% Notes, and 10% Notes include covenants that, among other things and subject to certain exceptions, restrict our ability to pay dividends or make other distributions in respect of our capital stock. Accordingly, essentially all of our net income is restricted from being used to make distributions on our common stock unless such distributions are expressly permitted under these indentures and/or after such distributions, on a pro forma basis, after giving effect to such payment, EFH Corp.'s consolidated leverage ratio is equal to or less than 7.0 to 1.0. For purposes of this calculation, "consolidated leverage ratio" is defined as the ratio of consolidated total indebtedness (as defined in the indenture) to Adjusted EBITDA, in each case, consolidated with its subsidiaries other than Oncor Holdings and its subsidiaries. In addition, the indenture governing the EFH Notes generally restricts Intermediate Holding from making any distribution to EFH Corp. for the ultimate purpose of making a distribution to Texas Holdings unless at the time, and after giving effect to such distribution, Intermediate Holding's consolidated leverage ratio is equal to or less than 6.0 to 1.0. Under the indenture governing the EFIH Notes, the term "consolidated leverage ratio" is defined as the ratio of consolidated total indebtedness (as defined in the indenture) to Adjusted EBITDA on a consolidated basis.

The TCEH Senior Secured Facilities generally restrict TCEH from making any distribution to any of its parent companies for the ultimate purpose of making a distribution to Texas Holdings unless at the time, and

EFIHMW00052231

EFIHMW00051935

Table of Contents

after giving effect to such distribution, its consolidated total debt (as defined in the TCEH Senior Secured Facilities) to Adjusted EBITDA would be equal to or less than 6.5 to 1.0. In addition, the TCEH Senior Secured Facilities and indenture governing the TCEH Senior Notes generally restrict TCEH's ability to make distributions or loans to any of its parent companies, EFC Holdings and EFH Corp., unless such distributions or loans are expressly permitted under the TCEH Senior Secured Facilities and indenture governing the TCEH Senior Notes. Those agreements generally permit TCEH to make unlimited distributions or loans to its parent companies for corporate overhead costs, SG&A expenses, taxes and principal and interest payments. In addition, those agreements contain certain investment and dividend baskets that would allow TCEH to make additional distributions and/or loans to its parent companies up to the amount of such baskets. At December 31, 2009, EFH Corp. notes payable to TCEH totaled $1.406 billion.

In addition, under applicable law, we would be prohibited from paying any dividend to the extent that immediately following payment of such dividend, there would be no statutory surplus or we would be insolvent.

EFH Corp. has not paid any cash dividends subsequent to the Merger.

*Shareholder Actions*—In May 2009, the shareholders of EFH Corp. approved the change of the stated capital of EFH Corp.'s common stock, no par value per share, to an amount equal to $0.001 for each outstanding share of common stock, resulting in total stated value of outstanding common stock of $2 million. Also in May 2009, EFH Corp.'s board of directors approved a decrease in additional paid–in capital of the same amount and the allocation of $0.001 per share to stated value of common stock upon issuance of any authorized but unissued shares of common stock that may occur from time to time, with the remainder of any amounts received for such shares allocated to additional paid–in capital.

*Common Stock Registration Rights*—The Sponsor Group and certain other investors entered into a registration rights agreement with EFH Corp. upon closing of the Merger. Pursuant to this agreement, in certain instances, the Sponsor Group can cause EFH Corp. to register shares of EFH Corp.'s common stock owned directly or indirectly by them under the Securities Act. In certain instances, the Sponsor Group and certain other investors are also entitled to participate on a pro rata basis in any registration of EFH Corp.'s common stock under the Securities Act that it may undertake.

See Note 22 for discussion of stock–based compensation plans.

*Predecessor*

*Declaration of Dividend*—At its August 2007 meeting, EFH Corp.'s board of directors declared a quarterly dividend of $0.4325 per share, which was paid October 1, 2007 to shareholders of record on September 7, 2007. At its May 2007 meeting, EFH Corp.'s board of directors declared a quarterly dividend of $0.4325 per share, which was paid on July 2, 2007 to shareholders of record on June 1, 2007. At its February 2007 meeting, EFH Corp.'s board of directors declared a quarterly dividend of $0.4325 a share, payable April 2, 2007 to shareholders of record on March 2, 2007.

*Thrift Plan*—The Thrift Plan is an employee savings plan under which we matched a portion of employees' contributions of their earnings with a contribution in shares of EFH Corp. common stock. Contributions to the Thrift Plan are held by an unconsolidated trust. At October 10, 2007, the Thrift Plan had an obligation of $201 million outstanding in the form of a note payable to EFH Corp. (LESOP note). Proceeds from the issuance of the note, which EFH Corp. purchased from a third–party lender in 1990, were used by the Thrift Plan trustee to purchase EFH Corp.'s common stock on the open market for the purpose of satisfying future matching requirements. These shares (LESOP shares) were held by the Thrift Plan trustee under the leveraged employee stock ownership provision of the Thrift Plan. The note receivable had been classified as a reduction of common stock equity, and the principal and related interest was being amortized as a component of LESOP–related expense.

F–59

EFIHMW00052232

EFIHMW00051935

**PX 030**
**Page 298 of 734**

**Table of Contents**

The Thrift Plan used dividends received on the LESOP shares held and contributions from us, if required, to repay interest and principal on the LESOP note; such contributions totaled $14 million for the period from January 1, 2007 through October 10, 2007.

On the date of the Merger, the Thrift Plan trustee held approximately 5.7 million shares of EFH Corp.'s common stock. These shares were converted to cash at $69.25 per share in connection with the closing of the Merger. The Thrift Plan trustee used the cash proceeds to repay the LESOP note, and then made an additional allocation of the remaining cash proceeds to eligible Thrift Plan participants.

The table below reflects the changes in the number of Predecessor common stock shares outstanding:

|  | Period from January 1, 2007 through October 10, 2007 |
|---|---|
| Balance at beginning of period | 459,244,523 |
| Issuances under stock–based incentive compensation plans (Note 22) | 2,771,257 |
| Issued on conversion of convertible senior notes | 36,372 |
| Forfeitures and cancellations under stock–based incentive compensation plans | (900,143) |
| Purchased in connection with Merger | (461,152,009) |
| Balance at end of period | — |

## 15. NONCONTROLLING INTERESTS

In November 2008, equity interests in Oncor were sold to Texas Transmission for $1.254 billion in cash. Equity interests were also indirectly sold to certain members of Oncor's board of directors and its management team. Accordingly, after giving effect to all equity issuances, as of December 31, 2009, Oncor's ownership was as follows: 80.03% held indirectly by EFH Corp., 0.22% held indirectly by Oncor's management and board of directors and 19.75% held by Texas Transmission.

The proceeds (net of closing costs) of $1.253 billion received by Oncor from Texas Transmission and the members of Oncor management upon completion of these transactions were distributed ultimately to EFH Corp. Under the terms of certain financing arrangements of EFH Corp. and TCEH, upon such distribution, under certain circumstances, EFH Corp. (parent entity) is required to repay certain outstanding intercompany loans from TCEH. In November 2008, EFH Corp. repaid the $253 million balance of notes payable to TCEH that related to payments of principal and interest on EFH Corp. (parent entity) debt.

See Note 14 for discussion of amounts recorded as a reduction of shareholders' equity as a result of the sale of Oncor interests.

Of the noncontrolling interests balance reported in the December 31, 2009 and 2008 consolidated balance sheets, $1.363 billion and $1.355 billion, respectively, related to Oncor's noncontrolling interests. The noncontrolling interests balance reported in the December 31, 2009 consolidated balance sheet represented the proportional share of Oncor's net assets at the date of the transaction less $96 million representing the noncontrolling interests' share of Oncor's net losses for the periods subsequent to the transaction (including the goodwill impairment charge), net of $58 million in cash distributions.

In connection with the filing of a combined operating license application with the NRC for two new nuclear generation units, in January 2009, TCEH and Mitsubishi Heavy Industries Ltd. (MHI) formed a joint venture,

F–60

EFIHMW00052233

EFIHMW00051935

**PX 030**
**Page 299 of 734**

Table of Contents
known as Comanche Peak Nuclear Power Company LLC, to further the development of the two new nuclear generation units using MHI's US–Advanced Pressurized Water Reactor technology. Under the terms of the joint venture agreement, a subsidiary of TCEH owns an 88% interest in the venture and a subsidiary of MHI owns a 12% interest. This joint venture is a variable interest entity, and a subsidiary of TCEH is considered the primary beneficiary.

16.    FAIR VALUE MEASUREMENTS

    Accounting standards related to the determination of fair value define fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. We use a "mid–market" valuation convention (the mid–point price between bid and ask prices) as a practical expedient to measure fair value for the majority of our assets and liabilities subject to fair value measurement on a recurring basis. We primarily use the market approach for recurring fair value measurements and use valuation techniques to maximize the use of observable inputs and minimize the use of unobservable inputs.

    We categorize our assets and liabilities recorded at fair value based upon the following fair value hierarchy:

*    Level 1 valuations use quoted prices in active markets for identical assets or liabilities that are accessible at the measurement date. An active market is a market in which transactions for the asset or liability occur with sufficient frequency and volume to provide pricing information on an ongoing basis. Our Level 1 assets and liabilities include exchange traded commodity contracts. For example, a significant number of our derivatives are NYMEX futures and swaps transacted through clearing brokers for which prices are actively quoted.

*    Level 2 valuations use inputs, in the absence of actively quoted market prices, that are observable for the asset or liability, either directly or indirectly. Level 2 inputs include: (a) quoted prices for similar assets or liabilities in active markets, (b) quoted prices for identical or similar assets or liabilities in markets that are not active, (c) inputs other than quoted prices that are observable for the asset or liability such as interest rates and yield curves observable at commonly quoted intervals and (d) inputs that are derived principally from or corroborated by observable market data by correlation or other means. Our Level 2 valuations utilize over–the–counter broker quotes, quoted prices for similar assets or liabilities that are corroborated by correlations or other mathematical means and other valuation inputs. For example, our Level 2 assets and liabilities include forward commodity positions at locations for which over–the–counter broker quotes are available.

*    Level 3 valuations use unobservable inputs for the asset or liability. Unobservable inputs are used to the extent observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the measurement date. We use the most meaningful information available from the market combined with internally developed valuation methodologies to develop our best estimate of fair value. For example, our Level 3 assets and liabilities include certain derivatives whose values are derived from pricing models that utilize multiple inputs to the valuations, including inputs that are not observable or easily corroborated through other means.

    We utilize several different valuation techniques to measure the fair value of assets and liabilities, relying primarily on the market approach of using prices and other market information for identical and/or comparable assets and liabilities for those items that are measured on a recurring basis. These methods include, among others, the use of broker quotes and statistical relationships between different price curves.

    In utilizing broker quotes, we attempt to obtain multiple quotes from brokers that are active in the commodity markets in which we participate (and require at least one quote from two brokers to determine a pricing input as observable); however, not all pricing inputs are quoted by brokers. The number of broker quotes received for certain pricing inputs varies depending on the depth of the trading market, each individual broker's

F–61

EFIHMW00052234

EFIHMW00051935

**PX 030**
**Page 300 of 734**

**Table of Contents**

publication policy, recent trading volume trends and various other factors. In addition, for valuation of interest rate swaps, we use a combination of dealer provided market valuations (generally non−binding) and Bloomberg valuations based on month−end interest rate curves and standard rate swap valuation models.

Certain derivatives and financial instruments are valued utilizing option pricing models that take into consideration multiple inputs including commodity prices, volatility factors, discount rates and other inputs. Additionally, when there is not a sufficient amount of observable market data, valuation models are developed that incorporate proprietary views of market factors. Those valuation models are generally used in developing long−term forward price curves for certain commodities. We believe the development of such curves is consistent with industry practice; however, the fair value measurements resulting from such curves are classified as Level 3.

With respect to amounts presented in the following fair value hierarchy tables, the fair value measurement of an asset or liability (e.g., a contract) is required to fall in its entirety in one level, based on the lowest level input that is significant to the fair value measurement. Certain assets and liabilities would be classified in Level 2 instead of Level 3 of the hierarchy except for the effects of credit reserves and non−performance risk adjustments, respectively. Assessing the significance of a particular input to the fair value measurement in its entirety requires judgment, considering factors specific to the asset or liability being measured.

At December 31, 2009, assets and liabilities measured at fair value on a recurring basis consisted of the following:

| | Level 1 | Level 2 | Level 3 (a) | Reclassification (b) | Total |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Commodity contracts | $ 918 | $2,588 | $ 350 | $ 4 | $3,860 |
| Interest rate swaps | — | 64 | — | — | 64 |
| Nuclear decommissioning trust—equity securities (c) | 154 | 105 | — | — | 259 |
| Nuclear decommissioning trust—debt securities (c) | — | 216 | — | — | 216 |
| Total assets | $1,072 | $2,973 | $ 350 | $ 4 | $4,399 |
| **Liabilities:** | | | | | |
| Commodity contracts | $1,077 | $ 796 | $ 269 | $ 4 | $2,146 |
| Interest rate swaps | — | 1,306 | — | — | 1,306 |
| Total liabilities | $1,077 | $2,102 | $ 269 | $ 4 | $3,452 |

(a)    Level 3 assets and liabilities consist primarily of complex long−term power purchase and sales agreements, including long−term wind generation purchase contracts and certain natural gas positions (collars) in the long−term hedging program.
(b)    Represents the effects of reclassification of the assets and liabilities to conform to the balance sheet presentation of current and long−term assets and liabilities.
(c)    The nuclear decommissioning trust investment is included in the Investments line on the balance sheet. See Note 19.

See Note 21 for fair value measurements related to pension and OPEB plan assets.

F−62

EFIHMW00052235

EFIHMW00051935

Table of Contents

At December 31, 2008, assets and liabilities measured at fair value on a recurring basis consisted of the following:

| | Level 1 | Level 2 | Level 3 (a) | Total |
|---|---|---|---|---|
| Assets: | | | | |
| Commodity contracts | $1,010 | $2,061 | $ — | $3,354 |
| Interest rate swaps | — | 142 | — | 142 |
| Nuclear decommissioning trust—equity securities (b) | 109 | 83 | — | 192 |
| Nuclear decommissioning trust—debt securities (b) | — | 193 | — | 193 |
| Total assets | $1,119 | $2,479 | $ 283 | $3,881 |
| Liabilities: | | | | |
| Commodity contracts | $1,288 | $1,274 | $ 355 | $2,917 |
| Interest rate swaps | — | 2,086 | — | 2,086 |
| Total liabilities | $1,288 | $3,360 | $ 355 | $5,003 |

(a)   Level 3 assets and liabilities consist primarily of complex long–term power purchase and sales agreements, including long–term wind generation purchase contracts and certain natural gas positions (collars) in the long–term hedging program.

(b)   The nuclear decommissioning trust investment is included in the Investments line on the balance sheet. See Note 19.

Commodity contracts consist primarily of natural gas, electricity, fuel oil and coal derivative instruments entered into for hedging purposes and include physical contracts that have not been designated "normal" purchases or sales. See Note 18 for further discussion regarding the company's use of derivative instruments.

Interest rate swaps include variable–to–fixed rate swap instruments that are economic hedges of interest on long–term debt as well as interest rate basis swaps designed to effectively reduce the hedged borrowing costs. See Note 12 for discussion of interest rate swaps.

Nuclear decommissioning trust assets represent securities held for the purpose of funding the future retirement and decommissioning of the nuclear generation units. These investments include equity, debt and other fixed–income securities consistent with investment rules established by the NRC and the PUCT.

The following table presents the changes in fair value of the Level 3 assets and liabilities (all related to commodity contracts) for the years ended December 31, 2009 and 2008:

| | Year Ended December 31, 2009 | Year Ended December 31, 2008 |
|---|---|---|
| Balance at beginning of period | $ (72) | $ (173) |
| Total realized and unrealized gains (losses) (a): | | |
| Included in net income (loss) | 115 | (5) |
| Included in other comprehensive income (loss) | (30) | — |
| Purchases, sales, issuances and settlements (net) (b) | 51 | (13) |
| Net transfers in and/or out of Level 3 (c) | 17 | 119 |
| Balance at end of period | $ 81 | $ (72) |
| Net change in unrealized gains (losses) included in net income relating to instruments held at end of period (d) | $ 105 | 87 |

(a)   Substantially all changes in values of commodity contracts are reported in the income statement in net gain (loss) from commodity hedging and trading activities.

F–63

EFIHMW00052236

EFIHMW00051935

Table of Contents

(b)   Settlements represent reversals of unrealized mark–to–market valuations of these positions previously recognized in net income. Purchases and issuances reflect option premiums paid or received.

(c)   Includes transfers due to changes in the observability of significant inputs used in valuing derivatives. Transfers in are assumed to transfer in at the beginning of the quarter and transfers out at the end of the quarter, which is when the assessments are performed. Any changes in value during the period are reported as unrealized gains and losses in net gain (loss) from commodity hedging and trading activities.

(d)   Includes unrealized gains and losses of instruments held at the end of the period.

17.   FAIR VALUE OF NONDERIVATIVE FINANCIAL INSTRUMENTS

The carrying amounts and related estimated fair values of significant nonderivative financial instruments were as follows:

| | Successor | | | |
| | December 31, 2009 | | December 31, 2008 | |
| | Carrying Amount | Fair Value (a) | Carrying Amount | Fair Value (a) |
|---|---|---|---|---|
| **On balance sheet assets (liabilities):** | | | | |
| Long–term debt (including current maturities) (b): | | | | |
| TCEH, EFH Corp., and other | $(36,600) | $(29,115) | $(35,860) | $(24,162) |
| Oncor | $ (5,104) | $ (5,644) | $ (5,204) | $ (4,990) |
| Total | $(41,704) | $(34,759) | $(41,064) | $(29,152) |
| **Off balance sheet assets (liabilities):** | | | | |
| Financial guarantees | $  — | $  (6) | $  — | $  (3) |

(a)   Fair value determined in accordance with accounting standards related to the determination of fair value.

(b)   Excludes capital leases.

See Notes 16 and 18 for discussion of accounting for financial instruments that are derivatives.

18.   COMMODITY AND OTHER DERIVATIVE CONTRACTUAL ASSETS AND LIABILITIES

*Risk Management Hedging Strategy*

We enter into physical and financial derivative instruments, such as options, swaps, futures and forward contracts, primarily to manage commodity price risk and interest rate risk exposure. Our principal activities involving derivatives consist of a long–term hedging program and the hedging of interest costs on our long–term debt. See Note 16 for a discussion of the fair value of all derivatives.

*Long–Term Hedging Program*—TCEH has a long–term hedging program designed to reduce exposure to changes in future electricity prices due to changes in the price of natural gas, thereby hedging future revenues from electricity sales and related cash flows. In ERCOT, the wholesale price of electricity is highly correlated to the price of natural gas. Under the program, TCEH has entered into market transactions involving natural gas–related financial instruments and has sold forward natural gas over the next five years. These transactions are intended to hedge a majority of electricity price exposure related to expected baseload generation for this period. Changes in the fair value of the instruments under the long–term hedging program are reported in the income statement in net gain (loss) from commodity hedging and trading activities.

*Interest Rate Swap Transactions*—Interest rate swap agreements are used to reduce exposure to interest rate changes by converting floating–rate debt to a fixed basis, thereby hedging future interest costs and related

F–64

EFIHMW00052237

EFIHMW00051935

Table of Contents
cash flows. Interest rate basis swaps are used to effectively reduce the hedged borrowing costs. Changes in the fair value of the swaps are recorded as unrealized gains and losses in interest expense and related charges. See Note 12 for additional information about these and other interest rate swap agreements.

*Other Commodity Hedging and Trading Activity*—In addition to the long–term hedging program, TCEH enters into derivatives, including electricity, natural gas, fuel oil and coal instruments, generally for shorter–term hedging purposes. To a limited extent, TCEH also enters into derivative transactions for proprietary trading purposes, principally in natural gas and electricity markets.

The following table provides detail of commodity and other derivative contractual assets and liabilities, substantially all arising from mark–to–market accounting, as reported in the balance sheet at December 31, 2009:

|  | Derivatives not under hedge accounting | | | | |
|  | Derivative assets | | Derivative liabilities | | |
|  | Commodity contracts | Interest rate swaps | Commodity contracts | Interest rate swaps | Total |
|---|---|---|---|---|---|
| Current assets | $ 2,327 | $ 60 | $ 4 | $ — | $ 2,391 |
| Noncurrent assets | 1,529 | 4 | | | 1,533 |
| Current liabilities | — | — | (1,705) | (687) | (2,392) |
| Noncurrent liabilities | — | — | (441) | (619) | (1,060) |
| Net assets (liabilities) | $ 3,856 | $ 64 | $ (2,142) | $ (1,306) | $ 472 |

As of December 31, 2009, there were no derivative positions accounted for as cash flow or fair value hedges.

Margin deposits that contractually offset these derivative instruments are reported separately in the balance sheet and totaled $358 million and $190 million in net liabilities at December 31, 2009 and 2008, respectively, which do not include the collateral investments related to certain interest rate swaps and commodity positions discussed immediately below. Reported amounts as presented in the above table do not reflect netting of assets and liabilities with the same counterparties under existing netting arrangements. This presentation can result in significant volatility in derivative assets and liabilities because we may enter into offsetting positions with the same counterparties, resulting in both assets and liabilities, and the underlying commodity prices can change significantly from period to period.

In early 2009, we entered into collateral funding transactions with counterparties to certain interest rate swap agreements related to TCEH debt. Under the terms of these transactions, which we elected to enter into as a cash management measure, as of December 31, 2009, EFH Corp. (parent) has posted $400 million in cash and TCEH has posted $65 million in letters of credit to the counterparties, with the outstanding balance of such collateral earning interest. TCEH had also entered into commodity hedging transactions with one of these counterparties, and under an arrangement effective August 2009, both the interest rate swaps and certain of the commodity hedging transactions with the counterparty are under the same derivative agreement, which continues to be secured by a first–lien interest in the assets of TCEH. We are not required to post any additional collateral to these counterparties, regardless of the net mark–to–market liability under the applicable derivative agreement, and the applicable counterparty will return the cash collateral to the extent the mark–to–market liability under the applicable derivative agreement falls below the funded amount, subject to a $50 million minimum transfer amount. At December 31, 2009, the collateral posted approximated the net mark–to–market liability of the related derivatives. Under the agreements, the counterparties are to return any remaining collateral, along with accrued and unpaid interest, on March 31, 2010. The cash collateral was recorded as an investment and is presented in the balance sheet (including accrued interest) as a separate line item under current assets.

F–65

EFIHMW00052238

EFIHMW00051935

Table of Contents

The following table presents the pre-tax effect of derivatives not under hedge accounting on net income, including realized and unrealized effects:

| Derivative (Income statement presentation) | Year Ended December 31, 2009 |
|---|---|
| Commodity contracts (Net gain (loss) from commodity hedging and trading activities) | $ 1,741 |
| Interest rate swaps (Interest expense and related charges) | 12 |
| Net gain | $ 1,753 |

Amounts reported in the income statement in net gain (loss) from commodity hedging and trading activities include net "day one" mark-to-market losses of $2 million, $68 million and $8 million in the 2009, 2008 and 2007 Successor periods, respectively, and $201 million in the 2007 Predecessor period. Substantially all of these losses arose from a related series of derivative transactions entered into under the long-term hedging program. The 2007 Predecessor period amount is net of a $30 million "day one" gain associated with a long-term power purchase agreement.

A multi-year power sales agreement was entered into with Alcoa Inc. in the 2007 Predecessor period. The agreement was determined to be a derivative and resulted in a "day one" mark-to-market loss of $235 million. The agreement was entered into concurrently with the transfer of an air permit from Alcoa Inc. to a subsidiary of ours as well as other agreements with Alcoa Inc. that provide, among other things, access to real property and a supply of lignite fuel, all of which provides value to us by providing the right and ability to develop, construct and operate the new lignite-fueled generation unit at Sandow. In consideration of this right and ability, the initial "day one" loss of the sales agreement, as well as a $29 million below market value of a related interim power sales agreement entered into in late 2006, were recorded as part of the construction work-in-process asset balance for the Sandow unit.

The following tables present the pre-tax effect of derivative instruments accounted for as cash flow hedges on net income (loss) and other comprehensive income (loss) (OCI) for the year ended December 31, 2009:

| Derivative | Amount of (loss) recognized in OCI (effective portion) | Income statement presentation of gain (loss) reclassified from accumulated OCI into income (effective portion) | Amount |
|---|---|---|---|
| Interest rate swaps | $ — | Interest expense and related charges | $ (184) |
| Commodity contracts | (30) | Fuel, purchased power costs and delivery fees | (16) |
| | | Operating revenues | (2) |
| Total | $ (30) | | $ (202) |

There were no ineffectiveness net gains or losses related to transactions designated as cash flow hedges in the year ended December 31, 2009.

Accumulated other comprehensive income related to cash flow hedges at December 31, 2009 totaled $128 million in net losses (after-tax), substantially all of which relates to interest rate swaps. We expect that $59 million of net losses related to cash flow hedges included in accumulated other comprehensive income as of December 31, 2009 will be reclassified into net income during the next twelve months as the related hedged transactions affect net income.

F-66

EFIHMW00052239

EFIHMW00051935

**PX 030**
**Page 305 of 734**

Table of Contents

*Derivative Volumes*—The following table presents the gross notional amounts of derivative volumes at December 31, 2009:

| Derivative type | | Notional Volume | Unit of Measure |
|---|---|---|---|
| Interest rate swaps: | | | |
| Floating/fixed | $ | 18,000 | Million US dollars |
| Basis | $ | 16,250 | Million US dollars |
| Natural gas: | | | |
| Long−term hedge forward sales and purchases (a) | | 3,402 | Million MMBtu |
| Locational basis swaps | | 1,010 | Million MMBtu |
| All other | | 1,433 | Million MMBtu |
| Electricity | | 198,230 | GWh |
| Coal | | 6 | Million tons |
| Fuel oil | | 161 | Million gallons |

(a)    Represents gross notional forward sales, purchases and options of fixed and basis (price point) transactions in the long−term hedging program. The net amount of these transactions, excluding basis transactions, is 1.6 billion MMBtu.

*Credit Risk−Related Contingent Features*

The agreements that govern our derivative instrument transactions may contain certain credit risk−related contingent features that could trigger liquidity requirements in the form of cash collateral, letters of credit or some other form of credit enhancement. Certain of those agreements require the posting of collateral if our credit rating is downgraded by one or more of the credit rating agencies; however, due to our below investment grade ratings, substantially all of such collateral posting requirements are already effective.

As of December 31, 2009, the fair value of liabilities related to derivative instruments under agreements with credit risk−related contingent features that were not fully cash collateralized totaled $687 million. The liquidity exposure associated with these liabilities was reduced by cash and letter of credit postings with the counterparties totaling $152 million as of December 31, 2009. If all the credit risk−related contingent features related to these derivatives had been triggered, including cross−default provisions, as of December 31, 2009, the remaining related liquidity requirement would have totaled $20 million after reduction for net accounts receivable and derivative assets under netting arrangements.

In addition, certain derivative agreements that are collateralized primarily with asset liens include indebtedness cross−default provisions that could result in the settlement of such contracts if there were a failure under other financing arrangements to meet payment terms or to comply with other covenants that could result in the acceleration of such indebtedness. As of December 31, 2009, the fair value of derivative liabilities subject to such cross−default provisions, largely related to interest rate swaps, totaled $1.482 billion (before consideration of the amount of assets under the liens). The liquidity exposure associated with these liabilities was reduced by cash collateral and letters of credit posted with counterparties totaling $489 million as of December 31, 2009. If all the credit risk−related contingent features related to these derivatives, including amounts related to cross−default provisions, had been triggered as of December 31, 2009, the remaining related liquidity requirement would have totaled $480 million after reduction for derivative assets under netting arrangements (before consideration of the amount of assets under the liens). See Note 12 for a description of other obligations that are supported by asset liens.

As discussed immediately above, the aggregate fair values of liabilities under derivative agreements with credit risk−related contingent features, including cross−default provisions, totaled $2.169 billion at December 31, 2009. This amount is before consideration of cash and letter of credit collateral posted, net accounts receivable and derivative assets under netting arrangements and assets under related liens.

F−67

EFIHMW00052240

EFIHMW00051935

Table of Contents

Some commodity derivative contracts contain credit risk–related contingent features that do not provide for specific amounts to be posted if the features are triggered. These provisions include material adverse change, performance assurance, and other clauses that generally provide counterparties with the right to request additional credit enhancements. The amounts disclosed above exclude credit risk–related contingent features that do not provide for specific amounts or exposure calculations.

*Concentrations of Credit Risk*

TCEH has significant concentrations of credit risk with the counterparties to its derivative contracts. As of December 31, 2009, total credit risk exposure to all counterparties related to derivative contracts totaled $4.0 billion. The net exposure to those counterparties totaled $1.3 billion after taking into effect master netting arrangements, setoff provisions and collateral. As of December 31, 2009, the credit risk exposure to the banking and financial sector represented more than 90% of the total credit risk exposure. As of December 31, 2009, the largest net exposure to a single counterparty totaled $536 million. Exposure to the banking and financial sector counterparties is considered to be within an acceptable level of risk tolerance because substantially all of this exposure is with counterparties with credit ratings of "A" or better. However, this concentration increases the risk that a default by any of these counterparties would have a material adverse effect on our financial condition and results of operations.

The transactions with these counterparties contain certain provisions that would require the counterparties to post collateral in the event of a material downgrade in their credit rating. We maintain credit risk policies with regard to our counterparties to minimize overall credit risk. These policies specify authorized risk mitigation tools including, but not limited to, use of standardized master netting contracts and agreements that allow for netting of positive and negative exposures associated with a single counterparty. Credit enhancements such as parent guarantees, letters of credit, surety bonds, liens on assets and margin deposits are also utilized. Prospective material adverse changes in the payment history or financial condition of a counterparty or downgrade of its credit quality result in the reassessment of the credit limit with that counterparty. The process can result in the subsequent reduction of the credit limit or a request for additional financial assurances. An event of default by one or more counterparties could subsequently result in termination–related settlement payments that reduce available liquidity if amounts are owed to the counterparties related to the commodity contracts or delays in receipts of expected settlements if the counterparties owe amounts to us.

19. **INVESTMENTS**

The investments balance consists of the following:

| | December 31, 2009 | December 31, 2008 |
|---|---|---|
| Nuclear decommissioning trust | $ 475 | $ 385 |
| Assets related to employee benefit plans, including employee savings programs, net of distributions | 184 | 210 |
| Land | 43 | 44 |
| Investment in natural gas gathering pipeline business (a) | 44 | — |
| Miscellaneous other | 4 | 6 |
| Total investments | $ 750 | $ 645 |

(a)   A controlling interest in this previously consolidated subsidiary was sold in August 2009.

F–68

EFIHMW00052241

EFIHMW00051935

**PX 030**
**Page 307 of 734**

Table of Contents
*Nuclear Decommissioning Trust*

Investments in a trust that will be used to fund the costs to decommission the Comanche Peak nuclear generation plant are carried at fair value. Decommissioning costs are being recovered from Oncor's customers as a delivery fee surcharge over the life of the plant and deposited in the trust fund. Net gains and losses on investments in the trust fund are offset by a corresponding adjustment to a regulatory asset/liability. A summary of investments in the fund follows:

| | December 31, 2009 | | | |
| | Cost (a) | Unrealized gain | Unrealized loss | Fair market value |
|---|---|---|---|---|
| Debt securities (b) | $ 211 | $ 8 | $ (3) | $ 216 |
| Equity securities (c) | 195 | 83 | (19) | 259 |
| Total | $ 406 | $ 91 | $ (22) | $ 475 |

| | December 31, 2008 | | | |
| | Cost (a) | Unrealized gain | Unrealized loss | Fair market value |
|---|---|---|---|---|
| Debt securities (b) | $ 203 | $ 4 | $ (14) | $ 193 |
| Equity securities (c) | 181 | 46 | (35) | 192 |
| Total | $ 384 | $ 50 | $ (49) | $ 385 |

(a)   Includes realized gains and losses of securities sold.
(b)   The investment objective for debt securities is to invest in a diversified tax efficient portfolio with an overall portfolio rating of AA or above as graded by S&P or Aa2 by Moody's. The debt securities are heavily weighted with municipal bonds. The debt securities had an average coupon rate of 4.44% and 3.77% and an average maturity of 7.8 years and 8.0 years at December 31, 2009 and 2008, respectively.
(c)   The investment objective for equity securities is to invest tax efficiently and to match the performance of the S&P 500 Index.

Debt securities held at December 31, 2009 mature as follows: $82 million in one to five years, $32 million in five to ten years and $102 million after ten years.

*Assets Related to Employee Benefit Plans*

The majority of these assets represent cash surrender values of life insurance policies that are purchased to fund liabilities under deferred compensation plans. We pay the premiums and are the beneficiary of these life insurance policies. As of December 31, 2009 and 2008, the face amount of these policies totaled $322 million and $481 million, and the net cash surrender values totaled $124 million and $155 million, respectively. Changes in cash surrender value are netted against premiums paid. Other investment assets held to satisfy deferred compensation liabilities are recorded at fair value.

**20.    TERMINATION OF OUTSOURCING ARRANGEMENTS**

In connection with the closing of the Merger, EFH Corp., TCEH and Oncor commenced a review, under the change of control provision, of certain outsourcing arrangements with Capgemini, Capgemini America, Inc. and Capgemini North America, Inc. (collectively, CgE). In 2008, EFH Corp. and TCEH executed a Separation Agreement with CgE. Simultaneous with the execution of that Separation Agreement, Oncor entered into a substantially similar Separation Agreement with CgE. The Separation Agreements principally provide for (i) notice of termination of each of the Master Framework Agreements, dated as of May 17, 2004, as each has been amended, between Capgemini and each of TCEH and Oncor and the related service agreements under each of the Master Framework Agreements and (ii) termination of the joint venture arrangements between EFH Corp. (and its applicable subsidiaries) and CgE. Under the Master Framework Agreements and related services

F–69

EFIHMW00052242

EFIHMW00051935

Table of Contents

agreements, Capgemini provided outsourced support services, including information technology, customer care and billing, human resources, procurement and certain finance and accounting activities. As a result, during 2008:

- the 2.9% limited partnership interest in Capgemini owned by a subsidiary of EFH Corp. was redeemed in exchange for the termination of the license that was granted by a subsidiary of EFH Corp. to Capgemini at the time the Master Framework Agreements were executed in order for Capgemini to use certain information technology assets primarily consisting of capitalized software to provide services to us and third parties;

- we received approximately $70 million in exchange for the termination of a purchase option agreement pursuant to which our subsidiaries had the right to "put" to Capgemini (and Capgemini had the right to "call" from a subsidiary of ours) our 2.9% limited partnership interest in Capgemini and the licensed assets upon the expiration of the Master Framework Agreements in 2014 or, in some circumstances, earlier, and

- Capgemini repaid $25 million (plus accrued interest) representing all amounts owed by Capgemini under the working capital loan provided by us in July 2004.

Under the Separation Agreements, the parties also entered into a mutual release of all claims under the Master Framework Agreements and related services agreements and the joint venture agreements, subject to certain defined exceptions, resulting in our receipt of $10 million in cash settlement.

The carrying value of the partnership interest was $2.9 million, and the carrying value of the purchase option was $177 million prior to the application of purchase accounting (recorded as a noncurrent asset). The effects of the termination of the outsourcing arrangements, including an accrued liability of $54 million for incremental costs to exit and transition the services, were included in the final purchase price allocation. See Note 2 for additional disclosure, including a reversal to income of a portion of the liability recorded in purchase accounting.

## 21. PENSION AND OTHER POSTRETIREMENT EMPLOYEE BENEFITS (OPEB) PLANS

EFH Corp. is the plan sponsor of the EFH Retirement Plan (Retirement Plan), which provides benefits to eligible employees of subsidiaries (participating employers). The Retirement Plan is a qualified defined benefit pension plan under Section 401(a) of the Internal Revenue Code of 1986, as amended (Code), and is subject to the provisions of ERISA. The Retirement Plan provides benefits to participants under one of two formulas: (i) a Cash Balance Formula under which participants earn monthly contribution credits based on their compensation and a combination of their age and years of service, plus monthly interest credits or (ii) a Traditional Retirement Plan Formula based on years of service and the average earnings of the three years of highest earnings. The interest component of the Cash Balance Formula is variable and is determined using the yield on 30-year Treasury bonds. Under the Cash Balance Formula, future increases in earnings will not apply to prior service costs.

Effective October 1, 2007, all new employees, with the exception of employees hired by Oncor, are not eligible to participate in the Retirement Plan. New hires at Oncor are eligible to participate in the Cash Balance Formula of the Retirement Plan. It is our policy to fund the plans on a current basis to the extent deductible under existing federal tax regulations.

We also have supplemental unfunded retirement plans for certain employees whose retirement benefits cannot fully be earned under the qualified Retirement Plan, the information for which is included below.

We offer OPEB in the form of health care and life insurance to eligible employees and their eligible dependents upon the retirement of such employees. For employees retiring on or after January 1, 2002, the retiree contributions required for such coverage vary based on a formula depending on the retiree's age and years of service.

F-70

EFIHMW00052243

EFIHMW00051935

<u>**Table of Contents**</u>
*Regulatory Recovery of Pension and OPEB Costs*

PURA provides for the recovery by Oncor of pension and OPEB costs for all applicable former employees of the regulated predecessor integrated electric utility, which in addition to Oncor's own employees consists largely of active and retired personnel engaged in TCEH's activities, related to service of those additional personnel prior to the deregulation and disaggregation of our businesses effective January 1, 2002. Oncor is authorized to establish a regulatory asset or liability for the difference between the amounts of pension and OPEB costs approved in current billing rates and the actual amounts that would otherwise have been recorded as charges or credits to earnings. Amounts deferred are ultimately subject to regulatory approval. As of December 31, 2009, Oncor had recorded regulatory assets totaling $889 million related to pension and OPEB costs, including amounts related to deferred expenses as well as amounts related to unfunded liabilities that otherwise would be recorded as other comprehensive income.

*Pension and OPEB Costs Recognized as Expense*

|  | Successor | | | Predecessor |
| --- | --- | --- | --- | --- |
|  | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Pension costs | $ 44 | $ 21 | $ (1) | $ 34 |
| OPEB costs | 70 | 58 | 11 | 49 |
| Total benefit costs | 114 | 79 | 10 | 83 |
| Less amounts deferred principally as a regulatory asset or property | (66) | (42) | (8) | (43) |
| Net amounts recognized as expense | $ 48 | $ 37 | $ 2 | $ 40 |

We use the calculated value method to determine the market–related value of the assets held in trust. We include the realized and unrealized gains or losses in the market–related value of assets over a rolling four–year period. Each year, 25% of such gains and losses for the current year and for each of the preceding three years is included in the market–related value. Each year, the market–related value of assets is increased for contributions to the plan and investment income and is decreased for benefit payments and expenses for that year.

F–71

EFIHMW00052244

EFIHMW00051935

**Table of Contents**

*Detailed Information Regarding Pension Benefits*

The following information is based on December 31, 2009, 2008, 2007 and October 10, 2007 measurement dates:

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| *Assumptions Used to Determine Net Periodic Pension Cost:* | | | | |
| Discount rate | 6.90% | 6.55% | 6.45% | 5.90% |
| Expected return on plan assets | 8.25% | 8.25% | 8.75% | 8.75% |
| Rate of compensation increase | 3.75% | 3.70% | 3.44% | 3.44% |
| *Components of Net Pension Cost:* | | | | |
| Service cost | $ 38 | $ 36 | $ 10 | $ 30 |
| Interest cost | 159 | 148 | 36 | 107 |
| Expected return on assets | (166) | (165) | (47) | (119) |
| Amortization of prior service cost | 1 | 1 | — | 1 |
| Amortization of net loss | 12 | 1 | — | 15 |
| Recognized curtailment loss | — | — | — | — |
| Net periodic pension cost | $ 44 | $ 21 | $ (1) | $ 34 |
| *Other Changes in Plan Assets and Benefit Obligations Recognized in Other Comprehensive Income:* | | | | |
| Net loss (gain) | $ 45 | $ 204 | $ 20 | $ (52) |
| Transition obligation (asset) | — | — | — | — |
| Prior service cost (credit) | — | — | — | — |
| Amortization of net loss (gain) | — | — | — | (3) |
| Amortization of transition obligation (asset) | — | — | — | — |
| Amortization of prior service cost | — | — | — | (1) |
| Reclassification to regulatory asset | — | (6) | — | — |
| Purchase accounting adjustment | — | (10) | — | 49 |
| Total recognized in other comprehensive income | $ 45 | $ 188 | $ 20 | $ (7) |
| Total recognized in net periodic benefit cost and other comprehensive income | $ 89 | $ 209 | $ 19 | $ 27 |

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| *Assumptions Used to Determine Benefit Obligations:* | | | | |
| Discount rate | 5.90% | 6.90% | 6.55% | 6.45% |
| Rate of compensation increase | 3.71% | 3.75% | 3.70% | 3.44% |

F–72

EFIHMW00052245

EFIHMW00051935

Table of Contents

|  | Successor | |
|---|---|---|
|  | Year Ended December 31, 2009 | Year Ended December 31, 2008 |
| *Change in Pension Obligation:* | | |
| Projected benefit obligation at beginning of year | $ 2,337 | $ 2,335 |
| Service cost | 38 | 36 |
| Interest cost | 160 | 148 |
| Plan amendments | — | — |
| Actuarial (gain) loss | 326 | (58) |
| Benefits paid | (133) | (124) |
| Settlements | 14 | — |
| Projected benefit obligation at end of year | $ 2,742 | $ 2,337 |
| Accumulated benefit obligation at end of year | $ 2,581 | $ 2,203 |
| *Change in Plan Assets:* | | |
| Fair value of assets at beginning of year | $ 1,736 | $ 2,108 |
| Actual return (loss) on assets | 292 | (412) |
| Employer contributions (a) | 109 | 164 |
| Benefits paid | (133) | (124) |
| Settlements | — | — |
| Fair value of assets at end of year | $ 2,004 | $ 1,736 |
| *Funded Status:* | | |
| Projected pension benefit obligation | $ (2,742) | $ (2,337) |
| Fair value of assets | 2,004 | 1,736 |
| Funded status at end of year | $ (738) | $ (601) |

|  | Successor | |
|---|---|---|
|  | Year Ended December 31, 2009 | Year Ended December 31, 2008 |
| *Amounts Recognized in the Balance Sheet Consist of:* | | |
| Other noncurrent assets (b) | $ 10 | $ 10 |
| Other current liabilities | (4) | (4) |
| Other noncurrent liabilities | (744) | (607) |
| Net liability recognized | $ (738) | $ (601) |
| *Amounts Recognized in Accumulated Other Comprehensive Income Consist of:* | | |
| Net loss | $ 252 | $ 208 |
| Prior service cost | — | — |
| Net amount recognized | $ 252 | $ 208 |
| *Amounts Recognized as Regulatory Assets Consist of:* | | |
| Net loss | $ 529 | $ 387 |
| Prior service cost | 1 | 1 |
| Net amount recognized | $ 530 | $ 388 |

(a)  2009 amount includes transfers of investments related to the salary deferral and supplemental retirement plans totaling $31 million.
(b)  Amounts represent overfunded plans.

F–73

EFIHMW00052246

EFIHMW00051935

Table of Contents

The following table provides information regarding pension plans with projected benefit obligation (PBO) and accumulated benefit obligation (ABO) in excess of the fair value of plan assets.

| | Successor | |
|---|---|---|
| | December 31, 2009 | December 31, 2008 |
| *Pension Plans with PBO and ABO in Excess Of Plan Assets:* | | |
| Projected benefit obligations | $ 2,738 | $ 2,332 |
| Accumulated benefit obligation | 2,577 | 2,199 |
| Plan assets | 1,989 | 1,721 |

*Pension Plan Investment Strategy and Asset Allocations*

Our investment objective for the Retirement Plan is to invest in a suitable mix of assets to meet the future benefit obligations at an acceptable level of risk, while minimizing the volatility of contributions. Equity securities are held to achieve returns in excess of passive indexes by participating in a wide range of investment opportunities. International equity securities are used to further diversify the equity portfolio and may include investments in both developed and emerging international markets. Fixed income securities include primarily corporate bonds from a diversified range of companies, US Treasuries and agency securities and money market instruments. Our investment strategy for fixed income investments is to maintain a high grade portfolio of securities which assist us in managing the volatility and magnitude of plan contributions and expense.

The target asset allocation ranges of pension plan investments by asset category are as follows:

| Asset Category | Target Allocation Ranges |
|---|---|
| US equities | 15%–50% |
| International equities | 5%–20% |
| Fixed income (a) | 40%–70% |
| Other | 0%–10% |

*Fair Value Measurement of Pension Plan Assets*

At December 31, 2009, pension plan assets measured at fair value on a recurring basis (see Note 16) consisted of the following:

| Asset Category | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Interest–bearing cash | $ — | $ 99 | $ — | $ 99 |
| Equity securities: | | | | |
| US | 340 | 242 | — | 582 |
| International | 257 | 79 | — | 336 |
| Fixed income securities: | | | | |
| Corporate bonds (a) | — | 908 | — | 908 |
| US Treasuries | — | 21 | — | 21 |
| Other (b) | — | 44 | — | 44 |
| Preferred securities | — | — | 14 | 14 |
| | | | | |
| Total assets | $ 597 | $1,393 | $ 14 | $2,004 |

_____

(a)  Substantially all corporate bonds are rated investment grade by a major ratings agency such as Moody's.
(b)  Other consists primarily of US agency securities.

F–74

EFIHMW00052247

EFIHMW00051935

Table of Contents

At December 31, 2008, pension plan assets measured at fair value on a recurring basis consisted of the following:

| Asset Category | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Interest–bearing cash | $ — | $ 141 | $ — | $ 141 |
| Equity securities: | | | | |
| US | 272 | 213 | — | 485 |
| International | 220 | 80 | — | 300 |
| Fixed income securities: | | | | |
| Corporate bonds (a) | — | 317 | — | 317 |
| US Treasuries | — | 368 | — | 368 |
| Other (b) | — | 110 | 1 | 111 |
| Preferred securities | — | — | 14 | 14 |
| Total assets | $ 492 | $1,229 | $ 15 | $1,736 |

(a)   Substantially all corporate bonds are rated investment grade by a major ratings agency such as Moody's.
(b)   Other consists primarily of US agency securities.

The following table presents the changes in fair value of the Level 3 pension plan assets for the years ended December 31, 2009 and 2008:

| | Year Ended December 31, 2009 | Year Ended December 31, 2008 |
|---|---|---|
| Balance at beginning of period | $      15 | $      14 |
| Actual return on plan assets: | | |
| Relating to assets held | (1) | — |
| Relating to assets sold during the period | — | — |
| Purchases, sales and settlements | — | 1 |
| Transfers in and/or out of Level 3 | — | — |
| Balance at end of period | $      14 | $      15 |
| Net unrealized gains (losses) included in net assets held at end of period | $      — | $      — |

F–75

EFIHMW00052248

EFIHMW00051935

**PX 030
Page 314 of 734**

**Table of Contents**

*Detailed Information Regarding Postretirement Benefits Other Than Pensions*

The following OPEB information is based on December 31, 2009, 2008, 2007 and October 10, 2007 measurement dates:

| | Successor | | | Predecessor Period from January 1, 2007 through October 10, 2007 |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | |
| *Assumptions Used to Determine Net Periodic Benefit Cost:* | | | | |
| Discount rate | 6.85% | 6.55% | 6.45% | 5.90% |
| Expected return on plan assets | 7.64% | 7.90% | 8.67% | 8.67% |
| *Components of Net Postretirement Benefit Cost:* | | | | |
| Service cost | $ 10 | $ 10 | $ 3 | $ 9 |
| Interest cost | 61 | 59 | 14 | 41 |
| Expected return on assets | (13) | (20) | (6) | (15) |
| Amortization of net transition obligation | 1 | 1 | — | 1 |
| Amortization of prior service cost/(credit) | (1) | 1 | — | (2) |
| Amortization of net loss | 12 | 9 | — | 15 |
| Net periodic OPEB cost | $ 70 | $ 58 | $ 11 | $ 49 |
| *Other Changes in Plan Assets and Benefit Obligations Recognized in Other Comprehensive Income:* | | | | |
| Net loss (gain) | $ 15 | $ 1 | 36 | $ (16) |
| Transition obligation (asset) | — | — | — | — |
| Prior service cost (credit) | — | — | — | — |
| Amortization of net loss (gain) | — | — | — | — |
| Amortization of transition obligation (asset) | — | — | — | — |
| Amortization of prior service cost | — | — | — | 1 |
| Reclassification to regulatory asset | — | (28) | — | — |
| Purchase accounting adjustment | — | (1) | — | 13 |
| Total recognized in other comprehensive income | $ 15 | $ (28) | $ 36 | $ (2) |
| Total recognized in net periodic benefit cost and other comprehensive income | $ 85 | $ 30 | $ 47 | $ 47 |

| | Successor | | | Predecessor Period from January 1, 2007 through October 10, 2007 |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | |
| *Assumptions Used to Determine Benefit Obligations at Period End:* | | | | |
| Discount rate | 5.90% | 6.85% | 6.55% | 6.45% |

F–76

EFIHMW00052249

EFIHMW00051935

Table of Contents

|  | Successor | | | |
|---|---|---|---|---|
|  | Year Ended December 31, 2009 | | Year Ended December 31, 2008 | |
| *Change in Postretirement Benefit Obligation:* |  |  |  |  |
| Benefit obligation at beginning of year | $ | 919 | $ | 928 |
| Service cost |  | 10 |  | 10 |
| Interest cost |  | 61 |  | 59 |
| Participant contributions |  | 23 |  | 16 |
| Medicare Part D reimbursement |  | 6 |  | 4 |
| Actuarial (gain) loss |  | 108 |  | (35) |
| Benefits paid |  | (64) |  | (63) |
| Benefit obligation at end of year | $ | 1,063 | $ | 919 |
| *Change in Plan Assets:* |  |  |  |  |
| Fair value of assets at beginning of year | $ | 198 | $ | 260 |
| Actual return (loss) on assets |  | 32 |  | (54) |
| Employer contributions |  | 22 |  | 35 |
| Participant contributions |  | 23 |  | 16 |
| Medicare Part D reimbursement |  | — |  | 4 |
| Benefits paid |  | (64) |  | (63) |
| Fair value of assets at end of year | $ | 211 | $ | 198 |
| *Funded Status:* |  |  |  |  |
| Benefit obligation | $ | (1,063) | $ | (919) |
| Fair value of assets |  | 211 |  | 198 |
| Funded status at end of year | $ | (852) | $ | (721) |

|  | Successor | | | |
|---|---|---|---|---|
|  | Year Ended December 31, 2009 | | Year Ended December 31, 2008 | |
| *Amounts Recognized on the Balance Sheet Consist of:* |  |  |  |  |
| Other noncurrent liabilities | $ | (852) | $ | (721) |
| *Amounts Recognized in Accumulated Other Comprehensive Income Consist of:* |  |  |  |  |
| Net loss | $ | 23 | $ | 7 |
| Prior service cost credit |  | — |  | — |
| Net transition obligation |  | — |  | — |
| Net amount recognized | $ | 23 | $ | 7 |
| *Amounts Recognized as Regulatory Assets Consist of:* |  |  |  |  |
| Net loss | $ | 242 | $ | 174 |
| Prior service cost credit |  | (7) |  | (8) |
| Net transition obligation |  | 4 |  | 5 |
| Net amount recognized | $ | 239 | $ | 171 |

F–77

EFIHMW00052250

EFIHMW00051935

**PX 030**
**Page 316 of 734**

**Table of Contents**

The following tables provide information regarding the assumed health care cost trend rates.

| | Successor | |
| --- | --- | --- |
| | December 31, 2009 | December 31, 2008 |
| *Assumed Health Care Cost Trend Rates–Not Medicare Eligible* : | | |
| Health care cost trend rate assumed for next year | 8.00% | 8.64% |
| Rate to which the cost trend is expected to decline (the ultimate trend rate) | 5.00% | 5.00% |
| Year that the rate reaches the ultimate trend rate | 2016 | 2017 |
| *Assumed Health Care Cost Trend Rates–Medicare Eligible* : | | |
| Health care cost trend rate assumed for next year | 7.00% | 8.32% |
| Rate to which the cost trend is expected to decline (the ultimate trend rate) | 5.00% | 5.00% |
| Year that the rate reaches the ultimate trend rate | 2016 | 2017 |

| | 1–Percentage Point Increase | 1–Percentage Point Decrease |
| --- | --- | --- |
| *Sensitivity Analysis of Assumed Health Care Cost Trend Rates:* | | |
| Effect on accumulated postretirement obligation | $  126 | $  (105) |
| Effect on postretirement benefits cost | 10 | (8) |

**OPEB Plan Investment Strategy and Asset Allocations**

Our investment objective for the OPEB plan primarily follows the objectives of the Retirement Plan discussed above, while maintaining sufficient cash and short–term investments to pay near–term benefits and expenses.

**Fair Value Measurement of OPEB Plan Assets**

At December 31, 2009, OPEB plan assets measured at fair value on a recurring basis consisted of the following:

| Asset Category | Level 1 | Level 2 | Level 3 | Total |
| --- | --- | --- | --- | --- |
| Interest–bearing cash | $  — | $  18 | $  — | $ 18 |
| Equity securities: | | | | |
| US | 56 | 13 | — | 69 |
| International | 27 | 4 | — | 31 |
| Fixed income securities: | | | | |
| Corporate bonds (a) | — | 50 | — | 50 |
| US Treasuries | — | 1 | — | 1 |
| Other (b) | 39 | 2 | — | 41 |
| Preferred securities | — | — | 1 | 1 |
| | | | | |
| Total assets | $ 122 | $  88 | $  1 | $211 |

(a)   Substantially all corporate bonds are rated investment grade by a major ratings agency such as Moody's.
(b)   Other consists primarily of US agency securities.

F–78

EFIHMW00052251

EFIHMW00051935

Table of Contents

At December 31, 2008, OPEB plan assets measured at fair value on a recurring basis consisted of the following:

| Asset Category | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Interest–bearing cash | $ — | $ 19 | $ — | $ 19 |
| Equity securities: | | | | |
|     US | 70 | 13 | — | 83 |
|     International | 13 | 5 | — | 18 |
| Fixed income securities: | | | | |
|     Corporate bonds (a) | — | 19 | — | 19 |
|     US Treasuries | — | 22 | — | 22 |
|     Other (b) | 29 | 7 | — | 36 |
| Preferred securities | — | — | 1 | 1 |
| Total assets | $ 112 | $ 85 | $ 1 | $198 |

(a)   Substantially all corporate bonds are rated investment grade by a major ratings agency such as Moody's.
(b)   Other consists primarily of US agency securities.

There was no change in the fair values of Level 3 assets in the periods presented.

*Expected Long–Term Rate of Return on Assets Assumption*

The Retirement Plan strategic asset allocation is determined in conjunction with the plan's advisors and utilizes a comprehensive Asset–Liability modeling study to evaluate potential long–term outcomes of various investment strategies. The study incorporates long–term rate of return assumptions for each asset class based on historical and future expected asset class returns, current market conditions, rate of inflation, current prospects for economic growth, and taking into account the diversification benefits of investing in multiple asset classes and potential benefits of employing active investment management.

**Retirement Plan**

| Asset Class | Expected Long–Term Rate of Return |
|---|---|
| US equity securities | 9.3% |
| International equity securities | 10.3% |
| Fixed income securities | 7.0% |
| Preferred securities | 8.0% |
| | 8.0% |

**OPEB Plan**

| Plan Type | Expected Long–Term Returns |
|---|---|
| 401(h) accounts | 8.0% |
| Life Insurance VEBA | 7.5% |
| Union VEBA | 7.5% |
| Non–Union VEBA | 4.00% |
| | 7.6% |

*Significant Concentrations of Risk*

The plans' investments are exposed to risks such as interest rate, capital market and credit risks. We seek to optimize return on investment consistent with levels of liquidity and investment risk which are prudent and

F–79

EFIHMW00052252

EFIHMW00051935

**Table of Contents**

reasonable, given prevailing capital market conditions and other factors specific to us. While we recognize the importance of return, investments will be diversified in order to minimize the risk of large losses unless, under the circumstances, it is clearly prudent not to do so. There are also various restrictions and guidelines in place including limitations on types of investments allowed and portfolio weightings for certain investment securities to assist in the mitigation of the risk of large losses.

*Assumed Discount Rate*

We selected the assumed discount rate using the Hewitt Top Quartile yield curve, which is based on actual corporate bond yields and at December 31, 2009 consisted of 111 corporate bonds rated AA or higher as reported by either Moody's or S&P.

*Amortization in 2010*

In 2010, we estimate amortization of the net actuarial loss and prior service cost for the defined benefit pension plan from accumulated other comprehensive income into net periodic benefit cost will be $51 million and $1 million, respectively. We estimate amortization of the net actuarial loss, prior service credit, and transition obligation for the OPEB plan from accumulated other comprehensive income into net periodic benefit cost will be $21 million, a $1 million credit and $1 million, respectively.

*Contributions in 2010*

Estimated funding for calendar year 2010 totals $45 million for the Retirement Plan and $24 million for the OPEB plan.

*Future Benefit Payments*

Estimated future benefit payments to beneficiaries are as follows:

|  | Successor | | | | | |
|---|---|---|---|---|---|---|
|  | 2010 | 2011 | 2012 | 2013 | 2014 | 2015–19 |
| Pension benefits | $142 | $149 | $161 | $171 | $173 | $1,020 |
| OPEB | $54 | $57 | $60 | $63 | $67 | $377 |
| Medicare Part D subsidies received | $6 | $7 | $7 | $8 | $8 | $49 |

*Thrift Plan*

Our employees may participate in a qualified savings plan, the Thrift Plan. This plan is a participant–directed defined contribution plan intended to qualify under Section 401(a) of the Code, and is subject to the provisions of ERISA. The Thrift Plan included an employee stock ownership component until October 10, 2007. Under the terms of the Thrift Plan, employees who do not earn more than the IRS threshold compensation limit used to determine highly compensated employees may contribute, through pre–tax salary deferrals and/or after–tax payroll deductions, the lesser of 75% of their regular salary or wages or the maximum amount permitted under applicable law. Employees who earn more than such threshold may contribute from 1% to 16% of their regular salary or wages. Employer matching contributions are also made in an amount equal to 100% of the first 6% of employee contributions for employees who are covered under the Cash Balance Formula of the Retirement Plan, and 75% of the first 6% of employee contributions for employees who are covered under the Traditional Retirement Plan Formula of the Retirement Plan. Effective January 1, 2006 through October 10, 2007, employees could reallocate or transfer all or part of their accumulated or future employer matching contributions to any of the plan's other investment options. As of October 10, 2007, employer matching contributions are made in cash and may be allocated by participants to any of the plan's investment options. Our contributions to the Thrift Plan totaled $28 million, $25 million, $6 million and $33 million in the years ended December 31, 2009 and 2008, the

F–80

EFIHMW00052253

EFIHMW00051935

Table of Contents
period October 11, 2007 through December 31, 2007 and the period January 1, 2007 through October 10, 2007, respectively. See Note 14 for additional information related to the Thrift Plan.

**22.  STOCK–BASED COMPENSATION**

*Successor—EFH Corp. 2007 Stock Incentive Plan*

In December 2007, we established the 2007 Stock Incentive Plan for Key Employees of EFH Corp. and its Affiliates (2007 SIP). Incentive awards under the 2007 SIP may be granted to directors and officers and qualified managerial employees of EFH Corp. or its subsidiaries or affiliates in the form of non‑qualified stock options, stock appreciation rights, restricted shares, deferred shares, shares of common stock, the opportunity to purchase shares of common stock and other awards that are valued in whole or in part by reference to, or are otherwise based on the fair market value of EFH Corp.'s shares of common stock. The 2007 SIP permits the grant of awards for 72 million shares of common stock, subject to adjustments under applicable laws for certain events, such as a change in control, and no such grants may be issued after December 26, 2017. Shares related to grants that are forfeited, terminated, cancelled, expire unexercised, withheld to satisfy tax withholding obligations, or are repurchased by the Company are available for new grants under the 2007 SIP.

*Stock Options*—Under the terms of the 2007 SIP, options to purchase 14.7 million, 33.1 million and 19.5 million shares of EFH Corp. common stock were granted to certain management employees in 2009, 2008 and December 2007, respectively. Of the options granted in 2009, 9.2 million were granted in exchange for previously granted options. Vested awards must be exercised within 10 years of the grant date. The options initially provided the holder the right to purchase EFH Corp. common stock for $5.00 per share. The terms of the options were fixed at grant date. The stock option awards under the 2007 SIP consist of three types of stock options. One–half of the options initially granted vest solely based upon continued employment over a specific period of time, generally five years, with the options vesting ratably on an annual basis over the period (Time–Based Options). One–half of the options initially granted vest based upon both continued employment and the achievement of targeted five–year EFH Corp. EBITDA levels (Performance–Based Options). The Performance–Based Options may also vest in part or in full upon the occurrence of certain specified liquidity events. All options remain exercisable for ten years from the date of grant. Prior to vesting, expenses are recorded if the achievement of the EBITDA levels is probable, and amounts recorded are adjusted or reversed if the probability of achievement of such levels changes. Probability of vesting is evaluated at least each quarter.

In October 2009, in consideration of the recent economic dislocation and the desire to provide incentives for retention, grantees of Performance–Based Options (excluding named executive officers and a small group of other employees) were provided an offer, which substantially all accepted, to exchange their unvested Performance–Based Options granted under the 2007 SIP with a strike price of $5.00 per share and a vesting schedule through October 2012 for new time–based stock options (Cliff–Vesting Options) granted under the 2007 SIP with a strike price of $3.50 per share (the then most recent market valuation of each share), with one–half of these options vesting in September 2012 and one–half of these options vesting in September 2014. Additionally, 3.1 million Cliff–Vesting Options were granted to certain Named Executive Officers and a small group of other employees under the 2007 SIP with a strike price of $3.50 per share, vesting in September 2014. Substantially all of this group of employees also accepted an offer to exchange half of their unvested Performance–Based Options under the 2007 SIP with a strike price of $5.00 per share and a vesting schedule through December 2012 for new time–based stock options granted under the 2007 SIP with a strike price of $3.50 per share, vesting in September 2014.

The fair value of all options granted was estimated using the Black–Scholes option pricing model and the assumptions noted in the table below. Since EFH Corp. is a private company, expected volatility is based on actual historical experience of comparable publicly–traded companies for a term corresponding to the expected life of the options. The expected life represents the period of time that options granted are expected to be outstanding and is calculated using the simplified method prescribed by the SEC Staff Accounting Bulletin No. 107. The simplified method was used since EFH Corp. does not have stock option history upon which to

F–81

EFIHMW00052254

EFIHMW00051935

**PX 030
Page 320 of 734**

Table of Contents

base the estimate of the expected life and data for similar companies was not reasonably available. The risk-free rate is based on the US Treasury security with terms equal to the expected life of the option as of the grant date.

| Assumptions | | | Successor | | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 |
| | | Time-Based Options | | | Performance-Based Options | |
| Expected volatility | 30% | 30% – 33% | 30% | 30% | 30% – 33% | 30% |
| Expected annual dividend | — | — | — | — | — | — |
| Expected life (in years) | 6.4 – 7.4 | 6.0 – 6.5 | 6.4 | 5.3 – 7.6 | 5.0 – 7.3 | 5.4 – 7.4 |
| Risk-free rate | 2.54% – 3.14% | 1.51% – 3.50% | 3.81% | 2.51% – 3.25% | 1.35% – 3.64% | 3.92% |

The weighted average grant-date fair value of the Time-Based Options granted in 2009, 2008 and December 2007 was $1.32, $1.89 and $1.92 per option, respectively. The weighted-average grant fair value of the Performance-Based Options granted in 2009, 2008 and December 2007 ranged from $1.16 to $1.91, $1.73 to $2.25 and $1.74 to $2.09, respectively, depending upon the performance period.

Compensation expense for Time-Based Options is based on the grant-date fair value and recognized over the vesting period as employees perform services. During 2009, 2008 and the 2007 Successor period, $8.6 million, $11.9 million and less than $100,000, respectively, was recognized as expense for Time-Based Options.

As of December 31, 2009, there was approximately $48.9 million of unrecognized compensation expense related to nonvested Time-Based Options, which is expected to be recognized ratably over a remaining weighted-average period of approximately three to five years.

A summary of Time-Based Options activity is presented below:

| Options | Year Ended December 31, 2009 | | |
|---|---|---|---|
| | Options (millions) | Weighted Average Exercise Price | Aggregate Intrinsic Value (millions) |
| Total outstanding at beginning of period | 24.6 | $ 5.00 | $ — |
| Granted | 13.9 | 3.50 | |
| Exercised | — | — | |
| Forfeited | (2.9) | 5.00 | |
| Total outstanding at end of period (weighted average remaining term of 8—10 years) | 35.6 | 4.42 | — |
| Exercisable at end of period (weighted average remaining term of 8—10 years) | (4.7) | 5.00 | — |
| Expected forfeitures | (0.3) | 5.00 | — |
| Expected to vest at end of period (weighted average remaining term of 8—10 years) | 30.6 | 4.32 | — |

F–82

EFIHMW00052255

EFIHMW00051935

Table of Contents

| Options | Year Ended December 31, 2008 | | |
|---|---|---|---|
| | Options (millions) | Weighted Average Exercise Price | Aggregate Intrinsic Value (millions) |
| Total outstanding at beginning of period | 9.8 | $ 5.00 | $ — |
| Granted | 16.8 | 5.00 | — |
| Exercised | — | 5.00 | — |
| Forfeited | (2.0) | 5.00 | — |
| Total outstanding at end of period (weighted average remaining term of 9 years) | 24.6 | 5.00 | — |
| Exercisable at end of period (weighted average remaining term of 9 years) | (4.7) | 5.00 | — |
| Expected forfeitures | (0.4) | 5.00 | — |
| Expected to vest at end of period (weighted average remaining term of 9 years) | 19.5 | 5.00 | — |

| Options | Period from October 11, 2007 through December 31, 2007 | | |
|---|---|---|---|
| | Options (millions) | Weighted Average Exercise Price | Aggregate Intrinsic Value (millions) |
| Total outstanding at beginning of period | — | $ — | $ — |
| Granted | 9.8 | 5.00 | — |
| Exercised | — | — | — |
| Forfeited | — | — | — |
| Total outstanding at end of period (weighted average remaining term of 10 years) | 9.8 | 5.00 | — |
| Exercisable at end of period (weighted average remaining term of 10 years) | — | — | — |
| Expected forfeitures | (0.5) | 5.00 | — |
| Expected to vest at end of period (weighted average remaining term of 10 years) | 9.3 | 5.00 | — |

| Nonvested Options | Year Ended December 31, 2009 | | Year Ended December 31, 2008 | | Period from October 11, 2007 through December 31, 2007 | |
|---|---|---|---|---|---|---|
| | Options (millions) | Weighted Average Grant-Date Fair Value | Options (millions) | Weighted Average Grant-Date Fair Value | Options (millions) | Grant-Date Fair Value |
| Total nonvested at beginning of period | 19.9 | $ 2.05 | 9.8 | $ 1.92 | — | $ — |
| Granted | 13.9 | 1.32 | 16.8 | 1.89 | 9.8 | 1.92 |
| Vested | (4.7) | 1.86 | (4.7) | 1.80 | — | — |
| Forfeited | (2.9) | 1.85 | (2.0) | 1.92 | — | — |
| Total nonvested at end of period | 26.2 | 1.67 | 19.9 | 2.05 | 9.8 | 1.92 |

Compensation expense for Performance–Based Options is based on the grant–date fair value and recognized over the requisite performance and service periods for each tranche of options depending upon the achievement of financial performance, or if certain liquidity events occur, as discussed above. No amounts were expensed in 2009 for Performance–Based Options because the 2009 EBITDA target was not met. Additionally, most

F‑83

EFIHMW00052256

EFIHMW00051935

**Table of Contents**

participants' Performance–Based Options were exchanged for Time–Based Options in 2009. Expense recognized for Performance–Based Options in 2008 totaled $8.1 million. No amounts were expensed in the 2007 Successor period for Performance–Based Options because the performance period for the first tranche of the options did not begin until January 1, 2008.

As of December 31, 2009, there was approximately $19.1 million of unrecognized compensation expense related to nonvested Performance–Based Options, which we could record as an expense over a remaining weighted–average period of approximately three to five years, subject to the achievement of financial performance being probable. A total of 4.8 million of the 2008 and none of the 2009 Performance–Based Options have vested.

A summary of Performance–Based Options activity is presented below:

| Options | Year Ended December 31, 2009 | | |
| --- | --- | --- | --- |
| | Options (millions) | Weighted Average Exercise Price | Aggregate Intrinsic Value (millions) |
| Outstanding at beginning of period | 23.9 | $    5.00 | $    — |
| Granted | 0.8 | 3.50 | — |
| Exercised | — | — | — |
| Forfeited | (3.0) | 5.00 | — |
| Exchanged | (9.2) | 5.00 | — |
| Total outstanding at end of period (weighted average remaining term of 8—10 years) | 12.5 | 4.90 | — |
| Exercisable at end of period (weighted average remaining term of 8—10 years) | (4.8) | 5.00 | — |
| Expected forfeitures | (0.3) | 5.00 | — |
| Expected to vest at end of period (weighted average remaining term of 8—10 years) | 7.4 | 4.90 | — |

| Options | Year Ended December 31, 2008 | | |
| --- | --- | --- | --- |
| | Options (millions) | Weighted Average Exercise Price | Aggregate Intrinsic Value (millions) |
| Outstanding at beginning of period | 9.8 | $    5.00 | $    — |
| Granted | 16.2 | 5.00 | — |
| Exercised | — | — | — |
| Forfeited | (2.1) | 5.00 | — |
| Total outstanding at end of period (weighted average remaining term of 9 years) | 23.9 | 5.00 | — |
| Exercisable at end of period (weighted average remaining term of 9 years) | — | — | — |
| Expected forfeitures | (0.5) | 5.00 | — |
| Expected to vest at end of period (weighted average remaining term of 9 years) | 23.4 | 5.00 | — |

F–84

EFIHMW00052257

EFIHMW00051935

Table of Contents

| Options | Period from October 11, 2007 through December 31, 2007 | | |
| --- | --- | --- | --- |
| | Options (millions) | Weighted Average Exercise Price | Aggregate Intrinsic Value (millions) |
| Outstanding at beginning of period | — | $ — | $ — |
| Granted | 9.8 | 5.00 | |
| Exercised | | | |
| Forfeited | | | |
| Total outstanding at end of period (weighted average remaining term of 10 years) | 9.8 | 5.00 | — |
| Exercisable at end of period (weighted average remaining term of 10 years) | | | |
| Expected forfeitures | (0.5) | | — |
| Expected to vest at end of period (weighted average remaining term of 10 years) | 9.3 | 5.00 | — |

| Nonvested Options | Year Ended December 31, 2009 | | Year Ended December 31, 2008 | | Period from October 11, 2007 through December 31, 2007 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Options (millions) | Grant-Date Fair Value | Options (millions) | Grant-Date Fair Value | Options (millions) | Grant-Date Fair Value |
| Total nonvested at beginning of period | 23.9 | $ 1.73 – 2.21 | 9.8 | $ 1.74 – 2.09 | — | $ — |
| Granted | 0.8 | 1.16 – 1.91 | 16.2 | 1.73 – 2.25 | 9.8 | 1.74 – 2.09 |
| Vested | (4.8) | 1.73 – 2.21 | | | | |
| Forfeited | (3.0) | 1.73 – 2.21 | (2.1) | 1.74 – 2.09 | — | — |
| Exchanged | (9.2) | — | | | | |
| Total nonvested at end of period | 7.7 | 1.16 – 2.11 | 23.9 | 1.73 – 2.21 | 9.8 | 1.74 – 2.09 |

*Other Share and Share–Based Awards*—In 2008, we granted 2.4 million deferred share awards, each of which represents the right to receive one share of EFH Corp. stock, to certain management employees who agreed to forego share–based awards that vested at the Merger date. The deferred share awards are fully vested and are payable in cash or stock upon the earlier of a change of control or separation of service. No expense was recorded in 2008 related to these awards. An additional 1.2 million deferred share awards were granted to certain management employees in 2008, approximately half of which are payable in cash or stock and the balance payable in stock, these awards vest over periods of one to five years, and $3.7 million and $2.2 million in expense was recorded in 2009 and 2008, respectively, to recognize the vesting. In 2009, 120 thousand deferred share awards were surrendered by an employee upon termination of employment. Deferred share awards that are payable in cash or stock are accounted for as liability awards; therefore, the effects of changes in value of EFH Corp. shares are recognized in earnings.

We granted 1.5 million shares of EFH Corp. stock in 2009, 1.7 million shares in 2008 and 1.0 million shares in 2007, to board members and other non–employees. The shares vest over periods of one to two years, and a portion may be settled in cash. Expense recognized in 2009, 2008 and 2007 related to these grants totaled $4.0 million, $8.2 million and $1 million, respectively.

*Stock Appreciation Rights*—In 2008, Oncor established the Oncor Electric Delivery Company LLC Stock Appreciation Rights Plan (the SARs Plan) under which certain employees of Oncor and its subsidiaries may be granted stock appreciation rights (SARs) payable in cash, or in some circumstances, Oncor units. Two types of SARs may be granted under the SARs Plan. Time–based SARs (Time SARs) vest solely based upon continued

F–85

EFIHMW00052258

EFIHMW00051935

**PX 030**
**Page 324 of 734**

**Table of Contents**

employment ratably on an annual basis on each of the first five anniversaries of the grant date. Performance–based SARs (Performance SARs) vest based upon both continued employment and the achievement of a predetermined level of Oncor EBITDA over time, generally ratably over five years based upon annual Oncor EBITDA levels, with provisions for vesting if the annual levels are not achieved but cumulative two– or three–year total Oncor EBITDA levels are achieved. Time and Performance SARs may also vest in part or in full upon the occurrence of certain specified liquidity events and are exercisable only upon the occurrence of certain specified liquidity events. Since the exercisability of the Time and Performance SARs is conditioned upon the occurrence of a liquidity event, compensation expense will not be recorded until it is probable that a liquidity event will occur. Generally, awards under the SARs Plan terminate on the tenth anniversary of the grant, unless the participant's employment is terminated earlier under certain circumstances.

In February 2009, Oncor implemented a similar plan for primarily non–employee members of Oncor's board of directors. The terms and conditions are similar to the SARs Plan with the exception that SARs granted to non–employee board members vest in eight equal quarterly installments over a two–year period.

SARs are generally payable in cash based on the fair market value of the SAR on the date of exercise. No SARs were granted under the SARs Plan during the year ended December 31, 2009. Oncor granted 6.9 million Time SARs under the SARs Plan during the year ended December 31, 2008, and Time SARS vested at December 31, 2009 totaled 2.8 million. Oncor granted 6.9 million Performance SARs under the SARs Plan during the year ended December 31, 2008, and Performance SARs vested at December 31, 2009 totaled 1.4 million. Oncor granted 55 thousand SARs under the Director SARs Plan during the year ended December 31, 2009, and SARs vested under the Director SARs Plan at December 31, 2009 totaled 27.5 thousand. There were no SARs under either plan eligible for exercise at December 31, 2009.

*Predecessor*

Under our shareholder–approved long–term incentive plans, we provided discretionary awards to qualified management employees payable in EFH Corp. common stock. As presented below, the awards generally vested over a three–year period and the number of shares ultimately earned was based on the performance of EFH Corp.'s stock over the vesting period.

|  | **Awards Granted in 2007** |
|---|---|
| Vesting period | Three years |
| Potential share pay–out as a percent of initial number of awards granted | 0% to 100% (a) |
| Basis for pay–out percentage—actual EFH Corp. three–year share return compared to: | Share returns of companies comprising the S&P 500 Electric Utilities Index |
| Award type | Performance units payable in EFH Corp. stock upon vesting |

(a)  For a small number of employees under employment agreements, potential share pay–out as a percent of initial number of awards granted was 0% to 200%, and the number of shares distributed was based 100% on EFH Corp.'s total share return over the vesting period compared to the total returns of companies comprising the Standard & Poor's 500 Electric Utilities Index.

In addition, we established restrictions that limited certain employees' opportunities to liquidate vested awards. For both restricted stock and performance unit awards, dividends over the vesting periods were converted to equivalent shares of EFH Corp. common stock to be distributed upon vesting.

F–86

EFIHMW00052259

EFIHMW00051935

Table of Contents

The determination of the fair value of stock–based compensation awards at grant date was based on a Monte Carlo simulation. The more significant assumptions used in this valuation process were as follows:

- Expected volatility of the stock price of EFH Corp. and peer group companies – expected volatility was determined based on historical stock price volatilities using daily stock price returns for the three years prior to the grant date.

- The dividend rate for EFH Corp. and peer group companies was based on the observed dividend payments over the twelve months prior to grant date.

- Risk–free rate (three–year US Treasury securities) during the three year vesting period.

- Discount for liquidation restrictions—this factor estimated the discount for lack of marketability of vested awards due to the anticipated time for the approval and issuance of the awards, the black–out period immediately after the grant and additional holding requirements imposed on senior executives. This discount was determined based on an estimation of the cost of a protective put at the award date and is calculated using the Black–Scholes option pricing model using expected volatility assumptions based on historical and implied volatility as discussed above and a risk–free rate of return over the option period.

- Change–in–control and no–change–in–control scenarios were considered. The change–in–control scenario was based on three different change–in–control dates each assigned projected probabilities. The change–in–control value was probability weighted with the value assuming no change of control

| Assumptions | Period from January 1, 2007 through October 10, 2007 |
|---|---|
| Expected volatility | 29% – 30% |
| Expected annual dividend | — |
| Risk–free rate | 4.8% – 4.9% |
| Discount for liquidity restrictions | 0% – 4.8% |

The following table presents information about Predecessor stock–based compensation plans.

| | Performance Unit Awards |
|---|---|
| **Number of awards:** | |
| Balance—December 31, 2006 | 4,250,340 |
| Granted in period from January 1, 2007 to October 10, 2007 | 474,000 |
| Forfeited/expired | (41,492) |
| Vested/exercised | (4,682,848) |
| Balance at Merger closing date | — |
| **Weighted average fair value**—Period from January 1, 2007 through October 10, 2007 | |
| Outstanding—Beginning of year | $   23.60 |
| Granted | $   67.08 |
| Forfeited | $   36.24 |
| Vested | $   28.30 |
| Outstanding—October 10, 2007 | $   — |
| Weighted average fair value of awards granted in | |
| Period from January 1, 2007 to October 10, 2007 | $   67.08 |

The table above reflects the weighted average fair value of the awards on grant date.

F–87

EFIHMW00052260

EFIHMW00051935

**PX 030**
**Page 326 of 734**

Table of Contents

Reported expense related to the awards totaled $27 million ($18 million after–tax) in the period from January 1, 2007 through October 10, 2007. Such expenses are reported in SG&A expense, except for immaterial amounts capitalized.

The fair value of awards that vested in the period from January 1, 2007 through October 10, 2007 totaled $613 million based on the vesting date share prices.

Under the terms of the Merger Agreement, all outstanding Performance Unit awards were deemed to be vested at the date of the Merger. See Note 2.

**23.    RELATED PARTY TRANSACTIONS**

We incur an annual management fee under the terms of a management agreement with the Sponsor Group for which we accrued $36 million, $35 million and $8 million for the years ended December 31, 2009 and 2008 and the period October 11, 2007 to December 31, 2007, respectively. The fee is reported as SG&A expense in Corporate and Other activities. Also, under terms of the management agreement, affiliates of the Sponsor Group and Lehman Brothers Inc. were paid transaction fees of $300 million for certain services provided in connection with the Merger and related transactions. A portion of these fees was included in the purchase price that was allocated to identifiable assets and liabilities as part of purchase accounting, and the remainder was reported as deferred financing costs.

At the closing of the Merger, TCEH entered into the TCEH Senior Secured Facilities and Oncor entered into a revolving credit facility, each with syndicates of financial institutions and other lenders. These syndicates included affiliates of GS Capital Partners, which is a member of the Sponsor Group. Affiliates of GS Capital Partners and Kohlberg Kravis Roberts & Co. L.P. (a member of the Sponsor Group) have from time to time engaged in commercial banking and financial advisory transactions with us in the normal course of business.

Affiliates of the Sponsor Group participated in debt exchange offers completed in November 2009 by EFH Corp., Intermediate Holding and EFIH Finance to exchange new senior secured notes for certain EFH Corp. and TCEH notes as discussed in Note 12 and in an EFH Corp. issuance of $500 million principal amount of senior secured notes completed in January 2010. Goldman, Sachs & Co. and KKR Capital Markets LLC acted as dealer managers and TPG Capital, L.P. served as an advisor in the exchange offers. Goldman, Sachs & Co. also acted as an initial purchaser in the issuance of senior secured notes. (See Note 12 for additional information.) These affiliates were compensated for their services in accordance with the terms of the respective agreements. These fees totaled $1 million for the year ended December 31, 2009.

Affiliates of Goldman Sachs & Co. are parties to certain commodity and interest rate hedging transactions with us in the normal course of business.

Affiliates of the Sponsor Group may sell or acquire debt or debt securities issued by us in open market transactions or through loan syndications.

**24.    SEGMENT INFORMATION**

Our operations are aligned into two reportable business segments: Competitive Electric and Regulated Delivery. The segments are managed separately because they are strategic business units that offer different products or services and involve different risks.

The Competitive Electric segment is engaged in competitive market activities consisting of electricity generation, the development and construction of new generation facilities, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales to residential and business

F–88

EFIHMW00052261

EFIHMW00051935

**PX 030**
**Page 327 of 734**

**Table of Contents**

customers, all largely in Texas. These activities are conducted by TCEH. The results of this segment also include equipment salvage and resale activities related to the 2007 cancellation of the development of eight new coal-fueled generation units discussed in Note 4.

The Regulated Delivery segment is engaged in regulated electricity transmission and distribution operations in Texas. These activities are conducted by Oncor, including its wholly owned bankruptcy-remote financing subsidiary.

Corporate and Other represents the remaining nonsegment operations consisting primarily of discontinued operations, general corporate expenses and interest on EFH Corp., Intermediate Holding and EFC Holdings debt.

The accounting policies of the business segments are the same as those described in the summary of significant accounting policies in Note 1. We evaluate performance based on income from continuing operations. We account for intersegment sales and transfers as if the sales or transfers were to third parties, that is, at current market prices.

| | Successor | | | Predecessor |
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
|---|---|---|---|---|
| **Operating Revenues** | | | | |
| Competitive Electric | $ 7,911 | $ 9,787 | $ 1,671 | $ 6,884 |
| Regulated Delivery | 2,690 | 2,580 | 532 | 1,987 |
| Corp. and Other | 20 | 37 | 11 | 37 |
| Eliminations | (1,075) | (1,040) | (220) | (864) |
| Consolidated | $ 9,546 | $ 11,364 | $ 1,994 | $ 8,044 |
| **Regulated Revenues—Included in Operating Revenues** | | | | |
| Competitive Electric | $ — | $ — | $ — | $ — |
| Regulated Delivery | 2,690 | 2,580 | 532 | 1,987 |
| Corp. and Other | | | | |
| Eliminations | (1,051) | (1,001) | (208) | (824) |
| Consolidated | $ 1,639 | $ 1,579 | $ 324 | $ 1,163 |
| **Affiliated Revenues—Included in Operating Revenues** | | | | |
| Competitive Electric | $ 8 | $ 7 | $ 2 | $ 5 |
| Regulated Delivery | 1,051 | 1,001 | 208 | 824 |
| Corp. and Other | 16 | 32 | 10 | 35 |
| Eliminations | (1,075) | (1,040) | (220) | (864) |
| Consolidated | $ — | $ — | $ — | $ — |
| **Depreciation and Amortization** | | | | |
| Competitive Electric | $ 1,172 | $ 1,092 | $ 315 | $ 253 |
| Regulated Delivery | 557 | 492 | 96 | 366 |
| Corp. and Other | 25 | 26 | 4 | 15 |
| Eliminations | — | — | — | — |
| Consolidated | $ 1,754 | $ 1,610 | $ 415 | $ 634 |
| **Equity in Earnings (Losses) of Unconsolidated Subsidiaries (a)** | | | | |
| Competitive Electric | $ (7) | $ (10) | $ (2) | $ (5) |
| Regulated Delivery | (2) | (4) | (1) | (2) |
| Corp. and Other | (3) | (5) | (1) | (4) |
| Eliminations | 12 | 19 | 4 | 10 |
| Consolidated | $ — | $ — | $ — | $ (1) |

F–89

EFIHMW00052262

EFIHMW00051935

Table of Contents

|  | Successor | | | Predecessor |
|---|---|---|---|---|
|  | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| **Interest Income** |  |  |  |  |
| Competitive Electric | $ 64 | $ 61 | $ 10 | $ 271 |
| Regulated Delivery | 43 | 45 | 12 | 44 |
| Corp. and Other | 147 | 100 | 42 | 106 |
| Eliminations | (209) | (179) | (40) | (365) |
| Consolidated | $ 45 | $ 27 | $ 24 | $ 56 |
| **Interest Expense and Related Charges** |  |  |  |  |
| Competitive Electric | $ 1,946 | $ 4,010 | $ 609 | $ 357 |
| Regulated Delivery | 346 | 317 | 70 | 242 |
| Corp. and Other | 829 | 787 | 200 | 437 |
| Eliminations | (209) | (179) | (40) | (365) |
| Consolidated | $ 2,912 | $ 4,935 | $ 839 | $ 671 |
| **Income Tax Expense (Benefit)** |  |  |  |  |
| Competitive Electric | $ 407 | $ (450) | $ (656) | $ 306 |
| Regulated Delivery | 173 | 221 | 30 | 160 |
| Corp. and Other | (213) | (242) | (47) | (157) |
| Eliminations | — | — | — | — |
| Consolidated | $ 367 | $ (471) | $ (673) | $ 309 |
| **Income (loss) from Continuing Operations** |  |  |  |  |
| Competitive Electric | $ 631 | $ (8,929) | $ (1,245) | $ 722 |
| Regulated Delivery | 320 | (486) | 63 | 265 |
| Corp. and Other | (543) | (583) | (179) | (288) |
| Eliminations | — | — | — | — |
| Consolidated | $ 408 | $ (9,998) | $ (1,361) | $ 699 |
| **Investment in Equity Investees** |  |  |  |  |
| Competitive Electric | $ 42 | $ (2) | $ (1) |  |
| Regulated Delivery | — | — | — |  |
| Corp. and Other | — | — | — |  |
| Eliminations | — | — | — |  |
| Consolidated | $ 42 | $ (2) | $ (1) |  |
| **Total assets (b)** |  |  |  |  |
| Competitive Electric | $ 43,302 | $ 43,061 | $ 49,297 |  |
| Regulated Delivery | 16,246 | 15,772 | 15,458 |  |
| Corp. and Other | 4,355 | 3,526 | 2,992 |  |
| Eliminations | (4,241) | (3,096) | (2,943) |  |
| Consolidated | $ 59,662 | $ 59,263 | $ 64,804 |  |
| **Capital Expenditures** |  |  |  |  |
| Competitive Electric | $ 1,324 | $ 1,914 | $ 530 | $ 1,901 |
| Regulated Delivery | 998 | 919 | 162 | 580 |
| Corp. and Other | 26 | 16 | 1 | 7 |
| Eliminations | — | — | — | — |
| Consolidated | $ 2,348 | $ 2,849 | $ 693 | $ 2,488 |

(a)    Amounts invested in equity investees were not material in any period presented.
(b)    Assets by segment exclude investments in affiliates.

F–90

EFIHMW00052263

EFIHMW00051935

Table of Contents

25.   SUPPLEMENTARY FINANCIAL INFORMATION

*Regulated Versus Unregulated Operations*

| | Successor | | | Predecessor |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Operating revenues | | | | |
| Regulated | $ 2,690 | $ 2,580 | $ 532 | $ 1,987 |
| Unregulated | 7,931 | 9,824 | 1,682 | 6,921 |
| Intercompany sales eliminations—regulated | (1,051) | (1,001) | (208) | (824) |
| Intercompany sales eliminations—unregulated | (24) | (39) | (12) | (40) |
| Total operating revenues | 9,546 | 11,364 | 1,994 | 8,044 |
| Fuel, purchased power and delivery fees—unregulated (a) | (2,878) | (4,595) | (644) | (2,381) |
| Net gain (loss) from commodity hedging and trading activities—unregulated | 1,736 | 2,184 | (1,492) | (554) |
| Operating costs—regulated | (908) | (828) | (182) | (637) |
| Operating costs—unregulated | (690) | (675) | (124) | (470) |
| Depreciation and amortization—regulated | (557) | (492) | (96) | (366) |
| Depreciation and amortization—unregulated | (1,197) | (1,118) | (319) | (268) |
| Selling, general and administrative expenses—regulated | (194) | (164) | (45) | (134) |
| Selling, general and administrative expenses—unregulated | (874) | (793) | (171) | (557) |
| Franchise and revenue–based taxes—regulated | (250) | (255) | (62) | (198) |
| Franchise and revenue–based taxes—unregulated | (109) | (108) | (31) | (84) |
| Impairment of goodwill | (90) | (8,860) | — | — |
| Other income | 204 | 80 | 14 | 69 |
| Other deductions | (97) | (1,301) | (61) | (841) |
| Interest income | 45 | 27 | 24 | 56 |
| Interest expense and other charges | (2,912) | (4,935) | (839) | (671) |
| Income (loss) from continuing operations before income taxes | $ 775 | $ (10,469) | $ (2,034) | $ 1,008 |

(a)   Includes unregulated cost of fuel consumed of $1.269 billion in 2009, $1.604 billion in 2008, $255 million in the period from October 11, 2007
through December 31, 2007 and $868 million in the period from January 1, 2007 through October 10, 2007. The balance represents energy purchased
for resale and delivery fees net of intercompany eliminations.

F–91

EFIHMW00052264

EFIHMW00051935

Table of Contents
*Interest Expense and Related Charges*

| | Successor | | | Predecessor |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Interest paid/accrued (including net amounts settled/accrued under interest rate swaps) | $    3,479 | $    3,482 | $    800 | $    722 |
| Unrealized mark-to-market net (gain) loss on interest rate swaps | (696) | 1,477 | — | — |
| Amortization of interest rate swap losses at dedesignation of hedge accounting | 184 | 66 | — | 10 |
| Amortization of fair value debt discounts resulting from purchase accounting | 82 | 75 | 17 | — |
| Amortization of debt issuance costs and discounts | 140 | 146 | 81 | 19 |
| Capitalized interest, primarily related to generation facility and regulated utility asset construction | (277) | (311) | (59) | (80) |
| Total interest expense and related charges | $    2,912 | $    4,935 | $    839 | $    671 |

*Restricted Cash*

| | Successor | | | |
| --- | --- | --- | --- | --- |
| | At December 31, 2009 | | At December 31, 2008 | |
| | Current Assets | Noncurrent Assets | Current Assets | Noncurrent Assets |
| Amounts related to TCEH's Letter of Credit Facility (See Note 12) | $    — | $    1,135 | $    — | $    1,250 |
| Amounts related to margin deposits held | 1 | — | 4 | — |
| Amounts related to securitization (transition) bonds | 47 | 14 | 51 | 17 |
| Total restricted cash | $    48 | $    1,149 | $    55 | $    1,267 |

*Inventories by Major Category*

| | Successor | |
| --- | --- | --- |
| | December 31, 2009 | December 31, 2008 |
| Materials and supplies | $    248 | $    199 |
| Fuel stock | 204 | 162 |
| Natural gas in storage | 33 | 65 |
| Total inventories | $    485 | $    426 |

F-92

EFIHMW00052265

EFIHMW00051935

**PX 030**
**Page 331 of 734**

**Table of Contents**
*Property, Plant and Equipment*

| | Successor | |
| --- | --- | --- |
| | December 31, 2009 | December 31, 2008 |
| Competitive Electric: | | |
| Generation and mining | $ 20,755 | $ 16,954 |
| Nuclear fuel (net of accumulated amortization of $426 and $235) | 430 | 433 |
| Other assets | 27 | 16 |
| Regulated Delivery: | | |
| Transmission | 3,917 | 3,626 |
| Distribution | 8,778 | 8,429 |
| Other assets | 174 | 166 |
| Corporate and Other | 161 | 138 |
| | | |
| Total | 34,242 | 29,762 |
| Less accumulated depreciation | 6,633 | 5,321 |
| | | |
| Net of accumulated depreciation | 27,609 | 24,441 |
| Construction work in progress: | | |
| Competitive Electric | 2,163 | 4,852 |
| Regulated Delivery | 321 | 213 |
| Corporate and Other | 15 | 16 |
| | | |
| Total construction work in progress | 2,499 | 5,081 |
| | | |
| Property, plant and equipment—net | $ 30,108 | $ 29,522 |

Depreciation expense totaled $1.454 billion, $1.355 billion, $297 million and $467 million for the years ended December 31, 2009 and 2008, the period October 11, 2007 through December 31, 2007 and the period January 1, 2007 through October 10, 2007, respectively, including $394 million, $330 million, $63 million and $235 million, respectively, related to Oncor.

We began depreciating two recently completed lignite-fueled generation units in the fourth quarter 2009.

Assets related to capitalized leases included above totaled $167 million at both December 31, 2009 and 2008, net of accumulated depreciation.

*Asset Retirement Obligations*

These liabilities primarily relate to nuclear generation plant decommissioning, land reclamation related to lignite mining, removal of lignite/coal-fueled plant ash treatment facilities and generation plant asbestos removal and disposal costs. There is no earnings impact with respect to the recognition of the asset retirement costs for nuclear decommissioning, as all costs are recoverable through the regulatory process as part of Oncor's rates.

F-93

EFIHMW00052266

EFIHMW00051935

**PX 030**
**Page 332 of 734**

**Table of Contents**

The following table summarizes the changes to the asset retirement liability, reported in other noncurrent liabilities and deferred credits in the balance sheet, during the years ended December 31, 2009 and 2008:

| | |
|---|---:|
| Asset retirement liability at January 1, 2008 | $773 |
| Additions: | |
| Accretion | 48 |
| Incremental mining reclamation costs | 59 |
| Reductions: | |
| Payments, essentially all mining reclamation | (21) |
| | |
| Asset retirement liability at December 31, 2008 | $859 |
| | |
| Additions: | |
| Accretion | 59 |
| Incremental mining reclamation costs | 59 |
| Reductions: | |
| Payments, essentially all mining reclamation | (29) |
| | |
| Asset retirement liability at December 31, 2009 | $948 |

F–94

EFIHMW00052267

EFIHMW00051935

**PX 030**
**Page 333 of 734**

Table of Contents
*Oncor's Regulatory Assets and Liabilities*

Recognition of regulatory assets and liabilities and the amortization periods over which they are expected to be recovered or refunded through rate regulation reflect the decisions of the PUCT. Components of the regulatory assets and liabilities are provided in the table below. Amounts not earning a return through rate regulation are noted. On August 31, 2009, the PUCT issued a final order on Oncor's rate review filed in June 2008. The rate review included a determination of the recoverability of regulatory assets as of December 31, 2007, including the recoverability period of those assets deemed allowable by the PUCT. The PUCT's findings included denial of recovery of certain regulatory assets primarily related to business restructuring costs and rate case expenses, which resulted in a $25 million charge ($16 million after-tax) in the third quarter 2009 reported in other deductions in the Regulated Delivery segment.

| | Remaining Rate Recovery/Amortization Period as of December 31, 2009 | Carrying Amount | |
| --- | --- | --- | --- |
| | | December 31, 2009 | December 31, 2008 |
| Regulatory assets: | | | |
| Generation-related regulatory assets securitized by transition bonds (a) | 7 years | $ 759 | $ 865 |
| Employee retirement costs | 5 years | 80 | — |
| Employee retirement costs to be reviewed (b)(c) | To be determined | 41 | 100 |
| Employee retirement liability (a)(c)(d) | To be determined | 768 | 559 |
| Self-insurance reserve (primarily storm recovery costs)—net | 7 years | 137 | — |
| Self-insurance reserve to be reviewed (b)(c) | To be determined | 106 | 214 |
| Nuclear decommissioning cost under-recovery (a)(c)(e) | Not applicable | 85 | 127 |
| Securities reacquisition costs (pre-industry restructure) | 8 years | 62 | 68 |
| Securities reacquisition costs (post-industry restructure) | Terms of related debt | 27 | 29 |
| Recoverable amounts for/in lieu of deferred income taxes—net | Life of related asset or liability | 68 | 77 |
| Rate case expenses (f) | Largely 3 years | 9 | 10 |
| Rate case expenses to be reviewed (b)(c) | To be determined | 1 | — |
| Advanced meter customer education costs | 10 years | 4 | 2 |
| Deferred conventional meter depreciation | 10 years | 14 | — |
| Energy efficiency performance bonus | 1 year | 9 | — |
| Business restructuring costs (g) | Not applicable | — | 20 |
| | | | |
| Total regulatory assets | | 2,170 | 2,071 |
| | | | |
| Regulatory liabilities: | | | |
| Committed spending for demand-side management initiatives (a) | 3 years | 78 | 96 |
| Deferred advanced metering system revenues | 10 years | 57 | — |
| Investment tax credit and protected excess deferred taxes | Various | 44 | 49 |
| Over-collection of securitization (transition) bond revenues (a) | 7 years | 27 | 28 |
| Other regulatory liabilities (a) | Various | 5 | 6 |
| | | | |
| Total regulatory liabilities | | 211 | 179 |
| | | | |
| Net regulatory asset | | $ 1,959 | $ 1,892 |

F-95

EFIHMW00052268

EFIHMW00051935

**Table of Contents**

(a)   Not earning a return in the regulatory rate–setting process.
(b)   Costs incurred since the period covered under the last rate review.
(c)   Recovery is specifically authorized by statute, subject to reasonableness review by the PUCT.
(d)   Represents unfunded liabilities recorded in accordance with pension and OPEB accounting standards.
(e)   Offset by an intercompany payable to TCEH.
(f)   Rate case expenses totaling $4 million were disallowed by the PUCT and written off in the third quarter of 2009.
(g)   All previously recorded business restructuring costs were disallowed by the PUCT and written off in the third quarter of 2009.

As part of purchase accounting, the carrying value of the generation–related regulatory assets was reduced by $213 million, and this amount is being accreted to other income over the approximate nine–year recovery period remaining as of the date of the Merger.

In September 2008, the PUCT approved a settlement for Oncor to recover its estimated future investment for advanced metering deployment. Oncor began billing the advanced metering surcharge in the January 2009 billing month cycle. The surcharge is expected to total $1.023 billion over the 11–year recovery period and includes a cost recovery factor of $2.19 per month per residential retail customer and $2.39 to $5.15 per month for non–residential retail customers. We account for the difference between the surcharge billings for advanced metering facilities and the allowed revenues under the surcharge provisions, which are based on expenditures and an allowed return, as a regulatory asset or liability. Such differences arise principally as a result of timing of expenditures. As indicated in the table above, the regulatory liability at December 31, 2009 totaled $57 million.

See Note 6 for discussion of effects on regulatory assets and liabilities of the stipulation approved by the PUCT and Note 19 for additional information regarding nuclear decommissioning cost recovery.

*Other Noncurrent Liabilities and Deferred Credits*

The balance of other noncurrent liabilities and deferred credits consists of the following:

| | Successor | |
| --- | --- | --- |
| | December 31, 2009 | December 31, 2008 |
| Uncertain tax positions (including accrued interest) (Note 8) | $ 1,999 | $ 1,780 |
| Retirement plan and other employee benefits | 1,711 | 1,451 |
| Asset retirement obligations | 948 | 859 |
| Unfavorable purchase and sales contracts | 700 | 727 |
| Liabilities related to subsidiary tax sharing agreement | 321 | 299 |
| Other | 87 | 89 |
| Total other noncurrent liabilities and deferred credits | $ 5,766 | $ 5,205 |

*Unfavorable Purchase and Sales Contracts*—Unfavorable purchase and sales contracts primarily represent the extent to which contracts on a net basis were unfavorable to market prices as of the date of the Merger. These are contracts for which: (i) TCEH has made the "normal" purchase or sale election allowed or (ii) the contract did not meet the definition of a derivative under accounting standards related to derivative instruments and hedging transactions. Under purchase accounting, TCEH recorded the value as of October 10, 2007 as a deferred credit. Amortization of the deferred credit related to unfavorable contracts is primarily on a straight–line basis, which approximates the economic realization, and is recorded as revenues or a reduction of purchased power costs as appropriate. The amortization amount totaled $27 million and $30 million in 2009 and 2008, respectively, and $5 million in the 2007 Successor period. Favorable purchase and sales contracts are recorded as intangible assets (see Note 3).

F–96

EFIHMW00052269

EFIHMW00051935

**PX 030**
**Page 335 of 734**

Table of Contents

The estimated amortization of unfavorable purchase and sales contracts for each of the next five fiscal years is as follows:

| Year | Amount |
|------|--------|
| 2010 | $   27 |
| 2011 | 27 |
| 2012 | 27 |
| 2013 | 26 |
| 2014 | 25 |

*Liabilities Related to Subsidiary Tax Sharing Agreement*—Amount represents the previously recorded net deferred tax liabilities of Oncor related to the noncontrolling interests. Upon the sale of noncontrolling interests in Oncor (see Note 15), Oncor became a partnership for US federal income tax purposes, and the temporary differences which gave rise to the deferred taxes will, over time, become taxable to the noncontrolling interests. Under a tax sharing agreement among Oncor and its equity holders, Oncor reimburses the equity holders for federal income taxes as the partnership earnings become taxable to such holders. Accordingly, as the temporary differences become taxable, the equity holders will be reimbursed by Oncor. In the unlikely event such amounts are not reimbursed under the tax sharing agreement, it is probable they would be refunded to rate payers. The net changes in the liability for the year ended December 31, 2009 totaling $22 million reflected changes in temporary differences.

### Supplemental Cash Flow Information

|  | Successor | | | Predecessor |
|--|-----------|--|--|-------------|
|  | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Cash payments (receipts) related to continuing operations: |  |  |  |  |
| Interest paid (a) | $    2,972 | $    3,495 | $    496 | $    674 |
| Capitalized interest | (277) | (311) | (59) | (80) |
| Interest paid (net of capitalized interest) (a) | 2,695 | 3,184 | 437 | 594 |
| Income taxes | (42) | (204) | — | 271 |
| Noncash investing and financing activities: |  |  |  |  |
| Debt exchange transaction (Note 12) | (101) | — | — | — |
| Below market values of power sales agreements (b) | — | — | — | 264 |
| Noncash construction expenditures (c) | 197 | 183 | 211 | 210 |
| Promissory note issued in conjunction with acquisition of mining–related assets | — | — | — | 65 |
| Capital leases | 15 | 16 | — | 52 |
| Noncash capital contribution from Texas Holdings | — | — | 23 | — |

(a)    Net of interest received on interest rate swaps.
(b)    Multi-year power sales agreement entered into with Alcoa Inc. and recorded as part of the construction work–in–process asset balance for the Sandow 5 coal–fueled generation unit.
(c)    Represents end–of–period accruals.

F–97

EFIHMW00052270

EFIHMW00051935

Table of Contents

26.  SUPPLEMENTAL GUARANTOR CONDENSED FINANCIAL INFORMATION

In 2007, EFH Corp. issued $2.0 billion EFH Corp. 10.875% Notes and $2.5 billion EFH Corp. Toggle Notes (collectively, the EFH Corp. Senior Notes). In May 2009 and November 2009, EFH Corp. issued an additional $150 million and $159 million, respectively, of the EFH Corp. Toggle Notes. In November 2009, EFH Corp. issued $115 million EFH Corp. 9.75% Notes in exchange for certain outstanding debt securities (see Note 12). The EFH Corp. Senior Notes and 9.75% Notes are unconditionally guaranteed by EFC Holdings and Intermediate Holding, 100% owned subsidiaries of EFH Corp. (collectively, the Guarantors) on an unsecured basis except for the Intermediate Holding guarantee of the EFH Corp. 9.75% Notes, which is secured by a pledge of all membership interests and other investments Intermediate Holding owns or holds in Oncor Holdings or any of Oncor Holdings' subsidiaries as described in Note 12. The guarantees issued by the Guarantors are full and unconditional, joint and several guarantees of the EFH Corp. Senior Notes and 9.75% Notes. The guarantees by EFC Holdings and the guarantee of the EFH Corp. Senior Notes by Intermediate Holding rank equally with any senior unsecured indebtedness of the Guarantors and rank effectively junior to all of the secured indebtedness of the Guarantors to the extent of the assets securing that indebtedness. All other subsidiaries of EFH Corp., either direct or indirect, do not guarantee the EFH Corp. Senior Notes and 9.75% Notes (collectively, the Non-Guarantors). The indentures governing the EFH Corp. Senior Notes and 9.75% Notes contain certain restrictions, subject to certain exceptions, on EFH Corp.'s ability to pay dividends or make investments. See Note 12.

The following tables have been prepared in accordance with Regulation S-X Rule 3-10, "Financial Statements of Guarantors and Issuers of Guaranteed Securities Registered or Being Registered" in order to present the condensed consolidating statements of income and cash flows of EFH Corp. (the Parent/Issuer), the Guarantors and the Non-Guarantors for the years ended December 31, 2009 and 2008, the period from October 11, 2007 through December 31, 2007 and the period from January 1, 2007 through October 10, 2007 and the consolidating balance sheets as of December 31, 2009 and 2008 of the Parent/Issuer, the Guarantors and the Non-Guarantors. Investments in consolidated subsidiaries are accounted for under the equity method. The presentations reflect the application of SEC Staff Accounting Bulletin Topic 5-J, "Push Down Basis of Accounting Required in Certain Limited Circumstances", including the effects of the push down of the $4.63 billion and $4.5 billion principal amount of EFH Corp. Senior Notes as of December 31, 2009 and 2008, respectively, and the $115 million principal amount of the EFH Corp. 9.75% Notes as of December 31, 2009 to the Guarantors (see Notes 12 and 13).

EFH Corp. (Parent) received dividends from its consolidated subsidiaries totaling $216 million, $329 million and $1.461 billion for the years ended December 31, 2009 and 2008 and the Predecessor period from January 1, 2007 through October 10, 2007, respectively. EFH Corp. also received a distribution of $1.253 billion indirectly from Oncor as discussed in Note 15. No dividends were received during the period from October 11, 2007 through December 31, 2007. See Note 14.

F-98

EFIHMW00052271

EFIHMW00051935

**PX 030**
**Page 337 of 734**

_0

Table of Contents

ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES
Condensed Consolidating Statements of Income
For the Year Ended December 31, 2008
(millions of dollars)

| | Successor | | | | |
|---|---|---|---|---|---|
| | Parent/ Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated |
| Operating revenues | $ — | $ — | $ 11,364 | $ — | $ 11,364 |
| Fuel, purchased power costs and delivery fees | — | — | (4,595) | — | (4,595) |
| Net gain from commodity hedging and trading activities | — | — | 2,184 | — | 2,184 |
| Operating costs | — | — | (1,503) | — | (1,503) |
| Depreciation and amortization | — | — | (1,610) | — | (1,610) |
| Selling, general and administrative expenses | (105) | — | (852) | — | (957) |
| Franchise and revenue–based taxes | — | 1 | (364) | — | (363) |
| Impairment of goodwill | — | — | (8,860) | — | (8,860) |
| Other income | — | — | 80 | — | 80 |
| Other deductions | (22) | — | (1,279) | — | (1,301) |
| Interest income | 168 | 7 | 147 | (295) | 27 |
| Interest expense and related charges | (919) | (537) | (4,298) | 819 | (4,935) |
| Income (loss) from continuing operations before income taxes and equity earnings of subsidiaries | (878) | (529) | (9,586) | 524 | (10,469) |
| Income tax (expense) benefit | 291 | 180 | 176 | (176) | 471 |
| Equity earnings of subsidiaries | (9,251) | (9,184) | — | 18,435 | |
| Net loss | (9,838) | (9,533) | (9,410) | 18,783 | (9,998) |
| Net loss attributable to noncontrolling interests | — | — | 160 | — | 160 |
| Net loss attributable to EFH Corp. | $(9,838) | $ (9,533) | $ (9,250) | $ 18,783 | $ (9,838) |

F–100

EFIHMW00052273

EFIHMW00051935

Table of Contents

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**
Condensed Consolidating Statements of Income
For the Period from October 11, 2007 through December 31, 2007
(millions of dollars)

| | Successor | | | | |
|---|---|---|---|---|---|
| | Parent/ Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated |
| Operating revenues | $ — | $ — | $ 1,994 | $ — | $ 1,994 |
| Fuel, purchased power costs and delivery fees | — | — | (644) | — | (644) |
| Net loss from commodity hedging and trading activities | — | — | (1,492) | — | (1,492) |
| Operating costs | — | — | (306) | — | (306) |
| Depreciation and amortization | — | — | (416) | 1 | (415) |
| Selling, general and administrative expenses | (17) | — | (198) | (1) | (216) |
| Franchise and revenue–based taxes | (1) | — | (92) | — | (93) |
| Other income | — | — | 14 | — | 14 |
| Other deductions | (54) | — | (7) | — | (61) |
| Interest income | 54 | 6 | 32 | (68) | 24 |
| Interest expense and related charges | (234) | (140) | (670) | 205 | (839) |
| | | | | | |
| Loss from continuing operations before income taxes and equity earnings of subsidiaries | (252) | (134) | (1,785) | 137 | (2,034) |
| Income tax benefit | 53 | 28 | 637 | (45) | 673 |
| Equity earnings of subsidiaries | (1,161) | (1,142) | — | 2,303 | |
| Loss from continuing operations | (1,360) | (1,248) | (1,148) | 2,395 | (1,361) |
| Income from discontinued operations, net of tax effect | — | — | 1 | — | 1 |
| Net loss attributable to EFH Corp. | $(1,360) | $ (1,248) | $ (1,147) | $ 2,395 | $ (1,360) |

F–101

EFIHMW00052274

EFIHMW00051935

Table of Contents

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**
Condensed Consolidating Statements of Income
For the Period from January 1, 2007 through October 10, 2007
(millions of dollars)

|  | Predecessor | | | | |
|---|---|---|---|---|---|
|  | Parent/ Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated |
| Operating revenues | $ — | $ — | $ 8,044 | $ — | $ 8,044 |
| Fuel, purchased power costs and delivery fees | — | — | (2,381) | — | (2,381) |
| Net loss from commodity hedging and trading activities | — | — | (554) | — | (554) |
| Operating costs | — | — | (1,107) | — | (1,107) |
| Depreciation and amortization | — | — | (634) | — | (634) |
| Selling, general and administrative expenses | (58) | — | (633) | — | (691) |
| Franchise and revenue-based taxes | — | (1) | (282) | 1 | (282) |
| Other income | 8 | 1 | 60 | — | 69 |
| Other deductions | (108) | — | (733) | — | (841) |
| Interest income | 133 | 210 | 368 | (655) | 56 |
| Interest expense and related charges | (566) | (192) | (567) | 654 | (671) |
| Income (loss) from continuing operations before income taxes and equity earnings of subsidiaries | (591) | 18 | 1,581 | — | 1,008 |
| Income tax (expense) benefit | 235 | (2) | (542) | — | (309) |
| Equity earnings of subsidiaries | 1,077 | 1,554 | — | (2,631) | — |
| Income from continuing operations | 721 | 1,570 | 1,039 | (2,631) | 699 |
| Income from discontinued operations, net of tax effect | 2 | — | 22 | — | 24 |
| Net income attributable to EFH Corp. | $ 723 | $ 1,570 | $ 1,061 | $ (2,631) | $ 723 |

F-102

EFIHMW00052275

EFIHMW00051935

Table of Contents

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

Condensed Consolidating Statements of Cash Flows
For the Year Ended December 31, 2009
(millions of dollars)

| | Parent/ Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Cash provided by (used in) operating activities | $ (42) | $ 208 | $ 1,977 | $ (432) | $ 1,711 |
| **Cash flows—financing activities:** | | | | | |
| Issuances of long-term borrowings | — | — | 522 | — | 522 |
| Retirements of long-term borrowings | (4) | (7) | (385) | — | (396) |
| Change in short-term borrowings | — | — | 332 | — | 332 |
| Contributions from noncontrolling interests | — | — | 48 | — | 48 |
| Distributions paid to noncontrolling interests | — | — | (56) | — | (56) |
| Cash dividends paid | — | (216) | (216) | 432 | — |
| Change in advances—affiliates | 425 | 15 | (440) | — | — |
| Other, net | 5 | — | (33) | — | (28) |
| Cash provided by (used in) financing activities | 426 | (208) | 212 | (8) | 422 |
| **Cash flows—investing activities:** | | | | | |
| Capital expenditures and nuclear fuel purchases | — | — | (2,545) | — | (2,545) |
| Money market fund redemptions | — | — | 142 | — | 142 |
| Investment posted with derivative counterparty | (400) | — | — | — | (400) |
| Net proceeds from sale of majority interest in natural gas gathering pipeline business | — | — | 40 | — | 40 |
| Reduction of restricted cash related to letter of credit facility | — | — | 115 | — | 115 |
| Proceeds from sale of environmental allowances and credits | — | — | 19 | — | 19 |
| Purchases of environmental allowances and credits | — | — | (19) | — | (19) |
| Proceeds from sales of nuclear decommissioning trust fund securities | — | — | 3,064 | — | 3,064 |
| Investments in nuclear decommissioning trust fund securities | — | — | (3,080) | — | (3,080) |
| Change in advances—affiliates | — | — | (440) | 440 | — |
| Other, net | — | — | 31 | — | 31 |
| Cash provided by (used in) investing activities | (400) | — | (2,673) | 440 | (2,633) |
| Net change in cash and cash equivalents | (16) | — | (484) | — | (500) |
| Cash and cash equivalents—beginning balance | 1,075 | — | 614 | — | 1,689 |
| Cash and cash equivalents—ending balance | $1,059 | $ — | $ 130 | $ — | $ 1,189 |

F-103

EFIHMW00052276

EFIHMW00051935

**PX 030**
**Page 342 of 734**