Table of Contents

83% of its nuclear fuel enrichment services requirements. In addition, Luminant has contracts for all of its nuclear fuel fabrication services requirements through 2018 and a contract for a portion of its uranium requirements through 2024. Contracts for the acquisition of additional nuclear fuel enrichment services through 2023 and 2029 are substantially complete. Luminant does not anticipate any significant difficulties in acquiring uranium and contracting for associated conversion services and enrichment services in the foreseeable future.

Luminant believes its on–site used nuclear fuel storage capability is sufficient for a minimum of three years. The nuclear industry is continuing to review ways to enhance security of used–fuel storage with the NRC to fully utilize physical storage capacity. Current on–site used nuclear fuel storage capability will require the use of the industry technique of dry cask storage within the next three years.

The Comanche Peak nuclear generation units have an estimated useful life of 60 years from the date of commercial operation. Therefore, assuming that Luminant receives 20–year license extensions, similar to what has been granted by the NRC to several other commercial generation reactors over the past several years, plant decommissioning activities would be scheduled to begin in 2050 for Comanche Peak Unit 1 and 2053 for Unit 2 and common facilities. Decommissioning costs will be paid from a decommissioning trust that, pursuant to state law, is funded from Oncor's customers through an ongoing delivery surcharge. See Note 19 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for discussion of the decommissioning trust fund.

Nuclear insurance provisions are discussed in Note 13 to EFH Corp's historical consolidated financial statements for the year ended December 31, 2009.

*Nuclear Generation Development*—In September 2008, a subsidiary of TCEH filed a combined operating license application with the NRC for two new nuclear generation units, each with approximately 1,700 MW (gross capacity), at its existing Comanche Peak nuclear generation site. In connection with the filing of the application, in January 2009, subsidiaries of TCEH and Mitsubishi Heavy Industries Ltd. (MHI) formed a joint venture, Comanche Peak Nuclear Power Company (CPNPC), to further the development of the two new nuclear generation units using MHI's US–Advanced Pressurized Water Reactor technology. The TCEH subsidiary owns an 88% interest in CPNPC, and a MHI subsidiary owns a 12% interest.

In March 2009, the NRC announced an official review schedule for the license application. Based on the schedule, the NRC expects to complete its review by December 2011, and it is expected that a license would be issued approximately one year later. In November 2009, CPNPC filed a comprehensive revision to the license application that updated the license application for developments occurring after the initial filing.

In 2009, the DOE announced that it had selected four applicants to proceed to the due diligence phase of its Loan Guarantee Program and to commence negotiations towards potential loan guarantees for their respective generation projects. CPNPC was not among the initial four applicants selected by the DOE; however, CPNPC continues to update the DOE on its progress, with the goal of securing a DOE loan guarantee for financing the proposed units prior to commencement of construction.

*Lignite/Coal–Fueled Generation Operations*—Luminant's lignite/coal–fueled generation fleet capacity totals 7,217 MW (including two recently completed new units) and consists of the Big Brown (2 units), Monticello (3 units), Martin Lake (3 units), Oak Grove (1 unit and Sandow (2 units) plants. These plants are generally operated at full capacity to help meet the load requirements in ERCOT. Maintenance outages are scheduled during off–peak demand periods. Over the last three years, the total annual scheduled and unscheduled outages per unit averaged 31 days. Luminant's lignite/coal–fueled generation fleet operated at a capacity factor of 90.9% in 2007, 87.6% in 2008 and 86.5% in 2009, which represents top quartile performance of US coal–fueled generation facilities. The 2008 performance reflects extended unplanned outages at several units, and the 2009 performance reflects increased economic backdown of the units.

B–6

EFIHMW00052455

EFIHMW00051935

Table of Contents

Luminant has substantially completed a program to develop and construct three lignite–fueled generation units with a total estimated capacity of 2,200 MW. The three units consist of one unit at a leased site that is adjacent to an existing owned lignite–fueled generation unit (Sandow) and two units at an owned site (Oak Grove). The Sandow unit and the first and second Oak Grove units achieved substantial completion (as defined in the EPC Agreements for the respective units) effective September 30, 2009, December 22, 2009 and June 1, 2010, respectively. Accordingly, the company has operational control of these units.

Aggregate cash capital expenditures for these three units are expected to total approximately $3.25 billion including all construction, site preparation and mining development costs, of which $3.21 billion was spent as of June 30, 2010. The investment includes approximately $500 million for state–of–the–art emissions controls for the three new units. Including capitalized interest and the step–up in construction work–in–process balances to fair value as a result of purchase accounting for the Merger in 2007, carrying value of the units are estimated to total approximately $4.8 billion upon completion. Agreements were executed with EPC contractors Bechtel Power Corporation and Fluor Enterprises, Inc. to engineer and construct the units at Sandow and Oak Grove, respectively.

Luminant also has an environmental retrofit program under which it plans to install additional environmental control systems at its existing lignite/coal–fueled generation facilities. Capital expenditures associated with these additional environmental control systems could exceed $1.0 billion, of which $326 million was spent through 2009. Luminant has not yet completed all detailed cost and engineering studies for the additional environmental systems, and the cost estimates could change materially as it determines the details of and further evaluates the engineering and construction costs related to these investments.

Approximately 47% of the fuel used at Luminant's lignite/coal–fueled generation plants in 2009 was supplied from lignite reserves owned in fee or leased surface–minable deposits dedicated to the Big Brown, Monticello, Martin Lake and Oak Grove plants, which were constructed adjacent to the reserves. Luminant owns in fee or has under lease an estimated 843 million tons of lignite reserves dedicated to its generation plants and 241 million tons associated with an undivided interest in the lignite mine that provides fuel for the Sandow facility. Luminant also owns in fee or has under lease in excess of 85 million tons of reserves not currently dedicated to specific generation plants. In 2009, Luminant recovered approximately 20 million tons of lignite to fuel its generation plants. Luminant utilizes owned and/or leased equipment to remove the overburden and recover the lignite.

Luminant's lignite mining operations include extensive reclamation activities that return the land to productive uses such as wildlife habitats, commercial timberland and pasture land. In 2009, Luminant reclaimed 1,485 acres of land. In addition, Luminant planted more than 1.1 million trees in 2009, the majority of which were part of the reclamation effort.

Luminant supplements its lignite fuel at Big Brown, Monticello and Martin Lake with western coal from the Powder River Basin in Wyoming. The coal is purchased from multiple suppliers under contracts of various lengths and is transported from the Powder River Basin to Luminant's generation plants by railcar. Based on its current usage, Luminant believes that it has sufficient lignite reserves for the foreseeable future and has contracted approximately 90% of its western coal resources and all of the related transportation through 2011.

*Natural Gas–Fueled Generation Operations*—Luminant's fleet of 35 natural gas–fueled generation units totaling 8,002 MW of capacity includes 3,866 MW of currently available capacity, 2,183 MW of capacity being operated for unaffiliated third parties (including 655 MW under RMR agreements with ERCOT), and 1,953 MW of capacity currently mothballed (idled). The natural gas–fueled units predominantly serve as peaking units that can be ramped up or down as demand for electricity warrants. See "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three and Six Months Ended June 30, 2010—Significant Activities and Events—Idling of Natural Gas–Fueled Units."

B–7

EFIHMW00052456

EFIHMW00051935

**Table of Contents**

*Wholesale Operations*—Luminant's wholesale operations play a pivotal role in our competitive business portfolio by optimally dispatching the generation fleet, including the baseload facilities, sourcing TXU Energy's and other customers' electricity requirements and managing commodity price risk.

Our commodity price exposure is managed across the complementary Luminant generation and TXU Energy retail businesses on a portfolio basis. Under this approach, Luminant's wholesale operations manage the risks of imbalances between generation supply and sales load, which primarily represent exposures to natural gas price movements and market heat rate changes (variations in the relationships between natural gas prices and wholesale electricity prices), through wholesale markets activities that include physical purchases and sales and transacting in financial instruments.

Luminant's wholesale operations manage this commodity price and heat rate exposure through asset management and hedging activities. These operations provide TXU Energy and other retail and wholesale customers with electricity and related services to meet their demands and the operating requirements of ERCOT. Luminant also sells forward generation and seeks to maximize the economic value of the generation fleet, particularly the baseload facilities. In consideration of operational production and customer consumption levels that can be highly variable, as well as opportunities for long–term purchases and sales with large wholesale market participants, Luminant buys and sells electricity in short–term transactions and executes longer–term forward electricity purchase and sales agreements. Luminant is the largest purchaser of wind–generated electricity in Texas and the fifth largest in the US with more than 900 MW of existing wind power under contract.

In its hedging activities, Luminant enters into contracts for the physical delivery of electricity and natural gas, exchange traded and "over–the–counter" financial contracts and bilateral contracts with producers, generators and end–use customers. A major part of these hedging activities is a long–term hedging program, described above under "EFH Corp.'s Strategies", designed to reduce exposure to changes in future electricity prices due to changes in the price of natural gas, principally utilizing natural gas–related financial instruments.

The wholesale operations also dispatch Luminant's available natural gas–fueled generation capacity. Luminant's dispatching activities are performed through a centrally managed real–time operational staff that synthesizes operational activities across the fleet and interfaces with various wholesale market channels. Luminant's wholesale operations coordinate the overall commercial strategy for these plants working closely with other Luminant operations. In addition, the wholesale operations manage the natural gas and fuel–oil procurement requirements for Luminant's natural gas–fueled generation fleet.

Luminant's wholesale operations engage in commercial operations such as physical purchases, storage and sales of natural gas, electricity and natural gas trading and third–party energy management. Natural gas operations include direct purchases from natural gas producers, transportation agreements, storage leases and commercial retail sales. Luminant currently manages approximately 11 billion cubic feet of natural gas storage capacity.

Luminant's wholesale operations manage exposure to wholesale commodity and credit–related risk within established transactional risk management policies, limits and controls. These policies, limits and controls have been structured so that they are practical in application and consistent with stated business objectives. Risk management processes include capturing transactions, performing and validating valuations and reporting exposures on a daily basis using risk management information systems designed to support a large transactional portfolio. A risk management forum meets regularly to ensure that business practices comply with approved transactional limits, commodities, instruments, exchanges and markets. Transactional risks are monitored and limits are enforced to comply with the established risk policy. Luminant has a disciplinary program to address any violations of the risk management policies and periodically reviews these policies to ensure they are responsive to changing market and business conditions.

B–8

EFIHMW00052457

EFIHMW00051935

**PX 030**
**Page 523 of 734**

**Table of Contents**

*TXU Energy*—TXU Energy serves approximately 2.1 million residential and commercial retail electricity customers in Texas with approximately 61% of retail revenues in 2009 from residential customers. Texas is one of the fastest growing states in the nation with a diverse economy and, as a result, has attracted a number of competitors into the retail electricity market; consequently, competition is expected to continue to be robust. TXU Energy, as an active participant in this competitive market, provides retail electric service to all areas of the ERCOT market now open to competition, including the Dallas/Fort Worth, Houston, Corpus Christi, and lower Rio Grande Valley areas of Texas. TXU Energy continues to market its services in Texas to add new customers and to retain its existing customers. There are more than 140 active REPs certified to compete within the State of Texas.

TXU Energy's strategy focuses on providing its customers with high quality customer service and creating new products and services to meet customer needs; accordingly, a new customer management computer system was implemented in 2009, and other customer care enhancements are being implemented to further improve customer satisfaction. TXU Energy offers a wide range of residential products to meet various customer needs. TXU Energy is investing $100 million over five years ending in 2012, including a total of $20 million spent as of December 31, 2009, in energy efficiency initiatives as part of a program to offer customers a broad set of innovative energy products and services.

*Regulation*—Luminant is an exempt wholesale generator under the Energy Policy Act of 2005 and is subject to the jurisdiction of the NRC with respect to its nuclear generation plant. NRC regulations govern the granting of licenses for the construction and operation of nuclear–fueled generation facilities and subject such facilities to continuing review and regulation. Luminant also holds a power marketer license from the FERC and, with respect to any wholesale power sales outside the ERCOT market, is subject to market behavior and any other competition–related rules and regulations under the Federal Power Act that are administered by the FERC.

Luminant is also subject to the jurisdiction of the PUCT's oversight of the competitive ERCOT wholesale electricity market. PUCT rules do not set wholesale power prices in the market but do provide certain limits and framework for such pricing and market behavior. Luminant is also subject to the requirements of the ERCOT Protocols, the soon to be effective Nodal Protocols, and ERCOT reliability standards as adopted and enforced by the TRE and NERC.

TXU Energy is a licensed REP under the Texas Electric Choice Act and is subject to the jurisdiction of the PUCT with respect to provision of electricity service in ERCOT. PUCT rules govern the granting of licenses for REPs, including oversight but not setting of prices charged. TXU Energy is also subject to the requirements of the ERCOT Protocols, the soon to be effective Nodal Protocols and ERCOT reliability standards as adopted and enforced by the TRE and NERC.

### Regulated Delivery Segment

The Regulated Delivery segment consists of the operations of Oncor. Oncor is a regulated electricity transmission and distribution company that provides the service of delivering electricity safely, reliably and economically to end–use consumers through its distribution systems, as well as providing transmission grid connections to merchant generation facilities and interconnections to other transmission grids in Texas. Oncor's service territory has an estimated population in excess of seven million, about one–third of the population of Texas, and comprises 91 counties and over 400 incorporated municipalities, including Dallas/Fort Worth and surrounding suburbs, as well as Waco, Wichita Falls, Odessa, Midland, Tyler and Killeen. Oncor's transmission and distribution assets are located principally in the north–central, eastern and western parts of Texas. Most of Oncor's power lines have been constructed over lands of others pursuant to easements or along public highways, streets and rights–of–way as permitted by law. Oncor's transmission and distribution rates are regulated by the PUCT.

Oncor is not a seller of electricity, nor does it purchase electricity for resale. It provides transmission services to other electricity distribution companies, cooperatives and municipalities. It provides distribution

EFIHMW00052458

EFIHMW00051935

**PX 030**
**Page 524 of 734**

**Table of Contents**

services to REPs, which sell electricity to retail customers. Oncor is also subject to the requirements of the ERCOT Protocols, the soon to be effective Nodal Protocols and ERCOT reliability standards as adopted and enforced by the TRE and NERC.

*Performance*—Oncor achieved market-leading electricity delivery performance in nine out of 12 key PUCT market metrics in 2009. These metrics measure the success of transmission and distribution companies in facilitating customer transactions in the competitive Texas electricity market. Two additional metrics for expedited switching have been added by the PUCT in 2010.

*Investing in Infrastructure and Technology*—In 2009, Oncor invested $1.0 billion in its network to construct, rebuild and upgrade transmission lines and associated facilities, to extend the distribution infrastructure, and to pursue certain initiatives in infrastructure maintenance and information technology. Reflecting its commitment to infrastructure, in September 2008, Oncor and several other ERCOT utilities filed with the PUCT a plan to participate in the construction of transmission improvements designed to interconnect existing and future renewable energy facilities to transmit electricity from Competitive Renewable Energy Zones (CREZs) identified by the PUCT. In 2009, the PUCT awarded approximately $1.3 billion of CREZ construction projects to Oncor. The projects involve the construction of transmission lines to support the transmission of electricity from renewable energy sources, principally wind generation facilities, in west Texas to population centers in the eastern part of the state. The cost estimates for the CREZ construction projects are based upon analyses prepared by ERCOT in April 2008. Based on the selection of final routes for the three default and nine priority projects and identification of additional costs not included in the original ERCOT estimate (e.g., wind interconnection facilities and required modifications to existing facilities), Oncor estimates that the cost of these projects will exceed ERCOT estimates by approximately $220 million. Final routes for five subsequent projects have not yet been selected by the PUCT. As of June 30, 2010, Oncor's CREZ-related capital expenditures totaled $217 million. See "Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A")—Regulation and Rates."

Oncor's technology upgrade initiatives include development of a modernized grid through the replacement of existing meters with advanced digital metering equipment and development of advanced digital communication, data management, real-time monitoring and outage detection capabilities. This modernized grid is expected to produce electricity service reliability improvements and provide the potential for additional products and services from REPs that will enable businesses and consumers to better manage their electricity usage and costs. Oncor's plans provide for the full deployment of over three million advanced meters by the end of 2012 to all residential and most non-residential retail electricity customers in Oncor's service area. The advanced meters can be read remotely, rather than by a meter reader physically visiting the location of each meter. Advanced meters facilitate automated demand side management, which allows consumers to monitor the amount of electricity they are consuming and adjust their electricity consumption habits. As of June 30, 2010, Oncor has installed approximately 1.085 million advanced digital meters. As the new meters are integrated, Oncor reports 15-minute interval, billing-quality electricity consumption data to ERCOT for Texas market settlement purposes. The data makes it possible for REPs to support new programs and pricing options. In addition to the potential energy efficiencies from advanced metering, Oncor expects to invest over $300 million ($100 million in excess of regulatory requirements) over the five years ending in 2012 in programs designed to improve customer electricity demand efficiencies. As of December 31, 2009, Oncor has invested $125 million in these programs, including $67 million in 2009, and 22% of the amount in excess of regulatory requirements has been spent.

In a stipulation with several parties that was approved by the PUCT (as discussed in Note 6 to EFH Corp's historical consolidated financial statements for the year ended December 31, 2009), Oncor committed to a variety of actions, including minimum capital spending of $3.6 billion over the five-year period ending December 31, 2012, subject to certain defined conditions. Approximately 50% of this total was spent as of December 31, 2009. This spending does not include the CREZ facilities.

*Electricity Transmission*—Oncor's electricity transmission business is responsible for the safe and reliable operations of its transmission network and substations. These responsibilities consist of the construction and

B-10

EFIHMW00052459

EFIHMW00051935

**Table of Contents**

maintenance of transmission facilities and substations and the monitoring, controlling and dispatching of high–voltage electricity over Oncor's transmission facilities in coordination with ERCOT.

Oncor is a member of ERCOT, and its transmission business actively assists the operations of ERCOT and market participants. Through its transmission business, Oncor participates with ERCOT and other member utilities to plan, design, construct and operate new transmission lines, with regulatory approval, necessary to maintain reliability, interconnect to merchant generation facilities, increase bulk power transfer capability and minimize limitations and constraints on the ERCOT transmission grid.

Transmission revenues are provided under tariffs approved by either the PUCT or, to a small degree related to an interconnection to other markets, the FERC. Network transmission revenues compensate Oncor for delivery of electricity over transmission facilities operating at 60 kV and above. Other services offered by Oncor through its transmission business include, but are not limited to: system impact studies, facilities studies, transformation service and maintenance of transformer equipment, substations and transmission lines owned by other parties.

Provisions of the 1999 Restructuring Legislation allow Oncor to annually update its transmission rates to reflect changes in invested capital. These "capital tracker" provisions encourage investment in the transmission system to help ensure reliability and efficiency by allowing for timely recovery of and return on new transmission investments.

At December 31, 2009, Oncor's transmission facilities includes approximately 5,173 circuit miles of 345–kV transmission lines and approximately 9,954 circuit miles of 138–and 69–kV transmission lines. Sixty–two generation facilities totaling 36,165 MW are directly connected to Oncor's transmission system, and 277 transmission stations and 702 distribution substations are served from Oncor's transmission system.

At December 31, 2009, Oncor's transmission facilities have the following connections to other transmission grids in Texas:

| Grid Connections | Number of Interconnected Lines | | |
|---|---|---|---|
| | 345kV | 138kV | 69kV |
| Centerpoint Energy Inc. | 8 | — | — |
| American Electric Power Company, Inc (a) | 4 | 7 | 12 |
| Lower Colorado River Authority | 6 | 20 | 3 |
| Texas Municipal Power Agency | 8 | 6 | — |
| Texas New Mexico Power | 2 | 9 | 11 |
| Brazos Electric Power Cooperative | 4 | 104 | 20 |
| Rayburn Country Electric Cooperative | — | 32 | 7 |
| City of Georgetown | | 2 | — |
| Tex–La Electric Cooperative | — | 11 | 1 |
| Other small systems operating wholly within Texas | | 3 | 2 |

(a)    One of the 345–kV lines is an asynchronous high–voltage direct current connection with the Southwest Power Pool.

*Electricity Distribution*—Oncor's electricity distribution business is responsible for the overall safe and efficient operation of distribution facilities, including electricity delivery, power quality and system reliability. These responsibilities consist of the ownership, management, construction, maintenance and operation of the distribution system within Oncor's certificated service area. Oncor's distribution system receives electricity from the transmission system through substations and distributes electricity to end–users and wholesale customers through approximately 3,097 distribution feeders.

The Oncor distribution system includes over 3.1 million points of delivery. Over the past five years, the number of distribution system points of delivery served by Oncor, excluding lighting sites, grew an average of approximately 1.26% per year, adding approximately 24,689 points of delivery in 2009.

B–11

EFIHMW00052460

EFIHMW00051935

Table of Contents

The Oncor distribution system consists of approximately 56,260 miles of overhead primary conductors, approximately 21,587 miles of overhead secondary and street light conductors, approximately 15,352 miles of underground primary conductors and approximately 9,528 miles of underground secondary and street light conductors. The majority of the distribution system operates at 25–kV and 12.5–kV.

Oncor's distribution rates for residential and small commercial users are based on actual monthly consumption (kWh), and rates for large commercial and industrial users are based on the greater of actual monthly demand (kilowatt) or 80% of peak monthly demand during the prior eleven months.

*Customers*—Oncor's transmission customers consist of municipalities, electric cooperatives and other distribution companies. Oncor's distribution customers consist of more than 70 REPs in Oncor's certificated service area, including TCEH. Distribution revenues from TCEH represented 38% of Oncor's total revenues for 2009, and revenues from subsidiaries of Reliant Energy, Inc., each of which is a non–affiliated REP, represented 14% of Oncor's total revenues for 2009. No other customer represented more than 10% of Oncor's total operating revenues. The consumers of the electricity delivered by Oncor are free to choose their electricity supplier from REPs who compete for their business.

*Regulation and Rates*—As its operations are wholly within Texas, Oncor is not a public utility as defined in the Federal Power Act and, as a result, it is not subject to general regulation under this Act. However, Oncor is subject to reliability standards adopted and enforced by the TRE and NERC under the Federal Power Act.

The PUCT has original jurisdiction over transmission and distribution rates and services in unincorporated areas and in those municipalities that have ceded original jurisdiction to the PUCT and has exclusive appellate jurisdiction to review the rate and service orders and ordinances of municipalities. Generally, PURA prohibits the collection of any rates or charges by a public utility (as defined by PURA) that does not have the prior approval of the appropriate regulatory authority (PUCT or municipality with original jurisdiction). In accordance with a stipulation approved by the PUCT, Oncor filed a rate case with the PUCT in June 2008, based on a test year ended December 31, 2007. In August 2009, the PUCT issued a final order with respect to the rate review as discussed in "Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A")—Regulation and Rates."

At the state level, PURA, as amended, requires owners or operators of transmission facilities to provide open–access wholesale transmission services to third parties at rates and terms that are nondiscriminatory and comparable to the rates and terms of the utility's own use of its system. The PUCT has adopted rules implementing the state open–access requirements for utilities that are subject to the PUCT's jurisdiction over transmission services, such as Oncor.

*Securitization Bonds*—The Regulated Delivery segment includes Oncor's wholly–owned, bankruptcy–remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC. This financing subsidiary was organized for the limited purpose of issuing specified transition bonds in 2003 and 2004. Oncor Electric Delivery Transition Bond Company LLC issued $1.3 billion principal amount of securitization (transition) bonds to recover generation–related regulatory asset stranded costs and other qualified costs under an order issued by the PUCT in 2002.

**Environmental Regulations and Related Considerations**

*Global Climate Change*

*Background*—A growing concern has emerged nationally and internationally about global climate change and how greenhouse gas (GHG) emissions, such as $CO_2$, might contribute to global climate change. We produce GHG emissions from the direct combustion of fossil fuels at our generation plants, primarily our lignite/coal-fueled generation units. $CO_2$, methane and nitrous oxide are emitted in this combustion process, with $CO_2$ representing the largest portion of these GHG emissions. GHG emissions (primarily $CO_2$) from our combustion

B–12

EFIHMW00052461

EFIHMW00051935

**Table of Contents**

of fossil fuels represent the substantial majority of our total GHG emissions. For 2009, we estimate that our generation plants produced 54 million short tons of $CO_2$ based on continuously monitored data reported to and approved by the EPA. The three new lignite–fueled units that have achieved substantial completion (as defined in the EPC Agreement for the units) will generate additional $CO_2$ emissions. Other aspects of our operations result in emissions of GHGs including, among other things, coal piles at our generation plants, sulfur hexafluoride in our electric operations, refrigerant from our chilling and cooling equipment, fossil fuel combustion in our motor vehicles and electricity usage at our facilities and headquarters. Because a substantial portion of our generation portfolio consists of lignite/coal–fueled generation plants, including the three new lignite–fueled generation units that are at or near completion, our financial condition and/or results of operations could be materially adversely affected by the enactment of statutes or regulations that mandate a reduction in GHG emissions or that impose financial penalties, costs or taxes on those that produce GHG emissions. See "Risk Factors" elsewhere in this Prospectus for additional discussion of risks posed to us regarding global climate change regulation.

*Global Climate Change Legislation*—Several bills have been introduced in the US Congress or advocated by the Obama Administration that are intended to address climate change using different approaches, including most prominently a cap on carbon emissions with emitters allowed to trade unused emission allowances (cap–and–trade). In addition to potential federal legislation to regulate GHG emissions, the US Congress might also consider other legislation that could result in the reduction of GHG emissions, such as the establishment of renewable energy portfolio standards.

Through our own evaluation and working in tandem with other companies and industry trade associations, we have supported the development of an integrated package of recommendations for the federal government to address the global climate change issue through federal legislation, including GHG emissions reduction targets for total US GHG emissions and rigorous cost containment measures to ensure that program costs are not prohibitive. In the event GHG legislation involving a cap–and–trade program is enacted, we believe that such a program should be mandatory, economy–wide, consistent with expected technology development timelines and designed in a way to limit potential harm to the economy and protect consumers. We contend that any mechanism for allocation of GHG emission allowances should include substantial allocation of allowances to offset the cost of GHG regulation, including the cost to electricity consumers. In addition, we participate in a voluntary electric utility industry sector climate change initiative in partnership with the DOE. Our strategies are generally consistent with the "EEI Global Climate Change Points of Agreement" published by the Edison Electric Institute in January 2009 and "The Carbon Principles" announced in February 2008 by three major financial institutions. Finally, we have created a Sustainable Energy Advisory Board that advises us on technology development opportunities that reduce the effects of our operations on the environment while balancing the need to address the energy requirements of Texas. Our Sustainable Energy Advisory Board is comprised of individuals who represent the following interests, among others: the environment, customers, economic development in Texas and technology/reliability standards. If, despite these efforts, a substantial number of our investors, customers or others refuse to do business with us because of our GHG emissions, it could have a material adverse effect on our results of operations, financial position and liquidity.

*Federal Level*—A number of pieces of legislation dealing with GHG emissions have been proposed in the US Congress, including the Waxman–Markey bill, known as the American Clean Energy and Security Act of 2009 (Waxman–Markey), the Kerry–Boxer bill, known as the Clean Energy Jobs and American Power Act (Kerry–Boxer) and the Kerry–Lieberman bill, known as the American Power Act (Kerry–Lieberman). This proposed legislation is not law, but in June 2009 Waxman–Markey was passed by the US House of Representatives and sent to the US Senate for consideration. Kerry–Boxer was reported out of the US Senate Environment and Public Works Committee, but has not been taken up by the Senate as a whole. Kerry–Lieberman was released by its sponsors in May 2010 when it appeared that progress on passing Kerry–Boxer had stalled.

As currently proposed, Waxman–Markey takes several approaches to address GHG emissions, including establishing renewable energy and energy efficiency standards, establishing performance standards for coal–

B–13

EFIHMW00052462

EFIHMW00051935

**PX 030**
**Page 528 of 734**

**Table of Contents**

fueled electricity generation units, and creating an economy−wide cap−and−trade program. The renewable energy and energy efficiency standards would require retail electricity suppliers to meet 6% of their load with renewable energy sources by 2012, increasing to 20% of their load by 2020, some of which could be met by energy efficiency measures. The performance standards for coal−fueled electricity generation units would require a 65% reduction in CO2 emissions for subject generation units initially permitted after January 1, 2020, and a 50% reduction in CO2 emissions for subject electricity generation units initially permitted between January 1, 2009 and January 1, 2020 once certain technology deployment criteria are met but no later than January 1, 2025. The cap−and−trade program would require emissions from capped sources, including coal−fueled electricity generation units, to be reduced 3% below 2005 levels by 2012, 17% by 2020, 42% by 2030 and 83% by 2050. The version of Waxman−Markey passed by the US House of Representatives included provisions that allocated a large percentage of the emissions allowances at no charge to various groups that would be impacted by such a cap−and−trade program, including certain merchant coal−fueled generation units. The Kerry−Boxer and Kerry−Lieberman proposals employ a cap and trade approach similar to Waxman−Markey, with Kerry−Boxer requiring a greater reduction in CO2 emissions levels by 2020 and providing a smaller grant of emission allowances to the electric power sector, including merchant coal−fueled generation units. Emission reduction requirements applicable to electric generation sources under Kerry−Lieberman would start a year later than under Waxman−Markey and Kerry−Boxer, but at an initially higher rate (4.75% below 2005 emission levels). Neither Kerry−Boxer nor Kerry−Lieberman includes a renewable energy and energy efficiency standard, which is addressed in a separate proposal in the US Senate.

Recent developments in the US Senate indicate that the prospects for passage of any cap−and−trade legislation in this Congress are not likely. However, if any of them or similar legislation were to be adopted, our costs of compliance with the law could be material.

In April 2007, the US Supreme Court issued a decision in the case of Massachusetts v. US Environmental Protection Agency holding that CO2 and other GHG emissions are pollutants subject to regulation under the new motor vehicle provisions of the federal Clean Air Act. The case was remanded to the EPA for further rulemaking to determine whether GHG emissions may reasonably be anticipated to endanger public health or welfare, or in the alternative, provide a reasonable explanation why GHG emissions should not be regulated. In December 2009, the EPA issued a finding that GHG emissions endanger human health and the environment and that emissions from motor vehicles contribute to that endangerment. The EPA's finding required it to begin regulating GHG emissions from motor vehicles and ultimately stationary sources under existing provisions of the federal Clean Air Act. Since the issuance of the finding, a number of parties (including the State of Texas) have appealed the finding to the US District Court of Appeals.

Following its endangerment finding, the EPA took three regulatory actions with respect to the control of GHG emissions. First, the EPA adopted in April 2010 GHG emission standards for certain new motor vehicles. Second, the EPA on March 29, 2010 completed a reconsideration of a memorandum issued in December 2008 by then EPA Administrator Stephen Johnson on the issue of when the Clean Air Act's Prevention of Significant Deterioration ("PSD") program would apply to newly identified pollutants such as GHGs. The EPA's determination on reconsideration was that the Clean Air Act's PSD permit requirements would apply when a nation−wide rule requiring the control of a pollutant takes effect. Under this determination, the earliest time that PSD permitting requirements would apply to GHG emissions from stationary sources like power generation facilities would be January 2011 – the first date that new motor vehicles must meet the new GHG standards. Third, the EPA finalized on June 3, 2010 its so−called "tailoring rule" that established new thresholds of GHG emissions for the applicability of permits under the Clean Air Act for stationary sources, including power generation facilities. The EPA's tailoring rule defines the threshold of GHG emissions for determining applicability of the Clean Air Act's permitting programs and PSD program at levels greater than the lower emission thresholds contained in the Clean Air Act. In addition, in September 2009, the EPA issued a final rule requiring the reporting, by March 2011, of calendar year 2010 GHG emissions from specified large GHG emissions sources in the US (such reporting rule would apply to our lignite−fueled generation facilities).

B−14

EFIHMW00052463

EFIHMW00051935

**PX 030**
**Page 529 of 734**

Table of Contents

Any federal GHG legislation is expected to limit, to some extent, the EPA's authority to regulate GHGs under existing Clean Air Act regulatory programs, but if Congress fails to pass GHG legislation, the EPA is expected to continue its announced Clean Air Act regulatory actions. Our costs of complying with future EPA limitations on GHG emissions could be material.

In September 2009, the US Court of Appeals for the Second Circuit issued a decision in the case of State of Connecticut v. American Electric Power Company Inc. holding that various states, a municipality and certain private trusts have standing to sue and have sufficiently alleged a cause of action under the federal common law of nuisance for injuries allegedly caused by the defendant power generation companies' emissions of GHGs. The decision does not address the merits of the nuisance claim, and is still subject to appeal.

In October 2009, the US Court of Appeals for the Fifth Circuit issued a decision in the case of Comer v. Murphy Oil USA holding that certain Mississippi residents have standing to sue to pursue state law nuisance, negligence and trespass claims for injuries purportedly suffered because the defendants' emissions of GHGs allegedly increased the destructive force of Hurricane Katrina. This decision, like the American Electric Power decision discussed above, did not address the merits of such a nuisance claim. The US Court of Appeals accepted the case for rehearing, but was unable to muster a quorum to issue a decision, resulting in a dismissal of the Court of Appeals' earlier decision that had found that the residents had standing to assert their claims. The case is subject to further appeal.

In September 2009, the US District Court for the Northern District of California issued a decision in the case of Native Village of Kivalina v. ExxonMobil Corporation dismissing claims asserted by an Eskimo village that emissions of GHGs from approximately 24 oil and energy companies are causing global warming, which has damaged the arctic sea ice that protects the village from winter storms and erosion. The court dismissed the claims because they raised nonjudiciable political questions and because plaintiffs lacked standing to sue. The decision is subject to appeal.

While we are not a party to these suits, they could encourage or form the basis for a lawsuit asserting similar nuisance claims regarding emissions of GHGs. If any similar suit was successfully asserted against us in the future, it could have a material adverse effect on our business, results of operations and financial condition.

*State and Regional Level*—There are currently no Texas state regulations in effect concerning GHGs, and there are no regional initiatives concerning GHGs in which the State of Texas is a participant. We oppose state-by-state regulation of GHGs. In October 2009, Public Citizen Inc. filed a lawsuit against the Texas Commission on Environmental Quality (TCEQ) and its commissioners seeking to compel the TCEQ to regulate GHG emissions under the Texas Clean Air Act. The Attorney General of Texas has filed special exceptions to the Public Citizen pleading. We are not a party to this litigation. If limitations on emissions of GHGs are enacted in Texas, our costs of compliance could be material.

*International Level*—The US currently is not a party to the Kyoto Protocol, which is a protocol to the United Nations Framework Convention on Climate Change (UNFCCC). The United Nations' Kyoto Protocol process generally requires developed countries to cap GHG emissions at certain levels during the 2008 to 2012 time period. At the conclusion of the December 2007 United Nations Climate Change Conference, the Bali Action Plan was adopted, which identifies a work group, process and timeline for the consideration of possible post-2012 international actions to further address climate change. In December 2009, leaders of developed and developing countries met in Copenhagen under the UNFCCC and issued the Copenhagen Accord. The Copenhagen Accord provides a mechanism for countries to make economy-wide GHG emission mitigation commitments for reducing emissions of GHGs by 2020 and provides for developed countries to fund GHG emission mitigation projects in developing countries. President Obama participated in the development of, and endorsed, the Copenhagen Accord. In January 2010, the US informed the United Nations that it would reduce GHG emissions by 17% from 2005 levels by 2020, contingent on Congress passing climate change legislation.

B–15

EFIHMW00052464

EFIHMW00051935

Table of Contents

We continue to assess the risks posed by possible future legislative or regulatory changes pertaining to GHG emissions. Because the proposals described above are in their formative stages, we are unable to predict the potential effects on our business, financial condition and/or results of operations; however, any such effects could be material. The effect will depend, in large part, on the specific requirements of the legislation or regulation and how much, if any, of the costs are included in wholesale prices.

*EFH Corp.'s Voluntary Energy Efficiency, Renewable Energy, and Global Climate Change Efforts*—We are considering, or expect to be actively engaged in, business activities that could result in reduced GHG emissions including:

- *Investing in Energy Efficiency or Related Initiatives by Our Competitive Businesses*—Our competitive businesses expect to invest $100 million in energy efficiency or related initiatives over a five-year period that began in 2008, including initiatives such as the TXU Energy Power Monitor™, an in-home display device that enables residential customers to monitor whole-house energy usage and cost in real-time, and projects month-end bill amounts; the TXU Energy iThermostat™, a web-enabled programmable thermostat with a load control feature for cycling off air conditioners during times of peak energy demand; time-based electricity rates that are expected to work in conjunction with advanced metering infrastructure; rate plans that include electricity from renewable resources; an Online Energy Store that provides customers the opportunity to purchase hard-to-find, cost-effective energy efficiency products; a Compact Fluorescent Light (CFL) program that provides packages of CFLs to customers; a program to refer customers to energy efficiency contractors; the provision of rebates to business customers for purchasing new energy efficient equipment for their facilities based on a detailed engineering design through the Energy Conservation Investment Program; the Energy Efficiency Assistance Program that delivers products and services, as well as grants through social service agencies, to improve the energy efficiency of participating low income customer homes and apartment complexes; and online energy audit tools and tips for using less electricity;

- *Investing in Energy Efficiency Initiatives by Oncor*—In addition to the potential energy efficiencies from advanced metering, Oncor expects to invest over $300 million in energy efficiency initiatives over a five-year period that began in 2008 through such efforts as traveling across the State of Texas educating consumers about electricity, including the benefits of energy efficiency, advanced meters and renewable energy, and investment of over $16 million in the installation of solar photovoltaic systems in customer's homes and facilities that is expected to result in savings of up to 4.8 million kWh of electricity;

- *Participating in the CREZ Program*—Oncor has been selected by the PUCT to construct CREZ transmission facilities that are designed to connect existing and future renewable energy facilities to the electricity transmission system in ERCOT (see the 1  Quarter MD&A "—Regulation and Rates");

- *Purchasing Electricity from Renewable Sources*—We expect to remain a leader in the ERCOT market in providing electricity from renewable sources by purchasing up to 1,500 MW of wind power. Our total wind power portfolio is currently more than 900 MW;

- *Promoting the Use of Solar Power*—TXU Energy currently purchases surplus renewable distributed generation from qualified customers. In addition, TXU Energy's Solar Academy works with Texas school districts to teach and demonstrate the benefits of solar power;

- *Investing in Technology*—We continue to evaluate the development and commercialization of cleaner power facility technologies; technologies that support sequestration and/or reduction of CO2; incremental renewable sources of electricity, including wind and solar power, energy storage, including advanced battery and compressed air storage, as well as related technologies that seek to lower emissions intensity. Additionally, we continue to explore the advances in electric cars and plug-in hybrid electric vehicles that have the potential to reduce overall GHG emissions;

- *Evaluating the Development of a New Nuclear Generation Facility*—We have filed an application with the NRC for combined construction and operating licenses for up to 3,400 MW of new nuclear

B-16

EFIHMW00052465

EFIHMW00051935

**PX 030**

**Page 531 of 734**

Table of Contents

generation capacity (the lowest GHG emission source of baseload generation currently available) at our Comanche Peak nuclear generation facility. In addition, we have (i) filed a loan guarantee application with the DOE for financing of the proposed units and (ii) formed a joint venture with MHI to further develop the units using MHI's US–Advanced Pressurized Water Reactor technology, and

• *Offsetting GHG Emissions by Planting Trees*—We are engaged in a number of tree planting programs that offset GHG emissions, resulting in the planting of over 1.1 million trees in 2009. The majority of these trees were planted as part of our mining reclamation efforts but also include TXU Energy's Urban Tree Farm program, which has planted more than 150,000 trees since its inception in 2002.

*Sulfur Dioxide, Nitrogen Oxide and Mercury Air Emissions*

The EPA has promulgated Acid Rain Program rules that require fossil–fueled plants to have sufficient SO2 emission allowances and meet certain NOx emission standards. Our generation plants meet these SO2 allowance requirements and NOx emission rates.

In 2005, the EPA issued a final rule to further reduce SO2 and NOx emissions from power plants. The SO2 and NOx reductions required under the Clean Air Interstate Rule (CAIR), which were required to be phased in between 2009 and 2015, were based on a cap and trade approach (market–based) in which a cap was put on the total quantity of emissions allowed in 28 eastern states (including Texas). Emitters were required to have allowances for each ton emitted, and emitters were allowed to trade emissions under the cap. In July 2008, the US Court of Appeals for the D.C. Circuit (D.C. Circuit Court) vacated CAIR. In December 2008, in response to an EPA petition, the D.C. Circuit Court reversed, in part, its previous ruling. Such reversal confirmed CAIR is not valid, but allowed it to remain in place while the EPA revises CAIR to correct the previously identified shortcomings. In July 2010, the EPA released a proposed rule called the Clean Air Transport Rule (CATR). The CATR, as proposed, would replace CAIR in 2012 and would require no additional emission reductions for Luminant. However, we cannot predict the impact of a final rule on our business, results of operations and financial condition. See Note 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for discussion of the impairment of emission allowances intangible assets.

In 2005, the EPA also published a final rule requiring reductions of mercury emissions from coal–fueled generation plants. The Clean Air Mercury Rule (CAMR) was based on a nationwide cap and trade approach. The mercury reductions were required to be phased in between 2010 and 2018. In March 2008, the D.C. Circuit Court vacated CAMR. In February 2009, the US Supreme Court refused to hear the appeal of the D.C. Circuit Court's ruling. The EPA agreed in a consent decree submitted for court approval to propose Maximum Achievable Control Technology rules by March 2011 and finalize those rules by November 2011. See Note 13 to EFH Corp's historical consolidated financial statements for the year ended December 31, 2009—"Litigation Related to Generation Facilities".

SO2 reductions required under the proposed regional haze/visibility rule (or so–called BART rule) only apply to units built between 1962 and 1977. The reductions are required on a unit–by–unit basis. The EPA provides the option for states to use CAIR to satisfy BART reductions for electricity generating units, and Texas has chosen this option. In 2009, Texas submitted its plan to the EPA for approval. We cannot predict what decision the EPA will make or when.

In connection with our construction of three new lignite–fueled generation units in Texas, we have committed to reduce emissions of NOx, SO2 and mercury through the installation of emissions control equipment at both new and existing units and fuel blending at some existing units. We have also applied with the TCEQ to seek a "maximum achievable control technology" determination for our two Oak Grove units that are under construction and have agreed to offset any emissions above those levels. These efforts, which will involve incremental equipment investments as well as additional costs for facility operations and maintenance in the future, will be coordinated with efforts related to applicable environmental rules to provide the most cost–effective compliance plan options.

B–17

EFIHMW00052466

EFIHMW00051935

**PX 030**
**Page 532 of 734**

**Table of Contents**

The following are the major air quality improvements planned at our existing and new coal–fueled generation plants to help meet the offset and reduction commitment:

- To reduce NOx emissions, we have applied for permits to install selective catalytic reduction (SCR) systems at our Martin Lake plant. In addition, we have installed selective non–catalytic reduction systems at our Monticello and Big Brown plants and improved the low–NOx burner technology at one of our Monticello units. These activities are in addition to SCR systems recently installed at the legacy Sandow unit and at the new Oak Grove units;

- To reduce mercury emissions, we have installed activated carbon injection equipment, a sorbent injection system technology, at all of our lignite/coal–fired plants, and

- To reduce SO2 emissions, we plan to increase use of lower–sulfur coal at various plants. In addition, Martin Lake mine is using coal–cleaning technology to reduce both SO2 and mercury emissions, and we are evaluating the effectiveness of this technology at Big Brown and Monticello mines.

The Clean Air Act requires each state to monitor air quality for compliance with federal health standards. The EPA is required to periodically review, and if appropriate, revise all national ambient air quality standards. The standards for ozone are not being achieved in several areas of Texas. The TCEQ adopted State Implementation Plan (SIP) rules in May 2007 to deal with eight–hour ozone standards, which required NOx emission reductions from certain of our peaking natural gas–fueled units in the Dallas–Fort Worth area. In March 2008, the EPA made the eight–hour ozone standards more stringent. In January 2010, the EPA proposed to further reduce the eight–hour ozone standard and to adopt a secondary standard for the protection of sensitive vegetation from ozone–related damage. Since the EPA projects that SIP rules to address attainment of these new more stringent standards will not be required until December 2013, we cannot yet predict the impact of this action on our generation facilities. In January 2010, the EPA added a new one–hour NOx National Ambient Air Quality standard that may require actions within Texas to reduce emissions. The TCEQ will be required to revise its monitoring network and submit an implementation plan with compliance required by January 2021/2022. In June 2010, the EPA adopted a new one–hour SO2 national ambient air quality standard that may require action within Texas to reduce SO2 emissions. The TCEQ will be required to conduct modeling and develop an implementation plan by 2014, pursuant to which compliance will be required by 2017, according to the EPA's implementation timeline. We cannot predict the impact of the new standards on our business, results of operations or financial condition until the TCEQ adopts (if required) an implementation plan with respect to the standards.

We believe that we hold all required emissions permits for facilities in operation and have applied for or obtained the necessary construction permits for facilities under construction. However, any of the regulatory actions or proposed regulatory actions described above could lead to significant restrictions on operations or significant compliance costs for Luminant.

*Water*

The TCEQ and the EPA have jurisdiction over water discharges (including storm water) from facilities in Texas. We believe our facilities are presently in material compliance with applicable state and federal requirements relating to discharge of pollutants into water. We believe we hold all required waste water discharge permits from the TCEQ for legacy facilities and have applied for or obtained necessary permits for recently constructed facilities. We also believe we can satisfy the requirements necessary to obtain any required permits or renewals. Recent changes to federal rules pertaining to the Spill Prevention, Control and Countermeasure (SPCC) plans for oil–filled electrical equipment and bulk storage facilities for oil will require updating of certain of our facilities. We have determined that SPCC plans will be required for certain substations, work centers and distribution systems by November 10, 2010, and we are currently compiling data for development of these plans.

Diversion, impoundment and withdrawal of water for cooling and other purposes are subject to the jurisdiction of the TCEQ and the EPA. We believe we possess all necessary permits for these activities from the TCEQ for our present operations. We have obtained the necessary water rights permit from the TCEQ for the

B–18

EFIHMW00052467

EFIHMW00051935

**PX 030**

**Page 533 of 734**

Table of Contents
lignite mine that supports the Oak Grove units. Clean Water Act Section 316(b) regulations pertaining to existing water intake structures at large generation facilities were published by the EPA in 2004. As prescribed in the regulations, we began implementing a monitoring program to determine the future actions that might need to be taken to comply with these regulations. In January 2007, a federal court ruled against the EPA in a lawsuit brought by environmental groups challenging aspects of these regulations, and in July 2007, the EPA announced that it was suspending the regulations pending further rulemaking. The US Supreme Court issued a decision in April 2009 reversing the federal court's decision, in part, and finding that the EPA permissibly used cost–benefit analysis in the Section 316(b) regulations. In the absence of regulations, the EPA has instructed the states implementing the Section 316(b) program to use best professional judgment in reviewing applications and issuing permits under Section 316(b). We cannot predict the impact on our operations of the suspended regulations or of new regulations, if any, that replace them.

*Radioactive Waste*

We currently ship low–level waste material to a disposal facility outside of Texas. Under the federal Low–Level Radioactive Waste Policy Act of 1980, as amended, the State of Texas is required to provide, either on its own or jointly with other states in a compact, for the disposal of all low–level radioactive waste generated within the state. The State of Texas has agreed to a compact for a disposal facility that would be located in Texas. That compact was ratified by Congress and signed by the President in 1998. In 2003, the State of Texas enacted legislation allowing a private entity to be licensed to accept low–level radioactive waste for disposal, and in 2004 the State received a license application from such an entity for review. In January 2009, the TCEQ approved this permit. We expect to continue to ship low–level waste material off–site for as long as an alternative disposal site is available. Should existing off–site disposal become unavailable, the low–level waste material will be stored on–site. (See discussion under "Luminant—Nuclear Generation Operations" above.)

We believe that our on–site used nuclear fuel storage capability is sufficient for a minimum of three years. The nuclear industry is continuing to review ways to enhance security of used–fuel storage with the NRC to fully utilize physical storage capacity. Current on–site used nuclear fuel storage capability will require the use of the industry technique of dry cask storage within the next three years.

*Solid Waste, Including Fly Ash Associated with Lignite/Coal–Fueled Generation*

Treatment, storage and disposal of solid waste and hazardous waste are regulated at the state level under the Texas Solid Waste Disposal Act and at the federal level under the Resource Conservation and Recovery Act of 1976, as amended, and the Toxic Substances Control Act. The EPA has issued regulations under the Resource Conservation and Recovery Act of 1976 and the Toxic Substances Control Act, and the TCEQ has issued regulations under the Texas Solid Waste Disposal Act applicable to our facilities. We believe we are in material compliance with all applicable solid waste rules and regulations. In addition, we have registered solid waste disposal sites and have obtained or applied for permits required by such regulations.

In December 2008, an ash impoundment facility at a Tennessee Valley Authority (TVA) site ruptured releasing a significant quantity of coal ash slurry. No impoundment failures of this magnitude have ever occurred at any of our impoundments, which are inspected on a regular basis, and we routinely sample groundwater monitoring wells to ensure compliance with all applicable regulations. As a result of the TVA ash impoundment failure, in May 2010, the EPA released a proposed rule that considers regulating coal combustion residuals as either a hazardous waste or a non–hazardous waste. We are unable to predict the potential cost of compliance with their

The EPA issued a notice in December 2009 that it had identified several industries, including the electric power industry, that should be subject to financial responsibility requirements under the Comprehensive Environmental Response, Compensation and Liability Act consistent with the risk associated with their

B–19

EFIHMW00052468

EFIHMW00051935

**PX 030**
**Page 534 of 734**

Table of Contents

production, transportation, treatment, storage or disposal of hazardous substances. The EPA indicated in its notice that it would develop regulations that define the scope of those financial responsibility requirements. We do not know, at this time, the scope of these requirements, nor are we able to estimate the potential cost (which could be material) of complying with any such new requirements.

*Environmental Capital Expenditures*

Capital expenditures for our environmental projects totaled $149 million in 2009 and are expected to total approximately $80 million in 2010, consisting primarily of environmental projects at existing lignite/coal–fueled generation plants. These amounts are exclusive of emissions control equipment investment planned as part of the three–unit generation development program, which is expected to total up to $500 million over the construction period. See discussion above under "Luminant—Lignite/Coal–Fueled Generation Operations" regarding planned investments in emissions control systems.

*Litigation Related to Generation Facilities*

In September 2007, an administrative appeal challenging the order of the TCEQ issuing the air permit for construction and operation of the Oak Grove generation facility in Robertson County, Texas was filed in the State District Court of Travis County, Texas. Plaintiffs asked that the District Court reverse the TCEQ's approval of the Oak Grove air permit and the TCEQ's adoption and approval of the TCEQ Executive Director's Response to Comments, and remand the matter back to TCEQ for further proceedings. In addition to this administrative appeal, two other petitions were filed in Travis County District Court by non–parties to the administrative hearing before the TCEQ and the State Office of Administrative Texas Hearings (SOAH) seeking to challenge the TCEQ's issuance of the Oak Grove air permit and asking the District Court to remand the matter to the SOAH for further proceedings. Finally, the plaintiffs in these two additional lawsuits filed a third, joint petition claiming insufficiencies in the Oak Grove application, permit, and process and seeking party status and remand to the SOAH for further proceedings. One of the plaintiffs asked the District Court to consolidate all three proceedings, and the Attorney General of Texas, on behalf of TCEQ, filed pleas to the jurisdiction seeking dismissal of all but the administrative appeal. In May 2009, the District Court dismissed the claims that contest the merits of the TCEQ's permitting decision, but declined to dismiss the claims that contest the process by which the TCEQ handled the permit application. Oak Grove Management Company LLC (a subsidiary of TCEH) has subsequently intervened in these proceedings and has filed its own pleas to the jurisdiction asking the court to dismiss the remaining collateral attack claims. In October 2009, one of the plaintiffs ended its legal challenge to the permit. In December 2009, the Attorney General and Oak Grove Management Company LLC filed pleadings asking the court to dismiss the administrative appeal challenging the permit for want of prosecution by the plaintiffs. In January 2010, the court denied that request and set the case for a hearing on the merits in June 2010. In March 2010, the remaining two non–parties to the administrative hearing before the TCEQ and SOAH filed a notice of non–suit, thus ending their legal challenge. Therefore, only one plaintiff remains in the case. After conducting the hearing in June 2010, the court in July issued its order rejecting the remaining plaintiff's claims and upholding the TCEQ's issuance of the permit. The plaintiff may appeal the court's order. We believe the Oak Grove air permit granted by the TCEQ was issued in accordance with applicable law. There can be no assurance that the outcome of these matters will not adversely impact the Oak Grove project.

In July 2008, Alcoa Inc. filed a lawsuit in the State District Court of Milam County, Texas against Luminant Generation and Luminant Mining (wholly–owned subsidiaries of TCEH), later adding EFH Corp., a number of its subsidiaries, Texas Holdings and Texas Holdings' general partner as parties to the suit. The lawsuit made various claims concerning the operation of the Sandow Unit 4 generation facility and the related Three Oaks lignite mine, including claims for breach of contract, breach of fiduciary duty, fraud, tortious interference, civil conspiracy and conversion. The plaintiff requested money damages of no less than $500 million, declaratory judgment, rescission and other forms of equitable relief. In May 2010, the trial court granted a summary judgment dismissing substantially all of Alcoa's claims other than its breach of contract claims against Luminant Generation and Luminant Mining. On the breach of contract claims against Luminant Generation relating to the

B–20

EFIHMW00052469

EFIHMW00051935

**PX 030**

**Page 535 of 734**

**Table of Contents**

Sandow Unit 4 generation facility, a jury rendered a verdict in Luminant Generation's favor in June 2010. The jury awarded no damages to Alcoa and awarded $10 million in damages to Luminant Generation. In June 2010, the judge presiding in the case ruled in Luminant Mining's favor on the claims against it, awarding no damages to Alcoa and awarding nearly $2 million in damages to Luminant Mining. The June 2010 jury verdict and court ruling concluded the lawsuit favorably to Luminant, subject to any appeals. We cannot predict whether Alcoa will file an appeal with respect to the jury's verdict or the court's ruling. If such appeals are filed, we intend to vigorously defend the appeals.

In February 2010, the Sierra Club informed Luminant that it may sue Luminant, after the expiration of a 60‑day waiting period, for allegedly violating federal Clean Air Act provisions in connection with Luminant's Big Brown generation facility. This notice is similar to the notice that Luminant received in July 2008 with respect to its Martin Lake generation facility. We cannot predict whether the Sierra Club will actually file suit or the outcome of any resulting proceedings.

*Regulatory Investigations and Reviews*

In June 2008, the EPA issued a request for information to TCEH under EPA's authority under Section 114 of the Clean Air Act. The stated purpose of the request is to obtain information necessary to determine compliance with the Clean Air Act, including New Source Review Standards and air permits issued by the TCEQ for the Big Brown, Monticello and Martin Lake generation facilities. Historically, as the EPA has pursued its New Source Review enforcement initiative, companies that have received a large and broad request under Section 114, such as the request received by TCEH, have in many instances subsequently received a notice of violation from the EPA, which has in some cases progressed to litigation or settlement. The company is cooperating with the EPA and is responding in good faith to the EPA's request, but is unable to predict the outcome of this matter.

*Settlement of Force Majeure Claims*

As previously disclosed, Sandow Power Company LLC (Sandow Power), a subsidiary of TCEH, is a party to a federal consent decree (the Consent Decree) with, among others, the US Department of Justice (DOJ) and certain private plaintiffs related to Sandow Power's Sandow Unit 5 lignite–fueled generation facility. Between December 3, 2009 and March 31, 2010, Sandow Power submitted several force majeure claims to the DOJ regarding certain deviations from emissions limits at Sandow Unit 5 resulting from force majeure events, as that term is defined in the Consent Decree. In June 2010, Sandow Power and the DOJ agreed to extend, to August 31, 2010, the DOJ's deadline to respond to these force majeure claims. We anticipate that this extension period will be used to pursue a negotiated resolution of the force majeure claims. We believe that a negotiated resolution of the force majeure claims between Sandow Power, the DOJ and the private plaintiffs, if reached, would likely involve a payment that is immaterial to the company, but in excess of the $100,000 disclosure threshold applicable to such matters.

*Other Proceedings*

In addition to the above, we are involved in various other legal and administrative proceedings in the normal course of business, the ultimate resolution of which, in the opinion of management, should not have a material effect on our financial position, results of operations or cash flows.

B–21

EFIHMW00052470

EFIHMW00051935

Table of Contents

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS AS OF AND FOR THE THREE AND SIX MONTHS ENDED JUNE 30, 2010**

The following discussion and analysis of EFH Corp.'s financial condition and results of operations as of and for the three and six months ended June 30, 2010 and 2009 was included in EFH Corp.'s Quarterly Report on Form 10-Q for the quarter ended June 30, 2010 filed with the SEC on August 2, 2010 (the "2nd Quarter MD&A"). The 2nd Quarter MD&A should be read in conjunction with EFH Corp.'s historical condensed consolidated financial statements for the three and six months ended June 30, 2010 and the notes to those statements. The 2nd Quarter MD&A should also be read in conjunction with the disclosure set forth in "Summary—Recent Developments" beginning on page 14 of this Prospectus, which provides material updates to certain of the information contained in the 2nd Quarter MD&A. See "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009" below for a discussion and analysis of EFH Corp.'s financial condition and results of operations as of and for the year ended December 31, 2009.

All dollar amounts in the tables in the following discussion and analysis are stated in millions of US dollars unless otherwise indicated.

**Business**

EFH Corp. is a Dallas–based holding company with operations consisting principally of our TCEH and Oncor subsidiaries. TCEH is a holding company for subsidiaries engaged in competitive electricity market activities largely in Texas including electricity generation, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales. Oncor is a majority–owned (approximately 80%) subsidiary engaged in regulated electricity transmission and distribution operations in Texas. Various "ring–fencing" measures have been taken to enhance the credit quality of Oncor. See Notes 1 and 3 to EFH Corp.'s historical condensed consolidated financial statements for the three and six months ended June 30, 2010 for a description of the material features of these "ring–fencing" measures and for a discussion of the deconsolidation of Oncor (and its majority owner, Oncor Holdings) in 2010 as the result of a change in accounting principles.

*Operating Segments*

We have aligned and report our business activities as two operating segments: the Competitive Electric segment and the Regulated Delivery segment. The Competitive Electric segment is principally comprised of TCEH. The Regulated Delivery segment is comprised of Oncor and its wholly–owned bankruptcy–remote financing subsidiary. See Notes 1 and 3 to EFH Corp.'s historical condensed consolidated financial statements for the three and six months ended June 30, 2010 for discussion of the deconsolidation of Oncor Holdings and, accordingly, Oncor and the Regulated Delivery segment, in 2010.

See Note 15 to EFH Corp.'s historical condensed consolidated financial statements for the three and six months ended June 30, 2010 for further information regarding reportable business segments.

*Significant Activities and Events*

*Natural Gas Prices and Long–Term Hedging Program*—TCEH has a long–term hedging program designed to reduce exposure to changes in future electricity prices due to changes in the price of natural gas. Under the program, the company has entered into market transactions involving natural gas–related financial instruments, and as of June 30, 2010, has effectively sold forward approximately 1.4 billion MMBtu of natural gas (equivalent to the natural gas exposure of approximately 175,000 GWh at an assumed 8.0 market heat rate) for the period from July 1, 2010 through December 31, 2014 at weighted average annual hedge prices ranging from $7.80 per MMBtu to $7.18 per MMBtu. These transactions, as well as forward power sales, have effectively hedged an

B–22

EFIHMW00052471

EFIHMW00051935

Table of Contents

estimated 65% of the natural gas price exposure related to TCEH's expected generation output for the period beginning July 1, 2010 and ending December 31, 2014 (on an average basis for such period and assuming an 8.0 market heat rate). The hedges were entered into with the continuing expectation that wholesale electricity prices in ERCOT will be highly correlated with natural gas prices, which is expected to be the marginal fuel for the purpose of setting electricity prices approximately 75% to 90% of the time. If the correlation changes in the future, the cash flows targeted under the long–term hedging program may not be achieved.

The long–term hedging program is comprised primarily of contracts with prices based on the New York Mercantile Exchange (NYMEX) Henry Hub pricing point. However, because there are other local and regional natural gas pricing points such as Houston Ship Channel, future wholesale power prices in ERCOT may not correlate as closely to the Henry Hub pricing as other pricing points, which could decrease the effectiveness of the positions in the long–term hedging program in mitigating power price exposure. The company has hedged more than 95% of the Houston Ship Channel versus Henry Hub pricing point risk for 2010.

The company has entered into related put and call transactions (referred to as collars), primarily for year 2014 of the program, that effectively hedge natural gas prices within a range. These transactions represented 8% of the positions in the long–term hedging program at June 30, 2010, with the approximate weighted average strike prices under the collars being a floor of $7.80 per MMBtu and a ceiling of $11.75 per MMBtu. The company expects to use financial instruments, including collars, in future hedging activity under the long–term hedging program.

The following table summarizes the natural gas hedges in the long–term hedging program as of June 30, 2010:

| | Measure | Balance 2010 (a) | 2011 | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|---|---|
| Natural gas hedge volumes (b) | mm MMBtu | ~126 | ~372 | ~475 | ~298 | ~105 | ~1,376 |
| Weighted average hedge price (c) | $/MMBtu | ~7.75 | ~7.53 | ~7.34 | ~7.18 | ~7.80 | — |
| Weighted average market price (d) | $/MMBtu | ~4.82 | ~5.34 | ~5.68 | ~5.89 | ~6.10 | — |

(a)   Balance of 2010 is from July 1, 2010 through December 31, 2010.
(b)   Where collars are reflected, the volumes are estimated based on the natural gas price sensitivity (i.e., delta position) of the derivatives. The notional volumes for collars are approximately 150 million MMBtu, which corresponds to a delta position of approximately 105 million MMBtu in 2014.
(c)   Weighted average hedge prices are based on NYMEX Henry Hub prices of forward natural gas sales positions in the long–term hedging program (excluding the impact of offsetting purchases for rebalancing and pricing point basis transactions). Where collars are reflected, sales price represents the collar floor price.
(d)   Based on NYMEX Henry Hub prices.

Changes in the fair value of the instruments in the long–term hedging program are being recorded as unrealized gains and losses in net gain (loss) from commodity hedging and trading activities in the statement of income, which has and could continue to result in significant volatility in reported net income. Based on the size of the long–term hedging program as of June 30, 2010, a $1.00/MMBtu change in natural gas prices across the hedged period would result in the recognition of up to approximately $1.4 billion in pretax unrealized mark–to–market gains or losses.

Unrealized mark–to–market net gains (losses) related to the long–term hedging program are as follows:

| | Period Ended June 30, 2010 | |
|---|---|---|
| | Three Months | Six Months |
| Effect of natural gas market price changes on open positions | $ 119 | $ 1,419 |
| Reversals of previously recorded amounts on positions settled | (286) | (529) |
| Total unrealized effect (pre-tax) | $ (167) | $ 890 |

B–23

EFIHMW00052472

EFIHMW00051935

**Table of Contents**

The cumulative unrealized mark−to−market net gain related to positions in the long−term hedging program totaled $2.868 billion and $1.978 billion at June 30, 2010 and December 31, 2009, respectively. See discussion below under "Operating Results" for realized net gains from hedging activities, which amounts are largely related to the long−term hedging program.

Given the volatility of natural gas prices, it is not possible to predict future reported unrealized mark−to−market gains or losses and the actual gains or losses that will ultimately be realized upon settlement of the hedge positions in future years. If natural gas prices at settlement are lower than the prices of the hedge positions, the hedges are expected to mitigate the otherwise negative effect on earnings of lower wholesale electricity prices. However, if natural gas prices at settlement are higher than the prices of the hedge positions, the hedges are expected to dampen the otherwise positive effect on earnings of higher wholesale electricity prices and will in this context be viewed as having resulted in an opportunity cost.

The significant cumulative unrealized mark−to−market net gain related to positions in the long−term hedging program reflects declining forward market natural gas prices. As previously disclosed, forward natural gas prices have generally trended downward since mid−2008 as shown in the table of forward NYMEX Henry Hub natural gas prices below. While the long−term hedging program is designed to mitigate the effect on earnings of lower wholesale power prices, due to the lower natural gas prices, these market conditions are challenging to the long−term profitability of our generation assets. Specifically, this downward trend in natural gas prices and the correlated trend in ERCOT power prices could have a material adverse impact on the overall profitability of our generation assets for periods in which we do not have significant hedge positions. Additionally, a continued decline in forward natural gas prices will limit our ability to hedge our wholesale power revenues at reasonable price levels to support our interest payments and debt maturities.

| | Forward Market Prices for Calendar Year ($/MMBtu) (a) | | | | |
|---|---|---|---|---|---|
| Date | 2010 (b) | 2011 | 2012 | 2013 | 2014 |
| June 30, 2008 | $11.24 | $10.78 | $10.74 | $10.90 | $11.12 |
| September 30, 2008 | $ 8.58 | $ 8.54 | $ 8.41 | $ 8.30 | $ 8.30 |
| December 31, 2008 | $ 7.13 | $ 7.31 | $ 7.23 | $ 7.15 | $ 7.15 |
| March 31, 2009 | $ 5.93 | $ 6.67 | $ 6.96 | $ 7.11 | $ 7.18 |
| June 30, 2009 | $ 6.06 | $ 6.89 | $ 7.16 | $ 7.30 | $ 7.43 |
| September 30, 2009 | $ 6.21 | $ 6.87 | $ 7.00 | $ 7.06 | $ 7.17 |
| December 31, 2009 | $ 5.79 | $ 6.34 | $ 6.53 | $ 6.67 | $ 6.84 |
| March 31, 2010 | $ 4.27 | $ 5.34 | $ 5.79 | $ 6.07 | $ 6.36 |
| June 30, 2010 | $ 4.82 | $ 5.34 | $ 5.68 | $ 5.89 | $ 6.10 |

(a)   Based on NYMEX Henry Hub prices.
(b)   For June 30, 2010 and March 31, 2010, natural gas prices for 2010 represent the average of forward prices for July through December and April through December, respectively.

As of June 30, 2010, more than 95% of the long−term hedging program transactions were directly or indirectly secured by a first−lien interest in TCEH's assets (including the transactions supported by the TCEH Commodity Collateral Posting Facility—see discussion below under "Financial Condition—Liquidity and Capital Resources") thereby reducing the cash and letter of credit collateral requirements for the hedging program.

B−24

EFIHMW00052473

EFIHMW00051935

**PX 030**
**Page 539 of 734**

Table of Contents

The following sensitivity table provides estimates of the potential impact (in $ millions) of movements in natural gas and certain other commodity prices and market heat rates on realized pre–tax earnings for the periods presented. The estimates related to price sensitivity are based on TCEH's unhedged position and forward prices as of June 30, 2010, which for natural gas reflects estimates of electricity generation less amounts hedged through the long–term natural gas hedging program and amounts under existing wholesale and retail sales contracts. On a rolling twelve–month basis, the substantial majority of retail sales under month–to–month arrangements are deemed to be under contract.

| | Balance 2010 (a) | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| $1.00/MMBtu change in gas price (b) | $  ~9 | $~55 | $~85 | $~295 | $~500 |
| 0.1/MMBtu/MWh change in market heat rate (c) | $  ~3 | $~30 | $~45 | $  ~50 | $  ~50 |
| $1.00/gallon change in diesel fuel price | $  ~1 | $  ~2 | $  ~3 | $  ~50 | $  ~50 |

(a)    Balance of 2010 is from August 1, 2010 through December 31, 2010.
(b)    Assumes conversion of electricity positions based on an approximate 8.0 market heat rate with natural gas being on the margin 75% to 90% of the time (i.e., when coal is forecast to be on the margin, no natural gas position is assumed to be generated).
(c)    Based on Houston Ship Channel natural gas prices as of June 30, 2010.

  *Liability Management Program* —As of June 30, 2010, EFH Corp. and its subsidiaries (excluding Oncor and its subsidiaries) had $38 billion aggregate principal amount of debt outstanding. Of that amount, $22 billion matures in 2014 and the majority of the remaining amount matures from 2015 to 2017. As a result, in October 2009, we implemented a liability management program focused on improving our balance sheet by reducing debt and extending debt maturities.

  Year–to–date July 2010, EFH Corp. acquired $1.108 billion aggregate principal amount of EFH Corp. and TCEH outstanding debt. As consideration for this acquired debt, EFH Corp. issued $561 million aggregate principal amount of EFH Corp. 10% Notes and paid $235 million in cash (excluding accrued interest payments).

  The following table details our liability management program from its inception in October 2009 through July 2010 (debt amounts are principal amounts):

| Security | Debt Acquired | Debt Issued/ Cash Paid |
|---|---|---|
| EFH Corp 10.875% Notes due 2017 | $   213 | $   — |
| EFH Corp. Toggle Notes 2017 | 266 | — |
| EFH Corp. 5.55% Series P Senior Notes due 2014 | 566 | — |
| EFH Corp. 6.50% Series Q Senior Notes due 2024 | 10 | — |
| EFH Corp. 6.55% Series R Senior Notes due 2034 | 6 | — |
| TCEH 10.25% Notes due 2015 | 332 | — |
| TCEH Toggle Notes due 2016 | 52 | — |
| Term Loans under the TCEH Senior Secured Facilities due 2014 | 20 | — |
| EFH Corp. and EFH 9.75% Notes due 2019 | — | 256 |
| EFH Corp 10% Notes due 2020 | — | 561 |
| Cash | — | 235 |
| Total | $ 1,465 | $ 1,052 |

  The transactions resulted in the capture of $413 million of debt discount and aggregate projected interest savings (pre–tax) through 2014 of $148 million.

  See Note 6 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010 for further discussion of the transactions completed under our liability management program and the exchange offers and consent solicitations commenced in July 2010.

B–25

EFIHMW00052474

EFIHMW00051935

**PX 030**
**Page 540 of 734**

Table of Contents

*TCEH Interest Rate Swap Transactions*—As of June 30, 2010, TCEH had entered into a series of interest rate swaps that effectively fix the interest rates at between 7.3% and 8.3% on $16.30 billion principal amount of its senior secured debt maturing from 2010 to 2014. All of these swaps were entered into prior to January 1, 2010. Taking into consideration these swap transactions, 11% of our total long–term debt portfolio at June 30, 2010 was exposed to variable interest rate risk. TCEH also entered into interest rate basis swap transactions, which further reduce the fixed (through swaps) borrowing costs, related to an aggregate of $16.30 billion principal amount of senior secured debt, including swaps entered into in 2010 related to $2.55 billion principal amount of debt and reflecting the expiration in 2010 of swaps related to an aggregate $2.50 billion principal amount of debt. We may enter into additional interest rate hedges from time to time. Unrealized mark–to–market net losses related to all TCEH interest rate swaps, which are reported in interest expense and related charges, totaled $254 million and $361 million for the three and six months ended June 30, 2010, respectively. The cumulative unrealized mark–to–market net liability related to all TCEH interest rate swaps totaled $1.574 billion and $1.212 billion at June 30, 2010 and December 31, 2009, respectively, of which $140 million and $194 million (both pre–tax), respectively, was reported in accumulated other comprehensive income. These fair values can change materially as market conditions change, which could result in significant volatility in reported net income. See discussion in Note 6 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010 regarding various interest rate swap transactions.

*Texas Generation Facilities Development*—TCEH has substantially completed a program to develop three lignite–fueled generation units (2 units at Oak Grove and 1 unit at Sandow) in Texas with a total estimated capacity of approximately 2,200 MW. The Sandow and first Oak Grove units achieved substantial completion (as defined in the EPC agreements) in the fourth quarter 2009, and the second Oak Grove unit achieved substantial completion in the second quarter 2010. We began depreciating the units and recognizing revenues and fuel costs for accounting purposes in those respective periods. Aggregate cash capital expenditures for these three units are expected to total approximately $3.25 billion including all construction, site preparation and mining development costs, of which $3.21 billion was spent as of June 30, 2010. Total recorded costs, including purchase accounting fair value adjustments and capitalized interest, are expected to total approximately $4.8 billion, and the balance was $4.7 billion as of June 30, 2010. See discussion in Note 7 to Financial Statements regarding contingencies related to these units.

*Idling of Natural Gas–Fueled Units*—In February 2010, we notified ERCOT of plans to mothball (idle) four of our natural gas–fueled units, totaling 1,856 MW of capacity (1,933 MW installed nameplate capacity), in September 2010. In April 2010, ERCOT affirmed that the units may be mothballed. As discussed elsewhere herein, in 2009 we retired 10 units, totaling 2,114 MW of capacity (2,226 MW installed nameplate capacity), mothballed three units, totaling 1,081 MW capacity (1,135 MW installed nameplate capacity) and entered into RMR (operational standby) agreements with ERCOT for two units, totaling 630 MW capacity (655 MW installed nameplate capacity).

As of June 30, 2010, TCEH's operational fleet of natural gas–fueled generation facilities is generally used as peaking resources and consists of 16 units, totaling 2,848 MW installed nameplate capacity, including two units under RMR agreements and excluding eight units operated for unaffiliated parties as well as seven currently, and four pending, mothballed units.

*Financial Services Reform Legislation*—In July 2010, the US Congress enacted, and President Obama signed, financial reform legislation known as the Dodd–Frank Wall Street Reform and Consumer Protection Act (the Financial Reform Act). The primary purposes of the Financial Reform Act are, among other things, to address systemic risk in the financial system; to establish a Bureau of Consumer Financial Protection with broad powers to enforce consumer protection laws and promulgate rules against unfair, deceptive or abusive practices; to enhance regulation of the derivatives markets, including the requirement for central clearing of over–the counter derivative instruments and additional capital and margin requirements for certain derivative market participants; and to implement a number of new corporate governance requirements for companies with listed or,

EFIHMW00052475

EFIHMW00051935

**Table of Contents**

in some cases, publicly−traded securities. While the legislation is broad and detailed, substantial portions of the legislation will require rulemaking by federal governmental agencies to either implement the standards set out in the legislation or to adopt new standards. As a result, the full scope and effect of the legislation will likely not be known for several years.

Title VII of the Financial Reform Act provides for the regulation of the over−the−counter (OTC) derivatives market. The Financial Reform Act generally requires OTC derivatives (including the types of asset−backed OTC derivatives that we use to hedge risks associated with commodity and interest rate exposure) to be cleared by a derivatives clearing organization. However, end−users that are non−financial entities using the swap to hedge or mitigate commercial risk are exempt from these clearing requirements. The type of asset−backed OTC derivatives that we use to hedge commodity and interest rate risk should be exempt from the clearing requirements. In addition, existing swaps are grandfathered from the clearing requirements.

The Financial Reform Act also requires the posting of cash collateral for uncleared swaps. Because these cash collateral requirements are unclear as to whether an end−user or its counterparty (i.e., swap dealer) is required to post cash collateral, there is a risk that the cash collateral requirement could be used to effectively negate the end−user clearing exemption. However, the legislative history of the Financial Reform Act suggests that it was not Congress' intent to require end−users (rather that such requirement applies to swap dealers) to post cash collateral with respect to swaps. If we were required to post cash collateral on our swap transactions, our liquidity would likely be materially impacted, and our ability to enter into OTC derivatives to hedge our commodity and interest rate risks would be significantly limited.

We cannot predict the outcome of the rulemaking to implement the OTC derivative market provisions of the Financial Reform Act. This rulemaking could negatively affect our ability to hedge our commodity and interest rate risks. The inability to hedge these risks would likely have a material adverse effect on our results of operations, financial condition or cash flows.

*Global Climate Change*—Several bills have been introduced in the US Congress or advocated by the Obama Administration that are intended to address climate change using different approaches, including most prominently a cap on carbon emissions with emitters allowed to trade unused emission allowances (cap−and−trade). These bills include the Waxman−Markey bill, known as the American Clean Energy and Security Act of 2009 (Waxman−Markey), the Kerry−Boxer bill, known as the Clean Energy Jobs and American Power Act (Kerry−Boxer) and the Kerry−Lieberman bill, known as the American Power Act (Kerry−Lieberman). This proposed legislation is not law, but in June 2009 Waxman−Markey was passed by the US House of Representatives and sent to the US Senate for consideration. Kerry−Boxer was reported out of the US Senate Environment and Public Works Committee, but has not been taken up by the Senate as a whole. Kerry−Lieberman was released by its sponsors in May 2010 when it appeared that progress on passing Kerry−Boxer had stalled.

Recent developments in the US Senate indicate that the prospects for passage of any cap−and−trade legislation in this Congress are not likely. However, if any of them or similar legislation were to be adopted, our costs of compliance could be material.

In December 2009, the EPA issued a finding that GHG emissions endanger human health and the environment and that emissions from motor vehicles contribute to that endangerment. The EPA's finding required it to begin regulating GHG emissions from motor vehicles and ultimately stationary sources under existing provisions of the federal Clean Air Act. Following its endangerment finding, the EPA took three regulatory actions with respect to the control of GHG emissions. First, in March 2010, the EPA completed a reconsideration of a memorandum issued in December 2008 by then EPA Administrator Stephen Johnson on the issue of when the Clean Air Act's Prevention of Significant Deterioration (PSD) program would apply to newly identified pollutants such as GHG's. The EPA determined that the Clean Air Act's PSD permit requirements would apply when a nation−wide rule requiring the control of a pollutant takes effect. Under this determination, the earliest time that PSD permitting requirements would apply to GHG emissions from stationary sources,

EFIHMW00052476

EFIHMW00051935

**PX 030**
**Page 542 of 734**

Table of Contents
including our power generation facilities, would be January 2011 – the first date that new motor vehicles must meet the new GHG standards. Second, in April 2010, the EPA adopted GHG emission standards for certain new motor vehicles. Third, in June 2010, the EPA finalized its so-called "tailoring rule" that established new thresholds of GHG emissions for the applicability of permits under the Clean Air Act for stationary sources, including our power generation facilities. The EPA's tailoring rule defines the threshold of GHG emissions for determining applicability of the Clean Air Act's permitting programs and PSD program at levels greater than the lower emission thresholds contained in the Clean Air Act. In addition, in September 2009, the EPA issued a final rule requiring the reporting, by March 2011, of calendar year 2010 GHG emissions from specified large GHG emissions sources in the US (such reporting rule would apply to our lignite-fueled generation facilities).

*Sulfur Dioxide, Nitrogen Oxide and Mercury Air Emissions*—Following the invalidation of the Clean Air Interstate Rule (CAIR) by the federal courts in July 2008, the EPA was required to revise CAIR to correct the shortcomings identified by the federal courts. In July 2010, the EPA released a proposed rule called the Clean Air Transport Rule (CATR). The CATR, as proposed, would replace CAIR in 2012 and would require no additional emission reductions for Luminant. However, we cannot predict the impact of a final rule on our business, results of operations and financial condition.

The Clean Air Act requires each state to monitor air quality for compliance with federal health standards. The EPA is required to periodically review, and if appropriate, revise all national ambient quality standards. The standards for ozone are not being achieved in several areas of Texas. The TCEQ adopted State Implementation Plan (SIP) rules in May 2007 to deal with eight-hour ozone standards, which required $NO_x$ emission reductions from certain of our peaking natural gas-fueled units in the Dallas–Fort Worth area. In March 2008, the EPA made the eight-hour ozone standards more stringent. In January 2010, the EPA proposed to further reduce the eight-hour ozone standard and to adopt a secondary standard for the protection of sensitive vegetation from ozone-related damage. Since the EPA projects that SIP rules to address attainment of these new more stringent standards will not be required until December 2013, we cannot yet predict the impact of this action on our generation facilities. In January 2010, the EPA added a new one-hour $NO_x$ National Ambient Air Quality standard that may require actions within Texas to reduce emissions. The TCEQ will be required to revise its monitoring network and submit an implementation plan with compliance required by January 2021/2022. In June 2010, the EPA adopted a new one-hour $SO_2$ national ambient air quality standard that may require action within Texas to reduce $SO_2$ emissions. The TCEQ will be required to conduct modeling and develop an implementation plan by 2014, pursuant to which compliance will be required by 2017, according to the EPA's implementation timeline. We cannot predict the impact of the new standards on our business, results of operations or financial condition until the TCEQ adopts (if required) an implementation plan with respect to the standards.

*Solid Waste, Including Fly Ash Associated with Lignite/Coal-Fueled Generation*—Treatment, storage and disposal of solid and hazardous waste are regulated at the federal and state level. In December 2008, an ash impoundment facility at a Tennessee Valley Authority (TVA) site ruptured, releasing a significant quantity of coal ash slurry. No impoundment failures of this magnitude have ever occurred at any of our impoundments, which are inspected on a regular basis, and we routinely sample groundwater monitoring wells to ensure compliance with all applicable regulations. As a result of the TVA ash impoundment failure, in May 2010, the EPA released a proposed rule that considers regulating coal combustion residuals as either a hazardous waste or a non-hazardous waste. We are unable to predict the requirements of a final rule; however, the potential cost of compliance could be material.

*Oncor Technology Initiatives*—Oncor continues to invest in technology initiatives that include development of a modernized grid through the replacement of existing meters with advanced digital metering equipment and development of advanced digital communication, data management, real-time monitoring and outage detection capabilities. This modernized grid is expected to produce electricity service reliability improvements and provide the potential for additional products and services from REPs that will enable businesses and consumers to better manage their electricity usage and costs. Oncor's plans provide for the full deployment of over three million advanced meters by the end of 2012 to all residential and most non-residential retail electricity customers in Oncor's

B–28

EFIHMW00052477

EFIHMW00051935

**PX 030**
**Page 543 of 734**

**Table of Contents**

service area. The advanced meters can be read remotely, rather than by a meter reader physically visiting the location of each meter. Advanced meters facilitate automated demand side management, which allows consumers to monitor the amount of electricity they are consuming and adjust their electricity consumption habits.

As of June 30, 2010, Oncor has installed approximately 1,085,000 advanced digital meters, including approximately 425,000 during the six months ended June 30, 2010. As the new meters are integrated, Oncor reports 15-minute interval, billing-quality electricity consumption data to ERCOT for market settlement purposes. The data makes it possible for REPs to support new programs and pricing options. Cumulative capital expenditures for the deployment of the advanced meter system totaled $277 million as of June 30, 2010. Oncor expects to complete installations of all 3 million meters by the end of 2012.

*Oncor Matters with the PUCT*—See discussion of these matters, including the awarded construction of CREZ-related transmission lines, below under "Regulation and Rates."

B-29

EFIHMW00052478

EFIHMW00051935

**PX 030**

**Page 544 of 734**

**Table of Contents**
Results of Operations

*Pro Forma Consolidated Financial Results*

As the result of deconsolidation of Oncor Holdings effective 2010, the results of Oncor Holdings are reflected in the 2010 consolidated statement of income as equity in earnings of unconsolidated subsidiary (net of tax) instead of separately as revenues and expenses as they are shown for periods prior to January 1, 2010. The following pro forma results for the three and six months ended June 30, 2009 are presented to provide for a meaningful comparison, along with the analyses on the following pages, of consolidated operating results in consideration of the deconsolidation of Oncor Holdings as discussed in Notes 1 and 3 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010.

|  | Three Months Ended June 30, 2010 | Three Months Ended June 30, 2009 | | |
|  |  | As Reported | Pro Forma Adjustments (a) | Pro Forma |
|  |  | (millions of dollars) | | |
| Operating revenues | $ 1,993 | $ 2,342 | $ (395) | $ 1,947 |
| Fuel, purchased power costs and delivery fees | (1,074) | (700) | (258) | (958) |
| Net gain (loss) from commodity hedging and trading activities | 67 | (248) | — | (248) |
| Operating costs | (229) | (395) | 221 | (174) |
| Depreciation and amortization | (350) | (423) | 132 | (291) |
| Selling, general and administrative expenses | (185) | (270) | 44 | (226) |
| Franchise and revenue–based taxes | (26) | (79) | 58 | (21) |
| Other income | 211 | 13 | (10) | 3 |
| Other deductions | (7) | (7) | 1 | (6) |
| Interest income | — | 11 | 1 | 12 |
| Interest expense and related charges | (1,122) | (431) | 76 | (355) |
| | | | | |
| Income (loss) before income taxes and equity in earnings of unconsolidated subsidiaries | (722) | (187) | (130) | (317) |
| Income tax (expense) benefit | 237 | 48 | 48 | 96 |
| Equity in earnings of unconsolidated subsidiaries (net of tax) | 59 | — | 66 | 66 |
| | | | | |
| Net income (loss) | (426) | (139) | (16) | (155) |
| Net income attributable to noncontrolling interests | — | (16) | 16 | — |
| | | | | |
| Net income (loss) attributable to EFH Corp. | $ (426) | $ (155) | $ — | $ (155) |

———————
(a)  All pro forma adjustments relate to Oncor Holdings and result in the presentation of the investment in Oncor Holdings under the equity method of accounting for the three months ended June 30, 2009.

B–30

EFIHMW00052479

EFIHMW00051935

Table of Contents

|  | Six Months Ended June 30, 2010 | Six Months Ended June 30, 2009 | | |
|---|---|---|---|---|
|  |  | As Reported | Pro Forma Adjustments (a) | Pro Forma |
|  |  | (millions of dollars) | | |
| Operating revenues | $ 3,992 | $ 4,481 | $ (766) | $ 3,715 |
| Fuel, purchased power costs and delivery fees | (2,121) | (1,301) | (500) | (1,801) |
| Net gain from commodity hedging and trading activities | 1,280 | 880 | — | 880 |
| Operating costs | (426) | (783) | 441 | (342) |
| Depreciation and amortization | (692) | (830) | 258 | (572) |
| Selling, general and administrative expenses | (373) | (516) | 88 | (428) |
| Franchise and revenue-based taxes | (49) | (165) | 118 | (47) |
| Impairment of goodwill | — | (90) | — | (90) |
| Other income | 244 | 26 | (20) | 6 |
| Other deductions | (18) | (18) | 4 | (14) |
| Interest income | 9 | 12 | 2 | 14 |
| Interest expense and related charges | (2,074) | (1,096) | 150 | (946) |
| Income (loss) before income taxes and equity in earnings of unconsolidated subsidiaries | (228) | 600 | (225) | 375 |
| Income tax (expense) benefit | 35 | (285) | 85 | (200) |
| Equity in earnings of unconsolidated subsidiaries (net of tax) | 122 | — | 112 | 112 |
| Net income (loss) | (71) | 315 | (28) | 287 |
| Net income attributable to noncontrolling interests | — | (28) | 28 | — |
| Net income (loss) attributable to EFH Corp. | $ (71) | $ 287 | $ — | $ 287 |

(a)    All pro forma adjustments relate to Oncor Holdings and result in the presentation of the investment in Oncor Holdings under the equity method of accounting for the six months ended June 30, 2009.

*Consolidated Financial Results—Three Months Ended June 30, 2010 Compared to Pro Forma Three Months Ended June 30, 2009*

See comparison of results of the Competitive Electric segment for discussion of variances in: operating revenues; fuel, purchased power costs and delivery fees; net gain (loss) from commodity hedging and trading activities, operating costs; depreciation and amortization, and franchise and revenue–based taxes.

SG&A expenses decreased $41 million, or 18%, to $185 million in 2010. The decline reflected decreases in both the Competitive Electric segment and Corporate and Other and was driven by $30 million in lower transition costs associated with outsourced support services and the retail customer information system implemented in 2009.

Other income totaled $211 million in 2010 and $3 million in 2009. The 2010 amount included debt extinguishment gains totaling $129 million (see discussion of debt exchanges and repurchases in Note 6 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010), a $44 million gain on sale of land and related water rights and a $30 million gain on sale of interests in a natural gas gathering pipeline business. See Note 16 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010 for details of other income and deductions.

Interest income totaled $12 million in 2009 primarily representing interest on $465 million in collateral under a funding arrangement described in Note 11 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010.

B–31

EFIHMW00052480

EFIHMW00051935

**PX 030**
**Page 546 of 734**

Table of Contents

Interest expense and related charges increased $767 million to $1.122 billion in 2010 reflecting a $254 million unrealized mark−to−market net loss related to interest rate swaps in 2010 compared to a $460 million net gain in 2009 and a $63 million decrease in capitalized interest due to completion of certain new generation facility construction activities, partially offset by a $20 million decrease in noncash amortization of losses on interest rate swaps dedesignated as cash flow hedges. See Note 16 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010.

Income tax benefit totaled $237 million in 2010 compared to $96 million in 2009. The effective tax rate was 32.8% and 30.3% in 2010 and 2009, respectively. The increase in the rate reflects the effect of ongoing accruals of interest on uncertain tax positions on a significantly higher pre−tax loss in 2010.

Equity in earnings of unconsolidated subsidiaries (net of tax) totaled $59 million in 2010 compared to $66 million in 2009 reflecting a $6 million decline (which is before the effect of noncontrolling interests) in Oncor's net income. The decrease was driven by timing differences in recognizing increased revenues and expenses resulting from Oncor's August 2009 rate case order.

Net loss attributable to EFH Corp. increased $271 million to $426 million in 2010.

- Net loss in the Competitive Electric segment increased $349 million to $427 million.

- Earnings from the Regulated Delivery segment decreased $7 million to $59 million as discussed above.

- Corporate and Other net expenses (after−tax) totaled $58 million in 2010 and $143 million in 2009. The amounts in 2010 and 2009 include recurring interest expense on outstanding debt and notes payable to subsidiaries, as well as corporate general and administrative expenses. The decrease of $85 million reflected debt extinguishment gains totaling $83 million and $19 million in lower SG&A expense primarily reflecting lower transition costs associated with outsourced support services and costs allocated to the competitive operations effective 2010, partially offset by a $21 million increase in interest expense driven by higher borrowings (all amounts after−tax).

*Consolidated Financial Results—Six Months Ended June 30, 2010 Compared to Pro Forma Six Months Ended June 30, 2009*

See comparison of results of the Competitive Electric segment for discussion of variances in: operating revenues; fuel, purchased power costs and delivery fees; net gain from commodity hedging and trading activities, operating costs; depreciation and amortization, and franchise and revenue−based taxes.

SG&A expenses decreased $55 million, or 13%, to $373 million in 2010 driven by $46 million in lower transition costs associated with outsourced support services and the retail customer information system implemented in 2009.

The $90 million impairment of goodwill recorded in 2009 largely related to the Competitive Electric segment and resulted from the completion of fair value calculations supporting a goodwill impairment charge recorded in the fourth quarter of 2008 as discussed in Note 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009.

Other income totaled $244 million in 2010 and $6 million in 2009. The 2010 amount included debt extinguishment gains totaling $143 million (see discussion of debt exchanges and repurchases in Note 6 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010), a $44 million gain on sale of land and related water rights and a $37 million gain on sale of interests in a natural gas gathering pipeline business. See Note 16 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010 for details of other income and deductions.

B−32

EFIHMW00052481

EFIHMW00051935

Table of Contents

Interest income decreased $5 million, or 36%, to $9 million in 2010 reflecting lower interest in 2010 on $465 million in collateral under a funding arrangement, due to settlement of the arrangement as described in Note 11 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010.

Interest expense and related charges increased $1.128 billion to $2.074 billion in 2010 reflecting a $361 million unrealized mark–to–market net loss related to interest rate swaps in 2010 compared to a $665 million net gain in 2009 and a $126 million decrease in capitalized interest due to completion of certain new generation facility construction activities, partially offset by $31 million in decreased noncash amortization of losses on interest rate swaps dedesignated as cash flow hedges. See Note 16 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010.

Income tax benefit totaled $35 million in 2010 compared to income tax expense of $200 million in 2009. The effective tax rate was 15.4% and 53.3% in 2010 and 2009, respectively. The decrease in the rate reflects the impact of the nondeductible goodwill impairment of $90 million in 2009, which increased the rate 10.3 percentage points in 2009 and the effect of the $8 million deferred tax charge in 2010 related to the Patient Protection and Affordable Care Act (see Note 13 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010). In addition, interest accrued on uncertain tax positions increased the rate on income in 2009 and decreased the rate on the loss in 2010.

Equity in earnings of unconsolidated subsidiaries (net of tax) totaled $122 million in 2010 compared to $112 million in 2009 reflecting a $15 million increase (which is before the effect of noncontrolling interests) in Oncor's net income. The increase was driven by the effects of higher average consumption on revenues, primarily due to colder winter weather, partially offset by timing differences in recognizing increased revenues and expenses resulting from Oncor's 2009 rate case order.

Net earnings attributable to EFH Corp. decreased $358 million to a loss of $71 million in 2010.

- Net income in the Competitive Electric segment decreased $474 million to $5 million.

- Earnings from the Regulated Delivery segment increased $10 million to $122 million as discussed above.

- Corporate and Other net expenses (after–tax) totaled $198 million in 2010 and $304 million in 2009. The amounts in 2010 and 2009 include recurring interest expense on outstanding debt and notes payable to subsidiaries, as well as corporate general and administrative expenses. The decrease of $106 million reflected a $93 million debt extinguishment gain, $35 million in lower SG&A expense primarily reflecting lower transition costs associated with outsourced support services and costs allocated to the competitive operations effective 2010 and $20 million goodwill impairment charge in 2009, partially offset by a $32 million increase in interest expense driven by higher borrowings and an $8 million deferred tax charge due to the implementation of the Patient Protection and Affordable Care Act (all amounts after–tax).

*Non–GAAP Earnings Measures*

In communications with investors, we use a non–GAAP earnings measure that reflects adjustments to earnings reported in accordance with US GAAP in order to review underlying operating performance. These adjusting items, which are generally noncash, consist of unrealized mark–to–market gains and losses, impairment charges, debt extinguishment gains and other charges, credits or gains that are unusual or nonrecurring. All such items and related amounts are disclosed elsewhere herein and in our annual report on Form 10–K and quarterly reports on Form 10–Q. Our communications with investors also reference "adjusted EBITDA," which is a non–GAAP measure used in calculation of ratios in covenants of certain of our debt securities (see "Financial Covenants, Credit Rating Provisions and Cross Default Provisions" below).

B–33

EFIHMW00052482

EFIHMW00051935

**Table of Contents**
*Competitive Electric Segment*

*Financial Results*

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 |
| Operating revenues | $ 1,993 | $ 1,945 | $ 3,992 | $ 3,711 |
| Fuel, purchased power costs and delivery fees | (1,074) | (957) | (2,121) | (1,800) |
| Net gain (loss) from commodity hedging and trading activities | 67 | (248) | 1,280 | 880 |
| Operating costs | (229) | (174) | (426) | (343) |
| Depreciation and amortization | (345) | (283) | (681) | (559) |
| Selling, general and administrative expenses | (180) | (192) | (363) | (363) |
| Franchise and revenue–based taxes | (26) | (22) | (49) | (46) |
| Impairment of goodwill | | | | (70) |
| Other income | 76 | 2 | 89 | 5 |
| Other deductions | (5) | (5) | (11) | (16) |
| Interest income | 21 | 12 | 42 | 19 |
| Interest expense and related charges | (948) | (191) | (1,721) | (617) |
| Income (loss) before income taxes | (650) | (113) | 31 | 801 |
| Income tax (expense) benefit | 223 | 35 | (26) | (322) |
| Net income (loss) | $ (427) | $ (78) | $ 5 | $ 479 |

*Competitive Electric Segment*

*Sales Volume and Customer Count Data*

| | Three Months Ended June 30, | | % Change | Six Months Ended June 30, | | % Change |
|---|---|---|---|---|---|---|
| | 2010 | 2009 | | 2010 | 2009 | |
| **Sales volumes:** | | | | | | |
| Retail electricity sales volumes—(GWh): | | | | | | |
| Residential | 6,848 | 7,084 | (3.3) | 13,568 | 12,964 | 4.7 |
| Small business (a) | 1,993 | 1,908 | 4.5 | 3,974 | 3,629 | 9.5 |
| Large business and other customers | 3,925 | 3,551 | 10.5 | 7,444 | 6,857 | 8.6 |
| Total retail electricity | 12,766 | 12,543 | 1.8 | 24,986 | 23,450 | 6.6 |
| Wholesale electricity sales volumes | 10,985 | 10,262 | 7.0 | 23,348 | 20,053 | 16.4 |
| Net sales (purchases) of balancing electricity to/from ERCOT | 925 | (112) | — | 270 | (265) | — |
| Total sales volumes | 24,676 | 22,693 | 8.7 | 48,604 | 43,238 | 12.4 |
| Average volume (kWh) per residential customer (b): | 3,723 | 3,688 | 0.9 | 7,351 | 6,777 | 8.5 |
| **Weather (North Texas average)—percent of normal (c):** | | | | | | |
| Cooling degree days | 117.2% | 105.3% | 11.3 | 115.1% | 111.6% | 3.1 |
| Heating degree days | 63.5% | 143.2% | (55.7) | 131.9% | 93.3% | 41.4 |
| **Customer counts:** | | | | | | |
| Retail electricity customers (end of period and in thousands) (d): | | | | | | |
| Residential | | | | 1,830 | 1,911 | (4.2) |
| Small business (a) | | | | 241 | 279 | (13.6) |
| Large business and other customers | | | | 22 | 21 | 4.8 |
| Total retail electricity customers | | | | 2,093 | 2,211 | (5.3) |

B–34

EFIHMW00052483

EFIHMW00051935

**Table of Contents**

(a)   Customers with demand of less than 1 MW annually.
(b)   Calculated using average number of customers for the period.
(c)   Weather data is obtained from Weatherbank, Inc., an independent company that collects and archives weather data from reporting stations of the
       National Oceanic and Atmospheric Administration (a federal agency under the US Department of Commerce). Normal is defined as the average over
       a 10-year period.
(d)   Based on number of meters. Typically, large business and other customers have more than one meter; therefore, number of meters does not reflect the
       number of individual customers.

*Competitive Electric Segment*

*Revenue and Commodity Hedging and Trading Activities*

| | Three Months Ended June 30, | | % Change | Six Months Ended June 30, | | % Change |
|---|---|---|---|---|---|---|
| | 2010 | 2009 | | 2010 | 2009 | |
| **Operating revenues:** | | | | | | |
| Retail electricity revenues: | | | | | | |
| Residential | $ 906 | $ 984 | (7.9) | $1,776 | $1,776 | — |
| Small business (a) | 263 | 295 | (10.8) | 529 | 558 | (5.2) |
| Large business and other customers | 307 | 310 | (1.0) | 592 | 625 | (5.3) |
| Total retail electricity revenues | 1,476 | 1,589 | (7.1) | 2,897 | 2,959 | (2.1) |
| Wholesale electricity revenues (b) | 425 | 314 | 35.4 | 970 | 663 | 46.3 |
| Net sales (purchases) of balancing electricity to/from ERCOT | 24 | (22) | — | (17) | (45) | 62.2 |
| Amortization of intangibles (c) | 3 | 1 | — | 2 | (10) | — |
| Other operating revenues | 65 | 63 | 3.2 | 140 | 144 | (2.8) |
| Total operating revenues | $ 1,993 | $ 1,945 | 2.5 | $3,992 | $3,711 | 7.6 |
| **Net gain (loss) from commodity hedging and trading activities:** | | | | | | |
| Unrealized net gains (losses) from changes in fair value | $ 73 | $ (265) | — | $1,276 | $ 890 | 43.4 |
| Unrealized net losses representing reversals of previously recognized fair values of positions settled in the current period | (235) | (35) | — | (460) | (141) | — |
| Realized net gains on settled positions | 229 | 52 | — | 464 | 131 | — |
| Total gain (loss) | $ 67 | $ (248) | — | $1,280 | $ 880 | 45.5 |

(a)   Customers with demand of less than 1 MW annually.
(b)   Upon settlement of physical derivative power sales and purchase contracts that are marked-to-market in net income, wholesale electricity revenues
       and fuel and purchased power costs are reported at approximated market prices, as required by accounting rules, instead of the contract price. As a
       result, these line item amounts include a noncash component, which the company considers "unrealized." (The offsetting differences between contract
       and market prices are reported in net gain (loss) from commodity hedging and trading activities.) These amounts are as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 |
| Reported in revenues | $ (14) | $ (63) | $ (32) | $ (123) |
| Reported in fuel and purchased power costs | 31 | 43 | 64 | 84 |
| Net gain (loss) | $ 17 | $ (20) | $ 32 | $ (39) |

(c)   Represents amortization of the intangible net asset value of retail and wholesale power sales agreements resulting from purchase accounting.

B-35

EFIHMW00052484

EFIHMW00051935

**Table of Contents**

*Competitive Electric Segment*

*Production, Purchased Power and Delivery Cost Data*

| | Three Months Ended June 30, | | % Change | Six Months Ended June 30, | | % Change |
|---|---|---|---|---|---|---|
| | 2010 | 2009 | | 2010 | 2009 | |
| **Fuel, purchased power costs and delivery fees ($ millions):** | | | | | | |
| Nuclear fuel | $ 35 | $ 37(f) | (5.4) | $ 73 | $ 75(f) | (2.7) |
| Lignite/coal | 209 | 147 | 42.2 | 432 | 299 | 44.5 |
| Total baseload fuel | 244 | 184 | 32.6 | 505 | 374 | 35.0 |
| Natural gas fuel and purchased power (a) | 390 | 302 | 29.1 | 714 | 521 | 37.0 |
| Amortization of intangibles (b) | 37 | 62(f) | (40.3) | 80 | 123(f) | (35.0) |
| Other costs | 42 | 49 | (14.3) | 106 | 107 | (0.9) |
| Fuel and purchased power costs | 713 | 597 | 19.4 | 1,405 | 1,125 | 24.9 |
| Delivery fees (c) | 361 | 360 | 0.3 | 716 | 675 | 6.1 |
| Total | $ 1,074 | $ 957 | 12.2 | $ 2,121 | $ 1,800 | 17.8 |
| **Fuel and purchased power costs (which excludes generation plant operating costs) per MWh:** | | | | | | |
| Nuclear fuel | $ 7.80 | $ 7.36(f) | 6.0 | $ 7.68 | $ 7.26(f) | 5.8 |
| Lignite/coal (d) | 19.49 | 16.03 | 21.6 | 19.76 | 16.47 | 20.0 |
| Natural gas fuel and purchased power | 44.32 | 39.31 | 12.7 | 46.25 | 41.14 | 12.4 |
| Delivery fees per MWh | $ 28.18 | $ 28.44 | (0.9) | $ 28.57 | $ 28.51 | 0.2 |
| **Production and purchased power volumes (GWh):** | | | | | | |
| Nuclear | 4,527 | 5,103 | (11.3) | 9,539 | 10,293 | (7.3) |
| Lignite/coal | 12,479 | 10,450 | 19.4 | 25,297 | 20,705 | 22.2 |
| Total baseload generation | 17,006 | 15,553 | 9.3 | 34,836 | 30,998 | 12.4 |
| Natural gas–fueled generation | 464 | 775 | (40.1) | 836 | 1,033 | (19.1) |
| Purchased power | 8,344 | 6,904 | 20.9 | 14,600 | 11,633 | 25.5 |
| Total energy supply | 25,814 | 23,232 | 11.1 | 50,272 | 43,664 | 15.1 |
| Less line loss and power imbalances (e) | 1,138 | 539 | — | 1,668 | 426 | — |
| Net energy supply volumes | 24,676 | 22,693 | 8.7 | 48,604 | 43,238 | 12.4 |
| **Baseload capacity factors:** | | | | | | |
| Nuclear | 90.1% | 101.8% | (11.5) | 95.5% | 103.2% | (7.5) |
| Lignite/coal | 74.1% | 82.0% | (9.6) | 78.1% | 81.7% | (4.4) |
| Total baseload | 78.0% | 87.6% | (11.0) | 82.3% | 87.8% | (6.3) |

(a) See note (b) on previous page.
(b) Represents amortization of the intangible net asset values of emission credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel resulting from purchase accounting.
(c) Includes delivery fee charges from Oncor.
(d) Includes depreciation and amortization of lignite mining assets, which is reported in the depreciation and amortization expense line item, but is part of overall fuel costs.
(e) Includes physical purchases and sales, the financial results of which are reported in commodity hedging and trading activities in the income statement.
(f) Reflects reclassification to correct amortization.

B–36

EFIHMW00052485

EFIHMW00051935

**PX 030**
**Page 551 of 734**

Table of Contents
*Competitive Electric Segment—Financial Results—Three Months Ended June 30, 2010 Compared to Three Months Ended June 30, 2009*

Operating revenues increased $48 million, or 2%, to $1.993 billion in 2010.

Wholesale electricity revenues increased $111 million, or 35%, to $425 million in 2010 as compared to 2009 when revenues decreased 70%. An 8% increase in average wholesale electricity prices, reflecting higher natural gas prices and market heat rates, increased revenues by $34 million. A 7% increase in wholesale electricity sales volumes, reflecting production from the new generation units, increased revenue $27 million. The balance of the revenue increase reflected a decrease in unrealized losses related to physical derivative commodity sales contracts as discussed in footnote (b) to the "Revenue and Commodity Hedging and Trading Activities" table above.

Bilateral electricity contracting activity includes hedging transactions that utilize contracts for physical delivery. Wholesale sales and purchases of electricity are reported gross in the income statement if the transactions are scheduled for physical delivery with ERCOT.

Comparisons of wholesale balancing activity, reported net, are generally not meaningful because the activity represents intraday purchases and sales transactions with ERCOT for real–time balancing purposes, as measured in 15–minute intervals, which are highly variable.

Retail electricity revenues decreased $113 million, or 7%, to $1.476 billion and reflected the following:

- Lower average pricing decreased revenues by $141 million driven by the contract business market and also reflecting lower residential pricing. Lower average pricing in both business and residential markets is reflective of competitive activity and a change in customer mix.

- A 2% increase in sales volumes increased revenues by $28 million reflecting an increase in the business markets, partially offset by a decrease in the residential market. An 8% increase in business markets sales volumes reflected a change in customer mix and improved economic activity. A 3% decrease in residential sales volumes reflected a 4% decline in customer count that was driven by competitive activity.

Fuel, purchased power costs and delivery fees increased $117 million, or 12%, to $1.074 billion in 2010. Higher purchased power costs contributed $91 million to the increase and reflected increased volumes driven by unplanned outages of the new lignite–fueled units and a planned nuclear–fueled unit outage, as well as higher prices driven by the effect of higher natural gas prices and market heat rates as discussed above regarding wholesale revenues. Other factors contributing to the increase included $32 million in lignite fuel costs related to production from the new generation units at Oak Grove and Sandow and $30 million in higher lignite/coal costs at existing plants, reflecting higher purchased coal commodity and transportation costs. These increases were partially offset by $25 million in lower amortization of the intangible net asset values (including the stepped–up value of nuclear fuel) resulting from purchase accounting.

Overall baseload generation production increased 9% in 2010 reflecting a 19% increase in lignite/coal–fueled production, driven by the production in 2010 from the new generation units, partially offset by an 11% decrease in nuclear production reflecting year–to–year timing differences of planned outages.

Following is an analysis of amounts reported as net gain (loss) from commodity hedging and trading activities for the three months ended June 30, 2010 and 2009, which totaled a net gain of $67 million and a net loss of $248 million, respectively:

*Three Months Ended June 30, 2010*—Unrealized mark–to–market net losses totaling $162 million included:

- $149 million in net losses related to hedge positions, which includes $74 million in net gains from changes in fair value, $3 million in day one gains related to commodity hedging positions and $226 million in net losses that represent reversals of previously recorded net gains on positions settled in the period, and

B–37

EFIHMW00052486

EFIHMW00051935

Table of Contents

- $13 million in net losses related to trading positions, which includes $4 million in net losses from changes in fair value and $9 million in net losses that represent reversals of previously recorded net gains on positions settled in the period.

Realized net gains totaling $229 million included:

- $222 million in net gains related to positions that primarily hedged electricity revenues recognized in the period, largely related to the long-term hedging program, and

- $7 million in net gains related to trading positions.

*Three Months Ended June 30, 2009*—Unrealized mark-to-market net losses totaling $300 million included:

- $328 million in net losses related to hedge positions, which includes $272 million in net losses from changes in fair value, a $3 million day one loss related to a commodity hedging position (see Note 11 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010) and $53 million in net losses that represent reversals of previously recorded net gains on positions settled in the period, and

- $28 million in net gains related to trading positions, which includes $10 million in net gains from changes in fair value and $18 million in net gains that represent reversals of previously recorded net losses on positions settled in the period.

Realized net gains totaling $52 million included:

- $64 million in net gains related to positions that primarily hedged electricity revenues recognized in the period, largely related to the long-term hedging program, and

- $12 million in net losses related to trading positions.

Unrealized gains and losses that are related to physical derivative commodity contracts and are reported as revenues and purchased power costs, as required by accounting rules, totaled $17 million in net gains in 2010 and $20 million in net losses in 2009.

Operating costs increased $55 million, or 32%, to $229 million in 2010. The increase reflected $25 million in incremental expense related to the new generation units. The increase also reflects $17 million in higher costs due to the year-to-year timing of planned refueling outages at the Comanche Peak nuclear-fueled plant, $4 million in higher maintenance costs for legacy lignite/coal-fueled operations, $3 million in higher property taxes and $6 million in various other operating cost variances.

Depreciation and amortization increased $62 million, or 22%, to $345 million in 2010. The increase reflected $45 million in incremental expense related to the new generation units and associated mining operations. The balance of the increase was driven by equipment additions and changes in depreciation rate estimates related to pending equipment retirements.

SG&A expenses decreased $12 million, or 6%, to $180 million in 2010. The decrease reflected $15 million in lower transition costs associated with outsourced services and the retail customer information management system implemented in 2009, $3 million in lower employee-related costs, $3 million related to accounts receivable securitization program fees that are reported as interest expense and related charges in 2010 (see Note 5 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010) and $11 million of various other cost reductions, partially offset by $12 million of new costs in 2010 allocated from corporate, principally fees paid to the Sponsor Group and $8 million in higher marketing expenses.

Other income totaled $76 million in 2010 and $2 million in 2009. Other income in 2010 includes a $44 million gain on the sale of land and related water rights and a $30 million gain on the sale of interests in a natural gas gathering pipeline business.

B-38

EFIHMW00052487

EFIHMW00051935

Table of Contents
Interest income increased $9 million, or 75%, to $21 million in 2010 reflecting higher notes receivable balances from affiliates.

Interest expense and related charges increased by $757 million to $948 million in 2010 reflecting a $254 million unrealized mark–to–market net loss related to interest rate swaps in 2010 compared to a $460 million net gain in 2009 and a $63 million decrease in capitalized interest due to completion of certain new generation facility construction activities, partially offset by a $20 million decrease in noncash amortization of losses on interest rate swaps dedesignated as cash flow hedges.

Income tax benefit totaled $223 million in 2010 compared to income tax benefit of $35 million in 2009. The effective tax rate was 34.3% and 31.0% on losses in 2010 and 2009, respectively. The increase in the effective rate reflects the effect of ongoing accruals of interest on uncertain tax positions.

Net loss for the segment increased $349 million to $427 million in 2010 reflecting higher interest expense and related charges, partially offset by higher realized net gains and lower unrealized net losses related to commodity hedging activities and higher baseload generation.

*Competitive Electric Segment—Financial Results—Six Months Ended June 30, 2010 Compared to Six Months Ended June 30, 2009*

Operating revenues increased $281 million, or 8%, to $3.992 billion in 2010.

Wholesale electricity revenues increased $307 million, or 46%, to $970 million in 2010 as compared to 2009 when revenues decreased 60%. A 16% increase in wholesale electricity sales volumes, reflecting production from the new generation units, increased revenues by $129 million. A 10% increase in average wholesale electricity prices, reflecting higher natural gas prices and market heat rates, increased revenues by $87 million. The balance of the revenue increase reflected a decrease in unrealized losses related to physical derivative commodity sales contracts as discussed in footnote (b) to the "Revenue and Commodity Hedging and Trading Activities" table above.

Retail electricity revenues decreased $62 million, or 2%, to $2.897 billion and reflected the following:

* Lower average pricing decreased revenues by $256 million driven by the contract business market and also reflecting lower residential pricing. Lower average pricing in both business and residential markets is reflective of competitive activity and a change in customer mix.

* A 7% increase in sales volumes increased revenues by $194 million reflecting increases in both the residential and business markets. A 9% increase in business markets sales volumes reflected a change in customer mix, the impact of colder winter weather and improved economic activity. Higher average consumption resulted in a 5% overall increase in residential sales volumes, reflecting colder than normal winter weather in 2010 compared to warmer than normal winter weather in 2009, partially offset by a decline in residential customer counts.

The change in operating revenues also reflected a $12 million decrease in amortization of intangible assets arising from purchase accounting reflecting expiration of retail sales contracts.

Fuel, purchased power costs and delivery fees increased $321 million, or 18%, to $2.121 billion in 2010. Higher purchased power costs contributed $166 million to the increase and reflected increased volumes driven by outages of the new lignite–fueled units and the nuclear facility and higher retail demand, as well as higher prices driven by the effect of higher natural gas prices and market heat rates as discussed above regarding wholesale revenues. Other factors contributing to the increase included $70 million in lignite fuel costs related to production from the new generation units at Oak Grove and Sandow, $63 million in higher lignite/coal costs at existing plants, reflecting higher purchased coal commodity and transportation costs, $41 million in higher

B–39

EFIHMW00052488

EFIHMW00051935

**Table of Contents**

delivery fees, reflecting increased retail sales volumes and tariffs and $26 million in higher fuel costs for natural gas–fueled generation driven by higher prices. These increases were partially offset by $43 million in lower amortization of the intangible net asset values (including the stepped–up value of nuclear fuel) resulting from purchase accounting.

Overall baseload generation production increased 12% in 2010 reflecting a 22% increase in lignite/coal–fueled production, driven by the production in 2010 from the new generation units, partially offset by a 7% decrease in nuclear–fueled production. The decrease in nuclear–fueled production was due to an unplanned transformer outage in January 2010 and year–to–year timing differences of planned refueling outages.

Following is an analysis of amounts reported as net gain from commodity hedging and trading activities for the six months ended June 30, 2010 and 2009, which totaled $1.280 billion and $880 million, respectively:

*Six Months Ended June 30, 2010*—Unrealized mark–to–market net gains totaling $816 million included:

- $814 million in net gains related to hedge positions, which includes $1.249 billion in net gains from changes in fair value, $3 million in day one gains related to commodity hedging positions and $438 million in net losses that represent reversals of previously recorded net gains on positions settled in the period, and

- $2 million in net gains related to trading positions, which includes $23 million in net gains from changes in fair value, a $1 million day one gain related to a trading position and $22 million in net losses that represent reversals of previously recorded net gains on positions settled in the period.

Realized net gains totaling $464 million included:

- $431 million in net gains related to positions that primarily hedged electricity revenues recognized in the period, largely related to the long–term hedging program, and

- $33 million in net gains related to trading positions.

*Six Months Ended June 30, 2009*—Unrealized mark–to–market net gains totaling $749 million included:

- $754 million in net gains related to hedge positions, which includes $892 million in net gains from changes in fair value, a $3 million day one loss related to a commodity hedging position and $135 million in net losses that represent reversals of previously recorded fair values of positions settled in the period, and

- $5 million in net losses related to trading positions, which includes $1 million in net gains from changes in fair value and $6 million in net losses that represent reversals of previously recorded fair values of positions settled in the period.

Realized net gains totaling $131 million include:

- $137 million in net gains related to positions that primarily hedged electricity revenues recognized in the period, largely related to the long–term hedging program, and

- $6 million in net losses related to trading positions.

Unrealized gains and losses that are related to physical derivative commodity contracts and are reported as revenues and purchased power costs, as required by accounting rules, totaled $32 million in net gains in 2010 and $39 million in net losses in 2009.

Operating costs increased $83 million, or 24%, to $426 million in 2010. The increase reflected $45 million in incremental expense related to the new generation units. The increase also reflects $25 million in outage–related costs at the Comanche Peak nuclear–fueled plant reflecting year–to–year timing of planned outage maintenance costs and the first quarter 2010 unplanned transformer related outage, $7 million in higher lignite/coal maintenance costs for legacy operations and $6 million in various other operating cost variances.

B–40

EFIHMW00052489

EFIHMW00051935

**Table of Contents**

Depreciation and amortization increased $122 million, or 22%, to $681 million in 2010. The increase reflected $80 million in incremental expense related to the new generation units and associated mining operations. The balance of the increase was driven by equipment additions and changes in depreciation rate estimates related to pending equipment retirements.

SG&A expenses totaled $363 million in both 2010 and 2009 and reflected:

- $23 million of new costs in 2010 allocated from corporate, principally fees paid to the Sponsor Group;

- $15 million in increased bad debt expense in 2010 for retail operations primarily associated with residential customers, reflecting higher delinquencies due to delays in final bills and disconnects resulting from a system conversion, customer losses and general economic conditions, and

- $9 million of higher marketing expenses in 2010;

offset by:

- $23 million in lower transition costs associated with outsourced services and the retail customer information management system implemented in 2009;

- $10 million in lower employee compensation–related expense in 2010;

- $6 million of accounts receivable securitization program fees that are reported in 2010 as interest expense and related charges (see Note 5 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010), and

- $8 million of various other cost reductions.

The $70 million impairment of goodwill recorded in 2009 resulted from the completion of fair value calculations supporting a goodwill impairment charge recorded in the fourth quarter of 2008 as discussed in Note 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009.

Other income totaled $89 million in 2010 and $5 million in 2009. Other income in 2010 includes a $44 million gain on the sale of land and related water rights, a $37 million gain associated with the sale of interests in a natural gas gathering pipeline business (see Note 16) and a $5 million refund of sales taxes related to prior years. Other deductions totaled $11 million in 2010 and $16 million in 2009 reflecting lower severance charges in 2010.

Interest income increased $23 million to $42 million in 2010 reflecting higher notes receivable balances from affiliates.

Interest expense and related charges increased by $1.104 billion to $1.721 billion in 2010 reflecting a $361 million unrealized mark–to–market net loss related to interest rate swaps in 2010 compared to a $665 million net gain in 2009 and a $126 million decrease in capitalized interest due to completion of certain new generation facility construction activities, partially offset by a $31 million decrease in noncash amortization of losses on interest rate swaps dedesignated as cash flow hedges and $18 million in lower average rates.

Income tax expense totaled $26 million in 2010 compared to $322 million in 2009. The effective rate was 83.9% and 40.2% in 2010 and 2009, respectively. The increase in the effective tax rate reflects the effect of interest accrued on uncertain tax positions on a significantly lower pretax income base in 2010 compared to 2009, partially offset by the impact of the nondeductible goodwill impairment of $70 million in 2009, which increased the rate approximately three percentage points.

Net income for the segment decreased $474 million in 2010 to $5 million reflecting higher interest expense and related charges, partially offset by higher realized net gains related to commodity hedging activities, the charge for impairment of goodwill in 2009 and higher baseload generation.

B–41

EFIHMW00052490

EFIHMW00051935

**PX 030**
**Page 556 of 734**

Table of Contents
*Energy–Related Commodity Contracts and Mark–to–Market Activities*

The table below summarizes the changes in commodity contract assets and liabilities for the six months ended June 30, 2010 and 2009. The net change in these assets and liabilities, excluding "other activity" as described below, represents the pretax effect on earnings of positions in the commodity contract portfolio that are marked–to–market in net income (see Note 11 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010). The portfolio consists primarily of economic hedges but also includes trading positions.

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2010 | 2009 |
| Commodity contract net asset at beginning of period | $ 1,718 | $ 430 |
| Settlements of positions (a) | (428) | (181) |
| Changes in fair value (b) | 1,276 | 890 |
| Other activity (c) | 44 | 40 |
| Commodity contract net asset at end of period (d) | $ 2,610 | $ 1,179 |

(a) Represents reversals of previously recognized unrealized gains and losses upon settlement (offsets realized gains and losses recognized in the settlement period).

(b) Represents unrealized gains and losses recognized, primarily related to positions in the long–term hedging program (see discussion above under "Long–Term Hedging Program").

(c) These amounts do not represent unrealized gains or losses. Includes initial values of positions involving the receipt or payment of cash or other consideration, generally related to options purchased/sold and physical natural gas exchange transactions. 2010 amount includes $46 million related to net payment of option premiums and $10 million related to settlement of a power sales agreement, partially offset by $12 million for expired option premiums. 2009 amount includes $7 million related to net payment of option premiums, $29 million in natural gas provided under physical gas exchange transactions and $7 million related to settlement of a certain power sales agreement, partially offset by $3 million for expired option premiums.

(d) 2010 amount excludes $2 million in net derivative liability related to cash flow hedge positions not marked–to–market in net income. See Note 11 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010 for additional discussion of commodity contracts assets and liabilities.

Unrealized gains and losses related to commodity contracts are summarized as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2010 | 2009 | 2010 | 2009 |
| Unrealized gains/(losses) related to contracts marked–to–market | $ (145) | $ (321) | $848 | $709 |
| Ineffectiveness gains/losses related to cash flow hedges | — | 1 | — | 1 |
| Total unrealized gains (losses) related to commodity contracts | $ (145) | $ (320) | $848 | $710 |

B–42

EFIHMW00052491

EFIHMW00051935

**Table of Contents**

*Maturity Table*—The following table presents the net commodity contract asset arising from recognition of fair values under mark-to-market accounting as of June 30, 2010, scheduled by the source of fair value and contractual settlement dates of the underlying positions.

| | Maturity dates of unrealized commodity contract asset at June 30, 2010 | | | | |
| | Less than 1 year | 1–3 years | 4–5 years | Excess of 5 years | Total |
|---|---|---|---|---|---|
| Source of fair value | | | | | |
| Prices actively quoted | $ (102) | $ (54) | $ — | $ — | $ (156) |
| Prices provided by other external sources | 964 | 1,447 | 186 | — | 2,597 |
| Prices based on models | 32 | (6) | 316 | (173) | 169 |
| Total | $ 894 | $ 1,387 | $ 502 | $ (173) | $2,610 |
| Percentage of total fair value | 34% | 53% | 19% | (6)% | 100% |

The "prices actively quoted" category reflects only exchange traded contracts for which active quotes are readily available. The "prices provided by other external sources" category represents forward commodity positions valued using prices for which over-the-counter broker quotes are available in active markets. Over-the-counter quotes for power in ERCOT that are deemed active markets (excluding the West zone) generally extend through 2012 and over-the-counter quotes for natural gas generally extend through 2015, depending upon delivery point. The "prices based on models" category contains the value of all nonexchange traded options, valued using option pricing models. In addition, this category contains other contractual arrangements that may have both forward and option components, as well as other contracts that are valued using proprietary long-term pricing models that utilize certain market based inputs. See Note 9 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010 for fair value disclosures and discussion of fair value measurements.

## FINANCIAL CONDITION

*Liquidity and Capital Resources*

*Cash Flows*—Cash provided by operating activities for the six months ended June 30, 2010 and 2009 totaled $134 million and $504 million, respectively. The decrease in cash provided of $370 million was driven by a $383 million effect of the amended accounting standard related to the sale of accounts receivable program (see Note 5 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010). Changes in funding under the program have previously been reported as operating cash flows, and the amended accounting rule requires that the amount of funding under the program upon the January 1, 2010 adoption ($383 million) be reported as a use of operating cash flows and a source of financing cash flows. All changes in funding subsequent to adoption of the amended standard are reported as financing activities.

Cash provided by financing activities decreased $405 million as summarized below:

| | Six Months Ended June 30, | |
| | 2010 | 2009 |
|---|---|---|
| Net issuances, repayments and repurchases of borrowings | $ (151) | $ 408 |
| Net contributions from and distributions to noncontrolling interests | 14 | 15 |
| Net short-term borrowings under accounts receivable sales program | 158 | — |
| Other | 18 | 21 |
| Total provided by financing activities | $ 39 | $ 444 |

B–43

EFIHMW00052492

EFIHMW00051935

**PX 030**
**Page 558 of 734**

**Table of Contents**

Cash used in investing activities decreased $1.356 billion driven by the return in 2010 of the collateral posted in 2009 related to interest rate swaps discussed in Note 11 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010 and decreased capital expenditures. These activities are summarized below:

|  | Six Months Ended June 30, | |
|---|---|---|
|  | **2010** | **2009** |
| Capital expenditures, including nuclear fuel | $ (637) | $ (1,364) |
| Redemption of investment held in money market fund | — | 142 |
| Investment redeemed/(posted) with counterparty | 400 | (400) |
| Proceeds from sale of assets | 141 | 1 |
| Change in restricted cash | (5) | 129 |
| Other | (21) | 14 |
| Total used in investing activities | $ (122) | $ (1,478) |

The decline in capital spending for the six months ended June 30, 2010 as compared to the six months ended June 30, 2009 primarily reflected the deconsolidation of Oncor ($537 million capital expenditures in 2009) (see Note 3 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010) in 2010 and a decrease in spending related to the construction of the now substantially complete new generation facilities.

Depreciation and amortization expense reported in the statement of cash flows exceeded the amount reported in the statement of income by $189 million and $215 million for the six months ended June 30, 2010 and 2009, respectively. The difference represented amortization of nuclear fuel, which is reported as fuel cost in the statement of income consistent with industry practice, and amortization of intangible net assets and debt fair value discounts arising from purchase accounting that is reported in various other income statement line items including operating revenues, fuel and purchased power costs and delivery fees, other income and interest expense and related charges.

*Debt Financing Activity*—Activities related to short-term borrowings and long-term debt during the six months ended June 30, 2010 are as follows (all amounts presented are principal, and repayments and repurchases include amounts related to capital leases and exclude amounts related to debt discount, financing and reacquisition expenses):

|  | Borrowings (a) | Repayments and Repurchases (b) |
|---|---|---|
| TCEH | $ 107 | $ 426 |
| EFC Holdings | — | 2 |
| Intermediate Holding | — | — |
| EFH Corp. | 768 | 217 |
| Total long–term | 875 | 645 |
| Total short–term—TCEH (c) | — | 218 |
| Total | $ 875 | $ 863 |

---

(a)    Includes the following activities (see Note 6 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010):

• $500 million of EFH Corp. 10% Notes issued by EFH Corp., the proceeds of which may be used in debt exchanges or repurchases.

B–44

EFIHMW00052493

EFIHMW00051935

Table of Contents

- Principal increases in payment of accrued interest totaling $162 million and $107 million of EFH Corp. and TCEH Toggle Notes, respectively.

- $106 million of EFH Corp. 10% Notes issued by EFH Corp. in debt exchanges.

(b)    Includes $249 million of noncash retirements as a result of 2010 debt exchange and repurchase transactions discussed in Note 6 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010.

(c)    Short−term amounts represent net borrowings/repayments.

See Note 6 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010 for further detail of long−term debt and other financing arrangements.

We, our affiliates or our agents may from time to time purchase our outstanding debt for cash in open market purchases or privately negotiated transactions (including pursuant to a Section 10b−5(1) plan) or via privately negotiated exchange transactions similar to the private exchange transactions completed in 2010, or we may refinance existing debt. We will evaluate any such transactions in light of market prices of the debt, taking into account liquidity requirements and prospects for future access to capital, contractual restrictions and other factors. The amounts involved in any such transactions, individually or in the aggregate, may be material.

*Available Liquidity*—The following table summarizes changes in available liquidity for the six months ended June 30, 2010 (excluding Oncor):

| | Available Liquidity | | |
| --- | --- | --- | --- |
| | June 30, 2010 | December 31, 2009 | Change |
| Cash and cash equivalents | $    1,211 | $    1,161 | $    50 |
| TCEH Revolving Credit Facility (a) | 1,880 | 1,721 | 159 |
| TCEH Letter of Credit Facility | 429 | 399 | 30 |
| Subtotal | $    3,520 | $    3,281 | $    239 |
| Short−term investment (b) | — | 490 | (490) |
| Total liquidity | $    3,520 | $    3,771 | $ (251) |

(a)    As of June 30, 2010 and December 31, 2009, the TCEH Revolving Credit Facility includes $144 million and $141 million, respectively, of commitments from Lehman that are only available from the fronting banks and the swingline lender.

(b)    December 31, 2009 amount includes $425 million cash investment (including accrued interest) and $65 million in letters of credit posted related to certain interest rate and commodity hedge transactions. Pursuant to the related agreement, the collateral was returned in March 2010. See Note 11 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010.

Note: Available liquidity above does not include the amounts available from exercising the payment−in−kind (PIK) option on the EFH Corp. Toggle Notes and TCEH Toggle Notes, which for the remaining payment dates from November 2010 through November 2012 could avoid cash interest payments of approximately $1.2 billion, excluding any effect of the ongoing debt exchange offers launched in July 2010 discussed in Note 6 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010.

The $251 million decrease in available liquidity was driven by a reduction of financing under the accounts receivable securitization program as discussed in Note 5 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010. Cash from debt issued was largely offset by cash used for debt repayments and repurchases.

See Note 6 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010 for additional discussion of the credit facilities.

EFIHMW00052494

EFIHMW00051935

Table of Contents

*Pension and OPEB Plan Funding*—Pension and OPEB plan funding is expected to total $45 million and $24 million, respectively, in 2010. Oncor is expected to fund approximately 88% of this amount consistent with its share of the pension liability. We made pension and OPEB contributions of $14 million and $12 million, respectively, in the six months ended June 30, 2010, including $22 million contributed by Oncor.

*Toggle Notes Interest Election*—EFH Corp. and TCEH have the option every six months at their discretion, ending with the payment due November 2012, to use the payment-in-kind (PIK) feature of their respective toggle notes in lieu of making cash interest payments. We elected to do so beginning with the May 2009 interest payment as an efficient and cost-effective method to further enhance liquidity, in light of the weaker economy and related lower electricity demand and the continuing uncertainty in the financial markets. Once EFH Corp. and/or TCEH make a PIK election, the election is valid for each succeeding interest payment period until EFH Corp. and/or TCEH revoke the applicable election. Use of the PIK feature will be evaluated at each election period, taking into account market conditions and other relevant factors at such time.

EFH Corp. made its May 2010 interest payment and will make its November 2010 interest payment on the EFH Corp. Toggle Notes by using the PIK feature of those notes. During such applicable interest periods, the interest rate on these notes is increased from 11.25% to 12.00%. EFH Corp. increased the aggregate principal amount of the notes by $162 million in May 2010 and will further increase the aggregate principal amount of the notes by a currently estimated $162 million in November 2010. The elections increased liquidity in May 2010 by an amount equal to $152 million and will further increase liquidity in November 2010 by an amount equal to a currently estimated $152 million, constituting the amounts of cash interest that otherwise would have been payable on the notes in May 2010 and November 2010, respectively.

Similarly, TCEH made its May 2010 interest payment and will make its November 2010 interest payment on the TCEH Toggle Notes by using the PIK feature of those notes. During such applicable interest periods, the interest rate on these notes is increased from 10.50% to 11.25%. TCEH increased the aggregate principal amount of the notes by approximately $110 million in May 2010, including $3 million principal amount paid to EFH Corp. and eliminated in consolidation, and will further increase the aggregate principal amount of the notes by $116 million in November 2010, including $3 million principal amount paid to EFH Corp. and eliminated in consolidation. The elections increased liquidity in May 2010 by an amount equal to $103 million and will further increase liquidity in November 2010 by an amount equal to an estimated $108 million, constituting the amounts of cash interest that otherwise would have been payable on the notes in May 2010 and November 2010, respectively.

See Note 6 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010 for discussion of debt repurchase and exchange transactions in 2010 that resulted in redemption of portions of the outstanding principal of the EFH Corp. and TCEH Toggle Notes held by unaffiliated parties that are reflected in the amounts related to the May 2010 and November 2010 PIK elections. No effects of the ongoing debt exchange offers launched in July 2010 are reflected above.

*Liquidity Effects of Commodity Hedging and Trading Activities*—Commodity hedging and trading transactions typically require a counterparty to post collateral if the forward price of the underlying commodity moves such that the hedging or trading instrument held by such counterparty has declined in value. TCEH uses cash, letters of credit, asset–backed liens and other forms of credit support to satisfy such collateral obligations. In addition, TCEH's Commodity Collateral Posting Facility, an uncapped senior secured revolving credit facility, funds the cash collateral posting requirements for a significant portion of the positions in the long–term hedging program not otherwise secured by a first–lien in the assets of TCEH. The aggregate principal amount of this facility is determined by the exposure arising from higher forward market prices, regardless of the amount of such exposure, on a portfolio of certain natural gas hedging transaction volumes. Including those hedging transactions where margin deposits are covered by unlimited borrowings under the TCEH Commodity Collateral Posting Facility, at June 30, 2010, more than 95% of the long–term natural gas hedging program transactions were secured by a first–lien interest in the assets of TCEH that is pari passu with the TCEH Senior Secured

B–46

EFIHMW00052495

EFIHMW00051935

PX 030
Page 561 of 734

Table of Contents
Facilities, the effect of which is a significant reduction in the liquidity exposure associated with collateral requirements for those hedging transactions. See Note 6 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010 for more information about this facility.

As of June 30, 2010, TCEH received or posted cash and letters of credit for commodity hedging and trading activities as follows:

- $168 million in cash has been posted with counterparties for exchange cleared transactions (including initial margin), as compared to $183 million posted as of December 31, 2009;

- $525 million in cash has been received from counterparties, net of $5 million in cash posted, for over–the–counter and other non–exchange cleared transactions, as compared to $516 million received, net of $4 million in cash posted, as of December 31, 2009;

- $318 million in letters of credit have been posted with counterparties, as compared to $379 million posted as of December 31, 2009, and

- $31 million in letters of credit have been received from counterparties, as compared to $44 million received as of December 31, 2009.

With respect to exchange cleared transactions, these transactions typically require initial margin (i.e., the upfront cash and/or letter of credit posted to take into account the size and maturity of the positions and credit quality) in addition to variance margin (i.e., the daily cash margin posted to take into account changes in the value of the underlying commodity). The amount of initial margin required is generally defined by exchange rules. Clearing agents, however, typically have the right to request additional initial margin based on various factors including market depth, volatility and credit quality, which may be in the form of cash, letters of credit, a guaranty or other forms as negotiated with the clearing agent. With respect to cash collateral that is received, such cash collateral is either used for working capital or other corporate purposes, including reducing short–term borrowings under credit facilities, or it is required to be deposited in a separate account and restricted from being used for working capital and other corporate purposes. With respect to over–the–counter transactions, counterparties generally have the right to substitute letters of credit for such cash collateral. In such event, the cash collateral previously posted would be returned to such counterparties thereby reducing liquidity in the event that it was not restricted. As of June 30, 2010, restricted cash collateral held totaled $6 million. See Note 16 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010 regarding restricted cash.

With the long–term hedging program, increases in natural gas prices generally result in increased cash collateral and letter of credit postings to counterparties. As of June 30, 2010, approximately 500 million MMBtu of positions related to the long–term hedging program were not directly secured on an asset–lien basis and thus have cash collateral posting requirements. The uncapped TCEH Commodity Collateral Posting Facility supports the collateral posting requirements related to substantially all of these transactions.

*Income Tax Refunds/Payments*—Income tax payments, primarily amounts related to the Texas margin tax, are expected to total approximately $72 million in the next 12 months. Payments in the six months ended June 30, 2010 totaled $52 million.

*Accounts Receivable Securitization Program*—TXU Energy participates in EFH Corp.'s accounts receivable securitization program with financial institutions (the funding entities). As discussed in Note 1 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010, in accordance with amended transfers and servicing accounting standards, the trade accounts receivable amounts under the program are reported as pledged balances and the related funding amounts are reported as short–term borrowings. Under the program, TXU Energy (originator) sells retail trade accounts receivable to TXU Receivables Company, a consolidated wholly–owned bankruptcy–remote direct subsidiary of EFH Corp., which sells undivided interests in the purchased accounts receivable for cash to entities established for this purpose by the funding entities. All new trade receivables under the program generated by the originator are continuously

B–47

EFIHMW00052496

EFIHMW00051935

**PX 030**
**Page 562 of 734**

**Table of Contents**

purchased by TXU Receivables Company with the proceeds from collections of receivables previously purchased. Funding under the program totaled $158 million and $383 million at June 30, 2010 and December 31, 2009, respectively. See Note 5 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010 for a more complete description of the program including amendments to the program in June 2010, the impact of the program on the financial statements for the periods presented and the contingencies that could result in termination of the program and a reduction of liquidity should the underlying financing be settled.

*Financial Covenants, Credit Rating Provisions and Cross Default Provisions*—The terms of certain of our financing arrangements contain maintenance covenants with respect to leverage ratios and/or minimum net worth. As of June 30, 2010, we were in compliance with all such covenants.

*Covenants and Restrictions under Financing Arrangements*—Each of the TCEH Senior Secured Facilities and the indentures governing substantially all of the debt we have issued in connection with, and subsequent to, the Merger contain covenants that could have a material impact on the liquidity and operations of EFH Corp. and its subsidiaries.

Adjusted EBITDA (as used in the restricted payments covenant contained in the indenture governing the EFH Corp. Senior Notes) for the twelve months ended June 30, 2010 totaled $5.116 billion for EFH Corp. See elsewhere herein for a reconciliation of net income to Adjusted EBITDA for EFH Corp., TCEH and Intermediate Holding, respectively, for the six and twelve months ended June 30, 2010 and 2009.

B~48

EFIHMW00052497

EFIHMW00051935

**PX 030**
**Page 563 of 734**

**Table of Contents**

The following table summarizes TCEH's secured debt to adjusted EBITDA ratio under the maintenance covenant in the TCEH Senior Secured Facilities and various other financial ratios of EFH Corp., Intermediate Holding and TCEH that are applicable under certain other covenants in the TCEH Senior Secured Facilities and the indentures governing the TCEH Senior Notes, the EFH Corp. Senior Notes, the EFH Corp. Senior Secured Notes and the EFIH 9.75% Notes as of June 30, 2010 and December 31, 2009 and the corresponding maintenance and other covenant threshold levels as of June 30, 2010:

| | June 30, 2010 | December 31, 2009 | Threshold Level as of June 30, 2010 |
|---|---|---|---|
| Maintenance Covenant: | | | |
| TCEH Senior Secured Facilities: | | | |
| Secured debt to adjusted EBITDA ratio (a) | 5.06 to 1.00 | 4.76 to 1.00 | Must not exceed 7.00 to 1.00 (b) |
| Debt Incurrence Covenants: | | | |
| EFH Corp. Senior Notes: | | | |
| EFH Corp. fixed charge coverage ratio | 1.3 to 1.0 | 1.2 to 1.0 | At least 2.0 to 1.0 |
| TCEH fixed charge coverage ratio | 1.5 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| EFH Corp. Senior Secured Notes: | | | |
| EFH Corp. fixed charge coverage ratio | 1.3 to 1.0 | 1.2 to 1.0 | At least 2.0 to 1.0 |
| TCEH fixed charge coverage ratio | 1.5 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| EFIH 9.75% Notes: | | | |
| Intermediate Holding fixed charge coverage ratio (c) | 95.1 to 1.0 | 53.8 to 1.0 | At least 2.0 to 1.0 |
| TCEH Senior Notes: | | | |
| TCEH fixed charge coverage ratio | 1.5 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| TCEH Senior Secured Facilities: | | | |
| TCEH fixed charge coverage ratio | 1.5 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| Restricted Payments/Limitations on Investments Covenants: | | | |
| EFH Corp. Senior Notes: | | | |
| General restrictions (non-Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (d) | 1.5 to 1.0 | 1.4 to 1.0 | At least 2.0 to 1.0 |
| General restrictions (Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (d) | 1.3 to 1.0 | 1.2 to 1.0 | At least 2.0 to 1.0 |
| EFH Corp. leverage ratio | 9.0 to 1.0 | 9.4 to 1.0 | Equal to or less than 7.0 to 1.0 |
| EFH Corp. Senior Secured Notes: | | | |
| General restrictions (non-Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (d) | 1.5 to 1.0 | 1.4 to 1.0 | At least 2.0 to 1.0 |
| General restrictions (Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (d) | 1.3 to 1.0 | 1.2 to 1.0 | At least 2.0 to 1.0 |
| EFH Corp. leverage ratio | 9.0 to 1.0 | 9.4 to 1.0 | Equal to or less than 7.0 to 1.0 |
| EFIH 9.75% Notes: | | | |
| General restrictions (non-EFH Corp. payments): | | | |
| Intermediate Holding fixed charge coverage ratio (c)(e) | 4.9 to 1.0 | 3.9 to 1.0 | At least 2.0 to 1.0 |
| General restrictions (EFH Corp. payments): | | | |
| Intermediate Holding fixed charge coverage ratio (c)(e) | 95.1 to 1.0 | 53.8 to 1.0 | At least 2.0 to 1.0 |
| Intermediate Holding leverage ratio | 4.2 to 1.0 | 4.4 to 1.0 | Equal to or less than 6.0 to 1.0 |
| TCEH Senior Notes: | | | |
| TCEH fixed charge coverage ratio | 1.5 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| TCEH Senior Secured Facilities: | | | |
| Payments to Sponsor Group: | | | |
| TCEH total debt to adjusted EBITDA ratio | 8.2 to 1.0 | 8.4 to 1.0 | Equal to or less than 6.5 to 1.0 |

(a) In accordance with the terms of the TCEH Senior Secured Facilities and as the result of the new Sandow and first Oak Grove generating units achieving average capacity factors of greater than or equal to 70% for the three months ended March 31, 2010, the maintenance covenant as of June 30, 2010 includes pro forma twelve months adjusted EBITDA for the units and the proportional amount of outstanding debt under the Delayed Draw Term Loan (see Note 6 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010) applicable to the two units.

(b) Threshold level will decrease to a maximum of 6.75 to 1.00 effective December 31, 2010. Calculation excludes debt that ranks junior to the TCEH Senior Secured Facilities.

B-49

EFIHMW00052498

EFIHMW00051935

**PX 030**
**Page 564 of 734**

Table of Contents

(c)   Although Intermediate Holding currently meets the fixed charge coverage ratio threshold applicable to certain covenants contained in the indenture governing the EFIH 9.75% Notes, Intermediate Holding's ability to use such thresholds to incur debt or make restricted payments/investments is currently limited by the covenants contained in the EFH Corp. Senior Notes and the EFH Corp. Senior Secured Notes.

(d)   The EFH Corp. fixed charge coverage ratio for Sponsor Group payments includes the results of Oncor Holdings and its subsidiaries. The EFH Corp. fixed charge coverage ratio for Sponsor Group payments excludes the results of Oncor Holdings and its subsidiaries.

(e)   The Intermediate Holding fixed charge coverage ratio for non–EFH Corp. payments includes the results of Oncor Holdings and its subsidiaries. The Intermediate Holding fixed charge coverage ratio for EFH Corp. payments excludes the results of Oncor Holdings and its subsidiaries.

*Material Credit Rating Covenants and Credit Worthiness Effects on Liquidity*—As a result of TCEH's non–investment grade credit rating and considering collateral thresholds of certain retail and wholesale commodity contracts, as of June 30, 2010, counterparties to those contracts could have required TCEH to post up to an aggregate of $18 million in additional collateral. This amount largely represents the below market terms of these contracts as of June 30, 2010; thus, this amount will vary depending on the value of these contracts on any given day.

Certain transmission and distribution utilities in Texas have tariffs in place to assure adequate credit worthiness of any REP to support the REP's obligation to collect securitization bond–related (transition) charges on behalf of the utility. Under these tariffs, as a result of TCEH's below investment grade credit rating, TCEH is required to post collateral support in an amount equal to estimated transition charges over specified time periods. The amount of collateral support required to be posted, as well as the time period of transition charges covered, varies by utility. As of June 30, 2010, TCEH has posted collateral support in the form of letters of credit to the applicable utilities in an aggregate amount equal to $30 million, with $16 million of this amount posted for the benefit of Oncor.

The PUCT has rules in place to assure adequate credit worthiness of each REP, including the ability to return customer deposits, if necessary. Under these rules, as of June 30, 2010, TCEH posted letters of credit in the amount of $84 million, which are subject to adjustments. See "Regulation and Rates—Certification of REPs."

The RRC has rules in place to assure adequate credit worthiness of parties that have mining reclamation obligations. Under these rules, should the RRC determine that the credit worthiness of Luminant Generation Company LLC (a subsidiary of TCEH) is not sufficient to support its reclamation obligations, TCEH may be required to post cash or letter of credit collateral support in an amount currently estimated to be approximately $650 million to $850 million. The actual amount (if required) could vary depending upon numerous factors, including Luminant Generation Company LLC's credit worthiness and the level of mining reclamation obligations.

ERCOT has rules in place to assure adequate credit worthiness of parties that schedule power on the ERCOT System. Under these rules, TCEH has posted collateral support, predominantly in the form of letters of credit, totaling $36 million as of June 30, 2010 (which is subject to weekly adjustments based on settlement activity with ERCOT).

Other arrangements of EFH Corp. and its subsidiaries, including Oncor's credit facility, the accounts receivable securitization program (see Note 5 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010) and certain leases, contain terms pursuant to which the interest rates charged under the agreements may be adjusted depending on the relevant credit ratings.

In the event that any or all of the additional collateral requirements discussed above are triggered, we believe we will have adequate liquidity to satisfy such requirements.

*Material Cross Default Provisions*—Certain financing arrangements contain provisions that may result in an event of default if there were a failure under other financing arrangements to meet payment terms or to observe other covenants that could or does result in an acceleration of payments due. Such provisions are referred to as "cross default" provisions.

B–50

EFIHMW00052499

EFIHMW00051935

Table of Contents

A default by TCEH or any of its restricted subsidiaries in respect of indebtedness, excluding indebtedness relating to the accounts receivable securitization program and hedging obligations, in an aggregate amount in excess of $200 million may result in a cross default under the TCEH Senior Secured Facilities. Under these facilities, such a default will allow the lenders to accelerate the maturity of outstanding balances ($22.016 billion at June 30, 2010) under such facilities.

The indenture governing the TCEH Senior Notes contains a cross acceleration provision where a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of TCEH or any of its restricted subsidiaries in an aggregate amount equal to or greater than $250 million may cause the acceleration of the TCEH Senior Notes.

Under the terms of a TCEH rail car lease, which had $46 million in remaining lease payments as of June 30, 2010 and terminates in 2017, if TCEH failed to perform under agreements causing its indebtedness in aggregate principal amount of $100 million or more to become accelerated, the lessor could, among other remedies, terminate the lease and effectively accelerate the payment of any remaining lease payments due under the lease.

Under the terms of a TCEH rail car lease, which had $52 million in remaining lease payments as of June 30, 2010 and terminates in 2028, if obligations of TCEH in excess of $200 million in the aggregate for payments of obligations to third party creditors under lease agreements, deferred purchase agreements or loan or credit agreements are accelerated prior to their original stated maturity, the lessor could, among other remedies, terminate the lease and effectively accelerate the payment of any remaining lease payments due under the lease.

Each of the indentures governing the EFH Corp. Senior Notes and Senior Secured Notes contains a cross acceleration provision whereby a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of EFH Corp. or any of its restricted subsidiaries in an aggregate amount equal to or greater than $250 million may cause the acceleration of the EFH Corp. Senior Notes and Senior Secured Notes.

The indenture governing the EFIH 9.75% Notes contains a cross acceleration provision whereby a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of Intermediate Holding or any of its restricted subsidiaries in an aggregate amount equal to or greater than $250 million may cause the acceleration of the EFIH 9.75% Notes.

The accounts receivable securitization program contains a cross default provision with a threshold of $200 million that applies in the aggregate to the originator, any parent guarantor of an originator or any subsidiary acting as collection agent under the program. TXU Receivables Company and EFH Corporate Services Company (a direct subsidiary of EFH Corp.), as collection agent, in the aggregate have a cross default threshold of $50,000. If any of the aforementioned defaults on indebtedness of the applicable threshold were to occur, the program could terminate.

We enter into energy-related and financial contracts, the master forms of which contain provisions whereby an event of default or acceleration of settlement would occur if we were to default under an obligation in respect of borrowings in excess of thresholds, which vary, stated in the contracts. The subsidiaries whose default would trigger cross default vary depending on the contract.

Each of TCEH's natural gas hedging agreements that are secured with a lien on its assets on a pari passu basis with the TCEH Senior Secured Facilities contains a cross default provision. In the event of a default by TCEH or any of its subsidiaries relating to indebtedness (such amounts varying by contract but ranging from $200 million to $250 million) that results in the acceleration of such debt, then each counterparty under these hedging agreements would have the right to terminate its hedge agreement with TCEH and require all outstanding obligations under such agreement to be settled.

B-51

EFIHMW00052500

EFIHMW00051935

PX 030
Page 566 of 734

**Table of Contents**

In the event of a default by TCEH relating to indebtedness in an amount equal to or greater than $200 million that results in the acceleration of such debt, then each counterparty under TCEH's interest rate swap agreements with an aggregate derivative liability of $1.574 billion at June 30, 2010 would have the right to terminate its interest rate swap agreement with TCEH and require all outstanding obligations under such agreement to be settled.

A default by Oncor or any subsidiary thereof in respect of indebtedness in a principal amount in excess of $50 million may result in a cross default under its credit facility. Under this facility such a default may cause the maturity of outstanding balances ($948 million at June 30, 2010) under such facility to be accelerated.

Other arrangements, including leases, have cross default provisions, the triggering of which would not be expected to result in a significant effect on liquidity.

*Guarantees*—See Note 7 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010 for details of guarantees.

## OFF–BALANCE SHEET ARRANGEMENTS

See Notes 3 and 7 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010 regarding VIEs and guarantees.

## COMMITMENTS AND CONTINGENCIES

See Note 7 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010 for discussion of commitments and contingencies.

## CHANGES IN ACCOUNTING STANDARDS

See Note 1 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010 for a discussion of changes in accounting standards.

## REGULATION AND RATES

*Regulatory Investigations and Reviews*

See Note 7 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010.

*Certification of REPs*

In April 2009, the PUCT finalized a rule relating to the Certification of Retail Electric Providers. The rule strengthens the certification requirements for REPs in order to better protect customers, transmission and distribution utilities (TDUs), and other REPs from the potential insolvency of REPs. The rule, among other things, increases creditworthiness and financial reporting requirements for REPs and provides additional customer protection requirements and regulatory asset consideration for TDU bad debt expenses. Under the new financial requirements, TXU Energy filed an amended certification, which became effective in March 2010. As a result, TCEH posted letters of credit in March 2010 totaling $84 million with the PUCT securing its payment obligations to TDUs, and is no longer required to reserve liquidity for such purposes. Liquidity reserved at December 31, 2009 totaled $228 million.

B–52

EFIHMW00052501

EFIHMW00051935

Table of Contents
*Wholesale Market Design—Nodal Market*

In August 2003, the PUCT adopted a rule that, when implemented, will alter the wholesale market design in the ERCOT market. The rule requires ERCOT to:

- use a stakeholder process to develop a new wholesale market model;
- operate a voluntary day-ahead energy market;
- directly assign all congestion rents to the resources that caused the congestion;
- use nodal energy prices for resources;
- provide information for energy trading hubs by aggregating nodes;
- use zonal prices for loads, and
- provide congestion revenue rights (CRRs) (but not physical rights).

ERCOT currently has a zonal wholesale market structure consisting of four geographic zones. The proposed location-based congestion-management market is referred to as a "nodal" market because wholesale pricing would differ across the various nodes on the transmission grid instead of across the geographic zones. The implementation of a nodal market is being done in conjunction with transmission improvements designed to reduce current congestion. The implementation of a nodal market is scheduled for December 2010. We cannot predict the ultimate impact of the proposed nodal wholesale market design on our operations or financial results.

In 2010, ERCOT began conducting market testing activities in preparation for the December 2010 transition to the nodal market design. These testing activities have included certifying qualified scheduling entities (QSEs) to participate in the day-ahead and real-time markets, conducting market-wide tests of ERCOT's nodal operation systems to deploy generation resources to maintain grid frequency, holding mock auctions related to CRRs and conducting simulations of day-ahead market operations with market participants. In addition to these operational market testing activities, ERCOT has provided simulated full financial settlement and calculation of simulated credit exposure and collateral requirements for each simulated operating day. We have participated in these activities and are currently fully certified for participating in both the day-ahead market and real-time operations. Additionally, all of our operational and mothballed generation assets and our QSEs have completed certification for operation in the nodal market. In the upcoming months, we will continue to actively participate in ERCOT's market tests, including the upcoming 168-hour test that is planned to be completed by October 2010.

*Oncor Matters with the PUCT*

*Stipulation Approved by the PUCT*—In April 2008, the PUCT entered an order, which became final in June 2008, approving the terms of a stipulation relating to the filing in 2007 by Oncor and Texas Holdings of a Merger-related Joint Report and Application with the PUCT pursuant to Section 14.101(b) of PURA and PUCT Substantive Rule 25.75. The stipulation required the filing of a rate case by Oncor no later than July 1, 2008 based on a test year ended December 31, 2007. In July 2008, Nucor Steel filed an appeal of the PUCT's order in the 200th District Court of Travis County, Texas. A hearing in the appeal was held in June 2010, and the District Court affirmed the PUCT order in its entirety. Oncor filed the rate case with the PUCT in June 2008, and the PUCT issued a final order with respect to the rate case in August 2009 as discussed elsewhere herein. Oncor and four other parties appealed various portions of the rate case final order to state district court. The parties have agreed to a schedule that would result in a hearing in October 2010.

*Transmission Rates (PUCT Docket Nos. 37882, 38460 and 38495)*—In order to recover increases in its transmission costs, including incremental fees paid to other transmission service providers due to an increase in their rates, Oncor is allowed to request an update twice a year to the transmission cost recovery factor (TCRF) component of its retail delivery rates charged to REPs. In January 2010, an application was filed to increase the TCRF, which was administratively approved in February 2010 and became effective March 1, 2010. Thus

B-53

EFIHMW00052502

EFIHMW00051935

Table of Contents

application is expected to increase annualized revenues by $13 million. In July 2010, an application was filed to increase the TCRF, which is expected to be administratively approved and become effective in September 2010. This application is expected to increase Oncor's annualized revenues by $15 million.

In July 2010, Oncor filed an application for an interim update of its wholesale transmission rate. Oncor expects PUCT approval of the new rate before the end of 2010. Following approval, Oncor's annualized revenues are expected to increase by an estimated $43 million with $27 million of this increase recoverable through transmission rates charged to wholesale customers, and the remaining $16 million recoverable from REPs through the TCRF component of Oncor's delivery rates.

*Proposed PUCT Rulemaking*—The PUCT has published proposed rule changes in two proceedings that would impact transmission rates. The first proceeding (PUCT Project No. 37909), which the PUCT is expected to consider by the end of September 2010, proposes changes to the TCRF rule to allow for more complete cost recovery of wholesale transmission charges incurred by distribution service providers. Currently, increased wholesale transmission charges are recoverable by distribution service providers, effective with the March 1 and September 1 TCRF updates, but distribution service providers cannot recover increased charges incurred prior to such updates. If the rule is approved as proposed, TCRF filings would still be effective March 1 and September 1, but distribution service providers would be allowed to include wholesale transmission charges based on the effective date of the wholesale transmission rate changes. In the second proceeding (PUCT Project No. 37519), the PUCT approved the proposal for adoption at its July 30, 2010 open meeting, making changes to the wholesale transmission rules to allow transmission service providers to update their wholesale transmission rates twice in a calendar year, as compared to once per year under the current rules, providing more timely recovery of incremental capital investment. Other changes included in this rule will (i) tie the effective date of the rule to the effective date of the TCRF rule in Project No. 37909, (ii) require the PUCT to consider the effects of reduced regulatory lag when setting rates in the next full rate case and (iii) provide for administrative approval of uncontested interim wholesale transmission rate applications.

*Application for 2011 Energy Efficiency Cost Recovery Factor (PUCT Docket No. 38217)*—In April and May 2010, Oncor filed an application with the PUCT to request approval of an energy efficiency cost recovery factor (EECRF) for 2011. PUCT rules require Oncor to make an annual EECRF filing by May 1 for implementation at the beginning of the next calendar year. The requested 2011 EECRF, as adjusted, is $54 million, the same amount established for 2010, and would result in a $0.95 per month charge for residential customers, as compared to the 2010 residential charge of $0.89 per month. As allowed by the rule, the 2011 EECRF is designed to recover $45 million of Oncor's costs for the 2011 programs, to be reduced by $2 million for the over-recovery of 2009 program costs, plus a performance bonus to Oncor of $11 million based on 2009 results. No party has requested a hearing, and the PUCT staff has recommended approval of Oncor's application. Oncor anticipates that the PUCT will issue an order in the third quarter 2010.

*Competitive Renewable Energy Zones (CREZs)*—In January 2009, the PUCT awarded approximately $1.3 billion of CREZ construction projects to Oncor (PUCT Docket Nos. 35665 and 37902). The projects involve the construction of transmission lines to support the transmission of electricity from renewable energy sources, principally wind generation facilities, in west Texas to population centers in the eastern part of the state. A written order reflecting the PUCT's decision was entered in March 2009, and an order on rehearing was issued by the PUCT in May 2009. The cost estimates for the CREZ construction projects are based upon cost analyses prepared by ERCOT in April 2008. Based on the selection of final routes for the three default and nine priority projects and identification of additional costs not included in the original ERCOT estimate (e.g., wind interconnection facilities and required modifications to existing facilities), Oncor estimates that the cost of these projects will exceed ERCOT estimates by approximately $220 million. Final routes for five subsequent projects have not yet been selected by the PUCT. As of June 30, 2010, Oncor's cumulative CREZ–related capital

B–54

EFIHMW00052503

EFIHMW00051935

**PX 030**
**Page 569 of 734**

Table of Contents

expenditures totaled $217 million, including $103 million during the six months ended June 30, 2010. It is expected that the necessary permitting actions and other requirements and all construction activities for Oncor's CREZ construction projects will be completed by the end of 2013.

In October 2009, the PUCT initiated a proceeding to determine whether there is sufficient financial commitment from generators of renewable energy to grant Certificates of Convenience and Necessity (CCNs) for transmission facilities located in two areas in the panhandle of Texas designated as CREZs. If the PUCT determines that there is not sufficient financial commitment from the generators for either CREZ, the PUCT may take action, including delaying the filing of CREZ CCN applications until such time as the PUCT finds sufficient financial commitment for that CREZ in accordance with the financial commitment provisions of the PUCT's rules. Three of the CREZ transmission projects awarded to Oncor are located in the two CREZs that are the subject of the proceeding. The estimated cost of these three transmission projects is approximately $380 million. In July 2010, a stipulation and proposed order was filed that would allow these projects to proceed. The PUCT approved the proposed order at its July 30, 2010 open meeting.

In July 2009, the City of Garland, Texas filed an Original Petition and Application for Stay and Injunction in the 200th District Court of Travis County, Texas seeking judicial review and a stay of the PUCT's March 2009 written order selecting transmission service providers (including Oncor) to build CREZ transmission facilities. In January 2010, the district court issued an order reversing the PUCT's order and remanding it to the PUCT for action consistent with the court's opinion. The district court order did not contain a stay or injunction and severed the City of Garland's requests for declaratory and injunctive relief. In February 2010, the PUCT issued orders that severed certain of the CREZ transmission projects awarded to Oncor and others from its consideration of the remand of the written order (PUCT Docket No. 37928) and suspended the schedule sequencing CREZ projects subsequent to CREZ priority projects (PUCT Docket No. 36802). In April 2010, the PUCT issued an order in Docket No. 36802 establishing the sequencing for CREZ projects subsequent to priority projects, which did not affect Oncor other than resulting in the schedule for Oncor to file CCN applications for its five CREZ subsequent projects between May and September 2010 as compared to the original March to May 2010 timeframe. That order excludes two CREZ subsequent projects that had been originally awarded to Lower Colorado River Authority, and the PUCT has opened Docket No. 38045 to award these two projects. In July 2010, the City of Garland and South Texas Electric Cooperative filed a participation agreement regarding these two projects. It is anticipated that the PUCT will award the projects in the third quarter of 2010.

*Sunset Review*—PURA, the PUCT, the RRC, ERCOT, the TCEQ and the Office of Public Utility Counsel (OPUC) will be subject to "sunset" review by the Texas Legislature in the 2011 legislative session. Sunset review includes, generally, a comprehensive review of the need for and effectiveness of an administrative agency (the PUCT, the RRC, ERCOT, the TCEQ or the OPUC), along with an evaluation of the advisability of any changes to that agency's authorizing legislation (PURA). A Sunset staff report on the PUCT offering various recommendations for consideration by the Sunset Commission was issued in April 2010, and the related Sunset public meeting was conducted in May 2010. The Sunset Commission met in July 2010 and adopted various recommendations regarding the PUCT, ERCOT and the OPUC. A Sunset staff report on the RRC is scheduled to be issued in October 2010, and the related Sunset public meeting is scheduled for November 2010. The Sunset Commission will submit its recommendations for the Texas Legislature's consideration during the next session, which begins in January 2011. We cannot predict the outcome of the sunset review process.

*Summary*

We cannot predict future regulatory or legislative actions or any changes in economic and securities market conditions. Such actions or changes could significantly alter our basic financial position, results of operations or cash flows.

B-55

EFIHMW00052504

Table of Contents

QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Market risk is the risk that we may experience a loss in value as a result of changes in market conditions affecting factors such as commodity prices and interest rates, that may be experienced in the ordinary course of business. Our exposure to market risk is affected by a number of factors, including the size, duration and composition of our energy and financial portfolio, as well as the volatility and liquidity of markets. Instruments used to manage this exposure include interest rate swaps to manage interest rate risk related to indebtedness, as well as exchange traded, over–the–counter contracts and other contractual arrangements to manage commodity price risk.

### Risk Oversight

TCEH manages the commodity price, counterparty credit and commodity–related operational risk related to the unregulated energy business within limitations established by senior management and in accordance with overall risk management policies. Interest rate risk is managed centrally by the corporate treasury function. Market risks are monitored by risk management groups that operate independently of the wholesale commercial operations, utilizing defined practices and analytical methodologies. These techniques measure the risk of change in value of the portfolio of contracts and the hypothetical effect on this value from changes in market conditions and include, but are not limited to, Value at Risk (VaR) methodologies. Key risk control activities include, but are not limited to, transaction review and approval (including credit review), operational and market risk measurement, validation of transaction capture, portfolio valuation and reporting, including mark–to–market valuation, VaR and other risk measurement metrics.

We have a corporate risk management organization that is headed by the Chief Financial Officer, who also functions as the Chief Risk Officer. The Chief Risk Officer, through his designees, enforces applicable risk limits, including the respective policies and procedures to ensure compliance with such limits and evaluates the risks inherent in our businesses.

### Commodity Price Risk

TCEH is subject to the inherent risks of market fluctuations in the price of electricity, natural gas and other energy–related products it markets or purchases. The company actively manages its portfolio of owned generation assets, fuel supply and retail sales load to mitigate the near–term impacts of these risks on results of operations. The company, similar to other participants in the market, cannot fully manage the long–term value impact of structural declines or increases in natural gas and power prices and spark spreads (differences between the market price of electricity and its cost of production).

In managing energy price risk, TCEH enters into a variety of market transactions including, but not limited to, short– and long–term contracts for physical delivery, exchange traded and over–the–counter financial contracts and bilateral contracts with customers. Activities include hedging, the structuring of long–term contractual arrangements and proprietary trading. The company continuously monitors the valuation of identified risks and adjusts positions based on current market conditions. The company strives to use consistent assumptions regarding forward market price curves in evaluating and recording the effects of commodity price risk.

*Long–Term Hedging Program*—See "Significant Activities and Events" above for a description of the program, including potential effects on reported results.

*VaR Methodology*—A VaR methodology is used to measure the amount of market risk that exists within the portfolio under a variety of market conditions. The resultant VaR produces an estimate of a portfolio's potential for loss given a specified confidence level and considers, among other things, market movements utilizing standard statistical techniques given historical and projected market prices and volatilities.

B–56

EFIHMW00052505

EFIHMW00051935

**PX 030**
**Page 571 of 734**

Table of Contents

A Monte Carlo simulation methodology is used to calculate VaR and is considered by management to be the most effective way to estimate changes in a portfolio's value based on assumed market conditions for liquid markets. The use of this method requires a number of key assumptions, such as use of (i) an assumed confidence level; (ii) an assumed holding period (i.e., the time necessary for management action, such as to liquidate positions); and (iii) historical estimates of volatility and correlation data.

*Trading VaR*—This measurement estimates the potential loss in fair value, due to changes in market conditions, of all contracts entered into for trading purposes based on a 95% confidence level and an assumed holding period of five to 60 days.

|  | Six Months Ended June 30, 2010 | | Year Ended December 31, 2009 | |
|---|---|---|---|---|
| Month-end average Trading VaR: | $ | 3 | $ | 4 |
| Month-end high Trading VaR: | $ | 4 | $ | 7 |
| Month-end low Trading VaR: | $ | 2 | $ | 2 |

*VaR for Energy-Related Contracts Subject to Mark-to-Market (MtM) Accounting*—This measurement estimates the potential loss in fair value, due to changes in market conditions, of all contracts marked-to-market in net income (principally hedges not accounted for as cash flow hedges and trading positions), based on a 95% confidence level and an assumed holding period of five to 60 days.

|  | Six Months Ended June 30, 2010 | | Year Ended December 31, 2009 | |
|---|---|---|---|---|
| Month-end average MtM VaR: | $ | 501 | $ | 1,050 |
| Month-end high MtM VaR: | $ | 621 | $ | 1,470 |
| Month-end low MtM VaR: | $ | 420 | $ | 638 |

*Earnings at Risk (EaR)*—This measurement estimates the potential reduction of pretax earnings for the periods presented, due to changes in market conditions, of all energy-related contracts marked-to-market in net income and contracts not marked-to-market in net income that are expected to be settled within the fiscal year (physical purchases and sales of commodities). Transactions accounted for as cash flow hedges are also included for this measurement. A 95% confidence level and a five to 60 day holding period are assumed in determining EaR.

|  | Six Months Ended June 30, 2010 | | Year Ended December 31, 2009 | |
|---|---|---|---|---|
| Month-end average EaR: | $ | 542 | $ | 1,088 |
| Month-end high EaR: | $ | 662 | $ | 1,511 |
| Month-end low EaR: | $ | 421 | $ | 676 |

The decreases in the risk measures (MtM VaR and EaR) above were primarily driven by changes in market volatility and underlying commodity prices.

*Interest Rate Risk*

As of June 30, 2010, the potential reduction of annual pretax earnings due to a one percentage-point (100 basis points) increase in floating interest rates on long-term debt totaled $41 million, taking into account the interest rate swaps discussed in Note 6 to EFH Corp.'s historical consolidated financial statements for the three and six months ended June 30, 2010.

*Credit Risk*

Credit risk relates to the risk of loss associated with nonperformance by counterparties. We maintain credit risk policies with regard to our counterparties to minimize overall credit risk. These policies prescribe practices for evaluating a potential counterparty's financial condition, credit rating and other quantitative and qualitative

B-57

EFIHMW00052506

EFIHMW00051935

PX 030
Page 572 of 734

**Table of Contents**

credit criteria and specify authorized risk mitigation tools including, but not limited to, use of standardized master netting contracts and agreements that allow for netting of positive and negative exposures associated with a single counterparty. We have processes for monitoring and managing credit exposure of our businesses including methodologies to analyze counterparties' financial strength, measurement of current and potential future exposures and contract language that provides rights for netting and set-off. Credit enhancements such as parental guarantees, letters of credit, surety bonds and margin deposits are also utilized. Additionally, individual counterparties and credit portfolios are managed to assess overall credit exposure. This evaluation results in establishing exposure limits or collateral requirements for entering into an agreement with a counterparty that creates exposure. Additionally, we have established controls to determine and monitor the appropriateness of these limits on an ongoing basis. Prospective material adverse changes in the payment history or financial condition of a counterparty or downgrade of its credit quality result in the reassessment of the credit limit with that counterparty. This process can result in the subsequent reduction of the credit limit or a request for additional financial assurances.

*Credit Exposure*—Our gross exposure to credit risk associated with trade accounts receivable (retail and wholesale) and net asset positions arising from hedging and trading activities totaled $2.475 billion at June 30, 2010. The components of this exposure are discussed in more detail below.

Assets subject to credit risk as of June 30, 2010 include $880 million in retail trade accounts receivable. Cash deposits held as collateral for these receivables totaled $73 million at June 30, 2010. The risk of material loss (after consideration of bad debt allowances) from nonperformance by these customers is unlikely based upon historical experience. Allowances for uncollectible accounts receivable are established for the potential loss from nonpayment by these customers based on historical experience, market or operational conditions and changes in the financial condition of large business customers.

The remaining credit exposure arises from wholesale energy sales and purchases and hedging and trading activities, including interest rate hedging. Counterparties to these transactions include energy companies, financial institutions, electric utilities, independent power producers, oil and gas producers, local distribution companies and energy trading and marketing companies. As of June 30, 2010, the exposure to credit risk from these counterparties totaled $1.595 billion taking into account the standardized master netting contracts and agreements described above but before taking into account $253 million in credit collateral (cash, letters of credit and other credit support). The net exposure (after credit collateral) of $1.342 billion did not change materially from December 31, 2009.

Of this $1.342 billion net exposure, essentially all is with investment grade customers and counterparties, as determined using publicly available information including major rating agencies' published ratings and our internal credit evaluation process. Those customers and counterparties without a S&P rating of at least BBB− or similar rating from another major rating agency are rated using internal credit methodologies and credit scoring models to estimate a S&P equivalent rating. The company routinely monitors and manages credit exposure to these customers and counterparties on this basis.

B–58

EFIHMW00052507

EFIHMW00051935

**PX 030**
**Page 573 of 734**