**Table of Contents**

*Available Liquidity*—The following table summarizes changes in available liquidity for the year ended December 31, 2009.

| | Available Liquidity | | |
| --- | --- | --- | --- |
| | December 31, 2009 | December 31, 2008 | Change |
| Cash and cash equivalents, excluding Oncor | $ 1,161 | $ 1,564 | $ (403) |
| Investments held in money market fund | — | 142 | (142) |
| TCEH Delayed Draw Term Loan Facility | — | 522 | (522) |
| TCEH Revolving Credit Facility (a) | 1,721 | 1,767 | (46) |
| TCEH Letter of Credit Facility | 399 | 490 | (91) |
| Subtotal | $ 3,281 | $ 4,485 | $(1,204) |
| Short–term investment (b) | 490 | — | 490 |
| Total liquidity, excluding Oncor (c) | $ 3,771 | $ 4,485 | $ (714) |
| Cash and cash equivalents—Oncor | $ 28 | $ 125 | $ (97) |
| Oncor Revolving Credit Facility | 1,262 | 1,508 | (246) |
| Total Oncor liquidity | $ 1,290 | $ 1,633 | $ (343) |

(a)     As of December 31, 2009 and 2008, the TCEH Revolving Credit Facility includes $141 million and $144 million, respectively, of commitments from Lehman that are only available from the fronting banks and the swingline lender.

(b)     Includes $425 million cash investment (including accrued interest) and $65 million in letters of credit posted related to certain interest rate and commodity hedge transactions. Under the related agreement, the collateral is to be returned no later than March 2010. See Note 18 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009.

(c)     Pursuant to PUCT rules, TCEH is required to maintain available liquidity to assure adequate credit worthiness of TCEH's REP subsidiaries, including the ability to return retail customer deposits, if necessary. As a result, at December 31, 2009, the total availability under the TCEH credit facilities should be further reduced by $228 million. See "Regulation and Rates—Certification of REPs."

Note:     Available liquidity above does not include the amounts available from exercising the payment-in-kind (PIK) option on the EFH Corp. Toggle Notes and TCEH Toggle Notes, which for the remaining payment dates from May 2010 through November 2012 could avoid cash interest payments of approximately $1.6 billion.

The $714 million decrease in available liquidity excluding Oncor, after taking into account the short-term investment, was driven by capital spending to construct the new generation facilities.

The decrease in available liquidity for Oncor of $343 million in the year ended December 31, 2009 reflected ongoing capital investment in transmission and distribution infrastructure.

See Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for additional discussion of these credit facilities.

The net proceeds from the January 2010 issuance of $500 million principal amount of senior secured notes (described in Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009) increased available liquidity.

*Pension and OPEB Plan Funding*—Pension and OPEB plan funding is expected to total $45 million and $24 million, respectively, in 2010. Based on the funded status of the pension plan at December 31, 2009, funding is expected to total approximately $750 million for the 2010 to 2014 period. Oncor is expected to fund approximately 75% of this amount consistent with its share of the pension liability. We made pension and OPEB contributions of $109 million and $22 million, respectively, in 2009 including transfers of investments related to the salary deferral and supplemental retirement plans totaling $31 million.

B–113

EFIHMW00052562

EFIHMW00051935

**Table of Contents**

See Note 21 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for more information regarding the pension and OPEB plans, including the funded status of the plans as of December 31, 2009.

*Toggle Notes Interest Election*—EFH Corp. and TCEH have the option every six months at their discretion, ending with the payment due November 2012, to use the payment−in−kind (PIK) feature of their respective toggle notes in lieu of making cash interest payments. We elected to do so for the May 2009, November 2009 and May 2010 interest payments as an efficient and cost−effective method to further enhance liquidity, in light of the weaker economy and related lower electricity demand and the continuing uncertainty in the financial markets. Once EFH Corp. and/or TCEH make a PIK election, the election is valid for each succeeding interest payment period until EFH Corp. and/or TCEH revoke the applicable election. Use of the PIK feature will be evaluated at each election period, taking into account market conditions and other relevant factors at such time.

EFH Corp. made its May and November 2009 interest payments and will make its May 2010 interest payment by using the PIK feature of the its Toggle Notes. During the applicable interest periods, the interest rate on the notes is increased from 11.25% to 12.00%. EFH Corp. increased the aggregate principal amount of the notes by $150 million and $159 million in May and November 2009, respectively, and will further increase the aggregate principal amount of the notes by $168 million in May 2010. The elections increased liquidity in 2009 by an amount equal to approximately $290 million and will further increase liquidity in May 2010 by an amount equal to approximately $157 million, with such amounts constituting the amount of cash interest that otherwise would have been payable on the notes. If paid in cash, the annual interest expense would increase by approximately $54 million, constituting the additional cash interest that would be payable with respect to the $477 million of additional principal amount. See Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for discussion of debt exchange offers that resulted in redemption of portions of the outstanding principal of these notes.

Similarly, TCEH made its May and November 2009 interest payments and will make its May 2010 interest payment by using the PIK feature of its Toggle Notes. During the applicable interest periods, the interest rate on the notes is increased from 10.50% to 11.25%. TCEH increased the aggregate principal amount of the notes by approximately $98.5 million and $104 million in May and November 2009, respectively, and will further increase the aggregate principal amount of the notes by approximately $110 million in May 2010. The elections increased liquidity in 2009 by an amount equal to approximately $189 million and will further increase liquidity in May 2010 by an amount equal to approximately $103 million, with such amounts constituting the amount of cash interest that otherwise would have been payable on the notes. If paid in cash, the annual interest expense would increase by approximately $33 million, constituting the additional interest that would be payable with respect to the $312 million of additional principal amount.

*Liquidity Needs, Including Capital Expenditures*—Capital expenditures, including capitalized interest, for 2010 are expected to total approximately $1.950 billion and include:

- $1.0 billion for investment in Oncor's transmission and distribution infrastructure, including $216 million for Oncor's investment related to the CREZ Transmission Plan;

- $900 million for investments in TCEH generation facilities, including approximately:

  - $700 million for major maintenance, primarily in existing generation operations;

  - $150 million related to completion of the construction of a second generation unit and mine development at Oak Grove, and

  - $50 million for environmental expenditures related to existing generation units, and

- $50 million for information technology and other corporate investments.

B−114

EFIHMW00052563

EFIHMW00051935

**Table of Contents**

We expect cash flows from operations combined with availability under our credit facilities discussed in Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 to provide sufficient liquidity to fund our current obligations, projected working capital requirements, any restructuring obligations and capital spending for a period that includes the next twelve months.

***Liquidity Effects of Commodity Hedging and Trading Activities***—Commodity hedging and trading transactions typically require a counterparty to post collateral if the forward price of the underlying commodity moves such that the hedging or trading instrument held by such counterparty has declined in value. TCEH uses cash, letters of credit, asset–backed liens and other forms of credit support to satisfy such collateral obligations. In addition, TCEH's Commodity Collateral Posting Facility, an uncapped senior secured revolving credit facility, funds the cash collateral posting requirements for a significant portion of the positions in the long–term hedging program not otherwise secured by a first–lien in the assets of TCEH. The aggregate principal amount of this facility is determined by the exposure arising from higher forward market prices, regardless of the amount of such exposure, on a portfolio of certain natural gas hedging transaction volumes. Including those hedging transactions where margin deposits are covered by unlimited borrowings under the TCEH Commodity Collateral Posting Facility, at December 31, 2009, more than 95% of the long–term natural gas hedging program transactions were secured by a first–lien interest in the assets of TCEH that is pari passu with the TCEH Senior Secured Facilities, the effect of which is a significant reduction in the liquidity exposure associated with collateral requirements for those hedging transactions. See Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for more information about this facility.

As of December 31, 2009, TCEH received or posted cash and letters of credit for commodity hedging and trading activities as follows:

- $183 million in cash has been posted with counterparties for exchange cleared transactions (including initial margin), as compared to $317 million posted as of December 31, 2008;

- $516 million in cash has been received from counterparties, net of $4 million in cash posted, for over–the–counter and other non–exchange cleared transactions, as compared to $402 million received, net of $122 million in cash posted, as of December 31, 2008;

- $379 million in letters of credit have been posted with counterparties, as compared to $342 million posted as of December 31, 2008, and

- $44 million in letters of credit have been received from counterparties, as compared to $30 million received as of December 31, 2008.

In addition, EFH Corp. (parent) elected to post cash collateral of $400 million in 2009 related to certain TCEH interest rate and commodity hedge transactions (see Note 18 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009).

With respect to exchange cleared transactions, these transactions typically require initial margin (i.e., the upfront cash and/or letter of credit posted to take into account the size and maturity of the positions and credit quality) in addition to variance margin (i.e., the daily cash margin posted to take into account changes in the value of the underlying commodity). The amount of initial margin required is generally defined by exchange rules. Clearing agents, however, typically have the right to request additional initial margin based on various factors including market depth, volatility and credit quality, which may be in the form of cash, letters of credit, a guaranty or other forms as negotiated with the clearing agent. With respect to cash collateral that is received, such cash collateral is either used for working capital and other corporate purposes, including reducing short–term borrowings under credit facilities, or it is required to be deposited in a separate account and restricted from being used for working capital and other corporate purposes. With respect to over–the–counter transactions, counterparties generally have the right to substitute letters of credit for such cash collateral. In such event, the cash collateral previously posted would be returned to such counterparties thereby reducing liquidity in the event that it was not restricted. As of December 31, 2009, restricted cash collateral held totaled $1 million. See Note 25 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 regarding restricted cash.

B–115

EFIHMW00052564

EFIHMW00051935

**PX 030**
**Page 630 of 734**

**Table of Contents**

With the long–term hedging program, increases in natural gas prices generally result in increased cash collateral and letter of credit postings to counterparties. As of December 31, 2009, approximately 600 million MMBtu of positions related to the long–term hedging program were not directly secured on an asset–lien basis and thus have cash collateral posting requirements. The uncapped TCEH Commodity Collateral Posting Facility supports the collateral posting requirements related to these transactions.

*Interest Rate Swap Transactions*—See Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for TCEH interest rate swaps entered into as of December 31, 2009.

*Distributions from Oncor*—Until December 31, 2012, distributions paid by Oncor to its members are limited to an amount not to exceed Oncor's net income determined in accordance with GAAP, subject to certain defined adjustments. Distributions are further limited by an agreement that Oncor's regulatory capital structure, as determined by the PUCT, will be at or below the assumed debt–to–equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.

In January 2009, the PUCT awarded approximately $1.3 billion of Competitive Renewable Energy Zone (CREZ) construction projects to Oncor. See discussion below under "Regulation and Rates—Oncor Matters with the PUCT." As a result of the increased capital expenditures for CREZ and the debt–to–equity ratio cap, we expect that Oncor may retain all or a portion of its available cash to fund such construction instead of paying distributions.

*Income Tax Refunds/Payments*—Income tax payments, primarily amounts related to the Texas margin tax, are expected to total approximately $75 million in the next 12 months. In 2009, we received a refund totaling $98 million in income taxes and related interest related to IRS audits of 1993 and 1994 income tax returns and made net payments totaling approximately $44 million related to the Texas margin tax. In 2008, we received net federal income tax refunds of $229 million, including $98 million related to 2007 tax payments and $142 million related to a net operating loss carryback to the 2006 tax year. Federal income tax payments totaled $257 million in 2007.

As discussed in Note 8 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009, we assess uncertain tax positions under a "more–likely–than–not" standard. We cannot reasonably estimate the ultimate amounts and timing of tax payments associated with uncertain tax positions, but expect that no material federal income tax payments related to such positions will be made in 2010.

*Sale of Accounts Receivable*—TXU Energy participates in an accounts receivable securitization program, the activity under which is accounted for as a sale of accounts receivable in accordance with transfers and servicing accounting standards. Under the program, TXU Energy (originator) sells retail trade accounts receivable to TXU Receivables Company, a consolidated wholly–owned bankruptcy–remote direct subsidiary of EFH Corp., which sells undivided interests in the purchased accounts receivable for cash to special purpose entities established by financial institutions. All new trade receivables under the program generated by the originator are continuously purchased by TXU Receivables Company with the proceeds from collections of receivables previously purchased. Funding under the program totaled $383 million and $416 million at December 31, 2009 and 2008, respectively. See Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for discussion of a new accounting standard that is expected to require consolidation of this program and Note 11 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for a more complete description of the program including the impact of the program on the financial statements for the periods presented and the contingencies that could result in termination of the program and a reduction of liquidity should the underlying financing be settled.

*Capitalization*—Our capitalization ratios consisted of 104.6% and 106.0% long–term debt, less amounts due currently, and (4.6)% and (6.0)% common stock equity, at December 31, 2009 and 2008, respectively. Total debt to capitalization, including short–term debt, was 104.4% and 105.8% at December 31, 2009 and 2008, respectively.

B–116

EFIHMW00052565

EFIHMW00051935

**PX 030**
**Page 631 of 734**

**Table of Contents**

*Financial Covenants, Credit Rating Provisions and Cross Default Provisions*—The terms of certain of our financing arrangements contain maintenance covenants with respect to leverage ratios and/or minimum net worth. As of December 31, 2009, we were in compliance with all such maintenance covenants.

*Covenants and Restrictions under Financing Arrangements*—Each of the TCEH Senior Secured Facilities and the indentures governing substantially all of the debt we have issued in connection with, and subsequent to, the Merger contain covenants that could have a material impact on the liquidity and operations of EFH Corp. and its subsidiaries.

Adjusted EBITDA (as used in the restricted payments covenant contained in the indenture governing the EFH Corp. Senior Notes) for the year ended December 31, 2009 totaled $4.857 billion for EFH Corp. See below in this Annex B the reconciliation of net income to Adjusted EBITDA for EFH Corp. and TCEH, respectively, for the years ended December 31, 2009 and 2008.

The following table summarizes TCEH's secured debt to adjusted EBITDA ratio under the maintenance covenant in the TCEH Senior Secured Facilities and various other financial ratios of EFH Corp., EFIH and TCEH that are applicable under certain other covenants in the TCEH Senior Secured Facilities and the indentures governing the TCEH Senior Notes, the EFH Corp. Senior Notes, the EFH Corp. 9.75% Notes and the EFIH Notes as of December 31, 2009 and 2008 and the corresponding maintenance and other covenant threshold levels as of December 31, 2009:

| | December 31, 2009 | December 31, 2008 | Threshold Level as of December 31, 2009 |
|---|---|---|---|
| Maintenance Covenant: | | | |
| TCEH Senior Secured Facilities: | | | |
| Secured debt to adjusted EBITDA ratio | 4.76 to 1.00 | 4.77 to 1.00 | Must not exceed 7.25 to 1.00 (a) |
| Debt Incurrence Covenants: | | | |
| EFH Corp. Senior Notes: | | | |
| EFH Corp. fixed charge coverage ratio | 1.2 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| TCEH fixed charge coverage ratio | 1.5 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| EFH Corp. 9.75% Notes: | | | |
| EFH Corp. fixed charge coverage ratio | 1.2 to 1.0 | N/A | At least 2.0 to 1.0 |
| TCEH fixed charge coverage ratio | 1.5 to 1.0 | N/A | At least 2.0 to 1.0 |
| EFIH Notes: | | | |
| EFIH fixed charge coverage ratio (b) | 53.8 to 1.0 | N/A | At least 2.0 to 1.0 |
| TCEH Senior Notes: | | | |
| TCEH fixed charge coverage ratio | 1.5 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| TCEH Senior Secured Facilities: | | | |
| TCEH fixed charge coverage ratio | 1.5 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| Restricted Payments/Limitations on Investments Covenants: | | | |
| EFH Corp. Senior Notes: | | | |
| General restrictions (non-Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (c) | 1.4 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| General restrictions (Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (c) | 1.2 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| EFH Corp. leverage ratio | 9.4 to 1.0 | 6.9 to 1.0 | Equal to or less than 7.0 to 1.0 |

B–117

EFIHMW00052566

EFIHMW00051935

**PX 030**
**Page 632 of 734**

Table of Contents

| | December 31, 2009 | December 31, 2008 | Threshold Level as of December 31, 2009 |
|---|---|---|---|
| EFH Corp. 9.75% Notes: | | | |
| General restrictions (non-Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (c) | 1.4 to 1.0 | N/A | At least 2.0 to 1.0 |
| General restrictions (Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (c) | 1.2 to 1.0 | N/A | At least 2.0 to 1.0 |
| EFH Corp. leverage ratio | 9.4 to 1.0 | N/A | Equal to or less than 7.0 to 1.0 |
| EFIH Notes: | | | |
| General restrictions (non-EFH Corp. payments): | | | |
| EFIH fixed charge coverage ratio (b)(d) | 3.9 to 1.0 | N/A | At least 2.0 to 1.0 |
| General restrictions (EFH Corp. payments): | | | |
| EFIH fixed charge coverage ratio (b)(d) | 53.8 to 1.0 | N/A | At least 2.0 to 1.0 |
| EFIH leverage ratio | 4.4 to 1.0 | N/A | Equal to or less than 6.0 to 1.0 |
| TCEH Senior Notes: | | | |
| TCEH fixed charge coverage ratio | 1.5 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| TCEH Senior Secured Facilities: | | | |
| Payments to Sponsor Group: | | | |
| TCEH total debt to adjusted EBITDA ratio | 8.4 to 1.0 | 8.7 to 1.0 | At least 6.5 to 1.0 |

(a)   Threshold level decreases to a maximum of 7.00 to 1.00 effective March 31, 2010 and to a maximum of 6.75 to 1.00 effective December 31, 2010. Calculation excludes debt that ranks junior to the TCEH Senior Secured Facilities.

(b)   Although EFIH currently meets the fixed charge coverage ratio threshold applicable to certain covenants contained in the indenture governing the EFIH Notes, EFIH's ability to use such thresholds to incur debt or make restricted payments/investments is currently limited by the covenants contained in the EFH Corp. Senior Notes and the EFH Corp. 9.75% Notes.

(c)   The EFH Corp. fixed charge coverage ratio for non-Sponsor Group payments includes the results of Oncor Holdings and its subsidiaries. The EFH Corp. fixed charge coverage ratio for Sponsor Group payments excludes the results of Oncor Holdings and its subsidiaries.

(d)   The EFIH fixed charge coverage ratio for non-EFH Corp. payments includes the results of Oncor Holdings and its subsidiaries. The EFIH fixed charge coverage ratio for EFH Corp. payments excludes the results of Oncor Holdings and its subsidiaries.

*Material Credit Rating Covenants and Credit Worthiness Effects on Liquidity*—As a result of TCEH's non-investment grade credit rating and considering collateral thresholds of certain retail and wholesale commodity contracts, as of December 31, 2009, counterparties to those contracts could have required TCEH to post up to an aggregate of $41 million in additional collateral. This amount largely represents the below market terms of these contracts as of December 31, 2009; thus, this amount will vary depending on the value of these contracts on any given day.

Certain transmission and distribution utilities in Texas have tariffs in place to assure adequate credit worthiness of any REP to support the REP's obligation to collect securitization bond-related (transition) charges on behalf of the utility. Under these tariffs, as a result of TCEH's below investment grade credit rating, TCEH is required to post collateral support in an amount equal to estimated transition charges over specified time periods. The amount of collateral support required to be posted, as well as the time period of transition charges covered,

B-118

EFIHMW00052567

EFIHMW00051935

**Table of Contents**

varies by utility. As of December 31, 2009, TCEH has posted collateral support in the form of letters of credit to the applicable utilities in an aggregate amount equal to $29 million, with $15 million of this amount posted for the benefit of Oncor.

The PUCT has rules in place to assure adequate credit worthiness of each REP, including the ability to return customer deposits, if necessary. Under these rules, as of December 31, 2009, TCEH maintained availability under its credit facilities of approximately $228 million. See "Regulation and Rates—Certification of REPs."

The RRC has rules in place to assure adequate credit worthiness of parties that have mining reclamation obligations. Under these rules, should the RRC determine that the credit worthiness of Luminant Generation Company LLC (a subsidiary of TCEH) is not sufficient to support its reclamation obligations, TCEH may be required to post cash or letter of credit collateral support in an amount currently estimated to be approximately $600 million to $800 million. The actual amount (if required) could vary depending upon numerous factors, including Luminant Generation Company LLC's credit worthiness and the level of mining reclamation obligations.

ERCOT also has rules in place to assure adequate credit worthiness of parties that schedule power on the ERCOT System. Under these rules, TCEH has posted collateral support, predominantly in the form of letters of credit, totaling $43 million as of December 31, 2009 (which is subject to weekly adjustments based on settlement activity with ERCOT).

Oncor and Texas Holdings agreed to the terms of a stipulation with major interested parties to resolve all outstanding issues in the PUCT review related to the Merger. As part of this stipulation, TCEH is required to post a letter of credit in an amount equal to $170 million to secure its payment obligations to Oncor if two or more rating agencies downgrade Oncor's credit ratings below investment grade.

Other arrangements of EFH Corp. and its subsidiaries, including Oncor's credit facility, the accounts receivable securitization program (see Note 11 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009) and certain leases, contain terms pursuant to which the interest rates charged under the agreements may be adjusted depending on the relevant credit ratings.

In the event that any or all of the additional collateral requirements discussed above are triggered, we believe we will have adequate liquidity to satisfy such requirements.

*Material Cross Default Provisions*—Certain financing arrangements contain provisions that may result in an event of default if there were a failure under other financing arrangements to meet payment terms or to observe other covenants that could or does result in an acceleration of payments due. Such provisions are referred to as "cross default" provisions.

A default by TCEH or any of its restricted subsidiaries in respect of indebtedness, excluding indebtedness relating to the sale of receivables program and hedging obligations, in an aggregate amount in excess of $200 million may result in a cross default under the TCEH Senior Secured Facilities. Under these facilities, such a default will allow the lenders to accelerate the maturity of outstanding balances ($22.357 billion at December 31, 2009) under such facilities.

The indenture governing the TCEH Senior Notes contains a cross acceleration provision where a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of TCEH or any of its restricted subsidiaries in an aggregate amount equal to or greater than $250 million may cause the acceleration of the TCEH Senior Notes.

Under the terms of a TCEH rail car lease, which had approximately $47 million in remaining lease payments as of December 31, 2009 and terminates in 2017, if TCEH failed to perform under agreements causing

B–119

EFIHMW00052568

EFIHMW00051935

**PX 030**
**Page 634 of 734**

**Table of Contents**

its indebtedness in aggregate principal amount of $100 million or more to become accelerated, the lessor could, among other remedies, terminate the lease and effectively accelerate the payment of any remaining lease payments due under the lease.

Under the terms of a TCEH rail car lease, which had approximately $53 million in remaining lease payments as of December 31, 2009 and terminates in 2028, if obligations of TCEH in excess of $200 million in the aggregate for payments of obligations to third party creditors under lease agreements, deferred purchase agreements or loan or credit agreements are accelerated prior to their original stated maturity, the lessor could, among other remedies, terminate the lease and effectively accelerate the payment of any remaining lease payments due under the lease.

The indentures governing the EFH Corp. Senior Notes, 9.75% and 10% Notes contain a cross acceleration provision whereby a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of EFH Corp. or any of its restricted subsidiaries in an aggregate amount equal to or greater than $250 million may cause the acceleration of the EFH Corp. Senior Notes, 9.75% and 10% Notes.

The indenture governing the EFIH Notes contains a cross acceleration provision whereby a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of EFIH or any of its restricted subsidiaries in an aggregate amount equal to or greater than $250 million may cause the acceleration of the EFIH Notes.

The accounts receivable securitization program contains a cross default provision with a threshold of $200 million that applies in the aggregate to the originator, any parent guarantor or any subsidiary acting as collection agent under the program. TXU Receivables Company and EFH Corporate Services Company (a direct subsidiary of EFH Corp.), as collection agent, in the aggregate have a cross default threshold of $50,000. If any of the aforementioned defaults on indebtedness of the applicable threshold were to occur, the program could terminate.

We enter into energy–related and financial contracts, the master forms of which contain provisions whereby an event of default or acceleration of settlement would occur if we were to default under an obligation in respect of borrowings in excess of thresholds, which vary, stated in the contracts. The subsidiaries whose default would trigger cross default vary depending on the contract.

Each of TCEH's natural gas hedging agreements that are secured with a lien on its assets on a pari passu basis with the TCEH Senior Secured Facilities contains a cross default provision. In the event of a default by TCEH or any of its subsidiaries relating to indebtedness (such amounts varying by contract but ranging from $200 million to $250 million) that results in the acceleration of such debt, then each counterparty under these hedging agreements would have the right to terminate its hedge agreement with TCEH and require all outstanding obligations under such agreement to be settled.

In the event of a default by TCEH relating to indebtedness in an amount equal to or greater than $200 million that results in the acceleration of such debt, then each counterparty under TCEH's interest rate swap agreements with an aggregate derivative liability of $1.21 billion at December 31, 2009 would have the right to terminate its interest rate swap agreement with TCEH and require all outstanding obligations under such agreement to be settled.

A default by Oncor or any subsidiary thereof in respect of indebtedness in a principal amount in excess of $50 million may result in a cross default under its credit facility. Under this facility such a default may cause the maturity of outstanding balances ($616 million at December 31, 2009) under such facility to be accelerated.

Other arrangements, including leases, have cross default provisions, the triggering of which would not be expected to result in a significant effect on liquidity.

B–120

EFIHMW00052569

EFIHMW00051935

**PX 030**
**Page 635 of 734**

Table of Contents

*Long–Term Contractual Obligations and Commitments*—The following table summarizes our contractual cash obligations as of December 31, 2009 (see Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for additional disclosures regarding these long–term debt and noncancellable purchase obligations).

| Contractual Cash Obligations | Less Than One Year | One to Three Years | Three to Five Years | More Than Five Years | Total |
|---|---|---|---|---|---|
| Long–term debt—principal (a) | $    340 | $    1,820 | $ 22,817 | $  17,492 | $42,469 |
| Long–term debt—interest (b) | 3,059 | 6,491 | 5,747 | 7,115 | 22,412 |
| Operating and capital leases (c) | 146 | 149 | 114 | 330 | 739 |
| Obligations under commodity purchase and services agreements (d) | 1,595 | 1,796 | 954 | 815 | 5,160 |
| Total contractual cash obligations | $  5,140 | $  10,256 | $ 29,632 | $  25,752 | $70,780 |

(a)   Excludes capital lease obligations, unamortized discounts and fair value premiums and discounts related to purchase accounting. Also excludes $278 million of additional principal amount of notes to be issued in May 2010 and due in 2016 and 2017, reflecting the election of the PIK feature on toggle notes as discussed above under "Toggle Notes Interest Election."

(b)   Includes net amounts payable under interest rate swaps. Variable interest payments and net amounts payable under interest rate swaps are calculated based on interest rates in effect at December 31, 2009.

(c)   Includes short–term noncancellable leases.

(d)   Includes capacity payments, nuclear fuel and natural gas take–or–pay contracts, coal contracts, business services and nuclear–related outsourcing and other purchase commitments. Amounts presented for variable priced contracts assumed the year–end 2009 price remained in effect for all periods except where contractual price adjustment or index–based prices were specified.

The following are not included in the table above:

  •   contracts between affiliated entities and intercompany debt;

  •   individual contracts that have an annual cash requirement of less than $1 million (however, multiple contracts with one counterparty that are more than $1 million on an aggregated basis have been included);

  •   contracts that are cancellable without payment of a substantial cancellation penalty;

  •   employment contracts with management;

  •   estimated funding of pension plan totaling $45 million in 2010 and approximately $750 million for the 2010 to 2014 period as discussed above under "Pension and OPEB Plan Funding;"

  •   liabilities related to uncertain tax positions totaling $1.6 billion discussed in Note 8 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 as the ultimate timing of payment is not known, and

  •   capital expenditures under PUCT orders (advanced meters and CREZ projects).

*Guarantees*—See Note 13 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for details of guarantees.

**OFF–BALANCE SHEET ARRANGEMENTS**

  See discussion above regarding sales of accounts receivable under "Financial Condition—Liquidity and Capital Resources" and in Note 11 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009.

B–121

EFIHMW00052570

EFIHMW00051935

**PX 030**
**Page 636 of 734**

**Table of Contents**
Also see Note 13 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 regarding guarantees.

**COMMITMENTS AND CONTINGENCIES**

See Note 13 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for discussion of commitments and contingencies.

**CHANGES IN ACCOUNTING STANDARDS**

See Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for a discussion of changes in accounting standards.

**REGULATION AND RATES**

*Regulatory Investigations and Reviews*

See Note 13 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009.

*Certification of REPs*

In April 2009, the PUCT finalized a rule relating to the Certification of Retail Electric Providers. The rule strengthens the certification requirements for REPs in order to better protect customers, transmission and distribution utilities (TDUs), and other REPs from the potential insolvency of REPs. The rule, among other things, increases creditworthiness and financial reporting requirements for REPs and provides additional customer protection requirements and regulatory asset consideration for TDU bad debt expenses. Under the rule, Oncor uncollectible amounts owed by REPs are deferred as a regulatory asset. Recovery of the regulatory asset will be considered in a future rate case. Accordingly, Oncor recognized an approximately $3 million one-time reversal of bad debt expense in the three months ended June 30, 2009 (reported in other income). Due to the commitments made to the PUCT in connection with the Merger, Oncor may not recover bad debt expense, or certain other costs and expenses, from rate payers in the event of a TXU Energy default or bankruptcy. Under the rule, REPs are required to amend their certifications, including the manner in which they meet financial requirements, by May 21, 2010. TXU Energy plans to file its amended certification no later than the first quarter 2010. Under the new financial requirements, which will be effective upon approval of the amended certification, the amount of available liquidity required to be maintained by TCEH would have been reduced from $228 million as of December 31, 2009 to approximately $83 million as a result of no longer having to reserve liquidity for payments related to TDUs.

*FERC Infrastructure Protection Standards*

In September 2009, the FERC issued an order approving a revised set of mandatory NERC standards for critical infrastructure protection (CIP). These standards are designed to protect the nation's bulk power system against potential disruptions from cyber security breaches. The mandatory reliability standards require certain users, owners and operators of the bulk power system to establish policies, plans and procedures to safeguard physical and electronic access to control systems, to train personnel on security matters, to report security incidents, and to be prepared to recover from a cyber incident. Both Oncor and Luminant were compliant at December 31, 2009 and are expected to achieve "Auditable Compliance" by year-end 2010 in accordance with the NERC CIP implementation schedule.

*Wholesale Market Design—Nodal Market*

In August 2003, the PUCT adopted a rule that, when implemented, will alter the wholesale market design in the ERCOT market. The rule requires ERCOT to:

* use a stakeholder process to develop a new wholesale market model;

B–122

EFIHMW00052571

EFIHMW00051935

Table of Contents

- operate a voluntary day–ahead energy market;
- directly assign all congestion rents to the resources that caused the congestion;
- use nodal energy prices for resources;
- provide information for energy trading hubs by aggregating nodes;
- use zonal prices for loads, and
- provide congestion revenue rights (but not physical rights).

ERCOT currently has a zonal wholesale market structure consisting of four geographic zones. The proposed location–based congestion–management market is referred to as a "nodal" market because wholesale pricing would differ across the various nodes on the transmission grid. The implementation of a nodal market is being done in conjunction with transmission improvements designed to reduce current congestion. Pursuant to a request from the PUCT, ERCOT announced in November 2008 a preliminary schedule for the implementation of the nodal market by December 2010.

ERCOT imposes a surcharge on all Qualified Scheduling Entities in the ERCOT market (including subsidiaries of TCEH) for the purpose of financing 38% of ERCOT's expected nodal implementation costs. In November 2008, ERCOT filed a request with the PUCT for approval of an interim increase in the nodal surcharge from $0.169 per MWh to $0.375 per MWh. In September 2009, the PUCT approved an increase in the nodal surcharge to $0.375 per MWh, effective January 1, 2010. At the approved $0.375 per MWh nodal surcharge, the annual surcharge to us will be an estimated $30 million to $35 million, which is reported in fuel, purchased power costs and delivery fees. The implementation of a nodal market is scheduled for December 2010. We cannot predict the ultimate impact of the proposed nodal wholesale market design on our operations or financial results.

*Environmental Regulations*

See discussion in Note 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 regarding the invalidation of the EPA's Clean Air Interstate Rule and the related impairment in 2008 of intangible assets representing NOx and SO2 emission allowances.

*Oncor Matters with the PUCT*

*Stipulation Approved by the PUCT*—In April 2008, the PUCT entered an order in Docket No. 34077, which became final in June 2008, approving the terms of a stipulation relating to the filing in 2007 by Oncor and Texas Holdings of a Merger–related Joint Report and Application with the PUCT pursuant to Section 14.101(b) of PURA and PUCT Substantive Rule 25.75. The stipulation required the filing of a rate case by Oncor no later than July 1, 2008 based on a test year ended December 31, 2007. In July 2008, Nucor Steel filed an appeal of the PUCT's order in the 200th District Court of Travis County, Texas. The parties to the appeal have agreed to a schedule that would result in a hearing in June 2010. Oncor was named a defendant and intends to vigorously defend the appeal. Oncor filed the rate case with the PUCT in June 2008, and the PUCT issued a final order with respect to the rate review in August 2009 as discussed below.

*Rate Case*—In June 2008, Oncor filed for a rate review with the PUCT and 204 cities. In August 2009, the PUCT issued a final order with respect to the rate review. The final order approves a total annual revenue requirement for Oncor of $2.64 billion, based on Oncor's 2007 test year cost of service and customer characteristics. New rates were calculated for all customer classes using 2007 test year billing metrics and the approved class cost allocation and rate design. The PUCT staff has estimated that the final order results in an approximate $115 million increase in base rate revenues over Oncor's 2007 adjusted test year revenues, before recovery of rate case expenses. Prior to implementing the new rates in September 2009, Oncor had already begun

B–123

EFIHMW00052572

EFIHMW00051935

**PX 030**
**Page 638 of 734**

**Table of Contents**

recovering $45 million of the $115 million increase as a result of approved transmission cost recovery factor and energy efficiency cost recovery factor filings, such as those discussed below. Also see Note 25 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 regarding the PUCT's review of regulatory assets and liabilities.

Key findings made by the PUCT in the rate review include:

- recognizing and affirming Oncor's corporate ring–fence from EFH Corp. and its unregulated affiliates by rejecting a proposed consolidated tax savings adjustment arising out of EFH Corp.'s ability to offset Oncor's taxable income against losses from other investments;

- approving the recovery of all of Oncor's capital investment in its transmission and distribution system, including investment in certain automated meters that will be replaced pursuant to Oncor's advanced meter deployment plan;

- denying recovery of $25 million of regulatory assets, which resulted in a $16 million after tax loss being recognized in the three months ended September 30, 2009, and

- setting Oncor's return on equity at 10.25%.

New rates were implemented upon approval of new tariffs in September 2009. In November 2009, the PUCT issued an Order on Rehearing that established a new rate class but did not change the revenue requirements. In January 2010, the PUCT denied all Second Motions for Rehearing, which made the November 2009 Order on Rehearing final and appealable.

*Advanced Meter Rulemaking*—In 2005, the Texas Legislature passed legislation that authorized electric utilities to implement a surcharge to recover costs incurred in deploying advanced metering and meter information networks. Benefits of the advanced metering installation include improved safety, on–demand meter reading, enhanced outage identification and restoration and system monitoring of voltages. In 2007, the PUCT issued its advanced metering rule to implement this legislation. This rule outlined the minimum required functionality for an electric utility's advanced metering systems to qualify for cost recovery under a surcharge. Subsequent to the issuance of the rule, the PUCT opened an implementation proceeding for market participants to fine–tune the rule requirements, address the impacts of advanced metering deployment on retail and wholesale markets in ERCOT, and help ensure that retail customers receive benefits from advanced metering deployment. The implementation proceeding is expected to continue through the end of 2010.

*Advanced Metering Deployment Surcharge Filing*—In May 2008, Oncor filed with the PUCT a description and request for approval of its proposed advanced metering system deployment plan and its proposed surcharge for the recovery of its estimated future investment for advanced metering deployment. Oncor's plan provides for the full deployment of over three million advanced meters by the end of 2012 to all residential and most non–residential retail electricity customers in Oncor's service area. As of December 31, 2009, Oncor has installed approximately 660 thousand advanced digital meters, including 620 thousand in the year ended December 31, 2009. Cumulative capital expenditures for the deployment of the advanced meter system totaled $196 million as of December 31, 2009, including $166 million in the year ended December 31, 2009.

In August 2008, a settlement was reached with the majority of the parties to this surcharge filing. The settlement included the following major provisions, as amended by the final order in the 2008 rate review:

- a surcharge beginning on January 1, 2009 and continuing for 11 years;

- a total revenue requirement over the surcharge period of $1.023 billion;

- estimated capital expenditures for advanced metering facilities of $686 million;

- related operation and maintenance expenses for the surcharge period of $153 million;

B–124

EFIHMW00052573

EFIHMW00051935

**PX 030**
**Page 639 of 734**

Table of Contents

- $204 million of operation and maintenance expense savings, and
- an advanced metering cost recovery factor of $2.19 per month per residential retail customer and varying from $2.39 to $5.15 per month for non-residential retail customers.

An order approving the settlement was issued by the PUCT in August 2008 and became final in September 2008. Oncor began billing the advanced metering surcharge in the January 2009 billing month cycle. Oncor may, through subsequent reconciliation proceedings, request recovery of additional costs that are reasonable and necessary. While there is a presumption that costs spent in accordance with a plan approved by the PUCT are reasonable and necessary, recovery of any costs that are found not to have been spent or properly allocated, or not to be reasonable or necessary, must be refunded.

*Transmission Rates*—In order to recover increases in its transmission costs, including incremental fees paid to other transmission service providers due to an increase in their rates, Oncor is allowed to request an update twice a year to the transmission cost recovery factor (TCRF) component of its retail delivery rate charged to REPs. In January 2010, an application was filed to increase the TCRF, which is expected to be administratively approved and become effective in March 2010. This application is expected to increase annualized revenues by $13 million.

In September 2009, Oncor filed an application for an interim update of its wholesale transmission rate, and the PUCT approved the new rate effective December 2009. Accordingly, annualized revenues are expected to increase by approximately $34 million. Approximately $21 million of this increase is recoverable through transmission rates charged to wholesale customers, and the remaining $13 million is recoverable from REPs through the TCRF component of Oncor's delivery rates.

*Application for 2010 Energy Efficiency Cost Recovery Factor*—In May 2009, Oncor filed an application with the PUCT to request approval of an energy efficiency cost recovery factor (EECRF) for 2010. PUCT rules require Oncor to make an annual EECRF filing by May 1 for implementation at the beginning of the next calendar year. The requested 2010 EECRF is $54 million, the same amount established for 2009, and would result in the same $0.92 per month charge for residential customers as proposed in Oncor's rate case. As allowed by the rule, the 2010 EECRF is designed to recover the costs of the 2010 programs, the under–recovery of 2008 program costs, and a performance bonus based on 2008 results. In its November 2009 order, the PUCT approved the application with minor modifications, resulting in an immediate recognition of $9 million in revenues, representing the performance bonus. The final order resulted in a residential EECRF of $0.89 per month due to the PUCT approval of a different allocation methodology for the performance bonus. Oncor's new EECRF rider became effective for billings on and after December 30, 2009.

*Competitive Renewable Energy Zones (CREZs)*—In January 2009, the PUCT awarded approximately $1.3 billion of CREZ construction projects to Oncor. The projects involve the construction of transmission lines to support the transmission of electricity from renewable energy sources, principally wind generation facilities, in west Texas to population centers in the eastern part of the state. A written order reflecting the PUCT's decision was entered in March 2009, and an order on rehearing was issued by the PUCT in May 2009. The cost estimates for the CREZ construction projects are based upon cost analyses prepared by ERCOT in April 2008. For the year ended December 31, 2009, Oncor's CREZ–related capital expenditures totaled $114 million. It is expected that the necessary permitting actions and other requirements and all construction activities for Oncor's CREZ construction projects will be completed by the end of 2013.

In October 2009, the PUCT initiated a proceeding to determine whether there is sufficient financial commitment from generators of renewable energy to grant Certificates of Convenience and Necessity (CCNs) for transmission facilities located in two areas in the panhandle of Texas designated as CREZs. If the PUCT determines that there is not sufficient financial commitment from the generators for either CREZ, the PUCT may take action, including delaying the filing of CREZ CCN applications until such time as the PUCT finds sufficient

B–125

EFIHMW00052574

EFIHMW00051935

**PX 030**
**Page 640 of 734**

**Table of Contents**

financial commitment for that CREZ in accordance with the financial commitment provisions of the PUCT's rules. Three of the CREZ transmission projects awarded to Oncor are located in the two CREZs that are the subject of the proceeding. The estimated cost of these three transmission projects is approximately $380 million. The PUCT held a hearing in this proceeding in January 2010. Oncor expects the PUCT to issue an order concluding this proceeding in the second quarter of 2010.

In July 2009, the City of Garland, Texas filed an Original Petition and Application for Stay and Injunction in the 200th District Court of Travis County, Texas seeking judicial review and a stay of the PUCT's March 2009 written order selecting transmission service providers (including Oncor) to build CREZ transmission facilities. In January 2010, the district court issued an order reversing the PUCT's order and remanding it to the PUCT for action consistent with the court's opinion. The district court did not contain a stay or injunction and severed the City of Garland's requests for declaratory and injunctive relief. On February 4, 2010, the PUCT issued an order that severs certain of the CREZ transmission projects awarded to Oncor and others from its consideration of the remand of the written order. On February 12, 2010, the PUCT issued an order suspending the schedule sequencing CREZ projects subsequent to CREZ priority projects. In the original sequencing order, Oncor was scheduled to file CCN applications for its five CREZ subsequent projects between March and May 2010. The PUCT's order stated that with the record evidence regarding the selection of the transmission service providers for the CREZ subsequent projects will be reevaluated without delay. Oncor cannot predict the impact, if any, the reevaluation may have on its CREZ construction projects.

*Sunset Review*

PURA, the PUCT and the RRC will be subject to "sunset" review by the Texas Legislature in the 2011 legislative session. Sunset review includes, generally, a comprehensive review of the need for and effectiveness of an administrative agency (the PUCT or the RRC), along with an evaluation of the advisability of any changes to the PUCT's authorizing legislation (PURA). A Sunset staff report is scheduled to be issued in April 2010, and a Sunset public meeting is scheduled for May 2010. We cannot predict the outcome of the Sunset review process.

*Summary*

We cannot predict future regulatory or legislative actions or any changes in economic and securities market conditions. Such actions or changes could significantly alter our basic financial position, results of operations or cash flows.

QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Market risk is the risk that we may experience a loss in value as a result of changes in market conditions affecting factors such as commodity prices and interest rates, that may be experienced in the ordinary course of business. Our exposure to market risk is affected by a number of factors, including the size, duration and composition of our energy and financial portfolio, as well as the volatility and liquidity of markets. Instruments used to manage this exposure include interest rate swaps to manage interest rate risk related to indebtedness, as well as exchange traded, over-the-counter contracts and other contractual arrangements to manage commodity price risk.

*Risk Oversight*

TCEH manages the commodity price, counterparty credit and commodity-related operational risk related to the unregulated energy business within limitations established by senior management and in accordance with overall risk management policies. Interest rate risk is managed centrally by the corporate treasury function. Market risks are monitored by risk management groups that operate independently of the wholesale commercial operations, utilizing defined practices and analytical methodologies. These techniques measure the risk of change in value of the portfolio of contracts and the hypothetical effect on this value from changes in market conditions

B-126

EFIHMW00052575

EFIHMW00051935

**PX 030**
**Page 641 of 734**

Table of Contents

and include, but are not limited to, Value at Risk (VaR) methodologies. Key risk control activities include, but are not limited to, transaction review and approval (including credit review), operational and market risk measurement, validation of transaction capture, portfolio valuation and reporting, including mark-to-market valuation, VaR and other risk measurement metrics.

We have a corporate risk management organization that is headed by the Chief Financial Officer, who also functions as the Chief Risk Officer. The Chief Risk Officer, through his designees, enforces applicable risk limits, including the respective policies and procedures to ensure compliance with such limits and evaluates the risks inherent in our businesses.

*Commodity Price Risk*

TCEH is subject to the inherent risks of market fluctuations in the price of electricity, natural gas and other energy-related products it markets or purchases. The company actively manages its portfolio of owned generation assets, fuel supply and retail sales load to mitigate the near-term impacts of these risks on results of operations. The company, similar to other participants in the market, cannot fully manage the long-term value impact of structural declines or increases in natural gas and power prices and spark spreads (differences between the market price of electricity and its cost of production).

In managing energy price risk, TCEH enters into a variety of market transactions including, but not limited to, short- and long-term contracts for physical delivery, exchange traded and over-the-counter financial contracts and bilateral contracts with customers. Activities include hedging, the structuring of long-term contractual arrangements and proprietary trading. The company continuously monitors the valuation of identified risks and adjusts positions based on current market conditions. The company strives to use consistent assumptions regarding forward market price curves in evaluating and recording the effects of commodity price risk.

*Long-Term Hedging Program*—See "Significant Activities and Events" above for a description of the program, including potential effects on reported results.

*VaR Methodology*—A VaR methodology is used to measure the amount of market risk that exists within the portfolio under a variety of market conditions. The resultant VaR produces an estimate of a portfolio's potential for loss given a specified confidence level and considers among other things, market movements utilizing standard statistical techniques given historical and projected market prices and volatilities.

A Monte Carlo simulation methodology is used to calculate VaR and is considered by management to be the most effective way to estimate changes in a portfolio's value based on assumed market conditions for liquid markets. The use of this method requires a number of key assumptions, such as use of (i) an assumed confidence level; (ii) an assumed holding period (i.e., the time necessary for management action, such as to liquidate positions); and (iii) historical estimates of volatility and correlation data.

*Trading VaR*—This measurement estimates the potential loss in fair value, due to changes in market conditions, of all contracts entered into for trading purposes based on a 95% confidence level and an assumed holding period of five to 60 days.

| | Year Ended December 31, 2009 | | Year Ended December 31, 2008 | |
|---|---|---|---|---|
| Month-end average Trading VaR: | $ | 4 | $ | 6 |
| Month-end high Trading VaR: | $ | 7 | $ | 15 |
| Month-end low Trading VaR: | $ | 2 | $ | 2 |

*VaR for Energy-Related Contracts Subject to Mark-to-Market (MtM) Accounting*—This measurement estimates the potential loss in fair value, due to changes in market conditions, of all contracts marked-to-market

B-127

EFIHMW00052576

EFIHMW00051935

PX 030
Page 642 of 734

**Table of Contents**

in net income (principally hedges not accounted for as cash flow hedges and trading positions), based on a 95% confidence level and an assumed holding period of five to 60 days.

| | Year Ended December 31, 2009 | Year Ended December 31, 2008 |
|---|---|---|
| Month-end average MtM VaR: | $ 1,050 | $ 2,290 |
| Month-end high MtM VaR: | $ 1,470 | $ 3,549 |
| Month-end low MtM VaR: | $ 638 | $ 1,087 |

*Earnings at Risk (EaR)*—This measurement estimates the potential reduction of pretax earnings for the periods presented, due to changes in market conditions, of all energy–related contracts marked–to–market in net income and contracts not marked–to–market in net income that are expected to be settled within the fiscal year (physical purchases and sales of commodities). Transactions accounted for as cash flow hedges are also included for this measurement. A 95% confidence level and a five to 60 day holding period are assumed in determining EaR.

| | Year Ended December 31, 2009 | Year Ended December 31, 2008 |
|---|---|---|
| Month-end average EaR: | $ 1,088 | $ 2,300 |
| Month-end high EaR: | $ 1,511 | $ 3,916 |
| Month-end low EaR: | $ 676 | $ 1,069 |

The decreases in the risk measures (MtM VaR and EaR) above were primarily driven by lower natural gas prices in 2009.

B–128

EFIHMW00052577

EFIHMW00051935

**PX 030**
**Page 643 of 734**

Table of Contents
*Interest Rate Risk*

The table below provides information concerning our financial instruments as of December 31, 2009 and 2008 that are sensitive to changes in interest rates, which include debt obligations and interest rate swaps. We have entered into interest rate swaps under which we have exchanged the difference between fixed–rate and variable–rate interest amounts calculated with reference to specified notional principal amounts at dates that generally coincide with interest payments under our credit facilities. In addition, in connection with entering into certain interest rate basis swaps to further reduce fixed borrowing costs, TCEH has changed the variable interest rate terms of certain debt from three–month LIBOR to one–month LIBOR, as discussed in Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009. The weighted average interest rate presented is based on the rate in effect at the reporting date. Capital leases and the effects of unamortized premiums and discounts and fair value hedges are excluded from the table. See Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for a discussion of changes in debt obligations.

| | Expected Maturity Date | | | | | | Successor | | | |
| | (millions of dollars, except percentages) | | | | | | | | | |
| | 2010 | 2011 | 2012 | 2013 | 2014 | There–After | 2009 Total Carrying Amount | 2009 Total Fair Value | 2008 Total Carrying Amount | 2008 Total Fair Value |
|---|---|---|---|---|---|---|---|---|---|---|
| Long–term debt (including current maturities): | | | | | | | | | | |
| Fixed rate debt amount (a) | $ 135 | $ 559 | $ 851 | $ 866 | $ 1,163 | $17,287 | $20,861 | $17,296 | $20,646 | $14,266 |
| Average interest rate | 5.46% | 5.66% | 6.24% | 6.00% | 5.57% | 9.59% | 8.95% | | 8.70% | |
| Variable rate debt amount | $ 205 | $ 205 | $ 205 | $ 205 | $20,583 | $ 205 | $21,608 | $17,463 | $21,261 | $14,886 |
| Average interest rate | 3.74% | 3.74% | 3.74% | 3.74% | 3.74% | 0.29% | 3.71% | | 5.28% | |
| | | | | | | | | | | |
| Total debt | $ 340 | $ 764 | $1,056 | $1,071 | $21,746 | $17,492 | $42,469 | $34,759 | $41,907 | $29,152 |
| | | | | | | | | | | |
| Debt swapped to fixed: | | | | | | | | | | |
| Amount | $ 500 | $ 600 | $2,600 | $3,600 | $ 9,000 | $ — | $16,300 | | $17,550 | |
| Average pay rate | 7.43% | 7.57% | 7.99% | 7.60% | 8.18% | — | 7.98% | | 8.00% | |
| Average receive rate | 3.74% | 3.74% | 3.74% | 3.74% | 3.74% | — | 3.74% | | 5.88% | |
| Variable basis swaps: | | | | | | | | | | |
| Amount | $3,600 | $5,450 | $7,200 | $ — | $ — | $ — | $16,250 | | $13,045 | |
| Average pay rate | 0.32% | 0.33% | 0.33% | — | — | — | 0.33% | | 2.48% | |
| Average receive rate | 0.24% | 0.24% | 0.24% | — | — | — | 0.24% | | 2.00% | |

(a) Reflects the remarketing date and not the maturity date for certain debt that is subject to mandatory tender for remarketing prior to maturity. See Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for details concerning long–term debt subject to mandatory tender for remarketing.

As of December 31, 2009, the potential reduction of annual pretax earnings due to a one percentage point (100 basis points) increase in floating interest rates on long–term debt totaled approximately $42 million, taking into account the interest rate swaps discussed in Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009.

B–129

EFIHMW00052578

EFIHMW00051935

Table of Contents
*Credit Risk*

Credit risk relates to the risk of loss associated with nonperformance by counterparties. We maintain credit risk policies with regard to our counterparties to minimize overall credit risk. These policies prescribe practices for evaluating a potential counterparty's financial condition, credit rating and other quantitative and qualitative credit criteria and specify authorized risk mitigation tools including, but not limited to, use of standardized master netting contracts and agreements that allow for netting of positive and negative exposures associated with a single counterparty. We have processes for monitoring and managing credit exposure of our businesses including methodologies to analyze counterparties' financial strength, measurement of current and potential future exposures and contract language that provides rights for netting and set-off. Credit enhancements such as parental guarantees, letters of credit, surety bonds and margin deposits are also utilized. Additionally, individual counterparties and credit portfolios are managed to assess overall credit exposure. This evaluation results in establishing exposure limits or collateral requirements for entering into an agreement with a counterparty that creates exposure. Additionally, we have established controls to determine and monitor the appropriateness of these limits on an ongoing basis. Prospective material adverse changes in the payment history or financial condition of a counterparty or downgrade of its credit quality result in the reassessment of the credit limit with that counterparty. This process can result in the subsequent reduction of the credit limit or a request for additional financial assurances.

*Credit Exposure*—Our gross exposure to credit risk associated with trade accounts receivable (retail and wholesale) and net asset positions arising from hedging and trading activities totaled $2.616 billion at December 31, 2009. The components of this exposure are discussed in more detail below.

Assets subject to credit risk as of December 31, 2009 include $897 million in accounts receivable from the retail sale of electricity to residential and business customers. Cash deposits held as collateral for these receivables totaled $83 million at December 31, 2009. The risk of material loss (after consideration of bad debt allowances) from nonperformance by these customers is unlikely based upon historical experience. Allowances for uncollectible accounts receivable are established for the potential loss from nonpayment by these customers based on historical experience, market or operational conditions and changes in the financial condition of large business customers.

Assets subject to credit risk also include accounts receivable from electricity transmission and distribution services. This exposure, which totaled $245 million at December 31, 2009, consists almost entirely of noninvestment grade trade accounts receivable. Of this amount, $180 million represents trade accounts receivable from REPs. Oncor has a customer with subsidiaries that collectively represent 11% of the total exposure. No other nonaffiliated parties represent 10% or more of the total exposure.

The remaining credit exposure arises from wholesale energy sales and purchases and hedging and trading activities, including interest rate hedging. Counterparties to these transactions include energy companies, financial institutions, electric utilities, independent power producers, oil and gas producers, local distribution companies and energy trading and marketing companies. As of December 31, 2009, the exposure to credit risk from these counterparties totaled $1.474 billion taking into account the standardized master netting contracts and agreements described above but before taking into account $177 million in credit collateral (cash, letters of credit and other credit support). The net exposure (after credit collateral) of $1.297 billion increased approximately $502 million in the year ended December 31, 2009, driven by increased derivative asset/decreased derivative liability values due to the effect of changes in natural gas prices and interest rates on the values of our hedge positions.

Of this $1.297 billion net exposure, 99.7% is with investment grade customers and counterparties, as determined using publicly available information including major rating agencies' published ratings and our internal credit evaluation process. Those customers and counterparties without a S&P rating of at least BBB− or similar rating from another major rating agency are rated using internal credit methodologies and credit scoring

B−130

EFIHMW00052579

EFIHMW00051935

**PX 030**
**Page 645 of 734**

**Table of Contents**
models to estimate a S&P equivalent rating. The company routinely monitors and manages credit exposure to these customers and counterparties on this basis.

The following table presents the distribution of credit exposure as of December 31, 2009 arising from wholesale energy sales and purchases and hedging and trading activities. This credit exposure represents wholesale trade accounts receivable and net asset positions on the balance sheet arising from hedging and trading activities after taking into consideration netting and setoff provisions within each contract and any master netting contracts with counterparties.

| | Exposure Before Credit Collateral | Credit Collateral | Net Exposure | Net Exposure by Maturity | | | Total |
| | | | | 2 years or less | Between 2–5 years | Greater than 5 years | |
|---|---|---|---|---|---|---|---|
| Investment grade | $ 1,467 | $ 174 | $ 1,293 | $ 880 | $ 413 | $ — | $1,293 |
| Noninvestment grade | 7 | 3 | 4 | 4 | — | — | 4 |
| Totals | $ 1,474 | $ 177 | $ 1,297 | $ 884 | $ 413 | $ — | $1,297 |
| Investment grade | 99.5% | | 99.7% | | | | |
| Noninvestment grade | 0.5% | | 0.3% | | | | |

In addition to the exposures in the table above, contracts classified as "normal" purchase or sale and non–derivative contractual commitments are not marked–to–market in the financial statements. Such contractual commitments may contain pricing that is favorable considering current market conditions and therefore represent economic risk if the counterparties do not perform. Nonperformance could have a material adverse impact on future results of operations, financial condition and cash flows.

Significant (10% or greater) concentration of credit exposure exists with three counterparties, which represented 41%, 37% and 12% of the net $1.297 billion exposure. We view exposure to these counterparties to be within an acceptable level of risk tolerance due to the applicable counterparty's credit rating and the importance of our business relationship with the counterparty. However, this concentration increases the risk that a default would have a material effect on results of operations.

With respect to credit risk related to the long–term hedging program, over 99% of the transaction volumes are with counterparties with an A credit rating or better. However, there is current and potential credit concentration risk related to the limited number of counterparties that comprise the substantial majority of the program with such counterparties being in the banking and financial sector. The transactions with these counterparties contain certain credit rating provisions that would require the counterparties to post collateral in the event of a material downgrade in the credit rating of the counterparties. An event of default by one or more hedge counterparties could subsequently result in termination–related settlement payments that reduce available liquidity if amounts are owed to the counterparties related to the commodity contracts or delays in receipts of expected settlements if the hedge counterparties owe amounts to us. While the potential concentration of risk with these counterparties is viewed to be within an acceptable risk tolerance, the exposure to hedge counterparties is managed through the various ongoing risk management measures described above.

B–131

EFIHMW00052580

EFIHMW00051935

**Table of Contents**
Adjusted EBITDA Reconciliation

**EFH Corp. Consolidated**
**Adjusted EBITDA Reconciliation**

| | Year Ended December 31, 2009 | | Year Ended December 31, 2008 |
|---|---|---|---|
| | (millions of dollars) | | |
| Net income (loss) attributable to EFH Corp. | $ 344 | $ | (9,838) |
| Income tax expense (benefit) | 367 | | (471) |
| Interest expense and related charges | 2,912 | | 4,935 |
| Depreciation and amortization | 1,754 | | 1,610 |
| **EBITDA** | $ 5,377 | $ | (3,764) |
| Oncor EBITDA | (1,354) | | (496) |
| Oncor distributions/dividends (a) | 216 | | 1,582 |
| Interest income | (45) | | (27) |
| Amortization of nuclear fuel | 95 | | 76 |
| Purchase accounting adjustments (b) | 346 | | 460 |
| Impairment of goodwill | 90 | | 8,000 |
| Impairment of assets and inventory write down (c) | 42 | | 1,221 |
| Net gain on debt exchange offers | (87) | | — |
| Net income (loss) attributable to noncontrolling interests | 64 | | (160) |
| EBITDA amount attributable to consolidated unrestricted subsidiaries | 3 | | — |
| Unrealized net (gain) loss resulting from hedging transactions | (1,225) | | (2,329) |
| Amortization of "day one" net loss on Sandow 5 power purchase agreement | (10) | | — |
| Losses on sale of receivables | 12 | | 29 |
| Noncash compensation expenses (d) | 11 | | 27 |
| Severance expense (e) | 10 | | 3 |
| Transition and business optimization costs (f) | 22 | | 45 |
| Transaction and merger expenses (g) | 81 | | 64 |
| Insurance settlement proceeds (h) | — | | (21) |
| Restructuring and other (i) | (14) | | 35 |
| Expenses incurred to upgrade or expand a generation station (j) | 100 | | 100 |
| **Adjusted EBITDA per Incurrence Covenant** | $ 3,734 | $ | 4,845 |
| **Add back Oncor adjustments** | $ 1,123 | $ | (267) |
| **Adjusted EBITDA per Restricted Payments Covenants** | $ 4,857 | $ | 4,578 |

(a)  2008 amount includes $1.253 billion distribution of net proceeds from the sale of Oncor noncontrolling interests.
(b)  Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel. Also include certain credits not recognized in net income due to purchase accounting.
(c)  Impairment of assets includes impairments of emission allowances and trade name intangible assets, impairments of land and the natural gas-fueled generation fleet and charges related to the cancelled development of coal-fueled generation facilities.
(d)  Noncash compensation expenses are accounted for under accounting standards related to stock compensation and exclude capitalized amounts.
(e)  Severance expense includes amounts incurred related to outsourcing, restructuring and other amounts deemed to be in excess of normal recurring amounts.

B-132

EFIHMW00052581

EFIHMW00051935

**PX 030**
**Page 647 of 734**

**Table of Contents**

(f)     Transition and business optimization costs include professional fees primarily for retail billing and customer care systems enhancements and incentive compensation.

(g)     Transaction and merger expenses include costs related to the Merger and abandoned strategic transactions, outsourcing transition costs, administrative costs related to the cancelled program to develop coal–fueled generation facilities, the Sponsor Group management fee, costs related to certain growth initiatives and costs related to the Oncor sale of noncontrolling interests.

(h)     Insurance settlement proceeds include the amount received for property damage to certain mining equipment.

(i)     Restructuring and other for 2009 primarily represents reversal of certain liabilities accrued in purchase accounting and recorded as other income, partially offset by restructuring and nonrecurring activities; 2008 includes a litigation accrual, a charge related to the bankruptcy of a subsidiary of Lehman Brothers Holdings Inc., and other restructuring initiatives and nonrecurring activities.

(j)     Expenses incurred to upgrade or expand a generation station reflect noncapital outage costs.

B–133

EFIHMW00052582

EFIHMW00051935

Table of Contents

**TCEH Consolidated**
**Adjusted EBITDA Reconciliation**

| | Year Ended December 31, 2009 | Year Ended December 31, 2008 |
|---|---|---|
| | (millions of dollars) | |
| Net income (loss) | $ 709 | $ (8,862) |
| Income tax expense (benefit) | 447 | (411) |
| Interest expense and related charges | 1,833 | 3,918 |
| Depreciation and amortization | 1,172 | 1,092 |
| **EBITDA** | $ 4,161 | $ (4,263) |
| Interest income | (64) | (60) |
| Amortization of nuclear fuel | 95 | 76 |
| Purchase accounting adjustments (a) | 299 | 413 |
| Impairment of goodwill | 70 | 8,000 |
| Impairment of assets and inventory write down (b) | 36 | 1,210 |
| EBITDA amount attributable to consolidated unrestricted subsidiaries | 3 | — |
| Unrealized net (gain) loss resulting from hedging transactions | (1,225) | (2,329) |
| Amortization of "day one" net loss on Sandow 5 power purchase agreement | (10) | — |
| Corporate depreciation, interest and income tax expenses included in SG&A expense | 6 | — |
| Losses on sale of receivables | 12 | 29 |
| Noncash compensation expense (c) | 1 | 10 |
| Severance expense (d) | 10 | 3 |
| Transition and business optimization costs (e) | 25 | 33 |
| Transaction and merger expenses (f) | 5 | 10 |
| Insurance settlement proceeds (g) | — | (21) |
| Restructuring and other (h) | (19) | 31 |
| Expenses incurred to upgrade or expand a generation station (i) | 100 | 100 |
| **Adjusted EBITDA per Incurrence Covenant** | $ 3,505 | $ 3,242 |
| Expenses related to unplanned generation station outages (i) | 91 | 250 |
| Other adjustments allowed to determine Adjusted EBITDA per Maintenance Covenant (j) | 38 | 15 |
| **Adjusted EBITDA per Maintenance Covenant** | $ 3,634 | $ 3,507 |

(a)  Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel. Also include certain credits not recognized in net income due to purchase accounting.
(b)  Impairment of assets includes impairments of emission allowances and trade name intangible assets and impairments of land and the natural gas–fueled generation fleet.
(c)  Noncash compensation expenses are accounted for under accounting standards related to stock compensation and exclude capitalized amounts.
(d)  Severance expense includes amounts incurred related to outsourcing, restructuring and other amounts deemed to be in excess of normal recurring amounts.
(e)  Transition and business optimization costs include professional fees primarily for retail billing and customer care systems enhancements and incentive compensation.
(f)  Transaction and merger expenses include costs related to the Merger, outsourcing transition costs and costs related to certain growth initiatives.

B–134

EFIHMW00052583

EFIHMW00051935

**Table of Contents**

(g)  Insurance settlement proceeds include the amount received for property damage to certain mining equipment.
(h)  Restructuring and other for 2009 primarily represents reversal of certain liabilities accrued in purchase accounting and recorded as other income, partially offset by restructuring and nonrecurring activities; 2008 includes a charge related to the bankruptcy of a subsidiary of Lehman Brothers Holdings Inc. and other restructuring initiatives and nonrecurring activities.
(i)  Expenses incurred to upgrade or expand a generation station reflect noncapital outage costs.
(j)  Primarily pre-operating expenses relating to Oak Grove and Sandow 5.

B-135

EFIHMW00052584

EFIHMW00051935

**PX 030
Page 650 of 734**

Table of Contents

### CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

There were no changes in or disagreements with accountants on accounting and financial disclosure during EFH Corp.'s two most recent fiscal years and each subsequent interim period since the end of the most recent fiscal year.

### MANAGEMENT

**Directors**

The names of EFH Corp.'s directors and information about them, as furnished by the directors themselves, are set forth below:

| Name | Age | Served As Director Since | Business Experience |
|---|---|---|---|
| Arcilia C. Acosta (1)(4) | 44 | 2008 | Arcilia C. Acosta has served as a Director of EFH Corp. since May 2008. During the last five years, Ms. Acosta's principal occupation and employment has been serving as the CEO of CARCON Industries & Construction, L.L.C. (CARCON) and its subsidiaries. She is also the CEO and controlling principal of Southwestern Testing Laboratories, L.L.C. (STL). CARCON's principal business is commercial, institutional and transportation construction. STL's principal business is geotechnical engineering, construction materials testing and environmental consulting. Ms. Acosta is a former Chair of the State of Texas Hispanic chambers organization known as the Texas Association of Mexican American Chambers of Commerce (TAMACC) and the Greater Dallas Hispanic Chamber of Commerce. Ms. Acosta serves on the Board of Advisors for Compass Bank and the Board of Governors for the Dallas Foundation. |
| David Bonderman | 67 | 2007 | David Bonderman has served as a Director of EFH Corp. since October 2007. He is a founding partner of TPG Capital, L.P. (TPG). Before forming TPG in 1992, Mr. Bonderman was Chief Operating Officer of the Robert M. Bass Group (now doing business as Keystone Group L.P.) in Fort Worth, Texas. He serves on the boards of the following public companies: Armstrong World Industries, Inc., CoStar Group, Inc., Gemalto N.V., General Motors Company, Harrah's Entertainment, RyanAir Holdings PLC, for which he serves as Chairman of the Board, and Univision Communications, Inc. During the past five years, Mr. Bonderman also served on the boards of Burger King Holdings, Inc., Ducati Motor Holding S.P.A., Gemplus International S.A. (predecessor to Gemalto N.V.), IASIS Healthcare Corporation, Korea First Bank Ltd., Mobilcom AG, and Washington Mutual, Inc. |

B-136

EFIHMW00052585

EFIHMW00051935

**Table of Contents**

| Name | Age | Served As Director Since | Business Experience |
|---|---|---|---|
| Donald L. Evans (2)(3)(4) | 64 | 2007 | Donald L. Evans has served as a Director and Non−Executive Chairman of EFH Corp. since October 2007. He was CEO of the Financial Services Forum from 2005 to 2007, after serving as the 34th secretary of the US Department of Commerce. Before serving as Secretary of Commerce, Mr. Evans was the former CEO of Tom Brown, Inc., a large independent energy company. He also previously served as a member and chairman of the Board of Regents of the University of Texas System. Mr. Evans is also a Senior Partner at Quintana Energy Partners, L.P. |
| Thomas D. Ferguson (3) | 56 | 2008 | Thomas D. Ferguson has served as a Director of EFH Corp. since December 2008. He is a Managing Director of Goldman, Sachs & Co., having joined the firm in 2003. Mr. Ferguson heads the asset management efforts for the merchant bank's infrastructure investment activity worldwide. He currently serves on the boards of some of Goldman, Sachs & Co.'s largest infrastructure investments, including Associated British Ports, the largest port company in the UK; Carrix, one of the largest private container terminal operators in the world; and Red de Carreteras, a major toll road concessionaire in Mexico. Additional responsibilities at Goldman, Sachs & Co. include an 18 month stint as the CEO of National Golf/American Golf, one of the leading owner/operators of golf courses in the US for which he now serves as the company's non−executive Chairman. |
| Frederick M. Goltz (2)(3) | 39 | 2007 | Frederick M. Goltz has served as a Director of EFH Corp. since October 2007. He has been with Kohlberg Kravis Roberts and Co., L.P. (KKR) for 14 years. Mr. Goltz has played a significant role in the development of many of the themes pursued by KKR in the energy space, including those related to integrated utilities, merchant generation, and oil and gas exploration and production. He now heads KKR's newly created Mezzanine Fund headquartered in San Francisco. He is a director of EFCH, TCEH, and Luminant Holding Company LLC (Luminant). During the past five years, Mr. Goltz also served on the boards of Accuride Corp. and Texas Genco Holdings, Inc. |
| James R. Huffines (1)(3) | 59 | 2007 | James R. Huffines has served as a Director of EFH Corp. since October 2007. He is Chairman of the University of Texas System Board of Regents, after previously serving as Vice Chairman from November 2007 to April 2009 and Chairman from June 2004 to November 2007. He also is Chairman, Central and South Texas Region, of PlainsCapital Bank, Senior Executive Vice President of PlainsCapital Corporation, and a director of Andrew Harper Travel Publications, Inc. and PlainsCapital Bank. Mr. Huffines also serves on the boards of EFIH and EFIH Finance. |

B−137

EFIHMW00052586

EFIHMW00051935

**Table of Contents**

| Name | Age | Served As Director Since | Business Experience |
|---|---|---|---|
| Scott Lebovitz | 34 | 2007 | Scott Lebovitz has served as a Director of EFH Corp. since October 2007. He is a Managing Director of Goldman, Sachs & Co. in its Principal Investment Area. He joined Goldman, Sachs & Co. in 1997 and was promoted to Managing Director in 2007. Mr. Lebovitz serves on the boards of both public and private companies, including CVR Energy, Inc., EFCH, TCEH, and Luminant. |
| Jeffrey Liaw | 33 | 2007 | Jeffrey Liaw has served as a Director of EFH Corp. since October 2007. He is active in TPG's energy and industrial investing practice areas. Before joining TPG in 2005, he worked for Bain Capital in its industrials practice. Mr. Liaw serves on the boards of both public and private companies, including Graphic Packaging Holding Company, EFIH and Oncor. |
| Marc S. Lipschultz (2)(4) | 41 | 2007 | Marc S. Lipschultz has served as a Director of EFH Corp. since October 2007. He joined KKR in 1995 and is the global head of KKR's Energy and Infrastructure business. Mr. Lipschultz serves on KKR's Management Committee and its Infrastructure Investment Committee. Currently, he is on the boards of Accel-KKR Company and Oncor. During the past five years, Mr. Lipschultz also served on the boards of Texas Genco Holdings, Inc., The Boyds Collection, Ltd. and EFIH. |
| Michael MacDougall (2)(3) | 39 | 2007 | Michael MacDougall has served as a Director of EFH Corp. since October 2007. He is a partner of TPG. Prior to joining TPG in 2002, Mr. MacDougall was a vice president in the Principal Investment Area of the Merchant Banking Division of Goldman, Sachs & Co., where he focused on private equity and mezzanine investments. Mr. MacDougall serves on the board of directors of both public and private companies, including Graphic Packaging Holding Company, Kraton Performance Polymers Inc., Valerus Compression Services, L.P., EFCH, TCEH, and Luminant. During the past five years, he also served on the board of Aleris International. Mr. MacDougall also serves as the Chairman of the Board of The Opportunity Network and is a member of the Board of the Dwight School Foundation and Islesboro Affordable Property. |

B–138

EFIHMW00052587

EFIHMW00051935

Table of Contents

| Name | Age | Served As Director Since | Business Experience |
|---|---|---|---|
| Lyndon L. Olson, Jr. (3) | 63 | 2007 | Lyndon L. Olson, Jr. has served as a Director of EFH Corp. since October 2007. He was a Senior Advisor with Citigroup Inc. from 2002 to 2008, after serving as United States Ambassador to Sweden from 1998 to 2001. He previously was affiliated with Citigroup from 1990 to 1998, as President and CEO of Travelers Insurance Holdings and the Associated Madison Companies, predecessor companies. Before joining Citigroup, he had been President of the National Group Corporation and CEO of its National Group Insurance Company. Ambassador Olson also is a former Chairman and a Member of the Texas 173 State Board of Insurance, former President of the National Association of Insurance Commissioners, and a former member of the Texas House of Representatives. Ambassador Olson also serves on the board of First Acceptance Corporation, Sammons Enterprises and Texas Meter and Device Company. |
| Kenneth Pontarelli (2)(4) | 40 | 2007 | Kenneth Pontarelli has served as a Director of EFH Corp. since October 2007. He is a Managing Director of Goldman, Sachs & Co. in its Principal Investment Area. He transferred to the Principal Investment Area in 1999 and was promoted to Managing Director in 2004. Mr. Pontarelli serves as a director of both public and private companies, including CCS, Inc., Cobalt International Energy, L.P., Expro International Group Ltd., CVR Energy, Inc., Kinder Morgan, Inc. and TXU Energy. |
| William K. Reilly | 70 | 2007 | William K. Reilly has served as a Director of EFH Corp. since October 2007. He is a Senior Advisor to TPG and a founding partner of Aqua International Partners, an investment group that invests in companies that serve the water and renewable energy sectors. Mr. Reilly previously served as the seventh Administrator of the EPA. Mr. Reilly is a director of the following public companies: E.I DuPont de Nemours and Company, Eden Springs, Ltd. of Israel, ConocoPhillips and Royal Caribbean International. During the past five years, he also served on the board of Ionics Inc. Before serving as EPA Administrator, Mr. Reilly was President of World Wildlife Fund and President of The Conservation Foundation. He previously served as Executive Director of the Rockefeller Task Force on Land Use and Urban Growth, a senior staff member of the President's Council on Environmental Quality, and Associate Director of the Urban Policy Center and the National Urban Coalition. Mr. Reilly is Co-Chairman of the National Commission on Energy Policy. |

B–139

EFIHMW00052588

EFIHMW00051935

**PX 030**
**Page 654 of 734**

Table of Contents

| Name | Age | Served As Director Since | Business Experience |
|---|---|---|---|
| Jonathan D. Smidt | 37 | 2007 | Jonathan D. Smidt has served as a Director of EFH Corp. since October 2007. He has been with KKR since 2000, where he is a member of the firm's Energy and Natural Resources industry team. Currently, he is a director of Laureate Education Inc., East Resources Inc. and TXU Energy. |
| John F. Young (2)(3) | 53 | 2008 | John F. Young has served as a Director and President and Chief Executive of EFH Corp. since January 2008. Before joining EFH Corp., Mr. Young served in many leadership roles at Exelon from March 2003 to January 2008 including Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation; President of Exelon Generation; and President and Chief Operating Officer of Exelon Power. Prior to joining Exelon, Mr. Young was Senior Vice President of Sierra Pacific Resources Corporation. Mr. Young also serves on the boards of EFIH, EFIH Finance and Luminant. |
| Kneeland Youngblood (1) | 54 | 2007 | Kneeland Youngblood has served as a Director of EFH Corp. since October 2007. He is a founding partner of Pharos Capital Group, a private equity firm that focuses on providing growth and expansion capital to businesses in technology, business services, and health care services. Mr. Youngblood is a director of the following public companies: Starwood Hotels and Resorts Worldwide, Inc., Gap Inc. and Burger King Holdings, Inc. Mr. Youngblood is a member of the Council on Foreign Relations. |

(1)    Member of Audit Committee.
(2)    Member of Executive Committee.
(3)    Member of Governance and Public Affairs Committee
(4)    Member of Organization and Compensation Committee

B–140

EFIHMW00052589

EFIHMW00051935

Table of Contents
**Executive Officers**

The names and information regarding EFH Corp.'s executive officers are set forth below:

| Name of Officer | Age | Positions and Offices Presently Held | Date First Elected to Present Offices | Business Experience (Preceding Five Years) |
|---|---|---|---|---|
| John F. Young | 53 | President and Chief Executive Officer of EFH Corp. | January 2008 | John F. Young was elected President and Chief Executive Officer of EFH Corp. in January 2008. Before joining EFH Corp., Mr. Young served in many leadership roles at Exelon Corporation from March 2003 to January 2008, including Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation; President of Exelon Generation; and President and Chief Operating Officer of Exelon Power. Prior to joining Exelon, Mr. Young was Senior Vice President of Sierra Pacific Resources Corporation. |
| James A. Burke | 41 | President and Chief Executive of TXU Energy | August 2005 | James A. Burke was elected President and Chief Executive of TXU Energy in August 2005. Previously, Mr. Burke was Senior Vice President Consumer Markets of TXU Energy. |
| David A. Campbell | 41 | President and Chief Executive of Luminant | June 2008 | David A. Campbell was elected President and Chief Executive of Luminant in June 2008. Mr. Campbell was Executive Vice President and Chief Financial Officer of EFH Corp. from April 2007 to June 2008 having previously served as Acting Chief Financial Officer beginning in March 2006 and as Executive Vice President for Corporate Planning, Strategy & Risk when he joined the company in May 2004. |
| Charles R. Enze | 57 | Executive Vice President and Chief Executive of Luminant Construction | September 2006 | Charles R. Enze was elected Executive Vice President and Chief Executive of Luminant Construction in September 2006. Prior to joining EFH Corp. in 2006, Mr. Enze was Vice President of Engineering and Projects for Shell International Exploration & Production. |

B-141

EFIHMW00052590

EFIHMW00051935

Table of Contents

| Name of Officer | Age | Positions and Offices Presently Held | Date First Elected to Present Offices | Business Experience (Preceding Five Years) |
|---|---|---|---|---|
| M. S. Greene | 64 | Vice Chairman of EFH Corp. | June 2008 | M. S. Greene was elected Vice Chairman of EFH Corp. in June 2008. Previously Mr. Greene held several other offices including President and Chief Executive of Luminant, Chairman of the Board, President and Chief Executive of TXU Power, Executive Vice President of TCEH, and Vice Chairman, Chief Executive and President of Oncor. |
| Joel D. Kaplan | 41 | Executive Vice President of EFH Corp. | November 2009 | Joel D. Kaplan was elected Executive Vice President of EFH Corp. in November 2009 and oversees the company's public affairs organization. Prior to joining EFH Corp., Mr. Kaplan served as Deputy Chief of Staff in the George W. Bush White House from 2006 to 2008 and Deputy Director of the Office of Management and Budget from 2003 to 2006. |
| Paul M. Keglevic | 56 | Executive Vice President and Chief Financial Officer of EFH Corp. | July 2008 | Paul M. Keglevic was elected Executive Vice President and Chief Financial Officer of EFH Corp. in July 2008. Before joining EFH Corp., he was an audit partner at PricewaterhouseCoopers. Mr. Keglevic was PricewaterhouseCoopers' Utility Sector Leader from 2002 to 2008 and Clients and Sector Assurance Leader from 2007 to 2008. |
| Richard J. Landy | 64 | Executive Vice President of EFH Corp. | February 2010 | Richard J. Landy was elected Executive Vice President of EFH Corp. in February 2010 and oversees human resources. Prior to joining EFH Corp., Mr. Landy was owner and consultant of Richard J. Landy, LLC from 2007 to 2009 and Senior Vice President of Exelon from 2002 to 2007. |
| M. A. McFarland | 40 | Executive Vice President and Chief Commercial Officer of Luminant and Executive Vice President of EFH Corp. | July 2008 | M. A. McFarland was elected Executive Vice President and Chief Commercial Officer of Luminant and Executive Vice President of EFH Corp. in July 2008. Before joining Luminant, Mr. McFarland served as Senior Vice President of Mergers, Acquisitions and Divestitures and as a Vice President in the wholesale marketing and trading division power team at Exelon. |

B-142

EFIHMW00052591

EFIHMW00051935

**PX 030**
**Page 657 of 734**

Table of Contents

| Name of Officer | Age | Positions and Offices Presently Held | Date First Elected to Present Offices | Business Experience (Preceding Five Years) |
|---|---|---|---|---|
| Robert C. Walters | 52 | Executive Vice President and General Counsel of EFH Corp. | March 2008 | Robert C. Walters was elected Executive Vice President and General Counsel of EFH Corp. in March 2008. Prior to joining EFH Corp., Mr. Walters was a Partner of Vinson & Elkins LLP and served on the firm's management committee. Mr. Walters was co–managing partner of the Dallas office of Vinson & Elkins LLP from 1998 through 2005. |

There is no family relationship between any of the above–named executive officers.

B–143

EFIHMW00052592

EFIHMW00051935

**PX 030**
**Page 658 of 734**

Table of Contents

### EXECUTIVE COMPENSATION
#### Organization and Compensation Committee

The Organization and Compensation Committee (the "O&C Committee") of EFH Corp.'s Board of Directors (the "Board") is comprised of four non–employee directors: Arcilia C. Acosta, Donald L. Evans, Marc S. Lipschultz and Kenneth Pontarelli. The primary responsibility of the O&C Committee is to:

- determine and oversee the compensation program of EFH Corp. and its subsidiaries (other than the Oncor Ring–Fenced Entities), including making recommendations to the Board with respect to the adoption, amendment or termination of compensation and benefits plans, arrangements, policies and practices;

- evaluate the performance of EFH Corp.'s Chief Executive Officer (the "CEO") and the other executive officers of EFH Corp. and its subsidiaries (other than the Oncor Ring–Fenced Entities) (collectively, the "executive officers"), including all of the executive officers named in the Summary Compensation Table (the "Named Executive Officers"), and

- approve executive compensation based on those evaluations.

#### Compensation Discussion and Analysis

**Compensation of the CEO**

In determining the compensation of the CEO, the O&C Committee annually follows a thorough and detailed process. At the end of each year, the O&C Committee reviews a self–assessment prepared by the CEO regarding his performance and the performance of our businesses and meets (with and without the CEO) to evaluate and discuss his performance and the performance of our businesses.

In addition to conducting an annual review of the CEO's performance, the O&C Committee periodically uses independent compensation consultants to assess the compensation of the CEO against a variety of market reference points and competitive data, including the compensation practices of a number of companies that we consider to comprise our peer group, size–adjusted energy services industry survey data and size–adjusted general industry survey data. While the O&C Committee tries to ensure that the bulk of the CEO's compensation is directly linked to his performance and the performance of our businesses, the O&C Committee also seeks to set his compensation in the manner that is competitive for retention purposes. The last assessment of the CEO's compensation was performed in late 2009 / early 2010, when the O&C Committee engaged Towers Watson to perform a competitive analysis of the CEO's compensation. In January 2010, Towers Watson delivered its report to the O&C Committee, which report included market data for a peer group composed of the following companies:

| | | |
|---|---|---|
| AES Corporation | Allegheny Energy, Inc. | Ameren Corp. |
| American Electric Power Co. Inc, | Calpine Corp. | Constellation Energy Group Inc. |
| Dominion Resources Inc. | Duke Energy Corp. | Edison International |
| Entergy Corp. | Exelon Corp. | FirstEnergy Corp. |
| FPL Group Inc. | Mirant Corp. | NRG Energy, Inc. |
| PPL Corp. | Progress Energy Inc. | Public Service Enterprise Group Inc. |
| RRI Energy Inc. | Southern Co. | Xcel Energy Inc. |

The data for CEO compensation of the peer group was developed at both the 50th and 75th percentiles of market in order to provide the O&C Committee with a broad market view and multiple benchmarks. The O&C Committee targets total direct compensation around the 75th percentile of the peer group.

While the O&C Committee considers market reference points and competitive data in determining the appropriate compensation of the CEO (and the other executive officers), the O&C Committee also considers

B–144

EFIHMW00052593

EFIHMW00051935

**PX 030**
**Page 659 of 734**

Table of Contents

qualitative and subjective factors that are more specific to EFH Corp. in making such determinations. One such factor is the fact that EFH Corp. is a highly-leveraged, privately-owned company. In this regard, while executive officers of publicly traded energy companies, including those in our peer group, are typically granted smaller long-term equity incentive awards on an annual basis, our executive officers received one-time, up front grants of long-term equity incentive awards intended to cover a multi-year period. Extended periods of economic strength or weakness generally has less affect on the cumulative value of annual awards as compared to one-time, up front awards because the annual awards are typically granted at fair market value over time. Accordingly, one-time, up front awards are typically riskier than annual awards.

After a comprehensive review of the CEO's performance and the performance of our businesses in 2009, and taking into consideration the Towers Watson report, the economic dislocation occurring over the last 18 months and other qualitative and subjective factors as described above, the O&C Committee approved several changes to the compensation arrangement for the CEO in February 2010. The O&C Committee made these changes to provide incentives for retention and performance and to maintain a strong alignment between the CEO and our shareholders. We believe these changes are consistent with our compensation philosophy as described below.

**Compensation of Other Executive Officers**

In determining whether to make any adjustments to the compensation of any of our executive officers (other than the CEO), the O&C Committee seeks the input of the CEO. At the end of each year, the CEO reviews a self-assessment prepared by each of these executive officers and assesses the executive officer's performance against business unit and individual goals and objectives. The O&C Committee and the CEO then review the CEO's assessments and, in that context, the O&C Committee approves any adjustments to the compensation for each of these executive officers.

In addition to these annual reviews/assessments, the CEO periodically assesses the compensation of each of these executive officers. The last assessment of the compensation of the executive officers by the CEO was performed in the second half of 2009. Following that assessment, and taking into consideration the economic dislocation occurring over the last 18 months and other qualitative and subjective factors as described above, the CEO suggested several changes to the compensation arrangements for certain of our executive officers in order to provide incentives for retention and performance and to maintain alignment between our executive officers and shareholders. These changes, which are described in more detail below, were approved by the O&C Committee in October 2009 with respect to such executive officers, including each of Messrs. Keglevic, Campbell, Walters and Burke. We believe these changes are consistent with our compensation philosophy as described below.

**Compensation Philosophy**

We have a pay-for-performance compensation philosophy, which places an emphasis on pay-at-risk. In other words, a significant portion of an executive officer's compensation is comprised of variable, at-risk incentive compensation. Our compensation program is intended to compensate executive officers appropriately for their contribution to the attainment of our financial, operational and strategic objectives. In addition, we believe it is important to retain our executive officers and strongly align their interests with EFH Corp.'s shareholders by emphasizing long-term incentive compensation, including equity-based compensation.

To achieve our compensation philosophy, we believe that:

- compensation plans should balance both long-term and short-term objectives;

- the overall compensation program should emphasize variable compensation elements that have a direct link to overall corporate performance and shareholder value, and

B-145

EFIHMW00052594

EFIHMW00051935

**PX 030**
**Page 660 of 734**

Table of Contents

- an executive officer's individual compensation level should be based upon an evaluation of the financial and operational performance of that executive officer's business unit as well as the executive officer's individual performance.

We believe our compensation philosophy supports our businesses by:

- aligning performance measures with our business objectives to drive the financial and operational performance of EFH Corp. and its business units;

- rewarding business unit and individual performance by providing compensation levels consistent with the level of contribution and degree of accountability;

- attracting and retaining the best performers, and

- strengthening the correlation between the long–term interests of our executive officers and shareholders.

## Elements of Compensation

The material elements of our executive compensation program are:

- a base salary;

- the opportunity to earn an annual performance–based cash bonus based on the achievement of specific corporate, business unit and individual performance goals, and

- long–term incentive awards, primarily in the form of (i) long–term cash incentive awards and (ii) options to purchase shares of EFH Corp.'s common stock (the "Stock Option Awards") under our 2007 Stock Incentive Plan for Key Employees of EFH Corp. and Affiliates (the "2007 Stock Incentive Plan").

In addition, executive officers generally have the opportunity to participate in certain of our broad–based employee compensation plans, including our Thrift (401(k)) Plan, retirement plans and non–qualified benefit plans, and to receive certain perquisites.

## Assessment of Compensation Elements

We design the majority of an executive officer's compensation to be directly linked to corporate and business unit performance. For example, an executive officer's annual performance–based cash bonus is primarily based on the achievement of certain corporate and business unit financial and operational targets (such as management EBITDA, cost management, generation output and customer satisfaction). In addition, the vesting of a portion of each executive officer's Stock Option Awards is contingent upon the attainment of certain management EBITDA targets. We also try to ensure that our executive compensation program is competitive in order to reduce the risk of losing our executive officers.

The following is a detailed discussion of the principal compensation elements provided to our executive officers. More detail about each of the elements can be found in the compensation tables, including the footnotes to the tables, and the narrative discussion following certain of the tables.

### Base Salary

Base salary should reward executive officers for the scope and complexity of their position and the level of responsibility required. We believe that a competitive level of base salary is required to attract and retain qualified talent.

B–146

EFIHMW00052595

EFIHMW00051935

PX 030
Page 661 of 734

**Table of Contents**

The O&C Committee annually reviews base salaries and periodically uses independent compensation consultants to ensure the base salaries are market–competitive. The O&C Committee may also review an executive officer's base salary from time to time during a year, including if the executive officer is given a promotion or if his responsibilities are significantly increased.

We want to ensure our cash compensation is competitive and sufficient to incent executive officers to remain with us, recognizing our high performance expectations across a broad set of operational, financial, customer service and community–oriented goals and objectives and the higher risk levels associated with being a significantly–leveraged company.

In light of the significant market dislocation and uncertainty that began in late 2008 and continued into 2009, our Named Executive Officers' base salaries for 2009 remained unchanged from 2008 levels. In October 2009, the O&C Committee approved an increase in the base salary, effective January 1, 2010, for each of the Named Executive Officers, with the exception of Messrs. Young and Burke. In February 2010, the O&C Committee approved an increase in the base salary of each of Messrs. Young and Burke, which increases took effect retroactively on January 1, 2010. These increases reflect, in part, that none of the Named Executive Officers received a salary increase for 2009. The following table indicates the Named Executive Officers' base salaries for 2008, 2009 and 2010.

| Name | Title | 2008 Base Salary | 2009 Base Salary | Approved 2010 Base Salary |
|---|---|---|---|---|
| John F. Young | President and Chief Executive Officer of EFH Corp. | $ 1,000,000 | $ 1,000,000 | $ 1,200,000 |
| Paul M. Keglevic | Executive Vice President and Chief Financial Officer of EFH Corp. | $ 600,000 | $ 600,000 | $ 650,000 |
| David A. Campbell | Chief Executive Officer of Luminant | $ 600,000 | $ 600,000 | $ 700,000 |
| Robert C. Walters | Executive Vice President and General Counsel of EFH Corp. | $ 575,000 | $ 575,000 | $ 600,000 |
| James A. Burke | Chief Executive Officer of TXU Energy | $ 600,000 | $ 600,000 | $ 630,000 |
| Rizwan Chand (1) | Former Executive Vice President—Human Resources of EFH Corp. | $ 450,000 | $ 450,000 | N/A |

(1)   Mr. Chand's employment with EFH Corp. terminated in October 2009.

*Annual Performance–Based Cash Bonus—Executive Annual Incentive Plan*

The Executive Annual Incentive Plan ("EAIP") provides an annual performance–based cash bonus for the successful attainment of certain annual financial and operational performance targets that are established annually at each of the corporate and business unit levels by the O&C Committee. Under the terms of the EAIP, performance against these targets, which are generally set at challenging levels to incent high performance, drives bonus funding. Based on the level of attainment of these performance targets, an aggregate EAIP funding percentage amount for all participants is determined.

Our financial performance targets typically include "management" EBITDA, a non–GAAP financial measure. When the O&C Committee reviews management EBITDA for purposes of determining our performance against the applicable management EBITDA target, it includes our earnings before interest, taxes, depreciation and amortization plus transaction, management and/or similar fees paid to the Sponsor Group, together with such adjustments as the O&C Committee shall determine appropriate in its discretion after good faith consultation with the CEO and the Chief Financial Officer, including adjustments consistent with those included in the comparable definitions in TCEH's Senior Secured Facilities (to the extent considered appropriate for executive compensation purposes). Our management EBITDA targets are also expected to be adjusted for acquisitions, divestitures or major capital investment initiatives to the extent that they were not contemplated in our financial plan (the "Financial Plan"). The management EBITDA targets are intended to measure achievement of the Financial Plan and the adjustments to management EBITDA described above primarily represent elements of our performance that are either beyond the control of management or were not predictable at the time the

B–147

EFIHMW00052596

EFIHMW00051935

**PX 030**
**Page 662 of 734**

**Table of Contents**

Financial Plan was submitted. The O&C Committee has broad authority to make these or any other adjustments to EBITDA that it deems appropriate in connection with its evaluation and compensation of our executive officers. Management EBITDA is an internal measure used only for performance management purposes, and EFH Corp. does not intend for management EBITDA to be an alternative to any measure of financial performance presented in accordance with GAAP. Management EBITDA is not the same as Adjusted EBITDA, which is disclosed elsewhere in the EFH Corp. 2009 Form 10–K and defined in Annex A.

*Financial and Operational Performance Targets*

The following table provides a summary of the performance targets for Mr. Young, who had primary responsibility at EFH Corp.

| Performance Targets—EFH Corp. | Weight | Performance (1) | Payout |
|---|---|---|---|
| EFH Corp. Management EBITDA | 50% | 101% | 50% |
| EFH Corp. Management EBITDA (excluding Oncor) | 10% | 119% | 12% |
| Luminant Scorecard Multiplier (see below) | 10% | 119% | 12% |
| TXU Energy Scorecard Multiplier (see below) | 10% | 141% | 14% |
| EFH Corp. Total Spend | 10% | 121% | 12% |
| EFH Business Services Cost | 10% | 130% | 13% |
| Total | 100% | | 113% |

(1)   Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

The following table provides a summary of the performance targets for Messrs. Keglevic and Walters, who had primary responsibility at EFH Corp. and EFH Business Services.

| Performance Targets—EFH Corp. / Services | Weight | Performance (1) | Payout |
|---|---|---|---|
| EFH Corp. Management EBITDA (excluding Oncor) | 60% | 119% | 72% |
| Luminant Scorecard Multiplier (see below) | 10% | 119% | 12% |
| TXU Energy Scorecard Multiplier (see below) | 10% | 141% | 14% |
| EFH Corp. Total Spend | 10% | 121% | 12% |
| EFH Business Services Cost | 10% | 130% | 13% |
| Total | 100% | | 123% |

(1)   Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

The following table provides a summary of the performance targets for Mr. Campbell, who had primary responsibility at Luminant.

| Performance Targets—Luminant | Weight | Performance (1) | Payout |
|---|---|---|---|
| EFH Corp. Management EBITDA (excluding Oncor) | 25% | 119% | 30% |
| Luminant Management EBITDA (excluding 3 new units) | 30% | 146% | 44% |
| Luminant Baseload Generation (excluding 3 new units) | 18.75% | 89% | 17% |
| Luminant O&M/SG&A/Capital Expenditures | 15% | 139% | 21% |
| Luminant Fossil Fuel Costs | 7.5% | 75% | 5% |
| Management EBITDA for 3 new units (excluding capital expenditure) | 3.75% | 56% | 2% |
| Total | 100% | | 119% |

(1)   Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

EFIHMW00052597

EFIHMW00051935

**PX 030**
**Page 663 of 734**

Table of Contents

The following table provides a summary of the performance targets for Mr. Burke, who had primary responsibility at TXU Energy.

| Performance Targets—TXU Energy | Weight | Performance (1) | Payout |
|---|---|---|---|
| EFH Corp. Management EBITDA (excluding Oncor) | 25% | 119% | 30% |
| TXU Energy Management EBITDA | 26.25% | 200% | 53% |
| Contribution Margin | 15% | 200% | 30% |
| TXU Energy Total Costs | 15% | 59% | 9% |
| Upgrades to Customer Care System (Project Spend, PUCT Complaints and Days Meter to Cash) | 11.25% | 29% | 3% |
| Customer Satisfaction | 7.5% | 150% | 11% |
| Total | 100% | | 136% |

(1)  Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

*Individual Performance Modifier*

After approving the actual performance against the applicable targets under the plan, the O&C Committee and/or the CEO reviews the performance of each of our executive officers on an individual and comparative basis. Based on this review, which includes an analysis of both objective and subjective criteria, including the CEO's recommendations (with respect to all executive officers other than himself), the O&C Committee approves an individual modifier for each executive officer. Under the terms of the EAIP for 2009, the individual performance modifier can range from an outstanding rating (200%) to an unacceptable rating (0%). In February 2010, the O&C Committee amended the EAIP to reduce the maximum individual performance modifier applicable for 2010 and beyond from 200% to 150%. To calculate an executive officer's final performance–based cash bonus, the executive officer's corporate/business unit payout percentages are multiplied by the executive officer's target incentive level, which is computed as a percentage of annualized base salary, and then by the executive officer's individual performance modifier.

*Actual Award*

The following table provides a summary of the 2009 performance–based cash bonus for each Named Executive Officer (other than Mr. Chand) under the EAIP.

| Name | Target (% of salary) | Target Award ($ Value) | Actual Award |
|---|---|---|---|
| John F. Young (1) | 100% | $ 1,000,000 | $ 1,469,000 |
| Paul M. Keglevic (2) | 75% | $ 450,000 | $ 664,200 |
| David A. Campbell (3) | 75% | $ 450,000 | $ 642,600 |
| Robert C. Walters (4) | 75% | $ 431,250 | $ 610,000 |
| James A. Burke (5) | 75% | $ 450,000 | $ 856,800 |

(1)  Mr. Young's incentive award is based on the successful achievement of the financial performance targets for EFH Corp. and the financial and operational performance targets for Luminant and TXU Energy and an individual performance modifier that increased his incentive award. In 2009, Mr. Young successfully led the company in a difficult year in which sales volumes and demand fell, wholesale power prices declined and the credit markets were at times inaccessible. Notwithstanding these difficulties, Mr. Young created value in many parts of the company's businesses. In particular, Mr. Young led the company's efforts in, among other things: improving operations and safety at our generation and mining operations; participating in the national debate on climate change, green energy and financial reforms; bringing online two new lignite

EFIHMW00052598

EFIHMW00051935

**PX 030**
**Page 664 of 734**

Table of Contents

fueled generation units on time and budget; implementing substantial and lasting cost reductions; exceeding EFH Corp.'s planned EBITDA for 2009; and strengthening the company's management team. Given these and other significant achievements, the O&C Committee approved an individual performance modifier that increased Mr. Young's incentive award.

(2) Mr. Keglevic's incentive award is based on the successful achievement of the financial performance targets for EFH Corp. and EFH Business Services and the financial and operational performance targets for Luminant and TXU Energy and an individual performance modifier that increased his incentive award. In 2009, Mr. Keglevic successfully implemented several new financial processes at EFH Corp. and its business units, including processes for understanding, managing and communicating the financial and operational performance of our businesses, managing the varied risks of our businesses and preserving effective liquidity levels. In addition, Mr. Keglevic led the company's liquidity and liability management efforts, including the successful amendment to the TCEH Senior Secured Facilities. Given these significant accomplishments and other achievements (including his installation of a "drive for results" culture), the O&C Committee approved an individual performance modifier that increased Mr. Keglevic's incentive award.

(3) Mr. Campbell's incentive award is based on the successful achievement of a financial performance target for EFH Corp. and the financial and operational performance targets for Luminant and an individual performance modifier that increased his incentive award. In 2009, Mr. Campbell strengthened the Luminant management team (including, among others, the designation of a new Chief Nuclear Officer and Chief Fossil Officer) while overseeing strong financial and operational results primarily at Luminant's nuclear plant and in Luminant's wholesale energy organization. Luminant's baseload generation construction program also achieved several important milestones, including the substantial completion of the two new lignite−fueled units, at costs and time−to−build schedules that are in the top decile relative to recent industry benchmarks. In addition, under Mr. Campbell's leadership, Luminant had a very strong year for safety, with substantially all of its recordable safety metrics being in the top quartile for its industry. Given these significant accomplishments and other achievements (including his focus on developing strategic business solutions and building a team−oriented culture), the O&C Committee approved an individual performance modifier that increased Mr. Campbell's incentive award.

(4) Mr. Walters' incentive award is based on the successful achievement of the financial performance targets for EFH Corp. and EFH Business Services and the financial and operational performance targets for Luminant and TXU Energy and an individual performance modifier that increased his incentive award. In 2009, Mr. Walters successfully managed several significant legal issues of the company. In particular, Mr. Walters' led the company's efforts in (i) defending the challenges to the Oak Grove and Sandow 5 construction and operating permits, (ii) negotiating the termination and transition of the company's outsourcing relationship with CapGemini Energy and (iii) settling a dispute with the PUCT regarding alleged market manipulation activities. In addition, Mr. Walters drove improvements in the financial performance of our real estate holdings. Given these significant accomplishments and other achievements (including his strategic contributions in the political and civic arena on a local, state and national level), the O&C Committee approved an individual performance modifier that increased Mr. Walters' incentive award.

(5) Mr. Burke's incentive award is based on the successful achievement of a financial performance target for EFH Corp. and the financial and operational performance targets for TXU Energy and an individual performance modifier that increased his incentive award. In 2009, Mr. Burke strengthened the TXU Energy management team and performance−oriented culture to drive strong financial and operational results at TXU Energy. Among the operational results, Mr. Burke led the successful implementation of a new customer care system and successfully managed the transition of a number of functions previously performed by Capgemini Energy. Among the financial results, Mr. Burke was successful in driving improvement in retail margins, managing TXU Energy through a challenging economic environment and implementing overall customer satisfaction ratings. Given these significant accomplishments and other achievements (including his continued commitment to build a strong retail and customer−focused culture at TXU Energy), the O&C Committee approved an individual performance modifier that increased Mr. Burke's incentive award.

B−150

EFIHMW00052599

EFIHMW00051935

**PX 030**
**Page 665 of 734**

**Table of Contents**

In October 2009, the O&C Committee approved an increase in the annual target award under the EAIP from 75% of base salary to 85% of base salary for Messrs. Keglevic, Campbell, Walters and Burke. These increases will be effective for the 2010 award period.

*Long−Term Incentive Awards*

*Long−Term Cash Incentive*

In October 2009, the O&C Committee approved the adoption of a new long−term cash incentive (the "LTI"), effective as of the date of adoption, to be included by amendment in the employment agreements of each of Messrs. Keglevic, Campbell, Walters and Burke. Under the terms of the LTI, each of Messrs. Keglevic, Campbell, Walters and Burke will be entitled to receive on September 30, 2012, to the extent such Named Executive Officer remains employed by EFH Corp. on such date (with customary exceptions for death, disability, and leaving for "good reason" or termination without "cause"), an additional one−time, lump−sum cash payment equal to 75% of the aggregate EAIP award received by such executive officer for fiscal years 2009, 2010 and 2011.

In February 2010, the O&C Committee approved the adoption of an LTI to be included by amendment in the employment agreement of Mr. Young. Under the terms of the LTI, Mr. Young will be entitled to receive on September 30, 2012, to the extent Mr. Young remains employed by EFH Corp. on such date (with customary exceptions for death, disability, and leaving for "good reason" or termination without "cause"), an additional one−time, lump−sum cash payment equal to 100% of the aggregate EAIP award received by Mr. Young for fiscal years 2009, 2010 and 2011.

These awards provide significant retentive value because an award is not paid to an executive officer unless the executive officer remains employed with us until September 30, 2012 (subject to the customary exceptions described above). In addition, these awards provide additional incentive to our executive officers to achieve top operational and financial performance because the award is based on a percentage of the executive officers' annual performance−based cash bonuses.

*Long−Term Equity Incentives*

We believe it is important to strongly align the interests of our executive officers and shareholders through equity−based compensation. In December 2007, our Board approved and adopted our 2007 Stock Incentive Plan pursuant to which we grant Stock Option Awards to our executive officers. The purpose of the 2007 Stock Incentive Plan is to:

- promote our long−term financial interests and growth by attracting and retaining management and other personnel with the training, experience and ability to make a substantial contribution to our success;

- motivate management and other personnel by means of growth−related incentives to achieve long−range goals, and

- strengthen the correlation between the long−term interests of our shareholders and the interests of our executive officers through opportunities for stock (or stock−based) ownership in EFH Corp.

The Stock Option Awards granted to our executive officers provide significant retentive value because a portion of these awards is time−based and vest over a five year period. In addition, we believe that the Stock Option Awards granted to our executive officers provide incentive to our executive officers to achieve top operational and financial performance because a portion of these Stock Option Awards is performance−based and only vests upon EFH Corp. achieving certain management EBITDA targets.

In February 2008, Mr. Young was granted 7,500,000 Stock Option Awards. In May 2008, Messrs. Campbell, Walters and Burke were granted 4,000,000, 2,000,000 and 2,450,000 Stock Option Awards, respectively. In December 2008, Mr. Keglevic was granted 2,500,000 Stock Option Awards. Each of these Stock Option Awards are set forth in

B−151

EFIHMW00052600

EFIHMW00051935

**Table of Contents**

the table below and are referred to as the "Original Stock Option Awards," half of which were "Original Time Vested Options" and half of which were "Original Performance Vested Options". The exercise price of the Original Stock Option Awards (the fair market value on the grant date) is $5.00.

| Executive Officer | Original Time Vested Options | Original Performance Vested Options | Exercise Price |
|---|---|---|---|
| John Young | 3,750,000 | 3,750,000 | $ 5.00 |
| Paul Keglevic | 1,250,000 | 1,250,000 | $ 5.00 |
| David Campbell | 2,000,000 | 2,000,000 | $ 5.00 |
| Robert Walters | 1,000,000 | 1,000,000 | $ 5.00 |
| James Burke | 1,225,000 | 1,225,000 | $ 5.00 |

In October 2009 (February 2010, with respect to Mr. Young), the O&C Committee approved the grant of new Stock Option Awards to the Named Executive Officers as set forth in the table below. The new Stock Option Awards are referred to as the "New Stock Option Awards," a portion of which are "New Time Vested Options" and a portion of which are "New Cliff Vested Options." In connection with these grants, each Named Executive Officer surrendered to EFH Corp. a portion of his Original Performance Vested Options. The exercise price of the New Stock Option Awards is $3.50.

| Executive Officer | Surrendered Original Performance Vested Options | New Time Vested Options | New Cliff Vested Options | Exercise Price |
|---|---|---|---|---|
| John Young | 1,500,000 | 1,500,000 | 1,500,000 | $ 5.00 |
| | | | | $ 3.50 |
| Paul Keglevic | 500,000 | 500,000 | 500,000 | $ 5.00 |
| | | | | $ 3.50 |
| David Campbell | 800,000 | 800,000 | 800,000 | $ 5.00 |
| | | | | $ 3.50 |
| Robert Walters | 400,000 | 400,000 | 400,000 | $ 5.00 |
| | | | | $ 3.50 |
| James Burke | 490,000 | 200,000 | 490,000 | $ 5.00 |
| | | | | $ 3.50 |

Please refer to the outstanding Equity Awards at Fiscal Year-End—2009 table, including the footnotes thereto, for a summary of the outstanding Stock Option Awards held by each of the Named Executive Officers.

The Stock Option Awards vest (subject to the executive officer continuing to be employed by EFH Corp.) as follows:

- Time Vested Options
  - The Original Time Vested Options and the New Time Vested Options vest in 20% increments on each of the first five anniversaries of September 30, 2007 and September 30, 2009, respectively.
  - The New Cliff Vested Options vest 100% on September 30, 2014.
- Performance Vested Options
  - The Original Performance Vested Options vest in 20% increments on each of the first five anniversaries of December 31, 2007, subject to our achievement of the annual management EBITDA target for the given fiscal year (or certain cumulative performance targets) as detailed in the stock option agreements.

In deciding whether to vest the Original Performance Vested Options, the O&C Committee considers EFH Corp.'s quantitative performance against certain management EBITDA targets. The method of calculating management EBITDA for purposes of vesting the Original Performance Vested Options is the same as the

B–152

EFIHMW00052601

EFIHMW00051935

**PX 030**
**Page 667 of 734**

**Table of Contents**

method for calculating management EBITDA for purposes of the EAIP, as described above. The O&C Committee also has broad discretion to consider other qualitative and quantitative criteria that it deems appropriate in connection with its decision to vest the Original Performance Vested Options.

Our management EBITDA for 2009 was less than the management EBITDA target of $5.569 billion set forth in the applicable stock option agreements with respect to 2009. While EFH Corp. did not meet the applicable management EBITDA target, which was originally established in 2007, it exceeded the management EBITDA target established by the O&C Committee in the beginning of 2009 for purposes of the EAIP. In addition, EFH Corp.'s actual SG&A for 2009 was less than the targeted amount of SG&A set by the O&C Committee. Given these achievements, as well as the successful attainment of most of the other annual financial and operational performance targets that were established by the O&C Committee at the beginning of 2009, the O&C Committee exercised its discretionary authority under the 2007 Stock Incentive Plan and approved the vesting of the 2009 Original Performance Vested Options.

In the future, we may make additional discretionary grants of stock options or other equity–based compensation to reward high performance or achievement.

*Equity Investment*

In addition to being granted Stock Option Awards, several of our Named Executive Officers (including Messrs. Young, Keglevic, Campbell and Burke) have an equity investment in EFH Corp. These investments have been made through a direct cash investment for shares of EFH Corp. common stock (Mr. Young) and/or through the receipt of restricted stock units (Mr. Young) or deferred shares of EFH Corp. common stock (Messrs. Keglevic, Campbell and Burke) (i) as a result of the executive officer foregoing the right to receive certain payments from EFH Corp., whether in respect of outstanding equity awards issued prior to the Merger or otherwise (Messrs. Campbell and Burke) or (ii) as consideration for compensation forfeited by the executive officer when he left his former employer to join EFH Corp. (Messrs. Young and Keglevic). We believe such investment strongly aligns the interests of our Named Executive Officers with the interests of our shareholders and provides increased incentive to our executive officers to maximize financial and operational performance because the value of their investment is dependant upon the success of EFH Corp. In addition, as we are a private company, the illiquid nature of the investment provides additional retentive value.

*Other Elements of Compensation*
*General*

Our executive officers generally have the opportunity to participate in certain of our broad–based employee compensation plans, including our Thrift (401(k)) Plan, retirement plans and non–qualified benefit plans. Please refer to the footnotes to the Summary Compensation table for a more detailed description of our Thrift Plan, the narrative that follows the Pension Benefits table for a more detailed description of our Retirement Plan and Supplemental Executive Retirement Plan and the footnotes to the Nonqualified Deferred Compensation table for a more detailed description of our Salary Deferral Program.

*Perquisites*

We do not believe that a significant amount of perquisites fit within our compensation philosophy. Those perquisites that exist are intended to serve as part of a competitive total compensation program and to enhance our executive officers' ability to conduct company business. These benefits include financial planning, a preventive physical health exam and reimbursement for certain spousal travel expenses. Expenditures for the perquisites outlined above are disclosed by individual in footnotes to the Summary Compensation Table.

B–153

EFIHMW00052602

EFIHMW00051935

**PX 030**
**Page 668 of 734**

Table of Contents

The following is a summary of perquisites offered to our Named Executive Officers that are not available to all employees:

**Executive Financial Planning:** We pay for our executive officers to receive financial planning services. This service is intended to support them in managing their financial affairs, which we consider especially important given the high level of time commitment and performance expectation required of our executive officers. Furthermore, we believe that such service helps ensure greater accuracy and compliance with individual tax regulations by our executive officers.

**Annual Executive Physical Health Exam:** We pay for our executive officers to receive annual physical health exams. The health of our executive officers is important given the vital leadership role they play in directing and operating the company. Our executive officers are important assets of EFH Corp., and this benefit is designed to help ensure their health and long‑term ability to serve our shareholders.

**Spouse Travel Expenses:** From time to time, we pay for an executive officer's spouse to travel with the executive officer when taking a business trip.

*Contingent Payments*

We have entered into employment agreements with Messrs. Young, Keglevic, Campbell, Walters and Burke. Each of the employment agreements provides that certain payments and benefits will be paid upon the expiration or termination of the agreement under various circumstances, including termination without cause, resignation for good reason and termination of employment within a fixed period of time following a change in control. We believe these provisions are important in order to attract and retain the caliber of executive officers that our business requires and provide incentive for our executive officers to fully consider potential changes that are in our and our shareholders' best interest, even if such changes would result in the executive officers' termination of employment. For a description of the applicable provisions in the employment agreements of our Named Executive Officers see "Potential Payments upon Termination or Change in Control."

*Other*

In February 2010, the O&C Committee approved certain other compensation arrangements for Mr. Young and Mr. Burke. For a discussion of these arrangements, please see "Other Information" in the EFH Corp. 2009 Form 10‑K.

**Accounting and Tax Considerations**

*Accounting Considerations*

Under FASB ASC Topic 718, the total amount of compensation expense to be recorded for stock‑based awards (e.g., Stock Option Awards granted under the 2007 Stock Incentive Plan) is based on the fair value of the award on the grant date. This fair value is then recorded as expense over the vesting period, with an offsetting increase in paid‑in capital. The amount of compensation expense is not subsequently adjusted for changes in our share price, for the actual number of shares distributed, or for any other factors except for true‑ups related to estimated forfeitures compared to actual forfeitures. The surrendered shares are considered modifications to the original awards and are treated as an exchange of the original award for a new award. The compensation expense related to the new award represents the incremental costs of the surrendered shares and is based on the new grant date fair value and is recognized over its new vesting period.

*Income Tax Considerations*

Section 162(m) of the Code limits the tax deductibility by a publicly held company of compensation in excess of $1 million paid to the CEO or any other of its three most highly compensated executive officers other than the principal financial officer. Because EFH Corp. is a privately‑held company, Section 162(m) will not limit the tax deductibility of any executive compensation for 2009.

B‑154

EFIHMW00052603

EFIHMW00051935

**Table of Contents**

The O&C Committee administers our compensation programs with the good faith intention of complying with Section 409A of the Code.

### Organization and Compensation Committee Report

The O&C Committee has reviewed and discussed with management the Compensation Discussion and Analysis set forth in EFH Corp. 2009 Form 10–K. Based on this review and discussions, the committee recommended to the Board that the Compensation Discussion and Analysis be included in the EFH Corp. 2009 Form 10–K.

Organization and Compensation Committee

Donald L. Evans, Chair
Arcilia C. Acosta
Marc S. Lipschultz
Kenneth Pontarelli

B–155

EFIHMW00052604

EFIHMW00051935

**PX 030**
**Page 670 of 734**

Table of Contents

### Summary Compensation Table

The following table provides information for the fiscal years ended December 31, 2009, 2008 and 2007 regarding the aggregate compensation paid to our Named Executive Officers.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) (7) | Non-Equity Incentive Plan Compensation ($) (8) | Change in Pension Value and Non-qualified Deferred Compensation Earnings ($) (9) | All Other Compensation ($) (10) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| John F. Young (1) | 2009 | 1,000,000 | — | — | — | 1,469,000 | — | 105,291 | 2,574,291 |
| President & CEO of EFH Corp. | 2008 | 912,500 | — | 3,000,000 | 13,635,000 | 1,418,000 | — | 462,258 | 19,427,758 |
| | 2007 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Paul M. Keglevic (2) | 2009 | 600,000 | — | 150,000 | 1,325,000 | 664,200 | — | 73,320 | 2,812,520 |
| EVP & Chief Financial Officer of EFH Corp. | 2008 | 293,182 | 250,000 | 1,125,000 | 6,442,500 | 613,800 | — | 88,508 | 8,812,990 |
| | 2007 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| David A. Campbell (3) | 2009 | 600,000 | — | — | 2,120,000 | 642,600 | 68,861 | 15,020 | 3,446,481 |
| President & CEO of Luminant | 2008 | 545,500 | 5,092,250 | 2,500,000 | 7,272,000 | 625,950 | 22,779 | 3,395,878 | 19,454,357 |
| | 2007 | 382,000 | — | — | 2,292,000 | 300,481 | 14,667 | 2,342,814 | 5,331,962 |
| Robert C. Walters (4) | 2009 | 575,000 | — | — | 1,060,000 | 610,000 | — | 81,562 | 2,326,562 |
| EVP & General Counsel of EFH Corp. | 2008 | 435,699 | 100,000 | — | 3,636,000 | 695,175 | — | 44,249 | 4,911,033 |
| | 2007 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| James A. Burke (5) | 2009 | 600,000 | — | — | 933,100 | 856,800 | 55,931 | 23,885 | 2,469,716 |
| President & CEO of TXU Energy | 2008 | 600,000 | — | — | 4,454,100 | 473,918 | 25,501 | 639,136 | 6,192,655 |
| | 2007 | 342,712 | — | 830,850 | — | 274,050 | 9,864 | 978,189 | 2,435,665 |
| Rizwan Chand (6) | 2009 | 348,750 | — | — | — | — | 36,218 | 2,110,925 | 2,495,893 |
| Former EVP—Human Resources of EFH Corp. | 2008 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | 2007 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

(1) Mr. Young commenced employment with EFH Corp. in January 2008. The amounts for 2009 reported as "All Other Compensation" for Mr. Young represent (i) the costs of providing certain perquisites, including $9,728 for financial planning and $863 of taxable reimbursements partially related to his spouse's travel and (ii) $14,700 and $80,000 for our matching contributions to the EFH Thrift Plan and the Salary Deferral Plan, respectively.

(2) Mr. Keglevic commenced employment with EFH Corp. in July 2008. Mr. Keglevic's employment agreement provides that we pay him a signing bonus equal to $550,000 as follows: (i) $250,000 payable in July 2008, (ii) $150,000 payable in July 2009 and (iii) $50,000 payable in July 2010, 2011 and 2012. The amount for 2009 reported as "Bonus" for Mr. Keglevic represents the 2009 portion of his signing bonus. The amounts for 2009 reported as "All Other Compensation" for Mr. Keglevic represent (i) the costs of providing certain perquisites, including $2,724 for an executive physical, $3,410 of taxable reimbursements primarily related to his spouse's travel and $11,836 for moving expenses and (ii) $7,350 and $48,000 for our matching contributions to the EFH Thrift Plan and the Salary Deferral Plan, respectively.

(3) The amount reported as "All Other Compensation" in 2009 for Mr. Campbell represents (i) $10,120 for financial planning and (ii) $4,900 for our matching contributions to the EFH Thrift Plan. The amount reported as "All Other Compensation" in 2008 for Mr. Campbell includes $3,319,963 for a tax gross–up payment that was made in 2009. The tax gross–up payment, which was not reported in the 2008 Summary Compensation Table, related to excise taxes due with respect to a January 2009 payment of $5,092,250 that was provided to Mr. Campbell as an inducement for entering into his employment agreement in 2008. The $5,092,250 was reported in the 2008 Summary Compensation Table under "Bonus," and we believe the tax gross–up payment should be reported for the same calendar year as the related payment.

(4) Mr. Walters commenced employment with EFH Corp. in March 2008. The amounts for 2009 reported as "All Other Compensation" for Mr. Walters represent (i) the costs of providing certain perquisites, including $16,800 for financial planning, $2,350 for an executive physical and $1,712 of taxable reimbursements primarily related to his spouse's travel and (ii) $14,700 and $46,000 for our matching contributions to the EFH Thrift Plan and the Salary Deferral Plan, respectively.

(5) The amounts for 2009 reported as "All Other Compensation" for Mr. Burke represent (i) the costs of providing certain perquisites, including $8,875 for financial planning, $2,350 for an executive physical and $660 of taxable reimbursements and (ii) $12,000 for our matching contributions to the EFH Thrift Plan.

(6) Mr. Chand's employment with EFH Corp. terminated in October 2009. The amounts for 2009 reported as "All Other Compensation" for Mr. Chand represent (i) the costs of providing certain perquisites, including $8,875 for financial planning and $2,350 for an executive physical (ii) $14,700 for our matching contributions to the EFH Thrift Plan, (iii) $1,485,000 in cash severance due to him under the terms of his employment agreement, and (iv) $600,000 related to his deferred share agreement with EFH Corp.

B-156

EFIHMW00052605

EFIHMW00051935

**Table of Contents**

(7)   The amounts reported as "Option Awards" represent the grant date fair value of Stock Option Awards granted in the fiscal year computed for the stock options awarded under the 2007 Stock Incentive Plan in accordance with FASB ASC Topic 718 and do not take into account estimated forfeitures. See table titled "Grants of Plan-Based Awards—2009". In February 2010, Mr. Young received certain new Stock Option Awards. The grant date fair value of those Stock Option Awards was $3,405,000.

(8)   The amounts in 2009 reported as "Non-Equity Incentive Plan Compensation" were earned by the executive officers in 2009 under the EAIP and are expected to be paid in March 2010.

(9)   The amounts in 2009 reported under "Change in Pension Value and Nonqualified Deferred Compensation Earnings" (i) include the aggregate increase in actuarial value of EFH Corp.'s Retirement Plan and Supplemental Retirement Plan and (ii) exclude amounts attributable to the portion of the vested amounts for Messrs. Young ($33,313), Keglevic ($44,409), Walters ($62,351) and Burke ($19,500) that were transferred from the Supplemental Retirement Plan and/or Salary Deferral Program to the cash balance component of the Retirement Plan as of December 31, 2009. For a more detailed description of EFH Corp.'s retirement plans, including the transfers of certain assets and liabilities from the Supplemental Retirement Plan and/or Salary Deferral Program to the cash balance component of the Retirement Plan, please refer to the narrative that follows the table titled "Pension Benefits". There are no above market earnings for nonqualified deferred compensation that is deferred under the Salary Deferral Program.

(10)   As described above, "All Other Compensation" includes amounts associated with our matching contributions to the EFH Thrift Plan and Salary Deferral Plan. Our Thrift Plan allows participating employees to contribute a portion of their regular salary or wages to the plan. Under the Thrift Plan, EFH Corp. matches a portion of an employee's contributions. This matching contribution is 100% of each Named Executive Officer's contribution up to 6% of the named Executive Officer's salary. All matching contributions are invested in Thrift Plan investments as directed by the participant. Please refer to the narrative that follows the Nonqualified Deferred Compensation table for a more detailed description of the Salary Deferral Program.

EFIHMW00052606

EFIHMW00051935

**PX 030**

**Page 672 of 734**

Table of Contents

## Grants of Plan–Based Awards—2009

The following table sets forth information regarding grants of compensatory awards to our Named Executive Officers during the fiscal year ended December 31, 2009.

| Name | Grant Date | Date of Board Action | Estimated Possible Payouts Under Non–Equity Incentive Plan Awards (1) | | | Estimated Future Payouts Under Equity Incentive Plan Awards | | | All Other Stock Awards: # Shares or Units | All Other Option Awards: # of Securities Underlying Options (#) (2) | Exercise or Base Price of Option Awards ($/sh) | Grant Date Fair Value of Stock and Option Awards (3) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Threshold ($) | Target ($) | Max. ($) | Threshold (#) | Target (#) | Max. (#) | | | | |
| John F. Young | 2/18/09 | 2/18/09 | 500,000 | 1,000,000 | 2,000,000 | | | | | | | |
| Paul M. Keglevic | 2/18/09 | 2/18/09 | | | | | | | | | | |
| | 12/17/09 | 10/29/09 | 225,000 | 450,000 | 900,000 | | | | | 1,000,000 | $ 3.50 | 1,325,000 |
| David A. Campbell | 2/18/09 | 2/18/09 | | | | | | | | | | |
| | 12/17/09 | 10/29/09 | 225,000 | 450,000 | 900,000 | | | | | 1,600,000 | $ 3.50 | 2,120,000 |
| Robert C. Walters | 2/18/09 | 2/18/09 | | | | | | | | | | |
| | 12/17/09 | 10/29/09 | 215,625 | 431,250 | 862,500 | | | | | 800,000 | $ 3.50 | 1,060,000 |
| James A. Burke | 2/18/09 | 2/18/09 | | | | | | | | | | |
| | 12/17/09 | 10/29/09 | 225,000 | 450,000 | 900,000 | | | | | 690,000 | $ 3.50 | 933,100 |
| Rizwan Chand | — | — | — | — | — | | | | | | | |

(1) The amounts disclosed under the heading "Estimated Possible Payouts under Non–Equity Incentive Plan Awards" reflect the threshold, target and maximum amounts available under the EAIP for each executive officer and each executive officer's employment agreement. The actual awards for the 2009 plan year are expected to be paid in March 2010 and are reported in the Summary Compensation Table under the heading "Non–Equity Incentive Plan Compensation" and described above under the section entitled "Annual Performance Bonus—EAIP."
(2) Represents grants of New Time Vested Options and New Cliff Vested Options under the 2007 Stock Incentive Plan, as described above under "Long–Term Incentive Awards."
(3) The amounts reported under "Grant Date Fair Value of Stock Award" represent the grant date fair value of stock options related to the 2009 Awards in accordance with FASB ASC Topic 718.

For a discussion of the terms of the New Stock Option Awards granted to each Named Executive Officer (other than Mr. Chand) in connection with such Named Executive Officer surrendering a portion of his Original Performance Vested Options, please see "Long–Term Incentive Awards—Long–Term Equity Incentives." For a discussion of certain material terms of the employment agreements with the Named Executive Officers, please see "Assessment of Compensation Elements" and "Potential Payments upon Termination or Change in Control."

B–158

EFIHMW00052607

EFIHMW00051935

**Table of Contents**

## Outstanding Equity Awards at Fiscal Year–End—2009

| Name | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| | # of Securities Underlying Unexercised Options | | Equity Incentive Plan Awards: # of Securities Underlying Unexercised Unearned Options (4) | Option Exercise Price | Option Expiration Date | # of Shares or Units of Stock That Have Not Vested (5) | Market Value of Shares or Units of Stock That Have Not Vested | Equity Incentive Plan Awards: # of Unearned Shares, Units or Other Rights That Have Not Vested | Equity Incentive Plan Awards: Market Payout Value of Unearned Shares, Units or Rights That Have Not Vested |
| | Exercisable | Unexercisable | | | | | | | |
| John F. Young (6) | 2,250,000 | 2,250,000 (1) | 3,000,000 | 5.00 | 02/01/2018 | | | | |
| Paul M. Keglevic | 750,000 | 750,000 (1) | 500,000 | 5.00 | 12/22/2018 | | | | |
| | | 500,000 (2) | | 3.50 | 12/17/2019 | | | | |
| | | 500,000 (3) | | 3.50 | 12/17/2019 | 225,000 | 787,500 | | |
| David A. Campbell | 1,200,000 | 1,200,000 (1) | 800,000 | 5.00 | 05/20/2018 | | | | |
| | | 800,000 (2) | | 3.50 | 12/17/2019 | | | | |
| | | 800,000 (3) | | 3.50 | 12/17/2019 | | | | |
| Robert C. Walters | 600,000 | 600,000 (1) | 400,000 | 5.00 | 05/20/2018 | | | | |
| | | 400,000 (2) | | 3.50 | 12/17/2019 | | | | |
| | | 400,000 (3) | | 3.50 | 12/17/2019 | | | | |
| James A. Burke | 735,000 | 735,000 (1) | 490,000 | 5.00 | 05/20/2018 | | | | |
| | | 200,000 (2) | | 3.50 | 12/17/2019 | | | | |
| | | 490,000 (3) | | 3.50 | 12/17/2019 | | | | |
| Rizwan Chand | 350,000 | | | 5.00 | 04/04/2010 | | | | |

(1) These Original Time Vested Options are scheduled to become exercisable ratably in September 2010, 2011 and 2012 provided the Named Executive Officer has remained continuously employed by EFH Corp. through the applicable vesting date (with customary exceptions for death, disability, and leaving for "good reason" or termination without "cause").

(2) These New Time Vested Options are scheduled to become exercisable ratably in September 2010, 2011, 2012, 2013 and 2014 provided the Named Executive Officer has remained continuously employed by EFH Corp. through the applicable vesting date (with customary exceptions for death, disability, and leaving for "good reason" or termination without "cause").

(3) These New Cliff Vested Options are scheduled to become exercisable in September 2014 provided the Named Executive Officer has remained continuously employed by EFH Corp. through that date (with customary exceptions for death, disability, and leaving for "good reason" or termination without "cause").

(4) If we achieve certain performance targets, these Original Performance Vested Options are eligible to become exercisable as of the end of fiscal years 2010, 2011 and 2012. See "Long–Term Incentive Awards–Long–Term Equity Incentives" for a detailed description of the vesting schedule for the Original Performance Vested Options and the decision by the O&C Committee in February 2010 to approve the vesting of a portion of the Original Performance Vested Options.

(5) This column reflects deferred shares described above under "Long–Term Incentive Awards–Equity Investment." The deferred shares for Mr. Keglevic will vest and become nonforfeitable as to (i) 112,500 of the shares on the third anniversary of his employment (July 2011) and (ii) 112,500 of the shares on the fifth anniversary of his employment (July 2013).

(6) In February 2010, Mr. Young surrendered 1,500,000 Original Performance Vested Options listed in the "Equity Incentive Plan Awards: # of Securities Underlying Unexercised Unearned Options" column, and in connection therewith received 1,500,000 New Time Vested options and 1,500,000 New Cliff Vested Options.

B–159

EFIHMW00052608

EFIHMW00051935

**PX 030
Page 674 of 734**

Table of Contents

### Options Exercised and Stock Vested—2009

None of the Named Executive Officers exercised any of his vested Stock Option Awards in 2009. In addition, none of the Named Executive Officers owned any restricted or deferred shares of EFH Corp. common stock that vested in 2009.

### Pension Benefits—2009

The table set forth below illustrates present value on December 31, 2009 of each Named Executive Officer's Retirement Plan benefit and benefits payable under the Supplemental Retirement Plan, based on their years of service and remuneration through December 31, 2009:

| Name | Plan Name | Number of Years Credited Service (#) | PV of Accumulated Benefit ($) | Payments During Last Fiscal Year ($) |
|---|---|---|---|---|
| John F. Young | Retirement Plan | N/A | 33,313 | — |
| | Supplemental Retirement Plan | N/A | N/A | N/A |
| Paul M. Keglevic | Retirement Plan | N/A | 44,409 | — |
| | Supplemental Retirement Plan | N/A | N/A | N/A |
| David A. Campbell (1) | Retirement Plan | 4.5833 | 109,838 | — |
| | Supplemental Retirement Plan | 7.5000 | 34,912 | — |
| Robert C. Walters | Retirement Plan | N/A | 62,351 | — |
| | Supplemental Retirement Plan | N/A | N/A | N/A |
| James A. Burke | Retirement Plan | 4.1667 | 99,396 | — |
| | Supplemental Retirement Plan | 4.1667 | 29,397 | — |
| Rizwan Chand | Retirement Plan | 3.3333 | 34,180 | — |
| | Supplemental Retirement Plan | 3.3333 | 41,752 | — |

EFH Corp. and its participating subsidiaries maintain the Retirement Plan, which is intended to be qualified under applicable provisions of the Code and covered by ERISA. The Retirement Plan contains both a traditional defined benefit component and a cash balance component. Only employees hired before January 1, 2002 may participate in the traditional defined benefit component. Accordingly, none of the Named Executive Officers participates in the traditional defined benefit component. Employees hired after January 1, 2002 and before October 1, 2007 are eligible to participate in the cash balance component. In addition, effective December 31, 2009, certain assets and liabilities under the Salary Deferral Program and the Supplemental Retirement Plan were transferred to the cash balance component of the Retirement Plan. Accordingly, Messrs. Campbell and Burke have participated and may continue to participate in the cash balance component of the Retirement Plan; and Messrs. Young, Keglevic and Walters participate in the cash balance component of the Retirement Plan solely with respect to amounts that were transferred from the Salary Deferral Program.

Under the cash balance component of the Retirement Plan, hypothetical accounts are established for participants and credited with monthly contribution credits equal to a percentage of the participant's compensation (3.5%, 4.5%, 5.5% or 6.5% depending on the participant's combined age and years of accredited service), contribution credits equal to the amounts transferred from the Salary Deferral Program and/or the Supplemental Retirement Plan effective as of December 31, 2009 and interest credits on all of such amounts based on the average yield of the 30–year Treasury bond for the 12 months ending November 30 of the prior year.

The Supplemental Retirement Plan provides for the payment of retirement benefits, which would otherwise be limited by the Code or the definition of earnings under the Retirement Plan. Under the Supplemental Retirement Plan, retirement benefits under the cash balance component are calculated in accordance with the

B–160

EFIHMW00052609

EFIHMW00051935

**PX 030**
**Page 675 of 734**

**Table of Contents**

same formula used under the Retirement Plan. Participation in EFH Corp.'s Supplemental Retirement Plan has been limited to employees of all of its businesses other than Oncor, who were employed by EFH Corp. (or its participating subsidiaries) on or before October 1, 2007. Accordingly, Messrs. Campbell and Burke participate in the Supplemental Retirement Plan, and Messrs. Young, Keglevic and Walters are not eligible to participate in the Supplemental Retirement Plan.

Benefits accrued under the Supplemental Retirement Plan after December 31, 2004, are subject to Section 409A of the Code. Accordingly, certain provisions of the Supplemental Retirement Plan have been modified in order to comply with the requirements of Section 409A and related guidance.

The present value of the accumulated benefit for the Retirement Plan (the cash balance component) was calculated as the value of their cash balance account projected to age 65 at an assumed growth rate of 4.75% and then discounted back to December 31, 2009 at 5.90%. No mortality or turnover assumptions were applied.

## Nonqualified Deferred Compensation—2009 (1)

The following table sets forth information regarding plans that provide for the deferral of the Named Executive Officers' compensation on a basis that is not tax–qualified for the fiscal year ended December 31, 2009:

| Name | Executive Contributions in Last FY ($) | Registrant Contributions in Last FY ($) (2) | Aggregate Earnings in Last FY ($) | Aggregate Withdrawals/ Distributions($) (3) | Aggregate Balance at Last FYE ($) (4) |
|---|---|---|---|---|---|
| John F. Young | 80,000 | 80,000 | 56,561 | — | 281,715 |
| Paul M. Keglevic | 48,000 | 48,000 | 72 | — | 87,703 |
| David A. Campbell | — | — | 48,558 | | 195,891 |
| Robert C. Walters | 46,000 | 46,000 | 32,367 | | 103,402 |
| James A. Burke | — | — | 86,658 | — | 233,262 |
| Rizwan Chand | — | | 28,960 | (116,068) | |

(1)   The amounts reported in the Nonqualified Deferred Compensation table include deferrals and the company match under the Salary Deferral Program. The amounts reported as "Executive Contributions in Last FY" are salary deferrals and are also included as "Salary" in the Summary Compensation Table. Under EFH Corp.'s Salary Deferral Program each employee of EFH Corp. and its participating subsidiaries who is in a designated job level and whose annual salary is equal to or greater than an amount established under the Salary Deferral Program ($110,840 for the program year beginning January 1, 2009) may elect to defer up to 50% of annual base salary, and/or up to 100% of any bonus or incentive award, for a maturity period of seven years, for a maturity period ending with the retirement of such employee, or for a combination thereof. EFH Corp. makes a matching award, which vests at the end of the applicable maturity period (subject to acceleration or forfeiture under certain circumstances), equal to 100% of up to the first 8% of salary deferred under the Salary Deferral Program. Deferrals are credited with earnings or losses based on the performance of investment alternatives under the Salary Deferral Program selected by each participant. At the end of the applicable maturity period, the trustee for the Salary Deferral Program distributes the deferred compensation, any vested matching awards and the applicable earnings in cash as a lump sum or in annual installments at the participant's election made at the time of deferral. EFH Corp. is financing the retirement option portion of the Salary Deferral Program through the purchase of corporate–owned life insurance on the lives of participants. The proceeds from such insurance are expected to allow EFH Corp. to fully recover the cost of the retirement option. Beginning in 2010, certain executive officers, including the Named Executive Officers, will not be eligible to participate in the Salary Deferral Program.

(2)   The amount included in "Registrant Contributions in Last FY" is attributable to EFH Corp.'s matching award under the Salary Deferral Program.

B–161

EFIHMW00052610

EFIHMW00051935

Table of Contents

(3)   The "Aggregate Withdrawals/Distributions($)" column excludes amounts transferred from the Supplemental Retirement Plan and/or Salary Deferral Program to the cash balance component of the Retirement Plan as of December 31, 2009 for Messrs. Young ($37,500), Keglevic ($48,511), Walters ($71,283) and Burke ($25,000). In accordance with the terms of the Salary Deferral Plan, Mr. Chand forfeited $39,606 of company matching and received a distribution of the remaining balance of his account upon termination of his employment.

(4)   A portion of the amounts reported as "Aggregate Balance at Last FYE" are also included in the Summary Compensation Table as follows: for Mr. Young, $80,000 and $66,667 of executive contributions are included as "Salary" for 2009 and 2008, respectively, and $80,000 and $66,667 of company matching contributions are included as "All Other Compensation" for 2009 and 2008, respectively; for Mr. Keglevic, $48,000 and $20,000 of executive contributions are included as "Salary" for 2009 and 2008, respectively, and $48,000 and $20,000 of company matching contributions are included as "All Other Compensation" for 2009 and 2008, respectively; for Mr. Walters, $46,000 and $30,667 of executive contributions are included as "Salary" for 2009 and 2008, respectively, and $46,000 and $30,667 of company matching contributions are included as "All Other Compensation" for 2009 and 2008, respectively; for Mr. Burke, $48,000 and $27,417 of executive contributions are included as "Salary" for 2008 and 2007, respectively, and $48,000 and $27,417 of company matching contributions are included as "All Other Compensation" for 2009 and 2008, respectively. The amounts reported as "Aggregate Balance at Last FYE" reflect decreases resulting from the amounts transferred from the Supplemental Retirement Plan and/or Salary Deferral Program to the cash balance component of the Retirement Plan as of December 31, 2009 for Messrs. Young ($37,500), Keglevic ($48,511), Walters ($71,283) and Burke ($25,000).

**Potential Payments upon Termination or Change in Control**

The tables and narrative below provide information for payments to each of the Named Executive Officers (or, as applicable, enhancements to payments or benefits) in the event of his termination, including if such termination is voluntary, for cause, as a result of death, as a result of disability, without cause or for good reason or without cause or for good reason in connection with a change in control.

The information in the tables below is presented in accordance with SEC rules, assuming termination of employment as of December 31, 2009.

**Employment Arrangements with Contingent Payments**

As of December 31, 2009, each of Messrs. Young, Keglevic, Campbell, Walters and Burke had employment agreements with change in control and severance provisions as described in the following tables. In addition, in October 2009, the O&C Committee approved several changes to the compensation arrangements for all of the Named Executive Officers other than Messrs. Young and Chand, which changes were effective as of December 31, 2009 but not yet documented in such Named Executive Officers' employment agreements. Certain of these changes affected the potential payments of Messrs. Keglevic, Campbell, Walters and Burke and are reflected in the following tables. In February, 2010, Mr. Young's employment agreement was amended and restated effective retroactively on January 1, 2010. Because the changes to Mr. Young's employment agreement were not effective as of December 31, 2009, they are not reflected in the following table for Mr. Young, but are described elsewhere in the EFH Corp. 2009 Form 10-K. Mr. Chand had an employment agreement, and the change in control and severance terms included in the employment agreement governed until his employment with EFH Corp. terminated in October 2009.

With respect to each Named Executive Officer's employment agreement, a change in control is generally defined as (i) a transaction that results in a sale of substantially all of our assets to another person and such person having more seats on our Board than the Sponsor Group, (ii) a transaction that results in a person not in the Sponsor Group owning more than 50% of our common stock and such person having more seats on our Board than the Sponsor Group or (iii) a transaction that results in the Sponsor Group owning less than 20% of our common stock and the Sponsor Group not being able to appoint a majority of the directors to our Board.

B–162

EFIHMW00052611

EFIHMW00051935

**Table of Contents**

Each Named Executive Officer's employment agreement includes customary non–compete and non–solicitation provisions that generally restrict the Named Executive Officer's ability to compete with us or solicit our customers or employees for his own personal benefit during the term of the employment agreement and 24 months (with respect to Mr. Young) or 18 months (with respect to Messrs. Keglevic, Campbell, Walters and Burke) after the employment agreement expires or is terminated.

In addition, in October 2009, the O&C Committee approved the adoption of a new LTI to be included by amendment in the employment agreement of Messrs. Keglevic, Campbell, Walters and Burke. Under the terms of the LTI, in the event of the death or disability of any such Named Executive Officer, his termination without cause or resignation for good reason (or in the event we elect not to extend his employment term), or his termination without cause or resignation for good reason (or in the event we elect not to extend his employment term) within 24 months following a change in control of EFH Corp., in each case prior to September 30, 2012, such named Executive Officer shall be entitled to receive the LTI, or a pro rata portion thereof, calculated as (i) 75% of the aggregate EAIP award actually earned by the Named Executive Officer for any applicable fiscal year completed prior to the date of the Named Executive Officer's termination, plus (ii) for a termination occurring in fiscal year 2009, 2010, or 2011, 75% of the Named Executive Officer's prorated annual performance–based cash bonus for the year of termination. In February 2010, Mr. Young's employment agreement was amended to add a similar new LTI that is calculated based on 100% of the aggregate EAIP award actually earned by Mr. Young for fiscal years 2009, 2010 and 2011.

As of December 31, 2009, each of Messrs. Young, Keglevic, Campbell, Walters and Burke had stock option agreements. Under the stock option agreement for each Named Executive Officer, in the event of such Named Executive Officer's termination without cause or resignation for good reason (or in the event we elect not to extend his employment term) following a change in control of EFH Corp., such Named Executive Officer's Original Time Vested Options would become immediately exercisable as to 100% of the shares of EFH Corp. common stock subject to such options immediately prior to the change in control. As of December 31, 2009, the fair market value of the shares of EFH Corp. common stock underlying each Named Executive Officer's Original Time Vested Options was less than the exercise price of such options.

**1. Mr. Young**

**Potential Payments to Mr. Young upon Termination as of December 31, 2009 (per employment agreement, restricted stock agreement and stock option agreement, each in effect as of December 31, 2009)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | N/A | N/A | N/A | N/A | $5,000,000 | $ 5,000,000 |
| EAIP | N/A | N/A | $1,000,000 | $1,000,000 | N/A | $ 1,000,000 |
| Payment of Common Stock in respect of Restricted Stock Unit | N/A | $1,950,000 | $1,950,000 | $1,950,000 | $1,950,000 | $ 1,950,000 |
| Acceleration of Stock Option Awards | N/A | N/A | N/A | N/A | N/A | $ 0 |
| Deferred Compensation | | | | | | |
| —Salary Deferral Program | N/A | N/A | $ 159,608 | $ 159,608 | N/A | $ 159,608 |
| Health & Welfare | | | | | | |
| —Medical/COBRA | N/A | N/A | N/A | N/A | $ 33,273 | $ 33,273 |
| —Dental/COBRA | N/A | N/A | N/A | N/A | $ 2,790 | $ 2,790 |
| Totals | N/A | $1,950,000 | $3,109,608 | $3,109,608 | $6,986,063 | $ 8,145,671 |

B–163

EFIHMW00052612

EFIHMW00051935

**Table of Contents**

Mr. Young has entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1.  In the event of Mr. Young's death or disability:

    a.  a prorated annual incentive bonus for the year of termination, and

    b.  payment of employee benefits, including stock compensation, if any, to which Mr. Young may be entitled.

2.  In the event of Mr. Young's termination without cause or resignation for good reason (or in the event we elect not to extend his employment term):

    a.  a lump sum payment equal to two and one-half times the sum of (i) his annualized base salary and (ii) a prorated annual incentive bonus for the year of termination;

    b.  payment of employee benefits, including stock compensation, if any, to which Mr. Young may be entitled, and

    c.  certain continuing health care and company benefits.

3.  In the event of Mr. Young's termination without cause or resignation for good reason (or in the event we elect not to extend his employment term) within 24 months following a change in control of EFH Corp.:

    a.  a lump sum payment equal to two and one-half times the sum of (i) his annualized base salary and (ii) his annual bonus target;

    b.  a prorated annual incentive bonus for the year of termination;

    c.  payment of employee benefits, including stock compensation, if any, to which Mr. Young may be entitled;

    d.  certain continuing health care and company benefits, and

    e.  a tax gross-up payment to offset any excise tax which may result from the change in control payments.

In addition, Mr. Young has entered into a restricted stock agreement. Under Mr. Young's restricted stock agreement, Mr. Young was granted 600,000 restricted stock units, payable in January 2010, with one share of common stock of EFH Corp. for each such unit, all of which were fully vested and nonforfeitable upon grant; provided, however, in the event of Mr. Young's voluntary termination prior to January 2010, Mr. Young would have had to forfeit all of his restricted stock units.

B-164

EFIHMW00052613

EFIHMW00051935

**PX 030**
**Page 679 of 734**

Table of Contents
2. Mr. Keglevic

Potential Payments to Mr. Keglevic upon Termination as of December 31, 2009 (per employment agreement, deferred share agreement and stock option agreement, each in effect as of December 31, 2009, and revisions to such employment agreement that were adopted by the O&C Committee in October 2009 and effective as of December 31, 2009)

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | N/A | N/A | N/A | N/A | $2,100,000 | $ 2,100,000 |
| EAIP | N/A | N/A | $ 450,000 | $ 450,000 | N/A | N/A |
| Put Right in respect of Deferred Shares | N/A | N/A | $3,200,000 | $3,200,000 | $3,200,000 | $ 3,200,000 |
| Acceleration of Stock Option Awards | N/A | N/A | N/A | N/A | N/A | $ 0 |
| LTI Cash Retention Award | N/A | N/A | $ 498,150 | $ 498,150 | $ 498,150 | $ 498,150 |
| Deferred Compensation | | | | | | |
| —Salary Deferral Program | N/A | N/A | $ 68,107 | $ 68,107 | $ 68,107 | $ 68,107 |
| Health & Welfare | | | | | | |
| —Dental/COBRA | N/A | N/A | N/A | N/A | $ 2,790 | $ 2,790 |
| Totals | N/A | N/A | $4,216,257 | $4,216,257 | $5,800,940 | $ 5,869,047 |

Mr. Keglevic entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1. In the event of Mr. Keglevic's death or disability:

   a. a prorated annual incentive bonus for the year of termination, and

   b. payment of employee benefits, including stock compensation, if any, to which Mr. Keglevic may be entitled.

2. In the event of Mr. Keglevic's termination without cause or resignation for good reason (or in the event we elect not to extend his employment term):

   a. for a termination occurring on or prior to the second anniversary of the effective date of the agreement, a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target, and for a termination occurring after the second anniversary of the effective date of the agreement, a lump sum payment equal to (i) two times his annualized base salary, (ii) a prorated annual incentive bonus for the year of termination and (iii) the matching contributions which would have been made on his behalf to EFH Corp.'s Salary Deferral Program had Mr. Keglevic continued his participation in the plan for an additional twelve months;

   b. payment of employee benefits, including stock compensation, if any, to which Mr. Keglevic may be entitled, and

   c. certain continuing health care and company benefits.

3. In the event of Mr. Keglevic's termination without cause or resignation for good reason (or in the event we elect not to extend his employment term) within 24 months following a change in control of EFH Corp.:

   a. a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target;

   b. payment of employee benefits, including stock compensation, if any, to which Mr. Keglevic may be entitled;

B–165

EFIHMW00052614

EFIHMW00051935

Table of Contents

    c.    certain continuing health care and company benefits, and

    d.    a tax gross–up payment to offset any excise tax which may result from the change in control payments.

In addition, Mr. Keglevic has entered into a deferred share agreement. Under Mr. Keglevic's deferred share agreement, EFH Corp. agreed to deliver to Mr. Keglevic 112,500 shares of EFH Corp. common stock on July 1, 2011 and 112,500 shares of EFH Corp. common stock on July 1, 2013; provided, however, that any shares not yet vested shall become 100% vested and become nonforfeitable in the event of Mr. Keglevic's death or disability or as a result of his termination without cause or for good reason or without cause or for good reason in connection with a change in control. Further, in the event of Mr. Keglevic's termination prior to July 1, 2013 as a result of death, as a result of disability, without cause or for good reason or without cause or for good reason in connection with a change in control, Mr. Keglevic shall have the right (but not the obligation) to sell to EFH Corp. all (but not less than all) of the shares of EFH Corp. common stock delivered pursuant to the deferred share agreement for a purchase price of $3,200,000.

### 3. Mr. Campbell

**Potential Payments to Mr. Campbell upon Termination as of December 31, 2009 (per employment agreement, deferred share agreement and stock option agreement, each in effect as of December 31, 2009, and revisions to such employment agreement that were adopted by the O&C Committee in October 2009 and effective as of December 31, 2009)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change In Control |
|---|---|---|---|---|---|---|
| Cash Severance | N/A | N/A | N/A | N/A | $ 2,100,000 | $ 2,100,000 |
| EAIP | N/A | N/A | $ 450,000 | $ 450,000 | N/A | N/A |
| Payment of EFH Corp. Common Stock in respect of Vested Deferred Shares | $ 1,625,000 | $ 1,625,000 | $ 1,625,000 | $ 1,625,000 | $ 1,625,000 | $ 1,625,000 |
| Acceleration of Stock Option Awards | N/A | N/A | N/A | N/A | N/A | $ 0 |
| LTI Cash Retention Award | N/A | N/A | $ 481,950 | $ 481,950 | $ 481,950 | $ 481,950 |
| Retirement Benefits | | | | | | |
| —Supplemental Retirement Plan | $ 43,511 | $ 43,511 | $ 45,205 | $ 271,531 | $ 43,511 | $ 43,511 |
| Deferred Compensation | | | | | | |
| —Salary Deferral Program (1) | $ 77,146 | $ 77,146 | $ 77,146 | $ 77,146 | $ 77,146 | $ 77,146 |
| Health & Welfare | | | | | | |
| —Medical/COBRA | N/A | N/A | N/A | N/A | $ 26,719 | $ 26,719 |
| —Dental/COBRA | N/A | N/A | N/A | N/A | $ 2,232 | $ 2,232 |
| **Totals** | $ 1,745,657 | $ 1,745,657 | $ 2,679,301 | $ 2,905,627 | $ 4,356,558 | $ 4,356,558 |

(1)    Mr. Campbell is fully vested in the company matching portion of the Salary Deferral Plan.

Mr. Campbell entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

    1.    In the event of Mr. Campbell's death or disability:

        a.    a prorated annual incentive bonus for the year of termination, and

        b.    payment of employee benefits, including stock compensation, if any, to which Mr. Campbell may be entitled.

EFIHMW00052615

EFIHMW00051935

**PX 030**
**Page 681 of 734**

Table of Contents

2.  In the event of Mr. Campbell's termination without cause or resignation for good reason (or in the event we elect not to extend his employment term):

    a.  for a termination occurring on or prior to the second anniversary of the effective date of the agreement, a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target, and for a termination occurring after the second anniversary of the effective date of the agreement, a lump sum payment equal to (i) two times his annualized base salary, (ii) a prorated annual incentive bonus for the year of termination and (iii) the matching contributions which would have been made on his behalf to EFH Corp.'s Salary Deferral Program had Mr. Campbell continued his participation in the plan for an additional twelve months;

    b.  payment of employee benefits, including stock compensations, if any, to which Mr. Campbell may be entitled, and

    c.  certain continuing health care and company benefits.

3.  In the event of Mr. Campbell's termination without cause or resignation for good reason (or in the event we elect not to extend his employment term) within 24 months following a change in control of EFH Corp.:

    a.  a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target;

    b.  payment of employee benefits, including stock compensation, if any, to which Mr. Campbell may be entitled;

    c.  certain continuing health care and company benefits, and

    d.  a tax gross–up payment to offset any excise tax which may result from the change in control payments.

In addition, Mr. Campbell has entered into a deferred share agreement. Under Mr. Campbell's deferred share agreement, EFH Corp. agreed to deliver to Mr. Campbell 500,000 shares of EFH Corp. common stock in the event of Mr. Campbell's termination for any reason.

**4. Mr. Walters**

**Potential Payments to Mr. Walters upon Termination as of December 31, 2009 (per employment agreement and stock option agreement, each in effect as of December 31, 2009, and revisions to such employment agreement that were adopted by the O&C Committee in October 2009 and effective as of December 31, 2009)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | N/A | N/A | N/A | N/A | $2,012,500 | $ 2,012,500 |
| EAIP | N/A | N/A | $ 431,250 | $ 431,250 | N/A | N/A |
| Acceleration of Stock Option Awards | N/A | N/A | N/A | N/A | N/A | $        0 |
| LTI Cash Retention Award | N/A | N/A | $ 457,500 | $ 457,500 | $ 457,500 | $   457,500 |
| Lump Sum Payment | N/A | N/A | $2,000,000 | $2,000,000 | $2,000,000 | $ 2,000,000 |
| Deferred Compensation | | | | | | |
| —Salary Deferral Program | N/A | N/A | $  87,343 | $  87,343 | N/A | $     87,343 |
| Health & Welfare | | | | | | |
| —Medical/COBRA | N/A | N/A | N/A | N/A | $  26,618 | $     26,618 |
| —Dental/COBRA | N/A | N/A | N/A | N/A | $   2,232 | $      2,232 |
| Totals | N/A | N/A | $2,976,093 | $2,976,093 | $4,498,850 | $ 4,586,193 |

B–167

EFIHMW00052616

EFIHMW00051935

**Table of Contents**

Mr. Walters entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1.  In the event of Mr. Walters' death or disability:

    a.  a prorated annual incentive bonus for the year of termination;

    b.  a lump sum payment equal to $2,000,000, and

    c.  payment of employee benefits, including stock compensation, if any, to which Mr. Walters may be entitled.

2.  In the event of Mr. Walters' termination without cause or resignation for good reason (or in the event we elect not to extend his employment term):

    a.  for a termination occurring on or prior to the second anniversary of the effective date of the agreement, a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target, and for a termination occurring after the second anniversary of the effective date of the agreement, a lump sum payment equal to (i) two times his annualized base salary, (ii) a prorated annual incentive bonus for the year of termination and (iii) the matching contributions which would have been made on his behalf to EFH Corp.'s Salary Deferral Program had Mr. Walters continued his participation in the plan for an additional twelve months;

    b.  a lump sum payment equal to $2,000,000;

    c.  payment of employee benefits, including stock compensation, if any, to which Mr. Walters may be entitled, and

    d.  certain continuing health care and company benefits.

3.  In the event of Mr. Walters' termination without cause or resignation for good reason (or in the event we elect not to extend his employment term) within 24 months following a change in control of EFH Corp.:

    a.  a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target;

    b.  a lump sum payment equal to $2,000,000;

    c.  payment of employee benefits, including stock compensation, if any, to which Mr. Walters may be entitled;

    d.  certain continuing health care and company benefits, and

    e.  a tax gross-up payment to offset any excise tax which may result from the change in control payments.

B–168

EFIHMW00052617

EFIHMW00051935

**PX 030**
**Page 683 of 734**

Table of Contents
5. Mr. Burke

Potential Payments to Mr. Burke upon Termination as of December 31, 2009 (per employment agreement and stock option agreement, each in effect as of December 31, 2009, and revisions to such employment agreement that were adopted by the O&C Committee in October 2009 and effective as of December 31, 2009)

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | N/A | N/A | N/A | N/A | $ 1,200,000 | $ 2,100,000 |
| EAIP | N/A | N/A | $ 450,000 | $ 450,000 | $ 450,000 | N/A |
| Acceleration of Stock Option Awards | N/A | N/A | N/A | N/A | N/A | $ 0 |
| LTI Cash Retention Award | N/A | N/A | $ 642,600 | $ 642,600 | $ 642,600 | $ 642,600 |
| Retirement Benefits | | | | | | |
| —Supplemental Retirement Plan | $ 35,747 | $ 35,747 | $ 38,099 | $ 255,572 | $ 35,747 | $ 35,747 |
| Deferred Compensation | | | | | | |
| —Salary Deferral Program | $ 66,775 | $ 66,775 | $ 128,976 | $ 128,976 | $ 66,775 | $ 128,976 |
| Health & Welfare | | | | | | |
| —Medical/COBRA | N/A | N/A | N/A | N/A | $ 26,618 | $ 26,618 |
| —Dental/COBRA | N/A | N/A | N/A | N/A | $ 2,232 | $ 2,232 |
| Totals | $ 102,522 | $ 102,522 | $ 1,259,675 | $ 1,477,148 | $ 2,423,972 | $ 2,936,173 |

Mr. Burke entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1.  In the event of Mr. Burke's death or disability:

    a.  a prorated annual incentive bonus for the year of termination, and

    b.  payment of employee benefits, including stock compensation, if any, to which Mr. Burke may be entitled.

2.  In the event of Mr. Burke's termination without cause or resignation for good reason (or in the event we elect not to extend his employment term):

    a.  a lump sum payment equal to (i) two times his annualized base salary, (ii) a prorated annual incentive bonus for the year of termination and (iii) the matching contributions which would have been made on his behalf to EFH Corp.'s Salary Deferral Program had Mr. Burke continued his participation in the plan for an additional twelve months;

    b.  payment of employee benefits, including stock compensation, if any, to which Mr. Burke may be entitled, and

    c.  certain continuing health care and company benefits.

3.  In the event of Mr. Burke's termination without cause or resignation for good reason (or in the event we elect not to extend his employment term) within 24 months following a change in control of EFH Corp.:

    a.  a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target;

    b.  payment of employee benefits, including stock compensation, if any, to which Mr. Burke may be entitled;

B-169

EFIHMW00052618

EFIHMW00051935

**Table of Contents**

    c.    certain continuing health care and company benefits and

    d.    a tax gross–up payment to offset any excise tax which may result from the change in control payments.

**6. Mr. Chand**

**Mr. Chand's employment with EFH Corp. terminated in October 2009. Under the terms of his Severance Agreement, EFH Corp. provided Mr. Chand a severance payment which consisted of a lump sum cash payment of (i) $1,485,000, representing the cash severance that was due under his employment agreement and (ii) $600,000 related to his deferred share agreement.**

*Excise Tax Gross–Ups*

Pursuant to their employment agreements, if any of our Named Executive Officers would be subject to the imposition of the excise tax imposed by Section 4999 of the Code, related to the executive's employment, but the imposition of such tax could be avoided by approval of our shareholders as described in Section 280G(b)(5)(B) of the Code, then such executive may cause EFH Corp. to seek such approval, in which case EFH Corp. will use its reasonable best efforts to cause such approval to be obtained and such executive will cooperate and execute such waivers as may be necessary so that such approval avoids imposition of any excise tax under Section 4999. If such executive fails to cause EFH Corp. to seek such approval or fails to cooperate and execute the waivers necessary in the approval process, such executive shall not be entitled to any gross–up payment for any resulting tax under Section 4999.

*Recent Compensation Developments*

Mr. Paul Keglevic, EFH Corp.'s Chief Financial Officer, recently forfeited his rights to the deferred shares granted to him in July 2008. Additionally, on July 28, 2010, the Organization and Compensation Committee of the Board of Directors of EFH Corp. approved certain changes to Mr. Keglevic's compensation arrangement. Pursuant to the new arrangement, Mr. Keglevic will receive 225,000 shares of EFH Corp.'s common stock if he is employed by EFH Corp. on September 30, 2012. If Mr. Keglevic's employment with EFH Corp. terminates for any reason prior to September 30, 2012 (other than for "cause" or without "good reason"), he will also be entitled to receive the 225,000 shares. If Mr. Keglevic receives the 225,000 shares in accordance with the terms of his new arrangement, he has the right to sell the shares to EFH Corp. for $3,140,000, at any time during the period beginning on September 30, 2012 and ending on the sixtieth business day following his termination of employment (or, in the event Mr. Keglevic receives the shares upon his termination of employment, at any time during the period ending on the sixtieth business day following his termination of employment).

**Compensation Committee Interlocks and Insider Participation**

There are no relationships among our executive officers, members of the O&C Committee or entities whose executives served on the O&C Committee that required disclosure under applicable SEC rules and regulations. For a description of related person transactions involving members of the O&C Committee, see "Related Person Transactions."

B–170

EFIHMW00052619

EFIHMW00051935

Table of Contents

### Director Compensation

The table below sets forth information regarding the aggregate compensation paid to the members of the Board during the year ended December 31, 2009. Directors who are officers of EFH Corp. or members of the Sponsor Group (or their respective affiliates) do not receive any fees for service as a director. EFH Corp. reimburses directors for certain reasonable expenses incurred in connection with their services as directors.

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Arcilia C. Acosta (1) | 150,000 | 100,000 | — | 250,000 |
| David Bonderman | — | — | — | — |
| Donald L. Evans (2) | 2,000,000 | 425,000 | 0 | 2,425,000 |
| Thomas D. Ferguson | — | — | — | — |
| Frederick M. Goltz | — | — | — | — |
| James R. Huffines (1)(3) | 150,000 | 100,000 | 900,000 | 1,150,000 |
| Scott Lebovitz | — | — | — | — |
| Jeffrey Liaw | — | — | — | — |
| Marc S. Lipschultz | — | — | — | — |
| Michael MacDougall | — | — | — | — |
| Lyndon L. Olson, Jr. (1)(3) | 150,000 | 100,000 | 900,000 | 1,150,000 |
| Kenneth Pontarelli | — | — | — | — |
| William K. Reilly (1) | 150,000 | 100,000 | 0 | 250,000 |
| Jonathan D. Smidt | — | — | — | — |
| John F. Young | — | — | — | — |
| Kneeland Youngblood (1) | 150,000 | 100,000 | 0 | 250,000 |

(1) Ms. Acosta and Messrs. Huffines, Olson, Reilly and Youngblood receive $150,000 annually and an annual equity award (paid in shares of EFH Corp. common stock) valued at $100,000 (the grant date fair value) for their service as a director.

(2) In May 2008, EFH Corp. entered into a consulting agreement with Mr. Evans, pursuant to which he received the following compensation:

    1.   An annual fee of $2,000,000; and

    2.   200,000 shares of restricted stock, half of which vested during 2009, 50,000 shares at $5.00 per share and 50,000 shares at $3.50 per share. The value of the shares that vested during 2009 is reported in the table above under the heading "Stock Awards".

Under the consulting agreement, Mr. Evans also received options to purchase 600,000 shares of EFH Corp.'s common stock at an exercise price of $5.00 per share. As a result, there should have been an "Option Awards" column in last year's Director Compensation table and it should have included $551,250 as the grant date fair value for the options granted to Mr. Evans in May 2008 based upon rules for valuing stock option awards as they existed last year. The consulting agreement had a term running through October 2009. In February 2010, EFH Corp. entered into a new consulting agreement with Mr. Evans effective retroactively to October 10, 2009, pursuant to which Mr. Evans is entitled to receive an annual fee of $2,000,000. The term of the new consulting agreement expires in October 2012.

(3) In December 2007, EFH Corp. entered into consulting agreements with Messrs. Huffines and Olson. As compensation for their consulting services, they received annual fees of $225,000, in addition to their standard director compensation described above. The amounts earned pursuant to these consulting agreements in 2009 are reflected above in the "All Other Compensation" column. In November 2009, the consulting agreements with Messrs. Huffines and Olson were terminated. In January 2010, Messrs. Huffines and Olson were each paid a $675,000 bonus for their exemplary efforts and past performance while serving as consultants.

B–171

EFIHMW00052620

EFIHMW00051935

**PX 030**
**Page 686 of 734**

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The following table presents information concerning stock–based compensation plans as of December 31, 2009. (See Note 22 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009.

| | (a) Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b) Weighted–average exercise price of outstanding options, warrants and rights | (c) Number of securities remaining available for future issuance under equity compensation plans, excluding securities reflected in column (a) |
|---|---|---|---|
| Equity compensation plans approved by security holders | — | $ — | — |
| Equity compensation plans not approved by security holders | 62,289,801 | $ 4.61 | 9,710,199 |
| | 62,289,801 | $ 4.61 | 9,710,199 |

Note:    Includes 49.8 million stock options with a weighted average exercise price of $4.63.

Includes 4.0 million vested and unvested restricted shares, deferred shares and stock granted to directors as part of their compensation plan.

B–172

EFIHMW00052621

EFIHMW00051935