Table of Contents
**Beneficial Ownership of Common Stock of Energy Future Holdings Corp.**

The following table lists the number of shares of common stock of EFH Corp. beneficially owned by each director and certain current and former executive officers of EFH Corp. and the holders of more than 5% of EFH Corp.'s common stock as of June 1, 2010.

| Name. | Number of Shares Beneficially Owned | Percent of Class |
|---|---|---|
| Texas Energy Future Holdings Limited Partnership (1) | 1,657,600,000 | 98.32% |
| Arcilia C. Acosta (2) | 100,770 | * |
| David Bonderman (3) | 1,657,600,000 | 98.32% |
| Donald L. Evans (4) | 1,000,000 | * |
| Thomas D. Ferguson (5) | 1,657,600,000 | 98.32% |
| Frederick M. Goltz (6) | 1,657,600,000 | 98.32% |
| James R. Huffines | 390,770 | * |
| Scott Lebovitz (5) | 1,657,600,000 | 98.32% |
| Jeffrey Liaw (3) | 1,657,600,000 | 98.32% |
| Marc S. Lipschultz (6) | 1,657,600,000 | 98.32% |
| Michael MacDougall (3) | 1,657,600,000 | 98.32% |
| Lyndon L. Olson, Jr. | 250,770 | * |
| Kenneth Pontarelli (5) | 1,657,600,000 | 98.32% |
| William K. Reilly | 230,770 | * |
| Jonathan D. Smidt (6) | 1,657,600,000 | 98.32% |
| John F. Young (7) | 3,637,009 | * |
| Kneeland Youngblood | 170,770 | * |
| James A. Burke (8) | 1,307,500 | * |
| David A. Campbell (9) | 1,900,000 | * |
| M. Rizwan Chand | 0 | * |
| Paul M. Keglevic (10) | 1,100,000 | * |
| Robert C. Walters (11) | 700,000 | * |
| All directors and current executive officers as a group (26 persons) | 1,672,880,359 | 99.23% |

\* Less than 1%.

(1) Texas Holdings beneficially owns 1,657,600,000 shares of EFH Corp. The sole general partner of Texas Holdings is Texas Energy Future Capital Holdings LLC (Texas Capital), which, pursuant to the Amended and Restated Limited Partnership Agreement of Texas Holdings, has the right to vote all of the EFH Corp. shares owned by Texas Holdings. The address of both Texas Holdings and Texas Capital is 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102.

(2) Shares held in a family limited partnership, ACA Family LP.

(3) Includes the 1,657,600,000 shares owned by Texas Holdings, over which TPG Partners V, L.P., TPG Partners IV, L.P., TPG FOF V–A, L.P. and TPG FOF V–B, L.P. (TPG Entities) may be deemed, as a result of their ownership of 27.01% of Texas Capital's outstanding units and certain provisions of Texas Capital's Amended and Restated Limited Liability Company Agreement (TC LLC Agreement), to have shared voting or dispositive power. The ultimate general partners of the TPG Entities are TPG Advisors IV, Inc. and TPG Advisors V, Inc. David Bonderman and James Coulter are the sole shareholders and directors of TPG Advisors IV Inc. and TPG Advisors V Inc., and therefore, Messrs. Bonderman and Coulter, TPG Advisors IV Inc. and TPG Advisors V Inc. may each be deemed to beneficially own the shares held by the TPG Entities. Messrs. Bonderman, Liaw and MacDougall are managers of Texas Capital. By virtue of their position in relation to Texas Capital and the TPG Entities, Messrs. Bonderman, Liaw and MacDougall may be deemed to have beneficial ownership with respect to the shares of EFH Corp. common stock owned by

B–173

EFIHMW00052622

EFIHMW00051935

**PX 030**
**Page 688 of 734**

Table of Contents

Texas Holdings. Each of Messrs. Liaw and MacDougall disclaims beneficial ownership of such shares except to the extent of their pecuniary interest in those shares. The address of each entity and individual listed in this footnote is 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102.

(4)   Includes 600,000 shares issuable upon exercise of vested options.

(5)   Includes the 1,657,600,000 shares owned by Texas Holdings, over which GS Capital Partners VI Fund, L.P., GSCP VI Offshore TXU Holdings, L.P., GSCP VI Germany TXU Holdings, L.P., GS Capital Partners VI Parallel, L.P., GS Global Infrastructure Partners I, L.P., GS Infrastructure Offshore TXU Holdings, L.P. (GSIP International Fund), GS Institutional Infrastructure Partners I, L.P., Goldman Sachs TXU Investors L.P. and Goldman Sachs TXU Investors Offshore Holdings, L.P. (collectively, Goldman Entities) may be deemed, as a result of their ownership of 27.02% of Texas Capital's outstanding units and certain provision of the TC LLC Agreement, to have shared voting or dispositive power. Affiliates of The Goldman Sachs Group, Inc. (Goldman Sachs) are the general partner, managing general partner or investment manager of each of the Goldman Entities, and each of the Goldman Entities shares voting and investment power with certain of their respective affiliates. Each of Goldman Sachs and the Goldman Entities disclaims beneficial ownership of such shares of common stock except to the extent of its pecuniary interest therein. Messrs. Ferguson, Lebovitz and Pontarelli are managers of Texas Capital and executives with affiliates of Goldman Sachs. By virtue of their position in relation to Texas Capital and the Goldman Entities, Messrs. Ferguson, Lebovitz and Pontarelli may be deemed to have beneficial ownership with respect to the shares of EFH Corp. common stock owned by Texas Holdings. Each of Messrs. Ferguson, Lebovitz and Pontarelli disclaims beneficial ownership of such shares except to the extent of their pecuniary interest in those shares. The address of each entity and individual listed in this footnote is c/o Goldman, Sachs & Co., 85 Broad Street, New York, New York 10004.

(6)   Includes the 1,657,600,000 shares owned by Texas Holdings, over which KKR 2006 Fund L.P., KKR PEI Investments, L.P., KKR Partners III, L.P., KKR North American Co-Invest Fund I L.P. and TEF TFO Co-Invest, LP (KKR Entities) may be deemed, as a result of their ownership of 37.05% of Texas Capital's outstanding units and certain provision of the TC LLC Agreement, to have shared voting or dispositive power. The KKR Entities disclaim beneficial ownership of any shares of our common stock in which they do not have a pecuniary interest. Messrs. Goltz, Lipschultz and Smidt are managers of Texas Capital and executives of Kohlberg Kravis Roberts & Co. L.P. By virtue of their position in relation to Texas Capital and the KKR Entities, Messrs. Goltz, Lipschultz and Smidt may be deemed to have beneficial ownership with respect to the shares of EFH Corp. common stock owned by Texas Holdings. Each of Messrs. Goltz, Lipschultz and Smidt disclaims beneficial ownership of such shares except to the extent of their pecuniary interest in those shares. The address of each entity and individual listed in this footnote is c/o Kohlberg Kravis Roberts & Co. L.P., 9 West 57th Street, Suite 4200, New York, New York 10019.

(7)   Includes 2,625,000 shares issuable upon exercise of vested options.

(8)   Includes 450,000 deferred shares which, in accordance with the terms of the Deferred Share Agreement, will be settled in shares of EFH Corp. common stock upon the earlier of termination of employment or a change in control of EFH Corp. and 857,500 shares issuable upon exercise of vested options.

(9)   Includes 500,000 deferred shares which, in accordance with the terms of the Deferred Share Agreement, will be settled in shares of EFH Corp. common stock upon the earlier of termination of employment or a change in control of EFH Corp. and 1,400,000 shares issuable upon exercise of vested options.

(10)  Includes 225,000 deferred shares which, in accordance with the terms of the Deferred Share Agreement, will be settled in shares of EFH Corp. common stock upon the earlier of termination of employment or a change in control of EFH Corp. and 875,000 shares issuable upon exercise of vested options.

(11)  Includes 700,000 shares issuable upon exercise of vested options.

B–174

EFIHMW00052623

EFIHMW00051935

**PX 030**
**Page 689 of 734**

Table of Contents

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS, DIRECTOR INDEPENDENCE

**Policies and Procedures Relating to Related Party Transactions**

The Board has adopted a policy regarding related person transactions. Under this policy, a related person transaction shall be consummated or shall continue only if:

1. the Audit Committee of the Board approves or ratifies such transaction in accordance with the policy and if the transaction is on terms comparable to those that could be obtained in arm's length dealings with an unrelated third party;

2. the transaction is approved by the disinterested members of the Board or the Executive Committee; or

3. the transaction involves compensation approved by the Organization and Compensation Committee of the Board.

For purposes of this policy, the term "related person" includes EFH Corp.'s directors, executive officers, 5% shareholders and their immediate family members. "Immediate family members" means any child, stepchild, parent, stepparent, spouse, sibling, mother–in–law, father–in–law, son–in–law, daughter–in–law, brother–in–law or sister–in–law or any person (other than a tenant or employee) sharing the household of a director, executive officer or 5% shareholder.

A "related person transaction" is a transaction between EFH Corp. or its subsidiaries and a related person, other than the types of transactions described below, which are deemed to be pre–approved by the Audit Committee of the Board:

1. any compensation paid to a director if the compensation is required to be reported under Item 402 of Regulation S–K of the Securities Act;

2. any transaction with another company at which a related person's only relationship is as an employee (other than an executive officer), director or beneficial owner of less than 10% of that company's ownership interests;

3. any charitable contribution, grant or endowment by EFH Corp. to a charitable organization, foundation or university at which a related person's only relationship is as an employee (other than an executive officer) or director;

4. transactions where the related person's interest arises solely from the ownership of EFH Corp.'s equity securities and all holders of that class of equity securities received the same benefit on a pro rata basis;

5. transactions involving a related party where the rates or charges involved are determined by competitive bids;

6. any transaction with a related party involving the rendering of services as a common or contract carrier, or public utility, as rates or charges fixed in conformity with law or governmental authority;

7. any transaction with a related party involving services as a bank depositary of funds, transfer agent, registrar, trustee under a trust indenture, or similar service;

8. transactions available to all employees or customers generally (unless required to be disclosed under Item 404 of Regulation S–K of the Securities Act, if applicable);

9. transactions involving less than $100,000 when aggregated with all similar transactions;

10. transactions between EFH Corp. and its subsidiaries or between subsidiaries of EFH Corp.;

11. transactions not required to be disclosed under Item 404 of Regulation S–K under the Securities Act of 1933, and

12. open market purchases of the EFH Corp. or its subsidiaries' debt or equity securities and interest payments on such debt.

B–175

EFIHMW00052624

EFIHMW00051935

**Table of Contents**

The Board has determined that it is appropriate for the Audit Committee of the Board to review and approve or ratify related person transactions. Accordingly, at least annually, management reviews related person transactions to be entered into by EFH Corp. or its subsidiaries, if any. After review, the Audit Committee of the Board approves/ratifies or disapproves such transactions. Management updates the Audit Committee of the Board as to any material changes to such related person transactions. In unusual circumstances, EFH Corp. or its subsidiaries may enter into related person transactions in advance of receiving approval, provided that such related person transactions are reviewed and ratified as soon as reasonably practicable by the Audit Committee of the Board. If the Audit Committee of the Board determines not to ratify such transactions, EFH Corp. shall make all reasonable efforts to cancel or otherwise terminate such transactions.

The related person transactions described below under "Related Person Transactions—Business Affiliations," were ratified by the Audit Committee of the Board pursuant to the policy described above. All other related person transactions were approved prior to EFH Corp.'s adoption of this policy, but were approved by either the Board or its Executive Committee. Transactions described below under "Related Person Transactions—Transactions with Sponsor Affiliates" are not related person transactions under the EFH Corp. policy because they are not with a director, executive officer, 5% shareholder or any of their immediate family members, but are described in the interest of greater disclosure.

## Related Person Transactions

*Limited Partnership Agreement of Texas Energy Future Holdings Limited Partnership; Limited Liability Company Agreement of Texas Energy Future Capital Holdings LLC*

The Sponsor Group and certain investors who agreed to co-invest with the Sponsor Group or through a vehicle jointly controlled by the Sponsor Group to provide equity financing for the Merger (Co–Investors) entered into (i) a limited partnership agreement (LP Agreement) in respect of EFH Corp.'s parent company, Texas Holdings and (ii) the LLC Agreement in respect of Texas Holdings' sole general partner, Texas Capital. The LP Agreement provides that Texas Capital has the right to vote or execute consents with respect to any shares of EFH Corp.'s common stock owned by Texas Holdings. The LLC Agreement and LP Agreement contain agreements among the parties with respect to the election of EFH Corp.'s directors, restrictions on the issuance or transfer of interests in EFH Corp., including tag–along rights and drag–along rights, and other corporate governance provisions (including the right to approve various corporate actions).

The LLC Agreement provides that Texas Capital and its members will take all action required to ensure that the managers of Texas Capital are also members of EFH Corp.'s Board. Pursuant to the LLC Agreement each of (i) KKR 2006 Fund L.P. and affiliated investment funds, (ii) TPG Partners V, L.P. and affiliated investment funds and (iii) certain funds affiliated with Goldman Sachs, has the right to designate three managers of Texas Capital. These rights are subject to maintenance of certain investment levels in Texas Holdings.

*Registration Rights Agreement*

The Sponsor Group and the Co–Investors entered into a registration rights agreement with EFH Corp. upon completion of the Merger. Pursuant to this agreement, in certain circumstances, the Sponsor Group can cause EFH Corp. to register shares of EFH Corp.'s common stock owned directly or indirectly by them under the Securities Act. In certain circumstances, the Sponsor Group and the Co–Investors are also entitled to participate on a pro rata basis in any registration of EFH Corp.'s common stock under the Securities Act that it may undertake. In 2008 and 2009, Ms. Acosta and Messrs. Evans, Huffines, Olson, Reilly and Youngblood, each of whom are members of our Board, and Messrs. Young, Greene, Campbell, Walters, Burke, Keglevic, McFarland, Enze, Kaplan and Landy, each of whom are executive officers of EFH Corp., became parties to this agreement.

B–176

EFIHMW00052625

EFIHMW00051935

**Table of Contents**

*Management Services Agreement*

In October 2007, in connection with the Merger, the Sponsor Group and Lehman Brothers Inc. entered into a management agreement with EFH Corp. (Management Agreement), pursuant to which affiliates of the Sponsor Group provide management, consulting, financial and other advisory services to EFH Corp. Pursuant to the Management Agreement, affiliates of the Sponsor Group are entitled to receive an aggregate annual management fee of $35 million, which amount increases 2% annually, and reimbursement of out-of-pocket expenses incurred in connection with the provision of services pursuant to the Management Agreement. The Management Agreement will continue in effect from year to year, unless terminated upon a change of control of EFH Corp. or in connection with an initial public offering of EFH Corp. or if the parties thereto mutually agree to terminate the Management Agreement. Pursuant to the Management Agreement, affiliates of the Sponsor Group and Lehman Brothers Inc. were paid transaction fees of $300 million for certain services provided in connection with the Merger and related transactions. In addition, the Management Agreement provides that the Sponsor Group will be entitled to receive a fee equal to a percentage of the gross transaction value in connection with certain subsequent financing, acquisition, disposition, merger combination and change of control transactions, as well as a termination fee based on the net present value of future payment obligations under the Management Agreement in the event of an initial public offering or under certain other circumstances. Under terms of the Management Agreement, EFH Corp. paid $36 million, inclusive of expenses, to the Sponsor Group during 2009.

*Indemnification Agreement*

Concurrently with entering into the Management Agreement, the Sponsor Group, Texas Holdings and EFH Corp. entered into an indemnification agreement (Indemnification Agreement), pursuant to which EFH Corp. and Texas Holdings agree to indemnify the Sponsor Group and their affiliates against any claims relating to (i) certain securities and financing transactions relating to the Merger, (ii) the performance of transaction services pursuant to the Management Agreement, (iii) actions or failures to act by EFH Corp., Texas Holdings, Texas Capital or their subsidiaries or affiliates (collectively, Company Group), (iv) service as an officer or director of, or at the request of, any member of the Company Group, and (v) any breach or alleged breach of fiduciary duty as a director or officer of any member of the Company Group.

*Sale Participation Agreement*

Ms. Acosta and Messrs. Evans, Huffines, Olson, Reilly and Youngblood, each of whom are members of our Board, and each of our executive officers have entered into sale participation agreements with EFH Corp. Pursuant to the terms of these agreements, among other things, shares of EFH Corp.'s common stock held by these individuals are subject to tag-along and drag-along rights in the event of a sale by the Sponsor Group of shares of EFH Corp.'s common stock held by the Sponsor Group.

*Certain Charter Provisions*

EFH Corp.'s restated certificate of formation contains provisions limiting directors' obligations in respect of corporate opportunities.

*Management Stockholders' Agreement*

Subject to a management stockholders' agreement, certain members of management, including EFH Corp.'s directors, executive officers, along with other members of management, elected to invest in EFH Corp. by contributing cash or common stock, or a combination of both, to EFH Corp. prior to or following the Merger and receiving common stock in EFH Corp. in exchange therefore. The net aggregate amount of this investment as of December 31, 2009 is approximately $42.6 million. The management stockholders' agreement creates certain rights and restrictions on these shares of common stock, including transfer restrictions and tag-along, drag-along, put, call and registration rights in certain circumstances.

B-177

EFIHMW00052626

EFIHMW00051935

**PX 030**
**Page 692 of 734**

Table of Contents
*Director Stockholders' Agreement*

Certain members of our Board have entered into a stockholders' agreement with EFH Corp. These stockholders' agreements create certain rights and restrictions on the equity, including transfer restrictions and tag–along, drag–along, put, call and registration rights in certain circumstances.

*Business Affiliations*

Mr. Olson, a member of our board, has an ownership interest in two companies with which Oncor does business. These companies are Texas Meter and Device Company (TMD) and Metrum Technologies LLC (Metrum). Mr. Olson and his brother collectively directly own approximately 24% of TMD and indirectly own approximately 19% of Metrum. Both entities are majority owned by their chief executive officer. In 2009, Oncor paid TMD approximately $1.2 million and paid Metrum approximately $0.2 million. TMD tests Oncor's high voltage personal protective equipment. Metrum provides Oncor with cellular–based wireless communications equipment for its meters. Oncor is Metrum's largest customer. The business relationships with both TMD and Metrum commenced several years prior to Mr. Olson joining the Board.

*Transactions with Sponsor Affiliates*

TCEH has entered into the TCEH Senior Secured Facilities, and Oncor has entered into a revolving credit facility, each with syndicates of financial institutions and other lenders. These syndicates included affiliates of GS Capital Partners. These transactions were approved by the Board of Directors.

Affiliates of the Sponsor Group participated in the debt exchange offers completed in November 2009 by EFH Corp., EFIH and EFIH Finance to exchange new senior secured notes for certain EFH Corp. and TCEH notes (see Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for additional information). Goldman, Sachs & Co. and KKR Capital Markets LLC were paid customary fees in the amounts of $750,000 and $260,000, respectively, as compensation for their services as dealer managers in the debt exchange offers and TPG Capital, L.P. received a fee in the amount of $260,000 as compensation for the advisory services it rendered in connection with the debt exchange offers.

Also, Goldman, Sachs & Co. acted as an initial purchaser in EFH Corp.'s issuance of $500 million principal amount of senior secured notes completed in January 2010. (See Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for additional information.)

Affiliates of GS Capital Partners have from time to time engaged in commercial and investment banking and financial advisory transactions with EFH Corp. in the normal course of business. Affiliates of Goldman Sachs & Co. are party to certain commodity and interest rate hedging transactions with EFH Corp. in the normal course of business.

From time to time affiliates of the Sponsor Group may acquire debt or debt securities issued by EFH Corp. or its subsidiaries in open market transactions or through loan syndications.

Members of the Sponsor Group and/or their respective affiliates have from time to time entered into, and may continue to enter into, arrangements with us to use our products and services in the ordinary course of their business, which often result in revenues to us in excess of $120,000 annually. In addition, we have entered into, and may continue to enter into, arrangements with members of the Sponsor Group and/or their respective affiliates to use their products and services in the ordinary course of their business, which often result in revenues to members of the Sponsor Group or their respective affiliates in excess of $120,000 annually.

*Director Independence*

Though not formally considered by the Board because EFH Corp.'s common stock is not currently registered with the SEC or traded on any national securities exchange, based upon the listing standards for issuers

B–178

EFIHMW00052627

EFIHMW00051935

PX 030
Page 693 of 734

**Table of Contents**

of equity securities on the New York Stock Exchange, the national securities exchange upon which EFH Corp.'s common stock was traded prior to the Merger, only Ms. Acosta and Mr. Youngblood would be considered independent. Because of their relationships with the Sponsor Group or with EFH Corp. directly, none of the other directors would be considered independent. See "Certain Relationships and Related Party Transactions" and "Executive Compensation—Director Compensation" below. Accordingly, we believe that Ms. Acosta is the only member of the Organization and Compensation Committee who would meet the New York Stock Exchange's independence requirements for issuers of equity securities. We believe that none of the members of EFH Corp.'s Governance and Public Affairs Committee would meet the New York Stock Exchange's independence requirements for issuers of equity securities. Under the New York Stock Exchange's audit committee independence requirement for issuers of debt securities, Messrs. Huffines and Youngblood and Ms. Acosta, who constitute the Audit Committee, are considered independent.

B–179

EFIHMW00052628

EFIHMW00051935

**PX 030**
**Page 694 of 734**

Table of Contents

### ANNEX C—INFORMATION RELATING TO EFIH AND EFIH FINANCE

**Capitalized terms used in this Annex C and not**
**otherwise defined herein have the meanings ascribed to them in Annex A to this Prospectus**

### BUSINESS

EFIH is a Dallas, Texas–based holding company whose wholly–owned subsidiary, Oncor Holdings, holds a majority interest (approximately 80%) in Oncor. The business and strategy of Oncor is discussed below as it is representative of essentially all of the assets and earnings of EFIH. Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell power in the north–central, eastern and western parts of Texas. Distribution revenues from TCEH represented 38% and 39% of total revenues for the years ended December 31, 2009 and 2008, respectively. EFIH is a direct, wholly–owned subsidiary of EFH Corp. See "Annex A–Definitions" for definition of terms and abbreviations, including the Merger. Because EFIH is managed as an integrated business, there are no separate reportable business segments.

References in this report to EFIH are to EFIH and/or its direct and indirect subsidiaries as apparent in the context.

**Oncor Business and Strategy**

Oncor's transmission and distribution assets are located principally in the north–central, eastern and western parts of Texas. This territory has an estimated population in excess of seven million, about one–third of the population of Texas, and comprises 91 counties and over 400 incorporated municipalities, including Dallas/Fort Worth and surrounding suburbs, as well as Waco, Wichita Falls, Odessa, Midland, Tyler and Killeen. Oncor is not a seller of electricity, nor does it purchase electricity for resale. It provides transmission services to other electricity distribution companies, cooperatives and municipalities. It provides distribution services to REPs, which sell electricity to retail customers. Oncor's transmission and distribution rates are regulated by the PUCT.

Oncor operates the largest transmission and distribution system in Texas, delivering electricity to approximately three million homes and businesses and operating more than 117,000 miles of transmission and distribution lines. Most of Oncor's power lines have been constructed over lands of others pursuant to easements or along public highways, streets and rights–of–way as permitted by law. At June 30, 2010, Oncor had approximately 3,825 full–time employees, including approximately 690 employees under collective bargaining agreements.

EFH Corp. and Oncor have implemented certain structural and operational "ring–fencing" measures based on commitments made by Texas Holdings and Oncor to the PUCT that are intended to enhance the credit quality of Oncor Holdings and Oncor. These measures serve to mitigate Oncor's and Oncor Holdings' credit exposure to the Texas Holdings Group and to reduce the risk that the assets and liabilities of Oncor or Oncor Holdings would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities. See Note 1 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 for a description of the material features of these "ring–fencing" measures.

In November 2008, Oncor sold equity interests to Texas Transmission. Oncor also indirectly sold equity interests to certain members of its board of directors and its management team. Accordingly, after giving effect to all equity issuances, as of December 31, 2009, Oncor's ownership was as follows: 80.03% held by Oncor Holdings and indirectly by EFH Corp., 19.75% held by Texas Transmission and 0.22% held indirectly by certain members of Oncor's management and board of directors. See Note 7 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 for additional details regarding the sales of equity interests.

C–1

EFIHMW00052629

EFIHMW00051935

**PX 030**
**Page 695 of 734**

**Table of Contents**

*Oncor's Market (ERCOT statistics below were derived from information published by ERCOT)*

Oncor operates within the ERCOT market. This market represents approximately 85% of electricity consumption in Texas. ERCOT is the regional reliability coordinating organization for member electricity systems in Texas and the system operator of the interconnected transmission grid for those systems. ERCOT is responsible for ensuring reliability, adequacy and security of the electric systems as well as nondiscriminatory access to transmission service by all wholesale market participants in the ERCOT region. ERCOT's membership consists of more than 300 corporate and associate members, including electric cooperatives, municipal power agencies, independent generators, independent power marketers, transmission service providers and distribution services providers, independent REPs and consumers.

In 2009, hourly demand peaked at a record 63,400 MW. The ERCOT market has limited interconnections to other markets in the US, which currently limits potential imports into and exports out of the ERCOT market to 1,106 MW of generation capacity (or approximately 2% of peak demand). In addition, wholesale transactions within the ERCOT market are generally not subject to regulation by the FERC.

The ERCOT market operates under the reliability standards adopted and enforced by NERC and the TRE. The PUCT has primary jurisdiction over the ERCOT market to ensure the adequacy and reliability of power supply across Texas's main interconnected transmission grid. Oncor, along with other owners of transmission and distribution facilities in Texas, assists the ERCOT independent system operator in its operations. Oncor has planning, design, construction, operation and maintenance responsibility for the portion of the transmission grid and for the load–serving substations it owns, primarily within its certificated distribution service area. Oncor participates with the ERCOT independent system operator and other ERCOT utilities in obtaining regulatory approvals and planning, designing and constructing new transmission lines in order to remove existing constraints and interconnect generation on the ERCOT transmission grid. The transmission lines are necessary to meet reliability needs, support renewable energy production and increase bulk power transfer capability.

*Oncor's Strategies*

Oncor focuses on delivering electricity in a safe and reliable manner, minimizing service interruptions and investing in its transmission and distribution infrastructure to maintain its system, serve its growing customer base with a modernized grid and support renewable energy production.

Oncor believes that building and leveraging upon opportunities to scale its operating advantage and technology programs enables Oncor to create value by eliminating duplicative costs, efficiently managing supply costs, and building and standardizing distinctive process expertise over a larger grid. Scale also allows Oncor to take part in large capital investments in its transmission and distribution system, with a smaller fraction of overall capital at risk and with an enhanced ability to streamline costs. Oncor's growth strategies are to invest in technology upgrades, including advanced metering systems and energy efficiency initiatives, and to construct new transmission and distribution facilities to meet the needs of the growing Texas market and support renewable energy production. Oncor and other transmission and distribution businesses in ERCOT benefit from regulatory capital recovery mechanisms known as "capital trackers" that Oncor believes enable adequate and timely recovery of transmission and advanced metering investments through its regulated rates.

*Oncor's Operations*

*Performance*—Oncor achieved market–leading electricity delivery performance in nine out of 12 key PUCT market metrics in 2009. These metrics measure the success of transmission and distribution companies in facilitating customer transactions in the competitive Texas electricity market. Two additional metrics for expedited switching have been added by the PUCT in 2010.

*Investing in Infrastructure and Technology*—In 2009, Oncor invested $1.0 billion in its network to construct, rebuild and upgrade transmission lines and associated facilities, to extend the distribution infrastructure, and to pursue certain initiatives in infrastructure maintenance and information technology.

C–2

*EFIHMW00052630*

*EFIHMW00051935*

**PX 030**
**Page 696 of 734**

Table of Contents

Reflecting its commitment to infrastructure, in September 2008, Oncor and several other ERCOT utilities filed with the PUCT a plan to participate in the construction of transmission improvements designed to interconnect existing and future renewable energy facilities to transmit electricity from Competitive Renewable Energy Zones (CREZs) identified by the PUCT. In 2009, the PUCT awarded approximately $1.3 billion of CREZ construction projects to Oncor. The projects involve the construction of transmission lines to support the transmission of electricity from renewable energy sources, principally wind generation facilities, in west Texas to population centers in the eastern part of the state. The cost estimates for the CREZ construction projects are based upon analyses prepared by ERCOT in April 2008. Based on the selection of final routes for the three default and nine priority projects and identification of additional costs not included in the original ERCOT estimate (e.g., wind interconnection facilities and required modification to existing facilities), Oncor estimates that the cost of these projects will exceed ERCOT estimates by approximately $220 million. Final routes for five subsequent projects have not yet been selected by the PUCT. As of June 30, 2010, Oncor's CREZ–related capital expenditures totaled $217 million. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Regulation and Rates."

Oncor's technology upgrade initiatives include development of a modernized grid through the replacement of existing meters with advanced digital metering equipment and development of advanced digital communication, data management, real–time monitoring and outage detection capabilities. This modernized grid is expected to produce electricity service reliability improvements and provide the potential for additional products and services from REPs that will enable businesses and consumers to better manage their electricity usage and costs. Oncor's plans provide for the full deployment of over three million advanced meters by the end of 2012 to all residential and most non–residential retail electricity customers in Oncor's service area. The advanced meters can be read remotely, rather than by a meter reader physically visiting the location of each meter. Advanced meters facilitate automated demand side management, which allows consumers to monitor the amount of electricity they are consuming and adjust their electricity consumption habits. As of June 30, 2010, Oncor has installed approximately 1.085 million advanced digital meters. As the new meters are integrated, Oncor reports 15–minute interval, billing–quality electricity consumption data to ERCOT for Texas market settlement purposes. The data makes it possible for REPs to support new programs and pricing options. In addition to the potential energy efficiencies from advanced metering, Oncor expects to invest over $300 million ($100 million in excess of regulatory requirements) over the five years ending in 2012 in programs designed to improve customer electricity demand efficiencies. As of December 31, 2009, Oncor has invested $125 million in these programs, including $67 million in 2009, and 22% of the amount in excess of regulatory requirements has been spent.

In a stipulation with several parties that was approved by the PUCT, Oncor committed to a variety of actions, including minimum capital spending of $3.6 billion over the five–year period ending December 31, 2012, subject to certain defined conditions. Approximately 50% of this total was spent as of December 31, 2009. This spending does not include the CREZ facilities.

*Electricity Transmission*—Oncor's electricity transmission business is responsible for the safe and reliable operations of its transmission network and substations. These responsibilities consist of the construction and maintenance of transmission facilities and substations and the monitoring, controlling and dispatching of high–voltage electricity over Oncor's transmission facilities in coordination with ERCOT.

Oncor is a member of ERCOT, and its transmission business actively assists the operations of ERCOT and market participants. Through its transmission business, Oncor participates with ERCOT and other member utilities to plan, design, construct and operate new transmission lines, with regulatory approval, necessary to maintain reliability, interconnect to merchant generation facilities, increase bulk power transfer capability and minimize limitations and constraints on the ERCOT transmission grid.

Transmission revenues are provided under tariffs approved by either the PUCT or, to a small degree related to an interconnection to other markets, the FERC. Network transmission revenues compensate Oncor for delivery of electricity over transmission facilities operating at 60 kV and above. Other services offered by Oncor through

C–3

EFIHMW00052631

EFIHMW00051935

**PX 030**
**Page 697 of 734**

**Table of Contents**

its transmission business include, but are not limited to: system impact studies, facilities studies, transformation service and maintenance of transformer equipment, substations and transmission lines owned by other parties.

Provisions of the 1999 Restructuring Legislation allow Oncor to annually update its transmission rates to reflect changes in invested capital. These "capital tracker" provisions encourage investment in the transmission system to help ensure reliability and efficiency by allowing for timely recovery of and return on new transmission investments.

At December 31, 2009, Oncor's transmission facilities includes approximately 5,173 circuit miles of 345–kV transmission lines and approximately 9,954 circuit miles of 138–and 69–kV transmission lines. Sixty–two generation facilities totaling 36,165 MW are directly connected to Oncor's transmission system, and 277 transmission stations and 702 distribution substations are served from Oncor's transmission system.

At December 31, 2009, Oncor's transmission facilities have the following connections to other transmission grids in Texas:

| Grid Connections | Number of Interconnected Lines | | |
|---|---|---|---|
| | 345kV | 138kV | 69kV |
| Centerpoint Energy Inc. | 8 | 15 | 1 |
| American Electric Power Company, Inc (a) | 4 | 7 | 12 |
| Lower Colorado River Authority | 8 | 20 | 3 |
| Texas Municipal Power Agency | 8 | 6 | — |
| Texas New Mexico Power | 2 | 9 | 11 |
| Brazos Electric Power Cooperative | 4 | 104 | 20 |
| Rayburn Country Electric Cooperative | — | 32 | 7 |
| City of Georgetown | — | 2 | — |
| Tex–La Electric Cooperative | — | 11 | 1 |
| Other small systems operating wholly within Texas | — | 3 | 2 |

(a)    One of the 345–kV lines is an asynchronous high–voltage direct current connection with the Southwest Power Pool.

*Electricity Distribution*—Oncor's electricity distribution business is responsible for the overall safe and efficient operation of distribution facilities, including electricity delivery, power quality and system reliability. These responsibilities consist of the ownership, management, construction, maintenance and operation of the distribution system within Oncor's certificated service area. Oncor's distribution system receives electricity from the transmission system through substations and distributes electricity to end–users and wholesale customers through approximately 3,097 distribution feeders.

The Oncor distribution system includes over 3.1 million points of delivery. Over the past five years, the number of distribution system points of delivery served by Oncor, excluding lighting sites, grew an average of approximately 1.26% per year, adding approximately 24,689 points of delivery in 2009.

The Oncor distribution system consists of approximately 56,260 miles of overhead primary conductors, approximately 21,587 miles of overhead secondary and street light conductors, approximately 15,352 miles of underground primary conductors and approximately 9,528 miles of underground secondary and street light conductors. The majority of the distribution system operates at 25–kV and 12.5–kV.

Distribution rates for residential and small commercial users are based on actual monthly consumption (kWh), and rates for large commercial and industrial users are based on the greater of actual monthly demand (kW) or 80% of peak monthly demand during the prior eleven months.

C–4

EFIHMW00052632

EFIHMW00051935

Table of Contents

*Customers*—Oncor's transmission customers consist of municipalities, electric cooperatives and other distribution companies. Oncor's distribution customers consist of 80 REPs in Oncor's certificated service area, including TCEH. Distribution revenues from TCEH represented 38% of Oncor's total revenues for 2009, and revenues from subsidiaries of Reliant Energy, Inc., each of which is a non–affiliated REP, represented 14% of Oncor's total revenues for 2009. No other customer represented more than 10% of Oncor's total operating revenues. The consumers of the electricity delivered by Oncor are free to choose their electricity supplier from REPs who compete for their business.

*Seasonality*—The revenues and results of operations of Oncor are subject to seasonality, weather conditions and other electricity usage drivers, with revenues being highest in the summer.

*Regulation and Rates*—As its operations are wholly within Texas, Oncor believes that it is not a public utility as defined in the Federal Power Act and, as a result, it is not subject to general regulation under this act although it is subject to national and regional reliability standards adopted and enforced by NERC and the TRE.

The PUCT has original jurisdiction over transmission and distribution rates and services in unincorporated areas and in those municipalities that have ceded original jurisdiction to the PUCT and has exclusive appellate jurisdiction to review the rate and service orders and ordinances of municipalities. Generally, PURA prohibits the collection of any rates or charges by a public utility (as defined by PURA) that does not have the prior approval of the appropriate regulatory authority (PUCT or municipality with original jurisdiction). In accordance with a stipulation approved by the PUCT, Oncor filed a rate case with the PUCT in June 2008, based on a test year ended December 31, 2007. In August 2009, the PUCT issued a final order with respect to the rate review as discussed in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Regulation and Rates."

At the state level, PURA, as amended, requires owners or operators of transmission facilities to provide open–access wholesale transmission services to third parties at rates and terms that are nondiscriminatory and comparable to the rates and terms of the utility's own use of its system. The PUCT has adopted rules implementing the state open–access requirements for utilities that are subject to the PUCT's jurisdiction over transmission services, such as Oncor.

*Securitization Bonds*—EFIH's consolidated financial statements include its indirect, bankruptcy–remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC. This financing subsidiary was organized for the limited purpose of issuing specified transition bonds in 2003 and 2004. Oncor Electric Delivery Transition Bond Company LLC issued $1.3 billion principal amount of securitization (transition) bonds to recover generation–related regulatory asset stranded costs and other qualified costs under an order issued by the PUCT in 2002.

**Environmental Regulations and Related Considerations**

*Water*

The TCEQ and the EPA have jurisdiction over water discharges (including storm water) from facilities in Texas. Facilities of Oncor are presently in material compliance with applicable state and federal requirements relating to discharge of pollutants into the water. Oncor holds all required waste water discharge permits from the TCEQ for facilities in operation and has applied for or obtained necessary permits for facilities under construction. Oncor believes it can satisfy the requirements necessary to obtain any required permits or renewals. Recent changes to federal rules pertaining to Spill Prevention, Control and Countermeasure (SPCC) plans for oil–filled electrical equipment and bulk storage facilities for oil will require updating of certain facilities. Oncor has determined that SPCC plans will be required for certain substations, work centers and distribution systems by November 10, 2010, and it is currently compiling data for development of these plans.

C–5

EFIHMW00052633

EFIHMW00051935

Table of Contents
*Solid Waste*

Treatment, storage and disposal of solid waste and hazardous waste are regulated at the state level under the Texas Solid Waste Disposal Act and at the federal level under the Resource Conservation and Recovery Act of 1976, as amended, and the Toxic Substances Control Act. The EPA has issued regulations under the Resource Conservation and Recovery Act of 1976 and the Toxic Substances Control Act, and the TCEQ has issued regulations under the Texas Solid Waste Disposal Act applicable to facilities of Oncor. Oncor is in compliance with applicable solid and hazardous waste regulations.

*Environmental Capital Expenditures*

Oncor's capital expenditures for environmental matters were $7 million in 2009 and are expected to be approximately $8 million in 2010.

C-6

EFIHMW00052634

EFIHMW00051935

**PX 030**
**Page 700 of 734**

Table of Contents

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS AS OF AND FOR THE THREE AND SIX MONTHS ENDED JUNE 30, 2010

The following discussion and analysis of EFIH's financial condition and results of operations as of and for the three and six months ended June 30, 2010 and 2009 was included in EFIH's Quarterly Report on Form 10–Q for the quarter ended June 30, 2010 filed with the SEC on August 2, 2010 (the "2 nd Quarter MD&A"). The 2 nd Quarter MD&A should be read in conjunction with EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010 and the notes to those statements. The 2 nd Quarter MD&A should also be read in conjunction with the disclosure set forth in "Summary—Recent Developments" beginning on page 14 of this Prospectus, which provides material updates to certain of the information contained in the 2 nd Quarter MD&A. See "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009" below for a discussion and analysis of EFIH's financial condition and results of operations as of and for the year ended December 31, 2009.

**Business**

EFIH is a Dallas, Texas–based holding company whose wholly–owned subsidiary, Oncor Holdings, holds a majority interest (approximately 80%) in Oncor. Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell power in the north–central, eastern and western parts of Texas. Intermediate Holding is a direct, wholly–owned subsidiary of EFH Corp. Because EFIH is managed as an integrated business, there are no separate reportable business segments. Various "ring–fencing" measures have been taken to enhance the credit quality of Oncor Holdings and Oncor. See Notes 1 and 2 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010 for a description of the material features of these "ring–fencing" measures and for a discussion of the deconsolidation of Oncor (and its majority owner, Oncor Holdings) as the result of a change in accounting principles.

*Significant Activities and Events*

*July 2010 Debt Exchange Offers*—See Note 3 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010 for discussion of debt exchange offers commenced in July 2010.

*Oncor Technology Initiatives*—Oncor continues to invest in technology initiatives that include development of a modernized grid through the replacement of existing meters with advanced digital metering equipment and development of advanced digital communication, data management, real–time monitoring and outage detection capabilities. This modernized grid is expected to produce electricity service reliability improvements and provide the potential for additional products and services from REPs that will enable businesses and consumers to better manage their electricity usage and costs. Oncor's plans provide for the full deployment of over three million advanced meters by the end of 2012 to all residential and most non–residential retail electricity customers in Oncor's service area. The advanced meters can be read remotely, rather than by a meter reader physically visiting the location of each meter. Advanced meters facilitate automated demand side management, which allows consumers to monitor the amount of electricity they are consuming and adjust their electricity consumption habits.

As of June 30, 2010, Oncor has installed approximately 1,085,000 advanced digital meters, including approximately 425,000 during the six months ended June 30, 2010. As the new meters are integrated, Oncor reports 15–minute interval, billing–quality electricity consumption data to ERCOT for Texas market settlement purposes. The data makes it possible for REPs to support new programs and pricing options. Cumulative capital expenditures for the deployment of the advanced meter system totaled $277 million as of June 30, 2010, including $81 million in 2010. Oncor expects to complete installations of all 3 million meters by the end of 2012.

*Oncor Matters with the PUCT*—See discussion of these matters, including the awarded construction of CREZ–related transmission lines, below under "Regulation and Rates."

C–7

EFIHMW00052635

EFIHMW00051935

**PX 030**
**Page 701 of 734**

Table of Contents

RESULTS OF OPERATIONS

*Financial Results—Three Months Ended June 30, 2010 Compared to Three Months Ended June 30, 2009*

Interest income was $3 million in 2010 compared to zero in 2009. The increase reflected interest on investments in long–term debt of affiliates (see Note 6 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010).

Interest expense and related charges increased $7 million, or 10%, to $76 million in 2010. The increase reflected the issuance of the EFIH notes in November 2009 and additional debt pushed down from EFH Corp. (see Note 3 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010).

Income tax benefit totaled $25 million in 2010 compared to $23 million in 2009. The effective rate on pretax income was 34.2% and 33.3% in 2010 and 2009, respectively.

Equity in earnings of unconsolidated subsidiary (net of tax) totaled $59 million in 2010 compared to $66 million in 2009 reflecting a $6 million decline (which is before the effect of noncontrolling interests) in Oncor's net income. The decrease was driven by timing differences in recognizing increased revenues and expenses resulting from Oncor's August 2009 rate case order.

Net income decreased $9 million to $11 million in 2010 reflecting decreased equity in earnings of Oncor Holdings and increased net interest expense.

*Financial Results—Six Months Ended June 30, 2010 Compared to Six Months Ended June 30, 2009*

Interest income was $4 million in 2010 compared to zero in 2009. The increase reflected interest on investments in long–term debt of affiliates (see Note 6 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010).

Interest expense and related charges increased $13 million, or 9%, to $150 million in 2010. The increase reflected the issuance of the EFIH notes in November 2009 and additional debt pushed down from EFH Corp. (see Note 3 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010).

Income tax benefit totaled $49 million in 2010 compared to $46 million in 2009. The effective rate on pretax income was 33.6% in both periods.

Equity in earnings of unconsolidated subsidiary (net of tax) totaled $122 million in 2010 compared to $112 million in 2009 reflecting a $15 million increase (which is before the effect of noncontrolling interests) in Oncor's net income. The increase was driven by the effects of higher average consumption on revenues, primarily due to colder winter weather, partially offset by timing differences in recognizing increased revenues and expenses resulting from Oncor's 2009 rate case order.

Net income increased $4 million to $25 million in 2010 reflecting increased equity in earnings of Oncor Holdings, partially offset by increased net interest expense.

C–8

EFIHMW00052636

EFIHMW00051935

Table of Contents

FINANCIAL CONDITION

*LIQUIDITY AND CAPITAL RESOURCES*

   *Cash Flows*—Cash provided by operating activities totaled $85 million and $58 million for the six months ended June 30, 2010 and 2009, respectively, and consisted of dividends received from Oncor Holdings.

   Cash used in financing activities totaled $5 million in 2010 compared to $58 million in 2009 with the $53 million decrease driven by reduced distributions to EFH Corp. The activity reflected:

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2010 | 2009 |
| Advances from EFH Corp. | $  4 | $  — |
| Distributions to EFH Corp. | (2) | (58) |
| Debt financing costs | (7) | — |
| Cash used in financing activities | $  (5) | $  (58) |

   Cash provided by investing activities was $3 million in 2010, reflecting EFH Corp.'s repayment of advances, as compared to zero in 2009.

   Depreciation and amortization expense reported in the condensed statement of consolidated cash flows represents the amortization of debt issuance expense related to debt pushed down from EFH Corp. (see Note 3 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010) and is reported in interest expense and related charges in the condensed statement of consolidated income.

   *Toggle Note Interest Election Related to Pushed Down EFH Corp. Debt*—EFH Corp. has the option every six months at its discretion, ending with the payment due November 2012, to use the payment−in−kind (PIK) feature of its senior toggle notes (EFH Corp. Toggle Notes) in lieu of making cash interest payments. EFH Corp. elected to do so beginning with the May 2009 interest payment as an efficient and cost−effective method to further enhance liquidity, in light of the weaker economy and related lower electricity demand and the continuing uncertainty in the financial markets. Once EFH Corp. makes a PIK election, the election is valid for each succeeding interest payment period until EFH Corp. revokes the election. Use of the PIK feature will be evaluated at each election period, taking into account market conditions and other relevant factors at such time.

   EFH Corp. made its May 2010 interest payment and will make its November 2010 interest payment on the EFH Corp. Toggle Notes by using the PIK feature of these notes. During such applicable interest periods, the interest rate on these notes is increased from 11.25% to 12.00%. EFH Corp. increased the aggregate principal amount of the notes by $162 million in May 2010 and will further increase the aggregate principal amount of the notes by a currently estimated $152 million in November 2010. These amounts are net of the effects of the debt repurchase and exchange transactions completed in July 2010 but exclude any effects of the ongoing debt exchange offers launched in July 2010 discussed in Note 3 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010.

   *Liquidity Needs*—EFIH's liquidity needs represent interest and principal payments on the EFIH Notes, which are expected to be sourced, in part, from interest and principal payments on TCEH and EFH Corp. debt securities acquired in exchange for the EFIH Notes and held as investments (see Notes 3 and 6 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010). EFIH's additional liquidity sources include receipts of distributions from Oncor Holdings and, as necessary, borrowings from EFH Corp. (See Note 5 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010.)

C−9

EFIHMW00052637

EFIHMW00051935

**PX 030**
**Page 703 of 734**

**Table of Contents**

*Distributions*—In April 2010, EFIH's board of directors declared, and EFIH paid a cash distribution to EFH Corp. totaling $2 million. See Note 5 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010 for discussion of distribution restriction provisions.

*Distributions from Oncor*—Substantially all of EFIH's net income is derived from Oncor. Until December 31, 2012, distributions paid by Oncor to its members are limited to an amount not to exceed Oncor's net income determined in accordance with GAAP, subject to certain defined adjustments. Distributions are further limited by an agreement that Oncor's regulatory capital structure, as determined by the PUCT, will be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. (See Note 5 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010.)

In January 2009, the PUCT awarded CREZ construction projects to Oncor. See discussion below under "Regulation and Rates—Matters with the PUCT." As a result of the increased capital expenditures for CREZ and the debt-to-equity ratio cap, EFIH expects that Oncor may retain all or a portion of its available cash to fund such construction instead of paying distributions.

*Financial Covenants, Credit Rating Provisions and Cross Default Provisions*—See Note 3 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010 for discussion of the EFIH 9.75% Notes and EFH Corp. debt pushed down to EFIH as a result of its guarantee of the debt. The indentures governing the EFIH 9.75% Notes, EFH Corp. Senior Notes and the EFH Corp. Senior Secured Notes contain covenants that could have a material impact on the liquidity and operations of EFIH. See Note 11 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 included elsewhere herein for additional discussion of the covenants contained in these financing arrangements.

Adjusted EBITDA, as used in the restricted payments covenants contained in the indentures governing the EFIH 9.75% Notes and the EFH Corp. Senior Notes and EFH Corp. Senior Secured Notes for the twelve months ended June 30, 2010 totaled $1.440 billion and $5.116 billion, respectively. See elsewhere herein for a reconciliation of net income (loss) to Adjusted EBITDA for EFIH and EFH Corp., respectively, for the six and twelve months ended June 30, 2010 and 2009.

C-10

EFIHMW00052638

EFIHMW00051935

**PX 030**
**Page 704 of 734**

Table of Contents

The following table summarizes various financial ratios of EFIH and EFH Corp. that are applicable under certain covenants in the indentures governing the EFIH 9.75% Notes, the EFH Corp. Senior Notes and the EFH Corp. Senior Secured Notes as of June 30, 2010 and December 31, 2009 and the corresponding covenant threshold levels as of June 30, 2010:

| | June 30, 2010 | December 31, 2009 | Threshold Level as of June 30, 2010 |
|---|---|---|---|
| Debt Incurrence Covenants: | | | |
| EFH Corp. Senior Notes: | | | |
| EFH Corp. fixed charge coverage ratio | 1.3 to 1.0 | 1.2 to 1.0 | At least 2.0 to 1.0 |
| TCEH fixed charge coverage ratio | 1.5 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| EFH Corp. Senior Secured Notes: | | | |
| EFH Corp. fixed charge coverage ratio | 1.3 to 1.0 | 1.2 to 1.0 | At least 2.0 to 1.0 |
| TCEH fixed charge coverage ratio | 1.5 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| EFIH 9.75% Notes: | | | |
| EFIH fixed charge coverage ratio (a) | 95.1 to 1.0 | 53.8 to 1.0 | At least 2.0 to 1.0 |
| Restricted Payments/Limitations on Investments Covenants: | | | |
| EFH Corp. Senior Notes: | | | |
| General restrictions (non–Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (b) | 1.5 to 1.0 | 1.4 to 1.0 | At least 2.0 to 1.0 |
| General restrictions (Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (b) | 1.3 to 1.0 | 1.2 to 1.0 | At least 2.0 to 1.0 |
| EFH Corp. leverage ratio | 9.0 to 1.0 | 9.4 to 1.0 | Equal to or less than 7.0 to 1.0 |
| EFH Corp. Senior Secured Notes: | | | |
| General restrictions (non–Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (b) | 1.5 to 1.0 | 1.4 to 1.0 | At least 2.0 to 1.0 |
| General restrictions (Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (b) | 1.3 to 1.0 | 1.2 to 1.0 | At least 2.0 to 1.0 |
| EFH Corp. leverage ratio | 9.0 to 1.0 | 9.4 to 1.0 | Equal to or less than 7.0 to 1.0 |
| EFIH 9.75% Notes: | | | |
| General restrictions (non–EFH Corp. payments): | | | |
| EFIH fixed charge coverage ratio (a)(c) | 4.9 to 1.0 | 3.9 to 1.0 | At least 2.0 to 1.0 |
| General restrictions (EFH Corp. payments): | | | |
| EFIH fixed charge coverage ratio (a)(c) | 95.1 to 1.0 | 53.8 to 1.0 | At least 2.0 to 1.0 |
| EFIH leverage ratio | 4.2 to 1.0 | 4.4 to 1.0 | Equal to or less than 6.0 to 1.0 |

(a)   Although EFIH currently meets the fixed charge coverage ratio threshold applicable to certain covenants contained in the indenture governing the EFIH 9.75% Notes, EFIH's ability to use such thresholds to incur debt or make restricted payments/investments is currently limited by the covenants contained in the EFH Corp. Senior Notes and the EFH Corp. Senior Secured Notes.

(b)   The EFH Corp. fixed charge coverage ratio for non–Sponsor Group payments includes the results of Oncor Holdings and its subsidiaries. The EFH Corp. fixed charge coverage ratio for Sponsor Group payments excludes the results of Oncor Holdings and its subsidiaries.

(c)   The EFIH fixed charge coverage ratio for non–EFH Corp. payments includes the results of Oncor Holdings and its subsidiaries. The EFIH fixed charge coverage ratio for EFH Corp. payments excludes the results of Oncor Holdings and its subsidiaries.

C–11

EFIHMW00052639

EFIHMW00051935

**Table of Contents**

*Material Cross Default Provisions*—Certain financing arrangements contain provisions that may result in an event of default if there were a failure under other financing arrangements to meet payment terms or to observe other covenants that could or does result in an acceleration of payments due. Such provisions are referred to as "cross default" provisions.

The indenture governing the EFIH 9.75% Notes contains a cross acceleration provision whereby a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of EFIH or any of its restricted subsidiaries in an aggregate amount equal to or greater than $250 million may cause the acceleration of the EFIH 9.75% Notes.

Each of the indentures governing the EFH Corp. Senior Notes and Senior Secured Notes contain a cross acceleration provision whereby a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of EFH Corp. or any of its restricted subsidiaries in an aggregate amount equal to or greater than $250 million may cause the acceleration of the EFH Corp. Senior Notes and Senior Secured Notes.

A default by Oncor or any subsidiary thereof in respect of indebtedness in a principal amount in excess of $50 million may result in a cross default under its credit facility. Under this facility such a default may cause the maturity of outstanding balances ($948 million at June 30, 2010) under such facility to be accelerated.

*Guarantees*—See Note 4 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010 for details of guarantees.

**OFF–BALANCE SHEET ARRANGEMENTS**

See Notes 2 and 4 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010 regarding VIEs and guarantees, respectively.

**COMMITMENTS AND CONTINGENCIES**

See Note 4 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010 for details of commitments and contingencies, including guarantees.

**CHANGES IN ACCOUNTING STANDARDS**

See Note 1 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010 for discussion of changes in accounting standards.

**REGULATION AND RATES**

*Oncor Matters with the PUCT*

*Stipulation Approved by the PUCT*—In April 2008, the PUCT entered an order, which became final in June 2008, approving the terms of a stipulation relating to the filing in 2007 by Oncor and Texas Holdings of a Merger–related Joint Report and Application with the PUCT pursuant to Section 14.101(b) of PURA and PUCT Substantive Rule 25.75. The stipulation required the filing of a rate case by Oncor no later than July 1, 2008 based on a test year ended December 31, 2007. In July 2008, Nucor Steel filed an appeal of the PUCT's order in the 200th District Court of Travis County, Texas. A hearing in the appeal was held in June 2010, and the District Court affirmed the PUCT order in its entirety. Oncor filed the rate case with the PUCT in June 2008, and the PUCT issued a final order with respect to the rate case in August 2009 as discussed elsewhere herein. Oncor and four other parties appealed various portions of the rate case final order to state district court. The parties have agreed to a schedule that would result in a hearing in October 2010.

C–12

EFIHMW00052640

EFIHMW00051935

**Table of Contents**

*Transmission Rates (PUCT Docket Nos. 37882, 38460 and 38495)*—In order to recover increases in its transmission costs, including incremental fees paid to other transmission service providers due to an increase in their rates, Oncor is allowed to request an update twice a year to the transmission cost recovery factor (TCRF) component of its retail delivery rates charged to REPs. In January 2010, an application was filed to increase the TCRF, which was administratively approved in February 2010 and became effective March 1, 2010. This application is expected to increase annualized revenues by $13 million. In July 2010, an application was filed to increase the TCRF, which is expected to be administratively approved and become effective in September 2010. This application is expected to increase Oncor's annualized revenues by $15 million.

In July 2010, Oncor filed an application for an interim update of its wholesale transmission rate. Oncor expects PUCT approval of the new rate before the end of 2010. Following approval, Oncor's annualized revenues are expected to increase by an estimated $43 million with $27 million of this increase recoverable through transmission rates charged to wholesale customers, and the remaining $16 million recoverable from REPs through the TCRF component of Oncor's delivery rates.

*Proposed PUCT Rulemaking* — The PUCT has published proposed rule changes in two proceedings that would impact transmission rates. The first proceeding (PUCT Project No. 37909), which the PUCT is expected to consider by the end of September 2010, proposes changes to the TCRF rule to allow for more complete cost recovery of wholesale transmission charges incurred by distribution service providers. Currently, increased wholesale transmission charges are recoverable by distribution service providers, effective with the March 1 and September 1 TCRF updates, but distribution service providers cannot recover increased charges incurred prior to such updates. If the rule is approved as proposed, TCRF filings would still be effective March 1 and September 1, but distribution service providers would be allowed to include wholesale transmission charges based on the effective date of the wholesale transmission rate changes. In the second proceeding (PUCT Project No. 37519), the PUCT approved the proposal for adoption at its July 30, 2010 open meeting, making changes to the wholesale transmission rules to allow transmission service providers to update their wholesale transmission rates twice in a calendar year, as compared to once per year under the current rules, providing more timely recovery of incremental capital investment. Other changes included in this rule will (i) tie the effective date of the rule to the effective date of the TCRF rule in Project No. 37909, (ii) require the PUCT to consider the effects of reduced regulatory lag when setting rates in the next full rate case and (iii) provide for administrative approval of uncontested interim wholesale transmission rate applications.

*Application for 2011 Energy Efficiency Cost Recovery Factor (PUCT Docket No. 38217)* — In April and May 2010, Oncor filed an application with the PUCT to request approval of an energy efficiency cost recovery factor (EECRF) for 2011. PUCT rules require Oncor to make an annual EECRF filing by May 1 for implementation at the beginning of the next calendar year. The requested 2011 EECRF, as adjusted, is $54 million, the same amount established for 2010, and would result in a $0.95 per month charge for residential customers, as compared to the 2010 residential charge of $0.89 per month. As allowed by the rule, the 2011 EECRF is designed to recover $45 million of Oncor's costs for the 2011 programs, to be reduced by $2 million for the over–recovery of 2009 program costs, plus a performance bonus to Oncor of $11 million based on 2009 results. No party has requested a hearing, and the PUCT staff has recommended approval of Oncor's application. Oncor anticipates that the PUCT will issue an order in the third quarter 2010.

*Competitive Renewable Energy Zones (CREZs)*—In January 2009, the PUCT awarded approximately $1.3 billion of CREZ construction projects to Oncor (PUCT Docket Nos. 35665 and 37902). The projects involve the construction of transmission lines to support the transmission of electricity from renewable energy sources, principally wind generation facilities, in west Texas to population centers in the eastern part of the state. A written order reflecting the PUCT's decision was entered in March 2009, and an order on rehearing was issued by the PUCT in May 2009. The cost estimates for the CREZ construction projects are based upon cost analyses prepared by ERCOT in April 2008. Based on the selection of final routes for the three default and nine priority

C–13

EFIHMW00052641

EFIHMW00051935

**PX 030**
**Page 707 of 734**

**Table of Contents**

projects and identification of additional costs not included in the original ERCOT estimate (e.g., wind interconnection facilities and required modification to existing facilities), Oncor estimates that the cost of these projects will exceed ERCOT estimates by approximately $220 million. Final routes for five subsequent projects have not yet been selected by the PUCT. As of June 30, 2010, Oncor's cumulative CREZ–related capital expenditures totaled approximately $217 million, including $103 million during the six months ended June 30, 2010. It is expected that the necessary permitting actions and other requirements and all construction activities for Oncor's CREZ construction projects will be completed by the end of 2013.

In October 2009, the PUCT initiated a proceeding to determine whether there is sufficient financial commitment from generators of renewable energy to grant Certificates of Convenience and Necessity (CCNs) for transmission facilities located in two areas in the panhandle of Texas designated as CREZs. If the PUCT determines that there is not sufficient financial commitment from the generators for either CREZ, the PUCT may take action, including delaying the filing of CREZ CCN applications until such time as the PUCT finds sufficient financial commitment for that CREZ in accordance with the financial commitment provisions of the PUCT's rules. Three of the CREZ transmission projects awarded to Oncor are located in the two CREZs that are the subject of the proceeding. The estimated cost of these three transmission projects is approximately $380 million. In July 2010, a stipulation and proposed order was filed that would allow these projects to proceed. The PUCT approved the proposed order at its July 30, 2010 open meeting.

In July 2009, the City of Garland, Texas filed an Original Petition and Application for Stay and Injunction in the 200th District Court of Travis County, Texas seeking judicial review and a stay of the PUCT's March 2009 written order selecting transmission service providers (including Oncor) to build CREZ transmission facilities. In January 2010, the district court issued an order reversing the PUCT's order and remanding it to the PUCT for action consistent with the court's opinion. The district court order did not contain a stay or injunction and severed the City of Garland's requests for declaratory and injunctive relief. In February 2010, the PUCT issued orders that severed certain of the CREZ transmission projects awarded to Oncor and others from its consideration of the remand of the written order (PUCT Docket No. 37928) and suspended the schedule sequencing CREZ projects subsequent to CREZ priority projects (PUCT Docket No. 36802). In April 2010, the PUCT issued an order in Docket No. 36802 establishing the sequencing for CREZ projects subsequent to priority projects, which did not affect Oncor other than resulting in the schedule for Oncor to file CCN applications for its five CREZ subsequent projects between May and September 2010 as compared to the original March to May 2010 timeframe. That order excludes two CREZ subsequent projects that had been originally awarded to Lower Colorado River Authority, and the PUCT has opened Docket No. 38045 to award these two projects. In July 2010, the City of Garland and South Texas Electric Cooperative filed a participation agreement regarding these two projects. It is anticipated that the PUCT will award the projects in the third quarter of 2010.

*Sunset Review*—PURA, the PUCT, ERCOT and the Office of Public Utility Counsel (OPUC) will be subject to "Sunset" review by the Texas Legislature in the 2011 legislative session. Sunset review includes, generally, a comprehensive review of the need for and effectiveness of an administrative agency (the PUCT, ERCOT or the OPUC), along with an evaluation of the advisability of any changes to that agency's authorizing legislation (PURA). A Sunset staff report on the PUCT, ERCOT and the OPUC offering various recommendations for consideration by the Sunset Commission was issued in April 2010, and the related Sunset public meeting was conducted in May 2010. The Sunset Commission met in July 2010 and adopted various recommendations regarding the PUCT, ERCOT and the OPUC. The Sunset Commission will submit its recommendations for the Texas Legislature's consideration during the next session, which begins in January 2011. EFIH cannot predict the outcome of the sunset review process.

*Summary*

EFIH cannot predict future regulatory or legislative actions or any changes in economic and securities market conditions. Such actions or changes could significantly alter its basic financial position, results of operations or cash flows.

C–14

EFIHMW00052642

EFIHMW00051935

**PX 030**
**Page 708 of 734**

Table of Contents
QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Market risk is the risk that EFIH may experience a loss in value as a result of changes in market conditions such as interest rates that may be experienced in the ordinary course of business. EFIH may transact in financial instruments to hedge interest rate risk related to its indebtedness, but there are currently no such hedges in place. All of the long-term debt at June 30, 2010 and December 31, 2009 carried fixed interest rates.

*Credit Risk*

EFIH is exposed to affiliate credit risk associated with the $79 million principal amount of TCEH debt securities and $18 million principal amount of EFH Corp. debt securities it acquired in November 2009 and holds as investments (see Note 6 to EFIH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010). The credit rating of each of these securities is below investment grade. The carrying value of these securities was $69 million, including $2 million of accretion of purchase discount, at June 30, 2010.

*Credit Risk—Oncor*—Credit risk relates to the risk of loss associated with nonperformance by counterparties. Customers consist primarily of REPs. As a prerequisite for obtaining and maintaining certification, a REP must meet the financial resource standards established by the PUCT. Meeting these standards does not guarantee that a REP will be able to perform its obligations. REP certificates granted by the PUCT are subject to suspension and revocation for significant violation of PURA and PUCT rules. Significant violations include failure to timely remit payments for invoiced charges to a transmission and distribution utility pursuant to the terms of tariffs approved by the PUCT.

Oncor's exposure to credit risk associated with accounts receivable totaled $177 million from affiliates, substantially all of which consisted of Oncor's trade accounts receivable from TCEH, and $284 million from nonaffiliated customers as of June 30, 2010. The nonaffiliated customer receivable amount is before the allowance for uncollectible accounts, which totaled $2 million at June 30, 2010. The nonaffiliated exposure consists almost entirely of noninvestment grade trade accounts receivable, of which $216 million represented trade accounts receivable from REPs. As of June 30, 2010, subsidiaries of one customer collectively represented 12% of the nonaffiliated trade receivable amount. No other nonaffiliated parties represented 10% or more of the total exposure.

Oncor is also exposed to credit risk associated with the note receivable from TCEH totaling $237 million ($38 million reported as current) at June 30, 2010.

C-15

EFIHMW00052643

EFIHMW00051935

PX 030
Page 709 of 734

Table of Contents

**EFIH Consolidated**
**Adjusted EBITDA Reconciliation**
**(millions in dollars)**

|  | Six Months Ended June 30, 2010 | Six Months Ended June 30, 2009 | Twelve Months Ended June 30, 2010 | Twelve Months Ended June 30, 2009 |
|---|---|---|---|---|
| Net income (loss) attributable to Intermediate Holding | $ 25 | $ 21 | $ 78 | $ (556) |
| Income tax expense (benefit) | (49) | (46) | (96) | (90) |
| Interest expense and related charges | 150 | 137 | 291 | 268 |
| Depreciation and amortization | — | — | — | — |
| **EBITDA** | $ 126 | $ 112 | $ 273 | $ (378) |
| Oncor EBITDA | — | — | — | — |
| Oncor distributions/dividends (a) | 87 | 58 | 244 | 1,505 |
| Interest income | (4) | — | (8) | (2) |
| Other | — | 1 | (1) | 2 |
| Equity in earnings of unconsolidated subsidiary (net of tax) | (122) | (112) | (265) | 380 |
| **Adjusted EBITDA per Incurrence Covenant** | $ 87 | $ 59 | $ 243 | $ 1,507 |
| Add back Oncor Holdings adjusted EBITDA (reduced by Oncor Holdings distributions/dividends) | 632 | 559 | 1,197 | (188) |
| **Adjusted EBITDA per Restricted Payments Covenant** | $ 719 | $ 618 | $ 1,440 | $ 1,319 |

(a)   Twelve months ended June 30, 2009 amount includes $1.253 billion distribution of net proceeds from the sale of Oncor noncontrolling interests in November 2008.

C–16

EFIHMW00052644

EFIHMW00051935

**PX 030**
**Page 710 of 734**

Table of Contents

**EFH Corp.**
**Adjusted EBITDA Reconciliation**
**(millions in dollars)**

| | Six Months Ended June 30, 2010 | Six Months Ended June 30, 2009 | Twelve Months Ended June 30, 2010 | Twelve Months Ended June 30, 2009 |
|---|---|---|---|---|
| Net income (loss) attributable to EFH Corp. | $ (71) | $ 287 | $ (14) | $ (4,951) |
| Income tax expense (benefit) | (35) | 285 | 47 | 2,278 |
| Interest expense and related charges | 2,074 | 1,096 | 3,890 | 4,357 |
| Depreciation and amortization | 692 | 830 | 1,616 | 1,654 |
| **EBITDA** | **$ 2,660** | **$ 2,498** | **$ 5,539** | **$ 3,338** |
| Oncor EBITDA | — | (636) | (718) | (496) |
| Oncor distributions/dividends (a) | 87 | 75 | 227 | 1,522 |
| Interest income | (9) | (12) | (42) | (26) |
| Amortization of nuclear fuel | 64 | 48 | 111 | 89 |
| Purchase accounting adjustments (b) | 114 | 180 | 280 | 394 |
| Impairment of goodwill | — | 90 | — | 8,090 |
| Impairment of assets and inventory write down (c) | 2 | 2 | 42 | 1,214 |
| Net gain on debt exchange offers | (143) | — | (230) | — |
| Net income (loss) attributable to noncontrolling interests | — | 28 | 36 | (132) |
| Equity in earnings of unconsolidated subsidiary | (122) | — | (122) | — |
| EBITDA amount attributable to consolidated unrestricted subsidiaries | — | 2 | 1 | 2 |
| Unrealized net gain resulting from hedging transactions | (848) | (710) | (1,364) | (9,402) |
| Amortization of "day one" net loss on Sandow 5 power purchase agreement | (11) | — | (20) | — |
| Losses on sale of receivables | — | 7 | 5 | 23 |
| Noncash compensation expenses (d) | 13 | 12 | 12 | 28 |
| Severance expense (e) | 3 | 8 | 5 | 11 |
| Transition and business optimization costs (f) | — | 19 | 3 | 40 |
| Transaction and merger expenses (g) | 24 | 42 | 63 | 80 |
| Insurance settlement proceeds (h) | — | — | — | (21) |
| Restructuring and other (i) | — | 12 | (25) | 41 |
| Expenses incurred to upgrade or expand a generation station (j) | 100 | 100 | 100 | 100 |
| **Adjusted EBITDA per Incurrence Covenant** | **$ 1,934** | **$ 1,765** | **$ 3,903** | **$ 4,895** |
| Add back Oncor adjusted EBITDA (reduced by Oncor distributions/dividends) | 632 | 542 | 1,213 | (206) |
| **Adjusted EBITDA per Restricted Payments Covenant** | **$ 2,566** | **$ 2,307** | **$ 5,116** | **$ 4,689** |

(a)   Twelve months ended June 30, 2009 amount includes $1.253 billion distribution of net proceeds from the sale of Oncor noncontrolling interests in November 2008.

(b)   Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel. Also include certain credits not recognized in net income due to purchase accounting.

(c)   Impairment of assets includes impairments of emission allowances and trade name intangible assets, impairments of land and the natural gas–fueled generation fleet and charges related to the cancelled development of coal–fueled generation facilities.

(d)   Noncash compensation expenses are accounted for under accounting standards related to stock compensation and exclude capitalized amounts.

C–17

EFIHMW00052645

EFIHMW00051935

**PX 030**
**Page 711 of 734**

Table of Contents

(e)    Severance expense includes amounts incurred related to outsourcing, restructuring and other amounts deemed to be in excess of normal recurring amounts.

(f)    Transition and business optimization costs include professional fees primarily for retail billing and customer care systems enhancements and incentive compensation.

(g)    Transaction and merger expenses include costs related to the Merger and abandoned strategic transactions, outsourcing transition costs, administrative costs related to the cancelled program to develop coal–fueled generation facilities, the Sponsor Group management fee, costs related to certain growth initiatives and costs related to the Oncor sale of noncontrolling interests.

(h)    Insurance settlement proceeds include the amount received for property damage to certain mining equipment.

(i)    Restructuring and other for twelve months ended June 30, 2010 primarily represents reversal of certain liabilities accrued in purchase accounting and recorded as other income, partially offset by restructuring and nonrecurring activities and for the twelve months ended June 30, 2009 includes a litigation accrual and a charge related to the bankruptcy of a subsidiary of Lehman Brothers Holdings Inc. and other restructuring initiatives and nonrecurring activities.

(j)    Expenses incurred to upgrade or expand a generation station reflect noncapital outage costs.

C–18

EFIHMW00052646

EFIHMW00051935

**PX 030**
**Page 712 of 734**

Table of Contents

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS AS OF AND FOR THE YEAR ENDED DECEMBER 31, 2009

The following discussion and analysis of EFIH's financial condition and results of operations for the fiscal years ended December 31, 2009, 2008 and 2007 was included in EFIH's Annual Report on Form 10–K for the year ended December 31, 2009 (except for disclosure regarding credit ratings, which has been deleted to comply with an intervening change in law) as recast in a Current Report on Form 8–K filed with the SEC on May 28, 2010 ("2009 Form 10–K") to reflect the adoption of amended consolidation accounting standards related to VIEs and should be read in conjunction with Selected Financial Data and EFIH's audited consolidated financial statements and the notes to those statements. This MD&A should be read in conjunction with "Selected Historical Consolidated Financial Data for EFIH and its Subsidiaries" and EFIH's historical consolidated financial statements for the year ended December 31, 2009 and the notes to those statements, each included elsewhere in this Prospectus. This MD&A should also be read in conjunction with the disclosure set forth in "Summary—Recent Developments" beginning on page 14 of this Prospectus and "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three and Six Months Ended June 30, 2010" above, each of which provides material updates to certain of the information contained in this MD&A.

All dollar amounts in the tables in the following discussion and analysis are stated in millions of US dollars unless otherwise indicated.

BUSINESS

EFIH is a Dallas, Texas–based holding company whose wholly–owned subsidiary, Oncor Holdings, holds a majority interest (approximately 80%) in Oncor. Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell power in the north–central, eastern and western parts of Texas. Revenues from delivery services provided to TCEH represented 38% and 39% of Oncor's total revenues for the years ended December 31, 2009 and 2008, respectively. EFIH is a direct, wholly–owned subsidiary of EFH Corp. See "Annex A – Definitions" for definition of terms and abbreviations, including the Merger. Because EFIH is managed as an integrated business, there are no separate reportable business segments. Various "ring–fencing" measures have been taken to enhance the credit quality of Oncor Holdings and Oncor. See Notes 1 and 2 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 for a description of the material features of these "ring–fencing" measures and for discussion of the deconsolidation of Oncor (and its majority owner, Oncor Holdings) as the result of a change in accounting principles. See Note 7 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 for discussion of equity interests sold by Oncor in November 2008.

*Significant Activities and Events*

*Oncor Technology Initiatives*—Oncor continues to invest in technology initiatives that include development of a modernized grid through the replacement of existing meters with advanced digital metering equipment and development of advanced digital communication, data management, real–time monitoring and outage detection capabilities. This modernized grid is expected to produce electricity service reliability improvements and provide the potential for additional products and services from REPs that will enable businesses and consumers to better manage their electricity usage and costs. Oncor's plans provide for the full deployment of over three million advanced meters by the end of 2012 to all residential and most non–residential retail electricity customers in Oncor's service area. The advanced meters can be read remotely, rather than by a meter reader physically visiting the location of each meter. Advanced meters facilitate automated demand side management, which allows consumers to monitor the amount of electricity they are consuming and adjust their electricity consumption habits.

As of December 31, 2009, Oncor has installed approximately 660 thousand advanced digital meters, including approximately 620 thousand during the year ended December 31, 2009. As the new meters are

C–19

EFIHMW00052647

EFIHMW00051935

PX 030
Page 713 of 734

**Table of Contents**
integrated, Oncor reports 15–minute interval, billing–quality electricity consumption data to ERCOT for Texas market settlement purposes. The data makes it possible for REPs to support new programs and pricing options. Cumulative capital expenditures for the deployment of the advanced meter system totaled $196 million as of December 31, 2009.

As discussed below under "Regulation and Rates," Oncor has implemented a rate surcharge effective January 1, 2009 to recover its investment in the advanced meter deployment.

*Oncor Matters with the PUCT*—See discussion of these matters, including the awarded construction of CREZ–related transmission lines and a rate case with the PUCT, below under "Regulation and Rates."

*Debt Exchanges and Issuances*—See Note 5 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 for discussion of debt exchange offers completed by EFH Corp., EFIH and EFIH Finance in November 2009 and the issuance of additional notes by EFH Corp., guaranteed by EFIH, in January 2010.

*Oncor's 2008 Impairment of Goodwill*—Financial market conditions had a significant effect on Oncor's 2008 assessment of the carrying value of goodwill. Oncor recorded a goodwill impairment charge of $860 million in 2008, primarily arising from the dislocation in the capital markets that had increased interest rate spreads and the resulting discount rates used in estimating fair values and the effects of declines in market values of debt and equity securities of comparable companies. EFIH's approximate 80% equity interest in the impairment is reflected in equity in earnings (losses) of unconsolidated subsidiary (net of tax) in the statement of consolidated income (loss). The annual impairment testing performed in 2009 resulted in no impairment.

KEY RISKS AND CHALLENGES

Following is a discussion of key risks and challenges facing management and the initiatives currently underway to manage such challenges.

*Rates and Cost Recovery*

The rates assessed by Oncor are regulated by the PUCT and certain cities and are subject to regulatory rate–setting processes and annual earnings oversight. This regulatory treatment does not provide any assurance as to achievement of earnings levels. Oncor's rates are regulated based on an analysis of Oncor's costs and capital structure, as reviewed and approved in a regulatory proceeding. While rate regulation is premised on the full recovery of prudently incurred costs and a reasonable rate of return on invested capital, there is no assurance that the PUCT will judge all of Oncor's costs to have been prudently incurred, that the PUCT will not reduce the amount of invested capital included in the capital structure that Oncor's rates are based upon or that the regulatory process in which rates are determined will always result in rates that produce full recovery of Oncor's costs. For example, in its final order in August 2009 with respect to the rate review Oncor filed in June 2008, the PUCT denied recovery of $25 million of regulatory assets, resulting in a $16 million after tax loss recognized in 2009. See "Regulation and Rates" below for further information regarding the final order.

*Advanced Meter Deployment*

Under a PUCT order, which became final in September 2008, approving Oncor's proposed advanced meter deployment plan and rate surcharge to recover its investment, Oncor began billing the advanced metering surcharge in the January 2009 billing month cycle. Oncor may, through subsequent reconciliation proceedings, request recovery of additional costs that are reasonable and necessary. While there is a presumption that costs spent in accordance with a plan approved by the PUCT are reasonable and necessary, recovery of any costs that are found not to have been spent or properly allocated, or not to be reasonable or necessary, must be refunded. See "Regulation and Rates" below for further information.

*Technology Initiatives*

Risks to Oncor's technology initiative programs discussed above under "Significant Activities and Events" include nonperformance by equipment and service providers, failure of the technology to meet performance expectations and inadequate cost recovery allowances by regulatory authorities. Oncor is implementing measures

EFIHMW00052648

EFIHMW00051935

**Table of Contents**
to mitigate these risks, but there can be no assurance that these technology initiatives will achieve the operational and financial objectives.

## APPLICATION OF CRITICAL ACCOUNTING POLICIES

EFIH's significant accounting policies are discussed in Note 1 to EFIH's historical consolidated financial statements for the year ended December 31, 2009. EFIH follows accounting principles generally accepted in the US. Application of these accounting policies in the preparation of EFIH's consolidated financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and revenues and expenses during the periods covered. The following is a summary of certain critical accounting policies of EFIH that are impacted by judgments and uncertainties and under which different amounts might be reported using different assumptions or estimation methodologies.

### Purchase Accounting

In 2007, the Merger was accounted for under purchase accounting, whereby the purchase price of the transaction was allocated to EFH Corp.'s identifiable assets acquired and liabilities assumed based upon their fair values. The estimates of the fair values recorded were determined based on the principles in accounting standards related to the determination of fair value and reflect significant assumptions and judgments. For Oncor, the realization of its assets and settlement of its liabilities are largely subject to cost–based regulatory rate–setting processes. Accordingly, the historical carrying values of a majority of its assets and liabilities are deemed to represent fair values.

The excess of the purchase price over the estimated fair values of the net assets acquired was recorded as goodwill. The goodwill amount recorded at EFH Corp. totaled $23.2 billion as a result of purchase accounting, of which $4.9 billion was assigned to Oncor. The assignment of goodwill was based on the relative estimated enterprise value of Oncor's operations as of the date of the Merger using discounted cash flow methodologies. In accordance with accounting guidance related to goodwill and other intangible assets, goodwill is not amortized to net income, but is required to be tested for impairment at least annually.

In the fourth quarter of 2008, Oncor recorded a goodwill impairment charge of $860 million based on estimated fair values as of December 31, 2008. EFIH's approximate 80% equity interest in the impairment is reflected in equity in earnings (losses) of unconsolidated subsidiary (net of tax) in the statement of consolidated income (loss).

### Push Down of Merger–Related Debt

Merger–related debt of EFH Corp. (parent) is fully and unconditionally guaranteed on a joint and several basis by EFC Holdings and EFIH. In accordance with SEC Staff Accounting Bulletin (SAB) Topic 5–J, a portion of such debt and related interest expense is reflected in the financial statements of EFIH. The amount reflected on EFIH's balance sheet represents 50% of the guaranteed EFH Corp. Merger–related debt. This percentage reflects the fact that at the time of the Merger, the equity investments of EFCH and EFIH in their respective operating subsidiaries were essentially equal amounts. Because payment of principal and interest on the notes is the responsibility of EFH Corp., EFIH records the settlement of such amounts as noncash capital contributions from EFH Corp. See Note 5 to EFIH's historical consolidated financial statements for the year ended December 31, 2009.

### Impairment of Investment

EFIH evaluates its investment in Oncor Holdings whenever indications exist that a loss in value that is not temporary has occurred. An impairment loss is recognized if the carrying value of the investment is greater than the fair value of the investment (i.e. the enterprise value of Oncor Holdings), and the loss is not deemed temporary. Fair value is determined by discounted cash flows, supported by available market valuations, if applicable. The determination of fair value involves judgments that are subjective in nature and may require the use of estimates in forecasting future results and cash flows.

C–21

EFIHMW00052649

EFIHMW00051935

**PX 030**
**Page 715 of 734**

Table of Contents
*Accounting for Income Taxes*

EFIH's income tax expense and related balance sheet amounts involve significant management estimates and judgments. Amounts of deferred income tax assets and liabilities, as well as current and noncurrent accruals, involve judgments and estimates of the timing and probability of recognition of income and deductions by taxing authorities. In assessing the likelihood of realization of deferred tax assets, management considers estimates of the amount and character of future taxable income. Actual income taxes could vary from estimated amounts due to the future impacts of various items, including changes in income tax laws, EFIH's forecasted financial condition and results of operations in future periods, as well as final review of filed tax returns by taxing authorities. EFH Corp.'s income tax returns are regularly subject to examination by applicable tax authorities. In management's opinion, pursuant to income tax accounting guidance related to uncertain tax positions, there is no material liability for future taxes that may be owed as a result of any examination. See Notes 1 and 4 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 for discussion of income tax matters.

## PRESENTATION AND ANALYSIS OF RESULTS

The accompanying statements of consolidated income and cash flows for 2007 are presented for two periods: January 1, 2007 through October 10, 2007 (Predecessor) and October 11, 2007 through December 31, 2007 (Successor), which relate to the period before the Merger and the period after the Merger, respectively. Management's discussion and analysis of results of operations and cash flows has been prepared by comparing the results of operations and cash flows of the Successor for the year ended December 31, 2009 to those of the Successor for the year ended December 31, 2008, by comparing the results of operations and cash flows of the Successor for the three months ended December 31, 2008 to those of the Successor for the period October 11, 2007 through December 31, 2007 and by comparing the results of operations and cash flows of the Successor for the nine months ended September 30, 2008 to those of the Predecessor for the period January 1, 2007 through October 10, 2007.

Reference is made to the discussion in Notes 1 and 2 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 of the retrospective deconsolidation of Oncor Holdings and Oncor. As a result of deconsolidation, the results of Oncor Holdings and Oncor are reflected in the statement of income as equity in earnings of unconsolidated subsidiary (net of tax).

## RESULTS OF OPERATIONS
*Financial Results*

| | Successor | | | | | Predecessor |
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Three Months Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Nine Months Ended September 30, 2008 | Period from January 1, 2007 through October 10, 2007 |
|---|---|---|---|---|---|---|
| Interest income | $ 4 | $ 2 | $ 2 | $ 2 | $ — | $ — |
| Interest expense and related charges | (279) | (262) | (67) | (68) | (195) | — |
| | | | | | | |
| Loss before income taxes and equity in earnings of unconsolidated subsidiary | (275) | (260) | (65) | (68) | (195) | — |
| Income tax benefit | 93 | 88 | 24 | 23 | 65 | |
| Equity in earnings (losses) of unconsolidated subsidiary (net of tax) | 256 | (323) | (632) | 64 | 309 | 263 |
| | | | | | | |
| Net income (loss) | $ 74 | $ (495) | $ (673) | $ 19 | $ 179 | $ 263 |

C–22

EFIHMW00052650

EFIHMW00051935

**PX 030**
**Page 716 of 734**

Table of Contents
*Financial Results—Year Ended December 31, 2009 Compared to Year Ended December 31, 2008*

Interest expense and related charges increased $17 million, or 6%, to $279 million in 2009. The increase reflected EFH Corp.'s PIK interest elections on the Toggle Notes pushed down to EFIH and EFIH's issuance of notes in November 2009 (see Note 5 to EFIH's historical consolidated financial statements for the year ended December 31, 2009).

Income tax benefit totaled $93 million in 2009 compared to $88 million in 2008. The effective rate on pretax income was 33.8% in both 2009 and 2008.

Equity in earnings of unconsolidated subsidiary (net of tax) totaled $256 million in 2009 compared to equity in losses of unconsolidated subsidiary (net of tax) of $323 million in 2008. The increase of $579 million was driven by an $807 million increase in Oncor's net income, partially offset by a $224 million increase in Oncor's minority interest holders' equity in Oncor's earnings. The $807 million increase in Oncor's net income was driven by an $860 million goodwill impairment charge recorded in 2008. Excluding the impairment charge, results in 2009 declined due to the effect of lower average consumption on revenues, the write−off of certain regulatory assets totaling $25 million (pre tax) and a $30 million (pre tax) increase in interest expense reflecting higher average borrowings due primarily to Oncor's ongoing capital investments and higher average interest rates due primarily to refinancing of short−term borrowings in September 2008.

Net income for 2009 totaled $74 million and net loss for 2008 totaled $495 million driven by the increase in Oncor's earnings.

*Financial Results—Three Months Ended December 31, 2008 Compared to Successor Period from October 11, 2007 through December 31, 2007*

Equity in losses of unconsolidated subsidiary (net of tax) totaled $632 million in 2008 compared to equity in earnings of unconsolidated subsidiary (net of tax) of $64 million in 2007. The decrease of $696 million was driven by an $860 million decrease in Oncor's net income, partially offset by a $160 million decrease in Oncor's minority interest holders' equity in Oncor's earnings, both of which reflected the $860 million goodwill impairment charge recorded in 2008.

Net loss for 2008 totaled $673 million, and net income for 2007 totaled $19 million. The change was driven by the decline in results of the Oncor Holdings equity investment.

*Financial Results—Nine Months Ended September 30, 2008 Compared to Predecessor Period from January 1, 2007 through October 10, 2007*

Interest expense and related charges totaled $195 million in 2008 and zero in 2007 reflecting Merger−related debt pushed down from EFH Corp. (see Note 5 to EFIH's historical consolidated financial statements for the year ended December 31, 2009).

Equity in earnings of unconsolidated subsidiary (net of tax) totaled $309 million in 2008 compared to $263 million in 2007. The $46 million improvement reflected an increase in Oncor's net income driven by the favorable effects on revenues of volume growth and increased tariffs to recover ongoing investment in the transmission system.

Net income decreased $84 million, or 32%, to $179 million in 2008 reflecting interest expense on debt pushed down from EFH Corp., partially offset by increased earnings of the Oncor Holdings equity investment.

C−23

EFIHMW00052651

EFIHMW00051935

Table of Contents
OTHER COMPREHENSIVE INCOME

In September 2008, Oncor entered into interest rate swap transactions hedging the variability of treasury bond rates used to determine the interest rates on an anticipated issuance of an aggregate of $1.0 billion of senior secured notes maturing from 2013 to 2018. The hedges were terminated the same day, and $2 million in after-tax losses were recorded as other comprehensive income.

An after tax loss of $1 million for the period January 1, 2007 through October 10, 2007 was recognized in net income related to Oncor's settled interest rate cash flow hedges.

## FINANCIAL CONDITION

### Liquidity and Capital Resources

Cash Flows—Cash flows from operating, financing and investing activities included:

| | Successor | | | | | Predecessor |
|---|---|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Three Months Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Nine Months Ended September 30, 2008 | Period from January 1, 2007 through October 10, 2007 |
| Cash flows—operating activities: | | | | | | |
| Net income (loss) | $ 74 | $ (495) | $ (673) | $ 19 | $ 179 | $ 263 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | | | | |
| Equity in (earnings) losses of unconsolidated subsidiaries | (256) | 323 | 632 | (64) | (309) | (263) |
| Distributions of earnings from unconsolidated subsidiary | 216 | 330 | 117 | — | 213 | 326 |
| Amortization of debt issuance costs | 10 | 11 | 3 | 2 | 8 | — |
| Deferred income taxes—net | (56) | 1 | | | 1 | — |
| Noncash interest expense related to pushed down debt of parent | 265 | 251 | 125 | 24 | 126 | — |
| Changes in debt-related assets and liabilities | (37) | (88) | (84) | 19 | (5) | — |
| Cash provided by operating activities | 216 | 333 | 120 | — | 213 | 326 |
| Cash flows—financing activities: | | | | | | |
| Proceeds from sale of Oncor equity interests, net of transaction costs | — | 1,253 | 1,253 | — | — | — |
| Distribution to parent of equity sale net proceeds | — | (1,253) | (1,253) | — | — | — |
| Distributions/dividends to EFH Corp. | (216) | (330) | (117) | — | (213) | (326) |
| Cash used in financing activities | (216) | (330) | (117) | — | (213) | (326) |
| Cash flows—investing activities: | | | | | | |
| Advances to EFH Corp. | — | (3) | (3) | — | — | — |
| Cash used in investing activities | — | (3) | (3) | — | — | — |
| Net change in cash and cash equivalents | $ — | $ — | $ — | $ — | $ — | $ — |

C–24

EFIHMW00052652

EFIHMW00051935

**PX 030**
**Page 718 of 734**

**Table of Contents**
Essentially all of the cash provided by operating activities for all periods presented consisted of dividends from Oncor Holdings/Oncor.

Amortization of debt issuance expense relates to debt pushed down from EFH Corp. (see Note 5 to EFIH's historical consolidated financial statements for the year ended December 31, 2009) and is reported in interest expense and related charges in the statements of consolidated income (loss).

***Long–Term Debt Activity***—As part of an EFH Corp. debt exchange transaction in November 2009, EFIH and EFIH Finance, a wholly–owned subsidiary of EFIH, as Co–Issuers, issued $141 million principal amount of 9.75% Senior Secured Notes due in 2019 (EFIH Notes) and acquired $99 million principal amount of outstanding EFH Corp. Senior Notes and $97 million principal amount of outstanding TCEH and other EFH Corp. debt securities. Also, EFH Corp. issued $115 million principal amount of 9.75% Senior Secured Notes due in 2019 (EFH Corp. 9.75% Notes) and acquired $82 million outstanding principal amount of its Senior Notes and $79 million principal amount of TCEH and other EFH Corp. debt securities. As discussed in Note 5 to EFIH's historical consolidated financial statements for the year ended December 31, 2009, the new EFH Corp. 9.75% Notes and the EFH Corp. Senior Notes are guaranteed by EFCH and EFIH and are subject to push down accounting. Accordingly, 50% of the new EFH Corp 9.75% Notes, or $57 million principal amount, was pushed down to EFIH. Following the debt exchange transaction, the EFH Corp. Senior Notes acquired by EFIH and EFH Corp. were retired; consequently, the amount of pushed down debt was reduced by 50% of the principal amount of retired debt, or $90 million.

See "Toggle Note Interest Election Related to Pushed Down EFH Corp. Debt" below for discussion of a $154 million increase in Toggle Notes pushed down to EFIH that were issued in May and November 2009 in payment of accrued interest.

See Note 5 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 for further information regarding long–term debt.

***Toggle Note Interest Election Related to Pushed Down EFH Corp. Debt***—EFH Corp. has the option every six months at its discretion, ending with the payment due November 2012, to use the payment–in–kind (PIK) feature of its senior toggle notes (Toggle Notes) in lieu of making cash interest payments. EFH Corp. elected to use the PIK feature for the May 2009, November 2009 and May 2010 interest payments as an efficient and cost–effective method to further enhance liquidity, in light of the weaker economy and related lower electricity demand and the continuing uncertainty in the financial markets. Once EFH Corp. makes a PIK election, the election is valid for each succeeding interest payment period until EFH Corp. revokes the election. Use of the PIK feature will be evaluated at each election period, taking into account market conditions and other relevant factors at such time.

EFH Corp. made its May and November 2009 interest payments and will make its May 2010 interest payment by using the PIK feature of the Toggle Notes. During the applicable interest periods, the interest rate on the Toggle Notes is increased from 11.25% to 12.00%. EFH Corp. increased the aggregate principal amount of the notes by $150 million and $159 million in May and November 2009, respectively, and will further increase the aggregate principal amount of the notes by $168 million in May 2010. If paid in cash, the annual interest expense would increase by approximately $54 million (50% of which relates to EFIH due to push down), constituting the additional cash interest that would be payable with respect to the $477 million of additional principal amount. See Note 5 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 for discussion of debt exchanges that resulted in redemption of portions of the outstanding principal amount of these notes.

***Liquidity Needs***—EFIH's liquidity needs represent interest and principal payments on the EFIH Notes, which are expected to be sourced, in part, from interest and principal payments on TCEH and EFH Corp. debt securities acquired in exchange for the EFIH Notes and held as investments (see Notes 5 and 8 to EFIH's

C–25

EFIHMW00052653

EFIHMW00051935

**PX 030
Page 719 of 734**

**Table of Contents**

historical consolidated financial statements for the year ended December 31, 2009). EFIH's additional liquidity sources include receipts of distributions from Oncor Holdings and, as necessary, borrowings from EFH Corp. (See Note 7 to EFIH's historical consolidated financial statements for the year ended December 31, 2009.)

*Distributions*—During 2009, EFIH's board of directors declared, and EFIH paid, $216 million in cash distributions to EFH Corp. (funded by distributions from its subsidiaries) as follows:

| Declaration Date | Payment Date | Amount Paid |
|---|---|---|
| November 12, 2009 | November 13, 2009 | $  99 |
| August 18, 2009 | August 19, 2009 | $  59 |
| May 19, 2009 | May 20, 2009 | $  40 |
| February 18, 2009 | March 3, 2009 | $  18 |

See Note 7 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 for discussion of distribution restriction provisions.

*Distributions from Oncor*—Until December 31, 2012, distributions paid by Oncor to its members are limited to an amount not to exceed Oncor's net income determined in accordance with GAAP, subject to certain defined adjustments. Distributions are further limited by an agreement that Oncor's regulatory capital structure, as determined by the PUCT, will be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.

In January 2009, the PUCT awarded CREZ construction projects to Oncor. See discussion below under "Regulation and Rates—Matters with the PUCT." As a result of the increased capital expenditures for CREZ and the debt-to-equity ratio cap, EFIH expects that Oncor may retain all or a portion of its available cash to fund such construction instead of paying distributions.

*Capitalization*—The capitalization ratios of EFIH were 54.5% and 57.7% membership interests and 45.5% and 42.3% long-term debt as of December 31, 2009 and 2008, respectively.

*Financial Covenants, Credit Rating Provisions and Cross Default Provisions—Covenants and Restrictions Related to EFIH Notes and Pushed Down Debt*—See Note 5 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 for discussion of the EFIH Notes and EFH Corp. debt pushed down to EFIH as a result of its guarantee of the debt. The indentures governing the EFIH Notes, EFH Corp. Senior Notes and EFH Corp. 9.75% Notes contain covenants that could have a material impact on the liquidity and operations of EFIH. See Note 5 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 for additional discussion of the covenants contained in these financing arrangements.

Adjusted EBITDA, as used in the restricted payments covenants contained in the indentures governing the EFIH Notes and EFH Corp. Senior Notes and 9.75% Notes for the year ended December 31, 2009 totaled $1.338 billion and $4.857 billion, respectively. See elsewhere herein for a reconciliation of net income (loss) to Adjusted EBITDA for EFIH and EFH Corp., respectively, for the years ended December 31, 2009 and 2008.

C–26

EFIHMW00052654

EFIHMW00051935

**Table of Contents**

The following table summarizes various financial ratios of EFIH and EFH Corp. that are applicable under certain covenants in the indentures governing the EFIH Notes and EFH Corp. Senior Notes and 9.75% Notes as of December 31, 2009 and 2008 and the corresponding covenant threshold levels as of December 31, 2009:

| | December 31, 2009 | December 31, 2008 | Threshold Level |
|---|---|---|---|
| Debt Incurrence Covenants: | | | |
| EFH Corp. Senior Notes: | | | |
| EFH Corp. fixed charge coverage ratio | 1.2 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| TCEH fixed charge coverage ratio | 1.5 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| EFH Corp. 9.75% Notes: | | | |
| EFH Corp. fixed charge coverage ratio | 1.2 to 1.0 | N/A | At least 2.0 to 1.0 |
| TCEH fixed charge coverage ratio | 1.5 to 1.0 | N/A | At least 2.0 to 1.0 |
| EFIH Notes: | | | |
| EFIH fixed charge coverage ratio (a) | 53.8 to 1.0 | N/A | At least 2.0 to 1.0 |
| Restricted Payments/Limitations on Investments Covenants: | | | |
| EFH Corp. Senior Notes: | | | |
| General restrictions (non–Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (b) | 1.4 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| General restrictions (Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (b) | 1.2 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| EFH Corp. leverage ratio | 9.4 to 1.0 | 6.9 to 1.0 | Equal to or less than 7.0 to 1.0 |
| EFH Corp. 9.75% Notes: | | | |
| General restrictions (non–Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (b) | 1.4 to 1.0 | N/A | At least 2.0 to 1.0 |
| General restrictions (Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (b) | 1.2 to 1.0 | N/A | At least 2.0 to 1.0 |
| EFH Corp. leverage ratio | 9.4 to 1.0 | N/A | Equal to or less than 7.0 to 1.0 |
| EFIH Notes: | | | |
| General restrictions (non–EFH Corp. payments): | | | |
| EFIH fixed charge coverage ratio (a)(c) | 3.9 to 1.0 | N/A | At least 2.0 to 1.0 |
| General restrictions (EFH Corp. payments): | | | |
| EFIH fixed charge coverage ratio (a)(c) | 53.8 to 1.0 | N/A | At least 2.0 to 1.0 |
| EFIH leverage ratio | 4.4 to 1.0 | N/A | Equal to or less than 6.0 to 1.0 |

(a)    Although EFIH currently meets the fixed charge coverage ratio threshold applicable to certain covenants contained in the indenture governing the EFIH Notes, EFIH's ability to use such thresholds to incur debt or make restricted payments/investments is currently limited by the covenants contained in the EFH Corp. Senior Notes and the EFH Corp. 9.75% Notes.

(b)    The EFH Corp. fixed charge coverage ratio for non–Sponsor Group payments includes the results of Oncor Holdings and its subsidiaries. The EFH Corp. fixed charge coverage ratio for Sponsor Group payments excludes the results of Oncor Holdings and its subsidiaries.

(c)    The EFIH fixed charge coverage ratio for non–EFH Corp. payments includes the results of Oncor Holdings and its subsidiaries. The EFIH fixed charge coverage ratio for EFH Corp. payments excludes the results of Oncor Holdings and its subsidiaries.

EFIHMW00052655

EFIHMW00051935

**PX 030**
**Page 721 of 734**

**Table of Contents**

*Material Cross Default Provisions*—Certain financing arrangements contain provisions that may result in an event of default if there were a failure under other financing arrangements to meet payment terms or to observe other covenants that could or does result in an acceleration of payments due. Such provisions are referred to as "cross default" provisions.

The indenture governing the EFIH Notes contains a cross acceleration provision whereby a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of EFIH or any of its restricted subsidiaries in the aggregate amount equal to or greater than $250 million may cause the acceleration of the EFIH Notes.

The indentures governing the EFH Corp. Senior Notes, 9.75% and 10% Notes contain a cross acceleration provision where a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of EFH Corp. and any of its restricted subsidiaries in the aggregate amount equal to or greater than $250 million may cause the acceleration of the EFH Corp. Senior Notes, 9.75% and 10% Notes.

A default by Oncor or any subsidiary thereof in respect of indebtedness in a principal amount in excess of $50 million may result in a cross default under its credit facility. Under this facility such a default may cause the maturity of outstanding balances ($616 million at December 31, 2009) under such facility to be accelerated.

*Long-Term Contractual Obligations and Commitments*—The following table summarizes EFIH's contractual cash obligations as of December 31, 2009 (see Note 5 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 for additional disclosures regarding these long-term debt obligations).

| Contractual Cash Obligations (a) | Less Than One Year | One to Three Years | Three to Five Years | More Than Five Years | Total |
|---|---|---|---|---|---|
| Long-term debt—principal | $  — | $  — | $  — | $ 2,513 | $2,513 |
| Long-term debt—interest | 198 | 572 | 572 | 848 | 2,190 |
| Total contractual cash obligations | $ 198 | $ 572 | $ 572 | $ 3,361 | $4,703 |

(a)    Excludes $84 million of additional principal amount of Toggle Notes to be issued in May 2010 and due in 2017, reflecting the election of the PIK feature on the Toggle Notes as discussed above under "Toggle Notes Interest Election Related to Pushed Down EFH Corp. Debt." Includes $2.372 billion principal amount and related interest of EFH Corp. notes pushed down to EFIH (see Note 5 to EFIH's historical consolidated financial statements for the year ended December 31, 2009.)

*Guarantees*—See Note 5 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 for details of guarantees.

## OFF-BALANCE SHEET ARRANGEMENTS

See Notes 2 and 5 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 regarding investment in Oncor Holdings and guarantees, respectively.

## COMMITMENTS AND CONTINGENCIES

See Note 6 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 for details of commitments and contingencies, including guarantees.

## CHANGES IN ACCOUNTING STANDARDS

See Note 1 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 for discussion of changes in accounting standards.

C-28

EFIHMW00052656

EFIHMW00051935

**PX 030**
**Page 722 of 734**

Table of Contents
REGULATION AND RATES

*FERC Infrastructure Protection Standards*

In September 2009, the FERC issued an order approving a revised set of mandatory NERC standards for critical infrastructure protection (CIP). These standards are designed to protect the nation's bulk power system against potential disruptions from cyber security breaches. The mandatory reliability standards require certain users, owners and operators of the bulk power system to establish policies, plans and procedures to safeguard physical and electronic access to control systems, to train personnel on security matters, to report security incidents, and to be prepared to recover from a cyber incident. Oncor was compliant at December 31, 2009 and expects to achieve "Auditable Compliance" by year-end 2010 in accordance with the NERC CIP implementation schedule.

*Oncor Matters with the PUCT*

*Certification of REPs*—In April 2009, the PUCT finalized a rule relating to the Certification of Retail Electric Providers. The rule strengthens the certification requirements for REPs in order to better protect customers, transmission and distribution utilities (TDUs), and other REPs from the potential insolvency of REPs. The rule, among other things, increases creditworthiness and financial reporting requirements for REPs and provides additional customer protection requirements and regulatory asset consideration for TDU bad debt expenses. Under the rule, Oncor uncollectible amounts owed by REPs are deferred as a regulatory asset. Recovery of the regulatory asset will be considered in a future rate case. Accordingly, Oncor recognized an approximately $3 million one-time reversal of bad debt expense in the three months ended June 30, 2009. Due to the commitments made to the PUCT in connection with the Merger, Oncor may not recover bad debt expense, or certain other costs and expenses, from rate payers in the event of a default or bankruptcy by an affiliate REP.

*Stipulation Approved by the PUCT*—In April 2008, the PUCT entered an order, which became final in June 2008, approving the terms of a stipulation relating to the filing in 2007 by Oncor and Texas Holdings of a Merger-related Joint Report and Application with the PUCT pursuant to Section 14.101(b) of PURA and PUCT Substantive Rule 25.75. The stipulation required the filing of a rate case by Oncor no later than July 1, 2008 based on a test year ended December 31, 2007. In July 2008, Nucor Steel filed an appeal of the PUCT's order in the 200th District Court of Travis County, Texas. The parties to the appeal have agreed to a schedule that would result in a hearing in June 2010. Oncor was named a defendant and intends to vigorously defend the appeal. Oncor filed the rate case with the PUCT in June 2008, and the PUCT issued a final order with respect to the rate review in August 2009 as discussed below.

*Rate Case*—In June 2008, Oncor filed for a rate review with the PUCT and 204 cities. In August 2009, the PUCT issued a final order with respect to the rate review. The final order approves a total annual revenue requirement for Oncor of $2.64 billion, based on Oncor's 2007 test year cost of service and customer characteristics. New rates were calculated for all customer classes using 2007 test year billing metrics and the approved class cost allocation and rate design. The PUCT staff has estimated that the final order results in an approximate $115 million increase in base rate revenues over Oncor's 2007 adjusted test year revenues, before recovery of rate case expenses. Prior to implementing the new rates in September 2009, Oncor had already begun recovering $45 million of the $115 million increase as a result of approved transmission cost recovery factor and energy efficiency cost recovery factor filings, such as those discussed below.

Key findings made by the PUCT in the rate review include:

*   recognizing and affirming Oncor's corporate ring-fence from EFH Corp. and its unregulated affiliates by rejecting a proposed consolidated tax savings adjustment arising out of EFH Corp.'s ability to offset Oncor's taxable income against losses from other investments;

*   approving the recovery of all of Oncor's capital investment in its transmission and distribution system, including investment in certain automated meters that will be replaced pursuant to Oncor's advanced meter deployment plan;

C–29

EFIHMW00052657

EFIHMW00051935

**PX 030**
**Page 723 of 734**

Table of Contents

- denying recovery of $25 million of regulatory assets, which resulted in a $16 million after tax loss being recognized in the three months ended September 30, 2009, and

- setting Oncor's return on equity at 10.25%.

New rates were implemented upon approval of new tariffs in September 2009. In November 2009, the PUCT issued an Order on Rehearing that established a new rate class but did not change the revenue requirements. In January 2010, the PUCT denied all Second Motions for Rehearing, which made the November 2009 Order on Rehearing final and appealable.

*Advanced Meter Rulemaking*—In 2005, the Texas Legislature passed legislation that authorized electric utilities to implement a surcharge to recover costs incurred in deploying advanced metering and meter information networks. Benefits of the advanced metering installation include improved safety, on–demand meter reading, enhanced outage identification and restoration and system monitoring of voltages. In 2007, the PUCT issued its advanced metering rule to implement this legislation. This rule outlined the minimum required functionality for an electric utility's advanced metering systems to qualify for cost recovery under a surcharge. Subsequent to the issuance of the rule, the PUCT opened an implementation proceeding for market participants to fine–tune the rule requirements, address the impacts of advanced metering deployment on retail and wholesale markets in ERCOT, and help ensure that retail customers receive benefits from advanced metering deployment. The implementation proceeding is expected to continue through the end of 2010.

*Advanced Metering Deployment Surcharge Filing*—In May 2008, Oncor filed with the PUCT a description and request for approval of its proposed advanced metering system deployment plan and its proposed surcharge for the recovery of its estimated future investment for advanced metering deployment. Oncor's plan provides for the full deployment of over three million advanced meters by the end of 2012 to all residential and most non–residential retail electricity customers in Oncor's service area. As of December 31, 2009, Oncor has installed approximately 660 thousand advanced digital meters, including 620 thousand in the year ended December 31, 2009. Cumulative capital expenditures for the deployment of the advanced meter system totaled $196 million as of December 31, 2009, including $166 million in the year ended December 31, 2009.

In August 2008, a settlement was reached with the majority of the parties to this surcharge filing. The settlement included the following major provisions, as amended by the final order in the 2008 rate review:

- a surcharge beginning on January 1, 2009 and continuing for 11 years;

- a total revenue requirement over the surcharge period of $1.023 billion;

- estimated capital expenditures for advanced metering facilities of $686 million;

- related operation and maintenance expenses for the surcharge period of $153 million;

- $204 million of operation and maintenance expense savings, and

- an advanced metering cost recovery factor of $2.19 per month per residential retail customer and varying from $2.39 to $5.15 per month for non–residential retail customers.

An order approving the settlement was issued by the PUCT in August 2008 and became final in September 2008. Oncor began billing the advanced metering surcharge in the January 2009 billing month cycle. Oncor may, through subsequent reconciliation proceedings, request recovery of additional costs that are reasonable and necessary. While there is a presumption that costs spent in accordance with a plan approved by the PUCT are reasonable and necessary, recovery of any costs that are found not to have been spent or properly allocated, or not to be reasonable or necessary, must be refunded.

*Transmission Rates*—In order to recover increases in its transmission costs, including incremental fees paid to other transmission service providers due to an increase in their rates, Oncor is allowed to request an update

C–30

EFIHMW00052658

EFIHMW00051935

**PX 030**
**Page 724 of 734**

Table of Contents

twice a year to the transmission cost recovery factor (TCRF) component of its retail delivery rate charged to REPs. In January 2010, an application was filed to increase the TCRF, which is expected to be administratively approved and become effective in March 2010. This application is expected to increase annualized revenues by $13 million.

In September 2009, Oncor filed an application for an interim update of its wholesale transmission rate, and the PUCT approved the new rate effective December 2009. Accordingly, annualized revenues are expected to increase by approximately $34 million. Approximately $21 million of this increase is recoverable through transmission rates charged to wholesale customers, and the remaining $13 million is recoverable from REPs through the TCRF component of Oncor's delivery rates.

*Application for 2010 Energy Efficiency Cost Recovery Factor*—In May 2009, Oncor filed an application with the PUCT to request approval of an energy efficiency cost recovery factor (EECRF) for 2010. PUCT rules require Oncor to make an annual EECRF filing by May 1 for implementation at the beginning of the next calendar year. The requested 2010 EECRF is $54 million, the same amount established for 2009, and would result in the same $0.92 per month charge for residential customers as proposed in Oncor's rate case. As allowed by the rule, the 2010 EECRF is designed to recover the costs of the 2010 programs, the under–recovery of 2008 program costs, and a performance bonus based on 2008 results. In its November 2009 order, the PUCT approved the application with minor modifications, resulting in an immediate recognition of $9 million in revenues, representing the performance bonus. The final order resulted in a residential EECRF of $0.89 per month due to the PUCT approval of a different allocation methodology for the performance bonus. Oncor's new EECRF rider became effective for billings on and after December 30, 2009.

*Competitive Renewable Energy Zones (CREZs)*—In January 2009, the PUCT awarded approximately $1.3 billion of CREZ construction projects to Oncor. The projects involve the construction of transmission lines to support the transmission of electricity from renewable energy sources, principally wind generation facilities, in west Texas to population centers in the eastern part of the state. A written order reflecting the PUCT's decision was entered in March 2009, and an order on rehearing was issued by the PUCT in May 2009. The cost estimates for the CREZ construction projects are based upon cost analyses prepared by ERCOT in April 2008. For the year ended December 31, 2009, Oncor's CREZ–related capital expenditures totaled $114 million. It is expected that the necessary permitting actions and other requirements and all construction activities for Oncor's CREZ construction projects will be completed by the end of 2013.

In October 2009, the PUCT initiated a proceeding to determine whether there is sufficient financial commitment from generators of renewable energy to grant Certificates of Convenience and Necessity (CCNs) for transmission facilities located in two areas in the panhandle of Texas designated as CREZs. If the PUCT determines that there is not sufficient financial commitment from the generators for either CREZ, the PUCT may take action, including delaying the filing of CREZ CCN applications until such time as the PUCT finds sufficient financial commitment for that CREZ in accordance with the financial commitment provisions of the PUCT's rules. Three of the CREZ transmission projects awarded to Oncor are located in the two CREZs that are the subject of the proceeding. The estimated cost of these three transmission projects is approximately $380 million. The PUCT held a hearing in this proceeding in January 2010. The PUCT is expected to issue an order concluding this proceeding in the second quarter of 2010.

In July 2009, the City of Garland, Texas filed an Original Petition and Application for Stay and Injunction in the 200th District Court of Travis County, Texas seeking judicial review and a stay of the PUCT's March 2009 written order selecting transmission service providers (including Oncor) to build CREZ transmission facilities. In January 2010, the district court issued an order reversing the PUCT's order and remanding it to the PUCT for action consistent with the court's opinion. The district court order did not contain a stay or injunction and severed the City of Garland's requests for declaratory and injunctive relief. On February 4, 2010, the PUCT issued an order that severs certain of the CREZ transmission projects awarded to Oncor and others from its consideration of the remand of the written order. On February 12, 2010, the PUCT issued an order suspending the schedule

C–31

EFIHMW00052659

EFIHMW00051935

**PX 030**
**Page 725 of 734**

Table of Contents

sequencing CREZ projects subsequent to CREZ priority projects. In the original sequencing order, Oncor was scheduled to file CCN applications for its five CREZ subsequent projects between March and May 2010. The PUCT's order stated that the record evidence regarding the selection of the transmission service providers for the CREZ subsequent projects will be reevaluated without delay. Oncor cannot predict the impact, if any, the reevaluation may have on its CREZ construction projects.

*Sunset Review*—PURA and the PUCT will be subject to "sunset" review by the Texas Legislature in the 2011 legislative session. Sunset review includes, generally, a comprehensive review of the need for and effectiveness of an administrative agency (the PUCT), along with an evaluation of the advisability of any changes to that agency's authorizing legislation (PURA). A Sunset staff report is scheduled to be issued in April 2010, and a Sunset public meeting is scheduled for May 2010. EFIH cannot predict the outcome of the sunset review process.

*Summary*

EFIH cannot predict future regulatory or legislative actions or any changes in economic and securities market conditions. Such actions or changes could significantly alter its basic financial position, results of operations or cash flows.

## QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

*Interest Rate Risk*

Market risk is the risk that EFIH may experience a loss in value as a result of changes in market conditions such as interest rates that may be experienced in the ordinary course of business. There are currently no interest rate swaps in place to hedge interest rate risk related to EFIH's indebtedness. All of the long-term debt at December 31, 2009 and 2008 carried fixed interest rates.

| | Expected Maturity Date | | | | | | Successor | | | |
| | | | | | | (millions of dollars, except percentages) | | | | |
| | | | | | | | 2009 Total Carrying Amount | 2009 Total Fair Value | 2008 Total Carrying Amount | 2008 Total Fair Value |
| | 2010 | 2011 | 2012 | 2013 | 2014 | There-after | | | | |
| Long-term debt (including current maturities) | | | | | | | | | | |
| Fixed rate debt amount (a) | $ — | $ — | $ — | $ — | $ — | $ 2,513 | $ 2,513 | $ 1,908 | $ 2,250 | $ 1,297 |
| Average interest rate (b) | — | — | — | — | — | 11.00% | 11.00% | — | 11.08% | — |

(a)   Includes pushed down debt. See Note 5 to EFIH's historical consolidated financial statements for the year ended December 31, 2009.
(b)   Uses 11.25% cash rate for Toggle Notes.

*Credit Risk*

EFIH is exposed to affiliate credit risk associated with the $79 million principal amount of TCEH debt securities and $18 million principal amount of EFH Corp. debt securities it acquired in November 2009 as part of the debt exchanges discussed in Note 5 to EFIH's historical consolidated financial statements for the year ended December 31, 2009 and held as investments (see Note 8 to EFIH's historical consolidated financial statements for the year ended December 31, 2009). The credit rating of each of these securities is below investment grade. The carrying value of these securities was $68 million, including $1 million of accretion of purchase discount, at December 31, 2009.

C–32

EFIHMW00052660

EFIHMW00051935

Table of Contents

*Credit Risk—Oncor*—Oncor's credit risk relates to the risk of loss associated with nonperformance by counterparties. Oncor's customers consist primarily of REPs. As a prerequisite for obtaining and maintaining certification, a REP must meet the financial resource standards established by the PUCT. Meeting these standards does not guarantee that a REP will be able to perform its obligations. REP certificates granted by the PUCT are subject to suspension and revocation for significant violation of PURA and PUCT rules. Significant violations include failure to timely remit payments for invoiced charges to a transmission and distribution utility pursuant to the terms of tariffs approved by the PUCT. See "Regulation and Rates" above regarding a new REP certification rule.

Oncor's exposure to credit risk associated with accounts receivable totaled $151 million from affiliates, substantially all of which consisted of Oncor's trade accounts receivable from TCEH, and $245 million from nonaffiliated customers as of December 31, 2009. The nonaffiliated customer receivable amount is before the allowance for uncollectible accounts, which totaled $2 million at December 31, 2009. The nonaffiliated exposure consists almost entirely of noninvestment grade trade accounts receivable, of which $180 million represented trade accounts receivable from REPs. As of December 31, 2009, subsidiaries of one customer collectively represented 11% of the nonaffiliated trade receivable amount. No other nonaffiliated parties represented 10% or more of the total exposure.

Oncor is also exposed to credit risk associated with a note receivable from TCEH totaling $254 million ($37 million reported as current) at December 31, 2009.

**Energy Future Intermediate Holding Company LLC. Consolidated**
**Adjusted EBITDA Reconciliation**

|  | Year Ended December 31, 2009 | | Year Ended December 31, 2008 | |
|---|---|---|---|---|
|  | (millions of dollars) | | | |
| Net income (loss) | $ | 74 | $ | (495) |
| Income tax expense (benefit) |  | (93) |  | (88) |
| Interest expense and related charges |  | 279 |  | 262 |
| Depreciation and amortization |  | — |  | — |
| **EBITDA** | $ | 260 | $ | (321) |
| Oncor distributions/dividends (a) |  | 216 |  | 1,582 |
| Interest income |  | (4) |  | (2) |
| Equity in (earnings) losses of unconsolidated subsidiary (net of tax) |  | (256) |  | 323 |
| Other |  | (1) |  | 2 |
| **Adjusted EBITDA per Incurrence Covenant** | $ | 215 | $ | 1,584 |
| Add back Oncor Holdings adjusted EBITDA (reduced by Oncor Holdings distributions/dividends) | $ | 1,123 | $ | (267) |
| **Adjusted EBITDA per Restricted Payments Covenants** | $ | 1,338 | $ | 1,317 |

_____

(a)  2008 amount includes $1.253 billion distribution of net proceeds from the sale of equity interests by Oncor.

C–33

EFIHMW00052661

EFIHMW00051935

**PX 030**
**Page 727 of 734**

Table of Contents

### Energy Future Holdings Corp. Consolidated
### Adjusted EBITDA Reconciliation

| | Year Ended December 31, 2009 | Year Ended December 31, 2008 |
|---|---|---|
| | (millions of dollars) | |
| Net income (loss) attributable to EFH Corp. | $ 344 | $ (9,838) |
| Income tax expense (benefit) | 367 | (471) |
| Interest expense and related charges | 2,912 | 4,935 |
| Depreciation and amortization | 1,754 | 1,610 |
| **EBITDA** | **$ 5,377** | **$ (3,764)** |
| Oncor EBITDA | (1,354) | (496) |
| Oncor distributions/dividends (a) | 216 | 1,582 |
| Interest income | (45) | (27) |
| Amortization of nuclear fuel | 95 | 76 |
| Purchase accounting adjustments (b) | 346 | 460 |
| Impairment of goodwill | 90 | 8,000 |
| Impairment of assets and inventory write down (c) | 42 | 1,221 |
| Net gain on debt exchange offers | (87) | — |
| Net income (loss) attributable to noncontrolling interests | 64 | (160) |
| EBITDA amount attributable to consolidated unrestricted subsidiaries | 3 | — |
| Unrealized net (gain) loss resulting from hedging transactions | (1,225) | (2,329) |
| Amortization of "day one" net loss on Sandow 5 power purchase agreement | (10) | — |
| Losses on sale of receivables | 12 | 29 |
| Noncash compensation expenses (d) | 11 | 27 |
| Severance expense (e) | 10 | 3 |
| Transition and business optimization costs (f) | 22 | 45 |
| Transaction and merger expenses (g) | 81 | 64 |
| Insurance settlement proceeds (h) | — | (21) |
| Restructuring and other (i) | (14) | 35 |
| Expenses incurred to upgrade or expand a generation station (j) | 100 | 100 |
| **Adjusted EBITDA per Incurrence Covenant** | **$ 3,734** | **$ 4,845** |
| **Add back Oncor adjustments** | **$ 1,123** | **$ (267)** |
| **Adjusted EBITDA per Restricted Payments Covenants** | **$ 4,857** | **$ 4,578** |

(a)   2008 amount includes $1.253 billion distribution of net proceeds from the sale of Oncor noncontrolling interests.

(b)   Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel. Also include certain credits not recognized in net income due to purchase accounting.

(c)   Impairment of assets includes impairments of emission allowances and trade name intangible assets, impairments of land and the natural gas–fueled generation fleet and charges related to the cancelled development of coal–fueled generation facilities.

(d)   Noncash compensation expenses are accounted for under accounting standards related to stock compensation and exclude capitalized amounts.

(e)   Severance expense includes amounts incurred related to outsourcing, restructuring and other amounts deemed to be in excess of normal recurring amounts.

(f)   Transition and business optimization costs include professional fees primarily for retail billing and customer care systems enhancements and incentive compensation.

C–34

EFIHMW00052662

EFIHMW00051935

**Table of Contents**

(g)  Transaction and merger expenses include costs related to the Merger and abandoned strategic transactions, outsourcing transition costs, administrative costs related to the cancelled program to develop coal−fueled generation facilities, the Sponsor Group management fee, costs related to certain growth initiatives and costs related to the Oncor sale of noncontrolling interests.

(h)  Insurance settlement proceeds include the amount received for property damage to certain mining equipment.

(i)  Restructuring and other for 2009 primarily represents reversal of certain liabilities accrued in purchase accounting and recorded as other income, partially offset by restructuring and nonrecurring activities; 2008 includes a litigation accrual, a charge related to the bankruptcy of a subsidiary of Lehman Brothers Holdings Inc., and other restructuring initiatives and nonrecurring activities.

(j)  Expenses incurred to upgrade or expand a generation station reflect noncapital outage costs.

C−35

EFIHMW00052663

EFIHMW00051935

**PX 030**
**Page 729 of 734**

Table of Contents

## CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

There were no changes in or disagreements with accountants on accounting and financial disclosure during EFIH's two most recent fiscal years and each subsequent interim period since the end of the most recent fiscal year.

## MANAGEMENT

### Managers

The names of EFIH's managers and information about them, as furnished by the managers themselves, are set forth below:

| Name | Age | Served As Manager Since | Business Experience |
|------|-----|-------------------------|---------------------|
| Paul M. Keglevic | 56 | 2008 | Paul M. Keglevic has served as a manager of EFIH since July 2008. Mr. Keglevic was elected Executive Vice President and Chief Financial Officer of EFH and EFH Corp. in July 2008 and EFIH Finance in September 2009. Before joining EFH Corp., he was an audit partner at PricewaterhouseCoopers. Mr. Keglevic was PricewaterhouseCoopers Utility Sector Leader from 2002 to 2008 and Clients and Sector Assurance Leader from 2007 to 2008. Mr. Keglevic also serves on the board of EFIH Finance. |
| Jeffrey Liaw | 33 | 2008 | Jeffrey Liaw has served as a manager of EFIH since July 2008. He is active in TPG Capital, L.P.'s (TPG) energy and industrial investing practice areas. Before joining TPG in 2005, he worked for Bain Capital in its industrials practice. Mr. Liaw serves on the boards of both public and private companies, including Graphic Packaging Holding Company, EFH Corp., Oncor Holdings and Oncor. |
| Marc S. Lipschultz | 41 | 2008 | Marc S. Lipschultz has served as a manager of EFIH since July 2008. He joined Kohlberg Kravis Roberts & Co. L.P. (KKR) in 1995 and is the global head of KKR's Energy and Infrastructure business. Mr. Lipschultz serves on KKR's Management Committee and its Infrastructure Investment Committee. Currently, he is also on the boards of Accel–KKR Company, Oncor Holdings, Oncor and EFH Corp. During the past five years, Mr. Lipschultz also served on the boards of Texas Genco Holdings, Inc. and The Boyds Collection, Ltd. |
| Kenneth Pontarelli | 39 | 2010 | Kenneth Pontarelli has served as a manager of EFIH since July 2010. He is a Managing Director of Goldman, Sachs & Co. in its Principal Investment Area. He transferred to the Principal Investment Area in 1999 and was promoted to Managing Director in 2004. Mr. Pontarelli serves as a director of both public and private companies, including CCS, Inc., Cobalt International Energy, L.P., Expro International Group Ltd., CVR Energy, Inc., Kinder Morgan, Inc. and TXU Energy. |
| John F. Young | 53 | 2008 | John F. Young has served as a manager of EFIH since July 2008. Mr. Young was elected President and Chief Executive Officer of EFIH in July 2008, EFH Corp. in January 2008 and EFIH Finance in September 2009. Before joining EFH Corp., Mr. Young served in many leadership roles at Exelon Corporation from March 2003 to January 2008, including Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation; President of Exelon Generation; and President and Chief Operating Officer of Exelon Power. Prior to joining Exelon, Mr. Young was Senior Vice President of Sierra Pacific Resources Corporation. Mr. Young also serves on the boards of EFH Corp., EFIH Finance and Luminant. |

C-36

EFIHMW00052664

EFIHMW00051935

**PX 030**

**Page 730 of 734**

Table of Contents

| Name | Age | Served As Manager Since | Business Experience |
|---|---|---|---|
| James R. Huffines (1) | 59 | 2009 | James R. Huffines has served as a manager of EFIH since November 2009. He is Chairman of the University of Texas System Board of Regents, after previously serving as Vice Chairman from November 2007 to April 2009 and Chairman from June 2004 to November 2007. He also is Chairman, Central and South Texas Region, of PlainsCapital Bank, Senior Executive Vice President of PlainsCapital Corporation, and a director of Andrew Harper Travel Publications, Inc. and PlainsCapital Bank. Mr. Huffines also serves on the boards of EFH Corp. and EFIH Finance. |

(1)  Member of Audit Committee.

### Directors

The names of EFIH Finance's directors and information about them, as furnished by the directors themselves, are set forth below:

| Name | Age | Served As Director Since | Business Experience |
|---|---|---|---|
| Paul M. Keglevic | 56 | 2009 | Paul M. Keglevic has served as a director of EFIH Finance since September 2009. Mr. Keglevic was elected Executive Vice President and Chief Financial Officer of EFIH Finance in September 2009 and EFIH and EFH Corp. in July 2008. Before joining EFH Corp., he was an audit partner at PricewaterhouseCoopers. Mr. Keglevic was PricewaterhouseCoopers Utility Sector Leader from 2002 to 2008 and Clients and Sector Assurance Leader from 2007 to 2008. Mr. Keglevic also serves on the board of EFIH. |
| John F. Young | 53 | 2009 | John F. Young has served as a director of EFIH Finance since September 2009. Mr. Young was elected President and Chief Executive Officer of EFIH Finance in September 2009, EFIH in July 2008 and of EFH Corp. in January 2008. Before joining EFH Corp., Mr. Young served in many leadership roles at Exelon Corporation from March 2003 to January 2008, including Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation; President of Exelon Generation; and President and Chief Operating Officer of Exelon Power. Prior to joining Exelon, Mr. Young was Senior Vice President of Sierra Pacific Resources Corporation. Mr. Young also serves on the boards of EFH Corp., EFIH and Luminant. |
| James R. Huffines (1) | 59 | 2009 | James R. Huffines has served as a director of EFIH since November 2009. He is Chairman of the University of Texas System Board of Regents, after previously serving as Vice Chairman from November 2007 to April 2009 and Chairman from June 2004 to November 2007. He also is Chairman, Central and South Texas Region, of PlainsCapital Bank, Senior Executive Vice President of PlainsCapital Corporation, and a director of Andrew Harper Travel Publications, Inc. and PlainsCapital Bank. Mr. Huffines also serves on the boards of EFH Corp. and EFIH. |

(1)    Member of Audit Committee

C–37

EFIHMW00052665

EFIHMW00051935

Table of Contents
**Executive Officers**

The names of EFIH and EFIH Finance's executive officers and information about them, as furnished by the executive officers themselves, are set forth below (except that each executive officer of EFIH Finance was first elected to such executive officer's office in September 2009 and Mr. Walters is not an executive officer of EFIH Finance).

| Name of Officer | Age | Positions and Offices Presently Held | Date First Elected to Present Offices | Business Experience (Preceding Five Years) |
|---|---|---|---|---|
| John F. Young | 53 | President and Chief Executive Officer | July 2008 | John F. Young was elected President and Chief Executive Officer of EFIH in July 2008. Mr. Young has also served as President and Chief Executive Officer of EFH Corp. since January 2008. Before joining EFH Corp., Mr. Young served in many leadership roles at Exelon Corporation from March 2003 to January 2008, including Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation; President of Exelon Generation; and President and Chief Operating Officer of Exelon Power. Prior to joining Exelon, Mr. Young was Senior Vice President of Sierra Pacific Resources Corporation. |
| Paul M. Keglevic | 56 | Executive Vice President and Chief Financial Officer | July 2008 | Paul M. Keglevic was elected Executive Vice President and Chief Financial Officer of EFIH in July 2008. Mr. Keglevic has also served as Executive Vice President and Chief Financial Officer of EFH Corp. since July 2008. Before joining EFH Corp., he was an audit partner at PricewaterhouseCoopers LLP. Mr. Keglevic was PricewaterhouseCoopers Utility Sector Leader from 2002 to 2008 and Clients and Sector Assurance Leader from 2007 to 2008. |
| Robert C. Walters | 52 | Executive Vice President and General Counsel | July 2008 | Robert C. Walters was elected Executive Vice President and General Counsel of EFIH in July 2008. Mr. Walters has also served as Executive Vice President and General Counsel of EFH Corp. since March 2008. Prior to joining EFH Corp., Mr. Walters was a Partner of Vinson & Elkins L.L.P. (V&E) and served on the firm's management committee. Mr. Walters was co-managing partner of the Dallas office of V&E from 1998 through 2005. |

There is no family relationship between any of the above-named executive officers.

C-38

EFIHMW00052666

EFIHMW00051935

Table of Contents

## EXECUTIVE COMPENSATION

EFIH and EFIH Finance's executive officers are comprised of executive officers of EFIH's parent company, EFH Corp. Consequently, all of EFIH and EFIH Finance's named executive officers are also named executive officers of EFH Corp. All compensation matters, including compensation philosophy, are administered by EFH Corp. As a result, with respect of all executive officers of EFIH and EFIH Finance, please see the executive compensation disclosure set forth under "Executive Compensation" in Annex B included elsewhere in this Prospectus.

## DIRECTOR COMPENSATION

EFIH did not pay any compensation to the members of its current and former board of managers during the fiscal year ended December 31, 2009. EFIH Finance has not paid any compensation to the members of its current and former board of directors since inception. EFIH and EFIH Finance reimburse some managers and directors for certain reasonable expenses incurred in connection with their services as managers or directors, as the case may be.

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

All of EFIH's equity interests are owned by EFH Corp. All of EFIH Finance's equity interests are owned by EFIH.

## COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

Neither EFIH nor EFIH Finance has a compensation committee or other board committee performing equivalent function. As described above, all compensation matters for EFIH and EFIH Finance, including compensation philosophy, are administered by EFH Corp. For a description of the compensation committee interlocks and insider participation of EFH Corp.'s Organization and Compensation Committee, please see the disclosure set forth under "Compensation Committee Interlocks and Insider Participation" in Annex B included elsewhere in this Prospectus.

C–39

EFIHMW00052667

EFIHMW00051935

**PX 030**
**Page 733 of 734**

**Table of Contents**

The Consent and Letter of Transmittal and any other required documents should be sent or delivered by each holder of Old Notes or such holder's broker, dealer, commercial bank, trust company or other nominee to the Exchange Agent at its address or facsimile number set forth below.

*Exchange Agent:*

**Global Bondholder Services Corporation**

| *By Mail, Hand or Overnight Courier:* | *By Facsimile (for Eligible Institutions only):* |
|---|---|
| Global Bondholder Services Corporation<br>Attention: Corporate Actions<br>65 Broadway – Suite 404<br>New York, New York 10006<br>(212) 430–3774 | (212) 430–3775<br>Confirmation:<br>(212) 430–3774 |

Questions and requests for assistance or for additional copies of the exchange offer documents may be directed to the Information Agent at its telephone number and mailing and delivery address listed below. You may also contact your broker, dealer, commercial bank, trust company or other nominee for assistance concerning the exchange offers and consent solicitations.

*Information Agent:*

**Global Bondholder Services Corporation**

65 Broadway – Suite 404
New York, New York 10006
Attention: Corporate Actions

Banks and Brokers: (212) 430–3774
Toll free: (866) 387–1500

*Lead Dealer Managers and Solicitation Agents:*

| **Citigroup Global Markets Inc.** | **Goldman, Sachs & Co.** |
|---|---|
| 390 Greenwich Street, 4th Floor<br>New York, New York 10013<br>Attention: Liability Management Group<br>(800) 558–3745 (toll free)<br>(212) 723–6106 (collect) | 200 West Street, 7th Floor<br>New York, New York 10282–2198<br>Liability Management Group<br>(800) 828–3182 (toll free)<br>(212) 902–5183 (collect) |

EFIHMW00052668

EFIHMW00051935

**PX 030**
**Page 734 of 734**