**OFFERING MEMORANDUM**                                                    **CONFIDENTIAL**

# TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC
# TCEH FINANCE, INC.

$350,000,000
**15% Senior Secured Second Lien Notes due 2021, Series B**

Texas Competitive Electric Holdings Company LLC ("TCEH") and TCEH Finance, Inc. ("TCEH Finance" and, together with TCEH, the "Issuer"), both of which are wholly-owned indirect subsidiaries of Energy Future Holdings Corp. ("EFH Corp."), are offering $350,000,000 aggregate principal amount of their 15% Senior Secured Second Lien Notes due 2021, Series B (the "notes"). The notes will accrue interest at the rate of 15% per annum. Interest on the notes will be payable on January 1, April 1, July 1 and October 1 of each year, commencing on January 1, 2011. The notes will mature on April 1, 2021.

The Issuer may redeem the notes, in whole or in part, beginning on October 1, 2015 at the redemption prices set forth in this offering memorandum. The Issuer may also redeem the notes, in whole or in part, at any time prior to October 1, 2015 at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make-whole" premium. In addition, before October 1, 2013, the Issuer may redeem up to 35% of the aggregate principal amount of the notes using the proceeds from certain equity offerings at the redemption price set forth in this offering memorandum.

The net proceeds from the offering of the notes that are not used to repurchase TCEH 2015/2016 Notes (as defined herein) at the closing of this offering will be deposited into an escrow account and pledged for the benefit of the noteholders on a first-priority basis until the Issuer uses such proceeds to pay, repay or prepay term loans under the TCEH Senior Secured Credit Facilities (as defined herein) and/or repurchase principal amounts outstanding of TCEH 2015/2016 Notes. If proceeds remain in the escrow account on March 31, 2013, an offer to purchase notes with the remaining proceeds will be made.

The notes are senior obligations of the Issuer and rank equally in right of payment with all existing and future senior debt of the Issuer. The notes are guaranteed (the "guarantees") on a senior basis, jointly and severally, by Energy Future Competitive Holdings Company ("EFCH"), TCEH's direct parent, and each subsidiary of TCEH that guarantees the TCEH Senior Secured Credit Facilities (as defined herein) (the "subsidiary guarantors" and, together with EFCH, the "guarantors"). The guarantees rank equally in right of payment with all existing and future senior debt of the guarantors. The notes are secured equally and ratably with the TCEH Existing Second Lien Notes on a second-priority basis by security interests in all of the assets of the Issuer, and the guarantees (other than the guarantee of EFCH) are secured equally and ratably with the guarantees of the TCEH Existing Second Lien Notes on a second-priority basis by all of the assets and equity interests of the subsidiary guarantors, in each case, to the extent such assets and equity interests secure obligations under the TCEH Senior Secured Credit Facilities, subject to certain important exceptions (the "Collateral"). The Issuer and the subsidiary guarantors may incur additional debt secured by the Collateral on a first-priority basis or on a second-priority basis equally and ratably with the notes and the guarantees.

The notes and the guarantees are both effectively subordinated to the Issuer's and the guarantors' existing and future debt that is secured by the Collateral on a first-priority basis, including the first-priority liens securing the TCEH Senior Secured Credit Facilities, to the extent of the value of the Collateral, and to the Issuer's and the guarantors' existing and future debt that is secured by assets that are not part of the Collateral, to the extent of the value of such assets. As of June 30, 2010, approximately $22.036 billion of outstanding debt of TCEH was secured by the Collateral on a first-priority basis, and TCEH had approximately $1.88 billion of additional available debt capacity under the TCEH Senior Secured Credit Facilities, which additional debt, if incurred, could be secured by the Collateral on a first-priority basis. The notes and the guarantees are structurally subordinated to all existing and future senior debt and other liabilities of the subsidiaries of TCEH (other than TCEH Finance) that do not guarantee the notes. The notes and the subsidiary guarantors' guarantees are effectively senior to all unsecured debt of the Issuer and the subsidiary guarantors to the extent of the value of the Collateral (after taking into consideration the obligations secured by the Collateral on a first-priority basis). The notes and the guarantees will be senior in right of payment to any future subordinated debt of the Issuer and the guarantors, respectively. The effective ranking of the notes, including the benefits of the guarantees and the Collateral, is subject to risks arising under fraudulent conveyance laws. See "Risk Factors — Risks Related to Fraudulent Conveyance Laws."

On October 6, 2010, the Issuer issued $335,905,000 aggregate principal amount of 15% Senior Secured Second Lien Notes due 2015 (the "TCEH Existing Second Lien Notes"). The notes will constitute a new series of senior notes but will be treated as a single class with the TCEH Existing Second Lien Notes for voting purposes with respect to amendments and waivers and for taking certain other actions.

The notes offered hereby and the guarantees have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), and may not be offered or sold within the United States (the "U.S.") or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. Accordingly, the notes are being offered and sold only (a) to "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) and (b) outside the U.S. to non-U.S. persons in compliance with Regulation S under the Securities Act. For details about eligible offers, deemed representations and agreements by investors and transfer restrictions, see "Notice to Investors."

Under certain circumstances, the Issuer and the guarantors have agreed to file a registration statement with the United States Securities and Exchange Commission (the "SEC") relating to an offer to exchange the notes for publicly tradable notes having substantially identical terms.

**Investing in the notes involves risk. See "Risk Factors" beginning on page 17 as well as those contained in EFH's Annual Report on Form 10-K for the fiscal year ended December 31, 2009 (the "EFCH 2009 Form 10-K") and EFCH's Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2010 (the "EFCH June 30, 2010 Form 10-Q"), each of which is incorporated into this offering memorandum by reference, for a discussion of certain risks that you should consider before investing in the notes.**

**Price for notes: 100% plus accrued interest, if any, from October 20, 2010.**

The initial purchasers expect to deliver book-entry interests in the notes to purchasers on or about October 20, 2010 through the facilities of The Depository Trust Company ("DTC").

*Joint Book-Running Managers*

**Citi**        **J.P. Morgan**        **Goldman, Sachs & Co.**        **Credit Suisse**

*Co-Managers*

**BofA Merrill Lynch**                                                        **Morgan Stanley**

October 15, 2010

**We have not, and the initial purchasers or their affiliates have not, authorized anyone to give you any information or to make any representation not contained in or incorporated by reference into this offering memorandum. We do not, and the initial purchasers and their affiliates do not, take any responsibility for, and can provide no assurance as to the reliability of, any information that others may give you. No offer of these securities is being made in any jurisdiction where any such offer is prohibited. The information contained in or incorporated by reference into this offering memorandum is only accurate as of the date of this offering memorandum or such incorporated information.**

### TABLE OF CONTENTS

| | |
|---|---:|
| FINANCIAL INFORMATION OF TCEH | iv |
| SECURITIES AND EXCHANGE COMMISSION REVIEW | iv |
| INDUSTRY AND MARKET INFORMATION | v |
| FORWARD-LOOKING STATEMENTS | vi |
| SUMMARY | 1 |
| RISK FACTORS | 17 |
| THE TRANSACTIONS | 35 |
| USE OF PROCEEDS | 38 |
| CAPITALIZATION | 39 |
| DESCRIPTION OF THE NOTES | 41 |
| EXCHANGE OFFER; REGISTRATION RIGHTS | 125 |
| NOTICE TO INVESTORS | 127 |
| BOOK ENTRY; DELIVERY AND FORM | 130 |
| CERTAIN UNITED STATES FEDERAL TAX CONSEQUENCES | 135 |
| CERTAIN ERISA CONSIDERATIONS | 140 |
| PLAN OF DISTRIBUTION | 142 |
| LEGAL MATTERS | 146 |
| INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | 147 |
| AVAILABLE INFORMATION | 148 |
| INCORPORATION BY REFERENCE | 148 |

---

The Issuer is making this offering and will sell the notes in reliance upon an exemption from registration under the Securities Act for offers and sales of securities that do not involve a public offering.

This offering memorandum is confidential. This offering memorandum has been prepared by the Issuer and the guarantors solely for use in connection with the proposed offering of the notes. This offering memorandum is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire securities. You are authorized to use this offering memorandum solely for the purpose of considering the purchase of the notes. Distribution of this offering memorandum to any person other than the prospective investor and any person retained to advise such prospective investor with respect to its purchase is unauthorized, and any disclosure of any of its contents without the prior written consent of the Issuer is prohibited. Each prospective investor, by accepting delivery of this offering memorandum, agrees to the foregoing and to make no photocopies of this offering memorandum or any documents referred to herein.

The initial purchasers make no representation or warranty, express or implied, as to the accuracy or completeness of the information contained in or incorporated by reference into this offering memorandum. Nothing contained in or incorporated by reference into this offering memorandum is, or should be relied upon as, a promise or representation by the initial purchasers as to the past or future. The initial purchasers have not independently verified any of the information contained in or incorporated by reference into this offering memorandum (financial, legal or otherwise) and assume no responsibility for the accuracy or completeness of any such information.

i

EFIHMW00079439

Neither the SEC, any state securities commission nor any other regulatory authority has approved or disapproved the securities nor have any of the foregoing authorities passed upon or endorsed the merits of this offering or the accuracy or adequacy of this offering memorandum. Any representation to the contrary is a criminal offense.

The notes are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and the applicable securities laws of any state or other jurisdiction pursuant to registration or exemption from registration. As a prospective purchaser, you should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time. For additional information, see "Notice to Investors" and "Plan of Distribution."

In making any investment decision, prospective investors must rely on their own examination of the Issuer and the guarantors and the terms of this offering, including the merits and risks involved. See "Risk Factors." Prospective investors should not construe anything contained in or incorporated by reference into this offering memorandum as legal, business or tax advice. Each prospective investor should consult its own advisors as needed to make its investment decision and to determine whether it is legally permitted to purchase the notes under applicable legal investment or similar laws or regulations.

Each prospective investor must comply with all applicable laws and regulations in force in any jurisdiction in which it purchases, offers or sells notes or possesses or distributes this offering memorandum and must obtain any consent, approval or permission required by it for the purchase, offer or sale by it of the notes under the laws and regulations in force in any jurisdiction to which it is subject or in which it makes such purchases, offers or sales, and neither we nor the initial purchasers nor any of our or their respective representatives shall have any responsibility therefor.

Some of the initial purchasers participating in this offering may engage in transactions that stabilize, maintain or otherwise affect the price of the notes, including over-allotment, stabilizing and short-covering transactions in the notes, and the imposition of a penalty bid during and after this offering. Such stabilization, if commenced, may be discontinued at any time without notice. For a description of some of these activities, see "Plan of Distribution."

This offering memorandum contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents for complete information. All such summaries are qualified in their entirety by such reference. Copies of documents referred to herein will be made available to prospective investors upon request to the Issuer. See "Available Information."

Each person receiving this offering memorandum acknowledges that (1) it has reviewed all information contained in or incorporated into this offering memorandum by reference considered by it to be necessary to make an investment decision, (2) it has been afforded an opportunity to request and to review, and it has received, all additional information considered by it to be necessary to verify the accuracy of or to supplement the information contained in or incorporated by reference into this offering memorandum, (3) it has not relied upon the initial purchasers or any person affiliated with the initial purchasers in connection with its investigation of the accuracy of such information or its investment decision, (4) this offering memorandum relates to an offering that is exempt from registration under the Securities Act and may not comply in important respects with SEC rules that would apply to an offering document relating to a public offering of securities and (5) no person has been authorized to give information or to make any representation concerning us, this offering or the notes, other than as contained in or incorporated by reference into this offering memorandum, in connection with an investor's examination of the Issuer and the guarantors and the terms of the offering contemplated by this offering memorandum.

Unless the context otherwise requires or as otherwise indicated, references in this offering memorandum to:

• "we," "our" and "us" are to Texas Competitive Electric Holdings Company LLC and its consolidated subsidiaries;

ii

EFIHMW00079440

PX 042
Page 3 of 157

- "2017 Notes" are to, collectively, the EFH Corp. 10.875% Senior Notes due 2017 and the EFH Corp. 11.250%/12.000% Senior Toggle Notes due 2017;

- "EFCH" are to Energy Future Competitive Holdings Company and not to any of its subsidiaries;

- "EFCH 2009 Form 10-K" are to EFCH's Annual Report on Form 10-K for the year ended December 31, 2009 that it filed with the SEC on February 19, 2010;

- "EFCH June 30, 2010 Form 10-Q" are to EFCH's Quarterly Report on Form 10-Q for the quarter ended June 30, 2010 that it filed with the SEC on August 3, 2010;

- "EFH Corp." are to Energy Future Holdings Corp. and not to any of its subsidiaries;

- "EFH Corp. 9.75% Notes" are to the EFH Corp. 9.75% Senior Secured Notes due 2019;

- "EFH Corp. 10.000% Notes" are to the EFH Corp. 10.000% Senior Secured Notes due 2020;

- "EFIH" are to Energy Future Intermediate Holding Company LLC and not to any of its subsidiaries;

- "EFIH 9.75% Notes" are to the EFIH and EFIH Finance Inc. ("EFIH Finance") 9.75% Senior Secured Notes due 2019;

- "EFIH 10.000% Notes" are to the EFIH and EFIH Finance 10.000% Senior Secured Notes due 2020;

- the "Issuer" are to TCEH and TCEH Finance, collectively, and not to any of their respective subsidiaries;

- "Legacy Notes" are to, collectively, the EFH Corp. 5.55% Series P Senior Notes due November 15, 2014, the EFH Corp. 6.50% Series Q Senior Notes due November 15, 2024 and the EFH Corp. 6.55% Series R Senior Notes due November 15, 2034;

- "Merger" means the merger of Merger Sub (as defined herein) with and into EFH Corp., which occurred on October 10, 2007 as described in "The Transactions";

- "Merger Sub" means Texas Energy Future Merger Sub Corp.;

- "Oncor Holdings" and "Oncor" are to Oncor Electric Delivery Holdings Company LLC and Oncor Electric Delivery Company LLC, respectively, with or without their subsidiaries as indicated in context;

- "TCEH" and "TCEH Finance" are to Texas Competitive Electric Holdings Company LLC and TCEH Finance, Inc., respectively, and not to any of their respective subsidiaries;

- "TCEH 2015/2016 Notes" are to, collectively, the Issuer's 10.25% Senior Notes due 2015, the Issuer's 10.25% Senior Notes due 2015, Series B, and the Issuer's 10.50%/11.25% Senior Toggle Notes due 2016;

- "TCEH Existing Second Lien Notes" are to the Issuer's 15% Senior Secured Second Lien Notes due 2021 issued pursuant to the Indenture, dated as of October 6, 2010, among the Issuer, the guarantors and the trustee as described in "Summary — Recent Developments — Recent Private Debt Exchange Transaction"; and

- "TCEH Senior Secured Credit Facilities" are to the credit facilities under the Credit Agreement, dated as of October 10, 2007, as amended on August 7, 2009, by and among EFCH, as guarantor, TCEH, as borrower, the lenders party thereto in their capacities as lenders thereunder and Citibank, N.A., as Administrative Agent, which consist of:

    (a)  a $16.45 billion senior secured initial term loan facility of TCEH;

    (b)  a $4.1 billion senior secured delayed draw term loan facility of TCEH;

    (c)  a $1.25 billion senior secured letter of credit facility of TCEH;

    (d)  a $2.7 billion senior secured revolving credit facility of TCEH; and

    (e)  a senior secured cash posting credit facility of TCEH.

iii

EFIHMW00079441

### NOTICE TO NEW HAMPSHIRE RESIDENTS ONLY

**NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ("RSA") WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE IMPLIES THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT ANY EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.**

### FINANCIAL INFORMATION OF TCEH

EFCH, a direct, wholly-owned subsidiary of EFH Corp., is a Dallas-based holding company that conducts its operations almost entirely through its wholly-owned subsidiary, TCEH. Consistent with the requirements of the indentures governing the TCEH 2015/2016 Notes and the rules and regulations of the SEC, TCEH satisfies its obligation under the indenture governing the TCEH 2015/2016 Notes to provide annual, quarterly and current reports and other reports that TCEH would be required to file with the SEC if it were subject to Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, through the filing with the SEC of such reports by EFCH, which is the direct parent of TCEH, a guarantor of the TCEH Senior Secured Credit Facilities, a guarantor of the TCEH 2015/2016 Notes, a guarantor of the TCEH Existing Second Lien Notes and a guarantor of the notes. This offering memorandum includes and incorporates by reference certain filings that EFCH has made with the SEC, including EFCH consolidated financial statements, as described in "Incorporation by Reference." This offering memorandum does not include or incorporate by reference any financial statements of TCEH.

### SECURITIES AND EXCHANGE COMMISSION REVIEW

The information in this offering memorandum relates to an offering that is exempt from registration under the Securities Act. The Issuer and the guarantors will agree to file under certain limited circumstances one or more registration statements with the SEC with respect to (1) a registered offer to exchange the notes for new exchange notes (the "exchange notes") having terms substantially identical in all material respects to the notes exchanged therefor (except that the exchange notes will not contain terms with respect to additional interest or transfer restrictions) or (2) resales of the notes. See "Exchange Offer; Registration Rights." In the course of the review by the SEC of any such registration statement and other filings the Issuer and the guarantors may make with the SEC, the Issuer and the guarantors may be required or may elect to make changes to the description of their business, financial statements and other information in those documents and filings. The Issuer and the guarantors believe that their financial statements and other financial data included in or incorporated by reference into this offering memorandum have been prepared in a manner that complies, in all material respects, with the regulations published by the SEC and are consistent with current practice.

iv

EFIHMW00079442

**PX 042
Page 5 of 157**

## INDUSTRY AND MARKET INFORMATION

The industry and market data and other statistical information used throughout this offering memorandum or incorporated by reference herein are based on independent industry publications, government publications, reports by market research firms or other published independent sources, including certain data published by the Electric Reliability Council of Texas, Inc. ("ERCOT") and the Public Utility Commission of Texas (the "PUCT"). We did not commission any of these publications or reports. Some data is also based on good faith estimates, which are derived from our review of internal surveys, as well as the independent sources listed above. Independent industry publications and surveys generally state that they have obtained information from sources believed to be reliable but do not guarantee the accuracy and completeness of such information. While we believe that each of these studies and publications is reliable, we have not independently verified such data and make no representation as to the accuracy of such information. Forecasts are particularly likely to be inaccurate, especially over long periods of time, and we do not know what assumptions regarding general economic growth are used in preparing the forecasts included in this offering memorandum, including the information incorporated into this offering memorandum by reference. Similarly, while we believe that such internal and external research is reliable, it has not been verified by any independent sources, and we make no assurances that the predictions contained therein are accurate.

v

EFIHMW00079443

**PX 042**
**Page 6 of 157**

## FORWARD-LOOKING STATEMENTS

This offering memorandum, including the information incorporated by reference into this offering memorandum, contains "forward-looking statements." All statements, other than statements of historical facts, that are included in this offering memorandum, or that are incorporated into this offering memorandum by reference or made in presentations, in response to questions or otherwise, that address activities, events or developments that the Issuer and/or the guarantors expect or anticipate to occur in the future, including such matters as projections, capital allocation, future capital expenditures, business strategy, competitive strengths, goals, future acquisitions or dispositions, development or operation of power generation assets, market and industry developments and the growth of their respective businesses and operations (often, but not always, through the use of words or phrases such as "intends," "plans," "will likely result," "are expected to," "will continue," "is anticipated," "estimated," "should," "projection," "target," "goal," "objective" and "outlook"), are forward-looking statements. Although we believe that in making any such forward-looking statement our expectations are based on reasonable assumptions, any such forward-looking statement involves uncertainties and is qualified in its entirety by reference to the discussion of risk factors under "Risk Factors" contained elsewhere in this offering memorandum and in the "Risk Factors" sections of the EFCH 2009 Form 10-K and the EFCH June 30, 2010 Form 10-Q, which are incorporated by reference into this offering memorandum, and the following important factors, among others, that could cause our actual results to differ materially from those projected in such forward-looking statements:

- prevailing governmental policies and regulatory actions, including those of the Texas Legislature, the Governor of Texas, the Congress of the United States of America, the United States Federal Energy Regulatory Commission ("FERC"), the North American Electric Reliability Corporation (the "NERC"), the Texas Reliability Entity (the "TRE"), the PUCT, ERCOT, the Railroad Commission of Texas (the "RRC"), the United States Nuclear Regulatory Commission (the "NRC"), the United States Environmental Protection Agency (the "EPA"), the Texas Commission on Environmental Quality (the "TCEQ") and the Commodities Futures Trading Commission (the "CFTC"), with respect to, among other things:

- allowed prices;

- industry, market and rate structure;

- purchased power and recovery of investments;

- operations of nuclear generating facilities;

- operations of fossil-fueled generating facilities;

- operations of mines;

- acquisitions and disposal of assets and facilities;

- development, construction and operation of facilities;

- decommissioning costs;

- present or prospective wholesale and retail competition;

- changes in tax laws and policies;

- changes in and compliance with environmental and safety laws and policies, including climate change initiatives; and

- clearing over the counter derivatives through exchanges and posting of cash collateral therewith;

- legal and administrative proceedings and settlements;

- general industry trends;

- economic conditions, including the impact of a recessionary environment;

- our ability to attract and retain profitable customers;

- our ability to profitably serve our customers;

Highly Confidential

- restrictions on competitive retail pricing;
- changes in wholesale electricity prices or energy commodity prices;
- changes in prices of, or changes in prices of transportation of, natural gas, coal, crude oil and refined products;
- unanticipated changes in market heat rates in the ERCOT electricity market;
- our ability to effectively hedge against changes in commodity prices, market heat rates and interest rates;
- weather conditions and other natural phenomena, and acts of sabotage, wars or terrorist activities;
- unanticipated population growth or decline, or changes in market demand and demographic patterns, particularly in ERCOT;
- changes in business strategy, development plans or vendor relationships;
- access to adequate transmission facilities to meet changing demands;
- unanticipated changes in interest rates, commodity prices, rates of inflation or foreign exchange rates;
- unanticipated changes in operating expenses, liquidity needs and capital expenditures;
- commercial bank market and capital market conditions and the potential impact of disruptions in U.S. and international credit markets;
- access to capital, the cost of such capital, and the results of financing and refinancing efforts, including availability of funds in capital markets;
- financial restrictions placed on us by the agreements governing our or EFH Corp.'s debt instruments;
- our ability to generate sufficient cash flow to make interest payments on our debt instruments;
- competition for new energy development and other business opportunities;
- inability of various counterparties to meet their obligations with respect to our financial instruments;
- changes in technology used by and services offered by us;
- changes in electricity transmission that allow additional electricity generation to compete with our generation assets;
- significant changes in our relationship with our employees, including the availability of qualified personnel, and the potential adverse effects if labor disputes or grievances were to occur;
- changes in assumptions used to estimate costs of providing employee benefits, including pension benefits and other postretirement employee benefits ("OPEB"), and future funding requirements related thereto;
- changes in assumptions used to estimate future executive compensation payments;
- hazards customary to the industry and the possibility that we may not have adequate insurance to cover losses resulting from such hazards;
- significant changes in critical accounting policies;
- actions by credit rating agencies;
- our ability to effectively execute our operational strategy; and
- our ability to implement cost reduction initiatives.

Any forward-looking statement speaks only as of the date on which it is made, and except as may be required by applicable law, we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which it is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for us to predict all of them; nor can we assess the impact of each such factor or the extent to which any factor, or combination of factors, may cause results to differ materially from those contained in any forward-looking statement. As such, you should not unduly rely on such forward-looking statements.

vii

Highly Confidential

# SUMMARY

*This summary highlights selected information appearing elsewhere in or incorporated by reference into this offering memorandum. This summary is not complete and does not contain all of the information that you should consider before investing in the notes. You should carefully read this summary together with the entire offering memorandum, including the information set forth in the section entitled "Risk Factors" in this offering memorandum, in the EFCH 2009 Form 10-K and in the EFCH June 30, 2010 Form 10-Q and the other information that is included in and incorporated by reference into this offering memorandum. See the sections entitled "Available Information" and "Incorporation by Reference" for a further discussion on incorporation by reference.*

*Investment funds associated with or designated by Kohlberg Kravis Roberts & Co. ("KKR"), TPG Capital, L.P. ("TPG") and Goldman, Sachs & Co. ("Goldman Sachs" and, together with KKR and TPG, the "Sponsor Group"), and certain other co-investors (collectively with the Sponsor Group, the "Investors"), own EFH Corp. through Texas Energy Future Holdings Limited Partnership ("Texas Holdings"), with the Sponsor Group controlling Texas Holdings' general partner, Texas Energy Future Capital Holdings LLC. EFCH is a wholly-owned subsidiary of EFH Corp., TCEH is a wholly-owned subsidiary of EFCH, and TCEH Finance is a wholly-owned subsidiary of TCEH.*

## Our Business

TCEH is a Dallas-based holding company for subsidiaries engaged in competitive electricity market activities largely in Texas, including electricity generation, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales. For purposes of operational accountability, performance management and market identity, operations of TCEH have been grouped into Luminant, engaged in electricity generation and wholesale markets activities, and TXU Energy, engaged in retail electricity sales activities. These activities are conducted through separate legal entities.

As of June 30, 2010, TCEH owned or leased 17,519 megawatts ("MW") of generation capacity in Texas, which consists of lignite/coal, nuclear and natural gas-fueled generation facilities. This amount includes two new lignite-fueled units (Sandow 5 and Oak Grove 1) that achieved substantial completion (as defined in the engineering, procurement and construction ("EPC") agreements for the units) in fall of 2009 but does not include one new approximately 800 MW lignite-fueled unit (Oak Grove 2) that achieved substantial completion (as defined in the EPC agreement for the unit) in June 2010. In addition, TCEH is the largest purchaser of wind-generated electricity in Texas and the fifth largest in the United States. TCEH provides competitive electricity and related services to more than two million retail electricity customers in Texas.

TCEH has no employees. At June 30, 2010, TCEH's subsidiaries collectively had approximately 4,950 full-time employees, including approximately 2,040 employees under collective bargaining agreements.

## Recent Developments

**Selected Preliminary Financial Data for the Quarterly Period Ended September 30, 2010**

Management of EFCH and TCEH (collectively, the "Companies") have prepared the selected preliminary financial data below in good faith based upon the most current information available to management. The Companies' normal quarterly closing and financial reporting processes with respect to such preliminary financial data have not been fully completed. As a result, the actual financial results could be different from such preliminary financial data, and any differences could be material. EFCH's independent accountants have not performed their customary review procedures with respect to the preliminary financial data provided below, nor have they expressed any opinion or any other form of assurance on such information.

1

EFIHMW00079446

**PX 042**
**Page 9 of 157**

While the financial data provided is preliminary and subject to change, EFCH does not expect actual operating revenues for the three months ended September 30, 2010 to be different by more than 5% from the preliminary amount provided below. EFCH also does not expect actual net income (loss), excluding a preliminary approximately $4.1 billion non-cash goodwill impairment charge, and TCEH adjusted EBITDA for the three months ended September 30, 2010 to be different by more than 10% and 5%, respectively, from the preliminary amounts provided below.

The preliminary financial data below has been prepared on a basis consistent with EFCH's historical condensed consolidated financial statements for the three and six months ended June 30, 2010 included in the EFCH June 30, 2010 Form 10-Q, which is incorporated into this offering memorandum by reference. The results of operations for an interim period, including the preliminary interim financial data provided below, may not give a true indication of the results to be expected for a full year or any future period.

*EFCH Preliminary Financial Data*

Selected preliminary financial data for EFCH for the three months ended September 30, 2010 and actual financial data for the three months ended September 30, 2009 (amounts in millions) are provided in the table below:

| | Three Months Ended | |
| --- | --- | --- |
| | September 30, 2010 (Preliminary) | September 30, 2009 |
| Operating revenues | $ 2,607 | $2,433 |
| Net income (loss) | $(3,727) | $   (72) |
| TCEH adjusted EBITDA | $ 1,150 | $1,108 |

Preliminary TCEH adjusted EBITDA for the twelve months ended September 30, 2010 totaled $3,916 million. Actual TCEH adjusted EBITDA for the twelve months ended September 30, 2009 totaled $3,559 million.

Preliminary net income (loss) includes a preliminary approximately $4.1 billion non-cash goodwill impairment charge. Remaining goodwill after the charge is expected to total approximately $6.2 billion. The charge is not deductible for income tax purposes. The goodwill impairment charge reflects the estimated effect of lower wholesale power prices on the value of TCEH, driven by the sustained decline in forward natural gas prices, as indicated by EFCH's cash flow projections and declines in market values of securities of comparable companies.

As shown (in millions) in the table below, EFCH's available liquidity at September 30, 2010 totaled $3.1 billion as compared to $2.3 billion at December 31, 2009.

| | September 30, 2010 (Preliminary) | December 31, 2009 | Change |
| --- | --- | --- | --- |
| Cash and cash equivalents | $   78 | $   94 | $(16) |
| TCEH Revolving Credit Facility (a) | 2,620 | 1,721 | 899 |
| TCEH Letter of Credit Facility | 410 | 399 | 11 |
| Subtotal | $3,108 | $2,214 | $894 |
| Short-term investment (b) | — | 65 | (65) |
| Total liquidity | $3,108 | $2,279 | $829 |

(a) As of September 30, 2010 and December 31, 2009, the TCEH Revolving Credit Facility includes $229 million and $141 million, respectively, of commitments from an affiliate of Lehman Brothers

2

EFIHMW00079447

PX 042
Page 10 of 157

Holdings Inc. that is currently in bankruptcy that are only available from the fronting banks and the swingline lender.

(b) December 31, 2009 amount includes $65 million in letters of credit posted related to certain interest rate transactions. Pursuant to the related agreement, the collateral was returned in March 2010.

Set forth below is a reconciliation (amounts in millions) of net income (loss) to EBITDA and then to TCEH adjusted EBITDA for the three and twelve months ended September 30, 2010 (preliminary) and 2009 (actual). For more information on EBITDA and adjusted EBITDA and why management believes adjusted EBITDA is a useful measure, see note (a) below.

| | Three Months Ended September 30, 2010 | Three Months Ended September 30, 2009 | Twelve Months Ended September 30, 2010 | Twelve Months Ended September 30, 2009 |
|---|---|---|---|---|
| **Net income (loss)** | $(3,690) | $ (25) | $(3,430) | $(7,559) |
| **Income tax expense (benefit)** | 214 | (11) | 377 | 343 |
| **Interest expense and related charges** | 852 | 770 | 3,017 | 3,492 |
| **Depreciation and amortization** | 345 | 303 | 1,337 | 1,127 |
| **EBITDA (a)** | $(2,279) | $1,037 | $ 1,301 | $(2,597) |
| Interest income | (23) | (21) | (89) | (55) |
| Amortization of nuclear fuel | 38 | 27 | 139 | 97 |
| Purchase accounting adjustments (b) | 33 | 63 | 186 | 343 |
| Impairment of goodwill | 4,100 | — | 4,100 | 8,070 |
| Impairment of assets and inventory write down (c) | — | 2 | 38 | 710 |
| EBITDA amount attributable to consolidated unrestricted subsidiaries | — | 1 | — | 3 |
| Unrealized net gain resulting from hedging transactions | (767) | (3) | (2,127) | (3,263) |
| Amortization of "day one" net loss on Sandow 5 power purchase agreement | (9) | (7) | (22) | (7) |
| Corporate depreciation, interest and income tax expenses included in SG&A expense | 4 | 5 | 9 | 5 |
| Losses on sale of receivables | — | 2 | 3 | 17 |
| Noncash compensation expense (d) | — | (3) | 11 | 3 |
| Severance expense (e) | — | 1 | 4 | 10 |
| Transition and business optimization costs (f) | 1 | 3 | 6 | 26 |
| Transaction and merger expenses (g) | 11 | 1 | 31 | 12 |
| Insurance settlement proceeds (h) | — | — | — | (21) |
| Restructuring and other (i) | — | (22) | (4) | (15) |
| Expenses incurred to upgrade or expand a generation station (j) | — | — | 100 | 100 |
| **Adjusted EBITDA per Incurrence Covenant** | $ 1,109 | $1,086 | $ 3,686 | $ 3,438 |
| Expenses related to unplanned generation station outages | 31 | 13 | 152 | 93 |
| Pro forma adjustment for Sandow 5 and Oak Grove 1 reaching 70% capacity in Q1 2010 (k) | — | — | 42 | — |
| Other adjustments allowed to determine Adjusted EBITDA per Maintenance Covenant (l) | 10 | 9 | 36 | 28 |
| **Adjusted EBITDA per Maintenance Covenant** | $ 1,150 | $1,108 | $ 3,916 | $ 3,559 |

3

EFIHMW00079448

---

(a) EBITDA refers to earnings (net income) before interest expense, income taxes, depreciation and amortization. Adjusted EBITDA refers to EBITDA adjusted to exclude non-cash items, unusual items and other adjustments allowable under certain of TCEH's debt arrangements. Adjusted EBITDA and EBITDA are not recognized terms under generally accepted accounting principles ("GAAP") and, thus, are non-GAAP financial measures. EFCH is providing TCEH's adjusted EBITDA solely because of the important role that it plays in respect of the certain covenants contained in its debt arrangements. EFCH does not intend for adjusted EBITDA (or EBITDA) to be an alternative to net income as a measure of operating performance or an alternative to cash flows from operating activities as a measure of liquidity or an alternative to any other measure of financial performance presented in accordance with GAAP. Additionally, EFCH does not intend for adjusted EBITDA (or EBITDA) to be used as a measure of free cash flow available for management's discretionary use, as the measure excludes certain cash requirements such as interest payments, tax payments and other debt service requirements. Because not all companies use identical calculations, EFCH's presentation of adjusted EBITDA (and EBITDA) may not be comparable to similarly titled measures of other companies.

(b) Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel. Also include certain credits not recognized in net income due to purchase accounting.

(c) Impairment of assets includes impairment of trade name intangible asset and impairment of land and the natural gas-fueled generation fleet.

(d) Noncash compensation expenses are accounted for under accounting standards related to stock compensation and exclude capitalized amounts.

(e) Severance expense includes amounts incurred related to outsourcing, restructuring and other amounts deemed to be in excess of normal recurring amounts.

(f) Transition and business optimization costs include professional fees primarily for retail billing and customer care systems enhancements and incentive compensation.

(g) Transaction and merger expenses include costs related to the Merger, outsourcing transition costs and costs related to certain growth initiatives.

(h) Insurance settlement proceeds include the amount received for property damage to certain mining equipment.

(i) Restructuring and other for the twelve months ended September 30, 2010 includes restructuring and nonrecurring activities, and for the twelve months ended September 30, 2009 primarily represents reversal of certain liabilities accrued in purchase accounting and recorded as other income, partially offset by restructuring and nonrecurring activities.

(j) Expenses incurred to upgrade or expand a generation station reflect noncapital outage costs.

(k) Pro forma adjustment represents the annualization of the actual nine months ended September 30, 2010 EBITDA results for these two units.

(l) Primarily pre-operating expenses relating to Oak Grove 2.

**Recent Private Debt Exchange Transaction**

On October 6, 2010, the Issuer completed a private exchange transaction with certain trusts and accounts managed by an institutional investor (collectively, the "Exchange Holder"). In the exchange, the Issuer issued approximately $336 million aggregate principal amount of TCEH Existing Second Lien Notes in exchange for the surrender by the Exchange Holder of approximately $478 million aggregate principal amount of TCEH 2015/2016 Notes. The TCEH 2015/2016 Notes surrendered by the Exchange Holder have been retired and

4

EFIHMW00079449

canceled. The notes will constitute a new series of senior notes but will be treated as a single class with the TCEH Existing Second Lien Notes for amendments and waivers and for taking certain other actions. See "Description of the Notes." For more information on this transaction see EFCH's Current Report on Form 8-K filed with the SEC on October 8, 2010, which is incorporated by reference into this offering memorandum.

**Recent Exchange Offer and Consent Solicitation**

In August 2010, EFIH and EFIH Finance completed an exchange offer (the "Exchange Offer") pursuant to which they issued $2.180 billion aggregate principal amount of EFIH 10.000% Notes and paid approximately $500 million in cash in exchange for $3.594 billion aggregate principal amount of 2017 Notes, which are guaranteed by EFCH and EFIH. The notes accepted for exchange remain outstanding and are held by EFIH. In connection with the Exchange Offer, EFH Corp. received the requisite consents from holders of the 2017 Notes to adopt, and executed a supplemental indenture in connection therewith to effectuate, certain amendments to the indenture that governs the 2017 Notes. These amendments, among other things, eliminated substantially all of the restrictive covenants related to the 2017 Notes, eliminated certain events of default, modified covenants regarding mergers and consolidations, and modified or eliminated certain other provisions.

**Sierra Club Lawsuit**

In September 2010, the Sierra Club sued EFH Corp. and Luminant Generation Company LLC (a wholly-owned subsidiary of TCEH) under the Clean Air Act (the "CAA") in the United States District Court for the Eastern District of Texas (Texarkana Division) for alleged violations of the CAA at Luminant's Martin Lake generation facility. As previously disclosed, in July 2008, the Sierra Club gave Luminant notice of its intention to sue. While we are unable to estimate any possible loss or predict the outcome of the litigation, we believe that the Sierra Club's claims are without merit, and we intend to vigorously defend this litigation.

**Additional Information**

TCEH was formed in Delaware in 2001, and TCEH Finance was incorporated in Delaware in 2007. Our principal executive offices are located at Energy Plaza, 1601 Bryan Street, Dallas, TX 75201-3411. The telephone number of our principal executive offices is (214) 812-4600. Information about TCEH can be found on EFH Corp.'s website, which is located at *http://www.energyfutureholdings.com*. Information on or connected to EFH Corp.'s website does not constitute part of this offering memorandum.

Highly Confidential

EFIHMW00079450

**PX 042**
**Page 13 of 157**

## Organizational Structure

The chart below is a summary of EFH Corp.'s organizational and ownership structure and illustrates EFH Corp.'s and certain of its subsidiaries' long-term debt as of June 30, 2010, after giving effect to the Exchange Offer described in "Recent Developments — Recent Exchange Offer and Consent Solicitation" and other repurchases and exchanges of EFH Corp.'s and its subsidiaries' debt since June 30, 2010 described under "Debt Related Activity in 2010 — 2010 EFH Corp. Debt Exchanges and Repurchases" in Note 4 to EFCH's unaudited financial statements included in the EFCH June 30, 2010 Form 10-Q, which is incorporated into this offering memorandum by reference, and under "Recent Developments — Recent Private Debt Exchange Transaction." TCEH debt reflected below include the amounts of TCEH 2015/2016 Notes and TCEH Senior Secured Credited Facility debt acquired and held by EFH Corp. and EFIH. Please see "Capitalization" for further information regarding our outstanding debt amounts after giving effect to the issuance of the notes. The chart below excludes certain subsidiaries of EFH Corp. that are not subsidiaries of EFCH, including TXU Receivables Company. TXU Receivables Company conducts an accounts receivable securitization program.



(1)  Excludes $3.594 billion principal amount of 2017 Notes held by EFIH.
(2)  Excludes $582 million aggregate principal amount of Legacy Notes held by EFH Corp. and EFIH.
(3)  None of EFH Corp., EFIH or EFIH's subsidiaries will guarantee, nor are any of them otherwise liable for, the notes. The ring-fenced entities will not be restricted subsidiaries under the indenture governing the notes and the TCEH Existing Second Lien Notes and will not be subject to covenants and events of default thereunder.
(4)  Substantially all of the subsidiaries of TCEH are engaged in competitive market activities and will guarantee the notes offered hereby, and have guaranteed the TCEH 2015/2016 Notes, the TCEH Existing Second Lien Notes and the TCEH Senior Secured Credit Facilities.
(5)  Includes $307 million principal amount of TCEH 2015/2016 Notes held by EFH Corp. and $79 million principal amount of TCEH 2015/2016 Notes held by EFIH.
(6)  Includes $20 million principal amount of TCEH Senior Secured Credit Facilities held by EFH Corp.
(7)  Holding company for the Luminant businesses, including its power generation, wholesale energy sales and purchases and commodity risk management and trading activities.

6

EFIHMW00079451

PX 042
Page 14 of 157

### The Notes

The summary below describes the principal terms of the notes, the guarantees and the related indenture and security documents. Certain of the terms and conditions described below are subject to important limitations and exceptions. The "Description of the Notes" section of this offering memorandum contains more detailed descriptions of the terms and conditions of the notes, the guarantees and the related indenture and security documents. The notes will be issued under a supplemental indenture to the indenture under which the TCEH Existing Second Lien Notes were issued or, at the Issuer's option, under an indenture separate from that indenture. All references in this offering memorandum to the "indenture" governing the notes are to either the existing indenture, as supplemented, or to the separate indenture, in each case, under which the notes will be issued. Regardless of whether the notes are issued under a supplemental indenture or a separate indenture, the notes will vote together with the TCEH Existing Second Lien Notes as described in this offering memorandum. See "Description of the Notes."

| | |
|---|---|
| Issuer . . . . . . . . . . . . . . . . . . . . . . . . . . . | Texas Competitive Electric Holdings Company LLC and TCEH Finance, Inc. (together, the "Issuer") |
| Securities Offered . . . . . . . . . . . . . . . . . . | $350,000,000 aggregate principal amount of 15% Senior Secured Second Lien Notes due 2021, Series B. |
| | Each of the notes and the TCEH Existing Second Lien Notes are a separate series of senior notes but will be treated as a single class for voting purposes with respect to amendments and waivers and for taking certain other actions, except as otherwise described under "Description of the Notes." |
| Maturity Date . . . . . . . . . . . . . . . . . . . . . | April 1, 2021. |
| Interest Rate . . . . . . . . . . . . . . . . . . . . . . . | The notes will accrue interest at the rate of 15% per annum. |
| Interest Payment Dates . . . . . . . . . . . . . . | Interest on the notes will be payable on January 1, April 1, July 1 and October 1 of each year, commencing on January 1, 2011. |
| Ranking . . . . . . . . . . . . . . . . . . . . . . . . . . | The notes will be: |

- senior obligations of the Issuer and will rank equally in right of payment with all existing and future senior debt of the Issuer;

- secured equally and ratably with approximately $336 million aggregate principal amount of TCEH Existing Second Lien Notes and any future obligations of the Issuer that are secured by a second-priority lien on the Collateral, on a second-priority basis, by a lien on the Collateral;

- effectively senior to all existing and future unsecured debt of the Issuer to the extent of the value of the Collateral (after taking into consideration any first-priority liens and certain other permitted liens on the Collateral, including the liens on the Collateral under the TCEH Senior Secured Credit Facilities);

- effectively subordinated to TCEH's obligations under the TCEH Senior Secured Credit Facilities and any future obligations subject to first-priority liens on the Collateral, to the extent of the value of the Collateral;

7

EFIHMW00079452

**PX 042**
**Page 15 of 157**

- effectively subordinated to all secured obligations of TCEH that are secured by assets other than the Collateral, to the extent of the value of the assets securing such obligations;

- structurally subordinated to any existing and future debt and liabilities of TCEH's non-guarantor subsidiaries;

- senior in right of payment to any future subordinated debt of the Issuer; and

- guaranteed as described under "— Guarantees."

As of June 30, 2010, the notes would have been effectively subordinated to approximately $22.319 billion principal amount of TCEH's senior secured debt, $22.036 billion of which would have been represented by its borrowings under the TCEH Senior Secured Credit Facilities. As of June 30, 2010, TCEH had approximately $2.309 billion of additional available capacity under the TCEH Senior Secured Credit Facilities (excluding amounts available under the Collateral Posting Facility (as defined in "Description of the Notes") and $85 million of commitments from a subsidiary of Lehman Brothers Holdings, Inc. that is in bankruptcy ("Lehman"), but including $144 million of undrawn commitments from Lehman that are only available from the fronting banks and the swingline lender and $429 million of available letter of credit capacity.

The effective ranking of the notes, including the benefits of the guarantees and the Collateral, is subject to risks arising under fraudulent conveyance laws. See "Risk Factors — Risks Related to Fraudulent Conveyance Laws."

Guarantees . . . . . . . . . . . . . . . . . . . . . . . .  The notes will be unconditionally guaranteed, jointly and severally, by TCEH's direct parent, EFCH, and by each subsidiary of TCEH that guarantees the TCEH Senior Secured Credit Facilities. The guarantees by TCEH's subsidiaries will be secured equally and ratably with the TCEH Existing Second Lien Notes and any future obligations of the subsidiary guarantors that are secured by a second-priority lien on the Collateral, on a second-priority basis, by a lien on the Collateral. The guarantees by TCEH's subsidiaries will be effectively senior to any unsecured debt of the guarantors to the extent of the value of the Collateral (after taking into consideration any first-priority liens and certain other permitted liens on the Collateral, including the liens on the Collateral under the TCEH Senior Secured Credit Facilities) and EFCH's guarantee will rank equally with $12.35 billion (as of June 30, 2010) principal amount of unsecured debt that it otherwise guarantees (including $3.98 billion aggregate principal amount of such debt held by EFH Corp. and EFIH that EFCH guarantees). The guarantees will be effectively subordinated to all debt of the guarantors secured by the Collateral on a first-priority basis or by certain permitted liens or that is secured by assets that are not part of the Collateral, to the extent of the value of the collateral securing that debt. As of June 30, 2010, the guarantees would have been effectively subordinated to approximately

8

EFIHMW00079453

$22.036 billion principal amount of debt under the TCEH Senior Secured Credit Facilities and approximately $382 million principal amount of other debt secured on a first-priority basis.

The effective ranking of the notes, including the benefits of the guarantees and the Collateral, is subject to risks arising under fraudulent conveyance laws. See "Risk Factors — Risks Related to Fraudulent Conveyance Laws."

EFH Corp., our indirect parent, will not guarantee the notes. None of EFIH, Oncor Holdings, the immediate parent of Oncor, Oncor or any of Oncor's subsidiaries will guarantee the notes.

Security . . . . . . . . . . . . . . . . . . . . . . . .    The notes will be secured, on a second-priority basis, equally and ratably with the TCEH Existing Second Lien Notes, by security interests in all of the assets of the Issuer and the guarantors (other than EFCH) that secure the obligations under the TCEH Senior Secured Credit Facilities on a first-priority basis, subject to permitted liens; provided that the Collateral will not include the equity interests of any subsidiary of TCEH from time to time to the extent that the pledge of such equity interests would result in separate financial statements of such subsidiary being required to be filed with the SEC. See "Description of the Notes — Security."

The value of the Collateral is subject to risks arising under fraudulent conveyance laws. See "Risk Factors — Risks Related to Fraudulent Conveyance Laws."

The Issuer and the guarantors can incur more debt secured by the Collateral, including debt secured by the Collateral on a first-priority basis ahead of the notes and the subsidiary guarantees or on a second-priority basis equally and ratably with the notes and the subsidiary guarantees. See "Risk Factors — Risks Related to the Notes and Our Substantial Debt — Noteholders' interest in the Collateral may be further subordinated or diluted if we incur additional debt that is secured on a senior or pari passu basis by the same Collateral securing the notes and the subsidiary guarantors' guarantees of the notes."

See also "Risk Factors — Risks Related to the Notes and Our Substantial Debt — The indenture governing the notes may not protect holders from all actions that we or our subsidiaries may take that would reduce noteholders' interest in the Collateral or that may reduce the value of the Collateral, including sales or exchanges of the Collateral or our subsidiaries' assets for other assets or investments" and "Risk Factors — Risks Related to the Notes and Our Substantial Debt — The notes and subsidiary guarantees will be secured, on a second-priority basis, only to the extent of the value of the assets that have been granted as security for the notes and the subsidiary guarantors' guarantees of the notes. After payment in full of all obligations secured by first-priority liens on the Collateral, there may

9

EFIHMW00079454

be insufficient proceeds to satisfy amounts owed under the notes and subsidiary guarantees."

| | |
|---|---|
| Optional Redemption . . . . . . . . . . . . . . | The Issuer may redeem the notes, in whole or in part, on and after October 1, 2015 at the redemption prices set forth in this offering memorandum. The Issuer may also redeem the notes, in whole or in part, at any time prior to October 1, 2015 at a price equal to 100% of their principal amount, plus accrued interest and a "make-whole" premium. In addition, before October 1, 2013, the Issuer may redeem up to 35% of the aggregate principal amount of the notes, using the proceeds from certain equity offerings at the redemption price set forth in this offering memorandum. See "Description of the Notes — Optional Redemption." |
| Change of Control Offer . . . . . . . . . . . . | Upon the occurrence of certain transactions meeting the definition of "change of control," holders of the notes will have the right to require the Issuer to repurchase some or all of the notes at 101% of their principal amount, plus accrued and unpaid interest to the repurchase date. This right is subject to important limitations. See "Description of the Notes — Repurchase at the Option of Holders — Change of Control" and the definition of "Change of Control" under "Description of the Notes." |

The Issuer may not be able to pay holders the required price for notes they present to it at the time of a change of control, because:

- the Issuer may not have enough funds at that time; or

- the terms of the Issuer's other debt or any of its subsidiaries' debt, including under the TCEH Senior Secured Credit Facilities, may prevent the Issuer from making such payment or receiving funds from its subsidiaries in an amount sufficient to fund such payment.

See "Risk Factors — Risks Related to the Notes and our Substantial Debt — We may not be able to repurchase the notes upon a change of control."

| | |
|---|---|
| Important Covenants . . . . . . . . . . . . . . . | The indenture governing the notes will contain covenants limiting TCEH's ability and the ability of its restricted subsidiaries to: |

- incur additional debt or issue preferred shares;

- pay dividends on, repurchase or make distributions in respect of capital stock or make other restricted payments;

- make investments;

- sell or transfer assets;

- create liens on assets to secure debt;

- consolidate, merge, sell or otherwise dispose of all or substantially all of our assets;

- enter into certain transactions with affiliates; and

- designate subsidiaries as unrestricted subsidiaries.

10

Highly Confidential

EFIHMW00079455

These covenants are subject to a number of important limitations and exceptions. TCEH is a holding company for its subsidiaries, including TCEH Finance, with no material operations of its own. See "Description of the Notes."

Voting . . . . . . . . . . . . . . . . . . . . . . . . . . The notes and the TCEH Existing Second Lien Notes will be treated as a single class for purposes of voting with respect to amendments and waivers and for taking certain other actions. See "Description of the Notes" and "Risk Factors — Risks Related to the Notes and Our Substantial Debt — The notes will constitute a new series of senior notes but will be treated as a single class with the TCEH Existing Second Lien Notes for voting purposes with respect to amendments and waivers and for taking certain other actions. If we issue additional debt that is secured equally and ratably with the notes and the TCEH Existing Second Lien Notes, the voting interest of noteholders will be diluted."

Exchange Offer; Registration Rights . . . The Issuer and the guarantors will use commercially reasonable efforts to register with the SEC a new issue of the Issuer's debt securities having substantially identical terms as the notes (except for the provisions relating to the transfer restrictions and payment of additional interest) as part of an offer to exchange freely tradable exchange notes for the notes; provided that such exchange offer registration statement need not be filed (or declared effective) if the notes held by holders eligible to participate in any such exchange offer (a) become freely transferable by such holders pursuant to Rule 144 under the Securities Act or any successor provision thereto or otherwise where no conditions of Rule 144 are then applicable (other than the holding period requirement in paragraph (d)(1)(ii) of Rule 144 so long as such holding period requirement is satisfied), (b) do not bear any restrictive legends and (c) do not bear a restrictive CUSIP number.

If required under special circumstances, the Issuer and the guarantors will file a shelf registration statement with the SEC covering resales of the notes.

If the exchange offer registration statement has not been filed and declared effective within 365 days after the original issue date of the notes (if the Issuer and the guarantors are then required to make an exchange offer) or such registration statement ceases to be effective at any time during the prescribed registration period (subject to certain exceptions) (a "registration default"), the annual interest rate on the notes will increase by 25 basis points for the first 90-day period during which a registration default continues, and thereafter the annual interest rate on the notes will increase by 50 basis points over the interest rate shown on the cover of this offering memorandum for the remaining period during which a registration default continues. If all registration defaults are cured, the interest rate on the notes will revert to the original level.

11

EFIHMW00079456

PX 042
Page 19 of 157

Any amounts of additional interest due as a result of a registration default will be payable on the same interest payment dates as interest on the notes is payable. See "Exchange Offer; Registration Rights."

Transfer Restrictions . . . . . . . . . . . . . . .    Neither the Issuer nor any guarantor has registered the notes or guarantees under the Securities Act or any state or other securities laws. The notes are subject to restrictions on transfer and may only be offered or sold in transactions exempt from, or not subject to, the registration requirements of the Securities Act. See "Notice to Investors."

No Prior Market  . . . . . . . . . . . . . . . . . .    The notes will be new securities for which there is currently no market. We cannot assure you as to the liquidity of markets that may develop for the notes, your ability to sell the notes or the price at which you would be able to sell the notes. The initial purchasers have advised us that they intend to make a market in the notes and, if issued pursuant to a registration rights exchange offer, in the exchange notes, as permitted by applicable laws and regulations; however, they are not obligated to do so, and they may discontinue their market-making activities at any time without notice. Additionally, certain of the initial purchasers may be restricted in their market-making activities. See "Risk Factors — Risks Related to the Notes and Our Substantial Debt — Noteholders' ability to transfer the notes may be limited by the absence of an active trading market, and there is no assurance that any active trading market will develop for the notes."

Use of Proceeds . . . . . . . . . . . . . . . . . . .    The net proceeds we receive from the issuance of the notes will be used for the payment, repayment or prepayment of term loans under the TCEH Senior Secured Credit Facilities and/or the repurchase of principal amounts outstanding of TCEH 2015/2016 Notes. Approximately $153 million of the net proceeds of this offering will be used to repurchase approximately $226 million principal amount of the existing 10.25% Senior Notes due 2015 and 10.25% Senior Notes due 2015, Series B of the Issuer acquired by an initial purchaser in connection with this offering, and such repurchased notes will be cancelled. The remaining net proceeds from the offering of the notes will be deposited in an escrow account and held by The Bank of New York Mellon Trust Company, N.A., as escrow agent, pursuant to a pledge and escrow agreement until such proceeds are used to pay, repay, prepay or repurchase debt as described above. The amounts in the escrow account will be pledged on a first-priority basis for the benefit of the noteholders. If proceeds remain in the escrow account on March 31, 2013, the Issuer will be required to use such amounts to offer to purchase the maximum principal amount of notes that may be purchased at a price of 100% of the principal amount thereof, plus accrued and unpaid interest, if any, to the purchase date. See "Use of Proceeds" and "Description of the Notes — Escrow of Proceeds; Escrow Proceeds Offer." Any amounts remaining following the offer to purchase will remain in the escrow account and will be

12

Highly Confidential

EFIHMW00079457

available for us to use to pay, repay or prepay term loans under the TCEH Senior Secured Credit Facilities and/or to repurchase principal amounts outstanding of TCEH 2015/2016 Notes pursuant to the terms and conditions of the pledge and escrow agreement. See "Description of the Notes — Escrow of Proceeds; Escrow Proceeds Offer."

Denominations . . . . . . . . . . . . . . . . . . . The notes will be issued in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof.

**Risk Factors** . . . . . . . . . . . . . . . . . . . . . **In addition to the other information included in or incorporated by reference into this offering memorandum, you should carefully consider the information set forth in the section entitled "Risk Factors" beginning on page 17 and those contained in the EFCH 2009 Form 10-K and the EFCH June 30, 2010 Form 10-Q, each of which is incorporated into this offering memorandum by reference, before deciding whether or not to invest in the notes. See "Incorporation by Reference."**

Highly Confidential

EFIHMW00079458

### Summary Historical Consolidated Financial Data of Energy Future Competitive Holdings Company

The following table sets forth EFCH and its subsidiaries' summary historical consolidated financial data as of and for the periods indicated. The historical financial data as of December 31, 2009 and 2008 (Successor) and for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor) and the period from January 1, 2007 through October 10, 2007 (Predecessor) have been derived from EFCH and its subsidiaries' audited historical consolidated financial statements and related notes included in the EFCH 2009 Form 10-K, which is incorporated into this offering memorandum by reference. The historical financial data as of December 31, 2007 (Successor), 2006 (Predecessor) and 2005 (Predecessor) and for the years ended December 31, 2006 and 2005 (Predecessor) have been derived from EFCH and its subsidiaries' audited historical consolidated financial statements that are not included in the EFCH 2009 Form 10-K and are not incorporated by reference into this offering memorandum. The "Predecessor" period reflects the period prior to the Merger, which occurred on October 10, 2007. The historical financial data as of June 30, 2010 and for the six months ended June 30, 2010 and 2009 have been derived from EFCH and its subsidiaries' unaudited historical interim condensed consolidated financial statements and related notes included in the EFCH June 30, 2010 Form 10-Q, which is incorporated into this offering memorandum by reference. In EFCH's opinion, such unaudited interim financial data reflects all adjustments, consisting of normal recurring accruals, necessary for the fair presentation of the results for those periods. The results of operations for the interim periods, for seasonal and other factors, are not necessarily indicative of the results to be expected for the full year or any future period. See "Available Information" and "Incorporation by Reference."

The summary historical consolidated financial data should be read in conjunction with EFCH's preliminary financial data for the three months ended September 30, 2010 included in "Summary — Recent Developments — Selected Preliminary Financial Data for the Quarterly Period Ended September 30, 2010," the EFCH 2009 Form 10-K, including the audited consolidated financial statements and related notes contained therein and the sections captioned "Selected Financial Data" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the EFCH June 30, 2010 Form 10-Q, including the unaudited interim condensed consolidated financial statements and related notes contained therein and the section captioned "Management's Discussion and Analysis of Financial Condition and Results of Operations."

| | Successor | | | Predecessor | | |
| | Year Ended December 31, | | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, | |
| | 2009 | 2008 | | | 2006 | 2005 |
| | (millions of dollars, except ratios) | | | | | |
| **Statement of Income Data:** | | | | | | |
| Operating revenues ..................... | $7,911 | $ 9,787 | $ 1,671 | $6,884 | $9,396 | $10,824 |
| Income (loss) from continuing operations before extraordinary loss and cumulative effect of changes in accounting principles .......................... | 515 | (9,039) | (1,266) | 1,306 | 2,501 | 1,816 |
| Loss from discontinued operations, net of tax effect .............................. | — | — | — | — | — | (8) |
| Extraordinary loss, net of tax effect ........ | — | — | — | — | — | (50) |
| Cumulative effect of changes in accounting principles, net of tax effect ............. | — | — | — | — | — | (8) |
| Net income (loss) ....................... | 515 | (9,039) | (1,266) | 1,306 | 2,501 | 1,750 |
| Preferred stock dividends ................. | — | — | — | — | — | 3 |
| Net income (loss) attributable to EFCH .... | 515 | (9,039) | (1,266) | 1,306 | 2,501 | 1,747 |
| Ratio of earnings to fixed charges(a) ....... | 1.36 | — | — | 5.88 | 10.84 | 5.04 |
| Ratio of earnings to combined fixed charges and preference dividends(a) ............. | 1.36 | — | — | 5.88 | 10.84 | 5.01 |

14

EFIHMW00079459

|  | Successor | | | Predecessor | | |
|---|---|---|---|---|---|---|
|  | Year Ended December 31, | | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, | |
|  | 2009 | 2008 | | | 2006 | 2005 |
|  | (millions of dollars) | | | | | |
| **Statement of Cash Flows Data:** | | | | | | |
| Cash flows provided by (used in) operating activities from continuing operations . . . . | $ 1,384 | $ 1,657 | $ (248) | $ 1,231 | $ 4,757 | $ 2,580 |
| Cash flows provided by (used in) financing activities from continuing operations . . . . | 279 | 1,289 | 1,488 | 895 | (1,265) | (61) |
| Cash flows used in investing activities from continuing operations . . . . . . . . . . . . . . . | (2,048) | (2,682) | (1,881) | (1,277) | (3,497) | (2,572) |
| Capital expenditures, including nuclear fuel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,521 | 2,074 | 519 | 1,585 | 908 | 1,099 |

|  | Successor | | | Predecessor | |
|---|---|---|---|---|---|
|  | December 31, | | | December 31, | |
|  | 2009 | 2008 | 2007 | 2006 | 2005 |
|  | (millions of dollars) | | | | |
| **Balance Sheet Data:** | | | | | |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $43,245 | $43,000 | $49,152 | $21,149 | $20,890 |
| Property, plant & equipment — net . . . . . . . . . . . . . . . . . . . | 20,980 | 20,902 | 20,545 | 10,344 | 9,994 |
| Goodwill and intangible assets . . . . . . . . . . . . . . . . . . . . . . . | 12,845 | 13,096 | 22,197 | 526 | 522 |
| Total debt(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33,376 | 32,725 | 31,402 | 4,084 | 4,444 |
| Total equity(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (4,218) | (5,002) | 4,003 | 7,943 | 5,640 |

(a)  Fixed charges and combined fixed charges and preference dividends exceeded "earnings" (net loss) by $9.543 billion for the year ended December 31, 2008 and $1.941 billion for the period from October 11, 2007 through December 31, 2007.

(b)  Includes short-term borrowings and long-term debt, which includes amounts due currently, amounts held by affiliates and EFH Corp. debt guaranteed by EFCH and pushed down to EFCH's financial statements. The amount of this debt pushed down to EFCH's financial statements totaled $2.371 billion as of December 31, 2009. See "Capitalization" and Note 10 to EFCH's financial statements included in the EFCH 2009 Form 10-K, which is incorporated by reference herein.

(c)  2009 amount includes $48 million of noncontrolling interests in subsidiaries. Amounts in 2005 through 2008 include preferred stock with a stated value of less than $1 million. There was no outstanding preferred stock at the end of 2009.

Although EFCH continued as the same legal entity after the Merger, its "Summary Historical Consolidated Financial Data" for periods preceding the Merger and for periods succeeding the Merger are presented as the consolidated financial statements of the "Predecessor" and the "Successor," respectively. See "Basis of Presentation" in Note 1 to EFCH's financial statements included in the EFCH 2009 Form 10-K. The financial statements of the Successor also reflect the application of "purchase accounting." Results for 2008 were significantly impacted by impairment charges related to goodwill, trade name and emission allowances intangible assets and natural gas-fueled generation plants. Results for 2010 reflect the prospective adoption of amended guidance regarding transfers of financial assets that resulted in the accounts receivable securitization program no longer being accounted for as a sale of accounts receivable and the funding under the program now reported as short-term borrowings as discussed in Note 3 to EFCH's financial statements included in the EFCH June 30, 2010 Form 10-Q and the prospective adoption of amended guidance that requires reconsideration of consolidation conclusions for all variable interest entities that resulted in the consolidation of TXU Receivables Company.

15

EFIHMW00079460

PX 042
Page 23 of 157

|  | Successor | |
|---|---|---|
|  | Six Months Ended June 30, | |
|  | 2010 | 2009 |
|  | (millions of dollars, except ratios) | |
| **Statement of Income Data:** | | |
| Operating revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,992 | $3,711 |
| Net income (loss) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (57) | 419 |
| Net income (loss) attributable to EFCH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (57) | 419 |
| Ratio of earnings to fixed charges(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 1.80 |
| Ratio of earnings to combined fixed charges and preference dividends(a) . . . . . . . . . . . | — | 1.80 |
| **Statement of Cash Flows Data:** | | |
| Cash flows provided by operating activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 136 | $ 487 |
| Cash flows provided by financing activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 574 | 280 |
| Cash flows used in investing activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (726) | (993) |
| Capital expenditures, including nuclear fuel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 616 | 822 |

|  | Successor |
|---|---|
|  | June 30, 2010 |
|  | (millions of dollars) |
| **Balance Sheet Data:** | |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $44,101 |
| Property, plant & equipment — net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20,548 |
| Goodwill and intangible assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,741 |
| Total debt(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33,311 |
| Total equity(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (4,179) |

(a) Fixed charges and combined fixed charges and preference dividends exceeded "earnings" by $60 million for the six months ended June 30, 2010.

(b) Includes short-term borrowings and long-term debt, which includes amounts due currently, amounts held by affiliates and EFH Corp. debt guaranteed by EFCH and pushed down to EFCH's financial statements. The amount of this debt pushed down to EFCH's financial statements totaled $2.435 billion as of June 30, 2010. See "Capitalization" and Note 4 to EFCH's financial statements included in the EFCH June 30, 2010 Form 10-Q, which is incorporated by reference herein.

(c) Includes $69 million of noncontrolling interests in subsidiaries.

16

EFIHMW00079461

**PX 042**
**Page 24 of 157**

## RISK FACTORS

*You should carefully consider the risk factors set forth below and the risk factors incorporated into this offering memorandum by reference to the EFCH 2009 Form 10-K and the EFCH June 30, 2010 Form 10-Q, as well as the other information contained in and incorporated by reference into this offering memorandum before deciding to invest in the notes. The selected risks described below and the risks that are incorporated into this offering memorandum by reference to the EFCH 2009 Form 10-K and the EFCH June 30, 2010 Form 10-Q are not the only risks to which we are or may become subject. Additional risks and uncertainties not currently known to us or those we currently view to be immaterial also may materially and adversely affect our and the guarantors' business, financial condition or results of operations. Any of the following risks or any of the risks described in the EFCH 2009 Form 10-K and the EFCH June 30, 2010 Form 10-Q could materially and adversely affect our and the guarantors' business, financial condition, operating results or cash flow. In such a case, the trading price of the notes could decline, we may not be able to make payments of interest and principal on the notes, or the guarantors may not be able to fulfill their obligations under the guarantees, and noteholders may lose all or part of their original investment.*

### Risks Related to the Notes and Our Substantial Debt

**Our substantial leverage could adversely affect our ability to raise additional capital to fund our operations, limit our ability to react to changes in the economy or our industry, expose us to interest rate risk to the extent of our variable rate debt and prevent us from meeting obligations under our various debt agreements.**

We are highly leveraged. As of June 30, 2010 on a pro forma basis before giving effect to the issuance of the notes offered hereby and after giving effect to (i) the Exchange Offer described in "Summary — Recent Developments — Recent Exchange Offer and Consent Solicitation", (ii) other repurchases and exchanges of EFH Corp.'s and its subsidiaries' debt since June 30, 2010 described under "Debt Related Activity in 2010 — 2010 EFH Corp. Debt Exchanges and Repurchases" in Note 4 to EFCH's financial statements included in the EFCH June 30, 2010 Form 10-Q, which is incorporated into this offering memorandum by reference, and (iii) the exchange described in "Summary — Recent Developments — Recent Private Debt Exchange Transaction," EFCH's consolidated principal amount of debt outstanding would have been approximately $31.569 billion (including short-term borrowings and long-term debt, including amounts due currently, amounts held by affiliates and amounts pushed down to EFCH as a result of its guarantee of certain EFH Corp. debt, but excluding $1.041 billion of notes issued to affiliates). On the same pro forma basis, EFCH would have guaranteed an additional approximately $4.8 billion of debt of EFH Corp. not pushed down to its financial statements. Our substantial leverage could have important consequences, including:

- making it more difficult for us to make payments on our debt;

- requiring a substantial portion of cash flow to be dedicated to the payment of principal and interest on debt, therefore reducing our ability to use our cash flow to fund operations, capital expenditures and future business opportunities and execute our strategy;

- increasing our vulnerability to adverse economic, industry or competitive developments;

- exposing us to the risk of increased interest rates because, as of June 30, 2010, taking into consideration interest swap transactions, 13% of EFCH and its subsidiaries' consolidated long-term borrowings are at variable rates of interest;

- limiting our ability to make strategic acquisitions or causing us to make non-strategic divestitures;

- limiting our ability to obtain additional financing for working capital, capital expenditures, product development, debt service requirements, acquisitions and general corporate or other purposes, or to refinance existing debt; and

- limiting our ability to adjust to changing market conditions and placing us at a competitive disadvantage compared to competitors who are less highly leveraged and who, therefore, may be able to take advantage of opportunities that we cannot due to our substantial leverage.

17

EFIHMW00079462

As of June 30, 2010, most of TCEH's debt, including amounts guaranteed by the guarantors of the notes, is scheduled to become due prior to the stated maturity of the notes offered hereby, including $22.036 billion, representing amounts outstanding under the TCEH Senior Secured Credit Facilities, which is scheduled to become due on or before October 10, 2014, and $5.0 billion and $2.062 billion aggregate principal amount of TCEH 2015/2016 Notes, which are scheduled to mature on November 1, 2015 and November 1, 2016, respectively. See Note 4 to EFCH's financial statements included in the EFCH June 30, 2010 Form 10-Q, which is incorporated into this offering memorandum by reference, for details of debt outstanding as of June 30, 2010. While we expect to be able to repay a portion of our debt obligations through cash flow from operations, we may not be able to repay or refinance all outstanding amounts as or before they become due, or may be able to refinance such amounts only on terms that will increase our cost of borrowing or on terms that may be more onerous. Our ability to successfully implement any future refinancing of our debt will also depend on a variety of factors, many of which may be beyond our control, such as then prevailing conditions in the capital and financial markets. We may also need to raise additional capital by raising additional debt, such as secured or unsecured high yield debt, on terms that may increase our cost of borrowing or result in more onerous terms or selling or disposing of some of our assets, possibly on unfavorable terms. We cannot assure you that any of, or any combination of, the above actions would be available or sufficient to fund our debt, that we will be able to refinance our debt as or before they come due, or that we will be able to obtain additional financing on favorable terms or at all, should the need arise.

In addition, future transactions and initiatives that we and EFH Corp. continuously contemplate and may pursue may have significant effects on our business, capital structure, liquidity and/or results of operations. For example, we and EFH Corp. have and may continue to pursue, from time to time, transactions and initiatives of various types, including, without limitation, debt exchange transactions, debt repurchases, equity or debt issuances, asset sales, joint ventures, recapitalizations, business combinations and other strategic transactions. There can be no guarantee that any of such transactions or initiatives would ultimately be successful or produce the desired outcome, which could ultimately affect us in a material and adverse manner. Moreover, the effects of any of these transactions or initiatives could be material and adverse to holders of our debt, including the notes, and could be disproportionate, and directionally different, with respect to one class or type of debt than with respect to others.

**Despite our current high debt level, we may still be able to incur substantially more debt. This could further exacerbate the risks associated with the notes and our other debt.**

We may be able to incur additional debt in the future. Although our and EFH Corp.'s debt agreements and the indenture or indentures governing the notes and the TCEH Existing Second Lien Notes contain restrictions on the incurrence of additional debt, these restrictions are subject to a number of significant qualifications and exceptions. Under certain circumstances, the amount of debt, including secured debt, that could be incurred in the future in compliance with these restrictions could be substantial. The indenture or indentures governing the notes and the TCEH Existing Second Lien Notes will permit us to incur additional debt, including debt that is secured by first-priority security interests on the Collateral, such as additional revolving facility borrowings under the TCEH Senior Secured Credit Facilities which, if incurred, could be secured by a first-priority security interest for which $1.88 billion was available for borrowing as of June 30, 2010. If new debt is added to our existing debt levels, the related risks that we and noteholders now face would intensify. See "Description of the Notes" and "Risk Factors — Noteholders' interests in the Collateral may be further subordinated or diluted if we incur additional debt that is secured on a senior or pari passu basis by the same Collateral securing the notes and the subsidiary guarantors' guarantees of the notes.

**Increases in interest rates may negatively impact our operating results and financial condition.**

Certain of our borrowings, to the extent the interest rate is not fixed by interest rate swaps, are at variable rates of interest. An increase in interest rates would have a negative impact on our results of operations by causing an increase in interest expense.

18

EFIHMW00079463

At June 30, 2010, EFCH and its subsidiaries had $4.117 billion aggregate principal amount of variable rate long-term debt (excluding $1.135 billion of long-term borrowings associated with the TCEH Senior Secured Credit Facilities that are invested at a variable rate and taking into account interest rate swaps that fix the interest rate on $16.3 billion in notional amount of variable rate debt). As a result, as of June 30, 2010, the impact of a 100 basis point increase in interest rates would increase our annual interest expense by approximately $41 million. See discussion of interest rate swap transactions in Note 4 to EFCH's financial statements in the EFCH June 30, 2010 Form 10-Q, which is incorporated into this offering memorandum by reference.

EFCH and its subsidiaries' consolidated interest expense for the six months ended June 30, 2010 was $1.375 billion (excluding related charges such as unrealized net losses and amortization).

**Our, our subsidiaries' and EFH Corp.'s debt agreements contain restrictions that limit flexibility in operating our and our subsidiaries' businesses.**

Our, our subsidiaries' and EFH Corp.'s debt agreements, including the TCEH Senior Secured Credit Facilities and the indenture or indentures governing the notes and the TCEH Existing Second Lien Notes contain various covenants and other restrictions that limit our ability and/or our restricted subsidiaries' ability to engage in specified types of transactions and may adversely affect the ability to operate our and our subsidiaries' businesses. These covenants and other restrictions limit our and/or our restricted subsidiaries' ability to, among other things:

- incur additional debt or issue preferred shares;
- pay dividends on, repurchase or make distributions in respect of capital stock or make other restricted payments;
- make investments;
- sell or transfer assets;
- create liens on assets to secure debt;
- consolidate, merge, sell or otherwise dispose of all or substantially all of our assets;
- enter into transactions with affiliates;
- designate subsidiaries as unrestricted subsidiaries; and
- repay, repurchase or modify certain subordinated and other material debt.

There are a number of important limitations and exceptions to these covenants and other restrictions. See "Description of the Notes" and Note 10 to EFCH's historical consolidated financial statements for the year ended December 31, 2009 included in the EFCH 2009 Form 10-K.

Under the TCEH Senior Secured Credit Facilities, TCEH is required to maintain a consolidated secured debt to consolidated EBITDA ratio below specified levels. TCEH's ability to maintain the consolidated secured debt to consolidated EBITDA ratio below such levels can be affected by events beyond its control, and there can be no assurance that it will comply with this ratio. As of June 30, 2010, TCEH's consolidated secured debt to consolidated EBITDA ratio was 5.06 to 1.00, which compares to the maximum consolidated secured debt to consolidated EBITDA ratio of 7.00 to 1.00 permitted under the TCEH Senior Secured Credit Facilities. The maximum ratio permitted under the TCEH Senior Secured Credit Facilities will decrease to 6.75 to 1.00 effective December 31, 2010. The secured debt portion of the ratio is not required to include debt secured by a lien ranking junior to the TCEH Senior Secured Credit Facilities, including the notes and the TCEH Existing Second Lien Notes.

A breach of any of these covenants or restrictions could result in an event of default under one or more of our and our subsidiaries' or EFH Corp.'s debt agreements, including the indenture or indentures governing the

19

EFIHMW00079464

notes and the TCEH Existing Second Lien Notes. Upon the occurrence of an event of default under one of these debt agreements, the lenders or noteholders could elect to declare all amounts outstanding under that debt agreement to be immediately due and payable and/or terminate all commitments to extend further credit. Such actions by those lenders or noteholders could cause cross defaults under our, our subsidiaries' and EFH Corp.'s other debt agreements, including the indenture or indentures governing the notes and the TCEH Existing Second Lien Notes. If we or one of our subsidiaries was unable to repay those amounts, the lenders could proceed against any collateral granted to them to secure such debt, which in the case of the TCEH Senior Secured Credit Facilities is the same Collateral that will secure the notes and subsidiary guarantees, which is pledged to the lenders under the TCEH Senior Secured Credit Facilities on a first-priority basis ranking ahead of the notes and subsidiary guarantees. If lenders accelerate the repayment of borrowings, we or such subsidiary may not have sufficient assets and funds to repay those borrowings.

**We may not be able to generate sufficient cash to service all of our debt, including the notes, and we may be forced to take other actions to satisfy our obligations under our debt agreements (including the indenture governing the notes), which may not be successful.**

Our ability to make scheduled payments on or to refinance our obligations depends on our and our subsidiaries' financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control. We and our subsidiaries may not be able to maintain a level of cash flows from operating activities sufficient to permit us to pay the principal, premium, if any, and interest on our debt, including the notes.

If cash flows and capital resources are insufficient to fund our and our subsidiaries' debt service obligations, we or our subsidiaries could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt, including the notes. These alternative measures may not be successful, may not be completed on economically-attractive terms or may not be adequate for us and our subsidiaries to meet our debt service obligations then due. Additionally, our and our subsidiaries' debt agreements, including the indenture or indentures governing the notes and the TCEH Existing Second Lien Notes and the TCEH Senior Secured Credit Facilities, as well as the indentures governing the EFH Corp. notes that are guaranteed by EFCH, limit the use of the proceeds from our or our subsidiaries' disposition of assets or operations; as a result, we may not be allowed, under these documents, to use proceeds from such dispositions to satisfy all current debt service obligations.

**EFH Corp., our indirect parent, is highly leveraged and will rely upon us for a significant amount of its cash flows.**

EFH Corp. is a holding company and substantially all of its consolidated assets are held by its subsidiaries. EFH Corp. is highly leveraged and its liquidity requirements are and will continue to be significant, primarily due to debt service requirements and related financing costs. To meet these debt service requirements, EFH Corp. will rely on loans and dividends from its subsidiaries, including TCEH. Operations of TCEH and its subsidiaries represented 83% and 100% of EFH Corp.'s consolidated revenues for the year ended December 31, 2009 and the six months ended June 30, 2010, respectively.

Upon the consummation of the Merger, EFH Corp. and Oncor, which is a subsidiary of EFH Corp. but not a subsidiary of ours, implemented certain structural and operational "ring-fencing" measures, including certain measures required by the PUCT's Order on Rehearing in Docket No. 34077, that were based on principles articulated by rating agencies and commitments made by Texas Holdings and Oncor to the PUCT and the FERC to further enhance Oncor's credit quality. These measures were put in place to mitigate Oncor's credit exposure to Texas Holdings, EFH Corp. and EFH Corp.'s subsidiaries (other than Oncor Holdings and its subsidiaries) (the "Texas Holdings Group") and to reduce the risk that the assets and liabilities of Oncor would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities.

Highly Confidential

Noteholders will not be entitled to look to the assets, financial condition or results of operations of Oncor for payments of interest or principal on the notes.

As part of the ring-fencing measures, a majority of the members of the board of directors of Oncor are required to be, and are, independent from EFH Corp. Any new independent directors of Oncor are required to be appointed by the nominating committee of Oncor Holdings. The organizational documents of Oncor give these independent directors, acting by majority vote, and, during certain periods, any director designated by Texas Transmission Investment LLC, the express right to prevent distributions from Oncor if they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements. Accordingly, there can be no assurance that Oncor will make any distributions to EFH Corp. that might in turn be contributed to us, and EFH Corp. will rely on us for a significant amount of its liquidity.

**If we or any of our subsidiaries default on obligations to pay debt, we may not be able to make payments on the notes.**

Any default under our, our subsidiaries' or EFCH's debt agreements that is not waived by the required lenders or noteholders, and the remedies sought by the holders of such debt, could prevent us from paying principal, premium, if any, and interest on the notes, which could substantially decrease the market price of the notes. If our subsidiaries are unable to generate sufficient cash flows and are otherwise unable to obtain funds necessary to meet required payments of principal, premium, if any, and interest on our or their debt, or if EFCH, we or our subsidiaries otherwise fail to comply with the various covenants, including any financial and operating covenants, in the instruments governing our or their debt, we or they could be in default under the terms of the agreements governing this debt. In the event of such default, the holders of this debt could elect to declare all the funds borrowed thereunder to be due and payable, together with accrued and unpaid interest, and/or the lenders could elect to terminate their commitments thereunder, cease making further loans and, in the case of the lenders under the TCEH Senior Secured Credit Facilities, institute foreclosure proceedings against the Collateral, and we could go into bankruptcy, liquidation or insolvency. If the operating performance of our subsidiaries declines, under the TCEH Senior Secured Credit Facilities we or certain of our subsidiaries may in the future need to obtain waivers from the required lenders under the TCEH Senior Secured Credit Facilities to avoid being in default. If we or our subsidiaries breach the covenants under the TCEH Senior Secured Credit Facilities or the indentures governing the TCEH 2015/2016 Notes or the notes and the TCEH Existing Second Lien Notes and we seek a waiver, we may not be able to obtain a waiver from the required lenders or noteholders. If this occurs, we would be in default under the instruments governing this debt, the lenders or noteholders could exercise their rights, as described above, and we and our subsidiaries could go into bankruptcy, liquidation or insolvency.

**The notes and subsidiary guarantees will be secured, on a second-priority basis, only to the extent of the value of the assets that have been granted as security for the notes and the subsidiary guarantees' guarantees of the notes. After payment in full of all obligations secured by first-priority liens on the Collateral, there may be insufficient proceeds to satisfy amounts owed under the notes and subsidiary guarantees.**

The notes will be, and the TCEH Existing Second Lien Notes are, secured by the Collateral on a second-priority basis while obligations under the TCEH Senior Secured Credit Facilities are secured by a first-priority lien on the Collateral. In the event of a bankruptcy, liquidation, dissolution, reorganization or similar proceeding against us, our subsidiaries, or any future subsidiary, the first-priority lien obligations will have a senior claim to the Collateral before the Collateral may be available for making any payments on the notes and the TCEH Existing Second Lien Notes. As a result, the lenders under the TCEH Senior Secured Credit Facilities and holders of other obligations secured by a first-priority security interest in the Collateral will be entitled to receive proceeds from the realization of value of the Collateral to repay such debt in full before noteholders, including the holders of the TCEH Existing Second Lien Notes, will be entitled to any recovery from the Collateral. We cannot assure noteholders that, in the event of a foreclosure, liquidation, bankruptcy or similar proceeding, the proceeds from the sale of the Collateral, after payment in full of all obligations secured by the first-priority liens on the Collateral, would be sufficient to satisfy the amounts under the notes and any other obligations secured by

21

EFIHMW00079466

a security interest in the Collateral of equal priority to that securing the notes, including the TCEH Existing Second Lien Notes. See "— Risks Related to Fraudulent Conveyance Laws" for more information regarding the value of the Collateral. If such proceeds are not sufficient to repay amounts outstanding under the notes and the TCEH Existing Second Lien Notes and such other secured obligations, then noteholders, along with holders of the TCEH Existing Second Lien Notes, will have an unsecured claim against our and the guarantors' remaining assets, if any, which will rank equally with the unsecured claims with respect to any unsatisfied portion of the obligations secured by the first-priority liens or pari passu liens and with the claims of our and the guarantors' other unsecured creditors, including the holders of the TCEH 2015/2016 Notes.

As of June 30, 2010, there was $22.036 billion of debt outstanding under the TCEH Senior Secured Credit Facilities, up to an additional $2.309 billion was available for borrowing under the TCEH Senior Secured Credit Facilities (excluding amounts available under the Collateral Posting Facility (as defined in "Description of the Notes") and $85 million of commitments from a subsidiary of Lehman Brothers Holdings, Inc. that is in bankruptcy ("Lehman"), but including $144 million of undrawn commitments from Lehman that are only available from the fronting banks and the swingline lender and $429 million of available letter of credit capacity, all of which will be secured by a first-priority lien on the Collateral). In addition, other arrangements that are customarily secured, such as hedging agreements, surety bonds, letters of credit and treasury management agreements, may be secured by first-priority liens on the Collateral.

In addition, the indenture or indentures governing the notes and the TCEH Existing Second Lien Notes permit TCEH and its restricted subsidiaries to incur or guarantee additional debt, including debt secured by the Collateral on a first-priority basis and debt secured by a security interest in the Collateral equal in priority to that securing the notes or by assets of TCEH and its restricted subsidiaries other than the Collateral. See "Description of the Notes."

The fair market value of the Collateral at any time will depend on market and other economic conditions, including the availability of suitable buyers for the Collateral, the condition of the Collateral, the timing and manner of sale and the ability to sell the Collateral in an orderly manner. No appraisal of the value of the Collateral will be made in connection with the issuance of the notes. See "— Risks Related to Fraudulent Conveyance Laws" for more information regarding the value of the Collateral. In addition, while the notes will be secured by the pledge of the equity interests of our subsidiaries, these pledges will be released to the extent that separate financial statements pursuant to Rule 3-16 of Regulation S-X would be required. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, no assurance can be given that the proceeds from any sale or liquidation of the Collateral will be sufficient to pay any of our obligations under the notes and any other obligations secured by a security interest in the Collateral of equal priority to that securing the notes, in full or at all, after first applying any proceeds from the Collateral to satisfy first-priority lien obligations. In addition, the book value of the Collateral should not be relied on as a measure of realizable value for such assets. By its nature, portions of the Collateral may be illiquid and may have no readily ascertainable market value. Accordingly, there can be no assurance that the Collateral can be sold in a short period of time in an orderly manner. A significant portion of the Collateral includes assets that may only be usable, and thus retain value, as part of the existing operating business of the subsidiary guarantors. Accordingly, any such sale of the Collateral separate from the sale of certain of our operating businesses may not be feasible or of significant value. As of June 30, 2010, our goodwill and other intangible assets had a net book value of $12.741 billion; however, as described in "Summary — Recent Developments — Selected Preliminary Financial Data for the Quarterly Period Ended September 30, 2010," EFCH expects that its financial results for the quarter ended September 30, 2010 will include a non-cash goodwill impairment charge of approximately $4.1 billion, which reflects the estimated effect of lower wholesale power prices on the value of TCEH, driven by the sustained decline in forward natural gas prices, as indicated by EFCH's cash flow projections and declines in market values of securities of comparable companies. The value of our goodwill and other intangible assets will continue to depend significantly upon the success of our business as a going concern and the growth in future cash flows. As a result, in the event of a bankruptcy, foreclosure, liquidation, dissolution, reorganization or similar proceeding, the realizable value of our goodwill and other intangible assets will likely be substantially lower and may be insufficient to satisfy the claims of our creditors, including the noteholders.

22

EFIHMW00079467

In the event that a bankruptcy or similar proceeding is commenced by or against us, if at the time of the filing the value of the Collateral is less than the amount of principal and accrued and unpaid interest on the notes, and other debt secured by liens on the Collateral that are equal and ratable with the liens securing the notes, including the TCEH Existing Second Lien Notes, the borrowed amounts outstanding under the TCEH Senior Secured Credit Facilities and any other first-priority lien obligations, interest may cease to accrue on the notes thereafter. If at the time of the filing the value of the Collateral is greater than the amount of principal and accrued and unpaid interest on the notes, and other debt secured by liens on the Collateral that are equal and ratable with the liens securing the notes, including the TCEH Existing Second Lien Notes, the borrowed amounts outstanding under the TCEH Senior Secured Credit Facilities and any other first-priority lien obligations, interest may nevertheless cease to accrue at a subsequent time if at such time the value ceases to be in excess of the principal and accrued and unpaid interest. It is possible, given the broad discretionary powers of a bankruptcy court, even if at the time of the filing the value of the Collateral is greater than the amount of principal and accrued and unpaid interest on the notes, and other debt secured by liens on the Collateral that are equal and ratable with the liens securing the notes, the borrowed amounts outstanding under the TCEH Senior Secured Credit Facilities and any other first-priority lien obligations on the date of filing, claims on the Collateral for interest accruing from and after the date the bankruptcy petition is filed might not be allowed. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, the proceeds from any sale of the Collateral may not be sufficient to pay the obligations due under the notes.

The security interest granted in favor of the collateral agent is subject to practical problems generally associated with the realization of security interests in collateral. For example, the collateral agent may need to obtain the consent of a third party to obtain or enforce a security interest in a contract, and we cannot assure you that the collateral agent will be able to obtain any such consent. The consents of any third-parties may not be given when required to facilitate a foreclosure on any particular assets. Accordingly, the collateral agent may not have the ability to foreclose upon such assets, and the value of the Collateral may significantly decrease.

**The imposition of certain permitted liens could adversely affect the value of the Collateral.**

The Collateral securing the notes and the subsidiary guarantees will be subject to liens permitted under the terms of the indenture governing the notes and the related security documents, whether arising on or after the date the notes are issued. The existence of any permitted liens could adversely affect the value of the Collateral securing the notes and the TCEH Existing Second Lien Notes, the guarantees and the other secured debt as well as the ability of the collateral agent to realize or foreclose on such Collateral. The liens of such third parties could also have priority over the liens securing the notes, the subsidiary guarantees and the other pari passu secured debt, including the TCEH Existing Second Lien Notes. For example, in the future if we were to acquire another company that already had outstanding debt secured by all of its assets, that debt would have a prior claim on the acquired company's assets than the notes. Even if that company's assets are pledged to secure the notes and subsidiary guarantees offered hereby, the lien securing the notes and subsidiary guarantees will be junior to the lien on such assets that existed at the time we acquired the company. See the definition of "Permitted Liens" under "Description of the Notes — Certain Definitions."

**The notes will be subject to an intercreditor agreement providing that noteholders' rights to realize upon the Collateral securing the notes will be junior to the lenders under the TCEH Senior Secured Credit Facilities that have a security interest in our assets.**

Our obligations, and those of the guarantors, under the TCEH Senior Secured Credit Facilities are secured on a first-priority basis by a pledge of substantially all of EFCH's, our and our subsidiaries' tangible and intangible assets. The trustee under the indenture or indentures governing the notes and the TCEH Existing Second Lien Notes is a party to an intercreditor agreement that provides, among other things, that if we or a guarantor is declared bankrupt, becomes insolvent or is liquidated or reorganized, our obligations under the TCEH Senior Secured Credit Facilities will be entitled to be paid in full from the Collateral before any payment may be made with respect to the notes. Holders of the notes would then participate ratably in the remaining Collateral, if any, with all holders of secured debt that are deemed to rank equally with the notes, which includes

23

the TCEH Existing Second Lien Notes, based upon the respective amount owed to each creditor. In addition, if we default under the TCEH Senior Secured Credit Facilities, the lenders could declare all of the funds borrowed thereunder, together with accrued interest, immediately due and payable and foreclose on the Collateral. Furthermore, if the lenders under the TCEH Senior Secured Credit Facilities foreclose and sell the pledged equity interests in any subsidiary that is a guarantor under the notes, then that guarantor will be released from its guarantee of the notes automatically and immediately upon such sale.

**The rights of holders of the notes with respect to the Collateral will be substantially limited by the terms of the intercreditor agreement.**

Under the terms of the intercreditor agreement between the collateral agent for the debt secured by second-priority liens (including the notes and the TCEH Existing Second Lien Notes) and the administrative agent for the TCEH Senior Secured Credit Facilities, at any time that obligations that have the benefit of the first-priority liens on the Collateral are outstanding, any actions that may be taken in respect of the Collateral, including the ability to cause the commencement of enforcement proceedings against the Collateral and to control the conduct of such proceedings, and the approval of amendments to, releases of Collateral from the lien of, and waivers of past defaults under, the security documents, will be at the direction of the holders of the obligations secured by the first-priority liens, and neither the trustee nor the collateral agent, on behalf of the holders of the notes, will have the ability to control or to direct such actions, even if the rights of the holders of the notes are adversely affected, subject to certain exceptions. See "Description of the Notes — Security." Under the terms of the intercreditor agreement, at any time that obligations that have the benefit of the first-priority liens on the Collateral are outstanding, if the holders of such debt release the Collateral for any reason whatsoever (except the payment in full of the first-priority obligations), including, without limitation, in connection with any sale of assets, the second-priority security interest in such Collateral securing the notes will be automatically and simultaneously released without any consent or action by the holders of the notes, subject to certain exceptions. The Collateral so released will no longer secure our and the guarantors' obligations under the notes. In addition, because the holders of the debt secured by first-priority liens in the Collateral control the disposition of the Collateral, such holders could decide not to proceed against the Collateral, regardless of whether there is a default under the documents governing such indebtedness or under the indenture governing the notes. In such event, subject to certain limited exceptions, the only remedy available to the holders of the notes would be to sue for payment on the notes and the related guarantees. In addition, in the event of any insolvency or liquidation proceeding, if the holders of the first-priority obligations desire to permit the use of cash collateral or to permit any debtor-in-possession ("DIP") financing, the collateral agent for the notes will, subject to certain exceptions, not be permitted to raise any objection to such cash collateral use or DIP financing. The intercreditor agreement limits the right of the collateral agent for the notes to seek relief from the "automatic stay" in an insolvency proceeding or to seek or accept "adequate protection" from a bankruptcy court even though such holders' rights with respect to the Collateral are being affected.

**The indenture governing the notes may not protect holders from all actions that we or our subsidiaries may take that would reduce noteholders' interest in the Collateral or that may reduce the value of the Collateral, including sales or exchanges of the Collateral or our or our subsidiaries' assets for other assets or investments.**

Under the indenture governing the notes, we will be permitted to dispose of all or a portion of the Collateral for fair market value consideration (including consideration other than cash). Additionally, there generally will be no event of default under the indenture governing the notes if our subsidiaries sell, transfer or otherwise dispose of their assets or equity interests for any form of consideration. If we or our subsidiaries effect any of these transactions, noteholders' interest in the Collateral or the value of the Collateral may be materially reduced.

The indenture governing the notes will allow us to transfer any of the Collateral in exchange for an equivalent fair market value of assets other than cash or for investments in businesses that are similar to our or our subsidiaries' businesses. The assets received as consideration and pledged as substitute Collateral may prove

24

EFIHMW00079469

to be less valuable than the value of the Collateral that was disposed of in such transfer or exchange. Additionally, if interests in a new business were received in exchange for the Collateral, such new business may, in the future, engage in business activities that are different from the business that we or our subsidiaries presently are in or such new business may not prove to be as creditworthy or valuable as those of ours or our subsidiaries. Therefore, such new collateral may negatively alter our risk profile or the value of such new collateral may decline relative to the value of the disposed investments.

The completion of any of the above events may result in the credit risk of the notes increasing, the credit rating agencies taking negative action with respect to the notes or the market price of the notes declining. Additionally, in the event of any foreclosure on the Collateral, you may recover less than if the Collateral still consisted of investments in our applicable subsidiaries.

**In the event of our or our subsidiaries' bankruptcy, the ability of the noteholders to realize upon the Collateral securing the guarantees of the notes will be subject to certain bankruptcy law limitations.**

The right of the trustee for the notes to repossess and dispose of the Collateral, which will secure the notes on a second-priority basis, upon acceleration is likely to be significantly impaired by federal bankruptcy law if bankruptcy proceedings are commenced by or against us or our subsidiaries. This could be true even if bankruptcy proceedings are commenced after the trustee for the notes has repossessed and disposed of the Collateral. Under bankruptcy law, a secured creditor, such as the trustee for the notes, is prohibited from repossessing collateral from a debtor in a bankruptcy case, or from disposing of collateral repossessed from a debtor, without bankruptcy court approval. Moreover, bankruptcy law permits the debtor to continue to retain and to use any such collateral, and the proceeds, products, rents or profits of such collateral, even though the debtor is in default under the applicable debt instruments, provided that the secured creditor is given "adequate protection." The meaning of the term "adequate protection" varies according to circumstances, but in general the doctrine of "adequate protection" requires a debtor to protect the value of a secured creditor's interest in the collateral, through cash payments, the granting of an additional security interest or otherwise. It is impossible to predict whether or when payments in respect of the notes and the TCEH Existing Second Lien Notes might be made following commencement of a bankruptcy case, whether or when the trustee would repossess or dispose of the Collateral, or whether or to what extent noteholders, including holders of the TCEH Existing Second Lien Notes, would be compensated for any delay in payment or loss of value of the Collateral through the requirements of "adequate protection." Furthermore, in the event the bankruptcy court determines that the value of the Collateral is not sufficient to repay all amounts due on the notes and the TCEH Existing Second Lien Notes, other debt secured by liens on the Collateral that are equal and ratable to the liens securing the notes, the borrowed amounts under the TCEH Senior Secured Credit Facilities and any other first-priority lien obligations, the noteholders, including holders of the TCEH Existing Second Lien Notes, would have unsecured "deficiency claims" as to the difference. Federal bankruptcy laws do not generally permit the payment of interest, costs, or attorneys' fees for unsecured claims during the debtor's bankruptcy case.

**Noteholders' interest in the Collateral may be further subordinated or diluted if we incur additional debt that is secured on a senior or pari passu basis by the same Collateral securing the notes and the subsidiary guarantors' guarantees of the notes.**

Obligations under the TCEH Senior Secured Credit Facilities are secured by the Collateral on a first-priority basis. In addition, the instruments governing the TCEH Senior Secured Credit Facilities and the indenture or indentures governing the notes and the TCEH Existing Second Lien Notes provide that we may incur a significant amount of additional debt that could be secured on a first-priority basis or on a pari passu basis with the notes by the Collateral (in addition to the approximately $22.036 billion of outstanding debt under the TCEH Senior Secured Credit Facilities as of June 30, 2010, which does not include the additional $1.88 billion of borrowings available thereunder, and approximately $336 million aggregate principal amount of outstanding TCEH Existing Second Lien Notes), subject to restrictions on our ability to incur debt and liens under the indenture or indentures governing the notes and the TCEH Existing Second Lien Notes and under other documents governing our, our subsidiaries' and

25

EFIHMW00079470

**PX 042
Page 33 of 157**

EFH Corp.'s debt. To the extent additional debt is incurred that is secured on a first-priority basis by the Collateral in the future, the interests of noteholders in the Collateral will be subordinated, and to the extent additional debt is secured on an equal and ratable basis by the Collateral, the interests of the noteholders in the Collateral will be diluted.

**TCEH and its subsidiaries will in most cases have control over the Collateral.**

TCEH and its subsidiaries will in most cases have control over the Collateral securing the notes and the subsidiary guarantees. The documents governing the pledge of the Collateral permit TCEH and its subsidiaries to remain in possession of, retain exclusive control over and freely operate the Collateral and collect, invest and dispose of any income from the Collateral, such as cash dividends. In addition, in certain limited circumstances TCEH or its subsidiaries will have the right to sell or otherwise dispose of the Collateral free and clear of the security interest underlying the notes and use the proceeds of such disposition in a manner that may not be favorable to holders of the notes. Our decisions and actions with respect to the Collateral may not be in the best interests of the noteholders.

**Rights of noteholders in the Collateral may be adversely affected by the failure to perfect security interests in certain Collateral acquired in the future.**

We and the guarantors (other than EFCH) may acquire assets or investments in the future that would be required to be pledged as Collateral securing the notes and the TCEH Existing Second Lien Notes. There can be no assurance that the trustee or the collateral agent will monitor, or that we will inform the trustee or the collateral agent of, the future acquisition of assets or investments that would be required to be pledged as Collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Collateral. Neither the trustee nor the collateral agent has an obligation to monitor the acquisition of additional assets or investments that are required to be pledged as Collateral or the perfection of any security interest in such Collateral. Such failure may result in the loss of the security interest in the Collateral or the priority of the security interest in favor of the notes against third parties.

**Security over certain real property constituting Collateral will not be in place on the issue date of the notes or will not be perfected on the issue date.**

Certain security over real property required to be given under the indenture governing the notes and the TCEH Existing Second Lien Notes, including executed mortgages and title insurance policies, will not be in place on the date of issuance of the notes or will not be perfected on such date. To the extent these security interests are not granted or perfected on such date, subject to certain exceptions, we will be required to have such security interests thereafter granted and/or perfected, to the extent required by the indenture or the security documents, with respect to (i) at least 75% of the fair market value of the material real property owned or leased on October 6, 2010, within 90 days after October 6, 2010 and (ii) the balance of the material real property within 150 days after October 6, 2010. Consequently, prior to the perfection of such security interests, noteholders may not benefit from such security interest. To the extent a security interest in any of the Collateral is perfected following the date of issuance of the notes, the security interest would remain at risk of having been perfected within 90 days prior to a bankruptcy filing (in which case it might be voided as a preferential transfer by a trustee in bankruptcy) even after the security interests granted and perfected on the date of issuance were no longer subject to that risk.

**The Collateral is subject to casualty risks and potential environmental liabilities.**

We intend to maintain insurance or otherwise insure against hazards in a manner appropriate and customary for our business. There are, however, certain losses that may be either uninsurable or not economically insurable, in whole or in part. Insurance proceeds may not compensate us fully for our losses. If there is a complete or partial loss of any of the Collateral, the insurance proceeds may not be sufficient to satisfy all of the secured obligations, including the notes and the guarantees.

26

EFIHMW00079471

In the event of a total or partial loss to any of our facilities, certain items of equipment may not be easily replaced. Accordingly, even though there may be insurance coverage, the extended period needed to manufacture replacement units could cause significant delays.

Moreover, the collateral agent may need to evaluate the impact of potential liabilities before determining to foreclose on Collateral consisting of real property because secured creditors that hold a security interest in real property may be held liable under environmental laws for the costs of remediating or preventing the release or threatened release of hazardous substances at such real property. Consequently, the collateral agent may decline to foreclose on such Collateral or exercise remedies available in respect thereof if it does not receive indemnification to its satisfaction from the noteholders.

**Regulatory approvals may be required in order to enforce the security interests in the Collateral and to dispose of the Collateral.**

The Collateral securing the notes and the subsidiary guarantors' guarantees includes equity interests of entities that own electric generation facilities and the electric generation assets owned by such entities. Pursuant to the Public Utility Regulatory Act, Texas Utilities Code § 39.158, PUCT approval is required in connection with the transfer of electric generation facilities to an owner of electric generation facilities that offers electricity for sale in Texas if the electricity offered for sale in the power region by the combined enterprise after the transfer would exceed one percent of the total electricity for sale in the power region. The approval must be requested at least 120 days before the date of the proposed transfer. If the PUCT determines that the transaction would result in the acquirer owning or controlling more than 20% of the installed generation capacity located in, or capable of delivering electricity to, a power region, the PUCT may condition approval of the transaction on reasonable modifications to the transaction as prescribed by the PUCT to mitigate potential market power abuses. In addition, while prior PUCT approval is not required, certain subsidiaries of TCEH are registered power generation companies under the Public Utility Regulatory Act and pursuant to PUCT rules, would have to provide notice of any material change in ownership to the PUCT within 45 days of such change.

Because it sells electricity to retail customers in the areas of Texas where the sale of electricity is open to retail competition, TXU Energy Retail Company LLC (a wholly-owned subsidiary of TCEH) is a Retail Electric Provider ("REP") under the Public Utility Regulatory Act. If enforcement of the security interests in the Collateral would result in a change in control of TXU Energy Retail Company LLC, TXU Energy Retail Company would be required to apply to the PUCT for an amendment of its existing REP certificate and the new owner would be required to satisfy the REP certification requirements in order to sell electricity to retail customers. These certification requirements include, among other things, financial suitability criteria. An application to amend the REP certificate must be filed within ten working days of a material change, but prior approval may be obtained by filing the amendment application before the occurrence of the material change. REP certification at the PUCT generally takes at least 60 to 90 days to complete.

Pursuant to the Atomic Energy Act of 1954 (as amended) and implementing regulations issued by the NRC, NRC approval is required prior to any direct or indirect transfer of control of any NRC-licensed facility. Accordingly, if enforcement of the security interests in the Collateral would result in a change in control of Luminant Generation Company LLC (a wholly-owned subsidiary of TCEH, the licensee of Comanche Peak Nuclear Power Plant Units 1 & 2, and an applicant for a construction and operating license for Comanche Peak Nuclear Power Plant Units 3 & 4) or Comanche Peak Nuclear Power Company LLC (an applicant for a construction and operating license for Comanche Peak Nuclear Power Plant Units 3 & 4), NRC approval would be required before transfer of possession or ownership. NRC approval generally takes at least six months to complete.

Other regulatory approvals, including with respect to transfers of permits required in connection with the transfer of power generation, mining or other assets, may apply to the enforcement of the security interests in the Collateral and to dispositions of the Collateral. In connection with any action taken to enforce the security against the Collateral, if regulatory approval is required, such approval may not be granted and, if it were to be granted, it is not known how long such approval would take to obtain or what, if any, conditions would be required to be satisfied prior to such approval.

27

EFIHMW00079472

**Equity interests of any of our subsidiaries will not be pledged to secure the notes to the extent the pledge of such equity interests would require the filing of separate financial statements for such subsidiary with the SEC.**

The notes, the subsidiary guarantees, the TCEH Existing Second Lien Notes and the guarantees of the TCEH Existing Second Lien Notes are secured by a pledge of the equity interests of our subsidiaries. Rule 3-16 of Regulation S-X under the Securities Act requires the presentation of a company's stand-alone, audited financial statements if that company's capital stock or other securities are pledged to secure the securities of another issuer, and the greater of the principal amount, par value, book value and market value of the pledged stock or securities equals or exceeds 20% of the principal amount of the securities secured by such pledge. The indenture governing the notes and the pledge agreement will provide that to the extent that Rule 3-16 would require the filing with the SEC (or any other governmental agency) of separate financial statements of any of our subsidiaries due to the fact that such subsidiaries' equity interests secure the notes, then such equity interests will automatically be deemed, for so long as such requirement would be in effect, not to be part of the Collateral to the extent necessary to not be subject to such requirement. In addition, in the event that Rule 3-16 is amended, modified or interpreted by the SEC to require (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, which would require) the filing with the SEC (or any other governmental agency) of separate financial statements of any subsidiary of TCEH due to the fact that such subsidiary's equity interests secure the notes and the TCEH Existing Second Lien Notes, then the equity interests of such subsidiary shall automatically be deemed not to be part of the Collateral, but only to the extent necessary to not be subject to such requirement. In such event, all liens on such equity interests shall be automatically released. The lenders under the TCEH Senior Secured Credit Facilities are not subject to a similar requirement. As a result, noteholders could lose their security interest in such portion of the pledged equity interests if and for so long as any such rule is in effect. In addition, the absence of a lien on a portion of the equity interests of a subsidiary pursuant to this provision in certain circumstances could result in less than a majority of the equity interests of a subsidiary being pledged to secure the notes and the TCEH Existing Second Lien Notes, which could impair the ability of the collateral agent, acting on behalf of the noteholders, to sell a controlling interest in such subsidiary or to otherwise realize value on the equity interests.

As a result, noteholders could lose a portion or all of their security interest in the capital stock or other securities of those subsidiaries. It may be more difficult, costly and time-consuming for noteholders to foreclose on the assets of a subsidiary than to foreclose on its capital stock or other securities, so the proceeds realized upon any such foreclosure could be significantly less than those that would have been received upon any sale of the capital stock or other securities of such subsidiary. See "Description of the Notes — Security."

**Not all of the assets related to, or needed for the operation of, the Collateral will be pledged to secure the notes. The value of the Collateral may be diminished by the absence of security interests in, and assured access to, those assets.**

As described under the caption "Description of the Notes — Security," the notes and the subsidiary guarantees will not be secured by certain excluded assets. In particular, the collateral agent will not have a security interest in any capital stock or assets that are not subject to a lien securing obligations under the TCEH Senior Secured Credit Facilities, capital stock and assets of unrestricted subsidiaries under the indenture governing the notes, capital stock of certain immaterial subsidiaries, assets relating to EFH Corp.'s receivables facilities, certain lease rights and real property acquired after the issue date having a fair market value of less than $20 million.

If an event of default occurs and the notes are accelerated, the notes and the subsidiary guarantees securing the notes will rank equally with the holders of all of our other unsubordinated and unsecured indebtedness and other liabilities with respect to such excluded assets. As a result, if the value of the assets securing the notes and the subsidiary guarantees (taking into account any secured indebtedness with a prior security interest on such assets) is less than the aggregate amount of the claims of the noteholders, no assurance can be provided that the noteholders would receive any substantial recovery from the excluded assets.

28

EFIHMW00079473

In addition, EFCH's guarantee of the TCEH Senior Secured Credit Facilities is secured by EFCH's assets, which include the equity interests in TCEH. Consequently, the collateral agent, acting on behalf of the lenders under the TCEH Senior Secured Credit Facilities, could sell a controlling interest in TCEH, and noteholders would not have a secured claim on the proceeds of such sale. Rather, claims by noteholders would rank equally in right of payment with all other senior debt of EFCH with respect to such proceeds.

**Under the indenture governing the notes, noteholders will agree to not file a bankruptcy proceeding against Oncor Holdings or any of its subsidiaries.**

Noteholders will acknowledge and agree that they will not (i) initiate any legal proceeding to procure the appointment of an administrative receiver or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against Oncor Holdings, Oncor or any of their subsidiaries, or against any of the assets of Oncor Holdings, Oncor or any of their subsidiaries. Such holders will further acknowledge and agree that each of Oncor Holdings, Oncor and any of their subsidiaries is a third-party beneficiary of the foregoing covenant and has the right to specifically enforce such covenant in any proceeding at law or in equity.

**We may not be able to repurchase the notes upon a change of control.**

Upon the occurrence of specific kinds of change of control events, we will be required to offer to repurchase all of the notes, including the TCEH Existing Second Lien Notes, at 101% of their respective principal amount plus accrued and unpaid interest. The source of funds for any purchase of the notes will be our available cash or cash generated from our subsidiaries' operations or other sources, including borrowings, sales of assets or sales of equity. We may not be able to repurchase the notes and the TCEH Existing Second Lien Notes upon a change of control because we may not have sufficient financial resources to purchase all of the notes and the TCEH Existing Second Lien Notes that are tendered upon a change of control. Further, we may be restricted under the terms of the TCEH Senior Secured Credit Facilities from repurchasing all of the notes and the TCEH Existing Second Lien Notes tendered by holders upon a change of control. Accordingly, we may not be able to satisfy our obligations to purchase the notes and the TCEH Existing Second Lien Notes unless we are able to refinance or obtain waivers under the instruments governing our debt. Our failure to repurchase the notes and the TCEH Existing Second Lien Notes upon a change of control would cause a default under the indenture or indentures governing the notes and the TCEH Existing Second Lien Notes and a cross-default under certain of our other debt agreements. The instruments governing the TCEH Senior Secured Credit Facilities also provide that a change of control will be a default that permits the lenders thereunder to accelerate the maturity of borrowings thereunder. Any of our future debt agreements may contain similar provisions.

**The notes will constitute a new series of senior notes but will be treated as a single class with the TCEH Existing Second Lien Notes for voting purposes with respect to amendments and waivers and for taking certain other actions. If we issue additional debt that is secured equally and ratably with the notes and the TCEH Existing Second Lien Notes, the voting interest of noteholders will be diluted.**

The notes and the TCEH Existing Second Lien Notes are each a separate series of debt securities but are generally treated as a single class of securities for voting purposes with respect to amendments and waivers and for taking certain other actions, except as otherwise described in "Description of the Notes." The notes, the TCEH Existing Second Lien Notes and any debt that we incur in the future that is secured equally and ratably with the notes and the TCEH Existing Second Lien Notes by a second-priority lien on the Collateral will be treated as a single class for amendments and waivers affecting all such debt and for actions requiring the consent of holders of the debt, such as declaring certain events of default under the indenture governing the notes or accelerating amounts due under the notes. As a result of the debt exchange transaction described in "Summary — Recent Developments — Recent Private Debt Exchange Transaction" pursuant to which the TCEH Existing Second Lien Notes were issued, a single institutional investor manages accounts holding an aggregate principal amount of approximately $336 million of the TCEH Existing Second Lien Notes, which will all vote as a single

29

EFIHMW00079474

class with the notes offered hereby. Consequently, certain actions, including amendments and waivers, which will affect the holders of the notes, may be accomplished whether or not the holders of the notes consent to such action. As a result, the individual voting interest of the holders of the notes would be accordingly diluted.

**There are restrictions on noteholders' ability to transfer or resell the notes without registration under applicable securities laws.**

The notes are being offered and sold pursuant to exemptions from registration under U.S. and applicable state securities laws. Therefore, noteholders may transfer or resell the notes in the U.S. only in a transaction registered under or exempt from the registration requirements of U.S. and applicable state securities laws, and noteholders may be required to bear the risk of noteholders' investment for an indefinite period of time. We are obligated to use our commercially reasonable efforts to commence an offer to exchange the notes for notes with substantially identical terms that are registered under the Securities Act or, in certain circumstances, register the reoffer and resale of the notes under the Securities Act. See "Exchange Offer; Registration Rights" and "Notice to Investors."

**Noteholders' ability to transfer the notes may be limited by the absence of an active trading market, and there is no assurance that any active trading market will develop for the notes.**

The notes are a new issue of securities for which there is no established trading market. The initial purchasers have advised us that they intend to make a market in the notes, and the exchange notes, if issued, as permitted by applicable laws and regulations; however, the initial purchasers are not obligated to make a market in the notes or the exchange notes, and they may discontinue their market-making activities at any time without notice. Because investment funds associated with or designated by Goldman, Sachs & Co. are members of the Sponsor Group, Goldman, Sachs & Co. would be required to deliver a "market-making prospectus" when effecting offers and sales of notes and exchange notes if Goldman, Sachs & Co. makes a market in the notes. For so long as the market-making prospectus would be required to be delivered, the ability of Goldman, Sachs & Co. to make a market in the notes and exchange notes would, in part, be dependent on our ability to maintain a current market-making prospectus. The liquidity of any market for the notes will depend upon the number of holders of the notes, our performance, the market for similar securities, the interest in securities dealers making a market in the notes and other factors. Therefore, we cannot assure noteholders that an active market for the notes or exchange notes will develop or, if developed, that it will continue. If an active market does not develop or is not maintained, the price and liquidity of the notes will be adversely affected.

Historically, the market for non investment-grade debt has been subject to disruptions that have caused substantial volatility in the prices of securities similar to the notes. We cannot assure noteholders that the market, if any, for the notes or exchange notes will be free from similar disruptions or that any such disruptions may not adversely affect the prices at which noteholders may sell their notes. In addition, subsequent to their initial issuance, the notes or exchange notes may trade at a discount from their initial offering price, depending upon prevailing interest rates, the market for similar notes, our performance and other factors.

**A decline in our credit ratings could negatively affect the trading price of the notes and also our ability to refinance our debt.**

Our credit rating and the rating for the notes could be lowered, suspended or withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment, circumstances warrant. In addition, changes in EFH Corp.'s credit ratings may impact the rating for the notes. A downgrade or withdrawal, or the announcement of a possible downgrade or withdrawal, of the credit rating for the notes may cause the trading price of the notes to decline significantly. In addition, downgrades in our long-term debt ratings may make it more difficult to refinance our debt and increase the cost of any debt that we may incur in the future.

Highly Confidential

**The interests of the Sponsor Group may differ from the interests of the noteholders.**

The Sponsor Group indirectly owns approximately 60% of EFH Corp.'s capital stock on a fully diluted basis through their investment in Texas Holdings. As a result of this ownership and the Sponsor Group's ownership in interests of the General Partner, the Sponsor Group indirectly has control over decisions regarding our operations, plans, strategies, finances and structure, including whether to enter into any corporate transaction, and will have the ability to prevent any transaction that requires the approval of EFH Corp.'s shareholders.

The interests of these persons may differ from noteholders' interests in material respects. For example, if we encounter financial difficulties or are unable to pay our debts as they mature, the interests of the Sponsor Group, as equity holders of EFH Corp., might conflict with noteholders' interests. The Sponsor Group may also have an interest in pursuing acquisitions, divestitures, financings or other transactions that, in their judgment, could enhance their equity investments, even though such transactions might involve risks to noteholders.

*Risks Related to Fraudulent Conveyance Laws*

**Our liabilities and those of EFCH exceed our and EFCH's assets as shown on our and EFCH's balance sheet as of June 30, 2010 and in valuation analyses, and it is likely that the liabilities (including contingent guarantee liabilities) of some or all of the subsidiary guarantors also exceed their assets. If a court were to find that we, EFCH or any subsidiary guarantor were insolvent before or after giving effect to this offering and did not receive reasonably equivalent value or fair consideration for the issuance of the notes or the incurrence of a guarantee or the pledge of the Collateral, as applicable, the court may void all or a portion of the obligations represented by the notes or the guarantee of the notes or the pledge of the Collateral as a fraudulent conveyance.**

In an insolvency proceeding, a trustee, debtor in possession or another person acting on behalf of the bankruptcy estate may seek to recover all or a portion of transfers made or void obligations incurred prior to the insolvency proceeding on the basis that such transfers and obligations constituted fraudulent conveyances. Under certain circumstances, creditors may recover transfers or void obligations under state fraudulent conveyance laws even if the debtor is not in an insolvency proceeding.

Fraudulent conveyances are generally defined to include transfers made or obligations incurred for inadequate consideration when a debtor was insolvent, inadequately capitalized or in similar financial distress, or transfers made or obligations incurred with the intent of hindering, delaying or defrauding current or future creditors. A trustee, debtor in possession or another person acting on behalf of a bankruptcy estate, or a creditor or other entity acting outside of an insolvency proceeding, may be able to recover such transfers under the fraudulent conveyance provisions of the bankruptcy law and/or state fraudulent conveyance laws. The fraudulent conveyance provisions of the bankruptcy law allows the trustee, debtor in possession, or other person acting on behalf of a bankruptcy estate to void a fraudulent conveyance made within two years prior to the commencement of an insolvency proceeding. Under state fraudulent conveyance laws, transfers made more than two years prior to the commencement of a fraudulent conveyance lawsuit may be subject to avoidance.

The notes or the related guarantees incurred or the pledge of the Collateral could be voided as a fraudulent conveyance, or claims in respect of the notes, such guarantee or pledge could be subordinated to all of our, EFCH's or the subsidiary guarantors' other debts, if we or EFCH or any subsidiary guarantor, at the time they incurred the debt evidenced by the notes or such guarantee or granted the pledge, received less than reasonably equivalent value or fair consideration for the issuance of the notes or the incurrence of such guarantee or the grant of such pledge and:

- were insolvent or rendered insolvent by reason of such issuance or incurrence;

- were engaged in a business or transaction for which their remaining assets constituted unreasonably small capital; or

- intended to incur, or believed that they would incur, debts beyond their ability to pay those debts as they mature.

31

EFIHMW00079476

The measures of insolvency for purposes of these fraudulent conveyance laws will vary depending upon the law applied in any proceeding to determine whether a fraudulent conveyance has occurred. Generally, however, a debtor would be considered insolvent if:

- the sum of its debts, including contingent liabilities, was greater than the fair saleable value of all of its assets;

- the present fair saleable value of its assets was less than the amount that would be required to pay its probable liability on its existing debts, including contingent liabilities, as they become absolute and mature; or

- it could not pay its debts as they become due.

Our liabilities and those of EFCH exceed our and EFCH's assets as shown on our and EFCH's respective balance sheet prepared in accordance with U.S. GAAP as of June 30, 2010, and it is likely that the liabilities (including contingent guarantee liabilities) of some or all of the subsidiary guarantors also exceed their assets. Additionally, as described in "Summary — Recent Developments — Selected Preliminary Financial Data for the Quarterly Period Ended September 30, 2010", EFCH expects that its financial results for the quarter ended September 30, 2010 will include a non-cash goodwill impairment charge of approximately $4.1 billion. Recent valuation analyses of TCEH's business indicate that its liabilities (including the principal amount of its outstanding indebtedness) currently exceed the fair value of its assets. We do not know whether a court would determine that we, EFCH or any of the subsidiary guarantors were insolvent under the solvency tests set forth in the bullet points immediately prior to this paragraph or that we, EFCH or any of the subsidiary guarantors were inadequately capitalized, or what standard a court would apply in determining whether we or EFCH would be considered to be insolvent or inadequately capitalized.

In addition, we cannot assure you that a court would determine that reasonably equivalent value or fair consideration was received by us, EFCH or any subsidiary guarantor in connection with the offering of the notes and the incurrence of the guarantee or pledge of the Collateral, as applicable. A court could conclude that because the proceeds of this offering were received initially by TCEH and not by the subsidiary guarantors and because there will be a time period between the receipt of the proceeds from this offering and the application thereof as contemplated herein, reasonably equivalent value or fair consideration was not received by the subsidiary guarantors. The risk that a court would conclude that reasonably equivalent value or fair consideration was not received would be even greater if the proceeds from this offering are never used for the purposes contemplated herein, due to an intervening event or otherwise, including the failure of TCEH to apply the proceeds as described in this offering memorandum. A court could also conclude that the use of proceeds did not constitute reasonably equivalent value because the court may determine that the amount of proceeds used to pay, repay or prepay the term loans under the TCEH Senior Secured Credit Facilities and/or repurchase principal amounts outstanding of TCEH 2015/2016 Notes exceeded the true value of the term loans under the TCEH Senior Secured Credit Facilities so paid, repaid or prepaid or the principal amounts outstanding of TCEH 2015/2016 Notes so repurchased. In addition, a court could reach this conclusion if it determines that the term loans under the TCEH Senior Secured Credit Facilities paid, repaid or prepaid or principal amounts outstanding of TCEH 2015/2016 Notes repurchased with the proceeds of this offering were not valid for the full face amount or that the guarantees thereof were reduced or eliminated, including as a result of fraudulent conveyance laws or the "savings clause" provision included in such debt, which, as described below, would limit the liability of each of the guarantors of such debt to the maximum amount that it could incur without such incurrence causing a fraudulent conveyance. If the proceeds of this offering are used to pay, repay or prepay term loans under the TCEH Senior Secured Credit Facilities and/or repurchase principal amounts outstanding of TCEH 2015/2016 Notes held by EFH Corp. or EFIH, a court may view this use of proceeds as not providing reasonably equivalent value or fair consideration because such debt was not held by a third party. The examples discussed above are not exhaustive.

If a court were to find that we issued the notes or any guarantor issued its guarantee, or we or any guarantor granted its pledge of the Collateral, under circumstances constituting a fraudulent conveyance, then a court could

32

EFIHMW00079477

void all or a portion of the obligations under the notes or such guarantee, or void the pledge of the Collateral. In addition, under such circumstances, the value of any consideration holders received with respect to the notes, such guarantee, and the Collateral, including upon foreclosure of the Collateral, could also be subject to recovery from such holders and, possibly, from subsequent transferees of the notes.

To the extent the guarantees are voided as a fraudulent conveyance, holders of the notes would have no claim on the Collateral securing the guarantees and would only have a senior secured claim against the Issuer that is structurally subordinated to all liabilities of the guarantors, including their existing guarantees of the TCEH Senior Secured Credit Facilities, the TCEH 2015/2016 Notes and any other obligations. To the extent that the pledge of Collateral by any subsidiary guarantor is voided, holders of the notes would have no claim on the Collateral securing the guarantees, and would only have a senior unsecured claim against the relevant guarantor that is effectively subordinated to that guarantor's secured obligations to the extent of the value of the assets securing such obligations, including its existing secured guarantee of the TCEH Senior Secured Credit Facilities or the TCEH Existing Second Lien Notes. A voiding of obligations under the notes or guarantees or of the pledge of Collateral would adversely affect the ranking and trading price of the notes.

As of June 30, 2010 after giving effect to the Exchange Offer described in "Summary — Recent Developments — Recent Exchange Offer and Consent Solicitation" and other repurchases and exchanges of EFH Corp.'s and its subsidiaries' debt since June 30, 2010 described under "Debt Related Activity in 2010 — 2010 EFH Corp. Debt Exchanges and Repurchases" in Note 4 to EFCH's unaudited financial statements included in the EFCH June 30, 2010 Form 10-Q, which is incorporated into this offering memorandum by reference, and under "Summary — Recent Developments — Recent Private Debt Exchange Transaction," $22.036 billion of indebtedness was outstanding under the TCEH Senior Secured Credit Facilities, $336 million aggregate principal amount of TCEH Existing Second Lien Notes were outstanding and $6.584 billion aggregate principal amount of TCEH 2015/2016 Notes were outstanding. In addition, we could incur up to an additional $1.88 billion of revolving credit facility indebtedness under the TCEH Senior Secured Credit Facilities.

In the future, the notes may be fungible with additional notes that bear the same CUSIP number that we issue under the indenture governing the notes. Such additional notes may be issued under circumstances in which there is an increased risk that a court would determine that the issuance of such additional notes, or any related guarantee or pledge of Collateral, constituted a fraudulent conveyance, or in which the court would apply the savings clause to eliminate or reduce the guarantee of such additional notes. In such a scenario, because such additional notes share the same CUSIP number as the notes, there will be no way to distinguish between the additional notes and the notes if the obligations under the notes, the guarantees or the pledge of Collateral were voided, eliminated or reduced, and therefore the recovery of holders of the notes in the case of an insolvency will be more difficult to determine, and may be less, than if no additional notes were issued.

**In the event of an insolvency proceeding, a court may find that the guarantees should be eliminated or reduced to an amount that would significantly diminish the value of the guarantees and the related liens on the Collateral. To the extent this were to occur, the guarantees could be structurally subordinated to the liabilities of the guarantors, including the existing guarantees of the TCEH 2015/2016 Notes.**

The guarantees of the notes contain a provision intended to limit the guarantor's liability to the maximum amount that it could incur without causing the incurrence of obligations under its guarantee to be a fraudulent conveyance, referred to as the "savings clause". This provision may not be effective to protect a guarantee from being voided under fraudulent conveyance law or may eliminate or reduce the guarantor's obligation to an amount that effectively makes the guarantee worthless. If a court interprets the savings clause as requiring that the amount of the guarantee be eliminated or reduced to the extent that it causes the guarantor to be insolvent, the court may eliminate or reduce the guarantee even if the court determines that the guarantor received reasonably equivalent value in connection with the incurrence of the guarantee.

As discussed above, our liabilities and those of EFCH exceed our and EFCH's assets as shown on our and EFCH's respective balance sheet prepared in accordance with GAAP as of June 30, 2010, without giving effect

33

EFIHMW00079478

to the preliminary approximately $4.1 billion goodwill impairment described in "Summary — Recent Developments — Selected Preliminary Financial Data for the Quarterly Period Ended September 30, 2010," and in valuation analyses, and it is likely that the liabilities (including contingent guarantee liabilities) of some or all of the subsidiary guarantors also exceed their assets. We do not know whether any of the guarantors would satisfy the solvency tests that a court may apply in determining whether all or a portion of any guarantee of the notes constituted a fraudulent conveyance. Because the lien on the Collateral of each subsidiary guarantor only secures such subsidiary's obligations under its guarantee, to the extent a guarantee obligation is reduced or eliminated, you would also lose the benefit of the related lien on the Collateral. As a result, the notes would effectively become junior to the liabilities of such subsidiary, including the existing guarantees of the TCEH 2015/2016 Notes, with little or no benefit provided by the guarantees and the related second priority lien. A reduction or elimination of the subsidiary guarantors' obligations would adversely affect the ranking and trading price of the notes.

*Risks Related to Structure*

**TCEH is a holding company and its obligations are structurally subordinated to existing and future liabilities and preferred stock of its subsidiaries.**

TCEH's cash flows and ability to meet its obligations are largely dependent upon the earnings of its respective subsidiaries and the payment of such earnings to TCEH in the form of dividends, distributions, loans or otherwise, and repayment of loans or advances from TCEH. These subsidiaries are separate and distinct legal entities and have no obligation to provide TCEH with funds for its payment obligations. Any decision by a subsidiary to provide TCEH with funds for its payment obligations, whether by dividends, distributions, loans or otherwise, will depend on, among other things, the subsidiary's results of operations, financial condition, cash requirements, contractual restrictions and other factors. In addition, a subsidiary's ability to pay dividends may be limited by covenants in its existing and future debt agreements or applicable law.

Because TCEH is a holding company, its obligations to its creditors are structurally subordinated to all existing and future liabilities and existing and future preferred stock of its subsidiaries that do not guarantee such obligations. Therefore, TCEH's rights and the rights of its creditors to participate in the assets of any subsidiary in the event that such a subsidiary is liquidated or reorganized are subject to the prior claims of such subsidiary's creditors and holders of such subsidiary's preferred stock. To the extent that TCEH may be a creditor with recognized claims against any such subsidiary, TCEH's claims would still be subject to the prior claims of such subsidiary's creditors to the extent that they are secured or senior to those held by TCEH. Subject to restrictions contained in financing arrangements, TCEH's subsidiaries may incur additional debt and other liabilities. In addition, EFCH, TCEH's parent company and a guarantor of the notes, is a holding company with no significant assets other than its membership interests in TCEH.

34

Highly Confidential

EFIHMW00079479

# THE TRANSACTIONS

## The Merger

On October 10, 2007, the Merger occurred. Upon the effectiveness of the Merger, each share of EFH Corp. common stock outstanding immediately prior to the Merger (other than shares held by EFH Corp. or any of its subsidiaries or Texas Holdings or any of its subsidiaries, including Merger Sub, in each case not held on behalf of third parties, or shares held by holders who properly exercised their rights of dissent and appraisal under Texas law) was cancelled and converted into the right to receive $69.25 in cash, without interest and less any applicable withholding taxes.

## Equity Contributions

At the closing of the Merger, Texas Holdings received an aggregate equity investment of approximately $8.3 billion. Investment funds affiliated with the Sponsor Group, or their respective assignees, contributed approximately $5.1 billion to Texas Holdings. The Sponsor Group consists of investment funds associated with or designated by KKR, TPG and Goldman, Sachs & Co. who, along with certain other co-investors, own EFH Corp. through Texas Holdings, with the Sponsor Group controlling Texas Holdings' general partner, Texas Energy Future Capital Holdings LLC. In addition, Citigroup Global Markets Inc. and Morgan Stanley & Co. Incorporated, each of which is an initial purchaser participating in this offering, or their respective affiliates, each made equity investments of approximately $250 million in Texas Holdings. The Sponsor Group obtained approximately $2.3 billion in equity investments from other existing investors in KKR's and TPG's private equity funds and other third party investors. Following the closing of the Merger and as of the date of this offering memorandum, the Sponsor Group owned approximately 60% of the limited partnership units issued by Texas Holdings in connection with the Merger.

The equity contributions by the Sponsor Group and the Investors are referred to in this offering memorandum as the "Equity Contributions."

## Debt Financing

In connection with the Merger, in addition to the Equity Contributions described above, EFH Corp. and/or its subsidiaries entered into the following debt financing arrangements, in each case, arranged by a consortium of arrangers and bookrunners:

- TCEH's Senior Secured Credit Facilities, which are guaranteed by EFCH and subsidiaries of TCEH;

- a $6.75 billion senior unsecured interim loan facility of TCEH (the "TCEH Senior Interim Facility"), which was used to fund the Merger and related transactions; and

- a $4.5 billion senior unsecured interim loan facility of EFH Corp. (the "EFH Senior Interim Facility"), which was used to fund the Merger and related transactions.

In October and December 2007, TCEH and TCEH Finance, Inc. issued $6.75 billion aggregate principal amount of the TCEH 2015/2016 Notes in two private offerings. The proceeds from the offerings of the TCEH 2015/2016 Notes, along with cash on hand, were used by TCEH to repay in full the TCEH Senior Interim Facility.

In October 2007, EFH Corp. issued the 2017 Notes in a private offering. The proceeds from the offering of the 2017 Notes, along with cash on hand, were used by EFH Corp. to repay in full the EFH Senior Interim Facility.

We refer to the above, collectively, as the "Merger Debt Financing."

Concurrently with the transactions described above, Oncor entered into a $2.0 billion senior revolving credit facility (the "Oncor Revolving Credit Facility"), which may be increased by up to $500 million, subject to certain

35

EFIHMW00079480

conditions, which is being used by Oncor for working capital and for other general corporate purposes. No portion of the Oncor Revolving Credit Facility was used to finance the Merger or the debt repayment that occurred in connection with the Merger.

We refer to the transactions listed above, including the Merger and the application of the proceeds of the Equity Contributions and the Merger Debt Financing, as the "Transactions."

**Ring-Fencing**

Upon the consummation of the Merger, EFH Corp. and Oncor implemented several measures, required by the PUCT Order on Rehearing on Docket No. 34077, that are referred to as "ring-fencing." Such measures included, among others, the following:

- the conversion of Oncor from a Texas corporation to a Delaware limited liability company;

- the inclusion of covenants in Oncor Holdings' and Oncor's limited liability company agreements intended to enhance the separation of Oncor Holdings and its subsidiaries, including Oncor, from Texas Holdings and its other subsidiaries, including EFIH;

- the establishment of boards of directors for Oncor Holdings and Oncor with a majority of members who meet the New York Stock Exchange requirements for independence in all material respects and whose unanimous consent is required to take certain material actions, including (i) to consolidate or merge (A) with EFH Corp. or any of EFH Corp.'s other subsidiaries or (B) with any other entity, if Oncor Holdings or Oncor, as applicable, would not be the surviving entity; (ii) to sell, transfer or dispose of all or substantially all of the assets of Oncor Holdings or Oncor, as applicable, without adequate provision for the payment of all of such entity's creditors; (iii) to institute, or consent to the institution of, bankruptcy or similar proceedings in respect of Oncor Holdings or Oncor, as applicable; or (iv) to the fullest extent permitted by law, to dissolve or liquidate Oncor Holdings or Oncor, as applicable, without adequate provision for the payment of all of such entity's creditors;

- the specific delegation to each of the board of directors and the independent directors of Oncor, each acting by majority vote, of the right to prevent distributions, if it or they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements;

- after the appointment of the initial independent directors, the delegation of the ability to nominate, appoint and fill vacancies in respect of the independent directors of Oncor Holdings and Oncor to a standing nominating committee of Oncor Holdings' board of directors, a majority of whose members are independent directors; and

- the incurrence of new debt, evidenced by the Oncor Revolving Credit Facility, the lenders of which will be specifically relying on the separateness of Oncor Holdings and Oncor, and their assets, from Texas Holdings and its other subsidiaries.

The ring-fencing measures were based on certain principles articulated by rating agencies and certain commitments made by Texas Holdings and Oncor to the PUCT and the FERC intended to further separate Oncor from Texas Holdings and its subsidiaries and to mitigate Oncor's credit exposure to those entities and to reduce the risk that the assets and liabilities of Oncor Holdings or of any of its subsidiaries would be substantively consolidated with the assets and liabilities of Texas Holdings or of any of its other subsidiaries in the event of a bankruptcy of one or more of those entities. A number of ring-fencing measures put in place were incorporated into the PUCT Order on Rehearing in Docket No. 34077 that is legally binding on Oncor.

None of the ring-fenced entities guarantees or otherwise holds out its credit as being available to support the obligations of EFH Corp., EFCH or any of their subsidiaries (other than the ring-fenced entities), including the notes offered hereby. In addition, lenders under TCEH's Senior Secured Credit Facilities and the holders of the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes, the EFIH 9.75% Notes, the EFIH 10.000% Notes, the

36

EFIHMW00079481

2017 Notes, the TCEH 2015/2016 Notes and the TCEH Existing Second Lien Notes have acknowledged, and the future holders of such notes will acknowledge, by acceptance of such notes, the legal separateness of Oncor and its subsidiaries from the borrowers and guarantors under such financing documents. Lenders under TCEH's Senior Secured Credit Facilities and the holders of the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes, the EFIH 9.75% Notes, the EFIH 10.000% Notes, the 2017 Notes, the TCEH 2015/2016 Notes and the TCEH Existing Second Lien Notes also agreed, and the future holders of such notes will agree, by acceptance of such notes, that they will not initiate any bankruptcy or similar proceeding against Oncor Holdings or its subsidiaries and that Oncor Holdings and its subsidiaries are entitled to enforce this non-petition covenant. In addition, holders of the notes, by acceptance of such notes, will acknowledge the legal separateness of Oncor and its subsidiaries from EFH Corp., the Issuer and EFCH under such financing documents. Holders of the notes, by acceptance of such notes, will also agree that they will not initiate any bankruptcy or similar proceeding against Oncor Holdings or its subsidiaries and that Oncor Holdings and its subsidiaries are entitled to enforce this non-petition covenant.

37

EFIHMW00079482

## USE OF PROCEEDS

The net proceeds we receive from the issuance of the notes will be used for the payment, repayment or prepayment of term loans under the TCEH Senior Secured Credit Facilities and/or the repurchase of principal amounts outstanding of TCEH 2015/2016 Notes. Approximately $153 million of the net proceeds of this offering will be used to repurchase approximately $226 million principal amount of the existing 10.25% Senior Notes due 2015 and 10.25% Senior Notes due 2015, Series B of the Issuer acquired by an initial purchaser in connection with this offering, and such repurchased notes will be cancelled. The remaining net proceeds from the offering of the notes will be deposited in an escrow account and held by The Bank of New York Mellon Trust Company, N.A., as escrow agent, pursuant to a pledge and escrow agreement until such proceeds are used to pay, repay, prepay or repurchase debt as described above. The amounts in the escrow account will be pledged on a first-priority basis for the benefit of the noteholders. If proceeds remain in the escrow account on March 31, 2013, the Issuer will be required to use such amounts to offer to purchase the maximum principal amount of notes that may be purchased at a price of 100% of the principal amount thereof, plus accrued and unpaid interest, if any, to the purchase date; provided that any accrued and unpaid interest will be paid by the Issuer using funds not from the escrow account. See "Description of the Notes — Escrow of Proceeds; Escrow Proceeds Offer." Any amounts remaining following the offer to purchase will remain in the escrow account and will be available for us to use to pay, repay or prepay term loans under the TCEH Senior Secured Credit Facilities and/or to repurchase principal amounts outstanding of TCEH 2015/2016 Notes pursuant to the terms and conditions of the pledge and escrow agreement.

Highly Confidential

EFIHMW00079483

PX 042
Page 46 of 157

## CAPITALIZATION

The following table sets forth as of June 30, 2010, EFCH's consolidated cash and cash equivalents and capitalization:

(1) on an actual basis;

(2) on an as adjusted basis to give effect to (i) the Exchange Offer as described in "Summary — Recent Developments — Recent Exchange Offer and Consent Solicitation," (ii) other repurchases and exchanges since June 30, 2010 of certain debt of EFH Corp. guaranteed by EFCH described under "Debt Related Activity in 2010 — 2010 EFH Corp. Debt Exchanges and Repurchases" in Note 4 to EFCH's financial statements included in the EFCH June 30, 2010 Form 10-Q, which is incorporated into this offering memorandum by reference, and (iii) the exchange described in "Summary — Recent Developments — Recent Private Debt Exchange Transaction"; and

(3) on an as further adjusted basis to give effect to the offering of the notes hereby, without giving effect to the repurchase of approximately $226 million aggregate principal amount of TCEH 2015/2016 Notes as described under "Use of Proceeds."

| | As of June 30, 2010 | | |
| --- | --- | --- | --- |
| | Actual | As Adjusted | As Further Adjusted |
| | (millions of dollars) | | |
| Cash and cash equivalents(a) | $ 85 | $ 66 | $ 66 |
| **Debt:** | | | |
| **EFCH:** | | | |
| 10.875% EFH Corp. Senior Notes due 2017(b) | $ 906 | $ 180 | $ 180 |
| 11.250%/12.000% EFH Corp. Senior Toggle Notes due 2017(b) | 1,379 | 269 | 269 |
| 9.75% EFH Corp. Senior Secured Notes due 2019(b) | 58 | 58 | 58 |
| 10.000% EFH Corp. Senior Secured Notes due 2020(b) | 92 | 328 | 328 |
| Other secured debt | 99 | 99 | 99 |
| Other unsecured debt | 9 | 9 | 9 |
| Unamortized fair value discount | (10) | (10) | (10) |
| Total EFCH debt | 2,533 | 933 | 933 |
| **TCEH:** | | | |
| Senior Secured Credit Facilities(c) | 22,036 | 22,036 | 22,036 |
| 10.25% Senior Notes due 2015(d) | 3,000 | 2,671 | 2,671 |
| 10.25% Senior Notes due 2015, Series B(d) | 2,000 | 1,906 | 1,906 |
| 10.50/11.25% Senior Toggle Notes due 2016(d) | 2,062 | 2,007 | 2,007 |
| 15% Senior Secured Second Lien Notes due 2021 | — | 336 | 336 |
| 15% Senior Secured Second Lien Notes due 2021, Series B offered hereby | — | — | 350 |
| Other secured debt(e) | 283 | 283 | 283 |
| Other unsecured debt | 1,540 | 1,540 | 1,540 |
| Unamortized fair value discount | (143) | (143) | (143) |
| Total TCEH debt | 30,778 | 30,636 | 30,986 |
| Total consolidated debt | 33,311 | 31,569 | 31,919 |
| EFCH shareholder's equity | (4,248) | (2,589) | (2,589) |
| Noncontrolling interests in subsidiaries | 69 | 69 | 69 |
| Total capitalization | $29,132 | $29,049 | $29,399 |

(a) As adjusted cash and cash equivalents reflects accrued interest paid on TCEH 2015/2016 Notes acquired in the exchange transaction described under "Summary — Recent Developments — Recent Private Debt

39

EFIHMW00079484

Exchange Transaction." As further adjusted cash and cash equivalents does not include the portion of the net proceeds from the issuance of the notes offered hereby that will be deposited in the escrow account, as described in "Use of Proceeds," and reported as restricted cash.

(b)  Represents 50% of the principal amount of certain EFH Corp. debt that is guaranteed by EFCH (pushed-down debt), as discussed in Note 4 to EFCH's financial statements included in the EFCH June 30, 2010 Form 10-Q, which is incorporated by reference into this offering memorandum.

(c)  Includes $20 million principal amount of term loans under the TCEH Senior Secured Credit Facilities held by EFH Corp.

(d)  Includes, collectively, $386 million aggregate principal amount of TCEH 2015/2016 Notes that are held by EFH Corp. and EFIH.

(e)  Includes $158 million of funding under the accounts receivable securitization program.

Highly Confidential

EFIHMW00079485

## DESCRIPTION OF THE NOTES

**General**

Certain terms used in this "Description of the Notes" are defined under "— Certain Definitions." In this "Description of the Notes," (i) the terms *"we," "our"* and *"us"* each refer to Energy Future Competitive Holdings Company and its consolidated Subsidiaries, (ii) the term *"Issuer"* refers only to Texas Competitive Electric Holdings Company LLC (*"TCEH"*) and TCEH Finance, Inc. (*"TCEH Finance"*), a Delaware corporation and a direct, wholly-owned subsidiary of TCEH, collectively, and not to any of their respective Subsidiaries and (iii) the term *"Parent Guarantor"* refers only to Energy Future Competitive Holdings Company and not to any of its Subsidiaries.

The Issuer issued $335,905,000 aggregate principal amount of 15% Senior Secured Second Lien Notes due 2021 (the *"Existing Second Lien Notes"*) under an Indenture dated as of October 6, 2010 (the *"Existing Indenture"*) among the Issuer, the Guarantors and The Bank of New York Mellon Trust Company, N.A., as trustee (the *"Trustee"*).

The Issuer will issue $350,000,000 aggregate principal amount of 15% Senior Secured Second Lien Notes due 2021, Series B (the *"New Notes"*) under the Existing Indenture, as supplemented by a supplemental indenture to be dated as of the Issue Date among the Issuer, the Guarantors and the Trustee (together with the Existing Indenture, the *"Indenture"*); *provided* that the Issuer, in lieu of a supplemental indenture, may elect to issue the New Notes under an indenture separate from the indenture pursuant to which the Existing Second Lien Notes were issued (in which case, references to the *"Indenture"* shall refer to this separate indenture). Regardless of whether the New Notes are issued under a supplemental indenture or a separate indenture, they will vote together with the Existing Second Lien Notes as Required Debt as described in this "Description of the Notes."

The New Notes and the Existing Second Lien Notes will each constitute a separate series of senior notes under the Indenture unless the New Notes are issued under a separate indenture, but, except as otherwise described in this "Description of the Notes," will have substantially identical terms. The Existing Second Lien Notes and the New Notes are collectively referred to herein as the *"Notes."* The New Notes will be issued in a private transaction that is not subject to the registration requirements of the Securities Act. See "Notice to Investors." The terms of the New Notes will include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act.

The Holders of the Notes, by accepting the Notes, will acknowledge (i) the legal separateness of the Parent Guarantor and its Subsidiaries from the Oncor Subsidiaries, (ii) that the lenders under the Oncor Electric Delivery Facility and the holders of the existing Oncor notes and Oncor's transition bonds have likely advanced funds thereunder in reliance upon the separateness of the Oncor Subsidiaries from the Parent Guarantor and its Subsidiaries, (iii) that the Oncor Subsidiaries have assets and liabilities that are separate from those of the Parent Guarantor and its Subsidiaries, (iv) that the obligations owing under the Notes are obligations and liabilities of the Issuer, the Parent Guarantor and the other Guarantors only, and are not the obligations or liabilities of any Oncor Subsidiary, (v) that the Holders of the Notes shall look solely to the Parent Guarantor and its Subsidiaries and their assets, and not to any assets, or to the pledge of any assets, owned by any Oncor Subsidiary, for the repayment of any amounts payable pursuant to the Notes and for satisfaction of any other obligations owing to the Holders under the Indenture, the applicable Registration Rights Agreement or any related documents and (vi) that none of the Oncor Subsidiaries shall be personally liable to the Holders of the Notes for any amounts payable, or any other obligation, under the Indenture, the applicable Registration Rights Agreement or any related documents.

The Holders of the Notes, by accepting the Notes, will acknowledge and agree that the Holders of the Notes shall not (i) initiate any legal proceeding to procure the appointment of an administrative receiver or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against any of the Oncor Subsidiaries, or against any of the Oncor Subsidiaries' assets. The Holders further

41

EFIHMW00079486

acknowledge and agree that each of the Oncor Subsidiaries is a third party beneficiary of the foregoing covenant and shall have the right to specifically enforce such covenant in any proceeding at law or in equity. The foregoing acknowledgements and agreements are contained in the Indenture.

The following description is only a summary of the material provisions of the Indenture and the Security Documents, does not purport to be complete and is qualified in its entirety by reference to the provisions of the Indenture and the Security Documents, including the definitions therein of certain terms used in this "Description of the Notes." We urge you to read the Indenture and the Security Documents because they, and not this "Description of the Notes," will define your rights as Holders of the Notes. You may request copies of the Indenture and the Security Documents at our address set forth under the heading "Summary."

**Brief Description of the New Notes and the Guarantees**

The New Notes will be:

- senior obligations of the Issuer and will rank equally in right of payment with all existing and future Senior Indebtedness of the Issuer (including the Existing Second Lien Notes and any amounts that remain outstanding under the Existing Notes);

- secured, equally and ratably with the Existing Second Lien Notes, on a second-priority basis, by Liens (the *"Second-Priority Liens"*), subject to any Permitted Liens, on the Collateral (as such term is defined and more fully described under "— Security"), which Second-Priority Liens are subject to the provisions of the Intercreditor Agreement;

- effectively senior to all existing and future unsecured Indebtedness of the Issuer to the extent of the value of the Collateral (after taking into consideration all first-priority Liens on the Collateral);

- effectively subordinated to all existing and future Indebtedness of the Issuer that is either (1) secured by a Lien on the Collateral that is senior or prior to the Second-Priority Liens securing the Notes, including the first-priority Liens securing the TCEH Senior Secured Facilities, any Collateral Posting Facility and any other First Lien Obligations (and any Permitted Liens) or (2) secured by assets that are not part of the Collateral securing the New Notes, in each case to the extent of the value of the assets securing such Indebtedness;

- structurally subordinated to all existing and future Indebtedness and liabilities of non-guarantor Subsidiaries, including any of the Issuer's Foreign Subsidiaries and any Unrestricted Subsidiaries;

- senior in right of payment to any future Subordinated Indebtedness of the Issuer;

- initially unconditionally guaranteed on a joint and several and senior basis by the Parent Guarantor and by each Restricted Subsidiary that guarantees the Issuer's Obligations under the TCEH Senior Secured Facilities; and

- subject to registration with the SEC pursuant to the applicable Registration Rights Agreement.

The Guarantees of the New Notes will:

- be senior obligations of each Guarantor;

- be secured, equally and ratably with the guarantees of the Existing Second Lien Notes, by Second-Priority Liens (subject to certain exceptions and any Permitted Liens) on the portion, if any, of the Collateral owned by each Guarantor (other than the Parent Guarantor, whose obligations will be unsecured), which Second-Priority Liens are subject to the provisions of the Intercreditor Agreement;

- be effectively subordinated to all existing and future Indebtedness of the Guarantors that are either (1) secured by a Lien on the Collateral that is senior or prior to the Second-Priority Liens securing a Guarantee, including first-priority Liens securing Obligations under the TCEH Senior Secured Facilities, any Collateral Posting Facility and any other First Priority Obligations (and any Permitted Liens) or

42

EFIHMW00079487

(2) secured by assets that are not part of the Collateral securing a Guarantee of the New Notes, in each case, to the extent of the value of the assets securing such Indebtedness;

- rank equally in right of payment with all existing and future Indebtedness of the Guarantors, except to the extent such Indebtedness is expressly subordinated to the Obligations arising under a Guarantee, in which case the obligations of a Guarantor under such Guarantee will rank senior in right of payment to such Indebtedness; and

- be effectively senior to all of the Guarantors' existing and future senior unsecured Indebtedness, to the extent of the value of the Collateral (after taking into consideration all first-priority Liens on the Collateral).

**Guarantees**

The Parent Guarantor and each Restricted Subsidiary that guarantees the Issuer's obligations under the TCEH Senior Secured Facilities will initially guarantee the Notes. Each Wholly-Owned Subsidiary that is a Restricted Subsidiary that guarantees the payment of the Indebtedness of TCEH will guarantee the Notes; however, only non-Wholly-Owned Subsidiaries that guarantee capital markets debt securities will guarantee the Notes.

The Guarantors, as primary obligors and not merely as sureties, will initially jointly and severally fully and unconditionally guarantee, on a senior basis, the performance and full and punctual payment when due, whether at maturity, by acceleration or otherwise, of all obligations of the Issuer under the Indenture and the Notes, whether for payment of principal of, premium, if any, or interest or Additional Interest in respect of the Notes, expenses, indemnification or otherwise, on the terms set forth in the Indenture by executing the Indenture.

The obligations of each Guarantor under its Guarantee will be limited as necessary to prevent the Guarantee from constituting a fraudulent conveyance under applicable law. However, this limitation may not be effective to prevent a Guarantee from being voided under fraudulent conveyance law, or may eliminate or reduce a Guarantor's obligation to an amount that effectively makes its Guarantee worthless.

Any entity that makes a payment under its Guarantee will be entitled upon payment in full of all guaranteed obligations under the Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's pro rata portion of such payment based on the respective net assets of all the Guarantors at the time of such payment determined in accordance with GAAP.

If a Guarantee were rendered voidable, it could be subordinated by a court to all other indebtedness (including guarantees and other contingent liabilities) of the Guarantor, and, depending on the amount of such indebtedness, a Guarantor's liability on its Guarantee could be reduced to zero. See "Risk Factors — Risks Related to Fraudulent Conveyance Laws."

Each Guarantee by a Guarantor (other than the Parent Guarantor) will provide by its terms that it will be automatically and unconditionally released and discharged upon:

(1) (a) any sale, exchange or transfer (by merger, consolidation, wind-up or otherwise) of the Capital Stock of such Guarantor (including any sale, exchange or transfer), after which the applicable Guarantor is no longer a Restricted Subsidiary or sale of all or substantially all the assets of such Guarantor, which sale, exchange or transfer is made in compliance with the applicable provisions of the Indenture;

(b) the release or discharge of its guarantee under the TCEH Senior Secured Facilities or of the guarantee by such Guarantor that resulted in the creation of such Guarantee, except a discharge or release by or as a result of payment under such guarantee;

(c) the designation of any Restricted Subsidiary that is a Guarantor as an Unrestricted Subsidiary in compliance with the applicable provisions of the Indenture; or

(d) the exercise by the Issuer of its legal defeasance option or covenant defeasance option as described under "— Legal Defeasance and Covenant Defeasance" or the discharge of the Issuer's obligations under the Indenture in accordance with the terms of the Indenture; and

43

(2)  such Guarantor delivering to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for in the Indenture relating to such transaction have been complied with.

## Holding Company Structure

Each of the Parent Guarantor and TCEH is a holding company for its respective Subsidiaries, with no material operations of its own and only limited assets. Accordingly, each of the Parent Guarantor and TCEH is dependent upon the distribution of the earnings of its Subsidiaries, whether in the form of dividends, advances or payments on account of intercompany obligations, to service its debt obligations. TCEH Finance is a Wholly-Owned Subsidiary of TCEH and has no Subsidiaries, assets or material operations.

## Paying Agent and Registrar for the Notes

The Issuer will maintain one or more paying agents for the Notes. The initial paying agent for the Notes will be the Trustee at its offices in Houston, Texas.

The Issuer will also maintain a registrar. The initial registrar will be the Trustee at its offices in Houston, Texas. The registrar will maintain a register reflecting ownership of the Notes outstanding from time to time and will make payments on and facilitate transfer of Notes on behalf of the Issuer.

The Issuer may change the paying agents or the registrars without prior notice to the Holders. The Issuer or any of its Subsidiaries may act as a paying agent or registrar.

## Transfer and Exchange

A Holder may transfer or exchange Notes in accordance with the Indenture. The registrar and the Trustee may require a Holder to furnish appropriate endorsements and transfer documents in connection with a transfer of Notes. Holders will be required to pay all taxes due on transfer. The Issuer will not be required to transfer or exchange any Note selected for redemption. Also, the Issuer will not be required to transfer or exchange any Note for a period of 15 days before a selection of Notes to be redeemed.

## Principal, Maturity and Interest

The Issuer issued $335,905,000 in aggregate principal amount of Existing Second Lien Notes on October 6, 2010. The Issuer will issue $350,000,000 in aggregate principal amount of New Notes in this offering. The Notes will mature on April 1, 2021. Subject to compliance with the covenants described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "— Certain Covenants — Limitation on Liens," the Issuer may issue additional Notes from time to time after this offering under the Indenture (any such Notes, the "*Additional Notes*"). The New Notes and the Existing Second Lien Notes are "Required Debt" under the Indenture and the Issuer may issue additional debt securities that constitute Required Debt. Each of the New Notes and the Existing Second Lien Notes will constitute separate series of Notes but will be treated as a single class of securities under the Indenture, except as otherwise described herein. As a result, Holders of each series of the Notes will not have separate rights to, among other things, give notice of Defaults or to direct the Trustee to exercise remedies during an Event of Default or otherwise, except as otherwise described in this "Description of the Notes." Except as described in this "Description of the Notes," the New Notes, the Existing Second Lien Notes, any Additional Notes subsequently issued under the Indenture and any additional Required Debt issued under the Indenture would be treated as a single class for all purposes under the Indenture, including waivers, amendments, redemptions and offers to purchase. Unless the context requires otherwise, references to "Notes" for all purposes of the Indenture and this "Description of the Notes" include any Additional Notes that are actually issued.

Any Additional Notes must be issued for cash and all of such cash proceeds must be deposited into the Escrow Account or an escrow account that is subject to the same terms and conditions as those of the Escrow Agreement, including those relating to the permitted use of escrowed funds.

44

EFIHMW00079489

Interest on the New Notes will accrue at the rate of 15% per annum and will be payable quarterly in arrears on January 1, April 1, July 1 and October 1 of each year, commencing on January 1, 2011, to the Holders of Notes of record on the immediately preceding December 15, March 15, June 15 and September 15. Interest on the New Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including the Issue Date. Interest on the Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months.

Principal of, premium, if any, and interest on the Notes will be payable at the office or agency of the Issuer maintained for such purpose within the City of Houston, Texas or, at the option of the Issuer, payment of interest may be made by check mailed to the Holders of the Notes at their respective addresses set forth in the register of Holders; *provided* that all payments of principal, premium, if any, and interest with respect to the Notes represented by global notes registered in the name of or held by The Depository Trust Company ("*DTC*") or its nominee will be made by wire transfer of immediately available funds to the accounts specified by the Holder or Holders thereof. Until otherwise designated by the Issuer, the Issuer's office or agency in the City of Houston, Texas will be the office of the Trustee maintained for such purpose.

*Additional Interest*

Additional Interest may accrue on the Notes in certain circumstances pursuant to the applicable Registration Rights Agreement. All references in the Indenture, in any context, to any interest or other amount payable on or with respect to the Notes will be deemed to include any Additional Interest pursuant to the applicable Registration Rights Agreement.

**Mandatory Redemption; Offers to Purchase; Open Market Purchases**

The Issuer will not be required to make any mandatory redemption or sinking fund payments with respect to the Notes. However, under certain circumstances, the Issuer may be required to offer to purchase Notes as described under "— Repurchase at the Option of Holders" or "Escrow of Proceeds; Escrow Proceeds Offer." The Issuer may at any time and from time to time purchase Notes in the open market or otherwise.

**Escrow of Proceeds; Escrow Proceeds Offer**

Immediately prior to the closing of this offering, the Issuer and the Trustee will enter into a pledge and escrow agreement (the "*Escrow Agreement*") with The Bank of New York Mellon Trust Company, N.A., as escrow agent (in such capacity, the "*Escrow Agent*"), pursuant to which the Issuer will, on the date of the closing of this offering, deposit with the Escrow Agent in a segregated escrow account (the "*Escrow Account*") the net proceeds from this offering that are not used to repurchase TCEH 2015/2016 Notes at the closing of this offering as described under "Use of Proceeds" (the "*Escrow Proceeds*"). The Issuer will grant to the Trustee, for the benefit of the Holders of the New Notes (including any Additional Notes issued for cash which is deposited in the Escrow Account), to the extent it has a property interest therein, a first priority security interest in the Escrow Account, all funds deposited therein, including the Escrow Proceeds and any investments made with such funds, and all proceeds of the foregoing.

Pursuant to the Escrow Agreement, so long as no Event of Default under the Indenture has occurred and is continuing, funds deposited in the Escrow Account will be released by the Escrow Agent to or at the direction of the Issuer upon receipt of an Officer's Certificate of TCEH to the effect that (a) the Issuer intends to use such released funds to pay, repay or prepay a portion of the principal amounts outstanding under the term loans made pursuant to the TCEH Senior Secured Facilities or to repurchase a portion of the principal amounts of Issuer's 10.25% Senior Notes due 2015, 10.25% Senior Notes due 2015, Series B or 10.50%/11.25% Senior Toggle Notes due 2016 and such debt will be cancelled and retired upon such payment, (b) specifying the amount of funds to be released from the Escrow Account to make such payment and the principal amount of debt to be repaid, (c) the Issuer will not use such funds to pay any interest or additional interest due or payable in connection with such payment, (d) the making of such payment by the Issuer using funds held in the Escrow Account is permitted by the Indenture, and (e) as of the date of such Officer's Certificate, no Event of Default

45

EFIHMW00079490

specified in clause (6) under the heading "— Events of Default and Remedies" and no other Event of Default under the Indenture that could result in the acceleration of the payment of principal, interest, premium, if any, pursuant to the terms of the Indenture, has occurred and is continuing, or would result from the making of such payment.

The Indenture will provide that TCEH will be required to provide the Trustee with evidence reasonably satisfactory to it of such payment, repayment, prepayment or repurchase promptly following the consummation thereof. The Escrow Agreement will provide that in the event that any released funds are not applied to make such payment, repayment, prepayment or repurchase within 10 business days of the release and transfer of funds to or at the direction of the Issuer, the Issuer will be required to return such funds to the Escrow Account. If such funds are not returned to the Escrow Account, an Event of Default will occur under the Indenture.

In the event that on March 31, 2013, any funds in the Escrow Account have not been released in accordance with the preceding paragraph, the Issuer will be required to make an offer (the "*Escrow Proceeds Offer*") to purchase the maximum principal amount of New Notes that may be purchased using such unused escrow funds, at a purchase price of 100% of the principal amount thereof, plus accrued and unpaid interest and Additional Interest, if any, to the purchase date. The Issuer will fund the payment of accrued and unpaid interest and Additional Interest, if any, to the purchase date, with respect to any New Notes purchased in the Escrow Proceeds Offer, as well as any expenses of the Escrow Proceeds Offer, with funds other than the Escrow Proceeds. The Escrow Proceeds Offer shall remain open for not less than 20 business days nor more than 40 business days and be otherwise made in accordance with the requirements of the Indenture.

If the Escrow Agent receives a notice of the Escrow Proceeds Offer pursuant to the terms of the Indenture, the Escrow Agent will liquidate the applicable escrowed funds or investments then held by it not later than the third business day prior to the purchase date for the Escrow Proceeds Offer and release such Escrow Proceeds to the Trustee as paying agent for the New Notes for payment to holders on such purchase date. Any funds remaining in the Escrow Account following the completion of the Escrow Proceeds Offer will be retained as Escrow Proceeds that continue to be subject to a first-priority security interest in favor of the Trustee, for the benefit of the Holders of the New Notes (including any Additional Notes).

During the period beginning March 31, 2013 and continuing until the Escrow Agent has received written notice from the Trustee following the completion of the Escrow Proceeds Offer and all New Notes (including any Additional Notes) validly tendered have been purchased, funds held in the Escrow Account may not be transferred to or at the direction of the Issuer. Following receipt by the Escrow Agent of a notice from the Trustee that the Escrow Proceeds Offer has been completed, funds and held in the Escrow Account may be released and transferred to fund payments, repayments, prepayments or repurchases of principal amounts outstanding under the term loans made pursuant to the TCEH Senior Secured Facilities or the Issuer's 10.25% Senior Notes due 2015, 10.25% Senior Notes due 2015, Series B or 10.50%/11.25% Senior Toggle Notes due 2016 in accordance with the terms of the Escrow Agreement as described above.

The Indenture will provide that the Trustee may, but is not obligated to, unless required to do so by the Holders of the New Notes (including any Additional Notes) pursuant to the terms of the Indenture, request that all or a portion of the funds held in the Escrow Account be released and delivered to the Trustee or otherwise as the Trustee shall direct to the Escrow Agent, upon the occurrence of an Event of Default specified in clause (6) under the heading "— Events of Default and Remedies" or if an Event of Default under the Indenture that could result in the acceleration of the payment of principal, interest, premium, if any, pursuant to the terms of the Indenture, has occurred and is continuing. During the continuation of such Event of Default, funds held in the Escrow Account may not be transferred to or at the direction of the Issuer.

The proceeds from the offering or sale of any Additional Notes will be deposited in the Escrow Account (and such proceeds will be deemed to be Escrow Proceeds for purposes of the Escrow Agreement) or in an escrow account that is subject to the same terms and conditions as those of the Escrow Agreement, including those relating to the permitted use of escrowed funds.

46

EFIHMW00079491

**Optional Redemption**

Except as set forth below, the Issuer will not be entitled to redeem any series of Notes at its option prior to October 1, 2015.

At any time prior to October 1, 2015, the Issuer may redeem each series of the Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of the series of Notes to be redeemed or otherwise delivered in accordance with the procedures of DTC, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest and Additional Interest, if any, to the applicable date of redemption (the "*Redemption Date*"), subject to the rights of Holders of such series of Notes on the relevant record date to receive interest due on the relevant interest payment date.

On and after October 1, 2015, the Issuer may redeem each series of the Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of the series of Notes to be redeemed or otherwise delivered in accordance with the procedures of DTC, at the redemption prices (expressed as percentages of principal amount of the Notes to be redeemed) set forth below, plus accrued and unpaid interest and Additional Interest, if any, to the applicable Redemption Date, subject to the right of Holders of such series of Notes of record on the relevant record date to receive interest due on the relevant interest payment date, if redeemed during the twelve-month period beginning on October 1 of each of the years indicated below:

*Existing Second Lien Notes*

| Year | Percentage |
|---|---|
| 2015 | 107.50% |
| 2016 | 105.00% |
| 2017 | 102.50% |
| 2018 and thereafter | 100.00% |

*New Notes*

| Year | Percentage |
|---|---|
| 2015 | 107.50% |
| 2016 | 105.00% |
| 2017 | 102.50% |
| 2018 and thereafter | 100.00% |

In addition, until October 1, 2013, the Issuer may, at its option, on one or more occasions redeem up to 35% of the aggregate principal amount of each series of Notes at a redemption price equal to 115.00%, in the case of the Existing Second Lien Notes, or 115.00%, in the case of the New Notes, of the aggregate principal amount thereof, plus accrued and unpaid interest and Additional Interest, if any, to the applicable Redemption Date, subject to the right of Holders of the series of Notes to be redeemed of record on the relevant record date to receive interest due on the relevant interest payment date, with the net cash proceeds of one or more Equity Offerings; *provided* that at least 50% of the sum of the original aggregate principal amount of such series of Notes issued under the Indenture and the original principal amount of any Additional Notes of such series of Notes issued under the Indenture remains outstanding immediately after the occurrence of each such redemption; and *provided further* that each such redemption occurs within 90 days of the date of closing of each such Equity Offering.

Any notice of any redemption may be given prior to the redemption thereof, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of an Equity Offering or other corporate transaction.

47

EFIHMW00079492

If the Issuer redeems less than all of the outstanding Notes of any series, the Trustee will select the Notes of such series to be redeemed in the manner described under "Repurchase at the Option of Holders — Selection and Notice."

**Security**

*General*

The Notes and the Guarantees will be secured by Second-Priority Liens, subject to certain exceptions described below and any Permitted Liens, granted by TCEH and the Subsidiary Guarantors on substantially all of the tangible and intangible assets of TCEH and the Subsidiary Guarantors (whether now owned or hereinafter arising or acquired), that secure any Obligations under the TCEH Senior Secured Facilities, and as further described in the Security Documents, including the following, but in each case excluding any Excluded Assets (collectively, the "*Collateral*"):

- The Capital Stock of any Subsidiary directly held by TCEH or any Subsidiary Guarantor; *provided, however*, that the Collateral shall not include:

    (A) solely in the case of any pledge of Voting Stock of any Foreign Subsidiary to secure the Obligations, any Capital Stock of such Foreign Subsidiary in excess of 65% of the outstanding Voting Stock of such Foreign Subsidiary;

    (B) the Capital Stock of any Subsidiary of a Foreign Subsidiary;

    (C) Capital Stock that does not secure any Obligations under the TCEH Senior Secured Facilities;

    (D) the Capital Stock of any Unrestricted Subsidiary or Immaterial Subsidiary;

    (E) any Capital Stock of any Subsidiary to the extent that the pledge of such Capital Stock would result in adverse tax or accounting consequences to TCEH or any Subsidiary as reasonably determined by TCEH;

    (F) the Capital Stock of any Receivables Entity if, after using commercially reasonable efforts, TCEH is unable to obtain the consent of the lenders to such Receivables Entity to the pledge of such Capital Stock;

    (G) any Capital Stock to the extent that the pledge thereof would violate applicable law; and

    (H) any Capital Stock of any Subsidiary that is not a Wholly-Owned Subsidiary of TCEH or any Subsidiary Guarantor at the time such Subsidiary becomes a Subsidiary to the extent (1) that a pledge thereof is prohibited by any applicable contractual requirement (other than customary non-assignment provisions which are ineffective under the UCC or other Applicable Law or any organizational document), (2) any contractual requirement prohibits such a pledge without the consent of any other party; *provided* that this clause (2) shall not apply if (x) such other party is TCEH, a Subsidiary Guarantor or a Wholly-Owned Subsidiary or (y) consent has been obtained to consummate such pledge (it being understood that the foregoing shall not be deemed to obligate TCEH or any Subsidiary Guarantor to obtain any such consent)) and for so long as such contractual requirement or replacement or renewal thereof is in effect or (3) a pledge thereof would give any other party (other than TCEH, a Subsidiary Guarantor or a Wholly-Owned Subsidiary) to any contract, agreement, instrument or indenture governing such Capital Stock the right to terminate its obligations thereunder (other than customary non-assignment provisions which are ineffective under the UCC or other applicable law) (collectively, the "*Excluded Equity Interests*");

- All other tangible and intangible property of TCEH and the Subsidiary Guarantors, wherever located or situated; and

- Proceeds and products of any and all of the foregoing.

48

EFIHMW00079493

For purposes of the preceding sentence, *"Excluded Assets"* include:

(A)  Receivables Facility Assets;

(B)  collections or proceeds of Receivables Facility Assets, while such collections or proceeds are in a lockbox, collateral account or similar account established pursuant to a Permitted Receivables Financing to receive collections of Receivables Facility Assets or are in an account subject to an intercreditor agreement related to Transition Charges or Transition Property;

(C)  amounts payable to TCEH or any Subsidiary Guarantor which are collected on behalf of other Persons, including Transition Property and Transition Charges, and any customer deposits related to the foregoing;

(D)  any Bundled Payment Amounts, while such Bundled Payment Amounts are in a lockbox, collateral account or similar account established pursuant to a Permitted Receivables Financing to receive collections of Receivables Facility Assets or are in an account subject to an intercreditor agreement related to Transition Charges or Transition Property;

(E)  motor vehicles and other assets subject to certificates of title;

(F)  Letter-of-Credit Rights;

(G)  Commercial Tort Claims;

(H)  Excluded Lease Rights;

(I)  assets specifically requiring perfection through control agreements;

(J)  property or assets subject to Capital Leases and purchase money obligations to the extent subject to a Lien, in each case permitted by the Indenture, and the terms of the Indebtedness secured by such Lien prohibit assignment of, or granting of a security interest in, TCEH's or such Subsidiary Guarantor's rights and interests therein (other than to the extent that any such prohibition would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law), provided, that immediately upon the repayment of all Indebtedness secured by such Lien, TCEH or such Subsidiary Guarantor shall be deemed to have granted a security interest in all the rights and interests with respect to such property or assets;

(K)  all interests in real property except for Material Real Property;

(L)  any assets to the extent (and only to the extent) that the grant of a security interest therein would violate any requirement of law applicable to such Collateral; and

(M)  any assets which do not secure any Obligations under the TCEH Senior Secured Facilities (other than assets which no longer secure Obligations under the TCEH Senior Secured Facilities because of a discharge or payment of such TCEH Senior Secured Facilities).

On the Existing Second Lien Notes Issue Date, TCEH, the Subsidiary Guarantors and the Collateral Agent entered into a pledge agreement (the *"Pledge Agreement"*) and a security agreement (the *"Security Agreement"*) to reflect the pledge by TCEH and the Subsidiary Guarantors of the Collateral in favor of the Collateral Agent for the benefit of the Holders of the Existing Second Lien Notes. On the Issue Date, the Collateral Agent and the Trustee for the benefit of the Holders of the New Notes will enter into a Joinder to the Intercreditor Agreement, and the New Notes will be designated as "Additional Second Lien Obligations" by TCEH. As a result of the Joinder to the Intercreditor Agreement and the designation referred to above, the Trustee and the Holders of the New Notes will benefit from the pledge of the Collateral under the Pledge Agreement and under the Security Agreement.

49

EFIHMW00079494

The Collateral will also not include Capital Stock and other securities of a Subsidiary of TCEH or any Subsidiary Guarantor to the extent that the pledge of such Capital Stock or other securities would result in TCEH being required to file separate financial statements of such Subsidiary with the SEC, but only to the extent necessary to not be subject to such requirement. Rule 3-16 of Regulation S-X under the Securities Act requires the presentation of a company's stand-alone, audited financial statements if that company's capital stock or other securities are pledged to secure the securities of another issuer, and the greatest of the principal amount, par value, book value and market value of the pledged stock or securities equals or exceeds 20% of the principal amount of the securities secured by such pledge.

In addition, in the event that Rule 3-16 is amended, modified or interpreted by the SEC to require (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, which would require) the filing with the SEC (or any other governmental agency) of separate financial statements of any Subsidiary of TCEH due to the fact that such Subsidiary's Capital Stock or other securities secure the Notes, then the Capital Stock or other securities of such Subsidiary shall automatically be deemed not to be part of the Collateral, but only to the extent necessary to not be subject to such requirement. In such event, all Liens on such Capital Stock or other securities shall be automatically released, and the Security Documents may be amended or modified without the consent of the Trustee or any Holder of the Notes, to the extent necessary to release the security interests in favor of the Collateral Agent on the Capital Stock or other securities that are so deemed to no longer constitute part of the Collateral. In the event that Rule 3-16 is amended, modified or interpreted by the SEC to permit (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, which would permit) such Subsidiary's Capital Stock or other securities to secure the Notes in excess of the amount then pledged without the filing with the SEC (or any other governmental agency) of separate financial statements of such Subsidiary, then the Capital Stock or other securities of such Subsidiary shall automatically be deemed to be a part of the Collateral but only to the extent that the pledge of such Capital Stock or other securities would not cause TCEH or such Subsidiary to be subject to any such financial statement requirement. The collateral securing the TCEH Senior Secured Facilities is not so limited to exclude collateral that would otherwise require the additional financial statements under Rule 3-16 and, accordingly, is secured by a pledge of such Capital Stock or other securities. See "Risk Factors — Risks Related to the Notes and Our Substantial Debt — Equity interests of any of our subsidiaries will not be pledged to secure the notes to the extent the pledge of such equity interests would require the filing of separate financial statements for such subsidiary with the SEC."

Subject to the limitations arising from Rule 3-16 above, from and after the Issue Date, if TCEH or any Subsidiary Guarantor creates any additional security interest upon any property to secure the Obligations under the TCEH Senior Secured Facilities or other obligations that are secured equally and ratably with the Notes, it must concurrently grant at least a second-priority Lien upon such property (subject to Permitted Liens) as security for the Notes substantially concurrently with granting any such additional security interest. However, a non-Wholly-Owned Subsidiary that guarantees the Obligations under the TCEH Senior Secured Facilities will not be required to become a Subsidiary Guarantor or grant a lien on its property to secure the Notes. Currently, the TCEH Senior Secured Facilities do not require non-Wholly-Owned Subsidiaries to guarantee Obligations thereunder. As of the Issue Date, the guarantors of the TCEH Senior Secured Facilities will be the Guarantors of the Notes.

TCEH did not complete all the actions necessary to perfect all the Liens in the real property that constitute Collateral by the Existing Second Lien Notes Issue Date, and does not expect to complete these actions by the Issue Date. If TCEH, or any Subsidiary Guarantor, were to become subject to a bankruptcy proceeding, any Liens recorded or perfected after the Issue Date would face a greater risk of being invalidated than if they had been recorded or perfected on the Issue Date. Additionally, a failure, for any reason that is not permitted or contemplated under the Security Documents, to perfect the security interest in the real property included in Collateral may result in a default under the Indenture.

Even though the Notes and Subsidiary Guarantees will be secured, pursuant to the terms of the Security Documents, the security interests in the Collateral securing the Notes and the Subsidiary Guarantees under the

50

EFIHMW00079495

Security Documents will rank junior in priority to any and all security interests in the Collateral at any time granted to secure the Obligations under the TCEH Senior Secured Facilities, any Collateral Posting Facility and any other First Lien Obligations, and will rank equally in priority with the security interest in the Collateral securing any other Pari Passu Secured Indebtedness. In addition, the Notes are not secured by any of the assets of any Subsidiary that is not a Guarantor. As of June 30, 2010, approximately $22.036 billion was outstanding under the TCEH Senior Secured Facilities. See "Risk Factors — Risks Related to the Notes and Our Substantial Debt."

### Intercreditor Agreement

On the Existing Second Lien Notes Issue Date, the Collateral Agent and the Administrative Agent entered into an intercreditor agreement (the "*Intercreditor Agreement*"). If any other First Lien Obligations or Indebtedness designated as Pari Passu Secured Indebtedness is incurred; *provided* that such Indebtedness is permitted pursuant to the provisions of the Indenture, the representatives of the holders of such other Indebtedness will also become party to the Intercreditor Agreement. Pursuant to the terms of the Intercreditor Agreement, prior to the discharge of all First Lien Obligations, the Senior Collateral Agent (as defined in the Intercreditor Agreement) (or the other Senior Secured Parties (as defined in the Intercreditor Agreement)) will determine the time and method by which the security interests in the Collateral will be enforced. The Collateral Agent will not be permitted to enforce the security interests and certain other rights related to the Notes even if an Event of Default has occurred and the Notes have been accelerated, except (1) in any insolvency or liquidation proceeding to file a proof of claim or any necessary responsive or defensive pleadings in opposition to any person objecting to the claims of the Holders of the Notes on the Collateral, subject to certain limitations in the Intercreditor Agreement with respect to the Notes or any Guarantee, (2) as described in the following paragraph and (3) in certain other limited situations. After the discharge of the first-priority Liens securing all First Lien Obligations, the Collateral Agent, acting at the instruction of the Holders of a majority in principal amount of the Notes and any Pari Passu Secured Indebtedness, voting as one class, in accordance with the provisions of the Indenture and the Security Documents, will determine the time and method by which the security interests in the Collateral will be enforced and, if applicable, will distribute proceeds (after payment of the costs of enforcement and Collateral administration) of the Collateral received by it under the Security Documents for the ratable benefit of the Holders of the Notes and any Pari Passu Secured Indebtedness.

The Collateral Agent may exercise rights and remedies with respect to the security interests after the passage of a period of 180 days from the date on which the Collateral Agent has notified the Administrative Agent that an Event of Default has occurred and is continuing and that it intends to exercise such rights and remedies, but only to the extent that the Senior Collateral Agent (or any of the Senior Secured Parties) is not diligently pursuing the exercise of its rights and remedies with respect to its security interests, or an insolvency or liquidation proceeding has been commenced with respect to any of TCEH or the Subsidiary Guarantors.

The rights of the Holders of the Notes with respect to the Collateral securing the Notes and the Subsidiary Guarantees will be materially limited pursuant to the terms of the Intercreditor Agreement. Under the terms of the Intercreditor Agreement, the Holders of the Notes and the holders of Pari Passu Secured Indebtedness will have security interests in the Collateral that rank immediately junior to that of the holders of the first-priority Liens securing the First Lien Obligations (subject to Permitted Liens). Accordingly, any proceeds received upon a realization of the Collateral securing the Notes, any Pari Passu Secured Indebtedness and First Lien Obligations will be applied as follows:

(1)  *first*, on a *pro rata* basis, to the payment of all costs and expenses incurred by the agent or agents for the First Lien Obligations, Trustee and Collateral Agent;

(2)  *second*, to the agent or the agents for the First Lien Obligations for application to the First Lien Obligations to be applied in the manner set forth in the TCEH Senior Secured Facilities and any other agreements governing First Lien Obligations;

51

EFIHMW00079496

(3)  *third*, to pay the Notes, any accrued and unpaid interest thereon, including additional interest and any other amounts due under the Indenture, and the Pari Passu Secured Indebtedness, on a *pro rata* basis, based on the respective amounts of the Notes and the Pari Passu Secured Indebtedness then outstanding; and

(4)  *fourth*, to the extent of the balance of such proceeds after application in accordance with clauses (1), (2) and (3) above, to TCEH or such Subsidiary Guarantor, as applicable, their successors or assigns, or as a court of competent jurisdiction may otherwise direct.

To the extent that the holders of the First Lien Obligations release their first-priority Liens on all or any portion of the Collateral, the Liens on such Collateral in favor of the Collateral Agent for the benefit of the Holders (as well as any Liens securing Pari Passu Secured Indebtedness) will likewise be released. Upon notice of the first-priority Liens' release, the Collateral Agent, at TCEH's sole cost and expense, will execute any document relating to the release of such Collateral. However, if the first-priority Liens securing the First Lien Obligations are released in connection with the discharge of the First Lien Obligations (without a contemporaneous incurrence of a new or replacement senior credit facility), the Second-Priority Liens on the Collateral will not be released (except to the extent the Collateral or any portion thereof was disposed of or otherwise transferred or used in order to repay the First Lien Obligations secured by the Collateral), and thereafter, the Trustee (acting at the direction of the Holders of a majority in outstanding principal amount of the Notes and any Pari Passu Secured Indebtedness, voting as one class, in accordance with the provisions of the Indenture and the Security Documents) will have the right to direct the Collateral Agent to exercise remedies and to take other actions with respect to the Collateral.

If, substantially concurrent with the discharge of First Lien Obligations, TCEH or any Subsidiary Guarantor incurs any new or replacement senior credit facility permitted under the Indenture (including any refinancing or replacement of the TCEH Senior Secured Facilities), then the discharge of First Lien Obligations will be deemed not to have occurred and the obligations under such new or replacement senior credit facility will automatically be treated as being secured by a first-priority Lien on the Collateral for all purposes of the Intercreditor Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth therein. The Notes will then be secured by a Second-Priority Lien on such assets, to the same extent as they were prior to such discharge of First Lien Obligations, as provided pursuant to the Security Documents.

Upon written notice from the Senior Collateral Agent of the acceleration of the First-Priority Obligations, the occurrence of an insolvency default by TCEH or any Subsidiary Guarantor under the TCEH Senior Secured Facilities, or the occurrence of an Event of Default under the First Lien Obligations and the commencement of an action to enforce the Liens securing the First-Priority Obligations, the Holders of the Notes and Pari Passu Secured Indebtedness will have the option, by irrevocable written notice to the Administrative Agent, to be delivered within 10 days after delivery of the notice referred to in the preceding sentence, to purchase all First Lien Obligations from the holders thereof in full in cash at a price equal to 100% of the First Lien Obligations (including any prepayment premiums). Such irrevocable notice shall specify the date for purchase, which shall be not less than five nor more than 10 days after receipt by the Senior Collateral Agent of such notice. The Collateral Agent will have no liability or responsibility for any payments made or to be made under the foregoing provision.

In the event a bankruptcy proceeding is or will be commenced by or against TCEH or any Subsidiary Guarantor and the Administrative Agent desires to permit TCEH or any Subsidiary Guarantor the use of any cash collateral that constitutes Collateral or to enter into certain debtor-in-possession financings (each, a "*DIP Financing*") in such proceeding, the Liens on the Collateral securing the Notes and the Guarantees may, without any further action or consent by the Trustee, the Collateral Agent or the Holders of the Notes, be made junior and subordinated to Liens granted to secure such DIP Financings, any adequate protection provided to the holders of the First Lien Obligations and any carve-out for fees agreed to by the Administrative Agent, subject to the granting and approval by the applicable bankruptcy court of adequate protection for the Holders of the Notes. If holders of the first-priority Liens securing the First Lien Obligations desire to consent (or not object) to the use of

52

EFIHMW00079497

DIP Financings, then Holders of the Notes will be deemed to have consented and will not object to such use, and will not request or accept adequate protection in connection with such use (except as set forth below). Unless no holder of the First Lien Obligations has committed or consented to provide or provided, or consented to or supported any other person committing to provide or providing, any DIP Financing, the Holders of the Notes may not (x) commit or consent to provide, or provide, any DIP Financing, without the prior written consent of the collateral agent for the holders of the First Lien Obligations or (y) consent to or support any other person (other than such collateral agent or any holder of the First Lien Obligations) committing to provide or providing any DIP Financing which is not supported by the collateral agent for the First Lien Obligations.

Neither the Collateral Agent nor any of the Holders of the Notes shall contest (1) any request by the holders of the First Lien Obligations for adequate protection, (2) any objection by the holders of the First Lien Obligations to any motion based on a claim of lack of adequate protection or (3) the payment of interest, fees, expenses or other amounts to the Administrative Agent or any other holder of First Lien Obligations. However, (a) if the Administrative Agent or any other holder of First Lien Obligations is granted adequate protection in the form of additional collateral in connection with any DIP Financing, then the Collateral Agent may seek adequate protection in the form of a lien on such additional collateral (subordinated to the liens securing the First Lien Obligations and such DIP Financing), (b) in the event the Collateral Agent is granted adequate protection in the form of additional collateral, then the holders of First Lien Obligations shall have a senior Lien and claim on such additional collateral and (c) in the event the Administrative Agent or any holder of First Lien Obligations is granted adequate protection in the form of a superpriority claim, then the Collateral Agent may seek adequate protection in the form of a junior superpriority claim, subordinated to the superpriority claim granted to the holders of the First Lien Obligations.

The Intercreditor Agreement also provides that neither the Collateral Agent nor any Holder of the Notes shall oppose any sale of Collateral in a bankruptcy proceeding of TCEH or any Subsidiary Guarantor that is supported by the Administrative Agent, and will be deemed to have consented to such sale and have released their Liens on such assets. In addition, the Collateral Agent and the Holders of the Notes shall not support or vote in favor of any plan of reorganization unless such plan (1) pays in cash in full the First Lien Obligations or (2) is accepted by the required holders of the First Lien Obligations; *provided* that the Collateral Agent will be able to retain the right to credit bid pursuant to Section 363(k) of the Bankruptcy Code, and the proceeds of such sale or disposition will be applied as described above in this section.

Holders of the Notes will be deemed to have agreed to and accepted the terms of the Intercreditor Agreement by their acceptance of the Notes.

### *Sufficiency of Collateral*

No appraisal of the value of the Collateral has been made in connection with the issuance of the New Notes. Consequently, liquidating the Collateral may not produce proceeds in an amount sufficient to pay any amounts due under the First Lien Obligations and Pari Passu Secured Indebtedness, including the New Notes. For information regarding the value of the Collateral, see "Risk Factors — Risks Related to Fraudulent Conveyance Laws."

The fair market value of the Collateral is subject to fluctuations based on factors that include, among others, the ability to sell the Collateral in an orderly sale, general economic conditions, the availability of buyers and similar factors. The amount to be received upon a sale of the Collateral would also be dependent on numerous factors, including, but not limited to, the actual fair market value of the Collateral at such time and the timing and the manner of the sale. By its nature, portions of the Collateral may be illiquid and may have no readily ascertainable market value. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, we cannot assure you that the proceeds from any sale or liquidation of the Collateral will be sufficient to pay the Obligations under the First Lien Obligations and Pari Passu Secured Indebtedness, including the New Notes. Any claims for the difference between the amount, if any realized by Holders of the Notes from the sale of the

53

EFIHMW00079498

Collateral and the Obligations owing under the Notes will rank equally in right of payment with all of our other unsecured unsubordinated Indebtedness and other obligations, including trade payables. In addition, in the event of a bankruptcy, the ability of the Holders of the Notes to realize upon any of the Collateral may be subject to certain bankruptcy law limitations as described below.

The Collateral securing the Notes includes equity interests of entities that own electric generation facilities and the electric generation assets owned by such entities, as well as entities that sell electricity to retail customers in the areas of Texas where the sale of electricity is open to retail competition. PUCT approval is required in connection with the transfer of electric generation facilities to an owner of electric generation facilities that offers electricity for sale in Texas if the electricity offered for sale in the power region by the combined enterprise after the transfer would exceed one percent of the total electricity for sale in the power region. In addition, any enforcement of the security interests in that Collateral that would result in a change in control of an entity that sells electricity to retail customers would generate certain certification requirements on the part of any new owner of such entity, including financial suitability criteria. In addition, regulatory approvals may be required in order to enforce the security interests in the Collateral and to dispose of the Collateral. See "Risk Factors — Risks Related to the Notes and Our Substantial Debt — Regulatory approvals may be required in order to enforce the security interests in the Collateral and to dispose of the Collateral."

### Certain Covenants with Respect to the Collateral

The Collateral will be pledged pursuant to the Security Documents, which contain provisions relating to the administration, preservation and disposition of the Collateral. The following is a summary of some of the covenants and provisions set forth in the Security Documents and the Indenture as they relate to the Collateral.

#### Maintenance of Collateral

The Indenture and/or the Security Documents provide that, subject to certain exceptions, TCEH and the Subsidiary Guarantors will (1) maintain the Collateral material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, (2) pay all real estates and other taxes with respect to the Collateral except where the failure to do so could not reasonably be expected to have a material adverse effect on the value of such Collateral or materially impair their use in the operation of its business and (3) maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations with each copy of, or certificate as to coverage under, such required insurance policies endorsed or otherwise amended to name the Collateral Agent, on behalf of the Second Lien Secured Parties, as "additional loss payee" and "additional mortgagee" under each casualty insurance policy, and the Second Lien Secured Parties as "additional insureds" under each liability insurance policy.

#### Further Assurances

The Indenture and the Security Documents provide that TCEH and the Subsidiary Guarantors will, at their sole expense, take all actions that may be required, or that the Collateral Agent from time to time may reasonably request, to assure and confirm that the Collateral Agent holds, for the benefit of the Holders of the Notes, the Collateral Agent and the Trustee, duly created, enforceable and perfected Liens upon the Collateral (including any property or assets that are acquired or otherwise become Collateral after the Notes are issued), in each case, as contemplated by, and with the Lien priority required under, the Indenture, the Intercreditor Agreement and the Security Documents.

Upon the reasonable request of the Collateral Agent or the Trustee at any time and from time to time, TCEH and the Subsidiary Guarantors will, at their sole expense, execute, acknowledge and deliver such documents and instruments and take such other actions, as may be necessary, or as the Collateral Agent may reasonably request, to create, protect, assure, perfect, transfer and confirm the Liens and benefits intended to be conferred by the

54

EFIHMW00079499

Indenture or the Security Documents for the benefit of the Holders and the Trustee, the Collateral Agent, including with respect to after-acquired Collateral.

Notwithstanding anything to the contrary in the covenants and provisions relating to the Collateral, TCEH or a Subsidiary Guarantor, as applicable, will not be obligated to take any action, execute or deliver any document or instrument if TCEH or such Subsidiary Guarantor, as applicable, was not required to take such action, execute or deliver such document or instrument under the TCEH Senior Secured Facilities.

*After-Acquired Property*

The Indenture and/or the relevant Security Documents require that TCEH and the Subsidiary Guarantors, grant a security interest in all After-Acquired Property to secure the Notes and the Subsidiary Guarantees, as Collateral. In addition, any future Restricted Subsidiaries that guarantee the Notes will have to similarly provide security on behalf of the Holders of the Notes.

*Real Estate Mortgages and Filings*

With respect to any fee or leasehold interest in real property interests (individually and collectively, the "*Premises*") owned or leased by TCEH or a Subsidiary Guarantor on the Existing Second Lien Notes Issue Date or acquired or leased by TCEH or a Subsidiary Guarantor after the Existing Second Lien Notes Issue Date, in each case that secures the First Lien Obligations:

(1) (A) With respect to Premises owned or leased on the Existing Second Lien Notes Issue Date ("*Issue Date Premises*"), TCEH or a Subsidiary Guarantor, as applicable, will deliver to the Collateral Agent, as mortgagee or beneficiary, as applicable, fully executed Mortgages representing (i) no less than 75% of the fair market value of the Issue Date Premises within 90 days after the Existing Second Lien Notes Issue Date and (ii) the remaining Issue Date Premises within 150 days after the Existing Second Lien Notes Issue Date; *provided* that TCEH (or such applicable Subsidiary Guarantor) shall continue to be in compliance with the requirement in this clause (ii) with respect to any Issue Date Premises for which a Mortgage has not been delivered within such 150-day period solely to the extent that the fair market value of such Issue Date Premises (individually or in the aggregate) for which a Mortgage has not been delivered shall be no greater than 5% of the fair market value of all Issue Date Premises and TCEH (or such applicable Subsidiary Guarantor) uses its reasonable best efforts to deliver any such Mortgage and (B) with respect to Premises acquired or leased after the Issue Date, the date such property is pledged to secure the First Lien Obligations, in each case, in accordance with the requirements of the Indenture and/or the Security Documents, duly executed by TCEH or the applicable Subsidiary Guarantor, together with satisfactory evidence of the completion (or satisfactory arrangements for the completion) of all recordings and filings of such Mortgage (and payment of any taxes and fees in connection therewith) as may be necessary to create a valid, perfected Lien (subject to any Permitted Liens) against the properties purported to be covered thereby;

(2) the Collateral Agent will have received mortgagee's title insurance policies in favor of the Collateral Agent, together with copies of all deeds and title exceptions that have been recorded after the date on which the first-lien mortgage on the applicable Premises was recorded referenced therein, and copies of such deeds and title exceptions recorded prior to that date as the Collateral Agent shall reasonably request (*provided* that TCEH or the applicable Subsidiary Guarantor will be required only to use commercially reasonable efforts to have such prior deeds and title exceptions delivered to the Collateral Agent), in the form necessary, with respect to any real property purported to be covered by its applicable Mortgage, to insure that the interests created by the Mortgage constitute valid Liens on such property free and clear of all Liens, defects and encumbrances (other than any Permitted Liens), each such title insurance policy to be in an amount equal to the lesser of (a) the principal amount of the Notes or (b) the maximum amount of title insurance coverage available at the time of issuance of any title insurance policy pursuant to the regulations promulgated by the Texas Department of Insurance,

55

 EFIHMW00079500

with coverage allocated among the various title insurance policies based upon the estimated fair market value of the applicable Premises insured thereby (*provided, however*, that title insurance policies (and the amount thereof) deemed satisfactory to the Administrative Agent will be deemed reasonably satisfactory to the Collateral Agent) and such policies will also include all legally available endorsements and affirmative coverages delivered in connection with the TCEH Senior Secured Facilities and will be accompanied by evidence of the payment in full of all premiums thereon. Notwithstanding anything to the contrary in the foregoing, (a) TCEH or a Subsidiary Guarantor, as applicable, shall not be obligated to obtain and deliver any mortgagee title insurance policies for any of the Premises if TCEH or a Subsidiary Guarantor, as applicable, was not required to obtain and deliver such policies, or with respect to After-Acquired Property is not required to obtain and deliver such policies, under the TCEH Senior Secured Facilities, and (b) with respect to the Issue Date Premises, TCEH or a Subsidiary Guarantor, as applicable, shall deliver mortgagee title insurance policies (i) with respect to the Mortgages required to be delivered pursuant to paragraph (1)(A)(i), within 90 days after the Existing Second Lien Notes Issue Date and (ii) with respect to the Mortgages required to be delivered pursuant to paragraph (1)(A)(ii), within 150 days after the Existing Second Lien Notes Issue Date; and

(3)    TCEH will, or will cause each Subsidiary Guarantor to, deliver to the Collateral Agent, with respect to each of the covered Premises, such evidence of filings, surveys (together with any updates or affidavits delivered to the title company), local counsel opinions, landlord agreements and fixture filings (if applicable), along with such other documents, instruments, certificates and agreements, to create, evidence or perfect a valid at least second-priority Lien on the property subject to each such Mortgage (subject to any Permitted Liens) (*provided, however*, that any such filings, opinions, documents, instruments, certificates or agreements deemed satisfactory to the Administrative Agent will be deemed reasonably acceptable to the Collateral Agent).

*No Impairment of the Security Interests*

Neither TCEH nor any of the Subsidiary Guarantors will be permitted to take any action, or knowingly or negligently omit to take any action, which action or omission might or would have the result of impairing the security interest with respect to the Collateral for the benefit of the Trustee and the Holders of the Notes (other than any impairments the effect of which are in the aggregate de minimis).

The Indenture provides that any release of Collateral in accordance with the provisions of the Indenture and the Security Documents will not be deemed to impair the security under the Indenture, and that any engineer, appraiser or other expert may rely on such provision in delivering a certificate requesting release so long as all other provisions of the Indenture with respect to such release have been complied with.

**Foreclosure**

Upon the occurrence and during the continuance of an Event of Default, the Security Documents provide for (among other available remedies) the foreclosure upon and sale of the applicable Collateral by the Collateral Agent and the distribution of the net proceeds from any such sale to the Holders of the Notes, subject to any prior Liens on the Collateral and the provisions of the Intercreditor Agreement. The Intercreditor Agreement imposes significant restrictions upon the ability of the Collateral Agent to pursue foreclosure. See "— Intercreditor Agreement." In the event of foreclosure on the Collateral, the proceeds from the sale of the Collateral may not be sufficient to satisfy in full TCEH's and the Subsidiary Guarantors' Obligations under the First Lien Obligations and Pari Passu Secured Indebtedness, including the Notes and the Subsidiary Guarantees.

The Collateral securing the Notes includes equity interests of entities that own electric generation facilities and the electric generation assets owned by such entities, as well as entities that sell electricity to retail customers in the areas of Texas where the sale of electricity is open to retail competition. PUCT approval is required in

56

EFIHMW00079501

connection with the transfer of electric generation facilities to an owner of electric generation facilities that offers electricity for sale in Texas if the electricity offered for sale in the power region by the combined enterprise after the transfer would exceed one percent of the total electricity for sale in the power region. In addition, any enforcement of the security interests in that Collateral that would result in a change in control of an entity that sells electricity to retail customers would generate certain certification requirements on the part of any new owner of such entity, including financial suitability criteria. In addition, regulatory approvals may be required in order to enforce the security interests in the Collateral and to dispose of the Collateral. See "Risk Factors — Risks Related to the Notes and Our Substantial Debt — Regulatory approvals may be required in order to enforce the security interests in the Collateral and to dispose of the Collateral."

### *Certain Bankruptcy Limitations*

The right of the Collateral Agent to repossess and dispose of the Collateral upon the occurrence of an Event of Default would be significantly impaired by applicable bankruptcy law in the event that a bankruptcy case were to be commenced by or against TCEH or any Subsidiary Guarantor prior to the Collateral Agent having repossessed and disposed of the Collateral. Upon the commencement of a case for relief under the Bankruptcy Code, a secured creditor such as the Collateral Agent is prohibited from repossessing its security from a debtor in a bankruptcy case, or from disposing of security repossessed from the debtor or any other Collateral, without bankruptcy court approval.

In view of the broad equitable powers of a U.S. bankruptcy court, it is impossible to predict how long payments under the Notes could be delayed following commencement of a bankruptcy case, whether or when the Collateral Agent could repossess or dispose of the Collateral, the value of the Collateral at the time of the bankruptcy petition or whether or to what extent Holders of the Notes would be compensated for any delay in payment or loss of value of the Collateral. The Bankruptcy Code permits only the payment and/or accrual of post-petition interest, costs and attorneys' fees to a secured creditor during a debtor's bankruptcy case to the extent the value of the Collateral is determined by the bankruptcy court to exceed the aggregate outstanding principal amount at maturity of the obligations secured by the Collateral, including any obligation secured on a priority or *pari passu* basis. There can be no assurance that the value of the Collateral will exceed the outstanding principal amount of the Notes and the Obligations under the TCEH Senior Secured Facilities, other First Priority Obligations and obligations under other Pari Passu Secured Indebtedness, including the Existing Second Lien Notes.

Furthermore, in the event a bankruptcy court determines that the value of the Collateral is not sufficient to repay all amounts due on the Notes and the other Pari Passu Secured Indebtedness after payment of any priority claims, including First Priority Obligations, the Holders of the Notes would hold secured claims only to the extent of the value of the Collateral to which the Holders of the Notes are entitled, and unsecured claims with respect to any such shortfall.

### *Release of Security Interests*

The Liens on the Collateral will be released with respect to the New Notes and the Guarantees thereof, as applicable:

(1) in whole, upon payment in full of the principal of, accrued and unpaid interest, including Additional Interest, and premium, if any, on the New Notes;

(2) in whole, upon satisfaction and discharge of the Indenture as set forth under "— Satisfaction and Discharge";

(3) in whole, upon a legal defeasance or covenant defeasance as set forth under "— Legal Defeasance and Covenant Defeasance";

Highly Confidential

EFIHMW00079502

(4)  in part, as to any asset constituting Collateral (A) that is sold or otherwise disposed of by TCEH or any of the Subsidiary Guarantors in a transaction permitted by "— Repurchase at the Option of Holders — Asset Sales" and by the Security Documents (to the extent of the interest sold or disposed of) or otherwise permitted by the Indenture and the Security Documents, other than a sale or other disposition to the Issuer or a Restricted Subsidiary or a Permitted Investment described in clause (3) of the definition of "Permitted Investments" (except to the extent the Liens on the asset sold or disposed of are released under the TCEH Senior Secured Facilities), (B) that is cash withdrawn from deposit accounts for any purpose not prohibited under the Indenture or the Security Documents, (C) that is otherwise released in accordance with, and as expressly provided for under, the Indenture, the Intercreditor Agreement and the Security Documents or (D) the Liens on which are released under the TCEH Senior Secured Facilities, except in connection with the full and complete discharge of the TCEH Senior Secured Facilities (without a substantially concurrent refinancing thereof); *provided*, that, in the case of any release described in clauses (A) through (C) immediately above, the Liens on such asset securing the TCEH Senior Secured Facilities are simultaneously released, and *provided further*, that, in the case of any release described in clause (A) immediately above, the Issuer has delivered an Officer's Certificate to the Collateral Agent certifying that any such sale or other disposition does not violate the terms of the Indenture, any applicable document governing any Pari Passu Secured Indebtedness or the TCEH Senior Secured Facilities;

(5)  as set forth under "— Amendment, Supplement and Waiver," as to property that constitutes less than all or substantially all of the Collateral, with the consent of Holders of at least a majority in aggregate principal amount of the Required Debt then outstanding, voting as a single class (or, in the case of a release of all or substantially all of the Collateral, with the consent of the Holders of at least 66²⁄₃% in aggregate principal amount of the Required Debt), including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Required Debt; *provided* the Issuer has delivered an Officer's Certificate to the Collateral Agent certifying that any such necessary consents have been obtained and that such release of the Collateral does not violate the terms of any applicable document governing any Pari Passu Secured Indebtedness or the TCEH Senior Secured Facilities; and

(6)  with respect to assets of a Subsidiary Guarantor upon release of such Subsidiary Guarantor from its Subsidiary Guarantee of the New Notes as set forth under "— Guarantees"; *provided*, that the Liens on such assets securing the TCEH Senior Secured Facilities are simultaneously released.

Upon compliance by TCEH or any Subsidiary Guarantor, as the case may be, with the conditions precedent required by the Indenture, the Trustee or the Collateral Agent will promptly cause to be released and reconveyed to TCEH, or the Subsidiary Guarantor, as the case may be, the released Collateral. Prior to each proposed release, TCEH and each Subsidiary Guarantor will furnish to the Trustee and the Collateral Agent all documents required by the Indenture and the Security Documents.

### Repurchase at the Option of Holders

#### *Change of Control*

The Indenture will provide that if a Change of Control occurs, unless the Issuer has previously or concurrently mailed or delivered a redemption notice with respect to all the outstanding Notes as described under "Optional Redemption" and will redeem all of the outstanding Notes pursuant thereto, the Issuer will make an offer to purchase all of the Notes pursuant to the offer described below (the "*Change of Control Offer*") at a price in cash (the "*Change of Control Payment*") equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest and Additional Interest, if any, to the date of purchase, subject to the right of Holders of the Notes of record on the relevant record date to receive interest due on the relevant interest payment date. Within 30 days following any Change of Control, the Issuer will send notice of such Change of Control Offer by first-class mail, with a copy to the Trustee, to each Holder of Notes to the address of such Holder appearing in the

58

EFIHMW00079503

security register with a copy to the Trustee or otherwise delivered in accordance with the procedures of DTC, with the following information:

(1)  that a Change of Control Offer is being made pursuant to the covenant entitled "Change of Control" and that all Notes properly tendered pursuant to such Change of Control Offer will be accepted for payment by the Issuer;

(2)  the purchase price and the purchase date, which will be no earlier than 30 days nor later than 60 days from the date such notice is mailed or delivered (the "*Change of Control Payment Date*");

(3)  that any Note not properly tendered will remain outstanding and continue to accrue interest;

(4)  that unless the Issuer defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest on the Change of Control Payment Date;

(5)  that Holders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the paying agent specified in the notice at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6)  that Holders will be entitled to withdraw their tendered Notes and their election to require the Issuer to purchase such Notes; *provided* that the paying agent receives, not later than the close of business on the expiration date of the Change of Control Offer, a telegram, facsimile transmission or letter setting forth the name of the Holder of the Notes, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased;

(7)  that the Holders whose Notes are being repurchased only in part will be issued new Notes and such new Notes will be equal in principal amount to the unpurchased portion of the Notes surrendered. The unpurchased portion of the Notes must be equal to $2,000 or an integral multiple of $1,000 in excess thereof; and

(8)  the other instructions, as determined by TCEH, consistent with the covenant described under this "— Repurchase at the Option of Holders — Change of Control" section, that a Holder must follow.

Any proceeds received by the Issuer or any Restricted Subsidiary from a sale, conveyance or disposition of Collateral that constitutes a Change of Control shall be subject to a perfected security interest for the benefit of the holders of the Notes, the TCEH Senior Secured Facilities and any Pari Passu Secured Indebtedness until consummation of the Change of Control Offer.

The Issuer will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of Notes pursuant to a Change of Control Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations described in the Indenture by virtue thereof.

On the Change of Control Payment Date, the Issuer will, to the extent permitted by law,

(1)  accept for payment all Notes issued by it or portions thereof properly tendered pursuant to the Change of Control Offer;

(2)  deposit with the paying agent an amount equal to the aggregate Change of Control Payment in respect of all Notes or portions thereof so tendered; and

59

EFIHMW00079504

(3) deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate to the Trustee stating that such Notes or portions thereof have been tendered to and purchased by the Issuer.

The TCEH Senior Secured Facilities, and future credit agreements or other agreements to which the Issuer becomes a party may, provide that certain change of control events with respect to the Issuer would constitute a default thereunder (including a Change of Control under the Indenture). If we experience a change of control that triggers a default under the TCEH Senior Secured Facilities, we could seek a waiver of such default or seek to refinance the TCEH Senior Secured Facilities. In the event we do not obtain such a waiver or refinance the TCEH Senior Secured Facilities, such default could result in amounts outstanding under the TCEH Senior Secured Facilities being declared due and payable and could cause a Receivables Facility to be wound down. Additionally, the terms of certain series of the Existing Notes provide that certain change of control events with respect to the Issuer (including a Change of Control under the Indenture) would result in the Issuer also being required to offer to repurchase such Existing Notes of such series.

Our ability to pay cash to the Holders of Notes following the occurrence of a Change of Control may be limited by our then-existing financial resources. Therefore, sufficient funds may not be available when necessary to make any required repurchases.

The Change of Control purchase feature of the Notes may in certain circumstances make more difficult or discourage a sale or takeover of us and, thus, the removal of incumbent management. As of the date of this offering memorandum, we have no present intention to engage in a transaction involving a Change of Control, and we are not aware of any such transaction being contemplated by EFH Corp., although it is possible that we or EFH Corp. could decide to engage in such a transaction in the future. Subject to the limitations discussed below, we could, in the future, enter into certain transactions, including acquisitions, refinancings or other recapitalizations, that would not constitute a Change of Control under the Indenture, but that could increase the amount of indebtedness outstanding at such time or otherwise affect our capital structure or credit ratings. Restrictions on our ability to incur additional Indebtedness are contained in the covenants described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "— Certain Covenants — Limitation on Liens." Such restrictions in the Indenture can be waived with the consent of the Required Holders of a majority in principal amount of the Required Debt. Except for the limitations contained in such covenants, however, the Indenture will not contain any covenants or provisions that may afford Holders of the Notes protection in the event of a highly leveraged transaction.

The Issuer will not be required to make a Change of Control Offer following a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in the Indenture applicable to a Change of Control Offer made by us and purchases all Notes validly tendered and not withdrawn under such Change of Control Offer. Notwithstanding anything to the contrary herein, a Change of Control Offer may be made in advance of a Change of Control, conditional upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

The definition of "Change of Control" includes a disposition of all or substantially all of the assets of the Issuer to any Person. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, in certain circumstances there may be a degree of uncertainty as to whether a particular transaction would involve a disposition of "all or substantially all" of the assets of the Issuer. As a result, it may be unclear as to whether a Change of Control has occurred and whether a Holder of Notes may require the Issuer to make an offer to repurchase the Notes as described above.

The provisions under the Indenture relating to the Issuer's obligation to make an offer to repurchase the Notes as a result of a Change of Control may be waived or modified with the written consent of the Required Holders of a majority in principal amount of the Required Debt.

60

EFIHMW00079505

PX 042
Page 68 of 157

*Asset Sales*

The Indenture will provide that TCEH will not, and will not permit any of its Restricted Subsidiaries to consummate, directly or indirectly, an Asset Sale, unless:

(1)   TCEH or such Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the fair market value (as determined in good faith by TCEH) of the assets sold or otherwise disposed of; and

(2)   except in the case of a Permitted Asset Swap, at least 75% of the consideration therefor received by TCEH or such Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; *provided* that the amount of:

    (a)   except in an Asset Sale of Collateral, any liabilities (as shown on TCEH's or such Restricted Subsidiary's most recent balance sheet or in the footnotes thereto) of TCEH or such Restricted Subsidiary, other than liabilities that are by their terms subordinated to the Notes or that are owed to TCEH or an Affiliate of TCEH, that are assumed by the transferee of any such assets and for which TCEH and all of its Restricted Subsidiaries have been validly released by all applicable creditors in writing;

    (b)   any securities received by TCEH or such Restricted Subsidiary from such transferee that are converted by TCEH or such Restricted Subsidiary into cash (to the extent of the cash received) within 180 days following the closing of such Asset Sale; and

    (c)   any Designated Non-cash Consideration received by TCEH or such Restricted Subsidiary in such Asset Sale having an aggregate fair market value, taken together with all other Designated Non-cash Consideration received pursuant to this clause (c) that is at that time outstanding, not to exceed 5% of Total Assets at the time of the receipt of such Designated Non-cash Consideration, with the fair market value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value,

will be deemed to be cash for purposes of this provision and for no other purpose.

Within 450 days after the receipt of any Net Proceeds of any Asset Sale (other than an Asset Sale of Collateral), TCEH or such Restricted Subsidiary, at its option, may apply the Net Proceeds from such Asset Sale,

(1)   to permanently reduce:

    (a)   First Lien Obligations, and to correspondingly reduce commitments with respect thereto;

    (b)   Pari Passu Secured Indebtedness, and to correspondingly reduce commitments with respect thereto; *provided* that the Issuer will equally and ratably reduce Obligations under the Notes as provided under "— Optional Redemption," through open-market purchases (to the extent such purchases are at or above 100% of the principal amount thereof) or otherwise by making an offer (in accordance with the procedures set forth below for an Asset Sale Offer) to all Holders to purchase their Notes at 100% of the principal amount thereof, plus the amount of accrued and unpaid interest and Additional Interest, if any;

    (c)   Obligations under Senior Indebtedness which is Secured Indebtedness permitted by the Indenture, and to correspondingly reduce commitments with respect thereto;

    (d)   Obligations under any Existing Notes with a final maturity (as in effect on the Issue Date) on or prior to April 1, 2021; *provided* that, at the time of, and after giving effect to, such repurchase, redemption or defeasance, the aggregate amount of Net Proceeds used to repurchase, redeem or defease such Existing Notes pursuant to this subclause (e) following the Issue Date will not exceed 3.5% of Total Assets at such time; or

    (e)   Indebtedness of a Restricted Subsidiary (other than TCEH Finance) that is not a Guarantor, other than Indebtedness owed to TCEH or another Restricted Subsidiary (or any Affiliate thereof);

61

EFIHMW00079506

(2) to make (a) an Investment in any one or more businesses; *provided* that such Investment in any business is in the form of the acquisition of Capital Stock and results in TCEH or another of its Restricted Subsidiaries, as the case may be, owning an amount of the Capital Stock of such business such that it constitutes a Restricted Subsidiary, (b) capital expenditures or (c) acquisitions of other assets, in each of (a), (b) and (c), used or useful in a Similar Business; or

(3) to make an Investment in (a) any one or more businesses; *provided* that such Investment in any business is in the form of the acquisition of Capital Stock and results in TCEH or another of its Restricted Subsidiaries, as the case may be, owning an amount of the Capital Stock of such business such that it constitutes a Restricted Subsidiary, (b) properties or (c) acquisitions of other assets that, in each of (a), (b) and (c), replace the businesses, properties and/or assets that are the subject of such Asset Sale;

*provided* that, in the case of clauses (2) and (3) above, a binding commitment will be treated as a permitted application of the Net Proceeds from the date of such commitment so long as TCEH, or such other Restricted Subsidiary enters into such commitment with the good faith expectation that such Net Proceeds will be applied to satisfy such commitment within 180 days of such commitment (an "*Acceptable Commitment*") (and reinvest within the later of 450 days from the date of receipt of Net Proceeds and 180 days of receipt of such commitment) and, in the event any Acceptable Commitment is later cancelled or terminated for any reason before the Net Proceeds are applied in connection therewith, TCEH or such Restricted Subsidiary enters into another Acceptable Commitment (a "*Second Commitment*") within the later of (a) 180 days of such cancellation or termination or (b) the initial 450-day period; *provided further*, that if any Second Commitment is later cancelled or terminated for any reason before such Net Proceeds are applied, then such Net Proceeds will constitute Excess Proceeds.

Notwithstanding the preceding paragraph, to the extent that regulatory approval is necessary for an asset purchase or investment, or replacement, repair or restoration on any asset or investment, then TCEH or any Restricted Subsidiary will have an additional 365 days to apply the Net Proceeds from such Asset Sale in accordance with the preceding paragraph.

Any Net Proceeds from Asset Sales (other than Asset Sales of Collateral) that are not invested or applied as provided and within the time period set forth in the first sentence of the second preceding paragraph will be deemed to constitute "*Excess Proceeds.*" When the aggregate amount of Excess Proceeds exceeds $200.0 million, TCEH and/or any of its Restricted Subsidiaries will make an offer to all Holders of the Notes and, if required or permitted by the terms of any Senior Indebtedness, to the holders of such Senior Indebtedness (an "*Asset Sale Offer*"), to purchase the maximum aggregate principal amount of the Notes and such Senior Indebtedness that is a minimum of $2,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus accrued and unpaid interest and Additional Interest, if any, to the date fixed for the closing of such offer, in accordance with the procedures set forth in the Indenture. TCEH and/or any of its Restricted Subsidiaries will commence an Asset Sale Offer with respect to Excess Proceeds within 10 Business Days after the date that Excess Proceeds exceed $200.0 million by mailing or delivering the notice required pursuant to the terms of the Indenture, with a copy to the Trustee.

To the extent that the aggregate amount of Notes and such Senior Indebtedness tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, TCEH and/or any of its Restricted Subsidiaries may use any remaining Excess Proceeds for general corporate purposes, subject to other covenants contained in the Indenture. If the aggregate principal amount of Notes or the Senior Indebtedness surrendered by such holders thereof exceeds the amount of Excess Proceeds, the Notes and such Senior Indebtedness will be purchased on a *pro rata* basis based on the accreted value or principal amount of the Notes or such Senior Indebtedness tendered. Additionally, TCEH and/or any of its Restricted Subsidiaries may, at its/their option, make an Asset Sale Offer using proceeds from any Asset Sale at any time after consummation of such Asset Sale; *provided* that such Asset

62

EFIHMW00079507

Sale Offer will be in an aggregate amount of not less than $25.0 million. Upon consummation of an Asset Sale Offer, any Net Proceeds not required to be used to purchase Notes will not be deemed Excess Proceeds and any remaining amounts may be used to make Restricted Payments to the extent permitted by the provisions of the covenant described in clause (16) of the second paragraph described under "— Certain Covenants — Limitation on Restricted Payments."

Within 450 days after the receipt by TCEH or any Restricted Subsidiary of any Net Proceeds of any Asset Sale of Collateral, TCEH or such Restricted Subsidiary, at its option, may apply the Net Proceeds from such Asset Sale,

(1)  to permanently reduce:

(a)  First Lien Obligations, and to correspondingly reduce commitments with respect thereto;

(b)  Pari Passu Secured Indebtedness, and to correspondingly reduce commitments with respect thereto; *provided* that the Issuer will equally and ratably reduce Obligations under the Notes as provided under "— Optional Redemption," through open-market purchases (to the extent such purchases are at or above 100% of the principal amount thereof) or otherwise by making an offer (in accordance with the procedures set forth below for a Collateral Asset Sale Offer) to all Holders to purchase their Notes at 100% of the principal amount thereof, plus the amount of accrued and unpaid interest and Additional Interest, if any;

(2)  to make (a) an Investment in any one or more businesses; *provided* that such Investment in any business is in the form of the acquisition of Capital Stock and results in TCEH or another of its Restricted Subsidiaries, as the case may be, owning an amount of the Capital Stock of such business such that it constitutes a Restricted Subsidiary, (b) capital expenditures or (c) acquisitions of other assets, in each of (a), (b) and (c), used or useful in a Similar Business; provided that such assets are concurrently with their acquisition added to the Collateral to the extent required by the TCEH Senior Secured Facilities and the Security Documents; or

(3)  to make an Investment in (a) any one or more businesses; *provided* that such Investment in any business is in the form of the acquisition of Capital Stock and results in TCEH or another of its Restricted Subsidiaries, as the case may be, owning an amount of the Capital Stock of such business such that it constitutes a Restricted Subsidiary, (b) properties or (c) acquisitions of other assets that, in each of (a), (b) and (c), replace the businesses, properties and/or assets that are the subject of such Asset Sale; *provided* that such assets are concurrently with their acquisition added to the Collateral to the extent required by the TCEH Senior Secured Facilities and the Security Documents;

*provided* that, in the case of clauses (2) and (3) above, an Acceptable Commitment shall be treated as a permitted application of the Net Proceeds from the date of such Acceptable Commitment, so long as the reinvestment occurs within the later of 450 days from the date of receipt of Net Proceeds and 180 days of receipt of such Acceptable Commitment, and, in the event any Acceptable Commitment is later cancelled or terminated for any reason before the Net Proceeds are applied in connection therewith, TCEH or such Restricted Subsidiary enters into a Second Commitment within the later of (a) 180 days of such cancellation or termination or (b) the initial 450-day period; *provided further*, that if any Second Commitment is later cancelled or terminated for any reason before such Net Proceeds are applied, then such Net Proceeds shall constitute Excess Proceeds.

Notwithstanding the preceding paragraph, to the extent that regulatory approval is necessary for an asset purchase or investment, or replacement, repair or restoration on any asset or investment, then TCEH or any Restricted Subsidiary will have an additional 365 days to apply the Net Proceeds from such Asset Sale in accordance with the preceding paragraph.

Any Net Proceeds from Asset Sales of Collateral that are not invested or applied as provided and within the time period set forth in the first sentence of the second preceding paragraph will be deemed to constitute

63

"Collateral Excess Proceeds." When the aggregate amount of Collateral Excess Proceeds exceeds $200.0 million, TCEH and/or any of its Restricted Subsidiaries shall make an offer to all Holders of the Notes and, if required or permitted by the terms of any First Lien Obligations and any Pari Passu Secured Indebtedness, to the holders of such other First Lien Obligations and such Pari Passu Secured Indebtedness (a *Collateral Asset Sale Offer*), to purchase the maximum aggregate principal amount of the Notes and such First Lien Obligations and Pari Passu Secured Indebtedness that is a minimum of $2,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Collateral Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus accrued and unpaid interest and Additional Interest, if any, to the date fixed for the closing of such offer in accordance with the terms and procedures set forth in the Indenture and the other documents governing the applicable First Lien Obligations and Pari Passu Secured Indebtedness; *provided* that in any such Collateral Asset Sale Offer, all First Lien Obligations properly tendered for purchase will be purchased before any Notes or Pari Passu Indebtedness is purchased. TCEH and/or any of its Restricted Subsidiaries will commence a Collateral Asset Sale Offer with respect to Collateral Excess Proceeds within 10 Business Days after the date that Collateral Excess Proceeds exceed $200.0 million by mailing or delivering the notice required pursuant to the terms of the Indenture, with a copy to the Trustee.

To the extent that the aggregate amount of First Lien Obligations, Notes and Pari Passu Secured Indebtedness tendered pursuant to a Collateral Asset Sale Offer is less than the Collateral Excess Proceeds, TCEH and/or any of its Restricted Subsidiaries may use any remaining Collateral Excess Proceeds for general corporate purposes, subject to other covenants contained in the Indenture. If the aggregate principal amount of First Lien Obligations, Notes and Pari Passu Secured Indebtedness surrendered by such holders thereof exceeds the amount of Collateral Excess Proceeds, all First Lien Obligations properly tendered for purchase will be purchased before any Notes or Pari Passu Indebtedness is purchased, and thereafter, the Notes and any other Pari Passu Secured Indebtedness will be purchased on a pro rata basis based on the accreted value or principal amount of the Notes or such other Pari Passu Secured Indebtedness tendered. Additionally, TCEH may, at its option, make a Collateral Asset Sale Offer using proceeds from any Asset Sale of Collateral at any time after consummation of such Asset Sale; *provided* that such Collateral Asset Sale Offer shall be in an aggregate amount of not less than $25.0 million. Upon consummation of such Collateral Asset Sale Offer, any Net Proceeds not required to be used to purchase First Lien Obligations, Notes and Pari Passu Secured Indebtedness shall not be deemed Collateral Excess Proceeds and TCEH and its Restricted Subsidiaries may use any remaining Net Proceeds for general corporate purposes, subject to the other covenants contained in the Indenture.

Pending the final application of any Net Proceeds pursuant to this covenant, the holder of such Net Proceeds may apply such Net Proceeds temporarily to reduce Indebtedness outstanding under a revolving credit facility or otherwise invest such Net Proceeds in any manner not prohibited by the Indenture.

The Issuer will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to an Asset Sale Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations described in the Indenture by virtue thereof.

### *Selection and Notice*

If the Issuer is redeeming less than all of any series of Notes issued by it at any time, the Trustee will select the Notes of such series to be redeemed (a) if the Notes of such series are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes of such series are listed, (b) on a pro rata basis to the extent practicable or (c) by lot or such other similar method in accordance with the procedures of DTC. No Notes of $2,000 or less may be redeemed in part.

Notices of purchase or redemption or any series of Notes will be mailed by first-class mail, postage prepaid, at least 30 but not more than 60 days before the purchase or Redemption Date to each Holder of Notes of such

64

EFIHMW00079509

series at such Holder's registered address or otherwise delivered in accordance with the procedures of DTC, except that redemption notices may be mailed or delivered more than 60 days prior to a Redemption Date if the notice is issued in connection with a defeasance of any series of Notes or a satisfaction and discharge of the Indenture. If any Note is to be purchased or redeemed in part only, any notice of purchase or redemption that relates to such Note will state the portion of the principal amount thereof that has been or is to be purchased or redeemed. The notice will also state any conditions applicable to a redemption.

The Issuer will issue a new Note in a principal amount equal to the unredeemed portion of the original Note in the name of the Holder upon cancellation of the original Note. Notes called for redemption become due on the date fixed for redemption, but such redemption may be subject to one or more conditions precedent. On and after the Redemption Date, interest ceases to accrue on Notes or portions thereof called for redemption.

## Certain Covenants

### *Limitation on Restricted Payments*

TCEH will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

(I)   declare or pay any dividend or make any payment or distribution on account of TCEH's, or any of its Restricted Subsidiaries' Equity Interests, including any dividend or distribution payable in connection with any merger or consolidation other than:

    (a)   dividends or distributions by TCEH payable solely in Equity Interests (other than Disqualified Stock) of TCEH; or

    (b)   dividends or distributions by a Restricted Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a Wholly-Owned Subsidiary, TCEH or a Restricted Subsidiary receives at least its pro rata share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities;

(II)   purchase, redeem, defease or otherwise acquire or retire for value any Equity Interests of TCEH or any direct or indirect parent of TCEH, including in connection with any merger or consolidation;

(III)   make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value in each case, prior to any scheduled repayment, sinking fund payment or maturity, any Subordinated Indebtedness, other than:

    (a)   Indebtedness permitted under clauses (7) and (8) of the covenant described under "— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; or

    (b)   the purchase, repurchase or other acquisition of Subordinated Indebtedness purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of purchase, repurchase or acquisition; or

(IV) make any Restricted Investment

(all such payments and other actions set forth in clauses (I) through (IV) above (other than any exception thereto) being collectively referred to as "*Restricted Payments*"), unless, at the time of such Restricted Payment:

    (1)   no Default will have occurred and be continuing or would occur as a consequence thereof;

    (2)   immediately after giving effect to such transaction on a *pro forma* basis, TCEH could incur $1.00 of additional Indebtedness pursuant to the provisions of the first paragraph of the covenant described under "— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; and

    (3)   such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by TCEH and its Restricted Subsidiaries after the Closing Date (including Restricted Payments permitted

65

EFIHMW00079510

by clauses (1), (2) (with respect to the payment of dividends on Refunding Capital Stock (as defined below) pursuant to clause (b) thereof only), (6)(c), (9) and (14) of the next succeeding paragraph, but excluding all other Restricted Payments permitted by the next succeeding paragraph), is less than the sum of (without duplication):

(a)    50% of the Consolidated Net Income of TCEH for the period (taken as one accounting period) beginning October 11, 2007, to the end of TCEH's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment, or, in the case such Consolidated Net Income for such period is a deficit, minus 100% of such deficit; plus

(b)    100% of the aggregate net cash proceeds and the fair market value, as determined in good faith by TCEH, of marketable securities or other property received by TCEH since immediately after the Closing Date (other than net cash proceeds to the extent such net cash proceeds have been used to incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (12)(a) of the second paragraph under "— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock") from the issue or sale of:

    (i)    (A) Equity Interests of TCEH, including Treasury Capital Stock (as defined below), but excluding cash proceeds and the fair market value, as determined in good faith by TCEH, of marketable securities or other property received from the sale of:

        (x)    Equity Interests to members of management, directors or consultants of TCEH, any direct or indirect parent company of TCEH and TCEH's Subsidiaries after the Closing Date to the extent such amounts have been applied to Restricted Payments made in accordance with clause (4) of the next succeeding paragraph; and

        (y)    Designated Preferred Stock; and

        (B) to the extent such net cash proceeds are actually contributed to the capital of TCEH, Equity Interests of TCEH's direct or indirect parent companies (excluding contributions of the proceeds from the sale of Designated Preferred Stock of such companies or contributions to the extent such amounts have been applied to Restricted Payments made in accordance with clause (4) of the next succeeding paragraph); or

    (ii)    debt securities of TCEH that have been converted into or exchanged for such Equity Interests of TCEH;

provided, however, that this clause (b) will not include the proceeds from (V) Refunding Capital Stock (as defined below), (W) Equity Interests or debt securities of TCEH sold to a Restricted Subsidiary, as the case may be, (X) Disqualified Stock or debt securities that have been converted into or exchanged for Disqualified Stock or (Y) Excluded Contributions; plus

(c)    100% of the aggregate amount of cash and the fair market value, as determined in good faith by TCEH, of marketable securities or other property contributed to the capital of TCEH following the Closing Date (other than net cash proceeds to the extent such net cash proceeds (i) have been used to incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (12)(a) of the second paragraph under "— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," (ii) are contributed by a Restricted Subsidiary or (iii) constitute Excluded Contributions); plus

(d)    100% of the aggregate amount received in cash and the fair market value, as determined in good faith by TCEH, of marketable securities or other property received by means of:

    (i)    the sale or other disposition (other than to TCEH or a Restricted Subsidiary) of Restricted Investments made by TCEH or its Restricted Subsidiaries after the Closing Date and repurchases and redemptions of such Restricted Investments from TCEH or its Restricted Subsidiaries and repayments of loans or advances, and releases of guarantees, which

66

EFIHMW00079511

constitute Restricted Investments by TCEH or its Restricted Subsidiaries, after the Closing Date; or

    (ii)   the sale (other than to TCEH or a Restricted Subsidiary) of the stock of an Unrestricted Subsidiary (other than to the extent the Investment in such Unrestricted Subsidiary was made by TCEH or a Restricted Subsidiary pursuant to clause (7) of the next succeeding paragraph or to the extent such Investment constituted a Permitted Investment) or a distribution or dividend from an Unrestricted Subsidiary after the Closing Date; *plus*

   (e)   in the case of the redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary after the Closing Date, the fair market value of the Investment in such Unrestricted Subsidiary, as determined by TCEH in good faith (or if such fair market value exceeds $200.0 million, in writing by an Independent Financial Advisor), at the time of the redesignation of such Unrestricted Subsidiary as a Restricted Subsidiary other than to the extent the Investment in such Unrestricted Subsidiary was made by TCEH or a Restricted Subsidiary pursuant to clause (7) of the next succeeding paragraph or to the extent such Investment constituted a Permitted Investment.

The foregoing provisions will not prohibit:

   (1)   the payment of any dividend within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of the Indenture;

   (2)   (a) the redemption, repurchase, retirement or other acquisition of any Equity Interests ("*Treasury Capital Stock*") or Subordinated Indebtedness of the Issuer or a Guarantor or any Equity Interests of any direct or indirect parent company of TCEH, in exchange for, or out of the proceeds of the substantially concurrent sale (other than to a Restricted Subsidiary) of, Equity Interests of TCEH or any direct or indirect parent company of TCEH to the extent contributed to the capital of TCEH (in each case, other than any Disqualified Stock) ("*Refunding Capital Stock*") and (b) if immediately prior to the retirement of Treasury Capital Stock, the declaration and payment of dividends thereon was permitted under clause (6) of this paragraph, the declaration and payment of dividends on the Refunding Capital Stock (other than Refunding Capital Stock the proceeds of which were used to redeem, repurchase, retire or otherwise acquire any Equity Interests of any direct or indirect parent company of TCEH) in an aggregate amount per year no greater than the aggregate amount of dividends per annum that were declarable and payable on such Treasury Capital Stock immediately prior to such retirement;

   (3)   the redemption, repurchase or other acquisition or retirement of Subordinated Indebtedness of the Issuer or a Guarantor (other than the Parent Guarantor) made in exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness of the Issuer or a Guarantor, as the case may be, which is incurred in compliance with the covenant described under "— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" so long as:

    (a)   the principal amount (or accreted value) of such new Indebtedness does not exceed the principal amount of (or accreted value, if applicable), plus any accrued and unpaid interest on, the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired for value, plus the amount of any reasonable premium (including reasonable tender premiums), defeasance costs and any reasonable fees and expenses incurred in connection with the issuance of such new Indebtedness;

    (b)   such new Indebtedness is subordinated to the Notes or the applicable Guarantee at least to the same extent as such Subordinated Indebtedness so purchased, exchanged, redeemed, repurchased, acquired or retired for value;

    (c)   such new Indebtedness has a final scheduled maturity date equal to or later than the final scheduled maturity date of the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired; and

67

EFIHMW00079512

    (d)   such new Indebtedness has a Weighted Average Life to Maturity equal to or greater than the remaining Weighted Average Life to Maturity of the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired;

(4)   a Restricted Payment to pay for the repurchase, retirement or other acquisition or retirement for value of Equity Interests (other than Disqualified Stock) of TCEH or any of its direct or indirect parent companies held by any future, present or former employee, director or consultant of TCEH, any of its Subsidiaries or any of its direct or indirect parent companies pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, including any Equity Interests rolled over by management of TCEH or any of its direct or indirect parent companies in connection with the Transactions; *provided, however,* that the aggregate Restricted Payments made under this clause (4) do not exceed in any calendar year $25.0 million (which will increase to $50.0 million subsequent to the consummation of an underwritten public Equity Offering by TCEH or any direct or indirect parent entity of TCEH) (with unused amounts in any calendar year being carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $75.0 million in any calendar year (which will increase to $150.0 million subsequent to the consummation of an underwritten public Equity Offering by TCEH or any direct or indirect parent company of TCEH)); *provided further* that such amount in any calendar year may be increased by an amount not to exceed:

    (a)   the cash proceeds from the sale of Equity Interests (other than Disqualified Stock) of TCEH and, to the extent contributed to the capital of TCEH, Equity Interests of any of TCEH's direct or indirect parent companies, in each case to members of management, directors or consultants of TCEH, any of its Subsidiaries or any of its direct or indirect parent companies that occurs after the Closing Date, to the extent the cash proceeds from the sale of such Equity Interests have not otherwise been applied to the payment of Restricted Payments by virtue of clause (3) of the preceding paragraph; *plus*

    (b)   the cash proceeds of key man life insurance policies received by TCEH or its Restricted Subsidiaries after the Closing Date; *less*

    (c)   the amount of any Restricted Payments previously made with the cash proceeds described in clauses (a) and (b) of this clause (4);

and *provided, further,* that cancellation of Indebtedness owing to TCEH or any Restricted Subsidiary from members of management of TCEH, any of TCEH's direct or indirect parent companies or any of TCEH's Restricted Subsidiaries in connection with a repurchase of Equity Interests of TCEH or any of its direct or indirect parent companies will not be deemed to constitute a Restricted Payment for purposes of this covenant or any other provision of the Indenture;

    (5)   the declaration and payment of dividends to holders of any class or series of Disqualified Stock of TCEH or any of its Restricted Subsidiaries or any class or series of Preferred Stock of any Restricted Subsidiary issued in accordance with the covenant described under "— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" to the extent such dividends are included in the definition of "Fixed Charges";

    (6)   (a) the declaration and payment of dividends to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued by TCEH after the Closing Date;

    (b)   the declaration and payment of dividends to a direct or indirect parent company of TCEH, the proceeds of which will be used to fund the payment of dividends to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) of such parent corporation issued after the Closing Date; *provided* that the amount of dividends paid pursuant to this clause (b) after the Closing Date shall not exceed the aggregate amount of cash actually contributed to the capital of TCEH from the sale of such Designated Preferred Stock; or

68

EFIHMW00079513

(c)  the declaration and payment of dividends on Refunding Capital Stock that is Preferred Stock in excess of the dividends declarable and payable thereon pursuant to clause (2) of this paragraph;

*provided, however*, in the case of each of (a) and (c) of this clause (6), that for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock or the declaration of such dividends on Refunding Capital Stock that is Preferred Stock, after giving effect to such issuance or declaration on a *pro forma* basis, TCEH and its Restricted Subsidiaries on a consolidated basis would have had a Fixed Charge Coverage Ratio of at least 2.00 to 1.00;

(7)  Investments in Unrestricted Subsidiaries having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (7) after the Closing Date that are at the time outstanding, without giving effect to the sale of an Unrestricted Subsidiary to the extent the proceeds of such sale do not consist of cash or marketable securities, not to exceed 1.0% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(8)  repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(9)  the declaration and payment of dividends on TCEH's common stock (or the payment of dividends to any direct or indirect parent entity to fund a payment of dividends on such entity's common stock), following consummation of the first public offering of TCEH's common stock or the common stock of any of its direct or indirect parent companies after the Closing Date, of up to 6% per annum of the net cash proceeds received by or contributed to TCEH in or from any such public offering, other than public offerings with respect to TCEH's common stock registered on Form S-4 or Form S-8 and other than any public sale constituting an Excluded Contribution;

(10) Restricted Payments in an aggregate amount equal to the amount of Excluded Contributions;

(11) (A) other Restricted Payments in an aggregate amount taken together with all other Restricted Payments made pursuant to this clause (A) after the Closing Date not to exceed 2.0% of Total Assets at the time made; and (B) dividends to or, the making of loans to, EFH Corp. in an aggregate amount not to exceed $1,000.0 million after the Closing Date, to the extent the proceeds of such loans or dividends are invested in any of the Oncor Subsidiaries; *provided* that no more than $500.0 million of payments under this clause (B) may be made other than by Intercompany Loans;

(12) distributions or payments of Receivables Fees;

(13) any Restricted Payment made as part of or in connection with the Transactions (including any payments made after the Closing Date in respect of the Issuer's and its Subsidiaries' long-term incentive plan or in respect of tax gross-ups and other deferred compensation) and the fees and expenses related thereto or used to fund amounts owed to Affiliates (including dividends to any direct or indirect parent of TCEH to permit payment by such parent of such amount), in each case to the extent permitted by the covenant described under "— Transactions with Affiliates";

(14) the repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness in accordance with the provisions similar to those described under "— Repurchase at the Option of Holders — Change of Control" and "— Repurchase at the Option of Holders — Asset Sales"; *provided* that all Notes tendered by Holders in connection with a Change of Control Offer or Asset Sale Offer, as applicable, have been repurchased, redeemed or acquired for value;

(15) the declaration and payment of dividends or distributions by TCEH to, or the making of loans to, any direct or indirect parent company in amounts required for any direct or indirect parent companies to pay, in each case without duplication,

(a)  franchise and excise taxes and other fees, taxes and expenses required to maintain their corporate existence;

69

EFIHMW00079514

**PX 042
Page 77 of 157**

(b)  foreign, federal, state and local income taxes (including any amounts reimbursable to the Oncor Subsidiaries in respect of such taxes pursuant to a tax sharing agreement), to the extent such income taxes are attributable to the income of (i) EFH Corp. and its Subsidiaries (other than the Oncor Subsidiaries) and (ii) the Oncor Subsidiaries, to the extent the Oncor Subsidiaries have not reimbursed EFH Corp. or such direct or indirect parent of TCEH for such payments in amounts required to pay such taxes; *provided* that the amount of such payments in any fiscal year does not exceed the amount that EFH Corp. and its Subsidiaries, is required to pay in respect of foreign, federal, state and local income taxes for such fiscal year (including any amounts reimbursable to the Oncor Subsidiaries in respect of such taxes pursuant to a tax sharing agreement);

(c)  customary salary, bonus and other benefits payable to officers and employees of EFH Corp. or any direct or indirect parent company of EFH Corp. that are paid in the ordinary course of business to the extent such salaries, bonuses and other benefits are attributable to (i) the ownership or operation of EFH Corp. and its Restricted Subsidiaries or (ii) the ownership and operation of the Oncor Subsidiaries, to the extent the Oncor Subsidiaries have not reimbursed EFH Corp. or such direct or indirect parent company of EFH Corp. for such payments;

(d)  general corporate operating and overhead costs and expenses of EFH Corp. or any direct or indirect parent company of EFH Corp. that are incurred in the ordinary course of business to the extent such costs and expenses are attributable to (i) the ownership or operation of EFH Corp. and its Restricted Subsidiaries or (ii) the ownership and operation of the Oncor Subsidiaries, to the extent the Oncor Subsidiaries have not reimbursed EFH Corp. or such direct or indirect parent company of EFH Corp. for such payments; and

(e)  fees and expenses other than to Affiliates of TCEH related to any unsuccessful equity or debt offering of such parent entity;

(16) Restricted Payments that are made with Excess Proceeds remaining after the completion of any Asset Sale Offer in an amount not to exceed $200 million;

(17) the making of Intercompany Loans to EFH Corp. so long as TCEH is a Subsidiary of EFH Corp. (A) in amounts required for EFH Corp. to pay, in each case without duplication, principal, premium and interest when due on (x) the EFH Corp. Notes outstanding on the Existing Second Lien Notes Issue Date and any Indebtedness of EFH Corp. or any of its Subsidiaries incurred to replace, refund or refinance such debt and (y) Indebtedness of EFH Corp. and Parent Guarantor in existence on the Existing Second Lien Notes Issue Date, including the Existing EFH Corp. Notes and the Existing Parent Guarantor Notes, and any Indebtedness incurred by EFH Corp. or any of its Subsidiaries to replace, refund or refinance such debt and (B) in amounts required for EFH Corp. and its Subsidiaries (other than TCEH and its Subsidiaries) that guarantee debt of EFH Corp. to pay, without duplication, principal, premium and interest when due on any Indebtedness incurred after the Closing Date by EFH Corp. or such Subsidiaries; *provided* that the aggregate amount of Intercompany Loans to EFH Corp. pursuant to this subclause (B) shall not exceed $600.0 million;

(18) any distributions of, or Investments in, accounts receivable for purposes of inclusion in any Receivables Facility for the benefit of TCEH or its Restricted Subsidiaries, in each case made in the ordinary course of business or consistent with past practices; or

(19) making of Intercompany Loans to EFH Corp. in an amount sufficient to permit EFH Corp. to make any Optional Interest Repayment (as defined in the EFH Corp. Notes), permitted by the terms of the EFH Corp. Notes or any similar payments on Indebtedness incurred to replace, refund or refinance such debt; *provided* that in connection with any such replacement, refunding or refinancing, the aggregate principal amount of such Indebtedness is not increased (except by an amount equal to accrued interest, fees and expenses payable in connection therewith);

*provided, however,* that at the time of, and after giving effect to (A) any Restricted Payment permitted under clauses (7), (11) and (19), no Default shall have occurred and be continuing or would occur as a consequence

70

EFIHMW00079515

thereof and (B) any Restricted Payment permitted under clause (17), no Default under clauses (1) or (2) under "— Events of Default and Remedies" will have occurred and be continuing or would occur as a consequence thereof or any payment default or bankruptcy event of default under the EFH Corp. Notes (or any Indebtedness incurred to replace, refund or refinance such debt) shall have occurred and be continuing.

As of the date of this offering memorandum, all of TCEH's Subsidiaries are Restricted Subsidiaries (other than Comanche Peak Nuclear Power Company, Nuclear Energy Future Holdings LLC and Nuclear Energy Future Holdings II LLC). TCEH will not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the last sentence of the definition of "Unrestricted Subsidiary." For purposes of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by TCEH and its Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated will be deemed to be Restricted Payments in an amount determined as set forth in the last sentence of the definition of "Investments." Such designation will be permitted only if a Restricted Payment in such amount would be permitted at such time, whether pursuant to the first paragraph of this covenant or clauses (7), (10) or (11) of the second paragraph of this covenant, or pursuant to the definition of "Permitted Investments," and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary. Unrestricted Subsidiaries will not be subject to any of the restrictive covenants set forth in the Indenture.

### *Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock*

TCEH will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise (collectively, "*incur*" and collectively, an "*incurrence*") with respect to any Indebtedness (including Acquired Indebtedness), and TCEH will not issue any shares of Disqualified Stock and will not permit any Restricted Subsidiary to issue any shares of Disqualified Stock or Preferred Stock; *provided, however*, that TCEH may incur Indebtedness (including Acquired Indebtedness) or issue shares of Disqualified Stock, and any of its Restricted Subsidiaries may incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock and issue shares of Preferred Stock, if the Fixed Charge Coverage Ratio on a consolidated basis for TCEH and its Restricted Subsidiaries' most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is incurred or such Disqualified Stock or Preferred Stock is issued would have been at least 2.00 to 1.00 determined on a *pro forma* basis (including a *pro forma* application of the net proceeds therefrom), as if the additional Indebtedness had been incurred, or the Disqualified Stock or Preferred Stock had been issued, as the case may be, and the application of proceeds therefrom had occurred at the beginning of such four-quarter period; *provided, further*, that Restricted Subsidiaries that are not Guarantors may not incur Indebtedness or issue Disqualified Stock or Preferred Stock if, after giving *pro forma* effect to such incurrence or issuance (including a *pro forma* application of the net proceeds therefrom), more than an aggregate of $1,250.0 million of Indebtedness or Disqualified Stock or Preferred Stock of Restricted Subsidiaries that are not Guarantors would be outstanding pursuant to this paragraph and clauses (12) and (14) below at such time.

The foregoing limitations will not apply to:

(1)  the incurrence of Indebtedness (which shall include (a) the New Notes and, without duplication, the related Subsidiary Guarantees issued on the Issue Date, and (b) the Existing Second Lien Notes and, without duplication, the related subsidiary guarantees thereof issued on the Existing Second Lien Notes Issue Date, in each case to the extent not classified as incurred under clause (12)(b) below) under (x) Credit Facilities by TCEH or any of its Restricted Subsidiaries and the issuance and creation of letters of credit and bankers' acceptances thereunder (with letters of credit and bankers' acceptances being deemed to have a principal amount equal to the face amount thereof), up to an aggregate principal amount of $26,500.0 million outstanding at any one time and (y) any Collateral Posting Facility;

(2)  [Intentionally omitted];

71

EFIHMW00079516

(3) Indebtedness of TCEH and its Restricted Subsidiaries in existence on the Existing Second Lien Notes Issue Date (other than Indebtedness described in clauses (1) and (2) and any Indebtedness outstanding under the TCEH Senior Secured Facilities on the Existing Second Lien Notes Issue Date), including the Existing Notes (including any PIK Interest which may be paid with respect thereto and guarantees thereof);

(4) Indebtedness consisting of Capitalized Lease Obligations and Purchase Money Obligations, so long as such Indebtedness (except Environmental CapEx Debt) exists at the date of such purchase, lease or improvement, or is created within 270 days thereafter;

(5) Indebtedness incurred by TCEH or any of its Restricted Subsidiaries constituting reimbursement obligations with respect to letters of credit issued in the ordinary course of business, including letters of credit in respect of workers' compensation or employee health claims, or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation or employee health claims; *provided, however*, that upon the drawing of such letters of credit or the incurrence of such Indebtedness, such obligations are reimbursed within 30 days following such drawing or incurrence;

(6) Indebtedness arising from agreements of TCEH or its Restricted Subsidiaries providing for indemnification, adjustment of purchase price or similar obligations, in each case, incurred or assumed in connection with the disposition of any business, assets or a Subsidiary, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or a Subsidiary for the purpose of financing such acquisition; *provided, however*, that such Indebtedness is not reflected on the balance sheet of TCEH, or any of its Restricted Subsidiaries (contingent obligations referred to in a footnote to financial statements and not otherwise reflected on the balance sheet will not be deemed to be reflected on such balance sheet for purposes of this clause (6));

(7) Indebtedness of TCEH to a Restricted Subsidiary; *provided* that any such Indebtedness owing to a Restricted Subsidiary that is not the Issuer or a Guarantor is expressly subordinated in right of payment to the Notes; *provided, further*, that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to TCEH or another Restricted Subsidiary) will be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause (7);

(8) Indebtedness of a Restricted Subsidiary to TCEH or another Restricted Subsidiary; *provided* that if the Issuer or a Guarantor incurs such Indebtedness to a Restricted Subsidiary that is not the Issuer or a Guarantor, such Indebtedness is expressly subordinated in right of payment to the Guarantee of the Notes of such Guarantor; *provided, further*, that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Issuer or another Restricted Subsidiary) will be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause (8);

(9) shares of Preferred Stock of a Restricted Subsidiary issued to TCEH or another Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock (except to TCEH or another of its Restricted Subsidiaries) shall be deemed in each case to be an issuance of such shares of Preferred Stock not permitted by this clause (9);

(10) Hedging Obligations; *provided* that (i) other than in the case of commodity Hedging Obligations, such Hedging Obligations are not entered into for speculative purposes (as determined by TCEH in its reasonable discretion acting in good faith) and (ii) in the case of speculative commodity Hedging Obligations, such Hedging Obligations are entered into in the ordinary course of business and are consistent with past practice;

(11) obligations in respect of performance, bid, appeal and surety bonds and completion guarantees provided by TCEH or any of its Restricted Subsidiaries in the ordinary course of business;

72

EFIHMW00079517

(12) (a) Indebtedness or Disqualified Stock of TCEH and Indebtedness, Disqualified Stock or Preferred Stock of any Restricted Subsidiary equal to 100.0% of the net cash proceeds received by TCEH since immediately after the Closing Date from the issue or sale of Equity Interests of TCEH or cash contributed to the capital of TCEH (in each case, other than Excluded Contributions or proceeds of Disqualified Stock or sales of Equity Interests to TCEH or any of its Subsidiaries) as determined in accordance with clauses (3)(b) and (3)(c) of the first paragraph under "— Limitation on Restricted Payments" to the extent such net cash proceeds or cash have not been applied pursuant to such clauses to make Restricted Payments or to make other Investments, payments or exchanges pursuant to the second paragraph under "— Limitation on Restricted Payments" or to make Permitted Investments (other than Permitted Investments specified in clauses (1) and (3) of the definition thereof) and (b) Indebtedness or Disqualified Stock of TCEH and Indebtedness, Disqualified Stock or Preferred Stock of any Restricted Subsidiary (which shall include (x) the New Notes and, without duplication, the related Subsidiary Guarantees issued on the Issue Date, and (y) the Existing Second Lien Notes and, without duplication, the related subsidiary guarantees thereof issued on the Existing Second Lien Notes Issue Date, in each case to the extent not classified as incurred under clause (1) above) not otherwise permitted hereunder in an aggregate principal amount or liquidation preference, which when aggregated with the principal amount and liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and incurred pursuant to this clause (12)(b), does not at any one time outstanding exceed $1,750.0 million (it being understood that any Indebtedness, Disqualified Stock or Preferred Stock incurred pursuant to this clause (12)(b) shall cease to be deemed incurred or outstanding for purposes of this clause (12)(b) but shall be deemed incurred for the purposes of the first paragraph of this covenant from and after the first date on which TCEH or such Restricted Subsidiary could have incurred such Indebtedness, Disqualified Stock or Preferred Stock under the first paragraph of this covenant without reliance on this clause (12)(b)); *provided, however* that on a pro forma basis, together with any amounts incurred and outstanding by Restricted Subsidiaries that are not Guarantors pursuant to the first paragraph of this covenant and clause (14), no more than $1,250.0 million of Indebtedness, Disqualified Stock or Preferred Stock at any one time outstanding and incurred pursuant to this clause (12) will be incurred by Restricted Subsidiaries that are not Guarantors;

(13) the incurrence or issuance by TCEH or any Restricted Subsidiary of Indebtedness, Disqualified Stock or Preferred Stock which serves to refund or refinance any Indebtedness, Disqualified Stock or Preferred Stock of TCEH or any Restricted Subsidiary incurred as permitted under the first paragraph of this covenant and clauses (2), (3), (4) and (12)(a) above and this clause (13) and clause (14) below or any Indebtedness, Disqualified Stock or Preferred Stock of TCEH or any Restricted Subsidiary issued to so refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock of TCEH or any Restricted Subsidiary including additional Indebtedness, Disqualified Stock or Preferred Stock incurred to pay premiums (including reasonable tender premiums), defeasance costs and fees in connection therewith (the "*Refinancing Indebtedness*") prior to its respective maturity; *provided, however*, that such Refinancing Indebtedness:

(a) has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is incurred which is not less than the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded or refinanced;

(b) to the extent such Refinancing Indebtedness refinances (i) Indebtedness subordinated or *pari passu* to the Notes or any Guarantee thereof, such Refinancing Indebtedness is subordinated or *pari passu* to the Notes or the Guarantee at least to the same extent as the Indebtedness being refinanced or refunded or (ii) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness must be Disqualified Stock or Preferred Stock, respectively; and

(c) shall not include Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of TCEH that is not the Issuer or a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of TCEH or a Guarantor;

73

EFIHMW00079518

and *provided, further*, that subclause (a) of this clause (13) will not apply to any refunding or refinancing of any Obligations under Credit Facilities secured by Permitted Liens; and *provided, further*, that with respect to any pollution control revenue bonds or similar instruments, the maturity of any series thereof shall be deemed to be the date set forth in any instrument governing such Indebtedness for the remarketing of such Indebtedness;

    (14) Indebtedness, Disqualified Stock or Preferred Stock of (x) TCEH or a Restricted Subsidiary incurred to finance an acquisition or (y) Persons that are acquired by TCEH or any Restricted Subsidiary or merged into TCEH or a Restricted Subsidiary in accordance with the terms of the Indenture; *provided* that after giving effect to such acquisition or merger, either

        (a) TCEH would be permitted to incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first sentence of this covenant, or

        (b) such Fixed Charge Coverage Ratio of TCEH and its Restricted Subsidiaries is greater than immediately prior to such acquisition or merger;

*provided, however* that on a pro forma basis, together with any amounts incurred and outstanding by Restricted Subsidiaries that are not Guarantors pursuant to the first paragraph of this covenant and clause (12), no more than $1,250.0 million of Indebtedness, Disqualified Stock or Preferred Stock at any one time outstanding and incurred pursuant to this clause (14) shall be incurred by Restricted Subsidiaries that are not Guarantors;

    (15) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within two Business Days of its incurrence;

    (16) Indebtedness of TCEH or any of its Restricted Subsidiaries supported by a letter of credit issued pursuant to any Credit Facilities, in a principal amount not in excess of the stated amount of such letter of credit;

    (17) (a) any guarantee by TCEH or a Restricted Subsidiary of Indebtedness or other obligations of any Restricted Subsidiary, so long as the incurrence of such Indebtedness incurred by such Restricted Subsidiary is permitted under the terms of the Indenture, or (b) any guarantee by a Restricted Subsidiary of Indebtedness of TCEH; *provided* that such guarantee is incurred in accordance with the covenant described under "— Limitation on Guarantees of Indebtedness by Restricted Subsidiaries";

    (18) Indebtedness of TCEH or any of its Restricted Subsidiaries consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, incurred in the ordinary course of business;

    (19) Indebtedness consisting of Indebtedness issued by TCEH or any of its Restricted Subsidiaries to current or former officers, directors and employees thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of TCEH or any direct or indirect parent company of TCEH to the extent described in clause (4) of the second paragraph under "— Limitation on Restricted Payments"; and

    (20) Indebtedness of TCEH or any Restricted Subsidiary to EFH Corp. or any of its Subsidiaries consistent with past practice in an aggregate amount not to exceed $25.0 million; *provided,* that at the time of incurring, and after giving effect to, such Indebtedness, no Default described in clauses (1) and (2) under "— Events of Default and Remedies" shall have occurred and be continuing or would occur as a consequence thereof; and *provided, further,* that any such Indebtedness owing to an entity that is not a Guarantor is expressly subordinated in right of payment to the Notes.

For purposes of determining compliance with this covenant:

    (1) in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness, Disqualified Stock or Preferred Stock described in clauses (1) through (20) above or is entitled to be incurred pursuant to the

74

EFIHMW00079519

first paragraph of this covenant, TCEH, in its sole discretion, will classify or reclassify such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) and will only be required to include the amount and type of such Indebtedness, Disqualified Stock or Preferred Stock in one of the above clauses; and

(2)   at the time of incurrence, TCEH will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in the first and second paragraphs above;

*provided* that all Indebtedness outstanding under the TCEH Senior Secured Facilities on the Closing Date will be treated as incurred under clause (1) of the preceding paragraph.

Accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness, Disqualified Stock or Preferred Stock will not be deemed to be an incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this covenant.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar- denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

The principal amount of any Indebtedness incurred to refinance other Indebtedness, if incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

The Indenture will provide that TCEH will not, and will not permit TCEH Finance or any Guarantor to, directly or indirectly, incur any Indebtedness (including Acquired Indebtedness) that is subordinated or junior in right of payment to any Indebtedness of TCEH, TCEH Finance or such Guarantor, as the case may be, unless such Indebtedness is expressly subordinated in right of payment to the Notes or such Guarantor's Guarantee to the extent and in the same manner as such Indebtedness is subordinated to other Indebtedness of TCEH, TCEH Finance or such Guarantor, as the case may be.

The Indenture will not treat (1) unsecured Indebtedness as subordinated or junior to Secured Indebtedness merely because it is unsecured or (2) Senior Indebtedness as subordinated or junior to any other Senior Indebtedness merely because it has a junior priority with respect to the same collateral.

*Limitation on Liens*

TCEH will not, and will not permit TCEH Finance or any Subsidiary Guarantor to, directly or indirectly, create, incur, assume or suffer to exist any Lien (except Permitted Liens) that secures obligations under any Indebtedness or any related guarantee, on any asset or property of the Issuer or any Subsidiary Guarantor, or any income or profits therefrom, or assign or convey any right to receive income therefrom, unless the Notes and related Subsidiary Guarantees are secured by a Lien on such property, assets or proceeds that is senior in priority to such Liens, except that the foregoing will not apply to (a) Liens securing the Existing Second Lien Notes and the related subsidiary guarantees thereof issued on the Existing Second Lien Notes Issue Date, (b) Liens securing Indebtedness permitted to be incurred under Credit Facilities, including any letter of credit relating thereto and the New Notes and the Subsidiary Guarantees, that was permitted by the terms of the Indenture to be incurred

75

EFIHMW00079520