Filed Pursuant to Rule 424(b)(3)
Registration No. 333-171253

PROSPECTUS

# ENERGY FUTURE HOLDINGS CORP.

### Offer to Exchange

**$1,060,757,000 aggregate principal amount of its 10.000% Senior Secured Notes due 2020 (the "exchange notes"), which have been registered under the Securities Act of 1933, as amended (the "Securities Act"), for any and all of its outstanding 10.000% Senior Secured Notes due 2020 (the "outstanding notes") (the "exchange offer").**

---

**We are conducting the exchange offer in order to provide you with an opportunity to exchange your unregistered outstanding notes for freely tradable notes that have been registered under the Securities Act.**

**The Exchange Offer**

- We will exchange all outstanding notes that are validly tendered and not validly withdrawn for an equal principal amount of exchange notes that are freely tradable.

- You may withdraw tenders of outstanding notes at any time prior to the expiration date of the exchange offer.

- The exchange offer expires at 11:59 p.m., New York City time, on March 1, 2011, unless extended. We do not currently intend to extend the expiration date.

- The exchange of outstanding notes for exchange notes in the exchange offer will not be a taxable event for U.S. federal income tax purposes. See "Certain United States Federal Income Tax Consequences."

- The terms of the exchange notes to be issued in the exchange offer are substantially identical to the terms of the outstanding notes, except that the exchange notes will be freely tradable.

**Results of the Exchange Offer**

- Except as prohibited by applicable law, the exchange notes may be sold in the over-the-counter market, in negotiated transactions or through a combination of such methods. We do not plan to list the exchange notes on a national market.

All untendered outstanding notes will continue to be subject to the restrictions on transfer set forth in the outstanding notes and in the indenture. In general, the outstanding notes may not be offered or sold, unless registered under the Securities Act, except pursuant to an exemption from, or in a transaction not subject to, the Securities Act and applicable state securities laws. Other than in connection with the exchange offer, we do not currently anticipate that we will register the outstanding notes under the Securities Act.

Each broker-dealer that receives exchange notes for its own account in the exchange offer must acknowledge that it will deliver a prospectus in connection with any resale of those exchange notes. The letter of transmittal states that by so acknowledging and delivering a prospectus, a broker-dealer will not be deemed to admit that it is an "underwriter" within the meaning of the Securities Act.

This prospectus, as it may be amended or supplemented from time to time, may be used by a broker-dealer in connection with resales of exchange notes received in exchange for outstanding notes where the broker-dealer acquired such outstanding notes as a result of market-making or other trading activities.

We have agreed that, for a period of 180 days after the consummation of the exchange offer, we will make this prospectus available to any broker-dealer for use in connection with any such resale. See "Plan of Distribution."

---

**See "Risk Factors" beginning on page 15 for a discussion of certain risks that you should consider before participating in the exchange offer.**

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the exchange notes to be distributed in the exchange offer or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.

**The date of this prospectus is February 1, 2011.**

Confidential

This prospectus is part of a registration statement that we have filed with the Securities and Exchange Commission (the "SEC"). You should read this prospectus together with the registration statement, the exhibits thereto and the additional information described under the heading "Available Information."

**EFH Corp. has not authorized any person (including any dealer, salesperson or broker) to provide you with any information or to make any representation other than as contained in this prospectus. EFH Corp. does not take any responsibility for, and can provide no assurance as to the reliability of, any information that others may give you. The information included in this prospectus is accurate as of the date of this prospectus. You should not assume that the information included in this prospectus is accurate as of any other date.**

The exchange offer is being made on the basis of this prospectus and the letter of transmittal and is subject to the terms described in this prospectus and the letter of transmittal. This prospectus does not constitute an offer to participate in the exchange offer to any person in any jurisdiction in which it would be unlawful to make the exchange offer. Any decision to participate in the exchange offer must be based on the information included in this prospectus. In making an investment decision, holders must rely on their own examination of EFH Corp. and the terms of the exchange offer and the exchange notes, including the merits and risks involved. Holders should not construe anything in this prospectus and letter of transmittal as legal, investment, business or tax advice. Each holder should consult its advisors as needed to make its investment decision and to determine whether it is legally permitted to participate in the exchange offer under applicable laws or regulations.

This prospectus contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents themselves for complete information. All such summaries are qualified in their entirety by such reference. Copies of documents referred to in this prospectus will be made available to holders in the exchange offer at no cost. See "Available Information."

You should not rely on or assume the accuracy of any representation or warranty in any agreement that we have filed as an exhibit to any document that we have publicly filed or that we may otherwise publicly file in the future because such representation or warranty may be subject to exceptions and qualifications contained in separate disclosure schedules, may have been included in such agreement for the purpose of allocating risk between the parties to the particular transaction, and may no longer continue to be true as of any given date.

---

## TABLE OF CONTENTS

| | Page |
|---|---|
| Industry and Market Information | iii |
| Available Information | iii |
| Forward-Looking Statements | iv |
| Prospectus Summary | 1 |
| Risk Factors | 15 |
| Use of Proceeds | 44 |
| Capitalization | 45 |
| Selected Historical Consolidated Financial Data for EFH Corp. and Its Subsidiaries | 47 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three and Nine Months Ended September 30, 2010 | 51 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009 | 90 |
| Our Businesses | 152 |
| Executive Compensation | 183 |
| Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 209 |
| Certain Relationships and Related Party Transactions | 212 |
| The Exchange Offer | 217 |

i

| | |
|---|---|
| Description of the Notes | 225 |
| Certain United States Federal Income Tax Consequences | 313 |
| Certain ERISA Considerations | 314 |
| Plan of Distribution | 316 |
| Legal Matters | 317 |
| Experts | 317 |
| Glossary | 318 |
| Index to Consolidated Financial Statements | |

ii

## INDUSTRY AND MARKET INFORMATION

The industry and market data and other statistical information used throughout this prospectus are based on independent industry publications, government publications, reports by market research firms or other published independent sources, including certain data published by the Electric Reliability Council of Texas ("ERCOT"), the Public Utility Commission of Texas (the "PUCT"), and the New York Mercantile Exchange. We did not commission any of these publications or reports. Some data is also based on good faith estimates, which are derived from our review of internal surveys, as well as the independent sources listed above. Independent industry publications and surveys generally state that they have obtained information from sources believed to be reliable, but do not guarantee the accuracy and completeness of such information. While we believe that each of these studies and publications is reliable, we have not independently verified such data and make no representation as to the accuracy of such information. Forecasts are particularly likely to be inaccurate, especially over long periods of time, and we do not know what assumptions regarding general economic growth are used in preparing the forecasts included in this prospectus. Similarly, while we believe that such internal and external research is reliable, it has not been verified by any independent sources, and we make no assurances that the predictions contained therein are accurate.

## AVAILABLE INFORMATION

EFH Corp. files annual, quarterly and current reports and other information with the SEC. You may read and copy any document EFH Corp. has filed or will file with the SEC at the SEC's public website (www.sec.gov) or at the Public Reference Room of the SEC located at 100 F Street, N.E., Washington, DC 20549. Copies of such materials can be obtained from the Public Reference Room of the SEC at prescribed rates. You can call the SEC at 1-800-SEC-0330 to obtain information on the operation of the Public Reference Room. These materials do not form part of this prospectus.

You may request a copy of any of our filings with the SEC, or any of the agreements or other documents that constitute exhibits to those filings, at no cost, by writing or telephoning us at the following address or phone number:

Energy Future Holdings Corp.
1601 Bryan Street
Dallas, Texas 75201-3411
Attention: Investor Relations
Telephone: (214) 812-4600

iii

Confidential

## FORWARD-LOOKING STATEMENTS

This prospectus and other presentations made by us contain "forward-looking statements." All statements, other than statements of historical facts, that are included in this prospectus, or made in presentations, in response to questions or otherwise, that address activities, events or developments that EFH Corp. expects or anticipates to occur in the future, including such matters as projections, capital allocation, future capital expenditures, business strategy, competitive strengths, goals, future acquisitions or dispositions, development or operation of power generation assets, market and industry developments and the growth of our businesses and operations (often, but not always, through the use of words or phrases such as "intends," "plans," "will likely result," "are expected to," "will continue," "is anticipated," "estimated," "should," "projection," "target," "goal," "objective" and "outlook"), are forward-looking statements. Although we believe that in making any such forward-looking statement our expectations are based on reasonable assumptions, any such forward-looking statement involves uncertainties and is qualified in its entirety by reference to the discussion of risk factors under "Risk Factors" contained elsewhere in this prospectus and the following important factors, among others, that could cause our actual results to differ materially from those projected in such forward-looking statements:

- prevailing governmental policies and regulatory actions, including those of the Texas Legislature, the Governor of Texas, the Congress of the United States of America ("U.S.") the U.S. Federal Energy Regulatory Commission (the "FERC"), the North American Electric Reliability Corporation (the "NERC"), the Texas Reliability Entity (the "TRE"), the PUCT, the Railroad Commission of Texas (the "RRC"), the U.S. Nuclear Regulatory Commission (the "NRC"), the U.S. Environmental Protection Agency (the "EPA"), the Texas Commission on Environmental Quality (the "TCEQ") and the Commodity Futures Trading Commission (the "CFTC"), with respect to, among other things:

  - allowed prices;

  - allowed rates of return;

  - permitted capital structure;

  - industry, market and rate structure;

  - purchased power and recovery of investments;

  - operations of nuclear generating facilities;

  - operations of fossil-fueled generating facilities;

  - operations of mines;

  - acquisitions and disposal of assets and facilities;

  - development, construction and operation of facilities;

  - decommissioning costs;

  - present or prospective wholesale and retail competition;

  - changes in tax laws and policies;

  - changes in and compliance with environmental and safety laws and policies, including climate change initiatives; and

  - clearing over the counter derivatives through exchanges and posting of cash collateral therewith;

- legal and administrative proceedings and settlements;

iv

EFIHMW00223028

PX 045
Page 5 of 561

- general industry trends;

- economic conditions, including the impact of a recessionary environment;

- our ability to attract and retain profitable customers;

- our ability to profitably serve our customers;

- restrictions on competitive retail pricing;

- changes in wholesale electricity prices or energy commodity prices;

- changes in prices of transportation of natural gas, coal, crude oil and refined products;

- unanticipated changes in market heat rates in the ERCOT electricity market;

- our ability to effectively hedge against changes in commodity prices, market heat rates and interest rates;

- weather conditions and other natural phenomena, and acts of sabotage, wars or terrorist activities;

- unanticipated population growth or decline, or changes in market demand and demographic patterns, particularly in ERCOT;

- changes in business strategy, development plans or vendor relationships;

- access to adequate transmission facilities to meet changing demands;

- unanticipated changes in interest rates, commodity prices, rates of inflation or foreign exchange rates;

- unanticipated changes in operating expenses, liquidity needs and capital expenditures;

- commercial bank market and capital market conditions and the potential impact of disruptions in U.S. and international credit markets;

- access to capital, the cost of such capital, and the results of financing and refinancing efforts, including availability of funds in capital markets;

- financial restrictions placed on us by the agreements governing our debt instruments;

- our ability to generate sufficient cash flow to make interest payments on our debt instruments;

- competition for new energy development and other business opportunities;

- inability of various counterparties to meet their obligations with respect to our financial instruments;

- changes in technology used by and services offered by us;

- changes in electricity transmission that allow additional electricity generation to compete with our generation assets;

- significant changes in our relationship with our employees, including the availability of qualified personnel, and the potential adverse effects if labor disputes or grievances were to occur;

- changes in assumptions used to estimate costs of providing employee benefits, including pension benefits and other postretirement employee benefits ("OPEB"), and future funding requirements related thereto;

v

Confidential

EFIHMW00223029

- changes in assumptions used to estimate future executive compensation payments;

- hazards customary to the industry and the possibility that we may not have adequate insurance to cover losses resulting from such hazards;

- significant changes in critical accounting policies;

- actions by credit rating agencies;

- our ability to effectively execute our operational strategy; and

- our ability to implement cost reduction initiatives.

Any forward-looking statement speaks only as of the date on which it is made, and except as may be required by law, we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which it is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for us to predict all of them; nor can we assess the impact of each such factor or the extent to which any factor, or combination of factors, may cause results to differ materially from those contained in any forward-looking statement. As such, you should not unduly rely on such forward-looking statements.

vi

Confidential

## PROSPECTUS SUMMARY

*This summary highlights selected information appearing elsewhere in this prospectus. This summary is not complete and does not contain all of the information that you should consider before participating in the exchange offer. You should carefully read this entire prospectus, including information set forth in the sections entitled "Risk Factors," "Selected Historical Consolidated Financial Data for EFH Corp. and Its Subsidiaries" and the other financial data and related notes included elsewhere in this prospectus.*

*On October 10, 2007, Texas Energy Future Merger Sub Corp ("Merger Sub") merged with and into EFH Corp. (the "Merger"). As a result of the Merger, investment funds associated with or designated by Kohlberg Kravis Roberts & Co. ("KKR"), TPG Capital, L.P.("TPG") and Goldman, Sachs & Co. ("Goldman Sachs, and together with KKR and TPG, the "Sponsor Group"), and certain other co-investors, including affiliates of Citigroup Global Markets Inc., Morgan Stanley & Co. Incorporated and LB I Group (collectively, the "Investors"), own EFH Corp. through Texas Energy Future Holdings Limited Partnership ("Texas Holdings"), with the Sponsor Group controlling Texas Holdings' general partner, Texas Energy Future Capital Holdings LLC (the "General Partner").*

*"Legacy Notes" means, collectively, EFH Corp.'s 5.55% Series P Senior Notes due 2014, 6.50% Series Q Senior Notes due 2024 and 6.55% Series R Senior Notes due 2034. "EFH Corp. Senior Notes" means, collectively, EFH Corp.'s 10.875% Senior Notes due November 1, 2017 (EFH Corp. 10.875% Notes) and EFH Corp.'s 11.25%/12.00% Senior Toggle Notes due November 1, 2017 (EFH Corp. Toggle Notes). "EFH Corp. Senior Secured Notes" means EFH Corp.'s 9.75% Senior Secured Notes due October 15, 2019 (EFH Corp. 9.75% Notes). "EFIH Notes" means, collectively, Energy Future Intermediate Holding Company LLC's ("EFIH") and EFIH Finance Inc.'s ("EFIH Finance") 9.75% Senior Secured Notes due October 15, 2019 (EFIH 9.75% Notes) and EFIH's and EFIH Finance's 10.000% Senior Secured Notes due December 1, 2020 (EFIH 10% Notes). The EFH Corp. Senior Secured Notes and the EFIH Notes are collectively referred to as the "Senior Secured Notes." "TCEH Senior Notes" means, collectively, Texas Competitive Electric Holdings Company LLC's ("TCEH") and TCEH Finance Inc.'s ("TCEH Finance") 10.25% Senior Notes due November 1, 2015 and 10.25% Senior Notes due November 1, 2015, Series B (collectively, TCEH 10.25% Notes) and 10.50%/11.25% Senior Toggle Notes due November 1, 2016 (TCEH Toggle Notes). "TCEH Senior Secured Second Lien Notes" means, collectively, TCEH's and TCEH Finance's 15% Senior Secured Second Lien Notes due April 1, 2021 and 15% Senior Secured Second Lien Notes due April 1, 2021, Series B.*

*The financial information presented in this prospectus is presented for two periods: Predecessor and Successor, which primarily relate to the periods preceding the Merger and the periods succeeding the Merger, respectively.*

*Unless the context otherwise requires or as otherwise indicated, references in this prospectus to "we," "our" and "us" refer to Energy Future Holdings Corp. and its consolidated subsidiaries. References to "EFH Corp." refer to Energy Future Holdings Corp. and not to any of its subsidiaries. See "Glossary" for other defined terms used in this prospectus.*

### Our Businesses

We are a Dallas-based energy company with a portfolio of competitive and regulated energy businesses in Texas. EFH Corp. is a holding company conducting its operations principally through its subsidiaries, TCEH and Oncor Electric Delivery Company LLC ("Oncor"). TCEH is wholly-owned, and EFH Corp. holds an approximately 80% equity interest in Oncor.

TCEH is a holding company for subsidiaries engaged in competitive electricity market activities largely in Texas including electricity generation, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales. Energy Future Competitive Holdings Company ("EFCH") is the parent company of TCEH and a direct subsidiary of EFH Corp.

TCEH owns or leases 17,519 megawatts ("MW") of generation capacity in Texas, which consists of lignite/coal, nuclear and natural gas-fueled generation facilities. This amount includes two new lignite-fueled units that achieved substantial completion (as defined in the engineering, procurement and construction agreements for the units) in the fourth quarter of 2009 but does not include a third new lignite-fueled unit that achieved substantial completion (as defined in the engineering, procurement and construction agreement for the unit) in the second quarter of 2010. In addition, TCEH is the largest purchaser of wind-generated electricity in Texas and the fifth largest in the United States. TCEH provides competitive electricity and related services to more than two million retail electricity customers in Texas.

1

EFIHMW00223031

EFIH, a direct subsidiary of EFH Corp., is a holding company whose wholly-owned subsidiary, Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings"), holds a majority interest (approximately 80%) in Oncor, which is principally engaged in providing electricity delivery services to retail electric providers, including subsidiaries of TCEH, that sell power in the north central, eastern and western parts of Texas.

Oncor is engaged in regulated electricity transmission and distribution operations in Texas that are primarily regulated by the PUCT. Oncor provides both distribution services to retail electric providers that sell electricity to consumers and transmission services to other electricity distribution companies, cooperatives and municipalities. Oncor operates the largest transmission and distribution system in Texas, delivering electricity to approximately three million homes and businesses and operating more than 117,000 miles of transmission and distribution lines. A significant portion of Oncor's revenues represent fees for delivery services provided to TCEH. Distribution revenues from TCEH represented 38% and 39% of Oncor's total revenues for the years ended December 31, 2009 and 2008, respectively.

EFH Corp. and Oncor have implemented certain structural and operational "ring-fencing" measures based on commitments made by Texas Holdings and Oncor to the PUCT that are intended to enhance the credit quality of Oncor. These measures serve to mitigate Oncor's and Oncor Holdings' credit exposure to Texas Holdings and its other subsidiaries (other than Oncor Holdings and its subsidiaries) (collectively, the "Texas Holdings Group") and to reduce the risk that the assets and liabilities of Oncor or Oncor Holdings would be substantially consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities. See Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for a description of the material features of these "ring-fencing" measures.

At September 30, 2010, we had approximately 9,200 full-time employees (including approximately 3,800 at Oncor), including approximately 2,750 employees (including approximately 660 at Oncor) under collective bargaining agreements.

### Recent Developments

On November 15, 2010, TCEH and TCEH Finance (collectively, the "TCEH Issuer"), completed a private exchange transaction (the "Exchange Transaction") pursuant to an Exchange Agreement among the TCEH Issuer, EFCH, the subsidiary guarantors named therein and an institutional investor (the "Exchange Holder"). In the Exchange Transaction, the TCEH Issuer issued approximately $885 million aggregate principal amount of its 15% Senior Secured Second Lien Notes due 2021, Series B in exchange for the surrender by certain funds and accounts managed by the Exchange Holder of approximately $1.27 billion aggregate principal amount of the TCEH Issuer's 10.25% Senior Notes due 2015 and 10.50%/11.25% Senior Toggle Notes due 2016. The notes received by the TCEH Issuer in the Exchange Transaction have been retired and canceled.

On January 7, 2011, Oncor filed for a rate review with the PUCT and 203 cities. If approved as requested, this review would result in an aggregate annual rate increase of approximately $353 million. In its filing, Oncor also requested a revised regulatory capital structure of 55% debt to 45% equity. The debt-to-equity ratio established by the PUCT is currently set at 60% debt to 40% equity. The PUCT, cities and other participating parties, with input from Oncor, are expected to set a schedule for consideration of Oncor's request. A resolution of Oncor's proposed increase is expected to occur during the second half of 2011. Upon such resolution, any resulting rate changes will commence.

---

EFH Corp. was incorporated in Texas in 1996. EFIH was formed in Delaware in 2007. EFCH was incorporated in Texas in 1982. Our principal executive offices are located at Energy Plaza, 1601 Bryan Street, Dallas, TX 75201-3411. The telephone number of our principal executive offices is (214) 812-4600. Our website is http://www.energyfutureholdings.com. Information on or connected to our website does not constitute part of this prospectus.

2

EFIHMW00223032

PX 045
Page 9 of 561

### The Exchange Offer

*The summary below describes the principal terms of the exchange offer. "The Exchange Offer" section of this Prospectus provides more comprehensive information. During the period from January 2010 through July 2010, EFH Corp. issued the outstanding notes in private placements. The term "notes" as used throughout this prospectus collectively refers to the outstanding notes and the exchange notes.*

| | |
|---|---|
| General | In connection with the private placements, EFH Corp. and the guarantors of the outstanding notes entered into a registration rights agreement with the initial purchasers and other purchasers of the outstanding notes pursuant to which they agreed, among other things, to deliver this prospectus to you and to complete the exchange offer within 360 days after the date of original issuance of the outstanding notes. You are entitled to exchange in the exchange offer your outstanding notes for exchange notes that are identical in all material respects to the outstanding notes except: |

- the exchange notes have been registered under the Securities Act;

- the exchange notes are not entitled to any registration rights that are applicable to the outstanding notes under the registration rights agreement; and

- the additional interest provisions of the registration rights agreement are not applicable.

| | |
|---|---|
| The Exchange Offer | EFH Corp. is offering to exchange $1,060,757,000 aggregate principal amount of 10.000% Senior Secured Notes due 2020 that have been registered under the Securities Act for any and all of its existing 10.000% Senior Secured Notes due 2020. |

You may only exchange outstanding notes in minimum denominations of $2,000 and integral multiples of $1,000 in excess of $2,000.

| | |
|---|---|
| Resale | Based on an interpretation by the staff of the SEC set forth in no-action letters issued to third parties, we believe that the exchange notes issued pursuant to the exchange offer in exchange for the outstanding notes may be offered for resale, resold and otherwise transferred by you (unless you are our "affiliate" within the meaning of Rule 405 under the Securities Act) without compliance with the registration and prospectus delivery provisions of the Securities Act, provided that: |

- you are acquiring the exchange notes in the ordinary course of your business; and

- you have not engaged in, do not intend to engage in, and have no arrangement or understanding with any person to participate in, a distribution of the exchange notes.

If you are a broker dealer and receive exchange notes for your own account in exchange for outstanding notes that you acquired as a result of market making activities or other trading activities, you must acknowledge that you will deliver this prospectus in connection with any resale of the exchange notes. See "Plan of Distribution."

3

Confidential

Any holder of outstanding notes who:

- is our affiliate;

- does not acquire exchange notes in the ordinary course of its business; or

- tenders its outstanding notes in the exchange offer with the intention to participate, or for the purpose of participating, in a distribution of exchange notes

cannot rely on the position of the staff of the SEC enunciated in Morgan Stanley & Co. Incorporated (available June 5, 1991) and Exxon Capital Holdings Corporation (available May 13, 1988), as interpreted in Shearman & Sterling (available July 2, 1993), or similar no-action letters and, in the absence of an exemption therefrom, must comply with the registration and prospectus delivery requirements of the Securities Act in connection with any resale of the exchange notes.

| | |
|---|---|
| Expiration Date | The exchange offer will expire at 11:59 p.m., New York City time, on March 1, 2011, unless extended by EFH Corp. EFH Corp. currently does not intend to extend the expiration date. |
| Withdrawal | You may withdraw the tender of your outstanding notes at any time prior to the expiration of the exchange offer. EFH Corp. will return to you any of your outstanding notes that are not accepted for any reason for exchange, without expense to you, promptly after the expiration or termination of the exchange offer. |
| Conditions to the Exchange Offer | The exchange offer is subject to customary conditions, which EFH Corp. may waive. See "The Exchange Offer — Conditions to the Exchange Offer." |
| Accrued Interest on the Exchange Notes and the Outstanding Notes | The exchange notes will accrue interest from the most recent date to which interest has been paid on the outstanding notes. Holders of outstanding notes that are accepted for exchange will be deemed to have waived the right to receive any further interest payments with respect to such outstanding notes. |
| Procedures for Tendering Outstanding Notes | To participate in the exchange offer, you must follow procedures established by The Depository Trust Company, or "DTC," for tendering notes held in book-entry form. These procedures require that: |

- the exchange agent receive, prior to the expiration date of the exchange offer, a computer generated message known as an "agent's message," which message is transmitted through DTC's automated tender offer program known as "ATOP;" and

- DTC confirm (i) that it has received your instructions to exchange your notes and (ii) that you agree to be bound by the terms of the letter of transmittal.

4

EFIHMW00223034

For more information on tendering your outstanding notes, please refer to the sections in this prospectus entitled "The Exchange Offer — Terms of the Exchange Offer" and "— Procedures for Tendering Outstanding Notes."

No Guaranteed Delivery

The exchange offer will not provide for guaranteed delivery procedures with respect to any outstanding notes.

Effect on Holders of Outstanding Notes

As a result of the making of, and upon acceptance for exchange of all validly tendered outstanding notes pursuant to the terms of the exchange offer, EFH Corp. and the guarantors of the notes will have fulfilled a covenant under the registration rights agreement. Accordingly, there will be no increase in the applicable interest rate on the outstanding notes under the circumstances described in the registration rights agreement following completion of the exchange offer. If you do not tender your outstanding notes in the exchange offer, you will continue to be entitled to all the rights and limitations applicable to the outstanding notes as set forth in the indenture, except EFH Corp. and the guarantors of the notes will not have any further obligation to you to provide for the exchange and registration of untendered outstanding notes under the registration rights agreement. To the extent that outstanding notes are tendered and accepted in the exchange offer, the trading market for outstanding notes that are not so tendered and accepted could be adversely affected.

Consequences of Failure to Exchange

All untendered outstanding notes will continue to be subject to the restrictions on transfer set forth in the outstanding notes and in the indenture. In general, the outstanding notes may not be offered or sold, unless registered under the Securities Act, except pursuant to an exemption from, or in a transaction not subject to, the Securities Act and applicable state securities laws. Other than in connection with the exchange offer, EFH Corp. and the guarantors of the notes do not currently anticipate that they will register the outstanding notes under the Securities Act.

Certain United States Federal Income Tax Consequences

The exchange of outstanding notes in the exchange offer will not be a taxable event for U.S. federal income tax purposes. See "Certain United States Federal Income Tax Consequences."

Use of Proceeds

We will not receive any cash proceeds from the issuance of the exchange notes in the exchange offer. See "Use of Proceeds."

Exchange Agent

The Bank of New York Mellon Trust Company, N.A. is the exchange agent for the exchange offer. The addresses and telephone numbers of the exchange agent are set forth in the section captioned "The Exchange Offer — Exchange Agent."

5

EFIHMW00223035

## The Exchange Notes

*The summary below describes the principal terms of the exchange notes. Certain of the terms and conditions described below are subject to important limitations and exceptions. The "Description of Notes" section of this prospectus contains more detailed descriptions of the terms and conditions of the outstanding notes and exchange notes. The exchange notes will have terms identical in all material respects to the outstanding notes, except that the exchange notes will not contain terms with respect to transfer restrictions, registration rights and additional interest for failure to observe certain obligations in the registration rights agreement.*

| | |
|---|---|
| Issuer | Energy Future Holdings Corp. |
| Securities Offered | $1,060,757,000 aggregate principal amount of 10.000% Senior Secured Notes due 2020. |
| Maturity Date | January 15, 2020. |
| Interest Rate | The exchange notes will accrue interest at the rate of 10.000% per annum. |
| Interest Payment Dates | Interest on the notes will be payable on January 15 and July 15 of each year. |
| Ranking | The exchange notes will be: |

- senior obligations of EFH Corp. and will rank equally in right of payment with all existing and future senior indebtedness of EFH Corp. (including the Legacy Notes, the EFH Corp. Senior Notes and the EFH Corp. Senior Secured Notes);

- effectively subordinated to any indebtedness of EFH Corp. secured by assets of EFH Corp. to the extent of the value of the assets securing such indebtedness;

- structurally subordinated to all indebtedness and other liabilities of EFH Corp.'s non-guarantor subsidiaries, including Oncor Holdings, TCEH and each of their respective subsidiaries, any of EFH Corp.'s foreign subsidiaries and any other unrestricted subsidiaries;

- senior in right of payment to any future subordinated indebtedness of EFH Corp; and

- guaranteed as described under "— Guarantees."

As of September 30, 2010, (1) EFH Corp. had $1.176 billion principal amount of senior secured indebtedness, including the notes, and (2) the outstanding notes were structurally subordinated to approximately $35.909 billion principal amount of debt (including long-term debt, including amounts due currently, and short-term borrowings) of EFH Corp.'s subsidiaries, including all of TCEH's and its subsidiaries' debt and all of Oncor Holdings' and its subsidiaries' debt. As of September 30, 2010, TCEH had approximately $3.03 billion of additional available capacity under the TCEH Senior Secured Facilities (excluding amounts available under its senior secured cash posting credit facility, but including $229 million of undrawn commitments from a subsidiary of Lehman Brothers Holding Inc. (such subsidiary, "Lehman") that has filed for bankruptcy under Chapter 11 of Title 11 of the United States Code, as amended (the "Bankruptcy Code") that are only available from the fronting banks and the swingline lender and $410 million of available letter of credit capacity), and Oncor had approximately $1.444 billion of additional available capacity under its revolving credit facility (excluding $122 million of undrawn commitments from Lehman and subject to certain bond credit availability). In addition, the TCEH Senior Secured Facilities permit TCEH to issue up to $5.0 billion of secured notes or loans ranking junior to TCEH's senior secured borrowings.

6

EFIHMW00223036

Guarantees

The notes are unconditionally guaranteed, jointly and severally, by EFCH (the parent of TCEH) on a senior unsecured basis and EFIH (the parent of Oncor Holdings) on a senior secured basis (to the extent of the assets securing the guarantee).

The guarantees:

- are senior obligations of each guarantor and rank equally in right of payment with all existing and future senior indebtedness of each guarantor;

- in the case of the guarantee from EFIH, are secured, equally and ratably with EFIH's guarantee of the EFH Corp. Senior Secured Notes and the EFIH Notes, by the pledge of any investments EFIH owns or holds in Oncor Holdings or any of its subsidiaries (the "Collateral"), which consists of all of the membership interests it owns in Oncor Holdings;

- in the case of the guarantee from EFCH, are not secured;

- in the case of the guarantee from EFIH, are effectively senior to all unsecured indebtedness of EFIH to the extent of the value of the Collateral securing such guarantee;

- are effectively subordinated to all secured indebtedness of each guarantor secured by assets other than the Collateral to the extent of the value of the assets securing such indebtedness;

- are structurally subordinated to any existing and future indebtedness and liabilities of subsidiaries of a guarantor that do not guarantee the notes, including Oncor Holdings and its subsidiaries (collectively, the "Oncor Subsidiaries" and each, an "Oncor Subsidiary") in the case of EFIH, and TCEH and its subsidiaries in the case of EFCH, and any other unrestricted subsidiaries;

- are senior in right of payment to any future subordinated indebtedness of each guarantor; and

- are effectively senior, in the case of EFIH, to all obligations under any future junior lien debt with respect to the Collateral.

7

Confidential

EFIHMW00223037

As of September 30, 2010, the EFCH guarantee was effectively junior to approximately $98 million principal amount of senior secured indebtedness of EFCH (excluding EFCH's secured guarantee of $21.330 billion of senior secured borrowings by TCEH under the TCEH Senior Secured Facilities). As of September 30, 2010, TCEH had approximately $3.03 billion of additional available senior secured capacity under the TCEH Senior Secured Facilities (excluding amounts available under its senior secured cash posting credit facility, but including $229 million of undrawn commitments from Lehman that are only available from the fronting banks and the swingline lender and $410 million of available letter of credit capacity). In addition, the TCEH Senior Secured Facilities permit TCEH to issue up to $5.0 billion of notes or loans ranking junior to TCEH's senior secured borrowings.

None of EFH Corp.'s other subsidiaries guarantee the notes. For the year ended December 31, 2009 and the nine months ended September 30, 2010, the non-guarantor subsidiaries generated all of EFH Corp.'s consolidated total revenue. In addition, as of September 30, 2010, TCEH held approximately 83% of EFH Corp.'s consolidated total assets and the remaining assets primarily reflected EFH Corp.'s investment in Oncor Holdings.

See "Risk Factors — Risks Related to the Notes — The liabilities of each of EFH Corp. and EFCH currently exceed its assets as shown on its most recent quarterly balance sheet. If a court were to find that EFH Corp., EFCH or EFIH were insolvent before or after giving effect to the offering of the notes and did not receive reasonably equivalent value or fair consideration for the issuance of the notes or the incurrence of a guarantee or the pledge of the Collateral, as applicable, the court may void all or a portion of the obligations represented by the notes or the guarantee of the notes by EFCH or EFIH or the pledge of the Collateral by EFIH as a fraudulent conveyance."

Security

EFIH's guarantee of the notes is secured, equally and ratably with EFIH's guarantee of the EFH Corp. Senior Secured Notes and the EFIH Notes, by its pledge of 100% of the membership interests and other investments it owns or holds in Oncor Holdings. As of the date of this prospectus, $115 million of EFH Corp. Senior Secured Notes and $2.321 billion of EFIH Notes were outstanding. See "Description of the Notes — Security for the Notes." See also "Risk Factors — Risks Related to the Notes — The liabilities of each of EFH Corp. and EFCH currently exceed its assets as shown on its most recent quarterly balance sheet. If a court were to find that EFH Corp., EFCH or EFIH were insolvent before or after giving effect to the offering of the notes and did not receive reasonably equivalent value or fair consideration for the issuance of the notes or the incurrence of a guarantee or the pledge of the Collateral, as applicable, the court may void all or a portion of the obligations represented by the notes or the guarantee of the notes by EFCH or EFIH or the pledge of the Collateral by EFIH as a fraudulent conveyance."

8

Confidential

| | |
|---|---|
| Optional Redemption | EFH Corp. may redeem any of the exchange notes on and after January 15, 2015 at the redemption prices set forth in this prospectus. EFH Corp. may also redeem the exchange notes at any time prior to January 15, 2015 at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make-whole" premium. In addition, before January 15, 2013, EFH Corp. may redeem up to 35% of the aggregate principal amount of the exchange notes, using the proceeds from certain equity offerings at the redemption price set forth in this prospectus. See "Description of the Notes — Optional Redemption." |
| Change of Control Offer | Upon the occurrence of certain transactions meeting the definition of "change of control," holders of the exchange notes will have the right to require EFH Corp. to repurchase some or all of the exchange notes at 101% of their face amount, plus accrued and unpaid interest to the repurchase date. This right is subject to important limitations. For example, this right will not apply to a transaction that would otherwise be a "change of control" if EFH Corp. complies with the provisions relating to a transfer of either the Oncor business or the TCEH business described below under "— Important Covenants" or if the transaction meets certain other requirements. See "Description of the Notes — Repurchase at the Option of Holders — Change of Control" and the definition of "Change of Control" under "Description of the Notes." |
| | EFH Corp. may not be able to pay holders the required price for exchange notes they present to it at the time of a change of control, because EFH Corp. may not have enough funds at that time or the terms of EFH Corp.'s other indebtedness or any of its subsidiaries' indebtedness, including the TCEH Senior Secured Facilities, may prevent EFH Corp. from making such payment or receiving funds from its subsidiaries in an amount sufficient to fund such payment. |
| | See "Risk Factors — Risks Related to the Notes — We may not be able to repurchase the notes upon a change of control," "Risk Factors — Risks Related to the Notes — We may transfer or dispose of our interests in EFIH or Oncor Holdings to a third party in a manner that would result in EFIH or such third party becoming the obligor under the notes, without EFH Corp. or EFIH being required to offer to repurchase the notes. The risks of an investment in the notes may increase further following such a transaction" and "Risk Factors — Risks Related to the Notes — We may transfer or dispose of our interests in or the assets of TCEH to a third party without such third party becoming the obligor under the notes and without being required to offer to repurchase the notes." |
| Important Covenants | The indenture governing the exchange notes contains covenants limiting EFH Corp.'s ability and the ability of each of its restricted subsidiaries to: |

- pay dividends on or make distributions in respect of EFH Corp.'s capital stock or make other restricted payments;

9

EFIHMW00223039

- make investments (including investments in Oncor);

- incur additional debt or issue some types of preferred shares;

- create liens on assets to secure debt;

- sell assets;

- consolidate, merge, sell or otherwise dispose of all or substantially all of their assets in certain circumstances;

- enter into certain transactions with their affiliates; and

- designate EFH Corp.'s subsidiaries as unrestricted subsidiaries.

These covenants are subject to a number of important limitations and exceptions. For example, the first to occur of the sale of all of the Oncor business (as defined under "Permitted Asset Transfer" under "Description of the Notes") and all of the TCEH business (as defined under "TCEH Transfer" under "Description of the Notes") will not be considered the sale of all or substantially all of EFH Corp.'s assets under the indenture so long as certain conditions are satisfied, in the case of the sale of the Oncor business, including the condition that the transferee assumes the obligations under the exchange notes. The transferee in the case of a TCEH Transfer would not be required to assume such obligations. Certain other transactions (including certain intercompany transactions) involving the Oncor business will also not be considered the sale of all or substantially all of EFH Corp.'s assets. Additionally, up to an aggregate of $4.0 billion of indebtedness secured by a first priority lien on the Collateral, including the Senior Secured Notes and the exchange notes, may be incurred under the indenture.

Oncor Holdings, the immediate parent of Oncor, and its subsidiaries and Comanche Peak Nuclear Power Company LLC, Nuclear Energy Future Holdings LLC and Nuclear Energy Future Holdings II LLC are unrestricted subsidiaries under the indenture and, accordingly, are not subject to any of the restrictive covenants in the indenture. See "Description of the Notes."

**No Prior Market**   The exchange notes will be freely transferable, but will be new securities for which there will not initially be a market. Accordingly, we cannot assure you whether a market for the exchange notes will develop or as to the liquidity of any such market that may develop. The initial purchasers in the private offering of the outstanding notes have informed us that they currently intend to make a market in the exchange notes; however, they are not obligated to do so, and they may discontinue any such market-making activities at any time without notice.

**Listing**   EFH Corp. does not intend to list the exchange notes for trading on any securities exchange or automated quotation system.

10

Confidential

EFIHMW00223040

**Risk Factors**                                    **In addition to the other information included in this prospectus, you should carefully consider the information set forth in the section entitled "Risk Factors" beginning on page 15 before deciding whether or not to participate in the exchange offer.**

11

**EFH Corp. and its Subsidiaries**
**Summary Historical Consolidated Financial Data**

The following table sets forth our summary historical consolidated financial data as of and for the periods indicated. The historical financial data as of December 31, 2009 and 2008 (Successor) and for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor) and the period from January 1, 2007 through October 10, 2007 (Predecessor) have been derived from our audited historical consolidated financial statements and related notes included elsewhere in this prospectus. The historical financial data as of December 31, 2007 (Successor), 2006 (Predecessor) and 2005 (Predecessor) and for the years ended December 31, 2006 and 2005 (Predecessor) have been derived from our audited historical consolidated financial statements that are not included in this prospectus. The "Predecessor" period reflects the period prior to the Merger, which occurred on October 10, 2007. The historical financial data as of September 30, 2010 and for the nine months ended September 30, 2010 and 2009 have been derived from our unaudited historical interim condensed consolidated financial statements and related notes included elsewhere in this prospectus. In EFH Corp.'s opinion, such unaudited interim financial data reflects all adjustments, consisting of normal recurring accruals, necessary for the fair presentation of the results for those periods. The results of operations for the interim periods, for seasonal and other factors, are not necessarily indicative of the results to be expected for the full year or any future period.

The summary historical consolidated financial data should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009" and "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three and Nine Months Ended September 30, 2010," and our historical consolidated financial statements and related notes that are included elsewhere in this prospectus.

| | Successor | | | Predecessor | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, | |
| | 2009 | 2008 | | | 2006 | 2005 |
| | (millions of dollars, except ratios and per share amounts) | | | | | |
| **Statement of Income Data:** | | | | | | |
| Operating revenues | $9,546 | $11,364 | $ 1,994 | $ 8,044 | $10,703 | $10,826 |
| Income (loss) from continuing operations before extraordinary loss and cumulative effect of changes in accounting principles | 408 | (9,998) | (1,361) | 699 | 2,465 | 1,775 |
| Income from discontinued operations, net of tax effect | — | — | 1 | 24 | 87 | 5 |
| Extraordinary loss, net of tax effect | — | — | — | — | — | (50) |
| Cumulative effect of changes in accounting principles, net of tax effect | — | — | — | — | — | (8) |
| Preference stock dividends | — | — | — | — | — | 10 |
| Net income (loss) | 408 | (9,998) | (1,360) | 723 | 2,552 | 1,712 |
| Net income (loss) attributable to noncontrolling interests | (64) | 160 | — | — | — | — |
| Net income (loss) attributable to EFH Corp. | 344 | (9,838) | (1,360) | 723 | 2,552 | 1,712 |
| Dividends declared per share | $ — | $ — | $ — | $ 1.30 | $ 1.67 | $ 1.26 |
| Ratio of earnings to fixed charges (a) | 1.24 | — | — | 2.30 | 5.11 | 3.80 |
| Ratio of earnings to combined fixed charges and preference dividends (a) | 1.24 | — | — | 2.30 | 5.11 | 3.74 |

12

EFHMW00223042

PX 045
Page 19 of 561

|  | Successor | | | Predecessor | | |
|---|---|---|---|---|---|---|
|  | Year Ended December 31, | | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, | |
|  | 2009 | 2008 | 2007 | 2007 | 2006 | 2005 |
|  | (millions of dollars, except ratios and per share amounts) | | | | | |
| **Statement of Cash Flows Data:** | | | | | | |
| Cash flows provided by (used in) operating activities from continuing operations | $ 1,711 | $ 1,505 | $ (450) | $ 2,265 | $ 4,954 | $ 2,793 |
| Cash flows provided by (used in) financing activities from continuing operations | 422 | 2,837 | 33,865 | 1,394 | (2,332) | (1,563) |
| Cash flows used in investing activities from continuing operations | (2,633) | (2,934) | (34,563) | (2,283) | (2,664) | (1,038) |
| **Other Financial Data:** | | | | | | |
| Capital expenditures, including nuclear fuel | $ 2,545 | $ 3,015 | $ 716 | $ 2,542 | $ 2,337 | $ 1,148 |

|  | Successor | | | Predecessor | |
|---|---|---|---|---|---|
|  | December 31, | | | December 31, | |
|  | 2009 | 2008 | 2007 | 2006 | 2005 |
|  | (millions of dollars) | | | | |
| **Balance Sheet Data:** | | | | | |
| Total assets | $59,662 | $59,263 | $64,804 | $27,216 | $27,978 |
| Property, plant & equipment — net | 30,108 | 29,522 | 28,650 | 18,569 | 17,006 |
| Goodwill and intangible assets | 17,192 | 17,379 | 27,319 | 729 | 728 |
| Total debt (b) | 43,426 | 42,460 | 40,834 | 12,607 | 13,380 |
| Preferred stock of subsidiaries (c) | — | — | — | — | — |
| Total equity | (1,836) | (2,318) | 6,685 | 2,140 | 475 |

(a)  Fixed charges exceeded "earnings" (net loss) by $10.469 billion and $2.034 billion for the year ended December 31, 2008 and for the period from October 11, 2007 through December 31, 2007, respectively.

(b)  Includes long-term debt, including amounts due currently, and short-term borrowings. Also includes equity-linked debt securities in the amount of $179 million for the year ended December 31, 2005.

(c)  Preferred stock outstanding at the end of 2008, 2007, 2006 and 2005 has a stated amount of $51 thousand. There was no outstanding preferred stock at the end of 2009.

Although EFH Corp. continued as the same legal entity after the Merger in October 2007, its "Summary Historical Consolidated Financial Data" for periods preceding the Merger and for periods succeeding the Merger are presented as the consolidated financial statements of the "Predecessor" and the "Successor," respectively. See "Basis of Presentation" in Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 included elsewhere in this prospectus. The consolidated financial statements of the Successor also reflect the application of "purchase accounting." Results for 2008 were significantly impacted by impairment charges related to goodwill, trade name and emission allowances intangible assets and natural gas-fueled generation plants. Results for 2010 reflect the prospective adoption of amended guidance regarding consolidation accounting standards related to variable interest entities that resulted in the deconsolidation of Oncor Holdings as discussed in Note 3 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 included elsewhere in this prospectus and amended guidance regarding transfers of financial assets that resulted in the accounts receivable securitization program no longer being accounted for as a sale of accounts receivable and the funding under the program now reported as short-term borrowings as discussed in Note 5 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 included elsewhere in this prospectus. Results for 2010 were significantly impacted by a goodwill impairment charge as discussed in Note 4 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010.

13

EFIHMW00223043

PX 045
Page 20 of 561

| | | Successor | | |
|---|---|---|---|---|
| | | Nine Months Ended September 30, 2010 | | Nine Months Ended September 30, 2009 |
| | | (millions of dollars, except ratios) | | |
| **Statement of Income Data:** | | | | |
| Operating revenues | $ | 6,599 | $ | 7,366 |
| Net income (loss) | | (2,973) | | 261 |
| Net income attributable to noncontrolling interests | | — | | (54) |
| Net income (loss) attributable to EFH Corp | | (2,973) | | 207 |
| Ratio of earnings to fixed charges (b) | | — | | 1.21 |
| Ratio of earnings to combined fixed charges and preference dividends | | — | | 1.21 |
| **Statement of Cash Flows Data:** | | | | |
| Cash flows provided by operating activities | $ | 966 | $ | 1,743 |
| Cash flows provided by (used in) financing activities | | (1,167) | | 420 |
| Cash flows used in investment activities | | (307) | | (2,127) |
| **Other Financial Data:** | | | | |
| Capital expenditures, including nuclear fuel | $ | 793 | $ | 2,034 |

| | | Successor September 30, 2010 |
|---|---|---|
| | | (millions of dollars) |
| **Balance Sheet Data:** | | |
| Total assets | $ | 47,114 |
| Property, plant & equipment — net | | 20,530 |
| Goodwill and intangible assets | | 8,618 |
| Total debt (a) | | 35,729 |
| Total equity | | (6,068) |

(a)   Includes long-term debt, including amounts due currently, and short-term borrowings.

(b)   Fixed charges exceeded earnings by $2.736 billion million for the nine months ended September 30, 2010.

14

Confidential

## RISK FACTORS

*You should carefully consider the risk factors set forth below, as well as the other information contained in this prospectus before deciding to participate in the exchange offer. The selected risks described below are not our only risks. Additional risks and uncertainties not currently known to us or those we currently view to be immaterial also may materially and adversely affect our business, financial condition or results of operations. Any of the following risks could materially and adversely affect our business, financial condition, operating results or cash flow. In such a case, the trading price of the exchange notes could decline, or we may not be able to make payments of interest and principal on the exchange notes, and noteholders may lose all or part of their original investment.*

### Risks Related to the Exchange Offer

*There may be adverse consequences if you do not exchange your outstanding notes.*

If you do not exchange your outstanding notes for exchange notes in the exchange offer, you will continue to be subject to restrictions on transfer of your outstanding notes. In general, the outstanding notes may not be offered or sold unless they are registered or exempt from registration under the Securities Act and applicable state securities laws. Except as required by the registration rights agreement, we do not intend to register resales of the outstanding notes under the Securities Act. You should refer to "Prospectus Summary — The Exchange Offer" and "The Exchange Offer" for information about how to tender your outstanding notes.

The tender of outstanding notes under the exchange offer will reduce the outstanding amount of the outstanding notes, which may have an adverse effect upon, and increase the volatility of, the market prices of the outstanding notes due to a reduction in liquidity.

*Your ability to transfer the exchange notes may be limited if there is absence of an active trading market, and there is no assurance that any active trading market will develop for the exchange notes.*

We do not intend to apply for a listing of the exchange notes on a securities exchange or on any automated dealer quotation system. There is currently no established market for the exchange notes, and we cannot assure you as to the liquidity of markets that may develop for the exchange notes, your ability to sell the exchange notes or the price at which you would be able to sell the exchange notes. If such markets were to exist, the exchange notes could trade at prices that may be lower than their principal amount or purchase price depending on many factors, including prevailing interest rates, the market for similar notes, our financial and operating performance and other factors. The initial purchasers in the private offering of the outstanding notes have advised us that they currently intend to make a market with respect to the exchange notes. However, these initial purchasers are not obligated to do so, and any market making with respect to the exchange notes may be discontinued at any time without notice. In addition, such market making activity may be limited during the pendency of the exchange offer or the effectiveness of a shelf registration statement in lieu thereof. Therefore, we cannot assure you that an active market for the exchange notes will develop or, if developed, that it will continue. Historically, the market for non-investment grade debt has been subject to disruptions that have caused substantial volatility in the prices of securities similar to the exchange notes. The market, if any, for the exchange notes may experience similar disruptions and any such disruptions may adversely affect the prices at which you may sell your exchange notes.

*Certain persons who participate in the exchange offer must deliver a prospectus in connection with resales of the exchange notes.*

Based on interpretations of the staff of the SEC contained in *Exxon Capital Holdings Corp.*, SEC no-action letter (May 13, 1988), *Morgan Stanley & Co. Inc.*, SEC no-action letter (June 5, 1991) and *Shearman & Sterling*, SEC no-action letter (July 2, 1993), we believe that you may offer for resale, resell or otherwise transfer the exchange notes without compliance with the registration and prospectus delivery requirements of the Securities Act. However, in some instances described in this prospectus under "Plan of Distribution," certain holders of exchange notes will remain obligated to comply with the registration and prospectus delivery requirements of the Securities Act to transfer the exchange notes. If such a holder transfers any exchange notes without delivering a prospectus meeting the requirements of the Securities Act or without an applicable exemption from registration under the Securities Act, such a holder may incur liability under the Securities Act. We do not and will not assume, or indemnify such a holder against, this liability.

15

EFIHMW00223045

**Risks Related to the Notes**

The following risks apply to the outstanding notes and will apply equally to the exchange notes.

***We may not be able to generate sufficient cash to service all of our indebtedness, including the notes, and may be forced to take other actions to satisfy our obligations under our debt agreements, which may not be successful.***

Our ability to make scheduled payments on or to refinance our debt obligations depends on our financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control. We may not be able to maintain a level of cash flows from operating activities sufficient to permit us to pay the principal, premium, if any, and interest on our indebtedness, including the notes.

If cash flows and capital resources are insufficient to fund our debt service obligations, we could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance indebtedness, including the notes. These alternative measures may not be successful or may not be adequate for us to meet our debt service obligations then due. Additionally, our debt agreements, including the indentures governing the notes, the Senior Secured Notes, the EFH Corp. Senior Notes, the TCEH Senior Notes and the TCEH Senior Secured Second Lien Notes and the terms of the TCEH Senior Secured Facilities, limit the use of the proceeds from any disposition; as a result, we may not be allowed, under these documents, to use proceeds from such dispositions to satisfy all current debt service obligations.

***If we or any of our subsidiaries default on obligations to pay indebtedness, we may not be able to make payments on the notes.***

Any default under our or our subsidiaries' debt agreements that is not waived by the required lenders or noteholders, and the remedies sought by the holders of such indebtedness, could prevent us from paying principal, premium, if any, and interest on the notes, which could substantially decrease the market price of the notes. If our subsidiaries are unable to generate sufficient cash flows and we are otherwise unable to obtain funds necessary to meet required payments of principal, premium, if any, and interest on our indebtedness, or if we or our subsidiaries otherwise fail to comply with the various covenants, including any financial and operating covenants, in the instruments governing our or their indebtedness, we or they could be in default under the terms of the agreements governing such indebtedness. In the event of such default, the holders of such indebtedness could elect to declare all the funds borrowed thereunder to be due and payable, together with accrued and unpaid interest, and/or the lenders could elect to terminate their commitments thereunder, cease making further loans and, in the case of the lenders under the TCEH Senior Secured Facilities or the TCEH Senior Secured Second Lien Notes, institute foreclosure proceedings against the pledged assets, and we or they could be forced into bankruptcy or liquidation. If the operating performance of our subsidiaries declines, we or certain of our subsidiaries, including TCEH, may in the future need to obtain waivers from the required lenders to avoid being in default. If our subsidiaries breach the covenants under the TCEH Senior Secured Facilities and seek a waiver, they may not be able to obtain a waiver from the required lenders. If this occurs, they would be in default under the instrument governing that indebtedness, the lenders could exercise their rights, as described above, and such subsidiaries could be forced into bankruptcy, liquidation or insolvency.

***We may not be able to repurchase the notes upon a change of control.***

Upon the occurrence of specific kinds of change of control events, EFH Corp. will be required to offer to repurchase all of the notes at 101% of their principal amount plus accrued and unpaid interest. The source of funds for any purchase of the notes will be EFH Corp.'s available cash or cash generated from its subsidiaries' operations or other sources, including borrowings, sales of assets or sales of equity. EFH Corp. may not be able to repurchase the notes upon a change of control because it may not have sufficient financial resources to purchase all of the notes that are tendered upon a change of control. Further, EFH Corp. may be restricted under the terms of debt agreements of TCEH, EFIH and Oncor from receiving funds from TCEH and Oncor sufficient to repurchase all of the notes tendered by holders upon a change of control. Accordingly, EFH Corp. may not be able to satisfy its obligations to purchase the notes unless it is able to refinance or obtain waivers under the instruments governing its indebtedness. EFH Corp.'s failure to repurchase the notes upon a change of control would cause a default under the indenture governing the notes and a cross-default under certain of EFH Corp.'s other debt agreements. The instruments governing the TCEH Senior Secured Facilities also provide that a change of control will be a default that permits the lenders thereunder to accelerate the maturity of borrowings thereunder. Any of our future debt agreements may contain similar provisions.

16

EFIHMW00223046

***EFCH's guarantee of the notes is effectively subordinated to those lenders who have a security interest in its assets.***

EFCH's obligations under its guarantee of the notes are unsecured, but its obligations under its guarantee of the TCEH Senior Secured Facilities are secured by a security interest in substantially all of its tangible and intangible assets. If EFCH were unable to pay under its guarantee of the TCEH Senior Secured Facilities, the lenders could foreclose on the pledged assets described above to the exclusion of holders of the notes, even if an event of default exists under the indenture governing the notes at such time. In any such event, because the guarantee of the notes is not secured by any of EFCH's assets, it is possible that there would be no assets remaining from which your claims as a noteholder could be satisfied or, if any assets remained, they might be insufficient to fully satisfy your claims as a noteholder under such guarantee.

***The notes are secured only to the extent of the value of the assets that have been granted as security for EFIH's guarantee of the notes.***

The Collateral securing EFIH's guarantee of the notes includes only EFIH's membership interests and other investments that EFIH owns or holds in Oncor Holdings and its subsidiaries (which consists of 100% of the membership interests of Oncor Holdings, which are owned by EFIH), but does not include any assets of Oncor Holdings or its subsidiaries. Oncor Holdings owns approximately 80% of Oncor. No appraisals of any of the Collateral securing the guarantee by EFIH of the notes have been prepared by or on behalf of EFH Corp. The fair market value of the Collateral may not be sufficient to repay the holders of the notes upon any foreclosure. The fair market value of the membership interests of Oncor Holdings is subject to fluctuations based on factors that include, among other things, the financial results and prospects of Oncor Holdings and its subsidiaries and its ability to implement its business strategy, Oncor's capital structure and the amount of its other existing indebtedness (as to which EFH Corp. will have no control), applicable regulatory approvals that may be required to foreclose on the membership interests of Oncor Holdings and subsequently dispose of the membership interests of Oncor Holdings, the ability to sell the membership interests of Oncor Holdings in an orderly sale, general economic conditions, the availability of buyers and similar factors. Furthermore, upon a foreclosure in the Collateral, holders may be limited in their ability to obtain the best price for the Collateral if they are unable to exercise a "drag-along" right to force Texas Transmission Investment LLC ("Texas Transmission"), Oncor's primary minority owner, to sell its membership interests pursuant to the terms of the investor rights agreement, dated November 5, 2007, among EFH Corp., Oncor Holdings, Oncor and Texas Transmission (the "Investor Rights Agreement"). In addition, a court could limit recoverability if it were to apply non-New York law to a proceeding and deem a portion of the interest claim usurious in violation of public policy. The amount to be received upon a sale of any Collateral would be dependent on numerous factors, including but not limited to the actual fair market value of the Collateral at such time, general, market and economic conditions and the timing and the manner of the sale.

EFIH's guarantees of the EFH Corp. Senior Secured Notes and the EFIH Notes are also secured by the Collateral, equally and ratably with the notes.

In the event that a bankruptcy or similar proceeding is commenced by or against EFH Corp., if at the time of the filing the value of the membership interests of Oncor Holdings and other Collateral is less than the amount of principal and accrued and unpaid interest on the notes and the Senior Secured Notes, interest may cease to accrue on the notes thereafter. If at the time of the filing the value of the membership interests of Oncor Holdings and other Collateral is greater than the amount of principal and accrued and unpaid interest on the notes and the Senior Secured Notes, interest may nevertheless cease to accrue at a subsequent time if at such time the value ceases to be in excess of the principal and accrued and unpaid interest. It is possible, given the broad discretionary powers of a bankruptcy court, even if at the time of the filing the value of the membership interests of Oncor Holdings and other Collateral is greater than the amount of principal and accrued and unpaid interest on the notes and the Senior Secured Notes on the date of filing, claims on the membership interests of Oncor Holdings and other Collateral for interest accruing from and after the date the bankruptcy petition is filed might not be allowed. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, the proceeds from any sale of the membership interests of Oncor Holdings and other Collateral may not be sufficient to pay the obligations due under the notes.

17

EFIHMW00223047

To the extent that the claims of the holders of the notes and the Senior Secured Notes exceed the value of the membership interests of Oncor Holdings and other Collateral, those claims will rank equally with the claims of the holders of EFH Corp.'s then outstanding senior notes and other senior debt. As a result, if the value of the membership interests of Oncor Holdings and other Collateral is less than the value of the claims of the holders of the notes and the Senior Secured Notes, those claims may not be satisfied in full.

The security interest granted in favor of the collateral trustee is subject to practical problems generally associated with the realization of security interests in collateral. For example, the collateral trustee may need to obtain the consent of a third party to obtain or enforce a security interest in a contract, and we cannot assure you that the collateral trustee will be able to obtain any such consent. The consents of any third parties may not be given when required to facilitate a foreclosure on any particular assets. Accordingly, the collateral trustee may not have the ability to foreclose upon such assets, and the value of the Collateral may significantly decrease.

***Regulatory approvals may be required in order to enforce the security interests in the Collateral and to dispose of an interest in, or operational control of, the Collateral that secures EFIH's guarantee of the notes.***

The Collateral securing EFIH's guarantee of the notes includes all of EFIH's membership interests and other investments that EFIH owns or holds in Oncor Holdings and its subsidiaries. Pursuant to the Public Utility Regulatory Act ("PURA"), Texas Utilities Code §§39.262(l) and 39.915, an electric utility must obtain prior PUCT approval of any change in majority ownership, controlling ownership or operational control of Oncor. As a result, prior to any foreclosure on the membership interests of Oncor Holdings, approval of the PUCT may be required for a change in ownership or control of Oncor Holdings. Pursuant to PURA §§39.262(m) and 39.915(b), the PUCT will approve such a transfer if it finds that the transaction is in the public interest. In making its determination, these sections of PURA provide that the PUCT will consider whether the transaction will adversely affect the reliability of service, availability of service or cost of service of Oncor. Therefore, in connection with any action taken to enforce the security against the Collateral, such approval may not be granted and, if it were to be granted, it is not known how long it would take to obtain such approval. Even if the approval were granted to foreclose on the Collateral, then additional prior PUCT approval may also be required for any subsequent change in majority ownership, controlling ownership or operational control in the membership interests of Oncor Holdings. Additionally, Texas Holdings has committed to hold a majority ownership interest in Oncor through October 10, 2012. This commitment is incorporated in the Order on Rehearing in PUCT Docket No. 34077.

In addition, pursuant to the terms of the Investor Rights Agreement, any transfer of the equity interests in Oncor Holdings to a third party, including as a result of any enforcement of the lien on the Collateral securing EFIH's guarantee of the notes, EFIH's guarantee of the EFH Corp. Senior Secured Notes and the EFIH Notes, may be limited and give rise to a tag-along right of Texas Transmission, the primary minority investor in Oncor, to participate in that transfer on a pro rata basis, which may hinder the enforcement of the lien on the Collateral in a timely manner, if at all.

***In the event of EFH Corp.'s bankruptcy, the ability of the holders of the notes to realize upon the Collateral securing EFIH's guarantee of the notes will be subject to certain bankruptcy law limitations.***

The right of the trustee for the notes to repossess and dispose of the Collateral, which secures EFIH's guarantee of the notes, upon acceleration is likely to be significantly impaired by federal bankruptcy law if bankruptcy proceedings are commenced by or against EFH Corp. This could be true even if bankruptcy proceedings are commenced after the trustee for the notes has repossessed and disposed of the Collateral. Under bankruptcy law, a secured creditor, such as the trustee for the notes, is prohibited from repossessing collateral from a debtor in a bankruptcy case, or from disposing of collateral repossessed from a debtor, without bankruptcy court approval. Moreover, bankruptcy law permits the debtor to continue to retain and to use any such collateral, and the proceeds, products, rents or profits of such collateral, even though the debtor is in default under the applicable debt instruments, provided that the secured creditor is given "adequate protection." The meaning of the term "adequate protection" varies according to circumstances, but in general the doctrine of "adequate protection" requires a debtor to protect the value of a secured creditor's interest in the collateral, through cash payments, the granting of an additional security interest or otherwise. It is impossible to predict whether or when payments in respect of the notes might be made following commencement of a bankruptcy case, whether or when the trustee would repossess or dispose of the Collateral, or whether or to what extent holders of the notes would be compensated for any delay in payment or loss of value of the Collateral through the requirements of "adequate protection." Furthermore, in the event the bankruptcy court determines that the value of the Collateral is not sufficient to repay all amounts due on the notes, the holders of the notes would have unsecured "deficiency claims" as to the difference. Federal bankruptcy laws do not generally permit the payment of interest, costs, or attorneys' fees for unsecured claims during the debtor's bankruptcy case.

18

Confidential

*The indenture governing the notes does not limit or restrict the activities of Oncor Holdings and its subsidiaries.*

Oncor Holdings and its subsidiaries are not "Restricted Subsidiaries" under the indenture governing the notes (except under certain circumstances, such as in connection with the calculation of the "fixed charge coverage ratio" or "consolidated leverage ratio" for purposes of making certain restricted payments; see "Description of the Notes"). As of the date of this prospectus, EFIH's subsidiaries (other than EFIH Finance, the co-issuer of the EFIH Notes) consist only of Oncor Holdings and its subsidiaries, all of which are unrestricted subsidiaries of EFH Corp. Accordingly, none of EFIH's subsidiaries (other than EFIH Finance) are subject to the restrictive covenants contained in the notes, described under "Description of the Notes," and none of EFIH's subsidiaries guarantee the notes.

Because Oncor Holdings and its subsidiaries are unrestricted subsidiaries of EFH Corp. under the indenture governing the notes and are therefore not subject to any of the restrictive covenants therein, the indenture does not serve to limit or restrict the ability of Oncor Holdings or its subsidiaries to take any actions or enter into any transactions that would impair their ability to dividend funds to EFH Corp. to make payments on the notes and other debt of EFH Corp., or that would negatively affect the value of EFIH's equity interests in Oncor Holdings that are pledged as Collateral for the notes, such as incurring debt, selling or transferring all or a portion of the assets of Oncor Holdings or its subsidiaries, entering into joint ventures, dividending out assets or engaging in speculative investments. Certain actions that would negatively affect the value of the Collateral may increase the ability of EFH Corp. to make restricted payments.

*Under the indenture governing the notes, holders of the notes agree not to file a bankruptcy proceeding against Oncor Holdings or any of its subsidiaries.*

Holders that receive the notes acknowledge and agree that they will not (i) initiate any legal proceeding to procure the appointment of an administrative receiver or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against Oncor Holdings, Oncor or any of their subsidiaries, or against any of the assets of Oncor Holdings, Oncor or any of their subsidiaries. Such holders further acknowledge and agree that each of Oncor Holdings, Oncor and any of their subsidiaries is a third party beneficiary of the foregoing covenant and have the right to specifically enforce such covenant in any proceeding at law or in equity.

*The value of the Collateral may be diluted if we issue additional debt that is secured equally and ratably by the same Collateral securing the guarantee by EFIH of the notes or if the Collateral is sold.*

The Senior Secured Notes are secured by the Collateral on a parity lien basis with the notes. In addition, the indentures governing the Senior Secured Notes provide, and the indenture governing the notes provides, that EFH Corp. and EFIH may incur up to an aggregate of $4.0 billion of debt, including the Senior Secured Notes and the notes, which would be secured on a parity lien basis by the Collateral. Therefore, because the principal amount of the Senior Secured Notes and the notes are, in the aggregate, less than $4.0 billion, EFH Corp. and EFIH may subsequently incur additional debt secured on a parity lien basis by the Collateral up to the $4.0 billion limit, subject to restrictions on their ability to incur debt and liens under the indenture governing the notes and under other documents governing their indebtedness. To the extent that any of this additional debt is incurred in the future, the interests of holders of the notes in the Collateral will be diluted. Additionally, EFH Corp. and EFIH are not restricted from issuing additional debt that is secured by a junior lien on the Collateral, subject to restrictions on their ability to incur debt and liens under the indenture governing the notes and under other documents governing their indebtedness.

19

Confidential

The collateral trust agreement governing the pledge of Collateral generally provides that the holders of a majority of the debt secured by a first priority lien on the Collateral, including the Senior Secured Notes, the notes and other future debt incurred by EFH Corp. or EFIH secured by the Collateral equally and ratably, have, subject to certain limited exceptions, the exclusive right to manage, perform and enforce the terms of the security documents securing the rights of secured debtholders in the Collateral, and to exercise and enforce all privileges, rights and remedies thereunder. To the extent that EFH Corp. and/or EFIH incurs additional secured debt that is secured equally and ratably with the notes and the amount of this secured debt, alone or together with any Senior Secured Notes, exceeds the amount of the notes, the holders of such secured debt may be able to exercise control under the collateral trust agreement and other security documents.

EFIH in most cases has control over the Collateral securing its guarantee of the notes, and to the extent permitted, its sale by EFIH would eliminate the collateral securing such guarantee. The documents governing the pledge of the Collateral permit EFIH to remain in possession of, retain exclusive control over, freely operate and collect, invest and dispose of, any income from, the Collateral, such as cash dividends. In addition, in certain limited circumstances EFIH has the right to sell the Collateral free and clear of the security interest underlying the notes.

***Rights of holders of the notes in the Collateral may be adversely affected by the failure to perfect security interests in certain Collateral acquired in the future.***

EFIH may acquire assets or investments in the future that would be required to be pledged as Collateral securing the notes. There can be no assurance that the trustee or the collateral trustee will monitor, or that we will inform the trustee or the collateral trustee of, the future acquisition of assets or investments that would be required to be pledged as Collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Collateral. Neither the trustee nor the collateral trustee has an obligation to monitor the acquisition of additional assets or investments that are required to be pledged as Collateral or the perfection of any security interest in such Collateral. Such failure may result in the loss of the security interest in the Collateral or the priority of the security interest in favor of the notes against third parties.

***We may transfer or dispose of our interests in EFIH or Oncor Holdings to a third party in a manner that would result in EFIH or such third party becoming the obligor under the notes, without EFH Corp. or EFIH being required to offer to repurchase the notes. The risks of an investment in the notes may increase further following such a transaction.***

The indenture governing the notes provides that EFH Corp. may engage in a "Permitted Asset Transfer" with respect to EFH Corp.'s ownership of EFIH or EFIH's ownership of Oncor Holdings that would result in the obligations under the notes being assumed by EFIH or by a third party to which the investments in Oncor Holdings and its subsidiaries are transferred in any such Permitted Asset Transfer (referred to as a "third party transferee"). The indenture governing the EFH Corp. Senior Secured Notes contains similar provisions. This prospectus does not include or incorporate by reference financial statements or other financial data of EFIH. However, this prospectus includes financial statements of Oncor Holdings. See Oncor Holdings' audited historical consolidated financial statements for the year ended December 31, 2009 and unaudited condensed consolidated financial statements for the three and nine months ended September 30, 2010, each of which is included elsewhere in this prospectus. A Permitted Asset Transfer includes:

20

EFIHMW00223050

- the direct or indirect sale, assignment, transfer, conveyance or other disposition (including by way of merger, wind-up or consolidation) or spin-off of the equity of EFIH such that it is no longer a subsidiary of EFH Corp., and

- the sale, assignment, transfer, conveyance or other disposition (other than by way of merger, wind-up or consolidation) of all of EFIH's equity interests and other investments in the Oncor Subsidiaries or successor Oncor business and all other Collateral held by EFIH.

If a valid Permitted Asset Transfer occurs, the notes would become obligations of EFIH or the third party transferee of the investments in the Oncor Subsidiaries, which would result in the guarantee of EFCH being released and EFH Corp. no longer being liable on the notes and the EFH Corp. Senior Secured Notes unless EFH Corp. is the transferee. Currently, and for some period of time after the date of this prospectus, it is expected that EFH Corp. will rely on the cash flows from TCEH and its subsidiaries to service its debt obligations, including the notes and the Senior Secured Notes. Following the completion of a Permitted Asset Transfer, other than a merger of EFIH into EFH Corp., the cash flows from EFH Corp. and its other subsidiaries, including TCEH and its subsidiaries, would no longer be available to pay interest and principal on the notes and the EFH Corp. Senior Secured Notes that would have become EFIH's obligation in connection with the Permitted Asset Transfer, and holders of the transferred notes would not be able to look to the assets of EFH Corp. and TCEH and its subsidiaries in the case of a bankruptcy, liquidation or insolvency with respect to EFIH. As of September 30, 2010, the assets of EFIH and its subsidiaries (including EFIH's investment in the Oncor Subsidiaries) represented approximately 12% of the total consolidated assets of EFH Corp. and its subsidiaries. In connection with a Permitted Asset Transfer to a third party transferee, such third party transferee would not be a subsidiary of EFH Corp. and would not have the access to such cash flows to service its debt obligations, which would include the transferred notes and the transferred Senior Secured Notes, nor would such third party transferee be able to look to the assets of EFH Corp. and its subsidiaries in the case of a bankruptcy, liquidation or insolvency. In addition, such third party transferee, as the successor obligor, may not have sufficient sources of capital to service its debt and the obligations under the notes and the Senior Secured Notes, and distributions from the Oncor Subsidiaries may not be available or sufficient to service the obligations under such notes. No Oncor Subsidiary will become obligated on the notes and the Senior Secured Notes as a result of a Permitted Asset Transfer.

Additionally, if a Permitted Asset Transfer occurs in accordance with the terms of the indenture governing the notes, EFH Corp. will not be required to make a change of control offer to repurchase the notes under the indenture even if a change of control may otherwise have occurred.

The indenture governing the notes provides that a Permitted Asset Transfer may only occur if certain conditions are met, including a requirement that the ratings of the notes are not lowered by two or more rating agencies (or the only rating agency then rating such notes) during a specified period before or after the proposed Permitted Asset Transfer has been publicly announced. However, these conditions may not protect holders against actions that EFIH or the permitted transferee could take that may negatively impact the credit risk of the notes following a Permitted Asset Transfer, such as removing assets and cash from EFIH or the Oncor Subsidiaries or increasing debt at EFIH before the Permitted Asset Transfer. In addition, because EFIH is a "Restricted Subsidiary" under the indenture governing the notes, assets of EFIH, other than the Collateral, could be transferred to EFH Corp. prior to a Permitted Asset Transfer and would in that case not be assets of EFIH or a third party transferee that has become the obligor of the notes.

The third party transferee that becomes the obligor on the notes may itself engage in a subsequent Permitted Asset Transfer, in which case the risks described above would continue to apply with respect to the subsequent Permitted Asset Transfer and the subsequent third party transferee.

There is no event of default under the indenture governing the notes if the Oncor Subsidiaries take actions or enter into transactions that would impair their ability to dividend funds to EFIH, which could impair EFIH's ability to make payments on the notes following a Permitted Asset Transfer, or that would negatively affect the value of the assets that are pledged as Collateral, such as incurring debt, selling or transferring all or a portion of the assets of Oncor, entering into joint ventures, dividending out assets or engaging in speculative investments.

21

Confidential

Any of the above actions on the part of EFIH, the third party transferee or subsequent third party transferee or the Oncor Subsidiaries following the completion of a Permitted Asset Transfer may further increase the credit risk of the notes, may result in the rating agencies taking negative action with respect to the notes and may reduce the market price of the notes.

See "Description of the Notes — Certain Covenants — Restrictions on Permitted Asset Transfers" and "Description of the Notes — Certain Covenants — Restrictions on TCEH Transfers" and the definitions of "Change of Control" and "Permitted Asset Transfer" contained under "Description of the Notes" for more information.

**You may be required to recognize taxable gain or loss in connection with a Permitted Asset Transfer.**

In connection with a Permitted Asset Transfer, EFH Corp.'s obligations under the notes would be transferred to, and assumed by, EFIH or a third party transferee or may be considered, for U.S. federal income tax purposes, to undergo a substitution of obligors even if not transferred to, or assumed by, a third party transferee. Upon any such transfer or deemed substitution of obligors, you may be deemed to have exchanged the notes for new notes for U.S. federal income tax purposes. Upon such deemed exchange, a holder, under U.S. federal income tax law, may be required to recognize gain or loss equal to the difference between the amount deemed to be realized in connection with the deemed exchange and such holder's adjusted tax basis in the notes on the date of the deemed exchange.

**We may transfer or dispose of our interests in or the assets of TCEH to a third party without such third party becoming the obligor under the notes and without being required to offer to repurchase the notes.**

The indenture governing the notes provides that, subject to certain conditions, certain transactions with respect to TCEH, referred to in this prospectus as a "TCEH Transfer," which include a disposition or spin-off of all of the equity interests of an entity that owns all or substantially all of the assets of TCEH (including EFCH), or the sale of all or substantially all of the assets of TCEH, will not result in the acquirer of the TCEH equity interests or assets becoming the obligor under the notes. The indenture governing the EFH Corp. Senior Secured Notes contains similar provisions.

If a TCEH Transfer occurs, EFH Corp. will remain the obligor of the notes and the EFH Corp. Senior Secured Notes, even though substantially all of the assets of EFH Corp. and its subsidiaries may have been transferred to a third party, and therefore EFH Corp. could be a more highly-leveraged company. Additionally, if a TCEH Transfer occurs, EFH Corp. will not be required to make a change of control offer to repurchase the notes, even if the assets of TCEH transferred accounted for substantially all of the assets of EFH Corp. and its subsidiaries. As of September 30, 2010, EFCH and its subsidiaries, including TCEH and its subsidiaries, accounted for approximately 83% of the consolidated assets of EFH Corp. The indenture governing the notes does not restrict EFH Corp.'s ability to transfer assets, other than Collateral, to any of its restricted subsidiaries, including EFCH and TCEH. EFH Corp. could take actions that may negatively impact the credit risk of the notes, including transferring assets to TCEH before a TCEH Transfer.

Currently, and for some period of time following the date of this prospectus, it is expected that EFH Corp. will rely on the cash flows from TCEH and its subsidiaries to service its debt obligations, including the notes. Following the completion of a TCEH Transfer, the cash flows from TCEH and its subsidiaries would no longer be available to pay interest and principal on the notes and the Senior Secured Notes. Additionally, the holders of the notes would not be able to look to the assets of TCEH and its subsidiaries in the case of a bankruptcy, liquidation or insolvency with respect to EFH Corp. In addition, EFH Corp. may transfer its interest in TCEH and its subsidiaries without any consideration if the transaction would not violate the "Limitation on Restricted Payments" covenant in the indenture governing the notes.

Additionally, following a TCEH Transfer, the only operating subsidiaries of EFH Corp. could be the Oncor Subsidiaries, which are "Unrestricted Subsidiaries" under the indenture governing the notes. Unrestricted Subsidiaries are not subject to the restrictive covenants contained in the indenture. The indenture governing the notes does not limit or restrict the ability of Unrestricted Subsidiaries, including the Oncor Subsidiaries, to take actions or enter into transactions that would impair their ability to dividend funds to EFH Corp. to make payments on the notes, or that would negatively affect the value of the Oncor Subsidiaries and therefore the equity value of the investments that are pledged as Collateral, such as incurring debt, selling or transferring all or a portion of the assets of the Oncor Subsidiaries, entering into joint ventures, dividending out assets or engaging in speculative investments.

22

The occurrence of a TCEH Transfer may further increase the credit risk of the notes, may result in the credit rating agencies taking negative action with respect to the notes and may reduce the market price of the notes.

See "Description of the Notes — Certain Covenants — Restrictions on TCEH Transfers" and the definitions of "Change of Control" and "TCEH Transfer" contained under "Description of the Notes" for more information.

*The indenture governing the notes may not protect holders from all actions that EFH Corp., EFIH or the Oncor Subsidiaries may take that would reduce your interest in the Collateral or that may reduce the value of the Collateral, including sales or exchanges of the Collateral or the assets of the Oncor Subsidiaries for other assets or investments.*

Under the indenture governing the notes, EFIH may dispose of all or a portion of the Collateral for fair market value consideration (including consideration other than cash) that may consist of assets or equity interests in joint ventures. Additionally, there is no event of default under such indenture if the Oncor Subsidiaries sell, transfer or otherwise dispose of their assets or equity interests for any form of consideration.

If EFIH or the Oncor Subsidiaries effect any of these transactions, noteholders' interest in the Collateral or the value of the Collateral may be materially reduced.

The indenture governing the notes allows EFIH to transfer any of the Collateral in exchange for an equivalent fair market value of assets other than cash or for investments in businesses that are similar to the businesses of Oncor, including interests in joint ventures in businesses that are not controlled by EFH Corp. or EFIH. The assets received as consideration and pledged as substitute Collateral may prove to be less valuable than the value of the investments in Oncor that were disposed of in such transfer or exchange. Additionally, if interests in a new business were received in exchange for the Collateral, such new business may, in the future, engage in businesses activities that are different from the business that Oncor presently is in or such new business may not prove to be as creditworthy or valuable as Oncor, and EFH Corp. may not have any control over such business' activities if a minority interest in the joint venture interests was received in such transfer or exchange. Therefore, such new collateral may negatively alter the risk profile of EFIH or the value of such new collateral may decline relative to the value of the disposed investments in Oncor.

There is no event of default under the indenture governing the notes if any of the Oncor Subsidiaries sells, transfers or disposes of the assets of Oncor Holdings or investments in or assets of Oncor. The consideration received in exchange for such assets or investments may decline in value as compared to the assets or investments that were so disposed, and, therefore, the value of the Collateral may be less than if such assets and investments had been retained. The Oncor Subsidiaries may transfer their assets and investments in exchange for interests in other businesses or assets, minority interests or interests in joint ventures, in which case the value of the Collateral may be at risk of declining due to the factors described above.

In any joint venture in which EFIH or an Oncor Subsidiary has an interest, EFIH or the Oncor Subsidiary may not have the right or power to direct the management and policies of such joint ventures and other participants may take action contrary to the instructions or requests of EFIH or such Oncor Subsidiary or against its policies and objectives, and any such actions taken by such joint ventures may not be in the best interests of holders of notes. In addition, the other participants to any such joint venture may become bankrupt or have economic or other business interests or goals that are inconsistent with the goals of EFIH or such Oncor Subsidiary and/or the holders of the notes.

Additionally, the TCEH Senior Secured Facilities do not allow EFH Corp. to prepay the notes using proceeds received from a disposition of any investments of EFH Corp. and EFIH in the Oncor Subsidiaries (including the Collateral) or from a sale of all or substantially all of the assets of any of the Oncor Subsidiaries, so long as certain intercompany loans from TCEH to EFH Corp. are at the time outstanding. As of September 30, 2010, $1.690 billion of such intercompany loans from TCEH to EFH Corp. were outstanding.

23

EFIHMW00223053

The completion of any of the above events may result in the credit risk of the notes increasing, the credit rating agencies taking negative action with respect to the notes or the market price of the notes declining. Additionally, in the event of any foreclosure on the Collateral, holders of the notes may recover less than if the Collateral still consisted of investments in the Oncor Subsidiaries.

*The liabilities of each of EFH Corp. and EFCH currently exceed its assets as shown on its most recent quarterly balance sheet. If a court were to find that EFH Corp., EFCH or EFIH were insolvent before or after giving effect to the offering of the notes and did not receive reasonably equivalent value or fair consideration for the issuance of the notes or the incurrence of a guarantee or the pledge of the Collateral, as applicable, the court may void all or a portion of the obligations represented by the notes or the guarantee of the notes by EFCH or EFIH or the pledge of the Collateral by EFIH as a fraudulent conveyance.*

In a bankruptcy proceeding, a trustee, debtor in possession or another person acting on behalf of the bankruptcy estate may seek to recover all or a portion of transfers made or void obligations incurred prior to the bankruptcy proceeding on the basis that such transfers and obligations constituted fraudulent conveyances. Under certain circumstances, creditors may recover transfers or void obligations under state fraudulent conveyance laws even if the debtor is not in bankruptcy.

Fraudulent conveyances are generally defined to include transfers made or obligations incurred for inadequate consideration when a debtor was insolvent, inadequately capitalized or in similar financial distress, or transfers made or obligations incurred with the intent of hindering, delaying or defrauding current or future creditors. A trustee, debtor in possession or another person acting on behalf of a bankruptcy estate may be able to recover such transfers under the fraudulent conveyance provisions of the bankruptcy law and/or state fraudulent conveyance laws. The fraudulent conveyance provisions of the bankruptcy law allows the trustee, debtor in possession, or other person acting on behalf of a bankruptcy estate to void a fraudulent conveyance made within two years prior to the commencement of a bankruptcy proceeding. Under state fraudulent conveyance laws, transfers made more than two years prior to the commencement of a fraudulent conveyance lawsuit may be subject to avoidance.

If a court were to find that EFH Corp. issued the notes or EFCH or EFIH issued its respective guarantee, or EFIH granted its pledge of the Collateral, under circumstances constituting a fraudulent conveyance, then a court could void all or a portion of the obligations under the notes, such guarantee or the pledge of the Collateral. In addition, under such circumstances, the value of any consideration holders received with respect to the notes, such guarantee, and the Collateral, including upon foreclosure of the Collateral, could also be subject to recovery from such holders and, possibly, from subsequent transferees of the notes. If the pledge of Collateral was voided and the issuance of the notes and/or the related guarantees were not voided, then holders of notes would become unsecured creditors.

The notes or the related guarantees incurred by EFCH or EFIH or the pledge of the Collateral by EFIH could be voided as a fraudulent conveyance, or claims in respect of the notes, such guarantee or pledge could be subordinated to all other debts of EFH Corp., EFCH or EFIH, if EFH Corp., EFCH or EFIH, at the time they incurred the indebtedness evidenced by the notes or such guarantee or granted the pledge received less than reasonably equivalent value or fair consideration for the issuance of the notes or the incurrence of such guarantee and:

- were insolvent or rendered insolvent by reason of such issuance or incurrence;

- were engaged in a business or transaction for which our or EFCH's or EFIH's remaining assets constituted unreasonably small capital; or

- intended to incur, or believed that they would incur, debts beyond their ability to pay those debts as they mature.

24

Confidential

The measures of insolvency for purposes of these fraudulent transfer laws will vary depending upon the law applied in any proceeding to determine whether a fraudulent transfer has occurred. Generally, however, a debtor would be considered insolvent if:

- the sum of its debts, including contingent liabilities, was greater than the fair saleable value of all of its assets;

- the present fair saleable value of its assets was less than the amount that would be required to pay its probable liability on its existing debts, including contingent liabilities, as they become absolute and mature; or

- it could not pay its debts as they become due.

The liabilities of each of EFH Corp. and EFCH currently exceed its assets as shown on its respective balance sheet prepared in accordance with U.S. GAAP as of September 30, 2010. The balance sheets showing the assets and liabilities of EFH Corp. and EFCH have been prepared in accordance with U.S. GAAP; however, the values assigned to assets and liabilities in these balance sheets are not necessarily indicative of the values that a court would assign to such assets and liabilities in making a solvency determination. We cannot assure you that EFH Corp., EFCH or EFIH would satisfy the solvency tests set forth in the bullet points immediately prior to this paragraph or what standard a court would apply in determining whether EFH Corp., EFCH or EFIH would be considered to be insolvent.

In addition, we cannot assure you that a court would determine that reasonably equivalent value or fair consideration was received by each of EFH Corp., EFCH and EFIH in connection with the offering of the notes and the incurrence of the guarantee or pledge, as applicable. EFIH did not receive any of the proceeds from the offering of the notes.

Each guarantee of the notes contains a provision intended to limit the guarantor's liability to the maximum amount that it could incur without causing the incurrence of obligations under its guarantee to be a fraudulent conveyance. This provision may not be effective to protect the guarantee from being voided under fraudulent conveyance law, or may reduce or eliminate the guarantor's obligation to an amount that effectively makes the guarantee worthless.

***The majority of our subsidiaries do not guarantee the notes. As a result, the notes are structurally subordinated to all liabilities of our subsidiaries that do not guarantee the notes.***

The notes are guaranteed on a senior secured basis by EFIH and on a senior unsecured basis by EFCH, but the notes are not guaranteed by any of EFH Corp.'s other subsidiaries. None of EFH Corp., EFIH or EFCH has any operations, and each relies on distributions from its subsidiaries. However, EFH Corp.'s historical consolidated financial statements reflect the results of operations and assets, among other things, of all of EFH Corp.'s subsidiaries (or EFH Corp.'s interest in such results of operations or assets in the case of the Oncor Subsidiaries). EFH Corp.'s non-guarantor subsidiaries generated all of its consolidated revenues for the year ended December 31, 2009 and for the nine months ended September 30, 2010, and as of September 30, 2010, EFH Corp.'s non-guarantor subsidiaries represented substantially all of its consolidated total assets.

EFH Corp.'s non-guarantor subsidiaries (including Oncor Holdings and Oncor and its subsidiaries) are separate and distinct legal entities and have no obligation, contingent or otherwise, to pay any amounts due pursuant to the notes, or to make any funds available therefore, whether by dividends, loans, distributions or other payments. The notes are structurally subordinated to indebtedness and other liabilities of EFH Corp.'s subsidiaries that do not guarantee the notes. The claims of creditors of each of the non-guarantor subsidiaries, including trade creditors, have priority as to the assets of these subsidiaries. In the event of a bankruptcy, liquidation or insolvency of any of these subsidiaries, these subsidiaries will pay the holders of their debts, holders of preferred equity interests and their trade creditors before they will be able to distribute any of their assets to EFH Corp. In addition, the guarantee of the notes by EFCH is structurally subordinated to the indebtedness of TCEH, the principal amount of which, as of September 30, 2010, was $30.282 billion (including long-term debt, including amounts due currently and $427 million principal amount held by EFH Corp. and EFIH, and short-term borrowings), as well as any other indebtedness of the other subsidiaries of EFCH. See Note 26 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 and Note 17 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for financial information regarding EFH Corp.'s subsidiaries. Additionally, EFH Corp. may be able to designate each of EFCH and TCEH as an "Unrestricted Subsidiary" under the indenture that governs the notes. If they are so designated, EFCH and TCEH will not be subject to the restrictive covenants contained in the indenture governing the notes, and EFCH's guarantee of the notes will be released.

Confidential

EFIHMW00223055

**PX 045**
**Page 32 of 561**

*The interests of the Sponsor Group may differ from the interests of the holders of the notes.*

The Sponsor Group indirectly owns approximately 60% of EFH Corp.'s capital stock on a fully diluted basis through their investment in Texas Holdings. As a result of this ownership and the Sponsor Group's ownership in interests of the general partner of Texas Holdings, the Sponsor Group has control over decisions regarding our operations, plans, strategies, finances and structure, including whether to enter into any corporate transaction, and will have the ability to prevent any transaction that requires the approval of EFH Corp.'s shareholders.

The interests of these persons may differ from your interests in material respects. For example, if we encounter financial difficulties or are unable to pay our debts as they mature, the interests of the Sponsor Group, as equity holders, might conflict with your interests as a noteholder. The Sponsor Group may also have an interest in pursuing acquisitions, divestitures, financings or other transactions that, in their judgment, could enhance their equity investments, even though such transactions might involve risks to you as a noteholder. Additionally, the indenture governing the notes permits us to pay advisory fees, dividends or make other restricted payments under certain circumstances, and the Sponsor Group may have an interest in our doing so.

**Risks Related to Substantial Indebtedness and Debt Agreements**

*Our substantial leverage could adversely affect our ability to raise additional capital to fund our operations, limit our ability to react to changes in the economy or our industry, expose us to interest rate risk to the extent of our variable rate debt and prevent us from meeting obligations under the various debt agreements governing our indebtedness.*

We are highly leveraged. As of September 30, 2010, our consolidated principal amount of debt (short-term borrowings and long-term debt, including amounts due currently) totaled $36.348 billion (see Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 included elsewhere in this prospectus and Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 included elsewhere in this prospectus), which does not include $5.956 billion principal amount of debt of the Oncor Subsidiaries that has been deconsolidated. Our substantial leverage could have important consequences, including:

- making it more difficult for us to make payments on our indebtedness, including the exchange notes;

- requiring a substantial portion of cash flow from operations to be dedicated to the payment of principal and interest on our indebtedness, therefore reducing our ability to use our cash flow to fund operations, capital expenditures and future business opportunities and execute our strategy;

- increasing our vulnerability to adverse economic, industry or competitive developments;

- exposing us to the risk of increased interest rates because, as of September 30, 2010, taking into consideration interest swap transactions, 11% of our long-term borrowings were at variable rates of interest;

- limiting our ability to make strategic acquisitions or causing us to make non-strategic divestitures;

26

EFIHMW00223056

PX 045
Page 33 of 561

- limiting our ability to obtain additional financing for working capital, capital expenditures, product development, debt service requirements, acquisitions and general corporate or other purposes, or to refinance existing debt;

- limiting our ability to adjust to changing market conditions; and

- placing us at a competitive disadvantage compared to competitors who are less highly leveraged and who therefore, may be able to take advantage of opportunities that we cannot due to our substantial leverage.

A substantial amount of this indebtedness is comprised of our indebtedness under the TCEH Senior Secured Facilities, substantially all of which matures in October 2014. We may not be able to refinance the TCEH Senior Secured Facilities or its other existing indebtedness because of our high levels of debt and debt incurrence restrictions under our debt agreements or because of generally adverse conditions in credit markets.

As of September 30, 2010, we have effectively hedged an estimated 64% of the natural gas price exposure related to our expected generation output for the period from October 1, 2010 through December 31, 2014 (on an average basis for such period and assuming an 8.0 market heat rate) under our long term hedging program. However, forward natural gas prices have generally trended downward since mid-2008. While our long-term hedging program is designed to mitigate the effect on earnings of low wholesale power prices, due to low natural gas prices, these market conditions are challenging to the long-term profitability of our generation assets. Specifically, these lower natural gas prices and the correlated effect in ERCOT on wholesale power prices could have a material adverse impact on the overall profitability of our generation assets for periods in which we do not have significant hedge positions. A continuation or worsening of these market conditions could limit our ability to hedge our wholesale power revenues at sufficient price levels to support our interest payments and debt maturities and could adversely impact our ability to refinance our substantial debt due in 2014.

While we expect to be able to repay a portion of our debt obligations through cash flow from operations, we may not be able to repay or refinance all outstanding amounts as or before they become due, or may be able to refinance such amounts only on terms that will increase our cost of borrowing or on terms that may be more onerous. Our ability to successfully implement any future refinancing of our debt will depend on our and our subsidiaries' financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control, including, without limitation, wholesale power prices in ERCOT (which are primarily driven by the price of natural gas and ERCOT market heat rates).

We may also need to raise additional capital by raising additional debt, such as secured or unsecured high yield debt, on terms that may increase our cost of borrowing or result in more onerous terms or selling or disposing of some of our assets, possibly on unfavorable terms. We cannot assure you that any of, or any combination of, the above actions would be available or sufficient to fund our debt, that we will be able to refinance our debt as or before it comes due, or that we will be able to obtain additional financing on favorable terms or at all, should the need arise.

In addition, future transactions and initiatives that we continuously contemplate and may pursue may have significant effects on our business, capital structure, liquidity and/or results of operations. For example, in addition to the exchanges and repurchases of our debt that are described in Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 included elsewhere in this prospectus, we have and may continue to pursue, from time to time, transactions and initiatives of various types, including, without limitation, other exchange transactions, debt repurchases, equity or debt issuances, asset sales, joint ventures, recapitalizations, business combinations and other strategic transactions. There can be no guarantee that any of such transactions or initiatives would ultimately be successful or produce the desired outcome, which could ultimately affect us in a material and adverse manner. Moreover, the effects of any of these transactions or initiatives could be material and adverse to holders of our debt and could be disproportionate, and directionally different, with respect to one class or type of debt than with respect to others.

***Despite our current high indebtedness level, we may still be able to incur substantially more indebtedness. This could further exacerbate the risks associated with our substantial indebtedness.***

We may be able to incur additional indebtedness in the future. Although our debt agreements contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of significant qualifications and exceptions, and under certain circumstances, the amount of indebtedness, including secured indebtedness, that could be incurred in compliance with these restrictions could be substantial. The indenture governing the notes allows EFH Corp. to incur up to an aggregate of $4.0 billion of debt, including the Senior Secured Notes and the notes, which would be secured on a parity lien basis by the Collateral, and a substantial amount of additional indebtedness, which additional indebtedness may be secured by a junior-priority security interest in the Collateral or by assets of EFH Corp. or EFIH other than the Collateral. If new debt is added to our existing debt levels, the related risks that we now face would intensify. See "Description of the Notes."

***Increases in interest rates may negatively impact our operating results and financial condition.***

Certain of our borrowings are at variable rates of interest. To the extent the interest rate for such borrowings is not fixed by interest rate swaps, an increase in interest rates would have a negative impact on our results of operations by causing an increase in interest expense.

At September 30, 2010, we had $4.045 billion aggregate principal amount of variable rate long-term indebtedness (excluding $1.135 billion of long-term borrowings associated with the senior secured letter of credit facility of TCEH that are invested at a variable rate), taking into account interest rate swaps that fix the interest rate on $16.3 billion in notional amount of variable rate indebtedness. As a result, as of September 30, 2010, the impact of a 100 basis point increase in interest rates would increase our annual interest expense by approximately $40 million. See discussion of interest rate swap transactions in Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010.

27

Confidential

EFIHMW00223058

**PX 045**
**Page 35 of 561**

Interest expense and related charges for the nine months ended September 30, 2010 totaled $3.092 billion, including $542 million of unrealized mark-to-market net losses on interest rate swaps.

***Our debt agreements contain restrictions that limit flexibility in operating our businesses.***

Our debt agreements contain various covenants and other restrictions that limit our ability to engage in specified types of transactions and may adversely affect our ability to operate our businesses. These covenants and other restrictions limit our ability to, among other things:

- incur additional indebtedness or issue preferred shares;

- pay dividends on, repurchase or make distributions in respect of capital stock or make other restricted payments;

- make investments;

- sell or transfer assets;

- create liens;

- consolidate, merge, sell or otherwise dispose of all or substantially all of our or our subsidiaries' assets;

- enter into transactions with affiliates; and

- repay, repurchase or modify certain subordinated and other material debt.

There are a number of important limitations and exceptions to these covenants and other restrictions. See "Description of the Notes" for a description of these covenants and other restrictions with respect to the exchange notes.

Under the TCEH Senior Secured Facilities, TCEH is required to maintain a leverage ratio below specified levels. TCEH's ability to maintain its leverage ratio below such levels can be affected by events beyond its control, and there can be no assurance that it will meet any such ratio.

A breach of any of these covenants or restrictions could result in an event of default under one or more of our debt agreements, including as a result of cross default provisions. Upon the occurrence of an event of default under one of the debt agreements, the lenders could elect to declare all amounts outstanding under that debt agreement to be immediately due and payable and/or terminate all commitments to extend further credit. Such actions by those lenders could cause cross defaults under our other indebtedness. If we were unable to repay those amounts, the lenders could proceed against any collateral granted to them to secure such indebtedness. If lenders accelerate the repayment of borrowings, we may not have sufficient assets and funds to repay those borrowings.

In addition, EFH Corp. and Oncor have implemented a number of "ring-fencing" measures to enhance the credit quality of Oncor, its immediate parent, Oncor Holdings, and Oncor Holdings' other subsidiaries. Those measures include, among other things:

- Oncor being treated as an unrestricted subsidiary with respect to EFH Corp.'s indebtedness;

- Oncor not being restricted from incurring its own indebtedness;

- Oncor not guaranteeing or pledging any of its assets to secure the indebtedness of any member of the Texas Holdings Group; and

- restrictions on dividends, and the right of the independent members of Oncor's board of directors and the primary noncontrolling member of Oncor to block the payment of dividends.

28

EFIHMW00223059

**PX 045**

**Page 36 of 561**

*Under the terms of the indentures governing the TCEH Senior Notes and the TCEH Senior Secured Second Lien Notes and the TCEH Senior Secured Facilities, TCEH is restricted from making certain payments to EFH Corp.*

EFH Corp. is a holding company and substantially all of its consolidated assets are held by its subsidiaries. As of September 30, 2010, TCEH and its subsidiaries held approximately 83% of EFH Corp.'s consolidated assets and for the nine months ended September 30, 2010, TCEH and its subsidiaries represented all of EFH Corp.'s consolidated revenues. Accordingly, EFH Corp. depends upon TCEH for a significant amount of its cash flows and ability to pay its obligations, including its obligations under the notes. However, under the terms of the indentures governing the TCEH Senior Notes and the TCEH Senior Secured Second Lien Notes and the terms of the TCEH Senior Secured Facilities, TCEH is restricted from making certain payments to EFH Corp., except in the form of certain loans to cover certain of EFH Corp.'s obligations and dividends and distributions in certain other limited circumstances if permitted by applicable state law. Further, the indentures governing the TCEH Senior Notes and the TCEH Senior Secured Second Lien Notes and the terms of the TCEH Senior Secured Facilities do not permit such intercompany loans to service EFH Corp. debt unless required for EFH Corp. to pay principal, premium and interest when due on indebtedness incurred by EFH Corp. to finance the Merger or that was in existence prior to the Merger, or any indebtedness incurred by EFH Corp. to replace, refund or refinance such debt. Such loans are also permitted to service other debt, subject to limitations on the amount of the loans. In addition, TCEH is prohibited from making certain loans to EFH Corp. if certain events of default under the indentures governing the TCEH Senior Notes or the TCEH Senior Secured Second Lien Notes or the terms of the TCEH Senior Secured Facilities have occurred and are continuing.

*Under the terms of the indentures governing the EFIH Notes, EFIH is restricted from making certain payments to EFH Corp.*

EFH Corp. is a holding company and substantially all of its consolidated assets are held by its subsidiaries. As of September 30, 2010, EFIH and its subsidiaries held approximately 12% of EFH Corp.'s consolidated assets, primarily reflecting the investment in the Oncor Subsidiaries. Accordingly, EFH Corp. depends upon EFIH for a significant amount of its cash flows and ability to pay its obligations. However, under the terms of the indenture governing the EFIH Notes, EFIH is restricted from making certain payments, including dividends and loans, to EFH Corp., except in limited circumstances.

*EFH Corp. has a very limited ability to control activities at Oncor due to structural and operational "ring-fencing" measures.*

EFH Corp. depends upon Oncor for a significant amount of its cash flows and ability to pay its obligations. However, EFH Corp. has a very limited ability to control the activities of Oncor. As part of the "ring-fencing" measures implemented by EFH Corp. and Oncor, a majority of the members of Oncor's board of directors are required to meet the New York Stock Exchange requirements for independence in all material respects, and the unanimous consent of such directors is required for Oncor to take certain actions. In addition, any new independent directors are required to be appointed by the nominating committee of Oncor Holdings' board of directors, a majority of whose members are independent directors. No member of EFH Corp.'s management is a member of Oncor's board of directors. Under Oncor Holdings' and Oncor's organizational documents, EFH Corp. has the right, indirectly, to consent to new issuances of equity securities by Oncor, material transactions with third parties involving Oncor outside of the ordinary course of business, actions that cause Oncor's assets to increase the level of jurisdiction of the FERC, any changes to the state of formation of Oncor, material changes to accounting methods not required by U.S. GAAP, and actions that fail to enforce certain tax sharing obligations between Oncor and EFH Corp. In addition, there are restrictions on Oncor's ability to make distributions to its members, including indirectly to EFH Corp.

29

EFIHMW00223060

**Risks Related to Structure**

*EFH Corp. is a holding company and its obligations are structurally subordinated to existing and future liabilities and preferred stock of its subsidiaries.*

EFH Corp.'s cash flows and ability to meet its obligations are largely dependent upon the earnings of its subsidiaries and the payment of such earnings to EFH Corp. in the form of dividends, distributions, loans or otherwise, and repayment of loans or advances from EFH Corp. These subsidiaries are separate and distinct legal entities and have no obligation to provide EFH Corp. with funds for its payment obligations. Any decision by a subsidiary to provide EFH Corp. with funds for its payment obligations, whether by dividends, distributions, loans or otherwise, will depend on, among other things, the subsidiary's results of operations, financial condition, cash requirements, contractual restrictions and other factors. In addition, a subsidiary's ability to pay dividends may be limited by covenants in its existing and future debt agreements or applicable law. Further, the distributions that may be paid by Oncor are limited as discussed below.

Because EFH Corp. is a holding company, its obligations to its creditors are structurally subordinated to all existing and future liabilities and existing and future preferred stock of its subsidiaries that do not guarantee such obligations. Therefore, with respect to subsidiaries that do not guarantee EFH Corp.'s obligations, EFH Corp.'s rights and the rights of its creditors to participate in the assets of any subsidiary in the event that such a subsidiary is liquidated or reorganized are subject to the prior claims of such subsidiary's creditors and holders of such subsidiary's preferred stock. To the extent that EFH Corp. may be a creditor with recognized claims against any such subsidiary, EFH Corp.'s claims would still be subject to the prior claims of such subsidiary's creditors to the extent that they are secured or senior to those held by EFH Corp. Subject to restrictions contained in financing arrangements, EFH Corp.'s subsidiaries may incur additional indebtedness and other liabilities.

*Oncor may or may not make any distributions to EFH Corp.*

Upon the consummation of the Merger, EFH Corp. and Oncor implemented certain structural and operational "ring-fencing" measures based on principles articulated by rating agencies and commitments made by Texas Holdings and Oncor to the PUCT and the FERC to further enhance Oncor's credit quality. These measures were put into place to mitigate Oncor's credit exposure to the Texas Holdings Group and to reduce the risk that the assets and liabilities of Oncor would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities.

As part of the ring-fencing measures, a majority of the members of the board of directors of Oncor are required to be, and are, independent from EFH Corp. Any new independent directors of Oncor are required to be appointed by the nominating committee of Oncor Holdings. The organizational documents of Oncor give these independent directors, acting by majority vote, and, during certain periods, any director designated by Texas Transmission, the express right to prevent distributions from Oncor if they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements. Accordingly, there can be no assurance that Oncor will make any distributions to EFH Corp.

In addition, Oncor's organizational documents limit Oncor's distributions to its owners, including EFH Corp. through December 31, 2012 to an amount not to exceed Oncor's net income (determined in accordance with U.S. GAAP, subject to certain defined adjustments, including goodwill impairments) and prohibit Oncor from making any distribution to EFH Corp. so long as and to the extent that such distribution would cause Oncor's debt-to-equity ratio to exceed the debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.

In March 2009, the PUCT awarded Oncor the right to construct approximately $1.3 billion (currently estimated to be approximately $1.75 billion) of transmission lines and facilities associated with its CREZ Transmission Plan (see discussion in "Management's Discussion and Analysis of Financial Condition and Results of Operations for the Three and Nine Months Ended September 30, 2010 — Regulation and Rates"). With the award, it is likely Oncor will incur additional debt. In addition, Oncor may incur additional debt in connection with other investments in infrastructure or technology. Accordingly, while Oncor is required to maintain a debt-to-equity ratio of 60% debt to 40% equity, there can be no assurance that Oncor's equity balance will be sufficient to maintain the required debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, thereby restricting Oncor from making any distributions to EFH Corp.

30

EFIHMW00223061

**Risks Related to Our Businesses**

***Our businesses are subject to ongoing complex governmental regulations and legislation that have impacted, and may in the future impact, our businesses and/or results of operations.***

Our businesses operate in changing market environments influenced by various state and federal legislative and regulatory initiatives regarding the restructuring of the energy industry, including competition in the generation and sale of electricity. We will need to continually adapt to these changes.

Our businesses are subject to changes in state and federal laws (including PURA, the Federal Power Act, the Atomic Energy Act, the Public Utility Regulatory Policies Act of 1978, the Clean Air Act and the Energy Policy Act of 2005), changing governmental policy and regulatory actions (including those of the PUCT, the NERC, the TRE, the RRC, the TCEQ, the FERC, the EPA, the NRC and the CFTC) and the rules, guidelines and protocols of ERCOT with respect to matters including, but not limited to, market structure and design, operation of nuclear generation facilities, construction and operation of other generation facilities, construction and operation of transmission facilities, acquisition, disposal, depreciation and amortization of regulated assets and facilities, recovery of costs and investments, decommissioning costs, return on invested capital for regulated businesses, market behavior rules, present or prospective wholesale and retail competition and environmental matters. TCEH, along with other market participants, is subject to electricity pricing constraints and market behavior and other competition-related rules and regulations under PURA that are administered by the PUCT and ERCOT, and, with respect to any wholesale power sales outside the ERCOT market, is subject to market behavior and other competition-related rules and regulations under the Federal Power Act that are administered by the FERC. Changes in, revisions to, or reinterpretations of existing laws and regulations (for example, with respect to prices at which TCEH may sell electricity, the required permits for the three lignite-fueled generation units recently completed or the cost of emitting greenhouse gases) may have an adverse effect on our businesses.

The Texas Legislature meets every two years (the next legislative session begins in January 2011), and from time to time bills are introduced and considered that could materially affect our businesses. There can be no assurance that future action of the Texas Legislature will not result in legislation that could have a material adverse effect on us and our financial prospects.

***PURA, the PUCT, ERCOT, the RRC, the TCEQ and the Office of Public Utility Council (OPC) are subject to a "Sunset" review by the Texas Sunset Advisory Commission. PURA will expire, and the PUCT and the RRC will be abolished, on September 1, 2011 unless extended by the Texas Legislature following such review. If any of PURA, the PUCT, ERCOT, the RRC, the TCEQ or the OPC are not renewed by the Texas Legislature pursuant to Sunset review, it could have a material effect on our business.***

Sunset review is the regular assessment of the continuing need for a state agency to exist, and is grounded in the premise that an agency will be abolished unless legislation is passed to continue its functions. The Texas Sunset Advisory Commission (Sunset Commission) closely reviews each agency and recommends action on each agency to the Texas Legislature, which action may include modifying or even abolishing the agency. Of the agencies scheduled for Sunset review by the Sunset Commission in 2010 and 2011, the following hold primary interest for us: the TCEQ, the PUCT, the OPC, the RRC and ERCOT, which are subject to a focused, limited scope, or special purpose review. These agencies, for the most part, govern and operate the electricity and mining markets in Texas upon which our business model is based. PURA, which expires September 1, 2011, is also subject to Sunset review. If the Texas Legislature fails to renew PURA or any of these agencies, it could result in a significant restructuring of the Texas electricity market or regulatory regime that could have a material impact on our business. There can be no assurance that future action of the Sunset Commission will not result in legislation that could have a material adverse effect on us and our financial prospects.

31

EFIHMW00223062

*Litigation, legal proceedings, regulatory investigations or other administrative proceedings could expose us to significant liabilities and reputation damage and have a material adverse effect on our results of operations, and the litigation environment in which we operate poses a significant risk to our businesses.*

We are involved in the ordinary course of business in a number of lawsuits involving employment, commercial, environmental and injuries and damages issues, among other matters. We evaluate litigation claims and legal proceedings to assess the likelihood of unfavorable outcomes and to estimate, if possible, the amount of potential losses. Based on these assessments and estimates, we establish reserves and disclose the relevant litigation claims or legal proceedings, as appropriate. These assessments and estimates are based on the information available to management at the time and involve a significant amount of judgment. Actual outcomes or losses may differ materially from current assessments and estimates. The settlement or resolution of such claims or proceedings may have a material adverse effect on our results of operations. In addition, judges and juries in the State of Texas have demonstrated a willingness to grant large verdicts, including punitive damages, to plaintiffs in personal injury, property damage and business tort cases. We use appropriate means to contest litigation threatened or filed against us, but the litigation environment in the State of Texas poses a significant business risk.

We are involved in the ordinary course of business in permit applications and renewals, and we are exposed to the risk that certain of our operating permits may not be granted or renewed on satisfactory terms. Failure to obtain and maintain the necessary permits to conduct our businesses could have a material adverse effect on our results of operations.

We are also involved in the ordinary course of business in regulatory investigations and other administrative proceedings, and we are exposed to the risk that we may become the subject of additional regulatory investigations or administrative proceedings. See Note 7 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 included elsewhere in this prospectus. While we cannot predict the outcome of any regulatory investigation or administrative proceeding, any such regulatory investigation or administrative proceeding could result in us incurring material penalties and/or other costs and have a material adverse effect on our results of operations.

*TXU Energy Retail Company LLC may lose a significant number of retail customers due to competitive marketing activity by other retail electric providers.*

TXU Energy Retail Company LLC ("TXU Energy") faces competition for customers. Competitors may offer lower prices and other incentives, which, despite TXU Energy's long-standing relationship with customers, may attract customers away from TXU Energy.

In some retail electricity markets, TXU Energy's principal competitor may be the incumbent retail electric provider. The incumbent retail electric provider has the advantage of long-standing relationships with its customers, including well-known brand recognition.

In addition to competition from the incumbent retail electric provider, TXU Energy may face competition from a number of other energy service providers, other energy industry participants, or nationally branded providers of consumer products and services who may develop businesses that will compete with TXU Energy. Some of these competitors or potential competitors may be larger or better capitalized than TXU Energy. If there is inadequate potential margin in these retail electricity markets, it may not be profitable for TXU Energy to compete in these markets.

*TCEH's revenues and results of operations may be negatively impacted by decreases in market prices for power, decreases in natural gas prices, and/or decreases in market heat rates.*

TCEH (EFH Corp.'s largest business) is not guaranteed any rate of return on capital investments in its competitive businesses. We market and trade electricity and natural gas, including electricity from our own generation facilities and generation contracted from third parties, as part of our wholesale markets operation. TCEH's results of operations depend in large part upon market prices for electricity, natural gas, uranium, coal and transportation in its regional market and other competitive markets and upon prevailing retail electricity rates, which may be impacted by actions of regulatory authorities. Market prices may fluctuate substantially over relatively short periods of time. Demand for electricity can fluctuate dramatically, creating periods of substantial under- or over-supply. During periods of over-supply, prices might be depressed. Also, at times there may be political pressure, or pressure from regulatory authorities with jurisdiction over wholesale and retail energy commodity and transportation rates, to impose price limitations, bidding rules and other mechanisms to address volatility and other issues in these markets.

Confidential

Some of the fuel for our generation facilities is purchased under short-term contracts. Prices of fuel, including diesel, natural gas, coal and nuclear fuel, may also be volatile, and the price we can obtain for electricity sales may not change at the same rate as changes in fuel costs. In addition, we purchase and sell natural gas and other energy related commodities, and volatility in these markets may affect costs incurred in meeting obligations.

Volatility in market prices for fuel and electricity may result from the following:

- volatility in natural gas prices;

- volatility in market heat rates;

- volatility in coal and rail transportation prices;

- severe or unexpected weather conditions;

- seasonality;

- changes in electricity and fuel usage;

- illiquidity in the wholesale power or other markets;

- transmission or transportation constraints, inoperability or inefficiencies;

- availability of competitively-priced alternative energy sources;

- changes in market structure;

- changes in supply and demand for energy commodities, including nuclear fuel and related enrichment and conversion services;

- changes in generation efficiency;

- outages at our generation facilities or those of our competitors;

- changes in the credit risk or payment practices of market participants;

- changes in production and storage levels of natural gas, lignite, coal, crude oil, diesel and other refined products;

- natural disasters, wars, sabotage, terrorist acts, embargoes and other catastrophic events; and

- federal, state and local energy, environmental and other regulation and legislation.

All of our generation facilities are located in the ERCOT market, a market with limited interconnections to other markets. Wholesale electricity prices in the ERCOT market generally correlate with the price of natural gas because marginal electricity demand is generally supplied by natural gas-fueled generation facilities.

Wholesale electricity prices also correlate with market heat rates (a measure of efficiency of the marginal price-setting generator of electricity), which could fall if demand for electricity were to decrease or if additional generation facilities are built in ERCOT. Accordingly, the contribution to earnings and the value of our baseload (lignite/coal-fueled and nuclear) generation assets, which provided a substantial portion of our supply volumes in 2009 and in 2010 to date, are dependent in significant part upon the price of natural gas and market heat rates. As a result, our baseload generation assets could significantly decrease in profitability and value if natural gas prices or market heat rates fall.

Confidential

EFIHMW00223064

***Our assets or positions cannot be fully hedged against changes in commodity prices and market heat rates, and hedging transactions may not work as planned or hedge counterparties may default on their obligations.***

We cannot fully hedge the risk associated with changes in commodity prices, most notably natural gas prices, or market heat rates because of the expected useful life of our generation assets and the size of our position relative to market liquidity. To the extent we have unhedged positions, fluctuating commodity prices and/or market heat rates can materially impact our results of operations and financial position, either favorably or unfavorably.

To manage our financial exposure related to commodity price fluctuations, we routinely enter into contracts to hedge portions of purchase and sale commitments, fuel requirements and inventories of natural gas, lignite, coal, crude oil, diesel fuel and refined products, and other commodities, within established risk management guidelines. As part of this strategy, we routinely utilize fixed-price forward physical purchase and sale contracts, futures, financial swaps and option contracts traded in over-the-counter markets or on exchanges. Although we devote a considerable amount of time and effort to the establishment of risk management procedures, as well as the ongoing review of the implementation of these procedures, the procedures in place may not always function as planned and cannot eliminate all the risks associated with these activities. For example, we hedge the expected needs of our wholesale and retail customers, but unexpected changes due to weather, natural disasters, market constraints or other factors could cause us to purchase power to meet unexpected demand in periods of high wholesale market prices or resell excess power into the wholesale market in periods of low prices. As a result of these and other factors, we cannot precisely predict the impact that risk management decisions may have on our businesses, results of operations or financial position.

With the tightening of credit markets, there has been some decline in the number of market participants in the wholesale energy commodities markets, resulting in less liquidity, particularly in the ERCOT electricity market. Participation by financial institutions and other intermediaries (including investment banks) has particularly declined. Extended declines in market liquidity could materially affect our ability to hedge our financial exposure to desired levels.

To the extent we engage in hedging and risk management activities, we are exposed to the risk that counterparties that owe us money, energy or other commodities as a result of market transactions will not perform their obligations. Should the counterparties to these arrangements fail to perform, we might be forced to enter into alternative hedging arrangements or honor the underlying commitment at then-current market prices. In such event, we might incur losses in addition to amounts, if any, already paid to the counterparties. ERCOT market participants are also exposed to risks that another ERCOT market participant may default on its obligations to pay ERCOT for power taken, in which case such costs, to the extent not offset by posted security and other protections available to ERCOT, may be allocated to various non-defaulting ERCOT market participants, including us.

***Our collateral requirements for hedging arrangements could be materially impacted if the rules implementing the Financial Reform Act broaden the scope of the Act's provisions regarding the regulation of over-the-counter financial derivatives and make them applicable to us.***

In July 2010, the U.S. Congress enacted, and President Obama signed, financial reform legislation known as the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Financial Reform Act"). Title VII of the Financial Reform Act provides for the regulation of the over-the-counter (OTC) derivatives market. While the legislation is broad and detailed, substantial portions of the legislation will require rulemaking by federal governmental agencies to either implement the standards set out in the legislation or to adopt new standards.

34

EFIHMW00223065

The Financial Reform Act generally requires OTC derivatives (including the types of asset-backed OTC derivatives that we use to hedge risks associated with commodity and interest rate exposure) to be cleared by a derivatives clearing organization. However, end-users that are non-financial entities using the swap to hedge or mitigate commercial risk are exempt from these clearing requirements. The type of asset-backed OTC derivatives that we use to hedge commodity and interest rate risk should be exempt from the clearing requirements. In addition, existing swaps are grandfathered from the clearing requirements.

The Financial Reform Act also requires the posting of cash collateral for uncleared swaps. Because these cash collateral requirements are unclear as to whether an end-user or its counterparty (i.e., swap dealer) is required to post cash collateral, there is risk that the cash collateral requirement could be used to effectively negate the end-user clearing exemption. However, the legislative history of the Financial Reform Act suggests that it was not Congress' intent to require end-users (rather than such requirement apply to swap dealers) to post cash collateral with respect to swaps. If we were required to post cash collateral on our swap transactions, our liquidity would likely be materially impacted, and our ability to enter into OTC derivatives to hedge our commodity and interest rate risks would be significantly limited.

We cannot predict the outcome of the rulemaking to implement the OTC derivative market provisions of the Financial Reform Act. This rulemaking could negatively affect our ability to hedge our commodity and interest rate risks. The inability to hedge these risks would likely have a material adverse effect on our results of operations, financial condition or cash flows.

***We may suffer material losses, costs and liabilities due to ownership and operation of the Comanche Peak nuclear generation facility.***

The ownership and operation of a nuclear generation facility involves certain risks. These risks include:

- unscheduled outages or unexpected costs due to equipment, mechanical, structural or other problems;

- inadequacy or lapses in maintenance protocols;

- the impairment of reactor operation and safety systems due to human error;

- the costs of storage, handling and disposal of nuclear materials, including availability of storage space;

- the costs of procuring nuclear fuel;

- the costs of securing the plant against possible terrorist attacks;

- limitations on the amounts and types of insurance coverage commercially available; and

- uncertainties with respect to the technological and financial aspects of decommissioning nuclear facilities at the end of their useful lives.

The prolonged unavailability of Comanche Peak could materially affect our financial condition and results of operations. The following are among the more significant of these risks:

- Operational Risk — Operations at any nuclear generation facility could degrade to the point where the facility would have to be shut down. If such degradations were to occur, the process of identifying and correcting the causes of the operational downgrade to return the facility to operation could require significant time and expense, resulting in both lost revenue and increased fuel and purchased power expense to meet supply commitments. Furthermore, a shut-down or failure at any other nuclear generation facility could cause regulators to require a shut-down or reduced availability at Comanche Peak.

- Regulatory Risk — The NRC may modify, suspend or revoke licenses and impose civil penalties for failure to comply with the Atomic Energy Act, the regulations under it or the terms of the licenses of nuclear generation facilities. Unless extended, the NRC operating licenses for Comanche Peak Unit 1 and Unit 2 will expire in 2030 and 2033, respectively. Changes in regulations by the NRC could require a substantial increase in capital expenditures or result in increased operating or decommissioning costs.

35

EFIHMW00223066

- Nuclear Accident Risk — Although the safety record of Comanche Peak and other nuclear generation facilities generally has been very good, accidents and other unforeseen problems have occurred both in the U.S. and elsewhere. The consequences of an accident can be severe and include loss of life, injury, lasting negative health impact and property damage. Any accident, or perceived accident, could result in significant liabilities and damage our reputation. Any such resulting liability from a nuclear accident could exceed our resources, including insurance coverage.

***The operation and maintenance of electricity generation and delivery facilities involves significant risks that could adversely affect our results of operations and financial condition.***

The operation and maintenance of electricity generation and delivery facilities involves many risks, including, as applicable, start-up risks, breakdown or failure of facilities, lack of sufficient capital to maintain the facilities, the dependence on a specific fuel source or the impact of unusual or adverse weather conditions or other natural events, as well as the risk of performance below expected levels of output, efficiency or reliability, the occurrence of any of which could result in lost revenues and/or increased expenses. A significant number of our facilities were constructed many years ago. In particular, older generating equipment and transmission and distribution equipment, even if maintained in accordance with good engineering practices, may require significant capital expenditures to keep operating at peak efficiency or reliability. The risk of increased maintenance and capital expenditures arises from (a) increased starting and stopping of generation equipment due to the volatility of the competitive generation market, (b) any unexpected failure to generate electricity, including failure caused by breakdown or forced outage and (c) damage to facilities due to storms, natural disasters, wars, terrorist acts and other catastrophic events. Further, our ability to successfully and timely complete capital improvements to existing facilities or other capital projects is contingent upon many variables and subject to substantial risks. Should any such efforts be unsuccessful, we could be subject to additional costs and/or the write-off of our investment in the project or improvement.

Insurance, warranties or performance guarantees may not cover all or any of the lost revenues or increased expenses, including the cost of replacement power. Likewise, the ability to obtain insurance, and the cost of and coverage provided by such insurance, could be affected by events outside our control.

***Our cost of compliance with environmental laws and regulations and our commitments, and the cost of compliance with new environmental laws, regulations or commitments could materially adversely affect our financial condition, liquidity and results of operations.***

We are subject to extensive environmental regulation by governmental authorities, including the EPA and the TCEQ. In operating our facilities, we are required to comply with numerous environmental laws and regulations and to obtain numerous governmental permits. We may incur significant additional costs beyond those currently contemplated to comply with these requirements. If we fail to comply with these requirements, we could be subject to civil or criminal liabilities and fines. Existing environmental regulations could be revised or reinterpreted, new laws and regulations could be adopted or become applicable to us or our facilities, and future changes in environmental laws and regulations could occur, including potential regulatory and enforcement developments related to air emissions, all of which could result in significant additional costs beyond those currently contemplated to comply with existing requirements.

The EPA has recently completed several regulatory actions establishing new requirements for control of certain emissions from sources that include coal-fueled generation facilities. It is also currently considering several other regulatory actions, as well as contemplating future additional regulatory actions, in each case that may affect our coal-fueled generation facilities. There is no assurance that the currently-installed emissions control equipment at our coal-fueled generation facilities will satisfy the requirements under any future EPA or TCEQ regulations. Some of the potential EPA or TCEQ regulatory actions could require us to install significant additional control equipment, resulting in material costs of compliance for our generation units, including capital expenditures and higher operating costs. These costs could result in material adverse effects on our financial condition, liquidity and results of operations.

36

EFIHMW00223067

In conjunction with the building of three new generation units, we have committed to reduce emissions of mercury, nitrogen oxide ($NO_x$) and sulfur dioxide ($SO_2$) through the installation of emissions control equipment at both the new and existing and lignite-fueled generation units. We may incur significantly greater costs than those contemplated in order to achieve this commitment.

We have formed a Sustainable Energy Advisory Board that advises us in our pursuit of technology development opportunities that, among other things, are designed to reduce our impact on the environment. Any adoption of Sustainable Energy Advisory Board recommendations may cause us to incur significant costs in addition to the costs referenced above.

We may not be able to obtain or maintain all required environmental regulatory approvals. If there is a delay in obtaining any required environmental regulatory approvals or if we fail to obtain, maintain or comply with any such approval, the operation and/or construction of our facilities could be stopped, curtailed or modified or become subject to additional costs.

In addition, we may be responsible for any on-site liabilities associated with the environmental condition of facilities that we have acquired, leased or developed, regardless of when the liabilities arose and whether they are known or unknown. In connection with certain acquisitions and sales of assets, we may obtain, or be required to provide, indemnification against certain environmental liabilities. Another party could, depending on the circumstances, assert an environmental claim against us or fail to meet its indemnification obligations to us.

***Our financial condition and results of operations may be materially adversely affected if new federal and/or state legislation or regulations are adopted to address global climate change.***

In recent years, a growing concern has emerged about global climate change and how greenhouse gas (GHG) emissions, such as carbon dioxide ($CO_2$), contribute to global climate change. Several bills addressing climate change have been introduced in the U.S. Congress or discussed by the Obama Administration that are intended to address climate change using different approaches, including a cap on carbon emissions with emitters allowed to trade unused emission allowances (cap-and-trade), incentives for the development of low-carbon technology and federal renewable portfolio standards. In addition, a number of federal court cases have been recently decided that could result in the future judicial regulation of GHG emissions.

The EPA recently issued a rule, known as the Prevention of Significant Deterioration (PSD) tailoring rule, that establishes new thresholds for regulating GHG emissions from stationary sources under the Clean Air Act. Beginning in January 2011, the rule will require any source subject to the PSD permitting program due to emissions of non-GHG pollutants that increases its GHG emissions by 75,000 tons per year (tpy) to have an operating permit under the Title V Operating Permit Program of the Clean Air Act and install the best available control technology in conjunction with construction activities or plant modifications. Beginning in July 2011, PSD permitting requirements will also apply to new projects with GHG emissions of at least 100,000 tpy and modifications to existing facilities that increase GHG emissions by at least 75,000 tpy (even if no non-GHG PSD thresholds are exceeded). The EPA also finalized regulations in 2009 that will require certain categories of GHG emitters to monitor and report their annual GHG emissions beginning in January 2011.

We produce GHG emissions from the combustion of fossil fuels at our generation facilities. For 2009, we estimate that our generation facilities produced 54 million short tons of carbon dioxide based on continuously monitored data reported to and approved by the EPA. The two new lignite-fueled units that achieved substantial completion (as defined in the engineering, procurement and construction (EPC) agreements for the units) in 2009 and the one new lignite-fueled unit that achieved substantial completion (as defined in the EPC agreement for the unit) in June 2010 will generate additional carbon dioxide emissions. Because a substantial portion of our generation portfolio consists of lignite/coal-fueled generation facilities, our financial condition and results of operations could be materially adversely affected by the enactment of any legislation or regulation that mandates a reduction in GHG emissions or that imposes financial penalties, costs or taxes upon those that produce GHG emissions. For example, to the extent a cap-and-trade program is adopted, we may be required to incur material costs to reduce our GHG emissions or to procure emission allowances or credits to comply with such a program. The EPA regulation of GHGs under the Clean Air Act, or judicially imposed limits on GHG emissions, may require us to make material expenditures to reduce our GHG emissions. If a significant number of our investors, customers or others refuse to do business with us because of our GHG emissions, it could have a material adverse effect on our results of operations, financial condition or cash flows.

37

EFIHMW00223068

***Our financial condition and results of operations may be materially adversely affected by the effects of extreme weather conditions.***

We could be subject to the effects of extreme weather. Extreme weather conditions could stress our transmission and distribution system or our generation facilities resulting in increased maintenance and capital expenditures. Extreme weather events, including hurricanes or storms or other natural disasters, could be destructive and result in casualty losses that are not ultimately offset by insurance proceeds or in increased capital expenditures or costs, including supply chain costs.

Moreover, an extreme weather event could cause disruption in service to customers due to downed wires and poles or damage to other operating equipment, which could result in us foregoing sales of electricity and lost revenue. Similarly, an extreme weather event might affect the availability of generation and transmission capacity, limiting our ability to source or deliver electricity to where it is needed. These conditions, which cannot be reliably predicted, could have an adverse consequence by requiring us to seek additional sources of electricity when wholesale market prices are high or to seek to sell excess electricity when those market prices are low.

***The rates of Oncor's electricity delivery business are subject to regulatory review, and may be reduced below current levels, which could adversely impact Oncor's financial condition and results of operations.***

The rates charged by Oncor are regulated by the PUCT and certain cities and are subject to cost-of-service regulation and annual earnings oversight. This regulatory treatment does not provide any assurance as to achievement of earnings levels. Oncor's rates are regulated based on an analysis of Oncor's costs and capital structure, as reviewed and approved in a regulatory proceeding. While rate regulation is premised on the full recovery of prudently incurred costs and a reasonable rate of return on invested capital, there can be no assurance that the PUCT will judge all of Oncor's costs to have been prudently incurred, that the PUCT will not reduce the amount of invested capital included in the capital structure that Oncor's rates are based upon, or that the regulatory process in which rates are determined will always result in rates that will produce full recovery of Oncor's costs, including regulatory assets reported in Oncor's balance sheet, and the return on invested capital allowed by the PUCT. Oncor expects to file with the PUCT for a regulatory review of its rates in January 2011.

In addition, in connection with the Merger, Oncor has made several commitments to the PUCT regarding its rates. For example, Oncor committed that it will, in rate cases after its 2008 general rate case through proceedings initiated prior to December 31, 2012, support a cost of debt that will be no greater than the then-current cost of debt of electric utilities with investment grade credit ratings equal to Oncor's ratings as of October 1, 2007. As a result, Oncor may not be able to recover all of its debt costs if they are above those levels.

***Our growth strategy may not be executed as planned, which could adversely impact our financial condition and results of operations.***

There can be no guarantee that the execution of our growth strategy will be successful. As discussed below, our growth strategy is dependent upon many factors. Changes in laws, regulations, markets, costs, the outcome of on-going litigation or other factors could negatively impact the execution of our growth strategy, including causing management to change the strategy. Even if we are able to execute our growth strategy, it may take longer than expected, and costs may be higher than expected.

38

EFIHMW00223069

There can be no guarantee that the execution of Oncor's capital deployment program for its electricity delivery facilities will be successful, and there can be no assurance that the capital investments Oncor intends to make in connection with its electricity delivery business will produce the desired reductions in cost and improvements to service and reliability. Furthermore, there can be no guarantee that Oncor's capital investments, including the investment of approximately $1.75 billion to construct CREZ-related transmission lines and facilities, will ultimately be recoverable through rates or, if recovered, that they will be recovered on a timely basis. There can also be no assurance that the PUCT's award of CREZ construction projects will not be delayed, modified or otherwise vacated through judicial or administrative actions. See "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three and Nine Months Ended September 30, 2010 — Regulation and Rates" included elsewhere in this prospectus.

***Ongoing performance improvement initiatives may not achieve desired cost reductions and may instead result in significant additional costs if unsuccessful.***

The implementation of performance improvement initiatives identified by management may not produce the desired reduction in costs and if unsuccessful, may instead result in significant additional costs as well as significant disruptions in our operations due to employee displacement and the rapid pace of changes to organizational structure and operating practices and processes. Such additional costs or operational disruptions could have an adverse effect on our businesses and financial prospects.

***TXU Energy's retail business is subject to the risk that sensitive customer data may be compromised, which could result in an adverse impact to its reputation and/or the results of operations of the retail business.***

TXU Energy's retail business requires access to sensitive customer data in the ordinary course of business. Examples of sensitive customer data are names, addresses, account information, historical electricity usage, expected patterns of use, payment history, credit bureau data, credit and debit card account numbers, drivers license numbers, social security numbers and bank account information. TXU Energy's retail business may need to provide sensitive customer data to vendors and service providers who require access to this information in order to provide services, such as call center operations, to the retail business. If a significant breach occurred, the reputation of TXU Energy's retail business may be adversely affected, customer confidence may be diminished, or TXU Energy's retail business may be subject to legal claims, any of which may contribute to the loss of customers and have a negative impact on the business and/or results of operations.

***TXU Energy relies on the infrastructure of local utilities or independent transmission system operators to provide electricity to, and to obtain information about, its customers. Any infrastructure failure could negatively impact customer satisfaction and could have a material negative impact on its business and results of operations.***

TXU Energy depends on transmission and distribution facilities owned and operated by unaffiliated utilities, as well as Oncor's facilities, to deliver the electricity it sells to its customers. If transmission capacity is inadequate, TXU Energy's ability to sell and deliver electricity may be hindered, it may have to forgo sales or it may have to buy more expensive wholesale electricity than is available in the capacity-constrained area. For example, during some periods, transmission access is constrained in some areas of the Dallas-Fort Worth metroplex, where TXU Energy has a significant number of customers. The cost to provide service to these customers may exceed the cost to provide service to other customers, resulting in lower profits. In addition, any infrastructure failure that interrupts or impairs delivery of electricity to TXU Energy's customers could negatively impact the satisfaction of its customers with its service.

***TXU Energy offers bundled services to its retail customers, with some bundled services offered at fixed prices and for fixed terms. If TXU Energy's costs for these bundled services exceed the prices paid by its customers, its results of operations could be materially adversely affected.***

TXU Energy offers its customers a bundle of services that include, at a minimum, electricity plus transmission, distribution and related services. The prices TXU Energy charges for its bundle of services or for the various components of the bundle, any of which may be fixed by contract with the customer for a period of time, could fall below TXU Energy's underlying cost to provide the components of such services.

Confidential

*TXU Energy's REP certification is subject to PUCT review.*

The PUCT may at any time initiate an investigation into whether TXU Energy is compliant with PUCT Substantive Rules and whether it has met all of the requirements for REP certification, including financial requirements. Any removal or revocation of a REP certification would mean that TXU Energy would no longer be allowed to provide electricity service to retail customers. Such decertification would have an adverse effect on TXU Energy and its financial prospects. See "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three and Nine Months Ended September 30, 2010 — Regulations and Rates" included elsewhere in this prospectus for a discussion of new rules regarding REP certification.

*Changes in technology or increased electricity conservation efforts may reduce the value of our generation plants and/or Oncor's electricity delivery facilities and may significantly impact our businesses in other ways as well.*

Research and development activities are ongoing to improve existing and alternative technologies to produce electricity, including gas turbines, fuel cells, microturbines, photovoltaic (solar) cells and concentrated solar thermal devices. It is possible that advances in these or other technologies will reduce the costs of electricity production from these technologies to a level that will enable these technologies to compete effectively with our traditional generation plants. While demand for electricity has been generally increasing throughout the U.S., the rate of construction and development of new, more efficient generation facilities may exceed increases in demand in some regional electric markets. Consequently, where we have facilities, the profitability and market value of our generation assets could be significantly reduced. Changes in technology could also alter the channels through which retail customers buy electricity. To the extent self-generation facilities become a more cost-effective option for certain customers, our revenues could be materially reduced.

Also, electricity demand could be reduced by increased conservation efforts and advances in technology, which could likewise significantly reduce the value of our generation assets and electricity delivery facilities. Certain regulatory and legislative bodies have introduced or are considering requirements and/or incentives to reduce energy consumption by a fixed date. Effective energy conservation by our customers could result in reduced energy demand or significantly slow the growth in demand. Such reduction in demand could materially reduce our revenues. Furthermore, we may incur increased capital expenditures if we are required to invest in conservation measures.

*Our revenues and results of operations may be adversely impacted by decreases in market prices of power due to the development of wind generation power sources.*

A significant amount of investment in wind generation in the ERCOT market over the past few years has increased overall wind power generation capacity. Generally, the increased capacity has led to lower wholesale electricity prices (driven by lower market heat rates) in the zones at or near wind generation development, especially in, but not exclusive to, the ERCOT West zone where most of the new wind power generation is located. As a result, the profitability of our generation facilities and power purchase contracts, including certain wind generation power purchase contracts, has been impacted and could be further impacted by the effects of the wind power generation, and the value could significantly decrease if wind power generation has a material sustained effect on market heat rates.

*Our revenues and results of operations may be adversely impacted as ERCOT transitions from a zonal market structure to a nodal wholesale market.*

Substantially all of our competitive businesses are located in the ERCOT market, which is currently in the process of transitioning from a zonal market structure with four congestion management zones to a nodal market structure that directly manages congestion on a localized basis. In a nodal market, the prices received and paid for power are based on pricing determined at specific interconnection points on the transmission grid (i.e., Locational Marginal Pricing), which could result in lower revenues or higher costs for our competitive businesses. This market structure change could have a significant impact on the profitability and value of our competitive businesses depending on how the Locational Marginal Pricing develops. See "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three and Nine Months Ended September 30, 2010 — Regulations and Rates — Wholesale Market Design" included elsewhere in this prospectus.

40

EFIHMW00223071

*Our future results of operations may be negatively impacted by settlement adjustments determined by ERCOT related to prior periods.*

ERCOT is the independent system operator that is responsible for maintaining reliable operation of the bulk electric power supply system in the ERCOT market. Its responsibilities include the clearing and settlement of electricity volumes and related ancillary services among the various participants in the deregulated Texas market. Settlement information is due from ERCOT within two months after the operating day, and true-up settlements are due from ERCOT within six months after the operating day. Likewise, ERCOT has the ability to resettle any operating day at any time after the six month settlement period, usually the result of a lingering dispute, an alternative dispute resolution process or litigated event. As a result, we are subject to settlement adjustments from ERCOT related to prior periods, which may result in charges or credits impacting our future reported results of operations.

*Our results of operations and financial condition could be negatively impacted by any development or event beyond our control that causes economic weakness in the ERCOT market.*

We derive substantially all of our revenues from operations in the ERCOT market, which covers approximately 75% of the geographical area in the State of Texas. As a result, regardless of the state of the economy in areas outside the ERCOT market, economic weakness in the ERCOT market could lead to reduced demand for electricity in the ERCOT market. Such a reduction could have a material negative impact on our results of operations and financial condition.

*EFH Corp.'s (or any applicable subsidiary's) credit ratings could negatively affect EFH Corp.'s (or the pertinent subsidiary's) ability to access capital and could require EFH Corp. or its subsidiaries to post collateral or repay certain indebtedness.*

Downgrades in EFH Corp.'s or any of its applicable subsidiaries' long-term debt ratings generally cause borrowing costs to increase and the potential pool of investors and funding sources to decrease and could trigger liquidity demands pursuant to the terms of new commodity contracts, leases or other agreements. Future transactions by EFH Corp. or any of its subsidiaries, including the issuance of additional debt or the consummation of debt exchanges, could result in temporary or permanent downgrades of EFH Corp.'s or its subsidiaries' credit ratings.

Most of EFH Corp.'s large customers, suppliers and counterparties require an expected level of creditworthiness in order for them to enter into transactions. If EFH Corp.'s (or an applicable subsidiary's) credit ratings decline, the costs to operate its businesses would likely increase because counterparties could require the posting of collateral in the form of cash-related instruments, or counterparties could decline to do business with EFH Corp. (or its applicable subsidiary).

*Continued market volatility may have impacts on our businesses and financial condition that we currently cannot predict.*

Because our operations are capital intensive, we expect to rely over the long-term upon access to financial markets (particularly the attainment of liquidity facilities) as a significant source of liquidity for capital requirements not satisfied by cash-on-hand, operating cash flows or our revolving credit facilities. Recently, the capital and credit markets have been experiencing extreme volatility and disruption. Our ability to access the capital or credit markets may be severely restricted at a time when we would like, or need, to access those markets, which could have an impact on our flexibility to react to changing economic and business conditions. In addition, the cost of debt financing may be materially impacted by these market conditions. Accordingly, there can be no assurance that the capital and credit markets will continue to be a reliable or acceptable source of short-term or long-term financing for us. Additionally, disruptions in the capital and credit markets could have a broader impact on the economy in general in ways that could lead to reduced electricity usage, which could have a negative impact on our revenues, or have an impact on our customers, counterparties and/or lenders, causing them to fail to meet their obligations to us.

41

EFIHMW00223072

*Our liquidity needs could be difficult to satisfy, particularly during times of uncertainty in the financial markets and/or during times when there are significant changes in commodity prices. The inability to access liquidity, particularly on favorable terms, could materially adversely affect results of operations and/or financial condition.*

Our businesses are capital intensive. We rely on access to financial markets and liquidity facilities as a significant source of liquidity for capital requirements not satisfied by cash-on-hand or operating cash flows. The inability to raise capital on favorable terms or access liquidity facilities, particularly during times of uncertainty similar to that which has recently been experienced in the financial markets, could impact our ability to sustain and grow our businesses and would likely increase capital costs. Our access to the financial markets and liquidity facilities could be adversely impacted by various factors, such as:

- changes in financial markets that reduce available credit or the ability to obtain or renew liquidity facilities on acceptable terms;

- economic weakness in the ERCOT or general U.S. market;

- changes in interest rates;

- a deterioration of our credit or a reduction in our credit ratings;

- a deterioration of the credit or bankruptcy of one or more lenders or counterparties under our liquidity facilities that affects the ability of such lender(s) to make loans to us;

- volatility in commodity prices that increases margin or credit requirements;

- a material breakdown in our risk management procedures; and

- the occurrence of changes in our businesses that restrict our ability to access liquidity facilities.

Although we expect to actively manage the liquidity exposure of existing and future hedging arrangements, given the size of the long-term hedging program, any significant increase in the price of natural gas could result in us being required to provide cash or letter of credit collateral in substantial amounts. While these potential posting obligations are primarily supported by the liquidity facilities, for certain transactions there is a potential for the timing of postings on the commodity contract obligations to vary from the timing of borrowings from the senior secured cash posting credit facility of TCEH. Any perceived reduction in our credit quality could result in clearing agents or other counterparties requesting additional collateral. We have credit concentration risk related to the limited number of lenders that provide liquidity to support our hedging program. A deterioration of the credit quality of such lenders could materially affect our ability to continue such program on acceptable terms. An event of default by one or more of our hedge counterparties could result in termination-related settlement payments that reduce available liquidity if we owe amounts related to commodity contracts or delays in receipts of expected settlements if the hedge counterparties owe amounts to us. These events could have a material negative impact on our financial condition and results of operations.

In the event that the governmental agencies that regulate the activities of our businesses determine that the creditworthiness of any such business is inadequate to support our activities, such agencies could require us to provide additional cash or letter of credit collateral in substantial amounts to qualify to do business.

In the event our liquidity facilities are being used largely to support the long-term hedging program as a result of a significant increase in the price of natural gas or significant reduction in credit quality, we may have to forego certain capital expenditures or other investments in our competitive businesses or other business opportunities.

42

EFIHMW00223073

Further, a lack of available liquidity could adversely impact the evaluation of our creditworthiness by counterparties and rating agencies. In particular, such concerns by existing and potential counterparties could significantly limit TCEH's wholesale markets activities, including its long-term hedging program.

***The costs of providing pension and OPEB and related funding requirements are subject to changes in pension fund values, changing demographics and fluctuating actuarial assumptions and may have a material adverse effect on our results of operations and financial condition.***

We provide pension benefits based on either a traditional defined benefit formula or a cash balance formula and also provide certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from us. Our costs of providing such benefits and related funding requirements are dependent upon numerous factors, assumptions and estimates and are subject to changes in these factors, assumptions and estimates, including the market value of the assets funding our pension and OPEB plans. Fluctuations in financial market returns as well as changes in general interest rates may result in increased or decreased benefit costs in future periods.

The substantial dislocation in the financial markets that began in 2008 caused the value of the investments that fund our pension and OPEB plans to significantly differ from, and may alter the values and actuarial assumptions we use to calculate, our projected future pension plan expense and OPEB costs. A continuation or further decline in the value of these investments could increase the expenses of the pension plan and the costs of the OPEB plans and related funding requirements in the future. Our costs of providing such benefits and related funding requirements are also subject to changing employee demographics (including but not limited to age, compensation levels and years of accredited service), the level of contributions made to retiree plans, expected and actual earnings on plan assets and the discount rates used in determining the projected benefit obligation. Changes made to the provisions of the plans may also impact current and future benefit costs. Fluctuations in financial market returns as well as changes in general interest rates may result in increased or decreased benefit costs in future periods.

***As was the case in the third quarter 2010 (as discussed in Note 4 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 included elsewhere in this prospectus), goodwill and/or other intangible assets not subject to amortization that we have recorded in connection with the Merger are subject to at least annual impairment evaluations, and as a result, we could be required to write off some or all of this goodwill and other intangible assets, which may cause adverse impacts on our financial condition and results of operations.***

In accordance with accounting standards, goodwill and certain other indefinite-lived intangible assets that are not subject to amortization are reviewed annually or more frequently for impairment, if certain conditions exist, and may be impaired. Any reduction in or impairment of the value of goodwill or other intangible assets will result in a charge against earnings, which could cause a material adverse impact on our reported results of operations and financial position.

***The loss of the services of our key management and personnel could adversely affect our ability to operate our businesses.***

Our future success will depend on our ability to continue to attract and retain highly qualified personnel. We compete for such personnel with many other companies, in and outside our industry, government entities and other organizations. We may not be successful in retaining current personnel or in hiring or retaining qualified personnel in the future. Our failure to attract new personnel or retain existing personnel could have a material adverse effect on our businesses.

43

Confidential

**USE OF PROCEEDS**

We will not receive any cash proceeds from the issuance of the exchange notes pursuant to the exchange offer. In consideration for issuing the exchange notes as contemplated in this prospectus, we will receive in exchange a like principal amount of outstanding notes, the terms of which are identical in all material respects to the exchange notes, except that the exchange notes will not contain terms with respect to transfer restrictions, registration rights and additional interest for failure to observe certain obligations in the registration rights agreement. The outstanding notes surrendered in exchange for the exchange notes will be retired and cancelled and cannot be reissued. Accordingly, the issuance of the exchange notes will not result in any change in our capitalization.

44

# CAPITALIZATION

The following table summarizes our cash position and capitalization as of September 30, 2010 as reported and as adjusted, with the latter reflecting the November 2010 debt exchange transaction described in "Propsectus Summary — Recent Developments" and October 2010 debt issuance, exchange and repurchase transactions described in Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010. This table should be read in conjunction with the information included under the headings "Use of Proceeds," "Selected Historical Consolidated Financial Data for EFH Corp. and Its Subsidiaries," "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three and Nine Months Ended September 30, 2010" and our consolidated financial statements and related notes included elsewhere in this prospectus.

| | As of September 30, 2010 | |
| | As Reported | As Adjusted |
|---|---:|---:|
| Cash and cash equivalents (a) | 652 | 614 |
| **Debt:** | | |
| EFH Corp.: | | |
| 5.550% Series P Senior Notes due 2014 (b) | 434 | 434 |
| 6.500% Series Q Senior Notes due 2024 (b) | 740 | 740 |
| 6.550% Series R Senior Notes due 2034 (b) | 744 | 744 |
| 10.875% Senior Notes due 2017 (c) | 359 | 359 |
| 11.250/12.000% Senior Toggle Notes due 2017 (c) | 539 | 539 |
| 9.75% Senior Secured Notes due 2019 | 115 | 115 |
| 10.000% Senior Secured Notes due 2020 | 1,061 | 1,061 |
| Capital lease obligations | 5 | 5 |
| Unamortized fair value discount | (485) | (485) |
| Total EFH Corp. debt | 3,512 | 3,512 |
| EFIH: (d) | | |
| 9.75% Senior Secured Notes due 2019 | 141 | 141 |
| 10.000% Senior Secured Notes due 2020 | 2,180 | 2,180 |
| Total EFIH debt | 2,321 | 2,321 |
| EFCH: (e) | | |
| Secured debt | 98 | 98 |
| Unsecured debt | 9 | 9 |
| Unamortized fair value discount | (10) | (10) |
| Total EFCH debt | 97 | 97 |
| TCEH: | | |
| Senior Secured Credit Facilities (f) | 21,310 | 21,310 |
| 10.25% Senior Notes due 2015 (including Series B) (f) | 4,663 | 3,164 |
| 10.50/11.25% Senior Toggle Notes due 2016 (f) | 1,992 | 1,308 |
| 15% Senior Secured Second Lien Notes due 2021 (including Series B) | — | 1,571 |
| Other secured debt (g) | 350 | 350 |
| Other unsecured debt | 1,540 | 1,540 |
| Unamortized fair value discount | (139) | (139) |
| Total TCEH debt | 29,716 | 29,104 |
| Debt of other subsidiaries: | | |
| Secured debt (h) | 83 | 83 |
| Total consolidated debt | 35,729 | 35,117 |
| EFH Corp. shareholders' equity | (6,139) | (5,721) |
| Noncontrolling interest in subsidiaries | 71 | 71 |
| Total capitalization | $ 29,661 | $ 29,467 |

(a)    The as adjusted amount reflects cash paid to acquire debt in October 2010, including accrued interest paid. Proceeds from the October 2010 issuance of the TCEH Senior Secured Second Lien Notes were used to repurchase TCEH Senior Notes except for $53 million being held in escrow pending use for payment or repurchase of certain TCEH debt, which is accounted for as restricted cash and thus excluded.

(b)    Amounts exclude an aggregate $18 million of the Legacy Notes that are held by EFIH and eliminated in consolidation.

45

EFIHMW00223076

(c)  Amounts exclude $1.428 billion and $2.166 billion of EFH Corp. 10.875% Notes and EFH Corp. Toggle Notes, respectively, that are held by EFIH and eliminated in consolidation.

(d)  Excludes the push down effects of EFIH's guarantees of the notes, the EFH Corp. Senior Notes and the EFH Corp. Senior Secured Notes.

(e)  Excludes the push down effects of EFCH's guarantees of the notes, the EFH Corp. Senior Notes and the EFH Corp. Senior Secured Notes.

(f)  As reported amounts exclude $20 million, $337 million and $70 million of the TCEH Senior Secured Facilities, TCEH 10.25% Notes and TCEH Toggle Notes, respectively, that are held either by EFH Corp. or EFIH and eliminated in consolidation. As adjusted amounts exclude an additional $9 million of TCEH Toggle Notes repurchased and held by EFH Corp. and for the TCEH 10.25% Notes and TCEH Toggle Notes reflect the TCEH exchange and repurchases with proceeds from the issuance of the TCEH Senior Secured Second Lien Notes.

(g)  Includes $228 million of funding under the accounts receivable securitization program.

(h)  Consists of a building financing lease.

46

EFIHMW00223077

**PX 045**
**Page 54 of 561**

## SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA FOR
## EFH CORP. AND ITS SUBSIDIARIES

The following table sets forth our selected historical consolidated financial data as of and for the periods indicated. The selected historical financial data as of December 31, 2009 and 2008 (Successor) and for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) have been derived from our audited historical consolidated financial statements and related notes included elsewhere in this prospectus. The historical financial data as of December 31, 2007 (Successor), 2006 (Predecessor) and 2005 (Predecessor) and for the years ended December 31, 2006 and 2005 (Predecessor) have been derived from our audited historical consolidated financial statements that are not included in this prospectus. The "Predecessor" period reflects the period prior to the Merger, which occurred on October 10, 2007. The historical financial data as of September 30, 2010 and for the nine months ended September 30, 2010 and 2009 have been derived from our unaudited historical interim condensed consolidated financial statements and related notes included elsewhere in this prospectus. In EFH Corp.'s opinion, such unaudited interim financial data reflects all adjustments, consisting of normal recurring accruals, necessary for the fair presentation of the results for those periods. The results of operations for the interim periods, for seasonal and other factors, are not necessarily indicative of the results to be expected for the full year or any future period.

The selected historical consolidated financial data should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009" and "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three and Nine Months Ended September 30, 2010," and our historical consolidated financial statements and related notes that are included elsewhere in this prospectus.

| | Successor | | | | Predecessor | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Year Ended December 31, | | Period from October 11, 2007 through December 31, 2007 | | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, | |
| | 2009 | 2008 | | | | 2006 | 2005 |
| | (millions of dollars, except ratios) | | | | | | |
| Operating Revenues | $9,546 | $11,364 | $ 1,994 | | $ 8,044 | $10,703 | $10,826 |
| Income (loss) from continuing operations before extraordinary loss and cumulative effect of changes in accounting principles | 408 | (9,998) | (1,361) | | 699 | 2,465 | 1,775 |
| Income from discontinued operations, net of tax effect | — | — | 1 | | 24 | 87 | 5 |
| Extraordinary loss, net of tax effect | — | — | — | | — | — | (50) |
| Cumulative effect of changes in accounting principles, net of tax effect | — | — | — | | — | — | (8) |
| Preference stock dividends | — | — | — | | — | — | 10 |
| Net income (loss) | 408 | (9,998) | (1,360) | | 723 | 2,552 | 1,712 |
| Net income (loss) attributable to noncontrolling interests | (64) | 160 | — | | | | |
| Net income (loss) attributable to EFH Corp. | 344 | (9,838) | (1,360) | | 723 | 2,552 | 1,712 |
| Ratio of earnings to fixed charges (a) | 1.24 | — | — | | 2.30 | 5.11 | 3.80 |
| Ratio of earnings to combined fixed charges and preference dividends (a) | 1.24 | — | — | | 2.30 | 5.11 | 3.74 |
| Embedded interest cost on long-term debt — end of period (b) | 7.2% | 9.2% | 9.5% | | 6.5% | 6.6% | 6.3% |
| Capital expenditures, including nuclear fuel | $2,545 | $ 3,015 | $ 716 | | $ 2,542 | $ 2,337 | $ 1,148 |

47

EFIHMW00223078

| | Successor December 31, | | | Predecessor December 31, | |
| | 2009 | 2008 | 2007 | 2006 | 2005 |
| | (millions of dollars, except ratios) | | | | |
| Total assets — end of year | $59,662 | $59,263 | $64,804 | $27,216 | $27,978 |
| Property, plant & equipment — net — end of year | $30,108 | $29,522 | $28,650 | $18,569 | $17,006 |
| Goodwill and intangible assets — end of year | $17,192 | $17,379 | $27,319 | $    729 | $    728 |
| Capitalization — end of year | | | | | |
|   Equity-linked debt securities | $    — | $    — | $    — | $    — | $    179 |
|   All other long-term debt, less amounts due currently | 41,440 | 40,838 | 38,603 | 10,631 | 11,153 |
|   Preferred stock of subsidiaries (not subject to mandatory redemption) (c) | — | — | — | — | — |
|   EFH Corp. common stock equity | (3,247) | (3,673) | 6,685 | 2,140 | 475 |
|   Noncontrolling interests in subsidiaries | 1,411 | 1,355 | — | — | — |
|     Total | $39,604 | $38,520 | $45,288 | $12,771 | $11,807 |
| Capitalization ratios — end of year | | | | | |
|   Equity-linked debt securities | —% | —% | —% | —% | 1.5% |
|   All other long-term debt, less amounts due currently | 104.6 | 106.0 | 85.2 | 83.2 | 94.5 |
|   Preferred stock of subsidiaries (c) | — | — | — | — | — |
|   EFH Corp. common stock equity | (8.2) | (9.5) | 14.8 | 16.8 | 4.0 |
|   Noncontrolling interests in subsidiaries | 3.6 | 3.5 | — | — | — |
|     Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Short-term borrowings — end of year | $ 1,569 | $ 1,237 | $ 1,718 | $ 1,491 | $    798 |
| Long-term debt due currently — end of year | $    417 | $    385 | $    513 | $    485 | $ 1,250 |

(a)    Fixed charges exceeded "earnings" (net loss) by $10.469 billion and $2.034 billion for the year ended December 31, 2008 and for the period from October 11, 2007 through December 31, 2007, respectively.

(b)    Represents the annual interest using year-end rates for variable rate debt and reflecting the effects of interest rate swaps (excluding unrealized mark-to-market gains or losses) and amortization of any discounts, premiums, issuance costs and any deferred gains/losses on reacquisitions divided by the carrying value of the debt plus or minus the unamortized balance of any discounts, premiums, issuance costs and gains/losses on reacquisitions at the end of the year.

(c)    Preferred stock outstanding at the end of 2008, 2007, 2006 and 2005 has a stated amount of $51 thousand. There was no outstanding preferred stock at the end of 2009.

Note: Although EFH Corp. continued as the same legal entity after the Merger, its "Selected Historical Consolidated Financial Data" for periods preceding the Merger and for periods succeeding the Merger are presented as the consolidated financial statements of the "Predecessor" and the "Successor," respectively. See "Basis of Presentation" in Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009. The consolidated financial statements of the Successor reflect the application of "purchase accounting." Results for 2008 were significantly impacted by impairment charges related to goodwill, trade name and emission allowances intangible assets and natural gas-fueled generation facilities. Results for 2010 reflect the prospective adoption of amended guidance regarding consolidation accounting standards related to variable interest entities that resulted in the deconsolidation of Oncor Holdings as discussed in Note 3 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 included elsewhere in this prospectus and amended guidance regarding transfers of financial assets that resulted in the accounts receivable securitization program no longer being accounted for as a sale of accounts receivable and the funding under the program now reported as short-term borrowings as discussed in Note 5 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 included elsewhere in this prospectus. Results for 2010 were significantly impacted by a goodwill impairment charge as discussed in Note 4 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010.

48

EFIHMW00223079

PX 045
Page 56 of 561

| | Successor | | | |
|---|---|---|---|---|
| | Nine Months Ended September 30, 2010 | | Nine Months Ended September 30, 2009 | |
| | (millions of dollars, except ratios) | | | |
| Operating revenues | $ | 6,599 | $ | 7,366 |
| Net income (loss) | $ | (2,973) | $ | 261 |
| Net income attributable to noncontrolling interests | $ | — | $ | (54) |
| Net income (loss) attributable to EFH Corp. | $ | (2,973) | $ | 207 |
| Ratio of earnings to fixed charges (a) | | — | | 1.21 |
| Ratio of earnings to combined fixed charges and preference dividends (a) | | — | | 1.21 |
| Capital expenditures, including nuclear fuel | $ | 793 | $ | 2,034 |

| | Successor | |
|---|---|---|
| | September 30, 2010 | |
| | (millions of dollars, except ratios) | |
| Total assets | $ | 47,114 |
| Property, plant & equipment — net | $ | 20,530 |
| Goodwill and intangible assets | $ | 8,618 |
| Capitalization | | |
| Long-term debt, less amounts due currently | $ | 35,169 |
| EFH Corp. shareholders' equity | | (6,139) |
| Noncontrolling interests in subsidiaries | | 71 |
| Total | $ | 29,101 |
| Capitalization ratios | | |
| Long-term debt, less amounts due currently | | 120.9% |
| EFH Corp. shareholders' equity | | (21.1) |
| Noncontrolling interests in subsidiaries | | 0.2 |
| Total | | 100% |
| Short-term borrowings | $ | 308 |
| Long-term debt due currently | $ | 252 |
| Embedded interest cost on long-term debt — end of period (b) | | 8.6% |

(a)   Fixed charges exceeded earnings by $2.736 billion for the nine months ended September 30, 2010.

(b)   Represents the annual interest using end of period rates for variable rate debt and reflecting the effects of interest rate swaps (excluding unrealized mark-to-market gains or losses) and amortization of any discounts, premiums, issuance costs and any deferred gains/losses on reacquisitions divided by the carrying value of the debt plus or minus the unamortized balance of any discounts, premiums, issuance costs and gains/losses on reacquisitions at the end of the period.

**Quarterly Information (unaudited)**

Results of operations by quarter are summarized below. In the opinion of EFH Corp., all adjustments (consisting of normal recurring accruals) necessary for a fair statement of such amounts have been made. Quarterly results are not necessarily indicative of a full year's operations because of seasonal and other factors. All amounts are in millions of dollars.

| | Successor | | | | | |
|---|---|---|---|---|---|---|
| **2010:** | First Quarter | | Second Quarter | | Third Quarter (a) | |
| Operating revenues | $ | 1,999 | $ | 1,993 | | 2,607 |
| Net income (loss) | | 355 | | (426) | | (2,902) |
| Net income (loss) attributable to EFH Corp. | $ | 355 | $ | (426) | $ | (2,902) |

49

Confidential

|  | Successor | | | |
|  | First Quarter (b) | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| **2009:** | | | | |
| Operating revenues | $ 2,139 | $ 2,342 | $ 2,885 | $ 2,180 |
| Net income (loss) | 454 | (139) | (54) | 147 |
| Net loss attributable to noncontrolling interests | (12) | (16) | (26) | (10) |
| Net income (loss) attributable to EFH Corp. | $ 442 | $ (155) | $ (80) | $ 137 |

|  | Successor | | | |
|  | First Quarter | Second Quarter | Third Quarter (c) | Fourth Quarter (d) |
|---|---|---|---|---|
| **2008:** | | | | |
| Operating revenues | $ 2,354 | $ 2,951 | $ 3,695 | $ 2,364 |
| Net income (loss) | (1,269) | (3,331) | 3,617 | (9,015) |
| Net loss attributable to noncontrolling interests | — | — | — | 160 |
| Net income (loss) attributable to EFH Corp. | $ (1,269) | $(3,331) | $ 3,617 | $ (8,855) |

_____

(a)    Net income (loss) amounts include the effects of impairment charge related to goodwill (see Note 4 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 included elsewhere in this prospectus).

(b)    Net income (loss) amounts include the effects of impairment charge related to goodwill (see Note 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 included elsewhere in this prospectus).

(c)    Net income (loss) amounts include the effects of impairment charge related to emission allowances intangible assets (see Note 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 included elsewhere in this prospectus).

(d)    Net income (loss) amounts include the effects of impairment charges related to goodwill, trade name and emission allowances intangible assets and natural gas-fueled generation facilities (see Notes 3 and 5 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 included elsewhere in this prospectus).

50

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS AS OF AND
## FOR THE THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2010

*The following discussion and analysis of our financial condition and results of operations covers the three and nine months ended September 30, 2010 and 2009, and was included in EFH Corp.'s Quarterly Report on Form 10-Q for the quarter ended September 30, 2010 filed with the SEC on October 29, 2010 (the "3rd Quarter MD&A"). You should read the 3rd Quarter MD&A in conjunction with the "Selected Historical Consolidated Financial Data for EFH Corp. and Its Subsidiaries" and EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 and the notes to those statements, each included elsewhere in this prospectus. The 3rd Quarter MD&A should also be read in conjunction with the disclosure set forth in "Prospectus Summary — Recent Developments," which provides material updates to certain of the information contained in the 3rd Quarter MD&A, as well as with "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009" and EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 and the notes to those statements, each included elsewhere in this prospectus. The 3rd Quarter MD&A contains forward-looking statements and involves numerous risks and uncertainties, including, but not limited to, those described in the "Risk Factors" section of this prospectus. Actual results may differ materially from those contained in any forward-looking statements.*

*You also should read the 3rd Quarter MD&A in conjunction with "Our Businesses" for a discussion of certain of our important financial policies and objectives; performance measures and operational factors we use to evaluate our financial condition and operating performance; and our business segments.*

*References to "EFH Corp." in the 3rd Quarter MD&A refer to Energy Future Holdings Corp. and/or its subsidiaries, depending on context. See "Glossary" for other defined terms used in the 3rd Quarter MD&A. All dollar amounts in the tables in the 3rd Quarter MD&A are stated in millions of U.S. dollars unless otherwise stated.*

### BUSINESS

We are a Dallas-based holding company with operations consisting principally of our TCEH and Oncor subsidiaries. TCEH is a holding company for subsidiaries engaged in competitive electricity market activities largely in Texas including electricity generation, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales. Oncor is a majority-owned (approximately 80%) subsidiary engaged in regulated electricity transmission and distribution operations in Texas. Various "ring-fencing" measures have been taken to enhance the credit quality of Oncor. See Notes 1 and 3 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for a description of the material features of these "ring-fencing" measures and for a discussion of the deconsolidation of Oncor (and its majority owner, Oncor Holdings) in 2010 as the result of a change in accounting principles.

### Operating Segments

We have aligned and report our business activities as two operating segments: the Competitive Electric segment and the Regulated Delivery segment. The Competitive Electric segment is principally comprised of TCEH. The Regulated Delivery segment is comprised of Oncor and its wholly-owned bankruptcy-remote financing subsidiary. See Notes 1 and 3 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for discussion of the deconsolidation of Oncor Holdings and, accordingly, Oncor and the Regulated Delivery segment, in 2010.

See Note 15 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for further information regarding reportable business segments.

51

EFIHMW00223082

### Significant Activities and Events

*Natural Gas Prices and Long-Term Hedging Program* — TCEH has a long-term hedging program designed to reduce exposure to changes in future electricity prices due to changes in the price of natural gas. Under the program, the company has entered into market transactions involving natural gas-related financial instruments, and as of September 30, 2010, has effectively sold forward approximately 1.25 billion MMBtu of natural gas (equivalent to the natural gas exposure of approximately 156,000 GWh at an assumed 8.0 market heat rate) for the period from October 1, 2010 through December 31, 2014 at weighted average annual hedge prices ranging from $7.82 per MMBtu to $7.19 per MMBtu.

These transactions, as well as forward power sales, have effectively hedged an estimated 64% of the natural gas price exposure related to TCEH's expected generation output for the period beginning October 1, 2010 and ending December 31, 2014 (on an average basis for such period and assuming an 8.0 market heat rate). The hedges were entered into with the continuing expectation that wholesale electricity prices in ERCOT will be highly correlated with natural gas prices, which is expected to be the marginal fuel for the purpose of setting electricity prices approximately 75% to 90% of the time. If the correlation changes in the future, the cash flows targeted under the long-term hedging program may not be achieved.

The long-term hedging program is comprised primarily of contracts with prices based on the New York Mercantile Exchange (NYMEX) Henry Hub pricing point. However, because there are other local and regional natural gas pricing points such as Houston Ship Channel, future wholesale power prices in ERCOT may not correlate as closely to the Henry Hub pricing as other pricing points, which could decrease the effectiveness of the positions in the long-term hedging program in mitigating power price exposure. The company has hedged more than 95% of the Houston Ship Channel versus Henry Hub pricing point risk for the fourth quarter 2010 and more than 80% for 2011.

The company has entered into related put and call transactions (referred to as collars), primarily for year 2014 of the program, that effectively hedge natural gas prices within a range. These transactions represented 9% of the positions in the long-term hedging program as of September 30, 2010, with the approximate weighted average strike prices under the collars being a floor of $7.80 per MMBtu and a ceiling of $11.75 per MMBtu. The company expects to use financial instruments, including collars, in future hedging activity under the long-term hedging program.

The following table summarizes the natural gas hedges in the long-term hedging program as of September 30, 2010:

| | Measure | Balance 2010 (a) | 2011 | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|---|---|
| Natural gas hedge volumes (b) | mm MMBtu | ~84 | ~315 | ~454 | ~285 | ~112 | ~1,250 |
| Weighted average hedge price (c) | $/MMBtu | ~7.82 | ~7.56 | ~7.36 | ~7.19 | ~7.80 | — |
| Weighted average market price (d) | $/MMBtu | ~3.94 | ~4.44 | ~5.07 | ~5.29 | ~5.42 | — |

(a)   Balance of 2010 is from October 1, 2010 through December 31, 2010.

(b)   Where collars are reflected, the volumes are estimated based on the natural gas price sensitivity (i.e., delta position) of the derivatives. The notional volumes for collars are approximately 150 million MMBtu, which corresponds to a delta position of approximately 113 million MMBtu in 2014.

(c)   Weighted average hedge prices are based on NYMEX Henry Hub prices of forward natural gas sales positions in the long-term hedging program (excluding the impact of offsetting purchases for rebalancing and pricing point basis transactions). Where collars are reflected, sales price represents the collar floor price.

(d)   Based on NYMEX Henry Hub prices.

Changes in the fair value of the instruments in the long-term hedging program are being recorded as unrealized gains and losses in net gain from commodity hedging and trading activities in the statement of income, which has and could continue to result in significant volatility in reported net income. Based on the size of the long-term hedging program as of September 30, 2010, a $1.00/MMBtu change in natural gas prices across the hedged period would result in the recognition of up to approximately $1.25 billion in pretax unrealized mark-to-market gains or losses.

52

EFIHMW00223083

Unrealized mark-to-market net gains related to the long-term hedging program are as follows:

| | Period Ended September 30, 2010 | |
| --- | --- | --- |
| | Three Months | Nine Months |
| Effect of natural gas market price changes on open positions | $    934 | $    2,353 |
| Reversals of previously recorded amounts on positions settled | (263) | (792) |
| Total unrealized effect (pre-tax) | $    671 | $    1,561 |

The cumulative unrealized mark-to-market net gain related to positions in the long-term hedging program totaled $3.539 billion and $1.978 billion as of September 30, 2010 and December 31, 2009, respectively. See discussion below under "Operating Results" for realized net gains from hedging activities, which amounts are largely related to the long-term hedging program.

Given the volatility of natural gas prices, it is not possible to predict future reported unrealized mark-to-market gains or losses and the actual gains or losses that will ultimately be realized upon settlement of the hedge positions in future years. If natural gas prices at settlement are lower than the prices of the hedge positions, the hedges are expected to mitigate the otherwise negative effect on earnings of lower wholesale electricity prices. However, if natural gas prices at settlement are higher than the prices of the hedge positions, the hedges are expected to dampen the otherwise positive effect on earnings of higher wholesale electricity prices and will in this context be viewed as having resulted in an opportunity cost.

The significant cumulative unrealized mark-to-market net gain related to positions in the long-term hedging program reflects declining forward market natural gas prices. As previously disclosed, forward natural gas prices have generally trended downward since mid-2008 as shown in the table of forward NYMEX Henry Hub natural gas prices below. While the long-term hedging program is designed to mitigate the effect on earnings of low wholesale power prices, due to low natural gas prices, these market conditions are challenging to the long-term profitability of our generation assets. Specifically, these lower natural gas prices and the correlated effect in ERCOT on power prices could have a material adverse impact on the overall profitability of our generation assets for periods in which we do not have significant hedge positions. A continuation or worsening of these market conditions would limit our ability to hedge our wholesale power revenues at sufficient price levels to support our interest payments and debt maturities and could adversely impact our ability to refinance our substantial debt due in 2014.

Also see discussion in Note 4 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 regarding the goodwill impairment charge recorded in the three months ended September 30, 2010.

| | Forward Market Prices for Calendar Year ($/MMBtu) (a) | | | | |
| --- | --- | --- | --- | --- | --- |
| Date | 2010 (b) | 2011 | 2012 | 2013 | 2014 |
| June 30, 2008 | $11.24 | $10.78 | $10.74 | $10.90 | $11.12 |
| September 30, 2008 | $ 8.58 | $ 8.54 | $ 8.41 | $ 8.30 | $ 8.30 |
| December 31, 2008 | $ 7.13 | $ 7.31 | $ 7.23 | $ 7.15 | $ 7.15 |
| March 31, 2009 | $ 5.93 | $ 6.67 | $ 6.96 | $ 7.11 | $ 7.18 |
| June 30, 2009 | $ 6.06 | $ 6.89 | $ 7.16 | $ 7.30 | $ 7.43 |
| September 30, 2009 | $ 6.21 | $ 6.87 | $ 7.00 | $ 7.06 | $ 7.17 |
| December 31, 2009 | $ 5.79 | $ 6.34 | $ 6.53 | $ 6.67 | $ 6.84 |
| March 31, 2010 | $ 4.27 | $ 5.34 | $ 5.79 | $ 6.07 | $ 6.36 |
| June 30, 2010 | $ 4.82 | $ 5.34 | $ 5.68 | $ 5.89 | $ 6.10 |
| September 30, 2010 | $ 3.94 | $ 4.44 | $ 5.07 | $ 5.29 | $ 5.42 |

(a)    Based on NYMEX Henry Hub prices.

(b)    For September 30, 2010, June 30, 2010 and March 31, 2010, natural gas prices for 2010 represent the average of forward prices for October through December, July through December and April through December, respectively.

Confidential

EFIHMW00223084

As of September 30, 2010, more than 95% of the long-term hedging program transactions were directly or indirectly secured by a first-lien interest in TCEH's assets (including the transactions supported by the TCEH Commodity Collateral Posting Facility — see discussion below under "Financial Condition — Liquidity and Capital Resources") thereby reducing the cash and letter of credit collateral requirements for the hedging program.

The following sensitivity table provides estimates of the potential impact (in $ millions) of movements in natural gas and certain other commodity prices and market heat rates on realized pre-tax earnings for the periods presented. The estimates related to price sensitivity are based on TCEH's unhedged position and forward prices as of September 30, 2010, which for natural gas reflects estimates of electricity generation less amounts hedged through the long-term natural gas hedging program and amounts under existing wholesale and retail sales contracts. On a rolling twelve-month basis, the substantial majority of retail sales under month-to-month arrangements are deemed to be under contract.

|  | Balance 2010 (a) | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| $1.00/MMBtu change in gas price (b) | $  ~2 | $~50 | $~80 | $~295 | $~480 |
| 0.1/MMBtu/MWh change in market heat rate (c) | $  — | $~15 | $~38 | $ ~43 | $ ~46 |
| $1.00/gallon change in diesel fuel price | $  ~1 | $ ~1 | $ ~5 | $ ~46 | $ ~40 |

(a)   Balance of 2010 is from November 1, 2010 through December 31, 2010.

(b)   Assumes conversion of electricity positions based on an approximate 8.0 market heat rate with natural gas being on the margin 75% to 90% of the time (i.e., when coal is forecast to be on the margin, no natural gas position is assumed to be generated).

(c)   Based on Houston Ship Channel natural gas prices as of September 30, 2010.

*Liability Management Program* — As of September 30, 2010, EFH Corp. and its subsidiaries (excluding Oncor and its subsidiaries) had $36 billion aggregate principal amount of debt outstanding. Of that amount, $22 billion matures in 2014 and the majority of the remaining amount matures from 2015 to 2017. As a result, in October 2009, we implemented a liability management program focused on improving our balance sheet by reducing debt and extending debt maturities.

Year-to-date October 28, 2010, we acquired $5.635 billion aggregate principal amount of EFH Corp. and TCEH outstanding debt. As consideration for this acquired debt, EFH Corp. issued $561 million aggregate principal amount of EFH Corp. 10% Notes and paid $252 million in cash (excluding accrued interest payments), EFIH issued $2.180 billion aggregate principal amount of EFIH 10% Notes and paid $500 million in cash (excluding accrued interest payments), and TCEH issued $336 million aggregate principal amount of TCEH 15% Senior Secured Second Lien Notes and paid $290 million in cash (excluding accrued interest payments).

The following table details our liability management program from its inception in October 2009 through October 2010 (debt amounts are principal amounts):

| Security | Debt Acquired | Debt Issued/Cash Paid |
|---|---|---|
| EFH Corp 10.875% Notes due 2017 | $  1,641 | $  — |
| EFH Corp. Toggle Notes due 2017 | 2,432 | — |
| EFH Corp. 5.55% Series P Senior Notes due 2014 | 566 | — |
| EFH Corp. 6.50% Series Q Senior Notes due 2024 | 10 | — |
| EFH Corp. 6.55% Series R Senior Notes due 2034 | 6 | — |
| TCEH 10.25% Notes due 2015 | 986 | — |
| TCEH Toggle Notes due 2016 | 331 | — |
| Term Loans under the TCEH Senior Secured Facilities due 2014 | 20 | — |
| EFH Corp. and EFIH 9.75% Notes due 2019 | — | 256 |
| EFH Corp 10% Notes due 2020 | — | 561 |
| EFIH 10% Notes due 2020 | — | 2,180 |
| TCEH 15% Notes due 2021 | — | 336 |
| Cash (a) | — | 1,042 |
| Total | $  5,992 | $  4,375 |

54

EFIHMW00223085

_____

(a)   Funded partially by a portion ($95 million) of the proceeds from the $500 million principal amount of EFH Corp. 10% Notes issued in January 2010 and a portion ($290 million) of the proceeds from the $350 million principal amount of TCEH 15% Senior Secured Second Lien Notes issued in October 2010.

The transactions resulted in the capture of $1.617 billion of debt discount and aggregate projected interest savings (pre-tax) through 2014 of approximately $1.1 billion.

See Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for further discussion of the transactions completed under its liability management program.

**TCEH Interest Rate Swap Transactions** — As of September 30, 2010, TCEH had entered into a series of interest rate swaps that effectively fix the interest rates at between 7.3% and 8.3% on $16.30 billion principal amount of its senior secured debt maturing from 2010 to 2014. All of these swaps were entered into prior to January 1, 2010. Taking into consideration these swap transactions, 11% of our total long-term debt portfolio as of September 30, 2010 was exposed to variable interest rate risk. TCEH also entered into interest rate basis swap transactions, which further reduce the fixed (through swaps) borrowing costs, related to an aggregate of $16.30 billion principal amount of senior secured debt, including swaps entered into in 2010 related to $2.55 billion principal amount of debt and reflecting the expiration in 2010 of swaps related to an aggregate $2.50 billion principal amount of debt. All of these swaps were entered into prior to July 2010. We may enter into additional interest rate hedges from time to time.

Unrealized mark-to-market net losses related to all TCEH interest rate swaps, which are reported in interest expense and related charges, totaled $181 million and $542 million for the three and nine months ended September 30, 2010, respectively. The cumulative unrealized mark-to-market net liability related to all TCEH interest rate swaps totaled $1.755 billion and $1.212 billion as of September 30, 2010 and December 31, 2009, respectively, of which $120 million and $194 million (both pre-tax), respectively, was reported in accumulated other comprehensive income. These fair values can change materially as market conditions change, which could result in significant volatility in reported net income. See discussion in Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 regarding various interest rate swap transactions.

**Texas Generation Facilities Development** — TCEH has substantially completed a program to develop three lignite-fueled generation units (2 units at Oak Grove and 1 unit at Sandow) in Texas with a total estimated capacity of approximately 2,200 MW. The Sandow and first Oak Grove units achieved substantial completion (as defined in the EPC agreements) in the fourth quarter 2009, and the second Oak Grove unit achieved substantial completion in the second quarter 2010. We began depreciating the units and recognizing revenues and fuel costs for accounting purposes in those respective periods. Aggregate cash capital expenditures for these three units are expected to total approximately $3.25 billion including all construction, site preparation and mining development costs, of which $3.23 billion was spent as of September 30, 2010. Total recorded costs, including purchase accounting fair value adjustments and capitalized interest, are expected to total approximately $4.8 billion, and the balance was $4.7 billion as of September 30, 2010. See discussion in Note 7 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 regarding contingencies related to these units.

**Idling of Natural Gas-Fueled Units** — In September 2010, after receiving affirmation from ERCOT in April 2010, we mothballed (idled) four of our natural gas-fueled units, totaling 1,856 MW of capacity (1,933 MW installed nameplate capacity). As discussed in the 2009 Form 10-K, in 2009 we retired 10 units, totaling 2,114 MW of capacity (2,226 MW installed nameplate capacity), mothballed three units, totaling 1,081 MW capacity (1,135 MW installed nameplate capacity) and entered into RMR (operational standby) agreements with ERCOT for two units, totaling 630 MW capacity (655 MW installed nameplate capacity).

In September 2010, we notified ERCOT of plans to retire eight currently mothballed natural gas-fueled units, totaling 2,633 MW of capacity (2,771 MW installed nameplate capacity) on December 31, 2010. No impairment is expected to be recorded as a result of the planned retirements. ERCOT may affirm the retirements or request RMR agreements for them.

55

Confidential

As of September 30, 2010, TCEH's operational fleet of natural gas-fueled generation facilities is generally used as peaking resources and consists of 16 units, totaling 2,848 MW installed nameplate capacity, including two units under RMR agreements and excluding eight units operated for unaffiliated parties and 11 mothballed units.

*Financial Services Reform Legislation* — In July 2010, the U.S. Congress enacted, and President Obama signed, financial reform legislation known as the Dodd-Frank Wall Street Reform and Consumer Protection Act (the Financial Reform Act). The primary purposes of the Financial Reform Act are, among other things, to address systemic risk in the financial system; to establish a Bureau of Consumer Financial Protection with broad powers to enforce consumer protection laws and promulgate rules against unfair, deceptive or abusive practices; to enhance regulation of the derivatives markets, including the requirement for central clearing of over-the-counter derivative instruments and additional capital and margin requirements for certain derivative market participants; and to implement a number of new corporate governance requirements for companies with listed or, in some cases, publicly-traded securities. While the legislation is broad and detailed, substantial portions of the legislation will require rulemaking by federal governmental agencies to either implement the standards set out in the legislation or to adopt new standards. As a result, the full scope and effect of the legislation will likely not be known for several years.

Title VII of the Financial Reform Act provides for the regulation of the over-the-counter (OTC) derivatives market. The Financial Reform Act generally requires OTC derivatives (including the types of asset-backed OTC derivatives that we use to hedge risks associated with commodity and interest rate exposure) to be cleared by a derivatives clearing organization. However, end-users that are non-financial entities using the swap to hedge or mitigate commercial risk are exempt from these clearing requirements. The type of asset-backed OTC derivatives that we use to hedge commodity and interest rate risk should be exempt from the clearing requirements. In addition, existing swaps are grandfathered from the clearing requirements.

The Financial Reform Act also requires the posting of cash collateral for uncleared swaps. Because these cash collateral requirements are unclear as to whether an end-user or its counterparty (i.e., swap dealer) is required to post cash collateral, there is a risk that the cash collateral requirement could be used to effectively negate the end-user clearing exemption. However, the legislative history of the Financial Reform Act suggests that it was not Congress' intent to require end-users (rather that such requirement applies to swap dealers) to post cash collateral with respect to swaps. If we were required to post cash collateral on our swap transactions, our liquidity would likely be materially impacted, and our ability to enter into OTC derivatives to hedge our commodity and interest rate risks would be significantly limited.

We cannot predict the outcome of the rulemakings to implement the OTC derivative market provisions of the Financial Reform Act. These rulemakings could negatively affect our ability to hedge our commodity and interest rate risks. The inability to hedge these risks would likely have a material adverse effect on our results of operations, financial condition or cash flows.

*Global Climate Change* — Several bills have been introduced in the U.S. Congress or advocated by the Obama Administration that are intended to address climate change using different approaches, including most prominently a cap on carbon emissions with emitters allowed to trade unused emission allowances (cap-and-trade). These bills include the Waxman-Markey bill, known as the American Clean Energy and Security Act of 2009 (Waxman-Markey), the Kerry-Boxer bill, known as the Clean Energy Jobs and American Power Act (Kerry-Boxer) and the Kerry-Lieberman bill, known as the American Power Act (Kerry-Lieberman). This proposed legislation is not law, but in June 2009 Waxman-Markey was passed by the U.S. House of Representatives and sent to the U.S. Senate for consideration. Kerry-Boxer was reported out of the U.S. Senate Environment and Public Works Committee, but has not been taken up by the Senate as a whole. Kerry-Lieberman was released by its sponsors in May 2010 when it appeared that progress on passing Kerry-Boxer had stalled.

56

EFIHMW00223087

Recent developments in the U.S. Congress indicate that the prospects for passage of any cap-and-trade legislation in this Congress are not likely. However, if any of them or similar legislation were to be adopted, our costs of compliance could be material.

In December 2009, the EPA issued a finding that GHG emissions endanger human health and the environment and that emissions from motor vehicles contribute to that endangerment. The EPA's finding required it to begin regulating GHG emissions from motor vehicles and ultimately stationary sources under existing provisions of the federal Clean Air Act. Following its endangerment finding, the EPA took three regulatory actions with respect to the control of GHG emissions. First, in March 2010, the EPA completed a reconsideration of a memorandum issued in December 2008 by then EPA Administrator Stephen Johnson on the issue of when the Clean Air Act's Prevention of Significant Deterioration (PSD) program would apply to newly identified pollutants such as GHG's. The EPA determined that the Clean Air Act's PSD permit requirements would apply when a nation-wide rule requiring the control of a pollutant takes effect. Under this determination, the earliest time that PSD permitting requirements would apply to GHG emissions from stationary sources, including our power generation facilities, would be January 2011 — the first date that new motor vehicles must meet the new GHG standards. Second, in April 2010, the EPA adopted GHG emission standards for certain new motor vehicles. Third, in June 2010, the EPA finalized its so-called "tailoring rule" that established new thresholds of GHG emissions for the applicability of permits under the Clean Air Act for stationary sources, including our power generation facilities. The EPA's tailoring rule defines the threshold of GHG emissions for determining applicability of the Clean Air Act's permitting programs and PSD program at levels greater than the lower emission thresholds contained in the Clean Air Act. In addition, in September 2009, the EPA issued a final rule requiring the reporting, by March 2011, of calendar year 2010 GHG emissions from specified large GHG emissions sources in the U.S. (such reporting rule would apply to our lignite-fueled generation facilities).

***Recent EPA Actions*** — The EPA has recently completed several regulatory actions establishing new requirements for control of certain emissions from sources that include coal-fueled generation facilities. It is also currently considering several other regulatory actions, as well as contemplating future additional regulatory actions, in each case that may affect our coal-fueled generation facilities.

Each of our coal-fueled generation facilities is currently equipped with substantial emissions control equipment. All of our coal-fueled generation facilities are equipped with activated carbon injection systems to reduce mercury emissions. Flue gas desulfurization systems designed primarily to reduce sulfur dioxide emissions are installed at Oak Grove Units 1 and 2, Sandow Units 4 and 5, Martin Lake Units 1, 2, and 3, and Monticello Unit 3. Selective catalytic reduction systems designed to reduce nitrogen oxide emissions are installed at Oak Grove Units 1 and 2 and Sandow Unit 4. Selective non-catalytic reduction systems designed to reduce nitrogen oxide emissions are installed at Sandow Unit 5, Monticello Units 1, 2, and 3, and Big Brown Units 1 and 2. Fabric filter systems designed primarily to reduce particulate matter emissions are installed at Oak Grove Units 1 and 2, Sandow Unit 5, Monticello Units 1 and 2, and Big Brown Units 1 and 2. Electrostatic precipitator systems designed primarily to reduce particulate matter emissions are installed at Sandow Unit 4, Martin Lake Units 1, 2, and 3, Monticello Units 1, 2, and 3, and Big Brown Units 1 and 2. Sandow Unit 5 uses a fluidized bed combustion process that facilitates control of nitrogen oxides and sulfur dioxide. Flue gas desulfurization systems, fabric filter systems, and electrostatic precipitator systems also assist in reducing mercury and other emissions.

There is no assurance that the currently-installed emissions control equipment at our coal-fueled generation facilities will satisfy the requirements under any future EPA or TCEQ regulations. Some of the potential EPA or TCEQ regulatory actions could require us to install significant additional control equipment, resulting in material costs of compliance for our generation units, including capital expenditures and higher operating costs. These costs could result in material adverse effects on our financial condition, liquidity and results of operations.

*Sulfur Dioxide, Nitrogen Oxide and Mercury Air Emissions* — Following the invalidation of the Clean Air Interstate Rule (CAIR) by the federal courts in July 2008, the EPA was required to revise CAIR to correct the shortcomings identified by the federal courts. In July 2010, the EPA released a proposed rule called the Clean Air Transport Rule (CATR). The CATR, as proposed, would replace CAIR in 2012 and would require no additional emission reductions for Luminant. However, we cannot predict the impact of a final rule on our business, results of operations and financial condition.

57

EFIHMW00223088

The Clean Air Act requires each state to monitor air quality for compliance with federal health standards. The EPA is required to periodically review, and if appropriate, revise all national ambient quality standards. The standards for ozone are not being achieved in several areas of Texas. The TCEQ adopted State Implementation Plan (SIP) rules in May 2007 to deal with eight-hour ozone standards, which required nitrogen oxide emission reductions from certain of our peaking natural gas-fueled units in the Dallas-Fort Worth area. In March 2008, the EPA made the eight-hour ozone standards more stringent. In January 2010, the EPA proposed to further reduce the eight-hour ozone standard and to adopt a secondary standard for the protection of sensitive vegetation from ozone-related damage. Since the EPA projects that SIP rules to address attainment of these new more stringent standards will not be required until December 2013, we cannot yet predict the impact of this action on our generation facilities. In January 2010, the EPA added a new one-hour nitrogen oxide National Ambient Air Quality standard that may require actions within Texas to reduce emissions. The TCEQ will be required to revise its monitoring network and submit an implementation plan with compliance required by January 2021/2022. In June 2010, the EPA adopted a new one-hour sulfur dioxide national ambient air quality standard that may require action within Texas to reduce sulfur dioxide emissions. The TCEQ will be required to conduct modeling and develop an implementation plan by 2014, pursuant to which compliance will be required by 2017, according to the EPA's implementation timeline. We cannot predict the impact of the new standards on our business, results of operations or financial condition until the TCEQ adopts (if required) an implementation plan with respect to the standards. If the TCEQ adopts implementation plans that require us to install additional emissions controls, or if the EPA adopts more stringent requirements through any of the number of potential rulemaking activities in which it is or may be engaged, we could incur material capital expenditures and higher operating costs, resulting in material adverse effects on our financial condition, liquidity and results of operations.

The EPA has also agreed, in a federal court consent decree, to publish proposed regulations concerning emissions of mercury and other hazardous air pollutants from electricity generating units by March 2011, and to finalize those regulations late in 2011. We cannot predict the substance of any final EPA regulations on such hazardous air pollutants. However, the EPA has informally indicated that recently proposed regulations regarding hazardous air pollutants from industrial boilers may serve as a template for the forthcoming electricity generating unit regulations. The industrial boiler regulations, if applied to electricity generating units, would likely require significant additions of control equipment. If required, such additions would result in material costs of compliance for our generation units, including capital expenditures to install new control equipment and higher operating costs, resulting in material adverse effects on our financial condition, liquidity and results of operations.

In October 2010, the EPA proposed to retroactively disapprove a portion of the SIP pursuant to which the state implements its program to achieve the EPA's National Ambient Air Quality Standards (NAAQS) under the Clean Air Act. In particular, the EPA proposes to retroactively disapprove certain standard permits for pollution control projects that the TCEQ adopted approximately 10 years ago. The EPA asserts that we hold such standard permits for two generation facilities (Big Brown and Stryker Creek). We are investigating the basis for the EPA's assertion. The EPA has proposed to disapprove this portion of the SIP while acknowledging that emissions covered by these standard permits do not threaten attainment or maintenance of the NAAQS under the Clean Air Act. We believe the TCEQ's adoption of the standard permit was consistent with the Clean Air Act. However, we cannot predict whether the EPA will take final action to disapprove this portion of the SIP. If the EPA takes final disapproval action, and if that causes us to undertake additional permitting activity and install additional emissions control equipment at our affected generation facilities, we could incur material capital expenditures, resulting in material adverse effects on our financial condition, liquidity and results of operations.

*Solid Waste, Including Fly Ash Associated with Lignite/Coal-Fueled Generation* — Treatment, storage and disposal of solid and hazardous waste are regulated at the federal and state level. In December 2008, an ash impoundment facility at a Tennessee Valley Authority (TVA) site ruptured, releasing a significant quantity of coal ash slurry. No impoundment failures of this magnitude have ever occurred at any of our impoundments, which are significantly smaller than TVA's and are inspected on a regular basis. We routinely sample groundwater monitoring wells to ensure compliance with all applicable regulations. As a result of the TVA ash impoundment failure, in May 2010, the EPA released a proposed rule that considers regulating coal combustion residuals as either a hazardous waste or a non-hazardous waste. We are unable to predict the requirements of a final rule; however, the potential cost of compliance could be material.

58

Confidential