*Oncor Technology Initiatives* — Oncor continues to invest in technology initiatives that include development of a modernized grid through the replacement of existing meters with advanced digital metering equipment and development of advanced digital communication, data management, real-time monitoring and outage detection capabilities. This modernized grid is expected to produce electricity service reliability improvements and provide the potential for additional products and services from REPs that will enable businesses and consumers to better manage their electricity usage and costs. Oncor's plans provide for the full deployment of over three million advanced meters to all residential and most non-residential retail electricity customers in Oncor's service area. The advanced meters can be read remotely, rather than by a meter reader physically visiting the location of each meter. Advanced meters facilitate automated demand side management, which allows consumers to monitor the amount of electricity they are consuming and adjust their electricity consumption habits.

As of September 30, 2010, Oncor has installed approximately 1,343,000 advanced digital meters, including approximately 683,000 during the nine months ended September 30, 2010. As the new meters are integrated, Oncor reports 15-minute interval, billing-quality electricity consumption data to ERCOT for market settlement purposes. The data makes it possible for REPs to support new programs and pricing options. Cumulative capital expenditures for the deployment of the advanced meter system totaled $324 million as of September 30, 2010. Oncor expects to complete installations of all three million meters by the end of 2012.

*Oncor Matters with the PUCT* — See discussion of these matters, including the awarded construction of CREZ-related transmission lines, below under "Regulatory Matters."

## RESULTS OF OPERATIONS

### Pro Forma Consolidated Financial Results

As the result of deconsolidation of Oncor Holdings effective 2010, the results of Oncor Holdings are reflected in the 2010 consolidated statement of income as equity in earnings of unconsolidated subsidiary (net of tax) instead of separately as revenues and expenses as they are shown for periods prior to January 1, 2010. The following pro forma results for the three and nine months ended September 30, 2009 are presented to provide for a meaningful comparison, along with the analyses on the following pages, of consolidated operating results in consideration of the deconsolidation of Oncor Holdings as discussed in Notes 1 and 3 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010.

| | Three Months Ended September 30, 2010 | Three Months Ended September 30, 2009 | | |
| --- | --- | --- | --- | --- |
| | | As Reported | Pro Forma Adjustments (a) | Pro Forma |
| | | (millions of dollars) | | |
| Operating revenues | $ 2,607 | $ 2,885 | $ (452) | $ 2,433 |
| Fuel, purchased power costs and delivery fees | (1,400) | (870) | (317) | (1,187) |
| Net gain from commodity hedging and trading activities | 992 | 123 | — | 123 |
| Operating costs | (197) | (388) | 228 | (160) |
| Depreciation and amortization | (352) | (456) | 147 | (309) |
| Selling, general and administrative expenses | (187) | (277) | 50 | (227) |
| Franchise and revenue-based taxes | (24) | (94) | 67 | (27) |
| Impairment of goodwill | (4,100) | — | — | — |
| Other income | 1,033 | 45 | (10) | 35 |
| Other deductions | (4) | (32) | 28 | (4) |
| Interest income | — | 18 | (3) | 15 |
| Interest expense and related charges | (1,018) | (1,039) | 75 | (964) |
| Loss before income taxes and equity in earnings of unconsolidated subsidiaries | (2,650) | (85) | (187) | (272) |
| Income tax (expense) benefit | (370) | 31 | 56 | 87 |
| Equity in earnings of unconsolidated subsidiaries (net of tax) | 118 | — | 105 | 105 |
| Net loss | (2,902) | (54) | (26) | (80) |
| Net income attributable to noncontrolling interests | — | (26) | 26 | — |
| Net loss attributable to EFH Corp. | $ (2,902) | $ (80) | $ — | $ (80) |

(a)  All pro forma adjustments relate to Oncor Holdings and result in the presentation of the investment in Oncor Holdings under the equity method of accounting for the three months ended September 30, 2009.

Confidential

EFIHMW00223090

| | Nine Months Ended September 30, 2010 | Nine Months Ended September 30, 2009 | | |
| | | As Reported | Pro Forma Adjustments (a) | Pro Forma |
| | | (millions of dollars) | | |
| Operating revenues | $ 6,599 | $ 7,366 | $ (1,219) | $ 6,147 |
| Fuel, purchased power costs and delivery fees | (3,521) | (2,171) | (816) | (2,987) |
| Net gain from commodity hedging and trading activities | 2,272 | 1,003 | — | 1,003 |
| Operating costs | (623) | (1,171) | 668 | (503) |
| Depreciation and amortization | (1,043) | (1,286) | 405 | (881) |
| Selling, general and administrative expenses | (560) | (792) | 138 | (654) |
| Franchise and revenue-based taxes | (73) | (259) | 185 | (74) |
| Impairment of goodwill | (4,100) | (90) | — | (90) |
| Other income | 1,278 | 71 | (30) | 41 |
| Other deductions | (23) | (50) | 32 | (18) |
| Interest income | 9 | 30 | — | 30 |
| Interest expense and related charges | (3,092) | (2,136) | 225 | (1,911) |
| Income (loss) before income taxes and equity in earnings of unconsolidated subsidiaries | (2,877) | 515 | (412) | 103 |
| Income tax expense | (336) | (254) | 141 | (113) |
| Equity in earnings of unconsolidated subsidiaries (net of tax) | 240 | — | 217 | 217 |
| Net income (loss) | (2,973) | 261 | (54) | 207 |
| Net income attributable to noncontrolling interests | — | (54) | 54 | — |
| Net income (loss) attributable to EFH Corp. | $ (2,973) | $ 207 | $ | $ 207 |

(a)   All pro forma adjustments relate to Oncor Holdings and result in the presentation of the investment in Oncor Holdings under the equity method of accounting for the nine months ended September 30, 2009.

*Consolidated Financial Results — Three Months Ended September 30, 2010 Compared to Pro Forma Three Months Ended September 30, 2009*

See comparison of results of the Competitive Electric segment for discussion of variances in: operating revenues; fuel, purchased power costs and delivery fees; net gain from commodity hedging and trading activities, operating costs; depreciation and amortization, and franchise and revenue-based taxes.

60

EFIHMW00223091

PX 045
Page 68 of 561

SG&A expenses decreased $40 million, or 18%, to $187 million in 2010. The decline reflected decreases in both the Competitive Electric segment and Corporate and Other and was driven by $13 million in lower bad debt expense, $11 million in lower transition costs associated with outsourced support services, $5 million in lower marketing expenses and $3 million in lower employee compensation-related expense.

See Note 4 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for discussion of the $4.1 billion impairment of goodwill recorded in the Competitive Electric segment in 2010.

Other income totaled $1.033 billion in 2010 and $35 million in 2009. The 2010 amount included debt extinguishment gains totaling $1.023 billion (see discussion of debt exchanges and repurchases in Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010). The 2009 amount included $23 million arising from the reversal of a use tax accrual recorded in purchase accounting related to periods prior to the Merger, which was triggered by a state ruling in the third quarter 2009. See Note 16 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for details of other income and deductions.

Interest income totaled $15 million in 2009 primarily representing interest on $465 million in collateral under a funding arrangement described in Note 11 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010.

Interest expense and related charges increased $54 million to $1.018 billion in 2010 reflecting $43 million in higher unrealized mark-to-market net losses related to interest rate swaps and a $73 million decrease in capitalized interest due to completion of certain new generation facility construction activities, partially offset by a $37 million decrease in noncash amortization of losses on interest rate swaps dedesignated as cash flow hedges, reflecting values attributed to earlier periods, as well as lower interest expense resulting from reduced debt under the liability management program as described above under "Significant Activities and Events." Also see Note 16 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010.

Income tax expense totaled $370 million in 2010 compared to an income tax benefit of $87 million in 2009. The effective tax rate was 25.5% and 32.0% in 2010 and 2009, respectively, excluding the effect of the $4.1 billion nondeductible goodwill impairment charge in 2010. The decrease in the rate was driven by a $146 million reversal of previously accrued interest related to uncertain income tax positions due to the expected resolution of matters related to the 1997-2002 tax audit (See Note 16 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010).

Equity in earnings of unconsolidated subsidiaries (net of tax) totaled $118 million in 2010 compared to $105 million in 2009 reflecting a $17 million increase (which is before the effect of noncontrolling interests) in Oncor's net income. The increase was driven by higher revenues, primarily due to rate increases and weather, and the effect of a $25 million write off of regulatory assets in 2009, partially offset by increased noncash expenses recognized as a result of the rate case.

Net loss attributable to EFH Corp. increased $2.822 billion to $2.902 billion in 2010.

- Net loss in the Competitive Electric segment increased $3.666 billion to $3.710 billion.

- Earnings from the Regulated Delivery segment increased $13 million to $118 million as discussed above.

- Corporate and Other net income totaled $690 million in 2010 compared to net expenses of $141 million in 2009. The amounts in 2010 and 2009 include recurring interest expense on outstanding debt and notes payable to subsidiaries, as well as corporate general and administrative expenses. The $831 million change reflected debt extinguishment gains in 2010 totaling $659 million, the $121 million Corporate and Other portion of the 2010 reversal of previously accrued interest on uncertain tax positions discussed above, $20 million in lower SG&A expense primarily reflecting lower transition costs associated with outsourced support services and costs allocated to the competitive operations effective 2010 and $7 million decrease in interest expense driven by lower borrowings (all amounts after-tax).

61

*Consolidated Financial Results — Nine Months Ended September 30, 2010 Compared to Pro Forma Nine Months Ended September 30, 2009*

See comparison of results of the Competitive Electric segment for discussion of variances in: operating revenues; fuel, purchased power costs and delivery fees; net gain from commodity hedging and trading activities, operating costs; depreciation and amortization, and franchise and revenue-based taxes.

SG&A expenses decreased $94 million, or 14%, to $560 million in 2010 driven by $57 million in lower transition costs associated with outsourced support services and the retail customer information system implemented in 2009, $13 million in lower employee compensation-related expense, and $9 million of accounts receivable securitization program fees that are reported as interest expense and related charges in 2010 (see Note 5 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010).

See Note 4 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for discussion of the $4.1 billion impairment of goodwill recorded in the Competitive Electric segment in 2010. The $90 million impairment of goodwill recorded in 2009 largely related to the Competitive Electric segment and resulted from the completion of fair value calculations supporting a goodwill impairment charge recorded in the fourth quarter of 2008 as discussed in Note 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009.

Other income totaled $1.278 billion in 2010 and $41 million in 2009. The 2010 amount included debt extinguishment gains totaling $1.166 billion (see discussion of debt exchanges and repurchases in Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010), a $44 million gain on sale of land and related water rights and a $37 million gain on sale of interests in a natural gas gathering pipeline business. The 2009 amount included $23 million arising from the reversal of a use tax accrual recorded in purchase accounting related to periods prior to the Merger, which was triggered by a state ruling in the third quarter 2009. See Note 16 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for details of other income and deductions.

Interest income decreased $21 million, or 70%, to $9 million in 2010 reflecting lower interest in 2010 on $465 million in collateral under a funding arrangement, due to settlement of the arrangement as described in Note 11 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010.

Interest expense and related charges increased $1.181 billion to $3.092 billion in 2010 reflecting a $542 million unrealized mark-to-market net loss related to interest rate swaps in 2010 compared to a $527 million net gain in 2009 and a $200 million decrease in capitalized interest due to completion of new generation facility construction activities, partially offset by $68 million in decreased noncash amortization of losses on interest rate swaps dedesignated as cash flow hedges, reflecting values attributed to earlier periods, as well as lower interest expense resulting from reduced debt under the liability management program as described above under "Significant Activities and Events." Also, see Note 16 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010.

Income tax expense totaled $336 million in 2010 compared to $113 million in 2009. Excluding the effects of the $4.1 billion and $90 million nondeductible goodwill impairment charges in 2010 and 2009, respectively, the effective tax rates were 27.5% in 2010 and 58.5% in 2009. The decrease in the effective tax rate in 2010 reflected the $146 million favorable adjustment in the third quarter related to uncertain tax positions (see Note 16 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010) net of the effect of an $8 million deferred tax charge in the first quarter related to the Patient Protection and Affordable Care Act (see Note 13 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010). The effective tax rate in 2009 reflected the effect of interest accruals related to uncertain tax positions on a small income base.

62

EFIHMW00223093

Equity in earnings of unconsolidated subsidiaries (net of tax) totaled $240 million in 2010 compared to $217 million in 2009 reflecting a $32 million increase (which is before the effect of noncontrolling interests) in Oncor's net income. The increase was driven by higher revenues, primarily due to rate increases and weather, and the effect of a $25 million write off of regulatory assets in 2009, partially offset by increased noncash expenses recognized as a result of the rate case.

Net earnings attributable to EFH Corp. decreased $3.180 billion to a loss of $2.973 billion in 2010.

- Results in the Competitive Electric segment decreased $4.141 billion to a loss of $3.705 billion.

- Earnings from the Regulated Delivery segment increased $23 million to $240 million as discussed above.

- Corporate and Other net income totaled $492 million in 2010 compared to net expenses of $446 million in 2009. The amounts in 2010 and 2009 include recurring interest expense on outstanding debt and notes payable to subsidiaries, as well as corporate general and administrative expenses. The change of $938 million reflected $758 million in debt extinguishment gains in 2010, the $121 million Corporate and Other portion of the 2010 reversal of accrued interest on uncertain tax positions discussed above, $55 million in lower SG&A expense primarily reflecting lower transition costs associated with outsourced support services and costs allocated to the competitive operations effective 2010 and a $20 million goodwill impairment charge in 2009, partially offset by a $26 million increase in interest expense driven by higher borrowings and an $8 million deferred tax charge due to the implementation of the Patient Protection and Affordable Care Act (all amounts after-tax).

### Non-GAAP Earnings Measures

In communications with investors, we use a non-GAAP earnings measure that reflects adjustments to earnings reported in accordance with U.S. GAAP in order to review underlying operating performance. These adjusting items, which are generally noncash, consist of unrealized mark-to-market gains and losses, impairment charges, debt extinguishment gains and other charges, credits or gains that are unusual or nonrecurring. All such items and related amounts are disclosed in our annual report on Form 10-K and quarterly reports on Form 10-Q. Our communications with investors also reference "Adjusted EBITDA," which is a non-GAAP measure used in calculation of ratios in covenants of certain of our debt securities (see "Financial Covenants, Credit Rating Provisions and Cross Default Provisions" below).

### Competitive Electric Segment

### Financial Results

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 |
| Operating revenues | $ 2,607 | $ 2,433 | $ 6,599 | $ 6,144 |
| Fuel, purchased power costs and delivery fees | (1,400) | (1,187) | (3,521) | (2,987) |
| Net gain from commodity hedging and trading activities | 992 | 123 | 2,272 | 1,003 |
| Operating costs | (197) | (161) | (623) | (504) |
| Depreciation and amortization | (345) | (303) | (1,027) | (862) |
| Selling, general and administrative expenses | (183) | (192) | (546) | (555) |
| Franchise and revenue-based taxes | (24) | (27) | (72) | (74) |
| Impairment of goodwill | (4,100) | — | (4,100) | (70) |
| Other income | 6 | 33 | 95 | 38 |
| Other deductions | (3) | (7) | (14) | (22) |
| Interest income | 23 | 21 | 65 | 40 |
| Interest expense and related charges | (883) | (798) | (2,604) | (1,414) |
| Income (loss) before income taxes | (3,507) | (65) | (3,476) | 737 |
| Income tax (expense) benefit | (203) | 21 | (229) | (301) |
| Net income (loss) | $(3,710) | $ (44) | $(3,705) | $ 436 |

63

EFIHMW00223094

**PX 045**
**Page 71 of 561**

*Competitive Electric Segment*

*Sales Volume and Customer Count Data*

| | Three Months Ended September 30, | | % | Nine Months Ended September 30, | | % |
|---|---|---|---|---|---|---|
| | 2010 | 2009 | Change | 2010 | 2009 | Change |
| **Sales volumes:** | | | | | | |
| Retail electricity sales volumes — (GWh): | | | | | | |
|     Residential | 9,473 | 9,348 | 1.3 | 23,040 | 22,312 | 3.3 |
|     Small business (a) | 2,417 | 2,598 | (7.0) | 6,392 | 6,228 | 2.6 |
|     Large business and other customers | 4,294 | 4,049 | 6.1 | 11,738 | 10,905 | 7.6 |
|         Total retail electricity | 16,184 | 15,995 | 1.2 | 41,170 | 39,445 | 4.4 |
| Wholesale electricity sales volumes | 14,011 | 10,126 | 38.4 | 37,359 | 30,180 | 23.8 |
| Net sales (purchases) of balancing electricity to/from ERCOT | 302 | (38) | — | 572 | (304) | — |
|         Total sales volumes | 30,497 | 26,083 | 16.9 | 79,101 | 69,321 | 14.1 |
| **Average volume (kWh) per residential customer (b)** | 5,220 | 4,936 | 5.8 | 12,584 | 11,772 | 6.9 |
| **Weather (North Texas average) — percent of normal (c):** | | | | | | |
| Cooling degree days | 107.1% | 97.1% | 10.3 | 109.9% | 102.2% | 7.5 |
| Heating degree days | —% | —% | — | 132.1% | 93.7% | 41.0 |
| **Customer counts:** | | | | | | |
| Retail electricity customers (end of period and in thousands) (d): | | | | | | |
|     Residential | | | | 1,800 | 1,876 | (4.1) |
|     Small business (a) | | | | 228 | 273 | (16.5) |
|     Large business and other customers | | | | 22 | 23 | (4.3) |
|         Total retail electricity customers | | | | 2,050 | 2,172 | (5.6) |

_____

(a)    Customers with demand of less than 1 MW annually.

(b)    Calculated using average number of customers for the period.

(c)    Weather data is obtained from Weatherbank, Inc., an independent company that collects and archives weather data from reporting stations of the National Oceanic and Atmospheric Administration (a federal agency under the U.S. Department of Commerce). Normal is defined as the average over a 10-year period.

(d)    Based on number of meters. Typically, large business and other customers have more than one meter; therefore, number of meters does not reflect the number of individual customers.

64

EFIHMW00223095

**PX 045**
**Page 72 of 561**

*Competitive Electric Segment*

*Revenue and Commodity Hedging and Trading Activities*

| | Three Months Ended September 30, | | % | Nine Months Ended September 30, | | % |
|---|---|---|---|---|---|---|
| | 2010 | 2009 | Change | 2010 | 2009 | Change |
| **Operating revenues:** | | | | | | |
| Retail electricity revenues: | | | | | | |
|   Residential | $ 1,231 | $ 1,272 | (3.2) | $3,007 | $3,048 | (1.3) |
|   Small business (a) | 309 | 366 | (15.6) | 839 | 924 | (9.2) |
|   Large business and other customers | 340 | 330 | 3.0 | 931 | 955 | (2.5) |
|     Total retail electricity revenues | 1,880 | 1,968 | (4.5) | 4,777 | 4,927 | (3.0) |
| Wholesale electricity revenues (b) | 642 | 380 | 68.9 | 1,612 | 1,043 | 54.6 |
| Net sales (purchases) of balancing electricity to/from ERCOT | (6) | (5) | (20.0) | (23) | (50) | 54.0 |
| Amortization of intangibles (c) | 14 | 20 | (30.0) | 16 | 10 | 60.0 |
| Other operating revenues | 77 | 70 | 10.0 | 217 | 214 | 1.4 |
|     Total operating revenues | $ 2,607 | $ 2,433 | 7.2 | $6,599 | $6,144 | 7.4 |
| **Net gain from commodity hedging and trading activities:** | | | | | | |
| Unrealized net gains from changes in fair value | $ 979 | $ 136 | — | $2,255 | $1,026 | — |
| Unrealized net losses representing reversals of previously recognized fair values of positions settled in the current period | (238) | (116) | — | (698) | (257) | — |
| Realized net gains on settled positions | 251 | 103 | — | 715 | 234 | — |
|     Total gain | $ 992 | $ 123 | — | $2,272 | $1,003 | — |

(a)  Customers with demand of less than 1 MW annually.

(b)  Upon settlement of physical derivative power sales and purchase contracts that are marked-to-market in net income, wholesale electricity revenues and fuel and purchased power costs are reported at approximated market prices, as required by accounting rules, instead of the contract price. As a result, these line item amounts include a noncash component, which the company considers "unrealized." (The offsetting differences between contract and market prices are reported in net gain (loss) from commodity hedging and trading activities.) These amounts are as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 |
| Reported in revenues | $ 42 | $ (11) | $ 10 | $ (135) |
| Reported in fuel and purchased power costs | (16) | (6) | 48 | 79 |
| Net gain (loss) | $ 26 | $ (17) | $ 58 | $ (56) |

(c)  Represents amortization of the intangible net asset value of retail and wholesale power sales agreements resulting from purchase accounting.

65

*Competitive Electric Segment*

*Production, Purchased Power and Delivery Cost Data*

| | Three Months Ended September 30, | | % Change | Nine Months Ended September 30, | | % Change |
|---|---|---|---|---|---|---|
| | 2010 | 2009 | | 2010 | 2009 | |
| **Fuel, purchased power costs and delivery fees ($ millions):** | | | | | | |
| Nuclear fuel | $ 43 | $ 30(f) | 43.3 | $ 116 | $ 88(f) | 31.8 |
| Lignite/coal | 246 | 175 | 40.6 | 678 | 474 | 43.0 |
| Total baseload fuel | 289 | 205 | 41.0 | 794 | 562 | 41.3 |
| Natural gas fuel and purchased power (a) | 580 | 431 | 34.6 | 1,294 | 953 | 35.8 |
| Amortization of intangibles (b) | 45 | 82(f) | (45.1) | 125 | 222(f) | (43.7) |
| Other costs | 46 | 39 | 17.9 | 152 | 145 | 4.8 |
| Fuel and purchased power costs | 960 | 757 | 26.8 | 2,365 | 1,882 | 25.7 |
| Delivery fees (c) | 440 | 430 | 2.3 | 1,156 | 1,105 | 4.6 |
| Total | $ 1,400 | $ 1,187 | 17.9 | $ 3,521 | $ 2,987 | 17.9 |
| **Fuel and purchased power costs (which excludes generation plant operating costs) per MWh:** | | | | | | |
| Nuclear fuel | $ 8.13 | $ 5.76(f) | 41.1 | $ 7.84 | $ 5.67(f) | 38.3 |
| Lignite/coal (d) | 18.24 | 16.53 | 10.3 | 19.18 | 16.49 | 16.3 |
| Natural gas fuel and purchased power | 54.33 | 47.99 | 13.2 | 49.56 | 44.06 | 12.5 |
| **Delivery fees per MWh** | $ 27.13 | $ 26.68 | 1.7 | $ 28.01 | $ 27.77 | 0.9 |
| **Production and purchased power volumes (GWh):** | | | | | | |
| Nuclear | 5,302 | 5,219 | 1.6 | 14,841 | 15,512 | (4.3) |
| Lignite/coal | 15,445 | 12,209 | 26.5 | 40,743 | 32,914 | 23.8 |
| Total baseload generation | 20,747 | 17,428 | 19.0 | 55,584 | 48,426 | 14.8 |
| Natural gas-fueled generation | 763 | 1,135 | (32.8) | 1,598 | 2,168 | (26.3) |
| Purchased power | 9,905 | 7,890 | 25.5 | 24,505 | 19,523 | 25.5 |
| Total energy supply | 31,415 | 26,453 | 18.8 | 81,687 | 70,117 | 16.5 |
| Less line loss and power imbalances (e) | 918 | 370 | — | 2,586 | 796 | — |
| Net energy supply volumes | 30,497 | 26,083 | 16.9 | 79,101 | 69,321 | 14.1 |
| **Baseload capacity factors:** | | | | | | |
| Nuclear | 104.4% | 103.1% | 1.3 | 98.5% | 103.1% | (4.5) |
| Lignite/coal | 89.7% | 94.0% | (4.6) | 82.0% | 85.9% | (4.5) |
| Total baseload | 93.2% | 96.6% | (3.5) | 86.0% | 90.7% | (5.2) |

(a)  See note (b) on previous page.

(b)  Represents amortization of the intangible net asset values of emission credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel resulting from purchase accounting.

(c)  Includes delivery fee charges from Oncor.

(d)  Includes depreciation and amortization of lignite mining assets, which is reported in the depreciation and amortization expense line item, but is part of overall fuel costs.

(e)  Includes physical purchases and sales, the financial results of which are reported in commodity hedging and trading activities in the income statement.

(f)  Reflects reclassification to correct amortization.

*Competitive Electric Segment — Financial Results — Three Months Ended September 30, 2010 Compared to Three Months Ended September 30, 2009*

Operating revenues increased $174 million, or 7%, to $2.607 billion in 2010.

Confidential

EFIHMW00223097

**PX 045**

**Page 74 of 561**

Wholesale electricity revenues increased $262 million, or 69%, to $642 million in 2010. A 38% increase in wholesale electricity sales volumes, primarily reflecting production from the new generation units and increased sales to third-party REPs, increased revenue $150 million. An 11% increase in average wholesale electricity prices, reflecting higher natural gas prices at the time underlying contracts were executed, increased revenues by $59 million. The balance of the revenue increase reflected unrealized gains in 2010 compared to unrealized losses in 2009 related to physical derivative commodity sales contracts as discussed in footnote (b) to the "Revenue and Commodity Hedging and Trading Activities" table above.

Bilateral electricity contracting activity includes hedging transactions that utilize contracts for physical delivery. Wholesale sales and purchases of electricity are reported gross in the income statement if the transactions are scheduled for physical delivery with ERCOT.

Comparisons of wholesale balancing activity, reported net, are generally not meaningful because the activity represents intraday purchases and sales transactions with ERCOT for real-time balancing purposes, as measured in 15-minute intervals, which are highly variable.

Retail electricity revenues decreased $88 million, or 4%, to $1.880 billion and reflected the following:

- Lower average pricing decreased revenues by $111 million reflecting declines in both the business and residential markets. Lower average pricing is reflective of competitive activity in a lower wholesale power price environment and a change in business customer mix.

- A 1% increase in sales volumes increased revenues by $23 million. Residential sales volumes increased 1% reflecting greater average consumption driven by hotter weather, partially offset by a 4% decrease in customer count due to competitive activity. Business sales volumes increased 1% reflecting a change in customer mix resulting from contracts executed with new customers.

Fuel, purchased power costs and delivery fees increased $213 million, or 18%, to $1.4 billion in 2010. Higher purchased power costs contributed $131 million to the increase and reflected an increase of 26% in purchased volumes driven by increased unplanned generation unit outages and higher sales to third-party REPs, as well as higher prices driven by higher natural gas prices at the time underlying contracts were executed. Other factors contributing to the increase included $36 million in higher lignite/coal costs at existing plants, driven by higher transportation and commodity costs for purchased coal, $35 million in higher lignite fuel costs related to production from the new generation units, a $13 million increase in nuclear fuel expense reflecting increased prices, a $10 million increase in unrealized losses related to physical derivative commodity purchase contracts, a $10 million increase in delivery costs and a $5 million increase in natural gas costs driven by higher prices. These increases were partially offset by $37 million in lower amortization of the intangible net asset values (including the stepped-up value of nuclear fuel) resulting from purchase accounting and reflected expiration of commodity contracts and consumption of the nuclear fuel.

Overall baseload generation production increased 19% in 2010 driven by the production in 2010 from the new generation units.

Following is an analysis of amounts reported as net gain from commodity hedging and trading activities for the three months ended September 30, 2010 and 2009, which totaled $992 million and $123 million, respectively:

*Three Months Ended September 30, 2010* — Unrealized mark-to-market net gains totaling $741 million included:

- $750 million in net gains related to hedge positions, which includes $980 million in net gains from changes in fair value driven by the impact of lower forward natural gas prices on the value of positions in the long-term hedging program, and $230 million in net losses that represent reversals of previously recorded net gains on positions settled in the period, and

67

EFIHMW00223098

**PX 045**
**Page 75 of 561**

- $9 million in net losses related to trading positions, which largely represent reversals of previously recorded net gains on positions settled in the period.

Realized net gains totaling $251 million included:

- $235 million in net gains related to positions that primarily hedged electricity revenues recognized in the period largely related to the long-term hedging program, and

- $16 million in net gains related to trading positions.

*Three Months Ended September 30, 2009* — Unrealized mark-to-market net gains totaling $20 million included:

- $4 million in net losses related to hedge positions, which includes $121 million in net gains from changes in fair value driven by the impact of lower forward natural gas prices on the value of positions in the long-term hedging program, and $125 million in net losses that represent reversals of previously recorded net gains on positions settled in the period, and

- $24 million in net gains related to trading positions, which includes $15 million in net gains from changes in fair value and $9 million in net gains that represent reversals of previously recorded net losses on positions settled in the period.

Realized net gains totaling $103 million included:

- $110 million in net gains related to positions that primarily hedged electricity revenues recognized in the period, and

- $7 million in net losses related to trading positions.

Unrealized gains and losses that are related to physical derivative commodity contracts and are reported as revenues and purchased power costs, as required by accounting rules, totaled $26 million in net gains in 2010 and $17 million in net losses in 2009.

Operating costs increased $36 million, or 22%, to $197 million in 2010. The increase reflected $26 million related to the new generation units. The balance of the increase reflected various base maintenance activities.

Depreciation and amortization increased $42 million, or 14%, to $345 million in 2010. The increase was driven by depreciation of the new generation units and associated mining operations.

SG&A expenses decreased $9 million, or 5%, to $183 million in 2010. The decrease reflected $13 million in lower bad debt expense reflecting 2009 delinquencies due to delays in final bills and disconnects resulting from a system conversion, $5 million in lower marketing expenses and $3 million in lower employee compensation-related expense, partially offset by $12 million of costs allocated from corporate in 2010, principally fees paid to the Sponsor Group and individually insignificant increases in various other expenses.

See Note 4 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for discussion of the $4.1 billion impairment of goodwill recorded in 2010.

Other income totaled $6 million in 2010 and $33 million in 2009. The 2009 amount included a $23 million reversal of a use tax accrual and a $6 million fee received related to an interest rate swap/commodity hedge derivative agreement. See Note 16 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for additional details.

68

EFIHMW00223099

Interest expense and related charges increased by $85 million to $883 million in 2010 reflecting a $73 million decrease in capitalized interest due to completion of certain new generation facility construction activities and a $43 million increase in unrealized mark-to-market net losses related to interest rate swaps, partially offset by a $37 million decrease in noncash amortization of losses on interest rate swaps dedesignated as cash flow hedges.

Income tax expense totaled $203 million in 2010 compared to a benefit of $21 million in 2009. Excluding the $4.1 billion nondeductible goodwill impairment charge the effective tax rate was 34.2% in 2010, and the effective benefit rate was 32.3% on a loss in 2009. The 2010 effective rate reflected a portion of the reversal of interest accrued on uncertain tax positions discussed above. The 2009 rate was depressed by the interest accrued on such positions, reflecting the loss position.

Loss for the segment increased $3.666 billion to a loss of $3.710 billion in 2010 reflecting the $4.1 billion goodwill impairment charge and increased interest expense, partially offset by an increase in realized and unrealized net gains from commodity hedging and trading activities.

***Competitive Electric Segment — Financial Results — Nine Months Ended September 30, 2010 Compared to Nine Months Ended September 30, 2009***

Operating revenues increased $455 million, or 7%, to $6.599 billion in 2010.

Wholesale electricity revenues increased $569 million, or 55%, to $1.612 billion in 2010. A 24% increase in wholesale electricity sales volumes, reflecting production from the new generation units and increased sales to third-party REPs, increased revenues by $280 million. A 10% increase in average wholesale electricity prices, reflecting higher natural gas prices at the time the underlying contracts were executed, increased revenues by $145 million. The balance of the revenue increase reflected unrealized gains in 2010 compared to unrealized losses in 2009 related to physical derivative commodity sales contracts as discussed in footnote (b) to the "Revenue and Commodity Hedging and Trading Activities" table above.

Retail electricity revenues decreased $150 million, or 3%, to $4.777 billion and reflected the following:

- Lower average pricing decreased revenues by $366 million reflecting declines in both the business and residential markets. Lower average pricing is reflective of competitive activity in a lower wholesale power price environment and a change in business customer mix.

- A 4% increase in sales volumes increased revenues by $216 million reflecting increases in both the business and residential markets. A 6% increase in business markets sales volumes reflected a change in customer mix resulting from contracts executed with new customers. Higher average consumption resulted in a 3% overall increase in residential sales volumes, reflecting colder winter weather and hotter summer weather, partially offset by a decline in residential customer counts.

Fuel, purchased power costs and delivery fees increased $534 million, or 18%, to $3.521 billion in 2010. Higher purchased power costs contributed $295 million to the increase and reflected increased volumes driven by increased planned and unplanned generation unit outages and higher retail demand, as well as increased prices driven by the effect of higher natural gas prices at the time the underlying contracts were executed. Other factors contributing to the increase included $105 million in lignite fuel costs related to production from the new generation units, $99 million in higher lignite/coal costs at existing plants, reflecting higher purchased coal transportation and commodity costs, $51 million in higher delivery fees, reflecting increased retail sales volumes and tariffs, a $31 million decrease in unrealized gains related to physical derivative commodity purchase contracts, a $28 million increase in nuclear fuel expense reflecting increased prices and a $12 million increase in natural gas and fuel oil costs driven by higher prices. These increases were partially offset by $97 million in lower amortization of the intangible net asset values (including the stepped-up value of nuclear fuel) resulting from purchase accounting and reflected expiration of commodity contracts and consumption of the nuclear fuel.

69

EFIHMW00223100

Overall baseload generation production increased 15% in 2010 reflecting a 24% increase in lignite/coal-fueled production, driven by production from new generation units, partially offset by a 4% decrease in nuclear production reflecting an unplanned transformer outage in January 2010 and year-to-year timing differences of planned outages.

Following is an analysis of amounts reported as net gain from commodity hedging and trading activities for the nine months ended September 30, 2010 and 2009, which totaled $2.272 billion and $1.003 billion, respectively:

*Nine Months Ended September 30, 2010* — Unrealized mark-to-market net gains totaling $1.557 billion included:

- $1.564 billion in net gains related to hedge positions, which includes $2.232 billion in net gains from changes in fair value driven by the impact of lower forward natural gas prices on the value of positions in the long-term hedging program, and $668 million in net losses that represent reversals of previously recorded net gains on positions settled in the period, and

- $7 million in net losses related to trading positions, which includes $23 million in net gains from changes in fair value, and $30 million in net losses that represent reversals of previously recorded net gains on positions settled in the period.

Realized net gains totaling $715 million included:

- $666 million in net gains related to positions that primarily hedged electricity revenues recognized in the period, largely related to the long-term hedging program, and

- $49 million in net gains related to trading positions.

*Nine Months Ended September 30, 2009* — Unrealized mark-to-market net gains totaling $769 million included:

- $750 million in net gains related to hedge positions, which includes $1.010 billion in net gains from changes in fair value, driven by the impact of lower forward natural gas prices on the value of positions in the long-term hedging program, and $260 million in net losses that represent reversals of previously recorded fair values of positions settled in the period, and

- $19 million in net gains related to trading positions, which includes $16 million in net gains from changes in fair value and $3 million in net gains that represent reversals of previously recorded fair values of positions settled in the period.

Realized net gains totaling $234 million include:

- $247 million in net gains related to positions that primarily hedged electricity revenues recognized in the period, and

- $13 million in net losses related to trading positions.

Unrealized gains and losses that are related to physical derivative commodity contracts and are reported as revenues and purchased power costs, as required by accounting rules, totaled $58 million in net gains in 2010 and $56 million in net losses in 2009.

Operating costs increased $119 million, or 24%, to $623 million in 2010. The increase reflected $71 million in incremental expense related to the new generation units and $26 million in outage-related costs at the Comanche Peak nuclear-fueled plant reflecting year-to-year timing of planned outage maintenance costs and the first quarter 2010 unplanned transformer-related outage. The balance of the increase reflected increased costs related to outages at the legacy lignite/coal operations and various individually insignificant increases.

70

EFIHMW00223101

Depreciation and amortization increased $165 million, or 19%, to $1.027 billion in 2010. The increase reflected $129 million in incremental expense related to the new generation units and associated mining operations. The balance of the increase was primarily driven by equipment additions.

SG&A expenses decreased $9 million, or 2%, to $546 million in 2010. The decrease reflected:

- $23 million in lower transition costs associated with outsourced services and the retail customer information management system implemented in 2009;

- $13 million in lower employee compensation-related expense in 2010; and

- $9 million of accounts receivable securitization program fees that are reported in 2010 as interest expense and related charges (see Note 5 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010),

partially offset by:

- $35 million of costs allocated from corporate in 2010, principally fees paid to the Sponsor Group, and

- $4 million in higher marketing expenses in 2010.

See Note 4 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for discussion of the $4.1 billion impairment of goodwill recorded in 2010. The $70 million impairment of goodwill recorded in 2009 resulted from the completion of fair value calculations supporting a goodwill impairment charge recorded in the fourth quarter of 2008 as discussed in Note 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009.

Other income totaled $95 million in 2010 and $38 million in 2009. Other income in 2010 included a $44 million gain on the sale of land and related water rights and a $37 million gain associated with the sale of interests in a natural gas gathering pipeline business. The 2009 amount included a $23 million reversal of a use tax accrual. Other deductions totaled $14 million in 2010 and $22 million in 2009 and included a number of individually immaterial expenses. See Note 16 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for additional details.

Interest income increased $25 million, or 63%, to $65 million in 2010 reflecting higher notes receivable balances from affiliates.

Interest expense and related charges increased by $1.190 billion, or 84%, to $2.604 billion in 2010 reflecting a $542 million unrealized mark-to-market net loss related to interest rate swaps in 2010 compared to a $527 million net gain in 2009 and a $200 million decrease in capitalized interest due to completion of new generation facility construction activities, partially offset by a $68 million decrease in noncash amortization of losses on interest rate swaps dedesignated as cash flow hedges.

Income tax expense totaled $229 million in 2010 compared to $301 million in 2009. Excluding the $4.1 billion and $70 million nondeductible goodwill impairment charges in 2010 and 2009, respectively, the effective tax rates were 36.7% and 37.3%, respectively. The decrease in the rate reflected a portion of the reversal of interest accrued on uncertain tax positions discussed above.

Results for the segment decreased $4.141 billion in 2010 to a loss of $3.705 billion reflecting the $4.1 billion goodwill impairment charge and increased interest expense, partially offset by an increase in net gains from commodity hedging and trading activities.

71

EFIHMW00223102

*Energy-Related Commodity Contracts and Mark-to-Market Activities*

The table below summarizes the changes in commodity contract assets and liabilities for the nine months ended September 30, 2010 and 2009. The net change in these assets and liabilities, excluding "other activity" as described below, represents the pretax effect on earnings of positions in the commodity contract portfolio that are marked-to-market in net income (see Note 11 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010). The portfolio consists primarily of economic hedges but also includes trading positions.

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2010 | 2009 |
| Commodity contract net asset at beginning of period | $ 1,718 | $   430 |
| Settlements of positions (a) | (642) | (314) |
| Changes in fair value (b) | 2,255 | 1,026 |
| Other activity (c) | 39 | 63 |
| Commodity contract net asset at end of period | $ 3,370 | $ 1,205 |

(a)  Represents reversals of previously recognized unrealized gains and losses upon settlement (offsets realized gains and losses recognized in the settlement period).

(b)  Represents unrealized gains and losses recognized, primarily related to positions in the long-term hedging program (see discussion above under "Long-Term Hedging Program").

(c)  These amounts do not represent unrealized gains or losses. Includes initial values of positions involving the receipt or payment of cash or other consideration, generally related to options purchased/sold and physical natural gas exchange transactions. 2010 amount includes $59 million related to net payment of option premiums and $19 million related to settlement of a power sales agreement, partially offset by $35 million for expired option premiums and $4 million in natural gas provided under physical gas exchange transactions. 2009 amount includes $28 million related to net payment of option premiums, $25 million in natural gas provided under physical gas exchange transactions and $15 million related to settlement of a power sales agreement, partially offset by $5 million for expired option premiums.

Unrealized gains and losses related to commodity contracts are summarized as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2010 | 2009 | 2010 | 2009 |
| Unrealized gains/(losses) related to contracts marked-to-market | $   765 | $     3 | $ 1,613 | $   712 |
| Ineffectiveness gains/(losses) related to cash flow hedges (a) | 2 | — | 2 | 1 |
| Total unrealized gains (losses) related to commodity contracts | $   767 | $     3 | $ 1,615 | $   713 |

(a)  Represents the reversal of previously recorded ineffectiveness upon settlement of such dedesignated hedges in 2010.

Following are the components of the net commodity contract asset as of September 30, 2010:

| | |
| --- | --- |
| Amount of net asset arising from mark-to-market accounting | $3,374 |
| Net liability associated with natural gas under physical gas exchange transactions | (4) |
| Net commodity contract asset | $3,370 |

*Maturity Table* — The following table presents the net commodity contract asset arising from recognition of fair values under mark-to-market accounting as of September 30, 2010, scheduled by the source of fair value and contractual settlement dates of the underlying positions.

| | Maturity dates of unrealized commodity contract asset as of September 30, 2010 | | | | |
| --- | --- | --- | --- | --- | --- |
| Source of fair value | Less than 1 year | 1-3 years | 4-5 years | Excess of 5 years | Total |
| Prices actively quoted | $  (144) | $   (39) | $    (1) | $     — | $  (184) |
| Prices provided by other external sources | 1,300 | 1,875 | 129 | — | 3,304 |
| Prices based on models | 4 | (16) | 384 | (118) | 254 |
| Total | $ 1,160 | $ 1,820 | $  512 | $  (118) | $ 3,374 |
| Percentage of total fair value | 34% | 54% | 15% | (3)% | 100% |

Confidential

EFIHMW00223103

The "prices actively quoted" category reflects only exchange traded contracts for which active quotes are readily available. The "prices provided by other external sources" category represents forward commodity positions valued using prices for which over-the-counter broker quotes are available in active markets. Over-the-counter quotes for power in ERCOT that are deemed active markets (excluding the West zone) generally extend through 2012 and over-the-counter quotes for natural gas generally extend through 2015, depending upon delivery point. The "prices based on models" category contains the value of all nonexchange traded options, valued using option pricing models. In addition, this category contains other contractual arrangements that may have both forward and option components, as well as other contracts that are valued using proprietary long-term pricing models that utilize certain market based inputs. See Note 9 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for fair value disclosures and discussion of fair value measurements.

## FINANCIAL CONDITION

### *Liquidity and Capital Resources*

*Cash Flows* — Cash provided by operating activities for the nine months ended September 30, 2010 and 2009 totaled $966 million and $1.743 billion, respectively. The decrease in cash provided of $777 million was driven by a $667 million effect of the amended accounting standard related to the accounts receivable securitization program (see Note 5 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010), under which the $383 million of funding under the program upon the January 1, 2010 adoption is reported as a use of operating cash flows and a source of financing cash flows, with subsequent 2010 activity reported as financing, while the $284 million of funding in 2009 is reported as operating cash flows. The remaining decrease of $110 million reflected the deconsolidation of Oncor, partially offset by higher earnings from the competitive business as adjusted for noncash items, reflecting the contribution of the new generation units.

Cash used in financing activities totaled $1.167 billion in 2010 compared to cash provided of $420 million in 2009. These activities are summarized below (see Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010):

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2010 | 2009 |
| Net issuances, repayments and repurchases of borrowings | $ (1,448) | $ 389 |
| Net contributions from and distributions to noncontrolling interests | 24 | 10 |
| Net short-term borrowings under accounts receivable securitization program | 228 | — |
| Other | 29 | 21 |
| Total provided by (used in) financing activities | $ (1,167) | $ 420 |

Cash used in investing activities decreased $1.820 billion driven by decreased capital expenditures and the return in 2010 of the collateral posted in 2009 related to interest rate swaps discussed in Note 11 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010. These activities are summarized below:

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2010 | 2009 |
| Capital expenditures, including nuclear fuel | $(793) | $ (2,034) |
| Redemption of investment held in money market fund | — | 142 |
| Investment redeemed/(posted) with counterparty | 400 | (400) |
| Proceeds from sale of assets | 141 | 41 |
| Change in restricted cash | (31) | 118 |
| Other | (24) | 6 |
| Total used in investing activities | $(307) | $ (2,127) |

Confidential

EFIHMW00223104

PX 045
Page 81 of 561

The decline in capital spending for the nine months ended September 30, 2010 as compared to the nine months ended September 30, 2009 reflected the deconsolidation of Oncor ($758 million capital expenditures in 2009) (see Note 3 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010) in 2010 and a decrease in spending related to the construction of the now substantially complete new generation facilities.

Depreciation and amortization expense reported in the statement of cash flows exceeded the amount reported in the statement of income by $278 million and $312 million for the nine months ended September 30, 2010 and 2009, respectively. The difference represented amortization of nuclear fuel, which is reported as fuel cost in the statement of income consistent with industry practice, and amortization of intangible net assets and debt fair value discounts arising from purchase accounting that is reported in various other income statement line items including operating revenues, fuel and purchased power costs and delivery fees, other income and interest expense and related charges.

*Debt Financing Activity* — Activities related to short-term borrowings and long-term debt during the nine months ended September 30, 2010 are as follows (all amounts presented are principal, and repayments and repurchases include amounts related to capital leases and exclude amounts related to debt discount, financing and reacquisition expenses):

|  | Borrowings (a) | Repayments and Repurchases (b) |
|---|---|---|
| TCEH | $ 107 | $ 521 |
| EFCH | — | 3 |
| EFIH | 2,180 | — |
| EFH Corp. | 1,223 | 4,443 |
| Total long-term | 3,510 | 4,967 |
| Total short-term — TCEH (c) | — | 873 |
| Total | $ 3,510 | $ 5,840 |

(a)  Includes the following activities (see Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010):

- $500 million of EFH Corp. 10% Notes issued by EFH Corp., the proceeds of which may be used in debt exchanges or repurchases.

- Principal increases in payment of accrued interest totaling $162 million and $107 million of EFH Corp. and TCEH Toggle Notes, respectively.

- $561 million of EFH Corp. 10% Notes issued by EFH Corp. in debt exchanges.

- $2.180 billion of EFIH 10% Notes issued by EFIH in debt exchanges.

(b)  Includes $3.976 billion of noncash retirements (including discounts captured on cash repurchases) as a result of 2010 debt exchange and repurchase transactions discussed in Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010.

(c)  Short-term amounts represent net borrowings/repayments.

See Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for further detail of long-term debt and other financing arrangements.

We, our affiliates or our agents may from time to time purchase our outstanding debt for cash in open market purchases or privately negotiated transactions (including pursuant to a Section 10b-5(1) plan) or via privately negotiated exchange transactions similar to the private exchange transactions completed in 2010, or we may refinance existing debt. We will evaluate any such transactions in light of market prices of the debt, taking into account liquidity requirements and prospects for future access to capital, contractual restrictions and other factors. The amounts involved in any such transactions, individually or in the aggregate, may be material.

74

EFIHMW00223105

**PX 045
Page 82 of 561**

*Available Liquidity* — The following table summarizes changes in available liquidity for the nine months ended September 30, 2010 (excluding Oncor):

| | Available Liquidity | | |
| | September 30, 2010 | December 31, 2009 | Change |
|---|---|---|---|
| Cash and cash equivalents | $ 652 | $ 1,161 | $ (509) |
| TCEH Revolving Credit Facility (a) | 2,620 | 1,721 | 899 |
| TCEH Letter of Credit Facility | 410 | 399 | 11 |
| Subtotal | $ 3,682 | $ 3,281 | $ 401 |
| Short-term investment (b) | — | 490 | (490) |
| Total liquidity (c) | $ 3,682 | $ 3,771 | $ (89) |

(a)  As of September 30, 2010 and December 31, 2009, the TCEH Revolving Credit Facility includes $229 million and $141 million, respectively, of commitments from Lehman that are only available from the fronting banks and the swingline lender.

(b)  December 31, 2009 amount includes $425 million cash investment (including accrued interest) and $65 million in letters of credit posted related to certain interest rate and commodity hedge transactions. Pursuant to the related agreement, the collateral was returned in March 2010. See Note 11 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010.

(c)  As of September 30, 2010 and December 31, 2009, total liquidity includes $693 million and $520 million, respectively, of cash received for "margin deposits related to commodity positions" and is net of cash totaling $196 million and $187 million, respectively, posted with counterparties as "margin deposits related to commodity positions."

Note: Available liquidity in the future could benefit from additional exercises of the payment-in-kind (PIK) option on the EFH Corp. Toggle Notes and TCEH Toggle Notes, which for the remaining payment dates from November 2010 through November 2012 would avoid cash interest payments of approximately $605 million.

See Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for additional discussion of the credit facilities.

*Pension and OPEB Plan Funding* — Pension and OPEB plan funding is expected to total $43 million and $24 million, respectively, in 2010. Oncor is expected to fund approximately 88% of this amount consistent with its share of the pension liability. We made pension and OPEB contributions of $28 million and $17 million, respectively, in the nine months ended September 30, 2010, of which $40 million was contributed by Oncor.

*Toggle Notes Interest Election* — EFH Corp. and TCEH have the option every six months at their discretion, ending with the payment due November 2012, to use the payment-in-kind (PIK) feature of their respective toggle notes in lieu of making cash interest payments. We elected to do so beginning with the May 2009 interest payment as an efficient and cost-effective method to further enhance liquidity, in light of the weaker economy and related lower electricity demand and the continuing uncertainty in the financial markets. Once EFH Corp. and/or TCEH make a PIK election, the election is valid for each succeeding interest payment period until EFH Corp. and/or TCEH revoke the applicable election. Use of the PIK feature will be evaluated at each election period, taking into account market conditions and other relevant factors at such time.

EFH Corp. made its May 2010 interest payment and will make its November 2010 interest payment on the EFH Corp. Toggle Notes by using the PIK feature of those notes. During such applicable interest periods, the interest rate on these notes is increased from 11.25% to 12.00%. EFH Corp. increased the aggregate principal amount of the notes by $162 million in May 2010 and will further increase the aggregate principal amount of the notes by a currently estimated $32 million in November 2010 (excluding $130 million principal amount to be issued to EFIH as holder of $2.166 billion principal amount of EFH Corp. Toggle Notes acquired in the debt exchange completed in August 2010 that is eliminated in consolidation). The elections increased liquidity in May 2010 by an amount equal to $152 million and will further increase liquidity in November 2010 by an amount equal to a currently estimated $30 million (excluding $122 million related to notes held by EFIH), constituting the amounts of cash interest that otherwise would have been payable on the notes in May 2010 and November 2010, respectively.

75

EFIHMW00223106

PX 045
Page 83 of 561

Similarly, TCEH made its May 2010 interest payment and will make its November 2010 interest payment on the TCEH Toggle Notes by using the PIK feature of those notes. During such applicable interest periods, the interest rate on these notes is increased from 10.50% to 11.25%. TCEH increased the aggregate principal amount of the notes by approximately $110 million in May 2010, including $3 million principal amount paid to EFH Corp. and eliminated in consolidation, and will further increase the aggregate principal amount of the notes by $102 million in November 2010, including $4 million principal amount paid to EFH Corp. and eliminated in consolidation. The elections increased liquidity in May 2010 by an amount equal to $100 million and will further increase liquidity in November 2010 by an amount equal to an estimated $91 million, constituting the amounts of cash interest that otherwise would have been payable on the notes in May 2010 and November 2010, respectively.

See Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for discussion of debt repurchase and exchange transactions in 2010 that resulted in redemption of portions of the outstanding principal of the EFH Corp. and TCEH Toggle Notes held by unaffiliated parties that are reflected in the amounts related to the May 2010 and November 2010 PIK elections.

***Liquidity Effects of Commodity Hedging and Trading Activities*** — Commodity hedging and trading transactions typically require a counterparty to post collateral if the forward price of the underlying commodity moves such that the hedging or trading instrument held by such counterparty has declined in value. TCEH uses cash, letters of credit, asset-backed liens and other forms of credit support to satisfy such collateral obligations. In addition, TCEH's Commodity Collateral Posting Facility, an uncapped senior secured revolving credit facility, funds the cash collateral posting requirements for a significant portion of the positions in the long-term hedging program not otherwise secured by a first-lien in the assets of TCEH. The aggregate principal amount of this facility is determined by the exposure arising from higher forward market prices, regardless of the amount of such exposure, on a portfolio of certain natural gas hedging transaction volumes. Including those hedging transactions where margin deposits are covered by unlimited borrowings under the TCEH Commodity Collateral Posting Facility, as of September 30, 2010, more than 95% of the long-term natural gas hedging program transactions were secured by a first-lien interest in the assets of TCEH that is pari passu with the TCEH Senior Secured Facilities, the effect of which is a significant reduction in the liquidity exposure associated with collateral requirements for those hedging transactions. See Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for more information about this facility.

As of September 30, 2010, TCEH received or posted cash and letters of credit for commodity hedging and trading activities as follows:

- $193 million in cash has been posted with counterparties for exchange cleared transactions (including initial margin), as compared to $183 million posted as of December 31, 2009;

- $690 million in cash has been received from counterparties, net of $3 million in cash posted, for over-the-counter and other non-exchange cleared transactions, as compared to $516 million received, net of $4 million in cash posted, as of December 31, 2009;

- $325 million in letters of credit have been posted with counterparties, as compared to $379 million posted as of December 31, 2009; and

- $44 million in letters of credit have been received from counterparties, as compared to $44 million received as of December 31, 2009.

76

With respect to exchange cleared transactions, these transactions typically require initial margin (i.e., the upfront cash and/or letter of credit posted to take into account the size and maturity of the positions and credit quality) in addition to variance margin (i.e., the daily cash margin posted to take into account changes in the value of the underlying commodity). The amount of initial margin required is generally defined by exchange rules. Clearing agents, however, typically have the right to request additional initial margin based on various factors including market depth, volatility and credit quality, which may be in the form of cash, letters of credit, a guaranty or other forms as negotiated with the clearing agent. With respect to cash collateral that is received, such cash collateral is either used for working capital and other corporate purposes, including reducing short-term borrowings under credit facilities, or it is required to be deposited in a separate account and restricted from being used for working capital and other corporate purposes. With respect to over-the-counter transactions, counterparties generally have the right to substitute letters of credit for such cash collateral. In such event, the cash collateral previously posted would be returned to such counterparties thereby reducing liquidity in the event that it was not restricted. As of September 30, 2010, restricted cash collateral held totaled $31 million. See Note 16 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 regarding restricted cash.

With the long-term hedging program, increases in natural gas prices generally result in increased cash collateral and letter of credit postings to counterparties. As of September 30, 2010, approximately 450 million MMBtu of positions related to the long-term hedging program were not directly secured on an asset-lien basis and thus have cash collateral posting requirements. The uncapped TCEH Commodity Collateral Posting Facility supports the collateral posting requirements related to substantially all of these transactions.

*Income Tax Refunds/Payments* — Income tax payments related to the Texas margin tax are expected to total approximately $60 million, and refunds of federal income taxes are expected to total approximately $30 million in the next 12 months. Payments in the nine months ended September 30, 2010 totaled $64 million.

*Accounts Receivable Securitization Program* — TXU Energy participates in EFH Corp.'s accounts receivable securitization program with financial institutions (the funding entities). As discussed in Note 1 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010, in accordance with amended transfers and servicing accounting standards, the trade accounts receivable amounts under the program are reported as pledged balances and the related funding amounts are reported as short-term borrowings. Under the program, TXU Energy (originator) sells retail trade accounts receivable to TXU Receivables Company, a consolidated wholly-owned bankruptcy-remote direct subsidiary of EFH Corp., which sells undivided interests in the purchased accounts receivable for cash to entities established for this purpose by the funding entities. All new trade receivables under the program generated by the originator are continuously purchased by TXU Receivables Company with the proceeds from collections of receivables previously purchased. Funding under the program totaled $228 million and $383 million as of September 30, 2010 and December 31, 2009, respectively. See Note 5 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for a more complete description of the program including amendments to the program in June 2010, the impact of the program on the financial statements for the periods presented and the contingencies that could result in termination of the program and a reduction of liquidity should the underlying financing be settled.

*Distributions from Oncor* — Until December 31, 2012, distributions paid by Oncor to its members are limited to an amount not to exceed Oncor's net income determined in accordance with GAAP, subject to certain defined adjustments. Distributions are further limited by an agreement that Oncor's regulatory capital structure, as determined by the PUCT, will be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. (See Note 8 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010.)

In January 2009, the PUCT awarded CREZ construction projects to Oncor. See discussion below under "Regulatory Matters — Oncor Matters with the PUCT." As a result of the increased capital expenditures for CREZ and the debt-to-equity ratio cap, we expect distributions to EFH Corp. from Oncor will be substantially reduced during the CREZ construction period.

77

***Financial Covenants, Credit Rating Provisions and Cross Default Provisions*** — The terms of certain of our financing arrangements contain maintenance covenants with respect to leverage ratios and/or minimum net worth. As of September 30, 2010, we were in compliance with all such covenants.

*Covenants and Restrictions under Financing Arrangements* — Each of the TCEH Senior Secured Facilities and the indentures governing substantially all of the debt we have issued in connection with, and subsequent to, the Merger contain covenants that could have a material impact on the liquidity and operations of EFH Corp. and its subsidiaries.

Adjusted EBITDA (as used in the restricted payments covenant contained in the indenture governing the EFH Corp. Senior Secured Notes) for the twelve months ended September 30, 2010 totaled $5.195 billion for EFH Corp. The following are reconciliations of net income to Adjusted EBITDA for EFH Corp., TCEH and EFIH, respectively, for the nine and twelve months ended September 30, 2010 and 2009.

78

EFIHMW00223109

**PX 045**
**Page 86 of 561**

**EFH Corp.**
**Adjusted EBITDA Reconciliation**

| | Nine Months Ended September 30, 2010 | Nine Months Ended September 30, 2009 | Twelve Months Ended September 30, 2010 | Twelve Months Ended September 30, 2009 |
|---|---|---|---|---|
| Net income (loss) attributable to EFH Corp. | $ (2,973) | $ 207 | $ (2,836) | $ (8,648) |
| Income tax expense | 336 | 254 | 449 | 245 |
| Interest expense and related charges | 3,092 | 2,136 | 3,868 | 4,566 |
| Depreciation and amortization | 1,043 | 1,286 | 1,511 | 1,679 |
| EBITDA | $ 1,498 | $ 3,883 | $ 2,992 | $ (2,158) |
| Oncor EBITDA | — | (1,043) | (311) | (488) |
| Oncor Holdings distributions/dividends (a) | 141 | 117 | 239 | 1,487 |
| Interest income | (9) | (30) | (24) | (35) |
| Amortization of nuclear fuel | 102 | 73 | 130 | 95 |
| Purchase accounting adjustments (b) | 159 | 257 | 241 | 392 |
| Impairment of goodwill | 4,100 | 90 | 4,100 | 8,090 |
| Impairment of assets and inventory write down (c) | 3 | 5 | 40 | 715 |
| Net gain on debt exchange offers | (1,166) | — | (1,253) | — |
| Net income (loss) attributable to noncontrolling interests | — | 54 | 9 | (106) |
| Equity in earnings of unconsolidated subsidiary | (240) | — | (240) | — |
| EBITDA amount attributable to consolidated unrestricted subsidiaries | — | 3 | 1 | 3 |
| Unrealized net gain resulting from hedging transactions | (1,615) | (713) | (2,127) | (3,263) |
| Amortization of "day one" net loss on Sandow 5 power purchase agreement | (19) | (7) | (22) | (7) |
| Losses on sale of receivables | — | 9 | 3 | 17 |
| Noncash compensation expenses (d) | 13 | 9 | 15 | 11 |
| Severance expense (e) | 3 | 9 | 4 | 10 |
| Transition and business optimization costs (f) | (2) | 22 | 1 | 29 |
| Transaction and merger expenses (g) | 37 | 65 | 53 | 84 |
| Insurance settlement proceeds (h) | — | — | — | (21) |
| Restructuring and other (i) | (1) | (10) | (4) | (6) |
| Expenses incurred to upgrade or expand a generation station (j) | 100 | 100 | 100 | 100 |
| Adjusted EBITDA per Incurrence Covenant | $ 3,104 | $ 2,893 | $ 3,947 | $ 4,949 |
| Add back Oncor Adjusted EBITDA (reduced by Oncor distributions/dividends) | 1,053 | 926 | 1,248 | (148) |
| Adjusted EBITDA per Restricted Payments Covenant | $ 4,157 | $ 3,819 | $ 5,195 | $ 4,801 |

(a)   Twelve months ended September 30, 2009 amount includes $1.253 billion distribution of net proceeds from the sale of Oncor noncontrolling interests in November 2008.

(b)   Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel. Also include certain credits not recognized in net income due to purchase accounting.

(c)   Impairment of assets includes impairment of trade name intangible asset, impairments of land and the natural gas-fueled generation fleet and charges related to the cancelled development of coal-fueled generation facilities.

(d)   Noncash compensation expenses are accounted for under accounting standards related to stock compensation and exclude capitalized amounts.

(e)   Severance expense includes amounts incurred related to outsourcing, restructuring and other amounts deemed to be in excess of normal recurring amounts.

(f)   Transition and business optimization costs include professional fees primarily for retail billing and customer care systems enhancements and incentive compensation.

(g)   Transaction and merger expenses include costs related to the Merger and abandoned strategic transactions, outsourcing transition costs, administrative costs related to the cancelled program to develop coal-fueled generation facilities, the Sponsor Group management fee, costs related to certain growth initiatives and costs related to the Oncor sale of noncontrolling interests.

(h)   Insurance settlement proceeds include the amount received for property damage to certain mining equipment.

EFIHMW00223110

(i)    Restructuring and other for twelve months ended September 30, 2010 includes restructuring and nonrecurring activities and for the twelve months ended September 30, 2009 primarily represents reversal of certain liabilities accrued in purchase accounting and recorded as other income, partially offset by restructuring initiatives and nonrecurring activities.

(j)    Expenses incurred to upgrade or expand a generation station reflect noncapital outage costs.

79

**TCEH Consolidated**
**Adjusted EBITDA Reconciliation**

| | Nine Months Ended September 30, 2010 | Nine Months Ended September 30, 2009 | Twelve Months Ended September 30, 2010 | Twelve Months Ended September 30, 2009 |
|---|---|---|---|---|
| Net income (loss) | $ (3,646) | $ 493 | $ (3,430) | $ (7,559) |
| Income tax expense | 260 | 330 | 377 | 343 |
| Interest expense and related charges | 2,516 | 1,331 | 3,019 | 3,492 |
| Depreciation and amortization | 1,027 | 862 | 1,337 | 1,127 |
| EBITDA | $ 157 | $ 3,016 | $ 1,303 | $ (2,597) |
| Interest income | (65) | (40) | (89) | (55) |
| Amortization of nuclear fuel | 102 | 73 | 130 | 95 |
| Purchase accounting adjustments (a) | 124 | 222 | 194 | 345 |
| Impairment of goodwill | 4,100 | 70 | 4,100 | 8,070 |
| Impairment of assets and inventory write down (b) | 1 | 2 | 35 | 710 |
| EBITDA amount attributable to consolidated unrestricted subsidiaries | — | 3 | 1 | 3 |
| Unrealized net gain resulting from hedging transactions | (1,615) | (713) | (2,127) | (3,263) |
| Amortization of "day one" net loss on Sandow 5 power purchase agreement | (19) | (7) | (22) | (7) |
| Corporate depreciation, interest and income tax expenses included in SG&A expense | 9 | 5 | 9 | 5 |
| Losses on sale of receivables | — | 9 | 3 | 17 |
| Noncash compensation expense (c) | 11 | 1 | 11 | 3 |
| Severance expense (d) | 3 | 9 | 4 | 10 |
| Transition and business optimization costs (e) | 2 | 22 | 5 | 26 |
| Transaction and merger expenses (f) | 29 | 3 | 30 | 12 |
| Insurance settlement proceeds (g) | — | — | — | (21) |
| Restructuring and other (h) | 1 | (15) | (1) | (15) |
| Expenses incurred to upgrade or expand a generation station (i) | 100 | 100 | 100 | 100 |
| Adjusted EBITDA per Incurrence Covenant | $ 2,940 | $ 2,760 | $ 3,686 | $ 3,438 |
| Expenses related to unplanned generation station outages | 122 | 61 | 152 | 93 |
| Pro forma adjustment for Sandow 5 and Oak Grove 1 reaching 70% capacity in Q1 (j) | — | — | 42 | — |
| Other adjustments allowed to determine Adjusted EBITDA per Maintenance Covenant (k) | 19 | 21 | 36 | 28 |
| Adjusted EBITDA per Maintenance Covenant | $ 3,081 | $ 2,842 | $ 3,916 | $ 3,559 |

---

(a)  Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel. Also include certain credits not recognized in net income due to purchase accounting.

(b)  Impairment of assets includes impairment of trade name intangible asset and impairment of land and the natural gas-fueled generation fleet.

(c)  Noncash compensation expenses are accounted for under accounting standards related to stock compensation and exclude capitalized amounts.

(d)  Severance expense includes amounts incurred related to outsourcing, restructuring and other amounts deemed to be in excess of normal recurring amounts.

(e)  Transition and business optimization costs include professional fees primarily for retail billing and customer care systems enhancements and incentive compensation.

(f)  Transaction and merger expenses include costs related to the Merger, outsourcing transition costs and costs related to certain growth initiatives.

(g)  Insurance settlement proceeds include the amount received for property damage to certain mining equipment.

(h)  Restructuring and other for the twelve months ended September 30, 2010 includes restructuring and nonrecurring activities, and for the twelve months ended September 30, 2009 primarily represents reversal of certain liabilities accrued in purchase accounting and recorded as other income, partially offset by restructuring and nonrecurring activities.

EFIHMW00223112

(i)    Expenses incurred to upgrade or expand a generation station reflect noncapital outage costs.

(j)    Pro forma adjustment for Sandow 5 and Oak Grove 1 represents the annualization of the actual nine months ended September 30, 2010 EBITDA results for these two units.

(k)    Primarily pre-operating expenses relating to Oak Grove 2.

80

EFIHMW00223113

**EFIH Consolidated**
**Adjusted EBITDA Reconciliation**

| | Nine Months Ended September 30, 2010 | Nine Months Ended September 30, 2009 | Twelve Months Ended September 30, 2010 | Twelve Months Ended September 30, 2009 |
|---|---|---|---|---|
| Net income (loss) | $ 142 | $ 80 | $ 136 | $ (593) |
| Income tax benefit | (59) | (70) | (82) | (91) |
| Interest expense and related charges | 233 | 207 | 305 | 273 |
| Depreciation and amortization | — | — | — | — |
| EBITDA | $ 316 | $ 217 | $ 359 | $ (411) |
| Oncor EBITDA | — | — | — | — |
| Oncor Holdings distributions/dividends (a) | 141 | 117 | 239 | 1,487 |
| Interest income | (76) | — | (80) | (2) |
| Equity in earnings of unconsolidated subsidiary (net of tax) | (240) | (217) | (278) | 414 |
| Other | — | 1 | — | 1 |
| Adjusted EBITDA per Incurrence Covenant | $ 141 | $ 118 | $ 240 | $ 1,489 |
| Add back Oncor Holdings Adjusted EBITDA (reduced by Oncor Holdings distributions/dividends) | 1,053 | 926 | 1,248 | (148) |
| Adjusted EBITDA per Restricted Payments Covenant | $ 1,194 | $ 1,044 | $ 1,488 | $ 1,341 |

(a)   Twelve months ended September 30, 2009 amount includes $1.253 billion distribution of net proceeds from the sale of Oncor
noncontrolling interests in November 2008.

The following table summarizes TCEH's secured debt to Adjusted EBITDA ratio under the maintenance covenant in the TCEH
Senior Secured Facilities and various other financial ratios of EFH Corp., EFIH and TCEH that are applicable under certain other
covenants in the TCEH Senior Secured Facilities and the indentures governing the TCEH Senior Notes, the EFH Corp. Senior Notes,
the EFH Corp. Senior Secured Notes and the EFIH Notes as of September 30, 2010 and December 31, 2009 and the corresponding
maintenance and other covenant threshold levels as of September 30, 2010:

| | September 30, 2010 | December 31, 2009 | Threshold Level as of September 30, 2010 |
|---|---|---|---|
| Maintenance Covenant: | | | |
| TCEH Senior Secured Facilities: | | | |
| Secured debt to Adjusted EBITDA ratio (a) | 4.84 to 1.00 | 4.76 to 1.00 | Must not exceed 7.00 to 1.00 (b) |
| Debt Incurrence Covenants: | | | |
| EFH Corp. Senior Secured Notes: | | | |
| EFH Corp. fixed charge coverage ratio | 1.3 to 1.0 | 1.2 to 1.0 | At least 2.0 to 1.0 |
| TCEH fixed charge coverage ratio | 1.5 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| EFIH Notes: | | | |
| EFIH fixed charge coverage ratio (c) | (d) | 53.8 to 1.0 | At least 2.0 to 1.0 |
| TCEH Senior Notes: | | | |
| TCEH fixed charge coverage ratio | 1.5 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| TCEH Senior Secured Facilities: | | | |
| TCEH fixed charge coverage ratio | 1.5 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| Restricted Payments/Limitations on Investments Covenants: | | | |
| EFH Corp. Senior Notes: | | | |
| General restrictions (Sponsor Group payments): | | | |
| EFH Corp. leverage ratio | 8.5 to 1.0 | 9.4 to 1.0 | Equal to or less than 7.0 to 1.0 |
| EFH Corp. Senior Secured Notes: | | | |

81

EFIHMW00223114

**PX 045**
**Page 91 of 561**

| | September 30, 2010 | December 31, 2009 | Threshold Level as of September 30, 2010 |
|---|---|---|---|
| General restrictions (non-Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (e) | 1.6 to 1.0 | 1.4 to 1.0 | At least 2.0 to 1.0 |
| General restrictions (Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (e) | 1.3 to 1.0 | 1.2 to 1.0 | At least 2.0 to 1.0 |
| EFH Corp. leverage ratio | 8.5 to 1.0 | 9.4 to 1.0 | Equal to or less than 7.0 to 1.0 |
| EFIH Notes: | | | |
| General restrictions (non-EFH Corp. payments): | | | |
| EFIH fixed charge coverage ratio (c) (f) | 14.3 to 1.0 | 3.9 to 1.0 | At least 2.0 to 1.0 |
| General restrictions (EFH Corp. payments): | | | |
| EFIH fixed charge coverage ratio (c) (f) | (d) | 53.8 to 1.0 | At least 2.0 to 1.0 |
| EFIH leverage ratio | 5.5 to 1.0 | 4.4 to 1.0 | Equal to or less than 6.0 to 1.0 |
| TCEH Senior Notes: | | | |
| TCEH fixed charge coverage ratio | 1.5 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| TCEH Senior Secured Facilities: | | | |
| Payments to Sponsor Group: | | | |
| TCEH total debt to Adjusted EBITDA ratio | 7.9 to 1.0 | 8.4 to 1.0 | Equal to or less than 6.5 to 1.0 |

_____

(a)  In accordance with the terms of the TCEH Senior Secured Facilities and as the result of the new Sandow and first Oak Grove generating units achieving average capacity factors of greater than or equal to 70% for the three months ended March 31, 2010, the maintenance covenant as of September 30, 2010 includes pro forma twelve months Adjusted EBITDA for the units and the proportional amount of outstanding debt under the Delayed Draw Term Loan (see Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010) applicable to the two units.

(b)  Threshold level will decrease to a maximum of 6.75 to 1.00 effective December 31, 2010 and 6.50 to 1.00 effective December 31, 2011. Calculation excludes debt that ranks junior to the TCEH Senior Secured Facilities.

(c)  Although EFIH currently meets the fixed charge coverage ratio threshold applicable to certain covenants contained in the indenture governing the EFIH Notes, EFIH's ability to use such thresholds to incur debt or make restricted payments/investments is currently limited by the covenants contained in the EFH Corp. Senior Notes and the EFH Corp. Senior Secured Notes.

(d)  EFIH meets the ratio threshold. Because EFIH's interest income exceeds interest expense, the result of the ratio calculation is not meaningful.

(e)  The EFH Corp. fixed charge coverage ratio for non-Sponsor Group payments includes the results of Oncor Holdings and its subsidiaries. The EFH Corp. fixed charge coverage ratio for Sponsor Group payments excludes the results of Oncor Holdings and its subsidiaries.

(f)  The EFIH fixed charge coverage ratio for non-EFH Corp. payments includes the results of Oncor Holdings and its subsidiaries. The EFIH fixed charge coverage ratio for EFH Corp. payments excludes the results of Oncor Holdings and its subsidiaries.

*Material Credit Rating Covenants and Credit Worthiness Effects on Liquidity* — As a result of TCEH's non-investment grade credit rating and considering collateral thresholds of certain retail and wholesale commodity contracts, as of September 30, 2010, counterparties to those contracts could have required TCEH to post up to an aggregate of $8 million in additional collateral. This amount largely represents the below market terms of these contracts as of September 30, 2010; thus, this amount will vary depending on the value of these contracts on any given day.

Certain transmission and distribution utilities in Texas have tariffs in place to assure adequate credit worthiness of any REP to support the REP's obligation to collect securitization bond-related (transition) charges on behalf of the utility. Under these tariffs, as a result of TCEH's below investment grade credit rating, TCEH is required to post collateral support in an amount equal to estimated transition charges over specified time periods. The amount of collateral support required to be posted, as well as the time period of transition charges covered, varies by utility. As of September 30, 2010, TCEH has posted collateral support in the form of letters of credit to the applicable utilities in an aggregate amount equal to $28 million, with $14 million of this amount posted for the benefit of Oncor.

82

EFIHMW00223115

The PUCT has rules in place to assure adequate credit worthiness of each REP, including the ability to return customer deposits, if necessary. Under these rules, as of September 30, 2010, TCEH posted letters of credit in the amount of $84 million, which are subject to adjustments. See "Regulatory Matters — Certification of REPs."

The RRC has rules in place to assure adequate credit worthiness of parties that have mining reclamation obligations. Under these rules, should the RRC determine that the credit worthiness of Luminant Generation Company LLC (a subsidiary of TCEH) is not sufficient to support its reclamation obligations, TCEH may be required to post cash or letter of credit collateral support in an amount currently estimated to be approximately $650 million to $900 million. The actual amount (if required) could vary depending upon numerous factors, including Luminant Generation Company LLC's credit worthiness and the level of mining reclamation obligations.

ERCOT has rules in place to assure adequate credit worthiness of parties that schedule power on the ERCOT System. Under these rules, TCEH has posted collateral support, predominantly in the form of letters of credit, totaling $36 million as of September 30, 2010 (which is subject to weekly adjustments based on settlement activity with ERCOT).

Other arrangements of EFH Corp. and its subsidiaries, including Oncor's credit facility, the accounts receivable securitization program (see Note 5 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010) and certain leases, contain terms pursuant to which the interest rates charged under the agreements may be adjusted depending on the relevant credit ratings.

In the event that any or all of the additional collateral requirements discussed above are triggered, we believe we will have adequate liquidity to satisfy such requirements.

*Material Cross Default Provisions* — Certain financing arrangements contain provisions that may result in an event of default if there were a failure under other financing arrangements to meet payment terms or to observe other covenants that could or does result in an acceleration of payments due. Such provisions are referred to as "cross default" provisions.

A default by TCEH or any of its restricted subsidiaries in respect of indebtedness, excluding indebtedness relating to the accounts receivable securitization program, in an aggregate amount in excess of $200 million may result in a cross default under the TCEH Senior Secured Facilities. Under these facilities, such a default will allow the lenders to accelerate the maturity of outstanding balances ($21.310 billion as of September 30, 2010) under such facilities.

The indentures governing the TCEH Senior Notes and the TCEH Senior Secured Second Lien Notes contain a cross acceleration provision where a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of TCEH or any of its restricted subsidiaries in an aggregate amount equal to or greater than $250 million may cause the acceleration of the TCEH Senior Notes and TCEH Senior Secured Second Lien Notes.

Under the terms of a TCEH rail car lease, which had $45 million in remaining lease payments as of September 30, 2010 and terminates in 2017, if TCEH failed to perform under agreements causing its indebtedness in aggregate principal amount of $100 million or more to become accelerated, the lessor could, among other remedies, terminate the lease and effectively accelerate the payment of any remaining lease payments due under the lease.

Under the terms of a TCEH rail car lease, which had $51 million in remaining lease payments as of September 30, 2010 and terminates in 2028, if obligations of TCEH in excess of $200 million in the aggregate for payments of obligations to third party creditors under lease agreements, deferred purchase agreements or loan or credit agreements are accelerated prior to their original stated maturity, the lessor could, among other remedies, terminate the lease and effectively accelerate the payment of any remaining lease payments due under the lease.

83

EFIHMW00223116

The indentures governing the EFH Corp. Senior Secured Notes contain a cross acceleration provision whereby a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of EFH Corp. or any of its restricted subsidiaries in an aggregate amount equal to or greater than $250 million may cause the acceleration of the EFH Corp. Senior Secured Notes.

Each of the indentures governing the EFIH Notes contains a cross acceleration provision whereby a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of EFIH or any of its restricted subsidiaries in an aggregate amount equal to or greater than $250 million may cause the acceleration of the EFIH Notes.

The accounts receivable securitization program contains a cross default provision with a threshold of $200 million that applies in the aggregate to the originator, any parent guarantor of an originator or any subsidiary acting as collection agent under the program. TXU Receivables Company and EFH Corporate Services Company (a direct subsidiary of EFH Corp.), as collection agent, in the aggregate have a cross default threshold of $50,000. If any of the aforementioned defaults on indebtedness of the applicable threshold were to occur, the program could terminate.

We enter into energy-related and financial contracts, the master forms of which contain provisions whereby an event of default or acceleration of settlement would occur if we were to default under an obligation in respect of borrowings in excess of thresholds, which vary, stated in the contracts. The subsidiaries whose default would trigger cross default vary depending on the contract.

Each of TCEH's natural gas hedging agreements that are secured with a lien on its assets on a pari passu basis with the TCEH Senior Secured Facilities contains a cross default provision. In the event of a default by TCEH or any of its subsidiaries relating to indebtedness (such amounts varying by contract but ranging from $200 million to $250 million) that results in the acceleration of such debt, then each counterparty under these hedging agreements would have the right to terminate its hedge agreement with TCEH and require all outstanding obligations under such agreement to be settled.

In the event of a default by TCEH relating to indebtedness in an amount equal to or greater than $200 million that results in the acceleration of such debt, then each counterparty under TCEH's interest rate swap agreements with an aggregate derivative liability of $1.755 billion as of September 30, 2010 would have the right to terminate its interest rate swap agreement with TCEH and require all outstanding obligations under such agreement to be settled.

Other arrangements, including leases, have cross default provisions, the triggering of which would not be expected to result in a significant effect on liquidity.

*Guarantees* — See Note 7 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for details of guarantees.

## OFF–BALANCE SHEET ARRANGEMENTS

See Notes 3 and 7 to EFIH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 regarding VIEs and guarantees.

## COMMITMENTS AND CONTINGENCIES

See Note 7 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for discussion of commitments and contingencies.

## CHANGES IN ACCOUNTING STANDARDS

See Note 1 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 for a discussion of changes in accounting standards.

84

EFIHMW00223117

## REGULATORY MATTERS

### *Regulatory Investigations and Reviews*

See Note 7 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010.

### *Certification of REPs*

In April 2009, the PUCT finalized a rule relating to the Certification of Retail Electric Providers. The rule strengthens the certification requirements for REPs in order to better protect customers, transmission and distribution utilities (TDUs), and other REPs from the potential insolvency of REPs. The rule, among other things, increases creditworthiness and financial reporting requirements for REPs and provides additional customer protection requirements and regulatory asset consideration for TDU bad debt expenses. Under the new financial requirements, TXU Energy filed an amended certification, which became effective in March 2010. As a result, TCEH posted letters of credit in March 2010 totaling $84 million with the PUCT securing its payment obligations to TDUs, and is no longer required to reserve liquidity for such purposes. Liquidity reserved as of December 31, 2009 totaled $228 million.

### *Wholesale Market Design — Nodal Market*

In August 2003, the PUCT adopted a rule that, when implemented, will alter the wholesale market design in the ERCOT market. The rule requires ERCOT to:

- use a stakeholder process to develop a new wholesale market model;

- operate a voluntary day-ahead energy market;

- directly assign all congestion rents to the resources that caused the congestion;

- use nodal energy prices for resources;

- provide information for energy trading hubs by aggregating nodes;

- use zonal prices for loads, and

- provide congestion revenue rights (CRRs) (but not physical rights).

ERCOT currently has a zonal wholesale market structure consisting of four geographic zones. The proposed location-based congestion-management market is referred to as a "nodal" market because wholesale pricing would differ across the various nodes on the transmission grid instead of across the geographic zones. The implementation of a nodal market is being done in conjunction with transmission improvements designed to reduce current congestion. The implementation of a nodal market is scheduled for December 2010. While we cannot predict the ultimate impact of the proposed nodal wholesale market design on our operations or financial results, such change could ultimately have an adverse impact on the profitability and value of our competitive business, particularly if such change results in lower revenue due to lower wholesale power prices, increased costs or increased collateral posting requirements with ERCOT.

In 2010, ERCOT began conducting market testing activities in preparation for the December 2010 transition to the nodal market design. These testing activities have included certifying qualified scheduling entities (QSEs) to participate in the day-ahead and real-time markets, conducting market-wide tests of ERCOT's nodal operation systems to deploy generation resources to maintain grid frequency, holding mock auctions related to CRRs and conducting simulations of day-ahead market operations with market participants. In addition to these operational market testing activities, ERCOT has provided simulated full financial settlement and calculation of simulated credit exposure and collateral requirements for each simulated operating day. We have participated in these activities and are currently fully certified for participating in both the day-ahead market and real-time operations. Additionally, all of our operational and mothballed generation assets and our QSEs have completed certification for operation in the nodal market. In October 2010, ERCOT's board authorized nodal implementation to commence on December 1, 2010.

85

EFIHMW00223118

*Oncor Matters with the PUCT*

**Stipulation Approved by the PUCT** — In April 2008, the PUCT entered an order, which became final in June 2008, approving the terms of a stipulation relating to the filing in 2007 by Oncor and Texas Holdings of a Merger-related Joint Report and Application with the PUCT pursuant to Section 14.101(b) of PURA and PUCT Substantive Rule 25.75. The stipulation required the filing of a rate case by Oncor no later than July 1, 2008 based on a test year ended December 31, 2007. In July 2008, Nucor Steel filed an appeal of the PUCT's order in the 200th District Court of Travis County, Texas. A hearing on the appeal was held in June 2010, and the District Court affirmed the PUCT order in its entirety. Nucor Steel has appealed that ruling. Oncor filed the rate case with the PUCT in June 2008, and the PUCT issued a final order with respect to the rate case in August 2009 as discussed in the 2009 Form 10-K. Oncor and four other parties appealed various portions of the rate case final order to a state district court. Oral argument was held on October 19, 2010. The judge has taken the matter under advisement, and Oncor anticipates receiving a ruling in November 2010.

**Transmission Rates (PUCT Docket Nos. 37882, 38460 and 38495)** — In order to recover increases in its transmission costs, including incremental fees paid to other transmission service providers due to an increase in their rates, Oncor is allowed to request an update twice a year to the transmission cost recovery factor (TCRF) component of its retail delivery rates charged to REPs. In January 2010, an application was filed to increase the TCRF, which was administratively approved in February 2010 and became effective March 1, 2010. This application is expected to increase annualized revenues by $13 million. In July 2010, an application was filed to increase the TCRF. It was administratively approved in August 2010 and became effective September 1, 2010. This application is expected to increase Oncor's annualized revenues by $15 million.

In July 2010, Oncor filed an application for an interim update of its wholesale transmission rate, and the PUCT approved the new rate effective September 29, 2010. Oncor's annualized revenues are expected to increase by an estimated $43 million with $27 million of this increase recoverable through transmission rates charged to wholesale customers and the remaining $16 million recoverable from REPs through the TCRF component of Oncor's delivery rates.

**PUCT Rulemaking** — The PUCT has published rule changes in two proceedings that would impact transmission rates. In the first proceeding (PUCT Project No. 37909), the PUCT approved the proposal for adoption at its September 29, 2010 open meeting, which changes the TCRF rule to allow for more complete cost recovery of wholesale transmission charges incurred by distribution service providers. Previously, increased wholesale transmission charges were recoverable by distribution service providers, effective with the March 1 and September 1 TCRF updates, but distribution service providers could not recover increased charges incurred prior to such updates. TCRF filings are still effective March 1 and September 1, but distribution service providers will be allowed to include wholesale transmission charges based on the effective date of the wholesale transmission rate changes. In the second proceeding (PUCT Project No. 37519), the PUCT approved the proposal for adoption at its July 30, 2010 open meeting, making changes to the wholesale transmission rules to allow transmission service providers to update their wholesale transmission rates twice in a calendar year, as compared to once per year under the previous rules, providing more timely recovery of incremental capital investment. Other changes included in this rule (i) tie the effective date of the biannual update portion of the rule to the effective date of the TCRF rule in Project No. 37909, (ii) require the PUCT to consider the effects of reduced regulatory lag when setting rates in the next full rate case and (iii) provide for administrative approval of uncontested interim wholesale transmission rate applications.

**Application for 2011 Energy Efficiency Cost Recovery Factor (PUCT Docket No. 38217)** — In April 2010, Oncor filed an application with the PUCT to request approval of an energy efficiency cost recovery factor (EECRF) for 2011. PUCT rules require Oncor to make an annual EECRF filing by May 1 for implementation at the beginning of the next calendar year. In September 2010, the PUCT ruled that Oncor will be allowed to recover $51 million through its 2011 EECRF, including $45 million for 2011 program costs and an $11 million performance bonus based on 2009 results as well as a $5 million reduction for over-recovery of 2009 costs, as compared to $54 million recovered through its 2010 EECRF. The resulting monthly charge for residential customers will be $0.91, as compared to the 2010 residential charge of $0.89 per month.

86

*Competitive Renewable Energy Zones (CREZs)* — In January 2009, the PUCT awarded approximately $1.3 billion of CREZ construction projects to Oncor (PUCT Docket Nos. 35665 and 37902). The projects involve the construction of transmission lines to support the transmission of electricity from renewable energy sources, principally wind generation facilities, in west Texas to population centers in the eastern part of the state. The cost estimates for the CREZ construction projects were based upon cost analyses prepared by ERCOT in April 2008. Based on the selection of final routes for the three default and nine priority projects, identification of additional costs not included in the original ERCOT estimate (e.g., wind interconnection facilities and required modifications to existing facilities) and Oncor's preferred routes for the remaining five subsequent projects, Oncor currently estimates that the cost of these projects will be approximately $1.75 billion. Individual project costs could change based on final route specifications for the subsequent projects determined by the PUCT. In addition, ERCOT is currently performing a study to determine what additional facilities need to be built to provide additional voltage support to the state's transmission grid as a result of CREZ, and the outcome of this study could result in additional CREZ project costs. Oncor cannot estimate those additional costs at this time. It is expected that ERCOT will release the results of the study by the end of 2010. As of September 30, 2010, Oncor's cumulative CREZ-related capital expenditures totaled $256 million, including $142 million during the nine months ended September 30, 2010. It is expected that the necessary permitting actions and other requirements and all construction activities for Oncor's CREZ construction projects will be completed by the end of 2013.

In October 2009, the PUCT initiated a proceeding (Docket No. 37567) to determine whether there was sufficient financial commitment from generators of renewable energy to grant Certificates of Convenience and Necessity for transmission facilities located in two areas in the panhandle of Texas designated as CREZs. Three of the CREZ transmission projects awarded to Oncor are located in the two CREZs that are the subject of the proceeding. The estimated cost of these three transmission projects is approximately $380 million and is included in the $1.75 billion estimate above. In July 2010, a stipulation and proposed order was filed that would allow these projects to proceed. The PUCT approved the proposed order and issued its written order on July 30, 2010.

In July 2009, the City of Garland, Texas filed an Original Petition and Application for Stay and Injunction in the 200th District Court of Travis County, Texas seeking judicial review and a stay of the PUCT's March 2009 written order selecting transmission service providers (including Oncor) to build CREZ transmission facilities. In January 2010, the district court issued an order reversing the PUCT's order and remanding it to the PUCT for action consistent with the court's opinion. The district court order did not contain a stay or injunction and severed the City of Garland's requests for declaratory and injunctive relief. In February 2010, the PUCT issued orders that severed certain of the CREZ transmission projects awarded to Oncor and others from its consideration of the remand of the written order (PUCT Docket No. 37928) and suspended the schedule sequencing CREZ projects subsequent to CREZ priority projects (PUCT Docket No. 36802). In April 2010, the PUCT issued an order in Docket No. 36802 establishing the sequencing for CREZ projects subsequent to priority projects, which did not affect Oncor other than resulting in the schedule for Oncor to file CCN applications for its five CREZ subsequent projects between May and September 2010 as compared to the original March to May 2010 timeframe. That order excludes two CREZ subsequent projects that had been originally awarded to Lower Colorado River Authority, and the PUCT opened Docket No. 38045 to award these two projects. In July 2010, the City of Garland and South Texas Electric Cooperative filed a participation agreement regarding these two projects. In September 2010, the PUCT awarded the projects to the City of Garland and South Texas Electric Cooperative.

*Sunset Review* — PURA, the PUCT, the RRC, ERCOT, the TCEQ and the Office of Public Utility Counsel (OPUC) will be subject to "sunset" review by the Texas Legislature in the 2011 legislative session. Sunset review includes, generally, a comprehensive review of the need for and effectiveness of an administrative agency (the PUCT, the RRC, ERCOT, the TCEQ or the OPUC), along with an evaluation of the advisability of any changes to that agency's authorizing legislation (PURA). A Sunset staff report on the PUCT offering various recommendations for consideration by the Sunset Commission was issued in April 2010, and the related Sunset public meeting was conducted in May 2010. The Sunset Commission met in July 2010 and adopted various recommendations regarding the PUCT, ERCOT and the OPUC. A Sunset staff report on the RRC is scheduled to be issued in October 2010, and the related Sunset public meeting is scheduled for November 2010. The Sunset Commission will submit its recommendations for the Texas Legislature's consideration during the next session, which begins in January 2011. We cannot predict the outcome of the sunset review process.

87

EFIHMW00223120

*Mine Safety Disclosures — Required by the Dodd-Frank Wall Street Reform and Consumer Protection Act*

Safety is a top priority in all our businesses, and accordingly, it is a key component of our focus on operational excellence, our employee performance reviews and employee compensation. Our health and safety program objectives are to prevent workplace accidents to ensure all employees return home safely and comply with all regulations.

We currently own and operate 12 surface lignite coal mines in Texas to provide fuel for our electricity generation facilities. These mining operations are regulated by the U.S. Mine Safety and Health Administration (MSHA) under the Federal Mine Safety and Health Act of 1977, as amended (the Mine Act) as well as other regulatory agencies such as the RRC. The MSHA inspects U.S. mines, including ours, on a regular basis and if it believes a violation of the Mine Act or any health or safety standard or other regulation has occurred, it may issue a citation or order, generally accompanied by a proposed fine or assessment. Such citations and orders can be contested and appealed to the Federal Mine Safety and Health Review Commission (FMSHRC), which often results in a reduction of the severity and amount and sometimes results in dismissal. The number of citations, orders and proposed assessments vary depending on the size of the mine as well as other factors.

Disclosures related to specific mines pursuant to Section 1503 of the recently enacted Dodd-Frank Wall Street Reform and Consumer Protection Act sourced from data documented as of October 7, 2010 in the MSHA Data Retrieval System for the three months ended September 30, 2010 (except pending legal actions, which are as of September 30, 2010) are as follows:

| Mine (a) | Section 104 S and S Citations (b) | Proposed MSHA Assessments ($ thousands) (c) | Pending Legal Action (d) |
|---|---|---|---|
| Beckville | 1 | 1 | 1 |
| Big Brown | 1 | 2 | 1 |
| Kosse | — | 1 | — |
| Oak Hill | 4 | — | 1 |
| Sulphur Springs | 2 | 1 | 2 |
| Tatum | — | — | 1 |
| Three Oaks | 1 | 3 | — |
| Winfield South | 1 | 3 | 1 |

(a)  Excludes mines for which there were no applicable events.

(b)  Includes MSHA citations for health or safety standards that could significantly and substantially contribute to a serious injury if left unabated.

(c)  Total dollar value for proposed assessments received from MSHA for all citations and orders issued in the three months ended September 30, 2010, including but not limited to Sections 104, 107 and 110 citations and orders that are not required to be reported.

(d)  Pending actions before the FMSHRC involving a coal or other mine.

During the three months ended September 30, 2010, our mining operations received no citations, orders or written notices under Sections 104(b), 104(d), 104(e), 107(a) or 110(b)(2) of the Mine Act, and they experienced no fatalities.

88

EFIHMW00223121

*Summary*

We cannot predict future regulatory or legislative actions or any changes in economic and securities market conditions. Such actions or changes could significantly alter our basic financial position, results of operations or cash flows.

## QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Market risk is the risk that we may experience a loss in value as a result of changes in market conditions affecting factors such as commodity prices and interest rates, that may be experienced in the ordinary course of business. Our exposure to market risk is affected by a number of factors, including the size, duration and composition of our energy and financial portfolio, as well as the volatility and liquidity of markets. Instruments used to manage this exposure include interest rate swaps to manage interest rate risk related to debt, as well as exchange traded, over-the-counter contracts and other contractual arrangements to manage commodity price risk.

*Risk Oversight*

TCEH manages the commodity price, counterparty credit and commodity-related operational risk related to the unregulated energy business within limitations established by senior management and in accordance with overall risk management policies. Interest rate risk is managed centrally by the corporate treasury function. Market risks are monitored by risk management groups that operate independently of the wholesale commercial operations, utilizing defined practices and analytical methodologies. These techniques measure the risk of change in value of the portfolio of contracts and the hypothetical effect on this value from changes in market conditions and include, but are not limited to, Value at Risk (VaR) methodologies. Key risk control activities include, but are not limited to, transaction review and approval (including credit review), operational and market risk measurement, validation of transaction capture, portfolio valuation and reporting, including mark-to-market valuation, VaR and other risk measurement metrics.

We have a corporate risk management organization that is headed by the Chief Financial Officer, who also functions as the Chief Risk Officer. The Chief Risk Officer, through his designees, enforces applicable risk limits, including the respective policies and procedures to ensure compliance with such limits and evaluates the risks inherent in our businesses.

*Commodity Price Risk*

TCEH is subject to the inherent risks of market fluctuations in the price of electricity, natural gas and other energy-related products it markets or purchases. The company actively manages its portfolio of owned generation assets, fuel supply and retail sales load to mitigate the near-term impacts of these risks on results of operations. The company, similar to other participants in the market, cannot fully manage the long-term value impact of structural declines or increases in natural gas and power prices and spark spreads (differences between the market price of electricity and its cost of production).

In managing energy price risk, TCEH enters into a variety of market transactions including, but not limited to, short- and long-term contracts for physical delivery, exchange traded and over-the-counter financial contracts and bilateral contracts with customers. Activities include hedging, the structuring of long-term contractual arrangements and proprietary trading. The company continuously monitors the valuation of identified risks and adjusts positions based on current market conditions. The company strives to use consistent assumptions regarding forward market price curves in evaluating and recording the effects of commodity price risk.

*Long-Term Hedging Program* — See "Significant Activities and Events" above for a description of the program, including potential effects on reported results.

*VaR Methodology* — A VaR methodology is used to measure the amount of market risk that exists within the portfolio under a variety of market conditions. The resultant VaR produces an estimate of a portfolio's potential for loss given a specified confidence level and considers, among other things, market movements utilizing standard statistical techniques given historical and projected market prices and volatilities.

A Monte Carlo simulation methodology is used to calculate VaR and is considered by management to be the most effective way to estimate changes in a portfolio's value based on assumed market conditions for liquid markets. The use of this method requires a number of key assumptions, such as use of (i) an assumed confidence level; (ii) an assumed holding period (i.e., the time necessary for management action, such as to liquidate positions); and (iii) historical estimates of volatility and correlation data.

*Trading VaR* — This measurement estimates the potential loss in fair value, due to changes in market conditions, of all contracts entered into for trading purposes based on a 95% confidence level and an assumed holding period of five to 60 days.

|  | Nine Months Ended September 30, 2010 | Year Ended December 31, 2009 |
|---|---|---|
| Month-end average Trading VaR: | $ 3 | $ 4 |
| Month-end high Trading VaR: | $ 4 | $ 7 |
| Month-end low Trading VaR: | $ 1 | $ 2 |

EFIHMW00223122

***VaR for Energy-Related Contracts Subject to Mark-to-Market (MtM) Accounting*** — This measurement estimates the potential loss in fair value, due to changes in market conditions, of all contracts marked-to-market in net income (principally hedges not accounted for as cash flow hedges and trading positions), based on a 95% confidence level and an assumed holding period of five to 60 days.

| | Nine Months Ended September 30, 2010 | | Year Ended December 31, 2009 | |
|---|---|---|---|---|
| Month-end average MtM VaR: | $ | 450 | $ | 1,050 |
| Month-end high MtM VaR: | $ | 621 | $ | 1,470 |
| Month-end low MtM VaR: | $ | 321 | $ | 638 |

***Earnings at Risk (EaR)*** — This measurement estimates the potential reduction of pretax earnings for the periods presented, due to changes in market conditions, of all energy-related contracts marked-to-market in net income and contracts not marked-to-market in net income that are expected to be settled within the fiscal year (physical purchases and sales of commodities). Transactions accounted for as cash flow hedges are also included for this measurement. A 95% confidence level and a five to 60 day holding period are assumed in determining EaR.

| | Nine Months Ended September 30, 2010 | | Year Ended December 31, 2009 | |
|---|---|---|---|---|
| Month-end average EaR: | $ | 507 | $ | 1,088 |
| Month-end high EaR: | $ | 662 | $ | 1,511 |
| Month-end low EaR: | $ | 404 | $ | 676 |

The decreases in the risk measures (MtM VaR and EaR) above were primarily driven by changes in market volatility and underlying commodity prices.

*Interest Rate Risk*

As of September 30, 2010, the potential reduction of annual pretax earnings due to a one percentage-point (100 basis points) increase in floating interest rates on long-term debt totaled $40 million, taking into account the interest rate swaps discussed in Note 6 to EFH Corp.'s historical condensed consolidated financial statements for three and nine months ended September 30, 2010.

*Credit Risk*

Credit risk relates to the risk of loss associated with nonperformance by counterparties. We maintain credit risk policies with regard to our counterparties to minimize overall credit risk. These policies prescribe practices for evaluating a potential counterparty's financial condition, credit rating and other quantitative and qualitative credit criteria and specify authorized risk mitigation tools including, but not limited to, use of standardized master netting contracts and agreements that allow for netting of positive and negative exposures associated with a single counterparty. We have processes for monitoring and managing credit exposure of our businesses including methodologies to analyze counterparties' financial strength, measurement of current and potential future exposures and contract language that provides rights for netting and set-off. Credit enhancements such as parental guarantees, letters of credit, surety bonds and margin deposits are also utilized. Additionally, individual counterparties and credit portfolios are managed to assess overall credit exposure. This evaluation results in establishing exposure limits or collateral requirements for entering into an agreement with a counterparty that creates exposure. Additionally, we have established controls to determine and monitor the appropriateness of these limits on an ongoing basis. Prospective material adverse changes in the payment history or financial condition of a counterparty or downgrade of its credit quality result in the reassessment of the credit limit with that counterparty. This process can result in the subsequent reduction of the credit limit or a request for additional financial assurances.

***Credit Exposure*** — Our gross exposure to credit risk associated with trade accounts receivable (retail and wholesale) and net asset positions (before credit collateral) arising from commodity contracts and hedging and trading activities totaled $3.251 billion as of September 30, 2010. The components of this exposure are discussed in more detail below.

Assets subject to credit risk as of September 30, 2010 include $885 million in retail trade accounts receivable before taking into account cash deposits held as collateral for these receivables totaling $71 million. The risk of material loss (after consideration of bad debt allowances) from nonperformance by these customers is unlikely based upon historical experience. Allowances for uncollectible accounts receivable are established for the potential loss from nonpayment by these customers based on historical experience, market or operational conditions and changes in the financial condition of large business customers.

The remaining credit exposure arises from wholesale trade receivables, commodity contracts and hedging and trading activities, including interest rate hedging. Counterparties to these transactions include energy companies, financial institutions, electric utilities, independent power producers, oil and gas producers, local distribution companies and energy trading and marketing companies. As of September 30, 2010, the exposure to credit risk from these counterparties totaled $2.366 billion taking into account the standardized master netting contracts and agreements described above but before taking into account $714 million in credit collateral (cash, letters

EFIHMW00223123

of credit and other credit support). The net exposure (after credit collateral) of $1.652 billion increased $355 million in the nine months ended September 30, 2010, reflecting the increase in derivative assets related to the long-term hedging program due to the decline in forward natural gas prices, partially offset by the return of the $400 million in collateral discussed in Note 11 to EFH Corp.'s historical condensed consolidated financial statements for three and nine months ended September 30, 2010.

Of this $1.652 billion net exposure, essentially all is with investment grade customers and counterparties, as determined using publicly available information including major rating agencies' published ratings and our internal credit evaluation process. Those customers and counterparties without a S&P rating of at least BBB- or similar rating from another major rating agency are rated using internal credit methodologies and credit scoring models to estimate a S&P equivalent rating. The company routinely monitors and manages credit exposure to these customers and counterparties on this basis.

The following table presents the distribution of credit exposure as of September 30, 2010 arising from wholesale trade receivables, commodity contracts and hedging and trading activities. This credit exposure represents wholesale trade accounts receivable and net asset positions on the balance sheet arising from hedging and trading activities after taking into consideration netting provisions within each contract, setoff provisions in the event of default and any master netting contracts with counterparties. See Note 11 to EFH Corp.'s historical condensed consolidated financial statements for three and nine months ended September 30, 2010 for further discussion of portions of this exposure related to activities marked-to-market in the financial statements.

| | Exposure Before Credit Collateral | Credit Collateral | Net Exposure | Gross Exposure by Maturity | | | |
|---|---|---|---|---|---|---|---|
| | | | | 2 years or less | Between 2-5 years | Greater than 5 years | Total |
| Investment grade | $ 2,333 | $ 712 | $ 1,621 | $ 1,576 | $ 757 | $ — | $2,333 |
| Noninvestment grade | 33 | 2 | 31 | 31 | 2 | — | 33 |
| Totals | $ 2,366 | $ 714 | $ 1,652 | $ 1,607 | $ 759 | $ — | $2,366 |
| Investment grade | 98.6% | | 98.1% | | | | |
| Noninvestment grade | 1.4% | | 1.9% | | | | |

In addition to the exposures in the table above, contracts classified as "normal" purchase or sale and non-derivative contractual commitments are not marked-to-market in the financial statements. Such contractual commitments may contain pricing that is favorable considering current market conditions and therefore represent economic risk if the counterparties do not perform. Nonperformance could have a material adverse impact on future results of operations, financial condition and cash flows.

Significant (10% or greater) concentration of credit exposure exists with two counterparties, which represented 49% and 29% of the net $1.652 billion exposure. We view exposure to these counterparties to be within an acceptable level of risk tolerance due to the applicable counterparty's credit rating and the importance of our business relationship with the counterparty. However, this concentration increases the risk that a default would have a material effect on results of operations.

With respect to credit risk related to the long-term hedging program, essentially all of the transaction volumes are with counterparties with an A credit rating or better. However, there is current and potential credit concentration risk related to the limited number of counterparties that comprise the substantial majority of the program with such counterparties being in the banking and financial sector. The transactions with these counterparties contain certain credit rating provisions that would require the counterparties to post collateral in the event of a material downgrade in the credit rating of the counterparties. An event of default by one or more hedge counterparties could subsequently result in termination-related settlement payments that reduce available liquidity if amounts are owed to the counterparties related to the commodity contracts or delays in receipts of expected settlements if the hedge counterparties owe amounts to us. While the potential concentration of risk with these counterparties is viewed to be within an acceptable risk tolerance, the exposure to hedge counterparties is managed through the various ongoing risk management measures described above.

89

EFIHMW00223124

PX 045
Page 101 of 561

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS AS OF AND FOR THE YEAR
ENDED DECEMBER 31, 2009

*The following discussion and analysis of our financial condition and results of operations covers fiscal years ended December 31, 2009 and 2008, and was included in EFH Corp.'s Annual Report on Form 10-K for the year ended December 31, 2009 filed with the SEC on February 19, 2010 (except for disclosure regarding credit ratings, which has been deleted to comply with an intervening change in law). You should read this MD&A in conjunction with the "Selected Historical Consolidated Financial Data for EFH Corp. and Its Subsidiaries" and EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 and the notes to those statements, each included elsewhere in this prospectus. This MD&A should also be read in conjunction with the disclosure set forth in "Prospectus Summary — Recent Developments," "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three and Nine Months Ended September 30, 2010" and EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010 and the notes to those statements, each included elsewhere in this prospectus and each of which provides material updates to certain of the information contained in this MD&A. This MD&A contains forward-looking statements and involves numerous risks and uncertainties, including, but not limited to, those described in the "Risk Factors" section of this prospectus. Actual results may differ materially from those contained in any forward-looking statements.*

*You also should read this MD&A with "Our Businesses" for a discussion of certain of our important financial policies and objectives; performance measures and operational factors we use to evaluate our financial condition and operating performance; and our business segments.*

*References to "EFH Corp." in this MD&A refer to Energy Future Holdings Corp. and/or its subsidiaries, depending on context. See "Glossary" for other defined terms used in this MD&A. All dollar amounts in the tables in this MD&A are stated in millions of U.S. dollars unless otherwise indicated.*

## BUSINESS

We are a Dallas-based holding company conducting operations principally through our TCEH and Oncor subsidiaries. TCEH is a holding company for subsidiaries engaged in competitive electricity market activities largely in Texas including electricity generation, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales. Oncor is a majority-owned (approximately 80%) subsidiary engaged in regulated electricity transmission and distribution operations in Texas. Various "ring-fencing" measures have been taken to enhance the credit quality of Oncor. See Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for a description of the material features of these "ring-fencing" measures and Note 15 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for discussion of noncontrolling interests sold by Oncor.

### Operating Segments

We have aligned and report our business activities as two operating segments: the Competitive Electric segment and the Regulated Delivery segment. The Competitive Electric segment is principally comprised of TCEH. The segment also includes equipment salvage and resale activities related to the cancellation of the development of eight new coal-fueled generation units in 2007. The Regulated Delivery segment is comprised of Oncor and its wholly-owned bankruptcy-remote financing subsidiary.

See Note 24 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for further information regarding reportable business segments.

### Significant Activities and Events

**Long-Term Hedging Program** — TCEH has a long-term hedging program designed to reduce exposure to changes in future electricity prices due to changes in the price of natural gas. Under the program, the company has entered into market transactions involving natural gas-related financial instruments, and as of December 31, 2009, has effectively sold forward approximately 1.6 billion MMBtu of natural gas (equivalent to the natural gas exposure of approximately 200,000 GWh at an assumed 8.0 market heat rate) for the period from January 1, 2010 through December 31, 2014 at weighted average annual hedge prices ranging from $7.80 per MMBtu to $7.19 per MMBtu. These transactions, as well as forward power sales, have effectively hedged an estimated 68% of the natural gas price exposure related to TCEH's expected generation output for the period beginning January 1, 2010 and ending December 31, 2014 (on an average basis for such period and assuming an 8.0 market heat rate). The hedges were entered into with the continuing expectation that wholesale electricity prices in ERCOT will be highly correlated with natural gas prices, which is expected to be the marginal fuel for the purpose of setting electricity prices approximately 75% to 90% of the time. If the correlation changes in the future, the cash flows targeted under the long-term hedging program may not be achieved.

90

EFIHMW00223125

The long-term hedging program is comprised primarily of contracts with prices based on the New York Mercantile Exchange (NYMEX) Henry Hub pricing point. However, because there are other local and regional natural gas pricing points such as Houston Ship Channel, future wholesale power prices in ERCOT may not correlate as closely to the Henry Hub pricing as other pricing points, which could decrease the effectiveness of the positions in the long-term hedging program in mitigating power price exposure. The company has hedged more than 95% of the Houston Ship Channel versus Henry Hub pricing point risk for 2010.

The company has entered into related put and call transactions (referred to as collars), primarily for year 2014 of the program, that effectively hedge natural gas prices within a range. These transactions represented approximately 6% of the positions in the long-term hedging program at December 31, 2009, with the approximate weighted average strike prices under the collars being a floor of $7.80 per MMBtu and a ceiling of $11.75 per MMBtu. The company expects to use financial instruments, including collars, in future hedging activity under the long-term hedging program.

The following table summarizes the natural gas hedges in the long-term hedging program as of December 31, 2009:

| | Measure | 2010 | 2011 | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|---|---|
| Natural gas hedge volumes (a) | mm MMBtu | ~240 | ~447 | ~490 | ~300 | ~97 | ~1,574 |
| Weighted average hedge price (b) | $/MMBtu | ~7.79 | ~7.56 | ~7.36 | ~7.19 | ~7.80 | — |
| Weighted average market price (c) | $/MMBtu | ~5.79 | ~6.34 | ~6.53 | ~6.67 | ~6.84 | — |

(a)   Where collars are reflected, the volumes are estimated based on the natural gas price sensitivity (i.e., delta position) of the derivatives. The notional volumes for collars are approximately 150 million MMBtu, which corresponds to a delta position of approximately 97 million MMBtu in 2014.

(b)   Weighted average hedge prices are based on NYMEX Henry Hub prices of forward natural gas sales positions in the long-term hedging program (excluding the impact of offsetting purchases for rebalancing and pricing point basis transactions). Where collars are reflected, sales price represents the collar floor price.

(c)   Based on NYMEX Henry Hub prices.

Changes in the fair value of the instruments in the long-term hedging program are being recorded as unrealized gains and losses in net gain (loss) from commodity hedging and trading activities in the statement of income, which has and could continue to result in significant volatility in reported net income. Based on the size of the long-term hedging program as of December 31, 2009, a $1.00/MMBtu change in natural gas prices across the hedged period would result in the recognition of up to approximately $1.6 billion in pretax unrealized mark-to-market gains or losses.

The reported unrealized mark-to-market net gain related to the long-term hedging program for the year ended December 31, 2009 totaled $1.107 billion. This amount reflects a $1.857 billion net gain due to the effect of lower forward prices of natural gas on the value of positions in the program, which was partially offset by net losses of $750 million representing reversals of previously recorded unrealized gains on positions that settled in the period. The reported unrealized mark-to-market net gain related to the long-term hedging program for the year ended December 31, 2008 totaled $2.587 billion reflecting declines in forward prices of natural gas in 2008. Given the volatility of natural gas prices, it is not possible to predict future reported unrealized mark-to-market gains or losses and the actual gains or losses that will ultimately be realized upon settlement of the hedge positions in future years. If natural gas prices at settlement are lower than the prices of the hedge positions, the hedges are expected to mitigate the otherwise negative effect on earnings of lower wholesale electricity prices. However, if natural gas prices at settlement are higher than the prices of the hedge positions, the hedges are expected to dampen the otherwise positive effect on earnings of higher wholesale electricity prices and will in this context be viewed as having resulted in an opportunity cost. The cumulative unrealized mark-to-market net gain related to positions in the long-term hedging program totaled $1.978 billion and $871 million at December 31, 2009 and December 31, 2008, respectively. These values can change materially as market conditions change.

91

EFIHMW00223126

As of December 31, 2009, more than 95% of the long-term hedging program transactions were directly or indirectly secured by a first-lien interest in TCEH's assets (including the transactions supported by the TCEH Commodity Collateral Posting Facility — see discussion below under "Financial Condition — Liquidity and Capital Resources") thereby reducing the cash and letter of credit collateral requirements for the hedging program.

See "Key Risks and Challenges — Substantial Leverage, Uncertain Financial Markets and Liquidity Risk" and "— Natural Gas Price and Market Heat Rate Exposure."

**Debt Exchanges and Issuances** — See Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for discussion of debt exchange offers completed in November 2009 and the issuance of additional notes in January 2010.

**TCEH Interest Rate Swap Transactions** — As of December 31, 2009, TCEH had entered into a series of interest rate swaps that effectively fix the interest rates at between 7.3% and 8.3% on $16.30 billion principal amount of its senior secured debt maturing from 2010 to 2014. All of these swaps were entered into prior to January 1, 2009. Taking into consideration these swap transactions, approximately 10% of our total long-term debt portfolio at December 31, 2009 was exposed to variable interest rate risk. TCEH also entered into interest rate basis swap transactions, which further reduce the fixed (through swaps) borrowing costs, related to an aggregate of $16.25 billion principal amount of senior secured debt. We may enter into additional interest rate hedges from time to time. Unrealized mark-to-market net gains and losses related to all TCEH interest rate swaps, which are reported in interest expense and related charges, totaled $696 million in net gains for the year ended December 31, 2009 and $1.477 billion in net losses for the year ended December 31, 2008. The cumulative unrealized mark-to-market net liability related to all TCEH interest rate swaps totaled $1.212 billion and $1.909 billion at December 31, 2009 and 2008, respectively, of which $194 million and $364 million (both pre-tax), respectively, was reported in accumulated other comprehensive income. These fair values can change materially as market conditions change, which could result in significant volatility in reported net income. See discussion in Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 regarding various interest rate swap transactions.

**Texas Generation Facilities Development** — TCEH is nearing completion of a program to develop three lignite-fueled generation units (2 units at Oak Grove and 1 unit at Sandow) in Texas with a total estimated capacity of approximately 2,200 MW. The Sandow unit and the first Oak Grove unit achieved substantial completion (as defined in the EPC agreements for the units) effective September 30, 2009 and December 22, 2009, respectively. Accordingly, the company has operational control of these units. We began depreciating these units and recognizing revenues and fuel costs for accounting purposes in the fourth quarter 2009. The second Oak Grove unit, which is in the commissioning and start-up phase, synchronized to the grid in January 2010 and is expected to achieve substantial completion (as defined in the EPC agreement for the unit) in mid-2010. Aggregate cash capital expenditures for these three units are expected to total approximately $3.25 billion including all construction, site preparation and mining development costs, of which approximately $3.1 billion was spent as of December 31, 2009. Total recorded costs, including purchase accounting fair value adjustments and capitalized interest, are expected to total approximately $4.8 billion upon completion of the units, and the balance was $4.6 billion as of December 31, 2009. See discussion in Note 13 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 regarding contingencies related to these units.

**Nuclear Generation Development** — In September 2008, a subsidiary of TCEH filed a combined operating license application with the NRC for two new nuclear generation units, each with approximately 1,700 MW (gross capacity), at its existing Comanche Peak nuclear generation site. In connection with the filing of the application, in January 2009, subsidiaries of TCEH and Mitsubishi Heavy Industries Ltd. (MHI) formed a joint venture, Comanche Peak Nuclear Power Company (CPNPC), to further the development of the two new nuclear generation units using MHI's US–Advanced Pressurized Water Reactor technology. The TCEH subsidiary owns an 88% interest in CPNPC, and a MHI subsidiary owns a 12% interest.

92

EFIHMW00223127

In March 2009, the NRC announced an official review schedule for the license application. Based on the schedule, the NRC expects to complete its review by December 2011, and it is expected that a license would be issued approximately one year later. In November 2009, CPNPC filed a comprehensive revision to the license application that updated the license application for developments occurring after the initial filing.

In 2009, the DOE announced that it had selected four applicants to proceed to the due diligence phase of its Loan Guarantee Program, and to commence negotiations towards potential loan guarantees for their respective generation projects. CPNPC was not among the initial four applicants selected by the DOE; however, CPNPC continues to update the DOE on its progress, with the goal of securing a DOE loan guarantee for financing the proposed units prior to commencement of construction.

*Idling of Natural Gas-Fueled Units* — In February 2009, we notified ERCOT of plans to retire 11 of our natural gas-fueled units, totaling 2,251 MW of capacity (2,341 MW installed nameplate capacity), in May 2009, and mothball (idle) an additional four units, totaling 1,651 MW of capacity (1,675 MW of installed nameplate capacity), in September 2009. In May and September 2009, we entered into reliability-must-run (RMR) agreements for the remainder of 2009 with ERCOT for the operation of one unit originally planned to be retired with 112 MW of capacity (115 MW of installed nameplate capacity) and one unit planned to be mothballed with 515 MW of capacity (540 MW of installed nameplate capacity), respectively. In December 2009, we entered into RMR agreements with ERCOT for these same two units for January through November 2010. The other units were retired in May 2009 or mothballed in September 2009 as originally planned. An impairment charge of $229 million related to the carrying value of these units was recorded in the fourth quarter of 2008.

*Global Climate Change* — See "Our Businesses — Environmental Regulations and Related Considerations" for discussion of global climate change and the effects on the company.

*Impairment of Goodwill* — Financial market conditions had a significant effect on our 2008 assessment of the carrying value of goodwill. We recorded a total goodwill impairment charge of $8.950 billion (which was not deductible for income tax purposes) in 2008 and 2009, primarily arising from the dislocation in the capital markets that had increased interest rate spreads and the resulting discount rates used in estimating fair values and the effects of declines in market values of debt and equity securities of comparable companies.

This non-cash impairment did not cause EFH Corp. or its subsidiaries to be in default under any of their respective debt covenants or impact counterparty trading agreements or have a material impact on liquidity.

See Note 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 and "Application of Critical Accounting Policies" below for more information on the goodwill impairment charge.

*Oncor Technology Initiatives* — Oncor continues to invest in technology initiatives that include development of a modernized grid through the replacement of existing meters with advanced digital metering equipment and development of advanced digital communication, data management, real-time monitoring and outage detection capabilities. This modernized grid is expected to produce electricity service reliability improvements and provide the potential for additional products and services from REPs that will enable businesses and consumers to better manage their electricity usage and costs. Oncor's plans provide for the full deployment of over three million advanced meters by the end of 2012 to all residential and most non-residential retail electricity customers in Oncor's service area. The advanced meters can be read remotely, rather than by a meter reader physically visiting the location of each meter. Advanced meters facilitate automated demand side management, which allows consumers to monitor the amount of electricity they are consuming and adjust their electricity consumption habits.

93

EFIHMW00223128

As of December 31, 2009, Oncor has installed approximately 660 thousand advanced digital meters, including approximately 620 thousand during the year ended December 31, 2009. As the new meters are integrated, Oncor reports 15-minute interval, billing-quality electricity consumption data to ERCOT for market settlement purposes. The data makes it possible for REPs to support new programs and pricing options. Cumulative capital expenditures for the deployment of the advanced meter system totaled $196 million as of December 31, 2009.

As discussed below under "Regulation and Rates," Oncor has implemented a rate surcharge effective January 1, 2009 to recover its investment in the advanced meter deployment.

***Oncor Matters with the PUCT*** — See discussion of these matters, including the awarded construction of $1.3 billion of transmission lines and a rate case with the PUCT, below under "Regulation and Rates."

## KEY RISKS AND CHALLENGES

Following is a discussion of key risks and challenges facing management and the initiatives currently underway to manage such challenges.

### Substantial Leverage, Uncertain Financial Markets and Liquidity Risk

Our substantial leverage, resulting in large part from debt incurred to finance the Merger, requires significant cash flows to be dedicated to interest and principal payments and could adversely affect our ability to raise additional capital to fund operations, limit our ability to react to changes in the economy, our industry or our business, and expose us to interest rate risk to the extent not hedged. Short-term borrowings and long-term debt, including amounts due currently, totaled $43.426 billion at December 31, 2009. Taking into consideration interest-rate swap transactions, as of December 31, 2009 approximately 90% of our total long-term debt portfolio is subject to fixed interest rates, at a weighted average interest rate of 8.95%. Interest payments on long-term debt in 2010 are expected to total approximately $3.059 billion, and principal payments are expected to total approximately $340 million.

While we believe our cash on hand and cash flow from operations combined with availability under existing credit facilities provide sufficient liquidity to fund current and projected expenses and capital requirements for 2010 (see "Financial Condition — Liquidity and Capital Resources" section below), there can be no assurance that counterparties to our credit facilities will perform as expected through the maturity dates or hedging and trading counterparties, particularly related to the long-term hedging program, will meet their obligations to us. Failure of such counterparties to meet their obligations or substantial changes in financial markets, the economy, the requirements of regulators or our industry or operations could result in constraints in our liquidity. See discussion of credit risk in Item 7A, "Quantitative and Qualitative Disclosures About Market Risk" in our 2009 Form 10-K and discussion of credit facilities in "Financial Condition — Liquidity and Capital Resources" and in Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009. Also, as a result of the financial crisis that arose in 2008, there has been a reduction of available counterparties for our hedging and trading activities, particularly for longer-dated transactions, which could impact our ability to hedge our commodity price and interest rate exposure to desired levels at reasonable costs. However, traditional counterparties with physical assets to hedge, as well as financial institutions and other parties, continue to participate in the markets.

A substantial amount of our indebtedness is scheduled to mature in the period from 2014 through 2017. We are focused on improving the balance sheet and expect to opportunistically look for ways to reduce the amount and extend the weighted average maturity of our outstanding debt. Progress to date on this initiative includes the August 2009 amendment to the Credit Agreement governing the TCEH Senior Secured Facilities that provides additional flexibility in restructuring debt obligations, the debt exchanges completed in November 2009 and the January 2010 issuance of $500 million of senior secured notes to be used for general corporate purposes, including but not limited to, repurchase of outstanding indebtedness. See Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for additional discussion of these transactions.

94

EFIHMW00223129

In addition, because our operations are capital intensive, we expect to rely over the long-term upon access to financial markets as a significant source of liquidity for capital requirements not satisfied by cash-on-hand, operating cash flows or our available credit facilities. Our ability to economically access the capital or credit markets could be restricted at a time when we would like, or need, to access those markets. Lack of such access could have an impact on our flexibility to react to changing economic and business conditions.

*Natural Gas Price and Market Heat-Rate Exposure*

Wholesale electricity prices in the ERCOT market generally move with the price of natural gas because marginal demand for electricity supply is generally met with natural gas-fueled generation facilities. Historically the price of natural gas has fluctuated due to the effects of weather, changes in industrial demand, supply availability, and other economic and market factors and such prices have been very volatile in recent years. Since 2005, forward natural gas prices ranged from below $4 per MMBtu to above $13 per MMBtu. The wholesale market price of power divided by the market price of natural gas represents the market heat rate. Market heat rate movements also affect wholesale electricity prices. Market heat rate reflects the efficiency of the marginal supplier (generally natural gas-fueled generation facilities) in generating electricity.

In contrast to our natural gas-fueled generation facilities, changes in natural gas prices have no significant effect on the cost of generating electricity from our nuclear and lignite/coal-fueled plants. All other factors being equal, these baseload generation assets, which provided 70% of supply volumes in 2009, increase or decrease in value as natural gas prices and market heat rates rise or fall, respectively, because of the effect of natural gas prices setting marginal wholesale power prices in ERCOT.

With the exposure to variability of natural gas prices, retail sales price management and hedging activities are critical to the profitability of the business and maintaining consistent cash flow levels.

Our approach to managing commodity price risk focuses on the following:

- employing disciplined hedging and risk management strategies through physical and financial energy-related (electricity and natural gas) contracts intended to partially hedge gross margins;

- continuing reduction of fixed costs to better withstand gross margin volatility;

- following a retail pricing strategy that appropriately reflects the magnitude and costs of commodity price and liquidity risk, and

- improving retail customer service to attract and retain high-value customers.

As discussed above under "Significant Activities and Events," we have implemented a long-term hedging program to mitigate the risk of future declines in wholesale electricity prices due to declines in natural gas prices.

The following sensitivity table provides estimates of the potential impact (in $millions) of movements in natural gas and certain other commodity prices and market heat rates on realized pre-tax earnings for the periods presented. The estimates related to price sensitivity are based on TCEH's unhedged position and forward prices as of December 31, 2009, which for natural gas reflects estimates of electricity generation less amounts hedged through the long-term natural gas hedging program and amounts under existing wholesale and retail sales contracts. On a rolling twelve-month basis, the substantial majority of retail sales under month-to-month arrangements are deemed to be under contract.

95

EFIHMW00223130

| | Balance 2010 (a) | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| $1.00/MMBtu change in gas price (b) | $ ~9 | $~45 | $~89 | $~308 | $~512 |
| 0.1/MMBtu/MWh change in market heat rate (c) | $ ~10 | $~44 | $~54 | $ ~57 | $ ~59 |
| $1.00/gallon change in diesel fuel price | $ ~1 | $ ~1 | $ ~2 | $ ~53 | $ ~57 |
| $10.00/pound change in uranium/nuclear fuel | $ — | $ — | $ ~1 | $ ~5 | $ ~4 |

(a)    Balance of 2010 is from February 1, 2010 through December 31, 2010.

(b)    Assumes conversion of electricity positions based on an approximate 8.0 market heat rate with natural gas being on the margin 75% to 90% of the time (i.e., when coal is forecast to be on the margin, no natural gas position is assumed to be generated).

(c)    Based on Houston Ship Channel natural gas prices as of December 31, 2009.

Our market heat rate exposure is impacted by changes in the mix of generation assets, such as generation capacity increases, particularly increases in lignite/coal- and nuclear-fueled generation capacity, as well as wind capacity, which could result in lower market heat rates. We expect that decreases in market heat rates would decrease the value of our generation assets because lower market heat rates generally result in lower wholesale electricity prices, and vice versa. We mitigate market heat rate risk through retail and wholesale electricity sales contracts and shorter-term market heat rate hedging transactions. We evaluate opportunities to mitigate market heat rate risk over extended periods through longer-term electricity sales contracts where practical considering pricing, credit, liquidity and related factors.

On an ongoing basis, we will continue monitoring our overall commodity risks and seek to balance our portfolio based on our desired level of exposure to natural gas prices and market heat rates and potential changes to our operational forecasts of overall generation and consumption (which is also subject to volatility resulting from customer churn, weather, economic and other factors) in our native and growth business. Portfolio balancing may include the execution of incremental transactions, including heat rate hedges, the unwinding of existing transactions and the substitution of natural gas hedges with commitments for the sale of electricity at fixed prices. As a result, commodity price exposures and their effect on earnings could materially change from time to time.

The Obama Administration has proposed financial market reforms with respect to the currently unregulated Over-the-Counter (OTC) financial derivatives market. As a result, the U.S. House of Representative has approved a bill to regulate OTC derivatives. The bill would require certain entities to clear OTC derivatives that are currently traded on the bilateral market through exchanges, which require that all collateral be in the form of cash. We have entered into a significant number of asset-backed OTC derivatives to hedge risks associated with commodity and interest rate exposure. The U.S. House of Representatives legislation would not require us to clear our OTC derivatives through exchanges. However, other proposals would have required such clearing, and it is not evident what, if any, U.S. Senate legislation might be approved. If we were required to clear such transactions, we would likely be precluded from using our noncash assets as collateral for hedging arrangements. This preclusion could have a material impact on our liquidity, particularly if the final legislation does not provide for the grandfathering of existing OTC derivatives. As a result, if applied to our OTC derivatives transactions, legislation that impairs the use of asset-backed transactions could significantly increase our costs of entering into OTC derivatives and/or could significantly limit our ability to enter into OTC derivatives and hedge our commodity and interest rate risks. We cannot predict whether or when final legislation will be enacted or whether the U.S. House of Representatives bill exemptions will be included in any final legislation.

See "Financial Condition — Liquidity and Capital Resources" below for a discussion of the liquidity effects of the long-term hedging program. Also see additional discussion of risk under Item 7A, "Quantitative and Qualitative Disclosures about Market Risk" in our 2009 Form 10-K.

*Competitive Retail Markets and Customer Retention*

Competitive retail activity in Texas has resulted in some volatility in retail customer counts. Total retail customer counts decreased less than 1% in 2007, rose 2% in 2008 and declined 3% in 2009. In responding to the competitive landscape in the ERCOT marketplace, we are focusing on the following key initiatives:

96

- Maintaining competitive pricing initiatives as evidenced by price reductions on most residential service plans in 2008 and 2009, in addition to the 15% cumulative price reduction in 2007 applicable to residential customers under qualifying service plans;

- Profitably growing the retail customer base by actively competing for new and existing customers in areas in Texas open to competition. The customer retention strategy remains focused on continuing to implement initiatives to deliver world-class customer service and improve the overall customer experience;

- Establishing TXU Energy as the most innovative retailer in the Texas market by continuing to develop tailored product offerings to meet customer needs. TXU Energy plans to invest $100 million over the five-year period beginning in 2008 (including $20 million invested through 2009) in retail initiatives aimed at helping consumers conserve energy and other demand-side management initiatives that are intended to moderate consumption and reduce peak demand for electricity, and

- Focusing business market initiatives largely on programs targeted to retain the existing highest-value customers and to recapture customers who have switched REPs. Initiatives include maintaining and continuously refining a disciplined contracting and pricing approach and economic segmentation of the business market to enhance targeted sales and marketing efforts and to more effectively deploy the direct-sales force. Tactical programs put into place include improved customer service, aided by a new customer management system implemented in 2009, the successful operation of which is critical to customer satisfaction, new product price/service offerings and a multichannel approach for the small business market.

*Volatile Energy Prices and Regulatory Risk*

Natural gas prices rose to unprecedented levels in the latter part of 2005, reflecting a world-wide increase in energy prices compounded by hurricane-related infrastructure damage. The related rise in electricity prices elevated public awareness of energy costs and dampened customer demand. Natural gas prices remain subject to events that create price volatility, and while not reaching 2005 levels, forward natural gas prices rose substantially in 2007 and part of 2008 before falling in the second half of 2008 and continuing to fall through most of 2009. Sustained high energy prices and/or ongoing price volatility also creates a risk for regulatory and/or legislative intervention with the mechanisms that govern the competitive wholesale and retail markets in ERCOT. We believe that competitive markets result in a broad range of innovative pricing and service alternatives to consumers and ultimately the most efficient use of resources and regulatory entities should continue to take actions that encourage competition in the industry. Regulatory and/or legislative intervention could disrupt the relationship between natural gas prices and electricity prices, which could impact the results of our long-term hedging strategy and our results of operations.

*New and Changing Environmental Regulations*

We are subject to various environmental laws and regulations related to $SO_2$, $NO_x$ and mercury emissions as well as other environmental contaminants that impact air and water quality. We are in compliance with all current laws and regulations, but regulatory authorities continue to evaluate existing requirements and consider proposals for changes. We continue to closely monitor any potential legislative and regulatory changes pertaining to global climate change. In view of the fact that a substantial portion of our generation portfolio consists of lignite/coal-fueled generation facilities, our financial condition or results of operations could be materially adversely affected by the enactment of any legislation, regulation or judicial action that mandates a reduction in GHG emissions or that imposes financial penalties, costs or taxes on entities that produce GHG emissions. For example, federal, state or regional legislation or regulation addressing global climate change could result in us either incurring increased material costs to reduce our GHG emissions or to procure emission allowances or credits to comply with a mandatory cap-and-trade emissions reduction program or incurring increased taxes, which could be material, due to the imposition of a carbon tax. See further discussion under, "Our Businesses — Environmental Regulations and Related Considerations."

97

*Exposures Related to Nuclear Asset Outages*

Our nuclear assets are comprised of two generation units at Comanche Peak, each with an installed nameplate capacity of 1,150 MW. The Comanche Peak plant represents approximately 13% of our total generation capacity. The nuclear generation units represent our lowest marginal cost source of electricity. Assuming both nuclear generation units experienced an outage, the unfavorable impact to pretax earnings is estimated to be approximately $2 million per day before consideration of any insurance proceeds. Also see discussion of nuclear facilities insurance in Note 13 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009.

The inherent complexities and related regulations associated with operating nuclear generation facilities result in environmental, regulatory and financial risks. The operation of nuclear generation facilities is complex and subject to continuing review and regulation by the NRC, covering, among other things, operations, maintenance, emergency planning, security, and environmental and safety protection. The NRC may implement changes in regulations that result in increased capital or operating costs, and it may require extended outages, modify, suspend or revoke operating licenses and impose fines for failure to comply with its existing regulations and the provisions of the Atomic Energy Act. In addition, an unplanned outage at another nuclear generation facility could result in the NRC taking action to shut down the Comanche Peak plant as a precautionary measure.

The Comanche Peak plant has not experienced an extended unplanned outage, and management continues to focus on the safe, reliable and efficient operations at the plant.

*Other Matters*

See Note 13 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for discussion of litigation related to our new lignite-fueled generation facility construction program and "Regulation and Rates" for discussion of ERCOT's planned implementation of a nodal market.

## APPLICATION OF CRITICAL ACCOUNTING POLICIES

Our significant accounting policies are discussed in Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009. We follow accounting principles generally accepted in the U.S. Application of these accounting policies in the preparation of our consolidated financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and revenues and expenses during the periods covered. The following is a summary of certain critical accounting policies that are impacted by judgments and uncertainties and under which different amounts might be reported using different assumptions or estimation methodologies.

*Purchase Accounting*

In 2007, the Merger was accounted for under purchase accounting, whereby the purchase price of the transaction was allocated to our identifiable assets acquired and liabilities assumed based upon their fair values. The estimates of the fair values recorded were determined based on the principles in accounting standards related to the determination of fair value (see Note 16 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009) and reflect significant assumptions and judgments. Material valuation inputs for long-lived assets and liabilities included forward electricity and natural gas price curves and market heat rates, discount rates, nonperformance risk adjustments related to liabilities, retail customer attrition rates, generation plant operating and construction costs and asset lives. The valuations reflected considerations unique to the competitive wholesale power market in ERCOT as well as our assets. For example, the valuation of the baseload generation facilities considered our lignite fuel reserves and mining capabilities.

The results of the purchase price allocation included an increase in the total carrying value of our baseload generation plants and the recording of intangible assets related to the retail customer base, the TXU Energy trade name and emission credits. Further, commodity and other contracts not already subject to fair value accounting were valued, and amounts representing favorable or unfavorable contracts (versus market conditions as of the date of the Merger) were recorded as intangible assets or liabilities, respectively. Management believes all material intangible assets were identified. See Notes 2 and 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for details of the purchase price allocation and intangible assets recorded, respectively.

98

EFIHMW00223133

With respect to Oncor, the realization of its assets and settlement of its liabilities are largely subject to cost-based regulatory rate-setting processes. Accordingly, the historical carrying values of a majority of Oncor's assets and liabilities are deemed to represent fair values. See discussion in Note 25 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 regarding adjustments to the carrying values of Oncor's regulatory asset and related long-term debt.

The excess of the purchase price over the estimated fair values of the net assets acquired was recorded as goodwill. The goodwill amount recorded upon finalization of purchase accounting totaled $23.2 billion. Management believes the drivers of the goodwill amount included the incremental value of the future cash flow potential of the baseload generation facilities, including facilities under construction, over the values assigned to those assets under purchase accounting rules, considering the market-pricing mechanisms and growth potential in the ERCOT market, as well as the value derived from the scale of the retail business. Management also believes that the goodwill reflected the value of the relatively stable, long-lived cash flows of the regulated business, considering the constructive regulatory environment and market growth potential. In accordance with accounting guidance related to goodwill and other intangible assets, goodwill is not amortized to net income, but is required to be tested for impairment at least annually. This guidance requires that goodwill be assigned to "reporting units," which management has determined to be the Competitive Electric segment and the Regulated Delivery segment, which are almost entirely comprised of TCEH and Oncor, respectively. The assignment of goodwill was based on the relative estimated enterprise values of the operations as of the date of the Merger using discounted cash flow methodologies. Goodwill amounts assigned totaled $18.3 billion to the Competitive Electric segment and $4.9 billion to the Regulated Delivery segment. None of this goodwill balance is being deducted for tax purposes.

In the first quarter of 2009 and fourth quarter of 2008, we recorded goodwill impairment charges totaling $8.950 billion. The $90 million charge in the first quarter of 2009 resulted from the completion of the previously estimated fair value calculations supporting the initial $8.860 billion goodwill impairment charge that was recorded in the fourth quarter of 2008. See discussion immediately below under "Impairment of Assets."

*Impairment of Assets*

We evaluate long-lived assets (including intangible assets with finite lives) for impairment whenever indications of impairment exist, in accordance with accounting standards related to impairment or disposal of long-lived assets, whenever events or changes in circumstances indicate that their carrying amount may not be recoverable. One of those indications is a current expectation that "more likely than not" a long-lived asset will be sold or otherwise disposed of significantly before the end of its previously estimated useful life (as was the case for the natural gas-fueled generation assets discussed below). For our baseload generation assets, another possible indication would be an expected long-term decline in natural gas prices and/or market heat rates. The determination of the existence of these and other indications of impairment involves judgments that are subjective in nature and may require the use of estimates in forecasting future results and cash flows related to an asset or group of assets. Further, the unique nature of our property, plant and equipment, which includes a fleet of generation assets with a diverse fuel mix and individual plants that have varying production or output rates, requires the use of significant judgments in determining the existence of impairment indications and the grouping of assets for impairment testing.

Goodwill and intangible assets with indefinite useful lives are required to be tested for impairment at least annually or whenever events or changes in circumstances indicate an impairment may exist, such as the possible impairments to long-lived assets discussed above. Effective with 2009 testing, we changed the annual test date for goodwill and intangible assets with indefinite useful lives from October 1 to December 1. Management determined the new annual goodwill test date is preferable because of efficiencies gained by aligning the test with our annual budget and five-year plan processes in the fourth quarter. The change in the annual test date did not delay, accelerate or avoid an impairment charge, and retrospective application of this change in accounting principle did not affect previously reported results. As required by accounting guidance related to goodwill and other intangible assets, we have allocated goodwill to our reporting units, which are our two segments: Competitive Electric and Regulated Delivery, and goodwill impairment testing is performed at the reporting unit level. Under this goodwill impairment analysis, if at the assessment date, a reporting unit's carrying value exceeds its estimated fair value (enterprise value), the estimated enterprise value of the reporting unit is compared to the estimated fair values of the reporting unit's operating assets (including identifiable intangible assets) and liabilities at the assessment date, and the resultant implied goodwill amount is then compared to the recorded goodwill amount. Any excess of the recorded goodwill amount over the implied goodwill amount is written off as an impairment charge.

99

EFIHMW00223134

The determination of enterprise value involves a number of assumptions and estimates. We use a combination of three fair value inputs to estimate enterprise values of our reporting units: internal discounted cash flow analyses (income approach), comparable company equity values and any recent pending and/or completed relevant transactions. The income approach involves estimates of future performance that reflect assumptions regarding, among other things, forward natural gas and electricity prices, market heat rates, generation plant performance and retail sales volume trends. Another key variable in the income approach is the discount rate, or weighted average cost of capital. The determination of the discount rate takes into consideration the capital structure, debt ratings and current debt yields of comparable companies as well as an estimate of return on equity that reflects historical market returns and current market volatility for the industry. Enterprise value estimates based on comparable company equity values involve using trading multiples of EBITDA of those selected companies to derive appropriate multiples to apply to the EBITDA of the reporting units. This approach requires an estimate, using historical acquisition data, of an appropriate control premium to apply to the reporting unit values calculated from such multiples. Critical judgments include the selection of comparable companies and the weighting of the three value inputs in developing the best estimate of enterprise value.

The 2009 annual impairment testing performed as of October 1, and December 1, 2009 for goodwill and intangible assets with indefinite useful lives in accordance with accounting guidance for a change in annual impairment testing dates resulted in no impairment (see discussion in Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 regarding change in the annual impairment test date from October 1 to December 1). The goodwill testing determined that the estimated fair value (enterprise value) of the Regulated Delivery segment exceeded its carrying value by approximately 10% resulting in no additional testing being required and no impairment for the segment. Key assumptions in the valuation of the regulated business include discount rates, growth of the rate base and return on equity allowed by the regulatory authority. Cash flows of the regulated business are relatively stable and more predictable than the competitive business. The Competitive Electric segment carrying value exceeded its estimated enterprise value (by less than 10%), so the estimated enterprise value of the segment was compared to the estimated fair values of its operating assets and liabilities. This additional testing indicated that the implied goodwill amount exceeded the recorded goodwill amount, and thus no goodwill impairment was recorded. The estimated enterprise value of the Competitive Electric segment reflects the impact of the decline in forward natural gas prices on wholesale electricity prices. Because lower wholesale electricity prices also result in lower fair values of our generation assets, calculated implied goodwill was sufficient to support the recorded goodwill amount. Key variables in the tests included forward natural gas prices, electricity prices, market heat rates and discount rates, assumptions regarding each of which could have a significant effect on valuations. Because of the volatility of these factors, we cannot predict the likelihood of any future impairment.

See Note 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for a discussion of the goodwill impairment charges of $8.860 billion and $90 million (not deductible for income tax purposes) recorded in the fourth quarter of 2008 and first quarter of 2009, respectively. The total $8.950 billion impairment charge represented approximately 39% of the goodwill balance resulting from purchase accounting for the Merger and reflected a decline of approximately 20% in the estimated value of EFH Corp. at year-end 2008 from the indicated value at the October 2007 Merger date. The impairment primarily arose from the dislocation in the capital markets that increased interest rate spreads and the resulting discount rates used in estimating fair values and the effect of declines in market values of debt and equity securities of comparable companies in the second half of 2008. Also see Note 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for discussion of the impairment charge of $481 million ($310 million after-tax) related to the trade name intangible asset also recorded in the fourth quarter of 2008. The estimated fair value of this intangible asset is based on an assumed royalty methodology.

100

EFIHMW00223135

In the fourth quarter of 2008, we recorded an impairment charge of $229 million ($147 million after-tax) related to our natural gas-fueled generation facilities. The natural gas-fueled generation units are generally operated to meet peak demands for electricity, and the facilities tested for impairment as an asset group. See Note 5 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for a discussion of the impairment. The estimated impairment was based on numerous judgments including forecasted production, forward prices of natural gas and electricity, overall generation availability in ERCOT and ERCOT grid congestion. See "Business — Significant Activities and Events" for discussion of natural gas-fueled units mothballed (idled) or retired in 2009 consistent with the factors that resulted in the impairment.

In 2007, we recorded a net charge totaling $757 million ($492 million after-tax) (substantially all of which was in the Predecessor period) in connection with the 2007 suspension and subsequent cancellation of the development of eight coal-fueled generation units. This decision and subsequent terminations of equipment orders required an evaluation and substantial judgments regarding the recoverability of recorded assets associated with the development program. In determining the net charges recorded, we applied accounting rules for impairment of long-lived assets under guidance related to impairment or disposal of long-lived assets and for exit activities under guidance related to accounting for costs associated with exit or disposal activities. See Note 4 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for additional discussion.

### Derivative Instruments and Mark-to-Market Accounting

We enter into contracts for the purchase and sale of energy-related commodities, and also enter into other derivative instruments such as options, swaps, futures and forwards primarily to manage commodity price and interest rate risks. Under accounting standards related to derivative instruments and hedging activities, these instruments are subject to mark-to-market accounting, and the determination of market values for these instruments is based on numerous assumptions and estimation techniques.

Mark-to-market accounting recognizes changes in the fair value of derivative instruments in the financial statements as market prices change. Such changes in fair value are accounted for as unrealized mark-to-market gains and losses in net income with an offset to derivative assets and liabilities. The availability of quoted market prices in energy markets is dependent on the type of commodity (e.g., natural gas, electricity, etc.), time period specified and delivery point. In computing fair value for derivatives, each forward pricing curve is separated into liquid and illiquid periods. The liquid period varies by delivery point and commodity. Generally, the liquid period is supported by exchange markets, broker quotes and frequent trading activity. For illiquid periods, fair value is estimated based on forward price curves developed using modeling techniques that take into account available market information and other inputs that might not be readily observable in the market. We adopted new accounting standards related to the determination of fair value concurrent with the Merger and estimate fair value as described in Note 16 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 and discussed under "Fair Value Measurements" below.

Accounting standards related to derivative instruments and hedging activities allow for "normal" purchase or sale elections and hedge accounting designations, which generally eliminate or defer the requirement for mark-to-market recognition in net income and thus reduce the volatility of net income that can result from fluctuations in fair values. These elections and designations are intended to match the accounting recognition of the contract's financial performance to that of the transaction the contract is intended to hedge. "Normal" purchases and sales are contracts that provide for physical delivery of quantities expected to be used or sold over a reasonable period in the normal course of business and are not subject to mark-to-market accounting.

Under hedge accounting, changes in fair value of instruments designated as cash flow hedges are recorded in other comprehensive income with an offset to derivative assets and liabilities to the extent the change in value is effective; that is, it mirrors the offsetting change in fair value of the forecasted hedged transaction. Changes in value that represent ineffectiveness of the hedge are recognized in net income immediately, and the effective portion of changes in fair value initially recorded in other comprehensive income are recognized in net income in the period that the hedged transactions are recognized. Although as of December 31, 2009, we do not have any derivatives designated as cash flow or fair value hedges, we continually assess our hedge elections and could designate positions as cash flow hedges in the future. In March 2007, the instruments making up a significant portion of the long-term hedging program that were previously designated as cash flow hedges were dedesignated as allowed under accounting standards related to derivative instruments and hedging activities, and subsequent changes in their fair value are being marked-to-market in net income. In addition, in August 2008, interest rate swap transactions in effect at that time were dedesignated as cash flow hedges in accordance with accounting standards, and subsequent changes in their fair value are being marked-to-market in net income. See further discussion of the long-term hedging program and interest rate swap transactions above under "Business — Significant Activities and Events."

101

EFIHMW00223136

The following tables provide the effects on both net income and other comprehensive income of mark-to-market accounting for those derivative instruments that we have determined to be subject to fair value measurement under accounting standards related to derivative instruments and hedging activities.

| | Successor | | | Predecessor |
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
|---|---|---|---|---|
| Amounts recognized in net income (after-tax): | | | | |
| Unrealized net gains (losses) on positions marked-to-market in net income (a) | $ 1,573 | $ 518 | $ (955) | $ (492) |
| Unrealized net (gains) losses representing reversals of previously recognized fair values of positions settled in the period (a) | (333) | 25 | (56) | (36) |
| Unrealized ineffectiveness net gains (losses) on positions accounted for as cash flow hedges | — | (3) | $ — | 74 |
| Reversals of previously recognized unrealized net (gains) losses related to cash flow hedge positions settled in the period | 1 | — | — | (15) |
| Total | $ 1,241 | $ 540 | $ (1,011) | $ (469) |
| Amounts recognized in other comprehensive income (after-tax): | | | | |
| Net losses in fair value of positions accounted for as cash flow hedges | $ (20) | $ (183) | $ (177) | $ (288) |
| Net (gains) losses on cash flow hedge positions recognized in net income to offset hedged transactions | 130 | 122 | — | (89) |
| Total | $ 110 | $ (61) | $ (177) | $ (377) |

(a)   Amounts for 2009 and 2008 include $788 million and $1.503 billion in net after-tax gains related to commodity positions, respectively, and $452 million in net after-tax gains and $960 million in net after-tax losses related to interest rate swaps, respectively. Prior period amounts are essentially all related to commodity positions.

The effect of mark-to-market and hedge accounting for derivatives on the balance sheet is as follows:

| | Successor | |
| | December 31, 2009 | December 31, 2008 |
|---|---|---|
| Net commodity contract asset (a) | $ 1,714 | $ 466 |
| Net derivative liability related to interest rate hedges | (1,242) | (1,944) |
| Net accumulated other comprehensive loss included in shareholders' equity (amounts after tax) | $ (128) | $ (238) |

(a)   2009 amount includes $4 million in net derivative liabilities and 2008 amount includes $7 million in net derivative assets related to cash flow hedge positions not marked-to-market in net income.

102

EFIHMW00223137

PX 045
Page 114 of 561

*Fair Value Measurements*

In addition to purchase accounting, we apply fair value accounting on a recurring basis to certain assets and financial instruments under the fair value hierarchy established in accounting standards related to the determination of fair value. We utilize several valuation techniques to measure the fair value of assets and liabilities, relying primarily on the market approach of using prices and other market information for identical and/or comparable assets and liabilities for those items that are measured on a recurring basis. These techniques include, but are not limited to, the use of broker quotes and statistical relationships between different price curves and are intended to maximize the use of observable inputs and minimize the use of unobservable inputs. In applying the market approach, we use a mid-market valuation convention (the mid-point between bid and ask prices) as a practical expedient.

Level 1 and Level 2 assets and liabilities consist primarily of commodity-related contracts for natural gas and electricity derivative instruments entered into for hedging purposes, securities associated with the nuclear decommissioning trust, and interest rate swaps intended to fix and/or lower interest payments on long-term debt. Level 1 valuations use quoted prices in active markets for identical assets or liabilities that are accessible at the measurement date. Level 2 valuations are based on evaluated prices that reflect observable market information, such as actual trade information of similar securities, adjusted for observable differences. Level 2 inputs include:

- quoted prices for similar assets or liabilities in active markets;

- quoted prices for identical or similar assets or liabilities in markets that are not active;

- inputs other than quoted prices that are observable for the asset or liability such as interest rates and yield curves observable at commonly quoted intervals, and

- inputs that are derived principally from or corroborated by observable market data by correlation or other means.

Examples of Level 2 valuation inputs utilized include over-the-counter broker quotes and quoted prices for similar assets or liabilities that are corroborated by correlation or through statistical relationships between different price curves. For example, certain physical power derivatives are executed for a particular location at specific time periods that might not have active markets; however, an active market might exist for such derivatives for a different time period at the same location. We utilize correlation techniques to compare prices for inputs at both time periods to provide a basis to value the non-active derivative. (See Note 16 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for additional discussion of how broker quotes are utilized.)

Level 3 assets and liabilities consist primarily of more complex long-term power purchases and sales agreements, including longer-term wind and other power purchase and sales contracts and certain natural gas positions (collars) in the long-term hedging program. Level 3 assets and liabilities are valued using significant unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets and liabilities. We use the most meaningful information available from the market, combined with our own internally developed valuation methodologies, to develop our best estimate of fair value. The determination of fair value for Level 3 assets and liabilities requires significant management judgment and estimation.

Valuations of Level 3 assets and liabilities are sensitive to the assumptions used for the significant inputs. Where market data is available, the inputs used for valuation reflect that information as of our valuation date. In periods of extreme volatility, lessened liquidity or in illiquid markets, there may be more variability in market pricing or a lack of market data to use in the valuation process. An illiquid market is one in which little or no observable activity has occurred or one that lacks willing buyers. Valuation risk is mitigated through the performance of stress testing of the significant inputs to understand the impact that varying assumptions may have on the valuation and other review processes performed to ensure appropriate valuation.

103

Confidential

As part of our valuation of assets subject to fair value accounting, counterparty credit risk is taken into consideration by measuring the extent of netting arrangements in place with the counterparty along with credit enhancements and the estimated credit rating of the counterparty. Our valuation of liabilities subject to fair value accounting takes into consideration the market's view of our credit risk along with the existence of netting arrangements in place with the counterparty and credit enhancements posted by us. We consider the credit risk adjustment to be a Level 3 input since judgment is used to assign credit ratings, recovery rate factors and default rate factors.

Level 3 assets totaled $350 million and $283 million at December 31, 2009 and 2008, respectively, and represented approximately 8% and 7%, respectively, of the assets measured at fair value, or less than 1% of total assets. Level 3 liabilities totaled $269 million and $355 million at December 31, 2009 and 2008, respectively, and represented approximately 8% and 7%, respectively, of the liabilities measured at fair value, or less than 1% of total liabilities.

Valuations of several of our Level 3 assets and liabilities are based on long-dated price curves for electricity that are developed internally. Additionally, Level 3 assets and liabilities are sensitive to changes in discount rates, option-pricing model inputs such as volatility factors and credit risk adjustments. As of December 31, 2009, a $5.00 per MWh change in electricity price assumptions across unobservable inputs, primarily related to the outer years in our long-dated pricing model (years that are not market observable) would cause an approximate $72 million change in net Level 3 assets. A 10% change in diesel fuel price assumptions across unobservable inputs would cause an approximate $11 million change in net Level 3 assets. In addition, we have derivative contracts that are valued based on option-pricing models with unobservable inputs. A 10% increase in volatility and correlation related to these contracts would cause an approximate $5 million change in net Level 3 assets. See Note 16 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for additional information about fair value measurements, including a table presenting the changes in Level 3 assets and liabilities for the twelve months ended December 31, 2009.

*Revenue Recognition*

Our revenue includes an estimate for unbilled revenue that represents estimated daily kWh consumption after the meter read date to the end of the period multiplied by the applicable billing rates. Estimated daily kWh usage is derived using historical kWh usage information adjusted for weather and other measurable factors affecting consumption. Calculations of unbilled revenues during certain interim periods are generally subject to more estimation variability because of seasonal changes in demand. Accrued unbilled revenues totaled $546 million, $505 million and $477 million at December 31, 2009, 2008 and 2007, respectively.

*Accounting for Contingencies*

Our financial results may be affected by judgments and estimates related to loss contingencies. A significant contingency that we account for is the loss associated with uncollectible trade accounts receivable. The determination of such bad debt expense is based on factors such as historical write-off experience, aging of accounts receivable balances, changes in operating practices, regulatory rulings, general economic conditions, effects of hurricanes and other natural disasters and customers' behaviors. Changes in customer count and mix due to competitive activity and seasonal variations in amounts billed add to the complexity of the estimation process. Historical results alone are not always indicative of future results, causing management to consider potential changes in customer behavior and make judgments about the collectability of accounts receivable. Bad debt expense totaled $113 million, $81 million, $13 million and $46 million for the years ended December 31, 2009 and 2008, the period from October 11, 2007 to December 31, 2007 and the period from January 1, 2007 to October 10, 2007, respectively. The increase in bad debt in 2009 reflected higher delinquencies due to delays in final bills and disconnects resulting from a customer billing and information management system conversion, customer losses and general economic conditions. Amounts in 2008 reflected competitive customer acquisitions in south Texas and the effects of Hurricane Ike. See Note 10 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 regarding a reserve recorded in 2008 for amounts due from subsidiaries of Lehman.

104

EFIHMW00223139

Litigation contingencies also may require significant judgment in estimating amounts to accrue. We accrue liabilities for litigation contingencies when such liabilities are considered probable of occurring and the amount is reasonably estimable. No significant amounts have been accrued for such contingencies during the three-year period ended December 31, 2009. See Item 3, "Legal Proceedings" in our 2009 Form 10-K for discussion of major litigation.

*Accounting for Income Taxes*

Our income tax expense and related balance sheet amounts involve significant management estimates and judgments. Amounts of deferred income tax assets and liabilities, as well as current and noncurrent accruals, involve judgments and estimates of the timing and probability of recognition of income and deductions by taxing authorities. In assessing the likelihood of realization of deferred tax assets, management considers estimates of the amount and character of future taxable income. Actual income taxes could vary from estimated amounts due to the future impacts of various items, including changes in income tax laws, our forecasted financial condition and results of operations in future periods, as well as final review of filed tax returns by taxing authorities. Our income tax returns are regularly subject to examination by applicable tax authorities. In management's opinion, the liability recorded pursuant to income tax accounting guidance related to uncertain tax positions reflects future taxes that may be owed as a result of any examination.

As discussed in Note 8 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009, in January 2007 we adopted new accounting standards that provide interpretive guidance for accounting for uncertain tax positions. See Notes 1 and 9 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for discussion of income tax matters.

*Depreciation and Amortization*

Depreciation expense related to generation facilities is based on the estimates of fair value and economic useful lives as determined in the application of purchase accounting described above. The accuracy of these estimates directly affects the amount of depreciation expense. If future events indicate that the estimated lives are no longer appropriate, depreciation expense will be recalculated prospectively from the date of such determination based on the new estimates of useful lives.

The estimated remaining lives range from 23 to 60 years for the lignite/coal- and nuclear-fueled generation units. See Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 under "Property, Plant and Equipment" for discussion of the change from composite to asset-by-asset depreciation effective with the Merger.

As a result of cost-based regulatory rate-setting processes, the book value of the majority of Oncor's assets and liabilities effectively represent fair value, and no adjustments to those regulated assets or liabilities were recorded as part of purchase accounting for the Merger. Depreciation expense for such assets totaled $394 million, $330 million and $298 million in 2009, 2008 and 2007, or 3.1% of carrying value in 2009 and 2.8% in 2008 and 2007.

Finite-lived intangibles identified as a result of purchase accounting are amortized over their estimated useful lives based on the expected realization of economic effects. See Note 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for additional information.

*Regulatory Assets*

The financial statements at December 31, 2009 and 2008, reflect total regulatory assets of $2.170 billion and $2.071 billion, respectively. These amounts include $759 million and $865 million, respectively, of generation-related regulatory assets recoverable by securitization (transition) bonds as discussed immediately below. Rate regulation is premised on the full recovery of prudently incurred costs and a reasonable rate of return on invested capital. The assumptions and judgments used by regulatory authorities continue to have an impact on the recovery of costs, the rate earned on invested capital and the timing and amount of assets to be recovered by rates. (See "Oncor's Regulatory Assets and Liabilities" in Note 25 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009.)

105

EFIHMW00223140

Generation-related regulatory asset stranded costs arising prior to the 1999 Restructuring Legislation became subject to recovery through issuance of $1.3 billion principal amount of transition bonds in accordance with a regulatory financing order. The carrying value of the regulatory asset upon final issuance of the bonds in 2004 represented the projected future cash flows to be recovered from REPs by Oncor through revenues as a transition charge to service the principal and fixed rate interest on the bonds. The regulatory asset is being amortized to expense in an amount equal to the transition charge revenues being recognized. As discussed in Note 2 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009, the regulatory asset and related transition bonds were adjusted to fair value on the date of the Merger in accordance with purchase accounting rules.

Other regulatory assets that we believe are probable of recovery, but are subject to review and possible disallowance, totaled $148 million at December 31, 2009. These amounts consist primarily of storm-related service recovery costs and employee retirement costs.

In August 2009, the PUCT issued a final order in Oncor's first rate review in more than seven years. As discussed in Note 25 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009, the order resulted in a write off of regulatory assets of $25 million.

### Defined Benefit Pension Plans and OPEB Plans

We provide pension benefits based on either a traditional defined benefit formula or a cash balance formula and also provide certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from our company. Reported costs of providing noncontributory defined pension benefits and OPEB are dependent upon numerous factors, assumptions and estimates.

PURA provides for the recovery by Oncor of pension and OPEB costs for all applicable former employees of the regulated predecessor integrated electric utility. These costs are associated with Oncor's active and retired employees, as well as active and retired personnel engaged in other EFH Corp. activities related to their service prior to the deregulation and disaggregation of our business effective January 1, 2002. Oncor is authorized to establish a regulatory asset or liability for the difference between the amounts of pension and OPEB costs reflected in Oncor's approved (by the PUCT) billing rates and the actual amounts that would otherwise have been recorded as charges or credits to earnings. Accordingly, Oncor defers (principally as a regulatory asset or property) additional pension and OPEB costs consistent with PURA. Amounts deferred are ultimately subject to regulatory approval.

Benefit costs are impacted by actual employee demographics (including but not limited to age, compensation levels and years of accredited service), the level of contributions made to retiree plans, expected and actual earnings on plan assets and the discount rates used in determining the projected benefit obligation. Changes made to the provisions of the plans may also impact current and future benefit costs. Fluctuations in actual equity market returns as well as changes in general interest rates may result in increased or decreased benefit costs in future periods.

In accordance with accounting rules, changes in benefit obligations associated with these factors may not be immediately recognized as costs in the income statement, but are recognized in future years over the remaining average service period of plan participants. As such, significant portions of benefit costs recorded in any period may not reflect the actual level of cash benefits provided to plan participants. Pension and OPEB costs as determined under applicable accounting rules are summarized in the following table:

|  | Successor | | | Predecessor |
|---|---|---|---|---|
|  | Year Ended December 31, | | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
|  | 2009 | 2008 | | |
| Pension costs | $ 44 | $ 21 | $ (1) | $ 34 |
| OPEB costs | 70 | 58 | 11 | 49 |
| Total benefit costs | $ 114 | $ 79 | $ 10 | $ 83 |
| Less amounts deferred principally as a regulatory asset or property | (66) | (42) | (8) | (43) |
| Net amounts recognized as expense | $ 48 | $ 37 | $ 2 | $ 40 |
| Discount rate (a) | 6.90% | 6.55% | 6.45% | 5.90% |

(a)    Discount rate for OPEB was 6.85% in 2009.

106

EFIHMW00223141

See Note 21 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 regarding other disclosures related to pension and OPEB obligations.

Sensitivity of these costs to changes in key assumptions is as follows:

| Assumption | Increase/(decrease) in 2009 Pension and OPEB Costs | |
|---|---|---|
| Discount rate — 1% increase | $ | (36) |
| Discount rate — 1% decrease | $ | 44 |
| Expected return on assets — 1% increase | $ | (22) |
| Expected return on assets — 1% decrease | $ | 22 |

## PRESENTATION AND ANALYSIS OF RESULTS

The accompanying statements of consolidated income and cash flows for 2007 are presented for two periods: January 1, 2007 through October 10, 2007 (Predecessor) and October 11, 2007 through December 31, 2007 (Successor), which relate to the period before the Merger and the period after the Merger, respectively. Management's discussion and analysis of results of operations and cash flows has been prepared by comparing the results of operations and cash flows of the Successor for the year ended December 31, 2009 to those of the Successor for the year ended December 31, 2008, by comparing the results of operations and cash flows of the Successor for the three months ended December 31, 2008 to those of the Successor for the period October 11, 2007 through December 31, 2007 and by comparing the results of operations and cash flows of the Successor for the nine months ended September 30, 2008 to those of the Predecessor for the period January 1, 2007 through October 10, 2007. To facilitate the discussion, certain volumetric and statistical data for 2008 have been presented as of and for the nine months ended September 30, 2008 compared to the nine months ended September 30, 2007 and as of and for the three months ended December 31, 2008 compared to the three months ended December 31, 2007. Such volumetric and statistical data are measured and reported on a monthly, quarterly and annual basis.

## RESULTS OF OPERATIONS

### Consolidated Financial Results

| | Successor | | | | | Predecessor |
|---|---|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Three Months Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Nine Months Ended September 30, 2008 | Period from January 1, 2007 through October 10, 2007 |
| Operating revenues | $ 9,546 | $ 11,364 | $ 2,364 | $ 1,994 | $ 9,001 | $ 8,044 |
| Fuel, purchased power costs and delivery fees | (2,878) | (4,595) | (728) | (644) | (3,867) | (2,381) |
| Net gain (loss) from commodity hedging and trading activities | 1,736 | 2,184 | 2,432 | (1,492) | (248) | (554) |
| Operating costs | (1,598) | (1,503) | (383) | (306) | (1,120) | (1,107) |
| Depreciation and amortization | (1,754) | (1,610) | (393) | (415) | (1,217) | (634) |

107

EFIHMW00223142

| | Successor | | | | | Predecessor |
|---|---|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Three Months Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Nine Months Ended September 30, 2008 | Period from January 1, 2007 through October 10, 2007 |
| Selling, general and administrative expenses | (1,068) | (957) | (245) | (216) | (712) | (691) |
| Franchise and revenue-based taxes | (359) | (363) | (104) | (93) | (259) | (282) |
| Impairment of goodwill | (90) | (8,860) | (8,860) | — | — | — |
| Other income | 204 | 80 | 37 | 14 | 43 | 69 |
| Other deductions | (97) | (1,301) | (718) | (61) | (583) | (841) |
| Interest income | 45 | 27 | 5 | 24 | 22 | 56 |
| Interest expense and related charges | (2,912) | (4,935) | (2,431) | (839) | (2,505) | (671) |
| Income (loss) from continuing operations before income taxes | 775 | (10,469) | (9,024) | (2,034) | (1,445) | 1,008 |
| Income tax (expense) benefit | (367) | 471 | 9 | 673 | 462 | (309) |
| Income (loss) from continuing operations | 408 | (9,998) | (9,015) | (1,361) | (983) | 699 |
| Income from discontinued operations, net of tax effect | — | — | — | 1 | — | 24 |
| Net income (loss) | 408 | (9,998) | (9,015) | (1,360) | (983) | 723 |
| Net (income) loss attributable to noncontrolling interests | (64) | 160 | 160 | — | — | — |
| Net income (loss) attributable to EFH Corp. | $ 344 | $ (9,838) | $ (8,855) | $ (1,360) | $ (983) | $ 723 |

*Consolidated Financial Results — Year Ended December 31, 2009 Compared to Year Ended December 31, 2008*

Reference is made to comparisons of results by business segment following the discussion of consolidated results. The business segment comparisons provide additional detail and quantification of items affecting financial results.

Operating revenues decreased $1.818 billion, or 16%, to $9.546 billion in 2009.

- Operating revenues in the Competitive Electric segment decreased $1.876 billion, or 19%, to $7.911 billion.

- Operating revenues in the Regulated Delivery segment increased $110 million, or 4%, to $2.690 billion.

- Net intercompany sales eliminations increased $52 million, reflecting Oncor's higher distribution revenues from REP subsidiaries of TCEH.

Fuel, purchased power costs and delivery fees decreased $1.717 billion, or 37%, to $2.878 billion in 2009, driven by lower purchased power costs. See discussion below in the analysis of Competitive Electric segment results of operations.

Net gains from commodity hedging and trading activities totaled $1.736 billion in 2009 and $2.184 billion in 2008. Results in 2009 and 2008 included unrealized mark-to-market net gains totaling $1.277 billion and $2.281 billion, respectively, driven by the effect of lower forward market prices of natural gas on the value of positions in the long-term hedging program. See discussion below in the analysis of Competitive Electric segment results of operations.

Operating costs increased $95 million, or 6%, to $1.598 billion in 2009.

- Operating costs in the Competitive Electric segment increased $16 million, or 2%, to $693 million.

EFIHMW00223143

- Operating costs in the Regulated Delivery segment increased $80 million, or 10%, to $908 million.

Depreciation and amortization increased $144 million, or 9%, to $1.754 billion in 2009.

- Depreciation and amortization in the Competitive Electric segment increased $80 million, or 7%, to $1.172 billion.

- Depreciation and amortization in the Regulated Delivery segment increased $65 million, or 13%, to $557 million.

SG&A expenses increased $111 million, or 12%, to $1.068 billion in 2009.

- SG&A expenses in the Competitive Electric segment increased $59 million, or 9%, to $741 million.

- SG&A expenses in the Regulated Delivery segment increased $30 million, or 18%, to $194 million.

- Corporate and Other SG&A expenses increased $22 million, or 20%, to $133 million driven by higher transition costs associated with outsourced support services.

See Note 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for discussion of the $90 million and $8.860 billion impairments of goodwill in 2009 and 2008, respectively.

Other income totaled $204 million in 2009 and $80 million in 2008, including $39 million and $44 million, respectively, in accretion of the fair value adjustment to certain regulatory assets due to purchase accounting. The 2009 amount also included an $87 million debt extinguishment gain (see discussion of debt exchanges in Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009), $23 million of income arising from the reversal of a use tax accrual recorded in purchase accounting related to periods prior to the Merger, which was triggered by a state ruling in the third quarter of 2009, and $21 million of income arising from the reversal of exit liabilities recorded in purchase accounting due to sooner than expected transition of outsourcing services (see Notes 2 and 20 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009). The 2008 amount also included a $21 million net insurance recovery for damage to certain mining equipment.

Other deductions totaled $97 million in 2009 and $1.301 billion in 2008. The 2009 amount included an impairment charge of $34 million related to land expected to be sold within the next 12 months and a $25 million write off of regulatory assets as discussed in Note 25 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 under "Oncor's Regulatory Assets and Liabilities." The 2008 amount included impairment charges of $501 million related to $NO_x$ and $SO_2$ environmental allowances intangible assets and $481 million related to trade name intangible assets, both discussed in Note 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009, $229 million in impairment charges related to the natural gas-fueled generation facilities and $26 million in charges to reserve for net receivables (excluding termination related costs) from terminated hedging transactions with subsidiaries of Lehman Brothers Holdings Inc., which filed for bankruptcy under Chapter 11 of the U.S. Bankruptcy Code. See Note 10 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for details of other income and deductions.

Interest income increased $18 million, or 67%, to $45 million driven by interest on $465 million in collateral under a funding arrangement described in Note 18 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009.

Interest expense and related charges decreased $2.023 billion to $2.912 billion in 2009 reflecting a $696 million unrealized mark-to-market net gain related to interest rate swaps in 2009 as compared to a $1.477 billion net loss in 2008, which was partially offset by $118 million in increased noncash amortization of losses on interest rate swaps designated as cash flow hedges and a $34 million decrease in capitalized interest. See Note 25 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009.

109

EFIHMW00223144
PX 045
Page 121 of 561

Income tax expense totaled $367 million in 2009 compared to an income tax benefit of $471 million in 2008. The effective rate on income in 2009 was 47.4%, and the effective rate on a loss in 2008 was 4.5%. The increase in the rate reflects the impacts of nondeductible goodwill impairments of $90 million in 2009 and $8.860 billion in 2008, which increased the effective rate by 5.0 percentage points in 2009 and decreased the effective rate by 24.8 percentage points in 2008. The increase also reflects the effect of interest accrued for uncertain tax positions, which increased the rate on income in 2009 and decreased the rate on a loss in 2008.

Reflecting the goodwill and other impairment charges recorded in 2008, after tax-results improved $10.406 billion to $408 million in net income in 2009.

- After-tax results in the Competitive Electric segment improved $9.560 billion to $631 million in net income in 2009.

- After-tax results in the Regulated Delivery segment improved $806 million to $320 million in net income in 2009.

- Corporate and Other net expenses totaled $543 million in 2009 and $583 million in 2008. The amounts in 2009 and 2008 include recurring interest expense on outstanding debt and notes payable to subsidiaries, as well as corporate general and administrative expenses. The after-tax decrease of $40 million reflected the debt extinguishment gain of $57 million and $16 million in interest income related to the collateral discussed above, partially offset by a $20 million goodwill impairment charge and the $14 million increase in SG&A expense as discussed above.

### Consolidated Financial Results — Three Months Ended December 31, 2008 Compared to Successor Period From October 11, 2007 Through December 31, 2007

Reference is made to comparisons of results by business segment following the discussion of consolidated results. The business segment comparisons provide additional detail and quantification of items affecting financial results.

Operating revenues increased $370 million, or 19%, to $2.364 billion in 2008.

- Operating revenues in the Competitive Electric segment increased $308 million, or 18%, to $1.979 billion.

- Operating revenues in the Regulated Delivery segment increased $80 million, or 15%, to $612 million.

- Net intercompany sales eliminations increased $18 million, reflecting Oncor's higher distribution revenues from REP subsidiaries of TCEH.

Fuel, purchased power costs and delivery fees increased $84 million, or 13%, to $728 million in 2008. See discussion below in the analysis of Competitive Electric segment results of operations.

Net gain (loss) from commodity hedging and trading activities totaled $2.432 billion in net gains in 2008 compared to $1.492 billion in net losses in 2007. Results in 2008 included $2.586 billion in unrealized mark-to-market net gains, and results in 2007 included $1.556 billion in unrealized mark-to-market net losses driven by the effect of changes in forward market prices of natural gas on the value of positions in the long-term hedging program. See discussion below in the analysis of Competitive Electric segment results of operations.

Operating costs increased $77 million, or 25%, to $383 million in 2008.

110

Confidential