Oncor's technology upgrade initiatives include development of a modernized grid through the replacement of existing meters with advanced digital metering equipment and development of advanced digital communication, data management, real-time monitoring and outage detection capabilities. This modernized grid is expected to produce electricity service reliability improvements and provide the potential for additional products and services from REPs that will enable businesses and consumers to better manage their electricity usage and costs. Oncor's plans provide for the full deployment of over three million advanced meters by the end of 2012 to all residential and most non-residential retail electricity customers in Oncor's service area. The advanced meters can be read remotely, rather than by a meter reader physically visiting the location of each meter. Advanced meters facilitate automated demand side management, which allows consumers to monitor the amount of electricity they are consuming and adjust their electricity consumption habits. As of September 30, 2010, Oncor has installed approximately 1,343,000 advanced digital meters. As the new meters are integrated, Oncor reports 15-minute interval, billing-quality electricity consumption data to ERCOT for Texas market settlement purposes. The data makes it possible for REPs to support new programs and pricing options. In addition to the potential energy efficiencies from advanced metering, Oncor expects to invest over $300 million ($100 million in excess of regulatory requirements) over the five years ending in 2012 in programs designed to improve customer electricity demand efficiencies. As of December 31, 2009, Oncor has invested $125 million in these programs, including $67 million in 2009, and 22% of the amount in excess of regulatory requirements has been spent.

In a stipulation with several parties that was approved by the PUCT (as discussed in Note 6 to EFH Corp.'s historical consolidated financial statements as of and for the year ended December 31, 2009), Oncor committed to a variety of actions, including minimum capital spending of $3.6 billion over the five-year period ending December 31, 2012, subject to certain defined conditions. Approximately 50% of this total was spent as of December 31, 2009. This spending does not include the CREZ facilities.

*Electricity Transmission* — Oncor's electricity transmission business is responsible for the safe and reliable operations of its transmission network and substations. These responsibilities consist of the construction and maintenance of transmission facilities and substations and the monitoring, controlling and dispatching of high-voltage electricity over Oncor's transmission facilities in coordination with ERCOT.

Oncor is a member of ERCOT, and its transmission business actively assists the operations of ERCOT and market participants. Through its transmission business, Oncor participates with ERCOT and other member utilities to plan, design, construct and operate new transmission lines, with regulatory approval, necessary to maintain reliability, interconnect to merchant generation facilities, increase bulk power transfer capability and minimize limitations and constraints on the ERCOT transmission grid.

Transmission revenues are provided under tariffs approved by either the PUCT or, to a small degree related to an interconnection to other markets, the FERC. Network transmission revenues compensate Oncor for delivery of electricity over transmission facilities operating at 60 kV and above. Other services offered by Oncor through its transmission business include, but are not limited to: system impact studies, facilities studies, transformation service and maintenance of transformer equipment, substations and transmission lines owned by other parties.

Provisions of the 1999 Restructuring Legislation allow Oncor to annually update its transmission rates to reflect changes in invested capital. These "capital tracker" provisions encourage investment in the transmission system to help ensure reliability and efficiency by allowing for timely recovery of and return on new transmission investments.

At December 31, 2009, Oncor's transmission facilities includes approximately 5,173 circuit miles of 345-kV transmission lines and approximately 9,954 circuit miles of 138-and 69-kV transmission lines. Sixty-two generation facilities totaling 36,165 MW are directly connected to Oncor's transmission system, and 277 transmission stations and 702 distribution substations are served from Oncor's transmission system.

At December 31, 2009, Oncor's transmission facilities have the following connections to other transmission grids in Texas:

| Grid Connections | Number of Interconnected Lines | | |
|---|---|---|---|
| | 345kV | 138kV | 69kV |
| Centerpoint Energy Inc. | 8 | — | — |
| American Electric Power Company, Inc (a) | 4 | 7 | 12 |
| Lower Colorado River Authority | 6 | 20 | 3 |
| Texas Municipal Power Agency | 8 | 6 | — |
| Texas New Mexico Power | 2 | 9 | 11 |
| Brazos Electric Power Cooperative | 4 | 104 | 20 |
| Rayburn Country Electric Cooperative | — | 32 | 7 |
| City of Georgetown | — | 2 | — |
| Tex-La Electric Cooperative | — | 11 | 1 |
| Other small systems operating wholly within Texas | — | 3 | 2 |

162

Confidential

EFIHMW00223201

_____

(a)  One of the 345-kV lines is an asynchronous high-voltage direct current connection with the Southwest Power Pool.

*Electricity Distribution* — Oncor's electricity distribution business is responsible for the overall safe and efficient operation of distribution facilities, including electricity delivery, power quality and system reliability. These responsibilities consist of the ownership, management, construction, maintenance and operation of the distribution system within Oncor's certificated service area. Oncor's distribution system receives electricity from the transmission system through substations and distributes electricity to end-users and wholesale customers through approximately 3,097 distribution feeders.

The Oncor distribution system includes over 3.1 million points of delivery. Over the past five years, the number of distribution system points of delivery served by Oncor, excluding lighting sites, grew an average of approximately 1.26% per year, adding approximately 24,689 points of delivery in 2009.

The Oncor distribution system consists of approximately 56,260 miles of overhead primary conductors, approximately 21,587 miles of overhead secondary and street light conductors, approximately 15,352 miles of underground primary conductors and approximately 9,528 miles of underground secondary and street light conductors. The majority of the distribution system operates at 25-kV and 12.5-kV.

Oncor's distribution rates for residential and small commercial users are based on actual monthly consumption (kWh), and rates for large commercial and industrial users are based on the greater of actual monthly demand (kilowatt) or 80% of peak monthly demand during the prior eleven months.

*Customers* — Oncor's transmission customers consist of municipalities, electric cooperatives and other distribution companies. Oncor's distribution customers consist of more than 70 REPs in Oncor's certificated service area, including TCEH. Distribution revenues from TCEH represented 38% of Oncor's total revenues for 2009, and revenues from subsidiaries of Reliant Energy, Inc., each of which is a non-affiliated REP, represented 14% of Oncor's total revenues for 2009. No other customer represented more than 10% of Oncor's total operating revenues. The consumers of the electricity delivered by Oncor are free to choose their electricity supplier from REPs who compete for their business.

*Regulation and Rates* — As its operations are wholly within Texas, Oncor is not a public utility as defined in the Federal Power Act and, as a result, it is not subject to general regulation under this Act. However, Oncor is subject to reliability standards adopted and enforced by the TRE and the NERC under the Federal Power Act.

The PUCT has original jurisdiction over transmission and distribution rates and services in unincorporated areas and in those municipalities that have ceded original jurisdiction to the PUCT and has exclusive appellate jurisdiction to review the rate and service orders and ordinances of municipalities. Generally, PURA prohibits the collection of any rates or charges by a public utility (as defined by PURA) that does not have the prior approval of the appropriate regulatory authority (PUCT or municipality with original jurisdiction). In accordance with a stipulation approved by the PUCT, Oncor filed a rate case with the PUCT in June 2008, based on a test year ended December 31, 2007. In August 2009, the PUCT issued a final order with respect to the rate review as discussed in "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009 — Regulation and Rates."

163

EFIHMW00223202

At the state level, PURA, as amended, requires owners or operators of transmission facilities to provide open-access wholesale transmission services to third parties at rates and terms that are nondiscriminatory and comparable to the rates and terms of the utility's own use of its system. The PUCT has adopted rules implementing the state open-access requirements for utilities that are subject to the PUCT's jurisdiction over transmission services, such as Oncor.

**Securitization Bonds** — The Regulated Delivery segment includes Oncor's wholly-owned, bankruptcy-remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC. This financing subsidiary was organized for the limited purpose of issuing specified transition bonds in 2003 and 2004. Oncor Electric Delivery Transition Bond Company LLC issued $1.3 billion principal amount of securitization (transition) bonds to recover generation-related regulatory asset stranded costs and other qualified costs under an order issued by the PUCT in 2002.

## Environmental Regulations and Related Considerations

### Global Climate Change

**Background** — A growing concern has emerged nationally and internationally about global climate change and how greenhouse gas (GHG) emissions, such as $CO_2$, might contribute to global climate change. We produce GHG emissions from the direct combustion of fossil fuels at our generation plants, primarily our lignite/coal-fueled generation units. $CO_2$, methane and nitrous oxide are emitted in this combustion process, with $CO_2$ representing the largest portion of these GHG emissions. GHG emissions (primarily $CO_2$) from our combustion of fossil fuels represent the substantial majority of our total GHG emissions. For 2009, we estimate that our generation facilities produced 54 million short tons of $CO_2$ based on continuously monitored data reported to and approved by the EPA. The three new lignite-fueled units that achieved substantial completion (as defined in the EPC agreements for the units) in the fourth quarter 2009 and the second quarter 2010 will generate additional $CO_2$ emissions. Other aspects of our operations result in emissions of GHGs including, among other things, coal piles at our generation plants, sulfur hexafluoride in our electric operations, refrigerant from our chilling and cooling equipment, fossil fuel combustion in our motor vehicles and electricity usage at our facilities and headquarters. Because a substantial portion of our generation portfolio consists of lignite/coal-fueled generation plants, including the three new lignite-fueled generation units that are substantially complete, our financial condition and/or results of operations could be materially adversely affected by the enactment of statutes or regulations that mandate a reduction in GHG emissions or that impose financial penalties, costs or taxes on those that produce GHG emissions. See "Risk Factors" for additional discussion of risks posed to us regarding global climate change regulation.

**Global Climate Change Legislation** — Several bills have been introduced in the U.S. Congress or advocated by the Obama Administration that are intended to address climate change using different approaches, including a cap on carbon emissions with emitters allowed to trade unused emission allowances (cap-and-trade), a tax on carbon emissions (carbon tax) and incentives for the development of low-carbon technology. In addition to potential federal legislation to regulate GHG emissions, the U.S. Congress might also consider other legislation that could result in the reduction of GHG emissions, such as the establishment of renewable energy portfolio standards.

Through our own evaluation and working in tandem with other companies and industry trade associations, we have supported the development of an integrated package of recommendations for the federal government to address the global climate change issue through federal legislation, including GHG emissions reduction targets for total U.S. GHG emissions and rigorous cost containment measures to ensure that program costs are not prohibitive. In the event GHG legislation involving a cap-and-trade program is enacted, we believe that such a program should be mandatory, economy-wide, consistent with expected technology development timelines and designed in a way to limit potential harm to the economy and protect consumers. We contend that any mechanism for allocation of GHG emission allowances should include substantial allocation of allowances to offset the cost of GHG regulation, including the cost to electricity consumers. In addition, we participate in a voluntary electric utility industry sector climate change initiative in partnership with the DOE. Our strategies are generally consistent with the "EEI Global Climate Change Points of Agreement" published by the Edison Electric Institute in January 2009 and "The Carbon Principles" announced in February 2008 by three major financial institutions. Finally, we have created a Sustainable Energy Advisory Board that advises us on technology development opportunities that reduce the effects of our operations on the environment while balancing the need to address the energy requirements of Texas. Our Sustainable Energy Advisory Board is comprised of individuals who represent the following interests, among others: the environment, customers, economic development in Texas and technology/reliability standards. If, despite these efforts, a substantial number of our investors, customers or others refuse to do business with us because of our GHG emissions, it could have a material adverse effect on our results of operations, financial position and liquidity.

164

EFIHMW00223203

*Federal Level* — Several bills have been introduced in the U.S. Congress or advocated by the Obama Administration that are intended to address climate change using different approaches, including most prominently a cap on carbon emissions with emitters allowed to trade unused emission allowances (cap-and-trade). These bills include the Waxman-Markey bill, known as the American Clean Energy and Security Act of 2009 (Waxman-Markey), the Kerry-Boxer bill, known as the Clean Energy Jobs and American Power Act (Kerry-Boxer) and the Kerry-Lieberman bill, known as the American Power Act (Kerry-Lieberman). This proposed legislation is not law, but in June 2009 Waxman-Markey was passed by the U.S. House of Representatives and sent to the U.S. Senate for consideration. Kerry-Boxer was reported out of the U.S. Senate Environment and Public Works Committee, but has not been taken up by the Senate as a whole. Kerry-Lieberman was released by its sponsors in May 2010 when it appeared that progress on passing Kerry-Boxer had stalled.

As currently proposed, Waxman-Markey takes several approaches to address GHG emissions, including establishing renewable energy and energy efficiency standards, establishing performance standards for coal-fueled electricity generation units, and creating an economy-wide cap-and-trade program. The renewable energy and energy efficiency standards would require retail electricity suppliers to meet 6% of their load with renewable energy sources by 2012, increasing to 20% of their load by 2020, some of which could be met by energy efficiency measures. The performance standards for coal-fueled electricity generation units would require a 65% reduction in $CO_2$ emissions for subject generation units initially permitted after January 1, 2020, and a 50% reduction in $CO_2$ emissions for subject electricity generation units initially permitted between January 1, 2009 and January 1, 2020 once certain technology deployment criteria are met but no later than January 1, 2025. The cap-and-trade program would require emissions from capped sources, including coal-fueled electricity generation units, to be reduced 3% below 2005 levels by 2012, 17% by 2020, 42% by 2030 and 83% by 2050. The version of Waxman-Markey passed by the U.S. House of Representatives included provisions that allocated a large percentage of the emissions allowances at no charge to various groups that would be impacted by such a cap-and-trade program, including certain merchant coal-fueled generation units. The Kerry-Boxer proposal employs a cap and trade approach similar to Waxman-Markey, but requires a 20% reduction in $CO_2$ emissions levels by 2020 and provides a smaller grant of emission allowances to the electric power sector, including merchant coal-fueled generation units. Kerry-Boxer does not include a renewable energy and energy efficiency standard, which is addressed in a separate proposal in the U.S. Senate.

Recent developments in the U.S. Congress indicate that the prospects for passage of any cap-and-trade legislation in this Congress are not likely. However, if any of them or similar legislation were to be adopted, our costs of compliance could be material.

In December 2009, the EPA issued a finding that GHG emissions endanger human health and the environment and that emissions from motor vehicles contribute to that endangerment. The EPA's finding required it to begin regulating GHG emissions from motor vehicles and ultimately stationary sources under existing provisions of the federal Clean Air Act. Following its endangerment finding, the EPA took three regulatory actions with respect to the control of GHG emissions. First, in March 2010, the EPA completed a reconsideration of a memorandum issued in December 2008 by then EPA Administrator Stephen Johnson on the issue of when the Clean Air Act's Prevention of Significant Deterioration (PSD) program would apply to newly identified pollutants such as GHG's. The EPA determined that the Clean Air Act's PSD permit requirements would apply when a nation-wide rule requiring the control of a pollutant takes effect. Under this determination, the earliest time that PSD permitting requirements would apply to GHG emissions from stationary sources, including our power generation facilities, would be January 2011 — the first date that new motor vehicles must meet the new GHG standards. Second, in April 2010, the EPA adopted GHG emission standards for certain new motor vehicles. Third, in June 2010, the EPA finalized its so-called "tailoring rule" that established new thresholds of GHG emissions for the applicability of permits under the Clean Air Act for stationary sources, including our power generation facilities. The EPA's tailoring rule defines the threshold of GHG emissions for determining applicability of the Clean Air Act's permitting programs and PSD program at levels greater than the lower emission thresholds contained in the Clean Air Act. In addition, in September 2009, the EPA issued a final rule requiring the reporting, by March 2011, of calendar year 2010 GHG emissions from specified large GHG emissions sources in the U.S. (such reporting rule would apply to our lignite-fueled generation facilities).

165

EFIHMW00223204

As with the regional GHG regulatory programs, any federal GHG legislation is expected to limit, to some extent, the EPA's authority to regulate GHGs under existing Clean Air Act regulatory programs, but if Congress fails to pass GHG legislation, the EPA is expected to continue its announced Clean Air Act regulatory actions. Our costs of complying with future EPA limitations on GHG emissions could be material.

In September 2009, the U.S. Court of Appeals for the Second Circuit issued a decision in the case of *State of Connecticut v. American Electric Power Company Inc.* holding that various states, a municipality and certain private trusts have standing to sue and have sufficiently alleged a cause of action under the federal common law of nuisance for injuries allegedly caused by the defendant power generation companies' emissions of GHGs. The decision does not address the merits of the nuisance claim, and is still subject to appeal.

In October 2009, the U.S. Court of Appeals for the Fifth Circuit issued a decision in the case of *Comer v. Murphy Oil USA* holding that certain Mississippi residents have standing to sue to pursue state law nuisance, negligence and trespass claims for injuries purportedly suffered because the defendants' emissions of GHGs allegedly increased the destructive force of Hurricane Katrina. This decision, like the *American Electric Power* decision discussed above, does not address the merits of such a nuisance claim and is still subject to appeal.

In September 2009, the U.S. District Court for the Northern District of California issued a decision in the case of *Native Village of Kivalina v. ExxonMobil Corporation* dismissing claims asserted by an Eskimo village that emissions of GHGs from approximately 24 oil and energy companies are causing global warming, which has damaged the arctic sea ice that protects the village from winter storms and erosion. The court dismissed the claims because they raised nonjudiciable political questions and because plaintiffs lacked standing to sue. The decision is subject to appeal.

While we are not a party to these suits, they could encourage or form the basis for a lawsuit asserting similar nuisance claims regarding emissions of GHGs. If any similar suit was successfully asserted against us in the future, it could have a material adverse effect on our business, results of operations and financial condition.

*State and Regional Level* — There are currently no Texas state regulations in effect concerning GHGs, and there are no regional initiatives concerning GHGs in which the State of Texas is a participant. We oppose state-by-state regulation of GHGs. In October 2009, Public Citizen Inc. filed a lawsuit against the Texas Commission on Environmental Quality (TCEQ) and its commissioners seeking to compel the TCEQ to regulate GHG emissions under the Texas Clean Air Act. The Attorney General of Texas has filed special exceptions to the Public Citizen pleading. We are not a party to this litigation. If limitations on emissions of GHGs are enacted in Texas, our costs of compliance could be material.

166

EFIHMW00223205

*International Level* — The U.S. currently is not a party to the Kyoto Protocol, which is a protocol to the United Nations Framework Convention on Climate Change (UNFCCC). The United Nations' Kyoto Protocol process generally requires developed countries to cap GHG emissions at certain levels during the 2008 to 2012 time period. At the conclusion of the December 2007 United Nations Climate Change Conference, the Bali Action Plan was adopted, which identifies a work group, process and timeline for the consideration of possible post-2012 international actions to further address climate change. In December 2009, leaders of developed and developing countries met in Copenhagen under the UNFCCC and issued the Copenhagen Accord. The Copenhagen Accord provides a mechanism for countries to make economy-wide GHG emission mitigation commitments for reducing emissions of GHGs by 2020 and provides for developed countries to fund GHG emission mitigation projects in developing countries. President Obama participated in the development of, and endorsed, the Copenhagen Accord. In January 2010, the U.S. informed the United Nations that it would reduce GHG emissions by 17% from 2005 levels by 2020, contingent on Congress passing climate change legislation.

We continue to assess the risks posed by possible future legislative or regulatory changes pertaining to GHG emissions. Because the proposals described above are in their formative stages, we are unable to predict the potential effects on our business, financial condition and/or results of operations; however, any such effects could be material. The effect will depend, in large part, on the specific requirements of the legislation or regulation and how much, if any, of the costs are included in wholesale prices.

*EFH Corp.'s Voluntary Energy Efficiency, Renewable Energy, and Global Climate Change Efforts* — We are considering, or expect to be actively engaged in, business activities that could result in reduced GHG emissions including:

- *Investing in Energy Efficiency or Related Initiatives by Our Competitive Businesses* — Our competitive businesses expect to invest $100 million in energy efficiency or related initiatives over a five-year period that began in 2008, including initiatives such as the TXU Energy Power Monitor™, an in-home display device that enables residential customers to monitor whole-house energy usage and cost in real-time, and projects month-end bill amounts; the TXU Energy iThermostat™, a web-enabled programmable thermostat with a load control feature for cycling off air conditioners during times of peak energy demand; time-based electricity rates that are expected to work in conjunction with advanced metering infrastructure; rate plans that include electricity from renewable resources; an Online Energy Store that provides customers the opportunity to purchase hard-to-find, cost-effective energy efficiency products; a Compact Fluorescent Light (CFL) program that provides packages of CFLs to customers; a program to refer customers to energy efficiency contractors; the provision of rebates to business customers for purchasing new energy efficient equipment for their facilities based on a detailed engineering design through the Energy Conservation Investment Program; the Energy Efficiency Assistance Program that delivers products and services, as well as grants through social service agencies, to improve the energy efficiency of participating low income customer homes and apartment complexes; and online energy audit tools and tips for using less electricity;

- *Investing in Energy Efficiency Initiatives by Oncor* — In addition to the potential energy efficiencies from advanced metering, Oncor expects to invest over $300 million in energy efficiency initiatives over a five-year period that began in 2008 through such efforts as traveling across the State of Texas educating consumers about electricity, including the benefits of energy efficiency, advanced meters and renewable energy, and investment of over $16 million in the installation of solar photovoltaic systems in customer's homes and facilities that is expected to result in savings of up to 4.8 million kWh of electricity;

- *Participating in the CREZ Program* — Oncor has been selected by the PUCT to construct approximately $1.75 billion of CREZ transmission facilities that are designed to connect existing and future renewable energy facilities to the electricity transmission system in ERCOT;

- *Purchasing Electricity from Renewable Sources* — We expect to remain a leader in the ERCOT market in providing electricity from renewable sources by purchasing up to 1,500 MW of wind power. Our total wind power portfolio is currently more than 900 MW;

- *Promoting the Use of Solar Power* — TXU Energy currently purchases surplus renewable distributed generation from qualified customers. In addition, TXU Energy's Solar Academy works with Texas school districts to teach and demonstrate the benefits of solar power;

167

EFIHMW00223206

- *Investing in Technology* — We continue to evaluate the development and commercialization of cleaner power facility technologies; technologies that support sequestration and/or reduction of $CO_2$; incremental renewable sources of electricity, including wind and solar power; energy storage, including advanced battery and compressed air storage, as well as related technologies that seek to lower emissions intensity. Additionally, we continue to explore the advances in electric cars and plug-in hybrid electric vehicles that have the potential to reduce overall GHG emissions;

- *Evaluating the Development of a New Nuclear Generation Facility* — We have filed an application with the NRC for combined construction and operating licenses for up to 3,400 MW of new nuclear generation capacity (the lowest GHG emission source of baseload generation currently available) at our Comanche Peak nuclear generation facility. In addition, we have (i) filed a loan guarantee application with the DOE for financing of the proposed units and (ii) formed a joint venture with Mitsubishi Heavy Industries Ltd. (MHI) to further develop the units using MHI's US-Advanced Pressurized Water Reactor technology, and

- *Offsetting GHG Emissions by Planting Trees* — We are engaged in a number of tree planting programs that offset GHG emissions, resulting in the planting of over 1.1 million trees in 2009. The majority of these trees were planted as part of our mining reclamation efforts but also include TXU Energy's Urban Tree Farm program, which has planted more than 150,000 trees since its inception in 2002.

### Other Environmental Regulations

*Recent EPA Actions* — The EPA has recently completed several regulatory actions establishing new requirements for control of certain emissions from sources that include coal-fueled generation facilities. It is also currently considering several other regulatory actions, as well as contemplating future additional regulatory actions, in each case that may affect our coal-fueled generation facilities.

Each of our coal-fueled generation facilities is currently equipped with substantial emissions control equipment. All of our coal-fueled generation facilities are equipped with activated carbon injection systems to reduce mercury emissions. Flue gas desulfurization systems designed primarily to reduce sulfur dioxide emissions are installed at Oak Grove Units 1 and 2, Sandow Units 4 and 5, Martin Lake Units 1, 2, and 3, and Monticello Unit 3. Selective catalytic reduction systems designed to reduce nitrogen oxide emissions are installed at Oak Grove Units 1 and 2 and Sandow Unit 4. Selective non-catalytic reduction systems designed to reduce nitrogen oxide emissions are installed at Sandow Unit 5, Monticello Units 1, 2, and 3, and Big Brown Units 1 and 2. Fabric filter systems designed primarily to reduce particulate matter emissions are installed at Oak Grove Units 1 and 2, Sandow Unit 5, Monticello Units 1 and 2, and Big Brown Units 1 and 2. Electrostatic precipitator systems designed primarily to reduce particulate matter emissions are installed at Sandow Unit 4, Martin Lake Units 1, 2, and 3, Monticello Units 1, 2, and 3, and Big Brown Units 1 and 2. Sandow Unit 5 uses a fluidized bed combustion process that facilitates control of nitrogen oxides and sulfur dioxide. Flue gas desulfurization systems, fabric filter systems, and electrostatic precipitator systems also assist in reducing mercury and other emissions.

There is no assurance that the currently-installed emissions control equipment at our coal-fueled generation facilities will satisfy the requirements under any future EPA or TCEQ regulations. Some of the potential EPA or TCEQ regulatory actions could require us to install significant additional control equipment, resulting in material costs of compliance for our generation units, including capital expenditures and higher operating costs. These costs could result in material adverse effects on our financial condition, liquidity and results of operations.

*Sulfur Dioxide, Nitrogen Oxide and Mercury Air Emissions* — The EPA has promulgated Acid Rain Program rules that require fossil-fueled plants to have sufficient $SO_2$ emission allowances and meet certain $NO_x$ emission standards. Our generation plants meet these $SO_2$ allowance requirements and $NO_x$ emission rates.

Confidential

In 2005, the EPA issued a final rule to further reduce $SO_2$ and $NO_x$ emissions from power plants. The $SO_2$ and $NO_x$ reductions required under the Clean Air Interstate Rule (CAIR), which were required to be phased in between 2009 and 2015, were based on a cap and trade approach (market-based) in which a cap was put on the total quantity of emissions allowed in 28 eastern states (including Texas). Emitters were required to have allowances for each ton emitted, and emitters were allowed to trade emissions under the cap. In July 2008, the U.S. Court of Appeals for the D.C. Circuit (D.C. Circuit Court) vacated CAIR. In December 2008, in response to an EPA petition, the D.C. Circuit Court reversed, in part, its previous ruling. Such reversal confirmed CAIR is not valid, but allowed it to remain in place while the EPA revises CAIR to correct the previously identified shortcomings. In July 2010, the EPA released a proposed rule called the Clean Air Transport Rule (CATR). The CATR, as proposed, would replace CAIR in 2012 and would require no additional emission reductions for Luminant. However, we cannot predict the impact of a final rule on our business, results of operations and financial condition. See Note 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for discussion of the impairment of emission allowances intangible assets.

In 2005, the EPA also published a final rule requiring reductions of mercury emissions from coal-fueled generation plants. The Clean Air Mercury Rule (CAMR) was based on a nationwide cap and trade approach. The mercury reductions were required to be phased in between 2010 and 2018. In March 2008, the D.C. Circuit Court vacated CAMR. In February 2009, the U.S. Supreme Court refused to hear the appeal of the D.C. Circuit Court's ruling. The EPA agreed, in a federal court consent decree, to publish proposed regulations concerning emissions of mercury and other hazardous air pollutants from electricity generating units by March 2011, and to finalize those regulations late in 2011. We cannot predict the substance of any final EPA regulations on such hazardous air pollutants. However, the EPA has informally indicated that recently proposed regulations regarding hazardous air pollutants from industrial boilers may serve as a template for the forthcoming electricity generating unit regulations. The industrial boiler regulations, if applied to electricity generating units, would likely require significant additions of control equipment. If required, such additions would result in material costs of compliance for our generation units, including capital expenditures to install new control equipment and higher operating costs, resulting in material adverse effects on our financial condition, liquidity and results of operations. See Note 7 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010, "Litigation Related to Generation Facilities."

$SO_2$ reductions required under the proposed regional haze/visibility rule (or so-called BART rule) only apply to units built between 1962 and 1977. The reductions are required on a unit-by-unit basis. The EPA provides the option for states to use CAIR to satisfy BART reductions for electricity generating units, and Texas has chosen this option. We believe the D.C. Circuit Court decision to leave CAIR in place while the EPA revises it should allow Texas to move forward with its plans.

In connection with our construction of three new lignite-fueled generation units in Texas, we have committed to reduce emissions of $NO_x$, $SO_2$ and mercury through the installation of emissions control equipment at both new and existing units and fuel blending at some existing units. We have also applied with the TCEQ to seek a "maximum achievable control technology" determination for our two Oak Grove units recently achieved substantial completion (as defined in the EPC agreements for the units) and have agreed to offset any emissions above those levels. These efforts, which will involve incremental equipment investments as well as additional costs for facility operations and maintenance in the future, will be coordinated with efforts related to applicable environmental rules to provide the most cost-effective compliance plan options.

The following are the major air quality improvements planned at our existing and new coal-fueled generation plants to help meet the offset and reduction commitment:

- To reduce $NO_x$ emissions, we have applied for permits to install selective catalytic reduction (SCR) systems at our Martin Lake plant. In addition, we have installed selective non-catalytic reduction systems at our Monticello and Big Brown plants and improved the low-$NO_x$ burner technology at one of our Monticello units. These activities are in addition to SCR systems being installed at the legacy Sandow unit and at the new Oak Grove units;

169

EFIHMW00223208

- To reduce mercury emissions, we plan to use activated carbon injection, a sorbent injection system technology, at all of our plants, and

- To reduce $SO_2$ emissions, we plan to increase use of lower-sulfur coal at various plants. In addition, Martin Lake mine is using coal-cleaning technology to reduce both $SO_2$ and mercury emissions, and we are evaluating the effectiveness of this technology at Big Brown and Monticello mines.

The Clean Air Act requires each state to monitor air quality for compliance with federal health standards. The EPA is required to periodically review, and if appropriate, revise all national ambient quality standards. The standards for ozone are not being achieved in several areas of Texas. The TCEQ adopted State Implementation Plan (SIP) rules in May 2007 to deal with eight-hour ozone standards, which required nitrogen oxide emission reductions from certain of our peaking natural gas-fueled units in the Dallas-Fort Worth area. In March 2008, the EPA made the eight-hour ozone standards more stringent. In January 2010, the EPA proposed to further reduce the eight-hour ozone standard and to adopt a secondary standard for the protection of sensitive vegetation from ozone-related damage. Since the EPA projects that SIP rules to address attainment of these new more stringent standards will not be required until December 2013, we cannot yet predict the impact of this action on our generation facilities. In January 2010, the EPA added a new one-hour nitrogen oxide National Ambient Air Quality standard that may require actions within Texas to reduce emissions. The TCEQ will be required to revise its monitoring network and submit an implementation plan with compliance required by January 2021/2022. In June 2010, the EPA adopted a new one-hour sulfur dioxide national ambient air quality standard that may require action within Texas to reduce sulfur dioxide emissions. The TCEQ will be required to conduct modeling and develop an implementation plan by 2014, pursuant to which compliance will be required by 2017, according to the EPA's implementation timeline. We cannot predict the impact of the new standards on our business, results of operations or financial condition until the TCEQ adopts (if required) an implementation plan with respect to the standards. If the TCEQ adopts implementation plans that require us to install additional emissions controls, or if the EPA adopts more stringent requirements through any of the number of potential rulemaking activities in which it is or may be engaged, we could incur material capital expenditures and higher operating costs, resulting in material adverse effects on our financial condition, liquidity and results of operations.

In October 2010, the EPA proposed to retroactively disapprove a portion of the SIP pursuant to which the state implements its program to achieve the EPA's National Ambient Air Quality Standards (NAAQS) under the Clean Air Act. In particular, the EPA proposes to retroactively disapprove certain standard permits for pollution control projects that the TCEQ adopted approximately 10 years ago. The EPA asserts that we hold such standard permits for two generation facilities (Big Brown and Stryker Creek). We are investigating the basis for the EPA's assertion. The EPA has proposed to disapprove this portion of the SIP while acknowledging that emissions covered by these standard permits do not threaten attainment or maintenance of the NAAQS under the Clean Air Act. We believe the TCEQ's adoption of the standard permit was consistent with the Clean Air Act. However, we cannot predict whether the EPA will take final action to disapprove this portion of the SIP. If the EPA takes final disapproval action, and if that causes us to undertake additional permitting activity and install additional emissions control equipment at our affected generation facilities, we could incur material capital expenditures, resulting in material adverse effects on our financial condition, liquidity and results of operations.

We believe that we hold all required emissions permits for facilities in operation and have applied for or obtained the necessary construction permits for facilities under construction.

*Water* — The TCEQ and the EPA have jurisdiction over water discharges (including storm water) from facilities in Texas. We believe our facilities are presently in material compliance with applicable state and federal requirements relating to discharge of pollutants into water. We believe we hold all required waste water discharge permits from the TCEQ for facilities in operation and have applied for or obtained necessary permits for facilities under construction. We also believe we can satisfy the requirements necessary to obtain any required permits or renewals. Recent changes to federal rules pertaining to the Spill Prevention, Control and Countermeasure (SPCC) plans for oil-filled electrical equipment and bulk storage facilities for oil required updating of certain of our facilities. We have developed and implemented SPCC plans as required for those substations, work centers and distribution systems, and we are currently in compliance with the new rules that become effective in November 2011.

170

Confidential

EFIHMW00223209

PX 045
Page 186 of 561

Diversion, impoundment and withdrawal of water for cooling and other purposes are subject to the jurisdiction of the TCEQ and the EPA. We believe we possess all necessary permits for these activities from the TCEQ for our present operations. We have obtained the necessary water rights permit from the TCEQ for the lignite mine that supports the Oak Grove units. Clean Water Act Section 316(b) regulations pertaining to existing water intake structures at large generation facilities were published by the EPA in 2004. As prescribed in the regulations, we began implementing a monitoring program to determine the future actions that might need to be taken to comply with these regulations. In January 2007, a federal court ruled against the EPA in a lawsuit brought by environmental groups challenging aspects of these regulations, and in July 2007, the EPA announced that it was suspending the regulations pending further rulemaking. The U.S. Supreme Court issued a decision in April 2009 reversing the federal court's decision, in part, and finding that the EPA permissibly used cost-benefit analysis in the Section 316(b) regulations. In the absence of regulations, the EPA has instructed the states implementing the Section 316(b) program to use best professional judgment in reviewing applications and issuing permits under Section 316(b). We cannot predict the impact on our operations of the suspended regulations or of new regulations, if any, that replace them.

*Radioactive Waste* — We currently ship low-level waste material to a disposal facility outside of Texas. Under the federal Low-Level Radioactive Waste Policy Act of 1980, as amended, the State of Texas is required to provide, either on its own or jointly with other states in a compact, for the disposal of all low-level radioactive waste generated within the state. The State of Texas has agreed to a compact for a disposal facility that would be located in Texas. That compact was ratified by Congress and signed by the President in 1998. In 2003, the State of Texas enacted legislation allowing a private entity to be licensed to accept low-level radioactive waste for disposal, and in 2004 the State received a license application from such an entity for review. In January 2009, the TCEQ approved this permit. We expect to continue to ship low-level waste material off-site for as long as an alternative disposal site is available. Should existing off-site disposal become unavailable, the low-level waste material will be stored on-site. (See discussion under "Luminant — Nuclear Generation Operations" above.)

We believe that our on-site used nuclear fuel storage capability is sufficient for a minimum of three years. The nuclear industry is continuing to review ways to enhance security of used-fuel storage with the NRC to fully utilize physical storage capacity. Current on-site used nuclear fuel storage capability will require the use of the industry technique of dry cask storage within the next three years.

*Solid Waste, Including Fly Ash Associated with Lignite/Coal-Fueled Generation* — Treatment, storage and disposal of solid waste and hazardous waste are regulated at the state level under the Texas Solid Waste Disposal Act and at the federal level under the Resource Conservation and Recovery Act of 1976, as amended, and the Toxic Substances Control Act. The EPA has issued regulations under the Resource Conservation and Recovery Act of 1976 and the Toxic Substances Control Act, and the TCEQ has issued regulations under the Texas Solid Waste Disposal Act applicable to our facilities. We believe we are in material compliance with all applicable solid waste rules and regulations. In addition, we have registered solid waste disposal sites and have obtained or applied for permits required by such regulations.

In December 2008, an ash impoundment facility at a Tennessee Valley Authority (TVA) site ruptured, releasing a significant quantity of coal ash slurry. No impoundment failures of this magnitude have ever occurred at any of our impoundments, which are significantly smaller than TVA's and are inspected on a regular basis. We routinely sample groundwater monitoring wells to ensure compliance with all applicable regulations. As a result of the TVA ash impoundment failure, in May 2010, the EPA released a proposed rule that considers regulating coal combustion residuals as either a hazardous waste or a non-hazardous waste. We are unable to predict the requirements of a final rule; however, the potential cost of compliance could be material.

171

EFIHMW00223210

The EPA issued a notice in December 2009 that it had identified several industries, including the electric power industry, that should be subject to financial responsibility requirements under the Comprehensive Environmental Response, Compensation and Liability Act consistent with the risk associated with their production, transportation, treatment, storage or disposal of hazardous substances. The EPA indicated in its notice that it would develop regulations that define the scope of those financial responsibility requirements. We do not know, at this time, the scope of these requirements, nor are we able to estimate the potential cost (which could be material) of complying with any such new requirements.

*Environmental Capital Expenditures*

Capital expenditures for our environmental projects totaled $149 million in 2009 and are expected to total approximately $80 million in 2010, consisting primarily of environmental projects at existing lignite/coal-fueled generation plants. These amounts are exclusive of emissions control equipment investment planned as part of the three-unit generation development program, which is expected to total up to $500 million over the construction period. See discussion above under "Luminant — Lignite/Coal-Fueled Generation Operations" regarding planned investments in emissions control systems.

172

Confidential

EF[HMW00223211

## MANAGEMENT

**Directors**

The names of EFH Corp.'s directors and information about them, as furnished by the directors themselves, are set forth below:

| Name | Age | Served As Director Since | Business Experience |
|---|---|---|---|
| Arcilia C. Acosta (1)(4) | 45 | 2008 | Arcilia C. Acosta has served as a Director of EFH Corp. since May 2008. During the last five years, Ms. Acosta's principal occupation and employment has been serving as the CEO of CARCON Industries & Construction, L.L.C. (CARCON) and its subsidiaries. She is also the CEO and controlling principal of Southwestern Testing Laboratories, L.L.C. (STL). CARCON's principal business is commercial, institutional and transportation construction. STL's principal business is geotechnical engineering, construction materials testing and environmental consulting. Ms. Acosta is a former Chair of the State of Texas Hispanic chambers organization known as the Texas Association of Mexican American Chambers of Commerce (TAMACC) and the Greater Dallas Hispanic Chamber of Commerce. Ms. Acosta serves on the Board of Advisors for Compass Bank and the Board of Governors for the Dallas Foundation. |
| David Bonderman | 68 | 2007 | David Bonderman has served as a Director of EFH Corp. since October 2007. He is a founding partner of TPG Capital, L.P. (TPG). Before forming TPG in 1992, Mr. Bonderman was Chief Operating Officer of the Robert M. Bass Group (now doing business as Keystone Group L.P.) in Fort Worth, Texas. He serves on the boards of the following public companies: Armstrong World Industries, Inc., CoStar Group, Inc., Gemalto N.V., General Motors Company, Harrahs's Entertainment, RyanAir Holdings PLC, for which he serves as Chairman of the Board, and Univision Communications, Inc. During the past five years, Mr. Bonderman also served on the boards of Burger King Holdings, Inc., Ducati Motor Holding S.P.A., Gemplus International S.A. (predecessor to Gemalto N.V.), IASIS Healthcare Corporation, Korea First Bank Ltd., Mobilcom AG, and Washington Mutual, Inc. |
| Donald L. Evans (2)(3)(4) | 64 | 2007 | Donald L. Evans has served as a Director and Non-Executive Chairman of EFH Corp. since October 2007. He was CEO of the Financial Services Forum from 2005 to 2007, after serving as the 34th secretary of the U.S. Department of Commerce. Before serving as Secretary of Commerce, Mr. Evans was the former CEO of Tom Brown, Inc., a large independent energy company. He also previously served as a member and chairman of the Board of Regents of the University of Texas System. Mr. Evans is also a Senior Partner at Quintana Energy Partners, L.P. |

173

EFIHMW00223212

| Name | Age | Served As Director Since | Business Experience |
|---|---|---|---|
| Thomas D. Ferguson (3) | 56 | 2008 | Thomas D. Ferguson has served as a Director of EFH Corp. since December 2008. He is a Managing Director of Goldman, Sachs & Co., having joined the firm in 2003. Mr. Ferguson heads the asset management efforts for the merchant bank's infrastructure investment activity worldwide. He currently serves on the boards of some of Goldman, Sachs & Co.'s largest infrastructure investments, including Associated British Ports, the largest port company in the UK; Carrix, one of the largest private container terminal operators in the world; and Red de Carreteras, a major toll road concessionaire in Mexico. Additional responsibilities at Goldman, Sachs & Co. include an 18 month stint as the CEO of National Golf/American Golf, one of the leading owner/operators of golf courses in the U.S. for which he now serves as the company's non-executive Chairman. |
| Frederick M. Goltz (2)(3) | 39 | 2007 | Frederick M. Goltz has served as a Director of EFH Corp. since October 2007. He has been with Kohlberg Kravis Roberts and Co., L.P. (KKR) for 14 years. Mr. Goltz has played a significant role in the development of many of the themes pursued by KKR in the energy space, including those related to integrated utilities, merchant generation, and oil and gas exploration and production. He now heads KKR's newly created Mezzanine Fund headquartered in San Francisco. He is a director of EFCH, TCEH, and Luminant. During the past five years, Mr. Goltz also served on the boards of Accuride Corp. and Texas Genco Holdings, Inc. |
| James R. Huffines (1)(3) | 59 | 2007 | James R. Huffines has served as a Director of EFH Corp. since October 2007. He is Chairman of the University of Texas System Board of Regents, after previously serving as Vice Chairman from November 2007 to April 2009 and Chairman from June 2004 to November 2007. He also is Chairman, Central and South Texas Region, of PlainsCapital Bank, Senior Executive Vice President of PlainsCapital Corporation, and a director of Andrew Harper Travel Publications, Inc. and PlainsCapital Bank. |
| Scott Lebovitz | 35 | 2007 | Scott Lebovitz has served as a Director of EFH Corp. since October 2007. He is a Managing Director of Goldman, Sachs & Co. in its Principal Investment Area. He joined Goldman, Sachs & Co. in 1997 and was promoted to Managing Director in 2007. Mr. Lebovitz serves on the boards of both public and private companies, including CVR Energy, Inc., EFCH, TCEH, and Luminant. |

174

EFIHMW00223213

| Name | Age | Served As Director Since | Business Experience |
|------|-----|--------------------------|---------------------|
| Jeffrey Liaw | 33 | 2007 | Jeffrey Liaw has served as a Director of EFH Corp. since October 2007. He is active in TPG's energy and industrial investing practice areas. Before joining TPG in 2005, he worked for Bain Capital in its industrials practice. Mr. Liaw serves on the boards of both public and private companies, including Graphic Packaging Holding Company and Oncor. |
| Marc S. Lipschultz (2)(4) | 41 | 2007 | Marc S. Lipschultz has served as a Director of EFH Corp. since October 2007. He joined KKR in 1995 and is the global head of KKR's Energy and Infrastructure business. Mr. Lipschultz serves on KKR's Management Committee and its Infrastructure Investment Committee. Currently, he is on the boards of Accel-KKR Company and Oncor. During the past five years, Mr. Lipschultz also served on the boards of Texas Genco Holdings, Inc. and The Boyds Collection, Ltd. |
| Michael MacDougall (2)(3) | 40 | 2007 | Michael MacDougall has served as a Director of EFH Corp. since October 2007. He is a partner of TPG. Prior to joining TPG in 2002, Mr. MacDougall was a vice president in the Principal Investment Area of the Merchant Banking Division of Goldman, Sachs & Co., where he focused on private equity and mezzanine investments. Mr. MacDougall serves on the board of directors of both public and private companies, including Graphic Packaging Holding Company, Kraton Performance Polymers Inc., Valerus Compression Services, L.P., EFCH, TCEH, and Luminant. During the past five years, he also served on the board of Aleris International. Mr. MacDougall also serves as the Chairman of the Board of The Opportunity Network and is a member of the Board of the Dwight School Foundation and Islesboro Affordable Property. |
| Lyndon L. Olson, Jr. (3) | 63 | 2007 | Lyndon L. Olson, Jr. has served as a Director of EFH Corp. since October 2007. He was a Senior Advisor with Citigroup Inc. from 2002 to 2008, after serving as United States Ambassador to Sweden from 1998 to 2001. He previously was affiliated with Citigroup from 1990 to 1998, as President and CEO of Travelers Insurance Holdings and the Associated Madison Companies, predecessor companies. Before joining Citigroup, he had been President of the National Group Corporation and CEO of its National Group Insurance Company. Ambassador Olson also is a former Chairman and a Member of the Texas 173 State Board of Insurance, former President of the National Association of Insurance Commissioners, and a former member of the Texas House of Representatives. Ambassador Olson also serves on the board of First Acceptance Corporation, Sammons Enterprises and Texas Meter and Device Company. |

175

EFIHMW00223214

| Name | Age | Served As Director Since | Business Experience |
|---|---|---|---|
| Kenneth Pontarelli (2)(4) | 40 | 2007 | Kenneth Pontarelli has served as a Director of EFH Corp. since October 2007. He is a Managing Director of Goldman, Sachs & Co. in its Principal Investment Area. He transferred to the Principal Investment Area in 1999 and was promoted to Managing Director in 2004. Mr. Pontarelli serves as a director of both public and private companies, including CCS, Inc., Cobalt International Energy, L.P., Expro International Group Ltd., CVR Energy, Inc., Kinder Morgan, Inc. and TXU Energy. |
| William K. Reilly | 70 | 2007 | William K. Reilly has served as a Director of EFH Corp. since October 2007. He is a Senior Advisor to TPG and a founding partner of Aqua International Partners, an investment group that invests in companies that serve the water and renewable energy sectors. Mr. Reilly previously served as the seventh Administrator of the EPA. Mr. Reilly is a director of the following public companies: E.I DuPont de Nemours and Company, Eden Springs, Ltd. of Israel, ConocoPhillips and Royal Caribbean International. During the past five years, he also served on the board of Ionics Inc. Before serving as EPA Administrator, Mr. Reilly was President of World Wildlife Fund and President of The Conservation Foundation. He previously served as Executive Director of the Rockefeller Task Force on Land Use and Urban Growth, a senior staff member of the President's Council on Environmental Quality, and Associate Director of the Urban Policy Center and the National Urban Coalition. Mr. Reilly is Co-Chairman of the National Commission on Energy Policy. |
| Jonathan D. Smidt | 38 | 2007 | Jonathan D. Smidt has served as a Director of EFH Corp. since October 2007. He has been with KKR since 2000, where he is a member of the firm's Energy and Natural Resources industry team. Currently, he is a director of Laureate Education Inc., East Resources Inc. and TXU Energy. |
| John F. Young (2)(3) | 54 | 2008 | John F. Young has served as a Director and President and Chief Executive of EFH Corp. since January 2008. Before joining EFH Corp., Mr. Young served in many leadership roles at Exelon from March 2003 to January 2008 including Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation; President of Exelon Generation; and President and Chief Operating Officer of Exelon Power. Prior to joining Exelon, Mr. Young was Senior Vice President of Sierra Pacific Resources Corporation. Mr. Young is also a director of Luminant. |

176

EFIHMW00223215

| Name | Age | Served As Director Since | Business Experience |
|------|-----|------------------------|---------------------|
| Kneeland Youngblood (1) | 55 | 2007 | Kneeland Youngblood has served as a Director of EFH Corp. since October 2007. He is a founding partner of Pharos Capital Group, a private equity firm that focuses on providing growth and expansion capital to businesses in technology, business services, and health care services. Mr. Youngblood is a director of the following public companies: Starwood Hotels and Resorts Worldwide, Inc., Gap Inc. and Burger King Holdings, Inc. Mr. Youngblood is a member of the Council on Foreign Relations. |

(1)  Member of Audit Committee.

(2)  Member of Executive Committee.

(3)  Member of Governance and Public Affairs Committee

(4)  Member of Organization and Compensation Committee

**Director Qualifications**

In October 2007, David Bonderman, Donald L. Evans, Frederick M. Goltz, James R. Huffines, Scott Lebovitz, Jeffrey Liaw, Marc S. Lipschultz, Michael MacDougall, Lyndon L. Olson, Jr., Kenneth Pontarelli, William K. Reilly, Jonathan D. Smidt, and Kneeland Youngblood were elected to EFH Corp.'s board of directors (the "Board"). Arcilia C. Acosta, Thomas D. Ferguson and John F. Young joined the Board in 2008. Messrs. Bonderman, Ferguson, Goltz, Lebovitz, Liaw, Lipschultz, MacDougall, Pontarelli, and Smidt are collectively referred to as the "Sponsor Directors." Ms. Acosta and Messrs. Evans, Huffines, Olson, Reilly, Young, and Youngblood are collectively referred to as the "Non-Sponsor Directors."

Each of the Sponsor Directors was elected to the Board pursuant to the Limited Partnership Agreement of Texas Energy Future Holdings Limited Partnership, the holder of a majority of the outstanding capital stock of the Company. Pursuant to such agreement, Messrs. Goltz, Lipschultz and Smidt were appointed to the Board as a consequence of their relationships with Kohlberg Kravis Roberts & Co.; Messrs. Bonderman, Liaw and MacDougall were appointed to the Board as a consequence of their relationships with TPG Capital, L.P., and Messrs. Ferguson, Lebovitz and Pontarelli were appointed to the Board as a consequence of their relationships with GS Capital Partners.

When considering whether the Board's directors and nominees have the experience, qualifications, attributes and skills, taken as a whole, to enable the Board to satisfy its oversight responsibilities effectively in light of EFH Corp.'s business and structure, the Board focused primarily on the information in each of the Board member's or nominee's biographical information set forth on the pages above. In addition, EFH Corp. believes that each of its directors possesses high ethical standards, acts with integrity, and exercises careful judgment. Each is committed to employing his/her skills and abilities in the long-term interests of EFH Corp and its stakeholders. Finally, our directors are knowledgeable and experienced in business, governmental, and civic endeavors, further qualifying them for service as members of the Board.

The Sponsor Directors possess experience in owning and managing privately held enterprises and are familiar with corporate finance and strategic business planning activities of highly-leveraged companies such as EFH Corp. Some of the Sponsor Directors also have experience advising and overseeing the operations of large industrial, manufacturing or retail companies similar to our businesses. Finally, several of the Sponsor Directors possess substantial expertise in advising and managing companies in segments of energy industry, including, among others, power generation, oil and gas, and energy infrastructure and transportation.

177

EFIHMW00223216

As a group and individually, the Non-Sponsor Directors possess extensive experience in governmental and civic endeavors and in the business community, in each case, in the markets where our businesses operate.

Mr. Young's employment agreement provides that he will serve as a member of the Board during the time he is employed by the Company. Before joining the Company as President and Chief Executive Officer, he held various senior management positions at other companies in the energy industry over twenty years, including, most recently, his role as Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation.

Ms. Acosta manages the operations of a large commercial construction company in Texas and has significant experience within the local Hispanic business community, having served as the chair of the Greater Dallas Hispanic Chamber of Commerce and the Texas Association of Mexican American Chambers of Commerce. Mr. Evans has demonstrated ability and achievement in both the private and public sectors, serving as U.S. Secretary of Commerce during the Bush Administration, and both before and after his government service, acting as Chairman and Chief Executive Officer of a publicly-owned energy company, Tom Brown, Inc. Mr. Huffines has demonstrated achievement in both business and academic endeavors, and, given his employment in various senior management positions in the banking industry, has sufficient experience and expertise in financial matters to qualify him to serve as EFH Corp.'s "audit committee financial expert." Mr. Olson possesses substantial experience in both federal and state government through, among other things, his service as the former U.S. Ambassador to Sweden and as a former member of the Texas House of Representatives, and has advised and overseen the operations of large companies, in particular his service in the insurance industry. Mr. Reilly possesses a distinguished record of public service and extensive policy-making experience as a former administrator of the EPA, lectures extensively on environmental issues facing companies operating in the energy industry and currently serves as Co-Chairman of the National Commission on Energy Policy. Mr. Youngblood has served on numerous boards for large public companies, has extensive experience managing and advising companies in his capacity as a partner in a private equity firm (not affiliated with the Sponsor Group), is highly knowledgeable of federal and state political matters, and has served on the board of directors of the United States Enrichment Corporation, a company that contracts with the U.S. Department of Energy to produce enriched uranium for use in nuclear power plants.

178

EFIHMW00223217

**Executive Officers**

The names and information regarding EFH Corp.'s executive officers are set forth below:

| Name of Officer | Age | Positions and Offices Presently Held | Date First Elected to Present Offices | Business Experience (Preceding Five Years) |
|---|---|---|---|---|
| John F. Young | 54 | President and Chief Executive Officer of EFH Corp. | January 2008 | John F. Young was elected President and Chief Executive Officer of EFH Corp. in January 2008. Before joining EFH Corp., Mr. Young served in many leadership roles at Exelon Corporation from March 2003 to January 2008, including Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation; President of Exelon Generation; and President and Chief Operating Officer of Exelon Power. Prior to joining Exelon, Mr. Young was Senior Vice President of Sierra Pacific Resources Corporation. |
| James A. Burke | 42 | President and Chief Executive of TXU Energy | August 2005 | James A. Burke was elected President and Chief Executive of TXU Energy in August 2005. Previously, Mr. Burke was Senior Vice President Consumer Markets of TXU Energy. |
| David A. Campbell | 42 | President and Chief Executive of Luminant | June 2008 | David A. Campbell was elected President and Chief Executive of Luminant in June 2008. Mr. Campbell was Executive Vice President and Chief Financial Officer of EFH Corp. from April 2007 to June 2008 having previously served as Acting Chief Financial Officer beginning in March 2006 and as Executive Vice President for Corporate Planning, Strategy & Risk when he joined the company in May 2004. |

179

EFIHMW00223218

**PX 045**
**Page 195 of 561**

| Name of Officer | Age | Positions and Offices Presently Held | Date First Elected to Present Offices | Business Experience |
|---|---|---|---|---|
| Charles R. Enze | 57 | Executive Vice President and Chief Executive of Luminant Construction | September 2006 | Charles R. Enze was elected Executive Vice President and Chief Executive of Luminant Construction in September 2006. Prior to joining EFH Corp. in 2006, Mr. Enze was Vice President of Engineering and Projects for Shell International Exploration & Production. |
| Joel D. Kaplan | 41 | Executive Vice President of EFH Corp. | November 2009 | Joel D. Kaplan was elected Executive Vice President of EFH Corp. in November 2009 and oversees the company's public affairs organization. Prior to joining EFH Corp., Mr. Kaplan served as Deputy Chief of Staff in the George W. Bush White House from 2006 to 2008 and Deputy Director of the Office of Management and Budget from 2003 to 2006. |
| Paul M. Keglevic | 56 | Executive Vice President and Chief Financial Officer of EFH Corp. | July 2008 | Paul M. Keglevic was elected Executive Vice President and Chief Financial Officer of EFH Corp. in July 2008. Before joining EFH Corp., he was an audit partner at PricewaterhouseCoopers. Mr. Keglevic was PricewaterhouseCoopers' Utility Sector Leader from 2002 to 2008 and Clients and Sector Assurance Leader from 2007 to 2008. |
| Richard J. Landy | 64 | Executive Vice President of EFH Corp. | February 2010 | Richard J. Landy was elected Executive Vice President of EFH Corp. in February 2010 and oversees human resources. Prior to joining EFH Corp., Mr. Landy was owner and consultant of Richard J. Landy, LLC from 2007 to 2009 and Senior Vice President of Exelon from 2002 to 2007. |

180

EFIHMW00223219

| Name of Officer | Age | Positions and Offices Presently Held | Date First Elected to Present Offices | Business Experience |
|---|---|---|---|---|
| M. A. McFarland | 41 | Executive Vice President and Chief Commercial Officer of Luminant and Executive Vice President of EFH Corp. | July 2008 | M. A. McFarland was elected Executive Vice President and Chief Commercial Officer of Luminant and Executive Vice President of EFH Corp. in July 2008. Before joining Luminant, Mr. McFarland served as Senior Vice President of Mergers, Acquisitions and Divestitures and as a Vice President in the wholesale marketing and trading division power team at Exelon. |
| Robert C. Walters | 52 | Executive Vice President and General Counsel of EFH Corp. | March 2008 | Robert C. Walters was elected Executive Vice President and General Counsel of EFH Corp. in March 2008. Prior to joining EFH Corp., Mr. Walters was a Partner of Vinson & Elkins LLP and served on the firm's management committee. Mr. Walters was co-managing partner of the Dallas office of Vinson & Elkins LLP from 1998 through 2005. Mr. Walters will resign from EFH Corp. effective during the first quarter of 2011. |

There is no family relationship between any of the above-named executive officers.

**Audit Committee Financial Expert**

The Board has determined that James R. Huffines is an "Audit Committee Financial Expert" as defined in Item 407(d)(5) of SEC Regulation S-K.

**Code of Conduct**

EFH Corp. maintains certain corporate governance documents on EFH Corp's website at www.energyfutureholdings.com. EFH Corp.'s Code of Conduct can be accessed by selecting "Investor Relations" on the EFH Corp. website. EFH Corp.'s Code of Conduct applies to all of its employees, officers (including the Chief Executive Officer, Chief Financial Officer and Principal Accounting Officer) and directors. Any amendments to the Code of Conduct will be posted on EFH Corp.'s website. Printed copies of the corporate governance documents that are posted on EFH Corp.'s website are also available to any investor upon request to the Secretary of EFH Corp. at 1601 Bryan Street, Dallas, Texas 75201-3411.

**Procedures for Shareholders to Nominate Directors; Arrangement to Serve as Directors**

The Amended and Restated Limited Liability Company Agreement of Texas Energy Future Capital Holdings LLC, the general partner of Texas Holdings, generally requires that the members of Texas Energy Future Capital Holdings LLC take all necessary action to ensure that the persons who serve as its managers also serve on the EFH Corp. Board. In addition, Mr. Young's employment agreement provides that he will continue to serve as a member of the Board during the time he is employed by EFH Corp.

181

EFIHMW00223220

Because of these requirements, together with Texas Holdings' controlling ownership of EFH Corp.'s outstanding common stock, there is no policy or procedure with respect to shareholder recommendations for nominees to the EFH Corp. Board.

182

# EXECUTIVE COMPENSATION

## Organization and Compensation Committee

The Organization and Compensation Committee (the "O&C Committee") of EFH Corp.'s Board of Directors (the "Board") is comprised of four non-employee directors: Arcilia C. Acosta, Donald L. Evans, Marc S. Lipschultz and Kenneth Pontarelli. The primary responsibility of the O&C Committee is to:

- determine and oversee the compensation program of EFH Corp. and its subsidiaries (other than the Oncor Ring-Fenced Entities), including making recommendations to the Board with respect to the adoption, amendment or termination of compensation and benefits plans, arrangements, policies and practices;

- evaluate the performance of EFH Corp.'s Chief Executive Officer (the "CEO") and the other executive officers of EFH Corp. and its subsidiaries (other than the Oncor Ring-Fenced Entities) (collectively, the "executive officers"), including all of the executive officers named in the Summary Compensation Table (the "Named Executive Officers"), and

- approve executive compensation based on those evaluations.

## Compensation Discussion and Analysis

### Compensation of the CEO

In determining the compensation of the CEO, the O&C Committee annually follows a thorough and detailed process. At the end of each year, the O&C Committee reviews a self-assessment prepared by the CEO regarding his performance and the performance of our businesses and meets (with and without the CEO) to evaluate and discuss his performance and the performance of our businesses.

In addition to conducting an annual review of the CEO's performance, the O&C Committee periodically uses independent compensation consultants to assess the compensation of the CEO against a variety of market reference points and competitive data, including the compensation practices of a number of companies that we consider to comprise our peer group, size-adjusted energy services industry survey data and size-adjusted general industry survey data. While the O&C Committee tries to ensure that the bulk of the CEO's compensation is directly linked to his performance and the performance of our businesses, the O&C Committee also seeks to set his compensation in the manner that is competitive for retention purposes. The last assessment of the CEO's compensation was performed in late 2009 / early 2010, when the O&C Committee engaged Towers Watson to perform a competitive analysis of the CEO's compensation. In January 2010, Towers Watson delivered its report to the O&C Committee, which report included market data for a peer group composed of the following companies:

| | | |
|---|---|---|
| AES Corporation | Allegheny Energy, Inc. | Ameren Corp. |
| American Electric Power Co. Inc, | Calpine Corp. | Constellation Energy Group Inc. |
| Dominion Resources Inc. | Duke Energy Corp. | Edison International |
| Entergy Corp. | Exelon Corp. | FirstEnergy Corp. |
| FPL Group Inc. | Mirant Corp. | NRG Energy, Inc. |
| PPL Corp. | Progress Energy Inc. | Public Service Enterprise Group Inc. |
| RRI Energy Inc. | Southern Co. | Xcel Energy Inc. |

The data for CEO compensation of the peer group was developed at both the 50th and 75th percentiles of market in order to provide the O&C Committee with a broad market view and multiple benchmarks. The O&C Committee targets total direct compensation around the 75th percentile of the peer group.

While the O&C Committee considers market reference points and competitive data in determining the appropriate compensation of the CEO (and the other executive officers), the O&C Committee also considers qualitative and subjective factors that are more specific to EFH Corp. in making such determinations. One such factor is the fact that EFH Corp. is a highly-leveraged, privately-owned company. In this regard, while executive officers of publicly traded energy companies, including those in our peer group, are typically granted smaller long-term equity incentive awards on an annual basis, our executive officers received one-time, up front grants of long-term equity incentive awards intended to cover a multi-year period. Extended periods of economic strength or weakness generally has less affect on the cumulative value of annual awards as compared to one-time, up front awards because the annual awards are typically granted at fair market value over time. Accordingly, one-time, up front awards are typically riskier than annual awards.

183

EFIHMW00223222

**PX 045**
**Page 199 of 561**

After a comprehensive review of the CEO's performance and the performance of our businesses in 2009, and taking into consideration the Towers Watson report, the economic dislocation occurring over the last 18 months and other qualitative and subjective factors as described above, the O&C Committee approved several changes to the compensation arrangement for the CEO in February 2010. The O&C Committee made these changes to provide incentives for retention and performance and to maintain a strong alignment between the CEO and our shareholders. We believe these changes are consistent with our compensation philosophy as described below.

**Compensation of Other Executive Officers**

In determining whether to make any adjustments to the compensation of any of our executive officers (other than the CEO), the O&C Committee seeks the input of the CEO. At the end of each year, the CEO reviews a self-assessment prepared by each of these executive officers and assesses the executive officer's performance against business unit and individual goals and objectives. The O&C Committee and the CEO then review the CEO's assessments and, in that context, the O&C Committee approves any adjustments to the compensation for each of these executive officers.

In addition to these annual reviews/assessments, the CEO periodically assesses the compensation of each of these executive officers. The last assessment of the compensation of the executive officers by the CEO was performed in the second half of 2009. Following that assessment, and taking into consideration the economic dislocation occurring over the last 18 months and other qualitative and subjective factors as described above, the CEO suggested several changes to the compensation arrangements for certain of our executive officers in order to provide incentives for retention and performance and to maintain alignment between our executive officers and shareholders. These changes, which are described in more detail below, were approved by the O&C Committee in October 2009 with respect to such executive officers, including each of Messrs. Keglevic, Campbell, Walters and Burke. We believe these changes are consistent with our compensation philosophy as described below.

**Compensation Philosophy**

We have a pay-for-performance compensation philosophy, which places an emphasis on pay-at-risk. In other words, a significant portion of an executive officer's compensation is comprised of variable, at-risk incentive compensation. Our compensation program is intended to compensate executive officers appropriately for their contribution to the attainment of our financial, operational and strategic objectives. In addition, we believe it is important to retain our executive officers and strongly align their interests with EFH Corp.'s shareholders by emphasizing long-term incentive compensation, including equity-based compensation.

To achieve our compensation philosophy, we believe that:

- compensation plans should balance both long-term and short-term objectives;

- the overall compensation program should emphasize variable compensation elements that have a direct link to overall corporate performance and shareholder value, and

- an executive officer's individual compensation level should be based upon an evaluation of the financial and operational performance of that executive officer's business unit as well as the executive officer's individual performance.

184

EFIHMW00223223

We believe our compensation philosophy supports our businesses by:

- aligning performance measures with our business objectives to drive the financial and operational performance of EFH Corp. and its business units;

- rewarding business unit and individual performance by providing compensation levels consistent with the level of contribution and degree of accountability;

- attracting and retaining the best performers, and

- strengthening the correlation between the long-term interests of our executive officers and shareholders.

**Elements of Compensation**

The material elements of our executive compensation program are:

- a base salary;

- the opportunity to earn an annual performance-based cash bonus based on the achievement of specific corporate, business unit and individual performance goals, and

- long-term incentive awards, primarily in the form of (i) long-term cash incentive awards and (ii) options to purchase shares of EFH Corp.'s common stock (the "Stock Option Awards") under our 2007 Stock Incentive Plan for Key Employees of EFH Corp. and Affiliates (the "2007 Stock Incentive Plan").

In addition, executive officers generally have the opportunity to participate in certain of our broad-based employee compensation plans, including our Thrift (401(k)) Plan, retirement plans and non-qualified benefit plans, and to receive certain perquisites.

**Assessment of Compensation Elements**

We design the majority of an executive officer's compensation to be directly linked to corporate and business unit performance. For example, an executive officer's annual performance-based cash bonus is primarily based on the achievement of certain corporate and business unit financial and operational targets (such as management EBITDA, cost management, generation output and customer satisfaction). In addition, the vesting of a portion of each executive officer's Stock Option Awards is contingent upon the attainment of certain management EBITDA targets. We also try to ensure that our executive compensation program is competitive in order to reduce the risk of losing our executive officers.

The following is a detailed discussion of the principal compensation elements provided to our executive officers. More detail about each of the elements can be found in the compensation tables, including the footnotes to the tables, and the narrative discussion following certain of the tables.

***Base Salary***

Base salary should reward executive officers for the scope and complexity of their position and the level of responsibility required. We believe that a competitive level of base salary is required to attract and retain qualified talent.

The O&C Committee annually reviews base salaries and periodically uses independent compensation consultants to ensure the base salaries are market-competitive. The O&C Committee may also review an executive officer's base salary from time to time during a year, including if the executive officer is given a promotion or if his responsibilities are significantly increased.

We want to ensure our cash compensation is competitive and sufficient to incent executive officers to remain with us, recognizing our high performance expectations across a broad set of operational, financial, customer service and community-oriented goals and objectives and the higher risk levels associated with being a significantly-leveraged company.

185

Confidential

In light of the significant market dislocation and uncertainty that began in late 2008 and continued into 2009, our Named Executive Officers' base salaries for 2009 remained unchanged from 2008 levels. In October 2009, the O&C Committee approved an increase in the base salary, effective January 1, 2010, for each of the Named Executive Officers, with the exception of Messrs. Young and Burke. In February 2010, the O&C Committee approved an increase in the base salary of each of Messrs. Young and Burke, which increases took effect retroactively on January 1, 2010. These increases reflect, in part, that none of the Named Executive Officers received a salary increase for 2009. The following table indicates the Named Executive Officers' base salaries for 2008, 2009 and 2010.

| Name | Title | 2008 Base Salary | 2009 Base Salary | Approved 2010 Base Salary |
|------|-------|------------------|------------------|---------------------------|
| John F. Young | President and Chief Executive Officer of EFH Corp. | $1,000,000 | $1,000,000 | $ 1,200,000 |
| Paul M. Keglevic | Executive Vice President and Chief Financial Officer of EFH Corp. | $ 600,000 | $ 600,000 | $ 650,000 |
| David A. Campbell | Chief Executive Officer of Luminant | $ 600,000 | $ 600,000 | $ 700,000 |
| Robert C. Walters | Executive Vice President and General Counsel of EFH Corp. | $ 575,000 | $ 575,000 | $ 600,000 |
| James A. Burke | Chief Executive Officer of TXU Energy | $ 600,000 | $ 600,000 | $ 630,000 |
| Rizwan Chand (1) | Former Executive Vice President — Human Resources of EFH Corp. | $ 450,000 | $ 450,000 | N/A |

_____
(1)  Mr. Chand's employment with EFH Corp. terminated in October 2009.

### Annual Performance-Based Cash Bonus — Executive Annual Incentive Plan

The Executive Annual Incentive Plan ("EAIP") provides an annual performance-based cash bonus for the successful attainment of certain annual financial and operational performance targets that are established annually at each of the corporate and business unit levels by the O&C Committee. Under the terms of the EAIP, performance against these targets, which are generally set at challenging levels to incent high performance, drives bonus funding. Based on the level of attainment of these performance targets, an aggregate EAIP funding percentage amount for all participants is determined.

Our financial performance targets typically include "management" EBITDA, a non-GAAP financial measure. When the O&C Committee reviews management EBITDA for purposes of determining our performance against the applicable management EBITDA target, it includes our earnings before interest, taxes, depreciation and amortization plus transaction, management and/or similar fees paid to the Sponsor Group, together with such adjustments as the O&C Committee shall determine appropriate in its discretion after good faith consultation with the CEO and the Chief Financial Officer, including adjustments consistent with those included in the comparable definitions in the TCEH Senior Secured Facilities (to the extent considered appropriate for executive compensation purposes). Our management EBITDA targets are also expected to be adjusted for acquisitions, divestitures or major capital investment initiatives to the extent that they were not contemplated in our financial plan (the "Financial Plan"). The management EBITDA targets are intended to measure achievement of the Financial Plan and the adjustments to management EBITDA described above primarily represent elements of our performance that are either beyond the control of management or were not predictable at the time the Financial Plan was submitted. The O&C Committee has broad authority to make these or any other adjustments to EBITDA that it deems appropriate in connection with its evaluation and compensation of our executive officers. Management EBITDA is an internal measure used only for performance management purposes, and EFH Corp. does not intend for management EBITDA to be an alternative to any measure of financial performance presented in accordance with GAAP. Management EBITDA is not the same as Adjusted EBITDA, which is disclosed elsewhere in this prospectus and defined in the glossary to this prospectus.

186

*Financial and Operational Performance Targets*

The following table provides a summary of the performance targets for Mr. Young, who had primary responsibility at EFH Corp.

| Performance Targets — EFH Corp. | Weight | Performance (1) | Payout |
|---|---|---|---|
| EFH Corp. Management EBITDA | 50% | 101% | 50% |
| EFH Corp. Management EBITDA (excluding Oncor) | 10% | 119% | 12% |
| Luminant Scorecard Multiplier (see below) | 10% | 119% | 12% |
| TXU Energy Scorecard Multiplier (see below) | 10% | 141% | 14% |
| EFH Corp. Total Spend | 10% | 121% | 12% |
| EFH Business Services Cost | 10% | 130% | 13% |
| Total | 100% | | 113% |

(1)    Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

The following table provides a summary of the performance targets for Messrs. Keglevic and Walters, who had primary responsibility at EFH Corp. and EFH Business Services.

| Performance Targets — EFH Corp./Services | Weight | Performance (1) | Payout |
|---|---|---|---|
| EFH Corp. Management EBITDA (excluding Oncor) | 60% | 119% | 72% |
| Luminant Scorecard Multiplier (see below) | 10% | 119% | 12% |
| TXU Energy Scorecard Multiplier (see below) | 10% | 141% | 14% |
| EFH Corp. Total Spend | 10% | 121% | 12% |
| EFH Business Services Cost | 10% | 130% | 13% |
| Total | 100% | | 123% |

(1)    Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

The following table provides a summary of the performance targets for Mr. Campbell, who had primary responsibility at Luminant.

| Performance Targets — Luminant | Weight | Performance (1) | Payout |
|---|---|---|---|
| EFH Corp. Management EBITDA (excluding Oncor) | 25% | 119% | 30% |
| Luminant Management EBITDA (excluding 3 new units) | 30% | 146% | 44% |
| Luminant Baseload Generation (excluding 3 new units) | 18.75% | 89% | 17% |
| Luminant O&M/SG&A/Capital Expenditures | 15% | 139% | 21% |
| Luminant Fossil Fuel Costs | 7.5% | 75% | 5% |
| Management EBITDA for 3 new units (excluding capital expenditures) | 3.75% | 56% | 2% |
| Total | 100% | | 119% |

(1)    Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

187

EFIHMW00223226

PX 045
Page 203 of 561

The following table provides a summary of the performance targets for Mr. Burke, who had primary responsibility at TXU Energy.

| Performance Targets — TXU Energy | Weight | Performance (1) | Payout |
|---|---|---|---|
| EFH Corp. Management EBITDA (excluding Oncor) | 25% | 119% | 30% |
| TXU Energy Management EBITDA | 26.25% | 200% | 53% |
| Contribution Margin | 15% | 200% | 30% |
| TXU Energy Total Costs | 15% | 59% | 9% |
| Upgrades to Customer Care System (Project Spend, PUCT Complaints and Days Meter to Cash) | 11.25% | 29% | 3% |
| Customer Satisfaction | 7.5% | 150% | 11% |
| Total | 100% | | 136% |

(1) Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

*Individual Performance Modifier*

After approving the actual performance against the applicable targets under the plan, the O&C Committee and/or the CEO reviews the performance of each of our executive officers on an individual and comparative basis. Based on this review, which includes an analysis of both objective and subjective criteria, including the CEO's recommendations (with respect to all executive officers other than himself), the O&C Committee approves an individual modifier for each executive officer. Under the terms of the EAIP for 2009, the individual performance modifier can range from an outstanding rating (200%) to an unacceptable rating (0%). In February 2010, the O&C Committee amended the EAIP to reduce the maximum individual performance modifier applicable for 2010 and beyond from 200% to 150%. To calculate an executive officer's final performance-based cash bonus, the executive officer's corporate/business unit payout percentages are multiplied by the executive officer's target incentive level, which is computed as a percentage of annualized base salary, and then by the executive officer's individual performance modifier.

*Actual Award*

The following table provides a summary of the 2009 performance-based cash bonus for each Named Executive Officer (other than Mr. Chand) under the EAIP.

| Name | Target (% of salary) | Target Award ($ Value) | Actual Award |
|---|---|---|---|
| John F. Young (1) | 100% | $ 1,000,000 | $1,469,000 |
| Paul M. Keglevic (2) | 75% | $ 450,000 | $ 664,200 |
| David A. Campbell (3) | 75% | $ 450,000 | $ 642,600 |
| Robert C. Walters (4) | 75% | $ 431,250 | $ 610,000 |
| James A. Burke (5) | 75% | $ 450,000 | $ 856,800 |

(1) Mr. Young's incentive award is based on the successful achievement of the financial performance targets for EFH Corp. and the financial and operational performance targets for Luminant and TXU Energy and an individual performance modifier that increased his incentive award. In 2009, Mr. Young successfully led the company in a difficult year in which sales volumes and demand fell, wholesale power prices declined and the credit markets were at times inaccessible. Notwithstanding these difficulties, Mr. Young created value in many parts of the company's businesses. In particular, Mr. Young led the company's efforts in, among other things: improving operations and safety at our generation and mining operations; participating in the national debate on climate change, green energy and financial reforms; bringing online two new lignite-fueled generation units on time and budget; implementing substantial and lasting cost reductions; exceeding EFH Corp.'s planned EBITDA for 2009; and strengthening the company's management team. Given these and other significant achievements, the O&C Committee approved an individual performance modifier that increased Mr. Young's incentive award.

(2) Mr. Keglevic's incentive award is based on the successful achievement of the financial performance targets for EFH Corp. and EFH Business Services and the financial and operational performance targets for Luminant and TXU Energy and an individual performance modifier that increased his incentive award. In 2009, Mr. Keglevic successfully implemented several new financial processes at EFH Corp. and its business units, including processes for understanding, managing and communicating the financial and operational performance of our businesses, managing the varied risks of our businesses and preserving effective liquidity levels. In addition, Mr. Keglevic led the company's liquidity and liability management efforts, including the successful amendment to the TCEH Senior Secured Facilities. Given these significant accomplishments and other achievements (including his installation of a "drive for results" culture), the O&C Committee approved an individual performance modifier that increased Mr. Keglevic's incentive award.

188

(3)   Mr. Campbell's incentive award is based on the successful achievement of a financial performance target for EFH Corp. and the
financial and operational performance targets for Luminant and an individual performance modifier that increased his incentive
award. In 2009, Mr. Campbell strengthened the Luminant management team (including, among others, the designation of a new
Chief Nuclear Officer and Chief Fossil Officer) while overseeing strong financial and operational results primarily at
Luminant's nuclear plant and in Luminant's wholesale energy organization. Luminant's baseload generation construction
program also achieved several important milestones, including the substantial completion of the two new lignite-fueled units, at
costs and time-to-build schedules that are in the top decile relative to recent industry benchmarks. In addition, under
Mr. Campbell's leadership, Luminant had a very strong year for safety, with substantially all of its recordable safety metrics
being in the top quartile for its industry. Given these significant accomplishments and other achievements (including his focus
on developing strategic business solutions and building a team-oriented culture), the O&C Committee approved an individual
performance modifier that increased Mr. Campbell's incentive award.

(4)   Mr. Walters' incentive award is based on the successful achievement of the financial performance targets for EFH Corp. and
EFH Business Services and the financial and operational performance targets for Luminant and TXU Energy and an individual
performance modifier that increased his incentive award. In 2009, Mr. Walters successfully managed several significant legal
issues of the company. In particular, Mr. Walters' led the company's efforts in (i) defending the challenges to the Oak Grove
and Sandow 5 construction and operating permits, (ii) negotiating the termination and transition of the company's outsourcing
relationship with CapGemini Energy and (iii) settling a dispute with the PUCT regarding alleged market manipulation activities.
In addition, Mr. Walters drove improvements in the financial performance of our real estate holdings. Given these significant
accomplishments and other achievements (including his strategic contributions in the political and civic arena on a local, state
and national level), the O&C Committee approved an individual performance modifier that increased Mr. Walters' incentive
award.

(5)   Mr. Burke's incentive award is based on the successful achievement of a financial performance target for EFH Corp. and the
financial and operational performance targets for TXU Energy and an individual performance modifier that increased his
incentive award. In 2009, Mr. Burke strengthened the TXU Energy management team and performance-oriented culture to drive
strong financial and operational results at TXU Energy. Among the operational results, Mr. Burke led the successful
implementation of a new customer care system and successfully managed the transition of a number of functions previously
performed by Capgemini Energy. Among the financial results, Mr. Burke was successful in driving improvement in retail
margins, managing TXU Energy through a challenging economic environment and implementing overall customer satisfaction
ratings. Given these significant accomplishments and other achievements (including his continued commitment to build a strong
retail and customer-focused culture at TXU Energy), the O&C Committee approved an individual performance modifier that
increased Mr. Burke's incentive award.

In October 2009, the O&C Committee approved an increase in the annual target award under the EAIP from 75% of base salary
to 85% of base salary for Messrs. Keglevic, Campbell, Walters and Burke. These increases will be effective for the 2010 award
period.

### Long-Term Incentive Awards

#### Long-Term Cash Incentive

In October 2009, the O&C Committee approved the adoption of a new long-term cash incentive (the "LTI"), effective as of the
date of adoption, to be included by amendment in the employment agreements of each of Messrs. Keglevic, Campbell, Walters and
Burke. Under the terms of the LTI, each of Messrs. Keglevic, Campbell, Walters and Burke will be entitled to receive on
September 30, 2012, to the extent such Named Executive Officer remains employed by EFH Corp. on such date (with customary
exceptions for death, disability, and leaving for "good reason" or termination without "cause"), an additional one-time, lump-sum
cash payment equal to 75% of the aggregate EAIP award received by such executive officer for fiscal years 2009, 2010 and 2011.

In February 2010, the O&C Committee approved the adoption of an LTI to be included by amendment in the employment
agreement of Mr. Young. Under the terms of the LTI, Mr. Young will be entitled to receive on September 30, 2012, to the extent
Mr. Young remains employed by EFH Corp. on such date (with customary exceptions for death, disability, and leaving for "good
reason" or termination without "cause"), an additional one-time, lump-sum cash payment equal to 100% of the aggregate EAIP award
received by Mr. Young for fiscal years 2009, 2010 and 2011.

189

EFIHMW00223228

These awards provide significant retentive value because an award is not paid to an executive officer unless the executive officer remains employed with us until September 30, 2012 (subject to the customary exceptions described above). In addition, these awards provide additional incentive to our executive officers to achieve top operational and financial performance because the award is based on a percentage of the executive officers' annual performance-based cash bonuses.

*Long-Term Equity Incentives*

We believe it is important to strongly align the interests of our executive officers and shareholders through equity-based compensation. In December 2007, our Board approved and adopted our 2007 Stock Incentive Plan pursuant to which we grant Stock Option Awards to our executive officers. The purpose of the 2007 Stock Incentive Plan is to:

- promote our long-term financial interests and growth by attracting and retaining management and other personnel with the training, experience and ability to make a substantial contribution to our success;

- motivate management and other personnel by means of growth-related incentives to achieve long-range goals, and

- strengthen the correlation between the long-term interests of our shareholders and the interests of our executive officers through opportunities for stock (or stock-based) ownership in EFH Corp.

The Stock Option Awards granted to our executive officers provide significant retentive value because a portion of these awards is time-based and vest over a five year period. In addition, we believe that the Stock Option Awards granted to our executive officers provide incentive to our executive officers to achieve top operational and financial performance because a portion of these Stock Option Awards is performance-based and only vests upon EFH Corp. achieving certain management EBITDA targets.

In February 2008, Mr. Young was granted 7,500,000 Stock Option Awards. In May 2008, Messrs. Campbell, Walters and Burke were granted 4,000,000, 2,000,000 and 2,450,000 Stock Option Awards, respectively. In December 2008, Mr. Keglevic was granted 2,500,000 Stock Option Awards. Each of these Stock Option Awards are set forth in the table below and are referred to as the "Original Stock Option Awards," half of which were "Original Time Vested Options" and half of which were "Original Performance Vested Options." The exercise price of the Original Stock Option Awards (the fair market value on the grant date) is $5.00.

| Executive Officer | Original Time Vested Options | Original Performance Vested Options | Exercise Price |
|---|---|---|---|
| John Young | 3,750,000 | 3,750,000 | $   5.00 |
| Paul Keglevic | 1,250,000 | 1,250,000 | $   5.00 |
| David Campbell | 2,000,000 | 2,000,000 | $   5.00 |
| Robert Walters | 1,000,000 | 1,000,000 | $   5.00 |
| James Burke | 1,225,000 | 1,225,000 | $   5.00 |

In October 2009 (February 2010, with respect to Mr. Young), the O&C Committee approved the grant of new Stock Option Awards to the Named Executive Officers as set forth in the table below. The new Stock Option Awards are referred to as the "New Stock Option Awards," a portion of which are "New Time Vested Options" and a portion of which are "New Cliff Vested Options." In connection with these grants, each Named Executive Officer surrendered to EFH Corp. a portion of his Original Performance Vested Options. The exercise price of the New Stock Option Awards is $3.50.

190

| Executive Officer | Surrendered Original Performance Vested Options | New Time Vested Options | New Cliff Vested Options | Exercise Price | |
|---|---|---|---|---|---|
| John Young | 1,500,000 | 1,500,000 | 1,500,000 | $ | 5.00 |
| | | | | $ | 3.50 |
| Paul Keglevic | 500,000 | 500,000 | 500,000 | $ | 5.00 |
| | | | | $ | 3.50 |
| David Campbell | 800,000 | 800,000 | 800,000 | $ | 5.00 |
| | | | | $ | 3.50 |
| Robert Walters | 400,000 | 400,000 | 400,000 | $ | 5.00 |
| | | | | $ | 3.50 |
| James Burke | 490,000 | 200,000 | 490,000 | $ | 5.00 |
| | | | | $ | 3.50 |

Please refer to the outstanding Equity Awards at Fiscal Year-End — 2009 table, including the footnotes thereto, for a summary of the outstanding Stock Option Awards held by each of the Named Executive Officers.

The Stock Option Awards vest (subject to the executive officer continuing to be employed by EFH Corp.) as follows:

- *Time Vested Options*

  - The Original Time Vested Options and the New Time Vested Options vest in 20% increments on each of the first five anniversaries of September 30, 2007 and September 30, 2009, respectively.

  - The New Cliff Vested Options vest 100% on September 30, 2014.

- *Performance Vested Options*

  - The Original Performance Vested Options vest in 20% increments on each of the first five anniversaries of December 31, 2007, subject to our achievement of the annual management EBITDA target for the given fiscal year (or certain cumulative performance targets) as detailed in the stock option agreements.

In deciding whether to vest the Original Performance Vested Options, the O&C Committee considers EFH Corp.'s quantitative performance against certain management EBITDA targets. The method of calculating management EBITDA for purposes of vesting the Original Performance Vested Options is the same as the method for calculating management EBITDA for purposes of the EAIP, as described above. The O&C Committee also has broad discretion to consider other qualitative and quantitative criteria that it deems appropriate in connection with its decision to vest the Original Performance Vested Options.

Our management EBITDA for 2009 was less than the management EBITDA target of $5.569 billion set forth in the applicable stock option agreements with respect to 2009. While EFH Corp. did not meet the applicable management EBITDA target, which was originally established in 2007, it exceeded the management EBITDA target established by the O&C Committee in the beginning of 2009 for purposes of the EAIP. In addition, EFH Corp.'s actual SG&A for 2009 was less than the targeted amount of SG&A set by the O&C Committee. Given these achievements, as well as the successful attainment of most of the other annual financial and operational performance targets that were established by the O&C Committee at the beginning of 2009, the O&C Committee exercised its discretionary authority under the 2007 Stock Incentive Plan and approved the vesting of the 2009 Original Performance Vested Options.

In the future, we may make additional discretionary grants of stock options or other equity-based compensation to reward high performance or achievement.

191

EFIHMW00223230

*Equity Investment*

In addition to being granted Stock Option Awards, several of our Named Executive Officers (including Messrs. Young, Keglevic, Campbell and Burke) have an equity investment in EFH Corp. These investments have been made through a direct cash investment for shares of EFH Corp. common stock (Mr. Young) and/or through the receipt of restricted stock units (Mr. Young) or deferred shares of EFH Corp. common stock (Messrs. Keglevic, Campbell and Burke) (i) as a result of the executive officer foregoing the right to receive certain payments from EFH Corp., whether in respect of outstanding equity awards issued prior to the Merger or otherwise (Messrs. Campbell and Burke) or (ii) as consideration for compensation forfeited by the executive officer when he left his former employer to join EFH Corp. (Messrs. Young and Keglevic). We believe such investment strongly aligns the interests of our Named Executive Officers with the interests of our shareholders and provides increased incentive to our executive officers to maximize financial and operational performance because the value of their investment is dependant upon the success of EFH Corp. In addition, as we are a private company, the illiquid nature of the investment provides additional retentive value.

**Other Elements of Compensation**

*General*

Our executive officers generally have the opportunity to participate in certain of our broad-based employee compensation plans, including our Thrift (401(k)) Plan, retirement plans and non-qualified benefit plans. Please refer to the footnotes to the Summary Compensation table for a more detailed description of our Thrift Plan, the narrative that follows the Pension Benefits table for a more detailed description of our Retirement Plan and Supplemental Executive Retirement Plan and the footnotes to the Nonqualified Deferred Compensation table for a more detailed description of our Salary Deferral Program.

*Perquisites*

We do not believe that a significant amount of perquisites fit within our compensation philosophy. Those perquisites that exist are intended to serve as part of a competitive total compensation program and to enhance our executive officers' ability to conduct company business. These benefits include financial planning, a preventive physical health exam and reimbursement for certain spousal travel expenses. Expenditures for the perquisites outlined above are disclosed by individual in footnotes to the Summary Compensation Table.

The following is a summary of perquisites offered to our Named Executive Officers that are not available to all employees:

**Executive Financial Planning**: We pay for our executive officers to receive financial planning services. This service is intended to support them in managing their financial affairs, which we consider especially important given the high level of time commitment and performance expectation required of our executive officers. Furthermore, we believe that such service helps ensure greater accuracy and compliance with individual tax regulations by our executive officers.

**Annual Executive Physical Health Exam**: We pay for our executive officers to receive annual physical health exams. The health of our executive officers is important given the vital leadership role they play in directing and operating the company. Our executive officers are important assets of EFH Corp., and this benefit is designed to help ensure their health and long-term ability to serve our shareholders.

**Spouse Travel Expenses**: From time to time, we pay for an executive officer's spouse to travel with the executive officer when taking a business trip.

*Contingent Payments*

We have entered into employment agreements with Messrs. Young, Keglevic, Campbell, Walters and Burke. Each of the employment agreements provides that certain payments and benefits will be paid upon the expiration or termination of the agreement under various circumstances, including termination without cause, resignation for good reason and termination of employment within a fixed period of time following a change in control. We believe these provisions are important in order to attract and retain the caliber of executive officers that our business requires and provide incentive for our executive officers to fully consider potential changes that are in our and our shareholders' best interest, even if such changes would result in the executive officers' termination of employment. For a description of the applicable provisions in the employment agreements of our Named Executive Officers see "Potential Payments upon Termination or Change in Control."

192

EFIHMW00223231

*Other*

In February 2010, the O&C Committee approved certain other compensation arrangements for Mr. Young and Mr. Burke. For a discussion of these arrangements, please see Item 9B, entitled Other Information in EFH Corp.'s 2009 Form 10-K.

**Accounting and Tax Considerations**

*Accounting Considerations*

Under FASB ASC Topic 718, the total amount of compensation expense to be recorded for stock-based awards (e.g., Stock Option Awards granted under the 2007 Stock Incentive Plan) is based on the fair value of the award on the grant date. This fair value is then recorded as expense over the vesting period, with an offsetting increase in paid-in capital. The amount of compensation expense is not subsequently adjusted for changes in our share price, for the actual number of shares distributed, or for any other factors except for true-ups related to estimated forfeitures compared to actual forfeitures. The surrendered shares are considered modifications to the original awards and are treated as an exchange of the original award for a new award. The compensation expense related to the new award represents the incremental costs of the surrendered shares and is based on the new grant date fair value and is recognized over its new vesting period.

*Income Tax Considerations*

Section 162(m) of the Code limits the tax deductibility by a publicly held company of compensation in excess of $1 million paid to the CEO or any other of its three most highly compensated executive officers other than the principal financial officer. Because EFH Corp. is a privately-held company, Section 162(m) will not limit the tax deductibility of any executive compensation for 2009.

The O&C Committee administers our compensation programs with the good faith intention of complying with Section 409A of the Code.

**Organization and Compensation Committee Report**

The O&C Committee has reviewed and discussed with management the Compensation Discussion and Analysis set forth in this prospectus. Based on this review and discussions, the committee recommended to the Board that the Compensation Discussion and Analysis be included in this prospectus.

Organization and Compensation Committee

Donald L. Evans, Chair
Arcilia C. Acosta
Marc S. Lipschultz
Kenneth Pontarelli

193

EFIHMW00223232

### Summary Compensation Table

The following table provides information for the fiscal years ended December 31, 2009, 2008 and 2007 regarding the aggregate compensation paid to our Named Executive Officers.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) (7) | Non-Equity Incentive Plan Compensation ($) (8) | Change in Pension Value and Non-qualified Deferred Compensation Earnings ($) (9) | All Other Compensation ($) (10) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| John F. Young (1) President & CEO of EFH Corp. | 2009 | 1,000,000 | — | — | — | 1,469,000 | — | 105,291 | 2,574,291 |
| | 2008 | 912,500 | — | 3,000,000 | 13,635,000 | 1,418,000 | — | 462,258 | 19,427,758 |
| | 2007 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Paul M. Keglevic (2) EVP & Chief Financial Officer of EFH Corp. | 2009 | 600,000 | 150,000 | — | 1,325,000 | 664,200 | — | 73,320 | 2,812,520 |
| | 2008 | 293,182 | 250,000 | 1,125,000 | 6,442,500 | 613,800 | — | 88,508 | 8,812,990 |
| | 2007 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| David A. Campbell (3) President & CEO of Luminant | 2009 | 600,000 | — | — | 2,120,000 | 642,600 | 68,861 | 15,020 | 3,446,481 |
| | 2008 | 545,500 | 5,092,250 | 2,500,000 | 7,272,000 | 625,950 | 22,779 | 3,395,878 | 19,454,357 |
| | 2007 | 382,000 | — | 2,292,000 | | 300,481 | 14,667 | 2,342,814 | 5,331,962 |
| Robert C. Walters (4) EVP & General Counsel of EFH Corp. | 2009 | 575,000 | — | — | 1,060,000 | 610,000 | — | 81,562 | 2,326,562 |
| | 2008 | 435,609 | 100,000 | — | 3,636,000 | 695,175 | — | 44,249 | 4,911,033 |
| | 2007 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| James A. Burke (5) President & CEO of TXU Energy | 2009 | 600,000 | — | — | 933,100 | 856,800 | 55,931 | 23,885 | 2,469,716 |
| | 2008 | 600,000 | — | — | 4,454,100 | 473,918 | 25,501 | 639,136 | 6,192,655 |
| | 2007 | 342,712 | — | 830,850 | | 274,050 | 9,864 | 978,189 | 2,435,665 |
| Rizwan Chand (6) Former EVP — Human Resources of EFH Corp | 2009 | 348,750 | — | — | — | — | 36,218 | 2,110,925 | 2,495,893 |
| | 2008 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | 2007 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

(1)  Mr. Young commenced employment with EFH Corp. in January 2008. The amounts for 2009 reported as "All Other Compensation" for Mr. Young represent (i) the costs of providing certain perquisites, including $9,728 for financial planning and $863 of taxable reimbursements partially related to his spouse's travel and (ii) $14,700 and $80,000 for our matching contributions to the EFH Thrift Plan and the Salary Deferral Plan, respectively.

(2)  Mr. Keglevic commenced employment with EFH Corp. in July 2008. Mr. Keglevic's employment agreement provides that we pay him a signing bonus equal to $550,000 as follows: (i) $250,000 payable in July 2008; (ii) $150,000 payable in July 2009 and (iii) $50,000 payable in July 2010, 2011 and 2012. The amount for 2009 reported as "Bonus" for Mr. Keglevic represents the 2009 portion of his signing bonus. The amounts for 2009 reported as "All Other Compensation" for Mr. Keglevic represent (i) the costs of providing certain perquisites, including $2,724 for an executive physical, $3,410 of taxable reimbursements primarily related to his spouse's travel and $11,836 for moving expenses and (ii) $7,350 and $48,000 for our matching contributions to the EFH Thrift Plan and the Salary Deferral Plan, respectively.

(3)  The amount reported as "All Other Compensation" in 2009 for Mr. Campbell represents (i) $10,120 for financial planning and (ii) $4,900 for our matching contributions to the EFH Thrift Plan. The amount reported as "All Other Compensation" in 2008 for Mr. Campbell includes $3,319,963 for a tax gross-up payment that was made in 2009. The tax gross-up payment, which was not reported in the 2008 Summary Compensation Table, related to excise taxes due with respect to a January 2009 payment of $5,092,250 that was provided to Mr. Campbell as an inducement for entering into his employment agreement in 2008. The $5,092,250 was reported in the 2008 Summary Compensation Table under "Bonus," and we believe the tax gross-up payment should be reported for the same calendar year as the related payment.

(4)  Mr. Walters commenced employment with EFH Corp. in March 2008. The amounts for 2009 reported as "All Other Compensation" for Mr. Walters represent (i) the costs of providing certain perquisites, including $16,800 for financial planning, $2,350 for an executive physical and $1,712 of taxable reimbursements primarily related to his spouse's travel and (ii) $14,700 and $46,000 for our matching contributions to the EFH Thrift Plan and the Salary Deferral Plan, respectively.

194

EFIHMW00223233

(5)  The amounts for 2009 reported as "All Other Compensation" for Mr. Burke represent (i) the costs of providing certain perquisites, including $8,875 for financial planning, $2,350 for an executive physical and $660 of taxable reimbursements and (ii) $12,000 for our matching contributions to the EFH Thrift Plan.

(6)  Mr. Chand's employment with EFH Corp. terminated in October 2009. The amounts for 2009 reported as "All Other Compensation" for Mr. Chand represent (i) the costs of providing certain perquisites, including $8,875 for financial planning and $2,350 for an executive physical (ii) $14,700 for our matching contributions to the EFH Thrift Plan, (iii) $1,485,000 in cash severance due to him under the terms of his employment agreement, and (iv) $600,000 related to his deferred share agreement with EFH Corp.

(7)  The amounts reported as "Option Awards" represent the grant date fair value of Stock Option Awards granted in the fiscal year computed for the stock options awarded under the 2007 Stock Incentive Plan in accordance with FASB ASC Topic 718 and do not take into account estimated forfeitures. See table titled "Grants of Plan-Based Awards — 2009." In February 2010, Mr. Young received certain new Stock Option Awards. The grant date fair value of those Stock Option Awards was $3,405,000.

(8)  The amounts in 2009 reported as "Non-Equity Incentive Plan Compensation" were earned by the executive officers in 2009 under the EAIP and are expected to be paid in March 2010.

(9)  The amounts in 2009 reported under "Change in Pension Value and Nonqualified Deferred Compensation Earnings" (i) include the aggregate increase in actuarial value of EFH Corp.'s Retirement Plan and Supplemental Retirement Plan and (ii) exclude amounts attributable to the portion of the vested amounts for Messrs. Young ($33,313), Keglevic ($44,409), Walters ($62,351) and Burke ($19,500) that were transferred from the Supplemental Retirement Plan and/or Salary Deferral Program to the cash balance component of the Retirement Plan as of December 31, 2009. For a more detailed description of EFH Corp.'s retirement plans, including the transfers of certain assets and liabilities from the Supplemental Retirement Plan and/or Salary Deferral Program to the cash balance component of the Retirement Plan, please refer to the narrative that follows the table titled "Pension Benefits." There are no above market earnings for nonqualified deferred compensation that is deferred under the Salary Deferral Program.

(10)  As described above, "All Other Compensation" includes amounts associated with our matching contributions to the EFH Thrift Plan and Salary Deferral Plan. Our Thrift Plan allows participating employees to contribute a portion of their regular salary or wages to the plan. Under the Thrift Plan, EFH Corp. matches a portion of an employee's contributions. This matching contribution is 100% of each Named Executive Officer's contribution up to 6% of the named Executive Officer's salary. All matching contributions are invested in Thrift Plan investments as directed by the participant. Please refer to the narrative that follows the Nonqualified Deferred Compensation table for a more detailed description of the Salary Deferral Program.

### Grants of Plan-Based Awards — 2009

The following table sets forth information regarding grants of compensatory awards to our Named Executive Officers during the fiscal year ended December 31, 2009.

| Name | Grant Date | Date of Board Action | Estimated Possible Payouts Under Non-Equity Incentive Plan Awards (1) | | | Estimated Future Payouts Under Equity Incentive Plan Awards | | | All Other Stock Awards: # Shares or Units (#) | All Other Option Awards: # of Securities Underlying Options (#) (2) | Exercise or Base Price of Option Awards ($/sh) | Grant Date Fair Value of Stock and Option Awards (3) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Threshold ($) | Target ($) | Max. ($) | Threshold (#) | Target (#) | Max. (#) | | | | |
| John F. Young | 2/18/09 | 2/18/09 | 500,000 | 1,000,000 | 2,000,000 | | | | | | | |
| Paul M. Keglevic | 2/18/09 12/17/09 | 2/18/09 10/29/09 | 225,000 | 450,000 | 900,000 | | | | | 1,000,000 | $ 3.50 | 1,325,000 |
| David A. Campbell | 2/18/09 12/17/09 | 2/18/09 10/29/09 | 225,000 | 450,000 | 900,000 | | | | | 1,600,000 | $ 3.50 | 2,120,000 |
| Robert C. Walters | 2/18/09 12/17/09 | 2/18/09 10/29/09 | 215,625 | 431,250 | 862,500 | | | | | 800,000 | $ 3.50 | 1,060,000 |
| James A. Burke | 2/18/09 12/17/09 | 2/18/09 10/29/09 | 225,000 | 450,000 | 900,000 | | | | | 690,000 | $ 3.50 | 933,100 |
| Rizwan Chand | — | | — | — | — | | | | | — | — | — |

(1)  The amounts disclosed under the heading "Estimated Possible Payouts under Non-Equity Incentive Plan Awards" reflect the threshold, target and maximum amounts available under the EAIP for each executive officer and each executive officer's employment agreement. The actual awards for the 2009 plan year are expected to be paid in March 2010 and are reported in the Summary Compensation Table under the heading "Non-Equity Incentive Plan Compensation" and described above under the section entitled "Annual Performance Bonus — EAIP."

195

EFIHMW00223234

## PX 045
## Page 211 of 561

(2)    Represents grants of New Time Vested Options and New Cliff Vested Options under the 2007 Stock Incentive Plan, as described above under "Long-Term Incentive Awards."

(3)    The amounts reported under "Grant Date Fair Value of Stock Award" represent the grant date fair value of stock options related to the 2009 Awards in accordance with FASB ASC Topic 718.

For a discussion of the terms of the New Stock Option Awards granted to each Named Executive Officer (other than Mr. Chand) in connection with such Named Executive Officer surrendering a portion of his Original Performance Vested Options, please see "Long-Term Incentive Awards — Long-Term Equity Incentives." For a discussion of certain material terms of the employment agreements with the Named Executive Officers, please see "Assessment of Compensation Elements" and "Potential Payments upon Termination or Change in Control."

### Outstanding Equity Awards at Fiscal Year-End — 2009

| | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| | # of Securities Underlying Unexercised Options | | Equity Incentive Plan Awards: # of Securities Underlying Unexercised Unearned Options (4) | Option Exercise Price | Option Expiration Date | # of Shares or Units of Stock That Have Not Vested (5) | Market Value of Shares or Units of Stock That Have Not Vested | Equity Incentive Plan Awards: # of Unearned Shares, Units or Other Rights That Have Not Vested | Equity Incentive Plan Awards: Market Payout Value of Unearned Shares, Units or Rights That Have Not Vested |
| Name | Exercisable | Unexercisable | | | | | | | |
| John F. Young (6) | 2,250,000 | 2,250,000(1) | 3,000,000 | 5.00 | 02/01/2018 | | | | |
| Paul M. Keglevic | 750,000 | 750,000(1) | 500,000 | 5.00 | 12/22/2018 | | | | |
| | | 500,000(2) | | 3.50 | 12/17/2019 | | | | |
| | | 500,000(3) | | 3.50 | 12/17/2019 | 225,000 | 787,500 | | |
| David A. Campbell | 1,200,000 | 1,200,000(1) | 800,000 | 5.00 | 05/20/2018 | | | | |
| | | 800,000(2) | | 3.50 | 12/17/2019 | | | | |
| | | 800,000(3) | | 3.50 | 12/17/2019 | | | | |
| Robert C. Walters | 600,000 | 600,000(1) | 400,000 | 5.00 | 05/20/2018 | | | | |
| | | 400,000(2) | | 3.50 | 12/17/2019 | | | | |
| | | 400,000(3) | | 3.50 | 12/17/2019 | | | | |
| James A. Burke | 735,000 | 735,000(1) | 490,000 | 5.00 | 05/20/2018 | | | | |
| | | 200,000(2) | | 3.50 | 12/17/2019 | | | | |
| | | 490,000(3) | | 3.50 | 12/17/2019 | | | | |
| Rizwan Chand | 350,000 | | | 5.00 | 04/04/2010 | | | | |

(1)    These Original Time Vested Options are scheduled to become exercisable ratably in September 2010, 2011 and 2012 provided the Named Executive Officer has remained continuously employed by EFH Corp. through the applicable vesting date (with customary exceptions for death, disability, and leaving for "good reason" or termination without "cause").

(2)    These New Time Vested Options are scheduled to become exercisable ratably in September 2010, 2011, 2012, 2013 and 2014 provided the Named Executive Officer has remained continuously employed by EFH Corp. through the applicable vesting date (with customary exceptions for death, disability, and leaving for "good reason" or termination without "cause").

(3)    These New Cliff Vested Options are scheduled to become exercisable in September 2014 provided the Named Executive Officer has remained continuously employed by EFH Corp. through that date (with customary exceptions for death, disability, and leaving for "good reason" or termination without "cause").

(4)    If we achieve certain performance targets, these Original Performance Vested Options are eligible to become exercisable as of the end of fiscal years 2010, 2011 and 2012. See "Long-Term Incentive Awards-Long-Term Equity Incentives" for a detailed description of the vesting schedule for the Original Performance Vested Options and the decision by the O&C Committee in February 2010 to approve the vesting of a portion of the Original Performance Vested Options.

196

EFIHMW00223235

(5)    This column reflects deferred shares described above under "Long-Term Incentive Awards-Equity Investment." The deferred shares for Mr. Keglevic will vest and become nonforfeitable as to (i) 112,500 of the shares on the third anniversary of his employment (July 2011) and (ii) 112,500 of the shares on the fifth anniversary of his employment (July 2013).

(6)    In February 2010, Mr. Young surrendered 1,500,000 Original Performance Vested Options listed in the "Equity Incentive Plan Awards: # of Securities Underlying Unexercised Unearned Options" column, and in connection therewith received 1,500,000 New Time Vested options and 1,500,000 New Cliff Vested Options.

### Options Exercised and Stock Vested — 2009

None of the Named Executive Officers exercised any of his vested Stock Option Awards in 2009. In addition, none of the Named Executive Officers owned any restricted or deferred shares of EFH Corp. common stock that vested in 2009.

### Pension Benefits — 2009

The table set forth below illustrates present value on December 31, 2009 of each Named Executive Officer's Retirement Plan benefit and benefits payable under the Supplemental Retirement Plan, based on their years of service and remuneration through December 31, 2009:

| Name | Plan Name | Number of Years Credited Service (#) | PV of Accumulated Benefit ($) | Payments During Last Fiscal Year ($) |
|---|---|---|---|---|
| John F. Young | Retirement Plan | N/A | 33,313 | — |
| | Supplemental Retirement Plan | N/A | N/A | N/A |
| Paul M. Keglevic | Retirement Plan | N/A | 44,409 | — |
| | Supplemental Retirement Plan | N/A | N/A | N/A |
| David A. Campbell (1) | Retirement Plan | 4.5833 | 109,838 | — |
| | Supplemental Retirement Plan | 7.5000 | 34,912 | — |
| Robert C. Walters | Retirement Plan | N/A | 62,351 | — |
| | Supplemental Retirement Plan | N/A | N/A | N/A |
| James A. Burke | Retirement Plan | 4.1667 | 99,396 | — |
| | Supplemental Retirement Plan | 4.1667 | 29,397 | — |
| Rizwan Chand | Retirement Plan | 3.3333 | 34,180 | — |
| | Supplemental Retirement Plan | 3.3333 | 41,752 | — |

EFH Corp. and its participating subsidiaries maintain the Retirement Plan, which is intended to be qualified under applicable provisions of the Code and covered by ERISA. The Retirement Plan contains both a traditional defined benefit component and a cash balance component. Only employees hired before January 1, 2002 may participate in the traditional defined benefit component. Accordingly, none of the Named Executive Officers participates in the traditional defined benefit component. Employees hired after January 1, 2002 and before October 1, 2007 are eligible to participate in the cash balance component. In addition, effective December 31, 2009, certain assets and liabilities under the Salary Deferral Program and the Supplemental Retirement Plan were transferred to the cash balance component of the Retirement Plan. Accordingly, Messrs. Campbell and Burke have participated and may continue to participate in the cash balance component of the Retirement Plan; and Messrs. Young, Keglevic and Walters participate in the cash balance component of the Retirement Plan solely with respect to amounts that were transferred from the Salary Deferral Program.

Under the cash balance component of the Retirement Plan, hypothetical accounts are established for participants and credited with monthly contribution credits equal to a percentage of the participant's compensation (3.5%, 4.5%, 5.5% or 6.5% depending on the participant's combined age and years of accredited service), contribution credits equal to the amounts transferred from the Salary Deferral Program and/or the Supplemental Retirement Plan effective as of December 31, 2009 and interest credits on all of such amounts based on the average yield of the 30-year Treasury bond for the 12 months ending November 30 of the prior year.

Confidential

EFIHMW00223236

The Supplemental Retirement Plan provides for the payment of retirement benefits, which would otherwise be limited by the Code or the definition of earnings under the Retirement Plan. Under the Supplemental Retirement Plan, retirement benefits under the cash balance component are calculated in accordance with the same formula used under the Retirement Plan. Participation in EFH Corp.'s Supplemental Retirement Plan has been limited to employees of all of its businesses other than Oncor, who were employed by EFH Corp. (or its participating subsidiaries) on or before October 1, 2007. Accordingly, Messrs. Campbell and Burke participate in the Supplemental Retirement Plan, and Messrs. Young, Keglevic and Walters are not eligible to participate in the Supplemental Retirement Plan.

Benefits accrued under the Supplemental Retirement Plan after December 31, 2004, are subject to Section 409A of the Code. Accordingly, certain provisions of the Supplemental Retirement Plan have been modified in order to comply with the requirements of Section 409A and related guidance.

The present value of the accumulated benefit for the Retirement Plan (the cash balance component) was calculated as the value of their cash balance account projected to age 65 at an assumed growth rate of 4.75% and then discounted back to December 31, 2009 at 5.90%. No mortality or turnover assumptions were applied.

### Nonqualified Deferred Compensation — 2009 (1)

The following table sets forth information regarding plans that provide for the deferral of the Named Executive Officers' compensation on a basis that is not tax-qualified for the fiscal year ended December 31, 2009:

| Name | Executive Contributions in Last FY ($) | Registrant Contributions in Last FY ($) (2) | Aggregate Earnings in Last FY ($) | Aggregate Withdrawals/ Distributions ($) (3) | Aggregate Balance at Last FYE ($) (4) |
|---|---|---|---|---|---|
| John F. Young | 80,000 | 80,000 | 56,561 | — | 281,715 |
| Paul M. Keglevic | 48,000 | 48,000 | 72 | — | 87,703 |
| David A. Campbell | — | — | 48,558 | — | 195,891 |
| Robert C. Walters | 46,000 | 46,000 | 32,367 | — | 103,402 |
| James A. Burke | — | — | 86,658 | — | 233,262 |
| Rizwan Chand | — | — | 28,960 | (116,068) | — |

(1)  The amounts reported in the Nonqualified Deferred Compensation table include deferrals and the company match under the Salary Deferral Program. The amounts reported as "Executive Contributions in Last FY" are salary deferrals and are also included as "Salary" in the Summary Compensation Table. Under EFH Corp.'s Salary Deferral Program each employee of EFH Corp. and its participating subsidiaries who is in a designated job level and whose annual salary is equal to or greater than an amount established under the Salary Deferral Program ($110,840 for the program year beginning January 1, 2009) may elect to defer up to 50% of annual base salary, and/or up to 100% of any bonus or incentive award, for a maturity period of seven years, for a maturity period ending with the retirement of such employee, or for a combination thereof. EFH Corp. makes a matching award, which vests at the end of the applicable maturity period (subject to acceleration or forfeiture under certain circumstances), equal to 100% of up to the first 8% of salary deferred under the Salary Deferral Program. Deferrals are credited with earnings or losses based on the performance of investment alternatives under the Salary Deferral Program selected by each participant. At the end of the applicable maturity period, the trustee for the Salary Deferral Program distributes the deferred compensation, any vested matching awards and the applicable earnings in cash as a lump sum or in annual installments at the participant's election made at the time of deferral. EFH Corp. is financing the retirement option portion of the Salary Deferral Program through the purchase of corporate-owned life insurance on the lives of participants. The proceeds from such insurance are expected to allow EFH Corp. to fully recover the cost of the retirement option. Beginning in 2010, certain executive officers, including the Named Executive Officers, will not be eligible to participate in the Salary Deferral Program.

Confidential

EFIHMW00223237

(2)    The amount included in "Registrant Contributions in Last FY" is attributable to EFH Corp.'s matching award under the Salary Deferral Program.

(3)    The "Aggregate Withdrawals/Distributions($)" column excludes amounts transferred from the Supplemental Retirement Plan and/or Salary Deferral Program to the cash balance component of the Retirement Plan as of December 31, 2009 for Messrs. Young ($37,500), Keglevic ($48,511), Walters ($71,283) and Burke ($25,000). In accordance with the terms of the Salary Deferral Plan, Mr. Chand forfeited $39,606 of company matching and received a distribution of the remaining balance of his account upon termination of his employment.

(4)    A portion of the amounts reported as "Aggregate Balance at Last FYE" are also included in the Summary Compensation Table as follows: for Mr. Young, $80,000 and $66,667 of executive contributions are included as "Salary" for 2009 and 2008, respectively, and $80,000 and $66,667 of company matching contributions are included as "All Other Compensation" for 2009 and 2008, respectively; for Mr. Keglevic, $48,000 and $20,000 of executive contributions are included as "Salary" for 2009 and 2008, respectively, and $48,000 and $20,000 of company matching contributions are included as "All Other Compensation" for 2009 and 2008, respectively; for Mr. Walters, $46,000 and $30,667 of executive contributions are included as "Salary" for 2009 and 2008, respectively, and $46,000 and $30,667 of company matching contributions are included as "All Other Compensation" for 2009 and 2008, respectively; for Mr. Burke, $48,000 and $27,417 of executive contributions are included as "Salary" for 2008 and 2007, respectively, and $48,000 and $27,417 of company matching contributions are included as "All Other Compensation" for 2009 and 2008, respectively. The amounts reported as "Aggregate Balance at Last FYE" reflect decreases resulting from the amounts transferred from the Supplemental Retirement Plan and/or Salary Deferral Program to the cash balance component of the Retirement Plan as of December 31, 2009 for Messrs. Young ($37,500), Keglevic ($48,511), Walters ($71,283) and Burke ($25,000).

### Potential Payments upon Termination or Change in Control

The tables and narrative below provide information for payments to each of the Named Executive Officers (or, as applicable, enhancements to payments or benefits) in the event of his termination, including if such termination is voluntary, for cause, as a result of death, as a result of disability, without cause or for good reason or without cause or for good reason in connection with a change in control.

The information in the tables below is presented in accordance with SEC rules, assuming termination of employment as of December 31, 2009.

### Employment Arrangements with Contingent Payments

As of December 31, 2009, each of Messrs. Young, Keglevic, Campbell, Walters and Burke had employment agreements with change in control and severance provisions as described in the following tables. In addition, in October 2009, the O&C Committee approved several changes to the compensation arrangements for all of the Named Executive Officers other than Messrs. Young and Chand, which changes were effective as of December 31, 2009 but not yet documented in such Named Executive Officers' employment agreements. Certain of these changes affected the potential payments of Messrs. Keglevic, Campbell, Walters and Burke and are reflected in the following tables. In February, 2010, Mr. Young's employment agreement was amended and restated effective retroactively on January 1, 2010. Because the changes to Mr. Young's employment agreement were not effective as of December 31, 2009, they are not reflected in the following table for Mr. Young, but are described elsewhere in this prospectus. Mr. Chand had an employment agreement, and the change in control and severance terms included in the employment agreement governed until his employment with EFH Corp. terminated in October 2009.

With respect to each Named Executive Officer's employment agreement, a change in control is generally defined as (i) a transaction that results in a sale of substantially all of our assets to another person and such person having more seats on our Board than the Sponsor Group, (ii) a transaction that results in a person not in the Sponsor Group owning more than 50% of our common stock and such person having more seats on our Board than the Sponsor Group or (iii) a transaction that results in the Sponsor Group owning less than 20% of our common stock and the Sponsor Group not being able to appoint a majority of the directors to our Board.

Each Named Executive Officer's employment agreement includes customary non-compete and non-solicitation provisions that generally restrict the Named Executive Officer's ability to compete with us or solicit our customers or employees for his own personal benefit during the term of the employment agreement and 24 months (with respect to Mr. Young) or 18 months (with respect to Messrs. Keglevic, Campbell, Walters and Burke) after the employment agreement expires or is terminated.

199

EFIHMW00223238

**PX 045**
**Page 215 of 561**

In addition, in October 2009, the O&C Committee approved the adoption of a new LTI to be included by amendment in the employment agreement of Messrs. Keglevic, Campbell, Walters and Burke. Under the terms of the LTI, in the event of the death or disability of any such Named Executive Officer, his termination without cause or resignation for good reason (or in the event we elect not to extend his employment term), or his termination without cause or resignation for good reason (or in the event we elect not to extend his employment term) within 24 months following a change in control of EFH Corp., in each case prior to September 30, 2012, such named Executive Officer shall be entitled to receive the LTI, or a pro rata portion thereof, calculated as (i) 75% of the aggregate EAIP award actually earned by the Named Executive Officer for any applicable fiscal year completed prior to the date of the Named Executive Officer's termination, plus (ii) for a termination occurring in fiscal year 2009, 2010, or 2011, 75% of the Named Executive Officer's prorated annual performance-based cash bonus for the year of termination. In February 2010, Mr. Young's employment agreement was amended to add a similar new LTI that is calculated based on 100% of the aggregate EAIP award actually earned by Mr. Young for fiscal years 2009, 2010 and 2011.

As of December 31, 2009, each of Messrs. Young, Keglevic, Campbell, Walters and Burke had stock option agreements. Under the stock option agreement for each Named Executive Officer, in the event of such Named Executive Officer's termination without cause or resignation for good reason (or in the event we elect not to extend his employment term) following a change in control of EFH Corp., such Named Executive Officer's Original Time Vested Options would become immediately exercisable as to 100% of the shares of EFH Corp. common stock subject to such options immediately prior to the change in control. As of December 31, 2009, the fair market value of the shares of EFH Corp. common stock underlying each Named Executive Officer's Original Time Vested Options was less than the exercise price of such options.

1.  **Mr. Young**

    **Potential Payments to Mr. Young upon Termination as of December 31, 2009 (per employment agreement, restricted stock agreement and stock option agreement, each in effect as of December 31, 2009)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | N/A | N/A | N/A | N/A | $5,000,000 | $ 5,000,000 |
| EAIP | N/A | N/A | $1,000,000 | $1,000,000 | N/A | $ 1,000,000 |
| Payment of Common Stock in respect of | | | | | | |
|   Restricted Stock Units | N/A | $1,950,000 | $1,950,000 | $1,950,000 | $1,950,000 | $ 1,950,000 |
| Acceleration of Stock Option Awards | N/A | N/A | N/A | N/A | N/A | $ 0 |
| Deferred Compensation | | | | | | |
|   - Salary Deferral Program | N/A | N/A | $ 159,608 | $ 159,608 | N/A | $ 159,608 |
| Health & Welfare | | | | | | |
|   - Medical/COBRA | N/A | N/A | N/A | N/A | $ 33,273 | $ 33,273 |
|   - Dental/COBRA | N/A | N/A | N/A | N/A | $ 2,790 | $ 2,790 |
| **Totals** | **N/A** | **$1,950,000** | **$3,109,608** | **$3,109,608** | **$6,986,063** | **$ 8,145,671** |

Mr. Young has entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1.  In the event of Mr. Young's death or disability:

200

EFIHMW00223239

    a.    a prorated annual incentive bonus for the year of termination, and

    b.    payment of employee benefits, including stock compensation, if any, to which Mr. Young may be entitled.

2.    In the event of Mr. Young's termination without cause or resignation for good reason (or in the event we elect not to extend his employment term):

    a.    a lump sum payment equal to two and one-half times the sum of (i) his annualized base salary and (ii) a prorated annual incentive bonus for the year of termination;

    b.    payment of employee benefits, including stock compensation, if any, to which Mr. Young may be entitled, and

    c.    certain continuing health care and company benefits.

3.    In the event of Mr. Young's termination without cause or resignation for good reason (or in the event we elect not to extend his employment term) within 24 months following a change in control of EFH Corp.:

    a.    a lump sum payment equal to two and one-half times the sum of (i) his annualized base salary and (ii) his annual bonus target;

    b.    a prorated annual incentive bonus for the year of termination;

    c.    payment of employee benefits, including stock compensation, if any, to which Mr. Young may be entitled;

    d.    certain continuing health care and company benefits, and

    e.    a tax gross-up payment to offset any excise tax which may result from the change in control payments.

In addition, Mr. Young has entered into a restricted stock agreement. Under Mr. Young's restricted stock agreement, Mr. Young was granted 600,000 restricted stock units, payable in January 2010, with one share of common stock of EFH Corp. for each such unit, all of which were fully vested and nonforfeitable upon grant; provided, however, in the event of Mr. Young's voluntary termination prior to January 2010, Mr. Young would have had to forfeit all of his restricted stock units.

**2.    Mr. Keglevic**

**Potential Payments to Mr. Keglevic upon Termination as of December 31, 2009 (per employment agreement, deferred share agreement and stock option agreement, each in effect as of December 31, 2009, and revisions to such employment agreement that were adopted by the O&C Committee in October 2009 and effective as of December 31, 2009)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | N/A | N/A | N/A | N/A | $2,100,000 | $ 2,100,000 |
| EAIP | N/A | N/A | $ 450,000 | $ 450,000 | N/A | N/A |
| Put Right in respect of Deferred Shares | N/A | N/A | $3,200,000 | $3,200,000 | $3,200,000 | $ 3,200,000 |
| Acceleration of Stock Option Awards | N/A | N/A | N/A | N/A | N/A | $          0 |
| LTI Cash Retention Award | N/A | N/A | $ 498,150 | $ 498,150 | $ 498,150 | $ 498,150 |
| Deferred Compensation | | | | | | |
|   - Salary Deferral Program | N/A | N/A | $ 68,107 | $ 68,107 | N/A | $ 68,107 |
| Health & Welfare | | | | | | |
|   - Dental/COBR | N/A | N/A | N/A | N/A | $ 2,790 | $ 2,790 |
| **Totals** | **N/A** | **N/A** | **$4,216,257** | **$4,216,257** | **$5,800,940** | **$ 5,869,047** |

201

EFIHMW00223240

Mr. Keglevic entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1.    In the event of Mr. Keglevic's death or disability:

    a.    a prorated annual incentive bonus for the year of termination, and

    b.    payment of employee benefits, including stock compensation, if any, to which Mr. Keglevic may be entitled.

2.    In the event of Mr. Keglevic's termination without cause or resignation for good reason (or in the event we elect not to extend his employment term):

    a.    for a termination occurring on or prior to the second anniversary of the effective date of the agreement, a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target, and for a termination occurring after the second anniversary of the effective date of the agreement, a lump sum payment equal to (i) two times his annualized base salary, (ii) a prorated annual incentive bonus for the year of termination and (iii) the matching contributions which would have been made on his behalf to EFH Corp.'s Salary Deferral Program had Mr. Keglevic continued his participation in the plan for an additional twelve months;

    b.    payment of employee benefits, including stock compensation, if any, to which Mr. Keglevic may be entitled, and

    c.    certain continuing health care and company benefits.

3.    In the event of Mr. Keglevic's termination without cause or resignation for good reason (or in the event we elect not to extend his employment term) within 24 months following a change in control of EFH Corp.:

    a.    a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target;

    b.    payment of employee benefits, including stock compensation, if any, to which Mr. Keglevic may be entitled;

    c.    certain continuing health care and company benefits, and

    d.    a tax gross-up payment to offset any excise tax which may result from the change in control payments.

In addition, Mr. Keglevic has entered into a deferred share agreement. Under Mr. Keglevic's deferred share agreement, EFH Corp. agreed to deliver to Mr. Keglevic 112,500 shares of EFH Corp. common stock on July 1, 2011 and 112,500 shares of EFH Corp. common stock on July 1, 2013; provided, however, that any shares not yet vested shall become 100% vested and become nonforfeitable in the event of Mr. Keglevic's death or disability or as a result of his termination without cause or for good reason or without cause or for good reason in connection with a change in control. Further, in the event of Mr. Keglevic's termination prior to July 1, 2013 as a result of death, as a result of disability, without cause or for good reason or without cause or for good reason in connection with a change in control, Mr. Keglevic shall have the right (but not the obligation) to sell to EFH Corp. all (but not less than all) of the shares of EFH Corp. common stock delivered pursuant to the deferred share agreement for a purchase price of $3,200,000.

202

EFIHMW00223241

3.    **Mr. Campbell**

Potential Payments to Mr. Campbell upon Termination as of December 31, 2009 (per employment agreement, deferred share agreement and stock option agreement, each in effect as of December 31, 2009, and revisions to such employment agreement that were adopted by the O&C Committee in October 2009 and effective as of December 31, 2009)

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | N/A | N/A | N/A | N/A | $2,100,000 | $ 2,100,000 |
| EAIP | N/A | N/A | $ 450,000 | $ 450,000 | N/A | N/A |
| Payment of EFH Corp. Common Stock in respect of Vested Deferred Shares | $1,625,000 | $1,625,000 | $1,625,000 | $1,625,000 | $1,625,000 | $ 1,625,000 |
| Acceleration of Stock Option Awards | N/A | N/A | N/A | N/A | N/A | $        0 |
| LTI Cash Retention Award | N/A | N/A | $ 481,950 | $ 481,950 | $ 481,950 | $   481,950 |
| Retirement Benefits | | | | | | |
| - Supplemental Retirement Plan | $  43,511 | $  43,511 | $  45,205 | $ 271,531 | $  43,511 | $     43,511 |
| Deferred Compensation | | | | | | |
| - Salary Deferral Program (1) | $  77,146 | $  77,146 | $  77,146 | $  77,146 | $  77,146 | $     77,146 |
| Health & Welfare | | | | | | |
| - Medical/COBRA | N/A | N/A | N/A | N/A | $  26,719 | $     26,719 |
| - Dental/COBRA | N/A | N/A | N/A | N/A | $   2,232 | $      2,232 |
| Totals | $1,745,657 | $1,745,657 | $2,679,301 | $2,905,627 | $4,356,558 | $ 4,356,558 |

(1)   Mr. Campbell is fully vested in the company matching portion of the Salary Deferral Plan.

Mr. Campbell entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1.    In the event of Mr. Campbell's death or disability:

   a.    a prorated annual incentive bonus for the year of termination, and

   b.    payment of employee benefits, including stock compensation, if any, to which Mr. Campbell may be entitled.

2.    In the event of Mr. Campbell's termination without cause or resignation for good reason (or in the event we elect not to extend his employment term):

   a.    for a termination occurring on or prior to the second anniversary of the effective date of the agreement, a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target, and for a termination occurring after the second anniversary of the effective date of the agreement, a lump sum payment equal to (i) two times his annualized base salary, (ii) a prorated annual incentive bonus for the year of termination and (iii) the matching contributions which would have been made on his behalf to EFH Corp.'s Salary Deferral Program had Mr. Campbell continued his participation in the plan for an additional twelve months;

203

EFIHMW00223242

      b.      payment of employee benefits, including stock compensations, if any, to which Mr. Campbell may be entitled, and

      c.      certain continuing health care and company benefits.

    3.   In the event of Mr. Campbell's termination without cause or resignation for good reason (or in the event we elect not to extend his employment term) within 24 months following a change in control of EFH Corp.:

      a.      a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target;

      b.      payment of employee benefits, including stock compensation, if any, to which Mr. Campbell may be entitled;

      c.      certain continuing health care and company benefits, and

      d.      a tax gross-up payment to offset any excise tax which may result from the change in control payments.

In addition, Mr. Campbell has entered into a deferred share agreement. Under Mr. Campbell's deferred share agreement, EFH Corp. agreed to deliver to Mr. Campbell 500,000 shares of EFH Corp. common stock in the event of Mr. Campbell's termination for any reason.

## 4.   Mr. Walters

**Potential Payments to Mr. Walters upon Termination as of December 31, 2009 (per employment agreement and stock option agreement, each in effect as of December 31, 2009, and revisions to such employment agreement that were adopted by the O&C Committee in October 2009 and effective as of December 31, 2009)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | N/A | N/A | N/A | N/A | $2,012,500 | $ 2,012,500 |
| EAIP | N/A | N/A | $ 431,250 | $ 431,250 | N/A | N/A |
| Acceleration of Stock Option Awards | N/A | N/A | N/A | N/A | N/A | $ 0 |
| LTI Cash Retention Award | N/A | N/A | $ 457,500 | $ 457,500 | $ 457,500 | $ 457,500 |
| Lump Sum Payment | N/A | N/A | $2,000,000 | $2,000,000 | $2,000,000 | $ 2,000,000 |
| Deferred Compensation | | | | | | |
|   - Salary Deferral Program | N/A | N/A | $ 87,343 | $ 87,343 | N/A | $ 87,343 |
| Health & Welfare | | | | | | |
|   - Medical/COBRA | N/A | N/A | N/A | N/A | $ 26,618 | $ 26,618 |
|   - Dental/COBRA | N/A | N/A | N/A | N/A | $ 2,232 | $ 2,232 |
| **Totals** | **N/A** | **N/A** | **$2,976,093** | **$2,976,093** | **$4,498,850** | **$ 4,586,193** |

Mr. Walters entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

    1.   In the event of Mr. Walters' death or disability:

Confidential

a.    a prorated annual incentive bonus for the year of termination;

b.    a lump sum payment equal to $2,000,000, and

c.    payment of employee benefits, including stock compensation, if any, to which Mr. Walters may be entitled.

2.    In the event of Mr. Walters' termination without cause or resignation for good reason (or in the event we elect not to extend his employment term):

a.    for a termination occurring on or prior to the second anniversary of the effective date of the agreement, a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target, and for a termination occurring after the second anniversary of the effective date of the agreement, a lump sum payment equal to (i) two times his annualized base salary, (ii) a prorated annual incentive bonus for the year of termination and (iii) the matching contributions which would have been made on his behalf to EFH Corp.'s Salary Deferral Program had Mr. Walters continued his participation in the plan for an additional twelve months;

b.    a lump sum payment equal to $2,000,000;

c.    payment of employee benefits, including stock compensation, if any, to which Mr. Walters may be entitled, and

d.    certain continuing health care and company benefits.

3.    In the event of Mr. Walters' termination without cause or resignation for good reason (or in the event we elect not to extend his employment term) within 24 months following a change in control of EFH Corp.:

a.    a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target;

b.    a lump sum payment equal to $2,000,000;

c.    payment of employee benefits, including stock compensation, if any, to which Mr. Walters may be entitled;

d.    certain continuing health care and company benefits, and

e.    a tax gross-up payment to offset any excise tax which may result from the change in control payments.

**5.    Mr. Burke**

**Potential Payments to Mr. Burke upon Termination as of December 31, 2009 (per employment agreement and stock option agreement, each in effect as of December 31, 2009, and revisions to such employment agreement that were adopted by the O&C Committee in October 2009 and effective as of December 31, 2009)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | N/A | N/A | N/A | N/A | $1,200,000 | $ 2,100,000 |
| EAIP | N/A | N/A | $ 450,000 | $ 450,000 | $ 450,000 | N/A |
| Acceleration of Stock Option Awards | N/A | N/A | N/A | N/A | N/A | $         0 |
| LTI Cash Retention Award | N/A | N/A | $ 642,600 | $ 642,600 | $ 642,600 | $   642,600 |
| Retirement Benefits | | | | | | |
| - Supplemental Retirement Plan | $ 35,747 | $ 35,747 | $ 38,099 | $ 255,572 | $ 35,747 | $     35,747 |
| Deferred Compensation | | | | | | |
| - Salary Deferral Program | $ 66,775 | $ 66,775 | $ 128,976 | $ 128,976 | $ 66,775 | $   128,976 |
| Health & Welfare | | | | | | |
| - Medical/COBRA | N/A | N/A | N/A | N/A | $ 26,618 | $     26,618 |
| - Dental/COBRA | N/A | N/A | N/A | N/A | $ 2,232 | $      2,232 |
| **Totals** | **$102,522** | **$102,522** | **$1,259,675** | **$1,477,148** | **$2,423,972** | **$ 2,936,173** |

205

EFIHMW00223244

Mr. Burke entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1.   In the event of Mr. Burke's death or disability:

    a.   a prorated annual incentive bonus for the year of termination, and

    b.   payment of employee benefits, including stock compensation, if any, to which Mr. Burke may be entitled.

2.   In the event of Mr. Burke's termination without cause or resignation for good reason (or in the event we elect not to extend his employment term):

    a.   a lump sum payment equal to (i) two times his annualized base salary, (ii) a prorated annual incentive bonus for the year of termination and (iii) the matching contributions which would have been made on his behalf to EFH Corp.'s Salary Deferral Program had Mr. Burke continued his participation in the plan for an additional twelve months;

    b.   payment of employee benefits, including stock compensation, if any, to which Mr. Burke may be entitled, and

    c.   certain continuing health care and company benefits.

3.   In the event of Mr. Burke's termination without cause or resignation for good reason (or in the event we elect not to extend his employment term) within 24 months following a change in control of EFH Corp.:

    a.   a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target;

    b.   payment of employee benefits, including stock compensation, if any, to which Mr. Burke may be entitled;

    c.   certain continuing health care and company benefits and

    d.   a tax gross-up payment to offset any excise tax which may result from the change in control payments.

## 6.   Mr. Chand

Mr. Chand's employment with EFH Corp. terminated in October 2009. Under the terms of his Severance Agreement, EFH Corp. provided Mr. Chand a severance payment which consisted of a lump sum cash payment of (i) $1,485,000, representing the cash severance that was due under his employment agreement and (ii) $600,000 related to his deferred share agreement.

206

Confidential

**Excise Tax Gross-Ups**

Pursuant to their employment agreements, if any of our Named Executive Officers would be subject to the imposition of the excise tax imposed by Section 4999 of the Code, related to the executive's employment, but the imposition of such tax could be avoided by approval of our shareholders as described in Section 280G(b)(5)(B) of the Code, then such executive may cause EFH Corp. to seek such approval, in which case EFH Corp. will use its reasonable best efforts to cause such approval to be obtained and such executive will cooperate and execute such waivers as may be necessary so that such approval avoids imposition of any excise tax under Section 4999. If such executive fails to cause EFH Corp. to seek such approval or fails to cooperate and execute the waivers necessary in the approval process, such executive shall not be entitled to any gross-up payment for any resulting tax under Section 4999.

<h3>Compensation Committee Interlocks and Insider Participation</h3>

There are no relationships among our executive officers, members of the O&C Committee or entities whose executives served on the O&C Committee that required disclosure under applicable SEC rules and regulations. For a description of related person transactions involving members of the O&C Committee, see "Related Person Transactions."

<h3>Director Compensation</h3>

The table below sets forth information regarding the aggregate compensation paid to the members of the Board during the year ended December 31, 2009. Directors who are officers of EFH Corp. or members of the Sponsor Group (or their respective affiliates) do not receive any fees for service as a director. EFH Corp. reimburses directors for certain reasonable expenses incurred in connection with their services as directors.

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Arcilia C. Acosta (1) | 150,000 | 100,000 | — | 250,000 |
| David Bonderman | — | — | — | — |
| Donald L. Evans (2) | 2,000,000 | 425,000 | 0 | 2,425,000 |
| Thomas D. Ferguson | — | — | — | — |
| Frederick M. Goltz | — | — | — | — |
| James R. Huffines (1)(3) | 150,000 | 100,000 | 900,000 | 1,150,000 |
| Scott Lebovitz | — | — | — | — |
| Jeffrey Liaw | — | — | — | — |
| Marc S. Lipschultz | — | — | — | — |
| Michael MacDougall | — | — | — | — |
| Lyndon L. Olson, Jr. (1)(3) | 150,000 | 100,000 | 900,000 | 1,150,000 |
| Kenneth Pontarelli | — | — | — | — |
| William K. Reilly (1) | 150,000 | 100,000 | 0 | 250,000 |
| Jonathan D. Smidt | — | — | — | — |
| John F. Young | — | — | — | — |
| Kneeland Youngblood (1) | 150,000 | 100,000 | 0 | 250,000 |

(1)  Ms. Acosta and Messrs. Huffines, Olson, Reilly and Youngblood receive $150,000 annually and an annual equity award (paid in shares of EFH Corp. common stock) valued at $100,000 (the grant date fair value) for their service as a director.

(2)  In May 2008, EFH Corp. entered into a consulting agreement with Mr. Evans, pursuant to which he received the following compensation:

     1. An annual fee of $2,000,000; and

     2. 200,000 shares of restricted stock, half of which vested during 2009, 50,000 shares at $5.00 per share and 50,000 shares at $3.50 per share. The value of the shares that vested during 2009 is reported in the table above under the heading "Stock Awards."

207

EFIHMW00223246

**PX 045
Page 223 of 561**

Under the consulting agreement, Mr. Evans also received options to purchase 600,000 shares of EFH Corp.'s common stock at an exercise price of $5.00 per share. As a result, there should have been an "Option Awards" column in last year's Director Compensation table and it should have included $551,250 as the grant date fair value for the options granted to Mr. Evans in May 2008 based upon rules for valuing stock option awards as they existed last year. The consulting agreement had a term running through October 2009. In February 2010, EFH Corp. entered into a new consulting agreement with Mr. Evans effective retroactively to October 10, 2009, pursuant to which Mr. Evans is entitled to receive an annual fee of $2,000,000. The term of the new consulting agreement expires in October 2012.

(3)  In December 2007, EFH Corp. entered into consulting agreements with Messrs. Huffines and Olson. As compensation for their consulting services, they received annual fees of $225,000, in addition to their standard director compensation described above. The amounts earned pursuant to these consulting agreements in 2009 are reflected above in the "All Other Compensation" column. In November 2009, the consulting agreements with Messrs. Huffines and Olson were terminated. In January 2010, Messrs. Huffines and Olson were each paid a $675,000 bonus for their exemplary efforts and past performance while serving as consultants.

208

EFIHMW00223247

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

**Equity Compensation Plan Information**

The following table presents information concerning stock-based compensation plans as of December 31, 2009.

| | (a) Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b) Weighted-average exercise price of outstanding options, warrants and rights | (c) Number of securities remaining available for future issuance under equity compensation plans, excluding securities reflected in column (a) |
|---|---|---|---|
| Equity compensation plans approved by security holders | — | $ — | — |
| Equity compensation plans not approved by security holders | 62,289,801 | $ 4.61 | 9,710,199 |
| | 62,289,801 | $ 4.61 | 9,710,199 |

Note:    Includes 49.8 million stock options with a weighted average exercise price of $4.63.

Includes 4.0 million vested and unvested restricted shares, deferred shares and stock granted to directors as part of their compensation plan.

**Beneficial Ownership of Common Stock of Energy Future Holdings Corp.**

The following table lists the number of shares of common stock of EFH Corp. beneficially owned by each director and certain current and former executive officers of EFH Corp. and the holders of more than 5% of EFH Corp.'s common stock as of December 10, 2010.

209

EFIHMW00223248

| Name | Number of Shares Beneficially Owned | Percent of Class |
|---|---|---|
| Texas Energy Future Holdings Limited Partnership (1) | 1,657,600,000 | 97.85% |
| Arcilia C. Acosta (2) | 100,770 | * |
| David Bonderman (3) | 1,657,600,000 | 97.85% |
| Donald L. Evans (4) | 1,000,000 | * |
| Thomas D. Ferguson (5) | 1,657,600,000 | 97.85% |
| Frederick M. Goltz (6) | 1,657,600,000 | 97.85% |
| James R. Huffines | 390,770 | * |
| Scott Lebovitz (5) | 1,657,600,000 | 97.85% |
| Jeffrey Liaw (3) | 1,657,600,000 | 97.85% |
| Marc S. Lipschultz (6) | 1,657,600,000 | 97.85% |
| Michael MacDougall (3) | 1,657,600,000 | 97.85% |
| Lyndon L. Olson, Jr. | 250,770 | * |
| Kenneth Pontarelli (5) | 1,657,600,000 | 97.85% |
| William K. Reilly | 230,770 | * |
| Jonathan D. Smidt (6) | 1,657,600,000 | 97.85% |
| John F. Young (7) | 5,062,009 | * |
| Kneeland Youngblood | 170,770 | * |
| James A. Burke (8) | 1,715,000 | * |
| David A. Campbell (9) | 2,660,000 | * |
| M. Rizwan Chand (10) | 0 | * |
| Paul M. Keglevic (11) | 1,575,000 | * |
| Robert C. Walters (12) | 1,080,000 | * |
| M. A. McFarland (13) | 1,143,550 | * |
| All directors and current executive officers as a group (24 persons) | 1,674,219,409 | 98.83% |

---

\*    Less than 1%.

(1)    Texas Holdings beneficially owns 1,657,600,000 shares of EFH Corp. The sole general partner of Texas Holdings is Texas Energy Future Capital Holdings LLC (Texas Capital), which, pursuant to the Amended and Restated Limited Partnership Agreement of Texas Holdings, has the right to vote all of the EFH Corp. shares owned by Texas Holdings. The address of both Texas Holdings and Texas Capital is 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102.

(2)    70,000 shares held in a family limited partnership, ACA Family LP.

(3)    Includes the 1,657,600,000 shares owned by Texas Holdings, over which TPG Partners V, L.P., TPG Partners IV, L.P., TPG FOF V-A, L.P. and TPG FOF V-B, L.P. (TPG Entities) may be deemed, as a result of their ownership of 27.01% of Texas Capital's outstanding units and certain provisions of Texas Capital's Amended and Restated Limited Liability Company Agreement (TC LLC Agreement), to have shared voting or dispositive power. The ultimate general partners of the TPG Entities are TPG Advisors IV, Inc. and TPG Advisors V, Inc. David Bonderman and James Coulter are the sole shareholders and directors of TPG Advisors IV Inc. and TPG Advisors V Inc., and therefore, Messrs. Bonderman and Coulter, TPG Advisors IV Inc. and TPG Advisors V Inc. may each be deemed to beneficially own the shares held by the TPG Entities. Messrs. Bonderman, Liaw and MacDougall are managers of Texas Capital. By virtue of their position in relation to Texas Capital and the TPG Entities, Messrs. Bonderman, Liaw and MacDougall may be deemed to have beneficial ownership with respect to the shares of EFH Corp. common stock owned by Texas Holdings. Each of Messrs. Liaw and MacDougall disclaims beneficial ownership of such shares except to the extent of their pecuniary interest in those shares. The address of each entity and individual listed in this footnote is 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102.

(4)    Includes 600,000 shares issuable upon exercise of vested options.

210

Confidential

(5)   Includes the 1,657,600,000 shares owned by Texas Holdings, over which GS Capital Partners VI Fund, L.P., GSCP VI Offshore TXU Holdings, L.P., GSCP VI Germany TXU Holdings, L.P., GS Capital Partners VI Parallel, L.P., GS Global Infrastructure Partners I, L.P., GS Infrastructure Offshore TXU Holdings, L.P. (GSIP International Fund), GS Institutional Infrastructure Partners I, L.P., Goldman Sachs TXU Investors L.P. and Goldman Sachs TXU Investors Offshore Holdings, L.P. (collectively, Goldman Entities) may be deemed, as a result of their ownership of 27.02% of Texas Capital's outstanding units and certain provision of the TC LLC Agreement, to have shared voting or dispositive power. Affiliates of The Goldman Sachs Group, Inc. (Goldman Sachs) are the general partner, managing general partner or investment manager of each of the Goldman Entities, and each of the Goldman Entities shares voting and investment power with certain of their respective affiliates. Each of Goldman Sachs and the Goldman Entities disclaims beneficial ownership of such shares of common stock except to the extent of its pecuniary interest therein. Messrs. Ferguson, Lebovitz and Pontarelli are managers of Texas Capital and executives with affiliates of Goldman Sachs. By virtue of their position in relation to Texas Capital and the Goldman Entities, Messrs. Ferguson, Lebovitz and Pontarelli may be deemed to have beneficial ownership with respect to the shares of EFH Corp. common stock owned by Texas Holdings. Each of Messrs. Ferguson, Lebovitz and Pontarelli disclaims beneficial ownership of such shares except to the extent of their pecuniary interest in those shares. The address of each entity and individual listed in this footnote is c/o Goldman, Sachs & Co., 85 Broad Street, New York, New York 10004.

(6)   Includes the 1,657,600,000 shares owned by Texas Holdings, over which KKR 2006 Fund L.P., KKR PEI Investments, L.P., KKR Partners III, L.P., KKR North American Co-Invest Fund I L.P. and TEF TFO Co-Invest, LP (KKR Entities) may be deemed, as a result of their ownership of 37.05% of Texas Capital's outstanding units and certain provision of the TC LLC Agreement, to have shared voting or dispositive power. The KKR Entities disclaim beneficial ownership of any shares of our common stock in which they do not have a pecuniary interest. Messrs. Goltz, Lipschultz and Smidt are managers of Texas Capital and executives of Kohlberg Kravis Roberts & Co. L.P. By virtue of their position in relation to Texas Capital and the KKR Entities, Messrs. Goltz, Lipschultz and Smidt may be deemed to have beneficial ownership with respect to the shares of EFH Corp. common stock owned by Texas Holdings. Each of Messrs. Goltz, Lipschultz and Smidt disclaims beneficial ownership of such shares except to the extent of their pecuniary interest in those shares. The address of each entity and individual listed in this footnote is c/o Kohlberg Kravis Roberts & Co. L.P., 9 West 57th Street, Suite 4200, New York, New York 10019.

(7)   Includes 4,050,000 shares issuable upon exercise of vested options.

(8)   Includes 450,000 deferred shares which, in accordance with the terms of the Deferred Share Agreement, will be settled in shares of EFH Corp. common stock upon the earlier of termination of employment or a change in control of EFH Corp. and 1,265,00 shares issuable upon exercise of vested options.

(9)   Includes 500,000 deferred shares which, in accordance with the terms of the Deferred Share Agreement, will be settled in shares of EFH Corp. common stock upon the earlier of termination of employment or a change in control of EFH Corp. and 2,160,000 shares issuable upon exercise of vested options.

(10)   Mr. Chand's employment with EFH Corp. terminated in October 2009.

(11)   Includes 225,000 deferred shares which, in accordance with the terms of the Deferred Share Agreement, will be settled in shares of EFH Corp. common stock upon the earlier of termination of employment or a change in control of EFH Corp. and 1,350,000 shares issuable upon exercise of vested options.

(12)   Includes 1,080,000 shares issuable upon exercise of vested options.

(13)   Includes 1,080,000 shares issuable upon exercise of vested options.

211

EFIHMW00223250

### CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

**Policies and Procedures Relating to Related Party Transactions**

The Board has adopted a policy regarding related person transactions. Under this policy, a related person transaction shall be consummated or shall continue only if:

1.  the Audit Committee of the Board approves or ratifies such transaction in accordance with the policy and if the transaction is on terms comparable to those that could be obtained in arm's length dealings with an unrelated third party;

2.  the transaction is approved by the disinterested members of the Board or the Executive Committee; or

3.  the transaction involves compensation approved by the Organization and Compensation Committee of the Board.

For purposes of this policy, the term "related person" includes EFH Corp.'s directors, executive officers, 5% shareholders and their immediate family members. "Immediate family members" means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law or any person (other than a tenant or employee) sharing the household of a director, executive officer or 5% shareholder.

A "related person transaction" is a transaction between EFH Corp. or its subsidiaries and a related person, other than the types of transactions described below, which are deemed to be pre-approved by the Audit Committee of the Board:

1.  any compensation paid to a director if the compensation is required to be reported under Item 402 of Regulation S-K of the Securities Act;

2.  any transaction with another company at which a related person's only relationship is as an employee (other than an executive officer), director or beneficial owner of less than 10% of that company's ownership interests;

3.  any charitable contribution, grant or endowment by EFH Corp. to a charitable organization, foundation or university at which a related person's only relationship is as an employee (other than an executive officer) or director;

4.  transactions where the related person's interest arises solely from the ownership of EFH Corp.'s equity securities and all holders of that class of equity securities received the same benefit on a pro rata basis;

5.  transactions involving a related party where the rates or charges involved are determined by competitive bids;

6.  any transaction with a related party involving the rendering of services as a common or contract carrier, or public utility, as rates or charges fixed in conformity with law or governmental authority;

7.  any transaction with a related party involving services as a bank depositary of funds, transfer agent, registrar, trustee under a trust indenture, or similar service;

8.  transactions available to all employees or customers generally (unless required to be disclosed under Item 404 of Regulation S-K of the Securities Act, if applicable);

9.  transactions involving less than $100,000 when aggregated with all similar transactions;

10. transactions between EFH Corp. and its subsidiaries or between subsidiaries of EFH Corp.;

212

EFIHMW00223251

11.  transactions not required to be disclosed under Item 404 of Regulation S-K under the Securities Act of 1933; and

12.  open market purchases of the EFH Corp. or its subsidiaries' debt or equity securities and interest payments on such debt.

The Board has determined that it is appropriate for the Audit Committee of the Board to review and approve or ratify related person transactions. Accordingly, at least annually, management reviews related person transactions to be entered into by EFH Corp. or its subsidiaries, if any. After review, the Audit Committee of the Board approves/ratifies or disapproves such transactions. Management updates the Audit Committee of the Board as to any material changes to such related person transactions. In unusual circumstances, EFH Corp. or its subsidiaries may enter into related person transactions in advance of receiving approval, provided that such related person transactions are reviewed and ratified as soon as reasonably practicable by the Audit Committee of the Board. If the Audit Committee of the Board determines not to ratify such transactions, EFH Corp. shall make all reasonable efforts to cancel or otherwise terminate such transactions.

The related person transactions described below under "Related Person Transactions — Business Affiliations," were ratified by the Audit Committee of the Board pursuant to the policy described above. All other related person transactions were approved prior to the Board's adoption of this policy, but were approved by either the Board or its Executive Committee. Transactions described under "Related Person Transactions — Transactions with Sponsor Affiliates" are not related person transactions under the EFH Corp. policy because they are not with a director, executive officer, 5% shareholder or any of their immediate family members, but are described in the interest of greater disclosure.

The related person transactions described below under the heading "Business Affiliations," were ratified by the Audit Committee of the Board pursuant to the policy described above. All other related person transactions were approved prior to the Board's adoption of this policy, but were approved by either the Board or its Executive Committee.

*Related Person Transactions*

***Limited Partnership Agreement of Texas Energy Future Holdings Limited Partnership; Limited Liability Company Agreement of Texas Energy Future Capital Holdings LLC***

The Sponsor Group and certain investors who agreed to co-invest with the Sponsor Group or through a vehicle jointly controlled by the Sponsor Group to provide equity financing for the Merger (Co-Investors) entered into (i) a limited partnership agreement (LP Agreement) in respect of EFH Corp.'s parent company, Texas Holdings and (ii) the LLC Agreement in respect of Texas Holdings' sole general partner, Texas Capital. The LP Agreement provides that Texas Capital has the right to vote or execute consents with respect to any shares of EFH Corp.'s common stock owned by Texas Holdings. The LLC Agreement and LP Agreement contain agreements among the parties with respect to the election of EFH Corp.'s directors, restrictions on the issuance or transfer of interests in EFH Corp., including tag-along rights and drag-along rights, and other corporate governance provisions (including the right to approve various corporate actions).

The LLC Agreement provides that Texas Capital and its members will take all action required to ensure that the managers of Texas Capital are also members of EFH Corp.'s Board. Pursuant to the LLC Agreement each of (i) KKR 2006 Fund L.P. and affiliated investment funds, (ii) TPG Partners V, L.P. and affiliated investment funds and (iii) certain funds affiliated with Goldman Sachs, has the right to designate three managers of Texas Capital. These rights are subject to maintenance of certain investment levels in Texas Holdings.

**Registration Rights Agreement**

The Sponsor Group and the Co-Investors entered into a registration rights agreement with EFH Corp. upon completion of the Merger. Pursuant to this agreement, in certain circumstances, the Sponsor Group can cause EFH Corp. to register shares of EFH Corp.'s common stock owned directly or indirectly by them under the Securities Act. In certain circumstances, the Sponsor Group and the Co-Investors are also entitled to participate on a pro rata basis in any registration of EFH Corp.'s common stock under the Securities Act that it may undertake. In 2008 and 2009, Ms. Acosta and Messrs. Evans, Huffines, Olson, Reilly and Youngblood, each of whom are members of our Board, and Messrs. Young, Greene, Campbell, Walters, Burke, Keglevic, McFarland, Enze, Kaplan and Landy, each of whom are executive officers of EFH Corp., became parties to this agreement.

213

**Management Services Agreement**

In October 2007, in connection with the Merger, the Sponsor Group and Lehman Brothers Inc. entered into a management agreement with EFH Corp. (Management Agreement), pursuant to which affiliates of the Sponsor Group provide management, consulting, financial and other advisory services to EFH Corp. Pursuant to the Management Agreement, affiliates of the Sponsor Group are entitled to receive an aggregate annual management fee of $35 million, which amount increases 2% annually, and reimbursement of out-of-pocket expenses incurred in connection with the provision of services pursuant to the Management Agreement. The Management Agreement will continue in effect from year to year, unless terminated upon a change of control of EFH Corp. or in connection with an initial public offering of EFH Corp. or if the parties thereto mutually agree to terminate the Management Agreement. Pursuant to the Management Agreement, affiliates of the Sponsor Group and Lehman Brothers Inc. were paid transaction fees of $300 million for certain services provided in connection with the Merger and related transactions. In addition, the Management Agreement provides that the Sponsor Group will be entitled to receive a fee equal to a percentage of the gross transaction value in connection with certain subsequent financing, acquisition, disposition, merger combination and change of control transactions, as well as a termination fee based on the net present value of future payment obligations under the Management Agreement in the event of an initial public offering or under certain other circumstances. Under terms of the Management Agreement, EFH Corp. paid $36 million, inclusive of expenses, to the Sponsor Group during 2009.

**Indemnification Agreement**

Concurrently with entering into the Management Agreement, the Sponsor Group, Texas Holdings and EFH Corp. entered into an indemnification agreement (Indemnification Agreement), pursuant to which EFH Corp. and Texas Holdings agree to indemnify the Sponsor Group and their affiliates against any claims relating to (i) certain securities and financing transactions relating to the Merger, (ii) the performance of transaction services pursuant to the Management Agreement, (iii) actions or failures to act by EFH Corp., Texas Holdings, Texas Capital or their subsidiaries or affiliates (collectively, Company Group), (iv) service as an officer or director of, or at the request of, any member of the Company Group, and (v) any breach or alleged breach of fiduciary duty as a director or officer of any member of the Company Group.

**Sale Participation Agreement**

Ms. Acosta and Messrs. Evans, Huffines, Olson, Reilly and Youngblood, each of whom are members of our Board, and each of our executive officers have entered into sale participation agreements with EFH Corp. Pursuant to the terms of these agreements, among other things, shares of EFH Corp.'s common stock held by these individuals are subject to tag-along and drag-along rights in the event of a sale by the Sponsor Group of shares of EFH Corp.'s common stock held by the Sponsor Group.

**Certain Charter Provisions**

EFH Corp.'s restated certificate of formation contains provisions limiting directors' obligations in respect of corporate opportunities.

**Management Stockholders' Agreement**

Subject to a management stockholders' agreement, certain members of management, including EFH Corp.'s directors, executive officers, along with other members of management, elected to invest in EFH Corp. by contributing cash or common stock, or a combination of both, to EFH Corp. prior to or following the Merger and receiving common stock in EFH Corp. in exchange therefore. The net aggregate amount of this investment as of December 31, 2009 is approximately $42.6 million. The management stockholders' agreement creates certain rights and restrictions on these shares of common stock, including transfer restrictions and tag-along, drag-along, put, call and registration rights in certain circumstances.

214

EFIHMW00223253

**Director Stockholders' Agreement**

Certain members of our Board have entered into a stockholders' agreement with EFH Corp. These stockholders' agreements create certain rights and restrictions on the equity, including transfer restrictions and tag-along, drag-along, put, call and registration rights in certain circumstances.

**Business Affiliations**

Mr. Olson, a member of our board, has an ownership interest in two companies with which Oncor does business. These companies are Texas Meter and Device Company (TMD) and Metrum Technologies LLC (Metrum). Mr. Olson and his brother collectively directly own approximately 24% of TMD and indirectly own approximately 19% of Metrum. Both entities are majority owned by their chief executive officer. In 2009, Oncor paid TMD approximately $1.2 million and paid Metrum approximately $0.2 million. TMD tests Oncor's high voltage personal protective equipment. Metrum provides Oncor with cellular-based wireless communications equipment for its meters. Oncor is Metrum's largest customer. The business relationships with both TMD and Metrum commenced several years prior to Mr. Olson joining the Board.

*Transactions with Sponsor Affiliates*

TCEH has entered into the TCEH Senior Secured Facilities, and Oncor has entered into a revolving credit facility, each with syndicates of financial institutions and other lenders. These syndicates included affiliates of GS Capital Partners. These transactions were approved by the Board of Directors.

Affiliates of the Sponsor Group participated in the debt exchange offers completed in November 2009 by EFH Corp., EFIH and EFIH Finance to exchange new senior secured notes for certain EFH Corp. and TCEH notes (see Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for additional information). Goldman, Sachs & Co. and KKR Capital Markets LLC were paid customary fees in the amounts of $750,000 and $260,000, respectively, as compensation for their services as dealer managers in the debt exchange offers and TPG Capital, L.P. received a fee in the amount of $260,000 as compensation for the advisory services it rendered in connection with the debt exchange offers. Goldman, Sachs & Co. also acted as a dealer manager and solicitation agent in debt exchange offers completed in August 2010 as discussed in Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010, and received fees of $7 million in connection therewith.

Also, Goldman, Sachs & Co. acted as an initial purchaser in EFH Corp.'s issuance of $500 million principal amount of the notes and received fees totaling $3 million (see Note 12 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2009 for additional information). Goldman, Sachs & Co. also acted as an initial purchaser in the issuance of $350 million principal amount of TCEH 15% Senior Secured Second Lien Notes (Series B) in October 2010 as discussed in Note 6 to EFH Corp.'s historical condensed consolidated financial statements for the three and nine months ended September 30, 2010, and received fees totaling $1 million in connection therewith.

Affiliates of GS Capital Partners have from time to time engaged in commercial and investment banking and financial advisory transactions with EFH Corp. in the normal course of business. Affiliates of Goldman Sachs & Co. are party to certain commodity and interest rate hedging transactions with EFH Corp. in the normal course of business.

From time to time affiliates of the Sponsor Group may acquire debt or debt securities issued by EFH Corp. or its subsidiaries in open market transactions or through loan syndications.

215

EFIHMW00223254

Members of the Sponsor Group and/or their respective affiliates have from time to time entered into, and may continue to enter into, arrangements with us to use our products and services in the ordinary course of their business, which often result in revenues to us in excess of $120,000 annually. In addition, we have entered into, and may continue to enter into, arrangements with members of the Sponsor Group and/or their respective affiliates to use their products and services in the ordinary course of their business, which often result in revenues to members of the Sponsor Group or their respective affiliates in excess of $120,000 annually.

### Director Independence

Though not formally considered by the Board because EFH Corp.'s common stock is not currently registered with the SEC or traded on any national securities exchange, based upon the listing standards for issuers of equity securities on the New York Stock Exchange, the national securities exchange upon which EFH Corp.'s common stock was traded prior to the Merger, only Ms. Acosta and Mr. Youngblood would be considered independent. Because of their relationships with the Sponsor Group or with EFH Corp. directly, none of the other directors would be considered independent. See "Certain Relationships and Related Party Transactions" and "Executive Compensation — Director Compensation." Accordingly, we believe that Ms. Acosta is the only member of the Organization and Compensation Committee who would meet the New York Stock Exchange's independence requirements for issuers of equity securities. We believe that none of the members of EFH Corp.'s Governance and Public Affairs Committee would meet the New York Stock Exchange's independence requirements for issuers of equity securities. Under the New York Stock Exchange's audit committee independence requirement for issuers of debt securities, Messrs. Huffines and Youngblood and Ms. Acosta, who constitute the Audit Committee, are considered independent.

216

EFIHMW00223255

## THE EXCHANGE OFFER

**Purpose and Effect of the Exchange Offer**

EFH Corp. and the guarantors of the outstanding notes have entered into a registration rights agreement with the initial purchasers of the outstanding notes and other purchasers of the outstanding notes in which we agreed, under certain circumstances, to use our reasonable best efforts to file a registration statement relating to offers to exchange the outstanding notes for exchange notes and to complete the exchange offer within 360 days after the date of original issuance of the outstanding notes. The exchange notes will have terms identical in all material respects to the outstanding notes, except that the exchange notes will not contain terms with respect to transfer restrictions, registration rights and additional interest for failure to observe certain obligations in the registration rights agreement. The outstanding notes were issued in January 2010 through July 2010.

Under the circumstances set forth below, EFH Corp. and the guarantors will use our reasonable best efforts to cause the SEC to declare effective a shelf registration statement with respect to the resale of the outstanding notes within the time periods specified in the registration rights agreement and keep the statement effective for up to two years after the effective date of the shelf registration statement. These circumstances include:

- if any changes in law, SEC rules or regulations or applicable interpretations thereof by the SEC do not permit us to effect the exchange offer as contemplated by the registration rights agreement;

- if the exchange offer is not consummated within 360 days after the date of issuance of the outstanding notes;

- if any initial purchaser of the outstanding notes so requests with respect to the outstanding notes not eligible to be exchanged for the exchange notes and held by it within 30 days after the consummation of the exchange offer; or

- if any holder that participates in the exchange offer does not receive freely transferable exchange notes in exchange for tendered outstanding notes.

Under the registration rights agreement, if EFH Corp. fails to complete the exchange offer (other than in the event we file a shelf registration statement) or the shelf registration statement, if required thereby, is not declared effective, in either case on or prior to 360 days after the issue date of the outstanding notes (the "target registration date"), the interest rate on each series of the outstanding notes will be increased by (x) 0.25% per annum for the first 90-day period immediately following the target registration date and (y) an additional 0.50% per annum thereafter, in each case, until the exchange offer is completed or the shelf registration statement, if required, is declared effective by the SEC or the outstanding notes cease to constitute transfer restricted notes.

If you wish to exchange your outstanding notes for exchange notes in the exchange offer, you will be required to make the following written representations:

- you are not our affiliate or an affiliate of any guarantor within the meaning of Rule 405 of the Securities Act;

- you have no arrangement or understanding with any person to participate in a distribution (within the meaning of the Securities Act) of the exchange notes in violation of the provisions of the Securities Act;

- you are not engaged in, and do not intend to engage in, a distribution of the exchange notes; and

- you are acquiring the exchange notes in the ordinary course of your business.

217

EFIHMW00223256

Each broker-dealer that receives exchange notes for its own account in exchange for outstanding notes, where the broker-dealer acquired the outstanding notes as a result of market-making activities or other trading activities, must acknowledge that it will deliver a prospectus in connection with any resale of such exchange notes. Please see "Plan of Distribution."

**Resale of Exchange Notes**

Based on interpretations by the SEC set forth in no-action letters issued to third parties, we believe that you may resell or otherwise transfer exchange notes issued in the exchange offer without complying with the registration and prospectus delivery provisions of the Securities Act if:

- you are not our affiliate or an affiliate of any guarantor within the meaning of Rule 405 under the Securities Act;

- you do not have an arrangement or understanding with any person to participate in a distribution of the exchange notes;

- you are not engaged in, and do not intend to engage in, a distribution of the exchange notes; and

- you are acquiring the exchange notes in the ordinary course of your business.

If you are our affiliate or an affiliate of any guarantor, or are engaging in, or intend to engage in, or have any arrangement or understanding with any person to participate in, a distribution of the exchange notes, or are not acquiring the exchange notes in the ordinary course of your business:

- you cannot rely on the position of the SEC set forth in Morgan Stanley & Co. Incorporated (available June 5, 1991) and Exxon Capital Holdings Corporation (available May 13, 1988), as interpreted in the SEC's letter to Shearman & Sterling, dated July 2, 1993, or similar no-action letters; and

- in the absence of an exception from the position stated immediately above, you must comply with the registration and prospectus delivery requirements of the Securities Act in connection with any resale of the exchange notes.

This prospectus may be used for an offer to resell, resale or other transfer of exchange notes only as specifically set forth in this prospectus. With regard to broker-dealers, only broker-dealers that acquired the outstanding notes as a result of market-making activities or other trading activities may participate in the exchange offer. Each broker-dealer that receives exchange notes for its own account in exchange for outstanding notes, where such outstanding notes were acquired by such broker-dealer as a result of market-making activities or other trading activities, must acknowledge that it will deliver a prospectus in connection with any resale of the exchange notes. Please read "Plan of Distribution" for more details regarding the transfer of exchange notes.

**Terms of the Exchange Offer**

On the terms and subject to the conditions set forth in this prospectus and in the accompanying letter of transmittal, EFH Corp. will accept for exchange in the exchange offer any outstanding notes that are validly tendered and not validly withdrawn prior to the expiration date. Outstanding notes may only be tendered in minimum denominations of $2,000 and integral multiples of $1,000 in excess of $2,000. EFH Corp. will issue exchange notes in principal amount identical to outstanding notes surrendered in the exchange offer.

The form and terms of the exchange notes will be identical in all material respects to the form and terms of the outstanding notes except the exchange notes will be registered under the Securities Act, will not bear legends restricting their transfer and will not provide for any additional interest upon our failure to fulfill our obligations under the registration rights agreement to complete the exchange offer, or file, and cause to be effective, a shelf registration statement, if required thereby, within the specified time period. The exchange notes will evidence the same debt as the outstanding notes. The exchange notes will be issued under and entitled to the benefits of the indenture that authorized the issuance of the outstanding notes. For a description of the indenture, see "Description of Notes."

218

EFIHMW00223257

The exchange offer is not conditioned upon any minimum aggregate principal amount of outstanding notes being tendered for exchange.

As of the date of this prospectus, $1,060,757,000 aggregate principal amount of the 10.000% Senior Notes due 2020 are outstanding. This prospectus and the letters of transmittal are being sent to all registered holders of outstanding notes. There will be no fixed record date for determining registered holders of outstanding notes entitled to participate in the exchange offer. EFH Corp. intends to conduct the exchange offer in accordance with the provisions of the registration rights agreement, the applicable requirements of the Securities Act and the Exchange Act, and the rules and regulations of the SEC. Outstanding notes that are not tendered for exchange in the exchange offer will remain outstanding and continue to accrue interest and will be entitled to the rights and benefits such holders have under the indenture relating to such holders' outstanding notes except we will not have any further obligation to you to provide for the registration of the outstanding notes under the registration rights agreement.

EFH Corp. will be deemed to have accepted for exchange properly tendered outstanding notes when it has given oral or written notice of the acceptance to the exchange agent. The exchange agent will act as agent for the tendering holders for the purposes of receiving the exchange notes from us and delivering exchange notes to holders. Subject to the terms of the registration rights agreement, EFH Corp. expressly reserves the right to amend or terminate the exchange offer and to refuse to accept the occurrence of any of the conditions specified below under "— Conditions to the Exchange Offer."

If you tender your outstanding notes in the exchange offer, you will not be required to pay brokerage commissions or fees or, subject to the instructions in the letter of transmittal, transfer taxes with respect to the exchange of outstanding notes. We will pay all charges and expenses, other than certain applicable taxes described below in connection with the exchange offer. It is important that you read "— Fees and Expenses" below for more details regarding fees and expenses incurred in the exchange offer.

**Expiration Date, Extensions and Amendments**

As used in this prospectus, the term "expiration date" means 11:59 p.m., New York City time, on March 1, 2011. However, if we, in our sole discretion, extend the period of time for which the exchange offer is open, the term "expiration date" will mean the latest time and date to which we shall have extended the expiration of the exchange offer.

To extend the period of time during which the exchange offer is open, we will notify the exchange agent of any extension by oral or written notice, followed by notification by press release or other public announcement to the registered holders of the outstanding notes no later than 9:00 a.m., New York City time, on the next business day after the previously scheduled expiration date.

EFH Corp. reserves the right, in its sole discretion:

- to delay accepting for exchange any outstanding notes (only in the case that we amend or extend the exchange offer);

- to extend the exchange offer or to terminate the exchange offer if any of the conditions set forth below under "— Conditions to the Exchange Offer" have not been satisfied, by giving oral or written notice of such delay, extension or termination to the exchange agent; and

- subject to the terms of the registration rights agreement, to amend the terms of the exchange offer in any manner. In the event of a material change in the exchange offer, including the waiver of a material condition, we will extend the offer period, if necessary, so that at least five business days remain in such offer period following notice of the material change.

219

EFIHMW00223258

Any delay in acceptance, extension, termination or amendment will be followed as promptly as practicable by oral or written notice to the registered holders of the outstanding notes. If EFH Corp. amends the exchange offer in a manner that it determines to constitute a material change, it will promptly disclose the amendment in a manner reasonably calculated to inform the holders of applicable outstanding notes of that amendment.

**Conditions to the Exchange Offer**

Despite any other term of the exchange offer, EFH Corp. will not be required to accept for exchange, or to issue exchange notes in exchange for, any outstanding notes and it may terminate or amend the exchange offer as provided in this prospectus prior to the expiration date if in its reasonable judgment:

- the exchange offer or the making of any exchange by a holder violates any applicable law or interpretation of the SEC; or

- any action or proceeding has been instituted or threatened in writing in any court or by or before any governmental agency with respect to the exchange offer that, in our judgment, would reasonably be expected to impair our ability to proceed with the exchange offer.

In addition, EFH Corp. will not be obligated to accept for exchange the outstanding notes of any holder that has not made to us:

- the representations described under "— Purpose and Effect of the Exchange Offer," "— Procedures for Tendering Outstanding Notes" and "Plan of Distribution"; or

- any other representations as may be reasonably necessary under applicable SEC rules, regulations or interpretations to make available to us an appropriate form for registration of the exchange notes under the Securities Act.

EFH Corp. expressly reserves the right at any time or at various times to extend the period of time during which the exchange offer is open. Consequently, EFH Corp. may delay acceptance of any outstanding notes by giving oral or written notice of such extension to their holders. EFH Corp. will return any outstanding notes that it does not accept for exchange for any reason without expense to their tendering holder promptly after the expiration or termination of the exchange offer.

EFH Corp. expressly reserves the right to amend or terminate the exchange offer and to reject for exchange any outstanding notes not previously accepted for exchange, upon the occurrence of any of the conditions of the exchange offer specified above. EFH Corp. will give oral or written notice of any extension, amendment, non-acceptance or termination to the holders of the outstanding notes as promptly as practicable. In the case of any extension, such notice will be issued no later than 9:00 a.m., New York City time, on the next business day after the previously scheduled expiration date.

These conditions are for our sole benefit, and EFH Corp. may assert them regardless of the circumstances that may give rise to them or waive them in whole or in part at any or at various times prior to the expiration date in our sole discretion. If EFH Corp. fails at any time to exercise any of the foregoing rights, this failure will not constitute a waiver of such right. Each such right will be deemed an ongoing right that it may assert at any time or at various times prior to the expiration date.

In addition, EFH Corp. will not accept for exchange any outstanding notes tendered, and will not issue exchange notes in exchange for any such outstanding notes, if at such time any stop order is threatened or in effect with respect to the registration statement of which this prospectus constitutes a part or the qualification of the indenture under the Trust Indenture Act of 1939 (the "TIA").

**Procedures for Tendering Outstanding Notes**

In order to participate in the exchange offer, you must properly tender your outstanding notes to the exchange agent as described below. It is your responsibility to properly tender your notes. We have the right to waive any defects. However, we are not required to waive defects and are not required to notify you of defects in your tender.

220

EFIHMW00223259

If you have any questions or need help in exchanging your notes, please contact the exchange agent, whose contact information is set forth in "Prospectus Summary — The Exchange Offer — Exchange Agent."

All of the outstanding notes were issued in book-entry form, and all of the outstanding notes are currently represented by global certificates held for the account of DTC. We have confirmed with DTC that the outstanding notes may be tendered using ATOP instituted by DTC. The exchange agent will establish an account with DTC for purposes of the exchange offer promptly after the commencement of the exchange offer and DTC participants may electronically transmit their acceptance of the exchange offer by causing DTC to transfer their outstanding notes to the exchange agent using the ATOP procedures. In connection with the transfer, DTC will send an "agent's message" to the exchange agent. The agent's message will state that DTC has received instructions from the participant to tender outstanding notes and that the participant agrees to be bound by the terms of the letter of transmittal.

By using the ATOP procedures to exchange outstanding notes, you will not be required to deliver a letter of transmittal to the exchange agent. However, you will be bound by its terms just as if you had signed it.

There is no procedure for guaranteed late delivery of the notes.

*Determinations Under the Exchange Offer*

We will determine in our sole discretion all questions as to the validity, form, eligibility, time of receipt, acceptance of tendered outstanding notes and withdrawal of tendered outstanding notes. Our determination will be final and binding. We reserve the absolute right to reject any outstanding notes not properly tendered or any outstanding notes our acceptance of which would, in the opinion of our counsel, be unlawful. We also reserve the right to waive any defect, irregularities or conditions of tender as to particular outstanding notes. Our interpretation of the terms and conditions of the exchange offer, including the instructions in the letter of transmittal, will be final and binding on all parties. Unless waived, all defects or irregularities in connection with tenders of outstanding notes must be cured within such time as we shall determine. Although we intend to notify holders of defects or irregularities with respect to tenders of outstanding notes, neither we, the exchange agent nor any other person will incur any liability for failure to give such notification. Tenders of outstanding notes will not be deemed made until such defects or irregularities have been cured or waived. Any outstanding notes received by the exchange agent that are not properly tendered and as to which the defects or irregularities have not been cured or waived will be returned to the tendering holder, unless otherwise provided in the letter of transmittal, promptly following the expiration date.

*When We Will Issue Exchange Notes*

In all cases, we will issue exchange notes for outstanding notes that we have accepted for exchange under the exchange offer only after the exchange agent timely receives:

- a book-entry confirmation of such outstanding notes into the exchange agent's account at DTC; and

- a properly transmitted agent's message.

*Return of Outstanding Notes Not Accepted*

If we do not accept any tendered outstanding notes for exchange, the unaccepted outstanding notes will be returned without expense to their tendering holder. Such non-accepted outstanding notes will be credited to an account maintained with DTC. This action will occur promptly after the expiration or termination of the exchange offer.

221

Confidential

*Your Representations to Us*

By agreeing to be bound by the letter of transmittal, you will represent to us that, among other things:

- any exchange notes that you receive will be acquired in the ordinary course of your business;

- you have no arrangement or understanding with any person or entity to participate in the distribution of the exchange notes;

- you are not engaged in and do not intend to engage in the distribution of the exchange notes;

- if you are a broker-dealer that will receive exchange notes for your own account in exchange for outstanding notes, you acquired those notes as a result of market-making activities or other trading activities and you will deliver a prospectus, as required by law, in connection with any resale of such exchange notes; and

- you are not our "affiliate," as defined in Rule 405 of the Securities Act.

## Withdrawal Rights

Except as otherwise provided in this prospectus, you may withdraw your tender of outstanding notes at any time prior to 11:59 p.m., New York City time, on the expiration date.

For a withdrawal to be effective, you must comply with the appropriate procedures of DTC's ATOP system.

We will determine all questions as to the validity, form and eligibility of withdrawals, and our determination will be final and binding on all parties. Any outstanding notes so withdrawn will be deemed not to have been validly tendered for exchange for purposes of the exchange offer. Any outstanding notes that have been tendered for exchange but that are not exchanged for any reason will be returned to their holder, without cost to the holder, or, in the case of book-entry transfer, the outstanding notes will be credited to an account at the book-entry transfer facility, promptly after withdrawal, rejection of tender or termination of the exchange offer. Properly withdrawn outstanding notes may be retendered by following the procedures described under "— Procedures for Tendering Outstanding Notes" above at any time on or prior to the expiration date.

## Exchange Agent

The Bank of New York Mellon Trust Company, N.A. has been appointed as the exchange agent for the exchange offer. The Bank of New York Mellon Trust Company, N.A. also acts as trustee under the indenture governing the outstanding notes. You should direct all executed letters of transmittal and all questions and requests for assistance and requests for additional copies of this prospectus or of the letter of transmittal to the exchange agent addressed as follows:

| *By Registered or Certified Mail:* | *By Regular Mail:* | *By Overnight Courier or Hand Delivery:* |
|---|---|---|
| The Bank of New York Mellon Trust Company, N.A. c/o The Bank of New York Mellon Corporate Trust Operations Reorganization Unit 480 Washington Boulevard – 27th Floor Jersey City, NJ 07310 Attn: Mrs. Carolle Montreuil | The Bank of New York Mellon Trust Company, N.A. c/o The Bank of New York Mellon Corporate Trust Operations Reorganization Unit 480 Washington Boulevard – 27th Floor Jersey City, NJ 07310 Attn: Mrs. Carolle Montreuil | The Bank of New York Mellon Trust Company, N.A. c/o The Bank of New York Mellon Corporate Trust Operations Reorganization Unit 480 Washington Boulevard – 27th Floor Jersey City, NJ 07310 Attn: Mrs. Carolle Montreuil |

222

Confidential

*By Facsimile Transmission*
*(eligible institutions only):*
*212-298-1915*
*To Confirm by Telephone:*
*212-815-5920*

If you deliver the letter of transmittal to an address other than the one set forth above or transmit instructions via facsimile to a number other than the one set forth above, that delivery or those instructions will not be effective.

**Fees and Expenses**

The registration rights agreement provides that we will bear all expenses in connection with the performance of our obligations relating to the registration of the exchange notes and the conduct of the exchange offer. These expenses include registration and filing fees, accounting and legal fees and printing costs, among others. We will pay the exchange agent reasonable and customary fees for its services and reasonable out-of-pocket expenses. We will also reimburse brokerage houses and other custodians, nominees and fiduciaries for customary mailing and handling expenses incurred by them in forwarding this prospectus and related documents to their clients that are holders of outstanding notes and for handling or tendering for such clients.

We have not retained any dealer-manager in connection with the exchange offer and will not pay any fee or commission to any broker, dealer, nominee or other person, other than the exchange agent, for soliciting tenders of outstanding notes pursuant to the exchange offer.

**Accounting Treatment**

We will record the exchange notes in our accounting records at the same carrying value as the outstanding notes, which is the aggregate principal amount as reflected in our accounting records on the date of exchanges. Accordingly, we will not recognize any gain or loss for accounting purposes upon the consummation of the exchange offer. We will record the expenses of the exchange offer as incurred.

**Transfer Taxes**

We will pay all transfer taxes, if any, applicable to the exchanges of outstanding notes under the exchange offer. The tendering holder, however, will be required to pay any transfer taxes, whether imposed on the registered holder or any other person, if:

- certificates representing outstanding notes for principal amounts not tendered or accepted for exchange are to be delivered to any person other than the registered holder of outstanding notes tendered;

- tendered outstanding notes are registered in the name of any person other than the person signing the letter of transmittal; or

- a transfer tax is imposed for any reason other than the exchange of outstanding notes under the exchange offer.

If satisfactory evidence of payment of such taxes is not submitted with the letter of transmittal, the amount of such transfer taxes will be billed to that tendering holder.

Holders who tender their outstanding notes for exchange will not be required to pay any transfer taxes. However, holders who request that outstanding notes not tendered or not accepted in the exchange offer be returned to, a person other than the registered tendering holder will be required to pay any applicable transfer tax.

223

EFIHMW00223262

**Consequences of Failure to Exchange**

If you do not exchange your outstanding notes for exchange notes under the exchange offer, your outstanding notes will remain subject to the restrictions on transfer of such outstanding notes:

- as set forth in the legend printed on the outstanding notes as a consequence of the issuance of the outstanding notes pursuant to the exemptions from, or in transactions not subject to, the registration requirements of the Securities Act and applicable state securities laws; and

- as otherwise set forth in the prospectus distributed in connection with the private offerings of the outstanding notes.

In general, you may not offer or sell your outstanding notes unless they are registered under the Securities Act or if the offer or sale is exempt from registration under the Securities Act and applicable state securities laws. Except as required by the registration rights agreement, we do not intend to register resales of the outstanding notes under the Securities Act.

**Other**

Participating in the exchange offer is voluntary, and you should carefully consider whether to accept. You are urged to consult your financial and tax advisors in making your own decision on what action to take.

We may in the future seek to acquire untendered outstanding notes in open market or privately negotiated transactions, through subsequent exchange offer or otherwise. We have no present plans to acquire any outstanding notes that are not tendered in the exchange offer or to file a registration statement to permit resales of any untendered outstanding notes.

224

Confidential

## DESCRIPTION OF THE NOTES

**General**

Certain terms used in this description are defined under the subheading "Certain Definitions." In this description, (i) the terms "*we*," "*our*" and "*us*" each refer to Energy Future Holdings Corp. and its consolidated Subsidiaries; and (ii) the term "*Issuer*" refers only to Energy Future Holdings Corp. and not any of its Subsidiaries.

As of the date of this prospectus, the Issuer has issued $1,060,757,000 aggregate principal amount of 10.000% Senior Secured Notes due 2020 (the "*Notes*"). The Notes were issued under an Indenture dated as of January 12, 2010 and supplemental indentures thereto (collectively, the "*Indenture*") among the Issuer, the Guarantors and The Bank of New York Mellon Trust Company, N.A., as trustee (the "*Trustee*"). The Notes were issued in private transactions that were not subject to the registration requirements of the Securities Act. Except as set forth herein, the terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act.

Oncor Electric Delivery Company LLC ("*Oncor Electric Delivery*") has undertaken certain ring-fencing measures to separate itself, its subsidiaries and its immediate parent, Oncor Electric Delivery Holdings Company LLC ("*Oncor Holdings*"), from the Issuer and the Issuer's other Subsidiaries. Those measures include the Oncor Subsidiaries being treated as "Unrestricted Subsidiaries" with respect to the 10.875% Senior Notes due 2017, 11.250%/12.000% Senior Toggle Notes due 2017 and 9.75% Senior Secured Notes due 2019, in each case issued by the Issuer, and with respect to the 9.75% Senior Secured Notes due 2019 and 10.000% Senior Secured Notes due 2020 (the "*EFIH 10.000% Notes*"), in each case issued by Energy Future Intermediate Holding Company LLC ("*EFIH*") and EFIH Finance Inc. In order to comply with these ring-fencing obligations, the Oncor Subsidiaries will also be Unrestricted Subsidiaries with respect to the Notes. As Unrestricted Subsidiaries, the Oncor Subsidiaries are not subject to any of the covenants described herein and do not guarantee the Notes.

The Holders of the Notes, by accepting the Notes, acknowledge (i) the legal separateness of the Issuer and the Guarantors from the Oncor Subsidiaries, (ii) that the lenders under the Oncor Electric Delivery Facility and the holders of Oncor Electric Delivery's existing debt instruments have likely advanced funds thereunder in reliance upon the separateness of the Oncor Subsidiaries from the Issuer and the Guarantors, (iii) that the Oncor Subsidiaries have assets and liabilities that are separate from those of the Issuer and its other Subsidiaries, (iv) that the obligations owing under the Notes are obligations and liabilities of the Issuer and the Guarantors only, and are not the obligations or liabilities of any Oncor Subsidiary, (v) that the Holders of the Notes shall look solely to the Issuer and the Guarantors and their assets, and not to any assets, or to the pledge of any assets, owned by any Oncor Subsidiary, for the repayment of any amounts payable pursuant to the Notes and for satisfaction of any other obligations owing to the Holders under the Indenture, the Registration Rights Agreement and any related documents and (vi) that none of the Oncor Subsidiaries shall be personally liable to the Holders of the Notes for any amounts payable, or any other obligation, under the Indenture, the Registration Rights Agreement or any related documents.

The Holders of the Notes, by accepting the Notes, acknowledge and agree that the Holders of the Notes shall not (i) initiate any legal proceeding to procure the appointment of an administrative receiver or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against any Oncor Subsidiary, or against any of the Oncor Subsidiaries' assets. The Holders further acknowledge and agree that each of the Oncor Subsidiaries is a third party beneficiary of the forgoing covenant and shall have the right to specifically enforce such covenant in any proceeding at law or in equity. The foregoing acknowledgements and agreements are contained in the Indenture.

The following description is only a summary of the material provisions of the Indenture and the Security Documents, does not purport to be complete and is qualified in its entirety by reference to the provisions of the Indenture and the Security Documents, including the definitions therein of certain terms used below. We urge you to read the Indenture and the Security Documents because they, and not this description, define your rights as Holders of the Notes. You may request copies of the Indenture and the Security Documents at our address set forth under the heading "Prospectus Summary."

225

EFIHMW00223264

**PX 045**
**Page 241 of 561**

**Brief Description of Notes and the Guarantees**

The Notes:

- are senior obligations of the Issuer and rank equally in right of payment with all Senior Indebtedness of the Issuer (including the 9.75% Notes and the applicable Existing Notes);

- are effectively subordinated to any Indebtedness of the Issuer secured by assets of the Issuer, to the extent of the value of the assets securing such Indebtedness;

- are structurally subordinated to all Indebtedness and other liabilities of non-guarantor Subsidiaries, including the Oncor Subsidiaries, TCEH and its Subsidiaries, any of the Issuer's Foreign Subsidiaries and any other Unrestricted Subsidiaries;

- are senior in right of payment to any future Subordinated Indebtedness of the Issuer; and

- are initially unconditionally guaranteed, jointly and severally, on a senior unsecured basis by Energy Future Competitive Holdings Company ("*EFCH*") and on a senior secured basis (to the extent of the Collateral) by EFIH, as described below under "— Guarantees."

The Guarantees:

- are a general senior obligation of each Guarantor;

- in the case of the Guarantee from EFIH, are secured, equally and ratably with EFIH's guarantee of the 9.75% Notes, the EFIH Notes and the EFIH 10.000% Notes, by the pledge of any investments EFIH owns in any Oncor Subsidiary (as described below under "— Security for the Notes"), which as of the date of this prospectus consists of all of the membership interests it owns in Oncor Holdings;

- in the case of the Guarantee from EFCH, are not secured;

- rank equally in right of payment with all existing and future Senior Indebtedness of each Guarantor;

- in the case of the Guarantee from EFIH, are effectively senior to all unsecured Indebtedness of EFIH to the extent of the value of the Collateral securing such Guarantee;

- are effectively subordinated to all secured Indebtedness of each Guarantor secured by assets other than the Collateral to the extent of the value of the assets securing such Indebtedness;

- are structurally subordinated to any existing and future indebtedness and liabilities of Subsidiaries of a Guarantor that do not Guarantee the Notes, including the Oncor Subsidiaries in the case of EFIH, and TCEH and its Subsidiaries in the case of EFCH, and any other Unrestricted Subsidiaries;

- are senior in right of payment to any future Subordinated Indebtedness of each Guarantor; and

- are effectively senior to all obligations under any future Junior Lien Debt with respect to the Collateral.

See "Risk Factors — Risks Related to the Notes — The liabilities of each of EFH Corp. and EFCH currently exceed its assets as shown on its most recent quarterly balance sheet. If a court were to find that EFH Corp., EFCH or EFIH were insolvent before or after giving effect to the offering of the notes and did not receive reasonably equivalent value or fair consideration for the issuance of the notes or the incurrence of a guarantee or the pledge of the Collateral, as applicable, the court may void all or a portion of the obligations represented by the notes or the guarantee of the notes by EFCH or EFIH or the pledge of the Collateral by EFIH as a fraudulent conveyance."

226

EFIHMW00223265

## Guarantees

The Guarantors, as primary obligors and not merely as sureties, initially jointly and severally fully and unconditionally guaranteed, on a senior basis, the performance and full and punctual payment when due, whether at maturity, by acceleration or otherwise, of all obligations of the Issuer under the Indenture and the Notes, whether for payment of principal of, premium, if any, or interest or Additional Interest in respect of the Notes, expenses, indemnification or otherwise, on the terms set forth in the Indenture by executing the Indenture.

The Issuer and the Guarantors are holding companies and none of the Issuer's or the Guarantors' other Subsidiaries have guaranteed the Notes. In the event of a bankruptcy, liquidation or reorganization of any of the non-guarantor Subsidiaries, the non-guarantor Subsidiaries will pay the holders of their debt and their trade creditors before they will be able to distribute any of their assets to the Issuer or the Guarantors. None of TCEH, the Subsidiaries of TCEH, or the Oncor Subsidiaries have guaranteed the Notes. For the year ended December 31, 2009 and the nine months ended September 30, 2010, the non-guarantor Subsidiaries generated all of the Issuer's consolidated total revenue. In addition, as of September 30, 2010, the non-guarantor Subsidiaries held substantially all of the Issuer's consolidated total assets.

Any entity that makes a payment under its Guarantee will be entitled upon payment in full of all guaranteed obligations under the Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's pro rata portion of such payment based on the respective net assets of all the Guarantors at the time of such payment determined in accordance with GAAP.

The obligations of each Guarantor under its Guarantee will be limited as necessary to prevent the Guarantee from constituting a fraudulent conveyance under applicable law. However, this limitation may not be effective to prevent a Guarantee from being voided under fraudulent conveyance law, or may reduce or eliminate a Guarantor's obligation to an amount that effectively makes its Guarantee worthless.

If a Guarantee were rendered voidable, it could be subordinated by a court to all other indebtedness (including guarantees and other contingent liabilities) of the Guarantor, and, depending on the amount of such indebtedness, a Guarantor's liability on its Guarantee could be reduced to zero. See "Risk Factors — Risks Related to the Notes — The liabilities of each of EFH Corp. and EFCH currently exceed its assets as shown on its most recent quarterly balance sheet. If a court were to find that EFH Corp., EFCH or EFIH were insolvent before or after giving effect to the offering of the notes and did not receive reasonably equivalent value or fair consideration for the issuance of the notes or the incurrence of a guarantee or the pledge of the Collateral, as applicable, the court may void all or a portion of the obligations represented by the notes or the guarantee of the notes by EFCH or EFIH or the pledge of the Collateral by EFIH as a fraudulent conveyance."

Subject to "— Certain Covenants — Restrictions on Permitted Asset Transfers," each Guarantee by a Guarantor provides by its terms that it will be automatically and unconditionally released and discharged upon:

(1)(a) any sale, exchange or transfer (by merger, wind-up, consolidation or otherwise) of the Capital Stock of such Guarantor (including any sale, exchange or transfer), after which the applicable Guarantor is no longer a Restricted Subsidiary or sale of all or substantially all the assets of such Guarantor, which sale, exchange or transfer is made in compliance with the applicable provisions of the Indenture, except that the Guarantee by EFIH shall only be released and discharged as provided under "— Certain Covenants — Restrictions on Permitted Asset Transfers";

(b) the release or discharge of the guarantee by such Guarantor that resulted in the creation of such Guarantee, except a discharge or release by or as a result of payment under such guarantee;

(c) the designation of any Restricted Subsidiary that is a Guarantor as an Unrestricted Subsidiary in compliance with the applicable provisions of the Indenture; or

(d) the exercise by the Issuer of its legal defeasance option or covenant defeasance option as described under "— Legal Defeasance and Covenant Defeasance" or the discharge of the Issuer's obligations under the Indenture in accordance with the terms of the Indenture; and

227

EFIHMW00223266

(2) such Guarantor delivering to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for in the Indenture relating to such transaction have been complied with.

Further, the Guarantee by EFCH shall automatically be released in connection with a Permitted Asset Transfer made in accordance with "— Certain Covenants — Restrictions on Permitted Asset Transfers" other than a merger, wind-up or consolidation of EFIH into the Issuer where EFCH continues to be a Subsidiary of the Issuer.

**Holding Company Structure**

The Issuer is a holding company for its Subsidiaries, with no material operations of its own and only limited assets. Accordingly, the Issuer is dependent upon the distribution of the earnings of its Subsidiaries, whether in the form of dividends, advances or payments on account of intercompany obligations, to service its debt obligations. Each of the Guarantors is also a holding company for its Subsidiaries. See the risk factor entitled "EFH Corp. is a holding company and its obligations are structurally subordinated to existing and future liabilities and preferred stock of its subsidiaries."

**Paying Agent and Registrar for the Notes**

The Issuer will maintain one or more paying agents for the Notes. As of the date of this prospectus, the paying agent for the Notes is the Trustee at its offices in Houston, Texas.

The Issuer will also maintain a registrar. As of the date of this prospectus, the registrar is the Trustee at its offices in Houston, Texas. The registrar will maintain a register reflecting ownership of the Notes outstanding from time to time and will make payments on and facilitate transfer of Notes on behalf of the Issuer.

The Issuer may change the paying agents or the registrars without prior notice to the Holders. The Issuer or any of its Subsidiaries may act as a paying agent or registrar.

**Transfer and Exchange**

A Holder may transfer or exchange Notes in accordance with the Indenture. The registrar and the Trustee may require a Holder to furnish appropriate endorsements and transfer documents in connection with a transfer of Notes. Holders will be required to pay all taxes due on transfer. The Issuer will not be required to transfer or exchange any Note selected for redemption. Also, the Issuer will not be required to transfer or exchange any Note for a period of 15 days before a selection of Notes to be redeemed.

**Principal, Maturity and Interest**

As of the date of this prospectus, $1,060,757,000 aggregate principal amount of the Notes are outstanding. The Notes will mature on January 15, 2020. Subject to compliance with the covenants described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "— Certain Covenants — Liens," the Issuer may issue additional Notes from time to time after the Issue Date under the Indenture (any such Notes, "*Additional Notes*"). The Notes and any Additional Notes subsequently issued under the Indenture will be treated as a single class for all purposes under the Indenture, including waivers, amendments, redemptions and offers to purchase. Unless the context requires otherwise, references to "Notes" for all purposes of the Indenture and this "Description of the Notes" section include any Additional Notes that are actually issued.

Interest on the Notes will accrue at the rate of 10.000% per annum and will be payable semi-annually in arrears on each January 15 and July 15, commencing on July 15, 2010, to the Holders of record on the immediately preceding January 1 and July 1. Interest on the Notes will accrue from the most recent date to which interest has been paid. Interest on the Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months.

Principal of, premium, if any, and interest on the Notes will be payable at the office or agency of the Issuer maintained for such purpose within the City of Houston and State of Texas or, at the option of the Issuer, payment of interest may be made by check mailed to the Holders of the Notes at their respective addresses set forth in the register of Holders; *provided* that all payments of principal, premium, if any, and interest with respect to the Notes represented by one or more global notes registered in the name of or held by DTC or its nominee will be made by wire transfer of immediately available funds to the accounts specified by the Holder or Holders thereof. Until otherwise designated by the Issuer, the Issuer's office or agency in Houston, Texas will be the office of the Trustee maintained for such purpose.

228

EFIHMW00223267

**Additional Interest**

Additional Interest may accrue on the Notes in certain circumstances pursuant to the Registration Rights Agreement. All references in the Indenture, in any context, to any interest or other amount payable on or with respect to the Notes shall be deemed to include any Additional Interest pursuant to the Registration Rights Agreement.

**Mandatory Redemption; Offers to Purchase; Open Market Purchases**

The Issuer will not be required to make any mandatory redemption or sinking fund payments with respect to the Notes. However, under certain circumstances, the Issuer may be required to offer to purchase Notes as described under "— Repurchase at the Option of Holders." The Issuer may at any time and from time to time purchase Notes in the open market or otherwise.

**Optional Redemption**

Except as set forth below, the Issuer will not be entitled to redeem Notes at its option prior to January 15, 2015.

At any time prior to January 15, 2015, the Issuer may redeem all or a part of the Notes, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Notes or otherwise in accordance with the procedures of DTC, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest and Additional Interest, if any, to, the date of redemption (the "*Redemption Date*"), subject to the rights of Holders of Notes on the relevant record date to receive interest due on the relevant interest payment date.

On and after January 15, 2015, the Issuer may redeem the Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Notes or otherwise in accordance with the procedures of DTC, at the redemption prices (expressed as percentages of principal amount of the Notes to be redeemed) set forth below, plus accrued and unpaid interest and Additional Interest, if any, to the applicable Redemption Date, subject to the right of Holders of Notes of record on the relevant record date to receive interest due on the relevant interest payment date, if redeemed during the twelve-month period beginning on January 15 of each of the years indicated below:

| Year | Percentage |
|------|-----------|
| 2015 | 105.000% |
| 2016 | 103.333% |
| 2017 | 101.667% |
| 2018 and thereafter | 100.000% |

In addition, until January 15, 2013, the Issuer may, at its option, on one or more occasions redeem up to 35% of the aggregate principal amount of Notes at a redemption price equal to 110.000% of the aggregate principal amount thereof, plus accrued and unpaid interest and Additional Interest, if any, to the applicable Redemption Date, subject to the right of Holders of Notes of record on the relevant record date to receive interest due on the relevant interest payment date, with the net cash proceeds of one or more Equity Offerings; *provided* that at least 50% of the sum of the original aggregate principal amount of Notes issued under the Indenture and the original principal amount of any Additional Notes issued under the Indenture after the Issue Date remains outstanding immediately after the occurrence of each such redemption; and *provided, further* that each such redemption occurs within 90 days of the date of closing of each such Equity Offering.

229

Any notice of any redemption may be given prior to the redemption thereof, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of an Equity Offering or other corporate transaction.

If the Issuer redeems less than all of the outstanding Notes, the Trustee shall select the Notes to be redeemed in the manner described under "— Repurchase at the Option of Holders — Selection and Notice."

**Security for the Notes**

*Collateral Trustee*

EFIH has appointed The Bank of New York Mellon Trust Company, N.A. to serve as the collateral trustee (the "*Collateral Trustee*") for the benefit of the holders of the Secured Debt Obligations outstanding from time to time.

The Security Documents provide that the Collateral Trustee will be subject to such directions as may be given it by the Trustee and by any other Parity Lien Debt Representatives from time to time as required or permitted by the Indenture and the other Parity Lien Debt Documents. The relative rights with respect to control of the Collateral Trustee are specified in the collateral trust agreement dated as of November 16, 2009 by and among EFIH, the trustees for the 9.75% Notes and the EFIH Notes, any other Parity Lien Debt Representatives, any Junior Lien Debt Representatives and the Collateral Trustee (the "*Collateral Trust Agreement*"). The Collateral Trustee and the Trustee for the benefit of the Holders of the Notes have entered into a Joinder to the Collateral Trust Agreement, and the Notes have been designated as "Parity Lien Debt" by EFIH. Except as provided in the Collateral Trust Agreement or as directed by an Act of Required Debtholders, the Collateral Trustee will not be obligated:

      (1) to act upon directions purported to be delivered to it by any other Person;

      (2) to foreclose upon or otherwise enforce any Lien; or

      (3) to take any other action whatsoever with regard to any or all of the Security Documents, the Liens created thereby or the Collateral.

*Collateral*

The Indenture and the Security Documents provide that the Guarantee of the Notes by EFIH, together with any other Parity Lien Debt (which as of the date of this prospectus includes EFIH's guarantee of the 9.75% Notes, the EFIH Notes and the EFIH 10.000% Notes), are secured on an equal and ratable basis by first-priority security interests granted to the Collateral Trustee, in all of the following property of EFIH:

      (1) any Equity Interests it owned as of the Issue Date or may thereafter acquire in any Oncor Subsidiary and any promissory notes or other Indebtedness owed by, or other Investments in, any Oncor Subsidiary that it owned as of the Issue Date or it may thereafter acquire;

      (2) all proceeds of, income and other payments (including, without limitation, dividends and distributions received) now or hereafter due and payable with respect to, and supporting obligations relating to, any and all of the foregoing, which, in the case of cash dividends and distributions received by EFIH from Oncor Holdings may be used by EFIH for any purpose not prohibited by the Indenture so long as no Event of Default and no event of default under any other Parity Lien Debt, including the 9.75% Notes, the EFIH Notes and the EFIH 10.000% Notes, shall have occurred and be continuing; and

      (3) any Asset Sale Cash Collateral Account established pursuant to the Indenture, the 9.75% Notes Indenture or the EFIH Indenture.

230