(a) in exchange for any other Investment or accounts receivable held by the Issuer or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable; or

(b) as a result of a foreclosure by the Issuer or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7) Hedging Obligations permitted under clause (10) of the second paragraph of the covenant described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(8) any Investment in a Similar Business having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (8) that are at that time outstanding, not to exceed 3.5% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(9) Investments the payment for which consists of Equity Interests (exclusive of Disqualified Stock) of the Issuer or any of its direct or indirect parent companies; *provided, however,* that such Equity Interests will not increase the amount available for Restricted Payments under clause (3) of the first paragraph under the covenant described under "— Certain Covenants — Limitations on Restricted Payments";

(10) guarantees of Indebtedness of the Issuer or any of its Restricted Subsidiaries permitted under the covenant described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(11) any transaction to the extent it constitutes an Investment that is permitted and made in accordance with the provisions of the second paragraph of the covenant described under "— Certain Covenants —Transactions with Affiliates" (except transactions described in clauses (2), (5) and (9) of such paragraph);

(12) Investments consisting of purchases and acquisitions of inventory, fuel (including all forms of nuclear fuel), supplies, material or equipment;

(13) additional Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (13) that are at that time outstanding (without giving effect to the sale of an Investment to the extent the proceeds of such sale do not consist of cash or marketable securities), not to exceed 3.5% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(14) Investments relating to a Receivables Subsidiary that, in the good faith determination of the Issuer, are necessary or advisable to effect any Receivables Facility for the benefit of the Issuer or any of its Restricted Subsidiaries;

(15) advances to, or guarantees of Indebtedness of, employees not in excess of $25.0 million outstanding at any one time, in the aggregate;

(16) loans and advances to officers, directors and employees for business-related travel expenses, moving expenses and other similar expenses, in each case incurred in the ordinary course of business or consistent with past practices or to fund such Person's purchase of Equity Interests of the Issuer or any direct or indirect parent company thereof;

(17) any Investment in any Subsidiary or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business;

300

EFIHMW00223339

(18) any Investment in Shell Wind or in other wind or other renewable energy projects or in any nuclear power or energy joint venture in an aggregate amount not to exceed $1,500.0 million at any time outstanding;

(19) one or more letters of credit in an aggregate amount not to exceed $170.0 million posted by a Restricted Subsidiary in favor of an Oncor Subsidiary to secure that Restricted Subsidiary's contractual obligations to that Oncor Subsidiary; and

(20) Investments in any nuclear power or energy joint venture in an aggregate amount not to exceed $200.0 million prior to receiving the requisite combined construction and operating license from the U.S. Nuclear Regulatory Commission in respect thereof.

"*Permitted Liens*" means, with respect to any Person:

(1) pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business (including in connection with the construction or restoration of facilities for the generation, transmission or distribution of electricity) or otherwise constituting Permitted Investments;

(2) Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet overdue for a period of more than 30 days or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(3) Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than 30 days or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(4) Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5) minor survey or title exceptions or irregularities, minor encumbrances, easements or reservations of, or rights of others for, licenses, permits, conditions, covenants, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6) Liens securing Indebtedness permitted to be incurred pursuant to clause (4), (12) or (13) of the second paragraph under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that (a) Liens securing Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (13) relate only to Refinancing Indebtedness that serves to refund or refinance Indebtedness, Disqualified Stock or Preferred Stock incurred under clause (4) or (12) of the second paragraph under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," and (b) Liens securing Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (4) of the second paragraph under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" extend only to the assets so financed, purchased, constructed or improved;

301

Confidential

EFIHMW00223340

(7) Liens existing on the Issue Date (other than Liens in favor of the lenders under the TCEH Senior Secured Facilities);

(8) Liens on property or shares of stock of a Person at the time such Person becomes a Subsidiary; *provided, however,* such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; *provided, further, however,* that such Liens may not extend to any other property owned by the Issuer or any of its Restricted Subsidiaries;

(9) Liens on property at the time the Issuer or a Restricted Subsidiary acquired the property, including any acquisition by means of a merger or consolidation with or into the Issuer or any of its Restricted Subsidiaries; *provided, however,* that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition; *provided, further, however,* that the Liens may not extend to any other property owned by the Issuer or any of its Restricted Subsidiaries;

(10) Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Issuer or another Restricted Subsidiary permitted to be incurred in accordance with the covenant described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(11) Liens securing Hedging Obligations, of the Issuer or its Restricted Subsidiaries incurred under clause (10) of the second paragraph under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that such agreements were entered into in the ordinary course of business and not for speculative purposes (as determined by the Issuer in its reasonable discretion acting in good faith) and, in the case of any commodity Hedging Obligations or any Hedging Obligation of the type described in clause (c) of the definition of "Hedging Obligations," entered into in order to hedge against or manage fluctuations in the price or availability of any Covered Commodity;

(12) Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(13) leases, subleases, licenses or sublicenses granted to others in the ordinary course of business which do not materially interfere with the ordinary conduct of the business of the Issuer or any of its Restricted Subsidiaries;

(14) Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Issuer and its Restricted Subsidiaries in the ordinary course of business;

(15) Liens in favor of the Issuer or any Guarantor;

(16) [Intentionally omitted];

(17) Liens on accounts receivable, other Receivables Facility assets, or accounts into which collections or proceeds of Receivables Facility assets are deposited, in each case in connection with a Receivables Facility for the benefit of the Issuer or its Restricted Subsidiaries;

(18) Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8) and (9); *provided, however,* that (a) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property), and (b) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), and (9) at the time the original Lien became a Permitted Lien under the Indenture, and (ii) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement;

(19) deposits made in the ordinary course of business to secure liability to insurance carriers;

Confidential

EFIHMW00223341

(20) other Liens securing obligations incurred in the ordinary course of business which obligations do not exceed $100.0 million at any one time outstanding;

(21) Liens securing judgments for the payment of money not constituting an Event of Default under clause (5) under "— Events of Default and Remedies" so long as such Liens are adequately bonded and any appropriate legal proceedings that may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(22) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(23) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code, or any comparable or successor provision, on items in the course of collection, and (ii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(24) Liens deemed to exist in connection with Investments in repurchase agreements permitted by the covenant described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreements;

(25) ground leases or subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by the Issuer or any of its Subsidiaries are located;

(26) Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Issuer or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Issuer and its Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Issuer or any of its Restricted Subsidiaries in the ordinary course of business;

(27) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of goods entered into by the Issuer or any Restricted Subsidiary in the ordinary course of business;

(28) rights reserved to or vested in others to take or receive any part of, or royalties related to, the power, gas, oil, coal, lignite or other minerals or timber generated, developed, manufactured or produced by, or grown on, or acquired with, any property of the Issuer or any of its Restricted Subsidiaries and Liens upon the production from property of power, gas, oil, coal, lignite or other minerals or timber, and the by-products and proceeds thereof, to secure the obligations to pay all or a part of the expenses of exploration, drilling, mining or development of such property only out of such production or proceeds;

(29) Liens arising out of all presently existing and future division and transfer orders, advance payment agreements, processing contracts, gas processing plant agreements, operating agreements, gas balancing or deferred production agreements, pooling, unitization or communitization agreements, pipeline, gathering or transportation agreements, platform agreements, drilling contracts, injection or repressuring agreements, cycling agreements, construction agreements, salt water or other disposal agreements, leases or rental agreements, farm-out and farm-in agreements, exploration and development agreements, and any and all other contracts or agreements covering, arising out of, used or useful in connection with or pertaining to the exploration, development, operation, production, sale, use, purchase, exchange, storage, separation, dehydration, treatment, compression, gathering, transportation, processing, improvement, marketing, disposal or handling of any property of the Issuer or any of its Restricted Subsidiaries, *provided* that such agreements are entered into in the ordinary course of business (including in respect of construction and restoration activities);

(30) any restrictions on any stock or stock equivalents or other joint venture interests of the Issuer or any of its Restricted Subsidiaries providing for a breach, termination or default under any owners, participation, shared facility, joint venture, stockholder, membership, limited liability company or partnership agreement between such Person and one or more other holders of such stock or stock equivalents or interest of such Person, if a security interest or other Lien is created on such stock or stock equivalents or interest as a result thereof and other similar Liens;

303

EFIHMW00223342

(31) [Intentionally omitted];

(32) Liens and other exceptions to title, in either case on or in respect of any facilities of the Issuer or any of its Restricted Subsidiaries, arising as a result of any shared facility agreement entered into with respect to such facility, except to the extent that any such Liens or exceptions, individually or in the aggregate, materially adversely affect the value of the relevant property or materially impair the use of the relevant property in the operation of business of the Issuer or any of its Restricted Subsidiaries, taken as a whole;

(33) Liens on cash and Cash Equivalents (i) deposited by the Issuer or any of its Restricted Subsidiaries in margin accounts with or on behalf of brokers, credit clearing organizations, independent system operators, regional transmission organizations, pipelines, state agencies, federal agencies, futures contract brokers, customers, trading counterparties, or any other parties or issuers of surety bonds or (ii) pledged or deposited as collateral by the Issuer or any of its Restricted Subsidiaries with any of the entities described in clause (i) above to secure their respective obligations, in the case of each of clauses (i) and (ii) above, with respect to: (A) any contracts and transactions for the purchase, sale, exchange of, or the option (whether physical or financial) to purchase, sell or exchange (1) natural gas, (2) electricity, (3) coal and lignite, (4) petroleum-based liquids, (5) oil, (6) nuclear fuel (including enrichment and conversion), (7) emissions or other environmental credits, (8) waste byproducts, (9) weather, (10) power and other generation capacity, (11) heat rate, (12) congestion, (13) renewal energy credit, or (14) any other energy-related commodity or services or derivative (including ancillary services and related risk (such as location basis)); (B) any contracts or transactions for the purchase, processing, transmission, transportation, distribution, sale, lease, hedge or storage of, or any other services related to any commodity or service identified in subparts (1) through (14) above, including any capacity agreement; (C) any financial derivative agreement (including but not limited to swaps, options or swaptions) related to any commodity identified in subparts (1) through (14) above, or to any interest rate or currency rate management activities; (D) any agreement for membership or participation in an organization that facilitates or permits the entering into or clearing of any netting agreement or any agreement described in this clause (33); (E) any agreement combining part or all of a netting agreement or part or all of any of the agreements described in this clause (33); (E) any document relating to any agreement described in this clause (33) that is filed with a Government Authority and any related service agreements; or (F) any commercial or trading agreements, each with respect to, or involving the purchase, transmission, distribution, sale, lease or hedge of, any energy, generation capacity or fuel, or any other energy related commodity or service, price or price indices for any such commodities or services or any other similar derivative agreements, and any other similar agreements (such agreements described in clauses (A) through (F) of this clause (33) being collectively, "*Permitted Contracts*"), Netting Agreements, Hedging Obligations and letters of credit supporting Permitted Contracts, Netting Agreements and Hedging Obligations;

(34) Liens arising under Section 9.343 of the Texas Uniform Commercial Code or similar statutes of states other than Texas;

(35) Liens created in the ordinary course of business in favor of banks and other financial institutions over credit balances of any bank accounts of the Issuer and its Subsidiaries held at such banks or financial institutions, as the case may be, to facilitate the operation of cash pooling and/or interest set-off arrangements in respect of such bank accounts in the ordinary course of business;

(36) any zoning, land use, environmental or similar law or right reserved to or vested in any Government Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Issuer or any of its Restricted Subsidiaries, taken as a whole;

304

EFIHMW00223343

(37) any Lien arising by reason of deposits with or giving of any form of security to any Government Authority for any purpose at any time as required by applicable law as a condition to the transaction of any business or the exercise of any privilege or license, or to enable the Issuer or any of its Restricted Subsidiaries to maintain self-insurance or to participate in any fund for liability on any insurance risks;

(38) Liens, restrictions, regulations, easements, exceptions or reservations of any Government Authority applying particularly to nuclear fuel;

(39) rights reserved to or vested in any Government Authority by the terms of any right, power, franchise, grant, license or permit, or by any provision of applicable law, to terminate or modify such right, power, franchise, grant, license or permit or to purchase or recapture or to designate a purchaser of any of the property of such person;

(40) Liens arising under any obligations or duties affecting any of the property of the Issuer or any of its Restricted Subsidiaries to any Government Authority with respect to any franchise, grant, license or permit which do not materially impair the use of such property for the purposes for which it is held;

(41) rights reserved to or vested in any Government Authority to use, control or regulate any property of such person;

(42) any obligations or duties, affecting the property of the Issuer or any of its Restricted Subsidiaries, to any Government Authority with respect to any franchise, grant, license or permit;

(43) a set-off or netting rights granted by the Issuer or any Subsidiary of the Issuer pursuant to any agreements related to Hedging Obligations, Netting Agreements or Permitted Contracts solely in respect of amounts owing under such agreements;

(44) Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment described under the definition of "Permitted Investments" to be applied against the purchase price for such Investment and (ii) consisting of an agreement to sell, transfer, lease or otherwise dispose of any property in a transaction excluded from the definition described under "Asset Sale," in each case, solely to the extent such Investment or sale, disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien;

(45) rights of first refusal and purchase options in favor of Aluminum Company of America ("*Alcoa*") to purchase Sandow Unit 4 and/or the real property related thereto, as described in (i) the Sandow Unit 4 Agreement dated August 13, 1976, as amended, between Alcoa and Texas Power & Light Company ("*TPL*") and (ii) Deeds dated March 14, 1978 and July 21, 1980, as amended, executed by Alcoa conveying to TPL the Sandow Four real property; and

(46) any amounts held by a trustee in the funds and accounts under any indenture securing any revenue bonds issued for the benefit of the Issuer or any of its Restricted Subsidiaries.

For purposes of this definition, the term "Indebtedness" shall be deemed to include interest on such Indebtedness.

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"*Preferred Stock*" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"*Purchase Money Obligations*" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction, repair, restoration, replacement, expansion or improvement of property (real or personal) or assets (other than Capital Stock), and whether acquired through the direct acquisition of such property or assets, or otherwise, incurred in respect of capital expenditures, including Environmental CapEx Debt and Necessary CapEx Debt.

305

EFIHMW00223344

"*Qualified Proceeds*" means assets that are used or useful in, or Capital Stock of any Person engaged in, a Similar Business; *provided* that the fair market value of any such assets or Capital Stock shall be determined by the Issuer in good faith.

"*Rating Agencies*" means each of Moody's, S&P and Fitch, or if any of Moody's, S&P or Fitch shall not make a rating on the Notes or other investment publicly available, a "nationally recognized statistical rating organization" within the meaning of Rule 15c3-1(c)(2)(vi)(F) under the Exchange Act selected by the Issuer which shall be substituted for Moody's, S&P or Fitch, or all of them, as the case may be.

"*Receivables Facility*" means any of one or more receivables financing facilities or programs as amended, supplemented, modified, extended, renewed, restated or refunded from time to time, the Obligations of which are non-recourse (except for customary representations, warranties, covenants and indemnities made in connection with such facilities) to the Issuer or any of its Restricted Subsidiaries (other than a Receivables Subsidiary) pursuant to which the Issuer or any of its Restricted Subsidiaries purports to sell its accounts receivable to either (a) a Person that is not a Restricted Subsidiary or (b) a Receivables Subsidiary that in turn funds such purchase by purporting to sell its accounts receivable to a Person that is not a Restricted Subsidiary or by borrowing from such a Person or from another Receivables Subsidiary that in turn funds itself by borrowing from such a Person.

"*Receivables Fees*" means distributions or payments made directly or by means of discounts with respect to any accounts receivable or participation interest therein issued or sold in connection with, and other fees paid to a Person that is not a Restricted Subsidiary in connection with any Receivables Facility.

"*Receivables Subsidiary*" means any Subsidiary formed for the purpose of facilitating or entering into one or more Receivables Facilities, and in each case engages only in activities reasonably related or incidental thereto.

"*Redemption Date*" has the meaning set forth under "Optional Redemption."

"*Registration Rights Agreement*" means (1) the Registration Rights Agreement related to the Notes, dated as of the Issue Date, among the Issuer, the Guarantors and the initial purchasers of the Notes issued on the Issue Date, and (2) with respect to any Additional Notes, any registration rights agreement among the Issuer and the other parties thereto relating to the registration by the Issuer of such Additional Notes under the Securities Act.

"*Related Business Assets*" means (A) except in the case of a Permitted Asset Swap of Collateral, assets (other than cash or Cash Equivalents) used or useful in, or securities of, a Similar Business; *provided* that any assets or securities received by the Issuer or a Restricted Subsidiary in exchange for assets or securities transferred by the Issuer or a Restricted Subsidiary will not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Restricted Subsidiary and (B) in the case of a Permitted Asset Swap of Collateral, assets (other than cash or Cash Equivalents) used or useful in, or Capital Stock of, a Similar Oncor Business; *provided* that any Capital Stock received by EFIH in exchange for Collateral will not be deemed to be Related Business Assets, unless upon receipt of the Capital Stock of such Person, such Person would become a Subsidiary of EFIH or a joint venture in which EFIH has a significant equity interest (as determined by the Issuer in good faith).

"*Required Junior Lien Debtholders*" means, at any time, the holders of a majority in aggregate principal amount of all Junior Lien Debt (including outstanding letters of credit whether or not then available or drawn) then outstanding and the aggregate unfunded commitments to extend credit which, when funded, would constitute Junior Lien Debt, calculated in accordance with the provisions described under "— Security for the Notes — Voting." For purposes of this definition, Junior Lien Debt registered in the name of, or beneficially owned by, the Issuer or any Affiliate of the Issuer will be deemed not to be outstanding.

"*Required Parity Lien Debtholders*" means, at any time, the holders of a majority in aggregate principal amount of all Parity Lien Debt (including outstanding letters of credit whether or not then available or drawn) then outstanding and the aggregate unfunded commitments to extend credit which, when funded, would constitute Parity Lien Debt, calculated in accordance with the provisions described under "— Security for the Notes — Voting." For purposes of this definition, Parity Lien Debt registered in the name of, or beneficially owned by, the Issuer or any Affiliate of the Issuer will be deemed not to be outstanding.

306

EFIHMW00223345

"*Restoration Certificate*" shall mean, with respect to any Casualty Event, an Officer's Certificate provided to the Trustee prior to the 365th day after such Casualty Event has occurred certifying (a) that the Issuer or such Restricted Subsidiary intends to use the proceeds received in connection with such Casualty Event to repair, restore or replace the property or assets in respect of which such Casualty Event occurred, (b) the approximate costs of completion of such repair, restoration or replacement and (c) that such repair, restoration or replacement will be completed within the later of (x) 450 days after the date on which cash proceeds with respect to such Casualty Event were received and (y) 180 days after delivery of such Restoration Certificate.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Payment Coverage Ratio*" means (i) for Restricted Payments (other than payments of cash dividends or distributions on, or in respect of, the Issuer's Capital Stock, purchases for cash or other acquisitions for cash of any Capital Stock of the Issuer or any direct or indirect parent of the Issuer for the purpose of paying any such dividend or distribution to, or acquisitions of Capital Stock of any direct or indirect parent of the Issuer for cash from, the Investors, or guaranteeing any Indebtedness of any Affiliate of the Issuer for the purpose of paying such dividend, making such distribution or so acquiring such Capital Stock to or from the Investors, all such Restricted Payments being referred to as "*Investor Payments*"), the Fixed Charge Coverage Ratio of the Issuer and its Restricted Subsidiaries treating the Oncor Subsidiaries as Restricted Subsidiaries for purposes of such calculation and (ii) for Restricted Payments constituting Investor Payments, the Fixed Charge Coverage Ratio of the Issuer and its Restricted Subsidiaries.

"*Restricted Subsidiary*" means, at any time, any direct or indirect Subsidiary of the Issuer (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; *provided, however*, that upon an Unrestricted Subsidiary's ceasing to be an Unrestricted Subsidiary, such Subsidiary shall be included in the definition of "Restricted Subsidiary."

"*S&P*" means Standard & Poor's, a Standard & Poor's Financial Services LLC business, and any successor to its rating agency business.

"*Sale and Lease-Back Transaction*" means any arrangement providing for the leasing by the Issuer or any of its Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by the Issuer or such Restricted Subsidiary to a third Person in contemplation of such leasing.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Secured Debt Documents*" means the Parity Lien Documents and the Junior Lien Documents.

"*Secured Debt Obligations*" means Parity Lien Obligations and Junior Lien Obligations.

"*Secured Notes Issue Date*" means November 16, 2009.

"*Secured Indebtedness*" means any Indebtedness of the Issuer or any of its Restricted Subsidiaries secured by a Lien.

"*Secured Lien Debt*" means Parity Lien Debt and Junior Lien Debt.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Security Documents*" means the Collateral Trust Agreement, the Pledge Agreement, and all other security agreements, pledge agreements, collateral assignments, mortgages, collateral agency agreements, deed of trust or other grants or transfers for security executed and delivered by the Issuer, a Guarantor or any other obligor under the Notes creating (or purporting to create) a Lien upon Collateral in favor of the Collateral Trustee for the benefit of the holders of the Secured Debt Obligations, in each case, as amended, modified, renewed, restated or replaced, in whole or in part, from time to time, in accordance with its terms.

307

EFIHMW00223346

"*Senior Indebtedness*" means:

(1) all Indebtedness of the Issuer or any Guarantor outstanding under the TCEH Senior Secured Facilities, the TCEH Notes and related guarantees, the 9.75% Notes and the related guarantees, the EFIH Notes and related guarantees, or the Notes and related Guarantees (including interest accruing on or after the filing of any petition in bankruptcy or similar proceeding or for reorganization of the Issuer or any Guarantor (at the rate provided for in the documentation with respect thereto, regardless of whether or not a claim for post-filing interest is allowed in such proceedings)), and any and all other fees, expense reimbursement obligations, indemnification amounts, penalties, and other amounts (whether existing on the Issue Date or thereafter created or incurred) and all obligations of the Issuer or any Guarantor to reimburse any bank or other Person in respect of amounts paid under letters of credit, acceptances or other similar instruments;

(2) all Hedging Obligations (and guarantees thereof) owing to a Lender (as defined in the TCEH Senior Secured Facilities) or any Affiliate of such Lender (or any Person that was a Lender or an Affiliate of such Lender at the time the applicable agreement giving rise to such Hedging Obligation was entered into); *provided* that such Hedging Obligations are permitted to be incurred under the terms of the Indenture;

(3) any other Indebtedness of the Issuer or any Guarantor permitted to be incurred under the terms of the Indenture, unless the instrument under which such Indebtedness is incurred expressly provides that it is subordinated in right of payment to the Notes or any related Guarantee; and

(4) all Obligations with respect to the items listed in the preceding clauses (1), (2) and (3);

*provided, however,* that Senior Indebtedness shall not include:

(a) any obligation of such Person to the Issuer or any of its Subsidiaries;

(b) any liability for federal, state, local or other taxes owed or owing by such Person;

(c) any accounts payable or other liability to trade creditors arising in the ordinary course of business;

(d) any Indebtedness or other Obligation of such Person which is subordinate or junior in any respect to any other Indebtedness or other Obligation of such Person;

(e) that portion of any Indebtedness which at the time of incurrence is incurred in violation of the Indenture;

(f) EFCH Floating Rate Junior Subordinated Debentures, Series D due 2037; or

(g) EFCH 8.175% Fixed Junior Subordinated Debentures, Series E due 2037.

"*Series of Junior Lien Debt*" means, severally, each issue or series of Junior Lien Debt for which a single transfer register is maintained (*provided* that any Hedging Obligations constituting Junior Lien Debt shall be deemed part of the Series of Junior Lien Debt to which it relates).

"*Series of Parity Lien Debt*" means, severally, the Notes, the 9.75% Notes, the EFIH Notes and any Additional Notes or Exchange Notes or other Indebtedness that constitutes Parity Lien Debt (*provided* that any Hedging Obligations constituting Parity Lien Debt shall be deemed part of the Series of Parity Lien Debt to which it relates).

"*Series of Secured Lien Debt*" means each Series of Parity Lien Debt and each Series of Junior Lien Debt.

308

Confidential

"*Shell Wind*" means a joint venture with Shell WindEnergy Inc. (or a similar entity) in which the Issuer and its Restricted Subsidiaries have up to a 50% ownership interest relating to the joint development of a 3,000 megawatt wind project in Texas and other renewable energy projects in Texas.

"*Significant Subsidiary*" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such regulation is in effect on the Closing Date.

"*Similar Business*" means any business conducted or proposed to be conducted by the Issuer and its Subsidiaries on the Closing Date or any business that is similar, reasonably related, incidental or ancillary thereto.

"*Similar Oncor Business*" means any business which is primarily engaged in a regulated electricity or other energy transmission or distribution business in the United States (as determined by the Issuer in good faith).

"*Sponsor Management Agreement*" means the management agreement between certain of the management companies associated with the Investors and the Issuer.

"*Subordinated Indebtedness*" means,

(1) any Indebtedness of the Issuer which is by its terms subordinated in right of payment to the Notes, and

(2) any Indebtedness of any Guarantor which is by its terms subordinated in right of payment to the Guarantee of such entity of the Notes.

"*Subsidiary*" means, with respect to any Person:

(1) any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; and

(2) any partnership, joint venture, limited liability company or similar entity of which

(x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise, and

(y) such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"*Successor Oncor Business*" means any Person the Capital Stock of which is received by EFIH in an Asset Sale, including a Permitted Asset Swap, of Collateral or as a dividend or distribution from an Oncor Subsidiary.

"*TCEH*" means Texas Competitive Electric Holdings Company LLC.

"*TCEH Notes*" means the 10.25% Senior Notes due 2015, the 10.25% Senior Notes due 2015, Series B and the 10.50%/11.25% Senior Toggle Notes due 2016, in each case issued by TCEH and TCEH Finance, Inc., including the guarantees thereof and PIK interest which has been or may be paid with respect thereto.

"*TCEH Senior Interim Facility*" means the interim loan agreement, dated as of the Closing Date by and among EFCH, as guarantor, TCEH, as borrower, the other guarantors parties thereto, the lenders party thereto in their capacities as lenders thereunder and Morgan Stanley Senior Funding, Inc., as Administrative Agent, including any guarantees, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications or restatements thereof.

309

EFIHMW00223348

"*TCEH Senior Secured Facilities*" means the credit agreement dated as of the Closing Date, as amended on August 7, 2009, by and among EFCH, as guarantor, TCEH, as borrower, the lenders party thereto in their capacities as lenders thereunder and Citibank, N.A., as Administrative Agent, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any additional amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" above).

"*TCEH Transfer*" means the sale, transfer, disposition or spin-off (including by way of merger, wind-up or consolidation) of (a) the membership interests or other common Equity Interests of EFCH, TCEH or another Restricted Subsidiary that holds all or substantially all of the assets of TCEH and its Subsidiaries such that EFCH, TCEH or such Restricted Subsidiary ceases to be a Subsidiary of the Issuer or (b) all or substantially all of the assets of TCEH and its Subsidiaries, in each case other than any such transfer to a Restricted Subsidiary of the Issuer.

"*Total Assets*" means the total assets of the Issuer and its Restricted Subsidiaries on a consolidated basis, as shown on the most recent consolidated balance sheet of the Issuer or such other Person as may be expressly stated.

"*Transactions*" means the transactions contemplated by the Transaction Agreement, borrowings under the TCEH Senior Secured Facilities, the EFH Senior Interim Facility, the TCEH Senior Interim Facility, the Oncor Electric Delivery Facility and any Receivables Facility as in effect on the Closing Date, any repayments of indebtedness of the Issuer and its Restricted Subsidiaries in connection therewith, and the issuance of the 10.875% Senior Notes due 2017, 11.250%/12.000% Senior Toggle Notes due 2017, the TCEH Notes and any repayments of Indebtedness of the Issuer and its Restricted Subsidiaries in connection therewith.

"*Transaction Agreement*" means the Agreement and Plan of Merger, dated as of February 25, 2007, among Merger Sub, Texas Energy Future Holdings Limited Partnership and the Issuer.

"*Treasury Rate*" means, as of any Redemption Date, the yield to maturity as of such Redemption Date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the Redemption Date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the Redemption Date to January 15, 2015; *provided, however*, that if the period from the Redemption Date to January 15, 2015 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"*Trust Indenture Act*" means the Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa-77bbbb).

"*Unit*" shall mean an individual power plant generation system comprised of all necessary physically connected generators, reactors, boilers, combustion turbines and other prime movers operated together to independently generate electricity.

"*Unrestricted Cash*" means, as of any date, without duplication, (a) all cash and Cash Equivalents (in each case, free and clear of all Liens, other than nonconsensual Liens permitted by the covenant described under "— Certain Covenants — Liens" and Liens permitted by clause (23), subclauses (i) and (ii) of clause (26) and clause (33) of the definition of Permitted Liens, included in the cash and cash equivalents accounts listed on the consolidated balance sheet of the Issuer and its Restricted Subsidiaries as of such date and (b) all unrestricted margin deposits related to commodity positions listed on the consolidated balance sheet of Issuer and the Restricted Subsidiaries.

310

EFIHMW00223349

"*Unrestricted Subsidiary*" means:

(1) each of the Oncor Subsidiaries, Comanche Peak Nuclear Power Company, Nuclear Energy Future Holdings LLC and Nuclear Energy Future Holdings II LLC;

(2) any Subsidiary of the Issuer other than EFIH or any other Guarantor owning Collateral which at the time of determination is an Unrestricted Subsidiary (as designated by the Issuer, as provided below); and

(3) any Subsidiary of an Unrestricted Subsidiary.

The Issuer may designate any Subsidiary of the Issuer (including any existing Subsidiary and any newly acquired or newly formed Subsidiary) other than EFIH or any other Guarantor owning Collateral to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on, any property of, the Issuer or any Subsidiary of the Issuer (other than solely any Subsidiary of the Subsidiary to be so designated); *provided* that

(1) any Unrestricted Subsidiary must be an entity of which the Equity Interests entitled to cast at least a majority of the votes that may be cast by all Equity Interests having ordinary voting power for the election of directors or Persons performing a similar function are owned, directly or indirectly, by the Issuer;

(2) such designation complies with the covenants described under "— Certain Covenants — Limitation on Restricted Payments"; and

(3) each of:

(a) the Subsidiary to be so designated; and

(b) its Subsidiaries

has not at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness pursuant to which the lender has recourse to any of the assets of the Issuer or any Restricted Subsidiary.

The Issuer may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that, immediately after giving effect to such designation, no Default shall have occurred and be continuing and either:

(1) in the case of any Subsidiary of the Issuer other than TCEH and its Subsidiaries, (A) the Issuer could incur at least $1.00 of additional Indebtedness pursuant to clause (i) of the Fixed Charge Coverage Ratio test described in the first paragraph under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; or (B) the Fixed Charge Coverage Ratio for the Issuer and its Restricted Subsidiaries would be greater than such ratio for the Issuer and its Restricted Subsidiaries immediately prior to such designation, in each case on a *pro forma* basis taking into account such designation; or

(2) in the case of TCEH and any of its Subsidiaries, (A) TCEH could incur at least $1.00 of additional Indebtedness pursuant to clause (ii) of such Fixed Charge Coverage Ratio test or (B) such Fixed Charge Coverage Ratio for TCEH and its Restricted Subsidiaries would be greater than such ratio for TCEH and its Restricted Subsidiaries immediately prior to such designation, in each case on a pro forma basis taking into account such designation.

Any such designation by the Issuer shall be notified by the Issuer to the Trustee by promptly filing with the Trustee a copy of the resolution of the board of directors of the Issuer or any committee thereof giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing provisions.

311

Confidential

"*Voting Stock*" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing:

(1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment; by

(2) the sum of all such payments.

"*Wholly-Owned Subsidiary*" of any Person means a Subsidiary of such Person, 100% of the outstanding, Equity Interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

312

Confidential

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

**Federal Income Tax Considerations of the Exchange of Outstanding Notes for Exchange Notes**

The following discussion is a summary of certain federal income tax considerations relevant to the exchange of outstanding notes for exchange notes, but does not purport to be a complete analysis of all potential tax effects. This discussion is based upon the provisions of the Internal Revenue Code of 1986, as amended (the "Code"), applicable Treasury Regulations promulgated and proposed thereunder, judicial authority and administrative interpretations, as of the date hereof, all of which are subject to change, possibly with retroactive effect, or are subject to different interpretations. This discussion does not address the tax considerations arising under the laws of any foreign, state, local, or other jurisdiction.

We believe that the exchange of outstanding notes for exchange notes should not be an exchange or otherwise a taxable event to a holder for United States federal income tax purposes. Accordingly, a holder should not recognize gain or loss upon receipt of exchange notes, and a holder should have the same adjusted issue price, adjusted basis and holding period in the exchange notes as it had in the outstanding notes immediately before the exchange.

In any event, persons considering the exchange of outstanding notes for exchange notes should consult their own tax advisors concerning the United States federal income tax consequences in light of their particular situations as well as any consequences arising under the laws of any other taxing jurisdiction.

313

EFIHMW00223352
**PX 045**
**Page 329 of 561**

## CERTAIN ERISA CONSIDERATIONS

This disclosure was written in connection with the promotion and marketing of the notes by EFH Corp. and the initial purchasers, and it cannot be used by any holder for the purpose of avoiding penalties that may be asserted against the holder under the Code. Prospective purchasers of the notes should consult their own tax advisors with respect to the application of the U.S. federal income tax laws to their particular situations.

The following is a summary of certain considerations associated with the purchase of the notes and exchange notes by employee benefit plans that are subject to Title I of ERISA, individual retirement accounts and other plans and arrangements that are subject to Section 4975 of the Code or provisions under any federal, state, local, non-U.S. or other laws or regulations that are similar to such provisions of ERISA or the Code (collectively, "Similar Laws"), and entities whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each, a "Plan").

This summary is based on the provisions of ERISA and the Code (and related regulations and administrative and judicial interpretations) as of the date of this prospectus. This summary does not purport to be complete and future legislation, court decisions, administrative regulations, rulings or administrative pronouncements could significantly modify the requirements summarized below. Any of these changes may be retroactive and may thereby apply to transactions entered into prior to the date of their enactment or release.

### General Fiduciary Matters

ERISA imposes certain duties on persons who are fiduciaries of a Plan subject to Title I of ERISA or of a Plan subject to Section 4975 of the Code (each, a "Benefit Plan") and both ERISA and the Code prohibit certain transactions involving the assets of a Benefit Plan and its fiduciaries or other interested parties. Under ERISA and the Code, any person who exercises any discretionary authority or control over the administration of such a Benefit Plan or the management or disposition of the assets of such a Benefit Plan, or who renders investment advice for a fee or other compensation to such a Benefit Plan, is generally considered to be a fiduciary of the Benefit Plan.

In considering an investment in the notes of a portion of the assets of any Plan, a fiduciary should consult with its counsel in order to determine whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA, the Code or any Similar Law. In addition, a fiduciary of a Plan should consult with its counsel in order to determine if the investment satisfies the fiduciary's duties to the Plan including, without limitation, the prudence, diversification, delegation of control and prohibited transaction provisions of ERISA, the Code and any other applicable Similar Laws.

### Prohibited Transaction Issues

Section 406 of ERISA and Section 4975 of the Code prohibit Benefit Plans from engaging in specified transactions involving plan assets with persons or entities who are "parties in interest," within the meaning of ERISA, or "disqualified persons," within the meaning of Section 4975 of the Code, unless an exemption is available. A party in interest or disqualified person who engaged in a nonexempt prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code. In addition, the fiduciary of the Benefit Plan that engaged in such a nonexempt prohibited transaction may be subject to penalties and liabilities under ERISA and the Code. The acquisition and/or holding of notes by a Benefit Plan with respect to which EFH Corp., a guarantor or the initial purchasers are considered a party in interest or disqualified person may constitute or result in a direct or indirect prohibited transaction under Section 406 of ERISA and/or Section 4975 of the Code, unless the investment is acquired and is held in accordance with an applicable statutory, class or individual prohibited transaction exemption. In this regard, the United States Department of Labor has issued prohibited transaction class exemptions ("PTCEs") that may apply to the acquisition and holding of the notes. These class exemptions include, without limitation, PTCE 84-14 respecting transactions determined by independent qualified professional asset managers, PTCE 90-1 respecting insurance company pooled separate accounts, PTCE 91-38, respecting bank collective investment funds, PTCE 95-60, respecting life insurance company general accounts and PTCE 96-23, respecting transactions determined by in-house asset managers.

314

EFIHMW00223353

Each of these PTCEs contains conditions and limitations on its application. Fiduciaries of Plans considering acquiring and/or holding the notes in reliance of these or any other PTCE should carefully review the PTCE to assure it is applicable. There can be no assurance that all of the conditions of any such exemptions will be satisfied.

Because of the foregoing, the notes should not be purchased or held by any person investing "plan assets" of any Plan, unless such purchase and holding (and the exchange of notes for exchange notes) are entitled to exemption relief from the prohibited transaction provisions of ERISA and the Code and are otherwise permissible under all applicable Similar Laws.

**Representation**

Accordingly, by acceptance of a note or an exchange note, or any interest therein, each purchaser and subsequent transferee will be deemed to have represented and warranted that either (i) no portion of the assets used by such purchaser or transferee to acquire or hold the notes constitutes assets of any Plan or (ii) the acquisition and holding of the notes (and the exchange of notes for exchange notes) by such purchaser or transferee are entitled to exemptive relief from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code and are otherwise permissible under all applicable Similar Laws.

The foregoing discussion is general in nature and is not intended to be all-inclusive. Due to the complexity of these rules and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is particularly important that fiduciaries or other persons considering acquiring the notes (and holding the notes or exchange notes) on behalf of, or with the assets of, any Plan, consult with their counsel regarding the potential applicability of ERISA, Section 4975 of the Code and any Similar Laws to such investments and whether an exemption would be applicable to the purchase and holding of the notes and the exchange of notes for exchange notes.

315

Confidential

## PLAN OF DISTRIBUTION

Each broker-dealer that receives exchange notes for its own account pursuant to the exchange offer must acknowledge that it will deliver a prospectus in connection with any resale of such exchange notes. This prospectus, as it may be amended or supplemented from time to time, may be used by a broker-dealer in connection with resales of exchange notes received in exchange for outstanding notes where such outstanding notes were acquired as a result of market-making activities or other trading activities. We have agreed that, for a period of 180 days after the consummation of the exchange offer, we will make this prospectus, as amended or supplemented, available to any broker-dealer for use in connection with any such resale. In addition, all dealers effecting transactions in the exchange notes may be required to deliver a prospectus.

We will not receive any proceeds from any sale of exchange notes by broker-dealers. Exchange notes received by broker-dealers for their own account pursuant to the exchange offer may be sold from time to time in one or more transactions in the over-the-counter market, in negotiated transactions, through the writing of options on the exchange notes or a combination of such methods of resale, at market prices prevailing at the time of resale, at prices related to such prevailing market prices or at negotiated prices. Any such resale may be made directly to purchasers or through brokers or dealers who may receive compensation in the form of commissions or concessions from any such broker-dealer and/or the purchasers of any such exchange notes. Any broker-dealer that resells exchange notes that were received by it for its own account pursuant to an exchange offer and any broker or dealer that participates in a distribution of such exchange notes may be deemed to be an "underwriter" within the meaning of the Securities Act, and any profit of any such resale of exchange notes and any commission or concessions received by any such persons may be deemed to be underwriting compensation under the Securities Act. The letter of transmittal states that, by acknowledging that it will deliver and by delivering a prospectus, a broker-dealer will not be deemed to admit that it is an "underwriter" within the meaning of the Securities Act.

For a period of 180 days after the consummation of the exchange offer, we will promptly send additional copies of this prospectus and any amendments or supplements to this prospectus to any broker-dealer that requests such documents in the letter of transmittal. We have agreed to pay all expenses incident to the exchange offer (including the expenses of one counsel for the holders of the outstanding notes) other than commissions or concessions of any broker-dealers and will indemnify you (including any broker-dealers) against certain liabilities, including liabilities under the Securities Act.

316

EFIHMW00223355

**PX 045**
**Page 332 of 561**

## LEGAL MATTERS

The validity and enforceability of the exchange notes and the related guarantees will be passed upon for us by Andrew M. Wright, Vice President & Associate General Counsel of EFH Corporate Services Company, Dallas, Texas. Mr. Wright beneficially owns 150,000 shares of common stock of EFH Corp., including 100,000 shares issuable upon exercise of options. In addition, Mr. Wright has stock options to purchase an additional 150,000 shares of common stock of EFH Corp. that will not vest within 60 days, with 50,000 of such additional shares to be purchased at a price per share equal to $5.00 and 100,000 of such additional shares to be purchased at a price per share equal to $3.50.

## EXPERTS

The consolidated financial statements as of December 31, 2009 and 2008 (successor), and for the years ended December 31, 2009 and 2008 (successor), the period from October 11, 2007 through December 31, 2007 (successor) and the period from January 1, 2007 through October 10, 2007 (predecessor) of EFH Corp., included in this prospectus, have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report appearing herein, (which report expresses an unqualified opinion on the financial statements and includes an explanatory paragraph related to EFH Corp. completing its merger with Texas Energy Future Merger Sub Corp (Merger Sub) and becoming a subsidiary of Texas Energy Future Holdings Limited Partnership on October 10, 2007). Also, the consolidated financial statements as of December 31, 2009 and 2008 (successor balance sheets), and for the years ended December 31, 2009 and 2008, the period from October 11, 2007 through December 31, 2007 (successor operations) of Oncor Holdings and the financial statements for the period from January 1, 2007 through October 10, 2007 (predecessor operations) of Oncor (as Oncor Holdings' predecessor) included in this prospectus, have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report appearing herein (which report expresses an unqualified opinion and includes an explanatory paragraph referring to Oncor Holdings as an indirect subsidiary of EFH Corp., which was merged with Merger Sub on October 10, 2007). Such financial statements have been so included in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

317

EFIHMW00223356

## GLOSSARY

Other than under the caption "Description of the Notes," where a different meaning for a term or abbreviation listed below is provided, when the following terms and abbreviations appear in the text of this prospectus, they have the meanings indicated below.

| | |
|---|---|
| **1999 Restructuring Legislation** | Texas Electric Choice Plan, the legislation that restructured the electric utility industry in Texas to provide for retail competition |
| **Adjusted EBITDA** | Adjusted EBITDA means EBITDA adjusted to exclude non-cash items, unusual items and other adjustments allowable under certain of our debt arrangements. See the definition of EBITDA below. Adjusted EBITDA and EBITDA are not recognized terms under U.S. GAAP and, thus, are non-GAAP financial measures. We are providing Adjusted EBITDA in this prospectus (see reconciliations in "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Three and Nine Months Ended September 30, 2010 — Covenants and Restrictions Under Financing Arrangements" and "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009 — Covenants and Restrictions Under Financing Arrangements") solely because of the important role that Adjusted EBITDA plays in respect of certain covenants contained in our debt arrangements. We do not intend for Adjusted EBITDA (or EBITDA) to be an alternative to net income as a measure of operating performance or an alternative to cash flows from operating activities as a measure of liquidity or an alternative to any other measure of financial performance presented in accordance with U.S. GAAP. Additionally, we do not intend for Adjusted EBITDA (or EBITDA) to be used as a measure of free cash flow available for management's discretionary use, as the measure excludes certain cash requirements such as interest payments, tax payments and other debt service requirements. Because not all companies use identical calculations, our presentation of Adjusted EBITDA (and EBITDA) may not be comparable to similarly titled measures of other companies. |
| **ancillary services** | Refers to services necessary to support the transmission of energy and maintain reliable operations for the entire transmission system |
| **baseload** | Refers to the minimum constant level of electricity demand in a system, such as ERCOT, and/or to the electricity generation facilities or capacity normally expected to operate continuously throughout the year to serve such demand, such as our nuclear and lignite/coal-fueled generation units |
| **Capgemini Energy** | Capgemini Energy LP, a subsidiary of Cap Gemini North America Inc. that provides business support services to EFH Corp. and its subsidiaries |
| **Competitive Electric segment** | Refers to the EFH Corp. business segment that consists principally of TCEH. |

318

EFIHMW00223357

**PX 045**
**Page 334 of 561**

| | |
|---|---|
| **CREZ** | Competitive Renewable Energy Zone |
| **DOE** | US Department of Energy |
| **EBITDA** | Refers to earnings (net income) before interest expense, income taxes, depreciation and amortization. See the definition of Adjusted EBITDA above. |
| **ERISA** | Employee Retirement Income Security Act of 1974, as amended |
| **Exchange Act** | Securities Exchange Act of 1934, as amended |
| **FASB** | Financial Accounting Standards Board, the designated organization in the private sector for establishing standards for financial accounting and reporting |
| **Fitch** | Fitch Ratings, Ltd. (a credit rating agency) |
| **GAAP** | generally accepted accounting principles |
| **GWh** | gigawatt-hours |
| **IRS** | U.S. Internal Revenue Service |
| **kV** | kilovolts |
| **kWh** | kilowatt-hours |
| **Luminant Construction** | Refers to the operations of TCEH established for the purpose of developing and constructing new generation facilities. |
| **Luminant** | Refers to subsidiaries of TCEH engaged in competitive market activities consisting of electricity generation and wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas. |
| **market heat rate** | Heat rate is a measure of the efficiency of converting a fuel source to electricity. Market heat rate is the implied relationship between wholesale electricity prices and natural gas prices and is calculated by dividing the wholesale market price of electricity, which is based on the price offer of the marginal supplier in ERCOT (generally natural gas plants), by the market price of natural gas. Forward wholesale electricity market price quotes in ERCOT are generally limited to two or three years; accordingly, forward market heat rates are generally limited to the same time period. Forecasted market heat rates for time periods for which market price quotes are not available are based on fundamental economic factors and forecasts, including electricity supply, demand growth, capital costs associated with new construction of generation supply, transmission development and other factors. |
| **MMBtu** | million British thermal units |
| **Moody's** | Moody's Investors Services, Inc. (a credit rating agency) |
| **MWh** | megawatt-hours |

319

| | |
|---|---|
| **Oncor Ring-Fenced Entities** | Refers to Oncor Holdings and its direct and indirect subsidiaries, including Oncor. |
| **price-to-beat** | residential and small business customer electricity rates established by the PUCT that (i) were required to be charged in a REP's historical service territories until the earlier of January 1, 2005 or the date when 40% of the electricity consumed by such customer classes was supplied by competing REPs, adjusted periodically for changes in fuel costs, and (ii) were required to be made available to those customers until January 1, 2007 |
| **purchase accounting** | The purchase method of accounting for a business combination as prescribed by U.S. GAAP, whereby the cost or "purchase price" of a business combination, including the amount paid for the equity and direct transaction costs are allocated to identifiable assets and liabilities (including intangible assets) based upon their fair values. The excess of the purchase price over the fair values of assets and liabilities is recorded as goodwill |
| **Regulated Delivery segment** | Refers to the EFH Corp. business segment that consists of the operations of Oncor. |
| **REP** | retail electric provider |
| **S&P** | Standard & Poor's Ratings Services, a division of the McGraw Hill Companies Inc. (a credit rating agency) |
| **SG&A** | selling, general and administrative |
| **TCEH Senior Secured Facilities** | Refers collectively to the TCEH Initial Term Loan Facility, TCEH Delayed Draw Term Loan Facility, TCEH Revolving Credit Facility, TCEH Letter of Credit Facility and TCEH Commodity Collateral Posting Facility. See Note 6 to EFH Corp.'s historical consolidated financial statements for the three and nine months ended September 30, 2010 for details of these facilities |

320

Confidential

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|  | Page |
|---|---|
| **Audited Consolidated Financial Statements of Energy Future Holdings Corp.** |  |
| Report of Independent Registered Public Accounting Firm | F-1 |
| Glossary | F-2 |
| Statements of Consolidated Income (Loss) for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor) and the period from January 1, 2007 through October 10, 2007 (Predecessor) | F-7 |
| Statements of Consolidated Comprehensive Income (Loss) for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor) and the period from January 1, 2007 through October 10, 2007 (Predecessor) | F-8 |
| Statements of Consolidated Cash Flows for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor) and the period from January 1, 2007 through October 10, 2007 (Predecessor) | F-9 |
| Consolidated Balance Sheets as of December 31, 2009 (Successor) and December 31, 2008 (Successor) | F-12 |
| Statements of Consolidated Equity for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) | F-13 |
| Notes to Consolidated Financial Statements | F-15 |
| **Unaudited Condensed Consolidated Financial Statements of Energy Future Holdings Corp.** |  |
| Glossary | F-94 |
| Condensed Statements of Consolidated Income (Loss) for the three and nine months ended September 30, 2010 and 2009 | F-98 |
| Condensed Statements of Consolidated Comprehensive Income (Loss) for the three and nine months ended September 30, 2010 and 2009 | F-99 |
| Condensed Statements of Consolidated Cash Flows for the nine months ended September 30, 2010 and 2009 | F-100 |
| Condensed Consolidated Balance Sheets as of September 30, 2010 and December 31, 2009 | F-102 |
| Notes to Condensed Consolidated Financial Statements | F-103 |
| **Audited Consolidated Financial Statements of Oncor Electric Delivery Holdings Company LLC (Successor) and Oncor Electric Delivery Company LLC (Predecessor)** |  |
| Glossary | F-156 |
| Report of Independent Registered Public Accounting Firm | F-159 |
| Statements of Consolidated Income (Loss) for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor) and the period from January 1, 2007 through October 10, 2007 (Predecessor) | F-160 |
| Statements of Consolidated Comprehensive Income (Loss) for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor) and the period from January 1, 2007 through October 10, 2007 (Predecessor) | F-161 |

EFIHMW00223360

Statements of Consolidated Cash Flows for the years ended December 31, 2009 and 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor) and the period from January 1, 2007 through October 10, 2007 (Predecessor) — F-162

Consolidated Balance Sheets as of December 31, 2009 (Successor) and December 31, 2008 (Successor) — F-164

Statements of Consolidated Membership Interests for the years ended December 31, 2009 and 2008 (Successor) and the period from October 11, 2007 through December 31, 2007 (Successor) — F-165

Statement of Consolidated Shareholder's Equity for the period from January 1, 2007 through October 10, 2007 (Predecessor) — F-166

Notes to Consolidated Financial Statements — F-167

**Unaudited Condensed Consolidated Financial Statements of Oncor Electric Delivery Holdings Company LLC**

Glossary — F-197

Condensed Statements of Consolidated Income for the three and nine months ended September 30, 2010 and 2009 — F-199

Condensed Statements of Consolidated Cash Flows for the nine months ended September 30, 2010 and 2009 — F-200

Condensed Consolidated Balance Sheets as of September 30, 2010 and December 31, 2009 — F-201

Notes to Condensed Consolidated Financial Statements — F-202

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Shareholders of Energy Future Holdings Corp.
Dallas, Texas

We have audited the accompanying consolidated balance sheets of Energy Future Holdings Corp. and subsidiaries ("EFH Corp.") as of December 31, 2009 and 2008 (successor), and the related statements of consolidated income (loss), comprehensive income (loss), cash flows and equity for the years ended December 31, 2009 and 2008 (successor), the period from October 11, 2007 through December 31, 2007 (successor) and the period from January 1, 2007 through October 10, 2007 (predecessor). These financial statements are the responsibility of EFH Corp.'s management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Energy Future Holdings Corp. and subsidiaries as of December 31, 2009 and 2008 (successor), and the results of their operations and their cash flows for the years ended December 31, 2009 and 2008 (successor), the period from October 11, 2007 through December 31, 2007 (successor) and the period from January 1, 2007 through October 10, 2007 (predecessor), in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1 to the consolidated financial statements, EFH Corp. completed its merger with Texas Energy Future Merger Sub Corp and became a subsidiary of Texas Energy Future Holdings Limited Partnership on October 10, 2007.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), EFH Corp.'s internal control over financial reporting as of December 31, 2009, based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report (not presented herein) dated February 18, 2010 expressed an unqualified opinion on EFH Corp.'s internal control over financial reporting.

/s/ Deloitte & Touche LLP

Dallas, Texas
February 18, 2010

F-1

EFIHMW00223362

# GLOSSARY

When the following terms and abbreviations appear in the text of these financial statements, they have the meanings indicated below.

**1999 Restructuring Legislation**

Texas Electric Choice Plan, the legislation that restructured the electric utility industry in Texas to provide for retail competition

**2008 Form 10-K**

EFH Corp.'s Annual Report on Form 10-K for the year ended December 31, 2008 as recast in a Current Report on Form 8-K filed on May 20, 2009 to reflect the adoption of new accounting and disclosure guidance related to noncontrolling interests

**Adjusted EBITDA**

Adjusted EBITDA means EBITDA adjusted to exclude non-cash items, unusual items and other adjustments allowable under certain of our debt arrangements. See the definition of EBITDA below. Adjusted EBITDA and EBITDA are not recognized terms under GAAP and, thus, are non-GAAP financial measures. We are providing Adjusted EBITDA elsewhere herein (see reconciliations in "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2009 — Covenants and Restrictions Under Financing Arrangements") solely because of the important role that Adjusted EBITDA plays in respect of certain covenants contained in our debt arrangements. We do not intend for Adjusted EBITDA (or EBITDA) to be an alternative to net income as a measure of operating performance or an alternative to cash flows from operating activities as a measure of liquidity or an alternative to any other measure of financial performance presented in accordance with GAAP. Additionally, we do not intend for Adjusted EBITDA (or EBITDA) to be used as a measure of free cash flow available for management's discretionary use, as the measure excludes certain cash requirements such as interest payments, tax payments and other debt service requirements. Because not all companies use identical calculations, our presentation of Adjusted EBITDA (and EBITDA) may not be comparable to similarly titled measures of other companies.

**Ancillary services**

Refers to services necessary to support the transmission of energy and maintain reliable operations for the entire transmission system.

**CAIR**

Clean Air Interstate Rule

**Capgemini**

Capgemini Energy LP, a provider of business support services to EFH Corp. and its subsidiaries

**CO2**

carbon dioxide

**Competitive Electric segment**

Refers to the EFH Corp. business segment that consists principally of TCEH.

**CREZ**

Competitive Renewable Energy Zone

**DOE**

US Department of Energy

**EBITDA**

Refers to earnings (net income) before interest expense, income taxes, depreciation and amortization. See the definition of Adjusted EBITDA above.

F-2

EFIHMW00223363

**PX 045**

**Page 340 of 561**

| | |
|---|---|
| **EFC Holdings** | Refers to Energy Future Competitive Holdings Company, a direct subsidiary of EFH Corp. and the direct parent of TCEH. |
| **EFH Corp.** | Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context. Its major subsidiaries include TCEH and Oncor. |
| **EFH Corp. Senior Notes** | Refers collectively to EFH Corp.'s 10.875% Senior Notes due November 1, 2017 (EFH Corp. 10.875% Notes) and EFH Corp.'s 11.25%/12.00% Senior Toggle Notes due November 1, 2017 (EFH Corp. Toggle Notes). |
| **EFH Corp. 9.75% Notes** | Refers to EFH Corp.'s 9.75% Senior Secured Notes due October 15, 2019. |
| **EFIH Finance** | Refers to EFIH Finance Inc., a direct, wholly-owned subsidiary of Intermediate Holding, formed for the sole purpose of serving as co-issuer with Intermediate Holding of certain debt securities. |
| **EFIH Notes** | Refers to Intermediate Holding's and EFIH Finance's 9.75% Senior Secured Notes due October 15, 2019. |
| **EPA** | US Environmental Protection Agency |
| **EPC** | engineering, procurement and construction |
| **ERCOT** | Electric Reliability Council of Texas, the independent system operator and the regional coordinator of various electricity systems within Texas |
| **ERISA** | Employee Retirement Income Security Act of 1974, as amended |
| **FASB** | Financial Accounting Standards Board, the designated organization in the private sector for establishing standards for financial accounting and reporting |
| **FERC** | US Federal Energy Regulatory Commission |
| **Fitch** | Fitch Ratings, Ltd. (a credit rating agency) |
| **GAAP** | generally accepted accounting principles |
| **GHG** | greenhouse gas |
| **GWh** | gigawatt-hours |
| **Intermediate Holding** | Refers to Energy Future Intermediate Holding Company LLC, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings. |
| **IRS** | US Internal Revenue Service |
| **kV** | kilovolts |
| **kWh** | kilowatt-hours |
| **LIBOR** | London Interbank Offered Rate. An interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market. |

F-3

EFIHMW00223364

**PX 045**
**Page 341 of 561**

| | |
|---|---|
| **Luminant** | Refers to subsidiaries of TCEH engaged in competitive market activities consisting of electricity generation and wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas. |
| **Market heat rate** | Heat rate is a measure of the efficiency of converting a fuel source to electricity. Market heat rate is the implied relationship between wholesale electricity prices and natural gas prices and is calculated by dividing the wholesale market price of electricity, which is based on the price offer of the marginal supplier in ERCOT (generally natural gas plants), by the market price of natural gas. Forward wholesale electricity market price quotes in ERCOT are generally limited to two or three years; accordingly, forward market heat rates are generally limited to the same time period. Forecasted market heat rates for time periods for which market price quotes are not available are based on fundamental economic factors and forecasts, including electricity supply, demand growth, capital costs associated with new construction of generation supply, transmission development and other factors. |
| **Merger** | The transaction referred to in "Merger Agreement" (defined immediately below) that was completed on October 10, 2007. |
| **Merger Agreement** | Agreement and Plan of Merger, dated February 25, 2007, under which Texas Holdings agreed to acquire EFH Corp. |
| **Merger Sub** | Texas Energy Future Merger Sub Corp, a Texas corporation and a wholly-owned subsidiary of Texas Holdings that was merged into EFH Corp. on October 10, 2007 |
| **MMBtu** | million British thermal units |
| **Moody's** | Moody's Investors Services, Inc. (a credit rating agency) |
| **MW** | megawatts |
| **MWh** | megawatt-hours |
| **NERC** | North American Electric Reliability Corporation |
| **NOx** | nitrogen oxide |
| **NRC** | US Nuclear Regulatory Commission |
| **Oncor** | Refers to Oncor Electric Delivery Company LLC, a direct majority-owned subsidiary of Oncor Holdings and an indirect subsidiary of EFH Corp., and/or its consolidated bankruptcy-remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC, depending on context, that is engaged in regulated electricity transmission and distribution activities. |
| **Oncor Holdings** | Refers to Oncor Electric Delivery Holdings Company LLC, a direct wholly-owned subsidiary of Intermediate Holding and the direct majority owner of Oncor, that is consolidated as a variable interest entity under consolidations accounting standards. |
| **Oncor Ring-Fenced Entities** | Refers to Oncor Holdings and its direct and indirect subsidiaries, including Oncor. |

F-4

Confidential

| | |
|---|---|
| **OPEB** | other postretirement employee benefits |
| **PUCT** | Public Utility Commission of Texas |
| **PURA** | Texas Public Utility Regulatory Act |
| **Purchase accounting** | The purchase method of accounting for a business combination as prescribed by GAAP, whereby the cost or "purchase price" of a business combination, including the amount paid for the equity and direct transaction costs are allocated to identifiable assets and liabilities (including intangible assets) based upon their fair values. The excess of the purchase price over the fair values of assets and liabilities is recorded as goodwill. |
| **Regulated Delivery segment** | Refers to the EFH Corp. business segment, which consists of the operations of Oncor. |
| **REP** | retail electric provider |
| **RRC** | Railroad Commission of Texas, which among other things, has oversight of lignite mining activity in Texas |
| **S&P** | Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies Inc. (a credit rating agency) |
| **SARs** | Stock Appreciation Rights |
| **SARs Plan** | Refers to the Oncor Electric Delivery Company Stock Appreciation Rights Plan |
| **SEC** | US Securities and Exchange Commission |
| **Securities Act** | Securities Act of 1933, as amended |
| **SG&A** | selling, general and administrative |
| **SO2** | sulfur dioxide |
| **Sponsor Group** | Collectively, the investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P. (KKR), TPG Capital, L.P. and GS Capital Partners, an affiliate of Goldman Sachs & Co. (See Texas Holdings below.) |
| **TCEH** | Refers to Texas Competitive Electric Holdings Company LLC, a direct, wholly-owned subsidiary of EFC Holdings and an indirect subsidiary of EFH Corp., and/or its subsidiaries, depending on context, that are engaged in electricity generation and wholesale and retail energy markets activities. Its major subsidiaries include Luminant and TXU Energy. |
| **TCEH Finance** | Refers to TCEH Finance, Inc., a direct, wholly-owned subsidiary of TCEH, formed for the sole purpose of serving as co-issuer with TCEH of certain debt securities. |
| **TCEH Senior Notes** | Refers collectively to TCEH's 10.25% Senior Notes due November 1, 2015 and 10.25% Senior Notes Series B due November 1, 2015 (collectively, TCEH 10.25% Notes) and TCEH's 10.50%/11.25% Senior Toggle Notes due November 1, 2016 (TCEH Toggle Notes). |

F-5

| | |
|---|---|
| **TCEH Senior Secured Facilities** | Refers collectively to the TCEH Initial Term Loan Facility, TCEH Delayed Draw Term Loan Facility, TCEH Revolving Credit Facility, TCEH Letter of Credit Facility and TCEH Commodity Collateral Posting Facility. See Note 12 for details of these facilities. |
| **TCEQ** | Texas Commission on Environmental Quality |
| **Texas Holdings** | Refers to Texas Energy Future Holdings Limited Partnership, a limited partnership controlled by the Sponsor Group that owns substantially all of the common stock of EFH Corp. |
| **Texas Holdings Group** | Refers to Texas Holdings and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities. |
| **Texas Transmission** | Refers to Texas Transmission Investment LLC, a limited liability company that owns a 19.75% equity interest in Oncor. Texas Transmission is not affiliated with EFH Corp., any of its subsidiaries or any member of the Sponsor Group. |
| **TXU Energy** | Refers to TXU Energy Retail Company LLC, a direct, wholly-owned subsidiary of TCEH engaged in the retail sale of electricity to residential and business customers. TXU Energy is a REP in competitive areas of ERCOT. |
| **TXU Europe** | TXU Europe Limited, a subsidiary of EFH Corp. that is in administration (similar to bankruptcy) in the United Kingdom |
| **TXU Fuel** | TXU Fuel Company, a former subsidiary of TCEH |
| **TXU Gas** | TXU Gas Company, a former subsidiary of EFH Corp. |
| **US** | United States of America |

F-6

EFIHMW00223367

**PX 045**
**Page 344 of 561**

## ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES
## STATEMENTS OF CONSOLIDATED INCOME (LOSS)
### (Millions of Dollars)

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Operating revenues | $    9,546 | $   11,364 | $    1,994 | $    8,044 |
| Fuel, purchased power costs and delivery fees | (2,878) | (4,595) | (644) | (2,381) |
| Net gain (loss) from commodity hedging and trading activities | 1,736 | 2,184 | (1,492) | (554) |
| Operating costs | (1,598) | (1,503) | (306) | (1,107) |
| Depreciation and amortization | (1,754) | (1,610) | (415) | (634) |
| Selling, general and administrative expenses | (1,068) | (957) | (216) | (691) |
| Franchise and revenue-based taxes | (359) | (363) | (93) | (282) |
| Impairment of goodwill (Note 3) | (90) | (8,860) | — | — |
| Other income (Note 10) | 204 | 80 | 14 | 69 |
| Other deductions (Note 10) | (97) | (1,301) | (61) | (841) |
| Interest income | 45 | 27 | 24 | 56 |
| Interest expense and related charges (Note 25) | (2,912) | (4,935) | (839) | (671) |
| Income (loss) from continuing operations before income taxes | 775 | (10,469) | (2,034) | 1,008 |
| Income tax (expense) benefit | (367) | 471 | 673 | (309) |
| Income (loss) from continuing operations | 408 | (9,998) | (1,361) | 699 |
| Income from discontinued operations, net of tax effect (Note 1) | — | — | 1 | 24 |
| Net income (loss) | 408 | (9,998) | (1,360) | 723 |
| Net (income) loss attributable to noncontrolling interests | (64) | 160 | — | — |
| Net income (loss) attributable to EFH Corp. | $    344 | $   (9,838) | $   (1,360) | $    723 |

See Notes to Financial Statements.

F-7

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME (LOSS)**
**(Millions of Dollars)**

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | **Year Ended December 31, 2009** | **Year Ended December 31, 2008** | **Period from October 11, 2007 through December 31, 2007** | **Period from January 1, 2007 through October 10, 2007** |
| Net income (loss) | $    408 | $   (9,998) | $    (1,360) | $    723 |
| Other comprehensive income (loss), net of tax effects: | | | | |
| Reclassification of pension and other retirement benefit costs (net of tax (expense) benefit of $20, $69, $5, and $(19)) (Note 21) | (40) | (84) | (57) | 49 |
| Cash flow hedges: | | | | |
| Net decrease in fair value of derivatives (net of tax benefit of $10, $99, $97 and $154) | (20) | (183) | (177) | (288) |
| Derivative value net (gains) losses related to hedged transactions recognized during the period and reported in net income (net of tax (expense) benefit of $72, $66, $— and $(48)) | 130 | 122 | — | (89) |
| Total effect of cash flow hedges | 110 | (61) | (177) | (377) |
| Total adjustments to net income (loss) | 70 | (145) | (234) | (328) |
| Comprehensive income (loss) | 478 | (10,143) | (1,594) | 395 |
| Comprehensive (income) loss attributable to noncontrolling interests | (64) | 160 | — | — |
| Comprehensive income (loss) attributable to EFH Corp. | $    414 | $   (9,983) | $    (1,594) | $    395 |

See Notes to Financial Statements.

F-8

Confidential

ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES

STATEMENTS OF CONSOLIDATED CASH FLOWS

(Millions of Dollars)

|  | Successor | | | Predecessor |
|---|---|---|---|---|
|  | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Cash flows — operating activities |  |  |  |  |
| Net income (loss) | $ 408 | $ (9,998) | $ (1,360) | $ 723 |
| Income from discontinued operations, net of tax effect | — | — | (1) | (24) |
| Income (loss) from continuing operations | 408 | (9,998) | (1,361) | 699 |
| Adjustments to reconcile income from continuing operations to cash provided by operating activities: |  |  |  |  |
| Depreciation and amortization | 2,172 | 2,070 | 568 | 684 |
| Deferred income tax expense (benefit) — net | 253 | (477) | (736) | (111) |
| Impairment of goodwill (Note 3) | 90 | 8,860 | — | — |
| Impairment of trade name intangible asset (Note 3) | — | 481 | — | — |
| Impairment of emission allowances intangible assets (Note 3) | — | 501 | — | — |
| Impairment of natural gas-fueled generation facilities (Note 5) | — | 229 | — | — |
| Impairment of land (Note 10) | 34 | — | — | — |
| Charge related to Lehman bankruptcy (Note 10) | — | 26 | — | — |
| Write-off of regulatory assets (Note 25) | 25 | — | — | — |
| Increase of Toggle Notes in lieu of cash interest (Note 12) | 511 | — | — | — |
| Unrealized net (gains) losses from mark-to-market valuations of commodity positions | (1,225) | (2,329) | 1,556 | 722 |
| Unrealized net (gains) losses from mark-to-market valuations of interest rate swaps | (696) | 1,477 | — | — |
| Net gain on debt exchanges (Note 12) | (87) | — | — | — |
| Bad debt expense (Note 11) | 113 | 81 | 12 | 46 |
| Stock-based incentive compensation expense | 14 | 30 | — | 27 |
| Reversal of reserves recorded in purchase accounting (Note 10) | (44) | — | — | — |
| Losses on dedesignated cash flow hedges (interest rate swaps) | 184 | 66 | — | 10 |
| Net charges related to cancelled development of generation facilities (Note 4) | — | — | 2 | 676 |
| Write-off of deferred transaction costs (Note 10) | — | — | — | 38 |
| Credit related to impaired leases (Note 10) | — | — | — | (48) |
| Net gains on sale of assets, including amortization of deferred gains | (5) | (1) | (1) | (40) |
| Other, net | (4) | (20) | 5 | 19 |
| Changes in operating assets and liabilities: |  |  |  |  |
| Accounts receivable — trade | (125) | (505) | 309 | (200) |
| Impact of accounts receivable sales program (Note 11) | (33) | 53 | (336) | 72 |
| Inventories | (59) | (21) | (5) | (7) |
| Accounts payable — trade | (141) | 385 | (264) | 81 |
| Commodity and other derivative contractual assets and liabilities | (64) | (28) | 18 | (185) |
| Margin deposits — net | 248 | 595 | (614) | (569) |
| Deferred advanced metering system revenues (Note 25) | 57 | — | — | — |
| Other — net assets | (43) | 440 | 284 | (89) |
| Other — net liabilities | 128 | (410) | 113 | 440 |
| Cash provided by (used in) operating activities from continuing operations | $ 1,711 | $ 1,505 | $ (450) | $ 2,265 |

F-9

ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES

STATEMENTS OF CONSOLIDATED CASH FLOWS (Cont'd)
(Millions of Dollars)

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Cash flows — financing activities | | | | |
| Issuances of long-term debt/securities (Note 12): | | | | |
|   Equity financing from Sponsor Group and other investors | $ — | $ — | $ 8,236 | $ — |
|   Merger-related debt financing | — | — | 42,732 | 1,800 |
|   Pollution control revenue bonds | — | 242 | — | — |
|   Oncor long-term debt | — | 1,500 | — | — |
|   Other long-term debt | 522 | 1,443 | — | — |
|   Common stock | — | 34 | — | 1 |
| Repayments/repurchases of long-term debt/securities (Note 12): | | | | |
|   Pollution control revenue bonds | — | (242) | — | (143) |
|   Merger-related debt repurchases | — | — | (15,314) | — |
|   Other long-term debt | (396) | (925) | (81) | (302) |
|   Common stock | — | (3) | — | (13) |
| Increase (decrease) in short-term borrowings (Note 12): | | | | |
|   Banks | 332 | (481) | (722) | 2,245 |
|   Commercial paper | — | — | — | (1,296) |
| Proceeds from sale of noncontrolling interests, net of transaction costs (Note 15) | — | 1,253 | — | — |
| Contributions from noncontrolling interests | 48 | — | — | — |
| Distributions paid to noncontrolling interests | (56) | (2) | — | — |
| Common stock dividends paid | — | — | — | (788) |
| Settlements of minimum withholding tax liabilities under stock-based compensation plans | — | — | — | (93) |
| Debt discount, financing and reacquisition expenses | (49) | (21) | (986) | (17) |
| Other, net | 21 | 39 | — | — |
|   Cash provided by financing activities from continuing operations | $ 422 | $ 2,837 | $ 33,865 | $ 1,394 |

F-10

EFIHMW00223371

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**
**STATEMENTS OF CONSOLIDATED CASH FLOWS (Cont'd)**
**(Millions of Dollars)**

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Cash flows — investing activities | | | | |
| Acquisition of EFH Corp. | $ — | $ — | $ (32,694) | $ — |
| Capital expenditures | (2,348) | (2,849) | (693) | (2,366) |
| Nuclear fuel purchases | (197) | (166) | (23) | (54) |
| Money market fund redemptions (investments) (Note 1) | 142 | (142) | — | — |
| Investment posted with derivative counterparty (Note 18) | (400) | — | — | — |
| Reduction of (proceeds from) letter of credit facility deposited with trustee (restricted cash) (Note 12) | 115 | — | (1,250) | — |
| Reduction of restricted cash related to pollution control revenue bonds | — | 29 | 13 | 202 |
| Other changes in restricted cash | 9 | 1 | 14 | (16) |
| Purchase of mining-related assets | — | — | — | (122) |
| Proceeds from sale of assets | 2 | 80 | 86 | 71 |
| Proceeds from sale of controlling interest in natural gas gathering pipeline business | 40 | — | — | — |
| Proceeds from sale of environmental allowances and credits | 19 | 39 | — | — |
| Purchases of environmental allowances and credits | (19) | (34) | — | — |
| Cash settlements related to outsourcing contract termination (Note 20) | — | 70 | — | — |
| Settlement of loan (Note 20) | — | 25 | — | — |
| Proceeds from sales of nuclear decommissioning trust fund securities | 3,064 | 1,623 | 831 | 602 |
| Investments in nuclear decommissioning trust fund securities | (3,080) | (1,639) | (835) | (614) |
| Other, net | 20 | 29 | (12) | 14 |
| Cash used in investing activities from continuing operations | $ (2,633) | $ (2,934) | $ (34,563) | $ (2,283) |
| Discontinued operations: | | | | |
| Cash provided by (used in) operating activities | — | — | (7) | 35 |
| Cash used in financing activities | — | — | — | — |
| Cash provided by (used in) investing activities | — | — | — | — |
| Cash provided by (used in) discontinued operations | — | — | (7) | 35 |
| Net change in cash and cash equivalents | (500) | 1,408 | (1,155) | 1,411 |
| Cash and cash equivalents — beginning balance | 1,689 | 281 | 1,436 | 25 |
| Cash and cash equivalents — ending balance | $ 1,189 | $ 1,689 | $ 281 | $ 1,436 |

See Notes to Financial Statements.

F-11

EFIHMW00223372

ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS
(Millions of Dollars)

| | | Successor | | |
|---|---:|---:|---:|---:|
| | | December 31, 2009 | | December 31, 2008 |
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents (Note 1) | $ | 1,189 | $ | 1,689 |
| Investment posted with counterparty (Note 18) | | 425 | | — |
| Investments held in money market fund (Note 1) | | — | | 142 |
| Restricted cash (Note 25) | | 48 | | 55 |
| Trade accounts receivable — net (Note 11) | | 1,260 | | 1,219 |
| Income taxes receivable — net | | — | | 42 |
| Inventories (Note 25) | | 485 | | 426 |
| Commodity and other derivative contractual assets (Note 18) | | 2,391 | | 2,534 |
| Accumulated deferred income taxes (Note 9) | | 5 | | 44 |
| Margin deposits related to commodity positions | | 187 | | 439 |
| Other current assets | | 136 | | 165 |
| Total current assets | | 6,126 | | 6,755 |
| Restricted cash (Note 25) | | 1,149 | | 1,267 |
| Investments (Note 19) | | 750 | | 645 |
| Property, plant and equipment — net (Note 25) | | 30,108 | | 29,522 |
| Goodwill (Note 3) | | 14,316 | | 14,386 |
| Intangible assets — net (Note 3) | | 2,876 | | 2,993 |
| Regulatory assets — net (Note 25) | | 1,959 | | 1,892 |
| Commodity and other derivative contractual assets (Note 18) | | 1,533 | | 962 |
| Other noncurrent assets, principally unamortized debt issuance costs | | 845 | | 841 |
| Total assets | $ | 59,662 | $ | 59,263 |
| **LIABILITIES AND EQUITY** | | | | |
| Current liabilities: | | | | |
| Short-term borrowings (Note 12) | $ | 1,569 | $ | 1,237 |
| Long-term debt due currently (Note 12) | | 417 | | 385 |
| Trade accounts payable | | 896 | | 1,143 |
| Commodity and other derivative contractual liabilities (Note 18) | | 2,392 | | 2,908 |
| Margin deposits related to commodity positions | | 520 | | 525 |
| Accrued interest | | 526 | | 524 |
| Other current liabilities | | 744 | | 612 |
| Total current liabilities | | 7,064 | | 7,334 |
| Accumulated deferred income taxes (Note 9) | | 6,131 | | 6,067 |
| Investment tax credits | | 37 | | 42 |
| Commodity and other derivative contractual liabilities (Note 18) | | 1,060 | | 2,095 |
| Long-term debt, less amounts due currently (Note 12) | | 41,440 | | 40,838 |
| Other noncurrent liabilities and deferred credits (Note 25) | | 5,766 | | 5,205 |
| Total liabilities | | 61,498 | | 61,581 |
| Commitments and Contingencies (Note 13) | | | | |
| Equity (Note 14): | | | | |
| EFH Corp. shareholders' equity | | (3,247) | | (3,673) |
| Noncontrolling interests in subsidiaries | | 1,411 | | 1,355 |
| Total equity | | (1,836) | | (2,318) |
| Total liabilities and equity | $ | 59,662 | $ | 59,263 |

See Notes to Financial Statements.

F-12

EFIHMW00223373

## ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES
## STATEMENTS OF CONSOLIDATED EQUITY
### (Millions of Dollars)

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Common stock stated value of $0.001 effective May 2009 (number of authorized shares — Successor — 2,000,000,000; Predecessor — 1,000,000,000): | | | | |
| Balance at beginning of period | $  — | $  — | $  — | $  5 |
| Effects of shareholder actions related to stated value of common stock | 2 | — | — | — |
| Balance at end of period (number of shares outstanding: Successor: 2009 — 1,668,065,133; 2008 — 1,667,149,663; 2007 — 1,664,345,953; Predecessor: October 10, 2007 — 461,152,009) | 2 | — | — | 5 |
| Additional paid-in capital: | | | | |
| Balance at beginning of period | 7,904 | 8,279 | — | 1,104 |
| Investment by Sponsor Group and other investors | — | — | 8,279 | — |
| Effects of stock-based incentive compensation plans | 11 | 29 | — | (66) |
| Effects of shareholder actions related to stated value of common stock | (2) | — | — | — |
| Effect of sale of noncontrolling interests (Note 15) | — | (406) | — | — |
| Common stock repurchases | — | — | — | (13) |
| Excess tax benefit on stock-based compensation | — | — | — | 82 |
| Cost of Thrift Plan shares released by LESOP trustee (Note 21) | — | — | — | 210 |
| Effects of executive deferred compensation plan | — | — | — | 11 |
| Other | 1 | 2 | — | (2) |
| Balance at end of period | 7,914 | 7,904 | 8,279 | 1,326 |
| Retained earnings (deficit): | | | | |
| Balance at beginning of period | (11,198) | (1,360) | — | 622 |
| Net income (loss) attributable to EFH Corp | 344 | (9,838) | (1,360) | 723 |
| Dividends declared on common stock ($—, $—, $—, and $1.30 per share) | — | — | — | (596) |
| Effect of adoption of accounting guidance related to uncertain tax positions (Note 8) | — | — | — | 33 |
| LESOP dividend deduction tax benefit and other | — | — | — | 3 |
| Balance at end of period | (10,854) | (11,198) | (1,360) | 785 |
| Accumulated other comprehensive gain (loss), net of tax effects: | | | | |
| Pension and other postretirement employee benefit liability adjustments: | | | | |
| Balance at beginning of period | (141) | (57) | — | (2) |
| Change in unrecognized gains (losses) related to pension and other retirement benefit costs | (40) | (84) | (57) | 49 |
| Balance at end of period | (181) | (141) | (57) | 47 |
| Amounts related to cash flow hedges: | | | | |
| Balance at beginning of period | (238) | (177) | — | 411 |
| Change during the period | 110 | (61) | (177) | (377) |
| Balance at end of period | (128) | (238) | (177) | 34 |
| Total accumulated other comprehensive gain (loss) at end of period | (309) | (379) | (234) | 81 |
| EFH Corp. shareholders' equity at end of period | | | | |

EFIHMW00223374

| | | | | |
|---|---|---|---|---|
| (Note 14) | (3,247) | (3,673) | 6,685 | 2,197 |
| Noncontrolling interests in subsidiaries (Note 15): | | | | |
| Balance at beginning of period | 1,355 | — | — | — |
| Net income (loss) attributable to noncontrolling interests | 64 | (160) | — | — |
| Investment | 48 | 1,253 | — | — |

F-13

Confidential

ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES
STATEMENTS OF CONSOLIDATED EQUITY (Millions of Dollars)

| | Successor | | | Predecessor |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Effect of sale of noncontrolling interests | — | 265 | — | — |
| Distributions to noncontrolling interests | (56) | (2) | — | — |
| Other | — | (1) | — | — |
| Noncontrolling interests in subsidiaries at end of period | 1,411 | 1,355 | — | — |
| Total equity at end of period | $ (1,836) | $ (2,318) | $ 6,685 | $ 2,197 |

See Notes to Financial Statements.

F-14

Confidential

EFIHMW00223376

ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 1.    BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES

*Description of Business*

EFH Corp., a Texas corporation, is a Dallas-based holding company conducting its operations principally through its TCEH and Oncor subsidiaries. TCEH is a holding company for subsidiaries engaged in competitive electricity market activities largely in Texas, including electricity generation, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales. Oncor is a majority (approximately 80%) owned subsidiary engaged in regulated electricity transmission and distribution operations in Texas.

On October 10, 2007, EFH Corp. completed its Merger with Merger Sub. As a result of the Merger, EFH Corp. became a subsidiary of Texas Holdings, which is controlled by the Sponsor Group. See Note 2.

References in these financial statements to "we," "our," "us" and "the company" are to EFH Corp. and/or its subsidiaries, TCEH and/or its subsidiaries, or Oncor and/or its subsidiary as apparent in the context. See "Glossary" for other defined terms.

Various "ring-fencing" measures have been taken to enhance the credit quality of Oncor. Such measures include, among other things: the sale of a 19.75% equity interest in Oncor to Texas Transmission in November 2008; maintenance of separate books and records for the Oncor Ring-Fenced Entities; Oncor's board of directors being comprised of a majority of independent directors, and prohibitions on the Oncor Ring-Fenced Entities providing credit support to, or receiving credit support from, any member of the Texas Holdings Group. The assets and liabilities of the Oncor Ring-Fenced Entities are separate and distinct from those of the Texas Holdings Group and none of the assets of the Oncor Ring-Fenced Entities are available to satisfy the debt or other obligations of any member of the Texas Holdings Group. Moreover, Oncor's operations are conducted, and its cash flows managed, independently from the Texas Holdings Group. Oncor Holdings is consolidated with EFH Corp. as a variable interest entity under consolidations accounting standards.

See Note 15 for discussion of noncontrolling interests sold by Oncor in November 2008.

We have two reportable segments: the Competitive Electric segment, which is comprised principally of TCEH, and the Regulated Delivery segment, which is comprised of Oncor and its wholly-owned bankruptcy-remote financing subsidiary. See Note 24 for further information concerning reportable business segments.

*Basis of Presentation*

The consolidated financial statements have been prepared in accordance with US GAAP. The accompanying consolidated statements of income (loss), comprehensive income (loss), cash flows and equity present results of operations and cash flows for "Successor" and "Predecessor" periods, which relate to periods succeeding and preceding the Merger, respectively. The consolidated financial statements have been prepared on the same basis as the audited financial statements included in the 2008 Form 10-K. The consolidated financial statements of the Successor reflect the application of purchase accounting in accordance with the provisions of accounting standards related to business combinations, include the activities of Merger Sub, all of which related to the acquisition of EFH Corp., and reflect the adoption of accounting standards related to the determination of fair value. Certain reclassifications have been made to conform prior period data to current period presentation. All intercompany items and transactions have been eliminated in consolidation. All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated. Subsequent events have been evaluated through February 18, 2010, the date these consolidated financial statements were issued.

*Discontinued Businesses*

Results from discontinued businesses, which are reported as discontinued operations, during the period October 11, 2007 to December 31, 2007 totaled $1 million in net income and during the period from January 1, 2007 to October 10, 2007 totaled $24 million in net income and consisted primarily of insurance proceeds related to a 2005 TXU Europe litigation settlement agreement.

F-15

*Use of Estimates*

Preparation of financial statements requires estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including fair value measurements. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information. No material adjustments, other than those disclosed elsewhere herein, were made to previous estimates or assumptions during the current year.

*Purchase Accounting*

The Merger was accounted for under purchase accounting, whereby the total purchase price of the transaction was allocated to our identifiable tangible and intangible assets acquired and liabilities assumed based on their fair values, and the excess of the purchase price over the fair value of net assets acquired was recorded as goodwill. The allocation resulted in a significant amount of goodwill, an increase in the carrying value of property, plant and equipment and deferred income tax liabilities as well as new identifiable intangible assets and liabilities. Reported earnings in periods subsequent to the Merger reflect increases in interest, depreciation and amortization expense. See Note 2 for details regarding the effect of purchase accounting.

*Derivative Instruments and Mark-to-Market Accounting*

We enter into contracts for the purchase and sale of electricity, natural gas and other commodities and also enter into other derivative instruments such as options, swaps, futures and forwards primarily to manage commodity price and interest rate risks. If the instrument meets the definition of a derivative under accounting standards related to derivative instruments and hedging activities, changes in the fair value of the derivative are recognized in net income as unrealized gains and losses, unless the criteria for certain exceptions are met, and an offsetting derivative asset or liability is recorded in the balance sheet. This recognition is referred to as "mark-to-market" accounting. The fair values of our unsettled derivative instruments under mark-to-market accounting are reported in the balance sheet as commodity and other derivative contractual assets or liabilities. When derivative instruments are settled and realized gains and losses are recorded, the previously recorded unrealized gains and losses and derivative assets and liabilities are reversed. See Notes 16 and 18 for additional information regarding fair value measurement and commodity and other derivative contractual assets and liabilities. Under the election criteria of accounting standards related to derivative instruments and hedging activities, we may elect the "normal" purchase and sale exemption. A commodity-related derivative contract may be designated as a "normal" purchase or sale if the commodity is to be physically received or delivered for use or sale in the normal course of business. If designated as normal, the derivative contract is accounted for under the accrual method of accounting (not marked-to-market) with no balance sheet or income statement recognition of the contract until settlement.

Because derivative instruments are frequently used as economic hedges, accounting standards related to derivative instruments and hedging activities allow for "hedge accounting," which provides for the designation of such instruments as cash flow or fair value hedges if certain conditions are met. A cash flow hedge mitigates the risk associated with the variability of the future cash flows related to an asset or liability (e.g., a forecasted sale of electricity in the future at market prices or the payment of interest related to variable rate debt), while a fair value hedge mitigates risk associated with fixed future cash flows (e.g., debt with fixed interest rate payments). In accounting for changes in the fair value of cash flow hedges, derivative assets and liabilities are recorded on the balance sheet with an offset to other comprehensive income or loss to the extent the hedges are effective and the hedged transaction remains probable of occurring. If the hedged transaction becomes probable of not occurring, hedge accounting is discontinued and the amount recorded in other comprehensive income is immediately reclassified into net income. If the relationship between the hedge and the hedged transaction ceases to exist or is dedesignated, hedge accounting is discontinued, and the amounts recorded in other comprehensive income are recognized as the previously hedged transaction impacts earnings. Changes in value of fair value hedges are recorded as derivative assets or liabilities with an offset to net income, and the carrying value of the related asset or liability (hedged item) is adjusted for changes in fair value with an offset to net income. If the fair value hedge is settled prior to the maturity of the hedged item, the cumulative fair value gain or loss associated with the hedge is amortized into income over the remaining life of the hedged item. In the statement of cash flow, the effects of settlements of derivative instruments are classified consistent with the related hedged transactions.

To qualify for hedge accounting, a hedge must be considered highly effective in offsetting changes in fair value of the hedged item. Assessment of the hedge's effectiveness is tested at least quarterly throughout its term to continue to qualify for hedge accounting. Changes in fair value that represent hedge ineffectiveness, even if the hedge continues to be assessed as effective, are immediately recognized in net income. Ineffectiveness is generally measured as the cumulative excess, if any, of the change in value of the hedging instrument over the change in value of the hedged item. See Notes 12 and 18 for additional information concerning hedging activity.

F-16

EFIHMW00223378

Realized and unrealized gains and losses from transacting in energy-related derivative instruments are primarily reported in the income statement in net gain (loss) from commodity hedging and trading activities. In accordance with accounting rules, upon settlement of physical derivative sales and purchase contracts that are marked-to-market in net income, related wholesale electricity revenues and fuel and purchased power costs are reported at approximated market prices, instead of the contract price. As a result, this noncash difference between market and contract prices is included in the operating revenues and fuel and purchased power costs and delivery fees line items of the income statement, with offsetting amounts included in net gain (loss) from commodity hedging and trading activities.

### Revenue Recognition

We record revenue from electricity sales and delivery service under the accrual method of accounting. Revenues are recognized when electricity or delivery services are provided to customers on the basis of periodic cycle meter readings and include an estimated accrual for the revenues earned from the meter reading date to the end of the period (unbilled revenue).

Our reported revenues include, on a net basis, ERCOT electricity balancing transactions, which represent wholesale purchases and sales of electricity for real-time balancing purposes as measured in 15-minute intervals. As is industry practice, these purchases and sales with ERCOT, as the balancing energy clearinghouse agent, are reported net in the income statement. Balancing transactions are difficult to predict, with results varying from period to period between net revenues and net expense, and are reported as a component of revenues in the income statement.

### Impairment of Long-Lived Assets

We evaluate long-lived assets (including intangible assets with finite lives) for impairment whenever indications of impairment exist. The carrying value of such assets is deemed to be impaired if the projected undiscounted cash flows are less than the carrying value. If there is such impairment, a loss would be recognized based on the amount by which the carrying value exceeds the fair value. Fair value is determined primarily by discounted cash flows, supported by available market valuations, if applicable. See Note 5 for details of the impairment of the natural gas-fueled generation facilities recorded in 2008.

Finite-lived intangibles identified as a result of purchase accounting are amortized over their estimated useful lives based on the expected realization of economic effects. See Note 3 for additional information.

### Goodwill and Intangible Assets with Indefinite Lives

We evaluate goodwill and intangible assets with indefinite lives for impairment at least annually. The impairment tests performed are based on discounted cash flow analyses. See Note 3 for details of goodwill and intangible assets with indefinite lives, including discussion of goodwill and trade name intangible assets impairments recorded in 2009 and 2008.

In 2009, we changed the annual test date for goodwill and intangible assets with indefinite lives from October 1 to December 1. Management determined the new annual gas-fueled generation facilities recorded because of efficiencies gained by aligning the test with our annual budget and five-year plan processes in the fourth quarter. The change in the annual test date did not delay, accelerate or avoid an impairment charge, and retrospective application of this change in accounting principle did not affect previously reported results.

### Amortization of Nuclear Fuel

Amortization of nuclear fuel is calculated on the units-of-production method and is reported as fuel costs.

F-17

Confidential

*Major Maintenance*

Major maintenance costs incurred during generation plant outages and the costs of other maintenance activities are charged to expense as incurred and reported as operating costs.

*Defined Benefit Pension Plans and Other Postretirement Employee Benefit Plans*

We offer pension benefits based on either a traditional defined benefit formula or a cash balance formula and also offer certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from the company. Costs of pension and OPEB plans are dependent upon numerous factors, assumptions and estimates. The pension and OPEB accrued benefit obligations reported in the balance sheet are in accordance with accounting standards related to employers' accounting for defined benefit pension and other postretirement plans. See Note 21 for additional information regarding pension and OPEB plans.

*Stock-Based Incentive Compensation*

Prior to the Merger, we provided discretionary awards payable in EFH Corp. common stock to qualified managerial employees under our shareholder-approved long-term incentive plans. In December 2007, our board of directors established our 2007 Stock Incentive Plan, which authorizes discretionary grants to directors, officers and qualified managerial employees of EFH Corp. or its affiliates of non-qualified stock options, stock appreciation rights, restricted shares, shares of common stock, the opportunity to purchase shares of common stock and other stock-based awards. Stock-based compensation expense is recognized over the vesting period based on the grant-date fair value of those awards. See Note 22 for information regarding stock-based incentive compensation.

*Sales and Excise Taxes*

Sales and excise taxes are accounted for as a "pass through" item on the balance sheet; i.e., the tax is billed to customers and recorded as trade accounts receivable with an offsetting amount recorded as a liability to the taxing jurisdiction.

*Franchise and Revenue-Based Taxes*

Unlike sales and excise taxes, franchise and gross receipt taxes are not a "pass through" item. These taxes are assessed to us by state and local government bodies, based on revenues or kWh delivered, as a cost of doing business and are recorded as an expense. Rates charged to customers by us are intended to recover the franchise and gross receipt taxes, but we are not acting as an agent to collect the taxes from customers.

*Income Taxes*

We file a consolidated federal income tax return, and federal income taxes are calculated for our subsidiaries substantially as if the entities file separate income tax returns. Deferred income taxes are provided for temporary differences between the book and tax basis of assets and liabilities. Effective with the sale of noncontrolling interests in Oncor (see Note 15), Oncor became a partnership for US federal income tax purposes, and we provide deferred income taxes on the difference between the book and tax basis of our investment in Oncor. Previously earned investment tax credits were deferred and amortized as a reduction of income tax expense over the estimated lives of the related properties. In connection with purchase accounting, the remaining unamortized investment tax credit amount related to unregulated businesses of $300 million was eliminated. Investment tax credits related to Oncor's regulated operations will continue to be amortized over the lives of the related properties in accordance with regulatory treatment. Certain provisions of the accounting guidance for income taxes provide that regulated enterprises are permitted to recognize deferred taxes as regulatory tax assets or tax liabilities if it is probable that such amounts will be recovered from, or returned to, customers in future rates.

*Accounting for Contingencies*

Our financial results may be affected by judgments and estimates related to loss contingencies. Accruals for loss contingencies are recorded when management determines that it is probable that an asset has been impaired or a liability has been incurred and that such economic loss can be reasonably estimated. Such determinations are subject to interpretations of current facts and circumstances, forecasts of future events and estimates of the financial impacts of such events. See Note 13 for a discussion of contingencies.

F-18

EFIHMW00223380

*Cash and Cash Equivalents*

For purposes of reporting cash and cash equivalents, temporary cash investments purchased with a remaining maturity of three months or less are considered to be cash equivalents.

We held an interest in The Reserve's US Government Fund, which began liquidation proceedings in September 2008 due to the credit crisis and withdrawal demands. In September 2008, we attempted to redeem our interest, totaling $242 million, in the US Government Fund, but due to the liquidation process, the funds were not immediately made available; accordingly, such amount was reclassified from cash and cash equivalents to investment held in money market fund. We received $100 million of the funds in November 2008 and the remaining $142 million in January 2009.

*Restricted Cash*

The terms of certain agreements require the restriction of cash for specific purposes. At December 31, 2009, $1.135 billion of cash is restricted to support letters of credit. See Notes 12 and 25 for more details regarding this and other restricted cash.

*Property, Plant and Equipment*

As a result of purchase accounting, carrying amounts of property, plant and equipment related to unregulated businesses on the Merger date were adjusted to estimated fair values. Subsequent additions are recorded at cost. Regulated properties at Oncor continue to be reported at original cost, which is considered to be fair value due to the cost-based regulated recovery and returns associated with those assets. The cost of self-constructed property additions includes materials and both direct and indirect labor and applicable overhead, including payroll-related costs.

Depreciation of our property, plant and equipment is calculated on a straight-line basis over the estimated service lives of the properties. As is common in the industry, the Predecessor historically recorded depreciation expense using composite depreciation rates that reflected blended estimates of the lives of major asset groups as compared to depreciation expense calculated on a component asset-by-asset basis. Effective with the Merger, depreciation expense for unregulated properties is calculated on a component asset-by-asset basis. Estimated depreciable lives are based on management's estimates of the assets' economic useful lives. See Note 25.

In accordance with the PUCT's August 2009 order in Oncor's rate review, the remaining net book value and anticipated removal cost of existing meters that are being replaced by advanced meters is being charged (amortized) to expense over an 11-year cost recovery period.

*Capitalized Interest*

Interest related to qualifying construction projects and qualifying software projects are capitalized in accordance with accounting guidance related to capitalization of interest cost. See Note 25.

*Inventories*

All inventories are reported at the lower of cost (on a weighted average basis) or market unless expected to be used in the generation of electricity. Also see discussion immediately below regarding environmental allowances and credits.

*Environmental Allowances and Credits*

Effective with the Merger, we began accounting for all environmental allowances and credits as identifiable intangible assets with finite lives that are subject to amortization. The recorded values of these intangible assets were originally established reflecting fair value determinations as of the date of the Merger under purchase accounting. Amortization expense associated with these intangible assets is recognized on a unit of production basis as the allowances or credits are consumed in generation operations. The environmental allowances and credits are assessed for impairment when conditions or events occur that could affect the carrying value of the assets. See Note 3 for details of impairment amounts recorded in 2008.

F-19

EFIHMW00223381

*Regulatory Assets and Liabilities*

The financial statements of our regulated electricity delivery operations reflect regulatory assets and liabilities under cost-based rate regulation in accordance with accounting standards related to the effect of certain types of regulation. The assumptions and judgments used by regulatory authorities continue to have an impact on the recovery of costs, the rate earned on invested capital and the timing and amount of assets to be recovered by rates. See Note 25 for details of the regulatory assets and liabilities.

*Investments*

Investments in a nuclear decommissioning trust fund are carried at fair market value in the balance sheet. Investments in unconsolidated business entities over which we have significant influence but do not maintain effective control, generally representing ownership of at least 20% and not more than 50% of common equity, are accounted for under the equity method. Assets related to employee benefit plans represent investments held to satisfy deferred compensation liabilities and are recorded at market value. See Note 19 for details of investments.

*Noncontrolling Interests*

See Note 15 for discussion of accounting for the noncontrolling interests of Oncor.

*Changes in Accounting Standards*

In January 2010, the FASB issued guidance on disclosure about fair value measurements. The guidance requires new disclosures of transfers in and out of Levels 1 and 2 of the fair value hierarchy and separate disclosure about purchases, sales, issuances and settlements in Level 3 of the fair value hierarchy. The guidance also provides clarification on disclosures related to the level of disaggregation among assets and liabilities and to the inputs and valuation techniques used to measure fair value. This new guidance is effective for periods beginning January 1, 2010, except for the new disclosures about purchases, sales, issuances and settlements in Level 3, which are effective for periods beginning January 1, 2011. As this new guidance provides only disclosure requirements, the adoption will not have any effect on reported results of operations, financial condition or cash flows.

In August 2009, the FASB issued guidance on measuring fair value of liabilities, which provides clarification of fair value measurement when there is limited or no observable data available. The adoption of this guidance, as of October 1, 2009, did not have any effect on reported results of operations, financial condition or cash flows, and did not have any effect on the disclosures of the fair value of our debt provided in Note 17.

In June 2009, the FASB issued "The FASB Accounting Standards Codification™ and the Hierarchy of Generally Accepted Accounting Principles," which establishes the FASB Accounting Standards Codification™ (Codification) as the source of authoritative US GAAP recognized by the FASB to be applied to nongovernmental entities. The Codification was effective for financial statements issued for interim and annual periods ending after September 15, 2009. The adoption of the Codification did not affect reported results of operations, financial condition or cash flows.

In June 2009, the FASB issued new guidance that requires reconsideration of consolidation conclusions for all variable interest entities and other entities with which we are involved. This new guidance is effective January 1, 2010. The provisions of this guidance could result in different consolidation conclusions than reached under previous guidance, as the emphasis is on the power to direct the activities of the variable interest entity instead of risk and reward. We continue to evaluate the impact of this new guidance on our financial statements. In consideration of the ring-fencing measures in place, as discussed above under "Description of Business," our evaluation may result in the deconsolidation of Oncor Holdings and its subsidiaries, which are the ring-fenced entities.

In June 2009, the FASB issued new guidance regarding accounting for transfers of financial assets that eliminates the concept of a qualifying special purpose entity, changes the requirements for derecognizing financial assets and requires additional disclosures. This new guidance is effective in the first quarter of 2010. We continue to evaluate the impact of this new guidance on our financial statements and footnote disclosures; however, we expect that our accounts receivable securitization program discussed in Note 11 will no longer be accounted for as a sale of accounts receivable as a result of the guidance, and the funding under the program will be reported as short-term borrowings. We do not expect this new guidance to impact the covenant-related ratio calculations in our debt agreements.

F-20

In May 2009, the FASB issued new guidance related to subsequent events that requires disclosure of the date through which we have evaluated subsequent events related to the financial statements being issued and the basis for that date. Our adoption of this guidance as of April 1, 2009 did not affect reported results of operations, financial condition or cash flows, and the required disclosure is provided above in "Basis of Presentation."

In April 2009, the FASB issued new guidance regarding determining fair value when the volume and level of activity for the asset or liability have significantly decreased or market transactions are not orderly. We adopted this guidance as of April 1, 2009. While this guidance did not change our fair value measurement techniques, it requires disclosures of additional detail of securities held in our nuclear decommissioning trust that are provided in Notes 16 and 19.

In April 2009, the FASB issued new guidance regarding the recognition and presentation of other-than-temporary impairments, which changed the guidance for recording impairment of investments in debt securities. Our adoption as of April 1, 2009 did not affect the accounting for our nuclear decommissioning trust fund because the trust balance has historically been reported at fair value, with changes in fair value of the trust resulting in changes in Oncor's regulatory asset or liability related to the decommissioning cost.

In December 2008, the FASB issued new guidance for employers' disclosures about postretirement benefit plan assets. This new guidance provides enhanced disclosures regarding how investment allocation decisions are made and certain aspects of fair value measurements on plan assets. The required disclosures are intended to provide transparency related to the types of assets and associated risks in an employer's defined benefit pension or other postretirement employee benefits plan and events in the economy and markets that could have a significant effect on the value of plan assets. As this new guidance provides only disclosure requirements, our adoption as of December 31, 2009 did not have any effect on reported results of operations, financial condition or cash flows. The disclosures are provided in Note 21.

In March 2008, the FASB issued amended disclosure guidance for derivative instruments and hedging activities. This amended guidance enhances required disclosures regarding derivatives and hedging activities to enable investors to better understand their effects on an entity's financial position, financial performance and cash flows. As this guidance provides only disclosure requirements, our adoption as of January 1, 2009 did not have any effect on reported results of operations or financial condition. The disclosures are provided in Note 18.

## 2.    FINANCIAL STATEMENT EFFECTS OF THE MERGER

As discussed in Note 1, the Merger was completed on October 10, 2007. The aggregate purchase price paid for the equity securities of EFH Corp. was $31.9 billion, which was financed by a combination of equity invested by the Sponsor Group and certain other investors and by borrowings under a senior secured credit facility and senior unsecured interim facilities. These facilities also funded the repayment and redemption of certain existing credit facilities and debt upon completion of the Merger. See Note 12 for a discussion of our debt.

The statements of consolidated income (loss) and cash flows for 2007 present Predecessor results from January 1 through October 10 and Successor results from October 11 through December 31.

*Sources and Uses*

The sources and uses of the funds for the Merger are summarized in the table below.

| Sources of funds: | | Use of funds:<br>(billions of dollars) | |
|---|---|---|---|
| Cash and other sources | $ 0.3 | Equity purchase price (c) | $31.9 |
| TCEH credit facilities (Note 12) | 27.0 | Transaction costs (d) | 0.8 |
| EFH Corp. senior unsecured interim facility (a) | 4.5 | Repayment of existing debt | 5.3 |
| Equity contributions (b) | 8.3 | Restricted cash | 1.2 |
| | | Financing fees related to new facilities | 0.9 |
| Total source of funds | $40.1 | Total uses of funds | $40.1 |

(a)    Interim facility that was repaid with the proceeds from the issuance of the EFH Corp. Senior Notes that are discussed in Note 12.

(b)    Consists of equity contributions by the Sponsor Group and certain other investors.

F-21

EFIHMW00223383

(c)    Represents 461.2 million outstanding shares of EFH Corp. common stock multiplied by $69.25 per share.

(d)    Represents professional fees incurred by the Sponsor Group that were directly associated with the Merger and accounted for as part of the purchase price.

*Purchase Price Allocation*

We accounted for the Merger under purchase accounting in accordance with the provisions of accounting standards related to business combinations, whereby the total purchase price of the transaction was allocated to our identifiable tangible and intangible assets acquired and liabilities assumed based on their fair values as of the Merger date as summarized in the table below. The fair values were determined based upon assumptions related to future cash flows, discount rates, and asset lives as well as factors more unique to us, our industry and the competitive wholesale power market that include forward natural gas price curves and market heat rates, retail customer attrition rates, generation plant operating and construction costs, and the effect on generation facility values of lignite fuel reserves and mining capabilities using currently available information. As a result of cost-based regulatory rate-setting processes, the book value of the majority of Oncor's assets and liabilities effectively represent fair value, and no adjustments to those regulated assets or liabilities were recorded. The excess of the purchase price over the fair value of net assets acquired was recorded as goodwill.

The goodwill amount recorded upon finalization of purchase accounting in 2008 totaled $23.2 billion. Management believes the drivers of the goodwill amount include the incremental value of the future cash flow potential of the baseload generation facilities, including facilities under construction, over the values assigned to those assets under purchase accounting rules, considering the market-pricing mechanisms and growth potential in the ERCOT market, as well as the value derived from the scale of the retail business. Management also believes that the goodwill reflects the value of the relatively stable, long-lived cash flows of the regulated business, considering the constructive regulatory environment and market growth potential. See Note 3 for disclosures related to goodwill, including an impairment recorded in the fourth quarter of 2008 and first quarter of 2009.

The following table summarizes the components of the final purchase price allocation:

| | |
|---|---|
| Equity purchase price | $31,935 |
| Transaction costs | 759 |
|     Total purchase price | 32,694 |
| | |
| Property, plant and equipment | 28,088 |
| Intangible assets (Note 3) | 4,454 |
| Regulatory assets and deferred debits | 1,445 |
| Other assets | 5,187 |
|     Total assets acquired | 39,174 |
| Short-term borrowings and long-term debt | 14,183 |
| Deferred tax liabilities | 7,706 |
| Other liabilities | 7,837 |
|     Total liabilities assumed | 29,726 |
|     Net identifiable assets acquired | 9,448 |
|     Goodwill | $23,246 |

The following table summarizes the change in the total amount of goodwill during 2008 as a result of purchase accounting:

| | |
|---|---|
| Goodwill at December 31, 2007 | $22,954 |
| Property, plant and equipment | 311 |
| Intangible assets | 30 |
| Regulatory assets — net | 2 |
| Other assets | 174 |
|     Total assets acquired | 517 |
| Deferred income tax liabilities | (263) |
| Other liabilities | 38 |
|     Total liabilities assumed | (225) |
|     Net identifiable assets acquired | 292 |
|       Goodwill at completion of purchase accounting | $23,246 |

F-22

EFIHMW00223384

**PX 045**
**Page 361 of 561**

The above changes relate largely to finalization of fair values of natural gas-fueled generation plants and amounts related to the Capgemini outsourcing agreement, as well as the effects on related deferred income tax balances.

Accrued liabilities were recorded in purchase accounting for exit activities resulting from the Merger. Exit liabilities recorded related to the cancellation of the development of coal-fueled generation facilities discussed in Note 4, the exit of certain administrative activities and the termination of outsourcing arrangements with Capgemini under change of control provisions of such arrangements (see Note 20). The following table summarizes the changes to the exit liability:

| | Competitive Electric segment | Regulated Delivery segment | Total |
|---|---|---|---|
| Liability for exit activities as of October 11, 2007 | $ 60 | $ — | $ 60 |
| Liability for exit activities as of December 31, 2007 | 60 | — | 60 |
| Additions to liability (a) | 38 | 16 | 54 |
| Payments recorded against liability | (60) | — | (60) |
| Liability for exit activities as of December 31, 2008 | 38 | 16 | 54 |
| Payments recorded against liability | (24) | (4) | (28) |
| Other adjustments to the liability (b) | (11) | (10) | (21) |
| Liability for exit activities as of December 31, 2009 (c) | $ 3 | $ 2 | $ 5 |

_____

(a)    Additional amounts recorded upon finalization of purchase accounting.

(b)    Represents reversal of exit liabilities due primarily to a shorter than expected outsourcing services transition period.

(c)    Remaining accrual is expected to be settled in 2010, the targeted date to complete the transition of outsourced activities back to us or to service providers.

*Unaudited Pro Forma Financial Information*

The following unaudited pro forma financial position and results of operations assume that the Merger-related transactions occurred on January 1, 2007. The unaudited pro forma information is provided for informational purposes only and is not necessarily indicative of what our results of operations would have been if the Merger-related transactions had occurred on that date, or what our results of operations will be for any future periods.

For the year ended December 31, 2007, unaudited pro forma revenues and net loss were $10.0 billion and $2.3 billion, respectively. Pro forma adjustments for the year ended December 31, 2007 consist of adjustments for the Predecessor period and consist of $473 million in depreciation and amortization expense (including amounts recognized in revenues or fuel and purchased power costs), $2.1 billion in interest expense and a $895 million income tax benefit.

## 3.    GOODWILL AND IDENTIFIABLE INTANGIBLE ASSETS

*Goodwill*

As discussed in Note 2, we accounted for the Merger under purchase accounting. The total goodwill amount recorded as a result of purchase accounting totaled $23.2 billion, representing the excess of the purchase price over the fair value of the tangible and identifiable intangible net assets acquired in the Merger; subsequently, impairment charges were recorded in the fourth quarter of 2008 and the first quarter of 2009 (discussed immediately below). Accounting guidance related to goodwill and other intangible assets requires that goodwill be assigned to "reporting units," which management has determined to be the Competitive Electric segment and the Regulated Delivery segment, which are largely comprised of TCEH and Oncor, respectively. The original goodwill amounts assigned to the Competitive Electric segment of $18.3 billion and the Regulated Delivery segment of $4.9 billion were based on the enterprise values of those businesses at the closing date of the Merger and the completion of purchase accounting.

Reported goodwill as of December 31, 2009 totaled $14.3 billion, with $10.2 billion assigned to the Competitive Electric segment and $4.1 billion to the Regulated Delivery segment. Reported goodwill as of December 31, 2008 totaled $14.4 billion, with $10.3 billion assigned to the Competitive Electric segment and $4.1 billion to the Regulated Delivery segment. None of this goodwill balance is being deducted for tax purposes.

F-23

*Goodwill and Trade Name Intangible Asset Impairments*

The 2009 annual impairment testing performed as of October 1, and December 1, 2009 for goodwill and intangible assets with indefinite useful lives in accordance with accounting guidance for a change in annual impairment testing dates resulted in no impairment (see discussion in Note 1 regarding change in the annual impairment test date from October 1 to December 1). The goodwill testing determined that the estimated fair value (enterprise value) of the Regulated Delivery segment exceeded its carrying value by approximately 10% resulting in no additional testing being required and no impairment for the segment. Key assumptions in the valuation of the regulated business include discount rates, growth of the rate base and return on equity allowed by the regulatory authority. Cash flows of the regulated business are relatively stable and more predictable than the competitive business. The Competitive Electric segment carrying value exceeded its estimated enterprise value (by less than 10%), so the estimated enterprise value of the segment was compared to the estimated fair values of its operating assets and liabilities. This additional testing indicated that the implied goodwill amount exceeded the recorded goodwill amount, and thus no goodwill impairment was recorded. The estimated enterprise value of the Competitive Electric segment reflects the impact of the decline in forward natural gas prices on wholesale electricity prices. Because lower wholesale electricity prices also result in lower fair values of our generation assets, calculated implied goodwill was sufficient to support the recorded goodwill amount. Key variables in the tests included forward natural gas prices, electricity prices, market heat rates and discount rates, assumptions regarding each of which could have a significant effect on valuations. Because of the volatility of these factors, we cannot predict the likelihood of any future impairment.

In the first quarter of 2009, we recorded a $90 million goodwill impairment charge largely related to the Competitive Electric segment. This charge resulted from the completion of fair value calculations supporting the initial $8.860 billion goodwill impairment charge that was recorded in the fourth quarter of 2008 and consisted of an impairment of $8.0 billion related to the Competitive Electric segment and $860 million related to the Regulated Delivery segment. The impairment charge primarily reflected the dislocation in the capital markets during the fourth quarter of 2008 that increased interest rate spreads and the resulting discount rates used in estimating fair values and the effect of declines in market values of debt and equity securities of comparable companies. The impairment determination involved significant assumptions and judgments in estimating enterprise values of the Competitive Electric and Regulated Delivery segments and the fair values of their assets and liabilities. This cumulative $8.950 billion charge is the only goodwill impairment recorded since the Merger.

Also in the fourth quarter of 2008, we recorded a trade name intangible asset impairment charge totaling $481 million ($310 million after-tax). The impairment primarily arises from the increase in the discount rate used in estimating fair value as discussed above.

Although the annual impairment test date for goodwill and intangible assets with indefinite lives set by management was October 1, management determined that in consideration of the continuing deterioration of securities values during the fourth quarter of 2008, an impairment testing trigger occurred subsequent to that test date; consequently, the impairment charges were based on estimated fair values at December 31, 2008. See Note 1 for discussion of the change of the annual impairment test date to December 1 in 2009.

The calculations supporting the impairment determination utilized models that took into consideration multiple inputs, including commodity prices, debt yields, equity prices of comparable companies and other inputs. Those models were generally used in developing long-term forward price curves for certain commodities and discount rates for determining fair values of our reporting units as well as certain individual assets and liabilities of those businesses. The fair value measurements resulting from such models are classified as Level 3 non-recurring fair value measurements consistent with accounting standards related to the determination of fair value (see Note 16).

EFIHMW00223386

*Identifiable Intangible Assets*

Identifiable intangible assets reported in the balance sheet are comprised of the following:

| | Successor | | | | | |
|---|---|---|---|---|---|---|
| | As of December 31, 2009 | | | As of December 31, 2008 | | |
| | Gross Carrying Amount | Accumulated Amortization | Net | Gross Carrying Amount | Accumulated Amortization | Net |
| Retail customer relationship | $ 463 | $ 215 | $ 248 | $ 463 | $ 130 | $ 333 |
| Favorable purchase and sales contracts | 700 | 374 | 326 | 700 | 249 | 451 |
| Capitalized in-service software | 490 | 167 | 323 | 255 | 116 | 139 |
| Environmental allowances and credits | 992 | 212 | 780 | 994 | 121 | 873 |
| Land easements | 188 | 72 | 116 | 184 | 69 | 115 |
| Mining development costs | 32 | 5 | 27 | 19 | 2 | 17 |
| Total intangible assets subject to amortization | $ 2,865 | $ 1,045 | 1,820 | $ 2,615 | $ 687 | 1,928 |
| Trade name (not subject to amortization) | | | 955 | | | 955 |
| Mineral interests (not currently subject to amortization) | | | 101 | | | 110 |
| Total intangible assets | | | $2,876 | | | $2,993 |

Details of amortization expense related to intangible assets (including income statement line item in which the amortization is included) follows:

| Intangible Asset (Income Statement line) | Segment | Successor | | | | Predecessor |
|---|---|---|---|---|---|---|
| | | Useful lives at December 31, 2009 (weighted average in years) | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Retail customer relationship (Depreciation and amortization) | Competitive Electric | 4 | $ 85 | $ 51 | $ 79 | $ — |
| Favorable purchase and sales contracts (Operating revenues/ fuel, purchased power costs and delivery fees) | Competitive Electric | 12 | 125 | 168 | 72 | — |
| Capitalized in-service software (Depreciation and amortization) | All | 5 | 53 | 44 | 8 | 23 |
| Environmental allowances and credits (Fuel, purchased power costs and delivery fees) | Competitive Electric | 28 | 91 | 102 | 20 | — |
| Land easements (Depreciation and amortization) | Regulated Delivery | 67 | 3 | 3 | — | 2 |
| Mining development costs (Depreciation and amortization) | Competitive Electric | 5 | 3 | 1 | — | — |
| Total amortization expense | | | $ 360 | $ 369 | $ 179 | $ 25 |

Separately identifiable and previously unrecognized intangible assets acquired and recorded as part of purchase accounting for the Merger are described as follows:

- *Retail Customer Relationship* — Retail customer relationship intangible asset represents the estimated fair value of the non-contracted customer base and is being amortized using an accelerated method based on customer attrition rates and reflecting the expected pattern in which economic benefits are realized over their estimated useful life.

F-25

EFIHMW00223387

- *Favorable Purchase and Sales Contracts* — Favorable purchase and sales contracts intangible asset primarily represents the above market value, based on observable prices or estimates, of commodity contracts for which: (i) we have made the "normal" purchase or sale election allowed by accounting standards related to derivative instruments and hedging transactions or (ii) the contracts did not meet the definition of a derivative. The amortization periods of these intangible assets are based on the terms of the contracts. Unfavorable purchase and sales contracts are recorded as other noncurrent liabilities and deferred credits (see Note 25).

- *Trade name* — The trade name intangible asset represents the estimated fair value of the TXU Energy trade name, and was determined to be an indefinite-lived asset not subject to amortization. This intangible asset will be evaluated for impairment at least annually in accordance with accounting guidance related to goodwill and other intangible assets. See above for discussion of an impairment charge recorded in 2008.

- *Environmental Allowances and Credits* — This intangible asset represents the fair value, based on observable prices or estimates, of environmental credits, substantially all of which were expected to be used in our power generation activities. These credits are amortized utilizing a units-of-production method.

**Impairment of Environmental Allowances and Credits Intangible Assets**

In March 2005, the EPA issued regulations called the Clean Air Interstate Rule (CAIR) for 28 states, including Texas, where our generation facilities are located. CAIR requires reductions of SO2 and NOx emissions from power generation facilities in these states. The SO2 reductions were beyond the reductions required under the Clean Air Act's existing acid rain cap-and-trade program (the Acid Rain Program). CAIR also established a new regional cap-and-trade program for NOx emissions reductions.

In July 2008, the US Court of Appeals for the D.C. Circuit (the D.C. Circuit Court) invalidated CAIR. The D.C. Circuit Court did not overturn the existing cap-and-trade program for SO2 reductions under the Acid Rain Program.

Based on the D.C. Circuit Court's ruling, we recorded a noncash impairment charge to earnings in 2008. We impaired NOx allowances in the amount of $401 million (before deferred income tax benefit). As a result of the D.C. Circuit Court's decision, NOx allowances would no longer be needed, and thus there would not be an actively traded market for such allowances. Consequently, our NOx allowances would likely have very little value absent reversal of the D.C. Circuit Court's decision or promulgation of new rules by the EPA. In addition, we impaired SO 2 allowances in the amount of $100 million (before deferred income tax benefit). While the D.C. Circuit Court did not invalidate the Acid Rain Program, we would have more SO2 allowances than we would need to comply with the Acid Rain Program. While there continued to be a market for SO2 allowances, the D.C. Circuit Court's decision resulted in a material decrease in the market price of SO2 allowances.

The impairment amounts recorded in 2008 were reported in other deductions and reflected in the results of the Competitive Electric segment.

In December 2008, in response to an EPA petition, the D.C. Circuit Court reversed, in part, its previous ruling. Such reversal confirmed CAIR is not valid, but allowed it to remain in place while the EPA revises CAIR to correct the previously identified shortcomings. Since the D.C. Circuit Court did not prescribe a deadline for this revision, at this time, we cannot predict how or when the EPA may revise CAIR.

*Estimated Amortization of Intangible Assets* — The estimated aggregate amortization expense of intangible assets for each of the next five fiscal years is as follows:

| Year | Amortization Expense |
|------|---------------------:|
| 2010 | $ 278 |
| 2011 | 210 |
| 2012 | 166 |
| 2013 | 147 |
| 2014 | 133 |

F-26

EFIHMW00223388

**PX 045**
**Page 365 of 561**

4.    **CHARGES RELATED TO CANCELLED DEVELOPMENT OF COAL-FUELED GENERATION FACILITIES**

In 2007, we recorded a net charge totaling $757 million ($492 million after-tax), substantially all of which was in the Predecessor period, in connection with the February 2007 suspension of the development of eight coal-fueled generation units. This decision and subsequent terminations of equipment orders required an evaluation of the recoverability of recorded assets associated with the development program. The net charge included $705 million for the impairment of construction work-in-process asset balances (primarily pre-construction development costs), $79 million for costs arising from terminations of equipment orders, $29 million for the write-off of deferred financing costs and a $57 million gain on sale (in early October 2007) of two in-process boilers. Additional charges totaling $12 million ($8 million after-tax) were recorded in 2008, which primarily represented costs for transportation and storage of materials.

The construction work-in-process asset balances totaled $871 million prior to the writedown and included progress payments made and accruals for amounts due to equipment suppliers, based on percentage of completion estimates, engineering and design services costs, site preparation expenditures, internal salary and related overhead costs for personnel engaged directly in construction management activities and capitalized interest. The remaining carrying value of assets related to the program at December 31, 2009 totaled $77 million and represented estimated recovery amounts, using a probability-weighted methodology, from equipment salvage and potential resale activities. Cumulative net cash proceeds through December 31, 2009 from the sale of the impaired assets totaled $172 million.

We have terminated all of the equipment orders, with the exception of one purchase order for a boiler that we are attempting to sell, and the air permit applications related to the eight units were formally withdrawn from the TCEQ in October 2007 after the close of the Merger. The net charges arising from cancellation of this development program have been classified in other deductions and are reported in the results of the Competitive Electric segment.

5.    **IMPAIRMENT OF NATURAL GAS-FUELED GENERATION FACILITIES**

In 2008, we performed an evaluation of our natural gas-fueled generation facilities for impairment. The impairment test was triggered by a determination that it was more likely than not that certain generation units would be retired or mothballed (idled) earlier than previously expected. The natural gas-fueled generation units are generally operated to meet peak demands for electricity and all such facilities are tested for impairment as an asset group. As a result of the evaluation, it was determined that an impairment existed, and a charge of $229 million ($147 million after-tax) was recorded to write down the assets to fair value of approximately $28 million, which was determined based on discounted estimated future cash flows. The impairment was reported in other deductions in the Competitive Electric segment.

6.    **STIPULATION APPROVED BY THE PUCT**

Oncor and Texas Holdings agreed to the terms of a stipulation, which was conditional upon completion of the Merger, with major interested parties to resolve all outstanding issues in the PUCT review related to the Merger. In February 2008, the PUCT entered an order approving the stipulation. The PUCT issued a final order on rehearing in April 2008 that has been appealed to 200th District Court of Travis County, Texas. The parties to the appeal have agreed to a schedule that would result in a hearing in June 2010.

In addition to commitments Oncor made in its filings in the PUCT review, the stipulation included the following provisions, among others:

- Oncor provided a one-time $72 million refund to its REP customers in the September 2008 billing cycle. The refund was in the form of a credit on distribution fee billings. The liability for the refund was recorded as part of purchase accounting.

- Consistent with the 2006 cities rate settlement (see Note 7), Oncor filed a system-wide rate case in June 2008 based on a test-year ended December 31, 2007. In August 2009, the PUCT issued a final order on this rate case. See Note 25.

F-27

EFIHMW00223389

PX 045
Page 366 of 561

- Oncor agreed not to request recovery of approximately $56 million of regulatory assets related to self-insurance reserve costs and 2002 restructuring expenses. These regulatory assets were eliminated as part of purchase accounting.

- The dividends paid by Oncor will be limited through December 31, 2012, to an amount not to exceed Oncor's net income (determined in accordance with GAAP, subject to certain defined adjustments) for the period beginning October 11, 2007 and ending December 31, 2012, and are further limited by an agreement that Oncor's regulatory capital structure, as determined by the PUCT, will be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.

- Oncor committed to minimum capital spending of $3.6 billion over the five-year period ending December 31, 2012, subject to certain defined conditions.

- Oncor committed to an additional $100 million in spending over the five-year period ending December 31, 2012 on demand-side management or other energy efficiency initiatives. These additional expenditures will not be recoverable in rates, and this amount was recorded as a regulatory liability as part of purchase accounting and consistent with accounting standards related to the effect of certain types of regulation.

- If Oncor's credit rating is below investment grade with two or more rating agencies, TCEH will post a letter of credit in an amount of $170 million to secure TXU Energy's payment obligations to Oncor.

- Oncor agreed not to request recovery of the $4.9 billion of goodwill resulting from purchase accounting or any future impairment of the goodwill in its rates.

## 7. CITIES RATE SETTLEMENT IN 2006

In January 2006, Oncor agreed with a steering committee representing 108 cities in Texas (Cities) to defer the filing of a system-wide rate case with the PUCT to no later than July 1, 2008 (based on a test year ending December 31, 2007). Oncor filed the rate case with the PUCT in June 2008, and the PUCT issued a final order on the case in 2009. Oncor extended the benefits of the agreement to 292 nonlitigant cities. The agreements provided that Oncor would make payments to participating cities totaling approximately $70 million, including incremental franchise taxes.

This amount was recognized in earnings over the period from May 2006 through June 2008. Amounts recognized totaled $11 million in 2009, $23 million in 2008, $8 million for the period October 11, 2007 through December 31, 2007 and $25 million for the period January 1, 2007 through October 10, 2007, of which $2 million, $13 million, $6 million and $20 million, respectively, were reported in other deductions (see Note 10), with the remainder reported in franchise and revenue-based taxes. Amounts recognized in 2009 represented extension of benefits per the agreement related to the timing of completion of the rate case.

## 8. ACCOUNTING FOR UNCERTAINTY IN INCOME TAXES

Effective January 1, 2007, we adopted accounting guidance related to uncertain tax positions. This guidance requires that all tax positions subject to uncertainty be reviewed and assessed with recognition and measurement of the tax benefit based on a "more-likely-than-not" standard with respect to the ultimate outcome, regardless of whether this assessment is favorable or unfavorable. We applied updated guidance to determine if each tax position was effectively settled for the purpose of recognizing previously uncertain tax positions. We completed our review and assessment of uncertain tax positions and in the 2007 Predecessor period recorded a net benefit to retained earnings and a decrease to noncurrent liabilities of $33 million in accordance with the new accounting rule.

We file income tax returns in US federal, state and foreign jurisdictions and are subject to examinations by the IRS and other taxing authorities. Examinations of our income tax returns for the years ending prior to January 1, 2003 are complete, but the tax years 1997 to 2002 remain in appeals with the IRS. The conclusion of issues contested from the 1997 to 2002 audit, including matters related to TXU Europe, is not expected to occur prior to 2011. In 2008, we were notified of the commencement of an IRS audit of tax years 2003 to 2006. The audit is expected to require two years to complete. Texas franchise and margin tax returns are under examination or still open for examination for tax years beginning after 2002.

F-28

In 2008, we participated in negotiations with the IRS regarding the 2002 worthlessness loss associated with our discontinued Europe business, and we reduced the liability for uncertain tax positions in accordance with accounting guidance. The reduction in the liability of approximately $375 million was largely offset by a reduction of deferred tax assets related to alternative minimum tax.

We classify interest and penalties related to uncertain tax positions as current income tax expense. Amounts recorded related to interest and penalties totaled $42 million in 2009, $88 million in 2008, including $29 million recorded as goodwill, $12 million for the period October 11, 2007 through December 31, 2007 and $43 million for the period January 1, 2007 through October 10, 2007 (all amounts after tax).

Noncurrent liabilities included a total of $361 million and $198 million in accrued interest at December 31, 2009 and 2008, respectively. Effective in 2009, the federal income tax benefit on the interest accrued on uncertain tax positions is recorded as accumulated deferred income taxes. Such amounts were previously reported net as a reduction of the liability for uncertain tax positions.

The following table summarizes the changes to the uncertain tax positions, reported in other noncurrent liabilities in the consolidated balance sheet, during the years ended December 31, 2009 and 2008:

|  | 2009 | 2008 |
|---|---|---|
| Balance at January 1, excluding interest and penalties | $1,583 | $1,834 |
| Additions based on tax positions related to prior years | 71 | 124 |
| Reductions based on tax positions related to prior years | (82) | (451) |
| Additions based on tax positions related to the current year | 66 | 33 |
| Settlements with taxing authorities | — | 43 |
| Reductions related to the lapse of the tax statute of limitations | — | — |
| Balance at December 31, excluding interest and penalties | $1,638 | $1,583 |

Of the balance at December 31, 2009, $1.474 billion represents tax positions for which the uncertainty relates to the timing of recognition in tax returns. The disallowance of such positions would not affect the effective tax rate, but would accelerate the payment of cash to the taxing authority to an earlier period.

With respect to tax positions for which the ultimate deductibility is uncertain (permanent items), should we sustain such positions on income tax returns previously filed, liabilities recorded would be reduced by $164 million, resulting in increased income from continuing operations and a favorable impact on the effective tax rate.

We filed a claim in 2006 for refund of income taxes and related interest paid in 2005 associated with IRS audits of 1993 and 1994 tax returns of a discontinued operation. The expected refund was recognized in the adoption of accounting guidance related to uncertain tax positions. We received the refund, totaling $98 million, in February 2009.

We do not expect the total amount of liabilities recorded related to uncertain tax positions will significantly increase or decrease within the next 12 months.

F-29

EFIHMW00223391

9.   **INCOME TAXES**

The components of our income tax expense (benefit) applicable to continuing operations are as follows:

|  | Successor | | | Predecessor |
|---|---|---|---|---|
|  | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Current: | | | | |
| US Federal | $ 64 | $ (46) | $ 52 | $ 400 |
| State | 51 | 52 | 10 | 20 |
| Total | 115 | 6 | 62 | 420 |
| Deferred: | | | | |
| US Federal | 256 | (482) | (722) | 12 |
| State | 1 | 10 | (12) | (108) |
| Total | 257 | (472) | (734) | (96) |
| Amortization of investment tax credits | (5) | (5) | (1) | (15) |
| Total | $ 367 | $ (471) | $ (673) | $ 309 |

Reconciliation of income taxes computed at the US federal statutory rate to income tax expense:

|  | Successor | | | Predecessor |
|---|---|---|---|---|
|  | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Income (loss) from continuing operations before income taxes | $ 775 | $ (10,469) | $ (2,034) | $ 1,008 |
| Income taxes at the US federal statutory rate of 35% | $ 271 | $ (3,664) | $ (712) | $ 353 |
| Nondeductible goodwill impairment | 32 | 3,101 | — | — |
| Lignite depletion allowance | (18) | (29) | (5) | (30) |
| Production activities deduction | — | — | 10 | (10) |
| Amortization of investment tax credits — net of deferred income tax effect | (5) | (5) | (1) | (12) |
| Amortization (under regulatory accounting) of statutory rate changes | 5 | 2 | — | 2 |
| Medicare subsidy — other postretirement employee benefits | (7) | (6) | (2) | (6) |
| Nondeductible interest expense | 13 | 11 | 1 | — |
| Nondeductible losses (earnings) on benefit plans | (1) | 9 | (1) | (6) |
| Texas margin tax, net of federal tax benefit | 30 | 39 | (3) | 16 |
| Texas margin tax — deferred tax adjustment | — | — | — | (70) |
| Nondeductible merger transaction costs | — | — | 23 | — |
| Deferred tax adjustments | — | — | — | 25 |
| Accrual of interest, net of federal tax benefit | 42 | 59 | 12 | 43 |
| Other, including audit settlements | 5 | 12 | 5 | 4 |
| Income tax expense (benefit) | $ 367 | $ (471) | $ (673) | $ 309 |
| Effective tax rate | 47.4% | 4.5% | 33.1% | 30.7% |

*Texas Margin Tax*

In May 2006, the Texas legislature enacted a new law that reformed the Texas franchise tax system and replaced it with a new tax system, referred to as the Texas margin tax. The Texas margin tax has been determined to be an income tax for accounting purposes. In June 2007, an amendment to this law was enacted that included clarifications and technical changes to the provisions of the tax calculation. In the 2007 Predecessor period, we recorded a deferred tax benefit of $70 million, essentially all of which related to changes in the rate at which a tax credit is calculated as specified in the new law. Of the total $70 million deferred tax benefit, $32 million was recognized in the Competitive Electric segment results and $38 million was recognized in the Corporate and Other nonsegment results.

F-30

EFIHMW00223392

*Deferred Income Tax Balances*

Deferred income taxes provided for temporary differences based on tax laws in effect at December 31, 2009 and 2008 balance sheet dates are as follows:

| | | Successor | | | | |
|---|---|---|---|---|---|---|
| | December 31, 2009 | | | December 31, 2008 | | |
| | Total | Current | Noncurrent | Total | Current | Noncurrent |
| **Deferred Income Tax Assets** | | | | | | |
| Alternative minimum tax credit carryforwards | $ 438 | $ — | $ 438 | $ 447 | $ — | $ 447 |
| Employee benefit liabilities | 206 | 22 | 184 | 173 | 33 | 140 |
| Net operating loss (NOL) carryforwards | 422 | — | 422 | 523 | — | 523 |
| Unfavorable purchase and sales contracts | 249 | — | 249 | 259 | — | 259 |
| Accrued interest | 211 | — | 211 | — | — | — |
| Other | 351 | 13 | 338 | 260 | 44 | 216 |
| Total | 1,877 | 35 | 1,842 | 1,662 | 77 | 1,585 |
| **Deferred Income Tax Liabilities** | | | | | | |
| Property, plant and equipment | 4,141 | — | 4,141 | 4,375 | — | 4,375 |
| Basis difference in Oncor partnership (a) | 1,369 | — | 1,369 | 1,333 | — | 1,333 |
| Commodity contracts and interest rate swaps | 1,325 | 30 | 1,295 | 645 | 31 | 614 |
| Identifiable intangible assets | 921 | — | 921 | 1,049 | — | 1,049 |
| Debt fair value discounts | 184 | — | 184 | 257 | — | 257 |
| Other | 63 | — | 63 | 26 | 2 | 24 |
| Total | 8,003 | 30 | 7,973 | 7,685 | 33 | 7,652 |
| **Net Deferred Income Tax (Asset) Liability** | $6,126 | $ (5) | $ 6,131 | $6,023 | $ (44) | $ 6,067 |

(a) See Note 14.

At December 31, 2009 we had $438 million of alternative minimum tax credit carryforwards (AMT) available to offset future tax payments. The AMT credit carryforwards have no expiration date. At December 31, 2009, we had net operating loss (NOL) carryforwards for federal income tax purposes of $1.206 billion that expire between 2023 and 2028. The NOL carryforwards can be used to offset future taxable income. We expect to utilize all of our NOL carryforwards prior to their expiration dates.

The component of deferred income tax liabilities referred to as "basis difference in Oncor partnership" arose as a result of the sale of noncontrolling interests in Oncor (see Note 15) at which time Oncor became a partnership for US federal income tax purposes. The amount of this basis difference at the date of the transaction represented our interest (approximately 80%) in the net deferred tax liabilities related to Oncor's individual operating assets and liabilities. The remaining net deferred tax liabilities associated with Oncor ($321 million at December 31, 2009) that are attributable to the noncontrolling interests have been reclassified as other noncurrent liabilities (see Note 25).

The income tax effects of the components included in accumulated other comprehensive income at December 31, 2009 and 2008 totaled a net deferred tax asset of $165 million and $207 million, respectively.

See Note 8 for discussion regarding accounting for uncertain tax positions.

F-31

EFIHMW00223393

## 10.   OTHER INCOME AND DEDUCTIONS

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| **Other income:** | | | | |
| Accretion of adjustment (discount) of regulatory assets resulting from purchase accounting (Note 25) | $        39 | $        44 | $        10 | $        — |
| Amortization of gain on sale of TXU Fuel (a) | — | — | — | 36 |
| Debt extinguishment gain (Note 12) | 87 | — | — | — |
| Reversal of reserves recorded in purchase accounting (b) | 44 | — | — | — |
| Fee received related to interest rate swap/commodity hedge derivative agreement (c) (Note 18) | 6 | — | — | — |
| Insurance recoveries (d) | — | 21 | — | — |
| Net gain on sale of other properties and investments | 4 | 4 | 1 | 4 |
| Reduction of insurance reserves related to discontinued operations | — | — | 1 | 7 |
| Penalty received for nonperformance under a coal transportation agreement | — | — | — | 6 |
| Mineral rights royalty income | 6 | 4 | 1 | 8 |
| Other | 18 | 7 | 1 | 8 |
| Total other income | $      204 | $        80 | $        14 | $        69 |
| **Other deductions:** | | | | |
| Impairment of trade name intangible asset (Note 3) | $        — | $      481 | $        — | $        — |
| Impairment of emission allowances intangible assets (Note 3) | — | 501 | — | — |
| Charge for impairment of natural gas-fueled generation facilities (Note 5) | — | 229 | — | — |
| Impairment of land (e) | 34 | — | — | — |
| Charge related to Lehman bankruptcy (f) | — | 26 | — | — |
| Write-off of regulatory assets (Note 25) | 25 | — | — | — |
| Professional fees incurred related to the Merger (g) | — | 14 | 51 | 39 |
| Net charges related to cancelled development of generation facilities (Note 4) | 6 | 12 | 2 | 755 |
| Severance charges | 7 | — | — | — |
| Charge related to termination of rail car lease (h) | — | — | — | 10 |
| Other asset writeoffs (i) | 5 | 2 | — | 34 |
| Credit related to impaired leases (j) | — | — | — | (48) |
| Costs related to 2006 cities rate settlement (Note 7) | 2 | 13 | 6 | 20 |
| Litigation/regulatory settlements | 3 | 10 | — | 5 |
| Expenses related to cancelled joint venture at Oncor | — | — | — | 12 |
| Other | 15 | 13 | 2 | 14 |
| Total other deductions | $        97 | $    1,301 | $        61 | $      841 |

---

(a)   As part of the 2004 sale of the assets of TXU Fuel, TCEH entered into a transportation agreement with the new owner, intended to be market-price based, to transport natural gas to TCEH's generation plants. Because of the continuing involvement in the business through the transportation agreement, the pretax gain of $375 million related to the sale was deferred and being recognized over the eight-year life of the transportation agreement, and the business was not accounted for as a discontinued operation. The remaining $218 million deferred gain was eliminated as part of purchase accounting related to the Merger. Reported in Corporate and Other activities.

Confidential

(b)   Includes $23 million for reversal of a use tax accrual, related to periods prior to the Merger, due to a state ruling in 2009 (reported in Competitive Electric segment) and $21 million for reversal of excess exit liabilities recorded in connection with the termination of outsourcing arrangements (see Notes 2 and 20) (reported in Competitive Electric ($11 million) and Regulated Delivery segments ($10 million)).

(c)   Reported in Competitive Electric segment.

F-32

(d)  Represents insurance recovery for damage to mining equipment. Reported in Competitive Electric segment.

(e)  Impairment of land expected to be sold in the next 12 months. Reported in Competitive Electric segment.

(f)  Represents reserve established against amounts due (excluding termination related costs) from subsidiaries of Lehman Brothers Holdings Inc. (Lehman) arising from commodity hedging and trading activities. There are no open positions with these subsidiaries. Reported in Competitive Electric segment.

(g)  Includes post-Merger consulting expenses related to optimizing business performance. Reported in Corporate and Other activities.

(h)  Represents costs associated with termination and refinancing of a rail car lease. Reported in Competitive Electric segment.

(i)  Predecessor period includes $30 million of previously deferred costs, consisting primarily of professional fees for tax, legal and other advisory services, in connection with certain previously anticipated strategic transactions (including expected financings) that were no longer expected to be consummated as a result of the Merger. Reported in Corporate and Other activities.

(j)  In 2004, we recorded a charge of $157 million for leases of certain natural gas-fueled combustion turbines, net of estimated sublease revenues, that were no longer operated for our own benefit. In the third quarter of 2007, a $48 million reduction in the related liability was recorded to reflect new subleases entered into in October 2007 (reported in the Competitive Electric segment results). The remaining $59 million liability was eliminated as part of purchase accounting as we intend to operate these assets for our own benefit.

## 11.  TRADE ACCOUNTS RECEIVABLE AND SALE OF RECEIVABLES PROGRAM

TXU Energy participates in an accounts receivable securitization program, the activity under which is accounted for as a sale of accounts receivable in accordance with transfers and servicing accounting standards (see Note 1 for discussion of a new accounting standard effective in the first quarter of 2010). Under the program, TXU Energy (originator) sells trade accounts receivable to TXU Receivables Company, which is a special purpose entity created for the purpose of purchasing receivables from the originator and is a consolidated wholly-owned bankruptcy-remote direct subsidiary of EFH Corp. TXU Receivables Company sells undivided interests in the purchased accounts receivable for cash to special purpose entities established by financial institutions (the funding entities). As discussed below, Oncor also participated in the program prior to the Merger.

The maximum amount currently available under the accounts receivable securitization program is $700 million, and program funding totaled $383 million at December 31, 2009. Under the terms of the program, available funding was reduced by the total of $83 million of customer deposits held by the originator at December 31, 2009 because TCEH's credit ratings were lower than Ba3/BB-.

All new trade receivables under the program generated by the originator are continuously purchased by TXU Receivables Company with the proceeds from collections of receivables previously purchased. Changes in the amount of funding under the program, through changes in the amount of undivided interests sold by TXU Receivables Company, reflect seasonal variations in the level of accounts receivable, changes in collection trends and other factors such as changes in sales prices and volumes. TXU Receivables Company has issued subordinated notes payable to the originator for the difference between the face amount of the uncollected accounts receivable purchased, less a discount, and cash paid to the originator that was funded by the sale of the undivided interests. The balance of the subordinated notes payable, which is eliminated in consolidation, totaled $463 million and $268 million at December 31, 2009 and 2008, respectively.

The discount from face amount on the purchase of receivables from the originator principally funds program fees paid to the funding entities. The program fees, which are also referred to as losses on sale of the receivables under transfers and servicing accounting standards, consist primarily of interest costs on the underlying financing. The discount also funds a servicing fee paid by TXU Receivables Company to EFH Corporate Services Company (Service Co.), a direct wholly-owned subsidiary of EFH Corp., which provides recordkeeping services and is the collection agent for the program.

Program fee amounts, which are reported in SG&A expenses, were as follows:

|  | Successor | | | Predecessor |
|---|---|---|---|---|
|  | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Program fees | $        12 | $        25 | $        9 | $        32 |
| Program fees as a percentage of average funding (annualized) | 2.4% | 5.2% | 9.5% | 6.4% |

F-33

The trade accounts receivable balance reported in the December 31, 2009 consolidated balance sheet includes $846 million face amount of retail trade accounts receivable sold net of proceeds from the sale of undivided interests in those receivables totaling $383 million. Funding under the program decreased $33 million in 2009, increased $53 million in 2008 and decreased $264 million in 2007. Funding increases or decreases under the program are reflected as operating cash flow activity in the statement of cash flows. The carrying amount of the retained interests in the accounts receivable balance approximated fair value due to the short-term nature of the collection period.

In connection with the Merger, the accounts receivable securitization program was amended. Concurrently with the amendment, the financial institutions required that Oncor repurchase all of the receivables it had previously sold to TXU Receivables Company, which totaled $254 million. Oncor funded such repurchases through borrowings under its credit facility of $113 million, and a related subordinated note receivable from TXU Receivables Company in the amount of $141 million was canceled. Amounts related to Oncor's trade accounts receivable for the period from January 1, 2007 through October 10, 2007 totaled $6 million in program fees and $27 million in operating cash flows provided, exclusive of the $113 million used by Oncor to repurchase its receivables at the time of the Merger.

Activities of TXU Receivables Company were as follows:

| | Successor | | | Predecessor |
|---|---|---|---|---|
| | Year Ended December 31, 2009 | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| Cash collections on accounts receivable | $ 6,125 | $ 6,393 | $ 1,538 | $ 6,251 |
| Face amount of new receivables purchased | (6,287) | (6,418) | (1,194) | (6,628) |
| Discount from face amount of purchased receivables | 14 | 29 | 9 | 35 |
| Program fees paid to funding entities | (12) | (25) | (9) | (32) |
| Servicing fees paid to Service Co. for recordkeeping and collection services | (2) | (4) | (1) | (3) |
| Increase (decrease) in subordinated notes payable | 195 | (28) | (120) | 305 |
| Oncor's repurchase of receivables previously sold | — | — | 113 | — |
| Operating cash flows used by (provided to) originators under the program | $ 33 | $ (53) | $ 336 | $ (72) |

The program, which expires in October 2013, may be terminated upon the occurrence of a number of specified events, including if the delinquency ratio (delinquent for 31 days) for the sold receivables, the default ratio (delinquent for 91 days or deemed uncollectible), the dilution ratio (reductions for discounts, disputes and other allowances) or the days collection outstanding ratio exceed stated thresholds, and the funding entities do not waive such event of termination. The thresholds apply to the entire portfolio of sold receivables. In addition, the program may be terminated if TXU Receivables Company or the EFH Corp. subsidiary acting as collection agent defaults in any payment with respect to debt in excess of $50,000 in the aggregate for such entities, or if TCEH, any affiliate of TCEH acting as collection agent other than the EFH Corp. subsidiary, any parent guarantor of the originator or the originator shall default in any payment with respect to debt (other than hedging obligations) in excess of $200 million in the aggregate for such entities. As of December 31, 2009, there were no such events of termination.

Upon termination of the program, liquidity would be reduced as collections of sold receivables would be used by TXU Receivables Company to repurchase the undivided interests from the funding entities instead of purchasing new receivables. The level of cash flows would normalize in approximately 16 to 30 days.

The subordinated notes issued by TXU Receivables Company are subordinated to the undivided interests of the funding entities in the purchased receivables.

F-34

EFIHMW00223397

*Trade Accounts Receivable*

| | Successor December 31, | |
| | 2009 | 2008 |
|---|---|---|
| Gross wholesale and retail trade accounts receivable | $1,726 | $1,705 |
| Undivided interests in retail accounts receivable sold by TXU Receivables Company | (383) | (416) |
| Allowance for uncollectible accounts | (83) | (70) |
| Trade accounts receivable — reported in balance sheet | $1,260 | $1,219 |

Gross trade accounts receivable at December 31, 2009 and 2008 included unbilled revenues of $546 million and $505 million, respectively.

*Allowance for Uncollectible Accounts Receivable*

| Predecessor: | |
|---|---|
| Allowance for uncollectible accounts receivable as of December 31, 2006 | $ 13 |
| Increase for bad debt expense | 46 |
| Decrease for account write-offs | (54) |
| Changes related to receivables sold | 26 |
| Allowance for uncollectible accounts receivable as of October 10, 2007 | 31 |
| **Successor:** | |
| Allowance for uncollectible accounts receivable as of October 11, 2007 | 31 |
| Increase for bad debt expense | 13 |
| Decrease for account write-offs | (12) |
| Allowance for uncollectible accounts receivable as of December 31, 2007 | 32 |
| Increase for bad debt expense | 81 |
| Decrease for account write-offs | (69) |
| Charge related to Lehman bankruptcy | 26 |
| Allowance for uncollectible accounts receivable as of December 31, 2008 | 70 |
| Increase for bad debt expense | 113 |
| Decrease for account write-offs | (99) |
| Other | (1) |
| Allowance for uncollectible accounts receivable as of December 31, 2009 | $ 83 |

## 12.    SHORT-TERM BORROWINGS AND LONG-TERM DEBT

*Short-Term Borrowings*

At December 31, 2009, we had outstanding short-term borrowings of $1.569 billion at a weighted average interest rate of 2.50%, excluding certain customary fees, at the end of the period. Short-term borrowings under credit facilities totaled $953 million for TCEH and $616 million for Oncor.

At December 31, 2008, we had outstanding short-term borrowings of $1.237 billion at a weighted average interest rate of 3.41%, excluding certain customary fees, at the end of the period. Short-term borrowings under credit facilities totaled $900 million for TCEH and $337 million for Oncor.

*Credit Facilities*

Our credit facilities with cash borrowing and/or letter of credit availability at December 31, 2009 are presented below. The facilities are all senior secured facilities of the authorized borrower.

| | | At December 31, 2009 | | | |
| Authorized Borrowers and Facility | Maturity Date | Facility Limit | Letters of Credit | Cash Borrowings | Availability |
|---|---|---|---|---|---|
| TCEH Revolving Credit Facility (a) | October 2013 | $  2,700 | $  — | $  953 | $  1,721 |
| TCEH Letter of Credit Facility (b) | October 2014 | 1,250 | — | 1,250 | — |
| Subtotal TCEH (c) | | $  3,950 | $  — | $  2,203 | $  1,721 |
| TCEH Commodity Collateral Posting Facility (d) | December 2012 | Unlimited | $  — | — | Unlimited |
| Oncor Revolving Credit Facility (e) | October 2013 | $  2,000 | $  — | $  616 | $  1,262 |

F-35

Confidential

(a)  Facility used for letters of credit and borrowings for general corporate purposes. Borrowings are classified as short-term borrowings. Availability amount includes $141 million of commitments from Lehman that are only available from the fronting banks and the swingline lender and excludes $26 million of requested cash draws that have not been funded by Lehman. All outstanding borrowings under this facility at December 31, 2009 bear interest at LIBOR plus 3.5%, and a commitment fee is payable quarterly in arrears at a rate per annum equal to 0.50% of the average daily unused portion of the facility.

(b)  Facility used for issuing letters of credit for general corporate purposes, including, but not limited to, providing collateral support under hedging arrangements and other commodity transactions that are not eligible for funding under the TCEH Commodity Collateral Posting Facility. The borrowings under this facility were drawn at the inception of the facility, are classified as long-term debt, and except for $115 million related to a letter of credit drawn in June 2009, have been retained as restricted cash. Letters of credit totaling $736 million issued as of December 31, 2009 are supported by the restricted cash, and the remaining letter of credit availability totals $399 million.

(c)  Pursuant to PUCT rules, TCEH is required to maintain available capacity under its credit facilities to assure adequate credit worthiness of TCEH's REP subsidiaries, including the ability to return retail customer deposits, if necessary. As a result, at December 31, 2009, the total availability under the TCEH credit facilities should be further reduced by $228 million.

(d)  Revolving facility used to fund cash collateral posting requirements for specified volumes of natural gas hedges totaling approximately 600 million MMBtu as of December 31, 2009. As of December 31, 2009, there were no borrowings under this facility. See "TCEH Senior Secured Facilities" below for additional information.

(e)  Facility used by Oncor for its general corporate purposes. Borrowings are classified as short-term borrowings. Availability amount excludes $122 million of commitments from Lehman. All outstanding borrowings at December 31, 2009 bear interest at LIBOR plus 0.350%, and a facility fee is payable (currently at a rate per annum equal to 0.125%) on the commitments under the facility. The interest rate and facility fee rate per annum declined in June 2009 from LIBOR plus 0.425% and 0.150%, respectively, due to a two notch upgrade in Oncor's credit ratings by Moody's.

*Long-Term Debt*

At December 31, 2009 and 2008, the long-term debt consisted of the following:

| | December 31, 2009 | December 31, 2008 |
|---|---|---|
| **TCEH** | | |
| Pollution Control Revenue Bonds: | | |
| *Brazos River Authority:* | | |
| 5.400% Fixed Series 1994A due May 1, 2029 | $ 39 | $ 39 |
| 7.700% Fixed Series 1999A due April 1, 2033 | 111 | 111 |
| 6.750% Fixed Series 1999B due September 1, 2034, remarketing date April 1, 2013 (a) | 16 | 16 |
| 7.700% Fixed Series 1999C due March 1, 2032 | 50 | 50 |
| 8.250% Fixed Series 2001A due October 1, 2030 | 71 | 71 |
| 5.750% Fixed Series 2001C due May 1, 2036, remarketing date November 1, 2011 (a) | 217 | 217 |
| 8.250% Fixed Series 2001D-1 due May 1, 2033 | 171 | 171 |
| 0.264% Floating Series 2001D-2 due May 1, 2033 (b) | 97 | 97 |
| 0.317% Floating Taxable Series 2001I due December 1, 2036 (c) | 62 | 62 |
| 0.264% Floating Series 2002A due May 1, 2037 (b) | 45 | 45 |
| 6.750% Fixed Series 2003A due April 1, 2038, remarketing date April 1, 2013 (a) | 44 | 44 |
| 6.300% Fixed Series 2003B due July 1, 2032 | 39 | 39 |
| 6.750% Fixed Series 2003C due October 1, 2038 | 52 | 52 |
| 5.400% Fixed Series 2003D due October 1, 2029, remarketing date October 1, 2014 (a) | 31 | 31 |
| 5.000% Fixed Series 2006 due March 1, 2041 | 100 | 100 |
| *Sabine River Authority of Texas:* | | |
| 6.450% Fixed Series 2000A due June 1, 2021 | 51 | 51 |
| 5.500% Fixed Series 2001A due May 1, 2022, remarketing date November 1, 2011 (a) | 91 | 91 |
| 5.750% Fixed Series 2001B due May 1, 2030, remarketing date November 1, 2011 (a) | 107 | 107 |
| 5.200% Fixed Series 2001C due May 1, 2028 | 70 | 70 |
| 5.800% Fixed Series 2003A due July 1, 2022 | 12 | 12 |
| 6.150% Fixed Series 2003B due August 1, 2022 | 45 | 45 |
| *Trinity River Authority of Texas:* | | |
| 6.250% Fixed Series 2000A due May 1, 2028 | 14 | 14 |
| Unamortized fair value discount related to pollution control revenue bonds (d) | (147) | (161) |
| Senior Secured Facilities: | | |
| 3.743% TCEH Initial Term Loan Facility maturing October 10, 2014 (e)(f) | 16,079 | 16,244 |
| 3.735% TCEH Delayed Draw Term Loan Facility maturing October 10, 2014 (e)(f) | 4,075 | 3,562 |

F-36

EFIHMW00223399