Confidential - Subject to CA
Mike Kunkel

**OFFERING MEMORANDUM**                                                                                 **CONFIDENTIAL**

# ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC
# EFIH FINANCE INC.

## $250,000,000 6.875% Senior Secured Notes due 2017
## $600,000,000 11.750% Senior Secured Second Lien Notes due 2022

Energy Future Intermediate Holding Company LLC ("EFIH") and EFIH Finance Inc. ("EFIH Finance" and, together with EFIH, the "Issuer"), both of which are wholly-owned subsidiaries of Energy Future Holdings Corp. ("EFH Corp."), are offering $850,000,000 aggregate principal amount of senior secured notes, comprised of $250,000,000 aggregate principal amount of their 6.875% Senior Secured Notes due 2017 (the "first lien notes") and $600,000,000 aggregate principal amount of their 11.750% Senior Secured Second Lien Notes due 2022 (the "new second lien notes" and, together with the first lien notes, the "notes"). The new second lien notes will constitute part of the same series as the outstanding $1,150,000,000 aggregate principal amount of 11.750% Senior Secured Second Lien Notes due 2022 (the "Existing 2022 Second Lien Notes" and, together with the new second lien notes, the "second lien notes"), issued by the Issuer on February 6, 2012 and February 28, 2012. The new second lien notes will have identical terms and conditions as the Existing 2022 Second Lien Notes, other than the issue date and issue price, and will vote together as a single class with, and be fungible with, the Existing 2022 Second Lien Notes. Interest on the first lien notes will be payable on February 15 and August 15 of each year, commencing on February 15, 2013. The first lien notes will accrue interest at the rate of 6.875% per annum. The first lien notes will mature on August 15, 2017. Interest on the new second lien notes will be payable on March 1 and September 1 of each year, commencing on September 1, 2012. The new second lien notes will accrue interest at the rate of 11.750% per annum. The new second lien notes will mature on March 1, 2022.

The Issuer may redeem the first lien notes, in whole or in part, beginning on February 15, 2015, at the redemption prices set forth in this offering memorandum. The Issuer may also redeem the first lien notes, in whole or in part, at any time prior to February 15, 2015 at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make-whole" premium. In addition, before February 15, 2015, the Issuer may redeem up to 35% of the aggregate principal amount of the first lien notes using the proceeds from certain equity offerings at the redemption price set forth in this offering memorandum. The Issuer may redeem the new second lien notes, in whole or in part, beginning on March 1, 2017, at the redemption prices set forth in this offering memorandum. The Issuer may also redeem the new second lien notes, in whole or in part, at any time prior to March 1, 2017 at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make-whole" premium. In addition, before March 1, 2015, the Issuer may redeem up to 35% of the aggregate principal amount of the new second lien notes using the proceeds from certain equity offerings at the redemption price set forth in this offering memorandum.

The notes are senior obligations of the Issuer and rank equally in right of payment with all existing and future senior debt of the Issuer. The first lien notes are secured, equally and ratably with certain outstanding indebtedness of the Issuer and EFH Corp., on a first-priority basis by the pledge of all of the membership interests and other investments EFIH owns or holds in Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings") (such membership interests and other investments, the "Collateral"). As of the date of this offering memorandum, approximately $3.497 billion of outstanding debt of the Issuer and EFH Corp. (which includes debt of EFH Corp. that is guaranteed by EFIH) is secured by the Collateral on a first-priority basis. The second lien notes are secured, equally and ratably with the Existing 2021 Second Lien Notes (as defined below), on a second-priority basis by the pledge of the Collateral. The Issuer may incur additional debt secured by the Collateral on a first-priority basis equally and ratably with the first lien notes or on a second-priority basis equally and ratably with the second lien notes.

The first lien notes are effectively senior to all debt of EFIH secured by the Collateral on a second-priority basis to the extent of the value of the Collateral and to all unsecured debt of EFIH to the extent of the value of the Collateral. The second lien notes are effectively subordinated to EFIH's existing and future debt that is secured by the Collateral on a first-priority basis to the extent of the value of the Collateral, and effectively senior to all unsecured debt of EFIH to the extent of the value of the Collateral (after taking into account the obligations secured by the Collateral on a first-priority basis). The notes are structurally subordinated to all existing and future debt and other liabilities of the subsidiaries of EFIH (other than EFIH Finance), including all debt and other liabilities of Oncor Holdings and its subsidiaries. The notes will be senior in right of payment to any future subordinated debt of the Issuer.

In April 2011, the Issuer issued $406,392,000 aggregate principal amount of 11% Senior Secured Second Lien Notes due 2021 (the "Existing 2021 Second Lien Notes"). The Existing 2021 Second Lien Notes constitute a separate series of senior notes but are treated as a single class with the Existing 2021 Second Lien Notes for voting purposes with respect to amendments and waivers and for taking certain other actions.

The notes have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. Accordingly, the notes are being offered and sold only (a) to "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) and (b) outside the United States to non-U.S. persons in compliance with Regulation S under the Securities Act. For details about eligible offers, deemed representations and agreements by investors and transfer restrictions, see "Notice to Investors."

The Issuer has agreed to file one or more registration statements with the United States Securities and Exchange Commission (the "SEC") relating to an offer to exchange the notes for publicly tradable notes having substantially identical terms.

For a more detailed description of the notes, see "Description of the First Lien Notes" beginning on page 55 and "Description of the Second Lien Notes" beginning on page 150.

See "Risk Factors" beginning on page 16 as well as those contained in EFIH's and EFH Corp.'s Annual Reports on Form 10-K for the year ended December 31, 2011, and EFIH's and EFH Corp.'s Quarterly Reports on Form 10-Q for the quarter ended June 30, 2012, each of which is incorporated into this offering memorandum by reference, for a discussion of certain risks that you should consider before investing in the notes.

---

**Price for first lien notes: 100.000%, plus accrued interest from August 14, 2012.**
**Price for new second lien notes: 102.250%, plus accrued interest from February 6, 2012.**

---

The initial purchasers expect to deliver book-entry interests in the notes to purchasers on or about August 14, 2012 through the facilities of The Depository Trust Company ("DTC").

*Joint Book-Running Managers*

---

**Citigroup        Goldman, Sachs & Co.        Credit Suisse        J.P. Morgan        Morgan Stanley**

---

*Co-Manager*
### The Williams Capital Group, L.P.

August 9, 2012

Confidential - Subject to CA
Mike Kunkel

Confidential - Subject to CA
Mike Kunkel

**We have not, and the initial purchasers or their affiliates have not, authorized anyone to give you any information or to make any representation not contained in or incorporated by reference into this offering memorandum. We do not, and the initial purchasers and their affiliates do not, take any responsibility for, and can provide no assurance as to the reliability of, any information that others may give you. No offer of these securities is being made in any jurisdiction where any such offer is prohibited. The information contained in or incorporated by reference into this offering memorandum is only accurate as of the date of this offering memorandum or such incorporated information.**

---

## TABLE OF CONTENTS

EFH CORP. .................................................................................... v
ONCOR HOLDINGS .......................................................................... vi
SECURITIES AND EXCHANGE COMMISSION REVIEW ................................... vi
INDUSTRY AND MARKET INFORMATION .................................................. vi
FORWARD-LOOKING STATEMENTS ....................................................... vi
SUMMARY .................................................................................... 1
RISK FACTORS................................................................................ 16
THE TRANSACTIONS......................................................................... 49
USE OF PROCEEDS.......................................................................... 53
CAPITALIZATION ............................................................................ 54
DESCRIPTION OF THE FIRST LIEN NOTES ............................................... 55
DESCRIPTION OF THE SECOND LIEN NOTES ........................................... 150
EXCHANGE OFFER; REGISTRATION RIGHTS ............................................. 248
NOTICE TO INVESTORS .................................................................... 250
BOOK ENTRY; DELIVERY AND FORM ..................................................... 253
CERTAIN UNITED STATES FEDERAL TAX CONSEQUENCES............................. 258
CERTAIN ERISA CONSIDERATIONS....................................................... 265
PLAN OF DISTRIBUTION.................................................................... 267
LEGAL MATTERS............................................................................. 271
INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM.............................. 271
INDEPENDENT AUDITORS.................................................................. 271
AVAILABLE INFORMATION.................................................................. 272
INCORPORATION BY REFERENCE.......................................................... 272
INDEX TO CONSOLIDATED FINANCIAL STATEMENTS ................................... F-1

---

The Issuer is making this offering and will sell the notes in reliance upon an exemption from registration under the Securities Act for offers and sales of securities that do not involve a public offering.

This offering memorandum is confidential and has been prepared by the Issuer solely for use in connection with the proposed offering of the notes. This offering memorandum is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire securities. Distribution of this offering memorandum to any person other than the prospective investor and any person retained to advise such prospective investor with respect to its purchase is unauthorized, and any disclosure of any of its contents without the prior written consent of the Issuer is prohibited. Each prospective investor, by accepting delivery of this offering memorandum, agrees to the foregoing and to make no photocopies of this offering memorandum or any documents referred to herein.

i

Confidential - Subject to CA
Mike Kunkel

EFH00027401

Confidential - Subject to CA
Mike Kunkel

We have prepared and furnished the information contained in this offering memorandum. You acknowledge and agree that the initial purchasers make no representation or warranty, express or implied, as to the accuracy or completeness of the information contained in or incorporated by reference into this offering memorandum. Nothing contained in or incorporated by reference into this offering memorandum is, or should be relied upon as, a promise or representation by the initial purchasers as to the past or future. The initial purchasers have not independently verified any of the information contained in or incorporated by reference into this offering memorandum (financial, legal or otherwise) and assume no responsibility for the accuracy or completeness of any such information.

Neither the SEC, any state securities commission nor any other regulatory authority has approved or disapproved the securities nor have any of the foregoing authorities passed upon or endorsed the merits of this offering or the accuracy or adequacy of this offering memorandum. Any representation to the contrary is a criminal offense.

The notes are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and the applicable securities laws of any state or other jurisdiction pursuant to registration or exemption from registration. As a prospective purchaser, you should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time. For additional information, see "Notice to Investors" and "Plan of Distribution."

In making any investment decision, prospective investors must rely on their own examination of the Issuer and the terms of this offering, including the merits and risks involved. See "Risk Factors." Prospective investors should not construe anything contained in or incorporated by reference into this offering memorandum as legal, business or tax advice. Each prospective investor should consult its own advisors as needed to make its investment decision and to determine whether it is legally permitted to purchase the notes under applicable legal investment or similar laws or regulations.

Each prospective investor must comply with all applicable laws and regulations in force in any jurisdiction in which it purchases, offers or sells notes or possesses or distributes this offering memorandum and must obtain any consent, approval or permission required by it for the purchase, offer or sale by it of the notes under the laws and regulations in force in any jurisdiction to which it is subject or in which it makes such purchases, offers or sales, and neither we nor the initial purchasers nor any of our or their respective representatives shall have any responsibility therefor.

Some of the initial purchasers participating in this offering may engage in transactions that stabilize, maintain or otherwise affect the price of the notes, including over-allotment, stabilizing and short-covering transactions in the notes, and the imposition of a penalty bid during and after this offering. Such stabilization, if commenced, may be discontinued at any time without notice. For a description of some of these activities, see "Plan of Distribution."

This offering memorandum contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents for complete information. All such summaries are qualified in their entirety by such reference. Copies of documents referred to herein will be made available to prospective investors upon request to the Issuer. See "Available Information."

Each person receiving this offering memorandum acknowledges that (1) it has reviewed all information contained in or incorporated into this offering memorandum by reference considered by it to be necessary to make an investment decision, (2) it has been afforded an opportunity to request and to review, and it has received, all additional information considered by it to be necessary to verify the accuracy of or to supplement the information contained in or incorporated by reference into this offering memorandum, (3) it has not relied upon the initial purchasers or any person affiliated with the initial purchasers in connection with its investigation of the accuracy of such information or its investment decision, (4) this offering memorandum relates to an offering that is exempt from registration under the

ii

Confidential - Subject to CA
Mike Kunkel

Confidential - Subject to CA
Mike Kunkel

Securities Act and may not comply in important respects with SEC rules that would apply to an offering document relating to a public offering of securities and (5) no person has been authorized to give information or to make any representation concerning us, this offering or the notes, other than as contained in or incorporated by reference into this offering memorandum, in connection with an investor's examination of the Issuer and the terms of the offering contemplated by this offering memorandum.

The distribution of this offering memorandum and the offering and sale of the notes in certain jurisdictions may be restricted by law. We and the initial purchasers require persons into whose possession this offering memorandum comes to inform themselves about and to observe any such restrictions. This offering memorandum does not constitute an offer of, or an invitation to purchase, any of the notes in any jurisdiction in which such offer or sale would be unlawful. No person has taken any action that would permit an offering to occur in any jurisdiction other than the United States.

### NOTICE TO NEW HAMPSHIRE RESIDENTS ONLY

**NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ("RSA") WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE IMPLIES THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT ANY EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.**

Unless the context otherwise requires or as otherwise indicated, references in this offering memorandum to:

- "we," "our" and "us" are to Energy Future Intermediate Holding Company LLC and its consolidated subsidiaries;

- "2011 Form 10-K" are to EFIH's Annual Report on Form 10-K for the year ended December 31, 2011, filed with the SEC on February 21, 2012;

- "2017 Notes" are to, collectively, the 10.875% Senior Notes due 2017 and the 11.250%/ 12.000% Senior Toggle Notes due 2017 issued by EFH Corp.;

- "Adjusted EBITDA" are to EBITDA adjusted to exclude noncash items, unusual items and other adjustments allowable under the indentures for the notes, EFIH 9.75% Notes, EFIH 10.000% Notes, Existing 2021 Second Lien Notes and Existing 2022 Second Lien Notes and certain of EFH Corp.'s debt arrangements (as applicable). See definition of EBITDA below. Adjusted EBITDA and EBITDA are not recognized terms under GAAP and, thus, are non-GAAP financial measures. We are providing our and EFH Corp.'s Adjusted EBITDA in this offering memorandum solely because of the important role that Adjusted EBITDA plays in respect of certain covenants contained in the indentures for the notes, EFIH 9.75% Notes, EFIH 10.000% Notes, Existing 2021 Second Lien Notes and Existing 2022 Second Lien Notes and certain of EFH Corp.'s debt arrangements. We do not intend for Adjusted EBITDA (or EBITDA) to be an alternative to net income as a measure of operating performance or an alternative to cash flows from operating activities as a measure of liquidity or an alternative to any other measure of financial performance presented in accordance with GAAP. Additionally, we do not intend for Adjusted EBITDA (or EBITDA) to be used as a measure of free cash flow available for

iii

Confidential - Subject to CA
Mike Kunkel

EFH00027403

Confidential - Subject to CA
Mike Kunkel

management's discretionary use, as the measure excludes certain cash requirements such as interest payments, tax payments and other debt service requirements. Because not all companies use identical calculations, the presentation of Adjusted EBITDA (and EBITDA) for EFIH or EFH Corp. may not be comparable to similarly titled measures of other companies;

- "CAIR" are to the Clean Air Interstate Rule;

- "EBITDA" are to earnings (net income) before interest expense, income taxes, depreciation and amortization. See the definition of Adjusted EBITDA above;

- "EFCH" are to Energy Future Competitive Holdings Company and not to any of its subsidiaries;

- "EFH Corp." are to Energy Future Holdings Corp. and not to any of its subsidiaries;

- "EFH Corp. 2011 Form 10-K" are to EFH Corp.'s Annual Report on Form 10-K for the year ended December 31, 2011 that it filed with the SEC on February 21, 2012;

- "EFH Corp. 2017 Toggle Notes" are to the 11.250%/12.000% Senior Toggle Notes due 2017 issued by EFH Corp.;

- "EFH Corp. 9.75% Notes" are to the 9.75% Senior Secured Notes due 2019 issued by EFH Corp.;

- "EFH Corp. 10.000% Notes" are to the 10.000% Senior Secured Notes due 2020 issued by EFH Corp.;

- "EFH Corp. June 30, 2012 Form 10-Q" are to EFH Corp.'s Quarterly Report on Form 10-Q for the quarter ended June 30, 2012 that it filed with the SEC on July 31, 2012;

- "EFIH" and "EFIH Finance" are to Energy Future Intermediate Holding Company LLC and EFIH Finance Inc., respectively, and not to any of their respective subsidiaries;

- "EFIH 9.75% Notes" are to the 9.75% Senior Secured Notes due 2019 issued by EFIH and EFIH Finance;

- "EFIH 10.000% Notes" are to the 10.000% Senior Secured Notes due 2020 issued by EFIH and EFIH Finance;

- "Existing 2021 Second Lien Notes" are to the Issuer's 11% Senior Secured Second Lien Notes due 2021 issued pursuant to the indenture, dated as of April 25, 2011, between the Issuer and the trustee;

- "Existing 2022 Second Lien Notes" are to the Issuer's 11.750% Senior Secured Second Lien Notes due 2022 issued pursuant to the indenture, dated as of April 25, 2011, as supplemented as of February 6, 2012 and February 28, 2012, between the Issuer and the trustee;

- "Existing First Lien Notes" are to, collectively, the EFIH 9.75% Notes, the EFIH 10.000% Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes;

- "GAAP" are to United States generally accepted accounting principles;

- the "Issuer" are to EFIH and EFIH Finance, collectively, and not to any of their respective subsidiaries;

- "June 30, 2012 Form 10-Q" are to EFIH's Quarterly Report on Form 10-Q for the quarter ended June 30, 2012 that it filed with the SEC on July 31, 2012;

- "Legacy Notes" are to, collectively, the 5.55% Series P Senior Notes due November 15, 2014, the 6.50% Series Q Senior Notes due November 15, 2024 and the 6.55% Series R Senior Notes due November 15, 2034 issued by EFH Corp.;

- "Oncor Holdings" and "Oncor" are to Oncor Electric Delivery Holdings Company LLC and Oncor Electric Delivery Company LLC, respectively, with or without their respective subsidiaries as indicated in context;

iv

Confidential - Subject to CA
Mike Kunkel

EFH00027404

Confidential - Subject to CA
Mike Kunkel

- "TCEH" and "TCEH Finance" are to Texas Competitive Electric Holdings Company LLC and TCEH Finance, Inc., respectively, and not to any of their respective subsidiaries;

- "TCEH 10.25% Notes" are to, collectively, the 10.25% Senior Notes due 2015 and the 10.25% Senior Notes due 2015, Series B issued by TCEH;

- "TCEH 2015/2016 Notes" are to, collectively, the 10.25% Senior Notes due 2015, the 10.25% Senior Notes due 2015, Series B and the 10.50%/11.25% Senior Toggle Notes due 2016 issued by TCEH and TCEH Finance;

- "TCEH 2016 Toggle Notes" are to the 10.50%/11.25% Senior Toggle Notes due 2016 issued by TCEH and TCEH Finance;

- "TCEH 2020 Notes" are to the 11.5% Senior Secured Notes due 2020 issued by TCEH and TCEH Finance;

- "TCEH 2021 Notes" are to, collectively, the 15% Senior Secured Second Lien Notes due 2021 and the 15% Senior Secured Second Lien Notes due 2021, Series B issued by TCEH and TCEH Finance; and

- "TCEH Senior Secured Credit Facilities" are to the credit facilities under the Credit Agreement, dated as of October 10, 2007, as amended on August 7, 2009 and April 7, 2011, by and among EFCH, as guarantor, TCEH, as borrower, the lenders party thereto in their capacities as lenders thereunder and Citibank, N.A., as Administrative Agent, which consisted of the following as of June 30, 2012:

  (a)  a $3.809 billion senior secured term loan facility of TCEH maturing October 10, 2014;

  (b)  a $15.351 billion (excluding $19 million held by EFH Corp.) senior secured term loan facility of TCEH maturing October 10, 2017;

  (c)  a $42 million senior secured letter of credit facility of TCEH maturing October 10, 2014;

  (d)  a $1.020 billion senior secured letter of credit facility of TCEH maturing October 10, 2017;

  (e)  a $645 million senior secured revolving credit facility of TCEH maturing October 10, 2013;

  (f)  a $1.409 billion senior secured revolving credit facility of TCEH maturing October 10, 2016; and

  (g)  a senior secured cash posting credit facility of TCEH.

## EFH CORP.

As of June 30, 2012, we held $4.596 billion aggregate principal amount of debt of EFH Corp. and $79 million aggregate principal amount of debt of TCEH, an indirect wholly-owned subsidiary of EFH Corp. We depend and will continue to depend on cash interest payments on these debt securities to fund, at least in part, payments on the notes and our other debt obligations. In the past, EFH Corp. has serviced its debt securities in part with funds loaned to EFH Corp. by TCEH under demand notes (the "TCEH Demand Notes"). We will use $680 million of the net proceeds from this offering to pay a dividend to EFH Corp. in or before January 2013 (the "EFIH Dividend"). EFH Corp. will use the proceeds of the dividend to repay the balance of the TCEH Demand Notes, and there is no assurance that TCEH will make additional advances to EFH Corp. under the TCEH Demand Notes in the future to the extent EFH Corp. requests such advances. In addition, as of June 30, 2012, we guaranteed, either on a first-priority secured basis or on a senior unsecured basis, $1.836 billion principal amount of debt of EFH Corp. (excluding debt that we hold as an investment and $680 million of TCEH Demand Notes that we guarantee). For these and other reasons, we have significant exposure to EFH Corp. credit risk.

v

Confidential - Subject to CA
Mike Kunkel

EFH00027405

Confidential - Subject to CA
Mike Kunkel

Because information regarding EFH Corp. may be relevant to a decision to invest in the notes, this offering memorandum incorporates by reference certain documents that EFH Corp. has filed with the SEC. See "Incorporation by Reference."

## ONCOR HOLDINGS

Because the notes are secured by all of the membership interests EFIH owns or holds in Oncor Holdings, this offering memorandum includes and incorporates by reference financial statements of Oncor Holdings. See Oncor Holdings' audited historical consolidated financial statements for the year ended December 31, 2011, which are included as Exhibit 99(d) to our 2011 Form 10-K and incorporated into this offering memorandum by reference, and unaudited condensed consolidated financial statements for the three and six months ended June 30, 2012 and 2011, which are included elsewhere in this offering memorandum. See "Incorporation by Reference."

## SECURITIES AND EXCHANGE COMMISSION REVIEW

The information in this offering memorandum relates to an offering that is exempt from registration under the Securities Act. The Issuer will agree to file one or more registration statements with the SEC with respect to (1) a registered offer to exchange the notes for exchange notes (the "exchange notes") having terms substantially identical in all material respects to the notes exchanged therefor (except that the exchange notes will not contain terms with respect to additional interest or transfer restrictions) or (2) resales of the notes. See "Exchange Offer; Registration Rights." In the course of the review by the SEC of any such registration statement and other filings the Issuer may make with the SEC, the Issuer may be required or may elect to make changes to the description of its business, financial statements and other information in those documents and filings. The Issuer believes that its financial statements and other financial data included in or incorporated by reference into this offering memorandum have been prepared in a manner that complies, in all material respects, with the regulations published by the SEC and are consistent with current practice.

## INDUSTRY AND MARKET INFORMATION

The industry and market data and other statistical information used throughout or incorporated by reference into this offering memorandum are based on independent industry publications, government publications, reports by market research firms or other published independent sources, including certain data published by the Electric Reliability Council of Texas, Inc. ("ERCOT") and the Public Utility Commission of Texas (the "PUCT"). We did not commission any of these publications or reports. Some data is also based on good faith estimates, which are derived from our review of internal surveys, as well as the independent sources listed above. Independent industry publications and surveys generally state that they have obtained information from sources believed to be reliable but do not guarantee the accuracy and completeness of such information. While we believe that each of these studies and publications is reliable, we have not independently verified such data and make no representation as to the accuracy of such information. Forecasts are particularly likely to be inaccurate, especially over long periods of time, and we do not know what assumptions regarding general economic growth are used in preparing the forecasts included in this offering memorandum, including the information incorporated into this offering memorandum by reference. Similarly, while we believe that such internal and external research is reliable, it has not been verified by any independent sources, and we make no assurances that the predictions contained therein are accurate.

## FORWARD-LOOKING STATEMENTS

This offering memorandum, including the information incorporated into this offering memorandum by reference, contains "forward-looking statements." All statements, other than statements of historical

Confidential - Subject to CA
Mike Kunkel

EFH00027406

Confidential - Subject to CA
Mike Kunkel

facts, that are included in or incorporated by reference into this offering memorandum that address activities, events or developments that we expect or anticipate to occur in the future, including such matters as financial or operational projections, capital allocation, future capital expenditures, business strategy, competitive strengths, goals, future acquisitions or dispositions, development or operation of facilities, market and industry developments and the growth of our businesses and operations (often, but not always, through the use of words or phrases such as "intends," "plans," "will likely result," "are expected to," "could," "will continue," "is anticipated," "estimated," "should," "projection," "target," "goal," "objective" and "outlook"), are forward-looking statements. Although we believe that in making any such forward-looking statement our expectations are based on reasonable assumptions, any such forward-looking statement involves uncertainties and is qualified in its entirety by reference to the discussion of risk factors under "Risk Factors" contained elsewhere in this offering memorandum and in the sections captioned "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our 2011 Form 10-K, our June 30, 2012 Form 10-Q, the EFH Corp. 2011 Form 10-K and the EFH Corp. June 30, 2012 Form 10-Q, which are incorporated into this offering memorandum by reference, and the following important factors, among others, that could cause our actual results to differ materially from those projected in such forward-looking statements:

- prevailing governmental policies and regulatory actions, including those of the Texas Legislature, the Governor of Texas, the Congress of the United States of America ("U.S."), the U.S. Federal Energy Regulatory Commission (the "FERC"), the North American Electric Reliability Corporation, the Texas Reliability Entity, Inc., the PUCT, ERCOT, the U.S. Environmental Protection Agency (the "EPA"), the independent market monitor for the ERCOT market, the Nuclear Regulatory Commission and the Texas Commission on Environmental Quality with respect to, among other things:

  - allowed rate of return;

  - permitted capital structure;

  - industry, market and rate structure;

  - recovery of investments;

  - acquisitions and disposals of assets and facilities;

  - operation and construction of facilities;

  - changes in tax laws and policies; and

  - changes in and compliance with environmental and safety laws and policies;

- legal and administrative proceedings and settlements;

- weather conditions, including drought and limitations on access to water, and other natural phenomena, and acts of sabotage, wars or terrorist or cyber security threats or activities;

- economic conditions, including the impact of a recessionary environment;

- unanticipated population growth or decline, or changes in market supply or demand and demographic patterns, particularly in ERCOT;

- changes in business strategy, development plans or vendor relationships;

- unanticipated changes in interest rates or rates of inflation;

- unanticipated changes in operating expenses, liquidity needs and capital expenditures;

- inability of various counterparties to meet their financial obligations to us and/or our subsidiaries, including failure of counterparties to perform under agreements;

- general industry trends;

vii

Confidential - Subject to CA
Mike Kunkel

EFH00027407

Confidential - Subject to CA
Mike Kunkel

- hazards customary to the industry and the possibility that we and/or our subsidiaries may not have adequate insurance to cover losses resulting from such hazards;

- changes in technology used by and services offered by us and/or our subsidiaries;

- significant changes in relationships with our and/or our subsidiaries' employees, including the availability of qualified personnel, and the potential adverse effects if labor disputes or grievances were to occur;

- changes in assumptions used to estimate costs of providing employee benefits, including medical and dental benefits, pension and other postretirement employee benefits, and future funding requirements related thereto;

- significant changes in critical accounting policies material to us and/or our subsidiaries;

- commercial bank and financial market conditions, access to capital, the cost of such capital, and the results of financing and refinancing efforts by EFIH and/or its subsidiaries and affiliates, including availability of funds in the capital markets and the potential for disruptions in U.S. credit markets;

- willingness of EFH Corp.'s and TCEH's lenders to extend the maturities of their debt agreements and the terms and conditions of any such extensions;

- circumstances which may contribute to impairment of goodwill, intangible or other long-lived assets;

- restrictions imposed by the agreements governing our, Oncor's and certain of EFH Corp.'s and its subsidiaries' debt instruments;

- our or our subsidiaries' ability to generate sufficient cash flow to make interest payments on our or their debt instruments;

- EFH Corp.'s or its subsidiaries', including, in particular, TCEH's, ability to make principal and interest payments on their debt held by EFIH as an investment or to provide sufficient capital contributions or loans to us to make interest payments on our debt instruments, including the notes;

- activity in the credit default swap market related to our debt securities or debt securities of EFH Corp. that we guarantee;

- adverse claims by our and our subsidiaries' and affiliates' creditors or holders of our and our subsidiaries' and affiliates' debt securities;

- defaults under our debt agreements and agreements of EFH Corp. debt that EFIH guarantees that could trigger cross default or cross acceleration provisions under other debt agreements;

- actions by credit rating agencies;

- changes in the cost of fuel;

- changes in law or regulation applicable to market participants in the ERCOT market; and

- ability to effectively execute our or our subsidiaries' operational strategy.

Any forward-looking statement speaks only as of the date on which it is made, and except as may be required by law, we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which it is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for us to predict all of them; nor can we assess the impact of each such factor or the extent to which any factor, or combination of factors, may cause results to differ materially from those contained in any forward-looking statement. As such, you should not unduly rely on such forward-looking statements.

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

Confidential - Subject to CA
Mike Kunkel

## SUMMARY

*This summary highlights selected information appearing elsewhere in or incorporated by reference into this offering memorandum. This summary is not complete and does not contain all of the information that you should consider before investing in the notes. You should carefully read this summary together with the entire offering memorandum, including the information set forth in the section entitled "Risk Factors" and the information that is incorporated by reference into this offering memorandum. See the sections entitled "Available Information" and "Incorporation by Reference" for a further discussion on incorporation by reference.*

*Investment funds associated with or designated by Kohlberg Kravis Roberts & Co. L.P. ("KKR"), TPG Management, L.P. ("TPG") and Goldman, Sachs & Co. ("Goldman Sachs" and, together with KKR and TPG, the "Sponsor Group"), and certain other co-investors (collectively with the Sponsor Group, the "Investors"), own EFH Corp. through Texas Energy Future Holdings Limited Partnership ("Texas Holdings"), with the Sponsor Group controlling Texas Holdings' general partner, Texas Energy Future Capital Holdings LLC. EFIH is a wholly-owned subsidiary of EFH Corp., and EFIH Finance is a wholly-owned subsidiary of EFIH.*

### Our Businesses

We are a Dallas, Texas-based holding company whose wholly-owned subsidiary, Oncor Holdings, holds a majority interest (approximately 80%) in Oncor. The investment in Oncor represents a substantial portion of our reported consolidated net assets and earnings. As of June 30, 2012, our remaining reported consolidated assets consisted primarily of approximately $4.675 billion aggregate principal amount of debt of EFH Corp. and TCEH, an indirect wholly-owned subsidiary of EFH Corp. Oncor is engaged in regulated electricity transmission and distribution operations in Texas that are primarily regulated by the PUCT. Oncor provides both transmission and distribution services to retail electric providers, including subsidiaries of TCEH, that sell electricity to consumers and transmission services to other electricity distribution companies, cooperatives and municipalities. Oncor operates the largest transmission and distribution system in Texas, delivering electricity to more than three million homes and businesses and operating more than 118,000 miles of transmission and distribution lines. A significant portion of Oncor's revenues represents fees for services provided to TCEH, which is engaged in competitive electricity market activities largely in Texas, including electricity generation, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales. Revenues from TCEH represented 29% and 33% of Oncor's total reported consolidated revenues for the six months ended June 30, 2012 and for the year ended December 31, 2011, respectively.

EFH Corp. and Oncor have implemented certain structural and operational "ring-fencing" measures based on commitments made by Texas Holdings and Oncor to the PUCT to further enhance the credit quality of Oncor Holdings and Oncor and mitigate Oncor's and Oncor Holdings' credit exposure to Texas Holdings and its other subsidiaries, including EFIH (collectively, the "Texas Holdings Group"), with the intent to minimize the risk that a court would order any of the assets and liabilities of Oncor or Oncor Holdings to be substantively consolidated with the assets and liabilities of any member of the Texas Holdings Group (including EFIH and EFIH Finance) in the event any such member were to become a debtor in a bankruptcy case. We believe, as several major credit rating agencies have acknowledged, that the likelihood of such substantive consolidation of Oncor's or Oncor Holdings' assets and liabilities is remote in consideration of the ring-fencing measures and applicable law.

1

Confidential - Subject to CA
Mike Kunkel

EFH00027409

Confidential - Subject to CA
Mike Kunkel

We have no employees. At June 30, 2012, Oncor had approximately 3,600 full-time employees, including approximately 800 employees under collective bargaining agreements.

### Additional Information

EFIH was formed in Delaware in 2007 and EFIH Finance was incorporated in Delaware in 2009. Our principal executive offices are located at Energy Plaza, 1601 Bryan Street, Dallas, TX 75201-3411. The telephone number of our principal executive offices is (214) 812-4600. Our website is *http://www.energyfutureholdings.com/efih.* Information on or connected to our website does not constitute part of this offering memorandum.

2

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027410

Confidential - Subject to CA
Mike Kunkel

### Organizational Structure

The chart below is a summary of EFH Corp.'s organizational and ownership structure and illustrates EFH Corp.'s and its major subsidiaries' (other than Oncor and its subsidiaries) long-term debt as of June 30, 2012, after giving effect to this offering and the use of proceeds therefrom (including the payment by EFIH to EFH Corp. of the EFIH Dividend and the use of the proceeds from the EFIH Dividend to repay the balance of the TCEH Demand Notes). See "—Debt Issued or Guaranteed by EFIH" and "Capitalization" for further information regarding our outstanding debt amounts after giving effect to the issuance of the notes and the use of proceeds therefrom. The chart below excludes finance subsidiaries and subsidiaries of EFH Corp. that are not subsidiaries of EFIH or EFCH, including TXU Receivables Company. TXU Receivables Company conducts an accounts receivable securitization program.



(1)  Excludes $4.542 billion principal amount of 2017 Notes held by EFIH as investments.
(2)  Excludes $54 million aggregate principal amount of Legacy Notes held by EFIH as investments.
(3)  None of EFH Corp., EFIH's subsidiaries (including Oncor), or EFCH or its subsidiaries will guarantee, and none of them (other than EFIH Finance) will be otherwise liable for, the notes.
(4)  The ring-fenced entities will not be restricted subsidiaries under the indentures governing the notes and will not be subject to covenants and events of default thereunder.
(5)  Substantially all of the subsidiaries of TCEH are engaged in competitive market activities.
(6)  Excludes $284 million principal amount of TCEH 2015/2016 Notes held by EFH Corp. and $79 million principal amount of TCEH 2015/2016 Notes held by EFIH as investments.
(7)  Excludes $19 million principal amount of borrowings under the TCEH Senior Secured Credit Facilities held by EFH Corp.

3

Confidential - Subject to CA
Mike Kunkel

EFH00027411

PX 056
Page 12 of 308

Confidential - Subject to CA
Mike Kunkel

### Debt Issued or Guaranteed by EFIH

The following table sets forth as of June 30, 2012 the total outstanding principal amount of debt that EFIH has either issued or guaranteed (without giving effect to any debt push-down accounting):

(1)    on an actual basis; and

(2)    on an as adjusted basis to give effect to the offering of the notes hereby and the use of proceeds therefrom (including the payment by EFIH to EFH Corp. of the EFIH Dividend and the use of the proceeds from the EFIH Dividend to repay the balance of the TCEH Demand Notes).

| | As of June 30, 2012 | |
| --- | --- | --- |
| | Actual | As Adjusted |
| | (millions of dollars) | |
| **First Lien Secured Debt (a)** | | |
| EFIH 9.75% Senior Secured Notes due 2019 | $ 141 | $ 141 |
| EFIH 10.000% Senior Secured Notes due 2020 | 2,180 | 2,180 |
| EFIH 6.875% Senior Secured Notes due 2017 offered hereby | — | 250 |
| EFH Corp. 9.75% Senior Secured Notes due 2019 | 115 | 115 |
| EFH Corp. 10.000% Senior Secured Notes due 2020 | 1,061 | 1,061 |
| Total First Lien Secured Debt (issued or guaranteed) | 3,497 | 3,747 |
| **Second Lien Secured Debt (b)** | | |
| EFIH 11% Senior Secured Second Lien Notes due 2021 | 406 | 406 |
| EFIH 11.750% Senior Secured Second Lien Notes due 2022 | 1,150 | 1,150 |
| EFIH 11.750% Senior Secured Second Lien Notes due 2022 offered hereby | — | 600 |
| Total Second Lien Secured Debt (issued or guaranteed) | 1,556 | 2,156 |
| **Unsecured Debt** | | |
| EFH Corp. 10.875% Senior Notes due 2017 (c) | 196 | 196 |
| EFH Corp. 11.250%/12.000% Senior Toggle Notes due 2017 (d) | 464 | 464 |
| EFH Corp. P&I and SG&A demand notes payable to TCEH (e) | 680 | — |
| Total Unsecured Debt (issued or guaranteed) | 1,340 | 660 |
| Total Debt (issued or guaranteed) | $6,393 | $6,563 |

(a)    These notes or EFIH's guarantee thereof, as applicable, are secured by the Collateral on a first-priority basis.

(b)    These notes are secured by the Collateral on a second-priority basis.

(c)    Net of $1.591 billion principal amount of these notes held by EFIH.

(d)    Net of $2.951 billion principal amount of these notes held by EFIH.

(e)    These notes are payable on demand. The as adjusted column reflects the repayment of the outstanding balance of the TCEH Demand Notes by EFH Corp. using the proceeds from the EFIH Dividend. See "Use of Proceeds."

4

Confidential - Subject to CA
Mike Kunkel

EFH00027412

**PX 056**
**Page 13 of 308**

Confidential - Subject to CA
Mike Kunkel

### The Notes

The summary below describes the principal terms of the notes and the related indentures and security documents. Certain of the terms and conditions described below are subject to important limitations and exceptions. The "Description of the First Lien Notes" and the "Description of the Second Lien Notes" sections of this offering memorandum contain more detailed descriptions of the terms and conditions of the notes and the related indentures and security documents.

### Terms of the First Lien Notes

**Securities Offered** . . . . . . . . . . . . . . . .  $250,000,000 aggregate principal amount of 6.875% Senior Secured Notes due 2017.

**Maturity Date** . . . . . . . . . . . . . . . . . . . . .  The first lien notes will mature on August 15, 2017.

**Interest Rate** . . . . . . . . . . . . . . . . . . . . .  Interest on the first lien notes will accrue at a rate of 6.875% per annum.

**Interest Payment Dates** . . . . . . . . . . .  Interest on the first lien notes will be payable on February 15 and August 15 of each year, commencing on February 15, 2013.

**Ranking** . . . . . . . . . . . . . . . . . . . . . . . . .  The first lien notes are:

- senior obligations of the Issuer and rank equally in right of payment with all existing and future senior debt of the Issuer;

- secured equally and ratably with $3.497 billion aggregate principal amount of Existing First Lien Notes and any future obligations of the Issuer that are secured on a first-priority basis by a pledge of all of the membership interests and other investments EFIH owns or holds in Oncor Holdings, which on the date the notes are issued will consist of all of the membership interests EFIH owns in Oncor Holdings (the "Collateral");

- effectively senior to all debt of EFIH secured by the Collateral on a second-priority basis to the extent of the value of the Collateral and to all unsecured debt of EFIH to the extent of the value of the Collateral;

- effectively subordinated to all secured debt of EFIH that is secured by assets other than the Collateral, to the extent of the value of the assets securing such debt;

- structurally subordinated to all existing and future debt and other liabilities of EFIH's subsidiaries (other than EFIH Finance), including Oncor Holdings and its subsidiaries, any of EFIH's future foreign subsidiaries and any other unrestricted subsidiaries; and

- senior in right of payment to any future subordinated debt of the Issuer.

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027413

**PX 056**
**Page 14 of 308**

Confidential - Subject to CA
Mike Kunkel

As of June 30, 2012, after giving effect to the issuance of the notes offered hereby and the use of proceeds therefrom (including the payment by EFIH to EFH Corp. of the EFIH Dividend and the use of the proceeds from the EFIH Dividend to repay the balance of the TCEH Demand Notes), (1) the Issuer would have had $3.747 billion aggregate principal amount of debt secured by a first-priority lien on the Collateral (including its guarantee of $1.176 billion aggregate principal amount of EFH Corp. debt), $2.156 billion aggregate principal amount of debt secured by a second-priority lien on the Collateral and $660 million aggregate principal amount of EFH Corp. senior debt guaranteed by EFIH on a senior unsecured basis (excluding $4.542 billion of such unsecured guaranteed debt held as an investment by EFIH), and (2) the notes would have been structurally subordinated to approximately $6.555 billion principal amount of debt (includes long-term debt, including amounts due currently, and short-term borrowings) of EFIH's subsidiaries (other than EFIH Finance), including all of Oncor Holdings' and its subsidiaries' debt. In addition, as of June 30, 2012, Oncor had approximately $1.459 billion of additional available capacity under its revolving credit facility.

**Security** . . . . . . . . . . . . . . . . . . . . . . . . The first lien notes are secured, on a first-priority basis, equally and ratably with the Existing First Lien Notes, by EFIH's pledge of the Collateral, consisting of all of the membership interests and other investments it owns or holds in Oncor Holdings. As of June 30, 2012, $141 million aggregate principal amount of EFIH 9.75% Notes, $2.180 billion aggregate principal amount of EFIH 10.000% Notes, and guarantees of $115 million aggregate principal amount of EFH Corp. 9.75% Notes and $1.061 billion aggregate principal amount of EFH Corp. 10.000% Notes were outstanding and secured by first-priority liens on the Collateral. See "Description of the First Lien Notes—Security for the Notes." The Issuer can incur additional debt secured by the Collateral, including additional debt secured by the Collateral on a first-priority basis equally and ratably with the first lien notes unless and until the total outstanding debt secured by the Collateral on a first-priority basis (including the first lien notes) is $4.0 billion (of which approximately $3.747 billion aggregate principal amount will be outstanding after giving effect to this offering). See "Risk Factors—Risks Related to the Notes and Our Substantial Debt—Noteholders' interests in the Collateral may be further subordinated or diluted if we incur additional debt that is secured on a senior or pari passu basis by the same Collateral securing the notes."

See also "Risk Factors—Risks Related to the Notes and Our Substantial Debt—The indentures governing the notes may not protect noteholders from all actions that EFIH or the Oncor Subsidiaries may take that would reduce noteholders' interest

6

Highly Confidential

EFH00027414

Confidential - Subject to CA
Mike Kunkel

|  | in the Collateral or that may reduce the value of the Collateral, including sales or exchanges of the Collateral or the assets of the Oncor Subsidiaries for other assets or investments" and "Risk Factors—Risks Related to the Notes and Our Substantial Debt—The notes will be secured only to the extent of the value of the assets that have been granted as security for the notes. The fair market value of the Collateral upon any foreclosure may not be sufficient to repay the holders of the first lien notes. After payment in full of all obligations secured by first-priority liens on the Collateral, there may be insufficient proceeds to satisfy amounts owed under the second lien notes." |
|---|---|
| **Optional Redemption** . . . . . . . . . . . . . | The Issuer may redeem the first lien notes, in whole or in part, on and after February 15, 2015, in each case, at the redemption prices set forth in this offering memorandum plus accrued and unpaid interest to the redemption date. The Issuer may also redeem the first lien notes, in whole or in part, at any time prior to February 15, 2015 at a price equal to 100% of their principal amount, plus accrued and unpaid interest to the redemption date and a "make-whole" premium. In addition, before February 15, 2015, the Issuer may redeem up to 35% of the aggregate principal amount of the first lien notes using the proceeds from certain equity offerings at the redemption price set forth in this offering memorandum plus accrued and unpaid interest to the redemption date. See "Description of the First Lien Notes—Optional Redemption." |
| **Voting**. . . . . . . . . . . . . . . . . . . . . . . . . . | The indenture governing the first lien notes will provide that we may issue additional notes of the same or a different series from time to time that are secured by a first-priority lien on the Collateral and elect to treat those additional notes as a single class with the first lien notes for all purposes under that indenture, including for waivers, amendments and offers to purchase. In the event of such an issuance and election, holders of the first lien notes would not have a separate right to, among other things, give notice of defaults or to direct the trustee to exercise remedies during an event of default or otherwise, except as otherwise described under "Description of the First Lien Notes." |

**Terms of the New Second Lien Notes**

| **Securities Offered** . . . . . . . . . . . . . . . | $600,000,000 aggregate principal amount of 11.750% Senior Secured Second Lien Notes due 2022. The new second lien notes will have identical terms and conditions as the Existing 2022 Second Lien Notes, other than the issue date and issue price, and will constitute part of the same series as, vote together as a single class with, and be fungible with, the Existing 2022 Second Lien Notes. The second lien notes constitute a separate series of senior notes but are treated as a single class with the Existing 2021 Second Lien Notes for |
|---|---|

7

Confidential - Subject to CA
Mike Kunkel

EFH00027415

**PX 056**
**Page 16 of 308**

Confidential - Subject to CA
Mike Kunkel

voting purposes with respect to amendments and waivers and for taking certain other actions, except as otherwise described under "Description of the Second Lien Notes."

**Maturity Date** . . . . . . . . . . . . . . . . . . . .    The new second lien notes will mature on March 1, 2022.

**Interest Rate** . . . . . . . . . . . . . . . . . . . .    Interest on the new second lien notes will accrue at a rate of 11.750% per annum from February 6, 2012.

**Interest Payment Dates** . . . . . . . . . . .    Interest on the new second lien notes will be payable on March 1 and September 1 of each year, commencing on September 1, 2012.

**Ranking** . . . . . . . . . . . . . . . . . . . . . . . . . .    The new second lien notes are:

- senior obligations of the Issuer and rank equally in right of payment with all existing and future senior debt of the Issuer;

- secured equally and ratably with $1.150 billion aggregate principal amount of Existing 2022 Second Lien Notes and $406 million aggregate principal amount of Existing 2021 Second Lien Notes and any future obligations of the Issuer that are secured by a second-priority lien on the Collateral;

- effectively subordinated to EFIH's obligations under the first lien notes, the Existing First Lien Notes and any other future debt subject to first-priority liens on the Collateral, to the extent of the value of the Collateral;

- effectively subordinated to all secured debt of EFIH that is secured by assets other than the Collateral, to the extent of the value of the assets securing such debt;

- structurally subordinated to all existing and future debt and other liabilities of EFIH's subsidiaries (other than EFIH Finance), including Oncor Holdings and its subsidiaries, any of EFIH's future foreign subsidiaries and any other unrestricted subsidiaries;

- effectively senior to all unsecured debt of EFIH to the extent of the value of the Collateral (after taking into account any first-priority liens on the Collateral, including the liens on the Collateral under the first lien notes and the Existing First Lien Notes and any future obligations of the Issuer that are secured by a first-priority lien on the Collateral); and

- senior in right of payment to any future subordinated debt of the Issuer.

As of June 30, 2012, after giving effect to the issuance of the notes offered hereby and the use of proceeds therefrom (including the payment by EFIH to EFH Corp. of the EFIH Dividend and the use of the proceeds from the EFIH Dividend to repay the balance of the TCEH Demand Notes), (1) the

8

Confidential - Subject to CA
Mike Kunkel

EFH00027416

PX 056
Page 17 of 308

Confidential - Subject to CA
Mike Kunkel

Issuer would have had $3.747 billion aggregate principal amount of debt secured by a first-priority lien on the Collateral (including its guarantee of $1.176 billion aggregate principal amount of EFH Corp. debt), $2.156 billion aggregate principal amount of debt secured by a second-priority lien on the Collateral and $660 million aggregate principal amount of EFH Corp. senior debt guaranteed by EFIH on a senior unsecured basis (excluding $4.542 billion of such unsecured guaranteed debt held as an investment by EFIH), and (2) the new second lien notes would have been structurally subordinated to approximately $6.555 billion principal amount of debt (includes long-term debt, including amounts due currently, and short-term borrowings) of EFIH's subsidiaries (other than EFIH Finance), including all of Oncor Holdings' and its subsidiaries' debt. In addition, as of June 30, 2012, Oncor had approximately $1.459 billion of additional available capacity under its revolving credit facility.

**Security** ......................... The new second lien notes are secured, on a second-priority basis, equally and ratably with the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes, by EFIH's pledge of the Collateral, consisting of all of the membership interests and other investments it owns or holds in Oncor Holdings. As of June 30, 2012, $141 million aggregate principal amount of EFIH 9.75% Notes, $2.180 billion aggregate principal amount of EFIH 10.000% Notes, and guarantees of $115 million aggregate principal amount of EFH Corp. 9.75% Notes and $1.061 billion aggregate principal amount of EFH Corp. 10.000% Notes were outstanding and secured by first-priority liens on the Collateral, and $1.150 billion aggregate principal amount of Existing 2022 Second Lien Notes and $406 million aggregate principal amount of Existing 2021 Second Lien Notes were outstanding and secured by second-priority liens on the Collateral. See "Description of the Second Lien Notes—Security for the Notes." The Issuer can incur additional debt secured by the Collateral, including additional debt secured by the Collateral on a first-priority basis ahead of the second lien notes unless and until the total outstanding debt secured by the Collateral on a first-priority basis is $4.0 billion (of which approximately $3.747 billion will be outstanding after giving effect to this offering (including the first lien notes)) and a substantial amount of additional debt, including the new second lien notes offered hereby, secured by the Collateral on a second-priority basis equally and ratably with the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes. See "Risk Factors—Risks Related to the Notes and Our Substantial Debt—Noteholders' interests in the Collateral may be further subordinated or diluted if we incur additional debt that is secured on a senior or pari passu basis by the same Collateral securing the notes."

9

Confidential - Subject to CA
Mike Kunkel

EFH00027417

**PX 056**
**Page 18 of 308**

Confidential - Subject to CA
Mike Kunkel

See also "Risk Factors—Risks Related to the Notes and Our Substantial Debt—The indentures governing the notes may not protect noteholders from all actions that EFIH or the Oncor Subsidiaries may take that would reduce noteholders' interest in the Collateral or that may reduce the value of the Collateral, including sales or exchanges of the Collateral or the assets of the Oncor Subsidiaries for other assets or investments" and "Risk Factors—Risks Related to the Notes and Our Substantial Debt—The notes will be secured only to the extent of the value of the assets that have been granted as security for the notes. The fair market value of the Collateral upon any foreclosure may not be sufficient to repay the holders of the first lien notes. After payment in full of all obligations secured by first-priority liens on the Collateral, there may be insufficient proceeds to satisfy amounts owed under the second lien notes."

**Optional Redemption** . . . . . . . . . . . . The Issuer may redeem the new second lien notes, in whole or in part, on and after March 1, 2017, in each case, at the redemption prices set forth in this offering memorandum plus accrued and unpaid interest to the redemption date. The Issuer may also redeem the new second lien notes, in whole or in part, at any time prior to March 1, 2017 at a price equal to 100% of their principal amount, plus accrued and unpaid interest to the redemption date and a "make-whole" premium. In addition, before March 1, 2015, the Issuer may redeem up to 35% of the aggregate principal amount of the second lien notes, using the proceeds from certain equity offerings at the redemption price set forth in this offering memorandum plus accrued and unpaid interest to the redemption date. See "Description of the Second Lien Notes—Optional Redemption."

**Voting**. . . . . . . . . . . . . . . . . . . . . . . . . . . The new second lien notes, the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes will be treated as a single class for purposes of voting with respect to amendments and waivers and for taking certain other actions. See "Description of the Second Lien Notes" and "Risk Factors—Risks Related to the Notes and Our Substantial Debt—The second lien notes constitute a separate series of senior notes but will be treated as a single class with the Existing 2021 Second Lien Notes for voting purposes with respect to amendments and waivers and for taking certain other actions. If we issue additional debt that is secured equally and ratably with the new second lien notes, the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes, the voting interest of holders of the new second lien notes will be diluted."

**Terms Common to the First Lien Notes and the New Second Lien Notes**

**Issuer** . . . . . . . . . . . . . . . . . . . . . . . . . . . Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (together, the "Issuer")

10

Confidential - Subject to CA
Mike Kunkel

EFH00027418

**PX 056**
**Page 19 of 308**

Confidential - Subject to CA
Mike Kunkel

**Guarantees** . . . . . . . . . . . . . . . . . . . . . .   The notes will not initially be guaranteed.

**Change of Control Offer** . . . . . . . . . .   Upon the occurrence of certain transactions meeting the definition of "change of control," holders of the notes will have the right to require the Issuer to repurchase some or all of the notes at 101% of their principal amount, plus accrued and unpaid interest to the repurchase date. This right is subject to important limitations. For example, this right will not apply to a transaction that would otherwise be a "change of control" if the transaction meets certain requirements. See "Description of the First Lien Notes—Repurchase at the Option of Holders— Change of Control," "Description of the Second Lien Notes— Repurchase at the Option of Holders—Change of Control" and the definition of "Change of Control" under "Description of the First Lien Notes" and "Description of the Second Lien Notes."

The Issuer may not be able to pay holders the required price for notes they present to it at the time of a change of control, because the Issuer may not have enough funds at that time or the terms of the Issuer's other debt may prevent the Issuer from making such payment. See "Risk Factors—Risks Related to the Notes and Our Substantial Debt—We may not be able to repurchase the notes upon a change of control."

**Important Covenants** . . . . . . . . . . . . .   The indentures governing the notes contain covenants limiting EFIH's ability and the ability of its restricted subsidiaries to:

- incur additional debt or issue preferred shares;

- pay dividends on, repurchase or make other distributions in respect of its capital stock or make other restricted payments;

- make investments;

- sell or transfer assets;

- create liens on assets to secure debt;

- consolidate, merge, sell or otherwise dispose of all or substantially all of its assets;

- enter into certain transactions with affiliates; and

- designate subsidiaries as unrestricted subsidiaries.

These covenants are subject to a number of important limitations and exceptions. EFIH is a holding company for its subsidiaries, including EFIH Finance, with no material operations of its own and no operating assets. There are currently no restricted subsidiaries under the indentures (other than EFIH Finance, which has no assets). Oncor Holdings, the immediate parent of Oncor, and its subsidiaries are unrestricted subsidiaries under the indentures and, accordingly, are not

11

Confidential - Subject to CA
Mike Kunkel

EFH00027419

**PX 056**
**Page 20 of 308**

Confidential - Subject to CA
Mike Kunkel

subject to any of the restrictive covenants in the indentures. None of Oncor Holdings, Oncor or their respective subsidiaries will guarantee the notes. See "Description of the First Lien Notes" and "Description of the Second Lien Notes."

**Exchange Offer; Registration Rights**. . . . . . . . . . . . . . . . . . . . . . . . . . The Issuer will use commercially reasonable efforts to register with the SEC new issues of the Issuer's debt securities having substantially identical terms to the first lien notes and new second lien notes (except for the provisions relating to transfer restrictions and the payment of additional interest) as part of an offer to exchange freely tradable exchange notes for the notes.

The Issuer will file with the SEC one or more registration statements relating to such exchange offer and will agree to complete such exchange offer with respect to the first lien notes no later than 365 days after the issuance date of the first lien notes and, with respect to the new second lien notes, no later than 365 days after February 6, 2012. If required under special circumstances, the Issuer will file one or more shelf registration statements with the SEC covering resales of the notes.

If the Issuer fails to satisfy its obligations with respect to the registration of either the first lien notes or the new second lien notes (a "registration default"), the annual interest rate on the the first lien notes or the new second lien notes, as applicable, will increase by 25 basis points for the first 90-day period during which a registration default continues, and thereafter the annual interest rate on the the first lien notes or the new second lien notes, as applicable, will increase by 50 basis points over the interest rate shown on the cover of this offering memorandum with respect to such notes for the remaining period during which a registration default continues. If all registration defaults are cured, the interest rate on the the first lien notes or the new second lien notes, as applicable, will revert to the original level.

Any amounts of additional interest due as a result of a registration default will be payable on the same interest payment dates as interest on the notes is payable. See "Exchange Offer; Registration Rights."

**Transfer Restrictions** . . . . . . . . . . . . . The Issuer has not registered the notes under the Securities Act or any state or other securities laws. The notes are subject to restrictions on transfer and may only be offered or sold in transactions exempt from, or not subject to, the registration requirements of the Securities Act. See "Notice to Investors."

**Use of Proceeds** . . . . . . . . . . . . . . . . . . We will use $680 million of the net proceeds from this offering to pay the EFIH Dividend to EFH Corp. in or before January 2013. EFH Corp. will use the proceeds of the dividend to repay

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027420

PX 056
Page 21 of 308

Confidential - Subject to CA
Mike Kunkel

the balance of the TCEH Demand Notes. The balance of the TCEH Demand Notes outstanding as of June 30, 2012 was $680 million. Pending their application in or before January 2013, that portion of the net proceeds will be held in an escrow account. Holders of the notes will have no security interest in the escrow account. The remaining net proceeds will be used for general corporate purposes, which may include the payment of dividends to EFH Corp. See "Use of Proceeds."

**Denominations** . . . . . . . . . . . . . . . . . . . The notes will be issued in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof.

**Risk Factors**. . . . . . . . . . . . . . . . . . . . . **In addition to the other information included in or incorporated by reference into this offering memorandum, you should carefully consider the information set forth in the section entitled "Risk Factors" beginning on page 16 and those contained in our 2011 Form 10-K, our June 30, 2012 Form 10-Q, the EFH Corp. 2011 Form 10-K and the EFH Corp. June 30, 2012 Form 10-Q, each of which is incorporated into this offering memorandum by reference, before deciding whether or not to invest in the notes. See "Incorporation by Reference."**

13

Confidential - Subject to CA
Mike Kunkel

EFH00027421

Confidential - Subject to CA
Mike Kunkel

### Summary Historical Consolidated Financial Data

The following table sets forth EFIH and its subsidiaries' summary historical consolidated financial data as of and for the periods indicated. The historical financial data as of December 31, 2011 and 2010, and for the years ended December 31, 2011, 2010 and 2009 (Successor), have been derived from EFIH and its subsidiaries' audited historical consolidated financial statements and related notes included in our 2011 Form 10-K, which is incorporated into this offering memorandum by reference. The historical financial data as of December 31, 2009, 2008 and 2007 (Successor), for the year ended December 31, 2008, and for the period from October 11, 2007 through December 31, 2007 (Successor) and for the period from January 1, 2007 through October 10, 2007 (Predecessor) have been derived from EFIH and its subsidiaries' audited historical consolidated financial statements that are not included in our 2011 Form 10-K and are not incorporated by reference into this offering memorandum. EFIH was formed at the time of the merger of Texas Energy Future Merger Sub Corp. ("Merger Sub") with and into EFH Corp. (the "Merger"), which occurred on October 10, 2007, and its predecessor is Oncor. The "Predecessor" period reflects the period prior to the Merger. The historical financial data for all periods includes Oncor Holdings and its subsidiaries accounted for under the equity method. The historical financial data as of June 30, 2012 and for the six months ended June 30, 2012 and 2011 have been derived from EFIH and its subsidiaries' unaudited historical interim condensed consolidated financial statements and related notes included in our June 30, 2012 Form 10-Q, which is incorporated into this offering memorandum by reference. In EFIH's opinion, such unaudited interim financial data reflects all adjustments, consisting of normal recurring accruals, necessary for the fair presentation of the results for those periods. The results of operations for the interim periods, for seasonal and other factors, are not necessarily indicative of the results to be expected for the full year or any future period. See "Available Information" and "Incorporation by Reference."

The summary historical consolidated financial data should be read in conjunction with our 2011 Form 10-K, including the audited consolidated financial statements and related notes contained therein and the section captioned "Management's Discussion and Analysis of Financial Condition and Results of Operations," and our June 30, 2012 Form 10-Q, including the unaudited interim condensed consolidated financial statements and related notes contained therein and the section captioned "Management's Discussion and Analysis of Financial Condition and Results of Operations."

| | Successor (a) | | | | | Predecessor (a) |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| | 2011 | 2010 | 2009 | 2008 | | |
| | (millions of dollars, except ratios) | | | | | |
| **Statement of Income Data:** | | | | | | |
| Income (loss) before income taxes and equity in earnings of unconsolidated subsidiary | $ 204 | $(106) | $(275) | $(260) | $(68) | $ — |
| Equity in earnings (losses) of unconsolidated subsidiary (net of tax) (b) | 286 | 277 | 256 | (323) | 64 | 263 |
| Net income (loss) | 417 | 213 | 74 | (495) | 19 | 263 |
| Ratio of earnings to fixed charges (c) | 1.92 | 1.20 | — | 1.27 | — | — |
| **Statement of Cash Flows Data:** | | | | | | |
| Cash flows provided by operating activities | $ 3 | $ 133 | $ 216 | $ 333 | $— | $ 326 |
| Cash flows provided by (used in) financing activities | — | 407 | (216) | (330) | — | (326) |
| Cash flows used in investing activities | — | (497) | — | (3) | — | — |

14

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027422

Confidential - Subject to CA
Mike Kunkel

|  | Successor (a) | | | | |
|---|---|---|---|---|---|
|  | December 31, | | | | |
|  | 2011 | 2010 | 2009 | 2008 | 2007 |
| **Balance Sheet Data:** | (millions of dollars) | | | | |
| Total assets | $9,517 | $8,547 | $5,577 | $5,363 | $7,732 |
| Total debt (d) | 3,436 | 3,172 | 2,513 | 2,250 | 2,250 |
| Total membership interests | 5,805 | 5,193 | 3,010 | 3,069 | 5,439 |

(a)    The Predecessor reflects Oncor accounted for under the equity method; EFIH and Oncor Holdings were formed as of the time of the Merger. The consolidated financial statements of the Successor reflect the application of purchase accounting to Oncor.

(b)    Amount in 2008 includes the effects of Oncor's $860 million goodwill impairment charge.

(c)    Fixed charges exceeded earnings by $59 million and $68 million for the year ended December 31, 2009 and the period from October 11, 2007 through December 31, 2007, respectively. There were no fixed charges for the predecessor periods.

(d)    Includes push down of 50% of the principal amount of certain EFH Corp. (parent) debt due to EFIH's guarantee of the debt. See Note 5 to EFIH and its subsidiaries' historical consolidated financial statements included in the 2011 Form 10-K, which is incorporated by reference into this offering memorandum. Does not include other EFH Corp. (parent) debt guaranteed by EFIH but not subject to push down. Also does not include any amounts under the TCEH Demand Notes, which are guaranteed on a senior unsecured basis by EFIH.

|  | Successor | |
|---|---|---|
|  | Six Months Ended June 30, 2012 | Six Months Ended June 30, 2011 |
|  | (millions of dollars, except ratios) | |
| **Statement of Income Data:** | | |
| Income before income taxes and equity in earnings of unconsolidated subsidiary | 78 | 132 |
| Equity in earnings of unconsolidated subsidiary (net of tax) | 141 | 122 |
| Net income | 190 | 207 |
| Ratio of earnings to fixed charges | 1.63 | 1.96 |
| **Statement of Cash Flows Data:** | | |
| Cash flows used in operating activities | $(130) | $ (32) |
| Cash flows provided by financing activities | 163 | — |
| Cash flows used in investing activities | — | — |

|  | Successor |
|---|---|
|  | June 30, 2012 |
|  | (millions of dollars) |
| **Balance Sheet Data:** | |
| Total assets | $9,989 |
| Total debt (a) | 4,587 |
| Total membership interests | 5,144 |

(a)    Includes push down of 50% of the principal amount of certain EFH Corp. (parent) debt due to EFIH's guarantee of the debt. See Note 4 to EFIH and its subsidiaries' historical consolidated condensed financial statements included in our June 30, 2012 Form 10-Q, which is incorporated by reference into this offering memorandum. Does not include other EFH Corp. (parent) debt guaranteed by EFIH but not subject to push down. Also does not include any amounts under the TCEH Demand Notes, which are guaranteed on a senior unsecured basis by EFIH.

15

Confidential - Subject to CA
Mike Kunkel

EFH00027423

Confidential - Subject to CA
Mike Kunkel

## RISK FACTORS

*You should carefully consider the risk factors set forth below and the risk factors incorporated into this offering memorandum by reference to our 2011 Form 10-K, our June 30, 2012 Form 10-Q, the EFH Corp. 2011 Form 10-K and the EFH Corp. June 30, 2012 Form 10-Q as well as the other information contained in and incorporated by reference into this offering memorandum, before deciding to invest in the notes. Because we have significant exposure to EFH Corp. credit risk and to the business and financial condition of TCEH, some of the risks described below are risks pertaining to EFH Corp. and TCEH. The selected risks described below and the risks that are incorporated into this offering memorandum by reference to our 2011 Form 10-K, our June 30, 2012 Form 10-Q, the EFH Corp. 2011 Form 10-K and the EFH June 30, 2012 Form 10-Q are not the only risks to which we are or may become subject. Any of the following risks or any of the risks described in our 2011 Form 10-K, our June 30, 2012 Form 10-Q, the EFH Corp. 2011 Form 10-K and the EFH Corp. June 30, 2012 Form 10-Q could materially and adversely affect our business, financial condition, operating results or cash flow. In such a case, the trading price of the notes could decline, or we may not be able to make payments of interest and principal on the notes, and noteholders may lose all or part of their original investment.*

### Risks Related to the Notes and Our Substantial Debt

***We have significant exposure to EFH Corp. credit risk and to the business and financial condition of TCEH.***

As of June 30, 2012, approximately 39% of reported assets on our balance sheet consisted of debt securities of EFH Corp. that we also guarantee. As of June 30, 2012, we held $4.5 billion aggregate principal amount of such debt securities, which had a carrying value of $3.9 billion as of that date. As of June 30, 2012, we also had receivables from affiliates in the amount of $90 million, primarily representing our claims for accrued interest on these debt securities. We depend and will continue to depend on receiving cash interest payments on these EFH Corp. debt securities to fund, at least in part, payments on the notes and our other debt obligations. In the past, EFH Corp. has serviced its debt securities in part with funds loaned to EFH Corp. by TCEH under the TCEH Demand Notes. EFH Corp. will use the proceeds from the EFIH Dividend to repay the balance of the TCEH Demand Notes, and there is no assurance that TCEH will make additional advances to EFH Corp. under the TCEH Demand Notes in the future to the extent EFH Corp. requests such advances.

In addition, as of June 30, 2012, we guaranteed, either on a first-priority secured basis or on a senior unsecured basis, approximately $1.8 billion of debt of EFH Corp. that is held by third parties as well as $680 million of TCEH Demand Notes. Although EFH Corp. will use the proceeds from the EFIH Dividend to repay the balance of the TCEH Demand Notes, TCEH may advance up to $2.0 billion to EFH Corp. under the TCEH Demand Notes in the future. Any amounts owed by EFH Corp. under the TCEH Demand Notes now or in the future will be repayable on demand and will be guaranteed by EFIH on a senior unsecured basis.

Furthermore, a significant portion of Oncor's revenues represents fees for delivery services provided to TCEH. Revenues from TCEH represented 29% and 33% of Oncor's total reported revenues for the six months ended June 30, 2012 and for the year ended December 31, 2011, respectively.

The indentures governing the notes do not limit our ability to dividend the EFH Corp. debt securities that we hold to EFH Corp. so long as we received such securities in exchange for the issuance of EFIH debt. If EFH Corp. is unable to service its debt securities because TCEH no longer loans funds to EFH Corp. in response to a request by EFH Corp., or for other reasons, or if we dividend these debt securities to EFH Corp. and EFH Corp. does not make capital contributions or loans to us, we may be unable to make payments on the notes. We may acquire additional debt

16

Confidential - Subject to CA
Mike Kunkel

EFH00027424

**PX 056**
**Page 25 of 308**

Confidential - Subject to CA
Mike Kunkel

securities of EFH Corp. or TCEH in the future in connection with exchange offers, debt repurchases or other transactions, in which case our exposure to the business and financial condition of EFH Corp. and/or TCEH would be increased.

See "—Risks Related to Exposure to EFH Corp. and TCEH".

***Our substantial leverage could adversely affect our ability to raise additional capital to fund our operations, limit our ability to react to changes in the economy or our industry and prevent us from meeting obligations under our various debt agreements. Among other things, the incurrence of additional debt that is secured by a lien on our investment in Oncor Holdings could result in downgrades to Oncor's credit ratings and thus increase Oncor's borrowing costs and reduce the amounts that Oncor distributes to us.***

We are highly leveraged. As of June 30, 2012, our consolidated principal amount of debt, including amounts guaranteed in favor of and pushed down from EFH Corp. as described in Note 4 to the financial statements in our June 30, 2012 Form 10-Q totaled $4.595 billion. Such amount, presented in accordance with GAAP, does not include an additional $1.118 billion principal amount of EFH Corp. debt held by third parties that is guaranteed by EFIH and not reflected on (pushed down to) our balance sheet as long-term debt or an additional $680 million outstanding under the TCEH Demand Notes and guaranteed on a senior unsecured basis by EFIH. Our substantial leverage could have important consequences, including:

- making it more difficult for us to make payments on our debt;

- requiring a substantial portion of our cash flow to be dedicated to the payment of principal and interest on debt, thereby reducing our ability to use our cash flow to fund future business opportunities and execute our strategy;

- increasing our vulnerability to adverse economic, industry or competitive developments;

- limiting our ability to make strategic acquisitions or causing us to make non-strategic divestitures;

- limiting our ability to obtain additional financing for working capital, debt service requirements, acquisitions and general corporate or other purposes, or to refinance existing debt;

- limiting our ability to adjust to changing market conditions and placing us at a disadvantage compared to competitors who are less highly leveraged and who, therefore, may be able to operate at a lower overall cost (including debt service) and take advantage of opportunities that we cannot; and

- resulting in downgrades to Oncor's credit rating.

Some rating agencies have publicly expressed concerns that the financial condition of EFH Corp. and its non-ring-fenced affiliates could constrain Oncor's credit market access or margin spreads. One rating agency has publicly announced it may take an adverse action with respect to Oncor's credit ratings in response to liability management or other activities by EFH Corp. or any of its subsidiaries, including the incurrence of debt by EFH Corp. and/or EFIH which is secured by a lien on the equity of Oncor Holdings held by EFIH. Any adverse action with respect to Oncor's credit ratings would generally cause borrowing costs to increase and the potential pool of investors and funding sources to decrease. For example, the interest margin Oncor pays on borrowings under its revolving credit agreement depends on Oncor's credit ratings and will generally increase as its credit ratings are lowered. In the event any such adverse action to Oncor's credit ratings takes place and causes Oncor's borrowing costs to increase, it may not be able to recover these increased costs if they exceed Oncor's PUCT-approved cost of debt determined in its most recent rate case or subsequent rate cases. Consequently, the amount of Oncor's distributions to us may be reduced.

17

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

Confidential - Subject to CA
Mike Kunkel

In addition, future transactions and initiatives that EFIH, EFH Corp. and EFH Corp.'s other subsidiaries, including EFCH and TCEH, continuously contemplate and may pursue may have significant effects on our business, capital structure, liquidity and/or results of operations. For example, EFIH, EFH Corp. and EFH Corp.'s other subsidiaries, including EFCH and TCEH, have and may continue to pursue, from time to time, transactions and initiatives of various types, including, without limitation, exchange transactions, debt repurchases, equity or debt issuances, debt refinancing transactions (including extensions of maturity dates of our debt), asset sales, joint ventures, recapitalizations, business combinations and other strategic transactions. There can be no guarantee that any of such transactions or initiatives would ultimately be successful or produce the desired outcome, which could ultimately affect EFIH in a material and adverse manner. Moreover, the effects of any of these transactions or initiatives could be material and adverse to holders of our debt and could be disproportionate, and directionally different, with respect to one class or type of debt than with respect to others.

**Despite our current high debt level, we may still be able to incur substantially more debt. This could further exacerbate the risks associated with the notes and our other debt.**

We may be able to incur additional debt in the future. Although our and EFH Corp.'s debt agreements contain restrictions on the incurrence of additional debt, these restrictions are subject to a number of significant qualifications and exceptions. Under certain circumstances, the amount of debt, including debt secured by the Collateral, that could be incurred in the future in compliance with these restrictions could be substantial. The indentures governing the Existing First Lien Notes permit EFH Corp. and EFIH, and the indentures governing the notes, the Existing 2021 Second Lien Notes and the Existing 2022 Second Lien Notes permit EFIH, to incur up to an aggregate of $4.0 billion of debt secured by first-priority liens on the Collateral, including the Existing First Lien Notes and the first lien notes offered hereby. After giving effect to this offering, EFH Corp. and EFIH may incur an additional aggregate amount of debt equal to approximately $250 million that is secured by a first-priority lien on the Collateral. The indentures governing the notes permit EFIH to incur a substantial amount of additional debt, including the new second lien notes offered hereby, secured by a second-priority security interest in the Collateral, and permit EFIH to incur debt secured by assets of EFIH other than the Collateral. The indentures governing the notes, the Existing First Lien Notes, the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes also permit EFH Corp. and EFIH to incur additional debt in various other circumstances. For example, EFIH has guaranteed the TCEH Demand Notes. While EFH Corp. will use the proceeds of the EFIH Dividend to repay the balance of the TCEH Demand Notes, EFH Corp. in the future may request that TCEH advance additional amounts under the TCEH Demand Notes to EFH Corp. and TCEH may loan such amounts to EFH Corp. (the repayment of which would be guaranteed by EFIH), which would be payable on demand and may equal up to $2.0 billion in the aggregate at any time. If new debt is added to our existing debt levels, the related risks that we and noteholders now face would intensify. See "Description of the First Lien Notes," "Description of the Second Lien Notes" and "Risk Factors—Noteholders' interests in the Collateral may be further subordinated or diluted if we incur additional debt that is secured on a senior or junior basis by the Collateral securing the notes."

**Lenders and holders of our debt may allege that we are not operating in compliance with covenants in our debt agreements, which could cause the trading price of our debt securities to decline even if such claims are without merit.**

Given our financial condition, lenders or holders of our debt might assert at any time that we are not operating in compliance with covenants in the agreements governing our debt instruments or make other related allegations, including for the purpose of attempting to accelerate the maturity of such debt and/or attempting to obtain economic benefits from us. Even if any claim by lenders or holders of our debt alleging noncompliance or an event of default under agreements governing our debt instruments is without

18

Confidential - Subject to CA
Mike Kunkel

EFH00027426

**PX 056
Page 27 of 308**

Confidential - Subject to CA
Mike Kunkel

merit, such a claim could nevertheless cause the trading price of our debt securities, including the notes, to decline and adversely affect our ability to raise additional capital and/or refinance our existing debt.

***Our debt agreements, certain of the debt agreements of EFH Corp. and the Oncor "Ring-Fencing" measures contain restrictions that limit flexibility in operating our businesses.***

Our debt agreements, including the indentures governing the notes, the Existing First Lien Notes, the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes, contain various covenants and other restrictions that limit our ability to engage in specified types of transactions and may adversely affect our ability to operate our businesses. These covenants and other restrictions limit our ability to, among other things:

- incur additional debt or issue preferred shares;
- pay dividends on, repurchase or make distributions in respect of our capital stock or make other restricted payments;
- make investments;
- sell or transfer assets;
- create liens on assets to secure debt;
- consolidate, merge, sell or otherwise dispose of all or substantially all of our assets;
- enter into transactions with affiliates; and
- designate subsidiaries as unrestricted subsidiaries.

There are a number of important limitations and exceptions to these covenants and other restrictions. For a description of these covenants and other restrictions with respect to the notes, see "Description of the First Lien Notes" and "Description of the Second Lien Notes." See Note 5 to EFIH's historical consolidated financial statements for the year ended December 31, 2011 included in our 2011 Form 10-K and Note 4 to EFIH's historical condensed consolidated financial statements for the six months ended June 30, 2012 included in our June 30, 2012 Form 10-Q, both of which are incorporated by reference into this offering memorandum, for a summary description of certain of these covenants and other restrictions as they relate to certain of our debt.

In addition, as described in "The Transactions—Ring-Fencing," EFH Corp. and Oncor have implemented a number of "ring-fencing" measures to enhance the credit quality of Oncor, its immediate parent, Oncor Holdings, and Oncor Holdings' other subsidiaries. See the financial statements of Oncor Holdings, which are included as Exhibit 99(d) of our 2011 Form 10-K, for a description of the material features of these "ring-fencing" measures. Those measures, many of which were agreed to and required by the PUCT's Order on Rehearing in Docket No. 34077, include, among other things:

- Oncor Holdings' and Oncor's board of directors being comprised of a majority of directors that are independent from the Texas Holdings Group, including EFIH;
- Oncor being treated as an unrestricted subsidiary with respect to certain of our debt, including the notes;
- Oncor not being restricted from incurring its own debt;
- Oncor not guaranteeing or pledging any of its assets to secure the debt of any member of the Texas Holdings Group, including the Issuer;
- restrictions on the payment of distributions and the right of the independent members of Oncor's board of directors and the largest non-majority member of Oncor to block the payment of distributions to Oncor Holdings (i.e., such distributions not being available to us); and
- restrictions on the ability to sell a majority interest in Oncor until October 2012.

19

Confidential - Subject to CA
Mike Kunkel

Confidential - Subject to CA
Mike Kunkel

***We may not be able to generate or receive sufficient cash to service all of our debt, including the notes, and may be forced to take other actions to satisfy our obligations under our debt agreements, which may not be successful.***

Our ability to make scheduled payments on or to refinance our debt obligations depends on (i) Oncor's financial condition and operating performance, which are subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control, and Oncor making distributions to us, which it may be prohibited from doing and over which we have no control, (ii) our receipt of interest payments from EFH Corp. and TCEH on EFH Corp. and TCEH debt that we hold as an investment and (iii) capital contributions or loans from EFH Corp. Cash interest receipts may be limited by EFH Corp.'s option through November 2012 to settle interest payments on the EFH Corp. 2017 Toggle Notes (of which we own $2.951 billion principal amount as of June 30, 2012) with additional notes in lieu of cash. We may not be able to maintain a level of cash flows sufficient to permit us to pay the principal, premium, if any, and interest on our debt, including the notes.

If cash flows and capital resources are insufficient to fund our debt service obligations, we could face substantial liquidity problems and might be forced to reduce or delay investments, dispose of assets, seek additional capital or restructure or refinance debt, including the notes. These alternative measures may not be successful, may not be completed on economically attractive terms or may not be adequate for us to meet our debt service obligations when due. Additionally, our and our affiliates' debt agreements, including the indentures governing the notes, the Existing First Lien Notes, the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes, limit the use of the proceeds from many dispositions of our and our subsidiaries' assets or operations. As a result, we may not be allowed, under these documents, to use proceeds from such dispositions to satisfy all current debt service obligations.

Furthermore, a substantial portion of EFIH's cash flows comes from EFH Corp.'s and TCEH's payment of interest on certain debt of EFH Corp. and TCEH held by EFIH. As of June 30, 2012, EFIH held $4.675 billion principal amount of such debt on which annual interest income is approximately $525 million, approximately $350 million of which can be settled in new notes in lieu of cash through November 2012. There can be no assurance that EFH Corp. and TCEH will continue to have sufficient resources to pay interest on such debt. In addition, in the past, EFH Corp. has serviced its debt securities in part with funds loaned to EFH Corp. by TCEH under the TCEH Demand Notes. We will use $680 million of the net proceeds from this offering to pay the EFIH Dividend to EFH Corp., and EFH Corp. will use the proceeds of the dividend to repay the balance of the TCEH Demand Notes. There is no assurance that TCEH will make additional advances to EFH Corp. under the TCEH Demand Notes in the future to the extent EFH Corp. requests such advances. See "—Risks Related to Exposure to EFH Corp. and TCEH".

***If we, EFH Corp. or TCEH default on obligations to pay debt, we may not be able to make payments on the notes.***

Any default under our, our subsidiaries', EFH Corp.'s or TCEH's debt agreements that is not waived by the required lenders or noteholders, and the remedies sought by the holders of such debt, could prevent us from paying principal, premium, if any, and interest on the notes, which could substantially decrease the market price of the notes. If we, our subsidiaries or our affiliated entities (including EFH Corp. and TCEH) are unable to generate sufficient cash flows, including amounts that may be distributed to us from our unrestricted subsidiaries, and are otherwise unable to obtain funds necessary to meet required payments of principal, premium, if any, and interest on our or their debt, or if we or our subsidiaries or affiliated entities (including EFH Corp. and TCEH) otherwise fail to comply with the various covenants, including any financial and operating covenants, in the instruments governing our or their debt, or if we or they otherwise take any action or any event, occurrence, fact, condition, effect, change or development occurs that constitutes an event of default under such debt agreements, we or they could

20

Confidential - Subject to CA
Mike Kunkel

EFH00027428

**PX 056**
**Page 29 of 308**

Confidential - Subject to CA
Mike Kunkel

be in default under the terms of the agreements governing such debt. In the event of such default, the holders of such debt could elect to declare all the funds borrowed thereunder to be due and payable, together with accrued and unpaid interest, and/or the lenders could elect to terminate their commitments thereunder, cease making further loans and, in the case of the holders of the first lien notes and the Existing First Lien Notes, institute foreclosure proceedings against the Collateral. In the case of a default under debt of EFH Corp. that is guaranteed by us, holders of such debt could also seek to enforce these guarantees against us. As a result of any of the foregoing, we could go into bankruptcy, liquidation or insolvency. A portion of our cash flows comes from EFH Corp.'s and TCEH's payment of interest on certain of their debt securities held by EFIH, and a default under their debt agreements could result in EFIH no longer receiving interest payments on such debt. If we do not receive these interest payments, we may not be able to make payments on the notes.

***There will be no guarantors of the notes. As a result, the notes will be structurally subordinated to all liabilities of all of EFIH's subsidiaries (other than EFIH Finance) and will have no claim on the assets of EFH Corp. or its subsidiaries, including Oncor, Oncor Holdings, and TCEH.***

The notes will not be guaranteed. EFIH is a holding company. EFIH has no operations or operating assets, and it relies on distributions from Oncor, interest earned on investments in EFH Corp. and TCEH debt and loans and capital contributions from EFH Corp. for its cash flow. EFH Corp. has no obligation to make loans or capital contributions to EFIH. EFIH's subsidiaries generated a significant amount of its reported consolidated net income for the years ended December 31, 2010 and 2011. As of June 30, 2012, EFIH's investments in its subsidiaries represented approximately 58% of its total reported consolidated assets, and investments in EFH Corp. debt (the substantial majority of which is debt that EFIH guarantees) and TCEH debt represented substantially all of the remainder of its reported total assets. The carrying value of the EFH Corp. and TCEH debt held by EFIH totaled approximately $4.0 billion at June 30, 2012, representing the fair value of these debt securities, but most of such debt has a limited trading market, and the EFH Corp. debt has virtually no restrictive covenants.

EFIH's subsidiaries (including Oncor Holdings and Oncor and their subsidiaries) and EFH Corp. and its other subsidiaries are separate and distinct legal entities and have no obligation, contingent or otherwise, to pay any amounts due pursuant to the notes, or to make any funds available therefore, whether by dividends, loans, distributions or other payments. The notes will be structurally subordinated to the debt and other liabilities of all of EFIH's subsidiaries (including Oncor Holdings and Oncor and its subsidiaries), other than EFIH Finance, and holders of the notes will have no claim on the assets of EFH Corp., Oncor, Oncor Holdings, EFCH, TCEH or any of TCEH's subsidiaries, none of which is obligated to make payments on the notes. As of June 30, 2012, the notes would have been structurally subordinated to approximately $6.555 billion principal amount of debt (includes long-term debt, including amounts due currently, and short-term borrowings) of EFIH's subsidiaries (other than EFIH Finance), including all of Oncor Holdings' and its subsidiaries' debt. In addition, as of June 30, 2012, Oncor had approximately $1.459 billion of additional available capacity under its revolving credit facility.

***EFH Corp. and TCEH are not obligated to make payments on the notes, and our ability to obtain funds from EFH Corp. and TCEH to pay principal, premium and interest on the notes may be limited in some circumstances.***

None of EFH Corp., EFCH or TCEH and its subsidiaries are obligated to make any loans or payments to us other than interest and principal payments on EFH Corp. and TCEH debt held by us. However, EFH Corp. may choose to, but is not obligated to, loan or contribute cash to us to make such payments. EFH Corp. is a holding company and substantially all of its consolidated assets are held by its subsidiaries. Therefore, to the extent EFH Corp. chooses to loan or contribute cash to make payments on the notes, EFH Corp. may depend on cash generated by or loans from EFCH, TCEH and

21

Confidential - Subject to CA
Mike Kunkel

EFH00027429

**PX 056**
**Page 30 of 308**

Confidential - Subject to CA
Mike Kunkel

TCEH's subsidiaries to make such loans or contributions. Pursuant to the indentures governing the TCEH 2015/2016 Notes, the TCEH 2020 Notes and the TCEH 2021 Notes (collectively, the "TCEH Indentures"), and the TCEH Senior Secured Credit Facilities, as long as TCEH is a subsidiary of EFH Corp., TCEH may make advances under the TCEH Demand Notes to EFH Corp. on arm's length terms to allow EFH Corp. to pay principal, premium and interest on certain debt of EFH Corp. However, the TCEH Indentures limit TCEH's ability to provide such loans for payment of principal, premium and interest on debt of EFH Corp.'s subsidiaries, including the notes. In addition, the TCEH Senior Secured Credit Facilities limit the amount of borrowings that may be outstanding under certain notes receivable from EFH Corp. that are payable to TCEH for debt principal and interest payments of EFH Corp. to $2 billion in the aggregate at any time. Further, under the terms of TCEH's debt agreements and applicable state law, TCEH is restricted from paying distributions, except in limited circumstances. In the past, EFH Corp. has serviced its debt securities in part with funds loaned to EFH Corp. by TCEH under the TCEH Demand Notes. EFH Corp. will use the proceeds from the EFIH Dividend to repay the balance of the TCEH Demand Notes, and there is no assurance that TCEH will make additional advances to EFH Corp. under the TCEH Demand Notes in the future to the extent EFH Corp. requests such advances. As a result, if EFH Corp. does not make capital contributions or loans to EFIH or if TCEH does not or is not permitted to make loans to EFH Corp. for EFH Corp. to service its debt, then EFIH may not be able to make payments on the notes or its other obligations. See "—Risks Related to Exposure to EFH Corp. and TCEH."

### The indentures governing the notes, the Existing First Lien Notes, the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes do not limit or restrict the activities of Oncor Holdings and its subsidiaries.

Oncor Holdings and its subsidiaries are not "Restricted Subsidiaries" under the indentures governing the notes, the Existing First Lien Notes, the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes (except under certain circumstances, such as in connection with the calculation of the "fixed charge coverage ratio" or "consolidated leverage ratio" for purposes of making certain restricted payments; see "Description of the First Lien Notes" and "Description of the Second Lien Notes"). As of the date the notes offered hereby are issued, EFIH's subsidiaries (other than EFIH Finance, the co-issuer of the EFIH 9.75% Notes, the EFIH 10.000% Notes, the Existing 2022 Second Lien Notes, the Existing 2021 Second Lien Notes and the notes) will consist only of Oncor Holdings and its subsidiaries, all of which are unrestricted subsidiaries under the indentures governing the notes, the Existing First Lien Notes, the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes. Accordingly, none of EFIH's subsidiaries (other than EFIH Finance) are or will be subject to the restrictive covenants or events of default described under "Description of the First Lien Notes" and "Description of the Second Lien Notes."

Because Oncor Holdings and its subsidiaries are unrestricted subsidiaries of EFIH under the indentures governing the notes, the Existing First Lien Notes, the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes and therefore are not subject to any of the restrictive covenants therein, the indentures do not limit or restrict the ability of Oncor Holdings or its subsidiaries to take any actions or enter into any transactions that would impair their ability to dividend funds to EFIH to service the notes and other debt of EFIH, or that would negatively affect the value of EFIH's equity interests in Oncor Holdings that are pledged as Collateral for the notes, such as incurring debt, selling or transferring all or a portion of the assets of Oncor Holdings or its subsidiaries, entering into joint ventures, dividending out assets or engaging in speculative investments.

### EFIH has a very limited ability to control activities at Oncor due to structural and operational "ring-fencing" measures.

EFIH depends, in part, upon Oncor for its cash flows and ability to pay its obligations. However, EFIH has a very limited ability to control the activities of Oncor. As part of the ring-fencing measures

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027430

PX 056
Page 31 of 308

Confidential - Subject to CA
Mike Kunkel

implemented by EFH Corp. and Oncor, including certain measures required by the PUCT's Order on Rehearing in Docket No. 34077, a majority of the members of Oncor's board of directors are required to meet the New York Stock Exchange requirements for independence in all material respects, and the unanimous, or majority, consent of such directors is required for Oncor to take certain actions. In addition, any new independent Oncor directors are required to be appointed by the nominating committee of Oncor Holdings' board of directors, a majority of whose members are independent directors. No member of EFIH's or EFH Corp.'s management is a member of Oncor's board of directors. Under Oncor Holdings' and Oncor's organizational documents, EFH Corp. has the right, indirectly, to consent to new issuances of equity securities by Oncor, material transactions with third parties involving Oncor outside of the ordinary course of business, actions that cause Oncor's assets to increase the level of jurisdiction of the FERC, any changes to the state of formation of Oncor, material changes to accounting methods not required by GAAP and actions that fail to enforce certain tax sharing obligations between Oncor and EFH Corp. See "The Transactions—Ring-Fencing." Oncor's organizational documents provide for restrictions on Oncor's ability to make distributions to its members, including indirectly to EFIH. Additionally, the Sponsor Group has committed with the PUCT to hold a majority ownership interest in Oncor until October 2012.

**Oncor's ring-fencing measures may not work as planned and a bankruptcy court may nevertheless subject Oncor to the claims of Texas Holdings Group entity creditors.**

In 2007, EFH Corp. and Oncor implemented certain structural and operational "ring-fencing" measures, including certain measures required by the PUCT's Order on Rehearing in Docket No. 34077, that were based on principles articulated by rating agencies and commitments made by Texas Holdings and Oncor to the PUCT and the FERC to further enhance Oncor's credit quality. These measures were put in place to mitigate Oncor's credit exposure to the Texas Holdings Group and to minimize the risk that a court would order any of the assets and liabilities of Oncor Holdings, Oncor or any of Oncor's direct or indirect subsidiaries (collectively, the "Oncor Ring-Fenced Entities") to be substantively consolidated with those of any member of the Texas Holdings Group in the event that a member of the Texas Holdings Group were to become a debtor in a bankruptcy case. Substantive consolidation is an equitable remedy in bankruptcy that results in the pooling of the assets and liabilities of the debtor and one or more of its affiliates solely for purposes of the bankruptcy case, including for purposes of distributions to creditors and voting on and treatment under a reorganization plan. Bankruptcy courts have broad equitable powers, and as a result, outcomes in bankruptcy proceedings are inherently difficult to predict. To the extent a bankruptcy court were to determine that substantive consolidation was appropriate under the facts and circumstances, then the assets and liabilities of any Oncor Ring-Fenced Entity that were subject to the substantive consolidation order would be available to help satisfy the debt or contractual obligations of the Texas Holdings Group entity that was a debtor in bankruptcy and subject to the same substantive consolidation order. However, even if any Oncor Ring-Fenced Entity were included in such a substantive consolidation order, the secured creditors of Oncor would retain their liens and priority with respect to Oncor's assets.

If any member of the Texas Holdings Group were to become a debtor in a bankruptcy case, there can be no assurance that a court would not order an Oncor Ring-Fenced Entity's assets and liabilities to be substantively consolidated with those of such member of the Texas Holdings Group or that a proceeding would not result in a disruption of services Oncor receives from, or provides jointly with, our affiliates. See Note 1 to EFIH and its subsidiaries' condensed consolidated financial statements included in our June 30, 2012 Form 10-Q for additional information on ring-fencing measures.

In addition, Oncor's access to capital markets and cost of debt could be directly affected by its credit ratings. Any adverse action with respect to Oncor's credit ratings would generally cause borrowing costs to increase and the potential pool of investors and funding sources to decrease. Oncor's credit ratings are currently substantially higher than those of the Texas Holdings Group. If credit rating agencies were to change their views of Oncor's independence from any member of the

23

Highly Confidential

EFH00027431

**PX 056**
**Page 32 of 308**

Confidential - Subject to CA
Mike Kunkel

Texas Holdings Group, Oncor's credit ratings would likely decline. Despite the ring-fencing measures, rating agencies could take an adverse action with respect to Oncor's credit ratings in response to liability management or other activities by EFH Corp. or any of its subsidiaries, including the incurrence of debt by EFH Corp. and/or EFIH which is secured by a lien on the equity of Oncor Holdings held by EFIH. In the event any such adverse action takes place and causes Oncor's borrowing costs to increase, it may not be able to recover these increased costs if they exceed Oncor's PUCT-approved cost of debt determined in its most recent rate case or subsequent rate cases.

***The notes will be secured only to the extent of the value of the assets that have been granted as security for the notes. The fair market value of the Collateral upon any foreclosure may not be sufficient to repay the holders of the first lien notes. After payment in full of all obligations secured by first-priority liens on the Collateral, there may be insufficient proceeds to satisfy amounts owed under the second lien notes.***

The Collateral securing the notes, the Existing First Lien Notes, the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes will include only EFIH's membership interests and other investments that EFIH owns or holds in Oncor Holdings and its subsidiaries (which at the date of this offering memorandum consist of all of the membership interests of Oncor Holdings, which are owned by EFIH), but will not include any assets of Oncor Holdings or its subsidiaries. Oncor Holdings owns approximately 80% of Oncor. The fair market value of the Collateral upon any foreclosure may not be sufficient to repay the holders of the first lien notes and all of the holders of other debt secured by a first-priority security interest in the Collateral. The indentures governing the Existing First Lien Notes permit EFH Corp. and EFIH, and the indentures governing the notes, the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes permit EFIH, to incur up to an aggregate of $4.0 billion of debt secured by first-priority liens on the Collateral, including the Existing First Lien Notes and the first lien notes offered hereby. After giving effect to this offering, EFH Corp. and EFIH may incur an additional aggregate amount of debt equal to approximately $250 million that is secured by a first-priority lien on the Collateral. In addition, the fair market value of the Collateral may not be sufficient to repay the holders of the second lien notes and the Existing 2021 Second Lien Notes upon any foreclosure and after repayment of the holders of debt secured by a first-priority security interest in the Collateral, including the holders of the first lien notes and the Existing First Lien Notes and any additional indebtedness we or EFH Corp. incur that is secured by a first-priority security interest in the Collateral, and after taking into account the ratable claims of any other debt secured by a security interest in the Collateral of equal priority to that securing the new second lien notes. As of June 30, 2012, there was $3.497 billion aggregate principal amount of Existing First Lien Notes outstanding. The indenture governing the second lien notes and the Existing 2021 Second Lien Notes permits EFIH to incur additional debt, including the new second lien notes offered hereby, secured by liens that are equal and ratable with the lien securing the second lien notes and the Existing 2021 Second Lien Notes and also permits EFIH to incur debt secured by assets of EFIH other than the Collateral.

The fair market value of the membership interests of Oncor Holdings is subject to fluctuations based on factors that include, among other things, the financial results and prospects of Oncor Holdings and its subsidiaries and their ability to implement their business strategy, Oncor's capital structure and the amount of its other existing debt (as to which EFIH has no control), applicable regulatory approvals that may be required to foreclose on the membership interests of Oncor Holdings and subsequently dispose of the membership interests of Oncor Holdings, the ability to sell the membership interests of Oncor Holdings in an orderly sale, general economic conditions, the availability of buyers and similar factors. Furthermore, upon a foreclosure on the Collateral, holders of debt with a first-priority security interest in the Collateral, including the first lien notes and the Existing First Lien Notes, or, if no such debt is outstanding, the second lien notes and the Existing 2021 Second Lien Notes, may be limited in their ability to obtain the best price for the Collateral if they are unable to exercise a "drag-along" right to force Texas Transmission Investment LLC ("Texas Transmission"),

24

Confidential - Subject to CA
Mike Kunkel

Confidential - Subject to CA
Mike Kunkel

Oncor's largest non-majority owner, to sell its membership interests pursuant to the terms of an investor rights agreement, dated November 5, 2008, among EFH Corp., Oncor Holdings, Oncor and Texas Transmission (the "Investor Rights Agreement"). In addition, a court could limit recoverability if it were to apply non-New York law to a proceeding and deem a portion of the interest claim usurious in violation of public policy. The amount to be received by holders of the notes upon a sale of any Collateral would be dependent on numerous factors, including but not limited to the actual fair market value of the Collateral at such time; general, market and economic conditions; the timing and the manner of the sale; with respect to the first lien notes, the amount of proceeds after taking into account the ratable claims of any other debt secured by a security interest in the Collateral of equal priority to that securing the first lien notes, including the Existing First Lien Notes; and, with respect to holders of the second lien notes, the amount of proceeds remaining after payment of the holders of debt secured by a first-priority security interest in the Collateral, including the holders of the first lien notes and the Existing First Lien Notes, and after taking into account the ratable claims of any other debt secured by a security interest in the Collateral of equal priority to that securing the second lien notes, including the Existing 2021 Second Lien Notes.

In the event a bankruptcy or similar proceeding is commenced by or against the Issuer, holders of the notes may be deemed to have an unsecured claim if the Issuer's obligation under the notes equals or exceeds the fair market value of the Collateral securing such notes (in the case of the second lien notes, after giving effect to the claims of debt secured by a first-priority security interest in the Collateral). Upon a finding by a bankruptcy court that any notes are under-collateralized, the claims in the bankruptcy proceeding with respect to such notes would be bifurcated between a secured claim and an unsecured claim, and the unsecured claim would not be entitled to the benefits of security in the Collateral. If a bankruptcy court were to find that the debt of the Issuer secured by a first-priority security interest in the Collateral, including the first lien notes, is under-collateralized, the claims in the bankruptcy with respect to the new second lien notes would be completely unsecured. In the event that a bankruptcy or similar proceeding is commenced by or against the Issuer, if at the time of the filing the value of the membership interests of Oncor Holdings and other Collateral is less than the amount of principal and accrued and unpaid interest on either the first lien notes or the second lien notes, and any other debt secured by liens on the Collateral that are equal and ratable with the liens securing such notes, interest may cease to accrue on such notes thereafter. If at the time of the filing the value of the membership interests of Oncor Holdings and other Collateral is greater than the amount of principal and accrued and unpaid interest on either the first lien notes or the new second lien notes and any other debt secured by liens on the Collateral that are equal and ratable with the liens securing such notes, interest may nevertheless cease to accrue on such notes at a subsequent time if at such time the value ceases to be in excess of the principal and accrued and unpaid interest. It is possible, given the broad discretionary powers of a bankruptcy court, even if at the time of the filing the value of the membership interests of Oncor Holdings and other Collateral is greater than the amount of principal and accrued and unpaid interest on either the first lien notes or the new second lien notes, or any other debt secured by liens on the Collateral that are equal and ratable with the liens securing such notes on the date of filing, claims on the membership interests of Oncor Holdings and other Collateral for interest accruing from and after the date the bankruptcy petition is filed might not be allowed. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, the proceeds from any sale of the membership interests of Oncor Holdings and other Collateral may not be sufficient to pay the obligations due under the notes. Any resulting deficiency claims would be general unsecured claims against the remaining assets of the Issuer and would rank equally in right of payment with all of the Issuer's other senior unsecured debt.

In addition to the regulatory approvals described in the following risk factor, the security interest granted in favor of the collateral trustee is subject to practical problems generally associated with the realization of security interests in collateral. For example, the collateral trustee may need to obtain the consent of a third party to obtain or enforce a security interest in a contract, and we cannot assure

25

Confidential - Subject to CA
Mike Kunkel

EFH00027433

Confidential - Subject to CA
Mike Kunkel

noteholders that the collateral trustee will be able to obtain any such consent. The consents of any third parties may not be given when required to facilitate a foreclosure on any particular assets. Accordingly, the collateral trustee may not have the ability to foreclose upon such assets, and the value of the Collateral may significantly decrease.

**Regulatory approvals may be required in order to enforce the security interests in the Collateral and to dispose of an interest in, or operational control of, the Collateral securing the notes.**

The Collateral securing the notes will include, on a first-priority basis with respect to the first lien notes and on a second-priority basis with respect to the new second lien notes, all of the membership interests of Oncor Holdings, which are held by EFIH. Pursuant to the Public Utility Regulatory Act ("PURA"), Texas Utilities Code §§39.262(l) and 39.915, an electric utility must obtain prior PUCT approval of any change in majority ownership, controlling ownership or operational control of Oncor. As a result, prior to any foreclosure on the membership interests of Oncor Holdings, approval of the PUCT may be required for a change in ownership or control of Oncor Holdings. Pursuant to PURA §§39.262(m) and 39.915(b), the PUCT will approve such a transfer if it finds that the transaction is in the public interest. In making its determination, these sections of PURA provide that the PUCT will consider as part of its public interest analysis and, in addition to other factors, whether the transaction will adversely affect the reliability of service, availability of service or cost of service of Oncor. Therefore, in connection with any action taken to enforce the security against the Collateral, such approval may not be granted and, if it were to be granted, it is not known how long such approval would take. Even if the approval were granted to foreclose on the Collateral, then additional prior PUCT approval may also be required for any subsequent change in majority ownership, controlling ownership or operational control in the membership interests of Oncor Holdings. Additionally, Texas Holdings has committed to hold a majority ownership interest in Oncor through October 10, 2012. This commitment is incorporated in the PUCT's Order on Rehearing in Docket No. 34077.

In addition, pursuant to the terms of the Investor Rights Agreement, any transfer of the equity interests in Oncor Holdings to a third party, including as a result of any enforcement of the liens on the Collateral securing the notes, the Existing First Lien Notes, the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes, may be limited and give rise to a tag-along right of Texas Transmission to participate in that transfer on a pro rata basis, which may hinder the enforcement of the lien on the Collateral in a timely manner, if at all. See "The Transactions—Sale of Noncontrolling Interests in Oncor" for a description of the Investor Rights Agreement.

**In the event of the Issuer's bankruptcy, the ability to realize upon the Collateral securing the notes will be subject to certain bankruptcy law limitations.**

The right of the trustees for the notes to repossess and dispose of the Collateral, which secures the first lien notes on a first-priority basis and the new second lien notes on a second-priority basis, upon acceleration is likely to be significantly impaired by federal bankruptcy law if bankruptcy proceedings are commenced by or against the Issuer. This could be true even if bankruptcy proceedings are commenced after the trustee for the notes has repossessed and disposed of the Collateral. Under bankruptcy law, secured creditors, such as the trustee for the notes, are prohibited from repossessing collateral from a debtor in a bankruptcy case, or from disposing of collateral repossessed from a debtor, without bankruptcy court approval. Moreover, bankruptcy law permits the debtor to continue to retain and to use any such collateral, and the proceeds, products, rents or profits of such collateral, even though the debtor is in default under the applicable debt instruments, provided that the secured creditor is given "adequate protection." The meaning of the term "adequate protection" varies according to circumstances, but in general the doctrine of "adequate protection" requires a debtor to protect the value of a secured creditor's interest in the collateral, through cash payments, the granting of an additional security interest or otherwise. It is impossible to predict whether or when

26

Highly Confidential

EFH00027434

Confidential - Subject to CA
Mike Kunkel

payments in respect of the notes might be made following commencement of a bankruptcy case, whether or when the trustee would repossess or dispose of the Collateral, or whether or to what extent noteholders would be compensated for any delay in payment or loss of value of the Collateral through the requirements of "adequate protection." Furthermore, in the event the bankruptcy court determines that the value of the Collateral is not sufficient to repay all amounts due on the first lien notes or the new second lien notes, any other debt secured by liens on the Collateral that are equal and ratable with the liens securing such notes, including the Existing First Lien Notes, the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes, as applicable, noteholders would have unsecured "deficiency claims" as to the difference. Federal bankruptcy laws do not generally permit the payment of interest, costs, or attorneys' fees for unsecured claims during the debtor's bankruptcy case.

### Under the indentures governing the notes, noteholders will agree to not file a bankruptcy proceeding against Oncor Holdings or any of its subsidiaries.

Under the indentures governing the notes, noteholders will acknowledge and agree that they will not (i) initiate any legal proceeding to procure the appointment of an administrative receiver or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against Oncor Holdings, Oncor or any of their subsidiaries, or against any of the assets of Oncor Holdings, Oncor or any of their subsidiaries. Such holders will further acknowledge and agree that each of Oncor Holdings, Oncor and any of their subsidiaries is a third party beneficiary of the foregoing covenant and has the right to specifically enforce such covenant in any proceeding at law or in equity.

### Noteholders' interests in the Collateral may be further subordinated or diluted if we incur additional debt that is secured on a senior or junior basis by the Collateral securing the notes.

The indentures governing the Existing First Lien Notes permit EFH Corp. and EFIH, and the indentures governing the notes, the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes permit EFIH, to incur up to an aggregate of $4.0 billion of debt secured on a first-priority basis by the Collateral, including the first lien notes and the Existing First Lien Notes. After giving effect to this offering, EFH Corp. and EFIH may incur an additional aggregate amount of debt equal to approximately $250 million that is secured by a first-priority lien on the Collateral. To the extent that any of this additional debt that is secured by a first-priority lien on the Collateral is incurred in the future, the interests of holders of first lien notes in the Collateral will be diluted and the interests of holders of second lien notes will be further subordinated. The indenture governing the second lien notes and the Existing 2021 Second Lien Notes permits EFIH to incur a substantial amount of additional debt, including the new second lien notes offered hereby, secured by a second-priority lien on the Collateral and also permits EFIH to incur debt secured by assets of EFIH other than the Collateral. To the extent that any of this additional debt is incurred that is secured by the Collateral in the future, the interests of holders of new second lien notes in the Collateral will be diluted.

### The second lien notes constitute a separate series of senior notes but will be treated as a single class with the Existing 2021 Second Lien Notes for voting purposes with respect to amendments and waivers and for taking certain other actions. If we issue additional debt that is secured equally and ratably with the new second lien notes, the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes, the voting interest of holders of the new second lien notes will be diluted.

The second lien notes will constitute a separate series of senior notes but will be treated as a single class with the Existing 2021 Second Lien Notes for voting purposes with respect to amendments and waivers and for taking certain other actions. If we issue additional debt that is secured equally and ratably with the new second lien notes, the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes, the voting interest of holders of the new second lien notes will be diluted. The

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027435

Confidential - Subject to CA
Mike Kunkel

second lien notes, and the Existing 2021 Second Lien Notes are each a separate series of debt securities but are generally treated as a single class of securities for voting purposes with respect to amendments and waivers and for taking certain other actions, except as otherwise described in "Description of the Second Lien Notes." The new second lien notes, the Existing 2022 Second Lien Notes, the Existing 2021 Second Lien Notes and any debt that we incur in the future that is secured equally and ratably with the new second lien notes, the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes by a second-priority lien on the Collateral will be treated as a single class for amendments and waivers affecting all such debt and for actions requiring the consent of holders of the debt, such as declaring certain events of default under the indenture governing such notes or accelerating amounts due under such notes. In the event that we issue significant amounts of additional debt that is secured equally and ratably with the new second lien notes, the Existing 2022 Second Lien Notes and the Existing 2021 Second Lien Notes, certain actions, including amendments and waivers, which will affect the holders of the new second lien notes, may be accomplished whether or not the holders of the new second lien notes consent to such action. As a result, the individual voting interest of the holders of the second lien notes would be accordingly diluted.

**If we issue additional debt that is secured equally and ratably with the first lien notes and elect to treat that debt as a single class with the first lien notes, the voting interest of first lien noteholders will be diluted.**

The indenture governing the first lien notes will provide that we may issue additional notes of the same or a different series from time to time that are secured by a first-priority lien on the Collateral and elect to treat those additional notes as a single class with the first lien notes for all purposes under that indenture, including for waivers, amendments and offers to purchase. In the event of such an issuance and election, holders of the first lien notes would not have a separate right to, among other things, give notice of defaults or to direct the trustee to exercise remedies during an event of default or otherwise, except as otherwise described under "Description of the First Lien Notes." In the event that we issue significant amounts of additional debt that is secured equally and ratably with the first lien notes and we elect to treat that debt as a single class with the first lien notes, certain actions, including amendments and waivers, which will affect the holders of the first lien notes, may be accomplished whether or not the holders of the first lien notes consent to such action. As a result, the individual voting interest of the holders of the first lien notes would be accordingly diluted.

**The first lien notes will be a separate series of senior notes governed by a separate indenture and will not vote together with any other series of existing notes with respect to amendments, waivers or taking other actions.**

While the covenants in the indenture governing the first lien notes will be substantially similar to the covenants in the indenture governing the EFIH 10.000% Notes, the first lien notes will be a separate series of senior notes governed by a separate indenture and will not vote together with the EFIH 10.000% Notes or any other series of existing notes with respect to amendments, waivers or other actions. As a result, the first lien notes will have a separate vote for amendments, waivers and actions that may have a material effect on EFIH and EFIH's other existing senior debt, including the new second lien notes, such as declaring certain events of default under the indenture governing the first lien notes, accelerating amounts due under the first lien notes, and consenting or not consenting to amendments or waivers or other actions.

**The Collateral is subject to control by creditors with first-priority liens, and holders of second lien notes will not control decisions regarding Collateral.**

The collateral trust agreement governing the pledge of Collateral generally provides that the holders of a majority of the debt secured by a pledge of the Collateral on a first-priority basis, which includes the first lien notes and the Existing First Lien Notes and any other future debt or other

28

Confidential - Subject to CA
Mike Kunkel

obligations incurred by EFIH that are secured by a pledge of the Collateral on a first-priority basis (collectively, "the first-priority obligations"), will have, subject to certain limited exceptions, the exclusive right to manage, perform and enforce the terms of the security documents securing the rights of secured debtholders in the Collateral and to exercise and enforce all privileges, rights and remedies thereunder until such time as the first-priority obligations are paid in full, even if the rights of holders of second lien notes are adversely affected. See "Description of the Second Lien Notes—Security for the Notes—Enforcement of Liens" and "Description of the Second Lien Notes—Security for the Notes—Insolvency or Liquidation Proceedings."

The holders of first-priority obligations may cause the collateral trustee under the collateral trust agreement to dispose of, release, or foreclose on, or take other actions with respect to, the Collateral (including amendments of and waivers under the security documents) with which holders of second lien notes may disagree or that may be contrary to their interests, even after a default under the second lien notes or the Existing 2021 Second Lien Notes. To the extent Collateral is released from securing the first-priority obligations, the collateral trust agreement provides that in certain circumstances, the pledges of Collateral made on a second-priority basis securing the second lien notes and the Existing 2021 Second Lien Notes will also be released. In addition, the security documents relating to the pledge of Collateral on a second-priority basis related to the second lien notes and the Existing 2021 Second Lien Notes generally provide that, so long as the first-priority obligations are in effect, the holders of the first-priority obligations may change, waive, modify or vary the security documents governing such first-priority pledges without the consent of the holders of the second lien notes and the Existing 2021 Second Lien Notes, except under certain limited circumstances, and that the security documents governing the second-priority pledges will be automatically changed, waived and modified in the same manner. Further, the security documents governing the second-priority pledges may not be amended in any manner adverse to the holders of the first-priority obligations until the first-priority obligations are paid in full, except in certain circumstances. The security documents governing the second-priority pledges will prohibit second-priority holders from foreclosing on the Collateral until payment in full of the first-priority obligations. We cannot assure holders of the second lien notes that in the event of a foreclosure by the holders of the first-priority obligations, the proceeds from the sale of Collateral would be sufficient to satisfy all or any of the amounts outstanding under the second lien notes and the Existing 2021 Second Lien Notes after payment in full of the obligations secured by first-priority pledges on the Collateral.

The holders of the first-priority obligations are not required to proceed against the Collateral upon and during an event of default under the first-priority obligations or under the second lien notes. If, prior to the discharge of the first-priority obligations, the holders of such first-priority obligations decide not to proceed against the Collateral in such circumstances, holders of the second lien notes will not have any remedy other than to sue for payment on the second lien notes (subject to certain limited exceptions). The collateral trustee, acting at the direction of the holders of the first-priority obligations, may take actions under the security documents that may be adverse to holders of the second lien notes.

### EFIH will in most cases have control over the Collateral.

EFIH will in most cases have control over the Collateral securing the notes, and to the extent permitted, its sale by EFIH would eliminate the Collateral securing the notes, subject to the requirement to pledge proceeds from such sale to secure the notes and other secured debt obligations and to use such proceeds to repay first priority obligations in accordance with the covenants described under "Description of the First Lien Notes—Repurchase at the Option of Holders—Asset Sales" and "Description of the Second Lien Notes—Repurchase at the Option of the Holders—Asset Sales." The documents governing the pledge of the Collateral permit EFIH to remain in possession of, retain exclusive control over and freely operate the Collateral and collect, invest and dispose of any income from the Collateral, such as cash dividends. In addition, in certain limited circumstances EFIH will have

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027437

Confidential - Subject to CA
Mike Kunkel

the right to sell the Collateral free and clear of the security interest underlying the notes. See "Risk Factors—Risks Related to the Notes and Our Substantial Debt—We may transfer or dispose of our interests in Oncor Holdings to a third-party in a manner that would result in such third-party becoming the obligor under the notes, without EFIH being required to offer to repurchase the notes. The risks of an investment in the notes may increase further following such a transaction."

### Rights of holders of the notes in the Collateral may be adversely affected by the failure to perfect security interests in certain Collateral acquired in the future.

EFIH may acquire assets or investments in the future that would be required to be pledged as Collateral securing the notes. There can be no assurance that the trustee or the collateral trustee will monitor, or that we will inform the trustee or the collateral trustee of, the future acquisition of assets or investments that would be required to be pledged as Collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Collateral. Neither the trustee nor the collateral trustee has an obligation to monitor the acquisition of additional assets or investments that are required to be pledged as Collateral or the perfection of any security interest in such Collateral. Such failure may result in the loss of the security interest in the Collateral or the priority of the security interest in favor of the notes against third parties.

### We may transfer or dispose of our interests in Oncor Holdings to a third-party in a manner that would result in such third-party becoming the obligor under the notes, without EFIH being required to offer to repurchase the notes. The risks of an investment in the notes may increase further following such a transaction.

The indentures governing the notes provide that EFIH may engage in a "Permitted Asset Transfer" with respect to all of EFIH's equity interests and other investments in Oncor Holdings and its subsidiaries (collectively, the "Oncor Subsidiaries") that would result in the notes no longer being obligations of EFIH. A Permitted Asset Transfer includes the sale, assignment, transfer, conveyance or other disposition (other than by way of merger, wind-up or consolidation) of all of EFIH's equity interests and other investments in the Oncor Subsidiaries or successor Oncor business and all other Collateral held by EFIH.

If a valid Permitted Asset Transfer occurs, the notes would become obligations of the third-party transferee of the investments in the Oncor Subsidiaries.

If a Permitted Asset Transfer occurs in accordance with the terms of the indentures governing the notes, the Issuer will not be required to make a change of control offer to repurchase the notes even if a change of control may otherwise have occurred.

The indentures governing the notes provide that a Permitted Asset Transfer may only occur if certain conditions are met, including a requirement that the ratings of the notes are not lowered by two or more rating agencies (or the only rating agency then rating the notes) during a specified period before or after the proposed Permitted Asset Transfer has been publicly announced. However, these conditions may not protect noteholders against actions that EFIH or the permitted transferee could take that may negatively impact the credit risk of the notes following a Permitted Asset Transfer, such as removing assets and cash from EFIH or the Oncor Subsidiaries or increasing debt at EFIH before the Permitted Asset Transfer.

There will be no event of default under the indentures governing the notes if the Oncor Subsidiaries take actions or enter into transactions that would impair their ability to distribute funds to EFIH, which could impair EFIH's ability to service the notes, or that would negatively affect the value of the assets that are pledged as Collateral, such as incurring debt, selling or transferring all or a portion of the assets of Oncor, entering into joint ventures, dividending out assets or engaging in speculative investments.

30

Confidential - Subject to CA
Mike Kunkel

EFH00027438

**PX 056**
**Page 39 of 308**

Confidential - Subject to CA
Mike Kunkel

Any of the above actions on the part of EFIH, the third-party transferee or subsequent third-party transferee or the Oncor Subsidiaries following the completion of a Permitted Asset Transfer may further increase the credit risk of the notes, may result in the rating agencies taking negative action with respect to the notes and may reduce the market price of the notes. See the definitions of "Change of Control" and "Permitted Asset Transfer" contained in "Description of the First Lien Notes" and "Description of the Second Lien Notes" for more information.

**Noteholders may be required to recognize taxable gain or loss in connection with a Permitted Asset Transfer.**

In connection with a Permitted Asset Transfer, EFIH's obligations under the notes may be transferred to, and assumed by, a third party transferee or may be considered, for U.S. federal income tax purposes, to undergo a substitution of obligors even if not transferred to, or assumed by, a third party transferee. Upon any such transfer or deemed substitution of obligors, noteholders may be deemed to have exchanged the notes for new notes for U.S. federal income tax purposes. Upon such deemed exchange, noteholders, under U.S. federal income tax law, may be required to recognize gain or loss equal to the difference between the amount deemed to be realized in connection with the deemed exchange and such noteholders' adjusted tax basis in the notes on the date of the deemed exchange. For more information, please see "Certain United States Federal Tax Consequences—Certain Tax Consequences to U.S. Holders—Sale, Exchange, Retirement, Redemption or Other Taxable Disposition of Notes."

**The indentures governing the notes may not protect noteholders from all actions that EFIH or the Oncor Subsidiaries may take that would reduce noteholders' interest in the Collateral or that may reduce the value of the Collateral, including sales or exchanges of the Collateral or the assets of the Oncor Subsidiaries for other assets or investments.**

Under the indentures governing the notes, EFIH may dispose of all or a portion of the Collateral for fair market value consideration (including consideration other than cash) that may consist of assets or equity interests in joint ventures. Additionally, there will be no event of default under the indentures if the Oncor subsidiaries sell, transfer or otherwise dispose of their assets or equity interests for any form of consideration. If EFIH or the Oncor Subsidiaries effect any of these transactions, noteholders' interest in the Collateral or the value of the Collateral may be materially reduced.

The indentures governing the notes allow EFIH to transfer any of the Collateral in exchange for an equivalent fair market value of assets other than cash or for investments in businesses that are similar to the businesses of Oncor, including interests in joint ventures that are not controlled by EFIH. The assets received as consideration and pledged as substitute Collateral may prove to be less valuable than the value of the investments in Oncor that were disposed of in such transfer or exchange. Additionally, if interests in a new business were received in exchange for the Collateral, such new business may, in the future, engage in business activities that are different from the business that Oncor presently is in or such new business may not prove to be as creditworthy or valuable as Oncor, and EFIH may not have any control over such business' activities if a minority interest in the joint venture interests was received in such transfer or exchange. Therefore, such new collateral may negatively alter the risk profile of EFIH or the value of such new collateral may decline relative to the value of the disposed investments in Oncor.

There will be no event of default under the indentures governing the notes if any of the Oncor Subsidiaries sells, transfers or disposes of the assets of Oncor Holdings or investments in or assets of Oncor. The consideration received in exchange for such assets or investments may decline in value as compared to the assets or investments that were so disposed, and, therefore, the value of the Collateral may be less than if such assets and investments had been retained. The Oncor Subsidiaries may transfer their assets and investments in exchange for interests in other businesses or assets, minority interests or interests in joint ventures, in which case the value of the Collateral may be at risk of declining due to the factors described above.

31

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

Confidential - Subject to CA
Mike Kunkel

In any joint venture that EFIH or an Oncor Subsidiary has an interest, EFIH or the Oncor Subsidiary may not have the right or power to direct the management and policies of such joint ventures and other participants may take action contrary to the instructions or requests of EFIH or such Oncor Subsidiary or against its policies and objectives, and any such actions taken by such joint ventures may not be in noteholders' best interests. In addition, the other participants to any such joint venture may become bankrupt or have economic or other business interests or goals that are inconsistent with the goals of EFIH or such Oncor Subsidiary and/or noteholders.

The completion of any of the above events may result in the credit risk of the notes increasing, the credit rating agencies taking negative action with respect to the notes or the market price of the notes declining. Additionally, in the event of any foreclosure on the Collateral, noteholders may recover less than if the Collateral still consisted of interests in the Oncor Subsidiaries.

***If a court were to find that EFIH was insolvent before or after giving effect to this offering and did not receive reasonably equivalent value or fair consideration for the issuance of the notes or the pledge of the Collateral, as applicable, the court may void all or a portion of the obligations represented by the notes or the pledge of the Collateral as a fraudulent conveyance.***

In a bankruptcy proceeding, a trustee, debtor in possession or another person acting on behalf of the bankruptcy estate may seek to recover all or a portion of transfers made or void obligations incurred prior to the bankruptcy proceeding on the basis that such transfers and obligations constituted fraudulent conveyances. Under certain circumstances, creditors may recover transfers or void obligations under state fraudulent conveyance laws even if the debtor is not in bankruptcy.

Fraudulent conveyances are generally defined to include transfers made or obligations incurred for inadequate consideration when a debtor was insolvent, inadequately capitalized or in similar financial distress, or transfers made or obligations incurred with the intent of hindering, delaying or defrauding current or future creditors. A trustee, debtor in possession or another person acting on behalf of a bankruptcy estate may be able to recover such transfers under the fraudulent conveyance provisions of the bankruptcy law and/or state fraudulent conveyance laws. The fraudulent conveyance provisions of the bankruptcy law allow the trustee, debtor in possession, or other person acting on behalf of a bankruptcy estate to void a fraudulent conveyance made within two years prior to the commencement of a bankruptcy proceeding. Under state fraudulent conveyance laws, transfers made more than two years prior to the commencement of a fraudulent conveyance lawsuit may be subject to avoidance.

If a court were to find that EFIH issued the notes or granted its pledge of the Collateral under circumstances constituting a fraudulent conveyance, then a court could void all or a portion of the obligations under the notes or the pledge of the Collateral. In addition, under such circumstances, the value of any consideration (including interest) noteholders received with respect to the notes and the Collateral, including upon foreclosure of the Collateral, could also be subject to recovery from such noteholders and, possibly, from subsequent transferees of the notes. If the pledge of Collateral was voided and the issuance of the notes was not voided, then noteholders would become unsecured creditors.

The notes or pledge of the Collateral by EFIH could be voided as a fraudulent conveyance, or claims in respect of the notes or pledge could be subordinated to all other debts of EFIH, if, at the time it incurred the debt evidenced by the notes, or granted the pledge, EFIH received less than reasonably equivalent value or fair consideration for the issuance of the notes or the grant of the pledge of the Collateral, as applicable, and:

- was insolvent or rendered insolvent by reason of such issuance or incurrence or grant;

- was engaged in a business or transaction for which EFIH's remaining assets constituted unreasonably small capital; or

- intended to incur, or believed that it would incur, debts beyond its ability to pay those debts as they mature.

32

Confidential - Subject to CA
Mike Kunkel

Confidential - Subject to CA
Mike Kunkel

The measures of insolvency for purposes of these fraudulent transfer laws will vary depending upon the law applied in any proceeding to determine whether a fraudulent transfer has occurred. Generally, however, a debtor would be considered insolvent if:

- the sum of its debts, including contingent liabilities, was greater than the fair saleable value of all of its assets;

- the present fair saleable value of its assets was less than the amount that would be required to pay its probable liability on its existing debts, including contingent liabilities, as they become absolute and mature; or

- it could not pay its debts as they become due.

We will use $680 million of the net proceeds from this offering to pay a dividend to EFH Corp. in or before January 2013, and EFH Corp. will use the proceeds of the dividend to repay the balance of the TCEH Demand Notes. The remaining net proceeds will be used for general corporate purposes, which may include dividends to EFH Corp. EFIH's assets currently exceed its liabilities as shown on its balance sheet prepared in accordance with GAAP as of June 30, 2012. In accordance with these accounting principles, only a portion of EFH Corp.'s debt that is guaranteed by EFIH is included on (pushed down to) EFIH's balance sheet as long-term debt. If all of the debt of EFH Corp. guaranteed by EFIH is included in EFIH's liabilities, EFIH's total principal amount of debt as of June 30, 2012 would be approximately $6.4 billion (net of any such EFH Corp. debt that is held by EFIH). Approximately $4.1 billion of the assets shown on EFIH's balance sheet as of June 30, 2012 consisted of the carrying value of $4.675 billion aggregate principal amount of debt securities of EFH Corp. and TCEH that are held by EFIH and related receivables for accrued interest.

The values assigned to assets and liabilities in EFIH's balance sheet in accordance with GAAP are not necessarily indicative of the values that a court would assign to such assets and liabilities in making a solvency determination. As noted above, our GAAP liabilities do not include all the debt of EFH Corp. that we guarantee, and the value of our assets will be largely dependent on the fair saleable value of EFIH's investment in Oncor. Valuing EFIH's investment in Oncor involves a number of assumptions and judgments, including regarding the future cash flows of Oncor and the value of comparable companies, and we cannot assure you that a court would value this investment at an amount that would make us solvent.

We cannot assure noteholders that EFIH would satisfy the solvency tests set forth above, that EFIH's assets would not constitute unreasonably small capital or what standard a court would apply in determining whether EFIH would be considered to be insolvent. In addition, we cannot assure noteholders that a court would determine that reasonably equivalent value or fair consideration was received by EFIH in connection with the offering of the notes and/or the grant of the pledge, as applicable.

### *We may not be able to repurchase the notes upon a change of control.*

Upon the occurrence of specific kinds of change of control events, EFIH will be required to offer to repurchase all of the notes, the Existing 2022 Second Lien Notes, the Existing 2021 Second Lien Notes, the EFIH 9.75% Notes and the EFIH 10.000% Notes at 101% of their principal amount plus accrued and unpaid interest. The source of funds for any purchase of the notes, the Existing 2022 Second Lien Notes, the Existing 2021 Second Lien Notes, the EFIH 9.75% Notes and the EFIH 10.000% Notes will be EFIH's available cash or cash generated from EFIH's subsidiaries' operations or other sources, including borrowings, sales of assets, sales of equity or cash contributed by EFH Corp. EFIH may not be able to repurchase the notes, the Existing 2022 Second Lien Notes, the Existing 2021 Second Lien Notes, the EFIH 9.75% Notes and the EFIH 10.000% Notes upon a change of control because it may not have sufficient financial resources to purchase all of the notes, the Existing

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

Confidential - Subject to CA
Mike Kunkel

2022 Second Lien Notes, the Existing 2021 Second Lien Notes, the EFIH 9.75% Notes and the EFIH 10.000% Notes that are tendered upon a change of control. In addition, EFIH may be restricted under the terms of debt agreements of Oncor from receiving funds from Oncor sufficient to repurchase all of the notes tendered by holders upon a change of control. Accordingly, EFIH may not be able to satisfy its obligations to purchase the notes, the Existing 2022 Second Lien Notes, the Existing 2021 Second Lien Notes, the EFIH 9.75% Notes and the EFIH 10.000% Notes unless it is able to refinance or obtain waivers under the instruments governing its and/or EFH Corp.'s debt. EFIH's failure to repurchase the notes, the Existing 2022 Second Lien Notes, the Existing 2021 Second Lien Notes, the EFIH 9.75% Notes and the EFIH 10.000% Notes upon a change of control would cause a default under the indentures governing these debt securities and may cause a cross-default under certain of EFIH's and/or EFH Corp.'s or its other subsidiaries' other debt agreements.

*There are restrictions on noteholders' ability to transfer or resell the notes without registration under applicable securities laws.*

The notes are being offered and sold pursuant to exemptions from registration under U.S. and applicable state securities laws. Therefore, noteholders may transfer or resell the notes in the U.S. only in a transaction registered under or exempt from the registration requirements of U.S. and applicable state securities laws, and noteholders may be required to bear the risk of noteholders' investment for an indefinite period of time. We are obligated to use our commercially reasonable efforts to commence an offer to exchange the notes for notes with substantially identical terms that are registered under the Securities Act or, in certain circumstances, register the reoffer and resale of the notes under the Securities Act. See "Exchange Offer; Registration Rights" and "Notice to Investors."

*Noteholders' ability to transfer the notes may be limited by the absence of an active trading market, and there is no assurance as to the maintenance or liquidity of any active trading market for the notes.*

The initial purchasers have advised us that they intend to make a market in the notes, and the exchange notes, if issued, as permitted by applicable laws and regulations; however, the initial purchasers are not obligated to make a market in the notes or the exchange notes, and they may discontinue their market-making activities at any time without notice. Because Goldman, Sachs & Co. is a member of the Sponsor Group, it will be required to deliver a "market-making prospectus" when effecting offers and sales of notes and exchange notes. For so long as the market-making prospectus is required to be delivered, the ability of Goldman, Sachs & Co. to make a market in the notes and exchange notes may, in part, be dependent on our ability to maintain a current market-making prospectus. The liquidity of any market for the notes will depend upon the number of holders of the notes, our performance, the market for similar securities, the interest in securities dealers making a market in the notes and other factors. Although the new second lien notes offered hereby will be fungible with the Existing 2022 Second Lien Notes, for which a trading market currently exists, we cannot assure noteholders that an active market for the second lien notes or exchange notes will be maintained. If an active market is not maintained, the price and liquidity of the notes will be adversely affected.

Historically, the market for non investment-grade debt has been subject to disruptions that have caused substantial volatility in the prices of securities similar to the notes. We cannot assure noteholders that the market, if any, for the notes or exchange notes will be free from similar disruptions or that any such disruptions may not adversely affect the prices at which noteholders may sell their notes. In addition, subsequent to their initial issuance, the notes or exchange notes may trade at a discount from their initial offering price, depending upon prevailing interest rates, the market for similar notes, our performance and other factors.

34

Confidential - Subject to CA
Mike Kunkel

EFH00027442

**PX 056**
**Page 43 of 308**

Confidential - Subject to CA
Mike Kunkel

***A decline in our credit ratings could negatively affect the trading price of the notes and also our ability to refinance our debt.***

Our credit ratings and the ratings for the notes could be lowered, suspended or withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment, circumstances warrant, including in connection with this offering or as a result of our exposure to EFH Corp. credit risk and the business and financial condition of TCEH. A downgrade or withdrawal, or the announcement of a possible downgrade or withdrawal, of the credit ratings for the notes may cause the trading price of the notes to decline significantly. In addition, downgrades in our long-term debt ratings may make it more difficult to refinance our debt and increase the cost of any debt that we may incur in the future.

A downgrade in the credit ratings of Oncor could negatively affect Oncor's ability to access capital. See "Risk Factors—Risks Related to EFIH's Investment in Oncor—Adverse actions with respect to Oncor's credit ratings could negatively affect Oncor's ability to access capital" in our 2011 Form 10-K, which is incorporated into this offering memorandum by reference. See also "Risk Factors—Risks Related to the Notes and Our Substantial Debt—Our substantial leverage could adversely affect our ability to raise additional capital to fund our operations, limit our ability to react to changes in the economy or our industry and prevent us from meeting obligations under our various debt agreements. Among other things, the incurrence of additional debt that is secured by a lien on our investment in Oncor Holdings could result in downgrades to Oncor's credit ratings and thus increase Oncor's borrowing costs and reduce the amounts that Oncor distributes to us" and "Risk Factors—Risks Related to the Notes and Our Substantial Debt—Oncor's ring-fencing measures may not work as planned and a bankruptcy court may nevertheless subject Oncor to the claims of Texas Holdings Group entity creditors."

***The interests of the Sponsor Group may differ from the interests of the holders of the notes.***

The Sponsor Group in the aggregate indirectly owns approximately 60% of the capital stock of EFH Corp. (EFIH's sole member) on a fully diluted basis through their investment in Texas Holdings, and therefore indirectly controls EFIH. As a result of this ownership, the Sponsor Group's ownership in interests of the general partner of Texas Holdings, and appointment of a majority of the members of the Board of Directors of EFH Corp. by the Sponsor Group, the Sponsor Group taken as a whole has indirect control over decisions regarding our operations, plans, strategies, finances and structure, including whether to enter into any corporate transaction, and will have the ability to prevent any transaction that requires the approval of EFH Corp.'s shareholders. The Sponsor Group is comprised of Kohlberg Kravis Roberts & Co. L.P., TPG Management, L.P. and GS Capital Partners, each of which acts independently of the others with respect to its investment in EFH Corp. and Texas Holdings.

The interests of these persons may differ from noteholders' interests in material respects. For example, if we encounter financial difficulties or are unable to pay our debts as they mature, the interests of the Sponsor Group, as equity holders or as members of the board of directors of EFH Corp., might conflict with noteholders' interests. The Sponsor Group may also have an interest in pursuing acquisitions, divestitures, financings or other transactions that, in their judgment, could enhance their equity investments, even though such transactions might involve risks to noteholders. Additionally, the indentures governing the notes permit us to dividend cash to EFH Corp. to pay advisory fees, dividends or make other restricted payments under certain circumstances, and the Sponsor Group may have an interest in our doing so.

35

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027443

Confidential - Subject to CA
Mike Kunkel

### Risks Related to Structure

*EFIH is a holding company and its obligations are structurally subordinated to existing and future liabilities and preferred stock of its subsidiaries.*

EFIH's cash flows and ability to meet its obligations are largely dependent upon the earnings of its subsidiaries, in particular, Oncor, and the payment of such earnings to EFIH in the form of dividends or distributions. These subsidiaries are separate and distinct legal entities and have no obligation (other than existing contractual obligations) to provide EFIH with funds for its payment obligations. Any decision by a subsidiary to provide EFIH with funds for its payment obligations, whether by dividends or distributions, will depend on, among other things, the subsidiary's results of operations, financial condition, cash requirements, contractual restrictions and other factors. In addition, a subsidiary's ability to pay dividends may be limited by covenants in its existing and future debt agreements or applicable law. Further, the distributions that may be paid by Oncor are limited as discussed in the risk factor below.

Because EFIH is a holding company, its obligations to its creditors are structurally subordinated to all existing and future liabilities and existing and future preferred stock of its subsidiaries that do not guarantee such obligations. Therefore, EFIH's rights and the rights of its creditors to participate in the assets of any subsidiary in the event that such a subsidiary is liquidated or reorganized are subject to the prior claims of such subsidiary's creditors and holders of such subsidiary's preferred stock. As of June 30, 2012, the notes would have been structurally subordinated to approximately $6.555 billion principal amount of debt (includes long-term debt, including amounts due currently, and short-term borrowings) of EFIH's subsidiaries (other than EFIH Finance), including all of Oncor Holdings' and its subsidiaries' debt. In addition, as of June 30, 2012, Oncor had approximately $1.459 billion of additional available capacity under its revolving credit facility. To the extent that EFIH may be a creditor with recognized claims against any such subsidiary, EFIH's claims would still be subject to the prior claims of such subsidiary's creditors to the extent that they are secured or senior to those held by EFIH. Subject to restrictions contained in financing arrangements, EFIH's subsidiaries may incur additional debt and other liabilities.

*Oncor may or may not make any distributions to EFIH.*

EFH Corp. and Oncor have implemented certain structural and operational "ring-fencing" measures, including certain measures required by the PUCT's Order on Rehearing in Docket No. 34077, based on principles articulated by rating agencies and commitments made by Texas Holdings and Oncor to the PUCT and the FERC to further enhance Oncor's credit quality. These measures were put into place to mitigate Oncor's credit exposure to the Texas Holdings Group (including the Issuer) and to reduce the risk that the assets and liabilities of Oncor would be substantively consolidated with the assets and liabilities of the Texas Holdings Group (including the Issuer) in the event of a bankruptcy of one or more of those entities.

As part of the ring-fencing measures, a majority of the members of the board of directors of Oncor are required to be, and are, independent from EFH Corp. Any new independent directors of Oncor are required to be appointed by the nominating committee of Oncor Holdings, which is required to be, and is, comprised of a majority of directors that are independent from EFH Corp. (and the Issuer). The organizational documents of Oncor give these independent directors, acting by majority vote, and, during certain periods, any director designated by Texas Transmission, the express right to prevent distributions from Oncor if they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements. Accordingly, there can be no assurance that Oncor will make any distributions to EFIH.

In addition, Oncor's organizational documents limit Oncor's distributions to its owners, including EFIH, through December 31, 2012 to an amount not to exceed Oncor's net income (determined in

36

Confidential - Subject to CA
Mike Kunkel

accordance with GAAP, subject to certain defined adjustments, including goodwill impairments) and prohibit Oncor from making any distribution to its owners, including EFIH, so long as and to the extent that such distribution would cause Oncor's regulatory capital structure to exceed the debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.

Beginning in 2009, the PUCT awarded Oncor the right to construct transmission lines and facilities associated with its Competitive Renewable Energy Zone ("CREZ") Transmission Plan, the cost of which is estimated to be approximately $2.0 billion (see discussion in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Significant Activities and Events—Oncor Matters with the PUCT" in our June 30, 2012 Form 10-Q, which is incorporated by reference into this offering memorandum). With the award, Oncor has incurred additional debt. In addition, Oncor may incur additional debt in connection with other investments in infrastructure or technology. Accordingly, while Oncor is required to maintain a specified debt to equity ratio, there can be no assurance that Oncor's equity balance will be sufficient to maintain the required debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, thereby restricting Oncor from making any distributions to its owners, including EFIH. In addition, any increase in Oncor's interest expense may reduce the amounts available to be distributed to EFIH. See "Risk Factors— Risks Related to the Notes and Our Substantial Debt—Our substantial leverage could adversely affect our ability to raise additional capital to fund our operations, limit our ability to react to changes in the economy or our industry and prevent us from meeting obligations under our various debt agreements. Among other things, the incurrence of additional debt that is secured by a lien on our investment in Oncor Holdings could result in downgrades to Oncor's credit ratings and thus increase Oncor's borrowing costs and reduce the amounts that Oncor distributes to us."

## Risks Related to Exposure to EFH Corp. and TCEH

In addition to the risks described in the documents filed with the SEC by EFH Corp. that are incorporated in this offering memorandum by reference, EFH Corp. and TCEH are subject to the following risks and uncertainties.

***EFH Corp.'s and TCEH's substantial indebtedness could adversely affect their ability to fund their operations, limit their ability to react to changes in the economy or their industry (including changes to environmental regulations), expose them to interest rate risk to the extent of their variable rate debt, limit their ability to raise additional capital and adversely impact their ability to meet obligations under the various debt agreements governing their debt.***

EFH Corp. and TCEH are highly leveraged. As of June 30, 2012, EFH Corp.'s and TCEH's consolidated principal amount of debt (short-term borrowings and long-term debt, including amounts due currently) totaled $37.5 billion and $30.2 billion, respectively. EFH Corp.'s and TCEH's substantial indebtedness could have significant consequences, including:

- making it more difficult for them to make payments on their debt;

- requiring a substantial portion of their cash flow to be dedicated to the payment of principal and interest on their debt, thereby reducing their ability to use their cash flow to fund operations, capital expenditures and future business opportunities and execution of their growth strategy;

- increasing their vulnerability to adverse economic, industry or competitive conditions or developments, including changes to environmental regulations;

- limiting their ability to make strategic acquisitions or causing them to make non-strategic divestitures;

- limiting their ability to develop new (or maintain their current) generation facilities;

37

Confidential - Subject to CA
Mike Kunkel

EFH00027445

Confidential - Subject to CA
Mike Kunkel

- limiting their ability to obtain additional financing for working capital (including collateral posting), capital expenditures, product development, debt service requirements, acquisitions and general corporate or other purposes, or to refinance existing debt; and

- limiting their ability to adjust to changing market and industry conditions (including changes to environmental regulations) and placing them at a competitive disadvantage compared to competitors who are less highly leveraged and who, therefore, may be able to operate at a lower overall cost (including debt service) and take advantage of opportunities that they cannot.

***EFH Corp. and TCEH may not be able to repay or refinance their debt as or before it becomes due, or obtain additional financing, particularly if forward natural gas prices do not significantly increase and/or if environmental regulations are adopted that result in significant capital requirements.***

EFH Corp. and TCEH may not be able to repay or refinance their debt as or before it becomes due, or they may only be able to refinance such amounts on terms that will increase their cost of borrowing or on terms that may be more onerous. Their ability to successfully implement any future refinancing of their debt will depend, among other things, on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions, and to certain financial, business and other factors beyond their control, including, without limitation, wholesale electricity prices in ERCOT (which are primarily driven by the price of natural gas and ERCOT market heat rates), environmental regulations and general conditions in the credit markets. Refinancing may also be difficult because of the slow economic recovery, the possibility of rising interest rates and the impending, significant debt maturities of numerous other borrowers. Because their credit ratings are significantly below investment grade, they may be more heavily exposed to these refinancing risks than other borrowers. In addition, the timing of additional financings may require them to pursue such financings at inopportune times.

A substantial amount of EFH Corp.'s and TCEH's debt matures in the next few years, including approximately $120 million principal amount of debt maturing in 2012-2013, approximately $4.3 billion principal amount of debt maturing in 2014 and approximately $3.3 billion principal amount of debt maturing in 2015. A substantial amount of TCEH's debt is comprised of debt incurred under the TCEH Senior Secured Credit Facilities. In April 2011, TCEH secured an extension of a significant portion of the commitments and loans under the TCEH Senior Secured Credit Facilities. However, even after taking the extension into account, TCEH still has a significant amount of commitments and loans under the TCEH Senior Secured Credit Facilities that will mature in 2013 and 2014 because a significant portion of the commitments (approximately $645 million maturing in 2013) and loans (approximately $3.85 billion principal amount maturing in 2014) were not extended. In addition, notwithstanding the extension, the extended commitments and loans could mature earlier as described in the next paragraph. Moreover, while TCEH was able to extend a significant portion of the commitments and loans under the TCEH Senior Secured Credit Facilities, the extensions were only for three years. As a result, EFH Corp. and TCEH have a substantial principal amount of debt that matures in 2016 (approximately $1.7 billion) and 2017 (approximately $16.7 billion, including $947 million under the TCEH Letter of Credit Facility that is held in restricted cash).

The extended loans under the TCEH Senior Secured Credit Facilities include a "springing maturity" provision pursuant to which in the event that (a) more than $500 million aggregate principal amount of the TCEH 10.25% Notes or more than $150 million aggregate principal amount of the TCEH 2016 Toggle Notes (in each case, other than notes held by EFH Corp. or its controlled affiliates as of March 31, 2011 to the extent held as of the determination date), as applicable, remain outstanding as of 91 days prior to the maturity date of the applicable notes and (b) TCEH's consolidated total debt to consolidated EBITDA ratio (as defined in the TCEH Senior Secured Credit Facilities) is greater than 6.00 to 1.00 at such applicable determination date, then the maturity date of the extended loans will automatically change to

38

Confidential - Subject to CA
Mike Kunkel

EFH00027446

Confidential - Subject to CA
Mike Kunkel

90 days prior to the maturity date of the applicable notes. As a result of this "springing maturity" provision, TCEH may lose the benefit of the extension of the commitments and loans under the TCEH Senior Secured Credit Facilities if TCEH is unable to refinance the requisite portion of the TCEH 2015/2016 Notes by the applicable deadline. The TCEH 10.25% Notes mature on November 1, 2015, and the TCEH 2016 Toggle Notes mature on November 1, 2016. If holders of the TCEH 2015/2016 Notes are unwilling to extend the maturities of their notes, then, to avoid the "springing maturity" of the extended loans, TCEH may be required to repay a substantial portion of the TCEH 2015/2016 Notes at prices above market or at par. There is no assurance that TCEH will be able to make such payments, whether through cash on hand or additional financings. As of June 30, 2012, $3.125 billion and $1.656 billion aggregate principal amount of the TCEH 10.25% Notes and the TCEH 2016 Toggle Notes, respectively, were outstanding, excluding amounts held by EFH Corp. and EFIH.

Wholesale electricity prices in the ERCOT market have generally moved with the price of natural gas. Accordingly, the contribution to earnings and the value of TCEH's nuclear and lignite/coal-fueled generation assets are dependent in significant part upon the price of natural gas. Forward natural gas prices have generally trended downward since mid-2008 (from $10.90 per MMBtu in mid-2008 to $3.58 per MMBtu at June 30, 2012 for calendar year 2013). In recent years, natural gas supply has outpaced demand as a result of increased drilling of shale gas deposits combined with lingering demand weakness associated with the economic recession. Many industry experts expect this supply/demand imbalance to continue for a number of years, thereby depressing natural gas prices for a long-term period. These market conditions are challenging to the long-term profitability of TCEH's generation assets. Specifically, low natural gas prices and their effect in ERCOT on wholesale electricity prices could have a material impact on the overall profitability of TCEH's generation assets for periods in which TCEH does not have significant hedge positions. As of June 30, 2012, TCEH had hedged only approximately 67% and 33% of its wholesale natural gas price exposure related to expected generation output for 2013 and 2014, respectively, based on currently governing CAIR regulation, and it does not have any significant amounts of hedges in place for periods after 2014. Consequently, a continuation, or further decline, of current forward natural gas prices could result in further declines in the values of TCEH's nuclear and lignite/coal-fueled generation assets and limit or hinder TCEH's ability to hedge its wholesale electricity revenues at sufficient price levels to support its significant interest payments and debt maturities, which could adversely impact its ability to obtain additional liquidity and refinance and/or extend the maturities of its outstanding debt.

Aspects of EFH Corp.'s and TCEH's current financial condition may also be challenging to their efforts to obtain additional financing (or refinance or extend their existing financing) in the future. For example, EFH Corp.'s liabilities and those of EFCH exceeded their and EFCH's assets as shown on EFH Corp.'s and EFCH's respective balance sheet prepared in accordance with GAAP as of June 30, 2012. EFCH's assets included $6.152 billion of goodwill as of June 30, 2012. In 2010, EFCH recorded a $4.1 billion noncash goodwill impairment charge reflecting the estimated effect of lower wholesale electricity prices on the enterprise value of TCEH, driven by the sustained decline in forward natural gas prices, as indicated by cash flow projections and declines in market values of securities of comparable companies. The value of EFCH's goodwill will continue to depend on, among other things, wholesale electricity prices in the ERCOT market. Further, third party analyses of TCEH's business performed in connection with goodwill impairment testing in accordance with GAAP, which have indicated that the principal amount of TCEH's outstanding debt exceeds its enterprise value, may make it more difficult for EFH Corp. and TCEH to successfully access the capital markets to obtain liquidity and/or implement any refinancing or extensions of their debt or obtain additional financing. Their ability to obtain future financing is also limited by the value of their unencumbered assets. Almost all of their assets are encumbered (in some cases by both first and second liens), and they have a limited value of assets which could be used as additional collateral in future financing transactions.

Confidential - Subject to CA
Mike Kunkel

EFH00027447

**PX 056
Page 48 of 308**

Confidential - Subject to CA
Mike Kunkel

***EFH Corp.'s (or any applicable subsidiary's) credit ratings and any actual or perceived changes in their creditworthiness could negatively affect EFH Corp.'s (or the pertinent subsidiary's) ability to access capital and could require EFH Corp. or its subsidiaries to post collateral or repay certain indebtedness.***

EFH Corp.'s (or any applicable subsidiary's) credit ratings could be lowered, suspended or withdrawn entirely at any time by the rating agencies, if in each rating agency's judgment, circumstances warrant, including in connection with this offering. Downgrades in EFH Corp.'s or any of its applicable subsidiaries' long-term debt ratings generally cause borrowing costs to increase and the potential pool of investors and funding sources to decrease and could trigger liquidity demands pursuant to the terms of new commodity contracts, leases or other agreements. Future transactions by EFH Corp. or any of its subsidiaries, including the issuance of additional debt or the consummation of additional debt exchanges, could result in temporary or permanent downgrades of EFH Corp.'s or its subsidiaries' credit ratings.

Most of EFH Corp.'s large customers, suppliers and counterparties require an expected level of creditworthiness in order for them to enter into transactions. If EFH Corp.'s (or an applicable subsidiary's) credit ratings decline, or if their actual or perceived creditworthiness deteriorates, the costs to operate its businesses would likely increase because counterparties could require the posting of collateral in the form of cash or cash-related instruments, or counterparties could decline to do business with EFH Corp. (or its applicable subsidiary).

***EFH Corp. and TCEH may pursue transactions and initiatives that are unsuccessful or do not produce the desired outcome.***

Future transactions and initiatives that EFH Corp. and TCEH may pursue may have significant effects on their business, capital structure, liquidity and/or results of operations. For example, in addition to the exchanges, repurchases and extensions of their debt, they have and may continue to pursue, from time to time, transactions and initiatives of various types, including, without limitation, debt exchange transactions, debt repurchases, equity or debt issuances, debt refinancing transactions (including extensions of maturity dates of their debt), asset sales, joint ventures, recapitalizations, business combinations and other strategic transactions. There can be no guarantee that any of such transactions or initiatives would be successful or produce the desired outcome, which could ultimately affect them in a material manner.

***Despite their current high debt level, EFH Corp. and TCEH may still be able to incur substantially more debt. This could further exacerbate the risks associated with their substantial debt.***

EFH Corp. and TCEH may be able to incur additional debt in the future. Although their debt agreements contain restrictions on the incurrence of additional debt, these restrictions are subject to a number of significant qualifications and exceptions. Under certain circumstances, the amount of debt, including secured debt, that could be incurred in compliance with these restrictions could be substantial. If new debt is added to their existing debt levels, the related risks that they and holders of their existing debt, including EFIH, now face could intensify.

***EFH Corp.'s and TCEH's debt agreements and the Oncor "ring-fencing" measures contain restrictions that limit flexibility in operating their businesses.***

EFH Corp.'s and TCEH's debt agreements contain various covenants and other restrictions that limit their ability to engage in specified types of transactions and may adversely affect their ability to operate their businesses. These covenants and other restrictions limit their ability to, among other things:

- incur additional debt or issue preferred shares;

40

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027448

Confidential - Subject to CA
Mike Kunkel

- pay dividends on, repurchase or make distributions in respect of capital stock or make other restricted payments;

- make investments;

- sell or transfer assets;

- create liens on assets to secure debt;

- consolidate, merge, sell or otherwise dispose of all or substantially all of their assets;

- enter into transactions with affiliates;

- designate subsidiaries as unrestricted subsidiaries, and

- repay, repurchase or modify certain subordinated and other material debt.

There are a number of important limitations and exceptions to these covenants and other restrictions.

Under the TCEH Senior Secured Credit Facilities, TCEH is required to maintain a consolidated secured debt to consolidated EBITDA ratio below specified levels. TCEH's ability to maintain the consolidated secured debt to consolidated EBITDA ratio below such levels can be affected by events beyond its control, including, without limitation, wholesale electricity prices (which are primarily derived by the price of natural gas and ERCOT market heat rates) and environmental regulations, and there can be no assurance that TCEH will comply with this ratio. As of June 30, 2012, TCEH's consolidated secured debt to consolidated EBITDA ratio was 5.53 to 1.00, which compares to the maximum consolidated secured debt to consolidated EBITDA ratio of 8.00 to 1.00 currently permitted under the TCEH Senior Secured Credit Facilities. The secured debt portion of the ratio excludes (a) up to $1.5 billion of debt secured by a first-priority lien (including the TCEH 2020 Notes) if the proceeds of such debt are used to repay term loans or deposit letter of credit loans under the TCEH Senior Secured Credit Facilities and (b) debt secured by a lien ranking junior to the TCEH Senior Secured Credit Facilities, including the TCEH 2021 Notes. For the six months ended June 30, 2012, the maximum consolidated secured debt to consolidated EBITDA ratio permitted under the TCEH Senior Secured Credit Facilities continues to be 8.00 to 1.00.

A breach of any of these covenants or restrictions could result in an event of default under one or more of EFH Corp.'s and TCEH's debt agreements, including as a result of cross acceleration or default provisions. Upon the occurrence of an event of default under one of these debt agreements, lenders or noteholders could elect to declare all amounts outstanding under that debt agreement to be immediately due and payable and/or terminate all commitments to extend further credit. Such actions by those lenders or noteholders could cause cross defaults or accelerations under other debt, including debt that EFIH guarantees. If they were unable to repay those amounts, the lenders or noteholders could proceed against any collateral granted to them to secure such debt. If lenders or noteholders accelerate the repayment of all borrowings, EFH Corp. and TCEH would likely not have sufficient assets and funds to repay those borrowings.

In addition, EFH Corp. and Oncor have implemented a number of "ring-fencing" measures to enhance the credit quality of Oncor Holdings and its subsidiaries, including Oncor. Those measures, many of which were agreed to and required by the PUCT's Order on Rehearing in Docket No. 34077, include, among other things:

- Oncor Holdings' and Oncor's board of directors being comprised of a majority of directors that are independent from the Texas Holdings Group, EFH Corp. and its other subsidiaries;

- Oncor being treated as an unrestricted subsidiary with respect to EFH Corp.'s and EFIH's debt;

- Oncor not being restricted from incurring its own debt;

- Oncor not guaranteeing or pledging any of its assets to secure the debt of any member of the Texas Holdings Group;

41

Confidential - Subject to CA
Mike Kunkel

EFH00027449

Confidential - Subject to CA
Mike Kunkel

- restrictions on distributions by Oncor, and the right of the independent members of Oncor's board of directors and the largest non-majority member of Oncor to block the payment of distributions to Oncor Holdings (i.e., such distributions not being available to EFH Corp. under certain circumstances), and

- restrictions on the ability to sell a majority interest in Oncor until October 2012.

*Lenders and holders of TCEH debt have in the past alleged, and might allege in the future, that TCEH is not operating in compliance with covenants in its debt agreements or make allegations against directors and officers of TCEH and its affiliates of breach of fiduciary duty. In addition, holders of credit derivative securities related to TCEH's debt securities (including credit default swaps) have in the past claimed, and might claim in the future, that a credit event has occurred under such credit derivative securities. In each case, even if the claims have no merit, these claims could cause the trading price of EFH Corp., TCEH and EFIH debt securities to decline, adversely affect their and our ability to raise additional capital and/or refinance their and our existing debt or require them to repay the TCEH Demand Notes.*

Lenders or holders of TCEH debt have in the past alleged, and might allege in the future, that TCEH is not operating in compliance with the covenants in its debt agreements, that a default under its debt agreements has occurred or that its or its affiliates' boards of directors or similar bodies or officers are not properly discharging their fiduciary duties, or make other allegations regarding their business, including for the purpose, and potentially having the effect, of causing a default under their debt or other agreements, accelerating the maturity of such debt, protecting claims of debt issued at a certain entity or entities in their capital structure at the expense of debt claims elsewhere in their capital structure and/or obtaining economic benefits from them. These claims have included as recently as the first quarter of 2012, and may include in the future, among other things, claims that the TCEH Demand Notes were fraudulent transfers and should be repaid to TCEH, that authorization of the TCEH Demand Notes violates the fiduciary duties of EFCH's and TCEH's boards of directors, that the TCEH Demand Notes were in violation of the terms of TCEH's debt agreements or that the interest rate on the TCEH Demand Notes should be increased. In the event that a lender were to prevail on these claims, EFH Corp. may immediately be required to repay the TCEH Demand Notes to TCEH and be prevented from further borrowings under the TCEH Demand Notes. Further, holders of credit derivative securities related to TCEH's debt securities (including credit default swaps) have in the past claimed, and may claim in the future, that a credit event has occurred under such credit derivative securities based on TCEH's financial condition. Even if these claims are without merit, they could nevertheless cause the trading price of EFH Corp., TCEH and EFIH debt to decline and adversely affect their and our ability to raise additional capital and/or refinance their and our existing debt.

*EFH Corp. and TCEH may not be able to generate sufficient cash to service their debt and may be forced to take other actions to satisfy the obligations under their debt agreements, which may not be successful.*

EFH Corp.'s and TCEH's ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond their control, including, without limitation, wholesale electricity prices (which are primarily driven by the price of natural gas and ERCOT market heat rates) and environmental regulations. They may not be able to maintain a level of cash flows sufficient to pay the principal, premium, if any, and interest on their debt.

If cash flows and capital resources are insufficient to fund their debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt. These alternative measures may not be successful, may not be completed on economically

42

Highly Confidential

Confidential - Subject to CA
Mike Kunkel

attractive terms or may not be adequate for them to meet their debt obligations when due. Additionally, their debt agreements limit the use of the proceeds from many dispositions of assets or operations. As a result, they may not be permitted to use the proceeds from these dispositions to satisfy their debt obligations.

Further, if they suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies could be adversely impacted. In particular, such concerns by existing and potential counterparties could significantly limit TCEH's wholesale market activities, including its natural gas price hedging program.

**Under the terms of the indentures governing the TCEH 2015/2016 Notes, TCEH 2020 Notes and TCEH 2021 Notes and the terms of the TCEH Senior Secured Credit Facilities, TCEH is restricted from making certain payments to EFH Corp.**

EFH Corp. is a holding company and substantially all of its reported consolidated assets are held by its subsidiaries. As of June 30, 2012, TCEH and its subsidiaries held approximately 81% of EFH Corp.'s reported consolidated assets, and for the six months ended June 30, 2012, TCEH and its subsidiaries represented all of EFH Corp.'s reported consolidated revenues. Accordingly, TCEH and its subsidiaries constitute an important funding source for EFH Corp. to satisfy its obligations, including with respect to EFH Corp. notes held by EFIH. However, under the terms of the indentures governing the TCEH 2015/2016 Notes, TCEH 2020 Notes and TCEH 2021 Notes and the terms of the TCEH Senior Secured Credit Facilities, TCEH is restricted from making certain payments to EFH Corp., except in the form of certain loans to cover certain of EFH Corp.'s obligations (and dividends and distributions in certain other limited circumstances if permitted by applicable state law). Further, the indentures governing the TCEH 2015/2016 Notes, TCEH 2020 Notes and TCEH 2021 Notes and the terms of the TCEH Senior Secured Credit Facilities do not permit such intercompany loans to service EFH Corp.'s debt unless required for EFH Corp. to pay principal, premium and interest when due on debt incurred by EFH Corp. to finance the Merger or that was in existence prior to the Merger, or any debt incurred by EFH Corp. to replace, refund or refinance such debt. Such loans are also permitted in order to service other debt, subject to limitations on the amount of the loans. In addition, TCEH is prohibited from making certain loans to EFH Corp. if certain events of default under the indentures governing the TCEH 2015/2016 Notes, TCEH 2020 Notes or TCEH 2021 Notes or the terms of the TCEH Senior Secured Credit Facilities have occurred and are continuing. As of the date hereof, none of these events of default has occurred or is continuing.

In addition, the TCEH Senior Secured Credit Facilities contain provisions related to the TCEH Demand Notes, which are guaranteed by EFCH and EFIH on a senior unsecured basis and are demand notes, which means that TCEH can require payment of all or a portion of the TCEH Demand Notes at any time. These provisions include the following related to cash loaned by TCEH to EFH Corp. for (i) debt principal and interest payments (the "P&I Note") and (ii) other general corporate purposes (the "SG&A Note"):

- TCEH will not make any further loans under the SG&A Note to EFH Corp.;

- borrowings outstanding under the P&I Note will not exceed $2 billion in the aggregate at any time; and

- the sum of (a) the outstanding senior secured indebtedness (including guarantees) issued by EFH Corp. or any subsidiary of EFH Corp. (including EFIH) secured by a second-priority lien on the equity interests that EFIH owns in Oncor Holdings ("EFIH Second-Priority Debt") and (b) the aggregate outstanding amount of the TCEH Demand Notes will not exceed, at any time, the maximum amount of EFIH Second-Priority Debt permitted by the indenture governing the EFH Corp. 9.75% Notes and EFH Corp. 10.000% Notes as in effect on April 7, 2011.

43

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027451

Confidential - Subject to CA
Mike Kunkel

EFH Corp. will use the proceeds from the EFIH Dividend to repay the balance of the TCEH Demand Notes. If TCEH is not able or declines to continue making intercompany loans to EFH Corp. in the future as a result of the restrictions in the amendment or otherwise, EFH Corp. may not have sufficient cash flows to meet its obligations, including with respect to its notes held by EFIH. If EFH Corp. re-borrows amounts from TCEH under the P&I Note in the future, a failure by EFH Corp. to repay the TCEH Demand Notes when required, including as a result of any claims made by a creditor of TCEH that these loans constituted fraudulent transfers or breaches of fiduciary duty, could result in defaults under EFH Corp.'s other debt, including debt that EFCH and EFIH guarantee. It would also likely result in EFCH's and EFIH's guarantees of the TCEH Demand Notes being called, which could cause defaults under EFCH's and EFIH's other debt.

### EFH Corp. has a very limited ability to control activities at Oncor due to structural and operational "ring-fencing" measures.

EFH Corp. depends upon Oncor for a significant amount of its cash flows and relies on such cash flows in order to satisfy its obligations. However, EFH Corp. has a very limited ability to control the activities of Oncor. As part of the "ring-fencing" measures implemented by EFH Corp. and Oncor, including certain measures required by the PUCT's Order on Rehearing in Docket No. 34077, a majority of the members of Oncor's board of directors are required to meet the New York Stock Exchange requirements for independence in all material respects, and the unanimous, or majority, consent of such directors is required for Oncor to take certain actions. In addition, any new independent directors are required to be appointed by the nominating committee of Oncor Holdings' board of directors, a majority of whose members are independent directors. No member of EFH Corp.'s management is a member of Oncor's board of directors. Under Oncor Holdings' and Oncor's organizational documents, EFH Corp. has limited indirect consent rights with respect to the activities of Oncor, including new issuances of equity securities by Oncor, material transactions with third parties involving Oncor outside of the ordinary course of business, actions that cause Oncor's assets to be subject to an increased level of jurisdiction of the FERC, any changes to the state of formation of Oncor, material changes to accounting methods not required by GAAP, and actions that fail to enforce certain tax sharing obligations between Oncor and EFH Corp. In addition, Oncor's organizational agreements contain restrictions on Oncor's ability to make distributions to its members, including indirectly to EFH Corp.

### Oncor may or may not make any distributions to EFH Corp.

Upon the consummation of the Merger, EFH Corp. and Oncor implemented certain structural and operational "ring-fencing" measures, including certain measures required by the PUCT's Order on Rehearing in Docket No. 34077, that were based on principles articulated by rating agencies and commitments made by Texas Holdings and Oncor to the PUCT and the FERC to further enhance Oncor's credit quality. These measures were put in place to mitigate Oncor's credit exposure to the Texas Holdings Group and to reduce the risk that the assets and liabilities of Oncor would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities.

As part of the ring-fencing measures, a majority of the members of the board of directors of Oncor are required to be, and are, independent from EFH Corp. Any new independent directors of Oncor are required to be appointed by the nominating committee of Oncor Holdings, which is required to be, and is, comprised of a majority of directors that are independent from EFH Corp. The organizational documents of Oncor give these independent directors, acting by majority vote, and, during certain periods, any director designated by Texas Transmission, the express right to prevent distributions from Oncor if they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements. Accordingly, there can be no assurance that Oncor will make any distributions to EFH Corp.

44

Confidential - Subject to CA
Mike Kunkel

EFH00027452

Confidential - Subject to CA
Mike Kunkel

In addition, Oncor's organizational documents limit Oncor's distributions to its owners, including EFH Corp., through December 31, 2012 to an amount not to exceed Oncor's net income (determined in accordance with GAAP, subject to certain defined adjustments, including goodwill impairments) and prohibit Oncor from making any distribution to EFH Corp. so long as and to the extent that such distribution would cause Oncor's regulatory capital structure to exceed the debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.

In 2009, the PUCT awarded Oncor the right to construct transmission lines and facilities associated with its CREZ Transmission Plan, the cost of which is estimated by Oncor to be approximately $2.0 billion. With the award, Oncor has incurred additional debt. In addition, Oncor may incur additional debt in connection with other investments in infrastructure or technology. Accordingly, while Oncor is required to maintain a specified debt-to-equity ratio, there can be no assurance that Oncor's equity balance will be sufficient to maintain the required debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, thereby restricting Oncor from making any distributions to EFH Corp. In addition, any increase in Oncor's interest expense may reduce the amounts available to be distributed to EFH Corp.

***TCEH's revenues and results of operations generally are negatively impacted by decreases in market prices for electricity, natural gas prices, and/or market heat rates.***

TCEH is not guaranteed any rate of return on capital investments in its businesses. TCEH markets and trades electricity and natural gas, including electricity from its own generation facilities and generation contracted from third parties, as part of its wholesale markets operation. TCEH's results of operations depend in large part upon wholesale market prices for electricity, natural gas, uranium, coal and transportation in its regional market and other competitive markets and upon prevailing retail electricity rates, which may be impacted by, among other things, actions of regulatory authorities. Market prices may fluctuate substantially over relatively short periods of time. Demand for electricity can fluctuate dramatically, creating periods of substantial under- or over-supply. During periods of over-supply, prices might be depressed. Also, at times, there may be political pressure, or pressure from regulatory authorities with jurisdiction over wholesale and retail energy commodity and transportation rates, to impose price limitations, bidding rules and other mechanisms to address volatility and other issues in these markets.

Some of the fuel for TCEH's generation facilities is purchased under short-term contracts. Prices of fuel (including diesel, natural gas, coal and nuclear fuel) may also be volatile, and the price TCEH can obtain for electricity sales may not change at the same rate as changes in fuel costs. In addition, TCEH purchases and sells natural gas and other energy related commodities, and volatility in these markets may affect costs incurred in meeting obligations.

Volatility in market prices for fuel and electricity may result from the following:

- volatility in natural gas prices;

- volatility in ERCOT market heat rates;

- volatility in coal and rail transportation prices;

- severe or unexpected weather conditions, including drought and limitations on access to water;

- seasonality;

- changes in electricity and fuel usage;

- illiquidity in the wholesale power or other commodity markets;

- transmission or transportation constraints, inoperability or inefficiencies;

45

Confidential - Subject to CA
Mike Kunkel

Confidential - Subject to CA
Mike Kunkel

- availability of competitively-priced alternative energy sources;

- changes in market structure;

- changes in supply and demand for energy commodities, including nuclear fuel and related enrichment and conversion services;

- changes in the manner in which TCEH operates its facilities, including curtailed operation due to market pricing, environmental, safety or other factors;

- changes in generation efficiency;

- outages or otherwise reduced output from TCEH's generation facilities or those of its competitors;

- changes in the credit risk or payment practices of market participants;

- changes in production and storage levels of natural gas, lignite, coal, crude oil, diesel and other refined products;

- natural disasters, wars, sabotage, terrorist acts, embargoes and other catastrophic events, and

- federal, state and local energy, environmental and other regulation and legislation.

All of TCEH's generation facilities are located in the ERCOT market, a market with limited interconnections to other markets. Wholesale electricity prices in the ERCOT market have generally moved with the price of natural gas because marginal electricity demand is generally supplied by natural gas-fueled generation facilities. Accordingly, TCEH's earnings and the value of its nuclear and lignite/coal-fueled generation assets, which provided a substantial portion of its supply volumes in 2011 and the first six months of 2012, are dependent in significant part upon the price of natural gas. Forward natural gas prices have generally trended downward since mid-2008 (from $10.90 per MMBtu in mid-2008 to $3.58 per MMBtu at June 30, 2012 for calendar year 2013). In recent years natural gas supply has outpaced demand as a result of increased drilling of shale gas deposits combined with lingering demand weakness associated with the economic recession. Many industry experts expect this supply/demand imbalance to continue for a number of years, thereby depressing natural gas prices for a long-term period.

Wholesale electricity prices also have generally moved with ERCOT market heat rates, which could fall if demand for electricity were to decrease or if more efficient generation facilities are built in ERCOT. Accordingly, TCEH's earnings and the value of its nuclear and lignite/coal-fueled generation assets are also dependent in significant part upon market heat rates. As a result, TCEH's nuclear and lignite/coal-fueled generation assets could significantly decrease in profitability and value if ERCOT market heat rates decline.

***The percentage of TCEH's wholesale natural gas price exposure that is hedged declines significantly in future periods, which could result in reduced earnings (and related cash flows) and adversely affect TCEH's ability to pay principal and interest on its debt in those periods and refinance its debt if wholesale natural gas prices do not increase.***

TCEH's hedging activities, in particular its natural gas price hedging program, are designed to mitigate the adverse effect on earnings (and related cash flows) of low wholesale electricity prices (due to low natural gas prices). These market conditions are challenging to the long-term profitability of TCEH's generation assets. Specifically, low natural gas prices and their effect in ERCOT on wholesale power prices could have a material impact on the overall profitability of TCEH's generation assets for periods in which it does not have significant hedge positions. While TCEH has significantly hedged its natural gas price exposure for 2012 (approximately 96% under CAIR regulation), as of June 30, 2012, it has hedged only approximately 67% and 33% of its wholesale natural gas price exposure related to

46

Confidential - Subject to CA
Mike Kunkel

EFH00027454

**PX 056**
**Page 55 of 308**

Confidential - Subject to CA
Mike Kunkel

expected generation output for 2013 and 2014, respectively, based on currently governing CAIR regulation, and does not have any significant amounts of hedges in place for periods after 2014.

Forward natural gas prices have generally trended downward since mid-2008. In recent years natural gas supply has outpaced demand as a result of increased drilling of shale gas deposits combined with lingering demand weakness associated with the economic recession. Many industry experts expect this supply/demand imbalance to continue for a number of years, thereby depressing natural gas prices for a long-term period. A continuation or further decline of current forward natural gas prices could limit TCEH's ability to hedge its wholesale electricity revenues at sufficient price levels to pay principal and interest on its debt, result in further declines in the value of its nuclear and lignite/coal-fueled generation assets and could adversely impact its ability to refinance its debt or obtain additional financing. Consequently, TCEH's ability to fund its operations, meet its obligations under its debt agreements, refinance or extend its substantial indebtedness and obtain additional financing in the future is dependent on increases in the current and expected future price of natural gas.

***If TCEH is required to comply with the EPA's Cross-State Air Pollution Rule ("CSAPR") as revised by the EPA in February 2012, TCEH will likely incur material capital expenditures and operating costs and experience material revenue decreases due to reduced generation and wholesale power sales volumes.***

In July 2011, the EPA issued the CSAPR. In February 2012, the EPA released a final rule ("Final Revisions") and a proposed rule revising certain aspects of the CSAPR, including emissions budgets for the State of Texas as discussed in Items 1 and 2, "Business and Properties - Environmental Regulations and Related Considerations - Sulfur Dioxide, Nitrogen Oxide and Mercury Air Emissions" of the EFH Corp. 2011 Form 10-K. In March 2012, subsidiaries of TCEH submitted comments to the EPA on the proposed rule requesting the EPA to make additional corrections to the CSAPR's budgets for Texas. In June 2012, the EPA finalized the proposed rule ("Second Revised Rule"). In total, the emissions budgets established by the Final Revisions along with the Second Revised Rule would require TCEH's fossil-fueled generation units to reduce (i) their annual $SO_2$ and $NO_x$ emissions by approximately 120,600 tons (56 percent) and 9,000 tons (22 percent), respectively, compared to 2010 actual levels, and (ii) their seasonal $NO_x$ emissions by approximately 3,300 tons (18 percent), compared to 2010 levels. TCEH could comply with these emissions limits either through physical reductions or through the purchase of emissions credits from third parties, but the volume of $SO_2$ credits that may be purchased from sources outside of Texas is subject to limitations starting in 2014. Because the CSAPR is currently stayed by the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit Court"), the Final Revisions and the Second Revised Rule do not impose any immediate legal or compliance requirements on TCEH, the State of Texas, or other affected parties. In April 2012, subsidiaries of TCEH filed in the D.C. Circuit Court a petition for review of the Final Revisions on the ground, among others, that the rules do not include all of the budget corrections they requested from the EPA. EFH Corp. and EFCH cannot predict whether, when, or in what form the CSAPR, the Final Revisions, or the Second Revised Rule will take effect.

Material capital expenditures would be required to comply with the CSAPR, as revised in June 2012, as well as with other pending and expected environmental regulations, including the Mercury and Air Toxics Standard ("MATS"). In 2011, total capital expenditures for environmental projects totaled $142 million. Analysis is ongoing regarding expected capital expenditures relating to the CSAPR, the Final Revisions and the Second Revised Rule, the status of which is uncertain given the pending legal proceeding, and the final MATS rule, which was published in February 2012. EFH Corp. and EFCH budgeted total capital expenditures related to the CSAPR, the Final Revisions, the Second Revised Rule, MATS, and other environmental regulations of approximately $300 million in 2012. Prior to the publication of the final MATS rule, EFH Corp. and EFCH estimated that expenditures of more than $1.5 billion before the end of the decade in environmental control equipment would be

47

Confidential - Subject to CA
Mike Kunkel

Confidential - Subject to CA
Mike Kunkel

required to comply with regulatory requirements, including the CSAPR and MATS. EFH Corp. and EFCH are currently evaluating this estimate in light of the final MATS rule, the Final Revisions and the Second Revised Rule. In April 2012, a subsidiary of TCEH filed a petition for review of MATS in the D.C. Circuit Court. Certain states and industry participants have also filed petitions for review in the D.C. Circuit Court. EFH Corp. and EFCH cannot predict the timing or outcome of these petitions.

EFH Corp. and EFCH cannot predict (i) whether the legal challenge to the CSAPR will be ultimately successful on the merits, (ii) when the D.C. Circuit Court will issue a final ruling on the validity of the CSAPR and/or (iii) the effective date of the CSAPR if it is ultimately implemented. As a result, there can be no assurance that TCEH will not be required to implement a CSAPR compliance plan in a short time frame or that such plan will not materially affect TCEH's, EFCH's and EFH Corp.'s results of operations, liquidity or financial condition.

***Goodwill and/or other intangible assets not subject to amortization that were recorded in connection with the Merger are subject to at least annual impairment evaluations. As a result, EFH Corp. and EFCH could be required to write off some or all of this goodwill and other intangible assets, which may cause adverse impacts on their results of operations and financial condition.***

In accordance with accounting standards, goodwill and certain other indefinite-lived intangible assets that are not subject to amortization are reviewed annually or more frequently for impairment, if certain conditions exist, and may be impaired. Factors such as the economic climate, market conditions, including the market prices for wholesale electricity and natural gas and market heat rates, environmental regulation, and the condition of assets are considered when evaluating these assets for impairment. The actual timing and amounts of any goodwill impairments will depend on many sensitive, interrelated and uncertain variables. Any reduction in or impairment of the value of goodwill or other intangible assets will result in a charge against earnings, which could cause a material adverse impact on EFH Corp.'s and EFCH's reported results of operations and financial condition.

48

Confidential - Subject to CA
Mike Kunkel

EFH00027456

**PX 056**
**Page 57 of 308**

Confidential - Subject to CA
Mike Kunkel

## THE TRANSACTIONS

### The Merger

On October 10, 2007, the Merger occurred. Upon the effectiveness of the Merger, each share of EFH Corp. common stock outstanding immediately prior to the Merger (other than shares held by EFH Corp. or any of its subsidiaries or Texas Holdings or any of its subsidiaries, including Merger Sub, in each case not held on behalf of third parties, or shares held by holders who properly exercised their rights of dissent and appraisal under Texas law) was cancelled and converted into the right to receive $69.25 in cash, without interest and less any applicable withholding taxes.

### Equity Contributions

At the closing of the Merger, Texas Holdings received an aggregate equity investment of approximately $8.3 billion. Investment funds affiliated with the Sponsor Group, or their respective assignees, contributed approximately $5.1 billion to Texas Holdings. The Sponsor Group consists of investment funds associated with or designated by KKR, TPG and Goldman Sachs who, along with certain other co-investors, own EFH Corp. through Texas Holdings, with the Sponsor Group controlling Texas Holdings' general partner, Texas Energy Future Capital Holdings LLC. In addition, Citigroup Global Markets Inc. and Morgan Stanley & Co. LLC, each of which is an initial purchaser participating in this offering, or their respective affiliates, each made equity investments of approximately $250 million in Texas Holdings. The Sponsor Group obtained approximately $2.3 billion in equity investments from other existing investors in KKR's and TPG's private equity funds and other third party investors. Following the closing of the Merger, the Sponsor Group owned approximately 60% of the limited partnership units issued by Texas Holdings in connection with the Merger.

The equity contributions by the Sponsor Group and the Investors are referred to in this offering memorandum as the "Equity Contributions."

### Debt Financing

In connection with the Merger, in addition to the Equity Contributions described above, EFH Corp. and/or its subsidiaries entered into the following debt financing arrangements, in each case, arranged by a consortium of arrangers and bookrunners:

- TCEH's Senior Secured Credit Facilities, which are guaranteed by EFCH and subsidiaries of TCEH;

- a $6.75 billion senior unsecured interim loan facility of TCEH (the "TCEH Senior Interim Facility"), which was used to fund the Merger and related transactions; and

- a $4.5 billion senior unsecured interim loan facility of EFH Corp. (the "EFH Senior Interim Facility"), which was used to fund the Merger and related transactions.

In October and December 2007, TCEH and TCEH Finance, Inc. issued $6.75 billion aggregate principal amount of the TCEH 2015/2016 Notes in two private offerings. The proceeds from the offerings of the TCEH 2015/2016 Notes, along with cash on hand, were used by TCEH to repay in full the TCEH Senior Interim Facility.

In October 2007, EFH Corp. issued the 2017 Notes in a private offering. The proceeds from the offering of the 2017 Notes, along with cash on hand, were used by EFH Corp. to repay in full the EFH Senior Interim Facility.

We refer to the above, collectively, as the "Merger Debt Financing."

49

Confidential - Subject to CA
Mike Kunkel

EFH00027457

**PX 056**
**Page 58 of 308**

Confidential - Subject to CA
Mike Kunkel

Concurrently with the transactions described above, Oncor entered into a $2.0 billion senior revolving credit facility (the "Prior Oncor Revolving Credit Facility"). In October 2011, Oncor amended and restated the Prior Oncor Credit Facility (as so amended and restated, the "Oncor Revolving Credit Facility") which provides for a secured revolving credit facility in an aggregate principal amount of up to $2.4 billion, which may be increased by up to $100 million, subject to certain conditions. The Oncor Revolving Credit Facility is being used by Oncor for working capital and for other general corporate purposes. No portion of the Prior Oncor Revolving Credit Facility was used to finance the Merger or the debt repayment that occurred in connection with the Merger.

We refer to the transactions listed above, including the Merger and the application of the proceeds of the Equity Contributions and the Merger Debt Financing, as the "Transactions."

**Ring-Fencing**

Upon the consummation of the Merger, EFH Corp. and Oncor implemented several measures, including certain measures required by the PUCT's Order on Rehearing in Docket No. 34077, that are referred to as "ring-fencing." Such measures included, among others, the following:

- the conversion of Oncor from a Texas corporation to a Delaware limited liability company;

- the inclusion of covenants in Oncor Holdings' and Oncor's limited liability company agreements intended to enhance the separation of Oncor Holdings and its subsidiaries, including Oncor, from Texas Holdings and its other subsidiaries, including EFIH;

- the establishment of boards of directors for Oncor Holdings and Oncor with a majority of members who meet the New York Stock Exchange requirements for independence in all material respects and whose unanimous consent is required to take certain material actions, including (i) to consolidate or merge (A) with EFH Corp. or any of EFH Corp.'s other subsidiaries or (B) with any other entity, if Oncor Holdings or Oncor, as applicable, would not be the surviving entity; (ii) to sell, transfer or dispose of all or substantially all of the assets of Oncor Holdings or Oncor, as applicable, without adequate provision for the payment of all of such entity's creditors; (iii) to institute, or consent to the institution of, bankruptcy or similar proceedings in respect of Oncor Holdings or Oncor, as applicable; or (iv) to the fullest extent permitted by law, to dissolve or liquidate Oncor Holdings or Oncor, as applicable, without adequate provision for the payment of all of such entity's creditors;

- the specific delegation to each of the board of directors and the independent directors of Oncor, each acting by majority vote, of the right to prevent distributions, if it or they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements;

- after the appointment of the initial independent directors, the delegation of the ability to nominate, appoint and fill vacancies in respect of the independent directors of Oncor Holdings and Oncor to a standing nominating committee of Oncor Holdings' board of directors, a majority of whose members are independent directors; and

- the incurrence of new debt, evidenced by the Oncor Revolving Credit Facility, the lenders of which will be specifically relying on the separateness of Oncor Holdings and Oncor, and their assets, from Texas Holdings and its other subsidiaries.

The ring-fencing measures were based on certain principles articulated by rating agencies and certain commitments made by Texas Holdings and Oncor to the PUCT and the FERC intended to further separate Oncor from Texas Holdings and its subsidiaries (including EFIH) and to mitigate Oncor's credit exposure to those entities and to reduce the risk that the assets and liabilities of Oncor Holdings or of any of its subsidiaries would be substantively consolidated with the assets and liabilities of Texas Holdings or of any of its other subsidiaries (including EFIH) in the event of a bankruptcy of one or more of those entities. A number of ring-fencing measures put in place were incorporated into the PUCT's Order on Rehearing in Docket No. 34077 that is legally binding on Oncor.

50

Confidential - Subject to CA
Mike Kunkel

EFH00027458

Confidential - Subject to CA
Mike Kunkel

None of the ring-fenced entities guarantees or otherwise holds out its credit as being available to support the obligations of EFH Corp., EFIH or any of their subsidiaries (other than the ring-fenced entities), including the notes offered hereby. In addition, lenders under TCEH's Senior Secured Credit Facilities and the holders of the Existing First Lien Notes, the Existing 2022 Second Lien Notes, the Existing 2021 Second Lien Notes, the 2017 Notes, the TCEH 2015/2016 Notes, the TCEH 2020 Notes and the TCEH 2021 Notes have acknowledged, and the future holders of such notes will acknowledge, by acceptance of such notes, the legal separateness of Oncor and its subsidiaries from the borrowers and guarantors under such financing documents. Lenders under TCEH's Senior Secured Credit Facilities and the holders of the Existing First Lien Notes, the Existing 2022 Second Lien Notes, the Existing 2021 Second Lien Notes, the 2017 Notes, the TCEH 2015/2016 Notes, the TCEH 2020 Notes and the TCEH 2021 Notes also agreed, and the future holders of such notes will agree, by acceptance of such notes, that they will not initiate any bankruptcy or similar proceeding against Oncor Holdings or its subsidiaries and that Oncor Holdings and its subsidiaries are entitled to enforce this non-petition covenant. In addition, holders of the notes, by acceptance of such notes, will acknowledge the legal separateness of Oncor and its subsidiaries from EFH Corp., the Issuer and EFCH under such financing documents. Holders of the notes, by acceptance of such notes, will also agree that they will not initiate any bankruptcy or similar proceeding against Oncor Holdings or its subsidiaries and that Oncor Holdings and its subsidiaries are entitled to enforce this non-petition covenant.

**Sale of Noncontrolling Interests in Oncor**

In November 2008, Oncor issued and sold additional equity interests to Texas Transmission for $1.254 billion in cash. At the closing of the sale, Oncor also offered and sold additional equity interests to Oncor Management Investment LLC, an entity owned by certain members of Oncor's management, for the same price per unit of equity interest paid by Texas Transmission. Accordingly, the equity issuances resulted in EFH Corp. and EFIH indirectly owning 80.04% (80.03% as of the date of this offering memorandum) of Oncor, certain members of Oncor management indirectly owning 0.21% (0.22% as of the date of this offering memorandum) of Oncor and Texas Transmission owning 19.75% of Oncor.

The investor rights agreement dated as of November 5, 2008, by and among Oncor, Oncor Holdings, Texas Transmission, EFH Corp. and any other persons that subsequently become a party thereto (the "Investor Rights Agreement") governs certain rights of certain members of Oncor and EFH Corp. arising out of their direct or indirect ownership of Oncor membership interests, including, without limitation, transfers of Oncor membership interests and restrictions thereon. Among other transfer restrictions, the Investor Rights Agreement provides that, prior to the earlier of the completion of a qualified initial public offering or seven years from the date of the Investor Rights Agreement, Texas Transmission may transfer its Oncor membership interests only to certain permitted transferees or with the prior approval of Oncor Holdings. Following such time period, Texas Transmission may transfer its Oncor membership interests under a registration statement or pursuant to applicable securities laws. The Investor Rights Agreement also grants Texas Transmission certain "tag-along" rights in relation to certain sales, transfers or pledges of Oncor membership interests by Oncor Holdings or indirectly by EFH Corp. or its subsidiaries. Subject to certain conditions, these "tag-along" rights allow Texas Transmission to transfer a pro-rata portion of its Oncor membership interests in the event of a transfer of Oncor membership interests by Oncor Holdings or indirectly by EFH Corp. or its subsidiaries on the same terms as Oncor Holdings, EFH Corp. or a subsidiary of EFH Corp. would receive for the Oncor membership interests. The agreement further provides that under certain offerings of equity securities occurring before an initial public offering of Oncor, Texas Transmission and Oncor Holdings will receive preemptive rights to purchase their pro-rata share of the equity securities to be sold pursuant to such offerings. The Investor Rights Agreement also provides EFH Corp. with a right of first refusal to purchase any Oncor membership interests to be sold in a permitted sale by Texas Transmission or its permitted transferees.

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027459

Confidential - Subject to CA
Mike Kunkel

Additionally, Texas Holdings, EFH Corp., certain of EFH Corp.'s subsidiaries and Oncor Holdings have certain "drag-along" rights in relation to offers from third-parties to purchase their directly or indirectly owned membership interests in Oncor, where the resulting sale would constitute a change of control of Oncor. These "drag-along" rights compel Texas Transmission and all other members of Oncor to sell or otherwise transfer their membership interests in Oncor on substantially the same terms as Texas Holdings, EFH Corp., the EFH Corp. subsidiary or Oncor Holdings (as applicable). Pursuant to the Investor Rights Agreement, all members of Oncor that have entered into such agreement must cooperate with Oncor in connection with an initial public offering of Oncor.

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027460

Confidential - Subject to CA
Mike Kunkel

## USE OF PROCEEDS

We will use $680 million of the net proceeds from this offering to pay the EFIH Dividend to EFH Corp. in or before January 2013. EFH Corp. will use the proceeds of the dividend to repay the balance of the TCEH Demand Notes. The balance of the TCEH Demand Notes outstanding as of June 30, 2012 was $680 million. Pending their application in or before January 2013, that portion of the net proceeds will be deposited in an escrow account. Holders of the notes will have no security interest in the escrow account. The remaining net proceeds will be used for general corporate purposes, which may include the payment of dividends to EFH Corp.

The TCEH Demand Notes, which are guaranteed on a senior unsecured basis by EFIH, bear interest at a rate based on the one-month LIBOR rate plus 5.00%.

53

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027461

Confidential - Subject to CA
Mike Kunkel

## CAPITALIZATION

The following table sets forth as of June 30, 2012 EFIH's cash and cash equivalents and the capitalization of EFIH:

(1) on an actual basis; and

(2) on an as adjusted basis to give effect to the offering of the notes hereby and the use of proceeds therefrom.

| | As of June 30, 2012 | |
| --- | --- | --- |
| | Actual | As Adjusted |
| | (millions of dollars) | |
| Cash and cash equivalents (a) | $  79 | $  283 |
| Debt (b): | | |
| EFIH 9.75% Senior Secured Notes due 2019 (c) | $  141 | $  141 |
| EFIH 10.000% Senior Secured Notes due 2020 (c) | 2,180 | 2,180 |
| EFIH 6.875% Senior Secured Notes due 2017 offered hereby (c) | — | 250 |
| EFIH 11% Senior Secured Second Lien Notes due 2021 (d) | 406 | 406 |
| EFIH 11.750% Senior Secured Second Lien Notes due 2022 (d) | 1,150 | 1,150 |
| EFIH 11.750% Senior Secured Second Lien Notes due 2022 offered hereby (d) | — | 600 |
| Unamortized (discount)/premium on EFIH 11.750% Senior Secured Second Lien Notes due 2022 | (11) | 3 |
| Subtotal debt issued by EFIH | 3,866 | 4,730 |
| EFH Corp. 10.875% Senior Notes due 2017 (e)(f) | 98 | 98 |
| EFH Corp. 11.250%/12.000% Senior Toggle Notes due 2017 (e)(f) | 232 | 232 |
| EFH Corp. 9.75% Senior Secured Notes due 2019 (c)(f) | 57 | 57 |
| EFH Corp. 10.000% Senior Secured Notes due 2020 (c)(f)(g) | 331 | 331 |
| Unamortized premium on pushed down debt | 3 | 3 |
| Subtotal pushed down debt (f) | 721 | 721 |
| Total consolidated debt (b)(h) | 4,587 | 5,451 |
| Total membership interest (i) | 5,144 | 4,464 |
| Total capitalization | $9,731 | $9,915 |

(a)   As adjusted cash and cash equivalents reflects the estimated net proceeds from the issuance of the notes, including payments to be received for accrued interest on the new second lien notes from February 6, 2012, after the payment of the EFIH Dividend to EFH Corp. (the proceeds of which will be used by EFH Corp. to repay the balance of the TCEH Demand Notes).

(b)   This table includes only a portion of the debt of EFH Corp. that is guaranteed by EFIH. See "Summary—Debt Issued or Guaranteed by EFIH".

(c)   These notes or EFIH's guarantees thereof, as applicable, are secured by the Collateral on a first-priority basis.

(d)   These notes are secured by the Collateral on a second-priority basis.

(e)   EFIH's guarantees of these notes are on a senior unsecured basis.

(f)   Represents 50% of the principal amount of certain EFH Corp. debt guaranteed by EFIH (pushed-down debt), as discussed in Note 4 to EFIH and its subsidiaries' historical condensed consolidated financial statements included in our June 30, 2012 Form 10-Q, which is incorporated by reference into this offering memorandum.

(g)   $400 million principal amount of these notes is not subject to push-down accounting and therefore not included in the 50% push down calculation.

(h)   Does not include an additional $1.118 billion principal amount of EFH Corp. debt held by third parties that is guaranteed by EFIH and not reflected on (pushed down to) our balance sheet as additional long-term debt or an additional $680 million of TCEH Demand Notes that are guaranteed on a senior unsecured basis by EFIH and will be repaid by EFH Corp. using proceeds from the EFIH Dividend. See "Use of Proceeds."

(i)   As adjusted total membership interest reflects our payment of the EFIH Dividend (the proceeds of which will be used by EFH Corp. to repay the balance of the TCEH Demand Notes).

54

Confidential - Subject to CA
Mike Kunkel

EFH00027462

Confidential - Subject to CA
Mike Kunkel

## DESCRIPTION OF THE FIRST LIEN NOTES

**General**

Certain terms used in this "Description of the First Lien Notes" are defined under the subheading "Certain Definitions." In this "Description of the First Lien Notes," (i) the terms "*we*," "*our*" and "*us*" each refer to Energy Future Intermediate Holding Company LLC ("*EFIH*") and its consolidated Subsidiaries; and (ii) the term "*Issuer*" refers to EFIH and EFIH Finance Inc. ("*EFIH Finance*"), a Delaware corporation and a direct, wholly-owned subsidiary of EFIH, collectively, and not to any of EFIH's other Subsidiaries.

The Issuer will issue $250 million aggregate principal amount of 6.875% senior secured notes due 2017 (the "*Notes*") under an Indenture to be dated as of the Issue Date (the "*Indenture*") between the Issuer and The Bank of New York Mellon Trust Company, N.A., as trustee (the "*Trustee*"). The Notes will be issued a private transaction that is not subject to the registration requirements of the Securities Act. See "Notice to Investors." The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act.

Concurrently with the issuance of the Notes in this offering, the Issuer will issue $600 million aggregate principal amount of additional 11.750% Senior Secured Second Lien Notes due 2022 (the "*New EFIH Second Lien Notes*"). The principal terms of the New EFIH Second Lien Notes are described under "Description of the Second Lien Notes."

As more particularly described under "The Transactions—Ring-Fencing," upon the consummation of the Merger in 2007, Oncor Electric Delivery Company LLC ("*Oncor Electric Delivery*") undertook certain ring-fencing measures to separate itself, its subsidiaries and its immediate parent, Oncor Electric Delivery Holdings Company LLC ("*Oncor Holdings*"), from Energy Future Holdings Corp. ("*EFH Corp.*"), the parent of EFIH, and EFH Corp.'s other Affiliates, including the Issuer. Those measures include the Oncor Subsidiaries being treated as "Unrestricted Subsidiaries" with respect to the EFH Corp. 2017 Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, in each case guaranteed by EFIH and Energy Future Competitive Holdings Company ("*EFCH*") and the EFIH 9.75% Notes, the EFIH 10.000% Notes, the EFIH 11% Notes and the EFIH 11.750% Notes. In order to comply with these ring-fencing obligations, the Oncor Subsidiaries will also be Unrestricted Subsidiaries with respect to the Notes. As Unrestricted Subsidiaries, the Oncor Subsidiaries will not be subject to any of the covenants described herein and will not guarantee the Notes.

The Holders of the Notes, by accepting the Notes, will acknowledge (i) the legal separateness of the Issuer from the Oncor Subsidiaries, (ii) that the lenders under the Oncor Electric Delivery Facility and the holders of Oncor Electric Delivery's existing debt instruments have likely advanced funds thereunder in reliance upon the separateness of the Oncor Subsidiaries from the Issuer, (iii) that the Oncor Subsidiaries have assets and liabilities that are separate from those of the Issuer and EFIH's other Subsidiaries, (iv) that the obligations owing under the Notes are obligations and liabilities of the Issuer only, and are not the obligations or liabilities of any Oncor Subsidiary, (v) that the Holders of the Notes shall look solely to the Issuer and its assets, and not to any assets, or to the pledge of any assets, owned by any Oncor Subsidiary, for the repayment of any amounts payable pursuant to the Notes and for satisfaction of any other obligations owing to the Holders under the Indenture, the Registration Rights Agreement and any related documents and (vi) that none of the Oncor Subsidiaries shall be personally liable to the Holders of the Notes for any amounts payable, or any other obligation, under the Indenture, the Registration Rights Agreement or any related documents.

The Holders of the Notes, by accepting the Notes, will acknowledge and agree that the Holders of the Notes shall not (i) initiate any legal proceeding to procure the appointment of an administrative receiver or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like

55

Confidential - Subject to CA
Mike Kunkel

Confidential - Subject to CA
Mike Kunkel

proceeding under applicable law, against any Oncor Subsidiary, or against any of the Oncor Subsidiaries' assets. The Holders further acknowledge and agree that each of the Oncor Subsidiaries is a third party beneficiary of the forgoing covenant and shall have the right to specifically enforce such covenant in any proceeding at law or in equity. The foregoing acknowledgements and agreements are contained in the Indenture.

The following description is only a summary of the material provisions of the Indenture and the Security Documents, does not purport to be complete and is qualified in its entirety by reference to the provisions of the Indenture and the Security Documents, including the definitions therein of certain terms used below. We urge you to read the Indenture and the Security Documents because they, and not this description, will define your rights as Holders of the Notes. You may request copies of the Indenture and the Security Documents at our address set forth under the heading "Available Information."

### No Restricted Subsidiaries

EFIH is a holding company for its Subsidiaries, including EFIH Finance, with no material operations of its own and only limited assets. EFIH does not have any Restricted Subsidiaries (other than EFIH Finance). As of the date of this offering memorandum, the only Subsidiaries of EFIH consist of the Oncor Subsidiaries, which are Unrestricted Subsidiaries, and EFIH Finance, which does not have any Subsidiaries or assets. Accordingly, none of EFIH's Subsidiaries (other than EFIH Finance) will be subject to the restrictive covenants described herein and none of such Subsidiaries will guarantee the Notes.

### Brief Description of Notes

The Notes will be:

- senior obligations of the Issuer and will rank equally in right of payment with all existing and future Senior Indebtedness of the Issuer (including EFIH's guarantees of certain of EFH Corp.'s Indebtedness, including the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes and the EFH Corp. 2017 Notes);

- secured, equally and ratably with the EFIH 9.75% Notes and EFIH 10.000% Notes and EFIH's guarantee of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, by the pledge of all of the membership interests and other investments EFIH owns in any Oncor Subsidiary (which is referred to as the "*Collateral*," as more fully described below under "—Security for the Notes"), which consist of all of the membership interests EFIH owns in Oncor Holdings;

- effectively senior to all existing and future unsecured Indebtedness of EFIH and all existing and future Junior Lien Debt (including the EFIH 11% Notes and the EFIH 11.750% Notes), to the extent of the value of the Collateral;

- effectively subordinated to any existing and future Indebtedness of EFIH secured by assets of EFIH other than the Collateral, to the extent of the value of the assets securing such Indebtedness;

- structurally subordinated to all existing and future Indebtedness and other liabilities of the Subsidiaries of EFIH (other than EFIH Finance), including the Oncor Subsidiaries, any of EFIH's Foreign Subsidiaries and any other Unrestricted Subsidiaries;

- senior in right of payment to any future Subordinated Indebtedness of the Issuer; and

- subject to registration with the SEC to the extent required by the Registration Rights Agreement.

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

Confidential - Subject to CA
Mike Kunkel

See "Risk Factors—Risks Related to the Notes and Our Substantial Debt—If a court were to find that EFIH was insolvent before or after giving effect to this offering and did not receive reasonably equivalent value or fair consideration for the issuance of the notes or the pledge of the Collateral, as applicable, the court may void all or a portion of the obligations represented by the notes or the pledge of the Collateral as a fraudulent conveyance."

**Holding Company Structure**

EFIH is a holding company for its Subsidiaries, including EFIH Finance, with no material operations of its own and only limited assets. Accordingly, EFIH is dependent upon the distribution of the earnings of its Subsidiaries, whether in the form of dividends, advances or payments on account of intercompany obligations, payments of interest and principal on EFH Corp. and TCEH debt held as an investment by EFIH, and investments into, or loans to EFIH by its parent company, EFH Corp., to service its debt obligations. EFH Corp. is itself a holding company, and will primarily be dependent upon the distribution of the earnings of its other Subsidiaries (including TCEH and its Subsidiaries), whether in the form of dividends, advances or payments on account of intercompany obligations, and investments into EFH Corp. by its parent company, Texas Energy Future Holdings Limited Partnership, to make such Investments in EFIH. See "Risk Factors—Risks Related to Structure—EFIH is a holding company and its obligations are structurally subordinated to existing and future liabilities and preferred stock of its subsidiaries."

There will be no initial guarantees of the Notes. Therefore, the Notes will be structurally subordinated to all Indebtedness and other liabilities of all the Subsidiaries of EFIH (other than EFIH Finance). In the event of a bankruptcy, liquidation or reorganization of any of EFIH's Subsidiaries (other than EFIH Finance), such Subsidiaries will pay the holders of their debt and their trade creditors before they will be able to distribute any of their assets to EFIH. For the year ended December 31, 2011 and the six months ended June 30, 2012, EFIH's Subsidiaries generated a significant amount of EFIH's reported consolidated net income. In addition, at December 31, 2011 and at June 30, 2012, EFIH's investment in its Subsidiaries (other than EFIH Finance) represented approximately 60% and 58%, respectively, of its reported total assets and investments in EFH Corp. debt (the substantial majority of which is guaranteed by EFIH) and TCEH debt represented substantially all of the remainder of its reported total assets.

**Paying Agent and Registrar for the Notes**

The Issuer will maintain one or more paying agents for the Notes. The initial paying agent for the Notes will be the Trustee at its offices in Houston, Texas.

The Issuer will also maintain a registrar. The initial registrar will be the Trustee at its offices in Houston, Texas. The registrar will maintain a register reflecting ownership of the Notes outstanding from time to time and will make payments on and facilitate transfer of Notes on behalf of the Issuer.

The Issuer may change the paying agents or the registrars without prior notice to the Holders. The Issuer or any of its Subsidiaries may act as a paying agent or registrar.

**Transfer and Exchange**

A Holder may transfer or exchange Notes in accordance with the Indenture. The registrar and the Trustee may require a Holder to furnish appropriate endorsements and transfer documents in connection with a transfer of Notes. Holders will be required to pay all taxes due on transfer. The Issuer will not be required to transfer or exchange any Note selected for redemption. Also, the Issuer will not be required to transfer or exchange any Note for a period of 15 days before a selection of Notes to be redeemed.

57

Confidential - Subject to CA
Mike Kunkel

EFH00027465

Confidential - Subject to CA
Mike Kunkel

**Principal, Maturity and Interest**

The Issuer will issue $250 million in aggregate principal amount of Notes in this offering. The Notes will mature on August 15, 2017. Subject to compliance with the covenants described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "—Certain Covenants—Limitation on Liens," the Issuer may issue additional Notes from time to time after the Issue Date under the Indenture (any such Notes, the "*Additional Notes*"). Subject to compliance with those covenants, the Issuer may also issue additional debt securities that constitute Required Debt under the Indenture. As a result, Holders of the Notes, any Additional Notes issued under the Indenture and any additional series of debt securities designated as Required Debt will not have separate rights to, among other things, give notice of Defaults or to direct the Trustee to exercise remedies during an Event of Default or otherwise, except as otherwise described in this "Description of the First Lien Notes." Except as otherwise described in this "Description of the First Lien Notes," the Notes, any Additional Notes and any other series of debt securities constituting Required Debt under the Indenture will be treated as a single class for all purposes under the Indenture, including waivers, amendments and offers to purchase. Unless the context requires otherwise, references to "Notes" for all purposes of the Indenture and this "Description of the First Lien Notes" include any Additional Notes that are actually issued.

Interest on the Notes will accrue at the rate of 6.875% per annum and will be payable semi-annually in arrears on each February 15 and August 15, commencing on February 15, 2013, to the Holders of record on the immediately preceding February 1 and August 1. Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including the Issue Date. Interest on the Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months.

Principal of, premium, if any, and interest on the Notes will be payable at the office or agency of the Issuer maintained for such purpose within the City of Houston and State of Texas or, at the option of the Issuer, payment of interest may be made by check mailed to the Holders of the Notes at their respective addresses set forth in the register of Holders; *provided* that all payments of principal, premium, if any, and interest with respect to the Notes represented by one or more global notes registered in the name of or held by DTC or its nominee will be made by wire transfer of immediately available funds to the accounts specified by the Holder or Holders thereof. Until otherwise designated by the Issuer, the Issuer's office or agency in Houston, Texas will be the office of the Trustee maintained for such purpose.

**Additional Interest**

Additional Interest may accrue on the Notes in certain circumstances pursuant to the Registration Rights Agreement. All references in the Indenture, in any context, to any interest or other amount payable on or with respect to the Notes will be deemed to include any Additional Interest pursuant to the Registration Rights Agreement.

**Mandatory Redemption; Offers to Purchase; Open Market Purchases**

The Issuer will not be required to make any mandatory redemption or sinking fund payments with respect to the Notes. However, under certain circumstances, the Issuer may be required to offer to purchase Notes as described under "—Repurchase at the Option of Holders." The Issuer may at any time and from time to time purchase Notes in the open market or otherwise.

**Optional Redemption**

Except as set forth below, the Issuer will not be entitled to redeem Notes at its option prior to February 15, 2015.

58

Confidential - Subject to CA
Mike Kunkel

Confidential - Subject to CA
Mike Kunkel

At any time prior to February 15, 2015, the Issuer may redeem the Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Notes to be redeemed or otherwise delivered in accordance with the procedures of DTC, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest and Additional Interest, if any to, the date of redemption (the "*Redemption Date*"), subject to the rights of Holders of Notes on the relevant record date to receive interest due on the relevant interest payment date.

On and after February 15, 2015, the Issuer may redeem the Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Notes to be redeemed or otherwise delivered in accordance with the procedures of DTC, at the redemption prices (expressed as percentages of principal amount of the Notes to be redeemed) set forth below, plus accrued and unpaid interest and Additional Interest, if any, to the applicable Redemption Date, subject to the right of Holders of Notes of record on the relevant record date to receive interest due on the relevant interest payment date, if redeemed during the twelve-month period beginning on February 15 of each of the years indicated below:

| Year | Percentage |
|------|-----------|
| 2015 | 103.438% |
| 2016 | 101.719% |
| 2017 | 100.000% |

In addition, until February 15, 2015, the Issuer may, at its option, on one or more occasions redeem up to 35% of the aggregate principal amount of Notes at a redemption price equal to 106.875% of the aggregate principal amount thereof, plus accrued and unpaid interest and Additional Interest, if any, to the applicable Redemption Date, subject to the right of Holders of Notes to be redeemed of record on the relevant record date to receive interest due on the relevant interest payment date, with the net cash proceeds of one or more Equity Offerings; *provided* that at least 50% of the sum of the original aggregate principal amount of Notes issued under the Indenture and the original principal amount of any Additional Notes issued under the Indenture after the Issue Date remains outstanding immediately after the occurrence of each such redemption; and *provided, further* that each such redemption occurs within 90 days of the date of closing of each such Equity Offering.

Any notice of any redemption may be given prior to the redemption thereof, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of an Equity Offering or other corporate transaction.

If the Issuer redeems less than all of the outstanding Notes, the Trustee shall select the Notes to be redeemed in the manner described under "—Repurchase at the Option of Holders—Selection and Notice."

## Security for the Notes

### *Collateral Trustee*

EFIH has appointed The Bank of New York Mellon Trust Company, N.A. to serve as the collateral trustee (the "*Collateral Trustee*") for the benefit of the holders of the Secured Debt Obligations outstanding from time to time.

The Security Documents provide that the Collateral Trustee will be subject to such directions as may be given it by the Trustee and by any other Parity Lien Debt Representatives from time to time as required or permitted by the Indenture and the other Parity Lien Debt Documents. The relative rights

59

Confidential - Subject to CA
Mike Kunkel

Confidential - Subject to CA
Mike Kunkel

with respect to control of the Collateral Trustee are specified in the collateral trust agreement dated as of November 16, 2009 by and among EFIH, the trustees for the EFIH 9.75% Notes, the EFIH 10.000% Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, any other Parity Lien Debt Representatives, any Junior Lien Representatives and the Collateral Trustee (the "*Collateral Trust Agreement*"). On the Issue Date, the Collateral Trustee and the Trustee for the benefit of the Notes will enter into a Collateral Trust Joinder (as defined in the Collateral Trust Agreement) to the Collateral Trust Agreement (the "*Joinder*") and the Notes will be designated as "*Parity Lien Debt*" pursuant to an Additional Secured Debt Designation as defined in and as required by the Collateral Trust Agreement (the "*Designation*"). Except as provided in the Collateral Trust Agreement or as directed by an Act of Required Debtholders, the Collateral Trustee will not be obligated:

(1) to act upon directions purported to be delivered to it by any other Person;

(2) to foreclose upon or otherwise enforce any Lien; or

(3) to take any other action whatsoever with regard to any or all of the Security Documents, the Liens created thereby or the Collateral.

### Collateral

The Indenture will provide and the Security Documents provide that all Note Obligations of EFIH, together with any other Parity Lien Debt (which on the Issue Date will include the EFIH 9.75% Notes and EFIH 10.000% Notes and EFIH's guarantee of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes), will be secured on an equal and ratable basis by first-priority security interests granted to the Collateral Trustee, in all of the following property of EFIH:

(1) any Equity Interests it owns as of the Issue Date or may thereafter acquire in any Oncor Subsidiary and any promissory notes or other Indebtedness owed by, or other Investments in, any Oncor Subsidiary that it owns as of the Issue Date or it may thereafter acquire;

(2) all proceeds of, income and other payments (including, without limitation, dividends and distributions received) now or hereafter due and payable with respect to, and supporting obligations relating to, any and all of the foregoing, which, in the case of cash dividends and distributions received by EFIH from Oncor Holdings may be used by EFIH for any purpose not prohibited by the Indenture so long as no Event of Default and no event of default under any other Parity Lien Debt, including the EFIH 9.75% Notes and the EFIH 10.000% Notes and EFIH's guarantee of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, shall have occurred and be continuing; and

(3) any Asset Sale Cash Collateral Account established pursuant to the Indenture, the EFIH 9.75% Notes Indenture, the EFIH 10.000% Notes Indenture, the EFH Corp. 10.000% Notes Indenture or the EFH Corp. 9.75% Notes Indenture.

On the Issue Date, the Collateral will consist of a pledge of all of the membership interests EFIH owns in Oncor Holdings. Oncor Holdings owns approximately 80% of Oncor Electric Delivery's outstanding membership interests. On November 16, 2009, EFIH and the Collateral Trustee entered into a pledge agreement (the "*Pledge Agreement*"), whereby the Collateral was pledged in favor of the Collateral Trustee for the benefit of the Collateral Trustee, the trustee for, and the holders of, the EFIH 9.75% Notes and the EFH Corp. 9.75% Notes and any other Secured Debt Obligations that may be issued in accordance with the EFIH 9.75% Notes Indenture and the EFH Corp. 9.75% Notes Indenture (including the Notes, the EFIH 10.000% Notes and the EFH Corp. 10.000% Notes). As a result of the Joinder and the Designation, the Trustee and the holders of the Notes issued in this offering will benefit from the pledge of Collateral under the Pledge Agreement. The Collateral does not consist of any assets of any Oncor Subsidiary. See "Risk Factors—Risks Related to the Notes and Our Substantial Debt—The notes will be secured only to the extent of the value of the assets that have been granted

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027468

Confidential - Subject to CA
Mike Kunkel

as security for the notes. The fair market value of the Collateral upon any foreclosure may not be sufficient to repay the holders of the first lien notes. After payment in full of all obligations secured by first-priority liens on the Collateral, there may be insufficient proceeds to satisfy amounts owed under the second lien notes"; "—Regulatory approvals may be required in order to enforce the security interests in the Collateral and to dispose of an interest in, or operational control of, the Collateral securing the notes"; "—In the event of the Issuer's bankruptcy, the ability to realize upon the Collateral securing notes will be subject to certain bankruptcy law limitations"; and "—Noteholders' interests in the Collateral may be further subordinated or diluted if we incur additional debt that is secured on a senior or junior basis by the Collateral securing the notes."

No appraisal of the value of the Collateral was made in connection with the issuance of the EFIH 9.75% Notes, the EFIH 10.000% Notes, the EFIH 11% Notes, the EFIH 11.750% Notes, the EFH Corp. 9.75% Notes or the EFH Corp. 10.000% Notes, and no such appraisal will be made in connection with the issuance of the Notes. The value of the Collateral in the event of liquidation will depend on many factors. Consequently, liquidating the Collateral may not produce proceeds in an amount sufficient to pay any amounts due on the Secured Debt Obligations, including the Notes.

The fair market value of the Collateral is subject to fluctuations based on factors that include, among others, the ability to sell the Collateral in an orderly sale, general economic conditions, the availability of buyers and similar factors. The amount to be received upon a sale of the Collateral would be dependent on numerous factors, including but not limited to the actual fair market value of the Collateral at such time and the timing and the manner of the sale. By its nature, the Collateral may be illiquid and may have no readily ascertainable market value. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, we cannot assure you that the proceeds from any sale or liquidation of the Collateral will be sufficient to pay the Parity Lien Obligations, including the Note Obligations. Any claim for the difference between the amount, if any, realized by Holders of the Notes from the sale of Collateral securing the Secured Debt Obligations will rank equally in right of payment with all of our other unsecured unsubordinated Indebtedness and other obligations, including trade payables.

So long as no Event of Default and no event of default under any other Parity Lien Debt, including the EFIH 9.75% Notes, the EFIH 10.000% Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, shall have occurred and be continuing, and subject to certain terms and conditions, EFIH will be entitled to exercise any voting and other consensual rights pertaining to the Collateral (other than as set forth in the Pledge Agreement and the other Security Documents). The Pledge Agreement requires EFIH to deliver to the Collateral Trustee, for the Collateral Trustee to maintain in its possession, certificates, if any, evidencing the Collateral. Upon the occurrence and during the continuance of an Event of Default under the Notes, to the extent permitted by law and subject to the provisions of the Pledge Agreement, all of the rights of EFIH to exercise voting or other consensual rights with respect to the Collateral will cease, and all such rights will become vested in the Collateral Trustee, which, to the extent permitted by law, will have the sole right to exercise such voting and other consensual rights.

### *Certain Bankruptcy Limitations*

The right of the Collateral Trustee to repossess and dispose of the Collateral upon the occurrence of an Event of Default would be significantly impaired by applicable bankruptcy law in the event that a bankruptcy case were to be commenced by or against EFIH prior to the Collateral Trustee having repossessed and disposed of the Collateral. Upon the commencement of a case for relief under Title 11 of the United States Code, as amended (the "*Bankruptcy Code*"), a secured creditor such as the Collateral Trustee is prohibited from repossessing its security from a debtor in a bankruptcy case, or from disposing of security repossessed from the debtor, without bankruptcy court approval.

61

Confidential - Subject to CA
Mike Kunkel

EFH00027469

Confidential - Subject to CA
Mike Kunkel

In view of the broad equitable powers of a U.S. bankruptcy court, it is impossible to predict how long payments under the Notes could be delayed following commencement of a bankruptcy case, whether or when the Collateral Trustee could repossess or dispose of the Collateral, the value of the Collateral at the time of the bankruptcy petition or whether or to what extent Holders of the Notes would be compensated for any delay in payment or loss of value of the Collateral. The Bankruptcy Code permits only the payment and/or accrual of post-petition interest, costs and attorneys' fees to a secured creditor during a debtor's bankruptcy case to the extent the value of the Collateral is determined by the bankruptcy court to exceed the aggregate outstanding principal amount at maturity of the obligations secured by the Collateral. There can be no assurance that the value of the Collateral will exceed the outstanding principal amount of the Notes and the other Parity Lien Debt, including the EFIH 9.75% Notes, the EFIH 10.000% Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes.

Furthermore, in the event a bankruptcy court determines that the value of the Collateral is not sufficient to repay all amounts due on the Notes and the other Parity Lien Obligations, including the EFIH 9.75% Notes and the EFIH 10.000% Notes and EFIH's guarantee of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, the Holders of the Notes and the holders of the other Parity Lien Debt would hold secured claims to the extent of the value of the Collateral to which the Holders of the Notes and the holders of the other Parity Lien Debt are entitled, and unsecured claims with respect to any such shortfall.

### Additional Parity Lien Debt

As of the date of this offering memorandum, $3,497,286,000 aggregate principal amount of Parity Lien Debt was outstanding, including $141,083,000 aggregate principal amount of EFIH 9.75% Notes, $115,446,000 aggregate principal amount of EFH Corp. 9.75% Notes, $1,060,757,000 aggregate principal amount of EFH Corp. 10.000% Notes and $2,180,000,000 aggregate principal amount of EFIH 10.000% Notes, all of which is secured by the Collateral on an equal and ratable basis with the Notes. In addition, the Indenture will provide and the Security Documents provide that the Issuer may incur additional Parity Lien Debt as permitted by the covenants described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "—Certain Covenants—Limitation on Liens," by issuing Additional Notes under the Indenture or under one or more additional indentures or incurring other Indebtedness secured by Parity Liens on the Collateral. All additional Parity Lien Debt will be secured equally and ratably with the Notes by Liens on the Collateral held by the Collateral Trustee for as long as EFIH's Note Obligations are secured by the Collateral. The Collateral Trustee under the Collateral Trust Agreement will hold all Parity Liens in trust for the benefit of the Holders of the Notes and the holders of the other Parity Lien Debt and the holders of any future Parity Lien Debt and all other Parity Lien Obligations. Additional Parity Lien Debt will be permitted to be secured by the Collateral only if such Parity Lien Debt and the related Parity Liens are permitted to be incurred under the covenants described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "—Certain Covenants—Limitation on Liens." The agent or representative of any additional Parity Lien Debt will become a party to the Collateral Trust Agreement by joinder agreement.

### Additional Junior Lien Debt

As of the date of this offering memorandum, $1,555,392,000 aggregate principal amount of Junior Lien Debt was outstanding (including the EFIH 11% Notes and the EFIH 11.750% Notes). On the Issue Date, EFIH will issue additional 11.750% Senior Secured Second Lien Notes, which will also be secured by the Collateral on a junior basis to the Notes. In addition, the Indenture will provide and the Security Documents provide that the Issuer may incur additional Junior Lien Debt in the future by issuing or guaranteeing debt securities under one or more additional indentures, incurring

62

Confidential - Subject to CA
Mike Kunkel

EFH00027470

Confidential - Subject to CA
Mike Kunkel

Indebtedness under Credit Facilities or otherwise issuing or increasing a new Series of Secured Lien Debt secured by Junior Liens on the Collateral. Junior Lien Debt will be permitted to be secured by the Collateral only if such Junior Lien Debt and the related Junior Liens are permitted to be incurred under the covenants described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "—Certain Covenants—Limitation on Liens." The Collateral Trustee under the Collateral Trust Agreement will hold all Junior Liens in trust for the benefit of the holders of any future Junior Lien Debt and all other Junior Lien Obligations. The agent or representative of any additional Junior Lien Obligations will become a party to the Collateral Trust Agreement by joinder agreement.

### Enforcement of Liens

If the Collateral Trustee at any time receives written notice stating that any event has occurred that constitutes a default under any Secured Debt Document entitling the Collateral Trustee to foreclose upon, collect or otherwise enforce its Liens thereunder, it will promptly deliver written notice thereof to each Secured Debt Representative. Thereafter, the Collateral Trustee will await direction by an Act of Required Debtholders and will act, or decline to act, as directed by an Act of Required Debtholders, in the exercise and enforcement of the Collateral Trustee's interests, rights, powers and remedies in respect of the Collateral or under the Security Documents or applicable law and, following the initiation of such exercise of remedies, the Collateral Trustee will act, or decline to act, with respect to the manner of such exercise of remedies as directed by an Act of Required Debtholders. Unless it has been directed to the contrary by an Act of Required Debtholders, the Collateral Trustee in any event may (but will not be obligated to) take or refrain from taking such action with respect to any default under any Secured Debt Document as it may deem advisable to preserve and protect the value of the Collateral.

Until the Discharge of Parity Lien Obligations, the Holders of the Notes and the holders of other Parity Lien Obligations will have, subject to the exceptions set forth below in clauses (1) through (4), the exclusive right to authorize and direct the Collateral Trustee with respect to the Security Documents and the Collateral (including, without limitation, the exclusive right to authorize or direct the Collateral Trustee to enforce, collect or realize on any Collateral or exercise any other right or remedy with respect to the Collateral) and neither the provisions of the Security Documents relating thereto (other than in accordance with the Collateral Trust Agreement) nor any Junior Lien Representative or holder of Junior Lien Obligations, if any, may authorize or direct the Collateral Trustee with respect to such matters. Notwithstanding the foregoing, the holders of Junior Lien Obligations may direct the Collateral Trustee with respect to such matters:

(1) without any condition or restriction whatsoever, at any time after the Discharge of Parity Lien Obligations;

(2) to deliver any notice or demand necessary to enforce (subject to the prior Discharge of Parity Lien Obligations) any right to claim, take or receive proceeds of Collateral remaining after the Discharge of Parity Lien Obligations;

(3) as necessary to perfect or establish the priority (subject to Parity Liens) of the Junior Liens upon any Collateral; *provided* that, unless otherwise agreed to by the Collateral Trustee in the Security Documents, the holders of Junior Lien Obligations may not require the Collateral Trustee to take any action to perfect any Collateral through possession or control (other than the Collateral Trustee as agent for the benefit of the Parity Lien Representative and holders of Parity Lien Obligations agreeing pursuant to the Collateral Trust Agreement to act as bailee for the Collateral Trustee as agent for the benefit of the Junior Lien Representatives and holders of the Junior Lien Obligations); or

(4) as necessary to create, prove, preserve or protect (but not enforce) the Junior Liens upon any Collateral.

63

Confidential - Subject to CA
Mike Kunkel

EFH00027471

Confidential - Subject to CA
Mike Kunkel

Both before and during an insolvency or liquidation proceeding until the Discharge of Parity Lien Obligations, none of the holders of Junior Lien Obligations, the Collateral Trustee (unless acting pursuant to an Act of Required Debtholders) or any Junior Lien Representative will be permitted to:

(1) request judicial relief, in an insolvency or liquidation proceeding or in any other court, that would hinder, delay, limit or prohibit the lawful exercise or enforcement of any right or remedy otherwise available to the holders of Parity Lien Obligations in respect of the Parity Liens or that would limit, invalidate, avoid or set aside any Parity Lien or subordinate the Parity Liens to the Junior Liens or grant the Junior Liens equal ranking to the Parity Liens;

(2) oppose or otherwise contest any motion for (A) relief from the automatic stay or (B) any injunction against foreclosure or (C) any enforcement of Parity Liens, in each case made by any holder of Parity Lien Obligations or any Parity Lien Representative in any insolvency or liquidation proceeding;

(3) oppose or otherwise contest any lawful exercise by any holder of Parity Lien Obligations or any Parity Lien Representative of the right to credit bid Parity Lien Obligations at any sale of Collateral in the foreclosure of Parity Liens;

(4) oppose or otherwise contest any other request for judicial relief made in any court by any holder of Parity Lien Obligations or any Parity Lien Representative relating to the lawful enforcement of any Parity Lien; or

(5) challenge the validity, enforceability, perfection or priority of the Parity Liens with respect to the Collateral.

Notwithstanding the foregoing, both before and during an insolvency or liquidation proceeding, the holders of Junior Lien Obligations or Junior Lien Representatives may take any actions and exercise any and all rights that would be available to a holder of unsecured claims, including, without limitation, the commencement of an insolvency or liquidation proceeding against EFIH in accordance with applicable law; *provided* the Collateral Trust Agreement provides that no holder of Junior Lien Obligations or Junior Lien Representative will be permitted to take any of the actions prohibited by clauses (1) through (5) of the preceding paragraph or oppose or contest any order that it has agreed not to oppose or contest under the provisions described under "—Insolvency or Liquidation Proceedings."

At any time prior to the Discharge of Parity Lien Obligations and after (1) the commencement of any insolvency or liquidation proceeding in respect of EFIH or (2) the Collateral Trustee and each Junior Lien Representative have received written notice from any Parity Lien Representative stating that (A) any Series of Parity Lien Debt has become due and payable in full (whether at maturity, upon acceleration or otherwise) or (B) the holders of Parity Liens securing one or more Series of Parity Lien Debt have become entitled under any Parity Lien Document to and desire to enforce any or all of the Parity Liens by reason of a default under such Parity Lien Documents, no payment of money (or the equivalent of money) will be made from the proceeds of Collateral by EFIH to the Collateral Trustee (other than distributions to the Collateral Trustee in respect of its fees under the Collateral Trust Agreement and for the benefit of the holders of Parity Lien Obligations), any Junior Lien Representative or any holder of Junior Lien Obligations (including, without limitation, payments and prepayments made for application to Junior Lien Obligations).

All proceeds of Collateral received by any Junior Lien Representative or any holder of Junior Lien Obligations in violation of the immediately preceding paragraph will be held by such Person in trust for the account of the holders of Parity Lien Obligations and remitted to any Parity Lien Representative upon demand by such Parity Lien Representative. The Junior Liens will remain attached to and, subject to the provisions described under "—Provisions of the Indenture Relating to Security—Ranking

Confidential - Subject to CA
Mike Kunkel

EFH00027472

Confidential - Subject to CA
Mike Kunkel

of Parity Liens," enforceable against all proceeds so held or remitted. All proceeds of Collateral received by any Junior Lien Representative or any holder of Junior Lien Obligations not in violation of the immediately preceding paragraph will be received by such Person free from the Parity Liens.

Pursuant to the Public Utility Regulatory Act ("*PURA*"), Texas Utilities Code §§39.262(l) and 39.915 and, through October 10, 2012, to the Order on Rehearing in PUCT Docket No. 34077, the PUCT must approve any change in majority ownership, controlling ownership or operational control of Oncor Electric Delivery. As a result, prior to any foreclosure on the Collateral consisting of membership interests in Oncor Holdings, approval of the PUCT will be required if such foreclosure consists of a change in majority ownership or control of Oncor Holdings. Pursuant to PURA §§39.262(m) and 39.915(b), the PUCT will approve such a transfer if it finds that the transaction is in the public interest. In making its determination, these sections of PURA provide that the PUCT will consider whether the transaction will adversely affect the reliability of service, availability of service or cost of service of Oncor Electric Delivery. We cannot assure you that such approval will be granted and, if it is not granted, the Collateral Trustee may not be able to liquidate the Collateral consisting of membership interests and, accordingly, the Collateral Trustee may not be able to distribute any proceeds to Holders of the Notes upon such foreclosure. If the approval is granted, then PUCT approval would also be required with respect to any subsequent disposition of a majority or controlling interest in the membership interests of Oncor Holdings.

In addition, pursuant to the terms of an investor rights agreement among EFH Corp., Oncor Holdings, Oncor Electric Delivery and the minority investor in Oncor Electric Delivery, a transfer of the Equity Interests in Oncor Holdings to a third party, including as a result of any enforcement of the Lien on the Collateral consisting of Equity Interests of Oncor Holdings or Oncor Electric Delivery, may give rise to a tag-along right of the minority investor(s) in Oncor Electric Delivery to participate in that transfer on a pro rata basis.

### *Waiver of Right of Marshalling*

The Collateral Trust Agreement provides that, prior to the Discharge of Parity Lien Obligations, the holders of Junior Lien Obligations, each Junior Lien Representative and the Collateral Trustee may not assert or enforce any right of marshalling accorded to a junior lienholder, as against the holders of Parity Lien Obligations and the Parity Lien Representatives (in their capacity as senior or priority lienholders) with respect to the Collateral.

Following the Discharge of Parity Lien Obligations, the holders of Junior Lien Obligations and any Junior Lien Representative may assert their right under the Uniform Commercial Code or otherwise to any proceeds remaining following a sale or other disposition of Collateral by, or on behalf of, the holders of Parity Lien Obligations.

### *Insolvency or Liquidation Proceedings*

If in any insolvency or liquidation proceeding and prior to the Discharge of Parity Lien Obligations, the holders of Parity Lien Obligations by an Act of Required Debtholders consent to any order:

(1) for use of cash collateral;

(2) approving a debtor-in-possession financing secured by a Lien that is senior to or on a parity with all Parity Liens upon any property of the estate in such insolvency or liquidation proceeding;

(3) granting any relief on account of Parity Lien Obligations as adequate protection (or its equivalent) for the benefit of the holders of Parity Lien Obligations in the Collateral; or

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027473

Confidential - Subject to CA
Mike Kunkel

(4) relating to a sale of assets of EFIH that provides, to the extent the Collateral sold is to be free and clear of Liens, that all Parity Liens and Junior Liens will attach to the proceeds of the sale; then, the holders of Junior Lien Obligations and the Junior Lien Representatives will not oppose or otherwise contest the entry of such order; *provided*, that the holders of Junior Lien Obligations or a Junior Lien Representative may request the grant to the Collateral Trustee, for the benefit of the holders of Junior Lien Obligations and the Junior Lien Representatives, of a Junior Lien upon any property on which a Lien is (or is to be) granted under such order to secure the Parity Lien Obligations, co-extensive in all respects with, but subordinated, as provided in the provisions described under "—Provisions of the Indenture Relating to Security—Ranking of Parity Liens," to, such Lien and all Parity Liens on such property. The holders of Parity Lien Obligations (including the Holders of the Notes) and the Parity Lien Representatives (including the Trustee) will agree not to oppose or otherwise contest in any respect any request made by the Junior Lien Representatives for a Junior Lien pursuant to the proviso to the preceding sentence.

Notwithstanding the foregoing, both before and during an insolvency or liquidation proceeding, the holders of Junior Lien Obligations and the Junior Lien Representatives may take any actions and exercise any and all rights that would be available to a holder of unsecured claims, including, without limitation, the commencement of insolvency or liquidation proceedings against EFIH in accordance with applicable law; *provided* that the Collateral Trust Agreement provides that no holder of Junior Lien Obligations or Junior Lien Representative will be permitted to take any of the actions prohibited under the third and fourth paragraphs of the provisions described under "—Enforcement of Liens," or oppose or contest any order that it has agreed not to oppose or contest under clauses (1) through (4) of the preceding paragraph.

Neither the holders of Junior Lien Obligations nor any Junior Lien Representative will file or prosecute in any insolvency or liquidation proceeding any motion for adequate protection (or any comparable request for relief) based upon their interest in the Collateral under the Junior Liens, except that:

(1) they may freely seek and obtain relief granting a Junior Lien co-extensive in all respects with, but subordinated, as provided in the provisions described under "—Provisions of the Indenture Relating to Security—Ranking of Parity Liens," to, all Liens granted in such insolvency or liquidation proceeding to, or for the benefit of, the holders of Parity Lien Obligations; and

(2) they may freely seek and obtain any relief upon a motion for adequate protection (or any comparable relief), without any condition or restriction whatsoever, at any time after the Discharge of Parity Lien Obligations.

### Order of Application

The Collateral Trust Agreement provides that if any Collateral is sold or otherwise realized upon by the Collateral Trustee in connection with any foreclosure, collection or other enforcement of Liens granted to the Collateral Trustee in the Security Documents, the proceeds received by the Collateral Trustee from such foreclosure, collection or other enforcement will be distributed by the Collateral Trustee in the following order of application:

FIRST, to the payment of all amounts payable under the Collateral Trust Agreement on account of the Collateral Trustee's fees and any reasonable legal fees, costs and expenses or other liabilities of any kind incurred by the Collateral Trustee or any co-trustee or agent of the Collateral Trustee in connection with any Security Document;

SECOND, ratably to the respective Parity Lien Representatives for application, after payment of any fees and expenses (including but not limited to, attorney's fees and expenses) of such Parity Lien Representative, to the payment of all outstanding Notes and other Parity Lien Debt and any other

66

Confidential - Subject to CA
Mike Kunkel

EFH00027474

Confidential - Subject to CA
Mike Kunkel

Parity Lien Obligations that are then due and payable in such order as may be provided in the relevant Parity Lien Documents in an amount sufficient to pay in full in cash all outstanding Notes and other Parity Lien Debt and all other Parity Lien Obligations that are then due and payable (including all interest accrued thereon after the commencement of any insolvency or liquidation proceeding at the rate, including any applicable post-default rate, specified in the relevant Parity Lien Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding, and including the discharge or cash collateralization (at the lower of (1) 105% of the aggregate undrawn amount and (2) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the applicable Parity Lien Document) of all outstanding letters of credit constituting Parity Lien Debt);

THIRD, to the respective Junior Lien Representatives for application to the payment of all outstanding Junior Lien Debt and any other Junior Lien Obligations that are then due and payable in such order as may be provided in the relevant Junior Lien Documents in an amount sufficient to pay in full in cash all outstanding Junior Lien Debt and all other Junior Lien Obligations that are then due and payable (including all interest accrued thereon after the commencement of any insolvency or liquidation proceeding at the rate, including any applicable post-default rate, specified in the relevant Junior Lien Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding, and including the discharge or cash collateralization (at the lower of (1) 105% of the aggregate undrawn amount and (2) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the applicable Junior Lien Document) of all outstanding letters of credit, if any, constituting Junior Lien Debt); and

FOURTH, any surplus remaining after the payment in full in cash of the amounts described in the preceding clauses will be paid to EFIH, or its successors or assigns, or as a court of competent jurisdiction may direct.

If any Junior Lien Representative or any holder of a Junior Lien Obligation collects or receives any proceeds in respect of any foreclosure, collection or other enforcement to which it was not entitled pursuant to the terms of the immediately preceding paragraphs, whether after the commencement of an insolvency or liquidation proceeding or otherwise, such Junior Lien Representative or such holder of a Junior Lien Obligation, as the case may be, will forthwith deliver the same to the Collateral Trustee to be applied in accordance with the provisions set forth in the immediately preceding paragraphs. Until so delivered, such proceeds will be held by that Junior Lien Representative or that holder of a Junior Lien Obligation, as the case may be, in trust for the benefit of the holders of the Parity Lien Obligations. These provisions will not apply to payments received by any holder of Junior Lien Obligations if such payments are not proceeds of, or the result of a realization upon, Collateral.

The provisions set forth above under this "Order of Application" caption are intended for the benefit of, and will be enforceable as a third party beneficiary by, each present and future holder of Secured Debt Obligations, each present and future Secured Debt Representative and the Collateral Trustee as holder of Parity Liens and Junior Liens. EFIH will be required to cause the Secured Debt Representative of each future Series of Secured Lien Debt to deliver a joinder to the Collateral Trust Agreement, including a Lien Sharing and Priority Confirmation, to the Collateral Trustee and each other Secured Debt Representative at the time of incurrence of such Series of Secured Lien Debt.

In connection with the application of proceeds in accordance with the provisions set forth above under this "Order of Application" caption, except as otherwise directed by an Act of Required Debtholders, the Collateral Trustee may sell any non-cash proceeds for cash prior to the application of the proceeds thereof.

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027475

Confidential - Subject to CA
Mike Kunkel

### Release of Security Interests

The Security Documents provide that the Collateral will be released:

1. in whole, upon (a) payment in full of all outstanding Secured Debt Obligations at the time such debt is paid in full and (b) termination or expiration of all commitments to extend credit under all Secured Debt Documents and the cancellation or termination or cash collateralization in an account maintained by the Collateral Trustee (at the lower of (1) 105% of the aggregate undrawn amount and (2) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the applicable Secured Debt Documents) of all outstanding letters of credit issued pursuant to any Secured Debt Documents; *provided* that the Issuer has delivered an Officer's Certificate to the Collateral Trustee certifying that the conditions described in this paragraph 1. have been met and that such release of the Collateral does not violate the terms of any applicable Secured Debt Document;

2. with respect to the Note Obligations only, upon satisfaction and discharge of the Indenture as set forth under "—Satisfaction and Discharge";

3. with respect to the Note Obligations only, upon a Legal Defeasance or Covenant Defeasance as set forth under "—Legal Defeasance and Covenant Defeasance";

4. with respect to the Note Obligations only, upon payment in full of the Notes and all other Note Obligations that are outstanding, due and payable at the time the Notes are paid in full;

5. with respect to any Secured Debt Obligations (other than Note Obligations) only, upon payment in full of such Secured Lien Debt and all other Secured Debt Obligations in respect thereof that is outstanding, due and payable at the time such Secured Lien Debt is paid in full;

6. as to a release of all or substantially all of the Collateral, if (a) consent to the release of that Collateral has been given by the holders of 66⅔% of the aggregate principal amount of Parity Lien Debt at the time outstanding voting together as one class, as provided for in the applicable Secured Debt Documents; *provided* that if an Event of Default under the Notes or an event of default with respect to any other Secured Lien Debt has occurred and is continuing at the time of the solicitation of any such consent, the consent of holders of 66⅔% of the aggregate principal amount of Secured Lien Debt at the time outstanding voting together as one class shall also be required, and (b) EFIH has delivered an Officer's Certificate to the Collateral Trustee certifying that any such necessary consents have been obtained and that such release of the Collateral does not violate the terms of any applicable Secured Debt Document;

7. as to a release of less than all or substantially all of the Collateral, if (A) consent to the release of all Parity Liens (or, at any time after the Discharge of Parity Lien Obligations, consent to the release of all Junior Liens) on such Collateral has been given by holders of a majority of the aggregate principal amount of Parity Lien Debt at the time outstanding voting as one class, as provided for in the Parity Lien Documents (or, at any time after the Discharge of Parity Lien Obligations, holders of a majority of the aggregate principal amount of the Junior Lien Debt at the time outstanding voting together as one class, as provided for in the Junior Lien Documents) and (B) EFIH has delivered an Officer's Certificate to the Collateral Trustee certifying that any such necessary consents have been obtained and that such release of the Collateral does not violate the terms of any applicable Secured Debt Document;

8. as to any Collateral that is sold, transferred or otherwise disposed of by EFIH in a transaction or other circumstance that is not prohibited by the terms of any applicable Secured Debt Document, at the time of, or immediately prior to, such sale, transfer or other disposition; *provided* that EFIH has delivered an Officer's Certificate to the Collateral Trustee certifying that any such sale, transfer or other disposition does not violate the terms of any applicable Secured Debt Document; or

68

Confidential - Subject to CA
Mike Kunkel

EFH00027476

Confidential - Subject to CA
Mike Kunkel

9. with respect to the Note Obligations only, in whole or in part, with the consent of the Holders of the requisite percentage of Required Debt in accordance with the provisions described under "—Amendment, Supplement and Waiver," and upon delivery of instructions and any other documentation, in each case as required by the Indenture and the Security Documents, in a form satisfactory to the Collateral Trustee.

Upon compliance by, and at the request of, EFIH with the conditions precedent set forth above, the Collateral Trustee will promptly cause to be released and reconveyed to EFIH the released Collateral.

### Amendment

The Collateral Trust Agreement provides that no amendment or supplement to the provisions of the Collateral Trust Agreement or any other Security Document will be effective without the approval of the Collateral Trustee acting as directed by an Act of Required Debtholders, except that:

(1) any amendment or supplement that has the effect solely of (a) adding or maintaining Collateral, securing additional Secured Lien Debt that was otherwise permitted by the terms of the Secured Debt Documents to be secured by the Collateral or preserving, perfecting or establishing the priority of the Liens thereon or the rights of the Collateral Trustee therein, (b) curing any ambiguity, defect or inconsistency; (c) providing for the assumption of the obligations of EFIH under any Security Document in the case of a merger or consolidation or sale of all or substantially all of the assets of EFIH; or (d) making any change that would provide any additional rights or benefits to the holders of Secured Debt Obligations, the Secured Debt Representatives or the Collateral Trustee or that does not adversely affect the legal rights under any Secured Debt Document of any holder of Secured Debt Obligations, the Secured Debt Representatives or the Collateral Trustee, will, in each case, become effective when executed and delivered by EFIH and the Collateral Trustee;

(2) no amendment or supplement that reduces, impairs or adversely affects the right of any holder of Secured Debt Obligations:

(a) to vote its outstanding Secured Lien Debt as to any matter described as subject to an Act of Required Debtholders or direction by the Required Parity Lien Debtholders or Required Junior Lien Debtholders (or amends the provisions of this clause (2) or the definition of "Act of Required Debtholders," "Required Parity Lien Debtholders" or "Required Junior Lien Debtholders");

(b) to share in the order of application described under "—Order of Application" in the proceeds of enforcement of or realization on any Collateral that has not been released in accordance with the provisions described under "—Release of Security Interests"; or

(c) to require that Liens securing Secured Debt Obligations be released only as set forth in the provisions described under "—Release of Security Interests" will become effective without the consent of the requisite percentage or number of holders of each Series of Secured Lien Debt so affected under the applicable Secured Debt Documents; and

(3) no amendment or supplement that imposes any obligation upon the Collateral Trustee or any Secured Debt Representative or adversely affects the rights of the Collateral Trustee, as determined by the Collateral Trustee in its sole discretion, or any Secured Debt Representative, respectively, in its individual capacity as such will become effective without the consent of the Collateral Trustee or such Secured Debt Representative, respectively.

Confidential - Subject to CA
Mike Kunkel

EFH00027477

Confidential - Subject to CA
Mike Kunkel

Notwithstanding the foregoing clause (1), but subject to clauses (2) and (3) above:

(1) any Security Document that secures Junior Lien Obligations (but not Parity Lien Obligations) may be amended or supplemented with the approval of the Collateral Trustee acting as directed in writing by the Required Junior Lien Debtholders, unless such amendment or supplement would not be permitted under the terms of the Collateral Trust Agreement or the other Parity Lien Documents; and

(2) any amendment or waiver of, or any consent under, any provision of the Collateral Trust Agreement or any other Security Document that secures Parity Lien Obligations (except any such amendment, waiver or consent that releases Collateral with respect to which any consent of holders of Junior Lien Debt is required pursuant to the Collateral Trust Agreement, which will be governed by the provisions set forth above) will apply automatically to any comparable provision of any comparable Junior Lien Document without the consent of or notice to any holder of Junior Lien Obligations and without any action by EFIH or any Holder of Notes or holder of other Junior Lien Obligations.

### Voting

In connection with any matter under the Collateral Trust Agreement requiring a vote of holders of Secured Lien Debt, each Series of Secured Lien Debt will cast its votes in accordance with the Secured Debt Documents governing such Series of Secured Lien Debt. The amount of Secured Lien Debt to be voted by a Series of Secured Lien Debt will equal (1) the aggregate outstanding principal amount of Secured Lien Debt held by such Series of Secured Lien Debt (including outstanding letters of credit whether or not then available or drawn), plus (2) the aggregate unfunded commitments to extend credit which, when funded, would constitute Indebtedness of such Series of Secured Lien Debt. Following and in accordance with the outcome of the applicable vote under its Secured Debt Documents, the Secured Debt Representative of each Series of Secured Lien Debt will vote the total amount of Secured Lien Debt under that Series of Secured Lien Debt as a block in respect of any vote under the Collateral Trust Agreement.

### Provisions of the Indenture Relating to Security

#### Equal and Ratable Sharing of Collateral by Holders of Parity Lien Debt

The Indenture will provide that, notwithstanding:

(1) anything contained in the Collateral Trust Agreement or in any other Security Documents;

(2) the time of incurrence of any Series of Parity Lien Debt;

(3) the order or method of attachment or perfection of any Liens securing any Series of Parity Lien Debt;

(4) the time or order of filing or recording of financing statements or other documents filed or recorded to perfect any Parity Lien upon any Collateral;

(5) the time of taking possession or control over any Collateral;

(6) that any Parity Lien may not have been perfected or may be or have become subordinated, by equitable subordination or otherwise, to any other Lien; or

(7) the rules for determining priority under any law governing relative priorities of Liens,

all Parity Liens granted at any time by EFIH will secure, equally and ratably, all present and future Parity Lien Obligations.

70

Confidential - Subject to CA
Mike Kunkel

EFH00027478

Confidential - Subject to CA
Mike Kunkel

The foregoing section is intended for the benefit of, and will be enforceable as a third party beneficiary, each present and future holder of Parity Lien Obligations, each present and future Parity Lien Representative and the Collateral Trustee as holder of Parity Liens.

### Ranking of Parity Liens

The Indenture will require the Junior Lien Documents to provide that, notwithstanding:

(1) anything to the contrary contained in the Security Documents;

(2) the time of incurrence of any Series of Parity Lien Debt;

(3) the order or method of attachment or perfection of any Liens securing any Series of Parity Lien Debt;

(4) the time or order of filing or recording of financing statements or other documents filed or recorded to perfect any Lien upon any Collateral;

(5) the time of taking possession or control over any Collateral;

(6) that any Parity Lien may not have been perfected or may be or have become subordinated, by equitable subordination or otherwise, to any other Lien; or

(7) the rules for determining priority under any law governing relative priorities of Liens,

all Junior Liens at any time granted by EFIH will be subject and subordinate to all Parity Liens securing Parity Lien Obligations.

The Indenture will also require the Junior Lien Documents to provide that the provisions described in the foregoing clauses (1) through (7) are intended for the benefit of, and will be enforceable as a third party beneficiary by, each present and future holder of Parity Lien Obligations, each present and future Parity Lien Representative and the Collateral Trustee as holder of Parity Liens.

### Relative Rights

The Indenture will require that nothing in the Junior Lien Documents will:

(1) impair, as between EFIH and the Holders of the Notes, the obligation of EFIH to pay principal, premium, if any, and interest on the Notes in accordance with their terms or any other obligation of EFIH under the Indenture;

(2) affect the relative rights of Holders of Notes as against any other creditors of EFIH (other than holders of Junior Liens or other Parity Liens);

(3) restrict the right of any Holder of Notes to sue for payments that are then due and owing (but not enforce any judgment in respect thereof against any Collateral to the extent specifically prohibited by the provisions described under "—Security for the Notes—Enforcement of Liens" or "—Security for the Notes—Insolvency or Liquidation Proceedings");

(4) restrict or prevent any Holder of Notes or holder of other Parity Lien Obligations, the Collateral Trustee or any other Person from exercising any of its rights or remedies upon a Default or Event of Default not specifically restricted or prohibited by the provisions described under "—Security for the Notes—Enforcement of Liens" or "—Security for the Notes—Insolvency or Liquidation Proceedings"; or

(5) restrict or prevent any Holder of Notes or holder of other Parity Lien Obligations, the Trustee, the Collateral Trustee or any other Person from taking any lawful action in an insolvency or liquidation proceeding not specifically restricted or prohibited by the provisions described under "—Security for the Notes—Enforcement of Liens" or "—Security for the Notes—Insolvency or Liquidation Proceedings."

71

Confidential - Subject to CA
Mike Kunkel

EFH00027479

Confidential - Subject to CA
Mike Kunkel

### Further Assurances

The Indenture will provide and the Security Documents provide that EFIH, at its own expense, will do or cause to be done all acts and things that may be required, or that the Collateral Trustee from time to time may reasonably request, to assure and confirm that the Collateral Trustee holds, for the benefit of the Secured Debt Representatives and holders of Secured Debt Obligations, duly created and enforceable and perfected Liens upon the Collateral (including any property or assets that are acquired or otherwise become Collateral after the Notes are issued), in each case, as contemplated by, and with the Lien priority required under, the Secured Debt Documents.

Upon the reasonable request of the Collateral Trustee or any Secured Debt Representative at any time and from time to time, EFIH, at its own expense, will promptly execute, acknowledge and deliver such security documents, instruments, certificates, notices and other documents, and take such other actions as may be reasonably required, or that the Collateral Trustee may reasonably request, to create, perfect, protect, assure or enforce the Liens and benefits intended to be conferred, in each case as contemplated by the Secured Debt Documents for the benefit of the holders of Secured Debt Obligations.

### Impairment of Security Interest

The Pledge Agreement provides that EFIH will not take or omit to take any action which would or could reasonably be expected to have the result of materially adversely affecting or impairing the Liens in favor of the Collateral Trustee, the Trustee and the holders of the Notes with respect to the Collateral. EFIH shall not grant to any Person, or permit any Person to retain (other than the Collateral Trustee), any interest whatsoever in the Collateral, other than pursuant to clause (3) of the definition of "Permitted Liens." EFIH and its Restricted Subsidiaries will not enter into any agreement that requires the proceeds received from any sale of Collateral to be applied to repay, redeem, defease or otherwise acquire or retire any Indebtedness of any Person, other than as permitted by the Indenture, the Notes and the Security Documents. EFIH shall, at its sole cost and expense, execute and deliver all such agreements and instruments as necessary, or as the Trustee shall reasonably request, to more fully or accurately describe the assets and property intended to be Collateral or the obligations intended to be secured by the Pledge Agreement or any other Security Document.

### After-Acquired Property

Promptly following the acquisition by EFIH of any Equity Interests in any Oncor Subsidiary or any Indebtedness of, or other Investments in, any Oncor Subsidiary or any property or assets required to be pledged as Collateral pursuant to the covenant described under "—Repurchase at the Option of Holders—Asset Sales" or any Equity Interests in or any Indebtedness of, or other Investments in, any Successor Oncor Business, EFIH will execute and deliver such security instruments, pledges, financing statements and certificates and opinions of counsel as shall be reasonably necessary to vest in the Collateral Trustee a perfected first-priority security interest in such Equity Interests, Indebtedness or other Investments or property or assets and to have such Equity Interests, Indebtedness or other Investments or property or assets added to the Collateral and thereupon all provisions of the Indenture relating to the Collateral shall be deemed to relate to such Equity Interests, Indebtedness or other Investments or property or assets to the same extent and with the same force and effect.

## Repurchase at the Option of Holders

### Change of Control

The Indenture will provide that if a Change of Control occurs, unless the Issuer has previously or concurrently mailed or delivered a redemption notice with respect to all the outstanding Notes as described under "Optional Redemption" and will redeem all of the outstanding Notes pursuant thereto, the Issuer will make an offer to purchase all of the Notes pursuant to the offer described below (the

72

Confidential - Subject to CA
Mike Kunkel

EFH00027480

Confidential - Subject to CA
Mike Kunkel

"*Change of Control Offer*") at a price in cash (the "*Change of Control Payment*") equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest and Additional Interest, if any, to the date of purchase, subject to the right of Holders of the Notes of record on the relevant record date to receive interest due on the relevant interest payment date. Within 30 days following any Change of Control, the Issuer will send notice of such Change of Control Offer by first-class mail, with a copy to the Trustee, to each Holder of Notes to the address of such Holder appearing in the security register with a copy to the Trustee or otherwise delivered in accordance with the procedures of DTC, with the following information:

      (1) that a Change of Control Offer is being made pursuant to the covenant entitled "Change of Control" and that all Notes properly tendered pursuant to such Change of Control Offer will be accepted for payment by the Issuer;

      (2) the purchase price and the purchase date, which will be no earlier than 30 days nor later than 60 days from the date such notice is mailed or delivered (the "Change of Control Payment Date");

      (3) that any Note not properly tendered will remain outstanding and continue to accrue interest;

      (4) that unless the Issuer defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest on the Change of Control Payment Date;

      (5) that Holders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the paying agent specified in the notice at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

      (6) that Holders will be entitled to withdraw their tendered Notes and their election to require the Issuer to purchase such Notes; *provided* that the paying agent receives, not later than the close of business on the expiration date of the Change of Control Offer, a telegram, facsimile transmission or letter setting forth the name of the Holder of the Notes, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased;

      (7) that the Holders whose Notes are being repurchased only in part will be issued new Notes and such new Notes will be equal in principal amount to the unpurchased portion of the Notes surrendered. The unpurchased portion of the Notes must be equal to $2,000 or an integral multiple of $1,000 in excess thereof; and

      (8) the other instructions, as determined by the Issuer, consistent with the covenant described under this "—Repurchase at the Option of Holders—Change of Control" section, that a Holder must follow.

Any proceeds received by the Issuer or EFIH's Restricted Subsidiaries from a sale, conveyance or disposition of Collateral or other Oncor-related Assets that constitutes a Change of Control shall be subject to a perfected security interest for the benefit of the holders of the Secured Debt Obligations until consummation of the Change of Control Offer.

The Issuer will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of Notes pursuant to a Change of Control Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Issuer will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in the Indenture by virtue thereof.

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027481

Confidential - Subject to CA
Mike Kunkel

On the Change of Control Payment Date, the Issuer will, to the extent permitted by law,

(1) accept for payment all Notes issued by it or portions thereof properly tendered pursuant to the Change of Control Offer;

(2) deposit with the paying agent an amount equal to the aggregate Change of Control Payment in respect of all Notes or portions thereof so tendered; and

(3) deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate to the Trustee stating that such Notes or portions thereof have been tendered to and purchased by the Issuer.

Other agreements relating to Senior Indebtedness to which the Issuer may be a party may provide that certain change of control events with respect to the Issuer would constitute a default thereunder (including a Change of Control under the Indenture). If we experience a change of control that triggers a default under such agreements, we could seek a waiver of such default or seek to refinance the applicable indebtedness. In the event we do not obtain such a waiver or refinance the applicable indebtedness, such default could result in amounts outstanding under the applicable indebtedness being declared due and payable and could cause any Receivables Facility to be wound down. Additionally, the terms of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes and certain other series of EFH Corp.'s debt, including debt guaranteed by EFIH, provide that certain change of control events (including a Change of Control under the Indenture) would result in EFH Corp. being required to offer to purchase such debt.

Our ability to pay cash to the Holders of Notes following the occurrence of a Change of Control may be limited by our then-existing financial resources. Therefore, sufficient funds may not be available when necessary to make any required repurchases.

The Change of Control purchase feature of the Notes may in certain circumstances make more difficult or discourage a sale or takeover of us or EFH Corp. and, thus, the removal of incumbent management. As discussed above, a change in control of EFIH would require regulatory approval by the PUCT under the public interest standard and, through October 10, 2012, be subject to restrictions on the ability to sell a majority interest in Oncor under the PUCT's Order on Rehearing in Docket No. 34077. As of the date of this offering memorandum, we have no present intention to engage in a transaction involving a Change of Control and we are not aware of any such transaction being contemplated by EFH Corp., although it is possible that we or EFH Corp. could decide to engage in such a transaction in the future. Subject to the limitations discussed below, we could, in the future, enter into certain transactions, including acquisitions, refinancings or other recapitalizations, that would not constitute a Change of Control under the Indenture, but that could increase the amount of indebtedness outstanding at such time or otherwise affect our capital structure or credit ratings. Restrictions on our ability to incur additional Indebtedness are contained in the covenants described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "—Certain Covenants—Limitation on Liens." Such restrictions in the Indenture can be waived with the consent of the Required Holders of a majority in principal amount of the outstanding Required Debt. Except for the limitations contained in such covenants, however, the Indenture does not contain any covenants or provisions that may afford Holders of the Notes protection in the event of a highly leveraged transaction.

The Issuer will not be required to make a Change of Control Offer following a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in the Indenture applicable to a Change of Control Offer made by the Issuer and purchases all Notes validly tendered and not withdrawn under such Change of Control Offer. Notwithstanding anything to the contrary herein, a Change of Control Offer may be made in advance of a Change of Control, conditional upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

74

Confidential - Subject to CA
Mike Kunkel

EFH00027482

Confidential - Subject to CA
Mike Kunkel

The definition of "Change of Control" includes, subject to certain exceptions, a disposition of all or substantially all of the assets of the Issuer to any Person. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, in certain circumstances there may be a degree of uncertainty as to whether a particular transaction would involve a disposition of "all or substantially all" of the assets of the Issuer. As a result, it may be unclear as to whether a Change of Control has occurred and whether a Holder of Notes may require the Issuer to make an offer to repurchase the Notes as described above.

The provisions under the Indenture relating to the Issuer's obligation to make an offer to repurchase the Notes as a result of a Change of Control may be waived or modified with the written consent of the Holders of a majority in principal amount of the outstanding Notes.

### Asset Sales

The Indenture will provide that EFIH will not, and will not permit any of its Restricted Subsidiaries to consummate, directly or indirectly, an Asset Sale, unless:

(1) EFIH or such Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the fair market value (as determined in good faith by EFIH) of the assets sold or otherwise disposed of; and

(2) (A) except in the case of a Permitted Asset Swap, at least 75% of the consideration therefor received by EFIH or such Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; *provided* that the amount of:

(a) except in the case of an Asset Sale of Collateral, any liabilities (as shown on EFIH's or such Restricted Subsidiary's most recent balance sheet or in the footnotes thereto) of EFIH or such Restricted Subsidiary, other than liabilities that are by their terms subordinated to the Notes or that are owed to EFIH or an Affiliate of EFIH, that are assumed by the transferee of any such assets and for which EFIH and all of its Restricted Subsidiaries have been validly released by all applicable creditors in writing,

(b) any securities received by the EFIH or such Restricted Subsidiary from such transferee that are converted by EFIH or such Restricted Subsidiary into cash (to the extent of the cash received) within 180 days following the closing of such Asset Sale, and

(c) any Designated Non-cash Consideration received by EFIH or such Restricted Subsidiary in such Asset Sale having an aggregate fair market value, taken together with all other Designated Non-cash Consideration received pursuant to this clause (c) that is at that time outstanding, not to exceed 5% of Total Assets at the time of the receipt of such Designated Non-cash Consideration, with the fair market value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value; *provided* that the aggregate fair market value of Designated Non-cash Consideration received by EFIH after November 16, 2009 in respect of Asset Sales of Collateral shall not exceed $400.0 million, shall be deemed to be cash for purposes of this clause (A) and for no other purpose; and

(B) any consideration received by EFIH from an Asset Sale of Collateral shall be concurrently pledged as Collateral for the benefit of the Holders of the Notes and holders of the other Secured Debt Obligations; *provided* that to the extent such consideration is received by EFIH in cash, it shall be held in an Asset Sale Cash Collateral Account pending the application of such cash consideration pursuant to this covenant.

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027483

Confidential - Subject to CA
Mike Kunkel

In respect of Net Proceeds received by EFIH or any Restricted Subsidiary from Asset Sales (other than an Asset Sale of Collateral or other Oncor-related Assets), within 450 days after the receipt of any Net Proceeds of any such Asset Sale, EFIH or such Restricted Subsidiary, at its option, may apply the Net Proceeds from such Asset Sale,

(1) to repay or prepay Parity Lien Debt of EFIH (other than the Notes) (and, in the case of revolving loans and other similar obligations, permanently reduce the commitment thereunder) on a pro rata basis (including to make Restricted Payments to EFH Corp. to permit EFH Corp. to repay or prepay Indebtedness of EFH Corp. (other than Indebtedness owed to a Subsidiary of EFH Corp.) that is guaranteed by EFIH and constitutes Parity Lien Debt), but only up to an aggregate principal amount equal to such Net Proceeds to be used to repay Indebtedness pursuant to this clause (1) multiplied by a fraction, the numerator of which is the aggregate outstanding principal amount of such Parity Lien Debt and the denominator of which is the aggregate principal amount of all Parity Lien Debt (including the Notes), based on amounts outstanding on the date of closing of such Asset Sale; *provided* that EFIH shall either (x) equally and ratably reduce Obligations under the Notes as provided under "—Optional Redemption" or through open-market purchases (to the extent such purchases are at or above 100% of the principal amount thereof) or (y) make an offer (in accordance with the procedures set forth below for an Asset Sale Offer) to all Holders to purchase their Notes at 100% of the principal amount thereof plus the amount of accrued and unpaid interest and Additional Interest, if any;

(2) to permanently reduce:

(a) Obligations under Senior Indebtedness which is Secured Indebtedness permitted by the Indenture, and to correspondingly reduce commitments with respect thereto;

(b) Obligations under other Senior Indebtedness and to correspondingly reduce commitments with respect thereto; *provided* that the Issuer shall equally and ratably reduce Obligations under the Notes as provided under "—Optional Redemption," through open-market purchases (to the extent such purchases are at or above 100% of the principal amount thereof) or otherwise by making an offer (in accordance with the procedures set forth below for an Asset Sale Offer) to all Holders to purchase their Notes at 100% of the principal amount thereof, plus the amount of accrued and unpaid interest and Additional Interest, if any; or

(c) Indebtedness of a Restricted Subsidiary that is not a Guarantor, other than Indebtedness owed to the Issuer or another Restricted Subsidiary (or any Affiliate thereof);

(3) to make (a) an Investment in any one or more businesses; *provided* that such Investment in any business is in the form of the acquisition of Capital Stock and results in the Issuer or another of its Restricted Subsidiaries, as the case may be, owning an amount of the Capital Stock of such business such that it constitutes a Restricted Subsidiary, (b) capital expenditures or (c) acquisitions of other assets, in each of (a), (b) and (c), used or useful in a Similar Business; or

(4) to make an Investment in (a) any one or more businesses; *provided* that such Investment in any business is in the form of the acquisition of Capital Stock and results in the Issuer or another of its Restricted Subsidiaries, as the case may be, owning an amount of the Capital Stock of such business such that it constitutes a Restricted Subsidiary, (b) properties or (c) acquisitions of other assets that, in each of (a), (b) and (c), replace the businesses, properties and/or assets that are the subject of such Asset Sale;

*provided* that, in the case of clauses (3) and (4) above, a binding commitment shall be treated as a permitted application of the Net Proceeds from the date of such commitment so long as EFIH, or such other Restricted Subsidiary enters into such commitment with the good faith expectation that such Net Proceeds will be applied to satisfy such commitment within 180 days of such commitment (an

76

Confidential - Subject to CA
Mike Kunkel

EFH00027484

Confidential - Subject to CA
Mike Kunkel

"*Acceptable Commitment*") (and reinvest within the later of 450 days from the date of receipt of Net Proceeds and 180 days of receipt of such commitment), and, in the event any Acceptable Commitment is later cancelled or terminated for any reason before the Net Proceeds are applied in connection therewith, EFIH or such Restricted Subsidiary enters into another Acceptable Commitment (a "*Second Commitment*") within the later of (a) 180 days of such cancellation or termination or (b) the initial 450-day period; *provided further*, that if any Second Commitment is later cancelled or terminated for any reason before such Net Proceeds are applied, then such Net Proceeds shall constitute Excess Proceeds.

Notwithstanding the preceding paragraph, to the extent that regulatory approval is necessary for an asset purchase or investment, or replacement, repair or restoration on any asset or investment, then EFIH or any Restricted Subsidiary shall have an additional 365 days to apply the Net Proceeds from such Asset Sale in accordance with the preceding paragraph.

Any Net Proceeds from Asset Sales (other than Asset Sales of Collateral or other Oncor-related Assets) that are not invested or applied as provided and within the time period set forth in the first sentence of the second preceding paragraph will be deemed to constitute "*Excess Proceeds.*" When the aggregate amount of Excess Proceeds exceeds $200.0 million, EFIH shall make an offer to all Holders of the Notes and, if required or permitted by the terms of any Senior Indebtedness, to the holders of such Senior Indebtedness (an "*Asset Sale Offer*"), to purchase the maximum aggregate principal amount of the Notes and such Senior Indebtedness that is a minimum of $2,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus accrued and unpaid interest and Additional Interest, if any, to the date fixed for the closing of such offer, in accordance with the procedures set forth in the Indenture. EFIH will commence an Asset Sale Offer with respect to Excess Proceeds within 10 Business Days after the date that Excess Proceeds exceed $200.0 million by mailing or delivering the notice required pursuant to the terms of the Indenture, with a copy to the Trustee.

To the extent that the aggregate amount of Notes and such Senior Indebtedness tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, EFIH may use any remaining Excess Proceeds for general corporate purposes, subject to other covenants contained in the Indenture. If the aggregate principal amount of Notes or the Senior Indebtedness surrendered by such holders thereof exceeds the amount of Excess Proceeds, the Notes and such Senior Indebtedness will be purchased on a pro rata basis based on the accreted value or principal amount of the Notes or such Senior Indebtedness tendered. Additionally, EFIH may, at its option, make an Asset Sale Offer using proceeds from any Asset Sale (other than Asset Sales of Collateral or other Oncor-related Assets) at any time after consummation of such Asset Sale; *provided* that such Asset Sale Offer shall be in an aggregate amount of not less than $25.0 million. Upon consummation of such Asset Sale Offer, any Net Proceeds not required to be used to purchase Notes shall not be deemed Excess Proceeds.

In respect of Net Proceeds received by EFIH or any Restricted Subsidiary from Asset Sales of Collateral or other Oncor-related Assets, within 450 days after the receipt by EFIH or any Restricted Subsidiary of any Net Proceeds of any such Asset Sale, EFIH or such Restricted Subsidiary shall be required to deposit the Net Proceeds from such Asset Sale into an Asset Sale Cash Collateral Account that is subject to a perfected security interest for the benefit of the holders of Secured Lien Debt to be held solely for the purpose of repayment of principal of, and premium, if any, interest and Additional Interest, if any, on, and/or to repay, prepay, repurchase or redeem, the Notes and other Parity Lien Obligations as described in the following clauses (1) and (2),

    (1) to repay or prepay Parity Lien Debt of EFIH (other than the Notes) (and, in the case of revolving loans and other similar obligations, permanently reduce the commitment thereunder) on a pro rata basis (including to make Restricted Payments to EFH Corp. to permit EFH Corp. to

77

Highly Confidential

Confidential - Subject to CA
Mike Kunkel

repay or prepay Indebtedness of EFH Corp. that is guaranteed by EFIH and constitutes Parity Lien Debt), but only up to an aggregate principal amount equal to such Net Proceeds to be used to repay Indebtedness pursuant to this clause (1) multiplied by a fraction, the numerator of which is the aggregate outstanding principal amount of such Parity Lien Debt and the denominator of which is the aggregate outstanding principal amount of all Parity Lien Debt (including the Notes), in each case based on amounts outstanding on the date of closing of such Asset Sale; *provided* that EFIH shall equally and ratably reduce Obligations under the Notes as provided under "Optional Redemption," through open-market purchases (to the extent such purchases are at or above 100% of the principal amount thereof) or by making an offer (in accordance with the procedures set forth below for a Collateral Asset Sale Offer) to all Holders to purchase their Notes at 100% of the principal amount thereof plus the amount of accrued and unpaid interest, if any; or

(2) to repay, repurchase or redeem the Notes as provided under "—Optional Redemption," through open-market purchases (to the extent such purchases are at or above 100% of the principal amount thereof) or by making an offer (in accordance with the procedures set forth below for a Collateral Asset Sale Offer) to all Holders to purchase their Notes at 100% of the principal amount thereof plus the amount of accrued but unpaid interest, if any.

Notwithstanding the preceding paragraph, in the event that regulatory approval is necessary for an Investment in any Oncor Subsidiary, then the Issuer or any Restricted Subsidiary shall have an additional 365 days to apply the Net Proceeds from such Asset Sale in accordance with the preceding paragraph.

Any Net Proceeds from Asset Sales of Collateral or other Oncor-related Assets that are not invested or applied as provided and within the time period set forth in the first sentence of the preceding paragraph will be deemed to constitute "*Collateral Excess Proceeds.*" When the aggregate amount of Collateral Excess Proceeds exceeds $200.0 million, EFIH and/or any of EFIH's Restricted Subsidiaries will make an offer to all Holders of the Notes and, if required or permitted by the terms of any Parity Lien Debt, to the holders of such Parity Lien Debt (and if required or permitted by the terms of any Indebtedness of EFH Corp. that is guaranteed by EFIH and constitutes Parity Lien Debt, EFH Corp. may make an offer to all holders of such Indebtedness) (a "*Collateral Asset Sale Offer*"), to purchase the maximum aggregate principal amount of the Notes and such Parity Lien Debt that is a minimum of $2,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Collateral Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus accrued and unpaid interest and Additional Interest, if any, to the date fixed for the closing of such offer, in accordance with the terms and procedures set forth in the Indenture and the other applicable Secured Debt Documents. The Issuer and/or any of its Restricted Subsidiaries will commence a Collateral Asset Sale Offer with respect to Collateral Excess Proceeds within 10 Business Days after the date that Collateral Excess Proceeds exceed $200.0 million by mailing or delivering the notice required pursuant to the terms of the Indenture, with a copy to the Trustee.

To the extent that the aggregate amount of Notes and such Parity Lien Debt tendered pursuant to a Collateral Asset Sale Offer is less than the Collateral Excess Proceeds, EFIH and/or any of its Restricted Subsidiaries may use any remaining Collateral Excess Proceeds for general corporate purposes, subject to other covenants contained in the Indenture and the terms of such Parity Lien Debt. If the aggregate principal amount of Notes or the Parity Lien Debt surrendered by such holders thereof exceeds the amount of Collateral Excess Proceeds, the Notes and such Parity Lien Debt will be purchased on a pro rata basis based upon the accreted value or principal amount of the Notes or such Parity Lien Debt tendered. Additionally, the Issuer (and, if applicable, EFH Corp.) may, at its option, make a Collateral Asset Sale Offer using proceeds from any Asset Sale of Collateral or other Oncor-related Assets at any time after consummation of such Asset Sale; *provided* that such Collateral Asset Sale Offer shall be in an aggregate amount of not less than $25.0 million. Upon consummation

78

Confidential - Subject to CA
Mike Kunkel

EFH00027486

Confidential - Subject to CA
Mike Kunkel

of such Collateral Asset Sale Offer, any Net Proceeds not required to be used to purchase Notes shall not be deemed Collateral Excess Proceeds and the Issuer and its Restricted Subsidiaries may use any remaining Net Proceeds for general corporate purposes, subject to the other covenants contained in the Indenture.

Pending the final application of any Net Proceeds pursuant to this covenant, the holder of such Net Proceeds may apply such Net Proceeds temporarily to reduce Indebtedness outstanding under a revolving credit facility or otherwise invest such Net Proceeds in any manner not prohibited by the Indenture; *provided, however*, that any Net Proceeds that represent proceeds of Collateral or other Oncor-related Assets shall be deposited and held in an Asset Sale Cash Collateral Account pending final application thereof in accordance with this covenant. For the avoidance of doubt, "final application" of Net Proceeds that represent proceeds from the sale of Collateral or other Oncor-related Assets includes, without limitation, the consummation of a Collateral Asset Sale Offer.

The Issuer will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to an Asset Sale Offer or a Collateral Asset Sale Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Issuer will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in the Indenture by virtue thereof.

### Selection and Notice

If the Issuer is redeeming less than all of the Notes issued by it at any time, the Trustee will select the Notes to be redeemed (a) if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed, (b) on a pro rata basis to the extent practicable or (c) by lot or such other similar method in accordance with the procedures of DTC. No Notes of $2,000 or less can be redeemed in part.

Notices of purchase or redemption shall be mailed by first-class mail, postage prepaid, at least 30 but not more than 60 days before the purchase or Redemption Date to each Holder of Notes at such Holder's registered address or otherwise delivered in accordance with the procedures of DTC, except that redemption notices may be mailed or delivered more than 60 days prior to a Redemption Date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of the Indenture. If any Note is to be purchased or redeemed in part only, any notice of purchase or redemption that relates to such Note shall state the portion of the principal amount thereof that has been or is to be purchased or redeemed. The notice will also state any conditions applicable to a redemption.

The Issuer will issue a new Note in a principal amount equal to the unredeemed portion of the original Note in the name of the Holder upon cancellation of the original Note. Notes called for redemption become due on the date fixed for redemption but such redemption may be subject to one or more conditions precedent. On and after the Redemption Date, interest ceases to accrue on Notes or portions thereof called for redemption.

## Certain Covenants

### Limitation on Restricted Payments

EFIH will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

(I) declare or pay any dividend or make any payment or distribution on account of EFIH's, or any of its Restricted Subsidiaries' Equity Interests, including any dividend or distribution payable in connection with any merger or consolidation other than:

(a) dividends or distributions by EFIH payable solely in Equity Interests (other than Disqualified Stock) of EFIH; or

79

Highly Confidential

Confidential - Subject to CA
Mike Kunkel

(b) dividends or distributions by a Restricted Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a Wholly-Owned Subsidiary, EFIH or a Restricted Subsidiary receives at least its pro rata share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities;

(II) purchase, redeem, defease or otherwise acquire or retire for value any Equity Interests of EFIH or any direct or indirect parent of EFIH, including in connection with any merger or consolidation;

(III) make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value in each case, prior to any scheduled repayment, sinking fund payment or maturity, any Subordinated Indebtedness, other than:

(a) Indebtedness permitted under clauses (7) and (8) of the covenant described under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" (other than Subordinated Indebtedness of EFIH to EFH Corp. or any of its subsidiaries which was used by EFIH to pay principal on its Indebtedness); or

(b) the purchase, repurchase or other acquisition of Subordinated Indebtedness purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of purchase, repurchase or acquisition; or

(IV) make any Restricted Investment

(all such payments and other actions set forth in clauses (I) through (IV) above (other than any exception thereto) being collectively referred to as "*Restricted Payments*"), unless, at the time of such Restricted Payment:

(1) no Default shall have occurred and be continuing or would occur as a consequence thereof;

(2) immediately after giving effect to such transaction on a *pro forma* basis, the Restricted Payment Coverage Ratio for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such Restricted Payment would have been at least 2.00 to 1.00; and

(3) such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by EFIH and its Restricted Subsidiaries after the Closing Date (including Restricted Payments permitted by clauses (1), (2) (with respect to the payment of dividends on Refunding Capital Stock (as defined below) pursuant to clause (b) thereof only), (6)(c), (9), (14) and (18) of the next succeeding paragraph, but excluding all other Restricted Payments permitted by the next succeeding paragraph), is less than the sum of (without duplication):

(a) 50% of the Consolidated Net Income of EFIH for the period (taken as one accounting period) beginning October 11, 2007, to the end of EFIH's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment, or, in the case such Consolidated Net Income for such period is a deficit, minus 100% of such deficit; plus

(b) 100% of the aggregate net cash proceeds and the fair market value, as determined in good faith by EFIH, of marketable securities or other property received by EFIH since immediately after the Closing Date (other than net cash proceeds to the extent such net cash proceeds have been used to incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (12)(a) of the second paragraph under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock") from the issue or sale of:

(i) (A) Equity Interests of EFIH, including Treasury Capital Stock (as defined below), but excluding cash proceeds and the fair market value, as determined in good faith by EFIH, of marketable securities or other property received from the sale of:

80

Confidential - Subject to CA
Mike Kunkel

EFH00027488

Confidential - Subject to CA
Mike Kunkel

(x) Equity Interests to members of management, directors or consultants of EFIH, any direct or indirect parent company of EFIH and EFIH's Subsidiaries after the Closing Date to the extent such amounts have been applied to Restricted Payments made in accordance with clause (4) of the next succeeding paragraph; and

(y) Designated Preferred Stock; and

(B) to the extent such net cash proceeds are actually contributed to the capital of EFIH, Equity Interests of EFIH's direct or indirect parent companies (excluding contributions of the proceeds from the sale of Designated Preferred Stock of such companies or contributions to the extent such amounts have been applied to Restricted Payments made in accordance with clause (4) of the next succeeding paragraph); or

(ii) debt securities of EFIH that have been converted into or exchanged for such Equity Interests of EFIH;

*provided, however,* that this clause (b) shall not include the proceeds from (V) Refunding Capital Stock (as defined below), (W) Equity Interests or debt securities of EFIH sold to a Restricted Subsidiary, as the case may be, (X) Disqualified Stock or debt securities that have been converted into or exchanged for Disqualified Stock or (Y) Excluded Contributions; plus

(c) 100% of the aggregate amount of cash and the fair market value, as determined in good faith by EFIH, of marketable securities or other property contributed to the capital of EFIH following the Closing Date (other than net cash proceeds to the extent such net cash proceeds (i) have been used to incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (12)(a) of the second paragraph under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," (ii) are contributed by a Restricted Subsidiary or (iii) constitute Excluded Contributions); plus

(d) 100% of the aggregate amount received in cash and the fair market value, as determined in good faith by EFIH, of marketable securities or other property received by means of:

(i) the sale or other disposition (other than to EFIH or a Restricted Subsidiary) of Restricted Investments (other than Restricted Investments in any Oncor Subsidiary or Successor Oncor Business) made by EFIH or its Restricted Subsidiaries after the Closing Date and repurchases and redemptions of such Restricted Investments from EFIH or its Restricted Subsidiaries and repayments of loans or advances, and releases of guarantees, which constitute Restricted Investments by EFIH or its Restricted Subsidiaries after the Closing Date; or

(ii) the sale (other than to EFIH or a Restricted Subsidiary) of the stock of an Unrestricted Subsidiary (other than (x) to the extent the Investment in such Unrestricted Subsidiary was made by EFIH or a Restricted Subsidiary pursuant to clause (7) of the next succeeding paragraph (y) to the extent such Investment constituted a Permitted Investment or (z) an Investment in the Oncor Subsidiaries or any Successor Oncor Business) or a distribution or dividend from an Unrestricted Subsidiary after the Closing Date (other than distributions or dividends from the Oncor Subsidiaries or any Successor Oncor Business, except to the extent such distributions or dividends were received prior to November 16, 2009 and exceeded the aggregate amount of Investments in the Oncor Subsidiaries then outstanding under clauses (7) and (11) of the next succeeding paragraph and clauses (8) and (13) of the definition of "Permitted Investments"; and to the extent that the amount of such distributions or dividends did not exceed such aggregate amount of Investments then

81

Highly Confidential

Confidential - Subject to CA
Mike Kunkel

outstanding under such clauses, the amount of such Investments then outstanding under any of such clauses shall be reduced by the amount of such distributions or dividends received); plus

(e) in the case of the redesignation of an Unrestricted Subsidiary (other than the Oncor Subsidiaries or any Successor Oncor Business) as a Restricted Subsidiary after the Closing Date, the fair market value of the Investment in such Unrestricted Subsidiary, as determined by EFIH in good faith (or if such fair market value exceeds $200.0 million, in writing by an Independent Financial Advisor), at the time of the redesignation of such Unrestricted Subsidiary as a Restricted Subsidiary other than to the extent the Investment in such Unrestricted Subsidiary was made by EFIH or a Restricted Subsidiary pursuant to clause (7) of the next succeeding paragraph or to the extent such Investment constituted a Permitted Investment.

As of June 30, 2012, EFIH had no amounts available for Restricted Payments under clause (3) above.

The foregoing provisions will not prohibit:

(1) the payment of any dividend within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of the Indenture;

(2) (a) the redemption, repurchase, retirement or other acquisition of any Equity Interests ("*Treasury Capital Stock*") or Subordinated Indebtedness of the Issuer or a Guarantor or any Equity Interests of any direct or indirect parent company of EFIH, in exchange for, or out of the proceeds of the substantially concurrent sale (other than to a Restricted Subsidiary) of, Equity Interests of EFIH or any direct or indirect parent company of EFIH to the extent contributed to the capital of EFIH (in each case, other than any Disqualified Stock) ("*Refunding Capital Stock*") and (b) if immediately prior to the retirement of Treasury Capital Stock, the declaration and payment of dividends thereon was permitted under clause (6) of this paragraph, the declaration and payment of dividends on the Refunding Capital Stock (other than Refunding Capital Stock the proceeds of which were used to redeem, repurchase, retire or otherwise acquire any Equity Interests of any direct or indirect parent company of EFIH) in an aggregate amount per year no greater than the aggregate amount of dividends per annum that were declarable and payable on such Treasury Capital Stock immediately prior to such retirement;

(3) the redemption, repurchase or other acquisition or retirement of Subordinated Indebtedness of the Issuer or a Guarantor made in exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness of the Issuer or a Guarantor, as the case may be, which is incurred in compliance with the covenant described under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" so long as:

(a) the principal amount (or accreted value) of such new Indebtedness does not exceed the principal amount of (or accreted value, if applicable), plus any accrued and unpaid interest on, the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired for value, plus the amount of any reasonable premium (including reasonable tender premiums), defeasance costs and any reasonable fees and expenses incurred in connection with the issuance of such new Indebtedness;

(b) such new Indebtedness is subordinated to the Notes or the applicable Guarantee at least to the same extent as such Subordinated Indebtedness so purchased, exchanged, redeemed, repurchased, acquired or retired for value;

(c) such new Indebtedness has a final scheduled maturity date equal to or later than the final scheduled maturity date of the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired; and

82

Confidential - Subject to CA
Mike Kunkel

Confidential - Subject to CA
Mike Kunkel

(d) such new Indebtedness has a Weighted Average Life to Maturity equal to or greater than the remaining Weighted Average Life to Maturity of the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired;

(4) a Restricted Payment to pay for the repurchase, retirement or other acquisition or retirement for value of Equity Interests (other than Disqualified Stock) of EFIH or any of its direct or indirect parent companies held by any future, present or former employee, director or consultant of EFIH, any of its Subsidiaries or any of its direct or indirect parent companies pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, including any Equity Interests rolled over by management of EFIH or any of its direct or indirect parent companies in connection with the Transactions; *provided, however,* that the aggregate Restricted Payments made under this clause (4) do not exceed in any calendar year $25.0 million (which shall increase to $50.0 million subsequent to the consummation of an underwritten public Equity Offering by EFIH or any direct or indirect parent entity of EFIH) (with unused amounts in any calendar year being carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $75.0 million in any calendar year (which shall increase to $150.0 million subsequent to the consummation of an underwritten public Equity Offering by EFIH or any direct or indirect parent entity of EFIH)); *provided, further* that such amount in any calendar year may be increased by an amount not to exceed:

(a) the cash proceeds from the sale of Equity Interests (other than Disqualified Stock) of EFIH and, to the extent contributed to EFIH, Equity Interests of any of EFIH's direct or indirect parent companies, in each case to members of management, directors or consultants of EFIH, any of its Subsidiaries or any of its direct or indirect parent companies that occurs after the Closing Date, to the extent the cash proceeds from the sale of such Equity Interests have not otherwise been applied to the payment of Restricted Payments by virtue of clause (3) of the preceding paragraph; plus

(b) the cash proceeds of key man life insurance policies received by EFIH or its Restricted Subsidiaries after the Closing Date; less

(c) the amount of any Restricted Payments previously made with the cash proceeds described in clauses (a) and (b) of this clause (4);

and *provided, further* that cancellation of Indebtedness owing to EFIH or any Restricted Subsidiary from members of management of EFIH, any of EFIH's direct or indirect parent companies or any of EFIH's Restricted Subsidiaries in connection with a repurchase of Equity Interests of EFIH or any of its direct or indirect parent companies will not be deemed to constitute a Restricted Payment for purposes of this covenant or any other provision of the Indenture;

(5) the declaration and payment of dividends to holders of any class or series of Disqualified Stock of EFIH or any of its Restricted Subsidiaries or any class or series of Preferred Stock of any Restricted Subsidiary issued in accordance with the covenant described under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" to the extent such dividends are included in the definition of "Fixed Charges";

(6)    (a) the declaration and payment of dividends to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued by EFIH after the Closing Date;

(b) the declaration and payment of dividends to a direct or indirect parent company of EFIH, the proceeds of which will be used to fund the payment of dividends to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) of such parent corporation issued after the Closing Date; *provided* that the amount of dividends paid pursuant to this clause (b) shall not exceed the aggregate amount of cash actually contributed to EFIH from the sale of such Designated Preferred Stock; or

83

Highly Confidential

EFH00027491

Confidential - Subject to CA
Mike Kunkel

(c) the declaration and payment of dividends on Refunding Capital Stock that is Preferred Stock in excess of the dividends declarable and payable thereon pursuant to clause (2) of this paragraph;

*provided, however,* in the case of each of (a) and (c) of this clause (6), that for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock or the declaration of such dividends on Refunding Capital Stock that is Preferred Stock, after giving effect to such issuance or declaration on a pro forma basis, the Restricted Payment Coverage Ratio for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such Restricted Payment would have been at least 2.00 to 1.00;

(7) Investments in Unrestricted Subsidiaries having an aggregate fair market value (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value), taken together with all other Investments made pursuant to this clause (7) that are at the time outstanding, without giving effect to the sale of an Unrestricted Subsidiary to the extent the proceeds of such sale do not consist of cash or marketable securities, not to exceed (A) 1.5% of Total Assets at the time of such Investment and (B) to the extent invested in any of the Oncor Subsidiaries or any Successor Oncor Business, $500.0 million;

(8) repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(9) the declaration and payment of dividends on EFIH's common stock or membership interests (or the payment of dividends to any direct or indirect parent entity to fund a payment of dividends on such entity's common stock), following consummation of the first public offering of EFIH's common stock or the common stock of any of its direct or indirect parent companies after the Closing Date, of up to 6% per annum of the net cash proceeds received by or contributed to EFIH in or from any such public offering, other than public offerings with respect to EFIH's common stock registered on Form S-4 or Form S-8 and other than any public sale constituting an Excluded Contribution;

(10) Restricted Payments in an aggregate amount equal to the amount of Excluded Contributions;

(11) (A) other Restricted Payments in an aggregate amount taken together with all other Restricted Payments made pursuant to this clause (11)(A) not to exceed $100.0 million; and (B) the making of Intercompany Loans to EFH Corp. so long as EFIH is a Subsidiary of EFH Corp. in amounts required (after taking into account any funds received by EFH Corp. from its other Subsidiaries after November 16, 2009 for such purpose) for EFH Corp. to pay, in each case without duplication, (1) interest when due on the Existing EFH Corp. Notes (other than any Existing EFH Corp. Notes then held by EFIH) and any Indebtedness incurred to replace, refund or refinance any such debt and (2) any Optional Interest Repayment (as defined in the indenture pursuant to which the EFH Corp. 2017 Notes were issued) or any similar payments on Indebtedness incurred to replace, refund or refinance such Indebtedness; *provided* that in connection with any such replacement, refunding or refinancing under this clause (2), the aggregate principal amount of such Indebtedness is not increased (except by an amount equal to accrued interest, fees and expenses payable in connection therewith);

(12) distributions or payments of Receivables Fees;

(13) any Restricted Payment made as part of or in connection with the Transactions (including payments made after the Closing Date in respect of EFIH's and its Subsidiaries' or parent companies' long-term incentive plan or in respect of tax gross-ups or other deferred compensation) and the fees and expenses related thereto or used to fund amounts owed to

84

Highly Confidential

Confidential - Subject to CA
Mike Kunkel

Affiliates (including dividends to any direct or indirect parent of EFIH to permit payment by such parent of such amount), in each case to the extent permitted by the covenant described under "—Transactions with Affiliates";

(14) the repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness in accordance with the provisions similar to those described under "—Repurchase at the Option of Holders—Change of Control" and "—Repurchase at the Option of Holders—Asset Sales"; *provided* that all Notes tendered by Holders in connection with a Change of Control Offer, Asset Sale Offer or Collateral Asset Sale Offer, as applicable, have been repurchased, redeemed or acquired for value;

(15) the declaration and payment of dividends or distributions by EFIH to, or the making of loans to, any direct or indirect parent company in amounts required (after taking into account any funds received by such parent company from its other Subsidiaries after the Issue Date for such purpose) for any direct or indirect parent companies to pay, in each case without duplication,

(a) franchise and excise taxes and other fees, taxes and expenses required to maintain their corporate existence;

(b) foreign, federal, state and local income taxes, to the extent such income taxes are attributable to the income of EFIH and its Restricted Subsidiaries and, to the extent of the amount actually received from its Unrestricted Subsidiaries; *provided* that in each case the amount of such payments in any fiscal year does not exceed the amount that EFIH and its Subsidiaries would be required to pay in respect of foreign, federal, state and local taxes for such fiscal year were EFIH, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent described above) to pay such taxes separately from any such parent entity;

(c) customary salary, bonus and other benefits payable to officers and employees of any direct or indirect parent company of EFIH to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of EFIH and its Subsidiaries;

(d) general corporate operating and overhead costs and expenses of any direct or indirect parent company of EFIH to the extent such costs and expenses are attributable to the ownership or operation of EFIH and its Subsidiaries; and

(e) fees and expenses other than to Affiliates of EFIH related to any unsuccessful equity or debt offering of such parent entity;

(16) Restricted Payments to EFH Corp. with the Net Proceeds from Asset Sales to be used by EFH Corp. to repay or prepay Indebtedness of EFH Corp. that is guaranteed by EFIH and constitutes Parity Lien Debt, to the extent the repayment or prepayment of such Indebtedness is permitted by the second or sixth paragraphs of, or an Asset Sale Offer or a Collateral Asset Sale Offer made in accordance with, the covenant described under "—Repurchase at Option of Holders—Asset Sales";

(17) Restricted Payments in the form of a dividend to EFH Corp. (so long as EFIH is a Subsidiary of EFH Corp.) of (a) any Existing EFH Corp. Notes or Indebtedness of TCEH received by EFIH (i) in exchange for the EFIH 9.75% Notes or the EFIH 10.000% Notes in the respective exchange offer relating thereto in which such notes were issued or otherwise contributed to it or (ii) in exchange for Indebtedness of EFH Corp. or TCEH received in exchange for the EFIH 9.75% Notes or the EFIH 10.000% Notes in the respective exchange offer related thereto in which such notes were issued or otherwise contributed to it, or (b) any Indebtedness of EFH Corp. or its Subsidiaries existing on the Issue Date received by EFIH in exchange for Indebtedness of the Issuer or any Guarantor permitted to be incurred under clause (2) of the second paragraph under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," in each case, including any payments received from the applicable obligor thereon to the extent such payments are excluded when calculating Consolidated Net Income;

85

Highly Confidential

Confidential - Subject to CA
Mike Kunkel

(18) Restricted Payments to EFH Corp. (so long as EFIH is a Subsidiary of EFH Corp.) in an aggregate amount since November 16, 2009 not to exceed EFH Corp.'s Ratable Portion of Oncor Dividends to the extent such dividends have not been used by EFIH or any of its Restricted Subsidiaries to make a Restricted Payment pursuant to the first paragraph of this covenant; *provided* that the proceeds of such Restricted Payments are used by EFH Corp. to pay interest on the Existing EFH Corp. Notes, any Parity Lien Debt of EFH Corp. or any refinancings thereof;

(19) guarantees of Indebtedness of EFH Corp. to the extent permitted to be incurred under clause (2) and (3) of the second paragraph under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; or

(20) Restricted Payments in the form of a dividend to EFH Corp. from the cash collateral account established to hold Net Proceeds from Asset Sales of Collateral or other Oncor-related Assets in accordance with the sixth paragraph of the covenant described under "—Repurchase at the Option of Holders—Asset Sales," solely to fund scheduled interest payments when due and payable on Indebtedness of EFH Corp. that is guaranteed by EFIH and constitutes Parity Lien Debt; *provided* that any individual Restricted Payment made pursuant to this clause (20) may not exceed the amount of the next scheduled interest payment on such Parity Lien Debt of EFH Corp. and that proceeds from such cash collateral account are being applied pro rata to make scheduled interest payments on Parity Lien Debt of EFIH;

*provided, however,* that at the time of, and after giving effect to, any Restricted Payment permitted under clauses (7), (11) and (18), no Default shall have occurred and be continuing or would occur as a consequence thereof.

For the avoidance of doubt, the spin-off by EFH Corp. of the Equity Interests of EFIH in a Permitted Asset Transfer would not be a Restricted Payment.

As of the date of this offering memorandum, all of EFIH's Subsidiaries (including the Oncor Subsidiaries) are Unrestricted Subsidiaries other than EFIH Finance. EFIH will not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the penultimate paragraph of the definition of "Unrestricted Subsidiary." For purposes of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by EFIH and its Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated will be deemed to be Restricted Payments in an amount determined as set forth in the last sentence of the definition of "Investments." Such designation will be permitted only if a Restricted Payment in such amount would be permitted at such time, whether pursuant to the first paragraph of this covenant or under clause (7), (10) or (11) of the second paragraph of this covenant, or pursuant to the definition of "Permitted Investments," and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary. Unrestricted Subsidiaries will not be subject to any of the restrictive covenants set forth in the Indenture.

Notwithstanding the foregoing provisions of this covenant, EFIH will not, and will not permit any of its Restricted Subsidiaries to, pay any cash dividend or make any cash distribution to EFH Corp. or in respect of EFIH's Capital Stock or purchase for cash or otherwise acquire for cash any Capital Stock of EFIH or any direct or indirect parent of EFIH for the purpose of paying any cash dividend or making any cash distribution to, or acquiring Capital Stock of any direct or indirect parent of EFIH for cash from, the Investors, or guarantee any Indebtedness of any Affiliate of EFIH for the purpose of paying such dividend, making such distribution or so acquiring such Capital Stock to or from the Investors, in each case by means of utilization of the cumulative

Restricted Payment credit provided by the first paragraph of this covenant, or the exceptions provided by clauses (1), (7) or (11) of the second paragraph of this covenant or clauses (8), (10) or (13) of the definition of "Permitted Investments," unless (x) at the time and after giving effect to such

86

Confidential - Subject to CA
Mike Kunkel

Highly Confidential

EFH00027494