Execution Version

## Energy Future Intermediate Holding Company LLC
## EFIH Finance Inc.

**$250,000,000 6.875% Senior Secured Second Notes due 2017**
**$600,000,000 11.750% Senior Secured Second Lien Notes due 2022**

_____

<u>**Purchase Agreement**</u> (the "**Agreement**")

August 9, 2012

Citigroup Global Markets Inc.
390 Greenwich Street
New York, New York 10013

Goldman, Sachs & Co.
200 West Street
New York, New York, 10282

Credit Suisse Securities (USA) LLC
11 Madison Avenue
New York, NY 10010

J.P. Morgan Securities LLC
383 Madison Avenue
New York, New York 10179

Morgan Stanley & Co. LLC
1585 Broadway
New York, New York 10036

As representatives of the several Initial Purchasers
named in Schedule I hereto

Ladies and Gentlemen:

    Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("**EFIH**"), and EFIH Finance Inc., a Delaware corporation ("**EFIH Finance**" and, together with EFIH, the "**Issuers**"), propose, subject to the terms and conditions stated herein, to issue and sell to the Initial Purchasers named in Schedule I hereto (each an "**Initial Purchaser**" and collectively, the "**Initial Purchasers**") for whom you are acting as representative (each, a "**Representative**" and collectively, the "**Representatives**") $250,000,000 aggregate principal amount of their 6.875% Senior Secured Notes due 2017 (the "**First Lien Notes**") and $600,000,000 aggregate principal amount of their 11.750% Senior Secured Second Lien Notes due 2022 (the "**New Second Lien Notes**" and, together with the First Lien Notes, the "**Securities**").

EFIHMW00035168

The First Lien Notes are to be issued pursuant to the terms of an indenture (the "**First Lien Indenture**"), to be dated as of August 14, 2012, among the Issuers and The Bank of New York Mellon Trust Company, N.A., as trustee (the "**Trustee**").

The New Second Lien Notes are to be issued pursuant to the terms of an indenture (the "**Initial Second Lien Indenture**"), dated as of April 25, 2011, among the Issuers and the Trustee, as supplemented by a first supplemental indenture (the "**First Supplemental Indenture**"), dated as of February 6, 2012, among the Issuers and the Trustee, as supplemented by a second supplemental indenture (the "**Second Supplemental Indenture**"), dated as of February 28, 2012, among the Issuers and the Trustee, as supplemented by a third supplemental indenture (the "**Third Supplemental Indenture**"), dated as of May 31, 2012, among the Issuers and the Trustee, and as further supplemented by a fourth supplemental indenture (the "**Fourth Supplemental Indenture**," and together with the Initial Second Lien Indenture, the First Supplemental Indenture, the Second Supplemental Indenture and the Third Supplemental Indenture, the "**Second Lien Indenture**"), to be dated as of the Time of Delivery, among the Issuers and the Trustee. The First Lien Indenture and the Second Lien Indenture are collectively referred to as the "**Indentures**." The Issuers previously issued $1,150,000,000 aggregate principal amount of 11.750% Senior Secured Second Lien Notes due 2022 (the "**Existing Second Lien Notes**") under the Initial Second Lien Indenture, the First Supplemental Indenture and the Second Supplemental Indenture. The New Second Lien Notes constitute "Additional 2022 Second Lien Notes" (as such term is defined in the First Supplemental Indenture) under the Second Lien Indenture. Except as otherwise disclosed in the Pricing Disclosure Package and the Offering Memorandum, the New Second Lien Notes will have terms identical to the Existing Second Lien Notes and will be treated as a single class of securities with the Existing Second Lien Notes for all purposes under the Indenture.

The First Lien Notes will be secured by a first-priority security interest in the membership interests and other investments that EFIH owns in Oncor Electric Delivery Holdings Company LLC ("**Oncor Holdings**") as described in the Pricing Memorandum and the Offering Memorandum (each as defined below) (the "**Collateral**") as documented by the Pledge Agreement (the "**First Lien Pledge Agreement**") dated as of November 16, 2009, a Collateral Trust Joinder (the "**First Lien Joinder**") executed by the Trustee and acknowledged by The Bank of New York Mellon Trust Company, N.A., as collateral trustee (in such capacity, the "**Collateral Trustee**"), to be dated as of August 14, 2012, to the Collateral Trust Agreement dated as of November 16, 2009, among EFIH, The Bank of New York Mellon Trust Company, N.A. as trustee under indentures governing the Old Notes (as defined below) and the Collateral Trustee (the "**Collateral Trust Agreement**"), the Designation by EFIH of the First Lien Notes as "Additional Secured Debt" under the Collateral Trust Agreement (the "**First Lien Designation**") and other documents or instruments evidencing or creating or purporting to create security interests in favor of the Collateral Trustee for the benefit of the holders of Parity Lien Obligations (as defined in the Collateral Trust Agreement) (collectively, the "**First Lien Security Documents**").

2

EFIHMW00035169

The New Second Lien Notes will be secured by a second-priority security interest in the Collateral as documented by the Junior Lien Pledge Agreement (the "**Second Lien Pledge Agreement**") dated as of April 25, 2011, a Collateral Trust Joinder (the "**Second Lien Joinder**") executed by the Trustee and acknowledged by the Collateral Trustee, dated as of April 25, 2011, to the Collateral Trust Agreement, the Designation by EFIH of the New Second Lien Notes as "**Additional Secured Debt**" under the Collateral Trust Agreement (the "**Second Lien Designation**") and other documents or instruments evidencing or creating or purporting to create security interests in favor of the Collateral Trustee for the benefit of the holders of Junior Lien Obligations (as defined in the Collateral Trust Agreement) (collectively, the "**Second Lien Security Documents**" and, together with the First Lien Security Documents, the "**Security Documents**").

The Issuers will use $680 million of the net proceeds from the offering of the Securities to pay a dividend in or before January 2013 to Energy Future Holdings Corp., a Texas corporation ("**EFH**"), which will use the proceeds of the dividend to repay the balance of funds borrowed by EFH from Texas Competitive Electric Holdings Company LLC ("**TCEH**") under demand notes (the "**TCEH Demand Notes**"). Pending their application in or before January 2013, that portion of the net proceeds will be deposited in an escrow account to be governed by the terms of an Escrow Agreement (the "**Escrow Agreement**"), to be dated as of the Time of Delivery. Neither the Initial Purchasers nor holders of the Securities will be beneficiaries of the Escrow Agreement, and neither the Initial Purchasers nor holders of the Securities will have a security interest in the escrow account established thereunder.

This Agreement, the Registration Rights Agreement (the "**Registration Rights Agreement**") to be dated as of the Time of Delivery, the Escrow Agreement, the Securities, the Indentures and the Security Documents are hereinafter referred to collectively as the "**Transaction Documents**."

1.      Each of the Issuers and EFH, jointly and severally, represents and warrants to, and agrees with, each of the Initial Purchasers that**:**

        (a)     A preliminary offering memorandum, dated August 9, 2012 (the "**Preliminary Offering Memorandum**"), and an offering memorandum, dated August 9, 2012 (the "**Offering Memorandum**"), have been prepared in connection with the offering of the Securities. The Preliminary Offering Memorandum, as amended and supplemented immediately prior to the Applicable Time (as defined in Section 1(b)), is hereinafter referred to as the "**Pricing Memorandum**". All references in this Agreement to the Preliminary Offering Memorandum, the Pricing Memorandum or the Offering Memorandum shall be deemed as of the relevant time and date to refer to and include the documents incorporated by reference therein. Any reference to the Preliminary Offering Memorandum, the Pricing Memorandum or the Offering Memorandum shall be deemed to refer to and include any Additional Issuer Information (as defined in Section 5(f)) furnished by the Issuers or EFH on or prior to the completion of the

Highly Confidential

EFIHMW00035170

distribution of the Securities.  The Preliminary Offering Memorandum or the Offering Memorandum and any amendments or supplements thereto did not and will not, as of their respective dates, contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided, however*, that this representation and warranty shall not apply to any statements or omissions made in reliance upon and in conformity with information furnished in writing to the Issuers by an Initial Purchaser through the Representatives expressly for use therein;

(b)     For the purposes of this Agreement, the "**Applicable Time**" is 5:14 p.m. (Eastern time) on the date of this Agreement; the Pricing Memorandum, as supplemented by the information set forth in Schedule III hereto, taken together (collectively, the "**Pricing Disclosure Package**") as of the Applicable Time, did not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; and each Issuer Supplemental Disclosure Document (as defined in Section 6(a)(i)) listed on Schedule II(a) hereto does not conflict with the information contained in the Pricing Disclosure Package or the Offering Memorandum and each such Issuer Supplemental Disclosure Document, as supplemented by and taken together with the Pricing Disclosure Package as of the Applicable Time, did not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided, however,* that this representation and warranty shall not apply to statements or omissions made in an Issuer Supplemental Disclosure Document in reliance upon and in conformity with information furnished in writing to the Issuers by an Initial Purchaser through the Representatives expressly for use therein;

(c)     None of the Issuers, EFH or any of their respective subsidiaries have sustained since the date of the latest audited financial statements included in the Pricing Disclosure Package any material loss or interference with their business from fire, explosion, flood or other calamity, whether or not covered by insurance, or from any labor dispute or court or governmental action, order or decree, otherwise than as set forth or contemplated in the Pricing Disclosure Package.  Since the respective dates as of which information is given in the Pricing Disclosure Package, there has not been (1) any change in the capital stock (other than repurchases of capital stock from employees in the ordinary course of business, exchanges by employees of stock options for restricted stock units and the granting of equity incentive awards to employees, directors and consultants in the ordinary course of business) or long-term debt (other than (A) borrowings under revolving credit facilities in the ordinary course of business, (B) payment of debt on scheduled maturities, (C) payment of in-kind

4

EFIHMW00035171

interest pursuant to the terms of debt agreements, and (D) any other acquisition of indebtedness disclosed in the Pricing Disclosure Package and the Offering Memorandum) of the Issuers, EFH or any of their respective subsidiaries (other than Oncor Electric Delivery Holdings Company LLC and its subsidiaries), or (2) any material adverse change, or any development involving a prospective material adverse change, in or affecting the general affairs, management, financial position, stockholders' equity or results of operations, of the Issuers, EFH or any of their respective subsidiaries, in the case of each of clauses (1) and (2) otherwise than as set forth or contemplated in the Pricing Disclosure Package;

(d)     Each of the Issuers, EFH and their respective subsidiaries have good and marketable title in fee simple to all real property and good and marketable title to all personal property described in the Pricing Disclosure Package and the Offering Memorandum as owned by them, in each case free and clear of all liens, encumbrances and defects except (i) such as are described in the Pricing Disclosure Package and Offering Memorandum, (ii) any security interest, mortgage, pledge, lien, encumbrance or claim ("**Liens**") granted on, or in connection with the sale of, Transition Bonds or Transition Property (each as defined in the Public Utility Regulatory Act ("**PURA**") contained in the Texas Utilities Code) or in connection with the issuance of, or to secure the payment of, Transition Bonds issued pursuant to PURA or pursuant to a financing order issued by the Public Utility Commission of Texas ("**PUCT**"), (iii) Liens granted in connection with Oncor's first lien bonds and credit facility, (iv) Liens in favor of the Collateral Trustee for the benefit of the holders of the 9.75% Senior Secured Notes due 2019 of the Issuers, the 10.00% Senior Secured Notes due 2020 of the Issuers, the 11% Senior Secured Second Lien Notes due 2021 of the Issuers, the Existing Second Lien Notes of the Issuers, the 9.75% Senior Secured Notes due 2019 of EFH and the 10.00% Senior Secured Notes due 2020 of EFH (collectively, the "**Old Notes**"), (v) Liens granted in connection with the 11.5% Senior Secured Notes due 2020 issued by TCEH and TCEH Finance, Inc. ("**TCEH Finance**"), the 15% Senior Secured Second Lien Notes due 2021 issued by TCEH and TCEH Finance, the 15% Senior Secured Second Lien Notes due 2021, Series B, issued by TCEH and TCEH Finance, and the credit facilities under the Credit Agreement, dated as of October 10, 2007, as amended on August 7, 2009 and April 7, 2011, by and among Energy Future Competitive Holdings Company, as guarantor, TCEH, as borrower, the lenders party thereto in their capacities as lenders thereunder and Citibank, N.A., as Administrative Agent (collectively, the "**TCEH Secured Debt**"), (vi) Liens granted in connection with Energy Future Competitive Holdings Company's 9.580% Fixed Notes due in annual installments through December 4, 2019 and 8.254% Fixed Notes due in quarterly installments through December 31, 2021, which debt is referred to as the EFCH Tex-La debt and is secured by an undivided interest in the

5

EFIHMW00035172

Comanche Peak Nuclear Facility, (vii) such as do not materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by the Issuers, EFH and their respective subsidiaries.   Except as described in the Pricing Disclosure Package and the Offering Memorandum, any real property, buildings and improvements held under lease by the Issuers, EFH and their respective subsidiaries are held by them under valid, subsisting and enforceable leases, assuming due authorization, execution and delivery by the other parties to such leases, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding at equity or at law), with such exceptions as are not material and do not materially interfere with the use made and proposed to be made of such property, buildings and improvements by the Issuers, EFH and their respective subsidiaries. Consistent with the final order in PUCT Docket No. 34077, no assets owned by Oncor Electric Delivery Company LLC have been pledged to support any debt of the Issuers;

(e)     Each of the Issuers and EFH has been duly incorporated or formed and is validly existing as a corporation or limited liability company, as applicable, in good standing under the laws of the State of Delaware or the State of Texas, as applicable, with power and authority (corporate or limited liability company, as applicable) to own, lease and/or operate its properties and conduct its business as described in the Pricing Disclosure Package and the Offering Memorandum, and has been duly registered or qualified as a foreign corporation or limited liability company, as the case may be, for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except where the failure to so qualify or to be in good standing could not reasonably be expected to result in a material adverse effect upon the business, properties, financial condition or earnings of the Issuers and their respective subsidiaries, taken as a whole or EFH and its subsidiaries, taken as a whole (a "**Material Adverse Effect**"); and each subsidiary of EFIH and EFH, respectively, has been duly incorporated or formed and is validly existing as a corporation, limited partnership or limited liability company, as applicable, in good standing under the laws of its jurisdiction of incorporation, formation or organization;

(f)     As of June 30, 2012, each of EFH and EFIH had an authorized capitalization as set forth in the Pricing Disclosure Package and the Offering Memorandum, and all of the issued shares of capital stock or membership interests, as the case may be, of EFH and EFIH have been duly and validly authorized and issued and are fully paid and non-assessable; and all of the issued shares of capital stock, partnership interests or membership interests, as the case may be, of each subsidiary

6

EFIHMW00035173

of EFH and EFIH, respectively, have been duly and validly authorized and issued, are fully paid and non-assessable, and (except for Oncor Electric Delivery Company LLC, Oncor Management Investment LLC and Comanche Peak Nuclear Power Company LLC) are owned directly or indirectly by EFH and EFIH, respectively, free and clear of any Liens and preemptive or similar rights, except for Liens granted under the Security Documents and in respect of the Old Notes and the TCEH Secured Debt;

(g)     Each of the Issuers and EFH has duly authorized, executed and delivered this Agreement;

(h)     At the Time of Delivery (as defined below), each of the Indentures will have been duly authorized by each of the Issuers, and, when executed and delivered by the Issuers and, assuming due authorization, execution and delivery thereof by the Trustee, each of the Indentures will constitute a valid and legally binding instrument of the Issuers, enforceable against the Issuers in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law); at the Time of Delivery, the Securities will have been duly authorized by each of the Issuers and, when executed and authenticated by the Trustee in accordance with the provisions of the applicable Indenture, and delivered to and paid for by the Initial Purchasers pursuant to this Agreement, will have been duly executed, authenticated, issued and delivered by each of the Issuers and will constitute valid and legally binding obligations of the Issuers, enforceable against each of the Issuers, entitled to the benefits provided by the applicable Indenture, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law); and the Securities and the Indentures will conform to the descriptions thereof in the Pricing Disclosure Package and the Offering Memorandum and will be in substantially the forms previously delivered to you;

(i)     At the Time of Delivery, the Registration Rights Agreement, which will be substantially in the form previously delivered to you, will have been duly authorized by each of the Issuers and, as of the Time of Delivery, will have been duly executed and delivered by each of the Issuers, and (assuming due authorization, execution and delivery thereof by the Initial Purchasers) will constitute a valid and legally binding instrument of the Issuers enforceable against the Issuers in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law); and the Registration Rights Agreement will conform to the description thereof in the Pricing Disclosure Package and the Offering Memorandum;

7

(j)    At the Time of Delivery, the Escrow Agreement, which will be substantially in the form previously delivered to you, will have been duly authorized by EFIH and, as of the Time of Delivery, will have been duly executed and delivered by EFIH;

(k)    At the Time of Delivery, the securities to be offered in exchange for the Securities pursuant to the Registration Rights Agreement (collectively, the "**Exchange Securities**") will have been duly authorized by each of the Issuers, and, when issued and delivered pursuant to this Agreement, the Registration Rights Agreement and the applicable Indenture, will have been duly executed, authenticated, issued and delivered and will constitute valid and legally binding obligations of the Issuers, entitled to the benefits provided by the Registration Rights Agreement and the applicable Indenture, subject, as to enforcement, to applicable bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law); and the Exchange Securities will conform to the descriptions thereof in the Pricing Disclosure Package and the Offering Memorandum;

(l)    None of the transactions contemplated by this Agreement (including, without limitation, the use of the proceeds from the sale of the Securities as described in the Pricing Disclosure Package and the Offering Memorandum) will violate or result in a violation of Section 7 of the United States Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), or any regulation promulgated thereunder, including, without limitation, Regulations T, U, and X of the Board of Governors of the Federal Reserve System;

(m)    Prior to the date hereof, none of the Issuers, EFH nor any of their respective affiliates that are controlled by EFH or EFIH has taken any action, directly or indirectly, which is designed to or which has constituted or which might have been expected to cause or result, under the Exchange Act or otherwise, in stabilization or manipulation of the price of any security of the Issuers in connection with the offering of the Securities;

(n)    Except as set forth or contemplated in the Pricing Disclosure Package and the Offering Memorandum, the issue and sale of the Securities and the compliance by each of the Issuers and EFH with all of the provisions of the Transaction Documents to which it is a party and the consummation of the transactions herein and therein contemplated will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Issuers, EFH or any of their respective subsidiaries is a party or by which the Issuers, EFH or any of their respective subsidiaries is bound or to which any of the property or assets of the Issuers, EFH or any of their respective

8

Highly Confidential

subsidiaries is subject, except for such conflicts, breaches, violations or defaults that have previously been waived or could not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect; nor will such action result in any violation of (i) the provisions of the Certificate of Incorporation or By-laws or other organizational documents of the Issuers, EFH or any of their respective subsidiaries or (ii) any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over the Issuers, EFH or any of their respective subsidiaries or any of their respective properties, except in the case of clause (ii) where such violations could not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect; and no consent, approval, authorization, order, registration or qualification of or with any such court or governmental agency or body (each, a "**Governmental Consent**") is required in connection with the issuance and sale of the Securities or the consummation by the Issuers and EFH of the transactions contemplated in this Agreement and the other Transaction Documents to which they are a party, except for Governmental Consents as may have been obtained or may be required in connection with the registration of the Securities with the Securities and Exchange Commission (the "**Commission**") pursuant to the United States Securities Act of 1933, as amended (the "**Act**"), pursuant to the Registration Rights Agreement and for such Governmental Consents as may be required under state securities or blue sky laws in connection with the purchase and distribution of the Securities by the Initial Purchasers in the manner contemplated herein and in the Pricing Disclosure Package and Offering Memorandum or the failure to obtain which would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect;

(o)     None of the Issuers, EFH or any of their respective subsidiaries are (i) in violation of their Certificate of Incorporation or By-laws or other organizational documents or (ii) in default in the performance or observance of any material obligation, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement, lease or other agreement or instrument to which it is a party or by which it or any of its properties may be bound, except in connection with clause (ii) as could not reasonably be expected to result in a Material Adverse Effect;

(p)     The statements set forth in the Pricing Disclosure Package and the Offering Memorandum under the heading "Certain United States Federal Tax Consequences" insofar as such statements constitute a summary of the legal matters referred to therein, fairly present and summarize, in all material respects, the matters referred to therein; and the statements under the headings "Description of the First Lien Notes" and "Description of the Second Lien Notes" insofar as they purport to constitute a summary of the terms of the Securities, are accurate in all material respects;

9

EFIHMW00035176

(q)    The audited consolidated financial statements included in the Pricing Disclosure Package and the Offering Memorandum, together with the related notes, present fairly, in all material respects, the consolidated financial position of EFH, EFIH and Oncor Electric Delivery Holdings Company LLC ("**Oncor Holdings**") and their respective subsidiaries as of the dates indicated and the consolidated results of operations and cash flows of EFH and its subsidiaries, EFIH and its subsidiaries, and Oncor Holdings and its subsidiaries, for the periods specified and have been prepared in all material respects in conformity with United States generally accepted accounting principles applied on a consistent basis during the periods presented (except as otherwise noted therein); the other financial and statistical data set forth in the Pricing Disclosure Package and the Offering Memorandum under the caption "Summary Historical Consolidated Financial Data" are accurately presented in all material respects and where applicable, have been prepared on a basis consistent with the financial statements and books and records of EFIH; there are no financial statements (historical or pro forma) that would be required to be included in a registration statement under the Act if the Securities were being registered thereunder that are not included in the Pricing Disclosure Package and the Offering Memorandum;

(r)    Other than as set forth in the Pricing Disclosure Package, there are no legal or governmental proceedings pending to which the Issuers, EFH or any of their respective subsidiaries is a party or of which any property of the Issuers, EFH or any of their respective subsidiaries is the subject that, if determined adversely to the Issuers, EFH or any of their respective subsidiaries, (i) would individually or in the aggregate reasonably be expected to result in a Material Adverse Effect or (ii) would reasonably be expected to result in a material adverse effect on the performance by the Issuers and EFH of the Transaction Documents, the issuance of the Securities or the consummation of any of the transactions contemplated hereby or thereby or described in the Pricing Disclosure Package and the Offering Memorandum, and to the knowledge of each of the Issuers and EFH, no such proceedings are threatened;

(s)    The Issuers, EFH and each of their respective subsidiaries maintain insurance covering their respective properties, operations, personnel and businesses as the Issuers, EFH or their respective subsidiaries deem adequate and customary for companies engaged in similar businesses and all such policies are in full force and effect in all material respects, except where a failure to maintain such insurance policies would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect;

(t)    The Issuers, EFH and each of their respective subsidiaries own, possess or can acquire on reasonable terms, adequate rights to use all trademarks, trade names and other rights to inventions, know-how,

10

EFIHMW00035177

patents, copyrights, confidential information and other intellectual property (collectively, "**intellectual property rights**") necessary for the conduct of their respective business as currently conducted or proposed to be conducted as described in the Pricing Disclosure Package and the Offering Memorandum (except where a failure to own or possess such intellectual property rights could not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect), and have not received any notice of infringement of or conflict with asserted rights of others with respect to any intellectual property rights, except where any such notice the result of which, individually or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would not reasonably result in a Material Adverse Effect;

(u)     (i) Except as disclosed in the Offering Memorandum and the Pricing Disclosure Package and except for such matters that could not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect, none of the Issuers, EFH or any of their respective subsidiaries (A) is in violation of any statute, any rule, regulation, decision or order of any governmental agency or body or any court, domestic or foreign, relating to the use, disposal or release into the environment of regulated, hazardous or toxic substances or relating to the protection or restoration of the environment or human exposure to hazardous or toxic substances (collectively, the "**environmental laws**"), (B) owns or operates any real property contaminated with any regulated, hazardous or toxic substance that is subject to any remedial obligation or other liabilities pursuant to any environmental laws, (C) is liable for any off-site disposal or contamination pursuant to any environmental laws, or (D) is subject to any claim arising pursuant to any environmental laws; and (ii) except as disclosed in the Offering Memorandum and the Pricing Disclosure Package, each of the Issuers and EFH is not aware of any pending investigation pursuant to any environmental laws which would reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect;

(v)     When the Securities are issued and delivered pursuant to this Agreement and the applicable Indenture, the Securities will not be of the same class (within the meaning of Rule 144A(d)(3) under the Act) as any security of the Issuers which is listed on a national securities exchange registered under Section 6 of the Exchange Act or quoted in a U.S. automated inter-dealer quotation system;

(w)     Neither Issuer is, and after giving effect to the offering and sale of the Securities and the application of the proceeds thereof as described in the Offering Memorandum, neither of them will be, an "investment company", as such term is defined in the United States Investment Company Act of 1940, as amended (the "**Investment Company Act**");

11

EFIHMW00035178

**PX 057**
**Page 11 of 79**

(x)     Neither the Issuers nor any person acting on their behalf (provided that no representation is made as to the Initial Purchasers or any person acting on their behalf) have offered or sold the Securities by means of any general solicitation or general advertising within the meaning of Rule 502(c) under the Act or, with respect to Securities sold outside the United States to non-U.S. persons (as defined in Rule 902 under the Act), by means of any directed selling efforts within the meaning of Rule 902 under the Act, and the Issuers, each affiliate controlled by them and each person acting on their behalf have complied with and will implement the "offering restrictions" within the meaning of such Rule 902;

(y)     Within the six months preceding the date hereof, neither of the Issuers nor any other person acting on their behalf has offered or sold to any person any Securities, or any securities of the same or a similar class as the Securities, other than the Existing Second Lien Notes and the Securities offered or sold to the Initial Purchasers hereunder.  The Issuers will take reasonable precautions designed to ensure that any offer or sale, direct or indirect, in the United States or to any U.S. person (as defined in Rule 902 under the Act) of any Securities or any substantially similar security issued by the Issuers, within six months subsequent to the date on which the distribution of the Securities has been completed (as notified to the Issuers by the Representatives), is made under restrictions and other circumstances reasonably designed not to affect the status of the offer and sale of the Securities in the United States and to U.S. persons contemplated by this Agreement as transactions exempt from the registration provisions of the Act;

(z)     EFH and its subsidiaries, including EFIH, on a consolidated basis (but not including Oncor Holdings and its subsidiaries), maintain a system of internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that complies with the requirements of the Exchange Act and has been designed by EFH's principal executive officer and principal financial officer, or under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with United States generally accepted accounting principles. The internal control over financial reporting of EFH is effective, and EFH is not aware of any material weaknesses in its internal control over financial reporting;

(aa)    To the knowledge of EFH and EFIH, Oncor Holdings maintains a system of internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that complies with the requirements of the Exchange Act and has been designed by its principal executive officer and principal financial officer, or under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in

12

EFIHMW00035179

accordance with United States generally accepted accounting principles. To the knowledge of EFH and EFIH, the internal control over financial reporting of Oncor Holdings is effective, and EFH and EFIH are not aware of any material weaknesses in Oncor Holdings' internal control over financial reporting;

(bb)    Since the date of the latest audited financial statements included in the Pricing Disclosure Package, there has been no change in the internal control over financial reporting of EFH and its subsidiaries, including EFIH, that has materially affected, or is reasonably likely to materially affect, the internal control over financial reporting of EFH and its subsidiaries, including EFIH;

(cc)    EFH and its subsidiaries, including EFIH, on a consolidated basis (but not including Oncor Holdings and its subsidiaries), maintain disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Exchange Act) that comply with the requirements of the Exchange Act; such disclosure controls and procedures have been designed to ensure that material information relating to EFH and its subsidiaries, including EFIH (but not including Oncor Holdings and its subsidiaries), is made known to EFIH's principal executive officer and principal financial officer by others within those entities; and such disclosure controls and procedures are effective;

(dd)    To the knowledge of EFH and EFIH, Oncor Holdings maintains disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Exchange Act) that comply with the requirements of the Exchange Act; such disclosure controls and procedures have been designed to ensure that material information relating to Oncor Holdings and its subsidiaries, is made known to EFIH's principal executive officer and principal financial officer by others within those entities; and to the knowledge of EFH and EFIH, such disclosure controls and procedures are effective;

(ee)    Deloitte & Touche LLP, which has audited certain financial statements of EFH, EFIH and their respective subsidiaries, is an independent registered public accounting firm as required by the Act and the rules and regulations of the Commission thereunder;

(ff)    EFH and EFIH are subject to and in compliance in all material respects with the reporting requirements of Section 13 or Section 15(d) of the Exchange Act;

(gg)    At the Time of Delivery, the Security Documents will have been duly authorized, executed and delivered by EFIH (to the extent it is a party thereto) and, assuming due authorization, execution and delivery thereof by the other parties thereto, will constitute valid and legally binding instruments of EFIH (to the extent it is a party thereto), enforceable

Highly Confidential

EFIHMW00035180

against EFIH in accordance with their terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law); and, the First Lien Pledge Agreement, Second Lien Pledge Agreement and the Collateral Trust Agreement will conform to the descriptions in the Pricing Disclosure Package and Offering Memorandum in all material respects;

(hh)    The First Lien Pledge Agreement is effective to create a valid security interest in the Collateral in favor of the Collateral Trustee for the benefit of the holders of Parity Lien Obligations (including the First Lien Notes); and the Collateral Trust Agreement and the joinder thereto by the Collateral Trustee and the Trustee upon delivery of the First Lien Designation will provide that the Collateral Trustee holds the Collateral for the benefit of the holders of Secured Debt Obligations (as defined in the Collateral Trust Agreement) (including the First Lien Notes) subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law);

(ii)    The Second Lien Pledge Agreement is effective to create a valid security interest in the Collateral in favor of the Collateral Trustee for the benefit of the holders of Junior Lien Obligations (including the New Second Lien Notes); and the Collateral Trust Agreement and the joinder thereto by the Collateral Trustee and the Trustee upon delivery of the Second Lien Designation will provide that the Collateral Trustee holds the Collateral for the benefit of the holders of Secured Debt Obligations (as defined in the Collateral Trust Agreement) (including the New Second Lien Notes) subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law);

(jj)    At the Time of Delivery, EFIH will own the Collateral covered by the Security Documents, free and clear of any Liens, except for (i) Liens granted under the Security Documents; (ii) pre-emptive or similar rights granted under the Investor Rights Agreement (as defined in the Pricing Disclosure Package and the Offering Memorandum); (iii) security interests in favor of the Collateral Trustee for the benefit of the holders of the Old Notes, and (iv) the PUCT's right to approve any change in majority ownership, controlling ownership or operational control of Oncor Electric Delivery Company LLC as described in the Pricing Disclosure Package and the Offering Memorandum;

(kk)    At the Time of Delivery, the security interest of the Collateral Trustee for the benefit of the holders of Parity Lien Obligations and Junior Lien Obligations (including the Securities) in the Collateral will be perfected;

14

EFIHMW00035181

(ll)     EFIH is, and immediately after the Time of Delivery will be, Solvent.  As used herein, the term "Solvent" means that on such date (i) the fair market value of the assets of EFIH is greater than the total amount of liabilities (including contingent liabilities) of EFIH, (ii) the present fair salable value of the assets of EFIH is greater than the amount that will be required to pay the probable liabilities of EFIH on its debts as they become absolute and matured, (iii) EFIH is able to realize upon its assets and pay its debts and other liabilities, including contingent obligations, as they mature and (iv) EFIH does not have unreasonably small capital;

(mm)   Assuming the accuracy of the representations, warranties and agreements set forth in this Section 1 of this Agreement and compliance with the limitations and restrictions contained under the heading "Notice to Investors" in the Pricing Disclosure Package and the Offering Memorandum, it is not necessary in connection with the offer and delivery of the Securities, in the manner contemplated by this Agreement, the Pricing Disclosure Package and the Offering Memorandum, to register any of the Securities under the Act, or to qualify either of the Indentures under the Trust Indenture Act of 1939, as amended, except as may be required under the Registration Rights Agreement; and

(nn)    Any certificate signed by any officer of the Issuers or EFH and delivered to the Initial Purchasers or counsel for the Initial Purchasers in connection with the offering shall be deemed a representation and warranty by the Issuers or EFH, as applicable, as to matters covered thereby to the Initial Purchasers.

2.     Subject to the terms and conditions herein set forth, the Issuers agree to issue and sell to each of the Initial Purchasers, and each of the Initial Purchasers agrees, severally and not jointly, to purchase from the Issuers, at purchase prices as set forth on Schedule IV of the principal amount thereof plus, with respect to the New Second Lien Notes, accrued interest from February 6, 2012 to the Time of Delivery, the respective principal amounts of the Securities set forth opposite the name of such Initial Purchaser in Schedule I hereto.

3.     Upon the authorization by the Issuers of the release of the Securities, the several Initial Purchasers propose to offer the Securities for sale upon the terms and conditions set forth in this Agreement and the Offering Memorandum and each Initial Purchaser, severally and not jointly, hereby represents and warrants to, and agrees with the Issuers that:

(a)     It will offer and sell the Securities only to (i) persons who it reasonably believes are "qualified institutional buyers" within the meaning of Rule 144A under the Act in transactions meeting the requirements of Rule 144A or (ii) upon the terms and conditions set forth in Annex I to this Agreement;

15

EFIHMW00035182

(b)    It is an Institutional Accredited Investor; and

(c)    It will not offer or sell the Securities by any form of general solicitation or general advertising, including but not limited to the methods described in Rule 502(c) under the Act.

4.    (a)    The Securities to be purchased by each Initial Purchaser hereunder will be represented by two or more definitive global Securities in book-entry form which will be deposited by or on behalf of the Issuers with The Depository Trust Company ("**DTC**") or its designated custodian. The Issuers will deliver the Securities to Citigroup Global Markets Inc., for the account of each Initial Purchaser, against payment by or on behalf of such Initial Purchaser of the purchase prices therefor by wire transfer in Federal (same day) funds, by causing DTC to credit the Securities to the account of Citigroup Global Markets Inc. at DTC.  The Issuers will cause the certificates representing the Securities to be made available to the Initial Purchasers for checking at least twenty-four hours prior to the Time of Delivery (as defined below) at the office of Gibson, Dunn & Crutcher LLP, 2100 McKinney Avenue, Dallas, Texas 75201 (the "**Closing Location**").  The time and date of such delivery and payment shall be 9:00 a.m., New York City time, on August 14, 2012, or such other time and date as the Initial Purchasers and the Issuers may agree upon in writing.  Such time and date are herein called the "**Time of Delivery**."

(b)    The documents to be delivered at the Time of Delivery by or on behalf of the parties hereto pursuant to Section 8 hereof, including the cross-receipt for the Securities and any additional documents requested by the Initial Purchasers pursuant to Section 8(k) hereof, will be delivered at such time and date at the Closing Location, and the Securities will be delivered at DTC (or its designated custodian), all at the Time of Delivery.  Final drafts of the documents to be delivered pursuant to the preceding sentence will be available for review by the parties hereto a reasonable period prior to the Time of Delivery. For the purposes of this Section 4, "**New York Business Day**" shall mean each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions in New York are generally authorized or obligated by law or executive order to close.

5.    Each of the Issuers and EFH jointly and severally agrees with each of the Initial Purchasers that:

(a)    The Issuers will prepare the Offering Memorandum in a form approved by the Initial Purchasers, will furnish the Initial Purchasers with copies thereof, and will make no amendment or any supplement to the Offering Memorandum which shall be disapproved of by the Initial Purchasers promptly after reasonable notice thereof;

16

EFIHMW00035183

(b)     The Issuers will promptly from time to time use their reasonable best efforts to obtain the registration or qualification of the Securities for offer or sale by the Initial Purchasers under the securities laws or blue sky laws of such U.S. jurisdictions as they may request and to comply with such laws so as to permit the continuance of sales and dealings therein in such jurisdictions for as long as may be necessary to complete the distribution of the Securities; provided that in no event shall the Issuers be obligated to qualify to do business in any jurisdiction in which they are not now so qualified or take any action that would subject them to service of process in suits, other than those arising out of the offering or sale of the Securities, in any jurisdiction in which they are not now so subject.  The Issuers will promptly advise the Initial Purchasers of the receipt by the Issuers of any notification with respect to the suspension of the qualification of the Securities for sale in any U.S. jurisdiction or the initiation or threatening of any proceeding for such purpose;

(c)     The Issuers and EFH will furnish the Initial Purchasers with written and electronic copies of the Offering Memorandum in such quantities as the Initial Purchasers may from time to time reasonably request, and if, at any time prior to the expiration of six months after the date of the Offering Memorandum, any event shall have occurred as a result of which the Offering Memorandum as then amended or supplemented would include an untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made when such Offering Memorandum is delivered, not misleading, or, if for any other reason it shall be necessary or desirable during such same period to amend or supplement the Offering Memorandum, to notify the Initial Purchasers and upon the request of the Initial Purchasers to prepare and furnish without charge to each Initial Purchaser and to any dealer in securities as many written and electronic copies as they may from time to time reasonably request of an amended Offering Memorandum or a supplement to the Offering Memorandum which will correct such statement or omission or effect such compliance;

(d)     During the period beginning from the date hereof and continuing until the date that is (A) 15 days after the Time of Delivery, with respect to any debt exchange offer that is subject to Regulation 14E of the Exchange Act or with respect to any private debt exchange that is not subject to Regulation 14E of the Exchange Act, and (B) 30 days after the Time of Delivery in all other cases, the Issuers will not offer, sell, contract to sell or otherwise dispose of, or pledge or grant security interests on, except as provided hereunder, any securities, or guarantee any securities of EFH or its subsidiaries, of the Issuers that are substantially similar to the Securities, without the prior written consent of the Initial Purchasers;

Highly Confidential

EFIHMW00035184

(e)     Neither of the Issuers are, nor will they become, at any time prior to the expiration of two years after the Time of Delivery, an open-end investment company, unit investment trust, closed-end investment company or face-amount certificate company that is or is required to be registered under Section 8 of the Investment Company Act;

(f)     At any time when the Issuers are not subject to Section 13 or 15(d) of the Exchange Act, for the benefit of holders from time to time of Securities, to furnish, at their expense, upon request, to holders of Securities and prospective purchasers of Securities, information (the "**Additional Issuer Information**") satisfying the requirements of subsection (d)(4)(i) of Rule 144A under the Act;

(g)     Until the issuance of the Exchange Securities or the effectiveness of the resale registration statement contemplated by the Registration Rights Agreement, the Issuers will not, and will not permit any of their affiliates (as defined in Rule 144 under the Act) controlled by the Issuers to, resell any of the Securities which constitute "restricted securities" under Rule 144 that have been reacquired by any of them;

(h)     To use the net proceeds received by the Issuers from the sale of the Securities pursuant to this Agreement in the manner specified in the Pricing Disclosure Package under the caption "Use of Proceeds;"

(i)     Neither the Issuers nor any of their affiliates that are controlled by them will take any action, directly or indirectly, that is designed to or which has constituted or which might have been expected to cause or result, under the Exchange Act or otherwise, in the stabilization or manipulation of the price of any security of the Issuers in connection with the offering of the Securities; and

(j)     The Issuers will cooperate with the Initial Purchasers and use their commercially reasonable efforts to permit the Securities to be eligible for clearance and settlement through DTC.

6.    (a)    (i)    Each Issuer represents and agrees that, without the prior consent of the Initial Purchasers, it has not made and will not make any offer relating to the Securities that, if the offering of the Securities contemplated by this Agreement were conducted as a public offering pursuant to a registration statement filed under the Act with the Commission, would constitute an "issuer free writing prospectus," as defined in Rule 433 under the Act (any such offer is hereinafter referred to as a "**Issuer Supplemental Disclosure Document**");

(ii)    Each Initial Purchaser represents and agrees that, without the prior consent of the Issuers and the Representatives, other than one or

18

EFIHMW00035185

more term sheets relating to the Securities containing customary information and conveyed to purchasers of securities, it has not made and will not make any offer relating to the Securities that, if the offering of the Securities contemplated by this Agreement were conducted as a public offering pursuant to a registration statement filed under the Act with the Commission, would constitute a "free writing prospectus," as defined in Rule 405 under the Act, required to be filed with the Commission or retained by the Issuers pursuant to Rule 433 under the Act (any such offer (other than any such term sheets), is hereinafter referred to as an "**Initial Purchaser Supplemental Disclosure Document**"); and

(iii)    Any Issuer Supplemental Disclosure Document or Initial Purchaser Supplemental Disclosure Document the use of which has been consented to by the Issuers and the Initial Purchasers is listed on Schedule II hereto.

7.    Each of the Issuers and EFH, jointly and severally, covenants and agrees with the several Initial Purchasers that the Issuers and EFH will pay or cause to be paid the following:   (i) the fees, disbursements and expenses of the Issuers' counsels and accountants in connection with the issue of the Securities and all other expenses in connection with the preparation, printing, reproduction and filing of the Pricing Memorandum and the Offering Memorandum and any amendments and supplements thereto and the mailing and delivering of copies thereof to the Initial Purchasers and dealers; (ii) the cost of printing or producing any agreement among the Initial Purchasers, this Agreement, the Indenture, the Registration Rights Agreement, the Escrow Agreement, the Security Documents, the blue sky memorandum, closing documents (including any compilations thereof) and any other documents in connection with the offering, purchase, sale and delivery of the Securities; (iii) all expenses in connection with any registration or qualification of the Securities for offer and sale under the blue sky laws of the several states as provided in Section 5(b) or any non-U.S. jurisdiction (including filing fees and the reasonable fees and expenses of counsel for the Initial Purchasers relating to such registration and qualification); (iv) any fees charged by securities rating services for rating the Securities; (v) the cost of preparing, printing, authenticating, issuing and delivering the Securities, including any stamp or transfer taxes in connection with the original issuance and sale of the Securities; (vi) the fees and expenses of the Trustee and the Collateral Trustee, respectively, and any agent of the Trustee and the Collateral Trustee, respectively, and the fees and disbursements of counsel for the Trustee and the Collateral Trustee, respectively, in connection with the Indenture, the Security Documents and the Securities; and (vii) all other costs and expenses incident to the performance by the Issuers of their respective obligations hereunder which are not otherwise specifically provided for in this Section. It is understood, however, that, except as provided in this Section, and Sections 9 and 12 hereof, the Initial Purchasers will pay all of their own costs and expenses, including the

Highly Confidential

EFIHMW00035186

fees of their counsel, transfer taxes on resale of any of the Securities by them, and any advertising expenses connected with any offers they may make.

8. The obligations of the Initial Purchasers under this Agreement shall be subject to the accuracy of the representations and warranties on the part of the Issuers contained herein at the Time of Delivery (unless such representation or warranty speaks only as of a certain date, in which case such representation and warranty need only be true as of such date), to the accuracy, as of the date of such certificate, of the statements of the Issuers made in any certificates pursuant to the provisions hereof, to the performance by the Issuers of their obligations hereunder and to the following additional conditions:

(a) Shearman & Sterling LLP, counsel for the Initial Purchasers, shall have furnished to the Initial Purchasers their written opinion and negative assurance letter, in each case, dated the Time of Delivery, with respect to such matters as the Representatives may reasonably request, and such counsel shall have received such papers and information as they may reasonably request to enable them to pass upon such matters;

(b) (i) Simpson Thacher & Bartlett LLP, counsel for the Issuers and EFH, shall have furnished to you their written opinion, dated the Time of Delivery, substantially in the form of Exhibit A-1 hereto;

(ii) Gibson, Dunn & Crutcher LLP, counsel for the Issuers and EFH, shall have furnished to you their written opinion and negative assurance letter, dated the Time of Delivery, substantially in the form of Exhibit A-2 hereto; and

(iii) Andrew M. Wright, Vice President and Associate General Counsel of EFH Corporate Services Company shall have furnished to you his written opinion, dated the Time of Delivery, substantially in the form of Exhibit A-3 hereto;

(c) On the date of the Offering Memorandum prior to the execution of this Agreement and also at the Time of Delivery, Deloitte & Touche LLP shall have furnished to the Initial Purchasers a letter or letters, dated the respective dates of delivery thereof, in form and substance satisfactory to the Initial Purchasers;

(d) (A) None of the Issuers, EFH or any of their respective subsidiaries shall have sustained since the date of the latest audited financial statements included in the Pricing Disclosure Package any loss or interference with their business from fire, explosion, flood or other calamity, whether or not covered by insurance, or from any labor dispute or court or governmental action, order or decree, otherwise than as set forth or contemplated in the Pricing Disclosure Package, and (B) subsequent to the date hereof or, if earlier, the dates as of which information is given in the Pricing Disclosure

20

EFIHMW00035187

Package and the Offering Memorandum (exclusive of any amendment or supplement thereto), there shall not have been (i) any change specified in the letter or letters referred to in paragraph (c) of this Section 8 or (ii) any change, or any development involving a prospective change, in or affecting the condition (financial or otherwise), prospects, earnings, business or properties of the Issuers or any of their respective subsidiaries, taken as a whole, or EFH or any of its subsidiaries, taken as a whole, whether or not arising from transactions in the ordinary course of business, except as set forth in or contemplated in the Pricing Disclosure Package and the Offering Memorandum (exclusive of any amendment or supplement thereto), the effect of which, in any case referred to in clause (A) or (B) above, is, in the sole judgment of the Initial Purchasers, so material and adverse as to make it impracticable or inadvisable to proceed with the offering, sale or the delivery of the Securities as contemplated by the Pricing Disclosure Package and the Offering Memorandum  (exclusive of any amendment or supplement thereto);

(e)     On or after the Applicable Time (i) no downgrading shall have occurred in the rating accorded the Issuers or EFH or the rating accorded to any of the Issuers' or EFH's debt securities by any "nationally recognized statistical rating organization", as that term was defined by the Commission for purposes of former Rule 436(g)(2) under the Act, and (ii) no such organization shall make a public announcement that it has under surveillance or review, with possible negative implications, its rating of the Issuers or EFH or any of the Issuers' or EFH's debt securities;

(f)     On or after the Applicable Time there shall not have occurred any of the following:  (i) a suspension or material limitation in trading in securities generally on the New York Stock Exchange; (ii) a suspension or material limitation in trading of the Issuers' securities on any exchange or in any over-the-counter market (other than in circumstances described in clause (i) above); (iii) a general moratorium on commercial banking activities declared by either Federal or New York State authorities or a material disruption in commercial banking or securities settlement or clearance services in the United States; (iv) the outbreak or escalation of hostilities involving the United States or the declaration by the United States of a national emergency or war or (v) the occurrence of any other calamity or crisis or any material and adverse change in financial, political or economic conditions in the United States or elsewhere, if the effect of any such event specified in clauses (iv) or (v) in the collective judgment of the Initial Purchasers makes it impracticable or inadvisable to proceed with the offering, sale or the delivery of the Securities on the terms and in the manner contemplated in the Offering Memorandum;

(g)     The Initial Purchasers shall have received a counterpart of the Registration Rights Agreement that shall have been executed and delivered by a duly authorized officer of each of the Issuers;

Highly Confidential

(h)     Each of the Issuers and EFH shall have furnished or caused to be furnished to you at the Time of Delivery a certificate or certificates of the Issuer satisfactory to you, signed by the Chief Financial Officer and Treasurer of each of the Issuers and EFH, dated as of the Time of Delivery, to the effect that the signers of such certificate have examined the Pricing Disclosure Package, the Offering Memorandum and this Agreement and that:

(A)     the representations and warranties of such Issuer or EFH in this Agreement are true and correct in all material respects as if made at the Time of Delivery (unless such representation or warranty speaks only as of a certain date, in which case such representation and warranty need only be true as of such date), and such Issuer or EFH has in all material respects performed all covenants and agreements and satisfied all conditions on its part to be performed or satisfied at or prior to the Time of Delivery;

(B)     subsequent to the respective dates as of which information is given in the Pricing Disclosure Package and the Offering Memorandum, there has not been any event or development with respect to such entity and such entity's consolidated subsidiaries, considered as one entity, that would reasonably be expected to result in a Material Adverse Effect, otherwise than as set forth or contemplated in the Pricing Disclosure Package and the Offering Memorandum;

(i)     Prior to the Time of Delivery, the Issuers shall have obtained all consents, approvals, authorizations and orders of, and shall have duly made all registrations, qualifications and filing with, any court or regulatory authority or other governmental agency or instrumentality required in connection with the execution, delivery and performance of this Agreement, other than such consents, approvals, authorizations, orders, registrations, qualifications and filings that, if not obtained or made, would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect;

(j)     Prior to the Time of Delivery, the Issuers shall have delivered to the Initial Purchasers and their counsel a written certificate executed by Stanley J. Szlauderbach, Controller of EFH, dated the Time of Delivery, substantially in the form of Exhibit B hereto; and

(k)     Prior to the Time of Delivery, the Issuers shall have delivered to the Initial Purchasers and their counsel such further information, certificates and documents related to the transactions contemplated by this Agreement as they may reasonably request.

22

EFIHMW00035189

If (i) any of the conditions specified in this Section 8 shall not have been fulfilled when and as provided in this Agreement, or (ii) any of the opinions and certificates mentioned above or elsewhere in this Agreement shall not be reasonably satisfactory in form and substance to the Initial Purchasers and their counsel, this Agreement and all obligations of the Initial Purchasers hereunder may be cancelled by the Initial Purchasers at, or at any time prior to, the Time of Delivery.  Notice of such cancellation shall be given to the Issuers in writing or by telephone or facsimile and confirmed in writing.

9.    (a)    Each of the Issuers and EFH, agrees, jointly and severally, to indemnify and hold harmless each Initial Purchaser against any losses, claims, damages or liabilities, joint or several, to which such Initial Purchaser may become subject, under the Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in any Preliminary Offering Memorandum, the Pricing Disclosure Package, the Offering Memorandum, or any amendment or supplement thereto, any Issuer Supplemental Disclosure Document, or arise out of or are based upon the omission or alleged omission to state therein a material fact necessary to make the statements therein not misleading, and will reimburse each Initial Purchaser for any legal or other expenses reasonably incurred by such Initial Purchaser in connection with investigating or defending any such action or claim as such expenses are incurred; *provided, however*, that each of the Issuers and EFH shall not be liable in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in any Preliminary Offering Memorandum, the Pricing Disclosure Package, the Offering Memorandum or any such amendment or supplement, or any Issuer Supplemental Disclosure Document, in reliance upon and in conformity with written information furnished to the Issuers by any Initial Purchaser through the Representatives expressly for use therein.

(b)    Each Initial Purchaser, severally and not jointly, will indemnify and hold harmless each of the Issuers and EFH against any losses, claims, damages or liabilities to which the Issuers or EFH may become subject, under the Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in any Preliminary Offering Memorandum, the Pricing Disclosure Package, the Offering Memorandum, or any amendment or supplement thereto, or any Issuer Supplemental Disclosure Document, or arise out of or are based upon the omission or alleged omission to state therein a material fact necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in

23

EFIHMW00035190

any Preliminary Offering Memorandum, the Pricing Disclosure Package, the Offering Memorandum or any such amendment or supplement, or any Issuer Supplemental Disclosure Document in reliance upon and in conformity with written information furnished to the Issuers by such Initial Purchaser through the Representatives expressly for use therein; and will reimburse the indemnified parties for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such action or claim as such expenses are incurred.

(c)    Promptly after receipt by an indemnified party under subsection (a) or (b) above of notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party under such subsection, notify the indemnifying party in writing of the commencement thereof; but the omission to so notify the indemnifying party will not relieve it from any liability which it may have to any indemnified party under subsection (a) or (b) above except to the extent it has been materially prejudiced (through the forfeiture of substantive rights and defenses) by such failure and will not, in any event, relieve the indemnifying party from any obligations to any indemnified party other than the indemnification obligation provided in subsection (a) or (b) above. In case any such action shall be brought against any indemnified party and it shall notify the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel satisfactory to such indemnified party, and, after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party shall not thereafter be responsible for the fees and expenses of the indemnified party, including fees and expenses of any separate counsel retained by the indemnified party or parties, other than reasonable costs incurred in cooperating with the indemnifying party in connection with such action, except as set forth below.    Notwithstanding the indemnifying party's election to appoint counsel (including local counsel) to represent the indemnified party in an action, the indemnified party shall have the right to employ separate counsel (including local counsel), and the indemnifying party shall bear the reasonable fees, costs and expenses of such separate counsel if (i) the use of counsel chosen by the indemnifying party to represent the indemnified party would present such counsel with a conflict of interest; (ii) the actual or potential defendants in, or targets of, any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party; (iii) the indemnifying party shall not have employed counsel reasonably satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of the institution of such action; or

Highly Confidential

EFIHMW00035191

(iv) the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party.    An indemnifying party will not, without the prior written consent of the indemnified parties, settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (with respect to which the indemnified parties (i) are actual parties, or (ii) would reasonably be expected to become parties, to such claim, action, suit or proceeding) unless such settlement, compromise or consent includes an unconditional release of each indemnified party from all liability arising out of such claim, action, suit or proceeding and does not include any statement as to or any admission of fault, culpability or failure to act, by or on behalf of any indemnified party.

(d)    If the indemnification provided for in this Section 9 is unavailable to or insufficient to hold harmless an indemnified party under subsection (a) or (b) above in respect of any losses, claims, damages or liabilities (or actions in respect thereof) referred to therein, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (or actions in respect thereof) in such proportion as is appropriate to reflect the relative benefits received by the Issuers and EFH on the one hand, and the Initial Purchasers on the other, from the offering of the Securities. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law or if the indemnified party failed to give the notice required under subsection (c) above, then each indemnifying party shall contribute to such amount paid or payable by such indemnified party in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the Issuers and EFH on the one hand, and the Initial Purchasers on the other, in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities (or actions in respect thereof), as well as any other relevant equitable considerations.  The relative benefits received by the Issuers and EFH on the one hand, and the Initial Purchasers on the other, shall be deemed to be in the same proportion as the total net proceeds from the offering of the Securities (before deducting expenses) received by the Issuers and EFH bear to the total discounts and commissions received by the Initial Purchasers, therefrom, in each case as set forth in Schedule IV.  The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Issuers and EFH on the one hand, or the Initial Purchasers on the other, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Issuers and EFH and the Initial Purchasers agree that it would not be just and equitable if contribution pursuant to this subsection (d) were determined by *pro rata* allocation (even if the Initial

25

Highly Confidential

EFIHMW00035192

Purchasers were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to above in this subsection (d). The amount paid or payable by an indemnified party as a result of the losses, claims, damages or liabilities (or actions in respect thereof) referred to above in this subsection (d) shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this subsection (d), (i) no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation and (ii) no Initial Purchaser shall be required to contribute any amount in excess of the amount by which the total price at which the Securities purchased by it and distributed to investors were offered to investors exceeds the amount of any damages which such Initial Purchaser has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. The Initial Purchasers' obligations in this subsection (d) to contribute are several in proportion to their respective purchase obligations in connection with the Securities and not joint.

(e)     The obligations of the Issuers and EFH under this Section 9 shall be in addition to any liability which the Issuers and EFH may otherwise have and shall extend, upon the same terms and conditions, to directors, officers, employees and agents of each Initial Purchaser, any affiliate of each Initial Purchaser and each person, if any, who controls any Initial Purchaser within the meaning of the Act; and the obligations of the Initial Purchasers under this Section 9 shall be in addition to any liability which the respective Initial Purchasers may otherwise have and shall extend, upon the same terms and conditions, to each officer and director of the Issuers and to each person, if any, who controls the Issuers within the meaning of the Act.

10.     (a)     If any Initial Purchaser shall default in its obligation to purchase the Securities which it has agreed to purchase hereunder, the Initial Purchasers may in their discretion arrange for the Initial Purchasers or another party or other parties to purchase the Securities on the terms contained herein. If within thirty-six hours after such default by any Initial Purchaser the Representatives do not arrange for the purchase of the Securities, then the Issuers shall be entitled to a further period of thirty-six hours within which to procure another party or other parties satisfactory to the Representatives to purchase such Securities on such terms. In the event that, within the respective prescribed periods, the Initial Purchasers notify the Issuers that they have so arranged for the purchase of such Securities, or the Issuers notify the Initial Purchasers that they have so arranged for the purchase of such Securities, the Initial Purchasers and the Issuers shall have the right to postpone the Time of Delivery for a

26

EFIHMW00035193

period of not more than seven days, in order to effect whatever changes may thereby be made necessary in the Offering Memorandum, or in any other documents or arrangements, and the Issuers agree to prepare promptly any amendments to the Offering Memorandum which in the opinion of the Initial Purchasers may thereby be made necessary.  The term "Initial Purchaser" as used in this Agreement shall include any person substituted under this Section with like effect as if such person had originally been a party to this Agreement with respect to such Securities.

(b)     If, after giving effect to any arrangements for the purchase of the Securities of a defaulting Initial Purchaser or Initial Purchasers by the Issuers as provided in subsection (a) above, the aggregate principal amount of such Securities, which remains unpurchased does not exceed one-eleventh of the aggregate principal amount of all the Securities, then the Issuers shall have the right to require each non-defaulting Initial Purchaser to purchase the principal amount of Securities which such Initial Purchaser agreed to purchase hereunder and, in addition, to require each non-defaulting Initial Purchaser to purchase its *pro rata* share (based on the principal amount of the Securities which such Initial Purchaser agreed to purchase hereunder) of the Securities of such defaulting Initial Purchaser or Initial Purchasers for which such arrangements have not been made; but nothing herein shall relieve a defaulting Initial Purchaser from liability for its default.

(c)     If, after giving effect to any arrangements for the purchase of the Securities of a defaulting Initial Purchaser or Initial Purchasers by the Issuers as provided in subsection (a) above, the aggregate principal amount of the Securities which remains unpurchased exceeds one-eleventh of the aggregate principal amount of all the Securities, or if the Issuers shall not exercise the right described in subsection (b) above to require non-defaulting Initial Purchasers to purchase the Securities of a defaulting Initial Purchaser or Initial Purchasers, then this Agreement shall thereupon terminate, without liability on the part of any non-defaulting Initial Purchaser or the Issuers, except for the expenses to be borne by the Issuers and the Initial Purchasers as provided in Section 7 hereof and the indemnity and contribution agreements in Section 9 hereof; but nothing herein shall relieve a defaulting Initial Purchaser from liability for its default.

11.     The respective indemnities, agreements, representations, warranties and other statements of the Issuers, EFH and the several Initial Purchasers, as set forth in this Agreement or made by or on behalf of them, respectively, pursuant to this Agreement, shall remain in full force and effect, regardless of any investigation (or any statement as to the results thereof) made by or on behalf of any Initial Purchaser or any controlling person of any Initial Purchaser, or the Issuers or any officer or director or controlling person of the Issuers, and shall survive delivery of and payment for the Securities.

27

Highly Confidential

12.     If this Agreement shall be terminated (i) pursuant to Section 8(f) hereof because any condition specified therein shall not have been satisfied (other than the condition specified in Section 8(f)(ii)), (ii) pursuant to Section 10 hereof or (iii) as a result of any other default by any of the Initial Purchasers (each, a "**Selected Termination**"), the Issuers shall not then have any liability to any Initial Purchaser except as provided in Sections 7 and 9 hereof.  If the Securities are not delivered by or on behalf of the Issuers as provided herein, other than due to any Selected Termination, the Issuers shall not then have any liability to any Initial Purchaser except (a) as provided in Sections 7 and 9 hereof and (b) that the Issuers will reimburse the Initial Purchasers on demand for all reasonable expenses (including the reasonable fees and disbursements of Shearman & Sterling LLP) that shall have been incurred by them in connection with the proposed purchase and sale of the Securities.

13.     All statements, requests, notices and agreements hereunder shall be in writing, and if to the Initial Purchasers shall be delivered or sent by mail to Citigroup Global Markets Inc. at 390 Greenwich Street, New York, New York 10013, Attention: Madhur Agarwal and if to the Issuers shall be delivered or sent by mail to the address of the Issuers set forth in the Offering Memorandum, Attention: General Counsel.  Any such statements, requests, notices or agreements shall take effect upon receipt thereof.

14.     This Agreement shall be binding upon, and inure solely to the benefit of, the parties hereto and, to the extent provided in Sections 9 and 11 hereof, the officers and directors of the Issuers and each person who controls the Issuers or any Initial Purchaser, and their respective heirs, executors, administrators, successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.  No purchaser of any of the Securities from any Initial Purchaser shall be deemed a successor or assign by reason merely of such purchase.

15.     Time shall be of the essence of this Agreement.

16.     Each of the Issuers and EFH acknowledges and agrees that (i) the purchase and sale of the Securities pursuant to this Agreement is an arm's-length commercial transaction between each of the Issuers and EFH, on the one hand, and the several Initial Purchasers, on the other, (ii) in connection therewith and with the process leading to such transaction each Initial Purchaser is and has been acting solely as a principal and is not the agent or fiduciary of the Issuers or their respective affiliates, stockholders, creditors or employees or any other party, (iii) no Initial Purchaser has assumed or will assume any advisory or fiduciary responsibility in favor of the Issuers with respect to the offering contemplated hereby or the process leading thereto (irrespective of whether such Initial Purchaser has advised or is currently advising the Issuers on other matters) or any other obligation to the Issuers except the obligations expressly set forth in this Agreement, (iv) the several Initial Purchasers and their respective affiliates may be engaged in a broad range of transactions that involve interests that differ

28

EFIHMW00035195

from those of the Issuers and that the several Initial Purchasers have no obligation to disclose any of such interest by virtue of any fiduciary or advisory relationship, and (v) the Initial Purchasers have not provided any legal, accounting, regulatory or tax advice with respect to the offering contemplated hereby and the Issuers have consulted their own legal, accounting, regulatory and tax advisors to the extent they deemed appropriate. Each of the Issuers and EFH agrees that they will not claim that the Initial Purchasers, or any of them, has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to any of the Issuers or EFH, in connection with such transaction or the process leading thereto.

17.    In accordance with the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), the Initial Purchasers are required to obtain, verify and record information that identifies their respective clients, including the Issuers, which information may include the name and address of their respective clients, as well as other information that will allow the Initial Purchasers to properly identify their respective clients.

18.    This Agreement supersedes all prior agreements and understandings (whether written or oral) among the Issuers or EFH and the Initial Purchasers, or any of them, with respect to the subject matter hereof.

19.    **This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.**

20.    Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

21.    This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which together shall constitute one and the same instrument.

22.    Notwithstanding anything herein to the contrary, the Issuers and EFH (and the Issuers' and EFH's employees, representatives, and other agents) are authorized to disclose to any and all persons, the tax treatment and tax structure of the potential transaction and all materials of any kind (including tax opinions and other tax analyses) provided to the Issuers or EFH relating to that treatment and structure, without the Initial Purchasers' imposing any limitation of any kind. However, any information relating to the tax treatment and tax structure shall remain confidential (and the foregoing sentence shall not apply) to the extent necessary to enable any person to comply with securities laws. For this purpose, "tax treatment" means US federal and state income tax treatment, and "tax structure" is limited to any facts that may be relevant to that treatment.

Highly Confidential                                                                EFIHMW00035196

**PX 057**
**Page 29 of 79**

If the foregoing is in accordance with your understanding, please sign and return to us counterparts hereof, and upon the acceptance hereof by you, on behalf of each of the Initial Purchasers and EFH, this letter and such acceptance hereof shall constitute a binding agreement between each of the Initial Purchasers, the Issuers and EFH.  It is understood that your acceptance of this letter on behalf of each of the Initial Purchasers is pursuant to the authority set forth in a form of Agreement among Initial Purchasers, the form of which shall be submitted to the Issuers and EFH for examination upon request, but without warranty on your part as to the authority of the signers thereof.

30

Highly Confidential

08-09-'12 01:21 TO-   12148124097      FROM- Spectrum Rentals    P0001/0005 T-492 F-071

ENERGY FUTURE HOLDINGS CORP.

By:

Name:  Anthony R. Horton
Title:   Treasurer and Senior Vice President

ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC

By:

Name:  Anthony R. Horton
Title:   Treasurer and Senior Vice President

EFIH FINANCE INC.

By:

Name:  Anthony R. Horton
Title:   Treasurer and Senior Vice President

Purchase Agreement

Highly Confidential

EFIHMW00035198

Accepted as of the date hereof:

Citigroup Global Markets Inc.
Goldman, Sachs & Co.
Credit Suisse Securities (USA) LLC
J.P. Morgan Securities LLC
Morgan Stanley & Co. LLC

For themselves and as
Representatives of the
Several Initial Purchasers
Named in Schedule I hereto

By:   Citigroup Global Markets Inc.

By:   _____
       Name:
       Title:    KIRKWOOD ROLAND
                 DIRECTOR

By:   Goldman, Sachs & Co.

By:   _____
       Name:
       Title:

By:   Credit Suisse Securities (USA) LLC

By:   _____
       Name:
       Title:

By:   J.P. Morgan Securities LLC

By:   _____
       Name:
       Title:

By:   Morgan Stanley & Co. LLC

By:   _____
       Name:
       Title:

EFIH – Purchase Agreement Signature Page

Highly Confidential

EFIHMW00035199

Accepted as of the date hereof:

Citigroup Global Markets Inc.
Goldman, Sachs & Co.
Credit Suisse Securities (USA) LLC
J.P. Morgan Securities LLC
Morgan Stanley & Co. LLC

For themselves and as
Representatives of the
Several Initial Purchasers
Named in Schedule I hereto

By: Citigroup Global Markets Inc.

By: _____
          Name:
          Title:

By: Goldman, Sachs & Co.

By: _____
          Name:
          Title:

By: Credit Suisse Securities (USA) LLC

By: _____
          Name:
          Title:

By: J.P. Morgan Securities LLC

By: _____
          Name:
          Title:

By: Morgan Stanley & Co. LLC

By: _____
          Name:
          Title:

EFIH – Purchase Agreement Signature Page

Highly Confidential

EFIHMW00035200

Accepted as of the date hereof:

Citigroup Global Markets Inc.
Goldman, Sachs & Co.
Credit Suisse Securities (USA) LLC
J.P. Morgan Securities LLC
Morgan Stanley & Co. LLC

For themselves and as
Representatives of the
Several Initial Purchasers
Named in Schedule I hereto

By:   Citigroup Global Markets Inc.

By:   _____
           Name:
           Title:

By:   Goldman, Sachs & Co.

By:   _____
           Name:
           Title:

By:   Credit Suisse Securities (USA) LLC

By:   _____
           Name: Jean-Pierre Boudrias
           Title: Director

By:   J.P. Morgan Securities LLC

By:   _____
           Name:
           Title:

By:   Morgan Stanley & Co. LLC

By:   _____
           Name:
           Title:

EFIH – Purchase Agreement Signature Page

Highly Confidential

Accepted as of the date hereof:

Citigroup Global Markets Inc.
Goldman, Sachs & Co.
Credit Suisse Securities (USA) LLC
J.P. Morgan Securities LLC
Morgan Stanley & Co. LLC

For themselves and as
Representatives of the
Several Initial Purchasers
Named in Schedule I hereto

By:   Citigroup Global Markets Inc.

By:   _____
          Name:
          Title:

By:   Goldman, Sachs & Co.

By:   _____
          Name:
          Title:

By:   Credit Suisse Securities (USA) LLC

By:   _____
          Name:
          Title:

By:   J.P. Morgan Securities LLC

By:   _____
          Name:   T. W. Price
          Title:   Exec Dir

By:   Morgan Stanley & Co. LLC

By:   _____
          Name:
          Title:

EFIH – Purchase Agreement Signature Page

Highly Confidential

Accepted as of the date hereof:

Citigroup Global Markets Inc.
Goldman, Sachs & Co.
Credit Suisse Securities (USA) LLC
J.P. Morgan Securities LLC
Morgan Stanley & Co. LLC

For themselves and as
Representatives of the
Several Initial Purchasers
Named in Schedule I hereto

By:   Citigroup Global Markets Inc.

By:   _____
       Name:
       Title:

By:   Goldman, Sachs & Co.

By:   _____
       Name:
       Title:

By:   Credit Suisse Securities (USA) LLC

By:   _____
       Name:
       Title:

By:   J.P. Morgan Securities LLC

By:   _____
       Name:
       Title:


By:   Morgan Stanley & Co. LLC

By:   _Robert Gauss_____
       Name:  Robert Gauss
       Title:  Vice President

EFIH   Purchase Agreement Signature Page

EFIHMW00035203

**SCHEDULE I**

| Initial Purchasers | Principal Amount of First Lien Notes to be Purchased | Principal Amount of New Second Lien Notes to be Purchased |
|---|---|---|
| Citigroup Global Markets Inc. ................................... | $ 67,500,000 | $ 162,000,000 |
| Goldman, Sachs & Co. ............................................. | 50,000,000 | 120,000,000 |
| Credit Suisse Securities (USA) LLC ......................... | 37,500,000 | 90,000,000 |
| J.P. Morgan Securities LLC ..................................... | 37,500,000 | 90,000,000 |
| Morgan Stanley & Co. LLC ...................................... | 37,500,000 | 90,000,000 |
| KKR Capital Markets LLC ....................................... | 12,500,000 | 30,000,000 |
| The Williams Capital Group, L.P. ............................ | 7,500,000 | 18,000,000 |
| Total .................................................................. | $ 250,000,000 | $ 600,000,000 |

Highly Confidential

EFIHMW00035204

**SCHEDULE II**

(a)    Approved Issuer Supplemental Disclosure Documents:

None

(b)    Approved Initial Purchaser Supplemental Disclosure Documents:

None

Schedule II - 1

Highly Confidential

# SCHEDULE III

**Energy Future Intermediate Holding Company LLC**
**EFIH Finance Inc.**

$250,000,000 6.875% Senior Secured Notes due 2017 (the "first lien notes")
$600,000,000 11.750% Senior Secured Second Lien Notes due 2022 (the "new second lien notes" and, together with the first lien notes, the "notes")

Terms defined in the Preliminary Offering Memorandum dated August 9, 2012 (the "Offering Memorandum") are used as defined therein

**August 9, 2012**

| | |
|---|---|
| Issuer: | Energy Future Intermediate Holding Company LLC EFIH Finance Inc. |

### The first lien notes

| | |
|---|---|
| Securities: | 6.875% Senior Secured Notes due 2017 |
| Maturity: | August 15, 2017 |
| Principal Amount: | $250,000,000 |
| Gross Proceeds: | $250,000,000 |
| Coupon: | 6.875% per annum |
| Issue Price: | 100.000% of principal amount plus accrued interest from the date of issuance of the first lien notes. |
| Yield to Maturity: | 6.875% |
| Settlement Date: | August 14, 2012 (T+3) |
| Interest Payment Dates: | February 15 and August 15 of each year, beginning on February 15, 2013 |
| Redemption: | On and after February 15, 2015, the Issuer may redeem the first lien notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice, at the redemption prices (expressed as percentages of principal amount of the first lien notes to be redeemed) set forth below, plus accrued and unpaid interest thereon and additional interest, if any, to the applicable redemption date, if redeemed during the twelve-month period beginning on |

Schedule III - 1

February 15 of each of the years indicated below:

| Year | Price |
|------|-------|
| 2015 | 103.438% |
| 2016 | 101.719% |
| 2017 | 100.000% |

At any time prior to February 15, 2015, the Issuer may redeem the first lien notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice, at a redemption price equal to 100% of the principal amount of the first lien notes redeemed plus an applicable make-whole premium as of, and accrued and unpaid interest and additional interest, if any, to the date of redemption.

Equity Clawback:

Until February 15, 2015, the Issuer may, at its option, on one or more occasions redeem up to 35% of the aggregate principal amount of first lien notes at a redemption price equal to 106.875% of the aggregate principal amount of the first lien notes, plus accrued and unpaid interest thereon and additional interest, if any, to the applicable redemption date, with the net cash proceeds of one or more equity offerings. However, the Issuer may only make such redemption if at least 50% of the aggregate principal amount of the first lien notes issued under the First Lien Indenture remain outstanding immediately after the occurrence of such redemption, and if each such redemption occurs within 90 days of the date of closing of each such equity offering.

CUSIP/ISIN:

*Rule 144A:* 29269Q AE7 / US29269QAE70

*Reg. S:* U29197 AC1 / USU29197AC19

### The second lien notes

Securities:

11.750% Senior Secured Second Lien Notes due 2022

Maturity:

March 1, 2022

Principal Amount:

$600,000,000

The new second lien notes are part of the same series of notes as, and will be fungible with, the $1,150,000,000 aggregate principal amount of 11.750% Senior Secured Second Lien Notes due 2022 issued on February 6, 2012 and February 28, 2012 (together with the new second lien notes, the "second lien notes")

Schedule III - 2

Highly Confidential

| | |
|---|---|
| Gross Proceeds: | $613,500,000 |
| Coupon: | 11.750% per annum |
| Issue Price: | 102.250% of principal amount plus accrued interest from February 6, 2012 to the date of issuance of the new second lien notes |
| Yield to Worst: | 11.295% |
| Settlement Date: | August 14, 2012 (T+3) |
| Interest Payment Dates: | March 1 and September 1 of each year, beginning on September 1, 2012 |
| Redemption: | On and after March 1, 2017, the Issuer may redeem the second lien notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice, at the redemption prices (expressed as percentages of principal amount of the second lien notes to be redeemed) set forth below, plus accrued and unpaid interest thereon and additional interest, if any, to the applicable redemption date, if redeemed during the twelve-month period beginning on March 1 of each of the years indicated below: |

| Year | Price |
|---|---|
| 2017 | 105.875% |
| 2018 | 103.917% |
| 2019 | 101.958% |
| 2020 and thereafter | 100.000% |

|  |  |
|---|---|
| | At any time prior to March 1, 2017, the Issuer may redeem the second lien notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice, at a redemption price equal to 100% of the principal amount of the second lien notes redeemed plus an applicable make-whole premium as of, and accrued and unpaid interest and additional interest, if any, to the date of redemption. |
| Equity Clawback: | Until March 1, 2015, the Issuer may, at its option, on one or more occasions redeem up to 35% of the aggregate principal amount of second lien notes at a redemption price equal to 111.750% of the aggregate principal amount of the second lien notes, plus accrued and unpaid interest thereon and additional interest, if any, to the applicable redemption date, with the net cash proceeds of one or more equity offerings.  However, the Issuer may only make such redemption if at least 50% of the aggregate principal amount of the second lien notes issued under the Second Lien Indenture remain outstanding immediately after the occurrence of such redemption, and if each such |

Schedule III - 3

EFIHMW00035208

redemption occurs within 90 days of the date of closing of each such equity offering.

| | |
|---|---|
| CUSIP/ISIN: | *Rule 144A:* 29269Q AD9 / US29269QAD97 |
| | *Reg. S:* U29197 AD9 / USU29197AD91 |

**Terms Applicable to All Notes**

Distribution:    Regulation S/144A with registration rights

Supplemental Information to the Offering Memorandum:

EFIH is providing the following supplemental information to the Preliminary Offering Memorandum.

In relation to the information presented under "Capitalization" on page 54 of the Offering Memorandum, as adjusted for the offering, EFIH's cash and cash equivalents as of June 30, 2012 was $283 million, reflecting the estimated net proceeds from the issuance of the notes, including payments to be received for accrued interest on the new second lien notes from February 6, 2012, after payment of the EFIH Dividend to EFH Corp. (the proceeds of which will be used by EFH Corp. to repay the balance of the TCEH Demand Notes).

In relation to the potential action by ratings agencies referred to on page 17 of the Offering Memorandum, Moody's Investors Service announced today that it is lowering its credit rating for Oncor's senior secured debt securities from Baa1 to Baa2 with negative outlook.  In addition, Moody's Investors Service announced today that it is lowering EFH Corp.'s corporate family rating from Caa2 to Caa3, resulting in a lowering of its credit ratings for certain TCEH debt.

Use of Proceeds:    The Issuer will use $680 million of the net proceeds from this offering to pay the EFIH Dividend to EFH Corp. in or before January 2013.  EFH Corp. will use the proceeds from the EFIH Dividend to repay the balance of the TCEH Demand Notes.  The balance of the TCEH Demand Notes outstanding as of June 30, 2012 was $680 million. Pending their application in or before January 2013, that portion of the net proceeds will be held in an escrow account.  Holders of the notes will have no security interest in the escrow account.  The remaining net proceeds will be used for general corporate purposes, which may include the payment of dividends to EFH Corp.

Joint Book-Running Managers:    Citigroup Global Markets Inc.
Goldman, Sachs & Co.

Schedule III - 4

EFIHMW00035209

|  | Credit Suisse Securities (USA) LLC |
|  | J.P. Morgan Securities LLC |
|  | Morgan Stanley & Co. LLC |
| Co-Managers: | KKR Capital Markets LLC |
|  | The Williams Capital Group, L.P. |

**The notes have not been registered under the Securities Act.  The notes may not be offered or sold in the United States or to U.S. persons, except to qualified institutional buyers in reliance on the exemption from registration provided by Rule 144A and to certain persons in offshore transactions in reliance on Regulation S.  You are hereby notified that sellers of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A.**

**The information in this term sheet supplements the Offering Memorandum and supersedes the information in the Offering Memorandum to the extent inconsistent as so supplemented, with the information in the Offering Memorandum.  This term sheet is qualified in its entirety by reference to the Offering Memorandum.**

ANY DISCLAIMERS OR OTHER NOTICES THAT MAY APPEAR BELOW ARE NOT APPLICABLE TO THIS COMMUNICATION AND SHOULD BE DISREGARDED.  SUCH DISCLAIMERS OR OTHER NOTICES WERE AUTOMATICALLY GENERATED AS RESULT OF THIS COMMUNICATION BEING SENT VIA BLOOMBERG OR ANOTHER EMAIL SYSTEM.

Highly Confidential

## SCHEDULE IV

<u>First Lien Notes</u>

Net Proceeds to the Issuers from First Lien Notes (before expenses):  $245,625,000

Initial Purchaser Purchase Price of First Lien Notes:  98.25% ($245,625,000)

<u>New Second Lien Notes</u>

Net Proceeds to the Issuers from New Second Lien Notes (before expenses): $601,500,000

Initial Purchaser Purchase Price of New Second Lien Notes:  100.250% ($601,500,000), plus accrued interest from February 6, 2012 to the Time of Delivery

Schedule IV - 1

Highly Confidential

ANNEX I

(1)     The Securities have not been and will not be registered under the Act and may
        not be offered or sold within the United States or to, or for the account or benefit
        of, U.S. persons except in accordance with Regulation S under the Act or
        pursuant to an exemption from the registration requirements of the Act.  Each
        Initial Purchaser, severally and not jointly, represents that it has offered and sold
        the Securities, and will offer and sell the Securities (i) as part of their distribution
        at any time and (ii) otherwise until 40 days after the later of the commencement
        of the offering and the Time of Delivery, only in accordance with Rule 903 of
        Regulation S or Rule 144A under the Act.   Accordingly, each Initial Purchaser,
        severally and not jointly, agrees that neither it, affiliates that are controlled by
        such Initial Purchaser nor any persons acting on its or their behalf has engaged
        or will engage in any directed selling efforts with respect to the Securities, and it
        and they have complied and will comply with the offering restrictions requirement
        of Regulation S.  Each Initial Purchaser, severally and not jointly, agrees that, at
        or prior to confirmation of sale of Securities (other than a sale pursuant to
        Rule 144A), it will have sent to each distributor, dealer or person receiving a
        selling concession, fee or other remuneration that purchases Securities from it
        during the restricted period a confirmation or notice to substantially the following
        effect:

        "The Securities covered hereby have not been registered under the U.S.
        Securities Act of 1933 (the "Securities Act") and may not be offered and sold
        within the United States or to, or for the account or benefit of, U.S. persons (i) as
        part of their distribution at any time or (ii) otherwise until 40 days after the later of
        the commencement of the offering and the closing date, except in either case in
        accordance with Regulation S (or Rule 144A if available) under the Securities
        Act.  Terms used above have the meaning given to them by Regulation S."

        Terms used in this paragraph have the meanings given to them by Regulation S.

        Each Initial Purchaser, severally and not jointly, further agrees that it has not
        entered and will not enter into any contractual arrangement with respect to the
        distribution or delivery of the Securities, except with its affiliates or with the prior
        written consent of the Issuers.

(2)     Notwithstanding the foregoing, Securities in registered form may be offered, sold
        and delivered by the Initial Purchasers in the United States and to U.S. persons
        pursuant to Section 3 of this Agreement without delivery of the written statement
        required by paragraph (1) above.

(3)     Each Initial Purchaser, severally and not jointly, agrees that it will not offer, sell or
        deliver any of the Securities in any jurisdiction outside the United States except
        under circumstances that will result in compliance with the applicable laws
        thereof, and that it will take at its own expense whatever action is required to
        permit its purchase and resale of the Securities in such jurisdictions.  Each Initial

Highly Confidential

EFIHMW00035212

Purchaser understands that no action has been taken to permit a public offering in any jurisdiction outside the United States where action would be required for such purpose. Each Initial Purchaser, severally and not jointly, agrees not to cause any advertisement of the Securities to be published in any newspaper or periodical or posted in any public place and not to issue any circular relating to the Securities, except in any such case with Goldman, Sachs & Co.'s express written consent and then only at its own risk and expense.

Annex I - 2

EFIHMW00035213

**Exhibit A-1**

August [__], 2012

Citigroup Global Markets Inc.
[Additional initial purchasers to be added]
    as representatives of the several
    Initial Purchasers named in
    Schedule I to the Purchase Agreement
    referred to below

c/o Citigroup Global Markets Inc.
390 Greenwich Street
New York, New York 10013

[c/o   ]

Ladies and Gentlemen:

    We have acted as counsel to Energy Future Holdings Corp., a Texas corporation ("EFH Corp."), Energy Future Intermediate Holding Company LLC, a Delaware limited liability company (the "Company"), and EFIH Finance Inc., a Delaware corporation ("EFIH Finance" and, together with the Company, the "Issuers"), in connection with the purchase by you of $[_____] aggregate principal amount of [___]% Senior Secured Notes due 20[__] (the "First Lien Notes") and $[_____] aggregate principal amount of 11.750% Senior Secured Second Lien Notes due 2022 (the "Second Lien Notes" and, together with the First Lien Notes, the "Notes") issued by the Issuers, pursuant to the Purchase Agreement, dated August [__], 2012 (the "Purchase Agreement"), among EFH Corp., the Issuers and you, as initial purchasers (the "Initial Purchasers").   The Second Lien Notes are additional notes of the same series as the $1,150,000,000 aggregate principal amount of 11.750% Senior Secured Second Lien Notes due

Ex. A-1 - 1

EFIHMW00035214

2022 issued by the Issuers on February 6, 2012 and February 28, 2012 (the "Existing Second Lien Notes"). The Second Lien Notes will increase the aggregate principal amount of, and be consolidated and form a single series with, the Existing Second Lien Notes. The First Lien Notes are a new series of securities.

We have examined the Preliminary Offering Memorandum, dated August [__], 2012, relating to the sale of the Notes (the "Preliminary Offering Memorandum"), and the Offering Memorandum, dated August [__], 2012, relating to the sale of the Notes (the "Offering Memorandum"), each of which incorporates by reference the Company's Annual Report on Form 10-K for the year ended December 31, 2011, the Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2012 and June 30, 3012, the Company's Current Reports on Form 8-K filed on February 2, 2012, February 7, 2012 and February 29, 2012, EFH Corp.'s Annual Report on Form 10-K for the year ended December 31, 2011, EFH Corp.'s Quarterly Reports on Form 10-Q for the quarters ended March 31, 2012 and June 30, 2012, and EFH Corp.'s Current Reports on Form 8-K filed on June 5, 2012, July 3, 2012 and August 7, 2012, each as filed under the Securities Exchange Act of 1934, as amended; the pricing term sheet, dated August [__], 2012, relating to the Notes, in the form annexed to the Purchase Agreement (the "Pricing Term Sheet" and, together with the Preliminary Offering Memorandum, the "Pricing Disclosure Package"); the Indenture, dated as of August [__], 2012 (the "First Lien Indenture"), among the Issuers and The Bank of New York Mellon Trust Company, N.A., as trustee (the "First Lien Trustee"), relating to the First Lien Notes; the Indenture (the "Base Indenture"), dated as of April 25, 2011, as supplemented by the First Supplemental Indenture, dated as of February 6, 2012, the Second Supplemental Indenture, dated as of February 28, 2012, the Third Supplemental Indenture, dated as of May 31, 2012 and the Fourth Supplemental

Ex. A-1 - 2

EFIHMW00035215

Indenture, dated as of August [___], 2012 (the Base Indenture, as so supplemented, the "Second Lien Indenture" and, together with the First Lien Indenture, the "Indentures"), among the Issuers and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Second Lien Trustee" and, together with the First Lien Trustee, the "Trustee"),  relating to the Second Lien Notes; duplicates of the global notes representing the Notes; the Pledge Agreement, dated as of November 16, 2009 (the "Senior Pledge Agreement"), from the Company to The Bank of New York Mellon Trust Company, N.A., as Collateral Trustee (the "Collateral Trustee"); the Junior Lien Pledge Agreement, dated as of April 25, 2011 (the "Junior Pledge Agreement" and, together with the Senior Pledge Agreement, the "Pledge Agreements"), from the Company to the Collateral Trustee; the Collateral Trust Agreement, dated as of November 16, 2009 (such agreement, together with the Joinder Documents (as defined below), the "Collateral Trust Agreement"), among the Company, the First Lien Trustee, the other Secured Debt Representatives named therein and the Collateral Trustee; the Joinder relating to the First Lien Notes, dated August [___], 2012, to the Collateral Trust Agreement (the "First Lien Joinder"), by the First Lien Trustee and acknowledged by the Collateral Trustee; the Joinder relating to the Second Lien Notes, dated April 25, 2011, to the Collateral Trust Agreement (the "Second Lien Joinder"), by the Second Lien Trustee and acknowledged by the Collateral Trustee; the Additional Secured Debt Designation relating to the First Lien Notes, dated August [___], 2012 (the "First Lien Designation"); the Additional Secured Debt Designation relating to the Second Lien Notes, dated August [___], 2012 (the "Second Lien Designation" and, together with the First Lien Designation, the First Lien Joinder and the Second Lien Joinder, the "Joinder Documents"), by the Company and acknowledged by the Collateral Trustee; the Registration Rights Agreement, dated August [___], 2012 (the "Registration Rights Agreement" and, together with

Ex. A-1 - 3

Highly Confidential

the Indentures, the Notes, the Pledge Agreements, the Collateral Trust Agreement and the Purchase Agreement, the "Transaction Documents"), among the Issuers and the Initial Purchasers; and the Purchase Agreement.  We have also examined a copy of the financing statements (the "Delaware Financing Statements"), naming the Company as debtor and the Collateral Trustee as secured party, which were filed in the Office of the Secretary of State of Delaware (the "Delaware Filing Office") on November 16, 2009 and April 25, 2011.  In addition, we have examined, and have relied as to matters of fact upon, the documents delivered to you at the closing and upon originals, or duplicates or certified or conformed copies, of such records, agreements, documents and other instruments and such certificates or comparable documents of public officials and of officers and representatives of the Issuers and EFH Corp. and have made such other investigations, as we have deemed relevant and necessary in connection with the opinions hereinafter set forth.

In such examination, we have assumed the genuineness of all signatures, the legal capacity of natural persons, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as duplicates or certified or conformed copies and the authenticity of the originals of such latter documents.  We have also assumed that (i) EFH Corp. is validly existing and in good standing under the law of the State of Texas; (ii) EFH Corp. has duly authorized, executed and delivered the Purchase Agreement in accordance with the law of the State of Texas; (iii) the execution, delivery and performance by EFH Corp. of the Purchase Agreement does not violate the laws of any jurisdiction (except that no such assumption is made with respect to the federal law of the United States and the law of the State of New York, the Delaware Limited Liability Company Act and the Delaware General Corporation Law); and (iv) the execution, delivery and performance by EFH Corp. of the

Highly Confidential

Purchase Agreement does not constitute a violation or breach of its charter, by-laws or similar organizational documents. We have further assumed that (1) the Company has rights in the Collateral (as defined in each of the Pledge Agreements) existing on the date hereof and will have rights in property which becomes Collateral after the date hereof and (2) "value" (as defined in Section 1-201(44) of the Uniform Commercial Code as in effect on the date hereof in the State of New York (the "New York UCC")) has been given by the holders of the Notes to the Company for the security interests and other rights in the Collateral.

Based upon the foregoing, and subject to the qualifications, assumptions and limitations stated herein, we are of the opinion that:

1.     The Company has been duly formed and is validly existing and in good standing as a limited liability company under the law of the State of Delaware and has full limited liability company power and authority to conduct its business as described in the Pricing Disclosure Package and the Offering Memorandum.

2.     EFIH Finance has been duly incorporated and is validly existing and in good standing as a corporation under the law of the State of Delaware and has full corporate power and authority to conduct its business as described in the Pricing Disclosure Package and the Offering Memorandum.

3.     The Purchase Agreement has been duly authorized, executed and delivered by the Issuers and duly executed and delivered in accordance with the law of the State of New York by EFH Corp.

4.     Each Indenture has been duly authorized, executed and delivered by the Issuers and, assuming that such Indenture is the valid and legally binding obligation of the Trustee, constitutes a valid and legally binding obligation of the Issuers, enforceable against the Issuers in accordance with its terms.

5.     The Notes have been duly authorized, executed and issued by the Issuers and, assuming due authentication thereof by the Trustee and upon payment and delivery in accordance with the Purchase Agreement, will constitute valid and legally binding obligations of the Issuers, enforceable against the Issuers in accordance with their terms and entitled to the benefits of the First Lien Indenture, in the case of the First Lien Notes, and the Second Lien Indenture, in the case of the Second Lien Notes.

Ex. A-1 - 5

6.      The Senior Pledge Agreement has been duly authorized, executed and delivered by the Company and constitutes a valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms.

7.      The Junior Pledge Agreement has been duly authorized, executed and delivered by the Company and constitutes a valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms.

8.      The Collateral Trust Agreement has been duly authorized, executed and delivered by the Company and, assuming that the Collateral Trust Agreement is the valid and legally binding obligation of the Collateral Trustee, the Collateral Trust Agreement constitutes a valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms.

9.      The Senior Pledge Agreement, together with the First Lien Designation, creates a valid security interest in favor of the Collateral Trustee for the benefit of the Trustee and the holders of the First Lien Notes in the collateral described therein in which a security interest may be created under Article 9 of the New York UCC (the "First Lien Article 9 Collateral").

10.     The Junior Pledge Agreement, together with the Second Lien Designation, creates a valid security interest in favor of the Collateral Trustee for the benefit of the Trustee and the holders of the Second Lien Notes in the collateral described therein in which a security interest may be created under Article 9 of the New York UCC (the "Second Lien Article 9 Collateral" and, together with the First Lien Article 9 Collateral, the "Article 9 Collateral").

11.     The Registration Rights Agreement has been duly authorized, executed and delivered by the Issuers and, assuming that the Registration Rights Agreement is the valid and legally binding obligation of the Initial Purchasers, constitutes a valid and legally binding obligation of the Issuers, enforceable against the Issuers in accordance with its terms.

12.     The statements made in each of the Preliminary Offering Memorandum and the Offering Memorandum under the captions "Description of the First Lien Notes" and "Description of the Second Lien Notes," including, in the case of the Preliminary Offering Memorandum, the information contain in the Pricing Term Sheet, insofar as they purport to constitute summaries of certain terms of the documents referred to therein, constitute accurate summaries of the terms of such documents in all material respects.

13.     The issuance and sale of the Notes by the Issuers, the execution, delivery and performance of the Purchase Agreement and the Registration Rights Agreement by the Issuers, the execution and delivery of the Indentures by the Issuers and the granting of the security interest by the Company under the Collateral Trust Agreement and the Pledge Agreements will not breach or result in a default under any of the agreements or instruments identified on Schedule I hereto, nor will such actions violate the certificate of

Ex. A-1 - 6

EFIHMW00035219

formation or limited liability company agreement of the Company, the certificate of incorporation or by-laws of EFIH Finance or any U.S. federal or New York state statute or the Delaware Limited Liability Company Act or the Delaware General Corporation Law or any rule or regulation that has been issued pursuant to any U.S. federal or New York state statute or the Delaware Limited Liability Company Act or the Delaware General Corporation Law or any order known to us issued pursuant to any U.S. federal or New York state statute or the Delaware Limited Liability Company Act or the Delaware General Corporation Law by any court or governmental agency or body having jurisdiction over the Issuers or any of their properties, except that it is understood that no opinion is given in this paragraph 13 with respect to (i) any matters subject to federal law and regulations relating to the generation, storage, sale or transmission of electricity or the ownership or operation of generating facilities (including, without limitation, nuclear generating facilities) or transmission facilities (including, without limitation, the Atomic Energy Act of 1954, as amended, the Federal Power Act, the Energy Policy Act of 2005, the Interstate Commerce Act and the Public Utility Holding Company Act of 2005 and, in each case, the rules and regulations promulgated thereunder and such other rules, regulations and orders administered by the U.S. Federal Energy Regulatory Commission, the U.S. Nuclear Regulatory Commission and the U.S. Environmental Protection Agency) or (ii) any federal or state securities law or any rule or regulation issued pursuant to any federal or state securities law.

14.    No consent, approval, authorization, order, registration or qualification of or with any U.S. federal or New York state governmental agency or body or any Delaware state governmental agency or body acting pursuant to the Delaware Limited Liability Company Act or the Delaware General Corporation Law or, to our knowledge, any U.S. federal or New York state court or any Delaware court acting pursuant to the Delaware Limited Liability Company Act or the Delaware General Corporation Law is required for the issue and sale of the Notes by the Issuers, compliance by the Issuers with all of the provisions of the Purchase Agreement, the Registration Rights Agreement and the Indentures and compliance by the Company with all of the provisions of the Collateral Trust Agreement and the Pledge Agreements and the granting of the security interests thereunder, other than filings required for the perfection of security interests granted pursuant to each of the Pledge Agreements, except that it is understood that no opinion is given in this paragraph 14 with respect to (i) any matters subject to federal law and regulations relating to the generation, storage, sale or transmission of electricity or the ownership or operation of generating facilities (including, without limitation, nuclear generating facilities) or transmission facilities (including, without limitation, the Atomic Energy Act of 1954, as amended, the Federal Power Act, the Energy Policy Act of 2005, the Interstate Commerce Act and the Public Utility Holding Company Act of 2005 and, in each case, the rules and regulations promulgated thereunder and such other rules, regulations and orders administered by the U.S. Federal Energy Regulatory Commission, the U.S. Nuclear Regulatory Commission and the U.S. Environmental Protection Agency) or (ii) any federal or state securities law or any rule or regulation issued pursuant to any federal or state securities law.

15.    Neither of the Issuers is, and after giving effect to the offer and sale of the Notes and the application of the net proceeds therefrom (as described in the Offering

Highly Confidential

Memorandum), as of the date hereof neither of them will be, an "investment company" within the meaning of and subject to regulation under the Investment Company Act of 1940, as amended.

16.    No qualification of the Indentures under the Trust Indenture Act of 1939, as amended, is required for the offer and sale of the Notes by the Issuers to the Initial Purchasers or the reoffer and resale of the Notes by the Initial Purchasers to the initial purchasers therefrom solely in the manner contemplated by the Offering Memorandum, the Purchase Agreement and the Indentures.

A.    The Exchange Securities (as defined in the Purchase Agreement) have been duly authorized by the Issuers.

We express no opinion as to the law of the State of Delaware (other than the Delaware General Corporation Law and the Delaware Limited Liability Company Act); however, we have reviewed Article 9 of the Uniform Commercial Code in effect in the State of Delaware as set forth in the Commerce Clearing House, Inc. Secured Transactions Guide as supplemented through [_____], 2012 (the "Delaware UCC") and, based solely on such review, we advise you that (a) the Delaware Financing Statements were in appropriate form for filing in the Delaware Filing Office and (b) the Delaware Financing Statements having been filed in the Delaware Filing Office and the First Lien Designation and the Second Lien Designation having been delivered, (x) the Collateral Trustee has a perfected security interest for the benefit of the First Lien Trustee and the holders of the First Lien Notes in that portion of the First Lien Article 9 Collateral in which a security interest is perfected by filing a financing statement in the Delaware Filing Office and (y) the Collateral Trustee has a perfected security interest for the benefit of the Second Lien Trustee and the holders of the Second Lien Notes in that portion of the Second Lien Article 9 Collateral in which a security interest is perfected by filing a financing statement in the Delaware Filing Office.

Ex. A-1 - 8

Highly Confidential

EFIHMW00035221

Our opinions set forth in paragraphs 4, 5, 6, 7, 8, 9, 10 and 11 above are subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, (ii) general equitable principles (whether considered in a proceeding in equity or at law) and (iii) an implied covenant of good faith and fair dealing.  Our opinion in paragraph 11 above is further limited by considerations of public policy.

Our opinions in paragraphs 6, 7 and 8 above are subject to the qualification that certain provisions of the Pledge Agreements and the Collateral Trust Agreement may not be enforceable in whole or in part, although the inclusion of such provisions would not render the Pledge Agreements or the Collateral Trust Agreement invalid, and the Pledge Agreements and the Collateral Trust Agreement and the law of the State of New York contain adequate remedial provisions for the practical realization of the rights and benefits afforded thereby.

Our opinions in paragraph 9 and 10 above, and our advice in the third preceding paragraph, are limited to Article 9 of the New York UCC or the Delaware UCC, as the case may be, and, therefore, such opinion and advice paragraphs do not address (i) collateral of a type not subject to Article 9 of the New York UCC or the Delaware UCC, as the case may be, and (ii) the issue of which law governs perfection of the security interests granted in the collateral covered by this opinion letter.

We express no opinion as to the validity, legally binding effect or enforceability of any provisions of the Registration Rights Agreement, the Indentures or the Notes that requires or relates to payment of any interest at a rate or in an amount that a court would determine in the circumstances under applicable law to be commercially unreasonable or a penalty or a forfeiture.

Ex. A-1 - 9

EFIHMW00035222

In addition, we express no opinion as to the validity, legally binding effect or enforceability of (i) the waiver of rights and defenses contained in Section [4.06] of the Base Indenture and the First Lien Indenture or Section [9(h)] of the Registration Rights Agreement or (ii) Section [13.13] of the Base Indenture and the First Lien Indenture or Section [9(k)] of the Registration Rights Agreement, relating to the severability of provisions of such documents.

We express no opinion and render no advice with respect to:

(i)      perfection of any security interest in (1) any collateral of a type represented by a certificate of title and (2) any collateral consisting of money or cash equivalents;

(ii)     the effect of § 9-315(a)(2) of the New York UCC with respect to any proceeds of Collateral that are not identifiable;

(iii)    perfection of any security interest whose priority is subject to Section 9-334 of the New York UCC;

(iv)     the priority of any security interest;

(v)      the effect of Section 552 of the U.S. Bankruptcy Code (11 U.S.C. 552) (relating to property acquired by a pledgor after the commencement of a case under the U.S. Bankruptcy Code with respect to such pledgor) and Section 506(c) of the U.S. Bankruptcy Code (11 U.S.C. 506(c)) (relating to certain costs and expenses of a trustee in preserving or disposing of collateral); or

(vi)     the effect of any provision of either Pledge Agreement or the Collateral Trust Agreement which is intended to establish any standard other than a standard set forth in the New York UCC as the measure of the performance by any party thereto of such party's obligations of good faith, diligence, reasonableness or care or of the fulfillment of the duties imposed on any secured party with respect to the maintenance, disposition or redemption of collateral, accounting for surplus proceeds of collateral or accepting collateral in discharge of liabilities.

Our opinions set forth in paragraphs 13 and 14 above are limited to our review only of statutes, rules and regulations that, in our experience, are customarily applicable to transactions of the type contemplated by the Offering Memorandum, the Purchase Agreement and the Indentures.

Ex. A-1 - 10

Highly Confidential

We understand that, with respect to all matters of Texas law, you are relying on the opinion of Gibson Dunn & Crutcher LLP, counsel to the Company, dated the date hereof.

We do not express any opinion herein concerning any law other than the law of the State of New York, the federal law of the United States, the Delaware General Corporation Law and the Delaware Limited Liability Company Act.

This opinion letter is rendered to you in connection with the above-described transaction. This opinion letter may not be relied upon by you for any other purpose, or relied upon by, or furnished to, any other person, firm or corporation without our prior written consent, except that the Trustee may rely upon paragraphs 1, 2, 4, 5, 15, 16 and 17 above and the Collateral Trustee may rely upon paragraphs 6, 7, 8, 9 and 10 above, subject to the qualifications, assumptions and limitations relating thereto.

Very truly yours,

SIMPSON THACHER & BARTLETT LLP

Ex. A-1 - 11

EFIHMW00035224

SCHEDULE I

1.  Indenture and Deed of Trust, dated as of May 1, 2002, between Oncor Electric Delivery Company and The Bank of New York, as trustee, as supplemented by the Supplemental Indenture No. 1, dated as of October 25, 2005, between TXU Electric Delivery Company (formerly known as Oncor Electric Delivery Company) and The Bank of New York, as trustee, and the Supplemental Indenture No. 2, dated as of May 15, 2008, between Oncor Electric Delivery Company LLC (formerly known as TXU Electric Delivery Company, formerly known as Oncor Electric Delivery Company) and The Bank of New York, as trustee, together with (i) an Officer's Certificate 1-S-1, dated May 6, 2002, pursuant to which the 6.375% Senior Secured Notes due 2012 and the 7.000% Senior Secured Notes due 2032 of Oncor Electric Delivery Company were issued and (ii) an Officer's Certificate 2-S-2, dated December 20, 2002, pursuant to which the 6.375% Senior Secured Notes due 2015 and 7.250% Senior Secured Notes due 2033 of Oncor Electric Delivery Company were issued.

2.  Indenture, dated as of August 1, 2002, between Oncor Electric Delivery Company and The Bank of New York, as trustee, as supplemented by the Supplemental Indenture No. 1, dated as of May 15, 2008, between Oncor Electric Delivery Company LLC (formerly known as TXU Electric Delivery Company, formerly known as Oncor Electric Delivery Company) and The Bank of New York, as trustee, together with (i) an Officer's Certificate 1-D-1, dated August 30, 2002, pursuant to which the 7% Debentures due 2022 of Oncor Electric Delivery Company were issued, (ii) an Officer's Certificate 3-SN-1, dated September 8, 2008, pursuant to which the 5.95% Senior Secured Notes due 2013, the 6.80% Senior Secured Notes due 2018 and the 7.50% Senior Secured Notes due 2038 of Oncor Electric Delivery Company were issued, (iii) an Officer's Certificate 1-SN-1, dated September 13, 2010, pursuant to which the 5.25% Senior Secured Notes due 2040 of Oncor Electric Delivery Company LLC were issued and (iv) an Officer's Certificate, dated October 8, 2010, pursuant to which the 5.00% Senior Secured Notes due 2017 and the 5.75% Senior Secured Notes due 2020 of Oncor Electric Delivery Company LLC were issued.

3.  Indenture, dated as of November 1, 2004, as supplemented by the Supplemental Indenture, dated as of July 1, 2010, each between Energy Future Holdings Corp. (formerly TXU Corp.) and The Bank of New York Mellon (formerly known as The Bank of New York), as trustee, together with an Officer's Certificate, dated as of November 26, 2004, pursuant to which the 5.55% Series P Senior Notes due November 15, 2014 of Energy Future Holdings Corp. were issued.

4.  Indenture, dated as of November 1, 2004, between Energy Future Holdings Corp. (formerly TXU Corp.) and The Bank of New York Mellon (formerly known as The Bank of New York), as trustee, together with an Officer's Certificate, dated as of November 26, 2004, pursuant to which the 6.50% Series Q Senior Notes due November 15, 2024 of Energy Future Holdings Corp. were issued.

Ex. A-1 - 12

Highly Confidential

EFIHMW00035225

5. Indenture, dated as of November 1, 2004, between Energy Future Holdings Corp. (formerly TXU Corp.) and The Bank of New York Mellon (formerly known as The Bank of New York), as trustee, together with an Officer's Certificate, dated as of November 26, 2004, pursuant to which the 6.55% Series R Senior Notes due November 15, 2034 of Energy Future Holdings Corp. were issued.

6. Indenture, dated as of October 31, 2007, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A. (as successor to The Bank of New York), as trustee, as supplemented by the Supplemental Indenture, dated as of July 8, 2008, between Energy Future Intermediate Holding Company LLC and The Bank of New York Mellon Trust Company, N.A., as trustee, the Second Supplemental Indenture, dated as of August 3, 2009, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, the Third Supplemental Indenture, dated as of July 29, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, and the Fourth Supplemental Indenture, dated as of October 18, 2011, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, pursuant to which the 10.875% Senior Notes due 2017 and the 11.250%/12.000% Senior Toggle Notes due 2017 of Energy Future Holdings Corp. were issued.

7. Investor Rights Agreement, dated as of November 5, 2008, by and among Oncor Electric Delivery Company LLC, Oncor Electric Delivery Holdings Company LLC, Texas Transmission Investment LLC and Energy Future Holdings Corp.

8. Indenture, dated as of November 16, 2009, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, pursuant to which the 9.75% Senior Secured Notes due 2019 of Energy Future Holdings Corp. were issued.

9. Indenture, dated as of November 16, 2009, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as trustee, pursuant to which the 9.75% Senior Secured Notes due 2019 of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. were issued.

10. Pledge Agreement, dated as of November 16, 2009, from Energy Future Intermediate Holding Company LLC to The Bank of New York Mellon Trust Company, N.A., as collateral trustee.

Ex. A-1 - 13

Highly Confidential

11.  Collateral Trust Agreement, dated as of November 16, 2009, among Energy Future Intermediate Holding Company LLC, The Bank of New York Mellon Trust Company, N.A., as first lien trustee, the other Secured Debt Representatives named therein and The Bank of New York Mellon Trust Company, N.A., as collateral trustee.

12.  Indenture, dated as of January 12, 2010, as supplemented by the First Supplemental Indenture, dated as of March 16, 2010, the Second Supplemental Indenture, dated as of April 13, 2010, the Third Supplemental Indenture, dated as of April 14, 2010, the Fourth Supplemental Indenture, dated as of May 21, 2010, the Fifth Supplemental Indenture, dated as of July 2, 2010, the Sixth Supplemental Indenture, dated as of July 6, 2010, and the Seventh Supplemental Indenture, dated as of July 7, 2010, each among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, pursuant to which the 10.000% Senior Secured Notes due 2020 of Energy Future Holdings Corp. were issued.

13.  Indenture, dated as of August 17, 2010, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as trustee, pursuant to which the 10.000% Senior Secured Notes due 2020 of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. were issued.

14.  Junior Lien Pledge Agreement, dated as of April 25, 2011, from Energy Future Intermediate Holding Company LLC to The Bank of New York Mellon Trust Company, N.A., as collateral trustee.

15.  Amended and Restated Revolving Credit Agreement, dated as of October 11, 2011, among Oncor Electric Delivery Company LLC, as borrower, the lenders listed therein, JPMorgan Chase Bank, N.A., as administrative agent for the lenders, JPMorgan Chase Bank, N.A., as swingline lender, and JPMorgan Chase Bank, N.A., Barclays Bank PLC, The Royal Bank of Scotland plc, Bank of America, N.A. and Citibank, N.A., as fronting banks for letters of credit issued thereunder

Ex. A-1 - 14

EFIHMW00035227

**Exhibit A-2**

August [___], 2012

Citigroup Global Markets Inc.
[_____]
[_____]
[_____]

     as representatives of the initial purchasers named in Schedule I
     to the Purchase Agreement referred to below

c/o Citigroup Global Markets Inc.
390 Greenwich Street
New York, New York 10013

     [c/o _____]
     [c/o _____]
     [c/o _____]]

Re: *Senior Secured Notes and Senior Secured Second Lien Notes – Energy Future*
     *Intermediate Holding Company LLC and EFIH Finance Inc.*

Ladies and Gentlemen:

We have acted as counsel to Energy Future Intermediate Holding Company LLC, a Delaware limited liability company (the "Company"), and EFIH Finance Inc., a Delaware corporation ("EFIH Finance" and, together with the Company, the "Issuers"), in connection with the offering and sale by the Issuers of $250,000,000 principal amount of the Issuers' [___]% Senior Secured Notes due 2017 (the "First Lien Notes") and $500,000,000 principal amount of the Issuers' 11.750% Senior Secured Second Lien Notes due 2022 (the "Second Lien Notes" and, together with the First Lien Notes, the "Notes") to you, severally and not jointly, as initial purchasers (the "Initial Purchasers"), pursuant to the Purchase Agreement, dated August [___], 2012 (the "Purchase Agreement"), among the Issuers, Energy Future Holdings Corp., a Texas corporation ("EFH Corp." and, together with the Issuers, the "EFH Parties"), and you, as Initial Purchasers. The First Lien Notes are being issued pursuant to the Indenture, dated as of August [___], 2012 (the "First Lien Indenture"), between the Issuers and The Bank of New York Mellon Trust Company, N.A., as Trustee (the "Trustee"). The Second Lien Notes are being issued pursuant to the Indenture, dated as of April 25, 2011, as amended and supplemented by the First Supplemental Indenture, dated as of February 6, 2012, the Second Supplemental Indenture, dated as of February 28, 2012, the Third Supplemental Indenture, dated as of May 31, 2012, and the Fourth Supplemental Indenture, dated as of August [___], 2012 (as so supplemented, the "Second Lien Indenture" and, together with the First Lien Indenture, the "Indentures"), between the Issuers and the Trustee. The Purchase Agreement contemplates that the Issuers and the Initial Purchasers will enter

Ex. A-2 - 1

EFIHMW00035228

into a Registration Rights Agreement, dated as of August [__], 2012 (the "Registration Rights Agreement").  Pursuant to the Registration Rights Agreement, the Issuers have agreed under certain circumstances to file a registration statement on Form S-4 under the Securities Act of 1933, as amended (the "Securities Act"), with the Securities and Exchange Commission (the "Commission") pursuant to which the Issuers would register new securities that would be issued in exchange for the Notes (the "Exchange Notes").  This letter is delivered to you pursuant to [Section 8(b)(ii)] of the Purchase Agreement.

In arriving at the opinions expressed below, we have examined originals, or copies certified or otherwise identified to our satisfaction as being true and complete copies of the originals, of the following documents and instruments:

(i)      The Purchase Agreement;

(ii)     the Indentures;

(iii)    certificates evidencing the global Notes;

(iv)    the Registration Rights Agreement;

(v)     an Additional Secured Debt Designation, dated August [__], 2012 (the "Secured Debt Designations"), by the Company and acknowledged by The Bank of New York Mellon Trust Company, N.A., in its capacity as collateral trustee, with respect to each of the First Lien Notes and the Second Lien Notes;

(vi)    the Escrow Agreement, dated as of August [_], 2012, between the Company and The Bank of New York Mellon Trust Company, N.A., as escrow agent (the "Escrow Agreement");

(vii)   the section of the Offering Memorandum entitled "Certain United States Federal Tax Consequences"; and

(viii)  such other documents, corporate records, certificates of officers of the Issuers and of public officials and other instruments as we have deemed necessary or advisable to enable us to render these opinions.

The documents listed in clauses (i) through (vi) above are referred to herein collectively as the "Note Documents".

In our examination, we have assumed without independent investigation the genuineness of all signatures, the legal capacity and competency of all natural persons, the authenticity of all documents submitted to us as originals and the conformity to original documents of all documents submitted to us as copies.  To the extent that our opinions may be dependent upon such matters, we have assumed, without independent investigation, that each of the parties thereto, other than EFH Corp., has all requisite corporate or other entity power to execute, deliver and perform its obligations under the Note Documents to which it is a party; that the execution and delivery of such documents by each such party and the performance of its obligations thereunder have been duly authorized by all necessary corporate or other action

Ex. A-2 - 2

EFIHMW00035229

and except as expressly addressed in our opinions in paragraph 5 below, do not violate any law, regulation, order, judgment or decree applicable to each such party; and that such documents have been duly executed and delivered by each such party.  As to any facts material to these opinions, we have relied to the extent we deemed appropriate and without independent investigation upon statements and representations of officers and other representatives of the EFH Parties and others.  Capitalized terms used herein and not otherwise defined herein are used herein as defined in the Purchase Agreement.

Based upon the foregoing, and subject to the assumptions, exceptions, qualifications and limitations set forth herein, we are of the opinion that:

      1.     EFH Corp. is a validly existing corporation in good standing under the laws of the State of Texas.

      2.     EFH Corp. has all requisite corporate power to execute and deliver the Purchase Agreement and to perform its obligations thereunder.

      3.     The execution and delivery by EFH Corp. of the Purchase Agreement and the performance of its obligations thereunder have been duly authorized by all necessary corporate action.  The Purchase Agreement has been duly executed and delivered by EFH Corp.

      4.     The execution and delivery by the Company of the Escrow Agreement and the performance of its obligations thereunder have been duly authorized by all necessary corporate action.  The Escrow Agreement has been duly executed and delivered by the Company.

      5.     The execution and delivery by each of the EFH Parties of the Note Documents to which it is a party, the performance of its obligations thereunder, and the issuance by the Issuers of the Notes to the Initial Purchasers do not and will not:

      (i)     violate the charter or bylaws of EFH Corp.;

      (ii)     (A) result in a breach of or default under or (B) except to the extent described in the Note Documents, result in or require the creation or imposition of any lien or encumbrance upon any assets of any EFH Party under, any agreement that is listed on <u>Annex A</u>;

      (iii)     violate any order, judgment or decree of any court or other agency of government that is listed on <u>Annex B</u>;

      (iv)     result in any violation by any EFH Party of any Applicable Law (as defined below); and

      (v)     require that any Governmental Approval (as defined below) be obtained or taken by any EFH Party, other than any such Governmental Approval that has been obtained or taken, and is in full force and effect, as of the date hereof.

Ex. A-2 - 3

6.      Assuming the accuracy of the representations and warranties of the Issuers and the Initial Purchasers and compliance by them with their agreements contained in the Purchase Agreement, no registration of the Notes under the Securities Act is required for the sale and delivery of the Notes to the Initial Purchasers on the date hereof or for resales by the Initial Purchasers in the manner contemplated by the Purchase Agreement and the Offering Memorandum, dated August [__], 2012, issued in connection with the offer and sale of the Notes, it being understood that we express no opinion as to any subsequent resale of the Notes.

7.      To the extent that the statements in the Offering Memorandum under the caption "Certain United States Federal Tax Consequences," purport to describe specific provisions of the Internal Revenue Code of 1986, as amended, or the rules and regulations thereunder, such statements present in all material respects an accurate summary of such provisions.

As used herein (i) the term "Applicable Laws" means those laws, rules and regulations of the State of Texas and the rules, orders and regulations adopted thereunder (including protocols, rules and guidelines of the Electric Reliability Council of Texas), and including any order known to us that is issued by any Texas court, that, in our experience, are normally applicable to transactions of the type contemplated by the Note Documents, including without limitation Title 2 of the Texas Utilities Code and the rules, orders and regulations adopted thereunder and the final order in PUCT Docket No. 34077 (herein referred to collectively as the "Texas Electric Utilities Laws") and (ii) the term "Governmental Approvals" means, to the extent that, in our experience, any of the following are normally applicable to transactions of the type contemplated by the Note Documents, any consent, approval, license, permit, registration, certification, authorization or validation of, or filing, final order by, recording or registration with, any entity properly exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including without limitation the Electric Reliability Council of Texas, pursuant to any Applicable Laws.

The opinions expressed above are subject to the following additional exceptions, qualifications, limitations and assumptions:

1.      We render no opinion herein as to matters involving the laws of any jurisdiction other than the State of Texas and, for purposes of paragraphs 6 and 7 above, the United States of America.  This opinion is limited to the effect of the current state of the laws of the State of Texas and, to the limited extent set forth above, the United States of America and the facts as they currently exist.  We assume no obligation to revise or supplement this opinion in the event of future changes in such laws or the interpretations thereof or such facts.

2.      We express no opinion regarding (i) any state laws, rules or regulations relating to:  (A) pollution or protection of the environment; (B) zoning, land use, building or construction; (C) occupational safety and health or other similar matters; (D) labor, employee rights and benefits; (E) the regulation of utilities, except as to the Texas Electric Utilities Laws; (F) antitrust and trade regulation; (G) tax; (H) corrupt practices; and (I) copyrights,

Ex. A-2 - 4

EFIHMW00035231

patents and trademarks, and (ii) any laws, rules or regulations of any county, municipality or similar political subdivision or any agency or instrumentality thereof.  Except as expressly set forth in paragraph 6, we express no opinion regarding the Securities Act, the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Trust Indenture Act of 1939, as amended, the Investment Company Act of 1940, as amended, or any other federal or state securities laws or regulations.

3.      In rendering our opinions expressed in paragraph 5(ii) insofar as they require interpretation of any agreement referred to therein, we express no opinion with respect to the compliance by the Company or any of its subsidiaries with any covenants included in any such agreement to the extent compliance depends on financial calculations or data.

4.      In rendering our opinions in paragraphs 5(iii), 5(iv) and 5(v) above, we have assumed, with your permission and without independent verification, that (i) no EFH Party is an "electric utility" as such term is defined in Section 31.002(6) of the Texas Utilities Code; (ii) each entity owning in excess of a 4.5% direct or indirect equity interest in any EFH Party either (A) owns no interest in electric generating facilities that generate electricity that is offered for sale in the State of Texas or (B) is a broker or dealer registered under the Exchange Act, or a bank or insurance company, as defined in the Exchange Act; (iii) no entity owning any interest in electric generating facilities that generate electricity that is offered for sale in the State of Texas, which acquired any direct or indirect interest in any EFH Party, either has the ability to take, or has taken, any action that could reasonably be perceived to exert substantial influence or control over the policies and actions of any EFH Party, or any of their respective subsidiaries, prior to acquiring a direct or indirect equity interest in the EFH Parties; and (iv) all sales of electricity by each EFH Party will be to wholesale customers located within the Electric Reliability Council of Texas.  Due to the absence of controlling judicial precedent, our opinions in paragraphs 5(iv) and 5(v) above are necessarily a reasoned application of general legal principles, rules of construction and legal precedent that we believe may be persuasive, but not necessarily controlling.  Accordingly, these matters are not free from doubt and our opinions are not intended as a guaranty as to what position the Public Utility Commission of Texas might take or as to what a particular court would actually hold; rather, our opinion is an expression of our professional judgment as to the decision a court exercising reasonable judgement should reach if the issue were properly presented to it and the court followed what we believe to be the applicable legal principles under existing statutory and judicial precedent.  We express no opinion as to whether Governmental Approvals may be required to foreclose on the collateral securing the Notes, or otherwise to assume control of Oncor Electric Delivery Holdings Company LLC.

Ex. A-2 - 5

Highly Confidential

The opinions expressed above are solely for your benefit in connection with the transactions contemplated by the Purchase Agreement and the Indentures and are not to be used for any other purpose or circulated, quoted or otherwise referred to without, in each case, our written permission, except that (a) The Bank of New York Mellon Trust Company, N.A., in its capacity as Trustee under the Indentures, may rely on paragraphs 5 and 6 above as if it was addressed to it and (b) The Bank of New York Mellon Trust Company, N.A. , in its capacity as Escrow Agent under the Escrow Agreement, may rely on paragraphs 4 and 5 above as if it was addressed to it.

Very truly yours,

Ex. A-2 - 6

Highly Confidential

EFIHMW00035233

# ANNEX A

## Material Contracts
## [EFH TO CONFIRM/UPDATE]

1.   **Receivables Facility**

a.   Tenth Omnibus Amendment dated as of March [_], 2012 (the "Tenth Omnibus Amendment"), among TXU Receivables Company, a Delaware corporation, in the capacities therein stated ("TXU Receivables"), TXU Business Services Company, a Texas corporation, in the capacities therein stated ("TXUBS"), TXU Energy Retail Company LLC, a Texas limited liability company, as an Originator ("TXU Energy Retail"), TXU SESCO Energy Services Company, a Texas corporation, as an Originator ("TXU SESCO" and together with TXU Energy Retail, the "Originators"), TXU Corp., a Texas corporation ("TXU"), Citibank, N.A., and Citicorp North America, Inc., in the capacities therein stated, including as Administrative Agent (the "Agent").

b.   Second Amended and Restated Contribution and Sale Agreement by and among TXU Energy Retail Company LP, TXU SESCO Energy Services Company, each as an Originator, and TXU Receivables Company, as Buyer, and TXU Business Services Company, as Buyer's Collection Agent and TXU Corp., dated as of August 4, 2003, as amended by the Omnibus Amendment Agreement dated as of September 25, 2003, the Second Omnibus Amendment Agreement, dated as of September 30, 2003, the Third Omnibus Amendment Agreement, dated as of October 1, 2003, the Fourth Omnibus Amendment Agreement, dated as of November 5, 2003, the Fifth Omnibus Amendment Agreement, dated as of June 30, 2004, the Sixth Omnibus Amendment Agreement, dated as of April 29, 2005, the Seventh Omnibus Amendment Agreement, dated as of June 17, 2005, the Eighth Omnibus Amendment Agreement, dated as of October 10, 2007, the Ninth Omnibus Amendment, dated as of [_____], and the Tenth Omnibus Amendment (the "Contribution and Sale Agreement").

c.   Amended and Restated Trade Receivables Purchase and Sale Agreement by and among TXU Receivables Company, as Seller, TXU Business Services Company, as Collection Agent, JPMorgan Chase Bank, N.A., ABN AMRO Bank N.V., Calyon, New York Branch and Citicorp North America, Inc., as Administrative Agent, dated as of August 4, 2003, as amended by the Omnibus Amendment Agreement dated as of September 25, 2003, the Second Omnibus Amendment Agreement, dated as of September 30, 2003, the Third Omnibus Amendment Agreement, dated as of October 1, 2003, the Fourth Omnibus Amendment Agreement, dated as of November 5, 2003, the Fifth Omnibus Amendment Agreement, dated as of June 30, 2004, the Sixth Omnibus Amendment Agreement, dated as of April 29, 2005, the Seventh Omnibus Amendment Agreement, dated as of June 17, 2005, the Eighth Omnibus Amendment Agreement, dated as of October 10, 2007, the Ninth

Ex. A-2 - 7

EFIHMW00035234

Omnibus Amendment, dated as of [_____], the Tenth Omnibus Amendment, and the Amendment to the Amended and Restated Trade Receivables Purchase and Sales Agreements, dated as of June 11, 2010, and the Amendment to Amended and Restated Trade Receivables Purchase and Sale Agreement, dates as of June 15, 2012  (the "Parallel Purchase Commitment").

d.   Fourth Amended and Restated Trade Receivables Purchase and Sale Agreement by and among TXU Receivables Company, as Seller, TXU Business Services Company, as Collection Agent, and Chariot Funding LLC (as assignee of Jupiter Securitization Corporation), Windmill Funding Corporation, Ciesco LLC and Atlantic Asset Securitization LLC (as successor to Atlantic Asset Securitization Corp.) as Purchasers, and JPMorgan Chase Bank, N.A., ABN AMRO Bank N.V., Citicorp North America, Calyon, New York Branch, and Citicorp North America, Inc, as Administrative Agent, dated as of August 4, 2003, as amended by the Omnibus Amendment Agreement dated as of September 25, 2003, the Second Omnibus Amendment Agreement, dated as of September 30, 2003, the Third Omnibus Amendment Agreement, dated as of October 1, 2003, the Fourth Omnibus Amendment Agreement, dated as of November 5, 2003, the Fifth Omnibus Amendment Agreement, dated as of June 30, 2004, the Sixth Omnibus Amendment Agreement, dated as of April 29, 2005, the Seventh Omnibus Amendment Agreement, dated as of June 17, 2005, the Eighth Omnibus Amendment Agreement, dated as of October 10, 2007, the Ninth Omnibus Amendment, dated as of [_____], and the Tenth Omnibus Amendment, and the Amendment to the Amended and Restated Trade Receivables Purchase and Sales Agreements, dated as of June 11, 2010 (the "Fourth Amended Agreement" and together with the Parallel Purchase Agreement, the "Receivables Purchase Agreements").

e.   Subordinated Note dated October 10, 2007 by TXU Receivables Company in favor of TXU Energy Retail Company LLC.

f.   Second Amended and Restated Parent Undertaking Agreement, dated as of October 10, 2007, made by Texas Competitive Electric Holdings Company LLC in favor of TXU Receivables Company, CAFCO, LLC, CHARTA, LLC, CRC Funding, LLC, Citibank, N.A., the other Purchasers and Banks that from time to time become party to either of the Purchase Agreements referred to below, Citicorp North America, Inc., and the other Managing Agents, Group Managing Agents and other Indemnified Parties under the Receivables Agreements as defined and referred to therein.

2.   **Energy Plaza Lease**

a.   Lease Agreement dated as of February 14, 2002 between U.S. Bank, N.A. (as successor-in-interest to State Street Bank and Trust Company of Connecticut,

Ex. A-2 - 8

National Association), as owner trustee of the ZSF/Dallas Tower Trust, as Lessor, and TXU Properties Company, as Lessee

    b.    First Amendment to Lease Agreement dated as of June 1, 2007

    c.    Master Letter Agreement dated as of June 1, 2007 among TXU Properties Company, the Lessor, various lenders and others.

**3.    Organizational Documents of Oncor Electric Delivery Holdings Company LLC and Oncor Electric Delivery Company LLC**

    a.    Certificate of Formation of Oncor Electric Delivery Holdings Company LLC, dated October 5, 2007

    b.    Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery Holdings Company LLC, dated November 5, 2008, among Energy Future Intermediate Holding Company LLC, William T. Hill, Jr. and Richard W. Wortham III

    c.    Certificate of Formation of Oncor Electric Delivery Company LLC, dated October 5, 2007

    d.    Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery Company LLC, dated as of November 5, 2008, by and among Oncor Electric Delivery Holdings Company LLC, Texas Transmission Investment LLC and Oncor Management LLC, as amended by the First Amendment to the Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery Company LLC, entered into as of February 18, 2009, by and among Oncor Electric Delivery Holdings Company LLC, Texas Transmission Investment LLC and Oncor Management LLC

Highly Confidential

EFIHMW00035236

**ANNEX B**

**Material Orders, Judgments and Decrees**

1.      Order on Rehearing, PUCT Docket No. 34077, *Joint Report and Application of Oncor Electric Delivery Company and Texas Energy Future Holdings Limited Partnership Pursuant to PURA § 14.101.*

Ex. A-2 - 10

Highly Confidential

August [___], 2012

Citigroup Global Markets Inc.
[_____]
[_____]
[_____]
      as representatives of the initial purchasers named in Schedule I
      to the Purchase Agreement referred to below

c/o Citigroup Global Markets Inc.
390 Greenwich Street
New York, New York 10013

[c/o _____]

[c/o _____]

[c/o _____]]

Ladies and Gentlemen:

We have acted as counsel to Energy Future Intermediate Holding Company LLC, a Delaware limited liability company (the "Company"), and EFIH Finance Inc., a Delaware corporation ("EFIH Finance" and, together with the Company, the "Issuers"), in connection with the offering and sale by the Issuers of $250,000,000 principal amount of the Issuers' [__]% Senior Secured Notes due 2017 (the "First Lien Notes") and $500,000,000 principal amount of the Issuers' 11.750% Senior Secured Second Lien Notes due 2022 (the "Second Lien Notes" and, together with the First Lien Notes, the "Securities") to you, severally and not jointly, as initial purchasers (the "Initial Purchasers"), pursuant to the purchase agreement dated August [__], 2012 (the "Purchase Agreement") among the Issuers, Energy Future Holdings Corp., a Texas corporation ("EFH"), and you as Initial Purchasers. The First Lien Notes are being issued pursuant to the Indenture, dated as of August [__], 2012 (the "First Lien Indenture"), between the Issuers and The Bank of New York Mellon Trust Company, N.A., as Trustee (the "Trustee"). The Second Lien Notes are being issued pursuant to the Indenture, dated as of April 25, 2011, as amended and supplemented by the First Supplemental Indenture, dated as of February 6, 2012, the Second Supplemental Indenture, dated as of February 28, 2012, the Third Supplemental Indenture, dated as of May 31, 2012, and the Fourth Supplemental Indenture, dated as of August [__], 2012 (as so supplemented, the "Second Lien Indenture" and, together with the First Lien Indenture, the "Indentures"), between the Issuers and the Trustee. This letter is delivered to you pursuant to Section 8(b)(ii) of the Purchase Agreement.

In connection with the offering and sale of the Securities, we have reviewed (i) the Issuers' Preliminary Offering Memorandum, dated August [__], 2012 (the "Preliminary Offering Memorandum"), (ii) the final pricing term sheet dated August [__], 2012, prepared pursuant to Section 1(b) and Schedule III of the Purchase Agreement and attached as Exhibit A hereto (the "Term Sheet"), and (iii) the Issuers' Offering Memorandum, dated August [__], 2012

Ex. A-2 - 11

EFIHMW00035238

(the "Final Offering Memorandum").  The Preliminary Offering Memorandum, including the information incorporated therein by reference (as updated or superseded as provided therein) prior to [____] [a.m./p.m.] Eastern time, on August [__], 2012 (the "Applicable Time"), and the Term Sheet are collectively called the "General Disclosure Package".

We have participated in conferences with officers and other representatives of the Issuers and EFH, representatives of the independent auditors of the Issuers and EFH and your representatives and counsel at which the contents of the General Disclosure Package and the Final Offering Memorandum and related matters were discussed.  Because the purpose of our professional engagement was not to establish or confirm factual matters and because we did not independently undertake to verify the accuracy, completeness or fairness of the statements set forth in the General Disclosure Package or the Final Offering Memorandum, we are not passing upon and do not assume any responsibility for the accuracy, completeness or fairness of the statements contained in the General Disclosure Package or the Final Offering Memorandum except insofar as such statements specifically relate to us or as specifically addressed in paragraph 7 of our legal opinion addressed to you of even date herewith.  Our identification of information as constituting the General Disclosure Package is for the limited purpose of making the statements set forth in this letter.  We express no opinion or belief as to the conveyance of the General Disclosure Package or the Final Offering Memorandum or the information contained therein to investors generally or to any particular investors at any particular time or in any particular manner.

On the basis of the foregoing, and except for the financial statements and schedules and other accounting or financial information included or incorporated by reference therein, as to which we express no opinion or belief, no facts have come to our attention that led us to believe that (i) the General Disclosure Package, at the Applicable Time, included an untrue statement of material fact or omitted to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading or (ii) the Final Offering Memorandum, as of its date or as of the date hereof, included or includes an untrue statement of a material fact or omitted or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

We assume no obligation to revise or supplement this letter in the event of any changes in law or fact arising after the date hereof.  The statements made in this letter are solely for your benefit in connection with the transactions contemplated by the Purchase Agreement and the Indenture and are not to be used for any other purpose or circulated, quoted or otherwise referred to without, in each case, our written permission.

Very truly yours,

Ex. A-2 - 12

EFIHMW00035239

**Exhibit A-3**

**[Insert EFH Corp. Letterhead]**

August [_], 2012

Citigroup Global Markets Inc.
[_____]
[_____]
[_____]

      as representatives of the initial purchasers named in Schedule I
      to the Purchase Agreement referred to below

c/o Citigroup Global Markets Inc.
390 Greenwich Street
New York, New York 10013

[_____]

[_____]

[_____]]

Ladies and Gentlemen:

I am the Vice President and Deputy General Counsel of EFH Corporate Services Company, a wholly-owned subsidiary of Energy Future Holdings Corp., a Texas corporation ("EFH Corp."). As such, I have acted as counsel to Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), and EFIH Finance Inc., a Delaware corporation ("EFIH Finance" and, together with EFIH, the "Issuers"), in connection with the issuance and sale by the Issuers of $250,000,000 in aggregate principal amount of their [__]% Senior Secured Notes due 2017 (the "First Lien Notes") and $500,000,000 in aggregate principal amount of their 11.750% Senior Secured Second Lien Notes due 2022 (the "Second Lien Notes" and, together with the First Lien Notes, the "Notes") pursuant to that certain Purchase Agreement, dated August [__], 2012 (the "Purchase Agreement"), among the Issuers, EFH Corp. and you, as the initial purchasers (the "Initial Purchasers"). The Issuers and EFH Corp. are referred to collectively herein as the "EFH Parties". Capitalized terms used in this opinion and not defined herein shall have the respective meanings assigned thereto in the Purchase Agreement. This opinion is delivered to you pursuant to Section 8(b)(iii) of the Purchase Agreement.

I have examined the Preliminary Offering Memorandum dated August [__], 2012 (the "Preliminary Offering Memorandum" and, together with the information set forth on Schedule III to the Purchase Agreement, the "Pricing Disclosure Package") and the Offering Memorandum dated August [__], 2012 (the "Offering Memorandum").

Highly Confidential

EFIHMW00035240

Based upon, and subject to, the limitations and qualifications stated below, I am of the opinion that, as of the date hereof, other than as disclosed in or incorporated by reference into the Pricing Disclosure Package and the Offering Memorandum, (i) to my knowledge, there is no action, suit or proceeding now pending before or by any court, arbitrator or governmental agency, body or official to which the EFH Parties are a party or to which the business, assets or property of the EFH Parties are subject, and (ii) to my knowledge, no action, suit or proceeding is currently threatened in writing to which the EFH Parties would be a party or to which the business, assets or property of the EFH Parties would be subject, that in each case of (i) or (ii), could reasonably be expected to result in a Material Adverse Effect or could reasonably be expected to result in a material adverse effect on the performance by the EFH Parties of the Purchase Agreement and the other Transaction Documents, the issuance of the Securities or the consummation of any of the transactions contemplated thereby or described in the Pricing Disclosure Package and the Offering Memorandum (exclusive of any amendment or supplement thereto).

I am a member of the Bar of the State of Texas. I do not express any opinion herein concerning any law other than the law of the State of Texas and the federal law of the United States. I have relied as to various questions of fact upon representations and warranties made by the EFH Parties contained in the Purchase Agreement and upon certificates of officers of the EFH Parties furnished pursuant to the Purchase Agreement. In addition, I have examined, and have relied as to matters of fact upon, the documents delivered to you at the closing and originals, or duplicates or certified or conformed copies, of such corporate records, agreements, documents and other instruments and such certificates or comparable documents of public officials and of officers and representatives of the EFH Parties and have made such other investigations as I have deemed relevant and necessary in connection with the opinion set forth herein.

This opinion is limited to the laws and facts in effect on the date hereof.  I disclaim any obligation to advise you of facts, circumstances, events or developments that hereafter may be brought to my attention and that might alter, affect or modify the opinion expressed herein.

This opinion is given to you solely for the use of the Initial Purchasers in connection with the Purchase Agreement and the transactions contemplated therein and may not be relied upon by (or delivered to) any other person.

Sincerely,


Andrew M. Wright
Vice President and Deputy General Counsel
EFH Corporate Services Company

Ex. B - 2

EFIHMW00035241

**Exhibit A-3**

[UPDATE]

Ex. A-3 - 1

Highly Confidential

EFIHMW00035242

**Exhibit B**

# ENERGY FUTURE HOLDINGS CORP.

### Controller's Certificate

### Dated August [●], 2012

Reference is made to the Purchase Agreement, dated August [●], 2012 (the "Agreement"), by and among Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), EFIH Finance, Inc., a Delaware corporation ("EFIH Finance" and, together with EFIH, the "Issuers"), Energy Future Holdings Corp., a Texas corporation and the immediate parent of the Issuers (the "Company"), and the initial purchasers named therein (the "Initial Purchasers"), with respect to the issuance and sale of $[●] aggregate principal amount of the Issuers' [●]% Senior Secured Notes due 20[●] (the "First Lien Notes") and $[●] aggregate principal amount of the Issuers' 11.750% Senior Secured Second Lien Notes due 2022 (the "New Second Lien Notes," and together with the First Lien Notes, the "Securities"). Capitalized terms not defined in this certificate have the meaning ascribed to them in the Agreement.

I, Stanley J. Szlauderbach, Controller of the Company, hereby certify, in the name and on behalf of the Company, that:

1. I am the duly qualified and acting Controller of the Company and, as such, I am (a) responsible for the Company's financial accounting, (b) familiar with the Company's operations and internal accounting records and (c) qualified to certify the information certified herein.

2. I have read certain information included in the Company's Annual Report on Form 10-K for the year ended December 31, 2011 as filed with the Securities and Exchange Commission (the "SEC") on February 21, 2012 (the "EFH 10-K"), EFIH's Annual Report on Form 10-K for the year ended December 31, 2011 as filed with the SEC on February 21, 2012 (the "EFIH 10-K"), the Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2012 and June 30, 2012 as filed with the SEC on May 1, 2012 and July 31, 2012 (collectively, the "EFH 10-Qs") and EFIH's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2012 and June 30, 2012 as filed with the SEC on May 1, 2012 and July 31, 2012, respectively (collectively, the "EFIH 10-Qs"), each of which information is circled on the pages from the EFH 10-K, EFIH 10-K, EFH 10-Qs and EFIH 10-Qs attached hereto as Exhibit A (the "Circled Information").

3. The Circled Information is accurate in all material respects as of the Applicable Time and as of the date hereof.

4. I, or persons under my direct supervision who are knowledgeable about the Company's financial accounting matters, have compared or proved the arithmetical accuracy of the Circled Information with the amount, number or percentage included in a schedule or report prepared by employees in the Company's accounting department and found them to be in agreement.

Ex. B - 1

EFIHMW00035243

5. This certificate is being furnished to the Initial Purchasers to assist the Initial Purchasers in conducting and documenting their investigation of the affairs of the Company in connection with the offering and sale of the Securities covered by the Offering Memorandum.

[Signature Page Follows]

Ex. B - 2

Highly Confidential

IN WITNESS WHEREOF, the undersigned officer has hereunto executed this Controller's Certificate as of the date first set forth above.

ENERGY FUTURE HOLDINGS CORP.

By:_____
        Name:  Stanley J. Szlauderbach
        Title:   Controller

Ex. B - 3

EFIHMW00035245

**EXHIBIT A**

Ex. B - 4

Highly Confidential