"*GAAP*" means generally accepted accounting principles in the United States which are in effect on the Closing Date.

"*Government Authority*" means any nation or government, any state, province, territory or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including without limitation, ERCOT.

"*Government Securities*" means securities that are:

(1) direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged; or

(2) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America,

which, in either case, are not callable or redeemable at the option of the issuers thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to any such Government Securities or a specific payment of principal of or interest on any such Government Securities held by such custodian for the account of the holder of such depository receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the Government Securities or the specific payment of principal of or interest on the Government Securities evidenced by such depository receipt.

"*guarantee*" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"*Guarantee*" means the guarantee by any Guarantor of the Issuer's Obligations under the Indenture and the Notes.

"*Guarantor*" means each Restricted Subsidiary that Guarantees the Notes in accordance with the terms of the Indenture.

"*Hazardous Materials*" means (a) any petroleum or petroleum products, radioactive materials, friable asbestos, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing regulated levels of polychlorinated biphenyls and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "toxic substances," "toxic pollutants," "contaminants," or "pollutants" or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, which is prohibited, limited or regulated by any Environmental Law.

"*Hedging Obligations*" means with respect to any Person, the obligations of such Person under (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms

225

EFIHMW00034148

and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement and (c) physical or financial commodity contracts or agreements, power purchase or sale agreements, fuel purchase or sale agreements, environmental credit purchase or sale agreements, power transmission agreements, commodity transportation agreements, fuel storage agreements, netting agreements (including Netting Agreements), capacity agreement and commercial or trading agreements, each with respect to, or including the purchase, sale, exchange of (or the option to purchase, sell or exchange), transmission, transportation, storage, distribution, processing, sale, lease or hedge of, any Covered Commodity price or price indices for any such Covered Commodity or services or any other similar derivative agreements, and any other similar agreements.

"*Holder*" means the Person in whose name a Note is registered on the registrar's books.

"*Incremental Deposit L/C Loans*" means any Incremental Deposit L/C Loans under, and as defined in, any Credit Facilities.

"*Indebtedness*" means, with respect to any Person, without duplication:

(1) any indebtedness (including principal and premium) of such Person, whether or not contingent;

(a) in respect of borrowed money;

(b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof);

(c) representing the balance deferred and unpaid of the purchase price of any property (including Capitalized Lease Obligations), except (i) any such balance that constitutes a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business and (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP; or

(d) representing any Hedging Obligations;

if and to the extent that any of the foregoing Indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2) to the extent not otherwise included, any obligation by such Person to be liable for, or to pay, as obligor, guarantor or otherwise on, the obligations of the type referred to in clause (1) of a third Person (whether or not such items would appear upon the balance sheet of the such obligor or guarantor), other than by endorsement of negotiable instruments for collection in the ordinary course of business (for the avoidance of doubt, the obligations of the type referred to in clause (1) shall not include EFH Corp.'s obligations to repay indebtedness to TCEH and/or its Subsidiaries from time to time evidenced under notes existing on the 2021 Notes Issue Date); and

(3) to the extent not otherwise included, the obligations of the type referred to in clause (1) of a third Person secured by a Lien on any asset owned by such first Person, whether or not such Indebtedness is assumed by such first Person; *provided* that the amount of Indebtedness of such first Person for purposes of this clause (3) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such first Person in good faith;

226

Highly Confidential

*provided*, *however*, that notwithstanding the foregoing, Indebtedness shall be deemed not to include (a) Contingent Obligations incurred in the ordinary course of business or (b) obligations under or in respect of Receivables Facilities or (c) amounts payable by and between EFIH and its Subsidiaries in connection with retail clawback or other regulatory transition issues.

"*Independent Financial Advisor*" means an accounting, appraisal, investment banking firm or consultant to Persons engaged in Similar Businesses of nationally recognized standing that is, in the good faith judgment of EFIH, qualified to perform the task for which it has been engaged.

"*Initial Purchasers*" means Citigroup Global Markets Inc., Goldman, Sachs & Co., Credit Suisse Securities (USA) LLC, J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, KKR Capital Markets LLC and The Williams Capital Group, L.P.

"*Intercompany Loan*" means a senior, unsecured loan by EFIH or any of its Restricted Subsidiaries to EFH Corp., with an interest rate commensurate with an arm's length relationship.

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's, BBB- (or the equivalent) by S&P or an equivalent rating by any other Rating Agency.

"*Investment Grade Securities*" means:

(1) securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents);

(2) debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or instruments constituting loans or advances among EFIH and its Subsidiaries;

(3) investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) of this definition which fund may also hold immaterial amounts of cash pending investment or distribution; and

(4) corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"*Investments*" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit, advances to customers, commissions, travel and similar advances to officers and employees, in each case made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet (excluding the footnotes) of EFIH in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. For purposes of the definition of "Unrestricted Subsidiary" and the covenant described under "—Certain Covenants—Limitation on Restricted Payments":

(1) "Investments" shall include the portion (proportionate to EFIH's equity interest in such Subsidiary) of the fair market value of the net assets of a Subsidiary of EFIH at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided*, *however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, EFIH shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

(a) EFIH's "Investment" in such Subsidiary at the time of such redesignation; less

(b) the portion (proportionate to EFIH's equity interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation; and

(2) any property transferred to or from an Unrestricted Subsidiary shall be valued at its fair market value at the time of such transfer, in each case as determined in good faith by EFIH.

227

EFIHMW00034150

**PX 058**
**Page 236 of 308**

---

(3) Hedging Obligations of the Issuer or any Guarantor incurred to hedge or manage interest rate risk with respect to Junior Lien Debt; *provided* that, pursuant to the terms of the Junior Lien Documents, such Hedging Obligations are secured by a Junior Lien on all of the assets and properties that secure the Indebtedness in respect of which such Hedging Obligations are incurred.

"*Junior Lien Documents*" means, collectively, the Indenture, any additional indenture, credit agreement or other agreement governing a Series of Junior Lien Debt and the Security Documents that create or perfect Liens securing Junior Lien Obligations.

"*Junior Lien Obligations*" means Junior Lien Debt and all other Obligations in respect thereof.

"*Junior Lien Representative*" means (1) the Trustee, in the case of the 2022 Notes and the 2021 Notes, and (2) in the case of any future Series of Junior Lien Debt, the trustee, agent or representative of the holders of such Series of Junior Lien Debt who (a) is appointed as a Junior Lien Representative (for purposes related to the administration of the Security Documents) pursuant to the indenture, credit agreement or other agreement governing such Series of Junior Lien Debt, together with its successors in such capacity, and (b) has become a party to the Collateral Trust Agreement by executing a joinder in the form required under the Collateral Trust Agreement.

"*Legal Holiday*" means a Saturday, a Sunday or a day on which commercial banking institutions are not required to be open in the State of New York.

"*Lien*" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction; *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"*Lien Sharing and Priority Confirmation*" means:

(1) as to any Series of Senior Lien Debt, the written agreement enforceable against the holders of such Series of Senior Lien Debt, as set forth in the applicable Secured Debt Document:

(a) for the enforceable benefit of all holders of each existing and future Series of Senior Lien Debt and each existing and future Senior Lien Representative, that all Senior Lien Obligations will be and are secured equally and ratably by all Senior Liens at any time granted by the Issuer or any Guarantor to secure any Obligations in respect of such Series of Senior Lien Debt, and that all such Senior Liens will be enforceable by the Collateral Trustee for the benefit of all holders of Senior Lien Obligations equally and ratably;

(b) for the enforceable benefit of all holders of each existing and future Series of Senior Lien Debt and Series of Junior Lien Debt, and each existing and future Senior Lien Representative and Junior Lien Representative, that the holders of Obligations in respect of such Series of Senior Lien Debt are bound by the provisions of the Collateral Trust Agreement, including the provisions relating to the ranking of Senior Liens and the order of application of proceeds from enforcement of Senior Liens; and

(c) consenting to and directing the Collateral Trustee to perform its obligations under the Collateral Trust Agreement and the other security documents in respect of the Secured Debt Obligations.

229

EFIHMW00034152

(2) as to any Series of Junior Lien Debt, the written agreement enforceable against the holders of such Series of Junior Lien Debt, as set forth in the applicable Secured Debt Document:

(a) for the enforceable benefit of all holders of each existing and future Series of Junior Lien Debt and Series of Senior Lien Debt and each existing and future Junior Lien Representative and Senior Lien Representative, that all Junior Lien Obligations will be and are secured equally and ratably by all Junior Liens at any time granted by the Issuer or any Guarantor to secure any Obligations in respect of such Series of Junior Lien Debt, and that all such Junior Liens will be enforceable by the Collateral Trustee for the benefit of all holders of Junior Lien Obligations equally and ratably;

(b) for the enforceable benefit of all holders of each existing and future Series of Senior Lien Debt and Series of Junior Lien Debt and each existing and future Senior Lien Representative and Junior Lien Representative, that the holders of Obligations in respect of such Series of Junior Lien Debt are bound by the provisions of the Collateral Trust Agreement, including the provisions relating to the ranking of Junior Liens and the order of application of proceeds from the enforcement of Junior Liens; and

(c) consenting to and directing the Collateral Trustee to perform its obligations under the Collateral Trust Agreement and the other security documents in respect of the Secured Debt Obligations.

"*Moody's*" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"*Necessary CapEx Debt*" means Indebtedness of EFIH or any of its Restricted Subsidiaries incurred for the purpose of financing Necessary Capital Expenditures.

"*Necessary Capital Expenditures*" means capital expenditures by EFIH and its Restricted Subsidiaries that are required by applicable law (other than Environmental Law) or otherwise undertaken voluntarily for health and safety reasons (other than as required by Environmental Law). The term "Necessary Capital Expenditures" does not include any capital expenditure undertaken primarily to increase the efficiency of, expand or re-power any power generation facility.

"*Net Income*" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"*Net Proceeds*" means the aggregate cash proceeds and Cash Equivalents received by EFIH or any of its Restricted Subsidiaries in respect of any Asset Sale (including a Casualty Event), including any cash and Cash Equivalents received upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale (including a Casualty Event), net of the direct costs relating to such Asset Sale (including a Casualty Event) and the sale or disposition of such Designated Non-cash Consideration, including legal, accounting and investment banking fees, and brokerage and sales commissions, any relocation expenses incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), amounts required to be applied using proceeds from Asset Sales (other than Asset Sales of Collateral or other Oncor-related Assets) to the repayment of principal, premium, if any, and interest on other Senior Indebtedness required (other than required by clause (1) of the second paragraph under "—Repurchase at the Option of Holders—Asset Sales") to be paid as a result of such transaction and any deduction of appropriate amounts to be provided by EFIH or any of its Restricted Subsidiaries as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by EFIH or any of its Restricted Subsidiaries after such

Highly Confidential

EFIHMW00034153

sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"*Netting Agreement*" shall mean a netting agreement, master netting agreement or other similar document having the same effect as a netting agreement or master netting agreement and, as applicable, any collateral annex, security agreement or other similar document related to any master netting agreement or Permitted Contract.

"*Note Obligations*" means the Notes, the Guarantees, if any, and all other Obligations of the Issuer and each Guarantor, if any, under the Indenture, the Notes, the Guarantees, if any, and the Security Documents.

"*Obligations*" means any principal, interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law), premium, penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities, and guarantees of payment of such principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities, payable under the documentation governing any Indebtedness.

"*Officer*" means the Chairman of the Board, the Chief Executive Officer, the President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of EFIH or other Person, as the case may be.

"*Officer's Certificate*" means a certificate signed on behalf of EFIH by an Officer of EFIH or on behalf of another Person by an Officer of such Person, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of EFIH or such other Person, as applicable, that meets the requirements set forth in the Indenture.

"*Oncor Electric Delivery Facility*" means the revolving credit agreement entered into as of the Closing Date, as amended and restated on October 11, 2011, by and among Oncor Electric Delivery, as borrower, the lenders party thereto in their capacities as lenders thereunder and JPMorgan Chase Bank, N.A., as Administrative Agent, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof.

"*Oncor Holdings*" means Oncor Electric Delivery Holdings Company LLC.

"*Oncor-related Assets*" means the Equity Interests of any of the Oncor Subsidiaries or any Successor Oncor Business (including the Collateral) owned by EFIH or any Oncor Subsidiary or any Successor Oncor Business or constituting a primary issuance of such Equity Interests to the extent such issuance would constitute an Asset Sale and any assets owned directly or indirectly by any of the Oncor Subsidiaries or any Successor Oncor Business.

"*Oncor Subsidiaries*" means Oncor Holdings and its Subsidiaries, all of which were Unrestricted Subsidiaries on the 2021 Notes Issue Date.

231

EFIHMW00034154

"*Oncor Subsidiaries' Consolidated Total Indebtedness*" means, as at any date of determination, an amount equal to (1) the aggregate amount of all outstanding Indebtedness of the Oncor Subsidiaries on a consolidated basis consisting of Indebtedness for borrowed money, debt obligations evidenced by promissory notes and similar instruments, letters of credit (only to the extent of any unreimbursed drawings thereunder) and Obligations in respect of Capitalized Lease Obligations, plus (2) the aggregate amount of all outstanding Disqualified Stock and Preferred Stock of the Oncor Subsidiaries on a consolidated basis, with the amount of such Disqualified Stock and Preferred Stock equal to the greater of their respective voluntary or involuntary liquidation preferences and maximum fixed repurchase prices, in each case determined on a consolidated basis in accordance with GAAP, and less (3) all deposit L/C loans and incremental deposit L/C loans of the Oncor Subsidiaries outstanding on such date of determination. For purposes hereof, the "maximum fixed repurchase price" of any Disqualified Stock or Preferred Stock that does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Stock or Preferred Stock as if such Disqualified Stock or Preferred Stock were purchased on any date on which Oncor Subsidiaries' Consolidated Total Indebtedness shall be required to be determined, and if such price is based upon, or measured by, the fair market value of such Disqualified Stock or Preferred Stock, such fair market value shall be determined reasonably and in good faith by EFIH.

"*Opinion of Counsel*" means a written opinion from legal counsel who is acceptable to the Trustee. The counsel may be an employee of or counsel to the Issuer or the Trustee.

"*Permitted Asset Swap*" means the concurrent purchase and sale or exchange of Related Business Assets or a combination of Related Business Assets and cash or Cash Equivalents between EFIH or any of its Restricted Subsidiaries and another Person; *provided*, that any cash or Cash Equivalents received must be applied in accordance with the covenant described under "—Repurchase at the Option of Holders—Asset Sales."

"*Permitted Asset Transfer*" means (1) the direct or indirect sale, assignment, transfer, conveyance or other disposition (including by way of merger, wind-up or consolidation) or spin-off by dividend of the Equity Interests of EFIH such that EFIH is no longer a Subsidiary of EFH Corp. (including without limitation a merger of EFIH with and into EFH Corp.) or (2) the sale, assignment, transfer, conveyance or other disposition (other than by way of merger, wind-up or consolidation) of all of the Equity Interests of, and other Investments in, the Oncor Subsidiaries, Successor Oncor Businesses and all other Collateral held by EFIH to a Person (other than an Oncor Subsidiary) that shall continue to hold such Equity Interests, other Investments and any other Collateral, in each case other than any foreclosure on the Collateral.

"*Permitted Holders*" means each of the Investors, members of management (including directors) of EFIH or any of its direct or indirect parent companies or Subsidiaries who on the Closing Date were or at any time prior to the first anniversary of the Closing Date were holders of Equity Interests of EFIH (or any of its direct or indirect parent companies) and any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which any of the foregoing are members; *provided* that, in the case of such group and without giving effect to the existence of such group or any other group, such Investors and members of management, collectively, have beneficial ownership of more than 50% of the total voting power of the Voting Stock of EFIH or any of its direct or indirect parent companies.

"*Permitted Investments*" means:

(1) any Investment in EFIH or any of its Restricted Subsidiaries;

(2) any Investment in cash and Cash Equivalents or Investment Grade Securities;

232

EFIHMW00034155

(3) any Investment by EFIH or any of its Restricted Subsidiaries in a Person that is engaged in a Similar Business if as a result of such Investment:

(a) such Person becomes a Restricted Subsidiary; or

(b) such Person, in one transaction or a series of related transactions, is merged or consolidated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, EFIH or a Restricted Subsidiary,

and, in each case, any Investment held by such Person; *provided* that such Investment was not acquired by such Person in contemplation of such acquisition, merger, consolidation or transfer;

(4) any Investment in securities or other assets not constituting cash, Cash Equivalents or Investment Grade Securities and received in connection with an Asset Sale made pursuant to the provisions described under "—Repurchase at the Option of Holders—Asset Sales" or any other disposition of assets not constituting an Asset Sale;

(5) any Investment existing on the 2021 Notes Issue Date;

(6) any Investment acquired by EFIH or any of its Restricted Subsidiaries:

(a) in exchange for any other Investment or accounts receivable held by EFIH or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable; or

(b) as a result of a foreclosure by EFIH or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7) Hedging Obligations permitted under clause (10) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(8) any Investment in a Similar Business having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (8) that are at that time outstanding, not to exceed 3.5% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(9) Investments the payment for which consists of Equity Interests (exclusive of Disqualified Stock) of EFIH or any of its direct or indirect parent companies; *provided, however,* that such Equity Interests will not increase the amount available for Restricted Payments under clause (3) of the first paragraph under the covenant described under "—Certain Covenants—Limitations on Restricted Payments";

(10) guarantees of Indebtedness of EFIH or any of its Restricted Subsidiaries permitted under the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(11) any transaction to the extent it constitutes an Investment that is permitted and made in accordance with the provisions of the second paragraph of the covenant described under "—Certain Covenants—Transactions with Affiliates" (except transactions described in clauses (2), (5) and (9) of such paragraph);

(12) Investments consisting of purchases and acquisitions of inventory, fuel (including all forms of nuclear fuel), supplies, material or equipment;

233

EFIHMW00034156

(13) additional Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (13) that are at that time outstanding (without giving effect to the sale of an Investment to the extent the proceeds of such sale do not consist of cash or marketable securities), not to exceed 3.5% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(14) Investments relating to a Receivables Subsidiary that, in the good faith determination of EFIH, are necessary or advisable to effect any Receivables Facility for the benefit of EFIH or any of its Restricted Subsidiaries;

(15) advances to, or guarantees of Indebtedness of, employees not in excess of $25.0 million outstanding at any one time, in the aggregate;

(16) loans and advances to officers, directors and employees for business-related travel expenses, moving expenses and other similar expenses, in each case incurred in the ordinary course of business or consistent with past practices or to fund such Person's purchase of Equity Interests of EFIH or any direct or indirect parent company thereof;

(17) any Investment in any Subsidiary or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business; or

(18) (A) Investments in Indebtedness of TCEH or EFH Corp. received by EFIH (i) in exchange for the EFIH 9.75% Notes or EFIH 10.000% Notes issued in the exchange offers in which such notes were issued or (ii) in exchange for Indebtedness of TCEH or EFH Corp. received in exchange for the EFIH 9.75% Notes or EFIH 10.000% Notes in the exchange offers in which such notes were issued and (B) Investments in Indebtedness of EFH Corp. or its Subsidiaries received by EFIH in exchange for Indebtedness of EFIH or any Guarantor incurred under clause (2) of the second paragraph under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" covenant, including, in the case of both (A) and (B), for the avoidance of doubt, the exchanges of any such Indebtedness, which shall be deemed to be "Permitted Investments" hereunder.

"*Permitted Liens*" means, with respect to any Person:

(1) pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business (including in connection with the construction or restoration of facilities for the generation, transmission or distribution of electricity) or otherwise constituting Permitted Investments;

(2) Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet overdue for a period of more than 30 days or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(3) Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than 30 days or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

234

Highly Confidential

(4) Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5) minor survey or title exceptions or irregularities, minor encumbrances, easements or reservations of, or rights of others for, licenses, permits, conditions, covenants, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6) Liens securing Indebtedness permitted to be incurred pursuant to clause (4), (12) or (13) of the second paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that (a) Liens securing Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (13) relate only to Refinancing Indebtedness that serves to refund or refinance Indebtedness, Disqualified Stock or Preferred Stock incurred under clause (4) or (12) of the second paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," and (b) Liens securing Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (4) of the second paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" extend only to the assets so financed, purchased, constructed or improved;

(7) Liens existing on the 2021 Notes Issue Date;

(8) Liens on property or shares of stock of a Person at the time such Person becomes a Subsidiary; *provided, however*, such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; *provided, further, however*, that such Liens may not extend to any other property owned by EFIH or any of its Restricted Subsidiaries;

(9) Liens on property at the time EFIH or a Restricted Subsidiary acquired the property, including any acquisition by means of a merger or consolidation with or into EFIH or any of its Restricted Subsidiaries; *provided, however*, that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition; *provided, further, however*, that the Liens may not extend to any other property owned by EFIH or any of its Restricted Subsidiaries;

(10) Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to EFIH or another Restricted Subsidiary permitted to be incurred in accordance with the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(11) Liens securing Hedging Obligations, of EFIH or its Restricted Subsidiaries incurred under clause (10) of the second paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that such agreements were entered into in the ordinary course of business and not for speculative purposes (as determined by EFIH in its reasonable discretion acting in good faith) and, in the case of any commodity Hedging Obligations or any Hedging Obligation of the type described in clause (c) of the definition of "Hedging Obligations," entered into in order to hedge against or manage fluctuations in the price or availability of any Covered Commodity;

(12) Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

235

EFIHMW00034158

(13) leases, subleases, licenses or sublicenses granted to others in the ordinary course of business which do not materially interfere with the ordinary conduct of the business of EFIH or any of its Restricted Subsidiaries;

(14) Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by EFIH and its Restricted Subsidiaries in the ordinary course of business;

(15) Liens in favor of EFIH or any Guarantor;

(16) [Intentionally omitted];

(17) Liens on accounts receivable, other Receivables Facility assets, or accounts into which collections or proceeds of Receivables Facility assets are deposited, in each case in connection with a Receivables Facility for the benefit of EFIH or its Restricted Subsidiaries;

(18) Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8) and (9); *provided, however,* that (a) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property), and (b) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), and (9) at the time the original Lien became a Permitted Lien under the Indenture, and (ii) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement;

(19) deposits made in the ordinary course of business to secure liability to insurance carriers;

(20) other Liens securing obligations incurred in the ordinary course of business which obligations do not exceed $100.0 million at any one time outstanding;

(21) Liens securing judgments for the payment of money not constituting an Event of Default under clause (5) under "—Events of Default and Remedies" so long as such Liens are adequately bonded and any appropriate legal proceedings that may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(22) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(23) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code, or any comparable or successor provision, on items in the course of collection, and (ii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(24) Liens deemed to exist in connection with Investments in repurchase agreements permitted by the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreements;

(25) ground leases or subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by EFIH or any of its Subsidiaries are located;

(26) Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of EFIH or any of its Restricted Subsidiaries to permit

236

EFIHMW00034159

satisfaction of overdraft or similar obligations incurred in the ordinary course of business of EFIH and its Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of EFIH or any of its Restricted Subsidiaries in the ordinary course of business;

(27) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of goods entered into by EFIH or any Restricted Subsidiary in the ordinary course of business;

(28) rights reserved to or vested in others to take or receive any part of, or royalties related to, the power, gas, oil, coal, lignite or other minerals or timber generated, produced, manufactured or produced by, or grown on, or acquired with, any property of EFIH or any of its Restricted Subsidiaries and Liens upon the production from property of power, gas, oil, coal, lignite or other minerals or timber, and the by-products and proceeds thereof, to secure the obligations to pay all or a part of the expenses of exploration, drilling, mining or development of such property only out of such production or proceeds;

(29) Liens arising out of all presently existing and future division and transfer orders, advance payment agreements, processing contracts, gas processing plant agreements, operating agreements, gas balancing or deferred production agreements, pooling, unitization or communitization agreements, pipeline, gathering or transportation agreements, platform agreements, drilling contracts, injection or repressuring agreements, cycling agreements, construction agreements, salt water or other disposal agreements, leases or rental agreements, farm-out and farm-in agreements, exploration and development agreements, and any and all other contracts or agreements covering, arising out of, used or useful in connection with or pertaining to the exploration, development, operation, production, sale, use, purchase, exchange, storage, separation, dehydration, treatment, compression, gathering, transportation, processing, improvement, marketing, disposal or handling of any property of EFIH or any of its Restricted Subsidiaries; *provided* that such agreements are entered into in the ordinary course of business (including in respect of construction and restoration activities);

(30) any restrictions on any stock or stock equivalents or other joint venture interests of EFIH or any of its Restricted Subsidiaries providing for a breach, termination or default under any owners, participation, shared facility, joint venture, stockholder, membership, limited liability company or partnership agreement between such Person and one or more other holders of such stock or stock equivalents or interest of such Person, if a security interest or other Lien is created on such stock or stock equivalents or interest as a result thereof and other similar Liens;

(31) [Intentionally omitted];

(32) Liens and other exceptions to title, in either case on or in respect of any facilities of EFIH or any of its Restricted Subsidiaries, arising as a result of any shared facility agreement entered into with respect to such facility, except to the extent that any such Liens or exceptions, individually or in the aggregate, materially adversely affect the value of the relevant property or materially impair the use of the relevant property in the operation of business of EFIH or any of its Restricted Subsidiaries, taken as a whole;

(33) Liens on cash and Cash Equivalents (i) deposited by EFIH or any of its Restricted Subsidiaries in margin accounts with or on behalf of brokers, credit clearing organizations, independent system operators, regional transmission organizations, pipelines, state agencies, federal agencies, futures contract brokers, customers, trading counterparties, or any other parties or issuers of surety bonds or (ii) pledged or deposited as collateral by EFIH or any of its Restricted Subsidiaries with any of the entities described in clause (i) above to secure their respective obligations, in the case of each of clauses (i) and (ii) above, with respect to: (A) any contracts and transactions for the purchase, sale, exchange of, or the option (whether physical or

237

EFIHMW00034160

financial) to purchase, sell or exchange (1) natural gas, (2) electricity, (3) coal and lignite, (4) petroleum-based liquids, (5) oil, (6) nuclear fuel (including enrichment and conversion), (7) emissions or other environmental credits, (8) waste byproducts, (9) weather, (10) power and other generation capacity, (11) heat rate, (12) congestion, (13) renewal energy credit, or (14) any other energy-related commodity or services or derivative (including ancillary services and related risk (such as location basis)); (B) any contracts or transactions for the purchase, processing, transmission, transportation, distribution, sale, lease, hedge or storage of, or any other services related to any commodity or service identified in subparts (1) through (14) above, including any capacity agreement; (C) any financial derivative agreement (including but not limited to swaps, options or swaptions) related to any commodity identified in subparts (1) through (14) above, or to any interest rate or currency rate management activities; (D) any agreement for membership or participation in an organization that facilitates or permits the entering into or clearing of any netting agreement or any agreement described in this clause (33); (E) any agreement combining part or all of a netting agreement or part or all of any of the agreements described in this clause (33); (E) any document relating to any agreement described in this clause (33) that is filed with a Government Authority and any related service agreements; or (F) any commercial or trading agreements, each with respect to, or involving the purchase, transmission, distribution, sale, lease or hedge of, any energy, generation capacity or fuel, or any other energy related commodity or service, price or price indices for any such commodities or services or any other similar derivative agreements, and any other similar agreements (such agreements described in clauses (A) through (F) of this clause (33) being collectively, "Permitted Contracts"), Netting Agreements, Hedging Obligations and letters of credit supporting Permitted Contracts, Netting Agreements and Hedging Obligations;

(34) Liens arising under Section 9.343 of the Texas Uniform Commercial Code or similar statutes of states other than Texas;

(35) Liens created in the ordinary course of business in favor of banks and other financial institutions over credit balances of any bank accounts of EFIH and its Subsidiaries held at such banks or financial institutions, as the case may be, to facilitate the operation of cash pooling and/ or interest set-off arrangements in respect of such bank accounts in the ordinary course of business;

(36) any zoning, land use, environmental or similar law or right reserved to or vested in any Government Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of EFIH or any of its Restricted Subsidiaries, taken as a whole;

(37) any Lien arising by reason of deposits with or giving of any form of security to any Government Authority for any purpose at any time as required by applicable law as a condition to the transaction of any business or the exercise of any privilege or license, or to enable EFIH or any of its Restricted Subsidiaries to maintain self-insurance or to participate in any fund for liability on any insurance risks;

(38) Liens, restrictions, regulations, easements, exceptions or reservations of any Government Authority applying particularly to nuclear fuel;

(39) rights reserved to or vested in any Government Authority by the terms of any right, power, franchise, grant, license or permit, or by any provision of applicable law, to terminate or modify such right, power, franchise, grant, license or permit or to purchase or recapture or to designate a purchaser of any of the property of such person;

(40) Liens arising under any obligations or duties affecting any of the property of EFIH or any of its Restricted Subsidiaries to any Government Authority with respect to any franchise, grant, license or permit which do not materially impair the use of such property for the purposes for which it is held;

238

EFIHMW00034161

(41) rights reserved to or vested in any Government Authority to use, control or regulate any property of such person;

(42) any obligations or duties, affecting the property of EFIH or any of its Restricted Subsidiaries, to any Government Authority with respect to any franchise, grant, license or permit;

(43) a set-off or netting rights granted by EFIH or any Subsidiary of EFIH pursuant to any agreements related to Hedging Obligations, Netting Agreements or Permitted Contracts solely in respect of amounts owing under such agreements;

(44) Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment described under the definition of "Permitted Investments" to be applied against the purchase price for such Investment and (ii) consisting of an agreement to sell, transfer, lease or otherwise dispose of any property in a transaction excluded from the definition described under "Asset Sale," in each case, solely to the extent such Investment or sale, disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien;

(45) [Intentionally omitted]; and

(46) any amounts held by a trustee in the funds and accounts under any indenture securing any revenue bonds issued for the benefit of EFIH or any of its Restricted Subsidiaries.

For purposes of this definition, the term "Indebtedness" shall be deemed to include interest on such Indebtedness.

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"*Pledge Agreements*" means the Senior Pledge Agreement and the Junior Pledge Agreement.

"*Preferred Stock*" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"*Purchase Money Obligations*" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction, repair, restoration, replacement, expansion or improvement of property (real or personal) or assets (other than Capital Stock), and whether acquired through the direct acquisition of such property or assets, or otherwise, incurred in respect of capital expenditures, including Environmental CapEx Debt and Necessary CapEx Debt.

"*Qualified Proceeds*" means assets that are used or useful in, or Capital Stock of any Person engaged in, a Similar Business; *provided* that the fair market value of any such assets or Capital Stock shall be determined by EFIH in good faith.

"*Rating Agencies*" means each of Moody's, S&P and Fitch, or if any of Moody's, S&P or Fitch shall not make a rating on the Notes or other investment publicly available, a "nationally recognized statistical rating organization" within the meaning of Section 3(a)(62) of the Exchange Act selected by EFIH which shall be substituted for Moody's, S&P or Fitch, or all of them, as the case may be.

"*Receivables Facility*" means any of one or more receivables financing facilities or programs as amended, supplemented, modified, extended, renewed, restated or refunded from time to time, the Obligations of which are non-recourse (except for customary representations, warranties, covenants and indemnities made in connection with such facilities) to EFIH or any of its Restricted Subsidiaries (other than a Receivables Subsidiary) pursuant to which EFIH or any of its Restricted Subsidiaries purports to sell its accounts receivable to either (a) a Person that is not a Restricted Subsidiary or (b) a

239

EFIHMW00034162

Receivables Subsidiary that in turn funds such purchase by purporting to sell its accounts receivable to a Person that is not a Restricted Subsidiary or by borrowing from such a Person or from another Receivables Subsidiary that in turn funds itself by borrowing from such a Person.

"*Receivables Fees*" means distributions or payments made directly or by means of discounts with respect to any accounts receivable or participation interest therein issued or sold in connection with, and other fees paid to a Person that is not a Restricted Subsidiary in connection with any Receivables Facility.

"*Receivables Subsidiary*" means any Subsidiary formed for the purpose of facilitating or entering into one or more Receivables Facilities, and in each case engages only in activities reasonably related or incidental thereto.

"*Redemption Date*" has the meaning set forth under "Optional Redemption."

"*Registration Rights Agreement*" means (1) the Registration Rights Agreement relating to the 2021 Notes, dated as of the 2021 Notes Issue Date, among the Issuer and the initial purchasers of the 2021 Notes, (2) the Registration Rights Agreement relating to the Existing 2022 Notes, dated as of the Existing 2022 Notes Issue Date, among the Issuer and the initial purchasers of the Existing 2022 Notes and (3) with respect to any Additional Notes, any registration rights agreement among the Issuer and the other parties thereto relating to the registration by the Issuer of such Additional Notes under the Securities Act (including the Registration Rights Agreement relating to the New 2022 Notes, dated as of the Issue Date, among the Issuer and the Initial Purchasers).

"*Related Business Assets*" means (A) except in the case of a Permitted Asset Swap of Collateral, assets (other than cash or Cash Equivalents) used or useful in, or securities of, a Similar Business; *provided* that any assets or securities received by EFIH or a Restricted Subsidiary in exchange for assets or securities transferred by EFIH or a Restricted Subsidiary will not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Restricted Subsidiary and (B) in the case of a Permitted Asset Swap of Collateral, assets (other than cash or Cash Equivalents) used or useful in, or Capital Stock of, a Similar Oncor Business; *provided* that any Capital Stock received by EFIH in exchange for Collateral will not be deemed to be Related Business Assets, unless upon receipt of the Capital Stock of such Person, such Person would become a Subsidiary of EFIH or a joint venture in which EFIH has a significant equity interest (as determined by EFIH in good faith).

"*Required Debt*" means, with respect to any action, on any date, the outstanding principal amount of:

(1) the 2022 Notes and the 2021 Notes (including, in each case, any Additional Notes); and

(2) any securities that constitute Junior Lien Debt and are designated as Required Debt in an Officer's Certificate delivered to the Trustee

at such date, other than, in each case, any such debt beneficially owned by the Issuer or its Affiliates, voting as a single class, except to the extent prohibited by law; *provided* that (a) Required Debt shall only include debt described in clause (2) of this definition to the extent such debt would require the consent of the holders of the debt described in this definition voting as a single class to take such action, except to the extent described below in clauses (b) and (c); (b) if any amendment, waiver or other action would disproportionately affect the holders of the 2022 Notes, the 2021 Notes or any other series of securities that constitute Junior Lien Debt, Required Debt shall mean the 2022 Notes, the 2021 Notes or such other series of securities that constitute Junior Lien Debt, as the case may be, voting as a single class and the other series of debt described in clauses (1) and (2) voting as a single class, and (c) if any amendment, waiver or other action would affect (i) only the 2022 Notes, (ii) only

240

EFIHMW00034163

the 2021 Notes or (iii) only any other series of securities that constitute Junior Lien Debt, Required Debt shall mean the 2022 Notes, the 2021 Notes or such other series of securities that constitute Junior Lien Debt, as the case may be, voting as a single class without any other series of debt.

Notwithstanding the foregoing, with respect to the taking of any action with respect to a Default or Event of Default or the exercise of any rights or remedies with respect to an Event of Default, Required Debt shall mean the 2022 Notes, the 2021 Notes and any other series of securities that constitute Junior Lien Debt described in clause (2) of this definition voting together, only to the extent such Default or Event of Default applies to each such series of debt in the same manner and only to the extent the holders of each such series of debt have the right to take such action or exercise such rights or remedies.

"*Required Holders*" means Persons holding the Required Debt.

"*Required Junior Lien Debtholders*" means, at any time, the holders of a majority in aggregate principal amount of all Junior Lien Debt (including outstanding letters of credit whether or not then available or drawn) then outstanding and the aggregate unfunded commitments to extend credit which, when funded, would constitute Junior Lien Debt, calculated in accordance with the provisions described under "—Security for the Notes—Voting." For purposes of this definition, Junior Lien Debt registered in the name of, or beneficially owned by, the Issuer or any Affiliate of the Issuer will be deemed not to be outstanding.

"*Required Senior Lien Debtholders*" means, at any time, the holders of a majority in aggregate principal amount of all Senior Lien Debt (including outstanding letters of credit whether or not then available or drawn) then outstanding and the aggregate unfunded commitments to extend credit which, when funded, would constitute Senior Lien Debt, calculated in accordance with the provisions described under "—Security for the Notes—Voting." For purposes of this definition, Senior Lien Debt registered in the name of, or beneficially owned by, the Issuer or any Affiliate of the Issuer will be deemed not to be outstanding.

"*Restoration Certificate*" shall mean, with respect to any Casualty Event, an Officer's Certificate provided to the Trustee prior to the 365th day after such Casualty Event has occurred certifying (a) that EFIH or such Restricted Subsidiary intends to use the proceeds received in connection with such Casualty Event to repair, restore or replace the property or assets in respect of which such Casualty Event occurred, (b) the approximate costs of completion of such repair, restoration or replacement and (c) that such repair, restoration or replacement will be completed within the later of (x) 450 days after the date on which cash proceeds with respect to such Casualty Event were received and (y) 180 days after delivery of such Restoration Certificate.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Payment Coverage Ratio*" means (i) for Restricted Payments (other than payments of cash dividends or distributions to EFH Corp. on, or in respect of, EFIH's Capital Stock, purchases for cash or other acquisitions for cash of any Capital Stock of EFIH or any direct or indirect parent of EFIH for the purpose of paying any such dividend or distribution to, or acquisitions of Capital Stock of any direct or indirect parent of EFIH for cash from, the Investors, or guaranteeing any Indebtedness of any Affiliate of EFIH for the purpose of paying such dividend, making such distribution or so acquiring such Capital Stock to or from the Investors, all such Restricted Payments being referred to as "Investor Payments"), the Fixed Charge Coverage Ratio of EFIH and its Restricted Subsidiaries treating the Oncor Subsidiaries as Restricted Subsidiaries for purposes of such calculation and (ii) for Restricted Payments constituting Investor Payments, the Fixed Charge Coverage Ratio of EFIH and its Restricted Subsidiaries.

Highly Confidential

EFIHMW00034164

"*Restricted Subsidiary*" means, at any time, any direct or indirect Subsidiary of EFIH (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; *provided, however*, that upon an Unrestricted Subsidiary's ceasing to be an Unrestricted Subsidiary, such Subsidiary shall be included in the definition of "Restricted Subsidiary."

"*S&P*" means Standard & Poor's, a Standard & Poor's Financial Services LLC business, and any successor to its rating agency business.

"*Sale and Lease-Back Transaction*" means any arrangement providing for the leasing by EFIH or any of its Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by EFIH or such Restricted Subsidiary to a third Person in contemplation of such leasing.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Secured Debt Documents*" means the Senior Lien Documents and the Junior Lien Documents.

"*Secured Debt Obligations*" means Senior Lien Obligations and Junior Lien Obligations.

"*Secured Indebtedness*" means any Indebtedness of EFIH or any of its Restricted Subsidiaries secured by a Lien.

"*Secured Lien Debt*" means Senior Lien Debt and Junior Lien Debt.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Security Documents*" means the Collateral Trust Agreement, the Pledge Agreements, and all other security agreements, pledge agreements, collateral assignments, mortgages, collateral agency agreements, deed of trust or other grants or transfers for security executed and delivered by EFIH, a Guarantor or any other obligor under the Notes creating (or purporting to create) a Lien upon Collateral in favor of the Collateral Trustee for the benefit of the holders of the Secured Debt Obligations, in each case, as amended, modified, renewed, restated or replaced, in whole or in part, from time to time, in accordance with its terms.

"*Senior Indebtedness*" means:

(1) all Indebtedness of the Issuer or any Guarantor outstanding under EFIH's guarantee of any Existing EFH Corp. Notes, the EFIH 9.75% Notes, the EFIH 10.000% Notes and the Notes and any related Guarantees (including interest accruing on or after the filing of any petition in bankruptcy or similar proceeding or for reorganization of the Issuer or any Guarantor (at the rate provided for in the documentation with respect thereto, regardless of whether or not a claim for post-filing interest is allowed in such proceedings)), and any and all other fees, expense reimbursement obligations, indemnification amounts, penalties, and other amounts (whether existing on the 2021 Notes Issue Date or thereafter created or incurred) and all obligations of the Issuer or any Guarantor to reimburse any bank or other Person in respect of amounts paid under letters of credit, acceptances or other similar instruments;

(2) all Hedging Obligations of the Issuer or any Guarantor (and guarantees thereof) owing to a lender or any Affiliate of such lender (or any Person that was a lender or an Affiliate of such lender at the time the applicable agreement giving rise to such Hedging Obligation was entered into); *provided* that such Hedging Obligations are permitted to be incurred under the terms of the Indenture;

242

EFIHMW00034165

(3) any other Indebtedness of the Issuer or any Guarantor permitted to be incurred under the terms of the Indenture, unless the instrument under which such Indebtedness is incurred expressly provides that it is subordinated in right of payment to the Notes or any related Guarantee; and

(4) all Obligations with respect to the items listed in the preceding clauses (1), (2) and (3); *provided, however*, that Senior Indebtedness shall not include:

(a) any obligation of such Person to the Issuer or any of its Subsidiaries;

(b) any liability for federal, state, local or other taxes owed or owing by such Person;

(c) any accounts payable or other liability to trade creditors arising in the ordinary course of business;

(d) any Indebtedness or other Obligation of such Person which is subordinate or junior in any respect to any other Indebtedness or other Obligation of such Person; and

(e) that portion of any Indebtedness which at the time of incurrence is incurred in violation of the Indenture.

"*Senior Lien*" means a Lien granted by a security document to the Collateral Trustee, at any time, upon any Collateral to secure Senior Lien Obligations.

"*Senior Lien Debt*" means:

(1) the EFIH 9.75% Notes outstanding on the 2021 Notes Issue Date, any additional EFIH 9.75% Notes, the EFIH 10.000% Notes outstanding on the 2021 Notes Issue Date and any additional EFIH 10.000% Notes;

(2) any other Indebtedness (including letters of credit and reimbursement obligations with respect thereto) of EFIH, including the guarantee by EFIH of any Indebtedness of any other Person, including the EFH Corp. 9.75% Notes and any additional EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes and any additional EFH Corp. 10.000% Notes, that is secured on a senior basis to the Notes by a Senior Lien that was permitted to be incurred and so secured under each applicable Secured Debt Document (including the New EFIH First Lien Notes); *provided*, in the case of Indebtedness referred to in this clause (2), that, except with respect to the EFH Corp. 9.75% Notes and any additional EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes and any additional EFH Corp. 10.000% Notes outstanding on the 2021 Notes Issue Date:

(a) on or before the date on which such Indebtedness is incurred by EFIH, such Indebtedness is designated by EFIH, in accordance with the Collateral Trust Agreement, as "Senior Lien Debt" for the purposes of the Secured Debt Documents; *provided* that no Series of Secured Lien Debt may be designated as both Senior Lien Debt and Junior Lien Debt;

(b) such Indebtedness is governed by an indenture, credit agreement or other agreement that includes a Lien Sharing and Priority Confirmation; and

(c) all requirements set forth in the Collateral Trust Agreement as to the confirmation, grant or perfection of the Collateral Trustee's Lien to secure such Indebtedness or Obligations in respect thereof are satisfied (and the satisfaction of such requirements will be conclusively established if EFIH delivers to the Collateral Trustee an Officer's Certificate stating that such requirements have been satisfied and that such notes or such Indebtedness is "Senior Lien Debt"); and

243

EFIHMW00034166

(3) Hedging Obligations of EFIH incurred to hedge or manage interest rate risk with respect to Senior Lien Debt; *provided* that, pursuant to the terms of the Senior Lien Documents, such Hedging Obligations are secured by a Senior Lien on all of the assets and properties that secure the Indebtedness in respect of which such Hedging Obligations are incurred.

"*Senior Lien Documents*" means the EFIH 9.75% Notes Indenture, the EFIH 10.000% Notes Indenture, the EFH Corp. 9.75% Notes Indenture, the EFH Corp. 10.000% Notes Indenture and any additional indenture, credit agreement or other agreement governing a Series of Senior Lien Debt and the Security Documents that create or perfect Liens securing Senior Lien Obligations (including the indenture pursuant to which the New EFIH First Lien Notes are issued).

"*Senior Lien Obligations*" means Senior Lien Debt and all other Obligations in respect thereof.

"*Senior Lien Representative*" means (1) in the case of the EFIH 9.75% Notes, the EFIH 10.000% Notes, the New EFIH First Lien Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, The Bank of New York Mellon Trust Company, N.A., as trustee under the applicable indenture or (2) in the case of any other Series of Senior Lien Debt, the trustee, agent or representative of the holders of such Series of Senior Lien Debt who (a) is appointed as a Senior Lien Representative (for purposes related to the administration of the Security Documents) pursuant to the indenture, credit agreement or other agreement governing such Series of Senior Lien Debt, together with its successors in such capacity, and (b) has become a party to the Collateral Trust Agreement by executing a joinder in the form required under the Collateral Trust Agreement.

"*Senior Pledge Agreement*" means the Pledge Agreement dated as of November 16, 2009 from EFIH, as pledgor, to the Collateral Trustee.

"*Series of Junior Lien Debt*" means, severally, the 2022 Notes, the 2021 Notes, any Additional Notes, any Exchange Notes and each other issue or series of Junior Lien Debt for which a single transfer register is maintained; *provided* that any Hedging Obligations constituting Junior Lien Debt shall be deemed part of the Series of Junior Lien Debt to which it relates.

"*Series of Senior Lien Debt*" means, severally, the EFIH 9.75% Notes, the EFIH 10.000% Notes, the 9.75% EFH Corp. Notes, the EFH Corp. 10.000% Notes or other Indebtedness that constitutes Senior Lien Debt (including the New EFIH First Lien Notes); *provided* that any Hedging Obligations constituting Senior Lien Debt shall be deemed part of the Series of Senior Lien Debt to which it relates.

"*Series of Secured Lien Debt*" means each Series of Senior Lien Debt and each Series of Junior Lien Debt.

"*Significant Subsidiary*" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such regulation is in effect on the Closing Date.

"*Similar Business*" means any business conducted or proposed to be conducted by EFIH and its Subsidiaries on the Closing Date or any business that is similar, reasonably related, incidental or ancillary thereto.

"*Similar Oncor Business*" means any business which is primarily engaged in a regulated electricity or other energy transmission or distribution business in the United States (as determined by EFIH in good faith).

"*Sponsor Management Agreement*" means the management agreement between certain of the management companies associated with the Investors and EFH Corp.

244

EFIHMW00034167

**PX 058**
**Page 253 of 308**

"*Subordinated Indebtedness*" means,

(1) any Indebtedness of the Issuer which is by its terms subordinated in right of payment to the Notes, and

(2) any Indebtedness of any Guarantor which is by its terms subordinated in right of payment to the Guarantee of such entity of the Notes.

"Subsidiary" means, with respect to any Person:

(1) any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; and

(2) any partnership, joint venture, limited liability company or similar entity of which

(x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise, and

(y) such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"*Successor Oncor Business*" means any Person the Capital Stock of which is received by EFIH in an Asset Sale, including a Permitted Asset Swap, of Collateral or as a dividend or distribution from an Oncor Subsidiary.

"*TCEH*" means Texas Competitive Electric Holdings Company LLC.

"*TCEH Notes*" means the notes previously issued by TCEH to refinance indebtedness under the TCEH Senior Interim Facility.

"*TCEH Senior Interim Facility*" means the interim loan agreement, dated as of the Closing Date by and among EFCH, as guarantor, TCEH, as borrower, the other guarantors parties thereto, the lenders party thereto in their capacities as lenders thereunder and Morgan Stanley Senior Funding, Inc., as Administrative Agent, including any guarantees, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications or restatements thereof.

"*TCEH Senior Secured Facilities*" means the credit agreement dated as of the Closing Date, as amended on August 7, 2009 and April 7, 2011 by and among EFCH, as guarantor, TCEH, as borrower, the lenders party thereto in their capacities as lenders thereunder and Citibank, N.A., as Administrative Agent, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any additional amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof.

"*Total Assets*" means the total assets of EFIH and its Restricted Subsidiaries on a consolidated basis, as shown on the most recent consolidated balance sheet of EFIH or such other Person as may be expressly stated.

245

EFIHMW00034168

"*Transactions*" means the transactions contemplated by the Transaction Agreement, borrowings under the TCEH Senior Secured Facilities, the EFH Senior Interim Facility, the TCEH Senior Interim Facility, the Oncor Electric Delivery Facility and any Receivables Facility as in effect on the Closing Date, any repayments of indebtedness of EFH Corp. and its Subsidiaries in connection therewith, and the issuance of the EFH Corp. 2017 Notes and the TCEH Notes and any repayments of Indebtedness of EFH Corp. and its Subsidiaries in connection therewith.

"*Transaction Agreement*" means the Agreement and Plan of Merger, dated as of February 25, 2007, among Merger Sub, Texas Energy Future Holdings Limited Partnership and EFH Corp.

"*Treasury Rate*" means, as of any Redemption Date, the yield to maturity as of such Redemption Date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the Redemption Date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the Redemption Date to March 1, 2017; *provided, however,* that if the period from the Redemption Date to March 1, 2017 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"*Trust Indenture Act*" means the Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa-77bbbb).

"*Unrestricted Cash*" means, as of any date, without duplication, (a) all cash and Cash Equivalents (in each case, free and clear of all Liens, other than nonconsensual Liens permitted by the covenant described under "—Certain Covenants—Limitation on Liens" and Liens permitted by clause (23), subclauses (i) and (ii) of clause (26) and clause (33) of the definition of Permitted Liens, included in the cash and cash equivalents accounts listed on the consolidated balance sheet of EFIH and its Restricted Subsidiaries as of such date and (b) all unrestricted margin deposits related to commodity positions listed on the consolidated balance sheet of EFIH and the Restricted Subsidiaries.

"*Unrestricted Subsidiary*" means:

(1) each of the Oncor Subsidiaries;

(2) any Subsidiary of EFIH other than EFIH Finance or any Guarantor owning Collateral which at the time of determination is an Unrestricted Subsidiary (as designated by EFIH, as provided below); and

(3) any Subsidiary of an Unrestricted Subsidiary.

EFIH may designate any Subsidiary of EFIH (including any existing Subsidiary and any newly acquired or newly formed Subsidiary) other than EFIH Finance or any Guarantor owning Collateral to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on, any property of, EFIH or any Subsidiary of EFIH (other than solely any Subsidiary of the Subsidiary to be so designated); *provided* that

(1) any Unrestricted Subsidiary must be an entity of which the Equity Interests entitled to cast at least a majority of the votes that may be cast by all Equity Interests having ordinary voting power for the election of directors or Persons performing a similar function are owned, directly or indirectly, by EFIH;

(2) such designation complies with the covenants described under "—Certain Covenants—Limitation on Restricted Payments"; and

(3) each of:

(a) the Subsidiary to be so designated; and

246

EFIHMW00034169

(b) its Subsidiaries

has not at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness pursuant to which the lender has recourse to any of the assets of EFIH or any Restricted Subsidiary.

EFIH may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that, immediately after giving effect to such designation, no Default shall have occurred and be continuing and in the case of any Subsidiary of EFIH, (A) EFIH could incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test described in the first paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; or (B) the Fixed Charge Coverage Ratio for EFIH and its Restricted Subsidiaries would be greater than such ratio for EFIH and its Restricted Subsidiaries immediately prior to such designation, in each case on a pro forma basis taking into account such designation.

Any such designation by EFIH shall be notified by EFIH to the Trustee by promptly filing with the Trustee a copy of the resolution of the board of directors of EFIH or any committee thereof giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing provisions.

"*Voting Stock*" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing:

(1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment; by

(2) the sum of all such payments.

"*Wholly-Owned Subsidiary*" of any Person means a Subsidiary of such Person, 100% of the outstanding, Equity Interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

247

EFIHMW00034170

**PX 058**
**Page 256 of 308**

## EXCHANGE OFFER; REGISTRATION RIGHTS

The Issuer and the initial purchasers will enter into a registration rights agreement (the "Registration Rights Agreement") on the date the notes are issued. In the Registration Rights Agreement, the Issuer will agree that it will, at its expense, for the benefit of the holders of the notes, (1) file one or more registration statements on an appropriate registration form (each, an "*exchange offer registration statement*") with respect to a registered offer (the "*exchange offer*") to exchange the notes offered hereby for notes with terms substantially identical in all material respects to the notes (the notes so exchanged, the "*Exchange Notes*") (except that the Exchange Notes will not contain terms with respect to transfer restrictions or payment of Additional Interest) and (2) complete the exchange offer with respect to the first lien notes no later than 365 days after the issuance date of the first lien notes and, with respect to the new second lien notes, no later than 365 days after February 6, 2012. Upon the applicable exchange offer registration statement being declared effective, the Issuer will offer the Exchange Notes in exchange for surrender of the notes. The Issuer will keep the exchange offer open for not less than 20 business days (or longer if required by applicable law). For each note surrendered to the Issuer pursuant to the exchange offer, the holder who surrendered such note will receive an Exchange Note having a principal amount equal to that of the surrendered note. Interest on each Exchange Note will accrue (A) from the later of (1) the last interest payment date on which interest was paid on the note surrendered in exchange therefor or (2) if the note is surrendered for exchange on a date in a period that includes the record date for an interest payment date to occur on or after the date of such exchange and as to which interest will be paid, the date of such interest payment date or (B) if no interest has been paid on such note, from the issue date with respect to the first lien notes and from February 6, 2012 with respect to the new second lien notes.

Under existing interpretations of the SEC contained in several no-action letters to third parties, the Exchange Notes will be freely transferable by holders thereof (other than affiliates of the Issuer) after the exchange offer without further registration under the Securities Act; *provided, however*, that each holder that wishes to exchange its notes for Exchange Notes will be required to represent (1) that any Exchange Notes to be received by it will be acquired in the ordinary course of its business, (2) that, at the time of the commencement of the exchange offer, it has no arrangement or understanding with any person to participate in the distribution (within the meaning of Securities Act) of the Exchange Notes in violation of the Securities Act, (3) that it is not an "affiliate" (as defined in Rule 405 under the Securities Act) of the Issuer, (4) if such holder is not a broker-dealer, that it is not engaged in, and does not intend to engage in, the distribution of Exchange Notes and (5) if such holder is a broker-dealer (a "participating broker-dealer") that will receive Exchange Notes for its own account in exchange for notes that were acquired as a result of market-making or other trading activities, that it will deliver a prospectus in connection with any resale of such Exchange Notes.

The Issuer will agree to make available, during the period required by the Securities Act, a prospectus meeting the requirements of the Securities Act for use by participating broker-dealers and other persons, if any, with similar prospectus delivery requirements for use in connection with any resale of Exchange Notes.

If (1) because of any change in law or in currently prevailing interpretations of the staff of the SEC, the Issuer is not permitted to effect an exchange offer, (2) an exchange offer is not consummated within the requisite time period, (3) in certain circumstances, certain Holders of unregistered notes so request, or (4) in the case of any holder that participates in an exchange offer, such holder does not receive Exchange Notes on the date of the exchange that may be sold without restriction under state and federal securities laws (other than due solely to the status of such holder as an affiliate of the Issuer (within the meaning of the Securities Act)), then, in each case, the Issuer will (x) promptly deliver to the holders through the trustee written notice thereof and (y) at the Issuer's sole expense, (a) file a shelf registration statement covering resales of the notes within 30 days and use its commercially

248

EFIHMW00034171

**PX 058
Page 257 of 308**

reasonable efforts to cause such shelf registration statement to become effective within 90 days, in each case, after the obligation to file a shelf registration statement arises (but no earlier than the expiration of the requisite time period for completing the exchange offer for such notes) and (b) use its commercially reasonable efforts to keep effective such shelf registration statement until the earliest of (i) two years after the shelf registration statement has become effective, (ii) such time as all of the applicable notes have been sold thereunder or (iii) the date upon which all notes covered by such shelf registration statement (a) are freely transferable without restriction by persons that are not affiliates of the Issuer pursuant to Rule 144 under the Securities Act or any successor provision thereto or otherwise where no conditions of Rule 144 are then applicable (other than the holding period requirement in Rule 144(d)(1)(ii) so long as such holding period requirement is satisfied), (b) do not bear any restrictive legends and (c) do not bear a restrictive CUSIP number (the "shelf registration period"). The Issuer will, in the event that a shelf registration statement is filed, provide to each holder whose notes are registered under such shelf registration statement copies of the prospectus that is a part of such shelf registration statement, notify each such holder when such shelf registration statement has become effective and take certain other actions as are required to permit unrestricted resales of the notes. A holder that sells notes pursuant to a shelf registration statement will be required to be named as a selling security holder in the related prospectus and to deliver a prospectus to purchasers, will be subject to certain of the civil liability provisions under Securities Act in connection with such sales and will be bound by the provisions of the Registration Rights Agreement that are applicable to such a holder (including certain indemnification rights and obligations).

The Registration Rights Agreement permits the Issuer to prohibit offers and sales of registrable securities under the shelf registration statement for a period not to exceed an aggregate of 90 days in any 12-month period, if it is determined that there is a valid business purpose for such prohibition. Any such period during which the Issuer may prohibit offers and sales is referred to as a "suspension period."

If (1) the Issuer has not filed the exchange offer registration statement or shelf registration statement by the deadlines discussed above, (2) the exchange offer registration statement or shelf registration statement has not become or been declared effective by the deadlines discussed above, (3) the exchange offer has not been completed by the earlier of (i) 60 business days after the exchange offer registration statement has become effective or (ii) (a) with respect to the first lien notes, 365 days after the issuance date of the first lien notes or (b) with respect to the new second lien notes, 365 days after February 6, 2012 or (4) a registration statement relating to the first lien notes or the new second lien notes has been declared effective and such registration statement ceases to be effective at any time during the shelf registration period (subject to certain exceptions) (each of (1), (2), (3) or (4) above, a "*registration default*"), then Additional Interest will accrue on the principal amount of the first lien notes or the new second lien notes, as applicable at a rate of 0.25% per annum for the first 90-day period during which a registration default continues, and thereafter the interest rate on the first lien notes or the new second lien notes, as applicable will increase by 0.50% per annum over the interest rate shown on the cover of this offering memorandum for the remaining period during which a registration default continues. When all registration defaults are cured, the interest rate on the first lien notes or the new second lien notes, as applicable will revert to the original level.

Any amounts of additional interest due will be payable on the same original interest payment dates as interest on the notes is payable.

The Exchange Notes will be accepted for clearance through DTC.

This summary of the provisions of the Registration Rights Agreement does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all the provisions of the Registration Rights Agreement, copies of which will be available from the Issuer upon request.

Highly Confidential

EFIHMW00034172

**NOTICE TO INVESTORS**

Because the following restrictions will apply to the notes unless the Issuer completes an exchange offer for the notes or otherwise causes a registration statement with respect to the resale of the notes to be declared effective under the Securities Act, purchasers are advised to consult legal counsel prior to making any offer, resale, pledge or transfer of any of the notes. See "Description of the First Lien Notes" and "Description of the Second Lien Notes."

The notes have not been registered under the Securities Act and may not be offered or sold in the United States or to, or for the account or benefit of, U.S. persons except in transactions exempt from, or not subject to, the registration requirements of the Securities Act. Accordingly, the notes are being offered and sold only (1) to "qualified institutional buyers" under Rule 144A under the Securities Act and (2) outside the United States to non-U.S. persons in reliance upon Regulation S under the Securities Act.

Each purchaser of notes, by its acceptance thereof, will be deemed to have acknowledged, represented to and agreed with us and the initial purchasers as follows:

1. It is not an "affiliate" (as defined in Rule 144 under the Securities Act) of ours and is not acting on our behalf, and it is either a:

- "qualified institutional buyer" within the meaning of Rule 144A promulgated under the Securities Act and is aware that any sale of new notes to it will be made in reliance on Rule 144A, and such acquisition will be for its own account or for the account of another qualified institutional buyer; or

- person that, at the time the buy order for the new notes was originated, was outside the United States and was not a U.S. person (and was not purchasing for the account or benefit of a U.S. person) within the meaning of Regulation S under the Securities Act.

2. The notes are being offered for resale in a transaction not involving any public offering in the United States within the meaning of the Securities Act. The notes have not been registered under the Securities Act or any U.S. securities laws, and they are being offered for resale in transactions not requiring registration under the Securities Act. The notes may not be reoffered, resold, pledged or otherwise transferred except:

- to us or any of our subsidiaries;

- to a person whom the purchaser reasonably believes is a qualified institutional buyer in a transaction meeting the requirements of Rule 144A;

- in an offshore transaction complying with Rule 903 or Rule 904 of Regulation S;

- pursuant to the exemption from registration under the Securities Act provided by Rule 144 thereunder (if available);

- in accordance with another exemption from the registration requirements of the Securities Act (and based upon an opinion of counsel acceptable to us, if we so request); or

- pursuant to an effective registration statement under the Securities Act,

and, in each case, in accordance with all applicable U.S. state securities laws.

The purchaser will, and each subsequent holder is required to, notify any subsequent purchaser from it of the resale restrictions set forth in the preceding sentence. No representation is being made as to the availability of the exemption provided by Rule 144 for resales of the notes.

Highly Confidential

EFIHMW00034173

**PX 058**
**Page 259 of 308**

3. It is relying only on the information contained in or incorporated by reference into this offering memorandum in making its investment decision with respect to the notes. It acknowledges that no representation or warranty is made by the initial purchasers as to the accuracy or completeness of such materials. It further acknowledges that neither the Issuer nor the initial purchasers, nor any person representing any such party, has made any representation to it with respect to the Issuer or the offering or sale of any notes other than the information contained in or incorporated by reference into this offering memorandum. It has had access to such financial and other information concerning the Issuer and the notes as it has deemed necessary in connection with its decision to purchase any of the notes, including any opportunity to ask questions of and request information from the Issuer and the initial purchasers.

4. It acknowledges that prior to any proposed transfer of notes in certificated form or of beneficial interests in a note in global form (in each case other than pursuant to an effective registration statement), the holder of notes or the holder of beneficial interests in such note in global form, as the case may be, may be required to provide certifications and other documentation relating to the manner of such transfer and submit such certifications and other documentation as provided in the indenture.

5. It understands that all of the notes will bear a legend substantially to the following effect unless otherwise agreed by us and the holder thereof:

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS EXCEPT AS SET FORTH BELOW. BY ITS ACQUISITION HEREOF, THE HOLDER (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) OR (B) IT IS NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT, (2) AGREES THAT IT WILL NOT WITHIN [IN THE CASE OF RULE 144A GLOBAL NOTES: ONE YEAR] [IN THE CASE OF REGULATION S GLOBAL NOTES: 40 DAYS] AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF SUCH NOTE) [IN THE CASE OF RULE 144A GLOBAL NOTES: (THE "RESALE RESTRICTION TERMINATION DATE")][IN THE CASE OF REGULATION S GLOBAL NOTES: (THE "DISTRIBUTION COMPLIANCE PERIOD")] RESELL OR OTHERWISE TRANSFER THIS NOTE EXCEPT (A) TO THE ISSUER OR ANY SUBSIDIARY THEREOF, (B) INSIDE THE UNITED STATES TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 903 OR RULE 904 UNDER THE SECURITIES ACT, (D) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE), (E) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL IF THE ISSUER SO REQUESTS), OR (F) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (3) AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS NOTE IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANING GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT. THIS LEGEND WILL BE REMOVED ONLY AT THE DIRECTION AND IN THE ABSOLUTE DISCRETION OF THE ISSUER.

6. It acknowledges that the registrar will not be required to accept for registration of transfer any notes acquired by it, except upon presentation of evidence satisfactory to us and the registrar that the restrictions set forth herein have been complied with.

251

EFIHMW00034174

7. It acknowledges that we, the initial purchasers and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that if any of the acknowledgments, representations or agreements deemed to have been made by its purchase of the new notes are no longer accurate, it shall promptly notify us and the initial purchasers. If it is acquiring the notes as a fiduciary or agent for one or more investor accounts, it represents that it has sole investment discretion with respect to each such account and it has full power to make the foregoing acknowledgments, representations and agreements on behalf of each account.

8. Each purchaser and subsequent transferee of a note or an exchange note, or any interest therein, will be deemed to have represented and warranted that either (A) no portion of the assets used by such purchaser or transferee to acquire or hold the notes or exchange notes constitutes assets of any employee benefit plan (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) that is subject to Title I of ERISA, individual retirement account or other plan or arrangement that is subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), or any federal, state, local, non-U.S. or other laws, rules or regulations that are similar to such provisions of ERISA or the Code (collectively, "Similar Laws"), or entity whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement or (B) the acquisition and holding of the notes (and the exchange of notes for exchange notes) by such purchaser or transferee are entitled to exemption relief from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code and are otherwise permissible under all applicable Similar Laws.

Highly Confidential

EFIHMW00034175

## BOOK ENTRY; DELIVERY AND FORM

The notes offered hereby are being offered and sold to qualified institutional buyers in reliance on Rule 144A ("Rule 144A Notes"). The notes also may be offered and sold in offshore transactions in reliance on Regulation S ("Regulation S Notes"). Except as set forth below, the notes offered hereby will be issued in registered, global form in minimum denominations of $2,000 and integral multiples of $1,000 in excess of $2,000. Notes offered hereby will be issued at the closing of this offering only against payment in immediately available funds.

Rule 144A Notes initially will be represented by one or more global notes in registered form without interest coupons (collectively, the "Rule 144A Global Notes"). Regulation S Notes initially will be represented by one or more global notes in registered form without interest coupons (collectively, the "Regulation S Global Notes" and, together with the Rule 144A Global Notes, the "Global Notes"). The Rule 144A Global Notes and the Regulation S Global Notes will be deposited upon issuance with the applicable registrar as custodian for DTC, and registered in the name of DTC or its nominee, in each case, for credit to an account of a direct or indirect participant in DTC as described below. Through and including the 40th day after the later of the commencement of this offering and the closing of this offering (such period through and including such 40th day, the "Restricted Period"), beneficial interests in the Regulation S Global Notes may be held only through Euroclear Bank S.A./N.V., as operator of the Euroclear System ("Euroclear"), and Clearstream Banking, Société Anonyme ("Clearstream, Luxembourg") (as indirect participants in DTC), unless transferred to a person that takes delivery through a Rule 144A Global Note in accordance with the certification requirements described under "—Exchanges Between Regulation S Notes and Rule 144A Notes" below. Beneficial interests in the Rule 144A Global Notes may not be exchanged for beneficial interests in the Regulation S Global Notes at any time except in the limited circumstances described under "—Exchanges Between Regulation S Notes and Rule 144A Notes" below.

Except as set forth below, the Global Notes may be transferred, in whole and not in part, only to another nominee of DTC or to a successor of DTC or its nominee. Beneficial interests in the Global Notes may not be exchanged for definitive notes in registered certificated form ("Certificated Notes") except in the limited circumstances described below. See "—Exchange of Global Notes for Certificated Notes." Except in the limited circumstances described below, owners of beneficial interests in the Global Notes will not be entitled to receive physical delivery of notes in certificated form.

Rule 144A Notes (including beneficial interests in the Rule 144A Global Notes) will be subject to certain restrictions on transfer and will bear a restrictive legend as described under "Notice to Investors." Regulation S Notes will also be subject to certain restrictions on transfer and will also bear the legend as described under "Notice to Investors." In addition, transfers of beneficial interests in the Global Notes will be subject to the applicable rules and procedures of DTC and its direct or indirect participants (including, if applicable, those of Euroclear and Clearstream, Luxembourg), which may change from time to time.

### Depository Procedures

The following description of the operations and procedures of DTC, Euroclear and Clearstream, Luxembourg is provided solely as a matter of convenience. These operations and procedures are solely within the control of the respective settlement systems and are subject to changes by them. We take no responsibility for these operations and procedures and urge investors to contact the system or their participants directly to discuss these matters.

DTC has advised us that DTC is a limited-purpose trust company organized under the laws of the State of New York, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York

EFIHMW00034176

Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC was created to hold securities for its participating organizations (collectively, the "Participants") and to facilitate the clearance and settlement of transactions in those securities between the Participants through electronic book-entry changes in accounts of its Participants. The Participants include securities brokers and dealers (including the initial purchasers), banks, trust companies, clearing corporations and certain other organizations. Access to DTC's system is also available to other entities such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly (collectively, the "Indirect Participants"). Persons who are not Participants may beneficially own securities held by or on behalf of DTC only through the Participants or the Indirect Participants. The ownership interests in, and transfers of ownership interests in, each security held by or on behalf of DTC are recorded on the records of the Participants and Indirect Participants.

DTC has also advised us that, pursuant to procedures established by it:

- upon deposit of the Global Notes, DTC will credit the accounts of the Participants designated by the initial purchasers with portions of the principal amount of the Global Notes; and

- ownership of these interests in the Global Notes will be shown on, and the transfer of ownership of these interests will be effected only through, records maintained by DTC (with respect to the Participants) or by the Participants and the Indirect Participants (with respect to other owners of beneficial interests in the Global Notes).

Investors in the Rule 144A Global Notes who are Participants may hold their interests therein directly through DTC. Investors in the Rule 144A Global Notes who are not Participants may hold their interests therein indirectly through organizations (including Euroclear and Clearstream, Luxembourg) that are Participants. Investors in the Regulation S Global Notes must initially hold their interests therein through Euroclear or Clearstream, Luxembourg, if they are participants in such systems, or indirectly through organizations that are participants. After the expiration of the Restricted Period (but not earlier), investors may also hold interests in the Regulation S Global Notes through Participants in DTC other than Euroclear and Clearstream, Luxembourg. Euroclear and Clearstream, Luxembourg will hold interests in the Regulation S Global Notes on behalf of their participants through customers' securities accounts in their respective names on the books of their respective depositories, which in turn hold such interests in customers' securities accounts in the depositaries' names on the books of DTC. Citibank, N.A. acts as depositary for Clearstream, Luxembourg, and JP Morgan Chase Bank, N.A. acts as depositary for Euroclear. All interests in a Global Note, including those held through Euroclear or Clearstream, Luxembourg may be subject to the procedures and requirements of DTC. Those interests held through Euroclear or Clearstream, Luxembourg may also be subject to the procedures and requirements of such systems. The laws of some jurisdictions require that certain persons take physical delivery in definitive form of securities that they own. Consequently, the ability to transfer beneficial interests in a Global Note to such persons will be limited to that extent. Because DTC can act only on behalf of Participants, which in turn act on behalf of Indirect Participants, the ability of a person having beneficial interests in a Global Note to pledge such interests to persons that do not participate in the DTC system, or otherwise take actions in respect of such interests, may be affected by the lack of a physical certificate evidencing such interests.

**Except as described below, owners of interests in the Global Notes will not have notes registered in their names, will not receive physical delivery of notes in certificated form and will not be considered the registered owners or "holders" thereof under the indenture governing the notes for any purpose.**

Payments in respect of the principal of, and interest and premium, if any, and additional interest (as described in the registration rights agreement relating to the notes), if any, on a Global Note

Highly Confidential

registered in the name of DTC or its nominee will be payable to DTC in its capacity as the registered holder under the indentures governing the notes. Under the terms of the indentures, we, the trustee, the registrar, the paying agent and the transfer agent (together with the registrar and the paying agent, the "agents") will treat the persons in whose names the notes, including the Global Notes, are registered as the owners of the notes for the purpose of receiving payments and for all other purposes. Consequently, neither we, the trustee, the agents nor any agent of ours or theirs has or will have any responsibility or liability for:

- any aspect of DTC's records or any Participant's or Indirect Participant's records relating to, or payments made on account of, beneficial ownership interests in the Global Notes or for maintaining, supervising or reviewing any of DTC's records or any Participant's or Indirect Participant's records relating to the beneficial ownership interests in the Global Notes; or

- any other matter relating to the actions and practices of DTC or any of its Participants or Indirect Participants.

DTC has advised us that its current practice, upon receipt of any payment in respect of securities such as the notes (including principal and interest), is to credit the accounts of the relevant Participants with the payment on the payment date unless DTC has reason to believe that it will not receive payment on such payment date. Each relevant Participant is credited with an amount proportionate to its beneficial ownership of an interest in the principal amount of the relevant security as shown on the records of DTC. Payments by the Participants and the Indirect Participants to the beneficial owners of notes will be governed by standing instructions and customary practices and will be the responsibility of the Participants or the Indirect Participants and will not be our responsibility or the responsibility of DTC or either trustee. Neither we, the trustee nor the agents will be liable for any delay by DTC or any of the Participants or the Indirect Participants in identifying the beneficial owners of the notes, and we, the trustee and the agents may conclusively rely on and will be protected in relying on instructions from DTC or its nominee for all purposes.

Except for trades involving only Euroclear and Clearstream, Luxembourg participants, interests in the Global Notes are expected to be eligible to trade in DTC's Same Day Funds Settlement System and secondary market trading activity in such interests will, therefore, settle in immediately available funds, subject in all cases to the rules and procedures of DTC and its Participants. See "—Same Day Settlement and Payment."

Subject to the transfer restrictions set forth under "Notice to Investors," transfers between the Participants will be effected in accordance with DTC's procedures and will be settled in same day funds, and transfers between participants in Euroclear and Clearstream, Luxembourg will be effected in accordance with their respective rules and operating procedures.

Subject to compliance with the transfer restrictions applicable to the notes described herein, cross-market transfers between the Participants, on the one hand, and Euroclear or Clearstream, Luxembourg participants, on the other hand, will be effected through DTC in accordance with DTC's rules on behalf of Euroclear or Clearstream, Luxembourg, as the case may be, by its respective depositary. However, such cross-market transactions will require delivery of instructions to Euroclear or Clearstream, Luxembourg, as the case may be, by the counterparty in such system in accordance with the rules and procedures and within the established deadlines (Brussels time) of such system. Euroclear or Clearstream, Luxembourg, as the case may be, will, if the transaction meets its settlement requirements, deliver instructions to its respective depositary to take action to effect final settlement on its behalf by delivering or receiving interests in the relevant Global Note from DTC, and making or receiving payment in accordance with normal procedures for same day funds settlement applicable to DTC. Euroclear participants and Clearstream, Luxembourg participants may not deliver instructions directly to the depositories for Euroclear or Clearstream, Luxembourg.

255

EFIHMW00034178

DTC has advised us that it will take any action permitted to be taken by a holder of notes only at the direction of one or more Participants to whose account DTC has credited the interests in the Global Notes and only in respect of such portion of the aggregate principal amount of the notes as to which such Participant or Participants has or have given such direction. However, if there is an event of default under the notes, DTC reserves the right to exchange the Global Notes for legended notes in certificated form and to distribute such notes to its Participants.

Although DTC, Euroclear and Clearstream, Luxembourg have agreed to the foregoing procedures to facilitate transfers of interests in the Rule 144A Global Notes and the Regulation S Global Notes among participants in DTC, Euroclear and Clearstream, Luxembourg, they are under no obligation to perform or to continue to perform such procedures, and may discontinue such procedures at any time. Neither we nor the trustee nor any of our or its agents will have any responsibility for the performance by DTC, Euroclear or Clearstream, Luxembourg or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

### Exchange of Global Notes for Certificated Notes

A Global Note is exchangeable for Certificated Notes if:

- DTC (1) notifies us that it is unwilling or unable to continue as depositary for the Global Notes or (2) has ceased to be a clearing agency registered under the Exchange Act and, in either case, we fail to appoint a successor depositary; or

- there has occurred and is continuing an event of default with respect to the notes.

In addition, beneficial interests in a Global Note may be exchanged for Certificated Notes upon prior written notice given to the trustee by or on behalf of DTC in accordance with the indenture governing the notes. In all cases, Certificated Notes delivered in exchange for any Global Note or beneficial interests in Global Notes will be registered in the names, and issued in any approved denominations, requested by or on behalf of the depositary (in accordance with its customary procedures) and will bear the applicable restrictive legend referred to under "Notice to Investors," unless that legend is not required by applicable law.

### Exchange of Certificated Notes for Global Notes

Certificated Notes may not be exchanged for beneficial interests in any Global Note unless the transferor first delivers to the registrar a written certificate (in the form provided in the indenture governing the notes) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such notes. See "Notice to Investors."

### Exchanges Between Regulation S Notes and Rule 144A Notes

Prior to the expiration of the Restricted Period, beneficial interests in the Regulation S Global Notes may be exchanged for beneficial interests in the Rule 144A Global Notes only if:

- such exchange occurs in connection with a transfer of the notes pursuant to Rule 144A; and

- the transferor first delivers to the trustee a written certificate (in the form provided in the indenture governing the notes) to the effect that the notes are being transferred to a person:

  - whom the transferor reasonably believes to be a "qualified institutional buyer" within the meaning of Rule 144A; and

  - who is purchasing for its own account or the account of a "qualified institutional buyer" in a transaction meeting the requirements of Rule 144A; and

256

EFIHMW00034179

- in accordance with all applicable securities laws of the states of the United States and other jurisdictions.

Beneficial interests in a Rule 144A Global Note may be transferred to a person who takes delivery in the form of an interest in the Regulation S Global Notes, whether before or after the expiration of the Restricted Period, only if the transferor first delivers to the trustee a written certificate (in the form provided in the indenture governing the notes) to the effect that such transfer is being made in accordance with Rule 903 or 904 of Regulation S or Rule 144 (if available) and that, if such transfer occurs prior to the expiration of the Restricted Period, the interest transferred will be held immediately thereafter through Euroclear or Clearstream, Luxembourg.

Transfers involving exchanges of beneficial interests between the Regulation S Global Notes and the Rule 144A Global Notes will be effected by DTC by means of an instruction originated by the registrar through the DTC Deposit/Withdraw at Custodian system. Accordingly, in connection with any such transfer, appropriate adjustments will be made to reflect a decrease in the principal amount of the Regulation S Global Notes and a corresponding increase in the principal amount of the Rule 144A Global Notes or vice versa, as applicable. Any beneficial interest in one of the Global Notes that is transferred to a person who takes delivery in the form of an interest in the other Global Note will, upon transfer, cease to be an interest in such Global Note and will become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in such other Global Note for so long as it remains such an interest. The policies and practices of DTC may prohibit transfers of beneficial interests in the Regulation S Global Notes prior to the expiration of the Restricted Period.

**Same Day Settlement and Payment**

The Issuer will make payments in respect of the notes represented by the Global Notes (including principal, premium, if any, interest and additional interest, if any) by wire transfer of immediately available funds to the accounts specified by DTC or its nominee. The Issuer will make all payments of principal, interest and premium, if any, and additional interest, if any, with respect to Certificated Notes by wire transfer of immediately available funds to the accounts specified by the holders of the Certificated Notes or, if no such account is specified, by mailing a check to each such holder's registered address. The notes represented by the Global Notes are expected to be eligible to trade in DTC's Same Day Funds Settlement System, and any permitted secondary market trading activity in such notes will, therefore, be required by DTC to be settled in immediately available funds. The Issuer expects that secondary trading in any Certificated Notes will also be settled in immediately available funds.

Because of time-zone differences, credits of interests in the Global Notes received in Clearstream, Luxembourg or Euroclear as a result of a transaction with a DTC Participant will be made during subsequent securities settlement processing and dated the business day following the DTC settlement date. Such credits or any transactions involving interests in such Global Notes settled during such processing will be reported to the relevant Clearstream, Luxembourg or Euroclear participants on such business day. Cash received in Clearstream, Luxembourg or Euroclear as a result of sales of interests in the Global Notes by or through a Clearstream, Luxembourg participant or a Euroclear participant to a DTC Participant will be received with value on the DTC settlement date but will be available in the relevant Clearstream, Luxembourg or Euroclear cash account only as of the business day following settlement in DTC.

257

Highly Confidential

## CERTAIN UNITED STATES FEDERAL TAX CONSEQUENCES

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT ANY DISCUSSION OF TAX MATTERS SET FORTH IN THIS OFFERING MEMORANDUM WAS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN AND WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER FEDERAL, STATE OR LOCAL TAX LAW. EACH PROSPECTIVE INVESTOR SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following is a summary of certain United States federal income and, in the case of non-U.S. holders (as defined below), estate tax consequences of the purchase, ownership and disposition of the notes offered hereby as of the date of this offering memorandum. Unless otherwise stated, this summary deals only with notes offered hereby held as capital assets within the meaning of Section 1221 of the Code by persons who purchase the notes offered hereby for cash upon original issuance at their initial offering price.

As used herein, a "U.S. holder" means a beneficial owner of the notes offered hereby that is for United States federal income tax purposes any of the following:

- an individual citizen or resident of the United States;

- a corporation (or any other entity treated as a corporation for United States federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to United States federal income taxation regardless of its source; or

- a trust if it (1) is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

The term "non-U.S. holder" means a beneficial owner of the notes offered hereby (other than a partnership or any other entity treated as a partnership for United States federal income tax purposes) that is not a U.S. holder.

This summary does not represent a detailed description of the United States federal income tax consequences applicable to you if you are a person subject to special tax treatment under the United States federal income tax laws, including, without limitation:

- a dealer in securities or currencies;

- a financial institution;

- a regulated investment company;

- a real estate investment trust;

- a tax-exempt organization;

- an insurance company;

- a person holding the notes offered hereby as part of a hedging, integrated, conversion or constructive sale transaction or a straddle;

- a trader in securities that has elected the mark-to-market method of accounting for their securities;

Highly Confidential

EFIHMW00034181

**PX 058**
**Page 267 of 308**

- a person liable for alternative minimum tax;
- a partnership or other pass-through entity for United States federal income tax purposes (or an investor in such entities);
- a U.S. holder whose "functional currency" is not the U.S. dollar;
- a "controlled foreign corporation";
- a "passive foreign investment company"; or
- a United States expatriate.

This summary is based on the Code, United States Treasury regulations, administrative rulings and judicial decisions as of the date hereof. Those authorities may be changed, possibly on a retroactive basis, so as to result in United States federal income and estate tax consequences different from those summarized below. We have not and will not seek any rulings from the Internal Revenue Service ("IRS") regarding the matters discussed below. There can be no assurance that the IRS will not take positions concerning the tax consequences of the purchase, ownership or disposition of the notes that are different from those discussed below.

If a partnership (including any entity classified as a partnership for United States federal income tax purposes) holds notes offered hereby, the tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the partnership. If you are a partnership or a partner in a partnership holding notes offered hereby, you should consult your own tax advisors as to the tax consequences of the partnership's purchase, ownership and disposition of the notes offered hereby.

This summary does not represent a detailed description of the United States federal income and estate tax consequences to you in light of your particular circumstances and does not address the effects of any state, local or non-United States tax laws. It is not intended to be, and should not be construed to be, legal or tax advice to any particular purchaser of notes offered hereby. **If you are considering the purchase of notes offered hereby, you should consult your own tax advisors concerning the particular United States federal income, gift and estate tax consequences to you of the ownership of the notes offered hereby, as well as the consequences to you arising under the laws of any other taxing jurisdiction.**

## Qualified Reopening

We believe and intend to take the position that the new second lien notes will be treated as having been issued in a "qualified reopening" of the Existing 2022 Second Lien Notes for United States federal income tax purposes, and the following discussion assumes such treatment will be respected. Consequently, the new second lien notes will be part of the same issue as the Existing 2022 Second Lien Notes, and, for United States federal income tax purposes, will have the same issue date and the same issue price as those notes. The issue price of the Existing 2022 Second Lien Notes is the first price at which a substantial amount of those notes were sold for cash (ignoring sales to bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents or wholesalers).

## Certain Tax Consequences to U.S. Holders

The following is a summary of certain United States federal income tax consequences that will apply to U.S. holders of the notes offered hereby.

*Stated Interest.*   Interest on the notes offered hereby generally will be taxable to a U.S. holder as ordinary income at the time it is received or accrued, depending on the holder's method of accounting for United States federal income tax purposes. However, with respect to a new second lien note, U.S.

259

EFIHMW00034182

holders may exclude from income the portion of the interest payment paid on September 1, 2012 that relates to the period from the issue date of the Existing 2022 Second Lien Notes to the date the new second lien notes are issued ("pre-issuance accrued interest"). Any pre-issuance accrued interest received by a U.S. holder with respect to a new second lien note will reduce such U.S. holder's adjusted tax basis in the new second lien note.

   *Certain Additional Payments.*   In certain circumstances (see "Description of the First Lien Notes—Repurchase at the Option of Holders," "Description of the Second Lien Notes—Repurchase at the Option of Holders" and "Exchange Offer; Registration Rights"), we may be obligated to pay amounts on the notes offered hereby that are in excess of stated interest or principal on the notes offered hereby. These potential payments may implicate the provisions of the United States Treasury regulations relating to "contingent payment debt instruments." The possibility of such excess amounts being paid will not cause the notes offered hereby to be treated as contingent payment debt instruments if there is only a "remote" chance that these contingencies will occur, or if such contingencies are considered "incidental." We intend to take the position that the possibility that any such contingencies will occur is remote and/or that such contingencies are incidental and thus the notes offered hereby will not be treated as contingent payment debt instruments. Our determination that these contingencies are remote and/or incidental is binding on a holder unless such holder discloses its contrary position to the IRS in the manner that is required by applicable United States Treasury regulations. Our determination, however, is not binding on the IRS, and it is possible that the IRS may take a different position, in which case a holder might be required to accrue interest income at a higher rate than the stated interest rate, and to treat as ordinary interest income any gain realized on the taxable disposition of such note. This discussion assumes that the notes are not treated as contingent payment debt instruments. As such in the event a contingency occurs, it would affect the amount and timing of the income recognized by a U.S. holder. If any such amounts are in fact paid, U.S. holders will be required to recognize such amounts as income.

   *Amortizable Bond Premium.*   It is expected that the new second lien notes will be purchased with "amortizable bond premium." Such premium will equal the amount by which the purchase price of a new second lien note (excluding any amounts attributable to pre-issuance accrued interest, as discussed above) exceeds the sum of all amounts payable on the new second lien note after the purchase date, other than qualified stated interest. For this purpose, in determining the sum of all amounts payable on the new second lien note, it will initially be assumed that we will exercise our rights to call the new second lien notes at a premium, and subsequent adjustments may be made if we do not in fact exercise our call rights. This assumption may eliminate, reduce or defer any amortization deductions. The bond premium rules are complex and U.S. holders should consult their own tax advisors about the application of these rules to the new second lien notes.

   A U.S. holder may elect to amortize such premium as an offset to interest income using a constant yield method over the remaining term of the new second lien note based on the U.S. holder's yield to maturity or earlier call date with respect to the new second lien note (and taking into account the foregoing assumptions). An election to amortize bond premium applies to all taxable debt obligations held by the U.S. holder at the beginning of the first taxable year to which the election applies and thereafter acquired by the U.S. holder and may be revoked only with the consent of the IRS.

   A U.S. holder generally may use the amortizable bond premium allocable to an accrual period to offset interest required to be included in the U.S. holder's income under its regular method of accounting with respect to the new second lien note in that accrual period. If the amortizable bond premium allocable to an accrual period exceeds the amount of interest allocable to such accrual period, such excess would be allowed as a deduction for such accrual period, but only to the extent of the U.S. holder's prior interest inclusions on the new second lien note that have not been offset

260

EFIHMW00034183

previously by bond premium. Any excess is generally carried forward and allocable to the next accrual period.

A U.S. holder that elects to amortize bond premium will be required to reduce its tax basis in the new second lien note by the amount of the premium amortized during its holding period. If a U.S. holder does not elect to amortize bond premium, the amount of bond premium will be included in its tax basis in the new second lien note. Therefore, if a U.S. holder does not elect to amortize bond premium and it holds the new second lien note to maturity, the premium generally will be treated as capital loss when the new second lien note matures.

*Sale, Exchange, Retirement, Redemption or Other Taxable Disposition of Notes.*   Upon the sale, exchange, retirement, redemption, or other taxable disposition of a note offered hereby (including potentially upon a Permitted Asset Transfer), you generally will recognize gain or loss equal to the difference between the amount realized upon the sale, exchange, retirement, redemption or other taxable disposition (less an amount equal to any accrued and unpaid stated interest not previously included in income (other than pre-issuance accrued interest), which will be taxable as interest income as discussed above) and the adjusted tax basis of the note. Your adjusted tax basis in a note offered hereby will, in general, be your cost for that note reduced by any bond premium previously amortized by you with respect to the note and any pre-issuance accrued interest previously received. Any gain or loss will be capital gain or loss. Capital gains of individuals derived in respect of capital assets held for more than one year are eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

*Taxation of Net Investment Income.*   For taxable years beginning after December 31, 2012, United States persons that are not corporations will generally be subject to a 3.8% tax on the lesser of (1) the United States person's "net investment income" for the taxable year and (2) the excess of the United States person's modified adjusted gross income for the taxable year over a certain threshold. Prospective holders should consult their tax advisors with respect to the tax consequences of the new legislation relating to the taxation of net investment income.

### Certain Tax Consequences to Non-U.S. Holders

The following is a summary of certain United States federal income and estate tax consequences that will apply to non-U.S. holders of the notes offered hereby.

*United States Federal Withholding Tax.*   The 30% United States federal withholding tax will not apply to any payment of interest on the notes offered hereby under the "portfolio interest rule," provided that:

- interest paid on the notes offered hereby is not effectively connected with your conduct of a trade or business in the United States;

- you do not actually (or constructively) own 10% or more of the total combined voting power of all classes of our voting stock within the meaning of the Code and applicable United States Treasury regulations;

- you are not a controlled foreign corporation that is related to us actually or constructively through stock ownership;

- you are not a bank whose receipt of interest on the notes offered hereby is in connection with an extension of credit made pursuant to a loan agreement entered into in the ordinary course of your trade or business; and

Highly Confidential

EFIHMW00034184

**PX 058**
**Page 270 of 308**

- either (a) you provide your name and address on an IRS Form W-8BEN (or other applicable form), and certify, under penalties of perjury, that you are not a United States person as defined under the Code or (b) you hold your notes through certain foreign intermediaries and satisfy the certification requirements of applicable United States Treasury regulations. Special certification rules apply to non-U.S. holders that are pass-through entities rather than corporations or individuals.

If you cannot satisfy the requirements described above, payments of interest made to you will be subject to the 30% United States federal withholding tax, unless you provide us with a properly executed:

- IRS Form W-8BEN (or other applicable form) certifying an exemption from or reduction in withholding under the benefit of an applicable income tax treaty; or

- IRS Form W-8ECI (or other applicable form) certifying interest paid on the notes offered hereby is not subject to withholding tax because it is effectively connected with your conduct of a trade or business in the United States (as discussed below under "—United States Federal Income Tax").

A Non-U.S. holder may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

The certification requirements described above may require a non-U.S. holder that provides an IRS form, or that claims the benefit of an income tax treaty, to also provide its United States taxpayer identification number. Prospective investors should consult their tax advisors regarding the certification requirements for non-U.S. persons.

The 30% United States federal withholding tax generally will not apply to any payment of principal or gain that you realize on the sale, exchange, retirement, redemption or other disposition of a note offered hereby.

*United States Federal Income Tax.*  If you are engaged in a trade or business in the United States and interest on the notes offered hereby or gain from the disposition of a note offered hereby is effectively connected with the conduct of that trade or business (and, if required by an applicable income tax treaty, is attributable to a United States permanent establishment), then you will be subject to United States federal income tax on that interest or gain on a net income basis in generally the same manner as if you were a United States person as defined under the Code. In addition, if you are a foreign corporation, you may be subject to a branch profits tax equal to 30% (or lower applicable income tax treaty rate) of such interest or gain, subject to adjustments. If interest received with respect to the notes offered hereby or gain from the disposition of a note offered hereby is effectively connected income (whether or not a treaty applies), the 30% withholding tax described above will not apply, provided the certification requirements discussed above under "—United States Federal Withholding Tax" are satisfied.

Subject to the discussion of backup withholding below, any gain realized on the disposition of a note offered hereby generally will not be subject to United States federal income tax unless:

- the gain is effectively connected with your conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a United States permanent establishment); or

- you are an individual who is present in the United States for 183 days or more in the taxable year of that disposition, and certain other conditions are met.

262

EFIHMW00034185

**PX 058
Page 271 of 308**

*United States Federal Estate Tax.*    Your estate will not be subject to United States federal estate tax on notes offered hereby beneficially owned by you at the time of your death, provided that any payment to you on the notes offered hereby would be eligible for exemption from the 30% United States federal withholding tax under the "portfolio interest rule" described above under "—United States Federal Withholding Tax" without regard to the certification requirement described in the fifth bullet point of that section.

**Information Reporting and Backup Withholding**

### U.S. Holders

In general, information reporting requirements will apply to certain payments to you of principal and interest paid on the notes offered hereby and to the proceeds of the sale or other disposition (including a retirement or redemption) of a note before maturity (unless you are an exempt recipient such as a corporation). Backup withholding (currently at a rate of 28%) may apply to such payments if you fail to provide a taxpayer identification number or a certification that you are not subject to backup withholding, or if you fail to report in full dividend and interest income.

U.S. holders should consult their personal tax advisors regarding their qualification for an exemption from backup withholding and the procedures for obtaining such an exemption, if applicable. Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against your United States federal income tax liability provided the required information is timely furnished to the IRS.

We, our paying agent or other withholding agent generally will report to U.S. holders and to the IRS the amount of any reportable payments made in respect of the notes offered hereby for each calendar year and the amount of tax withheld, if any, with respect to such payments, unless such holder is an exempt recipient and appropriately establishes that exemption.

### Non-U.S. Holders

Generally, we will, when required, report to the IRS and to you the amount of interest paid to you and the amount of tax, if any, withheld with respect to those payments. Copies of the information returns reporting such interest payments and any withholding may also be made available to the tax authorities in the country in which you reside under the provisions of an applicable income tax treaty.

In general, you will not be subject to backup withholding with respect to payments of interest on the notes offered hereby that we make to you provided that we do not have actual knowledge or reason to know that you are a United States person as defined under the Code, and we have received from you the required certification that you are a non-U.S. holder described above in the fifth bullet point under "—Certain Tax Consequences to Non-U.S. Holders —United States Federal Withholding Tax."

Information reporting and, depending on the circumstances, backup withholding will apply to the proceeds of a sale or other disposition (including a retirement or redemption) of notes offered hereby within the United States or conducted through certain United States-related financial intermediaries, unless you certify to the payer under penalties of perjury that you are a non-U.S. holder (and the payer does not have actual knowledge or reason to know that you are a United States person as defined under the Code), or you otherwise establish an exemption.

Non-U.S. holders should consult their own tax advisors regarding the application of withholding and backup withholding in their particular circumstances and the availability of and procedure for obtaining an exemption from withholding and backup withholding under current Treasury regulations.

Highly Confidential

EFIHMW00034186

**PX 058**
**Page 272 of 308**

Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against your United States federal income tax liability provided the required information is timely furnished to the IRS.

**THE PRECEDING DISCUSSION OF CERTAIN UNITED STATES FEDERAL TAX CONSEQUENCES IS FOR GENERAL INFORMATION ONLY AND IS NOT TAX ADVICE. WE URGE EACH PROSPECTIVE INVESTOR TO CONSULT ITS TAX ADVISOR REGARDING THE PARTICULAR FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF PURCHASING, HOLDING, AND DISPOSING OF THE NOTES, INCLUDING THE CONSEQUENCES OF ANY PROPOSED CHANGE IN APPLICABLE LAWS.**

Highly Confidential

EFIHMW00034187

**PX 058
Page 273 of 308**

## CERTAIN ERISA CONSIDERATIONS

This disclosure was written in connection with the promotion and marketing of the notes by the Issuer and the initial purchasers, and it cannot be used by any holder for the purpose of avoiding penalties that may be asserted against the holder under the Code. Prospective purchasers of the notes should consult their own tax advisors with respect to the application of the U.S. federal income tax laws to their particular situations.

The following is a summary of certain considerations associated with the purchase of the notes and exchange notes by employee benefit plans that are subject to Title I of ERISA, individual retirement accounts and other plans and arrangements that are subject to Section 4975 of the Code or Similar Laws, and entities whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each, a "Plan").

This summary is based on the provisions of ERISA and the Code (and related regulations and administrative and judicial interpretations) as of the date of this offering memorandum. This summary does not purport to be complete and future legislation, court decisions, administrative regulations, rulings or administrative pronouncements could significantly modify the requirements summarized below. Any of these changes may be retroactive and may thereby apply to transactions entered into prior to the date of their enactment or release.

**General Fiduciary Matters**

ERISA and the Code impose certain duties on persons who are fiduciaries of a Plan subject to Title I of ERISA or Section 4975 of the Code (each a "Benefit Plan") and prohibit certain transactions involving the assets of a Benefit Plan and its fiduciaries or other interested parties.

In considering an investment in the notes of a portion of the assets of any Plan, a fiduciary should determine whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA, the Code or any Similar Law. In addition, a fiduciary of a Plan should consult with its counsel in order to determine if the investment satisfies the fiduciary's duties to the Plan including, without limitation, the prudence, diversification and prohibited transaction provisions of ERISA, the Code and any other applicable Similar Laws.

**Prohibited Transaction Issues**

Section 406 of ERISA and Section 4975 of the Code prohibit Benefit Plans from engaging in specified transactions involving plan assets with persons or entities who are "parties in interest," within the meaning of ERISA, or "disqualified persons," within the meaning of Section 4975 of the Code, unless an exemption is available. A party in interest or disqualified person who engaged in a nonexempt prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code. In addition, the fiduciary of the Benefit Plan that engaged in such a nonexempt prohibited transaction may be subject to penalties and liabilities under ERISA and the Code.

The acquisition and/or holding of notes (and the exchange of notes for exchange notes) by a Benefit Plan with respect to which the Issuer, the Investors, the initial purchasers or any of their affiliates are considered a party in interest or disqualified person may constitute or result in a direct or indirect prohibited transaction under Section 406 of ERISA and/or Section 4975 of the Code, unless the investment is acquired and is held in accordance with an applicable statutory, class or individual prohibited transaction exemption. In this regard, the United States Department of Labor has issued prohibited transaction class exemptions ("PTCEs") that may apply to the acquisition and holding of the

265

EFIHMW00034188

**PX 058
Page 274 of 308**

notes (and the exchange of notes for exchange notes). These class exemptions include, without limitation, PTCE 84-14 respecting transactions determined by independent qualified professional asset managers, PTCE 90-1, respecting insurance company pooled separate accounts, PTCE 91-38, respecting bank collective investment funds, PTCE 95-60, respecting life insurance company general accounts and PTCE 96-23, respecting transactions determined by in-house asset managers. In addition, Section 408(b)(17) of ERISA and Section 4975(d)(20) the Code provide relief from the prohibited transaction provisions of ERISA and the Code for certain transactions, provided that neither the Issuer of the notes nor any of its affiliates (directly or indirectly) have or exercise any discretionary authority or control or render any investment advice with respect to the assets of any Benefit Plan involved in the transaction and provided further that the Benefit Plan pays no more than adequate consideration in connection with the transaction.

Each of these prohibited transaction exemptions contains conditions and limitations on its application. Fiduciaries of Plans considering acquiring and/or holding the notes offered hereby in reliance on these or any other prohibited transaction exemptions should consult with counsel and carefully review the prohibited transaction exemption to assure it is applicable. There can be no assurance that all of the conditions of any such exemptions will be satisfied.

Because of the foregoing, the notes should not be purchased or held by any person investing "plan assets" of any Plan, unless such purchase and holding (and the exchange of notes for exchange notes) are entitled to exemptive relief from the prohibited transaction provisions of ERISA and the Code and are otherwise permissible under all applicable Similar Laws.

## Representation

Accordingly, by acceptance of a note or an exchange note, or any interest therein, each purchaser and subsequent transferee will be deemed to have represented and warranted that either (i) no portion of the assets used by such purchaser or transferee to acquire or hold the notes or exchange notes constitutes assets of any Plan or (ii) the acquisition and holding of the notes (and the exchange of notes for exchange notes) by such purchaser or transferee are entitled to exemptive relief from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code and are otherwise permissible under all applicable Similar Laws.

The foregoing discussion is general in nature and is not intended to be all-inclusive. Due to the complexity of these rules and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is particularly important that fiduciaries or other persons considering acquiring the notes (and holding the notes or exchange notes) on behalf of, or with the assets of, any Plan, consult with their counsel regarding the potential applicability of ERISA, Section 4975 of the Code and any Similar Laws to such investments and whether an exemption would be applicable to the purchase and holding of the notes and the exchange of notes for exchange notes.

Purchasers of the notes have the exclusive responsibility for ensuring that their purchase and holding of the notes (and their exchange of the notes for exchange notes) complies with the fiduciary responsibility rules of ERISA and does not violate the prohibited transaction rules of ERISA, the Code or applicable Similar Laws.

266

Highly Confidential

**PLAN OF DISTRIBUTION**

Citigroup Global Markets Inc., Goldman, Sachs & Co., Credit Suisse Securities (USA) LLC, J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC are acting as joint book-running managers for this offering, KKR Capital Markets LLC and The Williams Capital Group, L.P. are acting as co-managers for this offering, and each is an initial purchaser named in the purchase agreement. Subject to the terms and conditions stated in the purchase agreement dated the date of this offering memorandum, the initial purchasers have severally agreed to purchase, and we have agreed to sell to the several initial purchasers, the principal amount of the notes offered hereby set forth therein. In addition, in connection with this offering, the Issuer will pay TPG, a member of the Sponsor Group, an advisory fee of $818,750. TPG will not serve as an initial purchaser in connection with this offering.

The purchase agreement provides that the obligations of the initial purchasers to purchase the notes offered hereby are subject to approval of legal matters by counsel and to other conditions. The initial purchasers must purchase all of the notes offered hereby if they purchase any of the notes offered hereby.

We have been advised that the initial purchasers propose to resell the notes offered hereby at the applicable offering price set forth on the cover page of this offering memorandum within the United States to applicable qualified institutional buyers (as defined in Rule 144A) in reliance on Rule 144A and outside the United States to non-U.S. holders in reliance on Regulation S. See "Notice to Investors." The price at which the notes offered hereby are offered by the initial purchasers may be changed at any time without notice. The offering of the notes offered hereby by the initial purchasers is subject to receipt and acceptance and subject to the initial purchasers' right to reject any order in whole or in part.

The notes have not been registered under the Securities Act or any state securities laws and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons (as defined in Regulation S) except in transactions exempt from, or not subject to, the registration requirements of the Securities Act. See "Notice to Investors." Accordingly, in connection with sales outside the United States, the initial purchasers have agreed that, except as permitted by the purchase agreement, and set forth in the "Notice to Investors," they will not offer or sell the notes offered hereby within the United States or to, or for the account or benefit of, U.S. persons (i) as part of their distribution at any time or (ii) otherwise until 40 days after the later of the commencement of this offering and the closing date, and they will have sent to each dealer to which they sell notes offered hereby during the 40-day distribution compliance period a confirmation or other notice setting forth the restrictions on offers and sales of the notes offered hereby within the United States or to, or for the account or benefit of, U.S. persons. In addition, until 40 days after the commencement of this offering, an offer or sale within the United States by a dealer that is not participating in this offering may violate the registration requirements of the Securities Act if that offer or sale is made otherwise than in accordance with Rule 144A.

The Issuer has agreed that during the period beginning from the date of the purchase agreement and continuing until the date that is (A) 15 days after the date of the purchase agreement, with respect to any debt exchange offer that is subject to Regulation 14E of the Exchange Act or with respect to any private debt exchange that is not subject to Regulation 14E of the Exchange Act, and (B) 30 days after the date of the purchase agreement in all other cases, the Issuer will not offer, sell, contract to sell or otherwise dispose of, or pledge or grant security interests on, any securities of the Issuer, or guarantee any securities of EFH Corp. or its subsidiaries, that are substantially similar to the notes offered hereby, without the prior written consent of the Initial Purchasers.

Each initial purchaser has represented and agreed that:

- it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the

267

PX 058
Page 276 of 308

meaning of Section 21 of the Financial Services and Markets Act 2000 ("FSMA")) received by it in connection with the issue or sale of the notes in circumstances in which Section 21(1) of the FSMA does not apply to the Issuer; and

- it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the notes in, from or otherwise involving the United Kingdom.

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), each initial purchaser has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of notes which are the subject of the offering contemplated by this offering memorandum to the public in that Relevant Member State other than:

(a)    to any legal entity which is a qualified investor as defined in the Prospectus Directive;

(b)    to fewer than 100 or, if the Relevant Member State has implemented the relevant provision of the 2010 PD Amending Directive, 150, natural or legal persons (other than qualified investors as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the relevant Dealer or Dealers nominated by the Issuer for any such offer; or

(c)    in any other circumstances falling within Article 3(2) of the Prospectus Directive,

provided that no such offer of notes shall require the Issuer or any initial purchaser to publish a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of notes to the public" in relation to any notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the notes to be offered so as to enable an investor to decide to purchase or subscribe the notes, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State, the expression "Prospectus Directive" means Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive, to the extent implemented in the Relevant Member State), and includes any relevant implementing measure in the Relevant Member State and the expression "2010 PD Amending Directive" means Directive 2010/73/EU.

The notes may not be offered or sold by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap.32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap.571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap.32, Laws of Hong Kong), and no advertisement, invitation or document relating to the notes offered hereby may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to notes offered hereby which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

The notes have not been and will not be registered under the Financial Instruments and Exchange Law of Japan (the Financial Instruments and Exchange Law), and each initial purchaser has agreed that it will not offer or sell any notes, directly or indirectly, in Japan or to, or for the benefit of,

268

EFIHMW00034191

any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re-offering or resale, directly or indirectly, in Japan or to a resident of Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Financial Instruments and Exchange Law and any other applicable laws, regulations and ministerial guidelines of Japan.

This offering memorandum has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this offering memorandum and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the notes may not be circulated or distributed, nor may the notes be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the notes are subscribed or purchased under Section 275 by a relevant person which is: (a) a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or (b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor, shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for 6 months after that corporation or that trust has acquired the notes offered hereby under Section 275 except: (1) to an institutional investor under Section 274 of the SFA or to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA; (2) where no consideration is given for the transfer; or (3) by operation of law.

We may apply to list the notes on a securities exchange or automated quotation system; however, there is no assurance that such listing will occur. We cannot assure you that the prices at which the notes offered hereby will sell in the market after this offering will not be lower than the initial offering price or that an active trading market for the notes will continue after this offering. The initial purchasers have advised us that they currently intend to make a market in the notes. However, they are not obligated to do so and they may discontinue any market-making activities with respect to the notes at any time without notice. In addition, market-making activity will be subject to the limits imposed by the Securities Act and the Exchange Act and may be limited during a registered offer to exchange the notes for exchange notes and the pendency of any shelf registration statement. Because Goldman, Sachs & Co. is affiliated with the Sponsor Group, it is required to deliver a "market-making prospectus" when effecting offers or sales of the notes or the exchange notes. See "The Transactions—Equity Contributions." Subject to the compliance with applicable laws, the ability of Goldman, Sachs & Co. to make a market in the notes or the exchange notes will be subject to the availability of a current "market-making" prospectus. Accordingly, we cannot assure you as to the liquidity of, or the trading market for, the notes.

In connection with this offering, the initial purchasers may purchase and sell notes in the open market. These transactions may include over-allotment, covering transactions and stabilizing transactions. Over-allotment involves sales of notes in excess of the principal amount of notes to be purchased by the initial purchasers in this offering, which creates a short position for the initial purchasers. Covering transactions involve purchases of the notes in the open market after the distribution has been completed in order to cover short positions. Stabilizing transactions consist of certain bids or purchases of notes made for the purpose of preventing or retarding a decline in the market price of the notes while this offering is in progress. Any of these activities may have the effect of preventing or retarding a decline in the market price of the notes. They may also cause the price of the

Highly Confidential

notes to be higher than the price that otherwise would exist in the open market in the absence of these transactions. The initial purchasers may conduct these transactions in the over-the-counter market or otherwise. If the initial purchasers commence these transactions, they may discontinue them at any time.

The initial purchasers also may impose a penalty bid. This occurs when a particular initial purchaser repays to the initial purchasers a portion of the initial purchaser discount received by it because the representatives or their affiliates have repurchased notes sold by or for the account of such initial purchaser in stabilizing or short covering transactions.

The initial purchasers and their respective affiliates are full service financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, investment research, financial advisory, investment management, principal investment, hedging, financing and brokerage activities. In the ordinary course of their various business activities, the initial purchasers and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own accounts and for the accounts of their customers and such investment and securities activities may involve securities and/or instruments of the Issuer. The initial purchasers and their respective affiliates may also make investment recommendations and/or publish or express independent research views in respect of such securities or instruments and may at any time hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments. From time to time, the initial purchasers and their respective affiliates have provided, and may in the future provide from time to time, investment banking and commercial banking services and financial advisory services to us and our affiliates for which they have in the past received, and may in the future receive, customary fees. In addition, affiliates of the initial purchasers are and may from time to time be party to certain commodity and interest rate hedging transactions with the Issuer and/or its subsidiaries and/or EFH Corp. or its subsidiaries in the normal course of business and may at any time be creditors of the Issuer and/or such subsidiaries and/or EFH Corp. or its subsidiaries.

KKR Capital Markets LLC is an affiliate of KKR. KKR and Goldman, Sachs & Co. are each an affiliate of a member of the Sponsor Group. As a result, KKR Capital Markets LLC and Goldman, Sachs & Co. are each affiliates of the Issuer. See "The Transactions—Equity Contributions." Affiliates of certain other initial purchasers have indirect ownership interests in the Issuer. See "The Transactions—Equity Contributions."

Each of Scott Lebovitz, Kenneth Pontarelli and Thomas D. Ferguson, who are members of EFH Corp.'s board of directors, are employees of Goldman, Sachs & Co. or its affiliates. Messrs. Ferguson and Pontarelli are also members of the board of managers of EFIH. Lyndon Olson, a member of EFH Corp.'s board of directors, was a Senior Advisor with Citigroup Inc., an affiliate of Citigroup Global Markets Inc. Each of Brandon Freiman, Marc S. Lipschultz and Jonathan D. Smidt, who are members of EFH Corp.'s board of directors, are employees of KKR or its affiliates.

In addition, an affiliate of Citigroup Global Markets Inc. is the administrative agent and collateral agent, an affiliate of J.P. Morgan Securities LLC is the syndication agent, affiliates of Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co. and Morgan Stanley & Co. LLC are co-documentation agents, and certain of the initial purchasers or their respective affiliates are joint lead arrangers and joint lead bookrunners, for TCEH's Senior Secured Credit Facilities, and affiliates of certain of the initial purchasers are lenders under TCEH's Senior Secured Credit Facilities. An affiliate of Goldman, Sachs & Co. is sole lead arranger, sole bookrunner and posting agent for a senior secured cash posting credit facility of TCEH. An affiliate of J.P. Morgan Securities LLC is administrative agent, affiliates of Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC and Morgan Stanley & Co. LLC are co-documentation agents, and certain of the initial purchasers or their respective affiliates

270

EFIHMW00034193

are joint lead arrangers for the Oncor Revolving Credit Facility, and affiliates of certain of the initial purchasers are lenders under the Oncor Revolving Credit Facility.

We have agreed to indemnify the several initial purchasers against certain liabilities, including liabilities under the Securities Act, or to contribute to payments that the initial purchasers may be required to make because of any of these liabilities.

## LEGAL MATTERS

Certain legal matters in connection with the notes will be passed upon for the Issuer by Gibson, Dunn & Crutcher LLP, Dallas, Texas, and Simpson Thacher & Bartlett LLP, New York, New York. Certain legal matters in connection with the notes will be passed upon for the initial purchasers by Shearman & Sterling LLP, New York, New York. An investment vehicle comprised of several partners of Simpson Thacher & Bartlett LLP, members of their families, related persons and others own interests representing less than 1% of the capital commitments of the KKR Millennium Fund, L.P. and KKR 2006 Fund L.P.

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The consolidated financial statements of EFIH as of December 31, 2011 and 2010, and for each of the three years in the period ended December 31, 2011, and the effectiveness of EFIH's internal control over financial reporting as of December 31, 2011 incorporated by reference in this offering memorandum from EFIH's 2011 Form 10-K, have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports, which are incorporated herein by reference (which reports (1) express an unqualified opinion on the financial statements and includes an explanatory paragraph related to EFIH's investments in debt securities of related parties, guarantees of Energy Future Holdings Corp. debt securities, and primary liquidity needs being sourced from interest and principal payments on EFIH's investments in Energy Future Holdings Corp. and Texas Competitive Electric Holdings Company LLC debt securities and distributions from Oncor Electric Delivery Holdings Company LLC, all of which are related party transactions and (2) express an unqualified opinion on the effectiveness of internal control over financial reporting).

The consolidated financial statements and the related financial statement schedule of EFH Corp. as of December 31, 2011 and 2010, and for each of the three years in the period ended December 31, 2011, and the effectiveness of EFH Corp.'s internal control over financial reporting incorporated by reference in this offering memorandum from the EFH Corp. 2011 Form 10-K, have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports, which are incorporated herein by reference (which reports (1) express an unqualified opinion on the financial statements and includes an explanatory paragraph regarding EFH Corp.'s adoption of amended consolidation accounting standards related to variable interest entities and EFH Corp.'s adoption of amended guidance regarding transfers of financial assets effective January 1, 2010, on a prospective basis and (2) express an unqualified opinion on the effectiveness of internal control over financial reporting).

## INDEPENDENT AUDITORS

The consolidated financial statements as of December 31, 2011 and 2010, and for each of the three years in the period ended December 31, 2011 of Oncor Holdings incorporated by reference in this offering memorandum from EFIH's 2011 Form 10-K, have been audited by Deloitte & Touche LLP, independent auditors, as stated in their report which is incorporated herein by reference.

271

## AVAILABLE INFORMATION

EFIH files annual, quarterly and current reports and other information with the SEC. You may read and copy any document EFIH has filed or will file with the SEC at the SEC's public website (*www.sec.gov*) or at the Public Reference Room of the SEC located at 100 F Street, N.E., Washington, DC 20549. Copies of such materials can be obtained from the Public Reference Room of the SEC at prescribed rates. You can call the SEC at 1-800-SEC-0330 to obtain information on the operation of the Public Reference Room.

EFIH has agreed that even if it is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act or otherwise required to report on an annual and quarterly basis on forms provided for such annual and quarterly reporting pursuant to rules and regulations promulgated by the SEC, EFIH will nonetheless file with the SEC and make available to the trustee and to holders of notes the reports specified under "Description of the First Lien Notes—Certain Covenants—Reports and Other Information" and "Description of the Second Lien Notes—Certain Covenants—Reports and Other Information" subject to the provisions described in those sections.

## INCORPORATION BY REFERENCE

EFIH incorporates certain information into this offering memorandum by reference to other documents that it and EFH Corp. file with the SEC. This means that EFIH can disclose important information to you for purposes of this offering memorandum by referring you to other documents that have been filed separately with the SEC. EFIH incorporates into this offering memorandum by reference each of the following reports:

- EFIH's Annual Report on Form 10-K for the year ended December 31, 2011 that it filed with the SEC on February 21, 2012;

- EFIH's Quarterly Reports on Form 10-Q for the quarter ended March 31, 2012 that it filed with the SEC on May 1, 2012, and the quarter ended June 30, 2012 that it filed with the SEC on July 31, 2012;

- EFIH's Current Reports on Form 8-K that it filed with the SEC on February 2, 2012, February 7, 2012 and February 29, 2012;

- EFH Corp.'s Annual Report on Form 10-K for the year ended December 31, 2011 that it filed with the SEC on February 21, 2012;

- EFH Corp.'s Quarterly Reports on Form 10-Q for the quarter ended March 31, 2012 that it filed with the SEC on May 1, 2012, and the quarter ended June 30, 2012 that it filed with the SEC on July 31, 2012; and

- EFH Corp.'s Current Reports on Form 8-K that it filed with the SEC on June 5, 2012, July 3, 2012 and August 7, 2012.

Copies of these filings are available free of charge by writing to Energy Future Intermediate Holding Company LLC, Energy Plaza, 1601 Bryan Street, Dallas, TX 75201-3411, Attention: Investor Relations, or by telephoning us at 214-812-4600.

Because the notes are secured by all of the membership interests EFIH owns or holds in Oncor Holdings, this offering memorandum includes and incorporates by reference financial statements of Oncor Holdings. EFIH incorporates into this offering memorandum Oncor Holdings' audited historical consolidated financial statements for the year ended December 31, 2011, which are filed as Exhibit 99(d) to EFIH's 2011 Form 10-K. In addition, EFIH incorporates into this offering memorandum by reference the indentures governing the EFIH 9.75% Notes and the EFIH 10.000% Notes, which are filed as Exhibit 4.2 to EFIH's Current Report on Form 8-K filed with the SEC on November 20, 2009 and Exhibit 4.1 to EFIH's Current Report on Form 8-K filed with the SEC on August 18, 2010, respectively.

272

EFIHMW00034195

The information incorporated by reference is an important part of this offering memorandum. Neither we nor the initial purchasers have authorized anyone to provide you with information other than that contained in or incorporated by reference into this offering memorandum. You should not assume that the information in this offering memorandum is accurate as of any date other than the date of this offering memorandum.

You should not rely on or assume the accuracy of any representation or warranty in any agreement that we have filed as an exhibit to any document that we have publicly filed or that we may otherwise publicly file in the future because such representation or warranty may be subject to exceptions and qualifications contained in separate disclosure schedules, may have been included in such agreement for the purpose of allocating risk between the parties to the particular transaction, and may no longer continue to be true as of any given date.

Highly Confidential

EFIHMW00034196

**PX 058**
**Page 282 of 308**

## INDEX TO FINANCIAL STATEMENTS

### Oncor Electric Delivery Holdings Company LLC

Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-2

Condensed Statements of Consolidated Income for the three and six months ended June 30, 2012 and 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-5

Condensed Statements of Consolidated Comprehensive Income for the three and six months ended June 30, 2012 and 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-6

Condensed Statements of Consolidated Cash Flows for the six months ended June 30, 2012 and 2011. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-7

Condensed Consolidated Balance Sheets at June 30, 2011 and December 31, 2011 . . . . . . . . . . .    F-8

Notes to Condensed Consolidated Financial Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-9

F-1

## GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

**2011 Audited Financial Statements** . . . . . . . . . . . . . . . . . . . . . Oncor Holdings' audited financial statements for the year ended December 31, 2011 included in EFIH's Annual Report on Form 10-K for the year ended December 31, 2011 filed on February 21, 2012 (Commission File No. 1-34544)

**Bondco** . . . . . . . . . . . . . . . . . . . . . . . . . Refers to Oncor Electric Delivery Transition Bond Company LLC, a wholly-owned consolidated bankruptcy-remote financing subsidiary of Oncor that has issued securitization (transition) bonds to recover certain regulatory assets and other costs.

**Deed of Trust** . . . . . . . . . . . . . . . . . . . . Deed of Trust, Security Agreement and Fixture Filing, dated as of May 15, 2008, made by Oncor to and for the benefit of The Bank of New York Mellon Trust Company, N.A. (as successor to The Bank of New York Mellon, formerly The Bank of New York), as collateral agent, as amended

**EFH Corp.** . . . . . . . . . . . . . . . . . . . . . . . . Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context. Its major subsidiaries include Oncor and TCEH.

**EFH Retirement Plan** . . . . . . . . . . . . . Refers to the defined benefit pension plan sponsored by EFH Corp., in which Oncor is a participating subsidiary.

**EFIH** . . . . . . . . . . . . . . . . . . . . . . . . . . . . Refers to Energy Future Intermediate Holding Company LLC, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings.

**ERCOT** . . . . . . . . . . . . . . . . . . . . . . . . . . Electric Reliability Council of Texas, the independent system operator and the regional coordinator of various electricity systems within Texas

**GAAP** . . . . . . . . . . . . . . . . . . . . . . . . . . . generally accepted accounting principles

**Investment LLC** . . . . . . . . . . . . . . . . . Refers to Oncor Management Investment LLC, a limited liability company and minority membership interest owner (approximately 0.22%) of Oncor, whose managing member is Oncor and whose Class B Interests are owned by certain members of the management team and independent directors of Oncor.

**LIBOR** . . . . . . . . . . . . . . . . . . . . . . . . . . . London Interbank Offered Rate, an interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market

**Limited Liability Company Agreement** . . . . . . . . . . . . . . . . . . . . . The Second Amended and Restated Limited Liability Company Agreement of Oncor, dated as of November 5, 2008, by and among Oncor Holdings, Texas Transmission and Investment LLC, as amended

F-2

Highly Confidential

| | |
|---|---|
| **Luminant** . . . . . . . . . . . . . . . . . . . . . . | Refers to subsidiaries of TCEH engaged in competitive market activities consisting of electricity generation and wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas. |
| **Oncor** . . . . . . . . . . . . . . . . . . . . . . . . | Refers to Oncor Electric Delivery Company LLC, a direct, majority-owned subsidiary of Oncor Holdings, and/or its wholly-owned consolidated bankruptcy-remote financing subsidiary, Bondco, depending on context. |
| **Oncor Holdings** . . . . . . . . . . . . . . . . | Refers to Oncor Electric Delivery Holdings Company LLC, a direct, wholly-owned subsidiary of EFIH and the direct majority owner (approximately 80.03%) of Oncor, and/or its subsidiaries, depending on context. |
| **Oncor Plan** . . . . . . . . . . . . . . . . . . . . | Refers to the Oncor Supplemental Retirement Plan, also referred to herein as the "supplemental retirement plan." |
| **Oncor Ring-Fenced Entities** . . . . . . . | Refers to Oncor Holdings and its direct and indirect subsidiaries, including Oncor. |
| **OPEB** . . . . . . . . . . . . . . . . . . . . . . . . | other postretirement employee benefits |
| **OPEB Plan** . . . . . . . . . . . . . . . . . . . . | Refers to an EFH Corp.-sponsored plan (in which Oncor is a participating subsidiary) that offers certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from the company. |
| **PUCT** . . . . . . . . . . . . . . . . . . . . . . . . | Public Utility Commission of Texas |
| **PURA** . . . . . . . . . . . . . . . . . . . . . . . . | Texas Public Utility Regulatory Act |
| **purchase accounting** . . . . . . . . . . . . | The purchase method of accounting for a business combination as prescribed by US GAAP, whereby the cost or "purchase price" of a business combination, including the amount paid for the equity and direct transaction costs, are allocated to identifiable assets and liabilities (including intangible assets) based upon their fair values. The excess of the purchase price over the fair values of assets and liabilities is recorded as goodwill. |
| **REP** . . . . . . . . . . . . . . . . . . . . . . . . . | retail electric provider |
| **SEC** . . . . . . . . . . . . . . . . . . . . . . . . . | US Securities and Exchange Commission |
| **Securities Act** . . . . . . . . . . . . . . . . . | Securities Act of 1933, as amended |
| **Sponsor Group** . . . . . . . . . . . . . . . . . | Refers collectively to certain investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P., TPG Management, L.P. and GS Capital Partners, an affiliate of Goldman Sachs & Co., that have an ownership interest in Texas Holdings. |

F-3

Highly Confidential

**TCEH** . . . . . . . . . . . . . . . . . . . . . . . . . . . . Refers to Texas Competitive Electric Holdings Company LLC, a direct, wholly-owned subsidiary of Energy Future Competitive Holdings Company and an indirect subsidiary of EFH Corp., and/or its subsidiaries, depending on context.

**TCRF**. . . . . . . . . . . . . . . . . . . . . . . . . . . . transmission cost recovery factor

**Texas Holdings** . . . . . . . . . . . . . . . . . . Refers to Texas Energy Future Holdings Limited Partnership, a limited partnership controlled by the Sponsor Group that owns substantially all of the common stock of EFH Corp.

**Texas Holdings Group** . . . . . . . . . . . Refers to Texas Holdings and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities.

**Texas Transmission** . . . . . . . . . . . . . . Refers to Texas Transmission Investment LLC, a limited liability company that owns a 19.75% equity interest in Oncor. Texas Transmission is an entity indirectly owned by a private investment group led by OMERS Administration Corporation, acting through its infrastructure investment entity, Borealis Infrastructure Management Inc., and the Government of Singapore Investment Corporation, acting through its private equity and infrastructure arm, GIC Special Investments Pte Ltd. Texas Transmission is not affiliated with EFH Corp., any of EFH Corp.'s subsidiaries or any member of the Sponsor Group.

**TXU Energy** . . . . . . . . . . . . . . . . . . . . . . Refers to TXU Energy Retail Company LLC, a direct, wholly-owned subsidiary of TCEH engaged in the retail sale of electricity to residential and business customers. TXU Energy is a REP in competitive areas of ERCOT.

**US** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . United States of America

**VIE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . variable interest entity

These financial statements occasionally make references to Oncor Holdings or Oncor when describing actions, rights or obligations of their respective subsidiaries. References to "we," "our," "us" and "the company" are to Oncor Holdings and/or its direct or indirect subsidiaries as apparent in the context. These references reflect the fact that the subsidiaries are consolidated with their respective parent companies for financial reporting purposes. However, these references should not be interpreted to imply that the parent company is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or that the subsidiary company is undertaking an action or has the rights or obligations of its parent company or any other affiliate.

Highly Confidential

EFIHMW00034200

**PX 058**
**Page 286 of 308**

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**

**CONDENSED STATEMENTS OF CONSOLIDATED INCOME**
**(Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (millions of dollars) | | | |
| Operating revenues: | | | | |
| Affiliated | $238 | $251 | $ 465 | $ 490 |
| Nonaffiliated | 590 | 505 | 1,146 | 972 |
| Total operating revenues | 828 | 756 | 1,611 | 1,462 |
| Operating expenses: | | | | |
| Wholesale transmission service | 123 | 106 | 255 | 209 |
| Operation and maintenance | 162 | 153 | 326 | 309 |
| Depreciation and amortization | 192 | 178 | 376 | 350 |
| Income taxes (Note 9) | 65 | 53 | 109 | 87 |
| Taxes other than income taxes | 98 | 93 | 200 | 190 |
| Total operating expenses | 640 | 583 | 1,266 | 1,145 |
| Operating income | 188 | 173 | 345 | 317 |
| Other income and deductions: | | | | |
| Other income (Note 10) | 7 | 7 | 14 | 15 |
| Other deductions (Note 10) | 1 | 3 | 3 | 5 |
| Nonoperating income taxes | 10 | 7 | 17 | 15 |
| Interest income | 12 | 8 | 21 | 18 |
| Interest expense and related charges (Note 10) | 92 | 88 | 183 | 177 |
| Net income | 104 | 90 | 177 | 153 |
| Net income attributable to noncontrolling interests | (21) | (18) | (36) | (31) |
| Net income attributable to Oncor Holdings | $ 83 | $ 72 | $ 141 | $ 122 |

See Notes to Financial Statements.

F-5

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**

**CONDENSED STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME**
**(Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | | (millions of dollars) | | |
| Net income | $104 | $ 90 | $177 | $153 |
| Other comprehensive income: | | | | |
| Cash flow hedges—derivative value net loss recognized in net income (net of tax benefit) | — | — | 1 | — |
| Comprehensive income | 104 | 90 | 178 | 153 |
| Comprehensive income attributable to noncontrolling interests | (21) | (18) | (36) | (31) |
| Comprehensive income attributable to Oncor Holdings | $ 83 | $ 72 | $142 | $122 |

See Notes to Financial Statements.

F-6

Highly Confidential

## ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC

## CONDENSED STATEMENTS OF CONSOLIDATED CASH FLOWS
### (Unaudited)

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (millions of dollars) | |
| Cash flows—operating activities: | | |
| Net income | $ 177 | $ 153 |
| Adjustments to reconcile net income to cash provided by operating activities: | | |
| Depreciation and amortization | 391 | 358 |
| Deferred income taxes—net | 96 | 112 |
| Amortization of investment tax credits | (2) | (2) |
| Other—net | — | 1 |
| Deferred revenues (Note 1) | (87) | (6) |
| Changes in other operating assets and liabilities | (168) | (180) |
| Cash provided by operating activities | 407 | 436 |
| Cash flows—financing activities: | | |
| Issuance of long-term debt (Note 5) | 900 | — |
| Repayments of long-term debt (Note 5) | (959) | (56) |
| Net increase in short-term borrowings (Note 4) | 543 | 203 |
| Distributions to parent (Note 7) | (69) | (32) |
| Distributions to noncontrolling interests (Note 7) | (21) | (8) |
| Decrease in note receivable from TCEH | 20 | 18 |
| Debt discount, financing and reacquisition expenses—net | (44) | (1) |
| Cash provided by financing activities | 370 | 124 |
| Cash flows—investing activities: | | |
| Capital expenditures | (773) | (595) |
| Other | 17 | 17 |
| Cash used in investing activities | (756) | (578) |
| Net change in cash and cash equivalents | 21 | (18) |
| Cash and cash equivalents—beginning balance | 12 | 33 |
| Cash and cash equivalents—ending balance | $  33 | $  15 |

See Notes to Financial Statements.

F-7

EFIHMW00034203

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**

**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| | (millions of dollars) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $    33 | $    12 |
| Restricted cash—Bondco (Note 10) | 48 | 57 |
| Trade accounts receivable from nonaffiliates—net (Note 10) | 342 | 303 |
| Trade accounts and other receivables from affiliates (Note 9) | 191 | 179 |
| Income taxes receivable from EFH Corp. (Note 9) | 6 | — |
| Materials and supplies inventories—at average cost | 74 | 71 |
| Accumulated deferred income taxes | 73 | 73 |
| Prepayments and other current assets | 79 | 74 |
| Total current assets | 846 | 769 |
| Restricted cash—Bondco (Note 10) | 16 | 16 |
| Receivable from TCEH related to nuclear plant decommissioning (Note 9) | 260 | 225 |
| Investments and other property (Note 10) | 75 | 73 |
| Property, plant and equipment—net (Note 10) | 11,017 | 10,569 |
| Goodwill (Note 10) | 4,064 | 4,064 |
| Note receivable due from TCEH (Note 9) | 117 | 138 |
| Regulatory assets—net—Oncor (Note 3) | 1,075 | 1,078 |
| Regulatory assets—net—Bondco (Note 3) | 386 | 427 |
| Other noncurrent assets | 83 | 73 |
| Total assets | $17,939 | $17,432 |
| **LIABILITIES AND MEMBERSHIP INTERESTS** | | |
| Current liabilities: | | |
| Short-term borrowings (Note 4) | $   935 | $   392 |
| Long-term debt due currently—Oncor (Note 5) | — | 376 |
| Long-term debt due currently—Bondco (Note 5) | 121 | 118 |
| Trade accounts payable | 158 | 197 |
| Income taxes payable to EFH Corp. (Note 9) | — | 2 |
| Accrued taxes other than income taxes | 90 | 151 |
| Accrued interest | 98 | 108 |
| Other current liabilities | 101 | 112 |
| Total current liabilities | 1,503 | 1,456 |
| Long-term debt, less amounts due currently—Oncor (Note 5) | 5,088 | 4,711 |
| Long-term debt, less amounts due currently—Bondco (Note 5) | 372 | 433 |
| Accumulated deferred income taxes (Note 9) | 1,745 | 1,688 |
| Investment tax credits | 26 | 28 |
| Other noncurrent liabilities and deferred credits (Note 10) | 1,804 | 1,832 |
| Total liabilities | 10,538 | 10,148 |
| Commitments and Contingencies (Note 6) | | |
| Membership interests (Note 7): | | |
| Capital account | 5,818 | 5,745 |
| Accumulated other comprehensive loss | (24) | (25) |
| Oncor Holdings membership interest | 5,794 | 5,720 |
| Noncontrolling interests in subsidiary | 1,607 | 1,564 |
| Total membership interests | 7,401 | 7,284 |
| Total liabilities and membership interests | $17,939 | $17,432 |

See Notes to Financial Statements.

F-8

EFIHMW00034204

## ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC

### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
#### (Unaudited)

1. **BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES**

*Description of Business*

References in this report to "we," "our," "us" and "the company" are to Oncor Holdings and/or its direct or indirect subsidiaries as apparent in the context. The financial statements reflect almost entirely the operations of Oncor; consequently, there are no separate reportable business segments. See "Glossary" for definition of terms and abbreviations.

We are a Dallas, Texas-based holding company whose financial statements reflect almost entirely the operations of our direct, majority (approximately 80%) owned subsidiary, Oncor. Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell power in the north-central, eastern and western parts of Texas. Revenues from TCEH represented 29% and 34% of total revenues for the six months ended June 30, 2012 and 2011, respectively. We are a direct, wholly-owned subsidiary of EFIH, a direct, wholly-owned subsidiary of EFH Corp. EFH Corp. is a subsidiary of Texas Holdings, which is controlled by the Sponsor Group.

Our consolidated financial statements include the indirect, bankruptcy-remote financing subsidiary, Bondco, a VIE. This financing subsidiary was organized for the limited purpose of issuing certain transition bonds in 2003 and 2004. Bondco issued $1.3 billion principal amount of transition bonds to recover generation-related regulatory asset stranded costs and other qualified costs under an order issued by the PUCT in 2002.

Various "ring-fencing" measures have been taken to enhance the separateness between the Oncor Ring-Fenced Entities and the Texas Holdings Group and our credit quality. These measures serve to mitigate our and Oncor's credit exposure to the Texas Holdings Group and to reduce the risk that our assets and liabilities or those of Oncor would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities. Such measures include, among other things: Oncor's sale of a 19.75% equity interest to Texas Transmission in November 2008; maintenance of separate books and records for the Oncor Ring-Fenced Entities; our board of directors and Oncor's board of directors being comprised of a majority of independent directors; and prohibitions on the Oncor Ring-Fenced Entities providing credit support to, or receiving credit support from, any member of the Texas Holdings Group. The assets and liabilities of the Oncor Ring-Fenced Entities are separate and distinct from those of the Texas Holdings Group, including TXU Energy and Luminant, and none of the assets of the Oncor Ring-Fenced Entities are available to satisfy the debt or contractual obligations of any member of the Texas Holdings Group. We and Oncor do not bear any liability for debt or contractual obligations of the Texas Holdings Group, and vice versa. Accordingly, our operations are conducted, and our cash flows are managed, independently from the Texas Holdings Group.

*Basis of Presentation*

Our condensed consolidated financial statements have been prepared in accordance with US GAAP and on the same basis as our 2011 Audited Financial Statements. Adjustments (consisting of normal recurring accruals) necessary for a fair presentation of the results of operations and financial position have been included therein. All intercompany items and transactions have been eliminated in consolidation. Certain information and footnote disclosures normally included in annual consolidated financial statements prepared in accordance with US GAAP have been omitted pursuant to the rules and regulations of the SEC. Because the condensed consolidated interim financial statements do not

F-9

EFIHMW00034205

include all of the information and footnotes required by US GAAP, they should be read in conjunction with the audited financial statements and related notes included in our 2011 Audited Financial Statements. The results of operations for an interim period may not give a true indication of results for a full year due to seasonality. All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated. Subsequent events have been evaluated through the date these consolidated financial statements were issued.

From time to time, certain prior period amounts are reclassified to conform to the current period presentation. As disclosed in the condensed statements of consolidated cash flows included in this report, the amount previously reported as changes in deferred advanced metering system revenues for the six months ended June 30, 2011 is included in and reported as deferred revenues to conform to the current period presentation. In addition to deferred advanced metering system revenues, other reconcilable revenues (TCRF and energy efficiency surcharges), which were previously reported as changes in other operating assets and liabilities, are included in and reported as deferred revenues.

### Use of Estimates

Preparation of our financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including fair value measurements. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information.

### Derivative Instruments and Mark-to-Market Accounting

Oncor has from time-to-time entered into derivative instruments to hedge interest rate risk. If the instrument meets the definition of a derivative under accounting standards related to derivative instruments and hedging activities, the fair value of each derivative is recognized on the balance sheet as a derivative asset or liability and changes in the fair value are recognized in net income, unless criteria for certain exceptions are met. This recognition is referred to as "mark-to-market" accounting.

Because derivative instruments are frequently used as economic hedges, accounting standards related to derivative instruments and hedging activities allow for "hedge accounting," which provides for the designation of such instruments as cash flow or fair value hedges if certain conditions are met. A cash flow hedge mitigates the risk associated with the variability of the future cash flows related to an asset or liability (e.g., debt with variable interest rate payments), while a fair value hedge mitigates risk associated with fixed future cash flows (e.g., debt with fixed interest rate payments). In accounting for cash flow hedges, derivative assets and liabilities are recorded on the balance sheet at fair value with an offset to other comprehensive income to the extent the hedges are effective. Amounts remain in accumulated other comprehensive income and are reclassified into net income as the related transactions (hedged items) settle and affect net income. If the hedged transaction becomes probable of not occurring, hedge accounting is discontinued and the amount recorded in other comprehensive income is immediately reclassified into net income. Fair value hedges are recorded as derivative assets or liabilities with an offset to net income, and the carrying value of the related asset or liability (hedged item) is adjusted for changes in fair value with an offset to net income. If the fair value hedge is settled prior to the maturity of the hedged item, the cumulative fair value gain or loss associated with the hedge is amortized into income over the remaining life of the hedged item. To qualify for hedge accounting, a hedge must be considered highly effective in offsetting changes in fair value of the hedged item. Assessment of the hedge's effectiveness is tested at least quarterly throughout its term to continue to qualify for hedge accounting. Hedge ineffectiveness, even if the hedge continues to be assessed as effective, is immediately recognized in net income. Ineffectiveness is generally measured as the cumulative excess, if any, of the change in value of the hedging instrument over the change in value of the hedged item.

F-10

EFIHMW00034206

### Reconcilable Tariffs

The PUCT has designated certain tariffs (TCRF, energy efficiency and advanced meter surcharges and charges related to transition bonds) as reconcilable, which means the differences between amounts billed under these tariffs and the related incurred expenses are deferred as either regulatory assets or regulatory liabilities. Accordingly, at prescribed intervals, future tariffs are adjusted to either repay regulatory liabilities or collect regulatory assets.

### Adoption of New Accounting Standard

In May 2011, the Financial Accounting Standards Board (FASB) issued "*Accounting Standards Update 2011-05*" relating to the presentation of Comprehensive Income within financial statements. Effective January 1, 2012, we adopted the new standard. Adoption of the new standard did not affect our reported results of operations, financial condition or cash flows.

## 2.    REGULATORY MATTERS

### 2011 Rate Review

In January 2011, Oncor filed a rate review with the PUCT and 203 original jurisdiction cities based on a test year ended June 30, 2010 (PUCT Docket No. 38929). In April 2011, Oncor and the other parties reached a Memorandum of Settlement that would settle and resolve all issues in the rate review. Oncor filed a stipulation (including a proposed order and proposed tariffs) in May 2011 that incorporated the Memorandum of Settlement along with pleadings and other documentation (Stipulation) for the purpose of obtaining final approval of the settlement. The terms of the Stipulation include an approximate $137 million base rate increase and additional provisions to address franchise fees (discussed below) and other expenses. Approximately $93 million of the increase became effective July 1, 2011, and the remainder became effective January 1, 2012. Under the Stipulation, amortization of regulatory assets increased by approximately $24 million ($14 million of which will be recognized as tax expense) annually beginning January 1, 2012. The Stipulation did not change Oncor's authorized regulatory capital structure of 60% debt and 40% equity or its authorized return on equity of 10.25%. Under the terms of the Stipulation, Oncor cannot file another general base rate review prior to July 1, 2013, but is not restricted from filing wholesale transmission rate, TCRF, distribution-related investment and other rate updates and adjustments permitted by Texas state law and PUCT rules.

In response to concerns raised by PUCT Commissioners at a July 2011 PUCT open meeting regarding the Stipulation, Oncor filed a modified stipulation that removed from the Stipulation a one-time payment to certain cities it serves for retrospective franchise fees (Modified Stipulation). Instead, pursuant to the terms of a separate agreement with certain cities it serves, through June 30, 2012, Oncor has made approximately $22 million in retrospective franchise fee payments to cities that accepted the terms of the separate agreement. The payments are subject to refund from the cities or recovery from customers after final resolution of proceedings related to the appeals from Oncor's June 2008 rate review filing (discussed below). No other significant terms of the Stipulation were revised. In August 2011, the PUCT issued a final order approving the settlement terms contained in the Modified Stipulation.

Effective July 1, 2011, pursuant to the PUCT's final order, Oncor no longer recovers the cost of wholesale transmission service through base rates, and wholesale transmission service expenses incurred are reconcilable to revenues billed under the TCRF rider. For this purpose, all wholesale transmission service expenses consist of amounts charged under a PUCT-approved transmission tariff including Oncor's own wholesale transmission tariff. Oncor accounts for the difference between amounts charged under the TCRF rate and wholesale transmission service expense as a regulatory asset or regulatory liability (under- or over-recovered wholesale transmission service expense (see Note 1)). At June 30, 2012, approximately $71 million was deferred as under-recovered wholesale transmission service expense (see Note 3).

F-11

EFIHMW00034207

*2008 Rate Review*

In August 2009, the PUCT issued a final order with respect to Oncor's June 2008 rate review filing with the PUCT and 204 cities based on a test year ended December 31, 2007 (PUCT Docket No. 35717), and new rates were implemented in September 2009. In November 2009, the PUCT issued an order on rehearing that established a new rate class but did not change the revenue requirements. Oncor and four other parties appealed various portions of the rate review final order to a state district court, and oral argument was held in October 2010. In January 2011, the district court signed its judgment reversing the PUCT with respect to two issues: the PUCT's disallowance of certain franchise fees and the PUCT's decision that PURA no longer requires imposition of a rate discount for state colleges and universities. Oncor filed an appeal with the Texas Third Court of Appeals (Austin Court of Appeals) in February 2011 with respect to the issues it appealed to the district court and did not prevail upon, as well as the district court's decision to reverse the PUCT with respect to discounts for state colleges and universities. Oral argument before the Austin Court of Appeals was completed in April 2012. There is no deadline for the court to act. Oncor is unable to predict the outcome of the appeal.

*Stipulation Approved by the PUCT*

In April 2008, the PUCT entered an order (PUCT Docket No. 34077), which became final in June 2008, approving the terms of a stipulation relating to a filing in 2007 by Oncor and Texas Holdings with the PUCT pursuant to Section 14.101(b) of PURA and PUCT Substantive Rule 25.75. Among other things, the stipulation required Oncor to file a rate review no later than July 1, 2008 based on a test year ended December 31, 2007, which it filed in June 2008. The PUCT issued a final order with respect to the rate review in August 2009. In July 2008, Nucor Steel filed an appeal of the PUCT's order in the 200th District Court of Travis County, Texas (District Court). A hearing on the appeal was held in June 2010, and the District Court affirmed the PUCT order in its entirety. Nucor Steel appealed that ruling to the Austin Court of Appeals in July 2010. In March 2012, the Austin Court of Appeals affirmed the District Court's ruling, which is now final.

F-12

EFIHMW00034208

3.   **REGULATORY ASSETS AND LIABILITIES**

Recognition of regulatory assets and liabilities and the amortization periods over which they are expected to be recovered or refunded through rate regulation reflect the decisions of the PUCT. Components of the regulatory assets and liabilities are provided in the table below. Amounts not earning a return through rate regulation are noted.

| | Remaining Rate Recovery/Amortization Period at June 30, 2012 | Carrying Amount | |
| --- | --- | --- | --- |
| | | June 30, 2012 | December 31, 2011 |
| Regulatory assets: | | | |
| Generation-related regulatory assets securitized by transition bonds (a)(f) | 4 years | $  473 | $  531 |
| Employee retirement costs | 8 years | 95 | 103 |
| Employee retirement costs to be reviewed (b)(c) | To be determined | 88 | 74 |
| Employee retirement liability (a)(c)(d) | To be determined | 673 | 707 |
| Self-insurance reserve (primarily storm recovery costs)—net | 8 years | 205 | 221 |
| Self-insurance reserve to be reviewed (b)(c) | To be determined | 90 | 71 |
| Securities reacquisition costs (pre-industry restructure) | 5 years | 44 | 48 |
| Securities reacquisition costs (post-industry restructure)—net | Terms of related debt | 35 | 2 |
| Recoverable amounts in lieu of deferred income taxes—net | Life of related asset or liability | 89 | 104 |
| Rate review expenses (a) | Largely 3 years | 9 | 11 |
| Rate review expenses to be reviewed (b)(c) | To be determined | 1 | 1 |
| Advanced meter customer education costs (c) | 8 years | 9 | 9 |
| Deferred conventional meter depreciation | 8 years | 131 | 107 |
| Energy efficiency performance bonus (a) | 1 year | 4 | 8 |
| Under-recovered wholesale transmission service expense (a)(c) | 1 year | 71 | — |
| Wholesale transmission settlement costs | Not applicable | — | 9 |
| Other regulatory assets | Not applicable | — | 1 |
| Total regulatory assets | | 2,017 | 2,007 |
| Regulatory liabilities: | | | |
| Nuclear decommissioning cost over-recovery (a)(c)(e) | Not applicable | 260 | 225 |
| Estimated net removal costs | Life of utility plant | 180 | 115 |
| Committed spending for demand-side management initiatives (a) | 1 year | 14 | 25 |
| Deferred advanced metering system revenues | 8 years | 28 | 52 |
| Investment tax credit and protected excess deferred taxes | Various | 30 | 33 |
| Over-collection of transition bond revenues (a)(f) | 4 years | 34 | 37 |
| Over-recovered wholesale transmission service expense (a)(c) | 1 year | — | 13 |
| Energy efficiency programs (a) | Not applicable | 10 | 2 |
| Total regulatory liabilities | | 556 | 502 |
| Net regulatory asset | | $1,461 | $1,505 |

(a)   Not earning a return in the regulatory rate-setting process.
(b)   Costs incurred since the period covered under the last rate review.
(c)   Recovery is specifically authorized by statute or by the PUCT, subject to reasonableness review.

Highly Confidential

EFIHMW00034209

(d)  Represents unfunded liabilities recorded in accordance with pension and OPEB accounting standards.
(e)  Offset by an intercompany receivable from TCEH. See Note 9.
(f)  Bondco net regulatory assets of $386 million at June 30, 2012 consisted of $420 million included in generation-related regulatory assets net of the regulatory liability for over-collection of transition bond revenues of $34 million. Bondco net regulatory assets of $427 million at December 31, 2011 consisted of $464 million included in generation-related regulatory assets net of the regulatory liability for over-collection of transition bond revenues of $37 million.

## 4.  BORROWINGS UNDER CREDIT FACILITIES

At June 30, 2012, Oncor had a $2.4 billion secured revolving credit facility (reflecting a May 2012 $400 million commitment increase as discussed below) to be used for working capital and general corporate purposes, issuances of letters of credit and support for any commercial paper issuances. The revolving credit facility expires in October 2016, and Oncor has the option of requesting up to two one-year extensions, with such extensions subject to certain conditions and lender approval. Pursuant to the terms of the revolving credit facility, Oncor requested and received a $400 million increase in commitments under the revolving credit facility effective May 15, 2012. The terms of the revolving credit facility allow Oncor to request an additional increase in the borrowing capacity of $100 million, provided certain conditions are met, including lender approval.

Borrowings under the revolving credit facility are classified as short-term on the balance sheet and are secured equally and ratably with all of Oncor's other secured indebtedness by a first priority lien on property Oncor acquired or constructed for the transmission and distribution of electricity. The property is mortgaged under the Deed of Trust.

At June 30, 2012, Oncor had outstanding borrowings under the revolving credit facility totaling $935 million with an interest rate of 1.37% and outstanding letters of credit totaling $6 million. At December 31, 2011, Oncor had outstanding borrowings under the revolving credit facility totaling $392 million with an interest rate of 1.40% and outstanding letters of credit totaling $6 million. At June 30, 2012, all outstanding borrowings bore interest at LIBOR plus 1.125%, letters of credit bore interest at 1.125%, and a commitment fee (at a rate of 0.125% per annum) was payable on the unfunded commitments under the facility, each based on Oncor's current credit ratings. Amounts borrowed under the facility, once repaid, can be borrowed again from time to time.

Subject to the limitations described below, borrowing capacity available under the credit facility at June 30, 2012 and December 31, 2011 was $1.459 billion (including the $400 million increase in borrowing capacity discussed above) and $1.602 billion, respectively. Generally, Oncor's indentures and revolving credit facility limit the incurrence of other secured indebtedness except for indebtedness secured equally and ratably with the indentures and revolving credit facility and certain permitted exceptions. As described further in Note 7 to Financial Statements included in our 2011 Audited Financial Statements, the Deed of Trust permits Oncor to secure indebtedness (including borrowings under the revolving credit facility) with the lien of the Deed of Trust up to the aggregate of (i) the amount of available bond credits, and (ii) 85% of the lower of the fair value or cost of certain property additions that could be certified to the Deed of Trust collateral agent. At June 30, 2012, the available bond credits were approximately $1.991 billion and the amount of additional potential indebtedness that could be secured by property additions, subject to a certification process, was $470 million. At June 30, 2012, the available borrowing capacity of the revolving credit facility could be fully drawn. See Note 6 to Financial Statements included in our 2011 Audited Financial Statements for additional information concerning the revolving credit facility.

F-14

Highly Confidential

5. **LONG-TERM DEBT**

At June 30, 2012 and December 31, 2011, our long-term debt consisted of the following:

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| Oncor (a): | | |
| 6.375% Fixed Senior Notes due May 1, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ — | $ 376 |
| 5.950% Fixed Senior Notes due September 1, 2013 . . . . . . . . . . . . . . . . . . . . . . | — | 524 |
| 6.375% Fixed Senior Notes due January 15, 2015. . . . . . . . . . . . . . . . . . . . . . . . | 500 | 500 |
| 5.000% Fixed Senior Notes due September 30, 2017 . . . . . . . . . . . . . . . . . . . . . | 324 | 324 |
| 6.800% Fixed Senior Notes due September 1, 2018 . . . . . . . . . . . . . . . . . . . . . . | 550 | 550 |
| 5.750% Fixed Senior Notes due September 30, 2020 . . . . . . . . . . . . . . . . . . . . . | 126 | 126 |
| 4.100% Fixed Senior Notes due June 1, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 400 | — |
| 7.000% Fixed Debentures due September 1, 2022 . . . . . . . . . . . . . . . . . . . . . . . | 800 | 800 |
| 7.000% Fixed Senior Notes due May 1, 2032 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 500 | 500 |
| 7.250% Fixed Senior Notes due January 15, 2033. . . . . . . . . . . . . . . . . . . . . . . . | 350 | 350 |
| 7.500% Fixed Senior Notes due September 1, 2038 . . . . . . . . . . . . . . . . . . . . . . | 300 | 300 |
| 5.250% Fixed Senior Notes due September 30, 2040 . . . . . . . . . . . . . . . . . . . . . | 475 | 475 |
| 4.550% Fixed Senior Notes due December 1, 2041. . . . . . . . . . . . . . . . . . . . . . . | 300 | 300 |
| 5.300% Fixed Senior Notes due June 1, 2042 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 500 | — |
| Unamortized discount. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (37) | (38) |
| Less amounts due currently . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (376) |
| Total Oncor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,088 | 4,711 |
| Oncor Electric Delivery Transition Bond Company LLC (b): | | |
| 4.950% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2013. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 | 56 |
| 5.420% Fixed Series 2003 Bonds due in semiannual installments through August 15, 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 145 | 145 |
| 4.810% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 | 63 |
| 5.290% Fixed Series 2004 Bonds due in semiannual installments through May 15, 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 290 | 290 |
| Unamortized fair value discount related to transition bonds . . . . . . . . . . . . . . | (2) | (3) |
| Less amount due currently . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (121) | (118) |
| Total Oncor Electric Delivery Transition Bond Company LLC . . . . . . . . . | 372 | 433 |
| Total long-term debt (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $5,460 | $5,144 |

(a)    Secured by first priority lien on certain transmission and distribution assets equally and ratably with all of Oncor's other secured indebtedness. See "Deed of Trust Amendment" in Note 7 to Financial Statements included in our 2011 Audited Financial Statements for additional information.

(b)    The transition bonds are nonrecourse to Oncor and were issued to securitize a regulatory asset.

(c)    According to our organizational documents, Oncor Holdings (parent) is prohibited from directly incurring indebtedness for borrowed money.

F-15

Highly Confidential

***Debt-Related Activity in 2012***

*Debt Repayments*

Repayments of long-term debt in 2012 totaled $959 million and represent $376 million principal amount of Oncor's 6.375% senior secured notes paid at the scheduled maturity date of May 1, 2012, the redemption of $524 million principal amount of Oncor's 5.950% senior secured notes due September 1, 2013 (2013 Notes) as discussed below and $59 million principal amount of transition bonds paid at scheduled maturity dates.

On June 18, 2012, pursuant to the terms of the indenture and officer's certificate governing the 2013 Notes, Oncor redeemed all of the 2013 Notes. Oncor paid a redemption price equal to 100% of the principal amount of the 2013 Notes plus a make-whole amount of $33 million. For accounting purposes, the make-whole amount has been deferred as a regulatory asset and will be amortized to interest expense until September 1, 2013, the original maturity date of the 2013 Notes (see Note 3).

*Issuance of New Senior Secured Notes*

In May 2012, Oncor issued $400 million aggregate principal amount of 4.100% senior secured notes maturing in June 2022 (2022 Notes) and $500 million aggregate principal amount of 5.300% senior secured notes maturing in June 2042 (2042 Notes, and collectively with the 2022 Notes, the Notes). Oncor used the proceeds (net of the initial purchasers' discount, fees and expenses) of approximately $890 million from the sale of the Notes to repay borrowings under the revolving credit facility, redeem the 2013 Notes (as discussed above) and for other general corporate purposes. The Notes are secured by the first priority lien, and are secured equally and ratably with all of Oncor's other secured indebtedness.

Interest on the Notes is payable in cash semiannually in arrears on June 1 and December 1 of each year, beginning on December 1, 2012. Oncor may at its option at any time and from time to time redeem all or part of the Notes at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a make-whole premium. The Notes also contain customary events of default, including failure to pay principal or interest on the notes when due.

The Notes were issued in a private placement and were not registered under the Securities Act. Oncor has agreed, subject to certain exceptions, to register with the SEC notes having substantially identical terms as the Notes (except for provisions relating to the transfer restriction and payment of additional interest) as part of an offer to exchange freely tradable exchange notes for the Notes. Oncor has agreed to use commercially reasonable efforts to cause the exchange offer to be completed within 315 days after the issue date of the Notes. If Oncor does not comply with this obligation (an exchange default), the annual interest rate on the notes will increase 50 basis points per annum until the earlier of the expiration of the exchange default or the second anniversary of the issue date of the Notes.

*Interest Rate Hedge Transaction*

In August 2011, Oncor entered into an interest rate hedge transaction hedging the variability of treasury bond rates used to determine interest rates on an anticipated issuance of its senior secured notes (see Note 7 to Financial Statements included in our 2011 Audited Financial Statements for information regarding the debt issuance). The hedges were terminated in November 2011 upon the issuance of the senior secured notes. Oncor recognized the $46 million ($29 million after tax) loss related to the fair value of the hedge transaction in accumulated other comprehensive income, which is expected to be reclassified into net income over the life of the senior secured notes issued.

F-16

Highly Confidential