- requiring a substantial portion of their cash flow to be dedicated to the payment of principal and interest on their debt, thereby reducing their ability to use their cash flow to fund operations, capital expenditures and future business opportunities and execution of their growth strategy;

- increasing their vulnerability to adverse economic, industry or competitive conditions or developments, including changes to environmental regulations;

- limiting their ability to make strategic acquisitions or causing them to make non-strategic divestitures;

- limiting their ability to develop new (or maintain their current) generation facilities;

- limiting their ability to obtain additional financing for working capital (including collateral posting), capital expenditures, product development, debt service requirements, acquisitions and general corporate or other purposes, or to refinance existing debt; and

- limiting their ability to adjust to changing market and industry conditions (including changes to environmental regulations) and placing them at a competitive disadvantage compared to competitors who are less highly leveraged and who, therefore, may be able to operate at a lower overall cost (including debt service) and take advantage of opportunities that they cannot.

***EFH Corp. and TCEH may not be able to repay or refinance their debt as or before it becomes due, or obtain additional financing, particularly if forward natural gas prices do not significantly increase and/or if environmental regulations are adopted that result in significant capital requirements.***

EFH Corp. and TCEH may not be able to repay or refinance their debt as or before it becomes due, or they may only be able to refinance such amounts on terms that will increase their cost of borrowing or on terms that may be more onerous. Their ability to successfully implement any future refinancing of their debt will depend, among other things, on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions, and to certain financial, business and other factors beyond their control, including, without limitation, wholesale electricity prices in ERCOT (which are primarily driven by the price of natural gas and ERCOT market heat rates), environmental regulations and general conditions in the credit markets. Refinancing may also be difficult because of the slow economic recovery, the possibility of rising interest rates and the impending, significant debt maturities of numerous other borrowers. Because their credit ratings are significantly below investment grade, they may be more heavily exposed to these refinancing risks than other borrowers. In addition, the timing of additional financings may require them to pursue such financings at inopportune times.

A substantial amount of EFH Corp.'s and TCEH's debt matures in the next few years, including (as of September 30, 2012) approximately $150 million principal amount of debt maturing in 2012-2013, approximately $4.3 billion principal amount of debt maturing in 2014 and approximately $3.3 billion principal amount of debt maturing in 2015. A substantial amount of TCEH's debt is comprised of debt incurred under the TCEH Senior Secured Credit Facilities. In April 2011, TCEH secured an extension of a significant portion of the commitments and loans under the TCEH Senior Secured Credit Facilities. However, even after taking the extension into account, TCEH still has a significant amount of commitments and loans under the TCEH Senior Secured Credit Facilities that will mature in 2013 and 2014 because a significant portion of the commitments (approximately $645 million maturing in 2013) and loans (approximately $3.85 billion principal amount maturing in 2014) were not extended. In addition, notwithstanding the extension, the extended commitments and loans could mature earlier as described in the next paragraph. Moreover, while TCEH was able to extend a significant portion of the commitments and loans under the TCEH Senior Secured Credit Facilities, the extensions were only for three years. As a result, EFH Corp. and TCEH have a substantial principal amount of debt that matures in 2016 (approximately $1.9 billion) and 2017 (approximately $17.0 billion, including $947 million under the TCEH Letter of Credit Facility that is held in restricted cash).

The extended loans under the TCEH Senior Secured Credit Facilities include a "springing maturity" provision pursuant to which in the event that (a) more than $500 million aggregate principal amount of the TCEH 10.25% Notes or more than $150 million aggregate principal amount of the TCEH 2016 Toggle Notes (in each case, other than notes held by EFH Corp. or its controlled affiliates as of March 31, 2011 to the extent held as of the determination date), as applicable, remain outstanding as of 91 days prior to the maturity date of the applicable notes and (b) TCEH's consolidated total debt to consolidated EBITDA ratio (as defined in the TCEH Senior Secured Credit Facilities) is greater than 6.00 to 1.00 at such applicable determination date, then the maturity date of the extended loans will automatically change to 90 days prior to the maturity date of the applicable notes. As a result of this "springing maturity" provision, TCEH may lose the benefit of the extension of the commitments and loans under the TCEH Senior Secured Credit Facilities if TCEH is unable to refinance the

34

Confidential

EFIHMW00053130

EFIHMW00053083

**PX 070
Page 48 of 203**

requisite portion of the TCEH 2015/2016 Notes by the applicable deadline. The TCEH 10.25% Notes mature on November 1, 2015, and the TCEH 2016 Toggle Notes mature on November 1, 2016. If holders of the TCEH 2015/2016 Notes are unwilling to extend the maturities of their notes, then, to avoid the "springing maturity" of the extended loans, TCEH may be required to repay a substantial portion of the TCEH 2015/2016 Notes at prices above market or at par. There is no assurance that TCEH will be able to make such payments, whether through cash on hand or additional financings. As of September 30, 2012, $3.125 billion and $1.656 billion aggregate principal amount of the TCEH 10.25% Notes and the TCEH 2016 Toggle Notes, respectively, were outstanding, excluding amounts held by EFH Corp. and EFIH.

Wholesale electricity prices in the ERCOT market have generally moved with the price of natural gas. Accordingly, the contribution to earnings and the value of TCEH's nuclear and lignite/coal-fueled generation assets are dependent in significant part upon the price of natural gas. Forward natural gas prices have generally trended downward since mid-2008 (from $10.90 per MMBtu in mid-2008 to $3.84 per MMBtu at September 30, 2012 for calendar year 2013). In recent years, natural gas supply has outpaced demand as a result of increased drilling of shale gas deposits combined with lingering demand weakness associated with the economic recession. Many industry experts expect this supply/demand imbalance to continue for a number of years, thereby depressing natural gas prices for a long-term period. These market conditions are challenging to the long-term profitability of TCEH's generation assets. Specifically, low natural gas prices and their effect in ERCOT on wholesale electricity prices could have a material impact on the overall profitability of TCEH's generation assets for periods in which TCEH does not have significant hedge positions. As of September 30, 2012, TCEH had hedged only approximately 87% and 39% of its wholesale natural gas price exposure related to expected generation output for 2013 and 2014, respectively, based on currently governing CAIR regulation, and it does not have any significant amounts of hedges in place for periods after 2014. Consequently, a continuation, or further decline, of current forward natural gas prices could result in further declines in the values of TCEH's nuclear and lignite/coal-fueled generation assets and limit or hinder TCEH's ability to hedge its wholesale electricity revenues at sufficient price levels to support its significant interest payments and debt maturities, which could adversely impact its ability to obtain additional liquidity and service, refinance and/or extend the maturities of its outstanding debt in 2014.

Aspects of EFH Corp.'s and TCEH's current financial condition may also be challenging to their efforts to obtain additional financing (or refinance or extend their existing financing) in the future. For example, EFH Corp.'s liabilities and those of EFCH exceeded their and EFCH's assets as shown on EFH Corp.'s and EFCH's respective balance sheet prepared in accordance with GAAP as of September 30, 2012. EFCH's assets included $6.152 billion of goodwill as of September 30, 2012. In 2010, EFCH recorded a $4.1 billion noncash goodwill impairment charge reflecting the estimated effect of lower wholesale electricity prices on the enterprise value of TCEH, driven by the sustained decline in forward natural gas prices, as indicated by cash flow projections and declines in market values of securities of comparable companies. The value of EFCH's goodwill will continue to depend on, among other things, wholesale electricity prices in the ERCOT market. Further, third party analyses of TCEH's business performed in connection with goodwill impairment testing in accordance with GAAP, which have indicated that the principal amount of TCEH's outstanding debt exceeds its enterprise value, may make it more difficult for EFH Corp. and TCEH to successfully access the capital markets to obtain liquidity and/or implement any refinancing or extensions of their debt or obtain additional financing. Their ability to obtain future financing is also limited by the value of their unencumbered assets. Almost all of their assets are encumbered (in some cases by both first and second liens), and they have a limited value of assets that could be used as additional collateral in future financing transactions.

***EFH Corp.'s (or any applicable subsidiary's) credit ratings and any actual or perceived changes in their creditworthiness could negatively affect EFH Corp.'s (or the pertinent subsidiary's) ability to access capital and could require EFH Corp. or its subsidiaries to post collateral or repay certain indebtedness.***

EFH Corp.'s (or any applicable subsidiary's) credit ratings could be lowered, suspended or withdrawn entirely at any time by the rating agencies, if in each rating agency's judgment, circumstances warrant, including in connection with this offering. Downgrades in EFH Corp.'s or any of its applicable subsidiaries' long-term debt ratings generally cause borrowing costs to increase and the potential pool of investors and funding sources to decrease and could trigger liquidity demands pursuant to the terms of new commodity contracts, leases or other agreements. Future transactions by EFH Corp. or any of its subsidiaries, including the issuance of additional debt or the consummation of additional debt exchanges, could result in temporary or permanent downgrades of EFH Corp.'s or its subsidiaries' credit ratings.

Most of EFH Corp.'s large customers, suppliers and counterparties require an expected level of creditworthiness in order for them to enter into transactions. If EFH Corp.'s (or an applicable subsidiary's) credit ratings decline, or if their actual or perceived creditworthiness deteriorates, the costs to operate its businesses would likely increase because counterparties could require the posting of collateral in the form of cash or cash-related instruments, or counterparties could decline to do business with EFH Corp. (or its applicable subsidiary).

35

EFIHMW00053131

EFIHMW00053083

**PX 070**
**Page 49 of 203**

***EFH Corp. and TCEH may pursue transactions and initiatives that are unsuccessful or do not produce the desired outcome.***

Future transactions and initiatives that EFH Corp. and TCEH may pursue may have significant effects on their business, capital structure, liquidity and/or results of operations. For example, in addition to the exchanges, repurchases and extensions of their debt, they have and may continue to pursue, from time to time, transactions and initiatives of various types, including, without limitation, debt exchange transactions, debt repurchases, equity or debt issuances, debt refinancing transactions (including extensions of maturity dates of their debt), asset sales, joint ventures, recapitalizations, business combinations and other strategic transactions. There can be no guarantee that any of such transactions or initiatives would be successful or produce the desired outcome, which could ultimately affect them in a material manner.

***Despite their current high debt level, EFH Corp. and TCEH may still be able to incur substantially more debt. This could further exacerbate the risks associated with their substantial debt.***

EFH Corp. and TCEH may be able to incur additional debt in the future. Although their debt agreements contain restrictions on the incurrence of additional debt, these restrictions are subject to a number of significant qualifications and exceptions. Under certain circumstances, the amount of debt, including secured debt, that could be incurred in compliance with these restrictions could be substantial. If new debt is added to their existing debt levels, the related risks that they and holders of their existing debt, including EFIH, now face could intensify.

***EFH Corp.'s and TCEH's debt agreements and the Oncor "ring-fencing" measures contain restrictions that limit flexibility in operating their businesses.***

EFH Corp.'s and TCEH's debt agreements contain various covenants and other restrictions that limit their ability to engage in specified types of transactions and may adversely affect their ability to operate their businesses. These covenants and other restrictions limit their ability to, among other things:

- incur additional debt or issue preferred shares;

- pay dividends on, repurchase or make distributions in respect of capital stock or make other restricted payments;

- make investments;

- sell or transfer assets;

- create liens on assets to secure debt;

- consolidate, merge, sell or otherwise dispose of all or substantially all of their assets;

- enter into transactions with affiliates;

- designate subsidiaries as unrestricted subsidiaries, and

- repay, repurchase or modify certain subordinated and other material debt.

There are a number of important limitations and exceptions to these covenants and other restrictions.

Under the TCEH Senior Secured Credit Facilities, TCEH is required to maintain a consolidated secured debt to consolidated EBITDA ratio below specified levels. TCEH's ability to maintain the consolidated secured debt to consolidated EBITDA ratio below such levels can be affected by events beyond its control, including, without limitation, wholesale electricity prices (which are primarily derived by the price of natural gas and ERCOT market heat rates) and environmental regulations, and there can be no assurance that TCEH will comply with this ratio. As of September 30, 2012, TCEH's consolidated secured debt to consolidated EBITDA ratio was 5.59 to 1.00, which compares to the maximum consolidated secured debt to consolidated EBITDA ratio of 8.00 to 1.00 currently permitted under the TCEH Senior Secured Credit Facilities. The secured debt portion of the ratio excludes (a) up to $1.5 billion of debt secured by a first-priority lien (including the TCEH 2020 Notes) if the proceeds of such debt are used to repay term loans or deposit letter of credit loans under the TCEH Senior Secured Credit Facilities and (b) debt secured by a lien ranking junior to the TCEH Senior Secured Credit Facilities, including the TCEH 2021 Notes. As of September 30, 2012, the maximum consolidated secured debt to consolidated EBITDA ratio permitted under the TCEH Senior Secured Credit Facilities continues to be 8.00 to 1.00.

A breach of any of these covenants or restrictions could result in an event of default under one or more of EFH Corp.'s and TCEH's debt agreements, including as a result of cross acceleration or default provisions. Upon the occurrence

Confidential

EFIHMW00053132

EFIHMW00053083

**PX 070
Page 50 of 203**

of an event of default under one of these debt agreements, lenders or noteholders could elect to declare all amounts outstanding under that debt agreement to be immediately due and payable and/or terminate all commitments to extend further credit. Such actions by those lenders or noteholders could cause cross defaults or accelerations under other debt, including debt that EFIH guarantees. If they were unable to repay those amounts, the lenders or noteholders could proceed against any collateral granted to them to secure such debt. If lenders or noteholders accelerate the repayment of all borrowings, EFH Corp. and TCEH would likely not have sufficient assets and funds to repay those borrowings.

In addition, EFH Corp. and Oncor have implemented a number of "ring-fencing" measures to enhance the credit quality of Oncor Holdings and its subsidiaries, including Oncor. Those measures, many of which were agreed to and required by the PUCT's Order on Rehearing in Docket No. 34077, include, among other things:

- Oncor Holdings' and Oncor's board of directors being comprised of a majority of directors that are independent from the Texas Holdings Group, EFH Corp. and its other subsidiaries;

- Oncor being treated as an unrestricted subsidiary with respect to EFH Corp.'s and EFIH's debt;

- Oncor not being restricted from incurring its own debt;

- Oncor not guaranteeing or pledging any of its assets to secure the debt of any member of the Texas Holdings Group; and

- restrictions on distributions by Oncor, and the right of the independent members of Oncor's board of directors and the largest non-majority member of Oncor to block the payment of distributions to Oncor Holdings (i.e., such distributions not being available to EFH Corp. under certain circumstances).

These measures also included restrictions on the ability to sell a majority interest in Oncor until October 2012, which no longer apply.

*Lenders and holders of TCEH debt have in the past alleged, and might allege in the future, that TCEH is not operating in compliance with covenants in its debt agreements or make allegations against directors and officers of TCEH and its affiliates of breach of fiduciary duty. In addition, holders of credit derivative securities related to TCEH's debt securities (including credit default swaps) have in the past claimed, and might claim in the future, that a credit event has occurred under such credit derivative securities. In each case, even if the claims have no merit, these claims could cause the trading price of EFH Corp., TCEH and EFIH debt securities to decline, adversely affect their and our ability to raise additional capital and/or refinance their and our existing debt or require them to repay the TCEH Demand Notes.*

Lenders or holders of TCEH debt have in the past alleged, and might allege in the future, that TCEH is not operating in compliance with the covenants in its debt agreements, that a default under its debt agreements has occurred or that its or its affiliates' boards of directors or similar bodies or officers are not properly discharging their fiduciary duties, or make other allegations regarding their business, including for the purpose, and potentially having the effect, of causing a default under their debt or other agreements, accelerating the maturity of such debt, protecting claims of debt issued at a certain entity or entities in their capital structure at the expense of debt claims elsewhere in their capital structure and/or obtaining economic benefits from them. These claims have included as recently as the first quarter of 2012, and may include in the future, among other things, claims that the TCEH Demand Notes were fraudulent transfers and should be repaid to TCEH, that authorization of the TCEH Demand Notes violates the fiduciary duties of EFCH's and TCEH's boards of directors, that the TCEH Demand Notes were in violation of the terms of TCEH's debt agreements or that the interest rate on the TCEH Demand Notes should be increased. In the event that a lender were to prevail on these claims, EFH Corp. may immediately be required to repay the TCEH Demand Notes to TCEH and be prevented from further borrowings under the TCEH Demand Notes. Further, holders of credit derivative securities related to TCEH's debt securities (including credit default swaps) have in the past claimed, and may claim in the future, that a credit event has occurred under such credit derivative securities based on TCEH's financial condition. Even if these claims are without merit, they could nevertheless cause the trading price of EFH Corp., TCEH and EFIH debt to decline and adversely affect their and our ability to raise additional capital and/or refinance their and our existing debt.

*EFH Corp. and TCEH may not be able to generate sufficient cash to service their debt and may be forced to take other actions to satisfy the obligations under their debt agreements, which may not be successful.*

EFH Corp.'s and TCEH's ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond their control, including, without limitation, wholesale electricity prices (which

Confidential

EFIHMW00053133

EFIHMW00053083

are primarily driven by the price of natural gas and ERCOT market heat rates) and environmental regulations. They may not be able to maintain a level of cash flows sufficient to pay the principal, premium, if any, and interest on their debt in 2014.

If cash flows and capital resources are insufficient to fund their debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt. These alternative measures may not be successful, may not be completed on economically attractive terms or may not be adequate for them to meet their debt obligations when due. Additionally, their debt agreements limit the use of the proceeds from many dispositions of assets or operations. As a result, they may not be permitted to use the proceeds from these dispositions to satisfy their debt obligations.

Further, if they suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies could be adversely impacted. In particular, such concerns by existing and potential counterparties could significantly limit TCEH's wholesale market activities, including its natural gas price hedging program.

***Under the terms of the indentures governing the TCEH 2015/2016 Notes, TCEH 2020 Notes and TCEH 2021 Notes and the terms of the TCEH Senior Secured Credit Facilities, TCEH is restricted from making certain payments to EFH Corp.***

EFH Corp. is a holding company and substantially all of its reported consolidated assets are held by its subsidiaries. As of September 30, 2012, TCEH and its subsidiaries held approximately 78% of EFH Corp.'s reported consolidated assets, and for the nine months ended September 30, 2012, TCEH and its subsidiaries represented all of EFH Corp.'s reported consolidated revenues. Accordingly, TCEH and its subsidiaries constitute an important funding source for EFH Corp. to satisfy its obligations, including with respect to EFH Corp. notes held by EFIH. However, under the terms of the indentures governing the TCEH 2015/2016 Notes, TCEH 2020 Notes and TCEH 2021 Notes and the terms of the TCEH Senior Secured Credit Facilities, TCEH is restricted from making certain payments to EFH Corp., except in the form of certain loans to cover certain of EFH Corp.'s obligations (and dividends and distributions in certain other limited circumstances if permitted by applicable state law). Further, the indentures governing the TCEH 2015/2016 Notes, TCEH 2020 Notes and TCEH 2021 Notes and the terms of the TCEH Senior Secured Credit Facilities do not permit such intercompany loans to service EFH Corp.'s debt unless required for EFH Corp. to pay principal, premium and interest when due on debt incurred by EFH Corp. to finance the Merger or that was in existence prior to the Merger, or any debt incurred by EFH Corp. to replace, refund or refinance such debt. Such loans are also permitted in order to service other debt, subject to limitations on the amount of the loans. In addition, TCEH is prohibited from making certain loans to EFH Corp. if certain events of default under the indentures governing the TCEH 2015/2016 Notes, TCEH 2020 Notes or TCEH 2021 Notes or the terms of the TCEH Senior Secured Credit Facilities have occurred and are continuing. As of the date of this Offering Memorandum, none of these events of default has occurred or is continuing.

In addition, the TCEH Senior Secured Credit Facilities contain provisions related to the TCEH Demand Notes, which are guaranteed by EFCH and EFIH on a senior unsecured basis and are demand notes, which means that TCEH can require payment of all or a portion of the TCEH Demand Notes at any time. These provisions include the following related to cash loaned by TCEH to EFH Corp. for (i) debt principal and interest payments (the "P&I Note") and (ii) other general corporate purposes (the "SG&A Note"):

- TCEH will not make any further loans under the SG&A Note to EFH Corp.;

- borrowings outstanding under the P&I Note will not exceed $2 billion in the aggregate at any time; and

- the sum of (a) the outstanding senior secured indebtedness (including guarantees) issued by EFH Corp. or any subsidiary of EFH Corp. (including EFIH) secured by a second-priority lien on the equity interests that EFIH owns in Oncor Holdings ("EFIH Second-Priority Debt") and (b) the aggregate outstanding amount of the TCEH Demand Notes will not exceed, at any time, the maximum amount of EFIH Second-Priority Debt permitted by the indenture governing the EFH Corp. 9.75% Notes and EFH Corp. 10.000% Notes as in effect on April 7, 2011.

EFH Corp. will use the proceeds from the EFIH Dividend to repay the balance of the TCEH Demand Notes. If TCEH is not able or declines to continue making intercompany loans to EFH Corp. in the future as a result of the restrictions in the amendment or otherwise, EFH Corp. may not have sufficient cash flows to meet its obligations, including with respect to its notes held by EFIH. If EFH Corp. re-borrows amounts from TCEH under the P&I Note in the future, a failure by EFH Corp. to repay the TCEH Demand Notes when required, including as a result of any claims made by a creditor of TCEH that these loans constituted fraudulent transfers or breaches of fiduciary duty, could result in defaults under EFH Corp.'s other

38

EFIHMW00053134

EFIHMW00053083

debt, including debt that EFCH and EFIH guarantee. It would also likely result in EFCH's and EFIH's guarantees of the TCEH Demand Notes being called, which could cause defaults under EFCH's and EFIH's other debt.

***EFH Corp. has a very limited ability to control activities at Oncor due to structural and operational "ring-fencing" measures.***

EFH Corp. depends upon Oncor for a significant amount of its cash flows and relies on such cash flows in order to satisfy its obligations. However, EFH Corp. has a very limited ability to control the activities of Oncor. As part of the "ring-fencing" measures implemented by EFH Corp. and Oncor, including certain measures required by the PUCT's Order on Rehearing in Docket No. 34077, a majority of the members of Oncor's board of directors are required to meet the New York Stock Exchange requirements for independence in all material respects, and the unanimous, or majority, consent of such directors is required for Oncor to take certain actions. In addition, any new independent directors are required to be appointed by the nominating committee of Oncor Holdings' board of directors, a majority of whose members are independent directors. No member of EFH Corp.'s management is a member of Oncor's board of directors. Under Oncor Holdings' and Oncor's organizational documents, EFH Corp. has limited indirect consent rights with respect to the activities of Oncor, including new issuances of equity securities by Oncor, material transactions with third parties involving Oncor outside of the ordinary course of business, actions that cause Oncor's assets to be subject to an increased level of jurisdiction of the FERC, any changes to the state of formation of Oncor, material changes to accounting methods not required by GAAP, and actions that fail to enforce certain tax sharing obligations between Oncor and EFH Corp. In addition, Oncor's organizational agreements contain restrictions on Oncor's ability to make distributions to its members, including indirectly to EFH Corp.

***Oncor may or may not make any distributions to EFH Corp.***

Upon the consummation of the Merger, EFH Corp. and Oncor implemented certain structural and operational "ring-fencing" measures, including certain measures required by the PUCT's Order on Rehearing in Docket No. 34077, that were based on principles articulated by rating agencies and commitments made by Texas Holdings and Oncor to the PUCT and the FERC to further enhance Oncor's credit quality. These measures were put in place to mitigate Oncor's credit exposure to the Texas Holdings Group and to reduce the risk that the assets and liabilities of Oncor would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities.

As part of the ring-fencing measures, a majority of the members of the board of directors of Oncor are required to be, and are, independent from EFH Corp. Any new independent directors of Oncor are required to be appointed by the nominating committee of Oncor Holdings, which is required to be, and is, comprised of a majority of directors that are independent from EFH Corp. The organizational documents of Oncor give these independent directors, acting by majority vote, and, during certain periods, any director designated by Texas Transmission, the express right to prevent distributions from Oncor if they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements. Accordingly, there can be no assurance that Oncor will make any distributions to EFH Corp.

In addition, Oncor's organizational documents limit Oncor's distributions to its owners, including EFH Corp., through December 31, 2012 to an amount not to exceed Oncor's net income (determined in accordance with GAAP, subject to certain defined adjustments, including goodwill impairments) and prohibit Oncor from making any distribution to EFH Corp. so long as and to the extent that such distribution would cause Oncor's regulatory capital structure to exceed the debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.

In 2009, the PUCT awarded Oncor the right to construct transmission lines and facilities associated with its CREZ Transmission Plan, the cost of which is estimated by Oncor to be approximately $2.0 billion. With the award, Oncor has incurred additional debt. In addition, Oncor may incur additional debt in connection with other investments in infrastructure or technology. Accordingly, while Oncor is required to maintain a specified debt-to-equity ratio, there can be no assurance that Oncor's equity balance will be sufficient to maintain the required debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, thereby restricting Oncor from making any distributions to EFH Corp. In addition, any increase in Oncor's interest expense may reduce the amounts available to be distributed to EFH Corp.

***TCEH's revenues and results of operations generally are negatively impacted by decreases in market prices for electricity, natural gas prices, and/or market heat rates.***

TCEH is not guaranteed any rate of return on capital investments in its businesses. TCEH markets and trades electricity and natural gas, including electricity from its own generation facilities and generation contracted from third

39

Confidential

EFIHMW00053135

EFIHMW00053083

**PX 070**
**Page 53 of 203**

parties, as part of its wholesale markets operation. TCEH's results of operations depend in large part upon wholesale market prices for electricity, natural gas, uranium, coal and transportation in its regional markets and other competitive markets and upon prevailing retail electricity rates, which may be impacted by, among other things, actions of regulatory authorities. Market prices may fluctuate substantially over relatively short periods of time. Demand for electricity can fluctuate dramatically, creating periods of substantial under-or over-supply. During periods of over-supply, prices might be depressed. Also, at times, there may be political pressure, or pressure from regulatory authorities with jurisdiction over wholesale and retail energy commodity and transportation rates, to impose price limitations, bidding rules and other mechanisms to address volatility and other issues in these markets.

Some of the fuel for TCEH's generation facilities is purchased under short-term contracts. Prices of fuel (including diesel, natural gas, coal and nuclear fuel) may also be volatile, and the price TCEH can obtain for electricity sales may not change at the same rate as changes in fuel costs. In addition, TCEH purchases and sells natural gas and other energy related commodities, and volatility in these markets may affect costs incurred in meeting obligations.

Volatility in market prices for fuel and electricity may result from the following:

- volatility in natural gas prices;

- volatility in ERCOT market heat rates;

- volatility in coal and rail transportation prices;

- severe or unexpected weather conditions, including drought and limitations on access to water;

- seasonality;

- changes in electricity and fuel usage;

- illiquidity in the wholesale power or other commodity markets;

- transmission or transportation constraints, inoperability or inefficiencies;

- availability of competitively-priced alternative energy sources;

- changes in market structure;

- changes in supply and demand for energy commodities, including nuclear fuel and related enrichment and conversion services;

- changes in the manner in which TCEH operates its facilities, including curtailed operation due to market pricing, environmental, safety or other factors;

- changes in generation efficiency;

- outages or otherwise reduced output from TCEH's generation facilities or those of its competitors;

- changes in the credit risk or payment practices of market participants;

- changes in production and storage levels of natural gas, lignite, coal, crude oil, diesel and other refined products;

- natural disasters, wars, sabotage, terrorist acts, embargoes and other catastrophic events, and

- federal, state and local energy, environmental and other regulation and legislation.

All of TCEH's generation facilities are located in the ERCOT market, a market with limited interconnections to other markets. Wholesale electricity prices in the ERCOT market have generally moved with the price of natural gas because marginal electricity demand is generally supplied by natural gas-fueled generation facilities. Accordingly, TCEH's earnings and the value of its nuclear and lignite/coal-fueled generation assets, which provided a substantial portion of its supply volumes in 2011 and the first nine months of 2012, are dependent in significant part upon the price of natural gas. Forward natural gas prices have generally trended downward since mid-2008 (from $10.90 per MMBtu in mid-2008 to $3.84 per MMBtu at September 30, 2012 for calendar year 2013). In recent years natural gas supply has outpaced demand as a result of increased drilling of shale gas deposits combined with lingering demand weakness associated with the economic recession. Many industry experts expect this supply/demand imbalance to continue for a number of years, thereby depressing natural gas prices for a long-term period.

40

Confidential

EFIHMW00053136

EFIHMW00053083

PX 070
Page 54 of 203

Wholesale electricity prices also have generally moved with ERCOT market heat rates, which could fall if demand for electricity were to decrease or if more efficient generation facilities are built in ERCOT. Accordingly, TCEH's earnings and the value of its nuclear and lignite/coal-fueled generation assets are also dependent in significant part upon market heat rates. As a result, TCEH's nuclear and lignite/coal-fueled generation assets could significantly decrease in profitability and value if ERCOT market heat rates decline.

***The percentage of TCEH's wholesale natural gas price exposure that is hedged declines significantly in future periods, which could result in reduced earnings (and related cash flows) and adversely affect TCEH's ability to pay principal and interest on its debt in those periods and refinance its debt if wholesale natural gas prices do not increase.***

TCEH's hedging activities, in particular its natural gas price hedging program, are designed to mitigate the adverse effect on earnings (and related cash flows) of low wholesale electricity prices (due to low natural gas prices). These market conditions are challenging to the long-term profitability of TCEH's generation assets. Specifically, low natural gas prices and their effect in ERCOT on wholesale power prices could have a material impact on the overall profitability of TCEH's generation assets for periods in which it does not have significant hedge positions. While TCEH has significantly hedged its natural gas price exposure for 2012 (approximately 99% under CAIR regulation), as of September 30, 2012, it has hedged only approximately 87% and 39% of its wholesale natural gas price exposure related to expected generation output for 2013 and 2014, respectively, based on currently governing CAIR regulation, and does not have any significant amounts of hedges in place for periods after 2014.

Forward natural gas prices have generally trended downward since mid-2008. In recent years natural gas supply has outpaced demand as a result of increased drilling of shale gas deposits combined with lingering demand weakness associated with the economic recession. Many industry experts expect this supply/demand imbalance to continue for a number of years, thereby depressing natural gas prices for a long-term period. A continuation or further decline of current forward natural gas prices could limit TCEH's ability to hedge its wholesale electricity revenues at sufficient price levels to pay principal and interest on its debt, result in further declines in the value of its nuclear and lignite/ coal-fueled generation assets and could adversely impact its ability to refinance its debt or obtain additional financing. Consequently, TCEH's ability to fund its operations, meet its obligations under its debt agreements, refinance or extend its substantial indebtedness in 2014 and obtain additional financing in the future is dependent on increases in the current and expected future price of natural gas.

***If TCEH is required to comply with the EPA's Cross-State Air Pollution Rule ("CSAPR") as revised by the EPA in February 2012 or a similar replacement, TCEH will likely incur material capital expenditures and operating costs and experience material revenue decreases due to reduced generation and wholesale power sales volumes.***

In July 2011, the EPA issued the CSAPR, a replacement for the Clean Air Interstate Rule. In February 2012, the EPA released a final rule ("Final Revisions") and a proposed rule revising certain aspects of the CSAPR, including emissions budgets for the State of Texas as discussed in Items 1 and 2, "Business and Properties -Environmental Regulations and Related Considerations -Sulfur Dioxide, Nitrogen Oxide and Mercury Air Emissions" of the EFH Corp. 2011 Form 10-K. In March 2012, subsidiaries of TCEH submitted comments to the EPA on the proposed rule requesting the EPA to make additional corrections to the CSAPR's budgets for Texas. In June 2012, the EPA finalized the proposed rule ("Second Revised Rule"). In total, the emissions budgets established by the Final Revisions along with the Second Revised Rule would require TCEH's fossil-fueled generation units to reduce (i) their annual SO2 and NOx emissions by approximately 120,600 tons (56 percent) and 9,000 tons (22 percent), respectively, compared to 2010 actual levels, and (ii) their seasonal NOx emissions by approximately 3,300 tons (18 percent), compared to 2010 levels. TCEH could comply with these emissions limits either through physical reductions or through the purchase of emissions credits from third parties, but the volume of SO2 credits that may be purchased from sources outside of Texas is subject to limitations starting in 2014. Because the CSAPR was vacated and remanded to the EPA in August 2012 by a three judge panel of the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit Court"), the CSAPR, the Final Revisions and the Second Revised Rule do not impose any immediate legal or compliance requirements on TCEH, the State of Texas, or other affected parties. In October 2012, the EPA and certain other parties that supported the CSAPR filed a petition seeking review by the full court of the D.C. Circuit Court's ruling. EFH Corp. and EFCH cannot predict whether, when, or in what form the CSAPR, Final Revisions, the Second Revised Rule or any replacements will take effect.

Material capital expenditures would be required to comply with the CSAPR, as revised in June 2012, as well as with other pending and expected environmental regulations, including the Mercury and Air Toxics Standard ("MATS"), for which a subsidiary of TCEH and certain states and industry participants have filed petitions for review in the D.C. Circuit Court. TCEH cannot predict the outcome of these petitions.

41

Confidential

EFIHMW00053137

EFIHMW00053083

In 2011, total capital expenditures for environmental projects totaled $142 million. EFH Corp. and TCEH budgeted total capital expenditures related to the CSAPR, the Final Revisions, the Second Revised Rule, MATS, and other environmental regulations of approximately $300 million in 2012. Prior to the publication of the final MATS rule and the vacatur and remand of the CSAPR, EFH Corp and TCEH estimated that expenditures of more than $1.5 billion before the end of the decade in environmental control equipment would be required to comply with regulatory requirements, including the CSAPR and MATS. In October 2012, EFH Corp. and TCEH revised their estimates of capital expenditures for environmental control equipment to comply with regulatory requirements, based on analysis and testing of options to comply with the MATS rule, as well as estimates related to other EPA regulations, including expenditures previously incurred related to the CSAPR. Between 2011 and the end of the decade, they estimate that they will incur more than $1 billion in capital expenditures for environmental control equipment, though the ultimate total will depend on the evolution of pending or future regulatory requirements. Based on regulations currently in effect, they estimate that they will incur approximately $500 million of capital expenditures for environmental control equipment between 2013 and 2017, including amounts required to maintain installed environmental control equipment.

EFH Corp. and EFCH cannot predict whether the D.C. Circuit Court will grant the EPA's request for a rehearing of the D.C. Circuit Court's decision with respect to the CSAPR, or, if such rehearing is granted, how the D.C. Circuit will rule on the EPA's appeal of the CSAPR. As a result, there can be no assurance that TCEH will not be required to implement a compliance plan for the CSAPR, the Final Revisions, the Second Revised Rule or any replacement rules in a short time frame or that such plan will not materially affect TCEH's, EFCH's and EFH Corp.'s results of operations, liquidity or financial condition.

***Goodwill and/or other intangible assets not subject to amortization that were recorded in connection with the Merger are subject to at least annual impairment evaluations. As a result, EFH Corp. and EFCH could be required to write off some or all of this goodwill and other intangible assets, which may cause adverse impacts on their results of operations and financial condition.***

In accordance with accounting standards, goodwill and certain other indefinite-lived intangible assets that are not subject to amortization are reviewed annually for impairment, or more frequently if certain conditions exist. Factors such as the economic climate, market conditions, including the market prices for wholesale electricity and natural gas and market heat rates, environmental regulation, and the condition of assets are considered when evaluating these assets for impairment. The actual timing and amounts of any goodwill impairments will depend on many sensitive, interrelated and uncertain variables. Any reduction in or impairment of the value of goodwill or other intangible assets will result in a charge against earnings, which could cause a material adverse impact on EFH Corp.'s and EFCH's reported results of operations and financial condition.

42

Confidential

EFIHMW00053138

EFIHMW00053083

## THE TRANSACTIONS

**The Merger**

On October 10, 2007, the Merger occurred. Upon the effectiveness of the Merger, each share of EFH Corp. common stock outstanding immediately prior to the Merger (other than shares held by EFH Corp. or any of its subsidiaries or Texas Holdings or any of its subsidiaries, including Merger Sub, in each case not held on behalf of third parties, or shares held by holders who properly exercised their rights of dissent and appraisal under Texas law) was cancelled and converted into the right to receive $69.25 in cash, without interest and less any applicable withholding taxes.

**Equity Contributions**

At the closing of the Merger, Texas Holdings received an aggregate equity investment of approximately $8.3 billion. Investment funds affiliated with the Sponsor Group, or their respective assignees, contributed approximately $5.1 billion to Texas Holdings. The Sponsor Group consists of investment funds associated with or designated by KKR, TPG and Goldman Sachs who, along with certain other co-investors, own EFH Corp. through Texas Holdings, with the Sponsor Group controlling Texas Holdings' general partner, Texas Energy Future Capital Holdings LLC. In addition, Citigroup Global Markets Inc. and Morgan Stanley & Co. LLC, each of which is an initial purchaser participating in this offering, or their respective affiliates, each made equity investments of approximately $250 million in Texas Holdings. The Sponsor Group obtained approximately $2.3 billion in equity investments from other existing investors in KKR's and TPG's private equity funds and other third party investors. Following the closing of the Merger, the Sponsor Group owned approximately 60% of the limited partnership units issued by Texas Holdings in connection with the Merger. The equity contributions by the Sponsor Group and the Investors are referred to in this Offering Memorandum as the "Equity Contributions."

**Debt Financing**

In connection with the Merger, in addition to the Equity Contributions described above, EFH Corp. and/or its subsidiaries entered into the following debt financing arrangements, in each case, arranged by a consortium of arrangers and bookrunners:

- TCEH's Senior Secured Credit Facilities, which are guaranteed by EFCH and subsidiaries of TCEH;

- a $6.75 billion senior unsecured interim loan facility of TCEH (the "TCEH Senior Interim Facility"), which was used to fund the Merger and related transactions; and

- a $4.5 billion senior unsecured interim loan facility of EFH Corp. (the "EFH Senior Interim Facility"), which was used to fund the Merger and related transactions.

In October and December 2007, TCEH and TCEH Finance, Inc. issued $6.75 billion aggregate principal amount of the TCEH 2015/2016 Notes in two private offerings. The proceeds from the offerings of the TCEH 2015/2016 Notes, along with cash on hand, were used by TCEH to repay in full the TCEH Senior Interim Facility. In October 2007, EFH Corp. issued the EFH Corp. 2017 Notes in a private offering. The proceeds from the offering of the EFH Corp. 2017 Notes, along with cash on hand, were used by EFH Corp. to repay in full the EFH Senior Interim Facility. We refer to the above, collectively, as the "Merger Debt Financing."

Concurrently with the transactions described above, Oncor entered into a $2.0 billion senior revolving credit facility (the "Prior Oncor Revolving Credit Facility"). In October 2011, Oncor amended and restated the Prior Oncor Credit Facility (as so amended and restated, the "Oncor Revolving Credit Facility") which provides for a secured revolving credit facility in an aggregate principal amount of up to $2.4 billion, which may be increased by up to $100 million, subject to certain conditions. The Oncor Revolving Credit Facility is being used by Oncor for working capital and for other general corporate purposes. No portion of the Prior Oncor Revolving Credit Facility was used to finance the Merger or the debt repayment that occurred in connection with the Merger. We refer to the transactions listed above, including the Merger and the application of the proceeds of the Equity Contributions and the Merger Debt Financing, as the "Transactions."

43

EFIHMW00053139

EFIHMW00053083

**PX 070**
**Page 57 of 203**

**Ring-Fencing**

Upon the consummation of the Merger, EFH Corp. and Oncor implemented several measures, including certain measures required by the PUCT's Order on Rehearing in Docket No. 34077, that are referred to as "ring-fencing." Such measures included, among others, the following:

- the conversion of Oncor from a Texas corporation to a Delaware limited liability company;

- the inclusion of covenants in Oncor Holdings' and Oncor's limited liability company agreements intended to enhance the separation of Oncor Holdings and its subsidiaries, including Oncor, from Texas Holdings and its other subsidiaries, including EFIH;

- the establishment of boards of directors for Oncor Holdings and Oncor with a majority of members who meet the New York Stock Exchange requirements for independence in all material respects and whose unanimous consent is required to take certain material actions, including (i) to consolidate or merge (A) with EFH Corp. or any of EFH Corp.'s other subsidiaries or (B) with any other entity, if Oncor Holdings or Oncor, as applicable, would not be the surviving entity; (ii) to sell, transfer or dispose of all or substantially all of the assets of Oncor Holdings or Oncor, as applicable, without adequate provision for the payment of all of such entity's creditors; (iii) to institute, or consent to the institution of, bankruptcy or similar proceedings in respect of Oncor Holdings or Oncor, as applicable; or (iv) to the fullest extent permitted by law, to dissolve or liquidate Oncor Holdings or Oncor, as applicable, without adequate provision for the payment of all of such entity's creditors;

- the specific delegation to each of the board of directors and the independent directors of Oncor, each acting by majority vote, of the right to prevent distributions, if it or they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements;

- after the appointment of the initial independent directors, the delegation of the ability to nominate, appoint and fill vacancies in respect of the independent directors of Oncor Holdings and Oncor to a standing nominating committee of Oncor Holdings' board of directors, a majority of whose members are independent directors; and

- the incurrence of new debt, evidenced by the Oncor Revolving Credit Facility, the lenders of which will be specifically relying on the separateness of Oncor Holdings and Oncor, and their assets, from Texas Holdings and its other subsidiaries.

The ring-fencing measures were based on certain principles articulated by rating agencies and certain commitments made by Texas Holdings and Oncor to the PUCT and the FERC intended to further separate Oncor from Texas Holdings and its subsidiaries (including EFIH) and to mitigate Oncor's credit exposure to those entities and to reduce the risk that the assets and liabilities of Oncor Holdings or of any of its subsidiaries would be substantively consolidated with the assets and liabilities of Texas Holdings or of any of its other subsidiaries (including EFIH) in the event of a bankruptcy of one or more of those entities. A number of ring-fencing measures put in place were incorporated into the PUCT's Order on Rehearing in Docket No. 34077 that is legally binding on Oncor.

None of the ring-fenced entities guarantees or otherwise holds out its credit as being available to support the obligations of EFH Corp., EFIH or any of their subsidiaries (other than the ring-fenced entities), including the New Notes. In addition, lenders under TCEH's Senior Secured Credit Facilities and the holders of the Existing First Lien Notes, the EFIH Second Lien Notes, the EFIH 2018 Toggle Notes, the EFH Corp. 2017 Notes, the TCEH 2015/2016 Notes, the TCEH 2020 Notes and the TCEH 2021 Notes have acknowledged, and the future holders of such notes will acknowledge, by acceptance of such notes, the legal separateness of Oncor and its subsidiaries from the borrowers and guarantors under such financing documents. Lenders under TCEH's Senior Secured Credit Facilities and the holders of the Existing First Lien Notes, the EFIH Second Lien Notes, the EFIH 2018 Toggle Notes, the EFH Corp. 2017 Notes, the TCEH 2015/2016 Notes, the TCEH 2020 Notes and the TCEH 2021 Notes also agreed, and the future holders of such notes will agree, by acceptance of such notes, that they will not initiate any bankruptcy or similar proceeding against Oncor Holdings or its subsidiaries and that Oncor Holdings and its subsidiaries are entitled to enforce this non-petition covenant. In addition, holders of the New Notes, by acceptance of such notes, will acknowledge the legal separateness of Oncor and its subsidiaries from EFH Corp., the Issuer and EFCH under such financing documents. Holders of the New Notes, by acceptance of such notes, will also agree that they will not initiate any bankruptcy or similar proceeding against Oncor Holdings or its subsidiaries and that Oncor Holdings and its subsidiaries are entitled to enforce this non-petition covenant.

Confidential

EFIHMW00053140

EFIHMW00053083

**PX 070**
**Page 58 of 203**

### Sale of Noncontrolling Interests in Oncor

In November 2008, Oncor issued and sold additional equity interests to Texas Transmission for $1.254 billion in cash. At the closing of the sale, Oncor also offered and sold additional equity interests to Oncor Management Investment LLC, an entity owned by certain members of Oncor's management, for the same price per unit of equity interest paid by Texas Transmission. Accordingly, the equity issuances resulted in EFH Corp. and EFIH indirectly owning 80.04% (80.03% as of the date of this Offering Memorandum) of Oncor, certain members of Oncor management indirectly owning 0.21% (0.22% as of the date of this Offering Memorandum) of Oncor and Texas Transmission owning 19.75% of Oncor.

The investor rights agreement dated as of November 5, 2008, by and among Oncor, Oncor Holdings, Texas Transmission, EFH Corp. and any other persons that subsequently become a party thereto (the "Investor Rights Agreement") governs certain rights of certain members of Oncor and EFH Corp. arising out of their direct or indirect ownership of Oncor membership interests, including, without limitation, transfers of Oncor membership interests and restrictions thereon. Among other transfer restrictions, the Investor Rights Agreement provides that, prior to the earlier of the completion of a qualified initial public offering or seven years from the date of the Investor Rights Agreement, Texas Transmission may transfer its Oncor membership interests only to certain permitted transferees or with the prior approval of Oncor Holdings. Following such time period, Texas Transmission may transfer its Oncor membership interests under a registration statement or pursuant to applicable securities laws. The Investor Rights Agreement also grants Texas Transmission certain "tag-along" rights in relation to certain sales, transfers or pledges of Oncor membership interests by Oncor Holdings or indirectly by EFH Corp. or its subsidiaries. Subject to certain conditions, these "tag-along" rights allow Texas Transmission to transfer a pro-rata portion of its Oncor membership interests in the event of a transfer of Oncor membership interests by Oncor Holdings or indirectly by EFH Corp. or its subsidiaries on the same terms as Oncor Holdings, EFH Corp. or a subsidiary of EFH Corp. would receive for the Oncor membership interests. The agreement further provides that under certain offerings of equity securities occurring before an initial public offering of Oncor, Texas Transmission and Oncor Holdings will receive preemptive rights to purchase their pro-rata share of the equity securities to be sold pursuant to such offerings. The Investor Rights Agreement also provides EFH Corp. with a right of first refusal to purchase any Oncor membership interests to be sold in a permitted sale by Texas Transmission or its permitted transferees.

Additionally, Texas Holdings, EFH Corp., certain of EFH Corp.'s subsidiaries and Oncor Holdings have certain "drag-along" rights in relation to offers from third-parties to purchase their directly or indirectly owned membership interests in Oncor, where the resulting sale would constitute a change of control of Oncor. These "drag-along" rights compel Texas Transmission and all other members of Oncor to sell or otherwise transfer their membership interests in Oncor on substantially the same terms as Texas Holdings, EFH Corp., the EFH Corp. subsidiary or Oncor Holdings (as applicable). Pursuant to the Investor Rights Agreement, all members of Oncor that have entered into such agreement must cooperate with Oncor in connection with an initial public offering of Oncor.

45

Confidential

EFIHMW00053141

EFIHMW00053083

**USE OF PROCEEDS**

The Offerors will not receive any cash proceeds from the exchange offers and the consent solicitations. Any Existing Notes exchanged in the exchange offers will be canceled.

46

EFIHMW00053142

EFIHMW00053083

**PX 070
Page 60 of 203**

## CAPITALIZATION

The following table sets forth as of September 30, 2012, EFIH's cash and cash equivalents and the capitalization of EFIH:

(1) on an actual basis; and

(2) on an adjusted basis to give effect to the October 2012 Notes Offering, the December 2012 Private Exchange and completion of the exchange offers and the consent solicitations, assuming 100% participation in the exchange offers by the holders of Existing Notes at or prior to the Early Tender Date and the exchange of all of the Existing Notes for New Notes (reflecting the issuance of the Total Consideration per each $1,000 principal amount of the Existing Notes) in the exchange offers.

| | As of September 30, 2012 | |
| --- | --- | --- |
| | Actual | As Adjusted |
| | (millions of dollars) | |
| Cash and cash equivalents (a) | $   178 | $   [_] |
| Debt (b): | | |
| EFIH 6.875% Senior Secured Notes due 2017 (c) | $   250 | $   503 |
| EFIH 9.75% Senior Secured Notes due 2019 (c) | 141 | — |
| EFIH 10.000% Senior Secured Notes due 2020 (c) | 2,180 | 2,180 |
| EFIH 10.000% Senior Secured Notes due 2020 offered hereby (c) | — | 1,317 |
| EFIH 11% Senior Secured Second Lien due 2021 (d) | 406 | 406 |
| EFIH 11.750% Senior Secured Second Lien Notes due 2022 (d) | 1,750 | 1,750 |
| EFIH 11.25%/12.25% Senior Toggle Notes due 2018 | — | 1,145 |
| Unamortized premium | 14 | [22] |
| Unamortized discount | (11) | [_] |
| Subtotal debt issued by EFIH | 4,730 | [7,312] |
| EFIH Corp. 10.875% Senior Notes due 2017 (e)(f) | 98 | [_] |
| EFIH Corp. 11.250%/12.000% Senior Toggle Notes due 2017 (e)(f) | 232 | [_] |
| EFIH Corp. 9.75% Senior Secured Notes due 2019 (c)(f) | 57 | — |
| EFIH Corp. 10.000% Senior Secured Notes due 2020 (c)(f)(g) | 331 | — |
| Unamortized premium on pushed down debt (f) | 3 | [3] |
| Subtotal pushed down debt (f) | 721 | [_] |
| Total consolidated debt (b)(h) | 5,451 | [   ] |
| Total membership interest (i) | 5,465 | |
| Total capitalization | $ 10,916 | $ [   ] |

---

(a) "Actual" and "As Adjusted" include $680 million in proceeds from the August 2012 Notes Offering that was placed in escrow (and is reported as restricted cash in the balance sheet) to be used to pay the EFIH Dividend. "As Adjusted" includes [the net proceeds from the October 2012 Notes Offering].

(b) This table includes only a portion of the debt of EFH Corp. that is guaranteed by EFIH. See "Summary—Debt Issued or Guaranteed by EFIH."

(c) These notes or EFIH's guarantees thereof, as applicable, are secured by the Collateral on a first-priority basis.

(d) These notes are secured by the Collateral on a second-priority basis.

(e) EFIH's guarantees of these notes are on a senior unsecured basis.

(f) Represents 50% of the principal amount of certain EFH Corp. debt guaranteed by EFIH (pushed-down debt), as discussed in Note 4 to historical condensed consolidated financial statements included in our September 30, 2012 Form 10-Q, which is incorporated by reference into this Offering Memorandum.

(g) $400 million principal amount of these notes is not subject to push-down accounting and therefore not included in the 50% push down calculation.

(h) "Actual" and "As Adjusted" do not include an additional $1.118 billion and $[___] million, respectively, principal amount of EFH Corp. debt held by third parties that is guaranteed by EFIH and not reflected on (pushed down to) our balance sheet as

47

EFIHMW00053143

EFIHMW00053083

**PX 070**
**Page 61 of 203**

additional long-term debt and do not include an additional $689 million of TCEH Demand Notes that are guaranteed on a senior unsecured basis by EFIH and will be repaid by EFH Corp. using proceeds from the EFIH Dividend.

(i)    As adjusted total membership interest reflects our payment of the EFIH Dividend (the proceeds of which will be used by EFH Corp. to repay the balance of the TCEH Demand Notes).

48

EFIHMW00053144

EFIHMW00053083

**PX 070**
**Page 62 of 203**

**GENERAL TERMS OF THE EXCHANGE OFFERS AND CONSENT SOLICITATIONS**

**Purpose of the Exchange Offers and Consent Solicitations**

The purpose of the exchange offers is to reduce the outstanding principal amount of the long-term debt of EFH Corp. The purpose of the consent solicitations is to adopt the Proposed Amendments which will provide EFH Corp. and its subsidiaries additional financial and operational flexibility.

**General**

Upon the terms and subject to the conditions set forth in this Offering Memorandum and the Consent and Letter of Transmittal, the Offerors are offering to exchange outstanding Existing Notes validly tendered and not validly withdrawn for New Notes.

All holders whose Existing Notes are accepted for exchange will receive an amount equal to accrued and unpaid interest on such Existing Notes, if any, in cash, from the last applicable interest payment date to, but not including, the Settlement Date.

In addition, EFH Corp. and EFIH and EFIH Finance are soliciting Consents in the consent solicitations to amend the Existing Notes Indentures. The purpose of the consent solicitations is to obtain the Consents required to adopt the Proposed Amendments, which would, among other things, eliminate substantially all of the restrictive covenants contained in the Existing Notes Indentures and the Existing Notes, eliminate certain events of default, modify covenants regarding mergers and consolidations, and modify or eliminate [certain other provisions].

Execution and delivery of the Consent and Letter of Transmittal will constitute an express waiver by a consenting holder of the Existing Notes with respect to all claims against EFH Corp., the Offerors and the Sponsor Group of any breach, default or event of default that may have arisen under the Existing Notes Indentures. As of the date of this Offering Memorandum, EFH Corp. and the Offerors are not aware of any such breaches, defaults or events of default.

In order to be adopted with respect to a series of the Existing Notes, the Proposed Amendments must be consented to by the holders of at least a majority of the outstanding aggregate principal amount of such series of the Existing Notes. It is expected but not required that the Supplemental Indentures for the Existing Notes will be executed and delivered promptly following the Consent Date assuming receipt of the requisite Consents for the Proposed Amendments. The Supplemental Indentures will become effective immediately upon execution and delivery by the parties thereto; however, the Proposed Amendments contained therein will not become operative until immediately prior to the acceptance for exchange of Existing Notes upon the terms and subject to the conditions set forth in this Offering Memorandum. See "Proposed Amendments."

The Proposed Amendments with respect to each series of Existing Notes constitute a single proposal and a consenting holder must consent to the Proposed Amendments applicable to all Existing Notes of such series tendered by that holder in their entirety.

Existing Notes validly tendered pursuant to the exchange offers (and not validly withdrawn) at or prior to the Consent Date will be deemed to include Consents to the Proposed Amendments with respect to such Existing Notes. The completion, execution and delivery of a Consent and Letter of Transmittal, or transmission of an Agent's Message, in connection with a valid tender of Existing Notes pursuant to the exchange offers at or prior to the Consent Date will constitute the delivery of Consents with respect to such Existing Notes. Holders may not validly tender Existing Notes in the exchange offers at or prior to the Consent Date without delivering the related Consents, but holders may tender Existing Notes after the Consent Date and at or prior to the Expiration Date without delivering Consents with respect to such Existing Notes. However, holders tendering Existing Notes after the Early Tender Date will not be eligible to receive the applicable Total Consideration for such Existing Notes. Holders may not deliver Consents in the consent solicitations without validly tendering their related Existing Notes in the exchange offers at or prior to the Consent Date and may only validly revoke Consents by validly withdrawing the previously tendered related Existing Notes at or prior to the Consent Date or by revoking Consents after the Consent Date and prior to the execution and delivery of the applicable Supplemental Indenture by the parties thereto. Because it is expected that the Supplemental Indentures will be executed and delivered promptly following the Consent Date assuming receipt of the requisite Consents for the Proposed Amendments, holders should not expect that they will be able to revoke their Consents after the Consent Date. A withdrawal of Existing Notes after the later of the Consent Date and the execution and delivery of the applicable Supplemental Indenture will not revoke any related

49

EFIHMW00053145

EFIHMW00053083

**PX 070**
**Page 63 of 203**

Consents, and withdrawing holders will be subject to the Proposed Amendments if adopted. If the exchange offers are terminated, the Proposed Amendments in any executed Supplemental Indenture will not become operative.

All Existing Notes validly tendered in accordance with the procedures set forth under "Procedures for Tendering Existing Notes and Delivering Consents" and not validly withdrawn in accordance with the procedures set forth under "Withdrawal of Tenders and Revocation of Consents" at or prior to the Expiration Date, will, upon the terms and subject to the conditions hereof, including those relating to our right to reject tendered Existing Notes, be accepted by the Offerors.

If the requisite Consents are received, the applicable Supplemental Indenture has been executed and the Proposed Amendments have become operative, the Proposed Amendments will be binding on all holders of the Existing Notes. Completion of the exchange offers and the adoption of the Proposed Amendments may have adverse consequences with respect to Existing Notes that remain outstanding following the completion of the exchange offers. See "Risk Factors" and "Proposed Amendments."

The Offerors' obligation to accept Existing Notes that are validly tendered is subject to the satisfaction or waiver of the conditions described under "Conditions of the Exchange Offers and the Consent Solicitations."

Following the completion, termination or withdrawal of the exchange offers, and subject to applicable law, the Offerors or their affiliates may acquire any Existing Notes that are not validly tendered or accepted in the exchange offers or any New Notes issued in the exchange offers through open market purchases, privately negotiated transactions, tender offers, exchange offers, redemption or otherwise, upon such terms and at such prices as the Offerors may determine (or as may be provided for in the indentures governing the Existing Notes or the New Notes), which with respect to the Existing Notes may be more or less than the consideration to be received by participating holders in the exchange offers and, in either case, could be for cash or other consideration. There can be no assurance as to which, if any, of these alternatives or combinations thereof the Offerors or their affiliates may choose to pursue.

The exchange offers will expire at 11:59 p.m., New York City time, on January 17, 2013, unless extended by the Offerors. Holders must validly tender and not validly withdraw their Existing Notes at or prior to 11:59 p.m., New York City time, on January 2, 2013, unless such Early Tender Date is extended by the Offerors, to be eligible to receive the Total Consideration. Consents must be delivered and not revoked at or prior to 11:59 p.m., New York City time, on [January 2], 2013, unless such Consent Date is extended by EFH Corp. or EFIH and EFIH Finance, as applicable.

**Consideration**

Upon the terms and subject to the conditions of the exchange offers, the Offerors are offering, in exchange for each $1,000 principal amount of Existing Notes validly tendered (and not validly withdrawn), the following:

(i)     for Existing Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date and accepted for exchange, a principal amount of New Notes equal to the "Total Consideration" as listed in the table on page ii of this Offering Memorandum under "Total Consideration if Tendered at or prior to the Early Tender Date," with the amount of New Notes depending on the aggregate principal amount of Existing Notes validly tendered (and not validly withdrawn) at or prior to the Early Tender Date, as described below, and

(ii)    for Existing Notes validly tendered (and not validly withdrawn) after the Early Tender Date and at or prior to the Expiration Date and accepted for exchange, a principal amount of New Notes as listed in the table on page ii of this Offering Memorandum under "Exchange Consideration if Tendered After the Early Tender Date and At or Prior to the Expiration Date."

The Offerors will not accept any tender of Existing Notes that would result in the issuance of less than $2,000 principal amount of New Notes to a participating holder. The aggregate principal amount of New Notes issued to each participating holder for all Existing Notes validly tendered (and not validly withdrawn) will be rounded down, if necessary, to $2,000 or the nearest whole multiple of $1,000 in excess thereof. This rounded amount will be the principal amount of New Notes you will receive, and no additional cash will be paid in lieu of any principal amount of New Notes not received as a result of such rounding down.

50

Confidential

**Acceptance**

Subject to the terms and upon the conditions of the exchange offers, all Existing Notes validly tendered (and not validly withdrawn) in the exchange offers will be accepted in the exchange offers.

**Extension, Termination or Amendment**

Subject to the applicable regulations of the SEC, each of the Offerors and EFH Corp. expressly reserves the right, in its sole discretion, at any time and from time to time, and regardless of whether any events preventing satisfaction of the conditions to the exchange offers or the consent solicitations shall have occurred or shall have been determined by the Offerors or EFH Corp., as applicable, to have occurred, to extend the period during which the exchange offers and the consent solicitations are open by giving oral (to be confirmed in writing) or written notice of such extension to the Exchange Agent and by making public disclosure by press release or other appropriate means of such extension to the extent required by law. During any extension of the exchange offers and the consent solicitations, all Existing Notes previously validly tendered and not validly withdrawn will remain subject to the exchange offers and all Consents will remain subject to the consent solicitations, and may, subject to the terms and conditions of the exchange offers and the consent solicitations, be accepted by the Offerors. See also "—Announcements."

Subject to applicable law, each exchange offer and the consent solicitation related to the Existing Notes subject to such exchange offer is being made independently of the other exchange offers and consent solicitations, and the Offerors reserve the right to terminate, withdraw or amend each exchange offer, and EFH Corp. and EFIH and EFIH Finance, as applicable, reserve the right to terminate, withdraw or amend the consent solicitation related to the Existing Notes subject to such exchange offer, independently of the other exchange offers and consent solicitations at any time and from time to time, as described in this Offering Memorandum.

Any waiver, amendment or modification of the exchange offers or consent solicitations will apply to all Existing Notes validly tendered pursuant to the exchange offers and all Consents delivered pursuant to the consent solicitations. If either the Offerors or EFH Corp., as applicable, makes a change that it determines to be material to any of the terms of the exchange offers or the consent solicitations, or waives any condition of the exchange offers or the consent solicitations that it determines to be material, the Offerors or EFH Corp., as applicable, will give oral (to be confirmed in writing) or written notice of such amendment or such waiver to the Exchange Agent and will disseminate additional exchange offer documents and extend the exchange offers and the consent solicitations and withdrawal and revocation rights as it determines necessary and to the extent required by law. Any such extension, amendment, waiver, decrease or change will not result in the reinstatement of any withdrawal or revocation rights if those rights had previously expired, except to the extent required by applicable law.

There can be no assurance that the Offerors or EFH Corp., as applicable, will exercise their right to extend, terminate or amend the exchange offers or the consent solicitations. During any extension and irrespective of any amendment to the exchange offers or the consent solicitations, all Existing Notes previously validly tendered and not validly withdrawn will remain subject to the exchange offers and all related Consents will remain subject to the consent solicitations, and may be accepted thereafter by the Offerors or EFH Corp., as applicable, subject to compliance with the terms of the exchange offers and the consent solicitations and applicable law. In addition, the Offerors and EFH Corp., as applicable, may waive conditions without extending the exchange offers or the consent solicitations in accordance with applicable law.

**Announcements**

Any extension, termination or amendment of the exchange offers or the consent solicitations will be followed as promptly as practicable by announcement thereof, such announcement in the case of an extension to be issued no later than 9:00 a.m., New York City time, on the next business day following the previously scheduled Expiration Date. Without limiting the manner in which the Offerors and EFH Corp., as applicable, may choose to make such announcement, the Offerors and EFH Corp., as applicable, will not, unless otherwise required by law, have any obligation to publish, advertise or otherwise communicate any such announcement other than by making a release to a U.S. news agency or another means of announcement that the Offerors deem appropriate. See also "—Extension, Termination or Amendment."

**Accounting Treatment**

[On a consolidated EFH Corp. basis, we will record the difference between the fair values of the New Notes plus the carrying values related to the Existing Notes received in exchange, including the principal amounts and unamortized debt

51

EFIHMW00053147

EFIHMW00053083

discounts/premiums and deferred issuance costs, as a gain on early extinguishment of debt. The gain will be reported in the consolidated statement of income as other income. Applicable deferred and current income taxes will also be recorded. See "Material U.S. Federal Income Tax Considerations" for further discussion of the effects of income taxes. Deferrable issuance costs related to the New Notes, as well as any related debt discount/premium, will be amortized to interest expense over the term of the debt.

On an EFIH basis, there will be no gain on the exchange of debt. EFIH will report the principal amount of the New Notes as long-term debt. Deferrable issuance costs related to the New Notes, as well as any related debt discount/premium, will be amortized to interest expense over the term of the debt. For Existing Notes acquired, which will be canceled or retired by EFH Corp., EFIH will eliminate its investment in such debt with an offsetting amount recorded to equity.]

**Certain Matters Relating to Compliance with Securities Laws in Non-U.S. Jurisdictions**

Countries outside the United States may have their own legal requirements that govern securities offerings made to persons resident in those countries and may impose requirements about the form, content and process of offers made to the general public. We have not to date taken any action under such non-U.S. regulations. Non-U.S. holders should consult their advisors in considering whether they may participate in the exchange offers in accordance with the laws of their home countries and, if they do participate, whether there are any restrictions or limitations on transactions in the New Notes that may apply in their home countries or if the participation would result in a requirement for us to make any deliveries, filings or registrations. We and the Dealer Managers cannot provide any assurance about whether such limitations may exist. The Dealer Managers are only acting as dealer managers and solicitation agents for the exchange offers and consent solicitations in the United States. In addition, in some non-U.S. jurisdictions there may be restrictions on the ability of a holder to transfer New Notes received in the exchange offers. By signing or being deemed to sign the Consent and Letter of Transmittal, you are representing that if you are located outside the United States, the offer to you and your acceptance of it does not contravene the applicable laws where you are located and that your participation in the exchange offers will not impose on us any requirement to make any deliveries, filings or registrations. If we become aware of any jurisdiction where the making of the exchange offers is not in compliance with applicable law or would require us to make any delivery, filing or registration (without any obligation to make any further or ongoing filings), we will make a good faith effort to comply with the applicable law.

**Interests of Related Parties**

Each member of the Sponsor Group has advised us that it, and the affiliates that it controls, in the aggregate, own an insignificant amount of Existing Notes, and it and/or such affiliates may participate in the exchange offers and consent solicitations. Such participation, if any, will be on the same terms and subject to the same conditions set forth in this Offering Memorandum applicable to other holders of the respective Existing Notes held by the Sponsor Group and such affiliates. Existing Notes held by the Sponsor Group and such affiliates will not be considered outstanding for the purposes of determining whether the holders of the required outstanding principal amount of any series of Existing Notes have delivered Consents necessary to adopt the Proposed Amendments.

52

Confidential

EFIHMW00053148

EFIHMW00053083

## PROPOSED AMENDMENTS

[TO COME]

53

Confidential

EFIHMW00053149

EFIHMW00053083

**PX 070**
**Page 67 of 203**

### ACCEPTANCE OF EXISTING NOTES; ACCEPTANCE OF CONSENTS; ACCRUAL OF INTEREST

**Acceptance of Existing Notes; Acceptance of Consents**

If the conditions to the exchange offers and the consent solicitations are satisfied, or if the Offerors and/or EFH Corp., as applicable, waive all of the conditions that have not been satisfied, and the Offerors and/or EFH Corp., as applicable, otherwise do not terminate or withdraw any of the exchange offers and consent solicitations for any reason, the Offerors will accept for exchange at the Settlement Date, after they receive validly completed and duly executed Consents and Letters of Transmittal or Agent's Messages with respect to any and all of the Existing Notes validly tendered (and not validly withdrawn), the Existing Notes to be exchanged by notifying the Exchange Agent of the Offerors' acceptance, subject to the terms and conditions set forth in the exchange offers. The notice may be oral if the Offerors promptly confirm such notice in writing.

The Offerors expressly reserve their right, in their sole discretion but subject to applicable law, to delay acceptance for exchange of, or the exchange of, any of the Existing Notes validly tendered (and not validly withdrawn) under any exchange offer (subject to Rule 14e-1(c) under the Exchange Act, which requires that the Offerors issue or pay the offered consideration, as applicable, or return the Existing Notes deposited pursuant to any exchange offer promptly after termination or withdrawal of the exchange offers), or to terminate any exchange offer and not accept any Existing Notes not previously accepted, (1) if any of the conditions to any exchange offer shall not have been satisfied or validly waived by the Offerors, (2) in order to comply in whole or in part with any applicable law or (3) for any other reason. In addition, if not previously accepted for exchange, Existing Notes may be withdrawn after the expiration of 40 business days from January 17, 2013.

In all cases, the Total Consideration and Exchange Consideration for Existing Notes validly tendered (and not validly withdrawn) pursuant to the exchange offers will be made only after timely receipt by the Exchange Agent of (1) certificates representing the Existing Notes, or timely confirmation of a book-entry transfer (a "Book-Entry Confirmation") of the Existing Notes into the Exchange Agent's account, (2) the properly completed and duly executed Consent and Letter of Transmittal (or a facsimile thereof) or an Agent's Message in lieu thereof and (3) any other documents required by the Consent and Letter of Transmittal. The exchange offers are scheduled to expire on the Expiration Date, unless extended by the Offerors.

The Offerors will have accepted validly tendered (and not validly withdrawn) Existing Notes, if, as and when EFIH gives oral or written notice to the Exchange Agent of the Offerors' acceptance of the Existing Notes for exchange pursuant to the exchange offers. In all cases, exchange of Existing Notes pursuant to the exchange offers will be made by the deposit of any Total Consideration or Exchange Consideration, as applicable, and any accrued and unpaid interest payable, with the Exchange Agent (or, upon its instruction, DTC), which will act as your agent for the purposes of receiving New Notes and payments from the Offerors, and delivering New Notes and transmitting any interest cash payments to you. If, for any reason whatsoever, acceptance for exchange of, or the exchange of, any Existing Notes validly tendered (and not validly withdrawn) pursuant to the exchange offers is delayed (whether before or after the Offerors' acceptance of the Existing Notes) or the Offerors extend the exchange offers or are unable to accept the Existing Notes tendered pursuant to the exchange offers, then, without prejudice to the Offerors' rights set forth herein, the Offerors may instruct the Exchange Agent to retain tendered Existing Notes, and those Existing Notes may not be withdrawn, subject to the limited circumstances described in "Withdrawal of Tenders and Revocation of Consents."

If any tendered Existing Notes are not accepted for exchange for any reason pursuant to the terms and conditions of any exchange offer, or if certificates are submitted evidencing more Existing Notes than those that were validly tendered, certificates evidencing the unexchanged Existing Notes will be returned, without expense, to the tendering holder, unless otherwise requested by such holder under "Special Delivery Instructions" in the Consent and Letter of Transmittal (or, in the case of any Existing Notes tendered by book-entry transfer into the Exchange Agent's account pursuant to the procedures set forth under "Procedures for Tendering Existing Notes and Delivering Consents—Book-Entry Transfer," such Existing Notes will be credited to the account from which such Existing Notes were delivered), promptly following the Expiration Date or the termination of the exchange offers.

**Treatment of Fractions**

Tenders of Existing Notes pursuant to the exchange offers will be accepted only in principal amounts equal to permitted denominations for such Existing Notes. The Offerors will not accept any tender of Existing Notes that would result in the issuance of less than $2,000 principal amount of New Notes to a participating holder. The aggregate principal amount

Confidential

EFIHMW00053150

EFIHMW00053083

**PX 070**
**Page 68 of 203**

of New Notes issued to each participating holder for all Existing Notes validly tendered (and not validly withdrawn) will be rounded down, if necessary, to $2,000 or the nearest whole multiple of $1,000 in excess thereof. This rounded amount will be the principal amount of New Notes you will receive, and no additional cash will be paid in lieu of any principal amount of New Notes not received as a result of such rounding down.

**Accrued Interest**

All holders whose Existing Notes are validly tendered (and not validly withdrawn) for exchange pursuant to the exchange offers and are accepted for exchange will be entitled to receive, with respect to any of such holder's accepted Existing Notes, accrued and unpaid interest, if any, in cash from the last applicable interest payment date to, but not including, the Settlement Date, which amounts will be in addition to the Total Consideration or Exchange Consideration, as applicable, that such holder would receive in the exchange offers.

Under no circumstances will any additional interest be payable because of any delay in the delivery or transmission of New Notes or funds to any holder of Existing Notes as a result in any delay in delivery or transmission by the Exchange Agent, DTC or any holder's nominee.

**Sources of Funds for the Exchange Offers**

The Offerors intend to fund all cash payable to eligible holders pursuant to the exchange offers, represented by accrued and unpaid cash interest from the last applicable interest payment date to, but not including, the Settlement Date on any Existing Notes accepted in the exchange offers, with cash on hand.

**Payment of Transfer Taxes, Fees and Expenses**

The Offerors will pay or cause to be paid all transfer taxes with respect to the valid tender of any Existing Notes unless the box titled "Special Delivery Instructions" on the Consent and Letter of Transmittal has been completed, as described in the Instructions thereto.

55

Confidential

## PROCEDURES FOR TENDERING EXISTING NOTES AND DELIVERING CONSENTS

**General**

In order to participate in the exchange offers, you must validly tender (and not validly withdraw) your Existing Notes to the Exchange Agent and in order to participate in the consent solicitations, you must properly deliver your Consents to the Exchange Agent, in each case as further described below. It is your responsibility to validly tender your Existing Notes and/or deliver your Consents. The Offerors have the right to waive any defects. However, the Offerors are not required to waive defects and are not required to notify you of defects in your tender or delivery.

The method of delivery of the Existing Notes, the Consent and Letter of Transmittal and all other required documents to the Exchange Agent is at the election and risk of the holder. Holders should use an overnight or hand delivery service, properly insured. In all cases, sufficient time should be allowed to assure delivery to and receipt by the Exchange Agent at or prior to the Expiration Date or, in order to receive the Total Consideration, at or prior to the Early Tender Date. **Do not send the Consent and Letter of Transmittal or any Existing Notes to anyone other than the Exchange Agent.**

If you have any questions or need help in tendering your Existing Notes, please contact the Information Agent or the Exchange Agent whose addresses and telephone numbers are listed on the back cover of this Offering Memorandum or your broker, dealer, commercial bank, trust company or other nominee through which your Existing Notes are held.

**Valid Tender of Existing Notes and Delivery of Consents**

Except as set forth below with respect to ATOP procedures, for a holder to validly tender Existing Notes pursuant to the exchange offers and validly deliver Consents pursuant to the consent solicitations, a properly completed and duly executed Consent and Letter of Transmittal (or a facsimile thereof) together with any signature guarantees and any other documents required by the Instructions to the Consent and Letter of Transmittal, or an Agent's Message in lieu thereof, must be received by the Exchange Agent at the address or facsimile number set forth on the back cover of this Offering Memorandum at or prior to the Expiration Date (or the Early Tender Date, if the holder wishes to be eligible to receive the Total Consideration in respect of tendered Existing Notes, or the Consent Date, if the holder wishes to deliver consents pursuant to the consent solicitations), and either (1) certificates representing the Existing Notes must be received by the Exchange Agent at such address, or (2) the Existing Notes must be transferred pursuant to the procedures for book-entry transfer described below and a Book-Entry Confirmation must be received by the Exchange Agent, in each case at or prior to the Expiration Date (or the Early Tender Date, if the holder wishes to be eligible to receive the Total Consideration, or the Consent Date, if the holder wishes to deliver consents pursuant to the consent solicitations).

In all cases, exchange of Existing Notes validly tendered (and not validly withdrawn) pursuant to the exchange offers will be made only after timely receipt by the Exchange Agent of:

- certificates representing such Existing Notes or a Book-Entry Confirmation with respect to such Existing Notes;
- the Consent and Letter of Transmittal (or a facsimile thereof) properly completed and duly executed, or an Agent's Message in lieu thereof; and
- any required signature guarantees and other documents required by the Consent and Letter of Transmittal.

The Offerors have not provided guaranteed delivery procedures in conjunction with the exchange offers or under any of the exchange offer documents or other exchange offer materials provided therewith. Holders must timely tender their Existing Notes in accordance with the procedures set forth in the exchange offer documents.

**Tender of and Delivery of Consents for Existing Notes Held in Physical Form**

The Offerors do not believe any Existing Notes exist in physical form. If you believe you hold Existing Notes in physical form, please contact the Exchange Agent regarding procedures for participating in the exchange offers and/or consent solicitations. Any Existing Notes in physical form must be tendered using a Consent and Letter of Transmittal and such Existing Notes must be delivered to the Exchange Agent at its address set forth on the back cover of this Offering Memorandum.

56

EFIHMW00053083

**PX 070
Page 70 of 203**

**Tendering and Consenting with Respect to Existing Notes Held through a Custodian**

Any holder whose Existing Notes are held by a broker, dealer, commercial bank, trust company or other nominee and who wishes to tender Existing Notes and deliver Consents should contact such custodial entity promptly and instruct such custodial entity to tender the Existing Notes and deliver Consents on such holder's behalf. **A custodial entity cannot tender Existing Notes and deliver Consents on behalf of a holder of Existing Notes without such holder's instructions.**

**Holders whose Existing Notes are held by a custodial entity such as a broker, dealer, commercial bank, trust company or other nominee should be aware that such nominee may have deadlines earlier than the Early Tender Date, the Consent Date and the Expiration Date for such nominees to be advised of the action that you may wish for them to take with respect to your Existing Notes and, accordingly, such holders are urged to contact any custodial entity such as a bank, broker, dealer, trust company or other nominee through which they hold their Existing Notes as soon as possible in order to learn of the applicable deadlines of such nominees.**

The Offerors will pay brokerage houses and other custodians, nominees and fiduciaries the reasonable out-of-pocket expenses incurred by them in forwarding copies of this Offering Memorandum and related documents to the beneficial owners of the Existing Notes. The Offerors will not make any payment to brokers, dealers or others soliciting acceptances of the exchange offers and consent solicitations other than the Dealer Managers, as described herein.

Book-Entry Transfer

The Exchange Agent has or will establish an account with respect to the Existing Notes at DTC for purposes of the exchange offers and consent solicitations, and any financial institution that is a participant in the DTC system and whose name appears on a security position listing as the record owner of the Existing Notes may make book-entry delivery of Existing Notes by causing DTC to transfer the Existing Notes into the Exchange Agent's account at DTC in accordance with DTC's procedure for transfer. Although delivery of Existing Notes may be effected through book-entry transfer into the Exchange Agent's account at DTC, either an Agent's Message or a Consent and Letter of Transmittal (or a facsimile thereof) properly completed and duly executed, along with any required signature guarantees and any other required documents, must be transmitted to and received by the Exchange Agent at one of the addresses set forth on the back cover of this Offering Memorandum at or prior to the Expiration Date (or the Early Tender Date, if the holder wishes to be eligible to receive the Total Consideration, or the Consent Date, if the holder wishes to deliver consents pursuant to the consent solicitations).

Tender of Existing Notes and Delivery of Consents through ATOP

In lieu of physically completing and signing the Consent and Letter of Transmittal and delivering it to the Exchange Agent, DTC participants may electronically transmit their acceptance of the exchange offers through ATOP, for which the transaction will be eligible. In accordance with ATOP procedures, DTC will then verify the acceptance of the exchange offers and send an Agent's Message to the Exchange Agent for its acceptance.

An "Agent's Message" is a message transmitted by DTC, received by the Exchange Agent and forming part of the Book-Entry Confirmation, which states that DTC has received an express acknowledgement from you that you have received the exchange offer documents and agree to be bound by the terms of the Consent and Letter of Transmittal, and that the Offerors may enforce such agreement against you.

If an eligible holder of Existing Notes transmits its acceptance through ATOP, delivery of such tendered Existing Notes must be made to the Exchange Agent (either physically or pursuant to the book-entry delivery procedures set forth herein). Unless such holder delivers (either physically or by book-entry delivery) the Existing Notes being tendered to the Exchange Agent, the Offerors may, at their option, treat such tender as defective for purposes of delivery of acceptance for exchange, and for the right to receive New Notes. Delivery of documents to DTC (physically or by electronic means) does not constitute delivery to the Exchange Agent. If you desire to tender your Existing Notes on the day that the Early Tender Date, Consent Date or the Expiration Date occurs, you must allow sufficient time for completion of the ATOP procedures during the normal business hours of DTC on such date. The Offerors will have the right, which may be waived, to reject the defective tender of Existing Notes as invalid and ineffective.

**Holders whose Existing Notes are held by DTC should be aware that DTC may have deadlines earlier than the Early Tender Date, or the Consent Date, if the holder wishes to deliver consents pursuant to the consent solicitations, and the Expiration Date for DTC to be advised of the action that you may wish for them to take with**

Confidential

EFIHMW00053153

EFIHMW00053083

respect to your Existing Notes and, accordingly, such holders are urged to contact DTC as soon as possible in order to learn of DTC's applicable deadlines.

**Effect of Consent and Letter of Transmittal**

Subject to and effective upon the acceptance of and the exchange of the Existing Notes validly tendered thereby, by executing and delivering a Consent and Letter of Transmittal, a tendering holder, among other things, (1) irrevocably sells, assigns and transfers to or upon the order of the Offerors, all right, title and interest in and to all the Existing Notes tendered thereby; and (2) irrevocably appoints the Exchange Agent as its true and lawful agent and attorney-in-fact (with full knowledge that the Exchange Agent also acts as the Offerors' agent with respect to the tendered Existing Notes, with full power coupled with an interest) to:

- deliver certificates representing the Existing Notes, or transfer ownership of the Existing Notes on the account books maintained by DTC, together with all accompanying evidences of transfer and authenticity, to or upon the applicable Offeror or Offerors' order, as applicable;

- present the Existing Notes for transfer on the relevant security register;

- receive all benefits or otherwise exercise all rights of beneficial ownership of the Existing Notes (except that the Exchange Agent will have no rights to or control over the Offerors' funds); and

- deliver to EFH Corp. and EFIH and EFIH Finance, as applicable, and the trustee the Consent and Letter of Transmittal as evidence of the holders' Consent to the Proposed Amendments and as certification that validly delivered and not revoked Consents from holders of the requisite aggregate principal amount of any series of outstanding Existing Notes to adopt the Proposed Amendments with respect to such series, duly executed by holders of such Existing Notes, have been received,

all in accordance with the terms and conditions of the exchange offers and the consent solicitations as described in this Offering Memorandum.

The agreement between the Offerors, EFH Corp. and a holder set forth in a Consent and Letter of Transmittal (and any Agent's Message in lieu thereof) will be governed by, and construed in accordance with, the laws of the State of New York.

**Signature Guarantees**

Signatures on all Consents and Letters of Transmittal must be guaranteed by a recognized participant in the Securities Transfer Agents Medallion Program, the New York Stock Exchange, Inc. Medallion Signature Program or the Stock Exchange Medallion Program (each, a "Medallion Signature Guarantor"), unless the Existing Notes tendered thereby are tendered (i) by a holder of Existing Notes (or by a participant in DTC whose name appears on a security position listing as the owner of such Existing Notes) who has not completed the box entitled "Special Delivery Instructions" on the Consent and Letter of Transmittal or (ii) for the account of a member firm of a registered national securities exchange, a member of the Financial Industry Regulatory Authority, Inc. or a commercial bank or trust company having an office or correspondent in the United States. If the Existing Notes not accepted for exchange are to be returned to a person other than the registered holder, then the signatures on the Consents and Letters of Transmittal accompanying the tendered Existing Notes must be guaranteed by a Medallion Signature Guarantor as described above.

**Determination of Validity**

All questions as to the validity, form, eligibility (including time of receipt) and acceptance of any tendered Existing Notes (including the delivery of Consents) pursuant to any of the procedures described above, and the form and validity (including time of receipt of notices of withdrawal) of all documents will be determined by the Offerors and/or EFH Corp., as applicable, in their sole discretion, which determination will be final and binding. The Offerors and/or EFH Corp., as applicable, reserve the absolute right to reject any or all tenders of any Existing Notes and delivery of Consents determined by the Offerors and/or EFH Corp., as applicable, not to be in proper form, or if the acceptance of or exchange of such Existing Notes may, in the opinion of the Offerors' counsel, be unlawful or result in a breach of consent. A waiver of any defect or irregularity with respect to the tender of one Existing Note shall not constitute a waiver of the same or any other defect or irregularity with respect to the tender of any other Existing Note. The Offerors also reserve the right to waive any conditions to the exchange offers that the Offerors are legally permitted to waive, and EFH Corp. reserves the right to waive any conditions to the consent solicitations the EFH Corp. is legally permitted to waive.

58

Confidential

EFIHMW00053083

**PX 070**
**Page 72 of 203**

Your tender of Existing Notes and delivery of Consents will not be deemed to have been validly made until all defects or irregularities in your tender and delivery have been cured or waived. None of the Offerors, EFH Corp., the Dealer Managers, the Exchange Agent, the Information Agent or any other person or entity is under any duty to give notification of any defects or irregularities in any tender or withdrawal of any Existing Notes or Consents, or will incur any liability for failure to give any such notification.

**Please send all materials to the Exchange Agent and not to the Offerors, EFH Corp., the Dealer Managers or any trustee.**

59

Confidential

EFIHMW00053155

EFIHMW00053083

**PX 070**
**Page 73 of 203**

### WITHDRAWAL OF TENDERS AND REVOCATION OF CONSENTS

Tendered Existing Notes may be withdrawn at any time at or prior to the Expiration Date. Tendered Existing Notes, if not previously accepted for exchange, may also be withdrawn after the expiration of 40 business days from January 17, 2013. Consents may be revoked at any time at or prior to the later of the Consent Date and the execution and delivery of the applicable Supplemental Indenture. Because it is expected that the Supplemental Indentures will be executed and delivered promptly following the Consent Date assuming receipt of the requisite Consents for the Proposed Amendments, holders should not expect that they will be able to revoke their Consents after the Consent Date.

Each holder of Existing Notes that validly tenders (and does not validly withdraw) its Existing Notes at or prior to the Consent Date in the exchange offers is deemed to have delivered its Consent in the consent solicitations to the Proposed Amendments with respect to such Existing Notes. A valid withdrawal of tendered Existing Notes at or prior to the Consent Date will be deemed a valid revocation of the related Consent in the consent solicitations. A holder of Existing Notes that has validly tendered its Existing Notes at or prior to the Consent Date in the exchange offers and consent solicitations may only validly revoke the related Consents by validly withdrawing the previously tendered related Existing Notes to which such Consents relate at or prior to the Consent Date or by revoking Consents after the Consent Date and prior to the execution and delivery of the applicable Supplemental Indenture. A withdrawal of Existing Notes after the later of the Consent Date and the execution and delivery of the applicable Supplemental Indenture will not revoke any related Consents, and withdrawing holders will be subject to the Proposed Amendments if adopted. If the exchange offers are terminated without any Existing Notes being accepted, the terms of the Proposed Amendments will not become operative.

Subject to applicable regulations of the SEC, if, for any reason whatsoever, acceptance for exchange of any Existing Notes validly tendered pursuant to the exchange offers, and any Consents delivered pursuant to the consent solicitations is delayed (whether before or after the Offerors' acceptance for exchange of Existing Notes) or the Offerors extend the exchange offers or EFH Corp. and EFIH and EFIH Finance, as applicable, extend the consent solicitations or the Offerors are unable to accept for exchange the Existing Notes validly tendered pursuant to the exchange offers, as applicable, the Offerors may instruct the Exchange Agent to retain tendered Existing Notes, and those Existing Notes may not be withdrawn, and all Consents delivered with respect thereto will remain subject to the consent solicitations, except to the extent that you are entitled to the withdrawal rights set forth herein; provided that, if tendered, Existing Notes may also be withdrawn after the expiration of 40 business days from January 17, 2013 if previously tendered Existing Notes have not been accepted for exchange.

To be effective, a written or facsimile transmission notice of withdrawal of a tender of Existing Notes or a revocation of a Consent or a properly transmitted "Request Message" through DTC's ATOP system for a withdrawal of a tender of Existing Notes or a revocation of a Consent must:

- be received by the Exchange Agent at one of the addresses specified on the back cover of this Offering Memorandum (i) at or prior to the Expiration Date, in the case of a withdrawal of Existing Notes, (ii) at or prior to the Consent Date, in the case of a withdrawal of Existing Notes and a revocation of related Consents, or (iii) by the execution and delivery of the Supplemental Indenture, in the case of a revocation of the Consents after the Consent Date;

- specify the name of the holder of the Existing Notes and corresponding Consent to be withdrawn or revoked, as applicable;

- contain the description of the Existing Notes and the Consent, in each case to be withdrawn or revoked, as the case may be, the certificate numbers shown on the particular certificates representing such Existing Notes (or, in the case of Existing Notes tendered by book-entry transfer, the number of the account at DTC from which the Existing Notes were tendered and the name and number of the account at DTC to be credited with the Existing Notes withdrawn) and the aggregate principal amount represented by such Existing Notes; and

- in the case of certificated Existing Notes, be signed by the holder of the Existing Notes in the same manner as the original signature on the Consent and Letter of Transmittal or be accompanied by documents of transfer sufficient to have the trustee register the transfer of the Existing Notes into the name of the person withdrawing the Existing Notes.

After the Consent Date and prior to the execution and delivery of the applicable Supplemental Indenture, such Consent can only be revoked by delivering written notice to the Exchange Agent on behalf of the applicable trustee in accordance with the terms of the applicable Existing Notes Indenture. Because it is expected that the Supplemental

60

Indentures will be executed and delivered promptly following the Consent Date assuming receipt of the requisite Consents for the Proposed Amendments, holders should not expect that they will be able to revoke their Consents after the Consent Date.

If the Existing Notes to be withdrawn or the Consents to be revoked have been delivered or otherwise identified to the Exchange Agent, a signed notice of withdrawal or revocation, as applicable, is effective immediately upon receipt by the Exchange Agent of written or facsimile transmission of the notice of withdrawal and/or revocation, as the case may be (or receipt of a Request Message), even if physical release is not yet effected, provided such notice is received at or prior to the Expiration Date. A withdrawal of Existing Notes and a revocation of a Consent can only be accomplished in accordance with the foregoing procedures.

If you withdraw Existing Notes (and revoke a related Consent), you will have the right to re-tender and/or re-deliver them at or prior to the Expiration Date (or the Early Tender Date, if you wish to be eligible to receive the Total Consideration, or the Consent Date, if you wish to deliver consents pursuant to the consent solicitations) in accordance with the procedures described in "Procedures for Tendering Existing Notes and Delivering Consents." If the Offerors amend or modify the terms of the exchange offers or the information concerning the exchange offers, or EFH Corp. and EFIH and EFIH Finance, as applicable, amend or modify the terms of the consent solicitations or the information concerning the consent solicitations, in any case in a manner determined by the Offerors and/or EFH Corp., as applicable, to constitute a material change to holders of Existing Notes, the Offerors and/or EFH Corp., as applicable, will disseminate additional exchange offer and consent solicitation materials and extend the period of the exchange offers and consent solicitations, including any withdrawal and revocation rights, to the extent required by law and as the Offerors and/or EFH Corp., as applicable, determines necessary. An extension of the Early Tender Date, the Consent Date or the Expiration Date will not affect a holder's withdrawal and revocation rights unless otherwise provided herein or in any additional exchange offer materials or as required by applicable law.

61

Confidential

EFIHMW00053157

EFIHMW00053083

### CONDITIONS OF THE EXCHANGE OFFERS AND THE CONSENT SOLICITATIONS

The exchange offers are not conditioned on any minimum principal amount of Existing Notes being validly tendered or the issuance of a minimum principal amount of New Notes.

Notwithstanding any other provisions of the exchange offers and the consent solicitations, the Offerors will not be required to accept for exchange or to exchange Existing Notes validly tendered (and not validly withdrawn) pursuant to the exchange offers, and the Offerors and/or EFH Corp., as applicable, may, in their sole discretion, terminate, amend or extend any of the exchange offers and consent solicitations or delay or refrain from accepting for exchange or exchanging any of the Existing Notes if any of the following "General Conditions" shall occur:

- there shall have been instituted, threatened or be pending any action, proceeding, application, claim counterclaim or investigation (whether formal or informal) (or there shall have been any material adverse development to any action, application, claim, counterclaim or proceeding currently instituted, threatened or pending) before or by any court, governmental, regulatory or administrative agency or instrumentally, domestic or foreign, or by any other person, domestic or foreign, in connection with the exchange offers or the consent solicitations that, in the Offerors' reasonable judgment, either (a) is, or is reasonably likely to be, materially adverse to EFH Corp. and its subsidiaries' business, operations, properties, condition (financial or otherwise), income, assets, liabilities or prospects, (b) could prohibit, prevent, restrict or delay completion of any of the exchange offers or the consent solicitations or (c) could materially impair the contemplated benefits of the exchange offers or consent solicitations to EFH Corp. and its subsidiaries or be material to holders in deciding whether to participate in the exchange offers or consent solicitations;

- an order, statute, rule, regulation, executive order, stay, decree, judgment or injunction shall have been proposed, enacted, entered, issued, promulgated, enforced or deemed applicable by any court or governmental, regulatory or administrative agency or instrumentality that, in the Offerors' and/or EFH Corp.'s, as applicable, reasonable judgment, either (a) could prohibit, prevent, restrict or delay completion of any of the exchange offers or the consent solicitations or (b) is, or is reasonably likely to be, materially adverse to EFH Corp. and its subsidiaries' business, operations, properties, condition (financial or otherwise), income, assets, liabilities or prospects;

- there shall have occurred or be likely to occur any event or condition affecting EFH Corp. and its subsidiaries' business or financial affairs that, in the Offerors' and/or EFH Corp.'s, as applicable, reasonable judgment, either (a) is, or is reasonably likely to be, materially adverse to EFH Corp. and its subsidiaries' business, operations, properties, condition (financial or otherwise), income, assets, liabilities or prospects, (b) could prohibit, prevent, restrict or delay completion of any exchange offer or consent solicitation or (c) could materially impair the contemplated benefits of the exchange offers or consent solicitations to EFH Corp. and its subsidiaries or be material to holders in deciding whether to participate in the exchange offers and the consent solicitations;

- the trustee under the Existing Notes Indentures shall have objected in any respect to or taken action that could, in the Offerors' and/or EFH Corp.'s, as applicable, reasonable judgment, adversely affect the completion of any of the exchange offers or the consent solicitations or shall have taken any action that challenges the validity or effectiveness of the procedures used by the Offerors and/or EFH Corp., as applicable, in the making of the exchange offers or consent solicitations or the acceptance of some or all of the Existing Notes pursuant to any exchange offers;

- there has occurred (a) any general suspension of, or limitation on prices for, trading in securities in the U.S. securities or financial markets, (b) any significant adverse change in the price of New Notes or Existing Notes in the United States or other major securities or financial markets, (c) a material impairment in the trading market for debt securities, (d) a declaration of a banking moratorium or any suspension of payments in respect to banks in the United States or other major financial markets, (e) any limitation (whether or not mandatory) by any government or governmental, administrative or regulatory authority or agency, domestic or foreign, or other event that, in the Offerors' and/or EFH Corp.'s, as applicable, reasonable judgment, might affect the extension of credit by banks or other lending institutions, (f) a commencement of a war, armed hostilities, terrorist acts or other national or international calamity directly or indirectly involving the United States or (g) in the case of any of the foregoing existing on the date hereof, a material acceleration or worsening thereof.

In addition, the Offerors' obligation to transfer any Total Consideration and Exchange Consideration is conditioned upon the Offerors' acceptance of Existing Notes for exchange pursuant to the exchange offers.

62

EFIHMW00053158

EFIHMW00053083

These conditions are for the Offerors' and/or EFH Corp.'s, as applicable, benefit and may be asserted by the Offerors and/or EFH Corp., as applicable, or may be waived by the Offerors and/or EFH Corp., as applicable, including any action or inaction by the Offerors and/or EFH Corp., as applicable, giving rise to any condition, in whole or in part at any time and from time to time prior to the Expiration Date, in their sole discretion. Under each of the exchange offers and the consent solicitations, if any of these events occur, the Offerors and/or EFH Corp., as applicable, may (i) return Existing Notes tendered thereunder to you, (ii) extend an exchange offer or consent solicitation and retain all tendered Existing Notes until the expiration of the extended exchange offer or consent solicitation or (iii) amend the exchange offers and the consent solicitations in any respect by giving oral or written notice of such amendment to the Exchange Agent and making public disclosure of such amendment to the extent required by law.

Neither the Offerors nor EFH Corp. has made a decision as to what circumstances would lead the Offerors and/or EFH Corp., as applicable, to waive any such condition, and any such waiver would depend on circumstances prevailing at the time of such waiver. Although neither the Offerors nor EFH Corp. has present plans or arrangements to do so, the Offerors reserve the right to amend, at any time, the terms of any of the exchange offers, and EFH Corp., EFIH and EFIH Finance reserve the right to amend, at any time, the terms of the consent solicitations. The Offerors will give holders notice of such amendments as may be required by applicable law.

Confidential

EFIHMW00053159

EFIHMW00053083

**PX 070**
**Page 77 of 203**

## EXCHANGE AGENT; INFORMATION AGENT; DEALER MANAGERS AND SOLICITATION AGENTS

**Exchange Agent**

[Global Bondholder Services Corporation] has been appointed the exchange agent for the exchange offers and consent solicitations. Consents and Letters of Transmittal and all correspondence in connection with the exchange offers and consent solicitations should be sent or delivered by each holder of Existing Notes, or a beneficial owner's custodian bank, depositary, broker, trust company or other nominee, to the Exchange Agent at the addresses and telephone numbers set forth on the back cover of this Offering Memorandum. The Offerors will pay the Exchange Agent reasonable compensation for its services and will reimburse it for certain reasonable expenses in connection therewith. The Offerors have agreed to indemnify the Exchange Agent against certain liabilities, including liabilities arising under the federal securities laws.

**Information Agent**

[Global Bondholder Services Corporation] has also been appointed as the information agent for the exchange offers and consent solicitations, and will receive reasonable compensation for its services. Questions concerning exchange procedures and requests for additional copies of this Offering Memorandum or the Consent and Letter of Transmittal should be directed to the Information Agent at the address and telephone numbers set forth on the back cover of this Offering Memorandum. Holders of Existing Notes may also contact their custodian bank, depositary, broker, trust company or other nominee for assistance concerning the exchange offers and consent solicitations. The Offerors will pay the Information Agent reasonable compensation for its services and will reimburse it for certain reasonable expenses in connection therewith. The Offerors have agreed to indemnify the Information Agent against certain liabilities, including liabilities arising under federal securities laws.

**Dealer Managers and Solicitation Agents**

The Offerors have retained [Citigroup Global Markets Inc.] to act as the dealer managers in connection with the exchange offers, including as solicitation agents in connection with the consent solicitations. The Offerors will pay the Dealer Managers reasonable compensation for soliciting tenders in the exchange offers. The Offerors will also reimburse the Dealer Managers for certain reasonable expenses. The obligations of the Dealer Managers to perform such functions are subject to certain conditions. The Offerors have agreed to indemnify the Dealer Managers against certain liabilities, including liabilities under the federal securities laws.

From time to time, the Dealer Managers and their respective affiliates have provided, and may in the future provide from time to time, investment banking and commercial banking services and financial advisory services to us for which they have in the past received, and may in the future receive, customary fees.

An affiliate of Citigroup Global Markets Inc. is the administrative agent and collateral agent for TCEH's Senior Secured Credit Facilities. Affiliates of Citigroup Global Markets Inc. are co-documentation agents for the Oncor Revolving Credit Facility.

In the ordinary course of their respective businesses, the Dealer Managers or their respective affiliates may at any time hold long or short positions, and may trade for their own accounts or the accounts of customers, in securities of the Offerors and their subsidiaries, including any of the Existing Notes or the New Notes, and, to the extent that the Dealer Managers or their respective affiliates own Existing Notes during the exchange offers and consent solicitations, they may tender such Existing Notes pursuant to the terms of the exchange offers and consent solicitations.

Confidential

EFIHMW00053160

EFIHMW00053083

**PX 070**
**Page 78 of 203**

## DESCRIPTION OF THE NEW NOTES

**General**

Certain terms used in this "Description of the New Notes" are defined under the subheading "Certain Definitions." In this "Description of the New Notes," (i) the terms "we," "our" and "us" each refer to Energy Future Intermediate Holding Company LLC ("EFIH") and its consolidated Subsidiaries; and (ii) the term "Issuer" refers to EFIH and EFIH Finance Inc. ("EFIH Finance"), a Delaware corporation and a direct, wholly-owned subsidiary of EFIH, collectively and not to any of EFIH's other Subsidiaries.

The Issuer issued $2.180 billion aggregate principal amount of 10.000% Senior Secured Notes due 2020 (the "Existing EFIH 2020 Notes") under an Indenture dated as of August 17, 2010 (the "Base Indenture") between the Issuer and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Trustee").

The Issuer will issue up to $[___] [billion] aggregate principal amount of additional 10.000% Senior Secured Notes due 2020 (the "New EFIH 2020 Notes" and, together with the Existing EFIH 2020 Notes, the "Notes") under the Base Indenture, as supplemented by a supplemental indenture to the Base Indenture between the Issuer and the Trustee (together with the Base Indenture, the "Indenture") in the Exchange Offer.

The New EFIH 2020 Notes are Additional Notes (as defined below) under the Indenture, and will have identical terms and conditions as, and form a single series and vote together as a single class with, the Existing EFIH 2020 Notes, except that (i) the New EFIH 2020 Notes will be issued on the date the Exchange Offer is consummated (the "Exchange Date"), (ii) interest on the New EFIH 2020 Notes payable on June 1, 2013 will accrue only from the Exchange Date, and (iii) (a) the New EFIH 2020 Notes have not been registered under the Securities Act and, therefore, will bear legends restricting their transfer and will be subject to registration rights under the Registration Rights Agreement relating to the New EFIH 2020 Notes, dated as of the date the New EFIH 2020 Notes are issued, among the Issuer and the holders listed therein (the "Registration Rights Agreement"), and (b) until the exchange offer under the Registration Rights Agreement is completed or a shelf registration statement has been filed and has been declared effective for the New EFIH 2020 Notes, the New EFIH 2020 Notes will have different CUSIP and ISIN numbers than those of the Existing EFIH 2020 Notes and will not be fungible for trading purposes with the Existing EFIH 2020 Notes. The New EFIH 2020 Notes will be issued in a private transaction that is not subject to the registration requirements of the Securities Act. See "Notice to Investors." The terms of the New EFIH 2020 Notes will include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act.

As more particularly described under "The Transactions—Ring-Fencing," upon the consummation of the Merger in 2007, Oncor Electric Delivery Company LLC ("Oncor Electric Delivery") undertook certain ring-fencing measures to separate itself, its subsidiaries and its immediate parent, Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings"), from Energy Future Holdings Corp. ("EFH Corp."), the parent of EFIH, and EFH Corp.'s other Affiliates, including the Issuer. Those measures include the Oncor Subsidiaries being treated as "Unrestricted Subsidiaries" with respect to the EFH Corp. 2017 Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, in each case guaranteed by EFIH and Energy Future Competitive Holdings Company ("EFCH") and the EFIH 9.75% Notes, the Existing EFIH 2020 Notes, the EFIH 11% Notes, the EFIH 11.750% Notes, the EFIH 6.875% Notes and the EFIH 11.25%/12.25% Toggle Notes. In order to comply with these ring-fencing obligations, the Oncor Subsidiaries will also be Unrestricted Subsidiaries with respect to the New EFIH 2020 Notes. As Unrestricted Subsidiaries, the Oncor Subsidiaries will not be subject to any of the covenants described herein and will not guarantee the Notes.

The Holders of the New EFIH 2020 Notes, by accepting the New EFIH 2020 Notes, will acknowledge (i) the legal separateness of the Issuer from the Oncor Subsidiaries, (ii) that the lenders under the Oncor Electric Delivery Facility and the holders of Oncor Electric Delivery's existing debt instruments have likely advanced funds thereunder in reliance upon the separateness of the Oncor Subsidiaries from the Issuer, (iii) that the Oncor Subsidiaries have assets and liabilities that are separate from those of the Issuer and EFIH's other Subsidiaries, (iv) that the obligations owing under the New EFIH 2020 Notes are obligations and liabilities of the Issuer only, and are not the obligations or liabilities of any Oncor Subsidiary, (v) that the Holders of the New EFIH 2020 Notes shall look solely to the Issuer and its assets, and not to any assets, or to the pledge of any assets, owned by any Oncor Subsidiary, for the repayment of any amounts payable pursuant to the New EFIH 2020 Notes and for satisfaction of any other obligations owing to the Holders under the Indenture, the Registration Rights Agreement and any related documents and (vi) that none of the Oncor Subsidiaries shall be personally liable to the Holders of

65

EFIHMW00053161

EFIHMW00053083

**PX 070**
**Page 79 of 203**

the New EFIH 2020 Notes for any amounts payable, or any other obligation, under the Indenture, the Registration Rights Agreement or any related documents.

The Holders of the New EFIH 2020 Notes, by accepting the New EFIH 2020 Notes, will acknowledge and agree that the Holders of the New EFIH 2020 Notes shall not (i) initiate any legal proceeding to procure the appointment of an administrative receiver or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against any Oncor Subsidiary, or against any of the Oncor Subsidiaries' assets. The Holders of the New EFIH 2020 Notes further acknowledge and agree that each of the Oncor Subsidiaries is a third party beneficiary of the forgoing covenant and shall have the right to specifically enforce such covenant in any proceeding at law or in equity. The foregoing acknowledgements and agreements are contained in the Indenture.

The following description is only a summary of the material provisions of the Indenture and the Security Documents, does not purport to be complete and is qualified in its entirety by reference to the provisions of the Indenture and the Security Documents, including the definitions therein of certain terms used below. We urge you to read the Indenture and the Security Documents because they, and not this description, will define your rights as Holders of the New EFIH 2020 Notes. You may request copies of the Indenture and the Security Documents at our address set forth under the heading "Available Information."

## No Restricted Subsidiaries

EFIH is a holding company for its Subsidiaries, including EFIH Finance, with no material operations of its own and only limited assets. EFIH does not have any Restricted Subsidiaries (other than EFIH Finance). As of the date of this offering memorandum, the only Subsidiaries of EFIH consist of the Oncor Subsidiaries, which are Unrestricted Subsidiaries, and EFIH Finance, which does not have any Subsidiaries or assets. Accordingly, none of EFIH's Subsidiaries (other than EFIH Finance) will be subject to the restrictive covenants described herein and none of such Subsidiaries will guarantee the Notes.

## Brief Description of Notes

The Notes are:

- senior obligations of the Issuer and will rank equally in right of payment with all existing and future Senior Indebtedness of the Issuer (including EFIH's guarantees of certain of EFH Corp.'s Indebtedness, including the EFH Corp. 9.75% Notes, the EFH Corp. 10.000% Notes and the EFH Corp. 2017 Notes);

- secured, equally and ratably with the EFIH 9.75% Notes, the EFIH 6.875% Notes and EFIH's guarantee of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, by the pledge of all of the membership interests and other investments EFIH owns in any Oncor Subsidiary (which is referred to as the "*Collateral*") as more fully described below under "—Security for the Notes"), which consist of all of the membership interests EFIH owns in Oncor Holdings;

- effectively senior to all existing and future unsecured Indebtedness of EFIH (including the 11.25%/12.25% Toggle Notes) and all existing and future Junior Lien Debt (including the EFIH 11% Notes and the EFIH 11.750% Notes), to the extent of the value of the Collateral;

- effectively subordinated to any existing and future Indebtedness of EFIH secured by assets of EFIH other than the Collateral, to the extent of the value of the assets securing such Indebtedness;

- structurally subordinated to all existing and future Indebtedness and other liabilities of the Subsidiaries of EFIH (other than EFIH Finance), including the Oncor Subsidiaries, any of EFIH's Foreign Subsidiaries and any other Unrestricted Subsidiaries;

- senior in right of payment to any future Subordinated Indebtedness of the Issuer; and

- in the case of the New EFIH 2020 Notes only, subject to registration with the SEC to the extent required by the Registration Rights Agreement.

See *[NTD: all risk factors cross-references to be confirmed]* "Risk Factors—Risks Related to the Exchange Offers and the New Notes and Our Substantial Indebtedness—If a court were to find that EFIH was insolvent before or after giving effect to the Exchange Offer and did not receive reasonably equivalent value or fair consideration for the issuance of the New Notes or the pledge of the Collateral, as applicable, the court may void all or a portion of the obligations represented by the New Notes or the pledge of the Collateral as a fraudulent conveyance."

66

Confidential                                                                 EFIHMW00053162

EFIHMW00053083

**PX 070**
**Page 80 of 203**

## Holding Company Structure

EFIH is a holding company for its Subsidiaries, including EFIH Finance, with no material operations of its own and only limited assets. Accordingly, EFIH is dependent upon the distribution of the earnings of its Subsidiaries, whether in the form of dividends, advances or payments on account of intercompany obligations, payments of interest and principal on EFH Corp. and TCEH debt held as an investment by EFIH, and investments into, or loans to, EFIH by its parent company, EFH Corp., to service its debt obligations. EFH Corp. is itself a holding company, and will primarily be dependent upon the distribution of the earnings of its other Subsidiaries (including TCEH and its Subsidiaries), whether in the form of dividends, advances or payments on account of intercompany obligations, and investments into EFH Corp. by its parent company, Texas Energy Future Holdings Limited Partnership, to make such Investments in EFIH. See "Risk Factors—Risks Related to Structure— EFIH is a holding company and its obligations are structurally subordinated to existing and future liabilities and preferred stock of its subsidiaries."

There will be no initial guarantees of the Notes. Therefore, the Notes are structurally subordinated to all Indebtedness and other liabilities of all the Subsidiaries of EFIH (other than EFIH Finance). In the event of a bankruptcy, liquidation or reorganization of any of EFIH's Subsidiaries (other than EFIH Finance), such Subsidiaries will pay the holders of their debt and their trade creditors before they will be able to distribute any of their assets to EFIH. For the year ended December 31, 2011 and the nine months ended September 30, 2012, EFIH's Subsidiaries generated a significant amount of EFIH's reported consolidated net income. In addition, at December 31, 2011 and at September 30, 2012, EFIH's investment in its Subsidiaries (other than EFIH Finance) represented approximately 60% and 52%, respectively, of its reported total assets and investments in EFH Corp. debt (the substantial majority of which is guaranteed by EFIH) and TCEH debt represented substantially all of the remainder of its reported total assets.

## Paying Agent and Registrar for the Notes

The Issuer will maintain one or more paying agents for the Notes. The initial paying agent for the Notes is the Trustee at its offices in Houston, Texas.

The Issuer will also maintain a registrar for the Notes. The initial registrar for the Notes is the Trustee at its offices in Houston, Texas. The registrar will maintain a register reflecting ownership of the Notes outstanding from time to time and will make payments on and facilitate transfer of Notes on behalf of the Issuer.

The Issuer may change the paying agents or the registrars without prior notice to the Holders. The Issuer or any of its Subsidiaries may act as a paying agent or registrar.

## Transfer and Exchange

A Holder may transfer or exchange Notes in accordance with the Indenture. The registrar and the Trustee may require a Holder to furnish appropriate endorsements and transfer documents in connection with a transfer of Notes. Holders will be required to pay all taxes due on transfer. The Issuer will not be required to transfer or exchange any Note selected for redemption. Also, the Issuer will not be required to transfer or exchange any Note for a period of 15 days before a selection of Notes to be redeemed.

## Principal, Maturity and Interest

The Issuer issued $2.180 billion aggregate principal amount of Existing EFIH 2020 Notes on August 17, 2010. The Issuer will issue up to $[___] [billion] in aggregate principal amount of New EFIH 2020 Notes in the Exchange Offer. The Notes will mature on December 1, 2020. Subject to compliance with the covenants described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "—Certain Covenants—Limitation on Liens," the Issuer may issue additional Notes from time to time under the Indenture (any such Notes, the "*Additional Notes*"). Except as otherwise described in this "Description of the New Notes," the Notes and any Additional Notes under the Indenture will be treated as a single class for all purposes under the Indenture, including waivers, amendments and offers to purchase. Unless the context requires otherwise, references to "Notes" for all purposes of the Indenture and this "Description of the New Notes" include any Additional Notes that are actually issued.

Interest on the Notes will accrue at the rate of 10.000% per annum and will be payable semi-annually in arrears on each June 1 and December 1, commencing on December 1, 2010, to the Holders of record on the immediately preceding May 15 and November 15. Interest on the New EFIH 2020 Notes will accrue from the most recent date to which interest has been

67

EFIHMW00053163

EFIHMW00053083

PX 070
Page 81 of 203

paid or, if no interest has been paid, from and including the Issue Date. Interest on the Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months.

Principal of, premium, if any, and interest on the Notes will be payable at the office or agency of the Issuer maintained for such purpose within the City of Houston and State of Texas or, at the option of the Issuer, payment of interest may be made by check mailed to the Holders of the Notes at their respective addresses set forth in the register of Holders; *provided* that all payments of principal, premium, if any, and interest with respect to the Notes represented by one or more global notes registered in the name of or held by DTC or its nominee will be made by wire transfer of immediately available funds to the accounts specified by the Holder or Holders thereof. Until otherwise designated by the Issuer, the Issuer's office or agency in Houston, Texas will be the office of the Trustee maintained for such purpose.

**Additional Interest**

Additional interest may accrue on the New EFIH 2020 Notes in certain circumstances pursuant to the Registration Rights Agreement.

**Mandatory Redemption; Offers to Purchase; Open Market Purchases**

The Issuer will not be required to make any mandatory redemption or sinking fund payments with respect to the Notes. However, under certain circumstances, the Issuer may be required to offer to purchase Notes as described under "— Repurchase at the Option of Holders." The Issuer may at any time and from time to time purchase Notes in the open market or otherwise.

**Optional Redemption**

Except as set forth below, the Issuer will not be entitled to redeem Notes at its option prior to December 1, 2015.

At any time prior to December 1, 2015, the Issuer may redeem the Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Notes to be redeemed or otherwise in accordance with the procedures of DTC, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest to, the date of redemption (the "*Redemption Date*"), subject to the rights of Holders of such Notes on the relevant record date to receive interest due on the relevant interest payment date.

On and after December 1, 2015, the Issuer may redeem the Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Notes to be redeemed or otherwise in accordance with the procedures of DTC, at the redemption prices (expressed as percentages of principal amount of the Notes to be redeemed) set forth below, plus accrued and unpaid interest to the applicable Redemption Date, subject to the right of Holders of such Notes of record on the relevant record date to receive interest due on the relevant interest payment date, if redeemed during the twelve-month period beginning on December 1 of each of the years indicated below:

| Year | Percentage |
|------|-----------|
| 2015 | 105.000% |
| 2016 | 103.333% |
| 2017 | 101.667% |
| 2018 and thereafter | 100.000% |

In addition, until December 1, 2013, the Issuer may, at its option, on one or more occasions redeem up to 35% of the aggregate principal amount of Notes at a redemption price equal to 110.000% of the aggregate principal amount thereof, plus accrued and unpaid interest to the applicable Redemption Date, subject to the right of Holders of Notes of record on the relevant record date to receive interest due on the relevant interest payment date, with the net cash proceeds of one or more Equity Offerings; *provided* that at least 50% of the sum of the original aggregate principal amount of Notes issued under the Indenture and the original principal amount of any Additional Notes issued under the Indenture after the Issue Date remains outstanding immediately after the occurrence of each such redemption; and *provided, further* that each such redemption occurs within 90 days of the date of closing of each such Equity Offering.

68

Confidential

EFIHMW00053164

EFIHMW00053083

**PX 070**
**Page 82 of 203**

Any notice of any redemption may be given prior to the redemption thereof, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of an Equity Offering or other corporate transaction.

If the Issuer redeems less than all of the outstanding Notes, the Trustee shall select the Notes to be redeemed in the manner described under "—Repurchase at the Option of Holders—Selection and Notice."

**Security for the Notes**

*Collateral Trustee*

EFIH has appointed The Bank of New York Mellon Trust Company, N.A. to serve as the collateral trustee (the "*Collateral Trustee*") for the benefit of the holders of the Secured Debt Obligations outstanding from time to time.

The Security Documents provide that the Collateral Trustee will be subject to such directions as may be given it by the Trustee and by any other Parity Lien Debt Representatives from time to time as required or permitted by the Indenture and the other Parity Lien Debt Documents. The relative rights with respect to control of the Collateral Trustee are specified in the collateral trust agreement dated as of November 16, 2009 by and among EFIH, the trustees for the Notes, the EFIH 9.75% Notes, the EFIH 6.875% Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, any other Parity Lien Debt Representatives, any Junior Lien Representatives and the Collateral Trustee (the "*Collateral Trust Agreement*"). On the Issue Date, the Collateral Trustee and the Trustee for the benefit of the Existing EFIH 2020 Notes entered into a Joinder (as defined in the Collateral Trust Agreement) to the Collateral Trust Agreement (the "*Joinder*") with respect to the Existing EFIH 2020 Notes, and designated the Existing EFIH 2020 Notes as "Parity Lien Debt" under the Collateral Trust Agreement. The New EFIH 2020 Notes will also be designated as "Parity Lien Debt" pursuant to an Additional Secured Debt Designation as defined in and as required by the Collateral Trust Agreement (the "*Designation*"). Except as provided in the Collateral Trust Agreement or as directed by an Act of Required Debtholders, the Collateral Trustee will not be obligated:

(1) to act upon directions purported to be delivered to it by any other Person;

(2) to foreclose upon or otherwise enforce any Lien; or

(3) to take any other action whatsoever with regard to any or all of the Security Documents, the Liens created thereby or the Collateral.

*Collateral*

The Indenture and the Security Documents provide that all Note Obligations of EFIH, together with any other Parity Lien Debt (which as of the date of this offering memorandum includes the EFIH 9.75% Notes, the EFIH 6.875% Notes and EFIH's guarantee of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes), are secured on an equal and ratable basis by first-priority security interests granted to the Collateral Trustee, in all of the following property of EFIH:

(1) any Equity Interests it owned as of the Issue Date or may thereafter acquire in any Oncor Subsidiary and any promissory notes or other Indebtedness owed by, or other Investments in, any Oncor Subsidiary that it owned as of the Issue Date or it may thereafter acquire;

(2) all proceeds of, income and other payments (including, without limitation, dividends and distributions received) due and payable on the Issue Date or thereafter with respect to, and supporting obligations relating to, any and all of the foregoing, which, in the case of cash dividends and distributions received by EFIH from Oncor Holdings may be used by EFIH for any purpose not prohibited by the Indenture so long as no Event of Default and no event of default under any other Parity Lien Debt, including the EFIH 9.75% Notes and the EFIH 6.875% Notes and EFIH's guarantee of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, shall have occurred and be continuing; and

(3) any Asset Sale Cash Collateral Account established pursuant to the Indenture, the EFIH 9.75% Notes Indenture, the EFIH 6.875% Notes Indenture, the EFH Corp. 10.000% Notes Indenture or the EFH Corp. 9.75% Notes Indenture.

The Collateral consists of a pledge of all of the membership interests EFIH owns in Oncor Holdings. Oncor Holdings owns approximately 80% of Oncor Electric Delivery's outstanding membership interests. On November 16, 2009,

69

EFIHMW00053165

EFIHMW00053083

**PX 070**
**Page 83 of 203**

EFIH and the Collateral Trustee entered into a pledge agreement (the "*Pledge Agreement*"), whereby the Collateral was pledged in favor of the Collateral Trustee for the benefit of the Collateral Trustee, the trustee for, and the holders of, the EFIH 9.75% Notes and the EFH Corp. 9.75% Notes and any other Secured Debt Obligations that may be issued in accordance with the EFIH 9.75% Notes Indenture and the EFH Corp. 9.75% Notes Indenture (including the Notes, the EFIH 6.875% Notes and the EFH Corp. 10.000% Notes). As a result of the Joinder and the Designation, the Trustee and the holders of the New EFIH 2020 Notes issued in the Exchange Offer will benefit from the pledge of Collateral under the Pledge Agreement. The Collateral does not consist of any assets of any Oncor Subsidiary. See "Risk Factors—Risks Related to the Exchange Offers, the New Notes and Our Substantial Indebtedness— The New Notes will be secured only to the extent of the value of the assets that have been granted as security for the New Notes. The fair market value of the Collateral upon any foreclosure may not be sufficient to repay the holders of the New Notes and all of the holders of other debt secured by a first-priority security interest in the Collateral."; "—Regulatory approvals may be required in order to enforce the security interests in the Collateral and to dispose of an interest in, or operational control of, the Collateral securing the New Notes"; and "—In the event of EFIH's bankruptcy, the ability to realize upon the Collateral securing the New Notes will be subject to certain bankruptcy law limitations."

No appraisal of the value of the Collateral was made in connection with the issuance of the EFIH 9.75% Notes, the EFIH 11% Notes, the EFIH 11.750% Notes, the Existing EFIH 2020 Notes, the EFIH 6.875% Notes, the EFH Corp. 9.75% Notes or the EFH Corp. 10.000% Notes, and no such appraisal will be made in connection with the issuance of the New EFIH 2020 Notes. The value of the Collateral in the event of liquidation will depend on many factors. Consequently, liquidating the Collateral may not produce proceeds in an amount sufficient to pay any amounts due on the Secured Debt Obligations, including the Notes.

The fair market value of the Collateral is subject to fluctuations based on factors that include, among others, the ability to sell the Collateral in an orderly sale, general economic conditions, the availability of buyers and similar factors. The amount to be received upon a sale of the Collateral would be dependent on numerous factors, including but not limited to the actual fair market value of the Collateral at such time and the timing and the manner of the sale. By its nature, the Collateral may be illiquid and may have no readily ascertainable market value. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, we cannot assure you that the proceeds from any sale or liquidation of the Collateral will be sufficient to pay the Parity Lien Obligations, including the Note Obligations. Any claim for the difference between the amount, if any, realized by Holders of the Notes from the sale of Collateral securing the Secured Debt Obligations will rank equally in right of payment with all of our other unsecured unsubordinated Indebtedness and other obligations, including trade payables.

So long as no Event of Default and no event of default under any other Parity Lien Debt, including the EFIH 9.75% Notes, the EFIH 6.875% Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, shall have occurred and be continuing, and subject to certain terms and conditions, EFIH will be entitled to exercise any voting and other consensual rights pertaining to the Collateral (other than as set forth in the Pledge Agreement and the other Security Documents). The Pledge Agreement requires EFIH to deliver to the Collateral Trustee, for the Collateral Trustee to maintain in its possession, certificates, if any, evidencing the Collateral. Upon the occurrence and during the continuance of an Event of Default under the Notes, to the extent permitted by law and subject to the provisions of the Pledge Agreement, all of the rights of EFIH to exercise voting or other consensual rights with respect to the Collateral will cease, and all such rights will become vested in the Collateral Trustee, which, to the extent permitted by law, will have the sole right to exercise such voting and other consensual rights.

**Certain Bankruptcy Limitations**

The right of the Collateral Trustee to repossess and dispose of the Collateral upon the occurrence of an Event of Default would be significantly impaired by applicable bankruptcy law in the event that a bankruptcy case were to be commenced by or against EFIH prior to the Collateral Trustee having repossessed and disposed of the Collateral. Upon the commencement of a case for relief under Title 11 of the United States Code, as amended (the "*Bankruptcy Code*"), a secured creditor such as the Collateral Trustee is prohibited from repossessing its security from a debtor in a bankruptcy case, or from disposing of security repossessed from the debtor, without bankruptcy court approval.

In view of the broad equitable powers of a U.S. bankruptcy court, it is impossible to predict how long payments under the Notes could be delayed following commencement of a bankruptcy case, whether or when the Collateral Trustee could repossess or dispose of the Collateral, the value of the Collateral at the time of the bankruptcy petition or whether or to what extent Holders of the Notes would be compensated for any delay in payment or loss of value of the Collateral. The Bankruptcy Code permits only the payment and/or accrual of post-petition interest, costs and attorneys' fees to a secured creditor during a debtor's bankruptcy case to the extent the value of the Collateral is determined by the bankruptcy court to

70

EFIHMW00053166

EFIHMW00053083

exceed the aggregate outstanding principal amount at maturity of the obligations secured by the Collateral. There can be no assurance that the value of the Collateral will exceed the outstanding principal amount of the Notes and the other Parity Lien Debt, including the EFIH 9.75% Notes, the EFIH 6.875% Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes.

Furthermore, in the event a bankruptcy court determines that the value of the Collateral is not sufficient to repay all amounts due on the Notes and the other Parity Lien Obligations, including the EFIH 9.75% Notes, the EFIH 6.875% Notes and EFIH's guarantee of the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes, the Holders of the Notes and the holders of the other Parity Lien Debt would hold secured claims to the extent of the value of the Collateral to which the Holders of the Notes and the holders of the other Parity Lien Debt are entitled, and unsecured claims with respect to any such shortfall.

*Additional Parity Lien Debt*

As of the date of this offering memorandum, $4,000,000,000 aggregate principal amount of Parity Lien Debt was outstanding, including $115,446,000 aggregate principal amount of EFH Corp. 9.75% Notes, $1,060,757,000 aggregate principal amount of EFH Corp. 10.000% Notes, $141,083,000 aggregate principal amount of EFIH 9.75% Notes, $502,714,000 aggregate principal amount of EFIH 6.875% Notes and $2,180,000,000 aggregate principal amount of Existing EFIH 2020 Notes, all of which is secured by the Collateral on an equal and ratable basis with the New EFIH 2020 Notes. In addition, the Indenture and the Security Documents provide that the Issuer may incur additional Parity Lien Debt as permitted by the covenants described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "—Certain Covenants—Limitation on Liens," by issuing Additional Notes under the Indenture or under one or more additional indentures or incurring other Indebtedness secured by Parity Liens on the Collateral. All additional Parity Lien Debt will be secured equally and ratably with the Notes by Liens on the Collateral held by the Collateral Trustee for as long as EFIH's Note Obligations are secured by the Collateral. The Collateral Trustee under the Collateral Trust Agreement will hold all Parity Liens in trust for the benefit of the Holders of the Notes and the holders of the other Parity Lien Debt and the holders of any future Parity Lien Debt and all other Parity Lien Obligations. Additional Parity Lien Debt will be permitted to be secured by the Collateral only if such Parity Lien Debt and the related Parity Liens are permitted to be incurred under the covenants described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "—Certain Covenants—Limitation on Liens." The agent or representative of any additional Parity Lien Debt will become a party to the Collateral Trust Agreement by joinder agreement.

*Additional Junior Lien Debt*

As of the date of this offering memorandum, $2,155,392,000 aggregate principal amount of Junior Lien Debt was outstanding (including the EFIH 11% Notes and the EFIH 11.750% Notes). In addition, the Indenture and the Security Documents provide that the Issuer may incur additional Junior Lien Debt in the future by issuing or guaranteeing debt securities under one or more additional indentures, incurring Indebtedness under Credit Facilities or otherwise issuing or increasing a new Series of Secured Lien Debt secured by Junior Liens on the Collateral. Junior Lien Debt will be permitted to be secured by the Collateral only if such Junior Lien Debt and the related Junior Liens are permitted to be incurred under the covenants described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "—Certain Covenants—Limitation on Liens." The Collateral Trustee under the Collateral Trust Agreement will hold all Junior Liens in trust for the benefit of the holders of any future Junior Lien Debt and all other Junior Lien Obligations. The agent or representative of any additional Junior Lien Obligations will become a party to the Collateral Trust Agreement by joinder agreement.

*Enforcement of Liens*

If the Collateral Trustee at any time receives written notice stating that any event has occurred that constitutes a default under any Secured Debt Document entitling the Collateral Trustee to foreclose upon, collect or otherwise enforce its Liens thereunder, it will promptly deliver written notice thereof to each Secured Debt Representative. Thereafter, the Collateral Trustee will await direction by an Act of Required Debtholders and will act, or decline to act, as directed by an Act of Required Debtholders, in the exercise and enforcement of the Collateral Trustee's interests, rights, powers and remedies in respect of the Collateral or under the Security Documents or applicable law and, following the initiation of such exercise of remedies, the Collateral Trustee will act, or decline to act, with respect to the manner of such exercise of remedies as directed by an Act of Required Debtholders. Unless it has been directed to the contrary by an Act of Required Debtholders, the

71

EFIHMW00053167

EFIHMW00053083

Collateral Trustee in any event may (but will not be obligated to) take or refrain from taking such action with respect to any default under any Secured Debt Document as it may deem advisable to preserve and protect the value of the Collateral.

Until the Discharge of Parity Lien Obligations, the Holders of the Notes and the holders of other Parity Lien Obligations will have, subject to the exceptions set forth below in clauses (1) through (4), the exclusive right to authorize and direct the Collateral Trustee with respect to the Security Documents and the Collateral (including, without limitation, the exclusive right to authorize or direct the Collateral Trustee to enforce, collect or realize on any Collateral or exercise any other right or remedy with respect to the Collateral) and neither the provisions of the Security Documents relating thereto (other than in accordance with the Collateral Trust Agreement) nor any Junior Lien Representative or holder of Junior Lien Obligations, if any, may authorize or direct the Collateral Trustee with respect to such matters. Notwithstanding the foregoing, the holders of Junior Lien Obligations may direct the Collateral Trustee with respect to such matters:

    (1)   without any condition or restriction whatsoever, at any time after the Discharge of Parity Lien Obligations;

    (2)   to deliver any notice or demand necessary to enforce (subject to the prior Discharge of Parity Lien Obligations) any right to claim, take or receive proceeds of Collateral remaining after the Discharge of Parity Lien Obligations;

    (3)   as necessary to perfect or establish the priority (subject to Parity Liens) of the Junior Liens upon any Collateral; provided that, unless otherwise agreed to by the Collateral Trustee in the Security Documents, the holders of Junior Lien Obligations may not require the Collateral Trustee to take any action to perfect any Collateral through possession or control (other than the Collateral Trustee as agent for the benefit of the Parity Lien Representative and holders of the Parity Lien Obligations agreeing pursuant to the Collateral Trust Agreement to act as bailee for the Collateral Trustee as agent for the benefit of the Junior Lien Representatives and holders of the Junior Lien Obligations); or

    (4)   as necessary to create, prove, preserve or protect (but not enforce) the Junior Liens upon any Collateral.

Both before and during an insolvency or liquidation proceeding until the Discharge of Parity Lien Obligations, none of the holders of Junior Lien Obligations, the Collateral Trustee (unless acting pursuant to an Act of Required Debtholders) or any Junior Lien Representative will be permitted to:

    (1)   request judicial relief, in an insolvency or liquidation proceeding or in any other court, that would hinder, delay, limit or prohibit the lawful exercise or enforcement of any right or remedy otherwise available to the holders of Parity Lien Obligations in respect of the Parity Liens or that would limit, invalidate, avoid or set aside any Parity Lien or subordinate the Parity Liens to the Junior Liens or grant the Junior Liens equal ranking to the Parity Liens;

    (2)   oppose or otherwise contest any motion for (A) relief from the automatic stay or (B) any injunction against foreclosure or (C) any enforcement of Parity Liens, in each case made by any holder of Parity Lien Obligations or any Parity Lien Representative in any insolvency or liquidation proceeding;

    (3)   oppose or otherwise contest any lawful exercise by any holder of Parity Lien Obligations or any Parity Lien Representative of the right to credit bid Parity Lien Obligations at any sale of Collateral in the foreclosure of Parity Liens;

    (4)   oppose or otherwise contest any other request for judicial relief made in any court by any holder of Parity Lien Obligations or any Parity Lien Representative relating to the lawful enforcement of any Parity Lien; or

    (5)   challenge the validity, enforceability, perfection or priority of the Parity Liens with respect to the Collateral.

Notwithstanding the foregoing, both before and during an insolvency or liquidation proceeding, the holders of Junior Lien Obligations or Junior Lien Representatives may take any actions and exercise any and all rights that would be available to a holder of unsecured claims, including, without limitation, the commencement of an insolvency or liquidation proceeding against EFIH in accordance with applicable law; *provided* the Collateral Trust Agreement provides that no holder of Junior Lien Obligations or Junior Lien Representative will be permitted to take any of the actions prohibited by clauses (1) through (5) of the preceding paragraph or oppose or contest any order that it has agreed not to oppose or contest under the provisions described under "—Insolvency or Liquidation Proceedings."

Confidential

EFIHMW00053168

EFIHMW00053083

**PX 070**
**Page 86 of 203**

At any time prior to the Discharge of Parity Lien Obligations and after (1) the commencement of any insolvency or liquidation proceeding in respect of EFIH or (2) the Collateral Trustee and each Junior Lien Representative have received written notice from any Parity Lien Representative stating that (A) any Series of Parity Lien Debt has become due and payable in full (whether at maturity, upon acceleration or otherwise) or (B) the holders of Parity Liens securing one or more Series of Parity Lien Debt have become entitled under any Parity Lien Document to and desire to enforce any or all of the Parity Liens by reason of a default under such Parity Lien Documents, no payment of money (or the equivalent of money) will be made from the proceeds of Collateral by EFIH to the Collateral Trustee (other than distributions to the Collateral Trustee in respect of its fees under the Collateral Trust Agreement and for the benefit of the holders of Parity Lien Obligations), any Junior Lien Representative or any holder of Junior Lien Obligations (including, without limitation, payments and prepayments made for application to Junior Lien Obligations).

All proceeds of Collateral received by any Junior Lien Representative or any holder of Junior Lien Obligations in violation of the immediately preceding paragraph will be held by such Person in trust for the account of the holders of Parity Lien Obligations and remitted to any Parity Lien Representative upon demand by such Parity Lien Representative. The Junior Liens will remain attached to and, subject to the provisions described under "—Provisions of the Indenture Relating to Security—Ranking of Parity Liens," enforceable against all proceeds so held or remitted. All proceeds of Collateral received by any Junior Lien Representative or any holder of Junior Lien Obligations not in violation of the immediately preceding paragraph will be received by such Person free from the Parity Liens.

*[Gibson Dunn/EFH to advise as to appropriate PUCT disclosure, if any]* [Pursuant to the Public Utility Regulatory Act ("*PURA*"), Texas Utilities Code §§39.262(l) and 39.915 and, through October 10, 2012, to the Order on Rehearing in PUCT Docket No. 34077, the Public Utility Commission of Texas (the "*PUCT*") must approve any change in majority ownership, controlling ownership or operational control of Oncor Electric Delivery. As a result, prior to any foreclosure on the Collateral consisting of membership interests in Oncor Holdings, approval of the PUCT will be required if such foreclosure consists of a change in majority ownership or control of Oncor Holdings. Pursuant to PURA §§39.262(m) and 39.915(b), the PUCT will approve such a transfer if it finds that the transaction is in the public interest. In making its determination, these sections of PURA provide that the PUCT will consider whether the transaction will adversely affect the reliability of service, availability of service or cost of service of Oncor Electric Delivery. We cannot assure you that such approval will be granted and, if it is not granted, the Collateral Trustee may not be able to liquidate the Collateral consisting of membership interests and, accordingly, the Collateral Trustee may not be able to distribute any proceeds to Holders of the Notes upon such foreclosure. If the approval is granted, then PUCT approval would also be required with respect to any subsequent disposition of a majority or controlling interest in the membership interests of Oncor Holdings.]

In addition, pursuant to the terms of an investor rights agreement among EFH Corp., Oncor Holdings, Oncor Electric Delivery and the minority investor in Oncor Electric Delivery, a transfer of the Equity Interests in Oncor Holdings to a third party, including as a result of any enforcement of the Lien on the Collateral consisting of Equity Interests of Oncor Holdings or Oncor Electric Delivery, may give rise to a tag-along right of the minority investor(s) in Oncor Electric Delivery to participate in that transfer on a pro rata basis.

*Waiver of Right of Marshalling*

The Collateral Trust Agreement provides that, prior to the Discharge of Parity Lien Obligations, the holders of Junior Lien Obligations, each Junior Lien Representative and the Collateral Trustee may not assert or enforce any right of marshalling accorded to a junior lienholder, as against the holders of Parity Lien Obligations and the Parity Lien Representatives (in their capacity as senior or priority lienholders) with respect to the Collateral. Following the Discharge of Parity Lien Obligations, the holders of Junior Lien Obligations and any Junior Lien Representative may assert their right under the Uniform Commercial Code or otherwise to any proceeds remaining following a sale or other disposition of Collateral by, or on behalf of, the holders of Parity Lien Obligations.

*Insolvency or Liquidation Proceedings*

If in any insolvency or liquidation proceeding and prior to the Discharge of Parity Lien Obligations, the holders of Parity Lien Obligations by an Act of Required Debtholders consent to any order:

(1) for use of cash collateral;

(2) approving a debtor-in-possession financing secured by a Lien that is senior to or on a parity with all Parity Liens upon any property of the estate in such insolvency or liquidation proceeding;

73

EFIHMW00053169

EFIHMW00053083

**PX 070**
**Page 87 of 203**

(3) granting any relief on account of Parity Lien Obligations as adequate protection (or its equivalent) for the benefit of the holders of Parity Lien Obligations in the Collateral; or

(4) relating to a sale of assets of EFIH that provides, to the extent the Collateral sold is to be free and clear of Liens, that all Parity Liens and Junior Liens will attach to the proceeds of the sale;

then, the holders of Junior Lien Obligations and the Junior Lien Representatives will not oppose or otherwise contest the entry of such order; *provided*, that the holders of Junior Lien Obligations or a Junior Lien Representative may request the grant to the Collateral Trustee, for the benefit of the holders of Junior Lien Obligations and the Junior Lien Representatives, of a Junior Lien upon any property on which a Lien is (or is to be) granted under such order to secure the Parity Lien Obligations, co-extensive in all respects with, but subordinated, as provided in the provisions described under "—Provisions of the Indenture Relating to Security—Ranking of Parity Liens," to, such Lien and all Parity Liens on such property. The holders of Parity Lien Obligations (including the Holders of the Notes) and the Parity Lien Representatives (including the Trustee) will agree not to oppose or otherwise contest in any respect any request made by the Junior Lien Representatives for a Junior Lien pursuant to the proviso to the preceding sentence.

Notwithstanding the foregoing, both before and during an insolvency or liquidation proceeding, the holders of Junior Lien Obligations and the Junior Lien Representatives may take any actions and exercise any and all rights that would be available to a holder of unsecured claims, including, without limitation, the commencement of insolvency or liquidation proceedings against EFIH in accordance with applicable law; *provided* that the Collateral Trust Agreement provides that no holder of Junior Lien Obligations or Junior Lien Representative will be permitted to take any of the actions prohibited under the third and fourth paragraphs of the provisions described under "—Enforcement of Liens," or oppose or contest any order that it has agreed not to oppose or contest under clauses (1) through (4) of the preceding paragraph.

Neither the holders of Junior Lien Obligations nor any Junior Lien Representative will file or prosecute in any insolvency or liquidation proceeding any motion for adequate protection (or any comparable request for relief) based upon their interest in the Collateral under the Junior Liens, except that:

(1) they may freely seek and obtain relief granting a Junior Lien co-extensive in all respects with, but subordinated, as provided in the provisions described under "—Provisions of the Indenture Relating to Security—Ranking of Parity Liens," to, all Liens granted in such insolvency or liquidation proceeding to, or for the benefit of, the holders of Parity Lien Obligations; and

(2) they may freely seek and obtain any relief upon a motion for adequate protection (or any comparable relief), without any condition or restriction whatsoever, at any time after the Discharge of Parity Lien Obligations.

*Order of Application*

The Collateral Trust Agreement provides that if any Collateral is sold or otherwise realized upon by the Collateral Trustee in connection with any foreclosure, collection or other enforcement of Liens granted to the Collateral Trustee in the Security Documents, the proceeds received by the Collateral Trustee from such foreclosure, collection or other enforcement will be distributed by the Collateral Trustee in the following order of application:

FIRST, to the payment of all amounts payable under the Collateral Trust Agreement on account of the Collateral Trustee's fees and any reasonable legal fees, costs and expenses or other liabilities of any kind incurred by the Collateral Trustee or any co-trustee or agent of the Collateral Trustee in connection with any Security Document;

SECOND, ratably to the respective Parity Lien Representatives for application, after payment of any fees and expenses (including but not limited to, attorney's fees and expenses) of such Parity Lien Representative, to the payment of all outstanding Notes and other Parity Lien Debt and any other Parity Lien Obligations that are then due and payable in such order as may be provided in the relevant Parity Lien Documents in an amount sufficient to pay in full in cash all outstanding Notes and other Parity Lien Debt and all other Parity Lien Obligations that are then due and payable (including all interest accrued thereon after the commencement of any insolvency or liquidation proceeding at the rate, including any applicable post-default rate, specified in the relevant Parity Lien Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding, and including the discharge or cash collateralization (at the lower of (1) 105% of the aggregate undrawn amount and (2) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the applicable Parity Lien Document) of all outstanding letters of credit constituting Parity Lien Debt);

74

Confidential

EFIHMW00053170

EFIHMW00053083

THIRD, to the respective Junior Lien Representatives for application to the payment of all outstanding Junior Lien Debt and any other Junior Lien Obligations that are then due and payable in such order as may be provided in the relevant Junior Lien Documents in an amount sufficient to pay in full in cash all outstanding Junior Lien Debt and all other Junior Lien Obligations that are then due and payable (including all interest accrued thereon after the commencement of any insolvency or liquidation proceeding at the rate, including any applicable post-default rate, specified in the relevant Junior Lien Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding, and including the discharge or cash collateralization (at the lower of (1) 105% of the aggregate undrawn amount and (2) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the applicable Junior Lien Document) of all outstanding letters of credit, if any, constituting Junior Lien Debt); and

FOURTH, any surplus remaining after the payment in full in cash of the amounts described in the preceding clauses will be paid to EFIH, or its successors or assigns, or as a court of competent jurisdiction may direct.

If any Junior Lien Representative or any holder of a Junior Lien Obligation collects or receives any proceeds in respect of any foreclosure, collection or other enforcement to which it was not entitled pursuant to the terms of the immediately preceding paragraphs, whether after the commencement of an insolvency or liquidation proceeding or otherwise, such Junior Lien Representative or such holder of a Junior Lien Obligation, as the case may be, will forthwith deliver the same to the Collateral Trustee to be applied in accordance with the provisions set forth in the immediately preceding paragraphs. Until so delivered, such proceeds will be held by that Junior Lien Representative or that holder of a Junior Lien Obligation, as the case may be, in trust for the benefit of the holders of the Parity Lien Obligations. These provisions will not apply to payments received by any holder of Junior Lien Obligations if such payments are not proceeds of, or the result of a realization upon, Collateral.

The provisions set forth above under this "Order of Application" caption are intended for the benefit of, and will be enforceable as a third party beneficiary by, each present and future holder of Secured Debt Obligations, each present and future Secured Debt Representative and the Collateral Trustee as holder of Parity Liens and Junior Liens. EFIH will be required to cause the Secured Debt Representative of each future Series of Secured Lien Debt to deliver a joinder to the Collateral Trust Agreement, including a Lien Sharing and Priority Confirmation, to the Collateral Trustee and each other Secured Debt Representative at the time of incurrence of such Series of Secured Lien Debt.

In connection with the application of proceeds in accordance with the provisions set forth above under this "Order of Application" caption, except as otherwise directed by an Act of Required Debtholders, the Collateral Trustee may sell any non-cash proceeds for cash prior to the application of the proceeds thereof.

*Release of Security Interests*

The Security Documents provide that the Collateral will be released:

1. in whole, upon (a) payment in full of all outstanding Secured Debt Obligations at the time such debt is paid in full and (b) termination or expiration of all commitments to extend credit under all Secured Debt Documents and the cancellation or termination or cash collateralization in an account maintained by the Collateral Trustee (at the lower of (1) 105% of the aggregate undrawn amount and (2) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the applicable Secured Debt Documents) of all outstanding letters of credit issued pursuant to any Secured Debt Documents; *provided* that the Issuer has delivered an Officer's Certificate to the Collateral Trustee certifying that the conditions described in this paragraph 1. have been met and that such release of the Collateral does not violate the terms of any applicable Secured Debt Document;

2. with respect to the Note Obligations only, upon satisfaction and discharge of the Indenture as set forth under "—Satisfaction and Discharge";

3. with respect to the Note Obligations only, upon a Legal Defeasance or Covenant Defeasance as set forth under "—Legal Defeasance and Covenant Defeasance";

4. with respect to the Note Obligations only, upon payment in full of the Notes and all other Note Obligations that are outstanding, due and payable at the time the Notes are paid in full;

75

EFIHMW00053171

EFIHMW00053083

5. with respect to any Secured Debt Obligations (other than Note Obligations) only, upon payment in full of such Secured Lien Debt and all other Secured Debt Obligations in respect thereof that is outstanding, due and payable at the time such Secured Lien Debt is paid in full;

6. as to a release of all or substantially all of the Collateral, if (a) consent to the release of that Collateral has been given by holders of 66⅔% of the aggregate principal amount of Parity Lien Debt at the time outstanding voting together as one class, as provided for in the applicable Secured Debt Documents; *provided* that if an Event of Default under the Notes or an event of default with respect to any other Secured Lien Debt has occurred and is continuing at the time of the solicitation of any such consent, the consent of holders of 66⅔% of the aggregate principal amount of Secured Lien Debt at the time outstanding voting together as one class shall also be required, and (b) EFIH has delivered an Officer's Certificate to the Collateral Trustee certifying that any such necessary consents have been obtained and that such release of the Collateral does not violate the terms of any applicable Secured Debt Document;

7. as to a release of less than all or substantially all of the Collateral, if (A) consent to the release of all Parity Liens (or, at any time after the Discharge of Parity Lien Obligations, consent to the release of all Junior Liens) on such Collateral has been given by holders of a majority of the aggregate principal amount of Parity Lien Debt at the time outstanding voting as one class, as provided for in the Parity Lien Documents (or, at any time after the Discharge of Parity Lien Obligations, holders of a majority of the aggregate principal amount of the Junior Lien Debt at the time outstanding voting together as one class, as provided for in the Junior Lien Documents) and (B) EFIH has delivered an Officer's Certificate to the Collateral Trustee certifying that any such necessary consents have been obtained and that such release of the Collateral does not violate the terms of any applicable Secured Debt Document;

8. as to any Collateral that is sold, transferred or otherwise disposed of by EFIH in a transaction or other circumstance that is not prohibited by the terms of any applicable Secured Debt Document, at the time of, or immediately prior to, such sale, transfer or other disposition; *provided* that EFIH has delivered an Officer's Certificate to the Collateral Trustee certifying that any such sale, transfer or other disposition does not violate the terms of any applicable Secured Debt Document; or

9. with respect to the Note Obligations only, in whole or in part, with the consent of the Holders of the requisite percentage of Notes in accordance with the provisions described under "—Amendment, Supplement and Waiver," and upon delivery of instructions and any other documentation, in each case as required by the Indenture and the Security Documents, in a form satisfactory to the Collateral Trustee.

Upon compliance by, and at the request of, EFIH with the conditions precedent set forth above, the Collateral Trustee will promptly cause to be released and reconveyed to EFIH the released Collateral.

*Amendment*

The Collateral Trust Agreement provides that no amendment or supplement to the provisions of the Collateral Trust Agreement or any other Security Document will be effective without the approval of the Collateral Trustee acting as directed by an Act of Required Debtholders, except that:

(1)    any amendment or supplement that has the effect solely of (a) adding or maintaining Collateral, securing additional Secured Lien Debt that was otherwise permitted by the terms of the Secured Debt Documents to be secured by the Collateral or preserving, perfecting or establishing the priority of the Liens thereon or the rights of the Collateral Trustee therein, (b) curing any ambiguity, defect or inconsistency; (c) providing for the assumption of the obligations of EFIH under any Security Document in the case of a merger or consolidation or sale of all or substantially all of the assets of EFIH; or (d) making any change that would provide any additional rights or benefits to the holders of Secured Debt Obligations, the Secured Debt Representatives or the Collateral Trustee or that does not adversely affect the legal rights under any Secured Debt Document of any holder of Secured Debt Obligations, the Secured Debt Representatives or the Collateral Trustee, will, in each case, become effective when executed and delivered by EFIH and the Collateral Trustee;

(2)    no amendment or supplement that reduces, impairs or adversely affects the right of any holder of Secured Debt Obligations:

(a) to vote its outstanding Secured Lien Debt as to any matter described as subject to an Act of Required Debtholders or direction by the Required Parity Lien Debtholders or Required Junior Lien

76

Confidential

EFIHMW00053172

EFIHMW00053083

**PX 070**
**Page 90 of 203**

Debtholders (or amends the provisions of this clause (2) or the definition of "Act of Required Debtholders," "Required Parity Lien Debtholders" or "Required Junior Lien Debtholders");

(b) to share in the order of application described under "—Order of Application" in the proceeds of enforcement of or realization on any Collateral that has not been released in accordance with the provisions described under "—Release of Security Interests"; or

(c) to require that Liens securing Secured Debt Obligations be released only as set forth in the provisions described under "—Release of Security Interests"

will become effective without the consent of the requisite percentage or number of holders of each Series of Secured Lien Debt so affected under the applicable Secured Debt Documents; and

(3)     no amendment or supplement that imposes any obligation upon the Collateral Trustee or any Secured Debt Representative or adversely affects the rights of the Collateral Trustee, as determined by the Collateral Trustee in its sole discretion, or any Secured Debt Representative, respectively, in its individual capacity as such will become effective without the consent of the Collateral Trustee or such Secured Debt Representative, respectively.

Notwithstanding the foregoing clause (1), but subject to clauses (2) and (3) above:

(1)     any Security Document that secures Junior Lien Obligations (but not Parity Lien Obligations) may be amended or supplemented with the approval of the Collateral Trustee acting as directed in writing by the Required Junior Lien Debtholders, unless such amendment or supplement would not be permitted under the terms of the Collateral Trust Agreement or the other Parity Lien Documents; and

(2)     any amendment or waiver of, or any consent under, any provision of the Collateral Trust Agreement or any other Security Document that secures Parity Lien Obligations (except any such amendment, waiver or consent that releases Collateral with respect to which any consent of holders of Junior Lien Debt is required pursuant to the Collateral Trust Agreement, which will be governed by the provisions set forth above) will apply automatically to any comparable provision of any comparable Junior Lien Document without the consent of or notice to any holder of Junior Lien Obligations and without any action by EFIH or any Holder of Notes or holder of other Junior Lien Obligations.

*Voting*

In connection with any matter under the Collateral Trust Agreement requiring a vote of holders of Secured Lien Debt, each Series of Secured Lien Debt will cast its votes in accordance with the Secured Debt Documents governing such Series of Secured Lien Debt. The amount of Secured Lien Debt to be voted by a Series of Secured Lien Debt will equal (1) the aggregate outstanding principal amount of Secured Lien Debt held by such Series of Secured Lien Debt (including outstanding letters of credit whether or not then available or drawn), plus (2) the aggregate unfunded commitments to extend credit which, when funded, would constitute Indebtedness of such Series of Secured Lien Debt. Following and in accordance with the outcome of the applicable vote under its Secured Debt Documents, the Secured Debt Representative of each Series of Secured Lien Debt will vote the total amount of Secured Lien Debt under that Series of Secured Lien Debt as a block in respect of any vote under the Collateral Trust Agreement.

**Provisions of the Indenture Relating to Security**

*Equal and Ratable Sharing of Collateral by Holders of Parity Lien Debt*

The Indenture provides that, notwithstanding:

(1)     anything contained in the Collateral Trust Agreement or in any other Security Document;

(2)     the time of incurrence of any Series of Parity Lien Debt;

(3)     the order or method of attachment or perfection of any Liens securing any Series of Parity Lien Debt;

77

Confidential

EFIHMW00053173

EFIHMW00053083

     (4)     the time or order of filing or recording of financing statements or other documents filed or recorded to perfect any Parity Lien upon any Collateral;

     (5)     the time of taking possession or control over any Collateral;

     (6)     that any Parity Lien may not have been perfected or may be or have become subordinated, by equitable subordination or otherwise, to any other Lien; or

     (7)     the rules for determining priority under any law governing relative priorities of Liens,

all Parity Liens granted at any time by EFIH will secure, equally and ratably, all present and future Parity Lien Obligations.

The foregoing section is intended for the benefit of, and will be enforceable as a third party beneficiary by, each present and future holder of Parity Lien Obligations, each present and future Parity Lien Representative and the Collateral Trustee as holder of Parity Liens.

*Ranking of Parity Liens*

The Indenture requires the Junior Lien Documents to provide that, notwithstanding:

     (1)     anything to the contrary contained in the Security Documents;

     (2)     the time of incurrence of any Series of Parity Lien Debt;

     (3)     the order or method of attachment or perfection of any Liens securing any Series of Parity Lien Debt;

     (4)     the time or order of filing or recording of financing statements or other documents filed or recorded to perfect any Lien upon any Collateral;

     (5)     the time of taking possession or control over any Collateral;

     (6)     that any Parity Lien may not have been perfected or may be or have become subordinated, by equitable subordination or otherwise, to any other Lien; or

     (7)     the rules for determining priority under any law governing relative priorities of Liens,

all Junior Liens at any time granted by EFIH will be subject and subordinate to all Parity Liens securing Parity Lien Obligations.

The Indenture also requires the Junior Lien Documents to provide that the provisions described in the foregoing clauses (1) through (7) are intended for the benefit of, and will be enforceable as a third party beneficiary by, each present and future holder of Parity Lien Obligations, each present and future Parity Lien Representative and the Collateral Trustee as holder of Parity Liens.

*Relative Rights*

The Indenture requires that nothing in any Junior Lien Document will:

     (1)     impair, as between EFIH and the Holders of the Notes, the obligation of EFIH to pay principal, premium, if any, and interest on the Notes in accordance with their terms or any other obligation of EFIH under the Indenture;

     (2)     affect the relative rights of Holders of Notes as against any other creditors of EFIH (other than holders of Junior Liens or other Parity Liens);

78

Confidential

EFIHMW00053174

EFIHMW00053083

(3)    restrict the right of any Holder of Notes to sue for payments that are then due and owing (but not enforce any judgment in respect thereof against any Collateral to the extent specifically prohibited by the provisions described under "—Security for the Notes—Enforcement of Liens" or "—Security for the Notes—Insolvency or Liquidation Proceedings");

(4)    restrict or prevent any Holder of Notes or holder of other Parity Lien Obligations, the Collateral Trustee or any other Person from exercising any of its rights or remedies upon a Default or Event of Default not specifically restricted or prohibited by the provisions described under "—Security for the Notes—Enforcement of Liens" or "—Security for the Notes—Insolvency or Liquidation Proceedings"; or

(5)    restrict or prevent any Holder of Notes or holder of other Parity Lien Obligations, the Trustee, the Collateral Trustee or any other Person from taking any lawful action in an insolvency or liquidation proceeding not specifically restricted or prohibited by the provisions described under "—Security for the Notes—Enforcement of Liens" or "—Security for the Notes—Insolvency or Liquidation Proceedings."

### *Further Assurances*

The Indenture and the Security Documents provide that EFIH, at its own expense, will do or cause to be done all acts and things that may be required, or that the Collateral Trustee from time to time may reasonably request, to assure and confirm that the Collateral Trustee holds, for the benefit of the Secured Debt Representatives and holders of Secured Debt Obligations, duly created and enforceable and perfected Liens upon the Collateral (including any property or assets that are acquired or otherwise become Collateral after the Notes are issued), in each case, as contemplated by, and with the Lien priority required under, the Secured Debt Documents.

Upon the reasonable request of the Collateral Trustee or any Secured Debt Representative at any time and from time to time, EFIH, at its own expense, will promptly execute, acknowledge and deliver such security documents, instruments, certificates, notices and other documents, and take such other actions as may be reasonably required, or that the Collateral Trustee may reasonably request, to create, perfect, protect, assure or enforce the Liens and benefits intended to be conferred, in each case as contemplated by the Secured Debt Documents for the benefit of the holders of Secured Debt Obligations.

### *Impairment of Security Interest*

The Pledge Agreement provides that EFIH will not take or omit to take any action which would or could reasonably be expected to have the result of materially adversely affecting or impairing the Liens in favor of the Collateral Trustee, the Trustee and the holders of the Notes with respect to the Collateral. EFIH shall not grant to any Person, or permit any Person to retain (other than the Collateral Trustee), any interest whatsoever in the Collateral, other than pursuant to clause (3) of the definition of "Permitted Liens." EFIH and its Restricted Subsidiaries will not enter into any agreement that requires the proceeds received from any sale of Collateral to be applied to repay, redeem, defease or otherwise acquire or retire any Indebtedness of any Person, other than as permitted by the Indenture, the Notes and the Security Documents. EFIH shall, at its sole cost and expense, execute and deliver all such agreements and instruments as necessary, or as the Trustee shall reasonably request, to more fully or accurately describe the assets and property intended to be Collateral or the obligations intended to be secured by the Pledge Agreement or any other Security Document.

### *After-Acquired Property*

Promptly following the acquisition by EFIH of any Equity Interests in any Oncor Subsidiary or any Indebtedness of, or other Investments in, any Oncor Subsidiary or any property or assets required to be pledged as Collateral pursuant to the covenant described under "—Repurchase at the Option of Holders—Asset Sales" or any Equity Interests in or any Indebtedness of, or other Investments in, any Successor Oncor Business, EFIH will execute and deliver such security instruments, pledges, financing statements and certificates and opinions of counsel as shall be reasonably necessary to vest in the Collateral Trustee a perfected first-priority security interest in such Equity Interests, Indebtedness or other Investments or property or assets and to have such Equity Interests, Indebtedness or other Investments or property or assets added to the Collateral and thereupon all provisions of the Indenture relating to the Collateral shall be deemed to relate to such Equity Interests, Indebtedness or other Investments or property or assets to the same extent and with the same force and effect.

79

Confidential

**Repurchase at the Option of Holders**

*Change of Control*

The Indenture provides that if a Change of Control occurs, unless the Issuer has previously or concurrently mailed a redemption notice with respect to all the outstanding Notes as described under "Optional Redemption" and will redeem all of the outstanding Notes pursuant thereto, the Issuer will make an offer to purchase all of the Notes pursuant to the offer described below (the "*Change of Control Offer*") at a price in cash (the "*Change of Control Payment*") equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest to the date of purchase, subject to the right of Holders of the Notes of record on the relevant record date to receive interest due on the relevant interest payment date. Within 30 days following any Change of Control, the Issuer will send notice of such Change of Control Offer by first-class mail, with a copy to the Trustee, to each Holder of Notes to the address of such Holder appearing in the security register with a copy to the Trustee or otherwise in accordance with the procedures of DTC, with the following information:

(1)      that a Change of Control Offer is being made pursuant to the covenant entitled "Change of Control" and that all Notes properly tendered pursuant to such Change of Control Offer will be accepted for payment by the Issuer;

(2)      the purchase price and the purchase date, which will be no earlier than 30 days nor later than 60 days from the date such notice is mailed (the "Change of Control Payment Date");

(3)      that any Note not properly tendered will remain outstanding and continue to accrue interest;

(4)      that unless the Issuer defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest on the Change of Control Payment Date;

(5)      that Holders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the paying agent specified in the notice at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6)      that Holders will be entitled to withdraw their tendered Notes and their election to require the Issuer to purchase such Notes; provided that the paying agent receives, not later than the close of business on the expiration date of the Change of Control Offer, a telegram, facsimile transmission or letter setting forth the name of the Holder of the Notes, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased;

(7)      that the Holders whose Notes are being repurchased only in part will be issued new Notes and such new Notes will be equal in principal amount to the unpurchased portion of the Notes surrendered. The unpurchased portion of the Notes must be equal to $2,000 or an integral multiple of $1,000 in excess thereof; and

(8)      the other instructions, as determined by the Issuer, consistent with the covenant described under this "—Repurchase at the Option of Holders—Change of Control" section, that a Holder must follow.

Any proceeds received by the Issuer or its Restricted Subsidiaries from a sale, conveyance or disposition of Collateral or other Oncor-related Assets that constitutes a Change of Control shall be subject to a perfected security interest for the benefit of the holders of the Secured Debt Obligations until consummation of the Change of Control Offer.

The Issuer will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of Notes pursuant to a Change of Control Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Issuer will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in the Indenture by virtue thereof.

On the Change of Control Payment Date, the Issuer will, to the extent permitted by law,

80

Confidential

EFIHMW00053176

EFIHMW00053083