From time to time, certain prior period amounts are reclassified to conform to the current period presentation. As disclosed in the condensed consolidated statements of consolidated cash flows included in this report, the amount previously reported as changes in deferred advanced metering system revenues for the nine months ended September 30, 2011 is included in and reported as deferred revenues to conform to the current period presentation. In addition to deferred advanced metering system revenues, other reconcilable revenues (TCRF and energy efficiency surcharges), which were previously reported as changes in other operating assets and liabilities, are included in and reported as deferred revenues.

*Use of Estimates*

Preparation of our financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including fair value measurements. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information.

*Derivative Instruments and Mark-to-Market Accounting*

Oncor has from time-to-time entered into derivative instruments to hedge interest rate risk. If the instrument meets the definition of a derivative under accounting standards related to derivative instruments and hedging activities, the fair value of each derivative is recognized on the balance sheet as a derivative asset or liability and changes in the fair value are recognized in net income, unless criteria for certain exceptions are met. This recognition is referred to as "mark-to-market" accounting.

Because derivative instruments are frequently used as economic hedges, accounting standards related to derivative instruments and hedging activities allow for "hedge accounting," which provides for the designation of such instruments as cash flow or fair value hedges if certain conditions are met. A cash flow hedge mitigates the risk associated with the variability of the future cash flows related to an asset or liability (e.g., debt with variable interest rate payments), while a fair value hedge mitigates risk associated with fixed future cash flows (e.g., debt with fixed interest rate payments). In accounting for cash flow hedges, derivative assets and liabilities are recorded on the balance sheet at fair value with an offset to other comprehensive income to the extent the hedges are effective. Amounts remain in accumulated other comprehensive income and are reclassified into net income as the related transactions (hedged items) settle and affect net income. If the hedged transaction becomes probable of not occurring, hedge accounting is discontinued and the amount recorded in other comprehensive income is immediately reclassified into net income. Fair value hedges are recorded as derivative assets or liabilities with an offset to net income, and the carrying value of the related asset or liability (hedged item) is adjusted for changes in fair value with an offset to net income. If the fair value hedge is settled prior to the maturity of the hedged item, the cumulative fair value gain or loss associated with the hedge is amortized into income over the remaining life of the hedged item. To qualify for hedge accounting, a hedge must be considered highly effective in offsetting changes in fair value of the hedged item. Assessment of the hedge's effectiveness is tested at least quarterly throughout its term to continue to qualify for hedge accounting. Hedge ineffectiveness, even if the hedge continues to be assessed as effective, is immediately recognized in net income. Ineffectiveness is generally measured as the cumulative excess, if any, of the change in value of the hedging instrument over the change in value of the hedged item.

*Reconcilable Tariffs*

The PUCT has designated certain tariffs (TCRF, energy efficiency and advanced meter surcharges and charges related to transition bonds) as reconcilable, which means the differences between amounts billed under these tariffs and the related incurred expenses are deferred as either regulatory assets or regulatory liabilities. Accordingly, at prescribed intervals, future tariffs are adjusted to either repay regulatory liabilities or collect regulatory assets.

*Adoption of New Accounting Standard*

In May 2011, the Financial Accounting Standards Board (FASB) issued "*Accounting Standards Update 2011-05*" relating to the presentation of Comprehensive Income within financial statements. Effective January 1, 2012, we adopted the new standard. Adoption of the new standard did not affect our reported results of operations, financial condition or cash flows.

F-9

Confidential

EFIHMW00053270

EFIHMW00053083

## 2.    REGULATORY MATTERS

*2011 Rate Review*

In January 2011, Oncor filed a rate review with the PUCT and 203 original jurisdiction cities based on a test year ended June 30, 2010 (PUCT Docket No. 38929).  In April 2011, Oncor and the other parties reached a Memorandum of Settlement that would settle and resolve all issues in the rate review.  Oncor filed a stipulation (including a proposed order and proposed tariffs) in May 2011 that incorporated the Memorandum of Settlement along with pleadings and other documentation (Stipulation) for the purpose of obtaining final approval of the settlement.  The terms of the Stipulation include an approximate $137 million base rate increase and additional provisions to address franchise fees (discussed below) and other expenses.  Approximately $93 million of the increase became effective July 1, 2011, and the remainder became effective January 1, 2012.  Under the Stipulation, amortization of regulatory assets increased by approximately $24 million ($14 million of which will be recognized as tax expense) annually beginning January 1, 2012.  The Stipulation did not change Oncor's authorized regulatory capital structure of 60% debt and 40% equity or its authorized return on equity of 10.25%.  Under the terms of the Stipulation, Oncor cannot file another general base rate review prior to July 1, 2013, but is not restricted from filing wholesale transmission rate, TCRF, distribution-related investment and other rate updates and adjustments permitted by Texas state law and PUCT rules.

In response to concerns raised by PUCT Commissioners at a July 2011 PUCT open meeting regarding the Stipulation, Oncor filed a modified stipulation that removed from the Stipulation a one-time payment to certain cities it serves for retrospective franchise fees (Modified Stipulation).  Instead, pursuant to the terms of a separate agreement with certain cities it serves, through September 30, 2012, Oncor has made approximately $22 million in retrospective franchise fee payments to cities that accepted the terms of the separate agreement.  The payments are subject to refund from the cities or recovery from customers after final resolution of proceedings related to the appeals from Oncor's June 2008 rate review filing (discussed below).  No other significant terms of the Stipulation were revised.  In August 2011, the PUCT issued a final order approving the settlement terms contained in the Modified Stipulation.

Effective July 1, 2011, pursuant to the PUCT's final order, Oncor no longer recovers the cost of wholesale transmission service through base rates, and wholesale transmission service expenses incurred are reconcilable to revenues billed under the TCRF rider.  For this purpose, all wholesale transmission service expenses consist of amounts charged under a PUCT-approved transmission tariff including Oncor's own wholesale transmission tariff.  Oncor accounts for the difference between amounts charged under the TCRF rate and wholesale transmission service expense as a regulatory asset or regulatory liability (under- or over-recovered wholesale transmission service expense (see Note 1)).  At September 30, 2012, approximately $51 million was deferred as under-recovered wholesale transmission service expense (see Note 3).

*2008 Rate Review*

In August 2009, the PUCT issued a final order with respect to Oncor's June 2008 rate review filing with the PUCT and 204 cities based on a test year ended December 31, 2007 (PUCT Docket No. 35717), and new rates were implemented in September 2009.  In November 2009, the PUCT issued an order on rehearing that established a new rate class but did not change the revenue requirements.  Oncor and four other parties appealed various portions of the rate review final order to a state district court, and oral argument was held in October 2010.  In January 2011, the district court signed its judgment reversing the PUCT with respect to two issues: the PUCT's disallowance of certain franchise fees and the PUCT's decision that PURA no longer requires imposition of a rate discount for state colleges and universities.  Oncor filed an appeal with the Texas Third Court of Appeals (Austin Court of Appeals) in February 2011 with respect to the issues it appealed to the district court and did not prevail upon, as well as the district court's decision to reverse the PUCT with respect to discounts for state colleges and universities.  Oral argument before the Austin Court of Appeals was completed in April 2012.  There is no deadline for the court to act.  Oncor is unable to predict the outcome of the appeal.

*Stipulation Approved by the PUCT*

F-10

Confidential                                                         EFIHMW00053271

EFIHMW00053083

**PX 070**
**Page 189 of 203**

In April 2008, the PUCT entered an order (PUCT Docket No. 34077), which became final in June 2008, approving the terms of a stipulation relating to a filing in 2007 by Oncor and Texas Holdings with the PUCT pursuant to Section 14.101(b) of PURA and PUCT Substantive Rule 25.75.  Among other things, the stipulation required Oncor to file a rate review no later than July 1, 2008 based on a test year ended December 31, 2007, which it filed in June 2008.  The PUCT issued a final order with respect to the rate review in August 2009.  In July 2008, Nucor Steel filed an appeal of the PUCT's order in the 200th District Court of Travis County, Texas (District Court).  A hearing on the appeal was held in June 2010, and the District Court affirmed the PUCT order in its entirety.  Nucor Steel appealed that ruling to the Austin Court of Appeals in July 2010.  In March 2012, the Austin Court of Appeals affirmed the District Court's ruling, which is now final.

F-11

Confidential

EFIHMW00053272

EFIHMW00053083

### 3.  REGULATORY ASSETS AND LIABILITIES

Recognition of regulatory assets and liabilities and the amortization periods over which they are expected to be recovered or refunded through rate regulation reflect the decisions of the PUCT.  Components of the regulatory assets and liabilities are provided in the table below.  Amounts not earning a return through rate regulation are noted.

| | Remaining Rate Recovery/Amortization Period at September 30, 2012 | Carrying Amount | |
| --- | --- | --- | --- |
| | | September 30, 2012 | December 31, 2011 |
| **Regulatory assets:** | | | |
| Generation-related regulatory assets securitized by transition bonds (a)(f) | 4 years | $ 441 | $ 531 |
| Employee retirement costs | 8 years | 91 | 103 |
| Employee retirement costs to be reviewed (b)(c) | To be determined | 96 | 74 |
| Employee retirement liability (a)(c)(d) | To be determined | 808 | 707 |
| Self-insurance reserve (primarily storm recovery costs) — net | 8 years | 198 | 221 |
| Self-insurance reserve to be reviewed (b)(c) | To be determined | 121 | 71 |
| Securities reacquisition costs (pre-industry restructure) | 5 years | 43 | 48 |
| Securities reacquisition costs (post-industry restructure) — net | Terms of related debt | 29 | 2 |
| Recoverable amounts in lieu of deferred income taxes — net | Life of related asset or liability | 80 | 104 |
| Rate review expenses (a) | Largely 3 years | 7 | 11 |
| Rate review expenses to be reviewed (b)(c) | To be determined | 1 | 1 |
| Advanced meter customer education costs (c) | 8 years | 10 | 9 |
| Deferred conventional meter depreciation | 8 years | 142 | 107 |
| Energy efficiency performance bonus (a) | 1 year | 11 | 8 |
| Under-recovered wholesale transmission service expense (a)(c) | 1 year | 51 | — |
| Wholesale transmission settlement costs | Not applicable | — | 9 |
| Other regulatory assets | Not applicable | — | 1 |
| Total regulatory assets | | 2,129 | 2,007 |
| **Regulatory liabilities:** | | | |
| Nuclear decommissioning cost over-recovery (a)(c)(e) | Not applicable | 286 | 225 |
| Estimated net removal costs | Life of utility plant | 212 | 115 |
| Committed spending for demand-side management initiatives (a) | 1 year | 6 | 25 |
| Deferred advanced metering system revenues | 8 years | 13 | 52 |
| Investment tax credit and protected excess deferred taxes | Various | 29 | 33 |
| Over-collection of transition bond revenues (a)(f) | 4 years | 38 | 37 |
| Over-recovered wholesale transmission service expense (a)(c) | 1 year | — | 13 |
| Energy efficiency programs (a) | Not applicable | 3 | 2 |
| Total regulatory liabilities | | 587 | 502 |
| Net regulatory asset | | $1,542 | $1,505 |

(a)   Not earning a return in the regulatory rate-setting process.

(b)   Costs incurred since the period covered under the last rate review.

(c)   Recovery is specifically authorized by statute or by the PUCT, subject to reasonableness review.

(d)   Represents unfunded liabilities recorded in accordance with pension and OPEB accounting standards.

(e)   Offset by an intercompany receivable from TCEH.  See Note 9.

(f)   Bondco net regulatory assets of $357 million at September 30, 2012 consisted of $395 million included in generation-related regulatory assets net of the regulatory liability for over-collection of transition bond revenues of $38 million.  Bondco net regulatory assets of $427 million at December 31, 2011 consisted of $464 million included in generation-related regulatory assets net of the regulatory liability for over-collection of transition bond revenues of $37 million.

F-12

EFIHMW00053273

EFIHMW00053083

4.    **BORROWINGS UNDER CREDIT FACILITIES**

At September 30, 2012, Oncor had a $2.4 billion secured revolving credit facility (reflecting a May 2012 $400 million commitment increase as discussed below) to be used for working capital and general corporate purposes, issuances of letters of credit and support for any commercial paper issuances. The revolving credit facility expires in October 2016, and Oncor has the option of requesting up to two one-year extensions, with such extensions subject to certain conditions and lender approval. Pursuant to the terms of the revolving credit facility, Oncor requested and received a $400 million increase in commitments under the revolving credit facility effective May 15, 2012. The terms of the revolving credit facility allow Oncor to request an additional increase in the borrowing capacity of $100 million, provided certain conditions are met, including lender approval.

Borrowings under the revolving credit facility are classified as short-term on the balance sheet and are secured equally and ratably with all of Oncor's other secured indebtedness by a first priority lien on property Oncor acquired or constructed for the transmission and distribution of electricity. The property is mortgaged under the Deed of Trust.

At September 30, 2012, Oncor had outstanding borrowings under the revolving credit facility totaling $784 million with an interest rate of 1.47% and outstanding letters of credit totaling $6 million. At December 31, 2011, Oncor had outstanding borrowings under the revolving credit facility totaling $392 million with an interest rate of 1.40% and outstanding letters of credit totaling $6 million. At September 30, 2012, all outstanding borrowings bore interest at LIBOR plus 1.25%, letters of credit bore interest at 1.25%, and a commitment fee (at a rate of 0.175% per annum) was payable on the unfunded commitments under the facility, each based on Oncor's current credit ratings. Amounts borrowed under the facility, once repaid, can be borrowed again from time to time.

Subject to the limitations described below, borrowing capacity available under the credit facility at September 30, 2012 and December 31, 2011 was $1.610 billion and $1.602 billion, respectively. Generally, Oncor's indentures and revolving credit facility limit the incurrence of other secured indebtedness except for indebtedness secured equally and ratably with the indentures and revolving credit facility and certain permitted exceptions. As described further in Note 7 to our 2011 Audited Financial Statements, the Deed of Trust permits Oncor to secure indebtedness (including borrowings under the revolving credit facility) with the lien of the Deed of Trust up to the aggregate of (i) the amount of available bond credits, and (ii) 85% of the lower of the fair value or cost of certain property additions that could be certified to the Deed of Trust collateral agent. At September 30, 2012, the available bond credits were approximately $2.141 billion and the amount of additional potential indebtedness that could be secured by property additions, subject to a certification process, was $475 million. At September 30, 2012, the available borrowing capacity of the revolving credit facility could be fully drawn.

F-13

Confidential

EFIHMW00053274

EFIHMW00053083

5.    **LONG-TERM DEBT**

At September 30, 2012 and December 31, 2011, our long-term debt consisted of the following:

| | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Oncor (a): | | |
| 6.375% Fixed Senior Notes due May 1, 2012 .......................................... | $ — | $ 376 |
| 5.950% Fixed Senior Notes due September 1, 2013 ................................... | — | 524 |
| 6.375% Fixed Senior Notes due January 15, 2015 ................................... | 500 | 500 |
| 5.000% Fixed Senior Notes due September 30, 2017 ................................ | 324 | 324 |
| 6.800% Fixed Senior Notes due September 1, 2018 ................................... | 550 | 550 |
| 5.750% Fixed Senior Notes due September 30, 2020 ................................ | 126 | 126 |
| 4.100% Fixed Senior Notes due June 1, 2022 .......................................... | 400 | — |
| 7.000% Fixed Debentures due September 1, 2022 .................................... | 800 | 800 |
| 7.000% Fixed Senior Notes due May 1, 2032 ........................................... | 500 | 500 |
| 7.250% Fixed Senior Notes due January 15, 2033 ................................... | 350 | 350 |
| 7.500% Fixed Senior Notes due September 1, 2038 ................................... | 300 | 300 |
| 5.250% Fixed Senior Notes due September 30, 2040 ................................ | 475 | 475 |
| 4.550% Fixed Senior Notes due December 1, 2041 ................................... | 300 | 300 |
| 5.300% Fixed Senior Notes due June 1, 2042 .......................................... | 500 | — |
| Unamortized discount ............................................................................... | (35) | (38) |
| Less amounts due currently ....................................................................... | — | (376) |
| Total Oncor ........................................................................................ | 5,090 | 4,711 |
| | | |
| Oncor Electric Delivery Transition Bond Company LLC (b): | | |
| 4.950% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2013 .......... | 10 | 56 |
| 5.420% Fixed Series 2003 Bonds due in semiannual installments through August 15, 2015 ............ | 145 | 145 |
| 4.810% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2012 ............ | 30 | 63 |
| 5.290% Fixed Series 2004 Bonds due in semiannual installments through May 15, 2016 ................ | 290 | 290 |
| Unamortized fair value discount related to transition bonds ............................... | (2) | (3) |
| Less amount due currently ....................................................................... | (123) | (118) |
| Total Oncor Electric Delivery Transition Bond Company LLC ...................... | 350 | 433 |
| | | |
| Total long-term debt (c)........................................................................... | $5,440 | $5,144 |

(a)    Secured by first priority lien on certain transmission and distribution assets equally and ratably with all of Oncor's other secured indebtedness. See "Deed of Trust Amendment" in Note 7 to Financial Statements included in our 2011 Audited Financial Statements for additional information.

(b)    The transition bonds are nonrecourse to Oncor and were issued to securitize a regulatory asset.

(c)    According to our organizational documents, Oncor Holdings (parent) is prohibited from directly incurring indebtedness for borrowed money.

*Debt-Related Activity in 2012*

*Debt Repayments*

Repayments of long-term debt in 2012 totaled $979 million and represent $376 million principal amount of Oncor's 6.375% senior secured notes paid at the scheduled maturity date of May 1, 2012, the redemption of $524 million principal amount of Oncor's 5.950% senior secured notes due September 1, 2013 (2013 Notes) as discussed below and $79 million principal amount of transition bonds paid at scheduled maturity dates.

In June 2012, pursuant to the terms of the indenture and officer's certificate governing the 2013 Notes, Oncor redeemed all of the 2013 Notes. Oncor paid a redemption price equal to 100% of the principal amount of the 2013 Notes plus a make-whole amount of $33 million. For accounting purposes, the make-whole amount has been

Confidential

EFIHMW00053275

EFIHMW00053083

**PX 070**
**Page 193 of 203**

deferred as a regulatory asset and will be amortized to interest expense until September 1, 2013, the original maturity date of the 2013 Notes (see Note 3).

*Issuance of New Senior Secured Notes*

In May 2012, Oncor issued $400 million aggregate principal amount of 4.100% senior secured notes maturing in June 2022 (2022 Notes) and $500 million aggregate principal amount of 5.300% senior secured notes maturing in June 2042 (2042 Notes, and collectively with the 2022 Notes, the Notes). Oncor used the proceeds (net of the initial purchasers' discount, fees and expenses) of approximately $890 million from the sale of the Notes to repay borrowings under the revolving credit facility, redeem the 2013 Notes (as discussed above) and for other general corporate purposes. The Notes are secured equally and ratably with all of Oncor's other secured indebtedness pursuant to the Deed of Trust by a first priority lien on property Oncor acquired or constructed for the transmission and distribution of electricity.

Interest on the Notes is payable in cash semiannually in arrears on June 1 and December 1 of each year, beginning on December 1, 2012. Oncor may at its option at any time and from time to time redeem all or part of the Notes at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a make-whole premium. The Notes also contain customary events of default, including failure to pay principal or interest on the Notes when due.

The Notes were issued in a private placement, and in August 2012 Oncor offered holders of the Notes the opportunity to exchange their respective Notes for notes that have terms identical in all material respects to the Notes (Exchange Notes), except that the Exchange Notes do not contain terms with respect to transfer restrictions, registration rights and payment of additional interest for failure to observe certain obligations in a certain registration rights agreement. The Exchange Notes were registered on a Form S-4, which was declared effective in July 2012.

*Interest Rate Hedge Transaction*

In August 2011, Oncor entered into an interest rate hedge transaction hedging the variability of treasury bond rates used to determine interest rates on an anticipated issuance of its senior secured notes (see Note 7 to Financial Statements included in our 2011 Audited Financial Statements for information regarding the debt issuance). The hedges were terminated in November 2011 upon the issuance of the senior secured notes. Oncor recognized the $46 million ($29 million after tax) loss related to the fair value of the hedge transaction in accumulated other comprehensive income, which is expected to be reclassified into net income over the life of the senior secured notes issued.

**Fair Value of Long-Term Debt**

At September 30, 2012 and December 31, 2011, the estimated fair value of our long-term debt (including current maturities) totaled $6.471 billion and $6.705 billion, respectively, and the carrying amount totaled $5.563 billion and $5.638 billion, respectively. The fair values are estimated based upon market values as determined by quoted market prices, representing Level 1 valuations under accounting standards related to the determination of fair value.

**6.    COMMITMENTS AND CONTINGENCIES**

*Guarantees*

Oncor has entered into contracts that contain guarantees to unaffiliated parties that could require performance or payment under certain conditions as discussed below.

Oncor is the lessee under various operating leases that obligate it to guarantee the residual values of the leased assets. At September 30, 2012, both the aggregate maximum amount of residual values guaranteed and the estimated residual recoveries totaled $7 million. These leased assets consist primarily of vehicles used in

F-15

Confidential

distribution activities. The average life of the residual value guarantees under the lease portfolio is approximately 1.7 years.

For the purpose of obtaining greater access to materials, Oncor has guaranteed the repayment of borrowings under a nonaffiliated party's $5 million credit facility maturing on December 31, 2012. The nonaffiliated party's borrowings under the credit facility are limited to inventory produced solely to satisfy the terms of a contract with Oncor. Oncor would be entitled to the related inventory upon repayment of the credit facility (or payment to the nonaffiliated party). At September 30, 2012, the nonaffiliated party had no outstanding borrowings under the facility.

*Legal/Regulatory Proceedings*

In October 2010, the PUCT established Docket No. 38780 for the remand of Docket No. 20381, the 1999 wholesale transmission charge matrix case. A joint settlement agreement was entered into effective October 6, 2003. This settlement resolves disputes regarding wholesale transmission pricing and charges for the period of January 1997 through August 1999, the period prior to the September 1, 1999 effective date of the legislation that authorized 100% postage stamp pricing for ERCOT wholesale transmission. After a series of appeals became final, the 1999 matrix docket was remanded to the PUCT to address two additional issues.

The first issue is the wholesale transmission transition mechanism for the period of September 1999 through December 1999. The disputed issue is whether the PUCT should have allowed the transition mechanism to continue for the last four months of 1999. The appealing parties (Texas Municipal Power Agency, the City of Denton, the City of Garland and GEUS (formerly known as Greenville Electric Utility System)) argued that the transition mechanism was not authorized in the September 1, 1999 100% postage stamp pricing legislation. Oncor's transmission deficit position was mitigated by approximately $8 million in the last four months of 1999 through the transition mechanism. In October 2011, certain parties filed a proposed settlement of this issue, subject to PUCT approval, in which Oncor would pay approximately $9 million including interest through October 9, 2003. The PUCT approved the settlement in January 2012. No appeals were filed prior to the appeals deadline, and the PUCT order became final in February 2012. Oncor made the payment in accordance with the settlement in February 2012. Oncor believes recovery of the settlement payment through future rates is probable.

The second issue is the San Antonio City Public Service Board's (CPSB) claim that the PUCT did not have the authority to reduce CPSB's requested Transmission Cost of Service (TCOS) revenue requirement. CPSB's initial TCOS rate was in effect from 1997 through 2000. Since the period of January 1997 through August 1999 is incorporated in the joint settlement, CPSB's remaining claim is for the period of September 1999 through December 2000. In January 2011, CPSB made a filing with the PUCT (PUCT Docket No. 39068), seeking an additional $22 million of TCOS revenue, including interest, for the 16-month period, of which Oncor would be responsible for approximately $11 million. In late 2011, Oncor intervened in the proceeding and, along with several other parties, filed motions to dismiss CPSB's request. In January 2012, the PUCT upheld an administrative law judge's earlier decision to dismiss CPSB's request. No appeals were filed prior to the appeals deadline, and the PUCT order became final in February 2012.

We are involved in various other legal and administrative proceedings in the normal course of business, the ultimate resolution of which, in the opinion of management, should not have a material effect upon our financial position, results of operations or cash flows. See Note 8 to Financial Statements included in our 2011 Audited Financial Statements for additional information concerning our legal and regulatory proceedings.

7.  **MEMBERSHIP INTERESTS**

On October 24, 2012, our board of directors declared a cash distribution of approximately $47 million to be paid to EFIH on October 30, 2012. During the nine months ended September 30, 2012, our board of directors declared, and we paid, the following cash distributions to EFIH:

F-16

EFIHMW00053277


EFIHMW00053083


**PX 070**
**Page 195 of 203**

| Declaration Date | Payment Date | Amount |
|---|---|---|
| July 25, 2012 | July 31, 2012 | $31 |
| April 25, 2012 | May 1, 2012 | $33 |
| February 14, 2012 | February 21, 2012 | $36 |

While there are no direct restrictions on our ability to distribute our net income that are currently material, substantially all of our net income is derived from Oncor. Our board of directors and Oncor's board of directors, which are composed of a majority of independent directors, can withhold distributions to the extent the boards determine that it is necessary to retain such amounts to meet our expected future requirements.

Oncor's distributions are limited to its cumulative net income and may not be paid except to the extent Oncor maintains a required regulatory capital structure, as discussed below. At September 30, 2012, $218 million was eligible to be distributed to Oncor's members after taking into account these restrictions, of which approximately 80% relates to our ownership interest.

For the period beginning October 11, 2007 and ending December 31, 2012, Oncor's cash distributions (other than distributions of the proceeds of any issuance of limited liability company units) are limited by the Limited Liability Company Agreement and a stipulation agreement with the PUCT to an amount not to exceed its cumulative net income determined in accordance with US GAAP, as adjusted by applicable orders of the PUCT. Such adjustments include the removal of noncash impacts of purchase accounting and deducting two specific cash commitments. To date, the noncash impact consists of removing the effect of an $860 million goodwill impairment charge in 2008 and the cumulative amount of net accretion of fair value adjustments. The two specific cash commitments are the $72 million ($46 million after tax) one-time refund to customers in September 2008 and the funds spent as part of the $100 million commitment for additional energy efficiency initiatives of which $94 million ($61 million after tax) has been spent through September 30, 2012. The goodwill impairment charge and refund are described in Notes 2 and 3 to Financial Statements included in our 2011 Audited Financial Statements. At September 30, 2012, $468 million of membership interests was available for distribution under the cumulative net income restriction, of which 80% relates to our ownership interest.

Distributions are further limited by Oncor's required regulatory capital structure to be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. At September 30, 2012, Oncor's regulatory capitalization ratio was 58.5% debt and 41.5% equity. The PUCT has the authority to determine what types of debt and equity are included in a utility's debt-to-equity ratio. For purposes of this ratio, debt is calculated as long-term debt plus unamortized gains on reacquired debt less unamortized issuance expenses, premiums and losses on reacquired debt. The debt calculation excludes transition bonds issued by Bondco. Equity is calculated as membership interests determined in accordance with US GAAP, excluding the effects of purchase accounting (which included recording the initial goodwill and fair value adjustments and the subsequent related impairments and amortization). At September 30, 2012, $218 million was available for distribution under the capital structure restriction, of which 80% relates to our ownership interest.

*Noncontrolling Interests*

At September 30, 2012, Oncor's ownership was as follows: 80.03% held by us, 19.75% held by Texas Transmission and 0.22% held indirectly by certain members of Oncor's management team and board of directors.

*Membership Interests*

The following tables present the changes to membership interests during the nine months ended September 30, 2012 and 2011, respectively:

F-17

Confidential

EFIHMW00053278

EFIHMW00053083

| | Capital Account | Accumulated Other Comprehensive Loss | Noncontrolling Interests | Total Membership Interests |
|---|---|---|---|---|
| Balance at December 31, 2011 | $5,745 | $ (25) | $1,564 | $7,284 |
| Net income | 249 | — | 64 | 313 |
| Distributions paid to parent | (100) | — | — | (100) |
| Distributions to noncontrolling interests | — | — | (31) | (31) |
| Sale of related-party agreements (net of tax) (Note 9) | (2) | — | — | (2) |
| Net effects of cash flow hedges (net of tax) | — | 2 | 1 | 3 |
| Change related to future tax distributions from Oncor | — | — | 48 | 48 |
| Other – net | 1 | — | — | 1 |
| Balance at September 30, 2012 | $5,893 | $ (23) | $1,646 | $7,516 |

F-18

Confidential

EFIHMW00053279

EFIHMW00053083

| | Capital Account | Accumulated Other Comprehensive Loss | Noncontrolling Interests | Total Membership Interests |
|---|---|---|---|---|
| Balance at December 31, 2010 .................................... | $5,546 | $ (2) | $1,452 | $6,996 |
| Net income .......................................................... | 235 | — | 60 | 295 |
| Distributions paid to parent ................................. | (64) | — | — | (64) |
| Distributions to noncontrolling interests .............................. | — | — | (16) | (16) |
| Capital contributions (a) ..................................... | 30 | — | — | 30 |
| Net effects of cash flow hedges (net of tax benefit of —, $13, $4 and $17) ... | — | (24) | (6) | (30) |
| Change related to future tax distributions from Oncor ........ | — | — | 71 | 71 |
| Balance at September 30, 2011 .................................. | $5,747 | $ (26) | $1,561 | $7,282 |

(a)   Reflects noncash settlement of certain income taxes payable arising as a result of the sale of noncontrolling interests in Oncor.

## 8.   PENSION AND OTHER POSTRETIREMENT EMPLOYEE BENEFITS (OPEB) PLANS

Oncor is a participating employer in the EFH Retirement Plan and also participates with EFH Corp. and other subsidiaries of EFH Corp. to offer certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees. Oncor also participates in the Oncor Plan, which is a supplemental retirement plan for certain employees whose retirement benefits cannot be fully earned under the qualified EFH Retirement Plan.

Oncor's net pension and OPEB costs related to the EFH Retirement Plan, the OPEB Plan and the Oncor Plan for the three and nine months ended September 30, 2012 and 2011 were comprised of the following:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| Components of net allocated pension costs: | | | | |
| Service cost ........................................................ | $    6 | $    5 | $   17 | $   15 |
| Interest cost ....................................................... | 26 | 27 | 80 | 83 |
| Expected return on assets ................................... | (28) | (25) | (80) | (75) |
| Amortization of net loss ..................................... | 21 | 16 | 58 | 48 |
| Net pension costs ........................................... | 25 | 23 | 75 | 71 |
| Components of net OPEB costs: | | | | |
| Service cost ........................................................ | 2 | 2 | 4 | 6 |
| Interest cost ....................................................... | 10 | 14 | 29 | 40 |
| Expected return on assets ................................... | (3) | (4) | (9) | (10) |
| Amortization of net transition obligation .................. | — | 1 | 1 | 1 |
| Amortization of prior service cost ........................... | (5) | (1) | (15) | (1) |
| Amortization of net loss ..................................... | 3 | 7 | 10 | 19 |
| Net OPEB costs ............................................. | 7 | 19 | 20 | 55 |
| Total net pension and OPEB costs ............................ | 32 | 42 | 95 | 126 |
| Amounts deferred principally as a regulatory asset or property ....... | (23) | (33) | (68) | (99) |
| Net amounts recognized as expense ........................... | $    9 | $    9 | $   27 | $   27 |

The discount rate reflected in net pension costs for January through July 2012 is 5.00% and for August and September 2012 is 4.15% (see discussion below). The discount rate reflected in net OPEB costs in 2012 is 4.95%. The expected rates of return on pension and OPEB plan assets reflected in the 2012 cost amounts are 7.4% and 6.8%, respectively.

Oncor made cash contributions to the EFH Retirement Plan, the OPEB Plan and the Oncor Plan of $89 million, $8 million and $2 million, respectively, during the nine months ended September 30, 2012, and expects to make additional cash contributions of zero, $3 million and $1 million, respectively, in the remainder of 2012.

F-19

Confidential

EFIHMW00053280

EFIHMW00053083

In August 2012, EFH Corp. approved certain amendments to the EFH Retirement Plan. These amendments will result in:

- the splitting off of assets and liabilities under the plan associated with Oncor employees and all retirees and terminated vested participants of EFH Corp. and its subsidiaries (and discontinued businesses) to a new plan that is expected to be sponsored and administered by Oncor;

- maintaining assets and liabilities under the plan associated with active collective bargaining unit employees of EFH Corp.'s competitive subsidiaries under the current plan;

- the splitting off of assets and liabilities under the plan associated with all other plan participants to a terminating plan, and freezing benefits and vesting all accrued plan benefits for these participants, and

- the termination of, distributions of benefits under, and settlement of all of EFH Corp.'s liabilities under the terminating plan.

EFH Corp. has informed Oncor that it intends to make cash contributions (currently estimated to aggregate approximately $240 million) to settle the terminating plan obligations and fully fund the EFH Corp. competitive business portion of liabilities (including discontinued businesses) under the new plan expected to be sponsored by Oncor. Of the estimated $240 million cash contribution, EFH Corp. paid $150 million in October 2012 and expects to contribute the remainder in the fourth quarter of 2012.

As a result of the amendments, Oncor's plan asset values and obligations were remeasured as of July 31, 2012, resulting in the projected benefit obligation, after consideration of the curtailment of benefits related to the terminating plan participants, increasing by $260 million, the fair value of assets increasing by $105 million and regulatory assets increasing by $155 million as compared to December 31, 2011 values. Assumptions used in the remeasurement included a decrease in the discount rate to 4.15% from 5.00% and no change in the expected return on assets of 7.4% assumed at December 31, 2011. The remeasurement did not materially affect reported pension expense for the three months ended September 30, 2012. Another remeasurement will be performed in the fourth quarter of 2012 upon the splitting off of assets and liabilities, which is not expected to have a material impact on our reported results of operations or financial condition.

In July 2012, the US Congress enacted legislation that includes, among other things, pension funding stabilization provisions. These provisions are expected to reduce required minimum pension plan contributions in the near term, but have no impact on long-term funding levels absent a sustained low interest rate environment. As a result of the new legislation and the effect of the amendments on the EFH Retirement Plan, Oncor estimates its aggregate pension funding for the year 2013 and the 2014 to 2016 period to total $10 million and $330 million, respectively.

## 9.    RELATED-PARTY TRANSACTIONS

The following represent our significant related-party transactions:

- Oncor records revenue from TCEH, principally for electricity delivery fees, which totaled $281 million and $309 million for the three months ended September 30, 2012 and 2011, respectively, and $746 million and $798 million for the nine months ended September 30, 2012 and 2011, respectively. These fees are based on rates regulated by the PUCT that apply to all REPs. The balance sheets at September 30, 2012 and December 31, 2011 reflect receivables from TCEH totaling $154 million and $138 million, respectively, primarily related to these electricity delivery fees.

- Oncor recognized interest income from TCEH under an agreement related to its generation-related regulatory assets, which have been securitized through the issuance of transition bonds by Bondco. This interest income, which served to offset Oncor's interest expense on the transition bonds, totaled $2 million and $8 million for the three months ended September 30, 2012 and 2011, respectively, and $16 million and

F-20

EFIHMW00053281

EFIHMW00053083

**PX 070**
**Page 199 of 203**

$24 million for the nine months ended September 30, 2012 and 2011, respectively. See discussion below regarding the sale to EFIH of this interest reimbursement agreement.

Incremental amounts payable by Oncor related to income taxes as a result of delivery fee surcharges to customers related to transition bonds were reimbursed by TCEH. Prior to the August 2012 sale to EFIH disclosed below, our financial statements reflected a note receivable from TCEH to Oncor that totaled $179 million ($41 million reported as current in trade accounts and other receivables from affiliates) at December 31, 2011 related to these income taxes.

In August 2012, Oncor sold to EFIH all future interest reimbursements and the remaining $159 million obligation under the note with TCEH. As a result, EFIH paid, and Oncor received, an aggregate $159 million to assign the agreements. The sale of the related-party agreements was reported as a $2 million (after tax) decrease in total membership interests for the three months ended September 30, 2012 in accordance with accounting rules for related-party matters.

- EFH Corp. subsidiaries charge Oncor for certain administrative services and shared facilities at cost. These costs, which are primarily reported in operation and maintenance expenses, totaled $10 million for each of the three-month periods ended September 30, 2012 and 2011 and $27 million and $28 million for the nine months ended September 30, 2012 and 2011, respectively.

- Under Texas regulatory provisions, the trust fund for decommissioning the Comanche Peak nuclear generation facility is funded by a delivery fee surcharge Oncor collects from REPs and remits monthly to TCEH. Delivery fee surcharges totaled $5 million for each of the three-month periods ended September 30, 2012 and 2011, respectively, and $12 million and $13 million for the nine months ended September 30, 2012 and 2011, respectively. These trust fund assets are established with the intent to be sufficient to fund the estimated decommissioning liability (both reported on TCEH's balance sheet). Income and expenses associated with the trust fund and the decommissioning liability are offset by a net change in Oncor's intercompany receivable/payable to TCEH, which in turn results in a change in Oncor's reported net regulatory asset/liability. The regulatory liability of $286 million and $225 million at September 30, 2012 and December 31, 2011, respectively, represents the excess of the trust fund balance over the net decommissioning liability (see Note 3).

- We are a member of EFH Corp.'s consolidated tax group, though Oncor is not, and EFH Corp.'s consolidated federal income tax return includes our results. Under the terms of a tax sharing agreement, we are obligated to make payments to EFH Corp. in an aggregate amount that is substantially equal to the amount of federal income taxes that we would have been required to pay if we were filing our own corporate income tax return. Also under the terms of the tax sharing agreement, Oncor makes similar payments to Texas Transmission and Investment LLC, pro rata in accordance with their respective membership interests in Oncor, in an aggregate amount that is substantially equal to the amount of federal income taxes that Oncor would have been required to pay if it were filing its own corporate income tax return. EFH Corp. also includes Oncor's results in its consolidated Texas state margin tax return, and consistent with the tax sharing agreement, Oncor remits to EFH Corp. Texas margin tax payments, which are accounted for as income taxes and calculated as if Oncor were filing its own return. See discussion in Note 1 to Financial Statements included in our 2011 Audited Financial Statements under "Income Taxes." At September 30, 2012 and December 31, 2011 we had amounts due to EFH Corp. under the agreement totaling $17 million and $2 million, respectively. In the nine months ended September 30, 2012, we made income tax payments to EFH Corp. totaling $27 million (net of a $21 million federal income tax-related refund received from EFH Corp.). In the nine months ended September 30, 2011, income tax payments to EFH Corp. related to the Texas margin tax totaled $20 million, and Oncor received federal income tax refunds totaling $109 million and $25 million from EFH Corp. and noncontrolling interests, respectively.

- Certain transmission and distribution utilities in Texas have tariffs in place to assure adequate credit worthiness of any REP to support the REP's obligation to collect transition bond-related charges on behalf of the utility. Under these tariffs, as a result of TCEH's credit rating being below investment grade, TCEH is required to post collateral support in an amount equal to estimated transition charges over specified time

F-21

EFIHMW00053282

EFIHMW00053083

periods. Accordingly, at September 30, 2012 and December 31, 2011, TCEH had posted letters of credit in the amount of $11 million and $12 million, respectively, for Oncor's benefit.

- Affiliates of the Sponsor Group have, and from time-to-time may in the future (1) sell, acquire or participate in the offerings of Oncor's debt or debt securities in open market transactions or through loan syndications, and (2) perform various financial advisory, dealer, commercial banking and investment banking services for Oncor and certain of our affiliates for which they have received or will receive customary fees and expenses. See Note 15 to Financial Statements included in our 2011 Audited Financial Statements for additional information.

See Notes 7 and 8 for information regarding distributions to EFIH and noncontrolling interests and the allocation of EFH Corp.'s pension and OPEB costs, respectively.

## 10. SUPPLEMENTARY FINANCIAL INFORMATION

### *Major Customers*

Revenues from TCEH represented 30% and 34% of total operating revenues for the three months ended September 30, 2012 and 2011, respectively, and 29% and 34% of total operating revenues for the nine months ended September 30, 2012 and 2011, respectively. Revenues from REP subsidiaries of a nonaffiliated entity collectively represented 16% and 17% of total operating revenues for the three months ended September 30, 2012 and 2011, respectively, and 15% and 16% of total operating revenues for the nine months ended September 30, 2012 and 2011, respectively. No other customer represented 10% or more of total operating revenues.

### *Other Income and Deductions*

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | 2012 | 2011 | 2012 | 2011 |
|---|---|---|---|---|
| Other income: |  |  |  |  |
| Accretion of fair value adjustment (discount) to regulatory assets due to purchase accounting | $ 6 | $ 7 | $ 18 | $ 22 |
| Other | — | 1 | 2 | 1 |
| Total other income | $ 6 | $ 8 | $ 20 | $ 23 |
| Other deductions: |  |  |  |  |
| Professional fees | $ — | $ 1 | $ 2 | $ 3 |
| Other | 1 | 1 | 2 | 4 |
| Total other deductions | $ 1 | $ 2 | $ 4 | $ 7 |

### *Interest Expense and Related Charges*

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | 2012 | 2011 | 2012 | 2011 |
|---|---|---|---|---|
| Interest expense | $ 90 | $ 88 | $ 275 | $ 263 |
| Amortization of debt issuance costs and discounts | 8 | 1 | 11 | 3 |
| Allowance for funds used during construction – capitalized interest portion | (2) | — | (7) | (1) |
| Total interest expense and related charges | $ 96 | $ 89 | $ 279 | $ 265 |

### *Restricted Cash*

All restricted cash amounts reported on our balance sheet at September 30, 2012 and December 31, 2011 relate to the transition bonds.

F-22

Confidential

EFIHMW00053283

EFIHMW00053083

### Trade Accounts Receivable

| | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Gross trade accounts receivable | $ 535 | $ 436 |
| Trade accounts receivable from TCEH | (158) | (131) |
| Allowance for uncollectible accounts | (2) | (2) |
| Trade accounts receivable from nonaffiliates – net | $ 375 | $ 303 |

Gross trade accounts receivable at September 30, 2012 and December 31, 2011 included unbilled revenues of $143 million and $127 million, respectively. At September 30, 2012 and December 31, 2011, REP subsidiaries of a nonaffiliated entity collectively represented approximately 14% and 10% of the nonaffiliated trade accounts receivable amount, respectively.

### Investments and Other Property

Investments and other property reported on our balance sheet consisted of the following:

| | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Assets related to employee benefit plans, including employee savings programs, net of distributions | $75 | $70 |
| Land | 3 | 3 |
| Total investments and other property | $78 | $73 |

### Property, Plant and Equipment

Property, plant and equipment reported on our balance sheet consisted of the following:

| | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Total assets in service | $15,771 | $15,227 |
| Less accumulated depreciation | 5,406 | 5,203 |
| Net of accumulated depreciation | 10,365 | 10,024 |
| Construction work in progress | 811 | 530 |
| Held for future use | 15 | 15 |
| Property, plant and equipment – net | $11,191 | $10,569 |

### Intangible Assets

Intangible assets (other than goodwill) reported on our balance sheet consisted of the following:

| | September 30, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net | Gross Carrying Amount | Accumulated Amortization | Net |
| Identifiable intangible assets subject to amortization included in property, plant and equipment: | | | | | | |
| Land easements | $ 264 | $ 79 | $ 185 | $ 248 | $ 77 | $ 171 |
| Capitalized software | 399 | 206 | 193 | 378 | 181 | 197 |
| Total intangible assets | $ 663 | $ 285 | $ 378 | $ 626 | $ 258 | $ 368 |

F-23

Confidential

Aggregate amortization expense for intangible assets totaled $13 million and $7 million for the three months ended September 30, 2012 and 2011, respectively, and $39 million and $30 million for the nine months ended September 30, 2012 and 2011, respectively. The estimated aggregate amortization expense for each of the next five fiscal years from December 31, 2011 is as follows:

| Year | Amortization Expense |
|------|----------------------|
| 2012 | $ 53 |
| 2013 | 55 |
| 2014 | 55 |
| 2015 | 55 |
| 2016 | 52 |

At both September 30, 2012 and December 31, 2011, goodwill totaling $4.1 billion was reported on our balance sheet. None of this goodwill is being deducted for tax purposes.

*Other Noncurrent Liabilities and Deferred Credits*

Other noncurrent liabilities and deferred credits balances consisted of the following:

| | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Retirement plan and other employee benefits | $1,441 | $1,340 |
| Liabilities related to subsidiary tax sharing agreement | 280 | 286 |
| Uncertain tax positions (including accrued interest) | 168 | 147 |
| Other | 55 | 59 |
| Total other noncurrent liabilities and deferred credits | $1,944 | $1,832 |

*Supplemental Cash Flow Information*

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2012 | 2011 |
| Cash payments (receipts) related to: | | |
| Interest | $ 291 | $ 311 |
| Capitalized interest | (7) | (1) |
| Interest (net of amounts capitalized) | $ 284 | $ 310 |
| Income taxes | $ 27 | $ (114) |
| Noncash investing and financing activities: | | |
| Noncash construction expenditures (a) | $ 78 | $ 103 |
| Noncash capital contribution related to settlement of certain income taxes payable (b) | $ — | $ 30 |

————————————
(a)    Represents end-of-period accruals.
(b)    Reflects noncash settlement of certain income taxes payable arising as a result of the sale of noncontrolling interests in Oncor.

101414122.5

F-24

Confidential

EFIHMW00053285

EFIHMW00053083

**PX 070**
**Page 203 of 203**