**OFFERING MEMORANDUM AND CONSENT SOLICITATION STATEMENT**          **CONFIDENTIAL**

# ENERGY FUTURE HOLDINGS CORP.
# ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC
# EFIH FINANCE INC.

### Offers to Exchange New 10.000% Senior Secured Notes due 2020
of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc.
for
Any and all outstanding
9.75% Senior Secured Notes due 2019 of Energy Future Holdings Corp.,
10.000% Senior Secured Notes due 2020 of Energy Future Holdings Corp., and
9.75% Senior Secured Notes due 2019 of Energy Future Intermediate
Holding Company LLC and EFIH Finance Inc.
and
Solicitations of Consents in Respect of the Related Indentures

---

THE EXCHANGE OFFERS FOR THE EXISTING NOTES (AS DEFINED BELOW) WILL EXPIRE AT 5:00 P.M., NEW YORK CITY TIME, ON JANUARY 24, 2013 (SUCH TIME AND DATE, AS IT MAY BE EXTENDED, THE "EXPIRATION DATE"). HOLDERS WHO VALIDLY TENDER (AND DO NOT VALIDLY WITHDRAW) EXISTING NOTES AT OR PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON JANUARY 8, 2013 (SUCH TIME AND DATE, AS IT MAY BE EXTENDED, THE "EARLY TENDER DATE") WILL BE ELIGIBLE TO RECEIVE ADDITIONAL CONSIDERATION AS DESCRIBED BELOW. TENDERS OF EXISTING NOTES MAY BE VALIDLY WITHDRAWN AT ANY TIME AT OR PRIOR TO THE EXPIRATION DATE.

THE SOLICITATION OF CONSENTS (AS DEFINED BELOW) FOR EXISTING NOTES WILL EXPIRE AT 5:00 P.M., NEW YORK CITY TIME, ON JANUARY 24, 2013 (SUCH TIME AND DATE, AS IT MAY BE EXTENDED, THE "CONSENT DATE"). CONSENTS MAY BE REVOKED AT ANY TIME AT OR PRIOR TO THE CONSENT DATE.

---

Upon the terms and subject to the conditions set forth in this Offering Memorandum and Consent Solicitation Statement (as it may be supplemented and amended from time to time, this "Offering Memorandum") and the related consent and letter of transmittal (as it may be supplemented and amended from time to time, the "Consent and Letter of Transmittal"), Energy Future Intermediate Holding Company LLC ("EFIH") and EFIH Finance Inc. ("EFIH Finance" and, together with EFIH, the "Offerors") are offering to exchange up to $1,309,590,130 aggregate principal amount of new 10.000% Senior Secured Notes due 2020 (the "New Notes") co-issued by the Offerors for any and all outstanding 9.75% Senior Secured Notes due 2019 (the "EFH Corp. 9.75% Notes") and 10.000% Senior Secured Notes due 2020 (the "EFH Corp. 10.000% Notes" and, together with the EFH Corp. 9.75% Notes, the "EFH Corp. Existing Notes") issued by Energy Future Holdings Corp. ("EFH Corp.") and any and all outstanding 9.75% Senior Secured Notes due 2019 co-issued by the Offerors (the "EFIH 9.75% Notes" and, together with the EFH Corp. Existing Notes, the "Existing Notes") validly tendered (and not validly withdrawn) pursuant to the exchange offers (the "exchange offers"), the terms of which are set forth in this Offering Memorandum and the Consent and Letter of Transmittal.

**Investing in the New Notes involves risks. See "Risk Factors" beginning on page 26.**

The New Notes issued in the exchange offers will constitute "Additional Notes" under the Indenture, dated as of August 17, 2010 (as amended and supplemented, the "EFIH 10.000% Notes Indenture"), among the Offerors and The Bank of New York Mellon Trust Company, N.A. ("BONYM"), as trustee. On August 17, 2010, the Offerors issued $2.180 billion aggregate principal amount of 10.000% Senior Secured Notes due 2020 under the EFIH 10.000% Notes Indenture (the "Existing EFIH 10.000% Notes"). The New Notes will have identical terms and conditions as, and form a single class as well as accrue from the Settlement Date, as a single class with, the Existing EFIH 10.000% Notes, except that interest on the New Notes will accrue from the Settlement Date, and the New Notes will initially be subject to transfer restrictions and will benefit from rights under a registration rights agreement (the "Registration Rights Agreement") among the Offerors and the Dealer Managers (as defined below), including rights to receive additional interest in the event of registration defaults under such Registration Rights Agreement.

The New Notes have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or any state securities laws. Accordingly, the New Notes will be subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and other applicable securities laws, pursuant to registration or exemption therefrom.

Pursuant to the terms of the Registration Rights Agreement, the Offerors will agree to file one or more registration statements with the United States Securities and Exchange Commission (the "SEC") relating to an offer to exchange the New Notes for publicly tradable notes having terms identical to the Existing EFIH 10.000% Notes (the "registered exchange offer"). Until the registered exchange offer is completed, the New Notes will not be fungible for trading purposes with the Existing EFIH 10.000% Notes. See "Notice to Investors" beginning on page 207 for a description of restrictions on resale or transfer of New Notes.

**The exchange offers are being made, and the New Notes are being offered and issued, only (a) in the United States to holders of Existing Notes who are "qualified institutional buyers" (as defined in Rule 144A under the Securities Act), and (b) outside the United States to holders of Existing Notes who are persons other than "U.S. persons" (as that term is defined in Rule 902 under the Securities Act) in reliance upon Regulation S under the Securities Act. Holders of Existing Notes who have certified to the Offerors that they are eligible to participate in the exchange offers pursuant to one of the foregoing conditions are referred to as "eligible holders." Only "eligible holders" are authorized to receive or review this Offering Memorandum and the Consent and Letter of Transmittal and to participate in the exchange offers.**

---

*Dealer Managers and Solicitation Agents*

**Citigroup**                                          **Goldman, Sachs & Co.**

**Credit Suisse**          **J.P. Morgan**          **Morgan Stanley**

December 21, 2012

Highly Confidential                                          EFH2D10011220

*(cover page continued)*

Upon the terms and subject to the conditions of the exchange offers, the Offerors are offering in exchange for each $1,000 principal amount of Existing Notes validly tendered (and not validly withdrawn) (i) at or prior to the Early Tender Date, the "Total Consideration" listed in the table below under "Total Consideration if Tendered at or prior to the Early Tender Date" and (ii) after the Early Tender Date but at or prior to the Expiration Date, the "Exchange Consideration" listed in the table below under "Exchange Consideration if Tendered after the Early Tender Date and at or prior to the Expiration Date."

| CUSIP/ISIN | Outstanding Principal Amount | Issuer(s) | Title of Existing Notes | Consideration Per $1,000 Principal Amount of Existing Notes Validly Tendered | |
|---|---|---|---|---|---|
| | | | | Total Consideration if Tendered at or prior to the Early Tender Date | Exchange Consideration if Tendered after the Early Tender Date and at or prior to the Expiration Date |
| 292680 AF2 US292680AF29 | $115,446,000 | EFH Corp. | 9.75% Senior Secured Notes due 2019 | $970.00 Principal Amount of New Notes | $920.00 Principal Amount of New Notes |
| 292680 AH8 US292680 AH84 292680AG0 US292680AG02 U29191AD2 USU29191AD22 | $1,060,757,000 | EFH Corp. | 10.000% Senior Secured Notes due 2020 | $1,000.00 Principal Amount of New Notes | $950.00 Principal Amount of New Notes |
| 292681 AA1 US292681AA15 | $141,083,000 | EFIH and EFIH Finance | 9.75% Senior Secured Notes due 2019 | $970.00 Principal Amount of New Notes | $920.00 Principal Amount of New Notes |

All participating holders will also receive, with respect to any of their Existing Notes accepted for exchange, accrued and unpaid interest, if any, in cash, from the last applicable interest payment date up to, but not including, the Settlement Date (as defined below).

Concurrent with the exchange offers, and on the terms and subject to the conditions set forth in this Offering Memorandum, (a) EFH Corp. is soliciting (the "EFH Corp. consent solicitations") consents (the "EFH Corp. Consents") from holders of the EFH Corp. Existing Notes to certain proposed amendments (with respect to each series of the EFH Corp. Existing Notes, the "EFH Corp. Proposed Amendments") to (i) the Indenture, dated as of November 16, 2009, among EFH Corp., the guarantors named therein and BONYM, as trustee, pursuant to which the EFH Corp. 9.75% Notes were issued (the "EFH Corp. 9.75% Notes Indenture"); and (ii) the Indenture, dated as of January 12, 2010, among EFH Corp., the guarantors named therein and BONYM, as trustee, as supplemented, pursuant to which the EFH Corp. 10.000% Notes were issued (the "EFH Corp. 10.000% Notes Indenture" and, together with the EFH Corp. 9.75% Notes Indenture, the "EFH Corp. Existing Notes Indentures"), and (b) the Offerors are soliciting (the "EFIH consent solicitation" and, together with the EFH Corp. consent solicitations, the "consent solicitations") consents (the "EFIH Consents" and, together with the EFH Corp. Consents, the "Consents") from holders of the EFIH 9.75% Notes to certain proposed amendments (the "EFIH Proposed Amendments" and, together with the EFH Corp. Proposed Amendments, the "Proposed Amendments") to the Indenture, dated as of November 16, 2009, among the Offerors and BONYM, as trustee, pursuant to which the EFIH 9.75% Notes were issued (the "EFIH 9.75% Notes Indenture" and, together with the EFH Corp. Existing Notes Indentures, the "Existing Notes Indentures").

ii

Highly Confidential

EFH2D10011221

EFH2D10011220

PX 074
Page 2 of 255

The Proposed Amendments consist of proposed amendments to the Existing Notes Indentures referred to herein as the "Proposed Indenture Amendments" and the "Proposed Collateral Release Amendments." In general, the Proposed Indenture Amendments would delete in their entirety many of the restrictive covenants and references thereto contained in the Existing Notes Indentures and the Existing Notes, as well as delete certain events of default, modify covenants regarding mergers and consolidations, modify or eliminate certain other provisions, including, among others, the limitations on the making of restricted payments and the incurrence of indebtedness and liens, and certain provisions relating to defeasance in the Existing Notes Indentures, and would make EFCH an "Unrestricted Subsidiary," thereby automatically releasing the guarantee by EFCH, under the EFH Corp. Existing Notes Indentures. The Proposed Collateral Release Amendments would release the collateral securing the EFH Corp. Existing Notes and would also make EFIH an "Unrestricted Subsidiary" under the EFH Corp. Existing Notes Indentures, and thereby cause the guarantee by EFIH of the EFH Corp. Existing Notes to be released automatically, which would make the EFH Corp. Existing Notes effectively junior to all secured and unsecured debt and other liabilities of EFIH. In addition, if the Proposed Collateral Release Amendments are adopted, the collateral securing the EFIH 9.75% Notes will be released in its entirety. The execution and delivery of the Consent and Letter of Transmittal will also constitute an express waiver by a consenting holder of the Existing Notes with respect to all claims against EFH Corp., the Offerors and the Sponsor Group of any breach, default or event of default that may have arisen under the Existing Notes Indentures. As of the date of this Offering Memorandum, EFH Corp. and the Offerors are not aware of any such breaches, defaults or events of default. See "The Proposed Amendments."

Consents in respect of at least a majority of the outstanding aggregate principal amount of a series of Existing Notes, voting as a separate class, are required to approve the Proposed Indenture Amendments with respect to such series and Consents in respect of a least 66⅔% of the outstanding aggregate principal amount of a series of Existing Notes, voting as a separate class, are required to approve the Proposed Collateral Release Amendments (such Consents collectively, the "Requisite Consents") with respect to such series.

Assuming that the Requisite Consents in respect of all of the Proposed Amendments for a series of Existing Notes are validly delivered and not validly revoked, it is expected that EFH Corp., EFCH, EFIH and the Trustee, in the case of the EFH Corp. Existing Notes Indentures, and the Offerors and the Trustee, in the case of the EFIH 9.75% Notes Indenture, will execute and deliver promptly after the Consent Date and prior to the acceptance of Existing Notes for exchange in the exchange offers one or more supplemental indentures (together, "Supplemental Indentures") providing for the Proposed Amendments with respect to the Existing Notes Indenture corresponding to such series. Any such Supplemental Indenture will be effective immediately upon its execution and delivery, but the Proposed Amendments contained therein will not become operative until immediately prior to the acceptance for exchange of Existing Notes of such series by the Offerors pursuant to the exchange offer therefor. In the event that the Requisite Consents to approve the Proposed Indenture Amendments, but not the Proposed Collateral Release Amendments, with respect to a series of Existing Notes are validly delivered and not validly revoked, it is expected that EFH Corp., EFCH, EFIH and the Trustee, in the case of the EFH Corp. Existing Notes Indentures, and the Offerors and the Trustee, in the case of the EFIH 9.75% Notes Indenture, will execute and deliver a Supplemental Indenture providing for the Proposed Indenture Amendments with respect to the Existing Notes Indenture corresponding to such series. Any such Supplemental Indenture will be effective immediately upon its execution and delivery, but the Proposed Indenture Amendments contained therein will not become operative until the Offerors accept for exchange pursuant to the exchange offer therefor Existing Notes of such series. The Proposed Amendments with respect to each series of Existing Notes constitute a single proposal for the related consent solicitation, and a consenting holder must consent to the Proposed Amendments applicable to such series of Existing Notes tendered by that holder in their entirety.

Highly Confidential                                                                                      EFH2D10011222

EFH2D10011220

Existing Notes validly tendered pursuant to the exchange offers (and not validly withdrawn) at or prior to the Consent Date will be deemed to include Consents to the Proposed Amendments with respect to such Existing Notes. Holders may not deliver Consents in the consent solicitations without validly tendering their related Existing Notes in the exchange offers at or prior to the Consent Date and may only validly revoke Consents by validly withdrawing the previously tendered related Existing Notes at or prior to the Consent Date or by withdrawing the related tendered Existing Notes after the Consent Date and prior to the execution and delivery of the applicable Supplemental Indenture.

**Tendered Existing Notes may be validly withdrawn at any time prior to the Consent Date. Consents may only be validly revoked by validly withdrawing the previously tendered related Existing Notes at or prior to the Consent Date or by withdrawing the related tendered Existing Notes after the Consent Date and prior to the execution and delivery of the applicable Supplemental Indenture by the parties thereto. See "Procedures for Tendering Existing Notes and Delivering Consents."**

Subject to applicable law, each exchange offer and consent solicitation related to a series of the Existing Notes is being made independently of the other exchange offers and consent solicitations, and, subject to applicable law, the Offerors reserve the right to terminate, withdraw or amend each exchange offer and EFH Corp. or EFIH and EFIH Finance, as applicable, reserve the right to terminate, withdraw or amend the consent solicitation related to such series of Existing Notes subject to such exchange offer independently of the other exchange offers and consent solicitations at any time and from time to time, as described herein.

The exchange offers are not conditioned on any minimum principal amount of Existing Notes being validly tendered, the issuance of a minimum principal amount of New Notes or the receipt of Requisite Consents to adopt the Proposed Amendments for any series of Existing Notes. However, the exchange offers and the consent solicitations are subject to the satisfaction or waiver of a number of conditions as set forth in this Offering Memorandum. See "Conditions of the Exchange Offers and the Consent Solicitations." The Offerors reserve the right to terminate or withdraw any of the exchange offers and the consent solicitations if any of the conditions described under the "Conditions of the Exchange Offers and the Consent Solicitations" is not satisfied or waived. If an exchange offer for a series of Existing Notes is terminated, the Proposed Amendments in any executed Supplemental Indenture related to such series of Existing Notes will not become operative.

### NOTICE TO NEW HAMPSHIRE RESIDENTS

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED, 1955, AS AMENDED ("RSA 421-B") WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT, ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

iv

Highly Confidential

## TABLE OF CONTENTS

|  | Page |
|---|---|
| NOTICE TO NEW HAMPSHIRE RESIDENTS | iv |
| GLOSSARY | viii |
| ONCOR HOLDINGS | xi |
| SECURITIES AND EXCHANGE COMMISSION REVIEW | xi |
| INDUSTRY AND MARKET INFORMATION | xi |
| AVAILABLE INFORMATION | xii |
| INCORPORATION BY REFERENCE | xii |
| SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS | xiv |
| SUMMARY | 1 |
| RISK FACTORS | 26 |
| THE TRANSACTIONS | 63 |
| USE OF PROCEEDS | 67 |
| CAPITALIZATION | 68 |
| GENERAL TERMS OF THE EXCHANGE OFFERS AND CONSENT SOLICITATIONS | 70 |
| PROPOSED AMENDMENTS | 75 |
| ACCEPTANCE OF EXISTING NOTES; ACCEPTANCE OF CONSENTS; ACCRUAL OF INTEREST | 82 |
| PROCEDURES FOR TENDERING EXISTING NOTES AND DELIVERING CONSENTS | 84 |
| WITHDRAWAL OF TENDERS AND REVOCATION OF CONSENTS | 88 |
| CONDITIONS OF THE EXCHANGE OFFERS AND THE CONSENT SOLICITATIONS | 90 |
| EXCHANGE AGENT; INFORMATION AGENT; DEALER MANAGERS AND SOLICITATION AGENTS | 92 |
| DESCRIPTION OF THE NEW NOTES | 94 |
| REGISTRATION RIGHTS | 189 |
| BOOK-ENTRY, DELIVERY AND FORM | 191 |
| CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS | 197 |
| CERTAIN ERISA CONSIDERATIONS | 205 |
| NOTICE TO INVESTORS | 207 |
| LEGAL MATTERS | 211 |
| INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | 211 |
| INDEPENDENT AUDITORS | 212 |
| INDEX TO FINANCIAL STATEMENTS | F-1 |

_____

This Offering Memorandum is submitted on a confidential basis to eligible holders for use solely in connection with the consideration of the exchange offers and consent solicitations. Its use for any other purpose is not authorized. Distribution of this Offering Memorandum to any person other than the eligible holders and any person retained to advise such eligible holders with respect to participation in the exchange offers and consent solicitations is prohibited, and any disclosure of any of its contents, without the Offerors' prior written consent, is also prohibited. Each prospective participant in the exchange offers and consent solicitations, by accepting delivery of this Offering Memorandum, agrees that it is an eligible holder and to the foregoing and to make no copies or reproductions of this Offering Memorandum or any documents referred to in this Offering Memorandum in whole or in part (other than publicly available documents).

None of EFH Corp. or its consolidated subsidiaries, including EFIH, EFIH Finance and their consolidated subsidiaries; the boards of directors or boards of managers of EFH Corp. and its

v

EFH2D10011220

**PX 074**
**Page 5 of 255**

subsidiaries; Global Bondholder Services Corporation, as the exchange agent (the "Exchange Agent") and the information agent (the "Information Agent"); Citigroup Global Markets Inc., Goldman, Sachs & Co., Credit Suisse Securities (USA) LLC, J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC as the dealer managers for the exchange offers and the solicitation agents for the consent solicitations (the "Dealer Managers"); BONYM; or the affiliates of any of them, makes any recommendation as to whether holders of the Existing Notes should tender their Existing Notes pursuant to the exchange offers or deliver Consents pursuant to the consent solicitations. Each holder must make its own decision as to whether to tender its Existing Notes and to deliver its Consents, and, if so, the principal amount of the Existing Notes as to which action is to be taken.

You should rely only on the information included in or incorporated by reference into this Offering Memorandum. Neither the Offerors nor the Dealer Managers have authorized any person (including any dealer, salesman or broker) to provide you with different information. If anyone should provide you with different or inconsistent information, you should not rely on it.

The information included in or incorporated by reference into this Offering Memorandum is only accurate on the date hereof or the dates of the documents incorporated herein by reference. You should not assume that the information included in or incorporated by reference into this Offering Memorandum is accurate as of any other date.

**The New Notes have not been approved or recommended by any federal or state jurisdiction of the United States of America ("U.S."), any foreign jurisdiction or any regulatory authority. Furthermore, those authorities have not been requested to confirm the accuracy or adequacy of this Offering Memorandum, and none of those authorities has passed upon or endorsed the merits of the exchange offers or consent solicitations. Any representation to the contrary is a criminal offense.**

The Offerors are not making an offer of New Notes in any jurisdiction where the exchange offers or consent solicitations are not permitted. This Offering Memorandum does not constitute an offer to participate in the exchange offers and consent solicitations to any person in any jurisdiction where it is unlawful to make such exchange offers and consent solicitations. The New Notes are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act pursuant to registration or exemption therefrom and any other applicable law. The New Notes will be subject to registration rights under the Registration Rights Agreement. Please refer to the sections in this Offering Memorandum entitled "Risk Factors," "Registration Rights" and "Notice to Investors."

The exchange offers and consent solicitations are being made on the basis of this Offering Memorandum and the Consent and Letter of Transmittal and are subject to the terms and conditions set forth herein or therein. Any decision to participate in the exchange offers and consent solicitations must be based on the information included in and incorporated by reference into this Offering Memorandum. In making an investment decision, prospective investors must rely on their own examination of us and the terms of the exchange offers, the consent solicitations and the New Notes, including the merits and risks involved. Investors should not construe anything in this Offering Memorandum and the Consent and Letter of Transmittal as legal, investment, business or tax advice. Each investor should consult its advisors as needed to make its investment decision and to determine whether it is legally permitted to participate in the exchange offers and consent solicitations under applicable laws and regulations.

Each holder must comply with all applicable laws and regulations in force in any jurisdiction in which it participates in the exchange offers and consent solicitations or possesses this Offering Memorandum and must obtain any consent, approval or permission required by it for participation in the exchange offers and consent solicitations under the laws and regulations in force in any jurisdiction

Highly Confidential

EFH2D10011225

EFH2D10011220

**PX 074**
**Page 6 of 255**

to which it is subject. None of the Offerors, the Dealer Managers or any of our or their respective affiliates or representatives shall have any responsibility therefor.

The Offerors and other sources identified herein have provided the information included in or incorporated by reference into this Offering Memorandum. The Dealer Managers make no representation or warranty, express or implied, as to the accuracy or completeness of such information, and nothing included in or incorporated by reference into this Offering Memorandum is, or shall be relied upon as, a promise or representation by the Dealer Managers.

This Offering Memorandum and the documents incorporated by reference into this Offering Memorandum contain summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents themselves for complete information. All such summaries are qualified in their entirety by such reference. Copies of documents referred to in, or in any document incorporated by reference into, this Offering Memorandum will be made available to eligible holders in the exchange offers and the consent solicitations at no cost upon request to us. See "Available Information" and "Incorporation by Reference."

You should not rely on or assume the accuracy of any representation or warranty in any agreement that we have filed as an exhibit to any document incorporated by reference herein or that we may otherwise publicly file in the future because such representation or warranty may be subject to exceptions and qualifications contained in separate disclosure schedules, may have been included in such agreement for the purpose of allocating risk between the parties to the particular transaction, and may no longer continue to be true as of any given date.

Highly Confidential                                                                                                    EFH2D10011226

EFH2D10011220

## GLOSSARY

Unless the context otherwise requires or as otherwise indicated, references in this Offering Memorandum to:

"*we*," "*our*" and "*us*" are to Energy Future Intermediate Holding Company LLC and its consolidated subsidiaries;

"*2011 Form 10-K*" are to EFIH's Annual Report on Form 10-K for the year ended December 31, 2011, filed with the SEC on February 21, 2012;

"*Adjusted EBITDA*" are to EBITDA adjusted to exclude noncash items, unusual items and other adjustments allowable under the indentures for the New Notes, EFIH 6.875% Notes, EFIH 9.75% Notes, Existing EFIH 10.000% Notes, EFIH Second Lien Notes and EFIH 2018 Toggle Notes and certain of EFH Corp.'s debt arrangements (as applicable). See definition of EBITDA below. Adjusted EBITDA and EBITDA are not recognized terms under GAAP and, thus, are non-GAAP financial measures. We are providing our and EFH Corp.'s Adjusted EBITDA in this Offering Memorandum solely because of the important role that Adjusted EBITDA plays in respect of certain covenants contained in the indentures governing the New Notes, EFIH 6.875% Notes, EFIH 9.75% Notes, Existing EFIH 10.000% Notes, EFIH Second Lien Notes and EFIH 2018 Toggle Notes and certain of EFH Corp.'s debt arrangements. We do not intend for Adjusted EBITDA (or EBITDA) to be an alternative to net income as a measure of operating performance or an alternative to cash flows from operating activities as a measure of liquidity or an alternative to any other measure of financial performance presented in accordance with GAAP. Additionally, we do not intend for Adjusted EBITDA (or EBITDA) to be used as a measure of free cash flow available for management's discretionary use, as the measure excludes certain cash requirements such as interest payments, tax payments and other debt service requirements. Because not all companies use identical calculations, the presentation of Adjusted EBITDA (and EBITDA) for EFIH or EFH Corp. may not be comparable to similarly titled measures of other companies;

"*August 2012 Notes Offering*" are to the August 14, 2012 issuance by the Issuer of $250 million aggregate principal amount of EFIH 6.875% Notes and $600 million aggregate principal amount of EFIH 11.750% Notes;

"*CAIR*" are to the Clean Air Interstate Rule;

"*EBITDA*" are to earnings (net income) before interest expense, income taxes, depreciation and amortization. See the definition of Adjusted EBITDA above;

"*EFCH*" are to Energy Future Competitive Holdings Company and not to any of its subsidiaries;

"*EFH Corp.*" are to Energy Future Holdings Corp. and not to any of its subsidiaries;

"*EFH Corp. 2011 Form 10-K*" are to EFH Corp.'s Annual Report on Form 10-K for the year ended December 31, 2011, filed with the SEC on February 21, 2012;

"*EFH Corp. 2017 Notes*" are to, collectively, the EFH Corp. 10.875% Notes and the EFH Corp. 2017 Toggle Notes;

"*EFH Corp. 2017 Toggle Notes*" are to the 11.250%/12.000% Senior Toggle Notes due 2017 issued by EFH Corp.;

"*EFH Corp. 9.75% Notes*" are to the 9.75% Senior Secured Notes due 2019 issued by EFH Corp.;

viii

Highly Confidential

EFH2D10011227

EFH2D10011220

"*EFH Corp. 10.000% Notes*" are to the 10.000% Senior Secured Notes due 2020 issued by EFH Corp.;

"*EFH Corp. 10.875% Notes*" are to the 10.875% Senior Notes due 2017 issued by EFH Corp.;

"*EFH Corp. June 30, 2012 Form 10-Q*" are to EFH Corp.'s Quarterly Report on Form 10-Q for the quarter ended June 30, 2012, filed with the SEC on July 31, 2012;

"*EFH Corp. September 30, 2012 Form 10-Q*" are to EFH Corp.'s Quarterly Report on Form 10-Q for the quarter ended September 30, 2012, filed with the SEC on October 30, 2012;

"*EFH Corp. Series P Notes*" are to the 5.55% Series P Senior Notes due November 15, 2014 issued by EFH Corp.;

"*EFH Corp. Series Q Notes*" are to the 6.50% Series Q Senior Notes due November 15, 2024 issued by EFH Corp.;

"*EFH Corp. Series R Notes*" are to the 6.55% Series R Senior Notes due November 15, 2034 issued by EFH Corp.;

"*EFIH*" and "*EFIH Finance*" are to Energy Future Intermediate Holding Company LLC and EFIH Finance Inc., respectively, and not to any of their respective subsidiaries;

"*EFIH 6.875% Notes*" are to the 6.875% Senior Secured Notes due 2017 issued by EFIH and EFIH Finance;

"*EFIH 9.75% Notes*" are to the 9.75% Senior Secured Notes due 2019 issued by EFIH and EFIH Finance;

"*EFIH 11% Notes*" are to the 11% Senior Secured Second Lien Notes due 2021 issued by EFIH and EFIH Finance;

"*EFIH 11.750% Notes*" are to the 11.750% Senior Secured Second Lien Notes due 2022 issued by EFIH and EFIH Finance;

"*EFIH 2018 Toggle Notes*" are to the 11.25%/12.25% Senior Toggle Notes due 2018 issued by EFIH and EFIH Finance;

"*EFIH Dividend*" are to the $680 million dividend EFIH will pay to EFH Corp. in or before January 2013 from a portion of the proceeds of the August 2012 Notes Offering;

"*EFIH Second Lien Notes*" are to, collectively, the EFIH 11% Notes and the EFIH 11.750% Notes;

"*Existing EFIH 10.000% Notes*" are to the 10.000% Senior Secured Notes due 2020 issued by EFIH and EFIH Finance on August 17, 2010;

"*Existing First Lien Notes*" are to, collectively, the EFIH 6.875% Notes, the EFIH 9.75% Notes, the Existing EFIH 10.000% Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes;

"*GAAP*" are to United States generally accepted accounting principles;

"*June 30, 2012 Form 10-Q*" are to EFIH's Quarterly Report on Form 10-Q for the quarter ended June 30, 2012, filed with the SEC on July 31, 2012;

ix

Highly Confidential                                                    EFH2D10011228

EFH2D10011220
## PX 074
## Page 9 of 255

"*Legacy Notes*" are to, collectively, the EFH Corp. Series P Notes, the EFH Corp. Series Q Notes and the EFH Corp. Series R Notes;

"*October 2012 Notes Offering*" are to the October 23, 2012 issuance by the Issuer of $252,714,000 aggregate principal amount of EFIH 6.875% Notes;

"*Offerors*" are to EFIH and EFIH Finance, collectively, and not to any of their respective subsidiaries;

"*Oncor Holdings*" and "*Oncor*" are to Oncor Electric Delivery Holdings Company LLC and Oncor Electric Delivery Company LLC, respectively, with or without their respective subsidiaries as indicated in context;

"*September 30, 2012 Form 10-Q*" are to EFIH's Quarterly Report on Form 10-Q for the quarter ended September 30, 2012, filed with the SEC on October 30, 2012;

"*TCEH*" and "*TCEH Finance*" are to Texas Competitive Electric Holdings Company LLC and TCEH Finance, Inc., respectively, and not to any of their respective subsidiaries;

"*TCEH 10.25% Notes*" are to, collectively, the 10.25% Senior Notes due 2015 and the 10.25% Senior Notes due 2015, Series B issued by TCEH and TCEH Finance;

"*TCEH 2015/2016 Notes*" are to, collectively, the TCEH 10.25% Notes and the TCEH 2016 Toggle Notes;

"*TCEH 2016 Toggle Notes*" are to the 10.50%/11.25% Senior Toggle Notes due 2016 issued by TCEH and TCEH Finance;

"*TCEH 2020 Notes*" are to the 11.5% Senior Secured Notes due 2020 issued by TCEH and TCEH Finance;

"*TCEH 2021 Notes*" are to, collectively, the 15% Senior Secured Second Lien Notes due 2021 and the 15% Senior Secured Second Lien Notes due 2021, Series B issued by TCEH and TCEH Finance;

"*TCEH Demand Notes*" are to certain loans from TCEH to EFH Corp. in the form of demand notes, which totaled $689 million as of September 30, 2012, for debt principal and interest payments and other general corporate purposes of EFH Corp. that are guaranteed on a senior unsecured basis by EFIH and EFCH (a direct subsidiary of EFH Corp. and parent of TCEH); and

"*TCEH Senior Secured Credit Facilities*" are to the credit facilities under the Credit Agreement, dated as of October 10, 2007, as amended on August 7, 2009 and April 7, 2011, by and among EFCH, as guarantor, TCEH, as borrower, the lenders party thereto in their capacities as lenders thereunder and Citibank, N.A., as Administrative Agent, which consisted of the following as of September 30, 2012:

(a)    a $3.809 billion senior secured term loan facility of TCEH maturing October 10, 2014;

(b)    a $15.351 billion (excluding $19 million held by EFH Corp.) senior secured term loan facility of TCEH maturing October 10, 2017;

x

Highly Confidential

(c)    a $42 million senior secured letter of credit facility of TCEH maturing October 10, 2014;

(d)    a $1.020 billion senior secured letter of credit facility of TCEH maturing October 10, 2017;

(e)    a $645 million senior secured revolving credit facility of TCEH maturing October 10, 2013;

(f)    a $1.409 billion senior secured revolving credit facility of TCEH maturing October 10, 2016; and

(g)    a senior secured cash posting credit facility of TCEH.

## ONCOR HOLDINGS

Because the New Notes are secured by all of the membership interests EFIH owns or holds in Oncor Holdings, this Offering Memorandum includes and incorporates by reference financial statements of Oncor Holdings. See Oncor Holdings' audited historical consolidated financial statements for the year ended December 31, 2011, which are included as Exhibit 99(d) to our 2011 Form 10-K and incorporated into this Offering Memorandum by reference, and unaudited condensed consolidated financial statements for the three and nine months ended September 30, 2012 and 2011, which are included elsewhere in this Offering Memorandum. See "Incorporation by Reference."

## SECURITIES AND EXCHANGE COMMISSION REVIEW

The information in this Offering Memorandum relates to an offering that is exempt from registration under the Securities Act. The Offerors will agree to file one or more registration statements with the SEC with respect to (1) a registered offer to exchange the New Notes for exchange notes (the "exchange notes") having terms substantially identical in all material respects to the New Notes exchanged therefor (except that the exchange notes will not contain terms with respect to additional interest or transfer restrictions) or (2) resales of the New Notes. See "Registration Rights." In the course of the review by the SEC of any such registration statement and other filings the Offerors may make with the SEC, the Offerors may be required or may elect to make changes to the description of their business, financial statements and other information in those documents and filings. The Offerors believe that the financial statements and other financial data included in or incorporated by reference into this Offering Memorandum have been prepared in a manner that complies, in all material respects, with the regulations published by the SEC and are consistent with current practice.

## INDUSTRY AND MARKET INFORMATION

The industry and market data and other statistical information used throughout or incorporated by reference into this Offering Memorandum are based on independent industry publications, government publications, reports by market research firms or other published independent sources, including certain data published by the Electric Reliability Council of Texas, Inc. ("ERCOT"), the Public Utility Commission of Texas (the "PUCT") and the New York Mercantile Exchange. We did not commission any of these publications or reports. Some data is also based on good faith estimates, which are derived from our review of internal surveys, as well as the independent sources listed above. Independent industry publications and surveys generally state that they have obtained information from sources believed to be reliable but do not guarantee the accuracy and completeness of such information. While we believe that each of these studies and publications is reliable, we have not independently verified such data and make no representation as to the accuracy of such information. Forecasts are particularly likely to be inaccurate, especially over long periods of time, and we do not know what assumptions regarding general economic growth are used in preparing the forecasts included in this Offering Memorandum, including the information incorporated into this Offering

xi

Memorandum by reference. Similarly, while we believe that such internal and external research is reliable, it has not been verified by any independent sources, and we make no assurances that the predictions contained therein are accurate.

## AVAILABLE INFORMATION

EFIH and EFH Corp. file annual, quarterly and current reports and other information with the SEC. You may read and copy any document EFIH or EFH Corp. has filed or will file with the SEC at the SEC's public website (www.sec.gov) or at the Public Reference Room of the SEC located at 100 F Street, N.E., Washington, DC 20549. Copies of such materials can be obtained from the Public Reference Room of the SEC at prescribed rates. You can call the SEC at 1-800-SEC-0330 to obtain information on the operation of the Public Reference Room.

EFIH has agreed in the indenture governing the New Notes that even if it is not subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise required to report on an annual and quarterly basis on forms provided for such annual and quarterly reporting pursuant to rules and regulations promulgated by the SEC, EFIH will nonetheless file with the SEC and make available to the trustee and to holders of New Notes the reports specified under "Description of the New Notes—Certain Covenants—Reports and Other Information" subject to the provisions described in those sections.

## INCORPORATION BY REFERENCE

We incorporate certain information into this Offering Memorandum by reference to other documents that EFIH and EFH Corp. have filed with the SEC. This means that we can disclose important information to you for purposes of this Offering Memorandum by referring you to other documents that have been filed separately with the SEC. We incorporate into this Offering Memorandum by reference each of the following reports:

- EFIH's Annual Report on Form 10-K for the year ended December 31, 2011 that it filed with the SEC on February 21, 2012;

- EFIH's Quarterly Reports on Form 10-Q for the quarter ended March 31, 2012 that it filed with the SEC on May 1, 2012, the quarter ended June 30, 2012 that it filed with the SEC on July 31, 2012 and the quarter ended September 30, 2012 that it filed with the SEC on October 30, 2012;

- EFIH's Current Reports on Form 8-K that it filed with the SEC on January 31, 2012, February 2, 2012, February 7, 2012, February 23, 2012, February 24, 2012, February 29, 2012, August 9, 2012, August 10, 2012, August 17, 2012, October 18, 2012, October 19, 2012, October 24, 2012, November 6, 2012, November 9, 2012, December 5, 2012, and December 21, 2012;

- EFH Corp.'s Annual Report on Form 10-K for the year ended December 31, 2011 that it filed with the SEC on February 21, 2012;

- EFH Corp.'s Quarterly Reports on Form 10-Q for the quarter ended March 31, 2012 that it filed with the SEC on May 1, 2012, the quarter ended June 30, 2012 that it filed with the SEC on July 31, 2012 and the quarter ended September 30, 2012 that it filed with the SEC on October 30, 2012; and

- EFH Corp.'s Current Reports on Form 8-K that it filed with the SEC on January 6, 2012, January 31, 2012, February 2, 2012, February 7, 2012, February 23, 2012, February 24, 2012, February 29, 2012, June 5, 2012, July 3, 2012, August 7, 2012, August 9, 2012, August 10, 2012, August 17, 2012, October 18, 2012, October 19, 2012, October 24, 2012, November 6, 2012, November 9, 2012, December 5, 2012, December 6, 2012, December 12, 2012, and December 21, 2012.

Highly Confidential

EFH2D10011231

EFH2D10011220

We also incorporate by reference each of the documents that we and EFH Corp. file with the SEC (excluding those filings made under Items 2.02 or 7.01 of Form 8-K and corresponding information furnished under Item 9.01 of Form 8-K or included as an exhibit, or other information furnished to the SEC unless otherwise expressly provided) under Section 13(a), 13(c), 14, or 15(d) of the Exchange Act on or after the date of this Offering Memorandum and prior to the Expiration Date. Any statements made in such documents will automatically update and supersede the information contained in this Offering Memorandum, and any statements made in this Offering Memorandum update and supersede the information contained in past SEC filings incorporated by reference into this Offering Memorandum.

Copies of these filings are available free of charge by writing to Energy Future Intermediate Holding Company LLC, Energy Plaza, 1601 Bryan Street, Dallas, TX 75201-3411, Attention: Investor Relations, or by telephoning us at 214-812-4600.

Because the New Notes are secured by all of the membership interests EFIH owns or holds in Oncor Holdings, this Offering Memorandum includes and incorporates by reference financial statements of Oncor Holdings. EFIH incorporates into this Offering Memorandum Oncor Holdings' audited historical consolidated financial statements for the year ended December 31, 2011, which are filed as Exhibit 99(d) to EFIH's 2011 Form 10-K.

xiii

Highly Confidential

EFH2D10011232

EFH2D10011220

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Offering Memorandum, including the information incorporated into this Offering Memorandum by reference, contains "forward-looking statements." All statements, other than statements of historical facts, that are included in or incorporated by reference into this Offering Memorandum that address activities, events or developments that we expect or anticipate to occur in the future, including such matters as future liability management program activities, financial or operational projections, capital allocation, future capital expenditures, business strategy, competitive strengths, goals, future acquisitions or dispositions, development or operation of facilities, market and industry developments and the growth of our businesses and operations (often, but not always, through the use of words or phrases such as "intends," "plans," "will likely," "expected," "could," "will continue," "anticipated," "estimated," "should," "projection," "target," "goal," "objective" and "outlook"), are forward-looking statements. Although we believe that in making any such forward-looking statement our expectations are based on reasonable assumptions, any such forward-looking statement involves uncertainties and is qualified in its entirety by reference to the discussion of risk factors under "Risk Factors" contained elsewhere in this Offering Memorandum and in the sections captioned "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our 2011 Form 10-K, our June 30, 2012 Form 10-Q, our September 30, 2012 Form 10-Q, the EFH Corp. 2011 Form 10-K, the EFH Corp. June 30, 2012 Form 10-Q and the EFH Corp. September 30, 2012 Form 10-Q, which are incorporated into this Offering Memorandum by reference, and the following important factors, among others, that could cause our actual results to differ materially from those projected in such forward-looking statements:

- prevailing governmental policies and regulatory actions, including those of the Texas Legislature, the Governor of Texas, the Congress of the United States of America, the U.S. Federal Energy Regulatory Commission (the "FERC"), the North American Electric Reliability Corporation, the Texas Reliability Entity, Inc., the PUCT, ERCOT, the Railroad Commission of Texas, the U.S. Nuclear Regulatory Commission, the U.S. Environmental Protection Agency (the "EPA"), the Texas Commission on Environmental Quality and the Commodity Futures Trading Commission, with respect to, among other things:

  - allowed prices;

  - allowed rates of return;

  - permitted capital structure;

  - industry, market and rate structure;

  - purchased power and recovery of investments;

  - operations of nuclear generation facilities;

  - operations of fossil-fueled generation facilities;

  - operations of mines;

  - acquisition and disposal of assets and facilities;

  - development, construction and operation of facilities;

  - decommissioning costs;

  - present or prospective wholesale and retail competition;

  - changes in tax laws and policies;

  - changes in and compliance with environmental and safety laws and policies, including the EPA's Cross-State Air Pollution Rule ("CSAPR") or its replacement, Mercury and Air Toxics Standard ("MATS") and climate change initiatives; and

xiv

Highly Confidential

EFH2D10011233

EFH2D10011220
**PX 074**
**Page 14 of 255**

- clearing over the counter derivatives through exchanges and posting of cash collateral therewith;
- legal and administrative proceedings and settlements;
- general industry trends;
- economic conditions, including the impact of a recessionary environment;
- EFH Corp. and its subsidiaries' ability to attract and retain profitable customers;
- EFH Corp. and its subsidiaries' ability to profitably serve their customers;
- restrictions on competitive retail pricing;
- changes in wholesale electricity prices or energy commodity prices, including the price of natural gas;
- changes in prices of transportation of natural gas, coal, crude oil and refined products;
- unanticipated changes in market heat rates in the ERCOT electricity market;
- EFH Corp. and its subsidiaries' ability to effectively hedge against unfavorable commodity prices, including the price of natural gas, market heat rates and interest rates;
- weather conditions, including drought and limitations on access to water, and other natural phenomena, and acts of sabotage, wars or terrorist or cybersecurity threats or activities;
- unanticipated population growth or decline, or changes in market demand and demographic patterns, particularly in ERCOT;
- changes in business strategy, development plans or vendor relationships;
- access to adequate transmission facilities to meet changing demands;
- unanticipated changes in interest rates, commodity prices, rates of inflation or foreign exchange rates;
- unanticipated changes in operating expenses, liquidity needs and capital expenditures;
- commercial bank market and capital market conditions and the potential impact of disruptions in U.S. and international credit markets;
- the willingness of EFH Corp. and its subsidiaries' (including EFIH and its subsidiaries') lenders to extend the maturities of their debt instruments and the terms and conditions of any such extensions;
- access to capital, the cost of such capital, and the result of financing and refinancing efforts, including availability of funds in capital markets;
- activity in the credit default swap market related to EFH Corp. and its subsidiaries' (including EFIH and its subsidiaries') debt instruments;
- restrictions placed on EFH Corp. and its subsidiaries (including EFIH and its subsidiaries) by the agreements governing their debt instruments;
- our ability to generate sufficient cash flow to make interest payments on, or refinance, our debt instruments;
- EFH Corp.'s or its subsidiaries', including, in particular, TCEH's, ability to make principal and interest payments on their debt held by EFIH or to provide sufficient capital contributions or loans to us to make interest payments on our debt instruments, including the New Notes;

xv

Highly Confidential                                                                                    EFH2D10011234

- EFH Corp. and its subsidiaries' ability to successfully execute their liability management program;

- any defaults under certain of EFH Corp. and its subsidiaries' (including EFIH and its subsidiaries') financing arrangements (including arrangements that EFIH guarantees) that could trigger cross default or cross acceleration provisions under other financing arrangements;

- EFH Corp. and its subsidiaries' (including EFIH and its subsidiaries') ability to make intercompany loans or otherwise transfer funds among different entities in their corporate structure;

- competition for new energy development and other business opportunities;

- inability of various counterparties to meet their obligations with respect to EFH Corp. and its subsidiaries' (including EFIH and its subsidiaries') financial instruments;

- changes in technology used by and services offered by EFH Corp. and its subsidiaries (including EFIH and its subsidiaries);

- changes in electricity transmission that allow additional electricity generation to compete with EFH Corp. and its subsidiaries' generation assets;

- significant changes in EFH Corp. and its subsidiaries' (including EFIH and its subsidiaries') relationship with their employees, including the availability of qualified personnel, and the potential adverse effects if labor disputes or grievances were to occur;

- significant changes in assumptions used to estimate costs of providing employee benefits, including medical and dental benefits, pension and other post-retirement benefits, and future funding requirements related thereto;

- changes in assumptions used to estimate future executive compensation payments;

- hazards customary to the industry and the possibility that EFH Corp. and its subsidiaries may not have adequate insurance to cover losses resulting from such hazards;

- significant changes in critical accounting policies;

- actions by credit rating agencies;

- adverse claims by EFH Corp. and its subsidiaries' (including EFIH and its subsidiaries') creditors or holders of their debt securities;

- EFH Corp. and its subsidiaries' (including EFIH and its subsidiaries') ability to effectively execute their operational strategy; and

- EFH Corp. and its subsidiaries' ability to implement cost reduction initiatives.

Any forward-looking statement speaks only as of the date on which it is made, and except as may be required by law, we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which it is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for us to predict all of them; nor can we assess the impact of each such factor or the extent to which any factor, or combination of factors, may cause results to differ materially from those contained in any forward-looking statement. Therefore, you should not unduly rely on forward-looking statements.

xvi

Highly Confidential

EFH2D10011235

EFH2D10011220

# SUMMARY

*This summary highlights selected information appearing elsewhere in or incorporated by reference into this Offering Memorandum. This summary is not complete and does not contain all of the information that you should consider before investing in the New Notes. You should carefully read this summary together with the entire Offering Memorandum, including the information set forth in the section entitled "Risk Factors" and the information that is incorporated by reference into this Offering Memorandum. See the sections entitled "Available Information" and "Incorporation by Reference" for further discussion on incorporation by reference.*

*Investment funds associated with or designated by Kohlberg Kravis Roberts & Co. L.P. ("KKR"), TPG Management, L.P. ("TPG") and Goldman, Sachs & Co. ("Goldman Sachs" and, together with KKR and TPG, the "Sponsor Group"), and certain other co-investors (collectively with the Sponsor Group, the "Investors"), own EFH Corp. through Texas Energy Future Holdings Limited Partnership ("Texas Holdings"), with the Sponsor Group controlling Texas Holdings' general partner, Texas Energy Future Capital Holdings LLC. EFH is a wholly-owned subsidiary of EFH Corp., and EFIH Finance is a wholly-owned subsidiary of EFIH.*

## Our Business

We are a Dallas, Texas-based holding company whose wholly-owned subsidiary, Oncor Holdings, holds a majority interest (approximately 80%) in Oncor. The investment in Oncor represents a substantial portion of our reported consolidated net assets and earnings. As of September 30, 2012, our other reported consolidated assets consisted primarily of approximately $4.675 billion aggregate principal amount of debt of EFH Corp. and TCEH, an indirect wholly-owned subsidiary of EFH Corp. Oncor is engaged in regulated electricity transmission and distribution operations in Texas that are primarily regulated by the PUCT. Oncor provides both transmission and distribution services to retail electric providers, including subsidiaries of TCEH, that sell electricity to consumers and transmission services to other electricity distribution companies, cooperatives and municipalities. Oncor operates the largest transmission and distribution system in Texas, delivering electricity to more than three million homes and businesses and operating more than 118,000 miles of transmission and distribution lines. A significant portion of Oncor's revenues represents fees for services provided to TCEH, which is engaged in competitive electricity market activities largely in Texas, including electricity generation, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales. Revenues from TCEH represented 29% and 33% of Oncor's total reported consolidated revenues for the nine months ended September 30, 2012 and for the year ended December 31, 2011, respectively.

EFH Corp. and Oncor have implemented certain structural and operational "ring-fencing" measures based on commitments made by Texas Holdings and Oncor to the PUCT to further enhance the credit quality of Oncor Holdings and Oncor and mitigate Oncor's and Oncor Holdings' credit exposure to Texas Holdings and its other subsidiaries, including EFIH (collectively, the "Texas Holdings Group"), with the intent to minimize the risk that a court would order any of the assets and liabilities of Oncor or Oncor Holdings to be substantively consolidated with the assets and liabilities of any member of the Texas Holdings Group (including EFIH and EFIH Finance) in the event any such member were to become a debtor in a bankruptcy case. We believe, as several major credit rating agencies have acknowledged, that the likelihood of such substantive consolidation of Oncor's or Oncor Holdings' assets and liabilities is remote in consideration of the ring-fencing measures and applicable law.

1

We have no employees. At September 30, 2012, Oncor had approximately 3,600 full-time employees, including approximately 800 employees under collective bargaining agreements.

## Recent Developments

### December 2012 Private Exchanges

On December 5, 2012, the Offerors completed a private debt exchange transaction (the "December 2012 Initial Private Exchange") pursuant to which the Offerors issued approximately $1.145 billion aggregate principal amount of EFIH 2018 Toggle Notes in exchange for the surrender by certain funds and accounts managed by institutional investors of approximately $234 million aggregate principal amount of EFH Corp. Series P Notes, approximately $510 million aggregate principal amount of EFH Corp. Series Q Notes, approximately $453 million aggregate principal amount of EFH Corp. Series R Notes, approximately $94 million aggregate principal amount of EFH Corp. 10.875% Notes and approximately $313 million aggregate principal amount of EFH Corp. 2017 Toggle Notes, including accrued and unpaid interest on such notes. The EFH Corp 10.875% Notes and the EFH Corp. 2017 Toggle Notes EFIH received in the December 2012 Initial Private Exchange are expected to be distributed to EFH Corp. prior to or in the first quarter of 2013 and cancelled. See "—Distribution and Cancellation of Debt Securities."

On December 19, 2012, the Offerors completed a private debt exchange transaction (the "December 2012 Subsequent Private Exchange") pursuant to which the Offerors issued approximately $159 million aggregate principal amount of EFIH 2018 Toggle Notes in exchange for the surrender by certain funds and accounts managed by institutional investors of approximately $38 million aggregate principal amount of EFH Corp. 10.875% Notes and approximately $119 million aggregate principal amount of EFH Corp. 2017 Toggle Notes, including any accrued but unpaid interest on such notes. The December 2012 Initial Private Exchange and the December 2012 Subsequent Private Exchange are referred to herein collectively as the "December 2012 Private Exchanges". The notes EFIH received in the December 2012 Subsequent Private Exchange were distributed to EFH Corp. and cancelled.

### Concurrent Exchange Offers

On December 21, 2012, the Offerors commenced private offers to exchange up to $123,842,000 aggregate principal amount of additional EFIH 2018 Toggle Notes for all outstanding EFH Corp. 2017 Notes validly tendered and not validly withdrawn (the "Concurrent Exchange Offers"), the terms of which are set forth in an offering memorandum and letter of transmittal relating to the Concurrent Exchange Offers (the "Concurrent Exchange Offers Offering Memorandum"). The Concurrent Exchange Offers will expire on the Expiration Date (as defined in the Concurrent Exchange Offers Offering Memorandum) (initially January 24, 2013), unless extended by the Offerors.

Highly Confidential

EFH2D10011237

EFH2D10011220

**PX 074**
**Page 18 of 255**

Upon the terms and subject to the conditions of the Concurrent Exchange Offers, the Offerors are offering in exchange for each $1,000 principal amount of EFH Corp. 10.875% Notes and EFH Corp. 2017 Toggle Notes validly tendered (and not validly withdrawn) (i) at or prior to the Early Tender Date (as defined in the Concurrent Exchange Offers Offering Memorandum) (initially January 8, 2013), the "Total Consideration" listed in the table below under "Total Consideration if Tendered at or prior to the Early Tender Date" and (ii) after the Early Tender Date but at or prior to the Expiration Date (as defined in the Concurrent Exchange Offers Offering Memorandum, the "Exchange Consideration" listed in the table below under "Exchange Consideration if Tendered after the Early Tender Date and at or prior to the Expiration Date."

| | | | Consideration Per $1,000 Principal Amount of Notes Validly Tendered | |
| Outstanding Principal Amount | Issuer | Title of Notes | Total Consideration if Tendered at or prior to the Early Tender Date | Exchange Consideration if Tendered after the Early Tender Date and at or prior to the Expiration Date |
|---|---|---|---|---|
| $64,135,000 | EFH Corp. | 10.875% Senior Notes due 2017 | $995.00 Principal Amount of EFIH 2018 Toggle Notes | $945.00 Principal Amount of EFIH 2018 Toggle Notes |
| $60,329,699 | EFH Corp. | 11.250%/12.000% Senior Toggle Notes due 2017 | $995.00 Principal Amount of EFIH 2018 Toggle Notes | $945.00 Principal Amount of EFIH 2018 Toggle Notes |

All of the EFH Corp. 2017 Notes that EFIH acquires in the Concurrent Exchange Offers are expected to be distributed to EFH Corp. prior to or in the first quarter of 2013 and cancelled. See "—Distribution and Cancellation of Debt Securities."

Consummation of the Concurrent Exchange Offers is not conditioned upon the completion of the exchange offers that are the subject of this Offering Memorandum or vice versa.

Nothing contained in this Offering Memorandum shall constitute an offer to exchange or the solicitation of an offer to exchange any of the notes offered in the Concurrent Exchange Offers, which exchange offers have not been registered under the Securities Act or any state securities or blue sky laws. The Concurrent Exchange Offers are being made, and the notes offered pursuant thereto are being offered and issued, only (a) in the United States to "qualified institutional buyers" (as defined in Rule 144A under the Securities Act), and (b) outside the United States to persons other than "U.S. persons" (as that term is defined in Rule 902 under the Securities Act) in reliance upon Regulation S under the Securities Act. The Concurrent Exchange Offers are only being made pursuant to the Concurrent Exchange Offers Offering Memorandum and the related letter of transmittal.

Highly Confidential

EFH2D10011238

EFH2D10011220

**PX 074**
**Page 19 of 255**

### Distribution and Cancellation of Debt Securities

After giving effect to EFIH's receipt of $177 million principal amount of EFH Corp. Toggle Notes in lieu of cash interest in November 2012 (the "EFIH November PIK Payment Receipt"), the December 2012 Private Exchanges and the distribution and cancellation of the EFH Corp. 10.875% Notes and EFH Corp. 2017 Toggle Notes acquired in the December 2012 Subsequent Private Exchange, EFIH holds approximately $1.684 billion aggregate principal amount of EFH Corp. 10.875% Notes and approximately $3.441 billion aggregate principal amount of EFH Corp. 2017 Toggle Notes. EFIH plans to distribute all or substantially all of the EFH Corp. 2017 Notes that it holds, (the "Distribution and Cancellation") to EFH Corp. prior to or in the first quarter of 2013. Following such distribution, EFH Corp. is expected to cancel these notes. The following table sets forth as of September 30, 2012 the total outstanding principal amount of debt securities of EFH Corp. and TCEH that EFIH holds:

(1) on an actual basis;

(2) on an as adjusted basis to give effect to the EFIH November PIK Payment Receipt, the December 2012 Private Exchanges and the distribution and cancellation of the EFH Corp. 2017 Notes acquired in the December 2012 Subsequent Private Exchange; and

(3) on an as further adjusted basis to also give effect to the distribution and cancellation of all the remaining EFH Corp. 2017 Notes held by EFIH:

| | As of September 30, 2012 | | | | | |
| | Actual | | As Adjusted | | As Further Adjusted | |
| | | | (millions of dollars) | | | |
| | Principal Amount | Carrying Value (a) | Principal Amount | Carrying Value (a) | Principal Amount | Carrying Value (a) |
|---|---|---|---|---|---|---|
| EFH Corp. 10.875% Senior Notes due 2017 ..................... | $1,591 | $1,447 | $1,684 | $1,533 | $ — | $— |
| EFH Corp. 11.25/12.00% Senior Toggle Notes due 2017 ........ | 2,951 | 2,774 | 3,441 | 3,234 | — | — |
| EFH Corp. 5.55% Series P Senior Notes due 2014 ............... | 45 | 36 | 279 | 220 | 279 | 220 |
| EFH Corp. 6.50% Series Q Senior Notes due 2024 .............. | 6 | 3 | 516 | 304 | 516 | 304 |
| EFH Corp. 6.55% Series R Senior Notes due 2034 .............. | 3 | 2 | 456 | 242 | 456 | 242 |
| TCEH 10.25% Senior Notes due 2015 (including $48 million principal amount of Series B Notes)......................... | 79 | 21 | 79 | 21 | 79 | 21 |
| Total ...................... | $4,675 | $4,283 | $6,455 | $5,554 | $1,330 | $787 |

(a)  Carrying value equals fair value, which is based on broker quotes. As of the date of this Offering Memorandum, EFIH holds a substantial majority of the outstanding EFH Corp. 2017 Notes and the majority of each of the other EFH Corp. securities listed above.

Generally, EFIH expects to service its interest obligations on its outstanding debt with dividends from Oncor Holdings and interest payments from the EFH Corp. and TCEH debt securities that it will continue to hold. However, in connection with the liability management program of EFH Corp. and its subsidiaries, including the December 2012 Private Exchanges, the Concurrent Exchange Offers and the exchange offers, EFH Corp. expects to make capital contributions of up to $75 million to EFIH to protect against the risk of any potential cash shortfalls.

4

Highly Confidential

EFH2D10011239

EFH2D10011220

## PX 074
## Page 20 of 255

*Release of Selected Preliminary Financial Data for the Quarterly Period Ended December 31, 2012*

Prior to the Expiration Date and Consent Date, the Offerors and EFH Corp. expect to release publicly by filing a Current Report on Form 8-K with the SEC selected preliminary financial data of EFH Corp., EFIH and Oncor Holdings for the year ended December 31, 2012. This information will be deemed incorporated by reference herein upon its filing with the SEC. See "Incorporation by Reference."

### Additional Information

EFH Corp. was incorporated in Texas in 1996. EFIH was formed in Delaware in 2007 and EFIH Finance was incorporated in Delaware in 2009. Our principal executive offices are located at Energy Plaza, 1601 Bryan Street, Dallas, TX 75201-3411. The telephone number of our principal executive offices is (214) 812-4600. Our website is http://www.energyfutureholdings.com/efih. Information on or connected to our website does not constitute part of this Offering Memorandum.

5

Highly Confidential

**Organizational Structure**

The chart below is a summary of EFH Corp.'s organizational and ownership structure and illustrates EFH Corp.'s and its major subsidiaries' (other than Oncor and its subsidiaries) long-term debt as of September 30, 2012, after giving effect to (i) the October 2012 Notes Offering, (ii) the December 2012 Private Exchanges (including the cancellation of EFH Corp. 2017 Notes acquired by EFIH in the December 2012 Subsequent Private Exchange) (iii) the completion of the exchange offers and the consent solicitations (assuming 100% participation in the exchange offers by the holders of Existing Notes at or prior to the Early Tender Date and the exchange of all of the Existing Notes for New Notes (reflecting the issuance of the Total Consideration per each $1,000 principal amount of the Existing Notes) and the cancellation of all Existing Notes exchanged in the exchange offers) and (iv) the completion of the Concurrent Exchange Offers (assuming 100% participation in the Concurrent Exchange Offers by the holders of the EFH Corp. 2017 Notes at or prior to the Early Tender Date (as defined in the Concurrent Exchange Offers Offering Memorandum) and the exchange of all of the EFH Corp. 2017 Notes for EFIH 2018 Toggle Notes (reflecting the issuance of the total consideration pursuant to the Concurrent Exchange Offers Offering Memorandum per each $1,000 principal amount of the EFH Corp. 2017 Notes) and the distribution to EFH Corp. and cancellation of all EFH Corp. 2017 Notes exchanged in the Concurrent Exchange Offers). See "—Debt Issued or Guaranteed by EFIH" and "Capitalization" for further information regarding our outstanding debt amounts. The chart below excludes finance subsidiaries and subsidiaries of EFH Corp. that are not subsidiaries of EFIH or EFCH, including TXU Receivables Company. TXU Receivables Company conducted an accounts receivable securitization program.

Highly Confidential

EFH2D10011241

EFH2D10011220

**PX 074**
**Page 22 of 255**



(1) Excludes $1.251 billion aggregate principal amount of Legacy Notes held by EFIH.
(2) We will use $680 million of the net proceeds from the August 2012 Notes Offering to pay the EFIH Dividend. EFH Corp. will use the proceeds from the EFIH Dividend to repay the balance of the TCEH Demand Notes.
(3) None of EFH Corp., EFIH's subsidiaries (including Oncor), or EFCH or its subsidiaries guarantee, and none of them (other than EFIH Finance) are otherwise liable for, the New Notes.
(4) Excludes $5.125 billion principal amount of EFH Corp. 2017 Notes held by EFIH. EFIH plans to distribute all or substantially all of the EFH Corp. 2017 Notes it holds to EFH Corp. prior to or in the first quarter of 2013. Following such distribution, EFH Corp. is expected to cancel these notes. See "—Recent Developments—Distribution and Cancellation of Debt Securities."
(5) The ring-fenced entities are not restricted subsidiaries under the indenture governing the New Notes and are not subject to covenants and events of default thereunder.
(6) Substantially all of the subsidiaries of TCEH are engaged in competitive market activities.
(7) Excludes $284 million principal amount of TCEH 2015/2016 Notes held by EFH Corp. and $79 million principal amount of TCEH 2015/2016 Notes held by EFIH.
(8) Excludes $19 million principal amount of borrowings under the TCEH Senior Secured Credit Facilities held by EFH Corp.

7

Highly Confidential

EFH2D10011242

EFH2D10011220

### Debt Issued or Guaranteed by EFIH

The following table sets forth as of September 30, 2012 the total outstanding principal amount of debt that EFIH has either issued or guaranteed (without giving effect to any debt push-down accounting):

(1) on an actual basis;

(2) on an as adjusted basis to give effect to the EFH Corp. issuance of $28 million principal amount of EFH Corp. Toggle Notes to third parties in lieu of cash interest payments in November 2012 (the "November 2012 PIK Payment"), the October 2012 Notes Offering and the December 2012 Private Exchanges, including the distribution to EFH Corp. and cancellation of the EFH Corp. 2017 Notes acquired by EFIH in the December 2012 Subsequent Private Exchange; and

(3) on an as further adjusted basis to also give effect to (a) the completion of the exchange offers and the consent solicitations (assuming 100% participation in the exchange offers by the holders of Existing Notes at or prior to the Early Tender Date and the exchange of all of the Existing Notes for New Notes (reflecting the issuance of the Total Consideration per each $1,000 principal amount of the Existing Notes) and the cancellation of all of the Existing Notes exchanged in the exchange offers) and (b) the completion of the Concurrent Exchange Offers (assuming 100% participation in the Concurrent Exchange Offers by the holders of the EFH Corp. 2017 Notes at or prior to the Early Tender Date (as defined in the Concurrent Exchange Offers Offering Memorandum) and the exchange of all of the EFH Corp. 2017 Notes for EFIH 2018 Toggle Notes (reflecting the issuance of the total consideration pursuant to the Concurrent Exchange Offers Offering Memorandum per each $1,000 principal amount of the EFH Corp. 2017 Notes) and the distribution to EFH Corp. and cancellation of all of the EFH Corp. 2017 Notes exchanged in the Concurrent Exchange Offers).

| | As of September 30, 2012 | | |
| --- | --- | --- | --- |
| | Actual | As Adjusted | As Further Adjusted |
| | (millions of dollars) | | |
| **First Lien Secured Debt (a)** | | | |
| *Issued* | | | |
| EFIH 6.875% Senior Secured Notes due 2017 | $ 250 | $ 503 | $ 503 |
| EFIH 9.75% Senior Secured Notes due 2019 (b) | 141 | 141 | — |
| EFIH 10.000% Senior Secured Notes due 2020 | 2,180 | 2,180 | 2,180 |
| EFIH 10.000% Senior Secured Notes due 2020 offered hereby (b) | — | — | 1,310 |
| *Guaranteed* | | | |
| EFH Corp. 9.75% Senior Secured Notes due 2019 (b) | 115 | 115 | — |
| EFH Corp. 10.000% Senior Secured Notes due 2020 (b) | 1,061 | 1,061 | — |
| Total First Lien Secured Debt (issued or guaranteed) | 3,747 | 4,000 | 3,993 |
| **Second Lien Secured Debt (c)** | | | |
| *Issued* | | | |
| EFIH 11% Senior Secured Second Lien Notes due 2021 | 406 | 406 | 406 |
| EFIH 11.750% Senior Secured Second Lien Notes due 2022 | 1,750 | 1,750 | 1,750 |
| Total Second Lien Secured Debt (issued or guaranteed) | 2,156 | 2,156 | 2,156 |
| **Unsecured Debt** | | | |
| *Issued* | | | |
| EFIH 11.25%/12.25% Senior Toggle Notes due 2018 | — | 1,304 | 1,304 |
| EFIH 11.25%/12.25% Senior Toggle Notes due 2018 offered in the Concurrent Exchange Offers (b) | — | — | 124 |
| *Guaranteed* | | | |
| EFH Corp. 10.875% Senior Notes due 2017 (b)(d) | 196 | 64 | — |
| EFH Corp. 11.250%/12.000% Senior Toggle Notes due 2017 (b)(e) | 464 | 60 | — |
| EFH Corp. P&I and SG&A demand notes payable to TCEH (f) | 689 | 689 | 689 |
| Total Unsecured Debt (issued or guaranteed) | 1,349 | 2,117 | 2,117 |
| Total Debt (issued or guaranteed) | $7,252 | $8,273 | $8,266 |
| Total Issued | $4,727 | $6,284 | $7,577 |
| Total Guaranteed | $2,525 | $1,989 | $ 689 |

8

Highly Confidential

EFH2D10011243

EFH2D10011220

---

(a)    These notes or EFIH's guarantee thereof, as applicable, are secured by the Collateral (as defined herein) on a first-priority basis, and "As Adjusted" and "As Further Adjusted" include $253 million of EFIH 6.875% Notes that were issued in the October 2012 Notes Offering.

(b)    To the extent there is less than 100% participation in the exchange offers or the Concurrent Exchange Offers with respect to a series of Existing Notes or EFH Corp. 2017 Notes, respectively, such series will remain outstanding and the New Notes or EFIH 2018 Toggle Notes, as applicable, outstanding as further adjusted would decrease accordingly.

(c)    These notes are secured by the Collateral on a second-priority basis.

(d)    "Actual" is net of $1.591 billion, and "As Adjusted" and "As Further Adjusted" are net of $1.684 billion, principal amount of these notes held by EFIH. EFIH plans to distribute all or substantially all of these notes to EFH Corp. prior to or in the first quarter of 2013. Following such distribution, EFH Corp. is expected to cancel these notes. See "—Recent Developments—Distribution and Cancellation of Debt Securities."

(e)    "Actual" is net of $2.951 billion, and "As Adjusted" and "As Further Adjusted" are net of $3.264 billion, principal amount of these notes held by EFIH. EFIH plans to distribute all or substantially all of these notes to EFH Corp. prior to or in the first quarter of 2013. Following such distribution, EFH Corp. is expected to cancel these notes. See "—Recent Developments—Distribution and Cancellation of Debt Securities."

(f)    These notes are payable on demand. We will use $680 million of the net proceeds from the August 2012 Notes Offering to pay the EFIH Dividend. EFH Corp. will use the proceeds from the EFIH Dividend to repay the balance of the TCEH Demand Notes.

9

Highly Confidential                                                            EFH2D10011244

EFH2D10011220

**PX 074**
**Page 25 of 255**

**Summary of the Terms of the Exchange Offers and the Consent Solicitations**

*The summary below describes the principal terms of the exchange offers and the consent solicitations. Certain of the terms and conditions described below are subject to important limitations and exceptions. For a more complete understanding of the terms and conditions of the exchange offers and the consent solicitations, you should read this entire Offering Memorandum.*

**The Exchange Offers** . . . . . . . . . . . .  Upon the terms and subject to the conditions of the exchange offers, the Offerors are offering to exchange New Notes for any and all outstanding Existing Notes validly tendered (and not validly withdrawn) at or prior to the Expiration Date.

Subject to applicable law, each exchange offer and consent solicitation related to a series of the Existing Notes is being made independently of the other exchange offers and consent solicitations, and, subject to applicable law, the Offerors reserve the right to terminate, withdraw or amend each exchange offer and the Offerors and/or EFH Corp., as applicable, reserve the right to terminate, withdraw or amend the consent solicitation related to such series of Existing Notes subject to such exchange offer independently of the other exchange offers and consent solicitations at any time and from time to time, as described herein.

**Consideration Offered** . . . . . . . . . . . .  Upon the terms and subject to the conditions of the exchange offers, the Offerors are offering in exchange for each $1,000 principal amount of Existing Notes of any series validly tendered (and not validly withdrawn) (a) at or prior to the Early Tender Date and accepted for exchange, the applicable Total Consideration set forth with respect to such series in the table on page iii of this Offering Memorandum under "Total Consideration if Tendered at or prior to the Early Tender Date" and (b) after the Early Tender Date but at or prior to the Expiration Date and accepted for exchange, the applicable Exchange Consideration set forth with respect to such series in the table on page iii of this Offering Memorandum under "Exchange Consideration if Tendered after the Early Tender Date and at or prior to the Expiration Date."

**Accrued and Unpaid Interest** . . . . . .  All holders whose Existing Notes are accepted for exchange will be entitled to receive, with respect to any of such holder's accepted Existing Notes, accrued and unpaid interest, if any, in cash from the last applicable interest payment date to, but not including, the Settlement Date.

**Fractions** . . . . . . . . . . . . . . . . . . . . . . . .  The Offerors will not accept any tender of Existing Notes that would result in the issuance of less than $2,000 principal amount of New Notes to a participating holder. The aggregate principal amount of New Notes issued to each participating

10

EFH2D10011245

holder for all Existing Notes of any series validly tendered (and not validly withdrawn) will be rounded down, if necessary, to $2,000 or the nearest whole multiple of $1,000 in excess thereof. This rounded amount will be the principal amount of New Notes you will receive in exchange for the Existing Notes of any series, and no additional cash will be paid in lieu of any principal amount of New Notes not received as a result of rounding down.

**The Consent Solicitations** . . . . . . . .  Upon the terms and subject to the conditions described in this Offering Memorandum and the Consent and Letter of Transmittal, EFH Corp. is soliciting the EFH Corp. Consents in the EFH Corp. consent solicitations of holders of the EFH Corp. Existing Notes to the EFH Corp. Proposed Amendments, and the Offerors are soliciting the EFIH Consents in the EFIH consent solicitation of holders of the EFIH Existing Notes to the EFIH Proposed Amendments. No separate consideration will be paid for any Consents.

The consent solicitations for the Existing Notes will expire on the Consent Date. Existing Notes validly tendered pursuant to the exchange offers (and not validly withdrawn) at or prior to the Consent Date will be deemed to include Consents to the Proposed Amendments with respect to such Existing Notes. The completion, execution and delivery of a Consent and Letter of Transmittal, or transmission of an Agent's Message (as defined below), in connection with a valid tender of Existing Notes pursuant to the exchange offers at or prior to the Consent Date will constitute the delivery of Consents with respect to such Existing Notes. Holders may not validly tender Existing Notes in the exchange offers at or prior to the Consent Date without delivering the related Consents in the consent solicitations and may not validly withdraw previously tendered Existing Notes at or prior to the Consent Date without revoking the related Consents. Holders may not deliver Consents in the consent solicitations without validly tendering their related Existing Notes in the exchange offers at or prior to the Consent Date and may only validly revoke Consents by validly withdrawing the previously tendered related Existing Notes at or prior to the Consent Date or by revoking Consents after the Consent Date and prior to the execution and delivery of the applicable Supplemental Indenture by the parties thereto. To the extent that the Expiration Date and the Consent Date remain the same time and date, all holders tendering Existing Notes in the exchange offers will be required to deliver Consents pursuant to the consent solicitations. In any event, holders tendering Existing Notes after the Early Tender Date will not be eligible to receive the applicable Total Consideration. Because it is expected but not required that the Supplemental Indentures will be executed and delivered promptly following

11

Highly Confidential

EFH2D10011246

EFH2D10011220

the Consent Date assuming receipt of the Requisite Consents for the Proposed Amendments, holders should not expect to be able to revoke their Consents after the Consent Date. Each of the Supplemental Indentures relating to the Proposed Amendments will become effective immediately upon its execution and delivery by the parties thereto, but the Proposed Amendments contained therein will not become operative until immediately prior to the acceptance for exchange of Existing Notes of the relevant series upon the terms and subject to the conditions set forth herein. Existing Notes held by members of the Sponsor Group and their affiliates will not be considered outstanding for the purposes of determining whether the holders of the required outstanding principal amount of the Existing Notes of the relevant series have delivered Consents necessary to adopt the Proposed Amendments.

If an exchange offer for a series of Existing Notes is terminated, the Proposed Amendments in any executed Supplemental Indenture related to such series of Existing Notes will not become operative. See "Procedures for Tendering Existing Notes and Delivering Consents" for more information.

**The Proposed Amendments** . . . . . .   The Proposed Amendments consist of the Proposed Indenture Amendments (requiring Consents in respect of at least a majority of the outstanding principal amount of the applicable series of Existing Notes) and the Proposed Collateral Release Amendments (requiring Consents in respect of at least 66⅔% of the outstanding principal amount of the applicable series of Existing Notes). In general, the Proposed Indenture Amendments would delete in their entirety many of the restrictive covenants and references thereto contained in the Existing Notes Indentures and the Existing Notes, as well as delete certain events of default, modify covenants regarding mergers and consolidations, modify or eliminate certain other provisions, including, among others, the limitations on the making of restricted payments and the incurrence of indebtedness and liens, and certain provisions relating to defeasance in the Existing Notes Indentures, and would make EFCH an "Unrestricted Subsidiary" under the EFH Corp. Existing Notes Indentures, and thereby cause the guarantee by EFCH of the EFH Corp. Existing Notes to be released automatically. The Proposed Collateral Release Amendments would release the collateral securing the EFH Corp. Existing Notes and would also make EFIH an "Unrestricted Subsidiary" under the EFH Corp. Existing Notes Indentures, and thereby cause the guarantee by EFIH of the EFH Corp. Existing Notes to be released automatically, which would make the EFH Corp. Existing Notes effectively junior to all secured and unsecured debt and other liabilities of EFIH. In addition, if the Proposed

12

Highly Confidential

Collateral Release Amendments are adopted, the collateral securing the EFIH 9.75% Notes will be released in its entirety.

The execution and delivery of the Consent and Letter of Transmittal will also constitute an express waiver by a consenting holder of the Existing Notes with respect to all claims against EFH Corp., the Offerors and the Sponsor Group of any breach, default or event of default that may have arisen under the Existing Notes Indentures. As of the date of this Offering Memorandum, EFH Corp. and the Offerors are not aware of any such breaches, defaults or events of default. See "The Proposed Amendments."

**Requisite Consents** . . . . . . . . . . . . . . . Consents in respect of at least a majority of the outstanding aggregate principal amount of a series of Existing Notes, voting as a separate class, are required to approve the Proposed Indenture Amendments with respect to such series. Consents in respect of a least 66⅔% of the outstanding aggregate principal amount of a series of Existing Notes, voting as a separate class, are required to approve the Proposed Collateral Release Amendments with respect to such series.

**Consent Date** . . . . . . . . . . . . . . . . . . . . . To deliver Consents pursuant to the consent solicitations, holders must validly tender (and not validly withdraw) their related Existing Notes of the applicable series, and thereby deliver Consents related to such Existing Notes, at or prior to 5:00 p.m., New York City time, on January 24, 2013, unless extended by EFH Corp. or the Offerors, as applicable, with respect to the relevant series.

**Early Tender Date** . . . . . . . . . . . . . . . . To receive the applicable Total Consideration, holders must validly tender (and not validly withdraw) their Existing Notes of the relevant series at or prior to 5:00 p.m., New York City time, on January 8, 2013, unless extended by the Offerors with respect to the relevant series of Existing Notes.

**Expiration Date** . . . . . . . . . . . . . . . . . . . Each of the exchange offers will expire at 5:00 p.m., New York City time, on January 24, 2013, unless extended by the Offerors with respect to the relevant series of Existing Notes.

**Procedure for Tenders and**
  **Delivery of Consents** . . . . . . . . . . . If a holder wishes to participate in the exchange offers and the consent solicitations and such holder's Existing Notes are held by a custodial entity such as a broker, dealer, commercial bank, trust company or other nominee, such holder must instruct such custodial entity (pursuant to the procedures of the custodial entity) to tender the Existing Notes and deliver the related Consents.

Custodial entities that are participants in The Depository Trust Company ("DTC") must tender Existing Notes and deliver

13

Highly Confidential

EFH2D10011248

EFH2D10011220

Consents through DTC's Automated Tender Offer Program, known as "ATOP," by which the custodial entity and the beneficial owner on whose behalf the custodial entity is acting agree to be bound by the Consent and Letter of Transmittal. **A Consent and Letter of Transmittal need not be completed and submitted in connection with tenders effected through ATOP.**

Each holder tendering Existing Notes registered in such holder's name must complete, sign and date the accompanying Consent and Letter of Transmittal according to the instructions contained in this Offering Memorandum and the Consent and Letter of Transmittal. Such holder must also deliver the Consent and Letter of Transmittal, together with the Existing Notes, if tendered, and any other required documents to the Exchange Agent at one of the addresses set forth on the front cover of the Consent and Letter of Transmittal. For further information, see "Procedures for Tendering Existing Notes and Delivering Consents" and the Consent and Letter of Transmittal.

**No Guaranteed Delivery** . . . . . . . . . . The exchange offers will not provide for guaranteed delivery procedures with respect to any series of Existing Notes.

**Withdrawal of Tenders and Revocation of Consents** . . . . . . . . A holder may withdraw the tender of its Existing Notes of any series at any time prior to the applicable Expiration Date by submitting a notice of withdrawal to the Exchange Agent using ATOP procedures and/or upon compliance with the other procedures described under "Withdrawal of Tenders and Revocation of Consents." The withdrawal of any Existing Notes at or prior to the Consent Date will constitute a revocation of the related Consents. Consents may not be revoked prior to the Consent Date except by withdrawing the related tendered Existing Notes at or prior to the Consent Date. Consents may be revoked after the Consent Date by withdrawing the related tendered Existing Notes prior to the execution and delivery of the applicable Supplemental Indenture. Because it is expected, but not required, that the Supplemental Indentures will be executed and delivered promptly following the Consent Date assuming receipt of the Requisite Consents for the Proposed Amendments, holders should not expect to be able to revoke their Consents after the Consent Date. Any Consents that are not revoked at or prior to the later of the Consent Date and the execution and delivery of the applicable Supplemental Indenture may not be revoked thereafter, as further described under "Withdrawal of Tenders and Revocation of Consents." A withdrawal of Existing Notes after the later of the Consent Date and the execution and delivery of the applicable Supplemental Indenture will not revoke any related Consents, and

14

Highly Confidential

EFH2D10011249

EFH2D10011220

**PX 074**
**Page 30 of 255**

|  | withdrawing holders will be subject to the Proposed Amendments if they become operative. |
|---|---|
| **Settlement Date** . . . . . . . . . . . . . . . . . | Subject to the terms and conditions of the exchange offers, the settlement date for the exchange offers will occur promptly following the Expiration Date (such date, the "Settlement Date"). Assuming that the exchange offers and consent solicitations are not extended, the Offerors expect that the Settlement Date will be on or about January 29, 2013, the third business day following the Consent Date and the Expiration Date. |
| **The New Notes** . . . . . . . . . . . . . . . . . . | For a description of the terms of the New Notes, see "—Summary of the New Notes" and "Description of the New Notes." |
| **Conditions of the Exchange Offers and the Consent Solicitations** . . . | None of the exchange offers is conditioned on any minimum principal amount of Existing Notes of the relevant series being validly tendered, the issuance of a minimum principal amount of New Notes or the receipt of requisite consents to adopt the Proposed Amendments with respect to such series, and none of the exchange offers is conditioned upon the others. However, they are subject to the conditions described under "Conditions of the Exchange Offers and the Consent Solicitations." Consummation of the Concurrent Exchange Offers is not conditioned upon the completion of the exchange offers and consent solicitations that are the subject of this offering memorandum or vice versa. |
|  | Subject to applicable law, the Offerors and EFH Corp., as applicable, have the right to terminate or withdraw any exchange offer and consent solicitation with respect to any series of Existing Notes if any of the conditions described under "Conditions of the Exchange Offers and the Consent Solicitations" is not satisfied or waived with respect to the relevant series. If an exchange offer for a series of Existing Notes is terminated, the Proposed Amendments in any executed Supplemental Indenture related to such series of Existing Notes will not become operative. |
| **Consequences of Failure to Tender** . . . . . . . . . . . . . . . . . . . . . . . . | If the Requisite Consents in respect of any series of Existing Notes are received with respect to the applicable Existing Notes Indenture and the Supplemental Indenture giving effect to the related Proposed Indenture Amendments is executed and the Proposed Indenture Amendments become operative with respect to such series, holders of Existing Notes of such series left outstanding following completion of such exchange |

15

Highly Confidential

EFH2D10011250

EFH2D10011220

**PX 074**
**Page 31 of 255**

offer therefor will no longer be entitled to the benefits of the covenants, events of default and other provisions that are eliminated or modified pursuant to such Proposed Indenture Amendments, and EFCH will be an "Unrestricted Subsidiary" and the guarantees by EFCH will be released under the EFH Corp. Existing Notes Indentures. If the Requisite Consents in respect of any series of Existing Notes are received with respect to the applicable Existing Notes Indenture and the Supplemental Indenture giving effect to the related Proposed Collateral Release Amendments is executed and the Proposed Collateral Release Amendments become operative with respect to such series, the Existing Notes of such series will cease to benefit from any security, and EFIH will be an "Unrestricted Subsidiary" and the guarantee by EFIH will be released under the EFH Corp. Existing Notes Indentures, which would cause any remaining EFH Corp. Existing Notes to become effectively junior to all secured and unsecured debt and other liabilities of EFIH. Any remaining EFIH 9.75% Notes would rank effectively junior to all secured debt of EFIH to the extent of the value of the collateral securing such debt. In addition, to the extent that Existing Notes of any series are tendered and accepted in the exchange offers, any existing trading market for the remaining Existing Notes of such series may become further limited. The smaller outstanding principal amount may make the trading price of the Existing Notes of such series that are not tendered and accepted for payment more volatile. Consequently, the liquidity, market value and price volatility of Existing Notes of any series that remain outstanding may be materially and adversely affected. For a description of other consequences of failing to tender your Existing Notes pursuant to the exchange offers, see "Risk Factors—Risks to Holders of Existing Notes Not Tendered or Not Accepted for Exchange."

**Amendment and Termination** . . . . .     Subject to applicable law, the Offerors may terminate or withdraw any of the exchange offers and EFH Corp. or EFIH and EFIH Finance, as applicable, may terminate or withdraw any of the consent solicitations if any condition to the exchange offers and the consent solicitations with respect to the applicable series of Existing Notes is not satisfied or waived by the Expiration Date. Each of the Offerors and EFH Corp. reserve the right, subject to applicable law, to (i) waive any and all of the conditions of the exchange offers or the consent solicitations at or prior to the Expiration Date or Consent Date, as applicable, and (ii) amend the terms of the exchange offers or the consent solicitations. Any waiver or amendment may apply to one or more but not all of the exchange offers and consent solicitations. In the event that an exchange offer is terminated, withdrawn or otherwise not completed at or prior to the Expiration Date, no consideration will be paid or become payable to holders who have validly tendered their Existing

Highly Confidential

EFH2D10011251

EFH2D10011220
## PX 074
## Page 32 of 255

Notes pursuant to such exchange offer. In any such event, (i) Existing Notes previously tendered pursuant to such exchange offer will be promptly returned to the tendering holders, (ii) the Proposed Amendments in any executed Supplemental Indenture relating to the Existing Notes that were the subject of such terminated exchange offer will not become operative with respect to such series of Existing Notes and (iii) the related Consents will be deemed voided. See "General Terms of the Exchange Offers and Consent Solicitations—Extension, Termination or Amendment."

**Use of Proceeds** . . . . . . . . . . . . . . . . . . Neither EFH Corp. nor the Offerors will receive any cash proceeds from the exchange offers and consent solicitations. Any EFH Corp. Existing Notes exchanged in the exchange offers will be distributed to EFH Corp. and cancelled, thus effectively releasing EFIH from its guarantee of such notes. Any EFIH 9.75% Notes exchanged in the exchange offers will be cancelled.

**Taxation** . . . . . . . . . . . . . . . . . . . . . . . . For a discussion of certain U.S. federal income tax consequences of the exchange offers, see "Certain U.S. Federal Income Tax Considerations."

**Dealer Managers and Solicitation Agents** . . . . . . . . . . . . . . . . . . . . . . . . Citigroup Global Markets Inc., Goldman, Sachs & Co., Credit Suisse Securities (USA) LLC, J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC. The addresses and telephone numbers of the Dealer Managers and Solicitation Agents are listed on the back cover of this Offering Memorandum.

**Exchange Agent and Information Agent** . . . . . . . . . . . . . . . . . . . . . . . . Global Bondholder Services Corporation. The address and telephone numbers of the Exchange Agent and Information Agent are listed on the back cover of this Offering Memorandum.

**Risk Factors** . . . . . . . . . . . . . . . . . . . . . . In addition to the other information included in or incorporated by reference into this Offering Memorandum, you should carefully consider the information set forth in the section entitled "Risk Factors" beginning on page 26 and those contained in our 2011 Form 10-K, our June 30, 2012 Form 10-Q, the EFH Corp. 2011 Form 10-K and the EFH Corp. June 30, 2012 Form 10-Q, which are incorporated into this Offering Memorandum by reference, before deciding whether or not to participate in the exchange offers and the consent solicitations.

17

Highly Confidential

EFH2D10011252

EFH2D10011220

**PX 074**
**Page 33 of 255**

### Summary of the New Notes

*The summary below describes the principal terms of the New Notes and the Existing EFIH 10.000% Notes and any related supplemental indenture. Certain of the terms and conditions described below are subject to important limitations and exceptions. The "Description of the New Notes" section of this Offering Memorandum contains more detailed descriptions of the terms and conditions of the New Notes and the Existing EFIH 10.000% Notes and any related supplemental indenture.*

**Issuers**......................... Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (together, the "Offerors")

**Securities Offered**............... 10.000% Senior Secured Notes due 2020. The New Notes are Additional Notes (as defined in the Existing EFIH 10.000% Notes Indenture) under the Existing EFIH 10.000% Notes Indenture, and will have identical terms and conditions as, and form a single series and vote together as a single class with, the Existing EFIH 10.000% Notes, except that (i) the New Notes will be issued on the date the exchange offers are consummated and (ii) (a) the New Notes have not been registered under the Securities Act and, therefore, will bear legends restricting their transfer and will be subject to registration rights under the Registration Rights Agreement, (b) until the exchange offer under the Registration Rights Agreement is completed, the New Notes will have different CUSIP and ISIN numbers than those of the Existing EFIH 10.000% Notes and will not be fungible for trading purposes with the Existing EFIH 10.000% Notes, and (c) unlike the Existing EFIH 10.000% Notes, the New Notes will not be listed on the New York Stock Exchange. The New Notes will be issued with accrued interest from December 1, 2012, the date of the most recent interest payment on the Existing EFIH 10.000% Notes.

**Maturity Date**.................... December 1, 2020.

**Interest Rate**.................... The New Notes will accrue interest at the rate of 10.000% per annum from December 1, 2012. Interest on the New Notes will accrue from the Settlement Date.

**Interest Payment Dates**........... Interest on the New Notes will be payable on June 1 and December 1 of each year.

**Ranking**.......................... The New Notes will be:

- senior obligations of the Offerors and rank equally in right of payment with all existing and future senior debt of the Offerors;

- secured equally and ratably with $2.683 billion aggregate principal amount of Existing First Lien Notes (assuming 100% participation in the exchange offers by the holders of Existing Notes at or prior to the Early Tender Date and the exchange of all of the Existing Notes for New Notes in the

18

exchange offers (reflecting the issuance of the Total Consideration per each $1,000 principal amount of the Existing Notes)) and any future obligations of the Offerors that are secured by a first-priority lien on the Collateral;

- effectively senior to all debt of the Offerors secured by the Collateral on a second-priority basis to the extent of the value of the Collateral;

- effectively subordinated to all secured debt of EFIH that is secured by assets other than the Collateral, to the extent of the value of the assets securing such debt;

- structurally subordinated to all existing and future debt and other liabilities of EFIH's subsidiaries (other than EFIH Finance), including Oncor Holdings and its subsidiaries, any of EFIH's future foreign subsidiaries and any other unrestricted subsidiaries;

- effectively senior to all unsecured debt of EFIH and any debt secured by the Collateral on a subordinated basis, to the extent of the value of the Collateral; and

- senior in right of payment to any future subordinated debt of the Offerors.

As of September 30, 2012, after giving effect to (i) the October 2012 Notes Offering, (ii) the December 2012 Private Exchanges, (iii) the issuance of the New Notes pursuant to the exchange offers (assuming 100% participation in the exchange offers by the holders of Existing Notes at or prior to the Early Tender Date and the exchange of all of the Existing Notes for New Notes in the exchange offers (reflecting the issuance of the Total Consideration per each $1,000 principal amount of the Existing Notes) and the cancellation of all Existing Notes exchanged in the exchange offers), and (iv) the completion of the Concurrent Exchange Offers (assuming 100% participation in the Concurrent Exchange Offers by the holders of the EFH Corp. 2017 Notes at or prior to the Early Tender Date (as defined in the Concurrent Exchange Offers Offering Memorandum) and the exchange of all of the EFH Corp. 2017 Notes for EFIH 2018 Toggle Notes (reflecting the issuance of the total consideration pursuant to the Concurrent Exchange Offers Offering Memorandum per each $1,000 principal amount of the EFH Corp. 2017 Notes) and the distribution to EFH Corp. and cancellation of all EFH Corp. 2017 Notes exchanged in the Concurrent Exchange Offers), (1) the Offerors would have had approximately $4.0 billion aggregate principal amount of debt secured by a first-priority lien on the Collateral, $2.156 billion aggregate principal amount of debt secured by a second-priority lien on the Collateral and $1.428 billion aggregate principal amount of senior unsecured debt and $689 million of

19

Highly Confidential

EFH2D10011254

EFH2D10011220

TCEH Demand Notes guaranteed by EFIH on a senior unsecured basis (excluding $5.125 billion aggregate principal amount of EFH Corp. senior unsecured debt guaranteed by EFIH on a senior unsecured basis and held by EFIH), and (2) the New Notes would have been structurally subordinated to approximately $6.384 billion principal amount of debt (includes long-term debt, including amounts due currently, and short-term borrowings) of EFIH's subsidiaries (other than EFIH Finance), including all of Oncor Holdings' and its subsidiaries' debt. In addition, as of September 30, 2012, Oncor had approximately $1.610 billion of additional available capacity under its revolving credit facility.

**Guarantees** . . . . . . . . . . . . . . . . . . . . . . The New Notes will not initially be guaranteed.

**Security** . . . . . . . . . . . . . . . . . . . . . . . . The New Notes will be secured, on a first-priority basis, equally and ratably with the Existing First Lien Notes, by a pledge of all of the membership interests and other investments EFIH owns or holds in Oncor Holdings, which as of the date of this Offering Memorandum consist of all of the membership interests of Oncor Holdings (the "Collateral"). As of September 30, 2012, after giving effect to the October 2012 Notes Offering, $141 million aggregate principal amount of EFIH 9.75% Notes, $2.180 billion aggregate principal amount of Existing EFIH 10.000% Notes, $503 million aggregate principal amount of EFIH 6.875% Notes and guarantees of $115 million aggregate principal amount of EFH Corp. 9.75% Notes and $1.061 billion aggregate principal amount of EFH Corp. 10.000% Notes were outstanding and secured by first-priority liens on the Collateral. See "Description of the New Notes—Security for the Notes."

See "Risk Factors—Risks Related to the Exchange Offers, the New Notes and Our Substantial Debt—The indenture governing the New Notes may not protect noteholders from all actions that EFIH or the Oncor Subsidiaries may take that would reduce noteholders' interest in the Collateral or that may reduce the value of the Collateral, including sales or exchanges of the Collateral or the assets of the Oncor Subsidiaries for other assets or investments" and "Risk Factors—Risks Related to the Exchange Offers, the New Notes and Our Substantial Debt—The New Notes will be secured only to the extent of the value of the assets that have been granted as security for the New Notes. The fair market value of the Collateral upon any foreclosure may not be sufficient to repay the holders of the New Notes and all of the holders of the other debt secured by a first-priority security interest in the Collateral."

**Optional Redemption** . . . . . . . . . . . . . The Offerors may redeem any of the New Notes, in whole or in part, on and after December 1, 2015 at the redemption prices

Highly Confidential                                                    EFH2D10011255

EFH2D10011220

set forth in this Offering Memorandum plus accrued and unpaid interest to the redemption date. The Offerors may also redeem any of the New Notes at any time prior to December 1, 2015 at a price equal to 100% of their principal amount, plus accrued and unpaid interest to the redemption date and a "make-whole" premium. In addition, before December 1, 2013, the Offerors may redeem up to 35% of the combined aggregate principal amount of the New Notes and the Existing EFIH 10.000% Notes, using the proceeds from certain equity offerings, at the redemption price set forth in this Offering Memorandum plus accrued and unpaid interest to the redemption date. See "Description of the New Notes—Optional Redemption."

**Change of Control Offer** . . . . . . . . . Upon the occurrence of certain transactions meeting the definition of "change of control," holders of the New Notes will have the right to require the Offerors to repurchase some or all of the New Notes at 101% of their principal amount, plus accrued and unpaid interest to the repurchase date. This right is subject to important limitations. For example, this right will not apply to a transaction that would otherwise be a "change of control" if the transaction meets certain requirements. See "Description of the New Notes—Repurchase at the Option of Holders—Change of Control" and the definition of "Change of Control" under "Description of the New Notes."

The Offerors may not be able to pay holders the required price for New Notes they present to the Offerors at the time of a change of control, because the Offerors may not have enough funds at that time or the terms of the Offerors' other debt may prevent the Offerors from making such payment. See "Risk Factors—Risks Related to the Exchange Offers, the New Notes and Our Substantial Debt—We may not be able to repurchase the New Notes upon a change of control."

**Important Covenants** . . . . . . . . . . . . . The Existing EFIH 10.000% Notes Indenture contains covenants limiting EFIH's ability and the ability of its restricted subsidiaries to:

- incur additional debt or issue preferred shares;

- pay dividends on, repurchase or make other distributions in respect of its capital stock or make other restricted payments;

- make investments;

- sell or transfer assets;

- create liens on assets to secure debt;

- consolidate, merge, sell or otherwise dispose of all or substantially all of its assets;

21

EFH2D10011256

- enter into certain transactions with affiliates; and

- designate subsidiaries as unrestricted subsidiaries.

These covenants are subject to a number of important limitations and exceptions. EFIH is a holding company for its subsidiaries, including EFIH Finance, with no material operations of its own and no operating assets. There are currently no restricted subsidiaries under the Existing EFIH 10.000% Notes Indenture (other than EFIH Finance, which has no assets). Oncor Holdings, the immediate parent of Oncor, and its subsidiaries are unrestricted subsidiaries under the Existing EFIH 10.000% Notes Indenture and, accordingly, are not subject to any of the restrictive covenants in the Existing EFIH 10.000% Notes Indenture. None of Oncor Holdings, Oncor or their respective subsidiaries will guarantee the New Notes. See "Description of the New Notes."

**Registration Rights** . . . . . . . . . . . . . . . The Offerors will use commercially reasonable efforts to register with the SEC a new issue of the Offerors' debt securities having substantially identical terms to the New Notes (except for the provisions relating to transfer restrictions and the payment of additional interest) as part of an offer to exchange freely tradable exchange notes for the New Notes (the "registered exchange offer").

The Offerors will file with the SEC a registration statement relating to such exchange offer and will agree to complete such exchange offer no later than 365 days after the date the New Notes are issued. If required under special circumstances, the Offerors will file a shelf registration statement with the SEC covering resales of the New Notes.

If the Offerors fail to satisfy their obligations with respect to the registration of the New Notes (a "registration default"), the annual interest rate on the New Notes will increase by 25 basis points over the interest rate shown on the cover of this Offering Memorandum for the first 90-day period during which a registration default continues, and thereafter the annual interest rate on the New Notes will increase by 50 basis points over the interest rate shown on the cover of this Offering Memorandum for the remaining period during which a registration default continues. If all registration defaults are cured, the interest rate on the New Notes will revert to the original level.

Any amounts of additional interest due as a result of a registration default will be payable on the same interest payment dates as interest on the New Notes is payable. See "Registration Rights."

Highly Confidential

EFH2D10011257

EFH2D10011220
**PX 074**
**Page 38 of 255**

**Transfer Restrictions** . . . . . . . . . . . . . The Offerors have not registered the New Notes under the Securities Act or any state or other securities laws. The New Notes are subject to restrictions on transfer and may only be offered or sold in transactions exempt from, or not subject to, the registration requirements of the Securities Act. See "Notice to Investors."

**No Prior Market**. . . . . . . . . . . . . . . . . While there is a market for the Existing EFIH 10.000% Notes, prior to the consummation of the registered exchange offer, the New Notes and the Existing EFIH 10.000% Notes will not be fungible. The New Notes will be new securities for which there is currently no market. We cannot assure you as to the liquidity of markets that may develop for the New Notes, your ability to sell the New Notes or the price at which you would be able to sell the New Notes. The Dealer Managers have advised us that they intend to make a market in the New Notes and, if issued pursuant to a registered exchange offer, in the exchange notes, as permitted by applicable laws and regulations; however, they are not obligated to do so, and they may discontinue their market-making activities at any time without notice. See "Risk Factors—Risks Related to the Exchange Offers, the New Notes and Our Substantial Debt—Noteholders' ability to transfer the New Notes may be limited by the absence of an active trading market, and there is no assurance as to the maintenance or liquidity of any active market that may develop for the New Notes."

**Denominations** . . . . . . . . . . . . . . . . . . The New Notes will be issued in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof. We will issue the New Notes in the form of one or more global notes in definitive, fully registered, book-entry form.

23

Highly Confidential

EFH2D10011258

EFH2D10011220

### Summary Historical Consolidated Financial Data

The following table sets forth EFIH and its subsidiaries' summary historical consolidated financial data as of and for the periods indicated. The historical financial data as of December 31, 2011 and 2010, and for the years ended December 31, 2011, 2010 and 2009 (Successor), have been derived from EFIH and its subsidiaries' audited historical consolidated financial statements and related notes included in our 2011 Form 10-K, which is incorporated into this Offering Memorandum by reference. The historical financial data as of December 31, 2009, 2008 and 2007 (Successor), for the year ended December 31, 2008, and for the period from October 11, 2007 through December 31, 2007 (Successor) and for the period from January 1, 2007 through October 10, 2007 (Predecessor) have been derived from EFIH and its subsidiaries' audited historical consolidated financial statements that are not included in our 2011 Form 10-K and are not incorporated by reference into this Offering Memorandum. EFIH was formed at the time of the merger of Texas Energy Future Merger Sub Corp. ("Merger Sub") with and into EFH Corp. (the "Merger"), which occurred on October 10, 2007, and its predecessor is Oncor. The "Predecessor" period reflects the period prior to the Merger. The historical financial data for all periods includes Oncor Holdings and its subsidiaries accounted for under the equity method. The historical financial data as of September 30, 2012 and for the nine months ended September 30, 2012 and 2011 have been derived from EFIH and its subsidiaries' unaudited historical interim condensed consolidated financial statements and related notes included in our September 30, 2012 Form 10-Q, which is incorporated into this Offering Memorandum by reference. In EFIH's opinion, such unaudited interim financial data reflects all adjustments, consisting of normal recurring accruals, necessary for the fair presentation of the results for those periods. The results of operations for the interim periods, for seasonal and other factors, are not necessarily indicative of the results to be expected for the full year or any future period. See "Available Information" and "Incorporation by Reference."

The summary historical consolidated financial data should be read in conjunction with our 2011 Form 10-K, including the audited consolidated financial statements and related notes contained therein and the section captioned "Management's Discussion and Analysis of Financial Condition and Results of Operations," and our September 30, 2012 Form 10-Q, including the unaudited interim condensed consolidated financial statements and related notes contained therein and the section captioned "Management's Discussion and Analysis of Financial Condition and Results of Operations."

| | Successor (a) | | | | | Predecessor (a) |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 |
| | 2011 | 2010 | 2009 | 2008 | | |
| | (millions of dollars, except ratios) | | | | | |
| **Statement of Income Data:** | | | | | | |
| Income (loss) before income taxes and equity in earnings of unconsolidated subsidiary | $ 204 | $(106) | $(275) | $(260) | $(68) | $— |
| Equity in earnings (losses) of unconsolidated subsidiary (net of tax) (b) | 286 | 277 | 256 | (323) | 64 | 263 |
| Net income (loss) | 417 | 213 | 74 | (495) | 19 | 263 |
| Ratio of earnings to fixed charges (c) | 1.92 | 1.20 | — | 1.27 | — | — |
| **Statement of Cash Flows Data:** | | | | | | |
| Cash flows provided by operating activities | $ 3 | $ 133 | $ 216 | $ 333 | $— | $326 |
| Cash flows provided by (used in) financing activities | — | 407 | (216) | (330) | — | (326) |
| Cash flows used in investing activities | — | (497) | — | (3) | — | — |

24

EFH2D10011259

| | Successor (a) | | | | |
|---|---|---|---|---|---|
| | | | December 31, | | |
| | 2011 | 2010 | 2009 | 2008 | 2007 |
| **Balance Sheet Data:** | (millions of dollars) | | | | |
| Total assets........................................ | $9,517 | $8,547 | $5,577 | $5,363 | $7,732 |
| Total debt (d)...................................... | 3,436 | 3,172 | 2,513 | 2,250 | 2,250 |
| Total membership interests ........................ | 5,805 | 5,193 | 3,010 | 3,069 | 5,439 |

(a)  The Predecessor reflects Oncor accounted for under the equity method; EFIH and Oncor Holdings were formed as of the time of the Merger. The consolidated financial statements of the Successor reflect the application of purchase accounting to Oncor.

(b)  Amount in 2008 includes the effects of Oncor's $860 million goodwill impairment charge.

(c)  Fixed charges exceeded earnings by $59 million and $68 million for the year ended December 31, 2009 and the period from October 11, 2007 through December 31, 2007, respectively. There were no fixed charges for the predecessor periods.

(d)  Includes push down of 50% of the principal amount of certain EFH Corp. (parent) debt due to EFIH's guarantee of the debt. See Note 5 to EFIH and its subsidiaries' historical consolidated financial statements included in our 2011 Form 10-K, which is incorporated by reference into this Offering Memorandum. Does not include other EFH Corp. (parent) debt guaranteed by EFIH but not subject to push down. Also does not include any amounts under the TCEH Demand Notes, which are guaranteed on a senior unsecured basis by EFIH.

| | Successor | |
|---|---|---|
| | Nine Months Ended September 30, 2012 | Nine Months Ended September 30, 2011 |
| | (millions of dollars, except ratios) | |
| **Statement of Income Data:** | | |
| Income before income taxes and equity in earnings of unconsolidated subsidiary ................................... | $  94 | $ 204 |
| Equity in earnings of unconsolidated subsidiary (net of tax) ..... | $  249 | $ 235 |
| Net income....................................................... | $  308 | $ 367 |
| Ratio of earnings to fixed charges ............................ | 1.53 | 2.03 |
| **Statement of Cash Flows Data:** | | |
| Cash flows used in operating activities......................... | $ (196) | $   (1) |
| Cash flows provided by financing activities .................... | 1,008 | — |
| Cash flows used in investing activities ........................ | (680) | — |

| | Successor |
|---|---|
| | September 30, 2012 |
| **Balance Sheet Data:** | (millions of dollars) |
| Total assets..................................................... | $11,306 |
| Total debt (a) .................................................. | 5,451 |
| Total membership interests...................................... | 5,465 |

(a)  Includes push down of 50% of the principal amount of certain EFH Corp. (parent) debt due to EFIH's guarantee of the debt. See Note 4 to EFIH and its subsidiaries' historical consolidated condensed financial statements included in our September 30, 2012 Form 10-Q, which is incorporated by reference into this Offering Memorandum. Does not include other EFH Corp. (parent) debt guaranteed by EFIH but not subject to push down. Also does not include any amounts under the TCEH Demand Notes, which are guaranteed on a senior unsecured basis by EFIH.

Highly Confidential

EFH2D10011260

EFH2D10011220

**PX 074**
**Page 41 of 255**

## RISK FACTORS

*You should carefully consider the risk factors set forth below and the risk factors incorporated into this Offering Memorandum by reference to our 2011 Form 10-K, our June 30, 2012 Form 10-Q, the EFH Corp. 2011 Form 10-K and the EFH Corp. June 30, 2012 Form 10-Q as well as the other information contained in and incorporated by reference into this Offering Memorandum before deciding to participate in the exchange offers and the consent solicitations. Because we have significant exposure to EFH Corp. credit risk and to the business and financial condition of TCEH, some of the risks described below are risks pertaining to EFH Corp. and TCEH. The selected risks described below and the risks that are incorporated into this Offering Memorandum by reference to our 2011 Form 10-K, our June 30, 2012 Form 10-Q, the EFH Corp. 2011 Form 10-K and the EFH Corp. June 30, 2012 Form 10-Q are not the only risks to which we are or may become subject. Any of the following risks or any of the risks described in our 2011 Form 10-K, our June 30, 2012 Form 10-Q, the EFH Corp. 2011 Form 10-K and the EFH Corp. June 30, 2012 Form 10-Q could materially and adversely affect our business, financial condition, operating results or cash flow. In such a case, the trading price of the New Notes could decline, or we may not be able to make payments of interest and principal on the New Notes, and noteholders may lose all or part of their original investment.*

### Risks to Holders of Existing Notes Not Tendered or Not Accepted for Exchange

The following risk factors apply to holders of Existing Notes that elect not to tender Existing Notes in the exchange offers. There are additional risks attendant to ownership of the Existing Notes that you should consider before deciding to tender your Existing Notes in the exchange offers. Such additional risks are described in this "Risk Factors" section under the headings "—Risks Related to the Exchange Offers, the New Notes and Our Substantial Debt," "—Risks Related to Structure," and "—Risks Related to Exposure to EFH Corp. and TCEH" and in the documents filed with the SEC by EFH Corp. and EFIH that are incorporated in this Offering Memorandum by reference.

*Following completion of the exchange offers, liquidity of the market for outstanding Existing Notes of any series will likely be reduced, and market prices for remaining Existing Notes of any series may materially decline as a result.*

To the extent the exchange offers are completed, the aggregate principal amount of outstanding Existing Notes of any series will be reduced. A reduction in the principal amount of outstanding Existing Notes of any series may materially and adversely affect the liquidity of the Existing Notes of any such series that remains outstanding after completion of the exchange offers. A series of securities with a small outstanding principal amount available for trading (referred to as "float") may command a lower price than does a comparable series of securities with a greater float. Therefore, the market price for each series of Existing Notes that remains outstanding after completion of the exchange offers may be materially and adversely affected. A reduced float may also make the trading prices of any series of Existing Notes that are not exchanged more volatile. Following the completion of the exchange offers, we cannot assure you that an active trading market in the Existing Notes of any series will exist or that the trading price for the Existing Notes of any series not tendered by holders or not accepted for exchange will not materially decline.

*If the Proposed Collateral Release Amendments become operative, EFH Corp. Existing Notes not tendered or accepted for exchange will become unsecured obligations of EFH Corp. that rank effectively junior to any debt or other liabilities of EFH Corp.'s subsidiaries, including any secured and unsecured debt or other liabilities of EFIH.*

If the Proposed Collateral Release Amendments become operative with respect to any series of EFH Corp. Existing Notes, the collateral securing such EFH Corp. Existing Notes would be released

26

EFH2D10011261

EFH2D10011220

**PX 074**
**Page 42 of 255**

in its entirety and EFIH would become an "Unrestricted Subsidiary" under such EFH Corp. Existing Notes Indenture and thereby cause EFIH to be automatically released from its guarantee of such notes. As a result, those remaining EFH Corp. Existing Notes will become unsecured obligations of EFH Corp. that do not benefit from any guarantee or security. As a result, those remaining EFH Corp. Existing Notes will be structurally subordinated to all liabilities of all of EFH Corp.'s subsidiaries, whether secured or unsecured, including trade payables, taxes and other liabilities, and will have no claim on the assets of those subsidiaries, including EFIH.

*If the Proposed Collateral Release Amendments become operative, EFH Corp. Existing Notes not tendered or accepted for exchange will have recourse only against EFH Corp., which is a holding company without operating assets that relies on distributions from its subsidiaries for its cash flow.*

If the proposed Collateral Release Amendments become operative with respect to any series of EFH Corp. Existing Notes and EFIH's guarantee of those notes is released, holders of those remaining EFH Corp. Existing Notes will have recourse only against EFH Corp. EFH Corp. is a holding company that has no operations or operating assets and relies on distributions from EFIH and EFCH for its cash flow. Neither EFIH nor EFCH nor any of their respective subsidiaries has any obligation to make distributions or other payments to EFH Corp. In addition, the agreements governing the debt of EFH Corp.'s direct and indirect subsidiaries generally limit their ability to make payments or other distributions directly or indirectly to EFH Corp. Any such distributions are also limited by applicable law.

*If the Proposed Collateral Release Amendments become operative, EFIH 9.75% Notes not tendered or accepted for exchange will become unsecured obligations of EFIH.*

If the Proposed Collateral Release Amendments become operative with respect to the EFIH 9.75% Notes, any such notes not tendered or accepted for exchange will no longer have any security interest in the Collateral and become unsecured obligations of EFIH that rank effectively junior to any secured debt of EFIH, including all of the existing first and second lien debt of EFIH, to the extent of the value of the Collateral securing such debt.

*If the Proposed Indenture Amendments become operative, holders of applicable Existing Notes will no longer benefit from the protections provided by any of the existing restrictive covenants, certain events of default and other provisions.*

With respect to each series of Existing Notes, if the applicable Proposed Indenture Amendments become operative with respect to such series, the Existing Notes of such series that remain outstanding immediately following the completion of the exchange offers will be subject to the terms of the applicable Existing Notes Indenture as modified by the applicable Supplemental Indenture. As a result of the adoption of the Proposed Indenture Amendments, even if the applicable Proposed Collateral Release Amendments do not become adopted, among other things, substantially all of the restrictive covenants and certain events of default contained in the applicable Existing Notes Indentures and the applicable Existing Notes will be eliminated, covenants regarding mergers and consolidations will be modified, and certain other provisions will be modified or eliminated. Following the adoption and implementation of the Proposed Indenture Amendments, holders of Existing Notes of any series that remain outstanding after the completion of the exchange offers will no longer be entitled to the benefits of such restrictive covenants, events of default and other provisions and will no longer have recourse against EFCH. The elimination or modification of these restrictive covenants, events of default and other provisions will permit us to take certain actions previously prohibited that could increase the credit risks with respect to EFH Corp. and EFIH and could adversely affect the market price and credit rating of the remaining Existing Notes of the applicable series.

27

Highly Confidential                                                                    EFH2D10011262

EFH2D10011220

*EFH Corp. and its subsidiaries, including EFIH, EFCH and TCEH, continuously contemplate future transactions and initiatives related to capital structure in light of, among other things, EFH Corp.'s and TCEH's substantial indebtedness, market projections of continued low wholesale natural gas prices and the reduced percentage of TCEH's wholesale natural gas price exposure that is subject to hedges. As a result of these transactions and initiatives, holders of Existing Notes may ultimately be in a worse position if they do not participate in the exchange offers.*

Future transactions and initiatives that EFH Corp., EFIH and EFH Corp.'s other subsidiaries, including EFCH and TCEH, continuously contemplate and may pursue may have significant effects on our business, capital structure, ownership, liquidity and/or results of operations. For example, EFH Corp., EFIH and EFH Corp.'s other subsidiaries, including EFCH and TCEH, have pursued and may continue to pursue, from time to time, transactions and initiatives related to capital structure, including, without limitation, debt exchange transactions, debt repurchases, equity or debt issuances, debt refinancing transactions (including extensions of maturity dates of their debt), asset sales, joint ventures, recapitalizations, business combinations and other strategic transactions. There can be no guarantee that any such transactions or initiatives would ultimately be successful or produce the desired outcome, which could ultimately affect EFH Corp. and its subsidiaries in a material and adverse manner. Moreover, the effects of any of these transactions or initiatives could be material and adverse to holders of our debt and could be disproportionate, and directionally different, with respect to one class or type of debt than with respect to others. As a result of these transactions and initiatives, holders of Existing Notes may ultimately be in a worse position if they do not participate in the exchange offers. Despite their current high debt level, EFH Corp. and TCEH may still be able to incur substantially more debt. This could further exacerbate the risks associated with their substantial debt.

*The credit ratings for the Existing Notes may not be maintained, and the market price of the Existing Notes may decrease as a result of negative action with respect to the credit ratings on the Existing Notes.*

A credit rating is not a recommendation to buy, sell or hold securities, and the credit rating agencies may change or withdraw the ratings assigned to any series of securities represented by the Existing Notes in their sole discretion at any time. As a result of the exchange offers, the consent solicitations or other events, one or more rating agencies, including Fitch Ratings, Ltd. ("Fitch"), Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc. ("S&P"), or Moody's Investors Services, Inc. ("Moody's"), may take action to withdraw their rating of any series of the Existing Notes, or downgrade or take other negative action upon their respective ratings on any series of Existing Notes. Any withdrawal, downgrade or negative action with respect to any series of Existing Notes may adversely affect the market price of such series of the Existing Notes.

**Risks Related to the Exchange Offers, the New Notes and Our Substantial Debt**

The following are some of the risks that apply to holders of Existing Notes that elect to participate in the exchange offers and whose Existing Notes are accepted for exchange in the exchange offers and receive New Notes. There are additional risk factors attendant to ownership of New Notes that you should consider before deciding to tender your Existing Notes in the exchange offers. These risks are described in this "Risk Factors" section under the headings "—Risks Related to Structure," and "—Risks Related to Exposure to EFH Corp. and TCEH" and in the documents filed with the SEC by EFIH and EFH Corp. that are incorporated in this Offering Memorandum by reference.

*Neither the Total Consideration nor the Exchange Consideration reflects any independent valuation of the Existing Notes or the New Notes.*

The Offerors have not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the Total Consideration or the Exchange Consideration or the relative value of the

Highly Confidential

New Notes as compared to the Existing Notes that you would have to tender to participate in any of the exchange offers. If you validly tender your Existing Notes, you may or may not receive more or as much value than if you choose to keep them.

*The New Notes will have a later maturity than the Existing Notes. To the extent that a holder of Existing Notes exchanges Existing Notes for New Notes, such holder may increase its risk that the Offerors will be unable to repay or refinance such notes when they mature.*

If the Offerors complete the Exchange Offers, the New Notes will have a later maturity than the Existing Notes. Holders of New Notes will be exposed to the risk of nonpayment on the New Notes for a longer period than the holders of Existing Notes that remain outstanding. For example, following the maturity date of the Existing Notes, but prior to the maturity date of the New Notes, the Offerors may become subject to a bankruptcy or similar proceeding. If such a proceeding were to occur, holders of Existing Notes may be paid in full at maturity, while there is a risk that the holders of New Notes would not be paid in full at maturity or in connection with any bankruptcy or similar proceeding.

*Holders of EFH Corp. Existing Notes that participate in the exchange offers will no longer have the benefit of a residual interest in EFH Corp.'s competitive business, including TCEH. As a result, if Oncor's financial condition or results of operations are adversely affected such that EFIH is unable to pay principal or interest on the New Notes, holders of EFH Corp. Existing Notes that do not participate in the exchange offers would have a residual interest in EFH Corp.'s competitive business, including TCEH, that would not exist for holders that participate in the exchange offers. As of September 30, 2012, TCEH's liabilities exceed its assets as shown on its balance sheet prepared in accordance with GAAP, and all of TCEH's debt is structurally senior to the EFH Corp. Existing Notes. However, there can be no assurance that, due to a significant rise in wholesale electricity prices in ERCOT, and/or if EFH Corp. and/or its subsidiaries engage in transactions or initiatives that significantly deleverage the capital structure of the competitive business, including TCEH, the residual interest in EFH Corp.'s competitive business would not benefit the EFH Corp. Existing Notes in the future.*

EFH Corp. Existing Notes have the benefit of a residual interest in both the regulated and competitive businesses of EFH Corp. EFH Corp. Existing Notes also have the benefit of a guarantee from EFCH, although that guarantee will be released if the Proposed Indenture Amendments become operative. Holders of EFH Corp. Existing Notes that participate in the exchange offers will no longer benefit from a residual interest in EFH Corp.'s competitive business, including TCEH, or the EFCH guarantee (if not released through the Proposed Indenture Amendments) because the New Notes will not be guaranteed by EFH Corp. or EFCH. As a result, if Oncor's financial condition or results of operations are adversely affected, the New Notes will not have a direct residual interest in the competitive business that might offset any such adverse effect at Oncor. Moreover, if there is significant improvement in wholesale electricity prices in ERCOT as a result of an increase in natural gas prices or market heat rates that enhances the profitability of EFH Corp.'s competitive business and increases the value of TCEH's generation assets, holders of New Notes might not directly benefit from such improvement.

In addition, as part of the ongoing liability management efforts of EFH Corp. and its subsidiaries (other than Oncor Holdings and its subsidiaries), EFH Corp., EFIH, EFCH and TCEH (collectively and individually) have considered and evaluated, and continue to consider and evaluate, possible future transactions and initiatives to address their highly leveraged balance sheets and significant cash interest requirements. As a result, EFH Corp. and its subsidiaries (other than Oncor Holdings and its subsidiaries) may from time to time enter into discussions with their lenders and bondholders with respect to such transactions and initiatives. These transactions and initiatives, which could include, among others, debt for debt exchanges, recapitalizations, amendments to, and extensions of, debt obligations and/or debt for equity exchanges or conversions, including exchanges or conversions of

29

debt of EFCH and TCEH into equity of EFH Corp., EFCH, TCEH, and/or any of their subsidiaries, could have significant effects on the business, capital structure, ownership, liquidity, credit ratings and/or results of operations of EFH Corp., EFIH, EFCH and TCEH. In addition, these transactions and initiatives could significantly impact the market trading prices for their debt securities, including the EFH Corp. Existing Notes. If these transactions and initiatives were to deleverage EFH Corp.'s competitive business substantially, and if Oncor's financial condition or results of operations are adversely affected such that EFIH is unable to pay principal or interest on the New Notes, holders of EFH Corp. Existing Notes that do not participate in the exchange offers would have the direct benefit of a residual interest in EFH Corp.'s deleveraged competitive business, including TCEH, which could result in the holders of such notes being better off than holders of the New Notes.

*We or our affiliates may purchase any Existing Notes not tendered in the exchange on terms that could be more or less favorable to holders of Existing Notes than the terms of the exchange offers.*

We or our affiliates may, at any time or from time to time and to the extent permitted by applicable law, purchase Existing Notes in the open market, in privately negotiated transactions, pursuant to the redemption provisions of the indentures governing the Existing Notes, through subsequent tender or exchange offers or otherwise. Any other purchases may be made on the same terms or on terms which are more or less favorable to holders than the terms of the exchange offers. If we or our affiliates decide to purchase Existing Notes on terms that are more favorable than the terms of the exchange offers, holders of Existing Notes not participating in the exchange offers could be better off than those that participated in the exchange offers.

*The New Notes may trade at a discount to their principal amount.*

The Existing Notes are trading at a premium to their principal amounts. While the market, if any, for the New Notes will depend upon many factors, including prevailing interest rates, the market for similar securities, general economic conditions and our financial condition, performance and prospects, the New Notes may trade, at least initially, at a discount to their principal amount, and any such discount may be significant. However, for the purposes of establishing the "Total Consideration if Tendered at or prior to the Early Tender Date" and the "Exchange Consideration if Tendered after the Early Tender Date and at or prior to the Expiration Date" set forth on page iii of this Offering Memorandum, the New Notes are treated as though they have a value equal to their face amount. There can be no assurance that the New Notes will be traded at or above the principal amount of such notes in the future.

*The exchange offers and the consent solicitations may be cancelled or delayed.*

Subject to applicable law, the Offerors have the right to terminate or withdraw any of the exchange offers, and EFH Corp. and the Offerors have the right to terminate or withdraw the applicable consent solicitations if any of the applicable conditions described in "Conditions of the Exchange Offers and the Consent Solicitations" are not satisfied or waived by the Expiration Date or Consent Date, as applicable. Even if the exchange offers and the consent solicitations are completed, they may not be completed on the schedule described in this Offering Memorandum. If EFH Corp. or the Offerors choose to extend any of the exchange offers or consent solicitations, EFH Corp. or the Offerors may not be required to correspondingly extend or reinstate withdrawal rights. Accordingly, holders participating in the exchange offers may have to wait longer than expected to receive their New Notes.

*You may not receive New Notes in the exchange offers if the procedures for the exchange offers are not followed.*

Subject to the terms and upon the conditions of the exchange offers, the Offerors will issue the New Notes in exchange for your Existing Notes only if you validly tender the Existing Notes and deliver

30

Highly Confidential

EFH2D10011265

a properly completed and duly executed Consent and Letter of Transmittal, or an Agent's Message in lieu thereof, and other required documents before the Expiration Date. You should allow sufficient time to ensure timely delivery of the necessary documents. None of the Exchange Agent, the Dealer Managers or the Offerors are under any duty to give notification of defects or irregularities with respect to the tenders of Existing Notes for exchange. If you are the beneficial owner of Existing Notes that are registered in the name of your broker, dealer, commercial bank, trust company or other nominee, and you wish to tender in the exchange offers, you should promptly contact the person in whose name your Existing Notes are registered and instruct that person to tender your Existing Notes on your behalf.

**Your ability to transfer the New Notes will be subject to securities law restrictions that do not presently apply to the Existing Notes.**

The New Notes issued in the exchange offers will not be registered under the Securities Act or any state or other securities laws. As a result, the New Notes may not be offered, sold or otherwise transferred except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws, or pursuant to an effective registration statement. As a result, you may be required to bear the risk of your investment for an indefinite period of time. Pursuant to the terms of the Registration Rights Agreement, we will be obligated to use our commercially reasonable efforts to commence an offer to exchange the New Notes for notes with substantially identical terms that are registered under the Securities Act or, in certain circumstances, register the reoffer and resale of the New Notes under the Securities Act.

**We have significant exposure to EFH Corp. credit risk and to the business and financial condition of TCEH.**

As of September 30, 2012, approximately 37% of reported assets on our balance sheet consisted of debt securities of EFH Corp. that we also guarantee. As of September 30, 2012, we held $4.5 billion aggregate principal amount of such debt securities, which had a carrying value of $4.2 billion as of that date before giving effect to the $407 million principal amount of such debt acquired in the December 2012 Initial Private Exchanges. As of September 30, 2012, we also had receivables from affiliates in the amount of $224 million, primarily representing our claims for accrued interest on these debt securities. We depend and will continue to depend on receiving cash interest payments on these EFH Corp. debt securities to fund, at least in part, payments on the New Notes and our other debt obligations. In the past, EFH Corp. has serviced its debt securities in part with funds loaned to EFH Corp. by TCEH under the TCEH Demand Notes. On August 14, 2012, we issued $250 million aggregate principal amount of EFIH 6.875% Notes and $600 million aggregate principal amount of EFIH 11.750% Notes. We will use $680 million of the net proceeds from the August 2012 Notes Offering to pay the EFIH Dividend. EFH Corp. will use the proceeds from the EFIH Dividend to repay the balance of the TCEH Demand Notes, which are guaranteed on a senior unsecured basis by EFIH and EFCH (a direct subsidiary of EFH Corp. and Parent of TCEH), and there is no assurance that TCEH will make additional advances to EFH Corp. under the TCEH Demand Notes in the future to the extent EFH Corp. requests such advances.

In addition, as of September 30, 2012, after giving effect to the December 2012 Private Exchanges, but without giving effect to the exchange offers or the Concurrent Exchange Offers, we guaranteed, either on a first-priority secured basis or on a senior unsecured basis, approximately $1.3 billion principal amount of debt of EFH Corp. that is held by third parties as well as $689 million of TCEH Demand Notes. Although EFH Corp. will use the proceeds from the EFIH Dividend to repay the balance of the TCEH Demand Notes, TCEH may advance up to $2.0 billion to EFH Corp. under the TCEH Demand Notes in the future. Any amounts owed by EFH Corp. under the TCEH Demand Notes now or in the future will be repayable on demand and will be guaranteed by EFIH on a senior unsecured basis.

31

Highly Confidential

EFH2D10011266

EFH2D10011220

EFIH plans to distribute all or substantially all of the EFH Corp. 2017 Notes it holds to EFH Corp. prior to or in the first quarter of 2013. Following such distribution, EFH Corp. is expected to cancel these notes. See "Summary—Recent Developments—Distribution and Cancellation of Debt Securities."

Furthermore, a significant portion of Oncor's revenues represents fees for delivery services provided to TCEH. Revenues from TCEH represented 29% and 33% of Oncor's total reported revenues for the nine months ended September 30, 2012 and for the year ended December 31, 2011, respectively.

The indenture governing the New Notes does not limit our ability to dividend the EFH Corp. debt securities that we hold to EFH Corp. so long as we received such securities in exchange for the issuance of EFIH debt. If EFH Corp. is unable to service its debt securities because TCEH no longer loans funds to EFH Corp. in response to a request by EFH Corp., or for other reasons, or if we dividend these debt securities to EFH Corp. and EFH Corp. does not make capital contributions or loans to us, we may be unable to make payments on the New Notes. We may acquire additional debt securities of EFH Corp. or TCEH in the future in connection with exchange offers, debt repurchases or other transactions, in which case our exposure to the business and financial condition of EFH Corp. and/or TCEH would be increased.

See "—Risks Related to Exposure to EFH Corp. and TCEH."

***Our substantial leverage could adversely affect our ability to raise additional capital to fund our operations, limit our ability to react to changes in the economy or our industry and prevent us from meeting obligations under our various debt agreements. Among other things, the incurrence of debt that is secured by a lien on our investment in Oncor Holdings could result in downgrades to Oncor's credit ratings and thus increase Oncor's borrowing costs and reduce the amounts that Oncor distributes to us.***

We are highly leveraged. As of September 30, 2012, our consolidated principal amount of debt, including amounts guaranteed in favor of and pushed down from EFH Corp. as described in Note 4 to the financial statements in our September 30, 2012 Form 10-Q, (which does not reflect the $253 million of debt we issued in the October 2012 Notes Offering and the $1.304 billion of debt we issued or the approximately $564 million of debt previously subject to push down (at 50%) we acquired in the December 2012 Private Exchanges) totaled $5.445 billion. Such amount, presented in accordance with GAAP, does not include an additional $1.118 billion principal amount of EFH Corp. debt held by third parties that is guaranteed by EFIH and not reflected on (pushed down to) our balance sheet as long-term debt or an additional $689 million outstanding under the TCEH Demand Notes and guaranteed on a senior unsecured basis by EFIH. Our substantial leverage could have important consequences, including:

- making it more difficult for us to make payments on our debt;
- requiring a substantial portion of our cash flow to be dedicated to the payment of principal and interest on debt, thereby reducing our ability to use our cash flow to fund future business opportunities and execute our strategy;
- increasing our vulnerability to adverse economic, industry or competitive developments;
- limiting our ability to make strategic acquisitions or causing us to make non-strategic divestitures;
- limiting our ability to obtain additional financing for working capital, debt service requirements, acquisitions and general corporate or other purposes, or to refinance existing debt;
- limiting our ability to adjust to changing market conditions and placing us at a disadvantage compared to competitors who are less highly leveraged and who, therefore, may be able to

32

EFH2D10011267

EFH2D10011220

**PX 074
Page 48 of 255**

operate at a lower overall cost (including debt service) and take advantage of opportunities that we cannot; and

- resulting in downgrades to Oncor's credit rating.

Some rating agencies have publicly expressed concerns that the financial condition of EFH Corp. and its non-ring-fenced affiliates could constrain Oncor's credit market access or margin spreads. One rating agency lowered Oncor's credit ratings by one notch after the August 2012 Notes Offering, and any further adverse action with respect to Oncor's credit ratings could cause Oncor's borrowing costs to increase and the potential pool of investors and funding sources to decrease. For example, the interest margin Oncor pays on borrowings under its revolving credit agreement depends on Oncor's credit ratings and will generally increase as its credit ratings are lowered. In the event any such adverse action to Oncor's credit ratings takes place and causes Oncor's borrowing costs to increase, it may not be able to recover these increased costs if they exceed Oncor's PUCT-approved cost of debt determined in its most recent rate case or subsequent rate cases. Consequently, the amount of Oncor's distributions to us may be reduced.

In addition, future transactions and initiatives that EFIH, EFH Corp. and EFH Corp.'s other subsidiaries, including EFCH and TCEH, continuously contemplate and may pursue may have significant effects on our business, capital structure, ownership, liquidity and/or results of operations. For example, EFIH, EFH Corp. and EFH Corp.'s other subsidiaries, including EFCH and TCEH, have and may continue to pursue, from time to time, transactions and initiatives of various types, including, without limitation, exchange transactions, debt repurchases, equity or debt issuances, debt refinancing transactions (including extensions of maturity dates of our debt), asset sales, joint ventures, recapitalizations, business combinations and other strategic transactions. There can be no guarantee that any of such transactions or initiatives would ultimately be successful or produce the desired outcome, which could ultimately affect EFIH in a material and adverse manner. Moreover, the effects of any of these transactions or initiatives could be material and adverse to holders of our debt and could be disproportionate, and directionally different, with respect to one class or type of debt than with respect to others.

***Despite our current high debt level, we may still be able to incur substantially more debt. This could further exacerbate the risks associated with the New Notes and our other debt.***

We may be able to incur additional debt in the future. Although our and EFH Corp.'s debt agreements contain restrictions on the incurrence of additional debt, these restrictions are subject to a number of significant qualifications and exceptions. Under certain circumstances, the amount of debt, including debt secured by the Collateral, that could be incurred in the future in compliance with these restrictions could be significant. The indenture governing the New Notes permits EFIH to incur $250 million of additional debt secured by a second-priority security interest in the Collateral, and the indentures governing the New Notes, the EFIH Second Lien Notes, the Existing First Lien Notes, and the EFIH 2018 Toggle Notes permit EFIH to incur debt secured by assets of EFIH other than the Collateral. The indentures governing the New Notes, the Existing First Lien Notes, the EFIH Second Lien Notes and the EFIH 2018 Toggle Notes permit EFH Corp. and EFIH to incur additional debt in various other circumstances. For example, EFIH has guaranteed the TCEH Demand Notes. While EFH Corp. will use the proceeds of the EFIH Dividend to repay the balance of the TCEH Demand Notes, EFH Corp. in the future may request that TCEH advance additional amounts under the TCEH Demand Notes to EFH Corp. and TCEH may loan such amounts to EFH Corp. (the repayment of which would be guaranteed by EFIH), which would be payable on demand and may equal up to $2.0 billion in the aggregate at any time. If new debt is added to our existing debt levels, the related risks that we and noteholders now face would intensify. See "Description of the New Notes."

33

Highly Confidential

EFH2D10011268

EFH2D10011220

*Lenders and holders of our debt may allege that we are not operating in compliance with covenants in our debt agreements, which could cause the trading price of our debt securities to decline even if such claims are without merit.*

Given our financial condition, lenders or holders of our debt might assert at any time that we are not operating in compliance with covenants in the agreements governing our debt instruments or make other related allegations, including for the purpose of attempting to accelerate the maturity of such debt and/or attempting to obtain economic benefits from us. Even if any claim by lenders or holders of our debt alleging noncompliance or an event of default under agreements governing our debt instruments is without merit, such a claim could nevertheless cause the trading price of our debt securities, including the New Notes, to decline and adversely affect our ability to raise additional capital and/or refinance our existing debt.

*Our debt agreements, certain of the debt agreements of EFH Corp. and the Oncor "ring-fencing" measures contain restrictions that limit flexibility in operating our businesses.*

Our debt agreements, including the indentures governing the New Notes, the Existing First Lien Notes, the EFIH Second Lien Notes and the EFIH 2018 Toggle Notes, contain various covenants and other restrictions that limit our ability to engage in specified types of transactions and may adversely affect our ability to operate our businesses. These covenants and other restrictions limit our ability to, among other things:

- incur additional debt or issue preferred shares;

- pay dividends on, repurchase or make distributions in respect of our capital stock or make other restricted payments;

- make investments;

- sell or transfer assets;

- create liens on assets to secure debt;

- consolidate, merge, sell or otherwise dispose of all or substantially all of our assets;

- enter into transactions with affiliates; and

- designate subsidiaries as unrestricted subsidiaries.

There are a number of important limitations and exceptions to these covenants and other restrictions. For a description of these covenants and other restrictions with respect to the New Notes, see "Description of the New Notes." See Note 5 to EFIH's historical consolidated financial statements for the year ended December 31, 2011 included in our 2011 Form 10-K and Note 4 to EFIH's historical condensed consolidated financial statements for the nine months ended September 30, 2012 included in our September 30, 2012 Form 10-Q, both of which are incorporated by reference into this Offering Memorandum, for a summary description of certain of these covenants and other restrictions as they relate to certain of our debt.

In addition, as described in "The Transactions—Ring-Fencing," EFH Corp. and Oncor have implemented a number of "ring-fencing" measures to enhance the credit quality of Oncor, its immediate parent, Oncor Holdings, and Oncor Holdings' other subsidiaries. See the financial statements of Oncor Holdings, which are included as Exhibit 99(d) of our 2011 Form 10-K, for a description of the material features of these "ring-fencing" measures. Those measures, many of which were agreed to and required by the PUCT's Order on Rehearing in Docket No. 34077, include, among other things:

- Oncor Holdings' and Oncor's board of directors being comprised of a majority of directors that are independent from the Texas Holdings Group, including EFIH;

34

Highly Confidential                                            EFH2D10011269

EFH2D10011220

**PX 074**
**Page 50 of 255**

- Oncor being treated as an unrestricted subsidiary with respect to certain of our debt, including the New Notes;

- Oncor not being restricted from incurring its own debt;

- Oncor not guaranteeing or pledging any of its assets to secure the debt of any member of the Texas Holdings Group, including the Issuer; and

- restrictions on the payment of distributions and the right of the independent members of Oncor's board of directors and the largest non-majority member of Oncor to block the payment of distributions to Oncor Holdings (i.e., such distributions not being available to us).

***We may not be able to generate or receive sufficient cash to service all of our debt, including the New Notes, and may be forced to take other actions to satisfy our obligations under our debt agreements, which may not be successful.***

EFIH is a holding company with no operations or operating assets. Our ability to make scheduled payments on or to refinance our debt obligations depends on (i) Oncor's financial condition and operating performance, which are subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control, and Oncor making distributions to EFIH, which it may be prohibited from doing and over which we have no control, (ii) EFIH's receipt of interest payments from EFH Corp. and TCEH on EFH Corp. and TCEH debt that EFIH holds and (iii) capital contributions or loans from EFH Corp. We may not be able to maintain a level of cash flows sufficient to permit us to pay the principal, premium, if any, and interest on our debt, including the New Notes.

The "ring fencing" measures in place at Oncor limit the payment of distributions and provide the independent members of Oncor's board of directors, acting by majority vote, and, during certain periods, the largest non-majority member of Oncor, with the right to block the payment of distributions to Oncor Holdings if they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements. As a result, there can be no assurance that EFIH will receive any distributions from Oncor. In addition, adverse action with respect to Oncor's credit ratings could cause Oncor's borrowing costs to increase and the potential pool of investors and funding to decrease, which could result in Oncor reducing the amount of distributions to EFIH. See "Risk Factors—Risks Related to Structure—Oncor may or may not make any distributions to EFIH."

Furthermore, a substantial portion of EFIH's cash flows comes from EFH Corp.'s and TCEH's payment of interest on certain debt of EFH Corp. and TCEH held by EFIH. As of September 30, 2012, EFIH held $4.7 billion principal amount of such debt on which annual interest is approximately $540 million. EFIH plans to distribute all or substantially all of the EFH Corp. 2017 Notes it holds to EFH Corp. prior to or in the first quarter of 2013. Following such distribution, EFIH Corp. is expected to cancel these notes. See "Summary—Recent Developments—Distribution and Cancellation of Debt Securities." After giving effect to the December 2012 Private Exchanges and the Distribution and Cancellation, the annual interest for the debt of EFH Corp. and TCEH retained by EFIH will be approximately $90 million. There can be no assurance that EFH Corp. and TCEH will continue to have sufficient resources to pay interest on their debt that we hold. In addition, in the past, EFH Corp. has serviced its debt securities in part with funds loaned to EFH Corp. by TCEH under the TCEH Demand Notes. EFIH will use $680 million of the net proceeds from the August 2012 Notes Offering to pay the EFIH Dividend to EFH Corp., and EFH Corp. will use the proceeds of the dividend to repay the balance of the TCEH Demand Notes. There is no assurance that TCEH will make additional advances to EFH Corp. under the TCEH Demand Notes in the future to the extent EFH Corp. requests such advances. See "—Risks Related to Exposure to EFH Corp. and TCEH."

If cash flows and capital resources are insufficient to fund our debt service obligations, we could face substantial liquidity problems and might be forced to reduce or delay investments, dispose of

35

Highly Confidential

EFH2D10011270

EFH2D10011220

assets, seek additional capital or restructure or refinance debt, including the New Notes. These alternative measures may not be successful, may not be completed on economically attractive terms or may not be adequate for us to meet our debt service obligations when due. Additionally, our and our affiliates' debt agreements, including the indentures governing the New Notes, the Existing First Lien Notes, the EFIH Second Lien Notes and the EFIH 2018 Toggle Notes, limit the use of the proceeds from many dispositions of our and our subsidiaries' assets or operations. As a result, we may not be allowed, under these documents, to use proceeds from such dispositions to satisfy all current debt service obligations.

***If we, EFH Corp. or TCEH default on obligations to pay debt, we may not be able to make payments on the New Notes.***

Any default under our, our subsidiaries', EFH Corp.'s or TCEH's debt agreements that is not waived by the required lenders or noteholders, and the remedies sought by the holders of such debt, could prevent us from paying principal, premium, if any, and interest on the New Notes, which could substantially decrease the market price of the New Notes. If we, our subsidiaries or affiliated entities (including EFH Corp. and TCEH) are unable to generate sufficient cash flows, including amounts that may be distributed to us from our unrestricted subsidiaries, and are otherwise unable to obtain funds necessary to meet required payments of principal, premium, if any, and interest on our or their debt, or if we, our subsidiaries or affiliated entities (including EFH Corp. and TCEH) otherwise fail to comply with the various covenants, including the requirement in the TCEH Senior Secured Credit Facilities to timely deliver to the lenders copies of audited annual financial statements that are not qualified as to the status of TCEH and its consolidated subsidiaries as a going concern, or any financial and operating covenants, in the instruments governing our or their debt, or if we or they otherwise take any action or any event, occurrence, fact, condition, effect, change or development occurs that constitutes an event of default under such debt agreements, we or they could be in default under the terms of the agreements governing such debt. In the event of such default, the holders of such debt could elect to declare all the funds borrowed thereunder to be due and payable, together with accrued and unpaid interest, and/or the lenders could elect to terminate their commitments thereunder, cease making further loans and, in the case of the holders of the New Notes and the Existing First Lien Notes, institute foreclosure proceedings against the Collateral. In the case of a default under debt of EFH Corp. that is guaranteed by us, holders of such debt could also seek to enforce these guarantees against us. As a result of any of the foregoing, we could go into bankruptcy, liquidation or insolvency. A portion of our cash flows comes from EFH Corp.'s and TCEH's payment of interest on certain of their debt securities held by EFIH, and a default under their debt agreements could result in EFIH no longer receiving interest payments on such debt. If we do not receive these interest payments, we may not be able to make payments on the New Notes.

***There will be no guarantors of the New Notes. As a result, the New Notes will be structurally subordinated to all liabilities of all of EFIH's subsidiaries (other than EFIH Finance) and will have no claim on the assets of EFH Corp. or its other subsidiaries, including Oncor, Oncor Holdings, and TCEH.***

The New Notes will not be guaranteed. EFIH is a holding company. EFIH has no operations or operating assets, and it relies on distributions from Oncor, interest earned on investments in EFH Corp. and TCEH debt and loans and capital contributions from EFH Corp. for its cash flow. EFH Corp. has no obligation to make loans or capital contributions to EFIH. EFIH's subsidiaries generated a significant amount of its reported consolidated net income for the years ended December 31, 2010 and 2011. As of September 30, 2012, EFIH's investments in its subsidiaries represented approximately 52% of its total reported consolidated assets, and except for $680 million of restricted cash for the EFIH Dividend, investments in EFH Corp. debt (the substantial majority of which is debt that EFIH guarantees) and TCEH debt represented substantially all of the remainder of its reported total assets. The carrying

36

EFH2D10011271

value of the EFH Corp. and TCEH debt held by EFIH totaled approximately $4.3 billion at September 30, 2012 representing the fair value of these debt securities, but most of such debt has a limited trading market, and the EFH Corp. debt has virtually no restrictive covenants. EFIH plans to distribute all or substantially all of the EFH Corp. 2017 Notes it holds to EFH Corp. prior to or in the first quarter of 2013. Following such distribution, EFH Corp. is expected to cancel these notes. See "Summary—Recent Developments—Distribution and Cancellation of Debt Securities."

EFIH's subsidiaries (including Oncor Holdings and Oncor and their subsidiaries) and EFH Corp. and its other subsidiaries are separate and distinct legal entities and have no obligation, contingent or otherwise, to pay any amounts due pursuant to the New Notes, or to make any funds available therefore, whether by dividends, loans, distributions or other payments. The New Notes will be structurally subordinated to the debt and other liabilities of all of EFIH's subsidiaries (including Oncor Holdings and Oncor and its subsidiaries), other than EFIH Finance, and holders of the New Notes will have no claim on the assets of EFH Corp., Oncor, Oncor Holdings, EFCH, TCEH or any of TCEH's subsidiaries, none of which is obligated to make payments on the New Notes. As of September 30, 2012, the New Notes would have been structurally subordinated to approximately $6.384 billion principal amount of debt (includes long-term debt, including amounts due currently, and short-term borrowings) of EFIH's subsidiaries (other than EFIH Finance), including all of Oncor Holdings' and its subsidiaries' debt. In addition, as of September 30, 2012, Oncor had approximately $1.610 billion of additional available capacity under its revolving credit facility. Holders of Existing Notes issued by EFH Corp. that remain outstanding after the exchange offers will have a claim on the assets of EFH Corp, including its indirect ownership interest in TCEH.

***EFH Corp. and TCEH are not obligated to make payments on the New Notes, and our ability to obtain funds from EFH Corp. and TCEH to pay principal, premium and interest on the New Notes may be limited in some circumstances.***

None of EFH Corp., EFCH or TCEH and TCEH's subsidiaries are obligated to make any loans or payments to us other than interest and principal payments on EFH Corp. and TCEH notes we hold. However, EFH Corp. may choose to, but is not obligated to, loan or contribute cash to us to make such payments. EFH Corp. is a holding company and substantially all of its consolidated assets are held by its subsidiaries. Therefore, to the extent EFH Corp. chooses to loan or contribute cash to make payments on the New Notes, EFH Corp. may depend on cash generated by or loans from EFCH, TCEH and TCEH's subsidiaries to make such loans or contributions. Pursuant to the indentures governing the TCEH 2015/2016 Notes, the TCEH 2020 Notes and the TCEH 2021 Notes (collectively, the "TCEH Indentures"), and the TCEH Senior Secured Credit Facilities, as long as TCEH is a subsidiary of EFH Corp., TCEH may make advances under the TCEH Demand Notes to EFH Corp. on arm's length terms to allow EFH Corp. to pay principal, premium and interest on certain debt of EFH Corp. However, the TCEH Indentures limit TCEH's ability to provide such loans for payment of principal, premium and interest on debt of EFH Corp.'s subsidiaries, including the New Notes. In addition, the TCEH Senior Secured Credit Facilities limit the amount of borrowings that may be outstanding under certain notes receivable from EFH Corp. that are payable to TCEH for debt principal and interest payments of EFH Corp. to $2 billion in the aggregate at any time. Further, under the terms of TCEH's debt agreements and applicable state law, TCEH is restricted from paying distributions, except in limited circumstances. In the past, EFH Corp. has serviced its debt securities in part with funds loaned to EFH Corp. by TCEH under the TCEH Demand Notes. EFH Corp. will use the proceeds from the EFIH Dividend to repay the balance of the TCEH Demand Notes, and there is no assurance that TCEH will make additional advances to EFH Corp. under the TCEH Demand Notes in the future to the extent EFH Corp. requests such advances. As a result, if EFH Corp. does not make capital contributions or loans to EFIH or if TCEH does not or is not permitted to make loans to EFH Corp. for EFH Corp. to service its debt, then EFIH may not be able to make payments on the New Notes or its other obligations. See "—Risks Related to Exposure to EFH Corp. and TCEH."

37

Highly Confidential

*The indentures governing the New Notes, the Existing First Lien Notes, the EFIH Second Lien Notes and the EFIH 2018 Toggle Notes do not limit or restrict the activities of Oncor Holdings and its subsidiaries.*

Oncor Holdings and its subsidiaries are not "Restricted Subsidiaries" under the indentures governing the New Notes, the Existing First Lien Notes, the EFIH Second Lien Notes and the EFIH 2018 Toggle Notes (except under certain circumstances, such as in connection with the calculation of the "fixed charge coverage ratio" or "consolidated leverage ratio" for purposes of making certain restricted payments; see "Description of the New Notes"). As of the date of this Offering Memorandum, EFIH's subsidiaries (other than EFIH Finance, the co-issuer of the EFIH 6.875% Notes, the EFIH 9.75% Notes, the Existing EFIH 10.000% Notes, the EFIH Second Lien Notes, the EFIH 2018 Toggle Notes and the New Notes) will consist only of Oncor Holdings and its subsidiaries, all of which are unrestricted subsidiaries under the indentures governing the New Notes, the Existing First Lien Notes, the EFIH Second Lien Notes and the EFIH 2018 Toggle Notes. Accordingly, none of EFIH's subsidiaries (other than EFIH Finance) are or will be subject to the restrictive covenants or events of default described under "Description of the New Notes."

Because Oncor Holdings and its subsidiaries are unrestricted subsidiaries of EFIH under the indentures governing the New Notes, the Existing First Lien Notes, the EFIH Second Lien Notes and the EFIH 2018 Toggle Notes and therefore are not subject to any of the restrictive covenants therein, the indentures do not limit or restrict the ability of Oncor Holdings or its subsidiaries to take any actions or enter into any transactions that would impair their ability to dividend funds to EFIH to service the New Notes and other debt of EFIH, or that would negatively affect the value of EFIH's equity interests in Oncor Holdings that are pledged as Collateral for the New Notes, such as incurring debt, selling or transferring all or a portion of the assets of Oncor Holdings or its subsidiaries, entering into joint ventures, dividending out assets or engaging in speculative investments.

*EFIH has a very limited ability to control activities at Oncor due to structural and operational "ring-fencing" measures.*

EFIH depends, in part, upon Oncor for its cash flows and ability to pay its obligations. However, EFIH has a very limited ability to control the activities of Oncor. As part of the ring-fencing measures implemented by EFH Corp. and Oncor, including certain measures required by the PUCT's Order on Rehearing in Docket No. 34077, a majority of the members of Oncor's board of directors are required to meet the New York Stock Exchange requirements for independence in all material respects, and the unanimous, or majority, consent of such directors is required for Oncor to take certain actions. In addition, any new independent Oncor directors are required to be appointed by the nominating committee of Oncor Holdings' board of directors, a majority of whose members are independent directors. No member of EFIH's or EFH Corp.'s management is a member of Oncor's board of directors. Under Oncor Holdings' and Oncor's organizational documents, EFH Corp. has the right, indirectly, to consent to new issuances of equity securities by Oncor, material transactions with third parties involving Oncor outside of the ordinary course of business, actions that cause Oncor's assets to increase the level of jurisdiction of the FERC, any changes to the state of formation of Oncor, material changes to accounting methods not required by GAAP and actions that fail to enforce certain tax sharing obligations between Oncor and EFH Corp. See "The Transactions—Ring-Fencing." Oncor's organizational documents provide for restrictions on Oncor's ability to make distributions to its members, including indirectly to EFIH.

*Oncor's ring-fencing measures may not work as planned and a bankruptcy court may nevertheless subject Oncor to the claims of Texas Holdings Group entity creditors.*

In 2007, EFH Corp. and Oncor implemented certain structural and operational "ring-fencing" measures, including certain measures required by the PUCT's Order on Rehearing in Docket No. 34077, that were based on principles articulated by rating agencies and commitments made by

38

Highly Confidential

Texas Holdings and Oncor to the PUCT and the FERC to further enhance Oncor's credit quality. These measures were put in place to mitigate Oncor's credit exposure to the Texas Holdings Group and to minimize the risk that a court would order any of the assets and liabilities of Oncor Holdings, Oncor or any of Oncor's direct or indirect subsidiaries (collectively, the "Oncor Ring-Fenced Entities") to be substantively consolidated with those of any member of the Texas Holdings Group in the event that a member of the Texas Holdings Group were to become a debtor in a bankruptcy case. Substantive consolidation is an equitable remedy in bankruptcy that results in the pooling of the assets and liabilities of the debtor and one or more of its affiliates solely for purposes of the bankruptcy case, including for purposes of distributions to creditors and voting on and treatment under a reorganization plan. Bankruptcy courts have broad equitable powers, and as a result, outcomes in bankruptcy proceedings are inherently difficult to predict. To the extent a bankruptcy court were to determine that substantive consolidation was appropriate under the facts and circumstances, then the assets and liabilities of any Oncor Ring-Fenced Entity that were subject to the substantive consolidation order would be available to help satisfy the debt or contractual obligations of the Texas Holdings Group entity that was a debtor in bankruptcy and subject to the same substantive consolidation order. However, even if any Oncor Ring-Fenced Entity were included in such a substantive consolidation order, the secured creditors of Oncor would retain their liens and priority with respect to Oncor's assets.

If any member of the Texas Holdings Group were to become a debtor in a bankruptcy case, there can be no assurance that a court would not order an Oncor Ring-Fenced Entity's assets and liabilities to be substantively consolidated with those of such member of the Texas Holdings Group or that a proceeding would not result in a disruption of services Oncor receives from, or provides jointly with, our affiliates. See Note 1 to our condensed consolidated financial statements included in our September 30, 2012 Form 10-Q for additional information on ring-fencing measures.

In addition, Oncor's access to capital markets and cost of debt could be directly affected by its credit ratings. Any adverse action with respect to Oncor's credit ratings could cause Oncor's borrowing costs to increase and the potential pool of investors and funding sources to decrease. Oncor's credit ratings are currently substantially higher than those of the Texas Holdings Group. If credit rating agencies were to change their views of Oncor's independence from any member of the Texas Holdings Group, Oncor's credit ratings would likely decline. Despite the ring-fencing measures, rating agencies could take an adverse action with respect to Oncor's credit ratings in response to liability management or other activities by EFH Corp. or any of its subsidiaries, including the incurrence of debt by EFH Corp. and/or EFIH that is secured by a lien on the equity of Oncor Holdings held by EFIH. In the event any such adverse action takes place and causes Oncor's borrowing costs to increase, it may not be able to recover these increased costs if they exceed Oncor's PUCT-approved cost of debt determined in its most recent rate case or subsequent rate cases.

**The Offerors or EFH Corp. may purchase or repay any Existing Notes not tendered in the exchange offers on terms that could be more favorable to holders of Existing Notes than the terms of these exchange offers.**

The Offerors or EFH Corp. may, at any time to the extent permitted by applicable law, purchase Existing Notes in the open market, in privately negotiated transactions, pursuant to redemption provisions of the indentures governing the Existing Notes, through subsequent tender or exchange offers or otherwise. Any other purchases may be made on the same terms or on terms which are more or less favorable to holders than the terms of these exchange offers. The Offerors and EFH Corp. also reserve the right to repay any Existing Notes not tendered. Although neither the Offerors nor EFH Corp. currently intend to do so, if they decide to repurchase or repay Existing Notes that are not tendered in the exchange offers on terms that are more favorable than the terms of the exchange offers, those holders who decided not to participate in the exchange offers could be better off than those that participated in the exchange offers.

Highly Confidential

EFH2D10011274

EFH2D10011220

**PX 074**
**Page 55 of 255**

*The New Notes will be secured only to the extent of the value of the assets that have been granted as security for the New Notes. The fair market value of the Collateral upon any foreclosure may not be sufficient to repay the holders of the New Notes and all of the holders of other debt secured by a first-priority security interest in the Collateral.*

The Collateral securing the New Notes and the Existing First Lien Notes will include only EFIH's membership interests and other investments that EFIH owns or holds in Oncor Holdings and its subsidiaries (which at the date of this Offering Memorandum consist of all of the membership interests of Oncor Holdings, which are owned by EFIH), but will not include any assets of Oncor Holdings or its subsidiaries. Oncor Holdings owns approximately 80% of Oncor. The fair market value of the Collateral may not be sufficient to repay the holders of the New Notes and Existing First Lien Notes upon any foreclosure. As of September 30, 2012, after giving effect to the October 2012 Notes Offering, there was approximately $4.0 billion aggregate principal amount of Existing First Lien Notes outstanding. After giving effect to the completion of the exchange offers and the consent solicitations, assuming 100% participation in the exchange offers by the holders of Existing Notes at or prior to the Early Tender Date and the exchange of all of the Existing Notes for New Notes (reflecting the issuance of the Total Consideration for each $1,000 principal amount of the Existing Notes) in the exchange offers, there will be approximately $4.0 billion aggregate principal amount of debt (including the New Notes) secured by a first-priority security interest in the Collateral.

The fair market value of the membership interests of Oncor Holdings is subject to fluctuations based on factors that include, among other things, the financial results and prospects of Oncor Holdings and its subsidiaries and their ability to implement their business strategy, Oncor's capital structure and the amount of its other existing debt (as to which EFIH has no control), applicable regulatory approvals that may be required to foreclose on the membership interests of Oncor Holdings and subsequently dispose of the membership interests of Oncor Holdings, the ability to sell the membership interests of Oncor Holdings in an orderly sale, general economic conditions, the availability of buyers and similar factors. Furthermore, upon a foreclosure in the Collateral, holders of debt with a first-priority security interest in the Collateral, including the New Notes and the Existing First Lien Notes, may be limited in their ability to obtain the best price for the Collateral if they are unable to exercise a "drag-along" right to force Texas Transmission Investment LLC ("Texas Transmission"), Oncor's largest non-majority owner, to sell its membership interests pursuant to the terms of an investor rights agreement, dated November 5, 2008, among EFH Corp., Oncor Holdings, Oncor and Texas Transmission (the "Investor Rights Agreement"). In addition, a court could limit recoverability if it were to apply non-New York law to a proceeding and deem a portion of the interest claim usurious in violation of public policy. The amount to be received by holders of the New Notes upon a sale of any Collateral would be dependent on numerous factors, including but not limited to the actual fair market value of the Collateral at such time; general, market and economic conditions; the timing and the manner of the sale, and the amount of proceeds remaining after taking into account the ratable claims of any other debt secured by a security interest in the Collateral of equal priority to that securing the New Notes, including the Existing First Lien Notes.

In the event a bankruptcy or similar proceeding is commenced by or against EFIH, holders of the New Notes may be deemed to have an unsecured claim if the Offerors' obligation under the New Notes equals or exceeds the fair market value of the Collateral securing such New Notes after taking into account the ratable claims of any other debt secured by a first-priority security interest in the Collateral, including the Existing First Lien Notes. Upon a finding by a bankruptcy court that any New Notes are under-collateralized, the claims in the bankruptcy proceeding with respect to such New Notes would be bifurcated between a secured claim and an unsecured claim, and the unsecured claim would not be entitled to the benefits of security in the Collateral. In the event that a bankruptcy or similar proceeding is commenced by or against EFIH, if at the time of the filing the value of the membership interests of Oncor Holdings and other Collateral is less than the amount of principal and accrued and unpaid interest on the New Notes and any debt secured by liens on the Collateral that are

40

EFH2D10011275

EFH2D10011220

equal and ratable with the liens securing the New Notes, including the Existing First Lien Notes, interest may cease to accrue on the New Notes thereafter. If at the time of the filing the value of the membership interests of Oncor Holdings and other Collateral is greater than the amount of principal and accrued and unpaid interest on the New Notes and any other debt secured by liens on the Collateral that are equal and ratable with the liens securing the New Notes, including the Existing First Lien Notes, interest may nevertheless cease to accrue on the New Notes at a subsequent time if at such time the value ceases to be in excess of the principal and accrued and unpaid interest. It is possible, given the broad discretionary powers of a bankruptcy court, even if at the time of the filing the value of the membership interests of Oncor Holdings and other Collateral is greater than the amount of principal and accrued and unpaid interest on New Notes and any other debt secured by liens on the Collateral that are equal and ratable with the liens securing the New Notes on the date of filing, including the Existing First Lien Notes, claims on the membership interests of Oncor Holdings and other Collateral for interest accruing from and after the date the bankruptcy petition is filed might not be allowed. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, the proceeds from any sale of the membership interests of Oncor Holdings and other Collateral may not be sufficient to pay the obligations due under the New Notes. Any resulting deficiency claims would be general unsecured claims against the remaining assets of EFIH and would rank equally in right of payment with all of EFIH's other senior unsecured debt.

In addition to the regulatory approvals described in the following risk factor, the security interest granted in favor of the collateral trustee is subject to practical problems generally associated with the realization of security interests in collateral. For example, the collateral trustee may need to obtain the consent of a third party to obtain or enforce a security interest in a contract, and we cannot assure noteholders that the collateral trustee will be able to obtain any such consent. The consents of any third parties may not be given when required to facilitate a foreclosure on any particular assets. Accordingly, the collateral trustee may not have the ability to foreclose upon such assets, and the value of the Collateral may significantly decrease.

***Regulatory approvals may be required in order to enforce the security interests in the Collateral and to dispose of an interest in, or operational control of, the Collateral securing the New Notes.***

The Collateral securing the New Notes will include, on a first-priority basis, all of the membership interests of Oncor Holdings, which are held by EFIH. Pursuant to the Public Utility Regulatory Act ("PURA"), Texas Utilities Code §§39.262(l) and 39.915, an electric utility must obtain prior PUCT approval of any change in majority ownership, controlling ownership or operational control of Oncor. As a result, prior to any foreclosure on the membership interests of Oncor Holdings, approval of the PUCT may be required for a change in ownership or control of Oncor Holdings. Pursuant to PURA §§39.262(m) and 39.915(b), the PUCT will approve such a transfer if it finds that the transaction is in the public interest. In making its determination, these sections of PURA provide that the PUCT will consider as part of its public interest analysis and, in addition to other factors, whether the transaction will adversely affect the reliability of service, availability of service or cost of service of Oncor. Therefore, in connection with any action taken to enforce the security against the Collateral, such approval may not be granted and, if it were to be granted, it is not known how long such approval would take. Even if the approval were granted to foreclose on the Collateral, then additional prior PUCT approval may also be required for any subsequent change in majority ownership, controlling ownership or operational control in the membership interests of Oncor Holdings.

In addition, pursuant to the terms of the Investor Rights Agreement, any transfer of the equity interests in Oncor Holdings to a third party, including as a result of any enforcement of the liens on the Collateral securing the New Notes, the First Lien Notes and the EFIH Second Lien Notes, may be limited and give rise to a tag-along right of Texas Transmission to participate in that transfer on a pro rata basis, which may hinder the enforcement of the lien on the Collateral in a timely manner, if at all.

41

Highly Confidential                                                    EFH2D10011276

EFH2D10011220

See "The Transactions—Sale of Noncontrolling Interests in Oncor" for a description of the Investor Rights Agreement.

***In the event of EFIH's bankruptcy, the ability to realize upon the Collateral securing the New Notes will be subject to certain bankruptcy law limitations.***

The right of the trustee for the New Notes to repossess and dispose of the Collateral, which secures the New Notes on a first-priority basis, upon acceleration is likely to be significantly impaired by federal bankruptcy law if bankruptcy proceedings are commenced by or against EFIH. This could be true even if bankruptcy proceedings are commenced after the trustee for the New Notes has repossessed and disposed of the Collateral. Under bankruptcy law, secured creditors, such as the trustee for the New Notes, are prohibited from repossessing collateral from a debtor in a bankruptcy case, or from disposing of collateral repossessed from a debtor, without bankruptcy court approval. Moreover, bankruptcy law permits the debtor to continue to retain and to use any such collateral, and the proceeds, products, rents or profits of such collateral, even though the debtor is in default under the applicable debt instruments, provided that the secured creditor is given "adequate protection." The meaning of the term "adequate protection" varies according to circumstances, but in general the doctrine of "adequate protection" requires a debtor to protect the value of a secured creditor's interest in the collateral, through cash payments, the granting of an additional security interest or otherwise. It is impossible to predict whether or when payments in respect of the New Notes might be made following commencement of a bankruptcy case, whether or when the trustee would repossess or dispose of the Collateral, or whether or to what extent noteholders would be compensated for any delay in payment or loss of value of the Collateral through the requirements of "adequate protection." Furthermore, in the event the bankruptcy court determines that the value of the Collateral is not sufficient to repay all amounts due on the New Notes and any other debt secured by liens on the Collateral that are equal and ratable with the liens securing the New Notes, including the Existing First Lien Notes, noteholders would have unsecured "deficiency claims" as to the difference. Federal bankruptcy laws do not generally permit the payment of interest, costs, or attorneys' fees for unsecured claims during the debtor's bankruptcy case.

***Under the indenture governing the New Notes, noteholders will agree not to file a bankruptcy proceeding against Oncor Holdings or any of its subsidiaries.***

Under the indenture governing the New Notes, noteholders will acknowledge and agree that they will not (i) initiate any legal proceeding to procure the appointment of an administrative receiver or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against Oncor Holdings, Oncor or any of their subsidiaries, or against any of the assets of Oncor Holdings, Oncor or any of their subsidiaries. Such holders will further acknowledge and agree that each of Oncor Holdings, Oncor and any of their subsidiaries is a third party beneficiary of the foregoing covenant and has the right to specifically enforce such covenant in any proceeding at law or in equity.

***EFIH will in most cases have control over the Collateral.***

EFIH will in most cases have control over the Collateral securing the New Notes, and to the extent permitted, its sale by EFIH would eliminate the Collateral securing the New Notes, subject to the requirement to pledge proceeds from such sale to secure the New Notes and other secured debt obligations and to use such proceeds to repay first priority obligations in accordance with the covenants described under "Description of the New Notes—Repurchase at the Option of the Holders—Asset Sales." The documents governing the pledge of the Collateral permit EFIH to remain in possession of, retain exclusive control over and freely operate the Collateral and collect, invest and dispose of any income from the Collateral, such as cash dividends. In addition, in certain limited circumstances EFIH will have the right to sell the Collateral free and clear of the security interest

42

Highly Confidential

EFH2D10011277

EFH2D10011220

underlying the New Notes. See "Risk Factors—Risks Related to the Exchange Offers, the New Notes and Our Substantial Debt—We may transfer or dispose of our interests in Oncor Holdings to a third-party in a manner that would result in such third-party becoming the obligor under the New Notes, without EFIH being required to offer to repurchase the New Notes. The risks of an investment in the New Notes may increase further following such a transaction."

***Rights of holders of the New Notes in the Collateral may be adversely affected by the failure to perfect security interests in certain Collateral acquired in the future.***

EFIH may acquire assets or investments in the future that would be required to be pledged as Collateral securing the New Notes. There can be no assurance that the trustee or the collateral trustee will monitor, or that we will inform the trustee or the collateral trustee of, the future acquisition of assets or investments that would be required to be pledged as Collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Collateral. Neither the trustee nor the collateral trustee has an obligation to monitor the acquisition of additional assets or investments that are required to be pledged as Collateral or the perfection of any security interest in such Collateral. Such failure may result in the loss of the security interest in the Collateral or the priority of the security interest in favor of the New Notes against third parties.

***We may transfer or dispose of our interests in Oncor Holdings to a third-party in a manner that would result in such third-party becoming the obligor under the New Notes, without EFIH being required to offer to repurchase the New Notes. The risks of an investment in the New Notes may increase further following such a transaction.***

The indenture governing the New Notes provides that EFIH may engage in a "Permitted Asset Transfer" with respect to all of EFIH's equity interests and other investments in Oncor Holdings and its subsidiaries (collectively, the "Oncor Subsidiaries") that would result in the New Notes no longer being obligations of EFIH. A Permitted Asset Transfer includes the sale, assignment, transfer, conveyance or other disposition (other than by way of merger, wind-up or consolidation) of all of EFIH's equity interests and other investments in the Oncor Subsidiaries or successor Oncor business and all other Collateral held by EFIH.

If a valid Permitted Asset Transfer occurs, the New Notes would become obligations of the third-party transferee of the investments in the Oncor Subsidiaries.

If a Permitted Asset Transfer occurs in accordance with the terms of the indenture governing the New Notes, the Offerors will not be required to make a change of control offer to repurchase the New Notes even if a change of control may otherwise have occurred.

The indenture governing the New Notes provides that a Permitted Asset Transfer may only occur if certain conditions are met, including a requirement that the ratings of the New Notes are not lowered by two or more rating agencies (or the only rating agency then rating the New Notes) during a specified period before or after the proposed Permitted Asset Transfer has been publicly announced. However, these conditions may not protect noteholders against actions that EFIH or the permitted transferee could take that may negatively impact the credit risk of the New Notes following a Permitted Asset Transfer, such as removing assets and cash from EFIH or the Oncor Subsidiaries or increasing debt at EFIH before the Permitted Asset Transfer.

There will be no event of default under the indenture governing the New Notes if the Oncor Subsidiaries take actions or enter into transactions that would impair their ability to distribute funds to EFIH, which could impair EFIH's ability to service the New Notes, or that would negatively affect the value of the assets that are pledged as Collateral, such as incurring debt, selling or transferring all or a portion of the assets of Oncor, entering into joint ventures, dividending out assets or engaging in speculative investments.

43

EFH2D10011278

EFH2D10011220

Any of the above actions on the part of EFIH, the third-party transferee or subsequent third-party transferee or the Oncor Subsidiaries following the completion of a Permitted Asset Transfer may further increase the credit risk of the New Notes, may result in the rating agencies taking negative action with respect to the New Notes and may reduce the market price of the New Notes. See the definitions of "Change of Control" and "Permitted Asset Transfer" contained in "Description of the New Notes" for more information.

**Noteholders may be required to recognize taxable gain or loss in connection with a Permitted Asset Transfer.**

In connection with a Permitted Asset Transfer, EFIH's obligations under the New Notes may be transferred to, and assumed by, a third party transferee or may be considered, for U.S. federal income tax purposes, to undergo a substitution of obligors even if not transferred to, or assumed by, a third party transferee. Upon any such transfer or deemed substitution of obligors, noteholders may be deemed to have exchanged the New Notes for new notes for U.S. federal income tax purposes. Upon such deemed exchange, noteholders, under U.S. federal income tax law, may be required to recognize gain or loss equal to the difference between the amount deemed to be realized in connection with the deemed exchange and such noteholders' adjusted tax basis in the New Notes on the date of the deemed exchange. For more information, please see "Certain U.S. Federal Income Tax Considerations—Tax Consequences to Participating U.S. Holders—The Exchange of Existing Notes Pursuant to the Exchange Offers—Sale, Exchange or Retirement of New Notes."

**The indenture governing the New Notes may not protect noteholders from all actions that EFIH or the Oncor Subsidiaries may take that would reduce noteholders' interest in the Collateral or that may reduce the value of the Collateral, including sales or exchanges of the Collateral or the assets of the Oncor Subsidiaries for other assets or investments.**

Under the indenture governing the New Notes, EFIH may dispose of all or a portion of the Collateral for fair market value consideration (including consideration other than cash) that may consist of assets or equity interests in joint ventures. Additionally, there will be no event of default under the indenture governing the New Notes if the Oncor subsidiaries sell, transfer or otherwise dispose of their assets or equity interests for any form of consideration. If EFIH or the Oncor Subsidiaries effect any of these transactions, noteholders' interest in the Collateral or the value of the Collateral may be materially reduced.

The indenture governing the New Notes allows EFIH to transfer any of the Collateral in exchange for an equivalent fair market value of assets other than cash or for investments in businesses that are similar to the businesses of Oncor, including interests in joint ventures that are not controlled by EFIH. The assets received as consideration and pledged as substitute Collateral may prove to be less valuable than the value of the investments in Oncor that were disposed of in such transfer or exchange. Additionally, if interests in a new business were received in exchange for the Collateral, such new business may, in the future, engage in business activities that are different from the business that Oncor presently is in or such new business may not prove to be as creditworthy or valuable as Oncor, and EFIH may not have any control over such business' activities if a minority interest in the joint venture interests was received in such transfer or exchange. Therefore, such new collateral may negatively alter the risk profile of EFIH or the value of such new collateral may decline relative to the value of the disposed investments in Oncor.

There will be no event of default under the indenture governing the New Notes if any of the Oncor Subsidiaries sells, transfers or disposes of the assets of Oncor Holdings or investments in or assets of Oncor. The consideration received in exchange for such assets or investments may decline in value as compared to the assets or investments that were so disposed, and, therefore, the value of the

44

Highly Confidential

Collateral may be less than if such assets and investments had been retained. The Oncor Subsidiaries may transfer their assets and investments in exchange for interests in other businesses or assets, minority interests or interests in joint ventures, in which case the value of the Collateral may be at risk of declining due to the factors described above.

In any joint venture that EFIH or an Oncor Subsidiary has an interest, EFIH or the Oncor Subsidiary may not have the right or power to direct the management and policies of such joint ventures and other participants may take action contrary to the instructions or requests of EFIH or such Oncor Subsidiary or against its policies and objectives, and any such actions taken by such joint ventures may not be in noteholders' best interests. In addition, the other participants to any such joint venture may become bankrupt or have economic or other business interests or goals that are inconsistent with the goals of EFIH or such Oncor Subsidiary and/or noteholders.

The completion of any of the above events may result in the credit risk of the New Notes increasing, the credit rating agencies taking negative action with respect to the New Notes or the market price of the New Notes declining. Additionally, in the event of any foreclosure on the Collateral, noteholders may recover less than if the Collateral still consisted of investments in the Oncor Subsidiaries.

***If a court were to find that EFIH was insolvent before or after giving effect to the exchange offers and did not receive reasonably equivalent value or fair consideration for the issuance of the New Notes or the pledge of the Collateral, as applicable, the court may void all or a portion of the obligations represented by the New Notes or the pledge of the Collateral as a fraudulent conveyance.***

In a bankruptcy proceeding, a trustee, debtor in possession or another person acting on behalf of the bankruptcy estate may seek to recover all or a portion of transfers made or void obligations incurred prior to the bankruptcy proceeding on the basis that such transfers and obligations constituted fraudulent conveyances. Under certain circumstances, creditors may recover transfers or void obligations under state fraudulent conveyance laws even if the debtor is not in bankruptcy.

Fraudulent conveyances are generally defined to include transfers made or obligations incurred for inadequate consideration when a debtor was insolvent, inadequately capitalized or in similar financial distress, or transfers made or obligations incurred with the intent of hindering, delaying or defrauding current or future creditors. A trustee, debtor in possession or another person acting on behalf of a bankruptcy estate may be able to recover such transfers under the fraudulent conveyance provisions of the bankruptcy law and/or state fraudulent conveyance laws. The fraudulent conveyance provisions of the bankruptcy law allow the trustee, debtor in possession, or other person acting on behalf of a bankruptcy estate to void a fraudulent conveyance made within two years prior to the commencement of a bankruptcy proceeding. Under state fraudulent conveyance laws (which also could be invoked on behalf of a bankruptcy estate), transfers made more than two years prior to the commencement of a fraudulent conveyance lawsuit may be subject to avoidance.

If a court were to find that EFIH issued the New Notes or granted its pledge of the Collateral under circumstances constituting a fraudulent conveyance, then a court could void all or a portion of the obligations under the New Notes or the pledge of the Collateral. In addition, under such circumstances, the value of any consideration (including interest) noteholders received with respect to the New Notes and the Collateral, including upon foreclosure of the Collateral, could also be subject to recovery from such noteholders and, possibly, from subsequent transferees of the New Notes. If the pledge of Collateral was voided and the issuance of the New Notes was not voided, then noteholders would become unsecured creditors.

45

Highly Confidential                                                      EFH2D10011280

EFH2D10011220

The New Notes or pledge of the Collateral by EFIH could be voided as a fraudulent conveyance, or claims in respect of the New Notes or pledge could be subordinated to all other debts of EFIH, if, at the time it incurred the debt evidenced by the New Notes, or granted the pledge, EFIH received less than reasonably equivalent value or fair consideration for the issuance of the New Notes or the grant of the pledge of the Collateral, as applicable, and:

- was insolvent or rendered insolvent by reason of such issuance or incurrence or grant;

- was engaged in a business or transaction for which EFIH's remaining assets constituted unreasonably small capital; or

- intended to incur, or believed that it would incur, debts beyond its ability to pay those debts as they mature.

The measures of insolvency for purposes of these fraudulent transfer laws will vary depending upon the law applied in any proceeding to determine whether a fraudulent transfer has occurred. Generally, however, a debtor would be considered insolvent if:

- the sum of its debts, including contingent liabilities, was greater than the fair saleable value of all of its assets;

- the present fair saleable value of its assets was less than the amount that would be required to pay its probable liability on its existing debts, including contingent liabilities, as they become absolute and mature; or

- it could not pay its debts as they become due.

In determining whether EFIH received reasonably equivalent value or fair consideration for the issuance of the New Notes or the grant of the pledge of the Collateral, a court may consider the value to EFIH of being released from its guarantee of the EFH Corp. notes. Existing Notes as a result of the cancellation of those notes. Any EFH Corp. Existing Notes exchanged in the exchange offers will be distributed to EFH Corp. and cancelled, thus effectively releasing EFIH from its guarantee of these notes. Any EFIH 9.75% Notes exchanged in the exchange offers will be cancelled.

EFIH's assets exceed its liabilities as shown on its balance sheet prepared in accordance with GAAP as of September 30, 2012. After giving effect to the December 2012 Private Exchanges, the Concurrent Exchange Offers, the exchange offers and the Distribution and Cancellation, EFIH's liabilities exceeded its assets as shown in the table in "Capitalization." In accordance with GAAP, only a portion of EFH Corp.'s debt that is guaranteed by EFIH is included on (pushed down to) EFIH's balance sheet as long-term debt. If all of the debt of EFH Corp. guaranteed by EFIH is included in EFIH's liabilities, EFIH's total principal amount of debt as of September 30, 2012, after giving effect to (i) the October 2012 Notes Offering, (ii) the December 2012 Private Exchanges, (iii) the completion of the exchange offers and the consent solicitations (assuming 100% participation in the exchange offers by the holders of Existing Notes at or prior to the Early Tender Date and the exchange of all of the Existing Notes for New Notes (reflecting the issuance of the Total Consideration per each $1,000 principal amount of the Existing Notes) and the cancellation of all Existing Notes exchanged in the exchange offers) and (iv) the completion of the Concurrent Exchange Offers (assuming 100% participation in the Concurrent Exchange Offers by the holders of the EFH Corp. 2017 Notes at or prior to the Early Tender Date (as defined in the Concurrent Exchange Offers Offering Memorandum) and the exchange of all of the EFH Corp. 2017 Notes for EFIH 2018 Toggle Notes (reflecting the issuance of the total consideration pursuant to the Concurrent Exchange Offers Offering Memorandum per each $1,000 principal amount of the EFH Corp. 2017 Notes) and the distribution to EFH Corp. and cancellation of all EFH Corp. 2017 Notes exchanged in the Concurrent Exchange Offers), would be approximately $8.3 billion (net of any such EFH Corp. debt that is held by EFIH). EFIH plans to

46

EFH2D10011281

EFH2D10011220

distribute all or substantially all of the EFH Corp. 2017 Notes it holds to EFH Corp. prior to or in the first quarter of 2013. Following such distribution, EFH Corp. is expected to cancel these notes. See "Summary—Recent Developments—Distribution and Cancellation of Debt Securities."

The values assigned to assets and liabilities in EFIH's balance sheet in accordance with GAAP are not necessarily indicative of the values that a court would assign to such assets and liabilities in making a solvency determination. As noted above, our GAAP liabilities do not include all the debt of EFH Corp. that we guarantee, and the value of our assets will be largely dependent on the fair saleable value of EFIH's investment in Oncor. Valuing EFIH's investment in Oncor involves a number of assumptions and judgments, including regarding the future cash flows of Oncor and the value of comparable companies, and we cannot assure you that a court would value this investment at an amount that would make us solvent.

We cannot assure noteholders that EFIH would satisfy the solvency tests set forth above, that EFIH's assets would not constitute unreasonably small capital or what standard a court would apply in determining whether EFIH would be considered to be insolvent. In addition, we cannot assure noteholders that a court would determine that reasonably equivalent value or fair consideration was received by EFIH in connection with the issuance of the New Notes and/or the grant of the pledge, as applicable, in the exchange offers.

### We may not be able to repurchase the New Notes upon a change of control.

Upon the occurrence of specific kinds of change of control events, EFIH will be required to offer to repurchase all of the New Notes, the EFIH Second Lien Notes, the EFIH 6.875% Notes, the EFIH 9.75% Notes, the Existing EFIH 10.000% Notes and the EFIH 2018 Toggle Notes at 101% of their principal amount plus accrued and unpaid interest. The source of funds for such purchases would be EFIH's available cash or cash generated from EFIH's subsidiaries' operations or other sources, including borrowings, sales of assets, sales of equity or cash contributed by EFH Corp. EFIH may not be able to repurchase these notes upon a change of control because it may not have sufficient financial resources to purchase all of these notes that are tendered upon a change of control. In addition, EFIH may be restricted under the terms of debt agreements of Oncor from receiving funds from Oncor sufficient to repurchase all of the notes tendered by holders upon a change of control. Accordingly, EFIH may not be able to satisfy its obligations to purchase these notes unless it is able to refinance or obtain waivers under the instruments governing its and/or EFH Corp.'s debt. EFIH's failure to repurchase these notes upon a change of control would cause a default under the indentures governing these debt securities and may cause a cross-default under certain of EFIH's and/ or EFH Corp.'s or its other subsidiaries' other debt agreements.

### Holders of the Existing Notes may be required to repay all or a portion of the New Notes (or value equal thereto) if a bankruptcy court concludes that all or a portion of the repayment of the Existing Notes with the New Notes is a voidable preference.

If EFH Corp. (in the case of Existing Notes issued by EFH Corp.) or EFIH (in the case of Existing Notes issued by EFIH) becomes a debtor under the U.S. Bankruptcy Code within 90 days after we consummate the exchange offers (or, with respect to any holder of Existing Notes that is an insider of any such entity as specified in bankruptcy law, within one year after consummation of the exchange offers), and a bankruptcy court determines that EFH Corp. or EFIH, as applicable, was insolvent at the time of the exchange offers (under the preference laws, the relevant entity would be presumed to have been insolvent on and during the 90 days immediately preceding the date of filing of any bankruptcy petition) and that no applicable defenses or exceptions exist, then the bankruptcy court could find that the delivery of the New Notes in repayment of the relevant Existing Notes involved a preferential transfer. If a bankruptcy court were to reach such a conclusion, such former holder of Existing Notes

47

Highly Confidential