"*Existing EFH Corp. Notes*" means:

• EFH Corp. 5.55% Fixed Senior Notes Series P due 2014;

• EFH Corp. 6.50% Fixed Senior Notes Series Q due 2024;

• EFH Corp. 6.55% Fixed Senior Notes Series R due 2034;

• EFH Corp. 2017 Notes;

• EFH Corp. 9.75% Notes; and

• EFH Corp. 10.000% Notes,

in each case to the extent outstanding on the Issue Date.

"*Existing EFH Corp. Notes Indentures*" means each of the indentures or other documents containing the terms of the Existing EFH Corp. Notes.

"*Fitch*" means Fitch Ratings Ltd. and any successor to its rating agency business.

"*Fixed Charge Coverage Ratio*" means, with respect to any Person for any period, the ratio of EBITDA of such Person for such period to the Fixed Charges of such Person for such period. In the event that EFIH or any Restricted Subsidiary incurs, assumes, guarantees, redeems, retires or extinguishes any Indebtedness (other than Indebtedness incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) or issues or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated but prior to or simultaneously with the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "*Fixed Charge Coverage Ratio Calculation Date*"), then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect to such incurrence, assumption, guarantee, redemption, retirement or extinguishment of Indebtedness, or such issuance or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, consolidations and disposed operations (as determined in accordance with GAAP) that have been made by EFIH or any of its Restricted Subsidiaries during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Fixed Charge Coverage Ratio Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, consolidations and disposed operations (and the change in any associated fixed charge obligations and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If, since the beginning of such period, any Person that subsequently became a Restricted Subsidiary or was merged with or into EFIH or any of its Restricted Subsidiaries since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation or disposed operation that would have required adjustment pursuant to this definition, then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, merger, consolidation or disposed operation had occurred at the beginning of the applicable four-quarter period.

For purposes of this definition, whenever pro forma effect is to be given to a transaction, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of EFIH. If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Fixed Charge Coverage Ratio Calculation Date had been the applicable rate for the entire period (taking into account any Hedging

166

Obligations applicable to such Indebtedness). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of EFIH to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP. For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed on a *pro forma* basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period except as set forth in the first paragraph of this definition. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate or other rate shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as EFIH may designate.

"*Fixed Charges*" means, with respect to any Person for any period, the sum of:

(1) Consolidated Interest Expense of such Person for such period;

(2) all cash dividends or other distributions paid (excluding items eliminated in consolidation) on any series of Preferred Stock during such period; and

(3) all cash dividends or other distributions paid (excluding items eliminated in consolidation) on any series of Disqualified Stock during such period.

"*Foreign Subsidiary*" means, with respect to any Person, any Restricted Subsidiary of such Person that is not organized or existing under the laws of the United States, any state or territory thereof or the District of Columbia and any Restricted Subsidiary of such Foreign Subsidiary.

"*GAAP*" means generally accepted accounting principles in the United States which are in effect on the Closing Date.

"*Government Authority*" means any nation or government, any state, province, territory or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including without limitation, ERCOT.

"*Government Securities*" means securities that are:

(1) direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged; or

(2) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America,

which, in either case, are not callable or redeemable at the option of the issuers thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to any such Government Securities or a specific payment of principal of or interest on any such Government Securities held by such custodian for the account of the holder of such depository receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the Government Securities or the specific payment of principal of or interest on the Government Securities evidenced by such depository receipt.

"*guarantee*" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

167

Highly Confidential

EFH2D10011402

EFH2D10011220

"*Guarantee*" means the guarantee by any Guarantor of the Issuer's Obligations under the Indenture and the Notes.

"*Guarantor*" means each Restricted Subsidiary that Guarantees the Notes in accordance with the terms of the Indenture.

"*Hazardous Materials*" means (a) any petroleum or petroleum products, radioactive materials, friable asbestos, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing regulated levels of polychlorinated biphenyls and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "toxic substances," "toxic pollutants," "contaminants," or "pollutants" or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, which is prohibited, limited or regulated by any Environmental Law.

"*Hedging Obligations*" means with respect to any Person, the obligations of such Person under (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "*Master Agreement*"), including any such obligations or liabilities under any Master Agreement and (c) physical or financial commodity contracts or agreements, power purchase or sale agreements, fuel purchase or sale agreements, environmental credit purchase or sale agreements, power transmission agreements, commodity transportation agreements, fuel storage agreements, netting agreements (including Netting Agreements), capacity agreement and commercial or trading agreements, each with respect to, or including the purchase, sale, exchange of (or the option to purchase, sell or exchange), transmission, transportation, storage, distribution, processing, sale, lease or hedge of, any Covered Commodity price or price indices for any such Covered Commodity or services or any other similar derivative agreements, and any other similar agreements.

"*Holder*" means the Person in whose name a Note is registered on the registrar's books.

"*Incremental Deposit L/C Loans*" means any Incremental Deposit L/C Loans under, and as defined in, any Credit Facilities.

"*Indebtedness*" means, with respect to any Person, without duplication:

(1) any indebtedness (including principal and premium) of such Person, whether or not contingent:

(a) in respect of borrowed money;

(b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof);

(c) representing the balance deferred and unpaid of the purchase price of any property (including Capitalized Lease Obligations), except (i) any such balance that constitutes a

168

EFH2D10011403

EFH2D10011220
**PX 074**
**Page 184 of 255**

trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business and (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP; or

(d) representing any Hedging Obligations;

if and to the extent that any of the foregoing Indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2) to the extent not otherwise included, any obligation by such Person to be liable for, or to pay, as obligor, guarantor or otherwise on, the obligations of the type referred to in clause (1) of a third Person (whether or not such items would appear upon the balance sheet of the such obligor or guarantor), other than by endorsement of negotiable instruments for collection in the ordinary course of business (for the avoidance of doubt, the obligations of the type referred to in clause (1) shall not include EFH Corp.'s obligations to repay indebtedness to TCEH and/or its Subsidiaries from time to time evidenced under notes existing on the Issue Date); and

(3) to the extent not otherwise included, the obligations of the type referred to in clause (1) of a third Person secured by a Lien on any asset owned by such first Person, whether or not such Indebtedness is assumed by such first Person; *provided* that the amount of Indebtedness of such first Person for purposes of this clause (3) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such first Person in good faith;

*provided, however*, that notwithstanding the foregoing, Indebtedness shall be deemed not to include (a) Contingent Obligations incurred in the ordinary course of business or (b) obligations under or in respect of Receivables Facilities or (c) amounts payable by and between EFIH and its Subsidiaries in connection with retail clawback or other regulatory transition issues.

"*Independent Financial Advisor*" means an accounting, appraisal, investment banking firm or consultant to Persons engaged in Similar Businesses of nationally recognized standing that is, in the good faith judgment of EFIH, qualified to perform the task for which it has been engaged.

"*Intercompany Loan*" means a senior, unsecured loan by EFIH or any of its Restricted Subsidiaries to EFH Corp., with an interest rate commensurate with an arm's length relationship.

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's, BBB- (or the equivalent) by S&P or an equivalent rating by any other Rating Agency.

"*Investment Grade Securities*" means:

(1) securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents);

(2) debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or instruments constituting loans or advances among EFIH and its Subsidiaries;

(3) investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment or distribution; and

(4) corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"*Investments*" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital

Highly Confidential                                                    EFH2D10011404

contributions (excluding accounts receivable, trade credit, advances to customers, commissions, travel and similar advances to officers and employees, in each case made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet (excluding the footnotes) of EFIH in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. For purposes of the definition of "Unrestricted Subsidiary" and the covenant described under "—Certain Covenants—Limitation on Restricted Payments":

(1) "Investments" shall include the portion (proportionate to EFIH's equity interest in such Subsidiary) of the fair market value of the net assets of a Subsidiary of EFIH at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided, however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, EFIH shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

(a) EFIH's "Investment" in such Subsidiary at the time of such redesignation; less

(b) the portion (proportionate to EFIH's equity interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation; and

(2) any property transferred to or from an Unrestricted Subsidiary shall be valued at its fair market value at the time of such transfer, in each case as determined in good faith by EFIH.

"*Investors*" means Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P., J.P. Morgan Ventures Corporation, Citigroup Global Markets Inc., Morgan Stanley & Co. Incorporated, Goldman, Sachs & Co. and LB I Group, Inc. and each of their respective Affiliates but not including, however, any portfolio companies of any of the foregoing.

"*Issue Date*" means August 17, 2010 (the date on which the Existing EFIH 2020 Notes were issued in the related exchange offer).

"*Issuer*" has the meaning set forth in the first paragraph under "General."

"*Junior Lien*" means a Lien granted by a security document to the Collateral Trustee, at any time, upon any Collateral to secure Junior Lien Obligations.

"*Junior Lien Debt*" means:

(1) any Indebtedness (including letters of credit and reimbursement obligations with respect thereto) of the Issuer or any Guarantor that is secured on a subordinated basis to the Parity Lien Debt by a Junior Lien that was permitted to be incurred and so secured under each applicable Secured Debt Document (including the EFIH 11% Notes and the EFIH 11.750% Notes); provided that:

(a) on or before the date on which such Indebtedness is incurred by the Issuer or such Guarantor, such Indebtedness is designated by the Issuer, in accordance with the Collateral Trust Agreement, as "Junior Lien Debt" for the purposes of the Secured Debt Documents, including the Collateral Trust Agreement; provided that no Series of Secured Lien Debt may be designated as both Junior Lien Debt and Parity Lien Debt;

(b) such Indebtedness is governed by an indenture, credit agreement or other agreement that includes a Lien Sharing and Priority Confirmation; and

(c) all requirements set forth in the Collateral Trust Agreement as to the confirmation, grant or perfection of the Collateral Trustee's Liens to secure such Indebtedness or

170

Highly Confidential

Obligations in respect thereof are satisfied (and the satisfaction of such requirements will be conclusively established if the Issuer delivers to the Collateral Trustee an officer's certificate stating that such requirements have been satisfied and that such Indebtedness is "Junior Lien Debt"); and

(2) Hedging Obligations of the Issuer or any Guarantor incurred to hedge or manage interest rate risk with respect to Junior Lien Debt; provided that, pursuant to the terms of the Junior Lien Documents, such Hedging Obligations are secured by a Junior Lien on all of the assets and properties that secure the Indebtedness in respect of which such Hedging Obligations are incurred.

"*Junior Lien Documents*" means, collectively, any indenture, credit agreement or other agreement governing a Series of Junior Lien Debt and the Security Documents that create or perfect Liens securing Junior Lien Obligations (including the EFIH 11% Indenture and the Junior Lien Pledge Agreement, entered into as of April 25, 2011, between EFIH and the Collateral Trustee).

"*Junior Lien Obligations*" means Junior Lien Debt and all other Obligations in respect thereof.

"*Junior Lien Representative*" means in the case of any future Series of Junior Lien Debt, the trustee, agent or representative of the holders of such Series of Junior Lien Debt (including the trustee for the EFIH 11% Notes and the EFIH 11.750% Notes) who (a) is appointed as a Junior Lien Representative (for purposes related to the administration of the Security Documents) pursuant to the indenture, credit agreement or other agreement governing such Series of Junior Lien Debt, together with its successors in such capacity, and (b) has become a party to the Collateral Trust Agreement by executing a joinder in the form required under the Collateral Trust Agreement.

"*Legal Holiday*" means a Saturday, a Sunday or a day on which commercial banking institutions are not required to be open in the State of New York.

"*Lien*" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction; *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"*Lien Sharing and Priority Confirmation*" means:

(1) as to any Series of Parity Lien Debt, the written agreement enforceable against the holders of such Series of Parity Lien Debt, as set forth in the applicable Secured Debt Document:

(a) for the enforceable benefit of all holders of each existing and future Series of Parity Lien Debt and each existing and future Parity Lien Representative, that all Parity Lien Obligations will be and are secured equally and ratably by all Parity Liens at any time granted by the Issuer or any Guarantor to secure any Obligations in respect of such Series of Parity Lien Debt, and that all such Parity Liens will be enforceable by the Collateral Trustee for the benefit of all holders of Parity Lien Obligations equally and ratably;

(b) for the enforceable benefit of all holders of each existing and future Series of Parity Lien Debt and Series of Junior Lien Debt, and each existing and future Parity Lien Representative and Junior Lien Representative, that the holders of Obligations in respect of such Series of Parity Lien Debt are bound by the provisions of the Collateral Trust

171

EFH2D10011406

EFH2D10011220
PX 074
Page 187 of 255

Agreement, including the provisions relating to the ranking of Parity Liens and the order of application of proceeds from enforcement of Parity Liens; and

(c) consenting to and directing the Collateral Trustee to perform its obligations under the Collateral Trust Agreement and the other security documents in respect of the Secured Debt Obligations.

(3) as to any Series of Junior Lien Debt, the written agreement enforceable against the holders of such Series of Junior Lien Debt, as set forth in the applicable Secured Debt Document:

(a) for the enforceable benefit of all holders of each existing and future Series of Junior Lien Debt and Series of Parity Lien Debt and each existing and future Junior Lien Representative and Parity Lien Representative, that all Junior Lien Obligations will be and are secured equally and ratably by all Junior Liens at any time granted by the Issuer or any Guarantor to secure any Obligations in respect of such Series of Junior Lien Debt, and that all such Junior Liens will be enforceable by the Collateral Trustee for the benefit of all holders of Junior Lien Obligations equally and ratably;

(b) for the enforceable benefit of all holders of each existing and future Series of Parity Lien Debt and Series of Junior Lien Debt and each existing and future Parity Lien Representative and Junior Lien Representative, that the holders of Obligations in respect of such Series of Junior Lien Debt are bound by the provisions of the Collateral Trust Agreement, including the provisions relating to the ranking of Junior Liens and the order of application of proceeds from the enforcement of Junior Liens; and

(c) consenting to and directing the Collateral Trustee to perform its obligations under the Collateral Trust Agreement and the other security documents in respect of the Secured Debt Obligations.

"*Moody's*" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"*Necessary CapEx Debt*" means Indebtedness of EFIH or any of its Restricted Subsidiaries incurred for the purpose of financing Necessary Capital Expenditures.

"*Necessary Capital Expenditures*" means capital expenditures by EFIH and its Restricted Subsidiaries that are required by applicable law (other than Environmental Law) or otherwise undertaken voluntarily for health and safety reasons (other than as required by Environmental Law). The term "Necessary Capital Expenditures" does not include any capital expenditure undertaken primarily to increase the efficiency of, expand or re-power any power generation facility.

"*Net Income*" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"*Net Proceeds*" means the aggregate cash proceeds and Cash Equivalents received by EFIH or any of its Restricted Subsidiaries in respect of any Asset Sale (including a Casualty Event), including any cash and Cash Equivalents received upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale (including a Casualty Event), net of the direct costs relating to such Asset Sale (including a Casualty Event) and the sale or disposition of such Designated Non-cash Consideration, including legal, accounting and investment banking fees, and brokerage and sales commissions, any relocation expenses incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), amounts required to be applied using proceeds from Asset Sales (other than Asset

172

Sales of Collateral or other Oncor-related Assets) to the repayment of principal, premium, if any, and interest on other Senior Indebtedness required (other than required by clause (1) of the second paragraph under "—Repurchase at the Option of Holders—Asset Sales") to be paid as a result of such transaction and any deduction of appropriate amounts to be provided by EFIH or any of its Restricted Subsidiaries as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by EFIH or any of its Restricted Subsidiaries after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"*Netting Agreement*" shall mean a netting agreement, master netting agreement or other similar document having the same effect as a netting agreement or master netting agreement and, as applicable, any collateral annex, security agreement or other similar document related to any master netting agreement or Permitted Contract.

"*Note Obligations*" means the Notes, the Guarantees and all other Obligations of any of the Issuer and any Guarantors under the Indenture, the Notes, the Guarantees and the Security Documents.

"*Obligations*" means any principal, interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law), premium, penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities, and guarantees of payment of such principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities, payable under the documentation governing any Indebtedness.

"*Officer*" means the Chairman of the Board, the Chief Executive Officer, the President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of EFIH or other Person, as the case may be.

"*Officer's Certificate*" means a certificate signed on behalf of EFIH by an Officer of EFIH or on behalf of another Person by an Officer of such Person, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of EFIH or such other Person, as applicable, that meets the requirements set forth in the Indenture.

"*Oncor Electric Delivery Facility*" means the revolving credit agreement entered into as of the Closing Date by and among Oncor Electric Delivery, as borrower, the lenders party thereto in their capacities as lenders thereunder and JPMorgan Chase Bank, N.A., as Administrative Agent, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof.

"*Oncor Holdings*" means Oncor Electric Delivery Holdings Company LLC.

"*Oncor-related Assets*" means the Equity Interests of any of the Oncor Subsidiaries or any Successor Oncor Business (including the Collateral) owned by EFIH or any Oncor Subsidiary or any Successor Oncor Business or constituting a primary issuance of such Equity Interests to the extent

Highly Confidential

such issuance would constitute an Asset Sale and any assets owned directly or indirectly by any of the Oncor Subsidiaries or any Successor Oncor Business.

"*Oncor Subsidiaries*" means Oncor Holdings and its Subsidiaries, all of which were Unrestricted Subsidiaries on the Issue Date.

"*Opinion of Counsel*" means a written opinion from legal counsel who is acceptable to the Trustee. The counsel may be an employee of or counsel to the Issuer or the Trustee.

"*Parity Lien*" means a Lien granted by a security document to the Collateral Trustee, at any time, upon any Collateral to secure Parity Lien Obligations.

"*Parity Lien Debt*" means:

(1) the Existing EFIH 2020 Notes issued by the Issuer under the Indenture on the Issue Date and any Additional Notes (including the New 2020 Notes offered hereby), the EFIH 9.75% Notes outstanding on the Issue Date and any additional EFIH 9.75% Notes;

(2) any other Indebtedness (including letters of credit and reimbursement obligations with respect thereto) of EFIH, including the guarantee by EFIH of any Indebtedness of any other Person, including the EFH Corp. 9.75% Notes and any additional EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes and any additional EFH Corp. 10.000% Notes and the EFIH 6.875% Notes, that is secured equally and ratably with the Notes by a Parity Lien that was permitted to be incurred and so secured under each applicable Secured Debt Document; *provided*, in the case of Indebtedness referred to in this clause (2), that, except with respect to the EFH Corp. 9.75% Notes and any additional EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes and any additional EFH Corp. 10.000% Notes outstanding on the Issue Date:

(a) on or before the date on which such Indebtedness is incurred by EFIH, such Indebtedness is designated by EFIH, in accordance with the Collateral Trust Agreement, as "Parity Lien Debt" for the purposes of the Secured Debt Documents; provided that no Series of Secured Lien Debt may be designated as both Parity Lien Debt and Junior Lien Debt;

(b) such Indebtedness is governed by an indenture, credit agreement or other agreement that includes a Lien Sharing and Priority Confirmation; and

(c) all requirements set forth in the Collateral Trust Agreement as to the confirmation, grant or perfection of the Collateral Trustee's Lien to secure such Indebtedness or Obligations in respect thereof are satisfied (and the satisfaction of such requirements will be conclusively established if EFIH delivers to the Collateral Trustee an Officer's Certificate stating that such requirements have been satisfied and that such notes or such Indebtedness is "Parity Lien Debt"); and

(3) Hedging Obligations of EFIH incurred to hedge or manage interest rate risk with respect to Parity Lien Debt; *provided* that, pursuant to the terms of the Parity Lien Documents, such Hedging Obligations are secured by a Parity Lien on all of the assets and properties that secure the Indebtedness in respect of which such Hedging Obligations are incurred.

"*Parity Lien Documents*" means the Indenture, the EFIH 9.75% Notes Indenture, the EFH Corp. 9.75% Notes Indenture, the EFH Corp. 10.000% Notes Indenture and any additional indenture, credit agreement or other agreement governing a Series of Parity Lien Debt and the Security Documents that create or perfect Liens securing Parity Lien Obligations (including the EFIH 6.875% Notes Indenture).

"*Parity Lien Obligations*" means Parity Lien Debt and all other Obligations in respect thereof.

174

Highly Confidential

EFH2D10011409

EFH2D10011220

"*Parity Lien Representative*" means (1) the Trustee, in the case of the Notes, (2) The Bank of New York Mellon Trust Company, N.A., in the case of the EFIH 9.75% Notes, the EFIH 6.875% Notes, the EFH Corp. 9.75% Notes and the EFH Corp. 10.000% Notes or (3) in the case of any other Series of Parity Lien Debt, the trustee, agent or representative of the holders of such Series of Parity Lien Debt who (a) is appointed as a Parity Lien Representative (for purposes related to the administration of the Security Documents) pursuant to the indenture, credit agreement or other agreement governing such Series of Parity Lien Debt, together with its successors in such capacity, and (b) has become a party to the Collateral Trust Agreement by executing a joinder in the form required under the Collateral Trust Agreement.

"*Permitted Asset Swap*" means the concurrent purchase and sale or exchange of Related Business Assets or a combination of Related Business Assets and cash or Cash Equivalents between EFIH or any of its Restricted Subsidiaries and another Person; *provided*, that any cash or Cash Equivalents received must be applied in accordance with the covenant described under "—Repurchase at the Option of Holders—Asset Sales."

"*Permitted Asset Transfer*" means (1) the direct or indirect sale, assignment, transfer, conveyance or other disposition (including by way of merger, wind-up or consolidation) or spin-off by dividend of the Equity Interests of EFIH such that EFIH is no longer a Subsidiary of EFH Corp. (including without limitation a merger of EFIH with and into EFH Corp.) or (2) the sale, assignment, transfer, conveyance or other disposition (other than by way of merger, wind-up or consolidation) of all of the Equity Interests of, and other Investments in, the Oncor Subsidiaries, Successor Oncor Businesses and all other Collateral held by EFIH to a Person (other than an Oncor Subsidiary) that shall continue to hold such Equity Interests, other Investments and any other Collateral, in each case other than any foreclosure on the Collateral.

"*Permitted Holders*" means each of the Investors, members of management (including directors) of EFIH or any of its direct or indirect parent companies or Subsidiaries who on the Closing Date were or at any time prior to the first anniversary of the Closing Date were holders of Equity Interests of EFIH (or any of its direct or indirect parent companies) and any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which any of the foregoing are members; *provided* that, in the case of such group and without giving effect to the existence of such group or any other group, such Investors and members of management, collectively, have beneficial ownership of more than 50% of the total voting power of the Voting Stock of EFIH or any of its direct or indirect parent companies.

"*Permitted Investments*" means:

(1) any Investment in EFIH or any of its Restricted Subsidiaries;

(2) any Investment in cash and Cash Equivalents or Investment Grade Securities;

(3) any Investment by EFIH or any of its Restricted Subsidiaries in a Person that is engaged in a Similar Business if as a result of such Investment:

(a) such Person becomes a Restricted Subsidiary; or

(b) such Person, in one transaction or a series of related transactions, is merged or consolidated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, EFIH or a Restricted Subsidiary,

and, in each case, any Investment held by such Person; *provided* that such Investment was not acquired by such Person in contemplation of such acquisition, merger, consolidation or transfer;

(4) any Investment in securities or other assets not constituting cash, Cash Equivalents or Investment Grade Securities and received in connection with an Asset Sale made pursuant to the

175

EFH2D10011410

provisions described under "—Repurchase at the Option of Holders—Asset Sales" or any other disposition of assets not constituting an Asset Sale;

(5) any Investment existing on the Issue Date;

(6) any Investment acquired by EFIH or any of its Restricted Subsidiaries:

(a) in exchange for any other Investment or accounts receivable held by EFIH or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable; or

(b) as a result of a foreclosure by EFIH or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7) Hedging Obligations permitted under clause (10) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(8) any Investment in a Similar Business having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (8) that are at that time outstanding, not to exceed 3.5% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(9) Investments the payment for which consists of Equity Interests (exclusive of Disqualified Stock) of EFIH or any of its direct or indirect parent companies; *provided, however*, that such Equity Interests will not increase the amount available for Restricted Payments under clause (3) of the first paragraph under the covenant described under "—Certain Covenants—Limitations on Restricted Payments";

(10) guarantees of Indebtedness of EFIH or any of its Restricted Subsidiaries permitted under the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(11) any transaction to the extent it constitutes an Investment that is permitted and made in accordance with the provisions of the second paragraph of the covenant described under "—Certain Covenants—Transactions with Affiliates" (except transactions described in clauses (2), (5) and (9) of such paragraph);

(12) Investments consisting of purchases and acquisitions of inventory, fuel (including all forms of nuclear fuel), supplies, material or equipment;

(13) additional Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (13) that are at that time outstanding (without giving effect to the sale of an Investment to the extent the proceeds of such sale do not consist of cash or marketable securities), not to exceed 3.5% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(14) Investments relating to a Receivables Subsidiary that, in the good faith determination of EFIH, are necessary or advisable to effect any Receivables Facility for the benefit of EFIH or any of its Restricted Subsidiaries;

(15) advances to, or guarantees of Indebtedness of, employees not in excess of $25.0 million outstanding at any one time, in the aggregate;

(16) loans and advances to officers, directors and employees for business-related travel expenses, moving expenses and other similar expenses, in each case incurred in the ordinary

176

EFH2D10011411

course of business or consistent with past practices or to fund such Person's purchase of Equity Interests of EFIH or any direct or indirect parent company thereof;

(17) any Investment in any Subsidiary or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business; or

(18)(A) Investments in Indebtedness of TCEH or EFH Corp. received by EFIH (i) in exchange for the Existing EFIH 2020 Notes in the exchange offer relating thereto or (ii) in exchange for Indebtedness of TCEH or EFH Corp. received in exchange for the Existing EFIH 2020 Notes in the exchange offer relating thereto and (B) Investments in Indebtedness of EFH Corp. or its Subsidiaries received by EFIH in exchange for other Indebtedness of EFIH or any Guarantor incurred under clause (2) under the second paragraph under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" covenant, including in the case of both (A) and (B) above, for the avoidance of doubt, the exchanges of any such Indebtedness, which shall be deemed to be "Permitted Investments" hereunder.

"*Permitted Liens*" means, with respect to any Person:

(1) pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business (including in connection with the construction or restoration of facilities for the generation, transmission or distribution of electricity) or otherwise constituting Permitted Investments;

(2) Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet overdue for a period of more than 30 days or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(3) Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than 30 days or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(4) Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5) minor survey or title exceptions or irregularities, minor encumbrances, easements or reservations of, or rights of others for, licenses, permits, conditions, covenants, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6) Liens securing Indebtedness permitted to be incurred pursuant to clause (4), (12) or (13) of the second paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that (a) Liens securing Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to

177

EFH2D10011412

clause (13) relate only to Refinancing Indebtedness that serves to refund or refinance Indebtedness, Disqualified Stock or Preferred Stock incurred under clause (4) or (12) of the second paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," and (b) Liens securing Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (4) of the second paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" extend only to the assets so financed, purchased, constructed or improved;

(7) Liens existing on the Issue Date;

(8) Liens on property or shares of stock of a Person at the time such Person becomes a Subsidiary; *provided, however*, such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; *provided, further, however*, that such Liens may not extend to any other property owned by EFIH or any of its Restricted Subsidiaries;

(9) Liens on property at the time EFIH or a Restricted Subsidiary acquired the property, including any acquisition by means of a merger or consolidation with or into EFIH or any of its Restricted Subsidiaries; *provided, however*, that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition; *provided, further, however*, that the Liens may not extend to any other property owned by EFIH or any of its Restricted Subsidiaries;

(10) Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to EFIH or another Restricted Subsidiary permitted to be incurred in accordance with the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(11) Liens securing Hedging Obligations, of EFIH or its Restricted Subsidiaries incurred under clause (10) of the second paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that such agreements were entered into in the ordinary course of business and not for speculative purposes (as determined by EFIH in its reasonable discretion acting in good faith) and, in the case of any commodity Hedging Obligations or any Hedging Obligation of the type described in clause (c) of the definition of "Hedging Obligations," entered into in order to hedge against or manage fluctuations in the price or availability of any Covered Commodity;

(12) Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(13) leases, subleases, licenses or sublicenses granted to others in the ordinary course of business which do not materially interfere with the ordinary conduct of the business of EFIH or any of its Restricted Subsidiaries;

(14) Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by EFIH and its Restricted Subsidiaries in the ordinary course of business;

(15) Liens in favor of EFIH or any Guarantor;

(16) [Intentionally omitted];

(17) Liens on accounts receivable, other Receivables Facility assets, or accounts into which collections or proceeds of Receivables Facility assets are deposited, in each case in connection with a Receivables Facility for the benefit of EFIH or its Restricted Subsidiaries;

178

Highly Confidential

EFH2D10011413

(18) Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8) and (9); *provided, however*, that (a) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property), and (b) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), and (9) at the time the original Lien became a Permitted Lien under the Indenture, and (ii) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement;

(19) deposits made in the ordinary course of business to secure liability to insurance carriers;

(20) other Liens securing obligations incurred in the ordinary course of business which obligations do not exceed $100.0 million at any one time outstanding;

(21) Liens securing judgments for the payment of money not constituting an Event of Default under clause (5) under "—Events of Default and Remedies" so long as such Liens are adequately bonded and any appropriate legal proceedings that may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(22) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(23) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code, or any comparable or successor provision, on items in the course of collection, and (ii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(24) Liens deemed to exist in connection with Investments in repurchase agreements permitted by the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreements;

(25) ground leases or subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by EFIH or any of its Subsidiaries are located;

(26) Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of EFIH or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of EFIH and its Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of EFIH or any of its Restricted Subsidiaries in the ordinary course of business;

(27) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of goods entered into by EFIH or any Restricted Subsidiary in the ordinary course of business;

(28) rights reserved to or vested in others to take or receive any part of, or royalties related to, the power, gas, oil, coal, lignite or other minerals or timber generated, developed, manufactured or produced by, or grown on, or acquired with, any property of EFIH or any of its Restricted Subsidiaries and Liens upon the production from property of power, gas, oil, coal, lignite or other minerals or timber, and the by-products and proceeds thereof, to secure the

179

Highly Confidential                                                                        EFH2D10011414

EFH2D10011220

obligations to pay all or a part of the expenses of exploration, drilling, mining or development of such property only out of such production or proceeds;

(29) Liens arising out of all presently existing and future division and transfer orders, advance payment agreements, processing contracts, gas processing plant agreements, operating agreements, gas balancing or deferred production agreements, pooling, unitization or communitization agreements, pipeline, gathering or transportation agreements, platform agreements, drilling contracts, injection or repressuring agreements, cycling agreements, construction agreements, salt water or other disposal agreements, leases or rental agreements, farm-out and farm-in agreements, exploration and development agreements, and any and all other contracts or agreements covering, arising out of, used or useful in connection with or pertaining to the exploration, development, operation, production, sale, use, purchase, exchange, storage, separation, dehydration, treatment, compression, gathering, transportation, processing, improvement, marketing, disposal or handling of any property of EFIH or any of its Restricted Subsidiaries, *provided* that such agreements are entered into in the ordinary course of business (including in respect of construction and restoration activities);

(30) any restrictions on any stock or stock equivalents or other joint venture interests of EFIH or any of its Restricted Subsidiaries providing for a breach, termination or default under any owners, participation, shared facility, joint venture, stockholder, membership, limited liability company or partnership agreement between such Person and one or more other holders of such stock or stock equivalents or interest of such Person, if a security interest or other Lien is created on such stock or stock equivalents or interest as a result thereof and other similar Liens;

(31) [Intentionally omitted];

(32) Liens and other exceptions to title, in either case on or in respect of any facilities of EFIH or any of its Restricted Subsidiaries, arising as a result of any shared facility agreement entered into with respect to such facility, except to the extent that any such Liens or exceptions, individually or in the aggregate, materially adversely affect the value of the relevant property or materially impair the use of the relevant property in the operation of business of EFIH or any of its Restricted Subsidiaries, taken as a whole;

(33) Liens on cash and Cash Equivalents (i) deposited by EFIH or any of its Restricted Subsidiaries in margin accounts with or on behalf of brokers, credit clearing organizations, independent system operators, regional transmission organizations, pipelines, state agencies, federal agencies, futures contract brokers, customers, trading counterparties, or any other parties or issuers of surety bonds or (ii) pledged or deposited as collateral by EFIH or any of its Restricted Subsidiaries with any of the entities described in clause (i) above to secure their respective obligations, in the case of each of clauses (i) and (ii) above, with respect to: (A) any contracts and transactions for the purchase, sale, exchange of, or the option (whether physical or financial) to purchase, sell or exchange (1) natural gas, (2) electricity, (3) coal and lignite, (4) petroleum-based liquids, (5) oil, (6) nuclear fuel (including enrichment and conversion), (7) emissions or other environmental credits, (8) waste byproducts, (9) weather, (10) power and other generation capacity, (11) heat rate, (12) congestion, (13) renewal energy credit, or (14) any other energy-related commodity or services or derivative (including ancillary services and related risk (such as location basis)); (B) any contracts or transactions for the purchase, processing, transmission, transportation, distribution, sale, lease, hedge or storage of, or any other services related to any commodity or service identified in subparts (1) through (14) above, including any capacity agreement; (C) any financial derivative agreement (including but not limited to swaps, options or swaptions) related to any commodity identified in subparts (1) through (14) above, or to any interest rate or currency rate management activities; (D) any agreement for membership or participation in an organization that facilitates or permits the entering into or clearing of any netting agreement or any agreement described in this clause (33); (E) any agreement combining part or all of a netting agreement or part or all of any of the agreements described in this clause

180

(33); (E) any document relating to any agreement described in this clause (33) that is filed with a Government Authority and any related service agreements; or (F) any commercial or trading agreements, each with respect to, or involving the purchase, transmission, distribution, sale, lease or hedge of, any energy, generation capacity or fuel, or any other energy related commodity or service, price or price indices for any such commodities or services or any other similar derivative agreements, and any other similar agreements (such agreements described in clauses (A) through (F) of this clause (33) being collectively, "*Permitted Contracts*"), Netting Agreements, Hedging Obligations and letters of credit supporting Permitted Contracts, Netting Agreements and Hedging Obligations;

(34) Liens arising under Section 9.343 of the Texas Uniform Commercial Code or similar statutes of states other than Texas;

(35) Liens created in the ordinary course of business in favor of banks and other financial institutions over credit balances of any bank accounts of EFIH and its Subsidiaries held at such banks or financial institutions, as the case may be, to facilitate the operation of cash pooling and/or interest set-off arrangements in respect of such bank accounts in the ordinary course of business;

(36) any zoning, land use, environmental or similar law or right reserved to or vested in any Government Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of EFIH or any of its Restricted Subsidiaries, taken as a whole;

(37) any Lien arising by reason of deposits with or giving of any form of security to any Government Authority for any purpose at any time as required by applicable law as a condition to the transaction of any business or the exercise of any privilege or license, or to enable EFIH or any of its Restricted Subsidiaries to maintain self-insurance or to participate in any fund for liability on any insurance risks;

(38) Liens, restrictions, regulations, easements, exceptions or reservations of any Government Authority applying particularly to nuclear fuel;

(39) rights reserved to or vested in any Government Authority by the terms of any right, power, franchise, grant, license or permit, or by any provision of applicable law, to terminate or modify such right, power, franchise, grant, license or permit or to purchase or recapture or to designate a purchaser of any of the property of such person;

(40) Liens arising under any obligations or duties affecting any of the property of EFIH or any of its Restricted Subsidiaries to any Government Authority with respect to any franchise, grant, license or permit which do not materially impair the use of such property for the purposes for which it is held;

(41) rights reserved to or vested in any Government Authority to use, control or regulate any property of such person;

(42) any obligations or duties, affecting the property of EFIH or any of its Restricted Subsidiaries, to any Government Authority with respect to any franchise, grant, license or permit;

(43) a set-off or netting rights granted by EFIH or any Subsidiary of EFIH pursuant to any agreements related to Hedging Obligations, Netting Agreements or Permitted Contracts solely in respect of amounts owing under such agreements;

(44) Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment described under the definition of "Permitted Investments" to be applied against the purchase price for such Investment and (ii) consisting of an agreement to sell, transfer, lease or otherwise dispose of any property in a transaction excluded from the definition described under

181

Highly Confidential

**PX 074**
**Page 197 of 255**

"Asset Sale," in each case, solely to the extent such Investment or sale, disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien;

(45) [Intentionally omitted]; and

(46) any amounts held by a trustee in the funds and accounts under any indenture securing any revenue bonds issued for the benefit of EFIH or any of its Restricted Subsidiaries.

For purposes of this definition, the term "Indebtedness" shall be deemed to include interest on such Indebtedness.

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"*Preferred Stock*" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"*Purchase Money Obligations*" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction, repair, restoration, replacement, expansion or improvement of property (real or personal) or assets (other than Capital Stock), and whether acquired through the direct acquisition of such property or assets, or otherwise, incurred in respect of capital expenditures, including Environmental CapEx Debt and Necessary CapEx Debt.

"*Qualified Proceeds*" means assets that are used or useful in, or Capital Stock of any Person engaged in, a Similar Business; provided that the fair market value of any such assets or Capital Stock shall be determined by EFIH in good faith.

"*Rating Agencies*" means each of Moody's, S&P and Fitch, or if any of Moody's, S&P or Fitch shall not make a rating on the Notes or other investment publicly available, a "nationally recognized statistical rating organization" within the meaning of Rule 15c3-1(c)(2)(vi)(F) under the Exchange Act selected by EFIH which shall be substituted for Moody's, S&P or Fitch, or all of them, as the case may be.

"*Receivables Facility*" means any of one or more receivables financing facilities or programs as amended, supplemented, modified, extended, renewed, restated or refunded from time to time, the Obligations of which are non-recourse (except for customary representations, warranties, covenants and indemnities made in connection with such facilities) to EFIH or any of its Restricted Subsidiaries (other than a Receivables Subsidiary) pursuant to which EFIH or any of its Restricted Subsidiaries purports to sell its accounts receivable to either (a) a Person that is not a Restricted Subsidiary or (b) a Receivables Subsidiary that in turn funds such purchase by purporting to sell its accounts receivable to a Person that is not a Restricted Subsidiary or by borrowing from such a Person or from another Receivables Subsidiary that in turn funds itself by borrowing from such a Person.

"*Receivables Fees*" means distributions or payments made directly or by means of discounts with respect to any accounts receivable or participation interest therein issued or sold in connection with, and other fees paid to a Person that is not a Restricted Subsidiary in connection with any Receivables Facility.

"*Receivables Subsidiary*" means any Subsidiary formed for the purpose of facilitating or entering into one or more Receivables Facilities, and in each case engages only in activities reasonably related or incidental thereto.

"*Redemption Date*" has the meaning set forth under "Optional Redemption."

182

Highly Confidential

"*Related Business Assets*" means (A) except in the case of a Permitted Asset Swap of Collateral, assets (other than cash or Cash Equivalents) used or useful in, or securities of, a Similar Business; provided that any assets or securities received by EFIH or a Restricted Subsidiary in exchange for assets or securities transferred by EFIH or a Restricted Subsidiary will not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Restricted Subsidiary and (B) in the case of a Permitted Asset Swap of Collateral, assets (other than cash or Cash Equivalents) used or useful in, or Capital Stock of, a Similar Oncor Business; *provided* that any Capital Stock received by EFIH in exchange for Collateral will not be deemed to be Related Business Assets, unless upon receipt of the Capital Stock of such Person, such Person would become a Subsidiary of EFIH or a joint venture in which EFIH has a significant equity interest (as determined by EFIH in good faith).

"*Required Junior Lien Debtholders*" means, at any time, the holders of a majority in aggregate principal amount of all Junior Lien Debt (including outstanding letters of credit whether or not then available or drawn) then outstanding and the aggregate unfunded commitments to extend credit which, when funded, would constitute Junior Lien Debt, calculated in accordance with the provisions described under "—Security for the Notes—Voting." For purposes of this definition, Junior Lien Debt registered in the name of, or beneficially owned by, the Issuer or any Affiliate of the Issuer will be deemed not to be outstanding.

"*Required Parity Lien Debtholders*" means, at any time, the holders of a majority in aggregate principal amount of all Parity Lien Debt (including outstanding letters of credit whether or not then available or drawn) then outstanding and the aggregate unfunded commitments to extend credit which, when funded, would constitute Parity Lien Debt, calculated in accordance with the provisions described under "—Security for the Notes—Voting." For purposes of this definition, Parity Lien Debt registered in the name of, or beneficially owned by, the Issuer or any Affiliate of the Issuer will be deemed not to be outstanding.

"*Restoration Certificate*" shall mean, with respect to any Casualty Event, an Officer's Certificate provided to the Trustee prior to the 365th day after such Casualty Event has occurred certifying (a) that EFIH or such Restricted Subsidiary intends to use the proceeds received in connection with such Casualty Event to repair, restore or replace the property or assets in respect of which such Casualty Event occurred, (b) the approximate costs of completion of such repair, restoration or replacement and (c) that such repair, restoration or replacement will be completed within the later of (x) 450 days after the date on which cash proceeds with respect to such Casualty Event were received and (y) 180 days after delivery of such Restoration Certificate.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Payment Coverage Ratio*" means (i) for Restricted Payments (other than payments of cash dividends or distributions to EFH Corp. on, or in respect of, EFIH's Capital Stock, purchases for cash or other acquisitions for cash of any Capital Stock of EFIH or any direct or indirect parent of EFIH for the purpose of paying any such dividend or distribution to, or acquisitions of Capital Stock of any direct or indirect parent of EFIH for cash from, the Investors, or guaranteeing any Indebtedness of any Affiliate of EFIH for the purpose of paying such dividend, making such distribution or so acquiring such Capital Stock to or from the Investors, all such Restricted Payments being referred to as "*Investor Payments*"), the Fixed Charge Coverage Ratio of EFIH and its Restricted Subsidiaries treating the Oncor Subsidiaries as Restricted Subsidiaries for purposes of such calculation and (ii) for Restricted Payments constituting Investor Payments, the Fixed Charge Coverage Ratio of EFIH and its Restricted Subsidiaries.

"*Restricted Subsidiary*" means, at any time, any direct or indirect Subsidiary of EFIH (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; *provided, however*, that upon an

183

Unrestricted Subsidiary's ceasing to be an Unrestricted Subsidiary, such Subsidiary shall be included in the definition of "Restricted Subsidiary."

"*S&P*" means Standard & Poor's, a Standard & Poor's Financial Services LLC business, and any successor to its rating agency business.

"*Sale and Lease-Back Transaction*" means any arrangement providing for the leasing by EFIH or any of its Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by EFIH or such Restricted Subsidiary to a third Person in contemplation of such leasing.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Secured Debt Documents*" means the Parity Lien Documents and the Junior Lien Documents.

"*Secured Debt Obligations*" means Parity Lien Obligations and Junior Lien Obligations.

"*Secured Indebtedness*" means any Indebtedness of EFIH or any of its Restricted Subsidiaries secured by a Lien.

"*Secured Lien Debt*" means Parity Lien Debt and Junior Lien Debt.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Security Documents*" means the Collateral Trust Agreement, the Pledge Agreement and all other security agreements, pledge agreements, collateral assignments, mortgages, collateral agency agreements, deed of trust or other grants or transfers for security executed and delivered by EFIH, a Guarantor or any other obligor under the Notes creating (or purporting to create) a Lien upon Collateral in favor of the Collateral Trustee for the benefit of the holders of the Secured Debt Obligations, in each case, as amended, modified, renewed, restated or replaced, in whole or in part, from time to time, in accordance with its terms.

"*Senior Indebtedness*" means:

(1) all Indebtedness of the Issuer or any Guarantor outstanding under EFIH's guarantee of any Existing EFH Corp. Notes, the EFIH 9.75% Notes and the Notes and any related Guarantees (including interest accruing on or after the filing of any petition in bankruptcy or similar proceeding or for reorganization of the Issuer or any Guarantor (at the rate provided for in the documentation with respect thereto, regardless of whether or not a claim for post-filing interest is allowed in such proceedings)), and any and all other fees, expense reimbursement obligations, indemnification amounts, penalties, and other amounts (whether existing on the Issue Date or thereafter created or incurred) and all obligations of the Issuer or any Guarantor to reimburse any bank or other Person in respect of amounts paid under letters of credit, acceptances or other similar instruments;

(2) all Hedging Obligations of the Issuer or any Guarantor (and guarantees thereof) owing to a lender or any Affiliate of such lender (or any Person that was a lender or an Affiliate of such lender at the time the applicable agreement giving rise to such Hedging Obligation was entered into); *provided* that such Hedging Obligations are permitted to be incurred under the terms of the Indenture;

(3) any other Indebtedness of the Issuer or any Guarantor permitted to be incurred under the terms of the Indenture (including the EFIH 6.875% Notes, the EFIH 11% Notes, the EFIH 11.750% Notes and the EFIH 11.25%/12.25% Toggle Notes), unless the instrument under which

184

EFH2D10011220

**PX 074
Page 200 of 255**

such Indebtedness is incurred expressly provides that it is subordinated in right of payment to the Notes or any related Guarantee; and

(4) all Obligations with respect to the items listed in the preceding clauses (1), (2) and (3);

*provided, however*, that Senior Indebtedness shall not include:

(a) any obligation of such Person to the Issuer or any of its Subsidiaries;

(b) any liability for federal, state, local or other taxes owed or owing by such Person;

(c) any accounts payable or other liability to trade creditors arising in the ordinary course of business;

(d) any Indebtedness or other Obligation of such Person which is subordinate or junior in any respect to any other Indebtedness or other Obligation of such Person; and

that portion of any Indebtedness which at the time of incurrence is incurred in violation of the Indenture.

"*Series of Junior Lien Debt*" means, severally, the EFIH 11% Notes and the EFIH 11.750% notes and each other issue or series of Junior Lien Debt for which a single transfer register is maintained (provided that any Hedging Obligations constituting Junior Lien Debt shall be deemed part of the Series of Junior Lien Debt to which it relates).

"*Series of Parity Lien Debt*" means, severally, the Notes, the EFIH 9.75% Notes, the EFIH 6.875% Notes, the 9.75% EFH Corp. Notes, the EFH Corp. 10.000% Notes and any Additional Notes or other Indebtedness that constitutes Parity Lien Debt (provided that any Hedging Obligations constituting Parity Lien Debt shall be deemed part of the Series of Parity Lien Debt to which it relates).

"*Series of Secured Lien Debt*" means each Series of Parity Lien Debt and each Series of Junior Lien Debt.

"*Significant Subsidiary*" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such regulation is in effect on the Closing Date.

"*Similar Business*" means any business conducted or proposed to be conducted by EFIH and its Subsidiaries on the Closing Date or any business that is similar, reasonably related, incidental or ancillary thereto.

"*Similar Oncor Business*" means any business which is primarily engaged in a regulated electricity or other energy transmission or distribution business in the United States (as determined by EFIH in good faith).

"*Sponsor Management Agreement*" means the management agreement between certain of the management companies associated with the Investors and EFH Corp.

"*Subordinated Indebtedness*" means,

(1) any Indebtedness of the Issuer which is by its terms subordinated in right of payment to the Notes, and

(2) any Indebtedness of any Guarantor which is by its terms subordinated in right of payment to the Guarantee of such entity of the Notes.

185

Highly Confidential

EFH2D10011420

EFH2D10011220

"*Subsidiary*" means, with respect to any Person:

(1) any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; and

(2) any partnership, joint venture, limited liability company or similar entity of which

(x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise, and

(y) such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"*Successor Oncor Business*" means any Person the Capital Stock of which is received by EFIH in an Asset Sale, including a Permitted Asset Swap, of Collateral or as a dividend or distribution from an Oncor Subsidiary.

"*TCEH*" means Texas Competitive Electric Holdings Company LLC.

"*TCEH Notes*" means the notes previously issued by TCEH to refinance indebtedness under the TCEH Senior Interim Facility.

"*TCEH Senior Interim Facility*" means the interim loan agreement, dated as of the Closing Date by and among EFCH, as guarantor, TCEH, as borrower, the other guarantors parties thereto, the lenders party thereto in their capacities as lenders thereunder and Morgan Stanley Senior Funding, Inc., as Administrative Agent, including any guarantees, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications or restatements thereof.

"*TCEH Senior Secured Facilities*" means the credit agreement dated as of the Closing Date, as amended on August 7, 2009, by and among EFCH, as guarantor, TCEH, as borrower, the lenders party thereto in their capacities as lenders thereunder and Citibank, N.A., as Administrative Agent, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any additional amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock").

"*Total Assets*" means the total assets of EFIH and its Restricted Subsidiaries on a consolidated basis, as shown on the most recent consolidated balance sheet of EFIH or such other Person as may be expressly stated.

"*Transactions*" means the transactions contemplated by the Transaction Agreement, borrowings under the TCEH Senior Secured Facilities, the EFH Senior Interim Facility, the TCEH Senior Interim Facility, the Oncor Electric Delivery Facility and any Receivables Facility as in effect on the Closing

186

Highly Confidential

Date, any repayments of indebtedness of EFH Corp. and its Subsidiaries in connection therewith, and the issuance of the EFH Corp. 2017 Notes and the TCEH Notes and any repayments of Indebtedness of EFH Corp. and its Subsidiaries in connection therewith.

"*Transaction Agreement*" means the Agreement and Plan of Merger, dated as of February 25, 2007, among Merger Sub, Texas Energy Future Holdings Limited Partnership and EFH Corp.

"*Treasury Rate*" means, as of any Redemption Date, the yield to maturity as of such Redemption Date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the Redemption Date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the Redemption Date to December 1, 2015; *provided, however,* that if the period from the Redemption Date to December 1, 2015 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"*Trust Indenture Act*" means the Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa-77bbbb).

"*Unrestricted Cash*" means, as of any date, without duplication, (a) all cash and Cash Equivalents (in each case, free and clear of all Liens, other than nonconsensual Liens permitted by the covenant described under "—Certain Covenants—Limitation on Liens" and Liens permitted by clause (23), subclauses (i) and (ii) of clause (26) and clause (33) of the definition of Permitted Liens, included in the cash and cash equivalents accounts listed on the consolidated balance sheet of EFIH and its Restricted Subsidiaries as of such date and (b) all unrestricted margin deposits related to commodity positions listed on the consolidated balance sheet of EFIH and the Restricted Subsidiaries.

"*Unrestricted Subsidiary*" means:

(1) each of the Oncor Subsidiaries;

(2) any Subsidiary of EFIH other than EFIH Finance or any Guarantor owning Collateral which at the time of determination is an Unrestricted Subsidiary (as designated by EFIH, as provided below); and

(3) any Subsidiary of an Unrestricted Subsidiary.

EFIH may designate any Subsidiary of EFIH (including any existing Subsidiary and any newly acquired or newly formed Subsidiary) other than EFIH Finance or any Guarantor owning Collateral to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on, any property of, EFIH or any Subsidiary of EFIH (other than solely any Subsidiary of the Subsidiary to be so designated); *provided* that

(1) any Unrestricted Subsidiary must be an entity of which the Equity Interests entitled to cast at least a majority of the votes that may be cast by all Equity Interests having ordinary voting power for the election of directors or Persons performing a similar function are owned, directly or indirectly, by EFIH;

(2) such designation complies with the covenants described under "—Certain Covenants—Limitation on Restricted Payments"; and

(3) each of:

(a) the Subsidiary to be so designated; and

(b) its Subsidiaries

has not at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness

Highly Confidential                                                                        EFH2D10011422

pursuant to which the lender has recourse to any of the assets of EFIH or any Restricted Subsidiary.

EFIH may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that, immediately after giving effect to such designation, no Default shall have occurred and be continuing and in the case of any Subsidiary of EFIH, (A) EFIH could incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test described in the first paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; or (B) the Fixed Charge Coverage Ratio for EFIH and its Restricted Subsidiaries would be greater than such ratio for EFIH and its Restricted Subsidiaries immediately prior to such designation, in each case on a *pro forma* basis taking into account such designation.

Any such designation by EFIH shall be notified by EFIH to the Trustee by promptly filing with the Trustee a copy of the resolution of the board of directors of EFIH or any committee thereof giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing provisions.

"*Voting Stock*" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing:

(1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment; by

(2) the sum of all such payments.

"*Wholly-Owned Subsidiary*" of any Person means a Subsidiary of such Person, 100% of the outstanding, Equity Interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

188

Highly Confidential

## REGISTRATION RIGHTS

The Offerors and the Dealer Managers will enter into the Registration Rights Agreement on the date the New Notes are issued. In the Registration Rights Agreement, the Offerors will agree that they will, at their expense, for the benefit of the holders of the New Notes, (1) file a registration statement on an appropriate registration form (each, an "exchange offer registration statement") with respect to a registered exchange offer to exchange the New Notes offered hereby for new notes with terms identical to the Existing EFIH 10.000% Notes (the notes so exchanged, the "Exchange Notes") (except that the Exchange Notes will not contain terms with respect to transfer restrictions or payment of Additional Interest) and (2) complete the registered exchange offer no later than 365 days after the issuance date of the New Notes. Upon the exchange offer registration statement being declared effective, the Offerors will offer the Exchange Notes in exchange for surrender of the New Notes. The Offerors will keep the registered exchange offer open for not less than 20 business days (or longer if required by applicable law). For each New Note surrendered to the Offerors pursuant to the registered exchange offer, the holder who surrendered such New Note will receive an Exchange Note having a principal amount equal to that of the surrendered New Note. Interest on each Exchange Note will accrue from the later of (1) the last interest payment date on which interest was paid on the New Note surrendered in exchange therefor or (2) if the New Note is surrendered for exchange on a date in a period that includes the record date for an interest payment date to occur on or after the date of such exchange and as to which interest will be paid, the date of such interest payment date.

Under existing interpretations of the SEC contained in several no-action letters to third parties, the Exchange Notes will be freely transferable by holders thereof (other than affiliates of the Offerors) after the registered exchange offer without further registration under the Securities Act; provided, however, that each holder that wishes to exchange its New Notes for Exchange Notes will be required to represent (1) that any Exchange Notes to be received by it will be acquired in the ordinary course of its business, (2) that, at the time of the commencement of the registered exchange offer, it has no arrangement or understanding with any person to participate in the distribution (within the meaning of Securities Act) of the Exchange Notes in violation of the Securities Act, (3) that it is not an "affiliate" (as defined in Rule 405 under the Securities Act) of the Offerors, (4) if such holder is not a broker-dealer, that it is not engaged in, and does not intend to engage in, the distribution of Exchange Notes and (5) if such holder is a broker-dealer (a "participating broker-dealer") that will receive Exchange Notes for its own account in exchange for New Notes that were acquired as a result of market-making or other trading activities, that it will deliver a prospectus in connection with any resale of such Exchange Notes.

The Offerors will agree to make available, during the period required by the Securities Act, a prospectus meeting the requirements of the Securities Act for use by participating broker-dealers and other persons, if any, with similar prospectus delivery requirements for use in connection with any resale of Exchange Notes.

If (1) because of any change in law or in currently prevailing interpretations of the staff of the SEC, the Offerors are not permitted to effect a registered exchange offer, (2) a registered exchange offer is not consummated within 365 days after the date the New Notes are issued, (3) in certain circumstances, certain holders of unregistered New Notes so request, or (4) in the case of any holder that participates in a registered exchange offer, such holder does not receive Exchange Notes on the date of the exchange that may be sold without restriction under state and federal securities laws (other than due solely to the status of such holder as an affiliate of the Offerors (within the meaning of the Securities Act)), then, in each case, the Offerors will (x) promptly deliver to the holders through the trustee written notice thereof and (y) at the Offerors' sole expense, (a) file a shelf registration statement covering resales of the New Notes within 30 days and use its commercially reasonable efforts to cause such shelf registration statement to become effective within 90 days, in each case, after the obligation

189

to file a shelf registration statement arises (but no earlier than 365 days after the date the New Notes are issued) and (b) use their commercially reasonable efforts to keep effective such shelf registration statement until the earliest of (i) two years after the shelf registration statement has become effective or (ii) such time as all of the applicable New Notes have been sold thereunder or (iii) the date upon which all New Notes covered by such shelf registration statement (a) are freely transferable without restriction by persons that are not affiliates of the Offerors pursuant to Rule 144 under the Securities Act or any successor provision thereto or otherwise where no conditions of Rule 144 are then applicable (other than the holding period requirement in Rule 144(d)(1)(ii) so long as such holding period requirement is satisfied), (b) do not bear any restrictive legends and (c) do not bear a restrictive CUSIP number (the "shelf registration period"). The Offerors will, in the event that a shelf registration statement is filed, provide to each holder whose New Notes are registered under such shelf registration statement copies of the prospectus that is a part of such shelf registration statement, notify each such holder when such shelf registration statement has become effective and take certain other actions as are required to permit unrestricted resales of the New Notes. A holder that sells New Notes pursuant to a shelf registration statement will be required to be named as a selling security holder in the related prospectus and to deliver a prospectus to purchasers, will be subject to certain of the civil liability provisions under Securities Act in connection with such sales and will be bound by the provisions of the Registration Rights Agreement that are applicable to such a holder (including certain indemnification rights and obligations).

The Registration Rights Agreement permits the Offerors to prohibit offers and sales of registrable securities under the shelf registration statement for a period not to exceed an aggregate of 90 days in any 12-month period, if it is determined that there is a valid business purpose for such prohibition. Any such period during which the Offerors may prohibit offers and sales is referred to as a "suspension period."

If (1) the Offerors have not filed the exchange offer registration statement or shelf registration statement by the deadlines discussed above, (2) the exchange offer registration statement or shelf registration statement has not become or been declared effective by the deadlines discussed above, (3) the registered exchange offer has not been completed by the earlier of (i) 60 business days after the exchange offer registration statement has become effective or (ii) 365 days after the issuance date of the New Notes (4) a registration statement relating to the New Notes has been declared effective and such registration statement ceases to be effective at any time during the shelf registration period (subject to certain exceptions) (each of (1), (2), (3) or (4) above, a "registration default"), then Additional Interest will accrue on the principal amount of the New Notes at a rate of 0.25% per annum for the first 90-day period during which a registration default continues, and thereafter the interest rate on the New Notes will increase by 0.50% per annum over the interest rate shown on the cover of this Offering Memorandum for the remaining period during which a registration default continues. When all registration defaults are cured, the interest rate on the New Notes will revert to the original level.

Any amounts of additional interest due will be payable on the same original interest payment dates as interest on the New Notes is payable.

The Exchange Notes will be accepted for clearance through DTC.

This summary of the provisions of the Registration Rights Agreement does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all the provisions of the Registration Rights Agreement, copies of which will be available from EFIH upon request.

190

## BOOK-ENTRY, DELIVERY AND FORM

The New Notes offered hereby are being offered and sold to qualified institutional buyers in reliance on Rule 144A ("Rule 144A Notes"). The New Notes also may be offered and sold in offshore transactions in reliance on Regulation S ("Regulation S Notes"). Except as set forth below, the New Notes offered hereby will be issued in registered, global form in minimum denominations of $2,000 and integral multiples of $1,000 in excess of $2,000.

The New Notes will have identical terms and conditions as, and form a single series and vote together as a single class with, the Existing EFIH 10.000% Notes, except that (i) the New Notes will be issued on the Settlement Date, (ii) interest on the New Notes payable on June 1, 2013 will accrue only from the Settlement Date, unlike the Existing EFH Corp. 10.000% Notes, the New Notes will not be listed on the New York Stock Exchange and (iv) (a) the New Notes have not been registered under the Securities Act and, therefore, will bear legends restricting their transfer and will be subject to registration rights under the Registration Rights Agreement and (b) until the registered exchange offer under the Registration Rights Agreement is completed, the New Notes will have different CUSIP and ISIN numbers than those of the Existing EFIH 10.000% Notes and will not be fungible for trading purposes with the Existing EFIH 10.000% Notes. See "Registration Rights."

Rule 144A Notes initially will be represented by one or more global notes in registered form without interest coupons (collectively, the "Rule 144A Global Notes"). Regulation S Notes initially will be represented by one or more global notes in registered form without interest coupons (collectively, the "Regulation S Global Notes" and, together with the Rule 144A Global Notes, the "Global Notes"). The Rule 144A Global Notes and the Regulation S Global Notes will be deposited upon issuance with the applicable registrar as custodian for DTC, and registered in the name of DTC or its nominee, in each case, for credit to an account of a direct or indirect participant in DTC as described below. Through and including the 40th day after the commencement of this offering and the closing of this offering (such period through and including such 40th day, the "Restricted Period"), beneficial interests in the Regulation S Global Notes may be held only through Euroclear Bank S.A./N.V., as operator of the Euroclear System ("Euroclear"), and Clearstream Banking, Société Anonyme ("Clearstream, Luxembourg") (as indirect participants in DTC), unless transferred to a person that takes delivery through a Rule 144A Global Note in accordance with the certification requirements described under "—Exchanges Between Regulation S Notes and Rule 144A Notes" below. Beneficial interests in the Rule 144A Global Notes may not be exchanged for beneficial interests in the Regulation S Global Notes at any time except in the limited circumstances described under "—Exchanges Between Regulation S Notes and Rule 144A Notes" below.

Except as set forth below, the Global Notes may be transferred, in whole and not in part, only to another nominee of DTC or to a successor of DTC or its nominee. Beneficial interests in the Global Notes may not be exchanged for definitive notes in registered certificated form ("Certificated Notes") except in the limited circumstances described below. See "—Exchange of Global Notes for Certificated Notes." Except in the limited circumstances described below, owners of beneficial interests in the Global Notes will not be entitled to receive physical delivery of New Notes in certificated form.

Rule 144A Notes (including beneficial interests in the Rule 144A Global Notes) will be subject to certain restrictions on transfer and will bear a restrictive legend as described under "Notice to Investors." Regulation S Notes will also be subject to certain restrictions on transfer and will also bear the legend as described under "Notice to Investors." In addition, transfers of beneficial interests in the Global Notes will be subject to the applicable rules and procedures of DTC and its direct or indirect participants (including, if applicable, those of Euroclear and Clearstream, Luxembourg), which may change from time to time.

191

**Depository Procedures**

The following description of the operations and procedures of DTC, Euroclear and Clearstream, Luxembourg is provided solely as a matter of convenience. These operations and procedures are solely within the control of the respective settlement systems and are subject to changes by them. We take no responsibility for these operations and procedures and urge investors to contact the system or their participants directly to discuss these matters.

DTC has advised us that DTC is a limited-purpose trust company organized under the laws of the State of New York, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC was created to hold securities for its participating organizations (collectively, the "Participants") and to facilitate the clearance and settlement of transactions in those securities between the Participants through electronic book-entry changes in accounts of its Participants. The Participants include securities brokers and dealers (including the Dealer Managers), banks, trust companies, clearing corporations and certain other organizations. Access to DTC's system is also available to other entities such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly (collectively, the "Indirect Participants"). Persons who are not Participants may beneficially own securities held by or on behalf of DTC only through the Participants or the Indirect Participants. The ownership interests in, and transfers of ownership interests in, each security held by or on behalf of DTC are recorded on the records of the Participants and Indirect Participants.

DTC has also advised us that, pursuant to procedures established by it:

- upon deposit of the Global Notes, DTC will credit the accounts of the Participants designated by the Dealer Managers with portions of the principal amount of the Global Notes; and

- ownership of these interests in the Global Notes will be shown on, and the transfer of ownership of these interests will be effected only through, records maintained by DTC (with respect to the Participants) or by the Participants and the Indirect Participants (with respect to other owners of beneficial interests in the Global Notes).

Investors in the Rule 144A Global Notes who are Participants may hold their interests therein directly through DTC. Investors in the Rule 144A Global Notes who are not Participants may hold their interests therein indirectly through organizations (including Euroclear and Clearstream, Luxembourg) that are Participants. Investors in the Regulation S Global Notes must initially hold their interests therein through Euroclear or Clearstream, Luxembourg, if they are participants in such systems, or indirectly through organizations that are participants. After the expiration of the Restricted Period (but not earlier), investors may also hold interests in the Regulation S Global Notes through Participants in DTC other than Euroclear and Clearstream, Luxembourg. Euroclear and Clearstream, Luxembourg will hold interests in the Regulation S Global Notes on behalf of their participants through customers' securities accounts in their respective names on the books of their respective depositories, which in turn hold such interests in customers' securities accounts in the depositaries' names on the books of DTC. Citibank, N.A. acts as depositary for Clearstream, Luxembourg, and JP Morgan Chase Bank, N.A. acts as depositary for Euroclear. All interests in a Global Note, including those held through Euroclear or Clearstream, Luxembourg, may be subject to the procedures and requirements of DTC. Those interests held through Euroclear or Clearstream, Luxembourg may also be subject to the procedures and requirements of such systems. The laws of some jurisdictions require that certain persons take physical delivery in definitive form of securities that they own. Consequently, the ability to transfer beneficial interests in a Global Note to such persons will be limited to that extent. Because

192

DTC can act only on behalf of Participants, which in turn act on behalf of Indirect Participants, the ability of a person having beneficial interests in a Global Note to pledge such interests to persons that do not participate in the DTC system, or otherwise take actions in respect of such interests, may be affected by the lack of a physical certificate evidencing such interests.

Except as described below, owners of interests in the Global Notes will not have New Notes registered in their names, will not receive physical delivery of New Notes in certificated form and will not be considered the registered owners or "holders" thereof under the indenture governing the New Notes for any purpose.

Payments in respect of the principal of, and interest and premium, if any, and additional interest (as described in the Registration Rights Agreement relating to the New Notes), if any, on a Global Note registered in the name of DTC or its nominee will be payable to DTC in its capacity as the registered holder under the indenture governing the New Notes. Under the terms of the indenture, we, the trustee, the registrar, the paying agent and the transfer agent (together with the registrar and the paying agent, the "agents") will treat the persons in whose names the New Notes, including the Global Notes, are registered as the owners of the New Notes for the purpose of receiving payments and for all other purposes. Consequently, neither we, the trustee, the agents nor any agent of ours or theirs has or will have any responsibility or liability for:

- any aspect of DTC's records or any Participant's or Indirect Participant's records relating to, or payments made on account of, beneficial ownership interests in the Global Notes or for maintaining, supervising or reviewing any of DTC's records or any Participant's or Indirect Participant's records relating to the beneficial ownership interests in the Global Notes; or

- any other matter relating to the actions and practices of DTC or any of its Participants or Indirect Participants.

DTC has advised us that its current practice, upon receipt of any payment in respect of securities such as the New Notes (including principal and interest), is to credit the accounts of the relevant Participants with the payment on the payment date unless DTC has reason to believe that it will not receive payment on such payment date. Each relevant Participant is credited with an amount proportionate to its beneficial ownership of an interest in the principal amount of the relevant security as shown on the records of DTC. Payments by the Participants and the Indirect Participants to the beneficial owners of New Notes will be governed by standing instructions and customary practices and will be the responsibility of the Participants or the Indirect Participants and will not be our responsibility or the responsibility of DTC or either trustee. Neither we, the trustee nor the agents will be liable for any delay by DTC or any of the Participants or the Indirect Participants in identifying the beneficial owners of the New Notes, and we, the trustee and the agents may conclusively rely on and will be protected in relying on instructions from DTC or its nominee for all purposes.

Except for trades involving only Euroclear and Clearstream, Luxembourg participants, interests in the Global Notes are expected to be eligible to trade in DTC's Same Day Funds Settlement System and secondary market trading activity in such interests will, therefore, settle in immediately available funds, subject in all cases to the rules and procedures of DTC and its Participants. See "—Same Day Settlement and Payment."

Subject to the transfer restrictions set forth under "Notice to Investors," transfers between the Participants will be effected in accordance with DTC's procedures and will be settled in same day funds, and transfers between participants in Euroclear and Clearstream, Luxembourg will be effected in accordance with their respective rules and operating procedures.

Subject to compliance with the transfer restrictions applicable to the New Notes described herein, cross-market transfers between the Participants, on the one hand, and Euroclear or Clearstream,

193

Luxembourg participants, on the other hand, will be effected through DTC in accordance with DTC's rules on behalf of Euroclear or Clearstream, Luxembourg, as the case may be, by its respective depositary. However, such cross-market transactions will require delivery of instructions to Euroclear or Clearstream, Luxembourg, as the case may be, by the counterparty in such system in accordance with the rules and procedures and within the established deadlines (Brussels time) of such system. Euroclear or Clearstream, Luxembourg, as the case may be, will, if the transaction meets its settlement requirements, deliver instructions to its respective depositary to take action to effect final settlement on its behalf by delivering or receiving interests in the relevant Global Note from DTC, and making or receiving payment in accordance with normal procedures for same day funds settlement applicable to DTC. Euroclear participants and Clearstream, Luxembourg participants may not deliver instructions directly to the depositories for Euroclear or Clearstream, Luxembourg.

DTC has advised us that it will take any action permitted to be taken by a holder of New Notes only at the direction of one or more Participants to whose account DTC has credited the interests in the Global Notes and only in respect of such portion of the aggregate principal amount of the New Notes as to which such Participant or Participants has or have given such direction. However, if there is an event of default under the New Notes, DTC reserves the right to exchange the Global Notes for legended New Notes in certificated form and to distribute such New Notes to its Participants.

Although DTC, Euroclear and Clearstream, Luxembourg have agreed to the foregoing procedures to facilitate transfers of interests in the Rule 144A Global Notes and the Regulation S Global Notes among participants in DTC, Euroclear and Clearstream, Luxembourg, they are under no obligation to perform or to continue to perform such procedures, and may discontinue such procedures at any time. Neither we nor the trustee nor any of our or its agents will have any responsibility for the performance by DTC, Euroclear or Clearstream, Luxembourg or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

**Exchange of Global Notes for Certificated Notes**

A Global Note is exchangeable for Certificated Notes if:

- DTC (1) notifies us that it is unwilling or unable to continue as depositary for the Global Notes or (2) has ceased to be a clearing agency registered under the Exchange Act and, in either case, we fail to appoint a successor depositary; or

- there has occurred and is continuing an event of default with respect to the New Notes.

In addition, beneficial interests in a Global Note may be exchanged for Certificated Notes upon prior written notice given to the trustee by or on behalf of DTC in accordance with the indenture governing the New Notes. In all cases, Certificated Notes delivered in exchange for any Global Note or beneficial interests in Global Notes will be registered in the names, and issued in any approved denominations, requested by or on behalf of the depositary (in accordance with its customary procedures) and will bear the applicable restrictive legend referred to under "Notice to Investors," unless that legend is not required by applicable law.

**Exchange of Certificated Notes for Global Notes**

Certificated Notes may not be exchanged for beneficial interests in any Global Note unless the transferor first delivers to the registrar a written certificate (in the form provided in the indenture governing the New Notes) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such New Notes. See "Notice to Investors."

194

Highly Confidential

**Exchanges Between Regulation S Notes and Rule 144A Notes**

Prior to the expiration of the Restricted Period, beneficial interests in the Regulation S Global Notes may be exchanged for beneficial interests in the Rule 144A Global Notes only if:

- such exchange occurs in connection with a transfer of the New Notes pursuant to Rule 144A; and

- the transferor first delivers to the trustee a written certificate (in the form provided in the indenture governing the New Notes) to the effect that the New Notes are being transferred to a person:

- whom the transferor reasonably believes to be a "qualified institutional buyer" within the meaning of Rule 144A; and

- who is purchasing for its own account or the account of a "qualified institutional buyer" in a transaction meeting the requirements of Rule 144A; and

- in accordance with all applicable securities laws of the states of the United States and other jurisdictions.

Beneficial interests in a Rule 144A Global Note may be transferred to a person who takes delivery in the form of an interest in the Regulation S Global Notes, whether before or after the expiration of the Restricted Period, only if the transferor first delivers to the trustee a written certificate (in the form provided in the indenture governing the New Notes) to the effect that such transfer is being made in accordance with Rule 903 or 904 of Regulation S or Rule 144 (if available) and that, if such transfer occurs prior to the expiration of the Restricted Period, the interest transferred will be held immediately thereafter through Euroclear or Clearstream, Luxembourg.

Transfers involving exchanges of beneficial interests between the Regulation S Global Notes and the Rule 144A Global Notes will be effected by DTC by means of an instruction originated by the registrar through the DTC Deposit/Withdraw at Custodian system. Accordingly, in connection with any such transfer, appropriate adjustments will be made to reflect a decrease in the principal amount of the Regulation S Global Notes and a corresponding increase in the principal amount of the Rule 144A Global Notes or vice versa, as applicable. Any beneficial interest in one of the Global Notes that is transferred to a person who takes delivery in the form of an interest in the other Global Note will, upon transfer, cease to be an interest in such Global Note and will become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in such other Global Note for so long as it remains such an interest. The policies and practices of DTC may prohibit transfers of beneficial interests in the Regulation S Global Notes prior to the expiration of the Restricted Period.

**Same Day Settlement and Payment**

The Offerors will make payments in respect of the New Notes represented by the Global Notes (including principal, premium, if any, interest and additional interest, if any) by wire transfer of immediately available funds to the accounts specified by DTC or its nominee. The Offerors will make all payments of principal, interest and premium, if any, and additional interest, if any, with respect to Certificated Notes by wire transfer of immediately available funds to the accounts specified by the holders of the Certificated Notes or, if no such account is specified, by mailing a check to each such holder's registered address. The New Notes represented by the Global Notes are expected to be eligible to trade in DTC's Same Day Funds Settlement System, and any permitted secondary market trading activity in such New Notes will, therefore, be required by DTC to be settled in immediately available funds. The Offerors expect that secondary trading in any Certificated Notes will also be settled in immediately available funds.

195

Highly Confidential

EFH2D10011430

EFH2D10011220

**PX 074**
**Page 211 of 255**

Because of time-zone differences, credits of interests in the Global Notes received in Clearstream, Luxembourg or Euroclear as a result of a transaction with a DTC Participant will be made during subsequent securities settlement processing and dated the business day following the DTC settlement date. Such credits or any transactions involving interests in such Global Notes settled during such processing will be reported to the relevant Clearstream, Luxembourg or Euroclear participants on such business day. Cash received in Clearstream, Luxembourg or Euroclear as a result of sales of interests in the Global Notes by or through a Clearstream, Luxembourg participant or a Euroclear participant to a DTC Participant will be received with value on the DTC settlement date but will be available in the relevant Clearstream, Luxembourg or Euroclear cash account only as of the business day following settlement in DTC.

196

Highly Confidential

EFH2D10011431

EFH2D10011220

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF EXISTING NOTES AND NEW NOTES (COLLECTIVELY, THE "NOTES") ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS OFFERING MEMORANDUM IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF NOTES FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF NOTES UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"); (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE OFFERORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF NOTES SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following discussion summarizes certain anticipated U.S. federal income tax consequences to U.S. Holders and Non-U.S. Holders (each term as defined below, and, in the aggregate, referred to as "holders") relating to the exchange of Existing Notes for New Notes pursuant to the exchange offers and consent solicitations and the ownership and disposition of New Notes acquired in the exchange offers. This summary is based upon the provisions of the Code, Treasury regulations promulgated under the Code (the "Regulations"), and administrative rulings and judicial decisions, in each case as of the date hereof. These authorities are subject to differing interpretations and may be changed, perhaps retroactively, resulting in U.S. federal income tax consequences materially different from those summarized below. The Offerors have not obtained, nor do they intend to obtain, any ruling from the U.S. Internal Revenue Service (the "IRS") with respect to the statements made and the conclusions reached in the following summary, and there can be no assurance that the IRS will agree with such statements and conclusions.

This summary assumes that the Existing Notes and the New Notes are and will be held as capital assets within the meaning of Section 1221 of the Code. This summary does not address the tax considerations arising under the U.S. federal estate and gift tax laws or the laws of any foreign, state or local jurisdiction. In addition, this summary does not purport to address all tax considerations that may be applicable to a particular holder's circumstances or to holders that may be subject to special tax rules, including holders subject to the alternative minimum tax, banks, insurance companies or other financial institutions, tax-exempt organizations, dealers, brokers or traders in securities, currencies or commodities, regulated investment companies, real estate investment trusts, holders that elect to use a mark-to-market method of accounting for their securities holdings, U.S. Holders whose "functional currency" is not the U.S. dollar, controlled foreign corporations, passive foreign investment companies, persons that own or are deemed to own 10% or more of EFH Corp.'s voting stock, former U.S. citizens or long-term residents, partnerships or other pass-through entities for U.S. federal income tax purposes or investors therein, holders holding the Existing Notes or the New Notes as a position in a hedging transaction, "straddle," "conversion transaction," other "synthetic security" or integrated transaction or other risk reduction transaction, holders deemed to sell the Existing Notes or the New Notes under the constructive sale provisions of the Code, or subsequent purchasers of New Notes.

For purposes of this discussion, the term "U.S. Holder" means a beneficial owner of Existing Notes or New Notes that is, for U.S. federal income tax purposes: (i) an individual who is a citizen or resident of the United States; (ii) a corporation, including any entity treated as a corporation for U.S. federal income tax purposes, created or organized in the United States or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust, if its administration is subject to the primary supervision of a U.S. court and one or more U.S. persons have the authority to control all substantial decisions of the trust, or if it has made a valid election in effect under applicable Regulations to be treated as a U.S. person.

197

Highly Confidential

EFH2D10011432

EFH2D10011220

For purpose of this discussion, the term "Non-U.S. Holder" means a beneficial owner of Existing Notes or New Notes (other than a partnership or other entity or arrangement treated as a partnership for U.S. federal income tax purposes) that is not a U.S. Holder.

If a partnership (or other entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds Existing Notes or New Notes, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. If you are a partnership or a partner of a partnership holding Existing Notes or New Notes, you should consult your tax advisor regarding the tax consequences of the exchange offers, the consent solicitations and the ownership and disposition of New Notes.

THIS SUMMARY IS FOR GENERAL INFORMATION PURPOSES ONLY, AND IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED TO BE, LEGAL OR TAX ADVICE TO ANY PARTICULAR HOLDER. YOU ARE URGED TO CONSULT YOUR OWN TAX ADVISOR WITH REGARD TO THE APPLICATION OF THE U.S. FEDERAL INCOME TAX LAWS, AS WELL AS THE APPLICATION OF NON-INCOME TAX LAWS AND THE LAWS OF ANY STATE, LOCAL OR FOREIGN TAXING JURISDICTION, TO YOUR PARTICULAR SITUATION.

**Tax Consequences to Participating U.S. Holders**

*The Exchange of Existing Notes Pursuant to the Exchange Offers*

A U.S. Holder that exchanges Existing Notes for New Notes in the exchange offers will not realize gain or loss unless such exchange is treated as a "significant modification" for U.S. federal income tax purposes. In general, a "significant modification" occurs if, based on all the facts and circumstances and taking into account all modifications of the debt instrument collectively, the legal rights or obligations of holders of the Existing Notes compared to those holders of the New Notes differ to an extent that is "economically significant." Certain types of modifications are, however, tested under specific rules.

The change in the nature of a debt instrument from recourse to nonrecourse will generally be treated as a significant modification. However, the change of a recourse debt instrument to a nonrecourse debt instrument will not be a significant modification if the debt instrument continues to be secured only by the original collateral and the change does not result in a change in payment expectations. For U.S. federal income tax purposes, EFIH is a disregarded entity wholly-owned by EFH Corp., and it is unclear whether a debt instrument that is recourse to EFIH is properly treated as recourse or nonrecourse to EFH Corp. EFH Corp. and the Offerors intend to take the position that the exchange of Existing Notes for New Notes will not result in a change in payment expectations and will not, therefore, cause the exchange to be treated as a significant modification.

A change in the timing of payments due under a debt instrument will be a significant modification if it results in the material deferral of scheduled payments. A deferral of payments for a period of time equal to the lesser of five years or fifty percent of the original term of the debt instrument will not be treated as a material deferral. Because no payment on the New Notes will be delayed beyond such period when compared to the Existing Notes, EFH Corp. and the Offerors intend to take the position that the exchange of Existing Notes for New Notes will not result in a material deferral of scheduled payments.

A change in the yield of a debt instrument will generally result in a significant modification only if the change exceeds the greater of (i) one quarter of one percent and (ii) five percent of the annual yield (as determined for U.S. federal income tax purposes) of the existing debt instrument. The difference between the yield on the New Notes and the yield on the Existing Notes will depend on whether the U.S. Holder receives the Total Consideration or the Exchange Consideration. Although the matter is

198

Highly Confidential

EFH2D10011433

EFH2D10011220

**PX 074**

**Page 214 of 255**

not free from doubt, if a U.S. Holder exchanges Existing Notes for New Notes and receives the Total Consideration, the exchange of Existing Notes for New Notes should not constitute a "significant modification." If a U.S. Holder exchanges Existing Notes for New Notes and receives the Exchange Consideration, the exchange of Existing Notes for New Notes should constitute a "significant modification." If the exchange offers result in a "significant modification," the exchange offers will either be treated as a recapitalization or as a taxable exchange, as described in more detail below.

*No Significant Modification.* If the exchange of Existing Notes for New Notes in the exchange offers does not constitute a "significant modification," the exchange offers would not be treated as an exchange for U.S. federal income tax purposes. Under such characterization, a U.S. Holder that receives New Notes in exchange for Existing Notes as a result of participation in the exchange offers will not recognize gain or loss on the exchange, a U.S. Holder's tax basis in the New Notes received in the exchange will be equal to the tax basis in the Existing Notes exchanged therefor and the U.S. Holder's holding period for such New Notes will include the period during which the Existing Notes surrendered in the exchange were held.

*Recapitalization Treatment.* If the exchange of an issue of Existing Notes for New Notes is treated as a significant modification, a U.S. Holder that exchanges Existing Notes for New Notes in the exchange offers will recognize gain or loss upon the exchange of the Existing Notes for New Notes (as described under the subheading "Taxable Exchange" below) unless such exchange qualifies as a recapitalization.

In order for such exchange to qualify as a recapitalization, the Existing Notes and the New Notes must both be treated as "securities" under the relevant provisions of the Code. Neither the Code nor the Regulations define the term "security." Whether a debt instrument is a security is based on all of the facts and circumstances. Factors evaluated include whether the holder of the debt instrument is subject to a material level of entrepreneurial risk. Most authorities have held that the term to maturity of the debt instrument is one of the most significant factors. In this regard, debt instruments with a term of ten years or more generally have qualified as securities, whereas debt instruments with a term of less than five years generally have not qualified as securities.

Additionally, for an exchange to qualify as a recapitalization, the exchanged securities and the newly issued securities must be issued by the same obligor. For U.S. federal income tax purposes, EFIH is classified as an entity disregarded as separate from EFH Corp. Accordingly, for U.S. federal income tax purposes, EFIH is generally treated as a division of EFH Corp., and the New Notes will generally be treated as issued by EFH Corp. However, there is no direct authority regarding whether the exchange of Existing Notes issued by EFH Corp. for New Notes can qualify as a recapitalization. The Offerors intend to take the position that the Existing Notes and the New Notes are issued by the same obligor. However, there can be no assurance that the IRS will not take a contrary position.

The Existing Notes had a term of more than ten years at the time of issuance, and the New Notes have a term of approximately seven years. While the Existing Notes are likely treated as securities, the characterization of the New Notes as securities is unclear. If the New Notes are treated as securities, the exchange of each issue of Existing Notes for New Notes will be treated as a recapitalization. Under such characterization, subject to the discussions under the heading "—Accrued Interest" below, a U.S. Holder that receives New Notes in exchange for Existing Notes as a result of participation in the exchange offers will not recognize gain or loss on the exchange, a U.S. Holder's tax basis in the New Notes received in the exchange will be equal to the tax basis in the Existing Notes exchanged therefor and the U.S. Holder's holding period for such New Notes will include the period during which the U.S. Holder held the Existing Notes. If the New Notes are not treated as securities, the exchange of Existing Notes for New Notes will not be treated as a recapitalization. U.S. Holders are encouraged to consult a tax advisor regarding the treatment of the New Notes as securities.

199

Highly Confidential

EFH2D10011434

EFH2D10011220

*Taxable Exchange.* If the exchange of an issue of Existing Notes for New Notes is treated as a significant modification but not as a recapitalization, a U.S. Holder of such issue of Existing Notes will recognize gain or loss equal to the difference between the amount realized on the exchange and the U.S. Holder's adjusted tax basis in the Existing Notes on the date of the exchange. The amount realized on the exchange will equal the "issue price" (determined as described below under "—Issue Price of New Notes") of any New Notes received in the exchange, subject to the discussions under the heading "—Accrued Interest" below. A U.S. Holder's adjusted tax basis in the Existing Notes exchanged will generally be equal to the amount paid therefor, increased by any market discount previously taken into income and reduced by any amortizable bond premium previously taken into account. A U.S. Holder's adjusted tax basis in the New Notes will be equal to their issue price (as determined as described below under "—Issue Price of New Notes") and the U.S. Holder's holding period in the New Notes will commence on the day after the exchange. Any gain or loss recognized will generally be capital gain or loss (except to the extent of any accrued market discount as described below under "—Market Discount"), and will be long-term capital gain or loss if the Existing Notes have been held for more than one year at the time of the exchange. Long-term capital gain recognized by non-corporate U.S. Holders is generally eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

*Issue Price of New Notes.* If the exchange of Existing Notes for New Notes does not constitute a "significant modification," the aggregate issue price of the New Notes will equal the aggregate adjusted issue price of the Existing Notes exchanged therefor. If the exchange of the Existing Notes for New Notes constitutes a "significant modification," the issue price of the New Notes will equal the fair market value of such notes on the date of issuance.

*Market Discount.* If the exchange offers do not result in a significant modification, any accrued market discount with respect to the Existing Notes will carry over to the New Notes. If the exchange offers result in a significant modification, for any U.S. Holder that acquired Existing Notes with market discount, any gain recognized on the exchange of Existing Notes for New Notes pursuant to the exchange offers will be treated as ordinary income to the extent of the market discount accrued during its period of ownership, unless such holder previously elected to include market discount in income as it accrued for U.S. federal income tax purposes. For these purposes, market discount is generally the excess, if any, of the stated principal amount of an Existing Note over such holder's initial tax basis in the Existing Note, if such excess exceeds a de minimis amount. In an exchange of Existing Notes with market discount for New Notes that qualifies as a recapitalization, New Notes that a U.S. Holder receives in exchange for such Existing Notes will be treated as acquired with market discount if the issue price of such New Notes exceeds the U.S. Holder's initial tax basis for such New Notes by more than a de minimis amount, and any accrued market discount with respect to such Existing Notes will carry over to such New Notes. U.S. Holders who acquired their Existing Notes other than at original issuance should consult their tax advisors regarding the possible application of the market discount rules of the Code to an exchange of the Existing Notes for New Notes pursuant to the exchange offers.

*Accrued Interest.* To the extent that any amount received by a U.S. Holder pursuant to the exchange offers is attributable to accrued and unpaid qualified stated interest (*i.e.*, stated interest unconditionally payable in cash at least annually) on an Existing Note, such amount will be includible in gross income as ordinary interest income if such accrued interest has not previously been included in gross income by the holder for U.S. federal income tax purposes.

### Ownership of New Notes

*Payments of Stated Interest.* The stated interest payments on the New Notes will generally be taxed to a U.S. Holder as ordinary income at the time paid or accrued in accordance with such holder's method of accounting for U.S. federal income tax purposes.

200

*New Medicare Tax.* For taxable years beginning after December 31, 2012, non-corporate U.S. persons will generally be subject to a 3.8% tax on the lesser of (1) the U.S. person's "net investment income" for the relevant taxable year and (2) the excess of the U.S. person's modified adjusted gross income for the taxable year over a certain threshold. A U.S. Holder's net investment income will generally include any interest or gain recognized by such U.S. Holder with respect to the New Notes, unless such interest or gain is derived in the ordinary course of the conduct of such U.S. Holder's trade or business (other than a trade or business that consists of certain passive or trading activities).

*Certain Additional Payments.* In certain circumstances (see "Description of the New Notes—Repurchase at the Option of Holders—Change of Control" and "Registration Rights"), the Offerors may be obligated to pay amounts on the New Notes that are in excess of stated interest or principal on the New Notes. The Offerors do not intend to treat the possibility of paying such additional amounts as affecting the determination of the yield to maturity of the New Notes or giving rise to any accrual of original issue discount ("OID") or recognition of ordinary income upon sale, exchange or retirement of the New Notes. However, additional income will be recognized if any such additional payment is made. It is possible, however, that the IRS may take a different position, in which case the timing, character, and amount of income recognized by a U.S. Holder may be different from that described above.

*Amortizable Bond Premium on New Notes.* If the exchange offers do not result in a significant modification, if a U.S. Holder acquired the Existing Notes with "amortizable bond premium," such amortizable bond premium will carry over to such New Notes. If the exchange of Existing Notes for New Notes qualifies as a recapitalization and a U.S. Holder's initial tax basis in the New Notes exceeds their stated principal amount, the U.S. Holder will be considered to have acquired the New Notes with "amortizable bond premium". A U.S. Holder may generally elect to amortize the premium over the remaining term of the New Notes on a constant yield method as an offset to stated interest when includible in income under such holder's regular method of tax accounting. If a U.S. Holder does not elect to amortize the premium, that premium will decrease the gain or increase the loss otherwise recognized on disposition of the New Notes.

*Sale, Exchange or Retirement of New Notes.* A U.S. Holder will generally recognize taxable gain or loss upon a sale, exchange or retirement of a New Note (including potentially upon a Permitted Asset Transfer) in an amount equal to the difference between (i) the amount of cash and the fair market value of any property received (less an amount attributable to any accrued and unpaid stated interest, which will be taxed in the manner described above under the subheading "—Payments of Stated Interest") and (ii) such holder's adjusted tax basis in the New Note. A U.S. Holder's adjusted tax basis in a New Note will generally be its initial tax basis in the New Note, increased by any market discount previously included in income, and reduced by any amortized bond premium.

Any gain or loss on the sale, exchange or retirement of a New Note will generally be capital gain or loss (except to the extent of the market discount that such U.S. Holder has not previously included in income and is treated as having accrued on the New Note at the time of the payment or disposition, which will be treated as ordinary income), and will be long-term capital gain or loss if the U.S. Holder has a holding period of more than one year at the time of the sale, exchange or retirement. Long-term capital gain recognized by non-corporate U.S. Holders is generally eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

**Tax Consequences to Non-Participating U.S. Holders**

The tax treatment of a U.S. Holder of Existing Notes that does not participate in the exchange offers (a "Non-Participating U.S. Holder") will depend upon whether the adoption of the Proposed Amendments constitutes a modification to the Existing Notes that would result in a "deemed" exchange of such Existing Notes for U.S. federal income tax purposes. Generally, the modification of a debt

201

EFH2D10011436

instrument will be treated as a "deemed" exchange of an "old" debt instrument for a "new" debt instrument if such modification is "significant" within the meaning of the Regulations. Under the Regulations, the modification of a debt instrument is a "significant modification" if, based on all the facts and circumstances and taking into account all modifications of the debt instrument collectively, the legal rights or obligations that are altered and the degree to which they are altered are "economically significant." The Regulations further provide that a modification of a debt instrument that adds, deletes or alters customary accounting or financial covenants is not a "significant modification." The Regulations do not, however, define "customary accounting or financial covenants." A modification that releases, substitutes, adds or otherwise alters the collateral for a recourse debt instrument is a "significant modification" if the modification results in a change in payment expectations. Whether the adoption of the Proposed Amendments would be considered a significant modification under the foregoing rules is not entirely clear.

EFH Corp. intends to take the position that adoption of the Proposed Amendments would not cause a "significant modification" of the Existing Notes under the Regulations, and therefore would not result in a deemed exchange of the Existing Notes for U.S. federal income tax purposes. It is possible, however, that the IRS could take a contrary position. If such a position were taken and sustained, the adoption of the Proposed Amendments would result in a deemed exchange of Existing Notes for "new" Existing Notes and a U.S. Holder would recognize gain or loss unless the exchange qualified as a recapitalization for U.S. federal income tax purposes (for which qualification is not entirely clear). In addition, the Non-Participating U.S. Holder could be treated as acquiring the "new" Existing Note with OID, which, regardless of such holder's regular method of tax accounting, would be included in income as it accrued, regardless of when any related cash was actually received, and a Non-Participating U.S. Holder could recognize ordinary interest income to the extent that any portion of the "new" Existing Notes is attributable to accrued but unpaid qualified stated interest not previously taken into income. U.S. Holders are encouraged to consult their tax advisors regarding the potential tax consequences of not tendering their Existing Notes pursuant to the exchange offers and consent solicitations.

**Tax Consequences to Participating Non-U.S. Holders**

*The Exchange of Existing Notes Pursuant to the Exchange Offers*

A Non-U.S. Holder will generally not be subject to taxation on any gain that a U.S. Holder would be required to recognize on the exchange of Existing Notes for New Notes as discussed above under "—Tax Consequences to Participating U.S. Holders—The Exchange of Existing Notes Pursuant to the Exchange Offers") unless:

- the gain is effectively connected with its conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains), in which case the gain will be subject to tax in the same manner as effectively connected interest income as described below under the heading "—Ownership of New Notes—Payments of Interest"; or

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of the exchange, and certain other conditions are met, in which case the gain will generally be subject to 30% tax subject to the reduction of such gain by such Non-U.S. Holder's capital losses from U.S. sources.

Any amount received by a Non-U.S. Holder that is attributable to accrued and unpaid interest on an Existing Note generally will be taxable in the same manner as described below under "—Ownership of New Notes—Payments of Interest.")

202

Highly Confidential

EFH2D10011437

EFH2D10011220

**PX 074**
**Page 218 of 255**

*Ownership of New Notes*

*Payments of Interest.* A Non-U.S. Holder will not be subject to tax on any payment of interest on the New Notes under the "portfolio interest rule," provided that (i) such interest is not effectively connected with the conduct of a trade or business of the Non-U.S. Holder in the United States (or, if required by an applicable income tax treaty, is not attributable to a U.S. permanent establishment of the Non-U.S. Holder); (ii) the Non-U.S. Holder does not actually or constructively own 10% or more of EFH Corp.'s voting stock within the meaning of the Code and the Regulations; (iii) the Non-U.S. Holder is not a controlled foreign corporation that is related to the Offerors actually or constructively through stock ownership; (iv) the Non-U.S. Holder is not a bank receiving interest on a loan agreement entered into in the ordinary course of its trade or business; and (v) the Non-U.S. Holder has provided a validly completed IRS Form W-8BEN (or other applicable form) establishing such Non-U.S. Holder status (or certain documentary evidence requirements for establishing such Non-U.S. Holder status).

If a Non-U.S. Holder cannot satisfy the requirements described above, payments of interest on the New Notes made to such Non-U.S. Holder will be subject to a 30% U.S. federal withholding tax, unless such Non-U.S. Holder provides to the issuer (or its paying agent) with a properly executed (i) IRS Form W-8BEN (or other applicable form) claiming an exemption from or reduction in withholding under the benefit of an applicable income tax treaty; or (ii) IRS Form W-8ECI (or other applicable form) certifying that interest paid on the New Notes is not subject to withholding tax because it is effectively connected with the conduct of a trade or business in the United States.

If a Non-U.S. Holder is engaged in a trade or business in the United States and interest on the New Notes is effectively connected with the conduct of that trade or business (and, if required by an applicable income tax treaty is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains), then such Non-U.S. Holder will be subject to U.S. federal income tax on that interest on a net income basis generally in the same manner as if it were a U.S. Holder unless an applicable income tax treaty provides otherwise (although the Non-U.S. Holder will be exempt from the 30% U.S. federal withholding tax, provided the certification requirements discussed above are satisfied). In addition, if the Non-U.S. Holder is a corporate Non-U.S. Holder, it may be subject to a branch profits tax equal to 30% (or lower applicable income tax rate) of such interest, subject to adjustments.

*Sale, Exchange or Retirement of New Notes.* Any gain realized upon the sale, exchange or retirement of New Notes will generally not be subject to U.S. federal income tax unless certain exceptions apply, as described above under the heading "—The Exchange of Existing Notes Pursuant to the Exchange Offers."

## Tax Consequences to Non-Participating Non-U.S. Holders

Non-U.S. Holders that do not validly tender their Existing Notes pursuant to the exchange offers and consent solicitations will generally not be subject to U.S. federal income tax as a result of the adoption of the Proposed Amendments if, as the Offerors believe, the adoption of the Proposed Amendments does not give rise to a deemed exchange of Existing Notes for "new" Existing Notes. Moreover, even if there were a deemed exchange, such exchange would generally result in a U.S. federal income tax liability only if the exchange were not considered a recapitalization and such Non-U.S. Holders were in one of the two categories described in the heading "—The Exchange of Existing Notes Pursuant to the Exchange Offers."

Highly Confidential                                                                EFH2D10011438

EFH2D10011220
**PX 074**
**Page 219 of 255**

**Backup Withholding and Information Reporting**

*U.S. Holders*

In general, information reporting requirements may apply to the exchange of Existing Notes for New Notes, and such requirements will apply to certain payments of interest on, or proceeds from a disposition (including a retirement or redemption of), Existing Notes and New Notes (unless, in each case, the holder is an exempt recipient such as a corporation).

Backup withholding may apply to the exchange of Existing Notes for New Notes and payments of interest on or proceeds from disposition (including a retirement or redemption) of New Notes if the holder fails to provide a taxpayer identification number or a certification that it is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against the holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

*Non-U.S. Holders*

Generally, the Offerors must report to the IRS and to each Non-U.S. Holder the amount of interest paid to such Non-U.S. Holder with respect to the Existing Notes and New Notes, and the amount of tax, if any, withheld with respect to such payments. Copies of the information returns reporting such interest payments and any withholding may also be made available to the tax authorities in the country in which such Non-U.S. Holder resides under the provisions of an applicable income tax treaty.

In general, a Non-U.S. Holder will not be subject to backup withholding with respect to the exchange of Existing Notes for New Notes or interest that the applicable Offeror pays to such Non-U.S. Holder on the Existing Notes or New Notes, provided that such Offeror does not have actual knowledge or reason to know that such Non-U.S. Holder is a United States person as defined under the Code, and such Non-U.S. Holder has provided a validly completed IRS Form W-8BEN (or other applicable form) establishing that it is a Non-U.S. Holder (or such Non-U.S. Holder satisfies certain documentary evidence requirements for establishing that it is a Non-U.S. Holder).

Information reporting and, depending on the circumstances, backup withholding will apply to the proceeds of a sale or other disposition (including a retirement or redemption) of Existing Notes or New Notes made within the United States or conducted through certain U.S.-related financial intermediaries, unless the Non-U.S. Holder certifies to the payor under penalties of perjury that it is a Non-U.S. Holder (and the payor does not have actual knowledge or reason to know that such Non-U.S. Holder is a United States person as defined under the Code), or it otherwise establishes an exemption.

Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against the Non-U.S. Holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

204

## CERTAIN ERISA CONSIDERATIONS

This disclosure was written in connection with the promotion and marketing of the New Notes by the Offerors and the Dealer Managers, and it cannot be used by any holder for the purpose of avoiding penalties that may be asserted against the holder under the Code. Prospective purchasers of the New Notes should consult their own tax advisors with respect to the application of the U.S. federal income tax laws to their particular situations.

The following is a summary of certain considerations associated with the exchange of the Existing Notes resulting in the acquisition or holding of the New Notes by employee benefit plans that are subject to Title I of ERISA, individual retirement accounts and other plans and arrangements that are subject to Section 4975 of the Code or Similar Laws, and entities whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each, a "Plan").

This summary is based on the provisions of ERISA and the Code (and related regulations and administrative and judicial interpretations) as of the date of this Offering Memorandum. This summary does not purport to be complete and future legislation, court decisions, administrative regulations, rulings or administrative pronouncements could significantly modify the requirements summarized below. Any of these changes may be retroactive and may thereby apply to transactions entered into prior to the date of their enactment or release.

### General Fiduciary Matters

ERISA and the Code impose certain duties on persons who are fiduciaries of a Plan subject to Title I of ERISA or Section 4975 of the Code (each a "Benefit Plan") and prohibit certain transactions involving the assets of a Benefit Plan and its fiduciaries or other interested parties.

In considering an investment in the New Notes of a portion of the assets of any Plan, a fiduciary should determine whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA, the Code or any Similar Law. In addition, a fiduciary of a Plan should consult with its counsel in order to determine if the investment satisfies the fiduciary's duties to the Plan including, without limitation, the prudence, diversification and prohibited transaction provisions of ERISA, the Code and any other applicable Similar Laws.

### Prohibited Transaction Issues

Section 406 of ERISA and Section 4975 of the Code prohibit Benefit Plans from engaging in specified transactions involving plan assets with persons or entities who are "parties in interest," within the meaning of ERISA, or "disqualified persons," within the meaning of Section 4975 of the Code, unless an exemption is available. A party in interest or disqualified person who engaged in a nonexempt prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code. In addition, the fiduciary of the Benefit Plan that engaged in such a nonexempt prohibited transaction may be subject to penalties and liabilities under ERISA and the Code.

The acquisition and/or holding of New Notes (and the exchange of New Notes for Existing Notes) by a Benefit Plan with respect to which the Offerors, the Investors, the Dealer Managers or any of their affiliates are considered a party in interest or disqualified person may constitute or result in a direct or indirect prohibited transaction under Section 406 of ERISA and/or Section 4975 of the Code, unless the investment is acquired and is held in accordance with an applicable statutory, class or individual prohibited transaction exemption. In this regard, the United States Department of Labor has issued prohibited transaction class exemptions ("PTCEs") that may apply to the acquisition and holding of the

205

New Notes (and the exchange of New Notes for Existing Notes). These class exemptions include, without limitation, PTCE 84-14 respecting transactions determined by independent qualified professional asset managers, PTCE 90-1, respecting insurance company pooled separate accounts, PTCE 91-38, respecting bank collective investment funds, PTCE 95-60, respecting life insurance company general accounts and PTCE 96-23, respecting transactions determined by in-house asset managers. In addition, Section 408(b)(17) of ERISA and Section 4975(d)(20) the Code provide relief from the prohibited transaction provisions of ERISA and the Code for certain transactions, provided that neither the Offerors nor any of their affiliates (directly or indirectly) have or exercise any discretionary authority or control or render any investment advice with respect to the assets of any Benefit Plan involved in the transaction and provided further that the Benefit Plan pays no more than adequate consideration in connection with the transaction.

Each of these prohibited transaction exemptions contains conditions and limitations on its application. Fiduciaries of Plans considering acquiring and/or holding the New Notes offered hereby in reliance on these or any other prohibited transaction exemptions should consult with counsel and carefully review the prohibited transaction exemption to assure it is applicable. There can be no assurance that all of the conditions of any such exemptions will be satisfied.

Because of the foregoing, the New Notes should not be purchased or held by any person investing "plan assets" of any Plan, unless such purchase and holding (and the exchange of New Notes for Existing Notes) are entitled to exemptive relief from the prohibited transaction provisions of ERISA and the Code and are otherwise permissible under all applicable Similar Laws.

**Representation**

Accordingly, by acceptance of a New Note, each purchaser, holder and subsequent transferee will be deemed to have represented and warranted that either (i) no portion of the assets used to acquire or hold the New Notes constitutes assets of any Plan or (ii) the acquisition and holding of the New Notes (including the exchange of Existing Notes for New Notes) are entitled to exemptive relief from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code and are otherwise permissible under all applicable Similar Laws.

The foregoing discussion is general in nature and is not intended to be all inclusive. Due to the complexity of these rules and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is particularly important that fiduciaries, or other persons considering acquiring the New Notes (or exchanging Existing Notes for New Notes) on behalf of, or with the assets of, any Plan, consult with their counsel regarding the potential applicability of ERISA, Section 4975 of the Code and any Similar Laws to such investment and whether an exemption would be applicable to the purchase and holding of the New Notes.

206

**NOTICE TO INVESTORS**

The exchange offers and the issuance of New Notes have not been registered under the Securities Act or any other applicable securities laws and, unless so registered, the New Notes may not be offered, sold, pledged or otherwise transferred within the United States or to or for the account of any U.S. person, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and any other applicable securities laws. The exchange offers are being made, and the New Notes are being offered and issued, only (a) in the United States, to holders of Existing Notes who are "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) ("QIB"), in a private transaction in reliance upon an exemption from the registration requirements of the Securities Act and (b) outside the United States to holders of Existing Notes who are persons other than "U.S. persons," as that term is defined in Rule 902 under the Securities Act, in reliance upon Regulation S under the Securities Act.

Each holder of Existing Notes that submits a Consent and Letter of Transmittal, or agrees to the terms of a Consent and Letter of Transmittal pursuant to an Agent's Message, will be deemed to represent, warrant and agree as follows (terms used in this paragraph that are defined in Rule 144A or Regulation S under the Securities Act are used herein as defined therein):

(1) It (A) (i) is a QIB and (ii) is acquiring the New Notes for its own account or for the account of a QIB, or (B) is not a U.S. person and is acquiring the New Notes in an offshore transaction pursuant to Regulation S.

(2) It understands that the New Notes are being offered in a transaction not involving any public offering in the United States within the meaning of the Securities Act, that the New Notes have not been and, except as described in this Offering Memorandum, will not be registered under the Securities Act and that (A) if in the future it decides to offer, resell, pledge or otherwise transfer any of the New Notes, such New Notes may be offered, resold, pledged or otherwise transferred only (i) to the Issuer or any subsidiary thereof, (ii) inside the United States to a QIB in compliance with Rule 144A under the Securities Act, (iii) outside the United States in an offshore transaction in compliance with Rule 903 or 904 under the Securities Act, (iv) pursuant to the exemption from registration provided by Rule 144 under the Securities Act (if available), (v) in accordance with another exemption from the registration requirements of the Securities Act (and based upon an opinion of counsel if the Issuer so requests), or (vi) pursuant to an effective registration statement under the Securities Act; provided that, prior to such transfer furnishes the relevant trustee a signed letter containing certain representations and agreements relating to the transfer of the New Notes, in each of cases (i) through (vi) in accordance with any applicable securities laws of any state of the United States, and that (B) it will, and each subsequent holder is required to, notify any subsequent purchaser of New Notes from it of the resale restrictions referred to in clause (A) above.

(3) It understands that the New Notes will, until the expiration of the applicable holding period with respect to the New Notes set forth in Rule 144(d)(1) of the Securities Act, unless otherwise agreed by the Offerors and the holder thereof, bear a legend substantially to the following effect:

"THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS EXCEPT AS SET FORTH BELOW. BY ITS ACQUISITION HEREOF, THE HOLDER (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) OR (B) IT IS NOT A U.S. PERSON AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT, (2) AGREES THAT IT WILL NOT WITHIN [IN THE CASE OF 144A GLOBAL NOTES: ONE YEAR] [IN THE CASE OF REGULATION S GLOBAL NOTES: 40 DAYS] AFTER THE LATER OF THE

207

Highly Confidential                                                          EFH2D10011442

ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF SUCH NOTE) RESELL OR OTHERWISE TRANSFER THIS NOTE EXCEPT (A) TO THE ISSUER OR ANY SUBSIDIARY THEREOF, (B) INSIDE THE UNITED STATES TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 903 OR RULE 904 UNDER THE SECURITIES ACT, (D) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE), (E) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL IF THE ISSUER SO REQUESTS), OR (F) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (3) AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS NOTE IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANING GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT."

(4) If it is an acquirer in a transaction that occurs outside the United States within the meaning of Regulation S, it acknowledges that until the expiration of the "40-day distribution compliance period" within the meaning of Rule 903 of Regulation S, any offer or sale of the New Notes shall not be made by it to a U.S. person or for the account or benefit of a U.S. person within the meaning of Rule 902 under the Securities Act, except in compliance with applicable securities laws.

(5) It (A) is able to act on its own behalf in the transactions contemplated by this Offering Memorandum, (B) has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its prospective investment (or the account for which it is acting) in the New Notes, and (C) has the ability to bear the economic risks of its prospective investment in the New Notes and can afford the complete loss of such investment.

(6) It acknowledges that (A) none of the Offerors, the Information Agent, the Exchange Agent, the Dealer Managers or any person acting on behalf of any of the foregoing has made any statement, representation, or warranty, express or implied, to it with respect to the Offerors or the offer or sale of any New Notes, other than the information the Offerors have included in this Offering Memorandum, including the information incorporated herein by reference (and as supplemented to the Expiration Date) and (B) any financial or other information it has deemed necessary concerning the Offerors, the New Notes or any other matter relevant to its decision to acquire the New Notes (including a copy of the Offering Memorandum and any opportunity to ask questions) is or has been made available to it.

(7) It acknowledges that the Offerors, the Dealer Managers and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements. If it is acquiring any New Notes for the account of one or more QIBs, it represents that it has sole investment discretion with respect to each such account and it has full power to make the foregoing acknowledgements, representations and agreements on behalf of such account.

(8) By acceptance of a New Note, it shall be deemed to have represented and warranted that either (A) no portion of the assets used to acquire or hold the New Notes constitutes assets of any employee benefit plan subject to ERISA, any plan, account or other arrangement subject to Section 4975 of the Code, or any entity whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement or any other plan subject to provisions under any Similar Laws or (B) the acquisition and holding of the New Notes (and the exchange of Existing Notes for New Notes) will not constitute a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or a similar violation under any applicable Similar Laws.

Highly Confidential                                                                                   EFH2D10011443


EFH2D10011220

**Canada.** This Offering Memorandum constitutes an offering of the New Notes only in those jurisdictions of Canada and to those persons where and to whom they may lawfully be offered. This Offering Memorandum is not, and under no circumstances is to be construed as, a prospectus, an advertisement or a public offering of the New Notes in Canada. No securities commission or similar regulatory authority in Canada has reviewed or in any way passed upon this Offering Memorandum or the merits of the New Notes and any representation to the contrary is an offense.

**France.** No prospectus (including any amendment, supplement or replacement thereto) has been prepared in connection with the offer that has been approved by the Autorité des marchés financiers or by the competent authority of another State that is a contracting party to the EEA and notified to the Autorité des marchés financiers; no New Notes have been offered or sold nor will be offered or sold, directly or indirectly, to the public in France; the prospectus or any other offering material relating to the New Notes have not been distributed or caused to be distributed and will not be distributed or caused to be distributed to the public in France; such offers, sales and distributions have been and shall only be made in France to persons licensed to provide the investment service of portfolio management for the account of third parties, qualified investors (investisseurs qualifiés) and/or a restricted circle of investors (cercle restreint d'investisseurs), in each case investing for their own account, all as defined in Articles L. 411-2, D. 411-1, D. 411-2, D. 411-4, D. 734-1, D. 744-1, D. 754-1 and D. 764-1 of the Code monétaire et financier. The direct or indirect distribution to the public in France of any so acquired New Notes may be made only as provided by Articles L. 411-1, L. 411-2, L. 412-1 and L. 621-8 to L. 621-8-3 of the Code monétaire et financier and applicable regulations thereunder.

Prospective investors are informed that:

(i) this Offering Memorandum has not been submitted for clearance to the French Financial Market Authority (Autorite des Marches Financiers);

(ii) in compliance with Decree no 98-880 dated October 1, 1998, any investors subscribing for the Notes should be acting for their own account; and

(iii) the direct and indirect distribution or sale to the public of the Notes acquired by them may only be made in compliance with articles L.411-1, L.411-2, L.412-1 and L.621-8 through L.621-8-3 of the French Code Monetair et Financier.

**Germany.** Any offer or solicitation of securities within Germany must be in full compliance with the German Securities Prospectus Act (Wertpapieiprospekt-gesetz (the "WpPG")). The offer and solicitation of securities to the public in Germany requires the approval of the offering document by the German Federal Financial Services Supervisory Authority (Bundesanstalt fur Finanzdienstleistungsaufsicht (the "BaFin")). This Offering Memorandum has not been and will not be submitted for approval to the BaFin. It may not be supplied to the public in Germany or used in connection with any offer for subscription of New Notes to the public, any public marketing of New Notes or any public solicitation for offers to subscribe for or otherwise acquire New Notes in Germany. This Offering Memorandum is personally addressed only to a limited number of persons in Germany who are qualified investors, as defined in the WpPG, is strictly confidential and may not be distributed to any person or entity other than the designated recipients hereof.

**United Kingdom.** Each Dealer Manager has represented and agreed that:

- it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act 2000 ("FSMA")) received by it in connection with the issue or sale of the New Notes in circumstances in which Section 21(1) of the FSMA does not apply to the Offerors; and

209

EFH2D10011220
**PX 074**
**Page 225 of 255**

- it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the New Notes in, from or otherwise involving the United Kingdom.

**European Economic Area.** In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), each Dealer Manager has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of New Notes which are the subject of the offering contemplated by this offering memorandum to the public in that Relevant Member State other than:

(a) to any legal entity which is a qualified investor as defined in the Prospectus Directive;

(b) to fewer than 100 or, if the Relevant Member State has implemented the relevant provision of the 2010 PD Amending Directive, 150, natural or legal persons (other than qualified investors as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the relevant Dealer or Dealers nominated by the Offerors for any such offer; or

(c) in any other circumstances falling within Article 3(2) of the Prospectus Directive,

provided that no such offer of New Notes shall require the Offerors or any Dealer Manager to publish a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of notes to the public" in relation to any New Notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the New Notes to be offered so as to enable an investor to decide to purchase or subscribe the New Notes, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State, the expression "Prospectus Directive" means Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive, to the extent implemented in the Relevant Member State), and includes any relevant implementing measure in the Relevant Member State and the expression "2010 PD Amending Directive" means Directive 2010/73/EU.

**Hong Kong.** The New Notes may not be offered or sold by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap.32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap.571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap.32, Laws of Hong Kong), and no advertisement, invitation or document relating to the New Notes offered hereby may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to New Notes offered hereby which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

**Japan.** The New Notes have not been and will not be registered under the Financial Instruments and Exchange Law of Japan (the Financial Instruments and Exchange Law), and each Dealer Manager has agreed that it will not offer or sell any New Notes, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re-

210

Highly Confidential

offering or resale, directly or indirectly, in Japan or to a resident of Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Financial Instruments and Exchange Law and any other applicable laws, regulations and ministerial guidelines of Japan.

**Singapore.** This offering memorandum has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this offering memorandum and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the New Notes may not be circulated or distributed, nor may the New Notes be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the New Notes are subscribed or purchased under Section 275 by a relevant person which is: (a) a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or (b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor, shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for 6 months after that corporation or that trust has acquired the New Notes offered hereby under Section 275 except: (1) to an institutional investor under Section 274 of the SFA or to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA; (2) where no consideration is given for the transfer; or (3) by operation of law.

## LEGAL MATTERS

Certain legal matters in connection with the New Notes will be passed upon for the Offerors by Gibson, Dunn & Crutcher LLP, Dallas, Texas, and Simpson Thacher & Bartlett LLP, New York, New York. The Dealer Managers are represented by Shearman & Sterling LLP, New York, New York. An investment vehicle comprised of several partners of Simpson Thacher & Bartlett LLP, members of their families, related persons and others own interests representing less than 1% of the capital commitments of the KKR Millennium Fund, L.P. and KKR 2006 Fund L.P.

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The consolidated financial statements of EFIH as of December 31, 2011 and 2010, and for each of the three years in the period ended December 31, 2011, and the effectiveness of EFIH's internal control over financial reporting as of December 31, 2011 incorporated by reference in this Offering Memorandum from EFIH's 2011 Form 10-K, have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports, which are incorporated herein by reference (which reports (1) express an unqualified opinion on the financial statements and includes an explanatory paragraph related to EFIH's investments in debt securities of related parties, guarantees EFH Corp. debt securities, and primary liquidity needs being sourced from interest and principal payments on EFIH's investments in EFH Corp. and TCEH debt securities and distributions from Oncor Holdings, all of which are related party transactions and (2) express an unqualified opinion on the effectiveness of internal control over financial reporting).

211

EFH2D10011446

The consolidated financial statements and financial statement schedule of EFH Corp. as of December 31, 2011 and 2010, and for each of the three years in the period ended December 31, 2011, and the effectiveness of EFH Corp.'s internal control over financial reporting incorporated by reference in this Offering Memorandum from the EFH Corp. 2011 Form 10-K, have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports, which are incorporated herein by reference (which reports (1) express an unqualified opinion on the financial statements and include an explanatory paragraph regarding EFH Corp.'s adoption of amended consolidation accounting standards related to variable interest entities and EFH Corp.'s adoption of amended guidance regarding transfers of financial assets effective January 1, 2010, on a prospective basis and (2) express an unqualified opinion on the effectiveness of internal control over financial reporting).

## INDEPENDENT AUDITORS

The consolidated financial statements as of December 31, 2011 and 2010, and for each of the three years in the period ended December 31, 2011 of Oncor Holdings incorporated by reference in this Offering Memorandum from EFIH's 2011 Form 10-K, have been audited by Deloitte & Touche LLP, independent auditors, as stated in their report which is incorporated herein by reference.

212

Highly Confidential                                    EFH2D10011447

EFH2D10011220
**PX 074**
**Page 228 of 255**

**INDEX TO FINANCIAL STATEMENTS**

**Oncor Electric Delivery Holdings Company LLC**

|  | Page |
|---|---|
| Glossary | F-2 |
| Condensed Statements of Consolidated Income for the three and nine months ended September 30, 2012 and 2011 | F-5 |
| Condensed Statements of Consolidated Comprehensive Income for the three and nine months ended September 30, 2012 and 2011 | F-6 |
| Condensed Statements of Consolidated Cash Flows for the nine months ended September 30, 2012 and 2011 | F-7 |
| Condensed Consolidated Balance Sheets at September 30, 2012 and December 31, 2011 | F-8 |
| Notes to Consolidated Financial Statements | F-9 |

F-1

Highly Confidential

EFH2D10011448

EFH2D10011220

## GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

| | |
|---|---|
| **2011 Audited Financial Statements** . . . . . . . . . . . . . . . . . . . . | Oncor Holdings' audited financial statements for the year ended December 31, 2011 included in EFIH's Annual Report on Form 10-K for the year ended December 31, 2011 filed on February 21, 2012 (Commission File No. 1-34544) |
| **Bondco** . . . . . . . . . . . . . . . . . . . . . . . . . | Refers to Oncor Electric Delivery Transition Bond Company LLC, a wholly-owned consolidated bankruptcy-remote financing subsidiary of Oncor that has issued securitization (transition) bonds to recover certain regulatory assets and other costs. |
| **Deed of Trust** . . . . . . . . . . . . . . . . . . . | Deed of Trust, Security Agreement and Fixture Filing, dated as of May 15, 2008, made by Oncor to and for the benefit of The Bank of New York Mellon Trust Company, N.A. (as successor to The Bank of New York Mellon, formerly The Bank of New York), as collateral agent, as amended |
| **EFH Corp.** . . . . . . . . . . . . . . . . . . . . . . | Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context. Its major subsidiaries include Oncor and TCEH. |
| **EFH Retirement Plan** . . . . . . . . . . . . . | Refers to the defined benefit pension plan sponsored by EFH Corp., in which Oncor is a participating subsidiary. |
| **EFIH** . . . . . . . . . . . . . . . . . . . . . . . . . . . | Refers to Energy Future Intermediate Holding Company LLC, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings. |
| **ERCOT** . . . . . . . . . . . . . . . . . . . . . . . . . | Electric Reliability Council of Texas, the independent system operator and the regional coordinator of various electricity systems within Texas |
| **GAAP** . . . . . . . . . . . . . . . . . . . . . . . . . . . | generally accepted accounting principles |
| **Investment LLC** . . . . . . . . . . . . . . . . . | Refers to Oncor Management Investment LLC, a limited liability company and minority membership interest owner (approximately 0.22%) of Oncor, whose managing member is Oncor and whose Class B Interests are owned by certain members of the management team and independent directors of Oncor. |
| **LIBOR** . . . . . . . . . . . . . . . . . . . . . . . . . . | London Interbank Offered Rate, an interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market |
| **Limited Liability Company Agreement** . . . . . . . . . . . . . . . . . . . . | The Second Amended and Restated Limited Liability Company Agreement of Oncor, dated as of November 5, 2008, by and among Oncor Holdings, Texas Transmission and Investment LLC, as amended |

F-2

Highly Confidential

EFH2D10011449

EFH2D10011220

**PX 074**
**Page 230 of 255**

| | |
|---|---|
| **Luminant** | Refers to subsidiaries of TCEH engaged in competitive market activities consisting of electricity generation and wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas. |
| **Oncor** | Refers to Oncor Electric Delivery Company LLC, a direct, majority-owned subsidiary of Oncor Holdings, and/or its wholly-owned consolidated bankruptcy-remote financing subsidiary, Bondco, depending on context. |
| **Oncor Holdings** | Refers to Oncor Electric Delivery Holdings Company LLC, a direct, wholly-owned subsidiary of EFIH and the direct majority owner (approximately 80.03%) of Oncor, and/or its subsidiaries, depending on context. |
| **Oncor Plan** | Refers to the Oncor Supplemental Retirement Plan, also referred to herein as the "supplemental retirement plan." |
| **Oncor Ring-Fenced Entities** | Refers to Oncor Holdings and its direct and indirect subsidiaries, including Oncor. |
| **OPEB** | other postretirement employee benefits |
| **OPEB Plan** | Refers to an EFH Corp.-sponsored plan (in which Oncor is a participating subsidiary) that offers certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from the company. |
| **PUCT** | Public Utility Commission of Texas |
| **PURA** | Texas Public Utility Regulatory Act |
| **purchase accounting** | The purchase method of accounting for a business combination as prescribed by US GAAP, whereby the cost or "purchase price" of a business combination, including the amount paid for the equity and direct transaction costs, are allocated to identifiable assets and liabilities (including intangible assets) based upon their fair values. The excess of the purchase price over the fair values of assets and liabilities is recorded as goodwill. |
| **REP** | retail electric provider |
| **SEC** | US Securities and Exchange Commission |
| **Securities Act** | Securities Act of 1933, as amended |
| **Sponsor Group** | Refers collectively to certain investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P., TPG Management, L.P. and GS Capital Partners, an affiliate of Goldman Sachs & Co., that have an ownership interest in Texas Holdings. |

F-3

Highly Confidential

EFH2D10011450

EFH2D10011220

**PX 074**
**Page 231 of 255**

| | |
|---|---|
| **TCEH** . . . . . . . . . . . . . . . . . . . . . . . . . | Refers to Texas Competitive Electric Holdings Company LLC, a direct, wholly-owned subsidiary of Energy Future Competitive Holdings Company and an indirect subsidiary of EFH Corp., and/or its subsidiaries, depending on context. |
| **TCRF** . . . . . . . . . . . . . . . . . . . . . . . . . | transmission cost recovery factor |
| **Texas Holdings** . . . . . . . . . . . . . . . . . | Refers to Texas Energy Future Holdings Limited Partnership, a limited partnership controlled by the Sponsor Group that owns substantially all of the common stock of EFH Corp. |
| **Texas Holdings Group** . . . . . . . . . . . | Refers to Texas Holdings and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities. |
| **Texas Transmission** . . . . . . . . . . . . . | Refers to Texas Transmission Investment LLC, a limited liability company that owns a 19.75% equity interest in Oncor. Texas Transmission is an entity indirectly owned by a private investment group led by OMERS Administration Corporation, acting through its infrastructure investment entity, Borealis Infrastructure Management Inc., and the Government of Singapore Investment Corporation, acting through its private equity and infrastructure arm, GIC Special Investments Pte Ltd. Texas Transmission is not affiliated with EFH Corp., any of EFH Corp.'s subsidiaries or any member of the Sponsor Group. |
| **TXU Energy** . . . . . . . . . . . . . . . . . . . . . | Refers to TXU Energy Retail Company LLC, a direct, wholly-owned subsidiary of TCEH engaged in the retail sale of electricity to residential and business customers. TXU Energy is a REP in competitive areas of ERCOT. |
| **US** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | United States of America |
| **VIE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . | variable interest entity |

These financial statements occasionally make references to Oncor Holdings or Oncor when describing actions, rights or obligations of their respective subsidiaries. References to "we," "our," "us" and "the company" are to Oncor Holdings and/or its direct or indirect subsidiaries as apparent in the context. These references reflect the fact that the subsidiaries are consolidated with their respective parent companies for financial reporting purposes. However, these references should not be interpreted to imply that the parent company is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or that the subsidiary company is undertaking an action or has the rights or obligations of its parent company or any other affiliate.

F-4

Highly Confidential

EFH2D10011451

EFH2D10011220

**PX 074**
**Page 232 of 255**

ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC

CONDENSED STATEMENTS OF CONSOLIDATED INCOME

(Unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (millions of dollars) | | | |
| Operating revenues: | | | | |
| Affiliated | $281 | $309 | $ 746 | $ 798 |
| Nonaffiliated | 644 | 588 | 1,790 | 1,561 |
| Total operating revenues | 925 | 897 | 2,536 | 2,359 |
| Operating expenses: | | | | |
| Wholesale transmission service | 123 | 113 | 378 | 322 |
| Operation and maintenance | 169 | 168 | 495 | 477 |
| Depreciation and amortization | 201 | 190 | 577 | 540 |
| Income taxes (Note 9) | 89 | 94 | 198 | 181 |
| Taxes other than income taxes | 113 | 107 | 313 | 297 |
| Total operating expenses | 695 | 672 | 1,961 | 1,817 |
| Operating income | 230 | 225 | 575 | 542 |
| Other income and deductions: | | | | |
| Other income (Note 10) | 6 | 8 | 20 | 23 |
| Other deductions (Note 10) | 1 | 2 | 4 | 7 |
| Nonoperating income taxes | 6 | 7 | 23 | 23 |
| Interest income | 3 | 7 | 24 | 25 |
| Interest expense and related charges (Note 10) | 96 | 89 | 279 | 265 |
| Net income | 136 | 142 | 313 | 295 |
| Net income attributable to noncontrolling interests | (27) | (29) | (64) | (60) |
| Net income attributable to Oncor Holdings | $109 | $113 | $ 249 | $ 235 |

See Notes to Financial Statements.

F-5

Highly Confidential

EFH2D10011452

EFH2D10011220

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**

**CONDENSED STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME**
**(Unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (millions of dollars) | | | |
| Net income ............................................... | $136 | $142 | $313 | $295 |
| Other comprehensive income: | | | | |
|   Cash flow hedges: | | | | |
|     Net decrease in fair value of derivatives (net of tax benefit of —, $17, — and $17) (Note 1) ........... | — | (30) | — | (30) |
|     Derivative value net loss recognized in net income (net of tax) ..................................... | 1 | — | 3 | — |
| Comprehensive income.................................... | 137 | 112 | 316 | 265 |
| Comprehensive income attributable to noncontrolling interests................................................ | (28) | (23) | (65) | (54) |
| Comprehensive income attributable to Oncor Holdings........ | $109 | $ 89 | $251 | $211 |

See Notes to Financial Statements.

F-6

Highly Confidential

ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC

CONDENSED STATEMENTS OF CONSOLIDATED CASH FLOWS
(Unaudited)

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2012 | 2011 |
| | (millions of dollars) | |
| Cash flows—operating activities: | | |
| Net income. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 313 | $ 295 |
| Adjustments to reconcile net income to cash provided by operating activities: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| Depreciation and amortization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 600 | 549 |
| Deferred income taxes—net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 172 | 203 |
| Amortization of investment tax credits . . . . . . . . . . . . . . . . . . . . . . . . | (3) | (3) |
| Other—net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1) | 1 |
| Deferred revenues (Note 1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (96) | 24 |
| Changes in other operating assets and liabilities . . . . . . . . . . . . . . . . . . . . | (194) | (198) |
| Cash provided by operating activities . . . . . . . . . . . . . . . . . . . . . . . . | 791 | 871 |
| Cash flows—financing activities: | | |
| Issuances of long-term debt (Note 5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 900 | — |
| Repayments of long-term debt (Note 5) . . . . . . . . . . . . . . . . . . . . . . . . . . | (979) | (76) |
| Net increase in short-term borrowings (Note 4) . . . . . . . . . . . . . . . . . . . . | 392 | 176 |
| Distributions to parent (Note 7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (100) | (64) |
| Distributions to noncontrolling interests (Note 7) . . . . . . . . . . . . . . . . . . | (31) | (16) |
| Decrease in note receivable from TCEH (Note 9) . . . . . . . . . . . . . . . . . . | 20 | 28 |
| Sale of related-party agreements (Note 9) . . . . . . . . . . . . . . . . . . . . . . . . | 159 | — |
| Debt discount, financing and reacquisition expenses—net . . . . . . . . . . . . | (45) | (2) |
| Other—net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1) | — |
| Cash provided by financing activities . . . . . . . . . . . . . . . . . . . . . . . . | 315 | 46 |
| Cash flows—investing activities: | | |
| Capital expenditures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,113) | (945) |
| Other—net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | (3) |
| Cash used in investing activities . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,109) | (948) |
| Net change in cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . | (3) | (31) |
| Cash and cash equivalents—beginning balance . . . . . . . . . . . . . . . . . . . . | 12 | 33 |
| Cash and cash equivalents—ending balance . . . . . . . . . . . . . . . . . . . . . . | $ 9 | $ 2 |

See Notes to Financial Statements.

F-7

Highly Confidential

ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC

CONDENSED CONSOLIDATED BALANCE SHEETS
(Unaudited)

| | September 30, 2012 | December 31, 2011 |
|---|---|---|
| | (millions of dollars) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 9 | $ 12 |
| Restricted cash—Bondco (Note 10) | 64 | 57 |
| Trade accounts receivable from nonaffiliates—net (Note 10) | 375 | 303 |
| Trade accounts and other receivables from affiliates (Note 9) | 154 | 179 |
| Materials and supplies inventories—at average cost | 72 | 71 |
| Accumulated deferred income taxes | 39 | 73 |
| Prepayments and other current assets | 74 | 74 |
| Total current assets | 787 | 769 |
| Restricted cash—Bondco (Note 10) | 16 | 16 |
| Receivable from TCEH related to nuclear plant decommissioning (Note 9) | 286 | 225 |
| Investments and other property (Note 10) | 78 | 73 |
| Property, plant and equipment—net (Note 10) | 11,191 | 10,569 |
| Goodwill (Note 10) | 4,064 | 4,064 |
| Note receivable due from TCEH (Note 9) | — | 138 |
| Regulatory assets—net—Oncor (Note 3) | 1,185 | 1,078 |
| Regulatory assets—net—Bondco (Note 3) | 357 | 427 |
| Other noncurrent assets | 77 | 73 |
| Total assets | $18,041 | $17,432 |
| **LIABILITIES AND MEMBERSHIP INTERESTS** | | |
| Current liabilities: | | |
| Short-term borrowings (Note 4) | $ 784 | $ 392 |
| Long-term debt due currently—Oncor (Note 5) | — | 376 |
| Long-term debt due currently—Bondco (Note 5) | 123 | 118 |
| Trade accounts payable | 111 | 197 |
| Income taxes payable to EFH Corp. (Note 9) | 17 | 2 |
| Accrued taxes other than income taxes | 130 | 151 |
| Accrued interest | 91 | 108 |
| Other current liabilities | 110 | 112 |
| Total current liabilities | 1,366 | 1,456 |
| Long-term debt, less amounts due currently—Oncor (Note 5) | 5,090 | 4,711 |
| Long-term debt, less amounts due currently—Bondco (Note 5) | 350 | 433 |
| Accumulated deferred income taxes (Note 9) | 1,750 | 1,688 |
| Investment tax credits | 25 | 28 |
| Other noncurrent liabilities and deferred credits (Note 10) | 1,944 | 1,832 |
| Total liabilities | 10,525 | 10,148 |
| Commitments and Contingencies (Note 6) | | |
| Membership interests (Note 7): | | |
| Capital account | 5,893 | 5,745 |
| Accumulated other comprehensive loss | (23) | (25) |
| Oncor Holdings membership interest | 5,870 | 5,720 |
| Noncontrolling interests in subsidiary | 1,646 | 1,564 |
| Total membership interests | 7,516 | 7,284 |
| Total liabilities and membership interests | $18,041 | $17,432 |

See Notes to Financial Statements.

F-8

Highly Confidential

EFH2D10011455

EFH2D10011220

ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)

**1.    BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES**

*Description of Business*

References in this report to "we," "our," "us" and "the company" are to Oncor Holdings and/or its direct or indirect subsidiaries as apparent in the context. The financial statements reflect almost entirely the operations of Oncor; consequently, there are no separate reportable business segments. See "Glossary" for definition of terms and abbreviations.

We are a Dallas, Texas-based holding company whose financial statements reflect almost entirely the operations of our direct, majority (approximately 80%) owned subsidiary, Oncor. Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell power in the north-central, eastern and western parts of Texas. Revenues from TCEH represented 29% and 34% of total revenues for the nine months ended September 30, 2012 and 2011, respectively. We are a direct, wholly-owned subsidiary of EFIH, a direct, wholly-owned subsidiary of EFH Corp. EFH Corp. is a subsidiary of Texas Holdings, which is controlled by the Sponsor Group.

Our consolidated financial statements include the indirect, bankruptcy-remote financing subsidiary, Bondco, a VIE. This financing subsidiary was organized for the limited purpose of issuing certain transition bonds in 2003 and 2004. Bondco issued $1.3 billion principal amount of transition bonds to recover generation-related regulatory asset stranded costs and other qualified costs under an order issued by the PUCT in 2002.

Various "ring-fencing" measures have been taken to enhance the separateness between the Oncor Ring-Fenced Entities and the Texas Holdings Group and our credit quality. These measures serve to mitigate our and Oncor's credit exposure to the Texas Holdings Group and to reduce the risk that our assets and liabilities or those of Oncor would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities. Such measures include, among other things: Oncor's sale of a 19.75% equity interest to Texas Transmission in November 2008; maintenance of separate books and records for the Oncor Ring-Fenced Entities; our board of directors and Oncor's board of directors being comprised of a majority of independent directors; and prohibitions on the Oncor Ring-Fenced Entities providing credit support to, or receiving credit support from, any member of the Texas Holdings Group. The assets and liabilities of the Oncor Ring-Fenced Entities are separate and distinct from those of the Texas Holdings Group, including TXU Energy and Luminant, and none of the assets of the Oncor Ring-Fenced Entities are available to satisfy the debt or contractual obligations of any member of the Texas Holdings Group. We and Oncor do not bear any liability for debt or contractual obligations of the Texas Holdings Group, and vice versa. Accordingly, our operations are conducted, and our cash flows are managed, independently from the Texas Holdings Group.

*Basis of Presentation*

Our condensed consolidated financial statements have been prepared in accordance with US GAAP and on the same basis as our 2011 Audited Financial Statements. Adjustments (consisting of normal recurring accruals) necessary for a fair presentation of the results of operations and financial position have been included therein. All intercompany items and transactions have been eliminated in consolidation. Certain information and footnote disclosures normally included in annual consolidated financial statements prepared in accordance with US GAAP have been omitted pursuant to the rules

F-9

and regulations of the SEC. Because the condensed consolidated interim financial statements do not include all of the information and footnotes required by US GAAP, they should be read in conjunction with the audited financial statements and related notes included in our 2011 Audited Financial Statements. The results of operations for an interim period may not give a true indication of results for a full year due to seasonality. All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated. Subsequent events have been evaluated through October 29, 2012, the date these consolidated financial statements were made available for issuance.

From time to time, certain prior period amounts are reclassified to conform to the current period presentation. As disclosed in the condensed consolidated statements of consolidated cash flows included in this report, the amount previously reported as changes in deferred advanced metering system revenues for the nine months ended September 30, 2011 is included in and reported as deferred revenues to conform to the current period presentation. In addition to deferred advanced metering system revenues, other reconcilable revenues (TCRF and energy efficiency surcharges), which were previously reported as changes in other operating assets and liabilities, are included in and reported as deferred revenues.

### Use of Estimates

Preparation of our financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including fair value measurements. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information.

### Derivative Instruments and Mark-to-Market Accounting

Oncor has from time-to-time entered into derivative instruments to hedge interest rate risk. If the instrument meets the definition of a derivative under accounting standards related to derivative instruments and hedging activities, the fair value of each derivative is recognized on the balance sheet as a derivative asset or liability and changes in the fair value are recognized in net income, unless criteria for certain exceptions are met. This recognition is referred to as "mark-to-market" accounting.

Because derivative instruments are frequently used as economic hedges, accounting standards related to derivative instruments and hedging activities allow for "hedge accounting," which provides for the designation of such instruments as cash flow or fair value hedges if certain conditions are met. A cash flow hedge mitigates the risk associated with the variability of the future cash flows related to an asset or liability (e.g., debt with variable interest rate payments), while a fair value hedge mitigates risk associated with fixed future cash flows (e.g., debt with fixed interest rate payments). In accounting for cash flow hedges, derivative assets and liabilities are recorded on the balance sheet at fair value with an offset to other comprehensive income to the extent the hedges are effective. Amounts remain in accumulated other comprehensive income and are reclassified into net income as the related transactions (hedged items) settle and affect net income. If the hedged transaction becomes probable of not occurring, hedge accounting is discontinued and the amount recorded in other comprehensive income is immediately reclassified into net income. Fair value hedges are recorded as derivative assets or liabilities with an offset to net income, and the carrying value of the related asset or liability (hedged item) is adjusted for changes in fair value with an offset to net income. If the fair value hedge is settled prior to the maturity of the hedged item, the cumulative fair value gain or loss associated with the hedge is amortized into income over the remaining life of the hedged item. To qualify for hedge accounting, a hedge must be considered highly effective in offsetting changes in fair value of the hedged item. Assessment of the hedge's effectiveness is tested at least quarterly throughout its term to

F-10

Highly Confidential                                                                 EFH2D10011457

EFH2D10011220

continue to qualify for hedge accounting. Hedge ineffectiveness, even if the hedge continues to be assessed as effective, is immediately recognized in net income. Ineffectiveness is generally measured as the cumulative excess, if any, of the change in value of the hedging instrument over the change in value of the hedged item.

### Reconcilable Tariffs

The PUCT has designated certain tariffs (TCRF, energy efficiency and advanced meter surcharges and charges related to transition bonds) as reconcilable, which means the differences between amounts billed under these tariffs and the related incurred expenses are deferred as either regulatory assets or regulatory liabilities. Accordingly, at prescribed intervals, future tariffs are adjusted to either repay regulatory liabilities or collect regulatory assets.

### Adoption of New Accounting Standard

In May 2011, the Financial Accounting Standards Board (FASB) issued "*Accounting Standards Update 2011-05*" relating to the presentation of Comprehensive Income within financial statements. Effective January 1, 2012, we adopted the new standard. Adoption of the new standard did not affect our reported results of operations, financial condition or cash flows.

### 2.    REGULATORY MATTERS

### 2011 Rate Review

In January 2011, Oncor filed a rate review with the PUCT and 203 original jurisdiction cities based on a test year ended June 30, 2010 (PUCT Docket No. 38929). In April 2011, Oncor and the other parties reached a Memorandum of Settlement that would settle and resolve all issues in the rate review. Oncor filed a stipulation (including a proposed order and proposed tariffs) in May 2011 that incorporated the Memorandum of Settlement along with pleadings and other documentation (Stipulation) for the purpose of obtaining final approval of the settlement. The terms of the Stipulation include an approximate $137 million base rate increase and additional provisions to address franchise fees (discussed below) and other expenses. Approximately $93 million of the increase became effective July 1, 2011, and the remainder became effective January 1, 2012. Under the Stipulation, amortization of regulatory assets increased by approximately $24 million ($14 million of which will be recognized as tax expense) annually beginning January 1, 2012. The Stipulation did not change Oncor's authorized regulatory capital structure of 60% debt and 40% equity or its authorized return on equity of 10.25%. Under the terms of the Stipulation, Oncor cannot file another general base rate review prior to July 1, 2013, but is not restricted from filing wholesale transmission rate, TCRF, distribution-related investment and other rate updates and adjustments permitted by Texas state law and PUCT rules.

In response to concerns raised by PUCT Commissioners at a July 2011 PUCT open meeting regarding the Stipulation, Oncor filed a modified stipulation that removed from the Stipulation a one-time payment to certain cities it serves for retrospective franchise fees (Modified Stipulation). Instead, pursuant to the terms of a separate agreement with certain cities it serves, through September 30, 2012, Oncor has made approximately $22 million in retrospective franchise fee payments to cities that accepted the terms of the separate agreement. The payments are subject to refund from the cities or recovery from customers after final resolution of proceedings related to the appeals from Oncor's June 2008 rate review filing (discussed below). No other significant terms of the Stipulation were revised. In August 2011, the PUCT issued a final order approving the settlement terms contained in the Modified Stipulation.

Effective July 1, 2011, pursuant to the PUCT's final order, Oncor no longer recovers the cost of wholesale transmission service through base rates, and wholesale transmission service expenses

Highly Confidential                                                                EFH2D10011458

incurred are reconcilable to revenues billed under the TCRF rider. For this purpose, all wholesale transmission service expenses consist of amounts charged under a PUCT-approved transmission tariff including Oncor's own wholesale transmission tariff. Oncor accounts for the difference between amounts charged under the TCRF rate and wholesale transmission service expense as a regulatory asset or regulatory liability (under- or over-recovered wholesale transmission service expense (see Note 1)). At September 30, 2012, approximately $51 million was deferred as under-recovered wholesale transmission service expense (see Note 3).

### 2008 Rate Review

In August 2009, the PUCT issued a final order with respect to Oncor's June 2008 rate review filing with the PUCT and 204 cities based on a test year ended December 31, 2007 (PUCT Docket No. 35717), and new rates were implemented in September 2009. In November 2009, the PUCT issued an order on rehearing that established a new rate class but did not change the revenue requirements. Oncor and four other parties appealed various portions of the rate review final order to a state district court, and oral argument was held in October 2010. In January 2011, the district court signed its judgment reversing the PUCT with respect to two issues: the PUCT's disallowance of certain franchise fees and the PUCT's decision that PURA no longer requires imposition of a rate discount for state colleges and universities. Oncor filed an appeal with the Texas Third Court of Appeals (Austin Court of Appeals) in February 2011 with respect to the issues it appealed to the district court and did not prevail upon, as well as the district court's decision to reverse the PUCT with respect to discounts for state colleges and universities. Oral argument before the Austin Court of Appeals was completed in April 2012. There is no deadline for the court to act. Oncor is unable to predict the outcome of the appeal.

### Stipulation Approved by the PUCT

In April 2008, the PUCT entered an order (PUCT Docket No. 34077), which became final in June 2008, approving the terms of a stipulation relating to a filing in 2007 by Oncor and Texas Holdings with the PUCT pursuant to Section 14.101(b) of PURA and PUCT Substantive Rule 25.75. Among other things, the stipulation required Oncor to file a rate review no later than July 1, 2008 based on a test year ended December 31, 2007, which it filed in June 2008. The PUCT issued a final order with respect to the rate review in August 2009. In July 2008, Nucor Steel filed an appeal of the PUCT's order in the 200th District Court of Travis County, Texas (District Court). A hearing on the appeal was held in June 2010, and the District Court affirmed the PUCT order in its entirety. Nucor Steel appealed that ruling to the Austin Court of Appeals in July 2010. In March 2012, the Austin Court of Appeals affirmed the District Court's ruling, which is now final.

F-12

Highly Confidential

EFH2D10011459

EFH2D10011220

## 3.    REGULATORY ASSETS AND LIABILITIES

Recognition of regulatory assets and liabilities and the amortization periods over which they are expected to be recovered or refunded through rate regulation reflect the decisions of the PUCT. Components of the regulatory assets and liabilities are provided in the table below. Amounts not earning a return through rate regulation are noted.

| | Remaining Rate Recovery/Amortization Period at September 30, 2012 | Carrying Amount | |
| | | September 30, 2012 | December 31, 2011 |
| --- | --- | --- | --- |
| Regulatory assets: | | | |
| Generation-related regulatory assets securitized by transition bonds (a)(f) | 4 years | $ 441 | $ 531 |
| Employee retirement costs | 8 years | 91 | 103 |
| Employee retirement costs to be reviewed (b)(c) | To be determined | 96 | 74 |
| Employee retirement liability (a)(c)(d) | To be determined | 808 | 707 |
| Self-insurance reserve (primarily storm recovery costs)—net | 8 years | 198 | 221 |
| Self-insurance reserve to be reviewed (b)(c) | To be determined | 121 | 71 |
| Securities reacquisition costs (pre-industry restructure) | 5 years | 43 | 48 |
| Securities reacquisition costs (post-industry restructure)—net | Terms of related debt | 29 | 2 |
| Recoverable amounts in lieu of deferred income taxes—net | Life of related asset or liability | 80 | 104 |
| Rate review expenses (a) | Largely 3 years | 7 | 11 |
| Rate review expenses to be reviewed (b)(c) | To be determined | 1 | 1 |
| Advanced meter customer education costs (c) | 8 years | 10 | 9 |
| Deferred conventional meter depreciation | 8 years | 142 | 107 |
| Energy efficiency performance bonus (a) | 1 year | 11 | 8 |
| Under-recovered wholesale transmission service expense (a)(c) | 1 year | 51 | — |
| Wholesale transmission settlement costs | Not applicable | — | 9 |
| Other regulatory assets | Not applicable | — | 1 |
| Total regulatory assets | | 2,129 | 2,007 |
| Regulatory liabilities: | | | |
| Nuclear decommissioning cost over-recovery (a)(c)(e) | Not applicable | 286 | 225 |
| Estimated net removal costs | Life of utility plant | 212 | 115 |
| Committed spending for demand-side management initiatives (a) | 1 year | 6 | 25 |
| Deferred advanced metering system revenues | 8 years | 13 | 52 |
| Investment tax credit and protected excess deferred taxes | Various | 29 | 33 |
| Over-collection of transition bond revenues (a)(f) | 4 years | 38 | 37 |
| Over-recovered wholesale transmission service expense (a)(c) | 1 year | — | 13 |
| Energy efficiency programs (a) | Not applicable | 3 | 2 |
| Total regulatory liabilities | | 587 | 502 |
| Net regulatory asset | | $1,542 | $1,505 |

F-13

EFH2D10011460

EFH2D10011220
PX 074
Page 241 of 255

---

(a)  Not earning a return in the regulatory rate-setting process.
(b)  Costs incurred since the period covered under the last rate review.
(c)  Recovery is specifically authorized by statute or by the PUCT, subject to reasonableness review.
(d)  Represents unfunded liabilities recorded in accordance with pension and OPEB accounting standards.
(e)  Offset by an intercompany receivable from TCEH. See Note 9.
(f)  Bondco net regulatory assets of $357 million at September 30, 2012 consisted of $395 million included in generation-related regulatory assets net of the regulatory liability for over-collection of transition bond revenues of $38 million. Bondco net regulatory assets of $427 million at December 31, 2011 consisted of $464 million included in generation-related regulatory assets net of the regulatory liability for over-collection of transition bond revenues of $37 million.

## 4.   BORROWINGS UNDER CREDIT FACILITIES

At September 30, 2012, Oncor had a $2.4 billion secured revolving credit facility (reflecting a May 2012 $400 million commitment increase as discussed below) to be used for working capital and general corporate purposes, issuances of letters of credit and support for any commercial paper issuances. The revolving credit facility expires in October 2016, and Oncor has the option of requesting up to two one-year extensions, with such extensions subject to certain conditions and lender approval. Pursuant to the terms of the revolving credit facility, Oncor requested and received a $400 million increase in commitments under the revolving credit facility effective May 15, 2012. The terms of the revolving credit facility allow Oncor to request an additional increase in the borrowing capacity of $100 million, provided certain conditions are met, including lender approval.

Borrowings under the revolving credit facility are classified as short-term on the balance sheet and are secured equally and ratably with all of Oncor's other secured indebtedness by a first priority lien on property Oncor acquired or constructed for the transmission and distribution of electricity. The property is mortgaged under the Deed of Trust.

At September 30, 2012, Oncor had outstanding borrowings under the revolving credit facility totaling $784 million with an interest rate of 1.47% and outstanding letters of credit totaling $6 million. At December 31, 2011, Oncor had outstanding borrowings under the revolving credit facility totaling $392 million with an interest rate of 1.40% and outstanding letters of credit totaling $6 million. At September 30, 2012, all outstanding borrowings bore interest at LIBOR plus 1.25%, letters of credit bore interest at 1.25%, and a commitment fee (at a rate of 0.175% per annum) was payable on the unfunded commitments under the facility, each based on Oncor's current credit ratings. Amounts borrowed under the facility, once repaid, can be borrowed again from time to time.

Subject to the limitations described below, borrowing capacity available under the credit facility at September 30, 2012 and December 31, 2011 was $1.610 billion and $1.602 billion, respectively. Generally, Oncor's indentures and revolving credit facility limit the incurrence of other secured indebtedness except for indebtedness secured equally and ratably with the indentures and revolving credit facility and certain permitted exceptions. As described further in Note 7 to our 2011 Audited Financial Statements, the Deed of Trust permits Oncor to secure indebtedness (including borrowings under the revolving credit facility) with the lien of the Deed of Trust up to the aggregate of (i) the amount of available bond credits, and (ii) 85% of the lower of the fair value or cost of certain property additions that could be certified to the Deed of Trust collateral agent. At September 30, 2012, the available bond credits were approximately $2.141 billion and the amount of additional potential indebtedness that could be secured by property additions, subject to a certification process, was $475 million. At September 30, 2012, the available borrowing capacity of the revolving credit facility could be fully drawn.

F-14

5.   **LONG-TERM DEBT**

At September 30, 2012 and December 31, 2011, our long-term debt consisted of the following:

| | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Oncor (a): | | |
| 6.375% Fixed Senior Notes due May 1, 2012 | $ — | $ 376 |
| 5.950% Fixed Senior Notes due September 1, 2013 | — | 524 |
| 6.375% Fixed Senior Notes due January 15, 2015 | 500 | 500 |
| 5.000% Fixed Senior Notes due September 30, 2017 | 324 | 324 |
| 6.800% Fixed Senior Notes due September 1, 2018 | 550 | 550 |
| 5.750% Fixed Senior Notes due September 30, 2020 | 126 | 126 |
| 4.100% Fixed Senior Notes due June 1, 2022 | 400 | — |
| 7.000% Fixed Debentures due September 1, 2022 | 800 | 800 |
| 7.000% Fixed Senior Notes due May 1, 2032 | 500 | 500 |
| 7.250% Fixed Senior Notes due January 15, 2033 | 350 | 350 |
| 7.500% Fixed Senior Notes due September 1, 2038 | 300 | 300 |
| 5.250% Fixed Senior Notes due September 30, 2040 | 475 | 475 |
| 4.550% Fixed Senior Notes due December 1, 2041 | 300 | 300 |
| 5.300% Fixed Senior Notes due June 1, 2042 | 500 | — |
| Unamortized discount | (35) | (38) |
| Less amounts due currently | — | (376) |
| Total Oncor | 5,090 | 4,711 |
| Oncor Electric Delivery Transition Bond Company LLC (b): | | |
| 4.950% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2013 | 10 | 56 |
| 5.420% Fixed Series 2003 Bonds due in semiannual installments through August 15, 2015 | 145 | 145 |
| 4.810% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2012 | 30 | 63 |
| 5.290% Fixed Series 2004 Bonds due in semiannual installments through May 15, 2016 | 290 | 290 |
| Unamortized fair value discount related to transition bonds | (2) | (3) |
| Less amount due currently | (123) | (118) |
| Total Oncor Electric Delivery Transition Bond Company LLC | 350 | 433 |
| Total long-term debt (c) | $5,440 | $5,144 |

_____

(a)   Secured by first priority lien on certain transmission and distribution assets equally and ratably with all of Oncor's other secured indebtedness. See "Deed of Trust Amendment" in Note 7 to Financial Statements included in our 2011 Audited Financial Statements for additional information.

(b)   The transition bonds are nonrecourse to Oncor and were issued to securitize a regulatory asset.

(c)   According to our organizational documents, Oncor Holdings (parent) is prohibited from directly incurring indebtedness for borrowed money.

***Debt-Related Activity in 2012***

*Debt Repayments*

Repayments of long-term debt in 2012 totaled $979 million and represent $376 million principal amount of Oncor's 6.375% senior secured notes paid at the scheduled maturity date of May 1, 2012,

F-15

Highly Confidential

the redemption of $524 million principal amount of Oncor's 5.950% senior secured notes due September 1, 2013 (2013 Notes) as discussed below and $79 million principal amount of transition bonds paid at scheduled maturity dates.

In June 2012, pursuant to the terms of the indenture and officer's certificate governing the 2013 Notes, Oncor redeemed all of the 2013 Notes. Oncor paid a redemption price equal to 100% of the principal amount of the 2013 Notes plus a make-whole amount of $33 million. For accounting purposes, the make-whole amount has been deferred as a regulatory asset and will be amortized to interest expense until September 1, 2013, the original maturity date of the 2013 Notes (see Note 3).

*Issuance of New Senior Secured Notes*

In May 2012, Oncor issued $400 million aggregate principal amount of 4.100% senior secured notes maturing in June 2022 (2022 Notes) and $500 million aggregate principal amount of 5.300% senior secured notes maturing in June 2042 (2042 Notes, and collectively with the 2022 Notes, the Notes). Oncor used the proceeds (net of the initial purchasers' discount, fees and expenses) of approximately $890 million from the sale of the Notes to repay borrowings under the revolving credit facility, redeem the 2013 Notes (as discussed above) and for other general corporate purposes. The Notes are secured equally and ratably with all of Oncor's other secured indebtedness pursuant to the Deed of Trust by a first priority lien on property Oncor acquired or constructed for the transmission and distribution of electricity.

Interest on the Notes is payable in cash semiannually in arrears on June 1 and December 1 of each year, beginning on December 1, 2012. Oncor may at its option at any time and from time to time redeem all or part of the Notes at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a make-whole premium. The Notes also contain customary events of default, including failure to pay principal or interest on the Notes when due.

The Notes were issued in a private placement, and in August 2012 Oncor offered holders of the Notes the opportunity to exchange their respective Notes for notes that have terms identical in all material respects to the Notes (Exchange Notes), except that the Exchange Notes do not contain terms with respect to transfer restrictions, registration rights and payment of additional interest for failure to observe certain obligations in a certain registration rights agreement. The Exchange Notes were registered on a Form S-4, which was declared effective in July 2012.

*Interest Rate Hedge Transaction*

In August 2011, Oncor entered into an interest rate hedge transaction hedging the variability of treasury bond rates used to determine interest rates on an anticipated issuance of its senior secured notes (see Note 7 to Financial Statements included in our 2011 Audited Financial Statements for information regarding the debt issuance). The hedges were terminated in November 2011 upon the issuance of the senior secured notes. Oncor recognized the $46 million ($29 million after tax) loss related to the fair value of the hedge transaction in accumulated other comprehensive income, which is expected to be reclassified into net income over the life of the senior secured notes issued.

***Fair Value of Long-Term Debt***

At September 30, 2012 and December 31, 2011, the estimated fair value of our long-term debt (including current maturities) totaled $6.471 billion and $6.705 billion, respectively, and the carrying amount totaled $5.563 billion and $5.638 billion, respectively. The fair values are estimated based upon market values as determined by quoted market prices, representing Level 1 valuations under accounting standards related to the determination of fair value.

F-16

Highly Confidential