## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**DECLARATION OF PAUL KEGLEVIC, EXECUTIVE VICE PRESIDENT, CHIEF FINANCIAL OFFICER, AND CO-CHIEF RESTRUCTURING OFFICER OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, IN SUPPORT OF FIRST DAY MOTIONS**

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.



EXHIBIT
Horton
4

**PX 095**
**Page 1 of 464**

## TABLE OF CONTENTS

|  |  | **Page** |
|---|---|---|
| **Part I. EFH's Business Operations and Capital Structure** | | **10** |
| A. | Overview of EFH's Corporate Structure. | 10 |
| B. | EFH's Business Operations | 12 |
| | 1. | TCEH | 12 |
| | 2. | EFH Corp. and Certain EFH Corp. Subsidiaries | 22 |
| | 3. | EFIH | 26 |
| | 4. | Oncor | 26 |
| | 5. | EFH's Regulatory Environment | 28 |
| C. | EFH's Capital Structure. | 30 |
| | 1. | TCEH Debtors | 30 |
| | 2. | EFH Corp. and EFIH | 37 |
| | 3. | Oncor | 43 |
| **Part II. The Events Leading to the Chapter 11 Cases** | | **44** |
| A. | History of EFH Corp | 44 |
| B. | The 2007 Acquisition | 45 |
| C. | EFH Following the 2007 Acquisition | 46 |
| | 1. | Luminant Remains a Market Leader in All Aspects of Electricity Generation and Wholesale Operations | 48 |
| | 2. | TXU Energy Remains a Market-Leading REP | 50 |
| | 3. | Other Initiatives | 52 |
| D. | The Result of Low Natural Gas Prices on EFH's Financial Performance Following the 2007 Acquisition | 52 |
| | 1. | The Texas Electricity Market and the Role of ERCOT | 53 |
| | 2. | The Precipitous Drop in Natural Gas Prices Resulting From the Development of Unconventional Natural Gas | 58 |
| | 3. | The Effect of Low Natural Gas Prices on EFH | 61 |
| E. | Other Market Conditions Affecting TCEH's Performance | 64 |
| F. | EFH's Financial Outlook and Business Strategy Going Forward | 66 |
| G. | EFH's Reorganization Efforts | 67 |
| | 1. | EFH Implements Financial Transactions | 67 |
| | 2. | Restructuring Negotiations | 70 |
| | 3. | The Restructuring Support Agreement | 75 |
| | 4. | The Debtors Commence the Chapter 11 Cases | 80 |
| **Part III. Overview of First Day Relief** | | **81** |

i

**PX 095**
**Page 2 of 464**

## EXHIBITS

EXHIBIT A        Evidentiary Support for First Day Motions

EXHIBIT B        List of the Debtors

EXHIBIT C        Corporate Structure

EXHIBIT D        Restructuring Support Agreement

Pursuant to 28 U.S.C. § 1746, I, Paul Keglevic, hereby declare as follows under penalty of perjury:

1.     I am the Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp. ("EFH Corp.") a corporation organized under the laws of the state of Texas; its direct subsidiary, Energy Future Competitive Holdings Company LLC ("EFCH"), a limited liability company organized under the laws of the state of Delaware; EFCH's direct subsidiary, Texas Competitive Electric Holdings Company LLC ("TCEH LLC" and, together with EFCH and TCEH LLC's direct and indirect subsidiaries, "TCEH," and the entities composing TCEH that are debtors in these chapter 11 cases, the "TCEH Debtors"), a limited liability company organized under the laws of the state of Delaware; and EFH Corp.'s direct subsidiary, Energy Future Intermediate Holding Company LLC ("EFIH"), a limited liability company organized under the laws of the state of Delaware. EFH Corp., various other direct and indirect subsidiaries of EFH Corp. that are debtors in these chapter 11 cases, the TCEH Debtors, and EFIH are collectively referred to as the "Debtors" in this declaration (this "First Day Declaration") and are listed on **Exhibit B** hereto.[1]

2.     I have worked for the Debtors since 2008. I am generally familiar with the Debtors' businesses, day-to-day operations, financial matters, results of operations, cash flows, and underlying books and records. Except as otherwise indicated in this First Day Declaration, all facts set forth in this declaration are based upon my personal knowledge of the Debtors'

---

[1]     EFH Corp., through EFCH and TCEH LLC, indirectly owns 100% of each of the entities composing Luminant (as defined herein) and TXU Energy (as defined herein), along with EFH's other retail electricity sales operations, with the exception of two joint venture entities with relatively small amounts of assets. Each of TCEH LLC's direct and indirect subsidiaries, other than Greenway Development Holding Company LLC, Collin G/G&B LLC, Nuclear Energy Future Holdings LLC, Nuclear Energy Future Holdings II LLC, and Comanche Peak Nuclear Power Company LLC, are TCEH Debtors. EFIH owns 100% of Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings"), which owns approximately 80% of Oncor Electric Delivery Company LLC ("Oncor").

businesses, operations, and related financial information gathered from my review of their books and records, relevant documents, and information supplied to me by members of the Debtors' management team and advisors. I am over the age of 18 and authorized by the Debtors' Boards of Directors and Managers (as applicable) to submit this declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this First Day Declaration.

3.      The Debtors have requested a variety of relief in "first day" motions and applications (the "First Day Motions"), filed concurrently herewith, to ensure a smooth transition into chapter 11. I am generally familiar with the contents of each of the First Day Motions, and I believe that the relief sought therein, including the ability to make certain essential payments and otherwise continue their business operations, is necessary to permit continued efficient operations of the Debtors' businesses and an effective transition into chapter 11.

4.      In my opinion, approval of the relief requested in the First Day Motions will minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization. A complete description of the relief requested under the Debtors' First Day Motions, and evidentiary support therefore, is attached to this First Day Declaration as **Exhibit A** and incorporated into this First Day Declaration by reference.

5.      To familiarize the Court with the Debtors and the relief they are seeking on the first day of these chapter 11 cases, this First Day Declaration begins with a Preliminary Statement, which provides an overview of the Debtors and their non-Debtor affiliates (collectively, "EFH"), the facts and circumstances surrounding these chapter 11 cases, and the Debtors' anticipated restructuring. This First Day Declaration is then organized as follows:

**PX 095**
**Page 5 of 464**

- **Part I** describes EFH's business operations and capital structure;

- **Part II** describes the events that led to the commencement of these chapter 11 cases, including a significant decline in wholesale electricity prices that frustrated the investment thesis of a transaction that took EFH private in 2007, the Debtors' efforts to address the challenging environment of low wholesale electricity prices and the Debtors' resulting balance sheet difficulties, the Debtors' negotiations regarding a consensual restructuring with their key stakeholders, the restructuring support agreement (the "Restructuring Support Agreement"), attached hereto as **Exhibit D**, and the anticipated events in these chapter 11 cases; and

- **Part III** provides an overview of the relief requested in the First Day Motions.

### Preliminary Statement

6.     EFH's businesses include the largest generator, distributor, and certified retail provider of electricity (or "REP") in Texas.[2] EFH conducts substantially all of its business operations in the electricity market overseen by the Electric Reliability Council of Texas ("ERCOT"), which covers the majority of Texas.   The Texas electricity market, in turn, is subject to oversight and regulation by the Public Utility Commission of Texas (the "PUC"). EFH has approximately 9,100 employees, approximately 5,700 of whom are employed by the Debtors, in three distinct business units:

- EFH's *competitive electricity generation, mining, wholesale electricity sales, and commodity risk management and trading activities,* conducted by the TCEH Debtors composing "Luminant";

- EFH's *competitive retail electricity sales operations and related operations*, mainly conducted by the TCEH Debtors composing "TXU Energy";[3] and

---

[2]    For financial reporting under Generally Accepted Accounting Principles, EFH Corp. reports information for two segments: the Competitive Electric and Regulated Delivery business segments. The Competitive Electric segment includes both Luminant and TXU Energy in consideration of the highly integrated nature of the competitive business, as evidenced by the centralized management of commodity risk across the business and Luminant's sourcing of all TXU Energy's electricity needs.  The Regulated Delivery segment is composed of Oncor. The Competitive Electric segment is essentially engaged in the production of electricity and the sale of electricity in wholesale and retail channels.

[3]    The Debtors also conduct a relatively small amount of retail electricity operations through their 4Change brand and another entity, Luminant ET Services Company, that provides retail electricity service to one municipality and to some of Luminant's mining operations, and a small amount of retail gas operations through Luminant Energy Company LLC.

3

- EFH's *rate-regulated electricity transmission and distribution operations*, conducted by the non-Debtor Oncor. EFIH indirectly owns approximately 80% of Oncor.

EFH and its management team have significant experience as leaders in the electricity industry.

7.    Luminant owns and operates fourteen power plants comprising 40 generation units. Of those units, 33 units are in active year-round operation, three units (at two plants) are subject to seasonal operation, and four units (at two plants) are idled. Luminant's total nameplate electricity generation capacity[4] of 15,427 megawatts ("MW") accounts for approximately 18% of the generation capacity for the ERCOT market. Luminant sells approximately 50% of its electricity generation output to TXU Energy, and sells the remainder through bi-lateral sales to third parties or through sales directly to ERCOT. Luminant also owns and operates 12 surface lignite coal mines in Texas that supply coal to Luminant's lignite/coal-fueled units.[5] Luminant is the largest coal miner in Texas and the seventh-largest coal miner in the United States.[6] Luminant's generation units and mines are high-performing and have impressive safety records. Moreover, Luminant's commodity trading and risk management activities have also delivered significant value to the Debtors.

8.    TXU Energy sells electricity to approximately 1.7 million residential and business customers, and is the single largest REP by customer count in Texas. TXU Energy serves approximately 26% of the residential customers and approximately 19% of the business customers in the areas of the ERCOT market that are open to competition. TXU Energy

---

[4]    "Nameplate" capacity is an industry-standard term for the original design capacity of an electricity generation unit.

[5]    Of these mines, eight are active, three are in development, and one is currently idle.

[6]    Based on tons of coal mined in 2012.

4

purchases all of its electricity requirements from Luminant. TXU Energy maintains a strong position in the highly competitive ERCOT retail electricity market based on industry-leading customer care performance and technological innovation and has maintained strong performance notwithstanding intense competition.

9.      Oncor is engaged in rate-regulated electricity transmission and distribution activities in Texas. Oncor provides these services, at rates approved by the PUC, to REPs (including TXU Energy) that sell electricity to residential and business customers, as well as to electricity distribution companies, cooperatives, and municipalities. Oncor operates the largest transmission and distribution system in Texas, delivering electricity to more than 3.2 million homes and businesses and operating more than 120,000 miles of transmission and distribution lines. Oncor has the largest geographic service territory of any transmission and distribution utility within the ERCOT market, covering 91 counties and over 400 incorporated municipalities. Importantly, however, Oncor is "ring-fenced" from the Debtors: it has an independent board of directors, and it is operated, financed, and managed independently. As a result, it is not consolidated into EFH Corp.'s financial statements. A significant portion of Oncor's revenues are attributable to TXU Energy, which is Oncor's largest customer. Oncor Holdings, Oncor, and their ring-fenced affiliates and subsidiaries are not Debtors in these chapter 11 cases.

10.      EFH largely adopted its current organizational structure, and issued a significant portion of the debt that composes its capital structure, in October 2007 as a result of the largest private acquisition of a public company in history (the "2007 Acquisition"). At the time, EFH's current equity owners, including affiliates of Goldman Sachs, KKR and TPG (the "EFH Equity Owners") (together with certain co-investors) contributed approximately $8.3 billion of equity capital into EFH. And, like many other private acquisitions, EFH issued significant new debt

5

and assumed existing debt and liabilities in connection with the 2007 Acquisition. Immediately following the 2007 Acquisition, the Debtors total funded indebtedness[7] was approximately $36.13 billion, comprised of approximately $28.8 billion at TCEH, $128 million at EFCH, and $7.2 billion at EFH Corp. Today, the Debtors' total funded indebtedness is nearly $42 billion, including:

- approximately $24.385 billion of first lien claims (excluding certain first lien hedging obligations), $1.571 billion of second lien claims, and $6.112 billion of unsecured claims against the TCEH Debtors;

- approximately $9 million of unsecured claims, and $61 million of claims secured by assets owned by other entities, against EFCH;

- approximately $1.929 billion of unsecured claims against EFH Corp.; and

- approximately $3.985 billion of first lien claims, $2.156 billion second lien claims, and $1.568 billion of unsecured claims against EFIH.

11.    Although the Debtors' operations are strong and TCEH and EFIH have historically been and will continue to be cash flow positive before debt service, low wholesale electricity prices in the Texas electricity market since mid-2008 have made it impossible for the TCEH Debtors to support their current debt load. In October 2007, the main ingredients for EFH's financial success were robust and steady economic growth and high wholesale electricity prices driven by high natural gas prices that were not expected to significantly decline over the long term. Since 2007, however, overall economic growth was reduced because of the recession in 2008 and 2009 and wholesale electricity prices have significantly declined. The material reduction in wholesale electricity prices was caused, in large part, by an increase in the supply of natural gas caused by the rise of hydraulic fracturing (known as "fracking"). This increase in the

---

[7]    References to "funded indebtedness" in this First Day Declaration include intercompany debt holdings and short-term borrowings, and exclude guarantees, unamortized discounts or premiums, accrued but unpaid interest, and certain other figures typically reported in the Debtors' filings with the Securities and Exchange Commission (the "SEC"), such as capital lease obligations, certain promissory notes, and certain other obligations.

6

PX 095
Page 9 of 464

supply of natural gas caused a significant decline in natural gas prices, and because the wholesale price of electricity in the ERCOT market is closely tied to the price of natural gas, the wholesale price of electricity in the ERCOT market has significantly declined. As a result of those decreases, the profitability of the TCEH Debtors' generation assets has substantially declined.

12.     Separately, EFIH and EFH Corp. have significant funded indebtedness and insufficient cash flows to service those obligations. Before the Petition Date, EFIH—which has no independent business operations—relied on dividend distributions from Oncor and intercompany interest payments (relating to debt issued by EFH Corp. and the TCEH Debtors that EFIH acquired in exchange offers) to satisfy its funded debt obligations. These sources of cash, however, were not sufficient to service EFIH's obligations. Similarly, EFH Corp. also has minimal cash flow. As a result, both EFIH and EFH Corp. faced significant liquidity constraints that prompted a chapter 11 filing.

13.     Accordingly, despite consistent top-tier operational performance in the Debtors' business units, industry-leading customer care, successful hedging operations, efficiencies generated by the Debtors' shared services framework, a consistent stream of dividend distributions to EFIH resulting from its indirect ownership of Oncor, numerous efforts to reduce and extend their funded debt and other obligations, and the fact that EFIH and TCEH are cash flow positive before debt service, the Debtors are significantly overleveraged.

14.     To address these issues, the Debtors retained restructuring professionals and commenced restructuring discussions in July 2012. These discussions accelerated in early 2013, when the Debtors began the process of organizing the various creditor and equity groups and encouraging them to retain professionals. Soon thereafter, the Debtors began substantive negotiations with these constituents and their advisors. These negotiations lasted for over a year

**PX 095**
**Page 10 of 464**

and included countless meetings among professionals and principals. In April 2013 and October 2014, the Debtors issued comprehensive cleansing disclosures through filings with the SEC, and the Debtors periodically made other disclosures regarding the ongoing negotiations.

15.     Two key issues drove negotiations. *First*, the tax consequences of certain restructuring outcomes have created a challenging negotiating dynamic. Certain restructuring scenarios, such as a sale of the Debtors' assets under a plan or under section 363 of the Bankruptcy Code, would trigger in excess of *$6 billion* of aggregate tax liability.[8] The Debtors and certain of their stakeholders have diverging views on whether the TCEH Debtors, EFIH, and/or EFH Corp. would be liable for those tax liabilities. Restructuring negotiations have, therefore, focused on attempting to restructure the Debtors in a tax-efficient manner through either a consolidated restructuring or a "tax free" spin of TCEH and/or EFIH.

16.     *Second*, the respective valuation of Oncor, on one hand, and TCEH, on the other hand, has been subject to dispute. Generally speaking, the recoveries of holders of claims against and interests in the TCEH Debtors will be determined by the value of the TCEH Debtors' assets. Similarly, the recoveries of holders of claims against and interests in EFIH will be determined by the value of EFIH's 80% ownership of Oncor. And the recoveries of holders of claims against and interests in EFH Corp. will be determined by the value of EFH Corp.'s assets, including any value allocated on account of EFH Corp.'s ownership of EFIH and TCEH and the value, if any, of EFH Corp.'s direct and indirect subsidiaries other than EFIH and TCEH. Differing views on the valuation of Oncor, on one hand, and TCEH, on the other hand, dominated negotiations of a "consolidated" restructuring scenario that involved various creditor

---

[8]     The actual amount of any tax would depend on, among other things, final sale prices of the assets. The $6 billion figure reflects the Debtors' view of the potential taxable gain that would arise based on the tax basis and the fair market value of TCEH's assets and EFIH's interests in Oncor.

PX 095
Page 11 of 464

constituencies receiving equity in EFH Corp.  Additionally, even in the context of a "tax-free"

spin, certain of TCEH's stakeholders have insisted that the stakeholders of EFH Corp. and EFIH

should "compensate" TCEH's stakeholders for forgoing the value associated with a step-up in

tax basis and the subsequent tax benefits of depreciation deductions.

17.    In the final weeks leading to the Debtors' chapter 11 cases, several of the

Debtors' stakeholders coalesced around a global restructuring of the Debtors (the "Global

Restructuring"), premised on a "tax-free" spin of TCEH (the "TCEH Tax-Free Spin") that will

deconsolidate TCEH from EFH, a simultaneous deleveraging of EFIH thorough a $2 billion

investment (with that investment to be converted into equity of EFH Corp. upon emergence from

chapter 11) (the "Investment Commitment"), and a framework for settling so-called

"makewhole" claims against the EFIH Debtors (such claims, the "EFIH Makewhole Claims,"

and such settlements, the "EFIH Makewhole Settlements").  The material terms of the Global

Restructuring are memorialized in the Restructuring Support Agreement that the Debtors and

certain of their key stakeholders executed just before filing for chapter 11.[9]

18.    The Restructuring Support Agreement is an important first step toward a

consensual and timely chapter 11 reorganization that avoids the spectre of in excess of $6 billion

of deconsolidation-related tax liabilities.  To be sure, the Debtors still face a number of hurdles,

including the need to obtain a private letter ruling from the IRS blessing the TCEH Tax-Free

Spin and resolve the EFIH Makewhole Claims of holdout secured creditors.  The Debtors

nevertheless believe that the Global Restructuring represents the best opportunity to conclude

their chapter 11 cases in a swift and tax-efficient manner that will maximize the value of their

estates.  Accordingly, during the course of these chapter 11 cases, the Debtors expect to finalize

---

[9]    The Debtors will seek authority to assume the Restructuring Support Agreement pursuant to a separate motion
(the "RSA Assumption Motion"), which will be filed on or shortly following the Petition Date.

**PX 095**
**Page 12 of 464**

the work that must be done to implement the Global Restructuring, while continuing to focus on "Job 1": operating one of the largest, most complex energy companies in the country in a way that maximizes value for all of their stakeholders, protects jobs, complies with their regulatory obligations, and ensures the smooth and reliable generation, sale, and delivery of electricity to EFH's customers.

## Part I.
## EFH's Business Operations and Capital Structure

**A.    Overview of EFH's Corporate Structure.**

19.    EFH Corp. is the parent company of each of the entities that compose EFH, including: (a) the entities composing TCEH (including TCEH LLC's parent company, EFCH); (b) EFIH; (c) non-Debtor Oncor Holdings, which is 100% owned by EFIH, Oncor, which is approximately 80% owned by Oncor Holdings, and certain subsidiaries and affiliates of Oncor Holdings and Oncor;[10] and (d) certain of EFH Corp.'s other direct and indirect Debtor and non-Debtor subsidiaries that are discussed below.

20.    The following chart is a simplified representation of EFH's corporate structure:[11]

---

[10]    Texas Transmission Investment LLC is an unaffiliated entity that owns approximately 19.75% of Oncor. It is owned by an investment group led by OMERS Administrative Corporation, acting through its infrastructure investment entity, Borealis Infrastructure Management Inc., and the Government of Singapore Investment Corporation, acting through its private equity and infrastructure arm, GIC Special Investments Pte. Ltd. The remaining ownership interests in Oncor are indirectly held by members of Oncor's management.

[11]    Exhibit B contains a full list of the TCEH Debtors and other Debtors. Exhibit C contains a full corporate structure chart of EFH.

PX 095
Page 13 of 464



21.    As of December 31, 2013, EFH Corp. reported total assets of approximately

$36.4 billion in book value, approximately $28.8 billion of which is attributable to TCEH, and

total liabilities of approximately $49.7 billion in book value, approximately $41.1 billion of

which is attributable to TCEH.[12]  EFH Corp.'s assets and liabilities that are not attributable to

TCEH are mostly attributable to EFIH's indirect ownership of approximately 80% of Oncor.

EFH Corp.'s consolidated revenues for the quarter ending December 31, 2013 were

approximately $1.3 billion, all of which were attributable to TCEH.  EFH Corp.'s consolidated

annual revenues for the year ending December 31, 2013 were approximately $5.9 billion.[13]

---

[12]    Figures for TCEH are derived from EFCH's public filings with the SEC, and are almost entirely attributable to TCEH LLC and its Debtor and non-Debtor subsidiaries.

[13]    Oncor's revenues are not included in EFH Corp.'s consolidated revenues because EFH Corp. accounts for its ownership of Oncor under the equity method of accounting.

11

**B.    EFH's Business Operations.**

    **1.    TCEH.**

22.    TCEH is composed of:    (a) the TCEH Debtors, including TCEH LLC; TCEH LLC's direct parent company, EFCH; and most of the entities that compose TCEH, including the entities that compose Luminant's electricity generation, mining, commodity risk management and trading activities, and wholesale operations, TXU Energy and the other entities that compose the Debtors' retail operations, and TCEH Finance, Inc. ("TCEH Finance"); and (b) certain other entities that are not obligated on the TCEH Debtors' funded indebtedness.[14] TCEH's business operations also depend on certain services that are provided by EFH Corporate Services Company ("EFH Corporate Services"), a subsidiary of EFH Corp., which acts as a shared services center for Luminant and TXU Energy.  These operations are discussed in more detail below.

        **a.    Luminant.**

            **i.    Overview.**

23.    Luminant is the largest electricity generator and lignite coal miner in Texas. Luminant also operates a wholesale electricity sales, commodity risk management and trading activities organization.  Luminant employs approximately 4,200 individuals.

24.    The map below depicts the location of Luminant's power plants and associated lignite mines in Texas.

---

[14]    Specifically, these entities are (a) non-Debtor Greenway Development Holding Company LLC, which is the managing partner of non-Debtor joint venture Collin G/G&B LLC; (b) non-Debtors Nuclear Energy Future Holdings LLC and Nuclear Energy Future Holdings II LLC, which indirectly or indirectly own approximately 88% of non-Debtor Comanche Peak Nuclear Power Company LLC; and (c) Debtor TXU Receivables Company LLC, an entity associated with a terminated accounts receivable program.

**PX 095**
**Page 15 of 464**



### ii.    Generation Activities.

25.    Luminant's total nameplate generation capacity of 15,427 MW, composed of nuclear, lignite/coal, and natural gas-fueled units, accounts for approximately 18% of the ERCOT market's nameplate generation capacity.    Luminant's generation capacity can be categorized as:

- Year-round or full operations:  approximately 11,892 MW (33 units) of lignite/coal, nuclear, and gas-fueled units;

- Seasonal operations:  approximately 1,880 MW (3 units) of lignite/coal-fueled units that Luminant has previously sought, and received, permission to operate only during high-demand periods (*e.g.*, during the peak demand of summer); and

- Idled:  approximately 1,655 MW (4 units) of natural gas-fueled units which could be restarted with approximately 90-days' notice and significant investment.

13

26.    In 2013, Luminant generated approximately 73,409 gigawatt hours ("GWh"), compared to the ERCOT market's total electricity consumption of approximately 331,000 GWh. As demonstrated by the chart below, Luminant is the 13th largest generator of electricity in the United States:

**2013 Net U.S. Generation by Holding Company**



(A)    **Nuclear Generation.**

27.    Luminant's nuclear generation operations consist of two units at its Comanche Peak location, with total nameplate capacity of 2,300 MW.  The units generally run at full capacity except during nuclear fuel assembly replacement outages scheduled approximately every 18 months.  Comanche Peak units 1 and 2 began commercial operation in 1990 and 1993, respectively; each unit has a permit allowing for 40 years of operations, and Luminant anticipates that it will obtain a permit to extend operation of the units for an additional 20 years. The Comanche Peak units operated at approximately 101.7%, 98.5%, 95.7%, and 100% of nameplate generation capacity in 2013, 2012, 2011, and 2010, respectively, and are consistently ranked in the top decile of nuclear plants in the U.S. for production reliability and cost

14

performance. Additionally, Comanche Peak has consistently demonstrated high performance as evaluated across the industry by the Institute of Nuclear Power Operations. Nuclear-fueled generation accounted for 15% of Luminant's nameplate capacity and 28% of Luminant's electricity generation in 2013.

### (B)    Lignite/Coal-Fueled Generation.

28.    Luminant's lignite/coal-fueled generation operations include twelve units at five plant sites, with total nameplate capacity of 8,017 MW. These include:

- two units at Big Brown with total nameplate capacity of 1,150 MW;

- three units at Monticello with total nameplate capacity of 1,880 MW;

- three units at Martin Lake with total nameplate capacity of 2,250 MW;

- two units at Oak Grove with total nameplate capacity of 1,600 MW; and

- two units at Sandow with total nameplate capacity of 1,137 MW.

29.    Luminant's lignite/coal units are generally available for full operations throughout the year except when they are out of service for either a scheduled or unscheduled maintenance outage. As discussed in more detail below, however, in recent years Luminant has reduced electricity generation from selected lignite/coal units during times when the demand for electricity and wholesale electricity prices in the ERCOT market are comparatively low. These reductions are achieved in one of two forms: either through short-term (*e.g.*, overnight) reductions in response to wholesale electricity prices, or through longer-term seasonal shutdowns in response to sustained periods of relatively low wholesale electricity prices and demand for electricity. Indeed, two units at Monticello and one unit at Martin Lake have, in the recent past, been subject to seasonal operations.

30.    Luminant's lignite/coal-fueled units operated at 74.1%, 70.0%, 83.5%, and 82.2% of nameplate generation capacity for the years 2013, 2012, 2011, and 2010, respectively. In

15

2011 and 2010, the units performed at the top decile for U.S. coal-fueled generation facilities. Reduced generation in 2012 and 2013 was largely due to low wholesale electricity prices in the ERCOT market. Coal/lignite-fueled generation accounted for 52% of Luminant's nameplate capacity and 71% of Luminant's electricity generation in 2013.

(C)    **Natural Gas-Fueled Generation**.

31.    Luminant's natural gas-fueled generation operations consist of 26 units at eight plant sites with 5,110 MW of total nameplate capacity and 3,455 MW of available capacity, including:

- two steam units at Graham with total nameplate capacity of 630 MW;

- two steam units at Lake Hubbard with total nameplate capacity of 921 MW;

- two steam units at Stryker Creek with total nameplate capacity of 685 MW;

- one steam unit at Trinidad with total nameplate capacity of 244 MW;

- four combustion turbines at DeCordova with total nameplate capacity of 260 MW;

- six combustion turbines at Morgan Creek with total nameplate capacity of 390 MW;

- five combustion turbines at Permian Basin with total nameplate capacity of 325 MW;

- three inactive steam units at Valley with total nameplate capacity of 1,115 MW; and

- one inactive steam unit at Permian Basin with total nameplate capacity of 540 MW.

32.    Luminant's natural gas-fueled units are primarily used when electricity demand is highest (*i.e.*, they are considered "peaking" units because they are generally used during peak demand periods) or to support system reliability at times of low "reserve margins" (*i.e.*, times when the system's overall generation capacity needs to be increased to maintain a certain target "cushion" over expected demand for electricity). Inactive units may be restarted in advance of anticipated electricity needs under proper economic conditions, but would likely require several months and incremental capital expenditures to restore them to full operational readiness.

16

Natural gas-fueled generation accounted for approximately 33% of Luminant's nameplate capacity and 1% of Luminant's electricity generation in 2013.

33.     Luminant also manages approximately 10.5 billion cubic feet of natural gas storage capacity, primarily to assist in fueling its natural gas-fueled units, and engages in various activities related to natural gas including direct purchases, transportation agreements, storage leases, and commercial retail sales.

34.     Luminant has filed permit applications with, and received approval from, the Texas Commission on Environmental Quality (the "TCEQ") to build two new natural gas combustion turbines totaling approximately 420–460 MW at its existing DeCordova plant site and two new natural gas combustion turbines totaling approximately 420–460 MW at its existing Tradinghouse plant site. Luminant has also filed air permit applications with the TCEQ to build a combined-cycle natural gas turbine generation unit totaling approximately 730–810 MW at its existing Eagle Mountain plant site and two natural gas combustion turbines totaling approximately 420–460 MW at its existing Lake Creek plant site. Luminant believes current market conditions, primarily driven by low wholesale electricity prices, do not provide adequate economic returns to warrant new construction. The permits that have been granted, and the permits in the application process, if granted, could allow Luminant to capitalize on opportunities for expansion when they are economically attractive in the future (assuming the TCEH Debtors' balance sheet has been addressed or the TCEH Debtors otherwise have access to sufficient capital to make these investments).

### iii.    Mining Operations.

35.     Luminant currently owns twelve surface lignite coal mines in Texas, eight of which are in active operation. Luminant is the largest coal miner in Texas and the seventh-largest coal miner in the United States. Luminant's mining activity supports generation

17

at its lignite/coal units; Luminant mined approximately 29 million tons of lignite in 2013, and approximately 68% of the fuel used at Luminant's lignite/coal-fueled units in 2013 was supplied from surface-minable lignite reserves located adjacent to Luminant's plants.

36.    As of December 31, 2013, Luminant owns or has under lease an estimated 715 million tons of lignite reserves supporting plant sites, including an undivided interest in approximately 175 million tons of lignite reserves that provide fuel for the Sandow facility, and also owns or has under lease approximately 85 million tons of reserves not currently dedicated to existing plant sites.  Luminant meets its fuel requirements at its Big Brown, Monticello, and Martin Lake plants by blending lignite with coal purchased from third-party suppliers in the Powder River Basin in Wyoming.  The coal is transported from the Powder River Basin to Luminant's plants by railcar pursuant to various contracts.

37.    Luminant Mining Company LLC ("Luminant Mining"), a Debtor entity, holds all of Luminant's mining permits and contracts with several of the TCEH Debtors to conduct Luminant's mining operations.  Luminant Mining is subject to regulatory oversight by the Railroad Commission of Texas (the "RCT"), which regulates, among other things, mining permits and land reclamation requirements related to mining sites.  As part of the land reclamation requirements, Luminant Mining is required to satisfy certain bonding requirements. Before the Petition Date, Luminant Mining "self-bonded" these obligations with the support of a guarantee from another Debtor entity, Luminant Generation Company LLC.  Following the Petition Date, Luminant Mining expects to satisfy the bonding requirement through either (a) the grant of a super-priority "carve-out" from the super-priority liens under the TCEH Debtors' proposed debtor in possession financing facility (the "TCEH DIP Facility") that will enable the RCT to be paid on account of reclamation obligations before the TCEH DIP Facility lenders and

18

the TCEH Debtors' secured creditors;[15] or (b) if negotiations are not successful with respect to the "carve-out," the delivery of one or more cash collateralized letters of credit. in an amount of up to $1.1 billion, issued under the TCEH DIP Facility.

<strong>iv.    Wholesale    Electricity    Sales,    Commodity    Risk<br>Management, and Trading Activities.</strong>

38.    Luminant's generation units provide electricity for its wholesale electricity sales, commodity risk management, and trading operations, through which Luminant supplies TXU Energy and other third-party wholesale and retail counterparties with electricity and electricity-related services.    Luminant enters into both short-term and long-term electricity contracts, enabling it to manage variations in electricity generation, price risk associated with generation output and changing consumer demand, as well as to meet the needs of large wholesale customers.    Luminant also purchases electricity, including electricity generated from renewable energy resources such as wind, from third-parties.    Additionally, Luminant manages physical fuel purchase agreements and financial hedges with a variety of counterparties to manage key commodity costs and delivery risks that affect Luminant's electricity generation and mining operations.

39.    Wholesale electricity prices in the ERCOT market vary and are based on electricity supply and demand, fuel prices, variable costs for electricity generation assets, and other market factors.    As discussed in greater detail below, wholesale electricity prices in the ERCOT market are closely tied to the price of natural gas.    Additionally, weather can significantly influence short-term wholesale electricity prices, particularly where there are

---

[15]    These options are discussed in greater detail in the *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Granting Adequate Protection, (D) Modifying the Automatic Stay, and (e) Scheduling a Final Hearing* (the "TCEH DIP Motion"), filed contemporaneously herewith.

weather extremes in Texas and throughout the country of the kind that occurred in the fall/winter of 2013 and 2014 or the summer of 2011.  Those weather extremes can cause increases in natural gas prices or shortages in electricity generation capacity and increased demand for electricity. Luminant's wholesale operations manage these risks, and others, through optimizing the dispatch of the electricity generation fleet, physical purchases and sales of electricity and fuel commodities, as well as the use of financial and bilateral contracts and other hedging activities.

40.     Luminant's commodity risk management and trading activities hedge the volume and price risk associated with Luminant's generation fleet and TXU Energy's retail needs. These activities require significant collateral support and account for a significant portion of funds the TCEH Debtors seek to borrow under the TCEH DIP Motion.[16]

### b.     TXU Energy.

41.     TXU Energy serves approximately 1.7 million residential and commercial retail electricity consumers.[17]   Approximately 69% of TXU Energy's retail revenues in 2013 represented sales to residential customers, with the remaining amount attributable to commercial and industrial business customers.  TXU Energy has a very strong market position in the ERCOT market, serving approximately 26% of the residential customers and 19% of the business customers in the areas of ERCOT open to competition.  Indeed, TXU Energy is the single largest certificated REP by customer count in Texas.  Luminant procures or supplies 100% of TXU

---

[16]   Luminant's trading and hedging activities, and the required collateral support obligations, are discussed in more detail in the *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements* (the "Hedging and Trading Agreements Motion"), filed contemporaneously herewith.

[17]   Customer count measured by number of meters served.

PX 095
Page 23 of 464

Energy's electricity requirements.  TXU Energy employs approximately 1,000 individuals in its marketing, customer operations, and support organizations.

42.    Texas is one of the fastest growing states in the United States with a diverse economy.  As a result, competition for retail electricity customers is robust.  The number of certified REPs has grown from approximately 40 in 2002, the first year of retail electricity competition in Texas, to over 140 today.  Based on data published by the PUC, as of September 30, 2013, approximately 62% of residential customers and 69% of small commercial customers in competitive areas of the ERCOT market are served by REPs that are not associated with the "incumbent" REP that was the traditional provider in their service area before deregulation.  Moreover, approximately 89% of residential customers and 90% of small commercial load customers have chosen an electricity provider at least once since the ERCOT retail market deregulation process began in Texas in 2002,[18] making Texas the only state with retail competition where more than half of residential customers have chosen to be served by electricity providers other than the incumbent electric utilities.  As a result, TXU Energy, like other REPs formerly affiliated with the regulated, monopoly electricity utilities (such as EFH's predecessor, TXU Corp.) that existed before deregulation of Texas's electricity market in 2002, has experienced customer attrition since the Texas electricity market was opened to competition.  Indeed, that significant level of competition is one of the reasons that TXU Energy believes it is essential that it receive the authority to promptly assume its retail electricity contracts.[19]

---

[18]    Electric Reliability Council of Texas, Inc., *Supplemental Information Retail Electric Market* (March 21, 2014).

[19]    The Debtors seek this authority pursuant to the *Motion of Energy Future Holdings Corp., et al., for Entry of (A) an Order Authorizing the Debtors to (I) Maintain and Administer Customer Programs, (II) Honor Prepetition Obligations, (III) Pay Certain Expenses on Behalf of Certain Organizations, (IV) Fix Deadlines to File Proofs of Claim for Certain Customer Claims, and (V) Establish Procedures for Notifying Customers of Commencement of the Debtors' Chapter 11 Cases, Assumption of Customer Agreements, and the Bar Dates for Customer Claims and (B) an Order Authorizing Certain of the Debtors to Assume Customer Agreements* (the "Customer Programs Motion"), filed contemporaneously herewith.

PX 095
Page 24 of 464

Importantly, TXU Energy's key customer metrics including bad debt, days sales outstanding, and PUC complaints have significantly improved since the 2007 Acquisition, performing at or better than industry-leading levels.

### 2.    EFH Corp. and Certain EFH Corp. Subsidiaries.

43.    In addition to EFCH, TCEH LLC and its subsidiaries, EFIH, Oncor Holdings, Oncor, and Oncor's affiliates and subsidiaries, EFH is composed of:  (a) EFH Corp.; (b) EFH Corporate Services; (c) EFH Properties Company; and (d) various other direct and indirect subsidiaries of EFH Corp. that are legacy entities without active business operations.  These entities are discussed below.

### a.    EFH Corp.

44.    EFH Corp. is the ultimate parent holding company of each of the entities composing EFH.  Its principal assets are its indirect approximately 80% ownership of Oncor (through its direct ownership of EFIH) and its indirect ownership of the TCEH LLC and its subsidiaries (through its direct ownership of EFCH).  EFH Corp. also directly or indirectly owns a number of other subsidiaries that are discussed below.

### b.    EFH Corporate Services.

45.    EFH Corporate Services provides a host of vital shared services, primarily to TCEH (*i.e.*, Luminant and TXU Energy) and, to a lesser extent, EFH Corp., EFIH, and Oncor.  EFH Corporate Services employs approximately 450 individuals—including the majority of the Debtors' senior executives.  These shared services are integral to EFH Corp. and its subsidiaries' business operations, and also generate significant cost savings.

46.    EFH Corporate Services provides the shared services to TCEH and EFIH under separate shared services agreements (the "Shared Services Agreements"), and to EFH Corp. and certain of EFH Corp.'s other direct and indirect subsidiaries through a series of operating

22

procedures and the cash management system administrated by EFH Corporate Services.[20] Services are provided to Oncor based on historical practice. All shared services are billed at cost. In 2014, shared services are expected to be allocated approximately 54% to Luminant, 30% to TXU Energy, 13% to Oncor, 2% to EFIH, and 2% to EFH Corp.[21]

      47.    The shared services include, among other things, certain:

- legal functions;

- human resources functions;

- treasury functions;

- enterprise and market risk management functions;

- controller functions;

- federal, state, and local tax services;

- financial planning functions;

- strategy and business development functions;

- information technology and infrastructure services;

- external affairs, including political and regulatory advocacy;

- investor and media relations;

- corporate secretarial, security, compliance, and ethics issues;

- internal auditing and Sarbanes-Oxley compliance;

- supply chain services;

- business services administration; and

---

[20]    EFH's cash management system, the Shared Services Agreements, and intercompany payments in general are discussed in more detail in the *Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Authorizing the Debtors to (I) Continue Using their Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Investment Accounts; (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims; and (C) Granting Postpetition Intercompany Claims Administrative Expense Priority* (the "Cash Management Motion"), filed contemporaneously herewith.

[21]    These figures exclude certain quarterly management fees payable to the EFH Equity Owners. The management fees have not been paid since the fourth quarter of 2013.

PX 095
Page 26 of 464

- facility design and construction and real estate management.

48.     As described in the Cash Management Motion, the treasury function at EFH Corporate Services provides certain cash management services to the Debtors (and certain of their non-Debtor, non-Oncor affiliates).  Specifically, EFH Corporate Services issues checks and automated clearing house payments to third parties for goods and services received by the Debtors (primarily by the TCEH Debtors).  The applicable Debtors then reimburse EFH Corporate Services for amounts paid.

### i.     Federal and State Income Tax Allocation (Tax Sharing) Agreements Administered by EFH Corporate Services.

49.     EFH Corp. files federal and state income tax returns that include the results of EFCH, TCEH LLC and its subsidiaries, EFIH, and Oncor Holdings.  EFH Corp. is a corporate member of the consolidated group, while each of EFIH, Oncor Holdings, EFCH, and TCEH LLC and a majority of its subsidiaries are classified as disregarded entities for federal income tax purposes.  Oncor is a partnership for income tax purposes and is not a corporate member of the EFH Corp. consolidated group.

50.     The tax obligations of the various entities composing EFH are guided by two tax sharing agreements.  Each entity's compliance with applicable tax requirements and the applicable tax sharing agreement is overseen by EFH Corporate Services.  During these chapter 11 cases, the Debtors will continue making certain payments under the tax sharing agreements to the extent the bankruptcy court authorizes such payments.[22]  Oncor will continue to make tax payments in accordance with its tax sharing agreement (the "Oncor TSA"), which effectively

---

[22]     In particular, the Debtors are seeking to pay certain state law tax claims in the ordinary course pursuant to the *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Granting Related Relief* (the "Taxes Motion"), and are seeking the authority to continue appropriate intercompany transactions related to such state law tax claims pursuant to the Cash Management Motion, each filed contemporaneously herewith.

24

**PX 095**
**Page 27 of 464**

requires Oncor to make payments approximately equal to payments it would make as a stand-alone taxpayer. As of the Petition Date, Oncor makes those payments to EFH Corp. As discussed in greater detail below, however, in connection with the Restructuring Support Agreement, EFH Corp.'s right to payment under the Oncor TSA will be assigned to EFIH.

### c.    EFH Properties Company.

51.    Non-Debtor EFH Properties Company, a direct subsidiary of EFH Corp., is the lessee of record with respect to certain of EFH's real property leases, including the lease of EFH Corp.'s headquarters, which houses approximately 370 EFH Corporate Services and EFH Corp. employees and executives and approximately 435 of Luminant's employees. Additionally, EFH Properties Company administers certain subleases with respect to EFH's real property leases, primarily with respect to the headquarters lease, and operates certain parking facilities.

### d.    Other Direct and Indirect Subsidiaries of EFH Corp.

52.    EFH Corp. also is the parent of several entities with *de minimis* assets,[23] including (i) three Debtor entities that once held international assets that have either been liquidated or are currently in administration and/or liquidation cases initiated before the 2007 Acquisition; (ii) Debtor entities associated with a natural gas distribution business that was sold in 2004, a related non-Debtor captive insurance company, a related non-Debtor United Kingdom entity in liquidation, and a related Debtor Canadian entity that is associated with certain *de minimis* pension obligations; and (iii) other entities that hold miscellaneous assets, including a small number of patents, trade names, IT assets, land, and other *de minimis* assets.[24]

---

[23]    Excluding intercompany receivables.

[24]    Each of these entities other than Basic Resources, Inc., which owns certain comparatively minor patents and is a wholly-owned subsidiary of non-Debtor EFH Properties Company, is a Debtor.

PX 095
Page 28 of 464

### 3.    EFIH.

53.    EFIH is a holding company and a direct, wholly-owned subsidiary of EFH Corp. Its primary asset is its 100% ownership of Oncor Holdings, which, in turn, owns approximately 80% of Oncor.    Oncor has made dividend distributions to EFIH (through Oncor Holdings) totaling approximately $213 million, $147 million, $116 million, and $169 million in 2013, 2012, 2011, and 2010, respectively,[25] and approximately $37 million between January 1, 2014 and the Petition Date.    EFIH has no active business operations, and its capital structure is premised on the value derived from its indirect ownership of Oncor.    EFIH's funded indebtedness was issued in a series of post-2007 Acquisition transactions.

### 4.    Oncor.

#### a.    Overview of Oncor's Business Operations.

54.    Oncor is a transmission and distribution utility that provides transmission and distribution services in Texas.    Unlike Luminant and TXU Energy, whose rates are subject to market competition, Oncor's rates are fully regulated and are subject to detailed rate-setting proceedings before the PUC.    Oncor provides these services to REPs, including TXU Energy, which sell electricity to residential and business customers, and electricity distribution companies, cooperatives, and municipalities.    TXU Energy is Oncor's largest customer and accounts for a large portion of Oncor's annual operating revenues:    approximately 27%, 29%, 33%, and 36% in 2013, 2012, 2011, and 2010, respectively.[26]    Oncor operates the largest transmission and distribution system in Texas:    it covers more than 91 counties and over 400

---

[25]    Does not include amounts in 2012 and 2013 distributed by Oncor to Oncor Holdings that Oncor Holdings used to pay its liability to EFH Corp. under the Oncor TSA.

[26]    These figures also include a relatively small amount attributable to TCEH's other REPs.

26

incorporated municipalities in Texas, delivers electricity to more than 3.2 million homes and businesses, and operates more than 120,000 miles of transmission and distribution lines.

55.     Pursuant to its organizational documents and applicable PUC orders and rules, Oncor is restricted from making distributions under certain conditions.   Oncor's dividend distributions are limited by its regulatory capital structure, which is required to be at or below the assumed debt-to-equity ratio established periodically by the PUC for ratemaking purposes.   That ratio is currently set at 60% debt to 40% equity.   Additionally, Oncor's independent directors, acting by majority vote, and, during certain periods, any director designated by Oncor's minority investor, may prevent dividend distributions from Oncor if they determine that it is in the best interests of Oncor to retain such amounts to meet expected future cash requirements.

### b.     The Ring-Fencing Measures.

56.     As part of the 2007 Acquisition, Oncor implemented certain structural and operational "ring-fencing" measures, including certain measures required by the PUC, to enhance Oncor's credit quality.   The ring-fence has a number of components.   Most importantly, Oncor's independence is ensured by a requirement that its board be composed of a majority of directors that are independent from EFH Corp. and TCEH, and Oncor also has management and employees separate from EFH's other businesses.   Two of Oncor's directors are appointed by EFIH.

57.     The ring-fence also provides that Oncor is prohibited from securing any indebtedness of EFH Corp. or its other non-Oncor subsidiaries (including the Debtors).[27]   In addition to protecting Oncor's credit rating, the prohibition on cross-collateralization means that

---

[27]     As noted below, certain obligations of EFCH that predate the 2007 Acquisition are secured by certain Oncor assets.

PX 095
Page 30 of 464

Oncor is not subject to the operational and financial restraints in the various documents governing the Debtors' funded indebtedness.

58.    Finally, among other things, Oncor's books and records are maintained separately from those of EFH Corp. and its non-Oncor subsidiaries, and Oncor's headquarters are physically separated from those of EFH Corp., Luminant, and TXU Energy.

59.    None of the Oncor entities are Debtors in the chapter 11 cases. The Debtors intend to respect and maintain the ring-fencing measures described above during the pendency of the chapter 11 cases.

### 5.    EFH's Regulatory Environment.

60.    EFH's business operations are subject to significant regulation and oversight. Certain of those regulators were discussed above, and the regulators that are most material to EFH's business operations are identified in the following chart:

| Agency or Entity | Area(s) of Authority |
|---|---|
| Commodity Futures Trading Commission (the "CFTC") | • Futures market derivatives and over-the-counter derivatives (including interest rate swaps and commodity swaps) |
| Electricity Reliability Council of Texas, Inc. (the "ERCOT") | • Ensure reliable operation of transmission and distribution grid in the ERCOT market<br>• Dispatch generation to satisfy electricity requirements in the ERCOT market<br>• Manage real-time and day-ahead markets and financial settlement process in wholesale electricity markets in the ERCOT market |
| Environmental Protection Agency (the "EPA") | • Air and water quality<br>• Solid waste disposal |
| Equal Employment Opportunity Commission (the "EEOC") | • Labor relations |
| Federal Communications Commission (the "FCC") | • Wireless, radio licenses for emergency radio communication |
| Federal Energy Regulatory Commission (the "FERC") | • FERC has nationwide electricity reliability authority, including with respect to the ERCOT market. The ERCOT market, however, is not subject to the plenary jurisdiction of the FERC and electricity sales within the ERCOT market are not within the FERC's jurisdiction. |
| Mine Safety and Health Administration (the "MSHA") | • Mine safety |
| North American Electric Reliability Corporation (the "NERC"), in conjunction with the Texas Reliability | • National electricity grid reliability standards |

28

| Agency or Entity | Area(s) of Authority |
|---|---|
| Entity (the "TRE") | |
| Nuclear Regulatory Commission (the "NRC") | • Nuclear operating licenses<br>• Nuclear waste disposal |
| Occupational Safety and Health Administration (the "OSHA") | • Workplace safety |
| Office of Surface Mining Reclamation and Enforcement (the "OSM") | • Enforces federal surface mining and environmental standards |
| Public Utility Commission of Texas (the "PUC") | • Wide-ranging oversight over the Texas electricity market including, among other things, ensuring customer protection and regulating the rates and services, as well as certain "change of control" transactions, of transmission and distribution utilities such as Oncor |
| Railroad Commission of Texas (the "RCT") | • Permits, enforces, and oversees Texas surface mining and land reclamation process |
| Texas Commission on Environmental Quality (the "TCEQ") | • Air quality<br>• Water quality<br>• Waste management |

61.    Pursuant to 28 U.S.C. § 959(b), the Debtors intend to comply with all applicable regulatory requirements, including all requirements related to or associated with safety, health, and environmental law compliance, during these chapter 11 cases. In addition, the Debtors will seek all necessary regulatory approvals, if any, from state and federal regulatory authorities, in connection with the Debtors' business operations and any proposed plan of reorganization. Moreover, to the extent the Debtors maintain insurance of their regulatory compliance obligations, the Debtors intend to continue such insurance in the ordinary course of business.

62.    The Debtors intend to continue funding their obligations related to a nuclear decommissioning trust that will be used to fund the decommissioning of the Comanche Peak plant. Those funding obligations are satisfied by customer surcharges collected by REPs on behalf of Oncor and indirectly remitted from Oncor to TCEH.[28]  The Debtors also intend to remain in compliance with their mining land reclamation obligations, including their reclamation bonding requirements, as discussed above.

---

[28]    The Debtors are seeking relief to continue making these payments to the nuclear decommissioning trust pursuant to the Taxes Motion.

29

PX 095
Page 32 of 464

C.    **EFH's Capital Structure.**

1.    **TCEH Debtors.**

a.    **Overview.**

63.    The TCEH Debtors' funded debt obligations as of the Petition Date totaled approximately $32.068 billion (excluding obligations under certain first lien hedging arrangements and capital leases). That amount includes approximately $24.385 billion of first lien debt, approximately $1.571 billion of second lien debt, and approximately $6.112 billion of unsecured debt,[29] as summarized in the following table:

| Security | Debt Obligation | Approx. Amount Outstanding as of the Petition Date | Interest or Other Payment Due Dates | Original Maturity/Payoff Date | Debtor Obligors |
|---|---|---|---|---|---|
| TCEH First Lien Secured | TCEH Credit Agreement | $22.635 billion | Varies | Varies | All TCEH Debtors |
| | TCEH First Lien Notes | $1.750 billion | Jan. 1; April 1; July 1; Oct. 1 | October 2020 | All TCEH Debtors |
| | TCEH First Lien Commodity Hedges | Amount subject to determination. | Varies | Varies | All TCEH Debtors |
| | TCEH First Lien Interest Rate Swaps | | | | |
| TCEH Second Lien Secured | TCEH Second Lien Notes | $1.571 billion | Jan. 1; April 1; July 1; Oct. 1 | April 2021 | All TCEH Debtors |
| TCEH Unsecured | TCEH 2015 Unsecured Notes | $3.488 billion | May 1; Nov. 1 | November 2015 | All TCEH Debtors |
| | TCEH Senior Toggle Notes | $1.749 billion | May 1, Nov. 1 | November 2016 | |
| | Pollution Control Revenue Bonds | $875 million | Varies | Varies | TCEH LLC |

64.    In addition to the amounts described above, EFCH is an unsecured guarantor of approximately $60 million of unsecured notes issued by EFH Corp. that are discussed in more detail below. Additionally, certain of the TCEH Debtors also have additional obligations not reflected in the above table, which are discussed below.

---

[29]    Total amounts exclude unamortized premiums, set off rights, accrued but unpaid interest, and fair value discounts, and include amounts held by EFH Corp. or EFIH. Amounts held by EFH Corp. or EFIH are noted below. The unsecured debt amount also includes approximately $19 million of outstanding Pollution Control Revenue bonds supported by letters of credit issued under the TCEH Credit Agreement.

30

**PX 095**
**Page 33 of 464**

#### b.    TCEH First Lien Debt.

65.    TCEH's first lien debt is composed of:  (i) approximately $22.635 billion in outstanding obligations under TCEH's first lien credit agreement (the "TCEH Credit Agreement"); (ii) approximately $1.750 billion issued and outstanding TCEH 11.50% senior secured notes (the "TCEH First Lien Notes"); and (iii) obligations related to TCEH's interest rate swaps that are secured on a first lien basis (the "TCEH First Lien Interest Rate Swaps") and natural gas commodity hedges that are secured on a first lien basis (the "TCEH First Lien Commodity Hedges" and, collectively with the TCEH Credit Agreement, the TCEH First Lien Notes, and the TCEH First Lien Interest Rate Swaps, the "TCEH First Lien Debt").

#### i.    TCEH Credit Agreement.

66.    Pursuant to the TCEH Credit Agreement, dated as of October 10, 2007 (as amended, modified, or supplemented and in effect immediately prior to the Petition Date), among TCEH LLC, as borrower, EFCH and the other TCEH Debtors, as guarantors, Citibank, N.A., as administrative and collateral agent, and the lenders that are parties thereto from time to time, the TCEH Debtors borrowed money from the lenders under term loan and revolving credit facilities. As of the Petition Date, a total of approximately $22.635 billion was outstanding under the TCEH Credit Agreement, which includes approximately $2.054 billion under a revolving credit facility, approximately $1.062 billion under deposit letter of credit term loan facilities, and approximately $19.519 billion of term loan facilities.[30]

#### ii.    TCEH First Lien Notes.

67.    Pursuant to that certain indenture, dated April 19, 2011, for the 11.50% TCEH First Lien Notes originally due October 1, 2020, by and among TCEH LLC and TCEH Finance,

---

[30]    Including approximately $19 million held by EFH Corp.

31

as issuers, the other TCEH Debtors, as guarantors, and BOKF, NA (d/b/a Bank of Arizona), as successor indenture trustee to Bank of New York Mellon Trust Company, N.A. ("BNY"), TCEH LLC and TCEH Finance issued the TCEH First Lien Notes. Approximately $1.75 billion in principal amount of TCEH First Lien Notes are outstanding as of the Petition Date.

> ### iii.    TCEH First Lien Interest Rate Swaps and TCEH First Lien Commodity Hedges.

68.    The TCEH Debtors are party to (A) certain transactions with counterparties under the TCEH First Lien Commodity Hedges and (B) certain transactions under the TCEH First Lien Interest Rate Swaps used to hedge interest rate exposure on their variable rate debt. Certain holders of TCEH First Lien Interest Rate Swaps are also counterparties to TCEH First Lien Commodity Hedges. The amount of the TCEH Debtors' obligations under these transactions, including with respect to any netting of the TCEH First Lien Interest Rate Swaps and TCEH First Lien Commodity Hedges, is subject to determination.

> ### iv.    Collateral Securing the TCEH First Lien Debt.

69.    The TCEH First Lien Debt is secured by first priority liens on the collateral as defined in the TCEH Credit Agreement and the TCEH First Lien Intercreditor Agreement (defined below), including substantially all of the assets of TCEH LLC, and is guaranteed on a secured basis by a first priority lien on EFCH's equity interests in TCEH LLC and by a first priority lien on substantially all of the assets of the other TCEH Debtors. The collateral documents governing the TCEH First Lien Debt provide that liens do not attach to certain limited categories of assets as provided in the governing collateral documents.

> ### c.    TCEH Second Lien Notes.

70.    Pursuant to that certain indenture, dated as of October 6, 2010 (as amended, modified, or supplemented) for the 15% second lien notes (the "TCEH Second Lien Notes")

32

originally due April 1, 2021, by and among TCEH LLC and TCEH Finance, as issuers, the other TCEH Debtors, as guarantors, and Wilmington Savings Fund Society, FSB (a/k/a Christiana Trust) ("Wilmington Savings"), as successor indenture trustee to BNY, TCEH LLC and TCEH Finance issued the TCEH Second Lien Notes. Approximately $1.571 billion in principal amount of TCEH Second Lien Notes are outstanding as of the Petition Date.

71.    The TCEH Second Lien Notes are secured by a second priority lien on the collateral as set forth in that certain second lien security agreement, dated as of October 6, 2010, by and among the TCEH Debtors and BNY, as collateral agent, including substantially all of the assets of the TCEH Debtors other than (i) the same categories of assets excluded from the TCEH First Lien Debt and (ii) EFCH's equity interests in TCEH LLC and TCEH LLC's direct and indirect equity interests in the TCEH Debtors if the pledge of such equity interests would require that separate financial statements be filed with the Securities and Exchange Commission (the "SEC") for such subsidiaries. EFCH's guarantee of the TCEH Second Lien Notes is unsecured.

### d.    TCEH Unsecured Funded Debt.

#### i.    Senior Unsecured Notes.

72.    Pursuant to that certain indenture, dated as of October 31, 2007 (as amended, modified, or supplemented) for two series of unsecured notes (the "TCEH Unsecured Notes"), by and among TCEH LLC and TCEH Finance, as issuers, the other TCEH Debtors, as guarantors, and Law Debenture Trust Company of New York ("LDTC"), as successor indenture trustee to BNY, TCEH LLC and TCEH Finance issued the TCEH Unsecured Notes. The following TCEH Unsecured Notes are issued and outstanding as of the Petition Date:

- approximately $3.488 billion principal amount of 10.25% notes originally due November 1, 2015;[31] and

---

[31]    Including approximately $284 million held by EFH Corp. and approximately $79 million held by EFIH.

33

**PX 095**
**Page 36 of 464**

- approximately $1.749 billion principal amount of 10.50% notes originally due November 1, 2016.

<b>ii.    Pollution Control Revenue Bonds.</b>

73.    TCEH LLC has executed certain assumption agreements with respect to multiple series of Pollution Control Revenue Bonds that are held by unaffiliated third-parties.[32] As of the Petition Date, principal amounts outstanding under the Pollution Control Revenue Bonds totaled approximately $875 million in the aggregate, with interest rates generally ranging from .29%[33] to 8.25%, and original maturities ranging from June 1, 2021 to March 1, 2041. Of that amount, approximately $19 million of variable interest rate Pollution Control Revenue Bonds are supported by outstanding letters of credit issued under the TCEH Credit Agreement.[34] The remaining amounts outstanding under the Pollution Control Revenue Bonds are unsecured obligations of TCEH LLC. TCEH LLC's obligations under these agreements are not secured or guaranteed by any of the other TCEH Debtors.

<b>e.    Other TCEH Indebtedness.</b>

<b>i.    EFCH 2037 Notes</b>

74.    Pursuant to that certain indenture, dated as of December 1, 1995, for two series of notes (the "EFCH 2037 Notes") originally due January 30, 2037, by and among EFCH, as issuer, and BNY, as trustee, EFCH issued the EFCH 2037 Notes. Approximately $9 million in principal amount of the EFCH 2037 Notes are outstanding as of the Petition Date, including approximately $1 million of floating-rate notes and $8 million of 8.175% notes. The EFCH

---

[32]    Additional series of Pollution Control Revenue Bonds have been repurchased by TCEH LLC and are held in a custody account.

[33]    As of March 31, 2013.

[34]    Before the Petition Date, these amounts were callable on a daily or weekly basis, depending on series.

34

2037 Notes are not secured or guaranteed, and are subordinate to EFCH's other funded indebtedness.

### ii.    Tex-La Obligations.

75.    EFCH is the principal obligor of, and EFH Corp. guarantees, approximately $61 million of obligations related to a series of transactions by and among the predecessors of EFH Corp. and EFCH, on one hand, and the Tex-La Electric Cooperative of Texas, Inc. ("Tex-La"), on the other hand (the "Tex-La Obligations").    Approximately $29 million and $32 million of the Tex-La Obligations were originally due in 2019 and 2021, respectively.    The Tex-La Obligations are secured by a 2.17% undivided ownership in Comanche Peak's electricity generation and transmission assets and a 6.02% undivided ownership interest in the 51.5 mile 345 kV Comanche Peak-Cleburne-Everman transmission facility.    The Tex-La Obligations relate to a settlement of litigation between the predecessor of EFCH and Tex-La in 1990.

### iii.    Leases.

76.    The TCEH Debtors are parties to leases relating to, among other things: (A) rail cars; (B) office space; (C) equipment used in business operations, including mining equipment; and (D) long-standing leases of tracts of real property.

77.    Certain of the TCEH Debtors' rail car leases are structured as leveraged leases. Under these railcar leases, a trust owns railcars and leases the railcars to the TCEH Debtors.    The trusts, in turn, have issued notes that are secured by, among other things, the railcars subject to the lease and the trust's interest in the lease.

### iv.    Fixed Facility Bonds.

78.    The TCEH Debtors' combustion turbine electricity generation assets are structured as leveraged leases that are similar to the railcar leveraged leases discussed above. Importantly, however, the TCEH Debtors own the beneficial equity interests in the trusts that

35

own these assets. Accordingly, the TCEH Debtors are the beneficial owners and the lessors of these assets. Approximately $39 million remains outstanding on the notes secured by the combustion turbines.

**v.    Oak Grove Promissory Note.**

79.    In December 2010, Oak Grove Power Company LLC ("Oak Grove"), an indirect subsidiary of TCEH LLC, purchased certain mineral rights located in Robertson County, Texas from North American Coal Royalty Company. Concurrent with the sale, Oak Grove executed the Oak Grove Promissory Note, which is non-interest bearing and secured by the purchased assets. Approximately $3 million is outstanding under the Oak Grove Promissory Note as of the Petition Date.

**f.    Intercreditor Agreements.**

**i.    TCEH First Lien Intercreditor Agreement.**

80.    The TCEH first lien intercreditor agreement (as amended, restated, modified, and supplemented from time to time, the "TCEH First Lien Intercreditor Agreement") entered into by and among the TCEH Debtors, Citibank, N.A., as administrative agent and collateral agent, certain holders of claims under the TCEH First Lien Debt, and other parties thereto from time to time, governs certain rights and remedies as between the various holders of claims under the TCEH First Lien Debt, relative priority of claims, and certain rights and remedies in these chapter 11 cases. In particular, the TCEH First Lien Intercreditor Agreement provides that the collateral agent, acting at the direction of the majority of holders of claims under the TCEH First Lien Debt, may consent to the use of cash collateral and the acquisition of postpetition debtor-in-possession financing.

36

ii.    TCEH Second Lien Intercreditor Agreement.

81.    The TCEH second lien intercreditor agreement (as amended, restated, modified and supplemented from time to time, the "TCEH Second Lien Intercreditor Agreement") entered into by and among the TCEH Debtors, Citibank, N.A., in its capacity as successor first lien agent and collateral agent, and Wilmington Savings, as successor second lien indenture trustee, governs certain rights and remedies as between the holders of claims under the TCEH First Lien Debt, on one hand, and the holders of claims under the TCEH Second Lien Notes, on the other hand, including certain rights and remedies in these chapter 11 proceedings. In particular, the TCEH Second Lien Intercreditor Agreement provides that if the collateral trustee, acting at a direction of a majority of the holders of TCEH First Lien Debt pursuant to the TCEH First Lien Intercreditor Agreement, consents to the use of cash collateral and the acquisition of postpetition debtor-in-possession financing, the holders of TCEH Second Lien Notes may not contest such relief.

2.    **EFH Corp. and EFIH.**

a.    **Overview.**

82.    As of the Petition Date, EFH Corp. and EFIH had outstanding funded indebtedness of approximately $1.929 billion at EFH Corp. and approximately $7.709 billion at EFIH as summarized in the following table:[35]

---

[35]    In addition to these amounts, EFH Properties Company is obligated on a leveraged lease relating to Energy Plaza, EFH's corporate headquarters. The lease is currently serviced by the proceeds of a previously-drawn letter of credit issued under the TCEH Credit Agreement. EFH Corp. has a receivable from EFH Properties Company for this letter of credit, and reimbursed the TCEH Debtors for this letter of credit when it settled its obligations under the TCEH Demand Note (defined herein).

37

**PX 095**
**Page 40 of 464**

| Security | Debt Obligation | Approx. Amount Outstanding as of the Petition Date | Interest Payment Due Dates | Original Maturity/Payoff Date | Obligors |
|---|---|---|---|---|---|
| **EFH Corp. Debt** | | | | | |
| EFH Corp. Unsecured | EFH Legacy Notes | $1.864 billion[36] | May 15; November 15 | Varies by series, November 2014, November 2024, and November 2034 | EFH Corp. as issuer |
| | EFH LBO Notes | $60 million | May 1; November 1 | November 2017 | EFH Corp. as issuer EFCH as unsecured guarantor EFIH as unsecured guarantor |
| | EFH Unexchanged Notes | $5 million | Varies | Varies | EFH Corp. as issuer |
| **EFIH Debt** | | | | | |
| EFIH First Lien Secured | EFIH First Lien 2017 Notes | $503 million | February 15; August 15 | August 2017 | EFIH and EFIH Finance as issuers |
| | EFIH First Lien 2020 Notes | $3.482 billion | June 1; December 1 | December 2020 | |
| EFIH Second Lien Secured | EFIH Second Lien 2021 Notes | $406 million | May 15; November 15 | October 2021 | EFIH and EFIH Finance as issuers |
| | EFIH Second Lien 2022 Notes | $1.750 billion | March 1; September 1 | March 2022 | |
| EFIH Unsecured | EFIH Senior Toggle Notes | $1.566 billion | June 1; December 1 | December 2018 | EFIH and EFIH Finance as issuers |
| | EFIH Unexchanged Notes | $2 million | April 15; October 15 | October 2019 | |

### b.    EFH Corp. Debt.

83.    Approximately $1.929 billion in outstanding unsecured notes issued by EFH Corp. (the "EFH Unsecured Notes") are outstanding as of the Petition Date (including amounts held by EFIH).  In addition to the EFH Unsecured Notes, EFH Corp. guarantees the Tex-La Obligations described above.

### i.    EFH Legacy Notes.

84.    Pursuant to three separate indentures, each dated as of November 1, 2004 (as amended, modified, or supplemented), and three associated officer's certificates, each dated as of November 26, 2004, for three series of unsecured notes (the "EFH Legacy Notes"), by and among EFH Corp., as issuer, and American Stock Transfer & Trust Company, LLC ("AST"), as successor indenture trustee to BNY, the predecessor to EFH Corp. issued the EFH Legacy Notes. The following EFH Legacy Notes are outstanding as of the Petition Date:

---

[36]    Includes approximately $1.282 billion held by EFIH.

- approximately $371 million principal amount of 5.55% notes originally due November 15, 2014;[37]

- approximately $746 million principal amount of 6.50% notes originally due November 15, 2024;[38] and

- approximately $747 million principal amount of 6.55% notes originally due November 15, 2034.[39]

## ii.    EFH LBO Notes.

85.    Pursuant to that certain indenture, dated as of October 31, 2007 (as amended, modified, or supplemented) for two series of notes (the "EFH LBO Notes") originally due November 1, 2017, by and among EFH Corp, as issuer, EFCH and EFIH, as guarantors, and AST, as successor indenture trustee to BNY, EFH Corp. issued the EFH LBO Notes. The EFH LBO Notes are guaranteed on an unsecured basis by EFCH and EFIH. Approximately $60 million principal amount of EFH LBO Notes, including $33 million of 10.875% notes and $27 million of 11.25% notes, are outstanding as of the Petition Date.

## iii.    EFH Unexchanged Notes.

86.    Pursuant to two separate indentures, one dated November 16, 2009, and the other dated January 12, 2010 (each as amended, modified, or supplemented) for two series of unsecured notes (the "EFH Unexchanged Notes"), by and among EFH Corp., as issuer, and AST, as successor indenture trustee to BNY, EFH Corp. issued the EFH Unexchanged Notes. The EFH Unexchanged Notes are unsecured, unguaranteed obligations of EFH Corp. Approximately $3 million of 10.00% EFH Unexchanged Notes originally due January 2020 and $2 million of

---

[37]    Approximately $281 million of these notes are held by EFIH.

[38]    Approximately $545 million of these notes are held by EFIH.

[39]    Approximately $456 million of these notes are held by EFIH.

39

**PX 095**
**Page 42 of 464**

9.75% EFH Unexchanged Notes originally due October 2019 are outstanding as of the Petition

Date.[40]

### c.    EFIH Debt.

87.    As of the Petition Date, EFIH has approximately $7.709 billion in outstanding

funded indebtedness, including approximately: (i) $3.985 billion of first lien notes (the "EFIH

First Lien Notes"); (ii) approximately $2.156 billion of second lien notes (the "EFIH Second

Lien Notes"); and (iii) approximately $1.568 billion of unsecured notes (the "EFIH Unsecured

Notes").[41]    Additionally, as described above, EFIH is an unsecured guarantor of approximately

$60 million of EFH LBO Notes.

### i.    EFIH First Lien Notes.

88.    Pursuant to that certain indenture, dated August 14, 2012 (as amended, modified,

or supplemented), for the 6.875% EFIH First Lien Notes originally due August 15, 2017, by and

among EFIH and EFIH Finance, as issuers, and CSC Trust Company of Delaware ("CSC") as

successor indenture trustee to BNY, EFIH and EFIH Finance issued a series of EFIH First Lien

---

[40]    The EFH Unexchanged Notes were previously guaranteed by EFCH and EFIH. EFIH's guarantee was secured by a first priority lien on EFIH's equity interest in Oncor. The guarantees and lien were eliminated in subsequent transactions.

[41]    These amounts do not include any EFIH Makewhole Claims (as defined herein). As discussed below, EFIH and EFIH Finance (the "EFIH Debtors") have contemporaneously filed the *Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc. for Entry of (I) an Interim Order (A) Approving Certain Fees Related to Postpetition Financing and Granting Such Fees Administrative Expense Priority and (B) Scheduling a Final Hearing; and (II) a Final Order (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH First Lien Refinancing, (E) Authorizing Issuance of Roll-Up Debt to the Extent Authorized by the Settlement Motion, (F) Determining the Value of Secured Claims, and (G) Modifying the Automatic Stay* (the "EFIH First Lien DIP Motion"), pursuant to which the EFIH Debtors seek the authority to borrow approximately $5.35 billion to fund their obligations during these chapter 11 cases and refinance the EFIH First Lien Notes in full. In connection with the EFIH First Lien DIP Motion, the EFIH Debtors seek a determination that no make-whole amounts are due. The EFIH Debtors will also seek to refinance the EFIH Second Lien Notes pursuant to a separate motion filed on or around the Petition Date. The EFIH Debtors will seek to disallow any EFIH Second Lien Makewhole Claims asserted as a result of the EFIH Second Lien Refinancing.

40

Notes, of which approximately $503 million principal amount is outstanding as of the Petition Date.[42]

89.     Pursuant to that certain indenture, dated August 17, 2010 (as amended, modified, or supplemented), for the 10.00% EFIH First Lien Notes originally due December 1, 2020, by and among EFIH and EFIH Finance, as issuers, and CSC, as successor indenture trustee to BNY, EFIH and EFIH Finance issued a series of EFIH First Lien Notes, of which approximately $3.482 billion principal amount is outstanding as of the Petition Date.[43]

90.     The EFIH First Lien Notes are secured by first priority liens in the collateral as defined in the EFIH Collateral Trust Agreement (defined below) and certain related documentation, specifically, EFIH's equity interest in Oncor Holdings.  The EFIH First Lien Notes are not guaranteed.

### ii.     EFIH Second Lien Notes.

91.     Pursuant to that certain indenture, dated April 25, 2011 (as amended, modified, or supplemented) for the EFIH Second Lien Notes, by and among EFIH and EFIH Finance, as issuers, and Computershare Trust Company, N.A. and Computershare Trust Company of Canada ("Computershare") as successor indenture trustee to BNY, EFIH issued two series of EFIH

---

[42]    Pursuant to a registration rights agreement, EFIH agreed to use its commercially reasonable efforts to register notes under the Securities Act having substantially the same terms as the EFIH First Lien 2017 Notes as part of an offer to exchange freely tradable notes for the EFIH First Lien 2017 Notes by August 14, 2013.  The exchange offer was not completed by August 14, 2013, resulting in a .25% increase in interest rate.  Under the terms of the registration rights agreement, the interest rate on the EFIH First Lien 2017 Notes increased by another .25% 90 days after August 14, 2013.  The Debtors have reserved all of their rights with respect to the registration rights agreement.

[43]    Pursuant to a registration rights agreement, EFIH agreed to use its commercially reasonable efforts to register notes under the Securities Act having substantially the same terms as the EFIH First Lien 2017 Notes as part of an offer to exchange freely tradable notes for approximately $1.302 billion of the EFIH First Lien 2017 Notes issued in January 2013.  Under the terms of the agreement, the registration was supposed to occur by January 29, 2014.  The exchange offer was not completed by January 29, 2014, resulting in a .25% increase in interest rate.  Under the terms of the registration rights agreement, the interest rate on the applicable EFIH First Lien 2017 Notes will increase by another .25% on April 30, 2014.  The Debtors have reserved all of their rights with respect to the registration rights agreement.

PX 095
Page 44 of 464

Second Lien Notes. The following EFIH Second Lien Notes are outstanding as of the Petition Date:

- approximately $406 million principal amount of 11.00% EFIH Second Lien Notes originally due October 1, 2021; and

- approximately $1.750 billion principal amount of 11.75% EFIH Second Lien Notes originally due March 1, 2022.[44]

92. The EFIH Second Lien Notes are secured by second priority liens in the collateral as defined in the EFIH Collateral Trust Agreement (defined below) and certain related documentation, specifically, EFIH's equity interest in Oncor Holdings. The EFIH Second Lien Notes are not guaranteed.

### iii.    EFIH Unsecured Notes.

93. Pursuant to that certain indenture, dated as of November 16, 2009 (as amended, modified, or supplemented) for the 9.75% unsecured notes (the "EFIH Unexchanged Notes") originally due October 15, 2019, by and among EFIH and EFIH Finance, as issuers, and UMB Bank, N.A. ("UMB"), as successor indenture trustee to BNY, EFIH and EFIH Finance issued the EFIH Unexchanged Notes. Approximately $2 million of EFIH Unexchanged Notes are outstanding as of the Petition Date.[45]

94. Pursuant to that certain indenture, dated as of December 5, 2012 (as amended, modified, or supplemented) for 11.25%/12.25% toggle notes (the "EFIH Senior Toggle Notes") originally due December 1, 2018, by and among EFIH and EFIH Finance, as issuers, and UMB,

---

[44]    Pursuant to a registration rights agreement, EFIH agreed to use its commercially reasonable efforts to register notes under the Securities and Exchange Act having substantially the same terms as the EFIH Second Lien 2022 Notes as part of an offer to exchange freely tradable notes for the EFIH Second Lien 2022 Notes by February 5, 2013. The exchange offer was not completed by February 5, 2013, resulting in a .25% increase in interest for 90 days and an additional .25% increase when the exchange offer was not completed by May 6, 2013. The Debtors have reserved all of their rights with respect to the registration rights agreement.

[45]    The EFIH Unexchanged Notes were previously secured by a first priority lien on EFIH's equity interest in Oncor Holdings. The lien was eliminated in subsequent transactions.

42

**PX 095**
**Page 45 of 464**

as successor indenture trustee to BNY, EFIH and EFIH Finance issued the EFIH Senior Toggle Notes. Approximately $1.566 billion of EFIH Senior Toggle Notes are outstanding as of the Petition Date.[46]

### d.    EFIH Collateral Trust Agreement.

95.    The collateral trust agreement (as amended, restated, modified, and supplemented from time to time, the "EFIH Collateral Trust Agreement") entered into by and among EFIH, CSC, as successor indenture trustee for the EFIH First Lien Notes and as successor "Collateral Trustee" in the indentures governing the EFIH First Lien Notes and the EFIH Second Lien Notes, Computershare, as indenture trustee for the EFIH Second Lien Notes, and other parties thereto from time to time, governs certain rights and remedies as between the holders of claims under the EFIH First Lien Notes, on one hand, and holders of claims under the EFIH Second Lien Notes, on the other hand, including certain rights and remedies in these chapter 11 proceedings. In particular, the EFIH Collateral Trust Agreement provides that the collateral trustee, acting at the direction of a majority of holders of the EFIH First Lien Notes, may consent to the use of cash collateral and the acquisition of postpetition debtor-in-possession financing, and that holders of EFIH Second Lien Notes may not contest such relief.

### 3.    Oncor.

96.    As of December 31, 2013, Oncor, together with its subsidiary Oncor Electric Delivery Transition Bond Company LLC ("Oncor BondCo"), had approximately $6.29 billion of outstanding funded indebtedness. The Debtors expect that none of Oncor's business operations,

---

[46]    Pursuant to a registration rights agreement, EFIH agreed to use its commercially reasonable efforts to register notes under the Securities and Exchange Act having substantially the same terms as the EFIH Senior Toggle Notes as part of an offer to exchange freely tradable notes for the EFIH Senior Toggle Notes by December 5, 2013. The exchange offer was not completed by December 5, 2013, resulting in a .25% increase in interest for 90 days and an additional .25% increase when the exchange offer was not completed by March 5, 2014. The Debtors have reserved all of their rights with respect to the registration rights agreement.

PX 095
Page 46 of 464

assets, or liabilities, including Oncor's and Oncor BondCo's outstanding funded indebtedness, will be materially affected by the chapter 11 cases. Oncor's outstanding funded indebtedness will vary during these chapter 11 cases.

**Part II.**
**The Events Leading to the Chapter 11 Cases**

**A.     History of EFH Corp.**

97.     TXU Corp. (the predecessor of EFH Corp.) was historically a geographically-determined, vertically-integrated, rate-regulated monopoly electricity provider. In other words, TXU Corp. generated its own electricity and transmitted and sold that electricity to customers within its service territory at rates determined by the PUC. That changed with the partial deregulation of the Texas electricity market, which proceeded in two steps. *First*, in 1995, the Texas legislature passed legislation to begin deregulation of the wholesale electricity market. *Second*, in 1999, the Texas legislature passed legislation that mandated deregulation of the retail electricity market and unbundling of integrated utilities in the competitive ERCOT market into separate transmission and distribution utilities, which remained rate-regulated, and competitive electricity generators/wholesalers and retail electricity providers, to be accomplished by 2002. Accordingly, in 2002, TXU Corp. separated its regulated transmission and distribution utility from its deregulated generation, wholesale, and retail electricity units. The transmission and distribution utility remained rate-regulated while the generation, wholesale, and retail businesses became subject to market-driven prices and competitive forces.

98.     As discussed in greater detail below, the wholesale price of electricity is closely related to the price of natural gas in the ERCOT market. The monthly settled price of natural gas almost tripled between 1999 and 2006, resulting in significant increases in the enterprise value of TXU Corp. Moreover, the robust Texas economy led to continuing increases in the demand for

44

electricity. As a result of increases in natural gas prices, along with other efforts undertaken in the mid-2000s to address certain leverage and over-diversification issues, TXU Corp.'s performance improved and its stock value significantly increased between 2003 and early 2007.

**B.      The 2007 Acquisition.**

99.      On February 26, 2007, TXU Corp. announced that it had entered into a merger agreement with the EFH Equity Owners (along with certain co-investors). The merger agreement contemplated that the EFH Equity Owners and their co-investors, through a merger involving a merger subsidiary of the newly-created Texas Energy Future Holdings Limited Partnership, would acquire all outstanding shares of TXU Corp. for $69.25 per share in cash. This amount represented a premium over the stock price of TXU Corp. before the 2007 Acquisition was announced.

100.      In the 2007 Acquisition transaction, approximately $31.5 billion in new debt was issued, including approximately $27 billion at TCEH and approximately $4.5 billion at EFH Corp. Additionally, Oncor and TCEH drew approximately $1.3 billion and $250 million on new revolving credit facilities, respectively. Finally, the EFH Equity Holders and their co-investors contributed approximately $8.3 billion as equity capital. The 2007 Acquisition resulted in the cash buy-out of the equity held by former TXU Corp. shareholders totaling approximately $31.9 billion and the assumption of approximately $14.7 billion of existing debt, of which approximately $6.5 billion was repaid when the 2007 Acquisition closed.[47] Following these transactions, EFH had approximately $41.3 billion of outstanding funded indebtedness, including approximately $28.8 billion at TCEH, $128 million at EFCH, $7.2 billion at EFH Corp., and

---

[47]      Amounts exclude capital leases and a promissory note.

PX 095
Page 48 of 464

$5.2 billion at Oncor. The 2007 Acquisition was—and remains—the largest private buy-out in history.

### C.    EFH Following the 2007 Acquisition.

101.    After the 2007 Acquisition, the EFH Equity Owners put in place an experienced

management team, including the retention of key pre-2007 Acquisition management, and also

elected a well-qualified, diverse board of directors to execute their plan to improve EFH's

immediate and long-term competitive position. Today, EFH continues to be led by an

experienced team of management and directors, who include, among others:

- Donald L. Evans, who has been the Chairman of EFH Corp. since October 2007. Mr. Evans previously served as the U.S. Secretary of Commerce.

- John Young, who has been the President and CEO of EFH Corp., TCEH LLC, and EFIH since January 2008. Mr. Young previously held many leadership roles at Exelon Corporation from March 2003 to January 2008, including Executive Vice President and Chief Financial Officer of Exelon Corporation; President of Exelon Generation; and President of Exelon Power. Before joining Exelon, Mr. Young was Senior Vice President of Sierra Pacific Resources Corporation, Executive Vice President of Southern Generation, and served as a naval officer in the United States Navy for 5 years. In sum, Mr. Young has 30 years of experience in the utility industry.

- Paul Keglevic, who has been the CFO of EFH Corp., TCEH, and EFIH since July 2008, the co-CRO of EFH Corp. since October 2013, and the co-CRO of TCEH LLC and EFIH since February 2014. Mr. Keglevic previously was PricewaterhouseCoopers' Utility Sector Leader from 2002 to 2008 and Clients and Sector Assurance Leader from 2007 to 2008. Before that, Mr. Keglevic was the head of the utilities practice and Pacific Rim Managing Partner at Arthur Andersen, where he was a partner for 15 years. In sum, Mr. Keglevic has 38 years of experience in the utility industry.

- Stacey Doré, who has been the General Counsel of EFH Corp., TCEH LLC, and EFIH since April 2012, the co-CRO of EFH Corp. since October 2013, and the co-CRO of TCEH LLC and EFIH since February 2014. Ms. Doré has been with EFH since December 2008 and previously served as Associate General Counsel of Litigation and General Counsel of Luminant. Ms. Doré was previously an attorney at Vinson & Elkins.

- Mac McFarland, who has been CEO of Luminant since December 2012. Mr. McFarland has been with EFH since July 2008 and previously served as Executive Vice President and Chief Commercial Officer of Luminant. Before joining Luminant,

46

Mr. McFarland served as Senior Vice President of Mergers, Acquisitions and Divestitures and as a Vice President in the wholesale marketing and trading division power team at Exelon Corporation. In sum, Mr. McFarland has 16 years of experience in the utility industry.

- Jim Burke, who has been the CEO of TXU Energy since August 2005. Mr. Burke has been with EFH since October 2004 and previously served as Senior Vice President of Consumer Markets of TXU Energy. Before joining TXU Energy, Mr. Burke served as President and Chief Operating Officer of Gexa Energy and as a Senior Vice President of Consumer Operations with Reliant Energy, two other major Texas REPs. Previously, Mr. Burke worked for the Coca-Cola Company for six years in finance and general management for the domestic and international juice divisions. In sum, Mr. Burke has more than 20 years of experience in the retail services and consumer products industry, including 14 years in the retail electricity market.

102.    EFH's management team and board of directors have focused their efforts on implementing a host of initiatives that have resulted in numerous operational accomplishments notwithstanding challenging wholesale electricity market conditions. In addition to the specific initiatives discussed below, management has, among other things:

- identified and invested more than $10 billion in new electric infrastructure in Texas, including three new generation units, two new mining complexes, new transmission and distribution wires, approximately two million advanced meters, and also upgraded critical support and IT systems;

- increased Adjusted EBITDA[48] from approximately $4.578 billion in 2008 to approximately $5.257 billion in 2012 and $4.699 billion in 2013 despite low wholesale electricity prices and other challenging market conditions;

- achieved a reduction of approximately 15% in selling, general, and administrative expenses for the competitive businesses, including "bad debt" expenses, from 2009 to 2013, successfully reducing costs without negatively impacting necessary capital expenditures; and

- hired and/or insourced approximately 1,900 employees to support new assets, improve customer service, and improve operations.

---

[48]  "Adjusted EBITDA" measures earnings (net income) before interest expense, income taxes, depreciation, and amortization, adjusted to exclude noncash items, unusual items, and other adjustments allowed under certain of EFH's debt documents.

47

PX 095
Page 50 of 464

1.     **Luminant Remains a Market Leader in All Aspects of Electricity Generation and Wholesale Operations.**

103.    Following the 2007 Acquisition, Luminant continued a robust hedging program designed to reduce the risks of a decline in wholesale electricity prices. The hedging program used financial natural gas instruments to reduce Luminant's exposure to declines in future wholesale electricity prices that result from decreases in the price of natural gas. This program has operated as designed and contributed approximately $998 million, $1.833 billion, and $1.265 billion, $1.152 billion, and $752 million of TCEH's Adjusted EBITDA in 2013, 2012, 2011, 2010, and 2009, respectively, compared to TCEH's overall Adjusted EBITDA of $2.919 billion, $3.574 billion, $3.584 billion, $3.85 billion, and $3.634 billion in those same years. As discussed below, however, a significant portion of TCEH's hedge program matured in 2013, and the remaining position has, or will, mature in 2014.

104.    Luminant also completed construction on three new lignite/coal units in 2009 (for new units at Sandow and Oak Grove) and 2010 (for a second new unit at Oak Grove) and offset 100% of key emissions from the new units through a voluntary emissions reduction program. The new units satisfied one of many commitments made in connection with the 2007 Acquisition, helped to ensure sufficient generation capacity in the ERCOT market, and were completed on-time and on-budget. Luminant also terminated plans for eight additional lignite/coal generation units in compliance with its 2007 Acquisition-related commitments.

105.    Since the 2007 Acquisition, Luminant has achieved significant operational milestones while making significant investments in environmental improvements. Luminant's nuclear and lignite/coal-fueled generation units are consistently among the most reliable and efficient in the country. Additionally, the two new units at Oak Grove have the lowest key emissions rates of any Texas lignite units with rates that are at least 63% lower than the national

48

average for coal units. Since the 2007 Acquisition, Luminant has increased its lignite/coal-fueled generation output by 21% while satisfying its commitment to decrease the key emissions of its lignite/coal-fueled units by more than 20% from a 2005 benchmark. Luminant is also a significant purchaser of wind-generated electricity in Texas, with contracts for approximately 700 MW of wind power and related renewable energy credits. These purchases have allowed Luminant to contribute to environmental improvements and allowed TXU Energy to diversify its retail product offerings.

106.    Luminant's mining activities have also continued to add value to EFH and, specifically, to the TCEH Debtors. Since the 2007 Acquisition, Luminant has added two mines and is in the process of opening three additional mining operations and expanding operations at other sites. Additionally, Luminant has been the recipient of numerous awards and acknowledgements related to mining safety and land reclamation, including an unprecedented five Director's Awards for advancing the science of reclamation from the U.S. Department of the Interior's Office of Surface Mining, most recently in 2009; the Texas Coal Mining Reclamation Award from the RCT in 2014; and the 2014 National Mine Reclamation Award in the coal category from the Interstate Mining Compact Commission.

107.    Importantly, Luminant has achieved these operational successes while maintaining a very strong safety record. For example:

- in 2012, Luminant recorded its best safety year on record as measured by a key industry standard of number of incidents reportable to the Occupational Safety and Health Administration per 200,000 man-hours;

- three of Luminant's mines have recorded between two and four years without any injuries that resulted in "lost time"—in other words, no workers at those mines have been injured in a way that has resulted in any time off the job;

- Luminant's natural gas-fueled plants have had no "lost time" injuries for nine years;

49

- the Monticello lignite/coal-fueled plant has not had a lost-time injury for 21 years; and

- Comanche Peak's employees and contractors have worked more than seven million total hours without a lost-time injury.

### 2.    TXU Energy Remains a Market-Leading REP.

108.    TXU Energy has maintained its position as a leading REP in Texas by providing top-tier customer services, focusing on target customers, leveraging its high brand recognition, maintaining highly competitive retail prices, and providing innovative products and services. Importantly, TXU Energy has reduced customer complaints by more than 88% since 2009 and is in the top decile of performance in the industry with respect to customer complaints. At the same time, TXU Energy has lowered "bad debt" expense by 71% since 2009 through collection initiatives, customer mix initiatives, and credit policy improvements. TXU Energy has also maintained its position as a leader in technological innovation, leading the way in developing digital capabilities that allow customers to manage and control their electricity costs, such as smart phone applications that allow users to adjust their thermostat remotely. TXU Energy's commitment to innovation makes its products more attractive to customers and improves the environmental footprint of EFH by improving its customers' energy efficiency.

109.    Following the 2007 Acquisition, TXU Energy instituted a 15% residential price cut to legacy customers, making it the lowest-cost incumbent provider in Texas, and locked those rates in place through 2008. TXU Energy also provided approximately $125 million in low-income customer assistance through 2012, waived deposit requirements for certain customers, and formed a new Low Income Advisory Committee made up of leaders in the social service delivery sector. TXU Energy Aid[SM] is the company's flagship program for customers in need and is the largest bill payment assistance program in the nation among electricity providers.

50

Over the past 30 years, TXU Energy Aid[SM] has provided more than $84 million to help more than 455,000 current or former customers in temporary financial need pay their electric bills.

110.    Additionally, TXU Energy has invested more than $100 million to develop innovative, sustainable, and energy savings products and services to help customers better manage their electricity usage.  The suite of sustainability and energy savings solutions, as well as time of use electricity plans, benefit residential and business customers.  A portion of the investment was dedicated to initiatives for low-income customers.  The program has been beneficial to the environment—lower consumption means lower levels of pollutants—and beneficial to EFH's ability to attract and retain customers demanding greater control over their electricity use.

111.    TXU Energy's initiatives have generated positive results.  There are more than 50 REPs offering more than 300 electricity plans to residential customers in areas serviced by Oncor.  Yet, even with that level of competition, TXU Energy's annual residential customer net attrition numbers have declined since 2011.  In fact, TXU Energy had less than 1% net attrition in both the third and fourth quarters of 2013.  Indeed, TXU Energy has the lowest residential net attrition among the "incumbent" REPs (*i.e.*, REPs that are associated with a pre-deregulation electric utility) in the areas traditionally served by those incumbent REPs since 2001.  In other words, since deregulation in 2002, TXU Energy has maintained a larger portion of its residential customers than other incumbent REPs.[49]

---

[49]    Based on information provided by the PUC that evaluates the number of residential customers who purchase electricity from the REP that is historically associated with that customer's regulated transmission and distribution utility.  In other words, a higher percentage of Oncor's customers purchase their electricity from TXU Energy compared to the same statistic for the other regulated transmission and distribution utilities and formerly affiliated REPs in Texas.

51

### 3.    Other Initiatives.

112.    Following the 2007 Acquisition, EFH put a number of initiatives in place in addition to the operational improvements at TXU Energy and Luminant.  Importantly, EFH has focused on achieving cost savings and service excellence in its provision of shared services to create value for TCEH and the rest of EFH.  The results have been positive:  costs have declined significantly while service has improved significantly.  Part of that improvement has been the reversal of certain outsourcing agreements for human resources, IT, supply chain, and some accounting functions.  Insourcing a significant portion of those functions has resulted in lower cost to EFH while also improving the quality of service to the business and external customers.

113.    Additionally, EFH established a sustainable energy advisory board composed of labor,  economic  development,  reliability/technology,  and  environmental  advocacy representatives of the Texas community as part of a long-term commitment to being a leader on sustainability issues.

### D.    The Result of Low Natural Gas Prices on EFH's Financial Performance Following the 2007 Acquisition.

114.    The 2007 Acquisition was driven, in part, by the expectation that natural gas prices and wholesale electricity prices in the ERCOT market would either stay steady or continue to rise over the long run, or, at a minimum, that there would not be a significant long-term decline in natural gas prices.  These expectations held true in the year following the 2007 Acquisition. The monthly NYMEX Henry Hub settled price of natural gas futures contracts was $6.42 per MMBtu in October 2007, when the 2007 Acquisition closed.  In 2008, that figure rose as high as $13.11 per MMBtu.  Additionally, the average monthly NYMEX Henry Hub futures contract settled prices for the years ending December 31, 2007 and 2008 were $6.86 per MMBtu and $9.03 per MMBtu, respectively.  Those increases in natural gas prices contributed, in part, to

52

increases in ERCOT wholesale electricity prices from $52.42 per MWh in 2007 to $63.44 per MWh in 2008. Operating revenues for the competitive electric segment (*i.e.*, TCEH) increased from $8.56 billion to $9.79 billion in the years ending December 31, 2007 and 2008, respectively, due in part to higher wholesale electricity prices reflecting rising natural gas prices. As discussed below, however, technological breakthroughs began to fundamentally alter the energy landscape beginning in 2008, leading, in principal part, to the Debtors' current financial difficulties.

> 1.    **The Texas Electricity Market and the Role of ERCOT.**

115.    Texas is the largest electricity market in the United States and the eleventh-largest electricity market worldwide—ranking ahead of, among others, the United Kingdom, Italy, and Spain. Several regional reliability coordinating organizations are responsible for ensuring the reliability of the Texas electricity system, and ERCOT is the largest such organization. The ERCOT market covers 75% of Texas's land mass and represents approximately 85% of the electricity consumption in Texas.

116.    The ERCOT mark is a unique "power island" contained within Texas. The following map shows reliability areas, which are generally subject to regulation by the FERC and several regional reliability agencies.

53

**PX 095**
**Page 56 of 464**



117.    Most of these reliability areas are part of the much larger western and eastern interconnections. The ERCOT reliability region, by contrast, is also its own standalone interconnection, and it has very limited export and import capability. Accordingly, approximately 98% of the electricity generated in the ERCOT market is consumed in the ERCOT market.

118.    ERCOT is the regional independent system operator ("ISO") for the ERCOT interconnection—by contrast, no other interconnections or reliability regions are completely served by a single ISO. ERCOT schedules power on an electric grid that connects 40,500 miles of transmission lines and more than 550 generation units, comprising approximately 84,500 MW of installed generation capacity, including approximately 2,000 MW of idled capacity and more than 11,500 MW of wind and other resources that are not available under certain conditions. Of the total installed capacity, approximately 59% is natural gas-fueled generation, 28% is lignite/coal and nuclear-fueled generation, and 13% is fueled by wind and other renewable resources.

54

PX 095
Page 57 of 464

119.    ERCOT is responsible for procuring energy on behalf of its members while maintaining the reliable operation of the electricity supply system in the market. ERCOT also performs financial settlements for the competitive wholesale electricity market and enforces certain credit requirements, including collateral posting requirements, to ensure market participants' creditworthiness for transactions facilitated by ERCOT.    Additionally, ERCOT administers retail switching for the 6.7 million customers[50] in the ERCOT market that have the ability to choose their REP. ERCOT's membership consists of approximately 300 corporate and associate members, including electric cooperatives, municipal power agencies, independent generators, independent power marketers, investor-owned utilities, REPs, and consumers. ERCOT operates under reliability standards set by the NERC and the TRE and is subject to regulatory and legislative oversight by the PUC.

120.    Notwithstanding the ERCOT market's "power island" status, the delivery of electricity in the ERCOT market operates similarly to other electricity markets in the United States. Market participants buy and sell electricity utilizing both the spot or "real-time" market (*i.e.*, electricity for current transmission/distribution and use by consumers) and the day-ahead market, both of which are facilitated by ERCOT in its role as the ISO, and through bilateral contracts that indirectly facilitate the majority of wholesale electricity sales in the ERCOT market. These markets allow ERCOT, in conjunction with the qualified scheduling entities that transact directly in the day-ahead and spot markets (facilitated by the bilateral contracts entered into between electricity generators/wholesalers, retailers, and the qualified scheduling entities), to ensure that electricity is reliably delivered to all market participants.

---

[50]    Measured by number of electricity meters.

**PX 095**
**Page 58 of 464**

a.    **The Role of Natural Gas in Wholesale Electricity Pricing in the ERCOT Market.**

121.    Natural gas-fueled generation accounted for approximately 59% of the electricity generation capacity, and 41% of the electricity actually produced and consumed, in the ERCOT market in 2013.    Natural gas units, however, meet the peak, or "marginal," electricity demand approximately 70-90% of the year.    Accordingly, when natural gas-fueled units satisfy demand, prices for wholesale electricity are highly correlated to the price of natural gas.    The chart below illustrates the correlation between natural gas prices and wholesale electricity prices between 2007 and the beginning of 2014:



ERCOT North HUB Power Price: Average of Hourly Real-Time Settlement Point Power Prices for the specified delivery month for the ERCOT North HUB (a price point in the current nodal market structure) from December 2011 to March 2014 and the ERCOT North Zone (comparable price point in the previous zonal market structure) from January 2007 to November 2011

NYMEX Natural Gas Price: Final NYMEX Henry Hub Physical Futures settled price for the specified delivery month from January 2007 to March 2014

122.    There are essentially six classes of generation assets in the ERCOT market: (i) renewable generation (including wind, hydro-electric, and solar generation); (ii) nuclear;

56

(iii) lignite/coal; (iv) combined-cycle gas turbines ("CCGTs"), which are more efficient natural gas units; (v) other natural gas and oil assets; and (vi) internal combustion assets. As demand for electricity increases or decreases, ERCOT dispatches its assets in ascending order based on cost to generate each marginal MW of electricity. That cost is generally approximated by a unit's fuel expense.

123.    Generally, in the ERCOT market, when natural gas prices are high, the cost to generate electricity using natural gas-fueled units is high. These natural gas-fueled units generally set the cost for wholesale electricity in the ERCOT market because they normally satisfy the marginal demand for electricity. As a result, high natural gas prices generally lead to high wholesale electricity prices. Lignite/coal and nuclear-fueled units have the ability to benefit from these increases in wholesale electricity prices: the variable cost to produce electricity using these units are not directly affected by changes in natural gas prices, and the electricity generated by lignite/coal and nuclear-fueled units can be sold for the higher wholesale prices set by natural gas-fueled plants. Importantly, however, lignite/coal and nuclear units have high start-up costs relative to natural gas units and require longer notice or "lead time" to start. As a result, lignite/coal units may run at a loss when wholesale electricity prices are low.

124.    Natural gas units, by contrast, typically have lower start-up costs and generation can be substantially increased or decreased in a relatively short period of time. As a result, natural gas units are more likely to be shut down when wholesale electricity prices are below the natural gas unit's cost to produce electricity. Importantly, when natural gas prices are relatively low, the cost of producing electricity from CCGTs may drop below the cost of producing electricity from lignite/coal units. When this occurs, these CCGTs—which Luminant does not own—can displace lignite/coal units, including certain of Luminant's lignite/coal units, at lower

levels of demand, and exacerbate the effect low natural gas prices have on the profitability of those lignite/coal units. This is a market function known as "coal to gas switching."

125.    These factors reflect a key economic driver for the Debtors: high natural gas prices contribute to high wholesale electricity prices and higher profitability for Luminant's entire electricity generation fleet, particularly its lignite/coal and nuclear-fueled units. By contrast, declines in natural gas prices result in lower wholesale electricity prices, increased coal-to-gas switching, lower generation from lignite/coal units, and lower profitability for Luminant's entire electricity generation fleet. As discussed below, market conditions and technological innovations led to such a decline following the 2007 Acquisition—and that decline has had a substantial negative effect on the results of TCEH's business operations, even after accounting for TCEH's natural gas hedging program.

### 2.    The Precipitous Drop in Natural Gas Prices Resulting From the Development of Unconventional Natural Gas.

126.    When the 2007 Acquisition closed, market conditions, including forward natural gas prices, indicated that EFH would be able to service, repay, and refinance its 2007 Acquisition-related debt and generate positive returns for the EFH Equity Owners and their co-investors. As discussed below, however, a precipitous and prolonged decline in natural gas prices that resulted from increased exploitation and production of "unconventional" natural gas fundamentally altered market conditions not just for EFH, but for the United States and global energy industry as a whole.

127.    The increased exploitation and development of unconventional natural gas largely results from the development of a process known as hydraulic fracturing (widely known as "fracking"). Unconventional natural gas rests 5,000 to 15,000 feet below the surface, trapped within shale rock and tight sand formations. Geologists have long known that the United States

58

has access to the world's largest concentration of natural gas, but until the development of fracking, much of that gas could not be economically extracted. At its core, the fracking process is simple. Engineers crack open the shale rock holding the gas by pumping highly-pressurized fluid into the rock, allowing the gas to escape. When the well is de-pressurized, the gas—which is higher-pressure than the fluids used to break the rock apart—flows to the surface.

128.    Both technological limitations and federal law limited early attempts to capitalize on fracking. For example, for effective fracking, the cracks in the shale rock must be maintained by a high amount of pressure. Early processes did not maintain pressure long enough to enable the gas to escape, and picking a spot for new drilling was little better than guesswork because of limitations on underground imaging technology. Moreover, fracking was essentially banned by the Safe Drinking Water Act, which imposed strict requirements on the injection of industrial chemicals into the ground. In 2005, however, Congress—citing a 2004 EPA study indicating that the process is safe—lifted the fracking ban.

129.    Between 2005 and 2008, natural gas prices continued to increase. The prolonged, substantial decreases in natural gas prices that later occurred as a result of fracking were not anticipated at the time of the 2007 Acquisition because of, among other things, technological barriers, environmental concerns, expected increases in natural gas exports, and expected decreases in production to offset decreases in price. Contrary to expectations at the time of the 2007 Acquisition, however, the technological barriers were overcome. Lubricating agents were developed that allowed for cheaper injection of fluid at higher pressures and chemical mixtures were developed that maintained the cracks in the shale rock for longer periods of time. Seismic imaging technology produced greater certainty about the location of wells. Horizontal drilling advancements allowed for the increase of the "drillable" size of each well.

PX 095
Page 62 of 464

130.    Together, these advances decreased costs and increased yield, making the process immensely profitable and leading to a dramatic increase in available natural gas reserves, as demonstrated by the following map:



### Shale Plays in Major U.S. Basins
**Total Basin Reserves - Year End 2006 & 2011**

131.    These improvements in the fracking process led to a dramatic increase in natural gas production in the United States since 2008, even as gross withdrawals from traditional sources of natural gas declined:[51]

---

[51]    Source-by-source information for natural gas production is not available from the EIA for 2013.

PX 095
Page 63 of 464



132.    These unexpected increases in natural gas production caused natural gas prices to fall to as low as $2.04 per MMBtu in April 2012—the lowest price since February 2002—and natural gas prices have generally stayed in the range of $2.50–$4.80 per MMBtu since then, with the exception of certain weather-driven events.  Although the extremely cold weather throughout most of the country in the fall and winter of 2013/2014 contributed to significant natural gas price increases—causing short-term prices to reach as high as $6.15 per MMBtu on February 19, 2014, for March 2014 delivery—short-term prices have already declined significantly from those highs.  And even those higher, weather-related short-term natural gas prices are below the natural gas prices that prevailed at the time of the 2007 Acquisition.  Longer-term natural gas prices were not significantly influenced by those increases in short-term prices.

### 3.    The Effect of Low Natural Gas Prices on EFH.

133.    The prolonged, significant decline in natural gas prices has significantly decreased the profitability of TCEH's lignite/coal and nuclear-fueled units.  These market conditions have resulted in significant declines in TCEH's revenues that have not been entirely

61

offset by TCEH's natural gas hedging program, and by the end of 2014, the remaining favorable

natural gas hedges will mature. The consequences to the profitability of TCEH's units have been

significant: declining natural gas prices, increased competition from more economic generation

assets (including renewable generation and more efficient natural gas-fueled technology), along

with other macroeconomic drivers, resulted in significant declines in revenues and the

recognition of impairments to TCEH's goodwill intangible asset balance of $1.0 billion in 2013,

$1.2 billion in 2012, and $4.1 billion in 2010.[52]

      134.    In response to these economic conditions, Luminant has reduced the amount of

time that certain lignite/coal-fueled units, that are comparatively more expensive to operate,

generate electricity in order to reduce the amount of electricity generated uneconomically. These

reductions generally take one of two forms. Luminant may temporarily cease electricity

generation at certain lignite/coal units for short periods of time when the demand for electricity

and wholesale electricity prices in the ERCOT market are comparatively low. The units resume

operation when demand for electricity, and wholesale electricity prices, are comparatively high.

Alternatively, certain units may be operated on a seasonal basis in response to sustained periods

of comparatively low wholesale electricity prices and demand for electricity. Indeed, Luminant

has sought and received permission in the past to operate two of its lignite/coal units at

Monticello, along with one unit at Martin Lake, on a seasonal basis, and Luminant anticipates

that it will continue to operate these units on a seasonal basis going forward. In 2013 and 2012,

the estimated effects of these generation reductions of lignite/coal-fueled units totaled

approximately 12,460 GWh and 10,410 GWh of lowered electricity output, respectively.

---

[52]    TCEH also recorded an $8 billion goodwill impairment in 2008. That impairment, however, was largely unrelated to TCEH's performance or the value of its assets. Instead, that impairment was due primarily to the financial crisis/economic recession in 2008 that dramatically increased discount rates; Oncor recorded a goodwill impairment of approximately $860 million in the same year.

PX 095
Page 65 of 464

135.    TCEH's long-term natural gas hedges, which were put in place in 2006, 2007, and 2008, largely matured by 2013, and the remainder either already has, or will mature in 2014. These maturities have already, and will continue to, exacerbate the TCEH Debtors' balance sheet-related challenges. As of April 30, 2008, TCEH had hedged approximately 85% of its 2009–2013 expected natural gas price exposure associated with its expected nuclear, coal, and lignite generation, with natural gas positions at average prices ranging from $7.25 per MMBtu to $8.26 per MMBtu. Further, most of the hedging transactions were secured with a first lien interest in TCEH's assets, which eliminated normal collateral posting requirements for those wholesale hedging transactions and associated effects on liquidity.

136.    As of December 31, 2013, approximately 95% of TCEH's exposure to natural gas prices in 2014 was hedged. Of that amount, however, only approximately 30% is attributable to TCEH's historical natural gas price hedging program, primarily consisting of financial options that effectively "lock in" the price of natural gas at approximately $7.80 - $11.75 per MMBtu. The options represent the final highly favorable positions that TCEH was able to enter into before natural gas prices declined; lower forward natural gas prices and the associated effect on TCEH's financial condition precluded entry into hedges on similar terms for the remainder of 2014 exposure and beyond. The remainder of TCEH's natural gas exposure for 2014 is hedged with either forward sales of electricity or other natural gas hedges. These forward sales or other natural gas hedges are at prices that are closer to current market prices of natural gas, versus the favorable prices of the hedges that were executed in 2006, 2007, and 2008. As a result, TCEH is experiencing significantly greater exposure to lower natural gas prices and correspondingly

63

lower wholesale electricity prices, and will continue to be exposed to these pressures going forward.[53]

### E.    Other Market Conditions Affecting TCEH's Performance.

137.    In addition to lower wholesale electricity prices resulting from low natural gas prices, TCEH's financial performance has also been affected by other market and regulatory considerations.

138.    *First*, TCEH's financial difficulties resulting from the effect of low natural gas prices are punctuated by TCEH's significant exposure to the uncertain costs of environmental litigation and regulation, including both air quality and global climate change regulation. TCEH incurred more than $600 million of environmental capital expenditures from 2010 through 2013, and additional such expenditures are expected to total nearly $450 million from 2014 through 2020. That amount could be subject to material increases depending upon any new environmental regulations.

139.    Examples of environmental regulation and litigation-related expenses include regulations and litigation related to air quality standards under the Clean Air Act, including the much-litigated Cross-State Air Pollution Rule that was heard by the Supreme Court of the United States in December 2013, litigation and regulation related to the byproducts of electricity generation, and steps to address greenhouse gas emissions. Each of these categories of regulation and litigation, along with others, impose cost and uncertainty on TCEH's business operations.

140.    *Second*, the cost of delivered coal has increased since the 2007 Acquisition for four reasons: (a) increases in the price of Powder River Basin Coal, which is used to fuel several

---

[53]    The TCEH Debtors have sought the authority to take steps to preserve these positions and otherwise continue their hedging activities on a postpetition basis pursuant to the Hedging and Trading Agreements Motion.

PX 095
Page 67 of 464

of the Debtors' coal-fueled units (b) higher rail transportation costs; (c) the addition of rail fuel surcharges to certain agreements; and (d) inflation. These increases in the cost of delivered Powder River Basin coal increase the cost of operating Luminant's lignite/coal-fueled units and, consequently, reduce overall profits.

141. **Third**, electricity demand is driven, in part, by general macroeconomic conditions. The economic recession in 2008/2009 had a negative effect on the demand for electricity, as illustrated by the following chart:[54]



142. **Fourth**, following the deregulation of the Texas electricity market, a significant number of REPs entered the retail electricity market. As is the case in most competitive markets, certain of these REPs have been willing to offer products with prices that are low enough to draw away customers from other REPs, including TXU Energy, that focus on maintaining a higher level of customer service and a broader variety of technological and other offerings. Retail market restructuring in the ERCOT market was designed to encourage customers to shop for alternatives to incumbent REPs such as TXU Energy that are associated with pre-deregulation utilities. As a result of this fierce competition, TXU Energy, along with many other Texas REPs, has experienced customer attrition.

---

[54]    Based on an ERCOT long-term forecast as of May 8, 2007.

143.    *Fifth*, developments, and associated tax incentives for, renewable energy sources like wind power have increased the supply of electricity derived from such sources. A key driver of increased wind generation has been the competitive renewable energy zone program, which is designed to facilitate the transmission of electricity generated in west Texas and the Texas panhandle to the load centers located in major metropolitan areas. Indeed, according to ERCOT, wind capacity in the ERCOT market has increased from approximately 3,426 MW in the summer of 2007 to approximately 10,570 MW in the summer of 2013—an increase of 208.5%. Similarly, actual wind production increased from approximately 8,800 GWh in 2007 to approximately 32,700 GWh in 2013—an increase of approximately 271.6%. After capital costs are invested, wind power is essentially free to generate: the fuel source (wind) is free, and, for each MWh of electricity generated, wind generators benefit from governmental incentives like production tax credits and renewable energy credits regardless of the wholesale price of electricity in the ERCOT market. These increases in wind generation can increase the amount of time Luminant's lignite/coal-fueled units operate unprofitably and at lower output than design.

**F.    EFH's Financial Outlook and Business Strategy Going Forward.**

144.    The Debtors' balance sheet is unsustainable given expected market conditions. Once the Debtors' balance sheet problems are addressed, however, EFH will be poised to leverage its core operations, sales and customer service expertise, and shared services skills to take advantage of possible growth opportunities. Demand for electricity in the ERCOT market is forecasted to grow at a compound annual growth rate of 1.3% from 2014 to 2022, resulting in the potential need to build generation resources in the ERCOT market. Additionally, the Debtors' fundamental business operations are strong notwithstanding the downward pressure placed on wholesale electricity prices by low natural gas prices and high levels of competition. Once the

66

Debtors' balance sheet is de-levered, the Debtors expect that they will be able to operate their businesses profitably and aggressively pursue opportunities as they arise.

### G.    EFH's Reorganization Efforts.

145.    Following the 2007 Acquisition and the subsequent decline in market conditions and increase in environmental costs, EFH took a number of steps to maximize the value of the business. As discussed below, those efforts resulted in significant successes.

#### 1.    EFH Implements Financial Transactions.

146.    Since the 2007 Acquisition, EFH has executed several transactions to reduce or extend its debt obligations, reduce cash interest payments, eliminate significant contingent liabilities, and maximize the value of EFH, as discussed below.

##### a.    The Liability Management Program.

147.    In October 2009, the Debtors initiated a Liability Management Program focused on improving the Debtors' balance sheets by reducing debt and cash interest payments and extending debt maturities through debt exchanges, repurchases, and issuances. Since its inception, the Liability Management Program has captured approximately $2.5 billion in debt discount, including approximately $700 million of debt discount at TCEH, by acquiring approximately $12.57 billion in debt in exchange for approximately $10.04 billion of new debt and/or cash (including cash funded by debt issuances).

148.    Additionally, through the liability management program, EFH has amended and extended approximately $25.7 billion of debt maturities to 2017-2021. The original maturities ranged from 2013 (in the case of certain amounts under the TCEH Credit Agreement, as discussed below) to 2017 (in the case of certain notes issued in connection with the 2007 Acquisition). Additionally, certain debt exchanges and repurchases involved debt issued in earlier Liability Management Program transactions that had maturity dates in 2019 and 2020.

**PX 095**
**Page 70 of 464**

149.    Amendments to the TCEH Credit Agreement completed in April 2011 and January 2013 resulted in the extension of $16.4 billion in loan maturities to 2017 and the extension of $2.05 billion of commitments under the revolving credit facility to 2016.[55]   In connection with the April 2011 amendment, approximately $1.623 billion of claims under the TCEH Credit Agreement were repaid using $1.604 billion of net proceeds from issuing the TCEH First Lien Notes (the remainder was sourced from cash on hand).   The April 2011 amendment also included an amendment to certain of the TCEH Credit Agreement's financial covenants that allowed the TCEH Debtors to avoid triggering an event of default.

150.    EFH also attempted to segregate the credit risk of EFH Corp., EFIH, and EFCH/TCEH. EFH attempted to accomplish this goal through a combination of the exchanges discussed above—many of which resulted in the elimination of EFH Corp. debt that was guaranteed by both EFCH and EFIH—and issuing EFIH Second Lien Notes to fund the repayment of intercompany demand notes from TCEH to EFH Corp. that were guaranteed by EFIH. This effort was driven, in part, by an effort to reduce the cost of capital at EFH Corp. and EFIH that would result from isolating EFH Corp. and EFIH from TCEH's credit risk, preserve EFIH's access to the credit markets, and settle the payment obligations of EFH Corp. and EFIH to TCEH in an efficient and orderly manner prior to TCEH needing cash to continue operations and demanding payment in full of all amounts outstanding under the intercompany demand notes. Additionally, isolating EFH Corp. and EFIH from TCEH's credit risk was part of EFH's strategy to pursue a consolidated restructuring transaction.

---

[55]    Additional amendments were made to the TCEH Credit Agreement in August 2009.

b.    **Tax Transactions.**

151.    In addition to the significant value generated through the Liability Management Program, EFH also eliminated several large contingent tax liabilities. *First*, as a result of various transactions over the years, including the 2007 Acquisition, EFH Corp. generated multi-billion dollar deferred intercompany gain ("DIG") and excess loss account ("ELA") contingent tax liabilities with respect to its equity interests in EFCH. Specifically, the equity interests in EFCH held by EFH Corp. reflected an accumulated excess loss account of approximately $19 billion and deferred intercompany gain of approximately $4 billion as a result of the 2007 Acquisition and prior corporate transactions. EFH determined that certain restructuring transactions could result in recognition of those amounts, resulting in significant taxable gain and tax liability.

152.    To eliminate the risk of these significant tax liabilities, EFH Corp. sought and obtained a private letter ruling from the IRS that allowed EFH Corp. to eliminate the DIG and ELA without adverse tax consequences. The transaction was consummated on April 15, 2013.

153.    It is important to note that while this transaction reduced certain potential tax liabilities with respect to the TCEH Debtors, the transaction did not eliminate the multi-billion-dollar tax burden associated with a potential taxable sale of the TCEH Debtors' assets or EFIH's direct and indirect equity interests in Oncor Holdings and Oncor, either through a plan or through a section 363 sale.

154.    *Second*, in March 2013, EFH and the IRS agreed on terms to resolve disputed tax return adjustments related to the IRS audit for tax years 2003-2006, including most significantly an adjustment relating to an accounting-method issue (as well as other less significant issues). This settlement allowed EFH to eliminate approximately $922 million of potential liability for uncertain tax positions while avoiding material cash liability payable to the IRS.

PX 095
Page 72 of 464

c.    **Restructuring of the Debtors' Long-Term Employee Pension Obligations.**

155.    EFH also modified its pension plan in 2012 to provide greater certainty regarding future costs.[56] The modifications resulted in:

- splitting off assets and liabilities under the plan associated with employees of Oncor and all retirees and terminated vested participants of EFH (including discontinued businesses) to a new plan sponsored and administered by Oncor;

- splitting off assets and liabilities under the plan associated with active employees of the Debtors, other than bargaining unit employees, to a terminating plan, freezing benefits, and vesting all accrued plan benefits for such pension participants;

- terminating, distributing benefits under, and settling all of EFH's liabilities under the terminating plan, resulting in a reduction in annual pension expense by approximately $40 million, mostly for the Debtors; and

- maintaining the plan associated with TCEH's bargaining unit employees.

2.    **Restructuring Negotiations.**

156.    Despite EFH's successful operational and restructuring initiatives since the 2007 Acquisition, the prepetition capital structure of EFH Corp., EFIH, and the TCEH Debtors cannot be supported by prevailing market realities, so their capital structure must be delevered. Accordingly, the Debtors commenced restructuring discussions and retained restructuring advisors in July 2012 in an effort to develop a consensual restructuring framework that would maximize the value of the Debtors' estates. These restructuring negotiations involved highly diverse stakeholders with varying goals and viewpoints and eventually grew to involve nearly every aspect of the Debtors' capital structure. Membership in the Debtors' various ad hoc stakeholder groups has shifted over time. Importantly, however, there is a consenting group of creditors at each of EFH Corp., TCEH, and EFIH, which lays the groundwork for a prearranged plan. Indeed, the majority of the Debtors' stakeholders are either consenting to or being paid in

---

[56]    These modifications did not affect EFH's other post-employment benefit ("OPEB") obligations.

**PX 095**
**Page 73 of 464**

full and in cash under the Global Restructuring. The following table shows certain members of the various ad hoc groups over time and as of the Petition Date, including those groups with members that have executed the Restructuring Support Agreement (the "Restructuring Support Parties"):[57]

| Constituency | Principals | Advisors |
|---|---|---|
| *Restructuring Support Parties* | | |
| Approximately $9.9 billion, or 41%, of the TCEH First Lien Debt | • Apollo, Oaktree, Centerbridge, Mason Capital, Fortress, Och-Ziff, and Franklin | • Paul Weiss, Millstein |
| Approximately $1.2 billion, or 76%, of the EFIH Unsecured Notes<br><br>Certain members also hold approximately $116 million, or 5% of EFIH Second Lien Notes | • Avenue Capital, GSO, PSAM, Third Avenue, and York Capital. | • Akin Gump, Centerview Partners |
| Approximately $471 million, or 73%, of the EFH Unsecured Notes held by parties other than EFIH<br><br>Approximately $437 million, or 11% of the EFIH First Lien Notes<br><br>Approximately $644 million, or 30% of EFIH Second Lien Notes<br><br>Also holds an undisclosed amount of TCEH First Lien Debt | • Fidelity | • Fried Frank, Perella Weinberg |
| EFIH First Lien Notes<br><br>Holds approximately $769 million, or 19%, of the EFIH First Lien Notes | • PIMCO | • Bingham McCutchen |
| EFH Equity Owners | • KKR, TPG, and Goldman Sachs. | • Wachtell Lipton, Blackstone |
| *Groups Not Supporting the Restructuring Support Agreement* | | |
| TCEH Second Lien Notes | • Arrowgrass Capital, Appaloosa Management, and Marathon Asset Management. | • Brown Rudnick, Peter J. Solomon |

---

[57]    In certain instances, principals reflected here may have subsequently sold their positions, and this chart is not necessarily a comprehensive list of the principals in applicable groups.

| Constituency | Principals | Advisors |
|---|---|---|
| TCEH Unsecured Notes | • BlueCrest, Claren Road, Cyrus Capital, Deutsche Bank AG, DO S1 Limited, Fairway Fund Limited, Fore, J.P. Morgan Securities LLC, LMA SPC, and Pine River. | • White & Case, Houlihan Lokey |
| EFIH First Lien Notes | • Davidson Kempner, WAMCO, Blue Mountain, Cyrus Capital, JP Morgan. | • Ropes & Gray, Capstone Advisors |
| EFIH Second Lien Notes | • Anchorage Capital, Cyrus Capital, Magnetar Financial, Oak Hill Advisors, Taconic, and Morgan Stanley. | • Kramer Levin, Rothschild |

157.    In addition to those key stakeholders, the Debtors also engaged in significant discussions with certain of their regulators and additional stakeholders, including the PUC, ERCOT, the Debtors' unions, the RCT, the NRC, the FERC, the IRS, and Oncor.

158.    Two key issues dominated prepetition negotiations. *First*, there was significant tension between whether the Debtors will be restructured on a consolidated basis that would maintain EFH's current corporate form, or on a deconsolidated basis that would separate EFIH (and Oncor) from TCEH. *Second*, any deconsolidated restructuring could either be on a tax-efficient basis, which would avoid triggering in excess of *$6 billion* in deconsolidation-related tax liability, or a taxable basis, which would potentially deliver a step-up in tax basis to certain of the Debtors' new owners.

159.    The Debtors' initial preference was to achieve a consensual, consolidated reorganization. There were advantages to such an outcome: EFH's current corporate form offers cost synergies, there would be no risk of triggering deconsolidation-related tax liabilities, and potential disruption to EFH's businesses would be minimized. Under a consolidated framework, however, a significant portion of EFIH, TCEH, and potentially EFH Corp. debt would have been converted into EFH Corp. equity, necessitating a need for a high degree of consensus among multiple creditor groups with claims to distinct asset classes.

72

160.    With that goal in mind, the Debtors engaged in nearly a year of negotiations with their stakeholders in an effort to bridge fundamental differences in opinion regarding the relative value of TCEH, on one hand, and EFIH (as reflected by its indirect 80% ownership of Oncor), on the other hand, along with various other issues—such as the amount and kind, if any, of recovery that would be received by EFH Corp.'s stakeholders in a consolidated framework.  Public disclosures of the status of these negotiations were required by the terms of principals' non-disclosure agreements in April 2013 and October 2013.  The Debtors explored various transaction alternatives, including out-of-court exchange offers of EFIH and EFH Corp. debt accompanied by a chapter 11 filing by TCEH.

161.    Following public disclosures of the status of negotiations in October 2013 and a $271 million interest payment that TCEH made to its junior creditors on November 1, 2013, it became clear that a consolidated transaction was not possible because the Debtors and their stakeholders were unable to bridge fundamental differences in opinion on valuation and tax-related issues.  As a result, the Debtors turned their attention to developing a deconsolidation strategy.

162.    The Debtors and their stakeholders focused on two potential deconsolidated transactions.  *First*, TCEH's and EFIH's assets could be sold in a taxable transaction under a plan of reorganization or pursuant to a sale under section 363 of the Bankruptcy Code.  Such a sale would potentially trigger in excess of *$6 billion* in deconsolidation-related tax liabilities, but may deliver a "step-up" in tax basis to the new owners of TCEH and EFIH.  *Second*, a tax-free, or tax-efficient, transaction that triggers no or reduced deconsolidation-related tax liabilities, but does not give the new owners of TCEH and EFIH a "step-up" in tax basis (or, in some cases, gives the new owners of TCEH a "partial" step-up).

73

163.    Evaluation of these transactions is significantly complicated by the tax structure of the Debtors. The substantial majority of the TCEH Debtors, as well as EFIH, are "disregarded entities" for federal tax purposes. As a result, certain constituencies—particularly the holders of TCEH First Lien Debt—have insisted that the majority of the entities composing TCEH and EFIH (as disregarded entities) would not be liable for any deconsolidation-related tax liabilities. Rather, such constituencies have argued that the taxpaying entities in EFH's consolidated tax group (excluding Oncor)—principally EFH Corp. and certain of EFH Corp.'s subsidiaries other than TCEH and EFIH—are the only entities liable for any deconsolidation-related tax. Certain creditors asserted that these considerations required that any deconsolidated transaction provide for a "step-up" in the basis of TCEH's assets, even though there is a significant risk that little or no tax liability would actually be paid. The Debtors, by contrast, were firmly of the view that the significant litigation and regulatory risk related to triggering massive deconsolidation-related tax liabilities that may be left impaired at EFH Corp. justified a focus on tax-free and tax-efficient transactions.

164.    Beginning in early 2014, the Debtors' negotiation runway was rapidly coming to an end. For a number of reasons, including dwindling liquidity and significant debt maturities in October and November 2014, the Debtors expected to receive a "qualified" going concern audit opinion in connection with its 2013 audit. That opinion, which would be disclosed in the Debtors' 2013 10-K filing with the SEC, would trigger an event of default under the TCEH Credit Agreement following an applicable grace period. As a result, the TCEH Debtors faced an impending chapter 11 filing. EFH Corp. and EFIH were expected to follow because of significant liquidity constraints.

PX 095
Page 77 of 464

165.    Until early March, the Debtors appeared to be on a path to filing for chapter 11 without having obtained any consent regarding the terms of a restructuring or a potential restructuring support agreement.  Beginning in early 2014, Fidelity and certain holders of EFIH Unsecured Notes began to coalesce around the terms of a consensual restructuring, including an infusion of new capital at EFIH and EFH Corp.  Notably, the EFH Equity Owners and their advisors played a vital role in those negotiations and were instrumental in bringing the parties to the table.  Those conversations, however, were premised on a TCEH Tax-Free Spin, and holders of TCEH First Lien Debt were unwilling to consider such a transaction because it did not provide a "step-up" in tax basis.  That all changed, however, in March 2014, when certain holders of TCEH First Lien Debt indicated a willingness to consider a TCEH Tax-Free Spin as long the transaction could be executed quickly and certain other conditions could be satisfied.

166.    These developments completely changed the tone of negotiations and, for the first time, opened a window to a consensual solution.  As a result, the Debtors and their stakeholders—including the EFH Equity Owners, who played a significant role—entered into an intense period of negotiations to negotiate and document a transaction based on the TCEH Tax-Free Spin and Investment Commitment.  To facilitate these negotiations, the TCEH Debtors elected not to make certain interest payments due on April 1, delayed making their public filings, and entered into a month-long grace period.  These negotiations were ultimately successful, and, in the last days before events of default would have forced the Debtors into a "traditional" chapter 11 filing, the Restructuring Support Parties executed the Restructuring Support Agreement.

### 3.    The Restructuring Support Agreement.

167.    The Restructuring Support Agreement represents a landmark settlement that either has the support of each of the Debtors' most important stakeholders or pays them in full in

75

**PX 095**
**Page 78 of 464**

cash.[58]  While the Debtors will be deconsolidated—a result the Debtors sought to avoid—the deconsolidation will avoid triggering deconsolidation-related tax liabilities and will allow the Debtors to emerge from chapter 11 quickly.  Nearly two years of preparation, and over one year of hard-fought negotiations, have gone into inking the Restructuring Support Agreement. Accordingly, the Debtors and the Restructuring Support Parties believe that the Global Restructuring embodied in the Restructuring Support Agreement maximizes the value of all of the Debtors' estates.

168.    The Global Restructuring has two key pieces.  *First*, the TCEH will be "spun off" from EFH Corp. in the TCEH Tax-Free Spin.  *Second*, EFIH and EFH Corp. will be significantly recapitalized.

### a.    TCEH Tax-Free Spin.

169.    Under the TCEH Tax-Free Spin, the TCEH Debtors' current first lien creditors will receive 100% of the equity in reorganized TCEH LLC.  Additionally, an important part of the TCEH Tax-Free Spin is to provide a "partial" step-up in the tax basis in TCEH's assets by using the Debtors' accumulated tax attributes.  This "partial" step-up, which provides significant value to the holders of TCEH First Lien Debt, is a vital aspect of the consideration being received by the TCEH Debtors' first lien creditors—without the "partial" step up, the Debtors may not have been able to reach a deal on the terms of the transaction.  The TCEH Tax-Free Spin will be conditioned on the receipt of a private letter ruling from the IRS that confirms, among other things, the tax-free nature of the TCEH Tax-Free Spin, and the execution by the

---

[58]    The Restructuring Support Agreement and the various settlements it embodies are discussed in more detail in motions that the Debtors will file to authorize the assumption of the Restructuring Support Agreement (the "RSA Assumption Motion") and the approval of certain settlements (the "Settlement Motion"), either of which will be filed on or shortly following the Petition Date.

PX 095
Page 79 of 464

Debtors of a "tax matters" agreement to protect the status of the transaction post-emergence. Finally, certain subsidiaries of EFH Corp. will transfer operating assets to TCEH.

170.    The TCEH Debtors will issue new debt in an amount to be determined to fund the repayment of the TCEH DIP Facility and fund cash payments to the TCEH Debtors' stakeholders.    Holders of unsecured and second lien claims against the TCEH Debtors will receive their *pro rata* share of the cash value of the TCEH Debtors' unencumbered assets.

### b.    EFIH/EFH Corp. Recapitalization.

171.    The lynchpin of the recapitalization of EFIH and EFH Corp. is the $1.9 billion Investment Commitment that is backstopped by certain holders of EFIH Unsecured Notes (the "Initial Commitment Parties" and, together with certain "Selected Partners," the "Commitment Parties").    Under the Investment Commitment, which is described in more detail in the Settlement Motion, the Commitment Parties and any other parties that elect to exercise their participation rights will inject $1.9 billion of cash into EFIH.    This Investment Commitment will initially take the form of a second lien DIP facility (the "EFIH Second Lien DIP Facility") that will mandatorily convert into approximately 65% of equity in reorganized EFH Corp.[59]    Holders of EFIH Unsecured Notes and EFH Unsecured Notes have participation rights in the Investment Commitment (91% and 9%,[60] respectively, subject, in the case of the participation rights held by holders of EFIH Unsecured Notes, to *pro rata* reduction by certain investing partners selected by the Initial Commitment Parties).    The Investment Commitment will be supported by the amending of the Oncor TSA (the "Oncor TSA Amendment") to provide that Oncor will make

---

[59]    The percent conversion will change based on the amount outstanding under the EFIH Second Lien DIP Financing on the effective date of the plan.

[60]    Only Fidelity has participation rights with respect to funding the EFIH Second Lien DIP Financing.    Other holders of EFH Unsecured Notes who elect to participate in the Investment Commitment will do so pursuant to a rights offering under the plan, the proceeds of which will be used to repay Fidelity's portion of the EFIH Second Lien DIP Financing.

payments directly to EFIH, rather than EFH Corp. Each of EFIH's DIP facilities will be secured by the new revenue attributable to the Oncor TSA Amendment.

172.    The EFIH Second Lien DIP Facility, together with the EFIH First Lien DIP Facility, will be used to repay the EFIH Second Lien Notes and the EFIH First Lien Notes (the "EFIH Second Lien Refinancing" and the "EFIH First Lien Refinancing," respectively, and together, the "EFIH Secured Refinancings"). The EFIH First Lien Refinancing will save EFIH approximately $13 million per month in interest expense. The EFIH Second Lien Refinancing will save interest expense and, more importantly, simultaneously deleverage EFH Corp. and EFIH while providing significant value to unsecured creditors.

173.    Although the EFIH Secured Refinancings will allow for a significant deleveraging of EFIH, certain holders of EFIH First Lien Notes and EFIH Second Lien Notes believe that they are entitled to so-called makewhole claims (the "EFIH First Lien Makewhole Claims" and "EFIH Second Lien Makewhole Claims," respectively, and together, the "EFIH Makewhole Claims"). The stakes are significant: the EFIH First Lien Makewhole Claims and the EFIH Second Lien Makewhole Claims each total over $700 million, respectively. EFIH is taking a dual-pronged approach to the EFIH Makewhole Claims.

174.    *First*, as described in greater detail in the Settlement Motion, EFIH has offered to settle all outstanding obligations under the EFIH First Lien Notes, including EFIH First Lien Makewhole Claims, for approximately $105 (plus accrued but unpaid interest) of roll-up notes under the EFIH First Lien DIP Facility for every $100 of EFIH First Lien Notes tendered into the settlement (the "EFIH First Lien Settlement"). Fidelity and PIMCO have agreed to participate in the EFIH First Lien Settlement.

78

175.    Additionally, EFIH has offered to settle all outstanding obligations under the EFIH Second Lien Notes, including EFIH Second Lien Makewhole Claims, for a cash payment equal to principal and accrued interest plus a *pro rata* share of a cash payment equal to 50% of the potential EFIH Second Lien Makewhole Claims (the "EFIH Second Lien Settlement" and, together with the EFIH First Lien Settlement, the "EFIH Makewhole Settlements"). Fidelity will have the option to receive up to $500 million of roll-up notes under the EFIH First Lien DIP Financing, in addition to cash, under the EFIH Second Lien Settlement, while certain other holders have agreed to receive claims under the EFIH Second Lien DIP Financing rather than payment in cash in exchange for their claims. All holders of EFIH First Lien Notes and EFIH Second Lien Notes will be given the opportunity to participate in the EFIH Makewhole Settlements pursuant to two tender offers that will be launched shortly after the Petition Date. Fidelity has agreed to participate.

176.    ***Second,*** with respect to holdout secured creditors, EFIH will execute the EFIH Secured Refinancings on a non-consensual basis and will litigate the EFIH Makewhole Claims. The EFIH First Lien DIP Motion, filed contemporaneously herewith, seeks to disallow the EFIH First Lien Makewhole Claims. EFIH will also seek to disallow the EFIH Second Lien Makewhole Claims, to the extent any creditors assert such claims.

177.    In addition to their rights under those transactions, EFIH unsecured creditors will receive approximately 35% of the equity in reorganized EFH Corp. (after accounting for dilution by the Equity Conversion). EFH Corp.'s unsecured creditors will receive any cash remaining at EFH Corp. at the end of the case, a cash payment from EFIH of up to $55 million, and a small distribution of equity in reorganized EFH Corp.

PX 095
Page 82 of 464

c.    **Case Milestones.**

178.    As described in more detail in the Settlement Motion and the RSA Assumption Motion, the Restructuring Support Agreement, the Investment Commitment, and the terms of the EFIH Second Lien DIP Facility each contain certain case milestones.  The goal of the Debtors and their stakeholders are to resolve these chapter 11 cases as expeditiously as possible.  Notably, the Debtors are poised to exit chapter 11 within a year.  To accomplish that goal, the Debtors will file a plan and disclosure within 45 days of the Petition Date and will aim to have a disclosure statement order entered within 105 days of the Petition Date.  From there, the Debtors will seek entry of the confirmation order within 275 days of the Petition Date, and will seek to emerge from chapter 11 within 305 days of the Petition Date.  Additionally, the EFIH Debtors will seek to effectuate the EFIH First Lien Refinancing and the EFIH Second Lien Refinancing within 75 days of the Petition Date.

4.    **The Debtors Commence the Chapter 11 Cases.**

179.    The Debtors commenced these chapter 11 cases to begin the process of implementing the Global Restructuring as memorialized in the Restructuring Support Agreement.  Although there is no question that there are significant issues to resolve even in the consensual framework the Debtors have achieved, the Debtors are confident that these chapter 11 cases will provide the framework to maximize the value of the Debtors' estates for *all* of their stakeholders.  In the meantime, the principal focus of the Debtors will remain on "Job 1": operating their businesses in a way that preserves value, protects jobs, and satisfies their regulatory operations.

80

### Part III.
### Overview of First Day Relief

180.    The Debtors have filed a number of First Day Motions, customary in large chapter 11 cases such as these, designed to minimize the adverse effects of the commencement of the chapter 11 cases on their ongoing business operations. I believe that court approval of the relief requested in the First Day Motions is essential to providing the Debtors with an opportunity to successfully meet their obligations by maintaining baseline operations, providing for a smooth transition into the chapter 11 cases, and minimizing any loss of value to the Debtors' businesses.

181.    The First Day Motions seek authority to, among other things, continue to pay employee compensation and benefits in order to maintain morale and retention as the Debtors transition into chapter 11, thus avoiding the potential for catastrophic "brain drain"; ensure the continuation of the Debtors' cash management systems and other business operations without interruption, including the Debtors' vital customer programs; provide the Debtors the ability to pay certain critical trade vendors and certain other vendors who could assert liens against the Debtors property and to provide adequate assurance of future performance to their utility providers; provide the ability to maintain existing hedging and trading agreements and/or enter into new agreements that play a vital role in the Debtors' operations and cash flow by managing the Debtors' forward commodities exposure; and assume certain key contracts with ERCOT and the regulated transmission and distribution utilities, including Oncor, that deliver the electricity that is generated and sold by TCEH.

PX 095
Page 84 of 464

I have reviewed each of the First Day Motions.  The facts stated therein, the description of the relief requested, and the facts supporting each motion and pleading are detailed in Exhibit A to this declaration.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the contents of the First Day Motions and the contents of the foregoing are true and correct to the best of my information and belief.

Paul Keglevic
Executive Vice President, Chief Financial
Officer, and Co-Chief Restructuring Officer
of EFH Corp., EFIH, and TCEH LLC

## EXHIBIT A

**Evidentiary Support for First Day Pleadings**

## TABLE OF CONTENTS

Page

**Financing Motions** ...............................................................................................................1
I.       TCEH DIP Financing Motion. ................................................................................1
II.      TCEH Cash Collateral Motion. ..............................................................................5
III.     EFIH First Lien DIP Financing Motion. ................................................................7
IV.      Cash Management Motion. .....................................................................................9

**Operational Motions** ...........................................................................................................31
V.       Wages Motion. ......................................................................................................31
VI.      Critical Vendors Motion. ......................................................................................61
VII.     Shippers, Warehousemen, and Materialmen Motion. ..........................................70
VIII.    Customer Programs Motion. .................................................................................73
IX.      Hedging and Trading Motion. ...............................................................................93
X.       Taxes and Fees Motion. ......................................................................................110
XI.      Utilities Motion. ..................................................................................................116
XII.     TDSPs Assumption Motion. ................................................................................119
XIII.    ERCOT Assumption Motion. ..............................................................................128

**Procedural Motions** .........................................................................................................134
XIV.     Joint Administration Motion. ..............................................................................134
XV.      Claims and Noticing Agent Motion. ...................................................................135
XVI.     Consolidated Creditors List Motion. ...................................................................135
XVII.    Retention Applications. .......................................................................................136

### EVIDENTIARY SUPPORT FOR FIRST DAY PLEADINGS[1]

1.      To minimize the adverse effects of the commencement of these chapter 11 cases on their business, the Debtors have requested various types of relief in their First Day Pleadings. The First Day Pleadings seek relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption to the Debtors' operations caused by their bankruptcy filings, thereby preserving the value of the Debtors' estates for the benefit of their stakeholders.  I am familiar with the contents of each First Day Pleading (including the exhibits thereto), and I believe that the relief sought in each First Day Pleading:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; (b) is necessary to provide the Debtors with a reasonable opportunity for a successful reorganization; and (c) best serves the interests of the Debtors' stakeholders.  The following paragraphs describe the factual bases for the relief requested in each of the First Day Pleadings.

### Financing Motions

I.      **TCEH DIP Financing Motion.**[2]

2.      The TCEH Debtors request entry of an interim and final order, (a) authorizing the TCEH Debtors to enter into the DIP Credit Agreement to obtain the DIP Financing, (b) granting liens and providing superpriority administrative expense claims, (c) modifying the automatic stay, and (d) scheduling a hearing to consider approval of the DIP Facility on a final basis.

---

[1]     Capitalized terms used in this exhibit and not otherwise defined shall have the meanings set forth in the applicable First Day Pleading or in the First Day Declaration.  Exhibit references are to the exhibits associated with the respective First Day Pleadings.

[2]     See *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Granting Adequate Protection, (D) Modifying the Automatic Stay, and (E) Scheduling a Final Order,* filed contemporaneously herewith.

3.    I understand that the TCEH Debtors have negotiated and reached an agreement to enter into, subject to approval of the court, a $4.475 billion secured superpriority postpetition debtor in possession financing agreement. The DIP Agreement, dated April 28, 2014, is by and among TCEH LLC as borrower, EFCH as Parent Guarantor, and each of TCEH LLC's direct and indirect Debtor subsidiaries, as Guarantors, Citibank, N.A., as administrative agent and DIP agent, Deutsche Bank AG New York Branch as Administrative Agent, and the lenders named therein.

4.    The TCEH Debtors with the assistance of their advisors developed a three-month budget with the assistance of their advisors. I understand that the DIP Budget incorporates a number of factors, including the effect of the chapter 11 filing, material cash disbursements, required vendor/supplier payments, cash flows from the TCEH Debtors' ongoing operations, and the cost of necessary goods and materials, and includes all of the expenditures for which the TCEH Debtors seek authority to pay in various "first day" pleadings.

5.    I understand that the TCEH Debtors will use Cash Collateral to fund working capital, capital expenditures, and other general corporate purposes; the TCEH Debtors believe Cash Collateral will ultimately be insufficient. Therefore, the TCEH Debtors have determined that postpetition financing is necessary to fund the following restructuring costs, among others: adequate protection payments, working capital (e.g., collateral for letters of credit), bankruptcy costs (e.g., business disruption and professional fees), and regulatory requirements (e.g., RCT mining reclamation obligations). I understand that without the DIP Facility, the TCEH Debtors may not have sufficient liquidity to continue their business in the ordinary course. Additionally, I understand that if the TCEH Debtors are unable to demonstrate that they have the means to operate in the ordinary course of business, customers may seek alternatives and vendors may

2

refuse to do business with the TCEH Debtors. Therefore, I believe that the TCEH Debtors have an immediate need to access the DIP Facility; otherwise, the ultimate success of the TCEH Debtors' restructurings may be jeopardized.

6.    As provided in the DIP Budget, the TCEH Debtors believe that approximately $1,600,000,000 in available liquidity is necessary for operations during the interim period of these chapter 11 cases. I understand that the proposed DIP Financing will provide the TCEH Debtors with immediate access of up to $2,700,000,000, consisting of (a) $800,000,000 under the Revolving Credit Facility, (b) $1,100,000,000 under the Delayed-Draw Term Facility, the proceeds of which, if funded, subject to the condition set forth above, will be applied by TCEH LLC to fund the RCT L/C Collateral Account, and (c) $800,000,000 under the Term Loan Facility, of which up to $800,000,000 may be applied by TCEH LLC to fund the General L/C Collateral Account. Moreover, upon entry of the Final Order, the proposed DIP Financing will provide the TCEH Debtors with up to $4,475,000,000, consisting of (x) $1,950,000,000 under the Revolving Credit Facility, (u) $1,425,000,000 under the Term Loan Facility, of which up to $800,000,000 may be applied by TCEH LLC to fund the General L/C Collateral Account, and (z) $1,100,000,000 under the Delayed Draw Term Facility, the proceeds of which, if funded, subject to the condition set forth above, will be applied by TCEH LLC to fund the RCT L/C Collateral Account to support RCT Letters of Credit.

7.    I understand that the TCEH Debtors' decision to proceed with the DIP Financing comes after a dedicated and diligent search for the best financing alternatives as described in greater detail in the Goldstein Declaration. I understand that in early September 2013, the TCEH Debtors and Evercore initiated a request for DIP RFPs, where the TCEH Debtors approached five large financial institutions that are actively involved in the debtor-in-possession and

3

syndicated finance markets. I understand that proposals were submitted in response to the TCEH Debtors' RFP and after substantial analysis, the TCEH Debtors concluded that no single financial institution would be able to underwrite the entire amount of the DIP financing due to the size of the proposed revolving credit facility. I understand that negotiations with financial institutions continued through October and on October 25, 2013, the TCEH Debtors determined that Citigroup Global Markets Inc. and Deutsche Bank Securities Inc. proposed the best possible combination of terms and effectively addressed the TCEH Debtors' liquidity needs. I understand that the TCEH Debtors thus began negotiating commitment letters with Citigroup Global Markets Inc. and Deutsche Bank Securities Inc., as well as five other lenders, understanding that the TCEH Debtors would require a broadly-syndicated facility to achieve a revolving credit facility of this size.

8.      I understand that the DIP Financing negotiations were renewed in early February 2014 using the initial discussions as a foundation. I also understand that negotiations with the DIP Lenders continued through April 2014, replacing one of the original seven lenders and culminating in the TCEH Debtors receiving signed commitment letters from all seven lenders on April 28, 2014.

9.      I understand that DIP Financing is the best source of financing, providing the TCEH Debtors with the liquidity they need to continue operating their businesses in the ordinary course and satisfy restructuring-related costs. I believe that the relief requested in the TCEH DIP Motion is in the best interest of the TCEH Debtors' estates, their creditors, and all other parties in interest, and is necessary for the TCEH Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the TCEH Debtors, I believe that the relief requested in the TCEH DIP Motion should be granted.

4

II.      **TCEH Cash Collateral Motion.**[3]

10.      In the TCEH Cash Collateral Motion, the TCEH Debtors seek entry of orders:
(a) authorizing the TCEH Debtors' use of Cash Collateral (as defined in the Interim Order) of the
Prepetition Secured Agents and Prepetition Secured Creditors (each as defined in the Interim
Order) on an interim basis pending a final hearing on the TCEH Cash Collateral Motion (the
"Final Hearing"); (b) granting adequate protection to the Prepetition First Lien Agents and
Prepetition First Lien Creditors for any diminution in value of their respective interests in the
Prepetition Collateral (each as defined in the Interim Order), including the Cash Collateral;
(c) subject to entry of a Final Order and to the extent set forth herein, waiving the TCEH
Debtors' right to surcharge the Prepetition Collateral pursuant to section 506(c) of the
Bankruptcy Code; (d) prescribing the form and manner of notice and setting the time for the
Final Hearing; (e) vacating or modifying the automatic stay imposed by section 362 of the
Bankruptcy Code to the extent necessary to permit the TCEH Debtors and the Prepetition
Secured Agents on behalf of the Prepetition First Lien Creditors to implement and effectuate the
terms and provisions of the Interim Order; (f) scheduling the Final Hearing to consider the relief
requested in the Motion and the entry of a Final Order, and approving the form of notice with
respect to the Final Hearing; and (g) granting related relief.

11.      In the normal course of business, the TCEH Debtors use cash on hand and cash
flow from operations to fund working capital, capital expenditures, and for other general
corporate purposes.  I understand that an inability to use these funds during these chapter 11
cases could cripple the TCEH Debtors' business operations.  Indeed, the TCEH Debtors must use

---

[3]      See *Motion of Energy Future Holdings Corp.*, et al., *for Entry of Interim and Final Orders (A) Authorizing Use
of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a
Final Hearing*, filed contemporaneously herewith.

**PX 095**
**Page 92 of 464**

their cash to, among other things, continue the operation of their business in an orderly manner, maintain business relationships with vendors, suppliers, and customers, pay employees, fulfill regulatory obligations, and satisfy other working capital and operational needs—all of which are necessary to preserve and maintain the TCEH Debtors' going-concern value and, ultimately, effectuate a successful reorganization.

12.    To obtain consent for the use of Cash Collateral and the priming liens provided for under the DIP Financing, the TCEH Debtors entered into negotiations with Paul, Weiss, Rifkind, Wharton, and Garrison LLP, as counsel to an informal steering committee representing holders of approximately 41% in amount of claims under the TCEH First Lien Credit Agreement and TCEH First Lien Notes Indenture (the "TCEH First Lien Ad Hoc Committee"). After weeks of these negotiations, the TCEH First Lien Ad Hoc Committee consented to both the priming liens (and other terms provided) under the DIP Motion and the TCEH Debtors' use of Cash Collateral, in exchange for the TCEH Debtors providing adequate protection against any diminution in value of the Prepetition First Lien Creditors' interests in the Prepetition Collateral.

13.    I understand that the TCEH Debtors will provide the Prepetition First Lien Creditors with various forms of adequate protection, including, primarily: (a) the First Lien Adequate Protection Payments; (b) the First Priority 507(b) Claim; (c) the First Priority Adequate Protection Liens; (d) professional fees and expenses; (e) the Financial Covenant; and (f) access to the TCEH Debtors' books and records, including budgets and financial forecasts (collectively, the "Adequate Protection Obligations"). The TCEH Debtors will also provide the Prepetition Second Lien Creditors with: (a) the Second Priority 507(b) Claim and (b) the Second Priority Adequate Protection Liens, in both cases junior in priority to those received by the

6

Prepetition First Lien Creditors, consistent with the terms of the Second Lien Intercreditor Agreement.

14.    Absent approval of the TCEH Cash Collateral Interim Order, the TCEH Debtors would be effectively unable to generate revenue, operate their businesses, or pay the hundreds of individuals who report to work each day.  I believe the TCEH DIP Financing Motion is appropriate and should be approved.

III.    **EFIH First Lien DIP Financing Motion.**[4]

15.    The EFIH Debtors request entry of (i) an interim order (the "Interim Fee Order") (a) approving certain fees as and to the extent required under the EFIH First Lien DIP Commitment Letter relating to commitments to fund the EFIH First Lien DIP Financing and that certain fee letter relating to the payment of fees in connection with the EFIH First Lien DIP Financing (the "EFIH First Lien DIP Fee Letter") and (b) scheduling a hearing to consider approval of the relief requested in the Motion on a final basis and (ii) a final order (a) authorizing the EFIH Debtors to enter into the EFIH First Lien DIP Credit Agreement to obtain the EFIH First Lien DIP Financing, (b) granting liens and providing superpriority administrative expense claims, (c) authorizing the use of EFIH Cash Collateral, (d) authorizing the EFIH First Lien Refinancing, (e) authorizing the issuance of EFIH First Lien DIP Roll-Up Claims to the extent provided in the Settlement Motion, (f) determining the value of the secured claims of the

_____

[4]    See *Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc., for Entry of for Entry of (I) and Interim Order (A) Approving Certain Fees Related to Postpetition Financing and Granting Such Fees Administrative Expense Priority and (B) Scheduling a Final Hearing; and (II) a Final Order (A) Approving Postpetition Financing, (b) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH First Lien DIP Refinancing, (E) Authorizing Issuance of Roll-Up Debt to the Extent Authorized by the Settlement Motion, (F) Determining the Value of Secured Claims, and (G) Modifying the Automatic Stay* (the "EFIH First Lien DIP Motion"), filed contemporaneously herewith.

Prepetition EFIH First Lien Creditors, including a determination that such amount does not include any EFIH First Lien Makewhole Premium, and modifying the automatic stay.

16.    I understand that the EFIH Debtors have negotiated and reached an agreement to enter into, subject to approval of the court, a $5.4 billion secured superpriority postpetition debtor in possession financing agreement.  I understand that the EFIH Debtors remain in active negotiations with all parties and will file the EFIH First Lien DIP Credit Agreement on or shortly following the Petition Date.  Further, I understand that the EFIH First Lien DIP Financing consists of a single term loan, along with various "roll-ups" of prepetition secured creditors in settlement of certain makewhole claims.  Given the significant difference in interest rates between the proposed EFIH First Lien DIP Credit Agreement, on one hand, a providing of-courI understand that the EFIH Debtors contest validity of such claims.  I understand that the EFIH Debtors have determined that when comparing the costs and savings of the transaction, it is in their best interest to execute the EFIH First Lien Refinancing as expeditiously as possible.

17.    In light of imminent liquidity needs, I understand that with the assistance of their advisors, the EFIH Debtors developed an initial three-month budget.  According to the EFIH Budget, the EFIH Debtors believe over $1 billion in liquidity is necessary to fund restructuring costs, financing fees, and professional fees.  I understand, however, that the EFIH Debtors need not satisfy these costs during the interim period.  As a result, I understand that the EFIH Debtors *are not* seeking relief with respect to the EFIH First Lien DIP Financing Motion.

8

IV.    **Cash Management Motion.**[5]

18.    In the Cash Management Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to continue to operate an integrated cash management system (as discussed in the Cash Management Motion, the "Cash Management System") in the day-to-day operation of their businesses, and to continue to honor certain prepetition obligations in accordance with the operation of the Cash Management System. I understand that the diagram attached to the Cash Management Motion as **Exhibit B** and incorporated by reference provides an overview of the Cash Management System. Specifically, the Debtors request authority to: (a) continue to use, with the same account numbers, each of the bank accounts held in the name of a Debtor (the "Bank Accounts") located at the financial institutions (collectively, the "Banks") listed on **Exhibit C** attached to the Cash Management Motion and incorporated in the Cash Management Motion by reference; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; and (c) conduct banking transactions by all usual means, and debit the Bank Accounts on account of all usual items and payment instructions.

19.    Additionally, the Debtors seek authority to: (a) use, in their present form, all business forms (including check stock, letterhead, purchase orders, and invoices) and other correspondence and documents related to the Bank Accounts, without reference to the Debtors' status as debtors in possession; (b) continue to use certain investment accounts in accordance with section 345 of the Bankruptcy Code; (c) close existing Bank Accounts and open new debtor-in-possession accounts with Authorized Depositories (as defined in the Cash Management Motion); and (d) continue certain intercompany and netting arrangements between and among

---

[5]    See *Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Investment Accounts; (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims; and (C) Granting Postpetition Intercompany Claims Administrative Expense Priority,* filed contemporaneously herewith.

the Debtors and their Debtor and non-Debtor affiliates on an administrative priority basis in the ordinary course of business and in accordance with historical practices (solely as described in the Cash Management Motion, the "Intercompany Transactions," and claims arising from the Intercompany Transactions, the "Intercompany Claims").

   **A.**  **The Bank Accounts.**

     **1.**  **Overview.**

  20.  I understand that the Cash Management System is composed of of 44 Bank Accounts, each of which is held in the name of one the following Debtors: (a) EFH Corp.; (b) EFIH; (c) EFH Corporate Services Company ("EFH Corporate Services"); (d) Generation Development Company LLC; and (e) TXU Receivables Company LLC; (f) EFCH; and (g) TCEH LLC and the following TCEH LLC subsidiaries: (i) Luminant Energy Company LLC ("Luminant Energy"); (ii) Luminant Generation Company LLC ("Luminant Generation"); (iii) Luminant Mining Company LLC ("Luminant Mining"); (iv) TXU Energy Retail Company LLC ("TXU Energy Retail"); (v) TXU Energy Receivables Company LLC ("TXU Energy Receivables"); and (vi) 4Change Energy Company ("4Change Energy"). The Cash Management System is primarily managed by the Debtors' financial personnel at their corporate headquarters located in Dallas, Texas.

  21.  The Debtors' primary Bank is J.P. Morgan Chase Bank ("JPM"), with which the Debtors maintain 34 Bank Accounts. The Debtors also maintain 10 Bank Accounts with 7 Banks other than JPM. The Debtors maintain each of the Bank Accounts at financial institutions insured by the Federal Deposit Insurance Corporation (the "FDIC"). Moreover, 43 of the Bank

**PX 095**
**Page 97 of 464**

Accounts are located at institutions that the Debtors believe are designated as authorized depositories (the "Authorized Depositories") by the U.S. Trustee.[6]

22.    I understand that the bulk of the Debtors' cash on-hand as of the Petition Date is from cash raised from debt issuances, distributions received from Oncor (in the case of EFH Corp. and EFIH), and proceeds generated from ongoing business operations.[7] As of the Petition Date, the Debtors have a total of approximately $795 million in cash held in the Bank Accounts and six investment accounts (as described in the Cash Management Motion, the "Investment Accounts"), approximately $235 million, $428 million, and $132 million of which is held in the segregated Bank Accounts and Investment Accounts of the EFH Debtors, TCEH Debtors, and EFIH, respectively.[8]

23.    Because the Bank Accounts are central to the Debtors' ongoing business operations, the Debtors hereby seek authority to continue utilizing the Cash Management System and Bank Accounts, including the authority to conduct banking transactions, pay the Bank Fees, and open new debtor in possession bank accounts or close any existing Bank Accounts.[9]    I

---

[6]    I understand that the sole Bank Account located at a Bank that is not designated as an Authorized Depository pursuant to the U.S. Trustee Guidelines does not contain significant deposits.  Specifically, I understand that Bank Account No. 7136, held in the name of Luminant Generation with First National Bank of Granbury, is a miscellaneous receipts account that holds amounts less than the FDIC insured amount at any given time.

[7]    I understand that before the Petition Date, TXU Energy Receivables sold all of its accounts receivable under the Debtors' prepetition accounts receivable securitization facility to Debtor TXU Energy Retail.  I also understand that Bank Account No. 0559, held in the name of Debtor TCEH LLC, holds approximately $419.6 million of unrestricted cash from proceeds of the receivables sale and TXU Energy Receivables' retained earnings.

[8]    Cash belonging to the EFH Debtors is segregated from cash belonging to the TCEH Debtors.  Similarly, cash belonging to either the TCEH Debtors or EFH Debtors is segregated from cash belonging to EFIH.

[9]    Specifically, I understand that the Debtors request that the Court authorize them to close any existing Bank Accounts, or to open new debtor in possession bank accounts at banks that are Authorized Depositories.  I understand that the Debtors will provide notice of any such opening or closing to the U.S. Trustee, counsel to any official committee appointed in these cases, counsel to the agent for the TCEH debtor-in-possession financing facility (the "TCEH DIP Facility" and such agent, the "TCEH DIP Agent"), counsel to the ad hoc committee of TCEH first lien creditors (the "Ad Hoc Committee of TCEH First Lien Creditors"), counsel to the agent for the EFIH first lien debtor-in-possession financing facility (the "EFIH DIP Facility" and such agent, the "EFIH DIP Agent"), counsel to the agent for the EFIH second lien debtor-in-possession notes (the "EFIH

11

believe that it is critical to the continued operation of their businesses, and to preserving the value of their estates, that the Debtors be allowed to continue to use the Cash Management System and Bank Accounts without disruption.

**2.    EFH Bank Accounts.**

24.    EFH Corp.'s principal Bank Account is Account No. 3584 (the "EFH Main Account"), which EFH Corp. maintains with JPM.  The EFH Main Account is a general concentration account for excess cash held by EFH Corp. and holds approximately $25 million as of the Petition Date.  As discussed below, the EFH Main Account transfers funds to the main Bank Account for the money pool arrangement used by EFH Corp. and certain of its subsidiaries (as described in the Cash Management Motion, the "EFH Money Pool").

25.    In addition, I understand that EFH Corp. maintains the following Bank Accounts:

- *Bank Account No. 2032,* maintained with JPM, collects miscellaneous receipts and holds approximately $1,000 as of the Petition Date; and

- *Bank Account No. 9707,* maintained with Bank of America, is available for wire transfers in the event of an emergency situation, and is unfunded as of the Petition Date.

- *Bank Account No. 9100,* maintained with JPM, will be used to collect future tax payments from Oncor under the Oncor TSA, and is unfunded as of the Petition Date.

26.    As described in detail below, I understand that EFH Corp. also uses the EFH Main Account to invest excess cash in two Investment Accounts, which together hold approximately $180.6 million as of the Petition Date.[10]

---

DIP Notes" and such agent, the "EFIH DIP Notes Agent"), and counsel to the ad hoc committee of EFIH unsecured creditors (the "Ad Hoc Committee of EFIH Unsecured Creditors").

[10]    As discussed below, I understand that EFH Corp. invests in the Goldman Sachs Financial Square Treasury Fund (Account No. 4691) and the Morgan Stanley Institutional Treasury Fund (Account No. 0166).

12

PX 095
Page 99 of 464

### 3.    EFH Corporate Services Bank Accounts.

27.    EFH Corporate Services, a direct subsidiary of EFH Corp., maintains a principal Bank Account with JPM, Account No. 3790 (the "EFH Money Pool Main Account"). As discussed below, the EFH Money Pool Main Account is the central Bank Account for the EFH Money Pool. I understand that the EFH Money Pool Main Account maintains a minimum net balance of approximately $10 million to prefund automated clearinghouse payments ("ACH Payments"), and next-day wires, and has a current balance of approximately $10 million. The Debtors' treasury personnel sweep any excess cash held in the EFH Money Pool Main Account above $10 million into the EFH Main Account on a daily basis. Likewise, and as discussed below, the Debtors' treasury personnel deposit funds into the EFH Money Pool Main Account from the EFH Main Account as necessary to fund the accounts payable, payroll, and other obligations related to the operations of the EFH Corp. and certain of its Debtor subsidiaries that have historically participated in the EFH Money Pool (other than EFIH and its subsidiaries) (collectively, the "EFH Debtors"),[11] as well as obligations related to the operations of EFCH, TCEH LLC, and its direct and indirect Debtor subsidiaries (collectively, the "TCEH Debtors") that are subsequently reimbursed as Intercompany Transactions.

28.    In addition to the EFH Money Pool Main Account, I understand that EFH Corporate Services maintains the following five Bank Accounts:

- *Bank Account No. 6572* is a collateral account for deposits related to commercial card obligations, with a current balance of approximately $4.4 million;

- *Bank Account No. 8749* is a zero balance account used for payroll disbursements to approximately 5,700 Debtor employees with a current balance of approximately $500,000;

---

[11]    I understand that the EFH Debtors include all direct and indirect Debtor subsidiaries of EFH Corp., other than EFIH and its subsidiaries and the TCEH Debtors (as defined in the Cash Management Motion).

13

- *Bank Account No. 6766* is an accounts payable disbursements account with a current balance of approximately $10 million;

- *Bank Account No. 0752* is an accounts payable disbursements account with a current balance of approximately $5 million; and

- *Bank Account No. 2019* is a Chase Investments brokerage account with a current balance of approximately $32,000.

    **4.      TCEH Bank Accounts.**

29.      I understand that TCEH LLC's principal Bank Accounts are Account No. 9810 (the "TCEH Main Account") and Account No. 0481 (the "TCEH Money Pool Main Account"), each of which TCEH maintains with JPM. As discussed below, the TCEH Main Account and the TCEH Money Pool Main Account together serve as the primary source of funds for the operations of the TCEH Debtors through a separate money pool (as described in the Cash Management Motion, the "TCEH Money Pool" and, together with the EFH Money Pool, the "Money Pools"). As of the Petition Date, the TCEH Main Account holds approximately $47 million. The TCEH Money Pool Main Account maintains a minimum net balance of approximately $2 million to prefund next-day wires. As of the Petition Date, the TCEH Money Pool Main Account holds approximately $2 million. The Debtors' treasury personnel sweep any excess cash held in the TCEH Money Pool Main Account into the TCEH Main Account on a daily basis. Likewise, the Debtors' treasury personnel deposit funds from the TCEH Main Account into the TCEH Money Pool Main Account as necessary to fund the operations of the TCEH Debtors.

30.      I understand that TCEH LLC also maintains the following four Bank Accounts:

- *Bank Account No. 4169*, maintained with JPM, is a receipt and disbursement account relating to financial settlements and over-the-counter transactions, with a current balance of approximately $1,000;

14

- • *Bank Account No. 3657*, maintained with Citibank, is an account used to fund certain letters of credit, with a current balance of approximately $27,000; and

- • *Bank Account No. 7837*, maintained with JPM, is an account used to collect the proceeds of the sale of receivables in connection with the wind-down of the accounts receivable securitization program that was terminated on October 28, 2013, with a current balance of $0; and

- • *Bank Account No. 0559*, maintained with Union Bank, N.A., is an account used to hold unrestricted cash related to the unwinding of the former accounts receivable securitization program, with a current balance of approximately $149.6 million.[12]

31.    Moreover, as described below, I understand that TCEH LLC invests excess cash in two Investment Funds, which together hold approximately $226 million as of the Petition Date.[13]

     **5.    Other Debtor Accounts.**

32.    I understand that EFIH, the direct parent of Oncor Electric Delivery Holdings LLC ("Oncor Holdings"), maintains two Bank Accounts with JPM. Bank Account No. 4789 holds approximately $3.7 million as of the Petition Date, and is used to pay general corporate expenses (the "EFIH Main Account"). Bank Account No. 4934 holds approximately $1,000 as of the Petition Date, and is used exclusively for the receipt of postpetition dividends from Oncor. As discussed below, EFIH invests excess cash in the Morgan Stanley Institutional Treasury Fund (Account No. 0127), an Investment Account that holds approximately $128.2 million as of the Petition Date.

---

[12]    I understand that the funds in this Bank Account and Bank Account No. 7837 are not part of the prepetition collateral securing the TCEH First Lien Debt or TCEH Second Lien Notes (as defined in the First Day Declaration).

[13]    As discussed below, I understand that TCEH LLC invests in the Goldman Sachs Financial Square Treasury Fund (Account No. 4694) and the Western Asset Institutional Treasury Fund (Account No. 4883).

15

33.    I understand that Generation Development Company LLC maintains a Bank Account with JPM (Account No. 3633) that holds approximately $1,000 as of the Petition Date. Generation Development Company LLC uses cash from this Bank Account in connection with currently limited activities related to development of generation assets.

34.    TXU Receivables Company LLC maintains a Bank Account with JPM (Account No. 8255) that holds $0 as of the Petition Date. The account was used in connection with a former accounts receivable securitization program.

35.    I understand that EFCH, the direct parent of TCEH LLC, maintains a Bank Account with JPM (Account No. 4511) that holds approximately $4,000 as of the Petition Date. EFCH uses cash from this Bank Account to pay for general corporate expenses.

36.    In addition, based on my understanding, six indirect Debtor subsidiaries of TCEH LLC—TXU Energy Retail, TXU Energy Receivables, Luminant Energy, Luminant Generation, 4Change Energy, and Luminant Mining—collectively maintain 23 collection and disbursement Bank Accounts, identified on **Exhibit C**, which together hold approximately $2.9 million as of the Petition Date.

### 6.    The Debtors' Anticipated Postpetition Controls on the Bank Accounts.

37.    The Debtors have taken steps to implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them before the Petition Date except as provided in the Order or another order of the Court. I understand that the procedures the Debtors have implemented (and will implement after the Petition Date) include: (a) notifying the Banks of all prepetition payments that should not be honored; (b) segregating the Debtors' accounts payable into prepetition and postpetition amounts; (c) training the Debtors' accounting and accounts payable staff regarding procedures for identifying and segregating prepetition

16

obligations; and (d) developing specific authorization procedures required for the Debtors' accounting and accounts payable staff to issue a payment for any prepetition liability that is authorized pursuant to an order of the Court.

**B.    Banking Transactions, Bank Fees and Related Expenses.**

38.    I understand that the Debtors employ two primary methods of making payments from the Bank Accounts to external third parties. First, substantially all payments by check or ACH Payment are made by EFH Corporate Services from the EFH Money Pool Main Account.[14] Specifically, the EFH Money Pool Main Account funds Bank Accounts 6766 and 0752, which then fund disbursements by check and ACH Payment, respectively. As discussed below, to the extent that other Debtor affiliates are obligated to reimburse EFH Corporate Services for payments made on behalf of the Debtors to third parties, the applicable Debtor reimburses EFH Corporate Services by wire transfer within two days of such check or ACH Payment clearing. Additionally, certain of the Debtors make direct payments by wire transfer to external third parties from an applicable disbursement Bank Account.

39.    In the ordinary course of business, I understand that the Banks debit the Bank Accounts on account of all manner of payment items and instructions. In connection with these payments and the general maintenance of the Bank Accounts, I understand that the Banks charge, and the Debtors pay, honor, or allow the deduction from the appropriate account, certain service charges, and other fees, costs, and expenses, including commercial card obligations that enable the Debtors' customers to pay by credit card (collectively, the "Bank Fees"). I understand that the Debtors receive credits from JPM in exchange for maintaining a minimum balance in some of their Bank Accounts with JPM, which JPM applies as an offset to certain Bank Fees.

---

[14]    Importantly, I understand that one exception to this payment process relates to refund payments to customers, which TXU Energy Retail makes directly to customers by check from Bank Account No. 6959.

**PX 095**
**Page 104 of 464**

40.    I understand that the Cash Management System depends on the ability of the Banks to maintain and administer the Bank Accounts and to honor and process the Debtors' banking transactions.

**C.    The Debtors' Existing Business Forms.**

41.    I understand that, in the ordinary course of business, the Debtors use a variety of correspondence and business forms, such as letterhead, blank check stock, purchase orders, invoices, and other documents related to the Bank Accounts (collectively, the "Business Forms").

**D.    Investment Policies.**

42.    I understand that certain of the Debtors invest funds that would otherwise be held in the EFH Main Account, the TCEH Main Account, or other Bank Accounts. These funds are held in six investment accounts:  (a) Goldman Sachs Financial Square Treasury Fund (Account No. 4694); (b) Western Asset Institutional Treasury Fund (Account No. 4883); (c) Goldman Sachs Financial Square Treasury Fund (Account No. 4691); (d) Morgan Stanley Institutional Treasury Fund (Account No. 0166); (e) Morgan Stanley Institutional Treasury Fund (Account No. 0127); and (f) Invesco Treasury Portfolio - Institutional Class (Account No. 4457) (collectively, the "Investment Accounts").  I understand that as of the Petition Date, the bulk of the Debtors' cash on-hand (approximately $534.8 million) is invested in the Investment Accounts.

43.    I understand that, pursuant to the Debtors' internal investment policy (the "Investment Policy"), the Debtors are authorized to invest in (a) short-term securities of the United States government and federal agencies, and (b) money market funds comprised of such securities, provided that such money market funds both: (i) comply with Rule 2a-7 of the

18

Investment Company Act of 1940; and (ii) have a rating of 'AAA' by S&P or 'Aaa' by Moody's.[15]

44.    In addition to complying with the Investment Policy, I understand that the Debtors have taken steps to ensure that they will, on a postpetition basis, only use the Investment Accounts or other investment accounts that substantially comply with Local Bankruptcy Rule 4001-3. Specifically, I understand that each of the Investment Accounts is held with an open-end management investment company regulated as a money market fund under Rule 2a-7 of the Investment Company Act of 1940 that (a) invests exclusively in United States Treasury securities owned directly or through repurchase agreements, (c) has received the highest money market fund rating of 'AAA' by S&P or 'Aaa' from Moody's, and (c) generally redeems fund shares in cash with payment being made no later than the business day following a redemption by a shareholder, except in the event of an unscheduled closing of the Federal Reserve Banks or the New York Stock Exchange.[16]  Additionally, I believe that the policies and practices with

---

[15]    I understand that the Debtors are also authorized under the Investment Policy, and with the approval of certain corporate officers, to make temporary cash investments in an amount at any one time outstanding not to exceed $50 million in any other short-term investment, security, or instrument.  I understand that during the pendency of these chapter 11 cases, however, the Debtors will not make any such temporary cash investments, as all funds in excess of operating requirements will be invested in the Investment Accounts.

[16]    I understand that certain of the money market funds with which the Investment Accounts are held reserve the right to pay redemptions by a distribution in-kind of securities.  Additionally, I understand that certain of the Investment Funds reserve the right to temporarily suspend redemptions if determined by such fund's manager or board of trustees to be in the interests of the fund and/or shareholders, or in accordance with Section 22(e) of the Investment Company Act or other applicable law.

Specifically, Section 22(e) of the Investment Company Act provides:

No registered investment company shall suspend the right of redemption, or postpone the date of payment or satisfaction upon redemption of any redeemable security in accordance with its terms for more than seven days after the tender of such security to the company or its agent designated for that purpose for redemption, except—

(1) for any period (A) during which the New York Stock Exchange is closed other than customary weekend and holiday closings or (B) during which trading on the New York Stock Exchange is restricted;

19

respect to (b) and (d) above generally will not be substantially altered by the applicable fund managers absent shareholder consent or advance notice.

45.    I understand that in the ordinary course of business, the Debtors engage in the following Intercompany Transactions that give rise to Intercompany Claims: (a) transfers and settlements through the Money Pools (as defined in the Cash Management Motion); (b) transactions and transfers under the Shared Services (as defined in the Cash Management Motion); (c) certain ordinary course transactions under the TSAs (as defined in the Cash Management Motion); (d) transactions related to Subleases (as defined in the Cash Management Motion); and (e) transactions related to Letters of Credit (as defined in the Cash Management Motion).

### 1.    The Money Pools.

46.    I understand that the Debtors utilize two "Money Pools" to facilitate transactions among themselves and to minimize the number of accounts needed for the corporate group to operate.  Specifically, EFH Debtors may participate in the EFH Money Pool,[17] and TCEH Debtors may participate in the TCEH Money Pool.  I understand that each Money Pool is a general ledger that tracks, aggregates, nets, and settles intercompany payables and receivables

---

(2) for any period during which an emergency exists as a result of which (A) disposal by the company of securities owned by it is not reasonably practicable or (B) it is not reasonably practicable for such company fairly to determine the value of its net assets; or

(3) for such other periods as the Commission may by order permit for the protection of security holders of the company. The Commission shall by rules and regulations determine the conditions under which (i) trading shall be deemed to be restricted and (ii) an emergency shall be deemed to exist within the meaning of this subsection.

Investment Company Act of 1940 § 22(e), 15 U.S.C. §§ 80a (1940).

[17]    I understand that historically, EFIH and certain of EFH Corp.'s non-Debtor subsidiaries have participated in the EFH Money Pool.  Pursuant to the Cash Management Motion, the Debtors do not seek relief to allow, on a postpetition basis, (a) EFIH or its subsidiaries to make or receive loans through the EFH Money Pool, or (b) non-Debtor entities to obtain access to cash through the EFH Money Pool.

owed to, and by, the entities that participate in that Money Pool. The list of Debtors that have historically participated in the EFH Money Pool or the TCEH Money Pool, and which will continue to participate in their respective Money Pools on a postpetition basis, is attached hereto as **Exhibit D** of the Cash Management Motion .

47.    I understand that the primary Bank Accounts associated with the EFH Money Pool are the EFH Main Account and the EFH Money Pool Main Account. The EFH Money Pool Main Account maintains a minimum net balance of approximately $10 million to prefund outstanding checks, ACH Payments, and next-day wires. I understand that the Debtors' treasury personnel sweep any excess cash above the minimum net balance held in the EFH Money Pool Main Account into the EFH Main Account on a daily basis, and subsequently invest this excess cash in certain of the Investment Accounts. Moreover, I understand that funds are deposited into the EFH Money Pool Main Account from the EFH Main Account as needed to the extent that scheduled disbursements exceed the minimum net cash balance in the EFH Money Pool Main Account.

48.    I understand that the primary Bank Accounts associated with the TCEH Money Pool are the TCEH Main Account and the TCEH Money Pool Main Account. The TCEH Money Pool Main Account maintains a minimum net balance of approximately $2 million to prefund next-day wires. I understand that the Debtors' treasury personnel sweep any excess cash held in the TCEH Money Pool Main Account (above minimum net balances required to prefund next-day wires) into the TCEH Main Account on a daily basis, and subsequently invest this excess cash in certain of the Investment Accounts. Moreover, I understand that funds are deposited into the TCEH Money Pool Main Account from the TCEH Main Account as needed to

21

the extent that scheduled disbursements exceed the minimum net cash balance in the TCEH Money Pool Main Account.

49.    I understand that the Money Pools facilitate Intercompany Transactions, including the provision of intercompany services and the payment of third-party obligations, among entities that participate in the same Money Pool. Each entity that participates in a Money Pool is either a net "borrower" of, or a net "lender" to, one of the Money Pools, depending upon whether, in the aggregate, an entity contributes or draws money from the Money Pool. Additionally, I understand that if an entity provides intercompany services to another entity that participates in the same Money Pool, or pays an expense on behalf of another entity within the same Money Pool, this is treated as an extension of intercompany credit through the appropriate Money Pool. These arrangements, in turn, give rise to Intercompany Claims, and net lenders accumulate interest on their balances at predetermined rates.[18]

50.    I understand that, historically, Intercompany Claims among the entities that participate in the same Money Pool have not been settled in cash; rather, they are recorded as a book entry and appropriate adjustment to the applicable account balances of both the borrower and lender. The Debtors track all such Intercompany Transactions electronically in their accounting system and can ascertain, trace, and account for them as necessary. Moreover, cash is not moved between the two separate Money Pools except pursuant to documented transactions. The Debtors seek authority to continue to operate the Money Pools in accordance with their past practices.

---

[18]    I understand that net borrowers from the EFH Money Pool must make interest payments to the EFH Money Pool at a rate of 10.875% per annum, a percentage that is based on the EFH Corp. 10.875% LBO Senior Notes due 2017. I also understand that net borrowers from the TCEH Money Pool must make interest payments to the TCEH Money Pool at a predetermined rate, equal to the daily weighted average cost of short-term borrowings under TCEH's prepetition revolving credit facility, plus the credit facility commitment fee spread. An entity's accrued interest is paid monthly by a book entry in the ledgers of both the borrower and lender.

22

### 2.    The Shared Services.

51.    I understand that, in accordance with the Shared Services Agreement between

Debtor EFH Corporate Services and the TCEH Debtors, dated October 23, 2013 (as amended,

the "TCEH Shared Services Agreement") and the Shared Services Agreement between Debtor

EFH Corporate Services and Debtor EFIH, dated April 1, 2014 (the "EFIH Shared Services

Agreement" and, together with the TCEH Shared Services Agreement, the "Shared Services

Agreements"), the Money Pools, or the Debtors' historical practices, EFH Corporate Services:

(a) provides essential centralized administrative and back-office services to its affiliates and

employs corporate-level employees to provide services for its affiliates (the "Centralized

Services"); (b) makes direct payments for certain expenses attributable to its affiliates,

irrespective of whether EFH Corporate Services is the payment obligor for such expenses,

including the Debtors' health and welfare benefits for their employees, certain pension related

obligations, certain information technology and capital expenditures, and certain real property

related expenses (the "Direct Billing Goods and Services"); (c) in connection with its treasury

function for the enterprise as a whole, (i) issues checks and ACH Payments on behalf of its

affiliates (the "Reimbursable Expenses"); and (ii) collects and receives payments owed to its

affiliates and remits such amounts to the appropriate affiliate (the "Remittance Services"); and

(d) purchases certain assets for the benefit of its affiliates (the "Shared Asset Costs," and together

with the Centralized Services, the Direct Billing Goods and Services, the Reimbursable

Expenses, the Remittance Services, and the Shared Asset Costs, the "Shared Services").[19]    I

understand that EFH Corporate Services employs approximately 500 employees, including the

---

[19]    Additionally, I understand that EFH Corporate Services seeks to provide similar services to certain direct and
indirect non-Debtor subsidiaries of EFH Corp. (collectively, the "Non-Debtor Affiliates"), including Oncor
Holdings and its subsidiaries, EFH Properties Company, Basic Resources Inc., EFH Vermont Insurance
Company, and Ebasco Services of Canada Limited on a postpetition basis, pursuant to its historical practices

majority of the Debtors' executives, and enters into thousands of contractual arrangements with third parties for and on behalf of its affiliates. I understand that EFH Corporate Services provides the Shared Services "at cost," and does not charge its affiliates any premium or markup.

52.     I understand that EFH Corporate Services receives payment from its affiliates for the allocated cost of the Centralized Services through monthly service bills, invoices its affiliates for their allocated cost of the Shared Asset Costs, and seeks reimbursement for the cost of the Direct Billing Goods and Services and the Reimbursable Expenses upon check or ACH clearance.[20] Pursuant to the Remittance Services, EFH Corporate Services collects payments owed to its affiliates and remits such amounts to the appropriate affiliate when due.[21]

53.     I understand that the EFH Debtors primarily settle Intercompany Claims owed to EFH Corporate Services related to the Shared Services by book entry and adjustment to their respective ledger balances in the EFH Money Pool. I understand that the TCEH Debtors, EFIH, and Non-Debtor Affiliates pay Intercompany Claims related to the Shared Services to EFH Corporate Services by making cash payments to the EFH Money Pool Main Account, net of Intercompany Claims owed by EFH Corporate Services on account of Remittance Services. I understand that in 2013, the total net amount reimbursed to EFH Corporate Services by the TCEH Debtors on account of the Shared Services was approximately $2,235.2 million (of which approximately $1,987.5 million was related to Reimbursable Expenses and Direct Billing Goods

---

[20]     On February 18, 2014, TCEH LLC posted a deposit letter of credit in the total amount of $157.2 million to EFH Corporate Services for amounts owing under the TCEH Shared Services Agreement, approximately $100 million of which has been drawn as of the Petition Date.

[21]     For example, EFH Corporate Services receives approximately $15 million to $20 million annually from Oncor on account of "nuclear decommissioning fees" that are payable by the TCEH Debtors on Oncor's behalf, and remits such amounts to the TCEH Debtors for payment of such fees. The nuclear decommissioning fees are further discussed in the *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Granting Related Relief* (the "Taxes Motion"), filed contemporaneously herewith.

24

and Services), and the total net amount reimbursed to EFH Corporate Services by EFIH on account of the Shared Services was approximately $125,000.

54.    I believe that the Shared Services result in efficiencies and cost savings to the Debtors, and create value for the Debtors and their estates. Moreover, I believe that given the integrated nature of the services and thousands of underlying agreements and employment relationships, requiring the Debtors to discontinue the Intercompany Transactions and the settlement of Intercompany Claims related to the Shared Services at this time would be extremely costly and inefficient, and detrimental to the value of the Debtors and their estates.

55.    As of the Petition Date, I understand that the TCEH Debtors owe EFH Corporate Services approximately $69.1 million on account of prepetition Intercompany Claims related to the Shared Services, and EFIH owes EFH Corporate Services approximately $700,000 on account of prepetition Intercompany Claims related to the Shared Services.

### 3.    The Tax Sharing Agreements.

56.    I understand that EFH Corp. is party to two tax sharing agreements: (a) one with EFCH, TCEH LLC and certain of its subsidiaries, and EFIH (the "Competitive TSA"); and (b) one with Oncor and Oncor Holdings (the "Oncor TSA" and, together with the Competitive TSA, the "TSAs").[22]  I believe that historically, the TSAs have been an efficient means of managing the Debtors' tax liabilities and utilizing tax attributes on a consolidated basis, and greatly facilitate the Debtors' accounting and tax reporting and payment obligations. Each of the TSA parties are liable for Texas state margin taxes. Under the TSAs, EFH Corp. files Texas

---

[22]  I understand that EFH Corp. and Oncor have implemented structural and operational "ring-fencing" measures to enhance the credit quality of Oncor. I understand that because Oncor is a partnership for federal income tax purposes, EFH Corp.'s consolidated federal income and Texas state margin tax returns only include EFH Corp.'s share of Oncor's income. Accordingly, I understand that under the Oncor TSA, payments from Oncor to EFH Corp. are limited to EFH Corp.'s share of the federal income and state margin taxes that Oncor would owe if it filed its own tax returns, net of tax refunds and any amounts owed to Oncor for the deemed use by other TSA parties of Oncor's tax attributes.

25

state margin tax returns that include the TSA parties' results, and subsequently settles Intercompany Claims with each of the TSA parties on account of the Texas state margin taxes that are owed by each TSA party.

57.     I understand that the Competitive TSA allocates the consolidated income tax liability of the Competitive TSA parties (the "Competitive Group") by first requiring the calculation of the tax liability for each corporate member of the Competitive Group that would have resulted if each such corporate member had filed a separate return on a stand-alone basis separate from the Competitive Group, with the liability of a corporate member further allocated to any subsidiaries that are disregarded as separate from such member.[23]  I understand that the total amount paid in 2013 by the TCEH Debtors to EFH Corp. under the Competitive TSA, net of any reimbursements paid from EFH Corp. to the TCEH Debtors, was approximately $143.1 million.

58.     Generally, I understand that the Oncor TSA (a) requires Oncor to make payments to EFH Corp. and the minority owners of Oncor in respect of tax liabilities generated by its operations (and in certain circumstances entitles Oncor to payments from EFH Corp. and the minority owners in respect of net operating losses or other tax attributes recognized by it) and (b) requires Oncor Holdings to make payments directly to EFH Corp. in respect of tax liabilities generated by its operations (and in certain circumstances entitles Oncor Holdings to payments from EFH Corp. in respect of tax losses recognized by it).  I understand that the total amount paid in 2013 to EFH Corp. by Oncor and Oncor Holdings under the Oncor TSA, net of any

---

[23]     I understand that the amount allocated to each member is comprised of two components. *First* is the fraction of the actual consolidated tax liability that corresponds to each such member's relative positive "separate taxable income." *Second* is the relative benefit to members with positive separate taxable incomes from losses generated by other members of the consolidated group and utilized by the group, whether such losses are recognized in the current period or in a prior period. I understand that in certain circumstances, a Competitive TSA party that generates a tax loss may be entitled to receive a payment from EFH Corp.

reimbursements owed from EFH Corp. to Oncor and Oncor Holdings, was approximately $90 million and $34 million, respectively.[24]

59.    I understand that pursuant to the *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Granting Related Relief* (the "Taxes Motion"), the Debtors are seeking authority to continue to pay approximately $70 million on account of certain prepetition state law margin tax claims to ensure that they will be able to continue operating their businesses in the ordinary course. Accordingly, pursuant to the Cash Management Motion, I understand that the Debtors are only seeking to settle prepetition Intercompany Claims under the TSAs relating to prepetition state law margin tax claims that the Debtors are authorized to pay under the Taxes Motion, and to continue to settle Intercompany Claims arising under the TSAs with respect to state law margin tax claims on a postpetition basis. I also understand that the Debtors are not seeking at this time to settle Intercompany Claims relating to federal income taxes among EFH Corp. and the TSA parties.

### 4.    Subleases.

60.    I understand that Non-Debtor EFH Properties Company and certain Debtors lease property for the operation of the businesses and, pursuant to sublease agreements, historical practices, and other arrangements (collectively, the "Subleases"), sublet office space and real property to their affiliates. For example, the Debtors and their affiliates' Dallas office headquarters, Energy Plaza, is leased pursuant to a lease agreement dated February 14, 2002 (the "EP Lease") between non-Debtor EFH Properties Company, as lessee, and U.S. Bank, National Association (as successor-in-interest to State Street Bank and Trust Company of Connecticut,

---

[24]    I understand that in accordance with the Restructuring Support Agreement attached to the First Day Declaration, the Debtors will seek to assign the Oncor TSA to EFIH during these chapter 11 cases.

National Association), as Owner Trustee of the ZSF/Dallas Tower Trust, as the lessor. EFH

Properties Company, in turn, subleases Energy Plaza office space to certain of its affiliates,

including EFH Corporate Services and Oncor. I understand that under the shared services

agreements, EFH Corporate Services seeks reimbursement from their affiliates for its allocated

share of rent, property taxes, operating costs, utilities, depreciation, and other related expenses. I

understand that Oncor sub-subleases its Energy Plaza space to Debtor Luminant Generation,

charging Luminant Generation below Oncor's cost of subleasing such space from EFH

Properties Company. I understand that in 2013, the TCEH Debtors paid approximately $4.3

million to Non-Debtor Affiliates under the Subleases. I also understand that as of the Petition

Date, the TCEH Debtors owe their affiliates approximately $400,000 on account of prepetition

Intercompany Claims under the Subleases.

### 5.    Letters of Credit

61.    I understand that TCEH LLC has issued, and is obligated under, the deposit letters

of credit for the benefit of its Debtor affiliates (the "Letters of Credit"). The following table lists

the Letters of Credit that TCEH LLC has issued to third parties for the benefit of certain EFH

Debtors and Non-Debtor Affiliates, and the amount outstanding net of draws on such Letters of

Credit:

28

| Applicable Beneficiary(ies) | Number of Letters of Credit | Total Net Amount Outstanding |
|---|---|---|
| EFH Corp. | 6 | $26,169,000 |
| EFH Corp. and LSGT Gas Company LLC | 1 | $12,014,000 |
| EFH Corporate Services | 8 | $5,935,000 |
| EFH Vermont Insurance Company[25] | 2 | $704,000 |
| Brighten Energy LLC | 2 | $500,000 |
| LSGT Gas Company LLC | 1 | $250,000 |

62.    The Letters of Credit are backed by restricted cash belonging to the TCEH Debtors. To the extent that third parties draw on these Letters of Credit as payment for goods and services provided to the Debtors and their affiliates, a payable will result from the applicable beneficiary (if the beneficiary is not TCEH LLC) to TCEH LLC. I understand that the TCEH Debtors' reimbursement obligations to TCEH LLC under the Letters of Credit are settled through the TCEH Money Pool. I understand that because TCEH LLC is a net payer to EFH Corp. and certain of its subsidiaries, including EFH Corporate Services, on account of Intercompany Claims arising under the other Intercompany Transactions, payables owed to TCEH LLC by these affiliates for drawdowns on the Letters of Credit are generally offset against the TCEH Debtors' obligations, thus reducing the amount of cash payments actually made by the TCEH Debtors. I understand that in 2013, EFH Corp. and certain of the EFH Debtors reimbursed TCEH LLC approximately $1.4 million for amounts drawn under the Letters of Credit. I also understand that as of the Petition Date, there are approximately $57.8 million of TCEH LLC Letters of Credit issued and outstanding for the benefit of EFH Corp. and certain EFH Debtors, of which approximately $56.4 million remains undrawn.

---

[25]    Non-Debtor Affiliate EFH Vermont Insurance Company is a direct subsidiary of EFH Corp.

PX 095
Page 116 of 464

63.     As of the Petition Date, I understand that there are no outstanding Intercompany Claims owing from the EFH Debtors and the Non-Debtor Affiliates to TCEH LLC on account of reimbursement obligations under the Letters of Credit.

> **6.     The Intercompany Transactions are Vital to the Debtors' Business Operations.**

64.     The Debtors' operations are highly complex and integrated, and the Intercompany Transactions enable the Debtors to efficiently provide essential goods and services to their Debtor and Non-Debtor Affiliates and settle internal and external obligations.  I believe that if the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' detriment.  Furthermore, I believe that preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption in the Cash Management System will facilitate the Debtors' reorganization efforts.

30

**Operational Motions**

V.    **Wages Motion.**[26]

65.    I understand that in the Wages Motion, the Debtors seek entry of Interim and Final Orders authorizing, but not directing, the Debtors to: (a) pay certain prepetition wages, salaries, reimbursable employee expenses, and other compensation; (b) pay and honor employee and retiree medical and similar benefits (each as described in sub-clauses (a) and (b) defined in the Wages Motion, and collectively, the "Employee Obligations"); and (c) continue employee compensation and employee and retiree benefit programs (each as defined in the Wages Motion, and collectively, the "Employee Programs") in the ordinary course of business on a postpetition basis and in accordance with prepetition policies.[27]

A.    **Overview of the Debtors' Work Force.**

66.    I understand that EFH Corp., the direct or indirect Debtor parent of each of the Debtors, and its subsidiaries collectively employ approximately 9,100 employees. I understand that of that number, the Debtors employ approximately 5,700 employees (collectively, the "Employees"), approximately 5,650 of whom are full-time and approximately 50 of whom are part-time.

67.    I understand that approximately 2,000 Employees are represented by unions that are party to 11 collective bargaining agreements (collectively, the "CBAs"). The Debtors pay approximately 2,100 Employees on an hourly basis and approximately 3,600 Employees are

---

[26]    See *Motion of Energy Future Holdings Corp.,* et al., *for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (II) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (III) Continue Employee and Retiree Benefit Programs, and (B) Modifying the Automatic Stay,* filed contemporaneously herewith.

[27]    I understand that the summary of the Debtors' various Employee Obligations and Employee Programs provided in the Wages Motion is qualified entirely by the Debtors' official policies or other practices, programs, or agreements, whether written or unwritten, evidencing an arrangement among the Debtors and their Employees (each, an "Official Policy"). I understand that in the event of any inconsistency or ambiguity between this summary and an Official Policy, the terms of such Official Policy shall govern.

31

**PX 095**
**Page 118 of 464**

salaried. I also understand that Debtors employ approximately 300 Staffing Provider Workers, during various periods throughout the year through an employment agency, and approximately 40 Independent Contractors.

  **B.**  **Payroll.**

    **1.**  **Employees Compensation.**

  68.  I understand that the Debtors generally are current on all their payroll obligations to the Employees. That said, as of the Petition Date, I understand that certain prepetition wage obligations have accrued and remain unpaid. Additionally, I understand that some Employees may be entitled to compensation because (a) discrepancies may exist as to amounts paid and (b) some payroll checks issued before the Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date. I understand that the Debtors compensate their Employees (collectively, "Compensation") as discussed below.

  69.  I understand that certain of the Debtors' Employees are compensated on an hourly basis and may be entitled to prepetition amounts on account of compensation that has accrued but remains unpaid as of the Petition Date on behalf of such Employees. Alternatively, I understand that certain of the Debtors' Employees are compensated by way of an annual salary which accrues on a monthly or quarterly basis. As a result, I understand that there may be prepetition amounts on account of compensation that has accrued but remains unpaid as of the Petition Date on behalf of such Employees.

  70.  On average, I understand that the Debtors pay approximately $10.0 million per week on account of Compensation. As of the Petition Date, I understand that the Debtors estimate that they owe Employees an aggregate amount of approximately $4.1 million on account of Compensation earned before the Petition Date (collectively, "Unpaid

32

Compensation"), approximately $4.1 million of which will become due and owing within the Interim Period. I understand that the Debtors believe that no amount owed to an Employee exceeds the $12,475 priority cap imposed by section 507(a)(4) of the Bankruptcy Code on account of Unpaid Compensation.

71.     I understand that the Employees perform a variety of critical functions, including sales, customer service, plant and mine operations, accounting, finance, management and other tasks for the Debtors, and in return, depend on the Debtors for their Compensation to pay their daily living expenses. Thus, I understand that pursuant to the Interim Order, the Debtors seek authority, but not direction, to continue to pay Compensation in the ordinary course of business on a postpetition basis, and to pay Employees any Unpaid Compensation accrued in the ordinary course of business that comes due during the Interim Period, up to $12,475 per eligible Employee (approximately $5.0 million in the aggregate). Pursuant to the Final Order, I understand that the Debtors seek authority, but not direction, to continue to pay Compensation in the ordinary course of business on a postpetition basis and to pay all Unpaid Compensation owed to Employees, including amounts owed to Employees above $12,475 (if any).

### 2.     Non-Insider Incentive Compensation.

72.     I understand that certain of the Debtors' non-insider Employees who work in a customer-facing sales capacity receive commission-based compensation from two performance based plans: (a) the TXU Sales Incentive Plan and (b) the Luminant Retail Gas Sales Incentive Plan (each as described in the Wages Motion). I understand that the Debtors have historically used these plans to drive sales efforts and motivate those Employees who have made significant individual and team contributions to the Debtors' sales efforts. I also understand that these Employees are highly marketable given the Debtors' fiercely competitive retail market, and the attrition rate associated with these Employees has historically been high. Failure to compensate

33

such Employees in accordance with prepetition practices could result in their immediate departure and jeopardize the Debtors' customer relationships. I understand that the majority of these Employees are eligible to receive such compensation on a biweekly or monthly basis, and, as a result, there may be prepetition amounts that have accrued but remain unpaid as of the Petition Date. Importantly, I understand that many of these Employees do not participate in other additive incentive programs.[28]

73. **TXU Sales Incentive Plan.** The Debtors have historically offered a sales incentive plan to approximately 200, non-insider, full-time Employees at TXU Energy based on their performance in sales management or sales support positions (the "TXU Sales Incentive Plan"). Specified senior management sets certain performance goals for eligible Employees based on the detailed business plan approved by the TXU Energy executive leadership team. Proposed payments are subject to a rigorous review process, including review by the vice presidents of the relevant business units and approval by a dedicated award committee. As of the Petition Date, the Debtors estimate that approximately $800,000 is due and outstanding on account of the TXU Sales Incentive Plan, approximately $800,000 of which will become due and payable during the Interim Period (approximately $4,000 per eligible Employee) (the "Unpaid TXU Sales Incentive Payments").

74. Importantly, I understand that none of the Employees who are eligible to participate in and receive payments from the TXU Sales Incentive Plan are insiders, as defined under section 101(31) of the Bankruptcy Code. Instead, I understand that these Employees work on commission earned through their efforts from interfacing with the Debtors' diverse customer

---

[28] Many of the Debtors' Employees participate in various additive employee compensation programs. Although the Debtors are not seeking relief with respect to such additive employee compensation programs in the Wages Motion, the Debtors intend to seek authority to continue such programs early in these chapter 11 cases pursuant to a separate motion.

34

base. I understand that the Employees eligible to participate in the TXU Sales Incentive Plan are uniquely positioned to know a significant amount about the Debtors and the Debtors' industry, as well as a significant amount of detail about the Debtors' customer base. As such, I understand that replacing these Employees would be highly disruptive to the business and directly affect the Debtors' relationship with their customers. As a result, I understand that the Debtors are seeking relief pursuant to the Interim Order to honor Unpaid TXU Sales Incentive Payments that become due and payable during the Interim Period and relief pursuant to the Final Order to honor all Unpaid TXU Sales Incentive Payments.

75.    18.    ***Luminant Retail Gas Sales Incentive Plan.*** The Debtors have historically offered a sales incentive plan to approximately four non-Insider, full-time gas sales Employees at Luminant based on financial EBIT targets for each year (the "Luminant Retail Gas Sales Incentive Plan"). Payments under the Luminant Retail Gas Sales Incentive Plan are subject to a rigorous approval process similar to the process described above with respect to the TXU Sales Incentive Plan. As of the Petition Date, the Debtors estimate that approximately $50,000 is due and outstanding on account of the Luminant Retail Gas Sales Incentive Plan (the "Unpaid Luminant Incentive Retail Plan Payments").

76.    I understand that as with the TXU Sales Incentive Plan, no Employees who are insiders (as defined under the Bankruptcy Code) are entitled to participate in the Luminant Retail Gas Sales Incentive Plan. I understand that like the TXU Sales Incentive Plan, the Luminant Retail Gas Sales Incentive Plan incentivizes those Employees in a customer-facing position to create sustainable customer relationships that ultimately provide direct and positive returns to the Debtors' operations.

77.    On average, I understand that the Debtors pay approximately $10 million per

35

week on account of Compensation.  As of the Petition Date, I understand that the Debtors estimate that they owe Employees an aggregate amount of approximately $5.2 million on account of Compensation earned before the Petition Date (collectively, "Unpaid Compensation"), approximately $4.2 million of which will become due and owing within the Interim Period.  I believe that no amount owed to an Employee exceeds the $12,475 priority cap imposed by section 507(a)(4) of the Bankruptcy Code on account of Unpaid Compensation.

78.    The Employees perform a variety of critical functions, including sales, customer service, plant and mine operations, accounting, finance, management and other tasks for the Debtors, and in return, depend on the Debtors for their Compensation to pay their daily living expenses.

### 3.    Staffing Provider Workers.

79.    I understand that the Debtors utilize the services of approximately 300 of various types of temporary workers (collectively, the "Staffing Provider Workers") through eight different vendors (collectively, the "Staffing Providers").[29]  I understand that the Debtors typically pay for the Staffing Provider Workers' services directly to the Staffing Providers through their accounts payable system.  The Staffing Providers, in turn, pay the Staffing Provider Workers.

80.    I understand that Staffing Provider Workers are, in many instances, highly skilled workers.  For example, I understand that a significant group of Staffing Provider Workers provide information technology services that would be difficult to replace in a short timeframe.

---

[29]    I understand that one of the Staffing Providers, Pinnacle Technical Resources, Inc. is an affiliate of Kohlberg Kravis Roberts & Co., which has a substantial equity interest in EFH.  Importantly, the Unpaid Staffing Provider Fees (as defined below) owed to Pinnacle are secured by two letters-of-credit in the collective amount of approximately $3 million (the "Letters of Credit"), both of which will expire in June of 2014.

36

I believe that the institutional knowledge held by such Staffing Provider Workers would also be difficult to replace in a short timeframe. I believe that if they are not permitted to pay the Staffing Providers for the services of the Staffing Provider Workers, the Staffing Providers may withdraw the Staffing Provider Workers or refuse to provide the Debtors with replacement workers.

81.    I understand that on average, the Debtors pay approximately $710,000 per week on account of fees paid to the Staffing Providers on account of compensation owed to Staffing Provider Workers (the "Staffing Provider Fees"). I understand that as of the Petition Date, the Debtors estimate that approximately $500,000 is outstanding on account of the Staffing Provider Fees (the "Unpaid Staffing Provider Fees").

### 4.    Independent Contractors.

82.    I understand that through various contracts, approximately 40 independent and small contractors (collectively, the "Independent Contractors") conduct a range of important services for the Debtors. I understand that the Independent Contractors provide on-site accounting, information technology, and other services on both a full-time and seasonal basis, and perform a variety of administrative, accounting, legal, finance, management support, and other related tasks. I believe that their skills, knowledge and understanding with respect to the Debtors' operations, customer relations and infrastructure are essential to the effective reorganization of the Debtors' business. In addition, I understand that many of the Independent Contractors are small companies that may suffer financial hardship without immediate payment for their services.

83.    On average, I understand that the Debtors pay the vendors approximately $60,000 per week on account of compensation owed to the Independent Contractors (collectively, the "Independent Contractor Fees"). I understand that as of the Petition Date, the Debtors estimate

37

that they owe an aggregate amount of approximately $160,000 in Independent Contractor Fees earned before the Petition Date (collectively, the "Unpaid Independent Contractor Fees"), approximately $150,000 of which will become due and owing within the Interim Period.

### 5.    Consultant Compensation.

84.    I understand that the EFH Corp. board of directors (the "Board") utilizes the services of two advisors who attend Board meetings and advise the Board as necessary and requested (the "Board Advisors"). I understand that the Debtors also collectively utilize the services of 13 third-party advisors who serve on a third-party advisory board (the "Regulatory Advisors" and, together with the Board Advisors, the "Consultants"). I understand that the Regulatory Advisors routinely advise companies in the Debtors' industry on critical nuclear and environmental regulatory issues. I understand that none of the Consultants are insiders. I understand that in the aggregate, the Board Advisors receive $500,000 annually for their services (the "Board Consultant Compensation") and the Regulatory Advisors receive $520,000 annually for their services (the "Regulatory Consultant Compensation" and, together with the Board Consultant Compensation, the "Consultant Compensation"). I believe that the Consultants' collective skills, knowledge, and understanding of the Debtors' operations and infrastructure are critical to the successful reorganization of the Debtors' businesses.

85.    The Debtors estimate that, as of the Petition Date, approximately $25,000 has accrued and remains outstanding on account of Regulatory Consultant Compensation (the "Unpaid Regulatory Consultant Compensation") and no amounts have accrued and remain outstanding on account of the Board Consultant Compensation as of the Petition Date.

### 6.    Payroll Processor.

86.    I understand that the Debtors use the services of Northgate Arinso (the "Payroll Processor") to process direct deposit transfers and administer payroll checks to

38

Employees.[30] I understand that the Debtors pay approximately 2% of their Employees by check and the remainder by direct deposit. I understand that the Payroll Processor calculates the Debtors' payroll, health benefit, and tax obligations for each Employee, and the Debtors then transfer funds sufficient to satisfy such obligations to the Payroll Processor in advance of the end of the applicable pay period.

87.     I understand that, on average, the Debtors pay approximately $300,000 per month to the Payroll Processor for the payroll-related services that it provides to the Debtors and related administrative costs (the "Payroll Processor Fees"). I understand that as of the Petition Date, the Debtors estimate that approximately $300,000 is outstanding on account of amounts owed to the Payroll Processor (the "Unpaid Payroll Processor Fees"), all of which will become due and owing within the Interim Period.

88.     I believe it is critical the Debtors be able to compensate Employees on the historical payroll schedule. The Debtors will be unable to stay on the historical payroll schedule without the Payroll Processor because the Payroll Processor is responsible for calculating benefits and administering paychecks for the Employees, and replacing the Payroll Processor would take a significant amount of time.

**C.      Reimbursable Expenses.**

89.     I understand that the Debtors reimburse certain Employees or pay credit card invoices on behalf of certain Employees for approved, legitimate expenses incurred on behalf of the Debtors in the scope of their employment (collectively, "Reimbursable Expenses"). I understand that Reimbursable Expenses include business development and training activities, activities with current or potential customers and partners, business-related travel expenses—

---

[30]    I understand that Northgate Arinso is an affiliate of Kohlberg Kravis Roberts & Co., which has a substantial equity interest in EFH.

39

including meals, hotels, flights, car rentals, fuel, cellular service used for business purposes—certain social club memberships, and purchases made for business purposes on the Debtors' corporate credit cards. I understand that Reimbursable Expenses are often incurred by Employees and certain members of the Debtors' boards who must travel as part of their employment responsibilities.

90.    I understand that the Debtors reimburse Employees for Reimbursable Expenses in two ways: through direct reimbursement (the "Direct Reimbursement Process") and the use of corporate credit and purchasing cards issued by JP Morgan Chase (collectively, the "Credit and Purchasing Cards"), each as described in the Wages Motion.

91.    I understand that the Debtors pay approximately $3 million per month on account of Reimbursable Expenses, which are paid in arrears.[31]

92.    I believe that the Employees incurred the Unpaid Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that the Debtors would reimburse the Employees. At a minimum, I understand that the Direct Reimbursement Process and the Credit and Purchasing Cards are a historical feature of the Debtors' employment arrangement, and curtailing or halting this program would substantially disrupt the expectations of the Employees and, therefore, the Debtors' operations. In addition, I understand that the Debtors' internal employee reimbursement policy imposes a number of internal controls to ensure reimbursement requests are properly reviewed. I understand that among other things, (a) reimbursement requests can only be approved by managers who are permitted to implement a

---

[31]    I understand that in certain narrow circumstances, the Reimbursable Expenses also include reasonable and documented expenses incurred by members of the Debtors' boards of directors and managers in the scope of their duties as board members. I understand that the approval of such expenses is subject to various internal review processes. As of the Petition Date, the Debtors anticipate that approximately $25,000 of Unpaid Reimbursable Expenses is attributable to reasonable and documented expenses incurred by board members in the scope of their employment.

PX 095
Page 127 of 464

stricter review process but not a more lenient review process, (b) expenses can only be reimbursed if incurred "for the benefit of the company" and (c) expenses can only be reimbursed if incurred at the lowest available costs (with very particular rules delineated with respect to travel and expenses).

### D.    Deductions and Withholdings.

#### 1.    Payroll Taxes.

93.    I understand that the Debtors are required by law to withhold from Employees' paychecks amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withheld Amounts"). In addition, I understand that the Debtors are required by applicable statutory authority to pay Social Security and Medicare taxes, and based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (the "Employer Payroll Taxes" and, together with the Withheld Amounts, the "Payroll Taxes").

94.    I understand that, on average, the Debtors withhold approximately $12 million per month for Payroll Taxes, including both Employee and Debtor-paid portions. I also understand that as of the Petition Date, the Debtors estimate that approximately $900,000 million in Payroll Taxes have accrued and remain unpaid (the "Unremitted Payroll Taxes"), all of which will become due and owing to various taxing authorities within the Interim Period.

95.    I believe that since the Debtors are statutorily obligated to pay Payroll Taxes, their inability to do so may result in adverse legal consequences that disrupt the reorganization process. Moreover, I understand from Debtors' counsel that certain of the Payroll Taxes are generally held in trust by the Debtors and are not property of their estates.

41

**PX 095**
**Page 128 of 464**

### E.    Miscellaneous Deductions.

96.    In addition to various deductions discussed throughout the Wages Motion, the Debtors routinely deduct certain amounts from Employees' paychecks during each applicable payroll period on account of miscellaneous items, including garnishments, child support, and other similar deductions (collectively, the "Miscellaneous Deductions").

97.    On average, the Debtors remit approximately $400,000 per month on account of the Miscellaneous Deductions. As of the Petition Date, the Debtors estimate they have collected approximately $400,000 in Miscellaneous Deductions from Employees' paychecks that they have not yet transferred to the appropriate third parties (the "Unremitted Miscellaneous Deductions"), all of which will become due and owing to various third parties within the Interim Period.

98.    The Debtors believe that the Miscellaneous Deductions are generally held in trust by the Debtors and are not property of their estates. The Debtors seek authorization—but not direction—pursuant to the Interim Order and the Final Order, to remit the Unremitted Miscellaneous Deductions and continue remitting the Miscellaneous Deductions in the ordinary course of business on a postpetition basis.

### F.    Employee Benefit Programs.

99.    The Debtors offer Employees the opportunity to participate in one or more insurance and benefit programs, including, medical, dental, and vision plans, life insurance, short and long-term disability insurance, and other employee benefit plans as described below.

#### 1.    Health Benefit Plans.

100.    As described below, I understand that the Debtors offer Employees that work more than 20 hours per week the opportunity to participate in a number of health benefit plans, including medical, prescription, dental, and vision plans (collectively, the "Health Benefit

42

Plans"), each as described in the Wages Motion.

101.    Overall, I understand that the the Debtors fund approximately 80% of the costs associated with the Health Benefit Plans and Employees fund the remainder. I understand that the Debtors estimate that they deduct or remit an aggregate amount of approximately $1.0 million each month on account of the Employees under the Health Benefit Plans and pay an aggregate amount of approximately $5.5 million each month on account of administrative fees, premiums, and claims under the Health Benefit Plans (collectively, the "Health Benefit Amounts"). I understand that the Debtors estimate that, as of the Petition Date, they owe approximately $5.5 million on account of the Health Benefit Amounts (the "Unpaid Health Benefit Claims and Fees"), all of which will become due and owing within the Interim Period.

102.    I understand that the Health Benefit Plans are customary for most large companies, and consequently, Employees and their dependents have come to rely on the Health Benefit Plans. Without the Health Benefit Plans, I believe that employees would be forced to obtain potentially prohibitively expensive out-of-pocket coverage, which would adversely affect Employee morale. In addition, I understand from counsel to the Debtors believe that deductions taken from Employee paychecks on account of the Health Benefit Plans are generally held in trust by the Debtors and are not property of their estates.

2.    **Health Savings Account.**

103.    I understand that in connection with the Medical Insurance Plans, Employees may opt to participate in the Health Savings Account plan (the "HSA"). I understand that under the HSA, the Debtor entity EFH Corporate Services contributes between $900 and $2,250 each year on behalf of participating Employees. I understand that EFH Corporate Services has already contributed such amounts for 2014 on behalf of participating Employees in an aggregate amount of approximately $5.4 million. That being said, I understand that the Debtors are obligated to

43

contribute amounts on behalf of (i) Employees who were hired after the 2014 funding and who opt to participate in the HSA and (ii) Employees who did not complete the activities required to receive contributions from the Debtors before the 2014 funding but subsequently completed such activities. I understand that as of the Petition Date, the Debtors believe they owe approximately $50,000 in prepetition amounts on account of the HSA (the "Unpaid HSA").

        **3.**      **Flexible Spending Accounts.**

104.    I understand that the Debtors offer Employees that work more than 20 hours per week the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for certain out-of-pocket health care and dependent care expenses (the "Flexible Spending Program"). I understand that approximately 630 Employees participate in the health care portion of the Flexible Spending Program. I understand that at the beginning of each year, participating Employees contribute anywhere from $200 to $2,500 on behalf of themselves and anywhere from $200 to $5,000 on behalf of their dependents by deducting such amounts from their paychecks. I understand that all FSA amounts were available for distribution in January 2014 and are deducted from employee's paychecks throughout the year.

105.    I understand that as of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the Flexible Spending Program.

        **4.**      **Insurance.**

        **a.**      **Life Insurance.**

106.    I understand that the Debtors provide approximately 5,650 Employees that work more than 20 hours per week with primary and split-dollar life insurance (the "Life Insurance") through Metropolitan Life Insurance Company. I understand that the Debtors provide eligible Employees with Life Insurance up to each Employee's base salary at no cost to the Employee.

107.    I understand that the coverage provided by these various policies costs the

**PX 095
Page 131 of 464**

Debtors approximately $200,000 per month (the "Life Insurance Amounts"). I understand that as of the Petition Date, the Debtors estimate that there are approximately $200,000 in prepetition amounts to be deducted and/or remitted on account of the Life Insurance Amounts. I understand that the Debtors estimate that approximately $200,000 will become due and owing on account of the Life Insurance Amounts within the Interim Period (the "Unpaid Life Insurance Premiums").

108.    I understand that many Employees' long-term planning consists solely of the Life Insurance coverage they receive as a benefit of their employment. I believe that continuing Life Insurance coverage is essential to maintaining Employee morale and protecting Employee expectations and protecting their families from the impact of a catastrophic event.

### b.    Disability Benefits.

109.    I understand that the Debtors provide approximately 5,650 Employees that work more than 20 hours per week with long-term disability benefits, administered through Metropolitan Life Insurance Company (the "Long-Term Disability Benefits"). I understand that the Debtors also provide Employees that work more than 30 hours per week with short-term disability benefits (the "Short-Term Disability Benefits," and, together with the Long-Term Disability Benefits, the "Disability Benefits"), administered through Metropolitan Life Insurance Company. I understand that the Short-Term Disability Benefits are self-insured and are not subject to any limits. I also understand that the Long-Term Disability Benefits are fully insured under a policy that costs the Debtors approximately $200,000 per month. I understand that the Debtors pay 100% of the costs for the Disability Benefits, and the coverage provided by these various policies costs approximately $200,000 per month. I understand the Debtors pay 100% of the costs for the Disability Benefits.

110.    Under the Short-Term Disability Benefits program, I understand that eligible Employees receive three weeks of benefits at 100% of their base pay and ten weeks of benefits at

45

50% of base pay after six months to a year of service for new Employees. I understand that after one and up to five years of service, eligible Employees receive 13 weeks of benefits at 100% of base pay and 13 weeks of benefits at 50% of base pay. I also understand that after five years of service, eligible Employees receive up to 26 weeks of benefits at 100% of base pay. I understand that the Short-Term Disability Benefits program was implemented in 2011, and Employees hired before that time are entitled to 100% of base pay for up to 26 weeks.

111.    On average, I understand that the Debtors pay approximately $200,000 per month on account of the Disability Benefits. I understand that as of the Petition Date, the Debtors estimate that they are obligated to deduct and/or remit approximately $200,000 on account of the Disability Benefits (the "Unpaid Disability Benefit Premiums"), all of which will become due and owing in the Interim Period.

112.    I understand that the vast majority of Employees rely on Disability Benefits as their sole form of wage-loss relief. Thus, I believe that Employees will suffer substantial losses if they are not permitted to receive Disability Benefits.

c.    **Supplemental Insurance.**

113.    I understand that approximately 5,650 Employees that work more than 20 hours per week may purchase supplemental coverage on their life, critical illness, and accidental death and dismemberment policies (for themselves and their dependents), administered through Metropolitan Life Insurance Company and Boston Mutual (collectively, the "Supplemental Insurance"). I understand that eligible Employees may purchase Supplemental Insurance in an aggregate amount no greater than six times their annual base salary, up to a limit of $2 million. I understand that the Supplemental Insurance is 100% paid by deductions from participating Employees' monthly paychecks.

114.    I understand that the Debtors deduct or remit approximately $700,000 per month

46

on account of Supplemental Insurance (the "Supplemental Insurance Amounts"). As of the

Petition Date, the Debtors estimate that there are approximately $700,000 in prepetition amounts

to be deducted and/or remitted to Metropolitan Life Insurance Company on account of the

Supplemental Insurance Amounts. I understand that the Debtors estimate that they will be

obligated to remit approximately $700,000 in deductions (taken on account of the premiums

owed by the approximately 3,500 Employees that have elected Supplemental Insurance

Coverage), within the Interim Period (the "Unremitted Supplemental Insurance Amounts").

115.    I understand from Debtors' counsel that the Supplemental Insurance Amounts are

generally held in trust by the Debtors and are not property of their estates. The Debtors seek

authorization—but not direction—pursuant to the Interim Order and the Final Order, to remit the

Unremitted Supplemental Insurance Amounts and continue Supplemental Insurance coverage in

the ordinary course of business on a postpetition basis.

### 5.    The 401(k) Plan.

116.    I understand that the Debtors maintain a retirement savings plan for the benefit of

their Employees who are at least 18 years old and have completed at least six months of eligible

service, in accordance with the requirements of section 401(k) of the Internal Revenue Code

(the "401(k) Plan"). I understand that approximately 5,300 Employees currently participate in

the 401(k) Plan.

117.    I understand that in addition to making contributions to their 401(k) Plan account,

all Employees have the option to take out a loan from their 401(k) Plan account. I understand

that the Debtors then deduct certain amounts from such Employees' paychecks and remit those

amounts for repayment of such loans. I understand that the Debtors deduct approximately $4.0

million in the aggregate each month from Employees' paychecks (a) on account of Employees'

401(k) contributions and (b) to repay Employees' 401(k) loans (which are capped at the lesser of

47

50% of the amount in a particular Employee's 401(k) account or $50,000) (collectively, the "401(k) Deductions"). As of the Petition Date, the Debtors estimate that they will be obligated to remit approximately $1.7 million on account of the 401(k) Deductions (the "Unremitted 401(k) Deductions"), all of which will become due and owing within the Interim Period.

118.    I understand that the Debtors also have a limited matching program under the 401(k) Plan (the "401(k) Matching Obligation"). Specifically, I understand that the Debtors match: (a) 100% of an Employee's contributions, up to 6% of the Employee's salary, if the Employee does not participate in a defined benefit program or if they participate in the cash balance formula of the defined benefit plan; and (b) 75% of an Employee's contributions, up to 6% of the Employee's salary, if the Employee participates in the traditional formula of the defined benefit plan. I understand that the Debtors paid approximately $23.2 million in 2013 and $6.0 million in the first quarter of 2014 on account of the 401(k) Matching Obligation. I understand that as of the Petition Date, the Debtors estimate that they owe approximately $1,000,000 on account of the 401(k) Matching Obligation (the "Unpaid 401(k) Matching Obligation"), all of which will become due and owing within the Interim Period.

119.    The 401(k) Plan is administered by Fidelity Workplace Services LLC ("Fidelity Workplace") and by other specialized vendors. I understand that the Debtors pay these administrators approximately $180,000 in the aggregate each month on account of administrative fees owed to Fidelity Workplace (the "401(k) Administrative Fees"). I also understand that as of the Petition Date, the Debtors estimate that they owe approximately $180,000 in 401(k) Administrative Fees earned before the Petition Date (the "Unpaid 401(k) Administrative Fees"), all of which will become due and owing within the Interim Period.

120.    I believe many Employees' retirement savings solely consist of the 401(k) Plan,

48

and many Employees choose to participate in the 401(k) Plan because of the 401(k) Matching Obligation provision. Thus, I believe that continuing the 401(k) Plan and the 401(k) Matching Obligation is essential to maintaining Employee morale and protecting Employee expectations. In addition, I understand from Debtors' counsel that the 401(k) Deductions are generally held in trust by the Debtors and are not property of their estates.

### G.    Workers' Compensation.

121.    I understand that the Debtors provide workers' compensation insurance for their Employees at the level required by statute for each state in which the Debtors have Employees (collectively, the "Workers' Compensation Program").[32]    The Debtors maintain the Workers' Compensation Program through Liberty Mutual Group, STARR, Kemper, and Reliance Insurance (the "Workers' Compensation Insurers"). I understand that the Debtors have a $2 million deductible per occurrence under the Workers' Compensation Program.

122.    I understand that on average, the Debtors pay approximately $1.4 million per year in fees and premiums on account of the Workers' Compensation Program (the "Workers' Compensation Coverage Fees"). I understand that the Debtors estimate that they do not owe any amounts on account of Workers' Compensation Coverage Fees as of the Petition Date.

123.    Additionally, I understand that the Debtors incur an average of approximately $1.4 million in workers' compensation claims per year, and pay an average of approximately $1.3 million per year on account of such incurred claims. I understand that third-party administrators—Crawford & Company, York Risk Services Group, Inc., and one of the

---

[32]    I understand that the Debtors' workers' compensation policies entitle the Debtors to protection when benefits are due to Employees under the following states' workers' compensation laws: (a) Arizona; (b) District of Columbia; (c) Georgia; (d) Maryland; (e) Maine; (f) New York; (g) South Carolina; and (h) Texas. I understand from Debtors' counsel that although Texas does not require employers to maintain a Workers' Compensation Program, the Debtors have not opted out of the Texas Workers' Compensation Act. Additional states are also covered in previous years.

PX 095
Page 136 of 464

Workers' Compensation Insurers, Liberty Mutual group—collect and process claims submitted pursuant to the Workers' Compensation Program in exchange for an administrative fee ("Workers' Compensation Administrative Fees").

124.    On average, I understand that the Debtors pay approximately $20,000 per month in Workers' Compensation Administrative Fees. I understand that as of the Petition Date, the Debtors estimate that they owe approximately $20,000 in Workers' Compensation Administrative Fees ("Unpaid Workers' Compensation Administrative Fees"), all of which will come due and owing within the Interim Period.

125.    I understand that certain benefits under the Workers' Compensation Program may have been incurred prepetition but have yet to be fully paid, and certain other claims may have been filed prepetition but have yet to be resolved (collectively, the "Unpaid Workers' Compensation Claims"). I understand from Debtors' counsel that for the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with their contractual obligations, the Debtors must continue to assess, determine, and adjudicate Unpaid Workers' Compensation Claims during these chapter 11 cases. In addition, I understand that to the extent any of the Employees assert claims under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with their claims under the Workers' Compensation Program. I understand from Debtors' counsel that the required modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

126.    I understand from Debtors' counsel that because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that disrupt the reorganization process.

50

**H.      Vacation, Holiday and Other Leave of Absence Time.**

127.    I understand that the Debtors provide vacation time to all full-time Employees other than union Employees as a paid time-off ("PTO") benefit (the "Vacation Time").[33] I also understand that the length of employment generally determines the amount of Vacation Time available to each eligible Employee and the rate at which such Vacation Time accrues.    I understand that the amount of available Vacation Time differs between Luminant Employees and all other Employees.    In addition, I understand that Vacation Time for Luminant Employees is earned January 1 of each year (e.g., a Luminant Employee receives 15 days of vacation beginning January 1 of the calendar year that the Employee will have served six years of service), while Vacation time for all other Employees is accrued each pay period.

128.    *Luminant Employees.*    I understand that the amount of Vacation Time that each eligible Luminant Employee can take is based on the number of years of continuous full-time employment, as follows:

- six days of Vacation Time for six months to 10 months of employment;

- 10 days of Vacation Time for 10 months of employment to six years of employment;

- 15 days of Vacation Time for six to 14 years of employment;

- 20 days of Vacation Time for 15 to 23 years of employment; and

- 25 days of Vacation Time for 24 or more years of employment.

129.    I understand that the Luminant Vacation Time amounts differ slightly for Luminant Employees that work in nuclear operations, at lignite plants, or at certain mine sites. Employees who do not use all of their accrued Vacation Time in a year may carry over accrued, unused Vacation Time to the next year, up to a maximum of 48 hours.

---

[33]    All full-time Employees are entitled to the Vacation Time benefits, with the exception of union Employees (as described in the Wages Motion).

51

130.   ***All Other Employees.*** I understand that the amount of Vacation Time that each eligible non-Luminant Employee can take is based on the number of years of continuous full-time employment, as follows:[34]

- •      17 days of Vacation Time for zero to four years of employment;
- •      22 days of Vacation Time for five to nine years of employment;
- •      27 days of Vacation Time for 10 to 19 years of employment; and
- •      32 days of Vacation Time for 20 or more years of employment.

131.   And I understand that Employees who do not use all of their accrued Vacation Time in a year may carry over accrued, unused Vacation Time to the next year, up to a maximum of 40 hours.

132.   I understand that all Employees who are eligible to take Vacation Time and who terminate their employment for any reason are entitled to the cash equivalent of any accrued but unused Vacation Time through their termination date.   I understand that the Debtors have approximately $32.0 million of total cash and non-cash accrued obligations on account of Vacation Time.   I understand that on average, the Debtors pay approximately $200,000 per month on account of cash obligations associated with the accrued but unused Vacation Time of terminated Employees.   I understand that as of the Petition Date, the Debtors estimate they owe an aggregate amount of approximately $200,000 in cash obligations on account of accrued Vacation Time (the "Unpaid Vacation Time"), all of which will come due within the Interim Period.

133.   In addition, I understand that the Debtors recognize eight to ten core holidays as a

---

[34]   The Luminant Vacation Time policies do not include sick-time. Luminant Employees are entitled to take sick leave but do not accrue sick leave benefits. Therefore, the Debtors do not have any cash obligations associated with accrued but unused sick-time on behalf of Luminant Employees.

PTO benefit for certain of their Employees (each, a "Holiday" and, collectively, the "Holidays").[35]  Generally, eligible Employees are not required to work on designated Holidays and are paid for Holiday time at their base rate of pay.  Employees who are required to work on designated Holidays are paid in accordance with the applicable Debtor's Holiday pay rates.

134.    On average, I understand that the Debtors pay approximately $17.0 million per year on account of the Holiday policies.  I understand that as of the Petition Date, the Debtors do not estimate they owe any amounts account of Holiday obligations.

135.    Employees may also take certain other unpaid leaves of absence for personal reasons (collectively, "Leave of Absence Time").  Leave of Absence Time includes family medical leaves, pregnancy, adoption and foster care leaves, military leaves, jury duty, voting leaves, personal leaves, and bereavement leaves.[36]  Employees are not entitled to cash payments for unused Leave of Absence Time.  Thus, I understand that there are no obligations owing as of the Petition Date on account of Leave of Absence Time.

136.    I believe that the continuation of the Vacation Time, Holiday, and Leave of Absence Time policies in accordance with prior practice (subject to the limitations described below), is essential to maintaining Employee morale during these chapter 11 cases.  Further, I understand that the policies are broad-based programs upon which all Employees have come to depend.

137.    I understand that the Debtors anticipate that their Employees will utilize any

---

[35]    I understand that all full-time Employees are entitled to take Holidays.  Full-time Employees of the Luminant entities are further entitled to two floating Holidays.  I understand that floating Holidays must be taken if the Employee is to receive pay for it as a Holiday.  I also understand that holiday premium pay may be earned on a floating Holiday only if the Employee is called to work because of an emergency.

[36]    I understand that Employees taking a military Leave of Absence to serve a regular tour of duty receive pay for all PTO benefits granted and accrued but not used before the effective date of the Leave of Absence.  I understand that such Employees do not receive any other pay during the tour of duty.

PX 095
Page 140 of 464

accrued Vacation Time, Holiday, and Leave of Absence Time in the ordinary course of business, and, therefore, the Debtors do not expect there to be any material cash requirements beyond the Debtors' normal payroll obligations on account of the relief requested in the Wages Motion.

### I.      Retiree Compensation and Benefits.

138.    I understand that the Debtors maintain one qualified defined benefit pension plan that provides benefits to the approximately 2,100 union Employees (the "Union Pension Plan"). I understand that the Debtors also provide certain benefits (the "Retiree Medical Benefits") to approximately 4,600 retired Employees and Oncor's retired employees, (collectively, the "Retirees"), and such Retirees' eligible dependents.

#### 1.      The Union Pension Plan.

139.    I understand that the Debtors plan to continue to make any and all contributions on account of the Union Pension Plan (the "Union Pension Plan Obligations") as required by applicable law and various contractual obligations. For 2014, I understand that the Debtors made their annual contribution of approximately $20.0 million on behalf of the Union Pension Plan.

#### 2.      Retiree Medical Benefits.

140.    I understand that the Debtors sponsor Retiree Medical Benefits for the Retirees and their eligible dependents. I understand that in March of 2005, the Debtors and Oncor entered into an allocation agreement, under which Oncor assumed the retiree medical benefit obligations for (a) all of its active and retired employees and (b) Debtor active and retired Employees for the amounts earned by such Employees pursuant to their service prior to the deregulation and disaggregation of the Debtors' and Oncor's combined predecessor electric utility business effective January 1, 2002.   As a result of this agreement, I understand that although the Debtors sponsor the Retiree Medical Benefits, Oncor is obligated to satisfy the vast majority of the Retiree Medical Benefits' obligations.  I understand that as of December 31, 2013,

approximately 88% of the Retiree Medical Benefits' liability was attributable to Oncor.

141.    I understand that the Debtors and Oncor are responsible for satisfying their portion of Retiree Medical Benefits' liability.

142.    I understand that generally, the medical coverage offered to the Retirees differs based on the specific plan in which a Retiree chooses to participate, and participant costs differ based on the chosen plan, whether the Retiree's dependents are covered by the chosen plan, and the Retiree's years of service and associated rate band. On average, I understand that the Debtors pay approximately $700,000 million each month to the VEBA Trusts to sponsor the Retiree Medical Benefits on behalf of the Retirees. I understand that as of the Petition Date, the Debtors estimate that they owe approximately $700,000 million on account of sponsoring the Retiree Medical Benefits (the "Unpaid Retiree Medical Benefit Claims and Fees"), all of which will become due and owing within the Interim Period.

143.    I understand from Debtors' counsel that the Debtors currently are obligated to provide Retiree Medical Benefits under section 1114 of the Bankruptcy Code. In addition, I believe that it is important that the Debtors continue to provide Retiree Medical Benefits to reassure all Employees that the Debtors intend to honor their obligations to Employees—both during and after their tenure with the Debtors.

    J.    **Severance Program.**

        1.    **Severance Payments.**

144.    I understand that the Debtors have historically maintained a severance program under which all Employees are entitled to a certain number of weeks of severance benefits based on their position and length of service with the Debtors, as well as post-employment benefits under the Health Benefit Plans (the "Severance Program").

145.    I understand that the payments under the Severance Program are not due and

55

payable until termination. I understand that as a basis for comparison, between the years of 2010 and 2013, the Debtors paid an average of $4 million on behalf of the Severance Program. I understand that this average reflects an atypical reduction in workforce in 2011, and, in fact, the Debtors paid less than $3 million in each of the last two years on account of the Severance Program. Importantly, I understand that as of the Petition Date, no cash amounts remain outstanding on account of the Severance Program.

146.    I believe that it is important that the Debtors fulfill their obligations under the Severance Program to reassure all Employees that the Debtors intend to honor their obligations to non-insider Employees—both during and after their tenure with the Debtors—including those obligations incurred postpetition under the Severance Program.

## 2.    COBRA Reimbursements.

147.    I understand that the Debtors reimburse former Employees for deductions taken on account of Consolidated Omnibus Budget Reconciliation Act ("COBRA") expenses for the duration of their severance benefits. Under COBRA, I understand that the Debtors are obligated to offer former Employees and their dependents continued coverage under the Health Benefit Plans for a period of up to eighteen months. I understand that the Debtors provide these reimbursements through a third-party administrator, Chard Snyder. I understand that approximately 40 former Employees participate in one or more Health Benefit Plans under COBRA. I understand that on average, the Debtors remit approximately $20,000 per month on account of COBRA reimbursements to Chard Snyder for former Employees (the "COBRA Reimbursements").

148.    I understand that as of the Petition Date, the Debtors estimate that they owe $20,000 on account of COBRA Reimbursements ("Unpaid COBRA Claims and Fees").

56

**K.      Other Employee Programs and Benefits.**

      **1.      Relocation Expenses.**

149.    I understand that the Debtors provide certain Employees with relocation-related expenses (collectively, the "Relocation Expenses") to incentivize desirable "new-hire" candidates to accept positions with the Debtors or incentivize existing Employees to accept transfers to other locations.   I understand that on average, the Debtors pay approximately $150,000 per month on account of Relocation Expenses.   I understand that as of the Petition Date, the Debtors estimate that they owe $150,000 on account of prepetition Relocation Expenses ("Unpaid Relocation Expenses"), all of which will come due during the Interim Period.

150.    I believe that it is critical that the Debtors be able to pay Relocation Expenses to attract and retain talented employees, as well as to ensure, among other things, that Employees will be reimbursed for the expenses incurred in connection with their moves for the Debtors' benefit.

      **2.      Tuition Reimbursement Expenses.**

151.    I understand that the Debtors provide tuition assistance for eligible Employees who study in fields related to the Debtors' businesses (the "Tuition Reimbursement Expenses"). I understand that Employees are eligible to participate in the program if they work more than 20 hours per week, not including temporary workers or interns.   I understand that on average, the Debtors pay approximately $60,000 per month on account of Tuition Reimbursement Expenses. I understand that as of the Petition Date, the Debtors estimate that they owe approximately $60,000 on account of Tuition Reimbursement Expenses (the "Unpaid Tuition Reimbursement Expenses"), all of which will come due during the Interim Period.

152.    I believe that it is important that the Debtors be permitted to reimburse Employees for their tuition costs to ensure that the Debtors remain a competitive and knowledgeable

presence in the energy industry.

### 3.    Commuter Assistance Program.

153.    The Debtors subsidize eligible Employees for their car pool, bus, and rail costs (the "Commuter Assistance Program").    On average, I understand that the Debtors prepay the costs to administer the Commuter Assistance Program in January of each year (approximately $230,000 for the year). I understand that as of the Petition Date, the Debtors do not believe there are any prepetition amounts on account of the Commuter Assistance Program, and the Debtors do not believe that any amounts will become due and owing during the Interim Period.

### 4.    Survivors' Benefit Program.

154.    I understand that the Debtors pay a benefit equal to one month of an Employee's base salary to an Employee's beneficiary upon death (the "Survivors' Benefit Program").    I understand that as of the Petition Date, the Debtors estimate that there are no amounts outstanding under the Survivors' Benefit Program.

### 5.    Employee Financing Programs.

155.    I understand that the Debtors have two programs in place in which they offer interest-free financing to Employees for appliances, including one for certain energy saving home appliances (the "Energy Conservation Program"), and another for certain other large household appliances, such as a dishwasher or clothes dryer (the "Appliance Financing Program," and together with the Energy Conservation Program, the "Employee Financing Programs"). I understand that the Energy Conservation Program has a maximum financing limit of $3,500 over a term of up to 60 months, and the Appliance Financing Program has a maximum financing limit of $2,000 over a term of up to 24 months. I understand that the Debtors' pay approximately $1.2 million per year on account of the Employee Financing Programs. I understand that as of the Petition Date, the Debtors do not believe they owe any amounts on

58

account of prepetition obligations related to the Employee Financing Programs.

156.   I understand that the Employee Financing Programs provide significant financing savings to those Employees who participate.

### 6.   United Way Matching Program.

157.   I understand that the Debtors maintain a matching program for Employee contributions to local chapters of United Way, a non-profit organization dedicated to identifying and resolving pressing community issues (the "United Way Matching Contributions"). I understand that for every $1.00 that Employees donate to local United Way chapters, the Debtors contribute $0.50 in United Way Matching Contributions. I understand that on an annual basis, the Debtors contribute approximately $430,000 in United Way Matching Contributions.

### 7.   Energy Aid Program.

158.   I understand that the Debtors maintain a matching program for customer and employee contributions to local communities (the "Energy Aid Program"). I understand that the Energy Aid Program is the largest bill-payment assistance program among electricity providers in the nation. I understand that the Debtors' Employees contribute to the Energy Aid Program through paycheck deductions, and the Debtors match Employee contributions (the "Energy Aid Matching Contributions").[37] I understand that for 2013, the Debtors contributed approximately $1.5 million in Energy Aid Matching Contributions on account of employee deductions.

159.   I understand that as of the Petition Date, the Debtors estimate that they owe $210,000 on account of prepetition obligations related to the Energy Aid Matching Contributions (the "Unpaid Energy Aid Matching Contributions"), all of which will come due during the Interim Period.

---

[37]   I understand that the Debtors also match customer donations to the Energy Aid Program: for every $1.00 that customers donate to the Energy Aid Program, the Debtors contribute $5.00 to local communities to help individuals pay their electricity bills.

### L.    Unions.

160.    I understand that approximately 2,100 Employees are represented by unions that are party to 11 CBAs with the International Brotherhood of Electrical Workers (the "IBEW").

161.    I understand from Debtors' counsel that the Debtors are required to withhold union member dues, and typically remit such dues on a monthly basis to the IBEW (collectively, the "Union Dues"). I understand that on average, the Debtors remit approximately $100,000 per month on account of the Union Dues. I understand that as of the Petition Date, the Debtors estimate they have collected approximately $100,000 in Union Dues that they have not yet transferred to the IBEW (the "Unremitted Union Dues"), all of which will become due and owing to the IBEW during the Interim Period. I understand that the Debtors generally hold the Union Dues in trust and as a result, the Debtors generally do not consider these as assets of their estates.

### M.    Relationship with Oncor.

162.    I understand that the Debtors also provide and administer benefits to eligible Oncor employees, retirees, and dependents with respect to certain Employee Programs including, among others: (a) the Health Benefit Plans; (b) the Flexible Spending Program; (c) the 401(k) Plan; and (d) the Retiree Medical Benefits. In the aggregate, I understand that the Debtors historically spend approximately $250,000 per year to provide and administer such benefits on behalf of eligible Oncor employees, retirees, and dependents. Importantly, however, I understand that Oncor reimburses the Debtors for the vast majority of these costs and many of the Debtors' activities in respect of Oncor employees, retirees, and dependents are administrative in nature. I understand that after accounting for Oncor's typical reimbursements to the Debtors, the Debtors generally spend approximately $250,000 per year to provide and administer such benefits on behalf of eligible Oncor employees, retirees, and dependents.

60

VI.    **Critical Vendors Motion.**[38]

163.    In the Critical Vendors Motion, the the Debtors seek entry of orders:  (a) schedule a final hearing as soon as practicable after the 21st day following the Petition Date (defined in the Critical Vendors Motion) to consider approval of the Critical Vendors Motion on a final basis (the "Final Hearing"); (b) after the Final Hearing, permit the Debtors to pay Critical Vendor Claims up to $40 million; and (c) authorize all applicable banks and financial institutions to receive, process, honor, and pay all checks presented for payment and all electronic payment requests made by the Debtors related to the Critical Vendor Claims, whether such checks were presented or electronic-payment requests were submitted before or after the Petition Date.

    A.    **Debtors' Process of Identifying Critical Vendors.**

164.    I understand that the Debtors purchase goods and services from more than 6,700 third-party vendors.  I understand that these third-party vendors provide a host of goods and services that are important to the continued and uninterrupted operation of the Debtors' businesses. I understand that the Debtors estimate they owe approximately $507 million to their third-party vendors as of the Petition Date.

165.    Recognizing that payment of all prepetition claims of such third-party vendors outside of a plan of reorganization would be extraordinary given the facts and circumstances of these cases, I understand that the Debtors spent significant time and effort reviewing their accounts payable and vendor lists to identify those vendors critical to the continued and uninterrupted operation of the Debtors' businesses (the "Critical Vendors").  In identifying the Critical Vendors, the Debtors examined each of their vendor relationships with the following criteria in mind:

---

[38]    See *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Critical Vendor Claims*, filed contemporaneously herewith.

**PX 095**
**Page 148 of 464**

- whether a particular vendor is a sole source supplier or service provider;

- whether the services provided by the vendor are so vital, or the vendors' operations are so commingled with the Debtors' business, that even the briefest disruption would cause significant harm to the Debtors;

- whether the Debtors would be unable to obtain comparable products or services from alternative sources on a cost-effective basis within a reasonable timeframe;

- whether the Debtors' inventory levels or service coverage is sufficient to meet customer demands while an alternative vendor is located;

- whether a vendor meeting the foregoing criteria is able or likely to refuse providing essential products or services to the Debtors if their prepetition balances are not paid; and

- whether the business relationship between the Debtors and the supplier is governed by a contract.

166.    Applying these criteria, I understand that the Debtors estimate that they owe approximately $40 million to the Critical Vendors on account of goods and services delivered before the Petition Date.  Accordingly, I understand that the Debtors seek authority to pay up to $30 million pursuant to the Interim Order and $40 million pursuant to the Final Order.  I understand that these amounts represent approximately 8.0% of the Debtors' outstanding trade debt and approximately 0.1% of the Debtors' total funded indebtedness as of the Petition Date.

**B.    Summary of the Critical Vendors.**

167.    I understand that the Critical Vendors generally fall into one of the following five categories:  (a) vendors that provide goods and services related to planned maintenance outages: (b) vendors that provide services and related goods that are highly specialized and/or closely integrated with the Debtors' business operations and customer relationships; (c) sole source or geographically limited providers of critical goods; (d) vendors that provide goods and services

related to regulatory compliance obligations; and (e) vendors that provide goods and services related to the Debtors' nuclear power plant at Comanche Peak.[39]

### 1.    Outage Vendors.

168.    I understand that the Debtors utilize the services of a variety of Critical Vendors in connection with planned maintenance outages of certain of the Debtors' plants (the "Outage Vendors"). I further understand that in preparation for and during planned outages, the Debtors schedule maintenance, repairs, replacements, upgrades, refueling, refurbishing, and stress-testing on their generation and mining assets, all in an effort to ensure that their assets are in optimal condition before peak electricity season begins and out of service for the least amount of time possible.

169.    Based on the information available to me, I believe that any delay in goods and services from the Outage Vendors would likely extend a planned outage at significant cost to the Debtors' estates and/or unfavorably affect the operational reliability of the Debtors' generation and mining assets and the overall reliability of the ERCOT electricity market. As a result, I understand that the Debtors believe that the services provided by the Outage Vendors are so vital that the costs of even the briefest disruption would exceed the prepetition claims owing to the Outage Vendors.

170.    Additionally, I understand from Debtors' counsel that certain of the Outage Vendors may not be subject to executory contracts and the Debtors believe that these Outage Vendors may refuse to continue doing business with the Debtors if they are not paid their

---

[39]    The Debtors have agreed not to knowingly pay Critical Vendor Claims to any Critical Vendor that is an affiliate or insider, as defined in sections 101(2) and 101(31) of the Bankruptcy Code, respectively, of the Debtor, with the exception of portfolio companies owed by EFH Corp.'s indirect equity holders with which the Debtors conduct arm's-length transactions. The Debtors request that they only be required to conduct a reasonable inquiry under the circumstances with respect to whether a particular Critical Vendor is an affiliate or insider.

63

prepetition claims.    Accordingly, I understand that the Debtors believe that payment of the

Outage Vendors' prepetition claims will benefit their estates.

### 2.    Specialized and Integrated Services Vendors.

171.    I understand that the Debtors rely on specialized labor services and other services

that are closely integrated with the Debtors' generation and retail business operations provided

by certain Critical Vendors (collectively, the "Integrated Services Vendors").

172.    In certain cases, I understand that the Debtors can only obtain services from

Integrated Services Vendors who have certifications, permits, or licenses as required by state or

federal laws and regulations.    I understand that certain services that could otherwise be

performed by a wide range of vendors (e.g., welding, electrical, waste removal, earth moving,

security, and cyber security services) can only be performed by certain Integrated Services

Vendors due to the risks posed by the nature of the Debtors' facilities, which expose Integrated

Services Vendors to, among other things, high speed rotation motors, toxic and radioactive

substances, high voltage electricity, and high pressure vessels, as well as the additional dangers

inherent in maintaining mining operations.    Other customer-facing services are vital to the

Debtors' customer relationships and business strategy given the highly competitive Texas

electricity market and the Debtors' emphasis on reliability and customer service to differentiate

themselves from other market participants.    I believe it is vital that these customer-facing

services are not negatively affected by, for example, dissatisfied vendors or the need to obtain

new vendors.

173.    I understand that even if alternative service providers who possess the necessary

qualifications, experience, and skills could be identified in a timely fashion, the Integrated

Services Vendors have specific experiential knowledge about the Debtors' business operations,

facilities, and customer demands—developed over the course of the Integrated Services Vendors' long-standing relationship with the Debtors—that cannot be replaced.

174.    I believe that some of the Integrated Services Vendors will refuse to provide postpetition services to the Debtors if all or a portion of their prepetition claims are not satisfied. I understand that the Debtors have determined that the harm that would be inflicted on the Debtors' businesses by an interruption in service greatly outweighs the cost of paying the prepetition claims of the Integrated Services Vendors. Although the Debtors will make every effort to obtain continued performance from the Integrated Services Vendors and, where applicable, would seek to enforce the automatic stay against Integrated Services Vendors who refuse to perform under valid prepetition agreements, due to the integrated nature of all of the services, limited availability of comparable vendors able to provide the Debtors with certain specialized services, and customer-facing nature of other services, it is vitally important that these services continue. Therefore, I believe it is critical that they have the discretion to satisfy certain of the prepetition claims of the Integrated Services Vendors.

### 3.    Critical Goods Vendors.

175.    I understand that the Debtors rely on a number of Critical Vendors to supply essential raw materials, fuels, specialized replacement parts and supplies, operations consumables, and certain other goods and services required to operate the Debtors' plants and continue their business operations (collectively, and as described in the Critical Vendors Motion, the "Critical Goods Vendors" and "Critical Goods"). In some cases, I understand that there is no alternative provider for certain Critical Goods. For example, I understand that certain Critical Goods Vendors supply the Debtors with specially fabricated repair and replacement parts for the turbines, transformers, boilers, and other equipment used in the Debtors' electricity generation and lignite mining operations. I understand that this equipment is generally based on patented

65

designs available only from the manufacturer or that is made or provided to the Debtors' exact specifications.

176.    In other cases, I understand that alternative suppliers cannot supply the required Critical Goods in sufficient quantity, quality, or reliability, or they are unable to supply the required Critical Goods on a cost-efficient and timely basis in the appropriate geographic areas. For example, the Debtors' plants are designed to utilize bulk quantities of certain "laboratory grade" chemicals as part of their energy production and pollution control activities. Due to the chemical specifications and quantities involved, I understand that the Debtors are dependent on a few Critical Vendors that can provide such chemicals to their plants to keep the plants running and compliant with environmental regulations. I understand that similarly, certain raw materials and fuels used in the Debtors' business operations, including raw materials that are necessary for the Debtors' compliance with environmental regulatory requirements, are locally sourced because they are expensive and inefficient to transport. I also understand that in any one of these locales, there may be only one potential counterparty to provide the Debtors with these raw materials and fuels.

177.    Accordingly, I understand that the Debtors have determined that they must be able, in their sole discretion, to satisfy certain of the prepetition claims of these Critical Goods Vendors to ensure the continued delivery of the Critical Goods to their plants and operational locations.

### 4.    Regulatory Compliance Vendors.

178.    I understand that the Debtors rely on a number of Critical Vendors to assist the Debtors in complying with applicable governmental laws and regulations (the "Regulatory Compliance Vendors"). For example, the Debtors rely on certain vendors to remove regulated waste and chemicals from the Debtors' facilities for proper disposal and vendors who perform

66

emissions testing and other critical compliance activities. I understand that other vendors ensure the Debtors' compliance with requirements under applicable permits and regulations related to the Debtors' generation, wholesale, and retail activities and related services.

179.    I understand that some of the Regulatory Compliance Vendors may refuse to perform postpetition services if their prepetition claims are not paid, thereby exposing the Debtors to the risk of noncompliance with applicable governmental laws and regulations. I also understand that even the slightest delay could cause governmental entities to attempt to levy fines or penalties against the Debtors or require idling or closing of facilities and may put the Debtors' licenses and permits at risk. Moreover, I understand that proper disposal of the regulated waste and chemicals and compliance with environmental requirements on an uninterrupted basis will help to protect the environment and benefit the public health, including that of the Debtors' employees. Additionally, I understand that the public relations and regulatory consequences that could result from even temporary noncompliance could have meaningful negative results for the Debtors. For example, the Debtors are required to manage and operate their property in compliance with all applicable state and federal laws and regulations, and the automatic stay does not stay the exercise of police and regulatory powers by regulators.

180.    Accordingly, I believe that the Debtors' ability, in their sole discretion, to pay the Regulatory Compliance Vendors is essential to their reorganization efforts.

### 5.    Nuclear Plant Vendors.

181.    I understand that certain Critical Vendors provide goods and services related to the Debtors' nuclear generation units at Comanche Peak (the "Nuclear Plant Vendors"). I understand that these goods and services may include general operations, maintenance, repairs, inspections, refurbishments, fuel and parts, disposal services, quality control and assurance,

67

physical plant security, and cyber security. I believe it is critical to both the Debtors' business, and as a matter of public safety, that the Debtors be permitted to pay the claims of Nuclear Plant Vendors as necessary to avoid complications, disruptions, or increased safety risks in the operation of their nuclear assets. I understand that the Debtors' nuclear operations are subject to extensive oversight from the Nuclear Regulatory Commission and other regulatory bodies. I also understand that operational difficulties with respect to the Debtors' current nuclear assets could have significant regulatory consequences for those assets and the overall reliability of the ERCOT electricity market.

182.    I understand that although the Debtors will make every effort to obtain continued performance from the Nuclear Plant Vendors and, where applicable, would seek to enforce the automatic stay against Nuclear Plant Vendors who refuse to perform under valid prepetition agreements, the Debtors believe that the importance of Comanche Peak's operations to the Debtors and the the critical public safety and regulatory issues that could be presented by any disruptions make continued performance vital. Accordingly, I understand that the Debtors have determined that they must be able to satisfy certain of the prepetition claims of these Nuclear Plant Vendors, in the Debtors' discretion.

### C.    Terms and Conditions of Prepetition Payments.

183.    I understand that subject to the Court's approval, the Debtors intend to pay the Critical Vendor Claims only to the extent necessary to preserve their businesses. I also understand that the Debtors have designated a core group of executives, consultants, and employees who have experience in the Debtors' business, as well as the reorganization process, to review, assess, and potentially recommend payment to a Critical Vendor.

184.    Moreover, I understand that the Debtors will use their commercially reasonable efforts to condition payment of Critical Vendors Claims upon each Critical Vendor's agreement

68

to continue supplying goods and services on terms that are acceptable to the Debtors in light of customary industry practices (the "Customary Trade Terms").

185.    Notwithstanding the Debtors' commercially reasonable efforts to the contrary, I understand that certain Critical Vendors may refuse to enter into a Vendor Agreement. I understand that the Debtors request that they be granted the authority to pay Critical Vendor Claims held by such Critical Vendors if the Debtors conclude, in their sole discretion, that such payment is necessary for the preservation of the Debtors' estates.[40]

186.    Additionally, I understand that the Debtors request that if a supplier or vendor accepts payment pursuant to an order granting the relief requested in the Critical Vendors Motion and thereafter does not continue to provide goods or services on prepetition trade terms that: (a) any payment on account of a Critical Vendor Claim may be deemed, in the Debtors' sole discretion in consultation with counsel to the Ad Hoc Committee of TCEH First Lien Creditors, to be an improper postpetition transfer, and, therefore, recoverable by the Debtors in cash upon written request; and (b) upon recovery of the payment by the Debtors, the Critical Vendor Claim shall be reinstated as if the payment had not been made. I understand that if there exists an outstanding postpetition balance due from the Debtors to a vendor or supplier, the Debtors may elect to recharacterize and apply any payment made pursuant to an order granting the relief requested in the Critical Vendors Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the

---

[40]    In the event any payments greater than $5 million are to be paid when (a) a Critical Vendor has not agreed to execute a Vendor Agreement, or (b) the Debtors seek to execute a Vendor Agreement that is modified from the version annexed as Exhibit 1 to Exhibit A, the Debtors have agreed to consult with counsel to certain holders of first lien claims against TCEH (the "Ad Hoc Committee of TCEH First Lien Creditors") before making such payment or modifying the form of Vendor Agreement, as applicable.

postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.[41]

VII.    **Shippers, Warehousemen, and Materialmen Motion.**[42]

187.    In the Shippers, Warehousemen, and Materialmen Motion, the the Debtors seek entry of orders:  (a) granting administrative expense priority to all undisputed obligations the Outstanding Orders and satisfy such obligations in the ordinary course of business; and (b) pay prepetition claims of the Claimants in the ordinary course of business in an aggregate amount not to exceed $35.3 million during the Interim Period and pursuant to the Final Order, in an aggregate amount not to exceed $39.5 million.

A.    **Outstanding Orders.**

188.    I understand that the Debtors' suppliers may be concerned that they will be rendered general unsecured creditors, rather than administrative claimants, with respect to goods and services ordered before the Petition Date for delivery or provision after the Petition Date. As a result, I understand that suppliers may refuse to ship or transport such goods (or recall such shipments) or provide services with respect to Outstanding Orders unless the Debtors issue

---

[41]    The Debtors have agreed to maintain a matrix summarizing (a) the name of each Critical Vendor that receives a payment (or payments) pursuant to the Interim Order or the Final Order; (b) the total amount paid to each Critical Vendor pursuant to the Interim Order or the Final Order; and (c) the nature of the goods and/or services provided by each Critical Vendor to whom a payment under the Interim Order or the Final Order is made (the "Critical Vendor Summary"). The Debtors will provide the Critical Vendor Summary, along with any executed Vendor Agreement, upon reasonable written request to the U.S. Trustee, the Ad Hoc Committee of TCEH First Lien Creditors, certain holders of unsecured claims against EFIH (the "Ad Hoc Committee of EFIH Unsecured Creditors", the agent for the TCEH and EFIH debtor in possession financing facilities, and, once appointed counsel to any official committee of unsecured creditors (the "Creditors Committee"). I understand that the Debtors request that this agreement to disclose payments be conditioned on the execution of a confidentiality agreement by any recipient of a Critical Vendor Summary and/or Vendor Agreements. The Debtors also request that the Debtors not be required to disclose any information that the Debtors deem to be proprietary or competitive in nature to any competitor or any individual member of any committee.

[42]    See Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Authorizing the Debtors to (A) Grant Administrative Expense Priority to All Undisputed Obligations for Goods and Services Ordered Prepetition and Delivered Postpetition and Satisfy Such Obligations in the Ordinary Course of Business, and (B) Pay Prepetition Claims of Shippers, Warehousemen, and Materialmen, filed contemporaneously herewith.

70

**PX 095**
**Page 157 of 464**

substitute purchase orders postpetition or obtain an order of the Court permitting the Debtors to meet their obligations under the Outstanding Orders even though the Outstanding Orders are entitled to administrative expense priority under section 503(b) of the Bankruptcy Code. Thus, I understand that the Debtors seek to affirm that the Outstanding Orders are entitled to administrative priority and to pay such Outstanding Orders in the ordinary course of business to avoid any unnecessary disruption to business operations and administrative costs associated with reissuing purchase orders or seeking additional relief.

**B.        Claims of Shippers, Warehousemen, and Materialmen.**

   **1.        Shippers.**

189.    I understand that the Debtors' ability to produce and deliver energy in a timely manner depends on their timely receipt of raw materials, parts, equipment, supplies, fuel, and components that are important to the Debtors' business operations. To that end, I understand that the Debtors rely upon certain professional domestic and international common carriers, shippers, truckers, logistics management companies, pipelines, rail carriers, and certain other third-party service providers to ship, transport, and deliver goods (the "Shippers"). I understand from Debtors' counsel that under certain state and federal laws, the Shippers could potentially assert possessory liens over goods currently in their possession for amounts the Debtors owe to the Shippers. *See* 49 U.S.C. § 80109 (providing for uniform shipper liens with respect to interstate shipments using common carriers); Tx. Bus. & Com. § 7.307 (providing that carriers have a lien on shipped goods). I understand that the value of the goods being shipped do not necessarily exceed the amounts owed to the Shippers, but an inability to acquire these materials or parts from the Shippers could result in serious disruption to the Debtors' operations. I also understand that timely delivery of these items is therefore vital to the operation of the Debtors' businesses.

**PX 095**
**Page 158 of 464**

190.    I understand that, as of the Petition Date, the Debtors owe approximately $19.4 million on account of shipping and logistics charges for goods ordered prepetition, all of which will become due and owing during the Interim Period.

### 2.    Warehousemen.

191.    I understand that to store certain of the same materials and parts transported by the Shippers, the Debtors use offsite storage space with certain warehouse facilities (collectively, the "Warehousemen"). For example, the Debtors have entered into several contracts to store natural gas utilized to fuel certain power generation assets and in other activities. From Debtors' counsel, I understand that under certain state laws, the Warehousemen may be able to assert possessory liens against the warehoused property for amounts owed to the Warehousemen. *See* Tx. Bus. & Com. § 7.209 (providing for warehousemen liens even where a storage agreement, rather than a warehouse receipt, governs the transaction). I understand that the availability of these warehoused goods and materials are similarly important to the continued operation of the Debtors' businesses, and the amount due to the Warehousemen is significantly less than the value of the goods being stored.

192.    I understand that, as of the Petition Date, the Debtors owe approximately $3.2 million on account of Warehousemen claims, all of which will become due and owing during the Interim Period.

### 3.    Materialmen.

193.    I understand that the Debtors' energy production and mining activities depend upon third-party contractors, mechanics, machinists, and repairmen that repair, fabricate, or perform other services on certain parts, equipment, and other materials used in the Debtors' facilities (the "Materialmen").

72

194.    I understand from Debtors' counsel that under certain state laws, including the Texas Constitution, the Materialmen could potentially assert possessory liens against the Debtors and their property for amounts that the Debtors owe and may refuse to return the Debtors' property until they are paid for their services. *See* Tex. Cont. Art. XVI § 37 (self-effectuating constitutional lien in favor of "[m]echanics, artisans and material men, of every class . . . upon the buildings and articles made or repaired by them"); Tx. Prop. § 70.001 (providing for certain possessory materialmen liens). I understand that the value of the property is greater than the amount of the Materialmens' claim for services rendered.

195.    I understand that, as of the Petition Date, the Debtors owe approximately $16.9 million on account of outstanding prepetition invoices of the Materialmen, of which approximately $12.7 million will become due and owing during the Interim Period.

### C.    Proposed Treatment of Claimants.

196.    Under the state and federal laws described above, I understand from Debtors' counsel that the Claimants may have perfected liens against certain of the Debtors' goods, equipment, and facilities, or may be able to perfect such liens postpetition. I understand that even in the absence of such liens, the Claimants may possess goods that are vital to the Debtors' ongoing business operations.

## VIII.    Customer Programs Motion.[43]

350.    In the Customer Programs Motion, the Debtors seek entry of:    (a) the Claims Order authorizing, but not directing, the Debtors to (i) maintain and administer all of the

---

[43]    See *Motion of Energy Future Holdings Corp.*, et al., *for Entry of (A) an Order Authorizing the Debtors to (I) Maintain and Administer Customer Programs and Customer Agreements, (II) Honor Prepetition Obligations Related Thereto, (III) Pay Certain Expenses on Behalf of Certain Organizations, (IV) Fix Deadlines to File Proofs of Claim for Certain Customer Claims, and (V) Establish Procedures for Notifying Customers of Commencement of the Debtors' Chapter 11 Cases, Assumption of Customer Agreements, and the Bar Dates for Customer Claims and (II) an Order Authorizing the Debtors to Assume the Customer Agreements*, filed contemporaneously herewith.

73

Customer Programs (each defined in the Customer Programs Motion) in the ordinary course of business, (ii) honor prepetition commitments owing on account of all of the Customer Programs, (iii) pay certain expenses on behalf of the PUC and ERCOT (each defined in the Customer Programs Motion) incurred during the chapter 11 cases, (iv) fix the Customer Claims Bar Date for filing Proofs of Claims for Customer Claims (each defined in the Customer Programs Motion), and (v) establish the Customer Noticing Procedures to provide notice to current and former customers of commencement of the chapter 11 cases, assumption of Customer Agreements with current customers, and the Customer Claims Bar Date; and (b) after a final hearing, the Assumption Order authorizing the Debtor entities TXU Energy Retail Company LLC ("TXU Energy Retail"), 4Change Energy Company ("4Change"), Luminant ET Services Company ("Luminant ET Services"), and Luminant Energy Company LLC ("Luminant Energy" and, together with TXU Energy Retail, 4Change, and Luminant ET Services, the "Retail Debtors") to assume the Customer Agreements with their customers.[44]

351.    I understand that the Debtors estimate that as of the Petition Date, the total amount of obligations to customers on account of the Customer Programs ranges from approximately $120 million to $135 million, including approximately $80 million to $90 million for Customer Credits, Customer Deposits, and the Average Monthly Billing Program.[45]  I also understand that the Debtors estimate that they are obligated to pay approximately $12 million on

---

[44]    The Customer Programs Motion does not request any relief with respect to or affect the rights, duties, or obligations of EFIH and EFIH Finance, Inc., or EFH Corp., other than with respect to EFH Corp.'s obligations under the Charitable Contributions Program (each defined in the Customer Programs Motion).

[45]    I understand that the Debtors' obligations to customers under the following Customer Programs are generally not cash payment obligations: the Average Monthly Billing Program, Customer Credits (excepting amounts refunded to customers, as described in the Customer Programs Motion), Customer Deposits, and Customer Agreements, all as defined and discussed in the Customer Programs Motion.  I also understand that obligations to customers under these Customer Programs fluctuate due to seasonality, business cycles, and various other business and economic factors.

PX 095
Page 161 of 464

account of prepetition Customer Programs obligations within the first 30 days of the Petition Date.

**A.      Overview of the Debtor's Business Operations and Customer Base.**

352.    I understand that the Debtors operate in all areas of the region overseen by ERCOT, which manages the supply of approximately 85% of the electricity consumption in Texas.  The majority of ERCOT is open to retail electric competition—approximately 6.7 million customers have the ability to choose their retail electric provider.[46]

353.    I understand that the Retail Debtors compose the Debtors' retail operations, through which the Debtors engage in retail sales of electricity to approximately 1.7 million residential and business customers in Texas, as well as the sale and delivery of natural gas to several hundred commercial and industrial customers.  In the first quarter of 2014, I understand that approximately 68% of the Debtors' retail operations revenue resulted from sales of electricity to residential customers.  I also understand that the Debtors compete against more than 100 other certified retail electric providers to supply customers with electricity in all areas of the ERCOT region open to competition, including the Dallas/Fort Worth, Houston, Corpus Christi, and lower Rio Grande Valley areas of Texas.

**B.      The Customer Agreements.**

197.    I understand that the Retail Debtors' agreements with their customers (collectively, the <u>Customer Agreements</u>") generally fall into three categories.  I also understand that the first category of Customer Agreements constitutes the vast majority of the Customer Agreements and consists of various retail electric power sales agreements that one of TXU Energy Retail, 4Change, or Luminant ET Services has entered into with residential and small

---

[46]    References to the number of customers in the Customer Programs Motion refer to the number of electricity meters.

75

business customers as well as large commercial and industrial end-use customers within the ERCOT region (collectively, the "Retail Agreements").[47]    Although they vary in size, I understand that the Retail Agreements typically include terms relating to the calculation and payment of charges, addition and removal of customer premises, adjustments to the contract price, events giving rise to the right to terminate, remedies upon termination, force majeure, notices, warranties and limitations of liabilities, and indemnifications.[48]    I understand that the customers that are party to the Retail Agreements include residential customers as well as more than 2,200 large organizations that represent a wide range of sectors, including manufacturing, energy, real estate, retail, and healthcare, as well as municipalities, schools, and religious organizations.    As of March 31, 2014, I understand that TXU Energy Retail, 4Change, and Luminant ET Services served approximately 1.7 million retail customers under the Retail Agreements.

198.    I understand that the second category of Customer Agreements is composed of approximately 350 commercial retail natural gas agreements that Luminant Energy has entered into with industrial and commercial customers to supply natural gas across North Texas and the greater Houston area (the "Retail Gas Agreements").    I also understand that the Retail Gas Agreements provide a consistent earnings and cash flow stream to the Debtors.

---

[47]    I understand that for the avoidance of doubt, the Retail Agreements do not include wholesale contracts to which any Debtor is a party with an affiliate of an end-use customer.

[48]    I understand that additionally, certain of the Customer Agreements impose an obligation on the Debtors to purchase power generated by their customers, which the Debtors subsequently sell into the ERCOT region (the "Power Purchase Obligations").  As of the Petition Date, the Debtors estimate that Luminant ET Services owes approximately $315,000 on account of such Power Purchase Obligations.

PX 095
Page 163 of 464

199.    I understand that the Customer Agreements also include agreements between Luminant Energy and one of the following customers: (a) The City of Goldsmith, Texas;[49] (b) Ameripower, LLC; (c) Infinite Electric, LLC and Veteran Electric, LLC; (d) Clearview Electric, Inc.; and (e) WM Renewable Energy, LLC[50] (collectively, the "Luminant Customer Agreements").    Pursuant to the Luminant Customer Agreements, Luminant Energy sells electricity and provides related services to, and/or schedules the delivery of power for, each customer.    Additional detail regarding the Luminant Customer Agreements, along with the respective Cure Amount, if any, are listed on **Exhibit 1** annexed to **Exhibit B** attached to the Customer Programs Motion.[51].

200.    I believe the Customer Agreements are essential to the Debtors' operations.    In particular, I understand that the Customer Agreements account for approximately 38 terawatt hours of delivered power on an annual basis, and over 74% of the Debtors' overall revenues.    I understand that to provide assurances to current and prospective customers that the Retail Debtors will continue to perform under the Customer Agreements and provide the same level of competitive and innovative service on par with their prepetition performance.

---

[49]    I understand that as discussed in **Exhibit 1** to **Exhibit B** attached to the Customer Programs Motion, Luminant Energy provides payment and invoice processing services to The City of Goldsmith.    Specifically, Luminant Energy pays The City of Goldsmith's transmission, distribution, and other charges to the applicable utility service provider, and then seeks reimbursement from the City of Goldsmith (the "Invoice Processing Services"). As of the Petition Date, the Debtors estimate that they owe approximately $3,000 of "pass-through" amounts on account of Invoice Processing Services.

[50]    I understand that as discussed in **Exhibit 1** to **Exhibit B** attached to the Customer Programs Motion, Luminant Energy purchases power produced by a landfill owned by WM Renewable Energy, LLC, which is subsequently sold to a retail customer of TXU Energy Retail.    As of the Petition Date, I understand that the Debtors estimate that Luminant Energy owes approximately $160,000 to WM Renewable Energy, LLC on account of such Power Purchase Obligations.

[51]    I understand that because the Debtors are seeking to honor prepetition obligations to customers pursuant to the Claims Order, the Debtors estimate that the Cure Amount with respect to each of the Customer Agreements will be $0.

**PX 095**
**Page 164 of 464**

C.     **The Debtors' Customer Programs.**

354.   The wholesale and retail electricity markets in the ERCOT region are highly competitive.  I understand that approximately 73% of the market's electricity demand in the ERCOT region is attributable to customers located in areas where there is a choice among retail electric providers.  I also understand that because Texas is one of the fastest growing states in the U.S. with a comparatively robust economy, competition within the ERCOT region for these customers is particularly fierce.  As of December 2013, I understand that there were more than 100 certified competitive retail electric providers (compared to approximately 40 in 2002, the first year of retail electric competition in Texas).   Based on data published by the PUC, as of September 30, 2013, I understand that approximately 62% of residential customers and 69% of small commercial customers in competitive areas of the ERCOT region are served by retail electric providers not affiliated with the pre-competition electric company in operation before the deregulation of the ERCOT region retail electricity market in 2002.  Moreover, approximately 89% of residential customers and 90% of small commercial load customers have chosen an electricity provider at least once since the ERCOT retail market deregulation process began in Texas in 2002,[52] making Texas the only state with retail competition where more than half of residential customers have chosen to be served by electricity providers other than the incumbent, traditional electric utilities.[53]

355.   In addition, I understand that the Debtors are a significant supplier of natural gas to small business and industrial and commercial customers in North Texas and the greater Houston area. I understand that the Debtors provide a variety of natural gas services, including

---

[52]   Electric Reliability Council of Texas, Inc., *Supplemental Information Retail Electric Market* (March 21, 2014).

[53]   Public Utility Commission of Texas et al., *Texas Energy Assurance Plan* 45 (Nov. 2012).  See the First Day Declaration for more information about deregulation in the ERCOT region.

**PX 095
Page 165 of 464**

firm supply, scheduling, nominations, and balancing for those commercial and industrial customers. The Debtors' natural gas customers participate in various industries, including manufacturing, steel, glass, heat treating, chemical, refining, food service, hospitals, and commercial buildings.

356.    In this highly competitive space, I understand that the Debtors' retail operations employ a number of programs to develop and maintain customer loyalty and attract new customers, including various cash-back, billing arrangements, and other rewards, rebates and incentive programs, and incur certain other obligations and commitments to customers, including credits, deposits, charitable contributions, and warranties (collectively, as discussed in the Customer Programs Motion, the "Customer Programs").

357.    I believe that continuing the Customer Programs in the ordinary course is essential to the Debtors' seamless transition into chapter 11 and will facilitate a successful reorganization. As discussed in the First Day Declaration, the Debtors filed these cases primarily to effectuate a balance sheet restructuring. Thus, to preserve the value of their businesses, they must promptly assure their customers that the Customer Programs will continue uninterrupted. I believe that the continuation of the Customer Programs is critical for maintaining customer confidence and trust in the Debtors' businesses and to ensure that the Debtors preserve market share in a highly competitive industry. The following describes Customer Programs that the Debtors actively use to cultivate customer support and loyalty.

### 1.    Rewards Programs.

358.    I understand that the Debtors' retail operations offer various rewards programs, including a cash-back loyalty rewards program (the "Cash-Back Rewards"), a welcome bonus program (the "Bonus Program"), the LUV 2Fly Rapid Rewards Program with Southwest Airlines (the "Rapid Rewards Program"), referral programs (the "Refer-a-Friend Programs"),

**PX 095**
**Page 166 of 464**

third-party partner incentives (the "<u>Partner Incentives</u>"), sweepstakes programs (the "<u>Sweepstakes Programs</u>"), and other reward and incentive programs (collectively, the "<u>Rewards Programs</u>").

359.    I understand that the Cash-Back Rewards are a customer loyalty program that makes recurring annual cash payments to participating customers.  I also understand that the Debtors accrue obligations over the course of the year on account of the Cash-Back Rewards and, in the first quarter of each year, make payments to customers in an amount equal to approximately 2% to 6% of the total energy and transmission and distribution utility charges incurred by customers during the preceding calendar year.  I understand that the payments primarily come in the form of Visa debit cards issued in the name of customers, and constitute actual cash obligations.  I also understand that customers with $5.00 or less in Cash-Back Rewards receive a credit on their bill rather than a debit card.  I understand that if customers do not use the full amount of the Cash-Back Rewards on their cards within six months from the date the cards are received, the unused portion is returned to the Debtors.  I understand that hundreds of thousands of residential and business customers participate in the Cash-Back Rewards.

360.    I understand that the Debtors also attract new customers and retain current customers through incentive programs, including the Bonus Program, the Refer-a-Friend Programs, and the Rapid Rewards Programs.  Under the Bonus Program, I understand that new customers and current customers who initiate, transfer, or renew their service receive a prepaid Visa debit card worth various amounts upon redemption.  I understand that under the Refer-a-Friend Programs, current customers who successfully refer a new person who becomes a customer receive up to $50 in the form of billing credits or a prepaid Visa debit card, as does the new customer.  I also understand that there is no limit on the amount of rewards a referring

80

customer can earn under the Refer-a-Friend Programs. I understand that the rewards under the

Bonus Program and the Refer-a-Friend Programs constitute actual cash obligations. I understand

that if customers do not use the full bonus amount on their cards by the expiration date printed on

the cards, the unused portion is returned to the Debtors. I understand that there are two Rapid

Rewards Programs, each of which lasts for either 12, 24, or 30 months. I also understand that

customers who signed up for one of the Rapid Rewards Programs earn and receive Southwest

Airlines rewards points over the duration of the program. I understand that the Debtors purchase

these rewards points from Southwest Airlines, which customers can redeem for Southwest

Airlines flights.

361.    I understand that customers occasionally receive Partner Incentives, including

coupons, discounts, and other incentives, from the Debtors and certain third-party partners. I

also understand that the Partner Incentives are typically included as inserts with customers'

monthly bills or are offered to customers through direct sales efforts. Additionally, I understand

that the Debtors and certain of their third-party partners offer Partner Incentives to customers

who enroll in one of the home warranty programs offered to customers by the Debtors and their

third-party partners. I understand that the Debtors reimburse third-party partners for their

allocated cost of associated Partner Incentives. I understand that the Sweepstakes Programs are

marketing and promotional tools used to attract new customers and retain current customers.

Under the Sweepstakes Programs, I understand that the Debtors offer customers the opportunity

to win travel and event tickets, gift cards, and certain other prizes.

362.    I understand that the Debtors pay approximately $40 million to $45 million each

year on account of the Rewards Programs. As of the Petition Date, I understand that the Debtors

81

PX 095
Page 168 of 464

estimate that the total amount due under the Rewards Programs will be approximately $15.9 million.

### 2.    Average Monthly Billing Program.

363.    As required by applicable PUC regulations, I understand that the Debtors' retail operations offer residential customers the option to pay their bills based on their average usage on a rolling basis, rather than a bill based on their actual usage in the preceding month (the "Average Monthly Billing Program"). I understand that the Average Monthly Billing Program is an attractive option for certain customers because it reduces the fluctuation in their energy bill due to seasonal requirements. I also understand that at any point in the year, the Average Monthly Billing Program results in either a net overpayment or underpayment by participating customers, depending on whether the running total of payments by such customers is greater or less than their actual electricity usage. If customers decide to discontinue the Average Monthly Billing Program, a credit or debit is applied to their next bill. To the extent that customers' payments under the Average Monthly Billing Program exceed the actual amounts used during those months, I understand that the Debtors are in possession of customer dollars, which constitute obligations to customers.

364.    I understand that a significant number of customers participate in the Average Monthly Billing Program, and the amount owed to customers varies widely during the year, ranging from approximately $2 million to approximately $20 million. As of the Petition Date, I understand that the Debtors estimate that they owe an aggregate amount of approximately $17 million worth of prepaid services on account of the Average Monthly Billing Program.

### 3.    Customer Deposits and Customer Credits.

365.    I understand that based on customers' utility payment data and history, the Debtors' retail operations request that certain customers pay a deposit (the "Customer

82

**PX 095**
**Page 169 of 464**

Deposits"). I understand that the Debtors hold Customer Deposits as part of their operating cash. I understand that the PUC, however, requires the Debtors to post letters of credit payable to the PUC in the amount of Customer Deposits held by the Debtors to maintain their status as a certified retail electric provider. In addition, I understand that the Debtors post letters of credit payable to the PUC in the amount of prepayments held by the Debtors under certain of their electricity plans. I understand that the Debtors return Customer Deposits to customers after they have paid their electricity bills in full with no late payments for 12 consecutive months, together with any interest that has accrued during the period. I also understand that the Debtors typically return Customer Deposits in the form of a credit to the customers' electricity bills.

366.    In addition to returned Customer Deposits that are credited to customers' electricity bills, I understand that the Debtors also treat overpayments, corrections, and prepayments (other than through the Average Monthly Billing Program) as credits to the customers' accounts (the "Customer Credits"). As discussed above, I understand that customers who discontinue the Average Monthly Billing Program may receive Customer Credits to the extent their cumulative payments exceed the value of services received. I understand that under certain electricity plans offered by the Debtors, customers are allowed to prefund their account balances. I understand that these prepayments constitute Customer Credits, against which subsequent electricity and other charges are debited. I also understand that based on historical data from the last twelve months, the Debtors estimate that the amount of outstanding Customer Credits fluctuates between $10 million to $20 million throughout the year.

367.    If a customer discontinues service with the Debtors or is an inactive customer and has outstanding Customer Deposits or Customer Credits, I understand that the Debtors will issue a refund check to the customer or otherwise credit a customer's credit card. I also understand

PX 095
Page 170 of 464

that the Debtors refund approximately $14 million to customers on an annual basis on account of the Customer Deposits and Customer Credits.

368.    As of the Petition Date, I understand that the Debtors estimate that they hold an aggregate amount of approximately $65 million to $75 million on account of the Customer Deposits and Customer Credits.

### 4.    Brighten Programs.

369.    I understand the Debtors' retail operations offer an energy savings program to certain business customers known as Brighten GreenBack (the "Brighten GreenBack Program"). I also understand that the Brighten GreenBack Program provides businesses with an incentive to purchase or install infrastructure or qualifying electric vehicles. I understand that after installing qualifying energy efficient equipment, customers can submit their expenses to the Debtors and the Debtors then reimburse these customers in the form of rebate checks up to a specified amount.

370.    I understand that the Debtors' retail operations also provide customers with discounts and incentives to purchase energy-saving items through its Brighten Online Energy Store (the "Brighten Online Store" and, together with the Brighten GreenBack Program, the "Brighten Programs"). I understand that a third party manages the Brighten Online Store and handles all product logistics costs in exchange for a percentage of revenues generated through the store with the Debtors. I understand that the Debtors reimburse this third party for the difference between the retail price and the discounted price of products purchased by the Debtors' customers through the Brighten Online Store.

371.    As of the Petition Date, I understand that the Debtors estimate that they owe an aggregate amount of approximately $1 million on account of the Brighten Programs, net of the Debtors' share of revenues associated with the Brighten Online Store.

84

5.    **Customer Partners.**

372.    I understand that the Debtors use a variety of third-party contractual arrangements to cultivate, maximize, and develop their customer relationships.  I also understand that the Debtors enter into third-party agreements and professional service agreements (the "Channel Partner Agreements") with third parties that act as brokers and consultants for the Debtors (each, a "Channel Partner").  I understand that the Channel Partner Agreements include collection and remittance agreements, under which the Debtors bill and collect payments from customers, and then remit payments to the Channel Partner.  I understand that if a customer disputes a fee obtained through a Channel Partner Agreement and does not pay, the Debtors do not continue to pay the Channel Partner, and the Channel Partner is responsible for collection from the customer. I understand that the Channel Partner Agreements also include professional service agreements, under which the Channel Partners agree to promote and market the Debtors as retail electric providers to prospective customers, and the Debtors agree to pay Channel Partners certain fees associated with contracts signed by customers.

373.    I understand that the Debtors also utilize third-party partners to conduct door to door sales of the Debtors' retail goods and services (the "Sales Partners").  I understand that the Sales Partners are typically paid commissions for enrolling new customers in the Debtors' electricity plans.  I understand that the rate of commission varies with the type and duration of the plan in which a customer successfully enrolls.  Additionally, I understand that the Sales Partners are paid on commission for the sale of related goods, including iThermostats (defined in the Customer Programs Motion).

374.    I understand that the Debtors also contract with various call centers to provide real-time customer service to the Debtors' retail customers (the "Call Center Partners" and, together with the Channel Partners and the Sales Partners, the "Customer Partners").  I

85

understand that the hourly rates at which the Debtors pay the Call Center Partners vary depending upon the specific type of work performed, including handling customer calls, training personnel, case management, and back-office services.

375.    I understand that the Customer Partners are key intermediaries between the Debtors' retail operations and potential customers, as they inform customers about the Debtors' products and services, assist with the enrollment of new customers, and service the Debtors' existing customers.  As such, I understand that the Customer Partners are important sources of new business and critical to the retention of existing business for the Debtors.  I understand that if the Debtors do not continue to perform under existing Customer Partner agreements and remit fees, the Customer Partners may be reluctant to promote the Debtors' retail operations, generate new customer leads, and provide the exemplary services to the customers that the Debtors are known for.  I believe failure to honor amounts owed to Customer Partners could damage the Debtors' reputation with existing and potential customers, to the detriment of the Debtors' operations.[54]

376.    I understand that the total obligation to Customer Partners is approximately $51 million annually.  As of the Petition Date, I understand that the Debtors estimate that they owe an aggregate amount of approximately $8.6 million to Customer Partners.

### 6.    Renewable Energy Obligations.

377.    I understand that certain regulations require the Debtors to obtain a specified amount of their supply of power from renewable energy sources or otherwise to purchase

---

[54]    I understand that pursuant to the Customer Programs Motion, the Debtors do not seek any relief with respect to employees of the Debtors that perform services similar to those performed by third-party Customer Partners. For additional information on the Debtors' employees, see the *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (II) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (III) Continue Employee and Retiree Benefit Programs, and (B) Modifying the Automatic Stay* (the "Wages Motion"), filed contemporaneously with the Customer Programs Motion.

86

**PX 095**
**Page 173 of 464**

renewable energy credits in the energy market from renewable energy credit "retailers" or brokers. Additionally, the Debtors' retail operations provide certain customers with an agreed-upon amount of power from renewable energy sources (together with the regulatory obligations, the "Renewable Energy Obligations"). The Debtors' performance of the Renewable Energy Obligations enables the Debtors and their customers to comply with statutory or regulatory requirements, maintain certain environmental sustainability certifications, and make public claims with respect to the use of power from renewable energy sources. ERCOT recognizes the transfer of renewable energy credits from one account holder to another. As a retail electric provider, I understand that the Debtors must "retire" purchased renewable energy credits to demonstrate fulfillment of Renewable Energy Commitments. I understand that renewable energy credits are "retired" by using the credits to comply with a statutory or regulatory requirement or to make a public claim associated with the purchase of the credits, at which point the "retired" renewable energy credits are no longer transferrable. I understand that total Renewable Energy Obligations to customers is approximately $12 million annually.

378. I understand that as of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $11 million on account of the Renewable Energy Obligations.

### 7.    Charitable Contributions Programs.

379. I understand that the Debtors maintain several charitable contribution programs (the "Charitable Contributions Programs"), including, but not limited to, the Energy Aid Program, the Support and Save Program, the 4Change Pledge, and the 501(c)(3) Donations (each as defined in the Customer Programs Motion). I understand that the Charitable Contributions Programs enhance the Debtors' standing in the industry and within the community and build goodwill that enhances the value of their business.

87

380.    I understand that the Debtors maintain a matching program for customer contributions to local communities (the "Energy Aid Program"). I understand that the Energy Aid Program is the largest bill-payment assistance program among regulated and competitive electricity providers in the nation. Under the Energy Aid Program, for every $1.00 that customers donate to the Energy Aid Program, the Debtors contribute $5.00 to local communities to help individuals pay their electricity bills. As described further in the Wages Motion, I understand that the Debtors' employees also contribute to the Energy Aid Program through paycheck deductions, and the Debtors match their employees' contributions.[55]

381.    I understand that the Debtors' retail operations also maintain a charitable contributions program to support nonprofit organizations (the "Support and Save Program"), under which persons can support a public or private school or other participating nonprofit organization by enrolling as a new customer through the program. I understand that the designated organization receives $50 for each such enrollment, and amounts are accumulated and awarded on a quarterly basis and are paid by check. I also understand that there are no annual limits on the amount a participating organization can receive through the program. Rewards under the Support and Save Program constitute actual cash obligations.

382.    I understand that Debtor 4Change Energy Company pledged to give 4% of its profits to one of several non-profit organizations, including Texas Food Bank, the American Cancer Society, the American Red Cross, and Heroes for Children (the "4Change Pledge"). Additionally, I understand that the Debtors plan to donate approximately $2 million during 2014 to various 501(c)(3) nonprofit organizations (the "501(c)(3) Donations").

---

[55]    For additional information on the Energy Aid Program, relief sought with respect to employee donations, and related matching, see the Wages Motion, filed contemporaneously herewith.

**PX 095**
**Page 175 of 464**