383.    I understand that the Debtors plan to contribute over $5 million in 2014 on account of Charitable Contributions Programs. As of the Petition Date, I understand that the Debtors estimate that their outstanding obligations under the Charitable Contributions Programs total approximately $1.2 million.

        **8.    Customer Warranties.**

384.    I understand that the Debtors and certain third-party service providers offer various products, services, and warranty programs to the Debtors' customers (the "Customer Warranties"). For example, the Debtors pay a third-party vendor to provide iThermostat installation services.[56] In addition to the iThermostats installations, I understand that this third-party vendor also provides a variety of services to the Debtors and their customers, including server hardware and database administration, license and software maintenance, warehousing, and other customer maintenance services such as repairing and replacing gateways and iThermostats (the "Support Services").

385.    As discussed above, I understand that the Debtors' retail operations and certain of their third-party partners also offer home warranty programs to customers (the "Home Warranties"). For example, the Debtors partner with a third-party to provide Home Warranties, including for repair services and replacement coverage for air conditioning units, heating units, electronics, and other appliances. I also understand that the Debtors collect payments from customers that participate in the Home Warranties and remit a portion of the proceeds to the third party, which provides the warranty goods and services.

386.    I believe the continued performance of customer-facing services under the Customer Warranties is important to satisfying and retaining existing customers, as well as

---

[56]    iThermostats are energy-saving programmable thermostats that allow customers to monitor and manage temperatures via the internet (the "iThermostats").

89

**PX 095
Page 176 of 464**

attracting new customers. I understand that the third-party partners are important intermediaries between the Debtors and their customers, and it is essential that performance of services under the Customer Warranties continue in the ordinary course of business. I believe that third-party partners may be reluctant to continue performing under the Customer Warranties absent specific authorization from the Court. I understand that to provide assurances to the Debtors' customers that the Customer Warranties will be honored, the Debtors seek authority to continue to honor and satisfy any and all obligations related to prepetition and any new postpetition Customer Warranties, including those obligations to third-parties that perform under the Customer Warranties for the benefit of customers.

387.    As of the Petition Date, I understand that the Debtors owe an aggregate amount of approximately $1 million on account of the Customer Warranties.

### 9.    Reduction Rewards.

388.    I understand that the Debtors' retail operations offer a critical peak rebate program (the "Reduction Rewards Program") to commercial and industrial customers with minimum annual electricity usage of approximately 1 megawatt. I understand that the Reduction Rewards Program helps the Debtors and their customers to address peak electricity demand issues within the ERCOT region, including demand and price volatility, by allowing customers to manage their electricity usage in response to peak events. I also understand that the Debtors alert participating customers to the occurrence of a peak event, and pay each customer for every kilowatt hour of electricity load reduction below the customer's corresponding baseline demand level. I understand that the rate per kilowatt hour of electricity reduction during the peak event that is paid to customers varies depending on market conditions.

389.    As of the Petition Date, I understand that the Debtors estimate that they do not owe any amounts on account of the Reduction Rewards Program.

### D.    Customer Incidents.

201.    I understand that the Customer Agreements and the Customer Programs occasionally give rise to customer complaints and claims (the "Customer Incidents"). To ensure continuing excellent service and customer satisfaction, I understand that the Debtors employ certain measures to address any service-related issues and to resolve and settle the Customer Incidents in the ordinary course of business. I also understand that as of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $2.1 million on account of the Customer Incidents.

### E.    Payment of Certain Expenses on Behalf of Certain Organizations.

390.    I understand that the Debtors are subject to regulation or oversight by various entities, including the PUC and ERCOT.[57] I understand that the PUC and ERCOT have wide-ranging oversight over the ERCOT and Texas electricity markets, including with respect to the sale, purchase, transmission, and distribution of electricity to consumers. I understand that because the Debtors are the preeminent merchant power generator and retail electricity provider within the ERCOT region, the Debtors anticipate that the PUC and ERCOT will play an active role in the Debtors' chapter 11 cases to ensure that the public interest is adequately represented and protected.

391.    I understand to facilitate the participation of the PUC and ERCOT in the Debtors' chapter 11 cases, the Debtors seek to pay certain expenses incurred by the PUC and ERCOT, including all reasonable CourtCall and remote conferencing costs and the cost of providing notice and/or service of filings by the PUC and ERCOT in these chapter 11 cases to relevant

---

[57]    ERCOT, the Electric Reliability Council of Texas, is a regional reliability coordinating organization responsible for ensuring the reliability of the electricity market in Texas. Additionally, I understand that ERCOT is the independent system operator of the interconnected transmission grid for member electricity systems within Texas.

91

parties. Additionally, I understand that the Debtors request authority to allow the PUC and

ERCOT to utilize the noticing services of Epiq Bankruptcy Solutions, LLC ("Epiq"), the

Debtors' claims and noticing agent, at the Debtors' expense.[58]  I understand that the Debtors

submit that the cost to their estates of paying these expenses on behalf of the PUC and ERCOT is

greatly outweighed by the benefits to their estates of ensuring that the public interest is

well-represented during these chapter 11 cases.

>    **F.    Assumption of the PPAs and Retail Agreements.**

392.    Pursuant to the Assumption Order, I understand that the Retail Debtors seek to

assume the Customer Agreements pursuant to section 365(a) of the Bankruptcy Code to provide

their customers and other parties in interest with additional assurance of the Retail Debtors'

intent to honor their obligations to customers and to continue providing electricity and natural

gas, and performing under the Customer Agreements.  I believe that assumption of the Customer

Agreements at the outset of these chapter 11 cases will reduce the likelihood of confusion or

uncertainty on the part of customers with respect to the continuing provision of electricity,

natural gas, and related services by the Debtors, to the benefit of the Debtors' estates.

393.    I understand that the Retail Debtors' obligations under the Customer Agreements

are primarily performance-based, and the Debtors do not believe that any defaults exist under the

Customer Agreements that must be cured under section 365(b)(1)(A) (after giving effect to

section 365(b)(2)).  Accordingly, I understand that the Debtors have determined that the amount

necessary to cure unpaid monetary obligations arising under the Customer Agreements is $0 (the

"Cure Amount").  Furthermore, I understand that to the extent any such defaults exist, the

---

[58]    The Debtors seek to retain Epiq as the Debtors' claims and noticing agent pursuant to the *Application of Energy Future Holdings Corp.*, et al., *for Entry of an Order Approving the Retention and Appointment of Epiq Bankruptcy Solutions, LLC as the Claims and Noticing Agent for the Debtors,* filed contemporaneously herewith.

**PX 095**
**Page 179 of 464**

Debtor's long history of providing electricity and natural gas to customers and honoring their contractual obligations with customers provides customers with adequate assurance of the Retail Debtors' ability to continue performing under the Customer Agreements.

IX.    **Hedging and Trading Motion.**[59]

202.    As is customary in the Debtors' industry, I understand that certain of the Debtor entities, including Luminant Energy Company LLC, Luminant ET Services Company, and Luminant Generation Company LLC (collectively, the "Hedging and Trading Entities"),[60] enter into hedging and trading contracts with various counterparties primarily to hedge their exposure to commodity risks, including price and delivery risk (collectively, and as described below, the "Hedging and Trading Arrangements" and the activities related thereto, the "Hedging and Trading Activities") within established risk management guidelines (as discussed below, the "Risk Management Guidelines").[61]

---

[59]    See *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performance Under the Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter into and Perform Under New Postpetition Hedging and Trading Arrangements*, filed contemporaneously herewith.

[60]    As a general matter, I understand that only the TCEH Debtors (as defined in the Hedging and Trading Motion) have operations like those described in the Hedging and Trading Motion. The Debtors are, therefore, not seeking relief or imposing any obligations in the Interim Order or Final Order as to any Debtors other than the TCEH Debtors. For the avoidance of doubt, the Hedging and Trading Motion does not request any relief with respect to, or affect the rights, duties, or obligations of, EFIH and EFIH Finance, Inc.

[61]    As described in detail in the First Day Declaration, I understand that over 95% of the TCEH Debtors' positions in the natural gas price hedging program and all of the first lien interest rate swaps of TCEH (collectively, the "First Lien Hedges and Swaps") are secured by a first lien on substantially all of the TCEH Debtors' assets that is pari passu with the outstanding obligations under the TCEH Debtors' first-lien credit agreement and first-lien notes. I understand that the total net first lien exposure on account of the First Lien Hedges and Swaps is approximately $1.255 billion as of April 11, 2014.

In addition, I understand that Energy Future Holdings Corp. transacted a number of unsecured interest rate swap agreements with various banks (collectively the "Legacy Swaps"). I understand that as of April 11, 2014, the exposure to the Hedging and Trading Entities on account of the Legacy Swaps is approximately $14.2 million. I understand that for the avoidance of doubt, the Debtors do not seek relief with respect to the First Lien Hedges and Swaps or the Legacy Swaps in the Trading Motion.

**PX 095**
**Page 180 of 464**

203.    I understand that the Hedging and Trading Activities and the Hedging and Trading Arrangements are vital to the success of the Debtors' various operational businesses and directly affect the ability of the Debtors to successfully operate their generation and retail divisions. I understand that as of the date hereof (the "Petition Date"), the Debtors estimate that they owe approximately $50.8 million of payables[62] on account of the Prepetition Hedging and Trading Arrangements (as defined below), approximately $43.7 million of which is secured by collateral held by third parties (e.g., letters of credit or cash), and all of which will become due and owing during the period between the Petition Date and entry of the Final Order (the "Interim Period") on account of the Prepetition Hedging and Trading Arrangements.

### A.    Overview of the Prepetition Hedging and Trading Arrangements.

204.    I believe the Hedging and Trading Activities and the Hedging and Trading Arrangements are vital to the success of the Debtors' various operational businesses and directly affect the ability of the Debtors to successfully operate their generation and retail divisions. I understand that as of December 31, 2013, the Debtors' annual underlying notional value[63] across all of their wholesale operations, based on energy prices for commodities sold and purchased in their operations, including natural gas, electricity, coal, fuel-oil, uranium, renewable energy credits, and emission allowances, is approximately $3.8 billion.

205.    I understand that the Hedging and Trading Activities and the Hedging and Trading Arrangements mitigate the risks that arise from the Debtors' operations from changes in the overall value of wholesale revenues and costs noted above.  Specifically, I understand that

---

[62]    This number represents the amount of obligations after netting payables and receivables permitted to be netted with the same counterparty under existing contractual terms.

[63]    "Notional value" refers to the fuel purchased by the Debtors and the electricity and ancillary services that the Debtors sell through their wholesale operations, valued at current prevailing market prices for each respective commodity.

94

the Hedging and Trading Activities and Hedging and Trading Arrangements allow the Debtors to utilize (a) physical commodity transactions to hedge price and delivery risk related to fuel inputs (including natural gas, coal, uranium, and fuel oil) to the Debtors' electricity generation and mining operations, (b) physical transactions for electricity and ancillary services produced in the electricity operations, and (c) financial derivatives that hedge price risk for both fuels and electricity generation.

206.    I understand that through the Hedging and Trading Activities and Hedging and Trading Arrangements, the Debtors are able to hedge against such price fluctuations and thereby protect the economic value of their operations by preventing substantial declines in cash flows. I understand that the Debtors also conduct limited proprietary trading activities in certain commodities that are core to the power generation operations. As an example, during the fiscal years 2009 through 2013, the Hedging and Trading Activities provided a positive incremental return to the Debtors' underlying operations ranging from approximately $240 million to $425 million on annual basis.

207.    I understand that the Hedging and Trading Entities have approximately 72 active prepetition Hedging and Trading Arrangements as of the Petition Date (the "Prepetition Hedging and Trading Arrangements" and, together with the anticipated Postpetition Hedging and Trading Arrangements, the "Hedging and Trading Arrangements"), all of which were entered into in accordance with the Debtors' Risk Management Guidelines.[64]  I understand that the Prepetition Hedging and Trading Arrangements generally fall into the following three categories:  (a) over-

---

[64]    In addition, I understand that the Debtors are party to a significant number of non-active hedging and trading arrangements. Because transactions are not being conducted under these agreements, the Debtors do not have any prepetition obligations arising under such agreements.

95

the-counter transactions; (b) transactions with the Electric Reliability Council of Texas, Inc. ("ERCOT"); and (c) Broker Arrangements (as defined in the Hedging and Trading Motion).[65]

### 1.    Over-the-Counter Transactions.

208.    I understand that the Hedging and Trading Entities enter into over-the-counter physical and financial transactions related to natural gas, electricity, coal, fuel oil, uranium, emission allowances, and other energy-related commodities directly with third parties ("OTC Counterparties"), including transactions that are subject to the standard terms and conditions of an ISDA Master Agreement (and related commodity Annexes for natural gas and electricity), an EEI Master Power Purchase and Sale Agreement, or a NAESB Agreement (for natural gas transactions), or other industry agreements, in each case, as modified pursuant to negotiations between the parties (the "OTC Agreements").

209.    Due to the Debtors' limited creditworthiness and in conjunction with industry standards, I understand the Debtors are required on a regular basis to collateralize certain OTC Agreements to provide hedging and trading counterparties with assurance that obligations under the contracts will be met.  As of the Petition Date, I understand that the Hedging and Trading Entities are party to open and active Prepetition Hedging and Trading Arrangements with approximately 68 OTC Counterparties.

---

[65] As described further in the Debtors' *Motion of Energy Future Holdings Corp., et al., for Entry of (A) An Order Authorizing the Debtors to (I) Maintain and Administer Customer Programs and Customer Agreements, (II) Honor Prepetition Obligations Related Thereto, (III) Pay Certain Expenses on Behalf of Certain Organizations, (IV) Fix Deadlines to File Proofs of Claim for Certain Customer Claims, and (V) Establish Procedures for Notifying Customers of Commencement of the Debtors' Chapter 11 Cases, Assumption of Customer Agreements, and the Bar Dates for Customer Claims and (B) An Order Authorizing Certain of the Debtors to Assume the Customer Agreements* (the "Customer Programs Motion"), filed contemporaneously with the Hedging and Trading Motion, I understand that the Debtors are seeking authority in the Customer Programs Motion to assume certain customer agreements.  I understand that by the Hedging and Trading Motion, the Debtors reserve the right to treat any customer contract to be assumed in the Customer Programs Motion as a Hedging and Trading Arrangement.

210.    As of the Petition Date, I understand that the Debtors estimate that they owe approximately $7.1 million on account of prepetition obligations arising from the OTC Agreements (net of any amounts that may be netted by cash receivables or secured by collateral held by third parties (e.g., letters of credit or cash)), all of which will become due and owing within the Interim Period.

### 2.    ERCOT Transactions.

211.    I understand that ERCOT manages the flow of electricity to 24 million people in Texas and manages the supply of approximately 85% of the electricity consumption in Texas, ERCOT schedules electricity on an electric grid that connects 40,500 miles of transmission lines and more than 550 generation units.    I understand that ERCOT also performs financial settlements for the competitive wholesale electricity market and the majority of ERCOT is open to retail electric competition - approximately 6.7 million customers (*i.e.* electricity meters) have the ability to choose their retail electric provider.    ERCOT is a membership-based 501(c)(4) nonprofit corporation governed by a board of directors and subject to oversight by the Public Utility Commission of Texas and the Texas Legislature.    I understand that ERCOT's members include consumers, cooperatives, electricity generators, electricity marketers, retail electricity providers, investor-owned electric utilities (transmission and distribution providers), and municipal-owned electric utilities.

212.    Through the Debtors' operations in the ERCOT region, I understand that the Hedging and Trading Entities participate in:  (a) the real-time energy market that allows a party to be paid or charged for physical electricity and ancillary services provided to or taken from the wholesale market; (b) financial transactions that are used by market participants to hedge differences in prices in the day-ahead energy market; (c) point-to-point transactions that allow a party to hedge against transmission congestion in ERCOT's real-time energy market between

97

two specific locations on the transmission system; and (d) auctions for the purchase and sale of congestion revenue rights, which are contracts that allow a party to hedge against transmission congestion costs in ERCOT's day-ahead energy market.

213.    I understand that these markets provide the Hedging and Trading Entities with particular channels to sell and procure electricity, ancillary services, and transmission congestion instruments to mitigate the Debtors' risks associated with the electricity generation assets and retail electricity businesses, and are core to the commercial operations of those businesses. I understand that the ability to participate in the ERCOT region is critical to the Debtors' daily cash flows. Moreover, I understand that the Hedging and Trading Entities consummate transactions with ERCOT that they cannot execute with any other party or entity in light of ERCOT's (a) central role in the Texas electricity system, (b) multi-dimensional investment platform, and (c) facilitation of congestion revenue right actions as well as electricity and ancillary services services, sales, and purchases.

214.    I understand that to facilitate the Debtors' Hedging and Trading Activities within the ERCOT region, the Debtors and ERCOT have entered into Standard Form Market Participation Agreements ("SFAs") that include, among other things, an outline of the procedures and processes used by ERCOT and other market participants to maintain the orderly functioning of the ERCOT grid system (the "ERCOT Protocols"). I understand that without the SFAs, the Debtors would be unable to access critical platforms provided by ERCOT. I also understand that the transactions the Debtors consummate with ERCOT cannot be executed with any other party or entity in light of ERCOT's pivotal role in the Texas electricity market.[66]

---

[66]    I understand that to ensure the Debtors' access to the ERCOT region remains uninterrupted, the Debtors have filed contemporaneously with the Hedging and Trading Motion, the *Motion of Energy Future Holdings Corp., for Entry of an Order Authorizing Certain of the Debtors to Assume Standard Form Participation Agreements with ERCOT* which motion seeks authority to assume the SFAs with ERCOT (the "ERCOT Assumption

### 3.    Broker Arrangements.

215.    I understand that the Hedging and Trading Entities are party to two types of broker arrangements, as follows: (collectively, the "Broker Arrangements"):

- *Clearing Broker and Exchange Arrangements.* The Hedging and Trading Entities are party to counterparty agreements with clearing brokers (the "Clearing Brokers") and centralized exchanges (the "Exchanges") to clear transactions related to the purchase and sale of electricity, fuel oil, natural gas, uranium, emission allowances, and other energy-related products and physical and financial derivatives thereof, through exchanges, including Intercontinental Exchange, Inc. ("ICE"), the New York Mercantile Exchange ("NYMEX"), and Natural Gas Exchange ("NGX"). As discussed in more detail below, certain of the Hedging and Trading Entities have guarantees from their Debtor parent, TCEH, in favor of each of the Clearing Brokers and are required to provide collateral as requested by each Clearing Broker in a manner that is similar to ICE or NYMEX collateral requirements. Generally, each Clearing Broker or Exchange has broad discretion under its arrangement to: (a) terminate its agreement with the Hedging and Trading Entities; (b) refuse to enter into future transactions for the benefit of the Hedging and Trading Entities; and (c) cancel or liquidate the Hedging and Trading Entities' open positions. As is common in the Debtors' industry, the Clearing Broker Arrangements are required to be fully-collateralized on a daily basis and the value of such activity and related collateral changes on a day-to-day basis.

- *Introductory Broker Arrangements.* The Hedging and Trading Entities have entered into agreements with certain brokers who facilitate purchase and sale negotiations between the Hedging and Trading Entities and certain of their counterparties. In some instances, the Hedging and Trading Entities compensate the brokers directly for their services. In other instances, the Hedging and Trading Entities collect the fees to which the brokers are entitled for their services from the counterparties (in accordance with the terms set forth in the separately executed agreement between the broker and the customer) and then remit such fees to the brokers.

### B.    Potential Exposure on Account of the Prepetition Hedging and Trading Arrangements.

#### 1.    Potential Settlement Obligation Exposure.

216.    I understand that the cumulative mark-to-market net value of all derivative assets and liabilities related to the Prepetition Hedging and Trading Arrangements valued using

---

Motion"). The relief requested in the Hedging and Trading Motion with respect to the SFAs and the ERCOT Protocols is primarily meant to provide limited relief until such time as the Court has an opportunity to hear the ERCOT Assumption Motion.

standard industry valuation processes (and excluding Prepetition Hedging and Trading Arrangements related to the First Lien Hedges and Swaps and the Legacy Swaps) is a net liability of approximately $108 million as of the Petition Date before taking into consideration collateral postings.  I understand that this value is calculated on a daily basis and is subject to fluctuations.  I understand that the Debtors estimate that of the payables that are due and owing on account of the Prepetition Hedging and Trading Arrangements as of the Petition Date (approximately $50.8 million in total).[67]  Approximately $43.7 million is secured by collateral held by third parties (*e.g.*, letters of credit or cash), leaving the Debtors with approximately $7.1 million due and owing as of the Petition Date.

217.    Even though I believe that continued performance under the Prepetition Hedging and Trading Arrangements (other than payment of accrued prepetition obligations)  on a postpetition basis in the ordinary course of business is permitted under section 363(c)(1) without court approval, the Debtors are seeking authority to continue performing postpetition obligations under the Prepetition Hedging and Trading Arrangements out of an abundance of caution, and to give counterparties to Hedging and Trading Arrangements comfort that the Debtors will honor such obligations.  I understand that the Debtors estimate that the Hedging and Trading Entities will owe approximately $19.2 million on account of postpetition payment obligations arising under the Prepetition Hedging and Trading Arrangements during the Interim Period.  I also understand that this estimate is based on the Debtors' best estimates of potential value change from current market prices.

---

[67]    This number represents the amount of obligations after netting payables and receivables permitted to be netted with the same counterparty under existing contractual terms.

100

2.    **Potential Collateral Exposure.**

218.    I understand that as is typical in the industries that have wholesale trading markets, an entity that participates in those markets must maintain an acceptable level of creditworthiness or provide acceptable credit support, generally in the form of guarantees, letters of credit, cash, prepayments, or other forms of collateral. In the ordinary course of business, the Debtors post collateral to and receive collateral from counterparties to Hedging and Trading Arrangement.

219.    Specifically, I understand the Debtors provide collateral support relating to the Prepetition Hedging and Trading Arrangements each as described in the Hedging and Trading Motion.

220.    As a general matter, I understand that the amount of credit support required under a Hedging and Trading Arrangement is subject to daily recalculation and posting requirements.[68] On any given day, with respect to any Hedging and Trading Arrangement, additional collateral may be required of the Debtors or posted collateral may be returned to the Debtors. I understand that in many instances, a counterparty to a Hedging and Trading Arrangement is required to post collateral with the Debtors to secure such counterparty's performance. I understand that generally, a failure by the Debtors or a counterparty to post or return credit support within the contractually required time period is an event of default under the applicable Hedging and Trading Arrangement.

221.    I understand that the most significant component of collateral requirements under most Hedging and Trading Arrangements is fairly straightforward — each party is required to post collateral equal to the amount of the counterparty's "exposure," minus collateral already

---

[68]    I understand that a limited number of Hedging and Trading Arrangements entered into by the Debtors may have fixed or other collateralization obligations that are calculated on a less frequent basis.

101

**PX 095**
**Page 188 of 464**

posted and any applicable credit threshold.[69]   I understand that while "exposure" can be

calculated in a variety of ways under the Hedging and Trading Arrangements, "exposure"

generally means an amount equal to the difference between the contract price and the market

price times the volume of commodity remaining under the transaction, plus any amounts due for

performance, goods, and service already provided for which payment has not yet been made.  I

understand that the key component of exposure is the net amount one party would owe to the

other in the event of a default under a Hedging and Trading Arrangement.[70]

      222.    To the extent the parties have actually posted collateral under the Hedging and

Trading Arrangement, I understand that the party receiving such performance assurance

collateral would subtract the value of such collateral from their exposure calculation, while the

party delivering the collateral would add the value of the collateral to their exposure calculation.

I understand that these amounts, together with the commodity exposure calculation are usually

calculated daily, with collateral either being posted or returned, by one party to the other, as

applicable, for the outstanding exposures.  I understand that as the parties continue to perform

under the Hedging and Trading Arrangements and the volume of the underlying commodity

remaining under the transaction decreases, payments for performance are made, resulting in the

eventual return of the collateral securing the Hedging and Trading Arrangement, absent a

default.

      223.    I understand that the amount of credit support required to be posted by or to the

Debtors to maintain credit standing and avoid default under Hedging and Trading Arrangements

---

[69]   I understand that because of the limited creditworthiness of the Debtors, they have limited ability to make use of credit thresholds and are generally required to fully secure counterparties to Hedging and Trading Arrangements.

[70]   I understand that the collateral obligation under a Hedging and Trading Arrangement may not be limited to exposure, as some counterparties may require additional security in connection with their trading requirements.

is significantly influenced by the inherent volatility of commodity prices. I also understand that commodity prices are directly influenced by a number of factors that can vary widely such as overall supply and demand, weather, supply disruptions, production increases, regulatory changes, and other factors. For example, the extreme winter weather recently experienced across the United States has imposed significant volatility in the natural gas market. I understand that the price of certain natural gas futures was recently exposed to large movements, and the price volatility was as high as 34% to 37% during 2014 due to the extreme weather conditions.

224. I understand that a failure by the Debtors to post credit support within the contractually required time period, which could be as little as a few hours after notice from the third party, would be considered a default under the applicable Hedging and Trading Arrangement. I understand that the third party would have the right to terminate and liquidate the applicable Hedging and Trading Arrangement creating risks to the generation and retail businesses. Therefore, I believe the ability of the Debtors to continue to meet their collateral obligations during the Interim Period to maintain the protections afforded by the Hedging and Trading Arrangements is critical.

225. Relatedly, I understand that due to the significant amount of activity that the Debtors' operations have with ERCOT, the Debtors issued a letter of credit in December 2009 for the benefit of ERCOT and in accordance with ERCOT's creditworthiness protocols. I understand that by the Hedging and Trading Motion, and in an abundance of caution, the Debtors seek authority in the orders to replace ERCOT's letter of credit with a postpetition letter of credit.[71] In addition, I understand that the Debtors anticipate that ERCOT's prepetition (or new, postpetition) letter of credit will likely be sufficient to satisfy the Debtors' prepetition collateral

---

[71] For the avoidance of doubt, if the Debtors replace ERCOT's letter of credit with a new postpetition letter of credit, the new postpetition letter of credit would not be subject to the Prepetition Collateral Posting Cap.

PX 095
Page 190 of 464

posting obligations that may come due during the Interim Period, but, in an abundance of caution are seeking authority in the Interim Order and the Final Order to satisfy prepetition collateral posting obligations to ERCOT, subject to the Prepetition Collateral Posting Cap, as applicable.

226.    Furthermore, in light of these concerns, I understand that the Debtors have negotiated with their postpetition lenders and prepetition secured lenders to obtain authority to grant TCEH Super-Priority Liens to counterparties to Postpetition Hedging and Trading Arrangements and Prepetition Hedging and Trading Arrangements that constitute Secured Commodity Hedge Agreements, in accordance with the TCEH DIP Orders and the TCEH Cash Collateral Orders.

### C.    The Prepetition Hedging and Trading Arrangements are Critical to the Debtors' Financial Success and Business Operations and Limited Relief Is Necessary to Preserve the Value of the Debtors' Estates.

227.    I understand that the commodity and financial instrument trading sector has been historically and consistently resistant to conducting business with hedging and trading entities in financial distress. I also understand that counterparties seeking to terminate Prepetition Hedging and Trading Arrangements and discontinue activity prospectively will do so because of fear that a chapter 11 hedging and trading partner is operating outside of the ordinary course of business with respect to sophisticated transactions necessary to conduct the hedging and trading business or because of a perception that the hedging and trading partner presents an unacceptable level of risk exposure without adequate credit support.

228.    At the same time, I understand that the Hedging and Trading Arrangements have historically provided the Debtors with annual returns in the hundreds of millions of dollars that add to and preserve the notional value across all of the Debtors' operations. I understand that the Debtors will lose this value opportunity if counterparties to Prepetition Hedging and Trading Arrangements who believe they are entitled to certain safe-harbor protections with respect to the

104

automatic stay provided under the Bankruptcy Code (described in more detail below) terminate the Prepetition Hedging and Trading Arrangements or take other adverse action in response to the Debtors' inability to meet postpetition obligations.

229.    In addition, I understand that the Debtors' market activities — specifically their ability to mitigate price and delivery risks associated with energy commodities — may be adversely affected if the Debtors are not authorized to maintain the Prepetition Hedging and Trading Arrangements in the ordinary course of business.  Ultimately, I understand that these circumstances could have a negative effect on the overall value of the Debtors' business.

230.    I understand that the Debtors intend to pay prepetition claims arising on account of the Prepetition Hedging and Trading Arrangements, to pledge and transfer collateral under Prepetition Hedging and Trading Arrangements, and to grant the TCEH Super-Priority DIP Liens only to the extent necessary to preserve their businesses and under commercially reasonable terms.  To that end, the Debtors will use their commercially reasonable efforts to condition the payment of prepetition claims and the posting of collateral under Prepetition Hedging and Trading Arrangements upon each Prepetition Hedging and Trading Arrangement counterparty's agreement to waive any rights it may have to liquidate, terminate, or accelerate its Hedging and Trading Arrangements with respect to events of default relating to these chapter 11 cases (the "Trading Continuation Agreement").

    D.    The Risk Management Guidelines.

231.    I understand that as discussed earlier, agreements like the Hedging and Trading Arrangements are common in the Debtors' industry and are routinely used in the ordinary course of business to mitigate exposure to commodity price fluctuations. I understand that as a measure of governance and control, companies in the Debtors' industry, like the Debtors, use risk management guidelines to ensure that hedging and trading arrangements are closely monitored

105

and are in the best interests of all the company's stakeholders. I also understand that to encourage superior risk management control within the energy trading field, the Committee of Chief Risk Officers, a nationally recognized, independent non-profit corporation comprised of risk management leaders in the energy field, establish "best practice" guidelines.

232.    To my knowledge, the Debtors' Risk Management Guidelines are consistent with these "best practice guidelines" and create a complementary framework for governance, operational accountabilities, risk management procedures, and transaction management of the Hedging and Trading Activities in the ordinary course of business.

233.    As a further control, I understand that the Debtors utilize (a) an independent internal audit function, under the direction of the Debtors' audit committee, routinely conduct internal audits of the Debtors' Hedging and Trading Activities and risk management areas and (b) an internal hedging policy, in effect as of the Petition Date, that establishes the parameters within which the Debtors may enter into certain Hedging and Trading Arrangements (the "Internal Hedging Policy"). I understand that the Internal Hedging Policy generally restricts the Debtors' ability to enter into Hedging and Trading Arrangements with respect to commodities other than uranium and Powder River Basin coal that would result in the Debtors being party to Hedging and Trading Arrangements that, on an aggregate basis, hedge more than 100% of the Debtors' projected exposure to such commodity for calendar year 2014. In addition, I understand that the Internal Hedging Policy generally includes a restriction on the Debtors' ability to hedge or manage its exposure with respect to commodities other than uranium or Powder River Basin coal, on an aggregate basis, for calendar year 2015, up to a percentage set forth in the Internal Hedging Policy, which percentage is both consistent with the Debtors' hedging practices over the past two years for the period 13 –24 months after any reference date

106

and is less than 70% (the limits set forth in the Internal Hedging Policy described in the preceding two sentences, the "Hedging Ceiling"). I understand that additionally, the internal audit function often employs the use of third party subject matter experts in the field of energy trading and risk management to assist in the audit work. Collectively, I understand that the Risk Management Guidelines and the Debtors' rigorous auditing process ensure that the Debtors deploy a robust governance and control function at all times related to the potential risks involved with the Hedging and Trading Arrangements. I understand that this activity helps ensure that the Debtors' enter into only those Hedging and Trading Arrangements that are in the best interests of the Debtors, their estates, and other parties in interest. I also understand that the Debtors will continue to abide by the Risk Management Guidelines, including the Internal Hedging Policy and their audit practices throughout these chapter 11 cases.

      **1.**    **Risk Governance Structure.**

    234.   I understand that each of the Debtors' business units has a group of senior level employees dedicated to discussing and monitoring the specific risks to which each particular business unit is vulnerable (each such group, a "Risk Management Committee" and, collectively, the "Risk Management Committees"). I understand that for the Hedging and Trading Entities' hedging and trading business, Luminant Energy Company LLC, there is a Risk Management Committee that is responsible for identifying Hedging and Trading Activities risks, including market, liquidity, credit, operational, legal, regulatory, and other risks and managing such risks in accordance with the Risk Management Guidelines ("Hedging and Trading Activities Risks"). I understand that this Risk Management Committee also reviews and approves the types of transactions that the Hedging and Trading Entities can enter into and reviews significant risks for the Hedging and Trading Entities on a regular basis.

**PX 095**
**Page 194 of 464**

235.    In addition to the Risk Management Committees, I understand that the Hedging and Trading Entities also maintain (a) a separate compliance group (the "Compliance Group") that is responsible for creating and enforcing internal policies and procedures to comply with federal and state laws and regulations, and that reports to the vice-president of regulatory law and the chief compliance officer for the Hedging and Trading Entities and (b) a separate risk management team that supervises specialized risk teams in their monitoring, measurement, and reporting of the Hedging and Trading Activities Risks, and that reports directly to the vice president of risk management for EFH and chief financial officer for EFH (the "EFH Risk Management Team").    Collectively, I understand that both groups monitor compliance with internal and external controls and processes, including legal and regulatory compliance, adhering to internal risk policies and limits, supervising and reporting processes, and providing transaction governance processes.

### 2.    Transaction Governance.

236.    I understand that the Hedging and Trading Entities are subject to certain transaction governance processes that ensure the Hedging and Trading Activities are aligned with acceptable risk levels.  I also understand that the Hedging and Trading Entities execute both standard and non-standard transactions, (respectively, the "Standard Transactions" and "Non-Standard Transactions" and, collectively, the "Hedging and Trading Transactions").  I understand that standard Transactions generally require a less rigorous approval process than Non-Standard Transactions.  I understand that this is because Standard Transactions:  (a) use only products pre-approved by the Risk Management Committees; (b) have standard terms and conditions; (c) have specified term limits; (d) are frequently used to mitigate volume and price risk on a regular basis; (e) are frequently used in the Hedging and Trading Activities and well understood by the commercial and support teams for the Hedging and Trading Entities; and

108

(f) generally operate under industry developed contracts.

237.    By contrast, I understand that Non-Standard Transactions are either:    (a) a combination of Standard Transactions; or (b) Standard Transactions with additional complicating and/or unique provisions, such as atypical settlement dates or complex valuation requirements or higher required levels of operational support.    I understand that non-Standard Transactions require two levels of internal approvals.  First, I understand that Non-Standard Transactions *must* be reviewed by eight specified practice areas to ensure that the transactions' various risks have been assessed and that the practice areas can accommodate the transaction into daily operations.[72]    I understand that second, Non-Standard Transactions must be approved in accordance with the Debtors' corporate risk policy.[73]

238.    I understand that different levels of approval are required depending on the size and tenor of the Hedging and Trading Transaction and whether the transaction is Standard or Non-Standard.  I also understand that the approval hierarchy is based on individual authorities given to personnel based on their role and experience within the Hedging and Trading Entities.

239.    I understand that the Hedging and Trading Entities also govern transactions by utilizing individual limits that provide specific limits to each person that has hedging and trading authority.  I also understand that individual hedging and trading personnel limits are set by the appropriate TCEH Hedging and Trading Entity vice-president and the EFH vice president of risk management on the basis of instrument, commodity, tenor, region, experience of the individual,

---

[72]    As a further control, I understand that the Hedging and Trading Entities' commercial teams are segregated from discussions relating to the management of the EFH Risk Management Team as well as discussion relating to the responsibilities and compensation of the EFH Risk Management Team.

[73]    I understand that the Debtors' corporate risk policy is established by the Debtors' corporate risk management group, which is comprised of: (a) the audit committee of the EFH Board; (b) the strategy and policy committee, which includes the chief risk officer for EFH; (c) each business unit Risk Management Committees; and (d) the EFH Risk Management Team.

**PX 095**
**Page 196 of 464**

and the individual's role within the business and monitored by the EFH Risk Management Team.

        **3.**    **Valuation and Risk Parameters.**

     240.   I understand that in accordance with the Debtors' corporate risk policy, the Debtors use individual trader limits, mark-to-market valuations of all transactions, position and profit and loss reporting, "at risk" measurements, sensitivities/stress testing, and risk/return metrics to measure and control the Hedging and Trading Activities Risks associated with the Hedging and Trading Transactions. I understand that the specific risk management measures employed by the Hedging and Trading Entities are each as described in the Hedging and Trading Motion.

     241.   I believe the continuation of the Hedging and Trading Activities, at all times subject to the Risk Management Guidelines, is key to maximizing the value of the Debtors' estates. I understand that through the establishment of a defined risk governance structure, the creation of parameters for transaction governance, and the imposition of valuation and risk parameters and reporting processes applicable to all Hedging and Trading Transactions, the Debtors ensure that such transactions are closely scrutinized and in the best interests of the Debtors and all parties in interest.

**X.**    **Taxes and Fees Motion.**[74]

     242.   In the Taxes and Fees Motion, the Debtors request that the Court schedule a final hearing as soon as practicable after the 21st day following the Petition Date to consider approval of the Taxes and Fees Motion on a final basis. Pursuant to the Interim Order, I understand that the Debtors seek authority to satisfy prepetition obligations on account of Taxes and Fees that come due during the Interim Period in an aggregate amount not to exceed $80.47 million, of

---

[74]   See *Motion of Energy Future Holdings Corp.,* et al., *for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees,* filed contemporaneously herewith.

PX 095
Page 197 of 464

which approximately $10 million (12.4%) is in the form of "trust fund" obligations which the Debtors collect from non-Debtors and/or hold in trust for payment to the Taxing and Regulatory Authorities. Pursuant to the Final Order, I understand that the Debtors seek authority to satisfy all prepetition obligations on account of Taxes and Fees in an aggregate amount not to exceed $146.74 million, of which approximately $10 million (6.8%) is in the form of "trust fund" obligations.

### A.    The Debtors' Tax Obligations.

243.    I understand that in the ordinary course of business, the Debtors: (a) incur and/or collect taxes, including margin, sales, use, property, and miscellaneous taxes in the operation of their businesses (collectively, the "Taxes"); (b) incur business license, permit fees and other assessments and charges (collectively, the "Fees") necessary to operate their businesses; and (c) remit such Taxes and Fees to various taxing, licensing, administrative, and governmental or similar authorities (collectively, the "Taxing Authorities," the "Regulatory Authorities," and, collectively the "Taxing and Regulatory Authorities") and make payments to various third parties for Taxes and Fees who, in turn, remit such Taxes and Fees to the Taxing and Regulatory Authorities. I understand that a list of the current Taxing Authorities is attached to the Taxes Motion as **Exhibit B** and incorporated by reference, and a list of the current Regulatory Authorities is attached to the Taxes Motion as **Exhibit C** and incorporated by reference. In many instances, I understand that the Debtors negotiate with the Taxing and Regulatory Authorities to determine the amount of Taxes and Fees due and payable by the Debtors. I understand that generally, the Debtors pay the Taxes and Fees monthly, quarterly, semi-annually, or annually, in each case as required by applicable laws, rules, and/or regulations. I understand that additional detail with respect to the main categories of Taxes and Fees for which the Debtors are liable is provided below.

111

### 1.    Income and Margin Taxes.

244.    I understand that the Debtors pay a Texas margin Tax (the "Texas Margin Tax")

to operate their businesses in Texas.  I understand that the Texas Margin Tax is calculated as a

percentage of estimated combined taxable income for the tax year, minus a deduction to account

for costs of goods sold.  I also understand that in May of each year, 90% of the Texas Margin

Tax from the previous tax year comes due, and in August of each year, the remaining 10%

comes due, subject to a potential true-up payment.  I understand that the Debtors estimate that

approximately $70 million in Texas Margin Tax obligations have accrued and remain unpaid as

of the Petition Date, approximately $54 million of which will become due and owing during the

Interim Period.[75]

245.    I understand that the Debtors are also required to report and pay state income and

margin Taxes in other jurisdictions (the "Other State Income and Margin Taxes"), as described

in **Exhibit B** of the Taxes and Fees Motion.  I understand that the Debtors estimate that

approximately $10,000 in Other State Income and Margin Tax obligations have accrued and

remain unpaid as of the Petition Date.

---

[75]    I understand that pursuant to two tax sharing agreements entered into by EFH Corp. with: (a) EFCH, TCEH
LLC and certain of its subsidiaries, and EFIH; and (b) Oncor and Oncor Holdings (together the "TSAs" and the
parties to the TSAs described in (a) and (b), the "TSA Parties"), EFH Corp. files Texas state margin tax returns
that include the TSA Parties' results, and subsequently settles intercompany claims with each of the TSA
Parties on account of the Texas state margin taxes that EFH Corp. has paid on their behalf.  I understand that
each of the TSA Parties is individually liable for their share of Texas state law margin taxes.

By the Taxes and Fees Motion, the Debtors seek authority for EFH Corp. to continue to pay the Texas state
margin taxes on the TSA Parties' behalf pursuant to the terms of the TSAs.  The authority to settle any
intercompany claims that arise due to EFH Corp.'s payment of the Texas state margin tax on behalf of the TSA
Parties is addressed in the *Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A)
Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing
Bank Accounts and Business Forms, and (III) Continue Using Certain Overnight Investment Accounts; (B)
Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims; and (C) Granting
Postpetition Intercompany Claims Administrative Expense Priority*, Docket No. [__].

**PX 095**
**Page 199 of 464**

2.      **Sales and Use Taxes.**

246.    I understand that the Debtors incur and collect an assortment of sales Taxes ("Sales Taxes") and use Taxes ("Use Taxes" and, together with Sales Taxes, the "Sales and Use Taxes") in connection with the operation of their businesses. I also understand that the Debtors collect Sales Taxes from their customers on behalf of the applicable Taxing Authorities and periodically remit the Sales Taxes to the applicable Taxing Authority on the basis of Sales Taxes actually billed to customers.

247.    I understand that the Debtors also incur Use Taxes in connection with their purchase of certain tangible personal property or taxable services from vendors. Use Taxes arise when the Debtors purchase items or services from a vendor who is not registered to collect Sales Taxes for Texas or when the Debtors exercise their direct pay permit exemption certificates. In either circumstance, I understand that such vendors are not obligated to charge or remit Texas Sales Taxes. I understand that Use Taxes may also arise when a vendor fails to bill the Debtors the appropriate tax or amount of tax. Nevertheless, I understand that the Debtors are obligated to self-assess and pay the Use Taxes, when applicable, to the relevant Taxing Authorities.

248.    I understand that in an average month, the Debtors incur an obligation of approximately $15 million in Sales and Use Taxes to the Taxing Authorities. I understand that the Debtors estimate that approximately $10 million in Sales Taxes have accrued and remain unpaid as of the Petition Date all of which will become due and owing within the first 21 days following the Petition Date, and approximately $5.6 million in Use Taxes have accrued and remain unpaid as of the Petition Date, all of which will become due and owing within the first 21 days following the Petition Date.

113

3.      **Real and Personal Property Taxes.**

249.    I understand that approximately 500 tax jurisdictions in Texas where the Debtors' business operations are located possess the authority to levy property Taxes against the Debtors' real and personal property (collectively, the "Real and Personal Property Taxes"). I understand that the Debtors typically pay Real and Personal Property Taxes in the ordinary course of business as such Taxes are invoiced. In an average month, I understand that the Debtors accrue approximately $16.25 million in Real and Personal Property Taxes. The Debtors estimate that approximately $43 million in Real and Personal Property Taxes have accrued and remain unpaid as of the Petition Date.

4.      **Texas Gross Receipts Tax.**

250.    I understand that in addition to the Taxes described above, the Debtors must pay a state gross receipts tax in Texas that is imposed on every utility company located in an incorporated town having a population greater than 1,000 as reflected in the last federal census (the "Texas Gross Receipts Tax"). In an average month, I understand that the Debtors incur an obligation of approximately $5 million on account of the Texas Gross Receipts Tax to certain Taxing Authorities in Texas.

B.     **The Debtors' Fee Obligations.**

251.    I understand that the Debtors must obtain various business licenses, permits, and certificates and pay corresponding Fees in certain jurisdictions in which they operate. In particular, I understand that the Regulatory Authorities described on **Exhibit C** who have oversight over the Debtors' generation and/or retail activities require the Debtors to obtain licenses and periodically remit related fees (collectively, the "Regulatory License Fees"). I understand that the Debtors estimate that approximately $18.13 million in Regulatory License Fees have accrued and remain unpaid as of the Petition Date. I understand that the Regulatory

PX 095
Page 201 of 464

License Fees consist of a number of different types of fees, several of which are described in the Taxes and Fees Motion.

252.    Moreover, I understand that the Debtors are also required to pay certain surcharges on their off road heavy-duty diesel equipment. Specifically, I understand that under the Texas Emissions Reduction Plan, which provides funding for various clean-air initiatives in Texas, a 2% surcharge is applied to the sale, lease, or rental price of heavy-duty, off-road diesel-powered equipment, in addition to regular state and local sales taxes (the "Heavy Duty Diesel Equipment Fees"). I understand that the Debtors remit approximately $21,900 per month to the Texas Comptroller on account of the Heavy Duty Diesel Equipment Fees. I understand that the Debtors estimate that approximately $20,000 in Heavy Duty Diesel Equipment Fees have accrued and remain unpaid as of the Petition Date.[76]

253.    Finally, I understand that the Debtors are required to pay registration Fees anytime a motor vehicle used as a company car is registered for use on the public highways (collectively, the "Vehicle Registration Fees"). I understand that the amount of Vehicle Registration Fees the Debtors pay varies according to: (a) the type of each vehicle; and (b) the state in which the motor vehicle is registered. I understand that the Debtors directly pay approximately $4,000 a month to the Taxing Authorities on account of the Vehicle Registration Fees. I understand that the Debtors estimate that approximately $5,000 in Vehicle Registration Fees have accrued and remain unpaid as of the Petition Date.

---

[76]    In connection with the Debtors' use of heavy duty diesel equipment, the Debtors are required to file a Texas fuels tax report (stating the amount of tax-free dyed diesel fuel purchased, sold, and used in an exempt manner) as well as a Texas petroleum products delivery fee report (required by all entities who pay Heavy Duty Diesel Equipment Fees). Neither of these reports imposes cash obligations on the Debtors, and the Debtors are not seeking any additional relief in connection with these reports.

115

XI.    **Utilities Motion.**[77]

394.    In the Utilities Motion, the Debtors seek entry of orders: (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Proposed Adequate Assurance (defined in the Utilities Motion); (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Proposed Adequate Assurance pending entry of the Final Order; (d) determining the Debtors are not required to provide any additional adequate assurance beyond what is proposed by the Utilities Motion.

395.    As part of the Debtors' business operations, I understand that the Debtors incur utility expenses for electric, gas, water, telephone, internet, waste disposal, and other similar services (the "Utility Services") in the ordinary course of business from approximately 110 utility providers (collectively, the "Utility Providers").[78]   I understand that the Utility Providers that provide Utility Services to the Debtors as of the Petition Date are identified in **Exhibit C** of the Utilities Motion (the "Utility Service List").[79]

---

[77]    See *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services*, filed contemporaneously herewith.

[78]    I understand that certain of the Utility Providers may also qualify for treatment under the *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performance Under Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under New Postpetition Hedging and Trading Arrangements* (the "Hedging and Trading Agreements Motion"), filed contemporaneously herewith.   I understand from Debtors' counsel that the applicability of the Hedging and Trading Arrangements Motion to such Utility Providers should not be treated as an admission by the Debtors that the safe harbor provisions of the Bankruptcy Code do or do not apply to those Utility Providers. From Debtors' counsel I understand that the Debtors reserve the right to argue that section 366 applies to a specific Utility Provider.

[79]    I understand from Debtors' counsel that the Utility Service List is not an admission that any entity is a utility provider within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve the right to contest any such characterization in the future.

116

396.    On average, I understand that the Debtors spend approximately $108.8 million each month on Utility Services pursuant to approximately 640 separate accounts, of which approximately $106.8 million is attributable to Utility Providers that provide electricity transmission and distribution services (the "TDSPs"). I understand that as of the Petition Date, the Debtors estimate that approximately $194.5 million in utility costs have accrued and remain outstanding, approximately $185.5 million of which is attributable to TDSPs. I understand that the Debtors not owe any past due amounts to the Utility Providers.

397.    I believe that uninterrupted Utility Services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Indeed, I understand that any interruption of Utility Services, even for a brief period of time, would negatively affect the Debtors' operations, revenues, and cash flows, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, recoveries to creditors. Accordingly, I believe it is critical, both for the Debtors and for the Debtors' customers, that the Debtors maintain uninterrupted access to Utility Services during these chapter 11 cases.

A.    **The Proposed Adequate Assurance.**

254.    I understand that the Debtors intend to pay postpetition obligations owed to the Utility Providers in the ordinary course of business. I understand that the Debtors expect that cash from operations and cash on hand will be sufficient to pay postpetition obligations related to their Utility Services.

255.    Nevertheless, I understand that to provide additional assurance of payment for future services to the Utility Providers other than (a) Utility Providers, including ERCOT, that have already been provided a deposit letter of credit that, even accounting for any draws to pay prepetition amounts, will be equal to, or greater than, two weeks of Utility Services, (b) Utility

117

Providers that have been paid in advance for Utility Services, and (c) the TDSPs,[80] the Debtors propose to deposit $1 million (the "Adequate Assurance Deposit") into a newly-created, segregated, interest-bearing account (the "Adequate Assurance Deposit Account") within 20 days of the Petition Date. I understand that the amount of the Adequate Assurance Deposit equals the estimated aggregate cost for two weeks of Utility Services for Utility Providers (other than the Utility Providers noted above), calculated as a historical average over the past 12 months.

256. ` I understand that the Adequate Assurance Deposit will be held for the benefit of Utility Providers during the pendency of these chapter 11 cases, provided that to the extent any Utility Provider receives any value from the Debtors as adequate assurance of payment, the Debtors may reduce the Adequate Assurance Deposit maintained in the Adequate Assurance Account by such amount.

257. I understand that the Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' demonstrated ability to pay for future Utility Services in the ordinary course of business, any other prepetition or postpetition value provided by the Debtors to the Utility Providers, and other relief granted by the Court in favor of the Utility Providers (together, the "Proposed Adequate Assurance") constitutes sufficient adequate assurance.

---

[80]  Pursuant to section 366(c)(2) of the Bankruptcy Code, I understand from Debtors' counsel that the Debtors need not provide adequate assurance of payment until 30 days after the Petition Date. The Debtors submit that the relief requested pursuant to the *Motion of Energy Future Holdings Corp., et al., for Entry of (A) an Order Authorizing Certain of the Debtors to Pay Certain Prepetition Transition Charges and Delivery Charges and (B) an Order Authorizing Certain of the Debtors to Assume Transmission and Distribution Service Agreement* (the "TDSP Motion"), filed contemporaneously with the Utilities Motion, will satisfy any adequate assurance obligation with respect to the TDSPs within the required 30-day period. From Debtors' counsel I understand that the Debtors' and the TDSP's respective rights under section 366 of the Bankruptcy Code are reserved and, in the event the Court does not grant the relief sought in the TDSP Motion, the amount of the Adequate Assurance Deposit may increase by up to $53 million.

118

**PX 095**
**Page 205 of 464**

XII.  **TDSPs Assumption Motion.**[81]

258.    In the TDSPs Assumption Motion, Debtor entities TXU Energy Retail Company

LLC, 4Change Energy Company LLC, and Luminant ET Services Company (collectively, the

"REP Debtors") are each party to one or more of the 23 Delivery Agreements on the list annexed

as **Exhibit 1** to **Exhibit B** attached to the TDSPs Assumption Motion.  I understand that each

Delivery Agreement is between a REP Debtor and one of seven non-debtor regulated

transmission and distribution utility service providers, six of which are non-affiliated entities (the

"Unaffiliated TDSPs"),[82] and the other of which is Oncor Electric Delivery Company LLC

("Oncor" and, together with the Unaffiliated TDSPs, the "TDSPs").  I understand that Oncor is

an affiliate of the Debtors, but is not a debtor in these chapter 11 cases.[83]  I understand that the

Debtors estimate that the REP Debtors owe approximately $185.2 million in the aggregate to the

---

[81]    See *Motion of Energy Future Holdings Corp., et al., for Entry of (A) an Order Authorizing Certain of the Debtors to Pay Certain Prepetition Transition Charges and Delivery Charges and (B) an Order Authorizing Certain of the Debtors to Assume Transmission and Distribution Service Agreements*, filed contemporaneously herewith.

[82]    I understand that the Unaffiliated TDSPs are AEP Texas Central Company, AEP Texas North Company, Centerpoint Energy Houston Electric, LLC, Sharyland Utilities, L.P., Nueces Electric Cooperative, Inc., and Texas-New Mexico Power Company.

[83]    Specifically, I understand that Oncor is an affiliate of the Debtors that is 80% owned by non-Debtor Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings" and, together with its direct and indirect subsidiaries, including Oncor, the "Oncor Ring-Fenced Entities"), which, in turn, is 100% owned by the Debtor entity Energy Future Intermediate Holding Company LLC ("EFIH"), a direct subsidiary of the Debtors' corporate parent Energy Future Holdings Corp. ("EFH Corp."). I understand that substantially all of the common stock of EFH Corp. is held by Texas Energy Future Holdings Limited Partnership ("Texas Holdings" and, together with EFH Corp. and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities, the "Texas Holdings Group"). I understand that EFH Corp. and Oncor have implemented certain structural and operational "ring-fencing" measures based on commitments made by Texas Holdings and Oncor to the PUC (as defined in the TDSP Motion) that are intended to enhance the credit quality of Oncor. I understand that these measures serve to mitigate Oncor's and Oncor Holdings' credit exposure to the Texas Holdings Group and to reduce the risk that the assets and liabilities of Oncor or Oncor Holdings would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities. Accordingly, I understand that EFH Corp. and EFIH do not control and do not consolidate Oncor for financial reporting purposes. The "ring-fencing" measures are described in further detail in the First Day Declaration.

**PX 095**
**Page 206 of 464**

TDSPs under the Delivery Agreements as of the Petition Date, approximately $143.1 million of which the REP Debtors owe to Oncor.

### A.    The TDSPs Are Critical to the Debtors' Business Operations.

259.    The REP Debtors cannot and do not own or operate electric distribution facilities in Texas.  Rather, I understand that the REP Debtors rely on the TDSPs' distribution facilities that connect the interconnected transmission grid and generation resources with customers.

260.    I understand that the TDSPs' distribution facilities receive electricity from the interconnected transmission system and distribute electricity to points of delivery, including customers.  I understand that the TDSPs are regulated because they are, in nearly every instance, the sole provider of delivery service in any particular service area where the REPs are certified to do business.

### B.    Prepetition Amounts Owed to the TDSPs and Outstanding Letters of Credit.

261.    I understand that the amounts that the REP Debtors pay to the TDSPs fall into two categories Delivery Charges and Transition Charges, each of which is discussed below.

#### 1.    Delivery Charges.

262.    The first category of amounts that the REP Debtors pay to the TDSPs is known as "Delivery Charges."  I understand that the Delivery Charges are based on the PUC-approved terms and conditions that govern each TDSP's delivery services (the "Tariffs"), including the rates that TDSPs may charge for such services.[84]  I also understand that the Delivery Charges constitute approximately 90% to 95% of the REP Debtors' payments to TDSPs.

---

[84]    From Debtors' counsel I understand that PUC regulations adopt a standard Tariff for all TDSPs.  *See* Tex. Admin. Code § 25.214.  Chapter 4 of the Tariff, which concerns remedies, is applicable to all TDSPs and cannot be modified.  PUC regulations also adopt a standard Tariff for all electric cooperatives, like Nueces Electric Cooperative, Inc., that have opted to offer retail customer choice. *See* Tex. Admin. Code § 25.215. Like the TDSP standard Tariff, Chapter 4 of this Tariff, relating to remedies, applies to all such electric cooperatives.    Copies    of    the    Tariffs    can    be    found    on    the    PUC    website    at http://www.puc.texas.gov/industry/electric/rates/TDR.aspx.

**PX 095**
**Page 207 of 464**

263.    As provided in the following table, as of the Petition Date, I understand that the REP Debtors owe approximately (a) $32.4 million in the aggregate to the Unaffiliated TDSPs on account of Delivery Charges (the "Unpaid Delivery Charges"), of which approximately $19.9 million has been secured with prepetition letters of credit (the "Delivery Charge LCs"), and (b) $138.1 million in the aggregate to Oncor on account of Unpaid Delivery Charges:[85]

| TDSP | Outstanding Delivery Charges | Delivery Charge LCs |
|---|---|---|
| AEP Texas Central Company | $5,000,000 | $3,400,000 |
| AEP Texas North Company | $2,800,000 | $1,000,000 |
| Centerpoint Energy Houston Electric, LLC | $20,900,000 | $13,800,000 |
| Sharyland Utilities, L.P. | $25,000 | None |
| Nueces Electric Cooperative, Inc. | None | None |
| Texas-New Mexico Power Company | $3,600,000 | $1,700,000 |
| Oncor Electric Delivery Company LLC | $138,100,000 | None |

264.    I estimate that $100 million of the Delivery Charges will come due during the Interim Period. I understand that the REP Debtors seek authority pursuant to the order to continue to pay approximately $26 million of Unpaid Delivery Charges to the Unaffiliated TDSPs as such amounts come due in the ordinary course during the Interim Period. I understand that the Debtors seek authority to honor all Unpaid Delivery Charges (including amounts owed to Oncor) pursuant to the Assumption Order.

---

[85]    I understand that PUC regulations do not require the REP Debtors to maintain the Delivery Charge LCs because, as of the Petition Date, the REP Debtors have not defaulted on their obligations. I understand that the REP Debtors anticipate that the Unaffiliated TDSPs may draw on the Delivery Charge LCs after the Petition Date. I understand that the REP Debtors do not believe that the Delivery Charge LCs constitute property of their estates because the TDSPs require Court authority to draw on the Delivery Charge LCs. Nevertheless, I understand that for purposes of clarity, the Debtors seek authority in both the Interim Order and the Assumption Order allowing (but not directing) the TDSPs to draw on the Delivery Charge LCs as payment for any outstanding amounts that the REP Debtors owe on account of Delivery Charges.

121

2.    **Transition Charges.**

265.    I understand that the second category of amounts that the REP Debtors pay to the TDSPs is known as Transition Charges. I understand that the Transition Charges allow TDSPs to recover certain PUC-approved costs that were securitized in conjunction with Texas's transition from a fully-regulated electricity market to an unbundled, competitive retail and generation market. I understand that the Transition Charges constitute approximately 5% to 10% of the REP Debtors' payments to the TDSPs.

266.    I understand that the PUC has issued financing orders that entitle the TDSPs to recover the Transition Charges, and several of the TDSPs have issued securities known as "transition bonds" that securitize the value of the Transition Charges (the "Transition Bonds").[86] I understand that for the TDSPs that have issued Transition Bonds,[87] each of the applicable Tariffs provides for the collection and payment of Transition Charges to the applicable TDSP, as well as the circumstances under which a REP must provide security for its payment of Transition Charges to the applicable TDSP.[88]

---

[86]    Pursuant to PUC financing orders, certain TDSPs are also entitled to use securitization financing to recover costs of restoring service and infrastructure associated with electric power outages as a result of hurricanes and other weather-related events or natural disasters (the "System Restoration Charges"). Under PUC regulations and applicable Tariffs, Transition Charges include System Restoration Charges, and Transition Bonds include bonds issued to securitize System Restoration Charges. See Tex. Admin. Code § 36.401-07. Centerpoint Energy Houston Electric, LLC has issued Transition Bonds to securitize System Restoration Charges. Accordingly, the Unpaid Transition Charges owed by the REP Debtors to Centerpoint Energy Houston Electric, LLC include prepetition System Restoration Charges, which are secured by Transition Charge Security in the form of letters of credit.

[87]    Sharyland Utilities, L.P., Nueces Electric Cooperative, Inc., AEP Texas North Company, and Texas-New-Mexico Power Company have not issued Transition Bonds. Accordingly, I understand that these TDSPs do not collect securitized Transition Charges from the REP Debtors. Texas-New Mexico Power Company collects PUC-approved, non-securitized "competitive transition charges." Pursuant to section 6.1.1.3 of the Tariff, these "competitive transition charges" are treated as Delivery Charges. Accordingly, I understand that these amounts are included in the estimated amount of Unpaid Delivery Charges owed to Texas-New Mexico Power Company.

[88]    I understand from Debtors' counsel that pursuant to PUC regulations and the Tariffs, each REP that pays Transition Charges to a TDSP must meet certain long-term unsecured credit ratings, or provide security for the

122

**PX 095**
**Page 209 of 464**

267.    As provided in the following table, as of the Petition Date, I understand that the REP Debtors owe approximately (a) $9.7 million in the aggregate to the Unaffiliated TDSPs on account of Transition Charges (the "Unpaid Transition Charges"), of which approximately $15.8 million has been secured with prepetition letters of credit, deposits or other collateral posted for the benefit of the Transition Bond indenture trustee  (the "Transition Charge Security"), and (b) $5 million in the aggregate to Oncor on account of Unpaid Transition Charges, of which approximately $10.1 million has been secured with a Transition Charge Security for the benefit of Oncor's Transition Bond indenture trustees:[89]

| TDSP | Outstanding Transition Charges | Transition Charge Security |
|---|---|---|
| AEP Texas Central Company | $3,600,000 | $5,100,000 |
| Centerpoint Energy Houston Electric, LLC | $6,100,000 | $10,700,000 |
| Oncor Electric Delivery Company LLC | $5,000,000 | $10,100,000 |

268.    I understand from Debtors' counsel that Texas law affords special protection in respect of the Transition Charges.  I understand that in particular, the Texas electric industry restructuring and unbundling legislation (which created the competitive retail market) and the PUC's related financing orders provide that Transition Bonds are to be issued by bankruptcy-remote, ring-fenced subsidiaries of the TDSPs.  Moreover, pursuant to state law, I understand from Debtors' counsel that the Transition Bonds are secured by a lien on "transition property,"

---

Transition Charges.  Security may take the form of a deposit, guaranty, surety bond, or letter of credit. *See* P.U.C. Subst. R. 25.108.

[89]    I understand from Debtors' counsel that under PUC regulations, the REP Debtors would need to replace the Transition Charge Security if drawn and, in any event, the REP Debtors anticipate remaining current with their obligations to the TDSPs with respect to Transition Charges during these chapter 11 cases such that the TDSPs will not need to seek recourse against the Transition Charge Security.  Accordingly, the Debtors anticipate that the TDSPs will not seek recourse against the Transition Charge Security and that, to the extent a letter of credit securing Transition Charges expires during these chapters 11 cases, the REP Debtors will replace such letter of credit under their post-petition financing facility or provide other security.

123

PX 095
Page 210 of 464

which includes the right to collect Transition Charges from the REP Debtors and any Transition Charges collected by the REP Debtors from their customers. I understand that the Transition Bond indenture trustees' lien on "transition property" is not affected by the commingling of funds.[90] Importantly, I understand that all of the Unpaid Transition Charges have been securitized with Transition Bonds, and are fully secured by the Transition Charge Security. I also understand that because the Transition Charge Security is security for obligations that are owed to the Transition Bond indenture trustees by entities collecting Transition Charges, the Transition Charges paid by the REP Debtors to the TDSPs will ultimately be paid to the Transition Bond indenture trustees.

### C. Additional Regulatory Implications.

269. I understand from Debtors' counsel while the Debtors would seek to avoid any negative issues associated with the REP Debtors' failure to pay the Transition Charges and the Delivery Charges, the benefits of avoiding any such litigation outweigh the costs of paying the amounts requested in the TDSP Motion. Indeed, I understand that the REP Debtors' failure to pay the Transition Charges and Delivery Charges could negatively affect the Debtors in at least five ways.

270. *First*, I understand that the REP Debtors' failure to make timely payments in respect of Transition Charges or Delivery Charges to a TDSP would permit PUC staff or "any affected person" to bring a complaint seeking to suspend or revoke the REP Debtors' operating certificate with the PUC (the "REP Certificate").[91] I understand that such an action, if

---

[90] *See* Tex. Util. Code. § 39.309(a) (providing for exclusive lien on "transition property"); Tex. Util. Code § 39.309(e).

[91] Specifically, the Texas Administrative Code provides as follows:

A certificate granted pursuant to this section is subject to amendment, suspension, or revocation by the commission for a significant violation of PURA, commission rules, or rules adopted by an independent

124

PX 095
Page 211 of 464

successful, would have drastic consequences for the Debtors' business operations: if the PUC suspended the REP Certificates, the REP Debtors would have to cease all activities associated with obtaining new customers in Texas; if the PUC revoked the REP Certificates, the REP Debtors would be required to cease *all* REP activities in Texas. I also understand that revocation of the REP Debtors' REP Certificates would result in a shutdown of their operations, resulting in the REP Debtors no longer being allowed to provide electricity service to retail customers. Such decertification would have a material effect on the REP Debtors' results of operations, liquidity, and financial condition.

271.    *Second*, I understand that if the Debtors do not satisfy the Transition Charges and Delivery Charges, the regulatory framework permits the TDSPs that have issued Transition Bonds to, among other things, transition the REP Debtors' customers to a competitor designated as the "provider of last resort," or to arrange for a lockbox account to collect the Delivery Charges directly from the REP Debtors' customers.[92] I understand that if the REP Debtors are required to notify customers of the lockbox arrangement, this could result in a negative market perception of the REP Debtors and lead to additional customer losses.

272.    *Third*, I understand that the REP Debtors' failure to satisfy Delivery Charges to an Unaffiliated TDSP permits the Unaffiliated TDSP to pass along the bad debt to all customers in its service area. I understand from Debtors' counsel that under applicable PUC regulations, if

---

organization. . . . The commission staff or any affected person may bring a complaint seeking to amend, suspend, or revoke a REP's certificate. Significant violations include the following: . . . (16) Failure to timely remit payment for invoiced charges to a transmission and distribution utility pursuant to the terms of the statewide standardized tariff adopted by the commission.

Tex. Admin. Code § 25.107(j)(16).

[92]    *See* Tex. Admin. Code § 25.214(d)(4), § 25.215; AEP Texas Central Company Tariff § 4.6.2.1(5); AEP Texas North Company Tariff § 4.6.2.1(5); Centerpoint Energy Houston Electric, LLC Tariff § 4.6.2.1(5); Oncor Tariff § 4.6.2.1(5); Sharyland Utilities, L.P. Tariff § 4.6.2.1(5); Nueces Electric Cooperative, Inc. Tariff § 4.6.3.2(5); Texas-New Mexico Power Company Tariff § 4.6.2.1(5).

PX 095
Page 212 of 464

a REP Debtor defaults on the payment of Delivery Charges to an Unaffiliated TDSP, the Unaffiliated TDSP may treat the resulting bad debt as a regulatory asset.[93]  I understand that the Unaffiliated TDSP may make a case before the PUC to increase the tariff rates that the PUC allows it to charge for Delivery Services to all REPs and other customers with which the TDSP does business.  I understand that this mechanism effectively allows the Unaffiliated TDSPs to pass on and recoup unpaid Delivery Charges from all REPs, irrespective of whether the particular REP is current on Delivery Charge payments.  I understand that these regulations are designed, in part, to ensure that Unaffiliated TDSPs are able to cover their operating costs and capital expenditures.  Ultimately, I understand that the unpaid Delivery Charges owed by any REP could be passed on to customers in the form of higher rates.  I also understand that the mere possibility of increased rates and overcharging of some customers could irreparably damage the REP Debtor's brand and goodwill with customers in the ERCOT region.

273.  *Fourth*, under applicable PUC regulations, I understand from counsel of the Debtors that failure to timely pay the Delivery Charges could result in the assessment of a late penalty equal to 5% of each delinquent balance, which could approximate $160,000 per day.[94]  I

---

[93]  Specifically, the Texas Administrative Code provides as follows:

A [TDSP] shall create a regulatory asset for bad debt expenses, net of collateral posted pursuant to subparagraph (A) of this paragraph and bad debt already included in its rates, resulting from a REP's default on its obligation to pay delivery charges to the [TDSP]. Upon a review of reasonableness and necessity, a reasonable level of amortization of such regulatory asset shall be included as a recoverable cost in the [TDSP]'s rates in its next rate case or such other rate recovery proceeding as deemed necessary.

16 Tex. Admin. Code § 25.107(f)(3)(B). I understand from Debtors' counsel that these provisions do not apply to Oncor pursuant to an order of the PUC under section 14.101 of the Public Utility Regulatory Act allowing the merger of Oncor with the Debtors. Specifically, under that order, Oncor may not, among other things, "seek to recover from its customers any costs incurred as a result of a bankruptcy of [the Debtors]." Accordingly, I understand from Debtors' counsel that it is unlikely that Oncor would be permitted to make a case before the PUC to increase tariff rates on the basis of the REP Debtors' non-payment of Delivery Charges to Oncor.

[94]  Standard Tariff for Retail Delivery Service § 4.4.6. See Tex. Admin. Code § 25.214.

**PX 095
Page 213 of 464**

understand that upon assumption of the Delivery Agreements, the Debtors would be required to satisfy such late penalties under section 365(b)(1) of the Bankruptcy Code.

274.    *Fifth*, I understand from Debtors' counsel that under applicable PUC regulations and the Tariffs, if a REP has defaulted in respect of Delivery Charges within a 24-month period, such REP is required to provide a deposit as security equal to "one-sixth of the estimated annual amount" billed to the REP under the Tariff, which security could remain outstanding for a minimum of two years.[95] I understand that with respect to Oncor alone, a two-month security deposit for Delivery Charges could amount to approximately $153 million. Similarly, I understand that if a REP defaults with respect to Transition Charges, the REP is required to provide a deposit or issue letters of credit equal to two months' maximum expected Transition Charges.[96] I understand that if the REP Debtors default with respect to all Unpaid Transition Charges, the applicable Transition Bond indenture trustee may seek recourse against the Transition Charge Security and the Debtors may be required to provide replacement security in the form of new letters of credit, deposits, or other collateral. I understand that the Debtors estimate that a replacement two-month security deposit with respect to Transition Charges could amount to approximately $18.2 million.

---

[95]    Importantly, I understand that the REP Debtors are not currently required to provide Delivery Charge LCs to the TDSPs because the REP Debtors have not defaulted on Delivery Charge payments within the past 24 months. I understand that if, however, the REP Debtors were to default on payment of Delivery Charges, they may be required to issue Delivery Charge LCs to secure future Delivery Charges equal to one-sixth of the estimated annual amount of Delivery Charges due to the TDSPs. *See* Tex. Admin. Code § 25.214(d)(4); AEP Texas Central Company Tariff § 4.5.2.1; AEP Texas North Company Tariff § 4.5.2.1; Centerpoint Energy Houston Electric, LLC Tariff § 4.5.2.1; Oncor Tariff § 4.5.2.1; Sharyland Utilities, L.P. Tariff § 4.5.2.1; Nueces Electric Cooperative, Inc. Tariff § 4.5.2; Texas-New Mexico Power Company Tariff § 4.5.2.1. *See also* 11 U.S.C. § 366 (requiring a debtor to provide adequate assurance of payment to its utility providers).

[96]    *See* P.U.C. Subst. R. 25.107, 108 (requiring a defaulting REP to provide a deposit or issue replacement letters of credit of two months' maximum expected Transition Charges).

127

**PX 095**
**Page 214 of 464**

275.    Accordingly, I believe payment of the Transition Charges and Delivery Charges in the ordinary course will help the REP Debtors to avoid potentially serious regulatory consequences, and will save the REP Debtors significant time and expense.

**D.    Adequate Assurance.**

276.    Following the commencement of these chapter 11 cases, I understand that the REP Debtors will continue to sell retail electricity to their customers, collect Transition Charges from customers, and incur Delivery Charges. I understand that upon assumption of the Delivery Agreements, and consistent with their long history of successful dealings with the TDSPs, the REP Debtors will continue to perform under the Delivery Agreements and pay the Transition Charges and Delivery Charges to the TDSPs. Indeed, I understand that the REP Debtors' continuing ability to pay the TDSPs is contingent upon the TDSPs continuing to provide electricity distribution service on an uninterrupted basis.

**XIII.    ERCOT Assumption Motion.[97]**

277.    In the ERCOT Assumption Motion, the Debtors entry of an order authorizing, but not directing, the SFA Debtors (as defined in the ERCOT Assumption Motion) to assume the SFAs and provide adequate assurance of future performance in relation thereto. I understand that the SFAs set out the terms and conditions by which ERCOT and the SFA Debtors will discharge their respective duties and responsibilities under the ERCOT Protocols (as defined in the SFAs). As such, I understand that executing and being a party to an SFA is a necessary prerequisite for, among other things, operating power generation assets in the ERCOT region; participating in the retail electricity in the ERCOT region; scheduling, buying and selling

---

[97]    See *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing Certain of the Debtors to Assume Standard Form Market Participant Agreements with ERCOT*, filed contemporaneously herewith.

128

electricity and ancillary services through the ERCOT region; transacting certain financial instruments; and transacting in the day-ahead market conducted by ERCOT.

278.    Additionally, I understand that to secure the Debtors' obligations to ERCOT, Citibank, N.A. issued that certain irrevocable and unconditional standby letter of credit No. 63664972 for the benefit of ERCOT, dated December 4, 2009, which is currently in the amount of $120 million (as amended, the "Letter of Credit") in accordance with ERCOT's creditworthiness protocols that ERCOT may draw upon in its discretion.    I understand that the Debtors do not believe that the Letter of Credit constitutes property of the Debtors' estate such that ERCOT requires Court authority to draw upon the Letter of Credit.[98]    Nevertheless, I believe in an abundance of caution, the Debtors are seeking authority in the ERCOT Assumption Motion to allow ERCOT to draw on the Letter of Credit in its discretion.    I believe that the availability of the Letter of Credit (regardless of whether ERCOT chooses to draw on the Letter of Credit) constitutes adequate assurance of the Debtors' future performance under the SFAs.    Furthermore, I understand that it is the Debtors' intentions to honor their respective obligations under the SFAs prior to the entry of the Order.

A.    ERCOT.

279.    ERCOT manages the flow of electric power to 24 million Texas customers, representing 85% of the state's electric load.    I understand that ERCOT schedules electricity on an electric grid that connects 40,500 miles of transmission lines and more than 550 generation units.    I understand that ERCOT also performs financial settlements for the competitive

---

[98]    See, e.g., In re Kaiser Grp. Int'l Inc., 399 F.3d 558 (3d. Cir. 2005) (citing the "well-established" rule that a letter of credit and the proceeds therefrom are not property of the debtor's estate); In re Hechinger Investment Co. of Delaware, Inc., 282 B.R. 149, 161 (D. Del. 2002) (finding that debtor could not provide any facts in support of its claim that a letter of credit constituted property of the estate); S-Tran Holdings, Inc., No. 05-11391 (KJC) (Bankr. D. Del. 2009) (recognizing that letters of credit do not constitute property of the debtor's estate); In re Sabratek Corp., 257 B.R. 732, 735 (Bankr. D. Del. 2000) (finding that debtors would be unlikely to succeed in establishing that a letter of credit constituted property of the estate).

129

wholesale power market, administers retail switching for 6.7 million premises in competitive

choice areas, and enforces certain credit requirements, including collateral posting requirements,

to ensure that the activity facilitated by ERCOT does not create credit risks in the market.

280.    Additionally, I understand that ERCOT provides a platform for its members to

participate in various aspects of the Texas electricity market. These include:

- (a) *Real-Time Energy Market*. The real-time energy market that allows a party to be paid or charged for physical electricity and ancillary services provided to or taken from the wholesale market;

- (b) *Congestion Revenue Rights Auctions*. Auctions for the purchase and sale of congestion revenue rights (which allow a party to hedge against transmission congestion costs in the day-ahead market);

 (c) *Day-Ahead Transactions*. Financial transactions (that allow participants to buy and sell electricity, ancillary services and congestion revenue rights to facilitate hedging price differences between the day-ahead market and the real-time market); and

- (d) *Point-to-Point Transactions*. Point-to-point transactions (which allow a party to hedge against transmission congestion in ERCOT's real-time energy market between two specific locations on the transmission system) (collectively, the "ERCOT Participation Rights"). 

281.    I understand that ERCOT is a membership-based 501(c)(4) nonprofit corporation.

I also understand that ERCOT's membership reflects all facets of the power business, including

consumers, electric cooperatives, power generators, power marketers, retail electric providers,

investor-owned electric utilities (transmission and distribution providers), and municipal-owned

electric utilities. I understand that only upon execution of an SFA may an entity enjoy the

ERCOT Participation Rights.

**B.    The Debtors' Participation in ERCOT.**

282.    I believe the Debtors' electricity generating, wholesale trading operations, and

retail operations are substantial and rely on ERCOT. To that end, I understand that certain of the

Debtors have executed SFAs with ERCOT. Specifically, I understand that the following Debtors

are party to one or more SFAs: 4Change Energy Company; Big Brown Power Company LLC;

Luminant Energy Company LLC; Luminant ET Services Company ("Luminant ET") ; Luminant

Generation Company LLC; Oak Grove Management Company LLC; Sandow Power Company

130

LLC; Tradinghouse Power Company LP; TXU Energy Retail Company LLC d/b/a TXU Energy ("TXU Energy LLC"); and Valley NG Power Company LLC (collectively, the "SFA Debtors").

283. I understand that Luminant is the largest electricity generator in Texas and accounts for approximately 18% of the installed generation capacity for the ERCOT region. I understand that to facilitate Luminant's sale of electricity produced by its power generation assets, one of its subsidiaries, Luminant Energy Company LLC ("Luminant Energy") executed an SFA permitting Luminant Energy to participate in the ERCOT region as an entity that may buy and sell energy and ancillary services for wholesale customers. Additionally, I understand that one of Luminant's subsidiaries, Luminant ET, executed an SFA permitting it to participate in the ERCOT region as an entity that may sell electricity to end-use customers.

284. From consulting my advisors, I understand the Debtors' retail operations also rely on ERCOT. TXU Energy LLC conducts the Debtors' primary retail electricity operations, has approximately 1.7 million residential and business customers, and accounts for approximately 26% of the residential and approximately 19% of the business retail electricity market in the ERCOT region. To sell electricity to these customers, I understand that its executed an SFA permitting it to participate in the ERCOT region as an entity that may sell electricity to end-use customers or wholesale customers therein. I understand that in order for TXU Energy LLC to continue to sell electricity to TXU Energy LLC's customers and for Luminant Energy to continue to sell electricity generated by Luminant, both of these subsidiaries must continue to be party to an SFA.

285. I understand that the Debtors also depend on continued participation in the electricity market in which ERCOT facilitates operational activities. I understand that ERCOT provides the SFA Debtors with particular channels to sell and procure power, ancillary services,

131

and congestion revenue rights to mitigate the Debtors' risks associated with the power generation assets and retail electricity businesses, and are core to the commercial operations of those businesses. I understand that ability to participate in the ERCOT region is critical to the daily cash flows of the Debtors. Moreover, I understand that the SFA Debtors consummate transactions with ERCOT that they cannot execute with any other party or entity in light of ERCOT's (a) central role in the Texas electricity system, (b) multi-dimensional investment platform, and (c) facilitation of real-time and day-ahead market transactions, congestion revenue right auctions, as well as electricity and ancillary services services, sales, and purchases.[99]

286.    I understand that these channels are important to the Debtors as a whole, given that, as of December 31, 2013, the Debtors' annual underlying, notional value across all their operations, based on energy prices for commodities sold and purchased in its operations, including natural gas, power, coal, fuel-oil, uranium, renewable energy credits and emission allowances, is approximately $3.8 billion.

287.    I understand that the Debtors participate in certain hedging and trading activities and arrangements to hedge against price fluctuations and thereby protect the economic value of their operations by preventing substantial declines in cash flows. As an example, during the fiscal years 2009 through 2013, I understand that the Debtors' hedging and trading activities provided a positive incremental return to the Debtors' underlying operations ranging from

---

[99]    For additional information regarding the Debtors' hedging and trading counterparties, hedging and trading activity in ERCOT, and the financial significance of these activities to the Debtors' businesses, *see Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performance Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements* (the "Hedging and Trading Motion"). In the Hedging and Trading Motion, the Debtors have requested that, to the extent necessary, the automatic stay provided in section 362 of the Bankruptcy Code is modified to permit ERCOT to continue performing its obligations and exercising its rights under the SFAs and ERCOT protocols. The relief requested in the ERCOT Assumption Motion is intended to further complement the Debtors' requested relief in the Hedging and Trading Motion to ensure the Debtors' continued access to ERCOT on a postpetition basis

132

PX 095
Page 219 of 464

approximately $240 million to $425 million on an annual basis. I understand that without access to ERCOT's operational platforms that play a critical role in optimizing economic value and cash flows, including settling physical energy delivery and certain financial transactions, the Debtors would face a significant hurdle in executing certain of their hedging and trading activities in a timely manner.

### C.    Parties' Financial Obligations

288.    Following the commencement of these chapter 11 cases, I understand that ERCOT may, in its discretion, draw upon the Letter of Credit to pay the approximately $10 million in prepetition obligations owed to ERCOT in connection with the SFAs.

289.    I understand that the TCEH Debtors also have sought authority to use cash collateral and to enter into a $4.475 billion debtor-in-possession financing facility (the "TCEH DIP Facility")[100], both of which will be used in part to fund future payments to ERCOT and provide a replacement or an additional letter(s) of credit for the benefit of ERCOT as may be required by the ERCOT protocols. I understand that these avenues of recourse, coupled with the availability of the Letter of Credit and the ability to provide ERCOT with a replacement or an additional letter(s) of credit for satisfaction of any of the Debtors' postpetition obligations to ERCOT, provide adequate assurance of the SFA Debtors' future performance under the SFAs.

---

[100]    I understand that the Debtors seek authority to use cash collateral pursuant to the *Motion of Texas Competitive Electric Holdings Company LLC, and certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* and as defined in such motion.

A more detailed description of the TCEH DIP Facility may be found in the *Motion of Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing*.

133

**PX 095**
**Page 220 of 464**

## Procedural Motions

XIV.    **Joint Administration Motion.**[101]

290.    In the Joint Administration Motion, the Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).  Specifically, I understand that the Debtors request that the Court maintain one file and one docket for all of these chapter 11 cases under the case of lead Debtor Energy Future Holdings Corp.  Further, the Debtors request that an entry be made on the docket of each of the cases of the Debtors other than Energy Future Holdings Corp. to indicate the joint administration of these chapter 11 cases.

291.    I understand that the 71 Debtors in these chapter 11 cases are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code.  As discussed in the First Day Declaration, the Debtors have highly integrated operations.  As such, I believe the joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  I understand that many of the motions, hearings, and orders that will arise in these chapter 11 cases will affect each and every Debtor.  In addition, I believe joint administration will reduce fees and costs by avoiding duplicative filings and objections.  I understand that joint administration also will allow the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

292.    I believe joint administration will not adversely affect the Debtors' respective constituencies because the Joint Administration Motion requests only administrative, not substantive, consolidation of the estates.  I understand that parties in interest will not be harmed

---

[101]    See *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases*, filed contemporaneously herewith.

134

by the relief requested, but, instead, will benefit from the cost reductions associated with the joint administration of these chapter 11 cases. Accordingly, I believe that joint administration of these chapter 11 cases is in the best interests of their estates, their creditors, and all other parties in interest.

XV.    **Claims and Noticing Agent Motion.**[102]

293.    In the Claims and Noticing Agent Motion, the Debtors seek to retain Epiq Bankruptcy Solutions, LLC ("Epiq") as their claims and noticing agent. I believe that by retaining Epiq in these chapter 11 cases, the Debtors' estates, and particularly their creditors, will benefit from Epiq's service. Since its inception in 1988, I understand that Epiq has provided claims and noticing services in numerous large cases in this district. Consequently, I understand that Epiq has developed efficient and cost-effective methods in its area of expertise. I also understand that Epiq is fully equipped to handle the volume of mailing involved in properly sending the required notices to creditors and other interested parties in the chapter 11 cases and, therefore, I believe that the Claims and Noticing Agent Motion should be approved.

XVI.    **Consolidated Creditors List Motion.**[103]

294.    In the Consolidated Creditors List Motion, the Debtors seek entry of an Order authorizing the Debtors to file a consolidated list of creditors in lieu of separate mailing matrix for each Debtor during the Interim Period and the latter of: (a) 90 days thereafter; or (b) until the SoFAs have been filed. I believe that with the assistance of Epiq as claims and noticing agent, the Debtors will be prepared to file a computer-readable consolidated list of creditors and a list of

---

[102]    See *Application of Energy Future Holdings Corp., et al., for Entry of an Order Approving the Retention and Appointment of Epiq Bankruptcy Solutions, LLC as the Claims and Noticing Agent for the Debtors*, filed contemporaneously herewith.

[103]    See *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor*, filed contemporaneously herewith.

**PX 095
Page 222 of 464**

equity security holders upon request and will be capable of undertaking all necessary mailings. Indeed, I understand that because the Debtors have thousands of creditors, converting the Debtors' computerized information to a format compatible with the matrix requirements would be an exceptionally burdensome task and would greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents.

295.    I believe that consolidation of the Debtors' computer records into a creditor database and mailing notices to all applicable parties in such database will be sufficient to permit Epiq to promptly notice those parties. Accordingly, I believe maintaining electronic-format lists of creditors and equity security holders rather than preparing and filing separate matrices will maximize efficiency and accuracy, and reduce costs.

## XVII.  Retention Applications[104]

296.    In the various retention applications, the Debtors will seek authorization to employ and retain counsel and professionals *nunc pro tunc* in accordance with their engagement letters.    These professionals include, among others, financial advisors, energy consultants, compensation consultants, lead restructuring counsel, restructuring advisors, accounting firms, and various special counsel.    The Debtors' operations are vast and complex, and I believe the retention of professionals is necessary for an efficient and effective transition into chapter 11 and a successful reorganization.    Accordingly, I believe the retention applications should be granted.

---

[104]    Retention Applications pursuant to 11 U.S.C. §§ 327(e) and 1107: Alvarez & Marsal LLC; Deloitte & Touche LLP; Epiq Bankruptcy Solutions, LLC; Ernst & Young LLP; Evercore Partners, Inc.; Filsinger Energy Partners, Inc.; Kirkland & Ellis LLP; PricewaterhouseCoopers LLP; KPMG LLP; Richards, Layton, & Finger, P.A.; Towers Watson & Co.

136

**PX 095**
**Page 223 of 464**

**Exhibit B**

**List of the Debtors**

### TCEH Debtors

Texas Competitive Electric Holdings Company LLC
4Change Energy Company
4Change Energy Holdings LLC
Big Brown 3 Power Company LLC
Big Brown Lignite Company LLC
Big Brown Power Company LLC
Collin Power Company LLC
DeCordova Power Company LLC
DeCordova II Power Company LLC
Eagle Mountain Power Company LLC
Energy Future Competitive Holdings Company LLC
Generation MT Company LLC
Generation SVC Company
Lake Creek 3 Power Company LLC
Luminant Big Brown Mining Company LLC
Luminant Energy Company LLC
Luminant Energy Trading California Company
Luminant ET Services Company
Luminant Generation Company LLC
Luminant Holding Company LLC
Luminant Mineral Development Company LLC
Luminant Mining Company LLC
Luminant Renewables Company LLC
Martin Lake 4 Power Company LLC
Monticello 4 Power Company LLC
Morgan Creek 7 Power Company LLC
NCA Resources Development Company LLC
Oak Grove Management Company LLC
Oak Grove Mining Company LLC
Oak Grove Power Company LLC
Sandow Power Company LLC
TCEH Finance, Inc.
Tradinghouse 3 & 4 Power Company LLC
Tradinghouse Power Company LLC
TXU Energy Receivables Company LLC
TXU Energy Retail Company LLC
TXU Energy Solutions Company LLC
TXU Retail Services Company
TXU SEM Company
Valley NG Power Company LLC
Valley Power Company LLC

## Other Debtors

Energy Future Holdings Corp.
Brighten Energy LLC
Brighten Holdings LLC
Dallas Power & Light Company, Inc.
Ebasco Services of Canada Limited
EEC Holdings, Inc.
EECI, Inc.
EFH Australia (No. 2) Holdings Company
EFH CG Holdings Company LP
EFH CG Management Company LLC
EFH Corporate Services Company
EFH Finance (No. 2) Holdings Company
EFH FS Holdings Company
EFH Renewables Company LLC
EFIH Finance Inc.
Energy Future Intermediate Holding Company LLC
Generation Development Company LLC
Lone Star Energy Company, Inc.
Lone Star Pipeline Company, Inc.
LSGT Gas Company LLC
LSGT SACROC, Inc.
NCA Development Company LLC
Southwestern Electric Service Company, Inc.
Texas Electric Service Company, Inc.
Texas Energy Industries Company, Inc.
Texas Power & Light Company, Inc.
Texas Utilities Company, Inc.
Texas Utilities Electric Company, Inc.
TXU Electric Company, Inc.
TXU Receivables Company

Exhibit 2
- 2 -

## Exhibit C

## Corporate Structure

**PX 095**
**Page 227 of 464**



**Exhibit D**

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AND LOCK-UP AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

## *RESTRUCTURING SUPPORT AND LOCK-UP AGREEMENT*

This RESTRUCTURING SUPPORT AND LOCK-UP AGREEMENT (including all exhibits and schedules attached hereto and in accordance with Section 2, this "**Agreement**") is made and entered into as of April 29, 2014, by and among the following parties:

    i.    Energy Future Holdings Corp., a Texas corporation ("**EFH**");[1]

    ii.    Energy Future Intermediate Holding Company LLC ("**EFIH**"), a Delaware limited liability company and a direct, wholly-owned subsidiary of EFH;

    iii.    EFH Corporate Services Company ("**EFH Corporate Services**"), a Delaware corporation and a direct, wholly-owned subsidiary of EFH;

    iv.    EFIH Finance Inc. ("**EFIH Finance**,"), a Delaware corporation and a direct, wholly-owned subsidiary of EFIH;

    v.    Energy Future Competitive Holdings Company LLC ("**EFCH**"), a Delaware limited liability company and a direct, wholly-owned subsidiary of EFH;

    vi.    Texas Competitive Electric Holdings Company LLC ("**TCEH**"), a Delaware limited liability company and a direct, wholly-owned subsidiary of EFCH;

    vii.    each of TCEH's direct and indirect subsidiaries listed on the signature pages hereto (the "**TCEH Subsidiaries**," and together with TCEH and EFCH, the "**TCEH Debtors**," and, together with each of the foregoing entities identified in sub-clauses (i) and (vii) a "**Debtor**" and, collectively, the "**Debtors**");

    viii.    Texas Energy Future Holdings Limited Partnership ("**Texas Holdings**"), a Texas limited partnership, which holds approximately 99.26% of the outstanding Interests in EFH (the "**EFH Interests**");

    ix.    Texas Energy Future Capital Holdings LLC, a Delaware limited liability company and the general partner of Texas Holdings ("**TEF**" and, together with Texas Holdings, the "**Consenting Interest Holders**");

---

[1]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the term sheet attached hereto as **Exhibit A** (the "**Term Sheet**"), subject to Section 2 hereof.

KE 26600124.42

x. the undersigned lenders or investment advisors or managers of discretionary accounts that hold claims[2] pursuant to the TCEH Credit Agreement against EFCH, TCEH, and the TCEH Subsidiaries under the TCEH Credit Agreement (such claims, the "**TCEH Credit Agreement Claims**" and, collectively, the "**Consenting TCEH First Lien Lenders**");

xi. the undersigned holders or investment advisors or managers of discretionary accounts that hold claims against EFCH, TCEH, and the TCEH Subsidiaries under the TCEH First Lien Note Indenture issued pursuant to the TCEH First Lien Note Indenture (such claims, the "**TCEH First Lien Note Claims**" and, collectively, the "**Consenting TCEH First Lien Noteholders**" and, together, with the Consenting TCEH First Lien Lenders, the "**Consenting TCEH First Lien Creditors**");

xii. the undersigned holders or investment advisors or managers of discretionary accounts that hold claims against EFIH and EFIH Finance under the EFIH First Lien Notes issued pursuant to the EFIH First Lien Indentures (collectively, the "**Consenting EFIH First Lien Noteholders**");

xiii. the undersigned holders or investment advisors or managers of discretionary accounts that hold claims against EFIH and EFIH Finance under the EFIH Second Lien Notes issued pursuant to the EFIH Second Lien Note Indenture (collectively, the "**Consenting EFIH Second Lien Noteholders**");

xiv. the undersigned holders or investment advisors or managers of discretionary accounts that hold claims against EFIH and EFIH Finance under the EFIH Unsecured Notes issued pursuant to the EFIH Unsecured Note Indentures (collectively, the "**Consenting EFIH Unsecured Noteholders**");

xv. the undersigned holders or investment advisors or managers of discretionary accounts that hold claims against EFH, EFIH, and EFCH under the EFH Unsecured Notes issued pursuant to the EFH Unsecured Indentures, but excluding any EFH Unsecured Notes held by EFIH (collectively, the "**Consenting EFH Unsecured Noteholders**," and/or together with the Consenting TCEH First Lien Creditors, the Consenting EFIH First Lien Noteholders, the Consenting EFIH Second Lien Noteholders, and the Consenting EFIH Unsecured Noteholders, (in each case, as to their respective issuance, and to the extent still a party thereto, the "**Consenting Creditors**"); and

xvi. each transferee who becomes a Permitted Transferee (as defined below) in accordance with Section 4.04 of this Agreement (each of the foregoing described in sub-clauses (i) through (xvi), a "**Party**" and, collectively, the "**Parties**"). Each Consenting Interest Holder, each Consenting Creditor, and each Permitted Transferee (if any) is a "**Restructuring Support Party**" and are collectively referred to herein as the "**Restructuring Support Parties**."

---

[2]   As used herein the term "<u>claim</u>" has the meaning ascribed to such term as set forth in section 101(5) of the Bankruptcy Code.

## RECITALS

**WHEREAS**, the Debtors and the Restructuring Support Parties have negotiated certain restructuring and recapitalization transactions with respect to the Debtors' capital structure, including the Debtors' respective obligations under each of the following: (i) the TCEH Credit Agreement; (ii) the TCEH First Lien Notes; (iii) the TCEH First Lien Commodity Hedges (but without respect to any setoff rights that a counterparty to a TCEH First Lien Commodity Hedge may have against TCEH); (iv) the TCEH First Lien Interest Rate Swaps (but without respect to any setoff rights that a counterparty to a TCEH First Interest Rate Swap may have against TCEH); (v) the EFIH First Lien Notes; (vi) the EFIH Second Lien Notes; (vii) the EFIH Unsecured Notes; (viii) the EFH Unsecured Notes; and (ix) the claims arising under the indentures listed on **Exhibit B** hereto (such claims, the "**Notes Claims**");

**WHEREAS**, the Debtors intend to commence voluntary reorganization cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (such court, or another bankruptcy court of competent jurisdiction with respect to the subject matter, the "**Bankruptcy Court**") to effect the restructuring through a prenegotiated chapter 11 plan of reorganization (as may be amended or supplemented from time to time in accordance with the terms of this Agreement, the "**Plan**"), all of which shall be on the terms and conditions described in this Agreement (such transactions, the "**Restructuring Transactions**");

**WHEREAS**, those Restructuring Support Parties that are party to the commitment letter attached hereto as **Exhibit C** (collectively, the "**Commitment Parties**"[3] and such letter (including the exhibits thereto), the "**Commitment Letter**") have agreed in accordance with the terms and conditions specified in the Commitment Letter to fund the EFIH Second Lien DIP Financing in an amount of up to $2 billion (the "**Investment Commitment**"); and

**WHEREAS**, the Debtors and the Consenting Interest Holders, as the direct or indirect owners of EFH, EFIH, EFIH Finance, EFCH, TCEH, and the TCEH Subsidiaries, have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement, the Commitment Letter, and the Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

**Section 1.**    *Agreement Effective Date.* This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the date on which: (a)(i) the Debtors shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Consenting Interest Holders and counsel to the Consenting Creditors; (ii) holders of at least 40% of the aggregate outstanding principal amount of the TCEH Credit Agreement

---

[3]    For the avoidance of doubt, as used herein, the terms "**Consenting Creditors**" and "**Restructuring Support Parties**" include the Commitment Parties in their capacities as such.

**PX 095**
**Page 232 of 464**

Claims and the TCEH First Lien Note Claims (determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) shall have executed and delivered to the Debtors counterpart signature pages of this Agreement; (iii) holders of at least 70% of the outstanding principal amount of each of the EFIH Unsecured Note Claims and the EFH Unsecured Note Claims (in each case determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) shall have executed and delivered to the Debtors counterpart signature pages of this Agreement; (iv) holders of at least 10% of the outstanding principal amount of the EFIH First Lien Note Claims (determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) held by Fidelity shall have executed and delivered to the Debtors counterpart signature pages of this Agreement (the "**Consenting Fidelity EFIH First Lien Noteholders**"); (v) holders of at least 19% of the outstanding principal amount of the EFIH First Lien Note Claims (determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) held by holders other than Fidelity shall have executed and delivered to the Debtors counterpart signature pages of this Agreement (the "**Consenting Non-Fidelity EFIH First Lien Noteholders**"); (vi) holders of at least 25% of the outstanding principal amount of the EFIH Second Lien Note Claims (determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) held by Fidelity shall have executed and delivered to the Debtors counterpart signature pages of this Agreement; and (vii) each of the Consenting Interest Holders shall have executed and delivered to the Debtors counterpart signatures of this Agreement; (b) each of the Commitment Parties shall have executed and delivered to the Debtors counterpart signatures to the Commitment Letter; (c) EFH and EFIH shall have paid the Execution Fee (as defined in the Commitment Letter); (d) the Debtors shall have paid all reasonable and documented fees and expenses incurred through the Agreement Effective Date (as defined below) for the professionals identified in Section 10 in the amounts set forth in **Schedule 1** attached hereto (including the request to increase or replenish the retainers as set forth on Schedule 1); and (e) the Debtors have given notice to counsel to the Consenting Interest Holders and counsel to the Consenting Creditors in accordance with Section 11.11 hereof that each of the foregoing conditions set forth in this Section 1, in each case, has been satisfied and this Agreement is effective; in each instance, on or before April 29, 2014 (such date, the "**Agreement Effective Date**").[4]

**Section 2.**    *Exhibits Incorporated by Reference.*  Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits. In the event of any inconsistency between this Agreement (without reference to the exhibits) and the exhibits, this Agreement (without reference to the exhibits) shall govern.

**Section 3.**    *Definitive Documentation.*  The definitive documents and agreements governing the Restructuring Transactions (collectively, the "**Plan Restructuring Documents**") shall

---

[4]    For the avoidance of doubt, the obligations and rights of the Consenting Creditors described in this Agreement shall apply to any postpetition claims acquired by such Consenting Creditors in accordance with the Restructuring Transactions.

4

consist of: (a) the motion to assume this Agreement pursuant to sections 105(a) and 365 of the Bankruptcy Code and the performance by the Debtors of their obligations hereunder (the "**RSA Assumption Motion**") and the order approving the RSA Assumption Motion (the "**RSA Assumption Order**"); (b) the Plan (and all exhibits thereto); (c) the Confirmation Order and pleadings in support of entry of the Confirmation Order; (d) the Disclosure Statement, the other solicitation materials in respect of the Plan (such materials, collectively, the "**Solicitation Materials**"), the motion to approve the Disclosure Statement, and the order entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "**Disclosure Statement Order**"); (e) the documentation in respect of the EFIH First Lien DIP Financing (including related motions and orders); (f) the documentation in respect of the EFIH Second Lien DIP Financing (including related motions and orders); (g) the Oncor TSA Amendment; (h) the IRS Submissions and the Private Letter Ruling, (i) the Conversion Agreement (as defined in the Commitment Letter) (including any related order); (j) the motion (the "**Approval Motion**") and related orders to obtain entry of (i) an order (the "**Approval Order**") authorizing, among other things, (A) the EFIH First Lien Settlement, (B) the EFIH Second Lien Settlement; and (C) EFH and EFIH to perform their obligations under the Commitment Letter, including the payment of professionals' fees on the terms set forth in the Commitment Letter and (ii) an order (the "**Oncor TSA Amendment Order**") authorizing the Oncor TSA Amendment, all in a manner consistent with the terms of this Agreement; (k) the documentation in respect of the EFIH First Lien Settlement (including the related order); (l) the documentation in respect of the EFIH Second Lien Settlement (including the related order); (m) any pleadings or orders related to the EFIH First Lien Makewhole Claim and/or EFIH Second Lien Makewhole Claim (collectively, the "**Make-Whole Pleadings**"); (n) all other documents that will comprise the Plan Supplement; and (o) a motion seeking entry of an order and the resulting order restricting transfers of claims against the Debtors to the extent such transfers would adversely affect the Debtors' ability to obtain any required regulatory consents (the "**Trading Motion**"). The Plan Restructuring Documents remain subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, and shall otherwise be in form and substance reasonably acceptable to each of (i) the Debtors, (ii) the Consenting Interest Holders, and (iii) the Required Consenting Creditors; provided, however, that, only EFH, EFIH, the Consenting Fidelity EFIH First Lien Noteholders, the Consenting EFIH Second Lien Noteholders, the Consenting EFH Unsecured Noteholders, and the Required EFIH Unsecured Consenting Creditors, and no other Restructuring Support Party, shall have the foregoing rights described in this Section 3 over those documents pertaining exclusively to the Restructuring Transactions and Chapter 11 Cases of EFH and EFIH; provided, further, that the Approval Order, the Oncor TSA Amendment Order, and the Make-Whole Pleadings shall be in form and substance reasonably satisfactory to EFH, EFIH, the Consenting Fidelity EFIH First Lien Noteholders, the Consenting EFH Unsecured Noteholders, and the Required EFIH Unsecured Consenting Creditors only (and no other Restructuring Support Party shall have the foregoing rights) provided, further, the new EFH/EFIH debt and equity documents (including the Conversion Agreement) and the EFH and EFIH corporate governance documents (including the selection of the board of directors and officers of such entities) shall be in form and substance satisfactory to the Required EFIH Unsecured Consenting Creditors only, in each case, subject to the terms and conditions specified in the Term Sheet, and the Required EFIH Unsecured

5

Consenting Creditors shall reasonably consult with the Consenting EFH Creditors in connection with the EFH and EFIH corporate governance documents; provided, further, that only TCEH and the Consenting TCEH First Lien Creditors, and no other Restructuring Support Party, shall have consent rights over those documents pertaining exclusively to the Restructuring Transactions and Chapter 11 cases of the TCEH Debtors.  Additionally, each Consenting Non-Fidelity EFIH First Lien Noteholder shall have reasonable consent rights over all definitive documentation (and orders) in respect of the terms and conditions not otherwise addressed in the Term Sheet regarding each of the EFIH First Lien DIP Financing (and related orders), the Approval Motion, the Approval Order, the RSA Assumption Motion, and the RSA Assumption Order.  As used herein, the term "**Required Consenting Creditors**" means, at any relevant time:  (a) at least three (3) members of the Ad Hoc TCEH Committee who collectively hold at least 50.1% of the TCEH First Lien Claims held by the members of the Ad Hoc TCEH Committee (the "**Consenting Ad Hoc TCEH Committee**"); (b) Consenting Creditors holding at least 50.1% of the EFIH First Lien Note Claims held by all Consenting Creditors; (c) Consenting Creditors holding at least 50.1% of the EFIH Second Lien Note Claims held by all Consenting Creditors; (d) Consenting Creditors holding at least 50.1% of the EFH Unsecured Note Claims held by all Consenting Creditors; and (e) at least three (3) investment advisors that manage and/or advise funds or accounts that beneficially own, collectively, at least 66.67% of the EFH Unsecured Note Claims held by all Consenting Creditors (the "**Required EFIH Unsecured Consenting Creditors**").

**Section 4.**    *Commitments Regarding the Restructuring Transactions.*

    4.01.    Commitment of the Consenting Creditors.

    (a)    During the period beginning on the Agreement Effective Date and ending on a Termination Date (as defined in Section 8.11) (such period, the "**Effective Period**"):

        (i)    each of the Consenting Creditors that is entitled to accept or reject the Plan pursuant to its terms agrees that it shall, subject to the receipt by such Consenting Creditor of the Disclosure Statement and the Solicitation Materials, in each case, approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code:

        (A)    to the extent a class of claims is permitted to vote to accept or reject the Plan, vote each of its claims (including each of its TCEH First Lien Claims, EFIH Unsecured Note Claims, EFH Unsecured Note Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, the Notes Claims, the TCEH DIP Claims, the EFIH First Lien DIP Claims, the EFIH Second Lien DIP Claims, and any other claims against the applicable Debtor) (such Claims, together with the EFH Interests, the Texas Holdings Interests, and the TEF Interests, collectively, the "**Debtor Claims/Interests**") to accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan on a timely basis following the commencement of the solicitation and its actual receipt of the Solicitation Materials and ballot; and

        (B)    not change or withdraw (or cause to be changed or withdrawn) such vote;

6

(ii)     each Consenting Creditor further agrees that it shall not directly or indirectly (A) object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions, (B) propose, file, support, or vote for any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors other than the Restructuring Transactions, or (C) direct the Agents[5] (as applicable) to take any action contemplated in (A) and (B) of this Section 4.01(a)(ii); provided, however, that to the extent a Consenting Creditor directs the Agents (as applicable) not to take an action contemplated in (A) and (B) of this Section 4.01(a)(ii), such direction shall not be construed in any way as requiring any Consenting Creditor to provide an indemnity to the applicable Agent, or to incur or potentially incur any other liability, in connection with such direction; and

(iii)     upon the commencement by the Debtors of the Chapter 11 Cases, and subject to Section 8.12, the automatic stay is invoked and each Consenting Creditor agrees that, except to the extent expressly contemplated under the Plan and this Agreement, it will not, and will not direct the Agents (as applicable) to, exercise any right or remedy for the enforcement, collection, or recovery of any of the Debtor Claims/Interests, and any other claims against any direct or indirect subsidiaries of the Debtors that are not Debtors; provided, however, that to the extent a Consenting Creditor directs the Agents (as applicable) to not take any action contemplated in the foregoing provision, such direction shall not be construed in any way as requiring any Consenting Creditor to provide an indemnity to the applicable Agent, or to incur or potentially incur any other liability, in connection with such direction; provided, further, however, that for the avoidance of doubt, upon (A) the termination of this Agreement or (B) termination of the automatic stay as to property or interests in property which secure any such claims upon motion by a person or entity other than a Consenting Creditor, each Consenting

---

[5]     For purposes of the Agreement, the term "**Agent**" means any of the following (and each of their respective successors and assigns): (a) Citibank, N.A., in its capacity as: (i) administrative agent under the TCEH Credit Agreement; (ii) administrative and collateral agent with respect to certain TCEH First Lien Claims pursuant to the Amended and Restated Collateral Agency and Intercreditor Agreement, dated as of August 7, 2009 (as may be amended, restated, or supplemented); and (iii) senior collateral agent and representative with respect to certain TCEH First and Second Lien Claims pursuant to the Second Lien Intercreditor Agreement, dated as of October 6, 2010 (as may be amended, restated, or supplemented, the "**TCEH Second Lien Intercreditor Agreement**"); (b) The Bank of New York Mellon Trust Company, N.A., in its capacity as: (i) collateral trustee with respect to certain EFIH Second Lien Notes Claims pursuant to the Collateral Trust Agreement (as may be amended, restated or supplemented); (ii) indenture trustee with respect to certain EFIH Senior Toggle Note Claims pursuant to the EFIH Senior Toggle Note Indenture; (iii) indenture trustee with respect to certain EFIH Unexchanged Note Claims pursuant to the EFIH Unexchanged Note Indenture; (iv) indenture trustee with respect to certain TCEH First Lien Note Claims pursuant to the TCEH First Lien Note Indenture; (v) EFH Notes Trustee; (vi) EFH LBO Notes Trustee; (vii) indenture trustee with respect to certain EFIH Second Lien Note Claims; and (viii) initial second priority representative under the TCEH Second Lien Intercreditor Agreement; (c) CSC Trust Company of Delaware in its capacity as: (i) collateral trustee with respect to certain EFIH First Lien Note Claims pursuant to the Collateral Trust Agreement (as may be amended, restated, or supplemented); (ii) collateral trustee with respect to certain EFIH First Lien Note Claims pursuant to that certain junior lien pledge agreement, dated as of April 25, 2011 (as may be amended, restated or supplemented); and (iii) indenture trustee with respect to certain EFIH First Lien Note Claims; (d) Wilmington Savings Fund Society, FSB, in its capacity as indenture trustee with respect to certain TCEH Second Lien Note Claims; (e) Law Debenture Trust Company of New York, in its capacity as indenture trustee with respect to certain TCEH Unsecured Note Claims; and (f) UMB Bank, N.A., in its capacity as: (i) indenture trustee with respect to certain EFIH Senior Toggle Note Claims pursuant to the EFIH Senior Toggle Note Indenture; and (ii) indenture trustee with respect to certain EFIH Unexchanged Note Claims pursuant to the EFIH Unexchanged Note Indenture.

7

Creditor may, after notifying counsel to the Debtors in accordance with Section 11.11(a), exercise such right or remedy.

(b)     The foregoing sub-clause (a) of this Section 4 will not limit any of the following Consenting Creditor rights, to the extent consistent with this Agreement:

(i)     to appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and do not hinder, delay, or prevent consummation of the Restructuring Transactions;

(ii)     under any applicable credit agreement, indenture, other loan document or applicable law; or

(iii)     to take or direct any action relating to maintenance, protection, or preservation of any collateral.

(c)     (i) It shall not be a violation of this Agreement, and no Restructuring Support Party will assert that it is an "Event of Default" under the TCEH Cash Collateral Order, if the Ad Hoc TCEH Committee or any of its members, within the Challenge Period (as defined in the TCEH Cash Collateral Order), seeks standing to commence, and if granted standing, assert and prosecute any Claims, objections or other Causes of Action relating to the validity, allowability, enforceability, priority, avoidance, or subordination of the TCEH 2012 Incremental Term Loans or the liens and security interests that secure the TCEH 2012 Incremental Term Loans (other than against the holders of EFH Interests, the Debtors' directors, the Debtors' officers, and each of their respective affiliates), and (ii) if any Consenting Creditor(s) (or the Claims beneficially held by such Consenting Creditor) or Consenting Interest Holder(s) becomes the subject of any Cause of Action commenced, or for which court authority is requested to commence, including in respect of any Cause of Action set forth in clause (i) above, by any other person in connection with these Chapter 11 Cases or related to the Debtors, then such Consenting Creditors or Consenting Interest Holder(s) shall be entitled to assert (or seek authority to assert) and prosecute any and all defenses, counterclaims, cross-complaints, cross-claims, and other claims relating in any way to such Cause of Action (other than against the holders of EFH Interests, the Debtors' directors, the Debtors' officers, and each of their respective affiliates) (such Claims, objections, or other Causes of Action described in this Section 4.01(c), a "**Permitted Cause of Action**").

4.02.     Commitment of the Consenting Interest Holders.

(a)     During the Effective Period, each of the Consenting Interest Holders agrees that it shall not, directly or indirectly, (i) object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions or (ii) propose, file, support, or vote for any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors other than the Restructuring Transactions.

(b)     Each Consenting Interest Holder agrees to (i) support and take all necessary steps to effectuate the Restructuring Transactions, including timely providing all requisite consents and approvals as required in order for the Debtors to file for relief under chapter 11 of the Bankruptcy Code under that certain Amended and Restated Limited Liability Company

8

Agreement of Texas Energy Future Capital Holdings LLC, dated as of October 10, 2007, by and among the parties thereto and (ii)(A) to the extent it is entitled to accept or reject the Plan pursuant to its terms that it shall, subject to the receipt by such Consenting Interest Holder of the Disclosure Statement and the Solicitation Materials, in each case, approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code, vote to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation and its actual receipt of the Solicitation Materials and ballot, and (B) not change or withdraw (or cause to be changed or withdrawn) such vote.

(c)    The foregoing sub-clause (a) and sub-clause (b) of this Section 4.02 will not limit any Consenting Interest Holder's rights to appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with the Restructuring Transactions and do not hinder, delay, or prevent consummation of the Restructuring Transactions.

4.03.    Commitment of the Debtors.

(a)    During the Effective Period and thereafter as required pursuant to clause (viii) below, the Debtors shall: (i) take all steps necessary or desirable to obtain orders of the Bankruptcy Court in respect of the Restructuring Transactions, including obtaining entry of the Confirmation Order; (ii) support and take all steps reasonably necessary or desirable to consummate the Restructuring Transactions in accordance with this Agreement, including the preparation and filing within the time-frame provided herein of the Plan Restructuring Documents; (iii) execute and deliver any other required agreements to effectuate and consummate the Restructuring Transactions; (iv) obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions; (v) complete the Restructuring Transactions within the time-frame provided herein; (vi) operate their business in the ordinary course, taking into account the Restructuring Transactions; (vii) not object to, delay, impede, or take any other action that is materially inconsistent with, or is intended or is likely to interfere in a material way with acceptance or implementation of the Restructuring Transactions; (viii) report income items to Consenting Creditors in a manner consistent with past practice; and (ix) file the Trading Motion at a time to be mutually agreed upon by the Debtors and the Required Consenting Creditors.

(b)    The Debtors represent and warrant to the Consenting Creditors and the Consenting Interest Holders that there are no pending agreements (oral or written) or understandings, with respect to any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests or restructuring (other than the Restructuring Transactions) involving the Debtors, or any of their assets, properties or businesses (an "**Alternative Proposal**"). If the Debtors make or receive a written proposal or expression of interest regarding an Alternative Proposal, the Debtors shall promptly notify counsel to the Consenting Creditors and the Consenting Interest Holders of the receipt of any such proposal or expression of interest relating to an Alternative Proposal, with such notice to include the material terms thereof, including (unless prohibited by a separate agreement) the identity of the person or group of persons involved. The Debtors shall promptly furnish counsel

9

to the Consenting Creditors and the Consenting Interest Holders with copies of any written offer or other information that they make or receive relating to an Alternative Proposal and shall keep counsel to the Consenting Creditors and the Consenting Interest Holders fully informed of any material changes to such Alternative Proposal.    The Debtors shall not enter into any confidentiality agreement with a party proposing an Alternative Proposal unless such party consents to identifying and providing to counsel to the Consenting Creditors and the Consenting Interest Holders (under a reasonably acceptable confidentiality agreement) the information contemplated under this Section 4.03(b).

      (c)     Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the board of directors, board of managers, or such similar governing body of a Debtor to take any action, or to refrain from taking any action, with respect to the Restructuring Transactions to the extent such board of directors, board of managers, or such similar governing body determines, based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

      4.04.   <u>Transfer of Interests and Securities</u>.

      (a)     During the Effective Period, no Consenting Interest Holder or Consenting Creditor shall sell, use, pledge, assign, transfer, permit the participation in, or otherwise dispose of (each, a "**Transfer**") any ownership (including any beneficial ownership)[6] in the Debtor Claims/Interests unless it satisfies all of the following requirements (a transferee that satisfies such requirements, a "**Permitted Transferee**," and such Transfer, a "**Permitted Transfer**"):

          (i)     the intended transferee executes and delivers to counsel to the Debtors on the terms set forth below an executed form of the transfer agreement in the form attached hereto as **Exhibit D** (a "**Transfer Agreement**") before such Transfer is effective (it being understood that any Transfer shall not be effective as against the Debtors until notification of such Transfer and a copy of the executed Transfer Agreement is received by counsel to the Debtors, in each case, on the terms set forth herein); and

          (ii)     the intended transferee, the intended transferee's affiliates, and/or any unaffiliated third-party in which the intended transferee has a beneficial ownership, or any group of persons acting pursuant to a plan or arrangement as described in Treasury Regulation Section 1.355-6(c)(4) (provided, however, that for purposes of this Section 4.04(a)(ii), none of the Consenting Interest Holders or Consenting Creditors will be treated as acting pursuant to a plan or arrangement as a result of participating in the Plan and Restructuring Transactions), will not, after giving effect to such Transfer, (A) have beneficial ownership of, in the aggregate, fifty percent (50%) or more of TCEH First Lien Claims, EFIH Second Lien DIP Claims, or the Texas Holdings Interests or TEF Interests or (B) have, assuming the Restructuring Transactions were to be consummated immediately upon such Transfer, beneficial ownership of, in the aggregate,

---

[6]    As used herein, the term "<u>**beneficial ownership**</u>" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Debtor Claims/Interests or the right to acquire such Claims or Interests.

10

fifty percent (50%) or more of the Reorganized TCEH Common Stock, the Reorganized EFH Common Stock, or the Texas Holdings Interests or TEF Interests.

(b)    [Reserved.]

(c)    Notwithstanding anything to the contrary herein, (i) the foregoing provisions shall not preclude any Consenting Creditor from settling or delivering securities or bank debt to settle any confirmed transaction pending as of the date of such Consenting Creditor's entry into this Agreement (subject to compliance with applicable securities laws and it being understood that such Debtor Claims/Interests so acquired and held (i.e., not as a part of a short transaction) shall be subject to the terms of this Agreement), and (ii) a Qualified Marketmaker[7] (as defined below) that acquires any of the Debtor Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Debtors Claims/Interests, shall not be required to execute and deliver to counsel a Transfer Agreement or otherwise agree to be bound by the terms and conditions set forth in this Agreement if such Qualified Marketmaker transfers such Debtor Claims/Interests (by purchase, sale, assignment, participation, or otherwise) within five (5) business days of its acquisition to a Consenting Interest Holder, Consenting Creditor, or Permitted Transferee (including, for the avoidance of doubt, the requirement that such transferee execute a Transfer Agreement) and the transfer otherwise is a Permitted Transfer.

(d)    This Agreement shall in no way be construed to preclude the Consenting Interest Holders or Consenting Creditors from acquiring additional Debtor Claims/Interests; provided, however, that (i) any Consenting Interest Holder or Consenting Creditor that acquires additional Debtor Claims/Interests, as applicable, after the Agreement Effective Date shall promptly notify the Debtors of such acquisition including the amount of such acquisition and (ii) such acquired Debtor Claims/Interests shall automatically and immediately upon acquisition by a Consenting Creditor or Consenting Interest Holder, as applicable, be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to the Debtors).

(e)    This Section 4.04 shall not impose any obligation on any Debtor to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Interest Holder or Consenting Creditor to Transfer any Debtor Claims/Interests. Notwithstanding anything to the contrary herein, to the extent the Debtors and another Party have entered into a separate agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information in connection with any proposed Restructuring Transactions (each such executed agreement, a "**Confidentiality Agreement**"), the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms.

---

[7]    As used herein, the term "**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims of the Debtors (or enter with customers into long and short positions in claims against the Debtors), in its capacity as a dealer or market maker in claims against the Debtors and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

(f)    Notwithstanding anything to the contrary herein: (i) following the funding in full of the EFIH First Lien DIP Financing, the Transfer of EFIH First Lien DIP Claims shall not be subject to this Section 4.04, but shall be subject only to the definitive documentation governing the EFIH First Lien DIP Financing; and (ii) each Consenting Non-Fidelity EFIH First Lien Noteholder and any funds managed by each Consenting Non-Fidelity EFIH First Lien Noteholder shall be bound by the transfer restrictions in this Section 4.04 only in respect of their EFIH First Lien Note Claims.

(g)    Any Transfer made in violation of this Sections 4.04 shall be void *ab initio*. Any Consenting Interest Holder or Consenting Creditor that effectuates a Permitted Transfer to a Permitted Transferee shall have no liability under this Agreement arising from or related to the failure of the Permitted Transferee to comply with the terms of this Agreement.

4.05.    Representations and Warranties of Consenting Interest Holders and Consenting Creditors. Each Consenting Creditor and Consenting Interest Holder, severally, and not jointly, represents and warrants that:

(a)    it is the beneficial owner of the face amount of the Debtor Claims/Interests, or is the nominee, investment manager, or advisor for beneficial holders of the Debtor Claims/Interests, as reflected in such Consenting Creditor's and/or Consenting Interest Holder's signature block to this Agreement, which amount each Party understands and acknowledges is proprietary and confidential to such Consenting Creditor and/or Consenting Interest Holder (such Debtor Claims/Interests, the "**Owned Debtor Claims/Interests**");

(b)    other than with respect to a Consenting Non-Fidelity EFIH First Lien Noteholder, it will not beneficially or legally own, either directly or indirectly through its affiliates (but excluding any affiliates that are subject to an internal ethical wall or screen), any unaffiliated third parties in which it may hold a direct or indirect beneficial interest, or as part of any group of persons acting pursuant to a plan or arrangement as described in Treasury Regulation Section 1.355-6(c)(4), provided, however, that for purposes of this Section 4.04(a)(ii), none of the Consenting Interest Holders or Consenting Creditors will be treated as acting pursuant to a plan or arrangement as a result of participating in the Plan and Restructuring Transactions), in the aggregate, fifty percent (50%) or more of (A) TCEH First Lien Claims, EFIH Second Lien DIP Claims, or the Texas Holdings Interests or TEF Interests or (B) the Reorganized TCEH Common Stock, the Reorganized EFH Common Stock, or the Texas Holdings Interests or TEF Interests;

(c)    it has the full power and authority to act on behalf of, vote and consent to matters concerning the Owned Debtor Claims/Interests;

(d)    the Owned Debtor Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Creditor's or Consenting Interest Holder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(e)    (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act or (B) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or

12

(7) under the Securities Act of 1933, as amended (the "**Securities Act**") (C) a Regulation S non-U.S. person or (D) the foreign equivalent of (A) or (B) above, and (ii) any securities of any Debtor acquired by the applicable Consenting Creditor or Consenting Interest Holder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act; and

(f)    as of the date hereof, it has no actual knowledge of any event that, due to any fiduciary or similar duty to any other person or entity, would prevent it from taking any action required of it under this Agreement.

**Section 5.**    *Mutual Representations, Warranties, and Covenants.*  Each of the Parties represents, warrants, and covenants to each other Party:

5.01.    Enforceability.  It is validly existing and in good standing under the laws of the state of its organization, and this Agreement (and, to the extent applicable, the Commitment Letter) is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

5.02.    No Consent or Approval.  Except as expressly provided in this Agreement, the Plan, the Term Sheet, the Commitment Letter, or the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform the respective obligations under, this Agreement (and, to the extent applicable, the Commitment Letter).

5.03.    Power and Authority.  Except as expressly provided in this Agreement, it has all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement (and, to the extent applicable, the Commitment Letter) and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement (and, to the extent applicable, the Commitment Letter).

5.04.    Governmental Consents.  Except as expressly set forth herein and with respect to the Debtors' performance of this Agreement (and subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Restructuring Transactions), the execution, delivery and performance by it of this Agreement does not, and shall not, require any registration or filing with consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body.

5.05.    No Conflicts.  The execution, delivery, and performance of this Agreement does not and shall not: (a) violate any provision of law, rules or regulations applicable to it or any of its subsidiaries in any material respect; (b) violate its certificate of incorporation, bylaws, or other organizational documents or those of any of its subsidiaries; or (c) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any contractual obligation to which it is a party, which conflict, breach, or default, would have a material adverse effect on the Restructuring Transactions.

**Section 6.**    *Acknowledgement.*  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes

13

for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code. The Debtors will not solicit acceptances of any Plan from Consenting Creditors or Consenting Interest Holders in any manner inconsistent with the Bankruptcy Code or applicable bankruptcy law.

**Section 7.**    *Certain Additional Chapter 11 Matters.*

7.01.    The Required Consenting Creditors shall have reviewed, commented on, and consented to the first-day pleadings identified on **Schedule 3** attached hereto (the "**First Day Pleadings**"). Additionally, during the Effective Period, the Debtors will use reasonable efforts to provide: (i) draft copies of all material motions, pleadings and other documents other than the First Day Pleadings (including the IRS Submissions) that the Debtors intend to file with any court or regulatory body (including, the Bankruptcy Court and the IRS) relating to the Chapter 11 Cases or the Restructuring Transactions to counsel to the Consenting Interest Holders and counsel to the Consenting Creditors at least two (2) business days before the date on which Debtors intend to file any such document; and (ii) copies of all documents actually filed by the Debtors with any court or regulatory body (including the Bankruptcy Court and the IRS) relating to the Chapter 11 Cases or the Restructuring Transactions to counsel to the Consenting Interest Holders and counsel to the Consenting Creditors promptly but not later than two (2) business days after such motions, pleadings, and other documents are filed; provided, however, that the Debtors will provide draft copies of all Plan Restructuring Documents to the Required Consenting Creditors three (3) business days before the date on which the Debtors intend to file such documents. To the extent such documents do not constitute Plan Restructuring Documents (which shall be consistent with Section 3), the Debtors shall consult in good faith with counsel to the Restructuring Support Parties regarding the form and substance of those documents.

7.02.    The Commitment Parties shall coordinate with Oncor Electric Delivery to obtain any necessary regulatory approvals from the Public Utility Commission of Texas related to the change in equity ownership at EFH ("**PUC Regulatory Approval**"). EFH and EFIH shall cooperate as reasonably necessary to obtain the PUC Regulatory Approval; provided, however, that the TCEH Debtors shall not have any obligation to participate in the process to obtain the PUC Regulatory Approval or agree to any conditions affecting the TCEH Debtors; provided, further, that EFH, EFIH, and the Commitment Parties agree to use commercially reasonable efforts to obtain a preliminary order from the PUC limiting the scope of the PUC Regulatory Approval proceeding to issues related to Oncor and the change in equity ownership at EFH and excluding consideration of any issues relating to the TCEH Debtors.

**Section 8.**    *Termination Events.*

8.01.    Shared Consenting Creditor Termination Events. This Agreement may be terminated as between: (a) the Consenting TCEH First Lien Creditors and the other Parties, (b) the Consenting Fidelity EFIH First Lien Noteholders and the other Parties, (c) the Consenting EFIH Second Lien Noteholders and the other Parties, (d) the Consenting EFH Unsecured Noteholders and the other Parties, or (e) the Consenting EFIH Unsecured Noteholders and the other Parties, in each case, by the delivery to the Debtors, counsel to the Consenting Interest Holders, and counsel to the other Consenting Creditors, other than the Consenting Creditors

14

seeking to terminate this Agreement pursuant to this Section 8.01 (such Consenting Creditors, the "**Terminating Consenting Creditors**") of a written notice in accordance with Section 11.11 hereof by, as applicable: (i) the Consenting Ad Hoc TCEH Committee; (ii) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFIH First Lien Note Claims held by the Consenting Creditors at such time; (iii) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFIH Second Lien Note Claims held by the Consenting Creditors at such time; (iv) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFH Unsecured Notes Claims held by the Consenting Creditors at such time; or (v) the Required EFIH Unsecured Consenting Creditors, in each case, in the exercise of their discretion, upon the occurrence and continuation of any of the following events:

(a)    the Debtors shall not have commenced the Chapter 11 Cases on or before April 29, 2014;

(b)    the Debtors shall not have filed the RSA Assumption Motion with the Bankruptcy Court on or before the date that is seven (7) days from the Petition Date;

(c)    the Bankruptcy Court shall not have entered the RSA Assumption Order on or before the date that is forty-five (45) days from the Petition Date;

(d)    the Debtors shall not have submitted the Ruling Request in respect of the Private Letter Ruling (which shall, among other things, request the Required Rulings) or filed the Plan and Disclosure Statement with the Bankruptcy Court on or before the date that is forty-five (45) days from the Petition Date;

(e)    the Bankruptcy Court shall not have entered the Disclosure Statement Order on or before the date that is one-hundred and five (105) days from the Petition Date;

(f)    the Bankruptcy Court shall not have entered the Confirmation Order on or before the date that is two-hundred and seventy-five (275) days from the Petition Date;

(g)    the IRS shall not have issued a Private Letter Ruling acceptable to the Required Consenting Creditors on or prior to the Extended Outside Date;

(h)    the Bankruptcy Court otherwise grants relief that would have a material adverse effect on the Restructuring Transactions;

(i)    the effective date of the Plan (the "**Plan Effective Date**") shall not have occurred on or before the date that is thirty (30) days after the date that the Bankruptcy Court enters the Confirmation Order (the "**Initial Outside Date**"), it being understood that if all conditions to the Plan Effective Date other than receipt of any applicable regulatory approvals required to consummate the Plan and/or the Private Letter Ruling have been satisfied on or before the Initial Outside Date, the Initial Outside Date shall be automatically extended by an additional thirty (30) days (such extended date, the "**Extended Outside Date**");

15

(j)    the IRS shall have denied the Debtors' Ruling Request or shall have informed the Debtors or their counsel, whether orally or in writing, of its decision not to issue one or more of the Required Rulings;

(k)    the breach by any Party other than the Terminating Consenting Creditors of any of the representations, warranties, or covenants of such breaching Party as set forth in this Agreement that would have a material adverse effect on the Restructuring Transactions or the recovery of any Consenting Creditor; provided, however, (i) that such Terminating Consenting Creditors shall transmit a notice to the Debtors, counsel to the Consenting Interest Holders and counsel to the other Consenting Creditors pursuant to Section 11.11 hereof, detailing any such breach and (ii) any other Consenting Creditor may transmit a notice to any Party detailing a breach (while providing copies of such notice pursuant to Section 11.11 hereof) and, in either case,, if such breach is capable of being cured, the breaching Party shall have twenty (20) business days after receiving such notice to cure any breach;

(l)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling or order enjoining, the consummation of a material portion of the Restructuring Transactions or materially impacting the recovery of any Consenting Creditor; provided, however, that the Debtors shall have ten (10) business days after issuance of such injunction, judgment, decree, charge, ruling or order to obtain relief that would allow consummation of the Restructuring Transactions that (i) does not prevent or diminish in a material way compliance with the terms of this Agreement or (ii) is otherwise reasonably acceptable to the Required Consenting Creditors;

(m)    an examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), or a trustee or receiver shall have been appointed in one or more of the Chapter 11 Cases;

(n)    any Party other than the Terminating Consenting Creditors files any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with this Agreement and such motion or pleading has not been withdrawn or is not otherwise denied by the Bankruptcy Court within twenty (20) business days of receipt of notice by such party that such motion or pleading is inconsistent with this Agreement;

(o)    the termination of this Agreement by (i)(a) the Consenting TCEH First Lien Creditors, (b) the Consenting EFH Unsecured Noteholders, (c) the Consenting EFIH Unsecured Noteholders, or (d) the Consenting Interest Holders or (ii)(a) the Consenting Fidelity EFIH First Lien Noteholders or (b) the Consenting EFIH Second Lien Noteholders, provided, however, solely with respect to subsection (ii) hereof, only to the extent Fidelity does not agree to remain bound to the terms of this Agreement and/or does not subsequently agree to re-execute this Agreement;

(p)    the entry of a ruling or order by the Bankruptcy Court or any other court with appropriate jurisdiction which, in each case, would have the effect of preventing consummation of the Restructuring Transactions or materially impacting the recovery of any Consenting Creditor; provided, however, that the Debtors shall have ten (10) business days after issuance of such ruling or order to obtain relief that would (i) allow consummation of a material portion of

16

the Restructuring Transactions, (ii)remedy the recovery of such Consenting Creditor in a manner that does not prevent or diminish in a material way compliance with the terms of this Agreement, or (iii) is otherwise reasonably acceptable to the Required Consenting Creditors;

(q)    the (i) conversion of one or more of the Chapter 11 Cases of EFH, EFIH, TCEH, EFCH or any Debtor entity obligated under the TCEH First Lien Secured Claims, TCEH Second Lien Note Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, EFIH Unsecured Note Claims, or EFH Unsecured Note Claims to a case under chapter 7 of the Bankruptcy Code or (ii) dismissal of one or more of the Chapter 11 Cases of EFH, EFIH, TCEH, EFCH or any Debtor entity obligated under the TCEH First Lien Secured Claims, TCEH Second Lien Note Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, EFIH Unsecured Note Claims, or EFH Unsecured Note Claims unless such conversion or dismissal, as applicable, is made with the prior written consent of counsel to the Required Consenting Creditors;

(r)    any of the Plan Restructuring Documents shall have been modified in any material respect or withdrawn, without the prior written consent of the Required Consenting Creditors, subject to Section 3; or

(s)    the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material assets of the Debtors that would have a material adverse effect on the Restructuring Transactions, without the prior written consent of the Required Consenting Creditors.

8.02.    **EFIH Unsecured Noteholder, EFIH First Lien Noteholder, EFIH Second Lien Noteholder, and EFH Unsecured Noteholder Termination Events.** This Agreement may be terminated as between (a) the Consenting EFIH Unsecured Noteholders and the other Parties, (b) the Consenting Fidelity EFIH First Lien Noteholders and the other Parties, (c) the Consenting EFIH Second Lien Noteholders and the other Parties, and (d) the Consenting EFH Unsecured Creditors and the other Parties by the delivery to the Debtors, counsel to the Consenting Interest Holders, and counsel to the other Consenting Creditors, of a written notice in accordance with Section 11.11 hereof by, as applicable: (i) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFIH First Lien Note Claims held by the Consenting Creditors at such time; (ii) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFIH Second Lien Note Claims held by the Consenting Creditors at such time; (iii) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFH Unsecured Note Claims held by the Consenting Creditors at such time; or (iv) the Required EFIH Unsecured Consenting Creditors, in each case, in the exercise of their discretion, upon the occurrence and continuation of any of the following events:

(a)    the Debtors have not filed each of the EFIH First Lien DIP Motion, the EFIH Second Lien DIP Motion, and the Approval Motion on or before the date that is fourteen (14) days from the Petition Date;

(b)    the Bankruptcy Court shall not have entered each of the Approval Order, the order approving the EFIH First Lien DIP Motion (the "**EFIH First Lien DIP Order**"), and an order approving the EFIH Second Lien DIP Motion (the "**EFIH Second Lien DIP Order**") on or

17

before the date that is seventy-five (75) days from the Petition Date (it being understood that the Debtors will use commercially reasonable efforts to obtain entry of the EFIH First Lien DIP Order and the EFIH Second Lien DIP Order on or before the date that is forty-five (45) days from the Petition Date);

(c)    the Debtors shall not have consummated each of (i) the EFIH First Lien DIP Financing, (ii) the EFIH Second Lien DIP Financing, and (iii) the transactions and settlements contemplated by the Approval Order on or before the date that is five (5) business days after the date the EFIH First Lien DIP Order, the EFIH Second Lien DIP Order, and the Approval Order, as applicable, is entered; or

(d)    either the Commitment Letter or the Conversion Agreement is terminated according to its terms prior to consummation of the transactions contemplated therein.

8.03.    Consenting TCEH First Lien Holders' Termination Events. This Agreement may be terminated as between the Consenting TCEH First Lien Creditors and the other Parties by the delivery to the Debtors, counsel to the Consenting Interest Holders, and counsel to the other Consenting Creditors other than the Terminating Consenting Creditors of a written notice in accordance with Section 11.11 hereof by the Consenting Ad Hoc TCEH Committee, in the exercise of their sole discretion, upon the occurrence and continuation of any of an "Event of Default" under the TCEH Cash Collateral Order.

8.04.    Consenting Non-Fidelity EFIH First Lien Noteholders. This Agreement may be terminated as between a Consenting Non-Fidelity EFIH First Lien Noteholder and the Debtors by the delivery to the Debtors of a written notice in accordance with Section 11.11 hereof by such terminating Consenting Non-Fidelity EFIH First Lien Noteholder, in the exercise of its discretion, upon the occurrence and continuation of any of the following events:

(a)    the Debtors have not filed each of the EFIH First Lien DIP Motion and the Approval Motion on or before the date that is fourteen (14) days from the Petition Date;

(b)    the Bankruptcy Court shall not have entered each of the Approval Order and the EFIH First Lien DIP Order on or before the date that is seventy-five (75) days from the Petition Date;

(c)    the Debtors shall not have consummated each of (i) the EFIH First Lien DIP Financing, (ii) the transactions and settlements contemplated by the Approval Order on or before the date that is five (5) business days after the date the EFIH First Lien DIP Order and the Approval Order, as applicable, is entered;

(d)    the Bankruptcy Court otherwise grants relief on a final basis that would have a material adverse effect on the Restructuring Transactions;

(e)    the Plan Effective Date shall not have occurred on or before the Initial Outside Date, it being understood that if all conditions to the Plan Effective Date other than receipt of any applicable regulatory approvals required to consummate the Plan and/or the Private Letter Ruling have been satisfied or are capable of being satisfied on or before the Initial Outside Date, the Initial Outside Date shall be automatically extended to the Extended Outside Date;

18

(f)    the breach by any Party other than the Terminating Consenting Creditors of any of the representations, warranties, or covenants of such breaching Party as set forth in this Agreement that would have a material adverse effect on the Restructuring Transactions or the recovery of any Consenting Creditor; provided, however, (i) that such Terminating Consenting Creditors shall transmit a notice to the Debtors, counsel to the Consenting Interest Holders and counsel to the other Consenting Creditors pursuant to Section 11.11 hereof, detailing any such breach and (ii) any other Consenting Creditor may transmit a notice to any Party detailing a breach (while providing copies of such notice pursuant to Section 11.11 hereof) and, in either case,, if such breach is capable of being cured, the breaching Party shall have twenty (20) business days after receiving such notice to cure any breach;

(g)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling or order enjoining, the consummation of a material portion of the Restructuring Transactions; provided, however, that the Debtors shall have ten (10) business days after issuance of such injunction, judgment, decree, charge, ruling or order to obtain relief that would allow consummation of the Restructuring Transactions that (i) does not prevent or diminish in a material way compliance with the terms of this Agreement or (ii) is otherwise reasonably acceptable to the applicable Consenting Non-Fidelity EFIH First Lien Noteholder(s);

(h)    an examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), or a trustee or receiver shall have been appointed in one or more of the Chapter 11 Cases;

(i)    any Party other than the Terminating Consenting Creditors files any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with this Agreement and such motion or pleading has not been withdrawn or is not otherwise denied by the Bankruptcy Court within twenty (20) business days of receipt of notice by such party that such motion or pleading is inconsistent with this Agreement; or

(j)    the entry of a ruling or order by the Bankruptcy Court or any other court with appropriate jurisdiction which, in each case, would have the effect of preventing consummation of the Restructuring Transactions or materially impacting the recovery of any Consenting Non-Fidelity EFIH First Noteholder ; provided, however, that the Debtors shall have ten (10) business days after issuance of such ruling or order to obtain relief that would (i) allow consummation of a material portion of the Restructuring Transactions, (ii) remedy the recovery of such Consenting Non-Fidelity EFIH First Lien Noteholder in a manner that does not prevent or diminish in a material way compliance with the terms of this Agreement, or (iii) is otherwise reasonably acceptable to the applicable Consenting Non-Fidelity EFIH First Lien Noteholder(s).

19

PX 095
Page 248 of 464

8.05.  _Consenting Interest Holders Termination Events._  This Agreement may be terminated as between the Consenting Interest Holders and the other Parties by the delivery to the Debtors and counsel to the Consenting Creditors, of a written notice in accordance with Section 11.11 hereof by all of the undersigned holders of the Texas Holdings Interests and the TEF Interests, in the exercise of their discretion, upon the occurrence and continuation of any of the following events:

(a)  the Debtors shall not have commenced the Chapter 11 Cases on or before April 29, 2014;

(b)  the Plan Effective Date shall not have occurred by the Initial Outside Date or the Extended Outside Date, as applicable;

(c)  the breach by the Debtors of any of the representations, warranties, or covenants of the Debtors set forth in this Agreement that would have a material adverse effect on the Restructuring Transactions; provided, however, that (i) the Debtors shall undertake commercially reasonable efforts to provide the Consenting Interest Holders with prompt written notice of the occurrence of such breach and (ii) the Consenting Interest Holders may transmit a notice to the Debtor (detailing a breach (while providing copies of such notice to the Consenting Creditors pursuant to Section 11.11 hereof) and, in either case, if such breach is capable of being cured, the Debtors shall have ten (10) business days after the date of providing or receiving notice, as applicable, to cure any breach; or

(d)  the (i) conversion of one or more of the Chapter 11 Cases of EFH, EFIH, TCEH, EFCH or any Debtor entity obligated under the TCEH First Lien Secured Claims, TCEH Second Lien Note Claims, EFIH First Lien Note Claims, or EFIH Second Lien Note Claims to a case under chapter 7 of the Bankruptcy Code or (ii) dismissal of one or more of the Chapter 11 Cases of EFH, EFIH, TCEH, EFCH or any Debtor entity obligated under the TCEH First Lien Secured Claims, TCEH Second Lien Note Claims, EFIH First Lien Note Claims, or EFIH Second Lien Claims, unless such conversion or dismissal, as applicable, is made with the prior written consent of counsel to the Consenting Interest Holders.

8.06.  _Debtors' Termination Events._  Any Debtor may terminate this Agreement as to all Parties upon five (5) business days' prior written notice, delivered in accordance with Section 11.11 hereof, upon the occurrence of any of the following events: (a) the Plan Effective Date shall not have occurred by the Initial Outside Date or the Extended Outside Date, as applicable; (b) the breach by any of the Restructuring Support Parties of any material provision set forth in this Agreement that remains uncured for a period of fifteen (15) business days after the receipt by the Restructuring Support Parties of notice of such breach; (c) the board of directors, board of managers, or such similar governing body of any Debtor determines based on advice of counsel that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties; or (d) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order enjoining the consummation of a material portion of the Restructuring Transactions.

20

8.07. <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual agreement among all of the following: (a) each of the Consenting Interest Holders; (b) the Consenting Ad Hoc TCEH Committee; (c) Consenting Fidelity EFIH First Lien Noteholders holding at least 50.1% in principal amount of the aggregate amount of the EFIH First Lien Note Claims held by the Consenting Fidelity EFIH First Lien Noteholders at such time; (d) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFIH Second Lien Note Claims held by all Consenting Creditors at such time; (e) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFH Unsecured Note Claims held by the Consenting Creditors at such time; (f) the Required EFIH Unsecured Consenting Creditors; and (g) each of the Debtors.

8.08. <u>Termination Upon Completion of the Restructuring Transactions</u>. This Agreement shall terminate automatically without any further required action or notice on the Plan Effective Date.

8.09. <u>Individual Consenting Creditor Termination</u>. Notwithstanding anything to the contrary herein:

(a)    If the Plan Effective Date does not occur by the earlier of (1) the Extended Outside Date and (2) three hundred thirty-five (335) days from the Petition Date, then each Consenting Creditor may terminate its rights and obligations under this Agreement without affecting the other Parties' rights and obligations by providing notice of the same in accordance with Section 11.11 hereof.

(b)    If there are any changes to the terms of the TCEH Cash Collateral Order that have a material, disproportionate (as compared to other Consenting Creditors holding Claims within the same Class as provided for in the Term Sheet) and adverse effect on a Consenting Creditor without such Consenting Creditor's prior written consent, then such Consenting Creditor may terminate its rights and obligations under this Agreement without affecting the other Parties' rights and obligations by providing notice of the same in accordance with Section 11.11 hereof.

(c)    If the Plan (as it may be modified, amended or supplemented) includes terms in respect of the TCEH Incremental 2012 Term Loans that provide for a material, disproportionate (as compared to other Consenting Creditors holding Claims within the same Class as provided for in the Term Sheet) and adverse effect on any Consenting Creditor that beneficially holds the TCEH Incremental 2012 Term Loans (including, without limitation, any disparate treatment with respect to the releases granted under the Plan), then such Consenting Creditor may terminate its rights and obligations under this Agreement without affecting the other Parties hereto by providing notice of the same in accordance with Section 11.11 hereof.

(d)    If any person commences, or obtains standing to commence, a Permitted Cause of Action against a Consenting Creditor (or with respect to Claims beneficially held by such Consenting Creditor), then such Consenting Creditor may terminate its rights and obligations under this Agreement without affecting the other Parties' rights and obligations by providing notice of the same in accordance with Section 11.11 hereof.

21

**PX 095**
**Page 250 of 464**

8.10.    Fidelity Termination Events.    This Agreement may be terminated as between Fidelity and all Parties by the delivery to the Debtors, counsel to the Consenting Interest Holders, and counsel to the other Consenting Creditors, of a written notice in accordance with Section 11.11 hereof by Fidelity with respect to all Debtor Claims/Interests that Fidelity holds at such time, in the exercise of its discretion, upon the occurrence and continuation of any of the following events; provided, however, Fidelity shall not have the right to terminate this Agreement pursuant to this Section 8.10 if the Commitment Parties exercise their Call Right within ten (10) days of Fidelity's exercise of a termination right under this Section 8.10:

(a)    on the date that is ten (10) business days prior to the first day of the hearing for the Bankruptcy Court to approve entry of the Disclosure Statement Order (the "**Disclosure Statement Hearing**"), if the Debtors have notified Fidelity and all other Parties at least fifteen (15) days prior to the Disclosure Statement Hearing that the Debtors have determined in good faith that the recovery for the EFH Non-Guaranteed Notes is expected to be less than 37.15% (such notification, the "**EFH Minimum Recovery Notification**"); and

(b)    on the date that is ten (10) business days prior to the first day of the hearing for the Bankruptcy Court to approve entry of the Confirmation Order (the "**Confirmation Hearing**"), if (i) the Debtors did not make the EFH Minimum Recovery Notification and (ii) Fidelity notifies all other Parties at least ten (10) business days prior to the first day of the Confirmation Hearing that Fidelity has determined in good faith that the recovery for the EFH Non-Guaranteed Notes is expected to be less than 37.15%.

8.11.    Effect of Termination.    No Party may terminate this Agreement if such Party failed to perform or comply in all material respects with the terms and conditions of this Agreement, with such failure to perform or comply causing, or resulting in, the occurrence of one or more termination events specified herein.    The date on which termination of this Agreement as to a Party is effective in accordance with Sections 8.01, 8.02, 8.03, 8.04, 8.05, 8.06, 8.07, 8.08, 8.09, and 8.10 shall be referred to as a "**Termination Date**". Except as set forth below, upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement; provided, however, that the occurrence of a Termination Date as to a Party shall not affect the Debtors' obligations under Section 10 with respect to amounts accrued up to and including such Termination Date; provided, further, that Section 4.03(a)(viii) and Section 8.12 shall survive the termination of this Agreement. Upon the occurrence of a Termination Date, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise. Notwithstanding anything to the contrary in this Agreement or the Commitment Letter, the foregoing shall not be construed to prohibit the Debtors or any of the Restructuring Support Parties from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement or the Commitment Letter that arose or existed before a Termination Date. Except as expressly provided in this

22

Agreement (including as set forth in Section 8.12) , nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Debtor or the ability of any Debtor to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Interest Holder or Consenting Creditor, and (b) any right of any Consenting Interest Holder or Consenting Creditor, or the ability of any Consenting Interest Holder or Consenting Creditor to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Debtor, Consenting Interest Holder, or Consenting Creditor.  Nothing in this Section 8.09 shall restrict any Debtor's right to terminate this Agreement in accordance with Section 8.06(c).

      8.12.   <u>No Violation of Automatic Stay</u>.  The automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Restructuring Support Party from taking any action necessary to effectuate the termination of this Agreement pursuant to the terms hereof.

**Section 9.**    *Amendments*. This Agreement, including the Term Sheet and the Plan, may not be modified, amended, or supplemented in any manner except in writing signed by all of the following:  (a) the Consenting Interest Holders, (b) the Consenting Ad Hoc TCEH Committee; (c) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFH Unsecured Note Claims held at such time by the Consenting Creditors; (d) Consenting Fidelity EFIH First Lien Noteholders holding at least 50.1% in principal amount of the aggregate amount of the EFIH First Lien Note Claims held by all Consenting Fidelity First Lien Noteholders at such time; (e) Consenting Creditors holding at least 50.1% in principal amount of the aggregate of each of the EFIH Second Lien Note Claims at such time; (f) the Required EFIH Unsecured Consenting Creditors; (g) each applicable Consenting Non-Fidelity EFIH First Lien Noteholder(s); and (h) each of the Debtors; <u>provided, however</u>, that if the proposed modification, amendment or supplement has a material, disproportionate (as compared to other Consenting Creditors holding Claims within the same Class as provided for in the Term Sheet) and adverse effect on any of the Restructuring Support Parties or the Claims held by such Restructuring Support Parties (including any disparate treatment with respect to the releases granted under the Plan), then the consent of each such affected Restructuring Support Party shall also be required to effectuate such modification, amendment or supplement; <u>provided, further, however</u>, that Section 8.09 and Section 9 shall not be amended without the consent of each Consenting Creditor. Any proposed modification, amendment, or supplement that is not approved by the requisite Parties as set forth above shall be ineffective and void *ab initio*.

**Section 10.**    *Fees and Expenses*. Subject to Section 8.11, the Debtors shall pay or reimburse when due the following reasonable and documented professional fees and expenses:  (a)(i) one (1) primary counsel, one (1) local counsel, one (1) regulatory counsel, one (1) financial advisor, one (1) tax advisor, and one (1) technical and market advisor for, on a collective basis, all Consenting TCEH First Lien Creditors and (ii) the professionals identified on **Schedule 2** attached hereto, in each case, upon the Bankruptcy Court's entry of the RSA Assumption Order; (b) one (1) primary counsel, one (1) local counsel, one (1) regulatory counsel, one (1) tax advisor, and one (1) financial advisor for, on a collective basis, all Consenting EFIH Unsecured Noteholders, upon the Bankruptcy Court's entry of the earlier of the Approval Order and the RSA Assumption Order; (c) one (1) primary counsel, one (1) local counsel, one (1) regulatory counsel, and one (1) financial advisor for, on a collective basis, all Consenting EFH Unsecured Noteholders, Consenting Fidelity EFIH First Lien Noteholders (in connection with EFH

23

Unsecured Note Claims, EFIH First Lien Note Claims, and EFIH Second Lien Note Claims beneficially owned by Fidelity) upon the Bankruptcy Court's entry of the earlier of the Approval Order and the RSA Assumption Order; (d) one (1) primary counsel and one (1) local counsel for each of the Consenting Non-Fidelity EFIH First Lien Noteholders that are a Party as of the Agreement Effective Date; and (e) one (1) primary counsel, one (1) local counsel, one (1) regulatory counsel, and one (1) financial advisor for, on a collective basis, all Consenting Interest Holders upon the occurrence of the Plan Effective Date. Additionally, EFIH may, in its reasonable discretion, pay the reasonable and documented fees and expenses of professionals retained by Consenting Non-Fidelity EFIH First Lien Noteholders that become a Party after the Agreement Effective Date. Fees and expenses described in this Section 10 shall be allocated as described in the Term Sheet.

**Section 11.**    *Miscellaneous.*

11.01. Further Assurances. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

11.02. Service on an Official Committee. Notwithstanding anything herein to the contrary, if an official committee is appointed in the Chapter 11 Cases and a Consenting Creditor is appointed to and serves on such official committee, then the terms of this Agreement shall not be construed to limit such Consenting Creditor's exercise of its fiduciary duties in its role as a member of such committee; provided, however, that serving as a member of such committee shall not relieve the Consenting Creditor of any obligations under this Agreement; provided, further, that nothing in the Agreement shall be construed as requiring any Consenting Creditor to serve on any official committee in these Chapter 11 Cases.

11.03. Complete Agreement. This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto.

11.04. Headings. The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

11.05. GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF DELAWARE APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in either the United States District Court for the District of Delaware or any Delaware State court (the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or

24

proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto; provided, however, that if the Debtors commence the Chapter 11 Cases, then the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive Chosen Court.

11.06. Confidentiality; Disclosure. The Debtors shall keep strictly confidential and shall not, without the prior written consent of the applicable Consenting Creditor, disclose publicly, or to any person (including any Restructuring Support Party) (a) the holdings of any Consenting Creditor, including the principal amount of TCEH First Lien Claims, EFIH Unsecured Note Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, and EFH Unsecured Note Claims and any other claims held against the applicable Debtor or (b) the identity of any Consenting Creditor or its controlled affiliates, officers, directors, managers, stockholders, members, employees, partners, representatives or agents as a party to this Agreement, in any public manner, including in the Solicitation Materials, the Plan, or any related press release; provided, however, that (x) the Debtors may disclose such names or amounts to the extent that, upon the advice of counsel, it is required to do so by any governmental or regulatory authority (including federal securities laws and regulations), in which case the Debtors, prior to making such disclosure, shall allow the Consenting Creditor to whom such disclosure relates reasonable time at its own cost to seek a protective order with respect to such disclosures, and (y) the Debtors may disclose the aggregate percentage or aggregate principal amount of (i) outstanding TEF Interests; (ii) outstanding Texas Holdings Interests; (iii) TCEH Credit Agreement Claims; (iv) TCEH First Lien Notes; (v) TCEH First Lien Commodity Hedges; (vi) TCEH First Lien Interest Rate Swaps; (vii) EFIH First Lien Notes; (viii) EFIH Second Lien Notes; (ix) EFIH Unsecured Notes; and (x) EFH Unsecured Note Claims held by the Consenting Creditors (without naming such Consenting Creditors). No Consenting Creditor or Consenting Interest Holder shall, without the prior written consent of the Debtors, make any public announcement or otherwise communicate (other than to decline to comment) with any person with respect to Restructuring Transactions or any of the transactions contemplated hereby or thereby, other than as may be required by applicable law and regulation or by any governmental or regulatory authority. This Section 11.06 shall not apply with respect to any information that is or becomes available to the public other than as a result of a disclosure in violation of any Party's obligations under this Agreement.

11.07. Trial by Jury Waiver. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.08. Execution of Agreement. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

11.09. Interpretation and Rules of Construction. This Agreement is the product of negotiations among the Debtors, the Consenting Interest Holders, and the Consenting Creditors,

25

and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Debtors, the Consenting Interest Holders, and the Consenting Creditors were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel. In addition, this Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.

11.10. <u>Successors and Assigns</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

11.11. <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Debtor, to:

Energy Future Holdings Corp., *et al.*
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201
Attention: General Counsel
E-mail address: stacey.dore@energyfutureholdings.com; and
andrew.wright@energyfutureholdings.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Richard M. Cieri, Edward O. Sassower, P.C., Stephen E. Hessler, and
Brian E. Schartz
E-mail addresses: rcieri@kirkland.com, esassower@kirkland.com,
shessler@kirkland.com, and bschartz@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention: Chad J. Husnick and Steven N. Serajeddini
E-mail address: chusnick@kirkland.com and steven.serajeddini@kirkland.com

(b)     if to a Consenting Interest Holder, to:

26

Wachtell Lipton Rosen & Katz
51 W. 52nd Street
New York, New York 10019
Attention: Richard G. Mason and Austin T. Witt
E-mail addresses: rgmason@wlrk.com and awitt@wlrk.com

(c)    if to a Consenting TCEH First Lien Lender, Consenting TCEH First Lien Noteholder, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention: Alan W. Kornberg, Brian S. Hermann, and Jacob A. Adlerstein
E-mail addresses: akornberg@paulweiss.com, bhermann@paulweiss.com, and jadlerstein@paulweiss.com

(d)    if to a Consenting EFIH Unsecured Noteholder, to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, New York 10036
Attention: Ira S. Dizengoff and Scott L. Alberino
E-mail addresses: idizengoff@akingump.com and salberino@akingump.com

(e)    if to a Consenting Fidelity EFIH First Lien Noteholder, Consenting EFIH Second Lien Noteholder, Consenting EFH Unsecured Noteholder (each in connection with EFH Unsecured Note Claims, EFIH First Lien Note Claims and EFIH Second Lien Note Claims beneficially owned by Fidelity), to:

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004
Attention: Brad Eric Scheler, Gary L. Kaplan, and Matthew Roose
E-mail addresses: brad.scheler@friedfrank.com, gary.kaplan@friedfrank.com, and matthew.roose@friedfrank.com

(f)    if to a Consenting Non-Fidelity EFIH First Lien Noteholder, to:

Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022-4689
Attention: Jeffrey S. Sabin
E-mail address: jeffrey.sabin@bingham.com

and

27

Bingham McCutchen LLP
One Federal Street
Boston, Massachussetts 02110-1726
Attention:  Julia Frost-Davies
E-mail address:  julia.frost-davies@bingham.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.

Any notice given by delivery, mail, or courier shall be effective when received.

11.12.  Access.  The Debtors will provide the Restructuring Support Parties and their respective attorneys, consultants, accountants, and other authorized representatives reasonable access, upon reasonable notice during normal business hours, to relevant properties, books, contracts, commitments, records, management personnel, lenders, and advisors of the Debtors; provided, however, that the Debtors' obligation hereunder shall be conditioned upon such Plan Support Party being party to an executed Confidentiality Agreement with the Debtors.

11.13.  Independent Due Diligence and Decision Making.  Each Consenting Party hereby confirms that its decision to execute this agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Debtors.

11.14.  Waiver.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring Transactions, or the payment of damages to which a Party may be entitled under this Agreement.

11.15.  Specific Performance.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

11.16.  Several, Not Joint, Claims.  The agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

11.17.  Severability and Construction.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

28

11.18. <u>Remedies Cumulative</u>.    All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

*[Remainder of page intentionally left blank.]*

29

**PX 095**
**Page 258 of 464**

**Debtor Signature Page to the Plan Support and Lock-Up Agreement**

ENERGY FUTURE HOLDINGS CORP.
TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC
4CHANGE ENERGY COMPANY
4CHANGE ENERGY HOLDINGS LLC
BIG BROWN 3 POWER COMPANY LLC
BIG BROWN LIGNITE COMPANY LLC
BIG BROWN POWER COMPANY LLC
BRIGHTEN ENERGY LLC
BRIGHTEN HOLDINGS LLC
COLLIN POWER COMPANY LLC
DALLAS POWER AND LIGHT COMPANY, INC.
DECORDOVA POWER COMPANY LLC
DECORDOVA II POWER COMPANY LLC
EAGLE MOUNTAIN POWER COMPANY LLC
EEC HOLDINGS, INC.
EECI, INC.
EFH AUSTRALIA (NO. 2) HOLDINGS COMPANY
EFH CORPORATE SERVICES COMPANY
EFH FINANCE (NO. 2) HOLDINGS COMPANY
EFH FS HOLDINGS COMPANY
EFH RENEWABLES COMPANY LLC
EFIH FINANCE INC.
ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC
ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC
GENERATION DEVELOPMENT COMPANY LLC
GENERATION MT COMPANY LLC
GENERATION SVC COMPANY
LAKE CREEK 3 POWER COMPANY LLC
LONE STAR ENERGY COMPANY, INC.
LONE STAR PIPELINE COMPANY, INC.
LSGT GAS COMPANY LLC
LSGT SACROC, INC.
LUMINANT BIG BROWN MINING COMPANY LLC
LUMINANT ENERGY COMPANY LLC
LUMINANT ENERGY TRADING CALIFORNIA COMPANY
LUMINANT ET SERVICES COMPANY
LUMINANT GENERATION COMPANY LLC
LUMINANT HOLDING COMPANY LLC
LUMINANT MINERAL DEVELOPMENT COMPANY LLC
LUMINANT MINING COMPANY LLC
LUMINANT RENEWABLES COMPANY LLC
MARTIN LAKE 4 POWER COMPANY LLC
MONTICELLO 4 POWER COMPANY LLC
MORGAN CREEK 7 POWER COMPANY LLC

NCA DEVELOPMENT COMPANY LLC
NCA RESOURCES DEVELOPMENT COMPANY LLC
OAK GROVE MANAGEMENT COMPANY LLC
OAK GROVE MINING COMPANY LLC
OAK GROVE POWER COMPANY LLC
SANDOW POWER COMPANY LLC
SOUTHWESTERN ELECTRIC SERVICE COMPANY, INC.
TCEH FINANCE, INC.
TEXAS ELECTRIC SERVICE COMPANY, INC.
TEXAS ENERGY INDUSTRIES COMPANY, INC.
TEXAS POWER AND LIGHT COMPANY, INC.
TEXAS UTILITIES COMPANY, INC.
TEXAS UTILITIES ELECTRIC COMPANY,   INC.
TRADINGHOUSE 3 & 4 POWER COMPANY LLC
TRADINGHOUSE POWER COMPANY LLC
TXU ELECTRIC COMPANY, INC.
TXU ENERGY RETAIL COMPANY LLC
TXU ENERGY SOLUTIONS COMPANY LLC
TXU RETAIL SERVICES COMPANY
TXU SEM COMPANY
VALLEY NG POWER COMPANY LLC
VALLEY POWER COMPANY LLC

By: _____
Name:  Anthony R. Horton
Title:  Senior Vice President & Treasurer

## SIGNATURE PAGES

## [REDACTED]

Document2

**EXHIBIT A** to
the Restructuring Support and Lock-Up Agreement

**Term Sheet**

**PX 095**
**Page 262 of 464**

*Execution Version*

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## *RESTRUCTURING TERM SHEET*

### INTRODUCTION

This term sheet (this "**Term Sheet**")[1] describes the terms of a restructuring of: (a) Energy Future Holdings Corp., a Texas corporation ("**EFH**"); (b) EFH's wholly-owned direct subsidiaries Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("**EFIH**") and Energy Future Competitive Holdings Company LLC, a Delaware limited liability company ("**EFCH**"); (c) EFIH's wholly-owned direct subsidiary, EFIH Finance Inc., a Delaware corporation; (d) EFCH's wholly-owned direct subsidiary, Texas Competitive Electric Holdings Company LLC, a Delaware limited liability company ("**TCEH**"); (e) TCEH's directly and indirectly-owned subsidiaries listed on **Exhibit B**; and (f) EFH's directly and indirectly-owned subsidiaries listed on **Exhibit C** (the entities listed in clauses (a) through (f) collectively, the "**Debtors**," and such restructuring, the "**Restructuring**").

The Debtors will implement the Restructuring through a prearranged plan of reorganization, which shall be consistent with the terms of this Term Sheet and the Restructuring Support Agreement (as it may be amended or supplemented from time to time in accordance with the terms of the Restructuring Support Agreement, the "**Plan**") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware or another bankruptcy court of competent jurisdiction with respect to the subject matter (the "**Bankruptcy Court**"). This Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code.

The governing documents with respect to the Restructuring will contain terms and conditions that are dependent on each other, including those described in this Term Sheet.

This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documentation governing the Restructuring, which remain subject to discussion and negotiation in accordance with the terms of the Restructuring Support Agreement. The Restructuring will not contain any material terms or conditions that are inconsistent in any material respect with this Term Sheet or the Restructuring Support Agreement. This Term Sheet is confidential and may not be released to any other party unless permitted under the Restructuring Support Agreement or in accordance with a Confidentiality Agreement (as defined in the Restructuring Support Agreement).

---

[1]    Capitalized terms used but not otherwise defined in this Term Sheet have the meanings ascribed to such terms as set forth on **Exhibit A**.

## OVERVIEW OF THE RESTRUCTURING

In general, the Restructuring contemplates that:

(a) The Debtors will implement the Restructuring in the Bankruptcy Court pursuant to the Plan on the terms set forth in this Term Sheet.

(b) Holders of the TCEH First Lien Secured Claims will receive their Pro Rata share of (i) 100% of the Reorganized TCEH Common Stock, subject to dilution only by the Reorganized TCEH Management Incentive Plan; and (ii) 100% of the net cash proceeds from the issuance of the New Reorganized TCEH Debt.

(c) Holders of General Unsecured Claims Against the TCEH Debtors (which shall include TCEH First Lien Deficiency Claims, TCEH Second Lien Note Claims, and TCEH Unsecured Note Claims) will receive their Pro Rata share of the TCEH Unsecured Claim Fund.

(d) Pursuant to the EFIH First Lien Settlement, Settling EFIH First Lien Note Holders will convert their EFIH First Lien Note Claims to EFIH First Lien DIP Claims in an amount equal to the greater of (i) (A) 105% of the principal plus (B) 101% of accrued and unpaid interest at the non-default rate on such principal, through consummation of the EFIH First Lien DIP Financing (which amount shall be deemed to include the original issue discount paid in respect of the EFIH First Lien DIP Financing); and (ii) (A) 104% of the principal plus (B) accrued and unpaid interest at the non-default rate on such principal, through consummation of the EFIH First Lien DIP Financing, plus original issue discount paid in respect of the EFIH First Lien DIP Financing, it being understood that in connection with such loans, Settling EFIH First Lien Note Holders shall be entitled to interest in accordance with the EFIH First Lien DIP Financing, but shall not be entitled to any other fees (including commitment fees) paid in respect of the EFIH First Lien DIP Financing. Any other Allowed EFIH First Lien Note Claims shall receive their Pro Rata share of cash in the amount of such Claims on the Effective Date or such other treatment as permitted under section 1129(b) of the Bankruptcy Code, as mutually agreed by EFIH and the Required EFIH Unsecured Consenting Creditors.

(e) Pursuant to the EFIH Second Lien Settlement, Settling EFIH Second Lien Note Holders will receive their Pro Rata share of (a) principal plus accrued and unpaid interest at the non-default rate, through consummation of the EFIH Second Lien DIP Financing; and (b) 50% of the aggregate amount of the EFIH Second Lien Makewhole Claims. Fidelity may use the proceeds it receives on account of the EFIH Second Lien Settlement to participate in the EFIH First Lien DIP Financing in an amount up to $500 million. The Debtors will initiate litigation to obtain entry of an order disallowing any EFIH Second Lien Makewhole Claim of Non-Settling EFIH Second Lien Note Holders, and Non-Settling EFIH Second Lien Note Holders will receive their Pro Rata share of cash on hand at EFIH or from the proceeds of the EFIH Second Lien DIP Financing and available cash at EFIH in an amount equal to the principal plus accrued and unpaid interest, through consummation of the EFIH Second Lien DIP Financing, at the non-default rate of such Holder's Claim (not including any premiums, fees, or Claims relating to the repayment of the EFIH Second Lien Note Claims). Any other Allowed EFIH Second Lien Note Claims shall receive their Pro Rata share of cash in the amount of such Claims on the Effective Date or such other treatment as permitted under section 1129(b) of the Bankruptcy Code, as mutually agreed by EFIH and the Required EFIH Unsecured Consenting Creditors.

(f) Pursuant to the Commitment Letter, certain Holders of EFIH Unsecured Note Claims will

2

commit up to $1,900 million in cash, which shall be utilized to backstop the EFIH Second Lien DIP Financing. On the Effective Date, EFIH Second Lien DIP Claims shall convert on a Pro Rata basis to Reorganized EFH Common Stock issued and outstanding as of the Effective Date pursuant to the Equity Conversion and the terms set forth in this Term Sheet.

(g)   Holders of General Unsecured Claims Against the EFIH Debtors will receive their Pro Rata share of (i) 91% of the Participation Rights and (ii) on the Effective Date, 98% of the Reorganized EFH Common Stock, subject to dilution on account of the Equity Conversion.

(h)   Holders of General Unsecured Claims Against EFH will receive their Pro Rata share of: (i) the Equity Conversion; (ii) on the Effective Date, 1% of the Reorganized EFH Common Stock, subject to dilution on account of the Equity Conversion; and (iii) on the Effective Date, either:  (A) if the Oncor TSA Amendment has been approved, (1) $55 million in cash from EFIH, *provided, however,* that if the Oncor tax payments received by EFIH under the Oncor TSA Amendment through the Effective Date are less than 80% of the projected amounts set forth in this Term Sheet, the $55 million shall be reduced dollar-for-dollar by such shortfall, and (2) cash on hand at EFH (not including the settlement payment in clause (1) hereof); or (B) if the Oncor TSA Amendment has not been approved, all EFH assets, including cash on hand and any Causes of Action, but excluding Interests in EFIH.

(i)   Holders of General Unsecured Claims Against EFH Debtors Other Than EFH shall receive treatment in accordance with the priorities set forth in the Bankruptcy Code.

(j)   Holders of EFH Interests will receive, on the Effective Date, their Pro Rata share of 1% of the Reorganized EFH Common Stock, subject to dilution on account of the Equity Conversion.

| GENERAL PROVISIONS REGARDING THE EFIH RESTRUCTURING | |
|---|---|
| **EFIH First Lien DIP Financing** | Consistent with the Restructuring Support Agreement, EFIH will file a motion (the "**EFIH First Lien DIP Motion**") or, to the extent necessary, commence an adversary proceeding to: |
| | (a) seek approval of the EFIH First Lien DIP Financing on the terms set forth in **Exhibit G**; |
| | (b) repay in full all outstanding principal and accrued and unpaid interest through consummation of the EFIH First Lien DIP Financing, at the non-default rate due and owing under the EFIH First Lien Notes (which shall not include any alleged premiums, fees or claims relating to the repayment of such Claims), held by Non-Settling EFIH First Lien Note Holders in cash from the proceeds of the EFIH First Lien DIP Financing in full satisfaction of such Holders' EFIH First Lien Note Claims; |
| | (c) exchange the EFIH First Lien Note Claims held by Settling EFIH First Lien Note Holders (and EFIH Second Lien Note Claims electing such treatment under the EFIH Second Lien Settlement, if any) for loans under the EFIH First Lien DIP Financing in accordance with the terms of the EFIH First Lien Settlement (and the EFIH Second Lien Settlement); and |

3

**PX 095**
**Page 265 of 464**

| | |
|---|---|
| | (d) obtain entry of an order or a judicial finding that no Allowed Claim exists on account of EFIH First Lien Makewhole Claims held by Non-Settling EFIH First Lien Note Holders. |
| **EFIH First Lien Settlement** | Consistent with the Restructuring Support Agreement, EFIH shall file a motion to:<br><br>(a) seek approval of a settlement with the Settling EFIH First Lien Note Holders (the "**EFIH First Lien Settlement**") on the terms set forth below;<br><br>(b) provide EFIH First Lien Note Claims held by Fidelity, PIMCO, and any other holders of EFIH First Lien Note Claims that are signatories to the Restructuring Support Agreement as of the date of the EFIH First Lien DIP Financing is consummated (such Holders, "**Settling EFIH First Lien Note Holders**") with, in connection with the EFIH First Lien DIP Financing, and as payment in full of their EFIH First Lien Note Claims, their Pro Rata share of an amount of loans under the EFIH First Lien DIP Financing equal to the greater of: (i) (A) 105% of the principal plus (B) 101% of accrued and unpaid interest at the non-default rate on such principal, through consummation of the EFIH First Lien DIP Financing (which amount shall be deemed to include the original issue discount paid in respect of the EFIH First Lien DIP Financing); and (ii) (A) 104% of the principal plus (B) accrued and unpaid interest at the non-default rate on such principal, through consummation of the EFIH First Lien DIP Financing, plus original issue discount paid in respect of the EFIH First Lien DIP Financing, it being understood that in connection with such loans, Settling EFIH First Lien Note Holders shall be entitled to interest (in no event less than LIBOR plus 3.25% with a LIBOR floor of 1.00%) in accordance with the EFIH First Lien DIP Financing, but shall not be entitled to any other fees (including commitment fees) paid in respect of the EFIH First Lien DIP Financing; and<br><br>(c) seek approval of a commitment by PIMCO, in the amount of $1.45 billion, and Fidelity or WAMCO if they elect to commit any additional amounts set forth on such parties' signature page to the Restructuring Support Agreement (each, the "**Backstop Amount**," such Backstop Amount, collectively, the "**Backstop Commitment**," and such backstopping parties, the "**Backstop Parties**") to provide backstop EFIH First Lien DIP Financing (the "**Backstop Financing**") on the terms set forth below within five (5) calendar days of the date of the Restructuring Support Agreement, it being understood that in connection with such loans, the Backstop Parties shall be entitled to interest (in no event less than LIBOR plus 3.25% with a LIBOR floor of 1.00%) and original issue discount equal to the greater of (i) 1.00% or such original issue discount as may be paid to other lenders in the EFIH First Lien DIP Financing, and shall be restricted by the Clear Market Provision set forth below, but shall be entitled to commitment fees upon entry of final order consummating the EFIH First Lien DIP Financing, in the following amounts:  (i) 1.75%, if such Settling EFIH First Lien Note Holders enter into a commitment by executing the |

4

Restructuring Support Agreement before the petition is filed, or (ii) 1.00%, if such Settling EFIH First Lien Note Holders enter into a commitment by executing the Restructuring Support Agreement after the petition is filed, paid in respect of such Backstop Financing, and a ticking fee if and when one becomes payable to EFIH First Lien DIP lenders, and with closing conditions as set forth in **Exhibit I**, and as otherwise set forth in the EFIH First Lien DIP Financing.    The Backstop Financing shall be funded (x) first, by PIMCO in an amount equal to the lesser of:  (a) $768.871 million; or (b) (i) the maximum possible amount of the First Lien Exchange Financing (i.e., assuming all Holders of EFIH First Lien Note Claims participated in the EFIH First Lien Settlement) less the actual amount of the First Lien Exchange Financing at such time (the "**Unallocated First Lien Exchange Capacity**") plus (ii) an amount equal to $4,850 million less the maximum possible amount of the First Lien Exchange Financing (i.e., assuming all Holders of EFIH First Lien Note Claims participated in the EFIH First Lien Settlement); provided, however, in such event, any Backstop Financing funded in excess of the Unallocated First Lien Exchange Capacity shall not be entitled to any commitment fees; (y) second, by all Backstop Parties (on a pro rata basis based on each Backstop Party's individual remaining unused Backstop Amount) in an amount equal to the lesser of:  (A) the remaining amount of the Backstop Commitment, if any; and (B) the remaining amount of the Unallocated First Lien Exchange Capacity, if any;

(d) seek approval of a commitment by GSO to fund $50 million on the terms set forth in the EFIH First Lien DIP Financing, including original issue discount, but not including commitment fees.

The EFIH First Lien Settlement shall be governed by the following principles:

(a) **Eligibility**.  The EFIH First Lien Settlement may be offered or made available, at EFIH's election, to other Holders of EFIH First Lien Note Claims that sign the Restructuring Support Agreement; provided, however, that any such offering shall (1) be completed within twenty-five (25) business days after May 5, 2014 and (2) include a "step-down" in the exchange rate applicable to the exchange on the tenth (10) business day after the launch of such exchange (provided such "step down" date can be extended by up to three (3) business days).

(b) **Reservation of Rights**. The EFIH First Lien Settlement shall in no way affect EFIH's position with respect to Holders of EFIH First Lien Note Claims that do not enter into the EFIH First Lien Settlement (such holders, the "**Non-Settling EFIH First Lien Note Holders**"). Accordingly, as to the Non-Settling EFIH First Lien Note Holders, EFIH shall reserve all rights.

(c) **Effect; Most Favored Nation**. The EFIH First Lien Settlement shall be binding on Settling EFIH First Lien Note Holders in all respects and irrespective of the outcome of any litigation in respect of any other EFIH First Lien Makewhole Claim; provided, however, that if EFIH reaches one or more voluntary settlements with a Non-Settling EFIH

5

|  | First Lien Note Holder in the period commencing on the Petition Date and ending on the date on which the EFIH First Lien DIP Financing is fully funded pursuant to a final order entered by the Bankruptcy Court, which provides a higher percentage recovery to a Non-Settling EFIH First Lien Note Holder does the EFIH First Lien Settlement, the EFIH First Lien Settlement shall be automatically amended to provide such higher percentage recovery to Fidelity and PIMCO, provided, further, that if the EFIH First Lien DIP Financing shall have been consummated by such date, such additional consideration may be in the form of cash, at the election of EFIH. |
|---|---|
|  | (d) **Clear Market Provision**. The "**Clear Market Provision**" shall mean the requirement that the Settling EFIH First Lien Note Holders not syndicate or attempt to syndicate any portion of their commitment under the DIP Facility, prior to the earlier of (x) the date that the lenders under the EFIH First Lien DIP Financing no longer hold any of the EFIH First Lien DIP Financing (i.e., successful syndication date) and (y) in the event of an offering with respect to the EFIH First Lien Settlement, the 25th day after the end of any 'early' election period given to the holders of the EFIH First Lien Notes Claims. |
|  | (e) **Definitive Documentation**. The final credit agreement consummating the DIP Financing shall be in form and substance, in all material respects, consistent with the draft credit agreement as modified by the draft DIP Financing term sheet, each as attached to this Term Sheet, and any material modification to such credit agreement (as modified by such DIP Financing term sheet) shall be approved by PIMCO (such approval not to be unreasonably withheld, delayed or conditioned). The final order consummating the DIP Financing shall be in form and substance reasonably acceptable in all material respects to PIMCO. |
| **EFIH Second Lien DIP Financing** | Consistent with the Restructuring Support Agreement, EFIH will file a motion (the "**EFIH Second Lien DIP Motion**") or, to the extent necessary, commence an adversary proceeding to: <br><br> (a) seek approval of the EFIH Second Lien DIP Financing on the terms set forth in **Exhibit H** in an amount up to $1,900 million; <br><br> (b) repay in full all outstanding principal plus accrued and unpaid interest at the non-default rate, through consummation of the EFIH Second Lien DIP Financing, due and owing under the EFIH Second Lien Notes (which shall not include any alleged premiums, fees or claims relating to the repayment of such Claims) to Non-Settling EFIH Second Lien Note Holders in cash from proceeds of the EFIH Second Lien DIP Financing and cash on hand at EFIH in full satisfaction of such Holders' EFIH Second Lien Note Claims; and <br><br> (c) repay the EFIH Second Lien Notes held by Settling EFIH Second Lien Note Holders with cash on hand at EFIH, cash from the proceeds of the EFIH Second Lien DIP Financing or, in the case of Fidelity, an exchange for participation in the EFIH First Lien DIP Financing in accordance with the terms of the EFIH Second Lien Settlement. |

6

| | |
|---|---|
| | The Debtors will assert that no Allowed Claim exists on account of any alleged premiums, fees or claims relating to the repayment of the EFIH Second Lien Note Claims held by Non-Settling EFIH Second Lien Note Holders, but will litigate such Claims at a later date in the Chapter 11 Cases. |
| | On the Effective Date, the EFIH Second Lien DIP Claims shall be subject to the Equity Conversion. |
| **EFIH Second Lien Settlement** | Consistent with the Restructuring Support Agreement, EFIH shall file a motion to: |
| | (a) seek approval of a settlement with the Settling EFIH Second Lien Note Holders (the "**EFIH Second Lien Settlement**") on the terms set forth below; and |
| | (b) provide settling Holders of EFIH Second Lien Note Claims, which shall include Fidelity, GSO, York, and Avenue and such other holders of the EFIH Second Lien Note Claims that are signatories to the Restructuring Support Agreement as of the date the EFIH Second Lien DIP Financing is consummated (such Holders, the "**Settling EFIH Second Lien Note Holders**"), as payment in full of their EFIH Second Lien Note Claims, their Pro Rata share of (i) an amount in cash equal to principal plus accrued but unpaid interest (including Additional Interest) on such principal at the contract non-default rate through the date of consummation of the EFIH Second Lien Settlement, plus (ii) 50% of the aggregate amount of the EFIH Second Lien Makewhole Claims calculated as of the date of consummation of the EFIH Second Lien Settlement and calculated without inclusion of Additional Interest, plus (iii) in the case of GSO, York, and Avenue, a settlement premium of $1.57 million in cash in the aggregate; *provided, however*, (1) Fidelity shall have the right to receive up to $500 million of its payment under the EFIH Second Lien Settlement in the form of EFIH First Lien DIP Financing to be implemented in a manner consistent with this Term Sheet and reasonably acceptable to Fidelity, it being understood that in connection with such loans, Fidelity shall be entitled to interest and original issue discount, if any, in respect of the EFIH First Lien DIP Financing plus a 1.75% commitment fee. |
| | The EFIH Second Lien Settlement shall be governed by the following principles: |
| | (a) **Eligibility.** The EFIH Second Lien Settlement may be made available, at EFIH's election, to other Holders of EFIH Second Lien Note Claims that sign the Restructuring Support Agreement. |
| | (b) **Reservation of Rights.** The EFIH Second Lien Settlement shall in no way affect EFIH's position with respect to Holders of EFIH Second Lien Note Claims that do not enter into the EFIH Second Lien Settlement (such holders, the "**Non-Settling EFIH Second Lien Note Holders**"). Accordingly, as to the Non-Settling EFIH Second Lien Note Holders, EFIH shall reserve all rights. |
| | (c) **Effect; Most Favored Nation.** The EFIH Second Lien Settlement shall be binding on Settling EFIH Second Lien Note Holders in all respects and irrespective of the outcome of any litigation in respect of any other |

7

| | |
|---|---|
| | EFIH Second Lien Makewhole Claim; *provided, however,* that if EFIH reaches one or more voluntary settlements with either:    (i) a Commitment Party or affiliate thereof on account of its EFIH Second Lien Note Claims (whenever acquired) at any time prior to a judgment on the merits on such Claims; or (ii) any other Non-Settling EFIH Second Lien Note Holder at any time prior to the earlier of (x) the date seven business days after the commencement of opening statements (or the equivalent) in any trial on the merits of the Second Lien Makewhole Claims and (y) the date upon which the Commitment Parties exercise and consummate the Call Right, and any such settlements, determined as of the final day of such period, provides a higher percentage recovery than does the EFIH Second Lien Settlement, then the EFIH Second Lien Settlement shall be automatically amended with respect to Fidelity to provide such higher percentage recovery to Fidelity, in its capacity as Settling EFIH Second Lien Note Holder; *provided, further,* that if the EFIH First Lien DIP Financing shall have been consummated by either such date, such additional consideration may be in the form of cash, at the election of EFIH.

(d) **Call Right**.  At any time before the Effective Date, any one or more Commitment Parties shall have the right to purchase from Fidelity all of its EFH Non-Guaranteed Notes for a purchase price equal to 37.15% of par plus accrued and unpaid interest through the Petition Date (the "**Call Right**"). |
| **EFIH Second Lien DIP Financing Commitment** | Pursuant to the terms and conditions of the Commitment Letter, certain Holders of General Unsecured Claims Against the EFIH Debtors (the "**Commitment Parties**") have committed up to $1,900 million in available funds (the "**EFIH Second Lien DIP Financing Commitment**") which shall be utilized, in accordance with and subject to the terms and conditions of the Commitment Letter and related documentation, to backstop the EFIH Second Lien DIP Financing, which shall, subject to the terms of the Conversion Agreement, mandatorily convert into Reorganized EFH Common Stock pursuant to the Equity Conversion.

The Commitment Letter is attached to the Restructuring Support Agreement as **Exhibit C**.

The Participation Rights with respect to the EFIH Second Lien DIP Financing shall be provided as follows:

(a) All Holders of EFIH Unsecured Note Claims shall receive their Pro Rata share of 91% of the Participation Rights; and

(b) Fidelity, as a Holder of General Unsecured Claims of EFH, shall receive 9% of the Participation Rights and General Unsecured Claims Against EFH shall receive a Pro Rata share of 9% of the Equity Conversion on account of the Tranche A-3 Notes.  Moreover, Fidelity shall receive an $11.25 million payment from EFIH in connection with the exercise of any of its Participation Rights.  If at any time (a) the PLR Denial (as defined in the Restructuring Support Agreement) has occurred and (b) the Oncor TSA Amendment has not yet been approved, the Required EFIH Unsecured Consenting Creditors shall have the sole and exclusive right to require the Holders of any Tranche A-3 Notes to assign such |

8

Case 14-10979-CSS    Doc 5576-1    Filed 08/18/15    Page 96 of 152

Case 14-10979-CSS    Doc 98    Filed 04/29/14    Page 271 of 464

<table>
<tr><td></td><td>notes to the Commitment Parties for a purchase price equal to the sum of (i) the par amount of such notes plus accrued and unpaid interest (including the paid-in-kind interest), which amount shall be payable on the purchase date, (ii) in the event such assignment is consummated before the payment of the one-time payment-in-kind fee, 10% of the par amount of such notes plus accrued and unpaid payment-in-kind interest, if any (but not, for the avoidance of doubt, any accrued and unpaid cash interest), which amount shall be payable on the purchase date, and (iii) a Pro Rata share of any Prepayment Fee (as defined in the EFIH Second Lien DIP Financing) subsequently paid on such Tranche A-3 Notes (which amount shall be paid by EFIH to the holders of the Tranche A-3 Notes immediately prior to such assignment and not the holders of the Tranche A-3 Notes as of the date that the Prepayment Fee is due and owing) ("**Tranche A-3 Redemption**").

The Debtors shall file a motion (the "**Approval Motion**") to obtain entry of

(a) an order (the "**Approval Order**") consistent with the Restructuring Support Agreement, authorizing, among other things, (i) the EFIH First Lien Settlement, (ii) the EFIH Second Lien Settlement, and (iii) EFH and EFIH to perform their obligations under the Commitment Letter; and

(b) an order (the "**Oncor TSA Amendment Order**") consistent with the Restructuring Support Agreement, authorizing the Oncor TSA Amendment.</td></tr>
<tr><td>**Oncor TSA Amendment**</td><td>Consistent with the Restructuring Support Agreement, the Approval Motion shall also include a request for authority to amend, or otherwise assign the payments under, the Oncor Tax Sharing Agreement (the "**Oncor TSA Amendment**") to provide that any payment required to be made to EFH under the Oncor Tax Sharing Agreement after March 31, 2014, will instead be made to EFIH. The Debtors agree to use commercially reasonable efforts to secure entry of the Oncor TSA Amendment Order. Any tax payments received by EFH before the Bankruptcy Court enters or denies the Oncor TSA Amendment Order shall be deposited by EFH into a segregated account (the "**Segregated Account**") and shall not be disbursed until the earlier of (i) the date the Bankruptcy Court enters the Oncor TSA Amendment Order, in which case, such amounts shall be remitted to EFIH or (ii) the date the Bankruptcy Court denies entry of the Oncor TSA Amendment Order, in which case, such amounts shall be remitted to EFH. After entry of the Oncor TSA Amendment Order, EFIH will reimburse EFH for cash taxes paid by EFH attributable to Oncor state taxes.

The Oncor TSA Amendment shall automatically terminate and be of no further force and effect in the event that the Commitment Letter is terminated by the Commitment Parties; *provided, however,* that any amounts that were paid to EFIH in accordance with the Oncor TSA Amendment before its termination shall be retained by EFIH if the Commitment Letter or EFIH Second Lien DIP Financing terminates or is not fully funded in accordance with its terms (i.e., except as a result of a breach by the Commitment Parties). Neither EFH nor EFIH shall have the right to terminate or modify the Oncor TSA Amendment during the Chapter 11 Cases if the EFIH Second Lien DIP Financing is consummated.</td></tr>
</table>

9

| | |
|---|---|
| | The collateral under the EFIH First Lien DIP Financing and the EFIH Second Lien DIP Financing (if any) will include proceeds of payments under the Oncor TSA Amendment, as long as the Oncor TSA Amendment remains in effect. |
| | If the Bankruptcy Court has not approved the Oncor TSA Amendment 90 days after the Petition Date, each Holder of EFIH Second Lien DIP Notes shall receive, in accordance with the EFIH Second Lien DIP Financing, 4.0% of additional interest with respect to the EFIH Second Lien DIP Notes, paid in kind and compounded quarterly on account of such Holder's EFIH Second Lien DIP Claim, from the date that is 90 days after the Petition Date. If the Bankruptcy Court do not approve the Oncor TSA Amendment by May 1, 2015, each Holder of EFIH Second Lien DIP Notes shall receive, in accordance with the EFIH Second Lien DIP Financing, a one-time 10.0% paid in kind fee on account of such Holder's EFIH Second Lien DIP Claim. |
| Private Letter Ruling | Consistent with the Restructuring Support Agreement, EFH, on behalf of the Debtors, shall file with the IRS a written request (the "**Ruling Request**," and together with all related materials and supplements thereto to be filed with the IRS, the "**IRS Submissions**") that the IRS issue a private letter ruling (the "**Private Letter Ruling**") to EFH that: |
| | (a) will provide that the Contribution and the Distribution qualify as a "reorganization" within the meaning of Sections 368(a)(1)(G), 355 and 356 of the Internal Revenue Code of 1986, as amended (the "**Code**") (collectively, the "**Intended Tax-Free Treatment**"); and |
| | (b) will include each of the other requested rulings set forth in Part IV of the Energy Future Holdings Corp. Pre-Submission Memorandum for Rulings Under Section 368(a)(1)(G) and 355 in the form attached as **Exhibit E** (the "**Pre-Submission Memo**"). |
| | Collectively, the rulings described in clauses (a) and (b) are the "**Required Rulings**." |
| | Prior to filing the Ruling Request, EFH shall use its reasonable best efforts to arrange a pre-submission conference with the IRS (a "**Pre-Submission Conference**") by requesting such Pre-Submission Conference as soon as reasonably practicable following the Petition Date. Such request must be made within 5 business days of the Petition Date. For the avoidance of doubt, the Pre-Submission Memo shall (a) request that the IRS provide, *inter alia*, the Required Rulings, (b) constitute an IRS Submission and (c) be submitted to the IRS in advance of the Pre-Submission Conference. |
| | EFH shall be responsible for the preparation and filing of the IRS Submissions. EFH shall provide tax counsel to the Consenting Creditors and Consenting Interest Holders (the "**PLR Participation Parties**") with a reasonable opportunity to review and comment on drafts of all IRS Submissions filed on or after the date of entry into the Restructuring Support Agreement; *provided, however*, that such rights shall not result in unreasonable delays in submitting the IRS Submissions to the IRS. No IRS Submission shall be filed without the consent of the Required Consenting Creditors, which consent shall not be unreasonably withheld or delayed. To the extent that EFH, in its good faith judgment, considers any information included in such IRS drafts to be confidential, EFH may require that any such documents provided to the PLR Participation Parties be redacted to exclude such information, but tax counsel to |

10

<table>
<tr><td></td><td>the PLR Participation Parties shall receive (and keep confidential) complete and unredacted copies of any IRS Submission.  Subject to the foregoing, EFH shall provide the PLR Participation Parties with copies of each IRS Submission promptly following the filing thereof.

EFH shall notify the PLR Participation Parties of any substantive communications with the IRS regarding the IRS Submissions and the Restructuring Transactions. Notwithstanding the foregoing, one representative from each PLR Participation Party (a "**PLR Participation Party Representative**") shall (a) be given the opportunity to participate in all scheduled communications with the IRS concerning the Ruling Request, including all scheduled conference calls and in-person meetings (including the Pre-Submission Conference); and (b) be updated in a timely fashion regarding any unscheduled communications with the IRS.  EFH and the PLR Participation Parties agree to cooperate and use their commercially reasonable efforts to assist in obtaining the Private Letter Ruling requested in the Ruling Request, including providing such appropriate information and representations as the IRS shall reasonably require in connection with the Required Rulings; *provided, however,* that (i) the representations are consistent with, or not more burdensome to the PLR Participation Parties than, those set forth in the Summary of Key Representations, attached as **Exhibit K**, and (ii) providing such information and representations does not restrict the liquidity of equity in Reorganized TCEH after the Effective Date or the Claims of the PLR Participation Parties against the Debtors prior to the Effective Date.  Notwithstanding the foregoing, the Debtors, the Consenting Creditors and the Consenting Interest Holders acknowledge that certain of the Required Rulings set forth in the Pre-Submission Memo address matters for which the IRS does not commonly issue private letter rulings and, as a result, there is substantial uncertainty as to what representations the IRS may require from the Debtors, the Consenting Creditors and the Consenting Interest Holders.  The Consenting Creditors and Consenting Interest Holders agree to reasonably consider in good faith any representations described in clause (i) above requested by the IRS in order to issue the Private Letter Ruling.

Other than as set forth in this Term Sheet (including, for this purpose, transactions described in the Pre-Submission Memo), the Debtors shall not take any action to change the entity classification for U.S. federal income tax purposes of any Debtor entity with material assets, by changing their legal form or otherwise, without the consent of the Required EFIH Unsecured Consenting Creditors, the Consenting Interest Holders, and the Ad Hoc TCEH Committee.</td></tr>
</table>

| TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN | | | |
|---|---|---|---|
| Class No. | Type of Claim | Treatment | Impairment / Voting |
| Unclassified Non-Voting Claims Against the Debtors | | | |
| N/A | **TCEH DIP Claims** | On the Effective Date, in full satisfaction of each Allowed TCEH DIP Claim, each Holder thereof shall receive (a) payment in full in cash or (b) such other less favorable treatment for such Holder as may be agreed to by such Holder and the TCEH Debtors. | N/A |

11

| N/A | EFIH First Lien DIP Claims | On the Effective Date, in full satisfaction of each Allowed EFIH First Lien DIP Claim, each Holder thereof shall receive payment in full in cash from the proceeds of New Reorganized EFIH Debt or cash on hand at EFIH up to the amount of such Holder's Claim. | N/A |
|---|---|---|---|
| N/A | EFIH Second Lien DIP Claims | On the Effective Date, in full satisfaction of each Allowed EFIH Second Lien DIP Claim, each Holder thereof shall receive its Pro Rata share of Reorganized EFH Common Stock in accordance with the terms of the Equity Conversion (or cash with respect to the Fidelity Repayment up to the amount of such Holder's Claim). | N/A |
| N/A | Administrative Claims | On the Effective Date, except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Claim, payment in full in cash. | N/A |
| N/A | Priority Tax Claims | Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Claim, payments in cash in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **Classified Claims and Interests of the TCEH Debtors** | | | |
| Class A1 | Other Secured Claims against TCEH Debtors | On the Effective Date, in full satisfaction of each Allowed Other Secured Claim, each Holder thereof shall receive, at the option of the applicable TCEH Debtor in consultation with the Ad Hoc TCEH Committee: (a) payment in full in cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Other Secured Claim; or (d) other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| Class A2 | Other Priority Claims against TCEH Debtors | On the Effective Date, in full satisfaction of each Allowed Other Priority Claim, each Holder thereof shall receive payment in full in cash or other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| Class A3 | TCEH First Lien Secured Claims | On the Effective Date, in full satisfaction of each Allowed TCEH First Lien Secured Claim, each Holder thereof shall receive its Pro Rata share of: (a) 100% of the Reorganized TCEH Common Stock, subject to dilution only from the Reorganized TCEH Management Incentive Plan; and (b) 100% of the net cash proceeds from the issuance of the New Reorganized TCEH Debt. | Impaired; entitled to vote. |
| Class A4 | General Unsecured | On the Effective Date, in full satisfaction of each | Impaired; |

12

| | Claims Against the TCEH Debtors | Allowed General Unsecured Claim Against the TCEH Debtors, each Holder thereof shall receive its Pro Rata share of the TCEH Unsecured Claim Fund. | entitled to vote. |
|---|---|---|---|
| Class A5 | TCEH Debtor Intercompany Claims | On the Effective Date, unless otherwise provided for under the Plan, each TCEH Debtor Intercompany Claim shall either be Reinstated or canceled and released as mutually agreed by the TCEH Debtors and the Ad Hoc TCEH Committee. | Impaired; deemed to reject or Unimpaired; deemed to accept. |
| Class A6 | Non-TCEH Debtor Intercompany Claims | On the Effective Date, Non-TCEH Debtor Intercompany Claims shall be canceled and released. | Impaired; deemed to reject. |
| Class A7 | Interests in TCEH Debtors other than TCEH and EFCH | On the Effective Date, Interests in the TCEH Debtors other than TCEH and EFCH shall either be Reinstated or canceled and released as mutually agreed by the TCEH Debtors and the Ad Hoc TCEH Committee. | Impaired; deemed to reject or Unimpaired; deemed to accept |
| Class A8 | Interests in TCEH and EFCH | On the Effective Date, Interests in TCEH and EFCH shall be canceled and released in accordance with the Tax-Free Spin-Off. | Impaired; deemed to reject. |
| Classified Claims and Interests of the EFIH Debtors | | | |
| Class B1 | Other Secured Claims against EFIH Debtors | On the Effective Date, in full satisfaction of each Allowed Other Secured Claim, each Holder thereof shall receive, at the option of the applicable EFIH Debtor in consultation with the Required EFIH Unsecured Consenting Creditors: (a) payment in full in cash; (b) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Other Secured Claim; or (d) other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| Class B2 | Other Priority Claims against EFIH Debtors | On the Effective Date, in full satisfaction of each Allowed Other Priority Claim, each Holder thereof shall receive payment in full in cash or other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| Class B3 | EFIH First Lien Note Claims | On the Effective Date, in full satisfaction of each Allowed EFIH First Lien Note Claim, and as mutually agreed by EFIH and the Required EFIH Unsecured Consenting Creditors, each Holder thereof shall receive payment in full in cash or such other treatment as permitted under section 1129(b) of the Bankruptcy Code. | Impaired; entitled to vote. |
| Class B4 | EFIH Second Lien Note Claims | On the Effective Date, in full satisfaction of each Allowed EFIH Second Lien Note Claim, and as mutually agreed by EFIH and the Required EFIH Unsecured Consenting Creditors, each Holder thereof shall receive | Impaired; entitled to vote. |

13

| | | payment in full in cash or such other treatment as permitted under section 1129(b) of the Bankruptcy Code. | |
|---|---|---|---|
| Class B5 | **General Unsecured Claims Against the EFIH Debtors** | On the Effective Date, in full satisfaction of each Allowed General Unsecured Claim Against the EFIH Debtors, each Holder thereof shall receive its Pro Rata share of 98% of the Reorganized EFH Common Stock, subject to dilution on account of the Equity Conversion. | Impaired; entitled to vote. |
| Class B6 | **EFIH Debtor Intercompany Claims** | On the Effective Date, unless otherwise provided in the Plan, EFIH Debtor Intercompany Claims shall either be Reinstated or canceled and released as mutually agreed by the EFIH Debtors and the Required EFIH Unsecured Consenting Creditors. | Impaired; deemed to reject or Unimpaired; deemed to accept. |
| Class B7 | **Non-EFIH Debtor Intercompany Claims** | On the Effective Date, Non-EFIH Debtor Intercompany Claims shall be canceled and released. | Impaired; deemed to reject. |
| Class B8 | **Interests in EFIH Debtors** | On the Effective Date, Interests in the EFIH Debtors shall be Reinstated. | Unimpaired, deemed to accept. |
| **Classified Claims and Interests of the EFH Debtors** | | | |
| Class C1 | **Other Secured Claims against EFH Debtors** | On the Effective Date, in full satisfaction of each Allowed Other Secured Claim, each Holder thereof shall receive, at the option of the applicable EFH Debtor in consultation with the Required EFIH Unsecured Consenting Creditors: (a) payment in full in cash; (b) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Other Secured Claim; or (d) other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| Class C2 | **Other Priority Claims against EFH Debtors** | On the Effective Date, in full satisfaction of each Allowed Other Priority Claim, each Holder thereof shall receive payment in full in cash or other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| Class C3 | **Legacy General Unsecured Claims Against EFH** | On the Effective Date, in full satisfaction of each Legacy General Unsecured Claim Against EFH, each Holder thereof shall receive: (a) payment in full in cash; (b) Reinstatement; or (c) such other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| Class C4 | **General Unsecured Claims Against EFH** | On the Effective Date, in full satisfaction of each Allowed General Unsecured Claim Against EFH, each Holder thereof shall receive its Pro Rata share of: (a) 1% of the Reorganized EFH Common Stock, subject to dilution by the Equity Conversion; and (b) if the Oncor TSA Amendment has been approved, (i) all Cash on hand at EFH, not including the Oncor TSA Amendment | Impaired; entitled to vote. |

14

**PX 095**
**Page 276 of 464**

| | | Payment; and (ii) the Oncor TSA Amendment Payment; or (b) if the Oncor TSA Amendment has _not_ been approved, the EFH Unsecured Claims Fund. | |
|---|---|---|---|
| Class C5 | **General Unsecured Claims Against the EFH Debtors Other Than EFH** | On the Effective Date, in full satisfaction of each Allowed General Unsecured Claim Against the EFH Debtors Other Than EFH, each Holder thereof shall receive treatment in accordance with the priorities set forth in the Bankruptcy Code. | Impaired; entitled to vote. |
| Class C6 | **EFH Debtor Intercompany Claims** | On the Effective Date, unless otherwise provided in the Plan, EFH Debtor Intercompany Claims shall either be Reinstated or canceled and released as mutually agreed by the EFH Debtors, the Required EFIH Unsecured Consenting Creditors, and Fidelity. | Impaired; deemed to reject or Unimpaired; deemed to accept. |
| Class C7 | **Non-EFH Debtor Intercompany Claims** | On the Effective Date, Non-EFH Debtor Intercompany Claims shall be canceled and released, *provided that* if the Oncor TSA Amendment is not approved by the Bankruptcy Court, each EFH-EFIH Intercompany Claim shall not be canceled or released and shall receive its Pro Rata share of the EFH Unsecured Claims Fund in full satisfaction of such Claim. | Impaired; deemed to reject. |
| Class C8 | **Interests in EFH Debtors Other Than EFH** | On the Effective Date, Interests in the EFH Debtors other than EFH shall either be Reinstated or canceled and released in the EFH Debtors' or Reorganized EFH Debtors' discretion. | Impaired; deemed to reject or Unimpaired; deemed to accept. |
| Class C9 | **EFH Interests** | On the Effective Date, EFH Interests shall be Reinstated, subject to dilution by the issuance of Reorganized EFH Common Stock to Holders of General Unsecured Claims Against the EFIH Debtors, Holders of General Unsecured Claims Against the EFH Debtors, and the Equity Conversion. | Impaired; entitled to vote. |

| **GENERAL PROVISIONS REGARDING THE PLAN** | |
|---|---|
| **Subordination** | The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |
| **Restructuring Transactions** | The Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Tax-Free Spin-Off. |
| **Tax-Free Spin-Off** | To preserve the Intended Tax-Free Treatment of the Restructuring Transactions and conditioned upon the receipt of the Private Letter Ruling with the Required Rulings, the Debtors shall undertake the Tax- |

15

**PX 095**
**Page 277 of 464**

| | Free Spin-Off as follows: |
|---|---|
| | (a) before the Effective Date, TCEH shall form a new subsidiary in the form of a limited liability company under the laws of Delaware ("**Reorganized TCEH**"); |
| | (b) on the Effective Date, the Claims against TCEH will be canceled in exchange for each Holder's right to receive its recovery in accordance with the terms of the Plan; |
| | (c) immediately following such cancellation, TCEH shall transfer all of its assets and its ordinary course operating liabilities, and the Debtors shall transfer assets and liabilities related to the Shared Services, to Reorganized TCEH (the "**Contribution**") in exchange for which TCEH shall receive (i) 100% of the newly issued Reorganized TCEH equity interests and (ii) the cash proceeds of the New Reorganized TCEH Debt, subject to preserving the Intended Tax-Free Treatment of the Restructuring Transactions. For the avoidance of doubt, no funded debt of TCEH, including the TCEH First Lien Claims, TCEH Second Lien Note Claims, and TCEH Unsecured Note Claims will be assumed by Reorganized TCEH pursuant to the Contribution (as all such Claims will have been canceled immediately prior to the transfer of assets to Reorganized TCEH); |
| | (d) immediately following the Contribution, Reorganized TCEH shall convert into a Delaware corporation; and |
| | (e) immediately following such conversion, TCEH shall distribute all of the Reorganized TCEH Common Stock it holds and the cash received from Reorganized TCEH to the Holders of TCEH First Lien Claims (the "**Distribution**"). |
| | EFH's earnings and profits will be allocated between Reorganized EFH and Reorganized TCEH pursuant to Treasury Regulations Section 1.312-10(a) in proportion to the fair market value of the business or businesses (and interests in any other properties) retained by Reorganized EFH and the business or businesses (and interests in any other properties) of Reorganized TCEH immediately after the Distribution. For purposes of determining their relative fair market values and shares of earnings and profits, the valuation of Reorganized TCEH and Reorganized EFH shall be made, to the extent permitted by law, immediately following the distribution of Reorganized TCEH and prior to (i) Holders of EFIH and EFH General Unsecured Claims receiving Reorganized EFH Common Stock, and (ii) the conversion of EFIH Second Lien DIP into Reorganized EFIH Common Stock, provided that to the extent required under the Private Letter Ruling, an amount of EFIH and EFH General Unsecured Claims, if any, required to cause Reorganized EFH to be solvent at such time shall be deemed exchanged for Reorganized EFH Common Stock. |
| **Tax Basis of Reorganized TCEH** | Immediately following the Distribution, the aggregate tax basis, for U.S. federal income tax purposes, of the assets held by Reorganized TCEH shall be equal to the sum of (x) TCEH's aggregate tax basis, for U.S. federal income tax purposes, in the assets it transfers to Reorganized TCEH pursuant to the Contribution plus (y) 95% of the aggregate amount |

16

| | |
|---|---|
| | of deductions, net operating losses and capital losses (including carryforwards) available to the EFH consolidated group as of the Effective Date (determined (i) as if the EFH consolidated tax year ended on the Effective Date and (ii) without regard to any gain or income generated as a result of the Contribution), in each case as determined by the Debtors in good faith and in consultation with the Ad Hoc TCEH Committee no later than 60 days prior to the Effective Date (the amount set forth in clause (y), the "**Basis Step-Up**", and the sum of clauses (x) and (y), the "**Minimum Basis**").<br><br>After the Petition Date, the Debtors shall continue to operate their business in the ordinary course and shall not take any actions (other than as set forth in this Term Sheet) outside the ordinary course of business that will materially increase the taxable income of the EFH consolidated group (excluding any taxable income generated by TCEH and its subsidiaries) during the period from the Petition Date through the Effective Date. |
| **Tax Matters Agreement** | Reorganized EFH and Reorganized TCEH shall enter into a Tax Matters Agreement as of the Effective Date that shall govern the rights and obligations of each party with respect to certain tax matters.<br><br>Specifically, the Tax Matters Agreement will address:<br><br>    (a) the filing of tax returns by Reorganized EFH and Reorganized TCEH;<br><br>    (b) tax indemnification obligations of Reorganized EFH and Reorganized TCEH;<br><br>    (c) the conduct of tax proceedings by Reorganized EFH and Reorganized TCEH; and<br><br>    (d) representations, warranties, and covenants with respect to the Intended Tax-Free Treatment of the Contribution and Distribution.<br><br>The Tax Matters Agreement will provide that:<br><br>    (i) Reorganized TCEH will indemnify Reorganized EFH for (x) income taxes imposed on Reorganized EFH attributable solely to a failure of the Tax-Free Spin-Off to qualify for the Intended Tax-Free Treatment as a result of a breach of one or more covenants (following the Distribution) by Reorganized TCEH, (y) any alternative minimum tax (A) arising from the resolution of IRS audits for periods (or portions thereof) ending on or before the Effective Date attributable to any business contributed to Reorganized TCEH or its subsidiaries, but in no event to exceed $15 million and (B) arising as a result of the utilization of NOL carryforwards to offset gain related to the portion (if any) of the Basis Step-Up in excess of $1.9 billion and (z) ordinary course non-income taxes for periods (or portions thereof) ending on or before the Effective Date attributable to any business contributed to Reorganized TCEH or its subsidiaries (but only to the extent such taxes are, consistent with past practice, payable by Reorganized TCEH, TCEH or its |

17

subsidiaries); and

(ii)   Reorganized EFH will indemnify Reorganized TCEH for taxes that are not specifically covered by clause (i), including, without duplication, (w) taxes attributable to any business retained by Reorganized EFH or its subsidiaries, (x) EFH and Reorganized EFH's consolidated U.S. federal income taxes (and any affiliated, consolidated, combined, unitary, aggregate or similar state or local taxes), and (y) income taxes attributable to a failure of the Tax-Free Spin-Off to qualify for the Intended Tax-Free Treatment (except as described in clause (i) above); provided, however, that Reorganized EFH will be responsible for income taxes attributable to such failure only if such failure is as a result of the breach of any covenant by EFH or Reorganized EFH hereunder. Nothing herein shall be interpreted to mean that any party other than EFH or Reorganized EFH shall be primarily liable for any taxes imposed on a failure of the Tax-Free Spin-Off to qualify for the Intended Tax-Free Treatment, except to the extent that such failure is as a result of the breach of any covenant by Reorganized TCEH as provided in clause (i) hereunder.

The Tax Matters Agreement will prohibit Reorganized EFH and Reorganized TCEH from taking those actions (or refraining from taking those actions) that are set forth below:

- For two years after the Distribution, Reorganized TCEH, Reorganized EFH, and Reorganized EFIH will not be permitted to:

  - cease, or permit its wholly-owned subsidiaries listed on **Exhibit D** to cease, the active conduct of a business that was conducted immediately prior to the Distribution or from holding certain assets held at the time of the Distribution;
  - dissolve, liquidate, take any action that is a liquidation for federal income tax purposes or permit its wholly-owned subsidiaries listed on **Exhibit D** from doing any of the foregoing;
  - redeem or repurchase any of its equity if such redemption or repurchase could reasonably be expected to adversely impact the continuity of interest requirement set forth in Treas. Reg. Section 1.368-1(e) or 1.355-2(c)(1); and
  - merge with or into another corporation with such other corporation surviving in a transaction that does not qualify as a reorganization under Section 368(a).

For the avoidance of doubt, the Tax Matters Agreement shall contain no express or implied limitation on the transferability or issuance of the stock of Reorganized EFH or Reorganized TCEH following the Effective Date.

Nevertheless, Reorganized TCEH, Reorganized EFH, and Reorganized EFIH will be permitted to take any of the actions described above if Reorganized EFH obtains a supplemental IRS private letter ruling (or an

18

| | |
|---|---|
| | opinion of counsel that is reasonably acceptable to Reorganized EFH and Reorganized TCEH) to the effect that the action will not affect the Intended Tax-Free Treatment of the Restructuring Transactions. Reorganized TCEH and/or Reorganized EFIH can require that Reorganized EFH seek such a supplemental IRS private letter ruling or opinion of counsel if Reorganized EFH does not seek one on its own.<br><br>The Tax Matters Agreement shall otherwise be in form and substance acceptable to the Debtors, the Required EFIH Unsecured Consenting Creditors and the Ad Hoc TCEH Committee. |
| **Shared Services** | Except as otherwise agreed by Reorganized TCEH, Reorganized EFH, and the Ad Hoc TCEH Committee, the TCEH Debtors and the EFH Debtors will transfer to Reorganized TCEH or its designee all operating assets, including executory contracts and liabilities owned by or asserted against the EFH Debtors, that are reasonably necessary to the continued operation of Reorganized TCEH (the "**Shared Services**") and that are not otherwise discharged, in exchange for the rights and benefits provided under the Plan, Restructuring Support Agreement, Term Sheet, and related commitments and settlements (which, for the avoidance of doubt, will not require Reorganized TCEH or the TCEH Debtors to make any cash payments to the EFH Debtors or Reorganized EFH Debtors); *provided, however*, Reorganized TCEH will cure and pay any and all amounts due and owing with respect to the Shared Services as of the Effective Date to the extent such payments are authorized pursuant to the Cash Management Order; *provided, further*, that employees of EFH and EFH Corporate Services must be transferred to Reorganized TCEH; *provided, further*, that Reorganized EFH shall retain liability, if any, for the Legacy General Unsecured Claims.<br><br>The TCEH Debtors, the EFIH Debtors, the EFH Debtors, the Required EFIH Unsecured Consenting Creditors and the Ad Hoc TCEH Committee will negotiate in good faith to reach an agreement on mutually acceptable terms regarding transition services reasonably necessary to the continued operation of Reorganized EFIH and/or Reorganized EFH relating to the foregoing assets, employees, executory contracts, and operating liabilities. |
| **Termination of Competitive Tax Sharing Agreement** | On the Effective Date, the Competitive Tax Sharing Agreement shall automatically terminate and all Claims and Causes of Action arising thereunder or in any way related thereto shall be forever discharged, cancelled and released. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Effective Date, except to the extent otherwise provided in this Term Sheet or the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Issuance of New Securities; Execution of the Plan Restructuring Documents** | On the Effective Date, the Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring, including the Plan Restructuring Documents. |

19

| | |
|---|---|
| **Executory Contracts and Unexpired Leases** | Except as otherwise provided in this Term Sheet, the Plan will provide for the Debtors, in consultation with the Ad Hoc TCEH Committee and the Required EFIH Unsecured Consenting Creditors, to assume or reject, as the case may be, executory contracts and unexpired leases identified in the Plan Supplement to the extent that any such executory contracts and unexpired leases have not been otherwise assumed or rejected. |
| **Resolution of Contested Claims** | The Plan will provide for the resolution of Contested Claims. |
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |
| **Discharge of Claims and Termination of Interests** | Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.   The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. |
| **Releases by the Debtors** | Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in any order resolving a Cause of Action that is entered in a proceeding of the sort described in Section 4.01(c) of the Restructuring Support Agreement, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other |

20

| | |
|---|---|
| | Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Liability Management Program, the Tax Sharing Agreements, the 2007 Acquisition, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, this Term Sheet, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, this Term Sheet, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a final order to have constituted actual fraud or gross negligence. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. |
| **Releases by Holders of Claims and Interests of the Debtors** | As of the Effective Date, and except as otherwise specifically provided in any order resolving a Cause of Action that is entered in a proceeding of the sort described in Section 4.01(c) of the Restructuring Support Agreement, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Liability Management Program, the Tax Sharing Agreements, the 2007 Acquisition, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, this Term Sheet, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, this Term Sheet, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Debtor, Reorganized Debtor, or Released Party that is determined in a final order to have constituted actual fraud or gross negligence. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any |

21

| | |
|---|---|
| | post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. |
| **Exculpation** | Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
| **Injunctions** | Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, Reorganized Debtors, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of |

PX 095
Page 284 of 464

| | |
|---|---|
| | setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan. |

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| **TCEH DIP Financing** | The TCEH Debtors' Chapter 11 Cases shall be funded with the proceeds of the TCEH DIP Financing and the Consenting TCEH First Lien Creditors consent to use of cash collateral and priming by the TCEH DIP Financing on the terms set forth in the TCEH Cash Collateral Order. |
| **EFIH DIP Financing** | The EFIH Debtors' Chapter 11 Cases shall be funded with the proceeds of the EFIH First Lien DIP Financing and the EFIH Second Lien DIP Financing. EFIH will seek authority to use the cash collateral of Holders of EFIH First Lien Note Claims and EFIH Second Lien Note Claims and to prime such Holders with the EFIH First Lien DIP Financing on the terms set forth on **Exhibit G**. |
| **Customer Obligations** | The Debtors shall honor all of their ordinary course customer obligations during the course of the Restructuring. |
| **Use of EFH and EFIH Cash During Chapter 11 Cases** | Unless otherwise agreed by EFH, EFIH, and the Required EFIH Unsecured Consenting Creditors, during the Chapter 11 Cases, EFH and EFIH shall only make payments, including professional fees, in the ordinary course of business consistent with prepetition practices based on benefit to their respective estates, including to each other under the EFIH Shared Services Agreement, as approved pursuant to first day motions in the Chapter 11 Cases, or as otherwise set forth in the Term Sheet; *provided, however,* that EFIH shall be entitled to enter into voluntary settlements from time to time with (i) Non-Settling First Lien Note Holders on economically equal terms to, or terms more favorable to the Estates than, the EFIH First Lien Settlement, so long as, except with respect to the EFIH First Lien Settlement, such terms provide for a settlement at no more than 102.25% of the principal amount of such Holders' EFIH First Lien Notes; and, (ii) with the consent of the Required EFIH Unsecured Consenting Creditors, Non-Settling Second Lien Note Holders on economically equal terms, or terms more favorable to the Estates than the EFIH Second Lien Settlement, except that such consent shall not be required with respect to the EFIH Second Lien Settlement. |
| **Excess EFIH Cash Upon Consummation** | The Required EFIH Unsecured Consenting Creditors shall, in consultation with EFH and EFIH, determine before the Effective Date how the Excess EFIH Cash will be used on and after the Effective Date. |
| **Allocation of Professional Fees** | Any professional fees (the "**Professional Fees**") incurred by professionals retained by the Debtors (the "**Debtors' Professionals**") shall be allocated to, and paid by, the applicable Debtors for whose direct benefit such Professional Fees were incurred (the "**Direct Benefit Fees**"). To the extent a Professional Fee is incurred for the collective benefit of the EFH Debtors, EFIH Debtors, and TCEH Debtors (the "**Collective Benefit Fees**"), such Professional Fees shall be allocated to each Debtor in the same proportion that the amount of Direct Benefit Fees incurred by such Debtor's Professional for such Debtor bears to the total amount of Direct Benefit Fees incurred by such Debtor's Professional for all of the Debtors, on a monthly |

23

|  | basis in connection with the Debtor's Professional's fee application (the "**Collective Fee Allocation**"). In connection with any quarterly/interim or final applications for payment of Professional Fees, the Debtors shall, as amongst themselves, make any necessary intercompany transfers or other adjustments such that the total Collective Benefit Fees for each of the Debtor's Professionals for the applicable fee period is allocated in a manner consistent with the Collective Fee Allocation for such period. |
|  | Any professional fees incurred by professionals retained by Fidelity for which the Debtors' have agreed to become liable shall be allocated on the following basis: (a) 50% to the EFH Debtors and (b) 50% to the EFIH Debtors. Any professional fees incurred by professionals retained by the Commitment Parties for which the Debtors' have agreed to become liable shall be allocated 100% to the EFIH Debtors. Any professional fees incurred by professionals retained by Holders of EFH Interests (together with the Professional Fees incurred by the Debtors' Professionals and all professional fees discussed in this paragraph, the "**Total Professional Fees**") for which the Debtors' have agreed to become liable shall be allocated 100% to the EFH Debtors. |
|  | On the Effective Date, the first $7.5 million of the Total Professional Fees that would have otherwise been allocated to the EFH Debtors on the terms as set forth above shall instead be allocated to EFIH. |
|  | After the Petition Date, all payment of Professional Fees, including any allocation formula, shall be subject to any applicable orders of the Bankruptcy Court (on an interim or final basis). |
| **Incentive Plans** | The Ad Hoc TCEH Committee and the Required EFIH Unsecured Consenting Creditors shall negotiate in good faith with the TCEH Debtors, the EFH Debtors, and the EFIH Debtors regarding the terms of key employee incentive plans for which the Debtors shall seek approval from the Bankruptcy Court during the Chapter 11 Cases. |
| **Employment Obligations** | Pursuant to the Restructuring Support Agreement and this Term Sheet, the Consenting Creditors consent to each of the Debtors' "first day" or "second day" motions relating to wages, compensation, and benefits, including executive compensation programs. After the Effective Date, the Reorganized Debtors' wages, compensation, and benefit programs shall be acceptable, in the case of Reorganized TCEH, to the TCEH Debtors and the Ad Hoc TCEH Committee and, in the case of Reorganized EFH, to the EFH Debtors and the Required EFIH Unsecured Consenting Creditors. |
|  | Additionally, employees who are party to employment agreements with the Debtors may receive new employment agreements with the applicable Reorganized Debtor, the terms and conditions of which shall be acceptable, in the case of Reorganized TCEH, to the TCEH Debtors and the Ad Hoc TCEH Committee and, in the case of Reorganized EFH, to the EFH Debtors and the Required EFIH Unsecured Consenting Creditors. Until such time as these new employment agreements are fully executed, all employment agreements in place as of the Petition Date between the Debtors and their employees shall remain in place in accordance with the terms of such agreements pending the applicable Debtor's assumption or rejection of such agreements. |

24

| Indemnification of Prepetition Directors, Officers, Managers, et al. | Under the Restructuring, consistent with applicable law, all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact and irrevocable and shall survive the effectiveness of the Restructuring.  For the avoidance of doubt, the TCEH Debtors and Reorganized TCEH shall not have any liability for, or any obligations in respect of, any indemnification provisions for the benefit of the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the EFH Debtors or the EFIH Debtors, in their capacities as such and the EFH Debtors and Reorganized EFH shall not have any liability for, or any obligations in respect of, any indemnification provisions for the benefit of the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the TCEH Debtors, in their capacities as such. |
|---|---|
| Director, Officer, Manager, and Employee Tail Coverage | On or before the Effective Date, the Debtors shall purchase and maintain directors, officers, managers, and employee liability tail coverage for the six-year period following the Effective Date on terms no less favorable than the Debtors' existing director, officer, manager, and employee coverage and with an available aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement; *provided, however*, that the costs of such policies shall be reasonably allocated among the Debtors in a manner reasonably acceptable to Required Consenting Creditors. |
| Claims of the Debtors | The Reorganized Debtors, as applicable, shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action released by the Debtors pursuant to the release and exculpation provisions outlined in this Term Sheet. |
| Conditions Precedent to Restructuring | The following shall be conditions to Consummation of the Restructuring (the "**Conditions Precedent**"):<br><br>(a) the Debtors shall have consummated the EFIH First Lien DIP Financing;<br><br>(b) the Debtors shall have consummated the EFIH Second Lien DIP Financing and the Equity Conversion in accordance with the Commitment Letter;<br><br>(c) the Debtors shall have consummated the EFIH First Lien Settlement and the EFIH Second Lien Settlement in accordance with this Term Sheet;<br><br>(d) the Debtors shall have obtained entry of the Approval Order, which order shall be in full force and effect and not subject to a stay;<br><br>(e) Holders of EFH Non-Guaranteed Notes shall have received not less than 37.15% on account of such Claims under to the Plan, which condition is waivable only by Fidelity as holder of a majority of the EFH Non-Guaranteed Notes on a personal and non-transferable |

25

basis, and ceases at any time Fidelity holds less than a majority of the EFH Notes;

(f) immediately following the Distribution, the aggregate tax basis, for federal income tax purposes, of the assets held by Reorganized TCEH shall be equal to the Minimum Basis and the Basis Step-Up shall be no less than $2.1 billion;

(g) the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, including from the FERC, the NRC, and the PUC, as applicable; *provided, however*, that the PUC Regulatory Approval shall not be required to implement and effectuate the Plan as to the TCEH Debtors;

(h) the Debtors shall have obtained the Private Letter Ruling from the IRS, which shall be in form and substance acceptable to the Required Consenting Creditors and shall include, *inter alia*, the Required Rulings;

(i) the Debtors shall have entered into the Tax Matters Agreement, which shall be in form and substance acceptable to the Required Consenting Creditors;

(j) other than as set forth in this Term Sheet (including, for this purpose, transactions described in the Pre-Submission Memo), the Debtors shall not have taken any action to change the entity classification for U.S. federal income tax purposes of any Debtor entity with material assets, by changing their legal form or otherwise, without the consent of the Required EFIH Unsecured Consenting Creditors and the Ad Hoc TCEH Committee; provided that the consent of the Ad Hoc TCEH Committee shall not be required with respect to the foregoing if such action by EFH, EFIH, or the Required EFIH Unsecured Consenting Creditors does not directly impact the TCEH Contribution and Distribution and does not prevent EFH from obtaining the Required Rulings; *provided, further*, that the consent of the Required EFIH Unsecured Consenting Creditors shall not be required with respect to the foregoing if such action by TCEH or the Ad Hoc TCEH Committee does not prevent EFH from obtaining the Required Rulings;

(k) the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Restructuring Support Agreement, this Term Sheet, and the Plan;

(l) the Restructuring Support Agreement shall remain in full force and effect;

(m) all professional fees and expenses approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in a professional fee escrow pending approval by the Bankruptcy Court;

(n) the Bankruptcy Court shall have entered the Confirmation Order, which shall:

26

PX 095
Page 288 of 464

|  |  |
|---|---|
|  | i.   authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;<br><br>ii.   decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;<br><br>iii.  authorize the Debtors, as applicable/necessary, to: (1) implement the Restructuring Transactions, including the Equity Conversion; (2) distribute the Reorganized EFH Common Stock, New Reorganized TCEH Debt, the Reorganized TCEH Common Stock, and the New Reorganized EFIH Debt, pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (3) make all distributions and issuances as required under the Plan, including cash, the Reorganized EFH Common Stock, New Reorganized TCEH Debt, the Reorganized TCEH Common Stock, and the New Reorganized EFIH Debt; and (4) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Reorganized TCEH Management Incentive Plan;<br><br>iv.  authorize the implementation of the Plan in accordance with its terms; and<br><br>v.   provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax (including, any mortgages or security interest filing to be recorded or filed in connection with the New Reorganized TCEH Debt, the New Reorganized EFIH Debt, and the New Reorganized EFIH Junior Debt, as applicable); and<br><br>(o) the Debtors shall have implemented the Restructuring Transactions, including the Tax-Free Spin-Off and all transactions contemplated by the Commitment Letter, in a manner consistent in all material respects with the Restructuring Support Agreement, this Term Sheet, and the Plan. |
| **Waiver of Conditions Precedent to the Restructuring** | The Debtors, with the prior written consent of the Required Consenting Creditors and Required EFIH Unsecured Consenting Creditors (each acting in their sole discretion), may waive any one or more of the Conditions Precedent to the Restructuring. |

| CORPORATE GOVERNANCE PROVISIONS/SECTION 1145 EXEMPTION | |
|---|---|
| **Charter; Bylaws; Corporate Governance** | Corporate governance for Reorganized TCEH, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable) and the Tax Matters Agreement, and the composition of the Reorganized TCEH Board shall be determined by the Ad Hoc TCEH Committee in consultation with (i) TCEH and, (ii) as appropriate, with other Holders of TCEH First Lien Notes. |
| | Corporate governance for Reorganized EFH and Reorganized EFIH, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable) and the Tax Matters Agreement, and the composition of the Reorganized EFH Board, the Reorganized EFIH Board, and the officers of Reorganized EFH and Reorganized EFIH shall be determined by the Required EFIH Unsecured Consenting Creditors in consultation with (i) EFH, (ii) EFIH, (iii) Fidelity, and (iv) as appropriate, with other Holders of EFIH Second Lien DIP Claims or EFIH Unsecured Note Claims that will receive greater than 15% of the Reorganized EFH Common Stock upon the Effective Date. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from SEC registration under applicable law. |

*[Exhibits follow.]*

28

## EXHIBIT A

### DEFINITIONS

| Term | Definition |
|------|-----------|
| 2007 Acquisition | The 2007 transaction in which TEF and Texas Holdings and their direct and indirect equity holders became the direct and indirect equity holders of the Debtors. |
| Ad Hoc TCEH Committee | The ad hoc committee of certain unaffiliated Consenting TCEH First Lien Creditors (as defined in the Restructuring Support Agreement) that is represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP and Millstein & Co., L.P. |
| Additional Interest | Additional interest payable on the EFIH First Lien Notes or EFIH Second Lien Notes, as applicable, under the registration rights agreement associated with such notes so long as EFIH has not registered such notes in accordance with the Securities Act, on the terms set forth in such registration rights agreement. |
| Administrative Claim | A Claim incurred by the Debtors on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code. |
| Affiliate | As defined in section 101(2) of the Bankruptcy Code. |
| Agreement Effective Date | The effective date of the Restructuring Support Agreement, as such term is further defined in the Restructuring Support Agreement. |
| Allowed | Any Claim that is not a Contested Claim or a Disallowed Claim. |
| Approval Motion | As defined in the Term Sheet. |
| Approval Order | As defined in the Term Sheet. |
| Avenue | Avenue Capital Group and its affiliates. |
| Bankruptcy Code | Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time. |
| Bankruptcy Court | As defined in the Term Sheet. |
| Bankruptcy Rules | The Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code, and the general, local, and chambers rules of the Bankruptcy Court. |
| Bar Date | The date established by the Bankruptcy Court by which Proofs of Claim must be filed with respect to such Claims, as may be ordered by the Bankruptcy Court. |
| Basis Step-Up | As defined in the Term Sheet. |
| BNY | The Bank of New York Mellon Trust Company, N.A., in its capacity as trustee under certain Indentures, described herein. |
| Call Right | As defined in the Term Sheet. |

29

| Term | Definition |
|---|---|
| Cash Management Order | An order of the Bankruptcy Court, in form and substance acceptable to the Ad Hoc TCEH Committee, authorizing the Debtors to, *inter alia*, continue using their existing cash management system, maintain certain existing bank account and continue certain intercompany transactions. |
| Cause of Action | Any claims, Claims, Interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code. |
| Chapter 11 Cases | When used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court. |
| Claim | As defined in section 101(5) of the Bankruptcy Code against a Debtor. |
| Claim Objection Deadline | The deadline for filing objections to Claims as set forth in the Plan or in any Order of the Bankruptcy Court establishing a Bar Date. |
| Class | A category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code. |
| Code | As defined in the Term Sheet. |
| Collateral Trust Agreement | That certain Collateral Trust Agreement, dated as of November 16, 2009, by and among EFIH, BNY, as trustee, and the other secured debt representatives party thereto. |
| Collective Benefit Fees | As defined in the Term Sheet. |
| Commitment Letter | That certain letter to EFH and EFIH from the Commitment Parties memorializing the EFIH Second Lien DIP Financing Commitment, dated as of April 29, 2014. |
| Commitment Parties | Those certain Holders of EFIH Unsecured Notes backstopping the EFIH Second Lien DIP Financing Commitment. |

30

| Term | Definition |
|------|------------|
| **Competitive Tax Sharing Agreement** | That certain Federal and State Income Tax Allocation Agreement (as amended and restated from time to time), dated May 15, 2012, by and among EFH and certain of its direct and indirect subsidiaries. |
| **Conditions Precedent** | As defined in the Term Sheet. |
| **Confirmation** | Entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan and this Term Sheet. |
| **Confirmation Order** | The order entered by the Bankruptcy Court confirming the Plan. |
| **Consenting Creditors** | As defined in the Restructuring Support Agreement. |
| **Consenting Interest Holders** | As defined in the Restructuring Support Agreement. |
| **Consummation** | The occurrence of the Effective Date. |
| **Contested Claim** | A Claim (a) to the extent it is listed in the Schedules as disputed, contingent, or unliquidated, in whole or in part, and as to which no Proof of Claim has been filed; (b) if it is listed in the Schedules as undisputed, liquidated, and not contingent and as to which a Proof of Claim has been filed with the Bankruptcy Court, to the extent (i) the Proof of Claim amount exceeds the amount indicated in the Schedules, or (ii) the Proof of Claim priority differs from the priority set forth in the Schedules; (c) if it is not listed in the Schedules or was listed in the Schedules as disputed, contingent or unliquidated, in whole or in part, but as to which a Proof of Claim has been filed with the Bankruptcy Court; or (d) as to which an objection has been filed on or before the Claim Objection Deadline; provided, that a Claim (x) that is fixed in amount and priority pursuant to the Plan or by final order of the Bankruptcy Court or (y) with respect to which a Proof of Claim has been timely filed and no objection has been filed by the Claim Objection Deadline, shall not be a Contested Claim. |
| **Contribution** | As defined in the Term Sheet. |
| **Conversion Agreement** | That certain agreement governing the terms of the Equity Conversion, which shall be on the terms set forth on Exhibit B to the Commitment Letter. |
| **Conversion Shares** | Shares of Reorganized EFH Common Stock issued and outstanding as of the Effective Date which will be issued pursuant to the Equity Conversion. |
| **Debtors** | As defined in the Introduction. |
| **Disallowed Claim** | A Claim, or a portion thereof, that has been disallowed by a final order of the Bankruptcy Court. |

31

PX 095
Page 293 of 464

| Term | Definition |
|------|------------|
| **Disclosure Statement** | The disclosure statement for the Plan, including all exhibits and schedules thereto and references therein that relate to the Plan that is prepared and distributed in accordance with this Term Sheet, the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law. |
| **Distribution** | As defined in the Term Sheet. |
| **EFCH** | As defined in the Introduction. |
| **EFCH 2037 Note Claims** | Any Claim derived from or based upon the EFCH 2037 Notes. |
| **EFCH 2037 Note Indenture** | That certain Indenture, dated as of December 1, 1995, by and among EFCH, as the issuer, and BNY, as trustee. |
| **EFCH 2037 Notes** | Collectively: (a) the EFCH Fixed 2037 Notes; and (b) the EFCH Floating 2037 Notes. |
| **EFCH 2037 Note Trustee** | BNY, or any successor thereto, in its capacity as trustee under the EFCH 2037 Notes. |
| **EFCH Fixed 2037 Notes** | The 8.175% Unsecured Fixed Notes due January 30, 2037, issued by EFCH pursuant to the EFCH 2037 Note Indenture. |
| **EFCH Floating 2037 Notes** | The 1.245% Unsecured Floating Rate Notes due January 30, 2037, issued by EFCH pursuant to the EFCH 2037 Note Indenture. |
| **Effective Date** | The date to be selected by the Debtors, in consultation with the Required Consenting Creditors, for the Consummation of the Plan, or as soon thereafter as reasonably practicable. |
| **EFH** | As defined in the Introduction. |
| **EFH 2019 Note Indenture** | That certain Indenture, dated November 16, 2009, by and among EFH, as issuer, and BNY, as trustee. |
| **EFH 2019 Notes** | The 9.75% unsecured notes due October 15, 2019, issued by EFH pursuant to the EFH 2019 Note Indenture |
| **EFH 2020 Note Indenture** | That certain Indenture dated January 12, 2010, by and among EFH, as issuer, and BNY, as trustee. |
| **EFH 2020 Notes** | The 10.0% unsecured notes due January 15, 2020, issued by EFH pursuant to the EFH 2020 Note Indenture. |
| **EFH Cash** | Cash on hand at EFH, including Oncor TSA payments if such is determined by the Bankruptcy Court, less $38 million. |
| **EFH Corporate Services** | EFH Corporate Services Company, a Texas corporation. |
| **EFH Debtor Intercompany Claim** | A Claim by an EFH Debtor against another EFH Debtor. |
| **EFH Debtors** | Collectively: (a) EFH; and (b) EFH's direct and indirect subsidiaries listed on **Exhibit C**. |

32

| Term | Definition |
|------|-----------|
| **EFH-EFIH Intercompany Claims** | Allowed Non-EFH Debtor Intercompany Claims held by EFIH against EFH; *provided, however,* that if the Restructuring Support Agreement terminates, such claims shall be reduced on a dollar-for-dollar basis to account for any Oncor TSA payments actually received by EFIH; *provided, further,* that, for the avoidance of doubt, all rights, offsets, claims, and defenses of EFH will be preserved (in all cases, subject to any defenses) with respect to such Claims. |
| **EFH Interest** | Any Interest in EFH. |
| **EFH LBO Note Primary Claims** | Any claims against EFH arising on account of the EFH LBO Notes. |
| **EFH LBO Note Claims** | Any claims arising on account of the EFH LBO Notes, including the EFH LBO Note Primary Claims and the EFH LBO Note Guaranty Claims. If the recovery to Holders of EFH LBO Note Claims under the Plan is greater than 100% of the amount of such Claims, any recovery on account of such claims shall be returned to EFH or EFIH on a Pro Rata basis based on the relative distributions from such Estates; *provided, further,* that if Holders of General Unsecured Claims Against the EFIH Debtors receive any postpetition interest on account of their Claims, Holder of EFH LBO Note Claims shall be entitled to postpetition interest before any such amounts are returned. |
| **EFH LBO Note Indenture** | That certain Indenture, dated as of October 31, 2007, by and among EFH, as the issuer, EFCH and EFIH, as guarantors, and BNY, as trustee. |
| **EFH LBO Notes** | Collectively: (a) the EFH LBO Senior Notes; and (b) the EFH LBO Toggle Notes. |
| **EFH LBO Notes Guaranty Claims** | Any guaranty claims against EFIH arising on account of the EFH LBO Notes. |
| **EFH LBO Notes Trustee** | BNY, or any successor thereto, in its capacity as trustee under the EFH LBO Notes. |
| **EFH LBO Senior Notes** | The 10.875% senior notes due November 1, 2017, issued by EFH pursuant to the EFH LBO Note Indenture. |
| **EFH LBO Toggle Notes** | The 11.25%/12.00% toggle notes due November 1, 2017, issued by EFH pursuant to the EFH LBO Note Indenture. |
| **EFH Legacy 2014 Notes** | The 5.55% series P senior notes due November 15, 2014, issued by EFH pursuant to the EFH Legacy Note Indenture. |
| **EFH Legacy 2024 Notes** | The 6.50% series Q senior notes due November 15, 2024, issued by EFH pursuant to the EFH Legacy Note Indenture. |
| **EFH Legacy 2034 Notes** | The 6.55% series R senior notes due November 15, 2034, issued by EFH pursuant to the EFH Legacy Note Indenture. |
| **EFH Legacy Note Indenture** | That certain Indenture, dated November 1, 2004, by and among EFH, as issuer, and BNY, as trustee. |

33

| Term | Definition |
|---|---|
| EFH Legacy Notes | Collectively: (a) the EFH Legacy 2014 Notes; (b) the EFH Legacy 2024 Notes; and (c) the EFH Legacy 2034 Notes. |
| EFH Non-Guaranteed Notes | Collectively: (a) the EFH Unexchanged Notes; and (b) the EFH Legacy Notes. |
| EFH Note Claim | Any Claim derived from or based upon the EFH Notes. |
| EFH Notes | Collectively: (a) the EFH Unexchanged Notes; (b) the EFH Legacy Notes; and (c) the EFH LBO Notes. |
| EFH Notes Trustee | BNY, or any successor thereto, in its capacity as trustee under the EFH Notes. |
| EFH Properties | EFH Properties Company, a Texas corporation. |
| EFH Unexchanged Notes | Collectively: (a) the EFH 2019 Notes; and (b) the EFH 2020 Notes. |
| EFH Unsecured Claim Fund | All EFH assets, including the EFH Cash, and Causes of Action, but excluding Interests in EFIH, subject to all applicable rights and defenses of EFH. In connection with the creation of the EFH Unsecured Claim Fund, the Debtors shall request a determination from the Bankruptcy Court regarding whether the payments under the Oncor Tax Sharing Agreement are assets of the Estates of the EFIH Debtors or the EFH Unsecured Claim Fund (as successor to the rights of EFH in such respect). |
| EFIH | As defined in the Introduction. |
| EFIH Debtor Intercompany Claim | A Claim by an EFIH Debtor against another EFIH Debtor. |
| EFIH Debtors | Collectively: (a) EFIH; and (b) EFIH Finance. |
| EFIH Finance | EFIH Finance Inc., a Delaware corporation. |
| EFIH First Lien 2017 Note Indenture | That certain Indenture, dated August 14, 2012, by and among EFIH and EFIH Finance, as issuers, and CSC Trust Company of Delaware, as successor trustee to BNY. |
| EFIH First Lien 2017 Notes | The 6.875% senior secured notes due August 15, 2017, issued by EFIH and EFIH Finance pursuant to the EFIH First Lien 2017 Note Indenture. |
| EFIH First Lien 2020 Note Indenture | That certain Indenture, dated August 17, 2010, by and among EFIH and EFIH Finance, as issuers, and CSC Trust Company of Delaware, as successor trustee to BNY. |
| EFIH First Lien 2020 Notes | The 10.0% senior secured notes due December 1, 2020, issued by EFIH and EFIH Finance pursuant to the EFIH First Lien 2020 Note Indenture. |
| EFIH First Lien DIP Claims | Any and all Claims derived from or based upon the EFIH First Lien DIP Financing. |

34

| Term | Definition |
|------|-----------|
| **EFIH First Lien DIP Financing** | The postpetition debtor-in-possession financing facility substantially on the terms set forth on **Exhibit G**. |
| **EFIH First Lien Indentures** | The EFIH First Lien 2020 Note Indenture and the EFIH First Lien 2017 Note Indenture. |
| **EFIH First Lien Makewhole Claim** | Any Claim derived from or based upon makewhole or other similar payment provisions under the EFIH First Lien Notes. |
| **EFIH Second Lien DIP Motion** | As defined in the Term Sheet. |
| **EFIH First Lien Note Claim** | Any Claim derived from or based upon the EFIH First Lien Notes. |
| **EFIH First Lien Notes** | Collectively: (a) the EFIH First Lien 2017 Notes; and (b) the EFIH First Lien 2020 Notes. |
| **EFIH First Lien Settlement** | As defined in the Term Sheet. |
| **EFIH Second Lien 2021 Notes** | The 11.0% senior secured second lien notes due October 1, 2021, issued by EFIH and EFIH Finance pursuant to the EFIH Second Lien Note Indenture. |
| **EFIH Second Lien 2022 Notes** | The 11.75% senior secured second lien notes due March 1, 2022, issued by EFIH and EFIH Finance pursuant to the EFIH Second Lien Note Indenture. |
| **EFIH Second Lien Cash-Out Option** | As defined in the Term Sheet. |
| **EFIH Second Lien DIP Claims** | Any and all Claims derived from or based upon the EFIH Second Lien DIP Financing. |
| **EFIH Second Lien DIP Financing** | The postpetition debtor-in-possession financing facility substantially on the terms set forth on Exhibit A to the Commitment Letter. |
| **EFIH Second Lien DIP Motion** | As defined in the Term Sheet. |
| **EFIH Second Lien DIP Financing Commitment** | As defined in the Term Sheet. |
| **EFIH Second Lien DIP Roll Option** | As defined in the Term Sheet. |
| **EFIH Second Lien Makewhole Claim** | Any Claim derived from or based upon makewhole or other similar payment provisions under the EFIH Second Lien Notes. |
| **EFIH Second Lien Note Claim** | Any Claim derived from or based upon the EFIH Second Lien Notes. |
| **EFIH Second Lien Note Indenture** | That certain Indenture, dated April 25, 2011, by and among EFIH and EFIH Finance, as issuers, and BNY, as trustee. |
| **EFIH Second Lien Notes** | Collectively: (a) the EFIH Second Lien 2021 Notes; and (b) the EFIH Second Lien 2022 Notes. |

35

| Term | Definition |
|------|-----------|
| **EFIH Second Lien Settlement** | As defined in the Term Sheet. |
| **EFIH Senior Toggle Note Indenture** | That certain Indenture, dated December 5, 2012, by and among EFIH and EFIH Finance, as issuers, and UMB Bank, N.A, as trustee. |
| **EFIH Senior Toggle Notes** | The 11.25%/12.25% unsecured senior toggle notes due December 1, 2018, issued by EFIH and EFIH Finance pursuant to the EFIH Senior Toggle Note Indenture. |
| **EFIH Shared Services Agreement** | That certain Shared Services Agreement, dated March 28, 2014, by and among EFIH, EFIH Finance, and EFH Corporate Services. |
| **EFIH Unexchanged Note Indenture** | That certain Indenture, dated November 16, 2009, by and among EFIH and EFIH Finance, as issuers, and BNY, as trustee. |
| **EFIH Unexchanged Notes** | The 9.75% fixed senior notes due October 15, 2019, issued by EFIH and EFIH Finance pursuant to the EFIH Unexchanged Note Indenture. |
| **EFIH Unsecured Note Claim** | Any Claim against EFIH derived from or based upon the EFIH Unsecured Notes. |
| **EFIH Unsecured Notes** | Collectively: (a) the EFIH Senior Toggle Notes and (b) the EFIH Unexchanged Notes. |
| **Entity** | As defined in section 101(15) of the Bankruptcy Code. |
| **Equity Conversion** | The mandatory conversion of the EFIH Second Lien DIP Financing, inclusive of any Commitment Fee (which for the avoidance of doubt, assumes a $1.9 billion funding amount and the Funding PIK Fee), into 177,658,788 Conversion Shares, plus an additional 89,052 Conversion Shares for each million dollars of EFIH Second Lien DIP Financing in excess of $1,995 million, and less 89,052 shares of Conversion Shares for each million dollars of EFIH Second Lien DIP Financing less than $1,995 million outstanding on the Effective Date; provided, however, that the stated plan value of the Conversion Shares is at least equal to the adjusted issue price of the EFIH Second Lien DIP Financing.[2] For the avoidance of doubt, this is a negotiated plan value solely for purposes of the deal embodied in this Term Sheet and the Restructuring Support Agreement and shall not be binding upon any party to the extent the Plan is not confirmed and consummated. |
| **Estate** | As to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code. |

---

[2]     Calculated contemplated accrued interest as of April 30, 2014.

36

PX 095
Page 298 of 464

| Term | Definition |
|---|---|
| **Exculpated Parties** | Collectively, and in each case in its capacity as such: (a) the Debtors and Reorganized Debtors; (b) the Consenting Creditors; (c) the Consenting Interest Holders; (d) the DIP Agents; (e) the DIP Lenders; and (f) with respect to each of the foregoing entities in clauses (a) through (e), such Entity's current and former affiliates, equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals. |
| **Extended Outside Date** | As defined in the Restructuring Support Agreement. |
| **FERC** | The Federal Energy Regulatory Commission. |
| **Fidelity** | Collectively, Fidelity Investments and its affiliates that execute the Restructuring Support Agreement before the Petition Date. |
| **Fidelity Repayment** | The cash payment by Holders of General Unsecured Claims Against EFH other than Fidelity that elected to participate in their Pro Rata share of up to 9% of the Equity Conversion, which shall be used by EFIH to repay in cash the applicable Second Lien DIP Notes held by Fidelity in respect of such share, simultaneously with the Equity Conversion. |
| **General Unsecured Claim Against EFH** | Any Unsecured Claim against EFH that is not otherwise paid in full pursuant to a separate order of the Bankruptcy Court, including the EFH Note Claims and the EFH LBO Note Primary Claims, but excluding: (a) Administrative Claims against the EFH Debtors; (b) Intercompany Claims against the EFH Debtors; and (c) Other Priority Claims against the EFH Debtors. |
| **General Unsecured Claim Against the EFH Debtors Other Than EFH** | Any Unsecured Claim against one or more of the EFH Debtors other than EFH that is not otherwise paid in full pursuant to a separate order of the Bankruptcy Court, excluding: (a) Administrative Claims against the EFH Debtors; (b) Intercompany Claims against the EFH Debtors; and (c) Other Priority Claims against the EFH Debtors. |
| **General Unsecured Claim Against the EFIH Debtors** | Any Unsecured Claim against one or more of the EFIH Debtors that is not otherwise paid in full pursuant to a separate order of the Bankruptcy Court, including the EFIH Unsecured Note Claims and the EFH LBO Notes Guaranty Claims, but excluding: (a) Administrative Claims against the EFIH Debtors; (b) Intercompany Claims against the EFIH Debtors; and (c) Other Priority Claims against the EFIH Debtors. |

37

| Term | Definition |
|---|---|
| **General Unsecured Claim Against the TCEH Debtors** | Any Unsecured Claim against one or more of the TCEH Debtors that is not otherwise paid in full pursuant to separate order of the Bankruptcy Court, including the EFCH 2037 Note Claims, TCEH First Lien Deficiency Claims, TCEH Second Lien Note Claims, and TCEH Unsecured Note Claims, but excluding: (a) Administrative Claims against the TCEH Debtors; (b) Intercompany Claims against the TCEH Debtors; and (c) Other Priority Claims against the TCEH Debtors. |
| **GSO** | GSO Capital Partners and its affiliates. |
| **Holder** | An Entity holding a Claim or Interest, as applicable. |
| **Impaired** | With respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| **Incremental Amendment Agreement** | That certain Incremental Amendment No. 1, dated as January 4, 2013, by and among the Incremental 2012 Term Lenders (as defined therein), EFCH, TCEH, the Credit Parties (as defined therein) party thereto, and Citibank, N.A., as Administrative Agent and Collateral Agent. |
| **Intended Tax-Free Treatment** | As defined in the Term Sheet. |
| **Intercompany Claim** | A Claim by EFH or any direct or indirect subsidiary of EFH against EFH or any direct or indirect subsidiary of EFH. |
| **Interest** | Any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor. |
| **IRS** | The Internal Revenue Service. |
| **IRS Submission** | As defined in the Term Sheet. |
| **Legacy General Unsecured Claims Against EFH** | Any Claims against EFH arising from liabilities based on asbestos exposure and post-employment benefits relating to discontinued operations of the Debtors and their Affiliates. |
| **Liability Management Program** | The various transactions, including debt buybacks, new debt issuances, debt exchanges, and maturity extensions, by EFH and its direct and indirect subsidiaries, and restructuring of such Entities' debt obligations completed before the Petition Date, as described in the Debtors' most recent annual SEC filing. |
| **Minimum Basis** | As defined in the Term Sheet. |
| **New Reorganized EFIH Debt** | The new long-term secured EFIH funded debt issued on the Effective Date on terms and conditions mutually acceptable to the EFIH Debtors and the Required EFIH Unsecured Consenting Creditors. |

38

| Term | Definition |
|---|---|
| New Reorganized TCEH Debt | The new long-term secured TCEH debt, consistent with the terms set forth in this Term Sheet. The amount of the New Reorganized TCEH Debt issued on the Effective Date shall not be less than the Minimum Basis. |
| Non-EFH Debtor Intercompany Claim | A Claim by EFH or any direct or indirect subsidiary of EFH other than an EFH Debtor against an EFH Debtor, including EFH Note Claims held by EFIH. |
| Non-EFIH Debtor Intercompany Claim | A Claim by EFH or any direct or indirect subsidiary of EFH other than an EFIH Debtor against an EFIH Debtor. |
| Non-Settling EFIH First Lien Note Holders | As defined in the Term Sheet. |
| Non-Settling EFIH Second Lien Note Holders | As defined in the Term Sheet. |
| Non-TCEH Debtor Intercompany Claim | A Claim by EFH or any direct or indirect subsidiary of EFH other than a TCEH Debtor against a TCEH Debtor, including any Claim against a TCEH Debtor arising under or related to the Competitive Tax Sharing Agreement, but excluding any Claim derived from or based upon TCEH First Lien Notes held by EFH. |
| NRC | The Nuclear Regulatory Commission. |
| Oak Grove Promissory Note | The promissory note issued by Oak Grove Power Company LLC and secured by certain minerals and real property in Robertson, Texas. |
| Oak Grove Promissory Note Claim | Any Claim derived from or based upon the Oak Grove Promissory Note. |
| Oncor Tax Sharing Agreement | The amended and restated Tax Sharing Agreement, dated as of November 5, 2008, by and among EFH, Oncor Electric Delivery Holdings Company LLC, Oncor Electric Delivery Company LLC, Texas Transmission Investment LLC, and Oncor Management Investment LLC. |
| Oncor TSA Amendment | As defined in the Term Sheet. |
| Oncor TSA Amendment Order | As defined in the Term Sheet. |

39

PX 095
Page 301 of 464

| Term | Definition |
|------|------------|
| Oncor TSA Amendment Payment | $55 million cash to be paid by EFIH to EFH on the Effective Date, which shall be paid to Holders of General Unsecured Claims Against EFH on the Effective Date; provided, however, that such payment from EFIH will be reduced dollar-for-dollar (for the avoidance of doubt, beginning with the first dollar of any shortfall) in the event that EFIH receives less than 80% of the amount shown below for the date that is nearest to the Effective Date: <br><br> Effective Date:        Projected EFIH Net Tax Receipts: <br> January 31, 2015     $254 million <br> February 28, 2015   $261 million <br> March 31, 2015       $261 million <br> April 30, 2015         $321 million <br> May 31, 2015          $328 million <br> June 30, 2015          $387 million <br> July 31, 2015           $387 million <br> August 31, 2015      $394 million <br> September 30, 2015  $453 million |
| Other Priority Claim | Any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| Other Secured Claim | Any Secured Claim against any of the Debtors, including the Oak Grove Promissory Note Claims and Tex-La Obligations, but not including a: (a) TCEH First Lien Secured Claim; (b) TCEH Second Lien Secured Claim; (b) EFIH First Lien Note Claim; or (c) EFIH Second Lien Note Claim. |
| Participation Rights | The right to participate in the EFIH Second Lien DIP Financing as set forth in the Commitment Letter. |
| Petition Date | The date on which the Debtors commence the Chapter 11 Cases. |
| PIMCO | Collectively, funds and accounts under the management of Pacific Investment Management Company LLC and its subsidiaries, in each case solely to the extent that they hold EFIH First Lien Note Claims in the aggregate amounts set forth on PIMCO's signature page to the Restructuring Support Agreement. |
| Plan | As defined in the Introduction. |
| Plan Restructuring Documents | As defined in the Restructuring Support Agreement. |
| Plan Supplement | The compilation of documents and forms of documents, schedules, and exhibits to the Plan filed by the Debtors. |
| PLR Participation Parties | As defined in the Term Sheet. |

40

PX 095
Page 302 of 464

| Term | Definition |
|---|---|
| **PLR Participation Party Representative** | As defined in the Term Sheet. |
| **Pre-Submission Conference** | As defined in the Term Sheet. |
| **Pre-Submission Memo** | As defined in the Term Sheet. |
| **Priority Tax Claims** | Claims of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code. |
| **Private Letter Ruling** | As defined in the Term Sheet. |
| **Professional Fees** | As defined in the Term Sheet. |
| **Proof of Claim** | A proof of Claim filed against any of the Debtors in the Chapter 11 Cases by the applicable Bar Date. |
| **Pro Rata** | The proportion that a Claim or Interest in a particular Class bears to the aggregate amount of the Claims or Interests in that Class, or the proportion of the Claims or Interests in a particular Class and other Classes entitled to share in the same recovery as such Claim or Interest under the Plan. |
| **PUC** | The Public Utility Commission of Texas. |
| **Reinstated** | (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such Claim, or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation under a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the holder of such Claim for any pecuniary loss incurred by such holder as the result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the holder thereof. |

41

| Term | Definition |
|---|---|
| Released Parties | Collectively, and in each case in its capacity as such: (a) the Consenting Creditors; (b) the Commitment Parties; (c) any Selected Partners (as defined in the Commitment Letter); (d) any Selected Investment Commitment Partners (as defined in the Commitment Letter); (e) the Consenting Interest Holders; (f) the lenders under the TCEH DIP Financing, EFIH First Lien DIP Financing, and the EFIH Second Lien DIP Financing; (g) the agents under the TCEH Credit Agreement, TCEH DIP Financing, EFIH First Lien DIP Financing, and the EFIH Second Lien DIP Financing; and (h) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (g), such Entity and its affiliates, and such Entity and its affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; provided, however, that any Holder of a Claim or Interest that opts out of the releases contained in the Plan shall not be a "Released Party." |
| Releasing Parties | Collectively, and in each case in its capacity as such: (a) the Consenting Creditors; (b) the Commitment Parties; (c) any Selected Partners (as defined in the Commitment Letter); (d) any Selected Investment Commitment Partners (as defined in the Commitment Letter); (e) the Consenting Interest Holders; (f) the lenders under the TCEH DIP Financing, EFIH First Lien DIP Financing, and the EFIH Second Lien DIP Financing; (g) the agents under the TCEH Credit Agreement, TCEH DIP Financing, EFIH First Lien DIP Financing, and the EFIH Second Lien DIP Financing; (h) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (g), such Entity and its affiliates, and such Entity and its affiliate's current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (i) all holders of Claims that are deemed to accept the Plan; (j) all holders of Claims who vote to accept the Plan; and (k) all holders in voting Classes who abstain from voting on the Plan and who do not opt out of the releases provided by the Plan. |
| Reorganized Debtors | Collectively, and each in its capacity as such (and to the extent such Entity is a Debtor in the Chapter 11 Cases): (a) Reorganized EFH; (b) Reorganized EFIH; and (c) the Reorganized TCEH Debtors. |

PX 095
Page 304 of 464

| Term | Definition |
|------|------------|
| **Reorganized EFH** | EFH, or any successor thereto, by merger, consolidation, or otherwise, on and after the Effective Date, it being understood that, as of the Effective Date, Reorganized EFH shall be a corporation organized under the laws of the state of Texas. |
| **Reorganized EFH Board** | The board of directors of Reorganized EFH on and after the Effective Date. |
| **Reorganized EFH Common Stock** | The newly-issued common stock in Reorganized EFH, which shall consist of 100 million shares prior to the Equity Conversion and the issuance of shares under the Reorganized EFH/EFIH Management Incentive Plan (if any), which shall be issued in accordance with this Term Sheet. The number of shares of newly-issued Reorganized EFH Common Stock may be increased or decreased at the direction of the Required EFIH Unsecured Consenting Creditors, which shall result in the proportionate increase or decrease, as applicable, of Reorganized EFH Common Stock issued under the Equity Conversion. |
| **Reorganized EFIH** | EFIH, or any successor thereto, by merger, consolidation, or otherwise, on and after the Effective Date, it being understood that, as of the Effective Date, Reorganized EFIH shall be a limited liability company organized under the laws of the state of Delaware. |
| **Reorganized EFIH Board** | The board of directors of Reorganized EFIH on and after the Effective Date. |
| **Reorganized TCEH** | TCEH, or any successor thereto, by merger, consolidation, or otherwise, on and after the Effective Date, it being understood that, as of the Effective Date, Reorganized TCEH shall be a corporation organized under the laws of the state of Delaware. |
| **Reorganized TCEH Board** | The board of directors of Reorganized TCEH on and after the Effective Date. |
| **Reorganized TCEH Common Stock** | The newly-issued common stock of Reorganized TCEH, which shall be issued in accordance with this Term Sheet. |
| **Reorganized TCEH Debtors** | TCEH and each of its Debtor subsidiaries, or any successor thereto, by merger, consolidation, or otherwise, on and after the Effective Date. |
| **Reorganized TCEH Management Incentive Plan** | The Management Incentive Plan of Reorganized TCEH on terms and conditions to be determined on or after the Effective Date by the compensation committee of the Reorganized TCEH Board. The maximum amount of Reorganized TCEH Common Stock to be allocated to the Management Incentive Plan will be determined by the Ad Hoc TCEH Committee, in consultation with the TCEH Debtors, on or before the hearing date regarding approval of the Disclosure Statement. |
| **Required Consenting Creditors** | As defined in the Restructuring Support Agreement. |

43

| Term | Definition |
|------|------------|
| **Required EFIH Unsecured Consenting Creditors** | At least three (3) investment advisors that manage and/or advise funds or accounts that beneficially own, collectively, at least 66.6% of the EFIH Unsecured Note Claims held by all Consenting Creditors. |
| **Required Rulings** | As defined in the Term Sheet. |
| **Restructuring** | As defined in the Introduction. |
| **Restructuring Support Agreement** | The Restructuring Support and Lock-Up Agreement to which this Term Sheet is attached as Exhibit A, pursuant to which the Debtors, the Consenting Interest Holders, the Consenting Creditors, and the Permitted Transferees (if any) (as defined in the Restructuring Support Agreement) agree to pursue and implement the Restructuring, including the transactions contemplated by the Commitment Letter, consistent in form and substance in all material respects with this Term Sheet and the Plan. |
| **Restructuring Transactions** | Those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors, the Consenting Interest Holders, and the Consenting Creditors reasonably determine to be necessary to implement the Plan. |
| **Ruling Request** | As defined in the Term Sheet. |
| **Rural Utilities Service** | An agency of the United States Department of Agriculture tasked with providing public utilities to rural areas in the United States through public-private partnerships. |
| **Schedules** | The schedules of assets and liabilities and the statements of financial affairs filed by the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 |
| **SEC** | The Securities and Exchange Commission. |
| **Secured** | When referring to a Claim: (a) secured by a lien on property in which any of Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim. |
| **Securities Act** | The Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder. |

44

| Term | Definition |
|------|-----------|
| Security | A security as defined in section 2(a)(1) of the Securities Act. |
| Selected Partners | As defined in the Commitment Letter. |
| Settling EFIH First Lien Note Holders | As defined in the Term Sheet. |
| Settling EFIH Second Lien Note Holders | As defined in the Term Sheet. |
| Shared Services | As defined in the Term Sheet. |
| Tax-Free Spin-Off | The transactions required to preserve the Intended Tax-Free Treatment of the Restructuring Transactions, including the Contribution and the Distribution. |
| Tax Matters Agreement | The tax matters agreement entered into by Reorganized EFH and Reorganized TCEH as of the Effective Date which shall govern the rights and obligations of each party with respect to certain tax matters, including covenants to protect the Intended Tax-Free Treatment of the Restructuring Transactions and indemnity provisions if either party takes action that causes the Restructuring Transactions to fail to qualify for the Intended Tax-Free Treatment. |
| Tax Sharing Agreements | Collectively: (a) the Competitive Tax Sharing Agreement; and (b) the Oncor Tax Sharing Agreement. |
| TCEH | As defined in the Introduction. |
| TCEH 2012 Incremental Term Loans | The TCEH First Lien Claims deemed to have been incurred pursuant to Section 1 of the Incremental Amendment Agreement. |
| TCEH 2015 Notes | The 10.25% fixed senior notes due November 1, 2015, issued by TCEH and TCEH Finance pursuant to the TCEH 2015 Note Indenture. |
| TCEH 2015 Note Indenture | That certain Indenture, dated as of October 31, 2007, by and among TCEH and TCEH Finance, as the issuers; EFCH and certain TCEH subsidiaries, as guarantors, and Law Debenture Trust Company of New York, as successor trustee to BNY. |
| TCEH Cash Collateral Order | An order entered by the Bankruptcy Court approving the TCEH Debtors' use of the TCEH First Lien Creditors' cash collateral subject to the terms and conditions described therein, which order shall be in form and substance reasonably satisfactory to the Ad Hoc TCEH Committee. |
| TCEH Credit Agreement | The TCEH Credit Agreement, dated as of October 10, 2007, by and among TCEH, as the borrower; EFCH and certain TCEH subsidiaries, as guarantors; Wilmington Trust, N.A., as successor administrative and collateral agent to Citibank, N.A.; and the TCEH First Lien Lenders. |
| TCEH Debtor Intercompany Claim | A Claim by a TCEH Debtor against another TCEH Debtor. |

45

| Term | Definition |
|---|---|
| TCEH Debtors | Collectively: (a) EFCH; (b) TCEH; and (c) the TCEH subsidiaries listed on **Exhibit B**. |
| TCEH DIP Claims | Any and all Claims arising under or related to the TCEH DIP Financing. |
| TCEH DIP Financing | The TCEH Debtors' $4,475 million debtor-in-possession financing facility on the terms set forth on **Exhibit F**. |
| TCEH Finance | TCEH Finance, Inc., a Delaware corporation. |
| TCEH First Lien Claims | Any Claim derived from or based upon: (a) the TCEH Credit Agreement (including the term loan, revolver, and letter of credit facilities); (b) the TCEH First Lien Notes, including TCEH First Lien Notes held by EFH; (c) the TCEH First Lien Interest Rate Swaps; or (d) the TCEH First Lien Commodity Hedges. |
| TCEH First Lien Commodity Hedges | The commodity hedges entered into by TCEH and secured by the same collateral as Claims under the TCEH Credit Agreement and the TCEH First Lien Notes (but without respect to any setoff rights that a counterparty to a TCEH First Lien Commodity Hedge may have against TCEH). |
| TCEH First Lien Deficiency Claims | Any TCEH First Lien Claim that is not a TCEH First Lien Secured Claim. |
| TCEH First Lien Interest Rate Swaps | The interest rate swaps entered into by TCEH and secured by the same collateral as Claims under the TCEH Credit Agreement and the TCEH First Lien Notes (but without respect to any setoff rights that a counterparty to a TCEH First Lien Interest Rate Swap may have against TCEH). |
| TCEH First Lien Lenders | The lending institutions party from time to time to the TCEH Credit Agreement. |
| TCEH First Lien Note Indenture | That certain Indenture, dated as of April 19, 2011, by and among TCEH and TCEH Finance, as the issuers, EFCH and certain TCEH subsidiaries, as guarantors, and BNY, as trustee. |
| TCEH First Lien Notes | The TCEH first lien notes due October 1, 2020, issued by TCEH and TCEH Finance pursuant to the TCEH First Lien Note Indenture. |
| TCEH First Lien Secured Claims | Any TCEH First Lien Claim that is Secured. TCEH First Lien Secured Claims shall be Allowed as Secured Claims in an amount to be determined by the TCEH Debtors with the reasonable consent of the Ad Hoc TCEH Committee. |
| TCEH Second Lien Note Claims | Any Claim derived from or based upon the TCEH Second Lien Notes. |
| TCEH Second Lien Note Indenture | That certain Indenture, dated as of October 6, 2010, by and among TCEH and TCEH Finance, as the issuers; Citibank, N.A., as administrative agent, EFCH and certain of TCEH's subsidiaries, as guarantors, and Wilmington Savings, as successor trustee to BNY. |

PX 095
Page 308 of 464

| Term | Definition |
|------|------------|
| **TCEH Second Lien Notes** | The TCEH Second Lien Notes due April 21, 2021, issued by TCEH pursuant to the TCEH Second Lien Note Indenture. |
| **TCEH Senior Toggle Note Indenture** | That certain Indenture, dated as of December 6, 2007, by and among TCEH and TCEH Finance, as the issuers; EFCH and certain TCEH subsidiaries, as guarantors; and Law Debenture Trust Company of New York, as successor trustee to BNY. |
| **TCEH Senior Toggle Notes** | The 10.50%/11.25% Senior Toggle Notes due November 1, 2016, issued by TCEH and TCEH Finance pursuant to the TCEH Senior Toggle Note Indenture. |
| **TCEH Unsecured Claim Fund** | Cash in an amount equal to the value of the unencumbered assets of TCEH. |
| **TCEH Unsecured Note Claims** | Any Claim derived from or based upon the TCEH Unsecured Notes. |
| **TCEH Unsecured Notes** | Collectively:  (a) the TCEH 2015 Notes; and (b) the TCEH Senior Toggle Notes. |
| **TEF** | As defined in the Restructuring Support Agreement. |
| **Term Sheet** | As defined in the Introduction. |
| **Tex-La** | Tex-La Electric Cooperative of Texas, Inc. |
| **Tex-La 2019 Obligations** | The payment obligations of EFCH under the terms of the Tex-La Assumption Agreement with respect to the 9.58% fixed notes due 2019 issued by Tex-La in the outstanding principal amount of $35 million. |
| **Tex-La 2021 Obligations** | The payment obligations of EFCH under the terms of the Tex-La Assumption Agreement with respect to the 8.254% Fixed Notes due 2021 issued by Tex-La in the outstanding principal amount of $37 million. |
| **Tex-La Assumption Agreement** | That certain Assumption Agreement, dated February 1, 1990, by and among EFCH, Tex-La, and the United States of America acting through the Administrator of the Rural Utilities Service, whereby EFCH agreed to assume certain payment obligations related to certain outstanding indebtedness of Tex-La that is guaranteed by the Rural Utilities Service. |
| **Tex-La Obligations** | Collectively:  (a) the Tex-La 2019 Obligations; and (b) the Tex-La 2021 Obligations, including any prepayment premiums and other costs and expenses due as full and final satisfaction of each of the foregoing. |
| **Texas Holdings** | As defined in the Restructuring Support Agreement. |
| **Total Professional Fees** | As defined in the Term Sheet. |
| **Tranche A-3 Redemption** | As defined in the Term Sheet |
| **Unimpaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired. |

47

| Term | Definition |
|------|------------|
| Unsecured Claim | Any Claim that is not a Secured Claim. |
| Wilmington Savings | Wilmington Savings Fund Society, FSB, as successor trustee under the TCEH Second Lien Note Indenture. |
| York | York Capital Management LLC and its affiliates. |

48

## EXHIBIT B

### TCEH SUBSIDIARIES PARTY TO RESTRUCTURING

4Change Energy Company
4Change Energy Holdings LLC
Big Brown 3 Power Company LLC
Big Brown Lignite Company LLC
Big Brown Power Company LLC
Collin Power Company LLC
DeCordova Power Company LLC
DeCordova II Power Company LLC
Eagle Mountain Power Company LLC
Energy Future Competitive Holdings Company LLC
Generation MT Company LLC
Generation SVC Company
Lake Creek 3 Power Company LLC
Luminant Big Brown Mining Company LLC
Luminant Energy Company LLC
Luminant Energy Trading California Company
Luminant ET Services Company
Luminant Generation Company LLC
Luminant Holding Company LLC
Luminant Mineral Development Company LLC
Luminant Mining Company LLC
Luminant Renewables Company LLC
Martin Lake 4 Power Company LLC
Monticello 4 Power Company LLC
Morgan Creek 7 Power Company LLC
NCA Resources Development Company LLC
Oak Grove Management Company LLC
Oak Grove Mining Company LLC
Oak Grove Power Company LLC
Sandow Power Company LLC
TCEH Finance
Tradinghouse 3 & 4 Power Company LLC
Tradinghouse Power Company LLC
TXU Energy Receivables Company LLC
TXU Energy Retail Company LLC
TXU Energy Solutions Company LLC
TXU Retail Services Company
TXU SEM Company
Valley NG Power Company LLC
Valley Power Company LLC

## EXHIBIT C

### EFH SUBSIDIARIES PARTY TO RESTRUCTURING

Brighten Energy LLC
Brighten Holdings LLC
Dallas Power and Light Company, Inc.
Ebasco Services of Canada Limited
EEC Holdings, Inc.
EECI, Inc.
EFH Australia (No. 2) Holdings Company
EFH CG Holdings Company LP
EFH CG Management Company LLC
EFH Corporate Services Company
EFH Finance (No. 2) Holdings Company
EFH FS Holdings Company
EFH Renewables Company LLC
Generation Development Company LLC
Lone Star Energy Company, Inc.
Lone Star Pipeline Company, Inc.
LSGT Gas Company LLC
LSGT SACROC, Inc.
NCA Development Company LLC
Southwestern Electric Service Company, Inc.
Texas Electric Service Company, Inc.
Texas Energy Industries Company, Inc.
Texas Power and Light Company, Inc.
Texas Utilities Company, Inc.
Texas Utilities Electric Company, Inc.
TXU Electric Company, Inc.
TXU Receivables Company

2

### EXHIBIT D

**REGARDED TCEH DEBTORS PARTY TO RESTRUCTURING**

4Change Energy Company
Generation SVC Company
Luminant Energy Trading California Company
Luminant ET Services Company
TCEH Finance
TXU Retail Services Company
TXU SEM Company

## EXHIBIT E

### PRE-SUBMISSION MEMO

**PX 095**
**Page 314 of 464**

**EXHIBIT F**

**TCEH DIP TERM SHEET**

**PX 095**
**Page 315 of 464**

## EXHIBIT G

### EFIH FIRST LIEN DIP FINANCING TERM SHEET

**EXHIBIT H**

**EFIH SECOND LIEN DIP FINANCING TERM SHEET**

## EXHIBIT I

### CLOSING CONDITIONS

**PX 095**
**Page 318 of 464**

## EXHIBIT J

### EQUITY CONVERSION TERM SHEET

**EXHIBIT K**

**SUMMARY OF KEY REPRESENTATIONS**

## EXHIBIT B

### TCEH SUBSIDIARIES PARTY TO RESTRUCTURING

4Change Energy Company
4Change Energy Holdings LLC
Big Brown 3 Power Company LLC
Big Brown Lignite Company LLC
Big Brown Power Company LLC
Collin Power Company LLC
DeCordova Power Company LLC
DeCordova II Power Company LLC
Eagle Mountain Power Company LLC
Energy Future Competitive Holdings Company LLC
Generation MT Company LLC
Generation SVC Company
Lake Creek 3 Power Company LLC
Luminant Big Brown Mining Company LLC
Luminant Energy Company LLC
Luminant Energy Trading California Company
Luminant ET Services Company
Luminant Generation Company LLC
Luminant Holding Company LLC
Luminant Mineral Development Company LLC
Luminant Mining Company LLC
Luminant Renewables Company LLC
Martin Lake 4 Power Company LLC
Monticello 4 Power Company LLC
Morgan Creek 7 Power Company LLC
NCA Resources Development Company LLC
Oak Grove Management Company LLC
Oak Grove Mining Company LLC
Oak Grove Power Company LLC
Sandow Power Company LLC
TCEH Finance
Tradinghouse 3 & 4 Power Company LLC
Tradinghouse Power Company LLC
TXU Energy Receivables Company LLC
TXU Energy Retail Company LLC
TXU Energy Solutions Company LLC
TXU Retail Services Company
TXU SEM Company
Valley NG Power Company LLC
Valley Power Company LLC

**EXHIBIT C**

**EFH SUBSIDIARIES PARTY TO RESTRUCTURING**

Brighten Energy LLC
Brighten Holdings LLC
Dallas Power and Light Company, Inc.
Ebasco Services of Canada Limited
EEC Holdings, Inc.
EECI, Inc.
EFH Australia (No. 2) Holdings Company
EFH CG Holdings Company LP
EFH CG Management Company LLC
EFH Corporate Services Company
EFH Finance (No. 2) Holdings Company
EFH FS Holdings Company
EFH Renewables Company LLC
Generation Development Company LLC
Lone Star Energy Company, Inc.
Lone Star Pipeline Company, Inc.
LSGT Gas Company LLC
LSGT SACROC, Inc.
NCA Development Company LLC
Southwestern Electric Service Company, Inc.
Texas Electric Service Company, Inc.
Texas Energy Industries Company, Inc.
Texas Power and Light Company, Inc.
Texas Utilities Company, Inc.
Texas Utilities Electric Company, Inc.
TXU Electric Company, Inc.
TXU Receivables Company

2

**PX 095**
**Page 322 of 464**

**EXHIBIT D**

**REGARDED TCEH DEBTORS PARTY TO RESTRUCTURING**

4Change Energy Company
Generation SVC Company
Luminant Energy Trading California Company
Luminant ET Services Company
TCEH Finance
TXU Retail Services Company
TXU SEM Company

**EXHIBIT E**

**PRE-SUBMISSION MEMO**

**PX 095**
**Page 324 of 464**

DRAFT 4.28.14
**Privileged & Confidential**

ENERGY FUTURE HOLDINGS CORP.
PRE-SUBMISSION MEMORANDUM FOR RULINGS UNDER
SECTIONS 368(A)(1)(G) AND 355

I.     **Overview**

This memorandum describes a significant bankruptcy restructuring transaction that requires an Internal Revenue Service ("IRS") ruling in order to be implemented.  The proposed transaction involves the spin-off of the assets of Texas Competitive Electric Holdings LLC ("TCEH") from Energy Future Holdings Corp. ("EFH") pursuant to Section 355 and Section 368(a)(1)(G) (a "G reorganization").[1]  TCEH has an enterprise value of approximately $18 billion and, prior to the restructuring, liabilities in excess of $32 billion.  Without regard to TCEH, EFH indirectly holds (and will continue to hold indirectly following the restructuring) an 80% interest in a partnership with an enterprise value of approximately $17 billion.[2]

A multi-party restructuring support agreement ("RSA") that provides for the transaction described above has been filed with the U.S. Bankruptcy Court for the District of Delaware.  The consummation of those transactions is expressly conditioned on obtaining IRS rulings with respect to the proposed transactions as further set forth herein.  If the IRS rulings set forth herein are not obtained, the parties to the RSA will have the right to terminate the RSA and abandon the transactions described therein.  EFH believes that if the proposed transactions are abandoned, one or more creditor groups will seek the transfer of the assets of EFH (and the assets of its subsidiaries) in satisfaction of their claims, with any such transfers being taxable transactions resulting in an expected tax liability in excess of $6 billion.  EFH does not expect to have sufficient assets to satisfy such tax liability.

All parties to this transaction desire to avoid triggering a multi-billion dollar tax that cannot be paid and that would be subordinated to the claims of the secured creditors.  As a result, the parties have agreed on a structure for a transaction that all sides believe generally should be tax-free.  But given the magnitude of the issue, the unique tax issues that it raises, the cash cost of the potential tax liability, and the public attention that this transaction is apt to attract, the parties are willing to go forward only if it can be done pursuant to an IRS ruling that covers the qualification of the proposed transaction under Sections 368(a)(1)(G) and 355 and the other rulings described herein.

II.     **Facts**

a.  **Bankruptcy Reorganization**

EFH is a Dallas, Texas-based holding company with a portfolio of competitive and regulated energy businesses in Texas that it operates through its direct and indirect subsidiaries.

---

[1] Unless otherwise noted, all section references contained herein are to the Internal Revenue Code of 1986, as amended, and Treasury Regulation references are to the Treasury Regulations promulgated thereunder.

[2] These valuations of $18 billion and $17 billion for TCEH and EFH's partnership subsidiary are illustrative only, based on the current trading prices of TCEH debt and the terms of the proposed transaction with EFIH creditors. Actual values at closing could be higher or lower.

1

**DRAFT 4.28.14**
**Privileged & Confidential**

EFH was acquired by a group of private equity funds (the "Sponsors") in 2007 pursuant to a leveraged buyout (the "LBO").    EFH owns 100% of the equity interests of Energy Future Competitive Holdings Company LLC ("EFCH") and Energy Future Intermediate Holding Company LLC ("EFIH"), both of which are disregarded entities for federal income tax purposes. EFCH's principal asset is its membership interest in TCEH, which, through its subsidiaries, is engaged in competitive electricity market activities primarily conducted in Texas. TCEH, also a disregarded entity, has approximately $24 billion of first lien debt (the "TCEH Debt," the holders of which are referred to herein as the "TCEH Creditors"),[3] as well as $7.7 billion of second lien and unsecured debt.  EFIH's principal asset is its indirect 80% membership interest in Oncor Electric Delivery Co. LLC ("Oncor"), which it owns through Oncor Electric Delivery Holdings LLC, a disregarded entity ("Oncor Holdings").  Oncor is a partnership for federal income tax purposes and operates the largest transmission and distribution system in Texas.  EFIH has approximately $7.7 billion of first lien, second lien and unsecured debt (the holders of which are referred to herein as the "EFIH Creditors").  EFH also has approximately $1.9 billion of debt outstanding.[4]  The chart below summarizes the existing structure of the relevant entities:



        To fund the 2007 LBO (which was the largest LBO in history), EFH and certain of its subsidiaries incurred substantial indebtedness, most of which currently resides at TCEH and EFIH.  EFH and its subsidiaries' debt levels have become unsustainable since the LBO, primarily because of rapid changes in the natural gas market that have caused a significant reduction in electricity prices.  As a result, EFH has been in negotiations with certain large creditors for more than one year in an effort to restructure indebtedness of EFH and its subsidiaries.

---

[3] Excludes obligations under certain first lien hedging arrangements.

[4] Includes approximately $1.3 billion of debt held by affiliate EFIH.

508551 000027 9611307.15

**PX 095**
**Page 326 of 464**

**DRAFT 4.28.14**
**Privileged & Confidential**

In these negotiations, the parties focused on developing a consensual restructuring plan that would achieve a sustainable capital structure and maximize the enterprise value of EFH and its subsidiaries without causing a taxable break-up of the EFH tax group, which would trigger significant tax liabilities at EFH. Unfortunately, no proposal garnered the necessary level of support from the relevant stakeholders. Accordingly, despite more than a year of negotiations and the development and consideration of numerous restructuring proposals, EFH and its subsidiaries' largest creditors were unable to reach an agreement on the terms of a restructuring that would maintain the existing EFH consolidated group (including its disregarded entities). The parties thus seemed destined to enter bankruptcy in April 2014 with no plan whatsoever, with the likely outcome being a break-up of the EFH group with each creditor group foreclosing on, or otherwise taking, its collateral (the assets of TCEH and EFIH) in taxable transactions. In doing so, EFH would recognize taxable gain with respect to virtually all of these assets, perhaps resulting in a tax liability in excess of $6 billion, with no ability to pay that tax. Indeed, EFH began discussions with the IRS regarding the possible implications of such a massive unpaid, uncollectible tax.

Within the last few weeks, a breakthrough occurred in the negotiations. The various creditor groups have agreed to attempt to implement a transaction pursuant to which the EFH group would be separated, but in a tax-free manner. More specifically, the idea is that TCEH would transfer its assets to a new corporation ("Spinco") that would then be distributed to the TCEH Creditors in a tax-free spin-off. We believe that this transaction should be tax-free as a G reorganization with a distribution occurring pursuant to Section 355. However, given the dollar magnitude of the potential tax liability, the relative lack of private letter rulings or other guidance regarding G reorganizations structured as spin-offs, and the unique issues presented by the transaction (as described below), the parties agreed that such a transaction could not be accomplished without an IRS ruling.

### b. Proposed Transaction

Each of EFH, EFCH, TCEH and EFIH (and certain of their respective subsidiaries, excluding Oncor Holdings and Oncor) filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code with the U.S. Bankruptcy Court for the District of Delaware on April __, 2014. As noted above, the filings were made pursuant to the RSA among the debtors, their creditors and certain other parties. The agreement contemplates the tax-free spin-off of Spinco but specifically conditions the transaction on the receipt of a ruling from the IRS concluding that the proposed transactions qualify as a G reorganization and a distribution under Section 355.

The separation transaction contemplated by the RSA is as follows:

1. Before the effective date of the TCEH bankruptcy plan of reorganization (the "TCEH Plan"), TCEH will form Spinco as a limited liability company under the laws of Delaware, which will be a disregarded entity upon formation.

2. On or before such effective date, Spinco will issue new debt (the "Spinco Debt") to third parties (which may include the TCEH Creditors) for cash.

3

508551 000027 9611307.15