**DRAFT 4.28.14**
**Privileged & Confidential**

3. On such effective date, the TCEH Debt (and junior debt of TCEH) will be cancelled in exchange for each creditor's right to receive its recovery in accordance with the terms of the TCEH Plan.

4. Immediately following such cancellation, pursuant to the TCEH Plan, TCEH will transfer all of its assets and its ordinary course operating liabilities to Spinco in exchange for which TCEH will receive (i) 100% of the newly-issued equity interests of Spinco and (ii) the cash proceeds of the Spinco Debt. None of the TCEH Debt will be assumed by Spinco (as all such debt will have been cancelled immediately prior to the transfer of assets to Spinco pursuant to the TCEH Plan).

5. Immediately thereafter, Spinco will convert into a Delaware corporation pursuant to Delaware's conversion statute. For federal income tax purposes, the incorporation of Spinco will be treated as if EFH contributed the Spinco assets to Spinco (a new corporation), with Spinco assuming the Spinco Debt, in exchange for all of the stock of Spinco (the "Contribution"). The Spinco Debt (together with other liabilities assumed by Spinco) is expected to exceed the tax basis in the assets transferred to Spinco by an amount approximately equal to EFH's net operating loss carryforwards ("NOLs").

6. Immediately following the Contribution, TCEH will distribute all of the Spinco stock and the cash proceeds from the Spinco Debt to the TCEH Creditors (the "Distribution," and together with the Contribution, the "Reorganization"). For federal income tax purposes, because TCEH and EFCH are disregarded entities, EFH will be treated as having made the Distribution to the TCEH Creditors.

The TCEH debt held by junior creditors (with a face amount of approximately $7.7 billion) will be cancelled in exchange for the recovery provided in the TCEH Plan. It is expected that such creditors will receive a recovery of less than $350 million cash.

Under the EFIH bankruptcy plan, which will occur simultaneously with the TCEH Plan, the first lien and second lien EFIH Creditors will receive a combination of new EFIH debt and cash, as determined by negotiations among the parties. The unsecured EFIH Creditors will receive EFH stock in a transaction that is expected to be treated as a recapitalization under Section 368(a)(1)(E). It is currently contemplated that the unsecured EFIH Creditors will own 98% of the EFH stock immediately after the bankruptcy, subject to dilution for management equity and the equity issuance described below.

The EFIH Creditors also may participate in and backstop an equity offering (or convertible DIP loan) to raise approximately $2.1 billion in exchange for approximately 65% of the EFH stock. The cash proceeds of the equity offering (or convertible DIP loan) will be used to de-lever EFIH. It is anticipated that such transaction will occur immediately after the exchange of the unsecured EFIH Creditors' claims for EFH stock.

After all transactions described above have occurred, (i) the Spinco stock will be held 100% by the TCEH Creditors; and (ii) the EFH stock will be held 2% by the Sponsors and

4

**DRAFT 4.28.14**
**Privileged & Confidential**

unsecured EFH creditors and 98% by the unsecured EFIH Creditors, subject to dilution for management equity and the approximate 65% equity issuance described above.

EFH believes that the Reorganization qualifies as a G reorganization and the Distribution qualifies under Sections 355 and 356, as described in more detail below.[5]

### III.    Analysis

#### a.    Qualification as a G Reorganization

##### i.    Generally

A G reorganization is statutorily defined generally as a transfer of assets by a corporation to another corporation in a title 11 or similar case, but only if, in pursuance of the plan, stock or securities of the transferee corporation are distributed in a transaction that qualifies under Section 354 (an acquisitive G reorganization), Section 355 (a divisive G reorganization) or Section 356.[6] The statutory requirements of a G reorganization should be satisfied here, provided that the Distribution qualifies under Sections 355 and Section 356 (as discussed below), because EFH (the sole owner of TCEH, which is a disregarded entity) is treated as transferring assets to Spinco in the Contribution, which will occur in a bankruptcy case.[7]

As with any reorganization under Section 368, a G reorganization also must satisfy the nonstatutory business purpose, continuity of business enterprise ("COBE") and continuity of interest ("COI") requirements.[8] The ruling request to be submitted will describe in detail the satisfaction of these requirements under applicable authority. For purposes of this memorandum, the focus is on the COI requirement, as this presents an area of uncertainty.

##### ii.    Continuity of Interest

There is no authority regarding the application of the Section 368 COI requirement to divisive G reorganizations (i.e., G reorganizations qualifying under Section 355). The Section 368 COI requirement does not apply to divisive D reorganizations in the same manner as to acquisitive reorganizations, in that divisive D Reorganizations must effectively only satisfy the Section 355 COI requirement (discussed below).[9] Divisive G reorganizations should be treated similarly to divisive D reorganizations. Nevertheless, in the absence of prior guidance, the

---

[5] The EFIH Creditors are considering an internal restructuring of EFH at or following emergence from bankruptcy to maximize the value of EFH in the marketplace. Among the transactions being considered are (i) causing Oncor to become a disregarded entity, either by purchasing the 20% minority interest or acquiring such interest for equity in EFH, (ii) restructuring Oncor so as to permit EFH to qualify as a REIT, (iii) transferring certain of Oncor's assets into a separate partnership or (iv) causing EFIH to become a partnership. Any such transaction will be structured such that the continuity of interest and active trade or business requirements for the Reorganization would be satisfied.

[6] I.R.C. § 368(a)(1)(G).

[7] There appear to be very few private letter rulings in which the IRS has ruled on a G reorganization qualifying under Section 355. See, e.g., PLR 200345049 (Nov. 7, 2003).

[8] Treas. Reg. § 1.368-1(b), (c).

[9] Treas. Reg. § 1.368-1(b).

508551 000027 9611307.15

DRAFT 4.28.14
Privileged & Confidential

following discussion also analyzes the Section 368 COI requirement assuming that a divisive G reorganization must satisfy such requirement in addition to the Section 355 COI requirement. Although the Section 355 COI test may differ from the Section 368 COI test, ultimately the analysis should be substantially the same as it relates to treating the creditors of an insolvent corporation as holding a proprietary interest in the corporation before and, by virtue of exchanging for shares, after the Distribution. In short, the Reorganization should satisfy the Section 368 COI requirement (as well as the Section 355 COI requirement) because the TCEH Creditors (and, for purposes of the Section 355 COI requirement, the unsecured EFIH Creditors) should be treated as holding a proprietary interest in EFH prior to the Reorganization for purposes of both COI tests.

Pursuant to the Treasury Regulations, COI "requires that in substance a substantial part of the value of the proprietary interests in the target corporation be preserved in the reorganization," and that such a proprietary interest is preserved "if it is exchanged for a proprietary interest in the issuing corporation."[10] In the Reorganization, the TCEH Creditors will exchange the TCEH Debt for stock of Spinco and cash. Because TCEH and EFCH are disregarded entities, the TCEH Creditors are treated as creditors of EFH for federal income tax purposes. The Spinco stock received by the TCEH Creditors clearly is a proprietary interest in Spinco (the issuing corporation). Thus, the determination of whether the Section 368 COI requirement can be satisfied in the Reorganization turns on whether the TCEH Creditors are treated as holding a proprietary interest in EFH (the target corporation) before the Reorganization.

The seminal *Alabama Asphaltic* case stands for the proposition that, in certain circumstances involving insolvent corporations, creditors of such corporation can be treated as holding an equity (or proprietary) interest in such corporation.[11] COI Treasury Regulations finalized in 2008 codify the principles of *Alabama Asphaltic*, providing as follows:

> A creditor's claim against a target corporation may be a proprietary interest in the target corporation if the target corporation is in a title 11 or similar case (as defined in section 368(a)(3)) or the amount of the target corporation's liabilities exceeds the fair market value of its assets immediately prior to the potential reorganization. In such cases, if any creditor receives a proprietary interest in the issuing corporation in exchange for its claim, every claim of that class of creditors and every claim of all equal and junior classes of creditors (in addition to the claims of shareholders) is a proprietary interest in the target corporation immediately prior to the potential reorganization to the extent provided in paragraph (e)(6)(ii) of this section.[12]

---

[10] Treas. Reg. § 1.368-1(e)(1)(i).

[11] *Helvering v. Alabama Asphaltic Limestone Co.*, 315 U.S. 179 (1942).

[12] Treas. Reg. § 1.368-1(e)(6). Although separate continuity rules contained in Treas. Reg. §1.355-2(c) apply to Section 355 transactions, this principle that creditors of an insolvent entity should be treated as owners should continue to apply. Treas. Reg. §1.355-2(c) merely refers to "one or more persons who, directly or indirectly, were the owners of the enterprise prior to the distribution or exchange". This regulation is consistent with treating a creditor as an owner for this purpose.

6

PX 095
Page 330 of 464

DRAFT 4.28.14
Privileged & Confidential

This regulation is consistent with the legislative history to the Bankruptcy Tax Act of 1980, Pub. L. 96-589, which states, "the most senior class of creditors to receive stock, together with all equal and junior classes (including shareholders who receive any consideration for their stock), should generally be considered the proprietors of the insolvent corporation for 'continuity' purposes." S Rep. 96-1035, 96th Cong., 2d Sess. at 36-37, 1980-2 C.B. 620, 639 (1980).[13]

By virtue of TCEH and EFCH being disregarded entities, the TCEH Creditors' claims are treated as claims against EFH (the target corporation) for tax purposes. Pursuant to the above Treasury Regulations, the TCEH Creditors (and junior creditors) should be treated as holding a proprietary interest in EFH immediately before the Reorganization because EFH is in a bankruptcy case and the amount of its liabilities exceeds the fair market value of its assets.

Once the TCEH Creditors and junior creditors are treated as proprietary interest holders in EFH, COI is determined by examining the mix of consideration received by the TCEH Creditors and junior creditors. For this purpose, it is assumed that the Spinco stock received by the TCEH Creditors will have a fair market value of approximately $10 billion.[14] Comparing such stock to the $350 million cash received by the junior creditors results in over 96% COI, more than sufficient to satisfy the Section 368 COI requirement.[15]

Because COI should be satisfied, the Reorganization should qualify as a G reorganization, provided that the Distribution otherwise qualifies under Sections 355 and Section 356.

### iii.   Tax Consequences to EFH and Spinco

Under Section 361(a), EFH recognizes no gain or loss upon the exchange of property pursuant to the Reorganization solely in exchange for stock in Spinco. Notwithstanding the nonrecognition rule in Section 361(a), Section 357(c) can cause the transferor corporation to recognize gain to the extent that liabilities assumed by the transferee corporation exceed the tax basis of the assets transferred.[16]

Accordingly, if the amount of liabilities assumed by Spinco from TCEH in the Contribution exceed the basis of the assets transferred (as is expected), EFH generally would be required to recognize gain under Section 357(c)(1). However, Section 357(c)(2)(B) provides an exception from such rule in the case of G reorganizations in which "no former shareholder of the

---

[13] See also Atlas Oil v. Comm'r, 36 T.C. 675 (1961); Rev. Rul. 59-222, 1959-1 C.B. 80.

[14] Under the formula set forth in Treas. Reg. § 1.368-1(e)(6)(ii)(A), only the value of the TCEH Creditors' claims that are exchanged for Spinco stock are taken into account in determining the value of the proprietary interest in EFH held by such creditors. Thus, the cash received by TCEH Creditors does not count against the COI percentage.

[15] COI = $10B / ($10B + $350M) = 96.6%

[16] Although Section 357(c) generally is turned off in the consolidated group context under Treasury Regulations Section 1.1502-80(d), it is not turned off when either the transferor or transferee becomes a nonmember as a part of the same plan or arrangement. Here, Spinco is either never a member of the group or will become a nonmember as part of the Reorganization, and thus, Treasury Regulations Section 1.1502-80(d) does not turn off Section 357(c). (See requested ruling #10 below.)

7

**PX 095**
**Page 331 of 464**

DRAFT 4.28.14
Privileged & Confidential

transferor corporation receives any consideration for his stock." In this case, the Sponsors will retain a small amount of stock in the distributing corporation and, therefore, Section 357(c)(2)(B) will not apply.

The Reorganization will be structured to trigger some gain under Section 357(c), achieving a partial step-up in the basis of the assets held by Spinco after the Reorganization.[17] It is contemplated that the amount of gain triggered would not exceed the NOLs available to offset such gain. Upon the Contribution, EFH will be treated as contributing the assets to Spinco and Spinco will be treated as assuming the Spinco Debt, which will exceed the tax basis of the assets transferred. As long as Section 357(c)(2)(B) does not apply, the excess liabilities assumed will trigger gain under Section 357(c). In such a case, EFH will recognize gain to the extent of such excess, providing Spinco with a partially stepped up basis in the assets.[18] Separately, the TCEH Debt will be cancelled prior to the Contribution. Therefore, such debt will not be treated as assumed by Spinco for purposes of Section 357.

### b. Qualification Under Section 355

#### i. Generally

Under Section 355(a) and (c), provided certain requirements are met, a distributing corporation may distribute stock or securities of a controlled subsidiary to its shareholders and security holders without causing either the distributing corporation or its shareholders and security holders to recognize income, gain, or loss. In order to qualify for tax-free treatment under Section 355, certain statutory requirements and nonstatutory requirements must be satisfied. The ruling request to be submitted will elaborate on all of those requirements.[19] For purposes of this memorandum, the focus is on the issues which are not adequately addressed by existing guidance and are critical to obtaining the requested rulings.

#### ii. TCEH Debt As "Securities" For Purposes of Section 355

Key to the satisfaction of Section 355 is that the TCEH Debt constitutes "securities" for purposes of Section 355. The TCEH Debt was originally issued in 2007 with a 2014 maturity date. A large portion of the debt was subject to a significant modification in 2011, which was treated as a deemed exchange for federal income purposes under Treasury Regulations Section 1.1001-3. As part of this modification, the maturity date was extended to 2017. Whether the security determination is made in 2007 or 2011, the TCEH Debt should be treated as securities.

#### iii. The Device Requirement

---

[17] The TCEH Creditors' support for the proposed transaction (rather than seeking a taxable asset transfer) was premised on Spinco's ability to increase the tax basis of the assets it would hold by an amount equal to the gain that EFH would recognize.

[18] I.R.C. §§ 357(c)(1) (flush language), 362(b).

[19] For example, both the distributing (EFH) and controlled (Spinco) corporations (or members of a "separate affiliated group," as defined in Section 355(b)(3)) have been engaged in active businesses for more than five years, and control of such corporations conducting such businesses has not been acquired by EFH (distributing) in taxable transactions within that five-year period.

8

PX 095
Page 332 of 464

DRAFT 4.28.14
Privileged & Confidential

Treasury Regulation Section 1.355-2(d)(1) provides that "Section 355 does not apply to a transaction used principally as a device for the distribution of the earnings and profits of the distributing corporation, the controlled corporation, or both."[20] Notwithstanding the absence of authority in the context of a divisive G reorganization, the device requirement should not apply to a distribution to creditors because such a distribution cannot be taxed as a dividend, and thus, has no potential to convert a dividend to capital gain.

### iv.    The COI Requirement

After the Distribution, Spinco stock will be owned 100% by the TCEH Creditors, and EFH stock will be owned 100% by the Sponsors, unsecured EFH creditors and the unsecured EFIH Creditors. Ownership of 100% of the stock of Spinco clearly is a sufficient percentage of ownership to establish a continuity of interest. The determination of whether COI is satisfied under Section 355 turns on whether the TCEH Creditors and the unsecured EFIH Creditors are considered "owners of the enterprise" (i.e., owners of EFH) prior to the Distribution.[21]

The same Section 368 principles of treating creditors as proprietary interest holders in the bankruptcy or insolvency context also should apply for Section 355 COI purposes. Commentators agree that the Section 368 and Section 355 COI principles should be applied similarly:

> "Given the difficulty of understanding why [COI] principles
> should apply differently in the section 355 context and the
> safeguards of the device requirement, section 355(d), and section
> 355(e), the authors believe that Reg. 1.355-2(c) should be modified
> to adopt similar principles to those contained in Reg. 1.368-1(e)."[22]

Thus, because the TCEH Creditors should be treated as holding a proprietary interest in EFH for Section 368 purposes (as discussed above), such creditors also should be treated as "owners of the enterprise" for Section 355 COI purposes. The same analysis holds true for the unsecured EFIH Creditors and the unsecured EFH creditors. Thus, because the TCEH Creditors will own 100% of Spinco, and the Sponsors, unsecured EFH creditors and unsecured EFIH Creditors will own 100% of EFH, after the Distribution, the Section 355 COI requirement should be satisfied.

After the Distribution, EFH expects to issue approximately 65% of its stock for $2.1 billion. However, such stock offering does not decrease the value of the interest in EFH held by

---

[20] Treas. Reg. § 1.355-2(d)(1).

[21] Treas. Reg. § 1.355-2(c) provides that the COI requirement in the context of a distribution under Section 355 is satisfied if one or more persons who, directly or indirectly, were the "owners of the enterprise" prior to the distribution own, in the aggregate, an amount of stock establishing continuity of interest in each of the distributing and controlled corporation.

[22] Thomas F. Wessel, Joseph M. Pari, and Richard D'Avino, *Corporate Distributions Under Section 355*, TAX STRATEGIES FOR CORPORATION ACQUISITIONS, DISPOSITIONS, DISTRIBUTIONS, JOINT VENTURES, FINANCINGS, REORGANIZATIONS AND RESTRUCTURINGS (PLI 2014).

508551 000027 9611307.15

**PX 095**
**Page 333 of 464**

**DRAFT 4.28.14**
**Privileged & Confidential**

the unsecured EFIH Creditors, the Sponsors and the unsecured EFH creditors and therefore should not impact COI.

### v. Section 355(d)

Even if a distribution otherwise qualifies under Section 355, Section 355(d) requires recognition of corporate-level gain by a distributing corporation if a distribution of subsidiary stock or securities is a "disqualified distribution."[23]  A disqualified distribution is a distribution to which Section 355 otherwise applies if, immediately after the distribution, "any person" holds a 50%-or-greater interest in either the distributing or controlled corporation consisting of "disqualified stock."[24]  Generally, disqualified stock is (i) stock in the distributing or controlled corporation "purchased" within the 5-year period preceding the distribution, (ii) stock in the controlled corporation received in the distribution with respect to disqualified stock in the distributing corporation, or (iii) stock in the controlled corporation received in the distribution with respect to securities in the distributing corporation "purchased" within such 5-year period.[25]  Generally, stock is "purchased" if acquired in a transaction other than a carryover basis transaction or a Section 351, 354, 355 or 356 transaction.[26]

Even assuming that the Spinco or EFH stock is "disqualified stock," Section 355(d) requires that a single person hold the requisite percentage of disqualified stock immediately after the distribution. No single TCEH Creditor will hold 50% or more of the stock in Spinco after the Distribution.  Nor will any single unsecured EFIH Creditor hold 50% or more of EFH after the Distribution.  However, Section 355(d)(7)(B) treats a group of persons acting pursuant to a plan or arrangement as a single person.  The Treasury Regulations elaborate on Section 355(d)(7)(B), specifically providing that the receipt of stock by creditors in satisfaction of debt in a bankruptcy case does not cause the group of creditors to be treated as acting pursuant to a plan or arrangement under Section 355(d)(7)(B).[27]  Thus, neither the TCEH Creditors nor the unsecured EFIH Creditors should be treated as a single person under Section 355(d)(7)(B).  Accordingly, Section 355(d) should not apply to the Distribution.

Also, EFH expects to issue stock representing an approximate 65% interest in EFH after the Distribution.  Section 355(d) should not apply to such a post-Distribution equity offering.  Further, no single purchaser of stock in the offering will own 50% or more of EFH and such purchasers should not be aggregated under Section 355(d).

### c. Section 355(e)

The exception to Section 355(e) under Section 355(e)(4)(B) should apply because the Distribution will be made in a title 11 case.  Accordingly, none of the Distribution, any pre-

---

[23] I.R.C. § 355(d)(1).
[24] I.R.C. § 355(d)(2).
[25] I.R.C. § 355(d)(3).
[26] I.R.C. § 355(d)(5)(A).
[27] Treas. Reg. § 1.355-6(c)(4)(ii).

10

**PX 095**
**Page 334 of 464**

DRAFT 4.28.14
Privileged & Confidential

closing trading of EFH debt, or post-closing trading of EFH or Spinco stock should trigger Section 355(e).

### d. Treatment of Spinco as Nonmember of EFH Consolidated Group

Treasury Regulations Section 1.1502-6(a) provides that the common parent and each subsidiary "which was a member of the group during any part of the consolidated return year shall be severally liable for the tax for such year." Treasury Regulations Section 1.1502-76(b) provides that when a corporation becomes a member of a group during a consolidated return year, it becomes a member of the group as of the end of the day on which it becomes a member. Here, Spinco becomes a corporation owned by EFH and immediately thereafter becomes wholly-owned by the TCEH Creditors before the end of a single day. Accordingly, Spinco is not a member of the EFH consolidated group at the end of such day, the time at which it would be treated as a member of the group under Treasury Regulations Section 1.1502-76(b).[28] Because Spinco is not a member of the group at such time, it should not be treated as ever becoming a member of the group.

### e. Allocation of EFH Earnings and Profits to Spinco

Section 312(h) provides that in a distribution or exchange to which Section 355 applies, allocation of the earnings and profits ("E&P") of the distributing corporation and the controlled corporation shall be made under regulations prescribed by the Secretary. Treasury Regulations Section 1.312-10(a) provides that if a corporation transfers part of its assets constituting an active trade or business to a newly-created controlled corporation in a D reorganization and distributes the stock and securities of the controlled corporation in a distribution to which Section 355 applies, the E&P of the distributing corporation immediately before the transaction shall be allocated between the distributing corporation and the controlled corporation in proportion to the fair market value of the business or businesses (and interests in any other properties) retained by the distributing corporation and the business or businesses (and interests in any other properties) of the controlled corporation immediately after the transaction.

Treasury Regulations Section 1.312-10(b) provides for a different E&P allocation in the case of a Section 355 distribution of the stock or securities of an existing corporation (i.e., a Section 355 distribution that is not part of a D reorganization). Although the application of Treasury Regulations Section 1.312-10(a) is limited on its face to a Section 355 distribution as part of a D reorganization, a G reorganization is closely analogous to a D reorganization and the method under such regulation also should apply in the case of a Section 355 distribution in a G reorganization. Further, any equity offering by EFH that occurs immediately after the Reorganization (including the conversion of the DIP loan into EFH stock) should not be taken into account for purposes of allocating EFH's E&P to Spinco because the proceeds of such an offering are not part of the "business or businesses (or interests in any other properties) retained by" EFH following the Distribution.

---

[28] We note that Treas. Reg. § 1.1502-76(b)(1)(ii)(C) treats a successor to a member as a member "from the beginning of its existence." Such regulation should not apply, however, where momentary affiliation prevents a potential successor from becoming a member of the group.

11

PX 095
Page 335 of 464

DRAFT 4.28.14
Privileged & Confidential

### f.  Impact on 2013 Private Letter Ruling

In April 2013, EFH effected an internal restructuring (the "2013 Reorganization") to eliminate an approximate $20 billion excess loss account ("ELA") and an approximate $5 billion deferred intercompany gain ("DIG") with respect to the stock of EFCH, which was a corporation at the time. The 2013 Reorganization was the subject of PLR 201326006. In PLR 201326006, the Service ruled, among other things, that as a result of a downstream merger, the ELA was eliminated without the recognition of gain under Treasury Regulations Section 1.1502-19(b)(2) and the DIG was redetermined to be excluded from income under Treasury Regulations Section 1.1502-13(c)(6)(ii)(C).

At the time of the 2013 Reorganization, the nature of any debt restructuring of the EFH group was unknown. Specifically, it was not known (i) whether such a restructuring may have occurred in or out of a bankruptcy proceeding, (ii) whether TCEH assets or equity may be transferred to the TCEH Creditors, (iii) whether any EFH equity may be issued to any creditors of EFH and/or TCEH, or (iv) which entities may be included in any such restructuring. However, it was certain that the existence of the ELA and the DIG prevented any type of debt restructuring and the 2013 Reorganization was key to proceeding with a debt restructuring. The Reorganization should not adversely impact the conclusion of PLR 201326006.

### IV.    Requested Rulings

EFH intends to request the following rulings in the Ruling Request:

1.  The Reorganization qualifies as a G reorganization and the Distribution qualifies under Sections 355 and 356.[29]

2.  The TCEH Creditors and the unsecured EFIH Creditors are treated as "owners of the enterprise" for purposes of the Section 355 COI requirement.

3.  The TCEH Creditors are treated as holding a proprietary interest in EFH prior to the Reorganization for purposes of Section 368(a)(1)(G) and the COI requirement of a G reorganization is satisfied (or alternatively, that the Reorganization need only satisfy the Section 355 COI requirement).

4.  The device requirement under Section 355(a)(1)(B) does not apply to the Distribution.

5.  The TCEH Debt constitutes "securities" of EFH for purposes of Section 355 and Section 368(a)(1)(G).

---

[29] Notwithstanding the IRS ruling policy set forth in Rev. Proc. 2013-32, the proposed transaction is conditioned on the receipt of a ruling regarding the qualification of the Reorganization under Sections 368 and 355. The unique nature of the transaction and the lack of guidance on divisive G reorganizations have made the parties unwilling to proceed without such a ruling. In the words of the revenue procedure, the treatment of the transaction as a G reorganization and a Section 355 distribution is "essentially not free from doubt" even if the sub-issues described above are addressed by the ruling.

12

508551 000027 9611307.15

DRAFT 4.28.14
Privileged & Confidential

6.  The EFIH debt held by the unsecured EFIH Creditors constitutes "securities" of EFH for purposes of Section 368(a)(1)(E).

7.  Neither the TCEH Creditors nor the unsecured EFIH Creditors will be aggregated for purposes of Section 355(d).

8.  The bankruptcy exception to Section 355(e) applies to the Distribution, any pre-Distribution trading of EFH debt, and post-Distribution trading of EFH and Spinco stock.

9.  EFH recognizes gain under Section 357(c) to the extent that the Spinco Debt and other liabilities assumed by Spinco exceed the tax basis of assets transferred to Spinco in the Contribution, and Spinco's basis in the former TCEH assets is increased by the amount of such gain under Section 362(b).

10. The TCEH Debt is not treated as assumed by Spinco for purposes of Section 357(c) and (d).

11. Spinco is not treated as ever having been a member of the EFH consolidated group.

12. EFH's earnings and profits will be allocated between EFH and Spinco pursuant to Treasury Regulations Section 1.312-10(a) in proportion to the fair market value of the business or businesses (and interests in any other properties) retained by EFH and the business or businesses (and interests in any other properties) of Spinco immediately after the Distribution.

13. Any equity offering by EFH that occurs immediately after the Reorganization (including the conversion of the EFIH DIP loan into EFH stock) will not be taken into account for purposes of allocating EFH's earnings and profits to Spinco.

14. The Reorganization will not affect the prior ruling received by EFH regarding the 2013 Reorganization.

PX 095
Page 337 of 464

**<u>EXHIBIT F</u>**

**TCEH DIP TERM SHEET**

**PX 095**
**Page 338 of 464**

**MILBANK DRAFT 4/25/14**

**Exhibit A**

## TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC

SUMMARY OF TERMS AND CONDITIONS OF THE $4,475,000,000
SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION FACILITIES
("TERM SHEET")

Capitalized terms used but not defined in this Exhibit A will have the meanings set forth in the Commitment Letter
to which this Exhibit A is attached.

| | |
|---|---|
| **Borrower and other debtor-in-possession subsidiaries:** | Texas Competitive Electric Holdings Company LLC ("**TCEH**" or the "**Borrower**"), as a debtor-in-possession under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") and certain of its subsidiaries as debtors-in-possession under the Bankruptcy Code in jointly administered cases (collectively the "**Cases**") in the United States Bankruptcy Court for the District of Delaware (such court, together with any other court having exclusive jurisdiction over the Cases from time to time and any Federal appellate court thereof, the "**Bankruptcy Court**"). |
| **Guarantors:** | All obligations under the DIP Facilities (defined below) and the other Loan Documents (defined below) will be unconditionally guaranteed by (a) Energy Future Competitive Holdings Company LLC ("**EFCH**"), as parent guarantor (the "**Parent Guarantor**") and (b) each subsidiary of the Borrower that is currently a guarantor under the Prepetition TCEH Credit Facility (defined below), as subsidiary guarantors (each a "**Subsidiary Guarantor**" and, collectively with the Parent Guarantor, the "**Guarantors**"), subject, in each case of other subsidiaries that may be required to become guarantors under the Loan Documents, to clause (ii) of "Priority/Security" below, covenant restrictions in joint venture agreements, general statutory limitations, corporate benefit and similar principles under applicable law, contractual restrictions and to the extent such guarantee would not result in adverse tax or accounting consequences, as reasonably determined by the Borrower, or as will require that such guarantee be limited by an amount or otherwise (collectively, "**Applicable Limitations**") to the extent of such Applicable Limitations, or as otherwise agreed by the Joint Lead Arrangers (defined below) and the Borrower (collectively, the "**Guarantee**"). |
| | All Guarantors shall also be debtors-in-possession under the Bankruptcy Code (such Guarantors, together with the Borrower, collectively the "**Debtors**"). |
| **Debtors:** | The Debtors are: (i) the Borrower, (ii) the Parent Guarantor and (iii) the subsidiaries of the Borrower identified on **Annex I** hereto. |

#4819-5662-6966

| | |
|---|---|
| **Prepetition Secured Facilities:** | The following are collectively referred to as the "**Prepetition Secured Facilities**":  (i) the Credit Agreement, dated as of October 10, 2007, among EFCH, TCEH, Citibank N.A., as administrative and collateral agent (the "**Prepetition First Lien Agent**"), and the other parties thereto (as amended, modified or supplemented and in effect prior to the Petition Date, the "**Prepetition TCEH Credit Facility**"); |
| | (ii) the 11.5% senior secured notes due October 1, 2020, issued under the indenture dated April 19, 2011, by and among TCEH and TCEH Finance, Inc., as issuers, The Bank of New York Mellon Trust Company, N.A. ("**BNY**"), as indenture trustee, EFCH and certain subsidiary obligors party thereto, as guarantors (the "**First Lien Secured Notes**"); |
| | (iii) (a) certain obligations to the Debtors' counterparties under certain first lien commodity hedges (the "**First Lien Commodity Hedges**"); and (b) certain obligations to the Debtors' counterparties under first lien interest rate swaps (the "**First Lien Interest Rate Swaps**," and together with the Prepetition TCEH Credit Facility, the First Lien Secured Notes and the First Lien Commodity Hedges, the "**Prepetition First Lien Debt**"), as provided in the Prepetition TCEH Credit Facility and the Restated Collateral Agency and Intercreditor Agreement dated as of October 10, 2007, as amended and restated as of August 7, 2009 (as amended, and in effect from time to time, the "**First Lien Intercreditor Agreement**"); and |
| | (iv) the 15% senior secured second lien notes due April 1, 2021 and 15% senior secured second lien notes due April 1, 2021, Series B, issued under the indenture dated October 6, 2010, by and among TCEH and TCEH Finance, Inc., as issuers, BNY, as indenture trustee and collateral agent (the "**Prepetition Second Lien Agent**"), EFCH and certain subsidiary obligors party thereto, as guarantors, and supplemental indentures thereto (the "**Prepetition Second Lien Debt**"). |
| **Eligible Pari Passu Hedges:** | The Borrower shall be entitled to grant liens in the Collateral (defined below) to counterparties under certain "right-way" hedging agreements that are *pari passu* to the liens securing the DIP Facilities (the "**Eligible Pari Passu Hedges**"). |
| **DIP Facilities:** | (a) Revolver Facility: A superpriority non-amortizing revolving credit facility (the "**Revolver Facility**") in an aggregate principal amount of $1,950,000,000 (the "**Revolver Commitments**").  Up to $800,000,000 of the Revolver Facility will be available in connection with Initial Availability (defined below) and up to $1,950,000,000 will be available in connection with Full Availability (defined below), in each case subject to the Revolver Commitments, in the form of loans for the account of the Debtors ("**Revolver Loans**"). |
| | (b) Delayed-Draw Term Facility:   A superpriority non-amortizing delayed draw term credit facility (the "**Delayed-Draw Term Facility**") in an aggregate principal amount of $1,100,000,000 (the "**Delayed-** |

2

Draw Term Commitment") shall be made available for up to two drawings (in minimum amounts of $250,000,000 (or the remainder of the Delayed Draw Term Commitment, if less than $250,000,000)) during the period beginning on the Closing Date (it being understood and agreed that the Initial Availability for the Delayed-Draw Term Facility shall equal the full Delayed-Draw Term Commitment) and ending on the date that is 90 days after the Closing Date (the "**Delayed-Draw Termination Date**"), but only if the Borrower shall have theretofore issued and delivered the RCT Carve Out Support Rejection Notice (as defined below), for (i) the purpose of making loans to the Borrower to provide cash collateral to support obligations of the Debtors (or to refinance any cash collateral previously provided by the Debtors) to the Railroad Commission of Texas and/or (ii) working capital, general corporate and other purposes permitted under "**Purpose: Use of Proceeds**" below (collectively, the "**Delayed-Draw Term Loans**"). Amounts drawn under the Delayed-Draw Term Facility may not be reborrowed once repaid; provided that the Borrower will be under no obligation to elect to reduce the Delayed-Draw Term Commitments or the size of the Delayed-Draw Term Facility. Upon being drawn, Delayed-Draw Term Loans shall be deemed to constitute the same loan tranche as the Term Loans and shall have the same terms as the Term Loans.

The Delayed-Draw Term Facility shall be permanently reduced (dollar-for-dollar) by an amount (the "**Delayed-Draw Term Facility Reduction Amount**") equal to the difference between $1,100,000,000 and the amount of Delayed-Draw Term Loans actually requested by and provided to the Borrower on the earlier of (1) the date of drawing of all of the Delayed-Draw Term Commitments and (2) the Delayed-Draw Termination Date (such earlier date, the "**Delayed-Draw Term Facility Reduction Date**").

(c) Term Loan Facility: A superpriority non-amortizing term credit facility (the "**Term Facility**") in an aggregate principal amount of $1,425,000,000 (the "**Term Commitments**"). Up to $800,000,000 of the Term Facility in connection with Initial Availability and up to $1,425,000,000 in connection with Full Availability, in each case subject to the Term Commitments, will be available in the form of loans for the account of the Debtors ("**Term Loans**" and, together with the Revolver Loans and the Delayed-Draw Term Loans, the "**Loans**"). Up to $800,000,000 of the proceeds of the Term Loans may be applied by the Borrower to fund the General L/C Cash Collateral Account (as defined below). Amounts drawn under the Term Facility may not be re-borrowed once repaid.

**General L/C Cash Collateral Account:**

To the extent so requested by the Borrower at its election, proceeds of the Term Facility may be deposited in one or more segregated depositary accounts under the name of the Borrower (collectively, the "**General L/C Cash Collateral Account**") to be subject to a first priority lien in favor of the Lenders and the other secured parties under the DIP Facilities and the General Letter of Credit Issuers (as defined

3

**PX 095**
**Page 341 of 464**

below) and shall be invested in cash and cash equivalents as directed by the Borrower (with any such gains or losses being for the account of the Borrower). For the avoidance of doubt, the commitment of the General Letter of Credit Issuers to issue General Letters of Credit shall not exceed the maximum stated amount set forth below under "General Letter of Credit Issuers".

The Borrower may at any time draw any funds in the General L/C Cash Collateral Account to the extent of the excess of such funds over the then aggregate undrawn amount of all General Letter of Credit plus the amount of unreimbursed drawings on General Letters of Credit; provided that the relevant General Letter of Credit Issuers shall have no obligation to issue General Letters of Credit in excess of the funds in the General L/C Cash Collateral Account. Any General Letter of Credit shall have the expiration dates (and renewal terms) agreed to with the relevant General Letter of Credit Issuer.

**General Letters of Credit:**    Drawings under General Letters of Credit shall be reimbursed by the Borrower (whether with its own funds or, at its election, with the proceeds in the General L/C Cash Collateral Account within one (1) business day of receipt of written notice from the Administrative Agent (as defined below) or the relevant General Letter of Credit Issuer to the effect that a General Letter of Credit has been drawn upon.

To the extent that the Borrower does not so reimburse the General Letter of Credit Issuer in respect of any General Letter of Credit, the General Letter of Credit Issuer may draw in its discretion any balances on deposit in the General L/C Cash Collateral Account in an amount up to such reimbursement obligation.

**RCT L/C Cash Collateral Account:**    To the extent so requested by the Borrower at its election, proceeds of the Delayed-Draw Term Facility shall be funded directly to one or more segregated depositary accounts under the name of the Borrower (collectively, the "**RCT L/C Cash Collateral Account**") to be subject to a first priority lien in favor of the Lenders and the other secured parties under the DIP Facilities and the RCT Letter of Credit Issuers (as defined below) and shall be invested in cash and cash equivalents as directed by the Borrower (with any such gains or losses being for the account of the Borrower). The Borrower may also draw Delayed-Draw Term Loans and use the proceeds thereof as permitted under "**Purpose/Use of Proceeds**" below. The RCT L/C Cash Collateral Account shall not be funded with proceeds of the Revolver Facility until the Term Facility and the Delayed-Draw Term Facility have been fully funded (or, in the case of the Delayed-Draw Term Facility, the Delayed-Draw Term Facility Reduction Date has occurred). For the avoidance of doubt, the commitment of the RCT Letter of Credit Issuers to issue RCT Letters of Credit shall not exceed the maximum stated amount set forth below under "RCT Letter of Credit Issuers".

The Borrower may at any time draw any funds in the RCT L/C Cash Collateral Account to the extent of the excess of such funds over the

4

**PX 095**
**Page 342 of 464**

then aggregate undrawn amount of all RCT Letter of Credit plus the amount of unreimbursed drawings on RCT Letters of Credit; provided that (x) the relevant RCT Letter of Credit Issuers shall have no obligation to issue RCT Letters of Credit in excess of the funds in the RCT L/C Cash Collateral Account and (y) such drawn amounts may not be used for any purpose other than prepaying the Term Loans or the Delayed-Draw Term Loans. Any RCT Letter of Credit shall have the expiration dates (and renewal terms) agreed to with the relevant RCT Letter of Credit Issuer.

**RCT Letters of Credit:**    Drawings under RCT Letters of Credit shall be reimbursed by the Borrower (whether with its own funds or, at its election, with the proceeds in the RCT L/C Cash Collateral Account within one (1) business day of receipt of written notice from the Administrative Agent or the RCT Letter of Credit Issuers to the effect that a RCT Letter of Credit has been drawn upon.

Upon a drawing under an RCT Letter of Credit, the applicable RCT Letter of Credit Issuer will draw any balances on deposit in the RCT L/C Cash Collateral Account in an amount up to the Borrower's reimbursement obligation.

**Purpose/Use of Proceeds:**    The proceeds of the Term Loans and the Revolver Loans will be used, in a manner consistent with the terms of the Budget (defined below): (i) to finance any and all working capital needs and for any other general corporate purposes, including without limitation, to provide collateral support in respect of financial or physical trading transactions, including commodities transactions, and to comply · with any legal and/or regulatory requirements of governmental and quasi-governmental entities (including for posting bonds and remediation or reclamation obligations of any nature, complying with any statutory or regulatory requirements and for self-bonding in respect of permits and licenses) of the Debtors, (and, to the limited extent set forth below, of the Specified Affiliates), (ii) to provide for Letters of Credit and (iii) to pay related transaction costs, fees, liabilities and expenses (including all Professional Fees (defined below)) and other administration costs incurred in connection with the Cases (including Adequate Protection Payments (defined below)) and the commitment, negotiation, syndication, documentation (including any commitment letters), execution and closing of the DIP Facilities.  The proceeds of the Delayed-Draw Term Loans will be used to fund the RCT L/C Cash Collateral Account. Up to $800,000,000 of the proceeds of the Term Facility may be used to fund the General L/C Cash Collateral Account. The General Letters of Credit may be used for general corporate purposes, including without limitation, providing collateral support in respect of financial or physical trading transactions, including commodities transactions related to the Debtors' businesses and activities (and, to the limited extent set forth below, of the Specified Affiliates) and to comply with any legal and/or regulatory requirements of governmental and quasi-governmental entities (including for posting bonds and remediation or reclamation obligations of any nature (such as

5

**PX 095**
**Page 343 of 464**

with the Railroad Commission of Texas (the "**RCT**")) complying with any statutory or regulatory requirements and for self-bonding in respect of permits and licenses). The RCT Letters of Credit will be used for the purpose of satisfying bonding requirements of the RCT.

| | |
|---|---|
| **Left Lead Revolving Arranger:** | Deutsche Bank Securities Inc. (the "**Left Lead Revolving Arranger**"). |
| **Left Lead Term Facilities Arranger:** | Citigroup Global Markets Inc. (the "**Left Lead Term Facilities Arranger**" and, together with the Left Lead Revolving Arranger, the "**Left Lead Arrangers**"). |
| **Joint Lead Arrangers:** | The Left Lead Term Facilities Arranger, the Left Lead Revolving Arranger, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("**MLPFS**"), Morgan Stanley Senior Funding, Inc. ("**Morgan Stanley**"), Barclays Bank PLC ("**Barclays**"), RBC Capital Markets ("**RBCCM**"), and Union Bank, N.A. ("**Union Bank**", and together with the Left Lead Term Facilities Arranger, the Left Lead Revolving Arranger, MLPFS, Morgan Stanley, Barclays and RBCCM, collectively, the "**Joint Lead Arrangers**"). |
| **DIP Facilities Commitments and Lenders:** | The Revolver Facility, the Delayed-Draw Term Facility and the Term Facility (together with the Incremental Facilities, if any) are collectively referred to as the "**DIP Facilities**". The lenders under the Revolver Facility are referred to as the "**Revolver Lenders**", the lenders under the Delayed-Draw Term Facility are referred to as the "**Delayed-Draw Term Lenders**" and the lenders under the Term Facility are referred to as the "**Term Lenders**". The Revolver Lenders, the Delayed-Draw Term Lenders and the Term Lenders (together with any lenders under the Incremental Facilities, if any) are collectively referred to as the "**Lenders**". The Revolver Commitments, the Delayed-Draw Term Commitments and the Term Commitments are collectively referred to as the "**Commitments**". |
| **General Letter of Credit Issuers:** | Citi and other mutually and reasonably satisfactory banks (the "**General Letter of Credit Issuers**") shall provide for the issuance of General Letters of Credit cash collateralized with the proceeds in the General L/C Cash Collateral Account (the "**General Letters of Credit**") in an aggregate stated amount of up to $800,000,000, which amount may be increased from time to time as may be agreed between the Borrower and the relevant General Letter of Credit Issuers. |
| **RCT Letter of Credit Issuers:** | Each of the initial Revolver Lenders, pro rata in proportion to their Revolver Commitments, and other mutually and reasonably satisfactory banks (the "**RCT Letter of Credit Issuers**" and together with the General Letter of Credit Issuers, the "**Letter of Credit Issuers**") shall provide for the issuance of RCT Letters of Credit cash collateralized with the proceeds in the RCT L/C Cash Collateral Account (the "**RCT Letters of Credit**" and together with the General Letters of Credit, the "**Letters of Credit**") in an aggregate stated amount of up to $1,100,000,000, but only if the Borrower shall have theretofore issued and delivered the RCT Carve Out Support Rejection Notice prior to the |

6

Delayed-Draw Termination Date.

| | |
|---|---|
| **Administrative Agent:** | Citibank, N.A. (together with its permitted successors and assigns, the "**Administrative Agent**" or "**Agent**"). |
| **Initial Availability:** | During the period commencing on the date (the "**Interim Order Entry Date**") of the Bankruptcy Court's entry of the Interim Order (defined in Annex II attached hereto) and ending on the date the Bankruptcy Court enters the Final Order (defined in Annex II attached hereto) (such period, the "**Interim Period**"), the Commitments shall be available to the Borrower, subject to (i) delivery by the Debtors of a Budget (defined below) and (ii) compliance with the applicable terms, conditions and covenants described in this Term Sheet in an amount as follows: |

1. Revolver Facility, $800,000,000;

2. Delayed-Draw Term Facility, $1,100,000,000; and

3. Term Facility, $800,000,000, or, in each case such other amount as may be approved by order of the Bankruptcy Court, to be made available during the Interim Period in accordance with the Budget (the "**Initial Availability**").

| | |
|---|---|
| **DIP Facilities Full Availability:** | Upon the Bankruptcy Court's entry of the Final Order (the "**Final Order Entry Date**"), the full amount of the Commitments shall be available to the Borrower subject to compliance with the applicable terms, conditions and covenants described in this Term Sheet (the "**Full Availability**"). Subject to the terms hereof, the balance of the DIP Facilities may be borrowed in amounts, and at intervals, to be set forth in the Loan Documents. |
| **Incremental Facilities:** | The Borrower shall be entitled to enter into one or more incremental term loan facilities (the "**Incremental Term Facility**") and/or one or more Incremental Revolver facilities (the "**Incremental Revolver Facility**" and, together with the Incremental Term Facility, the "**Incremental Facilities**") that will rank pari passu in right of payment with the Revolver Facility, the Delayed-Draw Term Facility and the Term Facility and will have the same guarantees as, and be secured on a pari passu basis by the same Collateral securing, the Revolver Facility, the Delayed-Draw Term Facility and the Term Facility, in a principal amount allocated between the Incremental Facilities determined by the Borrower (x) in minimum amounts of at least $100,000,000 and (y) not to exceed the sum of (1) $750,000,000 plus (2) if the RCT Carve Out Support Rejection Notice shall have been issued and delivered prior to the Delayed-Draw Termination Date, the Delayed-Draw Term Facility Reduction Amount; provided that in each case: |

(i)    no Event of Default or event that upon the passage of time, the giving of notice, or both, would become an Event of Default ("**Default**") under the Revolver Facility, the Delayed-Draw Term Facility or the Term Facility then exists or would exist immediately after giving effect

7

**PX 095**
**Page 345 of 464**

thereto, and the representations and warranties in the Loan Documents shall be true and correct in all material respects on and as of the date of the incurrence of such Incremental Facility (or, to the extent such representation and warranties relate to an earlier date, they shall be true and correct in all material respects as of such earlier date);

(ii)    such Incremental Facilities may be provided by then existing Lenders or, subject to the reasonable consent of the Administrative Agent, other persons who become Lenders in connection therewith if such consent would be required for an assignment to any such Lender under the Loan Documentation (provided that no existing Lender will be obligated to provide such Incremental Facilities without its consent);

(iii)    solely with respect to an Incremental Revolver Facility, pro forma compliance (assuming a full drawing of such Incremental Revolver Facility) after giving effect to all appropriate pro forma adjustments (but excluding all cash proceeds from such Incremental Revolver Facility) with the Consolidated Superpriority Secured Net Debt Leverage Test for the most recently ended quarterly test period for which financial statements are available;

(iv)    the maturity date of such Incremental Facilities shall be no earlier than the maturity date of the Revolver Facility, the Delayed-Draw Term Facility and the Term Facility, and such Incremental Facilities shall require no scheduled amortization or mandatory commitment reduction (other than pursuant to the same terms applicable to the Revolver Facility or the Term Facility, as applicable) prior to the final maturity of the Revolver Facility, the Delayed-Draw Term Facility and the Term Facility and, with respect to the Incremental Revolver Facility, shall be made pursuant to the same documentation, and (except as otherwise set forth in clause (v) below) shall be on the exact same terms, as are applicable to the Revolver Facility;

(v)    the interest rates, interest margins, any rate floors, fees, original issue and other funding discounts and premiums and (subject to clause (iv) above) amortization schedule applicable to such Incremental Facility shall be determined by the Borrower and the Lenders thereunder; provided that the total yield on the Incremental Term Facility or Incremental Revolver Facility (inclusive of interest rate floors and any original issue discount or upfront fees, but excluding any customary arrangement, administrative, advisory, origination or similar fees in connection therewith that are not paid to all of the Lenders providing the Incremental Facility) does not exceed the total yield on the initial Term Facility or initial Revolver Facility, as applicable, by more than 50 basis points, but the Borrower may increase the total yield on the initial Term Facility or initial Revolver Facility, as applicable, on or prior to the date of the incurrence of such Incremental Term Facility or Incremental Revolver Facility, as applicable, in order to comply with this proviso;

(vi)    except as otherwise set forth above, such Incremental Term

8

#4819-5662-6966

PX 095
Page 346 of 464

Facility shall be on terms and pursuant to documentation to be determined between the Borrower and the Lenders thereunder; provided that to the extent such terms and documentation are not consistent with the Term Facility (except to the extent permitted by clauses (iv) and (v) above), they shall be reasonably satisfactory to the Administrative Agent; and

(vii)    the Final Order Entry Date shall have occurred.

**Documentation Principles:** "**Documentation Principles**" means that (a) except as otherwise expressly set forth herein in this Term Sheet or the Commitment Letter, the terms and conditions of the mutually agreed definitive documentation for each of the DIP Facilities (the "**Loan Documents**") shall be consistent with the terms and conditions, and in no event more burdensome on the Debtors, than the terms and conditions of the Prepetition TCEH Credit Facility; (b) the Loan Documents will be prepared on the basis of, and using as precedent, the Prepetition TCEH Credit Facility and its related collateral documents; and (c) generally all terms and conditions (including exceptions, thresholds, baskets, grace periods, cure periods and financial definitions) in the Loan Documents will be consistent with those in the Prepetition TCEH Credit Facility and its related collateral documents and in no event more burdensome on the Debtors, in each case modified solely to the extent (i) required to reflect the express terms and conditions set forth in this Term Sheet and the Commitment Letter, (ii) required to reflect the shorter tenor of the DIP Facilities, (iii) to account for the existence and continuance of the Cases, the operational needs and requirements of the Debtors and the Specified Affiliates (defined below) between the Petition Date and the Maturity Date (including as set forth in the last two paragraphs of "**Negative Covenants**" below) and to include provisions applicable to debtor-in-possession facilities generally (including (subject to the last two paragraphs of "**Negative Covenants**" below) customary changes to be mutually agreed with respect to additional restrictions on indebtedness, liens, restricted payments, asset sales and investments), and (iv) as otherwise agreed by the Borrower.

**Budget:** As used in this Term Sheet and in Annex II hereto, "**Budget**" means the following:

Beginning on the Interim Order Entry Date, in the case of the initial Budget delivered as a condition to the closing and the funding of the Initial Availability (the "**Initial Budget**"), a statement of cash sources and uses of all free cash flow for the next full 3-calendar months of the Debtors (on a consolidated basis) broken down by month, including the anticipated uses of the DIP Facilities for such period, and after such 3-calendar month period, at the end of each fiscal quarter (or, at the election of the Borrower, at the end of each calendar month or such other earlier period as may be agreed).

The Borrower shall also provide on a monthly basis a Budget variance report/reconciliation for each calendar month (delivered no

9

#4819-5662-6966

later than the end of the subsequent calendar month), (i) showing a statement of actual cash sources and uses of all free cash flow for the immediately preceding calendar month, noting therein all material variances from values set forth for such historical periods in the most recently delivered Budget, and shall include explanations for all material variances, and (ii) certified as to its reasonableness when made by the Borrower.

**Annual Operating Forecast:**    Beginning on the date 60 days after the Interim Order Entry Date (and again no later than December 1, 2014 for the business plan and operating budget covering 2015 and no later than December 1, 2015 for the business plan and operating budget covering 2016), the approved annual business plan and projected operating budget through the stated maturity date (the "**Annual Operating Forecast**"), broken down by month, including, without limitation, income statements, balance sheets, cash flow statements, projected capital expenditures, asset sales, a line item for total available liquidity for the period of such Budget, and which shall set forth the anticipated uses of the DIP Facilities for such period; the associated underlying assumptions shall be certified by the Borrower as being reasonable when made.

Both the Budget and the Annual Operating Forecast shall provide, among other things, for the payment of the fees and expenses relating to the DIP Facilities, ordinary course administrative expenses, bankruptcy-related expenses and working capital, expected issuances and renewals of letters of credit, and other general corporate needs; *provided, however,* that notwithstanding anything to the contrary in this Term Sheet or in any of the Loan Documents, the Professional Fees (defined below) will be due and payable, and will be paid by the Debtors whether or not consistent with the items or amounts set forth in the Budget or the Annual Operating Forecast; and *provided, further* that under no circumstance will the Budget or the Annual Operating Budget be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Debtors.

**Maturity:**    The maturity date of the DIP Facilities will be (and all Loans and other payment obligations under the DIP Facilities shall be repaid in full in cash on) the earliest of: (i) stated maturity, which shall be 24 months from the Closing Date (defined below) subject to a six-month extension if as of the first day of such extension (1) no Event of Default is outstanding, (2) a Plan of Reorganization has been filed, (3) a hearing has been scheduled for the confirmation of such Plan of Reorganization, (4) the Debtors are working in good faith to confirm such Plan of Reorganization, (5) an updated Budget and Annual Operating Forecast have been delivered by the Borrower at least ten days prior to the first day of such extension, which Budget and Annual Operating Forecast demonstrate minimum liquidity sufficient to provide for Adequate Protection Payments through such additional six-month period plus an additional $250,000,000, and (6) the Borrower pays an extension fee in the amount of 0.25% of the then outstanding Commitments and Loans on the date of such payment to the Agent for distribution to the Lenders

10

#4819-5662-6966

on a pro rata basis based on the respective Commitments and Loans held by each Lender (subclauses (1) through (6), the "**Extension Conditions**"); (ii) the effective date of any Plan of Reorganization; (iii) the date that is 45 days after the Interim Order Entry Date if the Final Order Entry Date shall not have occurred by such date; (iv) the date of the consummation of a sale of all or substantially all of the Debtors' assets or stock under section 363 of the Bankruptcy Code; and (v) the acceleration of the Loans and termination of the Commitments under any of the DIP Facilities, including, without limitation, as a result of the occurrence and continuance of an Event of Default (any such occurrence, the "**Maturity Date**"); provided, however, that the Maturity Date will occur in any event no later than 30 months from the Closing Date.

Any plan of reorganization or liquidation or confirmation order entered in the Cases shall not discharge or otherwise affect in any way any of the joint and several obligations of the Debtors to the Lenders under the DIP Facilities and the Loan Documents, other than after the payment in full and in cash, to the Lenders of all obligations (other than indemnities and other contingent obligations not then due and payable and collateralized letters of credit) under the DIP Facilities and the Loan Documents on or before the effective date of such plan and the termination of the Commitments.

| | |
|---|---|
| **Closing Date:** | The date on which the specified portion of the Commitments is made available for borrowings under the DIP Facilities (the "**Closing Date**"), which shall be no later than five (5) business days after the Interim Order Entry Date, subject to satisfaction (or waiver) of the applicable conditions precedent set forth herein. |
| **Amortization:** | None. For the avoidance of doubt, there will be neither an excess cash flow sweep nor scheduled amortization under the DIP Facilities. |
| **Interest Rate and Fees:** | As set forth on Annex III. |
| **Borrowing Procedure:** | To be consistent with the Documentation Principles, including as follows: |

Borrowings under the Revolver Facility will be in minimum amounts of $5,000,000 or multiples of $1,000,000 in excess thereof (or, if less, the remaining available balance of the applicable Commitments), except for deemed draw requests upon the Agent's delivery of a Carve Out Trigger Notice.

The Term Facility will be available in single draws on or after the date the Interim Order or the Final Order is entered in respect of the portion of the Term Facility available on each such date in accordance with "DIP Facilities Initial Availability" and "DIP Facilities Full Availability" above.

Borrowing requests under each DIP Facility shall be made (i) on three

11

#4819-5662-6966

business days' notice, in the case of Loans bearing interest at a rate based on LIBOR ("**LIBOR Loans**") and (ii) on one business day's notice, in the case of Loans bearing interest based on the Alternate Base Rate ("**ABR Loans**"); provided that Loans funded and Letters of Credit issued on the Interim Order Entry Date will be funded or issued on the basis of a same day notice.

**Currency:** Borrowings will be made in U.S. Dollars. All payments under the DIP Facilities will be made without setoff or counterclaim.

**Voluntary Prepayments and Commitment Reductions:** To be consistent with the Documentation Principles, including as follows:

The Borrower may repay outstanding Term Loans and Delayed-Draw Term Loans and/or reduce the Term Commitments and/or Delayed-Draw Term Commitments at any time without premium or penalty, including without any make-whole premium (other than breakage costs, if applicable on the amount of the prepayment or reduction) upon (i) at least three (3) business days' notice in the case of LIBOR Loans and (ii) one business day's notice in the case of ABR Loans; provided that in the case of repayment, each partial repayment shall be in an amount of $5,000,000 or multiples of $1,000,000 in excess thereof (or, if less, the outstanding amount of applicable Loans), and, each partial reduction shall be in an amount of $5,000,000 or multiples of $1,000,000 in excess thereof (or, if less, the remaining available balance of the relevant Commitment).

The Borrower may repay the Revolver Loans under the Revolver Facility and/or reduce the Revolver Commitments at any time without premium or penalty (other than breakage costs, if applicable) upon (i) at least three (3) business days' notice in the case of LIBOR Loans and (ii) one business day's notice in the case of ABR Loans; provided that in the case of repayment, each partial repayment shall be in an amount of $1,000,000 or multiples of $500,000 in excess thereof (or, if less, the outstanding amount of applicable Loans), and, in the case of reduction of the Revolver Commitments, each partial reduction shall be in an amount of $1,000,000 or multiples of $500,000 in excess thereof (or, if less, the remaining available balance of the Revolver Commitments).

**Mandatory Prepayments:** The following mandatory prepayments shall be required, subject, in each case, to reinvestment rights, exceptions and mechanics consistent with the Documentation Principles:

1. Asset Sales: Prepayments of the DIP Facilities in an amount equal to 100% of the net cash proceeds of the sale or other disposition of any property or assets (other than any such proceeds received prior to the date of commencement of the Cases) of the Debtors, other than net cash proceeds of sales or other dispositions of power, capacity, energy, ancillary services and other products, inventory and services or contracts related to any of the foregoing (in each case, whether in physical, financial or other form), any dispositions between the

12

#4819-5662-6966

Debtors, any dispositions consisting of leases and sub-leases and any other sales or dispositions in the ordinary course of business or consistent with past practice, and subject, in each case, to any Applicable Limitations and additional exceptions to be mutually agreed on in the Loan Documents consistent with the Documentation Principles.

2. Insurance Proceeds: Prepayments of the DIP Facilities in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of any property or assets of the Debtors (other than any such proceeds received prior to the date of commencement of the Cases), subject to any Applicable Limitations and with restrictions to be mutually agreed, and subject to exceptions to be mutually agreed on in the Loan Documents consistent with the Documentation Principles.

3. RCT Letter of Credit Exposure. On any date that the outstanding RCT Letter of Credit L/C exposures exceed the balance on the RCT L/C Cash Collateral Account (an "**Excess RCT L/C Exposure**"), not later than within two (2) business days from written notice by the applicable RCT Letter of Credit Issuer of the existence of such Excess RCT L/C Exposure, the Borrower will either (i) deposit additional cash in the RCT L/C Cash Collateral Account or otherwise cash collateralize (at 100%) an amount at least equal to such Excess RCT L/C Exposure, or (ii) cause the reduction of any outstanding RCT Letters of Credit exposure in an amount at least equal to such Excess RCT L/C Exposure.

4. General Letter of Credit Exposure. On any date that the outstanding General Letter of Credit exposures exceed the balance on the General L/C Cash Collateral Account (an "**Excess General L/C Exposure**"), not later than within two (2) business days from written notice by the applicable General Letter of Credit Issuer of the existence of such Excess General L/C Exposure, the Borrower will either (i) deposit additional cash in the General L/C Cash Collateral Account or otherwise cash collateralize (at 100%) an amount at least equal to such Excess General L/C Exposure, or (ii) cause the reduction of any outstanding General Letters of Credit exposure in an amount at least equal to such Excess General L/C Exposure.

Notwithstanding the foregoing, no mandatory prepayments pursuant to clauses 1 and 2 above shall be due in respect of net cash proceeds that (x) do not exceed $25,000,000 in respect of a single mandatory prepayment event and (y) do not exceed $100,000,000 in respect of the aggregate amount of net cash proceeds of all mandatory prepayment events

**Application of Mandatory Prepayments:**

Any mandatory prepayments (other than as set forth in paragraph 3 of "**Mandatory Prepayments**" above) shall be applied first to the Term Facility and the Delayed-Draw Term Facility until paid in full, and then to the Revolver Facility (without any permanent reduction in

13

PX 095
Page 351 of 464

commitments thereof).

| | |
|---|---|
| **RCT Reclamation Support Carve Out:** | Unless and until the Borrower issues the RCT Carve Out Support Rejection Notice, all amounts up to $1,100,000,000 required to be paid to the RCT pursuant to amounts due and owing in respect of reclamation obligations incurred by the RCT will constitute the RCT Reclamation Support Carve Out, and such RCT Reclamation Support Carve Out will be senior to the Obligations and to any other obligations or liabilities of the Debtors (other than, and subject in any event to, the Carve Out). |

If the RCT denies or rejects the TCEH Debtors' application to utilize the RCT Reclamation Support Carve Out to satisfy RCT's bonding requirements, then the Borrower shall be obligated to promptly terminate and permanently reduce to $0 the RCT Reclamation Support Carve Out by issuing and delivering a notice in writing to the Administrative Agent, and the RCT shall thereafter cease to have any rights in respect of the RCT Reclamation Support Carve Out (the "**RCT Carve Out Support Rejection Notice**").

| | |
|---|---|
| **Priority/Security:** | All obligations of the Debtors to the Administrative Agent, the Lenders, and the Letter of Credit Issuers (such persons, collectively, the "**DIP Secured Parties**") under the Loan Documents (the "**Obligations**") including all Loans made under the DIP Facilities, shall, subject to the Carve Out (defined below) and the RCT Reclamation Support Carve Out, at all times: |

(i) pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several superpriority administrative expense claim status in the Cases, on a pari passu basis;

(ii) pursuant to Bankruptcy Code section 364(c)(2), be secured by the following:

> a perfected first-priority lien on substantially all now owned or hereafter acquired assets and property of the Debtors, including real and personal property, plant and equipment, the RCT L/C Cash Collateral Account, the General L/C Cash Collateral Account, cash and the proceeds of each of the foregoing (the "**Collateral**"); provided, however, that notwithstanding anything to the contrary herein or in any other Loan Document, (x) "Excluded Stock and Stock Equivalents", "Excluded Subsidiaries" and any "Excluded Property" (each as defined in the Prepetition TCEH Credit Facility and the "Credit Documents" (as defined therein)) will be excluded from the Collateral, and (y) in any event all "Guarantors" pursuant to the Prepetition TCEH Credit Agreement immediately prior to the Petition Date will be Guarantors and their assets will constitute "Collateral" to the same extent constituting "Collateral" pursuant to the Prepetition TCEH Credit Agreement immediately prior to the Petition Date; provided, further, that the Collateral shall exclude the Debtors' claims and causes of

14

action under Chapter 5 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**"), but subject only to, and effective upon, entry of the Final Order, shall include any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise; provided, further, that notwithstanding the Documentation Principles, the Collateral shall include (i) stock and stock equivalents of "Immaterial Subsidiaries" (as defined in the Prepetition TCEH Credit Facility) that are Debtors, (ii) deposit accounts and cash, and (iii) any other assets that were excluded from Collateral in the Prepetition Credit Facility due to practicality or the necessity of obtaining third party consents or taking other additional steps, but only to the extent that a lien in such Collateral may be perfected by the entry of the Interim Order and the Final Order. In addition, "Excluded Subsidiary" will include with respect to any actual or purported Obligation (including pursuant to any guarantee or grant of security) with respect to any "swap" (as defined under the Commodity Exchange Act) (after giving effect to keepwell agreements in the Loan Documents) entered into by the Parent Guarantor, the Borrower or Subsidiary Guarantor thereof that is not an "eligible contract participant" (as such term is defined in the Commodity Exchange Act) at the time such "swap" Obligation is incurred, or in the case of an Obligation resulting from a guarantee (or grant of security) at the later of the time such guarantee (or grant of security) is entered into and the time such "swap" obligation being guaranteed (or secured) is incurred. For the avoidance of doubt, Collateral will also exclude the following: (a) those assets over which the granting of security interests in such assets would be prohibited by contract (other than any in respect of any of the Prepetition Secured Facilities), applicable law or regulation or the organizational documents of any non-wholly owned subsidiary (including permitted liens, leases and licenses), or to the extent that such security interests would result in adverse tax or accounting consequences as determined in good faith by the Borrower, (b) those assets as to which the Administrative Agent and the Borrower reasonably determine that the cost of obtaining such a security interest or perfection thereof are excessive in relation to the benefit to the Lenders of the security to be afforded thereby, (c) assets in respect of which the granting or perfection of a lien would violate any applicable law or regulation (including regulations adopted by FERC, the Public Utility Commission of Texas and/or the Nuclear Regulatory Commission), and (d) subject to the requirement that all "Guarantors" pursuant to the Prepetition TCEH Credit Agreement immediately prior to the Petition Date will be Guarantors and their assets will constitute "Collateral" to the same extent constituting "Collateral" pursuant to the Prepetition TCEH Credit Agreement immediately prior to the Petition Date, other exceptions (i) to be mutually agreed upon or (ii) that are

15

usual and customary for facilities of this type for affiliates of the Borrower will not constitute "Collateral"); provided, however, notwithstanding anything to the contrary contained herein, to the extent the security interest in such Collateral may be perfected by the entry of the Interim Order and the Final Order, neither the Borrower nor any Guarantor shall be required to obtain, provide or execute any mortgage or control agreement in favor of the Agent or any other DIP Secured Party with regard to any Collateral nor shall the Borrower or any Guarantor be required to obtain a certificate of title evidencing the security interest of the Agent or any other Secured Party with respect to any Collateral;[1]

in each case, to the extent that such Collateral is not subject to valid, perfected and non-avoidable liens as of the commencement of the Cases;

(iii) pursuant to Bankruptcy Code section 364(c)(3), be secured by the following:

a perfected lien on all Collateral;

to the extent that such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (other than property that is subject to the existing liens that secure the obligations under any of the Prepetition Secured Facilities referred to above (excluding the "Deposit L/C Loan Collateral Account" to the extent of the "Deposit L/C Obligations" (each as defined in the Prepetition TCEH Credit Facility) (the "**Prepetition Deposit L/C Collateral**")), which liens shall be primed by the liens securing the DIP Facilities, the Carve Out and the liens securing the Eligible Pari Passu Hedges described in such clause); and

(iv) pursuant to Bankruptcy Code section 364(d), be secured by the following:

a perfected priming first-priority lien on all Collateral;

to the extent that such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties as of the commencement of the Cases, including, all accounts receivable, inventory, real and personal property, plant and equipment of the Debtors that secure the obligations of the Debtors under or in connection with the Prepetition Secured Facilities (including, for the avoidance of doubt, with respect to EFCH

---

[1]    To the extent "Excluded Assets" is to be limited at the request of the Joint Lead Arrangers in the manner set forth above, the Debtors and the Joint Lead Arrangers agree that the exclusions initially proposed by the Debtors on September 15, 2013 will be reinstated in full in the definition of "Excluded Assets" for purposes of any exit facility collateral.

16

#4819-5662-6966

**PX 095**
**Page 354 of 464**

as parent guarantor under the Prepetition TCEH Credit Facility, but excluding the Prepetition Deposit L/C Collateral (which shall be subject to the lien set forth in clause (iii) above);

subject, in each case, to the Carve Out and the RCT Reclamation Support Carve Out.

All liens securing the Obligations, the Adequate Protection Liens (defined below), the 507(b) Claim (as defined below), the Eligible Pari Passu Hedges, and any and all other forms of adequate protection, liens or claims securing the Obligations and all other prepetition obligations of the Debtors, including the liens and security interests granted to the respective lenders, counterparties and holders pursuant to and in connection with the Prepetition Secured Facilities (the "**Existing Primed Creditors**") (including all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the agents under the Prepetition Secured Facilities, for its benefit and for the benefit of the any secured party under or in connection with the Prepetition Secured Facilities), shall be subject and subordinate to the Carve Out and the RCT Reclamation Support Carve Out; provided, however, that cash or other amounts of cash equivalents on deposit to cash collateralize Letters of Credit shall not be subject to the Carve Out or the RCT Reclamation Support Carve Out.

The "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "**Professional Fees**") incurred by persons or firms ("**Debtor Professionals**") retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code and any official committee of unsecured creditors (the "**Committee**" and, together with the Debtor Professionals, the "**Professional Persons**") appointed in the Cases pursuant to section 1103 of the Bankruptcy Code at any time before or on the first Business Day following delivery by the Agent of a Carve Out Trigger Notice (defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Professional Fees of Professional Persons in an aggregate amount not to exceed $50,000,000 incurred after the first Business Day following delivery by the Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"). For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the Agent to the Debtors, their lead restructuring counsel, the United States Trustee, and lead counsel to the

17

#4819-5662-6966

Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the Obligations under the DIP Facilities, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

On the day on which a Carve Out Trigger Notice is given by the Agent to the Debtors, the Carve Out Trigger Notice shall (i) be deemed a request by the Debtors for Loans under the Revolver Commitment (on a pro rata basis based on the then outstanding Revolver Commitments), in an amount equal to the then unpaid amounts of the Professional Fees (any such amounts actually advanced shall constitute Revolver Loans), and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account at Revolver Facility Administrative Agent in trust to pay such then unpaid Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims. On the same day on which a Carve Out Trigger Notice is given, the Carve Out Trigger Notice shall also be deemed a draw request and notice of borrowing by the Debtors for Loans under the Revolver Commitment (on a pro rata basis based on the then outstanding Revolver Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute Revolver Loans). The Debtors shall deposit and hold such amounts in a segregated account at Administrative Agent in trust to pay such Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims. On the first Business Day after the Agent gives such notice to such Revolver Lenders, notwithstanding the existence of a Default or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for Revolver Loans under the Revolver Facility or the occurrence of the Maturity Date, each Revolver Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the Agent such Revolver Lender's pro rata share with respect to such Borrowing in accordance with the Revolver Facility. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (ii) through (iii) of the definition of Carve Out set forth above, but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Agent for the benefit of the Lenders, unless the Obligations have been paid in full, in which case any such excess shall be paid to the lenders under the Prepetition Secured Facilities in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above, and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Agent for the benefit of the Lenders,

18

unless the Obligations have been paid in full, in which case any such excess shall be paid to the lenders under the Prepetition Secured Facilities in accordance with their rights and priorities as of the Petition Date.

Notwithstanding anything to the contrary in the Loan Documents, the Interim Order or the Final Order, following delivery of a Carve Out Trigger Notice, the Agents and the Prepetition First Lien Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the Agents for application in accordance with the Loan Documents.

Further, notwithstanding anything to the contrary herein, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans or increase or reduce the Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Professional Fees shall not affect the priority of the Carve Out and (iii) in no way shall the Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, any Budget, the Initial Budget, any Annual Operating Forecast or any of the foregoing be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Debtors. The Debtors shall not assert or prosecute, and no portion of the proceeds of the DIP Facilities, the Collateral, or the Carve Out, and no disbursements set forth in the Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred by any person in connection with (a) preventing, hindering or delaying any of the Prepetition First Lien Agent's, the Prepetition First Lien Creditors', the Agent's or the Lenders' enforcement or realization upon any of the Collateral once an Event of Default has occurred and after the Remedies Notice Period, (b) objecting or challenging or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Obligations, the DIP liens, the obligations and liens under the Prepetition Secured Facilities, or any other rights or interest of any of the Agent, the Lenders, the Prepetition First Lien Agent or any Prepetition First Lien Creditor, or (c) asserting, commencing or prosecuting any claims or causes of action, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the Agent, any Lender, the Prepetition First Lien Agent, any Prepetition First Lien Creditor or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; provided, however, that the foregoing shall not restrict the Debtors from using proceeds of the DIP Facilities to seek to use cash collateral on a non-consensual basis or prosecuting a plan of reorganization over the objection of the Prepetition First Lien Creditors; provided, further, that the Carve Out and such collateral proceeds and loans under the Loan Documents may be used for allowed fees and expenses, in an amount not to exceed $250,000 in the aggregate, incurred solely by the Committee, if appointed, in investigating (but not commencing or prosecuting) the validity, enforceability, perfection,

19

priority or extent of the liens under the Prepetition Secured Facilities. Any party granted standing by the Bankruptcy Court other than the Committee must commence any claims against the Prepetition First Lien Agents no later than seventy-five (75) calendar days following entry of the Interim Order, and, with respect to the Committee, if appointed and granted standing by the Bankruptcy Court, no later than sixty (60) calendar days after its formation.

The liens on the Collateral securing the Prepetition Secured Facilities shall be junior and subordinate to the Carve Out, the RCT Reclamation Support Carve Out, the liens securing the Obligations, the Adequate Protection Liens, and the liens securing the Eligible Pari Passu Hedges. All of the liens described herein shall be effective and perfected as of the Interim Order Entry Date and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.

**Adequate Protection:**    Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, the Prepetition First Lien Agent, for the benefit of itself and the holders of claims on account of Prepetition First Lien Debt (the "**Prepetition First Lien Creditors**") and the Prepetition Second Lien Agent, for the benefit of itself and the holder of claims on account of Prepetition Second Lien Debt (the "**Prepetition Second Lien Creditors**"), in each case, shall be granted the following adequate protection (collectively, the "**Adequate Protection**") of the security interests of the Prepetition First Lien Creditors in the Collateral securing the Prepetition First Lien Debt (including, without limitation, cash collateral) (the "**Prepetition First Lien Collateral**") and of the security interests of the Prepetition Second Lien Creditors in the Collateral securing the Prepetition Second Lien Debt (including, without limitation, cash collateral) (the "**Prepetition Second Lien Collateral**"), and equal in amount to, any diminution in the value (collectively, the "**Diminution in Value**") of such prepetition security interests of such Prepetition First Lien Creditors and Prepetition Second Lien Creditors, respectively, calculated in accordance with section 506(a) of the Bankruptcy Code, whether or not the Diminution in Value results from the sale, lease or use by the Debtors of the Prepetition First Lien Collateral or Prepetition Second Lien Collateral, as applicable, the priming of the prepetition security interests of such Prepetition First Lien Creditors or Prepetition Second Lien Creditors, as applicable, or the stay of enforcement of any prepetition security interests arising from section 362 of the Bankruptcy Code, or otherwise:

(a) <u>Adequate Protection Liens</u>. As security for and solely to the extent of any Diminution in Value of their prepetition security interests, the Prepetition First Lien Agent shall be granted for its benefit and the benefit of the applicable Prepetition First Lien Creditors and the Prepetition Second Lien Agent shall be granted for its benefit and the benefit of the applicable Prepetition Second Lien Creditors, respectively, effective and perfected as of the Interim Order Entry Date and without the

20

**PX 095**
**Page 358 of 464**

necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, a replacement security interest in and lien on the Collateral (together, the "**Adequate Protection Liens**"), subject and subordinate only to (i) the Carve Out, (ii) the RCT Reclamation Support Carve Out, (iii) the liens securing the DIP Facilities, (iv) the liens securing the Eligible Pari Passu Hedges, which Adequate Protection Liens shall, *inter se*, rank in the same relative priority and right as do the respective security interests and liens of the respective Prepetition First Lien Creditors and Prepetition Second Lien Creditors, as applicable, as of the Petition Date.

(b) Super-Priority Claim. To the extent of any Diminution in Value of the Prepetition First Lien Creditors or the Prepetition Second Lien Creditors, in their respective prepetition security interests, the Prepetition First Lien Agent, on behalf of itself and the applicable Prepetition First Lien Creditors and the Prepetition Second Lien Agent, on behalf of itself and the applicable Prepetition Second Lien Creditors, respectively, shall be granted, subject to the payment of the Carve Out, a superpriority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code, immediately junior to the claims under section 364(c)(1) of the Bankruptcy Code held by the Agent and the Lenders and other secured parties under the DIP Facilities (the "**507(b) Claim**"), which 507(b) Claim shall, *inter se*, rank in the same relative priority and right as do the respective claims of the Prepetition First Lien Creditors and Prepetition Second Lien Creditors, as applicable, as of the Petition Date; provided that the Prepetition First Lien Agent and Prepetition First Lien Creditors and the Prepetition Second Lien Agent and Prepetition Second Lien Creditors shall not receive or retain any payments, property or other amounts on account of the 507(b) Claim or on account of the Prepetition First Lien Debt or Prepetition Second Lien Debt, as applicable, unless and until the Obligations (other than indemnities and/or contingent obligations not then due and payable) and the Eligible Pari Passu Hedges have indefeasibly been paid in cash in full.

(c) Fees and Expenses. The Prepetition First Lien Agent shall receive (for the benefit of the lenders under the Prepetition Secured Facilities) from the Debtors current cash payments of all reasonable and documented out-of-pocket fees and expenses of professionals payable pursuant to the engagement letters dated as of February 1, 2013, with Millstein & Co., L.P., financial advisors to certain of the Prepetition First Lien Creditors, and Paul, Weiss, Rifkind, Wharton & Garrison LLP, as lead counsel to certain of the Prepetition First Lien Creditors, plus the reasonable and documented professional fees and expenses of Young Conaway Stargatt & Taylor, LLP, as local counsel to certain of the Prepetition First Lien Creditors,

21

promptly upon receipt of invoices therefor, after providing the U.S. Trustee and counsel to any statutory committee with copies of the invoices and a ten day period to object.

As additional adequate protection, the Prepetition First Lien Agent, on behalf of itself and the other Prepetition First Lien Creditors thereunder, may be granted the following:

> Adequate Protection Payments. The Prepetition First Lien Agent on behalf of the Prepetition First Lien Creditors may receive from the Debtors periodic adequate protection payments (the "**Adequate Protection Payments**") in an amount resulting from applying (including, if any, settlement or termination amounts owed under the First Lien Commodity Hedges and any letter of credit fees, in each case in accordance with respective terms of the relevant Prepetition First Lien Debt) a per annum rate equal to LIBOR + 450 basis points to the aggregate outstanding amount of Prepetition First Lien Obligations as of the Petition Date in respect of such relevant periods ending after the Petition Date (and not, for the avoidance of doubt, at any different rate set forth in any of the Prepetition First Lien Debt); provided, however, that any Adequate Protection Payment shall be without prejudice, and with a full reservation of rights, as to whether such payment should be recharacterized or reallocated pursuant to section 506(b) of the Bankruptcy Code as principal payments under the Prepetition First Lien Debt (whether as to principal, interest or otherwise). The Adequate Protection Payments and the expenses paid by the Debtors pursuant to clause (c) of "Adequate Protection" do not themselves result in Diminution in Value. The Adequate Protection Payments will be calculated on a monthly basis, and be due and payable on the first business day of each month occurring after the first full month following the Petition Date.

The Prepetition First Lien Agent on behalf of Prepetition First Lien Creditors shall also receive (i) the Budget, (ii) the Annual Operating Forecast and (iii) to the extent given to the Lenders, reasonable access to the Debtors' records and information.

**Representations and Warranties:**

Each of the Debtors under the DIP Facilities will make only the following representations and warranties, consistent with the Documentation Principles and (for the avoidance of doubt) each as modified as necessary to reflect the commencement of the Cases and events leading up to and following commencement.

Financial statements; no Material Adverse Event since the Petition Date; existence and good standing, authorization and validity; compliance with law; corporate power and authority; due authorization, execution, deliver and enforceability of Loan Documents; no conflict with law, organizational documents, unstayed orders and decrees or post-petition material contractual obligations; no material unstayed litigation; no

22

**PX 095**
**Page 360 of 464**

default; ownership of property; intellectual property; taxes; insurance; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; environmental matters; labor matters; OFAC; FCPA; anti-terrorism laws and anti-money laundering laws; effectiveness of the Interim Order and the Final Order; creation, validity, perfection and priority of lien securing the DIP Facilities; and accuracy of disclosure. Notwithstanding anything in the Commitment Letter, the Fee Letter, this Term Sheet or any Loan Document to the contrary, the Debtors will not provide any representation or warranty concerning solvency.

As used herein and in the Loan Documents, a "**Material Adverse Event**" shall mean any circumstance or conditions affecting the business, assets, operations, properties or financial condition of the Borrower and its subsidiaries taken as a whole, that would individually or in the aggregate, materially adversely affect the ability of the Debtors (taken as a whole) to perform their payment obligations under the Loan Documents to which they are a party, or the rights and remedies of the Agent, the Letter of Credit Issuers and the Lenders under the Loan Documents (other than, in each case, as a result of the events leading up to, and following commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the continuation and prosecution thereof, including circumstances or conditions resulting from, or incidental to, such events, commencement, continuation and prosecution, which shall not, individually or in the aggregate, constitute a Material Adverse Event), and provided, further, that nothing disclosed in any of the following filings by EFH and/or EFCH (1) the Annual Report on Form 10-K for the year ended December 31, 2013 as filed on the date of the Commitment Letter (to the extent substantially the same in form and substance as the version provided to the Joint Lead Arrangers at least 2 days prior to the date of the Commitment Letter), (2) any filings on Form 8-K made through the date of the Commitment Letter and/or (3) any disclosure statement related to any plan of reorganization or liquidation of Debtors provided to the Joint Lead Arrangers on or prior to the date of the Commitment Letter, shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein) constitute a Material Adverse Event.

**Covenants:**

**- Financial Covenant:**  Each of the Debtors under the DIP Facilities will agree only to the following financial covenant (subject to the Documentation Principles):

Solely with respect to the Revolver Facility, on the last day of any fiscal quarter (but in no event earlier than June 30, 2014) (each, a "**Test Date**"), a Consolidated Superpriority Secured Net Debt leverage test pursuant to which on each such Test Date the ratio of (i) the outstanding principal amount of Term Loans, plus the outstanding principal amount of Delayed-Draw Term Loans, plus the aggregate amount of undrawn Revolver Commitments, the aggregate principal amount of Revolver

23

Loans then outstanding to (ii) Consolidated EBITDA may not exceed (x) if the RCT Carve Out Support Rejection Notice has not been issued or delivered on or prior to the applicable Test Date, 3.50 to 1.00 and (y) on all other Test Dates, 4.50 to 1.00 (the "**Consolidated Superpriority Secured Net Debt Leverage Test**");

The Consolidated Superpriority Secured Net Debt and the Consolidated EBITDA will be defined in a manner consistent with the Documentation Principles (including as to netting of unrestricted cash but without giving effect to any cap thereon; provided, however, that cash in the RCT L/C Cash Collateral Account and the General L/C Cash Collateral Account will not be netted).

"**Consolidated EBITDA**" will include, in addition to such add-backs as are consistent with the Documentation Principles, add-backs on account of (with each underlying definition to be defined in a manner consistent with the Documentation Principles) (i) restructuring-related or other similar charges, fees, costs, charges, commissions and expenses or other charges incurred during such period in connection with the DIP Facilities, the Cases, any reorganization plan in connection with the Cases, any "exit" credit agreements or financings, and any and all transactions contemplated by the foregoing, including the write-off of any receivables, the termination or settlement of executory contracts, professional and accounting costs fees and expenses, management incentive, employee retention or similar plans (in each case to the extent such plan is approved by the Bankruptcy Court to the extent required), litigation costs and settlements, asset write-downs, income and gains recorded in connection with the corporate reorganization of the Debtors and their subsidiaries; and (ii) the amount of any losses, costs, fees and expenses on disposition of receivables and related assets in connection with any Permitted Receivables Financing, and any losses, costs, fees and expenses in connection with the early repayment, accelerated amortization, repayment, termination or other payoff (including as a result of the exercise of remedies) of any Permitted Receivables Financing.

Notwithstanding the foregoing, the Consolidated EBITDA in respect of the following periods shall be as follows:

| Period | Consolidated EBITDA |
|---|---|
| Fiscal Quarter ending 9/30/13 | $500,000,000 |
| Fiscal Quarter ending 12/31/13 | $300,000,000 |
| Fiscal Quarter ending 3/31/14 | $350,000,000 |

24

#4819-5662-6966

Fiscal Month ending 4/30/14          $10,000,000

**- Affirmative Covenants:**

Each of the Debtors under each of the DIP Facilities (solely with respect to itself and each of the other Debtors and restricted subsidiaries) will agree only to the following affirmative covenants (consistent with, in each case, the Documentation Principles):

(a) delivery of (i) periodic updates of the Budget and monthly variance reports and (ii) quarterly and annual financial statements;

(b) delivery of monthly reports with respect to asset sales, cost savings, and other matters reasonably requested by the Agent;

(c) delivery to the Agent and its legal counsel, at least 2 business days in advance of filing with the Bankruptcy Court, of all proposed "first day" pleadings and proposed orders, which must be in form and substance reasonably satisfactory to the Agent (but in the case of the order governing cash management and the order governing adequate protection, shall be satisfactory in form and substance to the Agent);

(d) delivery to the Agent and its legal counsel, as soon as practicable in advance of filing with the Bankruptcy Court, of any plan or reorganization or liquidation and/or any disclosure statement related to such plan, which must be in form and substance reasonably satisfactory to the Agent; provided, however, that with respect to provisions of the plan of reorganization and/or any disclosure statement that relate to payment of the DIP Facilities, such provisions must be in form and substance satisfactory to the Agent;

(e) delivery to the Agent as soon as practicable in advance of filing with the Bankruptcy Court of the Final Order (which must be in form and substance satisfactory to the Agent), all other proposed material orders and pleadings related to the DIP Facilities (which must be in form and substance reasonably satisfactory to the Agent);

(f) file with the Bankruptcy Court a plan of reorganization and a disclosure statement relating thereto, each in form and substance reasonably satisfactory to the Agent, within 18 months after the Petition Date; provided, however, that with respect to provisions of the plan of reorganization and/or any disclosure statement that relate to payment of the DIP Facilities, such provisions must be in form and substance satisfactory to the Agent;

(g) maintenance of cash management system in accordance with the orders entered in the Cases, which orders shall be in form and substance satisfactory to the Agent;

25

(h) contest, if requested by the Agent, any motion seeking entry of an order, and entry of an order, that is materially adverse to the interests of the Agent or the Lenders or their respective material rights and remedies under the DIP Facilities in any of the Cases;

(i) additional reporting reasonably requested by the Agent, including, without limitation, with respect to litigation, contingent liabilities, Defaults, ERISA, environmental liabilities and Material Adverse Events;

(j) reasonable access to information (including historical information) and personnel (during normal business hours), including, regularly scheduled meetings as mutually agreed with senior management of the Borrower and other company advisors (during normal business hours), and a subset of the Agent and Millstein & Co., L.P. ("**Lenders' Financial Advisor**"), and Lenders' Financial Advisor shall be provided with access to all information it shall reasonably request and to other internal meetings regarding strategic planning, cash and liquidity management, operational and restructuring activities;

(k) if not already obtained, commercially reasonable efforts to obtain ratings from each of Moody's and Standard & Poor's as soon as reasonably practicable following the Closing Date; and

(l) only such additional affirmative covenants (as modified to account for the commencement and continuance of the Cases and other express provisions in this Term Sheet and the Commitment Letter) as are consistent with the Documentation Principles.

- Negative Covenants:    Each of the Debtors under each of the DIP Facilities (solely with respect to itself and each of the other Debtors and restricted subsidiaries) will agree only to the following negative covenants, consistent with, in each case, the Documentation Principles:

(a) prohibition on creating or permitting to exist any liens on any assets, other than liens securing the DIP Facilities and any permitted liens consistent with the Documentation Principles (which liens shall include, among others, scheduled liens in existence on the Closing Date) and other liens described in "**Priority/Security**" above;

(b) prohibition on creating or permitting to exist any other superpriority administrative expense claim or "claim" that is pari passu with or senior to the claims of the Lenders under the DIP Facilities (in each case, other than the Carve-Out, the RCT Reclamation Support Carve-Out or the Obligations);

(c) prohibition on making adequate protection payments to, or otherwise providing adequate protection for, the Prepetition

26

#4819-5662-6966

First Lien Creditors or the Second Lien Creditors other than as provided for in this Term Sheet and contained in the Interim Order, the Final Order and/or any cash collateral order;

(d) prohibition on the use of proceeds of the DIP Facilities or the Letters of Credit for purposes other than those described in this Term Sheet and contained in the Interim Order and Final Order;

(e) limitations on disposing of assets (including, without limitation, any sale and leaseback transaction and any disposition under Bankruptcy Code section 363);

(f) prohibition on modifying or altering in any material manner the nature and type of its business (taken as a whole) except as required by the Bankruptcy Code or orders entered by the Bankruptcy Court;

(g) prohibition on prepaying prepetition Indebtedness (other than for the avoidance of doubt, any payments under any financial or physical trading transaction, including commodities transactions, except as expressly provided for in the Loan Documents or pursuant to "first day" or other orders entered by the Bankruptcy Court upon pleadings in form and substance reasonably satisfactory to the Agent);

(h) prohibition on consenting to the termination or reduction of the Debtors' exclusive plan filing and plan solicitation periods under section 1121 of the Bankruptcy Code (the "**Exclusivity Periods**") or failing to object to any motion by a party in interest (other than a Lender or the Agent) seeking to terminate or reduce the Exclusivity Periods, in each case without the prior written consent of the Agent; and

(i) such additional negative covenants (as modified to account for the commencement of the Cases and other express provisions in this Term Sheet or the Commitment Letter) as are consistent with the Documentation Principles.

It is understood that there shall be no covenants regarding minimum required commodity hedging or trading arrangements. In addition, transactions (including any payments to affiliates) provided for in any shared services or similar agreement ("**Shared Services Agreement**"), any tax sharing agreements ("**Tax Sharing Agreements**"), any sublease of property from any Specified Affiliate to the Borrower or any of its restricted subsidiaries ("**Property Subleases**"), and certain other agreements or arrangements to be agreed to, each as in effect on the date of the Commitment Letter (and as amended, supplemented or modified in a manner that is not materially adverse to the interests of the Lenders in their capacity as such) and/or contemplated in the Initial Budget or any other Budget

27

#4819-5662-6966

that has been approved by the Agent and the majority of the Lead Arrangers from time to time (if any) in respect of any applicable period will in any event be permitted by the Loan Documents.

The DIP Facilities will include exceptions from the relevant covenants allowing for the existence of liens, the posting of cash collateral, the issuance of letters of credit, self-bonding and/or the making of other deposits for the benefit of any trading counterparties (including commodity hedging obligations), utilities, governmental and quasi-governmental entities (including the Federal Energy Regulatory Commission, ERCOT, the Nuclear Regulatory Commission, the Public Utility Commission of Texas and the Railroad Commission of Texas), in each case in respect of any contractual, statutory and regulatory requirements (including for purposes of posting bonds and remediation obligations of any nature (including mining reclamation bonds), complying with any contractual, statutory or regulatory requirements, and for self-bonding in respect of the Debtors' and Specified Affiliates' permits and licenses). Further, the DIP Facilities will include exceptions from the relevant covenants allowing for investments and/or restricted payments (in the form of intercompany loans, intercompany funding or otherwise) and transactions with affiliates between the Borrower, any of its subsidiaries, and the Specified Affiliates pursuant to which the Borrower may fund investments in an amount to be agreed at any time outstanding in, and, in addition, perform ordinary course transactions under the intercompany cash management systems (including pursuant to any Shared Services Agreements, any Tax Sharing Agreements, or Property Sublease and certain other agreements or arrangements to be agreed to) to the Specified Affiliates during the pendency of the Cases.

"**Specified Affiliates**" means, collectively, the following affiliates of the Borrower: (i) Comanche Peak Nuclear Power Company LLC; (ii) EFH Corporate Services Company; (iii) EFH Properties Company; (iv) Energy Future Holdings Corp; and (v) solely for the purpose of permitting ordinary course intercompany cash management activities subject to the order governing cash management, Oncor Electric Delivery Holdings Company LLC and its subsidiaries.

**Events of Default:**

The occurrence and continuance of any of the following events shall constitute an Event of Default under the DIP Facilities (consistent, in each case, with the Documentation Principles):

(a) The Final Order Entry Date shall not have occurred within 45 days after the Interim Order Entry Date;

(b) Any of the Cases shall be dismissed or converted to a Chapter 7

28

**PX 095**
**Page 366 of 464**

Case;

(c) A trustee, receiver, interim receiver, receiver or manager shall be appointed in any of the Cases, or a responsible officer or an examiner with enlarged powers shall be appointed in any of the Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4));

(d) Any other superpriority administrative expense claim or "claim" which is pari passu with or senior to the claims of the Agent or the Lenders under the DIP Facilities (other than in each case the Carve Out, the RCT Reclamation Support Carve Out or the Obligations) or any lien that is pari passu with or senior to the liens of the Agent or the Lenders under DIP Facilities shall be granted in any of the Cases, except with the prior written consent of the Agent or to the extent such lien constitutes a permitted lien under the Loan Documents;

(e) The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Debtors that have an aggregate value in excess of $150,000,000;

(f) The Borrower shall default in the payment of (i) principal on the Loans when due or reimbursement obligations in respect of any Letter of Credit; or (ii) interest or fees, and such default shall continue for more than five (5) days;

(g) Any representation or warranty made or deemed made by any Debtor in any Loan Document shall prove untrue in any material respect on the date as of which it is made or deemed made;

(h) The Borrower shall default (i) in the observance of any negative covenant (and certain specified affirmative covenants consistent with the Documentation Principles) in the DIP Agreement, (ii) if applicable on any Test Date, the Financial Covenant; or (iii) in the observance of any other covenant, term or condition not otherwise specified herein which default continues for more than 30 days after receipt of notice to the Borrower from the Agent or the Requisite Lenders (defined below); provided, however, that notwithstanding anything to the contrary herein or in the Loan Documents, an Event of Default under the Revolving Facility with respect to a failure of the Borrower to satisfy the Consolidated Superpriority Secured Net Debt Leverage Test shall not constitute an Event of Default under the Term Facility or the Delayed-Draw Term Facility unless the obligations under the Revolver Facility have been accelerated;

(i) An order shall be entered reversing, supplementing, staying for a period of five (5) business days or more, vacating or otherwise

29

modifying the Interim Order or the Final Order in a manner that is adverse to the interests of the Agent or the Lenders, or any of the Debtors shall apply for authority to do so, without the prior written consent of the Agent or the Requisite Lenders, or the Interim Order or Final Order with respect to the DIP Facilities shall cease to be in full force and effect;

(j) Any single judgment in excess of $150,000,000 as to any post-petition obligation, or any judgments that are in the aggregate in excess of $250,000,000 as to any one or more post-petition obligations, shall be rendered against the Debtors and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants, in each case, to the extent not paid or covered by insurance provided by a carrier not disputing coverage) or there shall be rendered against the Debtors a non-monetary judgment with respect to a post-petition event that causes or is reasonably expected to cause a Material Adverse Event; provided that this clause (j) shall not apply to any judgments as to any pre-petition obligation;

(k) Any Debtor makes any material payments relating to prepetition obligations (including any "adequate protection" payments) other than in accordance with a "first day" order, the Interim Order, the Final Order, or as otherwise agreed to by the Agent;

(l) A plan shall be confirmed in any of the Cases that does not provide for termination of the Commitments under the DIP Facilities and the indefeasible payment in full in cash of the Obligations (other than indemnities and other contingent obligations not then due and payable) on the effective date of such plan;

(m) The Interim Order or Final Order shall cease to create a valid and perfected lien on the Collateral;

(n) (i) Any Debtor shall file a motion or pleading or commence a proceeding that could reasonably be expected to result in an impairment of the Agent's or any of the Lenders' material rights or interests in their capacities as such under the DIP Facilities or (ii) a determination by a court with respect to a motion, pleading or proceeding brought by another party that results in such an impairment; provided, however, that this clause (n) will not apply to the termination of use of cash collateral (which shall be exclusively governed by clause (t) below);

(o) Any Loan Document or any material provision thereof shall cease to be effective (other than in accordance with its terms);

(p) Any of the Debtors shall fail to comply with the Interim Order

30

or Final Order in any material respect;[2]

(q) The Bankruptcy Court shall enter an order approving any claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation of any Collateral;

(r) The Bankruptcy Court shall enter a final non-appealable order that is adverse in any material respect to the interests (when taken as a whole) of the Agent or the Lenders or their respective material rights and remedies in their capacity as such under the DIP Facilities in any of the Cases; provided, however, that this clause (r) will not apply to the termination of use of cash collateral (which shall be governed exclusively by clause (t) below);

(s) The Borrower shall default on payment due or there shall be any event of default the effect of which is to accelerate or permit acceleration with respect to material indebtedness (threshold to be agreed) incurred after the Petition Date;

(t) The use of cash collateral by the Debtors shall be terminated and the Debtors have not obtained use of cash collateral (consensually or non-consensually) pursuant to an order in form and substance acceptable to the Left Lead Revolving Arranger and the Left Lead Term Facilities Arranger;

(u) The Loan Parties or any of their subsidiaries, or any person claiming by or through the Loan Parties or any of their subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Agent or the Lenders in each case relating to the DIP Facilities;

(v) Any Debtor shall file any pleading seeking, or otherwise consenting to, or shall support or acquiesce in any other person's motion as to any matter set forth in paragraph (b), (c), (d), (e), (i), (j), (k), (l), (m), (n), (q), (r), (t), or (u); and

(w) Such additional events of default (as modified to account for the commencement of the Cases and other express provisions in this Term Sheet or the Commitment Letter) as are consistent with the Documentation Principles (with the change of control definition to be agreed).

---

[2]   For the avoidance of doubt, the parties have agreed to this formulation on the understanding that if provisions in the Interim Order or the Final Order are identified by the Agent as necessitating their own Event of Default and such Events of Default are consented to by the Borrower (such consent not to be unreasonably withheld), such Events of Default shall be included notwithstanding their absence in this Term Sheet.

31

#4819-5662-6966

PX 095
Page 369 of 464

Notwithstanding anything to the contrary contained herein, any Event of Default under the Loan Documents, and any or similarly defined term under any Loan Document, other than any Event of Default which cannot be waived without the written consent of each Lender directly and adversely affected thereby, shall be deemed not to be "continuing" if the events, act or condition that gave rise to such Event of Default have been remedied or cured (including by payment, notice, taking of any action or omitting to take any action) or have ceased to exist.

Upon the enforcement of remedies after acceleration of the Loans as a result of an Event of Default, (i) proceeds in the RCT L/C Cash Collateral Account shall be distributed <u>first</u> to payment of amounts due to the RCT Letter of Credit Issuers and to other obligations with respect to the RCT Letters of Credit and <u>then</u> to the holders of all Obligations, (ii) proceeds in the General L/C Cash Collateral Account shall be distributed <u>first</u> to payment of amounts due to the General Letter of Credit Issuers and to other obligations with respect to the General Letters of Credit and <u>then</u> to the holders of all Obligations and (iii) proceeds of other Collateral will be paid: <u>first</u>, to holders of any then outstanding obligations under the Carve Out (if any), up to the amount thereof; <u>second</u>, to the RCT up to the amount of any then outstanding obligations under the RCT Reclamation Support Carve Out; and <u>then</u>, to the holders of Obligations.

**Rights and Remedies Upon Event of Default:**

Upon the occurrence of an Event of Default and following the giving of five calendar days' notice to the Debtors (the "**Remedies Notice Period**"), the Agent, on behalf of the Lenders, may (and at the direction of the Requisite Lenders, shall) exercise all rights and remedies provided for in the Loan Documents and may declare (i) the termination, reduction or restriction of any further Commitment to the extent any such Commitment remains, (ii) all Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, and (iii) the termination of the Loan Documents as to any future liability or obligation of the Agents and the Lenders, but without affecting any of the DIP liens or the Obligations.

During the Remedies Notice Period, the Debtors may continue to use cash collateral in the ordinary course of business, consistent with past practices and the most recently delivered Budget, but may not enter into, or seek approval of, any transactions or arrangements (including, without limitation, the incurrence of indebtedness or liens, investments, restricted payments, asset sales or transactions with non-Debtor affiliates) that are not in the ordinary course of business. Unless the Bankruptcy Court orders otherwise during the Remedies Notice Period, at the end of the Remedies Notice Period, the Debtors shall no longer have the right to use or seek to use cash collateral, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated without further notice to or order of the Bankruptcy Court,

32

and the Agent shall be permitted to exercise all rights against the Collateral in accordance with the Loan Documents and the Interim Order or Final Order, as applicable, and shall be permitted to satisfy the Obligations, without further order or application or motion to the Bankruptcy Court and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code. Notwithstanding anything herein to the contrary, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated for the purposes of giving any notice contemplated hereunder.

During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing, and the Debtors waive their right to, and shall not be entitled to seek relief, including without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the Agent, on behalf of the Lenders, set forth in the Interim Order, Final Order, or the Loan Documents.

The delay or failure to exercise rights and remedies under the Interim Order, the Final Order or the Loan Documents by the Agent, on behalf of the Lenders, shall not constitute a waiver of such Agent's rights thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable Loan Documents.

| | |
|---|---|
| **Conditions to Initial Availability:** | The obligation of the Lenders to make the initial Loans and/or issue Letters of Credit on the Closing Date under the DIP Facilities will be subject only to the conditions precedent listed on <u>Annex II</u> attached hereto under the captions "<u>**Conditions to Initial Availability**</u>" and, as applicable, "<u>**Additional Conditions to Availability of Delayed-Draw Term Loans and RCT Letters of Credit**</u>". |
| **Conditions to Full Availability:** | After the Closing Date, the obligation to provide Loans and/or issue Letters of Credit up to the full amount of the Commitments shall be subject to the satisfaction or waiver of the conditions precedent listed on <u>Annex II</u> attached hereto under the captions "<u>**Condition to Full Availability**</u>" and, as applicable, "<u>**Additional Conditions to Availability of Delayed-Draw Term Loans and RCT Letters of Credit**</u>", and in "<u>**Conditions to All Subsequent Borrowings**</u>" below. |

33

#4819-5662-6966

| | |
|---|---|
| **Conditions to All Subsequent Borrowings:** | Consistent in each case with the Documentation Principles, the conditions to all Loans and/or issuance of Letters of Credit (other than such Loans made and/or Letters of Credit issued on the Closing Date) will include requirements relating to prior written notice of borrowing, the accuracy in all material respects of all representations and warranties, the absence of any Default or Event of Default and the following: |

(a) The Interim Order or the Final Order, as the case may be, is in full force and effect;

(b) As a result of such extension of credit, usage of the Commitments shall not exceed (i) the applicable Commitments then in effect, (ii) the aggregate amount authorized by the Interim Order or the Final Order, as the case may be, (iii) the maximum amount of net borrowings contemplated to be outstanding as reflected in the Budget and other Budget milestones to be mutually agreed to by the Borrower and the Agent (it being agreed that the Budget will contemplate permitted variances); and

(c) The Debtors shall have paid the balance of all fees then earned, due and payable in respect of the DIP Facilities as referenced herein.

| | |
|---|---|
| **Additional Conditions to Availability of Delayed-Draw Term Loans and RCT Letters of Credit:** | The obligation of the Lenders to make Delayed-Draw Term Loans and/or issue RCT Letters of Credit will also be subject to the additional conditions precedent listed on **Annex II** attached hereto under the caption "**Additional Conditions to Availability of Delayed-Draw Term Loans and RCT Letters of Credit**". |
| **Assignments and Participations:** | Subject in each case to the Documentation Principles, each Lender may assign all or any part of the Revolver Facility, the Delayed-Draw Term Facility and/or the Term Facility to one or more affiliates, banks, financial institutions or other entities, in each case, with the prior written consent of the Borrower (unless a Term Loan or Delayed-Draw Term Loan is being assigned to a Lender, an affiliate of a Lender, or an approved fund of such Lender or its affiliate) and the Agent (unless a Term Loan or Delayed-Draw Term Loan is being assigned to a Lender, an affiliate of a Lender or an approved fund of such Lender or its affiliate) (in each case, not to be unreasonably withheld, conditioned or delayed); provided, however, that under no circumstances will assignments be made to a Disqualified Institution (defined below), and that the consent of the Borrower will not be required during the continuance of an Event of Default.  Upon such assignment, such affiliate, bank, financial institution or entity will become a Lender for all purposes under the Loan Documents. |

The Lenders will also have the right to sell participations (other than to Disqualified Institutions,) subject to customary limitations on voting

34

**PX 095**
**Page 372 of 464**

rights, in the DIP Facilities.

"**Disqualified Institutions**" means (a) any company engaged principally in the business of energy or power generation and/or transmission as identified in writing to the Agent by the Company from time to time, (b) any company whose principal business is that of an energy or power merchant as identified in writing to the Agent by the Company from time to time, (c) any financial institution identified in writing to the Joint Lead Arrangers by the Borrower on or prior to the date of the Commitment Letter (including any such person's affiliates that are clearly identifiable on the basis of such affiliates' names) and (d) a "defaulting" Lender (as described below).  The list of Disqualified Institutions shall be posted for the benefit of the Lenders.  Upon the identification in writing by the Borrower to the Agent of any additional Disqualified Institutions pursuant to clause (a) or (b) above, the Agent shall promptly post such addition to the list to the Lenders; provided that any additional person so identified shall not be deemed a Disqualified Institution until such time as such addition to the list is posted to the Lenders.

**Requisite Lenders:**     Voting with respect to the DIP Facilities will be done solely by the Lenders (and not, for the avoidance of doubt, by any holders of Eligible Pari Passu Hedges). The vote of the Lenders holding more than 50% of total Commitments under the DIP Facilities (or if no Commitments are outstanding, total exposure) (the "**Requisite Lenders**") shall be required to amend, waive or modify any terms and conditions of the DIP Facilities (with customary exceptions consistent with the Documentation Principles where only the consent of the relevant Agent or Letter of Credit Issuer will be required), except that with respect to matters relating to, among others, the reduction in, or compromise of payment rights with respect to, principal or interest rates, extension of maturity (it being understood and agreed that a waiver or amendment of the Extension Conditions (other than the Extension Conditions set forth under clauses (1) (solely with respect to a payment Event of Default) and (6) of the definition thereof, which will be subject to the consent of each Lender) will be subject to Requisite Lender consent) or scheduled date of payment of any interest or fees due, release of material guarantees and/or liens granted on all or substantially all of the Collateral (other than guarantees, liens, or Collateral subject to permitted dispositions, permitted mergers, consolidations, reorganizations, etc.), reduction in voting thresholds and increases in the RCT Reclamation Support Carve Out, the consent of the Lenders holding 100% of total Commitments (or if no Commitments are outstanding, total exposure) in respect of which the consent of all Lenders directly and adversely affected thereby will be required, except that the Commitment of a Lender may not be increased without such Lender's consent; and except, further, that any amendment, waiver or modification of any terms or conditions relevant to the Consolidated Superpriority Secured Net Debt Leverage Ratio Test shall only require more than 50% of total Revolver Commitments (or if no Commitments are outstanding, total exposure

35

under the Revolver Facility).

**Defaulting Lenders:**

The Loan Documents will contain customary provisions (but consistent in any event with the Documentation Principles) relating to "defaulting" Lenders (including provisions relating to the suspension of voting rights and rights to receive fees, and the termination or assignment of Commitments and Loans held by "defaulting" Lenders at par).

**Taxes:**

Consistent with each case to the Documentation Principles, the Loan Documents shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes (including in respect of Dodd-Frank and Basel III) and (b) indemnifying the Lenders for "breakage costs" incurred in connection with any prepayment of a LIBOR Loans on a day other than the last day of an interest period with respect thereto.

In connection with any proposed amendment, waiver or other modification to the DIP Facilities (a "**Proposed Change**") requiring the consent of all Lenders or all directly adversely affected Lenders, if the consent to such Proposed Change of all Lenders whose consent is required is not obtained, but the consent of the Lenders with a majority of the Loans and commitments held by the applicable group of Lenders is obtained (any such Lender whose consent is required but is not obtained, a "**Non-Consenting Lender**"), then the Borrower may, at its sole expense, upon notice to such Non-Consenting Lender and the Agent, require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to all restrictions otherwise applicable to assignments), all its interests, rights and obligations under the DIP Facilities to an assignee that shall assume such obligations or terminate such Non-Consenting Lender's commitments; provided that such Non-Consenting Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts then due and owing to it under the DIP Facilities from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts).

**Indemnity; Expenses:**

The Loan Documents will provide, in each case to the extent consistent with the Documentation Principles, that the Borrower shall indemnify, pay and hold harmless the Agent, the Joint Lead Arrangers, the Letter of Credit Issuers, and the Lenders and their affiliates (and their respective controlling persons, directors, officers, partners, employees, agents, advisors and other representatives (collectively, the "**Related Parties**")) (each, an "**Indemnified Person**") against any loss, claim, damage, liability or expense incurred in respect of the DIP Facilities contemplated hereby or the use of proceeds thereof or the Transactions or any claim, litigation, investigation or proceeding (a "**Proceeding**") relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such Proceedings are brought

36

#4819-5662-6966

by any Debtor, its equity holders, affiliates, creditors or any other person, and to reimburse each Indemnified Person promptly following written demand for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing (except, in the case of any Indemnified Person, to the extent resulting (i) from the gross negligence, bad faith or willful misconduct of such Indemnified Person (or its Related Parties), in each case as determined in a final non-appealable judgment of a court of competent jurisdiction, (ii) from a dispute solely among Indemnified Persons other than any claims against any Indemnified Person in its capacity or in fulfilling its role as an Agent or Joint Lead Arranger or any similar role under the DIP Facilities and other than any claims arising out of any act or omission on the part of the Borrower or the other Debtors or (iii) from any material breach of the Loan Documents by such Indemnified Person (or its Related Parties), as determined in a final non-appealable judgment of a court of competent jurisdiction) and (b) the Borrower shall reimburse within 10 days of written demand (together with reasonably detailed supporting documentation) the Agent, the Lenders and the Joint Lead Arrangers for their reasonable and documented out-of-pocket expenses incurred in connection with the negotiation, documentation, syndication and administration of the DIP Facilities, any amendments or waivers with respect thereto, any Event of Default in respect of the DIP Facilities and any exercise of remedies in respect thereof (including reasonable and documented out-of-pocket prepetition and post-petition fees, charges and disbursements of legal counsel, financial advisors and third-party appraisers and consultants advising the Agent incurred in connection with the Agent's participation in the Cases, limited in the case of legal counsel to one primary counsel (and (i) appropriate local counsel in applicable foreign and local jurisdictions, but limited to one local counsel in each such jurisdiction, (ii) appropriate regulatory counsel and (iii) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected indemnified persons similarly situated)); provided, however, that the Debtors shall promptly provide copies of invoices received on account of fees and expenses of the professionals retained as provided for in the DIP Documents to counsel to the Committee and the United States Trustee, and the Bankruptcy Court shall have exclusive jurisdiction over any objections raised to the invoiced amount of the fees and expenses proposed to be paid, which objections may only be raised within ten days after receipt thereof. In the event that within ten days from receipt of such invoices the Debtors, the United States Trustee or counsel to the Committee raise an objection to a particular invoice, and the parties are unable to resolve any dispute regarding the fees and expenses included in such invoice, the Bankruptcy Court shall hear and determine such dispute; provided, that payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final order of the Bankruptcy Court.

37

#4819-5662-6966

| | |
|---|---|
| **Governing Law and Jurisdiction:** | The Loan Documents will provide that the Debtors and the Lenders will submit to the exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the Southern District of New York and shall waive any right to trial by jury. New York law shall govern the Loan Documents. |
| **Miscellaneous:** | The terms and conditions of the interim orders and final orders (e.g. 506(c) waivers, marshaling, and successors and assigns) to be mutually agreed. |
| **Counsel to Joint Lead Arrangers and the Agent:** | Milbank, Tweed, Hadley & McCloy LLP. |

38

#4819-5662-6966

Case 14-10979-CSS    Doc 98    Filed 04/29/14    Page 377 of 464

**Annex I**

LIST OF DEBTORS

| Name | Bankruptcy Status | Jurisdiction of Organization |
|------|-------------------|------------------------------|
| Energy Future Competitive Holdings Company LLC; | | Texas |
| Texas Competitive Electric Holdings Company LLC; | | Delaware |
| 4Change Energy Company; | | Texas |
| 4Change Energy Holdings LLC; | | Texas |
| Big Brown 3 Power Company LLC; | | Texas |
| Big Brown Lignite Company LLC; | | Texas |
| Big Brown Power Company LLC; | | Texas |
| Collin Power Company LLC; | | Delaware |
| Decordova Power Company LLC; | | Texas |
| Decordova II Power Company LLC; | | Delaware |
| Eagle Mountain Power Company LLC | | Delaware |
| Generation MT Company LLC; | | Delaware |
| Generation SVC Company; | | Texas |
| Lake Creek 3 Power Company LLC; | | Texas |
| Luminant Big Brown Mining Company LLC; | | Texas |
| Luminant Energy Company LLC; | | Texas |
| Luminant Energy Trading California Company; | | Texas |
| Luminant ET Services Company; | | Texas |
| Luminant Generation Company LLC; | | Texas |
| Luminant Holding Company LLC; | | Delaware |
| Luminant Mineral Development Company LLC; | | Texas |
| Luminant Mining Company LLC; | | Texas |
| Luminant Renewables Company LLC; | | Texas |

#4819-5662-6966

| Name | Bankruptcy Status | Jurisdiction of Organization |
|---|---|---|
| Martin Lake 4 Power Company LLC; | | Texas |
| Monticello 4 Power Company LLC; | | Texas |
| Morgan Creek 7 Power Company LLC; | | Texas |
| NCA Resources Development Company LLC; | | Texas |
| Oak Grove Management Company LLC; | | Delaware |
| Oak Grove Mining Company LLC; | | Texas |
| Oak Grove Power Company LLC; | | Texas |
| Sandow Power Company LLC; | | Texas |
| TCEH Finance, Inc.; | | Delaware |
| Tradinghouse 3 & 4 Power Company LLC; | | Texas |
| Tradinghouse Power Company LLC; | | Texas |
| TXU Energy Retail Company LLC; | | Texas |
| TXU Energy Solutions Company LLC; | | Texas |
| TXU Retail Services Company; | | Delaware |
| TXU SEM Company; | | Delaware |
| Valley NG Power Company LLC; | | Texas |
| Valley Power Company LLC. | | Texas |

40

**PX 095**
**Page 378 of 464**

**Annex II**

**TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC**

SUMMARY OF CONDITIONS PRECEDENT TO THE DIP FACILITIES

A.    CONDITIONS TO INITIAL AVAILABILITY

1.    Interim Order/Bankruptcy Matters.

    (a)    The Bankruptcy Court shall have entered, upon motion in form and substance satisfactory to the Left Lead Arrangers, an interim order in form and substance satisfactory to the Left Lead Arrangers (the "**Interim Order**") as to the Initial Availability no later than ten (10) business days after the date of commencement of the Cases, approving and authorizing, on an interim basis, the DIP Facilities, the provisions thereof and the priorities and liens (including priming liens) granted therein.

    (b)    The Interim Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, that is adverse to the Lenders, without the consent of the Left Lead Arrangers.

    (c)    The Debtors shall be in compliance in all material respects with the Interim Order.

    (d)    The Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Cases or shortly thereafter shall have been reviewed in advance by the Left Lead Arrangers, and shall be reasonably satisfactory in form and substance to the Left Lead Arrangers, but in the case of orders relating to cash management and adequate protection, shall be satisfactory in form and substance to the Left Lead Arrangers.

    (e)    No trustee or examiner with enlarged powers (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the operations or the business of the Debtors.

2.    Financial Statements, Budgets and Reports.

    (a)    The Debtors shall have delivered the Budget to the Agent and the Lenders, which shall be in form and substance reasonably satisfactory to the Agent and the Joint Lead Arrangers, and the Agent and the Joint Lead Arrangers hereby confirm the receipt of the Budget dated [_____], 2014 in form and substance reasonably satisfactory to the Agent and the Joint Lead Arrangers prior to the date hereof;

    (b)    The Debtors shall have delivered to the Agent and the Lenders a base case model, including a statement of cash sources and uses of all free cash flow for the tenor of the DIP Facilities, which shall be in form and substance reasonably satisfactory to the Agent and the Joint Lead Arrangers, and the Agent and the Joint Lead Arrangers hereby confirm the receipt of a base case model dated [_____], 2014 in form and substance reasonably satisfactory to the Joint Lead Arrangers and the Lenders prior to the date hereof; and

    (c)    The Agent and the Lenders shall have received reasonably requested financial information.

41

**PX 095**
**Page 379 of 464**

3.    Performance of Obligations.

    (a)    All invoiced costs, fees, expenses (including, without limitation, reasonable legal fees) and other compensation contemplated by the Loan Documents and the Fee Letter to be payable to the Commitment Parties, the Agent and the Lenders in respect of the DIP Facilities shall have been paid to the extent earned, due and payable;

    (b)    Representations and warranties of the Debtors shall be true and correct in all material respects (or in all respects for representations and warranties qualified by materiality or Material Adverse Effect); and

    (c)    No Default or Event of Default shall exist under the DIP Facilities.

4.    Customary Closing Documents and Other Conditions.

    (a)    The Debtors shall have complied with the following closing conditions: (i) the delivery of customary legal opinions as to authority, authorization, execution and delivery; corporate records and documents from public officials, including good standing certificates; officer's certificates; and notice of borrowing; (ii) evidence of authority; and (iii) obtaining of any governmental consents, if any, necessary in connection with the DIP Facilities, the financing thereunder and related transactions. The Lenders shall have received at least five (5) days prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "**know-your-customer**" and anti-money laundering rules and regulations, including the Patriot Act.

    (b)    The Loan Documents (which shall be consistent with the Documentation Principles) shall have been entered into by the Debtors.

    (c)    The Agent shall have received results of a Uniform Commercial Code search for the jurisdiction of organization of the Debtors, a federal tax lien search for the jurisdiction of the chief executive office of the Debtors, and such other lien and/or other searches reasonably requested by the Agent as are customary for transactions of this type.

    (d)    The Agent shall have received proper financing statements (Form UCC-1 or the equivalent) for filing under the UCC in the jurisdiction of organization of each Debtor.

    (e)    As a result of the extension of such credit, usage of the Commitments shall not exceed (i) the applicable Commitments then in effect and (ii) the aggregate amount authorized by the Interim Order.

B.    CONDITIONS TO FULL AVAILABILITY

1.    Final Order.

    (a)    Not later than 45-days following the Interim Order Entry Date, a final order shall have been entered by the Bankruptcy Court (the "**Final Order**") in form and substance satisfactory to the Left Lead Arrangers on a motion by the Debtors that is in form and substance satisfactory to the Left Lead Arrangers, approving and authorizing on a final basis the matters and containing the provisions described in A.1. above.

42

#4819-5662-6966

      (b)    The Final Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated, and with respect to any modification or amendment, in a manner that is adverse to the Lenders without the consent of the Left Lead Arrangers.

      (c)    The Debtors shall be in compliance with the Final Order.

2.    <u>Other Conditions</u>.

      (a)    The Agent and the Lenders shall have received their required periodic updates of the Budget;

      (b)    No Default or Event of Default shall exist under any of the DIP Facilities;

      (c)    Representations and warranties of the Debtors shall be true and correct in all material respects;

      (d)    The Debtors shall have paid the balance of all invoiced fees then earned, due and payable in respect of the DIP Facilities as referenced in the Fee Letter; and

      (e)    As a result of the extension of such credit, usage of the Commitments shall not exceed (i) the applicable Commitments then in effect and (ii) the aggregate amount authorized by the Final Order.

C.    <u>ADDITIONAL CONDITIONS TO AVAILABILITY OF DELAYED-DRAW TERM LOANS AND RCT LETTERS OF CREDIT</u>

1.    The RCT Carve Out Support Rejection Notice shall have been exercised (a) prior to the Delayed-Draw Termination Date and (b) prior to the making of such Delayed-Draw Term Loans or the issuance of such RCT Letters of Credit.

43

#4819-5662-6966

## EXHIBIT G

### EFIH FIRST LIEN DIP FINANCING TERM SHEET

**PX 095**
**Page 382 of 464**

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC AND EFIH FINANCE, INC.**

SUMMARY OF TERMS AND CONDITIONS OF THE $5.4 BILLION
SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION FACILITY
("**TERM SHEET**")

Capitalized terms used but not defined in this Term Sheet will have the meanings set forth in the
Commitment Letter to which this Term Sheet is attached (the "**Commitment Letter**").

| | |
|---|---|
| **Borrower:** | Energy Future Intermediate Holding Company LLC ("**EFIH**" and EFIH Finance Inc. ("**EFIH Finance**," and together with EFIH, the "**Borrower**"), each as a debtor-in-possession under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in jointly administered cases (collectively the "**Cases**") in the Bankruptcy Court for District of Delaware (or such other court as may be acceptable to Commitment Parties in their sole discretion, the "**Bankruptcy Court**"). |
| **Guarantors:** | All obligations under the DIP Facility (defined below) and the other Loan Documents (defined below) will be unconditionally guaranteed (collectively, the "**Guarantee**") by each subsidiary of the Borrower (each a "**Guarantor**" and collectively, the "**Guarantors**" and collectively with the Borrower, the "**Debtors**") that may be required to become a guarantor under the definitive documentation of the DIP Facility (the "**Loan Documents**"). |
| **Oncor Entities and EFCH Entities:** | For the avoidance of doubt, Oncor Electric Delivery Holdings Company LLC and its subsidiaries (the "**Oncor Entities**") and Energy Future Holdings Corp. and its subsidiaries other than the Borrower and its subsidiaries including the Oncor Entities (the "**EFH Entities**") (i) will not be Guarantors under the DIP Facility (it being understood that certain of the EFH Entities will be in jointly administered cases expected to be filed on or prior to the Closing Date in the Bankruptcy Court in respect of other debtors-in-possession financings (the "**TCEH DIP Facility**")), and (ii) will not be directly or indirectly restricted in the conduct of their respective businesses by the Loan Documents (whether by application of representations and warranties, affirmative covenants, negative covenants, Events of Default or otherwise) (other than through customary covenants restricting transaction with affiliates, investments and loans). |

**Prepetition Facilities:**

| EFIH Secured Notes | Approximate Outstanding Principal Amount |
|---|---|
| | |
| 10.00% Senior Secured First Lien Notes due 2020 | $3.482 billion |

| | |
|---|---|
| 6.875% Senior Secured First Lien Notes due 2017 (collectively with the 10.00% Senior Secured First Lien Notes due 2020, the "**EFIH First Lien Secured Notes**") | $503 million |
| 11.00% Senior Secured Second Lien Notes due 2021 | $406 million |
| 11.75% Senior Secured Second Lien Notes due 2022 (collectively with the 11.00% Senior Secured Second Lien Notes due 2021, the "**EFIH Second Lien Secured Notes**") | $1.75 billion |

**DIP Facility:**   A superpriority non-amortizing term credit facility (the "**Term Facility**" or the "**DIP Facility**") in an aggregate principal amount of $5,400,000,000 (the "**Term Commitments**" or the "**Commitments**"). Up to $5,400,000,000 of the Term Facility will be available in connection with Full Availability (defined below) in the form of term loans for the account of the Borrower ("**Term Loans**", or the "**Loans**"). Amounts drawn under the Term Facility may not be re-borrowed once repaid.

It is understood that a portion of the DIP Facility may be provided by (i) the exchange or other roll pursuant to an exchange agreement, restructuring support agreement or other similar document or agreement in respect of your prepetition indebtedness into Term Loans or (ii) other Backstop Commitment (as defined in the Commitment Letter), in each case as contemplated by Section 1 of the Commitment Letter, and all such amounts shall constitute Term Loans under the DIP Facility.

Notwithstanding anything to the contrary contained herein, in the Commitment Letter, or in the Fee Letter, (i) the exchange rate for exchanging (or otherwise rolling such indebtedness into the Obligations) any such prepetition indebtedness (as identified in the Commitment Letter) into Term Loans shall be in the sole discretion of the Borrower, (ii) the Borrower shall be entitled to allocate and give fees (including in the form of OID solely to the extent related to the exchange rate under the Exchange Arrangements and the Upfront OID (as defined in the Fee Letter)) to any such person in its sole discretion, and (iii) neither the Agent, any Joint Lead Arranger shall have any right to consent to the participants (or their allocations) in any Exchange Arrangement or any person providing the Backstop Commitment (subject to the terms in the Commitment Letter).

2

**PX 095**
**Page 384 of 464**

| | |
|---|---|
| **Purpose/Use of Proceeds:** | The proceeds of the DIP Facility will be used, in a manner consistent with the terms of the Budget (defined below) (but not subject to any Budget compliance covenant in respect thereof): (i) *first*, to pay (w) transaction fees, liabilities and expenses (including all Professional Fees) (defined below) and other administration costs incurred in connection with the Cases and the negotiation, syndication, documentation (including any engagement or commitment letters), execution and closing of the DIP Facility, (x) the refinancing of the EFIH First Lien Secured Notes (as contemplated on Annex I) (including through the exchange or other roll of EFIH First Lien Secured Notes into Term Loans), and (y) Settlement Payments (as defined below), and (ii) *second*, to finance any and all working capital needs and for any other general corporate purposes, and to comply with any legal and/or regulatory requirements of governmental and quasi-governmental entities of the Debtors, (and, to the limited extent set forth below, of the Specified Affiliates). "Settlement Payments" shall mean amounts paid in accordance with the terms of any exchange agreement or similar document, agreement or arrangement to settle claims (including in respect of principal, interest and premium (if any)) in respect of the EFIH First Lien Secured Notes. |
| **Left Lead DIP Facility Arranger:** | Deutsche Bank Securities Inc. (the "**Left Lead DIP Facility Arranger**"). |
| **Joint Lead Arrangers:** | The Left Lead DIP Facility Arranger, Citigroup Global Markets Inc. ("**Citi**"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("**MLPFS**"), Morgan Stanley Senior Funding, Inc. ("**Morgan Stanley**"), Barclays Bank PLC ("**Barclays**"), RBC Capital Markets ("**RBCCM**") and Union Bank, N.A. ("**Union Bank**" and, together with the Left Lead DIP Facility Arranger, MLPFS, Citi, Morgan Stanley, Barclays and RBCCM, collectively, the "**Joint Lead Arrangers**"). |
| **Co-Managers:** | Loop Capital Markets, LLC ("**Loop Capital**") and The Williams Capital Group, L.P. ("**Williams Capital**", together with Loop Capital, the "**Co-Managers**"). |
| **DIP Facility Lenders:** | The Lenders under the Term Facility are referred to as the "**Term Lenders**" or the "**Lenders**". |
| **Administrative Agent:** | Deutsche Bank AG New York Branch (together with its permitted successors and assigns, the "**Administrative Agent**" or the "**Agent**"). |
| **DIP Facility Full Availability:** | Upon the Bankruptcy Court's entry of the Final Order (the "**Final Order Entry Date**"), the full amount of the Commitments shall be available to the Borrower subject to compliance with the applicable terms, conditions and covenants described in this Term Sheet (the "**Full Availability**"). |
| **Incremental Facilities:** | The Borrower shall be entitled to enter into one or more incremental term loan facilities (the "**Junior Incremental Term Facilities**" or the |

3

"**Junior Incremental Facilities**") that will rank junior in right of payment with the DIP Facility and will have the same guarantees as the DIP Facility, and be secured by a lien on the same Collateral securing the DIP Facility that is junior to the lien securing the DIP Facility, in a principal amount not to exceed $3,000,000,000 in the aggregate; *provided* that:

(i)     no Event of Default or event that upon the passage of time, the giving of notice, or both, would become an Event of Default ("**Default**") under the Term Facility would exist immediately after giving effect thereto, and the representations and warranties in the Loan Documents shall be true and correct in all material respects on and as of the date of the incurrence of each such Junior Incremental Facility (or to the extent such representations and warranties relate to an earlier date, they shall be true and correct in all material respects as of such earlier date);

(ii)    such Junior Incremental Facilities may be provided by then existing Lenders or, other persons, *provided* that no existing Lender will be obligated to provide such Incremental Facilities without its consent;

(iii)   the maturity date of such Junior Incremental Facilities shall be no earlier than the maturity date of the Term Facility, and such Incremental Facilities shall require no scheduled amortization prior to the final maturity of the Junior Term Facility;

(iv)    the interest rates, interest margins, any rate floors, fees, original issue and other funding discounts and premiums and (subject to clause (iii) above) amortization schedule applicable to such Junior Incremental Facility shall be determined by the Borrower and the lenders thereunder;

(v)     no part of the principal amount (including any principal amount arising from PIK interest or fees) of the Junior Incremental Term Facilities shall be required to be repaid in cash; and, subject to the proviso to this clause (v), at the final maturity of each Junior Incremental Term Facility (which shall occur at the exit of the Debtors from the Cases), the principal amount (including any principal amount arising from PIK interest or fees) of the loans under the Junior Incremental Term Facilities shall be converted into equity in accordance with the Plan of Reorganization; provided that nothing in the final documentation for the DIP Facility shall prevent a refinancing and/or repayment of the Junior Incremental Term Facilities at the exit of the Debtors from the Cases if (x) such refinancing and/or repayment occurs after the DIP Facility have been repaid in full in cash and (y) the Plan of Reorganization permits the Borrower to make such repayment and/or incur indebtedness to refinance such Junior Incremental Term Facilities;

(vi)    the proceeds of the Junior Incremental Term Facilities shall be

4

used solely to repay in full the EFIH Second Lien Secured Notes and all interest, premium and fees in connection with such repayment;

(vii)     the relative priority between the lien securing the Junior Incremental Term Facilities and the lien securing the DIP Facility shall be governed by an intercreditor agreement reasonably satisfactory to the Agent and the Borrower, which intercreditor agreement shall provide that so long as any obligations are outstanding under the DIP Facility, the Agent on behalf of the DIP Facility will control at all times all remedies and other actions related to the Collateral, and that the secured parties under the Junior Incremental Term Facilities will not be entitled to take any action with respect to the Collateral (other than limited actions to preserve and protect the liens securing the Junior Incremental Term Facilities that do not impair the liens securing the DIP Facility);

(viii)     except as otherwise set forth above, each Junior Incremental Term Facility shall be on terms and pursuant to documentation to be determined by the Borrower and the lenders providing such Junior Incremental Term Facility; *provided* that (1) the "baskets" for the covenants and events of default under the Junior Incremental Term Facility will be sized at a cushion reasonably satisfactory to the Agent to the levels of the "baskets" under the corresponding covenants and events of default under the DIP Facility, and (2) to the extent such terms and documentation are not consistent with the Term Facility (except to the extent permitted or required by clauses (iii) through (vii) above or clause (1) above or with respect to fees and immaterial terms), they shall be reasonably satisfactory to the Administrative Agent; and

(ix)     the Final Order Entry Date shall have occurred.

**Documentation Principles:**     "**Documentation Principles**" means that (a) except as otherwise expressly set forth herein in this Term Sheet or the Commitment Letter, the terms and conditions of the Loan Documents shall be consistent with the terms and conditions, and in no event more burdensome on the Debtors, than the terms and conditions of TCEH DIP Facility (the "**Specified Facility**"); (b) the Loan Documents will be prepared on the basis of, and using as precedent, the Specified Facility and its related collateral documents; and (c) generally all terms and conditions (including exceptions, thresholds, baskets, grace periods, cure periods and financial definitions) in the Loan Documents will be consistent with those in the Specified Facility and its related collateral documents and in no event more burdensome on the Debtors, in each case modified solely to the extent (i) required to reflect the express terms and conditions set forth in this Term Sheet and the Commitment Letter, (ii) required to reflect the shorter tenor of the DIP Facility, (iii) required to reflect that the Loan Documents will be for a borrower that is a holding company without any operations, (iv) to account for the existence and continuance of the Cases, the operational needs and requirements of the Borrower, the Guarantors

5

**PX 095**
**Page 387 of 464**

and the Specified Affiliates (defined below) between the Petition Date and the Maturity Date (including as set forth in the last two paragraphs of "**Negative Covenants**" below) and to include provisions applicable to debtor-in-possession facilities generally (including (subject to the last two paragraphs of "**Negative Covenants**" below) customary changes to be mutually agreed with respect to additional restrictions on indebtedness, liens, restricted payments, asset sales and investments in persons that are not subsidiaries of the Borrower), and (v) as otherwise agreed by the Borrower.

**Budget:**

As used in this Term Sheet and in <u>Annex I</u> hereto, "**Budget**" means the following:

Beginning on the Final Entry Order Date, in the case of the initial Budget delivered as a condition precedent to the occurrence of the Closing Date, a statement of cash sources and uses of all free cash flow for the next full 3-calendar months of the Debtors broken down by month, including the anticipated uses of the DIP Facility for such period, and after such 3-calendar month period, at the end of each fiscal quarter (or, at the election of the Borrower, at the end of each calendar month or such other earlier period as may be agreed).

The Borrower shall also provide on a monthly basis a Budget variance report/reconciliation for each calendar month (delivered no later than the end of the subsequent calendar month), (i) showing a statement of actual cash sources and uses of all free cash flow for the immediately preceding calendar month, noting therein all material variances from values set forth for such historical periods in the most recently delivered Budget, and shall include explanations for all material variances, and (ii) certified as to its reasonableness when made by the Borrower.

**Annual Operating Forecast:**

Beginning on the date 60 days after the Final Order Entry Date (and no later than December 1, 2014 for the business plan and operating budget covering 2015 and no later than December 1, 2015 for the business plan and operating budget covering 2016), on an annual basis, the approved annual business plan and projected operating budget through the Stated Maturity Date (the "**Annual Operating Forecast**"), broken down by month, including, without limitation, income statements, balance sheets, cash flow statements, projected capital expenditures, asset sales, a line item for total available liquidity for the period of such Budget, and which shall set forth the anticipated uses of the DIP Facility for such period; the associated underlying assumptions shall be certified by the Borrower as being reasonable when made.

Both the Budget and the Annual Operating Forecast shall provide, among other things, for the payment of the fees and expenses relating to the DIP Facility, ordinary course administrative expenses, bankruptcy-related expenses and working capital, and other general corporate needs; *provided, however*, that notwithstanding anything to

6

the contrary in this Term Sheet or in any of the Loan Documents, the Professional Fees (defined below) will be due and payable, and will be paid by the Debtors whether or not consistent with the items or amounts set forth in the Budget or the Annual Operating Forecast; and *provided, further* that under no circumstance will the Budget or the Annual Operating Budget be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Debtors.

**Maturity:**

The maturity date of the DIP Facility will be (and all Loans and other payment obligations under the DIP Facility shall be repaid in full in cash on) the earliest of (the "**Maturity Date**"): (i) stated maturity, which shall be twenty-four (24) months from the Closing Date (defined below), subject to a six-month extension on the last day of such 24-month period (the "**Stated Maturity Date**") if on such last day (1) no Event of Default is outstanding, (2) a Chapter 11 plan of reorganization for the Debtors (the "**Plan of Reorganization**") has been filed, (3) a hearing has been scheduled for the confirmation of such Plan of Reorganization, (4) the Debtors are working in good faith to confirm such Plan of Reorganization, (5) an updated Budget and Annual Operating Forecast have been delivered by the Borrower at least ten days prior to the first day of such extension, which Budget and Annual Operating Forecast demonstrate minimum liquidity sufficient through such additional six-month period plus $150,000,000, (6) the Borrower has paid an extension fee of 25 basis points on the outstanding principal amount of the Term Loans, and (7) the maturity date of each Junior Incremental Facility has simultaneously extended to a date not earlier than the extended Maturity Date (subclauses (1) through (7), the "**Extension Conditions**"); (ii) the effective date of the Plan of Reorganization; (iii) August 26, 2014 if the Final Order Entry Date shall not have occurred by such date; (iv) the date of the consummation of a sale of all or substantially all of the Debtors' assets or stock under section 363 of the Bankruptcy Code; and (v) the acceleration of the Loans and termination of the Commitments under any of the DIP Facility, including, without limitation, as a result of the occurrence and continuance of an Event of Default (any such occurrence, the "**Maturity Date**"); provided, however, that the Maturity Date will occur in any event no later than 30 months from the Closing Date.

Any plan of reorganization or liquidation or confirmation order entered in the Cases shall not discharge or otherwise affect in any way any of the joint and several obligations of the Debtors to the Lenders under the DIP Facility and the Loan Documents, other than after the payment in full and in cash, to the Lenders of all obligations (other than indemnities and other contingent obligations not then due and payable) under the DIP Facility and the Loan Documents on or before the effective date of a plan of reorganization and the termination of the Commitments.

**Closing Date:**

The date on which the initial portion of the Commitments are made available for borrowings under the DIP Facility (the "**Closing Date**"),

7

which shall be no later than five (5) business days after the Final Order Entry Date, subject to satisfaction (or waiver) of the applicable conditions precedent set forth herein.

| | |
|---|---|
| **Amortization:** | None. For the avoidance of doubt, there will be neither an excess cash flow sweep nor scheduled amortization under the DIP Facility. |
| **Interest Rate and Fees:** | As set forth on <u>Annex II</u>. |
| **Borrowing Procedure:** | The Term Facility will be available in a single draw on or after the date the Final Order is entered.  For the avoidance of doubt, the Borrower shall not be required to draw the full amount of the Term Commitments. |

Borrowing requests under the DIP Facility shall be made (i) on three business days' notice, in the case of Loans bearing interest at a rate based on LIBOR ("**LIBOR Loans**") and (ii) on one business day's notice, in the case of Loans bearing interest based on the Alternate Base Rate ("**ABR Loans**").

| | |
|---|---|
| **Currency:** | Borrowings will be made in U.S. Dollars. All payments under the DIP Facility will be made without setoff or counterclaim. |
| **Voluntary Prepayments and Commitment Reductions:** | To be consistent with the Documentation Principles: |

The Borrower may repay outstanding Term Loans and/or reduce the Term Commitments at any time without premium or penalty, including without any make-whole premium, (other than breakage costs, if applicable on the amount of the prepayment or reduction) upon (i) at least three (3) business days' notice in the case of LIBOR Loans and (ii) one business day's notice in the case of ABR Loans; *provided* that in the case of repayment, each partial repayment shall be in an amount of $5,000,000 or multiples of $1,000,000 in excess thereof (or, if less, the outstanding amount of applicable Term Loans), and, each partial reduction shall be in an amount of $5,000,000 or multiples of $1,000,000 in excess thereof (or, if less, the remaining available balance of the relevant Commitment).

| | |
|---|---|
| **Mandatory Prepayments:** | The following mandatory prepayments shall be required, subject, in each case, to reinvestment rights, exceptions and mechanics consistent with the Documentation Principles: |

1. <u>Asset Sales</u>: Prepayments of the DIP Facility in an amount equal to 100% of (i) the net cash proceeds of the sale or other disposition by the Oncor Entities (or successors thereof) of assets outside the ordinary course that have been actually distributed to the Borrower and (ii) the net cash proceeds of the sale or other disposition by the Debtors of any property or assets (other than any such proceeds received prior to the date of commencement of the Cases) of the Debtors, other than net cash proceeds of sales or other dispositions of power, capacity, energy, ancillary services and other products,

8

inventory and services or contracts related to any of the foregoing (in each case, whether in physical, financial or other form), any dispositions between the Debtors, any dispositions consisting of leases and sub-leases and any other sales or dispositions in the ordinary course of business or consistent with past practice, and subject, in each case of clauses (i) and (ii), to any exceptions to be mutually agreed on in the Loan Documents consistent with the Documentation Principles.

2. Insurance Proceeds: Prepayments of the DIP Facility in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of any property or assets of the Debtors (other than any such proceeds received prior to the date of commencement of the Cases), with restrictions to be mutually agreed, and subject to exceptions to be mutually agreed on in the Loan Documents consistent with the Documentation Principles.

Priority/Security:

All obligations of the Debtors to the Agent and the Lenders (such persons, collectively, the "**DIP Secured Parties**") under the Loan Documents (the "**Obligations**"), including all Loans made under the DIP Facility, shall, subject to the Carve-Out (defined below), at all times:

(i) pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several superpriority administrative expense claim status in the Cases, on a pari passu basis;

(ii) pursuant to Bankruptcy Code section 364(c)(2), be secured by the following:

a perfected first-priority lien on substantially all now owned or hereafter acquired assets of the Debtors and the proceeds thereof, and a perfected lien on such assets in each case to the extent such assets constitute "Collateral" (including the "Security Collateral" (including the Equity Interests in Oncor Electric Delivery Holdings Company LLC) and the "Account Collateral", as each such term is defined in the Pledge Agreement dated as of November 16, 2009 (as amended, amended and restated, supplemented or otherwise in effect from time to time) between EFIH, the other Pledgors party thereto, and the Bank of New York Mellon Trust Company N.A. as collateral trustee) for purposes of the Collateral Trust Agreement dated as of November 16, 2009 (as amended, amended and restated, supplemented, modified or otherwise in effect from time to time, the "**EFIH Collateral Trust Agreement**") among EFIH, The Bank of New York Mellon Trust Company, N.A. as First Lien Trustee, the other Secured Debt Representatives from time to time party thereto, and The Bank of New York Mellon Trust Company N.A. as Collateral Trustee (to be defined consistent with the Documentation Principles) the ("**Collateral**"); *provided, however,* that the

9

Collateral will not secure any actual or purported Obligation (including pursuant to any guarantee or grant of security) with respect to any "swap" (as defined under the Commodity Exchange Act) (after giving effect to keepwell agreements in the Loan Documents) entered into by the Borrower or any Guarantor thereof that is not an "eligible contract participant" (as such term is defined in the Commodity Exchange Act) at the time such "swap" Obligation is incurred, or in the case of an Obligation resulting from a guarantee (or grant of security) at the later of the time such guarantee (or grant of security) is entered into and the time such "swap" obligation being guaranteed (or secured) is incurred; *provided, further* that the Collateral shall exclude the Debtors' claims and causes of action under Chapter 5 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, the "<u>**Avoidance Actions**</u>"), but subject only to, and effective upon, entry of the Final Order, shall include any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise.    For the avoidance of doubt, Collateral will also exclude the following:  (a) those assets over which the granting of security interests in such assets would be prohibited by contract (other than any in respect of any of the Prepetition Facilities), applicable law or regulation or the organizational documents of any non-wholly owned subsidiary (including permitted liens, leases and licenses), or to the extent that such security interests would result in adverse tax or accounting consequences as determined in good faith by the Borrower, (b) those assets as to which the Administrative Agent and the Borrower reasonably determine that the cost of obtaining such a security interest or perfection thereof are excessive in relation to the benefit for the Lenders of the security to be afforded thereby, (c) assets in respect of which the granting or perfection of a lien would violate any applicable law or regulation (including regulations adopted by FERC, the Public Utility Commission of Texas and/or the Nuclear Regulatory Commission), and (d) other exceptions (i) to be mutually agreed or (ii) that are usual and customary for facilities of this type for affiliates of the Borrower will not constitute "Collateral"; *provided, however,* notwithstanding anything to the contrary contained herein, to the extent the security interest in such Collateral may be perfected by the entry of the Final Order, neither the Borrower nor any Guarantor shall be required to obtain, provide or execute any mortgage or control agreement in favor of the Agent or any other DIP Secured Party with regard to any Collateral nor shall the Borrower or any Guarantor be required to obtain a certificate of title evidencing the security interest of the Agent or any other Secured Party with respect to any Collateral;

in each case, to the extent that such Collateral is not subject to valid,

10

perfected and non-avoidable liens as of the commencement of the Cases;

(iii) pursuant to Bankruptcy Code section 364(c)(3), be secured by the following:

a perfected lien on all Collateral;

to the extent that such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (other than property that is subject to the existing liens that secure the obligations under any of the Existing Primed Secured Facilities referred to below, which liens shall be primed by the liens securing the DIP Facility described in such clause, subject to such liens in favor of such third parties); and

(iv) pursuant to Bankruptcy Code section 364(d), be secured by the following:

a perfected priming first-priority lien on all Collateral, and

to the extent that such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties as of the commencement of the Cases that secure the obligations of the Borrower and the Guarantors under or in connection with each of the Prepetition Facilities that are secured (collectively the "**Existing Primed Secured Facilities**");

subject, in each case, to the Carve Out.

All liens securing the Obligations, the 507(b) Claim (as defined below) and any and all forms of adequate protection, liens or claims securing the Obligations and other prepetition obligations, including the liens and security interests granted to the respective noteholders and other secured parties pursuant to and in connection with the Existing Primed Secured Facilities (the "**Existing Primed Creditors**") (including all security agreements, mortgages, pledge agreements, and other security documents executed by any of the Debtors in favor of the agents under the Existing Primed Secured Facilities, for its benefit and for the benefit of any secured party under the Existing Primed Secured Facilities), shall be subject and subordinate to the Carve Out.

The "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any

11

time, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "**Professional Fees**") incurred by persons or firms ("**Debtor Professionals**") retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code and any official committee of unsecured creditors (the "**Committee**" and, together with the Debtor Professionals, the "**Professional Persons**") appointed in the Cases pursuant to section 1103 of the Bankruptcy Code at any time before or on the first Business Day following delivery by the Agent of a Carve Out Trigger Notice (defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Professional Fees of Professional Persons in an aggregate amount not to exceed $25,000,000 incurred after the first Business Day following delivery by the Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"). For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the Agent to the Debtors, their lead restructuring counsel, the United States Trustee, and lead counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

On the day on which a Carve Out Trigger Notice is given by the Agent to the Debtors, the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account at the Agent in trust to pay such then unpaid Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims. The Debtors shall deposit and hold such amounts in a segregated account at Agent in trust to pay such Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (ii) through (iii) of the definition of Carve Out set forth above, but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Agent for the benefit of the Lenders, unless the Obligations have been paid in full, in which case any such excess shall be paid to the lenders under the Existing Primed Secured Facilities in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above, and then, to the extent the Post-Carve Out Trigger Notice Reserve has not

12

been reduced to zero, to pay the Agent for the benefit of the Lenders, unless the Obligations have been paid in full, in which case any such excess shall be paid to the lenders under the Existing Primed Secured Facilities in accordance with their rights and priorities as of the Petition Date.

Notwithstanding anything to the contrary in the Loan Documents, the Final Order, following delivery of a Carve Out Trigger Notice, the Agent and the agents under the Existing Primed Secured Facilities shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the Agent for application in accordance with the Loan Documents.

Further, notwithstanding anything to the contrary herein, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans or increase or reduce the Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Professional Fees shall not affect the priority of the Carve Out and (iii) in no way shall the Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Debtors. The Debtors shall not assert or prosecute, and no portion of the proceeds of the DIP Facility, the Collateral, or the Carve Out, and no disbursements set forth in the Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred by any person in connection with (a) preventing, hindering or delaying any of the Agent's or the Lenders' enforcement or realization upon any of the Collateral once an Event of Default has occurred and is continuing and after the Remedies Notice Period, (b) objecting or challenging or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Obligations, the liens securing the DIP Facility, or any other rights or interest of any of the Agent or the Lenders, or (c) asserting, commencing or prosecuting any claims or causes of action, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the Agent, any Lender or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees.

The liens on the Collateral securing the Existing Primed Secured Facilities shall be junior and subordinate to the Carve Out and the liens securing the DIP Facility. All of the liens described herein shall be effective and perfected as of the Final Order Entry Date and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.

**Representations and**                    Each of the Debtors under the DIP Facility will make only the

13

**Warranties:**

following representations and warranties, consistent with the Documentation Principles and (for the avoidance of doubt) each as modified as necessary to reflect the commencement of the Cases and events leading up to and following commencement:

Financial statements; no Material Adverse Event since the Petition Date; existence and good standing, authorization and validity; compliance with law; corporate power and authority; due authorization, execution, delivery and enforceability of Loan Documents; no conflict with law, organizational documents, unstayed orders and decrees or post-petition material contractual obligations; no material unstayed litigation; no default; ownership of property; intellectual property; taxes; insurance; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; environmental matters; labor matters; OFAC; FCPA; Patriot Act; anti-terrorism laws and anti-money laundering laws; effectiveness of the Final Order; creation, validity, perfection and priority of lien securing the DIP Facility; and accuracy of disclosure. Notwithstanding anything in this Term Sheet or any Loan Document to the contrary, the Debtors will not provide any representation or warranty concerning solvency.

As used herein and in the Loan Documents, a "**Material Adverse Event**" shall mean any circumstance or conditions affecting the business, assets, operations, properties or financial condition of the Borrower and its subsidiaries taken as a whole, that would individually or in the aggregate, materially adversely affect the ability of the Debtors (taken as a whole) to perform their payment obligations under the Loan Documents to which they are a party, or the rights and remedies of the Agent and the Lenders under the Loan Documents (other than, in each case, as a result of the events leading up to, and following commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the continuation and prosecution thereof, including circumstances or conditions resulting from, or incidental to, such events, commencement, continuation and prosecution, which shall not individually or in the aggregate constitute a Material Adverse Event), and *provided* that nothing disclosed in any of the following filings by EFIH and/or EFH (1) the Annual Report on Form 10-K for the year ended December 31, 2013, as filed on the date of the Commitment Letter (to the extent substantially the same in form and substance as the version provided to the Left Lead DIP Facility Arranger at least 2 days prior to the date of the Commitment Letter), (2) any filings on Form 8-K made through the date of the Commitment Letter and/or (3) any disclosure statement related to any plan of reorganization or liquidation of Debtors provided to the Joint Lead Arrangers on or prior to the date of the Commitment Letter, shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein) constitute a Material Adverse Event.

**Covenants:**

14

|  |  |
|---|---|
| **- Affirmative Covenants:** | Each of the Debtors under each of the DIP Facility (solely with respect to itself and each of the other Debtors and restricted subsidiaries) will agree only to the following affirmative covenants (consistent with, in each case, the Documentation Principles): |

    (a) delivery of (i) periodic updates of the Budget and monthly variance reports (as described above) and (ii) quarterly and annual financial statements;

    (b) delivery of monthly reports with respect to asset sales, cost savings, and other matters reasonably requested by the Agent;

    (c) delivery to the Agent and its legal counsel, at least 2 business days in advance of filing with the Bankruptcy Court, of all proposed "first day" pleadings and proposed orders, which must be in form and substance reasonably satisfactory to the Agent (but in the case of the order governing cash management and any order governing adequate protection, shall be satisfactory in form and substance to the Agent);

    (d) delivery to the Agent and its legal counsel, as soon as practicable in advance of filing with the Bankruptcy Court, of any plan or reorganization or liquidation and/or any disclosure statement related to such plan, which must be in form and substance reasonably satisfactory to the Agent; *provided, however,* that with respect to provisions of the plan of reorganization and/or any disclosure statement that relate to payment of the DIP Facility, such provisions must be in form and substance satisfactory to the Agent;

    (e) delivery to the Agent as soon as practicable in advance of filing with the Bankruptcy Court of the Final Order (which must be in form and substance satisfactory to the Agent) and all other proposed material orders and pleadings related to the DIP Facility (which must be in form and substance reasonably satisfactory to the Agent), any plan of reorganization or liquidation, and/or any disclosure statement related to such plan;

    (f) file with the Bankruptcy Court a plan of reorganization and a disclosure statement relating thereto, each in form and substance reasonably satisfactory to the Agent, within 18 months after the Petition Date; *provided, however,* that with respect to provisions of the plan of reorganization and/or any disclosure statement that relate to payment of the DIP Facility, such provisions must be in form and substance satisfactory to the Agent;

    (g) maintenance of cash management system in accordance with the orders entered in the Cases, which orders shall be in form and substance satisfactory to the Agent; and the Borrower

15

shall maintain its own bank accounts and not otherwise commingle cash with Energy Future Holdings Corp. or any of Energy Future Holdings Corp.'s other subsidiaries other than subsidiaries of the Borrower;

(h) contest, if requested by the Agent, any motion seeking entry of an order, and entry of an order, that is materially adverse to the interests of the Agent or the Lenders or their respective material rights and remedies under the DIP Facility in any of the Cases;

(i) additional reporting requirements reasonably requested by the Agent, including, without limitation, with respect to litigation, contingent liabilities, Defaults, ERISA, environmental liabilities and Material Adverse Events;

(j) reasonable access to information (including historical information) and personnel (during normal business hours), including, regularly scheduled meetings as mutually agreed with senior management of the Borrower and other company advisors (during normal business hours), and a subset of the Agent shall be provided with access to all information it shall reasonably request and to other internal meetings regarding strategic planning, cash and liquidity management, operational and restructuring activities;

(k) if not already obtained, commercially reasonable efforts to obtain ratings from each of Moody's and Standard & Poor's as soon as reasonably practicable following the Closing Date; and

(l) only such additional affirmative covenants (as modified to account for the commencement and continuance of the Cases and other express provisions in this Term Sheet) as are consistent with the Documentation Principles.

- Negative Covenants: Each of the Debtors under each of the DIP Facility (solely with respect to itself and each of the other Debtors and restricted subsidiaries) will agree only to the following negative covenants, consistent with, in each case, the Documentation Principles:

(a) prohibition on creating or permitting to exist any liens on any assets, other than liens securing the DIP Facility and any permitted liens consistent with the Documentation Principles (which liens shall include, among others, scheduled liens in existence on the Closing Date) and other liens described in "**Priority/Security**" above;

(b) prohibition on creating or permitting to exist any other superpriority claim that is pari passu with or senior to the claims of the Lenders under the DIP Facility, except for the

16

Carve-Out and liens securing the Obligations;

(c) prohibition on making adequate protection payments to, or otherwise providing adequate protection for, creditors under any of the Prepetition Facilities other than as provided for in this Term Sheet and contained in the Final Order and/or any cash collateral order approved by the Agent;

(d) prohibition on the use of proceeds of the DIP Facility for purposes other than those described in this Term Sheet and contained in the Final Order;

(e) limitations on disposing of assets (including, without limitation, any sale and leaseback transaction and any disposition under Bankruptcy Code section 363);

(f) prohibition on modifying or altering in any material manner the nature and type of its business (taken as a whole) except as required by the Bankruptcy Code or orders entered by the Bankruptcy Court;

(g) prohibition on prepaying prepetition Indebtedness, except as expressly provided for in the Loan Documents or pursuant to "**first day**" or other orders entered by the Bankruptcy Court upon pleadings in form and substance reasonably satisfactory to the Agent;

(h) prohibition on consenting to the termination or reduction of the Debtors' exclusive plan filing and plan solicitation periods under section 1121 of the Bankruptcy Code (the "**Exclusivity Periods**") or failing to object to any motion by a party in interest (other than a Lender or the Agent) seeking to terminate or reduce the Exclusivity Periods, in each case without the prior written consent of the Agent; and

(i) such additional negative covenants (as modified to account for the commencement of the Cases and other express provisions in this Term Sheet or the Commitment Letter) as are consistent with the Documentation Principles.

It is understood that transactions (including any payments to affiliates) under the ordinary course cash management system, including pursuant to any shared services or similar agreement ("**Shared Services Agreement**") and any tax sharing agreements ("**Tax Sharing Agreements**"), any sublease of property from any Specified Affiliate to the Borrower or any of its restricted subsidiaries ("**Property Subleases**") and certain other agreements or arrangements to be agreed to, each as in effect on the date of the Commitment Letter (and as amended, supplemented or modified in a manner that is not materially adverse to the interests of the Lenders in their

17

capacity as such) and/or contemplated in the Initial Budget or any other Budget that has been approved by the Agent from time to time (if any) in respect of any applicable period will in any event be permitted by the Loan Documents (as and when the Borrower and/or Guarantors elect to make such performance in their respective discretion); *provided, further* that failure to comply with any such agreements shall not constitute a Default or Event of Default under the Loan Documents.

The DIP Facility will include exceptions from the relevant covenants allowing for investments and/or restricted payments (in the form of intercompany loans, intercompany funding or otherwise) and transactions with affiliates between the Borrower, any of its subsidiaries, and the Specified Affiliates pursuant to which the Borrower may (in its discretion) perform intercompany transactions under the ordinary course cash management system (including pursuant to the Shared Services Agreement, any Tax Sharing Agreements, or Property Sublease and certain other agreements or arrangements to be agreed to) to, the Specified Affiliates, to finance general corporate purposes of the Specified Affiliates during the pendency of the Cases.

"**Specified Affiliates**" means, collectively, the following affiliates of the Borrower: EFH Corporate Services Company and Energy Future Holdings Corp.

| | |
|---|---|
| **- Financial Covenants:** | Minimum liquidity (to be defined as unrestricted cash) of $150 million at all times. |
| **Events of Default:** | The occurrence and continuance of any of the following events shall constitute an Event of Default under the DIP Facility (consistent, in each case, with the Documentation Principles): |

(a) (i) the Final Order Entry Date shall not have occurred on or prior to the date that is one hundred and ten (110) days after the date of the Commitment Letter or (ii) the Term Facility shall not have been funded in full within ten (10) days of the Final Order Entry Date;

(b) Any of the Cases shall be dismissed or converted to a Chapter 7 Case;

(c) A trustee, receiver, interim receiver, receiver or manager shall be appointed in any of the Cases, or a responsible officer or an examiner with enlarged powers shall be appointed in any of the Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4));

(d) Any other superpriority administrative expense claim or lien

18

(other than the Carve-Out) which is pari passu with or senior to the claims or liens of the Agent or the Lenders under the DIP Facility shall be granted in any of the Cases without the prior written consent of the Agent;

(e) The Bankruptcy Court shall enter an order granting relief from the automatic stay to (i) any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any equity interest in any of the Oncor Entities held by any of the Debtors or (ii) any creditor or party in interest with a value in excess of $25,000,000 to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Debtors (other than assets described in clause (i)) that have an aggregate value in excess of $25,000,000;

(f) The Borrower shall default in the payment of (i) principal on the Loans when due; or (ii) interest or fees and such default shall continue for more than five (5) days;

(g) Any representation or warranty made or deemed made by any Debtor in any Loan Document shall prove untrue in any material respect on the date as of which it is made or deemed made;

(h) The Debtors shall default (i) in the observance of any negative covenant (and certain specified affirmative covenants consistent with the Documentation Principles) in the Loan Documents, (ii) in the observance of the Financial Covenant; or (iii) in the observance of any other covenant, term or condition not otherwise specified herein which default continues for more than 30 days after receipt of notice to the Borrower from the Agent or the Requisite Lenders (defined below);

(i) An order shall be entered reversing, supplementing, or staying for a period of five (5) business days or more, vacating or otherwise modifying the Interim Fee Order or the Final Order in a manner that is adverse to the interests of the Agent or the Lenders, or any of the Debtors shall apply for authority to do so, without the prior written consent of the Agent or the Requisite Lenders, or the Interim Fee Order or the Final Order with respect to the DIP Facility shall cease to be in full force and effect;

(j) An order shall be entered amending in a manner that is adverse in any material respect to the interests of the Lenders the Interim Fee Order or the Final Order without the consent of the Lenders;

(k) Any judgments that are in the aggregate in excess of

19

$25,000,000 as to any post-petition obligation that is allowed as an administrative expense claim against the Debtors shall be rendered against the Debtors and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants, in each case, to the extent not paid or covered by insurance provided by a carrier not disputing coverage) or there shall be rendered against the Debtors a non-monetary judgment with respect to a post-petition event that causes or is reasonably expected to cause a Material Adverse Event;

(l)  Any Debtor makes any material payments relating to prepetition obligations (including any "adequate protection" payments) other than in accordance with a "first day" order, the Interim Fee Order, the Final Order, or as otherwise agreed to by the Agent;

(m) A plan shall be confirmed in any of the Cases that does not provide for termination of the Commitments under the DIP Facility and the indefeasible payment in full in cash of the Obligations (other than indemnities and other contingent obligations not then due and payable) on the effective date of such plan;

(n)  The Final Order shall cease to create a valid and perfected lien on the Collateral;

(o)  (i) Any Debtor shall file a motion or pleading or commence a proceeding that would reasonably be expected to result in a material impairment of any of the Lenders' material rights or interests in their capacities as Lenders under the DIP Facility or (ii) a determination by a court with respect to a motion, pleading or proceeding brought by another party that results in such an impairment;

(p)  Any Loan Document or any material provision thereof shall cease to be effective (other than in accordance with its terms);

(q)  Any of the Debtors shall fail to comply with the Interim Fee Order or the Final Order in any material respect;

(r)  The Bankruptcy Court shall enter an order approving any claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation of any Collateral;

(s)  The Bankruptcy Court shall enter a final non-appealable order that is adverse in any material respect to the interests (when taken as a whole) of the Agent or the Lenders or their respective material rights and remedies in their capacity as such under the DIP Facility in any of the Cases;

20

(t) The Borrower shall default on payment due or there shall be any event of default the effect of which is to accelerate or permit acceleration with respect to material indebtedness (threshold to be agreed) incurred after the Petition Date provided, that notwithstanding anything in the foregoing to the contrary, this section shall not apply with respect of make-whole payments or premiums in respect of indebtedness;

(u) The Loan Parties or any of their subsidiaries, or any person claiming by or through the Loan Parties or any of their subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Agent or the Lenders in each case relating to the DIP Facility;

(v) Any Debtor shall file any pleading seeking, or otherwise consenting to, or shall support or acquiesce in any other person's motion as to any matter set forth in clause (a), (b), (c), (d), (e), (i), (j), (k), (l), (m), (n), (o), (r), (s), or (u) above; and

(w) Such additional events of default (as modified to account for the commencement of the Cases and other express provisions in this Term Sheet or the Commitment Letter]) as are consistent with the Documentation Principles (with the change of control definition to be agreed).

Notwithstanding anything to the contrary contained herein, any Event of Default under the Loan Documents, and any or similarly defined term under any Loan Document, other than any Event of Default which cannot be waived without the written consent of each Lender directly and adversely affected thereby, shall be deemed not to be "continuing" if the events, act or condition that gave rise to such Event of Default have been remedied or cured (including by payment, notice, taking of any action or omitting to take any action) or have ceased to exist.

Upon the enforcement of remedies after acceleration of the Loans as a result of an Event of Default, proceeds of other Collateral will be paid:    first, to holders of any then outstanding obligations under the Carve Out (if any), up the amount thereof; and then, to the holders of the Obligations.

**Rights and Remedies Upon Event of Default:**    Upon the occurrence of an Event of Default and following the giving of five calendar days' notice to the Debtors (the "<u>Remedies Notice Period</u>"), the Agent, on behalf of the Lenders, may (and at the direction of the Requisite Lenders, shall) exercise all rights and remedies provided for in the Loan Documents and may declare (i) the termination, reduction or restriction of any further Commitment to the

21

extent any such Commitment remains, (ii) all Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, and (iii) the termination of the Loan Documents as to any future liability or obligation of the Agent and the Lenders, but without affecting any of the liens securing the DIP Facility or the Obligations.

During the Remedies Notice Period, the Debtors may continue to use cash collateral in the ordinary course of business, consistent with past practices and the most recently delivered Budget, but may not enter into, or seek approval of, any transactions or arrangements (including, without limitation, the incurrence of indebtedness or liens, investments, restricted payments, asset sales or transactions with non-Debtor affiliates) that are not in the ordinary course of business. Unless the Bankruptcy Court orders otherwise during the Remedies Notice Period, at the end of the Remedies Notice Period, the Debtors shall no longer have the right to use or seek to use cash collateral, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated without further notice to or order of the Bankruptcy Court, and the Agent shall be permitted to exercise all rights against the Collateral in accordance with the Loan Documents and the Final Order, as applicable, and shall be permitted to satisfy the Obligations, without further order or application or motion to the Bankruptcy Court and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code. Notwithstanding anything herein to the contrary, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated for the purposes of giving any notice contemplated hereunder.

During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing, and the Debtors waive their right to, and shall not be entitled to seek relief, including without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the Agent, on behalf of the Lenders, set forth in the Interim Fee Order, the Final Order, or the Loan Documents.

The delay or failure to exercise rights and remedies under the Interim Fee Order, the Final Order or the Loan Documents by the Agent, on behalf of the Lenders, shall not constitute a waiver of such Agent's rights thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable Loan Documents.

**Conditions to Full Availability:**

The obligation to provide Loans up to the full amount of the Commitments shall be subject to the satisfaction or waiver of the conditions precedent listed on Annex I attached hereto.

**Assignments and**

Subject in each case to the Documentation Principles, each Lender

22

**Participations:**
may assign all or any part of the Term Facility to one or more affiliates, banks, financial institutions or other entities, in each case, with the prior written consent of the Borrower (unless such an assignment is being made to a Lender, an affiliate of a Lender, or an approved fund of such Lender or its affiliate) and the Agent (unless such an assignment is being made to a Lender, an affiliate of a Lender or an approved fund of such Lender or its affiliate) (in each case, not to be unreasonably withheld, conditioned or delayed); *provided, however,* that under no circumstances will assignments be made to a Disqualified Institution (defined below), and that the consent of the Borrower will not be required during the continuance of an Event of Default. Upon such assignment, such affiliate, bank, financial institution or entity will become a Lender for all purposes under the Loan Documents.

The Lenders will also have the right to sell participations (other than to Disqualified Institutions), subject to customary limitations on voting rights, in the DIP Facility.

"**Disqualified Institutions**" means (a) any company engaged principally in the business of energy or power generation and/or transmission as identified in writing to the Agent by the Company from time to time, (b) any company whose principal business is that of an energy or power merchant as identified in writing to the Agent by the Company from time to time, (c) any financial institution identified in writing to the Joint Lead Arrangers by the Borrower on or prior to the date of the Commitment Letter (including any such person's affiliates that are clearly identifiable on the basis of such affiliates' names) and (d) a "defaulting" Lender (as described below). The list of Disqualified Institutions shall be posted for the benefit of the Lenders. Upon the identification in writing by the Borrower to the Agent of any additional Disqualified Institutions pursuant to clause (a) or (b) above, the Agent shall promptly post such addition to the list to the Lenders; <u>provided</u> that any additional person so identified shall not be deemed a Disqualified Institution until such time as such addition to the list is posted to the Lenders.

**Requisite Lenders:**
Voting with respect to the DIP Facility will be done solely by the Lenders. The vote of Lenders holding more than 50% of total Commitments under the DIP Facility (or if no Commitments are outstanding, total exposure) (the "**Requisite Lenders**") shall be required to amend, waive or modify any terms and conditions of the DIP Facility (with customary exceptions consistent with the Documentation Principles where only the consent of the relevant Agent will be required), except that with respect to matters relating to, among others, the reduction in, or compromise of payment rights with respect to, principal or interest rates, extension of maturity (it being understood and agreed that a waiver or amendment of the Extension Conditions (other than the Extension Conditions set forth under clauses (1) (solely with respect to a payment Event of Default) and (6) of the definition thereof, which will be subject to the consent of each

23

Lender) will be subject to Requisite Lender consent) or scheduled date of payment of any interest or fees due, release of material guarantees and/or liens granted on all or substantially all of the Collateral (other than guarantees, liens, or Collateral subject to permitted dispositions, permitted mergers, consolidations, reorganizations, etc.) and reduction in voting thresholds, the consent of the Lenders holding 100% of total Commitments (or if no Commitments are outstanding, total exposure) directly and adversely affected thereby will be required, except that the Commitment of a Lender may not be increased without such Lender's consent.

**Defaulting Lenders:**        The Loan Documents will contain customary provisions (but consistent in any event with the Documentation Principles) relating to "defaulting" Lenders (including provisions relating to the suspension of voting rights and rights to receive fees, and the termination or assignment of Commitments and Loans held by "defaulting" Lenders at par).

**Taxes:**        Consistent in each case with the Documentation Principles, the Loan Documents shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes (including in respect of Dodd-Frank and Basel III) and (b) indemnifying the Lenders for "breakage costs" incurred in connection with any prepayment of a LIBOR Loans on a day other than the last day of an interest period with respect thereto.

In connection with any proposed amendment, waiver or other modification to the DIP Facility (a "**Proposed Change**") requiring the consent of all Lenders or all directly and adversely affected Lenders, if the consent to such Proposed Change of all Lenders whose consent is required is not obtained, but the consent of Lenders with a majority of the Loans held by the applicable group of Lenders is obtained (any such Lender whose consent is required but is not obtained, a "**Non-Consenting Lender**"), then the Borrower may, at its sole expense, upon notice to such Non-Consenting Lender and the Agent, require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to all restrictions otherwise applicable to assignments), all its interests, rights and obligations under the DIP Facility to an assignee that shall assume such obligations or terminate such Non-Consenting Lender's commitments; *provided* that such Non-Consenting Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts then due and owing to it under the DIP Facility from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts).

**Indemnity; Expenses:**        The Loan Documents will provide, in each case to the extent consistent with the Documentation Principles, that the Borrower shall

24

indemnify, pay and hold harmless the Agent, the Joint Lead Arrangers, and the Lenders and their affiliates (and their respective controlling persons, directors, officers, partners, employees, agents, advisors and other representatives (collectively the "**Related Parties**")) (each, an "**Indemnified Person**") against any loss, claim, damage, liability, or expense incurred in respect of the DIP Facility contemplated hereby or the use of proceeds thereof or the Transactions or any claim, litigation, investigation or proceeding (a "**Proceeding**") relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such Proceedings are brought by any Debtor, its equity holders, affiliates, creditors or any other person, and to reimburse each Indemnified Person promptly following written demand for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing (except, in the case of any Indemnified Person, to the extent resulting (i) from the gross negligence, bad faith or willful misconduct of such Indemnified Person (or its Related Parties), in each case as determined in a final non-appealable judgment of a court of competent jurisdiction, (ii) from a dispute solely among Indemnified Persons other than any claims against any Indemnified Person in its capacity or in fulfilling its role as an Agent or Joint Lead Arranger or any similar role under the DIP Facility and other than any claims arising out of any act or omission on the part of the Borrower or the other Debtors or (iii) from any material breach of the Loan Documents by such Indemnified Person (or its Related Parties), as determined in a final non-appealable judgment of a court of competent jurisdiction) and (b) the Borrower shall reimburse within 10 days of written demand (together with reasonably detailed supporting documentation) the Agent, the Lenders and the Joint Lead Arrangers for their reasonable and documented out-of-pocket expenses incurred in connection with the negotiation, documentation, syndication and administration of the DIP Facility, any amendments or waivers with respect thereto, any Event of Default in respect of the DIP Facility and any exercise of remedies in respect thereof (including reasonable and documented out-of-pocket prepetition and post-petition fees, charges and disbursements of legal counsel, financial advisors and third-party appraisers and consultants advising the Agent incurred in connection with the Agent's participation in the Cases, limited in the case of legal counsel to one primary counsel (and (i) appropriate local counsel in applicable foreign and local jurisdictions, but limited to one local counsel in each such jurisdiction, (ii) appropriate regulatory counsel and (iii) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected indemnified persons similarly situated)); provided, however, that the Debtors shall promptly provide copies of invoices received on account of fees and expenses of the professionals retained as provided for in the DIP Documents to counsel to the Committee and the United States Trustee, and the Bankruptcy Court shall have exclusive jurisdiction over any objections raised to the invoiced amount of the fees and expenses proposed to be paid, which objections may only be raised within ten days after receipt thereof. In the event that within ten days from receipt

25

of such invoices the Debtors, the United States Trustee or counsel to the Committee raise an objection to a particular invoice, and the parties are unable to resolve any dispute regarding the fees and expenses included in such invoice, the Bankruptcy Court shall hear and determine such dispute; provided, that payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final order of the Bankruptcy Court.

**Governing Law and Jurisdiction:**

The Loan Documents will provide that the Debtors and the Lenders will submit to the exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the Southern District of New York and shall waive any right to trial by jury. New York law shall govern the Loan Documents.

**Miscellaneous:**

The terms and conditions of the Interim Fee Order and Final Orders (e.g. 506(c) waivers, marshaling, and successors and assigns) to be mutually agreed.

**Counsel to the Joint Lead Arrangers and the Agent:**

Shearman & Sterling LLP

26

**PX 095**
**Page 408 of 464**

<u>**Annex I**</u>

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC AND EFIH FINANCE, INC.**

SUMMARY OF CONDITIONS PRECEDENT TO THE DIP FACILITY

1.    <u>Interim Fee Order/Final Order/Bankruptcy Matters.</u>

      (a)    The Bankruptcy Court shall have entered, upon motion in form and substance satisfactory to the Left Lead DIP Facility Arranger, an interim order in form and substance satisfactory to the Left Lead DIP Facility Arranger (the "**<u>Interim Fee Order</u>**") as to the DIP Facility Fee, the Ticking Fee and the reimbursement of documented expenses of the Commitment Parties (including fees, charges and disbursements of counsel), no later than ten (10) business days after the date of commencement of the Cases, (a) approving and authorizing the Debtors to satisfy such fees when due under, to the extent provided in, and in accordance with the Commitment Letter and the Fee Letter; and (b) entitling such fees to administrative expense priority pursuant to section 503(b) of the Bankruptcy Code and ordering that such fees shall be deemed fully earned, indefeasibly paid, irrevocable, and non-avoidable irrespective of whether the Term Loans are approved; <u>provided, however,</u> that for the avoidance of doubt, the Borrower will not pay any amounts authorized under the Interim Fee Order in advance of the Final Order Entry Date unless pursuant to a separate Bankruptcy Court order authorizing the Borrower to use cash collateral.

      (b)    No later than the date that is one hundred and ten (110) days after the date of the Commitment Letter, a final order shall have been entered by the Bankruptcy Court in form and substance satisfactory to the Left Lead DIP Facility Arranger (which shall in any case approve the entirety of the Term Facility and the repayment and/or settlement (including via an exchange) in full of the principal amount plus any accrued and unpaid interest of the EFIH First Lien Secured Notes with the proceeds of the Term Loans and Incremental Term Loans) (the "**<u>Final Order</u>**") on a motion by the Debtors that is in form and substance satisfactory to the Left Lead DIP Facility Arranger, approving and authorizing on a final basis the matters and containing the other provisions described in this Section 1.

      (c)    Neither of the Interim Fee Order nor the Final Order shall have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, that is adverse to the Lenders, without the consent of the Left Lead DIP Facility Arranger.

      (d)    The Final Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated, and with respect to any modification or amendment, in a manner that is adverse to the Lenders without the consent of the Left Lead DIP Facility Arranger.

      (e)    The Debtors shall be in compliance in all material respects with the Interim Fee Order and the Final Order.

      (f)    The Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Cases

27

or shortly thereafter shall have been reviewed in advance by the Left Lead DIP Facility Arranger and shall be reasonably satisfactory in form and substance to the Left Lead DIP Facility Arranger, but in the case of orders relating to cash management and adequate protection, shall be satisfactory in form and substance to the Left Lead DIP Facility Arranger.

(g)     No trustee or examiner with enlarged powers (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the operations or the business of the Debtors.

2.     <u>Financial Statements, Budgets and Reports.</u>

(a)     The Borrower shall have delivered the Budget to the Agent and the Lenders, which shall be in form and substance reasonably satisfactory to the Agent and the Joint Lead Arrangers, and the Agent and the Joint Lead Arrangers hereby confirm the receipt of the Budget dated April 28, 2014 in form and substance reasonably satisfactory to the Agent and the Joint Lead Arrangers prior to the date hereof.

(b)     The Borrower shall have delivered to the Agent and the Lenders a base case model, including a statement of cash sources and uses of all free cash flow for the tenor of the DIP Facility, which shall be in form and substance reasonably satisfactory to the Agent and the Joint Lead Arrangers, and the Agent and the Joint Lead Arrangers hereby confirm the receipt of a base case model dated April 28, 2014 in form and substance reasonably satisfactory to the Joint Lead Arrangers and the Lenders prior to the date hereof.

(c)     The Agent and the Lenders shall have received reasonably requested financial information.

3.     <u>Performance of Obligations.</u>

(a)     All invoiced costs, fees, expenses (including, without limitation, reasonable legal fees) and other compensation contemplated by the Loan Documents and the Fee Letter to be payable to the Commitment Parties, the Agent and the Lenders in respect of the DIP Facility shall have been paid to the extent earned, due and payable.

(b)     Representations and warranties of the Debtors shall be true and correct in all material respects (or in all respects for representations and warranties qualified by materiality or Material Adverse Event).

(c)     No Default or Event of Default shall exist under the DIP Facility.

4.     <u>Customary Closing Documents.</u>

(a)     The Debtors shall have complied with the following closing conditions: (i) the delivery of customary legal opinions as to authority, authorization, execution and delivery; corporate records and documents from public officials, including good standing certificates; officer's certificates; and notice of borrowing; (ii) evidence of authority; and (iii) obtaining of any governmental consents, if any, necessary in connection with the DIP Facility, the financing thereunder and related transactions. The Lenders shall have received at least five (5) days prior to the Closing Date all documentation and other

28

information required by bank regulatory authorities under applicable "**know-your-customer**" and anti-money laundering rules and regulations, including the Patriot Act.

(b)     The Loan Documents (which shall be consistent with the Documentation Principles) shall have been entered into by the Debtors, the Agent and the Lenders.

(c)     The Agent shall have received results of a Uniform Commercial Code search for the jurisdiction of organization of the Debtors and a federal tax lien search for the jurisdiction of the chief executive office of the Debtors.

(d)     The Agent shall have received proper financing statements (Form UCC-1 or the equivalent) for filing under the UCC in the jurisdiction of organization of each Debtor.

(e)     As a result of the extension of such credit, usage of the Commitments shall not exceed (i) the applicable Commitments then in effect and (ii) the aggregate amount authorized by the Final Order.

5.     <u>Other Conditions</u>.

(a)     If the Final Order (or any order entered concurrently or prior to the entry of the Final Order) approves the repayment in full of the EFIH First Lien Secured Notes with the proceeds of the Term Facility, substantially concurrently with the borrowing under the Term Facility, the principal amount plus any accrued and unpaid interest of the EFIH First Lien Secured Notes (which, for the avoidance of doubt, shall not include make-whole payments or premiums in respect of the EFIH First Lien Secured Notes unless otherwise approved by the Borrower) shall be repaid in full.

29

## Annex II

### INTEREST AND CERTAIN FEES

**Interest Rate Options:**

The Borrower may elect that the loans comprising each borrowing bear interest at a rate per annum equal to (a) the Alternate Base Rate (such loans herein referred to as "**ABR Loans**") plus the Applicable Margin or (b) the Adjusted LIBO Rate (such loans herein referred to as "**Eurodollar Loans**") plus the Applicable Margin.

As used herein:

"**Alternate Base Rate**" or "**ABR**" means the greatest of (a) the prime rate of interest announced from time to time by the Agent, changing when and as said prime rate changes (the "**Prime Rate**"), (b) the federal funds effective rate from time to time plus 0.50% and (c) the Adjusted LIBO Rate (after giving effect to LIBO floor in the case of Term Loans) for a one month interest period appearing on the Reuters Page LIBOR01 (or on any successor or substitute page) on such day plus 1.00%.

"**Adjusted LIBO Rate**" means the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to one or two weeks, one, two, three or six months (as selected by the Borrower) appearing on Reuters Page LIBOR01 (or on any other service providing comparable rate quotations) at approximately 11:00 a.m., London time, two business days prior to the first day of the applicable interest period; *provided* that in the case of Term Loans, the Adjusted LIBO Rate shall be subject to a floor (the "**LIBO Floor**") of 1.00% per annum.

"**Applicable Margin**" means, a margin of:

2.25%, in the case of ABR Loans
3.25%, in the case of Eurodollar Loans

**Interest Payment Dates:**

In the case of ABR Loans, interest shall be payable in arrears on the first day of each month, upon any prepayment due to acceleration and at the Maturity Date.

In the case of Eurodollar Loans, interest shall be payable in arrears on the last day of each interest period and, in the case of an interest period longer than three months, quarterly, upon any prepayment and at the Maturity Date.

**Agent and Joint Lead Arrangers Fees:**

Such additional fees payable to the Agent and the Joint Lead Arrangers as are specified in the fee letter, dated April 28, 2014 (the "**Fee Letter**"), by and among the Agent, the Joint Lead Arrangers and the Borrower.

| | |
|---|---|
| **Default Rate:** | After any payment Event of Default and upon notice by the Agent, the applicable interest rate for all Loans will be increased to, and overdue interest, fees and other amounts (other than overdue principal) shall bear interest at 2% per annum above the applicable rate. Overdue principal shall bear interest at 2% above the rate otherwise applicable. |
| **Rate and Fee Basis:** | All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans) for actual days elapsed |

31

<u>Schedule 1</u>

<u>"Clear Market" Permitted Indebtedness</u>

1. Indebtedness pursuant to the Junior Incremental Facility.
2. The exchange or other roll of the holders of your prepetition indebtedness pursuant to any Exchange Arrangement.
3. Any Backstop Commitment sought or achieved prior to the date that is sixteen (16) business days after the date you countersign this Commitment Letter.

**PX 095**
**Page 414 of 464**

**<u>EXHIBIT H</u>**

**EFIH SECOND LIEN DIP FINANCING TERM SHEET**

*Execution Version*

**ENERGY FUTURE HOLDINGS CORP.**
**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**

<u>SECOND LIEN SUBORDINATED SECURED DEBTOR IN POSSESSION NOTES FACILITY TERM SHEET</u>

*Capitalized terms used but not defined herein shall have the meanings set forth in the letter agreement, dated as of April 29, 2014 (the "Commitment Letter"), to which this Term Sheet is attached, or the Restructuring Support Agreement (as defined in the Commitment Letter).*

| | |
|---|---|
| Issuers | Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), and EFIH Finance Inc., a Delaware corporation (collectively, the "Issuers"). |
| Guarantors | All of the Issuers' direct and indirect domestic restricted subsidiaries that guarantee the EFIH First Lien DIP Financing (collectively, the "Guarantors") in the Chapter 11 Cases. The Issuers and the Guarantors are referred to herein as "Note Parties" and each, a "Note Party." All obligations of the Issuers under the Second Lien DIP Facility (as defined below) will be unconditionally guaranteed by the Guarantors. |
| Backstop Commitment | To be provided by the entities set forth on Schedule I to the Commitment Letter on the date hereof (and defined as Initial Commitment Parties therein) and such other parties that become Commitment Parties from time to time pursuant to the terms of the Commitment Letter. The Commitment Parties will pursuant to the Commitment Letter, severally and not jointly, backstop the Second Lien DIP Facility in an amount not to exceed $1,900,000,000 (the "Backstop Commitment") based on the respective percentages set forth on Schedule I to the Commitment Letter. |
| Second Lien DIP Facility Rights Holders | The following persons shall have the right to participate in the Second Lien DIP Facility (such persons, the "Second Lien DIP Facility Rights Holder," and such rights, the "Participation Rights"): (i) (a) All Holders of EFIH Unsecured Note Claims shall receive their Pro Rata share of 91% of the Participation Rights; and (b) Fidelity shall receive their Pro Rata share of 9% of the Participation Rights which participation shall be in the form of Tranche A-3 Note; *provided, however,* General Unsecured Claims Against EFH may participate in the Equity Conversion by purchasing such Tranche A-3 Notes held by Fidelity, if the Required Transfer as described below has not occurred. Moreover, Fidelity shall receive an $11.25 million payment from EFIH in connection with the exercise of any Participation Rights. If at any time (a) the IRS shall have denied the Debtors' Ruling Request or shall have informed the Debtors or their counsel, whether orally or in writing, of its decision not to issue one or |

more of the Required Rulings (the "PLR Denial") and (b) the Oncor TSA Amendment has not yet been approved, the Required Commitment Parties shall have the sole and exclusive right to require the holders of any Tranche A-3 Notes to transfer such notes to the Commitment Parties (the "Required Transfer") for a purchase price equal to the sum of (i) the par amount of such notes plus accrued and unpaid interest (including the PIK Interest (as defined below)), which amount shall be payable on the purchase date, (ii) in the event such assignment is consummated before the payment of the One-Time PIK Fee (as defined below), 10% of the par amount of such notes plus accrued and unpaid PIK Interest, if any (but not, for the avoidance of doubt, any accrued and unpaid cash interest), which amount shall be payable on the purchase date, and (iii) a Pro Rata share of any Prepayment Fee (as defined below) subsequently paid on such Tranche A-3 Notes (which amount shall be paid by EFIH to the holders of the Tranche A-3 Notes immediately prior to such assignment and not the holders of the Tranche A-3 Notes as of the date that the Prepayment Fee is due and owing).

The Participation Rights of Holders of General Unsecured Claims Against the EFIH Debtors shall be subject to ratable reduction from participation by Selected Partners (if any), in an aggregate amount not to exceed $400,000,000.

| | |
|---|---|
| Administrative Agent | To be determined. |
| Collateral Agent | To be determined. |
| DIP Facility | A second lien subordinated secured debtor-in-possession note facility that consists of (a) the Tranche A Notes, composed of (i) the Tranche A-1 Notes (the "Tranche A-1 Notes") issued to Holders of EFIH Unsecured Note Claims pursuant to the Second Lien DIP Procedures, (ii) the Tranche A-2 Notes (the "Tranche A-2 Notes") issued to each Commitment Party solely as a result of its obligation under the Investment Commitment, the Selected Partners, Post-Funding Partners and Specified Consultants, and (iii) the Tranche A-3 Notes (the "Tranche A-3 Notes" and, together with the Tranche A-1 Notes and Tranche A-2 Notes, the "Tranche A Notes") issued to Fidelity, as a Holder of General Unsecured Claims Against EFH, in each case, which will be available to be drawn in a single drawing on the Closing in an amount up to $1,900,000,000 to consummate the Second Lien Refinancing, and (b) the Tranche B Notes. |
| Second Lien DIP Procedures | The procedures for offering Participation Rights to eligible Second Lien DIP Facility Rights Holders under the Second |

2

Lien DIP Facility shall be on terms and conditions which are consistent with this Term Sheet and otherwise satisfactory to the Required Commitment Parties, EFH and EFIH (the "Second Lien DIP Procedures") in advance of the consummation of the Second Lien DIP Facility.

The record date that shall determine the parties entitled to Participation Rights shall be the date of the commencement of the offering to eligible Second Lien DIP Facility Rights Holders.

The Second Lien DIP Facility shall be funded by any and all Second Lien DIP Facility Rights Holders that elect to participate in their Pro Rata share of the Second Lien DIP Facility and, with respect to any unfunded portion of the Second Lien DIP Facility, Pro Rata by the Commitment Parties in accordance with the terms of the Commitment Letter (such funding parties, together, with their successors and assigns, the "Note Purchasers"); *provided that* no Commitment Party shall be permitted or required to exercise any participation rights if, after giving effect to such participation, the aggregate principal amount of the Second Lien DIP Facility to be provided by such Commitment Party when aggregated with the aggregate principal amount of the Second Lien DIP Facility provided by affiliates of such Commitment Party would exceed such Commitment Party's Investment Commitment, *provided, however, that* such Commitment Party may exceed such Commitment Party's Investment Commitment to the extent necessary to satisfy any Commitment of a Defaulting Commitment Party; *provided, further, that* any party electing to exercise such participation shall execute a joinder to the Restructuring Support Agreement and Conversion Agreement as a precondition to any such participation becoming effective.

| Second Lien DIP Facility Termination Date | All Second Lien DIP Notes shall become due and payable on the DIP Facility Termination Date (as defined below), subject to the Equity Conversion. |

The "DIP Facility Termination Date" shall be the earliest of (a) the Scheduled Termination Date (as defined below), (b) the consummation of any Section 363 sale, (c) the effective date of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court or (d) the acceleration of the notes and the termination of the commitment with respect to the Second Lien DIP Facility in accordance with the DIP Documents (as defined below).

"Scheduled Termination Date" means the date that is 24

3

months from the date the Second Lien DIP Facility is funded.

| | |
|---|---|
| Equity Conversion | Upon the Effective Date, the Second Lien DIP Notes shall be subject to conversion to Reorganized EFH Common Stock, on the terms set forth in the Restructuring Support Agreement, the Equity Conversion Term Sheet, and the Conversion Agreement (as defined in the Equity Conversion Term Sheet).<br><br>If the Equity Conversion does not occur, the Tranche B Notes shall convert to Tranche A-2 Notes. |
| Use of Proceeds | Proceeds of the Second Lien DIP Facility will be used (together with cash on hand and proceeds of the EFIH First Lien DIP Financing) to (i) repay in full all outstanding principal plus accrued and unpaid interest at the non-default rate due and owing under the EFIH Second Lien Notes (which shall not include any alleged premiums, fees or claims relating to the repayment of such Claims) to Non-Settling EFIH Second Lien Note Holders and (ii) repay the EFIH Second Lien Notes held by Settling EFIH Second Lien Note Holders in accordance with the EFIH Second Lien Settlement (clauses (i) and (ii) collectively, the "Second Lien Refinancing"). |
| DIP Documents | The Second Lien DIP Facility will be documented by a note purchase agreement (the "Note Purchase Agreement") and other guarantee, security, intercreditor, and other relevant documentation (together with the Note Purchase Agreement, collectively, the "DIP Documents") reflecting the terms and provisions set forth in this Term Sheet and otherwise in form and substance reasonably satisfactory to the Required Commitment Parties and the Issuers; *provided, however*, that such DIP Documents will be drafted in form and substance consistent with the documents governing the EFIH First Lien DIP Financing (the "First Lien DIP Documents"), with adjustments made to reflect this Term Sheet. It is agreed that each "basket" or "cushion" set forth in the covenants and events of default contained in the DIP Documents shall be at least 15% more than the corresponding provision in the First Lien DIP Documents. |
| Transferability of Participation Rights | Subject to compliance with all applicable securities laws, unless otherwise agreed by the Issuers, the Participation Rights will only be transferable to affiliates of Second Lien DIP Facility Rights Holders and Selected Partners; *provided, however*, the Participation Rights may not be transferred, and any such transfer shall be null and void *ab initio* if, assuming the Restructuring Transactions were to be consummated immediately upon such Transfer, the transferee and/or its affiliates of such transfer were to obtain or have beneficial ownership of, in the aggregate, more than fifty percent (50%) |

4

or more of the Reorganized EFH Common Stock.

Notwithstanding anything to the contrary herein, the Holders of EFIH Senior Toggle Notes shall not transfer such EFIH Senior Toggle Notes apart from the Pro Rata share of the Participation Rights attributable to such EFIH Senior Toggle Notes to any party other than affiliates or Selected Partners, and any such transfer shall be retroactively void.

For the avoidance of doubt, any transferee of the Participation Rights described above shall execute a joinder to the Restructuring Support Agreement and Conversion Agreement as a precondition to any transfer described above becoming effective.

| | |
|---|---|
| Transferability of Second Lien DIP Notes | Subject to compliance with all applicable securities laws, unless otherwise agreed by the Issuers, the Second Lien DIP Notes shall only be transferable to (i) affiliates of a Note Purchaser, (ii) other Note Purchasers and their respective affiliates, and (iii) such other Persons that are qualified institutional buyers or accredited investors, *provided, however*, that such transfers of Second Lien DIP Notes are not permitted if, in the reasonable business judgment of the Issuers and their legal and tax advisors, in consultation with the Commitment Parties, such transfers would adversely (a) affect or delay the Debtors' ability to obtain the Private Letter Ruling or violate the terms and conditions of the Private Letter Ruling or (b) affect or delay the Debtors' ability to obtain the regulatory consents or approval necessary to effectuate the Restructuring Transactions, *provided, further*, that, any transfer described above shall be null and void *ab initio*, if, assuming the Restructuring Transactions were to be consummated immediately upon such Transfer, the transferee of such transfer (other than affiliates transfers) was to obtain beneficial ownership of, in the aggregate, more than fifty percent (50%) or more of the Reorganized EFH Common Stock. |

Notwithstanding anything to the contrary herein, the Holders of EFIH Senior Toggle Notes that become Note Purchasers shall not transfer such EFIH Senior Toggle Notes apart from the Pro Rata share of the Second Lien DIP Notes attributable to such EFIH Senior Toggle Notes and any such transfer shall be retroactively void; *provided, however*, that any Tranche A-2 Notes purchased by a Commitment Party solely as a result of its obligation to do so under the Investment Commitment shall be transferable separately from such Commitment Party's EFIH Senior Toggle Notes, that the Tranche B Notes shall be transferable separately from the Commitment Parties' EFIH Senior Toggle Notes and that any Tranche A-1

5

Notes transferred to Post-Funding Partners or Specified Consultants pursuant to the provision below shall be transferrable separately from such Commitment Party's EFIH Senior Toggle Notes.

Notwithstanding anything herein to the contrary, at any time prior to the earlier of the DIP Facility Termination Date and the Equity Conversion, the Required Commitment Parties (determined based on the amount of their respective Investment Commitments immediately prior to the closing of the Second Lien DIP Facility) may require (i) each Note Purchaser holding Tranche A-1 Notes or Tranche A-2 Notes, except those held by Selected Partners, Post-Funding Partners (as defined below) or Specified Consultants, to sell, at a price of no less than par value of such Second Lien DIP Notes plus accrued but unpaid interest thereon, a Pro Rata portion of its Second Lien DIP Notes to partners selected by the Required Commitment Parties (the "Post-Funding Partners") in an amount such that after giving effect to all such sales, the Post-Funding Partners shall own no more than $400,000,000 of principal amount of Second Lien DIP Notes, after taking into account all Second Lien DIP Notes owned (if any) by the Post-Funding Partners immediately prior to any such sale and any Tranche A-1 Notes received by such Post-Funding Partners pursuant to the above shall automatically become Tranche A-2 Notes (ii) each Note Purchaser holding Tranche A-1 Notes or Tranche A-2 Notes, except those held by Selected Partners, Post-Funding Partners or Specified Consultants, to sell, at a price of no less than par value of such Second Lien DIP Notes outstanding as of the Closing less paid interest thereof, to date, a Pro Rata portion of its Second Lien DIP Notes to consultants to the Administrative Agent or Initial Commitment Parties ("Specified Consultants") in an amount up to $100,000,000 and any Tranche A-1 Notes received by such Specified Consultant pursuant to the above shall automatically become Tranche A-2 Notes.

For the avoidance of doubt, any transferee of Second Lien DIP Notes described above shall execute a joinder to the Restructuring Support Agreement as a precondition to any transfer described above becoming effective.

| | |
|---|---|
| Interest Rates | The Tranche A Notes will bear interest at a fixed rate of 8% per annum, payable in cash on the final business day of each quarter beginning on the first such day after the Closing. |

If the Bankruptcy Court has not entered an order approving the Oncor TSA Amendment as of the date that is 90 days from the Petition Date, the Tranche A Notes shall bear additional interest at a rate of 4% per annum compounded quarterly, paid

in kind in additional Tranche A Notes, until such time as the Oncor TSA Amendment is approved (the "PIK Interest").

Default Interest

During the continuance of an event of default (as defined in the DIP Documents), overdue amounts on the Tranche A Notes will bear interest at an additional 2% per annum.

Fees

If the Bankruptcy Court has not entered an order approving the Oncor TSA Amendment by the date that is one year from the Petition Date, the Issuers shall pay a one-time fee in the amount of 10.00% of the Tranche A Notes and Tranche B Notes, as applicable, to the Note Purchasers, paid in kind in additional Tranche A Notes and Tranche B Notes, as applicable (the "One-Time PIK Fee").

If the Second Lien DIP Facility is repaid in cash without the consent of the Required Note Purchasers and other than upon acceleration, the Issuers shall pay an optional prepayment fee of $380 million (which payment may be waived upon the written consent of the Required Note Purchasers (as defined below) in their sole discretion, *provided, however, that* the Required Note Purchasers may not waive the Prepayment Fee with respect to the Tranche A-3 Notes) (the "Prepayment Fee") to the Note Purchasers.

Notwithstanding anything to the contrary herein, the Fidelity Repayment (as defined in the Equity Conversion Term Sheet) shall not constitute a repayment in cash of the Second Lien DIP Facility.

Optional Prepayment

The Issuers may prepay the Second Lien DIP Notes subject to customary notice periods and payment of breakage costs and the Prepayment Fee (which payment may be waived upon the written consent of the Required Note Purchasers in their sole discretion, *provided, however, that* the Required Note Purchasers may not waive the Prepayment Fee with respect to the Tranche A-3 Notes). Notwithstanding anything to the contrary herein, the Fidelity Repayment (as defined in the Equity Conversion Term Sheet) shall not constitute an Optional Prepayment under the Second Lien DIP Facility and shall not result in the Prepayment Fee being due.

Mandatory Prepayments

The DIP Documents will contain mandatory prepayment provisions found in the EFIH First Lien DIP Financing; provided that, (a) notwithstanding anything to the contrary herein, the Second Lien DIP Notes shall not be mandatorily prepaid unless the EFIH First Lien DIP Financing is mandatorily prepaid first and in full and (b) application of mandatory prepayment amounts shall be subject to the

7

provisions of the Intercreditor Agreement.

Security and Priority

All amounts owing by the Issuers under the Second Lien DIP Facility and the obligations of the Guarantors in respect thereof will be secured, subject to (i) the Carve-Out (as defined in the commitment letter dated as of the date hereof with respect to the EFIH First Lien DIP Facility among EFIH, Deutsche Bank Securities Inc., as Left Lead DIP Facility Arranger (as defined therein), and the other financial institutions party thereto (the "EFIH First Lien DIP Commitment Letter")), (ii) the liens granted to secure the EFIH First Lien DIP Financing and other liens and encumbrances permitted by the DIP Documents and (iii) all valid, perfected, enforceable and unavoidable liens as of the Closing (the "Permitted Liens"), by a second priority perfected security interest in all assets owned by the Issuers that secures the EFIH First Lien DIP Financing, including, without limitation, distributions pursuant to the Oncor TSA so long as the Oncor TSA Amendment is in effect (the "Collateral").

The liens granted under the Second Lien DIP Facility will be junior only to the (i) the Carve-Out, (ii) the liens granted to secure the EFIH First Lien DIP Financing and other liens and encumbrances permitted by the DIP Documents and (iii) the Permitted Liens. The Issuers shall use commercially reasonable efforts to obtain the entry of an order providing that the liens under the Second Lien DIP Facility prime, and are in all respects senior to, any Allowed EFIH Second Lien Makewhole Claims of Non-Settling EFIH Second Lien Note Holders.

In the Chapter 11 Cases, the Note Purchasers will be granted in the DIP Order (as defined below) a superpriority administrative claim under section 364(c)(1) of the Bankruptcy Code for the payment of the obligations under the Second Lien DIP Facility with priority above all other administrative claims, subject to the Carve-Out and the liens granted under the EFIH First Lien DIP Financing.

The Second Lien DIP Facility will be subject to an intercreditor agreement, which includes, among other things, customary payment block and standstill provisions (the "Intercreditor Agreement"), in form and substance reasonably acceptable to the lenders under the EFIH First Lien DIP Financing, the Issuers, and the Note Purchasers.

Conditions Precedent to the Closing

The closing date (the "Closing") under the Second Lien DIP Facility shall be subject to satisfaction (or waiver) of the

8

following conditions:

A.  The DIP Documents shall be in form and substance consistent with this Term Sheet and otherwise reasonably satisfactory to the Required Commitment Parties, the Administrative Agent, the Issuers and each of their counsel.

B.  The Chapter 11 Cases shall have been commenced by the Issuers and the Guarantors and the same shall each be a debtor and a debtor in possession.

C.  The Restructuring Support Agreement shall be in full force and effect and the Issuers shall be in compliance with the Restructuring Support Agreement in all material respects as of the Closing.

D.  Substantially concurrently with the Closing, the DIP Documents shall have been delivered, all applicable fees and expenses shall have been paid, and all applicable liens shall have been perfected.

E.  Substantially concurrently with the Closing, proceeds of the EFIH First Lien DIP Financing, which shall be on the terms set forth in the Restructuring Support Agreement and the aggregate principal amount under the EFIH First Lien DIP Financing shall not exceed $5,400,000,000 (with such changes that are not materially adverse to the Note Purchasers) shall have been used (together with cash on hand) to (i) repay in full all outstanding principal plus accrued and unpaid interest at the non-default rate due and owing under the EFIH First Lien Notes (which shall not include any alleged premiums, fees or claims relating to the repayment of such Claims) to Non-Settling EFIH First Lien Note Holders and (ii) repay the EFIH First Lien Notes held by Settling EFIH First Lien Noteholders in accordance with the EFIH First Lien Settlement.

F.  Substantially concurrently with the Closing, the Second Lien Refinancing shall have been consummated.

G.  The Administrative Agent shall have received a signed copy of an order of the Bankruptcy Court in form and substance satisfactory to the Required Commitment Parties and the Issuers (the "DIP Order"), authorizing and approving the issuance of the Second Lien DIP Notes and the granting of the superpriority claims and liens and other liens referred to above under the heading "Security and Priority", which DIP Order shall not have been vacated, reversed, modified, amended or stayed, in a manner

9

adverse to the Note Purchasers, without the consent of the Required Commitment Parties.

H. The Issuers shall have complied in all material respects with the terms and conditions of the Second Lien DIP Procedures, and the Participation Rights shall have been allocated in accordance with the Second Lien DIP Procedures.

I. No default (or any event which with the giving of notice or lapse of time or both would be a default) under the EFIH First Lien DIP Financing is then existing, after giving effect to applicable grace periods or waivers, which would permit the counterparty thereto to exercise remedies thereunder on a post-petition basis.

J. The Administrative Agent shall have received a customary opinion of counsel to the Issuers.

K. There shall not have occurred any circumstance or conditions affecting the business, assets, operations, properties or financial condition of the Issuers and their subsidiaries taken as a whole, that would individually or in the aggregate, materially adversely affect the ability of the Issuers (taken as a whole) to perform their payment obligations under the DIP Documents to which they are a party, or the rights and remedies of the Agent and the Note Purchasers under the DIP Documents (other than, in each case, as a result of the events leading up to, and following commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the continuation and prosecution thereof, including circumstances or conditions resulting from, or incidental to, such events, commencement, continuation and prosecution, which shall not individually or in the aggregate constitute a Material Adverse Event), and *provided* that nothing disclosed in any of the following filings by EFIH and/or EFH (1) the Annual Report on Form 10-K for the year ended December 31, 2013, as filed on the date of the Commitment Letter (to the extent substantially the same in form and substance as the version provided to the advisors of the Initial Commitment Parties prior to the date of the Commitment Letter), (2) any filings on Form 8-K made through the date of the Commitment Letter and/or (3) any disclosure statement related to any plan of reorganization or liquidation of the Issuers provided to the Commitment Parties on or prior to the date of the Commitment Letter, shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein) be a

10

|   |   |
|---|---|
|   | Material Adverse Event (any of the foregoing being a "Material Adverse Event"). |
|   | L.  Any and all governmental consents and approvals necessary in connection with the Second Lien DIP Facility shall have been obtained and shall remain in effect. |
|   | M.  To the extent requested at least 5 business days prior to Closing, each Note Purchaser who has requested the same shall have received "know your customer" and similar information. |
|   | The Note Purchasers shall have a valid and perfected second priority lien on and security interest in the Collateral pursuant to the DIP Order. |
|   | N.  (i) There shall exist no default under the DIP Documents, (ii) the representations and warranties of the Issuers and each Guarantor therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding and (iii) the issuance of the Second Lien DIP Notes shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently. |
| Representations and Warranties | The DIP Documents will contain representations and warranties consistent with those found in the First Lien DIP Facility and shall include representations and warranties with respect to: valid existence, compliance with law, requisite power, due authorization, approvals, no conflict with material postpetition agreements (to the extent enforceable post-petition) or applicable law, enforceability of the DIP Documents, ownership of subsidiaries and property, material accuracy of financial statements and certain other written information provided, litigation, absence of Material Adverse Event, taxes, margin regulations, no default under the DIP Documents, inapplicability of Investment Company Act, use of proceeds, insurance, labor matters, ERISA, environmental matters, security interests, necessary rights to intellectual property and ownership of properties, DIP Order, sanctioned persons, anti-corruption laws and Patriot Act. |

11

**PX 095**
**Page 426 of 464**

| | |
|---|---|
| <u>Affirmative Covenants</u> | The DIP Documents will contain affirmative covenants consistent with those found in the EFIH First Lien DIP Financing (subject to the principles set forth in "DIP Documents" above) and shall include affirmative covenants with respect to: |

A.  Preservation of corporate existence.

B.  Compliance with applicable laws (including ERISA and environmental laws).

C.  Conduct of business.

D.  Payment of taxes.

E.  Maintenance of insurance.

F.  Access to books and records and visitation rights.

G.  Maintenance of books and records.

H.  Maintenance of properties.

I.  Use of proceeds.

J.  Provision of additional collateral and mortgages.

K.  Delivery of certain reports and information.

L.  Transactions with affiliates.

M.  Certain bankruptcy matters.

N.  Limitations on changes to fiscal year.

O.  Further assurances.

| | |
|---|---|
| <u>Negative Covenants</u> | The DIP Documents will contain negative covenants consistent with those found in the EFIH First Lien DIP Financing (subject to the principles set forth in "DIP Documents" above), which include negative covenants with respect to: |

A.  Limitations on debt and guarantees.

B.  Limitations on liens.

12

    C.  Limitations on loans and investments.

    D.  Limitations on asset dispositions, including, without limitation, the issuance and sale of capital stock of subsidiaries; *provided that*, no sales, dispositions, or other transfers of equity interests in Oncor Electric Delivery Holdings Company LLC shall be permitted.

    E.  Limitations on dividends, redemptions and repurchases with respect to capital stock.

    F.  Limitations on cancellation of debt and on prepayments, redemptions and repurchases of pre-petition debt, except as expressly provided for in the DIP Documents or pursuant to "first day" or other orders entered by the Bankruptcy Court.

    G.  Limitations on fundamental changes.

    H.  Limitations on material changes in business.

    I.  Limitation on certain affiliate value transfers.

    J.  Limitations on sale/leasebacks.

    K.  Limitations on amendment of constituent documents except for modifications that could not reasonably be expected to materially and adversely affect the interests of the Note Purchasers.

    L.  Limitation on amending, modifying, or terminating the Oncor TSA Amendment, to the extent such agreement is effective without consent of the Required Note Purchasers.

    M.  Certain other bankruptcy matters.

**Financial Covenants**

The DIP Documents will contain financial covenants consistent with those found in the EFIH First Lien DIP Financing, subject to a 15% cushion.

**Reporting Requirements**

The DIP Documents will contain reporting requirements consistent with those found in the EFIH First Lien DIP Financing.

**Events of Default**

The DIP Documents will contain events of default consistent with those found in the EFIH First Lien DIP Financing (which will be applicable to the Issuers, the Gurantors, and their respective restricted subsidiaries), which (subject, where appropriate, to grace periods and exceptions consistent with

13

those in the EFIH First Lien DIP Financing and to the principles set forth in "DIP Documents" above) shall include events of default with respect to:

A. Failure to pay principal, interest or any other amount when due.

B. Representations and warranties incorrect in any material respect when given.

C. Failure to comply with covenants (with grace period as appropriate).

D. Cross-acceleration against post-petition indebtedness in excess of an amount to be mutually agreed upon.

E. Failure to satisfy or stay execution of final postpetition judgments in excess of an amount to be mutually agreed upon.

F. The occurrence of certain ERISA events that result in a Material Adverse Event.

G. Actual or asserted (by any Note Party or any affiliate thereof) invalidity or impairment of any DIP Document (including the failure of any lien to remain perfected).

H. Change of ownership or control.

I. (a) The entry of an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code,

(b) the entry of an order appointing a chapter 11 trustee in any of the Chapter 11 Cases;

(c) the entry of an order staying, reversing, vacating or otherwise modifying, in each case in a manner materially adverse to the Administrative Agent or the Note Purchasers, without the prior consent of the Commitment Parties, the Second Lien DIP Facility or the DIP Order;

(d) the entry of an order in any of the Chapter 11 Cases appointing an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code);

(e) the entry of an order in any of the Chapter 11 Cases denying or terminating use of cash collateral by the Issuers and such order has not be stayed or superseded by an order

14

granting use of cash collateral;

(f) the filing of any pleading by any Note Party seeking, or otherwise consenting to, any of the matters set forth in clauses (a) through (e) above;

(g) the entry of a final non-appealable order in the Chapter 11 Cases charging any of the Collateral under section 506(c) of the Bankruptcy Code against the Note Purchasers or the commencement of other actions that is materially adverse to the Administrative Agent, the Note Purchasers or their respective rights and remedies under the Second Lien DIP Facility in any of the Chapter 11 Cases or inconsistent with the DIP Documents;

(h) the entry of an order granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed against any material assets of the Issuers in excess of an amount to be mutually agreed upon in the aggregate;

(i) existence of any claims or charges, other than in respect of the Carve-Out, the EFIH First Lien DIP Financing or Second Lien DIP Facility or as otherwise permitted under the DIP Documents, entitled to superpriority under Section 364(c)(1) of the Bankruptcy Code *pari passu* or senior to the Second Lien DIP Facility; and

(j) the Note Parties or any of their subsidiaries, or any person claiming by or through the Note Parties any of their subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent or any of the Note Purchasers relating to the Second Lien DIP Facility.

(k) a plan shall be filed or confirmed in any of the Chapter 11 Cases that does not provide for either (i) the indefeasible payment in full in cash of the obligations (other than indemnities and other contingent obligations not then due and payable) on the effective date of such plan or (ii) conversion to Conversion Shares on terms pursuant to the Equity Conversion.

| Expenses and Indemnification | The Issuers will indemnify the Administrative Agent, the Commitment Parties, the Note Purchasers, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "Indemnified Person") and |

15

hold them harmless from and against all costs, expenses (in the case of legal counsel, limited to reasonable and documented fees, disbursements and other charges) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Issuers or any of its affiliates) that relates to the Second Lien DIP Facility or the transactions contemplated thereby; provided that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted from its or its related parties' gross negligence, willful misconduct or bad-faith. The Issuer shall reimburse the Administrative Agent for their reasonable and documented out-of-pocket expenses incurred in connection with the negotiation, documentation, syndication and administration of the Second Lien DIP Facility, any amendments or waivers with respect thereto, any Event of Default in respect of the Second Lien DIP Facility and any exercise of remedies in respect thereof (including reasonable and documented out-of-pocket prepetition and post-petition fees, charges and disbursements of legal counsel, financial advisors and third-party appraisers and consultants advising the Administrative Agent incurred in connection with the Agent's participation in the Chapter 11 Cases, limited in the case of legal counsel to one primary counsel (and (i) appropriate local counsel in applicable foreign and local jurisdictions, but limited to one local counsel in each such jurisdiction, (ii) appropriate regulatory counsel and (iii) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected indemnified persons similarly situated). The Issuer shall reimburse the reasonable and documented out-of-pocket expenses of (i) Akin Gump Strauss Hauer & Feld LLP, (ii) Cousins, Chipman & Brown LLP, (iii) Ernst & Young LLP, (iv) Leidos, Inc., (v) Centerview Partners LLC, and (vi) such other advisors retained by the Required Commitment Parties, including any regulatory counsel, during these cases (collectively, the "Commitment Party Professionals") incurred in connection with the negotiation, documentation, syndication and administration of the Second Lien DIP Facility, any amendments or waivers with respect thereto, any Event of Default in respect of the Second Lien DIP Facility and any exercise of remedies in respect thereof (including reasonable and documented out-of-pocket prepetition and post-petition fees, charges and disbursements of Commitment Party Professionals incurred in connection with the Note

16

Purchasers' participation in the Chapter 11 Cases).

| | |
|---|---|
| <u>Required Note Purchasers</u> | Note Purchasers managed and/or advised by three or more investment advisors holding at least 50.1% of the outstanding commitments and/or exposure under the Second Lien DIP Facility (the "<u>Required Note Purchasers</u>"). |
| <u>Amendments</u> | Required Note Purchasers, except for provisions customarily requiring approval by all directly and adversely affected Note Purchasers or all Note Purchasers, including the reduction of any portion of the principal amount of the Second Lien DIP Notes, the reduction of the interest rate (other than as a result of a default, events of default, or default interest) or the extension of the final maturity date, *provided, however*, that the Required Note Purchasers may waive the Prepayment Fee, *provided further, however, that* the Required Note Purchasers may not waive the Prepayment Fee with respect to the Tranche A-3 Notes. |
| <u>Miscellaneous</u> | The DIP Documents will include (i) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes (subject to customary qualifications)), (ii) waivers of consequential damages and jury trial, (iii) customary agency, set-off and sharing language and (iv) customary replacement of lender provisions. |
| <u>Governing Law and Submission to Non-Exclusive Jurisdiction</u> | State of New York. |
| <u>Counsel to Commitment Parties and Certain Note Purchasers</u> | Akin Gump Strauss Hauer & Feld LLP. |
| <u>Counsel to Administrative Agent</u> | To be determined by Administrative Agent |

17

**EXHIBIT I**

**CLOSING CONDITIONS**

**Annex I**

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC AND EFIH FINANCE, INC.**

SUMMARY OF CONDITIONS PRECEDENT TO THE DIP FACILITY

1.   Final Order/Bankruptcy Matters.

   (a)   No later than the date that is one hundred and ten (110) days after the date of the Commitment Letter, a final order shall have been entered by the Bankruptcy Court in form and substance satisfactory to PIMCO (which shall in any case approve (i) the entirety of the Term Facility and the repayment and/or settlement (including via an exchange) in full of the principal amount plus any accrued and unpaid interest of the EFIH First Lien Secured Notes with the proceeds of the Term Loans and Incremental Term Loans and (ii) consistent with this Term Sheet, the payment of fees to PIMCO set forth in the section titled "EFIH First Lien Settlement" and the reimbursement of documented expenses of PIMCO (including fees, charges and disbursements of counsel)) (the "**Final Order**") on a motion by the Debtors that is in form and substance satisfactory to PIMCO, approving and authorizing on a final basis the matters and containing the other provisions described in this Section 1.

   (b)   The Final Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, that is adverse to PIMCO, without the consent of PIMCO.

   (c)   The Final Order shall be in full force and effect.

   (d)   The Debtors shall be in compliance in all material respects with the Final Order.

   (e)   The Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Cases or shortly thereafter shall have been reviewed in advance by PIMCO.

   (f)   No trustee or examiner with enlarged powers (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the operations or the business of the Debtors.

2.   Performance of Obligations.

   (a)   All invoiced costs, fees, expenses (including, without limitation, reasonable legal fees) and other compensation contemplated by the Loan Documents and this Term Sheet to be payable to PIMCO in respect of the DIP Facility shall have been paid to the extent earned, due and payable.

   (b)   Representations and warranties of the Debtors shall be true and correct in all material respects (or in all respects for representations and warranties qualified by materiality or Material Adverse Event).

   (c)   No Default or Event of Default shall exist under the DIP Facility.

3.    <u>Customary Closing Documents.</u>

    (a)    The Debtors shall have complied with the following closing conditions in a manner satisfactory to the Administrative Agent: (i) the delivery of customary legal opinions as to authority, authorization, execution and delivery; corporate records and documents from public officials, including good standing certificates; officer's certificates; and notice of borrowing; (ii) evidence of authority; and (iii) obtaining of any governmental consents, if any, necessary in connection with the DIP Facility, the financing thereunder and related transactions. PIMCO shall have received at least five (5) days prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable **"know-your-customer"** and anti-money laundering rules and regulations, including the Patriot Act.

    (b)    The Loan Documents (which shall be consistent with the Documentation Principles and this Term Sheet) shall have been entered into by the Debtors, the Agent and the Lenders.

    (c)    As a result of the extension of such credit, usage of the DIP Financing shall not exceed the aggregate amount authorized by the Final Order.

4.    <u>Other Conditions.</u>

    (a)    If the Final Order (or any order entered concurrently or prior to the entry of the Final Order) approves the repayment in full of the EFIH First Lien Secured Notes with the proceeds of the Term Facility, substantially concurrently with the borrowing under the Term Facility, the principal amount plus any accrued and unpaid interest of the EFIH First Lien Secured Notes (which, for the avoidance of doubt, shall not include make-whole payments or premiums in respect of the EFIH First Lien Secured Notes unless otherwise approved by the Borrower) shall be repaid in full.

    (b)    The Restructuring Support Agreement shall be in full force and effect and the Debtors shall be in compliance with the Restructuring Support Agreement in all material respects as of the Closing Date.

2

## EXHIBIT J

### EQUITY CONVERSION TERM SHEET

**PX 095**
**Page 436 of 464**

*Execution Version*

## ENERGY FUTURE HOLDINGS CORP.

EQUITY CONVERSION TERM SHEET

*Capitalized terms used but not defined herein shall have the meanings set forth in the letter agreement, dated as of April 28, 2014 (the "Commitment Letter"), to which this Equity Conversion Term Sheet is attached, or the Restructuring Support Agreement (as defined in the Commitment Letter).*

| | |
|---|---|
| Issuer | Reorganized Energy Future Holdings Corp. ("Reorganized EFH"). |
| Summary of Equity Conversion | The newly issued common stock of Reorganized EFH shall consist of 100 million shares prior to the Equity Conversion and the issuance of shares under the Reorganized EFH/EFIH Management Incentive Plan (if any). In the Equity Conversion, the Second Lien DIP Notes shall be mandatorily converted to 177,658,788 Conversion Shares plus an additional 89,052 Conversion Shares for each million dollars of EFIH Second Lien DIP Financing in excess of $1,995 million, and less 89,052 shares of Conversion Shares for each million dollars of EFIH Second Lien DIP Financing of less than $1,995 million outstanding on the Effective Date, including on account of the Equity Conversion Fee, on the terms set forth herein (the "Equity Conversion"). Holders of General Unsecured Claims Against EFH other than Fidelity may elect to participate in their Pro Rata share (with all Holders of General Unsecured Claims Against EFH) of up to 9% of the Equity Conversion (such Holders, the "Equity Conversion Participants") provided that such Holders of General Unsecured Claims may only participate in the Equity Conversion by purchasing Tranche A-3 Notes held by Fidelity or any direct or indirect transferee thereof, if the Required Transfer (as defined in the Second Lien DIP Notes Term Sheet) has not occurred. Such Holders shall fund such share in cash, the proceeds of which shall be used by EFIH to repay in cash Tranche A-3 Notes, Pro Rata, in respect of such share, simultaneously with the Equity Conversion (the "Fidelity Repayment"); *provided, further*, that the stated plan value of the Conversion Shares shall be at least equal to the adjusted issue price of the EFIH Second Lien DIP Financing; *provided, however*, that, for the avoidance of doubt, this is a negotiated plan value solely for purposes of the deal embodied in this Term Sheet and the Restructuring Support Agreement and shall not be binding upon any party to the extent the Plan is not confirmed and consummated. The number of Conversion Shares issued pursuant to the Equity Conversion shall be adjusted to the extent that Reorganized EFIH Equity Interests, or a combination of Reorganized EFH Common Stock and Reorganized EFIH Equity Interests are issued pursuant to the Equity Conversion. |
| Parties | The parties entitled to participate in the Equity Conversion shall be |

104901095

limited to the Note Purchasers under the Second Lien DIP Facility and the Equity Conversion Participants (the "Conversion Parties").

**Conversion Agreement**

The parties acknowledge and agree that this Equity Conversion Term Sheet does not include all of the conditions, covenants, closing conditions, representations, warranties and other terms that would be contained in definitive documents for transactions of this type. As such, the Commitment Parties and EFH shall no later than 30 days after the date of execution of the Commitment Letter, enter into a conversion agreement (the "Conversion Agreement") containing the terms and conditions set forth in this Equity Conversion Term Sheet, the Commitment Letter and other customary terms and conditions for transactions of this type, and which must be consistent with the Restructuring Support Agreement and reasonably satisfactory to at least three (3) investment advisors that manage and/or advise funds or accounts that beneficially own, collectively, at least 66.6% of the EFIH Unsecured Note Claims held by all Consenting Creditors (the "Required EFIH Unsecured Consenting Creditors") and EFH, which Conversion Agreement shall be incorporated by reference into the Note Purchase Agreement or shall be attached as an exhibit thereto.

**Organizational Documents**

Corporate governance for Reorganized EFH and Reorganized EFIH, including charters, bylaws, operating agreements, or other organization documents, as applicable (the "Organizational Documents"), shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable) and the Tax Matters Agreement, shall be determined by the Required EFIH Unsecured Consenting Creditors in consultation with (i) EFH, (ii) EFIH, and, (iii) as appropriate, with other Holders of EFIH Second Lien DIP Claims or EFIH Unsecured Note Claims that upon the Effective Date will receive greater than 15% of the Reorganized EFH Common Stock.

**Registration Rights**

Reorganized EFH and any Conversion Parties that will constitute affiliates of Reorganized EFH under the Securities Act of 1933 after the Effective Date will enter into a registration rights agreement (the "Registration Rights Agreement"), which shall contain such terms and conditions reasonably satisfactory to the Required EFIH Unsecured Consenting Creditors and as necessary to comply with the terms of the Private Letter Ruling and provide for registration rights, including demand, piggyback and shelf registration rights, with the number of long form demand registration rights to be determined by the Required EFIH Unsecured Consenting Creditors.

**Transferability of Converted Shares**

The Conversion Shares will be transferable, subject to compliance with applicable securities laws (including the Securities Act of 1933, as amended) and the terms of the Private Letter Ruling.

2

| | |
|---|---|
| Representations and Warranties: | The Conversion Agreement shall contain customary representations and warranties of EFH and the Commitment Parties for transactions of this type, consistent with the Second Lien DIP Facility. |
| Covenants | The Conversion Agreement will contain covenants of EFH and EFIH, as provided by, consistent with, and subject to the Restructuring Support Agreement. |
| Conditions Precedent to Closing | The Equity Conversion will be conditioned upon satisfaction of terms and conditions in the Conversion Agreement, as provided by, consistent with, and subject to the Restructuring Support Agreement, including, without limitation, the following: |

- The Restructuring Support Agreement shall be in full force and effect as of the closing of the Equity Conversion and shall not have been amended or modified without the prior consent of the Required EFIH Unsecured Consenting Creditors in violation of the terms of the Restructuring Support Agreement;

- The Bankruptcy Court shall have entered the Disclosure Statement Order, and such order shall be in full force and effect and not subject to a stay;

- The Bankruptcy Court shall have entered the Confirmation Order, and such order shall be in full force and effect and not subject to a stay;

- The Registration Rights Agreement shall be in form and substance reasonably satisfactory to the Required EFIH Unsecured Consenting Creditors;

- Any and all governmental and third party consents and approvals necessary in connection with the Equity Conversion and the Plan Restructuring Documents shall have been obtained and shall remain in effect;

- The Private Letter Ruling shall have been obtained from the IRS;

- The Plan shall have become, or simultaneously with the issuance of the New Reorganized EFH Stock will become, effective;

- The covenants to be performed by EFH and EFIH in the Conversion Agreement shall have been performed and complied with in all material respects on the closing date of the Equity Conversion; and

- There shall not have been a continuing default (or any event which

3

|  | with the giving of notice or lapse of time or both would be a default) under the Second Lien DIP Facility. |
|---|---|
| Termination of Equity Conversion | All of the obligations of the Commitment Parties, Conversion Parties, EFH, and EFIH shall be of no further force or effect, upon the giving of written notice of termination by the Required EFIH Unsecured Consenting Creditors, in the event of: |

- a termination of the Restructuring Support Agreement by any party thereto, or the Commitment Letter; or

- an event of default, cancellation and/or acceleration of the Second Lien DIP Facility.

Indemnification    EFH and EFIH shall, jointly and severally, indemnify and hold harmless each Conversion Party not indemnified under the Commitment Letter, and their respective affiliates, shareholders, members, partners, and other equity holders, general partners, managers and its and their respective Representatives, agents and controlling persons (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities, and costs and expenses that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with the Plan, the Plan Restructuring Documents, the Equity Conversion, or any matter relating to the foregoing.

Amendments    Amendments to the Conversion Agreement will require the consent of the ; provided that, amendments relating to allocation percentages, fees, or otherwise disproportionately and materially adversely affecting a Conversion Party, shall require the consent such Conversion Party.

4

**PX 095**
**Page 440 of 464**

**EXHIBIT K**

**SUMMARY OF KEY REPRESENTATIONS**

**Energy Future Holdings Corp.**
**Summary of Key Representations For Ruling Request Under IRC §§ 368(a)(1)(G) and 355**

The ruling request expected to be filed by EFH with respect to its distribution of Spinco to the TCEH first lien creditors will include the representations set forth herein and any other representations reasonably acceptable to the TCEH Creditors and required for rulings for reorganizations under Section 368(a)(1)(G) and distributions under Section 355. Probably the most significant representation is that EFH and Spinco have actively conducted their respective businesses (regulated and competitive) for the past five years and will continue to actively conduct their respective businesses after the reorganization. Indeed, the Tax Matters Agreement will prohibit EFH and Spinco from ceasing to actively conduct their respective businesses after the reorganization.

The ruling request may include over 50 representations in total. The following is a summary of certain key representations:

1.  EFH, EFIH, TCEH and Spinco will be under the jurisdiction of the court in a Title 11 case and the G reorganization and the distribution of Spinco will occur pursuant to the bankruptcy plan in such cases.
2.  The Spinco stock and other consideration distributed by EFH will be received by the TCEH creditors in their capacity as holders of interests in EFH.
3.  The EFH group has actively conducted both the regulated and competitive businesses for the last five years, and EFH and Spinco will continue to actively conduct their respective businesses after the reorganization.
4.  The reorganization will be carried out for the purpose of restructuring the debt of the EFH group and is motivated in whole or substantial part by such purpose.
5.  After the reorganization, no person will own (i) 50% or more of EFH stock that was acquired by "purchase" within the last five years, or (ii) 50% or more of Spinco stock that was received in the distribution with respect to EFH stock or securities that was acquired by "purchase" within the last five years.
6.  The aggregate fair market value of the assets transferred to Spinco will exceed their aggregate tax basis.
7.  The aggregate fair market value of the assets transferred to Spinco will exceed the liabilities of Spinco at the time of the reorganization.
8.  Except for the Spinco securities issued in connection with the reorganization, the liabilities assumed by Spinco in the reorganization were incurred in the ordinary course of business.
9.  There will be no debt between EFH and Spinco at the time of, or subsequent to, the reorganization (except for debt incurred in the ordinary course of business).
10. Except for an elimination or reduction of intercompany balances in connection with the reorganization, EFH will neither accumulate its receivables nor make any extraordinary payment of its payables in anticipation of the reorganization.
11. Any transactions between EFH and Spinco after the reorganization will be on arm's length terms.
12. Neither EFH nor Spinco are an "investment company" under the Internal Revenue Code.
13. All of the parties will pay their own expenses incurred in connection with the reorganization.

**EXHIBIT B to**
**the Restructuring Support and Lock-Up Agreement**

**Notes Claims**

As used herein, the defined term "**Notes Claims**" collectively refers to any and all obligations of the Debtors arising under any of the following:

    i.    the 15% senior secured second lien notes due April 1, 2021 (the "**TCEH Second Lien Notes**") issued by TCEH and TCEH Finance, Inc. pursuant to an Indenture (as amended, restated, supplemented, or otherwise modified from time to time), dated as of October 6, 2010, by and among TCEH and TCEH Finance, as the issuers; EFCH and certain of the TCEH Subsidiaries, as guarantors; and Wilmington Savings Fund Society, FSB, as successor trustee to BNY (together with all Claims arising in connection with the TCEH Second Lien Notes, the "**TCEH Second Lien Note Claims**");

    ii.    the 10.25% senior notes due November 1, 2015 (the "**TCEH 2015 Notes**") issued by TCEH and TCEH Finance, Inc. pursuant to an Indenture (as amended, restated, supplemented, or otherwise modified from time to time), dated as of October 31, 2007, by and among TCEH and TCEH Finance, as the issuers; EFCH and certain TCEH Subsidiaries, as guarantors; and Law Debenture Trust Company of New York, as successor trustee to BNY (together with all Claims arising in connection with the TCEH 2015 Notes, the "**TCEH 2015 Note Claims**"); and

    iii.    the 10.50%/11.25% unsecured toggle notes due November 1, 2016 (the "**TCEH Senior Toggle Notes**" and, together with the TCEH 2015 Notes, the "**TCEH Unsecured Notes**") issued by TCEH and TCEH Finance pursuant to an Indenture, dated as of December 6, 2007, by and among TCEH and TCEH Finance, as the issuers; EFCH and certain of the TCEH Subsidiaries, as guarantors; and Law Debenture Trust Company of New York, as successor trustee to BNY (together with all Claims arising in connection with the TCEH Senior Toggle Notes, the "**TCEH Senior Toggle Note Claims**").

**EXHIBIT C** to
the Restructuring Support and Lock-Up Agreement

Commitment Letter

*Execution Version*

PRIVILEGED AND CONFIDENTIAL

April 28, 2014

Energy Future Holdings Corp.
Energy Future Intermediate Holdings Company LLC
Energy Plaza
1601 Bryan Street
Dallas, TX  75201

     Re:    Investment Commitment

Ladies and Gentlemen:

     Reference is made to the Restructuring Support and Lock-Up Agreement, dated as of April 28, 2014 (the "Restructuring Support Agreement"), by and among Energy Future Holdings Corp. ("EFH"), Energy Future Intermediate Holding Company LLC ("EFIH"), and certain of their affiliates (collectively, the "Debtors"), the other parties thereto, and parties listed on the signature pages hereto (the "Initial Commitment Parties"), and the term sheets and other documents attached to the Restructuring Support Agreement, pursuant to which EFH and EFIH intend to engage in a restructuring of their existing liabilities in accordance with the Bankruptcy Code (the "Restructuring"). Capitalized terms used in this letter agreement and not otherwise defined herein shall have the meanings provided in the Restructuring Support Agreement or the Restructuring Term Sheet attached thereto (subject to Section 2 of the Restructuring Support Agreement).

     The Restructuring contemplates, among other things, that the Commitment Parties and the Selected Partners, if any (as defined below), will, severally and not jointly, backstop a second lien subordinated secured debtor-in-possession note facility in accordance with the terms of the Second Lien DIP Notes Term Sheet (as defined below) (the "Second Lien DIP Facility") that consists of (a) non-amortizing notes in an amount up to $1,900,000,000 (the "Tranche A Notes") and (b) non-amortizing, non-interest-bearing notes issued in full satisfaction of the Funding PIK Fee (as defined below) (the "Tranche B Notes" and, together with the Tranche A Notes, the "Second Lien DIP Notes"). The Debtors will offer the right to purchase the Tranche A Notes to (i) Holders of General Unsecured Claims Against the EFIH Debtors (such Tranche A Notes, the "Tranche A-1 Notes"), subject to ratable reduction from participation by Selected Partners (as defined below), if any, in an aggregate amount not to exceed $400,000,000 and (ii) General Unsecured Claims Against EFH held by Fidelity (such Tranche A Notes, the "Tranche A-3 Notes"), subject to the conditions set forth in the Restructuring Support Agreement and the term sheet attached hereto as Exhibit A (the "Second Lien DIP Notes Term Sheet") .

     Upon the Effective Date, the Second Lien DIP Notes shall be subject to conversion to Reorganized EFH Common Stock (the "Equity Conversion"), on the terms set forth in the Restructuring Support Agreement, the term sheet attached hereto as Exhibit B (the "Equity

Conversion Term Sheet"), and the Conversion Agreement (as defined in the Equity Conversion Term Sheet).

To provide assurances that the issuance of the Second Lien DIP Notes will be consummated, the Initial Commitment Parties hereby, severally and not jointly, commit to backstop the Second Lien DIP Notes in the respective percentages set forth on Schedule I hereto, on the terms and conditions described herein (including in the Second Lien DIP Notes Term Sheet and the Equity Conversion Term Sheet) and the Restructuring Support Agreement; *provided, however,* that the aggregate amount of such backstop shall not exceed $1.9 billion ($1,900,000,000) (the "Investment Commitment"). The Required Commitment Parties (as defined below) may from time to time (in their sole discretion), up to the date of funding of the Second Lien DIP Facility, select certain partners to transfer the Participation Rights to or to participate in the Investment Commitment in an aggregate amount not to exceed $400,000,000 of the aggregate Investment Commitment, in each case on prior written consent of EFH and EFIH unless such party is included on Schedule III hereto (the "Selected Partners"); and any such inclusion of Selected Partners by the Required Commitment Parties shall ratably reduce each Commitment Party's portion of the Investment Commitment; *provided, however,* that such Selected Partner shall execute a joinder to this letter agreement, the Restructuring Support Agreement (in accordance with Section 4.04 thereof), and any applicable definitive document for the Second Lien DIP Notes; *provided, further,* that if a proposed transfer to a Selected Partner were to cause a Commitment Party to transfer more than 50% of its portion of the Investment Commitment (when taken in the aggregate with all other transfers of such Commitment Party's portion of the Investment Commitment in accordance with the below), then the Required Commitment Parties may choose to (x) reduce the amount of the Investment Commitment to be transferred to the Selected Partner to an amount in which such Commitment Party would no longer be transferring 50% (in the aggregate) of its portion of the Investment Commitment or (y) cancel the contemplated transfer of the Investment Commitment. In addition, an Initial Commitment Party may in its sole discretion select a Selected Partner, or other party otherwise consented to by EFH and EFIH (the "Transferee Commitment Parties") to purchase all or a portion of an Initial Commitment Party's portion of the Investment Commitment; *provided, that,* with respect to an affiliate Transferee Commitment Party, the transferring Initial Commitment Party's obligations with respect to the transferred portion of the Investment Commitment shall remain; *provided, further,* all Transferee Commitment Parties shall execute a joinder to this letter agreement, the Restructuring Support Agreement (in accordance with Section 4.04 thereof), and any applicable definitive document for the Second Lien DIP Notes; *provided, further,* if such transfer were to cause such Initial Commitment Party to transfer more than 50% of its portion of the Investment Commitment (when taken in the aggregate with all other transfers of its portion of the Investment Commitment by such Initial Commitment Party), such proposed transfer shall be deemed null and void *ab initio.* Subject to the foregoing, following any such sale or transfer by an Initial Commitment Party of all or a portion of its Investment Commitment, such Initial Commitment Party's obligations with respect to such sold or transferred Investment Commitment shall cease. No Commitment Party other than an Initial Commitment Party shall be permitted to transfer any portion of the Investment Commitment. For purposes of this letter agreement, (i) the term "Commitment Party" shall mean, collectively, the Initial Commitment Parties, the Selected Partners, and the Transferee Commitment Parties, and Schedule I hereto shall be updated accordingly to account for any additional Commitment Parties and (ii) the term

2

"Required Commitment Parties" shall mean, at any relevant time, three (3) Initial Commitment Parties (other than a Defaulting Commitment Party) that manage and/or advise funds or accounts that beneficially own, collectively, at least 66.6% of the Investment Commitment. Notwithstanding anything to the contrary contained herein, the identity of each Commitment Party shall be reasonably acceptable to the Borrowers.

In consideration for the Investment Commitment and on the terms set forth in this Commitment Letter and the Restructuring Support Agreement, EFIH shall (A) pay Pro Rata based on the respective percentages set forth on Schedule II hereto an amount in cash equal to 0.46% of $1.9 billion ($1,900,000,000) to the Initial Commitment Parties (the "Execution Fee"), which such Execution Fee shall be paid upon execution of this letter agreement, (B) subject to entry of the Approval Order, pay Pro Rata based on the respective percentages set forth on Schedule II hereto an amount in cash equal to 0.54% of $1.9 billion ($1,900,000,000) to the Initial Commitment Parties (the "Approval Fee"), which Approval Fee shall be paid within 5 days of entry of the Approval Order, (C) subject to entry of the Approval Order and the funding of the Second Lien DIP Facility, pay GSO and Avenue an arranger fee of $1,000,000 each in cash (the "Arranger Fees"), which Arranger Fees shall be paid within 5 days of entry of the Approval Order, (D) subject to entry of the Approval Order and the funding of the Second Lien DIP Facility, pay Pro Rata based on the respective percentages set forth on Schedule I hereto an amount in cash equal to 1.0% of $1.9 billion ($1,900,000,000) to the Commitment Parties (the "Funding Cash Fee"), which Funding Cash Fee shall become due and be paid in full by EFIH simultaneously with the funding of the Second Lien DIP Facility, and (D) issue Pro Rata based on the respective percentages set forth on Schedule I hereto an amount equal to 5.00% of $1.9 billion ($1,900,000,000) to the Commitment Parties in the form of Tranche B Notes (the "Funding PIK Fee" and, collectively with the Execution Fee, the Approval Fee, the Arranger Fees, and the Funding Cash Fee, the "Commitment Fee"), which Funding PIK Fee shall become due and be paid in full by EFIH simultaneously with the funding of the Second Lien DIP Facility. EFH and EFIH agree that the Commitment Fee and the Alternative Transaction Fee shall be nonrefundable once paid on the terms set forth in this letter agreement and that the Commitment Fee, the Alternative Transaction Fee and any other payments hereunder shall be paid without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim. For the avoidance of doubt, the Approval Fee, the Arranger Fee, and the Alternative Transaction Fee shall not be paid to any Defaulting Commitment Party.

If and to the extent that any one Commitment Party or multiple Commitment Parties do not satisfy its or their obligations in respect of its or their Pro Rata portion of the Investment Commitment (each such Commitment Party, a "Defaulting Commitment Party"), then each of the remaining non-defaulting Commitment Parties (the "Non-Defaulting Commitment Parties") shall have the right, but not the obligation (the "Default Purchase Right"), to assume all or a portion of the Investment Commitment that was to be funded by such Defaulting Commitment Party (the "Defaulted Investment Commitment"). To the extent that the Non-Defaulting Commitment Parties (in the aggregate) desire to assume more than the total amount of the Defaulted Investment Commitment, then such Defaulted Investment Commitment shall be allocated among the Non-Defaulting Commitment Parties electing to assume the Defaulted Investment Commitment Pro Rata based on the respective percentages set forth on Schedule I hereto; provided, however, that if a Non-Defaulting Commitment Party is a Selected Partner, then such Non-Defaulting Commitment Party may only assume such portion of the Defaulted

3

Investment Commitment so as not to exceed $400,000,000 of the Investment Commitment (calculated with all other Selected Partners). Each Defaulting Commitment Party shall immediately pay to each Non-Defaulting Commitment Party that elects to assume all or a portion of the Defaulted Investment Commitment, any portion of the Execution Fee, Approval Fee, and Arranger Fee received by such Defaulting Commitment Party, directly or indirectly, based on such Non-Defaulting Party's Pro Rata share of the Defaulted Investment Commitment so assumed by such Non-Defaulting Commitment Party. For purposes of the Commitment Percentages set forth on <u>Schedule I</u> hereto, the Commitment Percentage for each of the Non-Defaulting Commitment Parties electing to exercise the Default Purchase Right shall be adjusted accordingly to reflect the reallocation of the Defaulting Commitment Party's Commitment Percentage among the Non-Defaulting Committing Parties electing to exercise the Default Purchase Right (such that the total Commitment Percentage for the Non-Defaulting Commitment Parties shall equal 100%). In the event that the entire Defaulted Investment Commitment is not assumed by the Non-Defaulting Commitment Parties, the Required Commitment Parties may assign to a Selected Partner all or the remaining portion of the Defaulted Investment Commitment and following such assignment, <u>Schedule I</u> shall be accordingly adjusted as set forth in the immediately foregoing sentence.

Whether or not the transactions contemplated hereby are consummated, but subject to entry of the Approval Order, the Commitment Parties (other than any Defaulting Commitment Party and their respective affiliates and representatives, the "<u>Indemnified Parties</u>") shall be indemnified and held harmless by EFH and EFIH, on a joint and several basis, from and against any and all losses, claims, damages, liabilities and expenses as a result of a claim by a third party, which any such Indemnified Parties may incur, have asserted against it or be involved in as a result of or arising out of or in any way related to this letter agreement, the matters and transactions referred to herein, the proposed Investment Commitment contemplated hereby, the use of proceeds thereunder or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any of such Indemnified Parties is a party thereto, and to reimburse each of such indemnified persons for any legal or other expenses incurred in connection with any of the foregoing from the date of the execution of this letter agreement until the termination of this letter agreement (for the avoidance of doubt, any claim for indemnification made after termination of this letter agreement for any event arising prior to the termination of this letter agreement shall not thereafter be barred and all claims for indemnification hereunder shall survive until finally resolved); *provided, however,* that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from the bad faith or willful misconduct of such indemnified person (as determined by a court of competent jurisdiction in a final and non-appealable judgment). The terms set forth in this paragraph shall survive termination of this letter agreement. This letter agreement is not assignable (a) by either of EFH or EFIH, without the prior written consent of the Required Commitment Parties (and any purported assignment without such consent shall be null and void *ab initio*), or (b) by any of the Commitment Parties, except to (i) its affiliates, subject to the terms and conditions contained herein (provided that such Commitment Party shall remain liable hereunder) or a Transferee Commitment Party as set forth above and (ii) the Commitment Parties may assign all or a portion of the Commitment Parties' obligations hereunder to the Selected Partners as set forth above. This letter agreement is intended to be solely for the benefit of the parties hereto and is

4

not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto.

The obligations of the Commitment Parties to fund the Investment Commitment are conditioned upon satisfaction of, inter alia, each of the conditions set forth herein, in the Restructuring Support Agreement and in the Second Lien DIP Notes Term Sheet.

This letter agreement shall terminate upon the termination of the Restructuring Support Agreement. Subject to entry of the Approval Order, if EFIH enters into definitive documentation with respect to a reorganization, restructuring, merger, consolidation, share exchange, rights offering, equity investment, business combination, recapitalization or similar transaction (including the sale of all or substantially all of the assets of EFH, EFIH, or any other Debtor) involving EFIH on equal or better terms and conditions for EFIH than those contemplated in the Restructuring Support Agreement and the Term Sheet (such transaction, an "Alternative Transaction"), the Debtors shall pay Pro Rata based on the respective percentages set forth on Schedule II hereto, an amount in cash equal to 3.00% of $1.9 billion ($1,900,000,000) to the Initial Commitment Parties (the "Alternative Transaction Fee"), which Alternative Transaction Fee shall become due and be paid in full within 5 days Bankruptcy Court approval of such Alternative Transaction. For the avoidance of doubt, the Alternative Transaction Fee shall not become due or be payable if the Debtors consummate an Alternative Transaction because of the failure of the Commitment Parties to fulfil their obligations under the Investment Commitment.

All rights and remedies provided in this letter agreement are cumulative and not exclusive of any other rights or remedies that may be available to EFH, EFIH, and the Commitment Parties, including (without limitation) all rights to specific performance, or as otherwise provided by law, equity, statute, or in any other agreement entered into in connection with any of the transactions contemplated hereunder, including as to any Defaulting Commitment Party.

Upon execution of this letter agreement, EFH shall or shall cause EFIH to promptly pay (i) Akin Gump Strauss Hauer & Feld LLP, by wire transfer of immediately available funds, an advance payment of $3,000,000 (the "Akin Gump Advance Payment") and (ii) Centerview Partners LLC, by wire transfer of immediately available funds an advance payment of $675,000 (the "Centerview Advance Payment," and together with the Akin Gump Advance Payment, the "Advance Payment"). In accordance with the terms of that certain amended and restated engagement letter with EFIH dated April 27, 2014 (as may be amended or modified from time to time, the "Centerview Engagement Letter"), EFH shall or shall cause EFIH to promptly pay Centerview an aggregate arrangement payment of $5,000,000, which shall be paid as follows (x) $1,250,000 shall be paid upon the execution of this letter agreement (the "Arrangement Payment I"), (y) $1,250,000 shall be paid simultaneously be paid within 2 days of entry of the EFIH Second Lien DIP Order (the "Arrangement Payment II") and (z) $2,500,000 shall be paid simultaneously with the funding of the Second Lien DIP Notes (the "Arrangement Payment III," and together with the Arrangement Payment I and Arrangement Payment II, the "Arrangement Payment"). Upon entry of the Approval Order, EFH and EFIH agree to pay, within 15 business days of delivery of an invoice (which shall include reasonable supporting detail, which may be redacted to protect privileged or confidential information), the unpaid reasonable and

5

documented fees and expenses of Akin Gump Strauss Hauer & Feld LLP, pursuant to that certain engagement letter with EFIH dated May 24, 2013 (as may be amended or modified from time to time), Centerview Partners LLC, pursuant to the Centerview Engagement Letter and, without limitation, all other out-pocket fees, costs and expenses of the Commitment Parties, including the fees and expenses of the Commitment Party Professionals incurred previously or in the future relating to the Restructuring or the Chapter 11 Cases, pursuant to applicable engagement letters entered into between such professionals and EFH or EFIH, as applicable (such fees and expenses, the "Professional Fees").    Payment of the Advance Payment, the Arrangement Payment and Professional Fees shall not be subject to allowance by the Bankruptcy Court; *provided, however,* that EFH and EFIH shall promptly provide copies of invoices received on account of the Professional Fees to the U.S. Trustee and counsel to any Committee appointed in the Cases, and the Bankruptcy Court shall have exclusive jurisdiction over any objections raised to the invoiced amount of the Professional Fees, which objections may only be raised within 15 business days after delivery of an invoice(s) therefor. In the event that within 15 business days from delivery of such invoices EFH, EFIH, the U.S. Trustee, or counsel to the Committee raises an objection to a particular invoice, and the parties are unable to resolve such objection, the Court shall hear and determine such dispute; *provided that* payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final order of the Bankruptcy Court. EFH and EFIH agree that the Advance Payment, Arrangement Payment and Professional Fees shall be nonrefundable and that the Advance Payment, Arrangement Payment and Professional Fees and any other payments hereunder shall be paid without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim.    Notwithstanding anything to the contrary herein, the Debtors shall not be obligated for any of the professional fees or other obligations described in this paragraph incurred after this letter agreement terminates.

This letter agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this letter agreement, each of the parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this letter agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State of New York. By execution and delivery of this letter agreement, each of the parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding anything to the contrary herein, upon the commencement of the Chapter 11 Cases, each of the parties hereto hereby agrees that, if the petitions have been filed and the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this letter agreement. EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

This letter agreement may not be amended or waived except in a writing signed by EFH, EFIH, and the Initial Commitment Parties. Notwithstanding the foregoing, this letter agreement

6

may be amended by the Initial Commitment Parties to add Selected Partners and Transferee Commitment Parties as Commitment Parties in accordance with the terms of this letter agreement. This letter agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this letter agreement may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph.

Notwithstanding anything contained herein, each Initial Commitment Party acknowledges that its decision to enter into this letter agreement has been made by such Commitment Party independently of any other Commitment Party.

This letter agreement (including the exhibits and schedules hereto), along with the Restructuring Support Agreement (including the exhibits and schedules thereto), constitutes the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral, between the parties hereto with respect to the subject matter hereof, and shall become effective and binding upon (i) the mutual exchange of fully executed counterparts by the EFH and EFIH and all of the Commitment Parties, and (ii) payment by EFH or EFIH of the Execution Fee, the Advance Payment, the Arranger Fee, and the Arrangement Payment I in accordance with the above.

[SIGNATURE PAGES FOLLOW]

7

**PX 095**
**Page 451 of 464**

If the foregoing is in accordance with your understanding of our agreement, please sign this letter in the space indicated below and return it to us.

Very truly yours,


[INITIAL COMMITMENT
PARTIES]


By:_____
Name:
Title:

Signature page to letter agreement.

**THE FOREGOING IS HEREBY**
**AGREED TO AND ACCEPTED:**

ENERGY FUTURE HOLDINGS CORP.

By: _____

Name:

Title: SVP & Treasurer

ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC

By: _____

Name:

Title: SVP & Treasurer

**SCHEDULES I-II**

**[REDACTED]**

Document3

## EXHIBIT A

### Second Lien DIP Notes Term Sheet

**[SEE EXHIBIT H OF FULLY COMPILED AND EXECUTED RSA]**

**PX 095**
**Page 455 of 464**

## EXHIBIT B

**Equity Conversion Term Sheet**

**[SEE EXHIBIT J OF FULLY COMPILED AND EXECUTED RSA]**

## EXHIBIT D to
## the Restructuring Support and Lock-Up Agreement

### Provision for Transfer Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support and Lock-Up Agreement, dated as of _____ (the "**Agreement**"),[1] by and among Energy Future Holdings Corp. ("**EFH**") and its affiliates and subsidiaries bound thereto, the Consenting Interest Holders, and the Consenting Creditors, including the transferor to the Transferee of any TCEH Credit Agreement Claims, EFH Interests, Texas Holdings Interests, TEF Interests, TCEH First Lien Note Claims, TCEH First Lien Commodity Hedge Claims, TCEH First Lien Interest Rate Swap Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, EFIH Unsecured Note Claims, EFH Unsecured Note Claims, TCEH DIP Claims, EFIH First Lien DIP Claims, EFIH Second Lien DIP Claims, or any other claims against the Debtors (including the Notes Claims, as described on the following page) (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "**Consenting Creditor**" or "**Consenting Interest Holder**," as applicable, under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):
Telephone:
Facsimile:

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| EFH Interests (if any) | |
| Texas Holdings Interests (if any) | |
| TEF Interests (if any) | |
| TCEH Credit Agreement Claims (if any) | $ |
| TCEH First Lien Note Claims (if any) | $ |
| TCEH First Lien Commodity Hedge Claims (if any) | $ |
| TCEH First Lien Interest Rate Swap Claims (if any) | $ |
| TCEH Second Lien Note Claims (if any) | $ |
| TCEH 2015 Note Claims (if any) | $ |

---

[1] Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

| | |
|---|---|
| TCEH Senior Toggle Note Claims (if any) | $ |
| EFIH First Lien 2017 Note Claims (if any) | $ |
| EFIH First Lien 2020 Note Claims (if any) | $ |
| EFIH 2021 Note Claims (if any) | $ |
| EFIH 2022 Note Claims (if any) | $ |
| EFIH Senior Toggle Note Claims (if any) | $ |
| EFIH Unexchanged Note Claims (if any) | $ |
| EFH 2019 Note Claims (if any) | $ |
| EFH 2020 Note Claims (if any) | $ |
| EFH Series P Note Claims (if any) | $ |
| EFH Series Q Note Claims (if any) | $ |
| EFH Series R Note Claims (if any) | $ |
| EFH LBO Senior Note Claims (if any) | $ |
| EFH LBO Toggle Note Claims (if any) | $ |

<u>Schedule 1</u> to
the Restructuring Support and Lock-Up Agreement

**Professional Fees and Expenses to Be Paid on the Agreement Effective Date**

| Type of Advisor | Name of Firm | Invoiced Amount |
| --- | --- | --- |
| *TCEH First Lien Noteholders* | | |
| Primary Counsel | Paul Weiss Rifkind Wharton & Garrison LLP, pursuant to that certain engagement letter dated February 1, 2013 | $774,286.00 |
| Local Counsel | Young Conaway Stargatt & Taylor, LLP | $44,403.12 |
| Regulatory Counsel | Winstead, P.C., pursuant to that certain engagement letter dated March 19, 2013 | $379.62 |
| Financial Advisor | Millstein & Co, pursuant to that certain engagement letter dated February 1, 2013 | $4,500,000.00 |
| Tax Advisor | PricewaterhouseCoopers LLP, pursuant to that certain engagement letter dated March 8, 2013 | $95,790.00 |
| Technical and Market Advisor | Navigant Consulting, Inc., pursuant to that certain engagement letter dated February 23, 2013 | $3,000.00 |
| *TCEH Unsecured Noteholders* | | |
| Primary Counsel | Akin Gump Strauss Hauer & Feld LLP, pursuant to that certain engagement letter dated May 24, 2013 | $4,508,874.09 |
| Local Counsel | Cousins, Chipman & Brown LLP pursuant to that certain engagement letter dated April 25, 2014 | $35,000.00 |

| | | |
|---|---|---|
| **Technical and Market Advisor** | SAIC Energy Environment & Infrastructure, L.L.C. (n/k/a Leidos Engineering LLC), pursuant to that certain engagement letter dated June 17, 2013 | $0.00 |
| **Tax Advisor** | Ernst & Young LLP, pursuant to that certain statement of work dated August 23, 2013 | $0.00 |
| **Regulatory Counsel** | Duggins Wren Mann & Romero, LLP pursuant to that certain engagement letter dated April 28, 2014 | $73,589.49 |
| **Financial Advisor** | Centerview Partners, pursuant to that certain engagement letter dated June 13, 2013 | $206,717.43 (advisory) $5,025,000.00 (transaction) |
| ***EFH Unsecureds, EFIH First Liens, EFIH Second Liens (beneficially owned by Fidelity)*** | | |
| **Primary Counsel** | Fried, Frank, Harris, Shriver & Jacobson LLP, pursuant to that certain engagement letter dated August 13, 2013 | $956,897.13 |
| **Local Counsel** | [TBD] | $0.00 |
| **Regulatory Counsel** | [TBD] | $0.00 |
| **Financial Advisor** | Perella Weinberg Partners, pursuant to that certain engagement letter dated October 16, 2013 | $0.00 |
| ***Consenting Non-Fidelity EFIH First Liens*** | | |
| **Primary Counsel** | Bingham McCutchen LLP pursuant to that certain engagement letter dated as of April 27, 2014 | $200,000.00 |
| **Local Counsel** | [TBD] | $0.00 |
| ***Interest Holders*** | | |
| **Primary Counsel** | Wachtell, Lipton, Rosen, & Katz, pursuant to that certain engagement letter | $9,000,000.00 |

| | | |
|---|---|---|
| | dated March 3, 2013 | |
| **Local Counsel** | Morris, Nichols, Arsht & Tunnell | $1,200.000.00 |
| **Regulatory Counsel** | [TBD] | $0.00 |
| **Financial Advisor** | Blackstone Advisory Group L.P., pursuant to that certain engagement letter dated March 28, 2013 | $8,398,939.90 |

**Schedule 2** to
the Restructuring Support and Lock-Up Agreement

**Individual TCEH First Lien Creditor Advisor**

| TCEH First Lien Creditor | Name of Firm |
|---|---|
| Apollo | O'Melveney & Myers LLP, as primary counsel, pursuant to that certain engagement letter dated January 6, 2014 |
| | Cadwalader, Wickersham & Taft LLP, as counsel with respect to certain regulatory matters, pursuant to that certain engagement letter dated December 26, 2013 |
| | Moelis & Company, as financial advisor, pursuant to that certain engagement letter dated December 20, 2013 |
| Oaktree | Debevoise & Plimpton LLP, as primary counsel |
| Centerbridge | Schulte Roth & Zabel LLP, as primary counsel |

## Schedule 3 to
### the Restructuring Support and Lock-Up Agreement

1.  Motion of Energy Future Holdings Corp., *et. al.*, for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases

2.  Motion of Texas Competitive Electric Holdings Company LLC, *et. al.*, for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Granting Adequate Protection, (D) Modifying the Automatic Stay, and (E) Scheduling a Final Hearing

3.  Motion of Texas Competitive Electric Holdings Company LLC, *et al.*, for Entry of an Order Authorizing the TCEH Debtors to File Under Seal the Certain Fee Letter Related to Proposed Debtor-In-Possession Financing

4.  Motion of the TCEH Debtors for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing

5.  Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc., for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Granting Adequate Protection, (E) Authorizing the Repayment of Prepetition Debt, (F) Determining the Value of Secured Claims, (G) Modifying the Automatic Stay, and (H) Scheduling a Final Hearing

6.  Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc. for Entry of an Order Authorizing the EFIH Debtors to File Under Seal the Certain Fee Letter Related to Proposed Debtor-In-Possession Financing

7.  Motion of Energy Future Holdings Corp., *et al.*, for Entry of Interim and Final Orders Authorizing the Debtors to (A) Pay Certain Prepetition Wages, Salaries, Reimbursable Employee Expenses, and Other Compensation, (B) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (C) Continue Employee Compensation and Employee and Retiree Benefit Programs

8.  Motion of Energy Future Holdings Corp., *et al.*, for Entry of an Order (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Overnight Investment Accounts; (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims; and (C) Granting Postpetition Intercompany Claims Administrative Expense Priority

9.  Motion of Energy Future Holdings Corp., *et al.*, for Entry of (A) an Order Authorizing the Debtors to (I) Maintain and Administer Customer Programs, (II) Honor Prepetition Obligations Related Thereto, (III) Pay Certain Expenses on Behalf of Certain Organizations, (IV) Fix Deadlines to File Proofs of Claim for Certain Customer Claims, and (V) Establish Procedures for Notifying Customers of Commencement of the Debtors' Chapter 11 Cases, Assumption of Customer Agreements, and the Bar Dates for Customer Claims and (B) an Order Authorizing the Debtors to Assume Customer Agreements

10.     Motion of Energy Future Holdings Corp., *et al.*, for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Critical Vendor Claims

11.     Motion of Energy Future Holdings Corp., *et al.*, for Entry of Interim and Final Orders Authorizing the Debtors to (A) Grant Administrative Expense Priority to All Undisputed Obligations for Goods and Services Ordered Prepetition and Delivered Postpetition and Satisfy Such Obligations in the Ordinary Course of Business, and (B) Pay Prepetition Claims of Shippers, Warehousemen, and Materialmen

12.     Motion of Energy Future Holdings Corp., *et al.*, For Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangement

13.     Motion of Energy Future Holdings Corp., *et al.*, for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services

14.     Motion of Energy Future Holdings Corp., *et al.*, for Entry of an Order Authorizing the Debtors to Assume Certain Transmission and Distribution Service Agreements

15.     Motion of Energy Future Holdings Corp., *et al.*, for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees

16.     Application of Energy Future Holdings Corp., *et al.*, for Entry of an Order Approving the Retention and Appointment of Epiq Bankruptcy Solutions, LLC as the Claims and Noticing Agent for the Debtors

17.     Motion of Energy Future Holdings Corp., *et. al.*, for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor

18.     Motion of Energy Future Holdings Corp., *et. al.*, for Entry of an Order Authorizing the Debtors to Assume Certain ERCOT Participation Agreements[1]

---

[1]    Will not be heard at first day hearing.