Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

☒   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**FOR THE FISCAL YEAR ENDED DECEMBER 31, 2014**

— OR —

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission File Number 1-34544

# Energy Future Intermediate Holding Company LLC
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 26-1191638 |
| (State of organization) | (I.R.S. Employer Identification No.) |
| 1601 Bryan Street, Dallas, TX 75201-3411 | (214) 812-4600 |
| (Address of principal executive offices) (Zip Code) | (Registrant's telephone number, including area code) |

**Securities registered pursuant to Section 12(b) of the Act:** None

**Securities registered pursuant to Section 12(g) of the Act:** None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐ Accelerated filer ☐    Non-Accelerated filer ☒ (Do not check if a smaller reporting company)
Smaller reporting company ☐

Indicate by check mark if the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐ No ☒

At March 31, 2015, the outstanding membership interest in Energy Future Intermediate Holding Company LLC was directly held by Energy Future Holdings Corp.

**DOCUMENTS INCORPORATED BY REFERENCE -** None

**TABLE OF CONTENTS**

| | | PAGE |
|---|---|---|
| **Glossary** | | ii |
| | **PART I** | |
| **Items 1. and 2.** | BUSINESS AND PROPERTIES | 1 |
| **Item1A.** | RISK FACTORS | 6 |
| **Item1B.** | UNRESOLVED STAFF COMMENTS | 18 |
| **Item 3.** | LEGAL PROCEEDINGS | 18 |
| **Item 4.** | MINE SAFETY DISCLOSURES | 18 |
| | **PART II** | |
| **Item 5.** | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED EQUITY HOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 19 |
| **Item 6.** | SELECTED FINANCIAL DATA | 19 |
| **Item 7.** | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 21 |
| **Item 7A.** | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 33 |
| **Item 8.** | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 36 |
| **Item 9.** | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 67 |
| **Item 9A.** | CONTROLS AND PROCEDURES | 67 |
| **Item 9B.** | OTHER INFORMATION | 71 |
| | **PART III** | |
| **Item 10.** | MANAGERS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 72 |
| **Item 11.** | EXECUTIVE COMPENSATION | 76 |
| **Item 12.** | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 78 |
| **Item 13.** | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND MANAGER INDEPENDENCE | 79 |
| **Item 14.** | PRINCIPAL ACCOUNTING FEES AND SERVICES | 82 |
| | **PART IV** | |
| **Item 15.** | EXHIBITS, FINANCIAL STATEMENT SCHEDULES | 84 |

Energy Future Intermediate Holding Company LLC's (EFIH) annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and any amendments to those reports are made available to the public, free of charge, on the Energy Future Holdings Corp. (EFH Corp.) website at *http://www.energyfutureholdings.com* as soon as reasonably practicable after they have been filed with or furnished to the Securities and Exchange Commission. The information on EFH Corp.'s website shall not be deemed a part of, or incorporated by reference into, this annual report on Form 10-K. The representations and warranties contained in any agreement that EFIH has filed as an exhibit to this annual report on Form 10-K or that EFIH has or may publicly file in the future may contain representations and warranties made by and to the parties thereto at specific dates. Such representations and warranties may be subject to exceptions and qualifications contained in separate disclosure schedules, may represent the parties' risk allocation in the particular transaction, or may be qualified by materiality standards that differ from what may be viewed as material for securities law purposes.

This annual report on Form 10-K and other Securities and Exchange Commission filings of EFIH and its subsidiaries occasionally make references to EFIH (or "the company"), EFH Corp., Oncor Holdings or Oncor when describing actions, rights or obligations of their respective subsidiaries. These references reflect the fact that the subsidiaries are consolidated with, or otherwise reflected in, their respective parent company's financial statements for financial reporting purposes. However, these references should not be interpreted to imply that the relevant parent company is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or vice versa.

## GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

| | |
|---|---|
| **Bankruptcy Filing** | Voluntary petitions for relief under Chapter 11 of the US Bankruptcy Code (Bankruptcy Code) in the US Bankruptcy Court for the District of Delaware (Bankruptcy Court) filed on April 29, 2014 by the Debtors |
| **CREZ** | Competitive Renewable Energy Zone |
| **DIP Facilities** | Refers, collectively, to EFIH's debtor-in-possession financing (see Note 6 to the Financial Statements) and TCEH's debtor-in-possession financing (TCEH DIP Facility). |
| **Debtors** | EFH Corp. and the substantial majority of its direct and indirect subsidiaries, including EFIH, EFCH and TCEH but excluding the Oncor Ring-Fenced Entities |
| **EBITDA** | earnings (net income) before interest expense, income taxes, depreciation and amortization |
| **EFCH** | Energy Future Competitive Holdings Company LLC, a direct, wholly owned subsidiary of EFH Corp. and the direct parent of TCEH, and/or its subsidiaries, depending on context |
| **EFH Corp.** | Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context, whose major subsidiaries include TCEH and Oncor |
| **EFH Corp. 10.875% Notes** | EFH Corp.'s 10.875% Senior Notes with a maturity date of November 1, 2017, which are guaranteed on a senior unsecured basis by EFIH and EFCH as discussed in Note 8 to the Financial Statements |
| **EFH Corp. Toggle Notes** | EFH Corp.'s 11.25%/12.00% Senior Toggle Notes with a maturity date of November 1, 2017, which are guaranteed on a senior unsecured basis by EFIH and EFCH as discussed in Note 8 to the Financial Statements |
| **EFIH** | Energy Future Intermediate Holding Company LLC, a direct, wholly owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings, and/or its subsidiaries depending on context. |
| **EFIH Debtors** | EFIH and EFIH Finance |
| **EFIH Finance** | EFIH Finance Inc., a direct, wholly owned subsidiary of EFIH, formed for the sole purpose of serving as co-issuer with EFIH of certain debt securities |
| **EFIH First Lien Notes** | Refers, collectively, to EFIH's and EFIH Finance's $503 million principal amount of 6.875% Senior Secured First Lien Notes and $3.482 billion principal amount of 10.000% Senior Secured First Lien Notes. |
| **EFIH Second Lien Notes** | Refers, collectively, to EFIH's and EFIH Finance's $406 million principal amount of 11% Senior Secured Second Lien Notes and $1.75 billion principal amount of 11.75% Senior Secured Second Lien Notes. |
| **EFIH PIK Notes** | EFIH's $1.566 billion principal amount of 11.25%/12.25% Senior Toggle Notes. |
| **EPA** | US Environmental Protection Agency |
| **ERCOT** | Electric Reliability Council of Texas, Inc., the independent system operator and the regional coordinator of various electricity systems within Texas |
| **ERISA** | Employee Retirement Income Security Act of 1974, as amended |
| **Federal and State Income Tax Allocation Agreements** | EFH Corp. and certain of its subsidiaries (including EFCH, EFIH and TCEH, but not including Oncor Holdings and Oncor) are parties to a Federal and State Income Tax Allocation Agreement, executed on May 15, 2012 but effective as of January 1, 2010. EFH Corp., Oncor Holdings, Oncor, Oncor's third-party minority investor, and Oncor Management Investment LLC are parties to a separate Federal and State Income Tax Allocation Agreement dated November 5, 2008. See Note 4 to the Financial Statements and *Management's Discussion and Analysis,* under *Financial Condition*. |
| **GAAP** | generally accepted accounting principles |
| **LIBOR** | London Interbank Offered Rate, an interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market |

**PX 115**
**Page 3 of 154**

ii

| | |
|---|---|
| **Luminant** | subsidiaries of TCEH engaged in competitive market activities consisting of electricity generation and wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas |
| **Merger** | the transaction referred to in the Agreement and Plan of Merger, dated February 25, 2007, under which Texas Holdings agreed to acquire EFH Corp., which was completed on October 10, 2007 |
| **MW** | megawatts |
| **NERC** | North American Electric Reliability Corporation |
| **Oncor** | Oncor Electric Delivery Company LLC, a direct, majority owned subsidiary of Oncor Holdings, and/or its wholly owned consolidated bankruptcy-remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC, depending on context, that is engaged in regulated electricity transmission and distribution activities |
| **Oncor Holdings** | Oncor Electric Delivery Holdings Company LLC, a direct, wholly owned subsidiary of EFIH and the direct majority owner of Oncor, and/or its subsidiaries, depending on context |
| **Oncor Ring-Fenced Entities** | Oncor Holdings and its direct and indirect subsidiaries, including Oncor |
| **Oncor Tax Sharing Agreement** | Federal and State Income Tax Allocation Agreement among EFH Corp., Oncor Holdings, Oncor and Texas Transmission |
| **Petition Date** | April 29, 2014, the date the Debtors made the Bankruptcy Filing |
| **PUCT** | Public Utility Commission of Texas |
| **PURA** | Texas Public Utility Regulatory Act |
| **RSA** | Restructuring Support and Lock-Up Agreement |
| **SEC** | US Securities and Exchange Commission |
| **Securities Act** | Securities Act of 1933, as amended |
| **SG&A** | selling, general and administrative |
| **Sponsor Group** | Refers, collectively, to certain investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P., TPG Global, LLC (together with its affiliates, TPG) and GS Capital Partners, an affiliate of Goldman, Sachs & Co., that have an ownership interest in Texas Holdings. |
| **TCEH** | Texas Competitive Electric Holdings Company LLC, a direct, wholly owned subsidiary of EFCH and an indirect subsidiary of EFH Corp., and/or its subsidiaries, depending on context, that are engaged in electricity generation and wholesale and retail energy markets activities, and whose major subsidiaries include Luminant and TXU Energy |
| **TCEH Demand Notes** | Refers to certain loans from TCEH to EFH Corp. in the form of demand notes to finance EFH Corp. debt principal and interest payments and, until April 2011, other general corporate purposes of EFH Corp. that were guaranteed on a senior unsecured basis by EFCH and EFIH and were settled by EFH Corp. in January 2013. |
| **TCEQ** | Texas Commission on Environmental Quality |
| **Texas Holdings** | Texas Energy Future Holdings Limited Partnership, a limited partnership controlled by the Sponsor Group, that owns substantially all of the common stock of EFH Corp. |
| **Texas Holdings Group** | Texas Holdings and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities |
| **TRE** | Texas Reliability Entity, Inc., an independent organization that develops reliability standards for the ERCOT region and monitors and enforces compliance with NERC standards and monitors compliance with ERCOT protocols |
| **TXU Energy** | TXU Energy Retail Company LLC, a direct, wholly owned subsidiary of TCEH that is a REP in competitive areas of ERCOT and is engaged in the retail sale of electricity to residential and business customers |
| **US** | United States of America |

**VIE**                          variable interest entity

iii
-

**PART I.**

**Items 1. and 2. BUSINESS AND PROPERTIES**

References in this report to "the company" are to EFIH and/or its direct and indirect subsidiaries as apparent in the context. See *Glossary* for defined terms.

### Energy Future Intermediate Holding Company LLC Business and Strategy

EFIH, a direct, wholly owned subsidiary of EFH Corp., is a Dallas, Texas-based holding company whose wholly owned subsidiary, Oncor Holdings, holds a majority interest (approximately 80%) in Oncor. The business and strategy of Oncor is discussed below, as the investment in Oncor represents a substantial portion of the net assets and earnings of EFIH. Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell electricity to residential, business and other consumers in Texas. Revenues from services provided to TCEH represented 25% and 27% of Oncor's total consolidated revenues for the years ended December 31, 2014 and 2013, respectively. EFIH has no reportable business segments. See Notes 1 and 3 to the Financial Statements for a discussion of the reporting of EFIH's investment in Oncor Holdings as an equity method investment and a description of the ring-fencing measures implemented with respect to Oncor Holdings and Oncor. These measures were put in place to further enhance Oncor's credit quality and mitigate Oncor's and Oncor Holdings' exposure to the Texas Holdings Group with the intent to minimize the risk that a court would order any of the assets and liabilities of the Oncor Ring-Fenced Entities to be substantively consolidated with those of any member of the Texas Holdings Group in the event any such member were to become a debtor in a bankruptcy case. Accordingly, EFH Corp. and EFIH do not control and do not consolidate Oncor Holdings and Oncor for financial reporting purposes.

EFIH's sources of liquidity have included the EFIH DIP Facility, dividends received from Oncor Holdings and interest payments received on EFH Corp. and TCEH debt it holds. Its uses of liquidity have consisted of reorganization costs, interest payments on the EFIH DIP Facility and EFIH's outstanding debt and income taxes paid to EFH Corp. under a Federal and State Income Tax Allocation Agreement.

### *Chapter 11 Cases*

On April 29, 2014 (the Petition Date), EFH Corp. and the substantial majority of its direct and indirect subsidiaries, including EFIH, EFCH and TCEH but excluding the Oncor Ring-Fenced Entities, (the Debtors) filed voluntary petitions for relief (the Bankruptcy Filing) under Chapter 11 of the United States Bankruptcy Code (the Bankruptcy Code) in the United States Bankruptcy Court for the District of Delaware (the Bankruptcy Court). During the pendency of the Bankruptcy Filing (the Chapter 11 Cases), the Debtors will operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code.

Consistent with the ring-fencing measures discussed above, the assets and liabilities of the Oncor Ring-Fenced Entities have not been, and are not expected to be, substantively consolidated with the assets and liabilities of the Debtors in the Chapter 11 Cases.

For additional discussion of the Chapter 11 Cases and the effects on EFIH, see Note 2 to the Financial Statements and Item 1A, *Risk Factors – Risks Related to Chapter 11 Cases*. See Note 6 to the Financial Statements for discussion of the DIP Facilities.

### *Oncor's Business*

Oncor's transmission and distribution assets are located principally in the north-central, eastern and western parts of Texas. This territory comprises 91 counties and more than 400 incorporated municipalities, including Dallas/Fort Worth and surrounding suburbs, as well as Waco, Wichita Falls, Odessa, Midland, Tyler and Killeen. Oncor is not a seller of electricity, nor does it purchase electricity for resale. It provides transmission services to other electricity distribution companies, cooperatives, municipalities and REPs. It also provides distribution services to REPs, which sell electricity to residential, business and other consumers. Oncor's transmission and distribution rates are regulated by the PUCT, and in certain instances, the FERC.

Oncor operates the largest transmission and distribution system in Texas, delivering electricity to more than 3.3 million homes and businesses and operating more than 121,000 miles of transmission and distribution lines. Most of Oncor's power lines have been constructed over lands of others pursuant to easements or along public highways, streets and rights-of-way as permitted by law. At December 31, 2014, Oncor had approximately 3,410 full-time employees, including approximately 640 employees under collective bargaining agreements.

1

*Oncor's Market*

Oncor operates within the ERCOT market. This market represents approximately 90% of the electricity consumption in Texas. ERCOT is the regional reliability coordinating organization for member electricity systems in Texas and the Independent System Operator of the interconnected transmission grid for those systems. ERCOT is responsible for ensuring reliability, adequacy and security of the electric systems as well as nondiscriminatory access to transmission service by all wholesale market participants in the ERCOT region. ERCOT's membership consists of approximately 300 corporate and associate members, including electric cooperatives, municipal power agencies, independent generators, independent power marketers, transmission service providers and distribution services providers, independent REPs and consumers.

In 2014, ERCOT's hourly demand peaked at 66,454 MW as compared to the peak hourly demand of 67,245 MW in 2013. The ERCOT market has limited interconnections to other markets in the US and Mexico, which currently limits potential imports into and exports out of the ERCOT market to 1,100 MW of generation capacity (or approximately 2% of peak demand). In addition, wholesale transactions within the ERCOT market are generally not subject to regulation by the FERC.

The ERCOT market operates under reliability standards set by NERC. The PUCT has primary jurisdiction over the ERCOT market to ensure the adequacy and reliability of power supply across Texas' main interconnected transmission grid. Oncor, along with other owners of transmission and distribution facilities in Texas, assists ERCOT in its operations. Oncor has planning, design, construction, operation and maintenance responsibility for the portion of the transmission grid and for the load-serving substations it owns, primarily within its certificated distribution service area. Oncor participates with ERCOT and other ERCOT utilities in obtaining regulatory approvals and planning, designing, constructing and upgrading transmission lines in order to remove existing constraints and interconnect generation on the ERCOT transmission grid. The transmission line projects are necessary to meet reliability needs, support energy production and increase bulk power transfer capability.

*Oncor's Strategies*

Oncor focuses on delivering electricity in a safe and reliable manner, minimizing service interruptions and investing in its transmission and distribution infrastructure to maintain its system, serve its growing customer base with a modernized grid and support energy production.

Oncor believes that building and leveraging upon opportunities to scale its operating advantage and technology programs enables Oncor to create value by eliminating duplicative costs, efficiently managing supply costs, and building and standardizing distinctive process expertise over a larger grid. Scale also allows Oncor to take part in large capital investments in its transmission and distribution system, with a smaller fraction of overall capital at risk and with an enhanced ability to streamline costs. Oncor's growth strategies are to invest in technology upgrades, and to construct transmission and distribution facilities to meet the needs of the growing Texas market and support energy production. Oncor and other transmission and distribution businesses in ERCOT benefit from regulatory capital recovery mechanisms known as "capital trackers" that Oncor believes enable adequate and timely recovery of transmission, distribution and advanced metering investments through its regulated rates.

*Oncor's Operations*

*Performance* — Oncor achieved or exceeded market performance protocols in 12 out of 14 PUCT market metrics in 2014. These metrics measure the success of transmission and distribution companies in facilitating customer transactions in the competitive Texas electricity market.

*Investing in Infrastructure and Technology* — In 2014, Oncor invested approximately $1.1 billion in its network to construct, rebuild and upgrade transmission lines and associated facilities, to extend the distribution infrastructure and to pursue certain initiatives in infrastructure maintenance and information technology.

Oncor's technology upgrade initiatives include development of a modernized grid through advanced digital communication, data management, real-time monitoring and outage detection capabilities to take advantage of Oncor's deployment of advanced digital metering equipment. This modernized grid is producing electricity service reliability improvements and providing for additional products and services from REPs that enable businesses and consumers to better manage their electricity usage and costs.

*Electricity Transmission* — Oncor's electricity transmission business is responsible for the safe and reliable operations of its transmission network and substations. These responsibilities consist of the construction and maintenance of transmission facilities and substations and the monitoring, controlling and dispatching of high-voltage electricity over Oncor's transmission facilities in coordination with ERCOT.

Oncor is a member of ERCOT, and its transmission business actively assists the operations of ERCOT and market participants. Through its transmission business, Oncor participates with ERCOT and other member utilities to plan, design, construct and operate new transmission lines, with regulatory approval, necessary to maintain reliability, interconnect to merchant generation facilities, increase bulk power transfer capability and minimize limitations and constraints on the ERCOT transmission grid.

Transmission revenues are provided under tariffs approved by either the PUCT or, to a small degree related to an interconnection to other markets, the FERC. Network transmission revenues compensate Oncor for delivery of electricity over transmission facilities operating at 60 kilovolt (kV) and above. Other services offered by Oncor through its transmission business include system impact studies, facilities studies, transformation service and maintenance of transformer equipment, substations and transmission lines owned by other parties.

PURA allows Oncor to update its transmission rates periodically to reflect changes in invested capital. This capital tracker provision encourages investment in the transmission system to help ensure reliability and efficiency by allowing for timely recovery of and return on new transmission investments.

At December 31, 2014, Oncor's transmission facilities included 6,447 circuit miles of 345kV transmission lines and 9,634 circuit miles of 138kV and 69kV transmission lines. Sixty-seven generation facilities totaling 36,410 MW were directly connected to Oncor's transmission system at December 31, 2014, and 292 transmission stations and 715 distribution substations were served from Oncor's transmission system.

At December 31, 2014, Oncor's transmission facilities had the following connections to other transmission grids in Texas:

| Grid Connections | Number of Interconnected Lines | | |
|---|---|---|---|
| | 345kV | 138kV | 69kV |
| Brazos Electric Power Cooperative, Inc. | 8 | 113 | 23 |
| Rayburn Country Electric Cooperative, Inc. | — | 39 | 6 |
| Lower Colorado River Authority | 10 | 23 | 2 |
| Texas New Mexico Power | 4 | 10 | 12 |
| Tex-La Electric Cooperative of Texas, Inc. | — | 12 | 1 |
| American Electric Power Company, Inc. (a) | 5 | 7 | 11 |
| Texas Municipal Power Agency | 7 | 6 | — |
| Lone Star Transmission | 12 | — | — |
| Centerpoint Energy Inc. | 8 | — | — |
| Sharyland Utilities, L.P. | — | 8 | — |
| Electric Transmission Texas, LLC | 6 | 1 | — |
| Other small systems operating wholly within Texas | 6 | 7 | 3 |

_____

(a)  One of the 345kV lines is an asynchronous high-voltage direct current connection with the Southwest Power Pool.

*Electricity Distribution* — Oncor's electricity distribution business is responsible for the overall safe and efficient operation of distribution facilities, including electricity delivery, power quality and system reliability. These responsibilities consist of the ownership, management, construction, maintenance and operation of the distribution system within Oncor's certificated service area. Oncor's distribution system receives electricity from the transmission system through substations and distributes electricity to end-users and wholesale customers through 3,207 distribution feeders.

The Oncor distribution system included over 3.3 million points of delivery at December 31, 2014. Over the past five years, the number of distribution system points of delivery served by Oncor, excluding lighting sites, grew an average of 1.28% per year. Oncor added approximately 49,100 points of delivery in 2014.

The Oncor distribution system consists of 56,907 miles of overhead primary conductors, 21,541 miles of overhead secondary and street light conductors, 16,517 miles of underground primary conductors and 10,203 miles of underground secondary and street light conductors. The majority of the distribution system operates at 25kV and 12.5kV.

Oncor's distribution revenues from residential and small business users are based on actual monthly consumption (kWh), and, depending on size and annual load factor, revenues from large commercial and industrial users are based either on actual monthly demand (kilowatts) or the greater of actual monthly demand (kilowatts) or 80% of peak monthly demand during the prior eleven months.

The PUCT allows Oncor to file, under certain circumstances, up to four rate adjustments between rate reviews to recover distribution-related investments on an interim basis.

*Customers* — Oncor's transmission customers consist of municipalities, electric cooperatives and other distribution companies. Oncor's distribution customers consist of approximately 80 REPs, including TCEH's retail sales operations and certain electric cooperatives in Oncor's certificated service area. Revenues from services provided to TCEH represented 25% of Oncor's total reported consolidated revenues for 2014. Revenues from REP subsidiaries of one nonaffiliated entity, NRG Energy, Inc., collectively represented 16% of Oncor's total reported consolidated revenues for 2014. No other customer represented more than 10% of Oncor's total operating revenues. The consumers of the electricity delivered by Oncor are free to choose their electricity supplier from REPs who compete for their business.

*Seasonality* — Oncor's revenues and results of operations are subject to seasonality, weather conditions and other electricity usage drivers, with revenues being highest in the summer.

*Regulation and Rates* — As its operations are wholly within Texas, Oncor is not a public utility as defined in the Federal Power Act and, as a result, it is not subject to general regulation under that Act. However, Oncor is subject to reliability standards adopted and enforced by the TRE and the NERC, including NERC CIP standards, under the Federal Power Act.

The PUCT has original jurisdiction over transmission and distribution rates and services in unincorporated areas and in those municipalities that have ceded original jurisdiction to the PUCT and has exclusive appellate jurisdiction to review the rate and service orders and ordinances of municipalities. Generally, PURA prohibits the collection of any rates or charges by a public utility (as defined by PURA) that does not have the prior approval of the appropriate regulatory authority (i.e., the PUCT or the municipality with original jurisdiction).

At the state level, PURA requires owners or operators of transmission facilities to provide open-access wholesale transmission services to third parties at rates and terms that are nondiscriminatory and comparable to the rates and terms of the utility's own use of its system. The PUCT has adopted rules implementing the state open-access requirements for all utilities that are subject to the PUCT's jurisdiction over transmission services, including Oncor.

*Securitization Bonds* — Oncor's operations include its wholly owned, bankruptcy-remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC. This financing subsidiary was organized for the limited purpose of issuing certain securitization (transition) bonds in 2003 and 2004. Oncor Electric Delivery Transition Bond Company LLC issued $1.3 billion principal amount of transition bonds to recover generation-related regulatory asset stranded costs and other qualified costs under an order issued by the PUCT in 2002. At December 31, 2014, aggregate principal amounts of transition bonds outstanding, which mature in 2015 and 2016, totaled $180 million. See Note 12 to the Financial Statements for discussion of agreements between TCEH and Oncor regarding payment of interest and incremental taxes related to these bonds that were settled in 2012.

PX 115
Page 10 of 154

**Environmental Regulations and Related Considerations**

*Water*

The TCEQ and the EPA have jurisdiction over water discharges (including storm water) from facilities in Texas. Oncor believes its facilities are presently in material compliance with applicable state and federal requirements relating to discharge of pollutants into water. Oncor believes it holds all required waste water discharge permits from the TCEQ for facilities in operation and has applied for or obtained necessary permits for facilities under construction. Oncor also believes it can satisfy the requirements necessary to obtain any required permits or renewals. There are also federal rules pertaining to Spill Prevention, Control and Countermeasure (SPCC) plans for oil-filled electrical equipment and bulk storage facilities for oil that affect certain of Oncor's facilities. Oncor has implemented SPCC plans as required for those substations, work centers and distribution systems, and believes it is currently in compliance with these rules.

*Solid Waste*

Treatment, storage and disposal of solid waste and hazardous waste are regulated at the state level under the Texas Solid Waste Disposal Act and at the federal level under the Resource Conservation and Recovery Act of 1976, as amended, and the Toxic Substances Control Act. The EPA has issued regulations under the Resource Conservation and Recovery Act of 1976 and the Toxic Substances Control Act, and the TCEQ has issued regulations under the Texas Solid Waste Disposal Act applicable to Oncor's facilities. Oncor is in compliance with applicable solid and hazardous waste regulations.

*Environmental Capital Expenditures*

Oncor's capital expenditures for environmental matters totaled $10 million in 2014 and are expected to total approximately $8 million in 2015.

**PX 115**
**Page 11 of 154**

## Item 1A.    RISK FACTORS

Important factors, in addition to others specifically addressed in Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations*, that could have a material impact on EFIH's operations, liquidity, financial results and financial condition, or could cause its actual results or outcomes to differ materially from any projected outcome contained in any forward-looking statement in this report, are described below. There may be further risks and uncertainties that are not currently known or that are not currently believed to be material that may adversely affect EFIH's operations, liquidity and/or financial condition in the future.

### Risks Related to Chapter 11 Cases

***EFIH has filed voluntary petitions for relief under the Bankruptcy Code and is subject to the risks and uncertainties associated with bankruptcy cases.***

EFIH (together with its parent company, EFH Corp., and substantially all of the direct and indirect subsidiaries of EFH Corp. including EFCH and TCEH but excluding the Oncor Ring-Fenced Entities) has filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. For the duration of the Chapter 11 Cases, EFIH will be subject to various risks, including but not limited to the following:

- EFIH's ability to develop, file and complete a Chapter 11 plan of reorganization, particularly during the exclusivity period (i.e., in general the period in which EFIH has the exclusive right to file a Chapter 11 plan of reorganization);
- EFIH's ability to obtain Bankruptcy Court, creditor and regulatory approval of a Chapter 11 plan of reorganization in a timely manner;
- EFIH's ability to obtain Bankruptcy Court approval with respect to motions in the Chapter 11 Cases and the outcomes of Bankruptcy Court rulings and of the Chapter 11 Cases in general;
- Risks associated with third party motions in the Chapter 11 Cases, which may interfere with EFIH's ability to propose and/or complete a Chapter 11 plan of reorganization;
- Increased costs related to the Chapter 11 Cases and related litigation;
- EFIH's ability to maintain or obtain sufficient financing sources to fund a Chapter 11 plan of reorganization;
- Potential incremental increase in risks related to distributions from Oncor;
- The outcome of current or potential litigation regarding whether certain holders are entitled to make-whole or redemption premiums and/or post-petition interest in connection with the treatment of their claims in bankruptcy, and
- The outcome of current or potential claims regarding intercompany claims and/or derivative claims.

EFIH is also subject to risks and uncertainties with respect to the actions and decisions of creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with its plans. In addition, the Chapter 11 Cases subject EFIH to risks related to litigation and/or claims asserted by creditors or other stakeholders in the Chapter 11 Cases. These risks and uncertainties could affect EFIH in various ways and may significantly increase the duration of the Chapter 11 Cases. Because of the risks and uncertainties associated with Chapter 11 Cases, EFIH cannot predict or quantify the ultimate impact that events occurring during the Chapter 11 Cases may have on its cash flows, liquidity, financial condition and results of operations nor can EFIH predict the ultimate impact that events occurring during the Chapter 11 Cases may have on its or its affiliates' (excluding the Oncor Ring Fenced Entities) corporate structure. For example, in connection with the Chapter 11 Cases, certain of EFIH's or EFIH's affiliates' creditors may seek, and receive, Bankruptcy Court approval to sell or otherwise transfer certain of their respective assets in order to satisfy liabilities owed to such creditors. Any such transfer could result in significant tax liabilities for EFH Corp. and its subsidiaries (excluding the Oncor Ring-Fenced Entities), which could reduce the recovery of creditors.

***The duration of the Chapter 11 Cases is difficult to estimate and could be lengthy. Due to the termination of the Restructuring Support and Lock-Up Agreement (RSA), the Debtors (including the EFIH Debtors) are likely subject to more lengthy, costly and contentious Chapter 11 Cases. If the Debtors (including the EFIH Debtors) are unable to file and solicit votes for a Chapter 11 plan of reorganization prior to the expiration of the exclusivity period granted by the Bankruptcy Court, then third parties can file a plan, which would likely further exacerbate the length, cost and contentiousness of the Chapter 11 Cases. Moreover, the duration of the Chapter 11 Cases is subject to the receipt of Bankruptcy Court approval for a Chapter 11 plan of reorganization and regulatory approvals, the timing of which is unpredictable.***

The duration of the Chapter 11 Cases is difficult to estimate and could be lengthy. As a result of the termination of the RSA, the Debtors (including the EFIH Debtors) are likely subject to more lengthy, costly and contentious Chapter 11 Cases, which will likely have a more pronounced adverse effect on its business than the pre-arranged plan contemplated by the RSA. The Chapter 11 Cases will likely involve contested issues with multiple stakeholders.

PX 115
Page 12 of 154

If the Debtors (including the EFIH Debtors) are unable to file a Chapter 11 plan of reorganization, or solicit the appropriate votes for such plan, in each case, prior to the expiration of the exclusivity period granted by the Bankruptcy Court (currently June 23, 2015 for filing a Chapter 11 plan of reorganization and August 23, 2015 for soliciting the appropriate votes for such plan), third parties could file their own plan or plans of reorganization. Any such third party plan or plans will likely exacerbate the length, cost and contentiousness of the Chapter 11 Cases.

***Operating under Chapter 11 may restrict EFIH's ability to pursue its strategic initiatives. Moreover, EFIH is subject to various covenants and events of default under its DIP Facility.***

The EFIH Debtors are subject to various covenants and events of default under its DIP Facility. In general, certain of these covenants limit the Debtors' ability, subject to certain exceptions, to take certain actions such as selling assets, granting liens, incurring indebtedness and making investments. If the EFIH Debtors fail to comply with these covenants or an event of default occurs under the DIP Facility, its liquidity, financial condition or operations may be materially impacted.

***As a result of the Chapter 11 Cases, EFIH's historical financial information may not be indicative of its future financial performance.***

EFIH's capital structure will likely be significantly altered under any Chapter 11 plan confirmed by the Bankruptcy Court. Under fresh-start accounting rules that may apply to EFIH upon the effective date of a Chapter 11 plan, EFIH's assets and liabilities would be adjusted to fair value, which could have a significant impact on EFIH's financial statements. Accordingly, if fresh-start accounting rules apply, EFIH's financial condition and results of operations following its emergence from Chapter 11 would not be comparable to the financial condition and results of operations reflected in its historical financial statements. In connection with the Chapter 11 Cases and the development of a Chapter 11 plan, it is also possible that additional restructuring and related charges may be identified and recorded in future periods. Such charges could be material to EFIH's consolidated financial position, liquidity and results of operations.

***There is no assurance regarding the outcome of any litigation regarding whether note holders are entitled to make-whole or redemption premiums and/or post-petition interest in connection with the treatment of their claims in bankruptcy.***

The EFIH Debtors are engaged in litigation regarding whether holders of its outstanding notes are entitled to receive a make-whole or redemption premium in connection with the repayment of such notes, including pursuant to a Chapter 11 plan of reorganization. As of December 31, 2014, the total aggregate amount of make-whole or redemption premiums that would be owed if such alleged claims were allowed claims would be approximately $1.123 billion (of which $432 million relates to the EFIH First Lien Notes, $591 million relates to the EFIH Second Lien Notes and $100 million relates to the EFIH PIK Notes). In these matters, the EFIH Debtors have requested, or expect to request, orders from the Bankruptcy Court disallowing such make-whole or redemption claims. See Note 10 to the Financial Statements for a more detailed discussion regarding these claims.

Moreover, creditors may make additional claims in the Chapter 11 Cases in connection with a repayment or settlement of their pre-petition debt such as indemnification claims or for the payment of fees and expenses incurred in connection with litigating such claims.

In addition, creditors may assert claims for post-petition interest, including default interest, on their outstanding notes in connection with the repayment of such notes, including pursuant to a Chapter 11 plan of reorganization. Such amounts would be material, particularly if such post-petition interest were required to be paid at the contract rate as opposed to the federal judgment rate.

EFIH cannot predict whether any such litigations would be filed or, if filed, the outcome of any such litigation or the Bankruptcy Court's determination regarding the validity or the amounts payable in respect of any such claim.

***The EFIH DIP Facilities may be insufficient to fund EFIH's cash requirements through its emergence from bankruptcy. In addition, EFIH's independent auditor's report on its financial statements raises substantial doubt about its ability to continue as a going concern given the Chapter 11 Cases.***

For the duration of the Chapter 11 Cases, EFIH will be subject to various risks, including but not limited to (i) the inability to maintain or obtain sufficient financing sources for operations or to fund any reorganization plan and meet future obligations, and (ii) increased legal and other professional costs associated with the Chapter 11 Cases and its reorganization.

**PX 115**
**Page 13 of 154**

EFIH believes that the EFIH DIP Facilities, plus cash distributions received from Oncor Holdings, will be sufficient to fund EFIH's anticipated cash requirements through the pendency of the Chapter 11 Cases. However, if a Chapter 11 plan of reorganization is not completed during the term of the EFIH DIP Facilities, EFIH may not be able to obtain sufficient additional financing on acceptable terms or at all.

In its report on EFIH's financial statements included in this Annual Report on Form 10-K, EFIH's independent public accounting firm states that the uncertainties inherent in the bankruptcy process raise substantial doubt about EFIH's ability to continue as a going concern.

***EFIH may not be able to obtain exit financing to repay the EFIH DIP Facilities or, if EFIH is able to obtain such exit financing, the agreements governing such exit financing may significantly restrict its financing and operations flexibility after emerging from bankruptcy.***

It is expected that the EFIH First Lien DIP Facility will be repaid using, in whole or in part, the proceeds from borrowings under exit financings. EFIH's ability to obtain such exit financings will depend on, among other things, the timing and outcome of various ongoing matters in the Chapter 11 Cases, its business, operations and financial condition, and market conditions. EFIH has not yet received any commitment with respect to any exit facilities, and there can be no assurance that it will be able to obtain such exit facilities on reasonable economic terms, or at all. If EFIH cannot secure exit financing, it may not be able to emerge from bankruptcy and may not be able to repay the EFIH First Lien DIP Facility at its respective maturity. Any exit financing that EFIH is able to secure may include a number of significant restrictive covenants which could impair its financing and operational flexibility and make it difficult for EFIH to react to market conditions and satisfy its unanticipated cash requirements.

***As a result of the Chapter 11 Cases, net operating losses and other tax attributes are not expected to be available upon emergence from the Chapter 11 Cases.***

Certain tax attributes, such as net operating loss carry-forwards and certain tax credits, are expected to be utilized in connection with the Chapter 11 Cases. Under the Internal Revenue Code, tax attributes are reduced to the extent discharge of indebtedness income is excluded from gross income arising from a Chapter 11 case. If any attributes are still available after the application of this provision, such attributes may be limited or lost in the event EFH Corp. or any of its subsidiaries, including EFIH, experience an ownership change as defined under the Internal Revenue Code. In addition, tax attributes may be utilized in a transaction such as a sale or transfer of assets that could result in a significant tax liability for EFH Corp. and its subsidiaries, including EFIH. As a result of the foregoing rules, any pre-emergence net operating losses and certain tax credits are not expected to be available to EFH Corp. and its subsidiaries, including EFIH, to reduce taxable income for tax periods beginning after emergence from Chapter 11.

***While the Bankruptcy Court approved the Debtors' bidding procedures for the solicitation of bids from third parties to purchase EFH Corp.'s indirect economic ownership interest in Oncor, there can be no assurance that the Debtors will receive a bid the Debtors deem acceptable, that the Bankruptcy Court will approve any such bid or that any such transaction will ultimately close.***

In January 2015, the Bankruptcy Court approved the Debtors' bidding procedures motion that sets forth the process by which the Debtors are authorized to solicit proposals (i.e., bids) from third parties to acquire (in any form and employing any structure, whether taxable (in whole or in part) or tax-free) EFH Corp.'s indirect economic ownership in Oncor in accordance with the Bankruptcy Code. EFIH cannot predict the outcome of this process, including whether any acceptable bid will be received, whether the Bankruptcy Court will approve any such bid or whether any such transaction will (or when it will) ultimately close because any such transaction would be the subject of customary closing conditions, including receipt of all applicable regulatory approvals.

8
-

**Risks Related to EFIH's Structure**

***EFIH is a holding company and its obligations are structurally subordinated to existing and future liabilities and preferred stock of its subsidiaries.***

EFIH's cash flows and ability to meet its obligations are largely dependent upon the earnings of the Oncor Ring-Fenced Entities, and the payment of such earnings to EFIH in the form of dividends or distributions. The Oncor Ring-Fenced Entities are separate and distinct legal entities from EFIH and have no obligation (other than any existing contractual obligations, which may be suspended or altered in the Chapter 11 Cases) to provide EFIH with funds for its payment obligations. Any decision by a subsidiary to provide EFIH with funds for its payment obligations, whether by dividends or distributions, will depend on, among other things, the subsidiary's results of operations, financial condition, cash requirements, contractual restrictions and other factors. In addition, a subsidiary's ability to pay dividends may be limited by covenants in its existing and future debt agreements, applicable law and the Chapter 11 Cases. Further, the distributions that may be paid by Oncor are limited as discussed below.

Because EFIH is a holding company, its obligations to its creditors are structurally subordinated to all existing and future liabilities and existing and future preferred stock of its subsidiaries that do not guarantee such obligations. Therefore, EFIH's rights and the rights of its creditors to participate in the assets of any subsidiary in the event that such a subsidiary is liquidated or reorganized are subject to the prior claims of such subsidiary's creditors and holders of such subsidiary's preferred stock. To the extent that EFIH may be a creditor with recognized claims against any such subsidiary, EFIH's claims would still be subject to the prior claims of such subsidiary's creditors to the extent that they are secured or senior to those held by EFIH. Subject to restrictions contained in EFIH's financing arrangements and limitations imposed by the EFIH's subsidiaries may incur additional debt and other liabilities.

***EFIH has a very limited ability to control activities at Oncor due to structural and operational ring-fencing measures.***

EFIH depends upon Oncor for a significant amount of its cash flows and relies on such cash flows in order to satisfy its obligations. However, EFIH has a very limited ability to control the activities of Oncor. As part of the ring-fencing measures implemented by EFH Corp. and Oncor, including certain measures required by the PUCT's Order on Rehearing in Docket No. 34077, a majority of the members of Oncor's board of directors are required to meet the New York Stock Exchange requirements for independence in all material respects, and the unanimous, or majority, consent of such directors is required for Oncor to take certain actions. In addition, any new independent directors are required to be appointed by the nominating committee of Oncor Holdings' board of directors, a majority of whose members are independent directors. No member of EFIH's or EFH Corp.'s management is a member of Oncor's board of directors. Under Oncor Holdings' and Oncor's organizational documents, EFH Corp. has limited indirect consent rights with respect to the activities of Oncor, including (i) new issuances of equity securities by Oncor, (ii) material transactions with third parties involving Oncor outside of the ordinary course of business, (iii) actions that cause Oncor's assets to be subject to an increased level of jurisdiction of the FERC, (iv) any changes to the state of formation of Oncor, (v) material changes to accounting methods not required by US GAAP and (vi) actions that fail to enforce certain tax sharing obligations between Oncor and EFH Corp. In addition, Oncor's organizational agreements contain restrictions on Oncor's ability to make distributions to its members, including indirectly to EFIH.

Additionally, the restrictive measures required by the PUCT's Order on Rehearing in Docket No. 34077, include, among other things:

- Oncor not being restricted from incurring its own debt;
- Oncor not guaranteeing or pledging any of its assets to secure the debt of any member of the Texas Holdings Group; and
- restrictions on distributions by Oncor, and the right of the independent members of Oncor's board of directors and the largest non-majority member of Oncor to block the payment of distributions to Oncor Holdings (i.e., such distributions not being available to EFIH under certain circumstances).

***Oncor may or may not make any distributions to EFIH.***

EFH Corp. and Oncor have implemented certain structural and operational ring-fencing measures, including certain measures required by the PUCT's Order on Rehearing in Docket No. 34077, that were based on principles articulated by rating agencies and commitments made by Texas Holdings and Oncor to the PUCT and the FERC to further enhance Oncor's credit quality. These measures were put in place to mitigate Oncor's credit exposure to the Texas Holdings Group and to reduce the risk that the assets and liabilities of Oncor would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in a bankruptcy of one or more of those entities.

As part of the ring-fencing measures, a majority of the members of the board of directors of Oncor are required to be, and are, independent from EFH Corp. and EFIH. Any new independent directors of Oncor are required to be appointed by the nominating committee of Oncor Holdings, which is required to be, and is, comprised of a majority of directors that are independent from EFH Corp. and EFIH. The organizational documents of Oncor give its independent directors, acting by majority vote, and, during certain periods, any director designated by Texas Transmission, the express right to prevent distributions from Oncor if they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements. The Chapter 11 Cases could result in Oncor limiting or suspending such dividends to EFIH during the pendency of such filing. Accordingly, there can be no assurance that Oncor will make any distributions to EFIH.

In addition, Oncor's organizational documents prohibit Oncor from making any distribution to its owners, including EFIH, so long as and to the extent that such distribution would cause Oncor's regulatory capital structure to exceed the debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. Under the terms of a Federal and State Income Tax Allocation Agreement, Oncor makes tax payments to EFH Corp. (bypassing EFIH) based on its share of an amount calculated to approximate the amount of taxes Oncor would have paid to the IRS if it were a stand-alone taxpayer.

Moreover, Oncor has incurred debt in connection with CREZ and may incur additional debt in connection with other investments in infrastructure or technology. Accordingly, while Oncor is required to maintain a specified debt-to-equity ratio, there can be no assurance that Oncor's equity balance will be sufficient to maintain the required debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, thereby restricting Oncor from making any distributions to EFIH.

***Oncor's ring-fencing measures may not work as planned and the Bankruptcy Court may nevertheless subject Oncor to the claims of Texas Holdings Group entity creditors.***

In 2007, EFH Corp. and Oncor implemented certain structural and operational ring-fencing measures, including certain measures required by the PUCT's Order on Rehearing in Docket No. 34077, that were based on principles articulated by rating agencies and commitments made by Texas Holdings and Oncor to the PUCT and the FERC to further enhance Oncor's credit quality. These measures were put in place to mitigate Oncor's credit exposure to the Texas Holdings Group and to minimize the risk that a court would order any of Oncor Holdings', Oncor's or Oncor's subsidiary's (collectively, the Oncor Ring-Fenced Entities) assets and liabilities to be substantively consolidated with those of any member of the Texas Holdings Group in the event that a member of the Texas Holdings Group were to become a debtor in a bankruptcy case. Substantive consolidation is an equitable remedy in bankruptcy that results in the pooling of the assets and liabilities of the debtor and one or more of its affiliates solely for purposes of the bankruptcy case, including for purposes of distributions to creditors and voting on and treatment under a reorganization plan. Bankruptcy courts have broad equitable powers, and as a result, outcomes in bankruptcy proceedings are inherently difficult to predict. To the extent the Bankruptcy Court were to determine that substantive consolidation was appropriate under the facts and circumstances, then the assets and liabilities of any Oncor Ring-Fenced Entity that were subject to the substantive consolidation order would be available to help satisfy the debt or contractual obligations of the Texas Holdings Group entity that was a debtor in bankruptcy and subject to the same substantive consolidation order. However, even if any Oncor Ring-Fenced Entity were included in such a substantive consolidation order, the secured creditors of Oncor would retain their liens and priority with respect to Oncor's assets.

There can be no assurance that the Bankruptcy Court will not order an Oncor Ring-Fenced Entity's assets and liabilities to be substantively consolidated with those of the Debtors or that the Chapter 11 Cases will not result in a disruption of services Oncor receives from, or jointly with, EFIH's affiliates. See Note 1 to the Financial Statements for additional information on ring-fencing measures.

In addition, Oncor's access to capital markets and cost of debt could be directly affected by its credit ratings. Any adverse action with respect to Oncor's credit ratings would generally cause borrowing costs to increase and the potential pool of investors and funding sources to decrease. Oncor's credit ratings are currently substantially higher than those of the Texas Holdings Group. If credit rating agencies were to change their views of Oncor's independence from any member of the Texas Holdings Group, Oncor's credit ratings would likely decline. Despite the ring-fencing measures, rating agencies have in the past, and could in the future, take an adverse action with respect to Oncor's credit ratings in response to credit restructuring or other activities by EFH Corp. or any of its subsidiaries, including the Chapter 11 Cases In the event any such adverse action takes place and causes Oncor's borrowing costs to increase, it may not be able to recover these increased costs if they exceed Oncor's PUCT-approved cost of debt determined in its most recent rate case or subsequent rate cases.

**PX 115**
**Page 16 of 154**

**Risks Related to EFIH's Investment in Oncor**

EFIH is a holding company conducting its operations principally through its subsidiary, Oncor (in which it indirectly holds an approximate 80% ownership interest). As such, the risks described below relating to Oncor's business will apply to EFIH. Given the ring-fencing measures that have been implemented by EFH Corp. and Oncor described in Note 1 to the Financial Statements, EFIH will have limited ability to mitigate any of the risks described below.

***Oncor's business is subject to ongoing complex governmental regulations and legislation that have impacted, and will continue in the future to impact, its business and/or results of operations.***

Oncor's business operates in a changing market environment influenced by various state and federal legislative and regulatory initiatives regarding the electricity industry. Oncor will need to continually adapt to these changes.

Oncor's business is subject to changes in state and federal laws (including PURA, the Federal Power Act, the Public Utility Regulatory Policies Act of 1978 and the Energy Policy Act of 2005), changing governmental policy and regulatory actions including a review of a change in control of Oncor in connection with resolution of the EFH Bankruptcy Proceedings(including those of the PUCT, the NERC, the TRE, the TCEQ, the FERC and the EPA) and the rules, guidelines and protocols of ERCOT with respect to matters including, but not limited to, market structure and design, construction and operation of transmission facilities, acquisition, disposal, depreciation and amortization of regulated assets and facilities, recovery of costs and investments, return on invested capital and environmental matters. Changes in, revisions to, or reinterpretations of existing laws and regulations and other regulatory actions may have a material effect on Oncor's business and it could be exposed to increased costs to comply with the more stringent requirements or new interpretations and to potential liability for customer refunds, penalties or other amounts. If it is determined that Oncor did not comply with applicable statutes, regulations, rules, tariffs or orders and it is ordered to pay a material amount in customer refunds, penalties or other amounts, its financial condition, results of operations, and cash flows would be materially affected.

The Texas Legislature meets every two years. The current regular legislative session began in January 2015; however, at any time the governor of Texas may convene a special session of the legislature. During any regular or special session, bills may be introduced that, if adopted, could materially affect Oncor's business and its business prospects.

***The rates of Oncor's electricity delivery business are subject to regulatory review, and may be reduced below current levels, which could adversely impact Oncor's financial condition and results of operations.***

The rates charged by Oncor are regulated by the PUCT and certain cities and are subject to cost-of-service regulation and annual earnings oversight. This regulatory treatment does not provide any assurance as to achievement of earnings levels. Oncor's rates are regulated based on an analysis of Oncor's costs and capital structure, as reviewed and approved in a regulatory proceeding. While rate regulation is premised on the full recovery of prudently incurred costs and a reasonable rate of return on invested capital, there can be no assurance that the PUCT will judge all of Oncor's costs to have been prudently incurred, that the PUCT will not reduce the amount of invested capital included in the capital structure that Oncor's rates are based upon, or that the regulatory process in which rates are determined will always result in rates that will produce full recovery of Oncor's costs, including regulatory assets reported on Oncor's balance sheet, and the return on invested capital allowed by the PUCT. See Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations – Significant Activities and Events and Items Influencing Future Performance – Oncor Matters with the PUCT* for discussion of recent and pending rate-related filings with the PUCT.

**Oncor's Operational Risks**

***Attacks on Oncor's infrastructure or other events that disrupt or breach its cyber/data or physical security measures could have an adverse impact on its reputation, disrupt business operations and expose it to significant liabilities including penalties for failure to comply with federal, state or local statutes and regulations, which could have a material effect on Oncor's results of operations, liquidity and financial condition.***

A breach of cyber/data security measures that impairs Oncor's information technology infrastructure could disrupt normal business operations and affect its ability to control its transmission and distribution assets, access customer information and limit communication with third parties. Recently there have been numerous attacks on government and industry information technology systems that have resulted in material operational, reputation and/or financial costs. While Oncor has controls in place designed to protect its information technology infrastructure and has not had any significant breaches, any loss of confidential or proprietary data through a breach could adversely affect Oncor's reputation, expose it to material legal and regulatory claims, impair its ability to execute on business strategies and/or materially affect its results of operations, liquidity and financial condition.

PX 115
Page 17 of 154

A physical attack on Oncor's transmission and distribution infrastructure could also interfere with normal business operations and affect its ability to control its transmission and distribution assets. While Oncor has security measures in place designed to protect its transmission and distribution system and has not had any significant security breaches, a physical security breach could adversely affect its reputation, expose Oncor to material regulatory claims and/or materially affect its results of operations, liquidity and financial condition.

The FERC has established standards for assets identified as "critical cyber assets." Under the Energy Policy Act of 2005, the FERC can impose penalties (up to $1 million per day per violation) for failure to comply with mandatory electric reliability standards, including standards to protect the power system against potential disruptions from cyber and physical security breaches.

Oncor participates in industry groups and discussions with regulators to remain current on emerging threats and mitigating techniques. These groups include, but are not limited to: the US Cyber Emergency Response Team, the National Electric Sector Cyber Security Organization, the Department of Homeland Security, the US Nuclear Regulatory Commission and NERC. Oncor also applies the knowledge gained by continuing to invest in technology, processes, security measures and services to detect, mitigate and protect its assets, both physical and cyber. These investments include upgrades to network architecture and physical security measures, regular intrusion detection monitoring and compliance with emerging industry regulation.

***Oncor's capital deployment program may not be executed as planned, which could adversely impact Oncor's financial condition and results of operations.***

There can be no guarantee that the execution of Oncor's capital deployment program for its electricity delivery facilities will be successful, and there can be no assurance that the capital investments Oncor intends to make in connection with its electricity delivery business will produce the desired reductions in cost and improvements to service and reliability. Furthermore, there can be no guarantee that Oncor's capital investments will ultimately be recoverable through rates or, if recovered, that they will be recovered on a timely basis. For more information regarding the limitation on recovering the value of investments using rates, see Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations – Significant Activities and Events and Items Influencing Future Performance – Oncor Matters with the PUCT and – Key Risks and Challenges.*

***Market volatility may impact Oncor's business and financial condition in ways that Oncor currently cannot predict.***

Because its operations are capital intensive, Oncor expects to rely over the long-term upon access to financial markets as a significant source of liquidity for capital requirements not satisfied by cash-on-hand, operating cash flows or its revolving credit facility. Considering Oncor's construction plans to service its growing customer base and ERCOT needs, it is likely Oncor will incur additional debt. In addition, Oncor may incur additional debt in connection with other investments in infrastructure or technology, such as smart grid systems. Oncor's ability to access the capital or credit markets may be severely restricted at a time when Oncor would like, or need, to access those markets, which could have an impact on Oncor's flexibility to react to changing economic and business conditions. In addition, the cost of debt financing may be materially and adversely impacted by these market conditions. Even if Oncor is able to obtain debt financing, it may be unable to recover in rates some or all of the costs of such debt financing if they exceed its PUCT-approved cost of debt determined in Oncor's most recent rate review or subsequent rate reviews. Accordingly, there can be no assurance that the capital and credit markets will continue to be a reliable or acceptable source of short-term or long-term financing for Oncor. Additionally, disruptions in the capital and credit markets could have a broader impact on the economy in ways that could lead to reduced electricity usage, which could have a negative impact on Oncor's revenues, or have an impact on Oncor's customers, counterparties and/or lenders, causing them to fail to meet their obligations to Oncor.

***Adverse actions with respect to Oncor's credit ratings could negatively affect Oncor's ability to access capital.***

Oncor's access to capital markets and its cost of debt could be directly affected by its credit ratings. Any adverse action with respect to Oncor's credit ratings could generally cause borrowing costs to increase and the potential pool of investors and funding sources to decrease. Oncor's credit ratings are currently substantially higher than those of EFH Corp. and EFIH. If credit rating agencies were to change their views on Oncor's independence from EFH Corp., Oncor's credit ratings would likely decline. Despite the ring-fencing measures, rating agencies have in the past taken, and could in the future take, an adverse action with respect to Oncor's credit ratings in response to financing and liability management activities by, or restructuring transactions involving EFH Corp. and other members of the Texas Holdings Group. Further, it is unclear how the progress of the EFH Bankruptcy Proceedings may affect Oncor's credit ratings. In the event any action in connection with the EFH Bankruptcy Proceedings causes Oncor's borrowing costs to increase, Oncor may not be able to recover such increased costs if they exceed the PUCT-approved cost of debt determined in its most recent rate review or subsequent rate reviews.

PX 115
Page 18 of 154

Most of Oncor's suppliers and counterparties require an expected level of creditworthiness in order for them to enter into transactions with Oncor. If its credit ratings decline, the costs to operate Oncor's business could increase because counterparties could require the posting of collateral in the form of cash-related instruments, or counterparties could decline to do business with Oncor.

***Oncor is subject to mandatory reliability standards and periodic audits of its compliance with those standards. Efforts to comply with those standards could subject Oncor to higher operating costs and/or increased capital expenditures, and non-compliance with applicable standards could subject Oncor to penalties that could have a material effect on its business.***

The FERC has approved the delegation by NERC of compliance and enforcement authority for reliability in the ERCOT region to the TRE. To maintain compliance with the mandatory reliability standards, Oncor may be subjected to higher operating costs and/or increased capital expenditures. While Oncor expects to recover costs and expenditures from customers through regulated rates, there can be no assurance that the PUCT will approve full recovery of such costs or the timing of any such recovery. In addition, if Oncor were to be found in noncompliance with applicable reliability standards, it could be subject to sanctions, including monetary penalties. Under the Energy Policy Act of 2005, FERC can impose penalties (up to $1 million per day per violation) for failure to comply with reliability standards, which would not be recoverable from customers through regulated rates. Oncor has five registrations with NERC – as a transmission planner, a transmission owner, a transmission operator, a distribution provider and a load serving entity. As a registered entity, Oncor is subject to periodic audits by the TRE of its compliance with reliability standards. These audits will occur as designated by the TRE at a minimum of every three years. Oncor cannot predict the outcome of any such audits.

***Oncor's revenues are concentrated in a small number of customers, including TCEH, and any delay or default in payment could adversely affect its cash flows, financial condition and results of operations.***

Oncor's revenues from the distribution of electricity are collected from approximately 80 REPs (including TXU Energy, a subsidiary of TCEH) and certain electric cooperatives in Oncor's certificated service area, that sell the electricity Oncor distributes to consumers. Revenues from services provided to TCEH represented 25% of Oncor's total reported consolidated revenues for the year ended December 31, 2014. Revenues from services provided to REP subsidiaries of a non-affiliated entity collectively represented 16% of Oncor's total reported consolidated revenues for the year ended December 31, 2014. Adverse economic conditions, structural problems in the market served by ERCOT, the EFH Bankruptcy Proceedings involving TCEH or the financial difficulties of other REPs could impair the ability of these REPs to pay for Oncor's services or could cause them to delay such payments. Oncor depends on these REPs to timely remit these revenues. Oncor could experience delays or defaults in payment from these REPs, which could adversely affect Oncor's cash flows, financial condition and results of operations. Due to commitments made to the PUCT in connection with the Merger, Oncor will not be allowed to recover bad debt expense, or certain other costs and expenses, from rate payers in the event of a default or bankruptcy by an affiliate REP.

13

***In the future, Oncor could have liquidity needs that could be difficult to satisfy under some circumstances, especially in uncertain financial market conditions.***

Oncor's operations are capital intensive. Oncor relies on access to financial markets and its revolving credit facility as a significant source of liquidity for capital requirements, including maturities of long-term debt, not satisfied by cash-on-hand or operating cash flows. The inability to raise capital on favorable terms or access liquidity facilities, particularly during times of uncertainty similar to those experienced in the financial markets in 2008 and 2009, could adversely impact Oncor's ability to sustain and grow its business and would likely increase capital costs that may not be recoverable through rates. Oncor's access to the financial markets and its revolving credit facility, and the pricing and terms Oncor receives in the financial markets, could be adversely impacted by various factors, such as:

- changes in financial markets that reduce available credit or the ability to obtain or renew liquidity facilities on acceptable terms;
- economic weakness in the ERCOT market;
- changes in interest rates;
- a deterioration of Oncor's credit or a reduction in its credit ratings;
- a deterioration of the credit or insolvency or financial distress of one or more lenders under Oncor's revolving credit facility that affects the ability of the lender(s) to make loans to Oncor;
- a deterioration of the credit or bankruptcy of EFH Corp. or EFH Corp.'s other subsidiaries or a reduction in the credit ratings of EFH Corp. or EFH Corp.'s other subsidiaries that is perceived to potentially have an adverse impact on Oncor despite the ring-fencing of the Oncor Ring-Fenced Entities from the Texas Holdings Group;
- a material breakdown in Oncor's risk management procedures; and
- the occurrence of changes that restrict Oncor's ability to access its revolving credit facility.

Oncor's primary source of liquidity aside from operating cash flows is its ability to borrow under its revolving credit facility. The revolving credit facility contains a debt-to-capital ratio covenant that effectively limits Oncor's ability to incur indebtedness in the future. At December 31, 2014, Oncor was in compliance with such covenant. The revolving credit facility and the senior notes and debentures issued by Oncor are secured by the Deed of Trust, which permits Oncor to secure other indebtedness with the lien of the Deed of Trust up to the aggregate of (i) the amount of available bond credits, and (ii) 85% of the lower of the fair value or cost of certain property additions that could be certified to the Deed of Trust collateral agent. At December 31, 2014, the available bond credits were approximately $2.208 billion and the amount of future debt Oncor could secure with property additions, subject to those property additions being certified to the Deed of Trust collateral agent, was $1.570 billion. In connection with the Merger, Oncor committed to the PUCT that it would maintain a regulatory capital structure at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. At December 31, 2014, Oncor's regulatory capitalization ratio was 58.8% debt and 41.2% equity. Oncor's ability to incur additional long-term debt will be limited by its regulatory capital structure.

***The costs of providing pension and other postretirement employee benefits (OPEB) and related funding requirements may have a material adverse effect on Oncor's financial condition, results of operations and cash flows.***

Oncor offers certain pension, health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees through pension and OPEB plans. Previously, some of these benefits were provided through participation with EFH Corp. and certain other subsidiaries of EFH Corp. in joint plans.

In 2012, Oncor entered into an agreement with EFH Corp. to assume primary responsibility for pension benefits of certain participants for whom EFH Corp. bore primary funding responsibility (a closed group of retired and terminated vested plan participants not related to Oncor's regulated utility business). As the Oncor Retirement Plan received an amount of plan assets equal to the liabilities Oncor assumed for those participants, execution of the agreement did not have a material impact on its reported results of operations or financial condition in 2012. However, there can be no guarantee that such assumption will not have an impact on Oncor's results of operations or financial condition in the future.

In April 2014, Oncor entered into an agreement with EFH Corp. in which Oncor agreed to transfer to the Oncor OPEB Plan effective July 1, 2014, the assets and liabilities related to its eligible current and future retirees as well as retirees of EFH Corp. whose employment included service with both Oncor (or a predecessor regulated electric business) and a nonregulated business of EFH Corp. Pursuant to the agreement, EFH Corp. will retain its portion of the liability for retiree benefits related to those retirees. Since the Oncor OPEB Plan offers identical benefits as the EFH OPEB Plan and Oncor and EFH Corp. retain the same responsibility for participants as before, there was no financial impact as a result of the transfer other than from a remeasurement of the Oncor OPEB Plan's asset values and obligations. As Oncor is not responsible for EFH Corp.'s portion of the Oncor OPEB Plan's unfunded liability totaling $101 million as of December 31, 2014, that amount is not reported on its balance sheet.

Oncor's costs or share of the costs of providing pension and OPEB benefits and related funding requirements are dependent upon numerous factors, assumptions and estimates and are subject to changes in these factors, assumptions and estimates, including the market value of the assets funding the pension and OPEB plans. Benefits costs and related funding requirements are also subject to changing employee demographics (including but not limited to age, compensation levels and years of accredited service), the level of contributions made to retiree plans, expected and actual earnings on plan assets and the discount rates used in determining the projected benefit obligation. Changes made to the provisions of the plans may also impact current and future benefit costs. Fluctuations in actual market returns as well as changes in general interest rates may result in increased or decreased benefit costs in future periods.

If EFH Corp. was unable to make contributions to the EFH qualified retirement plan (the plan) assets while it is a member of Oncor's controlled group within the meaning of ERISA, Oncor could be liable under ERISA for such contributions as well as any unfunded plan liability that EFH Corp. is unable to pay. EFH Corp.'s portion of the plan's unfunded pension liability is $30 million at December 31, 2014. Funding for the plan is expected to total approximately $52 million in the 2015 to 2019 period, of which Oncor is expected to fund $41 million.

***Oncor's rights under certain agreements with EFH Corp. and other members of the Texas Holdings Group could be adversely affected in connection with the EFH Bankruptcy Proceedings***.

Oncor is party to various contracts and unexpired leases with EFH Corp. and other members of the Texas Holdings Group. The US Bankruptcy Code permits a debtor in bankruptcy to assume (accept) or reject contracts and unexpired leases. If members of the Texas Holdings Group, who are debtors in the EFH Bankruptcy Proceedings, were to reject some or all of their contracts and unexpired leases with Oncor in connection with that bankruptcy case, Oncor's results of operations and financial condition could be adversely affected, particularly if Oncor is an unsecured creditor with respect to pre-petition amounts owed to Oncor under such contracts.

***Oncor's results of operations and financial condition could be negatively impacted by any development or event beyond Oncor's control that causes economic weakness in the ERCOT market.***

Oncor derives substantially all of its revenues from operations in the ERCOT market, which covers approximately 75% of the geographical area in the State of Texas. As a result, regardless of the state of the economy in areas outside the ERCOT market, economic weakness in the ERCOT market could lead to reduced demand for electricity in the ERCOT market. Such a reduction could have a material negative impact on Oncor's results of operations and financial condition.

***Disruptions at power generation facilities owned by third parties could interrupt Oncor's sales of transmission and distribution services.***

The electricity Oncor transmits and distributes to customers of REPs is obtained by the REPs from electricity generation facilities. Oncor does not own or operate any generation facilities. If generation is disrupted or if generation capacity is inadequate, Oncor's sales of transmission and distribution services may be diminished or interrupted, and its results of operations, financial condition and cash flows may be adversely affected.

**PX 115**
**Page 21 of 154**

***The operation and maintenance of electricity delivery facilities involves significant risks that could adversely affect Oncor's results of operations and financial condition.***

The operation and maintenance of delivery facilities involves many risks, including equipment breakdown or failure of facilities, lack of sufficient capital to maintain the facilities, impact of unusual or adverse weather conditions or other natural events, as well as the risk of performance below expected levels of efficiency or reliability, the occurrence of any of which could result in lost revenues and/or increased expenses that may not be recoverable through rates. A significant number of Oncor's facilities were constructed many years ago. In particular, older transmission and distribution equipment, even if maintained in accordance with good engineering practices, may require significant capital expenditures to keep operating at peak efficiency or reliability. The risk of increased maintenance and capital expenditures arises from damage to facilities due to storms, natural disasters, wars, terrorist acts and other catastrophic events. Further, Oncor's ability to successfully and timely complete capital improvements to existing facilities or other capital projects is contingent upon many variables and subject to substantial risks. Should any such efforts be unsuccessful, Oncor could be subject to additional costs that may not be recoverable through rates and/or the write-off of its investment in the project or improvement.

Insurance, warranties or performance guarantees may not cover all or any of the lost revenues or increased expenses that could result from the risks discussed above. Likewise, Oncor's ability to obtain insurance, and the cost of and coverage provided by such insurance, could be affected by events outside Oncor's control.

***Changes in technology or increased electricity conservation efforts may reduce the value of Oncor's electricity delivery facilities and may significantly impact Oncor's business in other ways as well.***

Research and development activities are ongoing to improve existing and alternative technologies to produce electricity, including gas turbines, fuel cells, microturbines, photovoltaic (solar) cells and concentrated solar thermal devices. It is possible that advances in these or other technologies will reduce the costs of electricity production from these technologies to a level that will enable these technologies to compete effectively with traditional generation plants. Changes in technology could also alter the channels through which retail customers buy electricity. To the extent self-generation facilities become a more cost-effective option for certain customers, our revenues could be materially reduced.

Also, electricity demand could be reduced by increased conservation efforts and advances in technology, which could likewise significantly reduce the value of Oncor's electricity delivery facilities. Certain regulatory and legislative bodies have introduced or are considering requirements and/or incentives to reduce energy consumption by a fixed date. Effective energy conservation by its customers could result in reduced energy demand, or significantly slow the growth in demand. Such reduction in demand could materially reduce its revenues. Furthermore, Oncor may incur increased capital expenditures if it is required to invest in conservation measures.

***Oncor is dependent upon a limited number of suppliers and service providers for certain of its operations. If any of these suppliers or service providers failed or became unable to perform on their agreements with Oncor, it could disrupt Oncor's business and have an adverse effect on Oncor's cash flows, financial condition and results of operations.***

Oncor relies on suppliers and service providers to provide it with certain specialized materials and services, including materials and services for power line maintenance, repair and construction, its advanced metering system, information technology and customer operations. The financial condition of Oncor's suppliers and service providers may be adversely affected by general economic conditions, such as credit risk. Because many of the tasks of these suppliers and service providers require specialized electric industry knowledge and equipment, if any of these parties fail to perform, go out of business or otherwise become unable to perform, Oncor may not be able to transition to substitute suppliers or service providers in a timely manner. This could delay Oncor's construction and improvement projects, increase its costs and disrupt its operations, which could negatively impact its business and reputation. In addition, Oncor could be subject to fines or penalties in the event a delay resulted in a violation of a PUCT or other regulatory order.

***Oncor's revenues and results of operations are seasonal.***

A significant portion of Oncor's revenues is derived from rates that Oncor collects from REPs based on the amount of electricity Oncor distributes on behalf of such REPs. Sales of electricity to residential and commercial customers are influenced by temperature fluctuations. Thus, Oncor's revenues and results of operations are subject to seasonality, weather conditions and other electricity usage drivers, with revenues being highest in the summer.

PX 115
Page 22 of 154

***The litigation environment in which Oncor operates poses a significant risk to its business.***

Oncor is involved in the ordinary course of business in a number of lawsuits involving employment, commercial and environmental issues, and other claims for injuries and damages, among other matters. Judges and juries in the State of Texas have demonstrated a willingness to grant large verdicts, including punitive damages, to plaintiffs in personal injury, property damage and business tort cases. Oncor uses appropriate means to contest litigation threatened or filed against it, but the litigation environment in the State of Texas poses a significant business risk.

***The loss of the services of Oncor's key management and personnel could adversely affect Oncor's ability to operate its business.***

Oncor's future success will depend on its ability to continue to attract and retain highly qualified personnel. Oncor competes for such personnel with many other companies, in and outside Oncor's industry, government entities and other organizations. Oncor may not be successful in retaining its current personnel or in hiring or retaining qualified personnel in the future. Failure to attract new personnel or retain existing personnel could have a material effect on Oncor's business.

***EFIH has disclosed a material weakness in its internal control over financial reporting relating to its accounting for deferred income taxes, which could adversely affect EFIH's ability to report its financial condition, results of operations or cash flows accurately and on a timely basis.***

In connection with EFIH's assessment of internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act of 2002, it identified a material weakness in its internal control over financial reporting relating to its accounting for deferred income taxes. For a discussion of EFIH's internal control over financial reporting and a description of the identified material weakness, see *Management's Annual Report on Internal Control over Financial Reporting* under Item 9A, *Controls and Procedures.*

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of EFIH's annual or interim financial statements will not be prevented or detected on a timely basis. Management's procedures and testing identified control deficiencies related to incomplete underlying data and insufficient documentation in the reconciliation process related to deferred income tax accounting that led management to conclude that control deficiencies existed at December 31, 2014. As a result of these deficiencies, until they are substantially remediated, it is reasonably possible that internal controls over financial reporting may not prevent or detect errors in the financial statements from occurring that could have been material, either individually or in the aggregate.

While actions have been taken to improve EFIH's internal controls in response to the identified material weakness related to certain aspects of accounting for deferred income taxes, additional work continues to address and remediate the identified material weakness. Until these actions are fully implemented and tested, a material weakness in its internal control over financial reporting will continue to exist. As a result, EFIH's ability to timely or accurately report its future financial condition, results of operations or cash flows may be adversely affected.

**Item 1B.    UNRESOLVED STAFF COMMENTS**

None.

**Item 3.        LEGAL PROCEEDINGS**

From time to time, EFIH may be involved in various legal and administrative proceedings in the normal course of business, the ultimate resolutions of which, in the opinion of management, should not have a material effect on its results of operations, liquidity or financial condition.

**Item 4.MINE SAFETY DISCLOSURES**

Not applicable.

18

## PART II.

**Item 5.    MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED EQUITY HOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

Not applicable. EFIH's outstanding membership interest is held by EFH Corp.

See Note 11 to the Financial Statements for a description of cash distributions EFIH paid to EFH Corp. and the restrictions on EFIH's ability to pay such distributions.

**Item 6.    SELECTED FINANCIAL DATA**

### ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC
### SELECTED CONSOLIDATED FINANCIAL DATA
**(millions of dollars, except ratios)**

| | At December 31, | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2014** | | **2013** | | **2012 (c)** | | **2011** | | **2010** |
| Total assets | $ 7,236 | $ | 6,252 | $ | 7,023 | $ | 9,517 | $ | 8,547 |
| Capitalization | | | | | | | | | |
| Borrowings under debtor-in-possession credit facility | $ 5,400 | $ | — | $ | — | $ | — | $ | — |
| Debt (a) | — | | 7,877 | | 6,954 | | 3,436 | | 3,172 |
| Prepetition notes reported as liabilities subject to compromise (a) (b) | 3,876 | | — | | — | | — | | — |
| Membership interests | (2,203) | | (1,822) | | (179) | | 5,805 | | 5,193 |
| Total | $ 7,073 | $ | 6,055 | $ | 6,775 | $ | 9,241 | $ | 8,365 |
| Capitalization ratios | | | | | | | | | |
| Borrowings under debtor-in-possession credit facility | 76.3 % | | — % | | — % | | —% | | —% |
| Debt (a) | — % | | 130.1 % | | 102.6 % | | 37.2% | | 37.9% |
| Prepetition notes reported as liabilities subject to compromise (a) (b) | 54.8 % | | — % | | — % | | —% | | —% |
| Membership interests | (31.1)% | | (30.1)% | | (2.6)% | | 62.8% | | 62.1% |
| Total | 100.0 % | | 100.0 % | | 100.0 % | | 100.0% | | 100.0% |

| | Year Ended December 31, | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2014** | | **2013** | | **2012 (d)** | | **2011** | | **2010** |
| Income (loss) before income taxes and equity in earnings of unconsolidated subsidiary | $ (858) | $ | (606) | $ | 72 | $ | 204 | $ | (106) |
| Equity in earnings of unconsolidated subsidiary (net of tax) | $ 349 | $ | 335 | $ | 270 | $ | 286 | $ | 277 |
| Net income (loss) | $ (354) | $ | (102) | $ | 315 | $ | 417 | $ | 213 |
| Ratio of earnings to fixed charges (c) | — | | — | | 1.42 | | 1.92 | | 1.20 |

_____

(a)    Includes push down of certain EFH Corp. (parent) debt due to EFIH's guarantee of the debt (see Note 8 to the Financial Statements).

(b)    Includes both unsecured and secured obligations incurred prior to the Petition Date, and includes $33 million of deferred debt issuance costs.

(c)    Fixed charges exceeded earnings by $656 million and $393 million for years ended December 31, 2014 and 2013, respectively.

(d)    See Note 11 to the Financial Statements for discussion of the reclassification to membership interests in December 2012 of the EFH Corp. and TCEH debt EFIH held as an investment.

See Notes to the Financial Statements.

19

**PX 115**
**Page 26 of 154**

***Quarterly Information (Unaudited)***

Results of operations by quarter are summarized below. In EFIH's opinion, all adjustments (consisting of normal recurring accruals) necessary for a fair statement of such amounts have been made. Quarterly results are not necessarily indicative of a full year's operations because of seasonal and other factors. All amounts are in millions of dollars and may not add to full year amounts due to rounding.

| | First Quarter | | Second Quarter | | Third Quarter | | Fourth Quarter | |
|---|---|---|---|---|---|---|---|---|
| **2014:** | | | | | | | | |
| Income (loss) before income taxes and equity in earnings of unconsolidated subsidiary (a) | $ | (286) | $ | (482) | $ | (79) | $ | (11) |
| Equity in earnings of unconsolidated subsidiary (net of tax) | $ | 80 | $ | 72 | $ | 123 | $ | 74 |
| Net income (loss) (a) | $ | (134) | $ | (292) | $ | 69 | $ | 3 |

| | First Quarter | | Second Quarter | | Third Quarter | | Fourth Quarter | |
|---|---|---|---|---|---|---|---|---|
| **2013:** | | | | | | | | |
| Income (loss) before income taxes and equity in earnings of unconsolidated subsidiary (a) | $ | 100 | $ | (190) | $ | (196) | $ | (320) |
| Equity in earnings of unconsolidated subsidiary (net of tax) | $ | 67 | $ | 74 | $ | 114 | $ | 80 |
| Net income (a) | $ | 131 | $ | (49) | $ | (14) | $ | (170) |

_____

(a)  For the years ended December 31, 2014 and 2013, EFIH fully reserved income tax receivables from EFH Corp. in the amounts of $125 and $110 million (see Note 5 to the Financial Statements).

20

**Item 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

The following discussion and analysis of EFIH's financial condition and results of operations for the years ended December 31, 2014, 2013 and 2012 should be read in conjunction with Selected Consolidated Financial Data and its audited consolidated financial statements and the notes to those statements. Comparisons of year-over-year results are impacted by the effects of the Bankruptcy Filing and the application of Financial Accounting Standards Board Accounting Standards Codification (ASC) 852, *Reorganizations*.

All dollar amounts in the tables in the following discussion and analysis are stated in millions of US dollars unless otherwise indicated.

*Business*

EFIH, a direct, wholly owned subsidiary of EFH Corp., is a Dallas, Texas-based holding company whose wholly owned subsidiary, Oncor Holdings, holds a majority interest (approximately 80%) in Oncor. Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell electricity to residential, business and other consumers in Texas. Revenues from services provided to TCEH represented 25% and 27% of Oncor's total reported consolidated revenues for the years ended December 31, 2014 and 2013, respectively. EFIH has no reportable business segments. See Notes 1 and 3 to the Financial Statements for a discussion of the reporting of EFIH's investment in Oncor Holdings as an equity method investment and a description of the ring-fencing measures implemented with respect to Oncor Holdings and Oncor. These measures were put in place to mitigate Oncor's and Oncor Holdings' exposure to the Texas Holdings Group with the intent to minimize the risk that a court would order any of the assets and liabilities of the Oncor Ring-Fenced Entities to be substantively consolidated with those of any member of the Texas Holdings Group in the event any such member were to become a debtor in a bankruptcy case. Consistent with these ring-fencing measures, the assets and liabilities of the Oncor Ring-Fenced Entities have not been, and are not expected to be, substantively consolidated with the assets and liabilities of the Debtors in the Chapter 11 Cases.

*Significant Activities and Events and Items Influencing Future Performance*

***Filing under Chapter 11 of the United States Bankruptcy Code*** — On April 29, 2014 (the Petition Date), EFH Corp. and the substantial majority of its direct and indirect subsidiaries, including EFIH, EFCH and TCEH but excluding the Oncor Ring-Fenced Entities, filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. During the pendency of the Chapter 11 Cases, the Debtors (including the EFIH Debtors) will operate their businesses as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code.

For additional discussion of the Chapter 11 Cases and its effects, see Note 2 to the Financial Statements and Item 1A, *Risk Factors – Risks Related to the Chapter 11 Cases*. See Note 6 to the Financial Statements for discussion of the EFIH DIP Facilities.

***Proposed Sale of EFH Corp.'s Indirect Economic Ownership Interest in Oncor*** — In January 2015, the Bankruptcy Court approved the Debtors' bidding procedures motion that sets forth the process by which the Debtors are authorized to solicit proposals (i.e., bids) from third parties to acquire (in any form and employing any structure, whether taxable (in whole or in part) or tax-free) EFH Corp.'s indirect economic ownership interest in Oncor in accordance with the Bankruptcy Code. These bidding procedures contemplate that the Debtors select a stalking horse bid after a two-stage closed bidding process, and, after approval by the Bankruptcy Court of such stalking horse bid, the Debtors conduct a round of open bidding culminating in an auction intended to obtain a higher or otherwise best bid for a transaction. Initial bids were received in early March 2015, and each of the Debtors is currently assessing those submissions. For additional discussion see Note 2 to the Financial Statements and Item 1A, *Risk Factors – Risks Related to the Chapter 11 Cases*.

***Repayment of EFIH Second Lien Notes*** — In March 2015, with the approval of the Bankruptcy Court, EFIH used some of its cash to repay (Repayment) $735 million, including interest at contractual rates, in amounts outstanding under EFIH's pre-petition 11.00% Second Lien Notes due 2021 (11.00% Notes) and 11.75% Second Lien Notes due 2022 (11.75% Notes) and $15 million in certain fees and expenses of the trustee for such notes. The Repayment required the requisite consent of the lenders under the EFIH DIP Facility. EFIH received such consent from approximately 97% of the lenders under the EFIH DIP Facility and paid an aggregate consent fee equal to approximately $13 million. As a result of the Repayment, as of the date hereof, the principal amount outstanding on the 11.00% Notes and 11.75% are $322 million and $1.388 billion, respectively.

**PX 115**
**Page 28 of 154**

*EFIH First Lien Notes Settlement* — See Note 6 to the Financial Statements for discussion of the incurrence of the EFIH DIP Facility and the use of certain proceeds to settle the EFIH First Lien Notes.

*Oncor Credit Risk Exposure to EFH Corp. and its Subsidiaries* — As a result of the Bankruptcy Filing, Oncor had credit risk exposure to trade accounts receivable from TCEH, which related to delivery services provided by Oncor to TCEH's retail electricity operations. At the Petition Date, these accounts receivable totaled $109 million. In June 2014, the Bankruptcy Court authorized the TCEH Debtors to pay all pre-petition delivery charges due Oncor, and such amounts were paid in full.

EFH Corp., Oncor Holdings, Oncor and Oncor's minority investor are parties to a Federal and State Income Tax Allocation Agreement. Additional income tax amounts receivable or payable may arise in the normal course under that agreement.

Further, EFIH had current income tax receivables arising under the Federal and State Income Tax Allocation Agreement from EFH Corp. which totaled $125 million and $110 million at December 31, 2014 and 2013, respectively. Because of the significant uncertainty regarding the ultimate settlement of these amounts due to the Bankruptcy Filing, the income tax receivables were fully reserved, resulting in charges of $125 million and $110 million for the years ended December 31, 2014 and 2013, respectively, reported in other deductions. Additionally, as of December 31, 2014, Oncor has a noncurrent tax receivable from EFH Corp. of $64 million arising from the Oncor Tax Sharing Agreement.

*Settlement of Make-Whole Agreements with Oncor* — See Note 12 to the Financial Statements for discussion of the settlement in 2012 of EFIH's interest and tax-related reimbursement agreements with Oncor associated with Oncor's bankruptcy-remote financing subsidiary's securitization bonds.

*Oncor's Investment in Transmission and Distribution Infrastructure* — Oncor expects its capital expenditures on transmission and distribution infrastructure to total approximately $1.1 billion in 2015. Oncor's management currently expects to recommend to its board of directors capital expenditures of approximately $1.4 billion in 2016 and approximately $1.5 billion in each of the years 2017 through 2020. These capital expenditures are expected to be used for investment in transmission and distribution infrastructure, including approximately $1.2 billion in the period 2015 through 2018 that Oncor currently expects to use for electric infrastructure enhancement in the West Texas region.

*Oncor Matters with the PUCT* — *Application for Reconciliation of Advanced Meter Surcharge (PUCT Docket No. 41814)* — In September 2013, Oncor filed an application with the PUCT for reconciliation of all costs incurred and investments made from January 1, 2011 through December 31, 2012, in the deployment of Oncor's advanced metering system (AMS) pursuant to the AMS Deployment Plan approved in Docket No. 35718. During the 2011 to 2012 period, Oncor incurred approximately $300 million of capital expenditures and $34 million of operating and maintenance expense, and billed customers approximately $174 million through the AMS surcharge. Oncor was not seeking a change in the AMS surcharge in this proceeding. In November 2013, Oncor filed an amended request and the PUCT Staff filed its recommendation concluding that all costs presented in the amended application, with the exception of less than $1,000 of expenses, are appropriate for recovery. In December 2013, the PUCT issued its final order in the proceeding agreeing with the PUCT Staff's recommendation, finding that costs expended and investments made in the deployment of Oncor's AMS through December 31, 2012 were properly allocated, reasonable and necessary.

*Competitive Renewable Energy Zones (CREZs) (PUCT Docket Nos. 35665 and 37902)* — In 2009, the PUCT awarded Oncor CREZ construction projects. These projects involve the construction of transmission lines and stations to support the transmission of electricity from renewable energy sources, principally wind generation facilities, in the western part of Texas to population centers in the eastern part of Texas, as well as building additional facilities to provide further voltage support to the transmission grid as a result of CREZ. At December 31, 2014, Oncor's cumulative CREZ-related capital expenditures totaled $2.011 billion, including $140 million in 2014.

*2008 Rate Review Filing (PUCT Docket No. 35717)* — In August 2009, the PUCT issued a final order with respect to Oncor's June 2008 rate review filing with the PUCT and 204 cities based on a test year ended December 31, 2007, and new rates were implemented in September 2009. Oncor and four other parties appealed various portions of the rate review final order to a state district court. In January 2011, the district court signed its judgment reversing the PUCT with respect to two issues: the PUCT's disallowance of certain franchise fees and the PUCT's decision that PURA no longer requires imposition of a rate discount for state colleges and universities. Oncor filed an appeal with the Texas Third Court of Appeals (Austin Court of Appeals) in February 2011 with respect to the issues it appealed to the district court and did not prevail upon, as well as the district court's decision to reverse the PUCT with respect to discounts for state colleges and universities. In August 2014, the Austin Court of Appeals reversed the district court and affirmed the PUCT with respect to the PUCT's disallowance of certain franchise fees and the PUCT's decision that PURA no longer requires imposition of a rate discount for state colleges and universities. The Austin Court of Appeals also reversed the PUCT and district court's rejection of a proposed consolidated tax savings adjustment arising out of EFH Corp.'s ability to offset Oncor's taxable income against losses from other investments and remanded the issue to the PUCT to determine the amount of the consolidated tax savings adjustment. In late August 2014, Oncor filed a motion on rehearing with the Austin Court of Appeals with respect to certain appeal issues on which Oncor was not successful, including the consolidated tax savings adjustment. In December 2014, the Austin Court of Appeals issued its Opinion on Rehearing, clarifying that it was rendering judgment on the rate discount for state colleges and universities issue (affirming that PURA no longer requires imposition of the rate discount) rather than remanding it to the PUCT, and dismissing the motions for rehearing regarding the franchise fee issue and the consolidated tax savings adjustment. Oncor filed a petition for review with the Texas Supreme Court in February 2015. If Oncor's appeals efforts are unsuccessful and the proposed consolidated tax savings adjustment is implemented, Oncor estimates that on remand the impact on earnings of the consolidated tax savings adjustment's value could range from zero, as originally determined by the PUCT in Docket No. 35717, to a $130 million loss (after tax). Oncor does not believe that any of the other issues ruled upon by the Austin Court of Appeals would result in a material impact to its results of operations or financial condition.

*Transmission Cost Recovery and Rates (PUCT Docket Nos. 43858, 42558, 42059 and 41543)* — In order to reflect increases or decreases in its wholesale transmission costs, including fees it pays to other transmission service providers, PUCT rules allow Oncor to update the transmission cost recovery factor (TCRF) component of its retail delivery rates charged to REPs on March 1 and September 1 each year. In December 2014, Oncor filed an application to update the TCRF, which became effective March 1, 2015. This application was designed to reduce Oncor's billings for the period from March 2015 through August 2015 by $27 million. In May 2014, Oncor filed an application to update the TCRF, which became effective September 1, 2014. This application was designed to increase Oncor's billings for the period from September 2014 through February 2015 by $71 million. In December 2013, Oncor filed an application to update the TCRF, which became effective March 1, 2014. This application was designed to increase Oncor's billings for the period from March 2014 through August 2014 by $44 million. In June 2013, Oncor filed an application to update the TCRF, which became effective September 1, 2013. This application was designed to increase Oncor's billings for the period from September 2013 through February 2014 by $88 million.

*Transmission Interim Rate Update Applications (PUCT Docket Nos. 44363, 42706, 42267, 41706 and 41166)* — In order to reflect changes in its invested transmission capital, PUCT rules allow Oncor to update its transmission cost of service (TCOS) rates by filing up to two interim TCOS rate adjustments in a calendar year. TCOS revenues are collected from load serving entities benefiting from Oncor's transmission system. REPs serving customers in Oncor's service territory are billed through the TCRF mechanism discussed above while other load serving entities are billed directly. In January 2015, Oncor filed an application for an interim update of its TCOS rate. The new rate was approved by the PUCT and became effective in March 2015. Oncor's annualized revenues increased by an estimated $35 million with approximately $23 million of this increase recoverable through transmission costs charged to wholesale customers and $12 million recoverable from REPs through the TCRF component of Oncor's delivery rates.

In July 2014, Oncor filed an application for an interim update of its TCOS rate. The new rate was approved by the PUCT and became effective in September 2014. Oncor's annualized revenues increased by an estimated $12 million with approximately $8 million of this increase recoverable through transmission costs charged to wholesale customers and $4 million recoverable from REPs through the TCRF component of Oncor's delivery rates. In February 2014, Oncor filed an application for an interim update of its TCOS rate. The new rate was approved by the PUCT and became effective in April 2014. Oncor's annualized revenues increased by an estimated $74 million with approximately $47 million of this increase recoverable through transmission costs charged to wholesale customers and $27 million recoverable from REPs through the TCRF component of Oncor's delivery rates.

PX 115
Page 30 of 154

In July 2013, Oncor filed an application for an interim update of its TCOS rate. The new rate was approved by the PUCT and became effective in September 2013. Oncor's annualized revenues increased by an estimated $71 million with approximately $45 million of this increase recoverable through transmission costs charged to wholesale customers and $26 million recoverable from REPs through the TCRF component of Oncor's delivery rates. In January 2013, Oncor filed an application for an interim update of its TCOS rate. The new rate was approved by the PUCT and became effective in March 2013. Oncor's annualized revenues increased by an estimated $27 million with approximately $17 million of this increase recoverable through transmission costs charged to wholesale customers and $10 million recoverable from REPs through the TCRF component of Oncor's delivery rates.

*Application for 2015 Energy Efficiency Cost Recovery Factor Surcharge (PUCT Docket No. 42559)* — In May 2014, Oncor filed an application with the PUCT to request approval of the energy efficiency cost recovery factor (EECRF) for 2015. PUCT rules require Oncor to make an annual EECRF filing by the first business day in June in each year for implementation on March 1 of the next calendar year. The requested 2015 EECRF was $68 million as compared to $73 million established for 2014, and would result in a monthly charge for residential customers of $1.03 as compared to the 2014 residential charge of $1.01 per month. In October 2014, the PUCT issued a final order approving the 2015 EECRF, which is designed to recover $50 million of Oncor's costs for the 2015 program year, a $23 million performance bonus based on Oncor's 2013 results and a $5 million decrease for over-recovery of 2013 costs.

*Summary* — EFIH cannot predict future regulatory or legislative actions or any changes in economic and securities market conditions. Such actions or changes could significantly affect EFIH's results of operations, liquidity or financial condition.

## KEY RISKS AND CHALLENGES

Following is a discussion of key risks and challenges facing management and the initiatives currently underway to manage such challenges. These matters involve risks that could have a material effect on EFIH's results of operations, liquidity or financial condition. Also see Item 1A, *Risk Factors*.

### Chapter 11 Cases

As discussed above, EFIH filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. For the duration of the Chapter 11 Cases, EFIH will be subject to various risks, including but not limited to (i) the inability to maintain or obtain sufficient financing sources for operations or to fund any reorganization plan and meet future obligations, and (ii) increased legal and other professional costs associated with the Chapter 11 Cases and EFIH's reorganization.

The duration of the Chapter 11 Cases is difficult to estimate and ultimately could be lengthy. If the EFIH Debtors are unable to file a Chapter 11 plan of reorganization, or solicit the appropriate votes for such plan, in each case, prior to the expiration of the exclusivity period granted by the Bankruptcy Court (currently June 23, 2015 for filing a Chapter 11 plan of reorganization and August 23, 2015 for soliciting the appropriate votes for such plan), third parties could file their own plan or plans of reorganization. Any such third party plan or plans will likely exacerbate the duration, cost and contentiousness of the Chapter 11 Cases.

To mitigate the risks discussed above, EFIH has engaged outside counsel and other advisors who are experts in bankruptcy matters to assist it with legal and administrative matters related to the Chapter 11 Cases.

### Oncor's Rates and Cost Recovery

Oncor's rates are regulated by the PUCT and certain cities and are subject to regulatory rate-setting processes and annual earnings oversight. This regulatory treatment does not provide any assurance as to achievement of earnings levels. Oncor's rates are regulated based on an analysis of their costs and capital structure, as reviewed and approved in a regulatory proceeding. Rate regulation is premised on the full recovery of prudently incurred costs and a reasonable rate of return on invested capital. However, there is no assurance that the PUCT will judge all of Oncor's costs to have been prudently incurred, that the PUCT will not reduce the amount of invested capital included in the capital structure that Oncor's rates are based upon, that the regulatory process in which rates are determined will always result in rates that produce full recovery of Oncor's costs or that Oncor's authorized return on equity will not be reduced. See *Significant Activities and Events and Items Influencing Future Performance – Oncor Matters with the PUCT.*

*Oncor's Capital Availability and Cost*

EFIH's investment in Oncor, which represents approximately 80% of Oncor's membership interests, is a significant value driver of EFIH's overall business. Oncor's access to capital markets and cost of debt could be directly affected by its credit ratings. Any adverse action with respect to Oncor's credit ratings could generally cause borrowing costs to increase and the potential pool of investors and funding sources to decrease and could result in reduced distributions from Oncor. Oncor's credit ratings are currently substantially higher than those of the Texas Holdings Group. If credit rating agencies were to change their views of Oncor's independence from any member of the Texas Holdings Group, Oncor's credit ratings would likely decline. EFIH believes these risks are substantially mitigated by the significant ring-fencing measures implemented by EFH Corp. and Oncor as described in Note 1 to the Financial Statements.

*Oncor's Technology Initiatives*

Risks to Oncor's technology initiative programs include nonperformance by equipment and service providers, failure of the technology to meet performance expectations and inadequate cost recovery allowances by regulatory authorities. Oncor is implementing measures to mitigate these risks, but there can be no assurance that these technology initiatives will achieve the operational and financial objectives.

*Oncor's Cyber Security and Infrastructure Protection Risk*

A breach of Oncor's cyber/data or physical security measures that impairs Oncor's information technology infrastructure or transmission and distribution infrastructure could disrupt normal business operations, affect its ability to control its transmission and distribution system, expose Oncor to material regulatory claims and limit communication with third parties. Any loss of confidential or proprietary data through a cyber/data breach could also materially affect Oncor's reputation, expose the company to legal claims or impair its ability to execute on business strategies. Oncor participates in industry groups and with regulators to remain current on emerging threats and mitigating techniques. While it has not experienced any security breach with a significant operational, reputational or financial impact, Oncor recognizes the growing threat within its industry and is proactively taking steps to continuously improve its technology, security measures, processes and services to detect, mitigate and protect its assets, both physical and cyber.

**APPLICATION OF CRITICAL ACCOUNTING POLICIES**

EFIH's significant accounting policies are discussed in Note 1 to the Financial Statements. EFIH follows accounting principles generally accepted in the US. Application of these accounting policies in the preparation of its consolidated financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and income and expenses during the periods covered. The following is a summary of certain critical accounting policies that are impacted by judgments and uncertainties and under which different amounts might be reported using different assumptions or estimation methodologies.

*Investment in Affiliate Debt*

EFIH holds debt securities of EFH Corp. and TCEH that it acquired through debt exchanges. The securities were held as available for sale securities and were recorded at fair value, within the income statement as interest income. EFIH evaluated its affiliate debt for impairment and recorded an impairment loss if declines in fair value were deemed to be other than temporary, which occurred if it determined it would be unable to recover the carrying value of the investment. Impairments were accounted for as a reduction of interest income if related to the issuer's credit. If they were not related to the issuer's credit, the impairments were recorded in other comprehensive income. As discussed in Note 11 to the Financial Statements these securities were classified as a reduction of membership interests at December 31, 2012 and thus, were no longer carried as available for sale securities.

*Push Down of Merger-Related Debt*

Merger-related debt of EFH Corp. and its subsidiaries consists of debt issued or existing at the time of the Merger. Debt issued in exchange for Merger-related debt is considered Merger-related. Debt issuances are considered Merger-related debt to the extent the proceeds are used to repurchase Merger-related debt. Merger-related debt of EFH Corp. (parent) that is fully and unconditionally guaranteed on a joint and several basis by EFCH and EFIH is subject to push down in accordance with SEC Staff Accounting Bulletin Topic 5-J, and as a result, a portion of such debt and related interest expense is reflected in EFIH's financial statements. Merger-related debt of EFH Corp. held by its subsidiaries is not subject to push down. The amount reflected in EFIH's balance sheet represents 50% of the EFH Corp. Merger-related debt guaranteed by EFIH. This percentage reflects the fact that at the time of the Merger, the equity investments of EFCH and EFIH in their respective operating subsidiaries were essentially equal amounts. Because payment of principal and interest on the debt is the responsibility of EFH Corp., EFIH records the settlement of such amounts (net of income tax) as noncash capital contributions from EFH Corp. As a result of transactions completed in January 2013, $60 million principal amount of debt remains subject to push down at both December 31, 2014 and December 31, 2013. See Note 8 to the Financial Statements.

*Investment in Oncor Holdings*

EFIH's balance sheet reflects its investment in Oncor Holdings, which holds an approximate 80% interest in Oncor, as an equity method investment. See Note 3 to the Financial Statements for additional information regarding the accounting for EFIH's investment in Oncor Holdings.

*Impairment of Equity Method Investment*

EFIH evaluates its investment in Oncor Holdings for impairment when factors indicate that a decrease in value has occurred that is not temporary. Indications of a loss in value include recurring operating losses of Oncor Holdings or a fair value of the investment that is less than its carrying amount. An impairment loss is recognized if the carrying value of the investment is greater than the fair value of the investment, and the loss is not deemed temporary. Fair value is based on analyses that reflect discounted cash flows and values of comparable companies. The determination of the existence of impairment indicators and the determination of fair value involves judgments that are subjective in nature and require the use of estimates in forecasting future results and cash flows.

*Accounting for Income Taxes*

EFH Corp. files a US federal income tax return that includes the results of EFCH, EFIH, Oncor Holdings and TCEH. Oncor is a partnership for US federal income tax purposes and is not a corporate member of the EFH Corp. consolidated group.

PX 115
Page 33 of 154

EFH Corp. and its subsidiaries (including EFCH, EFIH, and TCEH, but not including Oncor Holdings and Oncor) are parties to a Federal and State Income Tax Allocation Agreement, which provides, among other things, that each of EFCH, EFIH, TCEH and any other subsidiaries under the agreement is required to make payments to EFH Corp. in an amount calculated to approximate the amount of tax liability such entity would have owed if it filed a separate corporate tax return. Accordingly, EFIH's income tax expense and related balance sheet amounts are recorded as if it files its own corporate income tax returns. Deferred income taxes are provided for temporary differences between the book and tax basis of assets and liabilities as required under accounting rules. Income tax assets and liabilities related to pushed down debt are settled as membership interests transactions.

EFH Corp., Oncor Holdings, Oncor and Oncor's third-party minority investor are parties to a Federal and State Income Tax Allocation Agreement, which governs the computation of federal income tax liability among such parties, and similarly provides, among other things, that each of Oncor Holdings and Oncor will pay EFH Corp. its share of an amount calculated to approximate the amount of tax liability such entity would have owed if it filed a separate corporate tax return.

EFIH's income tax expense and related consolidated balance sheet amounts involve significant management estimates and judgments. Amounts of deferred income tax assets and liabilities, as well as current and noncurrent accruals, involve estimates and judgments of the timing and probability of recognition of income and deductions by taxing authorities. In assessing the likelihood of realization of deferred tax assets, management considers estimates of the amount and character of future taxable income. Actual income taxes could vary from estimated amounts due to the future impacts of various items, including changes in income tax laws, EFIH's forecasted financial condition and results of operations in future periods, as well as final review of filed tax returns by taxing authorities. EFH Corp.'s income tax returns are regularly subject to examination by applicable tax authorities. In management's opinion, pursuant to income tax accounting guidance related to uncertain tax positions, there is no material liability for future taxes that may be owed as a result of any examination.

See Notes 1 and 4 to the Financial Statements for discussion of income tax matters.

### Accounting in Reorganization

Consolidated financial statements for periods following the Petition Date have been prepared in accordance with ASC 852, *Reorganizations*, which contemplates the realization of assets and the satisfaction of liabilities on a going concern basis. However, as a result of the Chapter 11 Cases, such realization of assets and satisfaction of liabilities are subject to a number of uncertainties. ASC 852 requires the following:

- Reclassification of unsecured or under-secured pre-petition debt, including unamortized deferred financing costs and discounts/premiums associated with debt, and other liabilities to a separate line item in the consolidated balance sheets, called "Liabilities subject to compromise;"

- Nonaccrual of interest expense for financial reporting purposes, to the extent not paid during bankruptcy;

- Reporting in a new line in the statements of consolidated income (loss) of incremental items of income or loss related to bankruptcy, such as professional fees, as well as adjustments of liabilities to allowed claim amounts and ultimately settlement amounts as a separate line item in the statements of consolidated income (loss);

- Evaluation of actual or potential bankruptcy claims, which are not already reflected as a liability on the consolidated balance sheets, under ASC 450, Contingencies. If valid unrecorded claims meeting the ASC 450 criteria are presented to EFIH in future periods, EFIH will accrue for these amounts at the expected amount of the allowed claim, and

- Upon emergence from Chapter 11 reorganization, fresh-start accounting under GAAP may be required. Under fresh-start accounting, the reorganization value of the entity would be allocated to the entity's individual assets and liabilities on a fair value basis in conformity with the procedures specified by ASC 805, Business Combinations.

PX 115
Page 34 of 154

## RESULTS OF OPERATIONS

### *Financial Results – Year Ended December 31, 2014 Compared to Year Ended December 31, 2013*

Selling, general, and administrative expenses increased $2 million to $22 million in 2014. The 2014 amount includes $15 million for legal and other professional services associated with EFIH's debt restructuring activities prior to the Petition Date, of which $4 million was allocated by EFH Corp. The 2014 amount also includes $3 million in allocated Sponsor Group management fees and $4 million in allocated other shared services costs. Payments of Sponsor Group management fees and associated cost allocations were suspended beginning with the payment due December 31, 2013. The 2013 amount reflects legal and other consulting services costs associated with EFH Corp.'s debt restructuring initiatives, of which $12 million was allocated by EFH Corp. See Note 12 to the Financial Statements for discussion of allocations from EFH Corp.

Other deductions increased $18 million to $128 million in 2014, primarily reflecting the recording of a larger reserve against EFIH's income tax receivable from EFH Corp. in 2014 (see Note 5 to the Financial Statements).

Interest income – affiliates decreased $284 million to zero in 2014. The decline reflects reclassification in 2013 of mark-to-market gains on certain holdings of affiliate debt from accumulated other comprehensive income to interest income resulting from the 2013 distribution of all EFH Corp. 10.875% Notes and EFH Corp. Toggle Notes held by EFIH. See Notes 11 and 13 to the Financial Statements.

Interest expense and related charges decreased $319 million to $441 million in 2014. The decrease reflected $479 million in lower interest expense on pre-petition debt due to the discontinuation of interest upon the Bankruptcy Filing, partially offset by $125 million in interest expense on debtor-in-possession financing and $35 million in lower amortization of pre-petition debt premiums, discounts and issuance costs due to discontinuance of amortization and reclassification of such amounts to liabilities subject to compromise

Reorganization items totaled $267 million in 2014 and included $50 million in legal advisory and representation services fees, a $108 million net loss on the exchange and settlement of the EFIH First Lien Notes and $94 million in fees associated with completion of the EFIH First Lien DIP Facility. See Note 7 to the Financial Statements for additional discussion.

Income tax benefit totaled $155 million and $169 million in 2014 and 2013, respectively. Pretax amounts exclude equity in earnings of unconsolidated subsidiaries. Excluding the effect of the reserve against the income tax receivable from EFH Corp. (see Notes 4 and 5 to the Financial Statements) that was recorded without income tax benefit, the effective tax rate was 21.1% in 2014 compared to 34.1% in 2013. The decrease in the effective income tax rate is driven primarily by a valuation allowance against deferred tax assets and higher nondeductible legal and other professional services costs related to the Chapter 11 Cases in 2014.

Equity in earnings of EFIH's Oncor Holdings unconsolidated subsidiary (net of tax) increased $14 million to $349 million in 2014. The increase in equity earnings of Oncor reflected increased revenue from higher transmission rates and lower interest expense. These favorable effects were partially offset by higher income taxes reflecting the $11 million favorable tax effect in 2013 due to resolution of certain income tax positions and an increase in non-deductible amortization of regulatory assets, higher depreciation, higher operation and maintenance expense and higher property taxes. See Note 3 to the Financial Statements.

Net loss increased $252 million to $354 million in 2014. The change was driven by a decrease in interest income - affiliates, the existence of reorganization items in 2014 and the reserve against the income tax receivable from EFH Corp., partially offset by lower interest expense on pre-petition debt and higher equity in earnings of Oncor Holdings.

### *Financial Results – Year Ended December 31, 2013 Compared to Year Ended December 31, 2012*

Selling, general, and administrative expenses totaled $20 million in 2013, and no amounts were recorded in 2012. The 2013 amount reflects legal and other professional services costs associated with EFH Corp.'s debt restructuring initiatives, of which $12 million was allocated by EFH Corp. (see Note 12 to the Financial Statements).

Other deductions totaled $110 million in 2013, reflecting the recording of a reserve against EFIH's income tax receivable from EFH Corp. (see Note 5 to the Financial Statements).

PX 115
Page 35 of 154

Interest income – affiliates decreased $314 million to $284 million in 2013. The decline reflects the reclassification of affiliate debt EFIH holds that resulted in interest received on such debt in 2013 being recorded as an increase in membership interests instead of interest income. This impact was partially offset by $284 million in interest income in 2013 that represents previous mark-to-market gains on certain holdings of affiliate debt reclassified from accumulated other comprehensive income. See Note 13 to the Financial Statements for discussion of these reclassifications.

Interest expense and related charges increased $234 million to $760 million in 2013. The increase was driven by the issuance of EFIH Notes in 2012 and 2013 (see Note 9 to the Financial Statements).

Income tax benefit totaled $169 million in 2013 on a pretax loss compared to income tax expense of $27 million on pretax income in 2012. Pretax amounts exclude equity in earnings of unconsolidated subsidiaries. Excluding the effect of the reserve against the income tax receivable that was recorded without income tax benefit, the effective tax rate was 34.1% in 2013 compared to 37.5% in 2012. The change in the effective income tax rate is due largely to the effects of a relatively large pretax loss in 2013 compared to the small pretax income amount in 2012. See Note 4 to the Financial Statements for a reconciliation of the effective rates to the US federal statutory rate.

Equity in earnings of EFIH's Oncor Holdings unconsolidated subsidiary (net of tax) increased $65 million to $335 million in 2013. The increase in equity earnings of Oncor reflected an $11 million favorable tax effect in 2013 due to resolution of certain income tax positions at Oncor and a $31 million unfavorable impact in 2012 from the settlement of a management incentive pay plan. The settlement resulted in a $57 million pretax charge reported by Oncor. Excluding these items, the increase in Oncor's earnings reflected higher revenues from higher transmission rates, the effect of colder fall/winter weather and growth in points of delivery, partially offset by higher operation and maintenance expenses and higher depreciation. See Note 3 to the Financial Statements.

Net loss totaled $102 million in 2013 compared to net income of $315 million in 2012. The $417 million change was driven by a decrease in interest income, an increase in interest expense and the reserve against the income tax receivable from EFH Corp., partially offset by higher equity in earnings of Oncor Holdings.

29
-

## FINANCIAL CONDITION

### Operating Cash Flows

*Year Ended December 31, 2014 Compared to Year Ended December 31, 2013* — Cash used in operating activities totaled $243 million in 2014 and $428 million in 2013, respectively. The decrease in cash used of $185 million was primarily driven by $243 million in lower cash interest payments due to the discontinuation of interest paid on pre-petition debt (see Note 9 to the Financial Statements), partially offset by higher legal and other professional services costs.

*Year Ended December 31, 2013 Compared to Year Ended December 31, 2012* — Cash used in operating activities totaled $428 million in 2013 and $202 million in 2012, respectively. The change of $226 million reflected $267 million in higher interest payments and a decrease of $184 million in interest received on affiliate debt, partially offset by a decrease of $185 million in income taxes paid to EFH Corp. (2012 payments included amounts related to prior years) and $66 million in higher cash distributions from Oncor Holdings. See Note 11 to the Financial Statements for discussion of the distribution of EFH Corp. debt as a dividend to EFH Corp., which has resulted in interest received in 2013 being reported as a financing cash flow.

Amortization of debt issuance costs reported in the condensed statements of consolidated cash flows relates to the debt pushed down from EFH Corp. and the debt issued by EFIH, including EFIH's debtor-in-possession financing. Remaining unamortized costs at the Petition Date were reclassified to liabilities subject to compromise (LSTC) and amortization ceased (see Note 8 to the Financial Statements). All amortized debt issuance costs are reported in interest expense and related charges in the condensed statements of consolidated income (loss).

### Financing Cash Flows

*Year Ended December 31, 2014 Compared to Year Ended December 31, 2013* — Cash provided by financing activities totaled $1.158 billion in 2014 and cash used in financing activities totaled $434 million in 2013. Cash provided by financing activities in 2014 included $3.564 billion in borrowings under the EFIH DIP Facility, partially offset by $2.312 billion in repayments of EFIH First Lien Notes and $94 million in payments for fees associated with the completion of the EFIH DIP Facility. Cash used in financing activities in 2013 reflected a cash distribution to EFH Corp. of $680 million for the purpose of EFH Corp. repaying the balance of the TCEH Demand Notes (see discussion below of investing cash flows), partially offset by $252 million of interest received on holdings of affiliate debt.

*Year Ended December 31, 2013 Compared to Year Ended December 31, 2012* — Cash used in financing activities totaled $434 million in 2013 compared to cash provided totaling $1.260 billion in 2012, respectively. Activity in 2013 reflected a cash distribution to EFH Corp. of $680 million released from an escrow account for the purpose of EFH Corp. repaying the balance of the TCEH Demand Notes (see discussion below of investing cash flows), partially offset by $252 million of interest received on holdings of affiliate debt. Activity in 2012 reflected the issuances of $2.253 billion of EFIH Notes and distributions of $950 million of the proceeds to EFH Corp. See Note 11 to the Financial Statements for discussion of reclassification of affiliate debt EFIH holds that resulted in interest received on such debt in 2013 being recorded as an increase in membership interests instead of interest income.

### Investing Cash Flows

*Year Ended December 31, 2014 Compared to Year Ended December 31, 2013* — There was no cash used in or provided by investing activities in 2014. Cash provided by investing activities in 2013 totaled $680 million and represented a release of funds from a collateral account to pay a distribution to EFH Corp. in January 2013. The funds represented a portion of the net proceeds from the issuance of EFIH Notes in 2012 that were placed in escrow at that time.

*Year Ended December 31, 2013 Compared to Year Ended December 31, 2012* — Cash provided by investing activities totaled $680 million in 2013 compared to cash used totaling $680 million in 2012. The change was driven by restricted cash movements, as $680 million was deposited in a collateral account in 2012 for the purpose of EFH Corp. repaying the balance of the TCEH Demand Notes and the funds were released from the escrow account in January 2013 to make the repayment (see Note 11 to the Financial Statements).

*Available Liquidity* — In March 2015, with the approval of the Bankruptcy Court, EFIH used some of its cash to repay (Repayment) $735 million, including interest at contractual rates, in amounts outstanding under EFIH's pre-petition 11.00% Second Lien Notes due 2021 (11.00% Notes) and 11.75% Second Lien Notes due 2022 (11.75% Notes) and $15 million in certain fees and expenses of the trustee for such notes. The Repayment required the requisite consent of the lenders under the EFIH DIP Facility. EFIH received such consent from approximately 97% of the lenders under the EFIH DIP Facility and paid an aggregate consent fee equal to approximately $13 million. As a result of the Repayment, as of the date hereof, the principal amount outstanding on the 11.00% Notes and 11.75% are $322 million and $1.388 billion, respectively.

*Liquidity After the Bankruptcy Filing* — Subject to certain exceptions under the Bankruptcy Code, the Bankruptcy Filing automatically enjoined, or stayed, the continuation of most pending judicial or administrative proceedings and the filing of other actions against the EFIH Debtors or their property to recover on, collect or secure a claim arising prior to the date of the Bankruptcy Filing (including with respect to EFIH's pre-petition debt instruments).

The Bankruptcy Court approved final orders in June 2014 authorizing the EFIH DIP Facility (see Note 6 to the Financial Statements). The EFIH DIP Facility provides for up to $5.4 billion in senior secured, super-priority financing.

EFIH believes that the EFIH DIP facility, plus cash distributions received from Oncor Holdings, will be sufficient to fund its anticipated cash requirements through at least the maturity date of the EFIH DIP facility. As a result of the Chapter 11 Cases, EFIH does not expect to receive further interest payments on affiliate debt securities it holds.

*Debt Capacity* — The EFIH DIP Facility permits, subject to certain terms, conditions and limitations, EFIH to incur incremental junior lien subordinated debt in an aggregate amount not to exceed $3 billion.

*Distributions of Earnings from Oncor Holdings* — Oncor Holdings' distributions of earnings to EFIH totaled $202 million, $213 million and $147 million for the years ended December 31, 2014, 2013 and 2012, respectively. On February 26, 2015, EFIH received a distribution totaling $74 million from Oncor Holdings. See Note 3 to the Financial Statements for discussion of limitations on amounts Oncor can distribute to its members.

*Debt Activity* — Debt activities during the year ended December 31, 2014 are principal amounts, and settlements exclude amounts related to debt discount, financing and reacquisition expenses. In June 2014, EFIH issued a $5.4 billion first-lien debtor-in-possession financing facility which was used in settlements of the EFIH First Lien Notes consisting of a $2.312 billion cash exchange and a $1.673 billion noncash exchange (see Note 6 to the Financial Statements).

*EFIH Toggle Notes Interest Election* — EFIH made its 2013 interest payments on the EFIH Toggle Notes by using the PIK feature of those notes. During the applicable PIK interest periods, the interest rate on these notes is increased from 11.25% to 12.25%. As a result of the PIK election, EFIH increased the aggregate principal amount of the notes by $173 million in 2013. See Note 8 to the Financial Statements for further discussion of the EFIH Toggle Notes.

*Income Tax Matters* — EFH Corp. and certain of its subsidiaries (including EFCH, EFIH, and TCEH, but not including Oncor Holdings and Oncor) are parties to a Federal and State Income Tax Allocation Agreement, which provides, among other things, that any corporate member or disregarded entity in the EFH Corp. group is required to make payments to EFH Corp. in an amount calculated to approximate the amount of tax liability such entity would have owed if it filed a separate corporate tax return. EFH Corp., Oncor Holdings, Oncor and Oncor's third-party minority investor are parties to a separate Federal and State Income Tax Allocation Agreement, which governs the computation of federal income tax liability among such parties, and similarly provides, among other things, that each of Oncor Holdings and Oncor will pay EFH Corp. its share of an amount calculated to approximate the amount of tax liability such entity would have owed if it filed a separate corporate tax return. The material weakness in EFH Corp.'s internal controls over financial reporting related to accounting for deferred income taxes, as described in Item 9A, *Controls and Procedures*, did not cause any change in its historic tax sharing practices or the interpretation of any tax sharing agreements within the different members of its company.

See Note 12 to the Financial Statements for discussion of income tax payments to and from EFH Corp.

**PX 115**
**Page 38 of 154**

*Capitalization* — At December 31, 2014, EFIH's capitalization ratios consisted of 131.1% borrowings under debtor -in-possession credit facilities and pre-petition notes reported as liabilities subject to compromise and (31.1)% membership interests. At December 31, 2013, EFIH's capitalization ratios consisted of 130.1% debt and (30.1)% membership interests.

*Financial Covenants* — The Bankruptcy Filing constituted an event of default and automatic acceleration under the agreements governing the pre-petition debt of the EFIH Debtors. The creditors are, however, stayed from taking any action against the EFIH Debtors as a result of such defaults and accelerations under the Bankruptcy Code.

The EFIH DIP Facility includes a minimum liquidity covenant pursuant to which EFIH cannot allow unrestricted cash (as defined in the EFIH DIP Facility) to be less than $150 million. EFIH is in compliance with this covenant.

See Note 6 to the Financial Statements for discussion of other covenants related to the DIP Facility.

*Material Cross Default/Acceleration Provisions* — Certain of EFIH's financing arrangements contain provisions that result in an event of default if there were a failure under other financing arrangements to meet payment terms or to observe other covenants that could or does result in an acceleration of payments due. Such provisions are referred to as "cross default" or "cross acceleration" provisions. The Bankruptcy Filing triggered defaults on EFIH's pre-petition debt obligations, but pursuant to the Bankruptcy Code, the creditors are stayed from taking any actions against the Debtors as a result of such defaults.

*Contractual Obligations and Commitments* — The following table summarizes EFIH's contractual cash obligations at December 31, 2014 (see Note 6 to the Financial Statements for additional disclosures regarding these debt obligations). Pre-petition liabilities subject to compromise (i.e., obligations incurred or accrued prior to the Bankruptcy Filing) are being administered by the Bankruptcy Court and are excluded from the table below due to the uncertainty related to when those obligations will mature.

| Contractual Cash Obligations | Less Than One Year | | One to Three Years | | Three to Five Years | | More Than Five Years | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Debt – principal (a) | $ | — | $ | 5,400 | $ | — | $ | — | $ | 5,400 |
| Debt – interest | | 230 | | 107 | | — | | — | | 337 |
| Total contractual cash obligations | $ | 230 | $ | 5,507 | $ | — | $ | — | $ | 5,737 |

_____
(a) Includes $5.4 billion of borrowings under the EFIH DIP Facility.

*Guarantees* — See Note 10 to the Financial Statements for discussion of guarantees.

## OFF-BALANCE SHEET ARRANGEMENTS

See Notes 3 and 10 to the Financial Statements regarding VIEs and guarantees, respectively.

## COMMITMENTS AND CONTINGENCIES

See Note 10 to the Financial Statements for discussion of commitments and contingencies.

## CHANGES IN ACCOUNTING STANDARDS

See Note 1 to the Financial Statements for discussion of changes in accounting standards.

**PX 115
Page 39 of 154**

**Item 7A.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

*Interest Rate Risk*

   Market risk is the risk that in the ordinary course of business that EFIH may experience a loss in value as a result of changes in market conditions that affect economic factors such as interest rates. EFIH's debt at December 31, 2014 consists of debtor-in-possession financing. Pre-petition obligations (i.e., obligation incurred or accrued prior to the Bankruptcy Filing) are being administered by the Bankruptcy Court and are excluded from the table below due to the uncertainty related to when those obligations will mature. All of EFIH's debt at December 31, 2013 carried fixed interest rates and exclude the effects of unamortized premiums. See Notes 6 and 8 to the Financial Statements for further discussion of these financial instruments.

| | 2014 Total Carrying Amount | | 2014 Total Fair Value | | 2013 Total Carrying Amount | | 2013 Total Fair Value |
|---|---|---|---|---|---|---|---|
| | *(millions of dollars, except percentages)* | | | | | | |
| Debt amounts: | | | | | | | |
| Fixed rate debt amount (a) | $ | — | $ | — | $ 7,739 | $ | 7,849 |
| Average interest rate (b) | —% | | | | 10.90% | | |
| Variable rate debt amount | $ | 5,400 | $ | 5,400 | $ — | $ | — |
| Average interest rate (b) | 4.25% | | | | | | |
| Total Debt | $ | 5,400 | | $5,400 | $7,739 | | $7,849 |

_____

(a)   2013 includes pushed down debt. See Note 8 to the Financial Statements.

(b)   The weighted average interest rate presented is based on the rate in effect at December 31, 2014.

*Credit Risk*

   *Oncor's Credit Risk* — Credit risk relates to the risk of loss associated with nonperformance by counterparties. Oncor's customers consist primarily of REPs. As a prerequisite for obtaining and maintaining certification, a REP must meet the financial resource standards established by the PUCT. Meeting these standards does not guarantee that a REP will be able to perform its obligations. REP certificates granted by the PUCT are subject to suspension and revocation for significant violation of Texas Public Utility Regulatory Act and PUCT rules. Significant violations include failure to timely remit payments for invoiced charges to a transmission and distribution utility pursuant to the terms of tariffs approved by the PUCT. PUCT rules allow for the recovery of uncollectible amounts from nonaffiliated REPs, reducing the credit risk of such receivables.

   At December 31, 2014, Oncor's exposure to credit risk associated with accounts receivable from nonaffiliate customers totaled $410 million. The nonaffiliated customer receivable amount is before the allowance for uncollectible accounts, which totaled $3 million, and includes trade accounts receivable from REPs totaling $298 million, which are almost entirely noninvestment grade. At December 31, 2014, REP subsidiaries of one nonaffiliated entity collectively represented approximately 12% of the nonaffiliated trade receivable amount. No other nonaffiliated parties represented 10% or more of the total exposure. Oncor views its exposure to this customer to be within an acceptable level of risk tolerance considering PUCT rules and regulations; however, this concentration increases the risk that a default would have a material effect on cash flows.

   See *Management's Discussion and Analysis of Financial Condition and Results of Operations – Significant Activities and Events and Items Influencing Future Performance – Credit Risk Exposure to EFH Corp. and its Subsidiaries* above for discussion of Oncor's credit risk to accounts receivable from affiliates.

   See Note 12 to the Financial Statements for discussion of transactions between Oncor and TCEH and EFH Corp.

**FORWARD-LOOKING STATEMENTS**

This report and other presentations made by EFIH contain "forward-looking statements." All statements, other than statements of historical facts, that are included in this report, or made in presentations, in response to questions or otherwise, that address activities, events or developments that may occur in the future, including such matters as activities related to EFIH's bankruptcy, financial or operational projections, capital allocation, future capital expenditures, business strategy, competitive strengths, goals, future acquisitions or dispositions, development or operation of facilities, market and industry developments and the growth of EFIH's business and operations (often, but not always, through the use of words or phrases such as "intends," "plans," "will likely," "unlikely," "expected," "anticipated," "estimated," "should," "projection," "target," "goal," "objective" and "outlook"), are forward-looking statements. Although EFIH believes that in making any such forward-looking statement its expectations are based on reasonable assumptions, any such forward-looking statement involves uncertainties and is qualified in its entirety by reference to the discussion of risk factors under Item 1A, *Risk Factors* and the discussion under Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations* in this report and the following important factors, among others, that could cause EFIH's actual results to differ materially from those projected in such forward-looking statements:

- The Debtors (including the EFIH Debtors) ability to develop, file and complete a Chapter 11 plan of reorganization that receives the necessary votes from the required creditors and stakeholders and the approval from the Bankruptcy Court, particularly prior to the expiration of the exclusivity period granted by the Bankruptcy Court;
- the outcome of the court-supervised bid process with respect to the restructuring of EFH Corp. and EFIH
- EFIH's ability to obtain Bankruptcy Court approval with respect to the EFIH Debtors' motions in the Chapter 11 Cases, including such approvals not being overturned on appeal or being stayed for any extended period of time;
- the terms and conditions of any Chapter 11 plan of reorganization that is ultimately approved by the Bankruptcy Court;
- EFIH's ability to remain in compliance with the requirements of the EFIH DIP Facility;
- EFIH's ability to maintain or obtain sufficient financing sources for EFIH's cash requirements during the pendency of the Chapter 11 Cases and its ability to obtain sufficient exit financing to fund any Chapter 11 plan of reorganization;
- the actions and decisions of creditors, regulators and other third parties that have an interest in the Chapter 11 Cases or reorganization that may be inconsistent with, or interfere with, EFIH's plans;
- the duration of the Chapter 11 Cases;
- the actions and decisions of regulatory authorities relative to any Chapter 11 plan of reorganization;
- restrictions on EFIH's activities due to the terms of its debt agreements, including the EFIH DIP Facility, and restrictions imposed by the Bankruptcy Court;
- EFIH's ability to obtain any required regulatory consent necessary to implement any Chapter 11 plan of reorganization;
- the outcome of current or potential litigation regarding whether holders are entitled to make-whole premiums and/or post-petition interest in connection with the treatment of their claims in bankruptcy;
- the outcome of current or potential litigations regarding intercompany claims and/or derivative claims;
- prevailing governmental policies and regulatory actions, including those of the Texas Legislature, the Governor of Texas, the US Congress, the FERC, the NERC, the TRE, the PUCT, the EPA and the TCEQ, with respect to, among other things:
  - allowed rates of return;
  - permitted capital structure;
  - industry, market and rate structure;
  - recovery of investments;
  - acquisition and disposal of assets and facilities;
  - development, construction and operation of facilities;
  - changes in tax laws and policies, and
  - changes in and compliance with environmental and safety laws and policies;
- legal and administrative proceedings and settlements, including the legal proceedings arising out of the Chapter 11 Cases;
- general industry trends;
- economic conditions, including the impact of an economic downturn;
- weather conditions, including drought and limitations on access to water, and other natural phenomena, and acts of sabotage, wars or terrorist or cyber security threats or activities;
- population growth or decline, or changes in market supply or demand and demographic patterns, particularly in ERCOT;
- changes in business strategy, development plans or vendor relationships;
- changes in interest rates or rates of inflation;
- changes in operating expenses, liquidity needs and capital expenditures;
- commercial bank market and capital market conditions and the potential impact of disruptions in US and international credit markets;
- the amount and timing of dividends received from Oncor;
- access to capital, the cost of such capital, and the results of financing and refinancing efforts, including availability of funds in capital markets;

PX 115
Page 41 of 154

- EFIH's ability to obtain and maintain sufficient cash flow to make interest payments, and EFIH's ability to refinance its debt instruments, including the EFIH DIP Facility;
- changes in technology used by and services offered by EFIH and/or its subsidiaries;
- significant changes in the relationship of EFIH with their employees, including the availability of qualified personnel, and the potential adverse effects if labor disputes or grievances were to occur;
- changes in assumptions used to estimate costs of providing employee benefits, including medical and dental benefits, pension and OPEB, and future funding requirements related thereto, including joint and several liability exposure under ERISA;
- changes in assumptions used to estimate future executive compensation payments;
- hazards customary to the industry and the possibility that EFIH may not have adequate insurance to cover losses resulting from such hazards;
- significant changes in critical accounting policies, and
- actions by credit rating agencies.

Any forward-looking statement speaks only at the date on which it is made, and except as may be required by law, EFIH undertakes no obligation to update any forward-looking statement to reflect events or circumstances after the date on which it is made or to reflect the occurrence of unanticipated events or circumstances. New factors emerge from time to time, and it is not possible for EFIH to predict all of them; nor can EFIH assess the impact of each such factor or the extent to which any factor, or combination of factors, may cause results to differ materially from those contained in any forward-looking statement. As such, you should not unduly rely on such forward-looking statements.

**INDUSTRY AND MARKET INFORMATION**

The industry and market data and other statistical information used throughout this report are based on independent industry publications, government publications, reports by market research firms or other published independent sources, including certain data published by ERCOT, the PUCT and NYMEX. EFIH did not commission any of these publications or reports. Some data is also based on good faith estimates, which are derived from EFIH's review of internal surveys, as well as the independent sources listed above. Independent industry publications and surveys generally state that they have obtained information from sources believed to be reliable, but do not guarantee the accuracy and completeness of such information. While EFIH believes that each of these studies and publications is reliable, it has not independently verified such data and make no representation as to the accuracy of such information. Forecasts are particularly likely to be inaccurate, especially over long periods of time, and EFIH does not know what assumptions regarding general economic growth are used in preparing the forecasts included in this report. Similarly, while EFIH believes that such internal and external research is reliable, it has not been verified by any independent sources, and EFIH makes no assurances that the predictions contained therein are accurate.

35

**Item 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Managers and Member of Energy Future Intermediate Holding Company LLC (Debtor-in-Possession)
Dallas, Texas

We have audited the accompanying consolidated balance sheets of Energy Future Intermediate Holding Company LLC (a direct subsidiary of Energy Future Holdings Corp. ("EFH Corp.")) and subsidiaries (Debtor-in-Possession) ("EFIH") as of December 31, 2014 and 2013, and the related statements of consolidated income (loss), comprehensive income (loss), cash flows and membership interests for each of the three years in the period ended December 31, 2014. These financial statements are the responsibility of EFIH's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Energy Future Intermediate Holding Company LLC and subsidiaries (Debtor-in-Possession) as of December 31, 2014 and 2013, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2014, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 2 to the consolidated financial statements, on April 29, 2014, Energy Future Holdings Corp. and the substantial majority of its direct and indirect subsidiaries (including Energy Future Intermediate Holding Company LLC), excluding Oncor Electric Delivery Holdings Company LLC and its subsidiaries, filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. The accompanying consolidated financial statements do not purport to reflect or provide for the consequences of the bankruptcy proceedings. In particular, such financial statements do not purport to show (1) as to assets, their realizable value on a liquidation basis or their availability to satisfy liabilities; (2) as to prepetition liabilities, the amounts that may be allowed for claims or contingencies, or the status and priority thereof; (3) as to membership interest accounts, the effect of any changes that may be made in the capitalization of EFIH; or (4) as to operations, the effect of any changes that may be made in its business.

The accompanying consolidated financial statements for the years ended December 31, 2014 and 2013 have been prepared assuming that EFIH will continue as a going concern. As discussed in Note 2 to the consolidated financial statements, EFIH's ability to continue as a going concern is contingent upon its ability to comply with the financial and other covenants contained in the DIP Facilities described in Note 6, its ability to obtain new debtor in possession financing in the event the DIP Facilities were to expire during the pendency of the Chapter 11 Cases, its ability to complete a Chapter 11 plan of reorganization in a timely manner, including obtaining creditor and Bankruptcy Court approval of such plan as well as applicable regulatory approvals required for such plan, and its ability to obtain any exit financing needed to implement such plan, among other factors. These circumstances and uncertainties inherent in the bankruptcy proceedings raise substantial doubt about EFIH's ability to continue as a going concern. Management's plans concerning these matters are also discussed in Note 2 to the consolidated financial statements. The consolidated financial statements do not include adjustments that might result from the outcome of these uncertainties.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), EFIH's internal control over financial reporting as of December 31, 2014, based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 31, 2015 expressed an adverse opinion on EFIH's internal control over financial reporting because of a material weakness.

/s/ Deloitte & Touche LLP

Dallas, Texas
March 31, 2015

36

### ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC, A DEBTOR-IN-POSSESSION
### STATEMENTS OF CONSOLIDATED INCOME (LOSS)

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2013 | 2012 |
| | (millions of dollars) | | |
| Selling, general and administrative expenses | $ (22) | $ (20) | $ — |
| Other deductions — (Note 5) | (128) | (110) | — |
| Interest income — affiliates (Note 13) | — | 284 | 598 |
| Interest expense and related charges (Note 9) | (441) | (760) | (526) |
| Reorganization items (Note 7) | (267) | — | — |
| Income (loss) before income taxes and equity in earnings of unconsolidated subsidiary | (858) | (606) | 72 |
| Income tax benefit (expense) (Note 4) | 155 | 169 | (27) |
| Equity in earnings of unconsolidated subsidiary (net of tax) (Note 3) | 349 | 335 | 270 |
| Net income (loss) | $ (354) | $ (102) | $ 315 |

See Notes to the Financial Statements.

### STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME (LOSS)

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2013 | 2012 |
| | (millions of dollars) | | |
| Net income (loss) | $ (354) | $ (102) | $ 315 |
| Other comprehensive income (loss) — net of tax effects: | | | |
| Reclassification to interest income of mark-to-market valuations of holdings of affiliate debt (net of tax expense of $—, $99 and $—) (Note 11) | — | (185) | — |
| Mark-to-market valuations of holdings of affiliate debt held as available for sale (net of tax expense of $—, $—, and $78) (Note 11) | — | — | 145 |
| Net effects related to Oncor (net of tax benefit (expense) of $(25), $(8) and $1) | (47) | (14) | 2 |
| Total other comprehensive income (loss) | (47) | (199) | 147 |
| Comprehensive income (loss) | $ (401) | $ (301) | $ 462 |

See Notes to the Financial Statements.

37
-

ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC, A DEBTOR-IN-POSSESSION
STATEMENTS OF CONSOLIDATED CASH FLOWS

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2013 | 2012 |
| | (millions of dollars) | | |
| Cash flows — operating activities: | | | |
| Net income (loss) | $  (354) | $  (102) | $  315 |
| Adjustments to reconcile net income (loss) to cash used in operating activities: | | | |
| Equity in earnings of unconsolidated subsidiary | (349) | (335) | (270) |
| Distributions of earnings from unconsolidated subsidiary | 202 | 213 | 147 |
| Deferred income taxes, net | (51) | (55) | (2) |
| Fees paid for EFIH DIP Facility (Notes 6 and 7) (reported as financing activities) | 94 | — | — |
| PIK interest income on EFH Corp. Toggle Notes held as investment (Note 13) | — | — | (288) |
| Interest expense related to pushed-down debt of parent (Notes 8 and 9) | 1 | 6 | 75 |
| Interest expense on toggle notes payable in additional principal (Notes 8 and 9) | 65 | 176 | 12 |
| Noncash impairment of investment in affiliate debt (Note 13) | — | — | 14 |
| Reserve recorded for income tax receivable from EFH Corp. (Note 5) | 125 | 110 | — |
| Loss on exchange and settlement of EFIH First Lien Notes (Note 6) | 108 | — | — |
| Accretion of purchase discount on investment in affiliate debt (Note 13) | — | — | (92) |
| Amortization of debt related balances (Note 9) | (17) | (52) | 5 |
| Mark-to-market gain reclassified from accumulated other comprehensive income (Note 11) | — | (284) | — |
| Other, net | 3 | — | — |
| Changes in operating assets and liabilities: | | | |
| Income taxes receivable from/payable to EFH Corp. (Note 12) | — | 1 | (120) |
| Assets | (2) | (5) | (2) |
| Accrued interest | 16 | 2 | 33 |
| Other liabilities (primarily accrued taxes) | (84) | (103) | (29) |
| Cash used in operating activities | (243) | (428) | (202) |
| Cash flows — financing activities: | | | |
| Proceeds from EFIH DIP Facility before fees paid (Notes 6 and 7) | 3,564 | — | — |
| Fees paid for EFIH DIP Facility (Note 6) | (94) | — | — |
| Repayments/repurchases of debt (Note 6) | (2,312) | — | — |
| Issuances of debt | — | — | 2,253 |
| Interest received on holdings of affiliate debt (Note 11) | — | 252 | — |
| Distributions to EFH Corp. (Note 11) | — | (680) | (950) |
| Debt exchange and issuance costs, premiums and discounts | — | (6) | (43) |
| Cash provided by (used in) financing activities | 1,158 | (434) | 1,260 |
| Cash flows — investing activities: | | | |
| Restricted cash related to debt issuance (Note 11) | — | 680 | (680) |
| Purchase of make-whole agreements between affiliate and unconsolidated subsidiary (Note 12) | — | — | (159) |
| Sale of make-whole agreements between affiliate and unconsolidated subsidiary (Note 12) | — | — | 159 |
| Cash provided by (used in) investing activities | — | 680 | (680) |
| Net change in cash and cash equivalents | 915 | (182) | 378 |
| Cash and cash equivalents — beginning balance | 242 | 424 | 46 |
| Cash and cash equivalents — ending balance | $  1,157 | $  242 | $  424 |

See Notes to the Financial Statements.

PX 115
Page 46 of 154

ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC, A DEBTOR-IN-POSSESSION
CONSOLIDATED BALANCE SHEETS

| | December 31, | |
|---|---|---|
| ASSETS | 2014 | 2013 |
| | (millions of dollars) | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,157 | $ 242 |
| Other current assets | 3 | 2 |
| Total current assets | 1,160 | 244 |
| Investment in Oncor Holdings (Note 3) | 6,050 | 5,950 |
| Accumulated deferred income taxes | 26 | — |
| Other noncurrent assets | — | 58 |
| Total assets | $ 7,236 | $ 6,252 |
| LIABILITIES AND MEMBERSHIP INTERESTS | | |
| Current liabilities: | | |
| Trade accounts and other payables to affiliates | $ 6 | $ 10 |
| Notes, loans and other debt (Note 8) | — | 7,877 |
| Accumulated deferred income taxes (Note 4) | 26 | 26 |
| Accrued interest | 1 | 137 |
| Other current liabilities | 18 | — |
| Total current liabilities | 51 | 8,050 |
| Borrowings under debtor-in-possession credit facilities (Note 6) | 5,400 | — |
| Liabilities subject to compromise (Note 8) | 3,988 | — |
| Accumulated deferred income taxes | — | 24 |
| Total liabilities | 9,439 | 8,074 |
| Commitments and Contingencies (Note 10) | | |
| Membership interests (Note 11): | | |
| Capital account | (1,482) | (1,148) |
| Affiliate debt held by EFIH | (635) | (635) |
| Accumulated other comprehensive income (loss) | (86) | (39) |
| Total membership interests | (2,203) | (1,822) |
| Total liabilities and membership interests | $ 7,236 | $ 6,252 |

See Notes to the Financial Statements.

39
-

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC, A DEBTOR-IN-POSSESSION**
**STATEMENTS OF CONSOLIDATED MEMBERSHIP INTERESTS**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2014** | **2013** | **2012** |
| | (millions of dollars) | | |
| Capital account: | | | |
| Balance at beginning of period | $ (1,148) | $ 5,049 | $ 5,790 |
| Net income (loss) | (354) | (102) | 315 |
| Cash distributions to EFH Corp. (Note 11) | — | (680) | (950) |
| Distribution to EFH Corp. of debt held as investment (Note 11) | — | (5,778) | (160) |
| Income tax on interest received on holdings of affiliate debt (b) | — | (88) | — |
| Deferred gain on debt exchanges, net of deferred tax asset (Note 8) | — | — | (253) |
| Effect of debt push-down from EFH Corp. (a) | 21 | 438 | 308 |
| Other | (1) | 13 | (1) |
| Balance at end of period | (1,482) | (1,148) | 5,049 |
| Affiliate debt held by EFIH: | | | |
| Balance at beginning of period | (635) | (5,388) | — |
| Reclassification of investments in debt securities of affiliates (Note 11) | — | — | (5,388) |
| EFH Corp. debt distributed to EFH Corp. ($5.125 billion principal amount) | — | 4,524 | — |
| Net affiliate debt received in debt exchanges ($31 million principal amount) | — | (23) | — |
| Interest received on holdings of affiliate debt (b) | — | 252 | — |
| Balance at end of period | (635) | (635) | (5,388) |
| Accumulated other comprehensive income (loss), net of tax effects: | | | |
| Balance at beginning of period | (39) | 160 | 15 |
| Recognition in interest income of mark-to-market valuations of investments in affiliate debt upon distribution to EFH Corp. (c) | — | (185) | — |
| Changes in fair values of investments in debt securities of affiliates | — | — | 145 |
| Unrecognized gains (losses) related to pension and other retirement benefit plans assumed by Oncor | (49) | (16) | (2) |
| Net effects related to Oncor | 2 | 2 | 2 |
| Balance at end of period | (86) | (39) | 160 |
| Total membership interests at end of period | $ (2,203) | $ (1,822) | $ (179) |

(a) Represents the effect of a net reduction of $420 million and $259 million in 2013 and 2012, respectively, of debt pushed down from EFH Corp. (Note 8) and related interest and income tax effects.
(b) Includes $244 million related to EFH Corp. debt held and $8 million related to TCEH debt held. Income tax effect of $88 million on cash interest received reported as a capital transaction.
(c) Pre-tax amount is $284 million.

See Notes to the Financial Statements.

40

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC, A DEBTOR-IN-POSSESSION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

1.    **BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES**

*Description of Business*

References in this report to "the company" are to EFIH and/or its direct and indirect subsidiaries as apparent in the context. See *Glossary* for defined terms.

EFIH, a direct, wholly owned subsidiary of EFH Corp., is a Dallas, Texas-based holding company with no operations or operating assets whose wholly owned subsidiary, Oncor Holdings, holds a majority interest (approximately 80%) in Oncor. Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell electricity to residential, business and other consumers in Texas. EFIH has no reportable business segments. Oncor Holdings and its subsidiaries (the Oncor Ring-Fenced Entities) are not consolidated in EFIH's financial statements in accordance with consolidation accounting standards related to variable interest entities (VIEs) (see Note 3).

Various ring-fencing measures have been taken to enhance the credit quality of Oncor Holdings and Oncor. These measures serve to mitigate Oncor's and Oncor Holdings' credit exposure to the Texas Holdings Group, which includes EFIH, and to reduce the risk that the assets and liabilities of the Oncor Ring-Fenced Entities would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of Texas Holding Group's subsidiaries. Such measures include, among other things: Oncor's sale of a 19.75% equity interest to Texas Transmission in November 2008; maintenance of separate books and records for the Oncor Ring-Fenced Entities; the board of directors of Oncor Holdings and Oncor being comprised of a majority of independent directors, and prohibitions on the Oncor Ring-Fenced Entities providing credit support to, or receiving credit support from, any member of the Texas Holdings Group. The assets and liabilities of the Oncor Ring-Fenced Entities are separate and distinct from those of the Texas Holdings Group, including TXU Energy and Luminant, and none of the assets of the Oncor Ring-Fenced Entities are available to satisfy the debt or contractual obligations of any member of the Texas Holdings Group. Oncor and Oncor Holdings do not bear any liability for debt or contractual obligations of the Texas Holdings Group (including, but not limited to, EFIH's debt obligations), and vice versa. Accordingly, Oncor Holdings' operations are conducted, and its cash flows managed, independently from the Texas Holdings Group.

Consistent with the ring-fencing measures discussed above, the assets and liabilities of the Oncor Ring-Fenced Entities have not been, and are not expected to be, substantively consolidated with the assets and liabilities of the Debtors in the Chapter 11 Cases.

*Bankruptcy Filing*

As discussed further in Note 2, on April 29, 2014 (the Petition Date), EFH Corp. and the substantial majority of its direct and indirect subsidiaries, including EFIH, EFCH and TCEH but excluding the Oncor Ring-Fenced Entities, (collectively, the Debtors), filed voluntary petitions for relief (the Bankruptcy Filing) under Chapter 11 of the United States Bankruptcy Code (the Bankruptcy Code) in the United States Bankruptcy Court for the District of Delaware (the Bankruptcy Court). See Note 6 for discussion of the DIP Facilities.

*Basis of Presentation, Including Application of Bankruptcy Accounting*

The consolidated financial statements have been prepared in accordance with US GAAP. The consolidated financial statements have been prepared as if EFIH is a going concern and contemplate the realization of assets and liabilities in the normal course of business. The consolidated financial statements reflect the application of Financial Accounting Standards Board Accounting Standards Codification (ASC) 852, *Reorganizations*. During the pendency of the Bankruptcy Filing, the Debtors will operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code. ASC 852 applies to entities that have filed a petition for bankruptcy under Chapter 11 of the Bankruptcy Code. The guidance requires that transactions and events directly associated with the reorganization be distinguished from the ongoing operations of the business. In addition, the guidance provides for changes in the accounting and presentation of liabilities. See Notes 7 and 8 for discussion of these accounting and reporting changes.

EFIH's investment in Oncor Holdings does not meet accounting standards criteria for consolidation and is accounted for under the equity method (see Note 3). All intercompany items and transactions have been eliminated in consolidation. All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated.

PX 115
Page 49 of 154

*Use of Estimates*

Preparation of financial statements requires estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of income and expense, including fair value measurements and estimates of expected allowed claims. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information.

*Income Taxes*

EFH Corp. files a consolidated US federal income tax return that includes the results of EFCH, EFIH, Oncor Holdings and TCEH. Oncor is a partnership for US federal income tax purposes and is not a corporate member of the EFH Corp. consolidated group. Deferred income taxes are provided for temporary differences between the book and tax basis of assets and liabilities as required under accounting rules. See Note 4.

*Investment in Affiliate Debt*

Investments in affiliate debt were classified as a reduction of membership interests effective December 31, 2012 (see Note 11). Prior to December 2012, investments in affiliate debt were classified as available-for-sale securities as assets in the balance sheet and were recorded at fair value with unrealized gains or losses recorded in other comprehensive income. EFIH evaluated its investment in affiliate debt for impairment and recorded an impairment loss if declines in fair value were deemed to be other than temporary, which occurred if it determined it would be unable to recover the carrying value of the investment. Impairments were accounted for as a reduction of interest income if related to the issuer's credit. If they were not related to the issuer's credit, the impairments were recorded in other comprehensive income.

*Impairment of Equity Method Investments*

EFIH evaluates its investment in Oncor Holdings when factors indicate that a decrease in the value of the investment has occurred that is not temporary. Indications of a loss in value include recurring operating losses of the investee or fair value measures that are less than carrying value. An impairment loss is recognized if the carrying value of the investment is greater than the fair value of the investment, and the loss is not deemed temporary. Fair value is determined primarily by discounted cash flows, supported by available market valuations, if applicable.

*Push-Down of EFH Corp. Debt*

In accordance with SEC Staff Accounting Bulletin (SAB) Topic 5-J, EFIH reflects amounts of certain EFH Corp. 10.875% Notes and EFH Corp. Toggle Notes on its balance sheet and the related interest expense in its income statement. The amounts reflected on EFIH's balance sheet were calculated based upon the relative equity investment of EFCH and EFIH in their respective operating subsidiaries at the time of the Merger (see Note 8).

*Changes in Accounting Standards*

In April 2014 the FASB issued ASU No. 2014-08, *Presentation of Financial Statements (Topic 205) and Property Plant, and Equipment (Topic 360): Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity*, which changes the requirements for reporting discontinued operations. The ASU states that a disposal of a component of an entity or a group of components of an entity is required to be reported in discontinued operations if the disposal represents a strategic shift that has or will have a major effect on an entity's operations and financial results when the component of an entity or group of components of an entity meets the criteria to be classified as held for sale, is disposed of by sale, or is disposed of other than by sale. The amendments in this ASU also require additional disclosures about discontinued operations. ASU 2014-08 is effective for the Company for the first quarter 2015. This new requirement is relevant to our presentation of the equity method investment in Oncor, which has been proposed for sale within the Chapter 11 Cases. The new guidance will eliminate a scope exception currently applicable to equity method investments, resulting in the requirement of further analysis of the presentation of the Oncor equity method investment within the consolidated financial statements in 2015. EFIH does not currently expect ASU 2014-08 to materially affect its results of operations, financial position, or cash flows, until a plan of sale of the Oncor investment is approved by the Bankruptcy Court, at which time presentation as a discontinued operations may be appropriate.

In August 2014, the FASB issued Accounting Standards Update No. 2014-15 (ASU 2014-15), *Presentation of Financial Statements – Going Concern*. ASU 2014-15 is effective for annual reporting periods (including interim periods within those periods) ending after December 15, 2016. Early application is permitted. The amendments in ASU 2014-15 create a new ASC Sub-topic 205-40, *Presentation of Financial Statements – Going Concern* and requires management to assess for each annual and interim reporting period if conditions exist that raise substantial doubt about an entity's ability to continue as a going concern. The rule requires various disclosures depending on the facts and circumstances surrounding an entity's ability to continue as a going concern. EFIH is in the process of assessing the effects of the application of the new guidance on its financial statement disclosures.

## 2.    CHAPTER 11 CASES

On the Petition Date, EFH Corp. and the substantial majority of its direct and indirect subsidiaries, including EFIH, EFCH and TCEH but excluding the Oncor Ring-Fenced Entities, filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. During the pendency of the Bankruptcy Filing (the Chapter 11 Cases), the Debtors will operate their businesses as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code.

The Bankruptcy Filing resulted primarily from the adverse effects on EFH Corp.'s competitive businesses of lower wholesale electricity prices in ERCOT driven by the sustained decline in natural gas prices since mid-2008. Further, the natural gas hedges that TCEH entered into when forward market prices of natural gas were significantly higher than current prices had largely matured before the remaining positions were terminated shortly after the Bankruptcy Filing. These market conditions challenged the profitability and operating cash flows of EFH Corp.'s competitive businesses and resulted in the inability to support their significant interest payments and debt maturities, including the remaining debt obligations due in 2014, and the inability to refinance and/or extend the maturities of their outstanding debt.

After a series of discussions with certain creditors that began in 2013 and in anticipation of the Bankruptcy Filing, on April 29, 2014, the Debtors entered into a Restructuring Support and Lock-Up Agreement (RSA) with various stakeholders (Consenting Parties) in order to effect an agreed upon restructuring of the Debtors through a pre-arranged Chapter 11 plan of reorganization.

Upon receiving competing bids for the sale of EFH Corp.'s indirect economic ownership interest in Oncor, which offered new alternatives to maximize the value of the Debtors' estates, the Debtors terminated the RSA effective July 31, 2014.

In cooperation with various stakeholders, the Debtors are focused on formulating and implementing an effective and efficient plan of reorganization for each of the Debtors under Chapter 11 of the Bankruptcy Code that maximizes enterprise value. The Debtors currently have the exclusive right to file a Chapter 11 plan of reorganization until June 23, 2015 and the exclusive right to solicit the appropriate votes for any such plan it files prior to such date until August 23, 2015 (i.e., the exclusivity period). Upon expiration of this exclusivity period (unless extended by the Bankruptcy Court), any creditor or stakeholder has the ability to file one or more Chapter 11 plans of reorganization.

### Proposed Sale of EFH Corp.'s Indirect Economic Ownership Interest in Oncor

In September 2014, with input and support from several key stakeholders, the Debtors filed a motion with the Bankruptcy Court seeking the entry of an order approving bidding procedures with respect to the potential sale of EFH Corp.'s indirect economic ownership interest in Oncor. During October 2014, the bankruptcy court held hearings regarding the motion. In November 2014, the Bankruptcy Court conditionally approved the motion. In January 2015, the Bankruptcy Court approved the Debtors' bidding procedures motion that sets forth the process by which the Debtors are authorized to solicit proposals (i.e., bids) from third parties to acquire (in any form and employing any structure, whether taxable (in whole or in part) or tax-free) EFH Corp.'s indirect economic ownership interest in Oncor in accordance with the Bankruptcy Code. These bidding procedures contemplate that the Debtors select a stalking horse bid after a two-stage closed bidding process, and, after approval by the Bankruptcy Court of such stalking horse bid, the Debtors conduct a round of open bidding culminating in an auction intended to obtain a higher or otherwise best bid for a transaction. Initial bids were received in early March 2015, and each of the Debtors is currently assessing those submissions. EFIH cannot predict the outcome of this process, including whether any acceptable bid will be received, whether the Bankruptcy Court will approve any such bid or whether any such transaction will (or when it will) ultimately close because any such transaction would be the subject of customary closing conditions, including receipt of all applicable regulatory approvals.

*Tax Matters*

In June 2014, EFH Corp. filed a request with the IRS for a private letter ruling (Private Letter Ruling) that, among other things, will provide (a) that (i) the transfer by TCEH of all of its assets and its ordinary course operating liabilities to reorganized TCEH completed through a tax-free spin (in accordance with the Private Letter Ruling) in connection with TCEH's emergence from bankruptcy (Reorganized TCEH), (ii) the transfer by the Debtors to Reorganized TCEH of certain assets and liabilities that are reasonably necessary to the operation of Reorganized TCEH and (iii) the distribution by TCEH of (A) the equity it holds in Reorganized TCEH and (B) the cash proceeds TCEH receives from Reorganized TCEH to the holders of TCEH first lien claims, will qualify as a reorganization within the meaning of Sections 368(a)(1)(G), 355 and 356 of the Code and (b) for certain other rulings under Sections 368(a)(1)(G) and 355 of the Code. The Debtors intend to continue to pursue the Private Letter Ruling to support potential Chapter 11 plans of reorganization that could ultimately be proposed. In October 2014, the Debtors filed a memorandum with the Bankruptcy Court that described tax related matters regarding restructuring alternatives.

*Operation and Implications of the Chapter 11 Cases*

EFIH's ability to continue as a going concern is contingent upon, among other factors, its ability to comply with the financial and other covenants contained in the EFIH DIP Facilities described in Note 6, its ability to obtain new debtor in possession financing in the event the EFIH DIP Facilities were to expire during the pendency of the Chapter 11 Cases and its ability to complete a Chapter 11 plan of reorganization in a timely manner, including obtaining creditor and Bankruptcy Court approval of such plan as well as applicable regulatory approvals required for such plan and obtaining any exit financing needed to implement such plan.

A Chapter 11 plan of reorganization determines the rights and satisfaction of claims of various creditors and security holders and is subject to the ultimate outcome of negotiations and Bankruptcy Court decisions ongoing through the date on which the Chapter 11 plan is confirmed. EFIH currently expect that any proposed Chapter 11 plan of reorganization will provide, among other things, mechanisms for settlement of claims against the Debtors' estates, treatment of EFH Corp.'s existing equity holders and the Debtors' respective existing debt holders, potential income tax liabilities and certain corporate governance and administrative matters pertaining to a reorganized EFH Corp. Any proposed Chapter 11 plan of reorganization will be subject to revision prior to submission to the Bankruptcy Court based upon discussions with the Debtors' creditors and other interested parties, and thereafter in response to creditor claims and objections and the requirements of the Bankruptcy Code or the Bankruptcy Court. There can be no assurance that the Debtors will be able to secure approval from the Bankruptcy Court for any Chapter 11 plan of reorganization it ultimately proposes or that any Chapter 11 plan will be accepted by the Debtors' creditors.

In order for the Debtors (including the EFIH Debtors) to emerge successfully from the Chapter 11 Cases as reorganized companies, they must obtain approval from the Bankruptcy Court and certain of their respective creditors for a Chapter 11 plan, which will enable each of the Debtors to transition from the Chapter 11 Cases into reorganized companies conducting ordinary course operations outside of bankruptcy. In connection with an exit from bankruptcy, TCEH and EFIH will require a new credit facility, or exit financing. EFIH's ability to obtain such financing and the approval of such financing will depend on, among other things, the timing and outcome of various ongoing matters in the Chapter 11 Cases.

*Pre-Petition Claims*

Holders of the substantial majority of pre-petition claims were required to file proofs of claims by the bar date established by the Bankruptcy Court. A bar date is the date by which certain claims against the Debtors must be filed if the claimants wish to receive any distribution in the Chapter 11 Cases. The Bankruptcy Court established a bar date of October 27, 2014 for the substantial majority of claims. The Debtors have received approximately 10,000 filed claims since the Petition Date. The Debtors are in the process of reconciling those claims to the amounts listed in its schedules of assets and liabilities, which includes communications with claimants to acquire additional information required for reconciliation. As of March 31, 2015, approximately 2,450 of those claims have been settled, withdrawn or expunged. To the extent claims are reconciled and resolved, EFIH has recorded them at the expected allowed amount. Claims that remain unresolved or unreconciled through the filing of this report have been estimated based upon management's best estimate of the likely claim amounts that the Bankruptcy Court will ultimately allow.

PX 115
Page 52 of 154

Beginning in November 2014, EFH Corp. began the process to request the Bankruptcy Court to disallow claims that it believes are duplicative, have been later amended or superseded, are without merit, are overstated or should be disallowed for other reasons. Given the substantial number of claims filed, the claims resolution process will take considerable time to complete. Differences between liability amounts recorded by the company as liabilities subject to compromise and claims filed by creditors will be investigated and, if necessary, the Bankruptcy Court will make a final determination of the allowable claim. Differences between those final allowed claims and the liabilities recorded in the consolidated balance sheets will be recognized as reorganization items in EFIH's statements of consolidated income (loss) as they are resolved. The determination of how liabilities will ultimately be resolved cannot be made until the Bankruptcy Court approves a plan of reorganization or approves orders related to settlement of specific liabilities. Accordingly, the ultimate amount or resolution of such liabilities is not determinable at this time. The resolution of such claims could result in material adjustments to the company's financial statements.

45

3.    **INVESTMENT IN ONCOR HOLDINGS**

EFIH has a wholly-owned subsidiary, Oncor Holdings, which holds an approximate 80% equity interest in Oncor. Oncor Holdings is considered a variable interest entity (VIE). A VIE is an entity with which an entity has a relationship or arrangement that indicates some level of control over the entity or results in economic risks to it. Accounting standards require consolidation of a VIE if an entity has (a) the power to direct the significant activities of the VIE and (b) the right or obligation to absorb profit and loss from the VIE (i.e., the entity is the primary beneficiary of the VIE). In determining the appropriateness of consolidation of a VIE, EFIH evaluates its purpose, governance structure, decision making processes and risks that are passed on to its interest holders. EFIH also examines the nature of any related party relationships among the interest holders of the VIE and the nature of any special rights granted to the interest holders of the VIE.

As discussed below, EFIH's consolidated balance sheets include assets and liabilities of VIEs that meet the consolidation standards. The maximum exposure to loss from EFIH's interests in VIEs does not exceed its carrying value.

EFIH does not consolidate Oncor Holdings and instead accounts for it as an equity method investment because the structural and operational ring-fencing measures discussed in Note 1 prevent it from having power to direct the significant activities of Oncor Holdings or Oncor. In accordance with accounting standards, EFIH accounts for its investment in Oncor Holdings under the equity method, as opposed to the cost method, based on its level of influence over its activities.

In reaching the conclusion to deconsolidate, EFIH conducted an extensive analysis of Oncor Holdings' underlying governing documents and management structure. Oncor Holdings' unique governance structure was adopted in conjunction with the Merger, when the Sponsor Group, EFH Corp. and Oncor agreed to implement structural and operational measures to ring-fence (the Ring-Fencing Measures) Oncor Holdings and Oncor as discussed in Note 1. The Ring-Fencing Measures were designed to prevent, among other things, (i) increased borrowing costs at Oncor due to the attribution to Oncor of debt from any of EFH Corp.'s other subsidiaries, (ii) the activities of EFH Corp.'s competitive operations following the Merger resulting in the deterioration of Oncor's business, financial condition and/or investment in infrastructure, and (iii) Oncor becoming substantively consolidated into a bankruptcy proceeding involving any member of the Texas Holdings Group. The Ring-Fencing Measures effectively separate the daily operational and management control of Oncor Holdings and Oncor from EFH Corp. and its other subsidiaries. By implementing the Ring-Fencing Measures, Oncor maintained its investment grade credit rating following the Merger, and EFH Corp. reaffirmed Oncor's independence from its competitive businesses to the PUCT.

EFIH determined the most significant activities affecting the economic performance of Oncor Holdings (and Oncor) are the operation, maintenance and growth of Oncor's electric transmission and distribution assets and the preservation of its investment grade credit profile. The boards of directors of Oncor Holdings and Oncor have ultimate responsibility for the management of the day-to-day operations of their respective businesses, including the approval of Oncor's capital expenditure and operating budgets and the timing and prosecution of Oncor's rate cases. While both boards include members appointed by EFH Corp., a majority of the board members are independent in accordance with rules established by the New York Stock Exchange, and therefore, EFIH concluded for purposes of applying the amended accounting standards that EFH Corp. does not have the power to control the activities deemed most significant to Oncor Holdings' (and Oncor's) economic performance.

In assessing EFIH's ability to exercise control over Oncor Holdings and Oncor, EFIH considered whether it could take actions to circumvent the purpose and intent of the Ring-Fencing Measures (including changing the composition of Oncor Holdings' or Oncor's board) in order to gain control over the day-to-day operations of either Oncor Holdings or Oncor. EFIH also considered whether (i) it has the unilateral power to dissolve, liquidate or force into bankruptcy either Oncor Holdings or Oncor, (ii) it could unilaterally amend the Ring-Fencing Measures contained in the underlying governing documents of Oncor Holdings or Oncor, and (iii) it could control Oncor's ability to pay distributions and thereby enhance its own cash flow. EFIH concluded that, in each case, no such opportunity exists.

The carrying value of EFIH's variable interest in Oncor Holdings totaled $6.050 billion and $5.950 billion at December 31, 2014 and 2013, respectively, and is reported as investment in Oncor Holdings in EFIH's consolidated balance sheets. EFIH's maximum exposure to loss from this investment does not exceed its carrying value.

See Note 12 for discussion of Oncor Holdings' and Oncor's transactions with EFH Corp. and its other subsidiaries.

*Distributions from Oncor Holdings* — Oncor Holdings' distributions of earnings to EFIH totaled $202 million, $213 million and $147 million for the years ended December 31, 2014, 2013 and 2012, respectively. Distributions may not be paid except to the extent Oncor maintains a required regulatory capital structure as discussed below. At December 31, 2014, $184 million was eligible to be distributed to Oncor's members after taking into account the regulatory capital structure limit, of which approximately 80% or $146 million relates to EFIH's ownership interest in Oncor. The boards of directors of each of Oncor and Oncor Holdings can withhold distributions to the extent the applicable board determines in good faith that it is necessary to retain such amounts to meet expected future requirements of Oncor and/or Oncor Holdings.

For the period beginning October 11, 2007 and ending December 31, 2012, distributions (other than distributions of the proceeds of any equity issuance) paid by Oncor to its members were limited by a PUCT order to an amount not to exceed Oncor's cumulative net income determined in accordance with US GAAP, as adjusted. Adjustments consisted of the removal of noncash impacts of purchase accounting and deducting two specific cash commitments. The noncash impacts consisted of removing the effect of an $860 million goodwill impairment charge in 2008 and the cumulative amount of net accretion of fair value adjustments. The two specific cash commitments were a $72 million ($46 million after tax) one-time refund to customers in September 2008 and funds spent as part of a five-year, $100 million commitment for additional energy efficiency initiatives that was completed in 2012.

Oncor's distributions are limited by its regulatory capital structure, which is required to be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. At December 31, 2014, Oncor's regulatory capitalization ratio was 58.8% debt and 41.2% equity. For purposes of this ratio, debt is calculated as long-term debt plus unamortized gains on reacquired debt less unamortized issuance expenses, premiums and losses on reacquired debt. The debt calculation excludes bonds issued by Oncor Electric Delivery Transition Bond Company LLC, which were issued in 2003 and 2004 to recover specific generation-related regulatory assets and other qualified costs. Equity is calculated as membership interests determined in accordance with US GAAP, excluding the effects of accounting for the Merger (which included recording the initial goodwill and fair value adjustments and the subsequent related impairments and amortization).

As a result of the Bankruptcy Filing, Oncor had credit risk exposure to trade accounts receivable from subsidiaries of TCEH, which related to delivery services provided by Oncor to TCEH's retail electricity operations. At the Petition Date, these accounts receivable totaled $109 million. In June 2014, the Bankruptcy Court authorized the Debtors to pay all pre-petition delivery charges due Oncor, and such amounts were paid in full.

EFH Corp., Oncor Holdings, Oncor and Oncor's minority investor are parties to a Federal and State Income Tax Allocation Agreement. Additional income tax amounts receivable or payable may arise in the normal course under that agreement.

*Oncor Holdings Financial Statements* — Condensed statements of consolidated income of Oncor Holdings and its subsidiaries for the years ended December 31, 2014, 2013 and 2012 are presented below:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2014** | **2013** | **2012** |
| Operating revenues | $ 3,822 | $ 3,552 | $ 3,328 |
| Operation and maintenance expenses | (1,453) | (1,269) | (1,171) |
| Depreciation and amortization | (851) | (814) | (771) |
| Taxes other than income taxes | (438) | (424) | (415) |
| Other income | 13 | 18 | 26 |
| Other deductions | (15) | (15) | (64) |
| Interest income | 3 | 4 | 24 |
| Interest expense and related charges | (353) | (371) | (374) |
| Income before income taxes | 728 | 681 | 583 |
| Income tax expense | (289) | (259) | (243) |
| Net income | 439 | 422 | 340 |
| Net income attributable to noncontrolling interests | (90) | (87) | (70) |
| Net income attributable to Oncor Holdings | $ 349 | $ 335 | $ 270 |

PX 115
Page 55 of 154

Assets and liabilities of Oncor Holdings at December 31, 2014 and 2013 are presented below:

| | December 31, | |
| | 2014 | 2013 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 5 | $ 28 |
| Restricted cash | 56 | 52 |
| Trade accounts receivable — net | 407 | 385 |
| Trade accounts and other receivables from affiliates | 118 | 135 |
| Income taxes receivable from EFH Corp. | 144 | 16 |
| Inventories | 73 | 65 |
| Accumulated deferred income taxes | 10 | 32 |
| Prepayments and other current assets | 91 | 82 |
| Total current assets | 904 | 795 |
| Restricted cash | 16 | 16 |
| Other investments | 97 | 91 |
| Property, plant and equipment — net | 12,463 | 11,902 |
| Goodwill | 4,064 | 4,064 |
| Regulatory assets — net | 1,429 | 1,324 |
| Other noncurrent assets | 67 | 71 |
| Total assets | $ 19,040 | $ 18,263 |
| **LIABILITIES** | | |
| Current liabilities: | | |
| Short-term borrowings | $ 711 | $ 745 |
| Long-term debt due currently | 639 | 131 |
| Trade accounts payable — nonaffiliates | 202 | 178 |
| Income taxes payable to EFH Corp. | 24 | 23 |
| Accrued taxes other than income | 174 | 169 |
| Accrued interest | 93 | 95 |
| Other current liabilities | 156 | 135 |
| Total current liabilities | 1,999 | 1,476 |
| Accumulated deferred income taxes | 1,978 | 1,905 |
| Long-term debt, less amounts due currently | 4,997 | 5,381 |
| Other noncurrent liabilities and deferred credits | 2,245 | 1,822 |
| Total liabilities | $ 11,219 | $ 10,584 |

**PX 115**
**Page 56 of 154**

4.    **INCOME TAXES**

EFH Corp. files a US federal income tax return that includes the results of EFCH, EFIH, Oncor Holdings and TCEH. Oncor is a partnership for US federal income tax purposes and is not a corporate member of the EFH Corp. consolidated group.

EFH Corp. and its subsidiaries (including EFCH, EFIH, and TCEH, but not including Oncor Holdings and Oncor) are parties to a Federal and State Income Tax Allocation Agreement, which provides for the computation of income tax liabilities and benefits, and among other things, that each of EFCH, EFIH, TCEH and any other subsidiaries under the agreement is required to make payments to EFH Corp. in an amount calculated to approximate the amount of tax liability such entity would have owed if it filed a separate corporate tax return. Accordingly, EFIH's income tax expense and related balance sheet amounts are recorded as if EFIH files its own corporate income tax returns. Deferred income taxes are provided for temporary differences between the book and tax basis of assets and liabilities as required under accounting rules. Income tax assets and liabilities related to pushed down debt are settled as membership interests transactions.

Deferred income taxes arise from temporary differences between the tax basis of assets and liabilities and their reported amounts in the financial statements, which will result in taxable or deductible amounts in the future. In evaluating EFIH's ability to recover its deferred tax assets related to its net operating losses, EFIH considers all available positive and negative information, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax-planning strategies, and results of operations. Due to the significant uncertainty of the ultimate recovery by EFIH of the benefit of its NOLs, a valuation allowance of $72 million has been recorded on EFIH's net deferred tax assets as of December 31, 2014.

EFH Corp., Oncor Holdings, Oncor and Oncor's third-party minority investor are parties to a separate Federal and State Income Tax Allocation Agreement, which governs the computation of federal income tax liability among such parties, and similarly provides, among other things, that each of Oncor Holdings and Oncor will pay EFH Corp. its share of an amount calculated to approximate the amount of tax liability such entity would have owed if it filed a separate corporate tax return.

The components of EFIH's income tax expense (benefit) are as follows:

|  | | Year Ended December 31, | | | | |
|  | | 2014 | | 2013 | | 2012 |
|---|---|---|---|---|---|---|
| Current: | | | | | | |
| US Federal | $ | (104) | $ | (115) | $ | 25 |
| State | | — | | 1 | | 4 |
| Deferred: | | | | | | |
| US Federal | | (52) | | (55) | | (2) |
| State | | 1 | | — | | — |
| Total income tax expense (benefit) | $ | (155) | $ | (169) | $ | 27 |

Reconciliation of income taxes computed at the US federal statutory rate to income tax expense (benefit) recorded:

|  | | Year Ended December 31, | | | | |
|  | | 2014 | | 2013 | | 2012 |
|---|---|---|---|---|---|---|
| Income (loss) before income taxes and equity in earnings of unconsolidated subsidiaries | $ | (858) | $ | (606) | $ | 72 |
| Income taxes at the US federal statutory rate of 35% | | (300) | | (212) | | 25 |
| Nondeductible reserve for tax receivable from EFH Corp. | | 43 | | 38 | | — |
| Nondeductible debt restructuring costs | | 28 | | — | | — |
| Valuation allowance | | 72 | | — | | — |
| Other | | 2 | | 5 | | 2 |
| Income tax expense (benefit) | $ | (155) | $ | (169) | $ | 27 |
| Effective rate | | 18.1% | | 27.9% | | 37.5% |

*Deferred Income Tax Balances*

Deferred income taxes provided for temporary differences based on tax laws in effect at December 31, 2014 and 2013 are as follows:

| | December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2014** | | | **2013** | | |
| | **Total** | **Current** | **Noncurrent** | **Total** | **Current** | **Noncurrent** |
| **Deferred Income Tax Assets:** | | | | | | |
| Accrued interest | $ — | $ — | $ — | $ 3 | $ — | $ 3 |
| Net operating loss (NOL) carryforwards | 232 | — | 232 | — | — | — |
| Debt extinguishment gains (Note 8) | 30 | — | 30 | 49 | — | 49 |
| Other | 2 | — | 2 | 1 | — | 1 |
| Total | 264 | — | 264 | 53 | — | 53 |
| **Deferred Income Tax Liabilities:** | | | | | | |
| Debt extinguishment gains related to pushed down debt of EFH Corp. (Note 8) | 80 | 26 | 54 | 103 | 26 | 77 |
| Accrued interest | 106 | — | 106 | — | — | — |
| Debt fair value discount | 6 | — | 6 | — | — | — |
| Total | 192 | 26 | 166 | 103 | 26 | 77 |
| **Valuation Allowance** | 72 | — | 72 | — | — | — |
| **Net Accumulated Deferred Income Tax (Asset) Liability** | $ — | $ 26 | $ (26) | $ 50 | $ 26 | $ 24 |

For the year ended December 31, 2014, EFIH generated net operating loss (NOL) carryforwards for federal income tax purposes of $663 million. EFIH believes that it is more likely than not that the benefit from the NOLs will not be realized. In recognition of this risk, EFIH has recorded a valuation allowance of $72 million on the net deferred tax assets. If EFIH's assumptions change and it determines it will be able to realize these NOLs, the tax benefits relating to any reversal of the valuation allowance on deferred tax assets would be recorded to income tax benefit. For the year ended December 31, 2013, EFIH generated NOLs for federal income tax purposes of $328 million.

Under the Federal and State Income Tax Allocation Agreement, EFIH had recorded a current income tax receivables from EFH Corp., which totaled $125 million and $110 million at December 31, 2014 and 2013, respectively, because EFH Corp. utilized the loss to offset current taxable income from Oncor. See Note 5 for discussion of the reserve recorded against the income tax receivable.

## 5.    OTHER DEDUCTIONS

EFIH has income tax receivables from EFH Corp. that arose under the Federal and State Income Tax Allocation Agreement. In consideration of the Bankruptcy Filing, EFIH fully reserved the income tax receivables because of the significant uncertainty regarding their ultimate settlement, resulting in charges of $125 million and $110 million at December 31, 2014 and 2013, respectively.

EFIH also fully reserved a pre-petition intercompany accounts receivable because of significant uncertainty regarding its ultimate settlement, resulting in a charge of $3 million at December 31, 2014.

PX 115
Page 58 of 154

**6.    DEBTOR-IN-POSSESSION BORROWING FACILITIES**

*EFIH DIP Facility and EFIH First Lien Notes Settlement* — The Bankruptcy Court approved the EFIH DIP Facility in June 2014. The EFIH DIP Facility provides for a $5.4 billion first-lien debtor-in-possession financing facility, all of which was utilized as of December 31, 2014 as follows:

- $1.836 billion of loans issued under the facility were issued as an exchange to holders of $1.673 billion principal amount of EFIH First Lien Notes plus accrued and unpaid interest totaling $78 million. Holders of substantially all of the principal amount exchanged received as payment in full a principal amount of loans under the DIP facility equal to 105% of the principal amount of the notes held plus 101% of the accrued and unpaid interest at the non-default rate on such principal;
- $2.438 billion of cash borrowings were used to repay all remaining $2.312 billion principal amount of EFIH First Lien Notes (plus accrued and unpaid interest totaling $128 million), and
- Remaining borrowings under the facility, net of fees, of $1.038 billion are held as cash and cash equivalents.

The exchange and settlement of the EFIH First Lien Notes resulted in a loss of $108 million, reported in reorganization items, which represents the excess of the principal amounts of debt issued, cash repayments and deferred financing costs associated with the exchanged and settled debt over the carrying value of the exchanged and settled debt and related accrued interest.

The principal amounts outstanding under the EFIH DIP Facility bear interest based on applicable LIBOR rates, subject to a 1% floor, plus 3.25%. At December 31, 2014, outstanding borrowings under the EFIH DIP Facility totaled $5.4 billion at an annual interest rate of 4.25%. The EFIH DIP Facility is a non-amortizing loan that may, subject to certain limitations, be voluntarily prepaid by the EFIH Debtors, in whole or in part, without any premium or penalty.

The EFIH DIP Facility will mature on the earlier of (a) the effective date of any reorganization plan, (b) upon the event of the sale of substantially all of EFIH's assets or (c) June 2016. The maturity date may be extended to no later than December 2016 subject to the satisfaction of certain conditions, including the payment of a 25 basis point extension fee, a requirement that an acceptable plan of reorganization has been filed on or prior to such extension and the availability of certain metrics of liquidity applicable to EFIH and EFIH Finance.

EFIH's obligations under the EFIH DIP Facility are secured by a first lien covering substantially all of EFIH's assets, rights and properties, subject to certain exceptions set forth in the EFIH DIP Facility. The EFIH DIP Facility provides that all obligations thereunder constitute administrative expenses in the Chapter 11 Cases, with administrative priority and senior secured status under the Bankruptcy Code and, subject to certain exceptions set forth in the EFIH DIP Facility, will have priority over any and all administrative expense claims, unsecured claims and costs and expenses in the Chapter 11 Cases.

The EFIH DIP Facility provides for affirmative and negative covenants applicable to EFIH and EFIH Finance, including affirmative covenants requiring EFIH and EFIH Finance to provide financial information, budgets and other information to the agents under the EFIH DIP Facility, and negative covenants restricting EFIH's and EFIH Finance's ability to incur additional indebtedness, grant liens, dispose of assets, pay dividends or take certain other actions, in each case except as permitted in the EFIH DIP Facility. The EFIH DIP Facility also includes a minimum liquidity covenant pursuant to which EFIH cannot allow the amount of its unrestricted cash (as defined in the EFIH DIP Facility) to be less than $150 million. The Oncor Ring-Fenced Entities are not restricted subsidiaries for purposes of the EFIH DIP Facility.

The EFIH DIP Facility provides for certain customary events of default, including events of default resulting from non-payment of principal, interest or other amounts when due, material breaches of representations and warranties, material breaches of covenants in the EFIH DIP Facility or ancillary loan documents, cross-defaults under other agreements or instruments and the entry of material judgments against EFIH. Upon the existence of an event of default, the EFIH DIP Facility provides that all principal, interest and other amounts due thereunder will become immediately due and payable, either automatically or at the election of specified lenders.

The EFIH DIP Facility permits, subject to certain terms, conditions and limitations set forth in the EFIH DIP Facility, EFIH to incur incremental junior lien subordinated debt in an aggregate amount not to exceed $3 billion.

**PX 115**
**Page 59 of 154**

7.    **REORGANIZATION ITEMS**

Expenses and income directly associated with the Chapter 11 Cases are reported separately in the condensed statements of consolidated income (loss) as reorganization items as required by ASC 852, *Reorganizations*. Reorganization items also include adjustments to reflect the carrying value of liabilities subject to compromise (LSTC) at their estimated allowed claim amounts, as such adjustments are determined. The following table presents reorganization items incurred since the Petition Date as reported in the statements of consolidated income (loss):

| | Post-Petition Period Through December 31, 2014 | |
|---|---|---|
| Loss on exchange and settlement of EFIH First Lien Notes (Note 6) | $ | 108 |
| Fees associated with completion of EFIH DIP Facility | | 94 |
| Expenses related to legal advisory and representation services | | 50 |
| Expenses related to other professional consulting and advisory services | | 15 |
| Total reorganization items | $ | 267 |

8.    **LIABILITIES SUBJECT TO COMPROMISE**

The amounts classified as liabilities subject to compromise (LSTC) reflect the company's estimate of pre-petition liabilities and other expected allowed claims to be addressed in the Chapter 11 Cases and may be subject to future adjustment as the Chapter 11 Cases proceed. Debt amounts include related unamortized deferred financing costs, discounts or premiums. The following table presents LSTC as reported in the consolidated balance sheets at December 31, 2014:

| | December 31, 2014 | |
|---|---|---|
| Notes, loans and other debt per the following table | $ | 3,843 |
| Accrued interest on notes, loans and other debt | | 138 |
| Advances and other payables to affiliates | | 7 |
| Total liabilities subject to compromise | $ | 3,988 |

52
-

**Pre-Petition Notes, Loans and Other Debt Reported as Liabilities Subject to Compromise**

Amounts reported below as of December 31, 2014 represent principal amounts of pre-petition notes, loans and other debt reported as liabilities subject to compromise. Amounts reported below as of December 31, 2013 represent notes, loans and other debt reported as current liabilities in EFIH's consolidated balance sheets. All pre-petition notes, loans and other debt outstanding as of December 31, 2014 are classified as LSTC.

| | December 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| Debt issued by EFIH: | | |
| 6.875% Fixed Senior Secured First Lien Notes due August 15, 2017 (a) | $ — | $ 503 |
| 10% Fixed Senior Secured First Lien Notes due December 1, 2020 (a) | | 3,482 |
| 11% Fixed Senior Secured Second Lien Notes due October 1, 2021 | 406 | 406 |
| 11.75% Fixed Senior Secured Second Lien Notes due March 1, 2022 | 1,750 | 1,750 |
| 11.25%/12.25% Senior Toggle Notes due December 1, 2018 | 1,566 | 1,566 |
| 9.75% Fixed Senior Notes due October 15, 2019 | 2 | 2 |
| Unamortized premium | 243 | 284 |
| Unamortized discount | (121) | (146) |
| Total debt issued by EFIH | 3,846 | 7,847 |
| Pushed down debt (b): | | |
| 10.875% EFH Corp. Fixed Senior Notes due November 1, 2017 | 17 | 17 |
| 11.25%/12.00% EFH Corp. Senior Toggle Notes due November 1, 2017 | 13 | 13 |
| Total pushed down debt | 30 | 30 |
| Deferred debt issuance costs (c) | (33) | — |
| Total debt | $ 3,843 | $ 7,877 |

_____

(a)  The EFIH First Lien Notes were exchanged or settled in June 2014 (see Note 6).

(b)  Represents 50% of the amount of these EFH Corp. securities guaranteed by EFIH and pushed down per the discussion below under "Guarantees and Push Down of EFH Corp. Debt."

(c)  Deferred debt issuance costs were reported in other noncurrent assets at December 31, 2013.

*Repayment of EFIH Second Lien Notes*

In March 2015, with the approval of the Bankruptcy Court, EFIH used some of its cash to repay (Repayment) $735 million, including interest at contractual rates, in amounts outstanding under EFIH's pre-petition 11.00% Second Lien Notes due 2021 (11.00% Notes) and 11.75% Second Lien Notes due 2022 (11.75% Notes) and $15 million in certain fees and expenses of the trustee for such notes. The Repayment required the requisite consent of the lenders under its EFIH DIP Facility. EFIH received such consent from approximately 97% of the lenders under the EFIH DIP Facility and paid an aggregate consent fee equal to approximately $13 million. As a result of the Repayment, as of the date hereof, the principal amount outstanding on the 11.00% Notes and 11.75% are $322 million and $1.388 billion, respectively.

*Debt Related Activity in 2013*

Principal amounts of debt issued in the year ended December 31, 2013 totaled $1.564 billion. These issuances consisted of $1.302 billion of EFIH 10% Notes issued in exchanges as discussed below, $173 million of EFIH Toggle Notes issued though the PIK election in lieu of making cash interest payments, and $89 million of EFIH Toggle Notes issued in debt exchanges as discussed below.

*EFIH Debt Exchanges and Distributions Involving EFH Corp. Debt* — In exchanges in January 2013, EFIH and EFIH Finance issued $1.302 billion principal amount of EFIH 10% Senior Secured Notes due 2020 (New EFIH 10% Notes) in exchange for $1.310 billion total principal amount of EFH Corp. and EFIH senior secured notes consisting of: (i) $113 million principal amount of EFH Corp. 9.75% Senior Secured Notes due 2019 (EFH Corp. 9.75% Notes), (ii) $1.058 billion principal amount of EFH Corp. 10% Senior Secured Notes due 2020 (EFH Corp. 10% Notes), and (iii) $139 million principal amount of EFIH 9.75% Senior Secured Notes due 2019 (EFIH 9.75% Notes). The New EFIH 10% Notes had terms and conditions substantially the same as the existing EFIH 10% Notes discussed below. EFIH cancelled the EFIH notes it received in the exchanges.

In connection with these debt exchange transactions, EFH Corp. received the requisite consents from holders of the EFH Corp. 9.75% Notes and EFH Corp. 10% Notes and EFIH received the requisite consents from holders of the EFIH 9.75% Notes to certain amendments to the respective indentures governing such notes. These amendments, among other things, (i) eliminated EFIH's pledge of its 100% ownership of the membership interests it owns in Oncor Holdings as collateral for the EFIH 9.75% Notes, (ii) made EFCH and EFIH unrestricted subsidiaries under the EFH Corp. 9.75% Notes and EFH Corp. 10% Notes, thereby eliminating EFCH's unsecured and EFIH's secured guarantees of the notes, (iii) eliminated substantially all of the restrictive covenants in the indentures and (iv) eliminated certain events of default, modified covenants regarding mergers and consolidations and modified or eliminated certain other provisions in these indentures.

In additional exchanges in January 2013, EFIH and EFIH Finance issued $89 million principal amount of additional 11.25%/12.25% Toggle Notes due 2018 (EFIH Toggle Notes) in exchange for $95 million total principal amount of EFH Corp. senior notes consisting of: (i) $31 million principal amount of EFH Corp. 10.875% Senior Notes due 2017 (EFH Corp. 10.875% Notes), (ii) $33 million principal amount of EFH Corp. 11.25%/12.00% Senior Toggle Notes due 2017 (EFH Corp. Toggle Notes), (iii) $2 million principal amount of EFH Corp. 5.55% Series P Notes due 2014 (EFH Corp. 5.55% Notes) and (iv) $29 million principal amount of EFH Corp. 6.50% Series Q Notes due 2024 (EFH Corp. 6.50% Notes). The additional EFIH Toggle Notes have the same terms and conditions as the existing EFIH Toggle Notes discussed below.

In the first quarter of 2013, EFIH distributed to EFH Corp. $6.360 billion principal amount of EFH Corp. debt that it previously received in debt exchanges, including $1.235 billion received in January 2013. EFH Corp. cancelled the notes, leaving $1.361 billion principal amount of affiliate debt still held by EFIH. The distribution included $3.474 billion principal amount of EFH Corp. Toggle Notes, $1.715 billion principal amount of EFH Corp. 10.875% Notes, $1.058 billion principal amount of EFH Corp. 10% Notes and $113 million principal amount of EFH Corp. 9.75% Notes.

*Accounting and Income Tax Effects of the January 2013 Debt Exchanges* — In consideration of the circumstances and terms of the exchanges, accounting rules require that the net loss on the exchanges, which totaled $21 million, be deferred and amortized to interest expense over the life of the debt issued. The deferred loss is reported as debt discount associated with the EFIH 10% Notes and EFIH Toggle Notes. The deferred loss and the related deferred tax liability were pushed down to EFIH as a membership interests transaction.

### Guarantees and Push Down of EFH Corp. Debt

Merger-related debt of EFH Corp. and its subsidiaries consists of debt issued or existing at the time of the Merger. Debt issued in exchange for Merger-related debt is considered Merger-related. Debt issuances for cash are considered Merger-related debt to the extent the proceeds are used to repurchase Merger-related debt. EFCH and EFIH (excluding their subsidiaries) fully and unconditionally guarantee on a joint and several basis the Merger-related debt of EFH Corp. (parent). Such debt is subject to push down in accordance with SEC Staff Accounting Bulletin Topic 5-J, and as a result, a portion of such debt and related interest expense is reflected in EFIH's financial statements. Merger-related debt of EFH Corp. held by its subsidiaries is not subject to push down.

Pre-petition debt guaranteed and subject to push down at December 31, 2014 totals $60 million and consists of $33 million principal amount of EFH Corp. 10.875% Notes and $27 million principal amount of EFH Corp. Toggle Notes. The amount reflected in EFIH's consolidated balance sheets as pushed down pre-petition debt ($30 million at both December 31, 2014 and 2013, as shown in the debt table above) represents 50% of the principal amount of the EFH Corp. Merger-related debt guaranteed. This percentage reflects the fact that at the time of the Merger, the equity investments of EFCH and EFIH in their respective operating subsidiaries were essentially equal amounts. Because payment of principal and interest on the debt is the responsibility of EFH Corp., EFIH records the settlement of such amounts as noncash capital contributions from EFH Corp.

There were no payments of interest by EFH Corp. on pre-petition debt pushed down for the year ended December 31, 2014. EFH Corp. payments of interest on debt pushed down totaled $23 million, and $53 million for the years ended December 31, 2013, and 2012, respectively.

The following table presents an analysis of the total outstanding principal amount of EFH Corp. debt guaranteed by EFCH and EFIH at December 31, 2012, December 31, 2013 and December 31, 2014, respectively.

| | December 31, 2012 | | | | | |
|---|---|---|---|---|---|---|
| Securities Guaranted (principal amounts) | Held by EFIH | Subject to Push Down | Not Merger-Related | Total Guaranteed | Debt Cancelled in 2013 (c) | Total Guaranteed December 31, 2013 and 2014 (d) |
| EFH Corp. 9.75% Senior Notes (a) | $    — | $   115 | $    — | $   115 | $   113 | $    — |
| EFH Corp. 10% Senior Notes (a) | — | 661 | 400 | 1,061 | 1,058 | — |
| EFH Corp. 10.875% Senior Notes | 1,685 | 64 | — | 1,749 | 1,715 | 33 |
| EFH Corp. 11.25%/12.00% Senior Toggle Notes | 3,441 | 60 | — | 3,501 | 3,474 | 27 |
| Subtotal | $ 5,126 | $   900 | $   400 | 6,426 | $ 6,360 | 60 |
| TCEH Demand Notes (b) | | | | 698 | | — |
| Total | | | | $ 7,124 | | $    60 |

_____

(a)  As a result of transactions completed in the first quarter 2013, as discussed above, the guarantees of the EFH Corp. 9.75% Notes and EFH Corp. 10% Notes were eliminated.

(b)  The TCEH Demand Notes were settled in January 2013. See Note 12.

(c)  See Note 8 for discussion of debt distributions and cancellations.

(d)  These amounts are subject to push down.

**Information Regarding Significant Pre-Petition Debt**

*EFIH 6.875% Senior Secured First Lien Notes* — There were no principal amounts of the EFIH 6.875% Notes outstanding at December 31, 2014 as the notes were exchanged or settled in June 2014 as discussed in Note 6. The notes bore interest at a fixed rate of 6.875% per annum. The EFIH 6.875% Notes were secured on a first-priority basis by EFIH's pledge of its 100% ownership of the membership interests in Oncor Holdings (the EFIH Collateral) on an equal and ratable basis with the EFIH 10% Notes (discussed below).

*EFIH 10% Senior Secured First Lien Notes* — There were no principal amounts of the EFIH 10% Notes outstanding at December 31, 2014 as the notes were exchanged or settled in June 2014 as discussed in Note 6. The notes bore interest at a fixed rate of 10% per annum. The notes were secured by the EFIH Collateral on an equal and ratable basis with the EFIH 6.875% Notes.

*EFIH 11% Senior Secured Second Lien Notes* — The principal amount of the EFIH 11% Notes totals $406 million with interest at a fixed rate of 11% per annum. The EFIH 11% Notes are secured on a second-priority basis by the EFIH Collateral on an equal and ratable basis with the EFIH 11.75% Notes. See discussion above related to the repayment of a portion of these notes in March 2015.

The EFIH 11% Notes are senior obligations of EFIH and EFIH Finance and rank equally in right of payment with all senior indebtedness of EFIH and are effectively senior in right of payment to all existing or future unsecured debt of EFIH to the extent of the value of the EFIH Collateral. The notes have substantially the same terms as the EFIH 11.75% Notes discussed below, and the holders of the EFIH 11% Notes will generally vote as a single class with the holders of the EFIH 11.75% Notes.

*EFIH 11.75% Senior Secured Second Lien Notes* — The principal amount of the EFIH 11.75% Notes totals $1.750 billion with interest at a fixed rate of 11.75% per annum. The EFIH 11.75% Notes are secured on a second-priority basis by the EFIH Collateral on an equal and ratable basis with the EFIH 11% Notes. The EFIH 11.75% Notes have substantially the same covenants as the EFIH 11% Notes, and the holders of the EFIH 11.75% Notes will generally vote as a single class with the holders of the EFIH 11% Notes. See discussion above related to the repayment of a portion of these notes in March 2015.

The EFIH 11.75% Notes were issued in private placements and are not registered under the Securities Act. EFIH had agreed to use its commercially reasonable efforts to register with the SEC notes having substantially identical terms as the EFIH 11.75% Notes (except for provisions relating to transfer restrictions and payment of additional interest) as part of an offer to exchange freely tradable notes for the EFIH 11.75% Notes. Because the exchange offer was not completed, the annual interest rate on the EFIH 11.75% Notes increased by 25 basis points (to 12.00%) on February 6, 2013 and by an additional 25 basis points (to 12.25%) on May 6, 2013.

PX 115
Page 63 of 154

*EFIH 11.25%/12.25% Senior Toggle Notes* — The principal amount of the EFIH Toggle Notes totals $1.566 billion with interest at a fixed rate of 11.25% per annum for cash interest and 12.25% per annum for PIK Interest. The terms of the Toggle Notes include an election by EFIH, for any interest period until June 1, 2016, to pay interest on the Toggle Notes (i) entirely in cash; (ii) by increasing the principal amount of the notes or by issuing new EFIH Toggle Notes (PIK Interest); or (iii) 50% in cash and 50% in PIK Interest. EFIH made its pre-petition interest payments on the EFIH Toggle Notes by using the PIK feature of those notes.

The EFIH Toggle Notes were issued in private placements and are not registered under the Securities Act. EFIH had agreed to use its commercially reasonable efforts to register with the SEC notes having substantially identical terms as the EFIH Toggle Notes (except for provisions relating to transfer restrictions and payment of additional interest) as part of an offer to exchange freely tradable notes for the EFIH Toggle Notes. Because the exchange offer was not completed, the annual interest rate on the EFIH Toggle Notes increased by 25 basis points (to 11.50%) in December 2013 and by an additional 25 basis points (to 11.75%) in March 2014.

*Material Cross Default/Acceleration Provisions* — Certain of EFIH's pre-petition financing arrangements contain provisions that result in an event of default if there were a failure under other financing arrangements to meet payment terms or to observe other covenants that could or does result in an acceleration of payments due. Such provisions are referred to as cross default or cross acceleration provisions. The Bankruptcy Filing triggered defaults on EFIH's pre-petition debt obligations, but pursuant to the Bankruptcy Code, the creditors are stayed from taking any actions against the Debtors as a result of such defaults.

*EFIH Collateral Trust Agreement* — EFIH entered into a Collateral Trust Agreement, among EFIH, The Bank of New York Mellon Trust Company, N.A., as First Lien Trustee, the other Secured Debt Representatives named therein and the Collateral Trustee. The Collateral Trust Agreement governing the pledge of collateral generally provides that the holders of a majority of the debt secured by a first priority lien on the collateral, including the notes and other future debt incurred by EFH or EFIH secured by the collateral equally and ratably, have, subject to certain limited exceptions, the exclusive right to manage, perform and enforce the terms of the security documents securing the rights of secured debt holders in the collateral, and to exercise and enforce all privileges, rights and remedies thereunder.

PX 115
Page 64 of 154

## 9.    INTEREST EXPENSE AND RELATED CHARGES

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2013 | 2012 |
| Interest expense on debtor-in-possession financing | $    125 | $    — | $    — |
| Interest expense on pre-petition debt | 267 | 630 | 434 |
| Interest expense related to pushed down debt | 1 | 6 | 75 |
| Interest expense on pre-petition toggle notes payable in additional principal (Note 8) | 65 | 176 | 12 |
| Amortization of debt exchange premiums | (24) | (80) | (8) |
| Amortization of debt exchange discounts and issuance costs | 7 | 28 | 13 |
| Total interest expense and related charges | $    441 | $    760 | $    526 |

Interest expense for the year ended December 31, 2014 reflects interest paid and accrued on debtor-in-possession financing and interest expense on pre-petition debt up to the Petition Date (See Note 6).

The Bankruptcy Code generally restricts payment of interest on pre-petition debt, subject to certain exceptions. However, the Bankruptcy Court ordered the payment of post-petition interest payments on EFIH First Lien Notes in connection with the settlement discussed in Note 6. Other than these amounts ordered by the Bankruptcy Court, effective April 29, 2014, EFIH discontinued recording interest expense on outstanding pre-petition debt classified as liabilities subject to compromise (LSTC). Interest expense as calculated under the contractual terms of EFIH's pre-petition debt, all of which is subject to compromise, would have totaled $363 million for the post-petition period through December 31, 2014. This amount exceeded actual interest expense recorded, which represented $54 million in interest since the Bankruptcy Filing, by $309 million.

## 10.    COMMITMENTS AND CONTINGENCIES

### Guarantees

See Note 8 for discussion of EFIH's guarantees of certain EFH Corp. debt.

### Legal Proceedings

From time to time, EFIH may be involved in various legal and administrative proceedings in the normal course of business, the ultimate resolutions of which, in the opinion of management, should not have a material effect upon its financial condition, results of operations or liquidity.

***Make-whole Claims*** — In May 2014, the indenture trustee for the EFIH 10% First Lien Notes initiated litigation in the Bankruptcy Court seeking, among other things, a declaratory judgment that EFIH is obligated to pay a make-whole premium in connection with the cash repayment of the EFIH First Lien Notes discussed in Note 6 and that such make-whole premium is an allowed secured claim (EFIH First Lien Make-whole Claims). The indenture trustee has alleged that the EFIH First Lien Make-whole Claims are valued at approximately $432 million plus reimbursement of expenses. Following argument and briefing on cross motions for summary judgment, in March 2015, the Bankruptcy Court issued a ruling and order in favor of the EFIH Debtors on almost all issues, including denying the indenture trustee's motion for summary judgment in full and granting the EFIH Debtors summary judgment on most counts. The remaining open issues are currently scheduled to be heard at a trial beginning on April 20, 2015.

PX 115
Page 65 of 154

In June 2014, the indenture trustee for the EFIH Second Lien Notes initiated litigation in the Bankruptcy Court seeking similar relief with respect to the EFIH Second Lien Notes, including among other things, that EFIH is obligated to pay a make-whole premium in connection with any repayment of the EFIH Second Lien Notes and that such make-whole premium would be an allowed secured claim (the EFIH Second Lien Make-whole Claims). In the EFIH Second Lien Make-whole Claims, as of December 31, 2014, the amount of such claims alleged would have been equal to approximately $591 million plus reimbursement of expenses. In December 2014, the EFIH Debtors filed counterclaims for relief against the Second Lien indenture trustee, seeking declaratory relief that, among other things, EFIH is not obligated to pay a make-whole premium in connection with any repayment of the EFIH Second Lien Notes and that such make-whole premium, if owing, would not constitute an allowed secured claim (EFIH Second Lien Counterclaims). In December 2014, the indenture trustee for the EFIH Second Lien Notes opposed the EFIH Debtors' motion to assert the EFIH Second Lien Counterclaims and also moved to dismiss its own complaint for relief, arguing that it was no longer necessary to resolve the EFIH Second Lien Make-whole Claims given that the EFIH Debtors had withdrawn their motion to repay the EFIH Second Lien Notes. However, as a result of EFIH's partial repayment of the EFIH Second Lien Notes, the parties have agreed that the litigation is ripe for adjudication. The parties are currently working together on a schedule to propose to the Bankruptcy Court in order to adjudicate this matter.

In December 2014, the EFIH Debtors initiated litigation against the indenture trustee for the EFIH PIK Notes seeking, among other things, a declaratory judgment that EFIH is not obligated to pay a make-whole premium in connection with the cash repayment of the EFIH PIK Notes and that any post-petition interest owing on these notes is to be paid at the statutory Federal Judgment Rate of interest. The indenture trustee for the EFIH PIK Notes filed a motion in February 2015 to dismiss the EFIH Debtors' complaint for declaratory relief, and the EFIH Debtors filed a brief in opposition to that motion in February 2015. If a make-whole claim was allowed, as of December 31, 2014, such claims would be approximately $100 million. The Bankruptcy Court has not yet announced a schedule for hearing argument or ruling on the indenture trustee's motion to dismiss.

In addition, creditors may make additional claims in the Chapter 11 Cases for make-whole or redemption premiums in connection with repayments or settlement of other pre-petition debt. These claims could be material. There can be no assurance regarding the outcome of any of the litigation regarding the validity or, if deemed valid, the amount of these make-whole or redemption claims.

### *Potential Inter/Intra Debtor Claims*

In August 2014, the Bankruptcy Court entered an order in the Chapter 11 Cases establishing discovery procedures governing, among other things, certain prepetition transactions among the various Debtors' estates. In February 2015, the ad hoc committee of certain TCEH unsecured noteholders; the official committee representing unsecured interests at EFCH and its direct subsidiary, TCEH; and the official committee representing unsecured interests at EFH and EFIH filed motions with the Bankruptcy Court seeking standing to prosecute derivative claims on behalf of TCEH relating to certain of these prepetition transactions. These motions are currently scheduled to be heard by the Bankruptcy Court at the Debtors' omnibus hearing in April 2015. In addition to the claims described above, certain of the Debtors (or creditors purporting to act derivatively in the name of a Debtor) may bring additional inter-Debtor or intra-Debtor claims (including claims under the Federal and State Income Tax Allocation Agreement among EFH Corp. and certain of its subsidiaries under which TCEH and EFH Corp. have previously filed claims in the Chapter 11 Cases) that could be material in amount. EFIH cannot predict the timing or outcome of future proceedings, if any, related to these transactions. The outcome of any of these claims could be material and could affect the results of operation, liquidity or financial condition of a particular Debtor.

PX 115
Page 66 of 154

## 11.  MEMBERSHIP INTERESTS

*Cash Distributions*

In January 2013, EFIH's board of directors declared, and EFIH paid, a cash distribution to EFH Corp. of $680 million (which as of December 31, 2012 was recorded as restricted cash), which was used by EFH Corp. to settle the TCEH Demand Notes (see Note 12).

In February 2012, EFIH's board of directors declared, and EFIH paid, a cash distribution to EFH Corp. of $950 million, which was used by EFH Corp. to partially settle the TCEH Demand Notes. EFIH did not declare or pay any cash distributions for the year ended December 31, 2012.

*Distribution Restrictions*

The agreement governing the EFIH DIP Facility generally restricts EFIH's ability to make distributions or loans to any of its parent companies or their subsidiaries unless such distributions or loans are expressly permitted under the agreement governing such facility.

Under applicable law, EFIH is prohibited from paying any dividend to the extent that immediately following payment of such dividend, there would be no statutory surplus or EFIH would be insolvent. In addition, due to the Chapter 11 Cases, no dividends are eligible to be paid without the approval of the Bankruptcy Court.

*Noncash Distributions to EFH Corp.*

See Notes 8 and "Affiliate Debt Held by EFIH" below for details of debt securities EFIH acquired in debt exchange transactions in December 2012 and January 2013 and securities returned to EFH Corp. The indentures governing EFIH's debt do not limit its ability to dividend EFH Corp. debt securities to EFH Corp. so long as EFIH received such securities in exchange for the issuance of EFIH debt.

*Equity Interests in Oncor*

At December 31, 2014, ownership of Oncor's membership interests was as follows: 80.03% held indirectly by EFH Corp., 0.22% held indirectly by Oncor's management and board of directors and 19.75% held by Texas Transmission.

*Capital Contributions*

See Notes 1 and 8 for discussion of noncash contributions from EFH Corp. related to debt pushed down to EFIH in accordance with SEC Staff Accounting Bulletin Topic 5-J.

*Affiliate Debt Held by EFIH*

As a result of debt exchanges in 2009 through 2013, EFIH held debt securities of EFH Corp. and TCEH as presented in the table below. In December 2012, management determined that some or all of these securities may be returned as dividends to EFH Corp.; accordingly, the balances were reclassified at that time from investment in debt of affiliates and reported as a reduction of membership interests. The securities are no longer marked-to-market. Interest income is no longer accrued and interest received reduces the carrying value of the securities and thus increases membership interests. Interest received in 2013 totaled $252 million. As a result of the Bankruptcy Filing, EFIH does not expect to receive further interest payments on affiliate debt it holds.

Prior to December 2012, when the debt securities were reported as investment in debt of affiliates, the securities were classified as available for sale, interest was recorded in the income statement as interest income and unrealized gains or losses were recorded in other comprehensive income unless such losses were other than temporary, in which case they were recorded as impairments in net income.

**PX 115**
**Page 67 of 154**

In the first quarter 2013, EFIH distributed to EFH Corp. $6.360 billion principal amount ($5.778 billion carrying amount) of EFH Corp. debt that it previously received in debt exchanges, leaving $1.361 billion principal amount of affiliate debt still held by EFIH. EFH Corp. cancelled the notes. The $6.360 billion principal amount consisted of $5.125 billion of debt held at December 31, 2012 and $1.235 billion (of the $1.266 billion) received in debt exchanges in January 2013 (see Note 8). The distribution included $1.715 billion principal amount of EFH Corp. 10.875% Notes, $3.474 billion principal amount of EFH Corp. Toggle Notes, $1.058 billion principal amount of EFH Corp. 10% Notes and $113 million principal amount of EFH Corp. 9.75% Notes.

In the fourth quarter 2012, EFIH distributed to EFH Corp. $158 million principal amount ($160 million carrying amount) of EFH Corp. debt that it previously received in debt exchanges. EFH Corp. cancelled the notes. The distribution included $119 million principal amount of EFH Corp. Toggle Notes and $39 million principal amount of EFH 10.875% Notes.

The principal amounts, coupon rates, maturities and carrying value of debt of affiliates held at both December 31, 2014 and 2013 are as follows:

| | Principal Amount | | Carrying Value | |
|---|---|---|---|---|
| EFH Corp. 5.55% Fixed Senior Notes Series P due November 15, 2014 | $ | 281 | $ | 185 |
| EFH Corp. 6.50% Fixed Senior Notes Series Q due November 15, 2024 | | 545 | | 249 |
| EFH Corp. 6.55% Fixed Senior Notes Series R due November 15, 2034 | | 456 | | 194 |
| TCEH 10.25% Fixed Senior Notes due November 1, 2015 (both periods include $48 million principal amount of Series B Notes) | | 79 | | 7 |
| Balance reported as reduction in membership interests | $ | 1,361 | $ | 635 |

In 2013, as a result of the distribution of all the EFH Corp. 10.875% Notes and EFH Corp. Toggle Notes EFIH held, EFIH recorded a gain of $284 million (pretax) representing the reclassification to interest income of mark-to-market gains previously recorded in accumulated other comprehensive income (AOCI).

The indentures governing the EFIH Notes do not limit EFIH's ability to distribute the EFH Corp. debt securities that it holds to EFH Corp. so long as it received such securities in exchange for the issuance of EFIH debt, which applies to all the EFH Corp. debt EFIH currently holds.

*Impairments* — In 2012, EFIH deemed the declines in values of the TCEH securities were other than temporary and recorded a $14 million impairment, which is reported as a reduction of interest income. EFIH considered that the securities were in a loss position for an extended period and the effects of low wholesale power prices on the profitability and cash flows of TCEH (which has below investment grade credit ratings) were unlikely to reverse in the near term.

Prior to December 2012, the debt securities were reported as investment in affiliate debt and EFIH determined value under the fair value hierarchy established in accounting standards. Under the fair value hierarchy, Level 2 valuations are based on prices that reflect observable market information, such as actual trade information of similar securities, adjusted for observable differences. The fair value of EFIH's investment in debt of affiliates was estimated at the lesser of either the call price or the market value as determined by broker quotes and quoted market prices for similar securities in active markets. For the periods presented, the fair values of EFIH's investment in debt of affiliates represented Level 2 valuations.

*Accumulated Other Comprehensive Income (Loss)*

The following table presents the changes to accumulated other comprehensive income (loss) for the year ended December 31, 2014.

| | Dedesignated Cash Flow Hedges - Oncor | Changes in Fair Values of Investment in Debt Securities of Affiliates | Pension and Other Postretirement Employee Benefit Liabilities Adjustments - Oncor | Total Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|
| Balance at December 31, 2013 | $ (21) | $ — | $ (18) | $ (39) |
| Other comprehensive loss before reclassifications (after tax) | — | — | (49) | (49) |
| Amounts reclassified from accumulated other comprehensive income (loss) and reported in: | | | | |
| Equity in earnings of unconsolidated subsidiaries | 2 | — | — | 2 |
| Total amount reclassified from accumulated other comprehensive income (loss) during the period | 2 | — | — | 2 |
| Total change during the period | 2 | — | (49) | (47) |
| Balance at December 31, 2014 | $ (19) | $ — | $ (67) | $ (86) |

The following table presents the changes to accumulated other comprehensive income (loss) for the year ended December 31, 2013.

| | Dedesignated Cash Flow Hedges - Oncor | Changes in Fair Values of Investment in Debt Securities of Affiliates | Pension and Other Postretirement Employee Benefit Liabilities Adjustments - Oncor | Total Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|
| Balance at December 31, 2012 | $ (23) | $ 185 | $ (2) | $ 160 |
| Other comprehensive loss before reclassifications (after tax) | — | — | (16) | (16) |
| Amounts reclassified from accumulated other comprehensive income (loss) and reported in: | | | | |
| Interest income | — | (284) | — | (284) |
| Equity in earnings of unconsolidated subsidiaries | 2 | — | — | 2 |
| Income tax benefit | — | 99 | — | 99 |
| Total amount reclassified from accumulated other comprehensive income (loss) during the period | 2 | (185) | — | (183) |
| Total change during the period | 2 | (185) | (16) | (199) |
| Balance at December 31, 2013 | $ (21) | $ — | $ (18) | $ (39) |

## 12.  RELATED–PARTY TRANSACTIONS

The following represent EFIH's significant related-party transactions. Also see Note 11 for a discussion of EFH Corp. and TCEH debt securities held by EFIH.

•  EFH Corp. allocates expense to EFIH for management fees owed by EFH Corp. to the Sponsor Group. This expense, which is reported in SG&A expenses, totaled $3 million for the year ended December 31, 2014. There was no allocation of fees to EFIH for the years ended December 31, 2013 and 2012. Beginning with the quarterly management fee due December 31, 2013, the Sponsor Group, while reserving the right to receive the fees, directed EFH Corp. to suspend payments of the management fees for an indefinite period. Accordingly, EFIH did not reimburse EFH Corp. for the allocated management fees. Effective with the Petition Date, EFH Corp. suspended allocations of such fees to EFIH. Fees accrued as of the Petition Date have been reclassified to liabilities subject to compromise (LSTC).

In addition to amounts incurred directly by EFIH, a subsidiary of EFH Corp. allocates costs to EFIH for legal and other consulting services associated with EFIH's debt restructuring activities, and EFIH reimburses the subsidiary for the allocated costs on a monthly basis. The allocated expense, which was reported in SG&A expenses up through the Petition Date, totaled $4 million and $12 million for the years ended December 31, 2014 and 2013, respectively. There was no allocation of legal and other consulting services costs to EFIH for the year ended December 31, 2012.

A subsidiary of EFH Corp. bills EFIH for administrative services such as accounting and finance at cost, and EFIH reimburses the subsidiary for the allocated costs on a monthly basis. This expense, which is reported in SG&A expenses, totaled $4 million for the year ended December 31, 2014. There was no allocation of administrative service costs to EFIH for the years ended December 31, 2013 and 2012.

•  EFH Corp. files consolidated federal income tax and Texas state margin tax returns, and under a Federal and State Income Tax Allocation Agreement, allocates income taxes to EFIH substantially as if it were filing its own corporate income tax returns. At December 31, 2014 and 2013, EFIH had current income tax receivables from EFH Corp. totaling $125 million and $110 million, respectively, both of which were fully reserved (see Note 5). EFIH made no income tax payments to EFH Corp. for the year ended December 31, 2014. EFIH's income tax refunds from EFH Corp. totaled $5 million for the year ended December 31, 2013, and income tax payments to EFH Corp. totaled $180 million for the year ended December 31, 2012. See discussion below in this Note regarding allocation of income tax liabilities to Oncor Holdings and Oncor under the Federal and State Income Tax Allocation Agreement.

•  At December 31, 2012, EFH Corp. had demand notes payable to TCEH (TCEH Demand Notes) totaling $698 million arising from borrowings used to fund EFH Corp. debt principal and interest payments and net borrowings for general corporate purposes. EFIH was a guarantor of these demand notes. EFH Corp. settled the balance of the TCEH Demand Notes in January 2013 using the cash distribution from EFIH discussed in Note 11.

•  In January 2013, fees paid to Goldman, Sachs & Co. (Goldman), an affiliate of GS Capital Partners, for services related to debt exchanges totaled $2 million, described as follows: (i) Goldman acted as a dealer manager for the offers by EFIH and EFIH Finance to exchange new EFIH 10% Notes for EFH Corp. 9.75% Notes, EFIH 10% Notes and EFIH 9.75% Notes (collectively, the Old Notes) and as a solicitation agent in the solicitation of consents by EFH Corp. and EFIH and EFIH Finance to amendments to the Old Notes and indentures governing the Old Notes and (ii) Goldman acted as a dealer manager for the offers by EFIH and EFIH Finance to exchange EFIH Toggle Notes for EFH Corp. 10.875% Notes and EFH Corp. Toggle Notes. See Note 8 for further discussion of these exchange offers.

For the year ended December 31, 2012, fees paid to Goldman related to debt issuances totaled $10 million, described as follows: (i) Goldman acted as a joint book-running manager and initial purchaser in the February 2012 issuance of $1.15 billion principal amount of EFIH 11.750% Notes for which it received fees totaling $7 million; and (ii) Goldman acted as joint book-running manager and initial purchaser in the August 2012 issuance of $600 million principal amount of 11.750% Notes and $250 million principal amount of EFIH 6.875% Notes for which it received fees totaling $3 million. In the October 2012 issuance of $253 million principal amount of EFIH 6.875% Notes, Goldman acted as joint book-running manager and initial purchaser for which it was paid $1 million. A broker-dealer affiliate of KKR served as a co-manager and initial purchaser and an affiliate of TPG served as an advisor in both of these transactions, for which they each received a total of $4 million.

•  Affiliates of the Sponsor Group have sold or acquired, and in the future may sell or acquire, debt or debt securities issued by EFIH in open market transactions or through loan syndications.

See Note 8 regarding guarantees and push-down of certain EFH Corp. pre-petition debt and Note 11 regarding distributions to, and contributions from, EFH Corp.

Significant related-party transactions between Oncor Holdings (including its consolidated subsidiary Oncor) and EFH Corp., other affiliates of EFH Corp. and the Sponsor Group are as follows:

- Oncor receives payments from subsidiaries of TCEH for services it provides, principally the delivery of electricity. Revenues recorded by Oncor for these services totaled approximately $1.0 billion for each of the years ended December 31, 2014, 2013 and 2012. The fees are based on rates regulated by the PUCT that apply to all REPs. These revenues from subsidiaries of TCEH represented 25%, 27% and 29% of Oncor Holdings' operating revenues for the years ended December 31, 2014, 2013 and 2012, respectively. Oncor Holdings' balance sheets at December 31, 2014 and 2013 reflect receivables from affiliates totaling $118 million and $135 million, respectively, consisting almost entirely of trade receivables from subsidiaries of TCEH related to these electricity delivery fees.

- In August 2012, TCEH and Oncor agreed to settle, at a discount, two agreements related to securitization (transition) bonds issued by Oncor's bankruptcy-remote financing subsidiary in 2003 and 2004 to recover generation-related regulatory assets. Under the agreements, TCEH had been reimbursing Oncor as described immediately below. Under the settlement, TCEH paid, and Oncor received, $159 million in cash. The settlement was executed by EFIH acquiring the right to reimbursement under the agreements from Oncor and then selling these rights for the same amount to TCEH. The transaction resulted in a decrease of approximately $2 million (after tax) in Oncor's membership interests in accordance with accounting rules for related party transactions. Accordingly, the transaction resulted in a decrease of approximately $1 million (reflecting EFIH's 80% interest in Oncor) in EFIH's investment in unconsolidated subsidiary with an offsetting decrease in equity.

  Oncor collects transition surcharges from its customers to recover the transition bond payment obligations. Oncor's incremental income taxes related to the transition surcharges it collects had been reimbursed by TCEH quarterly under a noninterest bearing note payable to Oncor that was to mature in 2016. TCEH's payments on the note prior to the August 2012 settlement totaled $20 million for the year ended December 31, 2012.

  Under an interest reimbursement agreement, TCEH had reimbursed Oncor on a monthly basis for interest expense on the transition bonds. The remaining interest to be paid through 2016 under the agreement totaled $53 million at the August 2012 settlement date. Only the monthly accrual of interest under this agreement was reported as a receivable by Oncor. This interest income prior to the August 2012 settlement totaled $16 million for the year ended December 31, 2012.

- Oncor pays EFH Corp. subsidiaries for financial and other administrative services and shared facilities at cost. Such amounts increased Oncor's reported operation and maintenance expense by $34 million, $32 million and $35 million for the years ended December 31, 2014, 2013 and 2012, respectively.

- Under Texas regulatory provisions, the trust fund for decommissioning the Comanche Peak nuclear generation facility (reported on TCEH's consolidated balance sheets) is funded by a delivery fee surcharge collected from REPs by Oncor, as collection agent, and remitted monthly to TCEH. The delivery fee surcharges remitted to TCEH totaled $17 million for the year ended December 31, 2014 and $16 million for each of the years ended December 31, 2013 and 2012.

- EFH Corp. files a consolidated federal income tax return that includes Oncor Holdings' results. Oncor is not a member of EFH Corp.'s consolidated tax group, but EFH Corp.'s consolidated federal income tax return includes EFH Corp.'s portion of Oncor's results as a result of EFH Corp.'s equity ownership in Oncor. EFH Corp. also files a consolidated Texas state margin tax return that includes all of Oncor Holdings' and Oncor's results. However, under a Federal and State Income Tax Allocation Agreement, Oncor Holdings and Oncor record their federal income tax and Texas state margin taxes as if Oncor Holdings and Oncor were filing their own corporate income tax returns.

  At December 31, 2014, Oncor Holdings had a net current receivable from EFH Corp. related to federal and state income taxes totaling $120 million, all of which related to Oncor. The $120 million net receivable from EFH Corp. included a $144 million federal income tax receivable offset by a $24 million state margin tax payable. Additionally, Oncor has a noncurrent tax receivable from EFH Corp. of $64 million. At December 31, 2013, Oncor Holdings had a current payable to EFH Corp. related to federal and state income taxes totaling $7 million, which includes $5 million payable by Oncor. Oncor's liability at December 31, 2013 consists of a $23 million state margin tax payable net of an $18 million federal income tax receivable.

For the year ended December 31, 2014, Oncor Holdings and Oncor made net federal and state income tax payments to EFH Corp. totaling $24 million and $237 million, respectively. For the year ended December 31, 2013, Oncor Holdings and Oncor made net federal and state income tax payments to EFH Corp. totaling $34 million and $90 million, respectively. The 2013 net payment included $33 million from Oncor related to the 1997 through 2002 IRS appeals settlement and a $10 million refund paid to Oncor related to the filing of amended Texas franchise tax returns for 1997 through 2001. For the year ended December 31, 2012, Oncor Holdings and Oncor made net federal and state income tax payments to EFH Corp. totaling $35 million and $3 million, respectively. The 2012 net payment included a $21 million federal income tax refund paid to Oncor Holdings.

• Oncor has requirements in place to assure adequate creditworthiness of any REP to support the REP's obligation to collect securitization bond-related (transition) charges on behalf of Oncor Electric Delivery Transition Bond Company LLC. Under these requirements, and as a result of TCEH's credit rating being below investment grade, TCEH is required to post collateral support in an amount equal to estimated transition charges over specified time periods. Accordingly, at both December 31, 2014 and 2013, TCEH had posted letters of credit and/or cash in the amount of $9 million for Oncor's benefit.

• Oncor and Texas Holdings agreed to the terms of a stipulation with major interested parties to resolve all outstanding issues in the PUCT review related to the Merger. As part of this stipulation, TCEH would be required to post a letter of credit in an amount equal to $170 million to secure its payment obligations to Oncor in the event, which has not occurred, two or more rating agencies downgrade Oncor's credit rating below investment grade.

• Affiliates of the Sponsor Group have (1) sold or acquired Oncor's debt or debt securities in open market transactions or through loan syndications, and (2) performed various financial advisory, dealer, commercial banking and investment banking services for Oncor and certain of its affiliates for which they have received customary fees and expenses.

• Oncor has participated in plans sponsored by EFH Corp. that provide pension, health care and other retiree benefits. Accordingly, Oncor Holdings' consolidated financial statements have reflected allocations to Oncor of amounts related to these retiree benefit plans. In accordance with an agreement between EFH Corp. and Oncor, Oncor ceased participation in EFH Corp.'s OPEB plan effective July 1, 2014 and established its own OPEB plan for Oncor's eligible existing and future retirees and their dependents. Additionally, the Oncor plan participants include those former participants in the EFH Corp. OPEB plan whose employment included service with both Oncor (or a predecessor regulated electricity business) and EFH Corp.'s competitive businesses (split service participants). Under the agreement, EFH Corp. will retain the liability for split service participants' benefits related to their years of service with the competitive business. The methodology for OPEB cost allocations between EFH Corp. and Oncor has not changed, and the plan separation does not materially affect the net assets or cash flows of EFIH.

• Until June 30, 2014, Oncor employees participated in a health and welfare benefit program offered by EFH Corp. In connection with Oncor establishing its own health and welfare benefits program, Oncor agreed to pay EFH Corp. $1 million to reimburse EFH Corp. for its increased costs of providing benefits under the EFH Corp. program as a result of Oncor's withdrawal and to compensate EFH Corp. for the administrative work related to the transition. This amount was paid in June 2014.

Oncor's retained liability under the Employee Retirement Income Security Act of 1974 (ERISA) relates to the nonrecoverable portion of the unfunded obligation of EFH Corp.'s pension plan. In the first quarter of 2014, TCEH contributed $20 million to the EFH Corp. pension plan assets, resulting in the plan being fully funded as calculated under the provisions of ERISA.

64

## 13.  SUPPLEMENTARY FINANCIAL INFORMATION

*Fair Value of Debt*

| Debt: | December 31, 2014 | | December 31, 2013 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| Borrowings under debtor-in-possession credit facilities (Note 6) | $        5,400 | $        5,400 | $        — | $        — |
| Pre-petition notes, loans and other debt reported as liabilities subject to compromise (Note 8) | 3,876 | 4,336 | — | — |
| Pre-petition notes, loans and other debt (Note 8) | — | — | 7,877 | 7,849 |

EFIH determines fair value in accordance with accounting standards, and at December 31, 2014, EFIH's fair value for debt and liabilities subject to compromise represent Level 2 valuations. EFIH obtains security pricing from an independent party who uses broker quotes and third-party pricing services to determine fair values. Where relevant, these prices are validated through subscription services such as Bloomberg.

*Interest Income on Affiliate Securities* — EFIH holds debt securities of EFH Corp. and TCEH. Prior to December 2012, when the debt securities were reported as investment in affiliate debt, the securities were classified as available for sale and interest was recorded in the income statement as interest income. In December 2012, management determined that some or all of these securities may be returned as dividends to EFH Corp.; accordingly, the balances were reclassified at that time from investment in affiliate debt and reported as a reduction of membership interests. As a result of the December 2012 reclassification of investment in debt of affiliates to membership interests, interest received in 2013 reduced the carrying value of the securities and thus increased membership interests. See Note 11.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2014 | 2013 | 2012 |
| Available-for-sale securities: | | | |
| Interest received/accrued | $        — | $        — | $        232 |
| Accretion of purchase discount | — | — | 92 |
| PIK interest received/accrued related to EFH Corp. Toggle Notes | — | — | 288 |
| Mark-to-market gain reclassified from AOCI | — | 284 | — |
| Impairments related to issuer credit | — | — | (14) |
| Total interest | $        — | $        284 | $        598 |

65
-

*Supplemental Cash Flow Information*

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2014 | 2013 | 2012 |
| Cash payments (receipts) related to: | | | |
| Interest paid | $ 376 | $ 619 | $ 352 |
| Interest received on investments in debt of affiliates (net of tax) (a) | — | — | (184) |
| Income taxes | — | (5) | 180 |
| Reorganization items (b) | 38 | — | — |
| Noncash investing and financing activities: | | | |
| Receipt of additional EFH Corp. Toggle Notes in lieu of cash interest | — | — | 344 |
| Principal amount of toggle notes issued in lieu of cash interest (Note 8) | — | 173 | — |
| Parent's payment of interest on pushed-down debt accounted for as a contribution of capital (net of tax) (Note 8) (c) | — | 23 | 22 |
| Reduction of debt pushed down from EFH Corp. (Note 8) (d) | — | (420) | (282) |
| Debt exchange transactions (e) | (85) | 14 | 457 |
| Distribution to EFH Corp. of debt held as an investment (Note 11) | — | (5,778) | 160 |
| Income tax on interest received on holdings of affiliate debt (Note 11) | — | (88) | — |

_____

(a)  Interest received in 2012 reported as an increase in membership interests (See Note 11).

(b)  Represents cash payments for legal and other professional services reported in reorganization items (See Note 7).

(c)  Reflects noncash settlement of certain income taxes payable arising as a result of the sale of noncontrolling interests in Oncor.

(d)  For the year ended December 31, 2013, represents $838 million principal amount of EFH Corp. debt exchanged (at 50%). For the year ended December 31, 2012, represents $564 million principal amount of EFH Corp. debt exchanged (at 50%). See Note 8.

(e)  For the year ended December 31, 2014, represents $1.836 billion principal amount of loans issued under the EFIH DIP Facility in excess of the $1.673 billion principal amount of EFIH First Lien Notes exchanged and $78 million of related accrued interest. For the year ended December 31, 2013 represents, $1.302 billion of EFIH debt issued in exchange for $1.310 billion of EFH Corp. and EFIH debt and $89 million of EFIH debt issued in exchange for $95 million of EFH Corp. debt. For the year ended December 31, 2012, represents $1.304 billion of EFIH debt issued in exchange for $1.761 billion of EFH Corp. debt. See Note 8.

66

**Item 9.**    **CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**Item 9A.**    **CONTROLS AND PROCEDURES**

The Company has established disclosure controls and procedures that are designed to ensure that information required to be disclosed in reports filed or submitted under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission and, as such, is accumulated and communicated to the Company's management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

An evaluation was performed under the supervision and with the participation of EFIH's management, including the principal executive officer and principal financial officer, of the effectiveness of the design and operation of the disclosure controls and procedures in effect at December 31, 2014. Based on the evaluation performed, EFIH's management, including the principal executive officer and principal financial officer, concluded that due to the material weakness in its internal controls over financial reporting related to accounting for deferred income taxes, as described below, the disclosure controls and procedures were not effective as of December 31, 2014. In light of the material weakness in internal control over financial reporting, management completed substantive procedures, including validating the completeness and accuracy of the underlying data used for accounting for deferred income taxes, prior to filing this Form 10-K.

These additional procedures have allowed EFIH to conclude that, notwithstanding the material weakness in internal control over financial reporting related to accounting for deferred income taxes, the consolidated financial statements included in this report fairly present, in all material respects, EFIH's financial position, results of operations and cash flows for the periods presented in conformity with GAAP. Additionally, no restatement of EFIH's previously issued consolidated financial statements was required.

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**
**MANAGEMENT'S ANNUAL REPORT ON**
**INTERNAL CONTROL OVER FINANCIAL REPORTING**

The management of Energy Future Intermediate Holding Company LLC is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) for the company. Energy Future Intermediate Holding Company LLC's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in condition or the deterioration of compliance with procedures or policies.

The management of Energy Future Intermediate Holding Company LLC performed an evaluation as of December 31, 2014 of the effectiveness of the company's internal control over financial reporting based on the Committee of Sponsoring Organizations of the Treadway Commission's (COSO's) *2013 Internal Control - Integrated Framework*. Based on the review performed, management believes that due to a material weakness in accounting for deferred income taxes, as described below, Energy Future Intermediate Holding Company LLC's internal control over financial reporting was not effective as of December 31, 2014. In light of the material weakness in internal control over financial reporting, management completed additional substantive procedures, including validating the completeness and accuracy of the underlying data used for accounting for deferred income taxes, prior to filing this Form 10-K. These additional procedures have allowed EFIH to conclude that, notwithstanding the material weakness in internal control over financial reporting, the consolidated financial statements included in this report fairly present, in all material respects, EFIH's financial position, results of operations and cash flows for the periods presented in conformity with GAAP.

The principal factors contributing to the material weakness in accounting for deferred income taxes were as follows:

- the significant complexity created as a result of recently resolving numerous open tax years with the IRS (including 1997 to 2007);
- constraints resulting from the significant time and effort required to be spent by EFIH's tax and other finance personnel in supporting the bankruptcy and restructuring activities; and
- turnover of key personnel in EFIH's tax department responsible for operating certain key controls.

Pursuant to SEC rules and regulations, a material weakness is "a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis". As of December 31, 2014, the EFIH's management concluded it did not maintain effective controls over the completeness and accuracy of its accounting for deferred income taxes, which constitutes a material weakness. Specifically, there was incomplete underlying data and insufficient documentation used in the operation of its reconciliation of deferred tax balances. These deficiencies in the operating effectiveness of the controls diminished the precision in EFIH's reconciliation of its income tax provision and related deferred tax asset and liability accounts. None of these deficiencies resulted in any restatement of EFIH's previously issued consolidated financial statements, and as stated above, management has concluded that the consolidated financial statements in this report fairly present, in all material respects, EFIH's financial position, results of operations and cash flows for the periods presented in conformity with GAAP.

The independent registered public accounting firm of Deloitte & Touche LLP as auditors of the consolidated financial statements of Energy Future Holdings Corp. has issued an attestation report on Energy Future Holdings Corp.'s internal control over financial reporting.

**Remediation Plan for the Material Weakness**

EFIH is developing and implementing a plan of remediation to strengthen its overall internal control over accounting for deferred income taxes. The remediation plan will include the following steps:

- enhancing the formality and rigor of review and documentation related to EFIH's deferred income tax reconciliation procedures;
- implementing additional oversight and monitoring controls over EFIH's deferred income tax review processes that are designed to operate at a level of precision to detect an error resulting from a related control failure before it results in a material misstatement of its financial statements; and
- hiring key personnel in EFIH's tax department and further evaluating staffing levels to ensure the execution of timely and rigorous control procedures.

EFIH is committed to maintaining a strong internal control environment and believes that these remediation efforts will represent improvements in its controls. EFIH has started to implement these steps; however, some of these steps will take time to be fully integrated and confirmed to be effective and sustainable. Additional controls may also be required over time. Until the remediation steps set forth above are fully implemented and tested, the material weakness described above will continue to exist.

**Changes to Internal Control over Financial Reporting**

There has been no change in the EFIH's internal control over financial reporting during the most recently completed fiscal quarter that has materially affected, or is reasonably likely to materially affect, its internal control over financial reporting. EFIH will continue to report on changes to internal controls related to the material weakness in future periods.

/s/ JOHN F. YOUNG                                    /s/ PAUL M. KEGLEVIC

_____                    _____
John F. Young, President and                    Paul M. Keglevic, Executive Vice President,
Chief Executive                                        Chief Financial Officer and Co-Chief Restructuring Officer

March 31, 2015

**PX 115**
**Page 76 of 154**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Member of Energy Future Intermediate Holding Company LLC (Debtor-in-Possession)
Dallas, Texas

We have audited the internal control over financial reporting of Energy Future Intermediate Holding Company LLC (a direct subsidiary of Energy Future Holdings Corp. ("EFH Corp.")) and subsidiaries (Debtor-in-Possession) ("EFIH") as of December 31, 2014 based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. EFIH's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on EFIH's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on that risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weakness has been identified and included in management's assessment: management has identified a material weakness related to ineffective controls over the completeness and accuracy of accounting for deferred income taxes. Specifically, there was incomplete underlying data and insufficient documentation used in the operation of their reconciliation of deferred tax balances. This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the consolidated financial statements as of and for the year ended December 31, 2014 of EFIH and this report does not affect our report on such financial statements.

In our opinion, because of the effect of the material weakness identified above on the achievement of the objectives of the control criteria, EFIH has not maintained effective internal control over financial reporting as of December 31, 2014, based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements as of and for the year ended December 31, 2014 of EFIH and our report dated March 31, 2015 expressed an unqualified opinion on those financial statements and included explanatory paragraphs regarding (1) the voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code of Energy Future Holdings Corp. and the substantial majority of its subsidiaries (Debtor-in-Possession) (including Energy Future Intermediate Holding Company LLC) and (2) substantial doubt about EFIH's ability to continue as a going concern, which is contingent upon its ability to comply with the financial and other covenants contained in the DIP Facilities, its ability to obtain new debtor in possession financing in the event the DIP Facilities were to expire during the pendency of the Chapter 11 Cases, its ability to complete a Chapter 11 plan of reorganization in a timely manner, including obtaining creditor and Bankruptcy Court approval of such plan as well as applicable regulatory approvals required for such plan, and its ability to obtain any exit financing needed to implement such plan, among other factors.

/s/ Deloitte & Touche LLP

Dallas, Texas
March 31, 2015

**Item 9B.    OTHER INFORMATION**

None.

71
-

**PX 115**
**Page 79 of 154**

## PART III.

**Item 10.    MANAGERS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

### Managers

The names of EFIH's managers and information about them, as furnished by the managers themselves, are set forth below:

| Name | Age | Served As Director Since | Business Experience |
|------|-----|--------------------------|---------------------|
| Charles H. Cremens | 61 | 2014 | Charles H. Cremens has served as a Manager of EFIH since February 2014. He has 30 years experience restructuring public and private companies. He was Chief Executive Officer of Spirit Finance Corporation, Chief Executive Officer of Conseco Finance Corp., and President of WMF Group, Ltd., during their restructuring. Prior to those assignments, he was Chief Investment Officer of Beacon Properties Corp., President of Real Estate Investments at Aetna Inc. and held various executive management positions at the Bank of Boston. He is presently a director of U. S. Steel Canada Inc., Patriot Coal Corporation, Capmark Financial Group Inc., and Specialty Brands Holdings, LLC. Within the last five years, he has served as a director for Conexant Systems, Inc., Kerzner International Resorts Inc., Intrawest Resorts Holdings, Inc., General Growth Properties, Inc. and Tactical Holdings Operations, Inc. |
| Thomas D. Ferguson | 61 | 2011 | Thomas D. Ferguson has served as a Manager of EFIH since January 2011. He is a Managing Director of Goldman, Sachs & Co., having joined the firm in 2002. Mr. Ferguson heads the asset management efforts for the merchant bank's U.S. real estate investment activities. Mr. Ferguson serves on the boards of EFH Corp., Oncor Electric Delivery Company LLC and Oncor Electric Delivery Holdings Company LLC, and also serves on the board of Caribbean Fund 2005 and National Golf Properties. He formerly held board seats at Associated British Ports, the largest port company in the UK, Carrix, one of the largest private container terminal operators in the world, as well as Red de Carreteras, a toll road concessionaire in Mexico, and American Golf and Agriculture Company of America. |
| Paul M. Keglevic | 61 | 2008 | Paul M. Keglevic has served as a Manager of EFIH since July 2008. He was elected Executive Vice President, Chief Financial Officer and Co-Chief Restructuring Officer of EFH Corp., EFIH and EFCH in October 2013, having previously served as Executive Vice President and Chief Financial Officer of EFH Corp., EFIH and EFCH from July 2008 to October 2013. Before joining EFH Corp., he was an audit partner at PricewaterhouseCoopers. Mr. Keglevic was PricewaterhouseCoopers' Utility Sector Leader from 2002 to 2008 and Clients and Sector Assurance Leader from 2007 to 2008. Mr. Keglevic also serves on the boards of EFCH, TCEH and Stellus Capital Corporation. |
| Kenneth Pontarelli | 44 | 2010 | Kenneth Pontarelli has served as a Manager of EFIH since July 2010. He is a Managing Director of Goldman, Sachs & Co. in its Principal Investment Area. He transferred to the Principal Investment Area in 1999 and was promoted to Managing Director in 2004. Mr. Pontarelli serves as a director of EFH Corp. and Tervita Corporation. During the past five years, he also served on the boards of Cobalt International Energy, L.P., CVR Energy, Inc., Expro International Group Ltd., and Kinder Morgan, Inc. |
| John F. Young | 58 | 2008 | John F. Young has served as a Manager of EFIH since July 2008. He was elected President and Chief Executive Officer of EFH Corp. in January 2008. He also has served as Chair, President and Chief Executive of EFIH and EFCH since July 2010, having previously served as President and Chief Executive of EFIH from July 2008 to July 2010 and EFCH from April 2008 to July 2010. Before joining EFH Corp., Mr. Young served in many leadership roles at Exelon Corporation from March 2003 to January 2008 including Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation; President of Exelon Generation; and President and Chief Operating Officer of Exelon Power. Prior to joining Exelon Corporation, Mr. Young was Senior Vice President of Sierra Pacific Resources Corporation. Mr. Young is also a director of Baylor Scott&White Health Foundation Advisory Board, EFH Corp., EFCH, Nuclear Electric Insurance Limited, TCEH, and USAA. |

72

| | | | |
|---|---|---|---|
| Kneeland Youngblood (1) | 59 | 2012 | Kneeland Youngblood has served as a Manager of EFIH since July 2012. He is a founding partner of Pharos Capital Group, a private equity firm that focuses on providing growth and expansion capital to businesses in business services and health care services. During the last five years, Mr. Youngblood served on the boards of Burger King Holdings, Inc., Gap Inc. and Starwood Hotels and Resorts Worldwide, Inc. He is a director of EFH Corp., Oncor and Mallinckrodt public limited company and a member of the Council on Foreign Relations. |

_____
(1)    Member of Audit Committee.

There is no family relationship between any of the above-named managers.

**Manager Qualifications**

In July 2008, Paul M. Keglevic and John F. Young were elected to EFIH's board of managers (the Board). Kenneth Pontarelli joined the Board in July 2010. Thomas D. Ferguson joined the Board in January 2011. Kneeland Youngblood joined the Board in June 2012. Charles H. Cremens joined the Board in February 2014. Messrs. Ferguson and Pontarelli are collectively referred to as the "Sponsor Managers." Messrs. Cremens, Keglevic, Young, and Youngblood are collectively referred to as the "Non-Sponsor Managers."

When considering whether the Board's managers and nominees have the experience, qualifications, attributes and skills, taken as a whole, to enable the Board to satisfy its oversight responsibilities effectively in light of EFIH's business and structure, the Board focused primarily on the qualifications summarized in each of the Board member's biographical information set forth above. In addition, EFIH believes that each of its managers possesses high ethical standards, acts with integrity, and exercises careful judgment. Each is committed to employing his/her skills and abilities in the long-term interests of EFIH and its stakeholders. Finally, EFIH's managers are knowledgeable and experienced in business, governmental, and civic endeavors, further qualifying them for service as members of the Board.

The Sponsor Managers possess experience in owning and managing privately held enterprises and are familiar with corporate finance and strategic business planning activities of highly-leveraged companies such as EFIH. Collectively, the Sponsor Managers possess substantial expertise in advising and managing companies in segments of the energy industry, including, among others, power generation, oil and gas, and energy infrastructure and transportation.

Before joining EFH Corp. as President and Chief Executive Officer, Mr. Young held various senior management positions at other companies in the energy industry over twenty years, including, most recently, his role as Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation.

Mr. Cremens has substantial experience in company restructurings having led Spirit Finance Corporation and Conseco Inc. through restructuring as President and Chief Executive Officer, and currently serves or has previously served as independent director of seven companies during their restructuring. Mr. Keglevic has considerable financial and accounting knowledge and expertise. Before joining EFH Corp. as Executive Vice President and Chief Financial Officer, he held various senior management positions at PricewaterhouseCoopers, including, most recently, his roles as Utility Sector Leader and Clients and Sector Assurance Leader. Mr. Youngblood has served on numerous boards for large public companies, has extensive experience managing and advising companies in his capacity as a partner in a private equity firm (not affiliated with the Sponsor Group), is highly knowledgeable of federal and state political matters, and has served on the board of directors of the United States Enrichment Corporation, a company that contracts with the US Department of Energy to produce enriched uranium for use in nuclear power plants.

PX 115
Page 82 of 154

### Executive Officers

The names and information regarding EFIH's executive officers are set forth below:

| Name of Officer | Age | Positions and Offices Presently Held | Date First Elected to Present Offices | Business Experience (Preceding Five Years) |
|---|---|---|---|---|
| John F. Young | 58 | President and Chief Executive Officer of EFH Corp. and Chair, President and Chief Executive of EFIH and EFCH | January 2008 | John F. Young was elected President and Chief Executive Officer of EFH Corp. in January 2008. He also has served as Chair, President and Chief Executive of EFIH and EFCH since July 2010, having previously served as President and Chief Executive of EFIH from July 2008 to July 2010 and EFCH from April 2008 to July 2010. Before joining EFH Corp., Mr. Young served in many leadership roles at Exelon Corporation from March 2003 to January 2008, including Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation; President of Exelon Generation; and President and Chief Operating Officer of Exelon Power. Prior to joining Exelon Corporation, Mr. Young was Senior Vice President of Sierra Pacific Resources Corporation. |
| Stacey H. Doré | 42 | Executive Vice President, General Counsel and Co-Chief Restructuring Officer of EFH Corp., EFIH and EFCH | October 2013 | Stacey H. Doré was elected Executive Vice President, General Counsel and Co-Chief Restructuring Officer of EFH Corp. and EFCH in October 2013 and EFIH in February 2014, having previously served as Senior Vice President, General Counsel and Co-Chief Restructuring Officer of EFIH from October 2013 to February 2014, Executive Vice President and General Counsel of EFH Corp. from February 2013 to October 2013 and EFCH from April 2013 to October 2013, and Senior Vice President and General Counsel of EFH Corp. from April 2012 to February 2013, and EFIH and EFCH from April 2012 to October 2013. Ms. Doré was Vice President and General Counsel of Luminant from November 2011 to March 2012, and Vice President and Associate General Counsel of EFH Corp. from July 2008 to November 2011. Prior to joining EFH Corp., she was an attorney at Vinson & Elkins LLP, where she engaged in a business litigation practice. |
| Paul M. Keglevic | 61 | Executive Vice President, Chief Financial Officer and Co-Chief Restructuring Officer of EFH Corp., EFIH and EFCH | October 2013 | Paul M. Keglevic was elected Executive Vice President, Chief Financial Officer and Co-Chief Restructuring Officer of EFH Corp., EFIH and EFCH in October 2013 having previously served as Executive Vice President and Chief Financial Officer of EFH Corp., EFIH and EFCH from July 2008 to October 2013. Before joining EFH Corp., he was an audit partner at PricewaterhouseCoopers. Mr. Keglevic was PricewaterhouseCoopers' Utility Sector Leader from 2002 to 2008 and Clients and Sector Assurance Leader from 2007 to 2008. |

There is no family relationship between any of the above-named executive officers.

PX 115
Page 83 of 154

**Audit Committee Financial Expert**

The board of managers has not made a determination that the member of the audit committee is an "audit committee financial expert" as defined in SEC Regulation S-K Item 407(d)(5). The board of managers believes that the current member of the audit committee has requisite levels of financial literacy and financial sophistication to enable the audit committee to be effective in relation to the Committee's purposes and in light of the scope and nature of the company's business and financial statements.

**Procedures for Nominating Managers**

The Second Amended and Restated Limited Liability Company Agreement of EFIH requires that vacancies on the Board be filled by the remaining managers, or, if there be none, by the sole member, EFH Corp.

PX 115
Page 84 of 154

**Item 11.    EXECUTIVE COMPENSATION**

**Compensation Discussion and Analysis**

EFIH does not have any employees and is managed by certain executive officers of its parent company, EFH Corp. The executive officers of EFH Corp. are compensated solely and directly by EFH Corp., with no amounts allocated to EFIH, and all decisions as to the compensation of its executive officers are made by the EFH Corp. Organization and Compensation Committee. The Board of Managers of EFIH does not have a compensation committee. For a full discussion of the compensation awarded to John F. Young, EFIH's Chief Executive Officer, Paul M. Keglevic, EFIH's Chief Financial Officer and Co-Chief Restructuring Officer, and Stacey H. Doré, EFIH's Executive Vice President, General Counsel and Co-Chief Restructuring Officer, collectively our named executive officers ("Named Executive Officers") for the fiscal year ending December 31, 2014, please see our parent EFH Corp.'s 10K on file at www.sec.gov and on EFH Corp.'s website at www.energyfutureholdings.com under the "Investor Relations" tab.

**Compensation Committee Report**

EFIH does not have a compensation committee. Therefore, its full Board of Managers recommends that the Compensation Discussion and Analysis be included in EFIH's Annual Report on Form 10-K.

Board of Managers

Charles H. Cremens
Thomas D. Ferguson
Paul M. Keglevic
Kenneth Pontarelli
John F. Young
Kneeland Youngblood

**Summary Compensation Table**

Pursuant to the SEC's executive compensation disclosure rules, a required table may be omitted if there has been no compensation awarded to, earned by or paid to any named executive officer that is required to be reported in that table. Therefore, we have not included a Summary Compensation Table or any other table regarding compensation paid to our Named Executive Officers.

76

**Director Compensation**

The table below sets forth information regarding the aggregate compensation paid to the members of the Board during the year ended December 31, 2014. Managers who are members of the EFH Corp. Board and are not members of the Sponsor Group (or their respective affiliates) receive compensation for their service as members of the EFH Corp. Board and do not receive additional compensation for service on this Board. Officers of EFIH or members or officers of the Sponsor Group (or their respective affiliates) do not receive any fees for service as a manager.

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|
| Charles H. Cremens(1) | $236,389 | — | $236,389 |
| Thomas D. Ferguson (2) | — | — | — |
| Paul M. Keglevic (3) | — | — | — |
| Jeffrey Liaw (2) | — | — | — |
| Kenneth Pontarelli (2) | — | — | — |
| John F. Young (3) | — | — | — |
| Kneeland Youngblood (4) | — | — | — |

_____

(1) Mr. Cremens, the disinterested manager on our Board, receives an annual retainer of $200,000, which was pro-rated in 2014 for Mr. Cremens because he joined our board in February of 2014. In recognition of the additional responsibilities he performs in his role as a disinterested manager on the Board of Managers of EFIH, we pay him an additional $7,500 per day for days substantially spent on matters related to our restructuring.

(2) Member or officer of the Sponsor Group (or their respective affiliates). Mr. Liaw resigned from the Board effective January 22, 2015.

(3) Officer of EFIH

(4) See the Directors Compensation Table in the EFH Corp. Form 10-K for compensation paid to Mr. Youngblood for his services as an EFH. Corp. director.

**PX 115**
**Page 86 of 154**

**Item 12.    SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED EQUITY HOLDER MATTERS**

EFIH is a wholly owned subsidiary of EFH Corp. and as a result, does not have compensation plans (including individual compensation arrangements) under which its equity securities are authorized for issuance.

**Beneficial Ownership of Membership Interests of Energy Future Intermediate Holding Company LLC**

EFIH is a wholly owned subsidiary of EFH Corp. As such, EFH Corp. is the beneficial owner of 100% of EFIH's membership interests and neither of its directors nor the executive officers of its parent, EFH Corp., beneficially own any membership interests of EFIH as of March 1, 2014. The following table lists the percentage of limited liability company interests of EFIH beneficially owned by each manager and certain executive officers of EFIH and the holders of more than 5% of EFIH's limited liability company interests as of March 1, 2014.

The amounts and percentages of limited liability interests of EFIH beneficially owned are reported on the basis of SEC regulations governing the determination of beneficial ownership of securities. Under SEC rules, a person is deemed to be a "beneficial owner" of a security if that person has or shares voting power or investment power, which includes the power to dispose of or to direct the disposition of such security. A person is also deemed to be a beneficial owner of any securities of which that person has a right to acquire beneficial ownership within 60 days. Securities that can be so acquired are deemed to be outstanding for purposes of computing such person's ownership percentage, but not for purposes of computing any other person's percentage. Under these rules, more than one person may be deemed to be a beneficial owner of the same securities, and a person may be deemed to be a beneficial owner of securities as to which such person has no economic interest.

| Name | Percentage Ownership |
|------|---------------------:|
| Energy Future Holdings Corp. | 100.00% |
| Charles H. Cremens | 0.00% |
| Thomas D. Ferguson | 0.00% |
| Paul M. Keglevic | 0.00% |
| Kenneth Pontarelli | 0.00% |
| John F. Young | 0.00% |
| Kneeland Youngblood | 0.00% |
| Stacey H. Doré | 0.00% |
| All owners, managers and current executive officers as a group (8 persons) | 100.00% |

**Item 13.    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND MANAGER INDEPENDENCE**

**Policies and Procedures Relating to Related Party Transactions**

The Board of Directors (the "Board") of EFH Corp., EFIH's parent company, has adopted a related person transactions policy. Under this policy, a related person transaction shall be consummated or shall continue only if:

1.  the Audit Committee of the Board approves or ratifies such transaction in accordance with the policy and determines that the transaction is on terms comparable to those that could be obtained in arm's length dealings with an unrelated third party;
2.  the transaction is approved by the disinterested members of the Board or the Executive Committee of the Board; or
3.  the transaction involves compensation approved by the Organization and Compensation Committee of the Board.

For purposes of this policy, the term "related person" includes EFH Corp.'s directors, executive officers, 5% shareholders and their immediate family members. "Immediate family members" means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law or any person (other than a tenant or employee) sharing the household of a director, executive officer or 5% shareholder.

A "related person transaction" is a transaction between EFH Corp. or its subsidiaries and a related person, other than the types of transactions described below, which are deemed to be pre-approved by the Audit Committee of the Board:

1.  any compensation paid to a director if the compensation is required to be reported under Item 402 of Regulation S-K of the Securities Act;
2.  any transaction with another company at which a related person's only relationship is as an employee (other than an executive officer), director or beneficial owner of less than 10% of that company's ownership interests;
3.  any charitable contribution, grant or endowment by EFH Corp. to a charitable organization, foundation or university at which a related person's only relationship is as an employee (other than an executive officer) or director;
4.  transactions where the related person's interest arises solely from the ownership of EFH Corp.'s equity securities and all holders of that class of equity securities received the same benefit on a pro rata basis;
5.  transactions involving a related party where the rates or charges involved are determined by competitive bids;
6.  any transaction with a related party involving the rendering of services as a common or contract carrier, or public utility, as rates or charges fixed in conformity with law or governmental authority;
7.  any transaction with a related party involving services as a bank depositary of funds, transfer agent, registrar, trustee under a trust indenture, or similar service;
8.  transactions available to all employees or customers generally (unless required to be disclosed under Item 404 of Regulation S-K of the Securities Act, if applicable);
9.  transactions involving less than $100,000 when aggregated with all similar transactions;
10. transactions between EFH Corp. and its subsidiaries or between subsidiaries of EFH Corp.;
11. transactions not required to be disclosed under Item 404 of Regulation S-K under the Securities Act of 1933, and
12. open market purchases of EFH Corp.'s or its subsidiaries' debt or equity securities and interest payments on such debt.

The Board has determined that it is appropriate for the Audit Committee of the Board to review and approve or ratify related person transactions. Accordingly, at least annually, management reviews related person transactions to be entered into, or previously entered into, by EFH Corp. or its subsidiaries, if any. After review, the Audit Committee of the Board approves, ratifies or disapproves such transactions. Management updates the Audit Committee of the Board as to any material changes to such related person transactions. In unusual circumstances, EFH Corp. or its subsidiaries may enter into related person transactions in advance of receiving approval, provided that such related person transactions are reviewed as soon as reasonably practicable by the Audit Committee of the Board. If the Audit Committee of the Board determines not to ratify such transactions, EFH Corp. makes all reasonable efforts to cancel or otherwise terminate the affected transactions.

The related person transactions described below were approved prior to the Board's adoption of this policy, but were approved by either the Board or its Executive Committee. Transactions described below under "Related Person Transactions - Transactions with Sponsor Affiliates" are not related person transactions under the EFH Corp. policy because they are not with a director, executive officer, 5% shareholder or any of their immediate family members, but are described in the interest of greater disclosure.

**Related Person Transactions**

***Limited Partnership Agreement of Texas Energy Future Holdings Limited Partnership; Limited Liability Company Agreement of Texas Energy Future Capital Holdings LLC***

The Sponsor Group and certain investors who agreed to co-invest with the Sponsor Group or through a vehicle jointly controlled by the Sponsor Group to provide equity financing for the Merger (Co-Investors) entered into (i) a limited partnership agreement (LP Agreement) in respect of EFIH's indirect parent company, Texas Holdings and (ii) the LLC Agreement in respect of Texas Holdings' sole general partner, Texas Capital. The LP Agreement provides that Texas Capital has the right to vote or execute consents with respect to any shares of EFH Corp.'s common stock owned by Texas Holdings. The LLC Agreement and LP Agreement contain agreements among the parties with respect to the election of EFH Corp.'s directors, restrictions on the issuance or transfer of interests in EFH Corp., including tag-along rights and drag-along rights, and other corporate governance provisions (including the right to approve various corporate actions).

The LLC Agreement provides that Texas Capital and its members will take all action required to ensure that the managers of Texas Capital are also members of EFH Corp.'s Board. Pursuant to the LLC Agreement each of (i) KKR 2006 Fund L.P. and affiliated investment funds, (ii) TPG Partners V, L.P. and affiliated investment funds and (iii) certain funds affiliated with Goldman, Sachs & Co. (Goldman), an affiliate of GS Capital Partners, has the right to designate three managers of Texas Capital. These rights are subject to maintenance of certain investment levels in Texas Holdings.

***Registration Rights Agreement***

The Sponsor Group and the Co-Investors entered into a registration rights agreement with EFIH's parent company, EFH Corp., upon completion of the Merger. Pursuant to this agreement, in certain circumstances, the Sponsor Group can cause EFH Corp. to register shares of EFH Corp.'s common stock owned directly or indirectly by them under the Securities Act. In certain circumstances, the Sponsor Group and the Co-Investors are also entitled to participate on a pro rata basis in any registration of EFH Corp.'s common stock under the Securities Act that it may undertake. Mr. Youngblood, who is a member of the EFIH Board of Managers, and Messrs. Young and Keglevic, each of whom are executive officers of EFIH and EFH Corp., are parties to this agreement.

***Management Services Agreement***

In October 2007, in connection with the Merger, the Sponsor Group and Lehman Brothers Inc. entered into a management agreement with EFIH's parent company, EFH Corp. (Management Agreement), pursuant to which affiliates of the Sponsor Group provide management, consulting, financial and other advisory services to EFH Corp. Pursuant to the Management Agreement, affiliates of the Sponsor Group are entitled to receive an aggregate annual management fee of $35 million, which amount increases 2% annually, and reimbursement of out-of-pocket expenses incurred in connection with the provision of services pursuant to the Management Agreement. The Management Agreement will continue in effect from year to year, unless terminated upon a change of control of EFH Corp. or in connection with an initial public offering of EFH Corp. or if the parties thereto mutually agree to terminate the Management Agreement. In addition, the Management Agreement provides that the Sponsor Group will be entitled to receive a fee equal to a percentage of the gross transaction value in connection with certain subsequent financing, acquisition, disposition, merger combination and change of control transactions, as well as a termination fee based on the net present value of future payment obligations under the Management Agreement in the event of an initial public offering or under certain other circumstances. Beginning with the quarterly management fee due December 31, 2013, the Sponsor Group, while reserving the right to receive the fees, directed EFH Corp. to suspend payments of the management fees for an indefinite period, and no such management fees were paid to the Sponsor Group during 2014.

***Indemnification Agreement***

Concurrently with entering into the Management Agreement, the Sponsor Group, Texas Holdings and EFIH's parent company, EFH Corp., entered into an indemnification agreement (Indemnification Agreement), pursuant to which EFH Corp. and Texas Holdings agree to indemnify the Sponsor Group and their affiliates against any claims relating to (i) certain securities and financing transactions relating to the Merger, (ii) the performance of transaction services pursuant to the Management Agreement, (iii) actions or failures to act by EFH Corp., Texas Holdings, Texas Capital or their subsidiaries or affiliates (collectively, Company Group), (iv) service as an officer or director of, or at the request of, any member of the Company Group, and (v) any breach or alleged breach of fiduciary duty as a director or officer of any member of the Company Group.

*Sale Participation Agreement*

Mr. Youngblood, who is a member of the EFIH and EFH Corp. Boards, Mr. Young, who is a member of the Boards and an executive officer of EFIH and EFH Corp. and Mr. Keglevic, who is a member of the Board of EFIH and an executive officer of EFIH and EFH Corp. and Ms. Doré who is an executive officer of EFIH and EFH Corp., entered into sale participation agreements with EFIH's parent company, EFH Corp. Pursuant to the terms of these agreements, among other things, shares of EFH Corp.'s common stock held by these individuals are subject to tag-along and drag-along rights in the event of a sale by the Sponsor Group of shares of EFH Corp.'s common stock held by the Sponsor Group. Mr. Cremens does not own shares of EFH Corp.'s common stock and has not entered into a sale participation agreement with EFH Corp.

*Management Stockholders' Agreement*

Subject to a management stockholders' agreement, EFIH's managers, its executive officers, and other members of management, elected to invest in EFH Corp. by contributing cash or common stock, or a combination of both, to EFH Corp. prior to or following the Merger and receiving common stock in EFH Corp. in exchange therefore. The management stockholders' agreement creates certain rights and restrictions on these shares of common stock, including transfer restrictions and tag-along, drag-along, put, call and registration rights in certain circumstances. Mr. Cremens does not own shares of EFH Corp.'s common stock and has not entered into the management stockholders' agreement.

*Director Stockholders' Agreement*

Certain members of the EFIH Board have entered into a stockholders' agreement with EFIH's parent company, EFH Corp. These stockholders' agreements create certain rights and restrictions on the equity, including transfer restrictions and tag-along, drag-along, put, call and registration rights in certain circumstances. Mr. Cremens does not own shares of EFH Corp.'s common stock and has not entered into a stockholders agreement with EFH Corp.

*Transactions with Sponsor Affiliates*

TCEH has entered into the TCEH Senior Secured Facilities, and Oncor has entered into a revolving credit facility, each with syndicates of financial institutions and other lenders. These syndicates included affiliates of GS Capital Partners.

Affiliates of GS Capital Partners have from time to time engaged in commercial and investment banking and financial advisory transactions with EFIH in the normal course of business.

From time to time affiliates of the Sponsor Group may acquire debt or debt securities issued by EFH Corp. or its subsidiaries in open market transactions or through loan syndications.

Members of the Sponsor Group and/or their respective affiliates have from time to time entered into, and may continue to enter into, arrangements with EFH Corp. to use its products and services in the ordinary course of business, which often results in revenues to EFH Corp. in excess of $120,000 annually. In addition, EFH Corp. has entered into, and may continue to enter into, arrangements with members of the Sponsor Group and/or their respective affiliates to use their products and services in the ordinary course of their business, which often result in revenues to members of the Sponsor Group or their respective affiliates in excess of $120,000 annually.

*Manager Independence*

Though not formally considered by the Board because EFH Corp.'s common stock is not currently registered under the Securities Exchange Act of 1934, as amended, with the SEC or traded on any national securities exchange, based upon the listing standards for issuers of equity securities on the New York Stock Exchange (NYSE), the national securities exchange upon which EFH Corp.'s common stock was traded prior to the Merger, only Mr. Cremens and Mr. Youngblood would be considered independent. Because of their relationships with the Sponsor Group or with EFH Corp. directly, none of the other managers would be considered independent under the NYSE listing standards for issuers of equity securities. See "Certain Relationships and Related Party Transactions" and Item 11, "Executive Compensation - Manager Compensation." Under the NYSE's audit committee independence requirement for issuers of debt securities, Mr. Youngblood, who constitutes the Audit Committee, is considered independent.

Item 14.    **PRINCIPAL ACCOUNTING FEES AND SERVICES**

The Audit Committee of the board of directors of EFH Corp. (Committee) has adopted a policy relating to the engagement of EFH Corp.'s independent auditor that applies to EFH Corp. and its consolidated subsidiaries, including EFIH. The policy provides that in addition to the audit of the financial statements, related quarterly reviews and other audit services, and providing services necessary to complete SEC filings, Deloitte & Touche LLP may be engaged to provide non-audit services as described herein. Prior to engagement, all services to be rendered by the independent auditor must be authorized by the Committee in accordance with preapproval procedures which are defined in the policy. The preapproval procedures require:

1. The annual review and preapproval by the Committee of all anticipated audit and non-audit services; and
2. The quarterly preapproval by the Committee of services, if any, not previously approved and the review of the status of previously approved services.

The Committee may also approve certain ongoing non-audit services not previously approved in the limited circumstances provided for in the SEC rules. All services performed by Deloitte & Touche LLP, the member firms of Deloitte Touche Tohmatsu and their respective affiliates ("Deloitte & Touche") for EFIH in 2013 were preapproved by the Committee.

The policy defines those non-audit services which Deloitte & Touche may also be engaged to provide as follows:

1. Audit related services, including:
    a. due diligence accounting consultations and audits related to mergers, acquisitions and divestitures;
    b. employee benefit plan audits;
    c. accounting and financial reporting standards consultation,
    d. internal control reviews, and
    e. attest services, including agreed upon procedures reports that are not required by statute or regulation.

2. Tax related services, including:
    a. tax compliance;
    b. general tax consultation and planning,
    c. tax advice related to mergers, acquisitions, and divestitures, and
    d. communications with and request for rulings from tax authorities.

3. Other services, including:
    a. process improvement, review and assurance;
    b. litigation and rate case assistance;
    c. forensic and investigative services, and
    d. training services.

The policy prohibits EFIH from engaging its independent auditor to provide:

1. Bookkeeping or other services related to EFIH's accounting records or financial statements;
2. Financial information systems design and implementation services;
3. Appraisal or valuation services, fairness opinions, or contribution-in-kind reports;
4. Actuarial services;
5. Internal audit outsourcing services;
6. Management or human resource functions;
7. Broker-dealer, investment advisor, or investment banking services;
8. Legal and expert services unrelated to the audit, and
9. Any other service that the Public Company Accounting Oversight Board determines, by regulation, to be impermissible.

In addition, the policy prohibits EFIH's independent auditor from providing tax or financial planning advice to any officer of EFIH.

Compliance with the Committee's policy relating to the engagement of Deloitte & Touche is monitored on behalf of the Committee by EFIH's chief accounting officer. Reports describing the services provided by the firm and fees for such services are provided to the Committee no less often than quarterly.

For the years ended December 31, 2014 and 2013, fees billed (in US dollars) to EFIH by Deloitte & Touche were as follows:

| | | 2014 | | 2013 |
|---|---|---|---|---|
| **Audit Fees.** Fees for services necessary to perform the annual audit, review SEC filings, fulfill statutory and other service requirements and provide comfort letters and consents. | $ | 1,364,000 | $ | 546,000 |
| **Audit-Related Fees.** Fees for services including due diligence related to mergers, acquisitions and divestitures, accounting consultations and audits in connection with acquisitions, internal control reviews, attest services that are not required by statute or regulation, and consultation concerning financial accounting and reporting standards | | 24,000 | | — |
| **Tax Fees.** Fees for tax compliance, tax planning, and tax advice related to mergers and acquisitions, divestitures, and communications with and requests for rulings from taxing authorities. | | — | | — |
| **All Other Fees.** Fees for services including process improvement reviews, forensic accounting reviews, litigation assistance and training services | | — | | — |
| **Total** | $ | 1,388,000 | $ | 546,000 |

83

PART IV.

Item 15.    EXHIBITS, FINANCIAL STATEMENT SCHEDULES

(a)    Oncor Holdings Financial Statements are presented pursuant to Rules 3–09 and 3–16 of Regulation S-X as Exhibit 99(d).

(b)    Exhibits:

### EFIH Exhibits to Form 10-K for the Fiscal Year Ended December 31, 2014

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| **(3(i))** | **Articles of Incorporation** | | | |
| 3(a) | 333-153529 Form S-4 (filed September 17, 2008) | 3(c) | — | Certificate of Formation of Energy Future Intermediate Holding Company LLC, as amended |
| **(3(ii))** | **By-laws** | | | |
| 3(b) | 1-34544 Form 10-K (filed February 21, 2012) | 3(b) | — | Second Amended and Restated Limited Liability Company Agreement of Energy Future Intermediate Holding Company LLC |
| **(4)** | **Instruments Defining the Rights of Security Holders, Including Indentures.** | | | |
| | **Energy Future Intermediate Holding Company LLC** | | | |
| 4(a) | 1-12833 Form 8-K (filed January 30, 2013) | 4.3 | — | Supplemental Indenture, dated January 25, 2013, to the indenture, dated November 16, 2009, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 9.75% Senior Secured Notes due 2019. |
| 4(b) | 1-12833 Form 8-K (filed January 30, 2013) | 4.4 | — | First Supplemental Indenture, dated January 29, 2013, to the indenture, dated August 17, 2010, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(c) | 1-34544 Form 10-Q (March 31, 2013) (filed May 2, 2013) | 4(n) | — | Second Supplemental Indenture, dated March 21, 2013, to the Indenture dated August 17, 2010, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(d) | 1-34544 Form 8-K (filed January 30, 2013) | 4.5 | — | Second Supplemental Indenture, dated January 29, 2013, to the indenture dated December 5, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc., and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 11.25%/12.25% Senior Toggle Notes due 2018. |
| 4(e) | 1-34544 Form 10-K (2012) (filed February 19, 2013) | 4.1 | — | Third Supplemental Indenture, dated January 30, 2013, to the indenture, dated December 5, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc., and the Bank of New York Mellon Trust Company, N.A., as trustee, relating to 11.25%/12.25% Senior Toggle Notes due 2018. |
| 4(f) | 1-12833 Form 8-K (filed November 20, 2009) | 4.2 | — | Indenture, dated as of November 16, 2009, among Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as trustee |
| 4(g) | 1-12833 Form 8-K (filed January 30, 2013) | 4.3 | — | Supplemental Indenture, dated January 25, 2013, to the indenture, dated November 16, 2009, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 9.75% Senior Secured Notes due 2019. |

PX 115
Page 93 of 154

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 4(h) | 1-12833<br>Form 10-K<br>(filed August 18, 2010) | 4.1 | — | Indenture, dated August 17, 2010, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(i) | 1-12833<br>Form 8-K<br>(filed January 30, 2013) | 4.4 | — | First Supplemental Indenture, dated January 29, 2013, to the indenture, dated August 17, 2010, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(j) | 1-12833<br>Form 10-Q<br>(Quarter ended March 31, 2011)<br>(filed April 29, 2011) | 4(e) | — | Indenture, dated as of April 25, 2011, among Energy Future Intermediate Holding Company LLC, EFIH Finance, Inc. and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 11% Senior Secured Second Lien Notes due 2021. |
| 4(k) | 1-12833<br>Form 8-K<br>(filed February 7, 2012) | 4.1 | — | First Supplemental Indenture, dated February 6, 2012, to the Indenture dated April 25, 2011, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as Trustee, relating to 11.750% Senior Secured Second Lien Notes due 2022. |
| 4(l) | 1-12833<br>Form 8-K<br>(filed February 29, 2012) | 4.1 | — | Second Supplemental Indenture, dated February 28, 2012, to the indenture dated April 25, 2011, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as Trustee, relating to 11.750% Senior Secured Second Lien Notes due 2022. |
| 4(m) | 1-12833<br>Form 10-Q<br>(Quarter ended June 30, 2012)<br>(filed July 31, 2012) | 4(a) | — | Third Supplemental Indenture, dated May 31, 2012, to the indenture dated April 25, 2011, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as Trustee, relating to 11.750% Senior Secured Second Lien Notes due 2022. |
| 4(n) | 1-12833<br>Form 8-K<br>(filed August 17, 2012) | 4.2 | — | Fourth Supplemental Indenture, dated August 14, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and the Bank of New York Mellon Trust Company, N.A., as trustee, relating to 11.75% Senior Secured Second Lien Notes due 2022. |
| 4(o) | 1-12833<br>Form 8-K<br>(filed August 17, 2012) | 4.1 | — | Indenture, dated August 14, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and the Bank of New York Mellon Trust Company, N.A., as trustee, relating to 6.875% Senior Secured Notes due 2017. |
| 4(p) | 1-12833<br>Form 8-K<br>(filed October 24, 2012) | 4.1 | — | First Supplemental Indenture, dated October 23, 2012, to the indenture, dated August 14, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc., and the Bank of New York Mellon Trust Company, N.A., as trustee, relating to 6.875% Senior Secured Notes due 2017. |
| 4(q) | 1-12833<br>Form 8-K<br>(filed December 5, 2012) | 4.1 | — | Indenture, dated December 5, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc., and the Bank of New York Mellon Trust Company, N.A., as trustee, relating to 11.25%/12.25% Senior Toggle Notes due 2018. |
| 4(r) | 1-12833<br>Form 8-K<br>(filed December 21, 2012) | 4.1 | — | First Supplemental Indenture, dated December 19, 2012, to the indenture dated December 5, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc., and the Bank of New York Mellon Trust Company, N.A., as trustee, relating to 11.25%/12.25% Senior Toggle Notes due 2018. |

PX 115
Page 94 of 154

| Exhibits | Previously Filed* With File Number | As Exhibit | |
|---|---|---|---|
| 4(s) | 1-34544<br>Form 8-K<br>(filed January 30, 2013) | 4.5 | — Second Supplemental Indenture, dated January 29, 2013, to the indenture dated December 5, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc., and the Bank of New York Mellon Trust Company, N.A., as trustee, relating to 11.25%/12.25% Senior Toggle Notes due 2018. |
| 4(t) | | 4.1 | — Third Supplemental Indenture, dated January 30, 2013, to the indenture, dated December 5, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc., and the Bank of New York Mellon Trust Company, N.A., as trustee, relating to 11.25%/12.25% Senior Toggle Notes due 2018. |
| 4(u) | 1-12833<br>Form 10-Q<br>(Quarter ended March 31, 2011)<br>(filed April 29, 2011) | 4(f) | — Junior Lien Pledge Agreement, dated as of April 25, 2011, from Energy Future Intermediate Holding Company LLC, as pledgor, to The Bank of New York Mellon Trust Company, N.A., as collateral trustee. |

**Energy Future Holdings Corp. (Merger-related push down debt)**

| Exhibits | Previously Filed* With File Number | As Exhibit | |
|---|---|---|---|
| 4(v) | 1-34544<br>Form 10-Q (March 31, 2013)<br>(filed May 2, 2013) | 4(a) | — Fifth Supplemental Indenture, dated April 15, 2013, to the Indenture, dated October 31, 2007, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to Senior Notes due 2017 and Senior Toggle Notes due 2017. |
| 4(w) | 1-12833<br>Form 8-K<br>(filed October 31, 2007) | 4.1 | — Indenture, dated October 31, 2007, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon, as trustee, relating to Senior Notes due 2017 and Senior Toggle Notes due 2017. |
| 4(x) | 1-12833<br>Form 10-K (2009)<br>(filed February 19, 2010) | 4(f) | — Supplemental Indenture, dated as of July 8, 2008, to the Indenture, dated as of October 31, 2007, relating to Energy Future Holdings Corp.'s 10.875% Senior Notes due 2017 and 11.25%/12.00% Senior Toggle Notes due 2017. |
| 4(y) | 1-12833<br>Form 10-Q<br>(Quarter ended June 30, 2009)<br>(filed August 4, 2009) | 4(a) | — Second Supplemental Indenture, dated as of August 3, 2009, to the Indenture, dated as of October 31, 2007, relating to Energy Future Holdings Corp.'s 10.875% Senior Notes due 2017 and 11.25%/12.00% Senior Toggle Notes due 2017. |
| 4(z) | 1-12833<br>Form 8-K<br>(filed July 30, 2010) | 99.1 | — Third Supplemental Indenture, dated as of July 29, 2010, to the Indenture dated as of October 31, 2007, relating to EFH Corp.'s 10.875% Senior Notes due 2017 and 11.25%/12.00% Senior Toggle Notes due 2017 |
| 4(aa) | 1-12833<br>Form 10-Q (Quarter ended September 30, 2011) (filed October 28, 2011) | 4(b) | — Fourth Supplemental Indenture, dated October 18, 2011, to the Indenture dated October 31, 2007. |
| 4(bb) | 1-12833<br>Form 8-K<br>(filed November 20, 2009) | 4.1 | — Indenture, dated November 16, 2009, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 9.75% Senior Secured Notes due 2019. |
| 4(cc) | 1-12833<br>Form 8-K<br>(filed January 30, 2013) | 4.1 | Supplemental Indenture, dated January 25, 2013, to the indenture, dated November 16, 2009, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 9.75% Senior Secured Notes due 2019. |

| Exhibits | Previously Filed* With File Number | As Exhibit | |
|---|---|---|---|
| 4(dd) | 333-171253<br>Form S-4<br>(filed January 24, 2011) | 4(k) | — Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(ee) | 333-165860<br>Form S-3<br>(filed April 1, 2010) | 4(j) | — First Supplemental Indenture, dated March 16, 2010, to the Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(ff) | 1-12833<br>Form 10-Q<br>(Quarter ended June 30, 2010)<br>(filed August 2, 2010) | 4(a) | — Second Supplemental Indenture, dated April 13, 2010, to the Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(gg) | 1-12833<br>Form 10-Q<br>(Quarter ended June 30, 2010)<br>(filed August 2, 2010) | 4(b) | — Third Supplemental Indenture, dated April 14, 2010, to the Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured notes due 2020. |
| 4(hh) | 1-12833<br>Form 10-Q<br>(Quarter ended June 30, 2010)<br>(filed August 2, 2010) | 4(c) | — Fourth Supplemental Indenture, dated May 21, 2010, to the Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(ii) | 1-12833<br>Form 10-Q<br>(Quarter ended June 30, 2010)<br>(filed August 2, 2010) | 4(d) | — Fifth Supplemental Indenture, dated July 2, 2010, to the Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(jj) | 1-12833<br>Form 10-Q<br>(Quarter ended June 30, 2010)<br>(filed August 2, 2010) | 4(e) | — Sixth Supplemental Indenture, dated July 6, 2010, to the Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(kk) | 1-12833<br>Form 10-Q<br>(Quarter ended June 30, 2010)<br>(filed August 2, 2010) | 4(f) | — Seventh Supplemental Indenture, dated July 7, 2010, to the Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(ll) | 1-12833<br>Form 8-K<br>(filed January 30, 2013) | 4.2 | — Eighth Supplemental Indenture, dated January 25, 2013, to the Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |

**Oncor Electric Delivery Company LLC**

| | | | |
|---|---|---|---|
| 4(mm) | 333-100240<br>Form S-4<br>(filed October 2, 2002) | 4(a) | — Indenture and Deed of Trust, dated as of May 1, 2002, between Oncor Electric Delivery Company LLC and The Bank of New York Mellon, as Trustee |
| 4(nn) | 1-12833<br>Form 8-K | 10.1 | — Supplemental Indenture No. 1, dated October 25, 2005, to the Indenture and Deed of Trust, dated as of May 1, 2002, between Oncor Electric Delivery |

(filed October 31, 2005)                          Company LLC and The Bank of New York Mellon.

87
-

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|----------|-----------------------------------|-----------|---|---|
| 4(oo) | 333-100240<br>Form 10-Q<br>(Quarter ended March 31, 2008)<br>(filed May 15, 2008) | 4(b) | — | Supplemental Indenture No. 2, dated May 15, 2008, to the Indenture and Deed of Trust, dated as of May 1, 2002, between Oncor Electric Delivery Company LLC and The Bank of New York. |
| 4(pp) | 333-100240<br>Form S-4<br>(filed October 2, 2002) | 4(b) | — | Officer's Certificate, dated May 6, 2002, establishing the terms of Oncor Electric Delivery Company LLC's 6.375% Senior Notes due 2012 and 7.000% Senior Notes due 2032. |
| 4(qq) | 333-100242<br>Form S-4<br>(filed October 2, 2002) | 4(a) | — | Indenture (for Unsecured Debt Securities), dated as of August 1, 2002, between Oncor Electric Delivery Company LLC and The Bank of New York Mellon, as Trustee. |
| 4(rr) | 333-100240<br>Form 10-Q<br>(Quarter ended March 31, 2008)<br>(filed May 15, 2008) | 4(c) | — | Supplemental Indenture No. 1, dated May 15, 2008, to the Indenture and Deed of Trust, dated as of August 1, 2002, between Oncor Electric Delivery Company LLC and The Bank of New York. |
| 4(ss) | 333-100242<br>Form S-4<br>(filed October 2, 2002) | 4(b) | — | Officer's Certificate, dated August 30, 2002, establishing the form and certain terms of Oncor Electric Delivery Company LLC's 5.00% debentures due 2007 and 7.00% Debentures due 2022. |
| 4(tt) | 333-106894<br>Form S-4<br>(filed July 9, 2003) | 4(c) | — | Officer's Certificate, dated December 20, 2002, establishing the form and certain terms of Oncor Electric Delivery Company LLC's 6.375% Senior Notes due 2015 and 7.250% Senior Notes due 2033. |
| 4(uu) | 333-100240<br>Form 10-Q (Quarter ended March 31, 2008)<br>(filed May 15, 2008) | 4(a) | — | Deed of Trust, Security Agreement and Fixture Filing, dated May 15, 2008, by Oncor Electric Delivery Company LLC, as Grantor, to and for the benefit of The Bank of New York, as Collateral Agent. |
| 4(vv) | 333-100240<br>Form 10-K (2008)<br>(filed March 3, 2009) | 4(n) | — | First Amendment, dated as of March 2, 2009, to Deed of Trust, Security Agreement and Fixture Filing, by and between Oncor Electric Delivery Company LLC and The Bank of New York Mellon (formerly The Bank of New York) as Trustee and Collateral Agent, dated May 15, 2008. |
| 4(ww) | 333-100240<br>Form 8-K<br>(filed September 3, 2010) | 10.1 | — | Second Amendment, dated September 3, 2010, to Deed of Trust, Security Agreement and Fixture Filing, by and between Oncor Electric Delivery Company LLC, as grantor, to and for the benefit of The Bank of New York Mellon, as collateral agent, dated May 15, 2008. |
| 4(xx) | 333-100240<br>Form 8-K<br>(filed November 15, 2011) | 10.1 | — | Third Amendment, dated November 10, 2011, to Deed of Trust, Security Agreement and Fixture Filing, by and between Oncor Electric Delivery Company LLC, as grantor, to and for the benefit of The Bank of New York Mellon, as collateral agent, dated May 15, 2008. |
| 4(yy) | 333-100242<br>Form 8-K<br>(filed September 9, 2008) | 4.1 | — | Officer's Certificate, dated September 8, 2008, establishing the form and certain terms of Oncor Electric Delivery Company LLC's 5.95% Senior Secured Notes due 2013, 6.80% Senior Secured Notes due 2018 and 7.50% Senior Secured Notes due 2038. |
| 4(zz) | 333-100240<br>Form 8-K<br>(filed September 16, 2010) | 4.1 | — | Officer's Certificate, dated September 13, 2010, establishing the form and certain terms of Oncor Electric Delivery Company LLC's 5.25% Senior Secured Notes due 2040. |
| 4(aaa) | 333-100240<br>Form 8-K<br>(filed October 12, 2010) | 4.1 | — | Officer's Certificate, dated October 8, 2010, establishing the form and certain terms of Oncor Electric Delivery Company LLC's 5.00% Senior Secured Notes due 2017 and 5.75% Senior Secured Notes due 2020. |

| | | | | |
|---|---|---|---|---|
| 4(bbb) | 333-100240<br>Form 8-K<br>(filed November 23, 2011) | 4.1 | — | Officer's Certificate, dated November 23, 2011, establishing the terms of Oncor Electric Delivery Company LLC's 4.55% Senior Secured Notes due 2041. |

88

**PX 115**
**Page 99 of 154**

| Exhibits | Previously Filed* With File Number | As Exhibit | |
|---|---|---|---|
| 4(ccc) | 333-100240<br>Form 8-K<br>(filed May 18, 2012) | 4.1 | Officer's Certificate, dated May 18, 2012, establishing the terms of Oncor's 4.10% Senior Secured Notes due 2022 and 5.30% Senior Secured Notes due 2042. |
| 4(ddd) | 333-100240<br>Form 8-K<br>(filed May 18, 2012) | 4.2 | — Registration Rights Agreement, dated May 18, 2012, among Oncor Electric Delivery Company LLC and the representatives of the initial purchasers of Oncor's 4.10% Senior Secured Notes due 2022 and 5.30% Senior Secured Notes due 2042. |
| 4(eee) | 333-100240<br>Form 8-K<br>(filed May 13, 2013) | 4.1 | — Registration Rights Agreement, dated May 13, 2013, among Oncor Electric Delivery Company LLC and the representatives of the initial purchasers of the addition 4.55% Senior Secure Notes due 2041. |
| 4(fff) | 333-100240<br>Form 8-K<br>(filed May 13, 2014) | 4.1 | — Officer's Certificate dated May 13, 2014, establishing the terms of Oncor Electric Delivery Company LLC's 2.15% Senior Secured Notes due 2019. |
| 4(ggg) | 333-100240<br>Form 8-K<br>(filed May 13, 2014) | 4.2 | — Registration Rights Agreement, dated May 13, 2014, among Oncor Electric Delivery Company LLC and the representatives of the initial purchasers of Oncor Electric Delivery Company LLC's 2.15% Senior Secured Notes due 2019. |
| **(10)** | **Material Contracts.** | | |
| | **Management Contracts; Compensatory Plans, Contracts and Arrangements** | | |
| 10(a) | | | — Energy Future Intermediate Holding Company LLC Non-Employee Manager Compensation Arrangements. |
| | **Credit Agreements** | | |
| 10(b) | 333-100240<br>Form 8-K<br>(filed October 11, 2011) | 10.1 | — Amended and Restated Revolving Credit Agreement, dated as of October 11, 2011, among Oncor Electric Delivery Company LLC, as borrower, the lenders listed therein, JPMorgan Chase Bank, N.A., as administrative agent for the lenders, JPMorgan Chase Bank, N.A., as swingline lender, and JPMorgan Chase Bank, N.A., Barclays Bank PLC, The Royal Bank of Scotland plc, Bank of America, N.A. and Citibank N.A., as fronting banks for letters of credit issued thereunder. |
| 10(c) | 333-100240<br>Form 8-K<br>(filed May 15, 2012) | 10.1 | — Joinder Agreement, dated as of May 15, 2012, by and among Oncor, as Borrower, JPMorgan Chase Bank, N.A., as administrative agent under the Credit Agreement, swingline lender and fronting bank, Barclays Bank PLC, Bank of America, N.A., Citibank, N.A. The Royal Bank of Scotland PLC, as fronting banks, and each party identified as an "Incremental Lender" on the signature pages thereto. |
| 10(d) | 1-12833<br>Form 8-K<br>(filed November 20, 2009) | 4.3 | — Pledge Agreement, dated November 16, 2009, made by Energy Future Intermediate Holding Company LLC and the additional pledgers to The Bank of New York Mellon Trust Company, N.A., as collateral trustee for the holders of parity lien obligations. |
| 10(e) | 1-12833<br>Form 8-K<br>(filed November 20, 2009) | 4.4 | — Collateral Trust Agreement, dated November 16, 2009, among Energy Future Intermediate Holding Company LLC, The Bank of New York Mellon Trust Company, N.A., as first lien trustee and as collateral trustee, and the other secured debt representatives party thereto. |
| | **Other Material Contracts** | | |
| 10(f) | 333-100240<br>Form 10-K (2004)<br>(filed March 23, 2005) | 10(i) | — Agreement, dated as of March 10, 2005, by and between Oncor Electric Delivery Company LLC and TXU Energy Company LLC allocating to Oncor Electric Delivery Company LLC the pension and post-retirement benefit costs for all Oncor Electric Delivery Company LLC employees who had retired or had terminated employment as vested employees prior to January 1, 2002. |

89

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 10(g) | 333-100240 Form 10-Q (Quarter ended September 30, 2008) (filed November 6, 2008) | 3(a) | — | Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery Holdings Company LLC, dated as of November 5, 2008, by and among Oncor Electric Delivery Holdings Company LLC, Texas Transmission Investment LLC and Oncor Management Investment LLC. |
| 10(h) | 333-100240 Form 10-K (2008) (filed March 3, 2009) | 3(c) | — | First Amendment to Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery Company LLC, entered into as of February 18, 2009, by and among Oncor Electric Delivery Holdings Company LLC, Texas Transmission Investment LLC and Oncor Management Investment LLC. |
| 10(i) | 333-100240 Form 10-Q (Quarter ended September 30, 2008) (filed November 6, 2008) | 10(b) | — | Amended and Restated Tax Sharing Agreement, dated as of November 5, 2008, by and among Oncor Electric Delivery Company LLC, Oncor Electric Delivery Holdings Company LLC, Oncor Management Investment LLC, Texas Transmission Investment LLC, Energy Future Intermediate Holding Company LLC and Energy Future Holdings Corp. |
| 10(j) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(eee) | — | Stipulation as approved by the PUCT in Docket No. 34077. |
| 10(k) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(fff) | — | Amendment to Stipulation Regarding Section 1, Paragraph 35 and Exhibit B in Docket No. 34077. |
| 10(l) | 333-100240 Form 10-K (2010) (filed February 18, 2011) | 10(ae) | — | PUCT Order on Rehearing in Docket No. 34077. |
| 10(m) | 333-100240 Form 10-Q (Quarter ended September 30, 2008) (filed November 6, 2008) | 4(c) | — | Investor Rights Agreement, dated as of November 5, 2008, by and among Oncor Electric Delivery Company LLC, Oncor Electric Delivery Holdings Company LLC, Texas Transmission Investment LLC and Energy Future Holdings Corp. |
| 10(n) | 1-12833 Form 10-Q (Quarter ended September 30, 2012) (filed October 30, 2012) | 10(b) | — | Federal and State Income Tax Allocation Agreement, effective January 1, 2010, by and among members of the Energy Future Holdings Corp. consolidated group. |
| **Debtor-In-Possession Facility** | | | | |
| 10(o) | 1-12833 Form 8-K (filed June 25, 2014) | 10(a) | — | Senior Secured Superpriority Debtor-In-Possession Credit Agreement, dated as of June 19, 2014, among the EFIH Debtors, the lenders party thereto, Deutsche Bank AG New York Branch, as Administrative Agent and Collateral Agent, Citibank, N.A., Bank of America, N.A. and Morgan Stanley Senior Funding, Inc., as Co-Syndication Agents, Barclays Bank PLC, Royal Bank of Canada and Union Bank, N.A., as Co-Documentation Agents, Deutsche Bank Securities Inc., Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley Senior Funding, Inc., Barclays Bank PLC, RBC Capital Markets and Union Bank, N.A., as Joint Lead Arrangers and Joint Bookrunners, and Loop Capital Markets, LLC and Williams Capital Group, LLC, as Co-Managers. |
| 10(p) | 1-12833 Form 8-K (filed June 25, 2014) | 10(b) | — | Pledge Agreement, dated as of June 19, 2014, by and among the EFIH Debtors and Deutsche Bank AG New York Branch, as collateral agent. |
| 10(q) | 1-12833 Form 8-K (filed June 25, 2014) | 10(c) | — | Security Agreement, dated as of June 19, 2014, by and among the EFIH Debtors and Deutsche Bank AG New York Branch, as collateral agent. |

90

| Exhibits | Previously Filed* With File Number | As Exhibit |
|---|---|---|
| **(12)** | **Statement Regarding Computation of Ratios** | |
| 12(a) | | — Computation of Ratio of Earnings to Fixed Charges, and Ratio of Earnings to Combined Fixed Charges and Preference Dividends. |
| **(21)** | **Subsidiaries of the Registrant** | |
| 21(a) | | — Subsidiaries of Energy Future Intermediate Holding Company LLC. |
| **(31)** | **Rule 13a - 14(a)/15d - 14(a) Certifications.** | |
| 31(a) | | — Certification of John F. Young, chair, president and chief executive of Energy Future Intermediate Holding Company LLC, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31(b) | | — Certification of Paul M. Keglevic, executive vice president and chief financial officer of Energy Future Intermediate Holding Company LLC, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| **(32)** | **Section 1350 Certifications.** | |
| 32(a) | | — Certification of John F. Young, chair, president and chief executive of Energy Future Intermediate Holding Company LLC, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32(b) | | — Certification of Paul M. Keglevic, executive vice president and chief financial officer of Energy Future Intermediate Holding Company LLC, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| **(99)** | **Additional Exhibits** | |
| 99(a) | | — Oncor Electric Delivery Holdings Company LLC financial statements presented pursuant to Rules 3–09 and 3–16 of Regulation S–X. |
| | **XBRL Data Files** | |
| 101.INS | | — XBRL Instance Document |
| 101.SCH | | — XBRL Taxonomy Extension Schema Document |
| 101.CAL | | — XBRL Taxonomy Extension Calculation Document |
| 101.DEF | | — XBRL Taxonomy Extension Definition Document |
| 101.LAB | | — XBRL Taxonomy Extension Labels Document |
| 101.PRE | | — XBRL Taxonomy Extension Presentation Document |

_____
\* Incorporated herein by reference

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Energy Future Intermediate Holding Company LLC has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

ENERGY FUTURE INTERMEDIATE HOLDING
COMPANY LLC

Date: March 31, 2015

By     /s/ JOHN F. YOUNG
_____
(John F. Young, Chair, President and Chief Executive)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of Energy Future Intermediate Holding Company LLC and in the capacities and on the date indicated.

| Signature | Title | Date |
|---|---|---|
| /s/   JOHN F. YOUNG<br>(John F. Young, Chair, President and Chief Executive) | Principal Executive Officer and Manager | March 31, 2015 |
| /s/   PAUL M. KEGLEVIC<br>(Paul M. Keglevic, Executive Vice President, Chief Financial Officer and Co-Chief Restructuring Officer) | Principal Financial Officer and Manager | March 31, 2015 |
| /s/   TERRY L. NUTT<br>(Terry L. Nutt, Senior Vice President and Controller) | Principal Accounting Officer | March 31, 2015 |
| /s/   CHARLES H. CREMENS<br>(Charles H. Cremens) | Manager | March 31, 2015 |
| /s/   THOMAS D. FERGUSON<br>(Thomas D. Ferguson) | Manager | March 31, 2015 |
| /s/   KENNETH PONTARELLI<br>(Kenneth Pontarelli) | Manager | March 31, 2015 |
| /s/   KNEELAND YOUNGBLOOD<br>(Kneeland Youngblood) | Manager | March 31, 2015 |

92

**Exhibit 10(a)**

**Manager Compensation Arrangements**

Managers who are current or former officers of Energy Future Holdings Corp. or any of its subsidiaries or employed by the Sponsor Group do not receive any fees for their service as managers. Mr. Cremens receives $200,000 annually and $7,500 per day for days substantially spent on matters related to our restructuring.

Exhibit 12(a)

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**
**COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES**

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2014** | | **2013** | | **2012** | | **2011** | | **2010** |
| EARNINGS: | | | | | | | | | |
| Net income (loss) before income taxes and equity earnings of unconsolidated subsidiary | $ | (858) | $ | (606) | $ | 72 | $ | 204 | $ | (106) |
| Add: Distributed income of equity investees | | 202 | | 213 | | 147 | | 116 | | 169 |
| Fixed charges (see detail below) | | 441 | | 760 | | 526 | | 348 | | 315 |
| Total earnings (losses) | $ | (215) | $ | 367 | $ | 745 | $ | 668 | $ | 378 |
| FIXED CHARGES: | | | | | | | | | |
| Interest expense | $ | 441 | $ | 760 | $ | 526 | $ | 348 | $ | 315 |
| Total fixed charges | $ | 441 | $ | 760 | $ | 526 | $ | 348 | $ | 315 |
| RATIO OF EARNINGS TO FIXED CHARGES (a) | | — | | — | | 1.42 | | 1.92 | | 1.20 |

_____

(a)  Fixed charges exceeded earnings by $656 million and $393 million for the years ended December 31, 2014 and December 31, 2013, respectively.

Exhibit 21(a)

**ENERGY FUTURE HOLDINGS CORP.**
**SUBSIDIARY HIERARCHY**
**Effective March 31, 2015**

| | Jurisdiction |
|---|---|
| Energy Future Intermediate Holding Company LLC | Delaware |
| EFIH Finance Inc. | Delaware |
| Oncor Electric Delivery Holdings Company LLC | Delaware |
| Oncor Electric Delivery Company LLC [1] | Delaware |
| Oncor Management Investment LLC [2] | Delaware |
| Oncor Electric Delivery Transition Bond Company LLC | Delaware |
| Oncor Electric Delivery Administration Corp. | Texas |
| Oncor License Holdings Company LLC | Texas |
| Oncor Communications Holdings Company LLC | Delaware |

_____

(1)  80.033% ownership interest

(2)  Oncor Management Investment LLC owns 0.217% of Oncor Electric Delivery Company LLC. Regarding the ownership of Oncor Management Investment LLC, Oncor Electric Delivery Company LLC owns 100% of the Class A membership interests. Certain management employees of Oncor Electric Delivery Company LLC own 100% of the Class B membership interests.

Exhibit 31(a)

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**
**Certificate Pursuant to Section 302**
**of Sarbanes - Oxley Act of 2002**

I, John F. Young, certify that:

1.    I have reviewed this annual report on Form 10-K of Energy Future Intermediate Holding Company LLC;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for purposes in accordance with generally accepted accounting principles;

    c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 31, 2015                           /s/ JOHN F. YOUNG

                                    Name:    John F. Young
                                    Title:    Chair, President and Chief Executive

<b>Exhibit 31(b)</b>

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**
**Certificate Pursuant to Section 302**
**of Sarbanes - Oxley Act of 2002**

I, Paul M. Keglevic, certify that:

1.   I have reviewed this annual report on Form 10-K of Energy Future Intermediate Holding Company LLC;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for purposes in accordance with generally accepted accounting principles;

   c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 31, 2015                              /s/ PAUL M. KEGLEVIC

                              Name:        Paul M. Keglevic

                                           Executive Vice President, Chief Financial Officer and
                              Title:       Co-Chief Restructuring Officer

**PX 115**
**Page 110 of 154**

**Exhibit 32(a)**

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**
**Certificate Pursuant to Section 906**
**of Sarbanes - Oxley Act of 2002**
**CERTIFICATION OF CEO**

The undersigned, John F. Young, Chair, President and Chief Executive of Energy Future Intermediate Holding Company LLC (the "Company"), DOES HEREBY CERTIFY that, to his knowledge:

1.  The Company's Annual Report on Form 10-K for the period ended December 31, 2014 (the "Report") fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2.  Information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.
    IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed this 31st day of March 2015.

/s/ JOHN F. YOUNG
Name:       John F. Young
Title:       Chair, President and Chief Executive

A signed original of this written statement required by Section 906 has been provided to Energy Future Intermediate Holding Company LLC and will be retained by Energy Future Intermediate Holding Company LLC and furnished to the Securities and Exchange Commission or its staff upon request.

**Exhibit 32(b)**

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**
**Certificate Pursuant to Section 906**
**of Sarbanes - Oxley Act of 2002**
**CERTIFICATION OF CFO**

The undersigned, Paul M. Keglevic, Executive Vice President, Chief Financial Officer and Co-Chief Restructuring Officer of Energy Future Intermediate Holding Company LLC (the "Company"), DOES HEREBY CERTIFY that, to his knowledge:

1. The Company's Annual Report on Form 10-K for the period ended December 31, 2014 (the "Report") fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2. Information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.
   IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed this 31st day of March 2015.


/s/ PAUL M. KEGLEVIC

Name:    Paul M. Keglevic

Title:    Executive Vice President, Chief Financial Officer and Co-Chief Restructuring Officer

A signed original of this written statement required by Section 906 has been provided to Energy Future Intermediate Holding Company LLC and will be retained by Energy Future Intermediate Holding Company LLC and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 99(c)

# ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC

# AN ENERGY FUTURE HOLDINGS CORP. ENTERPRISE

# CONSOLIDATED FINANCIAL STATEMENTS

# AS OF DECEMBER 31, 2014

# AND

# INDEPENDENT AUDITORS' REPORT

# GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

| | |
|---|---|
| **AMS** | advanced metering system |
| **Bondco** | Refers to Oncor Electric Delivery Transition Bond Company LLC, a wholly-owned consolidated bankruptcy-remote financing subsidiary of Oncor that has issued securitization (transition) bonds to recover certain regulatory assets and other costs. |
| **Deed of Trust** | Deed of Trust, Security Agreement and Fixture Filing, dated as of May 15, 2008, made by Oncor to and for the benefit of The Bank of New York Mellon Trust Company, N.A. (as successor to The Bank of New York Mellon, formerly The Bank of New York), as collateral agent, as amended |
| **EECRF** | energy efficiency cost recovery factor |
| **EFCH** | Refers to Energy Future Competitive Holdings Company LLC, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of TCEH, and/or its subsidiaries, depending on context. |
| **EFH Bankruptcy Proceedings** | Refers to voluntary petitions for relief under Chapter 11 of the US Bankruptcy Code filed in US Bankruptcy Court for the District of Delaware on April 29, 2014 (EFH Petition Date) by EFH Corp. and the substantial majority of its direct and indirect subsidiaries, including EFIH, EFCH and TCEH. The Oncor Ring-Fenced Entities are not parties to the EFH Bankruptcy Proceedings. |
| **EFH Corp.** | Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context. Its major subsidiaries include Oncor and TCEH. |
| **EFH OPEB Plan** | Refers to an EFH Corp. sponsored plan (in which Oncor participated prior to July 1, 2014) that offers certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from the company. |
| **EFH Petition Date** | April 29, 2014. See EFH Bankruptcy Proceedings above. |
| **EFH Retirement Plan** | Refers to the defined benefit pension plan sponsored by EFH Corp., in which Oncor participates. See Oncor Retirement Plan below. |
| **EFIH** | Refers to Energy Future Intermediate Holding Company LLC, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings. |
| **ERCOT** | Electric Reliability Council of Texas, Inc., the independent system operator and the regional coordinator of various electricity systems within Texas |
| **Fitch** | Fitch Ratings, Ltd. (a credit rating agency) |
| **GAAP** | generally accepted accounting principles |
| **Investment LLC** | Refers to Oncor Management Investment LLC, a limited liability company and minority membership interest owner (approximately 0.22%) of Oncor, whose managing member is Oncor and whose Class B Interests are owned by certain members of the management team and independent directors of Oncor. |
| **IRS** | US Internal Revenue Service |
| **LIBOR** | London Interbank Offered Rate, an interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market |
| **Luminant** | Refers to subsidiaries of TCEH engaged in competitive market activities consisting of electricity generation and wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas. |
| **Moody's** | Moody's Investors Services, Inc. (a credit rating agency) |
| **Oncor** | Refers to Oncor Electric Delivery Company LLC, a direct, majority-owned subsidiary of Oncor Holdings, and/or its wholly-owned consolidated bankruptcy-remote financing subsidiary, Bondco, depending on context. |
| **Oncor Holdings** | Refers to Oncor Electric Delivery Holdings Company LLC, a direct, wholly-owned subsidiary of EFIH and the direct majority owner (approximately 80.03%) of Oncor, and/or its subsidiaries, depending on context. |
| **Oncor OPEB Plan** | Refers to a plan sponsored by Oncor (effective July 1, 2014) that offers certain postretirement health care and life insurance benefits to eligible Oncor retirees, certain eligible EFH Corp. retirees, and their eligible dependents. |
| **Oncor Retirement Plan** | Refers to the defined benefit pension plan sponsored by Oncor (effective January 1, 2013). |
| **Oncor Ring-Fenced Entities** | Refers to Oncor Holdings and its direct and indirect subsidiaries, including Oncor. |

| | |
|---|---|
| **OPEB** | other postretirement employee benefits |
| **PUCT** | Public Utility Commission of Texas |
| **PURA** | Texas Public Utility Regulatory Act |
| **purchase accounting** | The purchase method of accounting for a business combination as prescribed by US GAAP, whereby the cost or "purchase price" of a business combination, including the amount paid for the equity and direct transaction costs, are allocated to identifiable assets and liabilities (including intangible assets) based upon their fair values. The excess of the purchase price over the fair values of assets and liabilities is recorded as goodwill. |
| **REP** | retail electric provider |
| **S&P** | Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc. (a credit rating agency) |
| **SARs** | Stock Appreciation Rights |
| **SARs Plan** | Refers to the Oncor Stock Appreciation Rights Plan. |
| **Sponsor Group** | Refers collectively to certain investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P. (KKR), TPG Global, LLC (together with its affiliates, TPG) and GS Capital Partners, an affiliate of Goldman, Sachs & Co., that have an ownership interest in Texas Holdings. |
| **TCEH** | Refers to Texas Competitive Electric Holdings Company LLC, a direct, wholly-owned subsidiary of EFCH and an indirect subsidiary of EFH Corp., and/or its subsidiaries, depending on context. Its major subsidiaries include Luminant and TXU Energy. |
| **TCRF** | transmission cost recovery factor |
| **Texas Holdings** | Refers to Texas Energy Future Holdings Limited Partnership, a limited partnership controlled by the Sponsor Group that owns substantially all of the common stock of EFH Corp. |
| **Texas Holdings Group** | Refers to Texas Holdings and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities. |
| **Texas margin tax** | A privilege tax imposed on taxable entities chartered/organized or doing business in the State of Texas that, for accounting purposes, is reported as an income tax. Also referred to as "Texas franchise tax" and/or "Texas gross margin tax." |
| **Texas Transmission** | Refers to Texas Transmission Investment LLC, a limited liability company that owns a 19.75% equity interest in Oncor. Texas Transmission is an entity indirectly owned by a private investment group led by OMERS Administration Corporation, acting through its infrastructure investment entity, Borealis Infrastructure Management Inc., and the Government of Singapore Investment Corporation, acting through its private equity and infrastructure arm, GIC Special Investments Pte Ltd. Texas Transmission is not affiliated with EFH Corp., any of EFH Corp.'s subsidiaries or any member of the Sponsor Group. |
| **TXU Energy** | Refers to TXU Energy Retail Company LLC, a direct, wholly-owned subsidiary of TCEH engaged in the retail sale of electricity to residential and business customers. TXU Energy is a REP in competitive areas of ERCOT. |
| **US** | United States of America |
| **VIE** | variable interest entity |

These consolidated financial statements occasionally make references to Oncor Holdings or Oncor when describing actions, rights or obligations of their respective subsidiaries. References to "we," "our," "us" and "the company" are to Oncor Holdings and/or its direct or indirect subsidiaries as apparent in the context. These references reflect the fact that the subsidiaries are consolidated with their respective parent companies for financial reporting purposes. However, these references should not be interpreted to imply that the parent company is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or that the subsidiary company is undertaking an action or has the rights or obligations of its parent company or any other affiliate.

**INDEPENDENT AUDITORS' REPORT**

To the Board of Directors and Member of
Oncor Electric Delivery Holdings Company LLC
Dallas, Texas

We have audited the accompanying consolidated financial statements of Oncor Electric Delivery Holdings Company LLC and its subsidiary (the "Company") which comprise the consolidated balance sheets as of December 31, 2014 and 2013, and the related statements of consolidated income, comprehensive income, membership interests, and cash flows for each of the three years in the period ended December 31, 2014, and the related notes to the consolidated financial statements.

**Management's Responsibility for the Consolidated Financial Statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditors' Responsibility**

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the Company's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Oncor Electric Delivery Holdings Company LLC and its subsidiary as of December 31, 2014 and 2013, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2014, in accordance with accounting principles generally accepted in the United States of America.

**Emphasis of Matter**

As discussed in Note 1 to the consolidated financial statements, the Company has implemented certain ring-fencing measures, which management believes mitigate the Company's potential exposure to the EFH Bankruptcy Proceedings. Our opinion is not modified with respect to this matter.

/s/ Deloitte & Touche LLP

Dallas, Texas
March 6, 2015

ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC
STATEMENTS OF CONSOLIDATED INCOME
(millions of dollars)

| | Year Ended December 31, | | |
| | 2014 | 2013 | 2012 |
|---|---|---|---|
| Operating revenues: | | | |
| Nonaffiliated | $ 2,851 | $ 2,585 | $ 2,366 |
| Affiliated | 971 | 967 | 962 |
| Total operating revenues | 3,822 | 3,552 | 3,328 |
| Operating expenses: | | | |
| Wholesale transmission service | 755 | 588 | 502 |
| Operation and maintenance | 698 | 681 | 669 |
| Depreciation and amortization | 851 | 814 | 771 |
| Income taxes (Notes 1, 4 and 13) | 280 | 247 | 240 |
| Taxes other than income taxes | 438 | 424 | 415 |
| Total operating expenses | 3,022 | 2,754 | 2,597 |
| Operating income | 800 | 798 | 731 |
| Other income and deductions: | | | |
| Other income (Note 14) | 13 | 18 | 26 |
| Other deductions (Note 14) | 15 | 15 | 64 |
| Nonoperating income taxes (Note 4) | 9 | 12 | 3 |
| Interest income | 3 | 4 | 24 |
| Interest expense and related charges (Note 14) | 353 | 371 | 374 |
| Net income | 439 | 422 | 340 |
| Net income attributable to noncontrolling interests | (90) | (87) | (70) |
| Net income attributable to Oncor Holdings | $ 349 | $ 335 | $ 270 |

See Notes to Financial Statements.

STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME
(millions of dollars)

| | Year Ended December 31, | | |
| | 2014 | 2013 | 2012 |
|---|---|---|---|
| Net income | $ 439 | $ 422 | $ 340 |
| Other comprehensive income (loss): | | | |
| Cash flow hedges — derivative value net loss recognized in net income (net of tax expense of $1, $1 and 1 ) (Note 1) | 2 | 2 | 3 |
| Defined benefit pension and OPEB plans (net of tax benefit of $33, $8 and $1) (Note 11) | (61) | (16) | (3) |
| Total other comprehensive loss | (59) | (14) | — |
| Comprehensive income | 380 | 408 | 340 |
| Comprehensive income attributable to noncontrolling interests | (78) | (84) | (70) |
| Comprehensive income attributable to Oncor Holdings | $ 302 | $ 324 | $ 270 |

See Notes to Financial Statements.

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**
**STATEMENTS OF CONSOLIDATED CASH FLOWS**
**(millions of dollars)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2014** | **2013** | **2012** |
| Cash flows — operating activities: | | | |
| Net income | $      439 | $      422 | $      340 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | |
| Depreciation and amortization | 892 | 848 | 802 |
| Deferred income taxes — net | 135 | 174 | 182 |
| Other — net | (3) | (4) | (4) |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable - trade (including affiliates) | 8 | (129) | 52 |
| Inventories | (9) | 9 | (3) |
| Accounts payable — trade (including affiliates) | 15 | 38 | (9) |
| Deferred revenues (Note 5) | (44) | (53) | (101) |
| Other — assets | (232) | 178 | (15) |
| Other — liabilities | 52 | (147) | (8) |
| Cash provided by operating activities | 1,253 | 1,336 | 1,236 |
| Cash flows — financing activities: | | | |
| Issuances of long-term debt (Note 7) | 250 | 100 | 900 |
| Repayments of long-term debt (Note 7) | (131) | (125) | (1,018) |
| Net (decrease) increase in short term borrowings (Note 6) | (34) | 10 | 343 |
| Distributions to parent (Note 8) | (202) | (213) | (147) |
| Distributions to noncontrolling interests | (56) | (62) | (45) |
| Decrease in note receivable from TCEH (Note 13) | — | — | 20 |
| Sale of related-party agreements (Note 13) | — | — | 159 |
| Debt discount, financing and reacquisition expenses — net | (5) | 1 | (46) |
| Other — net | (1) | — | (1) |
| Cash (used in) provided by financing activities | (179) | (289) | 165 |
| Cash flows — investing activities: | | | |
| Capital expenditures | (1,107) | (1,079) | (1,389) |
| Other — net | 10 | 15 | 21 |
| Cash used in investing activities | (1,097) | (1,064) | (1,368) |
| Net change in cash and cash equivalents | (23) | (17) | 33 |
| Cash and cash equivalents — beginning balance | 28 | 45 | 12 |
| Cash and cash equivalents — ending balance | $        5 | $       28 | $       45 |

See Notes to Financial Statements.

.

ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC
CONSOLIDATED BALANCE SHEETS
(millions of dollars)

| | At December 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $      5 | $      28 |
| Restricted cash — Bondco (Note 14) | 56 | 52 |
| Trade accounts receivable from nonaffiliates — net (Note 14) | 407 | 385 |
| Trade accounts and other receivables from affiliates (Note 13) | 118 | 135 |
| Income taxes receivable from EFH Corp. (Note 13) | 144 | 16 |
| Materials and supplies inventories — at average cost | 73 | 65 |
| Accumulated deferred income taxes (Note 4) | 10 | 32 |
| Prepayments and other current assets | 91 | 82 |
| Total current assets | 904 | 795 |
| Restricted cash — Bondco (Note 14) | 16 | 16 |
| Investments and other property (Note 14) | 97 | 91 |
| Property, plant and equipment — net (Note 14) | 12,463 | 11,902 |
| Goodwill (Notes 1 and 14) | 4,064 | 4,064 |
| Regulatory assets — net — Oncor (Note 5) | 1,321 | 1,098 |
| Regulatory assets — net — Bondco (Note 5) | 108 | 226 |
| Other noncurrent assets | 67 | 71 |
| Total assets | $ 19,040 | $ 18,263 |
| **LIABILITIES AND MEMBERSHIP INTERESTS** | | |
| Current liabilities: | | |
| Short-term borrowings (Note 6) | $    711 | $    745 |
| Long-term debt due currently — Oncor (Note 7) | 500 | — |
| Long-term debt due currently — Bondco (Note 7) | 139 | 131 |
| Trade accounts payable to nonaffiliates | 202 | 178 |
| Income taxes payable to EFH Corp. (Note 13) | 24 | 23 |
| Accrued taxes other than income taxes | 174 | 169 |
| Accrued interest | 93 | 95 |
| Other current liabilities | 156 | 135 |
| Total current liabilities | 1,999 | 1,476 |
| Long-term debt, less amounts due currently — Oncor (Note 7) | 4,956 | 5,202 |
| Long-term debt, less amounts due currently — Bondco (Note 7) | 41 | 179 |
| Accumulated deferred income taxes (Notes 1, 4 and 13) | 1,978 | 1,905 |
| Other noncurrent liabilities and deferred credits (Notes 13 and 14) | 2,245 | 1,822 |
| Total liabilities | 11,219 | 10,584 |
| Commitments and contingencies (Note 8) | | |
| Membership interests (Note 9): | | |
| Capital account | 6,136 | 5,989 |
| Accumulated other comprehensive loss, net of tax effects | (86) | (39) |
| Oncor Holdings membership interest | 6,050 | 5,950 |
| Noncontrolling interests in subsidiary | 1,771 | 1,729 |
| Total membership interests | 7,821 | 7,679 |
| Total liabilities and membership interests | $ 19,040 | $ 18,263 |

See Notes to Financial Statements.

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**
**STATEMENTS OF CONSOLIDATED MEMBERSHIP INTERESTS**
**(millions of dollars)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2014** | **2013** | **2012** |
| Capital account: | | | |
| Balance at beginning of period | $    5,989 | $    5,867 | $    5,745 |
| Net income attributable to Oncor Holdings | 349 | 335 | 270 |
| Distributions to parent | (202) | (213) | (147) |
| Sale of related-party agreements (net of tax benefit of $—, $— and $1) (Note 13) | — | — | (1) |
| Capital contributions (a) | — | — | — |
| Balance at end of period | 6,136 | 5,989 | 5,867 |
| Accumulated other comprehensive income (loss), net of tax effects: | | | |
| Balance at beginning of period | (39) | (25) | (25) |
| Net effects of cash flow hedges (net of tax expense of $1, $1 and $1) | 2 | 2 | 2 |
| Defined benefit pension and OPEB plans (net of tax benefit of $26, $9 and $1) | (49) | (16) | (2) |
| Balance at end of period | (86) | (39) | (25) |
| Oncor Holdings membership interest at end of period | 6,050 | 5,950 | 5,842 |
| Noncontrolling interests in subsidiary (Note 10): | | | |
| Balance at beginning of period | 1,729 | 1,645 | 1,564 |
| Net income attributable to noncontrolling interests | 90 | 87 | 70 |
| Distributions to noncontrolling interests | (56) | (62) | (45) |
| Change related to future tax distributions from Oncor | 20 | 63 | 56 |
| Net effects of cash flow hedges (net of tax expense of $—, $— and $—) | — | — | 1 |
| Defined benefit pension and OPEB plans (net of tax benefit of $7, $2 and $—) (Note 11) | (12) | (3) | (1) |
| Other | — | (1) | — |
| Noncontrolling interests in subsidiary at end of period | 1,771 | 1,729 | 1,645 |
| Total membership interests at end of period | $    7,821 | $    7,679 | $    7,487 |

_____
(a)  Reflects noncash settlement of certain income taxes payable arising as a result of the sale of noncontrolling interests in Oncor.

See Notes to Financial Statements.

.

ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**1.    DESCRIPTION OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES**

*Description of Business*

References in this report to "we," "our," "us" and "the company" are to Oncor Holdings and/or its direct or indirect subsidiaries as apparent in the context. The financial statements reflect almost entirely the operations of Oncor; consequently, there are no separate reportable business segments. See "Glossary" on page i for definition of terms and abbreviations.

We are a Dallas, Texas-based holding company whose financial statements reflect almost entirely the operations of our direct, majority (approximately 80%) owned subsidiary, Oncor. Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell power in the north-central, eastern and western parts of Texas. Revenues from TCEH represented 25%, 27% and 29% of total operating revenues for the years ended December 31, 2014, 2013 and 2012, respectively. We are a direct, wholly-owned subsidiary of EFIH, a direct, wholly-owned subsidiary of EFH Corp. EFH Corp. is a subsidiary of Texas Holdings, which is controlled by the Sponsor Group.

Our consolidated financial statements include our indirect, bankruptcy-remote financing subsidiary, Bondco, a VIE (see Note 14). This financing subsidiary was organized for the limited purpose of issuing certain transition bonds to recover generation-related regulatory asset stranded costs and other qualified costs under an order issued by the PUCT in 2002. Bondco issued an aggregate $1.3 billion principal amount of transition bonds during 2003 and 2004. At December 31, 2014, $180 million principal amount of transition bonds (maturing in 2015 and 2016) was outstanding (see Note 7).

Various "ring-fencing" measures have been taken to enhance the separateness between the Oncor Ring-Fenced Entities and the Texas Holdings Group and our credit quality. These measures serve to mitigate our and Oncor's credit exposure to the Texas Holdings Group and to reduce the risk that our assets and liabilities or those of Oncor would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in connection with a bankruptcy of one or more of those entities, including the EFH Bankruptcy Proceedings discussed below. Such measures include, among other things: Oncor's sale of a 19.75% equity interest to Texas Transmission in November 2008; maintenance of separate books and records for the Oncor Ring-Fenced Entities; our board of directors and Oncor's board of directors being comprised of a majority of independent directors; and prohibitions on the Oncor Ring-Fenced Entities providing credit support to, or receiving credit support from, any member of the Texas Holdings Group. The assets and liabilities of the Oncor Ring-Fenced Entities are separate and distinct from those of the Texas Holdings Group, including TXU Energy and Luminant, and none of the assets of the Oncor Ring-Fenced Entities are available to satisfy the debt or contractual obligations of any member of the Texas Holdings Group. We and Oncor do not bear any liability for debt or contractual obligations of the Texas Holdings Group, and vice versa. Accordingly, our operations are conducted, and our cash flows are managed, independently from the Texas Holdings Group.

*EFH Bankruptcy Proceedings*

On the EFH Petition Date, EFH Corp. and the substantial majority of its direct and indirect subsidiaries that are members of the Texas Holdings Group, including EFIH, EFCH and TCEH, commenced proceedings under Chapter 11 of the US Bankruptcy Code. The Oncor Ring-Fenced Entities are not parties to the EFH Bankruptcy Proceedings. We believe the "ring-fencing" measures discussed above mitigate our and Oncor's exposure to the EFH Bankruptcy Proceedings. See Note 2 for a discussion of the potential impacts of the EFH Bankruptcy Proceedings on our financial statements.

*Basis of Presentation*

Our consolidated financial statements have been prepared in accordance with US GAAP and on the same basis as our audited financial statements for the year ended December 31, 2013 included in EFH Corp.'s Annual Report on Form 10-K for the year ended December 31, 2013 filed on April 30, 2014 (Commission File No. 1-12833). All intercompany items and transactions have been eliminated in consolidation. All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated. Subsequent events have been evaluated through March 6, 2015, the date these consolidated financial statements were available to be issued.

*Consolidation of Variable Interest Entities*

A VIE is an entity with which we have a relationship or arrangement that indicates some level of control over the entity or results in economic risks to us. We consolidate a VIE if we have: a) the power to direct the significant activities of the VIE and b) the right or obligation to absorb profit and loss from the VIE (primary beneficiary). See Note 14.

*Income Taxes*

Effective with the November 2008 sale of equity interests in Oncor, Oncor became a partnership for US federal income tax purposes, and subsequently only EFH Corp.'s share of partnership income is included in its consolidated federal income tax return. Our tax sharing agreement with Oncor and EFH Corp. was amended in November 2008 to include Texas Transmission and Investment LLC. The tax sharing agreement provides for the calculation of tax liability substantially as if we and Oncor file our own income tax returns, and requires tax payments to members determined on that basis (without duplication for any income taxes paid by our subsidiaries). Deferred income taxes are provided for temporary differences between our book and tax bases of assets and liabilities.

Amounts of deferred income tax assets and liabilities, as well as current and noncurrent accruals, are determined in accordance with the provisions of accounting guidance for income taxes and for uncertainty in income taxes. The accounting guidance for rate-regulated enterprises requires the recognition of regulatory assets or liabilities if it is probable such deferred tax amounts will be recovered from, or returned to customers in future rates. Investment tax credits are amortized to income over the estimated lives of the related properties.

We classify interest and penalties expense related to uncertain tax positions as current accumulated deferred income taxes as discussed in Note 4.

*Use of Estimates*

Preparation of our financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including fair value measurements. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information. No material adjustments were made to previous estimates or assumptions during the current year.

*Derivative Instruments and Mark-to-Market Accounting*

Oncor has from time-to-time entered into derivative instruments to hedge interest rate risk. If the instrument meets the definition of a derivative under accounting standards related to derivative instruments and hedging activities, the fair value of each derivative is required to be recognized on the balance sheet as a derivative asset or liability and changes in the fair value are recognized in net income, unless criteria for certain exceptions are met. This recognition is referred to as "mark-to-market" accounting.

*Reconcilable Tariffs*

The PUCT has designated certain tariffs (TCRF, EECRF surcharges, AMS surcharges and charges related to transition bonds) as reconcilable, which means the differences between amounts billed under these tariffs and the related incurred costs are deferred as either regulatory assets or regulatory liabilities. Accordingly, at prescribed intervals, future tariffs are adjusted to either repay regulatory liabilities or collect regulatory assets.

*Revenue Recognition*

Revenue includes an estimate for electricity delivery services provided from the billed meter reading date to the end of the period (unbilled revenue). For electricity delivery services billed on the basis of kWh volumes, unbilled revenue is based on data collected through Oncor's AMS. For other electricity delivery services, unbilled revenue is based on average daily revenues for the most recent period applied to the number of unmetered days through the end of the period.

### Impairment of Long-Lived Assets and Goodwill

We evaluate long-lived assets (including intangible assets with finite lives) for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.

We also evaluate goodwill for impairment annually (at December 1) and whenever events or changes in circumstances indicate that an impairment may exist. The determination of the existence of these and other indications of impairment involves judgments that are subjective in nature and may require the use of estimates in forecasting future results and cash flows.

If at the assessment date our carrying value exceeds our estimated fair value (enterprise value), then the estimated enterprise value is compared to the estimated fair values of our operating assets (including identifiable intangible assets) and liabilities at the assessment date. The resultant implied goodwill amount is compared to the recorded goodwill amount. Any excess of the recorded goodwill amount over the implied goodwill amount is written off as an impairment charge.

The goodwill impairment test performed in 2014 was based on a qualitative assessment in which we considered macroeconomic conditions, industry and market considerations, cost factors, overall financial performance and other relative factors. Goodwill impairment tests performed in 2013 and 2012 were based on determinations of enterprise value using discounted cash flow analyses, comparable company equity values and any relevant transactions indicative of enterprise values (quantitative assessment). Based on tests results, no impairments were recognized in 2014, 2013 or 2012.

### System of Accounts

Our accounting records have been maintained in accordance with the US Federal Energy Regulatory Commission Uniform System of Accounts as adopted by the PUCT.

### Defined Benefit Pension Plans and OPEB Plans

Oncor has liabilities under pension plans that offer benefits based on either a traditional defined benefit formula or a cash balance formula and an OPEB plan that offers certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from the company. Costs of pension and OPEB plans are dependent upon numerous factors, assumptions and estimates. In 2012, EFH Corp. made various changes to the EFH Retirement Plan, including splitting off into a new plan all of the assets and liabilities associated with Oncor employees and all retirees and terminated vested participants of EFH Corp. and its subsidiaries (including discontinued businesses). See Note 11 for additional information regarding pension and OPEB plans.

### Contingencies

We evaluate and account for contingencies using the best information available. A loss contingency is accrued and disclosed when it is probable that an asset has been impaired or a liability incurred and the amount of the loss can be reasonably estimated. If a range of probable loss is established, the minimum amount in the range is accrued, unless some other amount within the range appears to be a better estimate. If the probable loss cannot be reasonably estimated, no accrual is recorded, but the loss contingency is disclosed to the effect that the probable loss cannot be reasonably estimated. A loss contingency will be disclosed when it is reasonably possible that an asset has been impaired or a liability incurred. If the likelihood that an impairment or incurrence is remote, the contingency is neither accrued nor disclosed. Gain contingencies are recognized upon realization.

### Fair Value of Nonderivative Financial Instruments

The carrying amounts for financial assets classified as current assets and the carrying amounts for financial liabilities classified as current liabilities approximate fair value due to the short maturity of such instruments. The fair values of other financial instruments, for which carrying amounts and fair values have not been presented, are not materially different than their related carrying amounts. The following discussion of fair value accounting standards applies primarily to our determination of the fair value of assets in the pension and OPEB plans trusts (see Note 11) and long-term debt (see Note 7).

Accounting standards related to the determination of fair value define fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. We use a "mid-market" valuation convention (the mid-point price between bid and ask prices) as a practical expedient to measure fair value for the majority of our assets and liabilities subject to fair value measurement on a recurring basis. We primarily use the market approach for recurring fair value measurements and use valuation techniques to maximize the use of observable inputs and minimize the use of unobservable inputs.

We categorize our assets and liabilities recorded at fair value based upon the following fair value hierarchy:

- Level 1 valuations use quoted prices in active markets for identical assets or liabilities that are accessible at the measurement date. An active market is a market in which transactions for the asset or liability occur with sufficient frequency and volume to provide pricing information on an ongoing basis.

- Level 2 valuations use inputs that, in the absence of actively quoted market prices, are observable for the asset or liability, either directly or indirectly. Level 2 inputs include: (a) quoted prices for similar assets or liabilities in active markets, (b) quoted prices for identical or similar assets or liabilities in markets that are not active, (c) inputs other than quoted prices that are observable for the asset or liability such as interest rates and yield curves observable at commonly quoted intervals and (d) inputs that are derived principally from or corroborated by observable market data by correlation or other means. Our Level 2 valuations utilize over-the-counter broker quotes, quoted prices for similar assets or liabilities that are corroborated by correlations or other mathematical means and other valuation inputs.

- Level 3 valuations use unobservable inputs for the asset or liability. Unobservable inputs are used to the extent observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the measurement date. We use the most meaningful information available from the market combined with internally developed valuation methodologies to develop our best estimate of fair value.

We utilize several different valuation techniques to measure the fair value of assets and liabilities, relying primarily on the market approach of using prices and other market information for identical and/or comparable assets and liabilities for those items that are measured on a recurring basis.

*Franchise Taxes*

Franchise taxes are assessed to Oncor by local governmental bodies, based on kilowatt-hours delivered and are the principal component of "taxes other than income taxes" as reported in the income statement. Franchise taxes are not a "pass through" item. Rates charged to customers by Oncor are intended to recover the franchise taxes, but Oncor is not acting as an agent to collect the taxes from customers.

*Cash and Cash Equivalents*

For purposes of reporting cash and cash equivalents, temporary cash investments purchased with a remaining maturity of three months or less are considered to be cash equivalents. See Note 14 for details regarding restricted cash.

*Property, Plant and Equipment*

Properties are stated at original cost. The cost of self-constructed property additions includes materials and both direct and indirect labor and applicable overhead and an allowance for funds used during construction.

Depreciation of property, plant and equipment is calculated on a straight-line basis over the estimated service lives of the properties based on depreciation rates approved by the PUCT. As is common in the industry, depreciation expense is recorded using composite depreciation rates that reflect blended estimates of the lives of major asset groups as compared to depreciation expense calculated on a component asset-by-asset basis. Depreciation rates include plant removal costs as a component of depreciation expense, consistent with regulatory treatment. Actual removal costs incurred are charged to accumulated depreciation. When accrued removal costs exceed incurred removal costs, the difference is reclassified as a regulatory obligation to retire assets in the future.

*Allowance for Funds Used During Construction (AFUDC)*

AFUDC is a regulatory cost accounting procedure whereby both interest charges on borrowed funds and a return on equity capital used to finance construction are included in the recorded cost of utility plant and equipment being constructed. AFUDC is capitalized on all projects involving construction periods lasting greater than thirty days. The equity portion of capitalized AFUDC is accounted for as other income. Oncor recorded no equity AFUDC in the years ended December 31, 2014 and 2013 and $1 million in the year ended December 31, 2012. See Note 14 for detail of amounts charged to interest expense.

*Regulatory Assets and Liabilities*

Our financial statements reflect regulatory assets and liabilities under cost-based rate regulation in accordance with accounting standards related to the effect of certain types of regulation. Regulatory decisions can have an impact on the recovery of costs, the rate earned on invested capital and the timing and amount of assets to be recovered by rates. See Note 5 for details of regulatory assets and liabilities.

*Changes in Accounting Standards*

In May 2014, the Financial Accounting Standards Board issued Accounting Standards Update No. 2014-09 (ASU 2014-09), *Revenue from Contracts with Customers*. ASU 2014-09 introduces new, increased requirements for disclosure of revenue in financial statements and is intended to eliminate inconsistencies in revenue recognition and thereby improve financial reporting comparability across entities, industries and capital markets. ASU 2014-09 is effective for annual reporting periods (including interim reporting periods within those periods) beginning after December 15, 2016 for public entities. Early application is not permitted. We are currently evaluating the potential impact of ASU 2014-09. The adoption of ASU 2014-09 is not expected to have a material effect on our reported results of operations, financial condition or cash flows.

2.    **EFH BANKRUPTCY PROCEEDINGS**

On the EFH Petition Date, EFH Corp. and the substantial majority of its direct and indirect subsidiaries that are members of the Texas Holdings Group, including EFIH, EFCH and TCEH, commenced proceedings under Chapter 11 of the US Bankruptcy Code. The Oncor Ring-Fenced Entities are not parties to the EFH Bankruptcy Proceedings. We believe the "ring-fencing" measures discussed above mitigate our and Oncor's exposure to the EFH Bankruptcy Proceedings. See Note 1 and below for further information regarding the EFH Bankruptcy Proceedings and the proposed change in control of Oncor's indirect majority owner in connection with such proceedings.

The US Bankruptcy Code automatically enjoined, or stayed, Oncor from judicial or administrative proceedings or filing of other actions against Oncor's affiliates or their property to recover, collect or secure Oncor's claims arising prior to the EFH Petition Date. Following the EFH Petition Date, EFH Corp. received approval from the bankruptcy court to pay or otherwise honor certain prepetition obligations generally designed to stabilize its operations. Included in the approval were the obligations owed to Oncor representing its prepetition electricity delivery fees. As of the EFH Petition Date, Oncor estimated that its receivables from the Texas Holdings Group totaled approximately $129 million. Since that time, Oncor has collected $127 million of the prepetition amount. Oncor estimates any potential pre-tax loss resulting from the EFH Bankruptcy Proceedings to be immaterial. As such, a provision for uncollectible accounts from affiliates had not been established as of December 31, 2014.

*Proposed Change in Control of Majority Owner*

In September 2014, with input and support from several key EFH Corp. stakeholders, the debtors in the EFH Bankruptcy Proceedings filed a motion with the bankruptcy court seeking the entry of an order approving bidding procedures that would result in a change in control of Oncor's indirect majority owner. During October 2014, the bankruptcy court held hearings regarding the motion. In November 2014, the bankruptcy court conditionally approved the motion. In January 2015, the bankruptcy court approved the debtors' bidding procedures motion that sets forth the process by which the debtors are authorized to solicit proposals (i.e., bids) from third parties to acquire (in any form and employing any structure, whether taxable (in whole or in part) or tax-free) an indirect equity ownership interest in Oncor in accordance with the Bankruptcy Code. These bidding procedures contemplate that the debtors select a stalking horse bid after a two-stage closed bidding process, and, after approval by the bankruptcy court of such stalking horse bid, the debtors conduct a round of open bidding culminating in an auction intended to obtain a higher or otherwise best bid for a transaction. Initial bids are due no later than March 2, 2015. We cannot predict the outcome of this process, including whether the debtors will receive any acceptable bid or whether the bankruptcy court will approve any such bid or whether any such transaction will (or when it will) ultimately close because any such transaction would be the subject of customary closing conditions, including receipt of all applicable regulatory approvals.

The EFH Bankruptcy Proceedings are a complex litigation matter and the full extent of potential exposure at this time is unknown. Bankruptcy courts have broad equitable powers, and as a result, outcomes in bankruptcy proceedings are inherently difficult to predict. We will continue to evaluate our affiliate transactions and contingencies throughout the EFH Bankruptcy Proceedings to determine any risks and resulting impacts on our and Oncor's financial statements. EFH Corp. has been exploring various options regarding potential transactions that could be deemed to implicate a regulatory review. Oncor has made some preliminary preparations for potential change in control filings, including discussions with EFH Corp. and others, in light of the proposals in the EFH Bankruptcy Proceedings, but cannot predict the result of any transaction or review.

See Note 13 for details of Oncor's related-party transactions with members of the Texas Holdings Group.

## 3.    REGULATORY MATTERS

### *2008 Rate Review*

In August 2009, the PUCT issued a final order with respect to Oncor's June 2008 rate review filing with the PUCT and 204 cities based on a test year ended December 31, 2007 (Docket 35717), and new rates were implemented in September 2009. Oncor and four other parties appealed various portions of the rate review final order to a state district court. In January 2011, the district court signed its judgment reversing the PUCT with respect to two issues: the PUCT's disallowance of certain franchise fees and the PUCT's decision that PURA no longer requires imposition of a rate discount for state colleges and universities. Oncor filed an appeal with the Texas Third Court of Appeals (Austin Court of Appeals) in February 2011 with respect to the issues it appealed to the district court and did not prevail upon, as well as the district court's decision to reverse the PUCT with respect to discounts for state colleges and universities. In early August 2014, the Austin Court of Appeals reversed the district court and affirmed the PUCT with respect to the PUCT's disallowance of certain franchise fees and the PUCT's decision that PURA no longer requires imposition of a rate discount for state colleges and universities. The Austin Court of Appeals also reversed the PUCT and district court's rejection of a proposed consolidated tax savings adjustment arising out of EFH Corp.'s ability to offset Oncor's taxable income against losses from other investments and remanded the issue to the PUCT to determine the amount of the consolidated tax savings adjustment. In late August 2014, Oncor filed a motion on rehearing with the Austin Court of Appeals with respect to certain appeal issues on which it was were not successful, including the consolidated tax savings adjustment. In December 2014, the Austin Court of Appeals issued its Opinion on Rehearing, clarifying that it was rendering judgment on the rate discount for state colleges and universities issue (affirming that PURA no longer requires imposition of the rate discount) rather than remanding it to the PUCT, and dismissing the motions for rehearing regarding the franchise fee issue and the consolidated tax savings adjustment. Oncor filed a petition for review with the Texas Supreme Court on February 19, 2015. If Oncor's appeals efforts are unsuccessful and the proposed consolidated tax savings adjustment is implemented, Oncor estimates that on remand, the impact on earnings of the consolidated tax savings adjustment's value could range from zero, as originally determined by the PUCT in Docket 35717, to a $130 million loss (after tax). Oncor does not believe that any of the other issues ruled upon by the Austin Court of Appeals would result in a material impact to its results of operations or financial condition.

Oncor is involved in various other regulatory proceedings in the normal course of business, the ultimate resolution of which, in the opinion of management, should not have a material effect upon our financial position, results of operations or cash flows.

## 4. INCOME TAXES

The components of our income tax expense (benefit) are as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2013 | 2012 |
| Reported in operating expenses: | | | |
| Current: | | | |
| US federal | $ 113 | $ 51 | $ 23 |
| State | 24 | 12 | 21 |
| Deferred: | | | |
| US federal | 146 | 181 | 200 |
| State | — | 6 | — |
| Amortization of investment tax credits | (3) | (3) | (4) |
| Total reported in operating expense | 280 | 247 | 240 |
| Reported in other income and deductions: | | | |
| Current: | | | |
| US federal | 21 | 26 | 21 |
| State | — | — | — |
| Deferred federal | (12) | (14) | (18) |
| Total reported in other income and deductions | 9 | 12 | 3 |
| Total income tax expense | $ 289 | $ 259 | $ 243 |

Reconciliation of income taxes computed at the US federal statutory rate to income taxes:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2013 | 2012 |
| Income before income taxes | $ 728 | $ 681 | $ 583 |
| Income taxes at the US federal statutory rate of 35% | $ 255 | $ 238 | $ 204 |
| Amortization of investment tax credits — net of deferred tax effect | (3) | (3) | (4) |
| Amortization (under regulatory accounting) of statutory tax rate changes | (2) | (2) | (3) |
| Amortization of Medicare subsidy regulatory asset | 14 | 14 | 14 |
| Texas margin tax, net of federal tax benefit | 16 | 15 | 14 |
| Nondeductible losses (gains) on benefit plan investments | (2) | (3) | (2) |
| Other, including audit settlements | 11 | — | 20 |
| Income tax expense | $ 289 | $ 259 | $ 243 |
| Effective rate | 39.7% | 38.0% | 41.7% |

At December 31, 2014 and 2013, net amounts of $1.968 billion and $1.873 billion, respectively, were reported in the balance sheets as accumulated deferred income taxes. These amounts include $2.005 billion and $1.896 billion, respectively, related to our investment in the Oncor partnership.

*Accounting For Uncertainty in Income Taxes*

EFH Corp. and its subsidiaries file or have filed income tax returns in US federal, state and foreign jurisdictions and are subject to examinations by the IRS and other taxing authorities. The examination process of EFH Corp. and its subsidiaries' federal income tax returns for the years ending prior to January 1, 2008 are complete, but the tax years 2003 through 2006 remain in appeals with the IRS. Texas franchise and margin tax returns are under examination or still open for examination for tax years beginning after 2006.

Oncor has been advised by EFH Corp. that approval by the Joint Committee on Taxation for the 1997 through 2002 IRS appeals settlement was received in May 2013 and that all issues contested have been resolved. As a result, the liability for uncertain tax positions was reduced by $32 million in the second quarter of 2013. This resolution also resulted in a $10 million net reduction to accumulated deferred income taxes and a reversal of accrued interest and tax totaling $5 million ($3 million after tax), which is reported as a decrease in income taxes. Oncor made a cash payment of $33 million to EFH Corp. in the third quarter of 2013, as required under the tax sharing agreement, to settle the liability resulting from the 1997 through 2002 IRS audit, and received a $10 million refund from EFH Corp. as a result of filing amended Texas franchise tax returns for 1997 through 2001.

The IRS audit for the years 2003 through 2006 was concluded in June 2011. A significant number of adjustments to the originally filed returns for such years were proposed. In March 2013, EFH Corp. and the IRS agreed on terms to resolve the disputed adjustments. In the first quarter of 2013, the liability for uncertain tax positions was reduced by $76 million to reflect the terms of the agreement. This reduction consisted of a $58 million increase to accumulated deferred income taxes and a reversal of accrued interest and tax totaling $18 million ($12 million after tax), which is reported as a decrease in income taxes. In the fourth quarter of 2013, the 2003 through 2006 state tax positions were remeasured, which resulted in a net reversal of accrued interest and tax totaling $3 million. The cash income tax impact related to the conclusion of the 2003 through 2006 audit is a refund from our members of approximately $9 million that is recorded in accumulated deferred income taxes.

In the first quarter of 2014, several uncertain tax positions were remeasured under US GAAP guidance as a result of new information received from the IRS with respect to the audit of tax years 2007 through 2009. As a result, the liability for uncertain tax positions was reduced by $18 million. This reduction consisted of a $16 million increase in accumulated deferred income tax liability and a $2 million ($1 million after tax) reversal of accrued interest, which is reported as a decrease in income taxes. In September 2014, EFH Corp. signed the final agreed Revenue Agent Report and associated documentation (RAR) for the 2007 tax year and filed a motion seeking approval of the bankruptcy court in the EFH Bankruptcy Proceedings of its signing of the RAR. With the signing of the RAR in the third quarter of 2014, the remaining $1 million liability for uncertain tax positions with respect to tax year 2007 was released. The reduction consisted of a $1 million reversal of income taxes. Final processing of the agreed RAR continues. The cash income tax impact related to the conclusion of the 2007 audit is expected to be a refund of approximately $44 million that is recorded in accumulated deferred income taxes.

In the fourth quarter of 2014, the Department of Justice filed a claim with the bankruptcy court for open tax years through 2013 that was consistent with the settlement EFH Corp. reached with the IRS for tax years 2003 through 2006. As a result of this filing, the 2003 through 2006 open tax years for GAAP purposes were settled and the liability for uncertain tax positions was reduced by $35 million. This reduction consisted of a $33 million increase in accumulated deferred income tax liability and a $2 million reduction in income taxes.

The following table summarizes the changes to the uncertain tax positions, reported in other noncurrent liabilities in our consolidated balance sheet, during the years ended December 31, 2014, 2013 and 2012:

| | 2014 | 2013 | 2012 |
|---|---|---|---|
| Balance at January 1, excluding interest and penalties | $ 54 | $ 144 | $ 126 |
| Additions based on tax positions related to prior years | — | — | 18 |
| Reductions based on tax positions related to prior years | (16) | (66) | — |
| Settlements with taxing authorities | (36) | (24) | — |
| Balance at December 31, excluding interest and penalties | $ 2 | $ 54 | $ 144 |

Of the balances at December 31, 2014 and 2013, $3 million and $51 million, respectively, represent tax positions for which the uncertainty relates to the timing of recognition for tax purposes. The disallowance of such positions would not affect the effective tax rate, but would accelerate the payment of cash under the tax sharing agreement to an earlier period. With respect to tax positions for which the ultimate deductibility is uncertain (permanent items), should EFH Corp. or we sustain such positions on income tax returns previously filed, our liabilities recorded would increase by $1 million resulting in decreased net income and an unfavorable impact on the effective tax rate.

Noncurrent liabilities included no accrued interest related to uncertain tax positions at December 31, 2014 and a total of $2 million in accrued interest related to uncertain tax positions at December 31, 2013. Amounts recorded related to interest and penalties totaled benefits of $1 million and $15 million in the years ended December 31, 2014 and 2013, respectively, and an expense of $3 million in the year ended December 31, 2012 (all amounts after tax). The federal income tax benefit on the interest accrued on uncertain tax positions is recorded as accumulated deferred income taxes.

## 5.    REGULATORY ASSETS AND LIABILITIES

Recognition of regulatory assets and liabilities and the amortization periods over which they are expected to be recovered or refunded through rate regulation reflect the decisions of the PUCT. Components of the regulatory assets and liabilities are provided in the table below.

| | Remaining Rate Recovery/Amortization Period at December 31, 2014 | Carrying Amount At | |
| --- | --- | --- | --- |
| | | December 31, 2014 | December 31, 2013 |
| Regulatory assets: | | | |
| Generation-related regulatory assets securitized by transition bonds (a)(e) | 1 year | $          148 | $          281 |
| Employee retirement costs | 5 years | 55 | 71 |
| Employee retirement costs to be reviewed (b)(c) | To be determined | 246 | 224 |
| Employee retirement liability (a)(c)(d) | To be determined | 865 | 491 |
| Self-insurance reserve (primarily storm recovery costs) — net | 5 years | 127 | 158 |
| Self-insurance reserve to be reviewed — net (b)(c) | To be determined | 242 | 196 |
| Securities reacquisition costs (pre-industry restructure) | 2 years | 23 | 32 |
| Securities reacquisition costs (post-industry restructure) — net | Lives of related debt | 7 | 5 |
| Recoverable amounts in lieu of deferred income taxes — net | Life of related asset or liability | 14 | 42 |
| Deferred conventional meter and metering facilities depreciation | Largely 6 years | 123 | 146 |
| Deferred AMS costs | To be determined | 113 | 62 |
| Energy efficiency performance bonus (a) | 1 year | 22 | 12 |
| Under-recovered wholesale transmission service expense (a)(c) | 1 year | 26 | 37 |
| Other regulatory assets | Various | 12 | 14 |
| Total regulatory assets | | 2,023 | 1,771 |
| Regulatory liabilities: | | | |
| Estimated net removal costs | Lives of related assets | 531 | 385 |
| Investment tax credit and protected excess deferred taxes | Various | 18 | 23 |
| Over-collection of transition bond revenues (a)(e) | 1 year | 32 | 35 |
| Energy efficiency programs (a) | Not applicable | 13 | 4 |
| Total regulatory liabilities | | 594 | 447 |
| Net regulatory asset | | $        1,429 | $        1,324 |

_____
(a)   Not earning a return in the regulatory rate-setting process.
(b)   Costs incurred since the period covered under the last rate review.
(c)   Recovery is specifically authorized by statute or by the PUCT, subject to reasonableness review.
(d)   Represents unfunded liabilities recorded in accordance with pension and OPEB accounting standards.

(e)  Bondco net regulatory assets of $108 million at December 31, 2014 consisted of $140 million included in generation-related regulatory assets net of the regulatory liability for over-collection of transition bond revenues of $32 million. Bondco net regulatory assets of $226 million at December 31, 2013 consisted of $261 million included in generation-related regulatory assets net of the regulatory liability for over-collection of transition bond revenues of $35 million.

In August 2011, the PUCT issued a final order in Oncor's rate review filed in January 2011. The rate review included a determination of the recoverability of regulatory assets at June 30, 2010, including the recoverability period of those assets deemed allowable by the PUCT.

In accordance with the PUCT's August 2009 order in Oncor's rate review, the remaining net book value and the approved amount of removal cost of existing conventional meters that were replaced by advanced meters are being charged to depreciation and amortization expense over an 11-year cost recovery period.

In September 2008, the PUCT approved a settlement for Oncor to recover its estimated future investment for advanced metering deployment. Oncor began billing the AMS surcharge in the January 2009 billing month cycle. The surcharge is expected to total $1.023 billion over the 11-year recovery period and includes a cost recovery factor of $2.19 per month per residential retail customer and $2.39 to $5.15 per month for non-residential retail customers. Oncor accounts for the difference between the surcharge billings for advanced metering facilities and the allowable revenues under the surcharge provisions, which are based on expenditures and an allowed return, as a regulatory asset or liability. Such differences arise principally as a result of timing of expenditures. As indicated in the table above, the regulatory asset at December 31, 2014 and 2013 totaled $113 million and $62 million, respectively.

As a result of purchase accounting, in 2007 the carrying value of certain generation-related regulatory assets securitized by transition bonds, which have been reviewed and approved by the PUCT for recovery but without earning a rate of return, was reduced by $213 million. This amount is being accreted to other income over the recovery period that was remaining at October 10, 2007 (approximately nine years).

See Note 13 for additional information regarding nuclear decommissioning cost recovery.

## 6.   BORROWINGS UNDER CREDIT FACILITIES

At December 31, 2014, Oncor had a $2.4 billion secured revolving credit facility to be used for working capital and general corporate purposes, issuances of letters of credit and support for any commercial paper issuances. The revolving credit facility expires in October 2016, and Oncor has the option of requesting up to two one-year extensions, with such extensions subject to certain conditions and lender approval. The terms of the revolving credit facility allow Oncor to request an additional increase in its borrowing capacity of $100 million, provided certain conditions are met, including lender approval.

Borrowings under the revolving credit facility are classified as short-term on the balance sheet and are secured equally and ratably with all of Oncor's other secured indebtedness by a first priority lien on property acquired or constructed for the transmission and distribution of electricity. The property is mortgaged under the Deed of Trust.

At December 31, 2014, Oncor had outstanding borrowings under the revolving credit facility totaling $711 million with an interest rate of 1.29% and outstanding letters of credit totaling $7 million. At December 31, 2013, Oncor had outstanding borrowings under the revolving credit facility totaling $745 million with an interest rate of 1.67% and outstanding letters of credit totaling $6 million.

Borrowings under the revolving credit facility bear interest at per annum rates equal to, at Oncor's option, (i) LIBOR plus a spread ranging from 1.00% to 1.75% depending on credit ratings assigned to Oncor's senior secured non-credit enhanced long-term debt or (ii) an alternate base rate (the highest of (1) the prime rate of JPMorgan Chase, (2) the federal funds effective rate plus 0.50%, and (3) daily one-month LIBOR plus 1.00%) plus a spread ranging from 0.00% to 0.75% depending on credit ratings assigned to Oncor's senior secured non-credit enhanced long-term debt. At December 31, 2013, all outstanding borrowings bore interest at LIBOR plus 1.125%. Amounts borrowed under the facility, once repaid, can be borrowed again from time to time.

An unused commitment fee is payable quarterly in arrears and upon termination or commitment reduction at a rate equal to 0.100% to 0.275% (such spread depending on certain credit ratings assigned to Oncor's senior secured debt) of the daily unused commitments under the revolving credit facility. Letter of credit fees on the stated amount of letters of credit issued under the revolving credit facility are payable to the lenders quarterly in arrears and upon termination at a rate per annum equal to the spread over adjusted LIBOR. Customary fronting and administrative fees are also payable to letter of credit fronting banks. At December 31, 2014, letters of credit bore interest at 1.325%, and a commitment fee (at a rate of 0.125% per annum) was payable on the unfunded commitments under the facility, each based on Oncor's current credit ratings.

Subject to the limitations described below, borrowing capacity available under the credit facility at December 31, 2014 and 2013 was $1.682 billion and $1.649 billion, respectively. Generally, Oncor's indentures and revolving credit facility limit the incurrence of other secured indebtedness except for indebtedness secured equally and ratably with the indentures and revolving credit facility and certain permitted exceptions. As described further in Note 7, the Deed of Trust permits Oncor to secure indebtedness (including borrowings under its revolving credit facility) with the lien of the Deed of Trust. At December 31, 2014, the available borrowing capacity of the revolving credit facility could be fully drawn.

The revolving credit facility contains customary covenants for facilities of this type, restricting, subject to certain exceptions, Oncor and its subsidiaries from, among other things: incurring additional liens; entering into mergers and consolidations; and sales of substantial assets. In addition, the revolving credit facility requires that Oncor maintain a consolidated senior debt-to-capitalization ratio of no greater than 0.65 to 1.00 and observe certain customary reporting requirements and other affirmative covenants. For purposes of the ratio, debt is calculated as indebtedness defined in the revolving credit facility (principally, the sum of long-term debt, any capital leases, short-term debt and debt due currently in accordance with US GAAP). The debt calculation excludes transition bonds issued by Bondco, but includes the unamortized fair value discount related to Bondco. Capitalization is calculated as membership interests determined in accordance with US GAAP plus indebtedness described above. At December 31, 2014, Oncor was in compliance with this covenant with a debt-to-capitalization ratio of 0.45 to 1.00 and with all other covenants.

7.    **LONG-TERM DEBT**

At December 31, 2014 and 2013, our long-term debt consisted of the following:

| | December 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| Oncor (a): | | |
| 6.375% Fixed Senior Notes due January 15, 2015 | $ 500 | $ 500 |
| 5.000% Fixed Senior Notes due September 30, 2017 | 324 | 324 |
| 6.800% Fixed Senior Notes due September 1, 2018 | 550 | 550 |
| 2.150% Fixed Senior Notes due June 1, 2019 | 250 | — |
| 5.750% Fixed Senior Notes due September 30, 2020 | 126 | 126 |
| 4.100% Fixed Senior Notes due June 1, 2022 | 400 | 400 |
| 7.000% Fixed Debentures due September 1, 2022 | 800 | 800 |
| 7.000% Fixed Senior Notes due May 1, 2032 | 500 | 500 |
| 7.250% Fixed Senior Notes due January 15, 2033 | 350 | 350 |
| 7.500% Fixed Senior Notes due September 1, 2038 | 300 | 300 |
| 5.250% Fixed Senior Notes due September 30, 2040 | 475 | 475 |
| 4.550% Fixed Senior Notes due December 1, 2041 | 400 | 400 |
| 5.300% Fixed Senior Notes due June 1, 2042 | 500 | 500 |
| Unamortized discount | (19) | (23) |
| Less amount due currently | (500) | — |
| Long-term debt, less amounts due currently - Oncor | 4,956 | 5,202 |
| Oncor Electric Delivery Transition Bond Company LLC (b): | | |
| 5.420% Fixed Series 2003 Bonds due in semiannual installments through August 15, 2015 | 54 | 106 |
| 5.290% Fixed Series 2004 Bonds due in semiannual installments through May 15, 2016 | 126 | 205 |
| Unamortized fair value discount related to transition bonds | — | (1) |
| Less amount due currently | (139) | (131) |
| Long-term debt, less amounts due currently - Bondco | 41 | 179 |
| Total long-term debt (c) | $ 4,997 | $ 5,381 |

_____

(a)  Secured by first priority lien on certain transmission and distribution assets equally and ratably with all of Oncor's other secured indebtedness. See "Deed of Trust" below for additional information.

(b)  The transition bonds are nonrecourse to Oncor and were issued to securitize a regulatory asset.

(c)  According to our organizational documents, Oncor Holdings (parent) is prohibited from directly incurring indebtedness for borrowed money.

*Debt-Related Activity in 2014*

*Debt Repayments*

Repayments of long-term debt in 2014 totaled $131 million and represent transition bond principal payments at scheduled maturity dates.

*Issuance of New Senior Secured Notes*

In May 2014, Oncor issued $250 million aggregate principal amount of 2.150% senior secured notes maturing in June 2019 (2019 Notes). Oncor used the proceeds (net of the initial purchasers' discount, fees and expenses) of approximately $248 million from the sale of the 2019 Notes to repay borrowings under its revolving credit facility and for other general corporate purposes. The 2019 Notes are secured by a first priority lien, and are secured equally and ratably with all of Oncor's other secured indebtedness.

Interest on the 2019 Notes is payable in cash semiannually in arrears on June 1 and December 1 of each year, beginning on December 1, 2014. Oncor may at its option redeem the 2019 Notes, in whole or in part, at any time, at a price equal to 100% of their principal amount, plus accrued and unpaid interest and, until May 1, 2019, a make-whole premium. The 2019 Notes also contain customary events of default, including failure to pay principal or interest on the 2019 Notes when due.

The 2019 Notes were issued in a private placement. In December 2014 Oncor completed an offering with the holders of the 2019 Notes to exchange their respective 2019 Notes for notes that have terms identical in all material respects to the Notes (2019 Exchange Notes), except that the 2019 Exchange Notes do not contain terms with respect to transfer restrictions, registration rights and payment of additional interest for failure to observe certain obligations in a certain registration rights agreement. The 2019 Exchange Notes were registered on a Form S-4, which was declared effective in November 2014.

### Debt-Related Activity in 2013

#### Debt Repayments

Repayments of long-term debt in 2013 totaled $125 million and represent transition bond principal payments at scheduled maturity dates.

#### Issuance of New Senior Secured Notes

In May 2013, Oncor completed the sale of $100 million aggregate principal amount of 4.550% senior secured notes maturing in December 2041 (Additional 2041 Notes). The Additional 2041 Notes were an additional issuance of Oncor's 4.550% senior secured notes maturing in December 2041, $300 million aggregate principal amount of which Oncor previously issued in November 2011 (2041 Notes). The Additional 2041 Notes were issued as part of the same series as the 2041 Notes. Oncor used the net proceeds of approximately $107 million from the sale of the Additional 2041 Notes to repay borrowings under its revolving credit facility and for general corporate purposes. The Additional 2041 Notes and 2041 Notes are secured by the first priority lien and are secured equally and ratably with all of Oncor's other secured indebtedness discussed below.

Interest on the Additional 2041 Notes is payable in cash semiannually in arrears on June 1 and December 1 of each year, beginning on June 1, 2013. Oncor may at its option redeem the Additional 2041 Notes, in whole or in part, at any time, at a price equal to 100% of their principal amount, plus accrued and unpaid interest and, until June 1, 2041, a make-whole premium. The notes also contain customary events of default, including failure to pay principal or interest on the notes when due.

The Additional 2041 Notes were issued in a private placement. In July 2013 Oncor completed an offering with the holders of the Additional 2041 Notes to exchange their respective Additional 2041 Notes for notes that have terms identical in all material respects to the Additional 2041 Notes (Exchange Notes), except that the Exchange Notes do not contain terms with respect to transfer restrictions, registration rights and payment of additional interest for failure to observe certain obligations in a certain registration rights agreement. The Exchange Notes were registered on a Form S-4, which was declared effective in June 2013.

### Deed of Trust

Oncor's secured indebtedness, including the revolving credit facility described in Note 5, is secured equally and ratably by a first priority lien on property Oncor acquired or constructed for the transmission and distribution of electricity. The property is mortgaged under the Deed of Trust. The Deed of Trust permits Oncor to secure indebtedness (including borrowings under our revolving credit facility) with the lien of the Deed of Trust up to the aggregate of (i) the amount of available bond credits, and (ii) 85% of the lower of the fair value or cost of certain property additions that could be certified to the Deed of Trust collateral agent. At December 31, 2014, the amount of available bond credits was approximately $2.208 billion and the amount of future debt Oncor could secure with property additions, subject to those property additions being certified to the Deed of Trust collateral agent, was $1.570 billion.

*Maturities*

Long-term debt maturities at December 31, 2014, are as follows:

| Year: | | Amount |
|---|---|---|
| 2015 | $ | 639 |
| 2016 | | 41 |
| 2017 | | 324 |
| 2018 | | 550 |
| 2019 | | 250 |
| Thereafter | | 3,851 |
| Unamortized discount | | (19) |
| Total | $ | 5,636 |

*Fair Value of Long-Term Debt*

At December 31, 2014 and 2013, the estimated fair value of our long-term debt (including current maturities) totaled $6.844 billion and $6.188 billion, respectively, and the carrying amount totaled $5.636 billion and $5.512 billion, respectively. The fair value is estimated based upon the market value as determined by quoted market prices, representing Level 1 valuations under accounting standards related to the determination of fair value.

## 8.    COMMITMENTS AND CONTINGENCIES

*EFH Bankruptcy Proceedings*

On the EFH Petition Date, EFH Corp. and the substantial majority of its direct and indirect subsidiaries that are members of the Texas Holdings Group, including EFIH, EFCH and TCEH, commenced proceedings under Chapter 11 of the US Bankruptcy Code. The Oncor Ring-Fenced Entities are not parties to the EFH Bankruptcy Proceedings. See Notes 3 and 13 for a discussion of the potential impacts on us as a result of the EFH Bankruptcy Proceedings and our related-party transactions involving members of the Texas Holdings Group, respectively.

*Leases*

At December 31, 2014, future minimum lease payments under operating leases (with initial or remaining noncancelable lease terms in excess of one year) were as follows:

| Year | | Amount |
|---|---|---|
| 2015 | $ | 5 |
| 2016 | | 4 |
| 2017 | | 1 |
| 2018 | | — |
| 2019 | | — |
| Thereafter | | — |
| Total future minimum lease payments | $ | 10 |

Rent charged to operation and maintenance expense totaled $9 million, $10 million and $15 million for the years ended December 31, 2014, 2013 and 2012, respectively.

*Efficiency Spending*

Oncor is required to annually invest in programs designed to improve customer electricity demand efficiencies to satisfy ongoing regulatory requirements. The 2015 requirement is $50 million.

*Guarantees*

Oncor is the lessee under various operating leases that obligate it to guarantee the residual values of the leased assets. At December 31, 2014, both the aggregate maximum amount of residual values guaranteed and the estimated residual recoveries totaled $6 million. These leased assets consist primarily of vehicles used in distribution activities. The average life of the residual value guarantees under the lease portfolio is approximately 2.5 years.

*Legal/Regulatory Proceedings*

We are involved in other various legal and administrative proceedings in the normal course of business, the ultimate resolution of which, in the opinion of management, should not have a material effect upon our financial position, results of operations or cash flows. See Note 3 for additional information regarding contingencies.

*Labor Contracts*

At December 31, 2014, approximately 19% of Oncor's full time employees were represented by a labor union and covered by a collective bargaining agreement with an expiration date of October 25, 2015.

*Environmental Contingencies*

Oncor must comply with environmental laws and regulations applicable to the handling and disposal of hazardous waste. Oncor is in compliance with all current laws and regulations; however, the impact, if any, of changes to existing regulations or the implementation of new regulations is not determinable. The costs to comply with environmental regulations can be significantly affected by the following external events or conditions:

- changes to existing state or federal regulation by governmental authorities having jurisdiction over control of toxic substances and hazardous and solid wastes, and other environmental matters, and
- the identification of additional sites requiring clean-up or the filing of other complaints in which Oncor may be asserted to be a potential responsible party.

## 9.  MEMBERSHIP INTERESTS

On February 25, 2015, our board of directors declared a cash distribution of $74 million, which was paid to EFIH on February 26, 2015.

During 2014, our board of directors declared, and we paid, the following cash distributions to EFIH:

| Declaration Date | Payment Date | Amount |
|---|---|---|
| October 21, 2014 | October 22, 2014 | $74 |
| July 30, 2014 | July 31, 2014 | $51 |
| April 30, 2014 | May 1, 2014 | $40 |
| February 19, 2014 | February 20, 2014 | $37 |

During 2013, our board of directors declared, and we paid, the following cash distributions to EFIH:

| Declaration Date | Payment Date | Amount |
|---|---|---|
| October 29, 2013 | October 31, 2013 | $65 |
| July 31, 2013 | August 1, 2013 | $68 |
| May 1, 2013 | May 2, 2013 | $49 |
| February 13, 2013 | February 15, 2013 | $31 |

While there are no direct restrictions on our ability to distribute our net income that are currently material, substantially all of our net income is derived from Oncor. Our board of directors and Oncor's board of directors, which are composed of a majority of independent directors, can withhold distributions to the extent the boards determine that it is necessary to retain such amounts to meet our expected future requirements.

Oncor's distributions are limited by its required regulatory capital structure to be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. At December 31, 2014, Oncor's regulatory capitalization ratio was 58.8% debt and 41.2% equity. The PUCT has the authority to determine what types of debt and equity are included in a utility's debt-to-equity ratio. For purposes of this ratio, debt is calculated as long-term debt plus unamortized gains on reacquired debt less unamortized issuance expenses, premiums and losses on reacquired debt. The debt calculation excludes transition bonds issued by Bondco. Equity is calculated as membership interests determined in accordance with US GAAP, excluding the effects of purchase accounting (which included recording the initial goodwill and fair value adjustments and the subsequent related impairments and amortization). At December 31, 2014, $184 million was available for distribution to Oncor's members under the capital structure restriction, of which approximately 80% relates to our ownership interest.

*Accumulated Other Comprehensive Income (Loss)*

The following table presents the changes to accumulated other comprehensive income (loss) for the year ended December 31, 2014.

| | Cash Flow Hedges - Interest Rate Swap | | Defined Benefit Pension and OPEB Plans | | Accumulated Other Comprehensive Income (Loss) | |
|---|---|---|---|---|---|---|
| Balance at December 31, 2013 | $ | (21) | $ | (18) | $ | (39) |
| Defined benefit pension plans (net of tax) | | — | | (49) | | (49) |
| Amounts reclassified from accumulated other comprehensive income (loss) and reported in interest expense and related charges | | 2 | | — | | 2 |
| Balance at December 31, 2014 | $ | (19) | $ | (67) | $ | (86) |

The following table presents the changes to accumulated other comprehensive income (loss) for the year ended December 31, 2013.

| | Cash Flow Hedges - Interest Rate Swap | | Defined Benefit Pension and OPEB Plans | | Accumulated Other Comprehensive Income (Loss) | |
|---|---|---|---|---|---|---|
| Balance at December 31, 2012 | $ | (23) | $ | (2) | $ | (25) |
| Defined benefit pension plans (net of tax) | | — | | (16) | | (16) |
| Amounts reclassified from accumulated other comprehensive income (loss) and reported in interest expense and related charges | | 2 | | — | | 2 |
| Balance at December 31, 2013 | $ | (21) | $ | (18) | $ | (39) |

**10.    NONCONTROLLING INTERESTS**

At December 31, 2014, Oncor's ownership was as follows: 80.03% held by us, 19.75% held by Texas Transmission and 0.22% held indirectly by certain members of Oncor's management team and board of directors.

**11.    PENSION AND OTHER POSTRETIREMENT EMPLOYEE BENEFITS (OPEB) PLANS**

*Regulatory Recovery of Pension and OPEB Costs*

PURA provides for Oncor's recovery of pension and OPEB costs applicable to services of its active and retired employees, as well as services of other EFH Corp. active and retired employees prior to the deregulation and disaggregation of EFH Corp.'s electric utility businesses effective January 1, 2002 (recoverable service). Accordingly, Oncor entered into an agreement with EFH Corp. whereby we assumed responsibility for applicable pension and OPEB costs related to those personnel's recoverable service.

Oncor is authorized to establish a regulatory asset or liability for the difference between the amounts of pension and OPEB costs approved in current billing rates and the actual amounts that would otherwise have been recorded as charges or credits to earnings related to recoverable service. Amounts deferred are ultimately subject to regulatory approval. At December 31, 2014 and 2013, Oncor had recorded regulatory assets totaling $1.166 billion and $786 million, respectively, related to pension and OPEB costs, including amounts related to deferred expenses as well as amounts related to unfunded liabilities that otherwise would be recorded as other comprehensive income.

In a 2012 agreement described below, Oncor assumed primary responsibility for retirement costs related to certain non-recoverable service. Any retirement costs associated with non-recoverable service is not recoverable through rates.

*Pension Plans*

Oncor participates in and has liabilities under the Oncor Retirement Plan and the EFH Retirement Plan, both of which are qualified pension plans under Section 401(a) of the Internal Revenue Code of 1986, as amended (Code), and are subject to the provisions of ERISA. Employees do not contribute to either plan. These pension plans provide benefits to participants under one of two formulas: (i) a Cash Balance Formula under which participants earn monthly contribution credits based on their compensation and a combination of their age and years of service, plus monthly interest credits or (ii) a Traditional Retirement Plan Formula based on years of service and the average earnings of the three years of highest earnings. The interest component of the Cash Balance Formula is variable and is determined using the yield on 30-year Treasury bonds. Under the Cash Balance Formula, future increases in earnings will not apply to prior service costs.

All eligible employees hired after January 1, 2001 participate under the Cash Balance Formula. Certain employees, who, prior to January 1, 2002, participated under the Traditional Retirement Plan Formula, continue their participation under that formula. It is the sponsors' policy to fund the plans on a current basis to the extent required under existing federal tax and ERISA regulations.

In August 2012, EFH Corp. approved certain amendments to the EFH Retirement Plan. These actions were completed in the fourth quarter of 2012, and the amendments resulted in:

- the splitting off of assets and liabilities under the plan associated with Oncor's employees and all retirees and terminated vested participants of EFH Corp. and its subsidiaries (including discontinued businesses) to a new qualified pension plan that provides benefits identical to those provided under the EFH Retirement Plan, for which Oncor assumed sponsorship from EFH Corp. effective January 1, 2013 (Oncor Retirement Plan);

- maintaining assets and liabilities under the plan associated with active collective bargaining unit (union) employees of EFH Corp.'s competitive subsidiaries under the current plan;

- the splitting off of assets and liabilities under the plan associated with all other plan participants (active nonunion employees of EFH Corp.'s competitive businesses) to a terminating plan, freezing benefits and vesting all accrued plan benefits for these participants, and

- the termination of, distributions of benefits under, and settlement of all of EFH Corp.'s liabilities under the terminating plan.

As a result of these actions and in connection with assuming sponsorship of the Oncor Retirement Plan, Oncor entered into an agreement with EFH Corp. to assume primary responsibility for benefits of certain participants for whom EFH Corp. bore primary funding responsibility (a closed group of retired and terminated vested plan participants not related to Oncor's regulated utility business) at December 31, 2012. As Oncor received a corresponding amount of assets with the assumed liabilities, execution of the agreement did not have a material impact on its reported results of operations or financial condition. In the fourth quarter of 2012, EFH Corp. made cash contributions totaling $259 million to settle the terminating plan obligations and fully fund its obligations under the Oncor Retirement Plan.

Oncor also has supplemental pension plans for certain employees whose retirement benefits cannot be fully earned under the qualified retirement plan, the information for which is included below.

### OPEB Plan

Until July 1, 2014, Oncor participated with EFH Corp. and other subsidiaries of EFH Corp. to offer certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees (EFH OPEB Plan). As discussed below, Oncor ceased participation in the EFH OPEB Plan and established its own OPEB plan for Oncor's eligible employees and their dependents (Oncor OPEB Plan). For employees retiring on or after January 1, 2002, the retiree contributions required for such coverage vary based on a formula depending on the retiree's age and years of service.

In April 2014, Oncor entered into an agreement with EFH Corp. in which it agreed to transfer to the Oncor OPEB Plan effective July 1, 2014, the assets and liabilities related to its eligible current and future retirees as well as certain eligible retirees of EFH Corp. whose employment included service with both Oncor (or a predecessor regulated electric business) and a non-regulated business of EFH Corp. Pursuant to the agreement, EFH Corp. will retain its portion of the liability for retiree benefits related to those retirees. Since the Oncor OPEB Plan offers identical coverages as the EFH OPEB Plan and Oncor and EFH Corp. retain the same responsibility for participants as before, there was no financial impact as a result of the transfer other than from a remeasurement of the Oncor OPEB Plan's asset values and obligations. As Oncor is not responsible for EFH Corp.'s portion of the Oncor OPEB Plan's unfunded liability totaling $101 million as of December 31, 2014, that amount is not reported on our balance sheet.

### Pension and OPEB Costs Recognized as Expense

Pension and OPEB amounts provided herein include amounts related only to Oncor's portion of the various plans based on actuarial computations and reflect Oncor's employee and retiree demographics as described above. Oncor's net costs related to pension and OPEB plans for the years ended December 31, 2014, 2013 and 2012 were comprised of the following:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2014** | | **2013** | | **2012** | |
| Pension cost | $ | 58 | $ | 95 | $ | 179 |
| OPEB cost | | 48 | | 37 | | 27 |
| Total benefit cost | | 106 | | 132 | | 206 |
| Less amounts deferred as a regulatory asset or property | | (69) | | (95) | | (169) |
| Net amounts recognized as expense | $ | 37 | $ | 37 | $ | 37 |

Oncor and EFH Corp. use the calculated value method to determine the market-related value of the assets held in the trust for purposes of calculating pension costs. Oncor and EFH Corp. include the realized and unrealized gains or losses in the market-related value of assets over a rolling four-year period. Each year, 25% of such gains and losses for the current year and for each of the preceding three years is included in the market-related value. Each year, the market-related value of assets is increased for contributions to the plan and investment income and is decreased for benefit payments and expenses for that year.

Oncor and EFH Corp. use the fair value method to determine the market-related value of the assets held in the trust for purposes of calculating OPEB cost.

*Detailed Information Regarding Pension and OPEB Benefits*

The following pension and OPEB information is based on December 31, 2014, 2013 and 2012 measurement dates:

| | Pension Plans | | | OPEB Plan | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | Year Ended December 31, | | |
| | 2014 | 2013 | 2012 | 2014 | 2013 | 2012 |
| *Assumptions Used to Determine Net Periodic Pension and OPEB Costs:* | | | | | | |
| Discount rate (a) | 4.74% | 4.10% | 5.00% | 4.98% | 4.10% | 4.95% |
| Expected return on plan assets | 6.47% | 6.14% | 7.40% | 7.05% | 6.70% | 6.80% |
| Rate of compensation increase | 3.94% | 3.94% | 3.81% | — | — | — |
| *Components of Net Pension and OPEB Costs:* | | | | | | |
| Service cost | $ 23 | $ 26 | $ 23 | $ 6 | $ 6 | $ 5 |
| Interest cost | 132 | 122 | 106 | 44 | 36 | 39 |
| Expected return on assets | (136) | (123) | (109) | (12) | (11) | (12) |
| Amortization of net transition obligation | — | — | — | — | — | 1 |
| Amortization of prior service cost (credit) | — | — | — | (20) | (20) | (20) |
| Amortization of net loss | 39 | 69 | 78 | 30 | 26 | 14 |
| Settlement charges | — | 1 | 81 | — | — | — |
| Net periodic pension and OPEB costs | 58 | 95 | 179 | 48 | 37 | 27 |
| *Other Changes in Plan Assets and Benefit Obligations Recognized as Regulatory Assets or in Other Comprehensive Income:* | | | | | | |
| Net loss (gain) | 388 | (139) | 110 | 128 | — | 83 |
| Amortization of net loss | (39) | (69) | (78) | (30) | (26) | (14) |
| Amortization of transition obligation (asset) | — | — | — | — | — | (1) |
| Amortization of prior service (cost) credit | — | — | — | 20 | 20 | 20 |
| Settlement charges | — | (1) | (81) | — | — | — |
| Curtailment | — | — | (5) | — | — | — |
| Total recognized as regulatory assets or other comprehensive income | 349 | (209) | (54) | 118 | (6) | 88 |
| Total recognized in net periodic pension and OPEB costs and as regulatory assets or other comprehensive income | $ 407 | $ (114) | $ 125 | $ 166 | $ 31 | $ 115 |

_____
(a)  As a result of the 2012 amendments discussed above, the discount rate reflected in net pension costs for January through July 2012 was 5.00%, for August through September 2012 was 4.15% and for October through December 2012 was 4.20%. As a result of the transfer of OPEB plan assets and liabilities from the EFH OPEB Plan to the Oncor OPEB Plan discussed above, the discount rate reflected in OPEB costs for January through June 2014 was 4.98% and for July through December 2014 was 4.39%.

| | Pension Plans | | | OPEB Plan | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | Year Ended December 31, | | |
| | 2014 | 2013 | 2012 | 2014 | 2013 | 2012 |
| *Assumptions Used to Determine Benefit Obligations at Period End:* | | | | | | |
| Discount rate | 3.96% | 4.74% | 4.10% | 4.23% | 4.98% | 4.10% |
| Rate of compensation increase | 3.29% | 3.94% | 3.94% | — | — | — |

| | Pension Plans | | OPEB Plan | |
|---|---|---|---|---|
| | Year Ended December 31, | | Year Ended December 31, | |
| | 2014 | 2013 | 2014 | 2013 |
| ***Change in Projected Benefit Obligation:*** | | | | |
| Projected benefit obligation at beginning of year | $ 2,857 | $ 3,038 | $ 924 | $ 913 |
| Service cost | 23 | 26 | 6 | 6 |
| Interest cost | 132 | 122 | 44 | 36 |
| Participant contributions | — | — | 15 | 14 |
| Medicare Part D reimbursement | — | — | — | 2 |
| Settlement charges | — | (3) | — | — |
| Curtailment | — | — | — | — |
| Actuarial (gain) loss | 515 | (183) | 128 | 10 |
| Benefits paid | (148) | (143) | (63) | (57) |
| Projected benefit obligation at end of year | $ 3,379 | $ 2,857 | $ 1,054 | $ 924 |
| Accumulated benefit obligation at end of year | $ 3,260 | $ 2,752 | $ — | $ — |
| | | | | |
| ***Change in Plan Assets:*** | | | | |
| Fair value of assets at beginning of year | $ 2,271 | $ 2,327 | $ 179 | $ 190 |
| Actual return (loss) on assets | 263 | 80 | 12 | 21 |
| Employer contributions | 68 | 9 | 18 | 11 |
| Settlement charges | — | (2) | — | — |
| Participant contributions | — | — | 15 | 14 |
| Benefits paid | (148) | (143) | (63) | (57) |
| Fair value of assets at end of year | 2,454 | 2,271 | 161 | 179 |
| | | | | |
| ***Funded Status:*** | | | | |
| Projected benefit obligation at end of year | $ (3,379) | $ (2,857) | $ (1,054) | $ (924) |
| Fair value of assets at end of year | 2,454 | 2,271 | 161 | 179 |
| Funded status at end of year | $ (925) | $ (586) | $ (893) | $ (745) |

| | Pension Plans | | OPEB Plan | |
|---|---|---|---|---|
| | Year Ended December 31, | | Year Ended December 31, | |
| | 2014 | 2013 | 2014 | 2013 |
| ***Amounts Recognized in the Balance Sheet Consist of:*** | | | | |
| Liabilities: | | | | |
| Other current liabilities | $ (4) | $ (3) | $ — | $ — |
| Other noncurrent liabilities | (921) | (583) | (893) | (745) |
| Net liability recognized | $ (925) | $ (586) | $ (893) | $ (745) |
| Regulatory assets: | | | | |
| Net loss | $ 619 | $ 362 | $ 316 | $ 220 |
| Prior service cost (credit) | — | — | (70) | (91) |
| Net regulatory asset recognized | 619 | 362 | 246 | 129 |
| Accumulated other comprehensive net loss | $ 126 | $ 33 | $ 2 | $ 1 |

The following tables provide information regarding the assumed health care cost trend rates

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| *Assumed Health Care Cost Trend Rates - Not Medicare Eligible:* | | |
| Health care cost trend rate assumed for next year | 8.00% | 8.00% |
| Rate to which the cost trend is expected to decline (the ultimate trend rate) | 5.00% | 5.00% |
| Year that the rate reaches the ultimate trend rate | 2022 | 2022 |
| | | |
| *Assumed Health Care Cost Trend Rates - Medicare Eligible:* | | |
| Health care cost trend rate assumed for next year | 6.50% | 7.00% |
| Rate to which the cost trend is expected to decline (the ultimate trend rate) | 5.00% | 5.00% |
| Year that the rate reaches the ultimate trend rate | 2021 | 2021 |

| | 1-Percentage Point Increase | 1-Percentage Point Decrease |
| --- | --- | --- |
| *Sensitivity Analysis of Assumed Health Care Cost Trend Rates:* | | |
| Effect on accumulated postretirement obligation | $ 161 | $ (129) |
| Effect on postretirement benefits cost | 8 | (7) |

The following table provides information regarding pension plans with projected benefit obligations (PBO) and accumulated benefit obligations (ABO) in excess of the fair value of plan assets.

| | At December 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| *Pension Plans with PBO and ABO in Excess of Plan Assets:* | | |
| Projected benefit obligations | $ 3,379 | $ 2,857 |
| Accumulated benefit obligations | 3,260 | 2,752 |
| Plan assets | 454 | 2,271 |

### Pension and OPEB Plans Investment Strategy and Asset Allocations

Oncor's investment objective for the retirement plans is to invest in a suitable mix of assets to meet the future benefit obligations at an acceptable level of risk, while minimizing the volatility of contributions. Equity securities are held to achieve returns in excess of passive indexes by participating in a wide range of investment opportunities. International equity and real estate securities are used to further diversify the equity portfolio. International equity securities may include investments in both developed and emerging international markets. Fixed income securities include primarily corporate bonds from a diversified range of companies, US Treasuries and agency securities and money market instruments. The investment strategy for fixed income investments is to maintain a high grade portfolio of securities, which assists Oncor in managing the volatility and magnitude of plan contributions and expense while maintaining sufficient cash and short-term investments to pay near-term benefits and expenses.

The retirement plans' investments are managed in two pools: one associated with the recoverable service portion of plan obligations related to Oncor's regulated utility business, and the other associated with plan obligations for the closed group of retired and terminated plan participants not related to Oncor's regulated utility business that Oncor assumed from EFH Corp. as discussed above. The recoverable service portion is invested in a broadly diversified portfolio of equity and fixed income securities. The nonrecoverable service portion is invested in fixed income securities intended to fully hedge the obligations, within practical limitations.

The target asset allocation ranges of pension plan investments by asset category are as follows:

| Asset Category | Target Allocation Ranges | |
| --- | --- | --- |
| | Recoverable | Nonrecoverable |
| US equities | 19%-25% | — |
| International equities | 14%-20% | — |
| Fixed income | 48%-65% | 100% |
| Real estate | 2%-7% | — |

The investment objective for the OPEB plan primarily follows the objectives of the pension plans discussed above, while maintaining sufficient cash and short-term investments to pay near-term benefits and expenses. The actual amounts at December 31, 2014 provided below are consistent with the asset allocation targets.

*Fair Value Measurement of Pension Plans Assets*

At December 31, 2014 and 2013, pension plans assets measured at fair value on a recurring basis consisted of the following:

| | At December 31, 2014 | | | | At December 31, 2013 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total | Level 1 | Level 2 | Level 3 | Total |
| **Asset Category** | | | | | | | | |
| Interest-bearing cash | $    — | $  120 | $    — | $  120 | $    — | $  160 | $    — | $  160 |
| Equity securities: | | | | | | | | |
|    US | 233 | 85 | — | 318 | 250 | 82 | — | 332 |
|    International | 281 | 12 | — | 293 | 337 | 7 | — | 344 |
| Fixed income securities: | | | | | | | | |
|    Corporate bonds (a) | — | 1,384 | — | 1,384 | — | 1,265 | — | 1,265 |
|    US Treasuries | — | 143 | — | 143 | — | 108 | — | 108 |
|    Other (b) | — | 157 | — | 157 | — | 55 | — | 55 |
| Real estate | — | 31 | 8 | 39 | — | — | 7 | 7 |
|    Total assets | $  514 | $ 1,932 | $  8 | $ 2,454 | $  587 | $ 1,677 | $  7 | $ 2,271 |

_____

(a)  Substantially all corporate bonds are rated investment grade by a major ratings agency such as Moody's.
(b)  Other consists primarily of municipal bonds, emerging market debt, bank loans and fixed income derivative instruments.

There was no significant change in the fair value of Level 3 assets in the periods presented.

*Fair Value Measurement of OPEB Plan Assets*

At December 31, 2014 and 2013, OPEB plan assets measured at fair value on a recurring basis consisted of the following:

| | At December 31, 2014 | | | | At December 31, 2013 | | | |
|---|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total | Level 1 | Level 2 | Level 3 | Total |
| **Asset Category** | | | | | | | | |
| Interest-bearing cash | $ 2 | $ 3 | $ — | $ 5 | $ — | $ 6 | $ — | $ 6 |
| Equity securities: | | | | | | | | |
| US | 54 | 4 | — | 58 | 53 | 5 | — | 58 |
| International | 31 | — | — | 31 | 35 | — | — | 35 |
| Fixed income securities: | | | | | | | | |
| Corporate bonds (a) | — | 31 | — | 31 | — | 34 | — | 34 |
| US Treasuries | — | 1 | — | 1 | — | 1 | — | 1 |
| Other (b) | 34 | 1 | — | 35 | 43 | 2 | — | 45 |
| Total assets | $ 121 | $ 40 | $ — | $ 161 | $ 131 | $ 48 | $ — | $ 179 |

_____

(a) Substantially all corporate bonds are rated investment grade by a major ratings agency such as Moody's.
(b) Other consists primarily of diversified bond mutual funds.

*Expected Long-Term Rate of Return on Assets Assumption*

The retirement plans' strategic asset allocation is determined in conjunction with the plans' advisors and utilizes a comprehensive Asset-Liability modeling approach to evaluate potential long-term outcomes of various investment strategies. The modeling incorporates long-term rate of return assumptions for each asset class based on historical and future expected asset class returns, current market conditions, rate of inflation, current prospects for economic growth, and taking into account the diversification benefits of investing in multiple asset classes and potential benefits of employing active investment management.

| Pension Plans | | OPEB Plan | |
|---|---|---|---|
| Asset Class | Expected Long-Term Rate of Return | Plan Type | Expected Long-Term Returns |
| International equity securities | 7.50% | | |
| US equity securities | 6.80% | 401(h) accounts | 6.96% |
| Real estate | 6.10% | Life insurance VEBA | 6.45% |
| Credit strategies | 4.74% | Union VEBA | 6.45% |
| Fixed income securities | 4.40% | Non-union VEBA | 2.90% |
| Weighted average (a) | 5.94% | Weighted average | 6.65% |

_____

(a) The 2015 expected long-term rate of return for the nonregulated portion of the Oncor Retirement Plan is 3.95%.

*Significant Concentrations of Risk*

The plans' investments are exposed to risks such as interest rate, capital market and credit risks. Oncor and EFH Corp. seek to optimize return on investment consistent with levels of liquidity and investment risk which are prudent and reasonable, given prevailing capital market conditions and other factors specific to participating employers. While Oncor and EFH Corp. recognize the importance of return, investments will be diversified in order to minimize the risk of large losses unless, under the circumstances, it is clearly prudent not to do so. There are also various restrictions and guidelines in place including limitations on types of investments allowed and portfolio weightings for certain investment securities to assist in the mitigation of the risk of large losses.

*Assumed Discount Rate*

For the Oncor retirement plans at December 31, 2014, Oncor selected the assumed discount rate using the Aon Hewitt AA-AAA Bond Universe yield curve, which is based on corporate bond yields and at December 31, 2014 consisted of 1,160 corporate bonds with an average rating of AA and AAA using Moody's, S&P and Fitch ratings. For the Oncor OPEB Plan and the EFH Retirement Plan at December 31, 2014, Oncor and EFH Corp., respectively, selected the assumed discount rate using the Aon Hewitt AA Above Median yield curve, which is based on corporate bond yields and at December 31, 2014 consisted of 415 corporate bonds with an average rating of AA using Moody's, S&P and Fitch ratings.

*Amortization in 2015*

In 2015, amortization of the net actuarial loss and prior service credit for the defined benefit pension plans from regulatory assets and other comprehensive income into net periodic benefit cost is expected to be $63 million and a less than $1 million credit, respectively. Amortization of the net actuarial loss and prior service credit for the OPEB plans from regulatory assets into net periodic benefit cost is expected to be $33 million and a $20 million credit, respectively.

*Pension and OPEB Plan Cash Contributions*

Oncor's contributions to the benefit plans were as follows:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2014** | **2013** | **2012** |
| Pension plans contributions | $ 68 | $ 9 | $ 93 |
| OPEB plan contributions | 18 | 11 | 11 |
| Total contributions | $ 86 | $ 20 | $ 104 |

Oncor's funding for the pension plans and the Oncor OPEB Plan is expected to total $45 million and $31 million, respectively, in 2015 and approximately $407 million and $156 million, respectively, in the 2015 to 2019 period.

*Future Benefit Payments*

Estimated future benefit payments to beneficiaries are as follows:

|  | **2015** | **2016** | **2017** | **2018** | **2019** | **2020-24** |
|---|---|---|---|---|---|---|
| Pension benefits | $ 159 | $ 165 | $ 170 | $ 176 | $ 182 | $ 990 |
| OPEB | $ 44 | $ 46 | $ 48 | $ 51 | $ 53 | $ 295 |

*Thrift Plan*

Oncor employees are eligible to participate in a qualified savings plan, a participant-directed defined contribution plan intended to qualify under Section 401(a) of the Code, and is subject to the provisions of ERISA. Under the plan, employees may contribute, through pre-tax salary deferrals and/or after-tax applicable payroll deductions, a portion of their regular salary or wages as permitted under law. Employer matching contributions are made in an amount equal to 100% of the first 6% of employee contributions for employees who are covered under the Cash Balance Formula of the Oncor Retirement Plan, and 75% of the first 6% of employee contributions for employees who are covered under the Traditional Retirement Plan Formula of the Oncor Retirement Plan. Employer matching contributions are made in cash and may be allocated by participants to any of the plan's investment options.

Until January 1, 2015, the thrift plan in which Oncor's eligible employees were able to participate was sponsored by EFH Corp. (EFH Thrift Plan). Oncor's contributions to the EFH Thrift Plan totaled $13 million, $13 million and $12 million for the years ended December 31, 2014, 2013 and 2012, respectively. Effective January 1, 2015, the accounts of Oncor participants were transferred from the EFH Thrift Plan to an Oncor-sponsored spin-off of the EFH Thrift Plan (Oncor Thrift Plan). Oncor's matching contributions are the same under the Oncor Thrift Plan as they were under the EFH Thift Plan at the time of the transfer. Since the Oncor Thrift Plan offers identical benefits to our employees, transfer to the Oncor Thrift Plan is not expected to have an impact on our results of operations, financial condition or cash flows.

## 12.  STOCK-BASED COMPENSATION

Oncor currently does not offer stock-based compensation to its employees or directors. In 2008, Oncor established the SARs Plan under which certain of its executive officers and key employees were granted stock appreciation rights payable in cash, or in some circumstances, Oncor membership interests. In February 2009, Oncor established the Oncor Electric Delivery Company LLC Director Stock Appreciation Rights Plan (the Director SARs Plan) under which certain non-employee members of its board of directors and other persons having a relationship with Oncor were granted SARs payable in cash, or in some circumstances, Oncor membership interests.

In November 2012, Oncor accepted the early exercise of all outstanding SARs (both vested and unvested, totaling 14,322,219 SARs under the SARs Plan and 55,000 SARs under the Director SARs Plan) issued to date pursuant to both SARs Plans. The early exercise was permitted by Oncor's board of directors pursuant to the provision of the SARs Plan that permits the board to accelerate the vesting and exercisability of SARs. The early exercise of SARs entitled each participant in the SARs Plan to: (1) an exercise payment (Exercise Payment) equal to the number of SARs exercised multiplied by the difference between $14.54 and the base price of the SARs (as stated in the award letter for each SARs grant); and (2) the accrual of interest on all dividends declared to date with respect to the SARs, but no further dividend accruals. As a result of the early exercise, in 2012 Oncor paid an aggregate of approximately $64 million related to Exercise Payments ($57 million charged to expense), and began accruing interest on approximately $18 million in aggregate dividends.

Additionally, certain executive officers agreed to defer payment of a portion of his/her Exercise Payment into a bankruptcy remote investment trust until the earlier of November 7, 2016 or the occurrence of an event triggering SAR exercisability pursuant to Section 5(c)(ii) of the SARs Plan. These deferred payments totaled approximately $6 million in the aggregate. In July 2014, the O&C Committee of Oncor's board of directors approved the early distribution of these deferred amounts and the winding up of the trust. As a result, in August 2014 the trust was dissolved and all deferred payments held in the trust were distributed to the respective executive officers, together with a proportionate share of the trust's aggregate investment earnings.

As described above, as part of the 2012 early exercise of SARs Oncor began accruing interest on dividends declared with respect to the SARs. Under both SARs plans, dividends that are paid in respect of Oncor membership interests while the SARs were outstanding were credited to the SARs holder's account as if the SARs were units, payable upon the earliest to occur of death, disability, separation from service, unforeseeable emergency, a change in control, or the exercise of the SARs. As a result, in 2012 Oncor recorded compensation expense of approximately $6 million relating to dividend accruals through November 2012. For accounting purposes, the liability is discounted based on an employee's or director's expected retirement date. Oncor recognized $1 million, $2 million and $1 million in accretion and interest with respect to such dividends in 2014, 2013 and 2012, respectively.

## 13.  RELATED-PARTY TRANSACTIONS

The following represent our significant related-party transactions and related matters. See Note 3 for additional information regarding related-party contingencies resulting from the EFH Bankruptcy Proceedings.

- Oncor records revenue from TCEH, principally for electricity delivery fees, which totaled $971 million, $967 million and $962 million for each of the years ended December 31, 2014, 2013 and 2012, respectively. The fees are based on rates regulated by the PUCT that apply to all REPs. The balance sheets at December 31, 2014 and 2013 reflect net accounts receivable from affiliates totaling $118 million ($52 million of which was unbilled) and $135 million ($56 million of which was unbilled), respectively, primarily consisting of trade receivables from TCEH related to these electricity delivery fees.

Trade accounts and other receivables from affiliates - net reported on our balance sheet consisted of the following:

| | At December 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| Trade accounts and other receivables from affiliates | $ 123 | $ 141 |
| Trade accounts and other payables to affiliates | (5) | (6) |
| Trade accounts and other receivables from affiliates — net | $ 118 | $ 135 |

- EFH Corp. subsidiaries charge Oncor for certain administrative services at cost. Oncor's payments to EFH Corp. subsidiaries for administrative services, which are primarily reported in operation and maintenance expenses, totaled $32 million, $30 million and $32 million for the years ended December 31, 2014, 2013 and 2012, respectively. Oncor and EFH Corp. also charge each other for shared facilities at cost. Oncor's payments to EFH Corp. subsidiaries for shared facilities totaled $4 million, $4 million and $5 million for the years ended December 31, 2014, 2013 and 2012, respectively. Payments Oncor received from EFH Corp. subsidiaries related to shared facilities, totaled $2 million for each of the years ended December 31, 2014 and 2013 and 2012.

- Through June 30, 2014, Oncor participated in the Energy Future Holdings Health and Welfare Benefit Program which provided employee benefits to Oncor's workforce. In October 2013, Oncor notified EFH Corp. of its intention to withdraw from the benefit program effective June 30, 2014 and entered into an agreement with EFH Corp. pursuant to which Oncor paid EFH Corp. $1 million in June 2014 to reimburse EFH Corp. for its increased costs under the program as a result of Oncor's withdrawal from the program and the additional administrative work required to effectuate Oncor's withdrawal from the benefit program and transition to the new benefit program. In April 2014, Oncor entered into a welfare benefit administration agreement with EFH Corp., pursuant to which EFH Corp. continued to provide Oncor with welfare benefit administration services under Oncor's new benefit plans from July 1, 2014 until December 31, 2014. These amounts are included in the administrative services payments to EFH Corp. subsidiaries reported above.

- We are a member of EFH Corp.'s consolidated tax group, though Oncor is not, and EFH Corp.'s consolidated federal income tax return includes our results. Under the terms of a tax sharing agreement, we are obligated to make payments to EFH Corp. in an aggregate amount that is substantially equal to the amount of federal income taxes that we would have been required to pay if we were filing our own corporate income tax return. Also under the terms of the tax sharing agreement, Oncor makes similar payments to Texas Transmission and Investment LLC, pro rata in accordance with their respective membership interests in Oncor, in an aggregate amount that is substantially equal to the amount of federal income taxes that Oncor would have been required to pay if it were filing its own corporate income tax return. EFH Corp. also includes Oncor's results in its consolidated Texas state margin tax return, and consistent with the tax sharing agreement, Oncor remits to EFH Corp. Texas margin tax payments, which are accounted for as income taxes and calculated as if Oncor was filing its own return. Our results are also included in the consolidated Texas state margin tax return filed by EFH Corp. See discussion in Note 1 to Financial Statements in our 2013 Audited Financial Statements under "Income Taxes."

Amounts payable to (receivable from) EFH Corp. related to income taxes under the tax sharing agreement and reported on our balance sheet consisted of the following:

|  | At December 31, | |
|  | 2014 | 2013 |
| --- | --- | --- |
| Federal income taxes receivable | $ (144) | $ (16) |
| Federal income taxes payable | — | — |
| Texas margin taxes payable | 24 | 23 |
| Net payable (receivable) | $ (120) | $ 7 |

Cash payments made to (received from) EFH Corp. related to income taxes consisted of the following:

|  | Year Ended December 31, | | |
|  | 2014 | 2013 | 2012 |
| --- | --- | --- | --- |
| Federal income taxes (a) | $ 239 | $ 113 | $ 14 |
| State margin taxes (b) | 22 | 11 | 21 |
| Total payments | $ 261 | $ 124 | $ 35 |

_____

(a)    Includes $33 million payment made to EFH Corp. in 2013 related to the 1997-2002 IRS appeals settlement.

(b)    Includes $10 million refund received from EFH Corp. in 2013 related to 1997-2001 amended Texas franchise tax returns.

- Certain transmission and distribution utilities in Texas have tariffs in place to assure adequate credit worthiness of any REP to support the REP's obligation to collect transition bond-related charges on behalf of the utility. Under these tariffs, as a result of TCEH's credit rating being below investment grade, TCEH is required to post collateral support in an amount equal to estimated transition charges over specified time periods. Accordingly, at both December 31, 2014 and 2013, TCEH had posted letters of credit each in the amount of $9 million for Oncor's benefit.

- Under Texas regulatory provisions, the trust fund for decommissioning TCEH's Comanche Peak nuclear generation facility is funded by a delivery fee surcharge Oncor collects from REPs and remits monthly to TCEH. Delivery fee surcharges totaled $17 million for the year ended December 31, 2014 and $16 million for each of the years ended December 31, 2013 and 2012. Oncor's sole obligation with regard to nuclear decommissioning is as the collection agent of funds charged to ratepayers for nuclear decommissioning activities. If, at the time of decommissioning, actual decommissioning costs exceed available trust funds, Oncor would not be obligated to pay any shortfalls but would be required to collect any rates approved by the PUCT to recover any additional decommissioning costs. Further, if there were to be a surplus when decommissioning is complete, such surplus would be returned to ratepayers under terms prescribed by the PUCT.

- Prior to August 2012, Oncor recognized interest income from TCEH under an agreement related to our generation-related regulatory assets, which have been securitized through the issuance of transition bonds by Bondco. This interest income, which served to offset Oncor's interest expense on the transition bonds, totaled $16 million for the year ended December 31, 2012. Also prior to August 2012, Oncor received reimbursement under a note receivable from TCEH for incremental amounts payable related to income taxes as a result of delivery fee surcharges related to the transition bonds. Amounts received under the note receivable for the year ended December 31, 2012 totaled $20 million.

  In August 2012, Oncor sold to EFIH all future interest reimbursements and the remaining $159 million obligation under the note with TCEH. As a result, EFIH paid, and Oncor received, an aggregate $159 million for the agreements. The sale of the related-party agreements was reported as a $2 million (after tax) decrease in total membership interests in 2012 in accordance with accounting rules for related-party matters.

- In connection with assuming sponsorship of the Oncor Retirement Plan, Oncor entered into an agreement with EFH Corp. to assume primary responsibility for retirement benefits of a closed group of retired and terminated vested retirement plan participants not related to its regulated utility business. As the Oncor Retirement Plan received an amount of plan assets equal to the liabilities Oncor assumed for those participants, execution of the agreement did not have a material impact on its reported results of operations or financial condition. See Note 10 for further information regarding funding for the pension plans.

- Affiliates of the Sponsor Group have, and from time-to-time may in the future (1) sell, acquire or participate in the offerings of Oncor's debt or debt securities in open market transactions or through loan syndications, and (2) perform various financial advisory, dealer, commercial banking and investment banking services for Oncor and certain of our affiliates for which they have received or will receive customary fees and expenses.

  See Notes 4, 9 and 11 for information regarding the tax sharing agreement, distributions to EFIH and Oncor's participation in the EFH Corp. pension and OPEB plans, respectively.

**14.   SUPPLEMENTARY FINANCIAL INFORMATION**

*Variable Interest Entities*

Oncor is the primary beneficiary and consolidates a wholly-owned VIE, Bondco, which was organized for the limited purpose of issuing specific transition bonds and purchasing and owning transition property acquired from Oncor that is pledged as collateral to secure the bonds. Oncor acts as the servicer for this entity to collect transition charges authorized by the PUCT. These funds are remitted to the trustee and used for interest and principal payments on the transition bonds and related costs.

The material assets and liabilities of Bondco are presented separately on the face of our Consolidated Balance Sheet because the assets are restricted and can only be used to settle the obligations of Bondco, and Bondco's creditors do not have recourse to our general credit or assets.

Oncor's maximum exposure does not exceed its equity investment in Bondco, which was $16 million at both December 31, 2014 and 2013. Oncor did not provide any financial support to Bondco during the years ended December 31, 2014, 2013 and 2012.

*Major Customers*

Revenues from TCEH represented 25%, 27% and 29% of total operating revenues for the years ended December 31, 2014, 2013 and 2012, respectively. Revenues from REP subsidiaries of a nonaffiliated entity, collectively represented 16% of total operating revenues for the year ended December 31, 2014 and 15% of total operating revenues for each of the years ended December 31, 2013 and 2012. No other customer represented 10% or more of total operating revenues in the years ended December 31, 2014, 2013 and 2012.

*Other Income and Deductions*

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2014 | | 2013 | | 2012 | |
| Other income: | | | | | | |
| Accretion of fair value adjustment (discount) to regulatory assets due to purchase accounting | $ | 12 | $ | 17 | $ | 23 |
| Net gain on sale of other properties and investments | | 1 | | 1 | | 3 |
| Total other income | $ | 13 | $ | 18 | $ | 26 |
| Other deductions: | | | | | | |
| Professional fees | $ | 14 | $ | 10 | $ | 3 |
| SARs exercise (Note 12) | | — | | 2 | | 57 |
| Other | | 1 | | 3 | | 4 |
| Total other deductions | $ | 15 | $ | 15 | $ | 64 |

*Interest Expense and Related Charges*

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2014 | | 2013 | | 2012 | |
| Interest expense | $ | 355 | $ | 360 | $ | 366 |
| Amortization of debt issuance costs and discounts | | 3 | | 21 | | 18 |
| Allowance for funds used during construction -capitalized interest portion | | (5) | | (10) | | (10) |
| Total interest expense and related charges | $ | 353 | $ | 371 | $ | 374 |

*Restricted Cash*

Restricted cash amounts reported on our balance sheet consisted of the following:

| | At December 31, 2014 | | At December 31, 2013 | |
| --- | --- | --- | --- | --- |
| | Current Assets | Noncurrent Assets | Current Assets | Noncurrent Assets |
| Customer collections related to transition bonds used only to service debt and pay expenses | $ 56 | $ — | $ 52 | $ — |
| Reserve for fees associated with transition bonds | — | 10 | — | 10 |
| Reserve for shortfalls of transition bond charges | — | 6 | — | 6 |
| Total restricted cash | $ 56 | $ 16 | $ 52 | $ 16 |

*Trade Accounts Receivable*

Trade accounts receivable reported on our balance consisted of the following:

| | At December 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| Gross trade accounts receivable | $ 531 | $ 527 |
| Trade accounts receivable from TCEH | (121) | (139) |
| Allowance for uncollectible accounts | (3) | (3) |
| Trade accounts receivable from nonaffiliates - net | $ 407 | $ 385 |

Gross trade accounts receivable at December 31, 2014 and 2013 included unbilled revenues of $182 million and $180 million, respectively. At both December 31, 2014 and 2013, REP subsidiaries of a nonaffiliated entity collectively represented approximately 12% of the nonaffiliated trade accounts receivable amount.

Under a PUCT rule relating to the Certification of Retail Electric Providers, write-offs of uncollectible amounts owed by REPs are deferred as a regulatory asset. Due to commitments made to the PUCT in 2007, we are not allowed to recover bad debt expense, or certain other costs and expenses, from ratepayers in the event of a default or bankruptcy by an affiliate REP.

*Investments and Other Property*

Investments and other property reported on our balance consisted of the following:

| | At December 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| Assets related to employee benefit plans, including employee savings programs | $ 94 | $ 88 |
| Land | 3 | 3 |
| Total investments and other property | $ 97 | $ 91 |

The majority of these assets represent cash surrender values of life insurance policies that are purchased to fund liabilities under deferred compensation plans. At December 31, 2014 and 2013, the face amount of these policies totaled $167 million and $159 million, respectively, and the net cash surrender values (determined using a Level 2 valuation technique) totaled $76 million and $71 million, respectively. Changes in cash surrender value are netted against premiums paid. Other investment assets held to satisfy deferred compensation liabilities are recorded at market value.

*Property, Plant and Equipment*

Property, plant and equipment reported on our balance consisted of the following:

| | Composite Depreciation Rate/ Avg. Life at December 31, 2014 | At December 31, | |
| --- | --- | --- | --- |
| | | 2014 | 2013 |
| Assets in service: | | | |
| Distribution | 4.1% / 24.6 years | $ 10,423 | $ 10,055 |
| Transmission | 2.8% / 35.7 years | 6,861 | 6,133 |
| Other assets | 9.2% / 10.9 years | 954 | 868 |
| Total | | 18,238 | 17,056 |
| Less accumulated depreciation | | 6,125 | 5,725 |
| Net of accumulated depreciation | | 12,113 | 11,331 |
| Construction work in progress | | 335 | 556 |
| Held for future use | | 15 | 15 |
| Property, plant and equipment - net | | $ 12,463 | $ 11,902 |

Depreciation expense as a percent of average depreciable property approximated 3.6%, 3.7% and 4.9% for the years ended December 31, 2014, 2013 and 2012, respectively.

*Intangible Assets*

Intangible assets (other than goodwill) reported on our balance sheet consisted of the following:

| | At December 31, 2014 | | | At December 31, 2013 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Gross Carrying Amount | Accumulated Amortization | Net | Gross Carrying Amount | Accumulated Amortization | Net |
| Identifiable intangible assets subject to amortization included in property, plant and equipment: | | | | | | |
| Land easements | $ 463 | $ 86 | $ 377 | $ 440 | $ 82 | $ 358 |
| Capitalized software | 433 | 242 | 191 | 385 | 189 | 196 |
| Total | $ 896 | $ 328 | $ 568 | $ 825 | $ 271 | $ 554 |

Aggregate amortization expense for intangible assets totaled $58 million, $53 million and $53 million for each of the years ended December 31, 2014, 2013 and 2012, respectively. At December 31, 2014, the weighted average remaining useful lives of capitalized land easements and software were 85 years and 3 years, respectively. The estimated aggregate amortization expense for each of the next five fiscal years is as follows:

| Year | Amortization Expense |
| --- | --- |
| 2015 | $62 |
| 2016 | 59 |
| 2017 | 51 |
| 2018 | 45 |
| 2019 | 42 |

At both December 31, 2014 and 2013, goodwill totaling $4.1 billion was reported on the balance sheet. None of this goodwill is being deducted for tax purposes (see Note 1 regarding goodwill impairment assessment and testing).

*Other Noncurrent Liabilities and Deferred Credits*

Other noncurrent liabilities and deferred credits reported on our balance sheet consisted of the following:

|  | At December 31, | |
|---|---|---|
|  | **2014** | **2013** |
| Retirement plans and other employee benefits | $ 1,894 | $ 1,399 |
| Liabilities related to subsidiary tax sharing agreement | 256 | 268 |
| Uncertain tax positions (including accrued interest) | 2 | 56 |
| Amount payable related to income taxes | 17 | 17 |
| Investment tax credits | 17 | 20 |
| Other | 59 | 62 |
| Total | $ 2,245 | $ 1,822 |

*Supplemental Cash Flow Information*

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2014** | **2013** | **2012** |
| Cash payments (receipts) related to: |  |  |  |
| Interest | $ 356 | $ 361 | $ 378 |
| Capitalized interest | (5) | (10) | (10) |
| Interest (net of amounts capitalized). | $ 351 | $ 351 | $ 368 |
| Income taxes |  |  |  |
| Federal | $ 293 | $ 124 | $ 9 |
| State | 22 | 11 | 21 |
| Total income taxes | $ 315 | $ 135 | $ 30 |
| SARs exercise | $ — | $ 4 | $ 64 |
| Noncash investing and financing activities: |  |  |  |
| Construction expenditures (a) | $ 82 | $ 84 | $ 103 |

_____

(a)  Represents end-of-period accruals.

15.   CONDENSED FINANCIAL INFORMATION

ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC
CONDENSED FINANCIAL INFORMATION

CONDENSED STATEMENTS OF COMPREHENSIVE INCOME
(millions of dollars)

|  | Year Ended December 31, | | |
|  | 2014 | 2013 | 2012 |
|---|---|---|---|
| Income tax expense | $ (11) | $ (10) | $ (9) |
| Equity in earnings of subsidiary | 360 | 345 | 279 |
| Net income | 349 | 335 | 270 |
| Other comprehensive income (net of tax benefit of $12, $3 and $—) | (47) | (11) | — |
| Comprehensive income | 302 | 324 | 270 |

See Notes to Financial Statements.

CONDENSED STATEMENTS OF CASH FLOWS
(millions of dollars)

|  | Year Ended December 31, | | |
|  | 2014 | 2013 | 2012 |
|---|---|---|---|
| Cash provided by operating activities | $ 202 | $ 214 | $ 146 |
| Cash used in financing activities — distributions paid to parent | (202) | (213) | (147) |
| Net change in cash and cash equivalents | — | 1 | (1) |
| Cash and cash equivalents - beginning balance | $ 1 | $ — | $ 1 |
| Cash and cash equivalents - ending balance | $ 1 | $ 1 | $ — |

See Notes to Financial Statements.

CONDENSED BALANCE SHEETS
(millions of dollars)

|  | At December 31, | |
|  | 2014 | 2013 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents — current | $ 1 | $ 1 |
| Investments — noncurrent | 6,274 | 6,226 |
| Accumulated deferred income taxes | 37 | — |
| Total assets | $ 6,312 | $ 6,227 |
| **LIABILITIES AND MEMBERSHIP INTEREST** | | |
| Income taxes payable to EFH Corp. — current | $ 6 | $ 5 |
| Accumulated deferred income taxes | — | 24 |
| Other noncurrent liabilities and deferred credits | 256 | 248 |
| Total liabilities | 262 | 277 |
| Membership interest | 6,050 | 5,950 |
| Total liabilities and membership interest | $ 6,312 | $ 6,227 |

See Notes to Financial Statements.

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**
**CONDENSED FINANCIAL INFORMATION**
**NOTES TO CONDENSED FINANCIAL STATEMENTS**

*Basis of Presentation*

References herein to "we," "our," "us" and "the company" are to Oncor Holdings and/or its direct or indirect subsidiaries as apparent in the context.

The accompanying unconsolidated condensed balance sheets are presented at December 31, 2014 and 2013, and the accompanying unconsolidated statements of income and cash flows are presented for the years ended December 31, 2014, 2013 and 2012. We are a Delaware limited liability company wholly-owned by EFIH, which is a wholly owned subsidiary of EFH Corp. As of December 31, 2014, we own approximately 80% of the membership interests in Oncor. Certain information and footnote disclosures normally included in financial statements prepared in accordance with US GAAP have been omitted pursuant to the rules of the US Securities and Exchange Commission. Because the unconsolidated condensed financial statements do not include all of the information and footnotes required by US GAAP, they should be read in conjunction with the consolidated financial statements and Notes 1 through 14. Our subsidiary has been accounted for under the equity method. All dollar amounts in the financial statements are stated in millions of US dollars unless otherwise indicated.

*Distribution Restrictions*

While there are no direct restrictions on our ability to distribute our net income that are currently material, substantially all of our net income is derived from Oncor. Our board of directors and Oncor's board of directors, which are composed of a majority of independent directors, can withhold distributions to the extent the boards determine that it is necessary to retain such amounts to meet our expected future requirements.

Oncor's distributions are limited by its required regulatory capital structure to be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. At December 31, 2014, Oncor's regulatory capitalization ratio was 58.8% debt and 41.2% equity. The PUCT has the authority to determine what types of debt and equity are included in a utility's debt-to-equity ratio. For purposes of this ratio, debt is calculated as long-term debt plus unamortized gains on reacquired debt less unamortized issuance expenses, premiums and losses on reacquired debt. The debt calculation excludes transition bonds issued by Bondco. Equity is calculated as membership interests determined in accordance with US GAAP, excluding the effects of purchase accounting (which included recording the initial goodwill and fair value adjustments and the subsequent related impairments and amortization). At December 31, 2014, $184 million was available for distribution to Oncor's members under the capital structure restriction, of which approximately 80% relates to our ownership interest.

On February 25, 2015, Oncor's board of directors declared a cash distribution of $74 million, which was paid to us on February 26, 2015. During 2014, 2013 and 2012, Oncor's board of directors declared, and Oncor paid to us cash distributions totaling $202 million, $213 million and $147 million, respectively.

*Supplemental Cash Flow Information*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2013 | 2012 |
| Cash payments to EFH Corp. related to federal income taxes | $        24 | $        34 | $        33 |