# In The Matter Of:

## *ENERGY FUTURE HOLDINGS CORPORATION, ET. AL.*

---

### *DAVID Y. YING - Vol. 1*
### *June 23, 2014*

---

## *CONFIDENTIAL*

**MERRILL CORPORATION**

LegaLink, Inc.

225 Varick Street
10th Floor
New York, NY 10017
Phone: 212.557.7400
Fax: 212.692.9171



EXHIBIT
Horton
21

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

Chapter 11

Case No. 14-10979 (CSS)

Jointly Administered

on an Interim Basis

------------------------------------x

In re:


ENERGY FUTURE HOLDINGS CORPORATION,

et al.,

               Debtors.

------------------------------------x

               June 23, 2014

               9:40 a.m.


        *** C O N F I D E N T I A L ***


    Videotaped Deposition of DAVID Y. YING,

pursuant to Notice, at the offices of KRAMER

LEVIN NAFTALIS & FRANKEL LLP, 1177 Avenue of

the Americas, New York, New York, before Frank

J. Bas, a Registered Professional Reporter,

Certified Realtime Reporter and Notary Public

within and for the State of New York.

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 2

```
1   A P P E A R A N C E S :
2
3   ROPES & GRAY LLP
4   Attorneys for CSC Trust Company of Delaware
5   As Successor Trustee for the
6   First Lien Notes Issued by EFIH
7       Prudential Tower
8       800 Boylston Street
9       Boston, Massachusetts  02199 - 3600
10  BY: ANDREW G. DEVORE, ESQ.
11      andrew.devore@ropesgray.com
12      WILLIAM ROBERTS, ESQ.
13      william.roberts@ropesgray.com
14
15  KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
16  Attorneys for the Ad Hoc Group of Legacy
17  Noteholders
18      1633 Broadway
19      New York, New York  10019-6799
20  BY: ANDREW GLENN, ESQ.
21      aglenn@kasowitz.com
22      RYAN MONTEFUSCO, ESQ.
23      montefusco@kasowitz.com
24
25
```

Page 4

```
1   A P P E A R A N C E S   C O N T I N U E D
2
3   BROWN RUDNICK LLP
4   Attorneys for Wilmington Savings Fund Society,
5   FSB, solely in its capacity as successor
6   Indenture Trustee for the Second Liens
7       Seven Times Square
8       New York, New York  10036
9   BY: SHIVANI PODDAR, ESQ.
10      spoddar@brownrudnick.com
11
12
13  CHADBOURNE & PARKE LLP
14  Attorneys for NextEra Energy, Inc.
15      30 Rockefeller Plaza
16      New York, New York  10112
17  BY: DAVID M. LeMAY, ESQ.
18      delemay@chadbourne.com
19      MARC B. ROITMAN, ESQ.
20      mroitman@chadbourne.com
21
22
23
24
25
```

Page 3

```
1   A P P E A R A N C E S   C O N T I N U E D
2   MORRISON & FOERSTER LLP
3   Attorneys for the Official Committee of
4   Unsecured Creditors
5       250 West 55th Street
6       New York, New York  10019-9601
7   BY: KAYVAN B. SADEGHI, ESQ.
8       ksadeghi@mofo.com
9
10  WHITE & CASE LLP
11  Attorneys for the Ad Hoc Group of TCEH
12  Unsecured Noteholders
13      1155 Avenue of the Americas
14      New York, New York  10036-2787
15  BY: J. CHRISTOPHER SHORE, ESQ.
16      cshore@whitecase.com
17
18  KRAMER LEVIN NAFTALIS & FRANKEL LLP
19  Attorneys for Computershare Trust Company
20      1177 Avenue of the Americas
21      New York, New York  10036
22  BY: GREGORY A. HOROWITZ, ESQ.
23      ghorowitz@kramerlevin.com
24      ALICE J. BYOWITZ, ESQ.
25      abyowitz@kramerlevin.com
```

Page 5

```
1   A P P E A R A N C E S   C O N T I N U E D
2   AKIN GUMP STRAUSS HAUER & FELD LLP
3   Attorneys for the Ad Hoc Committee of
4   EFIH Unsecured Noteholders and the Second
5   Lien Debt Holders
6       One Bryant Park
7       Bank of America Tower
8       New York, New York  10036-6745
9   BY: LINDSAY ZAHRADKA, ESQ.
10      lzahradka@akingump.com
11
12  BINGHAM McCUTCHEN LLP
13  Attorneys for Pacific Investment
14  Management Company
15      399 Park Avenue
16      New York, New York  10022-4689
17  BY: JEFFREY S. SABIN, ESQ.
18      jeffrey.sabin@bingham.com
19
20  WACHTELL LIPTON ROSEN & KATZ LLP
21  Attorneys for the EFH Equity Owners
22      51 West 52nd Street
23      New York, New York  10019
24  BY: LINDSEY WEISS, ESQ.
25      lweiss@wlrk.com
```

2  (Pages 2 to 5)

**PX 134**
**Page 3 of 165**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 6

1  APPEARANCES CONTINUED
2
3  KIRKLAND & ELLIS LLP
4  Proposed Counsel for Debtors
5      601 Lexington Avenue
6      New York, New York 10022-6411
7  BY: STEPHEN HESSLER, ESQ.
8      stephen.hessler@kirkland.com
9
10
11  KIRKLAND & ELLIS LLP
12  Proposed Counsel for Debtors
13      300 North LaSalle
14      Chicago, Illinois 60654
15  BY: WILLIAM PRUITT, ESQ.
16      william.pruitt@kirkland.com
17
18
19  FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
20  Attorneys for Fidelity
21      One New York Plaza
22      New York, New York 10004-1980
23  BY: JESSICA PEVZNER, ESQ.
24      jessica.pevzner@friedfrank.com
25

Page 7

1  APPEARANCES CONTINUED
2  SHEARMAN & STERLING LLP
3  Attorneys for Deutsche Bank as Agent
4  for the EFIH DIP Facility
5      599 Lexington Avenue
6      New York, New York 10022-6069
7  BY: ROBERT A. BRITTON, ESQ.
8      robert.britton@kirkland.com
9
10  FOLEY & LARDNER LLP
11  Attorneys for UMB Bank as Indenture Trustee
12  for EFIH Unsecured Notes
13      90 Park Avenue
14      New York, New York 10016-1314
15  BY: REBECCA A. HAYES, ESQ.
16      rhayes@foley.com
17
18
19  ALSO PRESENT:
20
21  DANIEL DAY, Summer Associate, Brown Rudnick
22  IAN HOLMES, Centerview Partners
23  ADAM KOWALCZYK, Videographer, Merrill Corp.
24  TIM POHL, Lazard
25  BORIS STEFFEN, (via phone)

Page 8

1          June 23, 2014
2          New York, New York
3          ---
4          THE VIDEOGRAPHER: Good
5  morning. This is the video operator speaking,
6  Adam Kowalczyk of Merrill Legal Solutions, 225
7  Varick Street, New York, New York -- actually
8  1345 Avenue of the Americas, New York,
9  New York. Today is Monday, June 23rd, 2014,
10  and the time is approximately 9:40 a.m.
11          We are at the offices of Kramer
12  Levin Naftalis & Frankel, 1177 Avenue of the
13  Americas, New York, New York, to take the
14  videotaped deposition of Mr. David Ying in the
15  matter of In Re Energy Future Holdings
16  Corporation et al., in the United States
17  Bankruptcy Court for the District of Delaware,
18  Chapter 11, Case Number 14-10979 CSS.
19          Will questioning and defending
20  attorneys please introduce themselves for the
21  record.
22          MR. DEVORE: Andrew Devore,
23  Ropes & Gray, for CSC Trust Company of
24  Delaware as indenture trustee for the EFIH ten
25  percent first lien notes.

Page 9

1          MR. PRUITT: Will Pruitt,
2  Kirkland & Ellis, proposed counsel for the
3  debtors.
4          MR. HESSLER: Steve Hessler, on
5  behalf of the debtors.
6          THE VIDEOGRAPHER: Thank you.
7          Will the court reporter, Frank
8  Bas of Merrill Legal Solutions, please swear
9  in the witness.
10          ---
11
12  DAVID YING,
13      called as a witness, having been duly
14      sworn by a Notary Public (Frank J. Bas),
15      was examined and testified as follows:
16  EXAMINATION
17  BY MR. DEVORE:
18      Q.  Good morning, Mr. Ying. We've
19  met before. Correct?
20      A.  Yes.
21      Q.  Okay. As you may recall, I'm
22  Andrew Devore from Ropes & Gray, representing
23  the first lien indenture trustee for the ten
24  percent notes on the EFIH side.
25          Mr. Ying, did you attend

3  (Pages 6 to 9)

**PX 134**
**Page 4 of 165**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 10

1  yesterday's board meeting concerning the
2  various second lien DIP proposals?
3      A.   I participated by telephone,
4  yes.
5      Q.   For the entire meeting?
6      A.   Yes.
7      Q.   Were you ever asked to excuse
8  yourself from the meeting?
9      A.   No.
10     Q.   Was there any board vote on the
11 proposals presented to the board?
12     A.   Yes.
13     Q.   And what was the outcome of the
14 board vote?
15     A.   The board voted to continue to
16 support the second lien DIP proposal as
17 proposed by the EFIH ad hoc unsecured
18 committee.
19     Q.   Did the board reject the
20 proposals from the other parties?
21     A.   They agreed to support the EFIH
22 unsecured proposal.
23              ---
24          (Exhibit 1 was marked for
25 identification.)

Page 11

1              ---
2  BY MR. DEVORE:
3      Q.   Mr. Ying, I'm handing you what
4  has been premarked as Exhibit 1, which is a
5  board deck dated June 22nd, 2014.
6              ---
7          (Witness reviewing document.)
8              ---
9  BY MR. DEVORE:
10     Q.   Mr. Ying, is this the board
11 deck from yesterday's board meeting?
12     A.   It's redacted, but yes, it is.
13     Q.   Have you seen this document
14 before?
15     A.   Yes, I have.
16     Q.   And were you involved in its
17 preparation?
18     A.   Yes, I was.
19     Q.   Did you prepare the summary on
20 Page 4?
21     A.   I helped prepare the financial
22 aspects of the summary on Page 4.
23     Q.   Okay.  Are there any proposals
24 for the second lien DIP facility that are not
25 reflected on Page 4 of this board deck?

Page 12

1      A.   This board deck was circulated
2  to the board on Sunday morning, yesterday, and
3  I recall that a modified proposal was
4  submitted by the NextEra second lien note
5  group, which is not reflected in this board
6  deck, but was discussed orally with the board.
7      Q.   Other than the second lien
8  proposal that you just mentioned, are there
9  any other existing proposals for the second
10 lien DIP that are not reflected in this
11 summary?
12     A.   Not that I'm aware of, no.
13     Q.   With respect to the modified
14 proposal for the second lien -- by the second
15 lien lenders, what changes to the proposal did
16 they provide in their modified proposal?
17     A.   I recall that they've clarified
18 that of the 2.4 billion DIP that's described
19 here, that a billion 6 would be provided by
20 NextEra, 700 would be rolled by existing
21 second lien noteholders, a hundred million of
22 second lien notes would remain outstanding but
23 would convert to their pro-rata share of the
24 equity of the original $2.4 billion DIP upon
25 conversion.  I believe that they reduced the

Page 13

1  optional redemption payment from 180 million
2  to 160 million, and I think those are the
3  salient points as described on Page 4.
4      Q.   With respect to the commitment
5  parties' proposal that is summarized in the
6  first column, are those the current terms that
7  the PIK parties are proposing?
8      A.   I believe that reflects their
9  most recent proposal, yes.
10     Q.   And what is the current
11 proposed interest rate on the PIKs?
12     A.   Six-and-a-quarter percent.
13     Q.   And that is reduced from eight
14 percent?
15     A.   Yes, that's correct.
16     Q.   You list a $95 million funding
17 PIK fee.  Does that remain to be the requested
18 fee?
19     A.   Are you referring to the
20 unsecured proposal?
21     Q.   Yes, for the unsecured PIK
22 proposal.
23     A.   Yes, that is their current
24 proposal.
25     Q.   On Page 3 of the deck it notes

4 (Pages 10 to 13)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 14

1  in the boxed-in section on Next Steps that the
2  debtors and their professionals have
3  reiterated the request for best and final
4  offers from the unsecured group, second lien
5  group and first lien group.
6        What is that best and final
7  proposed deadline?
8        A.  We've been asking for best and
9  finals for the last week-and-a-half.
10       Q.  And, in fact, you've requested
11 best and finals on several occasions?
12       A.  That is correct.
13       Q.  And you keep getting new
14 proposals?
15       A.  That is correct.
16       Q.  When is the board set to meet
17 again to consider further proposals?
18       A.  There is no scheduled meeting
19 for the board.
20       Q.  Do you anticipate the board
21 will meet again to consider further proposals?
22       A.  I defer to the company and
23 outside counsel to determine when the board
24 might choose to meet again.
25       Q.  Are you aware of any

Page 15

1  discussions concerning proposing a further --
2  concerning setting a further board meeting to
3  consider further proposals?
4        A.  I am not aware of any further
5  scheduled board meetings, and I defer to the
6  company and outside counsel to determine if
7  subsequent board meetings are called for.
8        Q.  Okay.  I'm going to ask this
9  again.
10       Are you aware of any
11 conversations concerning scheduling a further
12 board meeting to consider further proposals?
13       A.  I am not.
14       Q.  Okay.  Thank you.
15       At yesterday's board meeting
16 was there any discussion of whether the motion
17 to approve the second lien DIP facility would
18 proceed at the June 30th hearing?
19       A.  Please ask the question again?
20 I'm sorry.
21       Q.  Yep.  At yesterday's board
22 meeting was there any discussion of whether
23 the motion to approve the second lien DIP
24 facility would proceed at the June 30th
25 hearing?

Page 16

1        MR. PRUITT:  And, David, that's
2  just a yes-or-no question.
3        A.  Yes.
4        Q.  And what was the outcome of
5  that discussion?
6        A.  I believe because the board
7  approved the second lien DIP proposal by the
8  unsecureds, that's what would be proposed at
9  the hearing.
10       Q.  So it is your understanding
11 that the matter is still proceeding at the
12 June 30th hearing?
13       A.  Yes.
14       Q.  Did the board consider delaying
15 moving forward on the motion to approve the
16 second lien DIP proposed by the PIK creditors?
17       MR. PRUITT:  David, that's just
18 a yes-or-no question.
19       A.  No.
20       Q.  Did anyone suggest that that
21 was a possibility?
22       A.  I don't recall, no.
23       Q.  You don't recall, or the answer
24 is no?  I just want to be clear.
25       A.  I don't recall any such

Page 17

1  discussion that you suggested.
2        Q.  There was no board vote on
3  moving the June 30th hearing?
4        A.  No.
5        Q.  What is your understanding of
6  the importance of proceeding at the June 30th
7  hearing?
8        A.  Could you ask the question
9  again?  It's very broad and vague.
10       Q.  The debtors have scheduled the
11 hearing for June 30th.  Is that correct?
12       A.  Yes, they have.
13       Q.  Is there any business need for
14 the hearing to go forward at the June 30th
15 hearing, to your knowledge?
16       MR. PRUITT:  Objection to form.
17       A.  Well, this is a provision of
18 the prearranged plan that has been disclosed
19 to the universe and in the bankruptcy court
20 since the day we filed, so this is at no
21 variance to anything we've said prior hereto.
22       Q.  To your knowledge, is the June
23 30th date based on any deadlines in any of the
24 restructuring support agreements, the DIP
25 commitments, or any other operative financing

5 (Pages 14 to 17)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 18

1  document?
2      A.  I believe there are deadlines
3  embedded in the restructuring support
4  agreement, but I don't recall the exact dates.
5      Q.  You testified earlier that the
6  board is moving forward with the PIK proposal.
7  Is there any level of improvement from the
8  current PIK proposal that the board would have
9  considered sufficient improvement to select
10 the alternative proposals by either the first
11 or second lien creditors?
12             MR. PRUITT:  Object to form.
13 One second, David.  (Pause.)
14             You worded that as that the
15 board would have considered sufficient.  I'll
16 object on speculation and foundation.
17 BY MR. DEVORE:
18     Q.  Are you able to answer the
19 question?
20     A.  I can't respond to
21 hypotheticals.
22     Q.  I'll rephrase.
23             Have any deficiencies or
24 pricing terms in the first or second lien
25 proposals been identified that, if remedied or

Page 19

1  altered, would result in those proposals being
2  viewed as superior to the estates than the
3  current PIK proposal?
4             MR. PRUITT:  Object to form.
5  Again, it's -- it calls for speculation.
6  You're asking him what would the board
7  consider as an improvement.  I'm not sure if
8  he has a foundation for that.
9  BY MR. DEVORE:
10     Q.  Did you recommend any proposal
11 to the board?
12     A.  We recommended that the board
13 endorse the unsecured proposal.
14     Q.  Are there any improvements to
15 the first or second lien proposals that would
16 alter your recommendation to go with the
17 current PIK proposal and instead go with the
18 first or second lien proposals?
19     A.  We evaluated proposals based on
20 what the proposals are as best we understood
21 them as of the board meeting date.  We did not
22 speculate or evaluate as to what additional
23 changes might occur.  We only evaluated what
24 we knew at the time.
25     Q.  Okay.  Sitting here, are there

Page 20

1  any provisions or financial terms in those
2  proposals that you would consider, if altered
3  or modified, to reflect a better offer to the
4  company?
5             MR. PRUITT:  Object to form.
6      A.  I can only evaluate what's
7  proposed in front of me.  We have not tried to
8  speculate.
9      Q.  But I am asking you today, as
10 you sit here, can you identify a single
11 provision of either the first or second lien
12 DIP facility -- the first or second lien
13 proposals that, if altered, would -- that you
14 would recommend those proposals, as altered,
15 to the company?
16             MR. PRUITT:  Object to form.
17 Still calls for speculation.  Now we're
18 getting argumentative.
19      A.  As I sit here today, I have not
20 tried to speculate as to future changes that
21 people may propose, and, therefore, the answer
22 is no.
23      Q.  You did not consider any
24 alterations to the current proposals?
25      A.  I think the people who are

Page 21

1  making these offers are highly sophisticated.
2  If they choose to make changes, I'm sure
3  they're able to do so.
4      Q.  Did you reach out to either the
5  advisors for the first or second liens to
6  negotiate additional or different terms?
7      A.  Every time we received a
8  proposal we would get on the phone and give
9  ample opportunity for the advisors to discuss
10 the proposal.  We would ask them questions to
11 clarify what they meant by various words, and
12 we would evaluate those proposals.
13      Q.  And in those discussions did
14 you ever suggest that -- any changes to the
15 proposals that would improve them from your
16 perspective?
17      A.  We think all the advisors and
18 the parties involved are highly sophisticated.
19 If they want to make an offer, we have made
20 every effort to evaluate them and understand
21 them and treat them very seriously.
22      Q.  With respect, Mr. Ying, you're
23 not answering the question.  The question is:
24 did you ever suggest any changes to the
25 proposals that would improve them from your

6 (Pages 18 to 21)

PX 134
Page 7 of 165

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 22

1  perspective?
2      MR. PRUITT: And just a point
3  of clarity. You're saying "you." Are you
4  referring just to Mr. Ying, or are you
5  referring to his knowledge of perhaps other
6  discussions?
7      MR. DEVORE: Mr. Ying or any
8  other advisor or principal of the debtors.
9      A.  No, we never --
10     MR. PRUITT: That he's aware
11 of?
12     MR. DEVORE: That he's aware
13 of, yes.
14     A.  No, we've never provided advice
15 to the other advisors as to how they should
16 negotiate.
17            ---
18     (Exhibit 2 was marked for
19 identification.)
20            ---
21 BY MR. DEVORE:
22     Q.  Mr. Ying, I'm handing you what
23 has been premarked as Exhibit 2, which is your
24 declaration filed in connection with this
25 matter, at Docket Number 478.

Page 23

1      Is this your declaration?
2      A.  Yes, it is.
3      Q.  Do you believe your declaration
4  to be true and complete with respect to the
5  statements set forth therein?
6      A.  I believe it was true and
7  complete as of the date it was filed, yes.
8      Q.  And sitting here today, are
9  there any corrections that you need to make to
10 your declaration?
11     A.  I don't recall.
12     Q.  As sitting here today, you do
13 not know if there are any statements that need
14 to be corrected?
15     MR. PRUITT: Corrected as to
16 their truthfulness at the time they were made?
17 BY MR. DEVORE:
18     Q.  Truthfulness as to the time of
19 today.
20     A.  No, I think they were truthful
21 as of the time that this was filed.
22 Circumstances and information and proposals
23 have changed since then.
24     Q.  Other than the proposals that
25 have changed, is there any information set

Page 24

1  forth in your declaration that needs to be
2  changed, to be current as of today?
3      A.  I haven't read it to respond to
4  your specific question. This -- this
5  declaration was accurate, as it states on its
6  face, as of the time it was filed. No more,
7  no less.
8      Q.  Mr. Ying, you state in
9  Paragraph 20 of your declaration that the EFIH
10 debtors do not engage in the traditional
11 marketing process with respect to the EFIH
12 second lien DIP facility.
13     MR. PRUITT: Is there a
14 specific line you're referring to?
15     MR. DEVORE: It's the second
16 sentence of Paragraph 20.
17     A.  That is correct.
18     Q.  Did the company engage in any
19 marketing process for the second lien DIP
20 before signing the RSA?
21     A.  No.
22     Q.  Why did the company not engage
23 in any marketing process before signing the
24 RSA?
25     MR. PRUITT: Objection;

Page 25

1  foundation.
2      A.  Well, the company was
3  negotiating actively with all the key creditor
4  groups in the EFIH and EFH capital structure,
5  and because of the unique tax structure that
6  overlays the restructuring negotiations it was
7  not deemed to be appropriate to shop any part
8  of the company to any third parties, because
9  their role might interfere with the tax
10 strategies that were important to maintain.
11     Q.  Okay. So I understand your
12 testimony correctly, just because of the tax
13 considerations that the company did not engage
14 in a traditional marketing process.
15     MR. PRUITT: Object to the
16 form.
17     A.  That is correct.
18     Q.  So with respect to the tax
19 issues, you state in your declaration in
20 Paragraph 6, Page 3, that the second lien DIP
21 facility is a critical component of the
22 tax-free restructuring contemplated by the
23 RSA.
24     A.  I'm sorry. I'm just turning to
25 Paragraph 6, Page 3. I just want to read it.

7 (Pages 22 to 25)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 26

1    Q.   Yes.  It's the last sentence.
2    ---
3    (Witness reviewing document.)
4    ---
5    A.   And you're referring to the
6  last sentence of the first paragraph, or
7  Paragraph 6?
8    Q.   Yes.
9    A.   Okay.  I've read it.  Thank
10  you.
11    Q.   So Paragraph 6, the last
12  sentence states, "The EFIH second lien DIP
13  facility is a critical component of the
14  tax-free restructuring contemplated by the
15  restructuring support agreement."
16         Is that accurate -- is that
17  statement remain -- does that statement remain
18  accurate today?
19    A.   Yes, it does.
20    Q.   You go on to state in Paragraph
21  9, which is on the next page -- I'm sorry, two
22  pages down, that "The second lien DIP facility
23  facilitates a tax efficient restructuring of
24  each of EFH and EFIH, which is a necessary
25  condition for the contemplated tax-free

Page 27

1  spin-off of TCEH."
2         Does that remain a true and
3  accurate statement as of today?
4    A.   I'm sorry.  You're looking at
5  Paragraph 9?
6    Q.   Yes.  The first sentence.
7    A.   And the first sentence,
8  beginning with the word "third"?
9    Q.   Correct.
10    ---
11    (Witness reviewing document.)
12    ---
13    A.   Yes, I've read the sentence.
14    Q.   Does that remain accurate
15  today?
16    A.   Yes, it does.
17    Q.   You make various other
18  statements concerning tax issues in your
19  declaration, but I would like to turn to
20  Paragraph 18 of your declaration.
21         And in the second sentence you
22  state, "It was clear from the start of
23  negotiations that there was a limited universe
24  of potential investors whose investment
25  commitment would not preclude the proposed

Page 28

1  tax-free spin."
2         Do you see that?
3    A.   Yes, I do.
4    Q.   Who are the limited universe of
5  potential investors that you are referring to?
6    A.   The limited universe included
7  the existing creditor groups at EFIH and EFH.
8    Q.   Would that include the second
9  lien bondholders?
10    A.   Well, now you're asking me
11  detailed tax issues, which I'm not the expert
12  on.
13    Q.   When making the statement that
14  there was a limited universe of potential
15  investors, what parties were you referring to
16  specifically?
17       MR. PRUITT:  Just one second.
18       David, if you can answer that
19  question without disclosing the analysis of
20  Kirkland & Ellis, you may do so.  If you
21  cannot, I will instruct you not to answer.
22       THE WITNESS:  Sure.
23    A.   Well, at the time we were
24  actively -- or we had active discussions with
25  the EFH unsecureds, the EFIH unsecureds, and

Page 29

1  the second lien noteholder group represented
2  by Rothschild and Kramer Levin.
3    Q.   So back to Paragraph 18.  When
4  you state there is a limited universe of
5  potential investors, when you wrote that
6  statement, can you list the parties who you
7  were considering in writing that statement?
8    A.   Those are the three parties.
9       MR. PRUITT:  Objection.  The
10  same -- the same instruction.
11       THE WITNESS:  Sure.
12    A.   Those are the three parties.
13  The answer to my prior question is the answer
14  to yours.
15    Q.   So just to be clear, the
16  EFIH -- the EFH, the parent company
17  unsecureds?
18    A.   Correct.
19    Q.   The second liens, at EFIH?
20    A.   Correct.
21    Q.   And the PIK creditors?
22    A.   The EFIH unsecured creditors.
23    Q.   Did you ever consider whether
24  the existing first lien creditors was a
25  potential investor?

8  (Pages 26 to 29)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 30

1          MR. PRUITT: Objection.
2   That's -- it's a yes-or-no question.
3          A.   They never expressed any
4   interest.
5          Q.   The question was, did you ever
6   consider them as a potential investor?
7          A.   No, because they never
8   expressed any interest.
9          Q.   With respect to the three
10  groups that you just identified, other than
11  the PIKs, did you or the company, to your
12  knowledge, reach out to any of these groups to
13  gauge their interest of providing a second
14  lien DIP?
15         A.   I recall the second lien notes
16  approached us, but no, we never approached
17  them.
18         Q.   Did you ever approach the EFH
19  unsecured creditors?
20         A.   I believe that they were in
21  active discussion with the EFIH unsecured
22  creditors, and the company and the sponsors on
23  participating in a DIP finance financing.
24         Q.   But neither you or to your
25  knowledge the debtors ever reached out to the

Page 31

1   EFIH unsecured creditors to gauge their
2   interest?
3          A.   I recall that we asked them if
4   they would like to provide financing.
5          Q.   And when was that?
6          A.   I believe it might have been
7   late January, early February.
8          Q.   And who did you reach out to?
9          A.   My recollection is that we had
10  a meeting with the advisors to the EFH, and
11  Fidelity, we discussed lots of issues with
12  respect to the restructuring.
13         Q.   Other than Fidelity, did you
14  meet with any of the EFH unsecured holders
15  concerning a possible second lien DIP?
16         A.   No.  We didn't know who any of
17  them were, and only Fidelity was willing to
18  engage in conversations on a confidential
19  basis.
20         Q.   Turning back to the tax issues
21  that we were discussing a moment ago.
22              Are you aware that the debtors
23  are seeking a ruling on continuity of interest
24  based on the 98 percent of the equity prior
25  distributed to EFIH unsecured creditors prior

Page 32

1   to dilution from the DIP to equity conversion?
2          MR. PRUITT: Objection to form.
3          That's a yes-or-no question.
4          A.   Only in a general way, because
5   I'm not a tax expert.
6          Q.   You are aware that the company
7   takes the -- the position the company takes
8   into its presubmission memo to the IRS is that
9   the DIP-to-equity conversion has no impact on
10  the continuity of interest?
11         MR. PRUITT: Do you want to put
12  a document in front of him, or --
13         MR. DEVORE: I can.
14  BY MR. DEVORE:
15         Q.   The question is, are you aware?
16         MR. PRUITT: Yes or no.
17         A.   I have a vague notion of what
18  the private-letter ruling request is
19  requesting, but I don't have a specific
20  knowledge of exactly what it says.
21         Q.   With respect to continuity of
22  interest, what is your understanding as to
23  what the presubmission memo is seeking?
24         A.   Actually, I don't know what it
25  asks.  I just know that the issue is an

Page 33

1   important one.
2          Q.   And that issue is the same
3   issue that caused you to believe that there
4   was a limited universe of potential investors.
5          Correct?
6          A.   Yes, that is correct.
7          Q.   So if, in fact, there is no
8   limitation on the continuity of interest for
9   the potential investors, your statement in
10  your declaration that there was a limited
11  universe would be incorrect?
12         MR. PRUITT: Object to form.
13  Calls for a legal conclusion.
14         A.   Again, I'm not the tax expert
15  who opines on continuity of interest, so I
16  can't respond to that other than to say that
17  the advice that I had received was that --
18         MR. PRUITT: David, do not
19  disclose the substance of any advice given by
20  Kirkland & Ellis on tax issues.
21         THE WITNESS: Fine.
22  BY MR. DEVORE:
23         Q.   Were you aware of the company's
24  position in its presubmission memorandum that
25  continuity interest did not require existing

9 (Pages 30 to 33)

**PX 134
Page 10 of 165**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 34

1  holders to be the investors in the convertible
2  DIP?
3           Were you aware of that on the
4  petition date?
5        A.   Ask the question again, please?
6        Q.   Were you aware of the company's
7  position in its presubmission memorandum that
8  continuity of interest did not require
9  existing holders of the company's debt to be
10  the investors in the convertible DIP?
11          Were you aware of that
12  petition -- of that position as of the
13  petition date?
14          MR. PRUITT:  Objection.
15  Assumes facts.  If you have the submission, we
16  can cover it.
17        A.   The answer to your question is
18  no.
19        Q.   You were not aware of that on
20  the petition date?
21        A.   I'm not aware of what was in
22  the request for the private-letter ruling.
23        Q.   You consider yourself an expert
24  in restructuring matters.  Correct?
25        A.   I'm experienced.  I'm not sure

Page 35

1  I'm an expert.
2        Q.   Okay.  Would you have
3  considered it important in determining whether
4  to pursue a marketing process prior to the
5  petition date for the second lien DIP, would
6  you have considered it important to know the
7  potential universe of investors that would
8  permit the tax-free spin?
9        A.   At the time I thought actually
10  the most important thing about this
11  restructuring was that we get the existing
12  constituencies to support is.  Because without
13  existing constituencies to support something,
14  a marketing process might be nice, but without
15  creditor support a marketing process doesn't
16  mean a whole lot.  Because ultimately the
17  existing creditors have to agree to a deal.
18        Q.   And by "the existing creditors"
19  you mean the EFIH unsecured creditors?
20        A.   I mean all the creditors at EFH
21  and IH.
22        Q.   Including the first and second
23  lien holders?
24        A.   I think their participation was
25  well considered and very important.

Page 36

1        Q.   Could we turn to Paragraph 24
2  of your declaration.
3        A.   I'm sorry, 2 --
4        Q.   Paragraph 24.
5        A.   Twenty-four.
6        Q.   It's on Page 11.
7           And you state, in part, based
8  on your experience and review of the tax
9  considerations of each alternative, that you
10  believe that the EFIH second lien DIP facility
11  is the best available in the circumstances.
12           I would like to focus on the
13  phrase "review of the tax considerations of
14  each alternative."
15           What is the basis for your
16  statement in the declaration concerning the
17  tax implications of the second lien DIP or
18  alternative proposals?
19        A.   Well, there are many tax
20  considerations in this transaction.  I believe
21  when I wrote this portion of my declaration I
22  was referring to the fact that any
23  deconsolidation of EFIH from EFH would trigger
24  a very substantial deconsolidation tax, which
25  could adversely impact the recoveries for

Page 37

1  unsecured creditors at both EFH and EFIH and
2  mire the companies in lengthy litigation.
3        Q.   Were all of the statements in
4  your declaration concerning the tax
5  implications of the second lien DIP proposal
6  and alternative second lien DIP proposals
7  based on the analysis provided to you by
8  Kirkland?
9           MR. PRUITT:  Objection to form.
10        A.   I relied on Kirkland for tax
11  advice.
12        Q.   And what was that analysis
13  provided to you by Kirkland that formed the
14  basis for your statements in your declaration?
15           MR. PRUITT:  Objection.
16           I instruct you not to answer
17  that question.
18           MR. GLENN:  Just so the
19  record's clear, if counsel is going to take
20  the position the declarant in this affidavit
21  can make these statements without questioning
22  the basis for those statements, I think the
23  choice we very is either to move to strike
24  those -- those provisions or for you to allow
25  him to answer those questions.  I don't think

10 (Pages 34 to 37)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 38

1  you can have it both ways.
2         So just so that we're clear.
3  Go ahead.
4         MR. DEVORE:  And I would just
5  ask that you put on the record the basis for
6  your instruction.
7         MR. PRUITT:  Oh.  On -- on the
8  basis of attorney-client privilege.
9         MR. DEVORE:  Okay.  Will you
10  let him speak to anything concerning the tax
11  analysis provided by Kirkland?
12        MR. PRUITT:  I'm not sure what
13  you mean by "anything concerning."  We can
14  handle this just on a question-by-question
15  basis.
16             ---
17        (Direction Not To Answer)
18             ---
19  BY MR. DEVORE:
20     Q.   Are you aware of whether the
21  board relied on Kirkland's advice on the tax
22  implications of the second lien DIP proposed
23  by the PIKs and the alternative proposals in
24  making their decision as fiduciaries to
25  proceed with the current PIK proposal?

Page 39

1         MR. PRUITT:  Objection to form.
2  Speculation.
3         MR. DEVORE:  The question was
4  are you aware.
5     A.   I am aware that the board asks
6  questions about taxes and that Kirkland does
7  provide them advice.
8     Q.   And during the board meeting
9  yesterday, which you attended in its entirety
10  you testified earlier, did Kirkland provide
11  any tax advice to the board?
12        MR. PRUITT:  Yes or no.
13     A.   Yes.
14     Q.   And what was the content of
15  that tax advice?
16        MR. PRUITT:  Objection and
17  instruction not to answer on the grounds of
18  attorney-client privilege.
19             ---
20        (Direction Not To Answer)
21             ---
22  BY MR. DEVORE:
23     Q.   To your knowledge, did the
24  board rely on Kirkland's tax advice in
25  determining to proceed with the PIK proposal?

Page 40

1         MR. PRUITT:  Objection to form.
2  Calls for speculation.
3  BY MR. DEVORE:
4     Q.   The question is, to your
5  knowledge did the board rely on Kirkland's tax
6  advice in determining to proceed with the PIK
7  proposal?
8     A.   The board asked a lot of
9  questions, and some of them were tax-related.
10  That's all I know.
11     Q.   Have you or Evercore done any
12  independent analysis of the tax implications
13  of the second lien DIP proposed by the PIKs or
14  the alternatives proposed by the first and
15  second lien holders?
16     A.   No.
17     Q.   Do you consider yourself an
18  expert in so-called G reorganizations under
19  Sections 355 and 368(a)(1)(G) of the internal
20  revenue code?
21     A.   No.
22     Q.   Do you consider yourself an
23  expert in the continuity of interest doctrine
24  under Treasury Regulation 1.368-1(b) that is
25  referenced in Paragraph 23 of your

Page 41

1  declaration?
2     A.   No.
3     Q.   Do you consider yourself as an
4  expert as to the various factors the IRS will
5  consider in issuing a private-letter ruling
6  for the proposed tax-free spin?
7     A.   No.
8     Q.   At the hearing currently
9  scheduled for June 30th, are you offering any
10  expert opinion concerning the tax-free spin?
11     A.   No.
12     Q.   Are you offering any expert
13  opinion as to the factors the IRS will
14  consider in issuing a private-letter ruling?
15     A.   No.
16     Q.   Are you offering any expert
17  opinion at the June 30th hearing concerning
18  whether the tax-free nature of the
19  restructuring contemplated by the RSA would
20  still be available if the first or second lien
21  holders provided the second lien DIP?
22        MR. PRUITT:  Object to the
23  form.  One clarifying remark.  You're saying
24  are you offering, but you're referring to
25  something that hasn't happened yet.  I assume

                          11 (Pages 38 to 41)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 42

1  these are questions directed to do you have
2  any intent, or --
3       MR. DEVORE:  Yes.
4       MR. PRUITT:  Okay.
5       A.  I'm sorry.  Would you please
6  ask the question again so I can answer it
7  accurately?
8       MR. DEVORE:  Could you read
9  back the question.
10      (The reporter read back as
11 follows:
12      "QUESTION:  Are you offering
13 any expert opinion at the June 30th hearing
14 concerning whether the tax-free nature of the
15 restructuring contemplated by the RSA would
16 still be available if the first or second lien
17 holders provided the second lien DIP?")
18      A.  No.
19      Q.  You testified earlier that you
20 recommended to the board that the board
21 proceed with the current unsecured PIK
22 proposal.  Is that correct?
23      A.  That is correct.
24      Q.  Was Kirkland & Ellis's tax
25 advice, was that --

Page 43

1       MR. DEVORE:  Strike that.
2  BY MR. DEVORE:
3       Q.  Was the advice provided by
4  Kirkland & Ellis to you regarding tax
5  implications, did that form -- was that part
6  of your reasoning for recommending the current
7  PIK proposal to the board?
8       MR. PRUITT:  Objection to form.
9  One second.  (Pause.)  Yes-or-no question.
10      A.  I'm sorry.  Would you please
11 restate the question?
12      Q.  In recommending the current PIK
13 proposal to the board, was the tax advice
14 provided by Kirkland & Ellis part of the
15 reason for recommending that proposal?
16      MR. PRUITT:  Yes or no.
17      A.  You'll have to ask the board
18 why they chose something.  My recommendation
19 was based on financial issues, and I leave the
20 legal and tax issues for counsel to provide.
21      Q.  So in your recommendation, your
22 personal recommendation to the board, did the
23 tax issues have any impact on recommending the
24 current PIK proposal?
25      A.  You'll have to ask the question

Page 44

1  one more time.  It's a -- it's a brain
2  twister.
3       Q.  In recommending to the board
4  that the board proceed with the current PIK
5  proposal, did the tax issues concerning
6  continuity of interest have any impact on your
7  recommendation?
8       A.  As a purely financial matter, I
9  think I can recommend the unsecured proposal
10 standing on its own.  I think any legal tax
11 issues are additional factors for the board to
12 take into consideration.
13      Q.  Okay.  So in recommending the
14 current PIK proposal, did you consider the tax
15 implications in making that recommendation?
16      A.  I just said that obviously I'm
17 aware of what is said in the boardroom, but
18 from a purely financial matter I think I
19 can -- I believe that the recommendation that
20 we made was appropriate, and it was based
21 purely on financial analysis.
22      Q.  It was based purely on
23 financial analysis?
24      A.  Yes.
25      Q.  Okay.  Mr. Ying, are you aware

Page 45

1  that as of the petition date --
2       MR. DEVORE:  Strike that.
3  BY MR. DEVORE:
4       Q.  Mr. Ying, as of the petition
5  date, what were the holdings of PIK notes
6  represented by the commitment parties?
7       A.  I recall that they were about
8  75 percent of the outstanding PIK notes.
9       Q.  Do you have any understanding
10 as to whether the collective PIK holdings held
11 by the commitment parties has changed since
12 the petition date?
13      A.  I believe I've seen a report
14 that says that they actually -- that some of
15 the commitment parties bought some more PIK
16 notes since the filing date.
17      Q.  How much?
18      A.  My vague recollection is about
19 45 or 50 million.
20      Q.  And what percentage does that
21 translate to?
22      A.  I think on a billion-570 of
23 principal amount, so that's roughly three
24 percent.
25      Q.  So they're about 78 percent

12 (Pages 42 to 45)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 46

1  now?
2      A.   I think 79 percent is I think
3  the number that pops into my mind.
4      Q.   Okay.
5      A.   But I have not seen a report
6  for a good 30 days.
7      Q.   Okay.  Mr. Ying, you state in
8  Paragraph 30 of your declaration that the $57
9  million alternative transaction fee that was
10 presented to the court in the second lien DIP
11 motion is reasonable under the circumstances.
12        Do you recall that statement?
13     A.   Yes, I do.
14     Q.   Now, what is the basis for your
15 conclusion that the $57 million fee was
16 reasonable?
17     A.   Well, the $57 million fee is
18 operative between the date that the second
19 lien DIP is approved and the second lien DIP
20 is funded, and I have looked at other
21 transactions where equity commitments are
22 provided in a rights offering context, and the
23 three percent fee for that period of time
24 certainly looked reasonable in the context of
25 other rights -- equity rights offering

Page 47

1  transactions that I have seen.
2      Q.   Is there any other basis for
3  your statement that the fee was reasonable?
4        MR. PRUITT:  Objection to form.
5      A.   That's the basis on which I
6  made my statement.
7      Q.   What is the current break fee
8  proposed by the PIK proposal that has been
9  adopted -- that has been --
10       MR. DEVORE:  Strike that.
11 BY MR. DEVORE:
12     Q.   The current PIK proposal
13 recommends -- has no alternative transaction
14 fee.  Is that correct?
15     A.   That is correct.
16     Q.   Does the fact that the break
17 fee has been eliminated alter your view that
18 the original $57 million fee was reasonable?
19     A.   No.  I think it was reasonable
20 at the time.
21     Q.   How was the original $57
22 million break fee negotiated?
23     A.   I believe there was an active
24 negotiation back and forth between the
25 unsecureds -- excuse me, the EFIH unsecureds,

Page 48

1  the EFH unsecureds, the EFH equity, and the
2  company on all the terms that are embodied in
3  the second lien DIP proposal.
4      Q.   Do you recall what the bid/ask
5  spread was for the alternative transactions
6  fee?
7      A.   No, I do not.
8      Q.   Do you recall if there was any
9  fee that was proposed that was different than
10 the $57 million transaction fee?
11     A.   No, I do not.
12     Q.   Based on your preliminary views
13 of valuation, the PIKs are the fulcrum
14 security?  Is that correct?
15       THE COURT REPORTER:  Fulcrum?
16       MR. DEVORE:  Fulcrum.
17     A.   At the time we were negotiating
18 the RSA, that seemed to be the right
19 conclusion based on the positions and actions
20 taken by the second lien creditors at EFIH,
21 the first lien creditors at EFIH, the
22 unsecured PIK creditors at EFIH, and the
23 unsecured creditors at EFH, yes.
24     Q.   Your answer was focused on "at
25 the time we were negotiating the RSA."

Page 49

1        Does your answer change as of
2  today?
3      A.   As of today?  No, my answer
4  does not change.
5      Q.   As of today you believe that
6  the PIKs remain the fulcrum security?
7      A.   Yes, I do.
8      Q.   Okay.  Do you believe that the
9  PIKs needed any incentive to propose the
10 second lien DIP that is convertible to equity?
11       MR. PRUITT:  Objection to form.
12 Vague.
13     A.   I don't understand the
14 question.
15     Q.   Was it the PIKs that proposed
16 the concept of a convertible second lien DIP,
17 or did the company make that suggestion?
18     A.   I don't recall who made the
19 suggestion.
20     Q.   Did the company solicit any
21 convertible second lien DIP proposals from the
22 PIKs?
23     A.   I think at a very early stage
24 we had said to the PIKs that if they wished to
25 make a proposal to restructure the company, an

13 (Pages 46 to 49)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 50

1  important element of a proposal by them that
2  would leave to a feasible restructuring would
3  be if they were willing to commit to invest a
4  substantial amount of equity capital into the
5  EFH/EFIH companies to achieve a feasible plan
6  of reorganization.
7       Q.  Do you recall any statement by
8  you or the company to the PIKs suggesting that
9  that equity infusion come in the form of a
10  convertible second lien DIP?
11      A.  I don't recall the exact
12  genesis of the mandatorily convertible second
13  lien DIP.
14      Q.  We'll come back to that in a
15  minute.
16          The original second lien DIP as
17  presented to the current court -- as presented
18  to the court and as currently set forth in the
19  DIP motion, proposes a $380 million prepayment
20  fee. Is that correct?
21      A.  That is correct.
22      Q.  How was the $380 million
23  prepayment fee negotiated?
24      A.  I believe there was an active
25  dialogue between the EFIH unsecured creditor

Page 51

1  group, the EFH creditor group represented by
2  Fidelity, the EFH equity group, and the
3  company on that particular provision.
4       Q.  Do you recall what the bid/ask
5  spread was?
6       A.  No. I do not.
7       Q.  Do you recall any proposal that
8  was other than the $380 million proposed
9  prepayment fee?
10      A.  I recall being on a phone call
11  with some representatives of the EFIH creditor
12  group, and I recall that representatives of
13  the EFH equity were also on that phone call,
14  and we made a very impassioned argument as to
15  why there should be no prepayment penalty.
16      Q.  And what were the reasons why
17  you believe that there should be no prepayment
18  penalty?
19      A.  We thought that it would be
20  better for the estate if there were no
21  prepayment penalty.
22      Q.  And what was the response from
23  the PIK holders?
24      A.  I think at the time they
25  listened politely, but, obviously, they didn't

Page 52

1  listen to our impassioned pleas.
2       Q.  Other than your suggestion that
3  there should be no prepayment fee, do you
4  recall any other amount of prepayment fee that
5  was proposed in the negotiations?
6       A.  I don't recall.
7       Q.  You don't recall a single other
8  proposal?
9       A.  I do not recall.
10      Q.  Do you have any reason to
11  believe that there was a different proposal
12  other than the $380 million prepayment fee?
13      A.  I do not know.
14      Q.  Do you believe that the $380
15  million prepayment fee is reasonable?
16      A.  At the time I wrote this
17  declaration, yes, I did.
18      Q.  What was the basis for your
19  view that the fee was reasonable?
20      A.  It was an active dialogue
21  between the parties at interest in the capital
22  structure. It was important that we reach a
23  consensual agreement on how to allocate value
24  between the two junior constituencies in the
25  EFH/EFIH capital structure, and our failure to

Page 53

1  reach that agreement would have very adverse
2  consequences for all of the estates because we
3  could not get the TCEH creditors to agree to
4  their portion of the RSA without reaching this
5  agreement between the EFH and EFIH creditors.
6       Q.  When you say between the
7  parties at interest in the capital structure,
8  are you referring to the ad hoc group and
9  Fidelity?
10      A.  Yes, I'm referring to the ad
11  hoc group of unsecured EFIH creditors and
12  Fidelity as the 72 percent owner of the EFH
13  unsecured bonds.
14      Q.  Other than the fact that the
15  fee was negotiated by those parties, are there
16  any other factors that you considered in
17  concluding that the fee was reasonable?
18      A.  And other than the fact that on
19  behalf of the company we tried very hard to
20  get them to eliminate the fee entirely, it was
21  the best we could do.
22      Q.  Mr. Ying, I would like to turn
23  your attention to the second lien DIP motion .
24  which has been premarked as Exhibit 4 and is
25  Docket Number 477.

14  (Pages 50 to 53)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 54

1       ---
2              (Exhibit 4 was marked for
3    identification.)
4       ---
5    BY MR. DEVORE:
6       Q.   I would like to turn to Page
7    30, Paragraph 43. The line that begins at the
8    very bottom of the page, starting, "The
9    commitment parties required the prepayment fee
10   to preserve their expectation of owning the
11   equity in reorganized EFH Corp., a key
12   component of the EFIH second lien DIP
13   facility."
14             Do you agree with that
15   statement?
16      A.   Yes.
17      Q.   Did Evercore perform any
18   analysis as to whether the $380 million
19   prepayment fee would be a reasonable
20   approximation of damages to the PIKs in the
21   event of prepayment?
22             MR. PRUITT: Objection to form.
23   Vague.
24      A.   No, we didn't provide any of
25   that kind of analysis.

Page 55

1       Q.   Were you ever asked to?
2       A.   No.
3       Q.   Do you know how the $380
4    million prepayment fee was calculated?
5       A.   No. I believe it was a result
6    of good faith and hard-fought negotiation
7    between all the relevant parties at interest.
8       Q.   In your assessment that the --
9    the $380 prepayment fee represents 20 percent
10   of the commitment. Is that right?
11             MR. PRUITT: Objection to form.
12      A.   Yes. That is the mathematics,
13   yes.
14      Q.   In your assessment that the 20
15   percent fee was reasonable, how did you
16   justify the fee in light of the fact that the
17   commitment parties would be paid the principal
18   and interest on the second lien DIP?
19             MR. PRUITT: Objection to form.
20   Argumentative.
21      A.   Would you please ask the
22   question again?
23      Q.   In your assessment that the 20
24   percent fee was reasonable, how did you
25   justify the fee in light of the fact that the

Page 56

1    commitment parties would be paid the principal
2    and interest on the second lien DIP loan?
3       A.   Well, at the time, as I said
4    earlier, the EFIH unsecured group was
5    insistent on this fee. We tried very hard to
6    convince them to reduce it to zero, but they
7    persisted in being -- making it a condition of
8    their providing the second lien DIP financing,
9    which we thought was an integral part of
10   achieving the consensual restructuring
11   agreement, and we believed that the value to
12   the estate from achieving a consensual deal
13   was far, far better for the estate than this
14   particular fee. Which only is payable if a
15   superior offer were to appear. And,
16   obviously, they have since reduced it.
17      Q.   And what is the reduction that
18   is currently proposed?
19      A.   They've reduced the fee from
20   $380 million to $95 million.
21      Q.   Does the fact that the
22   prepayment fee has been reduced by 75 percent
23   alter your view that the original $380 million
24   fee was reasonable?
25      A.   No. At the time we agreed to

Page 57

1    the RSA, we believed -- I believed that the
2    fee was reasonable in the context of the
3    overall effect of the RSA.
4       Q.   And at the time you agreed to
5    the RSA, the debtors had not engaged in any
6    marketing process for the DIP?
7             MR. PRUITT: Objection to form.
8       A.   As I said earlier, and you've
9    asked earlier, we had been in active
10   discussion with all the relevant layers of the
11   capital structure.
12      Q.   In light of the ongoing
13   competitive bidding for the second lien DIP
14   proposal, do you believe that the currently
15   proposed prepayment fee of $95 million is
16   reasonable?
17      A.   Yes, I think it's very
18   reasonable.
19      Q.   And why is that?
20      A.   Because everybody has had an
21   opportunity to put their best foot forward.
22   We've always been very open with everybody
23   about the needs of the company and what's
24   necessary to achieve a consensual deal, and
25   the $95 million that's currently proposed by

15 (Pages 54 to 57)

PX 134
Page 16 of 165

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 58

1  the EFIH unsecured group is the lowest fee
2  proposed by any of the groups, from my
3  recollection.
4      Q.   But you are still soliciting
5  best and final offers?
6      A.   Well, the board's been asking
7  everyone for best and final offers for quite
8  some time.  The board has to make a decision.
9  We've made our decision.  Obviously if other
10 people are going to make further changes to
11 their proposals I believe the company will be
12 duly diligent and evaluate them if and when
13 they appear.
14     Q.   Do you know why best and final
15 offers keep being requested on multiple
16 iterations?
17     A.   Because we have asked --
18     MR. PRUITT:  David, just a
19 yes-or-no answer to that question.
20     A.   Okay.  Please ask the question
21 again?  Sorry.
22     Q.   Do you know why best and final
23 offers are being requested on an iterative
24 basis?
25     A.   I believe so, yes.

Page 59

1      Q.   And what is that reason?
2      A.   Because the various
3  constituencies that have expressed an interest
4  in making offers have refrained from
5  respecting the company's request to put their
6  best foot forward at the same time.
7      Q.   And who are those
8  constituencies that have not -- who are those
9  constituencies that have refrained from
10 putting forth their best and final offers at
11 the same time?
12     A.   I believe the EFIH first lien
13 constituency refrained from putting their best
14 foot forward and sent us a proposal on
15 Saturday night, which I believe we received
16 around 9 or 10 o'clock at night.  I believe
17 that the EFIH second lien creditor group, in
18 conjunction with NextEra, has provided us
19 multiple proposals and revisions to proposals
20 over the last several days, the exact dates I
21 don't recall, but certainly it's after the
22 time we asked for best and finals.  And I
23 believe the EFH unsecured creditors, who are
24 RSA parties, have, in response to the various
25 proposals, made a proposal to us effective as

Page 60

1  of, I think we received the proposal on
2  Saturday, which was included in the board
3  deck.
4      Q.   Are you dissatisfied with the
5  process that has been ongoing with respect to
6  the second lien DIP?
7      MR. PRUITT:  Objection to form.
8      A.   Am I dissatisfied?  No, not at
9  all.  I think it's a fair and open discussion.
10 I think we, as the company, are being as
11 responsive as possible on a real-time basis to
12 any and all proposals that people want to
13 make.  I think we try to evaluate them fairly
14 and honestly and call them like we see them.
15 And I think everybody who is involved is
16 highly aware of the issues and very
17 sophisticated, and eminently able to represent
18 themselves well.
19     Q.   Did the company set up any
20 formal process for bidding for the second lien
21 DIP?
22     MR. PRUITT:  Objection to the
23 form.  Vague.
24     A.   I don't know what "formal" is,
25 but we did ask for best and final proposals,

Page 61

1  and I just described to you what the reaction
2  has been.  And we've done our very best to be
3  as responsive as possible to evaluate every
4  proposal on its merits.
5      Q.   With respect to the $95 million
6  prepayment fee that is currently proposed by
7  the PIKs, has Evercore performed any analysis
8  as to whether the $95 million prepayment fee
9  would be a reasonable approximation of damages
10 to the PIKs in the event of prepayment?
11     MR. PRUITT:  Objection to form.
12     A.   No, I have not evaluated --
13 tried to estimate a damage claim.
14     Q.   Are you aware of any such
15 analysis by any party?
16     A.   I am not aware, no.
17     Q.   You state in your declaration
18 that the debtors must deleverage to achieve a
19 feasible and sustainable capital structure
20 upon emergence.  Is that right?
21     MR. PRUITT:  Counsel, are you
22 quoting something --
23     MR. DEVORE:  It's just a
24 foundation question.
25     A.   That is true, I have made those

16 (Pages 58 to 61)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 62

1  statements.
2      Q.   And the only way to deleverage
3  EFIH is to convert the second lien debt to
4  equity.  Is that correct?
5      A.   That is correct.
6      Q.   As a professional in Chapter 11
7  restructurings, you are familiar with the
8  concept that secured debt cannot be crammed to
9  equity.  Is that correct?
10     MR. PRUITT:  Objection to the
11 form.  Calls for a legal conclusion.
12     A.   I'm not aware of the legal
13 issues, but I certainly believe that if you
14 can do it contractually it's better than
15 having a bankruptcy litigation fight.
16     Q.   So are you familiar with the
17 concept that secured debt cannot be crammed to
18 equity?
19     MR. PRUITT:  Objection.
20     A.   I'll take your comment as
21 correct, counselor.
22     Q.   The only way to deleverage EFIH
23 without the consent of the second liens was to
24 refinance the second liens.  Isn't that right?
25     MR. PRUITT:  Objection to form.

Page 63

1  Calls for a legal conclusion.
2      A.   Well, they've offered to
3  refinance themselves into equity, so they
4  voluntarily offered a different alternative.
5      Q.   We'll come back to that in a
6  second.
7          You state in your declaration
8  that if there was a deconsolidation tax, EFIH
9  could be jointly and severally liable for the
10 approximately $3 billion deconsolidation tax.
11         Is that correct?
12     MR. PRUITT:  Counsel, do you
13 have a page --
14     MR. DEVORE:  You can turn to
15 Paragraph 10, if you want, but you might
16 remember that.
17     THE COURT REPORTER:  Which
18 paragraph?
19     MR. DEVORE:  Paragraph 10.
20     A.   Of which document?
21     Q.   Your declaration.  Exhibit 2.
22     A.   Your question about joint and
23 several refers to the language in Paragraph 10
24 that's referred to as, quote, check the box,
25 unquote?

Page 64

1      Q.   Yes.  And you state in your
2  declaration that EFIH could be jointly and
3  severally liable for that deconsolidation tax?
4      A.   Only if -- yes.  Only if an
5  entity at EFH would deem it appropriate to,
6  quote, check the box, unquote, which is a tax
7  term.
8      Q.   And the $3 billion claim on
9  EFIH would effectively preclude any meaningful
10 recovery to the unsecured creditors at the
11 EFIH box?
12     A.   Yes.  If EFH were to check the
13 box at EFIH, EFIH would now become a member of
14 the -- or become jointly and severally liable
15 with EFH for the EFIH deconsolidation tax, and
16 I understand that that tax would have
17 administrative claim status at EFIH and,
18 hence, that claim would rank senior to the
19 unsecured claims at EFIH.
20     Q.   You would agree that the PIKs
21 have every incentive to avoid the
22 deconsolidation tax?
23     MR. PRUITT:  Objection to form.
24     A.   We've certainly argued that
25 point to them.  If you ask them, I think they

Page 65

1  would take a different point of view.
2      Q.   And what is the point of view
3  that they've taken in discussions with you?
4      A.   I am not their legal counsel,
5  but they have said that they think they have
6  meritorious arguments to say that they're not
7  vulnerable to a deconsolidation tax at EFH.
8      Q.   I would like to go back to the
9  concept that secured debt cannot be crammed to
10 equity, and the viable transaction options
11 that were available to the PIKs in entering
12 into negotiations for the RSA.
13         One option that they could do
14 would be to negotiate with the first and
15 second liens to get a consensual conversion of
16 some or all of the secured debt to equity.
17         Is that correct?
18     MR. PRUITT:  Objection to form.
19     A.   As conjecture?  Sure.  Why not?
20     Q.   Or they could take out the
21 second liens with an equity infusion?
22     MR. PRUITT:  Objection to form.
23     A.   That's another possibility.
24     Q.   Other than those two
25 possibilities that we just discussed, as a

17 (Pages 62 to 65)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 66

1  restructuring professional do you believe that
2  there are any alternative transaction options
3  that were available to the PIKs --
4        MR. PRUITT: Objection to form.
5  BY MR. DEVORE:
6        Q.  -- to preserve value?
7        MR. PRUITT: Objection to the
8  form. Calls for speculation.
9        A.  As I sit here, I think those
10  are the -- the primary methods. But I would
11  have to think about it to see if I could come
12  up with any other viable alternatives.
13        Q.  Sitting here today -- have you
14  ever considered any alternative transactions
15  the PIKs could pursue?
16        A.  I've thought long and hard
17  about it, but those are the only two that come
18  to mind at the moment.
19        Q.  Okay. You state in your
20  declaration at Paragraph 32, if you want to
21  turn to it, that, "Taken as a whole, the fees
22  are competitive and well within the range of
23  fees to be found to be reasonable in other
24  large DIP facilities in recent years."
25        MR. PRUITT: Was that a

Page 67

1  question, counsel?
2  BY MR. DEVORE:
3        Q.  Do you see that?
4        A.  Yes, I do.
5        Q.  What comparable facilities are
6  you referring to?
7        A.  Well, I've looked at a number
8  of transactions that have been approved in --
9  actually, can I just restate my answer?
10        I recall --
11        Q.  To have a clear record, I'll
12  restate the question --
13        A.  Thank you very much, yes.
14        Q.  -- and then you can reanswer.
15        What comparable facilities are
16  you referring to in Paragraph 32 of your
17  declaration?
18        A.  I believe that I have looked at
19  fees of a large number of DIP facilities
20  across the years, some of which I've been
21  personally involved in advising other
22  companies, and I also looked at fees for
23  second lien financings that are not in
24  bankruptcy.
25        Q.  Of the comparable facilities

Page 68

1  that you refer to in Paragraph 32 of your you
2  are declaration, did any of those facilities
3  involve an equity conversion feature?
4        A.  No.
5        Q.  Are you aware of any case where
6  a 20 percent prepayment fee was proposed in
7  the context of a DIP facility that was
8  mandatorily convertible to equity?
9        A.  No. When I refer to DIP
10  facilities, all the DIP facilities I looked at
11  were for debt only. There was no mandatory
12  conversion feature, and the relevant benchmark
13  were the, essentially the up-front fees on the
14  DIP.
15        Q.  So with respect to the
16  mandatory conversion feature, I'm not a
17  financial expert, but I generally understand
18  convertible debt that is convertible at the
19  option of the lender. Why is this mandatorily
20  convertible?
21        MR. PRUITT: Objection to form.
22        A.  Well, I think as I have stated
23  in my declaration, with 5.4 billion of first
24  lien DIP and 1.9 billion of second lien DIP,
25  if that DIP loan -- second lien DIP loan were

Page 69

1  not mandatorily convertible, we don't think
2  that it would be possible to refinance the
3  company entirely with debt at emergence. It
4  would have to be refinanced with some equity.
5  And I believe that in the bankruptcy code DIP
6  loans must be paid off in cash.
7        So an important feature of a
8  second lien DIP loan in this context was that
9  it must have a mandatory conversion feature.
10  And, in fact, in securing the 5.4 billion of
11  first lien DIP, a condition in that first lien
12  DIP is that if the company does incur a second
13  lien DIP facility, it must be mandatorily
14  convertible.
15        Q.  So the second lien DIP
16  financing is effectively an equity infusion.
17        Is that correct?
18        MR. PRUITT: Objection to form.
19  Vague.
20        A.  The second lien DIP is a DIP
21  loan during the pendency of the case, and it
22  effectively secures a firm commitment to have
23  the form and effect of an equity rights
24  offering at the confirmation of the case,
25  where the use of proceeds of the rights

18 (Pages 66 to 69)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 70

1  offering is to repay, in full, the second lien
2  DIP.
3        Q.   If part of the purpose is for
4  the equity infusion and to convert debt to
5  equity, why is this structured as a loan?
6        MR. PRUITT: Objection to form.
7        A.   Well, the effect of the second
8  lien DIP is to repay the second lien notes,
9  and I think as is stated in my declaration,
10  the purpose of repaying the existing second
11  lien notes is that they carry a very high
12  interest rate, and that EFIH cannot support
13  that high interest burden, and that the effect
14  of the second lien DIP loan, while it is
15  outstanding, is to substantially reduce the
16  cost to the estate of the interest expense on
17  the existing second lien notes.
18        Q.   And by reducing the cost to the
19  estate of the interest expense on the existing
20  second lien notes, are you referring to during
21  the pendency of the case?
22        A.   Yes.
23        Q.   Do you take the position --
24  does the company take the position that the
25  EFIH second lien notes are oversecured?

Page 71

1        MR. PRUITT: Objection to form.
2  Foundation. Speculation.
3        A.   I think in my declaration I
4  have said that I believe there is an ample
5  equity cushion supporting the second lien DIP
6  and any alleged make-wholes by the first liens
7  and the second liens.
8        Q.   So it's your position that the
9  second lien bonds are oversecured?
10        MR. PRUITT: Objection to form.
11        A.   I do believe that they are well
12  secured, yes.
13        Q.   You say "well secured." Do you
14  mean oversecured?
15        MR. PRUITT: Objection to form.
16  Calls for a legal conclusion.
17        A.   I believe that there is an
18  equity cushion.
19        Q.   A significant equity cushion?
20        A.   Yes.
21        Q.   About how much?
22        A.   Well, since the proposed second
23  lien DIP I believe ranks junior to the first
24  lien DIP and ranks junior to the alleged first
25  lien make-whole claim and ranks junior to the

Page 72

1  alleged second lien make-whole claim in its
2  current proposal -- would you like me to speak
3  as to the current proposal or as of the
4  declaration date?
5        Q.   Let's start as of the petition
6  date.
7        A.   Okay. As of my declaration
8  and --
9        Q.   As of the petition date.
10        A.   -- and, therefore, the petition
11  date and, therefore, the terms of the original
12  second lien DIP as proposed by the EFIH
13  unsecured notes, their billion-9 of DIP loan
14  converted into 64 percent of the equity, I
15  believe that simple division implies that the
16  equity account is worth not quite $3 billion,
17  and that $3 billion is more than ample equity
18  cushion for the alleged make-whole claims of
19  the first and the seconds.
20        Q.   To summarize your testimony, as
21  of the petition date it is your view that
22  there was a $3 billion equity cushion behind
23  the second lien debt.
24        MR. PRUITT: Objection to form.
25  BY MR. DEVORE:

Page 73

1        Q.   Is that a correct summary?
2        A.   Yes.
3        Q.   As a result of that equity
4  cushion, the company is not required to pay
5  current interest on the second lien debt as
6  adequate protection. Isn't that correct?
7        MR. PRUITT: Objection to form.
8  Calls for a legal conclusion.
9        A.   I can't speak to the legal
10  argument you just made.
11        Q.   Are you familiar with any case
12  where debt was oversecured by $3 billion that
13  current interest payment was required by the
14  bankruptcy code?
15        A.   I haven't thought hard about
16  that question, and I don't think I'm suitably
17  trained to respond to it.
18        Q.   Do you have any reason to
19  believe that current interest pay is required
20  on the second lien interest?
21        MR. PRUITT: Objection to form.
22        A.   I don't feel expert to be able
23  to respond to your question.
24        Q.   You testified earlier that the
25  cash burn of the interest on the second lien

19 (Pages 70 to 73)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 74

1  debt during the case was the reason why the
2  second lien DIP was structured as a loan.
3       Do you recall that testimony?
4       MR. PRUITT: Objection to form.
5       A.   It's one of the reasons why we
6  have structured the second lien DIP with its
7  characteristics, yes.
8       Q.   All right. Let's check off
9  that list. What other reasons was the second
10  lien DIP structured as a loan instead of an
11  equity infusion?
12       A.   Well, I don't know of any
13  equity infusions during a bankruptcy case.
14       Q.   So other than the cash burn on
15  interest during the pendency of the case and
16  the inability to do an equity infusion outside
17  of a DIP loan, are there any other reasons why
18  the second lien -- any other reasons why this
19  transaction was structured as a loan?
20       MR. PRUITT: Objection to form.
21  Misstates testimony.
22       A.   If I understand your statement
23  correctly, I believe that is correct. Those
24  are the two primary reasons.
25       Q.   Now, with respect to the

Page 75

1  interest savings -- I'm sorry. With respect
2  to the cash burn of interest during the
3  pendency of the case, did you consider whether
4  the cash payment of interest during the
5  pendency of the case was required?
6       MR. PRUITT: Objection to form.
7       A.   Well, I know that in making the
8  calculation we've assumed it, yes, that cash
9  interest would be paid during the -- on the
10  second liens during the pendency of the
11  bankruptcy case.
12       Q.   And why did you assume that?
13       A.   Well, whether it's paid
14  currently or accrued, because they're well
15  secured, unless the second lien notes are paid
16  off, they would have to be paid both their
17  principal and accrued interest at some point
18  before they were -- to extinguish their
19  claims.
20       Q.   Now if current cash pay was not
21  required, meaning that the interest could be
22  paid at the end of the case, would there be a
23  cash requirement to do the second lien DIP
24  financing today?
25       MR. PRUITT: Objection to form.

Page 76

1  Calls for speculation.
2       A.   Well, if we wanted to pay full
3  interest on the second liens during the
4  pendency of the case, which would be
5  tantamount to paying them their make whole,
6  full make-whole payments during the pendency
7  of the case, sure, why not? But I don't think
8  that's the way to maximize the value for the
9  junior creditors in the capital structure.
10  Plus I'm sure you would ask for interest on
11  interest.
12       Q.   Have you done that calculation
13  of what the interest on interest would be for
14  the second liens?
15       A.   No, I have not.
16       MR. HOROWITZ: He's not the
17  second.
18       THE WITNESS: I know that.
19       MR. HOROWITZ: You said you
20  would ask. I just want to be clear on that.
21       THE WITNESS: I meant that
22  generically, since you're all listening.
23  BY MR. DEVORE:
24       Q.   So we discussed earlier
25  effectively two reasons for structuring the

Page 77

1  second lien DIP as a loan instead of an equity
2  infusion. The first was interest savings, and
3  the second was the fact that you can't do an
4  equity infusion prior to confirmation.
5       MR. PRUITT: Objection to form.
6       A.   That is correct.
7       Q.   I would like to talk about the
8  interest savings. I would like to refer you
9  to the DIP motion, which is Exhibit 4 on Page
10  7 of 53.
11       MR. PRUITT: I've got Exhibit
12  3.
13       MR. DEVORE: Did we not mark --
14       THE WITNESS: Yes. This is
15  this one. It's 4.
16       MR. DEVORE: Oh, yes, I'm
17  sorry. We skipped 3.
18  BY MR. DEVORE:
19       Q.   It is Page 7 of 53, where it
20  list the fees.
21       As originally proposed, the PIK
22  second lien DIP proposal provided for an $8.75
23  million execution fee, which is listed in sub
24  (a) on Page 7. Is that correct?
25       A.   Yes.

20 (Pages 74 to 77)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 78

1    Q.   Has there been any change to
2 this $8.75 million fee in the current PIK
3 proposal?
4    A.   I believe it was paid
5 prefiling.  So, no, there has been no change
6 to it.
7    Q.   So that has been paid.  Okay.
8        Sub (b) lists a $10.25 million
9 approval fee.  Is that correct?
10    A.   Yes.
11    Q.   Does that remain a fee to be
12 paid under the current PIK proposal?
13    A.   Yes.
14    Q.   Sub (c) lists a $1 million to
15 each of two arrangers, or $2 million, as an
16 arranger fee.  Correct?
17    A.   Yes.
18    Q.   Does that remain to be the fee
19 for the arranger fees, under the current PIK
20 proposal?
21    A.   Yes.
22    Q.   In sub (d) there is a funding
23 fee equal to $19 million as a, quote, funding
24 cash fee.
25        Correct?

Page 79

1    A.   Yes.
2    Q.   Does that remain to be the fee
3 with respect to the current PIK proposal?
4    A.   Yes.
5    Q.   Sub (e) lists a participation
6 fee equal to $11.25 billion.  Correct?
7    A.   Yes.
8    Q.   Does that remain to be the fee
9 with respect to the current PIK proposal?
10    A.   Yes.
11    Q.   (F) lists a $95 million closing
12 fee.  Correct?
13    A.   Yes.
14    Q.   Does that remain to be the fee,
15 the closing fee, under the current PIK
16 proposal?
17    A.   Yes.
18    Q.   Those fees add up to $146.25
19 million.  Is that correct?
20        MR. PRUITT:  Objection to form.
21 Do you want him to do the math?
22        MR. DEVORE:  Let me rephrase.
23 BY MR. DEVORE:
24    Q.   The fees listed that we just
25 discussed in the motion in Paragraph 9 sub (a)

Page 80

1 through sub (f), those fees total $146.25
2 million.  Is that correct?
3    A.   Not entirely.  You can add them
4 up that way, but I don't think that
5 characterizes how the fees really work.
6    Q.   That is the total amount of
7 fees that are proposed in the DIP motion.
8        Is that correct?
9        MR. PRUITT:  Objection to the
10 form.
11    A.   I can't argue that if you add
12 the numbers contained in A through F -- I
13 think I got that right, F -- I presume they
14 add up to the number you -- you have
15 described.
16    Q.   The EFH debtors --
17    A.   I don't think that it's a fair
18 characterization of how the fees work.
19    Q.   Is that because some are not
20 paid in cash?
21    A.   That's because some have been
22 already paid.  That's because some are to be
23 paid assuming the second lien DIP as the
24 unsecureds have proposed it is approved, and
25 that is because the $95 million fee in (f)

Page 81

1 which has been referred to as the funding PIK
2 fee is payable in additional Tranche B
3 noninterest-bearing notes which rank
4 pari passu with the Tranche A DIP loan -- DIP
5 loan, and that fee, upon conversion, isn't
6 paid, and in fact all the DIP loan Tranche A
7 and Tranche B convert into, as of this motion,
8 64 percent of EFH, and as of the current
9 proposal, 60 percent.  So basically the fee
10 really isn't paid.
11    Q.   Is it your testimony that the
12 $95 million closing fee represents zero dollar
13 in value transfer from the debtors?
14        MR. PRUITT:  Objection to form.
15    A.   If the DIP loan converts to
16 equity, it has no impact on the debtors.
17    Q.   And what happens if the DIP
18 does not convert to equity?
19        MR. PRUITT:  Objection to form.
20    A.   Please describe the
21 circumstances you're describing.
22    Q.   No, I'm asking -- I'm following
23 up on your question.
24    A.   Yes, I know you are.
25    Q.   And you say -- you said if the

21 (Pages 78 to 81)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 82

1  DIP loan converts to equity, it has no impact
2  on the debtors.
3       A.  I did say that, yes.
4       Q.  So my question is, what happens
5  if the DIP does not convert to equity?
6           MR. PRUITT: Objection to form.
7       A.  And I asked you please describe
8  the circumstances that you are describing, and
9  I'll try to do my best to answer your
10  question.
11       Q.  Well, since I'm asking the
12  questions, how about I ask you, can you think
13  of any circumstance in which the DIP loan does
14  not convert to equity?
15       A.  Well, if the RSA is not
16  approved, then the DIP loan doesn't have to
17  convert to equity.
18       Q.  And what happens to the $95
19  million closing fee in that circumstance?
20       A.  Well, the full billion-995 is
21  still a claim on the company, and it has to be
22  resolved. I don't know how it will be
23  resolved.
24       Q.  So in that circumstance the
25  closing fee would be paid in cash?

Page 83

1           MR. PRUITT: Objection to form.
2       A.  I don't know, because I don't
3  know how the case would get resolved.
4       Q.  The EFIH debtors seek to exit
5  bankruptcy within 12 months. Is that correct?
6       A.  Yes, that is correct.
7       Q.  Mr. Ying, I would like to turn
8  to a different topic, specifically --
9           MR. PRUITT: Counsel, we've
10  been going about an hour-and-a-half. I don't
11  know if you want to -- how much do you have
12  left, or ...
13           MR. DEVORE: I, personally,
14  probably have 15 minutes, but I'm happy to
15  take a break if you like.
16           THE WITNESS: I'm happy to keep
17  it going.
18           MR. DEVORE: And then I can
19  re-assess.
20           MR. PRUITT: That's fine.
21           THE WITNESS: Okay. Good
22  breaking point.
23  BY MR. DEVORE:
24       Q.  Mr. Ying, are you aware of how
25  the 64 percent/36 percent equity split was

Page 84

1  agreed to?
2       A.  No, not beyond the fact that it
3  was heavily negotiated between the relevant
4  parties.
5       Q.  Do you know whether the 64
6  percent to the commitment parties was the
7  first split that was proposed?
8       A.  I don't recall what the first
9  split was that might have been proposed.
10           MR. DEVORE: Can you mark this
11  as Exhibit 5.
12           ---
13           (Exhibit 5 was marked for
14  identification.)
15           ---
16  BY MR. DEVORE:
17       Q.  Mr. Ying, who is Bo Yi?
18  Spelled B-O, Y-I?
19       A.  Bo Yi is one of the very
20  bright, hard-working young gentlemen who works
21  for me in the restructuring group, and he does
22  a terrific job.
23           MR. HOROWITZ: What was the
24  exhibit number on this?
25           MR. DEVORE: 5.

Page 85

1  BY MR. DEVORE:
2       Q.  Exhibit 5 is an e-mail FROM Bo
3  Yi to persons at Perella Weinberg, and it
4  states, "We don't have any supporting analysis
5  on the 64.3 percent. That was the number we
6  heard came from Akin last night. We will be
7  reaching out to Centerview on how they got to
8  that ownership."
9           Have you seen this document
10  before?
11       A.  No, I haven't.
12       Q.  Do you agree -- do you have any
13  reason to doubt the statement set forth in the
14  e-mail?
15           MR. PRUITT: Objection to form.
16       A.  I see it in front of me, so I
17  can't doubt that this piece of paper exists.
18       Q.  Does this refresh your
19  recollection that the 64 percent equity split
20  was first proposed by Akin?
21           MR. PRUITT: Objection to form.
22       A.  Well, I know that Mr. Yi, on a
23  number of occasions, as part of our role in
24  the negotiation of the overall restructuring
25  agreement between the company and each of its

22 (Pages 82 to 85)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 86

1  creditor groups, would periodically have
2  conversations with the financial advisors to
3  the other constituencies in the capital
4  structure, and he would basically ask them
5  for -- to clarify what exactly does your
6  client mean by these certain provisions.
7         The intent of, I believe his
8  efforts, because I do believe that they were
9  numerous in nature and across a broad range of
10 terms of the restructuring agreement, were to
11 make sure that each of the constituent parties
12 were saying the same thing and that there was
13 no misunderstanding in terms of the actual
14 detailed financial impact of what was being
15 discussed.
16      **Q.  Mr. Ying, was there a bid/ask
17 spread on the equity split to the commitment
18 parties?**
19      A.  As I said earlier, I don't
20 recall the actual negotiation and any initial
21 intermediate discussing about what the actual
22 percentage might be.
23      **Q.  Do you have any reason to
24 believe that there was any equity split other
25 than the 64/36 split that was ever discussed?**

Page 87

1      A.  As I said earlier, I just don't
2  recall.
3      **Q.  Would you have been involved in
4  those negotiations?**
5      A.  I would have been well aware of
6  positions taken by various sides, but I just
7  don't recall.
8      **Q.  If a split other than the 64/36
9  split was negotiated, would you be aware of
10 that discussion?**
11         MR. PRUITT:  Objection to form.
12      A.  I don't know, but I just don't
13 recall.
14      **Q.  Sitting here today, do you
15 recall a single split other than 64/36 that
16 was ever discussed?**
17      A.  I don't recall.
18      **Q.  Mr. Ying, you're aware that the
19 PIKs are currently trading well above par.
20      Is that correct?**
21      A.  Yes, I've seen quotes for the
22 PIKs at well above par.
23      **Q.  And that would suggest that the
24 market views the valuation implied by the
25 second lien investment commitment is actually**

Page 88

1  **low.  Correct?**
2         MR. PRUITT:  Objection to form.
3      A.  Well, I would say that the
4  quotes in the market are in a very thinly
5  traded market.  Of the billion-570 face amount
6  of debt I believe that the committee now owns
7  80 percent of it, so there's not a big active
8  market in it.  Obviously there are a handful
9  of potentially trades offerings to be made,
10 so I think you have to take them with due
11 respect but some caution, because it's not a
12 broad market.
13         I also would say that it's not
14 uncommon for rights offerings to be struck at
15 a discount to market, and I think to the
16 extent that the claims are trading the way
17 they are, I think is a reflection of the fact
18 that today you can buy a claim and you have
19 the right both to own the claim and to own the
20 right to invest in the DIP.
21      **Q.  You are aware that there have
22 been active trades of the PIKs in recent
23 weeks.  Correct?**
24      A.  I did say to you that I'm aware
25 that the -- some of the participants in the

Page 89

1  EFIH unsecured committee have bought some
2  additional bonds.  But that was information
3  that's probably at least 30 days old.
4      **Q.  Other than the bonds that were
5  traded into the hands of the commitment
6  parties, are you aware of any other trades?**
7      A.  No.  I am not a market-maker,
8  so I am not aware of actual trades.
9      **Q.  Have you looked?**
10     A.  Again, I think -- excuse me.
11 Again, we do get a price report and so we're
12 aware of the indicated quotes in the
13 marketplace from time to time.
14     **Q.  What is the current indicated
15 quote in the marketplace?**
16        MR. PRUITT:  Counsel, as of
17 what day?
18 BY MR. DEVORE:
19     **Q.  As of the last date you looked.**
20     A.  As of the last date I looked,
21 which is probably last week, I think the last
22 quote I saw was around 125 percent of the
23 principal amount outstanding under the bonds.
24     **Q.  Mr. Ying, you've testified in
25 many cases as an expert witness.  Correct?**

23 (Pages 86 to 89)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 90

1    A.  Actually very few times.
2        Q.  You've testified in depositions
3  many times?
4        A.  I am not sure "many," but I
5  have definitely attended or have been asked to
6  appear in depositions.
7        Q.  In testifying either as an
8  expert or as a financial advisor, have you
9  ever used trading prices of bonds as an
10  indicator of value?
11        MR. PRUITT: Objection to form.
12        A.  Well, I'm respectful of trading
13  prices, because to the extent there's a liquid
14  market, it does indicate what people are
15  willing to buy and sell a particular
16  instrument at.  And, obviously, since the
17  market's dominated by, you know, very smart
18  wealthy hedge funds who employ you folks, I'm
19  very respectful of what they do.  But as an
20  investment banker, from a valuation
21  perspective we look at fundamental analysis
22  and we don't rely on the trading prices of
23  bankrupt securities as a determinative of
24  value.
25        Q.  But you do use trading prices

Page 91

1  as an indicator of value in some
2  circumstances.  Correct?
3        A.  Well, when we look at big
4  companies, public companies with listed stocks
5  that are actively traded and well researched
6  and well covered in a public way, we
7  absolutely do use comparable companies, which
8  is a term of art that I'm sure everybody in
9  this room is familiar with, we do use those
10  public trading prices to determine valuation
11  metrics, which are incorporated in valuation
12  analyses, yes.
13        Q.  You testified earlier that the
14  PIK bonds in your view were thinly traded, and
15  that was the reason why you were hesitant to
16  rely on them for valuation.  Is that a fair
17  characterization of your testimony?
18        A.  Yes.
19        Q.  Other than the fact that they
20  were, in your view, thinly traded, is there
21  any other reason why the PIK bond trading
22  price should not be used as a measure of
23  value?
24        MR. PRUITT:  Object to the
25  form.

Page 92

1        A.  Well, I'm construing your
2  question to be how would an investment banker
3  value the company, and my answer is is that we
4  don't use the company's trading prices as an
5  indicator of value.  We look to indicators of
6  value other than the company to arrive at a
7  valuation for this situation.
8        Q.  And what are those other
9  indicators of value?
10        A.  Well, again, when you're
11  talking about value, would you please be
12  specific as to the value of what?
13        Q.  We're talking about the EFIH
14  enterprise.  Correct?
15        A.  Yes.
16        Q.  And the PIKs represent the
17  unsecured creditors at EFIH?
18        A.  Yes.
19        Q.  And if the market views the
20  EFIH unsecured creditors as trading above par,
21  at or above par, that would suggest that the
22  market views the unsecured -- that the market
23  views the EFIH box to be solvent?
24        MR. PRUITT:  Objection; asked
25  and answered.

Page 93

1        A.  Well, I don't think that's an
2  inference you can make directly, because the
3  bond prices you see are expressed as a
4  percentage of a hundred dollars of principal
5  amount.  The bankruptcy claim that those bonds
6  have as of the date of filing is substantially
7  north of principal amount, and the trading
8  prices of those instruments as of today
9  include both the value that a claimant would
10  have as a creditor of the estate, plus the
11  right to participate in their pro-rata share
12  of the DIP financing.  So you have to take the
13  observed price and decompose it into its
14  constituent parts.
15        So I don't think you can say
16  that because the claims are trading where I
17  have suggested they are indicated to be
18  trading, that you can draw a straight-line
19  inference to the fact that what you said, is
20  that the EFIH entity is solvent.
21        Q.  You testified that the right to
22  participate in the pro-rata share of the DIP
23  financing would be reflected in the PIK
24  trading price.  Is that correct?
25        A.  Yes, I did.

24  (Pages 90 to 93)

PX 134
Page 25 of 165

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 94

1       Q.   If the PIK trading price was a
2   perfect measure, would you agree that a
3   trading price above par reflects the market
4   view that the PIKs are recovering more than a
5   hundred cents on their claims?
6           MR. PRUITT:  Object to the
7   form.
8       A.   No, because that's not what I
9   said. I said their claims are in excess of a
10  hundred dollars of principal amount, because
11  as of the filing date there was significant
12  accrued interest on those bonds.
13      Q.   What is your understanding of
14  what happens to bond trading prices after a
15  default?
16          MR. PRUITT:  Objection to the
17  form.  Vague and ambiguous.
18      A.   In the trading parlance, when
19  you buy a bond they go flat, so you're no
20  longer required, when you buy a bond, to pay
21  the bond quoted price plus accrued interest.
22  But my understanding is the quoted prices are
23  still expressed as a percentage of the
24  principal amount, not the claim amount.
25      Q.   When you say that the bonds

Page 95

1   trade flat, is that prepetition -- predefault
2   or postdefault?
3       A.   Well, generally bonds trade
4   with accrued before default and trade flat
5   postdefault.
6           MR. DEVORE:  I would reserve
7   right, because I'm short on my time, to circle
8   back at the end, but for efficiency we'll let
9   other people take the next set of questions.
10          MR. PRUITT:  Okay.  Why don't
11  we go off the record and take a break while we
12  reorganization the room.
13          THE VIDEOGRAPHER:  Here marks
14  the end of Media Number 1. We're going off
15  the record. The time is 11:17 a.m.
16          ---
17      (Recess from 11:17 to 11:31 a.m.)
18          ---
19          THE VIDEOGRAPHER:  Here marks
20  the beginning of Media Number 2.  We are back
21  on the record.  The time is 11:31 a.m.
22  EXAMINATION BY
23  MR. GLENN:
24      Q.   Good morning, Mr. Ying.
25  Following up on the questions you were asked

Page 96

1   about the bond trading prices, you indicated
2   that there was substantial interest that was
3   unpaid in respect of the PIK notes.
4           Do you recall testimony to that
5   effect?
6       A.   Yes.
7       Q.   Okay.  How much based on the
8   par value of the notes would be that unpaid
9   interest as of approximately today?
10      A.   My recollection is that there's
11  about $80 million of unpaid PIK interest on
12  the EFIH unsecureds, so that their principal
13  amount I think is about a billion-570, and
14  their claim as of the filing date I think is
15  about a billion-650 -- a billion and 650.
16      Q.   So is that about 108?
17      A.   Your math is better than mine,
18  but -- well, 80 on actually a billion-5
19  actually is probably closer to 105 or '6.
20      Q.   105 or '6?
21      A.   Yeah.  Probably 106.
22      Q.   Okay.  106.
23      A.   Mm-hmm.
24      Q.   And that's an approximation for
25  the record.  We won't hold you to that

Page 97

1   exactly.
2       A.   Mm-hmm.
3       Q.   So the testimony before, I
4   believe, based on your checking, was that the
5   PIKs are trading at approximately 125?
6           Am I correct?
7       A.   That's correct.
8       Q.   Okay.  So if as a matter of
9   math the implied interest amount would make
10  that a 106 bankruptcy claim, then the
11  distributable value for the rights offering
12  participation is approximately 19 points on
13  the PIKs. Am I correct about that?
14          MR. PRUITT:  Objection to form.
15      A.   I think that's right, yeah.
16      Q.   Okay.  That's just a matter of
17  math.  Right?
18      A.   Correct.
19      Q.   Okay.  Are you familiar with
20  warrants and options being distributed in
21  conjunction with bankruptcy plans?
22      A.   Yes.
23      Q.   And those have distributable
24  value.  Correct?
25      A.   You can value them via

25 (Pages 94 to 97)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 98

1 Black-Scholes, yes.
2      Q.  Right.  And we did the Mirant
3 case together, and there were warrants
4 distributed in conjunction with that plan.
5          Correct?
6      A.  You're testing my memory, but
7 yes.
8      Q.  You don't remember my
9 cross-examination at your trial?
10     A.  You know, when you sit there I
11 don't think about who it is; I just try to
12 answer the questions as best I can.
13     Q.  I'm honored.
14     A.  I didn't realize that we were
15 old friends. .
16     Q.  So is it your position, sir, is
17 it your position, sir, that the rights
18 offering is not distributable value that
19 should be considered on an account of the PIK
20 claims?  Is that your business understanding?
21     A.  Would you ask the question
22 again?
23     Q.  Sure.
24     A.  I am not following you.
25     Q.  Is it your understanding that

Page 99

1 that 19 points we just talked about is not
2 distributable value that's going to the PIKs
3 on account of their claims?
4          MR. PRUITT:  Object to the form
5 and also note again that we're basing on not
6 precise estimates?
7          MR. GLENN:  Correct, yes.  All
8 of my questioning on this, for the record, is
9 predicated on our following up on the math and
10 pinning that down.
11     A.  Well, I don't want to speak to
12 why the market wants to create a market at a
13 certain level.  Your question presupposes that
14 that trading price or indicated trading price,
15 which was very thin, is value.  Again, you
16 have very few bonds trading, I have no idea
17 who is on the bid side and the ask side, I
18 have no idea, you know, how deep those markets
19 are.  You know, they're just indications.
20          You know, when you ask an
21 investment banker about value, you go back to,
22 you know, the principles that you're very
23 familiar with, in terms of how bankers do
24 valuations.
25     Q.  Okay.

Page 100

1      A.  And so I think I have trouble
2 answering your question, and I'm trying my
3 best to answer it, because I -- I have trouble
4 saying that because that market valuation
5 indication is out there, that that really
6 indicates who is getting what and who is
7 getting paid.
8      Q.  Have you done any analysis to
9 determine the distributable value of
10 participating in the rights offering versus
11 other value that the PIK noteholders might
12 receive if the proposed plan contemplated by
13 the RSA is confirmed by the bankruptcy court?
14     A.  I'm not sure what you mean by
15 "other value" in your sentence.
16     Q.  Well, you seem to differentiate
17 in your answer with respect to the bond
18 trading prices that there's some separation
19 between bankruptcy claim and rights offering
20 participation.  So I'm asking you, sir, did
21 you separately analyze what people are
22 recovering in respect of their bankruptcy
23 claim versus rights offering participation?
24     A.  Well, embedded in some of our
25 analysis that we shared with the board is an

Page 101

1 analysis of what are the PIKs getting under
2 their proposal across a variety of assumed
3 potential enterprise values for the
4 restructured EFH.  So embedded in that
5 presentation is -- is a combination of here is
6 what they might be getting in their -- in
7 their -- by participating in the rights
8 offering in addition to what they might be
9 getting, you know, on their, in this case, you
10 know, the 40 percent of equity that's given to
11 the unsecured bonds and the EFH bonds and the
12 sponsors.
13     Q.  I'll get back to that later.
14          Do you expect to prepare any
15 opinions for presentation to the bankruptcy
16 court other than what's in your declaration?
17          MR. PRUITT:  Objection to the
18 form.
19     A.  That's a very broad question.
20     Q.  Well, I'm just trying to make
21 sure that we here are prepared for this
22 hearing, and I want to make sure we're not
23 going to be surprised.
24          So the question I have for you
25 is, other than the opinions and issues that

26 (Pages 98 to 101)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 102

1  you included in your declaration, do you have
2  any current expectation about any other
3  matters that you'll be testifying to at the
4  hearing on June 30th?
5          MR. PRUITT:  Objection to form,
6  and as Mr. Ying has already testified, the
7  declaration addresses prior iterations of
8  these DIP proposals.
9          MR. GLENN:  Okay.
10 BY MR. GLENN:
11     Q.  So I am asking if there's
12 anything else that you are prepared to testify
13 about, subject matter-wise.
14     A.  Nothing beyond the issues in
15 front of the court on June 30th, no.
16     Q.  Thank you.
17         In connection with the trading
18 issue we discussed a moment ago, how liquid
19 would the market have to be in the
20 circumstances before you would consider it a
21 reliable indicator of market value?
22         MR. PRUITT:  Objection to the
23 form.  Vague.
24     A.  Well, in general when bankers
25 do valuations, we don't rely on market prices

Page 103

1  of the subject that we're valuing and their
2  bankrupt securities.  We base our valuation
3  metrics on comparable companies, not on the
4  company itself, as the best third-party
5  indicator of value.
6      Q.  Okay.  I'm asking you a
7  different question, sir.  You indicated --
8      A.  I was trying to answer your
9  question.
10     Q.  Thank you.  I'll try to help
11 you further.
12     A.  Okay.
13     Q.  You indicated that the trading
14 values might not be representative or
15 indicative of valuation because they're thinly
16 traded.  Do you recall testimony generally to
17 that effect?
18     A.  Yes, I do.
19     Q.  Okay.  So the question I have
20 for you is, can you give me any indication of
21 how much trading would have to occur before
22 you would consider the trading activity a
23 reliable indicator of market value?
24         MR. PRUITT:  Objection.
25     A.  No, I have no bright-line

Page 104

1  indicator for that.
2      Q.  Okay.  Do you have any general
3  range, anything you can do to bracket what
4  might be a reasonable amount of trading for
5  that to be a reliable indicator of trading
6  value?
7      A.  No, I don't.
8      Q.  Okay.  Where would you go if
9  you wanted to find the most reliable source of
10 trading value for the company's bonds?
11     A.  Which bonds are you talking
12 about?
13     Q.  Any of them.
14     A.  I would probably have to go to
15 one of the big trading houses, Citibank,
16 JPMorgan, Bank of America, because none of
17 these bonds really trade actively on a listed
18 exchange, from what I can tell.
19     Q.  So --
20     A.  It's all over the counter.
21     Q.  So what would you ask of these
22 trading houses to determine what a reliable
23 source of trading value would be?
24         MR. PRUITT:  Objection to form.
25 Incomplete hypothetical.  Speculation.

Page 105

1  BY MR. GLENN:
2      Q.  I'm asking you about your last
3  answer.  You said you would have to go to one
4  of the big trading houses because none of the
5  bonds are listed on an exchange.  So what
6  would you ask those investment banking houses?
7          MR. PRUITT:  The same
8  objection.
9      A.  I would ask him, Give us the
10 best indicator you have of trading value.
11     Q.  Have you ever heard of
12 something called TRACE?
13     A.  Yes, I have.
14     Q.  What is TRACE?
15     A.  I believe it's a reporting
16 service that is monitored by the NASD, or
17 NASDAQ, N-A-S-D-A-Q.  I believe it's a
18 reporting system where people do have to
19 report trades after the fact.  It's a
20 reporting system where I think the volumes of
21 the trades are listed explicitly for below a
22 million dollars, but above a million dollars
23 it just says the trade is a million.  So it
24 could be a million, it could be a billion.
25 It's a million-dollar trade.

27  (Pages 102 to 105)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 106

1    Q.    Okay.
2    A.    And I believe those TRACE bonds
3  are only -- excuse me, the TRACE reporting
4  service is only for securities that are SEC
5  registered, and many of the securities in the
6  EFH/IH capital structure are not registered.
7    Q.    Have you looked at TRACE for
8  any indication of the trading values of any of
9  the bonds that are at issue on the E side of
10 the capital structure?
11   A.    I don't -- I don't personally.
12 I know that my people are getting information
13 which is coming from one of the big trading
14 houses for our sense of what quotes might be
15 for any given instrument in the EFH capital
16 structure.
17   Q.    And what trading house are you
18 referring to?
19   A.    I believe that with the
20 company's help we've been getting our quotes
21 from Citibank.
22   Q.    Okay.  For how long have you
23 been doing that?
24   A.    We've been doing that for at
25 least a year.

Page 107

1    Q.    Okay.  Have you noticed any
2  trends in the trading values over that last
3  year?
4    A.    It's a long time.  Lots of
5  trends.
6    Q.    Okay.  How about with PIKs?
7  Can you testify to any trends or values in the
8  PIKs over the last year?
9          MR. PRUITT:  Objection to form.
10   A.    Well, my vague recollection is
11 is that starting a year ago they've been quite
12 volatile, they've been trading, I think, you
13 know, maybe as high as 80 cents on the dollar,
14 they may have traded as low as 50 cents on the
15 dollar over the last year.  Just around the
16 time of the signing of the RSA I believe that
17 they were trading at about 70 cents.
18   Q.    Okay.  And now --
19   A.    Since the announcement of the
20 RSA I've told you I think their quotes are
21 about 120 or 25.
22   Q.    Okay.
23   A.    I don't know the exact number,
24 but it's in that range.
25   Q.    Fair enough.  So approximately

Page 108

1  the low water mark that you recall on the PIK
2  trading value is approximately 50 or in the
3  50s, and the high water mark that you can
4  recall is about 125, during the last year.
5          Correct?
6    A.    Only after the RSA was signed.
7  Prior to the RSA I think the high water mark
8  might have been, you know, 75.
9    Q.    Okay.  Have you noticed in that
10 last year the volumes of trading?
11   A.    I have no idea as to the
12 volumes.
13   Q.    Okay.  So you can't testify
14 whether the trading volume today is any lower
15 or higher than it was over the past year?
16   A.    Well, given that I know that as
17 much as 80 percent of the PIKs are now owned
18 by the people who are the ad hoc committee, my
19 guess is that the trading volumes are
20 substantially lower than they were a year ago.
21   Q.    But that's purely a guess.
22          Correct?
23   A.    It's based on the fact that the
24 PIKs that we were talking to a year ago owned
25 a lot less back then.

Page 109

1    Q.    And you know that how?
2    A.    By talking to the PIKs.
3    Q.    Did you verify their holdings
4  through documents?
5    A.    I don't have access to that
6  kind of information.
7    Q.    Okay.  Are you aware in our
8  industry that people are not always completely
9  honest about what they own?
10   A.    Oh, I would never say that
11 people are dishonest.
12   Q.    Okay.
13          MR. GLENN:  We're going to mark
14 Exhibit 3.
15          ---
16          (Exhibit 3 was marked for
17 identification.)
18          ---
19          MR. GLENN:  We're going back
20 because the previous questioner skipped over
21 Exhibit 3 intentionally.
22 BY MR. GLENN:
23   Q.    For the record, Exhibit 3 is an
24 e-mail chain from Robert Cilento of Centerview
25 dated September 25 of 2013.  We'll go through

28 (Pages 106 to 109)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 110

1  this quickly, sir, but I'm trying to just
2  understand the background in the negotiations.
3          Centerview represents the PIKs,
4  correct, or the financial advisor?
5      A.   That is correct.
6      Q.   Okay.  And attached to this
7  exhibit, sir, is a chart, and it was unclear
8  to me from this chart who is asking the
9  questions and who is providing the responses.
10         Is this something you recall
11  reviewing?
12     A.   If you give me a minute to try
13  to read this?
14     Q.   Sure.
15     A.   The type is very small.
16
17         (Witness reviewing document.)
18
19  BY MR. GLENN:
20     Q.   You're listed on the e-mail
21  chain, just for the record, about halfway
22  down.
23     A.   I did see that.
24             ---
25         (Witness reviewing document.)

Page 111

1             ---
2      A.   It's kind of hard to read this,
3  the way it's paginated.  Okay.  Go ahead.
4      Q.   So was this chart prepared by
5  your firm, Centerview, or a combination of the
6  two?  Tell me how this chart was created, if
7  you know.
8      A.   I don't recall it other than
9  just now reading it, but reading from the
10  bottom of the e-mail chain up, it starts with
11  an e-mail from Sam Greene, who was Centerview,
12  sent to me asking for a due diligence session,
13  and I believe it refers to some questions they
14  have that they want to cover.  So I'm assuming
15  this was an attachment to Sam's e-mail, I
16  believe this is a diligence list of questions
17  they had for us.
18     Q.   Okay.  If you could please turn
19  to the Bates range on the bottom right-hand
20  corner ending in 097.  And you should see on
21  the second row from the bottom, it says,
22  "EFH/EFIH breakdown of 2.3 billion unsecured
23  debt converted to equity."
24         Do you see that?
25     A.   I do.

Page 112

1      Q.   Okay.  At this stage of the
2  dialogue, was the company proposing that only
3  the unsecured debt at EFIH and EFH be
4  converted into reorganized equity?
5      A.   Well, as you can see right --
6      MR. PRUITT:  Objection.
7      A.   -- next to it, it talks about
8  the EFIH toggle notes of a billion-679, the
9  EFH guaranteed notes of 60, and the EFH
10  non-guaranteed notes of 589.  And I presume
11  that those numbers add up to the 2.3 billion.
12     Q.   Right.  I guess I'm asking you
13  a different question.  In the September, call
14  it fall 2013 time frame, was the company
15  proposing that only the unsecured debt convert
16  into the reorganized equity, or was there some
17  other proposal being discussed?
18     A.   I think back as of September
19  the discussion was that either the unsecured
20  debt of EFIH and EFH convert into equity of
21  EFH, or that the TCH -- TCEH group would agree
22  to buy out those constituencies for cash.
23     Q.   Okay.  And that was the
24  company's proposal at the time.  Correct?
25     A.   The proposal at the time was

Page 113

1  that both companies, TCEH and EFIH, remain
2  wholly owned subsidiaries of EFH, and would
3  not be a separation.
4      Q.   I understand that.  But I just
5  want to make sure.  The company in this time
6  frame was proposing that only the unsecured
7  debt of EFIH and EFH convert into reorganized
8  equity.  Correct?
9      A.   That is correct.
10     Q.   Okay.  Let's move to --
11     MR. GLENN:  The next document
12  is going to be Exhibit 6.
13             ---
14         (Exhibit 6 was marked for
15  identification.)
16             ---
17  BY MR. GLENN:
18     Q.   So this is an e-mail string of
19  September 26 of 2013, and attached to it is a
20  Project Olympus update dated September 21st,
21  2013.  Do you see that?
22     A.   Yes, I do.
23     Q.   Okay.  And you are in fact
24  included on the bottom e-mail.  Correct?
25     A.   Yes, I am.

29  (Pages 110 to 113)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 114

1    Q.  Okay.  Let's move on to the
2  attachment very quickly.  Is this a document
3  you prepared or reviewed in this time frame?
4    A.  I did not prepare this.
5    Q.  Okay.  Do you know who did?
6    A.  Because of the type style, I
7  believe it's a company-prepared document.
8    Q.  Fair enough.  Okay.  If you
9  turn to Page 4 of the document, please, sir,
10  the last two Bates numbers are, or three Bates
11  numbers, are 665.  The legend reads "2.3
12  billion equitization with blend & extend."
13    Are you at that page?
14    A.  Yes, I am.
15    Q.  And there is a column about
16  halfway down that says, At Emergence.
17    Am I correct that this
18  document, this page of the document at least,
19  contemplates again that only the EFIH and EFH
20  debt be converted at emergence?
21    MR. PRUITT:  And take your time
22  to review the document, if you need to.
23    A.  Well, it assumes a bunch of
24  things.  It does assume that there would be an
25  equitization of the unsecured debt, but the

Page 115

1  blend and extend reference assumes that the
2  company would do an exchange offer at EFIH
3  with the first lien and second lien debt, to
4  offer to exchange them into new debt with
5  lower coupons and longer call protection to
6  bring down the cash interest burden at EFIH so
7  that it would be able to meet its debt
8  obligations with the benefit of its own cash
9  flows.
10    Q.  Did the company ever launch
11  that exchange offer?
12    A.  No, they approached various
13  large holders of the first liens and second
14  liens and tried to get people to sign NDNAs
15  and have a negotiation.  I believe one of the
16  reasons why the advisors that we have here
17  today are involved is because they were part
18  of that discussion.  But I believe that those
19  efforts ceased at the end of October, and the
20  company's efforts to pursue this form of
21  restructuring ended.
22    Q.  Okay.  If you could turn to the
23  last page of the document, sir.  These are
24  Project Olympus Oncor projections.
25    Are you with me?

Page 116

1    A.  Yes.
2    Q.  Okay.  I would like you to go
3  to the EBITDA line excluding securitization.
4    Is it correct that the
5  company's projections have not materially
6  changed for the years 2014 through 2017 since
7  this document was created?
8    A.  I don't recall the current set
9  of projections.  I know that Oncor presented
10  an updated set of long-range projections
11  probably in October of 2013.  But given that
12  Oncor is a regulated utility, I would be
13  surprised if their revised projections are
14  materially different from these.
15    Q.  Okay.  Just so we're clear,
16  have any -- are you aware of any changes to
17  any restructuring proposals that were
18  generated as a result of any changes in the
19  company's revenue or EBITDA projections?
20    A.  I'm sorry.  Would you ask the
21  question again?  I didn't follow you.
22    Q.  Are you aware of any changes in
23  projections that led to any changes in
24  restructuring proposals during this process?
25    A.  Other than the new projections

Page 117

1  that Oncor produced, no.
2    Q.  And that was in the fall of
3  2013?
4    A.  I believe it was October of
5  2013, yes.
6    Q.  I think you testified, sir,
7  that at least some of the negotiations in this
8  process were intercreditor negotiations
9  between constituents at EFH and EFIH.
10    Do you recall testimony to that
11  effect?
12    A.  I recall testimony this morning
13  to that effect, yes.
14    Q.  Thank you.  And is it fair to
15  say that you left it up to the creditor
16  constituents to negotiate the value of any
17  rights offering or proposal to raise new
18  equity?
19    MR. PRUITT:  Object to the
20  form.
21    A.  I don't think we left it up to
22  the creditors to negotiate the terms of the
23  rights offering.  Obviously when you have
24  intercreditor negotiations, they both have to
25  agree.  But I think we were constantly

30 (Pages 114 to 117)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 118

1   monitoring the discussions and we constantly
2   looked at the various proposals through the
3   lens of what's best for the estate, what's
4   reasonable, and what would result in a
5   confirmable plan.
6       Q.   Isn't it correct, sir, that you
7   told the EFH and EFIH, in
8   negotiating the rights offering, to simply
9   name their price for that conversion and the
10  value of that conversion?
11      A.   I don't recall using that term,
12  no.
13      Q.   Okay.  So you didn't do that?
14      A.   I don't recall saying that.
15      Q.   Okay.
16          MR. GLENN:  We are going to
17  mark as Exhibit 6 an e-mail string --
18          THE COURT REPORTER:  Seven.
19          MR. PRUITT:  I think we've
20  already done Exhibit 6.
21          MR. GLENN:  Seven, thank you.
22  -- dated October 9th of 2013.
23          ---
24          (Exhibit 7 was marked for
25  identification.)

Page 119

1           ---
2   BY MR. GLENN:
3       Q.   So Exhibit 7, sir, is an e-mail
4   string where you're copied, the last one at
5   the top is October 9th of 2013.
6           Do you see that?
7       A.   Yes, I do.
8       Q.   And, in fact, some of the
9   constituents had asked for a meeting on
10  valuation at this time frame.
11          Do you recall that?
12      A.   I don't have a recollection,
13  but I'm trying to read the e-mail chain to
14  understand what you're saying.
15      Q.   We're going to mark another
16  document to help you out with that.
17
18          (Exhibit 8 was marked for
19  identification.)
20          ---
21          MR. GLENN:  Exhibit 8, for the
22  record, is a one-page document which appears
23  to be a calendar invite of some kind for an
24  October 10th, 2013, meeting.
25  BY MR. GLENN:

Page 120

1       Q.   Does that refresh your
2   recollection about a potential valuation
3   meeting with at least some of the
4   constituents?
5       A.   Yes, it does.
6       Q.   Okay.  Now let's go to the
7   second page of the document, please.
8           There's an e-mail from Sam
9   Greene, October 9th, 2013, at 1:19 to you
10  where he says, quote "David, can we reschedule
11  our valuation meeting for tomorrow or Friday?"
12          Do you see that?
13      A.   Yes, I do.
14      Q.   Okay.  And then you respond
15  directly above, quote:  "To talk about IPP
16  multiples?  Isn't this a moot point given the
17  latest proposal by TCEH?  I would rather talk
18  to you committee about a deal along the
19  general likes of the latest TCEH proposal.
20  Here's a feasible structure.  You get to name
21  your price."
22          Do you see that?
23      A.   Yes, I do.
24      Q.   Okay.  Now, what was the latest
25  TCEH proposal at this time?

Page 121

1       A.   Well, in the month of October
2   we were still talking about what we referred
3   to as Project Olympus, and we were -- the
4   basic theory behind Project Olympus is that we
5   would deleverage the capital structure at
6   TCEH, and we would deleverage the capital
7   structure at EFH and EFIH, and both
8   constituencies would agree to take stock in
9   the holding company, EFH.  And we were having
10  negotiations on behalf of both the TCEH and
11  the EFIH and EFH creditors about how would you
12  value your entity, and how would you
13  essentially do a stock merger of your
14  respective entity into a common company.  And
15  we were having a difficulty trying to get the
16  two sides to both value their own entity and
17  come up with a harmonious valuation for the
18  other parties' entity in the merger
19  negotiation.
20          And I think the dialogue here
21  was strictly an attempt to get the EFIH
22  creditors to come to the table to negotiate
23  exchange ratio, and in the negotiations the
24  EFIH creditors continually posed valuations
25  for themselves that were much higher, since

31 (Pages 118 to 121)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 122

1  that was their entity, and would propose
2  valuations for TCEH that were much lower and,
3  conversely, the TCEH creditors would proposal
4  valuations for their entity that was much
5  higher, and propose valuations for the
6  EFIH/EFH entity that was much lower.
7      Q.  But you told the PIKs'
8  financial advisor that the PIKs would get to
9  name their price.  Is that a fair summary of
10  what you're saying in this last sentence?
11      MR. PRUITT: Objection to the
12  form.  The document speaks for itself.
13      A.  It was an attempt to get the
14  PIKs to come to the room and negotiate by at
15  least putting on the table an ask and a bid.
16      Q.  And then Mr. Greene responds to
17  you above, "Value of Oncor is key to naming
18  price."
19      Do you see that?
20      A.  Yes, I do.
21      Q.  And it's your testimony, sir,
22  that the price we're talking about is the
23  equity split between the T side constituents
24  and the E side constituents in a consolidated
25  restructuring.  Correct?

Page 123

1      A.  That is correct.
2      Q.  Okay.  So did the meeting occur
3  on October 10?
4      A.  I believe it did.  And by the
5  way, the meeting was to talk about IPP
6  multiples, which is independent power
7  producer, which means it was to get the EFIH
8  group and Centerview to give us their view as
9  to the valuation of TCEH.
10      Q.  Okay.  But Mr. Greene did
11  indicate, did he not, that the value of Oncor
12  is the key to naming price.  Do you see that?
13      A.  I do.
14      Q.  So was a valuation of Oncor
15  discussed at this point in time?
16      A.  I don't recall if we spent that
17  much time on it.  The meeting was primarily to
18  talk about a value for TCEH.
19      Q.  Okay.  Did anyone exchange
20  documents at this meeting reflecting any
21  valuations?
22      A.  I don't recall any paperwork
23  that was shared, but there may have been.  I
24  just don't recall.
25      Q.  Had your firm done any

Page 124

1  valuation work in this time frame?
2      MR. PRUITT: Objection to the
3  form.  Vague.
4      A.  Well, we've been pondering the
5  issue of valuation for both EFH, EFIH and TCEH
6  since we were retained.
7      Q.  Okay.  But am I correct -- you
8  have not done a formal valuation yet.
9      Correct?
10      A.  That is correct.
11      Q.  Okay.  Through the entire time
12  you've been engaged by the company, you've
13  never done a formal valuation.  Correct?
14      A.  We've never submitted a formal
15  valuation to the company or the board.
16      Q.  Have you kept track of the
17  comparable company multiples during the time
18  of your engagement?
19      A.  Yes, we have.
20      Q.  Is it a fair statement that the
21  comparable company multiples have increased in
22  the last year?
23      A.  I think they've changed.  I
24  don't know if they've increased.
25      Q.  When was the last time you

Page 125

1  checked the comparable company multiples?
2      A.  Oh, probably in the last week
3  or two.
4      Q.  What multiples did you check?
5      A.  I checked multiples for
6  comparable companies for both Oncor and for
7  TCEH.
8      Q.  Okay.  EBITDA to EV multiples?
9  PE multiples?  What kind of multiples do you
10  look at?
11      A.  We looked at TEV -- TEV
12  multiples for TCEH, and TEV and PE multiples
13  for Oncor.
14      Q.  Okay.  And what do you consider
15  the comparable companies to Oncor?
16      A.  I think the list of comparables
17  have changed over time as we've tried to find
18  as many good comparables as we possibly can,
19  so I think the list has been evolving over the
20  past two years, and I think will continue to
21  evolve as we find new information and make
22  assessments.
23      Q.  How about over the last eight
24  months; are you aware of any changes in the
25  comparable company set that you've looked at?

32 (Pages 122 to 125)

PX 134
Page 33 of 165

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 126

1  A.  Yes.  Well, Exelon made an
2  offer to buy Pepco, and Pepco, before it was
3  subject of a takeover, was a pretty good
4  comparable.
5  Q.  Any other changes that you can
6  recall?
7  A.  None that I recall.
8  Q.  How long is the list of
9  comparable companies?
10  A.  I think it's varied from time
11  to time, but there are only a handful of
12  comparables on the TCEH side.
13  Q.  Well, we're here on the E side,
14  so --
15  A.  Okay.  I was trying to answer
16  your question.
17  Q.  Fair enough.  My questions are
18  all on E side unless I tell you otherwise, so
19  the record's clear.
20  A.  To be efficient, yes.
21  So for comparables for Oncor,
22  you know, maybe the list has been as many as
23  half a dozen.
24  Q.  Today what is the list of
25  comparable companies?

Page 127

1  A.  Actually, I don't have a
2  specific recollection of all of them.  We
3  continue to sift through comparables to try to
4  make the list as exhaustive as possible.  But,
5  obviously, the world keeps changing.
6  Q.  Okay.  But I believe you
7  testified the list has only been as many as
8  six; half a dozen.  So are you able to name
9  any of the six that you had in mind?
10  A.  Let's see now.  There's a
11  public company called ITC.
12  Q.  Okay.
13  A.  From time to time we've looked
14  at whether Centerpoint's a good comparable.  I
15  told you we were looking at Pepco, but it's
16  now subject to acquisition.  Those are the
17  only names that sort of pop into my head at
18  this point in time.
19  Q.  Okay.  What is the right
20  methodology to value Oncor?
21  MR. PRUITT:  Objection to the
22  form.
23  BY MR. GLENN:
24  Q.  Or methodologies?
25  A.  Well, typical investment banker

Page 128

1  procedure is to look at comparable companies'
2  multiples, to look at a discounted cash flow,
3  and to look at comparable precedent
4  transactions.
5  Q.  Okay.  And do you have in the
6  case of Oncor a view that one of these, or two
7  of these, or all three of these, are the best
8  methodologies?
9  A.  At the present time I don't
10  have a particular best or favorite.  I think
11  they're all relevant.
12  Q.  Do you have any expectation of
13  about when you are going to complete a formal
14  valuation?
15  MR. PRUITT:  Objection to form.
16  A.  Well, I know that when we
17  have -- when the company produces a disclosure
18  statement, embedded in that disclosure
19  statement will be a valuation of Oncor.
20  ---
21  (Exhibit 9 was marked for
22  identification.)
23  ---
24  BY MR. GLENN:
25  Q.  I've handed you a one-page

Page 129

1  document which appears to be a calendar invite
2  for a meeting on January 9th of 2014.
3  Do you see that you are one of
4  the required attendees, about halfway down?
5  A.  I'm trying to read through it
6  right now.
7  Q.  Okay.
8  ---
9  (Witness reviewing document.)
10  ---
11  A.  Okay.  I've read the invite.
12  Q.  Okay.  I would like you --
13  well, first of all, do you recall a meeting
14  with the EFIH unsecured holders, re immediate
15  next steps, as indicated at the subject line
16  here?
17  A.  No.  In fact, I don't remember
18  attending this meeting.
19  Q.  Okay.  If you go down under the
20  key topics, Number 6, it says -- actually,
21  let's start with Number 5.  "EFIH equity
22  clause second lien," and Number 6, EFIH second
23  lien menu of options for non-clawed amount
24  (cashout v equitized v reinstatement)."
25  Do you see that?

33 (Pages 126 to 129)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 130

1    A.  Yes, I do.
2        Q.  Do you recall discussions about
3    the use of an equity claw for the treatment of
4    the second liens in a restructuring?
5        A.  I don't recall being at this
6    meeting, but I do recall the subject matter.
7        Q.  Okay.  And do you recall that
8    that was discussed in the January 2014 time
9    frame?
10       A.  I believe it was discussed,
11   yes, in the January 2014 time frame.
12       Q.  Who proposed that?
13       A.  I believe the EFIH unsecureds
14   had over more than just the month of January
15   said that one of the ways to address the high
16   interest cost of the EFIH second lien bonds
17   is -- was to avail themselves of the equity
18   clawback feature in the indenture to those
19   instruments.
20       Q.  Did the company ever tell the
21   second liens, in words or in substance, that
22   that was not a feasible restructuring
23   alternative?  To your knowledge.
24       A.  Yes, we said that we saw some
25   great challenges to how that particular

Page 131

1    provision could be used.
2        Q.  What challenges are those?
3        A.  Well, at this point in time we
4    knew that EFIH and EFH would have to file for
5    bankruptcy, and the equity clawback provision
6    that's referred to in these instruments is a
7    typical provision you see in high-yield bonds,
8    where if the EFIH entity receives an equity
9    investment, the EFIH entity is entitled to
10   repurchase up to, I think the number is
11   usually 35 percent of the original principal
12   amount outstanding under any given issue, and
13   generally the repurchase price is set at par
14   plus the coupon of that instrument.
15           And usually those optional
16   redemption clawback provisions have a duration
17   associated with them, and the duration of
18   these particular clawback provisions were very
19   short, because the bonds had been issued a few
20   years ago.  And so we saw two real issues with
21   the clawback provision.
22           One was that you can only
23   exercise the clawback provision if the
24   indentures are operative, which either is
25   before the bankruptcy, and we knew we couldn't

Page 132

1    raise equity before the bankruptcy, or if in
2    the bankruptcy process you would reinstate
3    these instruments, emerge after the
4    bankruptcy, and then avail yourself of those
5    clawback provisions postfiling.
6            And given the duration of those
7    clawback provisions, we always saw big
8    obstacles to how could you time it just right,
9    given the fact that the clawback provisions
10   were of short duration and you could only claw
11   back a third of any given issue, which would
12   mean the remaining bonds would be outstanding,
13   reinstated.  And, hence, the discussion about
14   what do you do with the remaining 65 percent.
15       Q.  Okay.  Did the company ever
16   tell the second liens, in words or in
17   substance, that a plan, putting aside the
18   mechanics of how it would be implemented, but
19   that a plan that used the clawback was not
20   feasible in terms of the company's debt
21   capacity?
22       A.  I don't recall that statement
23   ever being proffered to the second liens, but
24   I'm not the only person who would speak to
25   their advisors.

Page 133

1        Q.  Have you done any debt-capacity
2    analysis for EFIH or EFH?
3        A.  I think over the past two years
4    we've done lots of debt-capacity analysis at
5    EFIH.
6        Q.  When was the last debt-capacity
7    analysis that you prepared?
8        A.  I don't recall.
9        Q.  Was it in 2014?
10       A.  I believe that we've looked
11   hard at debt capacity of EFIH, you know,
12   both -- in connection with the RSA.
13       Q.  Okay.  And do you have
14   documents that include that analysis, an Excel
15   spreadsheet or something?
16       A.  I presume that such documents
17   exist, you know, at Evercore.
18       Q.  Have you turned those over to
19   Kirkland & Ellis?
20       A.  I have no idea what's been
21   turned over.  I'm not part of that effort.
22       Q.  Okay.
23       A.  I just comply with what people
24   tell me to do.
25       Q.  Okay.  Is it correct that the

34 (Pages 130 to 133)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 134

1  EFIH PIKs continued to propose use of the
2  equity clawback at least through the March
3  2014 time frame?
4       A.   I don't recall how long they
5  used that as a mechanism they thought that was
6  a realistic approach.
7       Q.   Okay.  Do you recall when the
8  discussions changed from the use of the equity
9  claw to a rights-offering structure?
10      A.   I don't have a particular date
11 in mind, no.
12      Q.   Can you give me a general time
13 frame?
14      A.   Sometime in 2014, but I don't
15 recall when.
16      Q.   Were you negotiating that with
17 the PIKs?
18      A.   Most of the conversations with
19 the PIKs were held either by the company --
20 direct conversations with the PIK were held by
21 the company or by Mr. MacDougall of TPG or his
22 advisors.  Our role was a support role to the
23 company; reviewing all of the give and take
24 and back and forth to make sure that the plan
25 made good business sense, it was something

Page 135

1  that maximized the value of the estate, and
2  would result in a feasible outcome.
3       Q.   Okay.  That's consistent with
4  my recollection, too, but I want to make
5  something clear for the record.
6            What exactly, in the context of
7  this restructuring, did you or those working
8  for you negotiate, as opposed to the other
9  people you just identified?
10      A.   Would you restate the question?
11      Q.   Sure.  What did you and others
12 at Evercore negotiate in terms of this
13 restructuring?  Just general subjects, general
14 issues.
15           MR. PRUITT:  Objection; vague.
16 BY MR. GLENN:
17      Q.   As opposed to performing a
18 supporting role.
19      A.   Well, we would review all of
20 the proposals being made by the various sides.
21 We would assess whether they were reasonable
22 from the debtors' perspective.  We would
23 assess them in terms of whether they were
24 feasible from a capital structure perspective.
25           And we would advise the company

Page 136

1  and the other people who were involved in
2  direct conversations, including MacDougall and
3  Blackstone, and Wachtell, as to what we
4  thought in terms of various provisions of the
5  deal.
6            And we would have healthy
7  dialogue with them, and they would handle most
8  of the direct conversation.
9       Q.   I think I asked you a slightly
10 different question.  I want to know what you
11 personally negotiated in interacting with the
12 creditor constituencies as opposed to advising
13 your client and its representatives.
14           What did you personally
15 negotiate?
16           MR. PRUITT:  Object to the
17 form.
18      A.   I don't recall specifically
19 what we personally negotiated.  There were
20 some things that we would talk to one of the
21 creditor groups about directly, but I don't
22 recall specifically what it was.
23      Q.   Okay.  So as you sit here
24 today, you can't identify one particular
25 matter that you personally negotiated as

Page 137

1  opposed to the other constituents that you
2  just identified at the company?
3            MR. PRUITT:  Objection to the
4  form.
5       A.   Well, earlier today I testified
6  to the fact that I did have an extensive
7  conversation with the EFIH unsecured advisor
8  and others I think over the -- whether they
9  needed an optional redemption provision, and I
10 testified that I argued strenuously that they
11 didn't need any.
12      Q.   This is the postpetition recent
13 negotiations.  Correct?
14      A.   No.  This is pre-RSA.
15      Q.   Okay.  Anything else that
16 you --
17      A.   And, obviously, I wasn't
18 successful.
19      Q.   Anything else that you can
20 identify other than that, that you personally
21 negotiated?
22      A.   As I sit here today, I just
23 don't recall the specifics.
24      Q.   I'm going to hand you the next
25 one, Number 10, and we'll go through this very

35 (Pages 134 to 137)

PX 134
Page 36 of 165

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 138

1  quickly, hopefully.
2       ---
3       (Exhibit 10 was marked for
4  identification.)
5       ---
6  BY MR. GLENN:
7       Q.  This is a January 30th e-mail.
8  DIP overview is the subject, EFIH DIP process
9  document discussion, from Sam Greene to you.
10 And then there is a recommended EFIH DIP
11 process.
12      Do you recall receiving this
13 proposal?
14      A.  Yes.
15      Q.  What do you recall about it?
16      A.  Well, back on January 30th we
17 didn't even know if we could raise a first
18 lien DIP. And as you can see from the
19 analysis, the dollar amount of the DIP that's
20 assumed in this analysis is $4 billion. As
21 you know, we ended up with a $5.4 billion DIP.
22      And at the time the EFIH
23 unsecureds were very intent on refinancing out
24 the first, because that was the only way to
25 get them to agree to negotiate a settlement,

Page 139

1  because without refinancing amount there's no
2  threat, they just sit there and they keep
3  getting their interest payments, which is
4  tantamount to getting their make-whole.
5       And to assist the debtor in
6  trying to find financing to take out the first
7  lien creditors, the EFIH unsecured creditors
8  offered to do a, I think they termed it a
9  one-and-a-half lien junior tranche, so that if
10 we could only raise $3.1 billion, they were
11 offering to supplement that with a
12 $900 million junior DIP so that we could have
13 enough proceeds to take out the first liens.
14      Q.  And what happened with that
15 proposal?
16      A.  Well, we said that it's a very
17 constructive proposal, we appreciated it. I
18 think as I've testified in other depositions,
19 we started an RFP process with a large number
20 of banks, and we were ultimately able to
21 secure a $5.4 billion one-tranche first lien
22 DIP.
23      MR. GLENN:  We're going to mark
24 the next one as 11.
25      ---

Page 140

1       (Exhibit 11 was marked for
2  identification.)
3       ---
4  BY MR. GLENN:
5       Q.  This is an e-mail string from
6  you to Sam Greene and others below, and
7  there's an illustrative restructuring term
8  sheet attached. Do you see that?
9       A.  I'm just trying to read it so I
10 can understand it. Is that okay?
11      Q.  Yep.
12      A.  Thank you.
13      ---
14      (Witness reviewing document.)
15      ---
16 BY MR. GLENN:
17      Q.  I would like to direct your
18 attention to the first page of the term sheet
19 where it says EFIH 2L notes.
20      Do you see there's a line here
21 for a partial paydown via a favorable
22 resolution to make whole or equity claw in
23 emergence? Do you see that?
24      A.  I do see those words.
25      Q.  Okay. So in the February 2013

Page 141

1  time frame, the EFIH noteholders, or the PIK
2  noteholders, were still proposing an equity
3  claw. Correct?
4       A.  That is correct.
5       Q.  Okay. And do you know what
6  happened with that proposal?
7       A.  Obviously it's not there today.
8       Q.  Okay. And was that discussion
9  terminated because of the company's concern
10 about the use, the mechanics of the equity
11 claw?
12      A.  As I said before, we had some
13 big concerns about how it would work, and
14 leaving the other two-thirds, principal amount
15 of the second lien notes outstanding were --
16 also entered into the question of how would
17 this work.
18      Q.  Were you involved in the
19 negotiation of the first lien DIP?
20      A.  With banks?
21      Q.  Yes.
22      A.  Most of the discussions were
23 held by people who worked for me and would
24 report back to me on their discussions.
25      Q.  Did you review and approve the

36 (Pages 138 to 141)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 142

1  RFP that went out for the first lien DIP?
2       A.  I think primary responsibility
3  for the RFP was in the hands of a combination
4  of the company, Kirkland, and some of the
5  folks that worked for me, but I was well aware
6  of the provisions that were being suggested in
7  the first round of RFP.
8       Q.  And did you have any direct
9  interaction with the banks who would be
10  arranging the first lien DIP?
11      A.  I did not attend any of those
12  meetings. I got lots of calls from the banks
13  to me asking me about the proposal and what we
14  were looking for, which I had talked to them
15  one on one. But I left the day-to-day
16  interaction with the banks to the team that
17  was negotiating the first lien DIP facility.
18      Q.  Who at Evercore was in charge
19  of that process?
20      A.  I think at various times Steve
21  Goldstein, who was one of my partners, was
22  involved, and another person who played an
23  important role is one of our MDs, his name is
24  Chuck McMullen, who has a very strong
25  leveraged finance background, and participates

Page 143

1  and runs a lot of the processes that Evercore
2  gets hired to work on where we help companies
3  arrange bank financing and bond financing.
4       Q.  And does Evercore, or did
5  Evercore earn a fee by virtue of the
6  companies -- strike that -- the court's
7  approval of the first lien DIP?
8       A.  Yes. Our proposed engagement
9  letter calls for a DIP fee.
10      Q.  Okay. I'm going to hand you
11  the next exhibit, which is Number 12.
12          ---
13          (Exhibit 12 was marked for
14  identification.)
15          ---
16  BY MR. GLENN:
17      Q.  This is an October 26, 2013,
18  e-mail string from Kelvin Ji at Deutsche Bank.
19  You are listed as a cc on this e-mail.
20          Do you see that?
21      A.  Yes, I do.
22      Q.  Okay. And behind that,
23  starting on page -- Bates page ending in 699,
24  there's a presentation saying "TCEH follow-up
25  & EFIH financing thoughts."

Page 144

1          Do you see that?
2       A.  Yes, I do.
3       Q.  Have you seen this document
4  before today?
5       A.  I don't recall seeing this.
6       Q.  Okay. If you could turn,
7  please, to the page marked ending in 715.
8       A.  715?
9       Q.  Right.
10      A.  It's called Transaction
11  Overview?
12      Q.  Correct. I would like you to
13  turn to the bottom left corner. There's
14  something called collateral coverage listed at
15  the top of that box there. Do you see that?
16      A.  Yes, I do.
17      Q.  Okay. And it says 2014
18  estimated EBITDA, and then it has an
19  eight-and-a-half times multiple.
20          Do you see that?
21      A.  Yes, I do.
22      Q.  Is that consistent with your
23  recollection of where the EV EBITDA multiples
24  were at the -- in the fall of 2013?
25      A.  I don't have specific

Page 145

1  recollection of the particular multiples of
2  the comparable universe of companies I was
3  using at the time.
4       Q.  Okay. Let's go to the next
5  one, another DIP financing document.
6          MR. GLENN:  We're going to mark
7  as Exhibit 13.
8          ---
9          (Exhibit 13 was marked for
10  identification.)
11          ---
12          MR. GLENN:  This is a
13  presentation entitled Materials Regarding EFIH
14  DIP & Exit Financing, October 24 of 2013.
15  BY MR. GLENN:
16      Q.  Do you recall seeing this
17  document before today, sir?
18      A.  No, I don't.
19      Q.  What role were Bank of America
20  and Merrill Lynch playing in regard to the
21  EFIH first lien DIP?
22          MR. PRUITT:  One second. I
23  mean, counsel, I didn't want to interrupt your
24  questioning, but we're not here on the EFIH 1L
25  DIP, but it's just been going on for a while

37 (Pages 142 to 145)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 146

1  now.
2       MR. GLENN:  I'm wrapping it up
3  very soon.
4       MR. PRUITT:  It's your time,
5  but obviously --
6       MR. GLENN:  I'm wrapping up
7  very soon.  Thank you.
8       A.  Well, the date of this proposal
9  is October 24.
10      Q.  Right.
11      A.  And at the time we were still
12  deeply involved with the negotiation of a --
13  Olympus, merge the two companies together
14  proposal.
15      Q.  Right.
16      A.  We were still having active
17  negotiations with a handful of the first lien
18  creditors, BlackRock, PIMCO, who actually some
19  of them had signed confidentiality agreements.
20      Q.  So the question I'm asking is,
21  what are the roles of these two banks?  That's
22  all I'm asking.
23      A.  I'm trying to answer your
24  question in a very --
25      Q.  In respect of a first lien DIP?

Page 147

1       A.  -- in a very clear way.
2       MR. PRUITT:  Quit interrupting
3  him, please.  Let him finish.
4       A.  So if I may continue.
5       We were having an active
6  dialogue with the actual large first lien
7  creditors about a blend and extend, which is a
8  term that the company coined, and I explained
9  to you previously what that meant.  We were
10  not having particularly good progress, and one
11  of the things that I knew that the company
12  treasury department was doing was they were
13  reaching out to their banking contacts, who
14  they speak to on a very frequent and ongoing
15  basis, and asking them, if we were to try to
16  do a DIP, how would you price it, because this
17  was relevant information to us in terms of
18  what's a reasonable pricing for a first lien
19  exchange of these bonds -- first lien bonds
20  into a DIP during the bankruptcy.
21      And, in fact, we were also at
22  that time talking to the bondholders about not
23  only rolling into a DIP, but also rolling that
24  DIP into permanent financing at exit.
25      Q.  What role, if any, does Bank of

Page 148

1  America play in the first lien DIP that's been
2  approved by the court?
3       A.  I believe that they are one of
4  the underwriters along with Deutsche Bank and
5  four or five other banks.
6       Q.  Okay.  And that DIP has now
7  been approved.  Correct?
8       A.  Yes, it has.
9       Q.  I would like you to turn your
10  attention, very quickly, to the page --
11      MR. PRUITT:  We're still on
12  Ying 13?
13      MR. GLENN:  Yes.
14      THE WITNESS:  Oh, I'm sorry.
15 BY MR. GLENN:
16      Q.  -- that's 373.
17      Do you see the EV EBITDA
18  multiples in the lower right-hand corner here?
19      A.  I think I see -- you said lower
20  right-hand corner?
21      Q.  Yeah.  The multiples are eight
22  to nine times for 2013 estimated, and
23  seven-and-a-half to eight-and-a-half for 2014
24  estimated.
25      Do you see that?

Page 149

1       A.  You're on Page 573?
2       Q.  No, 373.
3       A.  373?
4       Q.  Yes.
5       A.  Is that this?  Okay.  I'm
6  sorry.  I'm just having a hard time following
7  you.  So I have EV to EBITDA --
8       Q.  It's below.
9       A.  -- and then 13 and 14 EBITDA.
10      Q.  Right.
11      A.  Okay, yes.  I see eight to nine
12  and seven to eight-and-a-half.
13      Q.  Is that consistent with where
14  the comparable company multiples were in this
15  time frame?
16      A.  I just don't remember that far
17  back, so I can't say yes or no.  I would like
18  to answer your question, but I can't.
19      Q.  Thank you.
20      MR. GLENN:  We'll move on to
21  the next one.  This was marked -- we won't
22  remark it -- as Keglevic Exhibit 11.
23      ---
24      (Exhibit Keglevic 11,
25  previously marked for identification.)

38 (Pages 146 to 149)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 150

1      ---
2            MR. PRUITT:  Do you have a copy
3  for me?
4            MR. GLENN:  Yes.
5  BY MR. GLENN:
6      Q.   The first page of Exhibit 11,
7  after the e-mail, is an Energy Future
8  Intermediate Holding Confidential Presentation
9  to Prospective Lenders.
10           Do you see that?
11     A.   It's a draft dated April 2014,
12  yes.
13     Q.   Okay.  And did you or members
14  of your team review this confidential
15  information memorandum before it was
16  finalized?
17     A.   I believe that some of my
18  colleagues did look at this, but I don't
19  recall reviewing it in its entirety.
20     Q.   Okay.  Did you review it at
21  all?
22     A.   I recall that there was
23  analysis in here that we did look at because
24  we were curious as to what exactly Deutsche
25  Bank was going to say with respect to the

Page 151

1  marketing of the EFIH first lien DIP.  But I
2  don't recall which pages.
3      Q.   Okay.  I would like you to turn
4  your attention, please, to -- the last three
5  numbers are 636, EFH2D10000636.
6      A.   Is it this page (indicating)?
7      Q.   Yes.
8      A.   Okay.
9      Q.   Now, there's a list of trading
10  comparables.  Do you see that?
11     A.   Yes, I do.
12     Q.   And at least some of the
13  comparable companies here are ones that you
14  have identified as being comparable.  Correct?
15     A.   That is correct.
16     Q.   And I think I remember you
17  saying Centerpoint was one.  Right?
18     A.   I think we've said that we
19  looked at Centerpoint as a possible comparable
20  from time to time, yes.
21     Q.   Are any of the other companies
22  here ones you consider comparable?
23     A.   Each one has its strengths and
24  virtues.  I haven't decided which ones
25  ultimately will make the cut.

Page 152

1      Q.   Okay.  And your team reviewed
2  and approved this confidential information
3  memorandum before it was distributed to the
4  potential first-lien lenders.  Correct?
5      A.   I believe that some of my team
6  have looked at this, but I don't think it was
7  our role to approve this document.  This is a
8  Deutsche Bank document.  They are the
9  underwriter.  They're the author of it.  This
10  is their job; not mine.
11     Q.   Okay.  And I showed you a
12  document earlier showing multiples from I
13  believe seven to eight-and-a-half for 2013 and
14  2014.  Do you recall that?
15     A.   Yes, I do.
16     Q.   And here it presents a median
17  multiple of nine-and-a-half times for 2014.
18           Do you see that?
19     A.   Yes, I do.
20     Q.   Does that refresh your
21  recollection as to whether EV to enterprise --
22           MR. GLENN:  Strike that.
23  BY MR. GLENN:
24     Q.   Does that refresh your
25  recollection about whether EBITDA multiples

Page 153

1  have increased since the fall of 2013?
2            MR. PRUITT:  Object to the
3  form.
4      A.   Again, we look at our own
5  universe, we do it in a very careful way.  I
6  have no idea from one document to the next,
7  from one underwriter to the next, there may be
8  different sample sets, what they're doing.  So
9  I can't opine as to what happened.
10     Q.   As you sit here today, can you
11  tell me any reason why any of these are not
12  comparable companies to Oncor?
13     A.   And you're referring to the top
14  half of the page --
15     Q.   Correct.
16     A.   -- or the bottom half of the
17  page?
18     Q.   Top half.
19     A.   Just top half?
20     Q.   Correct.
21           MR. PRUITT:  Objection to the
22  form.
23     A.   Well, I think with respect to
24  Duke Southern and Wisconsin Energy, these are
25  very large companies with both regulated and

39 (Pages 150 to 153)

PX 134
Page 40 of 165

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 154

1   unregulated activities. They also have, in
2   addition to transmission and distribution,
3   they have power. They may also have retail
4   operations. So the mix of their businesses is
5   substantially different from Oncor, which is
6   pure transmission distribution, T&D, so
7   they're probably not very good comparables.
8        Centerpoint is based in
9   Houston, so it's part of Texas. I believe
10  they also have significant natural gas
11  operations, which is a completely different
12  business in a complete different regulatory
13  regimen. I believe they also have retail and
14  power generation. So they do have some
15  transmission distribution, but, again, it's
16  such a big mix of businesses, it's not the
17  best comparable out there.
18        I think that Consolidated
19  Edison is obviously a different region, but
20  it's a fairly clean business, it's mostly
21  transmission distribution. And so I think
22  people do look at it as a pretty good comp.
23        ITC is a pretty unique animal,
24  it's only regulated by FERC, that's the
25  Federal Energy Regulatory Commission. And

Page 155

1   people view it as a good comparable, but given
2   the different regulatory regimen, it actually
3   is a different animal.
4        Northeast Utilities is I think
5   often viewed as a good comparable to Oncor.
6        UIL is quite small, and they
7   recently bought a gas business, I believe, in
8   Philadelphia, which has materially changed
9   their business mix. So whether it's a good
10  comp or not, I think we're still in the midst
11  of evaluating. But the acquisition does start
12  to distort its business mix.
13       Q.   And just so the record is
14  clear, and we'll finish this subject, can you
15  identify any comparable company that's not
16  listed on this chart?
17       A.   I can't recall one offhand, but
18  I -- I just can't recall.
19       Q.   Okay. Do you know why the
20  structure changed from --
21       MR. GLENN: Strike that.
22  BY MR. GLENN:
23       Q.   Do you recall that the
24  structure changed from the use of an equity
25  claw to a rights offering structure?

Page 156

1        A.   Well, the equity claw still
2   left more than two-thirds of the second lien
3   bonds outstanding, and since a major objective
4   of the exercise was to reduce interest expense
5   and reduce indebtedness, the equity claw idea
6   had only limited effect.
7        Obviously the net effect of --
8   I presume you're referring to the second lien
9   mandatorily convertible DIP that we are
10  working with today, obviously eliminates all
11  the second lien debt, and replaces it
12  primarily with equity.
13       Q.   Okay. The question I'm asking
14  is when.
15       A.   So I think the net effect is
16  systemically different.
17       Oh, what date? I don't recall
18  the date.
19       Q.   Do you recall that the
20  discussions changed generally from equity claw
21  to a rights offering that would be offered to
22  stakeholders upon consummation of a plan of
23  reorganization? Do you recall that being
24  discussed?
25       A.   I don't know if it was equity

Page 157

1   claw to rights offering, but, obviously, the
2   net effect is dramatically different.
3        Q.   So now the rights offering is
4   effectively going to be approved by the court
5   in conjunction with the DIP. Correct?
6        MR. PRUITT: Objection to the
7   form.
8        A.   Well, again, the instrument is
9   a mandatorily convertible second lien DIP.
10  Obviously you can try to decompose that
11  transaction into a DIP loan with an equity
12  rights offering at maturity date or emergence
13  date. So if that's the terminology you want
14  to use, I think the answer to your question is
15  yes.
16       Q.   I guess what I want to ask you
17  is, do you recall any discussions of whether
18  the company would do a rights offering only
19  at emergence versus in conjunction with a DIP;
20  those two variations being discussed?
21       A.   I recall that we did talk at
22  length about the need for a $2 billion equity
23  infusion, and, in fact, I do recall that at
24  many -- at many points in time it was two, and
25  maybe it was less and maybe it was more, but

40 (Pages 154 to 157)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 158

1  it ended up at 1.9.
2         I recall that during the course
3  of our, you know, active negotiations and
4  discussions, there was a concern that a
5  commitment at the end of the bankruptcy for an
6  equity infusion of that size was important,
7  but that we didn't want it to just be a free
8  look, and that how do you document and enforce
9  a commitment to be a real hard commitment?  As
10 you know, you can get debt commitments,
11 they're usually very short.  You can get
12 equity commitments in rights offerings, they
13 are also usually very short.  This commitment,
14 we don't know how long the bankruptcy will be,
15 obviously we would like it to be short, but it
16 could be long.  And we felt that there was a
17 great deal of importance to make sure that we
18 had a feasible plan and could assure people
19 that EFIH can get restructured.  It's
20 obviously critical to getting the TCEH
21 creditors to endorse the plan and sign the
22 RSA, as you know about.
23        So it was very important to
24 lock in that equity commitment.  And,
25 obviously, when the idea -- I don't recall

Page 159

1  when it happened, but the idea of this
2  instrument that we've created came up, I think
3  we all felt that it was a good solution to a
4  variety of issues that we were facing.
5      Q.   Did anyone ever tell you, in
6  words or in substance, that the restructuring
7  was going to be changed to deliver additional
8  economics to Fidelity Investments?
9         MR. PRUITT:  Object to the
10 form.
11     A.   I recall that there was
12 constant back and forth between the parties
13 over how Fidelity would be treated in the
14 restructuring.
15     Q.   Okay.  But you're aware that
16 Fidelity is going to be earning fees if the
17 transactions contemplated by the RSA are
18 ultimately approved.  Correct?
19     A.   I'm aware that they're getting
20 a fee of 11-and-a-quarter million dollars.
21     Q.   Okay.  And you're aware that
22 they hold positions in both the first and
23 second lien debt at EFIH.  Correct?
24     A.   And at EFH, yes.  All three of
25 those positions.

Page 160

1      Q.   And at EFH, okay.  Let's focus
2  on EFIH.  Okay.
3         Do you recall the discussions
4  about the structure of the transaction
5  changing to deliver economics to Fidelity
6  wearing its hat as a first and second lien
7  lender?
8      A.   I don't recall discussions
9  about Fidelity wearing their hat as second
10 lien lender.  I do recall that there was lots
11 of to and fro that Fidelity wanted more value,
12 and that various changes in the agreements
13 were made to satisfy them.
14     Q.   More value in respect of what?
15     A.   Well, I said that I realized --
16 excuse me, I recall that a provision was put
17 in the agreement that Fidelity would be paid
18 11-and-a-quarter million if they participated
19 in their share of the second lien DIP, and I
20 recall that Fidelity was offered the
21 opportunity to invest $500 million in the
22 first lien DIP facility, and would be paid
23 some fees associated with that, in
24 participation.
25     Q.   And do you know whether those

Page 161

1  economics were offered to Fidelity to obtain
2  its consent to the restructuring?
3      A.   I believe --
4         MR. PRUITT:  Object to the
5  form.
6      A.   I believe that they were asking
7  for additional value for their participation.
8  They had always made very clear, before they
9  ever were willing to sit down in the
10 negotiating room, that they would only
11 negotiate, settle their claims at EFH if they
12 had an acceptable agreement for them at EFIH
13 first lien and second lien positions.
14     Q.   Okay.
15     A.   And they negotiated hard to
16 make as much money as they could.
17     Q.   So Fidelity prioritized their
18 negotiations for their first and second lien
19 positions first before they would even
20 consider discussing EFH.  Correct?
21     A.   Well, they said that they
22 wouldn't agree to an EFH restructuring without
23 reaching an acceptable solution for their
24 first and second lien positions.  We would
25 have been happy just to negotiate a resolution

41 (Pages 158 to 161)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 162

1    of their EFH position if they had let us.
2        Q.   I want to talk to you briefly
3    about the interest savings that you talked
4    about earlier.  I believe the testimony in
5    your declaration is that the interest savings
6    on a monthly basis, if the second lien DIP is
7    approved, is approximately $8 million a month.
8        Correct?
9        MR. PRUITT:  Objection.  Are we
10   talking about current proposal or prior
11   proposals?
12       MR. GLENN:  I don't think the
13   interest has changed.
14       A.   It has.
15       Q.   It has?  Okay.  So what's the
16   savings now?
17       A.   Okay.  In my declaration the
18   interest rate at the time for the $1.9 billion
19   of second lien DIP was eight percent.  Today
20   it's six-and-a-quarter quarter percent.  So
21   the interest savings I think in my declaration
22   was 8 million a month, 96 million over a year.
23   I believe the correct number now is 11 million
24   a month, which is 130 million over a year.
25       Q.   How many months does the

Page 163

1    company have to be in bankruptcy for those
2    interest savings to exceed the amount of fees
3    that are payable in connection with the DIP?
4        MR. PRUITT:  Objection to the
5    form.
6        A.   If you just include the cash
7    fees that have to be paid going forward, which
8    would be the, I think .46 approval fee, .46
9    percent approval fee, the one percent funding
10   fee, the $2 million arranger fees, and the
11   11-and-a-quarter million fee to Fidelity, I
12   believe that adds up to $43 million.  And I
13   said the annual savings is $130 million, so I
14   guess if I -- my math is not that good, but
15   probably, you know, four months.
16       Q.   Okay.  What about the other
17   fees, the noncash fees; how much are those?
18       A.   Are you referring to the PIK
19   funding fee?
20       Q.   Yes.
21       A.   And is there a question then?
22       Q.   Yes.  So you testified as to
23   the cash fees.  I'm wondering, if you add the
24   cash and the noncash fees, when does the
25   interest rate savings exceed the fees that

Page 164

1    would be paid or incurred if the second lien
2    DIP is approved by the court?
3        A.   Well, I think earlier today --
4        MR. PRUITT:  Objection to the
5    form.
6        A.   -- I testified that I don't
7    think the PIK funding fee has to be ever paid.
8    As long as the PIK -- as long as the DIP loan
9    converts to equity, it's never paid.
10       Q.   Okay.  Are there any other fees
11   that we need to take into account that are non
12   cash?
13       A.   Not that I can recall.
14       Q.   How long do you expect this
15   bankruptcy to last?
16       A.   I think my general recollection
17   is that the RSA puts a time frame on it, I
18   can't remember if it's, you know, 11 or 12
19   months.
20       Q.   Okay.  But as you sit here
21   today, apart from what's in the RSA, do you
22   have any informed belief about how long the
23   bankruptcy will last?
24       A.   I have no idea.
25       MR. GLENN:  Take a five-minute

Page 165

1    break?
2        MR. HOROWITZ:  Wait.  Lunch has
3    been set up in the outside rooms, it's ten of
4    1 now, so I --
5        MR. GLENN:  Yes.  Shall we
6    break for lunch now?
7        MR. PRUITT:  Yeah.  Where are
8    we on time?
9        THE COURT REPORTER:  Do you
10   want to stay on the record?
11       MR. PRUITT:  No, let's go off.
12       THE VIDEOGRAPHER:  Stand by.
13   We're at the end of Media Number 2.  We're
14   going off the record.
15
16
17
18
19
20
21
22
23
24
25

42 (Pages 162 to 165)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 166

1    A F T E R N O O N   S E S S I O N
2         THE VIDEOGRAPHER: Here marks
3    the beginning of Media Number 3. We are back
4    on the record. The time is 1:38 p.m.
5         MR. GLENN: This is Andrew
6    Glenn. I'm going to pass the witness after
7    conferring and reserve for follow-up.
8    EXAMINATION BY
9    MR. SADEGHI:
10        Q.   Good afternoon, Mr. Ying. My
11   name is Kayvan Sadeghi. I'm from
12   Morrison & Foerster, on behalf of the official
13   committee of unsecured creditors.
14        Do you understand all of the
15   rules that applied this morning still apply
16   this afternoon?
17        A.   Yes.
18        Q.   And if I refer to the DIP, I'll
19   be referring to the EFIH second lien DIP,
20   okay?
21        A.   Okay.
22        Q.   We spoke earlier about the 95
23   million closing fee, and I believe your
24   testimony was that you did not believe that
25   was really a payment because it converts to

Page 167

1    equity. Is that fair?
2         A.   That is correct.
3         Q.   But that's only if the plan
4    contemplated by the RSA goes through.
5             Correct?
6         A.   That is correct.
7         Q.   And if the plan contemplated by
8    the RSA does not go through, then that $95
9    million would have to be paid in some form in
10   order to adopt an alternative?
11        A.   That's correct.
12        Q.   And in addition, there's a
13   separate prepayment fee of $95 million that
14   would also have to be paid if any alternative
15   is adopted. Correct?
16        A.   That's correct.
17        Q.   So in total there is a $190
18   million in payments that would have to be paid
19   in order to adopt an alternative to the plan
20   contemplated by the RSA?
21        A.   Yes.
22        Q.   Which is effectively a ten
23   percent breakup fee?
24        A.   It's 190 million, and -- on a
25   billion-9, that's ten percent.

Page 168

1         Q.   And your position is that a ten
2    percent breakup fee on this DIP is reasonable?
3         A.   In the context of the
4    importance of the DIP, yes.
5         Q.   Can you name for me any
6    precedent for a ten percent breakup fee in a
7    similar DIP?
8         A.   Well, the DIP is not just a
9    DIP; it's an equity infusion to own 60 percent
10   of the company, and EFH owns 80 percent of
11   Oncor. The implied TEV of Oncor per the
12   investment of the billion-9 for 60 percent of
13   EFIH is about sixteen-and-a-half billion
14   dollars. So when I look at the dollar amount
15   of the 190 in the context of a
16   sixteen-and-a-half billion total enterprise
17   company, I think that's a pretty reasonable
18   number.
19        Q.   I would just like to reask my
20   question. Can you name for me any precedent
21   transaction that you have seen or that you're
22   aware of that has a comparable fee in the
23   context of a DIP?
24        A.   I can't name a precedent
25   transaction that looks like this.

Page 169

1         Q.   In addition to the $190 million
2    in payments we just referred to, the proposed
3    DIP involves the incurrence of certain
4    transaction costs up front. Correct?
5         A.   That is true.
6         Q.   You mentioned $43 million in
7    fees, roughly, earlier today, but I believe
8    your testimony in your deposition in
9    connection with the first lien DIP referenced
10   $55 million being set aside out of the
11   proceeds of the first lien DIP for fees. Can
12   you explain to me the difference between the
13   43 million you referenced today and the 55
14   million you referenced in your prior
15   deposition?
16        A.   I don't recall the 55
17   specifically, but if you're asking what's the
18   total up-front costs already paid or to be
19   paid if the second lien DIP, as proposed by
20   the unsecureds, is approved, it's the 43
21   million I referred to, plus there is another,
22   a little over 10 million that was paid
23   prefiling. That adds up to about $53 million.
24        Q.   So the additional roughly over
25   10 million is money that's already been paid?

43  (Pages 166 to 169)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 170

1    A.   That's correct.
2    Q.   I'm going to come back to that.
3         So costs that have not yet been
4  paid would include at least $43 million in
5  fees?
6    A.   Correct.
7    Q.   So all together then with the
8  other $190 million in payments we discussed,
9  if an alternative proposal is adopted instead
10 of the plan contemplated by the RSA, that
11 would involve fees of approximately $230
12 million, $235 million?
13        MR. PRUITT:  Object to form.
14   A.   Well, if I add 53 to 190,
15 that's the total number, yes.  But I think it
16 slightly mischaracterizes the net effect of --
17 of what we're doing.
18   Q.   You testified earlier that if
19 the plan goes forward as contemplated, the $95
20 million closing fee is not really paid.  Do
21 you mean not really paid by the debtors?  What
22 exactly do you mean by not paid?
23   A.   Well, the debtors receive a
24 billion-9 of cash from the funding of the
25 second lien DIP, which is used to repay --

Page 171

1  help repay the second lien notes.  And if the
2  DIP converts at confirmation, the entire DIP,
3  including the billion -- the billion-9 DIP
4  plus the PIK funding fee, which is paid in
5  Tranche B notes, all those loans convert into
6  60 percent of the company.
7         So from an economic standpoint,
8  when we look at what's the net impact of the
9  second lien convertible DIP financing, we get
10 a billion 9 and it converts into 60 percent.
11 The $95 million funding PIK fee in Tranche B
12 notes never has a net impact on either the
13 company or the creditors.
14   Q.   But it does have an impact on
15 how that 60 percent is allocated among
16 creditors?
17   A.   Yes, it does.
18   Q.   In your prior testimony
19 concerning the first lien DIP, you also spoke
20 about $650 billion in proceeds from the first
21 lien DIP that was being used towards the
22 second lien DIP in related transactions.
23        Does that sound about right?
24   A.   $650 million; not billion.
25   Q.   Million, correct.

Page 172

1    A.   Yes, that's correct.
2    Q.   And one piece of that was
3  approximately $250 million in first lien DIP
4  proceeds that were being used to retire the
5  second lien notes?
6    A.   That's correct.  To supplement
7  the billion 9, since there are a billion -- 2
8  billion 150 of second lien notes outstanding.
9    Q.   And has that amount changed in
10 any way with the changes in proposals?
11   A.   No.
12   Q.   In addition, we discussed the
13 $55 million in transaction costs and fees that
14 you had referenced.  Has that amount changed
15 at all since -- in light of the more recent
16 proposals?
17   A.   I don't believe the up-front
18 fees have changed at all in light of the
19 modified unsecured noteholder proposal.
20   Q.   In addition, the remaining
21 component of the $650 million was a set-aside
22 of 340 million for the make-whole settlement
23 on the second lien DIP -- or second lien
24 notes.  Correct?
25   A.   I think as of today, given the

Page 173

1  modifications in the second lien note
2  settlement, the number that's being offered to
3  the second lien notes to settle their
4  make-whole claim aggregates $330 million.
5    Q.   And what exactly is the
6  modification?
7    A.   I believe the settlement date
8  of the second lien note redemption and
9  settlement payment has been changed from, I
10 believe it was June 11th, and I believe now
11 it's July 9th.  And I believe the settlement
12 payment was modified because of the change in
13 the settlement date.
14   Q.   So the settlement date was
15 moved out approximately one month?
16   A.   That's correct.
17   Q.   And that resulted in a
18 reduction of the settlement payment of
19 approximately $10 million?
20   A.   Again, I'm speaking to these
21 numbers out of memory, and across a month
22 between my last deposition and this one, but
23 that's approximately correct, yes.
24   Q.   And why does pushing out the
25 settlement date affect the settlement value?

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 174

1      A.   Because the net present value
2  of the future payments per the alleged
3  make-whole claim is reduced.
4      Q.   So all other things being
5  equal, the make-whole claim declines over
6  time.  Correct?
7          MR. PRUITT:  Object to the
8  form.
9      A.   That is correct.
10     Q.   Have you done any analysis of
11 the interest savings under the proposed DIP
12 net of the make-whole obligations?
13     A.   No.
14     Q.   Have you ever been asked to do
15 an analysis of that sort?
16     A.   No.
17     Q.   At the time you considered
18 EFIH's cash needs under the first and second
19 lien DIPs, did you have an expectation as to
20 whether Fidelity's interest was going to be a
21 roll-up, or something else?
22     A.   I'm sorry.  Would you ask the
23 question again?
24     Q.   Sure.  There's a plan for
25 Fidelity to -- Fidelity's participation to

Page 175

1  involve a roll-up at one time.  Correct?
2      A.   There was always the thought of
3  Fidelity would either fund a first lien DIP,
4  proceeds of which would be used as we've
5  described and, alternatively, which, from the
6  company's perspective, they were indifferent
7  from a cash-flow standpoint would be for
8  Fidelity, in lieu of funding the first lien
9  DIP and then have the second lien notes
10 redeemed pursuant to the second lien DIP,
11 there was a provision for Fidelity just to
12 exchange their second lien notes into some
13 first lien.  But the net effect to the company
14 is identical.
15     Q.   And so as of today how is
16 Fidelity participating?
17     A.   Fidelity has funded $500
18 million of the first lien DIP, and excess
19 proceeds from the first lien DIP are being
20 held at EFIH pending a resolution of the
21 second lien DIP.
22     Q.   Have you revisited your
23 analysis of EFIH's cash needs since it was
24 determined that that would be the mechanism by
25 which Fidelity would participate?

Page 176

1      A.   As I said earlier, the company,
2  from a cash standpoint, is indifferent as to
3  whether Fidelity funded the $500 million as a
4  participant in the first lien DIP by giving
5  the company cash, versus the roll-up.  So we
6  have not had to review our cash because of
7  that.  The extra cash that's sitting on our
8  balance sheet is a short-term phenomenon
9  pending a resolution of the refinancing of the
10 second lien notes.
11         I think people had asked what's
12 the cash impact of holding that cash for a
13 month, and we said it was a small number; you
14 know, under $3 million.  I believe that's in a
15 prior piece of deposition testimony.
16     Q.   Just switch topics for a minute
17 to the board meeting that took place
18 yesterday.
19         Was there any discussion at
20 that board meeting of the possibility of
21 simply not taking a second lien DIP and not
22 refinancing the second lien notes?
23     A.   I don't recall a discussion of
24 that subject.
25     Q.   Have you considered that

Page 177

1  possibility?
2      A.   Not recently, no.
3      Q.   When did you consider that
4  possibility?
5      A.   When we were agreeing to the
6  RSA.
7      Q.   Since agreeing to the RSA,
8  you've never reconsidered whether it was
9  necessary for EFIH or appropriate for EFIH to
10 take on a second lien DIP?
11     A.   I haven't changed my view of
12 the efficacy of the second lien DIP.
13     Q.   Have you reconsidered it in any
14 way?
15     A.   No.
16     Q.   Why not?
17     A.   I see no reason to change our
18 views.  The circumstances haven't changed one
19 bit.  The net effect to the debtor of
20 approving the second lien DIP haven't changed.
21 There's interest savings, it paves the way for
22 a consensual restructuring of EFIH and EFH,
23 and it was part and parcel of the inducement
24 to get the TCEH creditors to agree to the RSA.
25 And without their concurrence there would be

45 (Pages 174 to 177)

Merrill Corporation - New York

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 178

1   deconsolidation taxes all over the entities,
2   and your committee would be swamped with tax
3   claims, the unsecureds' creditors at EFH and
4   EFIH would be swamped with tax claims, and we
5   would be talking to a completely different
6   constituency about how to restructure the
7   company.
8       Q.   Your understanding is that the
9   plan contemplated by the RSA avoids triggering
10  a deconsolidation tax.  Is that correct?
11      A.   It avoids triggering two
12  deconsolidation taxes, yes.
13      Q.   Do you have any reason to
14  believe that the transaction contemplated by
15  the RSA is the only transaction structure that
16  could accomplish that objective of avoiding
17  the two deconsolidation taxes?
18      A.   Well, we've been working at
19  this for two years, and this is the only deal
20  we could come up with, given what the
21  creditors would agree to, to support.
22      Q.   Based on your analysis of this
23  deal, are there any creditors' constituencies
24  that you believe have a financial incentive to
25  trigger the -- either of the deconsolidation

Page 179

1   taxes?
2           MR. PRUITT:  Object to the
3   form.  Speculation.
4       A.   Well, I think it's on the
5   record that the TCEH first lien creditors may
6   have preferred to trigger the deconsolidation
7   tax by having TCEH separate from EFH.
8       Q.   Based on your analysis, do you
9   believe that would be in their financial best
10  interest?
11      A.   Well, assuming it could be
12  implemented in a reasonable period of time,
13  they would get the benefit of a large tax
14  step-up, which would be to the benefit of the
15  assets that they would own if they could
16  exchange their debt -- secured debt claims for
17  the assets of TCEH, yes.  But that's still a
18  long stretch, in terms of how they would
19  actually get there.
20      Q.   Have you considered what you
21  would advise the debtors to do with the cash
22  on their balance sheet as a result of the
23  first lien DIP if the second lien DIP is not
24  approved?
25      A.   No, I have not.

Page 180

1       Q.   Have you done any analysis of
2   that -- of the possibility that the second
3   lien DIP would not be approved?
4       A.   I have not analyzed that
5   potential outcome.
6       Q.   Sitting here today, do you have
7   any thoughts as to what would be an
8   appropriate use of that cash?
9           MR. PRUITT:  Objection to form.
10      A.   It depends on the
11  circumstances.
12      Q.   Have you ever been asked to do
13  any analysis of that possibility?
14      A.   I have not.
15      Q.   In these next questions I'm
16  just asking for your understanding and not any
17  legal conclusion, just to be clear.
18          Is it your understanding that
19  the TCEH creditors have no obligations under
20  the second lien DIP or the second lien
21  refinancing?
22      A.   I believe that's true.
23      Q.   And also no obligations --
24          MR. SADEGHI:  Strike that.
25  BY MR. SADEGHI:

Page 181

1       Q.   And the TCEH creditors have no
2   obligations under the second lien make-whole
3   settlement?
4       A.   I believe that's correct.
5       Q.   I'll just refer to those three
6   transactions, the DIP, the refinancing, and
7   the second lien make-whole settlement, as the
8   second-lien transactions for these next few
9   questions, okay?
10      A.   Okay.
11      Q.   So is it your understanding
12  that the TCEH creditors have no rights under
13  those second-lien transactions?
14          MR. PRUITT:  Object to the
15  form.
16      A.   Rights to approve -- rights to
17  what?
18      Q.   Rights of any kind.
19      A.   I'm not aware of any.
20      Q.   To your knowledge, did any TCEH
21  creditors participate in any negotiations
22  concerning any of the second-lien
23  transactions?
24      A.   No.  None to my knowledge.
25      Q.   To your knowledge, do any of

46 (Pages 178 to 181)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 182

1  the TCEH creditors have any right to
2  participate in the second lien DIP?
3      A.  No.  Not to my knowledge.
4      Q.  To your knowledge, do any of
5  the TCEH creditors receive any benefits under
6  any of the second-lien transactions other than
7  to the extent those transactions facilitate
8  the broader RSA?
9      A.  Other than speeding the case
10  along so that the TCEH creditors can get their
11  company and leave the consolidated group, no.
12      Q.  Have you ever considered
13  whether the second lien DIP is in the best
14  interest of the debtors as a stand-alone
15  financing transaction outside of the context
16  of the RSA?
17      A.  Yes, I have.
18      Q.  And I take it your --
19          MR. SADEGHI:  Strike that.
20  BY MR. SADEGHI:
21      Q.  How have you considered the
22  costs and benefits of the DIP outside the
23  context of the plan contemplated by the RSA?
24      A.  I believe that even if TCEH
25  didn't exist, that the structure of the

Page 183

1  restructuring that we proposed at EFIH and EFH
2  would look the same as it looks today.  EFH
3  and EFIH have to restructure together, there's
4  a deconsolidation tax to be paid if EFIH were
5  to deconsolidate with EFH, it would adversely
6  affect all the unsecured creditors of both
7  companies, and EFIH is overleveraged with debt
8  that has much too high an interest rate, and
9  that fact exists whether TCEH exists or
10  doesn't exist, and must be addressed.
11      Q.  All right.
12          MR. SADEGHI:  In order to keep
13  this efficient I'm going to reserve a little
14  bit of time, try to keep this brief, and hand
15  over the questioning.  Thank you, Mr. Ying.
16          THE WITNESS:  Thank you.
17          MR. PRUITT:  Who is next?
18          ---
19  EXAMINATION BY
20  MR. SHORE:
21      Q.  Good afternoon, Mr. Ying.  I'm
22  Chris Shore from White & Case, on behalf of
23  the Ad Hoc Group of TCEH unsecured
24  noteholders.  I've got a few questions for
25  you, and many of them just follow-up.

Page 184

1          You were asked questions before
2  with respect to comparables for EFIH.  What
3  has been -- what is currently your comp set
4  for TCEH?
5          MR. PRUITT:  Objection to form.
6  I believe Mr. Ying said all of his analysis
7  was preliminary at this point.
8  BY MR. SHORE:
9      Q.  Please take "current" to mean
10  the one you're currently using, that is
11  preliminary.
12      A.  Of course the three companies
13  that we consider potential comparables are
14  NRG, N as in Nancy, R as in Robert, G as in
15  George; Dynegy, D-Y-N-E-G-Y; and Calpine,
16  C-A-L-P-I-N-E.
17      Q.  Since you have been engaged by
18  any of the debtors in connection with the
19  restructuring efforts, have you ever had a
20  comp outside of those three?
21      A.  We have looked, but we haven't
22  found them yet.
23      Q.  And when you say "preliminary,"
24  when are you expecting to have your work done?
25          MR. PRUITT:  Objection; asked

Page 185

1  and answered.
2      A.  Well, we're constantly
3  monitoring the situation and updating
4  components of our work.  As I said earlier
5  today, I expect that in the disclosure
6  statement, which is scheduled to be filed in
7  the near term, embedded in that disclosure
8  statement will be the result of our valuation
9  work.
10      Q.  Okay.  And that the result of
11  your valuation work, are you planning on
12  making a presentation to the TCEH board which
13  will present them with a formal valuation?
14      A.  I haven't been asked or told
15  exactly what will be required in terms of
16  board presentations.
17      Q.  Would you pull out what's been
18  marked as Ying 1, please.
19      A.  This is the board presentation?
20      Q.  Yeah.
21      A.  I have it.
22      Q.  Let me follow up on some
23  questions.  I'm going to -- if you can turn to
24  Page 4.  Which is ending in Bates 35 --
25      A.  I'm sorry.  Just --

47  (Pages 182 to 185)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 186

1      Q.   And just for the record, Bates
2  3532.
3      A.   Okay.
4      Q.   All right.  Let's talk about
5  the status quo for a minute, because you were
6  asked some questions about that.  Are the
7  debtors currently paying, or EFH currently
8  paying, any interest to second lien
9  noteholders?
10     A.   I believe not.
11     Q.   Okay.  And as far as you know,
12 is there any plan outside the context of the
13 proposed DIP transactions to make any payments
14 of current interest to the second lien
15 noteholders?
16     A.   I am not aware of any plans
17 other than what's been proposed.
18     Q.   So let me refer to that
19 then as the status quo, since you don't have a
20 DIP approved.  Okay?
21     A.   Yes.
22     Q.   All right.  In the status quo
23 scenario, you would just continue to accrue
24 interest on the second lien notes to be paid
25 as part of a plan of reorganization.  Right?

Page 187

1      A.   Well, if the status quo is
2  maintained beyond the court hearing date, I
3  don't know what we're going to do.
4      Q.   Well, what is the -- there are
5  no contingency plans, as far as you know?
6      A.   I don't know of any.
7      Q.   Okay.  So absent some other
8  contingency plan, you would continue to just
9  accrue unpaid interest on the second lien
10 notes at whatever rate the court ultimately
11 deems appropriate.  Right?
12     A.   I think if the court didn't
13 approve the second lien DIP, we would have to
14 make some decisions as to how to treat the
15 various creditors.  But I don't know of any
16 contingency plans that exist as of this
17 moment.
18     Q.   And with the DIP proposal you
19 are going to be paying current interest; that
20 is, utilizing EFIH cash to pay interest?
21         MR. PRUITT:  Objection to the
22 form.
23     A.   I'm sorry.  Ask the question
24 again?
25     Q.   Sure.  If the DIP motion is

Page 188

1  granted, you will --
2      A.   The second lien DIP motion?
3      Q.   The second lien DIP motion.
4      A.   Yes, I'm sorry.
5      Q.   Sure.
6          -- is granted, you will switch
7  to paying cash on a monthly basis for
8  interest?
9          MR. PRUITT:  Objection to form.
10     A.   I think that the interest on
11 the second lien DIP is supposed to be
12 quarterly.
13     Q.   But then you're going to be
14 paying that on a cash basis?
15     A.   Yes, the terms of the DIP are
16 that interest be paid quarterly in cash.
17     Q.   And as I understand it -- well,
18 what's the reason you want to stop the accrual
19 of interest on the second lien notes?
20         MR. PRUITT:  Objection to the
21 form.
22     A.   Well, the accrue rate at an
23 average of roughly 12 percent today is very
24 high.  The company doesn't generate enough
25 cash flow to be able to service it out of its

Page 189

1  current cash inflows, and it's better to
2  resolve the make-whole payment as quickly as
3  possible as opposed to continuing to pay full
4  interest, which, as I've said earlier, is
5  tantamount to paying them their make-whole
6  over time.
7      Q.   Well, in the status quo
8  scenario, absent some contingency plan putting
9  in place, you're not going to be paying the
10 make whole either.  Right?
11     A.   Well, the make whole is the
12 present value of the future contractual
13 interest payments.
14     Q.   All right.  But you're not
15 making that payment?
16     A.   I said that they may accrue.
17 If they accrue we still have to pay them at
18 some point.  And if we choose to pay them
19 currently, given the cash that's on the
20 balance sheet, then we will be paying them.
21     Q.   But the status quo right now,
22 just so we're -- I just want to set it.  The
23 status quo, absent some contingency plan
24 coming forward, is just the accrual of
25 interest to be paid as the court may deem

48 (Pages 186 to 189)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 190

1  allowed at confirmation of an EFIH plan.
2      Right?
3      A.   I will agree with you that if
4  the status quo is we do nothing, I agree with
5  you.
6      Q.   Now, when is the last time --
7          MR. SHORE:  Let me rephrase
8  that.
9  BY MR. SHORE:
10     Q.   Have you ever considered doing
11 just a traditional stand-alone second lien
12 DIP?
13     A.   Yes.
14     Q.   And when is the last time you
15 considered that?
16     A.   In February of this year.
17     Q.   And in connection with the --
18 now I'm going to Page 4 of Ying Number 1.
19 With respect to the interest on this second
20 lien DIP, would you consider this a -- 6.25
21 percent, a market rate of interest for a
22 stand-alone DIP; that is, a DIP without an
23 equity conversion feature?
24     A.   In my opinion, I think it's
25 below market.

Page 191

1      Q.   So is it your opinion that the
2  proposed DIP lenders here are subsidizing the
3  interest rate in exchange for some other
4  consideration?
5          MR. PRUITT:  Object to the
6  form.
7      A.   Well, given that they're buying
8  an agreement that says that they lend money,
9  they get paid interest, they convert
10 mandatorily into a certain amount of equity at
11 confirmation, I don't think you can decompose
12 what they're paying -- what the interest rate
13 is paying for.
14     Q.   I don't understand your earlier
15 answer then.  Is 6.25 percent in your opinion
16 the market rate of interest on a traditional
17 DIP loan against the assets of EFIH?
18     A.   No, I said it's below market.
19 And I believe it is.
20     Q.   Okay.  So do you consider these
21 DIP lenders to be giving money to the company
22 in taking -- in demanding a below market
23 interest rate?
24          MR. PRUITT:  Objection to the
25 form.  Argumentative.

Page 192

1      A.   I think they're offering a
2  market interest rate given the terms of the
3  instrument.
4      Q.   Okay.  Well, the terms of the
5  instrument are all the plan features, then.
6  Right?  That is where the -- that is the
7  counterbalance for the subsidy on the interest
8  rate?
9      A.   Yes --
10          MR. PRUITT:  Object to the
11 form.
12     A.   My comment is the terms of the
13 instrument are both, that it's a loan and it
14 converts into a fixed amount of equity at
15 confirmation.
16     Q.   What are the components of the
17 current EFIH second lien DIP proposal which
18 are, in your view, the counterbalance for the
19 below-market DIP interest rate?
20          MR. PRUITT:  Object to the
21 form.
22     A.   I believe it's all the terms
23 taken together.
24     Q.   Okay.  And what are those
25 terms, outside the context of a traditional

Page 193

1  DIP?
2      A.   That it converts to equity,
3  that it has the various fees associated with
4  it.  Optional redemption provision.  The PIK
5  fee.  The up-front fees.  All the terms of the
6  agreement.
7      Q.   Now, in the status quo -- and
8  you say that the DIP that is contemplated, or
9  any of the -- sorry.  The unsecured group
10 updated proposal, which is on Page 4 of Ying
11 Number 1, that is a superior alternative to
12 the status quo.
13     A.   The status quo being no DIP at
14 all?
15     Q.   Right.
16     A.   Yes, I think it's a material
17 improvement.
18     Q.   Now, you do understand that
19 there are certain circumstances in which
20 secured lenders do not get paid postpetition
21 interest?
22     A.   Yes.
23     Q.   And one of those circumstances
24 would be if the value of their collateral was
25 exceeded by the amount of their -- the

49 (Pages 190 to 193)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 194

1  principal amount of their claim?
2       MR. PRUITT: Object to the
3  form. Calls for --
4       A.   Isn't it the reverse?
5       Q.   Didn't I say amount of their
6  collateral is exceeded by the amount of their
7  claim?
8       A.   I thought you said the amount
9  of the collateral exceeds their claim. You
10 meant the reverse.
11      Q.   Right. So in any event, one
12 circumstance would be where the secured lender
13 is undersecured?
14      A.   Yes.
15      MR. PRUITT: Objection. Let me
16 object as calling for a legal conclusion.
17      MR. SHORE: That's fine.
18 BY MR. SHORE:
19      Q.   You understand, as a
20 restructuring professional, one circumstance
21 in which interest isn't paid is the
22 circumstance in which the collateral is
23 exceeded by the -- the value of the collateral
24 is exceeded by the amount of the claim?
25      MR. PRUITT: The same

Page 195

1  objection.
2       A.   I think you mean the reverse
3  again. That the value of the collateral is
4  not exceeded by the amount of the debt. Or
5  the debt exceeds the value of the collateral.
6       Q.   Fine. But you've done no
7  formal valuation on which to provide the court
8  with an opinion that the value of the
9  collateral exceeds the amount of the second
10 lien notes claim?
11      A.   Well, I've looked at these
12 offers for quite some time, including the one
13 from the unsecured creditors, which has been
14 there for at least a month prior to us filing,
15 and I've said to you that the value of their
16 1.9 billion investment, which are coming from
17 sophisticated institutions, who are
18 substantive people, confirms that there is
19 significant equity value beyond all the
20 secured claims. So that I think is a very
21 strong indicia of valuation that leads me to
22 believe that there is collateral value beyond
23 the secured claims at EFIH.
24      I think the other issue that I
25 have said in other depositions is that my firm

Page 196

1  and I have been looking at the issue of
2  valuation at both TCEH and at EFIH since we
3  were retained in July of 2012. Although we
4  have not submitted a formal valuation opinion,
5  we've done substantial work all throughout our
6  retention period. We've evaluated all the
7  basic indicia evaluation, and at the time of
8  the signing of the RSA I did tell the board
9  that I thought that the form of the RSA with
10 respect to the restructuring support agreement
11 was totally consistent with our view as to
12 what the valuation of the underlying assets
13 were in relation to the various debt claims.
14      Q.   Are you finished?
15      A.   Sure.
16      Q.   Have you performed a formal
17 valuation on which you can provide expert
18 testimony to the court that the value of the
19 collateral securing the first -- or the second
20 lien's claims is exceeded by the amount of the
21 second lien note's claims?
22      A.   No.
23      MR. PRUITT: Objection; asked
24 and answered.
25 BY MR. SHORE:

Page 197

1       Q.   Thank you.
2       And in order to do that, you
3  would have to do this fundamental analysis,
4  you testified to before?
5       A.   As I just said, I've done
6  various portions of it, but I have not had to
7  deliver a formal valuation report.
8       Q.   And I take it --
9       A.   Using your words.
10      Q.   I take it that as an expert you
11 haven't prejudged the issue before you've done
12 your fundamental analysis; have you?
13      A.   Well, I've done enough
14 fundamental work to know that I have a very
15 strong sense of what valuation is.
16      Q.   Right. But strong sense does
17 not equal expert opinion, in your view; does
18 it?
19      MR. PRUITT: Objection to form.
20      A.   They're two different things.
21      Q.   Right. So that if what people
22 wanted was a strong sense, we could go to a
23 whole bunch of people other than experts who
24 might be able to provide their strong sense of
25 what the value of collateral was; couldn't we?

50 (Pages 194 to 197)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 198

1    MR. PRUITT: Objection;
2  argumentative.
3    A.  I don't think that's an
4  accurate representation of what our work
5  represents and the advice that we've given to
6  the board.
7    Q.  The advice you've given to the
8  board has been, as far as I can tell -- sorry.
9  Leave aside what I can tell.
10    Beyond the oral statement made
11  to the board of EFH in the context of a single
12  board meeting, have you made any other
13  expressions of value to the board with respect
14  to the enterprise value of EFIH?
15    MR. SABIN: Objection as to
16  form. I object to the form as this document
17  is referring to a board meeting of EFIH, and I
18  think the question assumed EFH.
19    MR. SHORE: I'm going to go
20  through both.
21    A.  In our various meetings with
22  the board we've expressed our strong sense of
23  valuation in the context of advising them as
24  to what kind of restructuring might be
25  possible, how the various creditor groups have

Page 199

1  been responding and reacting as the company
2  has engaged with them actively for over a year
3  in looking at various restructuring proposals,
4  and I think we've given the board constant
5  advice throughout our engagement period as to
6  what's possible.
7    A valuation is just as
8  important as what's the term of their
9  instrument, in terms of their rights and
10  remedies, and I think our advice has been
11  consistent throughout, in terms of what's
12  possible vis-à-vis a restructuring and how
13  each of the constituencies might respond and
14  agree or not agree to a restructuring.
15    Q.  I'm not -- the terminology,
16  what's a -- is there a definition of strong
17  sense of value somewhere in the valuation
18  literature?
19    A.  I have been out of school a
20  long time. I don't know what the literature
21  says.
22    Q.  Well, when is the last time you
23  read a valuation text?
24    A.  Probably not since I graduated
25  from Wharton.

Page 200

1    Q.  When is the last time you read
2  a valuation treatise?
3    A.  I don't know what a valuation
4  treatise is.
5    Q.  When is the last time you read
6  any kind of article on valuation?
7    A.  Actually, a couple of weeks ago
8  I read one by Judge Sontchi.
9    Q.  Okay.  And outside -- well, for
10  obvious reasons, you would want to be
11  reviewing that one.  Right?
12    A.  Of course.
13    Q.  And outside of the context of
14  reading an article by Judge Sontchi, when is
15  the last time you read a valuation article?
16    A.  I think I read a few actually
17  in the last couple of weeks.
18    Q.  In the context of performing a
19  valuation of EFIH?
20    MR. PRUITT: Object to the
21  form.
22    A.  Just in terms of seeing what
23  other judges say about valuation. I'm not
24  sure -- I'm not sure they're treatises, but
25  they're other judges' opinions.

Page 201

1    Q.  Okay.  What was the purpose for
2  reading other judges' opinions with respect to
3  valuation?
4    A.  Actually, the Delaware law
5  keeps changing in terms of what judges think
6  some of the methodologies that should be used.
7    Q.  And are you saying that you
8  wanted to make sure your valuation comported
9  with what the judges want?
10    A.  Well, I think that --
11    MR. PRUITT: Just one moment.
12  If -- if the work you're talking about right
13  now was specifically requested by counsel in
14  order to aid in potential litigation down the
15  road, I'm going to instruct you not to answer.
16    THE WITNESS: Sure.
17  BY MR. SHORE:
18    Q.  Can you answer my question?
19    A.  Well, our firm is constantly
20  reviewing its valuation methodologies to meet
21  the ever-changing legal framework that exists
22  and is set out by various judges' opinions in
23  different cases.
24    Q.  Is there any other monitoring
25  work that your firm does to keep up to speed

51 (Pages 198 to 201)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 202

1  on valuation?
2      A.   Well, we have a valuation
3  committee.  They're writing opinions all the
4  time, so they do lots of research into
5  different aspects of the cutting edge of what
6  is viewed to be the proper way to do
7  valuations.
8      Q.   The proceeds of the proposed
9  second lien DIP, those are going to be used to
10  pay the existing second lien noteholders.
11          Right?
12      A.   That is correct.
13      Q.   The assumption there is that
14  the second lien noteholders hold secured
15  claims?
16      A.   That is correct.
17      Q.   What analysis are you aware of
18  that any of the debtors have done into the
19  validity, extent and priority of the liens of
20  the second lien notes?
21      A.   That's not an area that I'm --
22  that I have looked into.
23      Q.   Well, are you aware of any
24  analysis being done?
25          MR. PRUITT:  Answer --

Page 203

1      A.   I'm not aware of what's been
2  done.
3      Q.   Have you heard any discussion
4  in any board meeting about any analysis of the
5  validity, priority or extent of the liens of
6  the current second lien notes?
7          MR. PRUITT:  That's a yes-or-no
8  question.
9      A.   I don't recall.
10      Q.   All right.  Since we have Page
11  4 open, I have one more question, because I
12  think a lot of these questions were asked.
13          The Implied TEV box, eight
14  boxes down.
15      A.   There's an implied total EFH
16  equity value box.
17      Q.   Right.  Okay.  That's what
18  TEV -- or that's an enterprise value -- okay.
19      A.   Not really.  It's just an
20  equity value.
21      Q.   Okay.  The equity value.  The
22  concern is, just so that I understand -- and
23  this is -- this is after the imposition of the
24  second lien DIP?
25      A.   This is actually after the DIP

Page 204

1  and after it's converted to equity.
2      Q.   Okay.  So the idea would be
3  there will be $3.1 billion under the unsecured
4  proposal, the assumption is there there will
5  be $3.1 billion to be distributed to equity
6  holders?
7      A.   Yes.  Pro forma for the
8  confirmation.
9      Q.   Okay.  But that would include
10  60 percent of that going to the DIP, to repay
11  the DIP?  That's what I'm not understanding
12  about.
13      A.   Yes.  That includes the DIP.
14      Q.   Okay.  So the 3.1 number is not
15  technically after the repayment of the DIP;
16  that's --
17      A.   No.
18      Q.   Okay.
19      A.   Well, after repayment of the
20  DIP?  After repayment of the second lien
21  notes?
22      Q.   After repayment -- no.  That's
23  what I am trying to understand the
24  presentation here.
25      A.   The presentation of that row is

Page 205

1  that the DIP has been funded, the second lien
2  notes have been retired, and that confirmation
3  has come and the DIP has converted to equity.
4      Q.   Okay.  So there's $3.1 billion.
5  60 percent under this assumption would go out
6  to the DIP lenders, and the other 40 percent
7  would go to the existing EFH unsecureds.
8      A.   And the EFH unsecureds and --
9      Q.   And the sponsors?
10      A.   -- and the sponsors.
11      Q.   All right.  And your concern
12  here -- just so that I understand why you're
13  doing the plan process, or you're including
14  the plan construct here, as far as a rights
15  offering -- your concern is that you are not
16  going to be able to, at confirmation under
17  these scenarios, raise enough money to repay
18  the second lien notes?
19          MR. PRUITT:  Objection to the
20  form.
21      A.   One of the important features
22  of the RSA is that the TCEH lenders would
23  actually have preferred to deconsolidate in a
24  taxable fashion and take the benefit of their
25  asset step-up.  And, obviously, we said that

52 (Pages 202 to 205)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 206

1  that's going to be a difficult road.  They
2  disagreed with us.  We felt that that
3  represented a, not a positive outcome for the
4  other constituencies, both at TCEH and at EFH
5  and at EFIH, so we insisted, and we -- they
6  finally relented to agree to not pursue their
7  asset step-up.  But the bargain to get them to
8  agree not to pursue their step-up was we must
9  do the case very quickly.  And to do the case
10  very quickly, they didn't want to see any
11  contingency in the plan of reorganization for
12  EFH and EFIH.
13          And so embedded in the plan
14  that you see is that we have consent from the
15  EFH creditors, we have consent from the EFIH
16  creditors, at least the 70-plus percent
17  ownership positions by the people we're
18  negotiating with, and there's very little room
19  for contingency other than the objections we
20  have now in terms of our ability to execute
21  the various steps of the plan.
22      Q.  Okay.
23      A.  But I am sorry for the long
24  answer.
25      Q.  No, that's fine.

Page 207

1      A.  That's the reason why we've
2  done it this way.
3      Q.  So let me kind of break it.
4  Let's just focus just on EFIH for a second.
5          Based on the -- you don't have
6  your own TEV of EFIH.  Right?
7      A.  Well, obviously, I can observe
8  them from these various proposals.
9      Q.  Right.  And looking at these
10  various proposals on Page 4 of Ying Number 1,
11  do you have a present concern that if these
12  metrics held true at confirmation you would
13  not be able to raise sufficient debt and
14  equity to repay the second lien notes?
15      A.  Well, I think when we come to
16  equity commitments, and since this commitment
17  stretches out for the duration of the DIP,
18  which is up to two years, you know, I couldn't
19  get an equity commitment for two years.  I can
20  barely get a debt commitment for three months,
21  and have to pay dearly for it.  So getting an
22  equity commitment now for something at
23  confirmation, I have no idea when confirmation
24  occurs, I don't think I can arguably say we
25  will definitely have it.  And values do

Page 208

1  change.
2      Q.  I understand.  But my question
3  was, do you have a concern that based upon the
4  TEV you're observing from the proposals, that
5  that, come confirmation, you're not going to
6  have the ability to raise sufficient funds to
7  take out the second lien notes?
8          MR. PRUITT:  Objection; asked
9  and answered.
10      A.  If I were unconcerned about
11  valuation, I think that it's fair to say that
12  you would probably get enough money to take
13  out the second liens irrespective of
14  valuation.
15      Q.  All right.
16      A.  But if I care about valuation,
17  then I think it's of great advantage to lock
18  in a fair valuation today.
19      Q.  All right.  Now let me ask you
20  that.  You don't have a concern -- if
21  valuation -- you're saying that you've got
22  concerns with respect to volatility in
23  valuation?  Is that fair to say?
24      A.  Yes.
25      Q.  All right.  Now, if valuations

Page 209

1  go up, you have no concern about the ability
2  to take out the second lien notes?
3      A.  If -- if valuations only go to
4  the sky, sure.
5      Q.  All right.  So the concern
6  you're talking about, is it fair to say, is
7  one in which valuations drop below the
8  observable TEVs coming out of the proposals in
9  Ying Number 1?
10      A.  That's correct.
11      Q.  All right.  And have you done
12  any analysis of any sort which show you that
13  valuations are dropping?
14          MR. PRUITT:  Object to the
15  form.
16      A.  Interestingly, since the
17  underlying asset is Oncor, which is a
18  regulated utility, when you look at regulated
19  utilities, there's an amazingly high
20  correlation of valuations to level of interest
21  rates.  And we, in fact, observed a period
22  where interest rates did rise, I think it
23  occurred from June to September of 2013, and I
24  think the valuation of regulated utility
25  stocks did drop as the ten year Treasury as an

53  (Pages 206 to 209)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 210

1  indicator of interest rates did rise from 1.7
2  percent to as high as three percent. Today
3  it's subsided back to 2.6 percent or
4  thereabouts.
5        So there's definitely clear
6  recent and strong empirical evidence, and
7  economic evidence to say that the valuation of
8  the underlying asset is inversely correlated
9  to interest rates.
10       Q.  All right. And have you
11  presented -- first of all, have you presented
12  any of this to the EFIH board?
13       A.  I've certainly described the
14  phenomenon to the board, and as we've gone
15  through the restructuring negotiations we've
16  clearly experienced that phenomenon as we
17  tried to get the TCEH lenders and the EFIH
18  lenders to harmonize their respective
19  valuation thoughts in a merger of both
20  companies on a deleveraged basis at the EFH
21  parent. I described that earlier this
22  morning.
23       Q.  All right. So have you done,
24  presented the EFH board with any analysis of
25  your views of interest rate movements over the

Page 211

1  next 24 months?
2        A.  No, I have not forecasted
3  interest rates.
4        Q.  Okay.
5        A.  That's not something that --
6  that an investment bank would do.
7        Q.  So have you provided the EFIH
8  board with any expert views on your part as to
9  the likelihood that valuations are going --
10  of the Oncor equity, essentially, are going to
11  be dropping in the next 24 months?
12       A.  Well, I think if you were to
13  open up the newspaper on any given day,
14  there's constant talk about the Federal
15  Reserve and when are they going to eliminate
16  quantitative easing, when are they going to
17  raise interest rates. You can look at the
18  shape of the Treasury curve and you can see
19  it's upward sloping, so I think everybody
20  knows that interest rates are going to rise;
21  it's just a matter of how much and when.
22       Q.  So have you provided the EFIH
23  board with any expert views on your part as to
24  the likelihood that valuations of the Oncor
25  equity are going to be dropping in the next 24

Page 212

1  months?
2        A.  No, we have not predicted
3  future values for Oncor.
4        Q.  So any views the EFIH board had
5  with respect to the likelihood that valuation
6  of Oncor equity are going to drop are going to
7  have to be based on their own personal views
8  and the papers they read?
9            MR. PRUITT: Objection to the
10  form. Speculation.
11       A.  I think it's very common
12  knowledge that the stock market goes up and
13  down and you can't assure that it will be at
14  the same place a year from now.
15       Q.  So one of the advantages is in
16  a falling valuation you have locked in your
17  equity purchase commitment now.
18       A.  That is correct.
19       Q.  All right. But in a rising
20  valuation, let's talk about that. Is it your
21  contemplation that a plan and disclosure comes
22  out with your valuation baked into it?
23            MR. PRUITT: Objection to the
24  form.
25       A.  The terms will be baked into

Page 213

1  it, yes, but the terms also allow the EFIH
2  unsecured creditors and the EFH unsecured
3  creditors to benefit from the rise in the
4  value of the company.
5        Q.  Let's figure out how this plays
6  out. You're going to come to confirmation, is
7  it your intent, with a valuation?
8        A.  It will be included in the
9  disclosure statement we file. Yes.
10       Q.  And when you get the valuation
11  you're providing your expert testimony to the
12  court, I take it you're not going to just
13  reverse-engineer this so your valuation
14  supports a 60/40 split of the equity.
15            MR. PRUITT: Object to the
16  form. Speculation.
17       A.  Obviously our valuation will be
18  based on the facts at the time.
19       Q.  Let me just address the -- the
20  speculation. Is it speculation on my part
21  that you're not going to reverse-engineer? Or
22  are you pretty certain as you sit here you're
23  not going to reverse-engineer a valuation so
24  that it supports the equity split which is
25  being committed to before you've finished your

54 (Pages 210 to 213)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 214

1  valuation?
2      A.   My firm will provide a
3  valuation that we think is appropriate at the
4  time.
5      Q.   Okay.  So you do your
6  valuation, and it actually shows that the
7  enterprise value has risen; we're in the good
8  situation.  The enterprise value has risen and
9  now the split should be 55/45.  Okay?  Do you
10  understand that?  Just as a hypothetical?
11      A.   Well, I think since the DIP is
12  being shared with the EFH unsecureds, to the
13  extent the value rises, I think that the deal
14  that's been struck is very robust relative to
15  what possible valuation outcomes may arise.
16      Q.   Okay.
17      A.   If there's a material change in
18  valuation, obviously that might change the
19  circumstance.  But I think people understand
20  the benefit of the bargain as it exists today.
21      Q.   I'm going to come back to the
22  benefit of the bargain in a bit.
23           Can you understand that
24  hypothetical, that valuation has risen such
25  that in order to repay the DIP you only need

Page 215

1  to give them 55 percent of the equity, not 60?
2      A.   I'll take your example in the
3  context in which it's given.
4      Q.   Okay.  And in that instance,
5  the company can exercise, or EFIH could
6  exercise its fiduciary out.  Right?
7      A.   That is correct.
8      Q.   But it's going to cost the
9  company $190 million to exercise that
10  fiduciary out?
11      A.   That's correct.
12      Q.   And have you done any --
13  presented any analysis to the EFIH board as to
14  the costs and benefits of providing that kind
15  of collar on valuation?
16      A.   No, but I know that 190 million
17  on a TEV of, total enterprise value of
18  16-and-a-half billion dollars is barely over
19  one percent.
20      Q.   Right.  But that's if you're
21  looking at the TEV of EFIH.  But if what
22  you're looking at --
23      A.   I'm looking at the TEV of
24  Oncor.
25      Q.   Of Oncor.  Okay.

Page 216

1      A.   Which is the driver for
2  valuation to all the constituencies in the
3  EFIH and EFH capital structure, and it's the
4  valuation of the company that we will be
5  valuing.
6      Q.   All right.  When you say the
7  unsecured share, first of all, no contingent
8  creditor of EFIH is being offered to purchase
9  into the DIP.  Right?
10      A.   The only people being offered
11  an opportunity to purchase the DIP are the EFH
12  unsecureds and the EFIH unsecureds.
13      Q.   Okay.  So let's be clear.
14  There is a real possibility in this case that
15  if the parties can't get to a deal, you're
16  going to have a, at least on the E side of the
17  house, a potentially $3 billion tax claim?
18      A.   Well, the $3 billion tax claim
19  relates to a deconsolidation.
20      Q.   Mm-hmm.
21      A.   I think it's not in the
22  interest of either the EFIH unsecureds or the
23  EFH unsecureds to trigger it.
24      Q.   I understand that.
25      A.   So under the circumstances

Page 217

1  you're suggesting that a tax claim might be
2  triggered, I suspect the two sides will come
3  to their senses and negotiate something to
4  avoid a deconsolidation.  Unless they wish to
5  inflict pain upon themselves.
6      Q.   Well, I guess that was the
7  question you got asked before.  Isn't it your
8  view, as a restructuring professional, that no
9  matter what the parties are going to come, at
10  least it is in the best interest of all
11  creditors other than the TCEH first liens that
12  the parties come to a deal that avoids the
13  incurrence of a deconsolidation tax at any of
14  the debtor entities?
15      A.   Well, that's --
16           MR. PRUITT:  Objection to the
17  form.
18      A.   That's certainly what -- the
19  message we've preached to all the creditors at
20  all the constituent companies.  Clearly
21  various creditor groups may have differing
22  views as to their vulnerability to such a tax.
23      Q.   But in providing your answer
24  with respect to its being, this -- the
25  participation in the DIP is being offered to

55 (Pages 214 to 217)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 218

1  all creditors, it would not include the
2  government as a contingent creditor?
3      A.  No, it would not, because
4  they're not a creditor at the moment.
5      Q.  Okay.  And what analysis has
6  been done as to whether or not any other
7  debtors are creditors of EFIH?
8      A.  I'm not aware of any.
9      Q.  Well, have you done any
10 analysis?
11     A.  I haven't.
12     Q.  Okay.  And have you heard of
13 any analysis being done?
14     A.  I know that --
15         MR. PRUITT:  Again, David,
16 that's a yes-or-no question.
17     A.  Yes.
18     Q.  By whom?
19     A.  I believe that work was done by
20 Kirkland & Ellis.
21     Q.  When?
22     A.  I believe it was done over the
23 past 12 months.
24     Q.  On behalf of whom?
25     A.  I believe they did it on behalf

Page 219

1  of all of the companies.  And that work was
2  shared with all of the RSA parties.
3      Q.  And what form did that work
4  take?
5      A.  My recollection is they have a
6  very well polished presentation that they
7  share with all of the RSA parties.
8      Q.  Presentation on what?
9      A.  On all of the transactions
10 amongst the various companies over the last
11 six, seven years since the buyout.
12     Q.  And have any of those
13 presentations been given to management, as far
14 as you know?
15     A.  I believe management helped
16 them prepare it, because they provided the
17 underlying data.
18     Q.  Just give me a better sense.
19 How big is it?
20         MR. PRUITT:  Object.  How big
21 is what?
22 BY MR. SHORE:
23     Q.  How big is the Kirkland
24 presentation?
25     A.  Oh, I think it's at least maybe

Page 220

1  50 pages, plus or minus.
2      Q.  Any doubt that, in your mind,
3  that Mr. Keglevic would know of its existence?
4      A.  I -- I have no idea what Paul
5  remembers and doesn't.  He's a busy man.
6      Q.  With respect to -- so
7  contingent creditors aren't participating in
8  the DIP.  Who else can't participate in the
9  EFIH second lien DIP --
10         MR. PRUITT:  Objection --
11 BY MR. SHORE:
12     Q.  -- who are EFIH creditors?
13         MR. PRUITT:  -- to the form.
14     A.  Well, the first liens have
15 offered to provide the DIP, and they've only
16 offered the opportunity to the nonsettling
17 first lien holders.  Second lien noteholders
18 have obviously offered to provide a DIP.
19     Q.  Under the -- I'm sorry.
20     A.  But under the current DIP that
21 we've endorsed, only the first lien -- excuse
22 me, only the EFIH unsecureds and the EFH
23 unsecureds have been offered an opportunity.
24     Q.  And which of the EFIH
25 unsecureds?  They all have to be QIBs.  Right?

Page 221

1      A.  Well, there's the backstop
2  parties, who backstop the facility, and then
3  the -- and then the opportunity to participate
4  in the DIPs being offered to all of the EFIH
5  unsecureds.  I don't think the unsecured
6  instrument has ever been registered.  So I
7  believe that it will be offered to all
8  holders, but obviously I believe all holders
9  are QIBs, because the security has never been
10 registered.  I'm not a securities law expert.
11 I'm sure the offering will be made only to
12 Judge Sontchi.
13     Q.  The TCEH firsts, and we'll go
14 back to your answer before about what they
15 were demanding, what did you understand --
16 first of all, were you present at any -- for
17 any communications by the TCEH firsts who
18 provided the statements that you attributed to
19 them before when answering about why you're
20 moving quickly?
21     A.  Yes.
22     Q.  Okay.  And who was speaking on
23 behalf of the TCEH firsts?
24     A.  Well, I've had individual
25 conversations with several of them, and I've

56 (Pages 218 to 221)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 222

1   had meetings with them as a group and with
2   their legal and financial advisors.
3       Q.   Okay.
4       A.   And they've continually made
5   those statements.
6       Q.   Give me the names of people who
7   have said that on behalf of the TCEH firsts.
8       A.   The people at Apollo. There
9   are several of them.
10      Q.   Okay.
11      A.   Do you need names?
12      Q.   Yeah.
13      A.   Okay. Scott Kleinman. Jordan
14  Zaken. Josh Harris. At Oaktree, Bruce Karsh
15  and Ken Liang.
16           At Angelo Gordon, Gavin Baiera.
17      Q.   How do you spell his last name?
18      A.   I think it's B-A-I-E-R-A.
19      Q.   Okay.
20      A.   And at Centerbridge, Bao
21  Truong. B-A-O, T-R ...
22      Q.   U-O-N-G?
23      A.   U-O-N-G, yes. Thank you.
24      Q.   Anybody else you've heard say
25  that on behalf of the TCEH firsts?

Page 223

1       A.   I don't recall the others.
2       Q.   And I can break it down into
3   the individual conversations, but can you
4   provide me more detail with respect to what
5   they said about their willingness to do a deal
6   and the need for velocity in that deal?
7       A.   We could spend all day talking
8   about it, but there was one aspect of our
9   negotiations with them which I think is
10  illuminating.
11      Q.   Okay.
12      A.   Which is that at one point --
13  and this was particularly coming from Apollo
14  and Oaktree -- that they would be willing to
15  consider a tax-free spin, and thereby they
16  would not get the benefit of their asset
17  step-up pursuant to a taxable deconsolidation.
18  But there was a strong desire to have us agree
19  that if we don't accomplish the completion of
20  the bankruptcy restructuring as we've
21  described it, that they would have the ability
22  to, after a certain date, present to the
23  bankruptcy court a sale of TCEH, in lieu of
24  pursuing any consensual restructuring. And we
25  had a lot of discourse and interaction, and we

Page 224

1   obviously fought vigorously against any such
2   provision in the agreements. And fortunately
3   we have prevailed.
4       Q.   Okay. So tell me how those
5   discussions with the TCEH firsts impacted
6   EFIH's decision, if it impacted it at all, to
7   enter into the second lien DIP transactions?
8       A.   Well, we constantly reassured
9   TCEH that we were going to get a deal between
10  EFH and EFIH. As you can see, we were
11  battling with the various constituencies at
12  EFH and EFIH to try to get to a consensual
13  agreement; that that battle or negotiation
14  went down to the wire; namely, the night of
15  April 28th, and we were relieved that we were
16  able to get an agreement, and that our
17  representations to TCEH that we will get them
18  to agree to a consensual restructuring so that
19  we can present a unified restructuring that
20  will result in a consensual tax-free spin can
21  happen in a reasonably compact time frame.
22      Q.   Is it your belief, based on
23  your participation in the negotiations, that
24  in the absence of the equity conversion
25  feature of the second lien DIP, you would not

Page 225

1   have been able to obtain the support of the
2   TCEH first lien creditors for the
3   restructuring support agreement?
4       A.   Yes, that is my belief.
5       Q.   In other words, the second lien
6   DIP was the sine qua non to getting the TCEH
7   firsts to agree to the RSA? ·
8           MR. PRUITT: Objection to form.
9       A.   I think the -- the second lien
10  DIP, the first lien DIP, the agreement with
11  EFH, were all necessary ingredients to assure
12  the TCEH group that the EFH/IH restructuring
13  was largely agreed to, and that, therefore,
14  that was the critical issue that got the TCEH
15  first lien lenders to agree to the tax-free
16  spin.
17      Q.   So let me just rephrase my
18  question. Is it your belief that the EFIH
19  second lien DIP, and in particular its equity
20  conversion feature, was a critical component
21  in getting the TCEH first lien group to
22  support the RSA?
23          MR. PRUITT: Objection to the
24  form.
25      A.   Yes, I do.

57 (Pages 222 to 225)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 226

1    Q.   Last question:  Have you ever
2  provided any valuation views at all to the
3  EFIH board with respect to either the equity
4  value or enterprise value of EFIH?
5    A.   Yes.
6    Q.   And when was that?
7    A.   Well, as recently as the
8  signing of the RSA.
9    Q.   And what did you tell them?
10    A.   I told them that the terms of
11  the RSA as it relates to EFH and EFIH are
12  consistent with our views as to a reasonable
13  valuation for Oncor.
14    Q.   And have you, to tie up that
15  loose end, have you provided them with any
16  writing that expresses your views with respect
17  to value?
18    A.   I have not provided a formal
19  valuation opinion on Oncor.
20    Q.   I didn't ask about a formal
21  valuation opinion; I asked about a writing.
22    A.   I have not provided writing on
23  that subject.
24    MR. SHORE:  All right.  I have
25  no further questions.

Page 227

1    MR. HOROWITZ:  Let's go off the
2  record.
3    THE VIDEOGRAPHER:  Here marks
4  the end of Media Number 3.  We are going off
5  the record.  The time is 2:37 [sic] p.m.
6    ---
7    (Recess from 2:47 to 3:02 p.m.)
8    ---
9    THE VIDEOGRAPHER:  Here marks
10  the beginning of Media Number 4.  We are back
11  on the record.  The time is 3:02 p.m.
12  EXAMINATION BY
13  MR. HOROWITZ:
14    Q.   Good afternoon, Mr. Ying.  For
15  the record, I'm Gregory Horowitz from Kramer
16  Levin, on behalf of the EFIH second lien notes
17  trustee, and the Ad Hoc Group of EFIH second
18  lien noteholders.
19    I would like to start by asking
20  you some questions about the declaration you
21  submitted in support of the second lien DIP
22  motion and the request, which has been marked
23  as Ying Exhibit 2.  So if you could get that
24  out in front of you.
25    A.   I have it.

Page 228

1    Q.   If I can direct your attention
2  to Page 3.  There's a Heading B that reads the
3  E -- tell me if you're there.
4    A.   I'm there.
5    Q.   Good.
6    -- that reads, "The EFIH second
7  lien DIP facility is an integral component of
8  the restructuring."
9    When you refer in this
10  declaration to the EFIH second lien DIP
11  facility as being an integral component, am I
12  correct in understanding that you're referring
13  not only to the portion of the transaction
14  that extends financing during the bankruptcy
15  case, but also, the what I think you've
16  referred to as something akin to a backstop
17  rights offering at the exit date?
18    A.   That is correct.
19    Q.   Okay.  So this is -- you've
20  said that this is a unique transaction that
21  you are not aware of any direct precedence
22  for.  Right?
23    A.   I'm not aware of any.
24    Q.   And one of the reasons that
25  it's a unique transaction is because it's a

Page 229

1  hybrid of two different types of transactions.
2    Correct?
3    A.   It's two transactions in one.
4    Q.   Okay.  And one of those
5  transactions is the extension of
6  debtor-in-possession financing during the
7  Chapter 11 case.  Right?
8    A.   That is correct.
9    Q.   And the other you have referred
10  to as something akin to a backstopped rights
11  offering.  Right?
12    A.   Yes.
13    Q.   And just tell me what, in the
14  more typical scenario, is a backstopped rights
15  offering?
16    A.   Well, it's typically a process
17  whereby the junior creditor, or the fulcrum
18  security holder, is converting their claims to
19  equity but the company still has too much
20  leverage and, therefore, there's a use of
21  proceeds that's needed for the junior
22  constituency to end up owning as much equity
23  as they would like, because without the use of
24  proceeds of the rights offering, the next
25  seniormost creditor in the capital structure

58  (Pages 226 to 229)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 230

1  would also have to convert some or all of
2  their claims to equity, and the two parties
3  end up generally in a very nasty dispute over
4  valuation.
5          The senior creditor wants a
6  lower valuation and the junior creditors wants
7  a higher valuation, and it requires a lengthy
8  fight in bankruptcy court over valuation
9  between those two parties, because the junior
10  constituency says, Okay, I'll put my money
11  where my mouth is, I'll write a check, I'll
12  verify that the valuation is of a certain
13  amount, it justifies that not only do I get to
14  own the company at a valuation of my choosing,
15  but there are enough cash proceeds from the
16  proceeds of the rights offering that the
17  proceeds are used to pay off any senior
18  creditors who must be paid off at their full
19  claim, so that the company has enough --
20  doesn't have too much leverage and, in fact,
21  has just the right amount of leverage so it
22  can refinance out the remaining debt at
23  emergence and have a feasible capital
24  structure.
25      Q.   Okay.  So in a rights offering

Page 231

1  what is being offered is the equity in the
2  reorganized company.  Correct?
3      A.   That is correct.
4      Q.   And the right is the right to
5  purchase the equity of that reorganized,
6  not-yet-existent entity.  Correct?
7      A.   That is correct.
8      Q.   And it's typical that in a
9  rights offering the value of the equity in the
10  reorganized company is going to be subjected
11  to a market test and that if other parties
12  believe that the equity is worth more they can
13  bid up the value?
14      A.   Well, generally the rights
15  offering is offered by the creditor group,
16  that's the juniormost, and I think that's what
17  is happening here, and obviously the creditor
18  group that ranks even junior to the EFIH
19  unsecureds was part of that negotiation, as
20  personified by Fidelity, and obviously they've
21  got a couple of trillion dollars under
22  management.  They're not babes in the woods,
23  they could have easily said I'll do the rights
24  offering and pay you the EFIH unsecureds off.
25  They could have done a 3.6 billion rights

Page 232

1  offering, but they chose not to.  They chose
2  to negotiate a deal where they get a piece of
3  the rights offering, they get some extra cash
4  from the Oncor TSA amendment, and both sides
5  agreed to a consensual deal.
6      Q.   Let me unpack that for a
7  second.  When you refer to the creditor, or I
8  guess actually probably more -- you referred
9  to it as the creditor group, but I think it's
10  probably more technically the stakeholder
11  group that ranks junior to the unsecureds at
12  EFIH as being represented by Fidelity, I take
13  it you're referring to Fidelity as a
14  representative of EFH as the equity owner of
15  EFIH?
16      A.   Yes.  That's what I was
17  referring to.
18      Q.   And you understand why I drew
19  the distinction between stakeholder and
20  creditor in that context, then?
21      A.   No, I don't.
22      Q.   Well, equity is typically
23  not -- an equity holder is typically not
24  considered a creditor.  Correct?
25      A.   Well, they're a creditor of

Page 233

1  EFH.
2      Q.   And a stakeholder of EFIH --
3  and EFH is a stakeholder of EFIH?
4      A.   Okay.  I understand your
5  definition.
6      Q.   And, therefore, Fidelity's
7  participation in the value of EFIH --
8  withdrawn.
9          You're using Fidelity as a
10  representative of the creditors of EFH in this
11  context.  Right?
12      A.   And I've highlighted the
13  importance that EFIH cannot deconsolidate from
14  EFH without damaging unsecured creditors at
15  both of those entities.
16      Q.   I understand.  In the -- let's
17  take just for a moment, stick with the DIP
18  that you were writing this declaration,
19  Exhibit 2, with reference to, the DIP proposal
20  that the debtors sought move to have confirmed
21  on or about the petition date.  In that date,
22  and also in the DIP that the board I guess has
23  decided to go forward with yesterday, some
24  portion of the rights offering is being made
25  available to EFH creditors.  Right?

59 (Pages 230 to 233)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 234

1    A.   That is correct.
2    Q.   And why is some portion of it
3  being made available to EFH creditors?
4    A.   It's giving them some hope that
5  even if the value of Oncor ends up being
6  substantially higher at some point in the
7  future, they get a piece of the upside.
8    Q.   So it's not untypical in a
9  situation where equity may or may not be out
10 of the money that the dispute as to whether or
11 not equity is out of the money as a result by
12 giving equity some ability to participate in
13 the rights offering.  Right?
14   A.   That's correct.
15   Q.   And this is an example of that?
16   A.   This is an example of that.
17   Q.   Okay.  Going back to the
18 concept of a backstopped rights offering.
19 What is the backstop element to the
20 backstopped rights offering?
21   A.   You can't just say we're going
22 to hold the rights -- well, you could just
23 say, you know, at some point in the future
24 we'll hold the rights offering and the price
25 will be the price.  The concept of a

Page 235

1  backstopped rights offering means that it's a
2  firm commitment by a group of investors who
3  sign real live commitment letters that say we
4  will provide the financing no matter what.  We
5  will offer the opportunity to invest to all of
6  those parties who aren't at the table pre the
7  filing of a bankruptcy and the signing of the
8  RSA, so they assure us that the money will be
9  there, but ultimately the individual investors
10 in the various classes, the EFH unsecureds and
11 the EFIH unsecureds, ultimately will get to
12 participate in that equity rights offering at
13 confirmation.
14   Q.   So in a backstopped equity
15 rights offering, the debtor has the ability to
16 invoke the backstop to compel the backstop
17 parties to purchase equity at the agreed upon
18 value.  Right?
19   A.   Right.  They're there to
20 backstop in the event that each investor
21 doesn't participate in their full pro-rata
22 share of the rights offering.
23   Q.   Now, you've referred, you refer
24 in your declaration, and you've referred today
25 to the conversion feature of the DIP as being

Page 236

1  a mandatory conversion.  Right?
2    A.   Yes.
3    Q.   And by mandatory conversion,
4  you're not referring to the -- withdrawn.
5        What does the word "mandatory"
6  refer to when you say a mandatory conversion?
7    A.   My understanding is the only
8  condition precedent to the conversion of a DIP
9  loan into the equity of EFH is that the RSA
10 has been incorporated into the plan of
11 reorganization and the plan of reorganization
12 has been confirmed by the bankruptcy court.
13   Q.   But the mandatory conversion
14 feature is also mandatory on the part of the
15 debtor.  Correct?
16   A.   That is the agreement.
17 Obviously if for some reason the debtor feels
18 that they could raise the equity at a better
19 valuation, and apportion the proceeds
20 differently, I guess in theory the RSA could
21 be violated and you could refinance out the
22 DIP with proceeds from a rights offering at a
23 higher valuation.
24   Q.   Okay.  But the RSA isn't up for
25 approval on the 30th; the DIP motion is up for

Page 237

1  approval on the 30th.  Right?
2    A.   That is correct.
3    Q.   And if the court approved the
4  DIP motion, then at that point the debtors
5  would be contractually obligated upon
6  emergence to give -- to allow the DIP -- the
7  PIK DIP providers to convert.  And not only to
8  allow, they would be obligated to convert the
9  PIK DIP holders' holdings into equity of the
10 new company at that preset conversion ratio.
11       Right?
12       MR. PRUITT:  Objection to the
13 form.
14   A.   Well, I think as I said, I
15 think the mandatory conversion feature is only
16 operative if the RSA has been incorporated
17 into the plan of reorganization, which has
18 been approved by the court.
19   Q.   But if the mandatory conversion
20 feature does not become operative, then the
21 alternative transaction fee would become
22 payable.  Right?
23   A.   Well, if the mandatory
24 conversion feature cannot be -- become
25 operative because of the condition I described

60  (Pages 234 to 237)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 238

1  is not met, we obviously now have just a
2  plain, ordinary second lien DIP loan, and we
3  now have to find a way to pay it off in cash.
4      Q.   Is it your understanding that
5  in those circumstances the PIK DIP providers
6  would be entitled to the alternative
7  transaction fee?
8      A.   In that case -- well, the
9  alternative transaction fee, as I recall it,
10  since it's now been eliminated in the current
11  proposal, was a three percent fee, and maybe
12  it was reduced to one-and-a-half percent at
13  one point, but it's only operative in the
14  period between the approval of the DIP loan
15  and the funding of the DIP loan.
16      Q.   I'm sorry.  I think I misspoke.
17  I apologize.
18      A.   That's okay.  There are too
19  many fees here.
20      Q.   There are.
21      A.   From a nomenclature standpoint.
22      Q.   I'm referring to the optional
23  redemption fee.
24      A.   Okay, the optional redemption
25  fee.

Page 239

1      Q.   Right.
2      A.   Yes.  If the -- if the DIP loan
3  is optionally redeemed and it's not by virtue
4  I think of an acceleration, yes, they're
5  entitled to a $95 million fee.
6      Q.   So just cutting to this, as I
7  understand it, if the PIK is approved -- if
8  the PIK DIP is approved -- do you understand
9  what I say when I'm referring to the PIK DIP?
10      A.   It's the DIP loan proposed by
11  the EFIH unsecured PIK holders.
12      Q.   Right.
13      A.   Okay.
14      Q.   If the PIK DIP is approved, at
15  that point either the debtors will have to on
16  emergence convert the DIP loan into equity in
17  the reorganized company at the preset
18  conversion ratio, or will have to pay the
19  optional redemption fee.  Correct?
20      A.   And repay the principal amount.
21      Q.   And repay the principal amount?
22      A.   That's correct.
23      Q.   So would you agree with me that
24  in that respect this optional redemption fee
25  acts akin to a stalking horse break fee?

Page 240

1      A.   Well, I think even in our deck
2  we referred to it as a topping fee, that the
3  competing offer would certainly have to be
4  better with respect to the view of the other
5  junior constituencies by being at least equal
6  to or greater than those costs.
7      Q.   Are there any other aspects of
8  the topping the overbid increment as it would
9  be?
10      A.   It's the five percent funding
11  PIK fee.
12      Q.   Okay.  Which is how much?
13      A.   Five percent of 1.9 billion, or
14  $95 million.
15      Q.   Okay.  So all totaled it would
16  be 190 million in overbid?
17      A.   Yes, 190 million.
18      Q.   Okay.  Now, sticking with
19  Paragraph 6 -- well, actually, we're still in
20  the heading.  We're moving right along.
21          When you say the EFIH second
22  lien DIP facility is an integral component of
23  the restructuring, do you mean to suggest that
24  there is no other way to accomplish the goals
25  of -- the essential goals of the debtors'

Page 241

1  restructuring?
2      A.   Yes.  Not without taking a lot
3  of risk and uncertainty and introducing it
4  into the restructuring.  Creating this
5  instrument served to accomplish a number of
6  goals we thought were key in securing the
7  votes of all of the parties to the RSA.
8      Q.   Okay.  And one of those goals
9  that you referred to, I think you referred to
10  repeatedly today, is the need to accomplish a
11  tax-free spin of EFH from the T side?
12      A.   Actually, it's a tax-free spin
13  of TCEH from EFIH -- from EFH.
14      Q.   Okay.  Is there a difference in
15  those two?  I thought it was just saying it
16  the other way.
17      A.   Well, again I'll say it the way
18  I think about it, because I only have a small
19  mind here.  But again, the objective is to
20  accomplish a tax-free spin of TCEH from EFH.
21      Q.   Okay.
22      A.   EFIH is not contemplated to
23  deconsolidate, tax free or otherwise, from
24  EFH.
25      Q.   Okay.  Now, I understand why

61 (Pages 238 to 241)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 242

1  it's necessary to assure -- well, withdrawn.
2       One aspect of the tax issues is
3  the need to assure that the equity of EFH
4  postrestructuring remains at least in large
5  part in the hands of prepetition creditors --
6  of creditors. Correct?
7       A.   (No response.)
8       Q.   Withdrawn. Let me try that
9  again.
10      A.   Yeah.
11      Q.   One of the tax exigencies was
12 the need to ensure that equity upon
13 restructuring remains in large part in the
14 hands of existing creditors. Correct?
15      A.   I think that is correct, as a
16 byproduct of achieving the private-letter
17 ruling which we're seeking that would give us
18 enough comfort that the TCEH tax-free spin
19 can, in fact, be accomplished.
20      Q.   And that goal is accomplished
21 by the second part of this hybrid transaction
22 that we've been talking about, the
23 quasi-backstopped rights offering mandatory
24 conversion. Right?
25      A.   Well, the conversion -- well,

Page 243

1  the second lien DIP, with the conversion
2  feature, exists for a variety of reasons. It
3  exists because, A, we want to stop paying the
4  12 percent interest rate on the existing
5  second lien notes. We couldn't do a straight
6  second lien DIP because even the first lien
7  DIP lenders, in their agreement, require that
8  if there's a second lien DIP it must be
9  mandatorily convertible, because they agree,
10 as I have said, that with the first and the
11 second lien DIP in place, EFIH is way too
12 levered, it can't -- the DIPs can't be
13 refinanced at emergence all as debt; it has to
14 be taken out in equity. So the second lien
15 DIP has to be convertible into equity,
16 assuming the RSA is approved.
17      Secondly, the DIP has to be
18 convertible into EFH equity, not EFIH equity.
19 So to do that you must need the EFH creditors'
20 consent for them to issue their stock to allow
21 the EFIH DIP to be converted.
22      And, obviously, all that was
23 important so that the TCEH first liens would
24 agree to do -- to support their end of the
25 bargain, which is to agree to tax-free spin,

Page 244

1  not taxably deconsolidate.
2       Q.   I understand you gave me a
3  bunch of reasons, you've put them in the
4  declaration, but the question really is
5  specifically with regard to the tax-free spin.
6       My question was, in order to
7  accomplish the tax-free spin, in order to
8  accomplish the goal of ensuring that the
9  equity of the reorganized EFH is in the hands
10 of creditors, you needed the rights offering
11 aspect of this two-parts deal. Right? I'm
12 just focusing on the tax issue. We'll get to
13 the -- we'll get to the interest issue, the
14 overleverage issue.
15      A.   Yes. What I just described was
16 arrived at without this issue that you have
17 now raised, which is who owns the stock, and
18 is there, I think the tax term is "continuity
19 of interest."
20      Q.   Good. We'll use that.
21      A.   Okay? Obviously, you know,
22 when we design these things, we're relying
23 heavily on tax advice, the company has a very
24 high-quality tax person internally, obviously
25 Kirkland & Ellis provides lots of advice. The

Page 245

1  whole continuity-of-interest issue wasn't in
2  the forefronts of our minds, none of these tax
3  terms are, quite honesty, since us mere
4  mortals don't understand them until the tax
5  lawyers tell us, ah-hah. Obviously a
6  necessary byproduct of the way the convertible
7  DIP -- mandatory convertible DIP is designed
8  is that it does meet the
9  continuity-of-interest tests and so, great,
10 it preserves the private-letter ruling and,
11 therefore, the tax-free spin. But again, the
12 continuity-of-interest test wasn't the tail
13 wagging the dog. The dog was that we needed
14 to have a mandatorily convertible DIP for all
15 of the reasons I described.
16      Q.   The continuity-of-interest
17 issue, the need for a tax-free spin, that was
18 something that was on the radar at an
19 important goal from at least January of 2014.
20      Correct?
21      A.   Well, the tax-free spin clearly
22 was. I think the continuity-of-interest
23 test -- again, I may be mischaracterizing it,
24 I am not a tax expert -- I don't think the
25 continuity-of-interest test was the guiding

62 (Pages 242 to 245)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 246

1  principle of the tax-free spin. As I recall
2  in the private-letter ruling requests, there
3  are over half a dozen issues that it raises,
4  and this, it may well be one of them, but it's
5  only one of many. Again, it wasn't the
6  driving force, if that's your question.
7        Q.   Sir, isn't it a fact that there
8  was a period of time when the PIKs, the EFIH
9  unsecureds, and the debtors were negotiating a
10 potential RSA that did not contemplate a DIP,
11 but did contemplate a rights offering?
12       A.   Yes. I think that there was a
13 time when that was contemplated.
14       Q.   Right. And I think Mr. Devore
15 this morning marked Ying Exhibit 11. If you
16 could take a look at that.
17       A.   Okay. I have it.
18       Q.   And this should be a document,
19 the top first page starts with an e-mail from
20 you to Sam Greene at Centerview.
21            Do you see that?
22       A.   Oh, I have 11. This is a
23 Deutsche Bank presentation.
24       Q.   Do I have the wrong one?
25       A.   It's a white sticker, not a

Page 247

1  yellow.
2        Q.   You know what? That was
3  because that was Mr. Keglevic's exhibit. Your
4  11 has the nice yellow sticker on it.
5        A.   Okay. Let me find the yellow
6  sticker, 11.
7             All right. I have it here.
8        Q.   So this starts with the e-mail
9  from you to Mr. Greene, February 1st, 2014.
10            Right?
11       A.   Yes, it does.
12       Q.   And if you look at the first
13 e-mail in the chain, you'll see that it's --
14 the chain starts with an e-mail from Sam
15 Greene to Mr. Sassower at Kirkland, which
16 attaches an illustrative restructuring term
17 sheet. And I want to direct your attention to
18 that term sheet which is Bates ending 734.
19       A.   I have it.
20       Q.   Now, you saw this term sheet.
21            Right?
22       A.   Yes.
23       Q.   Okay. And you understood this
24 to be a term sheet that was proposed by the
25 PIKs. Right?

Page 248

1        A.   At a very early stage in the
2  discussions, yes.
3        Q.   Okay. And you see that under
4  Framework, the second bullet point was
5  "Postemergence, EFH will continue to own 100
6  percent of EFIH, avoiding potential
7  deconsolidation tax claims."
8             Do you see that?
9        A.   Yes, I do.
10       Q.   And the third bullet point is
11 TCEH will be spun off. Right?
12       A.   Yes.
13       Q.   So this was a proposal that was
14 intended to be consistent with the concept of
15 a tax-free spin. Correct?
16       A.   That is correct.
17       Q.   And if you look down at the
18 second-to-last set of -- set of rows under the
19 heading Sources of Funding? Do you see that?
20       A.   Yes.
21       Q.   Do you see that -- well, first
22 in the first subbox, DIP Financing, there's a
23 contemplation of a first DIP to take out
24 the existing -- the EFIH first lien notes.
25            Right?

Page 249

1        A.   Correct.
2        Q.   And there's the concept which I
3  think you also discussed a little bit more
4  this morning, of a one-and-a-half lien DIP to
5  fund the costs of the case. Right?
6        A.   Well, actually it was -- the
7  one-and-a-half lien DIP was meant to help
8  facilitate our securing enough of a first lien
9  DIP so that we had enough proceeds to take out
10 the first lien notes.
11       Q.   Okay. And the PIKs were
12 offering to backstop that DIP. Right?
13       A.   Yes.
14       Q.   And then under the box
15 underneath, you'll see that there's the rights
16 offering. And this rights offering was going
17 to be backstopped by the PIKs as well. Right?
18       A.   That is correct.
19       Q.   Okay. So this is at a time
20 where --
21            MR. HOROWITZ: Withdrawn.
22 BY MR. HOROWITZ:
23       Q.   So am I right that in this
24 proposal the PIKs were prepared to support a
25 plan which would have a rights offering at

63 (Pages 246 to 249)

PX 134
Page 64 of 165

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 250

1  emergence but would not have a second lien
2  DIP?
3      A.  That's correct.
4      Q.  And, in fact, if you look at
5  under Treatment of Key Constituents, the
6  middle set of boxes, you'll see that under
7  EFIH second lien notes there was a proposal
8  for a partial paydown via a favorable
9  resolution of make-whole -- do you understand
10  that to mean that they would litigate over
11  whether or not the seconds were entitled to a
12  make-whole?
13      A.  It assumes that they would
14  litigate and win, yes.
15      Q.  Or if they didn't win,
16  Romanette ii was that they would do an equity
17  claw at emergence.  Right?
18      A.  Yes.
19      Q.  And I want to clarify, because
20  I think with due respect to Mr. Glenn, I think
21  he may have been confused, and I think he got
22  you confused.  He was suggesting that there
23  was a -- that there was an evolution from a
24  rights offering to an equity claw, and I just
25  want to clarify that.

Page 251

1      I am right, aren't I, that the
2  whole concept of an equity claw requires there
3  to be a rights offering?  Right?
4      A.  To exercise equity claw you
5  must have an equity infusion into EFIH.
6      Q.  Right.
7      A.  And in this term sheet the
8  conception was that there would be a rights
9  offering -- equity rights offering to fund the
10  claw.
11      Q.  Right.  And the claw would
12  accomplish a partial delever.  Right?
13      A.  Well, only very partial,
14  because only 35 percent of one of the two debt
15  issues were likely to be redeemed, given the
16  dates on the equity claw provision.
17      Q.  Right.  Although --
18      A.  There are two issues.  There's
19  a $400 million second lien issue, and a
20  billion-7 issue.  I think the $400 million
21  issue, the claw expires early next year.  The
22  claw on the billion-7 issue I think expires
23  later this year.
24      So the view was that to the
25  extent there was a claw, it would only apply

Page 252

1  to 35 percent of the billion-7 issue.  So the
2  size of the claw would be roughly $650 million
3  plus the claw premium of the coupon.
4      Q.  These two issues, they have
5  different maturity dates.  Right?
6      A.  Yes, they do.
7      Q.  And they also have different
8  first call dates.  Right?
9      A.  That's correct.
10      Q.  And just explain for the record
11  what a first call date is?
12      A.  Well, under these instruments,
13  as they operate in a nonbankruptcy context,
14  the issuer has the right to optionally redeem
15  these securities at certain times and at
16  certain prices.  In both of these instruments,
17  there's a period after issuance where they're
18  not callable by the issuer under the optional
19  redemption provision, and that only after
20  several years pass does the optional
21  redemption provision become operative, and the
22  instruments specify the pricing and the dates
23  at which the option redemption, at the
24  issuer's option, can be exercised.
25      Q.  Well, first of all, just to

Page 253

1  clarify.  When you say that they provide that
2  they're not callable, the indentures actually
3  provide that if they are prepaid prior to the
4  first call dates they must be prepaid with the
5  applicable premium.  Right?
6      MR. PRUITT:  Objection.  The
7  document speaks for itself.
8      MR. HOROWITZ:  I just need to
9  clarify the record.
10  BY MR. HOROWITZ:
11      Q.  I'm right about that; aren't I?
12      A.  There's a separate provision
13  that says if the issuer wishes to call --
14  retire the instruments prior to the dates,
15  that it can exercise the optional redemption
16  provision which you asked me to describe, that
17  it provides a separate procedure, a separate
18  pricing on which the issuer can redeem the
19  bonds before the optional redemption period
20  becomes effective.
21      Q.  We'll get to that in a little
22  bit more, but that's the applicable premium
23  which is also referred to as the make-whole.
24      Right?
25      A.  That's correct.

64 (Pages 250 to 253)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 254

1       Q.   Okay.  When are the first call
2   dates on the second lien?  And yes, I am
3   testing your memory.
4       A.   You're testing my memory.
5       Q.   I am.
6       A.   I think one's in '16 and one's
7   in '17.
8       Q.   Okay.  So if the debtors -- if
9   the debtor had left the second lien notes in
10  place subject to whatever equity claw they
11  could do under the terms of the indentures
12  within a little more than a year after
13  emergence, depending on when the company
14  emerged, they would be able to exercise their
15  first call rights under the indentures.
16          Right?
17          MR. PRUITT:  And I'm going to
18  object again and have a standing objection.
19  You're just asking the witness to interpret a
20  document.  The document's not in front of him,
21  and we can all read the document.
22          MR. HOROWITZ:  You know what?
23  You say "object to form," and then I move on.
24  Come on.
25  BY MR. HOROWITZ:

Page 255

1       Q.   I'm correct about that, right,
2   that if the debtors had left them in place,
3   the debtors would have been able to, in
4   accordance with the terms of the indentures,
5   delever by exercising the call at first call
6   within one and then two years after emergence,
7   based on the planned emergence?
8          MR. PRUITT:  The same
9   objection.
10      A.   I must say that when we saw
11  this term sheet we proceeded to try to model
12  the financial implications of what this term
13  sheet says, and my vague recollection is is
14  that it was not a pretty picture; that EFIH
15  was still negative cash flow.  I described the
16  size of the equity claw.  We told the
17  unsecureds, you know, nice idea, but you're
18  going to have to put a lot more money in here
19  to be a feasible capital structure.
20      Q.   And when you were modeling it,
21  you were modeling alternative scenarios where,
22  depending on the resolution of the legal
23  make -- issues about the make-whole claim?
24      A.   You know, I don't have a
25  specific recollection.  It's certainly logical

Page 256

1   to think that we would have modeled what
2   happens if you can take out the second liens
3   at par.
4       Q.   And would you have also had to,
5   since you can't count on that, you would have
6   also had to model what would have happened if
7   there were an adverse ruling?
8       A.   Yes, of course.  I presume
9   that's right.  I don't have a specific
10  recollection of what we modeled.
11          MR. HOROWITZ:  What are we up
12  to?
13          THE COURT REPORTER:  14.
14              ---
15          (Exhibit 14 was marked for
16  identification.)
17              ---
18          MR. HOROWITZ:  I've just marked
19  as Ying Exhibit 14 an e-mail and attachment
20  that are Bates-stamped ADHOC_EFIH-DIP0001209
21  through 1222.
22  BY MR. HOROWITZ:
23      Q.   Your name is not on this
24  e-mail, sir, but if I understood your
25  testimony, you -- is it true that as a general

Page 257

1   matter you reviewed and gave input on
2   proposals as they were exchanged?
3       A.   To the extent I was -- they
4   were shared with me, absolutely yes.
5       Q.   Okay.  Well, you can take a
6   minute to look at the -- I will direct you in
7   particular to the first paragraph, but as I'm
8   sure your counsel has told you, whenever I put
9   a document in front of you, you can look at
10  whatever you want to.
11          You know who Mr. Jeffrey
12  Rosenbaum is.  Right?
13      A.   Yes, I do.
14      Q.   Who is he?
15      A.   He's a person -- he's a senior
16  guy at York Capital, and York is one of the
17  large holders of EFIH unsecured debt.
18      Q.   And is it fair to say that
19  throughout the negotiations Mr. Rosenbaum
20  played a lead role in negotiations on behalf
21  of the PIKs?
22      A.   I think he, along with
23  representatives of Avenue and GSO, all played
24  an equally leading role in the negotiation.
25      Q.   Okay.  Well, do you see that in

65 (Pages 254 to 257)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 258

1  the first sentence of this e-mail
2  Mr. Rosenbaum writes, "Gentlemen, as per
3  various conversations over the last
4  day-and-a-half, please find attached a
5  new/alternative term sheet proposal titled
6  Term Sheet B."
7        And the date of this is March
8  15, 2014. Right?
9        A.   Yes.
10       Q.   Okay.  So taking a look at the
11  term sheet, which begins on the page Bates
12  ending 1211, I'll ask you, do you recall
13  seeing this?
14       A.   Well, I do recall term sheets
15  that were initially provided by Mr. Rosenbaum
16  and the other members of his group.  I do
17  recall in this time frame that there were
18  three versions:  an A, and a B, and a C.
19       Q.   And what were the general
20  differences between them, A, B and C?
21       A.   You're testing my memory, but I
22  believe Alternative A contemplated that there
23  was a prearranged plan with a tax-free spin of
24  TCEH, and it assumed the plan support
25  agreement assigned a filing by EFH and EFIH,

Page 259

1  and, obviously, TCEH.  And as distinct from A,
2  my recollection was that B assumed that there
3  was a tax-free spin of TCEH, and it also
4  assumed a consensual deal between EFH and
5  EFIH.  So there was an Oncor TSA amendment in
6  B, and the company --
7        Q.   Well, actually -- I apologize.
8  But if you would take a look at the e-mail
9  again at the first page.
10       A.   Yeah, maybe I should read that
11  first.
12       Q.   If you would look at the second
13  sentence, you'll see that Mr. Rosenbaum writes
14  "This Term Sheet B" -- that's a new term
15  sheet --
16       A.   Right.
17       Q.   -- "reflects a few minor tweaks
18  to our base original Term Sheet A, assuming
19  that EFH creditors (Fidelity) don't agree to a
20  consensual deal."
21       A.   That's it.  Right.
22       Q.   So one of the innovations in
23  this e-mail was this is what happens if
24  Fidelity doesn't get on board.
25       A.   Yes.  Again, I recall that

Page 260

1  there were three term sheets.  One said
2  everybody's agreeing.  Another term sheet said
3  Fidelity doesn't play ball as the EFH.
4  Another one said what if TCEH is not playing.
5        Q.   Let's just stick with Term
6  Sheet A on 1211.
7        A.   All right.
8        Q.   And if you read the first
9  bullet point under Framework, this is assuming
10  a restructuring of EFH and EFIH via
11  prearranged Chapter 11 plan with a tax-free
12  spin of TCEH.  Right?
13       A.   That's correct.
14       Q.   Okay.  And under Investment
15  Commitment, do you see that there's an
16  investment commitment backstopped in its
17  entirety by certain holders of the EFH/EFIH
18  unsecured notes?
19       A.   Yes.
20       Q.   Okay.  And if you look to the
21  next page, Bates ending 1212, I want to draw
22  your attention to the second row under
23  Treatment of Key Constituency EFIH second lien
24  notes.  You'll see that this is still, as with
25  the last one we were looking at, contemplating

Page 261

1  litigating the make-whole and if you win -- if
2  the debtors won refinancing the second lien at
3  par, and if the debtors lost, reinstating and
4  doing -- using the equity claw.  Right?
5        A.   I see that.
6        Q.   Okay.  So it's correct that as
7  of this time the PIKs were still prepared to
8  support a deal that did not have a DIP prior
9  to full litigation of the make-whole?  A
10  second lien DIP prior to full litigation of
11  the make-whole?
12       A.   I think it does refer to a
13  second lien DIP financing, on the prior page.
14       Q.   I'm sorry.  But just going back
15  to the box that I was reading --
16       A.   Okay.
17       Q.   -- EFIH second lien notes, it's
18  correct that this proposal did not contemplate
19  taking out the second lien notes unless and
20  until the make-whole was litigated, and only
21  if the outcome of the make-whole litigation
22  was favorable to the debtors?
23            MR. PRUITT:  Objection to form.
24  Calls for speculation.  You're asking him to
25  construe a document he didn't draft.

66 (Pages 258 to 261)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 262

1  BY MR. HOROWITZ:
2      Q.   Well, let me rephrase it then,
3  sir. Does this refresh your recollection that
4  as late as the middle of March the PIK holders
5  were prepared to support a plan which would
6  leave the second lien notes in place until and
7  unless the debtors received a favorable
8  decision on a make-whole litigation?
9      A.   Well, that seems to be the
10 inference in the words, although I'm looking
11 at the first page under Investment Commitment,
12 and it does talk about a $2 billion second
13 lien DIP.
14     Q.   And that's consistent with the
15 possibility that you, one, would pay down the
16 second lien notes during the case if a
17 favorable verdict was -- a favorable ruling
18 was received on the make-whole litigation.
19             MR. PRUITT: Objection to the
20 form.
21     A.   Yeah, look. Again, I haven't
22 seen this particular document, I've seen other
23 versions of it, which morphed from time to
24 time. It seems to be the interpretation.
25     Q.   Okay. So when, sir, did it --

Page 263

1  when did the RSA parties determine instead to
2  go with the current proposed DIP which
3  proposes to take out the second lien notes
4  prior to resolution of a make-whole
5  litigation?
6      A.   I don't recall.
7      Q.   In your opinion, is doing a
8  second lien DIP prior to adjudication of the
9  make whole as opposed to the proposal that was
10 embodied in this March 15 term sheet a
11 necessary and critical component of a tax --
12 and here now I'm reading from your declaration
13 on Page 6 -- on Page 3, Paragraph 6 -- a
14 critical component of the tax-free
15 restructuring contemplated by the
16 restructuring support agreement?
17     A.   I believe what I wrote in my
18 declaration was true, notwithstanding this
19 intermediate term sheet, which represents an
20 evolution along a very active change of
21 interaction. I have testified that by
22 early/mid March we had arranged for a first
23 lien DIP financing, and I have testified that
24 a condition of that financing was that if we
25 did a second lien DIP, it had to be

Page 264

1  mandatorily convertible into equity. So
2  sometime between the date of this document and
3  not very far thereafter I know we got to a
4  first lien agreement that called for a
5  mandatorily convertible second lien DIP.
6      Q.   Nothing in the first lien DIP
7  agreement requires you to take out a second
8  lien DIP. Right?
9             MR. PRUITT: Objection to form.
10     A.   I think it, like most
11 covenants, it operates in a negative covenant;
12 it prohibits us from making a second lien DIP
13 unless it is mandatorily convertible.
14     Q.   And it does not require you to
15 take out a second lien DIP?
16     A.   No, it does not. It stands on
17 its own.
18     Q.   And sitting here today, you
19 have no reason to believe that you could
20 not -- that the debtors could not equally well
21 have achieved their tax goals through a
22 backstopped rights offering contemplating
23 reinstating the second lien notes on
24 emergence? And I'm just talking about tax
25 goals at the moment. We'll get to the

Page 265

1  economics in a minute.
2             MR. PRUITT: Before you answer
3  the question --
4  BY MR. HOROWITZ:
5      Q.   Do you need the question again?
6             MR. PRUITT: -- just one
7  second.
8             If you have to rely on advice
9  that you've heard Kirkland give the company
10 with respect to tax issues solely, so rely on
11 what you've heard that analysis given in order
12 to answer that question, in other words, not
13 rely on anything you've heard in a -- the
14 ruling request, et cetera, I'll instruct you
15 not to answer.
16             THE WITNESS: Sure. Okay.
17     A.   Well, it's hard for me to
18 respond to a hypothetical, but the
19 hypothetical you pose strikes me as
20 problematic, because if you don't agree as to
21 the pricing of a rights offering, it's
22 impossible for EFIH to inform EFH how dilutive
23 it will be. It's impossible for EFH to know,
24 well, what's my deal in agreeing to let you,
25 EFIH, convert your debt into EFH equity, so

67 (Pages 262 to 265)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 266

1  you can leave it all to the end, but then you
2  would leave any consensual deal between EFH
3  and EFIH up in the air for determination at
4  some point in the future, which to me means,
5  Ah, we'll figure it out later, we'll kick the
6  can.
7          And that certainly wouldn't be
8  consistent with the desire by the TCEH
9  creditors to say, Well, do you have a deal
10  yet, at EFH and EFIH, and if you don't, what
11  are we even talking about?
12      Q.  When you enter into a
13  backstopped rights offering you can -- you
14  generally do specify the pricing of the
15  offering; don't you?
16      A.  Well, a backstopped rights
17  offering is another terminology for an
18  underwritten equity offering.  And, yes, the
19  terms of the offering are you specify pricing.
20      Q.  Right.  So is there any reason
21  that --
22          MR. HOROWITZ:  Well, withdrawn.
23  BY MR. HOROWITZ:
24      Q.  It's your understanding in this
25  March 15th, 2014, term sheet that the PIKs

Page 267

1  were proposing that they would enter into a
2  backstopped rights offering which would
3  specify the price at which they would commit
4  to purchase the equity on emergence?
5      A.  That's true.
6      Q.  Okay.  So was there any -- you
7  have no reason, as you sit here today, to
8  believe that that approach would not satisfy
9  the debtors' tax requirements?
10          MR. PRUITT:  And the same
11  instruction I gave you before.
12          THE WITNESS:  Sure.
13      A.  No, I think that a backstopped
14  rights offering of EFH would accomplish the
15  necessary objectives.
16      Q.  By the way, since -- if I could
17  just ask you quickly to turn to Page 11 of
18  your -- sorry, of your declaration, Ying
19  Exhibit 2.
20      A.  Page 11?
21      Q.  Yes.  Paragraph 24.
22      A.  Paragraph 25?
23      Q.  Twenty-four.
24      A.  Oh, 24.  I'm sorry.
25      Q.  Right above the heading.

Page 268

1      A.  Yes.
2      Q.  And I understand that this
3  is -- again, I understand this declaration is
4  not -- no longer referring to the operative
5  DIP proposal, but in Paragraph 24 you write,
6  "Based on my restructuring experience,
7  participation in these negotiations and review
8  of the tax considerations of each alternative,
9  I believe that the EFIH second lien DIP
10  facility is the best available in the
11  circumstances."
12          By EFIH second lien DIP
13  facility we substitute in the current PIK DIP
14  proposal, is this testimony that you would
15  intend to give at the hearing on June 30th?
16          MR. PRUITT:  Objection to form.
17  Calls for speculation.
18          MR. HOROWITZ:  I'm asking about
19  his current expectation.
20      A.  I haven't thought about my --
21  what I am going to -- what I am going to be
22  asked to say on June 30th.
23      Q.  Okay.  But when you wrote this
24  sentence, or when it was drafted, was it an
25  accurate reflection of your opinion?

Page 269

1      A.  When I wrote this sentence,
2  yes, it was an accurate reflection of my
3  opinion.
4      Q.  And in reaching your opinion,
5  which included consideration -- a review of
6  the tax considerations of each alternative, in
7  forming that opinion were you relying in any
8  part on tax advice from Kirkland & Ellis?
9      A.  Yes.
10          MR. HOROWITZ:  Okay.  I know
11  it's been covered a little bit this morning,
12  but to the extent that you intend to offer
13  expert opinion from Mr. Ying about the
14  desirability or the preferability of the PIK
15  DIP on the basis of tax considerations, we
16  will move to preclude it for failure to
17  disclose all of the Kirkland & Ellis tax
18  advice that he has seen, because that is
19  expert reliance material.
20          ---
21          (Motion To Strike)
22          ---
23  BY MR. HOROWITZ:
24      Q.  Let me ask you to turn back to
25  Page 4 of your declaration.

68 (Pages 266 to 269)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 270

1          Referring to, oh, about five,
2 ten lines down, do you see the sentence that
3 starts, The EFIH second lien DIP facility, and
4 the portion of the EFIH first lien DIP
5 financing being used to repay the EFIH
6 prepetition second lien notes, will have
7 significantly lower interest rates in the EFIH
8 prepetition second lien notes, thus saving the
9 EFIH debtors approximately $8 million in
10 monthly cash expense (approximately $36
11 million per year), during the EFIH debtors'
12 Chapter 11 cases --
13      A.   96 million per year.
14      Q.   Did I misspeak?
15      A.   I think you said 36.
16      Q.   You're right, 96.  I apologize.
17      A.   That's all right.
18      Q.   And then it goes on to talk
19 about the savings from the first lien notes.
20 And I think this morning you updated that 8
21 million in monthly cash based on the reduction
22 from eight percent to six-and-a-quarter
23 percent on the new PIK DIP?
24      A.   That's correct.
25      Q.   Okay.  Let me ask you a

Page 271

1 hypothetical so I know what you are going to
2 say.  It's not even hypothetical, actually.
3 This is true, I promise.
4          I have a fixed-rate mortgage at
5 five-and-a-quarter percent, and I'm getting
6 e-mails all the time saying that I can
7 refinance at three percent.  Should I do that?
8          MR. PRUITT:  Object to the
9 form.
10      A.   It depends on the other terms.
11      Q.   Right.  It's an incomplete
12 hypothetical.  Right?
13      A.   If you're thoughtful.  Unless
14 you're desperate to save annual cash interest,
15 and you don't care about the consequences.
16      Q.   Right.  You would -- among
17 other things, you would want to know what are
18 all the costs that would be associated with my
19 refinancing.  Right?
20      A.   That's a fair assumption in
21 this hypothetical.
22      Q.   Yes.  And you would also want
23 to know how long I planned to keep my mortgage
24 before I sell my house.  Right?
25      A.   In your hypothetical, yes, I

Page 272

1 think that's a good question to ask.
2      Q.   And I'll tell you that ten days
3 from now I'm closing on it, so it -- knowing
4 that would probably affect your opinion.
5          Right?
6      A.   Yes.
7      Q.   Okay.  So when you present this
8 comparison in the monthly cash interest
9 expense, you were not purporting to do some
10 sort of all-in cost of finance comparison
11 between the proposed DIP and the alternative
12 of leaving the existing second lien notes in
13 place.  Right?
14      A.   That's correct.  Because it's
15 impossible to know the duration of the case.
16      Q.   Okay.  But it is possible to
17 make certain assumptions about a duration of a
18 case; projections.  Right?
19      A.   Well, again, we can make a
20 bunch of hypotheticals, but for purposes of
21 this I think we were just illustrating that on
22 the margin there is an improvement.
23      Q.   On the margin there is an
24 improvement in what?  I'm sorry.
25      A.   In interest expense.

Page 273

1      Q.   In monthly interest expense.
2          Correct?
3      A.   Monthly interest expense.
4      Q.   But there are significant costs
5 associated with the -- with the new DIP loan.
6          Right?
7          MR. PRUITT:  Objection to the
8 form.
9      A.   I think we talked about them
10 earlier this morning.  Yes.
11      Q.   Right.  And I know one of them
12 that there was discussion about is whether
13 the -- and I'm going to get the title wrong
14 again -- what's the one that's rolled --
15 that's not payable in cash and converts to
16 equity?
17      A.   Oh, the five percent funding
18 PIK fee?
19      Q.   The funding PIK fee.  Right.
20 And you said that the funding PIK fee isn't
21 really a cash expense and, therefore, you
22 didn't consider that to be relevant to the
23 comparison.  Right?
24      A.   Because if the DIP loan
25 converts, as it's intended to, it's never

69 (Pages 270 to 273)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 274

1   paid.
2        Q.   Right. But if there is a --
3             MR. HOROWITZ: Well, withdrawn.
4   We already talked about that.
5   BY MR. HOROWITZ:
6        Q.   If it converts, it is paid in
7   equity of the reorganized company. Correct?
8        A.   And in evaluating proposals we
9   look at the total equity issued under the
10  various DIP proposals.
11       Q.   So it is paid in something that
12  is of value to the PIK lenders. Right?
13       A.   Well, actually, they've never
14  ascribed a particular percentage to the
15  funding PIK fee. I've just assumed that in
16  the case of the current proposal, that of that
17  60 percent of equity, five percent of it is
18  applicable to the PIK fee, 95 percent of it is
19  applicable to the DIP loan itself.
20       Q.   I see. And if it were not
21  payable, if that five percent PIK funding fee
22  were not paid out of equity in the reorganized
23  company, that equity in the reorganized
24  company would be available for distribution to
25  creditors. Correct?

Page 275

1        A.   Well, I think we -- if for some
2   reason we were to ask the unsecured creditors
3   to change their deal, we would have to confirm
4   how much does the billion-9 DIP loan convert
5   into. I suspect they might say that it
6   converts into 60 percent. But that's pure
7   speculation. I've never asked, and I don't
8   know the answer.
9        Q.   Well, if they said that they
10  would effectively be --
11            MR. HOROWITZ: Well, withdrawn.
12  I don't want to get into a fight with you at
13  this late time.
14            THE WITNESS: Sure.
15  BY MR. HOROWITZ:
16       Q.   In my hypothetical of the
17  remortgage refinancing, you would want to know
18  if there was a prepayment fee associated with
19  my existing mortgage. Right?
20       A.   Yes.
21       Q.   And if there was, that would be
22  one of the costs that you would consider in
23  the all-in costs of finance. Right?
24       A.   Yes.
25       Q.   Now, here, if the second lien

Page 276

1   noteholders litigate and win on the
2   make-whole, then that make-whole would be a
3   significant cost associated with this
4   refinancing. Right?
5        A.   It would be a significant cost
6   with or without the refinancing.
7        Q.   Well, if you don't do the
8   refinancing, you're never going to have to
9   make the make-whole. Right?
10            MR. PRUITT: Objection to the
11  form.
12       A.   I would assume that we would
13  reinstate the bonds and emerge without
14  altering the terms of the second lien notes,
15  which would be economically a negative for the
16  equity account.
17       Q.   If you don't refinance, then
18  the notes will be -- remain in place at the
19  current interest rates. Correct?
20       A.   If we were to reinstate the
21  bonds postemergence?
22       Q.   Yes.
23       A.   Yes, we would have to live up
24  to the contractual terms of those instruments.
25       Q.   And you say that that would be

Page 277

1   a negative for the equity account --
2        A.   Because the interest rates are
3   very high and the company would be much too
4   leveraged.
5        Q.   Right. But --
6        A.   And you probably could never
7   emerge from bankruptcy because there would be
8   too much debt.
9        Q.   When you say it would be too
10  high, though, don't you have to compare that
11  to the costs associated with paying the
12  make-whole?
13       A.   No, because my statement is is
14  that you're asking would we ever emerge
15  with -- and reinstate the second lien notes,
16  and I've told you that there's 5.4 billion of
17  first lien DIP, and I don't think we could
18  refinance both the first lien DIP and have
19  2.15 billion of second lien notes outstanding.
20  Capital markets would not be at all interested
21  in financing this company, because it would
22  run out of cash very quickly. The annual
23  interest expense would exceed the inflows it
24  would receive from its ownership in Oncor.
25       Q.   Leverage is a function of two

70 (Pages 274 to 277)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 278

1  things, right; the amount of debt on a
2  company's balance sheet?
3       A.   And cash flow.
4       Q.   Well, and equity.  Right?
5       A.   It's ability to cover its
6  interest payments.
7       Q.   Which would be cash flow, but
8  it can also be a new equity infusion.  Right?
9       A.   Well, if a company can't cover
10  its interest expense, it probably doesn't have
11  a lot of equity value.  Not a sine qua non,
12  but an indicia of a lack of equity value.
13       Q.   But if the company has a
14  committed rights offering, then the company is
15  going to get a cash infusion which will
16  delever the company whether it pays down
17  equity or not.  Right?
18       A.   You just told me we're
19  reinstating the second lien notes, so I don't
20  know what we're paying down.  What
21  hypothetical are you talking about?
22       Q.   I'm sorry if I'm getting you
23  confused.  Let's try it this way.
24       A.   Okay.
25       Q.   We've seen this March 15th term

Page 279

1  sheet.  And this March 15th term sheet does
2  contemplate some partial delevering from the
3  equity claw.  Right?
4       A.   And I have told you, my
5  guesstimate, it's only about $700 million
6  equity infusion to pay down 600 million of
7  debt.
8       Q.   Fine.  I said partial.
9       A.   Yes.
10       Q.   It may be small.  And it also
11  contemplates an equity infusion through a
12  rights offerings.  Right?
13       A.   That is correct.
14       Q.   And the PIK, in making this
15  proposal, recognized that if they lost on the
16  make-whole, but for the equity claw they would
17  reinstate and leave the second lien notes in
18  place.  Right?
19            MR. PRUITT:  Objection; calls
20  for speculation.
21  BY MR. HOROWITZ:
22       Q.   That's what's in that term
23  sheet.  Correct?
24       A.   That's the hypothetical they
25  posed in the term sheet.  Yes.

Page 280

1       Q.   Okay.  Thank you.
2            Now I gave you a -- I gave you
3  the hypothetical of if the make-whole were
4  litigated and the company lost.  In fact, in
5  connection with the RSA, the company signed up
6  settlements of the EFIH second lien make-whole
7  claim with certain EFIH second lien holders.
8       Right?
9       A.   That's correct.
10       Q.   Including Fidelity.  Right?
11       A.   That is correct.
12       Q.   And those settlements committed
13  the company -- commit the company, upon the
14  approval of this DIP and the taking out -- if
15  the second lien notes are taken out, obligates
16  the company to pay a significant amount in
17  settlement on those make-whole claims.  Right?
18            MR. PRUITT:  Objection to the
19  form.
20       A.   I believe the make-whole claims
21  are settled at approximately 50 percent of
22  their -- the alleged make-whole amount.
23       Q.   And something in the range of
24  40 percent of the outstanding -- with Fidelity
25  being the largest by far, about 40 percent of

Page 281

1  the outstanding EFIH second lien notes are
2  signed up for that.  Right?
3       A.   I believe the number is like 43
4  percent, yes.
5       Q.   And so just -- well, do you
6  know approximately how much then that
7  obligates the company to pay on the
8  make-whole?
9       A.   Well, the total make-whole
10  claim I think is about $60 million.  The
11  settling 43 percent I think account for 280
12  million of that 660.
13       Q.   So 50 percent is 140?
14       A.   And so they're paying 50
15  percent of that 280.  140 million.  That
16  leaves 380 million of make-whole claim,
17  alleged make-whole claim associated with the
18  nonsettling holders.  And our settlement offer
19  is to pay half of that, or they can allege
20  that they get paid the full amount.
21       Q.   I've got you.  But even if all
22  of the nonsettling holders litigate and even
23  if the company prevails on the make-whole
24  claim, the company is locked into paying $140
25  million in cash in connection with this

71 (Pages 278 to 281)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 282

1  refinancing to the settling noteholders.
2         Correct?
3      A.   That is correct.
4      Q.   And that $140 million at the
5  very least is part of the expense that you
6  would have to consider in the all-in cost of
7  financing associated with this refinancing.
8  Right?
9         MR. PRUITT: Objection to the
10 form.
11     A.   Which -- which has been funded
12 by the proceeds of the first lien financing.
13     Q.   Okay. But it is part of the
14 cost of financing to the debtor. Right?
15     A.   Which has been incorporated in
16 the first lien financing.
17     Q.   Okay. And just so I'm clear, I
18 think you've said this, but you have not done
19 any analysis of the all-in cost of financing
20 associated with any second lien DIP proposal
21 compared to leaving the second lien notes in
22 place. Right?
23     A.   I think we talked about the
24 fact that we probably did model some of the
25 proposals contained in one of the exhibits you

Page 283

1  gave me which were dated back in March 15th,
2  but I don't think I've modeled anything like
3  that in recent memory, now that we have the
4  RSA.
5      Q.   Right. And the March 15 --
6  that was before there was any contemplated --
7  any proposed second lien DIP, before you knew
8  what interest you would have to pay, what fees
9  you would have to pay, what make-whole
10 settlement you might have to pay. Right?
11     A.   I'm sorry. I didn't quite
12 follow your question.
13     Q.   You said you did some modeling
14 around March 15th, and I gather what you meant
15 is you did some modeling of what the world
16 would look like if the company emerged with
17 the second lien notes in place, did whatever
18 clawback it could do, and had the proceeds of
19 an equity offering. That's what you were
20 modeling. Right?
21     A.   That I believe we must have
22 done that, yes.
23     Q.   Right. But I was saying you
24 never did a comparison between that world and
25 the world where the company enters into a DIP

Page 284

1  agreement, funded by the PIKs, pays all of the
2  fees associated with that, pays the
3  make-whole -- and pays the make-whole
4  settlement. You've never done a comparison of
5  those two worlds. Right?
6      A.   I don't know specifically, but
7  I suspect we probably modeled that and a
8  couple of million other alternatives.
9      Q.   Are you telling me that there
10 are comparisons in writing?
11     A.   I don't know for sure, but
12 given the fact, do we model lots of scenarios?
13 I know we modeled lots of scenarios.
14        MR. HOROWITZ: If there are any
15 such scenarios, I call for their production.
16             ---
17     (Request for Production)
18             ---
19 BY MR. HOROWITZ:
20     Q.   Do you have any recollection of
21 whether those scenarios showed that it costs
22 more to the company in cash to do the PIK DIP
23 than it would to leave the second lien notes
24 in place?
25        MR. PRUITT: Objection. He

Page 285

1  just testified that he wasn't sure if they
2  even exist.
3      A.   Well --
4        MR. HOROWITZ: That's why I
5  have to know whether he has any understanding.
6  Because I can have --
7      A.   Sitting here today, my
8  financial intuition is that the refinancing
9  and settlement is cheaper than leaving the
10 bonds outstanding. Because leaving the bonds
11 outstanding would be paying the full
12 make-whole, in effect, by paying the full, you
13 know, 12 percent, or whatever the average rate
14 is.
15     Q.   You've said that before. So
16 let's probe that a little bit.
17     A.   But I would have to go back and
18 model it to confirm it. But that's my
19 intuition.
20     Q.   Tell me your understanding of
21 how a make-whole is calculated. Actually, why
22 don't I, instead of making it vague, say, tell
23 me your understanding of how the make-whole is
24 calculated under this indenture.
25        MR. PRUITT: Objection. Calls

72 (Pages 282 to 285)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 286

1  for him to construe a document that you don't
2  have in front of him, and he didn't write it.
3      MR. HOROWITZ: I'm asking for
4  his understanding.
5      A.  Sure. My general recollection
6  is you pick a date of redemption, you
7  calculate the net present value of the future
8  payments to be made under the instrument per
9  its contractual terms up through and including
10  the first optional redemption date. You also
11  have to adjust the first coupon payment for
12  accrued interest that's payable as of the
13  redemption date, so you net out accrued
14  interest to the redemption date against the
15  first interest payment date; and then you
16  discount those future cash flows to the
17  present. I think these instruments referred
18  to a specific source from the Federal Reserve,
19  Treasury rates that are used for each maturity
20  payment based on duration, and you do a net
21  present value calculation.
22      Q.  It's typically -- and I will
23  tell you I don't have it in memory myself, but
24  it's typically either Treasury or LIBOR
25  plus --

Page 287

1      A.  I apologize. And it's the
2  Treasury rate plus a margin, and I think the
3  margin here is 50 basis points.
4      Q.  Which is fairly typical.
5  Right?
6      A.  They're all over the map these
7  days, although 30 basis points is now,
8  actually, from what I can tell, the norm. But
9  in these it was at T plus 50 is the banker
10  talk.
11      Q.  And just arithmetically, the
12  lower the discount rate that's specified in
13  the make-whole provision, the higher the
14  make-whole amount will be. Right?
15      A.  That is correct.
16      Q.  And also as a matter of finance
17  what that means is that the lender will
18  receive the present value equal to the
19  difference between what they would have
20  received if the note had performed to maturity
21  and what they would receive if they took the
22  prepaid proceeds and invested them at that
23  specified treasury plus --
24      A.  Plus --
25      Q.  Basis points.

Page 288

1      A.  -- basis points.
2      That is correct.
3      Q.  And from the borrower's point
4  of view, it will cost more to prepay and pay
5  the make-whole than to leave the notes in
6  place if it has to borrow at any amount higher
7  than Treasury plus 50 or whatever the right
8  number is. Correct? It's just the flip side
9  of what it looks like to the lender.
10      A.  I must say, I wasn't quite
11  following the last part of your statement.
12  I'm sorry.
13      Q.  Okay. If I'm a borrower and I
14  have a loan outstanding with a make-whole and
15  I am trying to decide whether or not it makes
16  sense to prepay, whether or not it makes sense
17  to prepay and pay the make-whole will depend
18  on how much I have to pay for replacement
19  financing. Right?
20      A.  Okay. I'm following your
21  discourse. Keep going.
22      Q.  Right. If I can borrow --
23  let's assume that the make-whole -- that the
24  discount rate in the make-whole formula is
25  Treasury plus 50. If I can borrow at Treasury

Page 289

1  plus 50 or below, it will make sense for me to
2  borrow new money and to pay my lender with the
3  make-whole. Right?
4      A.  I want to think about that.
5  I'm not sure I entirely agree, but I'm
6  listening.
7      Q.  Okay. Because you referred to
8  finance intuition. My finance intuition is if
9  you have to pay more than Treasury plus 50 to
10  borrow, then it's more expensive for you to
11  pay the make-whole than to leave the notes in
12  place, putting aside expense, even if there
13  were no expenses associated with the
14  transaction, and I want to know if you think
15  my finance intuition is wrong.
16      MR. PRUITT: Objection to form.
17      A.  Yeah, I would have to think
18  about your question. I'm not -- I don't
19  concede the point.
20      Q.  Okay. But it's not an analysis
21  you've done here. Right?
22      A.  As I said, I would need to
23  think about what you said. I don't concede
24  the point.
25      Q.  Right. And all I'm saying is

73 (Pages 286 to 289)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 290

1  to date, before I raised it, you had not done
2  the analysis?
3       A.  If I had, I just don't remember
4  it.
5       Q.  Okay.
6       A.  By the way, if I followed your
7  point to its conclusion, no one would ever
8  exercise an applicable premium, which I know
9  plenty of people do.  So that's one of the
10  reasons I'm hesitant to agree with your
11  statement.
12       Q.  Okay.  On Page 6 of your
13  declaration -- do you still have it in front
14  of you?
15       A.  Page 6?
16       Q.  Yes.  In Heading C you say,
17  "The EFIH second lien DIP facility will reduce
18  interest expense," and then you say "reduce
19  litigation risk."
20           I just want to ask you about
21  that.  How does the EFIH second lien DIP
22  facility reduce litigation risk?
23       A.  Well --
24           MR. PRUITT:  Again --
25  BY MR. HOROWITZ:

Page 291

1       Q.  I don't see it on the text.
2           MR. PRUITT:  -- Mr. Ying, if
3  you have an appreciation of how it reduces
4  litigation risk separate and apart from any
5  analysis you've heard from Kirkland & Ellis,
6  you may answer the question.
7           MR. HOROWITZ:  Come on.  I'm
8  asking him about his own declaration.  He
9  writes it here, so I am asking him how does it
10  reduce litigation risk.
11           MR. PRUITT:  Right.
12       A.  Let me read the paragraph.
13       Q.  Sure.
14       A.  Because I hate taking sentences
15  out of context.
16       Q.  Sure.  And I would have pointed
17  you to language, but I didn't see any.
18       A.  Which is why I'm looking at
19  the -- at the subject heading versus what's in
20  the paragraphs.
21       Q.  Right.  Thank you.
22       A.  Give me a chance to read it.
23           ---
24       (Witness reviewing document.)
25           ---

Page 292

1       A.  Well, I can't explain the text
2  in the lead-in because there's no supporting
3  words in Paragraphs 12, 13 or 14.
4       Q.  Okay.  I just wanted to know if
5  I had missed something.  Thank you.
6           Okay.  Turning to Page 8,
7  Paragraph 15.  This is under the heading --
8  take your time.  "The EFIH second lien DIP
9  facility is the best available financing under
10  the circumstances."
11           I'm pointing you to Paragraph
12  15 in the second sentence.  You write, "No
13  facility that ranks junior to the proposed
14  EFIH second lien DIP was available on terms
15  that were comparable with the EFIH second lien
16  DIP facility."
17           At the time you wrote this, you
18  were referring to the original PIK DIP
19  proposal.  Correct?
20       A.  That's correct.
21       Q.  And as of today it is not true
22  that no facility exists is available on terms
23  that are comparable or preferable to that
24  original PIK DIP proposal.  Correct?
25       A.  The proposals are -- have been

Page 293

1  improved.
2       Q.  Okay.  And why did the -- in
3  your opinion, why did the PIKs improve the
4  terms of their DIP?
5           MR. PRUITT:  Objection to the
6  form.  Calls for speculation.
7       A.  You'll have to ask them.
8       Q.  But I am asking you based on
9  your professional experience.
10           Well, let me put it in a more
11  pointed way.  Isn't it clear, sir, that the
12  PIKs improved the terms of their DIP because
13  of the competition for the competing DIP
14  proposals that were put in by, among others,
15  my clients?
16           MR. PRUITT:  Objection to form.
17  You're asking him to speak to the intent of
18  other parties.
19  BY MR. HOROWITZ:
20       Q.  Sir, you're an experienced
21  investment banker.  Isn't it clear that the
22  competition among competing potential PIK
23  providers is what resulted in an improved DIP
24  proposal?
25           MR. PRUITT:  Same objection.

74 (Pages 290 to 293)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 294

1      A.   That's a reasonable inference,
2  but you would have to ask them why they did
3  it.
4      Q.   Prior to the petition date did
5  you make any effort to create competition
6  among alternative potential DIP providers?
7      A.   Well, we had a discussion with
8  Mr. Schneider, who made a proposal, and
9  unfortunately his proposal wasn't as good as
10 this one, so it was very hard to get great
11 competition without a superior proposal.
12     Q.   To be clear, you did not
13 approach Mr. Schneider; Mr. Schneider
14 approached you on this.  Right?
15     A.   Yes, he did.
16     Q.   Okay.  And after Mr. Schneider
17 made a proposal, you never came back and made
18 a counterproposal; did you?
19     A.   No, we did not.
20     Q.   And you never told him what
21 terms the PIKs had proposed that he might --
22 that his clients might be able to improve
23 upon?
24     A.   I don't know exactly what I
25 told Mr. Schneider, but I believe that we told

Page 295

1  him that what we're talking about with the
2  PIKs is -- is a higher enterprise value.  And
3  I think that was enough of a clue to
4  Mr. Schneider, who is extremely smart, that he
5  would know that if he wanted to really engage
6  he would have to come back with something
7  better.  And, obviously, only after we signed
8  the RSA and he found out what it was, he did
9  come back with something better.
10     Q.   So it was only -- well, it was
11 not very long after the terms of the RSA
12 became public that Mr. Schneider's clients
13 came back with a superior proposal; was it?
14     A.   They significantly improved
15 upon their -- upon the proposal that we saw
16 presigning of the RSA, yes.
17     Q.   Now, in Paragraph 16 --
18 actually, why don't I do this.  It's easier to
19 do this.
20          On Page 9, heading sub (1) --
21     A.   Page 9?
22     Q.   Of your declaration, yes.
23     A.   Okay.
24     Q.   Well, let's just look at
25 Paragraph 18.

Page 296

1      A.   All right.
2      Q.   Four lines down, and I think --
3  I can't remember who asked you this this
4  morning, but you write, "It was clear from the
5  start of negotiations that there was" a
6  limited number of -- "a limited universe of
7  potential investors whose investment
8  commitment would not preclude the proposed
9  tax-free spin."
10          And that's related to the
11 continuity-of-ownership issue.  Right?
12     A.   That is correct.
13     Q.   And if I -- if my math -- if my
14 counting was correct, the limited universe was
15 basically four different constituencies,
16 right?  The EFIH unsecureds, the EFIH seconds,
17 the EFIH firsts, and the EFH unsecureds.
18          Right?
19     A.   Well, those are the parties
20 that we were talking to about a restructuring
21 of EFIH.  In each case the content of, or the
22 scope of our negotiations with them was
23 limited to their view of the situation and
24 their willingness to participate.  I don't
25 think we necessarily offered to everybody,

Page 297

1  Hey, why don't you come in and do a
2  convertible DIP.
3      Q.   Okay.  That was really going to
4  be specifically my question.  You did not --
5  it's not particularly hard to do a marketing
6  process where your contact list is four
7  potential parties; is it?
8          MR. PRUITT:  Objection to form.
9      A.   Again, you know, we were
10 talking to each constituency about their own
11 particular wants and dislikes, and we
12 approached each one based on where they ranked
13 in the capital structure.
14          As I said earlier, you know,
15 typically these rights offerings are done by
16 the juniormost creditor, because they want to
17 capture the upside and take the downside if
18 they're wrong.  So it struck us as unusual to
19 think that a more senior fully secured
20 creditor wants to do an equity rights
21 offering.
22          In the case of the second lien
23 note group, they obviously did make us an
24 offer.  It wasn't as good as what the EFIH
25 unsecureds were offering.  Pretty natural,

75 (Pages 294 to 297)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 298

1  since the people who bought the second liens
2  got to buy into the capital structure at their
3  preferred loan-to-value ratio. And we
4  presumed that the EFIH unsecureds would
5  provide the best value. And we certainly knew
6  that if Fidelity, as the owner of the EFH
7  paper, who was even more junior, wanted to
8  make an even higher rights offering, they
9  could have obviously done it, they had plenty
10 of financial resources to do so. But they
11 chose not to.
12     Q.  You said it was pretty natural
13 that the second lien group wouldn't compete.
14 But, in fact, as soon as the second lien group
15 knew what the terms were, they did improve on
16 it. So do you agree that -- that experience
17 disproved your assumption that the second
18 liens wouldn't be willing to compete on the
19 DIP?
20     MR. PRUITT: Objection to form.
21 Misstates testimony.
22     A.  Well, I know that the EFH
23 unsecureds have further improved their offer.
24     Q.  The competition resulted in a
25 better -- has resulted in better --

Page 299

1     A.  Well, I think actually --
2     Q.  Let me just finish the
3 question.
4     A.  Yes, please, of course.
5     Q.  The competition has resulted in
6 preferable alternatives being I believe made
7 available to the debtors. Right?
8     A.  Well, there's certainly a cause
9 and effect going on that appears to be
10 happening. I think it ignores the fundamental
11 fact that the unsecured creditors, who are the
12 more junior creditors in the second liens,
13 have evidence of willingness to continue to
14 sweeten their offer, so that they get to own
15 the equity. I suspect that if you sweeten
16 further, they might sweeten more as well. And
17 you guys can keep going back and forth, you
18 know, which is fine for the debtor. But I
19 think -- but I think that they have the
20 ability to continue to sweeten, because they
21 own the unsecured debt, too. Every time they
22 sweeten, they're just moving money from the
23 DIP loan into the unsecured pocket.
24     Q.  Now, when you say that, and
25 you've said something similar to that in your

Page 300

1 supplemental declaration, and we can get to
2 that later, but you were making an assumption
3 that the unsecureds at EFIH were the fulcrum
4 security. Correct?
5     A.  That's correct.
6     Q.  If EFIH is solvent, then, in
7 fact any sweetening of the pot would inure to
8 the benefit of EFH and, hence, the EFH
9 unsecured creditors. Correct?
10     A.  That is a possibility.
11     Q.  Let's talk valuation for a
12 minute.
13     You will agree with me that the
14 fair-market value is what a willing buyer will
15 pay a willing seller at an arm's-length
16 transaction, absent duress?
17     MR. PRUITT: Objection to the
18 form.
19     A.  Well, it depends on what
20 they're buying. The whole company?
21 Investment in a company? A portion of the
22 company? And what strings are attached with
23 their purchase.
24     Q.  You've done valuation testimony
25 before. Right?

Page 301

1     A.  I sure have.
2     Q.  And do you understand that what
3 I just quoted was the classic and accepted
4 definition of fair-market value?
5     A.  Well, typically that definition
6 addresses either what price a share of stock
7 of a company trades at, which is its own
8 context, or you can say that what price would
9 someone pay for an entire company. I think
10 the statement is absolutely true and
11 classical, but you have to lay out the context
12 of the situation.
13     As you well know, people do
14 liquidation analysis and they say, Well, it's
15 not a willing buyer and seller; sell, you
16 know, you have 60 days to sell. Right?
17     Q.  Yes.
18     A.  So the context around the
19 willing buyer/seller comment really is very
20 important.
21     Q.  I agree. Do you agree with me
22 that an actual market transaction is generally
23 the best indication of value?
24     MR. PRUITT: Objection to form.
25     A.  Again, I think the context is

76 (Pages 298 to 301)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 302

1  paramount in that statement. You can't take
2  it in a vacuum.
3          Q.   We can point to it, if you
4  like.
5          A.   For example, a first offer may
6  not be the best offer.
7          Q.   No, but I had said an actual
8  transaction. I take your point, and we'll get
9  to that in a minute. But when you have an
10  actual consummated transaction, do you agree
11  with me that that is the best indication of
12  fair-market value of the item, be it a share
13  of stock, or a painting, or a full company in
14  question?
15          MR. PRUITT: Objection to form.
16          A.   Again, we can debate this all
17  day long. I think the context in which the
18  sale occurred is very important.
19          Q.   Okay.
20          A.   But if I had my house, for
21  example, and I said you're my friend, you're
22  my next-door neighbor, I like you, here, you
23  can have it, it doesn't matter to me, it's
24  appreciated, I've made so much money it
25  doesn't matter. That's one kind of sale.

Page 303

1  Another kind of sale is I hired some brokers,
2  they auction it off. That's a different kind
3  of sale.
4          Q.   I think you've made reference
5  to this principle, and I think accurately, so
6  I want to just hammer it down.
7          When you have, both in the
8  declarations here in this case and even in
9  testimony today made reference to the
10  committed DIP proposals with the implicit
11  rights offerings as a strong indication of the
12  value of EFIH, I think you've been embracing
13  the principle that a bona fide offer is a
14  strong indication of value. Am I right?
15          A.   That is correct. I have said
16  that.
17          Q.   Okay. And in this bidding
18  process for competing DIPs that --
19          MR. HOROWITZ: Well, withdrawn.
20  BY MR. HOROWITZ:
21          Q.   You would also -- and I think
22  you started to say this -- say that a bona
23  fide offer just sets a floor on value, there
24  may still be room to go up. Right?
25          A.   If you're running an auction,

Page 304

1  sure. That's a phenomenon that you observe.
2          Q.   And I think you referred here
3  to your belief that it's possible that the --
4  that the PIKs still have room to go up?
5          A.   Yes, I think it's a
6  possibility.
7          Q.   So it's possible that the
8  implied equity value, the implied value of
9  EFIH equity that you -- that's represented by
10  their DIP proposal may understate value?
11          MR. PRUITT: Objection to the
12  form.
13          A.   I think time will tell. That's
14  truly conjecture at this point.
15          Q.   And in fact -- why don't we
16  take a look at the board deck.
17          MR. HOROWITZ: Is that Exhibit
18  1?
19          MR. PRUITT: One.
20  BY MR. HOROWITZ:
21          Q.   You have Exhibit 1 in front of
22  you, which is the June 22nd, 2014, deck that
23  was presented to the board of directors.
24  Which board of directors?
25          A.   I believe it was presented

Page 305

1  specifically to the EFIH directors, but I
2  believe that directors of all the companies
3  were present on the call.
4          Q.   Okay. It was presented to the
5  EFIH board of directors last night. Right?
6          A.   That is correct.
7          Q.   Okay. And turn to Page 4.
8  This is a summary and comparison of the
9  various competing proposals. Right?
10          A.   That is correct.
11          Q.   And there is -- Mr. Shore
12  pointed this to you, I believe -- I think rows
13  down there's a row, Implied Total EFH Equity
14  Value?
15          A.   There is.
16          Q.   By the way, is that accurate?
17  Is it EFH or EFIH? I haven't been able to get
18  this straight in my mind.
19          A.   Well, because the RSA
20  contemplates that EFIH remains a wholly-owned
21  subsidiary of EFH, so EFH retains 100 percent
22  ownership in EFIH, and that all of the
23  creditors who are converting to equity or
24  infusing equity capital, they're all buying
25  EFH stock.

77 (Pages 302 to 305)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 306

1    Q.   Okay.
2    A.   And obviously we've said we
3  need to maintain the consolidation of EFIH
4  with EFH.
5    Q.   So it's the implied EFH equity
6  value upon emergence after satisfaction of EFH
7  unsecured creditors at a certain -- with a
8  certain specified level of cash?
9    A.   Yes.
10   Q.   Okay.  That's baked in there.
11     Right?
12   A.   Yes, it is.
13   Q.   Because EFH couldn't have
14  equity value unless its unsecured creditors
15  consented to taking less than --
16   A.   Well, it's all -- it's all a
17  series of interrelated, mutually dependent
18  transactions.
19   Q.   Okay.  So based on how much
20  each prospective DIP provider was prepared to
21  have converted into -- withdrawn.
22     Based on the percentage of
23  equity in the reorganized EFH that each of the
24  prospective PIK providers were prepared to
25  accept, you readily calculate the implied

Page 307

1  equity value of EFH on emergence.  Right?
2    A.   Yes.  Those numbers are derived
3  from taking the cash that people are offering
4  in the DIP and dividing it by the equity that
5  each DIP is proposed to convert into.
6    Q.   Okay.  Right.  I got you.
7      So, in fact, if I've got these
8  numbers right, I think the NextEra proposal
9  converts into a higher percentage of equity,
10  but it also is a higher amount of cash, and
11  that's why the equity value is greater.
12     Is that right?
13   A.   I'm sorry.
14   Q.   Maybe I'm wrong.
15   A.   You'll have to say it again.
16     MR. HOROWITZ:  Withdraw the
17  question.
18  BY MR. HOROWITZ:
19   Q.   Okay, anyway, doing that
20  calculation, the implied EFH equity value from
21  the PIK proposal is 3.17 billion.  Right?
22   A.   Correct.
23   Q.   And the implied equity value
24  from the NextEra proposal is actually north of
25  3.5 billion.  Correct?

Page 308

1    A.   That is correct.
2    Q.   And so you have no reason to
3  believe that NextEra is not a highly
4  sophisticated party capable of forming
5  rational opinions about the value of this
6  enterprise.  Right?
7      MR. PRUITT:  Objection to the
8  form.
9    A.   I believe NextEra is a very
10  sophisticated company.
11   Q.   And this would probably be part
12  of the basis for your reason to believe that
13  the PIKs probably have room to continue to
14  move up.  Is that right?
15   A.   I say that just because they
16  seem quite determined and since they owned the
17  EFIH equity, or the EFIH unsecured debt which
18  will become the equity, they have the ability
19  to continue to modify their offer and keep the
20  ownership within those two constituencies, the
21  DIP and the EFIH unsecured.
22   Q.   Let's look at the next row on
23  this Page 4 that's entitled Second Lien/EFIH
24  Unsecured/EFH Unsecured Recoveries.
25     Do you see that?

Page 309

1    A.   Yes, I do.
2    Q.   So in this -- in the columns on
3  this row, what I take you to be doing is
4  calculating how much each of these
5  constituencies will be recovering on their
6  claims as a percentage of par based on two
7  alternative Oncor total enterprise values.
8    A.   That's correct.
9    Q.   Why did you do that?
10   A.   Because we wanted to show the
11  apportionment of value across a range of
12  valuations.  Because the valuations that are
13  embedded in the various DIP proposals are
14  different.  And this is only a summary.  It's
15  actually laid out in a more fulsome and clear
16  fashion on Pages 14 and 15 numbered in the
17  deck, I think the Bates numbers are 542 and
18  543.
19   Q.   Okay.  So on each of these
20  pages you have what might be called a
21  sensitivity chart with regard to three
22  potential Oncor TEVs.  Right?
23   A.   That's correct.
24   Q.   But it is possible, the same
25  way that you derive the EFH -- the implied EFH

78 (Pages 306 to 309)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 310

1  equity value, it's possible to derive an
2  implied Oncor TEV.
3       A.   Yes, that is correct.
4       Q.   And you do that on Page 14.
5       Right?
6       A.   Yes, we do.
7       Q.   And on Page 14 -- what you see
8  on Page 14 is that the NextEra proposal
9  attributes a TEV of 17-and-a-half billion
10  dollars to Oncor.  Right?
11       A.   That is correct.
12       Q.   And because the bidding war may
13  not be at an end, that may understate?
14       A.   Well, I'm not sure that's the
15  comment, but clearly the implied Oncor TEV
16  embedded in the NextEra proposal is higher
17  than the implied TEV embedded in the current
18  proposal by the EFIH unsecureds.
19       Q.   Okay.  So going back to Page 4,
20  just because it's easier to see --
21       A.   Okay.
22       Q.   -- I'm right, am I not, that
23  the NextEra proposal and the value that is
24  implied by the NextEra proposal would result
25  in payment in full of all EFIH creditors?

Page 311

1       A.   That's their -- that's how
2  NextEra and the second lien notes would like
3  to portray their offer.  Yes.
4       Q.   And if that's accurate, that
5  would mean that EFIH is solvent?
6            MR. PRUITT:  Object to the
7  form.
8       A.   I think that if you can assert
9  that that's payment in full, I think that
10  would, yes, be the case.
11       Q.   It sounded to me like you were
12  getting ready to qualify your answer earlier
13  today, when somebody asked you whether you
14  were premising your analysis of the PIK DIP in
15  the declaration that was Exhibit 2 on the
16  belief that EFIH was insolvent, and you said,
17  Well, at the time that was my belief.
18            Based on developments in the
19  market since that time have you come to
20  conclude that there is a possibility, at
21  least, that EFIH is solvent?
22            MR. PRUITT:  Objection to form.
23       A.   I haven't decided, because as
24  of the writing of this deck there were still
25  some issues that we had with the NextEra

Page 312

1  proposal in terms of sources and uses of cash.
2  I know that, you know, at 4 o'clock yesterday
3  afternoon the bankers provided some additional
4  information which I've had limited time to
5  absorb, because I've been distracted by board
6  meetings and this session.  I still want to
7  clarify in my mind exactly what -- what goes
8  into the combined NextEra proposal.
9       Q.   It's accurate at least to say
10  that the professionals are trying very hard to
11  answer -- to respond to and answer all of your
12  questions?
13       A.   Yes.  They've been very good,
14  and we're trying very hard to absorb it as we
15  go through this.  I do think actually one of
16  the things that I am not clear about is
17  whether, in fact, the package of stock and
18  cash that has been offered to satisfy the EFIH
19  unsecureds in fact is equal to their full
20  claim.  That remains a question mark in my
21  mind, and one of the only ways I can resolve
22  that is if I have time to sit with the
23  Kirkland & Ellis folks and understand exactly
24  what the unsecureds might assert as their
25  claim.

Page 313

1       Q.   So that does kind of get to my
2  question about why you presented alternative
3  recoveries, both in the sensitivities on Pages
4  14 and 15, and on Page 4 in this column.
5            Were you trying to tell the
6  board, look, yes, each of these bidders has an
7  implied view of value of Oncor, but if they're
8  wrong, or if in the event at the effective
9  date the value is higher or lower this is what
10  their recoveries will end up looking like?
11       A.   It's to look at a sensitivity
12  analysis of, depending on what value for Oncor
13  is, how much are each of the constituencies
14  receiving under the various allocation schemes
15  embedded in the respective DIP proposals, and
16  what it shows is that in the NextEra proposal
17  they've offered to invest 1.6 billion for 45
18  percent ownership of EFH, but in doing so
19  they've allocated a lot of value to the second
20  lien notes, because they've said we're going
21  to pay your make-whole claim in full, and
22  they're hoping that that's sufficient because
23  there's sufficient value left over to satisfy
24  the EFIH unsecureds and say you've been paid
25  in full, and, therefore, you don't get a

79 (Pages 310 to 313)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 314

1 chance to vote.
2         I believe that's the combined
3 economic and legal rationale.
4         Conversely, if you look at the
5 EFIH unsecured proposal, they've said, Well,
6 obviously their proposal is based off of a
7 16.5 billion Oncor TEV, that's the valuation
8 implied by their billion-9 converting into 60
9 percent of EFH.  But if the true value of
10 Oncor is 17-and-a-half billion, they're not
11 paying the second lien notes 131 percent of
12 principal amount, the full amount of their
13 make-whole, they're only paying them 115
14 percent, 15 percent being the 50 percent of
15 the make-whole settlement that they've
16 offered, and that the incremental value that
17 NextEra has allocated to the second lien notes
18 goes to the benefit of the EFIH unsecureds and
19 the EFH unsecureds.  They do better under
20 their proposal than under the NextEra
21 proposal.
22         **Q.  Okay.  In fact, looking on Page**
23 **4 under the Oncor TEV of 17.5 billion in that**
24 **column, at 17.5 billion under the PIK**
25 **proposal, their recovery will end up being 121**

Page 315

1 **percent.  Right?**
2         A.  Of their bond principal amount.
3         **Q.  Right.**
4         A.  All of these prices are quoted
5 as bond prices.
6         **Q.  Understood.**
7         A.  Right.
8         **Q.  And if I understood your**
9 **testimony earlier today, as of the petition**
10 **date, their par plus accrued claim was**
11 **probably something in the range of 105, so --**
12         A.  I think that was a good guess,
13 and, obviously, I think they may well assert
14 additional claims for things like postpetition
15 interest and maybe even make-whole payments,
16 for all I know.
17         **Q.  That would be ironic; wouldn't**
18 **it?**
19         A.  Indeed.  Well, everybody seems
20 to want to make whole payment.
21         **Q.  If they're getting paid more**
22 **than in full, then potentially the EFH Ad Hoc**
23 **Group could have an issue with that.  Right?**
24         A.  That's true.  But under the
25 current structure the EFIH unsecured DIP is

Page 316

1 the only DIP being proposed that offers the
2 EFH unsecured creditors any value.  The EFH
3 unsecured creditors are entitled to invest in
4 nine percent of the billion-9 DIP.  None of
5 the other proposals give the EFH creditors
6 anything.
7         I overstate that, the NextEra
8 proposal offers 20 million of cash to EFH,
9 which is, you know, roughly 3 cents on the
10 dollar.  But you can see the recoveries to the
11 EFH unsecured creditors at higher valuations
12 are higher than in the NextEra proposal.
13         **Q.  Okay.  Since you raised that,**
14 **and it's the last question I have before we**
15 **take a break, you've said that the EFH**
16 **unsecured creditors are being offered nine**
17 **percent participation in the PIK DIP, and I**
18 **was unclear.  I know that Fidelity is being**
19 **offered a nine percent participation.  What is**
20 **your understanding of the mechanic by which,**
21 **if there is any, Fidelity is compelled to**
22 **share any portion of that participation with**
23 **other EFH unsecured creditors?**
24         A.  Well, Fidelity will fund nine
25 percent of the billion-9 DIP, and at the

Page 317

1 confirmation of the case when the DIP is
2 supposed to convert from debt into equity,
3 Fidelity will -- it has to basically -- we
4 have to help Fidelity, but Fidelity in effect
5 will be offering the nine percent of the DIP
6 that they bought and the right to therefore
7 own nine percent of the equity that the DIP's
8 convertible into.  So nine percent times 60
9 percent is, what, 5.4 percent of the company?
10 Fidelity will have to offer the pro-rata share
11 of that 5.4 percent to the non-Fidelity owned
12 EFH holders.  They will have to come up with
13 cash to fund out the Fidelity DIP, portion of
14 the DIP, and they will get their pro-rata
15 share of that 5.4 percent.
16         **Q.  Okay.  So they're not really**
17 **participating in the DIP; they're**
18 **participating in the rights offering at the**
19 **end, that's stuck at the end of the DIP?**
20         A.  That's correct.
21         **Q.  And at what price?**
22         A.  I believe they're investing at
23 the same price as implied by the conversion of
24 the DIP into equity.
25         MR. HOROWITZ:  Okay.  Let's

80 (Pages 314 to 317)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 318

1  take a break.
2  THE VIDEOGRAPHER: This marks
3  the end of Media Number 4. We're going off
4  the record. The time is 4:38 p.m.
5  ---
6  (Recess from 4:38 to 4:55 p.m.)
7  ---
8  THE VIDEOGRAPHER: Here marks
9  the beginning of Media Number 5. We are back
10  on the record. The time is 4:55 p.m.
11  BY MR. HOROWITZ:
12  Q. Thank you. Mr. Ying, could you
13  turn to Page 9 of your declaration. I hope
14  you still have that. It ought to be close to
15  the top. There. That's my deposition
16  outline.
17  A. Page 9?
18  Q. Yes. I'm under the heading sub
19  (2), "No EFIH second lien DIP facility was
20  available to the estates on more favorable
21  terms."
22  Without reading it out, in this
23  paragraph that carries over you refer to the
24  fact that there was a prepetition proposal --
25  an unsolicited prepetition proposal from the

Page 319

1  second lien group. Correct?
2  A. Yes.
3  MR. HOROWITZ: Let me just mark
4  as Ying Exhibit 15 this document.
5  ---
6  (Exhibit 15 was marked for
7  identification.)
8  ---
9  MR. HOROWITZ: For the record,
10  I have marked as Ying Exhibit 15 a slide deck
11  with the Rothschild logo that's Bates-stamped
12  EFH2D10072750 through 765. Materials for
13  discussion with the Company, March 3rd, 2014.
14  BY MR. HOROWITZ:
15  Q. Do you recall seeing this
16  document?
17  A. Yes.
18  Q. And this was a document that
19  Mr. Schneider and his colleagues presented at
20  a face-to-face meeting with you and
21  representatives of the company. Correct?
22  A. Yes.
23  Q. And in this deck, this deck
24  sets forth the second lien noteholders ad hoc
25  group's interest in providing a junior DIP

Page 320

1  facility?
2  A. Correct.
3  Q. And it was a junior DIP
4  facility that would also have the conversion
5  feature, conversion into equity at the end of
6  the case. Correct?
7  A. That is correct.
8  Q. And in this deck, turning your
9  attention to Page 4 -- I'm afraid my copy
10  doesn't have Bates numbers, so I'm going to
11  use the slide deck numbers. It's correct, is
12  it not, that at this meeting the financial
13  terms of this DIP proposal were not yet
14  spelled out?
15  Let me draw your attention to
16  the last bullet point, "Other material terms
17  subject to discussion and receipt of DIP
18  budget from the company."
19  Right?
20  A. True.
21  Q. For instance, the interest rate
22  was never discussed. Right?
23  A. That's correct.
24  Q. I'm sorry to have you flip back
25  and forth, but --

Page 321

1  A. That's all right.
2  Q. -- if I draw your attention
3  back to your declaration, Paragraph 21.
4  A. Mm-hmm.
5  Q. You write, "I believe that this
6  March 2014 proposal was inferior to the EFIH
7  second lien DIP facility now before the court
8  for several reasons. First, that proposal
9  provided the payment to prepetition EFIH
10  second lien creditors of postpetition interest
11  in an amount for their alleged make-whole
12  claims of over .8 billion or 39 percent of the
13  existing second lien notes, outstanding
14  prepetition principal, of 2.156 billion."
15  I've read that right?
16  A. That's correct.
17  Q. So in essence you're saying
18  that you understood one aspect of this
19  proposal to be we will provide you with a DIP
20  if you pay us the full amount of our
21  make-whole?
22  A. Because the way the proposal
23  was laid out, it, as I recall, it had interest
24  being paid on all the second lien notes for, I
25  can't remember whether it was 18 months or two

81 (Pages 318 to 321)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 322

1  years, and at the end of that time there was a
2  payment for the make-whole. And when I added
3  up both the accrued interest and the
4  penultimate make-whole payment, I think it
5  came up to the $800 million number.
6      Q.  Could I draw your attention to,
7  going back to Ying Exhibit 15, the slide deck,
8  if you turn to Page 5.
9      A.  Ying Exhibit 15?
10      Q.  The Rothschild --
11      A.  I'm sorry. This is the --
12      Q.  The Rothschild?
13      MR. PRUITT: The Rothschild.
14      A.  I'm sorry. I'm getting
15  confused with numbers.
16      Q.  That's all right. It happens.
17      If you turn to Page 5, the next
18  page of the deck. You see this illustrative
19  schematic?
20      A.  Yes.
21      Q.  And you see the 88.6 percent
22  ownership in EFIH upon conversion. Right?
23      Do you see that?
24      A.  Yes, I do.
25      Q.  And that, by the way, if you

Page 323

1  just flip back for a moment to your
2  declaration, that ties into the second point
3  in Paragraph 21 of your declaration, where you
4  say, "Second, that proposal provided EFIH
5  unsecured creditors with less than 12 percent
6  of the pro forma equity in reorganized EFH."
7      Right?
8      A.  That's correct.
9      Q.  Okay. That's the reciprocal of
10  that 88.6 percent ownership in EFIH in this
11  schematic?
12      A.  Correct.
13      Q.  Okay. Those two points are
14  tied together, the 88 percent of equity was
15  based on the full amount of the make-whole
16  being allowed and converted. Right?
17      A.  Well, I don't recall exactly,
18  but there were a lot of differences in this
19  proposal versus what we ended up with.
20      Q.  I understand. But --
21      A.  But the net effect was that the
22  equity ownership to the EFH unsecureds was, as
23  you pointed out, 11.4 percent. And so I was
24  focused on, aside from all the differences
25  that might have existed because they don't

Page 324

1  have the most up-to-date DIP budget, they kept
2  some debt outstanding, the sources and uses
3  were completely different, the net effect of
4  their proposal was that the unsecureds were
5  receiving X amount.
6      Q.  I want to draw your attention
7  to the -- are you still on -- you're on Page
8  5. Right?
9      A.  Yes.
10      Q.  -- to the callout box. I'm
11  sorry you don't have a color copy.
12      A.  That's all right.
13      Q.  You see the callout box to the
14  left of 88.6 ownership in EFIH?
15      A.  Yes. Illustrative analysis at
16  full make-whole as of 3/31/16. Exit date.
17      Q.  Okay. And read the next part
18  of that?
19      A.  "Consensual plan may involve a
20  discount."
21      Q.  Okay. So did you understand
22  that the second lien holders were saying,
23  Look, this is for illustration, if we were
24  allowed a full make-whole, but we're ready to
25  negotiate on a discount?

Page 325

1      MR. PRUITT: Objection to the
2  form.
3      A.  I think Mr. Titer -- excuse me.
4  Mr. Schneider made clear on all occasions this
5  was all about negotiating a make-whole
6  settlement. It was never about providing the
7  DIP financing.
8      Q.  Right. And he was -- also made
9  clear that having the full amount of the
10  make-whole allowed was not a condition to the
11  second lien holders being interested in
12  providing a DIP. Right?
13      A.  That's correct. And we
14  communicated that to the EFIH unsecured group,
15  and we've encouraged them to negotiate a
16  settlement of the make-whole ever since.
17      Q.  Say it louder.
18      A.  And I know they've tried, and
19  they unfortunately haven't been successful.
20      Q.  In fact, just jumping ahead off
21  of this document off a little bit,
22  postpetition when the second lien noteholders
23  learned of the terms of the -- of the PIK DIP
24  proposal, you've agreed with me that they were
25  very prompt in seeking to put in a concretely

82 (Pages 322 to 325)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 326

1   superior proposal.  Right?
2       A.   They were prompt in putting in
3   an alternative proposal.  I won't comment on
4   its -- on its merits.
5       Q.   Okay.  And at that time one of
6   the first things that the debtors sought to do
7   was to disconnect negotiations -- a
8   settlement of the make-whole from the DIP
9   process; fair to say?
10      A.   Well, I recall in that term
11  sheet, and there have been so many of them my
12  recollection is a little fuzzy, I remember
13  there was a line item that talked about the
14  make-whole payment, and we asked specifically
15  is this proposal conditioned on a -- on a
16  particular make-whole settlement, and the
17  answer I recall was emphatically no, that the
18  DIP proposal stands on its own and that the
19  second lien note group was willing to provide
20  the financing on the terms contained in the
21  term sheet, and that the make-whole
22  controversy could continue and evolve and get
23  resolved in its own due course.
24      Q.   By the way, today we've been
25  talking a fair amount about the NextEra

Page 327

1   proposal, but it's accurate, is it not, that
2   the second lien holders have also indicated
3   that they stand behind an alternative proposal
4   that has no make-whole settlement associated
5   with it as well?
6       A.   I believe in the original cover
7   letter accompanying the first of the NextEra
8   term sheets it says something to the effect
9   that if the board of EFIH rejects the NextEra
10  proposal, the second lien note group is
11  willing to continue to offer, prosecute its
12  case for the second lien DIP proposal that's
13  contained in the term sheet we were just
14  talking about.
15      Q.   Okay.  So going back to
16  Paragraph 21.  When you said that you believed
17  that the March 2014 second lien holders'
18  proposal was inferior, among other things,
19  because it provided for full payment to the
20  make-whole.  First of all, you recognize that
21  the second lien holders had expressly
22  indicated a willingness to compromise -- to
23  compromise with a discount on the make-whole.
24  Right?
25      MR. PRUITT:  Objection to the

Page 328

1   form.
2       A.   Actually, I remember at the
3   time asking how much of a discount, and Todd
4   was not willing to give me a sense of how big
5   the discount might be, and I know in the
6   settlement discussions that have happened
7   since that time, my understanding of the size
8   of the various bid and asks reflect in my mind
9   a very modest discount to the full make-whole
10  amount.
11      Q.   Well, we'll talk about that in
12  a minute.
13      A.   Okay.
14      Q.   The second thing is that when
15  you did ask the second lien holders to clarify
16  that their DIP proposal was not contingent on
17  a make-whole settlement, they promptly
18  clarified -- agreed that it was not
19  contingent.  Right?
20      A.   That's true.  But I'm trying to
21  remember, but all of this has happened
22  subsequent to my declaration.
23      Q.   True.  But at the time of this
24  meeting you didn't ask that question; did you?
25      A.   At the time of which meeting?

Page 329

1       Q.   At the time of the March 3rd
2   meeting where this deck was presented to you,
3   you didn't ask would you be interested in
4   providing a DIP without a make-whole
5   settlement?
6       A.   Actually, I specifically asked
7   Todd, Is owning a majority interest in EFH --
8   I think I used the word "your manifest
9   destiny," meaning that this is the real
10  essence of what you're asking for?  And he
11  said, No, absolutely not, my constituents -- I
12  believe he said my constituency is primarily
13  interested in negotiating a settlement of the
14  make-whole.
15      Q.   Again, you didn't ask if his
16  constituency was interested in putting in a
17  competing DIP proposal without a make-whole
18  settlement; did you?
19      MR. PRUITT:  Objection to form.
20      A.   At the time of the --
21      Q.   Yes.
22      A.   -- May 15 proposal?
23      I think I asked Todd a bunch of
24  questions, but I don't recall asking him that
25  specific one.

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 330

1    Q.   Do you recall telling
2 Mr. Schneider that you already have a DIP and
3 you're not interested in a competing DIP?
4        A.   I don't recall what we told him
5 with regard to the negotiations that were
6 going on. But I do recall that there were
7 lots of articles in various news publications
8 that seemed to disclose, the day after we had
9 an important discussion, the terms of
10 everything we were talking about. So my
11 impression, general impression was that
12 everybody seemed to be very much in the know,
13 in terms of what was going on behind the
14 scenes.
15       Q.   But if Mr. Schneider testifies
16 under oath that you told him at that meeting,
17 We already have a DIP, go away, you wouldn't
18 have any basis for denying that; would you?
19       A.   I just don't recall what we
20 told him.
21       Q.   Okay. And if he testifies
22 under oath that you refused to tell him the
23 terms of the DIP that you already had, you
24 wouldn't have any basis to deny that either;
25 would you?

Page 331

1        A.   I just don't recall what I said
2 at that time.
3        Q.   Now, in Paragraph 22, and you
4 said this to me I think a minute ago, so we'll
5 just confirm it, you write, "The EFIH debtors
6 chose not to pursue the March 2014 proposal
7 because they did not believe it was reasonably
8 likely that," and then I'm going to skip A
9 because I want to ask you about B, which you
10 just testified about, "B, the proponents would
11 agree to a less expensive settlement of their
12 alleged make-whole claims."
13            You told me a minute ago that
14 you did see the bid/asks, and you thought the
15 discount was quite modest.
16            Now, there came a time, did
17 there not, that the ad hoc second lien
18 noteholders through Fidelity made a make-whole
19 settlement proposal, prepetition?
20       A.   I had heard that Fidelity had
21 spoken to the second lien note Ad Hoc Group,
22 but I'm not aware of the substance of those
23 discussions.
24            MR. HOROWITZ:   Mark this as
25 Exhibit 16.

Page 332

1            ---
2            (Exhibit 16 was marked for
3 identification.)
4            ---
5 BY MR. HOROWITZ:
6        Q.   I've marked as Ying Exhibit 16
7 an e-mail from Nate Van -- I'll just pause for
8 a second. Nate Van Duzer is at Fidelity.
9            Right?
10       A.   That's right.
11       Q.   -- to a group of people, and I
12 will say that, Mr. Ying, you're not on it.
13 It's Bates-stamped TPG 0000099 through 107,
14 and the first page is an e-mail, the rest of
15 it is an attached -- is a slide deck entitled
16 Discussion Materials.
17            Sir, have you ever seen this
18 document before?
19       A.   I don't recall having seen it,
20 no.
21       Q.   Do you see the first sentence
22 that says, "Hi, Michael"?
23            That's Michael MacDougall.
24 Mr. MacDougall is with TPG. Right?
25       A.   Yes.

Page 333

1        Q.   And it's fair to say that
2 Mr. MacDougall was playing a very active role
3 in negotiating -- on behalf of the debtors in
4 negotiations of an E side RSA?
5        A.   Yes.
6        Q.   And did Mr. MacDougall keep you
7 apprised of developments in those
8 negotiations?
9        A.   Yes.
10       Q.   Okay. So reading again, it
11 says, "Hi, Michael. Please find attached a
12 proposal which is supported by funds holding
13 in excess of two-thirds of the EFIH second
14 lien notes including Fidelity."
15            Does this refresh your
16 recollection, sir, that the debtors received a
17 proposal through Fidelity that was represented
18 to have support of two-thirds of the EFIH
19 second lien notes?
20       A.   Well, I don't see any of the
21 debtors on this, and neither is Evercore, and
22 neither is Kirkland.
23       Q.   But I thought you testified --
24 Mr. MacDougall was acting on behalf of the
25 debtors in these negotiations; was he not?

84  (Pages 330 to 333)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 334

1      A.   Yes.  Although he's also a
2  principal in the negotiations, since the
3  shareholders were being offered some
4  consideration in the restructuring.  But if
5  you want to say that it was offered to the
6  debtors, I'll concede the point.  I was just
7  being -- trying to be precise.
8      Q.   Just so we're clear, you had
9  knowledge at the time of what percentage of
10  EFIH second lien notes, approximately what
11  percentage of the EFIH second lien notes were
12  held by members of the Ad Hoc Group.  Right?
13      A.   Every time we met with Todd and
14  Mr. Mayer of Kramer Levin, you know, we would
15  ask them who is in your group, and they would
16  describe generally who was -- the dollars
17  amount associated with their group, yes.
18      Q.   Right.  And you've always known
19  approximately how much Fidelity has held in
20  the second lien notes.  Right?
21      A.   Yes.
22      Q.   So you would know, and you can
23  confirm for me, that any proposal supported by
24  funds holding in excess of two-thirds of the
25  EFIH second lien notes, including Fidelity,

Page 335

1  would, as an arithmetic matter, have to
2  include the Ad Hoc Group.
3      A.   Yes.
4      Q.   Let me direct your attention to
5  Page 3 of the deck.  That's the page that's
6  Bates ending 102.
7           Do you see this is a page
8  that's headed Rights Offering Treatment?
9      A.   Yes.
10      Q.   And under Treatment of Key
11  Constituents, under EFIH second lien notes,
12  and I apologize, it's kind of hard to read
13  that --
14      A.   I'm following you.
15      Q.   Yeah.  You see the second
16  bullet point is, under Rights Offering
17  Treatment, "Make-whole settlement in an amount
18  equal to 68 percent of the full make-whole
19  claim due as of the date of repayment"?
20      A.   I see that.
21      Q.   Okay.  And then if you turn to
22  Page 3, Bates ending 104, do you see there's
23  an equity conversion treatment page?
24      A.   All right.  I'm following you.
25      Q.   And in the same box under

Page 336

1  Treatment of EFIH Second Lien Notes, do you
2  see that the reference is to a make-whole
3  settlement in an amount equal to 75 percent of
4  the full make-whole claim due as of the date
5  of repayment?  Do you see that?
6      A.   I do.  I'm confused.
7      Q.   And why are you confused?
8      A.   One says 68, and one says 75.
9      Q.   Oh.  But the distinction is --
10  I'll draw your attention to the box under
11  Equity Conversion Treatment.
12      A.   All right.
13      Q.   It says if the commitment
14  parties -- at the time the commitment parties
15  were -- let me orient you in time.
16           We should have mentioned this
17  e-mail is March 19, 2014.
18      A.   I did note the time, yes.
19      Q.   So in March 2000 -- 19th, 2014,
20  I think we've established there was discussion
21  about the -- certain of the PIK holders acting
22  as commitment parties for an equity -- for a
23  rights, equity rights offering.
24      A.   Okay.
25      Q.   Correct?  Okay.  So going back

Page 337

1  to that italics box, it says, "If the
2  commitment parties do not fund the rights
3  offering, the plan shall automatically toggle
4  to the equity conversion treatment as
5  described below, and sources of funding shall
6  remain unchanged."
7           Do you see that?
8      A.   I see that.
9      Q.   Let me just ask you:  Were you
10  ever made aware in this mid-March time frame,
11  I know it was a very active time frame, that
12  the Ad Hoc Group together with Fidelity had
13  made a proposal to settle make-whole claims
14  for either 68 percent in cash or 75 percent in
15  equity conversion?
16      A.   Actually, I was not aware of
17  those two numbers.
18      Q.   And you were not aware of those
19  numbers when you wrote in your declaration
20  that you did not believe that the Ad Hoc Group
21  would be -- agree to a less expensive
22  settlement of their alleged make-whole claims?
23      A.   That's correct, because it was
24  based on my meeting with Mr. Schneider.
25      Q.   The tender offer proposed

85 (Pages 334 to 337)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 338

1  make-whole settlement in this case for the
2  second lien notes proposed a 50 percent
3  make-whole settlement. Right?
4       A.  That is correct.
5       Q.  So in your professional
6  experience do you consider -- would you
7  consider a prepetition situation where the
8  bid/ask is between 68 percent and 50 percent
9  to be an unbridgeable gap?
10      MR. PRUITT: Objection to form.
11      A.  Well, the payment of more than
12  the 50 percent that's been offered in the
13  settlement per the RSA, obviously more money
14  is -- comes out of the pocket of the future
15  equity holders, which under the current plan
16  is primarily the EFIH unsecureds. So to a
17  certain extent it's their decision to either
18  make a settlement, litigate, have their second
19  lien DIP proposal challenged. I think they're
20  fully aware of all of the diverse range of
21  negotiation points that are outstanding
22  between your group and theirs.
23      Q.  Okay. But in your declaration
24  you wrote that the debtors chose not to pursue
25  negotiations with the second lien holders

Page 339

1  because you did not believe it was reasonably
2  likely that they would agree to a less
3  expensive settlement of their alleged
4  make-whole claims. And my question was, if
5  you had known at the time that the Ad Hoc
6  Group had made a proposal for 68 percent cash
7  or 75 percent equity, would you have concluded
8  that settlement negotiations were hopeless --
9      MR. PRUITT: Objection.
10 BY MR. HOROWITZ:
11      Q.  -- and not worth pursuing?
12      MR. PRUITT: Objection to the
13 form. Calls for speculation.
14      A.  Well, I don't know what I would
15 have done at the time, and I don't even know
16 who else saw this proposal. I presume that
17 EFIH unsecureds, who would be the payors of an
18 increased settlement, would have been made
19 aware of this. And if they chose not to
20 accept the settlement offer, unfortunately I
21 can't make them accept it.
22      Q.  Did you have any -- did you
23 play any role in negotiations --
24      MR. HOROWITZ: Withdrawn.
25 BY MR. HOROWITZ:

Page 340

1       Q.  It's fair to assume, from what
2  I've read, is it not, that you played no role
3  and made no effort to negotiate a prepetition
4  make-whole settlement between the PIKs, the
5  debtors and the EFIH second lien ad hoc
6  noteholders?
7       A.  I was not part of any
8  negotiation of a settlement.
9       Q.  Did you participate in
10 negotiation of the settlement of the
11 make-whole claim between Fidelity, the PIKs
12 and the debtors?
13      A.  No.
14      Q.  That was largely
15 Mr. MacDougall?
16      A.  Yes.
17      Q.  And are you familiar with the
18 terms of the settlement between the -- the
19 make-whole settlement between Fidelity and the
20 debtors supported by the PIKs?
21      A.  Yes.
22      Q.  And it's accurate, is it not,
23 that Fidelity received consideration worth
24 more than 50 percent of its make-whole?
25      MR. PRUITT: Objection to the

Page 341

1  form.
2       A.  Well, they're receiving --
3  yeah, Fidelity is receiving lots of things for
4  its various positions in the capital
5  structure. I don't necessarily agree with
6  your characterization.
7       Q.  Well, let me just ask you about
8  one in particular for now. Fidelity was
9  offered -- Fidelity has received the ability
10 to participate in the first lien DIP up to
11 $500 million, and to receive a 1.75 percent
12 fee in association with that participation.
13      Correct?
14      A.  That is correct.
15      Q.  And that -- Fidelity was
16 offered that opportunity specifically in
17 connection with its second lien note
18 settlement. Correct?
19      A.  Actually, I do not know whether
20 there was a -- whether that was offered, as
21 you say, in direct settlement of their second
22 lien note position. All I know is that
23 Fidelity wanted more, and there were various
24 ways in which we, as the debtor, were willing
25 to say that yes, Fidelity can have the right

86 (Pages 338 to 341)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 342

1  to fund $500 million of the first lien DIP.
2      Q.   Let me ask you to turn back to
3  Exhibit 1, last night's board deck, and I want
4  to ask you a few questions about that.  As
5  soon as I find it.
6          I would turn your attention to
7  Page 2 of the deck.  This is under Executive
8  Summary of the EFIH Second Lien DIP Proposals
9  Continued.
10     A.   Yes.
11     Q.   In the first box, I want to
12 direct you to the first subbullet point that
13 says, "At present, none of those proposals" --
14 this is referring to the proposals from the
15 first and second lien noteholders?
16     A.   I'm following you.
17     Q.   It says, "At present, none of
18 those proposals has the support of the
19 unsecured group, which holds more than
20 two-thirds in amount of the EFIH unsecured
21 claims, or of Fidelity, which similarly holds
22 more than two-thirds in amount of the EFIH
23 unsecured claims."
24         Tell me what efforts the
25 debtors have made during this DIP process to

Page 343

1  secure Fidelity's support for alternative
2  proposals?
3      A.   Well, I think per the terms of
4  our restructuring support agreement, we
5  provide all alternative proposals to all of
6  the RSA parties, and if they choose to read
7  them and respond to us and say we like, we
8  don't like, we obviously respond.  If they
9  don't call us up, we don't actively solicit
10 reaction.  We figure they're sufficiently
11 sophisticated parties that if they have a
12 reaction, that we will certainly hear from
13 them.
14     Q.   To your knowledge, has anyone
15 on behalf of the debtors contacted Fidelity's
16 representatives to ask Fidelity's views on the
17 two separate second lien noteholder proposals?
18     A.   Consistent with my answer, I am
19 not aware of any communication from Fidelity
20 or its advisors to the company, or the
21 company's advisors, certainly not to Evercore,
22 as to any reaction they have to the various
23 proposals that have been coming into the
24 company over the past two weeks.
25     Q.   Have the debtors made any

Page 344

1  efforts to reach out to other creditor
2  constituencies to hear their views on the
3  competing proposals?
4      A.   I think we respond to any
5  inquiries we get from other RSA parties.  I
6  don't think we've heard any inquiry from the
7  TCEH group.  I know we've obviously had
8  inquiries from the EFIH unsecured group.  And
9  when they call us, we respond.
10     Q.   When you say you've had
11 inquiries, you're referring to --
12     A.   I was referring to the EFIH
13 unsecured group.
14     Q.   How about the EFH Ad Hoc Group
15 represented by Kasowitz?
16     A.   I know that I had a call with
17 them last week, where we had a long
18 discussion, but I haven't heard any
19 communications from them with regard to any of
20 the proposals.
21     Q.   They have not taken any
22 position that you're aware of?
23     A.   They certainly haven't spoken
24 to me.  They may have spoken to others who
25 advised the company, or the company itself.

Page 345

1      Q.   Turning to Page 4 again.  I
2  guess one thing I don't -- on the key criteria
3  summary on Page 4, one thing I don't see on
4  there is the size of the facilities that are
5  offered.  Is that shown on another page in
6  this deck?
7      A.   Yes.  Actually, there was a
8  desire for a summary page, even though the
9  deals are quite complex, and --
10     Q.   I am sorry, it's Page 10.
11     A.   Yes.  When we addressed the
12 board we addressed Page 4 and also
13 simultaneously pointed them to Pages 10
14 through, I think it's Page 17.
15     Q.   Okay.  So Page 10, under DIP
16 size you see that the -- the NextEra proposal
17 is a $2.4 billion DIP compared to a $1.9
18 billion DIP from the PIKs.  Right?
19     A.   Yes.
20     Q.   And, by the way, why is -- who
21 decides on which of these items gets
22 highlighted with a box around it?
23     A.   I think the red highlights were
24 suggested by someone to attempt to highlight
25 to the board what's changed in this deck from

87 (Pages 342 to 345)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 346

1  the previous deck that was shared to the board
2  at a board meeting that we had early last
3  week.
4      Q.   So you're saying this was a
5  form of red-lining, as it were?
6      A.   Well, there are two red-lines.
7  There's a form of red-lining that try to
8  highlight to the board what had changed from a
9  prior deck, and then there were some
10 red-lining that was put in just to try to
11 highlight, you know, important numbers to
12 focus on.
13     Q.   Okay.  So with regard to the
14 size of the facility, you would agree with me
15 that the NextEra proposal is superior to the
16 PIK proposal?
17         MR. PRUITT:  Objection to the
18 form.
19     A.   It's certainly more dollars.
20     Q.   Is it more dollars than the
21 debtor wants?
22     A.   Well, obviously the debtor just
23 cared about being able to refinance the second
24 lien notes.  Obviously the extra $500 million
25 proposed in the NextEra proposal happens to

Page 347

1  correspond almost to the extra cash that is
2  now being offered to satisfy a portion of the
3  claims of the EFIH unsecureds.  I think the
4  actual number that they're allocating to the
5  EFIH unsecureds is like $580 million, is the
6  last set of numbers I saw.
7      But my recollection is a little
8  foggy, because, again, the first set of
9  sources and uses fund statement, which I think
10 we got Wednesday or Thursday, we had some
11 issue with, and I know that they sent us
12 another sources and uses statement on Sunday
13 at 4 p.m., or 5 p.m. -- actually, I think it
14 was 4:30.  I was not on that call, and I quite
15 honestly haven't had a lot of time to analyze
16 it.
17     But I do believe they made a
18 good bona fide effort to try to fill the $280
19 million cash sources and uses deficiency
20 that's stated in this proposal.  And we did
21 say to the board that they've made some
22 changes, including increasing the amount of
23 debt at exit to address the shortfall.
24     Q.   By the way, you mentioned that
25 $280 million.  That's referred to on Page 4.

Page 348

1      A.   Yes.
2      Q.   As I understand it, one portion
3  of that is based on differing assumptions as
4  to when the exit date would be.  Right?
5      A.   That was one of them, yes.
6      Q.   That's a large -- was that
7  because the debtor is currently cash-flow
8  positive and the further out the exit date the
9  more cash would be on hand?
10     A.   Right.  Our assumption is we're
11 coming out a year after filing, I think the
12 initial sources and uses assumed it would take
13 18 months.  And in that last six months there
14 was I think a positive 100 million of net cash
15 flow.
16     Q.   Okay.  So 100 million of the
17 280 million is a timing issue.  Correct?
18     A.   Correct.  I think another
19 portion of it is in the most recent proposal,
20 I think the NextEra group is assuming that the
21 cost of the exit financing to refinance the
22 first lien DIP is lower than is assumed in the
23 company's numbers.
24     Q.   Okay.  So there are differing
25 projections on the cost of exit financing.

Page 349

1      A.   Yes.
2      Q.   And you said that the NextEra
3  and the ad hocs are making good-faith efforts
4  to address the company's concerns about
5  whether those expenses end up being closer to
6  the company's number than --
7      A.   Yes.
8      Q.   -- than NextEra's projection?
9      A.   That's correct.
10     Q.   And those are the two biggest
11 elements.  Right?
12     A.   I believe those are, yes.
13     Q.   One element I think is the 55
14 million cash contribution from EFIH to EFH
15 under the -- on the tax sharing agreement
16 amendment was not included in the DIP budget?
17     A.   Yes.  Correct.  That is right.
18     Q.   Okay.  Good.  I'm glad I got
19 those three -- and those are the three.
20         Right?
21     A.   I think those are the three
22 biggest pieces.  I think there are a lot of
23 smaller numbers that we're just trying to
24 reconcile.
25     Q.   Okay.  Going back to Page 10,

88 (Pages 346 to 349)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 350

1  we could have -- yeah, Page 10 is good.  With
2  regard to interest, the NextEra proposal is --
3  would provide a DIP at six percent interest
4  whereas the PIK proposal is six-and-a-quarter
5  percent.  Right?
6      A.   That's correct.
7      Q.   So you agree with me that the
8  NextEra proposal is superior to the PIK
9  proposal in that regard?
10         MR. PRUITT:  Objection to the
11 form.
12     A.   In terms of interest rate, it
13 is a bit lower, yes.
14     Q.   In terms of implied equity
15 value -- we talked about that earlier -- the
16 NextEra proposal implies an equity value for
17 an implied EFH equity value that's some $350
18 million higher than the PIK proposal?
19     A.   That is correct.
20     Q.   Okay.  And in terms of upfront
21 PIK fee, what page would we get that on?
22     A.   I think --
23     Q.   Yeah, that's on Page 4.
24     A.   It's put in a number on Page 4.
25     Q.   Right.  The PIK funding fee is

Page 351

1  50 million on the NextEra proposal versus 95
2  million on the PIK proposal.  Right?
3      A.   Correct.
4      Q.   So the NextEra proposal is
5  superior in that regard, too.  Right?
6          MR. PRUITT:  Objection to form.
7      A.   In terms of dollar amount, yes.
8      Q.   Okay.  And financing fee, the
9  NextEra proposal is 10 million compared to 31
10 million for the PIK proposal.  Right?
11     A.   Yes.
12     Q.   Twelve month -- well, that's
13 just a function of the interest rate.  I don't
14 need to ask you about that one.
15         When I go through this, the
16 only fee that I see that is higher for the
17 NextEra proposal is the optional redemption
18 fee.  Right?
19     A.   On these criteria, yes.
20     Q.   And just so it's clear, before
21 the board meeting but after you prepared the
22 deck -- Page 4 under Optional Redemption Fees
23 show 95 million on the PIK proposal and 180
24 million on the NextEra proposal.  Right?
25     A.   Yes.  During the board call we

Page 352

1  did point out that an hour-and-a-half earlier
2  the proposal had reduced the 180 to 160.
3      Q.   Right.  Okay.  Thank you.
4  That's the only fee that I see where the
5  NextEra proposal compares adversely to the PIK
6  proposal.
7          What economic respect do you
8  identify where the PIK proposal is superior?
9      A.   Well, we pointed the board to
10 Page 11, and we did highlight assuming a
11 one-year case, or a one-year period under
12 which the DIP is outstanding, the relative
13 cash costs between the two.  Or between all
14 the proposals.  And that's the line entitled
15 Net Cash Savings Over 12 Months.  Again, this
16 is Page 11, titled Pricing of the DIP
17 Facilities.
18     Q.   Where does the delta come from
19 on that?
20     A.   It's the difference between the
21 net interest savings and the total cash
22 financing fees.  So in the first column
23 interest savings is 129 million, total cash
24 financing fees is 43.  129 minus 43 should
25 equal that 87 million number.

Page 353

1      Q.   I'm sorry, I'm missing -- so
2  explain that to me.  Why would -- why would
3  you subtract the financing fees from the
4  interest savings to get at a meaningful
5  number -- why would the --
6          MR. HOROWITZ:  Well, withdrawn.
7  BY MR. HOROWITZ:
8      Q.   What's the meaning of the
9  number that you get when you subtract the
10 financing fees that the debtor would have to
11 pay for the PIK DIP from the interest savings?
12     A.   We were trying to calculate the
13 net cash impact to the debtor of assuming any
14 of the particular financings.
15     Q.   But the debtor will -- if the
16 PIK DIP is approved, the debtor will have to
17 pay the 43 million in total cash financing
18 fees that you show up here.  Right?
19     A.   Yes.  But the debtor will then
20 save interest expense, and the difference
21 between those two numbers is the net cash
22 savings to the debtor.  Over a 12-month
23 period.
24         MR. HOROWITZ:  Somebody's going
25 to have to help me on that one.  Okay.

89 (Pages 350 to 353)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 354

1  BY MR. HOROWITZ:
2      Q.   What other elements do you
3  consider the -- on what other economic
4  elements do you consider the PIK proposal to
5  be superior?
6      A.   The next form of analysis we
7  pointed the board to was on Pages 14 and 15.
8  And there we highlight to the board, on each
9  of the proposals we were calculating, based on
10  the investment price embedded in the
11  convertible DIP, what was the implied equity
12  price. We noted how much net debt was on the
13  company under the various assumptions. We
14  noted, therefore, the implied value of EFH and
15  EFIH, based on the equity plus the net debt.
16  And then we imputed the implied Oncor total
17  enterprise value, recognizing that EFIH owns
18  only 80 percent of Oncor, and Oncor itself has
19  its own debt. And we said, Okay, these are
20  some interesting criteria, and obviously if
21  you just focused on TEV or equity value, the
22  NextEra proposal is higher.
23      We then said, But I think to
24  understand the proposals more clearly, one has
25  to look at who's getting what across a range

Page 355

1  of valuations. And I think I pointed this
2  group to this slide earlier, and I think it's
3  very evident that the NextEra proposal, at a
4  17-and-a-half billion valuation, gives the
5  second lien holders a better deal than they
6  have under the EFIH unsecured proposal, and
7  conversely, even though the NextEra proposal
8  purports to give the EFIH unsecureds a par
9  recovery, and hence hopefully they don't have
10  to vote on a plan of reorganization because
11  they're being paid all they're owed,
12  nonetheless in the EFIH unsecured proposals
13  their proposal has them getting the benefit of
14  the increased valuation. And, in fact, the
15  dollar amounts associated with the difference
16  between the recoveries for the second lien
17  notes and the EFIH unsecureds under the two
18  proposals at the 17 billion valuation is an
19  exact transfer of about $333 million of value.
20  Which is that 50 percent of the make-whole
21  claim.
22      So the NextEra proposal --
23      Q.   Who is --
24      A.   -- picks a result.
25      Q.   So I'm clear, though, what

Page 356

1  assumption are you making about what happens
2  with the EFIH second lien make-whole when
3  you're doing this calculation under the PIK
4  proposal?
5      A.   Under the PIK proposal I'm
6  assuming that all of the EFIH unsecured
7  creditors agree to take the 50 cent
8  settlement.
9      Q.   Okay. So if instead the
10  nonsettling creditors who have not --
11      MR. HOROWITZ: Withdrawn.
12  BY MR. HOROWITZ:
13      Q.   You recognize that more than 50
14  percent of the EFIH second lien holders have
15  rejected the settlement?
16      A.   Oh, yes, I do.
17      Q.   And you recognize that the
18  early tender date has past. Right?
19      A.   Oh, yes, I do.
20      Q.   And you recognize that if they
21  were inclined to take the settlement, they
22  would very likely have decided to do so before
23  that early tender deadline?
24      A.   I most certainly do.
25      Q.   Okay. So absent a settlement,

Page 357

1  whatever scenario occurs, it is unlikely to be
2  the scenario where the debtor ends up paying
3  50 percent across the board on make-whole.
4  Right?
5      A.   That's right. So what this
6  proposal said is that it assumes that if
7  everyone accepts the 50 percent, as you have
8  pointed out, 57 percent of the second liens
9  have not accepted the settlement. Therefore
10  if there's litigation, and if the outcome is
11  that there's no make-whole payment due, the
12  EFIH unsecureds will have bought in at an even
13  better price, and they will have saved
14  themselves 15 cents on the nonsettling
15  portion, which is about, I said the
16  nonsettling make-whole claim is about $380
17  million. So they will have saved themselves
18  half of $380 million, or 190 million, and if
19  they're wrong they'll have to pay an extra
20  $190 million above and beyond what's embedded
21  in these numbers.
22      Q.   Okay. So 190 million on 1.6
23  billion is going to be something over 10
24  cents --
25      A.   Yes, swing positive or

90  (Pages 354 to 357)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 358

1 negative, depending on the outcome of the
2 litigation.
3         Q.   Right.  If the make-whole -- if
4 the nonsettling make-whole parties win, then
5 their recovery across all of these scenarios
6 is going to be closer to what it would be
7 under the NextEra proposal.  Correct?
8         A.   I didn't quite follow that
9 comment.
10        Q.   If the nonsettling
11 make-whole -- if the nonsettling EFIH second
12 lien creditors prevail in their make-whole
13 claim, then their recovery under the PIK DIP
14 proposal will be -- well, for the nonsettling
15 holders it will be the same as it would be
16 under the NextEra proposal?
17        A.   Yes.  Except it will be all in
18 cash, whereas in the NextEra proposal some of
19 the second lien notes are rolling into equity.
20        Q.   Okay.
21        A.   But economically you're
22 correct.
23        Q.   Okay.  Got you.
24             What other respects, economic
25 respects, do you deem the PIK proposal to be

Page 359

1 superior to the NextEra proposal?
2         A.   I think it primarily relates to
3 who gets the upside in the value of the
4 company.
5         Q.   Okay.  So your conclusion is
6 that from an economic point of view, the
7 debtor can prefer the NextEra proposal because
8 of the recovery allocation that it effects?
9         A.   Yes.  In the NextEra proposal
10 they pick and choose who gets what.  In the
11 unsecured proposal they've said we want to be
12 the equity, we'll take the risk on the
13 downside, we'll take the risk on the
14 settlement not going our way.  Conversely, if
15 we're right about the settlement, conversely
16 if we're right that in the future the value of
17 the business may be higher with time, they get
18 the benefit of the upside.
19        Q.   Okay.  And have you gone back
20 to NextEra on the 100 percent make-whole issue
21 and provided any counterproposal?
22        A.   No, we have not.
23        Q.   Okay.  Do you intend to do so?
24        A.   I wasn't planning on it, but I
25 don't make all the decisions at the company.

Page 360

1         Q.   Okay.  And in terms of the
2 preferring a DIP based on the impact it has on
3 recovery allocation, is that something in your
4 experience that you've ever done before?
5         A.   Well, DIPs usually aren't
6 convertible, so usually recoveries don't come
7 embedded in a DIP.  Obviously because this DIP
8 is convertible, there is an equity rights
9 offering that to repay the DIP, obviously you
10 have to value this DIP on its terms and look
11 at the full implications of -- that it has for
12 the restructuring.
13        Q.   You would agree with me it's
14 not particularly common for a debtor to take
15 out a DIP during a bankruptcy to refinance
16 existing secured debt?  It's been done, but
17 it's not common.  Right?
18        A.   There are plenty of DIPs that
19 are roll-up DIPs, where in essence you are
20 rolling, taking out prepetition creditors.
21 Actually, I've seen a DIP where, for example,
22 in Delphi, where they put a DIP in place and
23 refinanced prepetition debt because they could
24 save interest rate.  Obviously that didn't
25 work out so well, but --

Page 361

1         Q.   Roll-up DIPs --
2         A.   That certainly is another case
3 where a DIP was put in place to save money on
4 prepetition debt.
5         Q.   And when you do that, when you
6 take out a DIP for that reason, would you
7 agree with me that basically the rationale is
8 that it's going to increase the size of the
9 pie that's available for distribution to
10 creditors?
11        A.   Well, in the --
12             MR. PRUITT:  Objection to the
13 form.
14        A.   -- Delphi case -- in the Delphi
15 case I described, it was exactly because they
16 wanted to reduce the interest burden on the
17 estate, to create more equity value.
18 Obviously in that case the Delphi value went
19 down a lot, and they had their own set of
20 problems.
21             I must say that since I've been
22 involved in a couple of roll-up DIPs, and I
23 know well the Delphi case because we advised
24 GM in Delphi, we're very mindful of the issue
25 of doing DIPs in a bankruptcy, and hence we

91 (Pages 358 to 361)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 362

1  were quite emphatic that if we were going to
2  do the second lien DIP, it needed to be
3  convertible in a certain way. Because we
4  don't want this entity to end up not being
5  able to refinance out DIP debt at emergence.
6       MR. PRUITT: Not to interrupt,
7  and I apologize for it, but I'm showing we're
8  rolling right up on your 2.5 --
9       MR. HOROWITZ: I was just
10  trying to look at that.
11      MR. PRUITT: Okay.
12      MR. GLENN: How much time is
13  left?
14      MR. HOROWITZ: Give me a
15  minute. Give me a minute to go through,
16  because I'm almost done with this.
17      THE VIDEOGRAPHER: You have 29
18  minutes left.
19      MR. HOROWITZ: Let's take five
20  minutes. I may be passing. I don't know if
21  anyone else is planning on asking anything?
22      MR. GLENN: I have a couple of
23  follow-ups. Two minutes.
24      MR. PRUITT: Anyone else?
25  Hearing none --

Page 363

1       MR. HOROWITZ: Give me five
2  minutes. I'll get through my notes, and I'll
3  have ten minutes I think at the most.
4       THE VIDEOGRAPHER: We're going
5  off the record. The time is 5:46 p.m.
6           ---
7  (Recess from 5:46 to 5:54 p.m.)
8           ---
9       THE VIDEOGRAPHER: Here marks
10  the beginning of Media Number 6. We are back
11  on the record. The time is 5:54 p.m.
12  FURTHER EXAMINATION
13  BY MR. GLENN:
14      Q.  Mr. Ying, a few follow-up
15  questions for you, starting with Exhibit 1.
16  Turning back to where Mr. Horowitz questioned
17  you on Page 4.
18      A.  Okay, I have Page 4.
19      Q.  Okay. You present in your
20  summary of the key criteria of these various
21  proposals Oncor TEVs of 16.5 billion to 17.5
22  billion. Do you see that?
23      A.  Yes, I do.
24      Q.  Why did you choose those
25  numbers?

Page 364

1       A.  They reflect the bookends of
2  the TEVs implied by the various proposals.
3       Q.  Okay. You testified earlier
4  that rights offerings often are done at a
5  discount to actual enterprise value.
6           Do you recall testimony to that
7  effect?
8       A.  Yes, I do.
9       Q.  What is the implied discount on
10  which the PIK proposal is predicated?
11      A.  I don't know. You would have
12  to ask the PIKs for what discount they thought
13  they were embedding into their offer.
14      Q.  Okay. I'm asking if you have a
15  view on that.
16      A.  At present I do not.
17      Q.  Okay. Are you able to
18  approximate that?
19      A.  The only way I could
20  approximate it is by asking them what they
21  think the discount is, since they set the
22  price of their rights offering, and they own
23  their own bonds, and the only other way I
24  could impute it is by determining what's an
25  average discount for a rights offering of this

Page 365

1  nature.
2       Q.  Okay. You could also do it by
3  taking a discount to the enterprise value that
4  you calculate yourself. Right?
5       A.  Well, actually, the enterprise
6  value that I've calculated here is derived
7  from the amount of the DIP loan divided by the
8  percentage equity the DIP loan converts into.
9  So all of these valuations that you see on
10  Page 4 and on Pages 14 and 15 are derived from
11  the investment price. Assuming that we agree
12  that DIP -- that rights offerings often come
13  at a discount to market, the inference is that
14  these values are the discounted price, and
15  that the market price is actually something
16  higher.
17      Q.  Okay. But you could also
18  calculate the discount to enterprise value
19  based on your own valuation. You could
20  compare your valuation to the valuation
21  implied by the investment amount. Correct?
22      A.  Clearly another exercise could
23  be we could go and do a -- a fundamental
24  valuation using all of the investment banker
25  techniques, come up with a range of values,

92 (Pages 362 to 365)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 366

1  decide what do we want plan value to be, and
2  that would then peg is the rights offering
3  being done at a premium equal to or at a
4  discount to our valuation.
5      Q.  But you have not done that yet.
6      Correct?
7      A.  I have not done that.
8      Q.  Okay.  One last question or
9  two.
10      You testified earlier that you
11  have a, quote, strong sense, close quote, with
12  respect to valuation in the course of your
13  work to advise the boards of EFIH and EFH.
14      Do you recall testimony to that
15  general effect?
16      A.  Yes, I do.
17      Q.  Okay.  What is the basis of
18  your, quote, strong sense, close quote?
19      A.  I've done, as I said earlier,
20  we've monitored trading prices for comparable
21  securities over time.  We've done pieces of
22  the traditional valuation methodology, which
23  includes comparable company analysis.  It
24  includes a discounted cash flow analysis, it
25  includes a comparable transactions analysis.

Page 367

1  But we have not provided a written formal
2  valuation report as of yet.
3      Q.  Can you summarize for me, very
4  briefly, the comparable company analysis that
5  you looked at to come up with a strong sense
6  of valuation?
7      A.  Well, it's only one of the
8  indicators, and --
9      Q.  Okay.  I'm just asking you
10  about that one.
11      A.  -- and your question -- any
12  particular time you're talking about?
13      Q.  Sure.  Over the last three
14  months.  Since March.
15      A.  I know we took a look at those
16  indicators before we -- we signed up the RSA.
17      Q.  Okay.
18      A.  And, like all comparable
19  company analyses, we looked at a set of comps,
20  we looked at TEV multiples and PE multiples.
21      Q.  Okay.  Can you tell me what the
22  TEV multiple you used was at that point?
23      A.  I just don't recall.  And
24  obviously TEVs on one year, two years
25  forward --

Page 368

1      Q.  On any of those years.
2      A.  I just don't recall the
3  numbers.
4      Q.  Can you recall or approximate
5  the total enterprise value that you shared
6  with the board, if you did, at any time
7  immediately before the RSA was signed up until
8  now?
9      A.  I never disclosed to the board
10  a specific number, but I did tell them that I
11  thought that the terms of the RSA were
12  reasonable in the context of our sense of what
13  valuation looked like.
14      Q.  And is that all you said, that
15  it was reasonable?  Did you give them ranges,
16  or anything beyond telling them that in your
17  opinion that it was reasonable?
18      A.  Nothing beyond what I have
19  described to you.
20      MR. GLENN:  Nothing further.
21  Thank you.
22      Anyone else?
23      MR. DEVORE:  I have one
24  follow-up question.
25  FURTHER EXAMINATION

Page 369

1  BY MR. DEVORE:
2      Q.  Mr. Ying, do you recall
3  Mr. Horowitz asked you various questions
4  concerning the possible solvency of EFIH?
5      A.  No, I don't recall any
6  questions about solvency.
7      Q.  Sitting here today, do you have
8  any reason to believe that EFIH may, in fact,
9  be solvent?
10      MR. PRUITT:  Objection to form.
11      A.  How do you define solvency in
12  this case?
13      Q.  What is your definition of
14  solvency?
15      A.  I don't know.  I'm just asking
16  what's your definition?
17      Q.  As a restructuring
18  professional, do you have an understanding of
19  the word "solvency"?
20      A.  I guess in this case the
21  question must be -- I'm inferring, but the
22  question must be do you think the value of the
23  underlying assets are sufficient to cover all
24  of EFIH's obligations.  I don't know an
25  answer, because I don't know exactly what the

93 (Pages 366 to 369)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 370

1 obligations are. I don't know how to measure
2 what is required to pay the obligations under
3 the EFIH unsecured loans at their full claim.
4     Q.   So sitting here today, you
5 cannot testify whether EFIH is solvent or
6 insolvent?
7           MR. PRUITT: Objection to form.
8 Mischaracterizes testimony.
9     A.   Based on my impression of value
10 as of the time of the signing of the RSA, I
11 believe that EFIH was not solvent.
12     Q.   But sitting here today, is my
13 question.
14     A.   I have not reassessed whether
15 EFIH is or isn't solvent, as sitting as we --
16 as we are sitting today.
17     Q.   Sitting here today, do you
18 believe that it is possible that EFIH is
19 solvent?
20           MR. PRUITT: Objection to form.
21 Asked and answered. Now we're at six
22 questions now.
23     A.   Sitting here today, I don't
24 know it is or isn't.
25           MR. DEVORE: That's all I have.

Page 371

1           THE VIDEOGRAPHER: Is that it?
2           MR. PRUITT: Yes.
3           THE VIDEOGRAPHER: Here marks
4 the end of Media Number 6. We're going off
5 the record. The time is 6:02 p.m.
6           ---
7           (Time noted: 6:02 p.m.)
8
9
10           DAVID Y. YING
11
12 Sworn and subscribed to before
13 me, this _____day
14 of _____, 2014,
15 in the jurisdiction aforesaid.
16
17 _____
18 NOTARY PUBLIC
19
20
21
22
23
24
25

Page 372

1               ***
2     ACKNOWLEDGMENT OF DEPONENT
3     I, DAVID Y. YING, do hereby acknowledge that
4 I have read and examined the foregoing
5 testimony, and the same is a true, correct and
6 complete transcription of the testimony given
7 by me, and any corrections appear on the
8 attached Errata sheet signed by me.
9
10
11
12
13 _____
14 (DATE)          (SIGNATURE)
15
16
17
18
19
20
21
22
23
24
25

Page 373

1     C E R T I F I C A T E
2 STATE OF NEW YORK     )
3                       ) ss:
4 COUNTY OF NEW YORK    )
5
6     I, FRANK J. BAS, a Registered
7 Professional Reporter, Certified Realtime
8 Reporter and Notary Public within and for the
9 State of New York, do hereby certify:
10     That DAVID Y. YING, the witness
11 whose testimony is hereinbefore set forth, was
12 duly sworn by me and that such testimony given
13 by the witness was taken down stenographically
14 by me and then transcribed.
15     I further certify that I am not
16 related by blood or marriage, to any of the
17 parties in this matter and that I am in no way
18 interested in the outcome of this matter.
19     IN WITNESS WHEREOF, I have hereunto
20 set my hand this 24th of June, 2014.
21
22     FRANK J. BAS, RPR CRR
23     Notary Public No. 01BA6260327
24
25

94 (Pages 370 to 373)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

| | Page 374 |
|---|---|
| 1 | STATE OF NEW YORK ) |
| | ss: |
| 2 | COUNTY OF NEW YORK ) |
| | I wish to make the following |
| 3 | changes, for the following reasons: |
| 4 | PAGE  LINE(S)  CHANGE      REASON |

```
5  ___|_____|_____|_____
6  ___|_____|_____|_____
7  ___|_____|_____|_____
8  ___|_____|_____|_____
9  ___|_____|_____|_____
10 ___|_____|_____|_____
11 ___|_____|_____|_____
12 ___|_____|_____|_____
13 ___|_____|_____|_____
14 ___|_____|_____|_____
15 ___|_____|_____|_____
16 ___|_____|_____|_____
17 ___|_____|_____|_____
18 ___|_____|_____|_____
19 ___|_____|_____|_____
20
```

```
            _____
            DAVID YING
21  SUBSCRIBED AND SWORN TO BEFORE ME
    THIS___DAY OF _____, 2014.
22
23  _____  _____
    (NOTARY PUBLIC)  MY COMMISSION EXPIRES:
24
25
```

| | Page 376 |
|---|---|
| 1 | ------------ EXHIBITS CONTINUED ------------ |
| 2 | |
| 3 | Exhibit 2................................ 22 |
| 4 | Declaration of David Ying |
| 5 | (No Bates) |
| 6 | |
| 7 | Exhibit 3................................ 109 |
| 8 | E-mails Ending at E-mail dated 9/25/13 |
| 9 | From R. Cilento to S. Greene and |
| 10 | D. Ying, with Attachment |
| 11 | EFH2D00019093 - 099 |
| 12 | |
| 13 | |
| 14 | Exhibit 4................................ 54 |
| 15 | EFIH Holding and EFIH Finance's Motion |
| 16 | For Entry of Order |
| 17 | (No Bates) |
| 18 | |
| 19 | Exhibit 5................................ 84 |
| 20 | E-mails Ending at E-mail dated 9/25/13 |
| 21 | From R. Cilento to S. Greene and |
| 22 | D. Ying, with Attachment |
| 23 | EFH2D00019093 - 099 |
| 24 | |
| 25 | |

| | Page 375 |
|---|---|
| 1 | --------------- I N D E X --------------- |
| 2 | WITNESS      EXAMINATION BY        PAGE |
| 3 | DAVID Y. YING    MR. DEVORE          9 |
| 4 | MR. GLENN          95 |
| 5 | MR. SADEGHI        166 |
| 6 | MR. SHORE          183 |
| 7 | MR. HOROWITZ       227 |
| 8 | MR. GLENN          363 |
| 9 | MR. DEVORE         369 |
| 10 | |
| 11 | --------------TRANSCRIPT MARKINGS----------- |
| 12 | DIRECTIONS: 38, 39 |
| 13 | MOTIONS:   269 |
| 14 | REQUESTS:   284 |
| 15 | |
| 16 | ----- EXHIBITS MARKED IN TODAY'S SESSION ---- |
| 17 | YING             FOR ID |
| 18 | Exhibit 1................................ 10 |
| 19 | Updated Presentation to Boards of |
| 20 | Managers and Directors of EFIH and EFIH |
| 21 | Finance, Inc., Second Lien DIP Facility |
| 22 | 6/22/14 |
| 23 | EFH2D10073528 - 553 |
| 24 | |
| 25 | |

| | Page 377 |
|---|---|
| 1 | ------------ EXHIBITS CONTINUED ------------ |
| 2 | |
| 3 | Exhibit 6................................ 113 |
| 4 | E-mails Ending at E-mail dated 9/26/13 |
| 5 | From R. Cilento to D. Ying, with |
| 6 | Attachment |
| 7 | EFH2D00026660 - 666 |
| 8 | |
| 9 | Exhibit 7................................ 118 |
| 10 | E-mails Ending at E-mail dated 10/9/13 |
| 11 | From J. Matican to D. Ying |
| 12 | EFH2D10009215 - 218 |
| 13 | |
| 14 | Exhibit 8................................ 119 |
| 15 | Calender Invite for Project |
| 16 | Olympus/Valuation Meeting on 10/10/13 |
| 17 | EFH2D00019043 |
| 18 | |
| 19 | Exhibit 9................................ 128 |
| 20 | Calendar Invite for EFH Meeting with |
| 21 | EFIH Unsecured Holders on 1/9/14 |
| 22 | EFH2D10010866 |
| 23 | |
| 24 | |
| 25 | |

95 (Pages 374 to 377)

**PX 134**
**Page 96 of 165**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 378

1  ------------- EXHIBITS CONTINUED -------------
2
3  Exhibit 10.............................. 138
4  E-mail dated 1/30/14 from S. Greene to
5  D. Ying, et al., with Attachment
6  EFH2D10010758 - 760
7
8  Exhibit 11.............................. 140
9  E-mails Ending at E-mail dated 2/1/14
10  From D. Ying to S. Greene, with Attachment
11  EFH2D10010731 - 735
12
13  Exhibit 12.............................. 143
14  E-mails Ending at E-mail dated 10/26/13
15  From K. Ji to T. Horton, et al., with
16  Attachment
17  EFH2D00025696 - 720
18
19  Exhibit 13.............................. 145
20  "Materials Regarding EFIH DIP & Exit
21  Financing October 24, 2013"
22  EFH2D10005363 - 383
23
24
25

Page 379

1  ------------- EXHIBITS CONTINUED -------------
2
3  Exhibit 14.............................. 256
4  E-mail dated 3/15/14 from J. Rosenbaum
5  to M. MacDougall, et al, with Attachment
6  ADHOC_EFIH-DIP0001209 - 222
7
8  Exhibit 15.............................. 319
9  "Materials for Discussion with the
10  Company" dated 3/3/14
11  EFH2D10072750 - 765
12
13  Exhibit 16.............................. 332
14  E-mail dated 3/19/14 from N. Van Duzer
15  To M. MacDougall, et al., with
16  Attachment
17  TPG_00000099 - 107
18
19  ----- EXHIBITS MARKED IN PRIOR SESSIONS -----
20
21  Exhibit Keglevic 11..................... 149
22  E-mail dated 4/2/14 from B. Giorgis
23  to G. Ley, et al., with Attachments
24  EFH2D10000552 - 682
25

96 (Pages 378 to 379)

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 1

**A**

**ability**
206:20 208:6 209:1 223:21 234:12 235:15 278:5 299:20 308:18 341:9
**able**
18:18 21:3 60:17 73:22 115:7 127:8 139:20 188:25 197:24 205:16 207:13 224:16 225:1 254:14 255:3 294:22 305:17 346:23 362:5 364:17
**absence**
224:24
**absent**
187:7 189:8,23 300:16 356:25
**absolutely**
91:7 257:4 301:10 329:11
**absorb**
312:5,14
**abyowitz@kramerl...**
3:25
**acceleration**
239:4
**accept**
306:25 339:20,21
**acceptable**
161:12,23
**accepted**
301:3 357:9
**accepts**
357:7
**access**
109:5
**accompanying**
327:7
**accomplish**
178:16 223:19 240:24 241:5,10,20 244:7,8 251:12 267:14

**accomplished**
242:19,20
**account**
72:16 98:19 99:3 164:11 276:16 277:1 281:11
**accrual**
188:18 189:24
**accrue**
186:23 187:9 188:22 189:16,17
**accrued**
75:14,17 94:12,21 95:4 286:12,13 315:10 322:3
**accurate**
24:5 26:16,18 27:3,14 198:4 268:25 269:2 305:16 311:4 312:9 327:1 340:22
**accurately**
42:7 303:5
**achieve**
50:5 57:24 61:18
**achieved**
264:21
**achieving**
56:10,12 242:16
**acknowledge**
372:3
**ACKNOWLEDGM...**
372:2
**acquisition**
127:16 155:11
**acting**
333:24 336:21
**actions**
48:19
**active**
28:24 30:21 47:23 50:24 52:20 57:9 88:7,22 146:16 147:5 158:3 263:20 333:2 337:11
**actively**

25:3 28:24 91:5 104:17 199:2 343:9
**activities**
154:1
**activity**
103:22
**acts**
239:25
**actual**
86:13,20,21 89:8 147:6 301:22 302:7 302:10 347:4 364:5
**ad**
2:16 3:11 5:3 10:17 53:8,10 108:18 183:23 227:17 315:22 319:24 331:17,21 334:12 335:2 337:12,20 339:5 340:5 344:14 349:3
**Adam**
7:23 8:6
**add**
79:18 80:3,11,14 112:11 163:23 170:14
**added**
322:2
**addition**
101:8 154:2 167:12 169:1 172:12,20
**additional**
19:22 21:6 44:11 81:2 89:2 159:7 161:7 169:24 312:3 315:14
**address**
130:15 213:19 347:23 349:4
**addressed**
183:10 345:11,12
**addresses**
102:7 301:6
**adds**
163:12 169:23

**adequate**
73:6
**ADHOC_EFIH-DI...**
256:20 379:6
**adjudication**
263:8
**adjust**
286:11
**Administered**
1:4
**administrative**
64:17
**adopt**
167:10,19
**adopted**
47:9 167:15 170:9
**advantage**
208:17
**advantages**
212:15
**adverse**
53:1 256:7
**adversely**
36:25 183:5 352:5
**advice**
22:14 33:17,19 37:11 38:21 39:7,11,15,24 40:6 42:25 43:3,13 198:5,7 199:5,10 244:23,25 265:8 269:8,18
**advise**
135:25 179:21 366:13
**advised**
344:25 361:23
**advising**
67:21 136:12 198:23
**advisor**
22:8 90:8 110:4 122:8 137:7
**advisors**
21:5,9,17 22:15 31:10 86:2 115:16 132:25 134:22 222:2 343:20 343:21

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 2

| | | | |
|---|---|---|---|
| **affect**<br>173:25 183:6 272:4<br>**affidavit**<br>37:20<br>**aforesaid**<br>371:15<br>**afraid**<br>320:9<br>**afternoon**<br>166:10,16 183:21<br>227:14 312:3<br>**Agent**<br>7:3<br>**aggregates**<br>173:4<br>**aglenn@kasowitz.c...**<br>2:21<br>**ago**<br>31:21 102:18 107:11<br>108:20,24 131:20<br>200:7 331:4,13<br>**agree**<br>35:17 53:3 54:14<br>64:20 85:12 94:2<br>112:21 117:25 121:8<br>138:25 161:22<br>177:24 178:21 190:3<br>190:4 199:14,14<br>206:6,8 223:18<br>224:18 225:7,15<br>239:23 243:9,24,25<br>259:19 265:20 289:5<br>290:10 298:16<br>300:13 301:21,21<br>302:10 331:11<br>337:21 339:2 341:5<br>346:14 350:7 356:7<br>360:13 361:7 365:11<br>**agreed**<br>10:21 56:25 57:4 84:1<br>225:13 232:5 235:17<br>325:24 328:18<br>**agreeing**<br>177:5,7 260:2 265:24<br>**agreement** | 18:4 26:15 52:23 53:1<br>53:5 56:11 85:25<br>86:10 160:17 161:12<br>191:8 193:6 196:10<br>224:13,16 225:3,10<br>236:16 243:7 258:25<br>263:16 264:4,7 284:1<br>343:4 349:15<br>**agreements**<br>17:24 146:19 160:12<br>224:2<br>**Ah**<br>266:5<br>**ahead**<br>38:3 111:3 325:20<br>**ah-hah**<br>245:5<br>**aid**<br>201:14<br>**air**<br>266:3<br>**akin**<br>5:2 85:6,20 228:16<br>229:10 239:25<br>**al**<br>1:7 8:16 378:5,15<br>379:5,15,23<br>**ALICE**<br>3:24<br>**allege**<br>281:19<br>**alleged**<br>71:6,24 72:1,18 174:2<br>280:22 281:17<br>321:11 331:12<br>337:22 339:3<br>**allocate**<br>52:23<br>**allocated**<br>171:15 313:19 314:17<br>**allocating**<br>347:4<br>**allocation**<br>313:14 359:8 360:3<br>**allow** | 37:24 213:1 237:6,8<br>243:20<br>**allowed**<br>190:1 323:16 324:24<br>325:10<br>**all-in**<br>272:10 275:23 282:6<br>282:19<br>**alter**<br>19:16 47:17 56:23<br>**alterations**<br>20:24<br>**altered**<br>19:1 20:2,13,14<br>**altering**<br>276:14<br>**alternative**<br>18:10 36:9,14,18 37:6<br>38:23 46:9 47:13<br>48:5 63:4 66:2,14<br>130:23 167:10,14,19<br>170:9 193:11 237:21<br>238:6,9 255:21<br>258:22 268:8 269:6<br>272:11 294:6 309:7<br>313:2 326:3 327:3<br>343:1,5<br>**alternatively**<br>175:5<br>**alternatives**<br>40:14 66:12 284:8<br>299:6<br>**amazingly**<br>209:19<br>**ambiguous**<br>94:17<br>**amendment**<br>232:4 259:5 349:16<br>**America**<br>5:7 104:16 145:19<br>148:1<br>**Americas**<br>1:17 3:13,20 8:8,13<br>**amount**<br>45:23 50:4 52:4 80:6 | 88:5 89:23 93:5,7<br>94:10,24,24 96:13<br>97:9 104:4 129:23<br>131:12 138:19 139:1<br>141:14 163:2 168:14<br>172:9,14 191:10<br>192:14 193:25 194:1<br>194:5,6,8,24 195:4,9<br>196:20 230:13,21<br>239:20,21 278:1<br>280:16,22 281:20<br>287:14 288:6 307:10<br>314:12,12 315:2<br>321:11,20 323:15<br>324:5 325:9 326:25<br>328:10 334:17<br>335:17 336:3 342:20<br>342:22 347:22 351:7<br>365:7,21<br>**amounts**<br>355:15<br>**ample**<br>21:9 71:4 72:17<br>**analyses**<br>91:12 367:19<br>**analysis**<br>28:19 37:7,12 38:11<br>40:12 44:21,23 54:18<br>54:25 61:7,15 85:4<br>90:21 100:8,25 101:1<br>133:2,4,7,14 138:19<br>138:20 150:23<br>174:10,15 175:23<br>178:22 179:8 180:1<br>180:13 184:6 197:3<br>197:12 202:17,24<br>203:4 209:12 210:24<br>215:13 218:5,10,13<br>265:11 282:19<br>289:20 290:2 291:5<br>301:14 311:14<br>313:12 324:15 354:6<br>366:23,24,25 367:4<br>**analyze**<br>100:21 347:15 |

Merrill Corporation - New York

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 3

analyzed
180:4
Andrew
2:10,20 8:22 9:22
  166:5
andrew.devore@ro...
2:11
Angelo
222:16
animal
154:23 155:3
announcement
107:19
annual
163:13 271:14 277:22
answer
16:23 18:18 20:21
  28:18,21 29:13,13
  34:17 37:16,25 38:17
  39:17,20 42:6 48:24
  49:1,3 58:19 67:9
  82:9 92:3 98:12
  100:3,17 103:8 105:3
  126:15 146:23
  149:18 157:14
  191:15 201:15,18
  202:25 206:24
  217:23 221:14 265:2
  265:12,15 275:8
  291:6 311:12 312:11
  312:11 326:17
  343:18 369:25
answered
92:25 185:1 196:24
  208:9 370:21
answering
21:23 100:2 221:19
anticipate
14:20
Anybody
222:24
anyway
307:19
apart
164:21 291:4

Apollo
222:8 223:13
apologize
238:17 259:7 270:16
  287:1 335:12 362:7
appear
56:15 58:13 90:6
  372:7
appears
119:22 129:1 299:9
applicable
253:5,22 274:18,19
  290:8
applied
166:15
apply
166:15 251:25
apportion
236:19
apportionment
309:11
appreciated
139:17 302:24
appreciation
291:3
apprised
333:7
approach
30:18 134:6 267:8
  294:13
approached
30:16,16 115:12
  294:14 297:12
appropriate
25:7 44:20 64:5 177:9
  180:8 187:11 214:3
approval
78:9 143:7 163:8,9
  236:25 237:1 238:14
  280:14
approve
15:17,23 16:15 141:25
  152:7 181:16 187:13
approved
16:7 46:19 67:8 80:24

82:16 148:2,7 152:2
  157:4 159:18 162:7
  164:2 169:20 179:24
  180:3 186:20 237:3
  237:18 239:7,8,14
  243:16 353:16
approving
177:20
approximate
364:18,20 368:4
approximately
8:10 63:10 96:9 97:5
  97:12 107:25 108:2
  162:7 170:11 172:3
  173:15,19,23 270:9
  270:10 280:21 281:6
  334:10,19
approximation
54:20 61:9 96:24
April
150:11 224:15
area
202:21
arguably
207:24
argue
80:11
argued
64:24 137:10
argument
51:14 73:10
argumentative
20:18 55:20 191:25
  198:2
arguments
65:6
arithmetic
335:1
arithmetically
287:11
arm's-length
300:15
arrange
143:3
arranged

263:22
arranger
78:16,19 163:10
arrangers
78:15
arranging
142:10
arrive
92:6
arrived
244:16
art
91:8
article
200:6,14,15
articles
330:7
ascribed
274:14
aside
132:17 169:10 198:9
  289:12 323:24
asked
10:7 31:3 40:8 55:1
  57:9 58:17 59:22
  82:7 90:5 92:24
  95:25 119:9 136:9
  174:14 176:11
  180:12 184:1,25
  185:14 186:6 196:23
  203:12 208:8 217:7
  226:21 253:16
  268:22 275:7 296:3
  311:13 326:14 329:6
  329:23 369:3 370:21
asking
14:8 19:6 20:9 28:10
  58:6 81:22 82:11
  100:20 102:11 103:6
  105:2 110:8 111:12
  112:12 142:13
  146:20,22 147:15
  156:13 161:6 169:17
  180:16 227:19
  254:19 261:24

PX 134
Page 100 of 165

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 4

268:18 277:14 286:3
  291:8,9 293:8,17
  328:3 329:10,24
  362:21 364:14,20
  367:9 369:15
**asks**
  32:25 39:5 328:8
**aspect**
  223:8 242:2 244:11
  321:18
**aspects**
  11:22 202:5 240:7
**assert**
  311:8 312:24 315:13
**assess**
  135:21,23
**assessment**
  55:8,14,23
**assessments**
  125:22
**asset**
  205:25 206:7 209:17
  210:8 223:16
**assets**
  179:15,17 191:17
  196:12 369:23
**assigned**
  258:25
**assist**
  139:5
**Associate**
  7:21
**associated**
  131:17 160:23 193:3
  271:18 273:5 275:18
  276:3 277:11 281:17
  282:7,20 284:2
  289:13 327:4 334:17
  355:15
**association**
  341:12
**assume**
  41:25 75:12 114:24
  276:12 288:23 340:1
**assumed**

75:8 101:2 138:20
  198:18 258:24 259:2
  259:4 274:15 348:12
  348:22
**assumes**
  34:15 114:23 115:1
  250:13 357:6
**assuming**
  80:23 111:14 179:11
  243:16 259:18 260:9
  348:20 352:10
  353:13 356:6 365:11
**assumption**
  202:13 204:4 205:5
  271:20 298:17 300:2
  348:10 356:1
**assumptions**
  272:17 348:3 354:13
**assure**
  158:18 212:13 225:11
  235:8 242:1,3
**attached**
  110:6 113:19 140:8
  258:4 300:22 332:15
  333:11 372:8
**attaches**
  247:16
**attachment**
  111:15 114:2 256:19
  376:10,22 377:6
  378:5,10,16 379:5,16
**Attachments**
  379:23
**attempt**
  121:21 122:13 345:24
**attend**
  9:25 142:11
**attended**
  39:9 90:5
**attendees**
  129:4
**attending**
  129:18
**attention**
  53:23 140:18 148:10

151:4 228:1 247:17
  260:22 320:9,15
  321:2 322:6 324:6
  335:4 336:10 342:6
**attorneys**
  2:4,16 3:3,11,19 4:4
  4:14 5:3,13,21 6:20
  7:3,11 8:20
**attorney-client**
  38:8 39:18
**attributed**
  221:18
**attributes**
  310:9
**auction**
  303:2,25
**author**
  152:9
**automatically**
  337:3
**avail**
  130:17 132:4
**available**
  36:11 41:20 42:16
  65:11 66:3 233:25
  234:3 268:10 274:24
  292:9,14,22 299:7
  318:20 361:9
**Avenue**
  1:16 3:13,20 5:15 6:5
  7:5,13 8:8,12 257:23
**average**
  188:23 285:13 364:25
**avoid**
  64:21 217:4
**avoiding**
  178:16 248:6
**avoids**
  178:9,11 217:12
**aware**
  12:12 14:25 15:4,10
  22:10,12 31:22 32:6
  32:15 33:23 34:3,6
  34:11,19,21 38:20
  39:4,5 44:17,25

60:16 61:14,16 62:12
  68:5 83:24 87:5,9,18
  88:21,24 89:6,8,12
  109:7 116:16,22
  125:24 142:5 159:15
  159:19,21 168:22
  181:19 186:16
  202:17,23 203:1
  218:8 228:21,23
  331:22 337:10,16,18
  338:20 339:19
  343:19 344:22
**a.m**
  1:10 8:10 95:15,17,21

_____

### B

**b**
  3:7 4:19 78:8 81:2,7
  171:5,11 228:2 258:6
  258:18,20 259:2,6,14
  331:9,10 379:22
**babes**
  231:22
**back**
  29:3 31:20 42:9,10
  47:24 50:14 63:5
  65:8 95:8,20 99:21
  101:13 108:25
  109:19 112:18
  132:11 134:24
  138:16 141:24
  149:17 159:12 166:3
  170:2 210:3 214:21
  221:14 227:10
  234:17 261:14
  269:24 283:1 285:17
  294:17 295:6,9,13
  299:17 310:19 318:9
  320:24 321:3 322:7
  323:1 327:15 336:25
  342:2 349:25 359:19
  363:10,16
**background**
  110:2 142:25
**backstop**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 5

221:1,2 228:16
234:19 235:16,16,20
249:12
**backstopped**
229:10,14 234:18,20
235:1,14 249:17
260:16 264:22
266:13,16 267:2,13
**Baiera**
222:16
**baked**
212:22,25 306:10
**balance**
176:8 179:22 189:20
278:2
**ball**
260:3
**bank**
5:7 7:3,11 104:16
143:3,18 145:19
147:25 148:4 150:25
152:8 211:6 246:23
**banker**
90:20 92:2 99:21
127:25 287:9 293:21
365:24
**bankers**
99:23 102:24 312:3
**banking**
105:6 147:13
**bankrupt**
90:23 103:2
**bankruptcy**
1:1 8:17 17:19 62:15
67:24 69:5 73:14
74:13 75:11 83:5
93:5 97:10,21 100:13
100:19,22 101:15
131:5,25 132:1,2,4
147:20 158:5,14
163:1 164:15,23
223:20,23 228:14
230:8 235:7 236:12
277:7 360:15 361:25
**banks**

139:20 141:20 142:9
142:12,16 146:21
148:5
**Bao**
222:20
**barely**
207:20 215:18
**bargain**
206:7 214:20,22
243:25
**Bas**
1:18 9:8,14 373:6,22
**base**
103:2 259:18
**based**
17:23 19:19 31:24
36:7 37:7 43:19
44:20,22 48:12,19
96:7 97:4 108:23
154:8 178:22 179:8
207:5 208:3 212:7
213:18 224:22 255:7
268:6 270:21 286:20
293:8 297:12 306:19
306:22 309:6 311:18
314:6 323:15 337:24
348:3 354:9,15 360:2
365:19 370:9
**basic**
121:4 196:7
**basically**
81:9 86:4 296:15
317:3 361:7
**basing**
99:5
**basis**
1:4 31:19 36:15 37:14
37:22 38:5,8,15
46:14 47:2,5 52:18
58:24 60:11 147:15
162:6 188:7,14
210:20 269:15 287:3
287:7,25 288:1
308:12 330:18,24
366:17

**Bates**
111:19 114:10,10
143:23 185:24 186:1
247:18 258:11
260:21 309:17
320:10 335:6,22
376:5,17
**Bates-stamped**
256:20 319:11 332:13
**battle**
224:13
**battling**
224:11
**beginning**
27:8 95:20 166:3
227:10 318:9 363:10
**begins**
54:7 258:11
**behalf**
9:5 53:19 121:10
166:12 183:22
218:24,25 221:23
222:7,25 227:16
257:20 333:3,24
343:15
**belief**
164:22 224:22 225:4
225:18 304:3 311:16
311:17
**believe**
12:25 13:8 16:6 18:2
23:3,6 30:20 31:6
33:3 36:10,20 44:19
45:13 47:23 49:5,8
50:24 51:17 52:11,14
55:5 57:14 58:11,25
59:12,15,16,23 62:13
66:1 67:18 69:5 71:4
71:11,17,23 72:15
73:19 74:23 78:4
86:7,8,24 88:6 97:4
105:15,17 106:2,19
107:16 111:13,16
114:7 115:15,18
117:4 123:4 127:6

130:10,13 133:10
148:3 150:17 152:5
152:13 154:9,13
155:7 161:3,6 162:4
162:23 163:12
166:23,24 169:7
172:17 173:7,10,10
173:11 176:14
178:14,24 179:9
180:22 181:4 182:24
184:6 186:10 191:19
192:22 195:22
218:19,22,25 219:15
221:7,8 231:12
258:22 263:17
264:19 267:8 268:9
280:20 281:3 283:21
294:25 299:6 304:25
305:2,12 308:3,9,12
314:2 317:22 321:5
327:6 329:12 331:7
337:20 339:1 347:17
349:12 369:8 370:11
370:18
**believed**
56:11 57:1,1 327:16
**below-market**
192:19
**benchmark**
68:12
**benefit**
115:8 179:13,14
205:24 213:3 214:20
214:22 223:16 300:8
314:18 355:13
359:18
**benefits**
182:5,22 215:14
**BENSON**
2:15
**best**
14:3,6,8,11 19:20
36:11 53:21 57:21
58:5,7,14,22 59:6,10
59:13,22 60:25 61:2

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 6

103:4 105:10 118:3
128:7,10 154:17
179:9 182:13 217:10
268:10 292:9 298:5
301:23 302:6,11
**better**
20:3 51:20 56:13
62:14 96:17 189:1
219:18 236:18 240:4
295:7,9 298:25,25
314:19 355:5 357:13
**beyond**
84:2 102:14 187:2
195:19,22 198:10
357:20 368:16,18
**bid**
99:17 122:15 231:13
328:8
**bidders**
313:6
**bidding**
57:13 60:20 303:17
310:12
**bid/ask**
48:4 51:4 86:16 338:8
**bid/asks**
331:14
**big**
88:7 91:3 104:15
105:4 106:13 132:7
141:13 154:16
219:19,20,23 328:4
**biggest**
349:10,22
**billion**
12:18,19,24 63:10
64:8 68:23,24 69:10
72:16,17,22 73:12
79:6 96:15 105:24
111:22 112:11
114:12 138:20,21
139:10,21 157:22
162:18 168:13,16
171:3,10,20,24 172:7
172:7,8 195:16 204:3

204:5 205:4 215:18
216:17,18 231:25
240:13 262:12
277:16,19 307:21,25
310:9 313:17 314:7
314:10,23,24 321:12
321:14 345:17,18
355:4,18 357:23
363:21,22
**billion-5**
96:18
**billion-570**
45:22 88:5 96:13
**billion-650**
96:15
**billion-679**
112:8
**billion-7**
251:20,22 252:1
**billion-9**
72:13 167:25 168:12
170:24 171:3 275:4
314:8 316:4,25
**billion-995**
82:20
**BINGHAM**
5:12
**bit**
177:19 183:14 214:22
249:3 253:22 269:11
285:16 325:21
350:13
**BlackRock**
146:18
**Blackstone**
136:3
**Black-Scholes**
98:1
**blend**
114:12 115:1 147:7
**blood**
373:16
**Bo**
84:17,19 85:2
**board**

10:1,10,11,14,15,19
11:5,10,11,25 12:1,2
12:5,6 14:16,19,20
14:23 15:2,5,7,12,15
15:21 16:5,7,12
18:6,8,15 19:6,11,12
19:21 38:21 39:5,8
39:11,24 40:5,8
42:20,20 43:7,13,17
43:22 44:3,4,11 58:8
60:2 100:25 124:15
176:17,20 185:12,16
185:19 196:8 198:6,8
198:11,12,13,17,22
199:4 203:4 210:12
210:14,24 211:8,23
212:4 215:13 226:3
233:22 259:24
304:16,23,24 305:5
312:5 313:6 327:9
342:3 345:12,25
346:1,2,8 347:21
351:21,25 352:9
354:7,8 357:3 368:6
368:9
**boardroom**
44:17
**boards**
366:13 375:19
**board's**
58:6
**bona**
303:13,22 347:18
**bond**
91:21 93:3 94:14,19
94:20,21 96:1 100:17
143:3 315:2,5
**bondholders**
28:9 147:22
**bonds**
53:13 71:9 89:2,4,23
90:9 91:14 93:5
94:12,25 95:3 99:16
101:11,11 104:10,11
104:17 105:5 106:2,9

130:16 131:7,19
132:12 147:19,19
156:3 253:19 276:13
276:21 285:10,10
364:23
**bookends**
364:1
**BORIS**
7:25
**borrow**
288:6,22,25 289:2,10
**borrower**
288:13
**borrower's**
288:3
**Boston**
2:9
**bottom**
54:8 111:10,19,21
113:24 144:13
153:16
**bought**
45:15 89:1 155:7
298:1 317:6 357:12
**box**
63:24 64:6,11,13
92:23 144:15 203:13
203:16 249:14
261:15 324:10,13
335:25 336:10 337:1
342:11 345:22
**boxed-in**
14:1
**boxes**
203:14 250:6
**Boylston**
2:8
**bracket**
104:3
**brain**
44:1
**break**
47:7,16,22 83:15
95:11 165:1,6 207:3
223:2 239:25 316:15

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 7

318:1
breakdown
111:22
breaking
83:22
breakup
167:23 168:2,6
brief
183:14
briefly
162:2 367:4
bright
84:20
bright-line
103:25
bring
115:6
BRITTON
7:7
broad
17:9 86:9 88:12
101:19
broader
182:8
Broadway
2:18
brokers
303:1
Brown
4:3 7:21
Bruce
222:14
Bryant
5:6
budget
320:18 324:1 349:16
bullet
248:4,10 260:9 320:16
335:16
bunch
114:23 197:23 244:3
272:20 329:23
burden
70:13 115:6 361:16
burn

73:25 74:14 75:2
business
17:13 98:20 134:25
154:12,20 155:7,9,12
359:17
businesses
154:4,16
busy
220:5
buy
88:18 90:15 94:19,20
112:22 126:2 298:2
buyer
300:14 301:15
buyer/seller
301:19
buying
191:7 300:20 305:24
buyout
219:11
BYOWITZ
3:24
byproduct
242:16 245:6
B-A-I-E-R-A
222:18
B-A-O
222:21
B-O
84:18

_____
C

c
1:12 2:1 3:1,1 4:1,1
5:1,1 6:1,1 7:1,1
78:14 258:18,20
290:16 373:1,1
calculate
286:7 306:25 353:12
365:4,18
calculated
55:4 285:21,24 365:6
calculating
309:4 354:9
calculation

75:8 76:12 286:21
307:20 356:3
calendar
119:23 129:1 377:20
Calender
377:15
call
51:10,13 60:14 112:13
115:5 252:8,11 253:4
253:13 254:1,15
255:5,5 284:15 305:3
343:9 344:9,16
347:14 351:25
callable
252:18 253:2
called
9:13 15:7 105:12
127:11 144:10,14
264:4 309:20
calling
194:16
callout
324:10,13
calls
19:5 20:17 33:13 40:2
62:11 63:1 66:8
71:16 73:8 76:1
142:12 143:9 194:3
261:24 268:17
279:19 285:25 293:6
339:13
Calpine
184:15
capable
308:4
capacity
4:5 132:21 133:11
capital
25:4 50:4 52:21,25
53:7 57:11 61:19
76:9 86:3 106:6,10
106:15 121:5,6
135:24 216:3 229:25
230:23 255:19
257:16 277:20

297:13 298:2 305:24
341:4
capture
297:17
care
208:16 271:15
cared
346:23
careful
153:5
carries
318:23
carry
70:11
case
1:3 3:10 8:18 68:5
69:21,24 70:21 73:11
74:1,13,15 75:3,5,11
75:22 76:4,7 83:3
98:3 101:9 128:6
182:9 183:22 206:9,9
216:14 228:15 229:7
238:8 249:5 262:16
272:15,18 274:16
296:21 297:22 303:8
311:10 317:1 320:6
327:12 338:1 352:11
361:2,14,15,18,23
369:12,20
cases
89:25 201:23 270:12
cash
69:6 73:25 74:14 75:2
75:4,8,20,23 78:24
80:20 82:25 112:22
115:6,8 128:2 163:6
163:23,24 164:12
170:24 174:18
175:23 176:2,5,6,7
176:12,12 179:21
180:8 187:20 188:7
188:14,16,25 189:1
189:19 230:15 232:3
238:3 255:15 270:10
270:21 271:14 272:8

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 8

273:15,21 277:22
278:3,7,15 281:25
284:22 286:16 306:8
307:3,10 312:1,18
316:8 317:13 337:14
339:6 347:1,19 348:9
348:14 349:14
352:13,15,21,23
353:13,17,21 358:18
366:24
**cashout**
129:24
**cash-flow**
175:7 348:7
**cause**
299:8
**caused**
33:3
**caution**
88:11
**cc**
143:19
**ceased**
115:19
**cent**
356:7
**Centerbridge**
222:20
**Centerpoint**
151:17,19 154:8
**Centerpoint's**
127:14
**Centerview**
7:22 85:7 109:24
110:3 111:5,11 123:8
246:20
**cents**
94:5 107:13,14,17
316:9 357:14,24
**certain**
86:6 99:13 169:3
191:10 193:19
213:22 223:22
230:12 252:15,16
260:17 272:17 280:7

306:7,8 336:21
338:17 362:3
**certainly**
46:24 59:21 62:13
64:24 210:13 217:18
240:3 255:25 266:7
298:5 299:8 343:12
343:21 344:23
346:19 356:24 361:2
**Certified**
1:19 373:7
**certify**
373:9,15
**cetera**
265:14
**CHADBOURNE**
4:13
**chain**
109:24 110:21 111:10
119:13 247:13,14
**challenged**
338:19
**challenges**
130:25 131:2
**chance**
291:22 314:1
**change**
49:1,4 78:1,5 173:12
177:17 208:1 214:17
214:18 263:20 275:3
374:4
**changed**
23:23,25 24:2 45:11
116:6 124:23 125:17
134:8 155:8,20,24
156:20 159:7 162:13
172:9,14,18 173:9
177:11,18,20 345:25
346:8
**changes**
12:15 19:23 20:20
21:2,14,24 58:10
116:16,18,22,23
125:24 126:5 160:12
172:10 347:22 374:3

**changing**
127:5 160:5 201:5
**Chapter**
1:3 8:18 62:6 229:7
260:11 270:12
**characteristics**
74:7
**characterization**
80:18 91:17 341:6
**characterizes**
80:5
**charge**
142:18
**chart**
110:7,8 111:4,6
155:16 309:21
**cheaper**
285:9
**check**
63:24 64:6,12 74:8
125:4 230:11
**checked**
125:1,5
**checking**
97:4
**Chicago**
6:14
**choice**
37:23
**choose**
14:24 21:2 189:18
343:6 359:10 363:24
**choosing**
230:14
**chose**
43:18 232:1,1 298:11
331:6 338:24 339:19
**Chris**
183:22
**CHRISTOPHER**
3:15
**Chuck**
142:24
**Cilento**
109:24 376:9,21 377:5

**circle**
95:7
**circulated**
12:1
**circumstance**
82:13,19,24 194:12,20
194:22 214:19
**circumstances**
23:22 36:11 46:11
81:21 82:8 91:2
102:20 177:18
180:11 193:19,23
216:25 238:5 268:11
292:10
**Citibank**
104:15 106:21
**claim**
61:13 64:8,17,18
71:25 72:1 82:21
88:18,19 93:5 94:24
96:14 97:10 100:19
100:23 173:4 174:3,5
194:1,7,9,24 195:10
216:17,18 217:1
230:19 255:23 280:7
281:10,16,17,24
312:20,25 313:21
315:10 335:19 336:4
340:11 355:21
357:16 358:13 370:3
**claimant**
93:9
**claims**
64:19 72:18 75:19
88:16 93:16 94:5,9
98:20 99:3 161:11
178:3,4 179:16
195:20,23 196:13,20
196:21 202:15
229:18 230:2 248:7
280:17,20 309:6
315:14 321:12
331:12 337:13,22
339:4 342:21,23
347:3

clarified
12:17 328:18
clarify
21:11 86:5 250:19,25
253:1,9 312:7 328:15
clarifying
41:23
clarity
22:3
classes
235:10
classic
301:3
classical
301:11
clause
129:22
claw
130:3 132:10 134:9
140:22 141:3,11
155:25 156:1,5,20
157:1 250:17,24
251:2,4,10,11,16,21
251:22,25 252:2,3
254:10 255:16 261:4
279:3,16
clawback
130:18 131:5,16,18,21
131:23 132:5,7,9,19
134:2 283:18
clean
154:20
clear
16:24 27:22 29:15
37:19 38:2 67:11
76:20 116:15 126:19
135:5 147:1 155:14
161:8 180:17 210:5
216:13 282:17
293:11,21 294:12
296:4 309:15 312:16
325:4,9 334:8 351:20
355:25
clearly
210:16 217:20 245:21

310:15 354:24
365:22
client
86:6 136:13
clients
293:15 294:22 295:12
close
318:14 366:11,18
closer
96:19 349:5 358:6
closing
79:11,15 81:12 82:19
82:25 166:23 170:20
272:3
clue
295:3
code
40:20 69:5 73:14
coined
147:8
collar
215:15
collateral
144:14 193:24 194:6,9
194:22,23 195:3,5,9
195:22 196:19
197:25
colleagues
150:18 319:19
collective
45:10
color
324:11
column
13:6 114:15 313:4
314:24 352:22
columns
309:2
combination
101:5 111:5 142:3
combined
312:8 314:2
come
50:9,14 63:5 66:11,17
121:17,22 122:14

170:2 178:20 205:3
207:15 208:5 213:6
214:21 217:2,9,12
254:24 291:7 295:6,9
297:1 311:19 317:12
352:18 360:6 365:12
365:25 367:5
comes
212:21 338:14
comfort
242:18
coming
106:13 189:24 195:16
209:8 223:13 343:23
348:11
comment
62:20 192:12 301:19
310:15 326:3 358:9
Commission
154:25 374:23
commit
50:3 267:3 280:13
commitment
13:4 27:25 45:6,11,15
54:9 55:10,17 56:1
69:22 84:6 86:17
87:25 89:5 158:5,9,9
158:13,24 207:16,19
207:20,22 212:17
235:2,3 260:15,16
262:11 296:8 336:13
336:14,22 337:2
commitments
17:25 46:21 158:10,12
207:16
committed
213:25 278:14 280:12
303:10
committee
3:3 5:3 10:18 88:6
89:1 108:18 120:18
166:13 178:2 202:3
common
121:14 212:11 360:14
360:17

communicated
325:14
communication
343:19
communications
221:17 344:19
comp
154:22 155:10 184:3
184:20
compact
224:21
companies
37:2 50:5 67:22 91:4,4
91:7 103:3 113:1
125:6,15 126:9,25
128:1 143:2,6 145:2
146:13 151:13,21
153:12,25 183:7
184:12 210:20
217:20 219:1,10
305:2
company
2:4 3:19 5:14 8:23
14:22 15:6 20:4,15
24:18,22 25:2,8,13
29:16 30:11,22 32:6
32:7 48:2 49:17,20
49:25 50:8 51:3
53:19 57:23 58:11
60:10,19 69:3,12
70:24 73:4 82:21
85:25 92:3,6 103:4
112:2,14 113:5 115:2
115:10 121:9,14
124:12,15,17,21
125:1,25 127:11
128:17 130:20
132:15 134:19,21,23
135:25 137:2 142:4
147:8,11 149:14
155:15 157:18 163:1
168:10,17 171:6,13
175:13 176:1,5 178:7
182:11 188:24
191:21 199:1 213:4

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 10

215:5,9 216:4 229:19
230:14,19 231:2,10
237:10 239:17
244:23 254:13 259:6
265:9 274:7,23,24
277:3,21 278:9,13,14
278:16 280:4,5,13,13
280:16 281:7,23,24
283:16,25 284:22
300:20,21,22 301:7,9
302:13 308:10 317:9
319:13,21 320:18
343:20,24 344:25,25
354:13 359:4,25
366:23 367:4,19
379:10
**company's**
33:23 34:6,9 59:5 92:4
104:10 106:20
112:24 115:20 116:5
116:19 132:20 141:9
175:6 278:2 343:21
348:23 349:4,6
**company-prepared**
114:7
**comparable**
67:5,15,25 91:7 103:3
124:17,21 125:1,6,15
125:25 126:4,9,25
127:14 128:1,3 145:2
149:14 151:13,14,19
151:22 153:12
154:17 155:1,5,15
168:22 292:15,23
366:20,23,25 367:4
367:18
**comparables**
125:16,18 126:12,21
127:3 151:10 154:7
184:2,13
**compare**
277:10 365:20
**compared**
282:21 345:17 351:9
**compares**

352:5
**comparison**
272:8,10 273:23
283:24 284:4 305:8
**comparisons**
284:10
**compel**
235:16
**compelled**
316:21
**compete**
298:18
**competing**
240:3 293:13,22
303:18 305:9 329:17
330:3 344:3
**competition**
293:13,22 294:5,11
298:24 299:5
**competitive**
57:13 66:22
**complete**
23:4,7 128:13 154:12
372:6
**completely**
109:8 154:11 178:5
324:3
**completion**
223:19
**complex**
345:9
**comply**
133:23
**component**
25:21 26:13 54:12
172:21 225:20 228:7
228:11 240:22
263:11,14
**components**
185:4 192:16
**comported**
201:8
**compromise**
327:22,23
**comps**

367:19
**Computershare**
3:19
**concede**
289:19,23 334:6
**concept**
49:16 62:8,17 65:9
234:18,25 248:14
249:2 251:2
**conception**
251:8
**concern**
141:9 158:4 203:22
205:11,15 207:11
208:3,20 209:1,5
**concerning**
10:1 15:1,2,11 27:18
31:15 36:16 37:4
38:10,13 41:10,17
42:14 44:5 171:19
181:22 369:4
**concerns**
141:13 208:22 349:4
**conclude**
311:20
**concluded**
339:7
**concluding**
53:17
**conclusion**
33:13 46:15 48:19
62:11 63:1 71:16
73:8 180:17 194:16
290:7 359:5
**concretely**
325:25
**concurrence**
177:25
**condition**
26:25 56:7 69:11
236:8 237:25 263:24
325:10
**conditioned**
326:15
**conferring**

166:7
**confidential**
31:18 150:8,14 152:2
**confidentiality**
146:19
**confirm**
275:3 285:18 331:5
334:23
**confirmable**
118:5
**confirmation**
69:24 77:4 171:2
190:1 191:11 192:15
204:8 205:2,16
207:12,23,23 208:5
213:6 235:13 317:1
**confirmed**
100:13 233:20 236:12
**confirms**
195:18
**confused**
250:21,22 278:23
322:15 336:6,7
**conjecture**
65:19 304:14
**conjunction**
59:18 97:21 98:4
157:5,19
**connection**
22:24 102:17 133:12
163:3 169:9 184:18
190:17 280:5 281:25
341:17
**consensual**
52:23 56:10,12 57:24
65:15 177:22 223:24
224:12,18,20 232:5
259:4,20 266:2
324:19
**consent**
62:23 161:2 206:14,15
243:20
**consented**
306:15
**consequences**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 11

53:2 271:15
consider
14:17,21 15:3,12
16:14 19:7 20:2,23
29:23 30:6 34:23
40:17,22 41:3,5,14
44:14 75:3 102:20
103:22 125:14
151:22 161:20 177:3
184:13 190:20
191:20 223:15
273:22 275:22 282:6
338:6,7 354:3,4
consideration
44:12 191:4 269:5
334:4 340:23
considerations
25:13 36:9,13,20
268:8 269:6,15
considered
18:9,15 35:3,6,25
53:16 66:14 98:19
174:17 176:25
179:20 182:12,21
190:10,15 232:24
considering
29:7
consistent
135:3 144:22 149:13
196:11 199:11
226:12 248:14
262:14 266:8 343:18
consolidated
122:24 154:18 182:11
consolidation
306:3
constant
159:12 199:4 211:14
constantly
117:25 118:1 185:2
201:19 224:8
constituencies
35:12,13 52:24 59:3,8
59:9 86:3 112:22
121:8 136:12 178:23

199:13 206:4 216:2
224:11 240:5 296:15
308:20 309:5 313:13
344:2
constituency
59:13 178:6 229:22
230:10 260:23
297:10 329:12,16
constituent
86:11 93:14 217:20
constituents
117:9,16 118:7 119:9
120:4 122:23,24
137:1 250:5 329:11
335:11
construct
205:14
constructive
139:17
construe
261:15 286:1
construing
92:1
consummated
302:10
consummation
156:22
contact
297:6
contacted
343:15
contacts
147:13
contained
80:12 282:25 326:20
327:13
contemplate
246:10,11 261:18
279:2
contemplated
25:22 26:14,25 41:19
42:15 100:12 159:17
167:4,7,20 170:10,19
178:9,14 182:23
193:8 241:22 246:13

258:22 263:15 283:6
contemplates
114:19 279:11 305:20
contemplating
260:25 264:22
contemplation
212:21 248:23
content
39:14 296:21
context
46:22,24 57:2 68:7
69:8 135:6 168:3,15
168:23 182:15,23
186:12 192:25
198:11,23 200:13,18
215:3 232:20 233:11
252:13 291:15 301:8
301:11,18,25 302:17
368:12
contingency
187:5,8,16 189:8,23
206:11,19
contingent
216:7 218:2 220:7
328:16,19
continually
121:24 222:4
continue
10:15 125:20 127:3
147:4 186:23 187:8
248:5 299:13,20
308:13,19 326:22
327:11
continued
134:1 342:9 376:1
377:1 378:1 379:1
continuing
189:3
continuity
31:23 32:10,21 33:8
33:15,25 34:8 40:23
44:6 244:18
continuity-of-interest
245:1,9,12,16,22,25
continuity-of-owner...

296:11
contractual
189:12 276:24 286:9
contractually
62:14 237:5
contribution
349:14
controversy
326:22
conversation
136:8 137:7
conversations
15:11 31:18 86:2
134:18,20 136:2
221:25 223:3 258:3
conversely
122:3 314:4 355:7
359:14,15
conversion
12:25 32:1,9 65:15
68:3,12,16 69:9 81:5
118:9,10 190:23
224:24 225:20
235:25 236:1,3,6,8
236:13 237:10,15,19
237:24 239:18
242:24,25 243:1
317:23 320:4,5
322:22 335:23
336:11 337:4,15
convert
12:23 62:3 70:4 81:7
81:18 82:5,14,17
112:15,20 113:7
171:5 191:9 230:1
237:7,8 239:16
265:25 275:4 307:5
317:2
converted
72:14 111:23 112:4
114:20 204:1 205:3
243:21 306:21
323:16
convertible
34:1,10 49:10,16,21

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 12

50:10,12 68:8,18,18
68:20 69:1,14 156:9
157:9 171:9 243:9,15
243:18 245:6,7,14
264:1,5,13 297:2
317:8 354:11 360:6,8
362:3
**converting**
229:18 305:23 314:8
**converts**
81:15 82:1 164:9
166:25 171:2,10
192:14 193:2 273:15
273:25 274:6 275:6
307:9 365:8
**convince**
56:6
**copied**
119:4
**copy**
150:2 320:9 324:11
**corner**
111:20 144:13 148:18
148:20
**Corp**
7:23 54:11
**Corporation**
1:6 8:16
**correct**
9:19 13:15 14:12,15
17:11 24:17 25:17
27:9 29:18,20 33:5,6
34:24 42:22,23 47:14
47:15 48:14 50:20,21
62:4,5,9,21 63:11
65:17 69:17 73:1,6
74:23 77:6,24 78:9
78:16,25 79:6,12,19
80:2,8 83:5,6 87:20
88:1,23 89:25 91:2
92:14 93:24 97:6,7
97:13,18,24 98:5
99:7 108:5,22 110:4
110:5 112:24 113:8,9
113:24 114:17 116:4

118:6 122:25 123:1
124:7,9,10,13 133:25
137:13 141:3,4
144:12 148:7 151:14
151:15 152:4 153:15
153:20 157:5 159:18
159:23 161:20 162:8
162:23 167:2,5,6,11
167:15,16 169:4
170:1,6 171:25 172:1
172:6,24 173:16,23
174:6,9 175:1 178:10
181:4 202:12,16
209:10 212:18 215:7
215:11 228:12,18
229:2,8 231:2,3,6,7
232:24 234:1,14
236:15 237:2 239:19
239:22 242:6,14,15
245:20 248:15,16
249:1,18 250:3 252:9
253:25 255:1 260:13
261:6,18 270:24
272:14 273:2 274:7
274:25 276:19
279:13,23 280:9,11
282:2,3 287:15 288:2
288:8 292:19,20,24
296:12,14 300:4,5,9
303:15 305:6,10
307:22,25 308:1
309:8,23 310:3,11
317:20 319:1,21
320:2,6,7,11,23
321:16 323:8,12
325:13 336:25
337:23 338:4 341:13
341:14,18 348:17,18
349:9,17 350:6,19
351:3 358:7,22
365:21 366:6 372:5
**corrected**
23:14,15
**corrections**
23:9 372:7

**correctly**
25:12 74:23
**correlated**
210:8
**correlation**
209:20
**correspond**
347:1
**cost**
70:16,18 130:16 215:8
272:10 276:3,5 282:6
282:14,19 288:4
348:21,25
**costs**
169:4,18 170:3 172:13
182:22 215:14 240:6
249:5 271:18 273:4
275:22,23 277:11
284:21 352:13
**counsel**
6:4,12 9:2 14:23 15:6
37:19 43:20 61:21
63:12 65:4 67:1 83:9
89:16 145:23 201:13
257:8
**counselor**
62:21
**count**
256:5
**counter**
104:20
**counterbalance**
192:7,18
**counterproposal**
294:18 359:21
**counting**
296:14
**COUNTY**
373:4 374:2
**couple**
200:7,17 231:21 284:8
361:22 362:22
**coupon**
131:14 252:3 286:11
**coupons**

115:5
**course**
158:2 184:12 200:12
256:8 299:4 326:23
366:12
**court**
1:1 8:17 9:7 17:19
46:10 48:15 50:17,18
63:17 100:13 101:16
102:15 118:18 148:2
157:4 164:2 165:9
187:2,10,12 189:25
195:7 196:18 213:12
223:23 230:8 236:12
237:3,18 256:13
321:7
**court's**
143:6
**covenant**
264:11
**covenants**
264:11
**cover**
34:16 111:14 278:5,9
327:6 369:23
**coverage**
144:14
**covered**
91:6 269:11
**crammed**
62:8,17 65:9
**create**
99:12 294:5 361:17
**created**
111:6 116:7 159:2
**Creating**
241:4
**creditor**
25:3 28:7 35:15 50:25
51:1,11 59:17 86:1
93:10 117:15 136:12
136:21 198:25 216:8
217:21 218:2,4
229:17,25 230:5
231:15,17 232:7,9,20

**PX 134
Page 109 of 165**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 13

232:24,25 297:16,20
344:1
**creditors**
3:4 16:16 18:11 29:21
29:22,24 30:19,22
31:1,25 35:17,18,19
35:20 37:1 48:20,21
48:22,23 53:3,5,11
59:23 64:10 76:9
92:17,20 117:22
121:11,22,24 122:3
139:7,7 146:18 147:7
158:21 166:13
171:13,16 177:24
178:3,21,23 179:5
180:19 181:1,12,21
182:1,5,10 183:6
187:15 195:13
206:15,16 213:2,3
217:11,19 218:1,7
220:7,12 225:2 230:6
230:18 233:10,14,25
234:3 242:5,6,14
243:19 244:10
259:19 266:9 274:25
275:2 299:11,12
300:9 305:23 306:7
306:14 310:25 316:2
316:3,5,11,16,23
321:10 323:5 356:7
356:10 358:12
360:20 361:10
**criteria**
345:2 351:19 354:20
363:20
**critical**
25:21 26:13 158:20
225:14,20 263:11,14
**cross-examination**
98:9
**CRR**
373:22
**CSC**
2:4 8:23
cshore@whitecase.c...

3:16
**CSS**
1:3 8:18
**curious**
150:24
**current**
13:6,10,23 18:8 19:3
19:17 20:24 24:2
38:25 42:21 43:6,12
43:24 44:4,14 47:7
47:12 50:17 72:2,3
73:5,13,19 75:20
78:2,12,19 79:3,9,15
81:8 89:14 102:2
116:8 162:10 184:9
186:14 187:19 189:1
192:17 203:6 220:20
238:10 263:2 268:13
268:19 274:16
276:19 310:17
315:25 338:15
**currently**
41:8 50:18 56:18
57:14,25 61:6 75:14
87:19 184:3,10 186:7
186:7 189:19 348:7
**curve**
211:18
**cushion**
71:5,18,19 72:18,22
73:4
**cut**
151:25
**cutting**
202:5 239:6
**C-A-L-P-I-N-E**
184:16

_____

**D**

**d**
1:12 3:1 4:1 5:1 6:1
7:1 9:12,12 78:22
375:1 376:10,22
377:5,11 378:5,10
**damage**

61:13
**damages**
54:20 61:9
**damaging**
233:14
**DANIEL**
7:21
**data**
219:17
**date**
17:23 19:21 23:7 34:4
34:13,20 35:5 45:1,5
45:12,16 46:18 72:4
72:6,9,11,21 89:19
89:20 93:6 94:11
96:14 134:10 146:8
156:17,18 157:12,13
173:7,13,14,25 187:2
223:22 228:17
233:21,21 252:11
258:7 264:2 286:6,10
286:13,14,15 290:1
294:4 313:9 315:10
324:16 335:19 336:4
348:4,8 356:18
372:14
**dated**
11:5 109:25 113:20
118:22 150:11 283:1
376:8,20 377:4,10
378:4,9,14 379:4,10
379:14,22
**dates**
18:4 59:20 251:16
252:5,8,22 253:4,14
254:2
**David**
1:14 4:17 8:14 16:1,17
18:13 28:18 33:18
58:18 120:10 218:15
371:10 372:3 373:10
374:20 375:3 376:4
**day**
7:21 17:20 89:17
211:13 223:7 302:17

330:8 371:13 374:21
**days**
46:6 59:20 89:3 272:2
287:7 301:16
**day-and-a-half**
258:4
**day-to-day**
142:15
**deadline**
14:7 356:23
**deadlines**
17:23 18:2
**deal**
35:17 56:12 57:24
120:18 136:5 158:17
178:19,23 214:13
216:15 217:12 223:5
223:6 224:9 232:2,5
244:11 259:4,20
261:8 265:24 266:2,9
275:3 355:5
**deals**
345:9
**dearly**
207:21
**debate**
302:16
**debt**
5:5 34:9 62:3,8,17
65:9,16 68:11,18
69:3 70:4 72:23 73:5
73:12 74:1 88:6
111:23 112:3,15,20
113:7 114:20,25
115:3,4,7 132:20
133:11 156:11
158:10 159:23
179:16,16 183:7
195:4,5 196:13
207:13,20 230:22
243:13 251:14
257:17 265:25 277:8
278:1 279:7 299:21
308:17 317:2 324:2
347:23 354:12,15,19

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 14

360:16,23 361:4
362:5
**debtor**
139:5 177:19 217:14
235:15 236:15,17
254:9 282:14 299:18
341:24 346:21,22
348:7 353:10,13,15
353:16,19,22 357:2
359:7 360:14
**debtors**
1:8 6:4,12 9:3,5 14:2
17:10 22:8 24:10
30:25 31:22 57:5
61:18 80:16 81:13,16
82:2 83:4 135:22
170:21,23 179:21
182:14 184:18 186:7
202:18 218:7 233:20
237:4 239:15 240:25
246:9 254:8 255:2,3
261:2,3,22 262:7
264:20 267:9 270:9
270:11 299:7 326:6
331:5 333:3,16,21,25
334:6 338:24 340:5
340:12,20 342:25
343:15,25
**debtor-in-possession**
229:6
**debt-capacity**
133:1,4,6
**decide**
288:15 366:1
**decided**
151:24 233:23 311:23
356:22
**decides**
345:21
**decision**
38:24 58:8,9 224:6
262:8 338:17
**decisions**
187:14 359:25
**deck**

11:5,11,25 12:1,6
13:25 60:3 240:1
304:16,22 309:17
311:24 319:10,23,23
320:8,11 322:7,18
329:2 332:15 335:5
342:3,7 345:6,25
346:1,9 351:22
**declarant**
37:20
**declaration**
22:24 23:1,3,10 24:1,5
24:9 25:19 27:19,20
33:10 36:2,16,21
37:4,14 41:1 46:8
52:17 61:17 63:7,21
64:2 66:20 67:17
68:2,23 70:9 71:3
72:4,7 101:16 102:1
102:7 162:5,17,21
227:20 228:10
233:18 235:24 244:4
263:12,18 267:18
268:3 269:25 290:13
291:8 295:22 300:1
311:15 318:13 321:3
323:2,3 328:22
337:19 338:23 376:4
**declarations**
303:8
**declines**
174:5
**decompose**
93:13 157:10 191:11
**deconsolidate**
183:5 205:23 233:13
241:23 244:1
**deconsolidation**
36:23,24 63:8,10 64:3
64:15,22 65:7 178:1
178:10,12,17,25
179:6 183:4 216:19
217:4,13 223:17
248:7
**deem**

64:5 189:25 358:25
**deemed**
25:7
**deems**
187:11
**deep**
99:18
**deeply**
146:12
**default**
94:15 95:4
**defending**
8:19
**defer**
14:22 15:5
**deficiencies**
18:23
**deficiency**
347:19
**define**
369:11
**definitely**
90:5 207:25 210:5
**definition**
199:16 233:5 301:4,5
369:13,16
**Delaware**
1:2 2:4 8:17,24 201:4
**delaying**
16:14
**delemay@chadbou...**
4:18
**delever**
251:12 255:5 278:16
**deleverage**
61:18 62:2,22 121:5,6
**deleveraged**
210:20
**delevering**
279:2
**deliver**
159:7 160:5 197:7
**Delphi**
360:22 361:14,14,18
361:23,24

**delta**
352:18
**demanding**
191:22 221:15
**deny**
330:24
**denying**
330:18
**department**
147:12
**depend**
288:17
**dependent**
306:17
**depending**
254:13 255:22 313:12
358:1
**depends**
180:10 271:10 300:19
**DEPONENT**
372:2
**deposition**
1:14 8:14 169:8,15
173:22 176:15
318:15
**depositions**
90:2,6 139:18 195:25
**derive**
309:25 310:1
**derived**
307:2 365:6,10
**describe**
81:20 82:7 253:16
334:16
**described**
12:18 13:3 61:1 80:15
175:5 210:13,21
223:21 237:25
244:15 245:15
255:15 337:5 361:15
368:19
**describing**
81:21 82:8
**design**
244:22

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 15

| | | | |
|---|---|---|---|
| designed | 246:14 368:23 369:1 | 32:1 34:2,10 35:5 | 214:25 216:9,11 |
| 245:7 | 370:25 375:3,9 | 36:10,17 37:5,6 | 217:25 220:8,9,15,18 |
| desirability | dialogue | 38:22 40:13 41:21 | 220:20 224:7,25 |
| 269:14 | 50:25 52:20 112:2 | 42:17 46:10,19,19 | 225:6,10,10,19 |
| desire | 121:20 136:7 147:6 | 48:3 49:10,16,21 | 227:21 228:7,10 |
| 223:18 266:8 345:8 | difference | 50:10,13,16,19 53:23 | 233:17,19,22 235:25 |
| desperate | 169:12 241:14 287:19 | 54:12 55:18 56:2,8 | 236:8,22,25 237:4,6 |
| 271:14 | 352:20 353:20 | 57:6,13 60:6,21 | 237:7,9 238:2,5,14 |
| destiny | 355:15 | 66:24 67:19 68:7,9 | 238:15 239:2,8,9,10 |
| 329:9 | differences | 68:10,14,24,24,25,25 | 239:14,16 240:22 |
| detail | 258:20 323:18,24 | 69:5,8,11,12,13,15 | 243:1,6,7,8,11,15,17 |
| 223:4 | different | 69:20,20 70:2,8,14 | 243:21 245:7,7,14 |
| detailed | 21:6 48:9 52:11 63:4 | 71:5,23,24 72:12,13 | 246:10 248:22,23 |
| 28:11 86:14 | 65:1 83:8 103:7 | 74:2,6,10,17 75:23 | 249:4,7,9,12 250:2 |
| determination | 112:13 116:14 | 77:1,9,22 80:7,23 | 261:8,10,13 262:13 |
| 266:3 | 136:10 153:8 154:5 | 81:4,4,6,15,17 82:1,5 | 263:2,8,23,25 264:5 |
| determinative | 154:11,12,19 155:2,3 | 82:13,16 88:20 93:12 | 264:6,8,12,15 268:5 |
| 90:23 | 156:16 157:2 178:5 | 93:22 102:8 138:8,8 | 268:9,12,13 269:15 |
| determine | 197:20 201:23 202:5 | 138:10,18,19,21 | 270:3,4,23 272:11 |
| 14:23 15:6 91:10 | 229:1 252:5,7 296:15 | 139:12,22 141:19 | 273:5,24 274:10,19 |
| 100:9 104:22 263:1 | 303:2 309:14 324:3 | 142:1,10,17 143:7,9 | 275:4 277:17,18 |
| determined | differentiate | 145:5,14,21,25 | 280:14 282:20 283:7 |
| 175:24 308:16 | 100:16 | 146:25 147:16,20,23 | 283:25 284:22 |
| determining | differently | 147:24 148:1,6 151:1 | 290:17,21 292:8,14 |
| 35:3 39:25 40:6 | 236:20 | 156:9 157:5,9,11,19 | 292:16,18,24 293:4 |
| 364:24 | differing | 160:19,22 162:6,19 | 293:12,13,23 294:6 |
| Deutsche | 217:21 348:3,24 | 163:3 164:2,8 166:18 | 297:2 298:19 299:23 |
| 7:3 143:18 148:4 | difficult | 166:19 168:2,4,7,8,9 | 303:10 304:10 |
| 150:24 152:8 246:23 | 206:1 | 168:23 169:3,9,11,19 | 306:20 307:4,5 |
| developments | difficulty | 170:25 171:2,2,3,9 | 308:21 309:13 |
| 311:18 333:7 | 121:15 | 171:19,21,22 172:3 | 311:14 313:15 |
| Devore | diligence | 172:23 174:11 175:3 | 315:25 316:1,4,17,25 |
| 2:10 8:22,22 9:17,22 | 111:12,16 | 175:9,10,18,19,21 | 317:1,5,13,14,17,19 |
| 11:2,9 18:17 19:9 | diligent | 176:4,21 177:10,12 | 317:24 318:19 |
| 22:7,12,21 23:17 | 58:12 | 177:20 179:23,23 | 319:25 320:3,13,17 |
| 24:15 32:13,14 33:22 | dilution | 180:3,20 181:6 182:2 | 321:7,19 324:1 325:7 |
| 38:4,9,19 39:3,22 | 32:1 | 182:13,22 186:13,20 | 325:12,23 326:8,18 |
| 40:3 42:3,8 43:1,2 | dilutive | 187:13,18,25 188:2,3 | 327:12 328:16 329:4 |
| 45:2,3 47:10,11 | 265:22 | 188:11,15 190:12,20 | 329:17 330:2,3,17,23 |
| 48:16 54:5 61:23 | DIP | 190:22,22 191:2,17 | 338:19 341:10 342:1 |
| 63:14,19 66:5 67:2 | 7:4 10:2,16 11:24 | 191:21 192:17,19 | 342:8,25 345:15,17 |
| 72:25 76:23 77:13,16 | 12:10,18,24 15:17,23 | 193:1,8,13 202:9 | 345:18 348:22 |
| 77:18 79:22,23 83:13 | 16:7,16 17:24 20:12 | 203:24,25 204:10,11 | 349:16 350:3 352:12 |
| 83:18,23 84:10,16,25 | 24:12,19 25:20 26:17 | 204:13,15,20 205:1,3 | 352:16 353:11,16 |
| 85:1 89:18 95:6 | 26:22 30:14,23 31:15 | 205:6 207:17 214:11 | 354:11 358:13 360:2 |

PX 134
Page 112 of 165

360:7,7,9,10,15,21
360:22 361:3,6 362:2
362:5 365:7,8,12
375:21 378:20
**DIPs**
174:19 221:4 243:12
303:18 360:5,18,19
361:1,22,25
**DIP's**
317:7
**DIP-to-equity**
32:9
**direct**
134:20 136:2,8 140:17
142:8 228:1,21
247:17 257:6 335:4
341:21 342:12
**directed**
42:1
**Direction**
38:17 39:20
**DIRECTIONS**
375:12`
**directly**
93:2 120:15 136:21
**directors**
304:23,24 305:1,2,5
375:20
**disagreed**
206:2
**disclose**
33:19 269:17 330:8
**disclosed**
17:18 368:9
**disclosing**
28:19
**disclosure**
128:17,18 185:5,7
212:21 213:9
**disconnect**
326:7
**discount**
88:15 286:16 287:12
288:24 324:20,25
327:23 328:3,5,9

331:15 364:5,9,12,21
364:25 365:3,13,18
366:4
**discounted**
128:2 365:14 366:24
**discourse**
223:25 288:21
**discuss**
21:9
**discussed**
12:6 31:11 65:25
76:24 79:25 86:15,25
87:16 102:18 112:17
123:15 130:8,10
156:24 157:20 170:8
172:12 249:3 320:22
**discussing**
31:21 86:21 161:20
**discussion**
15:16,22 16:5 17:1
30:21 57:10 60:9
87:10 112:19 115:18
132:13 138:9 141:8
176:19,23 203:3
273:12 294:7 319:13
320:17 330:9 332:16
336:20 344:18 379:9
**discussions**
15:1 21:13 22:6 28:24
65:3 118:1 130:2
134:8 141:22,24
156:20 157:17 158:4
160:3,8 224:5 248:2
328:6 331:23
**dishonest**
109:11
**dislikes**
297:11
**disproved**
298:17
**dispute**
230:3 234:10
**dissatisfied**
60:4,8
**distinct**

259:1
**distinction**
232:19 336:9
**distort**
155:12
**distracted**
312:5
**distributable**
97:11,23 98:18 99:2
100:9
**distributed**
31:25 97:20 98:4
152:3 204:5
**distribution**
154:2,6,15,21 274:24
361:9
**District**
1:2 8:17
**diverse**
338:20
**divided**
365:7
**dividing**
307:4
**division**
72:15
**Docket**
22:25 53:25
**doctrine**
40:23
**document**
11:7,13 18:1 26:3
27:11 32:12 63:20
85:9 110:17,25
113:11 114:2,7,9,18
114:18,22 115:23
116:7 119:16,22
120:7 122:12 129:1,9
138:9 140:14 144:3
145:5,17 152:7,8,12
153:6 158:8 198:16
246:18 253:7 254:20
254:21 257:9 261:25
262:22 264:2 286:1
291:24 319:4,16,18

325:21 332:18
**documents**
109:4 123:20 133:14
133:16
**document's**
254:20
**dog**
245:13,13
**doing**
106:23,24 147:12
153:8 170:17 190:10
205:13 261:4 263:7
307:19 309:3 313:18
356:3 361:25
**dollar**
81:12 107:13,15
138:19 168:14
316:10 351:7 355:15
**dollars**
93:4 94:10 105:22,22
159:20 168:14
215:18 231:21
310:10 334:16
346:19,20
**dominated**
90:17
**doubt**
85:13,17 220:2
**downside**
297:17 359:13
**dozen**
126:23 127:8 246:3
**draft**
150:11 261:25
**drafted**
268:24
**dramatically**
157:2
**draw**
93:18 260:21 320:15
321:2 322:6 324:6
336:10
**drew**
232:18
**driver**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 17

216:1
**driving**
246:6
**drop**
209:7,25 212:6
**dropping**
209:13 211:11,25
**due**
88:10 111:12 250:20
326:23 335:19 336:4
357:11
**Duke**
153:24
**duly**
9:13 58:12 373:12
**duration**
131:16,17 132:6,10
207:17 272:15,17
286:20
**duress**
300:16
**Duzer**
332:8 379:14
**Dynegy**
184:15
**D-Y-N-E-G-Y**
184:15

**E**

**e**
1:12 2:1,1 3:1,1,1 4:1
4:1,1 5:1,1,1 6:1,1,1
7:1,1,1 79:5 106:9
122:24 126:13,18
166:1,1 216:16 228:3
333:4 373:1,1 375:1
**earlier**
18:5 39:10 42:19 56:4
57:8,9 73:24 76:24
86:19 87:1 91:13
137:5 152:12 162:4
164:3 166:22 169:7
170:18 176:1 185:4
189:4 191:14 210:21
273:10 297:14

311:12 315:9 350:15
352:1 355:2 364:3
366:10,19
**early**
31:7 49:23 248:1
251:21 346:2 356:18
356:23
**early/mid**
263:22
**earn**
143:5
**earning**
159:16
**easier**
295:18 310:20
**easily**
231:23
**easing**
211:16
**EBITDA**
116:3,19 125:8 144:18
144:23 148:17 149:7
149:9 152:25
**economic**
171:7 210:7 314:3
352:7 354:3 358:24
359:6
**economically**
276:15 358:21
**economics**
159:8 160:5 161:1
265:1
**edge**
202:5
**Edison**
154:19
**effect**
57:3 69:23 70:7,13
96:5 103:17 117:11
117:13 156:6,7,15
157:2 170:16 175:13
177:19 285:12 299:9
317:4 323:21 324:3
327:8 364:7 366:15
**effective**

59:25 253:20 313:8
**effectively**
64:9 69:16,22 76:25
157:4 167:22 275:10
**effects**
359:8
**efficacy**
177:12
**efficiency**
95:8
**efficient**
26:23 126:20 183:13
**effort**
21:20 133:21 294:5
340:3 347:18
**efforts**
86:8 115:19,20 184:19
342:24 344:1 349:3
**EFH**
5:21 25:4 26:24 28:7
28:25 29:16 30:18
31:10,14 35:20 36:23
37:1 48:1,1,23 51:1,2
51:13 53:5,12 54:11
59:23 64:5,12,15
65:7 80:16 81:8
101:4,11 106:15
112:3,9,9,20,21
113:2,7 114:19 117:9
118:7 121:7,9,11
124:5 131:4 133:2
159:24 160:1 161:11
161:20,22 162:1
168:10 177:22 178:3
179:7 183:1,2,5
186:7 198:11,18
203:15 205:8 206:4
206:12,15 210:20,24
213:2 214:12 216:3
216:11,23 220:22
224:10,12 225:11
226:11 232:14 233:1
233:3,10,14,25 234:3
235:10 236:9 241:11
241:13,20,24 242:3

243:18,19 244:9
248:5 258:25 259:4
259:19 260:3,10
265:22,23,25 266:2
266:10 267:14
296:17 298:6,22
300:8,8 305:13,17,21
305:21,25 306:4,5,6
306:13,23 307:1,20
309:25,25 313:18
314:9,19 315:22
316:2,2,5,8,11,15,23
317:12 323:6,22
329:7 344:14 349:14
350:17 354:14
366:13 377:20
**EFH/EFIH**
50:5 52:25 111:22
260:17
**EFH/IH**
106:6 225:12
**EFH2D00019043**
377:17
**EFH2D00019093**
376:11,23
**EFH2D00025696**
378:17
**EFH2D00026660**
377:7
**EFH2D10000552**
379:24
**EFH2D10000636**
151:5
**EFH2D10005363**
378:22
**EFH2D10009215**
377:12
**EFH2D10010731**
378:11
**EFH2D10010758**
378:6
**EFH2D10010866**
377:22
**EFH2D10072750**
319:12 379:11

**PX 134**
**Page 114 of 165**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 18

**EFH2D10073528**
375:23
**EFIH**
2:6 5:4 7:4,12 8:24
9:24 10:17,21 24:9
24:11 25:4 26:12,24
28:7,25 29:16,19,22
30:21 31:1,25 35:19
36:10,23 37:1 47:25
48:20,21,22 50:25
51:11 53:5,11 54:12
56:4 58:1 59:12,17
62:3,22 63:8 64:2,9
64:11,13,13,15,17,19
70:12,25 72:12 83:4
89:1 92:13,17,20,23
93:20 96:12 112:3,8
112:20 113:1,7
114:19 115:2,6 117:9
118:7 121:7,11,21,24
123:7 124:5 129:14
129:21,22 130:13,16
131:4,8,9 133:2,5,11
134:1 137:7 138:8,10
138:22 139:17 140:19
141:1 143:25 145:13
145:21,24 151:1
158:19 159:23 160:2
161:12 166:19
168:13 175:20 177:9
177:9,22 178:4 183:1
183:3,4,7 184:2
187:20 190:1 191:17
192:17 195:23 196:2
198:14,17 200:19
205:7 206:5,12,15
207:4,6 210:12,17
211:7,22 212:4 213:1
215:5,13,21 216:3,8
216:12,22 218:7
220:9,12,22,24 221:4
224:10,12 225:18
226:3,4,11 227:16,17
228:6,10 231:18,24
232:12,15 233:2,3,7

233:13 235:11
239:11 240:21
241:13,22 243:11,18
243:21 246:8 248:6
248:24 250:7 251:5
255:14 257:17
258:25 259:5 260:10
260:23 261:17
265:22,25 266:3,10
268:9,12 270:3,4,5,7
270:9,11 280:6,7
281:1 290:17,21
292:8,14,15 296:16
296:16,17,21 297:24
298:4 300:3,6 303:12
304:9 305:1,5,17,20
305:22 306:3 308:17
308:17,21 310:18,25
311:5,16,21 312:18
313:24 314:5,18
315:25 318:19 321:6
321:9 322:22 323:4
323:10 324:14
325:14 327:9 331:5
333:13,18 334:10,11
334:25 335:11 336:1
338:16 339:17 340:5
342:8,20,22 344:8,12
347:3,5 349:14
354:15,17 355:6,8,12
355:17 356:2,6,14
357:12 358:11
366:13 369:4,8 370:3
370:5,11,15,18
375:20,20 376:15,15
377:21 378:20
**EFIH's**
174:18 175:23 224:6
369:24
**EFIH/EFH**
122:6
**eight**
13:13 125:23 148:21
149:11 162:19
203:13 270:22

305:12
**eight-and-a-half**
144:19 148:23 149:12
152:13
**either**
18:10 20:11 21:4
37:23 90:7 112:19
131:24 134:19
171:12 175:3 178:25
189:10 216:22 226:3
239:15 286:24 301:6
330:24 337:14
338:17
**element**
50:1 234:19 349:13
**elements**
349:11 354:2,4
**eliminate**
53:20 211:15
**eliminated**
47:17 238:10
**eliminates**
156:10
**Ellis**
6:3,11 9:2 28:20 33:20
43:4,14 133:19
218:20 244:25 269:8
269:17 291:5 312:23
**Ellis's**
42:24
**embedded**
18:3 100:24 101:4
128:18 185:7 206:13
309:13 310:16,17
313:15 354:10
357:20 360:7
**embedding**
364:13
**embodied**
48:2 263:10
**embracing**
303:12
**emerge**
132:3 276:13 277:7,14
**emerged**

254:14 283:16
**emergence**
61:20 69:3 114:16,20
140:23 157:12,19
230:23 237:6 239:16
243:13 250:1,17
254:13 255:6,7
264:24 267:4 306:6
307:1 362:5
**eminently**
60:17
**emphatic**
362:1
**emphatically**
326:17
**empirical**
210:6
**employ**
90:18
**encouraged**
325:15
**ended**
115:21 138:21 158:1
323:19
**endorse**
19:13 158:21
**endorsed**
220:21
**ends**
234:5 357:2
**Energy**
1:6 4:14 8:15 150:7
153:24 154:25
**enforce**
158:8
**engage**
24:10,18,22 25:13
31:18 295:5
**engaged**
57:5 124:12 184:17
199:2
**engagement**
124:18 143:8 199:5
**ensure**
242:12

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 19

| | | | |
|---|---|---|---|
| ensuring | 114:12,25 | 274:23 276:16 277:1 | 378:15 379:5,15,23 |
| 244:8 | equitized | 278:4,8,11,12,17 | EV |
| enter | 129:24 | 279:3,6,11,16 283:19 | 125:8 144:23 148:17 |
| 224:7 266:12 267:1 | equity | 297:20 299:15 304:8 | 149:7 152:21 |
| entered | 5:21 12:24 31:24 32:1 | 304:9 305:13,23,24 | evaluate |
| 141:16 | 46:21,25 48:1 49:10 | 306:5,14,23 307:1,4 | 19:22 20:6 21:12,20 |
| entering | 50:4,9 51:2,13 54:11 | 307:9,11,20,23 | 58:12 60:13 61:3 |
| 65:11 | 62:4,9,18 63:3 65:10 | 308:17,18 310:1 | evaluated |
| enterprise | 65:16,21 68:3,8 69:4 | 317:2,7,24 320:5 | 19:19,23 61:12 196:6 |
| 92:14 101:3 152:21 | 69:16,23 70:4,5 71:5 | 323:6,14,22 335:23 | evaluating |
| 168:16 198:14 | 71:18,19 72:14,16,17 | 336:11,22,23 337:4 | 155:11 274:8 |
| 203:18 214:7,8 | 72:22 73:3 74:11,13 | 337:15 338:15 339:7 | evaluation |
| 215:17 226:4 295:2 | 74:16 77:1,4 81:16 | 350:14,16,17 354:11 | 196:7 |
| 308:6 309:7 354:17 | 81:18 82:1,5,14,17 | 354:15,21 358:19 | event |
| 364:5 365:3,5,18 | 83:25 85:19 86:17,24 | 359:12 360:8 361:17 | 54:21 61:10 194:11 |
| 368:5 | 101:10 111:23 112:4 | 365:8 | 235:20 313:8 |
| enters | 112:16,20 113:8 | Errata | Evercore |
| 283:25 | 117:18 122:23 | 372:8 | 40:11 54:17 61:7 |
| entire | 129:21 130:3,17 | ESQ | 133:17 135:12 |
| 10:5 124:11 171:2 | 131:5,8 132:1 134:2 | 2:10,12,20,22 3:7,15 | 142:18 143:1,4,5 |
| 301:9 | 134:8 140:22 141:2 | 3:22,24 4:9,17,19 5:9 | 333:21 343:21 |
| entirely | 141:10 155:24 156:1 | 5:17,24 6:7,15,23 7:7 | everybody |
| 53:20 69:3 80:3 289:5 | 156:5,12,20,25 | 7:15 | 57:20,22 60:15 91:8 |
| entirety | 157:11,22 158:6,12 | essence | 211:19 296:25 |
| 39:9 150:19 260:17 | 158:24 164:9 167:1 | 321:17 329:10 360:19 | 315:19 330:12 |
| entities | 168:9 190:23 191:10 | essential | everybody's |
| 178:1 217:14 233:15 | 192:14 193:2 195:19 | 240:25 | 260:2 |
| entitled | 203:16,20,21 204:1,5 | essentially | ever-changing |
| 131:9 145:13 238:6 | 205:3 207:14,16,19 | 68:3 121:13 211:10 | 201:21 |
| 239:5 250:11 308:23 | 207:22 211:10,25 | established | evidence |
| 316:3 332:15 352:14 | 212:6,17 213:14,24 | 336:20 | 210:6,7 299:13 |
| entity | 215:1 224:24 225:19 | estate | evident |
| 64:5 93:20 121:12,14 | 226:3 229:19,22 | 51:20 56:12,13 70:16 | 355:3 |
| 121:16,18 122:1,4,6 | 230:2 231:1,5,9,12 | 70:19 93:10 118:3 | evolution |
| 131:8,9 231:6 362:4 | 232:14,22,23 234:9 | 135:1 361:17 | 250:23 263:20 |
| Entry | 234:11,12 235:12,14 | estates | evolve |
| 376:16 | 235:17 236:9,18 | 19:2 53:2 318:20 | 125:21 326:22 |
| equal | 237:9 239:16 242:3 | estimate | evolving |
| 78:23 79:6 174:5 | 242:12 243:14,15,18 | 61:13 | 125:19 |
| 197:17 240:5 287:18 | 243:18 244:9 250:16 | estimated | exact |
| 312:19 335:18 336:3 | 250:24 251:2,4,5,9 | 144:18 148:22,24 | 18:4 50:11 59:20 |
| 352:25 366:3 | 251:16 254:10 | estimates | 107:23 355:19 |
| equally | 255:16 261:4 264:1 | 99:6 | exactly |
| 257:24 264:20 | 265:25 266:18 267:4 | et | 32:20 86:5 97:1 135:6 |
| equitization | 273:16 274:7,9,17,22 | 1:7 8:16 265:14 378:5 | 150:24 170:22 173:5 |

PX 134
Page 116 of 165

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 20

185:15 294:24 312:7
312:23 323:17
361:15 369:25
**EXAMINATION**
9:16 95:22 166:8
183:19 227:12
363:12 368:25 375:2
examined
9:15 372:4
example
215:2 234:15,16 302:5
302:21 360:21
exceed
163:2,25 277:23
exceeded
193:25 194:6,23,24
195:4 196:20
exceeds
194:9 195:5,9
Excel
133:14
excess
94:9 175:18 333:13
334:24
exchange
104:18 105:5 115:2,4
115:11 121:23
123:19 147:19
175:12 179:16 191:3
exchanged
257:2
excluding
116:3
excuse
10:7 47:25 89:10
106:3 160:16 220:21
325:3
execute
206:20
execution
77:23
**Executive**
342:7
**Exelon**
126:1

exercise
131:23 156:4 215:5,6
215:9 251:4 253:15
254:14 290:8 365:22
exercised
252:24
exercising
255:5
exhaustive
127:4
exhibit
10:24 11:4 22:18,23
53:24 54:2 63:21
77:9,11 84:11,13,24
85:2 109:14,16,21,23
110:7 113:12,14
118:17,20,24 119:3
119:18,21 128:21
138:3 140:1 143:11
143:13 145:7,9
149:22,24 150:6
227:23 233:19
246:15 247:3 256:15
256:19 267:19
304:17,21 311:15
319:4,6,10 322:7,9
331:25 332:2,6 342:3
363:15 375:18 376:3
376:7,14,19 377:3,9
377:14,19 378:3,8,13
378:19 379:3,8,13,21
exhibits
282:25 375:16 376:1
377:1 378:1 379:1,19
exigencies
242:11
exist
133:17 182:25 183:10
187:16 285:2
existed
323:25
existence
220:3
existing
12:9,20 28:7 29:24

33:25 34:9 35:11,13
35:17,18 70:10,17,19
202:10 205:7 242:14
243:4 248:24 272:12
275:19 321:13
360:16
exists
85:11 183:9,9 201:21
214:20 243:2,3
292:22
exit
83:4 145:14 147:24
228:17 324:16
347:23 348:4,8,21,25
378:20
expect
101:14 164:14 185:5
expectation
54:10 102:2 128:12
174:19 268:19
expecting
184:24
expense
70:16,19 156:4 270:10
272:9,25 273:1,3,21
277:23 278:10 282:5
289:12 290:18
353:20
expenses
289:13 349:5
expensive
289:10 331:11 337:21
339:3
experience
36:8 268:6 293:9
298:16 338:6 360:4
experienced
34:25 210:16 293:20
expert
28:11 32:5 33:14
34:23 35:1 40:18,23
41:4,10,12,16 42:13
68:17 73:22 89:25
90:8 196:17 197:10
197:17 211:8,23

213:11 221:10
245:24 269:13,19
experts
197:23
expires
251:21,22 374:23
explain
169:12 252:10 292:1
353:2
explained
147:8
explicitly
105:21
expressed
30:3,8 59:3 93:3 94:23
198:22
expresses
226:16
expressions
198:13
expressly
327:21
extend
114:12 115:1 147:7
extends
228:14
extension
229:5
extensive
137:6
extent
88:16 90:13 182:7
202:19 203:5 214:13
251:25 257:3 269:12
338:17
extinguish
75:18
extra
176:7 232:3 346:24
347:1 357:19
extremely
295:4
e-mail
85:2,14 109:24 110:20
111:10,11,15 113:18

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 21

113:24 118:17 119:3
119:13 120:8 138:7
140:5 143:18,19
150:7 246:19 247:8
247:13,14 256:19,24
258:1 259:8,23 332:7
332:14 336:17 376:8
376:20 377:4,10
378:4,9,14 379:4,14
379:22
**e-mails**
271:6 376:8,20 377:4
377:10 378:9,14

——————————
**F**
——————————
**f**
1:12 79:11 80:1,12,13
80:25 166:1 373:1
**face**
24:6 88:5
**face-to-face**
319:20
**facilitate**
182:7 249:8
**facilitates**
26:23
**facilities**
66:24 67:5,15,19,25
68:2,10,10 345:4
352:17
**facility**
7:4 11:24 15:17,24
20:12 24:12 25:21
26:13,22 36:10 54:13
68:7 69:13 142:17
160:22 221:2 228:7
228:11 240:22
268:10,13 270:3
290:17,22 292:9,13
292:16,22 318:19
320:1,4 321:7 346:14
375:21
**facing**
159:4
**fact**

14:10 33:7 36:22
47:16 53:14,18 55:16
55:25 56:21 69:10
77:3 81:6 84:2 88:17
91:19 93:19 105:19
108:23 113:23 119:8
129:17 132:9 137:6
147:21 157:23 183:9
209:21 230:20
242:19 246:7 250:4
280:4 282:24 284:12
298:14 299:11 300:7
304:15 307:7 312:17
312:19 314:22
318:24 325:20
355:14 369:8
**factors**
41:4,13 44:11 53:16
**facts**
34:15 213:18
**failure**
52:25 269:16
**fair**
60:9 80:17 91:16
107:25 114:8 117:14
122:9 124:20 126:17
167:1 208:11,18,23
209:6 257:18 271:20
326:9,25 333:1 340:1
**fairly**
60:13 154:20 287:4
**fair-market**
300:14 301:4 302:12
**faith**
55:6
**fall**
112:14 117:2 144:24
153:1
**falling**
212:16
**familiar**
62:7,16 73:11 91:9
97:19 99:23 340:17
**far**
56:13,13 149:16

186:11 187:5 198:8
205:14 219:13 264:3
280:25
**fashion**
205:24 309:16
**favorable**
140:21 250:8 261:22
262:7,17,17 318:20
**favorite**
128:10
**feasible**
50:2,5 61:19 120:20
130:22 132:20 135:2
135:24 158:18
230:23 255:19
**feature**
68:3,12,16 69:7,9
130:18 190:23
224:25 225:20
235:25 236:14
237:15,20,24 243:2
320:5
**features**
192:5 205:21
**February**
31:7 140:25 190:2
247:9
**Federal**
154:25 211:14 286:18
**fee**
13:17,18 46:9,15,17
46:23 47:3,7,14,17
47:18,22 48:6,9,10
50:20,23 51:9 52:3,4
52:12,15,19 53:15,17
53:20 54:9,19 55:4,9
55:15,16,24,25 56:5
56:14,19,22,24 57:2
57:15 58:1 61:6,8
68:6 77:23 78:2,9,11
78:16,18,23,24 79:2
79:6,8,12,14,15
80:25 81:2,5,9,12
82:19,25 143:5,9
159:20 163:8,9,10,11

163:19 164:7 166:23
167:13,23 168:2,6,22
170:20 171:4,11
193:5 237:21 238:7,9
238:11,23,25 239:5
239:19,24,25 240:2
240:11 273:18,19,20
274:15,18,21 275:18
341:12 350:21,25
351:8,16,18 352:4
**feel**
73:22
**feels**
236:17
**fees**
66:21,23 67:19,22
68:13 77:20 78:19
79:18,24 80:1,5,7,18
159:16 160:23 163:2
163:7,10,17,17,23,24
163:25 164:10 169:7
169:11 170:5,11
172:13,18 193:3,5
238:19 283:8 284:2
351:22 352:22,24
353:3,10,18
**FELD**
5:2
**felt**
158:16 159:3 206:2
**FERC**
154:24
**fide**
303:13,23 347:18
**Fidelity**
6:20 31:11,13,17 51:2
53:9,12 159:8,13,16
160:5,9,11,17,20
161:1,17 163:11
174:25 175:3,8,11,16
175:17,25 176:3
231:20 232:12,13
233:9 259:19,24
260:3 280:10,24
298:6 316:18,21,24

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 22

317:3,4,4,10,13
331:18,20 332:8
333:14,17 334:19,25
337:12 340:11,19,23
341:3,8,9,15,23,25
342:21 343:19
**Fidelity's**
174:20,25 233:6 343:1
343:15,16
**fiduciaries**
38:24
**fiduciary**
215:6,10
**fight**
62:15 230:8 275:12
**figure**
213:5 266:5 343:10
**file**
131:4 213:9
**filed**
17:20 22:24 23:7,21
24:6 185:6
**filing**
45:16 93:6 94:11
96:14 195:14 235:7
258:25 348:11
**fill**
347:18
**final**
14:3,6 58:5,7,14,22
59:10 60:25
**finalized**
150:16
**finally**
206:6
**finals**
14:9,11 59:22
**finance**
30:23 142:25 272:10
275:23 287:16 289:8
289:8,15 375:21
**Finance's**
376:15
**financial**
11:21 20:1 43:19 44:8

44:18,21,23 68:17
86:2,14 90:8 110:4
122:8 178:24 179:9
222:2 255:12 285:8
298:10 320:12
**financing**
17:25 30:23 31:4 56:8
69:16 75:24 93:12,23
139:6 143:3,3,25
145:5,14 147:24
171:9 182:15 228:14
229:6 235:4 248:22
261:13 263:23,24
270:5 277:21 282:7
282:12,14,16,19
288:19 292:9 325:7
326:20 348:21,25
351:8 352:22,24
353:3,10,17 378:21
**financings**
67:23 353:14
**find**
104:9 125:17,21 139:6
238:3 247:5 258:4
333:11 342:5
**fine**
33:21 83:20 194:17
195:6 206:25 279:8
299:18
**finish**
147:3 155:14 299:2
**finished**
196:14 213:25
**firm**
69:22 111:5 123:25
195:25 201:19,25
214:2 235:2
**first**
2:6 8:25 9:23 13:6
14:5 18:10,24 19:15
19:18 20:11,12 21:5
26:6 27:6,7 29:24
35:22 40:14 41:20
42:16 48:21 59:12
65:14 68:23 69:11,11

71:6,23,24 72:19
77:2 84:7,8 85:20
115:3,13 129:13
138:17,24 139:6,13
139:21 140:18
141:19 142:1,7,10,17
143:7 145:21 146:17
146:25 147:6,18,19
148:1 150:6 151:1
159:22 160:6,22
161:13,18,19,24
169:9,11 171:19,20
172:3 174:18 175:3,8
175:13,18,19 176:4
179:5,23 196:19
210:11 216:7 217:11
220:14,17,21 221:16
225:2,10,15,21 243:6
243:10,23 246:19
247:12 248:21,22,23
248:24 249:8,10
252:8,11,25 253:4
254:1,15 255:5 257:7
258:1 259:9,11 260:8
262:11 263:22 264:4
264:6 270:4,19
277:17,18 282:12,16
286:10,11,15 302:5
321:8 326:6 327:7,20
332:14,21 341:10
342:1,11,12,15 347:8
348:22 352:22
**firsts**
221:13,17,23 222:7,25
224:5 225:7 296:17
**first-lien**
152:4
**five**
148:5 240:10,13 270:1
273:17 274:17,21
362:19 363:1
**five-and-a-quarter**
271:5
**five-minute**
.164:25

**fixed**
192:14
**fixed-rate**
271:4
**flat**
94:19 95:1,4
**flip**
288:8 320:24 323:1
**floor**
303:23
**flow**
128:2 188:25 255:15
278:3,7 348:15
366:24
**flows**
115:9 286:16
**focus**
36:12 160:1 207:4
346:12
**focused**
48:24 323:24 354:21
**focusing**
244:12
**Foerster**
3:2 166:12
**foggy**
347:8
**FOLEY**
7:10
**folks**
90:18 142:5 312:23
**follow**
116:21 185:22 283:12
358:8
**followed**
290:6
**following**
81:22 95:25 98:24
99:9 149:6 288:11,20
335:14,24 342:16
374:2,3
**follows**
9:15 42:11
**follow-up**
143:24 166:7 183:25

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 23

363:14 368:24
**follow-ups**
362:23
**foot**
57:21 59:6,14
**force**
246:6
**forecasted**
211:2
**forefronts**
245:2
**foregoing**
372:4
**form**
17:16 18:12 19:4 20:5
20:16 25:16 32:2
33:12 37:9 39:1 40:1
41:23 43:5,8 47:4
49:11 50:9 54:22
55:11,19 57:7 60:7
60:23 61:11 62:11,25
64:23 65:18,22 66:4
66:8 68:21 69:18,23
70:6 71:1,10,15
72:24 73:7,21 74:4
74:20 75:6,25 77:5
79:20 80:10 81:14,19
82:6 83:1 85:15,21
87:11 88:2 90:11
91:25 94:7,17 97:14
99:4 101:18 102:5,23
104:24 107:9 115:20
117:20 122:12 124:3
127:22 128:15
136:17 137:4 153:3
153:22 157:7 159:10
161:5 163:5 164:5
167:9 170:13 174:8
179:3 180:9 181:15
184:5 187:22 188:9
188:21 191:6,25
192:11,21 194:3
196:9 197:19 198:16
198:16 200:21
205:20 209:15

212:10,24 213:16
217:17 219:3 220:13
225:8,24 237:13
254:23 261:23
262:20 264:9 268:16
271:9 273:8 276:11
280:19 282:10
289:16 293:6,16
297:8 298:20 300:18
301:24 302:15
304:12 308:8 311:7
311:22 325:2 328:1
329:19 338:10
339:13 341:1 346:5,7
346:18 350:11 351:6
354:6 361:13 369:10
370:7,20
**forma**
204:7 323:6
**formal**
60:20,24 124:8,13,14
128:13 185:13 195:7
196:4,16 197:7
226:18,20 367:1
**formed**
37:13
**forming**
269:7 308:4
**formula**
288:24
**forth**
23:5 24:1 47:24 50:18
59:10 85:13 134:24
159:12 299:17
319:24 320:25
373:11
**fortunately**
224:2
**forward**
16:15 17:14 18:6
57:21 59:6,14 163:7
170:19 189:24
233:23 367:25
**fought**
224:1

**found**
66:23 184:22 295:8
**foundation**
18:16 19:8 25:1 61:24
71:2
**four**
148:5 163:15 296:2,15
297:6
**frame**
112:14 113:6 114:3
119:10 124:1 130:9
130:11 134:3,13
141:1 149:15 164:17
224:21 258:17
337:10,11
**framework**
201:21 248:4 260:9
**Frank**
1:17 6:19 9:7,14 373:6
373:22
**Frankel**
1:16 3:18 8:12
**free**
158:7 241:23
**frequent**
147:14
**Friday**
120:11
**FRIED**
6:19
**FRIEDMAN**
2:15
**friend**
302:21
**friends**
98:15
**fro**
160:11
**front**
20:7 32:12 85:16
102:15 169:4 227:24
254:20 257:9 286:2
290:13 304:21
**FSB**
4:5

**fulcrum**
48:13,15,16 49:6
229:17 300:3
**full**
70:1 76:2,6 82:20
189:3 230:18 235:21
261:9,10 281:20
285:11,12 302:13
310:25 311:9 312:19
313:21,25 314:12
315:22 321:20
323:15 324:16,24
325:9 327:19 328:9
335:18 336:4 360:11
370:3
**fully**
297:19 338:20
**fulsome**
309:15
**function**
277:25 351:13
**fund**
4:4 175:3 249:5 251:9
316:24 317:13 337:2
342:1 347:9
**fundamental**
90:21 197:3,12,14
299:10 365:23
**funded**
46:20 175:17 176:3
205:1 282:11 284:1
**funding**
13:16 78:22,23 81:1
163:9,19 164:7
170:24 171:4,11
175:8 238:15 240:10
248:19 273:17,19,20
274:15,21 337:5
350:25
**funds**
90:18 208:6 333:12
334:24
**further**
14:17,21 15:1,2,3,4,11
15:12 58:10 103:11

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 24

226:25 298:23
299:16 348:8 363:12
368:20,25 373:15
**future**
1:6 8:15 20:20 150:7
174:2 189:12 212:3
234:7,23 266:4 286:7
286:16 338:14
359:16
**fuzzy**
326:12

───── **G** ─────
**G**
2:10 9:12 40:18
184:14 379:23
**gap**
338:9
**gas**
154:10 155:7
**gather**
283:14
**gauge**
30:13 31:1
**Gavin**
222:16
**general**
32:4 102:24 104:2
120:19 134:12
135:13,13 164:16
256:25 258:19 286:5
330:11 366:15
**generally**
68:17 95:3 103:16
131:13 156:20 230:3
231:14 266:14
301:22 334:16
**generate**
188:24
**generated**
116:18
**generation**
154:14
**generically**
76:22

**genesis**
50:12
**gentlemen**
84:20 258:2
**George**
184:15
**getting**
14:13 20:18 100:6,7
101:1,6,9 106:12,20
139:3,4 158:20
159:19 207:21 225:6
225:21 271:5 278:22
311:12 315:21
322:14 354:25
355:13
**ghorowitz@kramer...**
3:23
**Giorgis**
379:22
**give**
21:8 103:20 105:9
110:12 123:8 134:12
134:23 215:1 219:18
222:6 237:6 242:17
265:9 268:15 291:22
316:5 328:4 355:8
362:14,15 363:1
368:15
**given**
33:19 101:10 106:15
108:16 116:11
120:16 131:12 132:6
132:9,11 155:1
172:25 178:20
189:19 191:7 192:2
198:5,7 199:4 211:13
215:3 219:13 251:15
265:11 284:12 372:6
373:12
**gives**
355:4
**giving**
176:4 191:21 234:4,12
**glad**
349:18

**Glenn**
2:20 37:18 95:23 99:7
102:9,10 105:1
109:13,19,22 110:19
113:11,17 118:16,21
119:2,21,25 127:23
128:24 135:16 138:6
139:23 140:4,16
143:16 145:6,12,15
146:2,6 148:13,15
149:20 150:4,5
152:22,23 155:21,22
162:12 164:25 165:5
166:5,6 250:20
362:12,22 363:15
368:20 375:4,8
**GM**
361:24
**go**
17:14 19:16,17 26:20
38:3 65:8 94:19
95:11 99:21 104:8,14
105:3 109:25 111:3
116:2 120:6 129:19
137:25 145:4 165:11
167:8 197:22 198:19
205:5,7 209:1,3
221:13 227:1 233:23
263:2 285:17 303:24
304:4 312:15 330:17
351:15 362:15
365:23
**goal**
242:20 244:8 245:19
**goals**
240:24,25 241:6,8
264:21,25
**goes**
167:4 170:19 212:12
270:18 312:7 314:18
**going**
15:8 37:19 58:10
83:10,17 95:14 99:2
101:23 109:13,19
113:12 118:16

119:15 128:13
137:24 139:23
143:10 145:6,25
150:25 157:4 159:7
159:16 163:7 165:14
166:6 170:2 174:20
183:13 185:23 187:3
187:19 188:13 189:9
190:18 198:19
201:15 202:9 204:10
205:16 206:1 208:5
211:9,10,15,16,20,25
212:6,6 213:6,12,21
213:23 214:21 215:8
216:16 217:9 224:9
227:4 231:10 234:17
234:21 249:16
254:17 255:18
261:14 268:21,21
271:1 273:13 276:8
278:15 288:21 297:3
299:9,17 310:19
313:20 318:3 320:10
322:7 327:15 330:6
330:13 331:8 336:25
349:25 353:24
357:23 358:6 359:14
361:8 362:1 363:4
371:4
**Goldstein**
142:21
**good**
8:4 9:18 46:6 55:6
83:21 95:24 125:18
126:3 127:14 134:25
147:10 154:7,22
155:1,5,9 159:3
163:14 166:10
183:21 214:7 227:14
228:5 244:20 272:1
294:9 297:24 312:13
315:12 347:18
349:18 350:1
**good-faith**
349:3

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 25

**Gordon**
222:16
**government**
218:2
**graduated**
199:24
**granted**
188:1,6
**Gray**
2:3 8:23 9:22
**great**
130:25 158:17 208:17
245:9 294:10
**greater**
240:6 307:11
**Greene**
111:11 120:9 122:16
123:10 138:9 140:6
246:20 247:9,15
376:9,21 378:4,10
**Gregory**
3:22 227:15
**grounds**
39:17
**group**
2:16 3:11 12:5 14:4,5
14:5 29:1 51:1,1,2,12
53:8,11 56:4 58:1
59:17 84:21 112:21
123:8 182:11 183:23
193:9 222:1 225:12
225:21 227:17
231:15,18 232:9,11
235:2 258:16 297:23
298:13,14 315:23
319:1 325:14 326:19
327:10 331:21
332:11 334:12,15,17
335:2 337:12,20
338:22 339:6 342:19
344:7,8,13,14 348:20
355:2
**groups**
25:4 28:7 30:10,12
58:2 86:1 136:21

198:25 217:21
**group's**
319:25
**GSO**
257:23
**guaranteed**
112:9
**guess**
108:19,21 112:12
157:16 163:14 217:6
232:8 233:22 236:20
315:12 345:2 369:20
**guesstimate**
279:5
**guiding**
245:25
**GUMP**
5:2
**guy**
257:16
**guys**
299:17

---
**H**
**half**
126:23 127:8 153:14
153:16,18,19 246:3
281:19 357:18
**halfway**
110:21 114:16 129:4
**hammer**
303:6
**hand**
137:24 143:10 183:14
348:9 373:20
**handed**
128:25
**handful**
88:8 126:11 146:17
**handing**
11:3 22:22
**handle**
38:14 136:7
**hands**
89:5 142:3 242:5,14

244:9
**happen**
224:21
**happened**
41:25 139:14 141:6
153:9 159:1 256:6
328:6,21
**happening**
231:17 299:10
**happens**
81:17 82:4,18 94:14
256:2 259:23 322:16
346:25 356:1
**happy**
83:14,16 161:25
**hard**
53:19 56:5 66:16
73:15 111:2 133:11
149:6 158:9 161:15
265:17 294:10 297:5
312:10,14 335:12
**hard-fought**
55:6
**hard-working**
84:20
**harmonious**
121:17
**harmonize**
210:18
**Harris**
6:19 222:14
**hat**
160:6,9
**hate**
291:14
**HAUER**
5:2
**HAYES**
7:15
**head**
127:17
**headed**
335:8
**heading**
228:2 240:20 248:19

267:25 290:16
291:19 292:7 295:20
318:18
**healthy**
136:6
**hear**
343:12 344:2
**heard**
85:6 105:11 203:3
218:12 222:24 265:9
265:11,13 291:5
331:20 344:6,18
**hearing**
15:18,25 16:9,12 17:3
17:7,11,14,15 41:8
41:17 42:13 101:22
102:4 187:2 268:15
362:25
**heavily**
84:3 244:23
**hedge**
90:18
**held**
45:10 134:19,20
141:23 175:20
207:12 334:12,19
**help**
103:10 106:20 119:16
143:2 171:1 249:7
317:4 353:25
**helped**
11:21 219:15
**hereinbefore**
373:11
**hereto**
17:21
**hereunto**
373:19
**hesitant**
91:15 290:10
**Hessler**
6:7 9:4,4
**Hey**
297:1
**Hi**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 26

332:22 333:11
**high**
70:11,13 107:13 108:3
108:7 130:15 183:8
188:24 209:19 210:2
277:3,10
**higher**
108:15 121:25 122:5
230:7 234:6 236:23
287:13 288:6 295:2
298:8 307:9,10
310:16 313:9 316:11
316:12 350:18
351:16 353:22
359:17 365:16
**highlight**
345:24 346:8,11
352:10 354:8
**highlighted**
233:12 345:22
**highlights**
345:23
**highly**
21:1,18 60:16 308:3
**high-quality**
244:24
**high-yield**
131:7
**hired**
143:2 303:1
**hoc**
2:16 3:11 5:3 10:17
53:8,11 108:18
183:23 227:17
315:22 319:24
331:17,21 334:12
335:2 337:12,20
339:5 340:5 344:14
**hocs**
349:3
**hold**
96:25 159:22 202:14
234:22,24
**holder**
229:18 232:23

**holders**
5:5 31:14 34:1,9 35:23
40:15 41:21 42:17
51:23 115:13 129:14
204:6 220:17 221:8,8
237:9 239:11 257:17
260:17 262:4 280:7
281:18,22 317:12
324:22 325:11 327:2
327:17,21 328:15
336:21 338:15,25
355:5 356:14 358:15
377:21
**holding**
121:9 150:8 176:12
333:12 334:24
376:15
**holdings**
1:6 8:15 45:5,10 109:3
237:9
**holds**
342:19,21
**HOLMES**
7:22
**honest**
109:9
**honestly**
60:14 347:15
**honesty**
245:3
**honored**
98:13
**hope**
234:4 318:13
**hopefully**
138:1 355:9
**hopeless**
339:8
**hoping**
313:22
**Horowitz**
3:22 76:16,19 84:23
165:2 227:1,13,15
249:21,22 253:8,10
254:22,25 256:11,18

256:22 262:1 265:4
266:22,23 268:18
269:10,23 274:3,5
275:11,15 279:21
284:14,19 285:4
286:3 290:25 291:7
293:19 303:19,20
304:17,20 307:16,18
317:25 318:11 319:3
319:9,14 331:24
332:5 339:10,24,25
353:6,7,24 354:1
356:11,12 362:9,14
362:19 363:1,16
369:3 375:7
**horse**
239:25
**Horton**
378:10
**hour-and-a-half**
83:10 352:1
**house**
106:17 216:17 271:24
302:20
**houses**
104:15,22 105:4,6
106:14
**Houston**
154:9
**hundred**
12:21 93:4 94:5,10
**hybrid**
229:1 242:21
**hypothetical**
104:25 214:10,24
265:18,19 271:1,2,12
271:21,25 275:16
278:21 279:24 280:3
**hypotheticals**
18:21 272:20

**I**

**IAN**
7:22
**ID**

375:17
**idea**
99:16,18 108:11
133:20 153:6 156:5
158:25 159:1 164:24
204:2 207:23 220:4
255:17
**identical**
175:14
**identification**
10:25 22:19 54:3
84:14 109:17 113:15
118:25 119:19
128:22 138:4 140:2
143:14 145:10
149:25 256:16 319:7
332:3
**identified**
18:25 30:10 135:9
137:2 151:14
**identify**
20:10 136:24 137:20
155:15 352:8
**ignores**
299:10
**IH**
35:21
**ii**
250:16
**Illinois**
6:14
**illuminating**
223:10
**illustrating**
272:21
**illustration**
324:23
**illustrative**
140:7 247:16 322:18
324:15
**immediate**
129:14
**immediately**
368:7
**impact**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 27

32:9 36:25 43:23
44:6 81:16 82:1
86:14 171:8,12,14
176:12 353:13 360:2
impacted
224:5,6
impassioned
51:14 52:1
implemented
132:18 179:12
implications
36:17 37:5 38:22
40:12 43:5 44:15
255:12 360:11
implicit
303:10
implied
87:24 97:9 168:11
203:13,15 304:8,8
305:13 306:5,25
307:20,23 309:25
310:2,15,17,24 313:7
314:8 317:23 350:14
350:17 354:11,14,16
364:2,9 365:21
implies
72:15 350:16
importance
17:6 158:17 168:4
233:13
important
25:10 33:1 35:3,6,10
35:25 50:1 52:22
69:7 142:23 158:6,23
199:8 205:21 243:23
245:19 301:20
302:18 330:9 346:11
imposition
203:23
impossible
265:22,23 272:15
impression
330:11,11 370:9
improve
21:15,25 293:3 294:22

298:13,15
improved
293:1,12,23 295:14
298:23
improvement
18:7,9 19:7 193:17
272:22,24
improvements
19:14
impute
364:24
imputed
354:16
inability
74:16
incentive
49:9 64:21 178:24
inclined
356:21
include
28:8 93:9 133:14
163:6 170:4 204:9
218:1 335:2
included
28:6 60:2 102:1
113:24 213:8 269:5
349:16
includes
204:13 366:23,24,25
including
35:22 136:2 171:3
195:12 205:13
280:10 286:9 333:14
334:25 347:22
incomplete
104:25 271:11
incorporated
91:11 236:10 237:16
282:15
incorrect
33:11
increase
361:8
increased
124:21,24 153:1

339:18 355:14
increasing
347:22
increment
240:8
incremental
314:16
incur
69:12
incurred
164:1
incurrence
169:3 217:13
indebtedness
156:5
indenture
4:6 7:11 8:24 9:23
130:18 285:24
indentures
131:24 253:2 254:11
254:15 255:4
independent
40:12 123:6
indicate
90:14 123:11
indicated
89:12,14 93:17 96:1
99:14 103:7,13
129:15 327:2,22
indicates
100:6
indicating
151:6
indication
100:5 103:20 106:8
301:23 302:11
303:11,14
indications
88:9 99:19
indicative
103:15
indicator
90:10 91:1 92:5
102:21 103:5,23
104:1,5 105:10 210:1

indicators
92:5,9 367:8,16
indicia
195:21 196:7 278:12
indifferent
175:6 176:2
individual
221:24 223:3 235:9
inducement
177:23
industry
109:8
inference
93:2,19 262:10 294:1
365:13
inferior
321:6 327:18
inferring
369:21
inflict
217:5
inflows
189:1 277:23
inform
265:22
information
23:22,25 89:2 106:12
109:6 125:21 147:17
150:15 152:2 312:4
informed
164:22
infusing
305:24
infusion
50:9 65:21 69:16 70:4
74:11,16 77:2,4
157:23 158:6 168:9
251:5 278:8,15 279:6
279:11
infusions
74:13
ingredients
225:11
initial
86:20 348:12

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 28

| | | | |
|---|---|---|---|
| **initially** | **intentionally** | 353:20 360:24 | **investing** |
| 258:15 | 109:21 | 361:16 | 317:22 |
| **innovations** | **interacting** | **interested** | **investment** |
| 259:22 | 136:11 | 277:20 325:11 329:3 | 5:13 27:24 87:25 |
| **input** | **interaction** | 329:13,16 330:3 | 90:20 92:2 99:21 |
| 257:1 | 142:9,16 223:25 | 373:18 | 105:6 127:25 131:9 |
| **inquiries** | 263:21 | **interesting** | 168:12 195:16 211:6 |
| 344:5,8,11 | **intercreditor** | 354:20 | 260:14,16 262:11 |
| **inquiry** | 117:8,24 | **Interestingly** | 293:21 296:7 300:21 |
| 344:6 | **interest** | 209:16 | 354:10 365:11,21,24 |
| **insisted** | 13:11 30:4,8,13 31:2 | **interfere** | **Investments** |
| 206:5 | 31:23 32:10,22 33:8 | 25:9 | 159:8 |
| **insistent** | 33:15,25 34:8 40:23 | **Interim** | **investor** |
| 56:5 | 44:6 52:21 53:7 55:7 | 1:4 | 29:25 30:6 235:20 |
| **insolvent** | 55:18 56:2 59:3 | **intermediate** | **investors** |
| 311:16 370:6 | 70:12,13,16,19 73:5 | 86:21 150:8 263:19 | 27:24 28:5,15 29:5 |
| **instance** | 73:13,19,20,25 74:15 | **internal** | 33:4,9 34:1,10 35:7 |
| 215:4 320:21 | 75:1,2,4,9,17,21 76:3 | 40:19 | 235:2,9 296:7 |
| **institutions** | 76:10,11,13,13 77:2 | **internally** | **invite** |
| 195:17 | 77:8 94:12,21 96:2,9 | 244:24 | 119:23 129:1,11 |
| **instruct** | 96:11 97:9 115:6 | **interpret** | 377:15,20 |
| 28:21 37:16 201:15 | 130:16 139:3 156:4 | 254:19 | **invoke** |
| 265:14 | 162:3,5,13,18,21 | **interpretation** | 235:16 |
| **instruction** | 163:2,25 174:11,20 | 262:24 | **involve** |
| 29:10 38:6 39:17 | 177:21 179:10 | **interrelated** | 68:3 170:11 175:1 |
| 267:11 | 182:14 183:8 186:8 | 306:17 | 324:19 |
| **instrument** | 186:14,24 187:9,19 | **interrupt** | **involved** |
| 90:16 106:15 131:14 | 187:20 188:8,10,16 | 145:23 362:6 | 11:16 21:18 60:15 |
| 157:8 159:2 192:3,5 | 188:19 189:4,13,25 | **interrupting** | 67:21 87:3 115:17 |
| 192:13 199:9 221:6 | 190:19,21 191:3,9,12 | 147:2 | 136:1 141:18 142:22 |
| 241:5 286:8 | 191:16,23 192:2,7,19 | **introduce** | 146:12 361:22 |
| **instruments** | 193:21 194:21 | 8:20 | **involves** |
| 93:8 130:19 131:6 | 209:20,22 210:1,9,25 | **introducing** | 169:3 |
| 132:3 252:12,16,22 | 211:3,17,20 216:22 | 241:3 | **IPP** |
| 253:14 276:24 | 217:10 243:4 244:13 | **intuition** | 120:15 123:5 |
| 286:17 | 244:19 270:7 271:14 | 285:8,19 289:8,8,15 | **ironic** |
| **integral** | 272:8,25 273:1,3 | **inure** | 315:17 |
| 56:9 228:7,11 240:22 | 276:19 277:2,23 | 300:7 | **irrespective** |
| **intend** | 278:6,10 283:8 | **inversely** | 208:13 |
| 268:15 269:12 359:23 | 286:12,14,15 290:18 | 210:8 | **IRS** |
| **intended** | 315:15 319:25 | **invest** | 32:8 41:4,13 |
| 248:14 273:25 | 320:21 321:10,23 | 50:3 88:20 160:21 | **issuance** |
| **intent** | 322:3 329:7 350:2,3 | 235:5 313:17 316:3 | 252:17 |
| 42:2 86:7 138:23 | 350:12 351:13 | **invested** | **issue** |
| 213:7 293:17 | 352:21,23 353:4,11 | 287:22 | 32:25 33:2,3 102:18 |

**PX 134**
**Page 125 of 165**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014
Page 29

106:9 124:5 131:12
132:11 195:24 196:1
197:11 225:14
243:20 244:12,13,14
244:16 245:1,17
251:19,20,21,22
252:1 296:11 315:23
347:11 348:17
359:20 361:24
**issued**
2:6 131:19 274:9
**issuer**
252:14,18 253:13,18
**issuer's**
252:24
**issues**
25:19 27:18 28:11
31:11,20 33:20 43:19
43:20,23 44:5,11
60:16 62:13 101:25
102:14 131:20
135:14 159:4 242:2
246:3 251:15,18
252:4 255:23 265:10
311:25
**issuing**
41:5,14
**italics**
337:1
**ITC**
127:11 154:23
**item**
302:12 326:13
**items**
345:21
**iterations**
58:16 102:7
**iterative**
58:23

───── J ─────
**J**
1:18 3:15,24 9:14
373:6,22 377:11
379:4

**JACOBSON**
6:19
**January**
31:7 129:2 130:8,11
130:14 138:7,16
245:19
**Jeffrey**
5:17 257:11
jeffrey.sabin@bing...
5:18
**JESSICA**
6:23
jessica.pevzner@fri...
6:24
**Ji**
143:18 378:15
**job**
84:22 152:10
**joint**
63:22
**jointly**
1:4 63:9 64:2,14
**Jordan**
222:13
**Josh**
222:14
**JPMorgan**
104:16
**Judge**
200:8,14 221:12
**judges**
200:23,25 201:2,5,9
201:22
**July**
173:11 196:3
**jumping**
325:20
**June**
1:9 8:1 11:5 15:18
15:24 16:12 17:3,6
17:11,14,22 41:9,17
42:13 102:4,15
173:10 209:23
268:15,22 304:22
373:20

**junior**
52:24 71:23,24,25
76:9 139:9,12 229:17
229:21 230:6,9
231:18 232:11 240:5
292:13 298:7 299:12
319:25 320:3
**juniormost**
231:16 297:16
**jurisdiction**
371:15
**justifies**
230:13
**justify**
55:16,25

───── K ─────
**K**
378:15
**Karsh**
222:14
**Kasowitz**
2:15 344:15
**KATZ**
5:20
**Kayvan**
3:7 166:11
**keep**
14:13 58:15 83:16
139:2 183:12,14
201:25 271:23
288:21 299:17
308:19 333:6
**keeps**
127:5 201:5
**Keglevic**
149:22,24 220:3
379:21
**Keglevic's**
247:3
**Kelvin**
143:18
**Ken**
222:15
**kept**

124:16 324:1
**key**
25:3 54:11 122:17
123:12 129:20 241:6
250:5 260:23 335:10
345:2 363:20
**kick**
266:5
**kind**
54:25 109:6 111:2
119:23 125:9 181:18
198:24 200:6 207:3
215:14 302:25 303:1
303:2 313:1 335:12
**Kirkland**
6:3,11 9:2 28:20 33:20
37:8,10,13 38:11
39:6,10 42:24 43:4
43:14 133:19 142:4
218:20 219:23
244:25 247:15 265:9
269:8,17 291:5
312:23 333:22
**Kirkland's**
38:21 39:24 40:5
**Kleinman**
222:13
**knew**
19:24 131:4,25 147:11
283:7 298:5,15
**know**
23:13 31:16 32:24,25
35:6 40:10 52:13
55:3 58:14,22 60:24
74:12 75:7 76:18
81:24 82:22 83:2,3
83:11 84:5 85:22
87:12 90:17 98:10
99:18,19,20,22 101:9
101:10 106:12
107:13,23 108:8,16
109:1 111:7 114:5
116:9 124:24 126:22
128:16 133:11,17
136:10 138:17,21

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 30

141:5 155:19 156:25
158:3,10,14,22
160:25 163:15
164:18 176:14
186:11 187:3,5,6,15
197:14 199:20 200:3
207:18 215:16
218:14 219:14 220:3
234:23 244:21 247:2
254:22 255:17,24
257:11 264:3 265:23
269:10 271:1,17,23
272:15 273:11 275:8
275:17 278:20 281:6
284:6,11,13 285:5,13
289:14 290:8 292:4
294:24 295:5 297:9
297:14 298:22
299:18 301:13,16
312:2,2 315:16 316:9
316:18 325:18 328:5
330:12 334:14,22
337:11 339:14,15
341:19,22 344:7,16
346:11 347:11
361:23 362:20
364:11 367:15
369:15,24,25 370:1
370:24
**knowing**
272:3
**knowledge**
17:15,22 22:5 30:12
30:25 32:20 39:23
40:5 130:23 181:20
181:24,25 182:3,4
212:12 334:9 343:14
**known**
334:18 339:5
**knows**
211:20
**Kowalczyk**
7:23 8:6
**Kramer**
1:15 3:18 8:11 29:2

227:15 334:14
ksadeghi@mofo.com
3:8
_____ **L** _____
**L**
1:12
**lack**
278:12
**laid**
309:15 321:23
**language**
63:23 291:17
**LARDNER**
7:10
**large**
66:24 67:19 115:13
139:19 147:6 153:25
179:13 242:4,13
257:17 348:6
**largely**
225:13 340:14
**largest**
280:25
**LaSalle**
6:13
**late**
31:7 262:4 275:13
**latest**
120:17,19,24
**launch**
115:10
**law**
201:4 221:10
**lawyers**
245:5
**lay**
301:11
**layers**
57:10
**Lazard**
7:24
**lead**
257:20
**leading**

257:24
**leads**
195:21
**lead-in**
292:2
**learned**
325:23
**leave**
43:19 50:2 182:11
198:9 262:6 266:1,2
277:18 279:17
284:23 288:5 289:11
**leaves**
281:16
**leaving**
141:14 272:12 282:21
285:9,10
**led**
116:23
**left**
83:12 117:15,21
142:15 144:13 156:2
254:9 255:2 313:23
324:14 362:13,18
**Legacy**
2:16
**legal**
8:6 9:8 33:13 43:20
44:10 62:11,12 63:1
65:4 71:16 73:8,9
180:17 194:16
201:21 222:2 255:22
314:3
**legend**
114:11
**LeMAY**
4:17
**lend**
191:8
**lender**
68:19 160:7,10 194:12
287:17 288:9 289:2
**lenders**
12:15 150:9 152:4
191:2,21 193:20

205:6,22 210:17,18
225:15 243:7 274:12
**length**
157:22
**lengthy**
37:2 230:7
**lens**
118:3
**letter**
143:9 327:7
**letters**
235:3
**let's**
72:5 74:8 113:10
114:1 120:6 127:10
129:1 145:4 160:1
165:11 186:4 207:4
212:20 213:5 216:13
227:1 233:16 260:5
278:23 285:16
288:23 295:24
300:11 308:22
317:25 362:19
**level**
18:7 99:13 209:20
306:8
**leverage**
229:20 230:20,21
277:25
**leveraged**
142:25 277:4
**levered**
243:12
**Levin**
1:16 3:18 8:12 29:2
227:16 334:14
**Lexington**
6:5 7:5
**Ley**
379:23
**liable**
63:9 64:3,14
**Liang**
222:15
**LIBOR**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 31

| | | | |
|---|---|---|---|
| 286:24 | 176:10,21,22 177:10 | 341:10,17,22 342:1,8 | LINE(S) |
| lien | 177:12,20 179:5,23 | 342:15 343:17 | 374:4 |
| 2:6 5:5 8:25 9:23 10:2 | 179:23 180:3,20,20 | 346:24 348:22 355:5 | LIPTON |
| 10:16 11:24 12:4,7 | 181:2,7 182:2,13 | 355:16 356:2,14 | 5:20 |
| 12:10,14,15,21,22 | 186:8,14,24 187:9,13 | 358:12,19 362:2 | liquid |
| 14:4,5 15:17,23 16:7 | 188:2,3,11,19 190:11 | 375:21 | 90:13 102:18 |
| 16:16 18:11,24 19:15 | 190:20 192:17 | liens | liquidation |
| 19:18 20:11,12 24:12 | 195:10 196:21 202:9 | 4:6 21:5 29:19 62:23 | 301:14 |
| 24:19 25:20 26:12,22 | 202:10,14,20 203:6 | 62:24 65:15,21 71:6 | list |
| 28:9 29:1,24 30:14 | 203:24 204:20 205:1 | 71:7 75:10 76:3,14 | 13:16 29:6 74:9 77:20 |
| 30:15 31:15 35:5,23 | 205:18 207:14 208:7 | 115:13,14 130:4,21 | 111:16 125:16,19 |
| 36:10,17 37:5,6 | 209:2 220:9,17,17,21 | 132:16,23 139:13 | 126:8,22,24 127:4,7 |
| 38:22 40:13,15 41:20 | 224:7,25 225:2,5,9 | 202:19 203:5 208:13 | 151:9 297:6 |
| 41:21 42:16,17 46:10 | 225:10,15,19,21 | 217:11 220:14 | listed |
| 46:19,19 48:3,20,21 | 227:16,18,21 228:7 | 243:23 256:2 298:1 | 77:23 79:24 91:4 |
| 49:10,16,21 50:10,13 | 228:10 238:2 240:22 | 298:18 299:12 357:8 | 104:17 105:5,21 |
| 50:16 53:23 54:12 | 243:1,5,6,6,8,11,14 | lien's | 110:20 143:19 |
| 55:18 56:2,8 57:13 | 248:23,24 249:4,7,8 | 196:20 | 144:14 155:16 |
| 59:12,17 60:6,20 | 249:10 250:1,7 | Lien/EFIH | listen |
| 62:3 67:23 68:24,24 | 251:19 254:2,9 | 308:23 | 52:1 |
| 68:25 69:8,11,11,13 | 260:23 261:2,10,13 | lieu | listened |
| 69:15,20 70:1,8,8,11 | 261:17,19 262:6,13 | 175:8 223:23 | 51:25 |
| 70:14,17,20,25 71:5 | 262:16 263:3,8,23,25 | light | listening |
| 71:9,23,24,25 72:1 | 264:4,5,6,8,12,15,23 | 55:16,25 57:12 172:15 | 76:22 289:6 |
| 72:12,23 73:5,20,25 | 268:9,12 270:3,4,6,8 | 172:18 | lists |
| 74:2,6,10,18 75:15 | 270:19 272:12 | likelihood | 78:8,14 79:5,11 |
| 75:23 77:1,22 80:23 | 275:25 276:14 | 211:9,24 212:5 | literature |
| 87:25 115:3,3 129:22 | 277:15,17,18,19 | likes | 199:18,20 |
| 129:23 130:16 | 278:19 279:17 280:6 | 120:19 | litigate |
| 138:18 139:7,9,21 | 280:7,15 281:1 | limitation | 250:10,14 276:1 |
| 141:15,19 142:1,10 | 282:12,16,20,21 | 33:8 | 281:22 338:18 |
| 142:17 143:7 145:21 | 283:7,17 284:23 | limited | litigated |
| 146:17,25 147:6,18 | 290:17,21 292:8,14 | 27:23 28:4,6,14 29:4 | 261:20 280:4 |
| 147:19 148:1 151:1 | 292:15 297:22 | 33:4,10 156:6 296:6 | litigating |
| 156:2,8,11 157:9 | 298:13,14 311:2 | 296:6,14,23 312:4 | 261:1 |
| 159:23 160:6,10,19 | 313:20 314:11,17 | LINDSAY | litigation |
| 160:22 161:13,13,18 | 318:19 319:1,24 | 5:9 | 37:2 62:15 201:14 |
| 161:24 162:6,19 | 321:7,10,13,24 | LINDSEY | 261:9,10,21 262:8,18 |
| 164:1 166:19 169:9 | 324:22 325:11,22 | 5:24 | 263:5 290:19,22 |
| 169:11,19 170:25 | 326:19 327:2,10,12 | line | 291:4,10 357:10 |
| 171:1,9,19,21,22 | 327:17,21 328:15 | 24:14 54:7 116:3 | 358:2 |
| 172:3,5,8,23,23 | 331:17,21 333:14,19 | 129:15 140:20 | little |
| 173:1,3,8 174:19 | 334:10,11,20,25 | 326:13 352:14 | 169:22 183:13 206:18 |
| 175:3,8,9,10,12,13 | 335:11 336:1 338:2 | lines | 249:1 253:21 254:12 |
| 175:18,19,21 176:4 | 338:19,25 340:5 | 270:2 296:2 | 269:11 285:16 |

CONFIDENTIAL
DAVID Y. YING - 6/23/2014
Page 32

325:21 326:12 347:7
**live**
235:3 276:23
**LLP**
1:16 2:3,15 3:2,10,18
4:3,13 5:2,12,20 6:3
6:11,19 7:2,10
**loan**
56:2 68:25,25 69:8,21
70:5,14 72:13 74:2
74:10,17,19 77:1
81:4,5,6,15 82:1,13
82:16 157:11 164:8
191:17 192:13 236:9
238:2,14,15 239:2,10
239:16 273:5,24
274:19 275:4 288:14
299:23 365:7,8
**loans**
69:6 171:5 370:3
**loan-to-value**
298:3
**lock**
158:24 208:17
**locked**
212:16 281:24
**logical**
255:25
**logo**
319:11
**long**
66:16 106:22 107:4
126:8 134:4 158:14
158:16 164:8,8,14,22
179:18 199:20
206:23 271:23
295:11 302:17
344:17
**longer**
94:20 115:5 268:4
**long-range**
116:10
**look**
90:21 91:3 92:5
125:10 128:1,2,3

150:18,23 153:4
154:22 158:8 168:14
171:8 183:2 209:18
211:17 246:16
247:12 248:17 250:4
257:6,9 258:10 259:8
259:12 260:20
262:21 274:9 283:16
295:24 304:16
308:22 313:6,11
314:4 324:23 354:25
360:10 362:10
367:15
**looked**
46:20,24 67:7,18,22
68:10 89:9,19,20
106:7 118:2 125:11
125:25 127:13
133:10 151:19 152:6
184:21 195:11
202:22 367:5,19,20
368:13
**looking**
27:4 127:15 142:14
196:1 199:3 207:9
215:21,22,23 260:25
262:10 291:18
313:10 314:22
**looks**
168:25 183:2 288:9
**loose**
226:15
**lost**
261:3 279:15 280:4
**lot**
35:16 40:8 108:25
143:1 203:12 223:25
241:2 255:18 278:11
313:19 323:18
347:15 349:22
361:19
**lots**
31:11 107:4 133:4
142:12 160:10 202:4
244:25 284:12,13

330:7 341:3
**louder**
325:17
**low**
88:1 107:14 108:1
**lower**
108:14,20 115:5 122:2
122:6 148:18,19
230:6 270:7 287:12
313:9 348:22 350:13
**lowest**
58:1
**lunch**
165:2,6
**lweiss@wlrk.com**
5:25
**Lynch**
145:20
**lzahradka@akingu...**
5:10

_____
**M**
**M**
4:17 379:5,15
**MacDougall**
134:21 136:2 332:23
332:24 333:2,6,24
340:15 379:5,15
**maintain**
25:10 306:3
**maintained**
187:2
**major**
156:3
**majority**
329:7
**make-whole**
71:25 72:1,18 76:6
139:4 172:22 173:4
174:3,5,12 181:2,7
189:2,5 250:9,12
253:23 255:23 261:1
261:9,11,20,21 262:8
262:18 263:4 276:2,2
276:9 277:12 279:16

280:3,6,17,20,22
281:8,9,16,17,23
283:9 284:3,3 285:12
285:21,23 287:13,14
288:5,14,17,23,24
289:3,11 313:21
314:13,15 315:15
321:11,21 322:2,4
323:15 324:16,24
325:5,10,16 326:8,14
326:16,21 327:4,20
327:23 328:9,17
329:4,14,17 331:12
331:18 335:17,18
336:2,4 337:13,22
338:1,3 339:4 340:4
340:11,19,24 355:20
356:2 357:3,11,16
358:3,4,11,12 359:20
**make-wholes**
71:6
**making**
21:1 28:13 38:24
44:15 56:7 59:4 75:7
185:12 189:15
264:12 279:14
285:22 300:2 349:3
356:1
**man**
220:5
**management**
5:14 219:13,15 231:22
**Managers**
375:20
**mandatorily**
50:12 68:8,19 69:1,13
156:9 157:9 191:10
243:9 245:14 264:1,5
264:13
**mandatory**
68:11,16 69:9 236:1,3
236:5,6,13,14 237:15
237:19,23 242:23
245:7
**manifest**

PX 134
Page 129 of 165

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 33

```
    329:8                markets              maximize             115:7 201:20 245:8
map                  99:18 277:20         76:8                 meeting
287:6                market's             maximized            10:1,5,8 11:11 14:18
MARC                 90:17                135:1                  15:2,12,15,22 19:21
4:19                 market-maker         Mayer                  31:10 39:8 119:9,24
March                89:7                 334:14                 120:3,11 123:2,5,17
134:2 258:7 262:4    MARKINGS             McCUTCHEN              123:20 129:2,13,18
  263:10,22 266:25   375:11               5:12                   130:6 176:17,20
  278:25 279:1 283:1,5 marks              McMullen               198:12,17 203:4
  283:14 319:13 321:6  95:13,19 166:2 227:3 142:24               319:20 320:12
  327:17 329:1 331:6   227:9 318:2,8 363:9 MDs                   328:24,25 329:2
  336:17,19 367:14     371:3              142:3                   330:16 337:24 346:2
margin               marriage             mean                   351:21 377:16,20
272:22,23 287:2,3    373:16               35:16,19,20 38:13    meetings
mark                 Massachusetts          71:14 86:6 100:14  15:5,7 142:12 198:21
77:13 84:10 108:1,3,7 2:9                   132:12 145:23        222:1 312:6
  109:13 118:17      material               170:21,22 184:9    member
  119:15 139:23 145:6 193:16 214:17 269:19  195:2 240:23 250:10 64:13
  312:20 319:3 331:24 320:16                311:5              members
marked               materially           meaning              150:13 258:16 334:12
10:24 22:18 54:2     116:5,14 155:8       75:21 329:9 353:8    memo
  84:13 109:16 113:14 Materials           meaningful           32:8,23
  118:24 119:18      145:13 319:12 332:16 64:9 353:4           memorandum
  128:21 138:3 140:1   378:20 379:9       means                33:24 34:7 150:15
  143:13 144:7 145:9 math                 123:7 235:1 266:4      152:3
  149:21,25 185:18   79:21 96:17 97:9,17    287:17             memory
  227:22 246:15        99:9 163:14 296:13 meant                98:6 173:21 254:3,4
  256:15,18 319:6,10 mathematics          21:11 76:21 147:9      258:21 283:3 286:23
  332:2,6 375:16     55:12                  194:10 249:7 283:14 mentioned
  379:19             Matican              measure              12:8 169:6 336:16
market               377:11               91:22 94:2 370:1       347:24
87:24 88:4,5,8,9,12,15 matter             mechanic             menu
  90:14 92:19,22,22  8:15 16:11 22:25 44:8 316:20              129:23
  94:3 99:12,12 100:4   44:18 97:8,16 130:6 mechanics           mere
  102:19,21,25 103:23   136:25 211:21 217:9 132:18 141:10       245:3
  190:21,25 191:16,18   235:4 257:1 287:16 mechanism            merge
  191:22 192:2 212:12   302:23,25 335:1    134:5 175:24         146:13
  231:11 301:22        373:17,18          Media                merger
  311:19 365:13,15   matters              95:14,20 165:13 166:3 121:13,18 210:19
marketing            34:24 102:3            227:4,10 318:3,9    meritorious
24:11,19,23 25:14    matter-wise            363:10 371:4        65:6
  35:4,14,15 57:6    102:13               median               merits
  151:1 297:5        maturity             152:16               61:4 326:4
marketplace          157:12 252:5 286:19 meet                 Merrill
89:13,15               287:20             14:16,21,24 31:14    7:23 8:6 9:8 145:20
```

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 34

message
217:19
met
9:19 238:1 334:13
methodologies
127:24 128:8 201:6,20
methodology
127:20 366:22
methods
66:10
metrics
91:11 103:3 207:12
Michael
332:22,23 333:11
middle
250:6 262:4
midst
155:10
mid-March
337:10
million
12:21 13:1,2,16 45:19
  46:9,15,17 47:18,22
  48:10 50:19,22 51:8
  52:12,15 54:18 55:4
  56:20,20,23 57:15,25
  61:5,8 77:23 78:2,8
  78:14,15,23 79:11,19
  80:2,25 81:12 82:19
  96:11 105:22,22,23
  105:24 139:12
  159:20 160:18,21
  162:7,22,22,23,24
  163:10,11,12,13
  166:23 167:9,13,18
  167:24 169:1,6,10,13
  169:14,21,22,23,25
  170:4,8,12,12,20
  171:11,24,25 172:3
  172:13,21,22 173:4
  173:19 175:18 176:3
  176:14 215:9,16
  239:5 240:14,16,17
  251:19,20 252:2
  270:9,11,13,21 279:5

279:6 281:10,12,15
281:16,25 282:4
284:8 316:8 322:5
341:11 342:1 346:24
347:5,19,25 348:14
348:16,17 349:14
350:18 351:1,2,9,10
351:23,24 352:23,25
353:17 355:19
357:17,18,18,20,22
million-dollar
105:25
mind
46:3 66:18 127:9
  134:11 220:2 241:19
  305:18 312:7,21
  328:8
mindful
361:24
minds
245:2
mine
96:17 152:10
minor
259:17
minus
220:1 352:24
minute
50:15 110:12 176:16
  186:5 257:6 265:1
  300:12 302:9 328:12
  331:4,13 362:15,15
minutes
83:14 362:18,20,23
  363:2,3
Mirant
98:2
mire
37:2
mischaracterizes
170:16 370:8
mischaracterizing
245:23
missed
292:5

missing
353:1
misspeak
270:14
misspoke
238:16
Misstates
74:21 298:21
misunderstanding
86:13
mix
154:4,16 155:9,12
Mm-hmm
96:23 97:2 216:20
  321:4
model
255:11 256:6 282:24
  284:12 285:18
modeled
256:1,10 283:2 284:7
  284:13
modeling
255:20,21 283:13,15
  283:20
modest
328:9 331:15
modification
173:6
modifications
173:1
modified
12:3,13,16 20:3
  172:19 173:12
modify
308:19
moment
31:21 66:18 102:18
  187:17 201:11 218:4
  233:17 264:25 323:1
Monday
8:9
money
161:16 169:25 191:8
  191:21 205:17
  208:12 230:10

234:10,11 235:8
255:18 289:2 299:22
302:24 338:13 361:3
monitored
105:16 366:20
monitoring
118:1 185:3 201:24
MONTEFUSCO
2:22
montefusco@kasow...
2:23
month
121:1 130:14 162:7,22
  162:24 173:15,21
  176:13 195:14
  351:12
monthly
162:6 188:7 270:10,21
  272:8 273:1,3
months
83:5 125:24 162:25
  163:15 164:19
  207:20 211:1,11
  212:1 218:23 321:25
  348:13,13 352:15
  367:14
moot
120:16
morning
8:5 9:18 12:2 95:24
  117:12 166:15
  210:22 246:15 249:4
  269:11 270:20
  273:10 296:4
morphed
262:23
Morrison
3:2 166:12
mortals
245:4
mortgage
271:4,23 275:19
motion
15:16,23 16:15 46:11
  50:19 53:23 77:9

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 35

79:25 80:7 81:7
187:25 188:2,3
227:22 236:25 237:4
269:21 376:15
**MOTIONS**
375:13
**mouth**
230:11
**move**
37:23 113:10 114:1
149:20 233:20
254:23 269:16
308:14
**moved**
173:15
**movements**
210:25
**moving**
16:15 17:3 18:6
221:20 240:20
299:22
**mroitman@chadbo...**
4:20
**multiple**
58:15 59:19 144:19
152:17 367:22
**multiples**
120:16 123:6 124:17
124:21 125:1,4,5,8,9
125:9,12,21 128:2
144:23 145:1 148:18
148:21 149:14
152:12,25 367:20,20
**mutually**
306:17

──────── **N** ────────
**N**
1:12,12 2:1 3:1,1,1 4:1
4:1,1 5:1,1,1 6:1,1,1
7:1,1,1 9:12 166:1,1
166:1 184:14 375:1
379:14
**Naftalis**
1:16 3:18 8:12

**name**
118:9 120:20 122:9
127:8 142:23 166:11
168:5,20,24 222:17
256:23
**names**
127:17 222:6,11
**naming**
122:17 123:12
**Nancy**
184:14
**NASD**
105:16
**NASDAQ**
105:17
**nasty**
230:3
**Nate**
332:7,8
**natural**
154:10 297:25 298:12
**nature**
41:18 42:14 86:9
365:1
**NDNAs**
115:14
**near**
185:7
**necessarily**
296:25 341:5
**necessary**
26:24 57:24 177:9
225:11 242:1 245:6
263:11 267:15
**need**
17:13 23:9,13 114:22
137:11 157:22
164:1 214:25
222:11 223:6 241:10
242:3,12 243:19
245:17 253:8 265:5
289:22 306:3 351:14
**needed**
49:9 137:9 229:21
244:10 245:13 362:2

**needs**
24:1 57:23 174:18
175:23
**negative**
255:15 264:11 276:15
277:1 358:1
**negotiate**
21:6 22:16 65:14
117:16,22 121:22
122:14 135:8,12
136:15 138:25
161:11,25 217:3
232:2 324:25 325:15
340:3
**negotiated**
47:22 50:23 53:15
84:3 87:9 136:11,19
136:25 137:21
161:15
**negotiating**
25:3 48:17,25 118:8
134:16 142:17
161:10 206:18 246:9
325:5 329:13 333:3
**negotiation**
47:24 55:6 85:24
86:20 115:15 121:19
141:19 146:12
224:13 231:19
257:24 338:21 340:8
340:10
**negotiations**
25:6 27:23 52:5 65:12
87:4 110:2 117:7,8
117:24 121:10,23
137:13 146:17 158:3
161:18 181:21
210:15 223:9 224:23
257:19,20 268:7
296:5,22 326:7 330:5
333:4,8,25 334:2
338:25 339:8,23
**neighbor**
302:22
**neither**

30:24 333:21,22
**net**
156:7,15 157:2 170:16
171:8,12 174:1,12
175:13 177:19 286:7
286:13,20 323:21
324:3 348:14 352:15
352:21 353:13,21
354:12,15
**never**
22:9,14 30:3,7,16
109:10 124:13,14
164:9 171:12 177:8
221:9 273:25 274:13
275:7 276:8 277:6
283:24 284:4 294:17
294:20 320:22 325:6
368:9
**new**
1:17,17,20 2:19,19 3:6
3:6,14,14,21,21 4:8,8
4:16,16 5:8,8,16,16
5:23,23 6:6,6,21,21
6:22 7:6,6,14,14 8:2
8:2,7,7,8,9,13,13
14:13 115:4 116:25
117:17 125:21
237:10 259:14
270:23 273:5 278:8
289:2 373:2,4,9
374:1,2
**news**
330:7
**newspaper**
211:13
**new/alternative**
258:5
**NextEra**
4:14 12:4,20 59:18
307:8,24 308:3,9
310:8,16,23,24 311:2
311:25 312:8 313:16
314:17,20 316:7,12
326:25 327:7,9
345:16 346:15,25

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 36

| | | | |
|---|---|---|---|
| 348:20 349:2 350:2,8 | 6:13 93:7 307:24 | 277:15,19 278:19 | 80:12 112:11 114:10 |
| 350:16 351:1,4,9,17 | **Northeast** | 279:17 280:15 281:1 | 114:11 151:5 173:21 |
| 351:24 352:5 354:22 | 155:4 | 282:21 283:17 | 307:2,8 309:17 |
| 355:3,7,22 358:7,16 | **Notary** | 284:23 288:5 289:11 | 320:10,11 322:15 |
| 358:18 359:1,7,9,20 | 1:19 9:14 371:18 | 311:2 313:20 314:11 | 337:17,19 346:11 |
| **NextEra's** | 373:8,23 374:23 | 314:17 321:13,24 | 347:6 348:23 349:23 |
| 349:8 | **note** | 333:14,19 334:10,11 | 353:21 357:21 |
| **next-door** | 12:4 99:5 173:1,8 | 334:20,25 335:11 | 363:25 368:3 |
| 302:22 | 287:20 297:23 | 336:1 338:2 346:24 | **numerous** |
| **nice** | 326:19 327:10 | 355:17 358:19 363:2 | 86:9 |
| 35:14 247:4 255:17 | 331:21 336:18 | **note's** | **N-A-S-D-A-Q** |
| **night** | 341:17,22 | 196:21 | 105:17 |
| 59:15,16 85:6 224:14 | **noted** | **Notice** | |
| 305:5 | 354:12,14 371:7 | 1:15 | **O** |
| **night's** | **noteholder** | **noticed** | **O** |
| 342:3 | 29:1 172:19 343:17 | 107:1 108:9 | 1:12 3:1 4:1 5:1 6:1 |
| **nine** | **noteholders** | **notion** | 7:1 166:1,1,1 |
| 148:22 149:11 316:4 | 2:17 3:12 5:4 12:21 | 32:17 | **Oaktree** |
| 316:16,19,24 317:5,7 | 100:11 141:1,2 | **notwithstanding** | 222:14 223:14 |
| 317:8 | 183:24 186:9,15 | 263:18 | **oath** |
| **nine-and-a-half** | 202:10,14 220:17 | **not-yet-existent** | 330:16,22 |
| 152:17 | 227:18 276:1 282:1 | 231:6 | **object** |
| **nomenclature** | 319:24 325:22 | **NRG** | 18:12,16 19:4 20:5,16 |
| 238:21 | 331:18 340:6 342:15 | 184:14 | 25:15 33:12 41:22 |
| **non** | **notes** | **number** | 91:24 94:6 99:4 |
| 164:11 225:6 278:11 | 2:6 7:12 8:25 9:24 | 8:18 22:25 46:3 53:25 | 117:19 136:16 153:2 |
| **nonbankruptcy** | 12:22 13:25 30:15 | 67:7,19 80:14 84:24 | 159:9 161:4 170:13 |
| 252:13 | 45:5,8,16 70:8,11,17 | 85:5,23 95:14,20 | 174:7 179:2 181:14 |
| **noncash** | 70:20,25 72:13 75:15 | 107:23 129:20,21,22 | 191:5 192:10,20 |
| 163:17,24 | 81:3 96:3,8 112:8,9 | 131:10 137:25 | 194:2,16 198:16 |
| **noninterest-bearing** | 112:10 140:19 | 139:19 143:11 | 200:20 209:14 |
| 81:3 | 141:15 171:1,5,12 | 162:23 165:13 166:3 | 213:15 219:20 |
| **nonsettling** | 172:5,8,24 173:3 | 168:18 170:15 173:2 | 254:18,23 271:8 |
| 220:16 281:18,22 | 175:9,12 176:10,22 | 176:13 190:18 | 311:6 |
| 356:10 357:14,16 | 186:24 187:10 | 193:11 204:14 | **objection** |
| 358:4,10,11,14 | 188:19 195:10 | 207:10 209:9 227:4 | 17:16 24:25 29:9 30:1 |
| **non-clawed** | 202:20 203:6 204:21 | 227:10 241:5 281:3 | 32:2 34:14 37:9,15 |
| 129:23 | 205:2,18 207:14 | 288:8 296:6 318:3,9 | 39:1,16 40:1 43:8 |
| **non-Fidelity** | 208:7 209:2 227:16 | 322:5 347:4 349:6 | 47:4 49:11 54:22 |
| 317:11 | 243:5 248:24 249:10 | 350:24 352:25 353:5 | 55:11,19 57:7 60:7 |
| **non-guaranteed** | 250:7 254:9 260:18 | 353:9 363:10 368:10 | 60:22 61:11 62:10,19 |
| 112:10 | 260:24 261:17,19 | 371:4 | 62:25 64:23 65:18,22 |
| **norm** | 262:6,16 263:3 | **numbered** | 66:4,7 68:21 69:18 |
| 287:8 | 264:23 270:6,8,19 | 309:16 | 70:6 71:1,10,15 |
| **north** | 272:12 276:14,18 | **numbers** | 72:24 73:7,21 74:4 |

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 37

74:20 75:6,25 77:5
79:20 80:9 81:14,19
82:6 83:1 85:15,21
87:11 88:2 90:11
92:24 94:16 97:14
101:17 102:5,22
103:24 104:24 105:8
107:9 112:6 122:11
124:2 127:21 128:15
135:15 137:3 153:21
157:6 162:9 163:4
164:4 180:9 184:5,25
187:21 188:9,20
191:24 194:15 195:1
196:23 197:19 198:1
198:15 205:19 208:8
212:9,23 217:16
220:10 225:8,23
237:12 253:6 254:18
255:9 261:23 262:19
264:9 268:16 273:7
276:10 279:19
280:18 282:9 284:25
285:25 289:16 293:5
293:16,25 297:8
298:20 300:17
301:24 302:15
304:11 308:7 311:22
325:1 327:25 329:19
338:10 339:9,12
340:25 346:17
350:10 351:6 361:12
369:10 370:7,20
**objections**
206:19
**objective**
156:3 178:16 241:19
**objectives**
267:15
**obligated**
237:5,8
**obligates**
280:15 281:7
**obligations**
115:8 174:12 180:19

180:23 181:2 369:24
370:1,2
**observable**
209:8
**observe**
207:7 304:1
**observed**
93:13 209:21
**observing**
208:4
**obstacles**
132:8
**obtain**
161:1 225:1
**obvious**
200:10
**obviously**
44:16 51:25 56:16
58:9 88:8 90:16
117:23 127:5 137:17
141:7 146:5 154:19
156:7,10 157:1,10
158:15,20,25 205:25
207:7 213:17 214:18
220:18 221:8 224:1
231:17,20 236:17
238:1 243:22 244:21
244:24 245:5 259:1
295:7 297:23 298:9
306:2 314:6 315:13
338:13 343:8 344:7
346:22,24 354:20
360:7,9,24 361:18
367:24
**occasions**
14:11 85:23 325:4
**occur**
19:23 103:21 123:2
**occurred**
209:23 302:18
**occurs**
207:24 357:1
**October**
115:19 116:11 117:4
118:22 119:5,24

120:9 121:1 123:3
143:17 145:14 146:9
378:21
**offer**
20:3 21:19 56:15
115:2,4,11 126:2
235:5 240:3 269:12
281:18 297:24
298:23 299:14 302:5
302:6 303:13,23
308:19 311:3 317:10
327:11 337:25
339:20 364:13
**offered**
63:2,4 139:8 156:21
160:20 161:1 173:2
216:8,10 217:25
220:15,16,18,23
221:4,7 231:1,15
296:25 312:18
313:17 314:16
316:16,19 334:3,5
338:12 341:9,16,20
345:5 347:2
**offering**
41:9,12,16,24 42:12
46:22,25 69:24 70:1
97:11 98:18 100:10
100:19,23 101:8
117:17,23 118:8
139:11 155:25
156:21 157:1,3,12,18
192:1 205:15 221:11
228:17 229:11,15,24
230:16,25 231:9,15
231:24 232:1,3
233:24 234:13,18,20
234:24 235:1,12,15
235:22 236:22
242:23 244:10
246:11 249:12,16,16
249:25 250:24 251:3
251:9,9 264:22
265:21 266:13,15,17
266:18,19 267:2,14

278:14 283:19
297:21,25 298:8
307:3 317:5,18 335:8
335:16 336:23 337:3
360:9 364:22,25
366:2
**offerings**
88:14 158:12 279:12
297:15 303:11 364:4
365:12
**offers**
14:4 21:1 58:5,7,15,23
59:4,10 195:12 316:1
316:8
**offhand**
155:17
**offices**
1:15 8:11
**official**
3:3 166:12
**oh**
38:7 77:16 109:10
125:2 148:14 156:17
219:25 246:22
267:24 270:1 273:17
336:9 356:16,19
**okay**
9:21 11:23 15:8,14
19:25 25:11 26:9
35:2 38:9 42:4 44:13
44:25 46:4,7 49:8
58:20 66:19 72:7
78:7 83:21 95:10
96:7,22 97:8,16,19
99:25 102:9 103:6,12
103:19 104:2,8 106:1
106:22 107:1,6,18,22
108:9,13 109:7,12
110:6 111:3,18 112:1
112:23 113:10,23
114:1,5,8 115:22
116:2,15 118:13,15
120:6,14,24 123:2,10
123:19 124:7,11
125:8,14 126:15

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 38

| | | | |
|---|---|---|---|
| 127:6,12,19 128:5 | 314:22 316:13 | one-tranche | 13:1 131:15 137:9 |
| 129:7,11,12,19 130:7 | 317:16,25 323:9,13 | 139:21 | 193:4 238:22,24 |
| 132:15 133:13,22,25 | 324:17,21 326:5 | one-year | 239:19,24 252:18,20 |
| 134:7 135:3 136:23 | 327:15 328:13 | 352:11,11 | 253:15,19 286:10 |
| 137:15 140:10,25 | 330:21 333:10 | ongoing | 351:17,22 |
| 141:5,8 143:10,22 | 335:21 336:24,25 | 57:12 60:5 147:14 | optionally |
| 144:6,17 145:4 148:6 | 338:23 345:15 | open | 239:3 252:14 |
| 149:5,11 150:13,20 | 346:13 348:16,24 | 57:22 60:9 203:11 | options |
| 151:3,8 152:1,11 | 349:18,25 350:20 | 211:13 | 65:10 66:2 97:20 |
| 155:19 156:13 | 351:8 352:3 353:25 | operate | 129:23 |
| 159:15,21 160:1,2 | 354:19 356:9,25 | 252:13 | oral |
| 161:14 162:15,17 | 357:22 358:20,23 | operates | 198:10 |
| 163:16 164:10,20 | 359:5,19,23 360:1 | 264:11 | orally |
| 166:20,21 181:9,10 | 362:11 363:18,19 | operations | 12:6 |
| 185:10 186:3,11,18 | 364:3,14,17 365:2,17 | 154:4,11 | order |
| 186:20 187:7 191:20 | 366:8,17 367:9,17,21 | operative | 167:10,19 183:12 |
| 192:4,24 200:9 201:1 | old | 17:25 46:18 131:24 | 197:2 201:14 214:25 |
| 203:17,18,21 204:2,9 | 89:3 98:15 | 237:16,20,25 238:13 | 244:6,7 265:11 |
| 204:14,18 205:4 | Olympus | 252:21 268:4 | 376:16 |
| 206:22 211:4 214:5,9 | 113:20 115:24 121:3,4 | operator | ordinary |
| 214:16 215:4,25 | 146:13 | 8:5 | 238:2 |
| 216:13 218:5,12 | Olympus/Valuation | opine | orient |
| 221:22 222:3,10,13 | 377:16 | 153:9 | 336:15 |
| 222:19 223:11 224:4 | Oncor | opines | original |
| 228:19 229:4 230:15 | 115:24 116:9,12 117:1 | 33:15 | 12:24 47:18,21 50:16 |
| 230:25 233:4 234:17 | 122:17 123:11,14 | opinion | 56:23 72:11 131:11 |
| 236:24 238:18,24 | 125:6,13,15 126:21 | 41:10,13,17 42:13 | 259:18 292:18,24 |
| 239:13 240:12,15,18 | 127:20 128:6,19 | 190:24 191:1,15 | 327:6 |
| 241:8,14,21,25 | 153:12 154:5 155:5 | 195:8 196:4 197:17 | originally |
| 244:21 246:17 247:5 | 168:11,11 209:17 | 226:19,21 263:7 | 77:21 |
| 247:23 248:3 249:11 | 211:10,24 212:3,6 | 268:25 269:3,4,7,13 | ought |
| 249:19 254:1,8 257:5 | 215:24,25 226:13,19 | 272:4 293:3 368:17 | 318:14 |
| 257:25 258:10 | 232:4 234:5 259:5 | opinions | outcome |
| 260:14,20 261:6,16 | 277:24 309:7,22 | 101:15,25 200:25 | 10:13 16:4 135:2 |
| 262:25 265:16 267:6 | 310:2,10,15 313:7,12 | 201:2,22 202:3 308:5 | 180:5 206:3 261:21 |
| 268:23 269:10 | 314:7,10,23 354:16 | opportunity | 357:10 358:1 373:18 |
| 270:25 272:7,16 | 354:18,18 363:21 | 21:9 57:21 160:21 | outcomes |
| 278:24 280:1 282:13 | ones | 216:11 220:16,23 | 214:15 |
| 282:17 288:13,20 | 151:13,22,24 | 221:3 235:5 341:16 | outline |
| 289:7,20 290:5,12 | one's | opposed | 318:16 |
| 292:4,6 293:2 294:16 | 254:6,6 | 135:8,17 136:12 137:1 | outside |
| 295:23 297:3 302:19 | one-and-a-half | 189:3 263:9 | 14:23 15:6 74:16 |
| 303:17 305:4,7 306:1 | 139:9 238:12 249:4,7 | option | 165:3 182:15,22 |
| 306:10,19 307:6,19 | one-page | 65:13 68:19 252:23,24 | 184:20 186:12 |
| 309:19 310:19,21 | 119:22 128:25 | optional | 192:25 200:9,13 |

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 39

**outstanding**
12:22 45:8 70:15
89:23 131:12 132:12
141:15 156:3 172:8
277:19 280:24 281:1
285:10,11 288:14
321:13 324:2 338:21
352:12
**overall**
57:3 85:24
**overbid**
240:8,16
**overlays**
25:6
**overleverage**
244:14
**overleveraged**
183:7
**oversecured**
70:25 71:9,14 73:12
**overstate**
316:7
**overview**
138:8 144:11
**owed**
355:11
**owned**
108:17,24 113:2
308:16 317:11
**owner**
53:12 232:14 298:6
**Owners**
5:21
**ownership**
85:8 206:17 277:24
305:22 308:20
313:18 322:22
323:10,22 324:14
**owning**
54:10 229:22 329:7
**owns**
88:6 168:10 244:17
354:17
**o'clock**
59:16 312:2

**P**

**P**
2:1,1 3:1,1 4:1,1 5:1,1
6:1,1 7:1,1
**Pacific**
5:13
**package**
312:17
**page**
11:20,22,25 13:3,25
25:20,25 26:21 36:6
54:6,8 63:13 77:9,19
77:24 114:9,13,18
115:23 120:7 140:18
143:23,23 144:7
148:10 149:1 150:6
151:6 153:14,17
185:24 190:18
193:10 203:10
207:10 228:2 246:19
258:11 259:9 260:21
261:13 262:11
263:13,13 267:17,20
269:25 290:12,15
292:6 295:20,21
305:7 308:23 310:4,7
310:8,19 313:4
314:22 318:13,17
320:9 322:8,17,18
324:7 332:14 335:5,5
335:7,22,23 342:7
345:1,3,5,8,10,12,14
345:15 347:25
349:25 350:1,21,23
350:24 351:22
352:10,16 363:17,18
365:10 374:4 375:2
**pages**
26:22 151:2 220:1
309:16,20 313:3
345:13 354:7 365:10
**paginated**
111:3
**paid**
55:17 56:1 69:6 75:9

75:13,15,16,22 78:4
78:7,12 80:20,22,23
81:6,10 82:25 100:7
160:17,22 163:7
164:1,7,9 167:9,14
167:18 169:18,19,22
169:25 170:4,20,21
170:22 171:4 183:4
186:24 188:16
189:25 191:9 193:20
194:21 230:18 274:1
274:6,11,22 281:20
313:24 315:21
321:24 355:11
**pain**
217:5
**painting**
302:13
**paper**
85:17 298:7
**papers**
212:8
**paperwork**
123:22
**par**
87:19,22 92:20,21
94:3 96:8 131:13
256:3 261:3 309:6
315:10 355:8
**paragraph**
24:9,16 25:20,25 26:6
26:7,11,20 27:5,20
29:3 36:1,4 40:25
46:8 54:7 63:15,18
63:19,23 66:20 67:16
68:1 79:25 240:19
257:7 263:13 267:21
267:22 268:5 291:12
292:7,11 295:17,25
318:23 321:3 323:3
327:16 331:3
**paragraphs**
291:20 292:3
**paramount**
302:1

**parcel**
177:23
**parent**
29:16 210:21
**pari**
81:4
**Park**
5:6,15 7:13
**PARKE**
4:13
**parlance**
94:18
**part**
25:7 36:7 43:5,14 56:9
70:3 85:23 115:17
133:21 154:9 177:23
186:25 211:8,23
213:20 231:19
236:14 242:5,13,21
269:8 282:5,13
288:11 308:11
324:17 340:7
**partial**
140:21 250:8 251:12
251:13 279:2,8
**participant**
176:4
**participants**
88:25
**participate**
93:11,22 175:25
181:21 182:2 220:8
221:3 234:12 235:12
235:21 296:24 340:9
341:10
**participated**
10:3 160:18
**participates**
142:25
**participating**
30:23 100:10 101:7
175:16 220:7 317:17
317:18
**participation**
35:24 79:5 97:12

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 40

| | | | |
|---|---|---|---|
| 100:20,23 160:24 | 18:13 43:9 332:7 | 278:16 284:1,2,3 | 215:1,19 238:11,12 |
| 161:7 174:25 217:25 | **paves** | **PE** | 240:10,13 243:4 |
| 224:23 233:7 268:7 | 177:21 | 125:9,12 367:20 | 248:6 251:14 252:1 |
| 316:17,19,22 341:12 | **pay** | **peg** | 270:22,23 271:5,7 |
| **particular** | 73:4,19 75:20 76:2 | 366:2 | 273:17 274:17,17,18 |
| 51:3 56:14 90:15 | 94:20 187:20 189:3 | **penalty** | 274:21 275:6 280:21 |
| 128:10 130:25 | 189:17,18 202:10 | 51:15,18,21 | 280:24,25 281:4,11 |
| 131:18 134:10 | 207:21 230:17 | **pendency** | 281:13,15 285:13 |
| 136:24 145:1 225:19 | 231:24 238:3 239:18 | 69:21 70:21 74:15 | 305:21 313:18 314:9 |
| 257:7 262:22 274:14 | 262:15 279:6 280:16 | 75:3,5,10 76:4,6 | 314:11,14,14,14 |
| 297:11 326:16 341:8 | 281:7,19 283:8,9,10 | **pending** | 315:1 316:4,17,19,25 |
| 353:14 367:12 | 288:4,17,18 289:2,9 | 175:20 176:9 | 317:5,7,8,9,9,11,15 |
| **particularly** | 289:11 300:15 301:9 | **penultimate** | 321:12 322:21 323:5 |
| 147:10 223:13 297:5 | 313:21 321:20 | 322:4 | 323:10,14,23 335:18 |
| 360:14 | 353:11,17 357:19 | **people** | 336:3 337:14,14 |
| **parties** | 370:2 | 20:21,25 58:10 60:12 | 338:2,8,8,12 339:6,7 |
| 10:20 13:5,7 21:18 | **payable** | 90:14 95:9 100:21 | 340:24 341:11 350:3 |
| 25:8 28:15 29:6,8,12 | 56:14 81:2 163:3 | 105:18 106:12 | 350:5 354:18 355:20 |
| 45:6,11,15 52:21 | 237:22 273:15 | 108:18 109:8,11 | 356:14 357:3,7,8 |
| 53:7,15 54:9 55:7,17 | 274:21 286:12 | 115:14 133:23 135:9 | 359:20 |
| 56:1 59:24 84:4,6 | **paydown** | 136:1 141:23 154:22 | **percentage** |
| 86:11,18 89:6 121:18 | 140:21 250:8 | 155:1 158:18 176:11 | 45:20 86:22 93:4 |
| 159:12 216:15 217:9 | **paying** | 195:18 197:21,23 | 94:23 274:14 306:22 |
| 217:12 219:2,7 221:2 | 76:5 186:7,8 187:19 | 206:17 214:19 | 307:9 309:6 334:9,11 |
| 230:2,9 231:11 235:6 | 188:7,14 189:5,9,20 | 216:10 222:6,8 290:9 | 365:8 |
| 235:17 241:7 263:1 | 191:12,13 243:3 | 298:1 301:13 307:3 | **percent/36** |
| 293:18 296:19 297:7 | 277:11 278:20 | 332:11 | 83:25 |
| 336:14,14,22 337:2 | 281:14,24 285:11,12 | **Pepco** | **Perella** |
| 343:6,11 344:5 358:4 | 314:11,13 357:2 | 126:2,2 127:15 | 85:3 |
| 373:17 | **payment** | **percent** | **perfect** |
| **partners** | 13:1 73:13 75:4 | 8:25 9:24 13:12,14 | 94:2 |
| 7:22 142:21 | 166:25 173:9,12,18 | 31:24 45:8,24,25 | **perform** |
| **parts** | 189:2,15 286:11,15 | 46:2,23 53:12 55:9 | 54:17 |
| 93:14 | 286:20 310:25 311:9 | 55:15,24 56:22 68:6 | **performed** |
| **party** | 315:20 321:9 322:2,4 | 72:14 81:8,9 83:25 | 61:7 196:16 287:20 |
| 61:15 308:4 | 326:14 327:19 | 84:6 85:5,19 88:7 | **performing** |
| **pass** | 338:11 357:11 | 89:22 101:10 108:17 | 135:17 200:18 |
| 166:6 252:20 | **payments** | 131:11 132:14 | **period** |
| **passing** | 76:6 139:3 167:18 | 162:19,20 163:9,9 | 46:23 179:12 196:6 |
| 362:20 | 169:2 170:8 174:2 | 167:23,25 168:2,6,9 | 199:5 209:21 238:14 |
| **passu** | 186:13 189:13 278:6 | 168:10,12 171:6,10 | 246:8 252:17 253:19 |
| 81:4 | 286:8 315:15 | 171:15 188:23 | 352:11 353:23 |
| **Paul** | **payors** | 190:21 191:15 | **periodically** |
| 220:4 | 339:17 | 204:10 205:5,6 | 86:1 |
| **pause** | **pays** | 206:16 210:2,2,3 | **permanent** |

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 41

147:24
**permit**
35:8
**persisted**
56:7
**person**
132:24 142:22 244:24
  257:15
**personal**
43:22 212:7
**personally**
67:21 83:13 106:11
  136:11,14,19,25
  137:20
**personified**
231:20
**persons**
85:3
**perspective**
21:16 22:1 90:21
  135:22,24 175:6
**petition**
34:4,12,13,20 35:5
  45:1,4,12 72:5,9,10
  72:21 233:21 294:4
  315:9
**PEVZNER**
6:23
**phenomenon**
176:8 210:14,16 304:1
**Philadelphia**
155:8
**phone**
7:25 21:8 51:10,13
**phrase**
36:13
**pick**
286:6 359:10
**picks**
355:24
**picture**
255:14
**pie**
361:9
**piece**

85:17 172:2 176:15
  232:2 234:7
**pieces**
349:22 366:21
**PIK**
13:7,17,21 16:16 18:6
  18:8 19:3,17 29:21
  38:25 39:25 40:6
  42:21 43:7,12,24
  44:4,14 45:5,8,10,15
  47:8,12 48:22 51:23
  77:21 78:2,12,19
  79:3,9,15 81:1 91:4
  91:21 93:23 94:1
  96:3,11 98:19 100:11
  108:1 134:20 141:1
  163:18 164:7,8 171:4
  171:11 193:4 237:7,9
  238:5 239:7,8,9,11
  239:14 240:11 262:4
  268:13 269:14
  270:23 273:18,19,20
  274:12,15,18,21
  279:14 284:22
  292:18,24 293:22
  306:24 307:21
  311:14 314:24
  316:17 325:23
  336:21 346:16 350:4
  350:8,18,21,25 351:2
  351:10,23 352:5,8
  353:11,16 354:4
  356:3,5 358:13,25
  364:10
**PIKs**
13:11 30:11 38:23
  40:13 48:13 49:6,9
  49:15,22,24 50:8
  54:20 61:7,10 64:20
  65:11 66:3,15 87:19
  87:22 88:22 92:16
  94:4 97:5,13 99:2
  101:1 107:6,8 108:17
  108:24 109:2 110:3
  122:7,8,14 134:1,17

134:19 246:8 247:25
  249:11,17,24 257:21
  261:7 266:25 284:1
  293:3,12 294:21
  295:2 304:4 308:13
  340:4,11,20 345:18
  364:12
**PIMCO**
146:18
**pinning**
99:10
**place**
176:17 189:9 212:14
  243:11 254:10 255:2
  262:6 272:13 276:18
  279:18 282:22
  283:17 284:24 288:6
  289:12 360:22 361:3
**plain**
238:2
**plan**
17:18 50:5 98:4
  100:12 118:5 132:17
  132:19 134:24
  156:22 158:18,21
  167:3,7,19 170:10,19
  174:24 178:9 182:23
  186:12,25 187:8
  189:8,23 190:1 192:5
  205:13,14 206:11,13
  206:21 212:21
  236:10,11 237:17
  249:25 258:23,24
  260:11 262:5 324:19
  337:3 338:15 355:10
  366:1
**planned**
255:7 271:23
**planning**
185:11 359:24 362:21
**plans**
97:21 186:16 187:5,16
**play**
148:1 260:3 339:23
**played**

142:22 257:20,23
  340:2
**playing**
145:20 260:4 333:2
**plays**
213:5
**Plaza**
4:15 6:21
**pleas**
52:1
**please**
8:20 9:8 15:19 34:5
  42:5 43:10 55:21
  58:20 81:20 82:7
  92:11 111:18 114:9
  120:7 144:7 147:3
  151:4 184:9 185:18
  258:4 299:4 333:11
**plenty**
290:9 298:9 360:18
**plus**
76:10 93:10 94:21
  131:14 169:21 171:4
  220:1 252:3 286:25
  287:2,9,23,24 288:7
  288:25 289:1,9
  315:10 354:15
**pocket**
299:23 338:14
**PODDAR**
4:9
**POHL**
7:24
**point**
22:2 64:25 65:1,2
  75:17 83:22 120:16
  123:15 127:18 131:3
  184:7 189:18 223:12
  234:6,23 237:4
  238:13 239:15 248:4
  248:10 260:9 266:4
  288:3 289:19,24
  290:7 302:3,8 304:14
  320:16 323:2 334:6
  335:16 342:12 352:1

PX 134
Page 138 of 165

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 42

359:6 367:22
**pointed**
291:16 293:11 305:12
323:23 345:13 352:9
354:7 355:1 357:8
**pointing**
292:11
**points**
13:3 97:12 99:1
157:24 287:3,7,25
288:1 323:13 338:21
**polished**
219:6
**politely**
51:25
**pondering**
124:4
**pop**
127:17
**pops**
46:3
**portion**
36:21 53:4 228:13
233:24 234:2 270:4
300:21 316:22
317:13 347:2 348:2
348:19 357:15
**portions**
197:6
**portray**
311:3
**pose**
265:19
**posed**
121:24 279:25
**position**
32:7 33:24 34:7,12
37:20 70:23,24 71:8
98:16,17 162:1 168:1
341:22 344:22
**positions**
48:19 87:6 159:22,25
161:13,19,24 206:17
341:4
**positive**

206:3 348:8,14 357:25
**possibilities**
65:25
**possibility**
16:21 65:23 176:20
177:1,4 180:2,13
216:14 262:15
300:10 304:6 311:20
**possible**
31:15 60:11 61:3 69:2
127:4 151:19 189:3
198:25 199:6,12
214:15 272:16 304:3
304:7 309:24 310:1
369:4 370:18
**possibly**
125:18
**postdefault**
95:2,5
**postemergence**
248:5 276:21
**postfiling**
132:5
**postpetition**
137:12 193:20 315:14
321:10 325:22
**postrestructuring**
242:4
**pot**
300:7
**potential**
27:24 28:5,14 29:5,25
30:6 33:4,9 35:7
101:3 120:2 152:4
180:5 184:13 201:14
246:10 248:6 293:22
294:6 296:7 297:7
309:22
**potentially**
88:9 216:17 315:22
**power**
123:6 154:3,14
**pre**
235:6
**preached**

217:19
**prearranged**
17:18 258:23 260:11
**precedence**
228:21
**precedent**
128:3 168:6,20,24
236:8
**precise**
99:6 334:7
**preclude**
27:25 64:9 269:16
296:8
**predefault**
95:1
**predicated**
99:9 364:10
**predicted**
212:2
**prefer**
359:7
**preferability**
269:14
**preferable**
292:23 299:6
**preferred**
179:6 205:23 298:3
**preferring**
360:2
**prefiling**
78:5 169:23
**prejudged**
197:11
**preliminary**
48:12 184:7,11,23
**premarked**
11:4 22:23 53:24
**premising**
311:14
**premium**
252:3 253:5,22 290:8
366:3
**prepaid**
253:3,4 287:22
**preparation**

11:17
**prepare**
11:19,21 101:14 114:4
219:16
**prepared**
101:21 102:12 111:4
114:3 133:7 249:24
261:7 262:5 306:20
306:24 351:21
**prepay**
288:4,16,17
**prepayment**
50:19,23 51:9,15,17
51:21 52:3,4,12,15
54:9,19,21 55:4,9
56:22 57:15 61:6,8
61:10 68:6 167:13
275:18
**prepetition**
95:1 242:5 270:6,8
318:24,25 321:9,14
331:19 338:7 340:3
360:20,23 361:4
**present**
7:19 128:9 174:1
185:13 189:12
207:11 221:16
223:22 224:19 272:7
286:7,17,21 287:18
305:3 342:13,17
363:19 364:16
**presentation**
101:5,15 143:24
145:13 150:8 185:12
185:19 204:24,25
219:6,8,24 246:23
375:19
**presentations**
185:16 219:13
**presented**
10:11 46:10 50:17,17
116:9 210:11,11,24
215:13 304:23,25
305:4 313:2 319:19
329:2

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 43

presents
152:16
preserve
54:10 66:6
preserves
245:10
preset
237:10 239:17
presigning
295:16
presubmission
32:8,23 33:24 34:7
presume
80:13 112:10 133:16
156:8 256:8 339:16
presumed
298:4
presupposes
99:13
pretty
126:3 154:22,23
168:17 213:22
255:14 297:25
298:12
prevail
358:12
prevailed
224:3
prevails
281:23
previous
109:20 346:1
previously
147:9 149:25
pre-RSA
137:14
price
89:11 91:22 93:13,24
94:1,3,21 99:14,14
118:9 120:21 122:9
122:18,22 123:12
131:13 147:16
234:24,25 267:3
301:6,8 317:21,23
354:10,12 357:13

364:22 365:11,14,15
prices
90:9,13,22,25 91:10
92:4 93:3,8 94:14,22
96:1 100:18 102:25
252:16 315:4,5
366:20
pricing
18:24 147:18 252:22
253:18 265:21
266:14,19 352:16
primarily
123:17 156:12 329:12
338:16 359:2
primary
66:10 74:24 142:2
principal
22:8 45:23 55:17 56:1
75:17 89:23 93:4,7
94:10,24 96:12
131:11 141:14 194:1
239:20,21 314:12
315:2 321:14 334:2
principle
246:1 303:5,13
principles
99:22
prior
17:21 29:13 31:25
35:4 77:4 102:7
108:7 162:10 169:14
171:18 176:15
195:14 253:3,14
261:8,10,13 263:4,8
294:4 346:9 379:19
prioritized
161:17
priority
202:19 203:5
private-letter
32:18 34:22 41:5,14
242:16 245:10 246:2
privilege
38:8 39:18
pro

204:7 323:6
probably
83:14 89:3,21 96:19
96:21 104:14 116:11
125:2 154:7 163:15
199:24 208:12 232:8
232:10 272:4 277:6
278:10 282:24 284:7
308:11,13 315:11
probe
285:16
problematic
265:20
problems
361:20
procedure
128:1 253:17
proceed
15:18,24 38:25 39:25
40:6 42:21 44:4
proceeded
255:11
proceeding
16:11 17:6
proceeds
69:25 139:13 169:11
171:20 172:4 175:4
175:19 202:8 229:21
229:24 230:15,16,17
236:19,22 249:9
282:12 283:18
287:22
process
24:11,19,23 25:14
35:4,14,15 57:6 60:5
60:20 116:24 117:8
132:2 138:8,11
139:19 142:19
205:13 229:16 297:6
303:18 326:9 342:25
processes
143:1
produced
117:1
producer

123:7
produces
128:17
production
284:15,17
professional
1:18 62:6 66:1 194:20
217:8 293:9 338:5
369:18 373:7
professionals
14:2 312:10
proffered
132:23
progress
147:10
prohibits
264:12
Project
113:20 115:24 121:3,4
377:15
projection
349:8
projections
115:24 116:5,9,10,13
116:19,23,25 272:18
348:25
promise
271:3
prompt
325:25 326:2
promptly
328:17
proper
202:6
proponents
331:10
proposal
10:16,22 12:3,8,14,15
12:16 13:5,9,20,22
13:24 16:7 18:6,8
19:3,10,13,17 21:8
21:10 37:5 38:25
39:25 40:7 42:22
43:7,13,15,24 44:5,9
44:14 47:8,12 48:3

PX 134
Page 140 of 165

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 44

| | | | |
|---|---|---|---|
| 49:25 50:1 51:7 52:8 | 14:14,17,21 15:3,12 | 113:6 141:2 267:1 | 131:16,18 132:5,7,9 |
| 52:11 57:14 59:14,25 | 18:10,25 19:1,15,18 | prosecute | 136:4 142:6 |
| 60:1 61:4 72:2,3 | 19:19,20 20:2,13,14 | 327:11 | pro-rata |
| 77:22 78:3,12,20 | 20:24 21:12,15,25 | prospective | 12:23 93:11,22 235:21 |
| 79:3,9,16 81:9 101:2 | 23:22,24 36:18 37:6 | 150:9 306:20,24 | 317:10,14 |
| 112:17,24,25 117:17 | 38:23 49:21 58:11 | protection | Prudential |
| 120:17,19,25 122:3 | 59:19,19,25 60:12,25 | 73:6 115:5 | 2:7 |
| 138:13 139:15,17 | 102:8 116:17,24 | provide | Pruitt |
| 141:6 142:13 146:8 | 118:2 135:20 162:11 | 12:16 31:4 39:7,10 | 6:15 9:1,1 16:1,17 |
| 146:14 162:10 170:9 | 172:10,16 199:3 | 43:20 54:24 195:7 | 17:16 18:12 19:4 |
| 172:19 187:18 | 207:8,10 208:4 209:8 | 196:17 197:24 214:2 | 20:5,16 22:2,10 |
| 192:17 193:10 204:4 | 257:2 274:8,10 | 220:15,18 223:4 | 23:15 24:13,25 25:15 |
| 233:19 238:11 | 282:25 292:25 | 235:4 253:1,3 298:5 | 28:17 29:9 30:1 32:2 |
| 248:13 249:24 250:7 | 293:14 303:10 305:9 | 321:19 326:19 343:5 | 32:11,16 33:12,18 |
| 258:5 261:18 263:9 | 309:13 313:15 316:5 | 350:3 | 34:14 37:9,15 38:7 |
| 268:5,14 274:16 | 342:8,13,14,18 343:2 | provided | 38:12 39:1,12,16 |
| 279:15 282:20 | 343:5,17,23 344:3,20 | 12:19 22:14 37:7,13 | 40:1 41:22 42:4 43:8 |
| 292:19,24 293:24 | 352:14 354:9,24 | 38:11 41:21 42:17 | 43:16 47:4 49:11 |
| 294:8,9,11,17 295:13 | 355:12,18 363:21 | 43:3,14 46:22 59:18 | 54:22 55:11,19 57:7 |
| 295:15 304:10 307:8 | 364:2 | 77:22 211:7,22 | 58:18 60:7,22 61:11 |
| 307:21,24 310:8,16 | propose | 219:16 221:18 226:2 | 61:21 62:10,19,25 |
| 310:18,23,24 312:1,8 | 20:21 49:9 122:1,5 | 226:15,18,22 258:15 | 63:12 64:23 65:18,22 |
| 313:16 314:5,6,20,21 | 134:1 | 312:3 321:9 323:4 | 66:4,7,25 68:21 |
| 314:25 316:8,12 | proposed | 327:19 359:21 367:1 | 69:18 70:6 71:1,10 |
| 318:24,25 320:13 | 6:4,12 9:2 10:17 13:11 | provider | 71:15 72:24 73:7,21 |
| 321:6,8,19,22 323:4 | 14:7 16:8,16 20:7 | 306:20 | 74:4,20 75:6,25 77:5 |
| 323:19 324:4 325:24 | 27:25 38:22 40:13,14 | providers | 77:11 79:20 80:9 |
| 326:1,3,15,18 327:1 | 41:6 47:8 48:9 49:15 | 237:7 238:5 293:23 | 81:14,19 82:6 83:1,9 |
| 327:3,10,12,18 | 51:8 52:5 56:18 | 294:6 306:24 | 83:20 85:15,21 87:11 |
| 328:16 329:17,22 | 57:15,25 58:2 61:6 | provides | 88:2 89:16 90:11 |
| 331:6,19 333:12,17 | 68:6 71:22 72:12 | 244:25 253:17 | 91:24 92:24 94:6,16 |
| 334:23 337:13 | 77:21 80:7,24 84:7,9 | providing | 95:10 97:14 99:4 |
| 338:19 339:6,16 | 85:20 100:12 130:12 | 30:13 56:8 110:9 | 101:17 102:5,22 |
| 345:16 346:15,16,25 | 143:8 169:2,19 | 213:11 215:14 | 103:24 104:24 105:7 |
| 347:20 348:19 350:2 | 174:11 183:1 186:13 | 217:23 319:25 325:6 | 107:9 112:6 114:21 |
| 350:4,8,9,16,18 | 186:17 191:2 202:8 | 325:12 329:4 | 117:19 118:19 |
| 351:1,2,4,9,10,17,23 | 239:10 247:24 263:2 | provision | 122:11 124:2 127:21 |
| 351:24 352:2,5,6,8 | 272:11 283:7 292:13 | 17:17 20:11 51:3 | 128:15 135:15 |
| 354:4,22 355:3,6,7 | 294:21 296:8 307:5 | 131:1,5,7,21,23 | 136:16 137:3 145:22 |
| 355:13,22 356:4,5 | 316:1 337:25 338:2 | 137:9 160:16 175:11 | 146:4 147:2 148:11 |
| 357:6 358:7,14,16,18 | 346:25 | 193:4 224:2 251:16 | 150:2 153:2,21 157:6 |
| 358:25 359:1,7,9,11 | proposes | 252:19,21 253:12,16 | 159:9 161:4 162:9 |
| 364:10 | 50:19 263:3 | 287:13 | 163:4 164:4 165:7,11 |
| proposals | proposing | provisions | 170:13 174:7 179:2 |
| 10:2,11,20 11:23 12:9 | 13:7 15:1 112:2,15 | 20:1 37:24 86:6 | 180:9 181:14 183:17 |

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 45

184:5,25 187:21
188:9,20 191:5,24
192:10,20 194:2,15
194:25 196:23
197:19 198:1 200:20
201:11 202:25 203:7
205:19 208:8 209:14
212:9,23 213:15
217:16 218:15
219:20 220:10,13
225:8,23 237:12
253:6 254:17 255:8
261:23 262:19 264:9
265:2,6 267:10
268:16 271:8 273:7
276:10 279:19
280:18 282:9 284:25
285:25 289:16
290:24 291:2,11
293:5,16,25 297:8
298:20 300:17
301:24 302:15
304:11,19 308:7
311:6,22 322:13
325:1 327:25 329:19
338:10 339:9,12
340:25 346:17
350:10 351:6 361:12
362:6,11,24 369:10
370:7,20 371:2
**public**
1:19 9:14 91:4,6,10
127:11 295:12
371:18 373:8,23
374:23
**publications**
330:7
**pull**
185:17
**purchase**
212:17 216:8,11 231:5
235:17 267:4 300:23
**pure**
154:6 275:6
**purely**

44:8,18,21,22 108:21
**purporting**
272:9
**purports**
355:8
**purpose**
70:3,10 201:1
**purposes**
272:20
**pursuant**
1:15 175:10 223:17
**pursue**
35:4 66:15 115:20
    206:6,8 331:6 338:24
**pursuing**
223:24 339:11
**pushing**
173:24
**put**
32:11 38:5 57:21 59:5
    160:16 230:10 244:3
    255:18 257:8 293:10
    293:14 325:25
    346:10 350:24
    360:22 361:3
**puts**
164:17
**putting**
59:10,13 122:15
    132:17 189:8 289:12
    326:2 329:16
**p.m**
166:4 227:5,7,11
    318:4,6,10 347:13,13
    363:5,7,11 371:5,7

─────────────
**Q**
─────────────
**QIBs**
220:25 221:9
**qua**
225:6 278:11
**qualify**
311:12
**quantitative**
211:16

**quarter**
162:20
**quarterly**
188:12,16
**quasi-backstopped**
242:23
**question**
15:19 16:2,18 17:8
    18:19 21:23,23 24:4
    28:19 29:13 30:2,5
    32:3,15 34:5,17
    37:17 39:3 40:4 42:6
    42:9,12 43:9,11,25
    49:14 55:22 58:19,20
    61:24 63:22 67:1,12
    73:16,23 81:23 82:4
    82:10 92:2 98:21
    99:13 100:2 101:19
    101:24 103:7,9,19
    112:13 116:21
    126:16 135:10
    136:10 141:16
    146:20,24 149:18
    156:13 157:14
    163:21 168:20
    174:23 187:23
    198:18 201:18 203:8
    203:11 208:2 217:7
    218:16 225:18 226:1
    244:4,6 246:6 265:3
    265:5,12 272:1
    283:12 289:18 291:6
    297:4 299:3 302:14
    307:17 312:20 313:2
    316:14 328:24 339:4
    366:8 367:11 368:24
    369:21,22 370:13
**questioned**
363:16
**questioner**
109:20
**questioning**
8:19 37:21 99:8
    145:24 183:15
**questions**

21:10 37:25 39:6 40:9
    42:1 82:12 95:9,25
    98:12 110:9 111:13
    111:16 126:17
    180:15 181:9 183:24
    184:1 185:23 186:6
    203:12 226:25
    227:20 312:12
    329:24 342:4 363:15
    369:3,6 370:22
**question-by-question**
38:14
**quickly**
110:1 114:2 138:1
    148:10 189:2 206:9
    206:10 221:20
    267:17 277:22
**Quit**
147:2
**quite**
58:7 72:16 107:11
    155:6 195:12 245:3
    283:11 288:10
    308:16 331:15 345:9
    347:14 358:8 362:1
**quo**
186:5,19,22 187:1
    189:7,21,23 190:4
    193:7,12,13
**quote**
63:24 64:6 78:23
    89:15,22 120:10,15
    366:11,11,18,18
**quoted**
94:21,22 301:3 315:4
**quotes**
87:21 88:4 89:12
    106:14,20 107:20
**quoting**
61:22

─────────────
**R**
─────────────
**R**
2:1 3:1 4:1 5:1 6:1 7:1
    166:1 184:14 373:1

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 46

376:9,21 377:5
**radar**
245:18
**raise**
117:17 132:1 138:17
139:10 205:17
207:13 208:6 211:17
236:18
**raised**
244:17 290:1 316:13
**raises**
246:3
**range**
66:22 86:9 104:3
107:24 111:19
280:23 309:11
315:11 338:20
354:25 365:25
**ranges**
368:15
**rank**
64:18 81:3
**ranked**
297:12
**ranks**
71:23,24,25 231:18
232:11 292:13
**rate**
13:11 70:12 162:18
163:25 183:8 187:10
188:22 190:21 191:3
191:12,16,23 192:2,8
192:19 210:25 243:4
285:13 287:2,12
288:24 320:21
350:12 351:13
360:24
**rates**
209:21,22 210:1,9
211:3,17,20 270:7
276:19 277:2 286:19
**ratio**
121:23 237:10 239:18
298:3
**rational**

308:5
**rationale**
314:3 361:7
**reach**
21:4 30:12 31:8 52:22
53:1 344:1
**reached**
30:25
**reaching**
53:4 85:7 147:13
161:23 269:4
**reacting**
199:1
**reaction**
61:1 343:10,12,22
**read**
24:3 25:25 26:9 27:13
42:8,10 110:13 111:2
119:13 129:5,11
140:9 199:23 200:1,5
200:8,15,16 212:8
254:21 259:10 260:8
291:12,22 321:15
324:17 335:12 340:2
346:3 372:4
**readily**
306:25
**reading**
111:9,9 200:14 201:2
261:15 263:12
318:22 333:10
**reads**
114:11 228:2,6
**ready**
311:12 324:24
**real**
131:20 158:9 216:14
235:3 329:9
**realistic**
134:6
**realize**
98:14
**realized**
160:15
**really**

80:5 81:10 100:5
104:17 166:25
170:20,21 203:19
244:4 273:21 295:5
297:3 301:19 317:16
**Realtime**
1:19 373:7
**real-time**
60:11
**reanswer**
67:14
**reask**
168:19
**reason**
43:15 52:10 59:1
73:18 74:1 85:13
86:23 91:15,21
153:11 177:17
178:13 188:18 207:1
236:17 264:19
266:20 267:7 275:2
308:2,12 361:6 369:8
374:4
**reasonable**
46:11,16,24 47:3,18
47:19 52:15,19 53:17
54:19 55:15,24 56:24
57:2,16,18 61:9
66:23 104:4 118:4
135:21 147:18 168:2
168:17 179:12
226:12 294:1 368:12
368:15,17
**reasonably**
224:21 331:7 339:1
**reasoning**
43:6
**reasons**
51:16 74:5,9,17,18,24
76:25 115:16 200:10
228:24 243:2 244:3
245:15 290:10 321:8
374:3
**reassessed**
370:14

**reassured**
224:8
**REBECCA**
7:15
**recall**
9:21 12:3,17 16:22,23
16:25 18:4 23:11
30:15 31:3 45:7
46:12 48:4,8 49:18
50:7,11 51:4,7,10,12
52:4,6,7,9 59:21
67:10 74:3 84:8
86:20 87:2,7,13,15
87:17 96:4 103:16
108:1,4 110:10 111:8
116:8 117:10,12
118:11,14 119:11
123:16,22,24 126:6,7
129:13 130:2,5,6,7
132:22 133:8 134:4,7
134:15 136:18,22
137:23 138:12,15
144:5 145:16 150:19
150:22 151:2 152:14
155:17,18,23 156:17
156:19,23 157:17,21
157:23 158:2,25
159:11 160:3,8,10,16
160:20 164:13
169:16 176:23 203:9
223:1 238:9 246:1
258:12,14,17 259:25
263:6 319:15 321:23
323:17 326:10,17
329:24 330:1,4,6,19
331:3 332:19 364:6
366:14 367:23 368:2
368:4 369:2,5
**receipt**
320:17
**receive**
100:12 170:23 182:5
277:24 287:18,21
341:11
**received**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 47

21:7 33:17 59:15
60:1 262:7,18 287:20
333:16 340:23 341:9
**receives**
131:8
**receiving**
138:12 313:14 324:5
341:2,3
**Recess**
95:17 227:7 318:6
363:7
**reciprocal**
323:9
**recognize**
327:20 356:13,17,20
**recognized**
279:15
**recognizing**
354:17
**recollection**
31:9 45:18 58:3 85:19
96:10 107:10 119:12
120:2 127:2 135:4
144:23 145:1 152:21
152:25 164:16 219:5
255:13,25 256:10
259:2 262:3 284:20
286:5 326:12 333:16
347:7
**recommend**
19:10 20:14 44:9
**recommendation**
19:16 43:18,21,22
44:7,15,19
**recommended**
19:12 42:20 138:10
**recommending**
43:6,12,15,23 44:3,13
**recommends**
47:13
**reconcile**
349:24
**reconsidered**
177:8,13
**record**

8:21 38:5 67:11 95:11
95:15,21 96:25 99:8
109:23 110:21
119:22 135:5 155:13
165:10,14 166:4
179:5 186:1 227:2,5
227:11,15 252:10
253:9 318:4,10 319:9
363:5,11 371:5
**record's**
37:19 126:19
**recoveries**
36:25 308:24 313:3,10
316:10 355:16 360:6
**recovering**
94:4 100:22 309:5
**recovery**
64:10 314:25 355:9
358:5,13 359:8 360:3
**red**
345:23
**redacted**
11:12
**redeem**
252:14 253:18
**redeemed**
175:10 239:3 251:15
**redemption**
13:1 131:16 137:9
173:8 193:4 238:23
238:24 239:19,24
252:19,21,23 253:15
253:19 286:6,10,13
286:14 351:17,22
**reduce**
56:6 70:15 156:4,5
290:17,18,22 291:10
361:16
**reduced**
12:25 13:13 56:16,19
56:22 174:3 238:12
352:2
**reduces**
291:3
**reducing**

70:18
**reduction**
56:17 173:18 270:21
**red-lines**
346:6
**red-lining**
346:5,7,10
**refer**
68:1,9 77:8 166:18
181:5 186:18 228:9
232:7 235:23 236:6
261:12 318:23
**reference**
115:1 233:19 303:4,9
336:2
**referenced**
40:25 169:9,13,14
172:14
**referred**
63:24 81:1 121:2
131:6 169:2,21
228:16 229:9 232:8
235:23,24 240:2
241:9,9 253:23
286:17 289:7 304:2
347:25
**referring**
13:19 22:4,5 24:14
26:5 28:5,15 36:22
41:24 53:8,10 67:6
67:16 70:20 106:18
153:13 156:8 163:18
166:19 198:17
228:12 232:13,17
236:4 238:22 239:9
268:4 270:1 292:18
342:14 344:11,12
**refers**
63:23 111:13
**refinance**
62:24 63:3 69:2
230:22 236:21 271:7
276:17 277:18
346:23 348:21
360:15 362:5

**refinanced**
69:4 243:13 360:23
**refinancing**
138:23 139:1 176:9,22
180:21 181:6 261:2
271:19 275:17 276:4
276:6,8 282:1,7
285:8
**reflect**
20:3 328:8 364:1
**reflected**
11:25 12:5,10 93:23
**reflecting**
123:20
**reflection**
88:17 268:25 269:2
**reflects**
13:8 94:3 259:17
**refrained**
59:4,9,13
**refresh**
85:18 120:1 152:20,24
262:3 333:15
**refused**
330:22
**regard**
145:20 244:5 309:21
330:5 344:19 346:13
350:2,9 351:5
**regarding**
43:4 145:13 378:20
**regimen**
154:13 155:2
**region**
154:19
**registered**
1:18 106:5,6 221:6,10
373:6
**regulated**
116:12 153:25 154:24
209:18,18,24
**Regulation**
40:24
**regulatory**
154:12,25 155:2

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 48

reinstate
132:2 276:13,20
    277:15 279:17
reinstated
132:13
reinstatement
129:24
reinstating
261:3 264:23 278:19
reiterated
14:3
reject
10:19
rejected
356:15
rejects
327:9
related
171:22 296:10 373:16
relates
216:19 226:11 359:2
relation
196:13
relative
214:14 352:12
relented
206:6
relevant
55:7 57:10 68:12 84:3
    128:11 147:17
    273:22
reliable
102:21 103:23 104:5,9
    104:22
reliance
269:19
relied
37:10 38:21
relieved
224:15
rely
39:24 40:5 90:22
    91:16 102:25 265:8
    265:10,13
relying

244:22 269:7
remain
12:22 13:17 26:17,17
    27:2,14 49:6 78:11
    78:18 79:2,8,14
    113:1 276:18 337:6
remaining
132:12,14 172:20
    230:22
remains
242:4,13 305:20
    312:20
remark
41:23 149:22
remedied
18:25
remedies
199:10
remember
63:16 98:8 129:17
    149:16 151:16
    164:18 290:3 296:3
    321:25 326:12 328:2
    328:21
remembers
220:5
remortgage
275:17
reorganization
50:6 95:12 156:23
    186:25 206:11
    236:11,11 237:17
    355:10
reorganizations
40:18
reorganized
54:11 112:4,16 113:7
    231:2,5,10 239:17
    244:9 274:7,22,23
    306:23 323:6
repay
70:1,8 170:25 171:1
    204:10 205:17
    207:14 214:25
    239:20,21 270:5

360:9
repaying
70:10
repayment
204:15,19,20,22
    335:19 336:5
repeatedly
241:10
rephrase
18:22 79:22 190:7
    225:17 262:2
replacement
288:18
replaces
156:11
report
45:13 46:5 89:11
    105:19 141:24 197:7
    367:2
reporter
1:18,19 9:7 42:10
    48:15 63:17 118:18
    165:9 256:13 373:7,8
reporting
105:15,18,20 106:3
represent
60:17 92:16
representation
198:4
representations
224:17
representative
103:14 232:14 233:10
representatives
51:11,12 136:13
    257:23 319:21
    343:16
represented
29:1 45:6 51:1 206:3
    232:12 304:9 333:17
    344:15
representing
9:22
represents
55:9 81:12 110:3

198:5 263:19
repurchase
131:10,13
request
14:3 32:18 34:22 59:5
    227:22 265:14
    284:17
requested
13:17 14:10 58:15,23
    201:13
requesting
32:19
requests
246:2 375:14
require
33:25 34:8 243:7
    264:14
required
54:9 73:4,13,19 75:5
    75:21 94:20 129:4
    185:15 370:2
requirement
75:23
requirements
267:9
requires
230:7 251:2 264:7
reschedule
120:10
research
202:4
researched
91:5
reserve
95:6 166:7 183:13
    211:15 286:18
resolution
140:22 161:25 175:20
    176:9 250:9 255:22
    263:4
resolve
189:2 312:21
resolved
82:22,23 83:3 326:23
resources

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 49

298:10
**respect**
12:13 13:4 21:22 23:4
   24:11 25:18 30:9
   31:12 32:21 60:5
   61:5 68:15 74:25
   75:1 79:3,9 88:11
   96:3 100:17,22
   146:25 150:25
   153:23 160:14 184:2
   190:19 196:10
   198:13 201:2 208:22
   212:5 217:24 220:6
   223:4 226:3,16
   239:24 240:4 250:20
   265:10 352:7 366:12
**respectful**
90:12,19
**respecting**
59:5
**respective**
121:14 210:18 313:15
**respects**
358:24,25
**respond**
18:20 24:3 33:16
   73:17,23 120:14
   199:13 265:18
   312:11 343:7,8 344:4
   344:9
**responding**
199:1
**responds**
122:16
**response**
51:22 59:24 242:7
**responses**
110:9
**responsibility**
142:2
**responsive**
60:11 61:3
**rest**
332:14
**restate**

43:11 67:9,12 135:10
**restructure**
49:25 178:6 183:3
**restructured**
101:4 158:19
**restructuring**
17:24 18:3 25:6,22
   26:14,15,23 31:12
   34:24 35:11 41:19
   42:15 50:2 56:10
   66:1 84:21 85:24
   86:10 115:21 116:17
   116:24 122:25 130:4
   130:22 135:7,13
   140:7 159:6,14 161:2
   161:22 177:22 183:1
   184:19 194:20
   196:10 198:24 199:3
   199:12,14 210:15
   217:8 223:20,24
   224:18,19 225:3,12
   228:8 240:23 241:1,4
   242:13 247:16
   260:10 263:15,16
   268:6 296:20 334:4
   343:4 360:12 369:17
**restructurings**
62:7
**result**
19:1 55:5 73:3 116:18
   118:4 135:2 179:22
   185:8,10 224:20
   234:11 310:24
   355:24
**resulted**
173:17 293:23 298:24
   298:25 299:5
**retail**
154:3,13
**retained**
124:6 196:3
**retains**
305:21
**retention**
196:6

**retire**
172:4 253:14
**retired**
205:2
**revenue**
40:20 116:19
**reverse**
194:4,10 195:2
**reverse-engineer**
213:13,21,23
**review**
36:8,13 114:22 135:19
   141:25 150:14,20
   176:6 268:7 269:5
**reviewed**
114:3 152:1 257:1
**reviewing**
11:7 26:3 27:11
   110:11,17,25 129:9
   134:23 140:14
   150:19 200:11
   201:20 291:24
**revised**
116:13
**revisions**
59:19
**revisited**
175:22
**re-assess**
83:19
**RFP**
139:19 142:1,3,7
**rhayes@foley.com**
7:16
**right**
48:18 55:10 61:20
   62:24 74:8 80:13
   88:19,20 93:11,21
   95:7 97:15,17 98:2
   112:5,12 127:19
   129:6 132:8 144:9
   146:10,15 149:10
   151:17 171:23 182:1
   183:11 186:4,22,25
   187:11 189:10,14,21

190:2 192:6 193:15
   194:11 197:16,21
   200:11 201:12
   202:11 203:10,17
   205:11 207:6,9
   208:15,19,25 209:5
   209:11 210:10,23
   212:19 215:6,20
   216:6,9 220:25
   226:24 228:22 229:7
   229:11 230:21 231:4
   231:4 233:11,25
   234:13 235:18,19
   236:1 237:1,11,22
   239:1,12 240:20
   242:24 244:11
   246:14 247:7,10,21
   247:25 248:11,25
   249:5,12,17,23
   250:17 251:1,3,6,11
   251:12,17 252:5,8,14
   253:5,11,24 254:16
   255:1 256:9 257:12
   258:8 259:16,21
   260:7,12 261:4 264:8
   266:20 267:25
   270:16,17 271:11,12
   271:16,19,24 272:5
   272:13,18 273:6,11
   273:19,23 274:2,12
   275:19,23 276:4,9
   277:5 278:1,4,8,17
   279:3,12,18 280:8,10
   280:17 281:2 282:8
   282:14,22 283:5,10
   283:20,23 284:5
   287:5,14 288:7,19,22
   289:3,21,25 291:11
   291:21 294:14 296:1
   296:11,16,18 299:7
   300:25 301:16
   303:14,24 305:5,9
   306:11 307:1,6,8,12
   307:21 308:6,14
   309:22 310:5,10,22

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 50

315:1,3,7,23 317:6
320:19,22 321:1,15
322:16,22 323:7,16
324:8,12 325:8,12
326:1 327:24 328:19
332:9,10,24 334:12
334:18,20 335:24
336:12 338:3 341:25
345:18 348:4,10
349:11,17,20 350:5
350:25 351:2,5,10,18
351:24 352:3 353:18
356:18 357:4,5 358:3
359:15,16 360:17
362:8 365:4
**rights**
46:22,25,25 69:23,25
88:14 97:11 98:17
100:10,19,23 101:7
117:17,23 118:8
155:25 156:21 157:1
157:3,12,18 158:12
181:12,16,16,18
199:9 205:14 228:17
229:10,14,24 230:16
230:25 231:9,14,23
231:25 232:3 233:24
234:13,18,20,22,24
235:1,12,15,22
236:22 242:23
244:10 246:11
249:15,16,25 250:24
251:3,8,9 254:15
264:22 265:21
266:13,16 267:2,14
278:14 279:12
297:15,20 298:8
303:11 317:18 335:8
335:16 336:23,23
337:2 360:8 364:4,22
364:25 365:12 366:2
**rights-offering**
134:9
**right-hand**
111:19 148:18,20

**rise**
209:22 210:1 211:20
213:3
**risen**
214:7,8,24
**rises**
214:13
**rising**
212:19
**risk**
241:3 290:19,22 291:4
291:10 359:12,13
**road**
201:15 206:1
**Robert**
7:7 109:24 184:14
**ROBERTS**
2:12
**robert.britton@kir...**
7:8
**robust**
214:14
**Rockefeller**
4:15
**ROITMAN**
4:19
**role**
25:9 85:23 134:22,22
135:18 142:23
145:19 147:25 152:7
257:20,24 333:2
339:23 340:2
**roles**
146:21
**rolled**
12:20 273:14
**rolling**
147:23,23 358:19
360:20 362:8
**roll-up**
174:21 175:1 176:5
360:19 361:1,22
**Romanette**
250:16
**room**

91:9 95:12 122:14
161:10 206:18
303:24 304:4 308:13
**rooms**
165:3
**Ropes**
2:3 8:23 9:22
**ROSEN**
5:20
**Rosenbaum**
257:12,19 258:2,15
259:13 379:4
**Rothschild**
29:2 319:11 322:10,12
322:13
**roughly**
45:23 169:7,24 188:23
252:2 316:9
**round**
142:7
**row**
111:21 204:25 260:22
305:13 308:22 309:3
**rows**
248:18 305:12
**RPR**
373:22
**RSA**
24:20,24 25:23 41:19
42:15 48:18,25 53:4
57:1,3,5 59:24 65:12
82:15 100:13 107:16
107:20 108:6,7
133:12 158:22
159:17 164:17,21
167:4,8,20 170:10
177:6,7,24 178:9,15
182:8,16,23 196:8,9
205:22 219:2,7 225:7
225:22 226:8,11
235:8 236:9,20,24
237:16 241:7 243:16
246:10 263:1 280:5
283:4 295:8,11,16
305:19 333:4 338:13

343:6 344:5 367:16
368:7,11 370:10
**Rudnick**
4:3 7:21
**rules**
166:15
**ruling**
31:23 32:18 34:22
41:5,14 242:17
245:10 246:2 256:7
262:17 265:14
**run**
277:22
**running**
303:25
**runs**
143:1
**RYAN**
2:22

————— S —————

**S**
2:1 3:1 4:1 5:1,17 6:1
7:1 166:1,1,1 376:9
376:21 378:4,10
**SABIN**
5:17 198:15
**Sadeghi**
3:7 166:9,11 180:24
180:25 182:19,20
183:12 375:5
**sale**
223:23 302:18,25
303:1,3
**salient**
13:3
**Sam**
111:11 120:8 138:9
140:6 246:20 247:14
**sample**
153:8
**Sam's**
111:15
**Sassower**
247:15

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 51

satisfaction
306:6
satisfy
160:13 267:8 312:18
313:23 347:2
Saturday
59:15 60:2
save
271:14 353:20 360:24
361:3
saved
357:13,17
saving
270:8
savings
4:4 75:1 77:2,8 162:3
162:5,16,21 163:2,13
163:25 174:11
177:21 270:19
352:15,21,23 353:4
353:11,22
saw
89:22 130:24 131:20
132:7 247:20 255:10
295:15 339:16 347:6
saying
22:3 41:23 86:12
100:4 118:14 119:14
122:10 143:24
151:17 201:7 208:21
241:15 271:6 283:23
289:25 321:17
324:22 346:4
says
32:20 45:14 105:23
111:21 114:16
120:10 129:20
140:19 144:17 191:8
199:21 230:10
253:13 255:13 327:8
332:22 333:11 336:8
336:8,13 337:1
342:13,17
scenario
186:23 189:8 229:14

357:1,2
scenarios
205:17 255:21 284:12
284:13,15,21 358:5
scenes
330:14
scheduled
14:18 15:5 17:10 41:9
185:6
scheduling
15:11
schematic
322:19 323:11
schemes
313:14
Schneider
294:8,13,13,16,25
295:4 319:19 325:4
330:2,15 337:24
Schneider's
295:12
school
199:19
scope
296:22
Scott
222:13
SEC
106:4
second
4:6 5:4 10:2,16 11:24
12:4,7,9,14,14,21,22
14:4 15:17,23 16:7
16:16 18:11,13,24
19:15,18 20:11,12
21:5 24:12,15,19
25:20 26:12,22 27:21
28:8,17 29:1,19
30:13,15 31:15 35:5
35:22 36:10,17 37:5
37:6 38:22 40:13,15
41:20,21 42:16,17
43:9 46:10,18,19
48:3,20 49:10,16,21
50:10,12,16 53:23

54:12 55:18 56:2,8
57:13 59:17 60:6,20
62:3,23,24 63:6
65:15,21 67:23 68:24
68:25 69:8,12,15,20
70:1,7,8,10,14,17,20
70:25 71:5,7,9,22
72:1,12,23 73:5,20
73:25 74:2,6,9,18
75:10,15,23 76:3,14
76:17 77:1,3,22
80:23 87:25 111:21
115:3,13 120:7
129:22,22 130:4,16
130:21 132:16,23
141:15 145:22 156:2
156:8,11 157:9
159:23 160:6,9,19
161:13,18,24 162:6
162:19 164:1 166:19
169:19 170:25 171:1
171:9,22 172:5,8,23
172:23 173:1,3,8
174:18 175:9,10,12
175:21 176:10,21,22
177:10,12,20 179:23
180:2,20,20 181:2,7
182:2,13 186:8,14,24
187:9,13 188:2,3,11
188:19 190:11,19
192:17 195:9 196:19
196:21 202:9,10,14
202:20 203:6,24
204:20 205:1,18
207:4,14 208:7,13
209:2 220:9,17 224:7
224:25 225:5,9,19
227:16,17,21 228:6
228:10 232:7 238:2
240:21 242:21 243:1
243:5,6,8,11,14
248:4 250:1,7 251:19
254:2,9 256:2 259:12
260:22,23 261:2,10
261:13,17,19 262:6

262:12,16 263:3,8,25
264:5,7,12,15,23
265:7 268:9,12 270:3
270:6,8 272:12
275:25 276:14
277:15,19 278:19
279:17 280:6,7,15
281:1 282:20,21
283:7,17 284:23
290:17,21 292:8,12
292:14,15 297:22
298:1,13,14,17
299:12 308:23 311:2
313:19 314:11,17
318:19 319:1,24
321:7,10,13,24 323:2
323:4 324:22 325:11
325:22 326:19 327:2
327:10,12,17,21
328:14,15 331:17,21
332:8 333:13,19
334:10,11,20,25
335:11,15 336:1
338:2,18,25 340:5
341:17,21 342:8,15
343:17 346:23 355:5
355:16 356:2,14
357:8 358:11,19
362:2 375:21
Secondly
243:17
seconds
72:19 250:11 296:16
second-lien
181:8,13,22 182:6
second-to-last
248:18
section
14:1
Sections
40:19
secure
139:21 343:1
secured
62:8,17 65:9,16 71:12

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 52

71:13 75:15 179:16
193:20 194:12
195:20,23 202:14
297:19 360:16
**secures**
69:22
**securing**
69:10 196:19 241:6
249:8
**securities**
90:23 103:2 106:4,5
221:10 252:15
366:21
**securitization**
116:3
**security**
48:14 49:6 221:9
229:18 300:4
**see**
28:2 60:14 66:11 67:3
85:16 93:3 110:23
111:20,24 112:5
·113:21 119:6 120:12
120:22 122:19
123:12 127:10 129:3
129:25 131:7 138:18
140:8,20,23,24
143:20 144:1,15,20
148:17,19,25 149:11
150:10 151:10
152:18 177:17
206:10,14 211:18
224:10 246:21
247:13 248:3,8,19,21
249:15 250:6 257:25
259:13 260:15,24
261:5 270:2 274:20
291:1,17 308:25
310:7,20 316:10
322:18,21,23 324:13
331:14 332:21
333:20 335:7,15,20
335:22 336:2,5 337:7
337:8 345:3,16
351:16 352:4 363:22

365:9
**seeing**
144:5 145:16 200:22
258:13 319:15
**seek**
83:4
**seeking**
31:23 32:23 242:17
325:25
**seen**
11:13 45:13 46:5 47:1
85:9 87:21 144:3
168:21 262:22,22
269:18 278:25
332:17,19 360:21
**select**
18:9
**sell**
90:15 271:24 301:15
301:16
**seller**
300:15 301:15
**senior**
64:18 230:5,17 257:15
297:19
**seniormost**
229:25
**sense**
106:14 134:25 197:15
197:16,22,24 198:22
199:17 219:18
288:16,16 289:1
328:4 366:11,18
367:5 368:12
**senses**
217:3
**sensitivities**
313:3
**sensitivity**
309:21 313:11
**sent**
59:14 111:12 347:11
**sentence**
24:16 26:1,6,12 27:6,7
27:13,21 100:15

122:10 258:1 259:13
268:24 269:1 270:2
292:12 332:21
**sentences**
291:14
**separate**
167:13 179:7 253:12
253:17,17 291:4
343:17
**separately**
100:21
**separation**
100:18 113:3
**September**
109:25 112:13,18
113:19,20 209:23
**series**
306:17
**seriously**
21:21
**served**
241:5
**service**
105:16 106:4 188:25
**session**
111:12 312:6 375:16
**SESSIONS**
379:19
**set**
14:16 23:5,25 50:18
60:19 85:13 95:9
116:8,10 125:25
131:13 165:3 169:10
184:3 189:22 201:22
248:18,18 250:6
347:6,8 361:19
364:21 367:19
373:11,20
**sets**
153:8 303:23 319:24
**setting**
15:2
**settle**
161:11 173:3 337:13
**settled**

280:21
**settlement**
138:25 172:22 173:2,7
173:9,11,13,14,18,25
173:25 181:3,7
280:17 281:18
283:10 284:4 285:9
314:15 325:6,16
326:8,16 327:4 328:6
328:17 329:5,13,18
331:11,19 335:17
336:3 337:22 338:1,3
338:13,18 339:3,8,18
339:20 340:4,8,10,18
340:19 341:18,21
356:8,15,21,25 357:9
359:14,15
**settlements**
280:6,12
**settling**
281:11 282:1
**set-aside**
172:21
**seven**
4:7 118:18,21 149:12
152:13 219:11
**seven-and-a-half**
148:23
**severally**
63:9 64:3,14
**shape**
211:18
**share**
12:23 93:11,22 160:19
216:7 219:7 235:22
301:6 302:12 316:22
317:10,15
**shared**
100:25 123:23 214:12
219:2 257:4 346:1
368:5
**shareholders**
334:3
**sharing**
349:15

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 53

**SHEARMAN**
7:2
**sheet**
140:8,18 176:8 179:22
    189:20 247:17,18,20
    247:24 251:7 255:11
    255:13 258:5,6,11
    259:14,15,18 260:2,6
    263:10,19 266:25
    278:2 279:1,1,23,25
    326:11,21 327:13
    372:8
**sheets**
258:14 260:1 327:8
**SHIVANI**
4:9
**shop**
25:7
**Shore**
3:15 183:20,22 184:8
    190:7,9 194:17,18
    196:25 198:19
    201:17 219:22
    220:11 226:24
    305:11 375:6
**short**
95:7 131:19 132:10
    158:11,13,15
**shortfall**
347:23
**short-term**
176:8
**show**
209:12 309:10 351:23
    353:18
**showed**
152:11 284:21
**showing**
152:12 362:7
**shown**
345:5
**shows**
214:6 313:16
**SHRIVER**
6:19

**sic**
227:5
**side**
9:24 99:17,17 106:9
    122:23,24 126:12,13
    126:18 216:16
    241:11 288:8 333:4
**sides**
87:6 121:16 135:20
    217:2 232:4
**sift**
127:3
**sign**
115:14 158:21 235:3
**SIGNATURE**
372:14
**signed**
108:6 146:19 280:5
    281:2 295:7 367:16
    368:7 372:8
**significant**
71:19 94:11 154:10
    195:19 273:4 276:3,5
    280:16
**significantly**
270:7 295:14
**signing**
24:20,23 107:16 196:8
    226:8 235:7 370:10
**similar**
168:7 299:25
**similarly**
342:21
**simple**
72:15
**simply**
118:8 176:21
**simultaneously**
345:13
**sine**
225:6 278:11
**single**
20:10 52:7 87:15
    198:11
**sir**

98:16,17 100:20 103:7
    110:1,7 114:9 115:23
    117:6 118:6 119:3
    122:21 145:17 246:7
    256:24 262:3,25
    293:11,20 332:17
    333:16
**sit**
20:10,19 66:9 98:10
    136:23 137:22 139:2
    153:10 161:9 164:20
    213:22 267:7 312:22
**sitting**
19:25 23:8,12 66:13
    87:14 176:7 180:6
    264:18 285:7 369:7
    370:4,12,15,16,17,23
**situation**
92:7 185:3 214:8
    234:9 296:23 301:12
    338:7
**six**
127:8,9 219:11 348:13
    350:3 370:21
**sixteen-and-a-half**
168:13,16
**six-and-a-quarter**
13:12 162:20 270:22
    350:4
**size**
158:6 252:2 255:16
    328:7 345:4,16
    346:14 361:8
**skip**
331:8
**skipped**
77:17 109:20
**sky**
209:4
**slide**
319:10 320:11 322:7
    332:15 355:2
**slightly**
136:9 170:16
**sloping**

211:19
**small**
110:15 155:6 176:13
    241:18 279:10
**smaller**
349:23
**smart**
90:17 295:4
**Society**
4:4
**solely**
4:5 265:10
**solicit**
49:20 343:9
**soliciting**
58:4
**solution**
159:3 161:23
**Solutions**
8:6 9:8
**solvency**
369:4,6,11,14,19
**solvent**
92:23 93:20 300:6
    311:5,21 369:9 370:5
    370:11,15,19
**somebody**
311:13
**Somebody's**
353:24
**Sontchi**
200:8,14 221:12
**soon**
146:3,7 298:14 342:5
**sophisticated**
21:1,18 60:17 195:17
    308:4,10 343:11
**sorry**
15:20 25:24 26:21
    27:4 36:3 42:5 43:10
    58:21 75:1 77:17
    116:20 148:14 149:6
    174:22 185:25
    187:23 188:4 193:9
    198:8 206:23 220:19

PX 134
Page 150 of 165

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 54

238:16 261:14
267:18,24 272:24
278:22 283:11
288:12 307:13
320:24 322:11,14
324:11 345:10 353:1
**sort**
127:17 174:15 209:12
272:10
**sought**
233:20 326:6
**sound**
171:23
**sounded**
311:11
**source**
104:9,23 286:18
**sources**
248:19 312:1 324:2
337:5 347:9,12,19
348:12
**Southern**
153:24
**so-called**
40:18
**speak**
38:10 72:2 73:9 99:11
132:24 147:14
293:17
**speaking**
8:5 173:20 221:22
**speaks**
122:12 253:7
**specific**
24:4,14 32:19 92:12
127:2 144:25 255:25
256:9 286:18 329:25
368:10
**specifically**
28:16 83:8 136:18,22
169:17 201:13 244:5
284:6 297:4 305:1
326:14 329:6 341:16
**specifics**
137:23

**specified**
287:12,23 306:8
**specify**
252:22 266:14,19
267:3
**speculate**
19:22 20:8,20
**speculation**
18:16 19:5 20:17 39:2
40:2 66:8 71:2 76:1
104:25 179:3 212:10
213:16,20,20 261:24
268:17 275:7 279:20
293:6 339:13
**speed**
201:25
**speeding**
182:9
**spell**
222:17
**spelled**
84:18 320:14
**spend**
223:7
**spent**
123:16
**spin**
28:1 35:8 41:6,10
223:15 224:20
225:16 241:11,12,20
242:18 243:25 244:5
244:7 245:11,17,21
246:1 248:15 258:23
259:3 260:12 296:9
**spin-off**
27:1
**split**
83:25 84:7,9 85:19
86:17,24,25 87:8,9
87:15 122:23 213:14
213:24 214:9
**spoddar@brownru...**
4:10
**spoke**
166:22 171:19

**spoken**
331:21 344:23,24
**sponsors**
30:22 101:12 205:9,10
**spread**
48:5 51:5 86:17
**spreadsheet**
133:15
**spun**
248:11
**Square**
4:7
**ss**
373:3 374:1
**stage**
49:23 112:1 248:1
**stakeholder**
232:10,19 233:2,3
**stakeholders**
156:22
**stalking**
239:25
**stand**
165:12 327:3
**standing**
44:10 254:18
**standpoint**
171:7 175:7 176:2
238:21
**stands**
264:16 326:18
**stand-alone**
182:14 190:11,22
**start**
27:22 72:5 129:21
155:11 227:19 296:5
**started**
139:19 303:22
**starting**
54:8 107:11 143:23
363:15
**starts**
111:10 246:19 247:8
247:14 270:3
**state**

**1:20 24:8 25:19 26:20**
27:22 29:4 36:7 46:7
61:17 63:7 64:1
66:19 373:2,9 374:1
**stated**
68:22 70:9 347:20
**statement**
26:17,17 27:3 28:13
29:6,7 33:9 36:16
46:12 47:3,6 50:7
54:15 74:22 85:13
124:20 128:18,19
132:22 185:6,8
198:10 213:9 277:13
288:11 290:11
301:10 302:1 347:9
347:12
**statements**
23:5,13 27:18 37:3,14
37:21,22 62:1 221:18
222:5
**states**
1:1 8:16 24:5 26:12
85:4
**status**
64:17 186:5,19,22
187:1 189:7,21,23
190:4 193:7,12,13
**stay**
165:10
**STEFFEN**
7:25
**stenographically**
373:13
**STEPHEN**
6:7
**stephen.hessler@ki...**
6:8
**steps**
14:1 129:15 206:21
**step-up**
179:14 205:25 206:7,8
223:17
**STERLING**
7:2

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 55

**Steve**
9:4 142:20
**stick**
233:17 260:5
**sticker**
246:25 247:4,6
**sticking**
240:18
**stock**
121:8,13 212:12
  243:20 244:17 301:6
  302:13 305:25
  312:17
**stocks**
91:4 209:25
**stop**
188:18 243:3
**straight**
243:5 305:18
**straight-line**
93:18
**strategies**
25:10
**STRAUSS**
5:2
**Street**
2:8 3:5 5:22 8:7
**strengths**
151:23
**strenuously**
137:10
**stretch**
179:18
**stretches**
207:17
**strictly**
121:21
**strike**
37:23 43:1 45:2 47:10
  143:6 152:22 155:21
  180:24 182:19
  269:21
**strikes**
265:19
**string**

113:18 118:17 119:4
  140:5 143:18
**strings**
300:22
**strong**
142:24 195:21 197:15
  197:16,22,24 198:22
  199:16 210:6 223:18
  303:11,14 366:11,18
  367:5
**struck**
88:14 214:14 297:18
**structure**
25:4,5 52:22,25 53:7
  57:11 61:19 76:9
  86:4 106:6,10,16
  120:20 121:5,7 134:9
  135:24 155:20,24,25
  160:4 178:15 182:25
  216:3 229:25 230:24
  255:19 297:13 298:2
  315:25 341:5
**structured**
70:5 74:2,6,10,19
**structuring**
76:25
**stuck**
317:19
**style**
114:6
**sub**
77:23 78:8,14,22 79:5
  79:25 80:1 295:20
  318:18
**subbox**
248:22
**subbullet**
342:12
**subject**
102:13 103:1 126:3
  127:16 129:15 130:6
  138:8 155:14 176:24
  226:23 254:10
  291:19 320:17
**subjected**

231:10
**subjects**
135:13
**submission**
34:15
**submitted**
12:4 124:14 196:4
  227:21
**subscribed**
371:12 374:21
**subsequent**
15:7 328:22
**subsided**
210:3
**subsidiaries**
113:2
**subsidiary**
135:24
**subsidizing**
191:2
**subsidy**
192:7
**substance**
33:19 130:21 132:17
  159:6 331:22
**substantial**
36:24 50:4 96:2 196:5
**substantially**
70:15 93:6 108:20
  154:5 234:6
**substantive**
195:18
**substitute**
268:13
**subtract**
353:3,9
**successful**
137:18 325:19
**successor**
2:5 4:5
**sufficient**
18:9,15 207:13 208:6
  313:22,23 369:23
**sufficiently**
343:10

**suggest**
16:20 21:14,24 87:23
  92:21 240:23
**suggested**
17:1 93:17 142:6
  345:24
**suggesting**
50:8 217:1 250:22
**suggestion**
49:17,19 52:2
**suitably**
73:16
**summarize**
72:20 367:3
**summarized**
13:5
**summary**
11:19,22 12:11 73:1
  122:9 305:8 309:14
  342:8 345:3,8 363:20
**Summer**
7:21
**Sunday**
12:2 347:12
**superior**
19:2 56:15 193:11
  294:11 295:13 326:1
  346:15 350:8 351:5
  352:8 354:5 359:1
**supplement**
139:11 172:6
**supplemental**
300:1
**support**
10:16,21 17:24 18:3
  26:15 35:12,13,15
  70:12 134:22 178:21
  196:10 225:1,3,22
  227:21 243:24
  249:24 258:24 261:8
  262:5 263:16 333:18
  342:18 343:1,4
**supported**
333:12 334:23 340:20
**supporting**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 56

71:5 85:4 135:18
292:2
**supports**
213:14,24
**supposed**
188:11 317:2
**sure**
19:7 21:2 28:22 29:11
34:25 38:12 65:19
76:7,10 86:11 90:4
91:8 98:23 100:14
101:21,22 110:14
113:5 134:24 135:11
158:17 174:24
187:25 188:5 196:15
200:24,24 201:8,16
209:4 221:11 257:8
265:16 267:12
275:14 284:11 285:1
286:5 289:5 291:13
291:16 301:1 304:1
310:14 367:13
**surprised**
101:23 116:13
**suspect**
217:2 275:5 284:7
299:15
**sustainable**
61:19
**swamped**
178:2,4
**swear**
9:8
**sweeten**
299:14,15,16,20,22
**sweetening**
300:7
**swing**
357:25
**switch**
176:16 188:6
**sworn**
9:14 371:12 373:12
374:21
**system**

105:18,20
**systemically**
156:16

_____
T
_____
**T**
1:12 3:1 4:1 5:1 6:1
7:1 122:23 166:1
241:11 287:9 373:1,1
378:15
**table**
121:22 122:15 235:6
**tail**
245:12
**take**
8:13 37:19 44:12
62:20 65:1,20 70:23
70:24 83:15 88:10
93:12 95:9,11 114:21
121:8 134:23 139:6
139:13 164:11,25
177:10 182:18 184:9
197:8,10 205:24
208:7,12 209:2
213:12 215:2 219:4
232:12 233:17
246:16 248:23 249:9
256:2 257:5 259:8
263:3 264:7,15 292:8
297:17 302:1,8
304:16 309:3 316:15
318:1 348:12 356:7
356:21 359:12,13
360:14 361:6 362:19
**taken**
48:20 65:3 66:21 87:6
192:23 243:14
280:15 344:21
373:13
**takeover**
126:3
**takes**
32:7,7
**talk**
77:7 120:15,17 123:5

123:18 136:20
157:21 162:2 186:4
211:14 212:20
262:12 270:18
287:10 300:11
328:11
**talked**
99:1 142:14 162:3
273:9 274:4 282:23
326:13 350:15
**talking**
92:11,13 104:11
108:24 109:2 121:2
122:22 147:22
162:10 178:5 201:12
209:6 223:7 242:22
264:24 266:11
278:21 295:1 296:20
297:10 326:25
327:14 330:10
367:12
**talks**
112:7
**tantamount**
76:5 139:4 189:5
**tax**
25:5,9,12,18 26:23
27:18 28:11 31:20
32:5 33:14,20 36:8
36:13,17,19,24 37:4
37:10 38:10,21 39:11
39:15,24 40:5,12
42:24 43:4,13,20,23
44:5,10,14 63:8,10
64:3,6,15,16,22 65:7
178:2,4,10 179:7,13
183:4 216:17,18
217:1,13,22 241:23
242:2,11 244:12,18
244:23,24 245:2,4,24
248:7 263:11 264:21
264:24 265:10 267:9
268:8 269:6,8,15,17
349:15
**taxable**

205:24 223:17
**taxably**
244:1
**taxes**
39:6 178:1,12,17
179:1
**tax-free**
25:22 26:14,25 28:1
35:8 41:6,10,18
42:14 223:15 224:20
225:15 241:11,12,20
242:18 243:25 244:5
244:7 245:11,17,21
246:1 248:15 258:23
259:3 260:11 263:14
296:9
**tax-related**
40:9
**TCEH**
3:11 27:1 53:3 112:21
113:1 120:17,19,25
121:6,10 122:2,3
123:9,18 124:5 125:7
125:12 126:12
143:24 158:20
177:24 179:5,7,17
180:19 181:1,12,20
182:1,5,10,24 183:9
183:23 184:4 185:12
196:2 205:22 206:4
210:17 217:11
221:13,17,23 222:7
222:25 223:23 224:5
224:9,17 225:2,6,12
225:14,21 241:13,20
242:18 243:23
248:11 258:24 259:1
259:3 260:4,12 266:8
344:7
**TCH**
112:21
**team**
142:16 150:14 152:1,5
**technically**
204:15 232:10

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 57

techniques
365:25
telephone
10:3
tell
104:18 111:6 126:18
130:20 132:16
133:24 153:11 159:5
196:8 198:8,9 224:4
226:9 228:3 229:13
245:5 272:2 285:20
285:22 286:23 287:8
304:13 313:5 330:22
342:24 367:21
368:10
telling
284:9 330:1 368:16
ten
8:24 9:23 165:3
167:22,25 168:1,6
209:25 270:2 272:2
363:3
tender
337:25 356:18,23
term
64:7 91:8 118:11
140:7,18 147:8 185:7
199:8 244:18 247:16
247:18,20,24 251:7
255:11,12 258:5,6,11
258:14 259:14,14,18
260:1,2,5 263:10,19
266:25 278:25 279:1
279:22,25 326:10,21
327:8,13
termed
139:8
terminated
141:9
terminology
157:13 199:15 266:17
terms
13:6 18:24 20:1 21:6
48:2 72:11 86:10,13
99:23 117:22 132:20

135:12,23 136:4
147:17 179:18
185:15 188:15 192:2
192:4,12,22,25 193:5
199:9,11 200:22
201:5 206:20 212:25
213:1 226:10 245:3
254:11 255:4 266:19
271:10 276:14,24
286:9 292:14,22
293:4,12 294:21
295:11 298:15 312:1
318:21 320:13,16
325:23 326:20 330:9
330:13,23 340:18
343:3 350:12,14,20
351:7 360:1,10
368:11
terrific
84:22
test
231:11 245:12,23,25
testified
9:15 18:5 39:10 42:19
73:24 89:24 90:2
91:3 93:21 102:6
117:6 127:7 137:5,10
139:18 163:22 164:6
170:18 197:4 263:21
263:23 285:1 331:10
333:23 364:3 366:10
testifies
330:15,21
testify
102:12 107:7 108:13
370:5
testifying
90:7 102:3
testimony
25:12 72:20 74:3,21
81:11 91:17 96:4
97:3 103:16 117:10
117:12 122:21 162:4
166:24 169:8 171:18
176:15 196:18

213:11 256:25
268:14 298:21
300:24 303:9 315:9
364:6 366:14 370:8
372:5,6 373:11,12
testing
98:6 254:3,4 258:21
tests
245:9
TEV
125:11,11,12 168:11
203:13,18 207:6
208:4 215:17,21,23
310:2,9,15,17 314:7
314:23 354:21
367:20,22
TEVs
209:8 309:22 363:21
364:2 367:24
Texas
154:9
text
199:23 291:1 292:1
thank
9:6 15:14 26:9 67:13
102:16 103:10
117:14 118:21
140:12 146:7 149:19
183:15,16 197:1
222:23 280:1 291:21
292:5 318:12 352:3
368:21
theirs
338:22
theory
121:4 236:20
thereabouts
210:4
thin
99:15
thing
35:10 86:12 328:14
345:2,3
things
114:24 136:20 147:11

174:4 197:20 244:22
271:17 278:1 312:16
315:14 326:6 327:18
341:3
think
13:2 20:25 21:17
23:20 35:24 37:22,25
44:9,10,18 45:22
46:2,2 47:19 49:23
51:24 57:17 60:1,9
60:10,13,15 64:25
65:5 66:9,11 68:22
69:1 70:9 71:3 73:16
76:7 80:4,13,17
82:12 88:10,15,17
89:10,21 93:1,15
96:13,14 97:15 98:11
100:1 105:20 107:12
107:20 108:7 112:18
117:6,21,25 118:19
121:20 124:23
125:16,19,20 126:10
128:10 131:10 133:3
136:9 137:8 139:8,18
142:2,20 148:19
151:16,18 152:6
153:23 154:18,21
155:4,10 156:15
157:14 159:2 162:12
162:21 163:8 164:3,7
164:16 168:17
170:15 172:25
176:11 179:4 187:12
188:10 190:24
191:11 192:1 193:16
195:2,20,24 198:3,18
199:4,10 200:16
201:5,10 203:12
207:15,24 208:11,17
209:22,24 211:12,19
212:11 214:3,11,13
214:19 216:21
219:25 221:5 222:18
223:9 225:9 228:15
231:16 232:9 237:14

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 58

237:15 238:16 239:4
240:1 241:9,18
242:15 244:18
245:22,24 246:12,14
249:3 250:20,20,21
251:20,22 254:6
256:1 257:22 261:12
264:10 267:13
270:15,20 272:1,21
273:9 275:1 277:17
281:10,11 282:18,23
283:2 286:17 287:2
289:4,14,17,23 295:3
296:2,25 297:19
299:1,10,19,19 301:9
301:25 302:17 303:4
303:5,12,21 304:2,5
304:13 307:8 309:17
311:8,9 312:15
315:12,13 322:4
325:3 329:8,23 331:4
336:20 338:19 343:3
344:4,6 345:14,23
347:3,9,13 348:11,14
348:18,20 349:13,21
349:22 350:22
354:23 355:1,2 359:2
363:3 364:21 369:22
**thinly**
88:4 91:14,20 103:15
**third**
25:8 27:8 132:11
248:10
**third-party**
103:4
**thought**
35:9 51:19 56:9 66:16
73:15 134:5 136:4
175:2 194:8 196:9
241:6,15 268:20
331:14 333:23
364:12 368:11
**thoughtful**
271:13
**thoughts**

143:25 180:7 210:19
**threat**
139:2
**three**
29:8,12 30:9 45:23
46:23 114:10 128:7
151:4 159:24 181:5
184:12,20 207:20
210:2 238:11 258:18
260:1 271:7 309:21
349:19,19,21 367:13
**Thursday**
347:10
**tie**
226:14
**tied**
323:14
**ties**
323:2
**TIM**
7:24
**time**
8:10 19:24 21:7 23:16
23:18,21 24:6 28:23
35:9 44:1 46:23
47:20 48:17,25 51:24
52:16 56:3,25 57:4
58:8 59:6,11,22
89:13,13 95:7,15,21
107:4,16 112:14,24
112:25 113:5 114:3
114:21 119:10
120:25 123:15,17
124:1,11,17,25
125:17 126:10,11
127:13,13,18 128:9
130:8,11 131:3 132:8
134:3,12 138:22
141:1 145:3 146:4,11
147:22 149:6,15
151:20,20 157:24
162:18 164:17 165:8
166:4 174:6,17 175:1
179:12 183:14 189:6
190:6,14 195:12

196:7 199:20,22
200:1,5,15 202:4
213:18 214:4 224:21
227:5,11 246:8,13
249:19 258:17 261:7
262:23,24 271:6
275:13 292:8,17
299:21 304:13
311:17,19 312:4,22
318:4,10 322:1 326:5
328:3,7,23,25 329:1
329:20 331:2,16
334:9,13 336:14,15
336:18 337:10,11
339:5,15 347:15
359:17 362:12 363:5
363:11 366:21
367:12 368:6 370:10
371:5,7
**times**
4:7 90:1,3 142:20
144:19 148:22
152:17 252:15 317:8
**timing**
348:17
**Titer**
325:3
**title**
273:13
**titled**
258:5 352:16
**today**
8:9 20:9,19 23:8,12,19
24:2 26:18 27:3,15
49:2,3,5 66:13 75:24
87:14 88:18 93:8
96:9 108:14 115:17
126:24 136:24 137:5
137:22 141:7 144:4
145:17 153:10
156:10 162:19 164:3
164:21 169:7,13
172:25 175:15 180:6
183:2 185:5 188:23
208:18 210:2 214:20

235:24 241:10
264:18 267:7 285:7
292:21 303:9 311:13
315:9 326:24 369:7
370:4,12,16,17,23
**TODAY'S**
375:16
**Todd**
328:3 329:7,23 334:13
**toggle**
112:8 337:3
**told**
107:20 118:7 122:7
127:15 185:14
226:10 255:16 257:8
277:16 278:18 279:4
294:20,25,25 330:4
330:16,20 331:13
**tomorrow**
120:11
**top**
119:5 144:15 153:13
153:18,19 246:19
318:15
**topic**
83:8
**topics**
129:20 176:16
**topping**
240:2,8
**TORRES**
2:15
**total**
80:1,6 167:17 168:16
169:18 170:15
203:15 215:17 274:9
281:9 305:13 309:7
352:21,23 353:17
354:16 368:5
**totaled**
240:15
**totally**
196:11
**Tower**
2:7 5:7

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 59

**TPG**
134:21 332:13,24
**TPG_00000099**
379:17
**TRACE**
105:12,14 106:2,3,7
**track**
124:16
**trade**
95:1,3,4 104:17
105:23,25
**traded**
88:5 89:5 91:5,14,20
103:16 107:14
**trades**
88:9,22 89:6,8 105:19
105:21 301:7
**trading**
87:19 88:16 90:9,12
90:22,25 91:10,21
92:4,20 93:7,16,18
93:24 94:1,3,14,18
96:1 97:5 99:14,14
99:16 100:18 102:17
103:13,21,22 104:4,5
104:10,15,22,23
105:4,10 106:8,13,17
107:2,12,17 108:2,10
108:14,19 151:9
366:20
**traditional**
24:10 25:14 190:11
191:16 192:25
366:22
**trained**
73:17
**tranche**
81:2,4,6,7 139:9 171:5
171:11
**transaction**
36:20 46:9 47:13
48:10 65:10 66:2
74:19 144:10 157:11
160:4 168:21,25
169:4 172:13 178:14

178:15 182:15
228:13,20,25 237:21
238:7,9 242:21
289:14 300:16
301:22 302:8,10
**transactions**
46:21 47:1 48:5 66:14
67:8 128:4 159:17
171:22 181:6,8,13,23
182:6,7 186:13 219:9
224:7 229:1,3,5
306:18 366:25
**transcribed**
373:14
**TRANSCRIPT**
375:11
**transcription**
372:6
**transfer**
81:13 355:19
**translate**
45:21
**transmission**
154:2,6,15,21
**treasury**
40:24 147:12 209:25
211:18 286:19,24
287:2,23 288:7,25,25
289:9
**treat**
21:21 187:14
**treated**
159:13
**treatise**
200:2,4
**treatises**
200:24
**treatment**
130:3 250:5 260:23
335:8,10,17,23 336:1
336:11 337:4
**trends**
107:2,5,7
**trial**
98:9

**tried**
20:7,20 53:19 56:5
61:13 115:14 125:17
210:17 325:18
**trigger**
36:23 178:25 179:6
216:23
**triggered**
217:2
**triggering**
178:9,11
**trillion**
231:21
**trouble**
100:1,3
**true**
23:4,6 27:2 61:25
169:5 180:22 207:12
256:25 263:18 267:5
271:2 292:21 301:10
314:9 315:24 320:20
328:20,23 372:5
**truly**
304:14
**Truong**
222:21
**Trust**
2:4 3:19 8:23
**trustee**
2:5 4:6 7:11 8:24 9:23
227:17
**truthful**
23:20
**truthfulness**
23:16,18
**try**
60:13 82:9 98:11
103:10 110:12 127:3
147:15 157:10
183:14 224:12 242:8
255:11 278:23 346:7
346:10 347:18
**trying**
100:2 101:20 103:8
110:1 119:13 121:15

126:15 129:5 139:6
140:9 146:23 204:23
288:15 312:10,14
313:5 328:20 334:7
349:23 353:12
362:10
**TSA**
232:4 259:5
**turn**
27:19 36:1 53:22 54:6
63:14 66:21 83:7
111:18 114:9 115:22
144:6,13 148:9 151:3
185:23 267:17
269:24 305:7 318:13
322:8,17 335:21
342:2,6
**turned**
133:18,21
**turning**
25:24 31:20 292:6
320:8 345:1 363:16
**tweaks**
259:17
**Twelve**
351:12
**Twenty-four**
36:5 267:23
**twister**
44:2
**two**
26:21 52:24 65:24
66:17 74:24 76:25
78:15 111:6 114:10
121:16 125:3,20
128:6 131:20 133:3
146:13,21 157:20,24
178:11,17,19 197:20
207:18,19 217:2
229:1,3 230:2,9
241:15 251:14,18
252:4 255:6 277:25
284:5 308:20 309:6
321:25 323:13
337:17 343:17,24

346:6 349:10 352:13
  353:21 355:17
  362:23 366:9 367:24
**two-parts**
244:11
**two-thirds**
141:14 156:2 333:13
  333:18 334:24
  342:20,22
**type**
110:15 114:6
**types**
229:1
**typical**
127:25 131:7 229:14
  231:8 287:4
**typically**
229:16 232:22,23
  286:22,24 297:15
  301:5
**T&D**
154:6
**T-R**
222:21

---

**U**

**U**
3:1 4:1 5:1 6:1 7:1
**UIL**
155:6
**ultimately**
35:16 139:20 151:25
  159:18 187:10 235:9
  235:11
**UMB**
7:11
**unbridgeable**
338:9
**uncertainty**
241:3
**unchanged**
337:6
**unclear**
110:7 316:18
**uncommon**

88:14
**unconcerned**
208:10
**underlying**
196:12 209:17 210:8
  219:17 369:23
**underneath**
249:15
**undersecured**
194:13
**understand**
21:20 25:11 49:13
  64:16 68:17 74:22
  110:2 113:4 119:14
  140:10 166:14
  188:17 191:14
  193:18 194:19
  203:22 204:23
  205:12 208:2 214:10
  214:19,23 216:24
  221:15 232:18 233:4
  233:16 239:7,8
  241:25 244:2 245:4
  250:9 268:2,3 301:2
  312:23 323:20
  324:21 348:2 354:24
**understanding**
16:10 17:5 32:22 45:9
  94:13,22 98:20,25
  178:8 180:16,18
  181:11 204:11
  228:12 236:7 238:4
  266:24 285:5,20,23
  286:4 316:20 328:7
  369:18
**understate**
304:10 310:13
**understood**
19:20 247:23 256:24
  315:6,8 321:18
**underwriter**
152:9 153:7
**underwriters**
148:4
**underwritten**

266:18
**unfortunately**
294:9 325:19 339:20
**unified**
224:19
**unique**
25:5 154:23 228:20,25
**United**
1:1 8:16
**universe**
17:19 27:23 28:4,6,14
  29:4 33:4,11 35:7
  145:2 153:5 296:6,14
**unpack**
232:6
**unpaid**
96:3,8,11 187:9
**unquote**
63:25 64:6
**unregulated**
154:1
**unsecured**
3:4,12 5:4 7:12 10:17
  10:22 13:20,21 14:4
  19:13 29:22 30:19,21
  31:1,14,25 35:19
  37:1 42:21 44:9
  48:22,23 50:25 53:11
  53:13 56:4 58:1
  59:23 64:10,19 72:13
  89:1 92:17,20,22
  101:11 111:22 112:3
  112:15,19 113:6
  114:25 129:14 137:7
  139:7 166:13 172:19
  183:6,23 193:9
  195:13 204:3 213:2,2
  216:7 221:5 233:14
  239:11 257:17
  260:18 275:2 299:11
  299:21,23 300:9
  306:7,14 308:17,21
  308:24 314:5 315:25
  316:2,3,11,16,23
  323:5 325:14 342:19

342:20,23 344:8,13
  355:6,12 356:6
  359:11 370:3 377:21
**unsecureds**
16:8 28:25,25 29:17
  47:25,25 48:1 80:24
  96:12 130:13 138:23
  169:20 178:3 205:7,8
  214:12 216:12,12,22
  216:23 220:22,23,25
  221:5 231:19,24
  232:11 235:10,11
  246:9 255:17 296:16
  296:17 297:25 298:4
  298:23 300:3 310:18
  312:19,24 313:24
  314:18,19 323:22
  324:4 338:16 339:17
  347:3,5 355:8,17
  357:12
**Unsecured/EFH**
308:24
**unsolicited**
318:25
**untypical**
234:8
**unusual**
297:18
**update**
113:20
**updated**
116:10 193:10 270:20
  375:19
**updating**
185:3
**upfront**
350:20
**upside**
234:7 297:17 359:3,18
**upward**
211:19
**up-front**
68:13 169:18 172:17
  193:5
**up-to-date**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 61

324:1
**use**
69:25 90:25 91:7,9
92:4 130:3 134:1,8
141:10 155:24
157:14 180:8 229:20
229:23 244:20
320:11
**uses**
312:1 324:2 347:9,12
347:19 348:12
**usually**
131:11,15 158:11,13
360:5,6
**utilities**
155:4 209:19
**utility**
116:12 209:18,24
**utilizing**
187:20
**U-O-N-G**
222:22,23

_____
**V**
_____
**v**
9:12 129:24,24
**vacuum**
302:2
**vague**
17:9 32:17 45:18
49:12 54:23 60:23
69:19 94:17 102:23
107:10 124:3 135:15
255:13 285:22
**validity**
202:19 203:5
**valuation**
48:13 87:24 90:20
91:10,11,16 92:7
100:4 103:2,15
119:10 120:2,11
121:17 123:9,14
124:1,5,8,13,15
128:14,19 185:8,11
185:13 195:7,21

196:2,4,12,17 197:7
197:15 198:23 199:7
199:17,23 200:2,3,6
200:15,19,23 201:3,8
201:20 202:1,2
208:11,14,16,18,21
208:23 209:24 210:7
210:19 212:5,16,20
212:22 213:7,10,13
213:17,23 214:1,3,6
214:15,18,24 215:15
216:2,4 226:2,13,19
226:21 230:4,6,7,8
230:12,14 236:19,23
300:11,24 314:7
355:4,14,18 365:19
365:20,20,24 366:4
366:12,22 367:2,6
368:13
**valuations**
99:24 102:25 121:24
122:2,4,5 123:21
202:7 208:25 209:3,7
209:13,20 211:9,24
309:12,12 316:11
355:1 365:9
**value**
52:23 56:11 66:6 76:8
81:13 90:10,24 91:1
91:23 92:3,5,6,9,11
92:12 93:9 96:8
97:11,24,25 98:18,18
99:2,15,21 100:9,11
100:15 102:21 103:5
103:23 104:6,10,23
105:10 108:2 117:16
118:10 121:12,16
122:17 123:11,18
127:20 135:1 160:11
160:14 161:7 173:25
174:1 189:12 193:24
194:23 195:3,5,8,15
195:19,22 196:18
197:25 198:13,14
199:17 203:16,18,20

203:21 213:4 214:7,8
214:13 215:17 226:4
226:4,17 231:9,13
233:7 234:5 235:18
274:12 278:11,12
286:7,21 287:18
295:2 298:5 300:14
301:4,23 302:12
303:12,14,23 304:8,8
304:10 305:14 306:6
306:14 307:1,11,20
307:23 308:5 309:11
310:1,23 313:7,9,12
313:19,23 314:9,16
316:2 350:15,16,17
354:14,17,21 355:19
359:3,16 360:10
361:17,18 364:5
365:3,6,18 366:1
368:5 369:22 370:9
**values**
101:3 103:14 106:8
107:2,7 207:25 212:3
309:7 365:14,25
**valuing**
103:1 216:5
**Van**
332:7,8 379:14
**variance**
17:21
**variations**
157:20
**Varick**
8:7
**varied**
126:10
**variety**
101:2 159:4 243:2
**various**
10:2 21:11 27:17 41:4
59:2,24 87:6 115:12
118:2 135:20 136:4
142:20 160:12
187:15 193:3 196:13
197:6 198:21,25

199:3 201:22 206:21
207:8,10 217:21
219:10 224:11
235:10 258:3 274:10
305:9 309:13 313:14
328:8 330:7 341:4,23
343:22 354:13
363:20 364:2 369:3
**velocity**
223:6
**verdict**
262:17
**verify**
109:3 230:12
**versions**
258:18 262:23
**versus**
100:10,23 157:19
176:5 291:19 323:19
351:1
**viable**
65:10 66:12
**video**
8:5
**Videographer**
7:23 8:4 9:6 95:13,19
165:12 166:2 227:3,9
318:2,8 362:17 363:4
363:9 371:1,3
**videotaped**
1:14 8:14
**view**
47:17 52:19 56:23
65:1,2 72:21 91:14
91:20 94:4 123:8
128:6 155:1 177:11
192:18 196:11
197:17 217:8 240:4
251:24 288:4 296:23
313:7 359:6 364:15
**viewed**
19:2 155:5 202:6
**views**
48:12 87:24 92:19,22
92:23 177:18 210:25

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 62

211:8,23 212:4,7
217:22 226:2,12,16
343:16 344:2
**vigorously**
224:1
**violated**
236:21
**virtue**
143:5 239:3
**virtues**
151:24
**vis-à-vis**
199:12
**volatile**
107:12
**volatility**
208:22
**volume**
108:14
**volumes**
105:20 108:10,12,19
**voluntarily**
63:4
**vote**
10:10,14 17:2 314:1
  355:10
**voted**
10:15
**votes**
241:7
**vulnerability**
217:22
**vulnerable**
65:7
_____
**W**
**Wachtell**
5:20 136:3
**wagging**
245:13
**Wait**
165:2
**want**
16:24 21:19 25:25
  32:11 60:12 63:15

66:20 76:20 79:21
83:11 99:11 101:22
111:14 113:5 135:4
136:10 145:23
157:13,16 158:7
162:2 165:10 188:18
189:22 200:10 201:9
206:10 243:3 247:17
250:19,25 257:10
260:21 271:17,22
275:12,17 289:4,14
290:20 297:16 303:6
312:6 315:20 324:6
331:9 334:5 342:3,11
359:11 362:4 366:1
**wanted**
76:2 104:9 160:11
197:22 201:8 292:4
295:5 298:7 309:10
341:23 361:16
**wants**
99:12 230:5,6 297:11
297:20 346:21
**war**
310:12
**warrants**
97:20 98:3
**wasn't**
137:17 245:1,12 246:5
285:1 288:10 294:9
297:24 359:24
**water**
108:1,3,7
**way**
32:4 62:2,22 76:8 80:4
88:16 91:6 111:3
123:5 138:24 147:1
153:5 172:10 177:14
177:21 202:6 207:2
238:3 240:24 241:16
241:17 243:11 245:6
267:16 278:23 290:6
293:11 305:16
309:25 321:22
322:25 326:24

345:20 347:24
359:14 362:3 364:19
364:23 373:17
**ways**
38:1 130:15 312:21
341:24
**wealthy**
90:18
**wearing**
160:6,9
**Wednesday**
347:10
**week**
89:21 125:2 344:17
346:3
**weeks**
88:23 200:7,17 343:24
**week-and-a-half**
14:9
**Weinberg**
85:3
**WEISS**
5:24
**went**
142:1 224:14 361:18
**West**
3:5 5:22
**we'll**
50:14 63:5 95:8
109:25 137:25
149:20 155:14
221:13 234:24
244:12,13,20 253:21
264:25 266:5,5 302:8
328:11 331:4 359:12
359:13
**we're**
20:17 38:2 89:11
92:13 95:14 99:5
101:22 103:1 109:13
109:19 116:15
119:15 122:22
126:13 139:23 145:6
145:24 148:11
155:10 165:13,13

170:17 185:2 187:3
189:22,22 206:17 214:7
234:21 240:19,20
242:17 244:22
278:18,20 295:1
312:14 313:20 318:3
324:24 334:8 348:10
349:23 359:15,16
361:24 362:7 363:4
370:21 371:4
**we've**
9:18 14:8 17:21 22:14
57:22 58:9 61:2
64:24 75:8 83:9
106:20,24 118:19
124:4,14 125:17
127:13 133:4,10
151:18 159:2 175:4
178:18 196:5,6 198:5
198:22 199:4 207:1
210:14,15 217:19
220:21 223:20
242:22 278:25 306:2
325:15 326:24
336:20 344:6,7
366:20,21
**Wharton**
199:25
**WHEREOF**
373:19
**white**
3:10 183:22 246:25
**wholly**
113:2
**wholly-owned**
305:20
**WILLIAM**
2:12 6:15
**william.pruitt@kir...**
6:16
**william.roberts@ro...**
2:13
**willing**
31:17 50:3 90:15
161:9 223:14 298:18

**PX 134**
**Page 159 of 165**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 63

300:14,15 301:15,19
326:19 327:11 328:4
341:24
**willingness**
223:5 296:24 299:13
327:22
**Wilmington**
4:4
**win**
250:14,15 261:1 276:1
358:4
**wire**
224:14
**Wisconsin**
153:24
**wish**
217:4 374:2
**wished**
49:24
**wishes**
253:13
**Withdraw**
307:16
**withdrawn**
233:8 236:4 242:1,8
249:21 266:22 274:3
275:11 303:19
306:21 339:24 353:6
356:11
**witness**
9:9,13 11:7 26:3 27:11
28:22 29:11 33:21
76:18,21 77:14 83:16
83:21 89:25 110:17
110:25 129:9 140:14
148:14 166:6 183:16
201:16 254:19
265:16 267:12
275:14 291:24
373:10,13,19 375:2
**won**
261:2
**wondering**
163:23
**woods**

231:22
**word**
27:8 236:5 329:8
369:19
**worded**
18:14
**words**
21:11 130:21 132:16
140:24 159:6 197:9
225:5 262:10 265:12
292:3
**work**
80:5,18 124:1 141:13
141:17 143:2 184:24
185:4,9,11 196:5
197:14 198:4 201:12
201:25 218:19 219:1
219:3 360:25 366:13
**worked**
141:23 142:5
**working**
135:7 156:10 178:18
**works**
84:20
**world**
127:5 283:15,24,25
**worlds**
284:5
**worth**
72:16 231:12 339:11
340:23
**wouldn't**
161:22 266:7 298:13
298:18 315:17
330:17,24
**wrapping**
146:2,6
**write**
230:11 268:5 286:2
292:12 296:4 321:5
331:5
**writes**
258:2 259:13 291:9
**writing**
29:7 202:3 226:16,21

226:22 233:18
284:10 311:24
**written**
367:1
**wrong**
246:24 273:13 289:15
297:18 307:14 313:8
357:19
**wrote**
29:5 36:21 52:16
263:17 268:23 269:1
292:17 337:19
338:24

---
**X**

**x**
1:5,8 324:5 375:1

---
**Y**

**Y**
1:14 9:12 371:10
372:3 373:10 375:3
**yeah**
96:21 97:15 148:21
165:7 185:20 222:12
242:10 259:10
262:21 289:17
335:15 341:3 350:1
350:23
**year**
106:25 107:3,8,11,15
108:4,10,15,20,24
124:22 162:22,24
190:16 199:2 209:25
212:14 251:21,23
254:12 270:11,13
348:11 367:24
**years**
66:24 67:20 116:6
125:20 131:20 133:3
178:19 207:18,19
219:11 252:20 255:6
322:1 367:24 368:1
**yellow**
247:1,4,5

**Yep**
15:21 140:11
**yesterday**
12:2 39:9 176:18
233:23 312:2
**yesterday's**
10:1 11:11 15:15,21
**yes-or-no**
16:2,18 30:2 32:3 43:9
58:19 203:7 218:16
**Yi**
84:17,19 85:3,22
**Ying**
1:14 8:14 9:18,25 11:3
11:10 21:22 22:4,7
22:22 24:8 44:25
45:4 46:7 53:22 83:7
83:24 84:17 86:16
87:18 89:24 95:24
102:6 148:12 166:10
183:15,21 184:6
185:18 190:18
193:10 207:10 209:9
227:14,23 246:15
256:19 267:18
269:13 291:2 318:12
319:4,10 322:7,9
332:6,12 363:14
369:2 371:10 372:3
373:10 374:20 375:3
375:17 376:4,10,22
377:5,11 378:5,10
**York**
1:17,20 2:19,19 3:6
3:6,14,14,21,21 4:8,8
4:16,16 5:8,8,16,16
5:23,23 6:6,6,21,22
6:22 7:6,6,14,14 8:2
8:2,7,7,8,9,13,13
257:16,16 373:2,4,9
374:1,2
**young**
84:20
**Y-I**
84:18

**PX 134**
**Page 160 of 165**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 64

| **Z** |
|---|
| **ZAHRADKA** |
| 5:9 |
| **Zaken** |
| 222:14 |
| **zero** |
| 56:6 81:12 |

| **$** |
|---|
| **$1** |
| 78:14 |
| **$1.9** |
| 162:18 345:17 |
| **$10** |
| 173:19 |
| **$10.25** |
| 78:8 |
| **$11.25** |
| 79:6 |
| **$130** |
| 163:13 |
| **$140** |
| 281:24 282:4 |
| **$146.25** |
| 79:18 80:1 |
| **$19** |
| 78:23 |
| **$190** |
| 167:17 169:1 170:8 |
| 215:9 357:20 |
| **$2** |
| 78:15 157:22 163:10 |
| 262:12 |
| **$2.4** |
| 12:24 345:17 |
| **$230** |
| 170:11 |
| **$235** |
| 170:12 |
| **$250** |
| 172:3 |
| **$280** |
| 347:18,25 |
| **$3** |
| 63:10 64:8 72:16,17 |

72:22 73:12 176:14
216:17,18
**$3.1**
139:10 204:3,5 205:4
**$330**
173:4
**$333**
355:19
**$350**
350:17
**$36**
270:10
**$380**
50:19,22 51:8 52:12
52:14 54:18 55:3,9
56:20,23 357:16,18
**$4**
138:20
**$400**
251:19,20
**$43**
163:12 169:6 170:4
**$5.4**
138:21 139:21
**$500**
160:21 175:17 176:3
341:11 342:1 346:24
**$53**
169:23
**$55**
169:10 172:13
**$57**
46:8,15,17 47:18,21
48:10
**$580**
347:5
**$60**
281:10
**$650**
171:20,24 172:21
252:2
**$700**
279:5
**$8**
162:7 270:9

**$8.75**
77:22 78:2
**$80**
96:11
**$800**
322:5
**$900**
139:12
**$95**
13:16 56:20 57:15,25
61:5,8 79:11 80:25
81:12 82:18 167:8,13
170:19 171:11 239:5
240:14

| **0** |
|---|
| **0000099** |
| 332:13 |
| **01BA6260327** |
| 373:23 |
| **02199** |
| 2:9 |
| **097** |
| 111:20 |
| **099** |
| 376:11,23 |

| **1** |
|---|
| **1** |
| 10:24 11:4 95:14 |
| 165:4 185:18 190:18 |
| 193:11 207:10 209:9 |
| 295:20 304:18,21 |
| 342:3 363:15 375:18 |
| **1L** |
| 145:24 |
| **1st** |
| 247:9 |
| **1.368-1(b)** |
| 40:24 |
| **1.6** |
| 313:17 357:22 |
| **1.7** |
| 210:1 |
| **1.75** |

341:11
**1.9**
68:24 158:1 195:16
240:13
**1/30/14**
378:4
**1/9/14**
377:21
**1:19**
120:9
**1:38**
166:4
**10**
59:16 63:15,19,23
123:3 137:25 138:3
169:22,25 345:10,13
345:15 349:25 350:1
351:9 357:23 375:18
378:3
**10th**
119:24
**10/10/13**
377:16
**10/26/13**
378:14
**10/9/13**
377:10
**100**
248:5 305:21 348:14
348:16 359:20
**10004-1980**
6:22
**10016-1314**
7:14
**10019**
5:23
**10019-6799**
2:19
**10019-9601**
3:6
**10022-4689**
5:16
**10022-6069**
7:6
**10022-6411**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 65

6:6
**10036**
3:21 4:8
**10036-2787**
3:14
**10036-6745**
5:8
**10112**
4:16
**102**
335:6
**104**
335:22
**105**
96:19,20 315:11
**106**
96:21,22 97:10
**107**
332:13 379:17
**108**
96:16
**109**
376:7
**11**
1:3 8:18 36:6 62:6
  139:24 140:1 149:22
  149:24 150:6 162:23
  164:18 229:7 246:15
  246:22 247:4,6
  260:11 267:17,20
  270:12 352:10,16
  378:8 379:21
**11th**
173:10
**11-and-a-quarter**
159:20 160:18 163:11
**11.4**
323:23
**11:17**
95:15,17
**11:31**
95:17,21
**113**
377:3
**115**

**314:13**
**1155**
3:13
**1177**
1:16 3:20 8:12
**118**
377:9
**119**
377:14
**12**
83:5 143:11,13 164:18
  188:23 218:23 243:4
  285:13 292:3 323:5
  352:15 378:13
**12-month**
353:22
**120**
107:21
**121**
314:25
**1211**
258:12 260:6
**1212**
260:21
**1222**
256:21
**125**
89:22 97:5 108:4
**128**
377:19
**129**
352:23,24
**13**
145:7,9 148:12 149:9
  292:3 378:19
**130**
162:24
**131**
314:11
**1345**
8:8
**138**
378:3
**14**
149:9 256:13,15,19

292:3 309:16 310:4,7
  310:8 313:4 354:7
  365:10 379:3
**14-10979**
1:3 8:18
**140**
281:13,15 378:8
**143**
378:13
**145**
378:19
**149**
379:21
**15**
83:14 258:8 263:10
  283:5 292:7,12
  309:16 313:4 314:14
  319:4,6,10 322:7,9
  329:22 354:7 357:14
  365:10 379:8
**15th**
266:25 278:25 279:1
  283:1,14
**150**
172:8
**16**
254:6 295:17 331:25
  332:2,6 379:13
**16-and-a-half**
215:18
**16.5**
314:7 363:21
**160**
13:2 352:2
**1633**
2:18
**166**
375:5
**17**
254:7 345:14 355:18
**17-and-a-half**
310:9 314:10 355:4
**17.5**
314:23,24 363:21
**18**

27:20 29:3 295:25
  321:25 348:13
**180**
13:1 351:23 352:2
**183**
375:6
**19**
97:12 99:1 336:17
**19th**
336:19
**190**
167:24 168:15 170:14
  215:16 240:16,17
  357:18,22

_____
         **2**
_____

**2**
22:18,23 36:3 63:21
  95:20 165:13 172:7
  227:23 233:19
  267:19 311:15
  318:19 342:7 376:3
**2L**
140:19
**2.15**
277:19
**2.156**
321:14
**2.3**
111:22 112:11 114:11
**2.4**
12:18
**2.5**
362:8
**2.6**
210:3
**2/1/14**
378:9
**2:37**
227:5
**2:47**
227:7
**20**
24:9,16 55:9,14,23
  68:6 316:8

Merrill Corporation - New York

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 66

**2000**
336:19
**2012**
196:3
**2013**
109:25 112:14 113:19
  113:21 116:11 117:3
  117:5 118:22 119:5
  119:24 120:9 140:25
  143:17 144:24
  145:14 148:22
  152:13 153:1 209:23
  378:21
**2014**
1:9 8:1,9 11:5 116:6
  129:2 130:8,11 133:9
  134:3,14 144:17
  148:23 150:11
  152:14,17 245:19
  247:9 258:8 266:25
  304:22 319:13 321:6
  327:17 331:6 336:17
  336:19 371:14
  373:20 374:21
**2017**
116:6
**21**
321:3 323:3 327:16
**21st**
113:20
**218**
377:12
**22**
331:3 376:3
**22nd**
11:5 304:22
**222**
379:6
**225**
8:6
**227**
375:7
**23**
1:9 8:1 40:25
**23rd**

8:9
24
36:1,4 145:14 146:9
  211:1,11,25 267:21
  267:24 268:5 378:21
**24th**
373:20
**25**
 107:21 109:25 267:22
**250**
3:5
**256**
379:3
**26**
113:19 143:17
**269**
375:13
**28th**
224:15
**280**
281:11,15 348:17
**284**
375:14
**29**
362:17

_____
       **3**
**3**
13:25 25:20,25 77:12
  77:17 109:14,16,21
  109:23 166:3 227:4
  228:2 263:13 316:9
  335:5,22 376:7
**3rd**
319:13 329:1
**3.1**
204:14
**3.17**
307:21
**3.5**
307:25
**3.6**
231:25
**3/15/14**
379:4

**3/19/14**
379:14
**3/3/14**
379:10
**3/31/16**
324:16
**3:02**
227:7,11
**30**
4:15 46:6,8 54:7 89:3
  287:7
**30th**
15:18,24 16:12 17:3,6
  17:11,14,23 41:9,17
  42:13 102:4,15 138:7
  138:16 236:25 237:1
  268:15,22
**300**
6:13
**31**
351:9
**319**
379:8
**32**
66:20 67:16 68:1
**332**
379:13
**340**
172:22
**35**
131:11 185:24 251:14
  252:1
**3532**
186:2
**355**
40:19
**36**
270:15
**3600**
2:9
**363**
375:8
**368(a)(1)(G)**
40:19
**369**

375:9
**373**
 148:16 149:2,3
**38**
375:12
**380**
281:16
**383**
378:22
**39**
321:12 375:12
**399**
5:15

_____
       **4**
**4**
11:20,22,25 13:3
  53:24 54:2 77:9,15
  114:9 185:24 190:18
  193:10 203:11
  207:10 227:10
  269:25 305:7 308:23
  310:19 312:2 313:4
  314:23 318:3 320:9
  345:1,3,12 347:13,25
  350:23,24 351:22
  363:17,18 365:10
  376:14
**4/2/14**
379:22
**4:30**
347:14
**4:38**
318:4,6
**4:55**
318:6,10
**40**
101:10 205:6 280:24
  280:25
**43**
54:7 169:13,20 281:3
  281:11 352:24,24
  353:17
**45**
45:19 313:17

Merrill Corporation - New York
1-800-325-3376                                      www.merrillcorp.com/law

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

Page 67

**46**
163:8,8
**477**
53:25
**478**
22:25

_____ **5** _____

**5**
84:11,13,25 85:2
129:21 318:9 322:8
322:17 324:8 347:13
376:19
**5.4**
68:23 69:10 277:16
317:9,11,15
**5:46**
363:5,7
**5:54**
363:7,11
**50**
45:19 107:14 108:2
220:1 280:21 281:13
281:14 287:3,9 288:7
288:25 289:1,9
314:14 338:2,8,12
340:24 351:1 355:20
356:7,13 357:3,7
**50s**
108:3
**51**
5:22
**52nd**
5:22
**53**
77:10,19 170:14
**54**
376:14
**542**
309:17
**543**
309:18
**55**
169:13,16 215:1
349:13

**55th**
3:5
**55/45**
214:9
**553**
375:23
**57**
357:8
**573**
149:1
**589**
112:10
**599**
7:5

_____ **6** _____

**6**
12:19 25:20,25 26:7
26:11 96:19,20
113:12,14 118:17,20
129:20,22 240:19
263:13,13 290:12,15
363:10 371:4 377:3
**6.25**
190:20 191:15
**6/22/14**
375:22
**6:02**
371:5,7
**60**
81:9 112:9 168:9,12
171:6,10,15 204:10
205:5 215:1 274:17
275:6 301:16 314:8
317:8
**60/40**
213:14
**600**
279:6
**601**
6:5
**60654**
6:14
**636**
151:5

**64**
72:14 81:8 83:25 84:5
85:19
**64.3**
85:5
**64/36**
86:25 87:8,15
**65**
132:14
**650**
96:15
**660**
281:12
**665**
114:11
**666**
377:7
**68**
335:18 336:8 337:14
338:8 339:6
**682**
379:24
**699**
143:23

_____ **7** _____

**7**
77:10,19,24 118:24
119:3 377:9
**70**
107:17
**70-plus**
206:16
**700**
12:20
**715**
144:7,8
**72**
53:12
**720**
378:17
**734**
247:18
**735**
378:11

**75**
45:8 56:22 108:8
336:3,8 337:14 339:7
**760**
378:6
**765**
319:12 379:11
**78**
45:25
**79**
46:2

_____ **8** _____

**8**
119:18,21 162:22
270:20 292:6 321:12
377:14
**80**
88:7 96:18 107:13
108:17 168:10
354:18
**800**
2:8
**84**
376:19
**87**
352:25
**88**
323:14
**88.6**
322:21 323:10 324:14

_____ **9** _____

**9**
26:21 27:5 59:16
79:25 128:21 171:10
172:7 295:20,21
318:13,17 375:3
377:19
**9th**
118:22 119:5 120:9
129:2 173:11
**9/25/13**
376:8,20
**9/26/13**

**PX 134
Page 164 of 165**

CONFIDENTIAL
DAVID Y. YING - 6/23/2014

  377:4
**9:40**
 1:10 8:10
**90**
 7:13
**95**
 166:22 274:18 351:1
  351:23 375:4
**96**
 162:22 270:13,16
**98**
 31:24