*****CONFIDENTIAL*****

1               KRISTOPHER MOLDOVAN

2       IN THE UNITED STATES BANKRUPTCY COURT

3           FOR THE DISTRICT OF DELAWARE

4   IN RE:                    )Chapter 11

5   ENERGY FUTURE HOLDINGS CORP.,)Case No.: 14-10979 (CSS)

6   et al.                    )(Jointly Administered)

7         Debtors             )

8   _____)

9   DELAWARE TRUST COMPANY, as  )

10  INDENTURE TRUSTEE,          )

11         Plaintiff,           )

12                             )

13  VS.                       )Adverse Proceeding

14                            )No.: 14-50363(CSS)

15  ENERGY FUTURE INTERMEDIATE  )

16  HOLDINGS COMPANY, LLC, and  )

17  EFIH FINANCE, INC.,         )

18         Defendants          )

19      ----------------------------------------

20        VIDEOTAPED ORAL DEPOSITION OF

21            KRISTOPHER MOLDOVAN

22            NOVEMBER 20, 2014

23        *****CONFIDENTIAL*****

24      ----------------------------------------

25  Job No. 87328

*****CONFIDENTIAL*****

Page 2

1                    KRISTOPHER MOLDOVAN

2        VIDEOTAPED ORAL DEPOSITION OF KRISTOPHER

3   MOLDOVAN, produced as a witness at the instance of the

4   PLAINTIFFS, and duly sworn, was taken in the above-styled

5   and numbered cause on the 20th day of November, 2014, from

6   9:13 a.m. to 5:52 p.m., before Kathryn R. Baker, CSR, RPR,

7   in and for the State of Texas, reported by machine

8   shorthand, at the offices of Haynes and Boone, 2323

9   Victory Avenue, Suite 700, in the City of Dallas, State of

10  Texas, pursuant to the Federal Rules of Civil Procedure.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*****CONFIDENTIAL*****

1              KRISTOPHER MOLDOVAN
2              A P P E A R A N C E S
3

   ATTORNEYS FOR THE DELAWARE TRUST COMPANY AS INDENTURE
4  TRUSTEE EFIH FIRST LEIN NOTES DUES 2020:
   Mr. Philip Anker
5  Mr. Charles Platt
   WILMERHALE
6  7 World Trade Center
   250 Greenwich Street
7  New York, New York 10007
8
9  -and-
10

   Mr. David Gringer
11 WILMERHALE
   1875 Pennsylvania Avenue, NW
12 Washington, D.C. 20006
13
14

   ATTORNEYS FOR THE DEBTORS AND THE WITNESS:
15 Mr. Rush Howell
   Mr. Steven Serejeddini (Appearing telephonically)
16 KIRKLAND & ELLIS
   300 North LaSalle
17 Chicago, Illinois 60654
18
19 -and-
20

   Mr. Alexander Davis
21 KIRKLAND & ELLIS
   555 California Street
22 San Francisco, California 94104
23
24 -and-
25

*****CONFIDENTIAL*****

Page 4

1                     KRISTOPHER MOLDOVAN
2    Mr. Gregory Santos
     ENERGY FUTURE HOLDINGS
3    1601 Bryan Street
     Dallas, Texas 75201
4
5
6    ATTORNEYS FOR EFIH 2ND LIEN INDENTURE TRUSTEE
     Mr. Gregory Horowitz
7    Ms. Alissa Goodman (Appearing telephonically)
     Mr. Josh Brody (Appearing telephonically)
8    KRAMER LEVIN NAFTALIS & FRANKEL
     1177 Avenue of the Americas
9    New York, New York 10036
10
11
12
     ATTORNEYS FOR PIMCO:
13   Mr. Patrick Strawbridge
     BINGHAM McCUTCHEN
14   One Federal Street
     Boston, Massachusetts 02110
15
16
17   ATTORNEYS FOR DELAWARE TRUST CO. AS INDENTURE TRUSTEE FOR
     THE 10 PERCENT FIRST LIEN NOTES:
18   Mr. Andrew Devore
     ROPES & GRAY
19   Prudential Tower
     800 Boylston Street
20   Boston, Massachusetts 02199
21
22
23
24
25

1                     KRISTOPHER MOLDOVAN

2   ATTORNEYS FOR AD HOC GROUP OF TCEH UNSECURED NOTES:
    Mr. Jason Bartlett
3   WHITE & CASE
    1155 Avenue of the Americas
4   New York, New York 10036
5   (Appearing telephonically)

6

7   ATTORNEYS FOR FIDELITY:
    Mr. Daniel Vaillant
8   FRIED FRANK HARRIS SHRIVER & JACOBSON
    One New York Plaza
9   New York, New York 10004
10  (Appearing telephonically)

11

12  ATTORNEYS FOR WILMINGTON SAVINGS FUND SOCIETY AS INDENTURE
    TRUSTEE OF 15 PERCENT SENIOR SECURED SECOND LIEN NOTES:
13  Mr. Jonathan Marshall
    BROWN RUDNICK
14  One Financial Center
    Boston, Massachusetts 02111
15  (Appearing telephonically)

16

17

    ATTORNEYS FOR UMB BANK, N.A.:
18  Mr. Barry Felder
    FOLEY & LARDNER
19  90 Park Avenue
    New York, New York 10016
20  (Appearing telephonically)

21

22  -and-

23

24

25

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN
2    Mr. Lars Peterson
     FOLEY & LARDNER
3    321 North Clark Street
4    Chicago, Illinois 60654
5    (Appearing telephonically)
6
7    ATTORNEYS FOR THE DEUTSCHE BANK:
     Ms. Julie Fleischman
8    SHEARMAN & STERLING
     599 Lexington Avenue
9    New York, New York 10022
10   (Appearing telephonically)
11
12   ATTORNEYS FOR THE AD HOC GROUP OF EFH CORP. NOTEHOLDERS:
     Ms. Shelly Ivan
13   KASOWITZ BENSON TORRES & FRIEDMAN
     1633 Broadway
14   New York, New York 10019
15   (Appearing telephonically)
16
17   FOR FIRST LEIN:
     Mr. Mark Shankweiler
18   CAPSTONE ADVISORY GROUP
     104 West 40th Street
19   New York, New York 10018
20   (Appearing telephonically)
21
22
     ALSO PRESENT:
23   Mr. Chase Huddleston, Videographer
24
25

*****CONFIDENTIAL*****

Page 7

                        KRISTOPHER MOLDOVAN
1                             INDEX
2
3    Appearances. . . . . . . . .                              3
4    KRISTOPHER MOLDOVAN
5         Examination by Mr. Anker . . .                11
6    Signature and Changes. . . . .                     301
7    Reporter's Certification . . .                     303
8
9                          EXHIBITS
10   NO.       DESCRIPTION                              PAGE
11             Exhibit 1. . . . . . . . . . . . . . . .        13
             Amended Notice of Deposition Pursuant
12           to FED.R.CIV.P 30(b)(6)
             Exhibit 2. . . . . . . . . . . . . . . .          14
13           Amended Notice of Deposition Pursuant
             to FED.R.CIV.P 30(b)(6)
14           Exhibit 3. . . . . . . . . . . . . . . .          46
             Dealer Management Agreement
15           Exhibit 4. . . . . . . . . . . . . . . .          65
             Energy Future Holdings Corp.
16           $2,000,000,000 10.875% Senior Notes
             Due 2017, $2,500,000,000 11.25%/12.000%
17           Senior Toggle Notes Due 2017
             Exhibit 5. . . . . . . . . . . . . . . .          85
18           Execution Version, Energy Future Holding
             Corp and Each of the Guarantors Party
19           Hereto Senior Notes Due 2017, Senior Toggle
             Notes Due 2017, Indenture, Dated as of
20           October 31, 2007
             Exhibit 6. . . . . . . . . . . . . . . .         105
21           October 8, 2007, E-mail from Ilir
             Mujalovic to Ed P. Tolley, Kirsten L.
22           Davis, and Maximilian Kirchner, with
             Attachment, Exhibit 7
23           Exhibit 7. . . . . . . . . . . . . . . .         106
             S&S Draft 10-25-07, Energy Future
24           Holdings Corp, Indenture Dated as of
             October 31, 2007
25

*****CONFIDENTIAL*****

Page 8

1              KRISTOPHER MOLDOVAN
2                   INDEX
3                 (CONTINUED)
4                  EXHIBITS
5   NO.      DESCRIPTION                        PAGE
6            Exhibit 8.................         114
             Energy Future Holdings Corp.
7            $2,000,000,000 10.875% Senior Notes
             Due 2017, $2,500,000,000 11.25%/12.000%
8            Senior Toggle Notes Due 2017, Placement
             Agreement (the "Agreement),
9            October 24, 2007
             Exhibit 9.................         120
10           October 26, 2007, E-mail from Simone Bono,
             Subject:  Project Thunder - Energy Future
11           Holdings Corp, with Attachment
             Exhibit 10................         144
12           August 17, 2010, E-mail from
             Shriram Bhashyam, Subject: EFH-Executed
13           Indenture, with Attachment, Exhibit 11
             Exhibit 11................         144
14           EFIH Finance, Inc., 10.000% Senior
             Secured Notes Due 2020, Indenture as of
15           August 17, 2010
             Exhibit 12................         192
16           Energy Future Intermediate Holding, Co.,
             LLC, 424B3 Prospectus Filed Pursuant
17           to Rule 424(b)(3), Filed on 8/16/2010
             Exhibit 13................         235
18           Execution Version, Texas Competitive
             Electric Holdings Company, LLC, and
19           TCEH Finance, Inc., and Each of the
             Guarantors Party Hereto, Senior
20           Notes Due 2015, Indenture Dated as
             Of October 31, 2007
21           Exhibit 14................         237
             September 17, 2010, E-mail from Tony
22           Horton to Andy Wright, Greg Santos
             with Attachment, Exhibit Exhibit 15
23           Exhibit 15................         240
             TXU, TCEH Bond Exchange Key Terms
24
25                   INDEX

*****CONFIDENTIAL*****

```
 1                  KRISTOPHER MOLDOVAN
 2                     (CONTINUED)
 3                      EXHIBITS
 4   NO.        DESCRIPTION                      PAGE
 5              Exhibit 16................        244
                September 18, 2010, E-mail from Andy
 6              Wright to apanossian@oaktreecapital.com,
                with Attachment, Exhibit 17
 7              Exhibit 17................        244
                Description of the Notes
 8              Exhibit 18................        249
                September 20, 2010, E-mail from Tony
 9              Horton to Paul Keglevic
                Exhibit 19................        252
10              September 20, 2010, E-mail from Kris
                Moldovan to Tony Horton
11              Exhibit 20................        253
                September 20, 2014, E-mail from Jack
12              Weingart to Tony Horton
                Exhibit 21................        255
13              September 20, 2010, E-mail from Paul
                Koglevic to Tony Horton
14              Exhibit 22................        259
                Execution Version, Texas Competitive
15              Electric Holdings Company, LLC, and
                TCEH Finance, Inc., and Each of the
16              Guarantors Party Hereto, Senior
                Secured Second Lien Notes Due 2021
17              Exhibit 23................        265
                October 7, 2010, E-mail from Julie
18              Hoffman, Subject: Fw: TXU-GMAM, with
                Attachment
19              Exhibit 24................        276
                Energy Future Holding, Form 8-K
20              Exhibit 25................        281
                December 14, 2012, E-mail from Andy
21              Wright to Stacy Dore and Paul Keglevic
                Exhibit 26................        282
22              Offering Memorandum and Consent
                Solicitation Statement
23
24
25                      INDEX
```

TSG Reporting - Worldwide   (877) 702-9580

*****CONFIDENTIAL*****

Page 10

1                    KRISTOPHER MOLDOVAN

2                         (CONTINUED)

3                         EXHIBITS

4    NO.        DESCRIPTION                              PAGE

5               Exhibit 27................            291
                Energy Future Intermediate Holding
6               Company $250 Million Senior Secured
                1st Lien Notes, $500 Million Senior
7               Lien Notes

8

                  REQUESTED DOCUMENTS/INFORMATION

9
                            (NONE)

10

11

                       CERTIFIED QUESTIONS

12
                            (NONE)

13

14

15

16

17

18

19

20

21

22

23

24

25                  P R O C E E D I N G S

*****CONFIDENTIAL*****

Page 11

1                    KRISTOPHER MOLDOVAN

2                    THE VIDEOGRAPHER:  This is the start of the

3    tape labeled Number 1 of the videotaped deposition of

4    Kristopher Moldovan, in the matter of Energy Future

5    Holdings Corporation, et al., for the United States

6    Bankruptcy Court for the District of Delaware.  This

7    deposition is being held at 2323 Victory Avenue, Suite

8    700, Dallas, Texas, on November 20th, 2014.  The time is

9    9:13 a.m.

10                   My name is Chase Huddleston; I'm the legal

11   video specialist from TSG Reporting, Incorporated,

12   headquartered at 747 Third Avenue, New York, New York.

13   The court reporter is Kathryn Baker, in association with

14   TSG Reporting.

15                   Will the court reporter please swear in the

16   witness.

17                   KRISTOPHER MOLDOVAN,

18   having been first duly sworn, testified as follows:

19                        EXAMINATION

20   BY MR. ANKER:

21      Q.   Good morning, Mr. Moldovan.  And I appreciate

22   your coming down today.

23                   Can you state your full name for the

24   record.

25      A.   Sure.  It's Kristopher Earl Moldovan.

*****CONFIDENTIAL*****

Page 12

KRISTOPHER MOLDOVAN

1

2      Q.    Okay.  Mr. Moldovan, I should introduce myself.

3  My name is Philip Anker, A-N-K-E-R.  I'm with the firm of

4  Wilmer, Cutler, Pickering, Hale, and Dorr.  We are counsel

5  to Delaware Trust Company, the indentured trustee for the

6  EFIH first lien notes due 2020, and the Plaintiff in the

7  adversary proceeding number 14-50363.

8            Are you represented by counsel today?

9      A.    I am.

10     Q.    And who is your counsel, sir?

11     A.    Richard Howell from Kirkland & Ellis.

12     Q.    Have you ever been deposed before, Mr. Moldovan?

13     A.    I have not.

14     Q.    Okay.  Let me go over a few ground rules,

15 although I'm sure your counsel has done that already.  I

16 will ask you a series of questions.  If, at any time, you

17 don't understand a question, please let me know, and I

18 will rephrase it.

19            If you answer a question, I'm going to

20 assume and the Court is going to assume you understood it,

21 okay?

22     A.    Okay.

23     Q.    If, at any time, you want to take a break, let

24 me know.  I only ask that, if there is a pending question,

25 you would answer that question.

*****CONFIDENTIAL*****

Page 13

KRISTOPHER MOLDOVAN

1

2          In addition, I'm going to need from you,

3   because we have a court reporter here, verbal responses to

4   questions.  Head shakes up and sideways are ways we

5   communicate in conversations generically, but they don't

6   work on a -- for a court reporter.

7          Does that all make sense to you, sir?

8      A.   Yes, it does.

9      Q.   Okay.  Do you understand that you've been called

10  here to testify both in your personal capacity and on

11  behalf of the Debtors?

12     A.   I do.

13     Q.   Okay.  And you understand you're testifying here

14  pursuant to notices of deposition?

15     A.   I do.

16     Q.   Okay.  Let me mark, as Moldovan Exhibit Number

17  1, an Amended Notice of Deposition Pursuant to FED.R.CIV.P

18  30(b)(6).

19          (Exhibit 1 marked.)

20     Q.   (BY MR. ANKER)   Mr. Moldovan, do you recognize

21  this document?

22     A.   I do.

23     Q.   Okay.  And is this the -- your understanding the

24  notice of deposition in -- 30(b)(6) deposition in which --

25  pursuant to which you are testifying on behalf of the

*****CONFIDENTIAL*****

Page 14

1                    KRISTOPHER MOLDOVAN

2     Debtors?

3          A.    Yes.

4          Q.    Okay.

5          A.    30(b)(6) for certain topics.

6          Q.    Okay.  And those topics, as I understand it,

7     sir, are topics numbers 1 and 2, which are specified on

8     pages 11 and 12 of Exhibit Number 1; is that right, sir?

9          A.    That's correct.

10         Q.    And you're also testifying on behalf of the

11    company as to topic number 10, which is all communications

12    and documents relating to any of the foregoing topics to

13    the extent that those communications and documents relate

14    to topics numbers 1 and 2, correct, sir?

15         A.    That's my understanding.

16         Q.    Okay.  And you're also testifying in your

17    personal capacity; are you not, sir?

18         A.    Yes.

19         Q.    Okay.  And let me mark, as Plaintiff's Exhibit

20    Number 2, a document entitled, Amended Notice of

21    Deposition Pursuant to FED.R.CIV.P 30(b)(1), and ask you,

22    Mr. Moldovan, if you can recognize -- if you recognize

23    that document?

24                (Exhibit 2 marked.)

25         A.    I do.

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2        Q.   (BY MR. ANKER)   Is that the notice of

3   deposition in your personal capacity pursuant to which you

4   are testifying personally here today?

5        A.   That is my understanding, yes.

6        Q.   Okay.  What did you do to prepare for this

7   deposition?

8        A.   I reviewed the topics.  I consulted with outside

9   counsel.  And I reviewed various documents that were

10  identified in the topics, particularly the indentures and

11  the notes, particularly the documents in topics 1 and 2.

12       Q.   Did you review any documents to prepare for this

13  deposition, beyond the indentures for the debt issuances

14  referenced in topics 1 and 2 of Exhibit Number 1?

15       A.   I did.

16       Q.   Which documents did you review in addition to

17  the indentures?

18       A.   Various documents.  I don't recall specific --

19  their presentations and communications, but I don't -- I

20  can't recall -- name them specifically.

21       Q.   Did you speak with anyone to prepare for your

22  deposition, other than outside counsel?

23       A.   I did.

24       Q.   Who did you speak with, sir?

25       A.   I spoke with internal counsel, Andy Wright,

*****CONFIDENTIAL*****

KRISTOPHER MOLDOVAN

1

2    who's our associate -- our deputy general counsel and vice

3    president.  I spoke with Greg Santos, the senior counsel.

4    I spoke with Tony Horton, our treasurer.  And I spoke with

5    one or two, probably, people in the finance planning group

6    on various specific topics.

7        Q.   Who are those individuals?

8        A.   One would be Michael Carter, senior vice

9    president, head of planning.  And the other one would be

10   Max Chen, who's a manager in our finance group.

11               MR. ANKER:  Can we go off the record for

12   one minute?

13               MR. HOWELL:  Yes.

14               THE VIDEOGRAPHER:  We are now off the

15   record.  The time is 9:20 a.m.

16               (Recess in the proceedings from 9:20 to

17               9:22 a.m.)

18               THE VIDEOGRAPHER:  We are now back on the

19   record.  The time is 9:22 a.m.

20        Q.   (BY MR. ANKER)  Mr. Moldovan, what did you

21   discuss with Mr. Carter in preparation for your deposition

22   today?

23        A.   I don't recall the specific topic that we talked

24   about.  It was, well, not this week.

25        Q.   So you cannot provide me any information about

Page 17

KRISTOPHER MOLDOVAN

your discussion with Mr. Carter?

    A.   I don't recall what the topic was.

    Q.   Do you recall anything about your conversation
with Mr. Carter?

    A.   No.

    Q.   Okay.  What about with respect to Mr. Chen; can
you tell me anything about your discussion with Mr. Chen?

    A.   I asked for clarification on a calculation that
was in one of the presentations.

    Q.   Do you recall the calculation or the
presentation?

    A.   I think the calculation related to the make
whole amount, but I don't remember the specific question,
or I certainly don't remember the presentation.

    Q.   Okay.  What can you tell me about your
conversation with Mr. Horton to prepare for this
deposition?

    A.   General discussions about -- about deposition
prep.  It was part of a preparation with our outside
counsel.

    Q.   Can you tell me anything about the substance of
your conversation with Mr. Horton in preparation for this
deposition?

    A.   No, I don't -- it was more about general -- my

*****CONFIDENTIAL*****

Page 18

KRISTOPHER MOLDOVAN

1  recollection is, it was a lot about general deposition

2  preparation provided by outside counsel.

3      Q.   I recognize Mr. Wright is a counsel, but you

4  spoke with him in preparation for this deposition to

5  obtain information to provide substantive information on

6  behalf of the company?

7                MR. HOWELL:  Object to form.

8      A.   I prepared with him generally and if necessary.

9  I don't recall speaking to him about any specific topic.

10     Q.   (BY MR. ANKER)   What about Mr. Santos; did you

11  discuss with him -- did you -- let me rephrase that.

12               With respect to Mr. Santos, did you have

13  any discussions about any of the substantive testimony you

14  were going to give today?

15               MR. HOWELL:  And I'll just caution you not

16  to provide any attorney/client privilege materials, but,

17  otherwise, answer the question if you can.

18     A.   Yes.

19     Q.   (BY MR. ANKER)   What?

20     A.   That -- I don't think I can answer, because it

21  was -- I view it to be privileged conversation with our

22  internal counsel.

23     Q.   Were you seeking legal advice from Mr. Santos?

24     A.   Yes.

*****CONFIDENTIAL*****

Page 19

KRISTOPHER MOLDOVAN

1    Q.    If, at any point today in response to any

2 question I ask you, your answer is informed by any

3 information Mr. Santos gave you, would you please let me

4 know?

5    A.    Yes.

6    Q.    Did you make any notes of any of your

7 conversations with any of these five individuals?

8    A.    Yes.

9    Q.    Do you have those notes with you?

10   A.    I do not.

11        MR. ANKER:  We would ask for the production

12 of those documents, and reserve the right to keep the

13 deposition open to question the witness about them.

14        MR. HOWELL:  Okay.

15   Q.    (BY MR. ANKER)  Did you bring any documents

16 with you today?

17   A.    I did not.

18   Q.    Any reason you cannot provide full and complete

19 testimony today, both in your individual capacity and on

20 behalf of the company, on the topics on which you have

21 been designated?

22   A.    Not that I'm aware of.

23   Q.    Okay.  Mr. Moldovan, I used term, "the company,"

24 there, and I may use it from time to time.  I will do my

*****CONFIDENTIAL*****

Page 20

1                    KRISTOPHER MOLDOVAN

2    best to be clear during this deposition.  But when I use

3    the term, "the company," I mean the Debtors, including,

4    but not limited to EFIH.

5                    With that clarification, does your answer

6    to the last question stand?

7        A.    Could you please repeat the question?

8        Q.    Sure.

9                    Any reason you cannot provide full and

10   complete testimony today, in your individual capacity and

11   on behalf of the company, that is, all the Debtors, on the

12   topics on which you have been designated?

13       A.    My understanding was that I was a 30(b)(6) --

14   30(b)(6) witness on behalf of EFIH.  Is that --

15       Q.    Well, I had clarification conversations with

16   your counsel if at any -- that these -- this notice was to

17   the Debtors more broadly.  But if there's any point in

18   this deposition today where you provide me what you

19   understand to be EFIH's understanding of the facts, and

20   you believe that EFH or TCEH or any other Debtor has a

21   different understanding, please let me know.

22       A.    Okay.

23       Q.    I'm going to otherwise assume that, when you

24   provide me with EFIH's understanding of any fact, that

25   speaks not only to EFIH's understanding, but that of all

*****CONFIDENTIAL*****

Page 21

1                    KRISTOPHER MOLDOVAN

2    the Debtors, okay?

3         A.   Okay.

4         Q.   Mr. Moldovan, I don't want to start with nursery

5    or elementary school, but starting with college, could you

6    please provide me briefly an overview of your education?

7         A.   Sure.  I went to the University of Illinois, and

8    got a bachelor's of science in engineering; graduated in

9    1994.  From there, I went to Duke University School of

10   Law, and got a JD; graduated in 1997.

11        Q.   Do you have any other post -- postgraduate

12   degrees, other than the law degree?

13        A.   I have a finance certificate from the graduate

14   school of business at SMU.

15        Q.   Okay.  After you graduated from law school in

16   1997, by whom were you employed, sir?

17        A.   A firm, Wildman, Harrold, Allen & Dixon, in

18   Chicago, Illinois.

19        Q.   And what practice -- what area of law did you

20   practice in?

21        A.   Corporate and securities.

22        Q.   By "corporate and securities," do you mean

23   transactional work?

24        A.   Transactional work, yes.

25        Q.   Okay.  And in connection with that, did you work

*****CONFIDENTIAL*****

Page 22

KRISTOPHER MOLDOVAN

1   on securities offerings?

3       A.    I did.

4       Q.    Debt offerings?

5       A.    I -- I don't recall.

6       Q.    Okay.  How long were you with the Wildman

7   Harrold firm?

8       A.    I was there for two years.

9       Q.    And what did you do thereafter?

10      A.    I became a transactional attorney at Gibson,

11  Dunn & Cutcher in Dallas.

12      Q.    And how long were you with Gibson, Dunn &

13  Cutcher in Dallas?

14      A.    I was there from 1999 until 2006.

15      Q.    And were you an associate during that entire

16  period?

17      A.    I was.

18      Q.    Okay.  What did you -- I take it, you left

19  Gibson Dunn in 2006?

20      A.    I did.

21      Q.    And what did you do at that point?

22      A.    I moved to what is now Energy Future Holdings as

23  a lawyer, senior counsel in the legal department.

24      Q.    What were your responsibilities, at that point,

25  as senior counsel at EFH?

*****CONFIDENTIAL*****

Page 23

1                    KRISTOPHER MOLDOVAN

2        A.    Transactional work, including mergers and

3    acquisitions, securities, filings, securities offerings,

4    real estate transactions.

5        Q.    And how long did you stay in that position?

6        A.    Until April of 2010.

7        Q.    What happened in April of 2010?

8        A.    I was moved and promoted to be vice president

9    and assistant treasurer in the finance department.

10        Q.    Am I correct to understand that, when you became

11    vice president and assistant treasurer in the finance

12    department, you no longer were playing a -- you no longer

13    were in a legal position?

14        A.    That's correct.

15        Q.    And are you still the assistant -- I'm sorry;

16    the vice president and assistant treasurer in the finance

17    department today?

18        A.    I am vice president and assistant treasurer at

19    EFH Corporate Services Company, and I am assistant

20    treasurer of all of the subsidiaries of Energy Future

21    Holdings Corp.  So just a clarification on the title.

22        Q.    Okay.  And have you held that position

23    continuously since April of 2010?

24        A.    I have.

25        Q.    Who do you report to, sir?

*****CONFIDENTIAL*****

Page 24

1                    KRISTOPHER MOLDOVAN

2        A.    Tony Horton, the treasurer.

3        Q.    And Mr. Horton, in turn, reports to

4   Mr. Keglevic; is that right, sir?

5        A.    That's correct.

6        Q.    Okay.  Can you briefly describe your

7   responsibilities as vice president and assistant

8   treasurer?  And I ask that question in the present tense.

9   Let me go back to April of 2010, but -- and tell me if the

10  responsibilities have changed at any point from then to

11  today.

12       A.    I'm sorry.  So could you restate --

13       Q.    Sure.

14       A.    -- what period you're asking about --

15       Q.    Sure.

16       A.    -- at this point?

17       Q.    Sure.

18             Can you describe your responsibilities

19  since April 2010; and if they've changed, fill me in on

20  the change?

21       A.    In my position, I oversee our corporate

22  compliance group; it's a group of four to five employees.

23  I also oversee our cash management group, which is a group

24  of currently three employees.  And I work with the

25  treasurer and the finance team regarding finance topics.

*****CONFIDENTIAL*****

Page 25

KRISTOPHER MOLDOVAN

1

2      Q.    Have you had a role, as assistant treasurer,

3  with respect to any of the debt offerings by EFH or any of

4  its subsidiaries?

5      A.    Yes.

6      Q.    What role has that been, sir?

7      A.    It has been to negotiate -- a primary

8  negotiation role in connection with offering documents,

9  indentures, closing documents.  It is also to negotiate

10 with the institutions regarding the terms of the -- with

11 the financial institutions regarding the terms of those

12 securities.

13     Q.    With respect to the debt issuances in particular

14 that are the subject of topics 1 and 2 identified in

15 Exhibit Number 1, can you tell me your role personally?

16     A.    For the EFIH 10 percent indenture, which was

17 done in connection with an exchange offer in 2010, I was

18 involved in the negotiation of the terms of that

19 indenture.  I was involved in reviewing and commenting on

20 the offering materials.

21            With -- with respect to the 10.875 senior

22 notes and 11.25, 12 percent senior toggle notes of EFH, at

23 that time, I was involved in my role as a counsel

24 reviewing the terms of the indenture and the offering

25 materials.

*****CONFIDENTIAL*****

Page 26

                    KRISTOPHER MOLDOVAN

1                    I need to go to the definition of "other."

2   Would you -- are there any other specific indentures?

3        Q.    How about with respect to the EFIH 6.875 senior

4   secured notes due in 2017?

5        A.    Yes, I was also involved in negotiating the

6   terms of that indenture, the terms of the notes, and the

7   preparation of the offering materials.

8        Q.    And you're aware, are you not, that, with

9   respect to the 10 percent notes, that there was a

10  supplemental indenture for an issuance that occurred in

11  late 2012 or early 2013?  Did you have any involvement in

12  that issuance?

13       A.    I did.

14       Q.    What was your involvement?

15       A.    I reviewed and worked on the terms of the

16  exchange offer that was made, and represented the company

17  in connection with that.

18       Q.    Okay.  Let's -- let's step back a second.

19                    I am right, am I not, that, as of the

20  bankruptcy filing date, EFIH had approximately $4-billion

21  in first lien debt outstanding?

22       A.    Approximately; yes, you are correct.

23       Q.    Okay.  And some of that debt bore a coupon of

24  10 percent, correct?

*****CONFIDENTIAL*****

Page 27

1          KRISTOPHER MOLDOVAN

2     A.   That is correct.

3     Q.   Okay.  And that debt matured in 2020, right?

4     A.   Yes.

5     Q.   And there were two tranches of it -- two --

6     "tranches" may be the wrong word.

7               It had been issued at two different times,

8     correct?

9     A.   That's correct.

10     Q.   Okay.  There was an exchange offer in 2010

11     resulting in the issuance of about $2.18-billion in

12     10 percent notes, right?

13     A.   Exactly, 2.18-billion, yes.

14     Q.   And then an additional issuance -- I think it's

15     January of 2013 -- but if I'm wrong on the date, correct

16     me -- of $1,302,106,000 in notes, right?

17     A.   The amount sounds right, and the date sounds

18     right, yes.

19     Q.   And that also involved an exchange of earlier

20     issued notes, right?

21     A.   That's correct.

22     Q.   Okay.  And so when you add those two together,

23     you have about 3.5-billion, give or take, right?

24     A.   That's correct.

25     Q.   Okay.  And the rest of the 4-billion was first

*****CONFIDENTIAL*****

Page 28

1                    KRISTOPHER MOLDOVAN

2    lien EFIH debt that bore a coupon of 6.875 percent

3    annually, right?

4         A.    Yes.  And issued in two separate times, yes.

5         Q.    And that debt matured in 2017, right?

6         A.    It was --

7         Q.    Scheduled --

8         A.    -- scheduled to mature in 2017, yes.

9         Q.    Okay.  And you said there were two different

10   issuances; one was 250-million in August of 2012, right?

11        A.    That date sounds correct, yes.

12        Q.    And an additional 253-million was issued in

13   October of 2012, right?

14        A.    Yes, that sounds correct.

15        Q.    And each of these issuances we've discussed --

16   I'm talking about the first lien EFIH notes -- was

17   governed by an indenture, right?

18        A.    Yes, each one was covered by an indenture.

19        Q.    And there was also a global note for each of the

20   issuances, right?

21        A.    For -- there are two indentures.  One for the

22   10 percent notes, and one for the 6.875 percent notes, and

23   there are multiple global notes, yes.

24        Q.    What did you understand the function of the

25   indenture to be?

*****CONFIDENTIAL*****

Page 29

1                    KRISTOPHER MOLDOVAN

2        A.    It governs the agreement between the company and

3    the lenders.

4        Q.    Okay.  It's a contract between, on the one hand,

5    EFIH, the issuer, and, on the other hand, the indenture

6    trustee for the investors, right?

7                    MR. HOWELL:  Object to form.

8        Q.    (BY MR. ANKER)   To your understanding,

9    Mr. Moldovan -- let me say something at the outset.  I am

10   not asking you, during this deposition, ever to provide a

11   legal conclusion.  I'm always asking for your

12   understanding personally and the company's understanding.

13   And if, at any point, your personal understanding and the

14   company's is different, please make that clear to me;

15   otherwise, I'm going to assume you're testifying both

16   individually and on behalf of company.

17                    Let me rephrase that question.

18                    Is it your understanding and that of the

19   Debtors, that the indentures constitute contracts between

20   EFIH, on the one hand, and the indenture trustees for the

21   noteholders on the other?

22        A.    That is my understanding.  I would add that the

23   issuer is EFIH and EFIH Finance.  But that is my

24   understanding.

25        Q.    I actually am going to use the term, "EFIH," in

*****CONFIDENTIAL*****

KRISTOPHER MOLDOVAN

1  this deposition to represent both of the entities you

2  mentioned.  If, at any point, that is not clear to you or

3  creates confusion, please let me know.

4                So the indenture set forth obligations on

5  behalf of EFIH that were binding, to your understanding,

6  on EFIH, right?

7                MR. HOWELL:  Object to form.

8        A.   To my understanding, it, yes, has provisions in

9  it that were binding to us.

10       Q.   (BY MR. ANKER)   Okay.  And it also set forth --

11  that is, the indenture set forth rights of the holders of

12  the notes, to your understanding, correct, sir?

13       A.   To my understanding, that is correct.

14       Q.   Okay.  And, again, I said, "To your

15  understanding."  I mean to your understanding and the

16  company's.  If there's ever a difference between your

17  understanding and the company's, please let me know.

18       A.   On those, each one that I answered to my

19  understanding, on those topics, I did not -- those are my

20  understanding.  I -- when I answered to my understanding,

21  I am limiting it to myself.

22       Q.   You have no information, as you sit here today,

23  to suggests that the company has a different understanding

24  from your personal understanding with respect to the

KRISTOPHER MOLDOVAN

2  subjects about which you testified over the last four or

3  five minutes, correct, Mr. Moldovan?

4      A.    I do not have any current information that the

5  company's understanding would be different.

6      Q.    And you also understood that the global notes

7  set forth terms that were binding on EFIH, right?

8              MR. HOWELL:  Object to form.

9      A.    My understanding is that there are terms in the

10 global notes that EFIH agreed to.  My understanding is,

11 also, to the extent that there's any inconsistency between

12 the notes and the indenture, that the indenture would

13 govern over the notes.

14     Q.    (BY MR. ANKER)  And the notes, also, to your

15 understanding, set forth rights of the holders of the

16 notes, correct?

17     A.    To my understanding, that's correct.

18     Q.    And this may seem like a silly question, because

19 I think the answer is obvious, but let me ask it as a

20 predicate.

21              EFIH cared about the terms of these

22 indentures and notes, right?

23     A.    I don't know how to answer that question.

24     Q.    EFIH was not indifferent to what the terms were,

25 right?

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2       A.    EFIH was not indifferent to what was put into

3  the indenture and the global notes.

4       Q.    Okay.  And have you heard the term, the

5  colloquial term used that a provision in an indenture or a

6  note is market?

7       A.    I have heard that.

8       Q.    Okay.  What do you -- what do you understand

9  that to mean?

10      A.    My understanding is that that is what -- that

11 that particular provision is -- has genuinely been

12 accepted by issuers and lenders in other comparable

13 transactions.

14      Q.    And EFIH wanted, in all of its issuances, that

15 the terms of the indentures and the notes be market or

16 perhaps more favorable to the company than is market,

17 right?

18      A.    I think that -- I don't know -- I think that

19 that's a broad generalization.

20      Q.    Are you aware --

21      A.    EFIH up front -- EFIH tried to negotiate the

22 best deal that it could.

23      Q.    I think you just said what I was saying more

24 eloquently, and I appreciate it.

25                    EFIH never knowingly intentionally agreed

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2    to terms that were less favorable for it than it could

3    have otherwise obtained, right?

4                    MR. HOWELL:  Object to form.

5         A.    Could you restate exact -- your question?

6         Q.    (BY MR. ANKER)   Sure.

7                    To your knowledge, EFIH never knowingly or

8    intentionally agreed to terms that were less favorable for

9    it than it could have otherwise obtained, correct?

10                   MR. HOWELL:  Object to form.

11        A.    It is my belief that, you know, the negotiations

12   are a balancing between getting the most favorable terms

13   and efficient execution on your transaction.  So I don't

14   think that one could say that every term the company

15   negotiated to get the very best word it could possibly

16   get.

17        Q.    (BY MR. ANKER)   Can you give me an example of

18   any term in any indenture or notes that EFIH agreed to

19   that you believe were less favorable for the company than

20   it could have otherwise obtained?

21        A.    Again, there are -- I don't have a specific

22   example.  There are tradeoffs in every negotiation.

23        Q.    Certainly you would agree with this, EFIH was

24   not strong armed into agreeing to any terms in any

25   indenture or in any of the notes, right, sir?

*****CONFIDENTIAL*****

Page 34

1                    KRISTOPHER MOLDOVAN

2        A.    What do you mean by "strong armed"?

3        Q.    It was never -- let me rephrase it.

4              It agreed to all of the terms in all of the

5   indentures and all of the notes, correct?

6        A.    EFIH was never forced to sign anything.

7        Q.    And before it signed and agreed to any indenture

8   or notes, those indentures and notes were reviewed by you,

9   when you were in the finance department, and others were

10  in the finance department, right?

11       A.    I can -- yes.

12       Q.    Okay.   And they were also reviewed by counsel,

13  both inside and outside counsel, right?

14       A.    That's correct.

15       Q.    And those outside counsel -- tell me if I have

16  this wrong -- included at different times, Simpson,

17  Thatcher & Bartlett; is that right?

18       A.    That's correct.

19       Q.    Your former firm, Gibson, Dunn & Cutcher?

20       A.    I don't have knowledge whether they reviewed --

21  I don't have specific knowledge to any -- whether they

22  reviewed indentures.   They were involved in transactions.

23  I don't -- I don't know how much -- I don't know if they

24  read the indenture cover to cover.

25       Q.    Okay.   Were they involved in the review or

1              KRISTOPHER MOLDOVAN

2    preparation of offering material for any of the debt

3    issuances?

4         A.   They were.

5         Q.   Okay.  What about Vincent & Elkins?

6         A.   In the same as -- capacity as Gibson, Dunn &

7    Cutcher.

8         Q.   What about the law firm of Covington and

9    Burling?

10        A.   I -- they would -- my understanding is they

11   would have been reviewing a very specific topic.

12        Q.   But they, in fact, reviewed topics and gave

13   advice to EFIH in connection with debt issuances on the

14   first lien debt, correct?

15        A.   I don't know.

16        Q.   What about Hunton & Williams?

17        A.   I don't recall.

18        Q.   Okay.  Given your lack of recollection, let's

19   limit my next question to the firms you do recall:

20   Simpson, Thatcher; Gibson, Dunn; and Vincent & Elkins.

21             You would agree with me that all of those

22   are highly-sophisticated law firms, right?

23        A.   I would.

24        Q.   Okay.  And EFIH has no complaint about the work

25   they performed in connection with any of the debt

*****CONFIDENTIAL*****

KRISTOPHER MOLDOVAN

1

2  issuances; does it?

3       A.    I think EFIH was satisfied with the work that

4  they performed, yes.

5       Q.    Okay.  Now, you testified that each indenture

6  was a contract between EFIH, on the one hand, and the

7  applicable indenture trustee for the notes issued pursuant

8  to that indenture.

9            Do I recall correctly?

10      A.    I testified that that is my understanding.

11      Q.    That -- that's fair.

12            But, in fact, the indenture trustees didn't

13  draft any of the provisions in any of the indentures or

14  notes; did they?

15      A.    Yes, they would have drafted certain provisions

16  or -- I don't know that they would have drafted them.

17  They would have been involved in the drafting of certain

18  provisions in the indenture, yes.

19      Q.    Can you identify for me any provision of any of

20  the indentures for any of the EFIH notes that were drafted

21  by any indenture trustee?

22            MR. HOWELL:  Just for clarification; you're

23  talking about the EFIH first lien notes that we've been

24  discussing?

25            MR. ANKER:  I am.  Thank you for the

*****CONFIDENTIAL*****

Page 37

1                    KRISTOPHER MOLDOVAN

2    clarification.

3         A.    No, I wouldn't have a recollection of a specific

4    provision that I was aware that they drafted.

5         Q.    (BY MR. ANKER)    Did any indenture trustee for

6    any EFIH first lien notes draft the optional redemption

7    provision in any of the EFIH debt issuances?

8         A.    I'm not aware that they would have done that,

9    no.

10         Q.    Did any indenture trustee for any EFIH first

11    lien notes draft the acceleration or events of default

12    provision in any of the EFIH debt issuances?

13              MR. HOWELL:    Object to form.

14         A.    I am not aware that they drafted it.  I'm

15    confident that they reviewed.  And I wouldn't -- wouldn't

16    recall whether they commented, but I'm certain that they

17    reviewed.

18         Q.    (BY MR. ANKER)    Let's focus on what you do

19    recollect.

20              Who did draft the indentures?

21         A.    Which indenture?

22         Q.    Okay.  I'm going to try to cover a lot of ground

23    just to make this efficient.  If I can't, and -- and you

24    need me to break it down, let me -- let me -- tell me.

25    And maybe you are telling me now.

*****CONFIDENTIAL*****

Page 38

KRISTOPHER MOLDOVAN

With respect to the EFIH first lien debt,
did representatives of EFIH draft the indentures?

A.    I don't believe so.

Q.    Who drafted them, sir?

A.    Sherman & Sterling is my recollection.

Q.    And Sherman & Sterling acted as counsel for the
dealer managers, right?

A.    That's correct.

Q.    Okay.   Those dealer managers were retained by
EFIH, correct?

A.    They were.

Q.    They were paid by EFIH, correct?

A.    Yes.

Q.    I will tell you -- and I may want to take you
through this in a little more detail later -- I am having
trouble actually reading the dealer manager agreements and
figuring out exactly how much they got paid.

But it's fair to say, with respect to each
issuance, they got paid millions of dollars, right?

A.    Depending on the issuance.

Q.    They got paid a lot of money with respect to
each of the issuances, correct?

MR. HOWELL:  Object to form.

A.    I don't -- it depends on your definition of "a

*****CONFIDENTIAL*****

Page 39

                    KRISTOPHER MOLDOVAN

1   lot."

3       Q.   (BY MR. ANKER)   With respect to the EFIH

4   10 percent notes, issued in 2010, the dealer managers got

5   paid millions of dollars, correct?

6       A.   I don't recall the exact amount.

7       Q.   But you recall that it was substantial; do you

8   not?

9       A.   I recall that we paid them what we believed was

10  the right amount to pay for the services they provided.

11      Q.   No noteholder chose those dealer managers on any

12  of the issuances, right?

13                  MR. HOWELL:   Object to foundation.

14      A.   I'm not -- wasn't the person deciding which

15  dealer managers or underwriters depending on the

16  transaction you're referring to.   I wasn't the ultimate

17  decision maker on that topic.

18      Q.   (BY MR. ANKER)   To your personal knowledge,

19  Mr. Moldovan, it was EFIH who selected the dealer managers

20  on each of the issuances, correct?

21      A.   To my personal knowledge, yes.

22      Q.   And, I take it, that's another subject about

23  which you cannot testify on behalf of the company?

24      A.   You'll have to clarify your questions.   I think

25  on behalf of the company, I can say that EFIH retained the

*****CONFIDENTIAL*****

Page 40

                    KRISTOPHER MOLDOVAN

1    dealer managers.  Whether or not -- I believe your

2    question before, and you can correct me if I am wrong, was

3    whether or not anybody else suggested them or -- I -- I'm

4    not aware of that.

5         Q.    Okay.

6         A.    That -- that's knowledge I can't...

7         Q.    One of the lead dealer managers on each of these

8    issuances was Goldman Sachs & Company, right?

9         A.    That's my recollection, yes.

10        Q.    And Goldman Sachs & Company is one of the three

11   sponsor owners of EFH, correct?

12        A.    A different part of Goldman Sachs, yes.  They're

13   a private investment arm.

14        Q.    And they own -- they own approximately how much

15   of EFH?

16        A.    I don't -- I don't recall.

17        Q.    A substantial -- they have a substantial

18   investment in EFH, right?

19        A.    The private investment arm that is the sponsor,

20   I think, yes, they have a significant investment in EFH.

21        Q.    Okay.  And you testified earlier that Sherman &

22   Sterling drafted certain of the indentures; is that right?

23        A.    That's my recollection, yes.

24        Q.    And your -- by that, you mean they prepared a

1                    KRISTOPHER MOLDOVAN

2    draft, correct?

3            A.    Correct.

4            Q.    And that draft was shared with counsel for the

5    company, right?

6            A.    Correct.

7            Q.    And the company had an opportunity to and, in

8    fact, did comment on the drafts, right?

9            A.    Yes.

10           Q.    And so it's fair to say the drafting process

11   involved both the counsel for the dealer managers and

12   counsel for -- in the finance department for EFIH, right?

13           A.    And the trustee and its counsel, yes.

14           Q.    Who was counsel for the trustee in any of these

15   transactions?

16           A.    My recollection is, at one time, it was Winston

17   & Strong.  And I'm actually -- then it changed, and I --

18   it may have changed.  There was another law firm, but

19   trustee always had counsel on each of our transactions, in

20   my recollection.

21           Q.    Mr. Moldovan, I'll represent to you that I have

22   not seen a single document in any of the productions made

23   by the Debtors suggesting that Winston & Strong or anyone

24   else representing any indenture trustee ever received or

25   commented on a single draft of the indenture.

1                    KRISTOPHER MOLDOVAN

2              Were you aware of such documents?

3        A.   I'm not aware that the company would have

4   retained any such documents.

5        Q.   So you're saying -- your testimony is that the

6   company didn't retain any documents establishing that

7   Winston & Strong or anyone else for the trust commented on

8   drafts of any of the indentures?

9              MR. HOWELL:  Object to form.

10       A.   I -- I don't have knowledge of what may be in

11  our...

12       Q.   (BY MR. ANKER)  Okay.  Are you able to point me

13  to any documentary proof, e-mails, drafts, anything, to

14  suggest that Winston & Strong or any other law firm

15  representing indenture trustees commented on any provision

16  in any indenture?

17       A.   Not at my disposal, no.

18       Q.   Okay.  Can you -- do you have any evidence that

19  drafts of the indentures -- I'm sorry.

20              Do you have any evidence of any negotiation

21  with any of the indenture trustees over the optional

22  redemption provision in any of the indentures?

23       A.   I cannot, sitting here today, recall whether the

24  trustee made any comments to the optional redemption

25  section, but I cannot affirmatively say they did not.

1                    KRISTOPHER MOLDOVAN

2        Q.    Is your testimony the same with respect to the

3   acceleration in the event of defaults provision?

4        A.    It is.

5        Q.    Now, what about with respect to -- you used

6   the -- wait a minute; let me start again.

7                    You used the term, "offering materials."

8                    What do you mean by "offering materials"?

9        A.    In certain cases, it would be an offering

10   memorandum; in certain cases, it would be a prospectus.

11   That's what I was referring to when I made that statement.

12        Q.    The offering memo -- the offering memorandums,

13   or memoranda, and the prospectuses described debt

14   offerings of EFIH, correct -- let me -- let me -- let me

15   rephrase that; that's a poorly worded question.

16                    The issuer of the debt was -- we're talking

17   about was EFIH, right?

18        A.    For the -- yeah, when you're -- when we're

19   talking about the 10 percent and the 6.875 percent, I

20   assume, yes, the issuer was EFIH.

21        Q.    And it was EFIH's prospectus or EFIH's offering

22   memoranda, right?

23        A.    That's correct.

24        Q.    Those documents were drafted by counsel for

25   EFIH, correct?

*****CONFIDENTIAL*****

1                      KRISTOPHER MOLDOVAN

2         A.    Portions, but not all of them; not the whole

3    portion.

4         Q.    The portions describing the notes were drafted

5    by EFIH, correct -- by counsel for EFIH, correct?

6         A.    No.

7         Q.    Who were they drafted by?

8         A.    The description of notes in both of those, for

9    the 10 percents and 6.875's would have -- the initial

10   draft would have come from Sherman & Sterling.

11        Q.    Okay.  Counsel for the dealer managers?

12        A.    The dealer managers in connection with the

13   exchanges, and the initial purchasers in connection with

14   the 6.875 percents, yes.

15        Q.    Okay.  Those provisions, the description of the

16   notes, were not drafted by counsel for the indenture

17   trustees; were they?

18        A.    Could you -- I'm getting confused in your

19   questions about what you mean by "draft."  I -- I do

20   believe that the indenture trustee and its counsel

21   commented on those provisions, but, no, they did not

22   prepare the initial draft.

23        Q.    And are you able to point me to any documentary

24   evidence that any counsel for any indenture trustee was

25   shown, let alone, commented on any language in any draft

1                      KRISTOPHER MOLDOVAN

2    offering memoranda or prospectus?

3                      MR. HOWELL:  Object to form.

4        A.   Not as I sit here.

5        Q.   (BY MR. ANKER)  Did EFIH retain, as a matter of

6    practice, copies of drafts of prospectuses reflect -- or

7    offering memoranda reflecting comments by different

8    counsel?

9        A.   Our policy would have been not to, but I cannot

10   state affirmatively whether any particular person who

11   would have received a copy of comments would have retained

12   them.

13       Q.   With respect to the offering memoranda and

14   prospectuses, those weren't drafted by any noteholder;

15   were they?

16       A.   No.

17       Q.   And the same is true -- I don't know if I asked

18   you this, and, if I did, I apologize.

19                      It's also true that the indentures and

20   notes were not drafted by any noteholder; were they?

21       A.   Not the 10 percent or 6.875 percent notes, no.

22       Q.   Okay.  Let's go back to the dealer managers.

23                      The dealer managers disclaimed owing any

24   fiduciary or other duty to any of the noteholders,

25   correct?

*****CONFIDENTIAL*****

Page 46

1                  KRISTOPHER MOLDOVAN

2           MR. HOWELL:  Object to foundation.

3      A.   I'm not aware.

4      Q.   (BY MR. ANKER)   Okay.  Why don't we...

5           (Exhibit 3 marked.)

6      Q.   (BY MR. ANKER)   Let me show you a document that

7  we've marked as Exhibit Number 3.  It bears the Bates

8  stamps EFIHMW00038410 through 479, Mr. Moldovan.

9           MR. HOWELL:  Thanks.

10      Q.   (BY MR. ANKER)   Mr. Moldovan, this is obviously

11  a long document.  I'm not going to ask you about every

12  provision in it, but can you identify it for me?

13      A.   It appears to be the dealer manager agreement

14  executed in connection with the exchange offer in which

15  the EFIH 10 percent notes were issued.

16      Q.   Okay.  And --

17      A.   At least the initial EFIH 10 percent notes were

18  issued.

19      Q.   And it is a document on the letterhead of EFH

20  and EFIH, correct, sir?

21      A.   That's correct.

22      Q.   And it's a letter addressed to Citigroup and

23  Goldman Sachs, right?

24      A.   Among other institutions, yes.

25      Q.   I'm sorry; Bank of America, Credit Suisse,

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2    JPMorgan, Morgan Stanley, as well, correct?

3         A.    Correct.

4         Q.    And those were the dealer managers, right, on

5    this exchange?

6         A.    Correct.

7         Q.    What was their role in connection with the

8    exchange?

9         A.    They supported us in the -- in the development

10   -- well, they worked with us to develop the terms of the

11   new notes, the terms of the -- when I say "worked with

12   us," we negotiated the terms of the EFIH 10 percent notes

13   with that group.  We engaged them to answer questions and

14   support the exchange so they would be successful.

15         Q.    When you say you negotiated the terms of the

16   notes with this group, what do you mean by that?

17         A.    Citigroup, who's listed first, would have

18   represented the interests of the lenders that would be

19   accepting the notes.  And we negotiated the terms of the

20   description of notes and the terms of the indenture with

21   both Citigroup and their counsel, Sherman & Sterling.

22         Q.    Mr. Moldovan, let me direct you to page 24 of

23   the agreement.

24         A.    (Witness complies.)

25         Q.    It bears the Bates stamp, last four digits --

*****CONFIDENTIAL*****

Page 48

1                    KRISTOPHER MOLDOVAN

2    last three digits are 433.

3                    Are you there, sir?

4         A.   I am.

5         Q.   You see the paragraph begins -- paragraph 8,

6    sir -- acknowledgements?

7         A.   I do.

8         Q.   Okay.  And let me direct you -- it begins:  Each

9    of EFH, EFIH, and EFIH Finance acknowledges and agrees.

10                   Do you see that, sir?

11        A.   I see those words, yes.

12        Q.   And now let me take you down to three in the

13   hole.

14                   You're familiar with the term, "three in

15   the hole," right, sir?

16        A.   I am familiar with that term.

17        Q.   And it says:  No dealer manager has assumed or

18   will assume any fiduciary responsibility in favor of EFH,

19   EFIH, or EFIH Finance with respect to any of the

20   transactions contemplated hereby or the process thereby --

21   I'm sorry; let me -- let me start again.  I meant to

22   direct you to two in the hole.

23                   It reads:  In connection with each

24   transaction contemplated hereby and the process leading to

25   such transaction, each dealer manager is and has been

                    KRISTOPHER MOLDOVAN

1  acting solely as principal and is not agent or fiduciary

2  of EFH, EFIH, or EFIH Finance or their respective

3  affiliate stockholders, creditors, or employees or any

4  other party.

5              Did I read that correctly?

6      A.   You read the words correctly, yes.

7      Q.   So, in fact, the dealer managers -- and the

8  company understood this -- did not represent the interest

9  of and owed no duty to the noteholders, right?

10             MR. HOWELL:  Object to form.

11     A.   This is provision I'd seek advice from counsel

12  on.

13     Q.   (BY MR. ANKER)  Okay.  As you sit here today,

14  do you have any basis that you can show me that any dealer

15  manager, in connection with this issuance, undertook any

16  obligation to act in the interest of any noteholders?

17     A.   Could you repeat what -- could you repeat the

18  question?

19     Q.   Sure.

20             As you sit here today, can you point me to

21  anything that indicates that any dealer manager, in

22  connection with this issuance, undertook any obligations

23  to any noteholders?

24     A.   I can tell you that my recollection is that they

*****CONFIDENTIAL*****

Page 50

1                    KRISTOPHER MOLDOVAN

2    ardently supported the -- the interests of the

3    noteholders, but I'm not aware of any document that I can

4    point you to.

5         Q.    They were chosen -- I think you testified to

6    this -- by the company, right?

7         A.    They were chosen by the company.

8         Q.    And they were paid by the company, right?

9         A.    That's correct.

10        Q.    And they acted as solicitation agents for the

11   company, right?

12              MR. HOWELL:   Object to form.

13        A.    They acted as dealer managers.

14        Q.    (BY MR. ANKER)   Well, it says dealer managers

15   and solicitation agents; does it not, sir?

16              Turn to page -- turn to page 3, paragraph

17   number 1; it carries over to the top of page 4.  That

18   indicates that EFH, EFIH, and EFIH Finance agree that you

19   will act as the exclusive dealer managers and exclusive

20   solicitation agents for the exchange offers.

21              Do I read that correctly?

22        A.    You did.

23        Q.    So it's right, is it not, that, to your

24   understanding, the dealer managers acted as solicitation

25   agents for the company for these offerings -- for this

*****CONFIDENTIAL*****

Page 51

1                    KRISTOPHER MOLDOVAN

2    issuance?

3         A.    Yes.

4         Q.    Okay.   Now, EFIH had final approval of the terms

5    of the indentures for each of the EFIH first lien

6    issuances, right?

7         A.    What do you mean by "final approval"?

8         Q.    Well, it didn't agree to any of the terms

9    without looking at it in final form and agreeing to it,

10   right?

11        A.    That's correct.

12        Q.    Okay.   And it also had, using the same

13   definition, final approval of the offering memoranda,

14   right?

15        A.    That's correct.

16        Q.    And the prospectuses?

17        A.    It agreed to the final form of the prospectuses,

18   yes.

19        Q.    And what was your understanding of the function

20   of the offering memoranda or prospectuses?

21        A.    My understanding is that they are -- both serve

22   as marketing materials and disclosure documents.

23        Q.    With respect to marketing materials, what you

24   mean is the company was seeking to solicit investor

25   interest in the issuances, right?

*****CONFIDENTIAL*****

Page 52

KRISTOPHER MOLDOVAN

1

2          A.    It was seeking to disclose the terms of the

3    securities that it was offering and...

4          Q.    Mr. Moldovan, you said a moment ago that you

5    understood the purpose of the documents was to both

6    function as marketing material and as disclosure

7    documents.  I want to focus on the first part.

8                "Marketing material," what do you mean by

9    that?

10         A.    Describes the terms of the notes and describes

11   what is being offered.

12         Q.    And the company wanted these offerings to be

13   successful; did it not?

14         A.    Yes.

15         Q.    And with respect to disclosure, the company

16   understood it had an obligation to provide accurate and

17   truthful disclosure, right?

18         A.    Yes.

19         Q.    It knew that the underlying notes were

20   securities, right?

21         A.    It did.

22         Q.    And it knew that they were, therefore, subject

23   to the federal and state securities laws, right?

24                MR. HOWELL:  Object to form.

25         A.    My understanding is yes.

*****CONFIDENTIAL*****

Page 53

KRISTOPHER MOLDOVAN

1

2    Q.    (BY MR. ANKER)    And the company understood that

3    the Debtors had a legal obligation to ensure that the

4    offering memoranda and prospectuses did not contain a

5    material misstatement of fact, right?

6    A.    That's correct.

7    Q.    And the company understood that the Debtors had

8    a legal obligation to ensure that the offering memoranda

9    did not omit or misstate a material fact necessary to make

10   the statements contained therein accurate, correct?

11                    MR. HOWELL:    Object to form.

12   A.    That's correct.

13   Q.    (BY MR. ANKER)    And did the company take

14   seriously those obligations?

15   A.    Yes, of course.

16   Q.    The company never knowingly and intentionally

17   made a material misrepresentation in the offering

18   memoranda with respect -- or prospectuses with respect to

19   any of the EFIH first lien issuances, right?

20   A.    Not knowingly, no.

21   Q.    Okay.  And it not knowingly -- that would have

22   been inarticulate.

23                    It is also true that the company did not

24   knowingly omit to state a material fact in the offering

25   memorandum or prospectus for any issuance of EFIH first

*****CONFIDENTIAL*****

1              KRISTOPHER MOLDOVAN

2    lien debt that was necessary to make that offering

3    memorandum or prospectus accurate, right?

4         A.   The company did not knowingly omit to state

5    anything.

6         Q.   And the same would be true -- let me back up.

7              The company also issued, at times, in

8    connection with EFIH first lien debt issuances, term

9    sheets, right?  The company -- let me rephrase it.  You

10   look puzzled.

11             Were there marketing materials or offering

12   materials, other than prospectuses and offer -- and

13   offering memoranda, in connection with any of the EFIH

14   first lien debt?

15        A.   There likely would have been pricing

16   supplements.

17        Q.   Did you ever -- do you recall ever seeing a

18   investor presentation, a PowerPoint presentation for any

19   of the issuances?

20        A.   I do.

21        Q.   And those were shared from time to time with

22   investors?

23        A.   Those -- I -- would have been made available on

24   a limited basis to investors as part of a phone call, but

25   not shared with them.

*****CONFIDENTIAL*****

Page 55

KRISTOPHER MOLDOVAN

1

2      Q.    And the company sought, in those documents, also
3  to be accurate and truthful, right?
4      A.    Yes.
5      Q.    It didn't seek to intentionally and knowingly
6  state any false -- any material mis -- misstatement of
7  fact, right?
8      A.    That's correct; it didn't knowingly do that.
9      Q.    Okay.  And it did not knowingly, in any of those
10  documents, omit to state any material fact necessary to
11  make the statements therein truthful, correct?
12      A.    That's correct, they did not knowingly do that.
13      Q.    Okay.  As you sit here today, are you aware of
14  any misstatement of material fact in any offering
15  memorandum or prospectus issued by EFIH in connection with
16  any of the EFIH first lien debt?
17      A.    I'm not aware of anything that rises to that
18  standard, no.
19      Q.    Are you aware, as you sit here today, of any
20  omission of any material fact in any EFIH prospectus or
21  offering memorandum for any of the EFIH first lien debt?
22      A.    Again, given that standard, no, I'm not aware of
23  any omission of a material fact.
24      Q.    Okay.
25              MR. ANKER:  Let's go off the record one

*****CONFIDENTIAL*****

Page 56

1                    KRISTOPHER MOLDOVAN

2     second.

3                    THE VIDEOGRAPHER:  We are now off the

4     record.  The time is 10:18 a.m.

5                    (Recess in the proceedings from 10:18 to

6                    10:30 a.m.)

7                    THE VIDEOGRAPHER:  We are now back on the

8     record.  The time is 10:30 a.m.

9         Q.   (BY MR. ANKER)   Mr. Moldovan, in the answers to

10    my two last set of questions -- I'll read you back one

11    question and answer.

12                    I asked a question:  Are you aware, as you

13    sit here today, of any omission of any material fact in --

14    in any EFIH prospectus or offering memoranda for any of

15    the EFIH first lien debt?

16                    You answered:  Again, given that standard,

17    no, I'm not aware of any omission of a material fact.

18                    Are you aware, as you sit here today, of

19    any omission of fact or misrepresent -- or misstatement in

20    any offering memoranda or prospectus, whether material or

21    immaterial, for any EFIH first lien issuance?

22                    MR. HOWELL:  Object to form.

23        A.   I'm not aware that anything was omitted.  Is

24    that -- I'm sorry; could you --

25        Q.   (BY MR. ANKER)   Omitted or misstated.

*****CONFIDENTIAL*****

Page 57

1                    KRISTOPHER MOLDOVAN

2        A.    I'm sorry; so ask that question again.

3        Q.    Sure.

4              Let's take the materiality qualifier out of

5        the equation, and I'll break it into two parts?

6              Are you aware of any misstatement made by

7        EFIH in any offering memorandum or prospectus with respect

8        to any issuance of EFIH first lien debt?

9              MR. HOWELL:    Object to form.

10       A.    It depends on what misstatement -- I -- I don't

11       believe -- I can't point that -- we have found things that

12       we would have liked to have worded differently, but I

13       don't know that they would rise to a misstatement.

14       Q.    (BY MR. ANKER)   What have you found or what has

15       the company found that it wishes it had stated

16       differently?

17       A.    I don't -- there are things over time.  I don't

18       recall.

19       Q.    You have no recollection, as you sit here today,

20       of anything that the company concluded it should have

21       stated differently or wishes it had stated differently in

22       the prospectus or offering memorandum for any first --

23       EFIH first lien debt?

24       A.    I would say that whether EFIH, as the company,

25       wishes it would have stated differently, I can't answer

*****CONFIDENTIAL*****

Page 58

1                    KRISTOPHER MOLDOVAN

2    that.

3         Q.   Is there anything that you personally,

4    Kris Moldovan, wish EFIH had stated differently in the

5    prospectus or offering memorandum for any EFIH first lien

6    debt?

7         A.   There's a provision outlined, I think, by you,

8    that I believe didn't tie directly to the applicable

9    provision in the description of notes or the indenture.

10   And I believe that that probably should have been written

11   differently.  Whether I view -- I don't --

12        Q.   I'm sorry; you said, "There's a provision

13   outlined, I think, by you," meaning me.

14             What provision are you referencing?

15        A.   In your -- in the trustees' complaint, I believe

16   it was.

17        Q.   What is that provision, sir?

18        A.   I need to look at it, refresh my memory.

19        Q.   Can you generally describe it for me?

20        A.   It's in the risk factors of the prospectus

21   relating, I believe, to the 10 percent, the initial

22   10 percent issuance.

23        Q.   And what do you recollect about that risk factor

24   disclosure?

25        A.   It's relating to what somebody would -- what a

*****CONFIDENTIAL*****

Page 59

1                    KRISTOPHER MOLDOVAN

2     lender would be entitled to recover against the

3     collateral.

4          Q.    And it stated, did it not, that he would -- the

5     lender would be able to look to the collateral to recover

6     principal interest plus premium, if any, correct, sir?

7          A.    I don't -- I didn't look at the language; I

8     don't have it memorized.

9          Q.    Well, is the language that you recollect

10    thinking, I wish we had phrased it differently, did it

11    have to do with whether a lender would be able to recover

12    a premium?

13         A.    I -- my recollection is that the language in

14    that section did not directly tie to the relevant

15    provisions in the description of notes and the indenture.

16         Q.    With respect to what?

17         A.    The words.

18         Q.    Words as to what; as to premium, right, sir?

19         A.    No, generally.  I'd need to look at it.  They do

20    not tie to the words used in one section of the

21    documents -- the words in one section don't mirror the

22    words used in another section.  You typically try to be

23    consistent.

24         Q.    With the exception of that instance, are you --

25    do you, Kris Moldovan -- Moldovan, believe that there were

*****CONFIDENTIAL*****

Page 60

KRISTOPHER MOLDOVAN

2  any other statements in any of the prospectuses or

3  offering memoranda for EFIH first lien debt that should

4  have been worded differently?

5              MR. HOWELL:  Object to form.

6      A.   I -- we've -- I don't recall any specific

7  instances at this time.

8      Q.   (BY MR. ANKER)  The last few minutes, we've

9  been talking about actual statements.  Now I want to focus

10  on omissions.

11              Do you, Mr. Moldovan, believe that there

12  were any omissions of fact in any prospectus for any EFIH

13  first lien debt that you believe should not have been

14  omitted?

15      A.   There are no material omissions.

16      Q.   What about immaterial, sir?

17      A.   I don't -- I don't understand that question.

18      Q.   Are there any omissions, whether material -- are

19  there any omissions of fact, whether material or

20  immaterial, that you believe the company should have, in

21  hindsight, disclosed in any prospectus or any offering

22  memorandum for any first lien EFIH debt?

23      A.   My belief is the company is obligated to

24  disclose material -- to disclose material facts, and so I

25  don't have a view as to whether anything that was

*****CONFIDENTIAL*****

Page 61

1                    KRISTOPHER MOLDOVAN

2   immaterial should have been or should not have been in the

3   document.

4        Q.   Mr. Moldovan, we were talking a minute ago about

5   the dealer manager agreement for the 2010 EFIH 10 percent

6   notes exchange.

7             Do you recollect that?

8        A.   I do.

9        Q.   Okay.  And that was an exchange for prior issued

10  notes, right?

11       A.   That's correct.

12       Q.   So the dealer managers did not, in fact, agree

13  pursuant to that agreement to buy any notes; is that

14  right?

15       A.   That's correct.

16       Q.   Okay.  They were simply acting as agents, right?

17            MR. HOWELL:  Object to form.

18       A.   They -- I think you read that they were named

19  solicitation agents.  You also, I believe, read a section

20  that said that they weren't acting as agents.  So...

21       Q.   (BY MR. ANKER)  They weren't acting as

22  principal acquiring securities issued by EFIH in

23  connection with that issuance; were they?

24       A.   Unless they happened to own some of the

25  securities that were tendered in, which I'm not aware of,

*****CONFIDENTIAL*****

Page 62

1                   KRISTOPHER MOLDOVAN

2    no, they did not act as principal acquiring the

3    securities.

4         Q.    One other question or set of questions prior to

5    when -- not prior -- I want to move to a new topic, but

6    before doing that, during the break, did you have any

7    substantive conversations with your counsel about your

8    testimony?

9                   MR. HOWELL:    Object to form.    Object to

10   privilege.

11                  Instruct you not to answer any

12   conversations that you had with counsel.

13                  MR. ANKER:    Okay.    I will -- I'm sorry?

14                  MR. HOROWITZ:    I think he answered the

15   question.

16        Q.    (BY MR. ANKER)    It is -- it does call for a yes

17   or no question (sic).

18                  Can you answer it?

19        A.    Could you rephrase it?    Could you restate it?

20        Q.    Sure.    Did you have any substantive

21   conversations with your counsel during the break -- let me

22   rephrase it.    I actually started to ask a garbled

23   question.

24                  During the break, did you have any

25   discussions with your counsel about the testimony you have

*****CONFIDENTIAL*****

1                      KRISTOPHER MOLDOVAN

2    provided or will be providing today?

3        A.   Yes.

4              MR. ANKER:  Okay.  I will tell you, I

5    believe there's a local rule in Delaware Federal District

6    Court that directs that those conversations cannot occur,

7    and, therefore, I do not believe that is privileged

8    communication.  I'm happy to take it up with you on a

9    break.

10             MR. HOWELL:  Okay.

11             MR. ANKER:  But I would direct you to the

12   local rules.  I take it that, if I ask for the substance

13   of that communication, you're going to assert privilege.

14             MR. HOWELL:  Yes.

15             MR. ANKER:  Okay.  And direct the witness

16   not to answer, correct?

17             MR. HOWELL:  That is correct.

18             MR. ANKER:  Okay.

19       Q.   (BY MR. ANKER)  Mr. Moldovan, you're obviously

20   familiar, you've already said, with the EFIH August 2010

21   notes offering?

22       A.   I was involved in that transaction, yes.

23       Q.   And that was an exchange for notes previously

24   issued not by EFIH, but by EFH itself, right?

25       A.   I believe that's correct.

*****CONFIDENTIAL*****

Page 64

1              KRISTOPHER MOLDOVAN

2         Q.   And those notes had been issued in 2007,

3    October?

4         A.   I'd have to recollect which notes we were

5    targeting, but that I know those were among the notes

6    that --

7         Q.   Okay.

8         A.   -- that were exchanged.

9         Q.   Okay.  When did the leverage buyout for EFH

10   occur?

11        A.   October of 2007.

12        Q.   Okay.  Let me represent to you, and I will show

13   you the document, that the issuance of the notes that were

14   -- the issuance of the notes in 2007, by EFH, that were

15   then exchanged in 2010 for the EFIH first lien notes, were

16   also issued in October of 2007.

17             I -- I've reviewed the prospectus for the

18   EFH notes issued in October of 2007.  And I'll also

19   represent to you that there's -- I don't see any risk

20   factor disclosure of any kind relating to a possible

21   bankruptcy filing.

22             Do you have a different recollection of the

23   2007 prospectus or offering memorandum?

24        A.   I would need to -- I don't have a different

25   recollection.  I'd need to review it to answer

1                      KRISTOPHER MOLDOVAN

2    definitively.

3         Q.   Was the company -- by "the company" here, I mean

4    EFH and all -- any of its subsidiaries.

5                   At the time of the leverage buyout in

6    October of 2007, did the company contemplate that it might

7    someday have to file for bankruptcy?

8         A.   I don't have an answer on behalf of the company.

9         Q.   Okay.  Are you aware, based on your own

10   employment at the company and role, of any discussion or

11   contemplation of any possible bankruptcy filing dating

12   back to October of 2007?

13        A.   No.

14        Q.   Okay.  And you -- strike that.

15                   Mr. Moldovan, let me show you a document

16   marked -- bearing the Bates stamp EFIHMW00283810-12.

17                   (Exhibit 4 marked.)

18        Q.   (BY MR. ANKER)   Mr. Moldovan, this is entitled,

19   Energy Future Holdings Corp., 2-billion 10.875 senior

20   notes due 2017; 2,500,000,000 11.25 percent, 12 percent

21   senior toggle notes due 2017, right?

22        A.   Yes, that's the title.

23        Q.   Can you identify this document?

24        A.   Not -- not definitively.

25        Q.   Do you have any sense of what this document is?

*****CONFIDENTIAL*****

Page 66

1                        KRISTOPHER MOLDOVAN

2        A.   It appears to be the pricing supplement related

3   to the -- that offering.

4        Q.   Okay.  And the pricing -- this is a pricing

5   supplement that was shown to potential investors in the

6   offering?

7                  MR. HOWELL:  Object to foundation.

8        Q.   (BY MR. ANKER)  To your knowledge?

9        A.   I don't know.

10       Q.   Do you know for what purpose the document was

11  created?

12       A.   It memorialized the terms agreed between the

13  underwriters and the company.

14       Q.   Okay.  And you'll notice that on page -- and one

15  of those terms that had been agreed to was outlined on the

16  bottom of page 1 and carried over to page 2, entitled,

17  Redemption.

18                  Do see that, sir?

19       A.   I do see.

20       Q.   Okay.  And, I take it, that EFIH -- I'm sorry;

21  EFH understood that, in connection with this issuance, it

22  could redeem the notes prior to November 1, 2012, so,

23  essentially, five years after the issuance, but only if it

24  paid 100 percent of principal, plus all accrued interest,

25  plus an applicable make whole premium, right?

*****CONFIDENTIAL*****

Page 67

1                    KRISTOPHER MOLDOVAN

2              MR. HOWELL:   Object to form.

3        A.   Can you restate?

4        Q.   (BY MR. ANKER)   Sure.

5              Did -- did the company understand that, in

6   connection with this issuance, it could redeem the notes

7   prior to November 1, 2012?

8        A.   There is a paragraph that describes the one

9   situation in which they could redeem the notes prior to

10  November 1st --

11       Q.   And what was that --

12       A.   -- 2012.

13       Q.   I'm sorry; I didn't mean to talk over you.

14              What was that one situation where the

15  company could redeem the notes prior to November 1, 2012?

16       A.   Well, in this particular -- it says:   At any

17  time prior to November 1st, 2012, the issuer may redeem

18  all or a part of each series of notes upon not less than

19  30, no more 60 days' prior notice at a redemption price

20  equal to 100 percent of the principal, none of the notes

21  redeem, plus an applicable make whole premium as of an

22  accrued and unpaid interest and additional interest, if

23  any, to the date of the redemption.

24       Q.   So the company understood that the only way, in

25  connection with this issuance, it could redeem the notes

KRISTOPHER MOLDOVAN

1
2    within five years of the date of issuance was by paying
3    all the principal, all accrued interests, plus a make
4    whole premium; am I right about that?
5        A.    Well, there's an equity clawback provision that
6    would also allow for a redemption in certain circumstances
7    prior to November 1st, 2010.
8        Q.    Putting aside the equity clawback provision, the
9    company understood that the only way, in connection with
10    this issuance, it could redeem the notes within five years
11    of the date of the issuance was by paying all principal,
12    all accrued interest, plus a make whole premium; am I
13    right?
14        A.    That -- that's the way they could option --
15    exercise the right to optionally redeem the notes prior to
16    November 1st, 2012, except if it was in an equity clawback
17    situation.
18        Q.    Okay.  Why -- why did EFH highlight this
19    optional redemption provision in this three-page document?
20            MR. HOWELL:  Object to foundation.
21        A.    I don't recall.
22        Q.    (BY MR. ANKER)    Okay.  Do you recall any
23    pricing supplement for any debt issuance by any EFH
24    company that did not highlight the redemption provision of
25    the issuance?

*****CONFIDENTIAL*****

Page 69

1                        KRISTOPHER MOLDOVAN

2        A.   I don't -- I'd have to review them.

3        Q.   But you don't recall any; do you?

4        A.   I do not recall any.

5        Q.   Okay.  Now, in fact, EFH included this optional

6    redemption provision in the offering, right?

7             MR. HOWELL:  Just -- just for the record,

8    can we clarify which offering?

9             MR. ANKER:  The EFH October 2007 offering.

10       A.   I'm sorry; could you ask the question again?

11       Q.   (BY MR. ANKER)  In fact, as the document

12   indicates, EFH did include this optional redemption

13   provision in this offering, right?

14       A.   It included an optional redemption provision in

15   the indenture and in the notes that -- based on this

16   language, but did not include this exact language, yes.

17       Q.   Okay.  Why did EFH do so?

18       A.   I don't understand your question.

19       Q.   Sure.  You testified earlier that EFH and the

20   EFH series of companies sought to negotiate the best

21   possible terms for the company, right?

22             MR. HOWELL:  Object to form.

23       A.   I don't recall that I -- I thought I qualified

24   that answer that the best overall entire --

25       Q.   (BY MR. ANKER)  Right.

*****CONFIDENTIAL*****

Page 70

1                    KRISTOPHER MOLDOVAN

2         A.    -- group of terms, gives and takes, yes.

3         Q.    Okay.   And so my question is, given that -- and

4    I didn't mean to exclude your give and takes point -- why

5    did EFH include, in this offering, an optional redemption

6    provision?

7         A.    It is a right of EFIH that it negotiated for.

8         Q.    Okay.   Your -- the company understood, did it

9    not, that -- let's back up.

10               You say it was a right the company

11   negotiated for.   So, I take it, the company believed that

12   this optional redemption provision had benefit for it?

13        A.    It had optional benefit for it.

14        Q.    Okay.

15        A.    Potential -- potential benefit for it.

16        Q.    And it -- it had optional benefit for it in the

17   sense that it could potentially redeem the notes, right?

18        A.    It could elect to optionally redeem the notes

19   and pay the amount that was negotiated.

20        Q.    And that would be potentially better for the

21   company than having an absolute no-call provision, right?

22        A.    Yes.

23        Q.    Okay.   And what do you understand that absolute

24   no-call provision to be?

25        A.    A period in which there's no ability to

1                    KRISTOPHER MOLDOVAN

2    redeem -- to optionally redeem the notes.

3          Q.    Okay.  Did you have an understanding -- I'm

4    sorry; did the company have an understanding that

5    investors expected, in connection with EFIH -- EFH and

6    EFIH debt offerings, that there be some form of call

7    protection?

8          A.    Some form of call protection.

9          Q.    And one form of call protection would be an

10   absolute no-call, right?

11         A.    That would be one form.

12         Q.    And another form would be an ability to call the

13   notes, but only if the company made a make whole payment,

14   right?

15         A.    Or -- and upon an equity or a different

16   redemption price, yes, there -- there's a -- that is one

17   of the options.

18         Q.    Are you aware of any debt issuance by EFH or

19   EFIH or TCEH or any other company in the EFH family of

20   companies, from the LBO forward, that did not include some

21   form of call protection for the investors?

22         A.    Yes, some of the loans.

23         Q.    Bank loans?

24         A.    Yes.

25         Q.    Okay.  Let me rephrase my question; it was too

*****CONFIDENTIAL*****

Page 72

1                    KRISTOPHER MOLDOVAN

2    broad.

3                         With respect to notes, bonds, are you aware

4    of any debt issuance by any of the EFH companies, from the

5    time of the LBO forward, that did not include some form of

6    debt -- of call protection for the investors?

7         A.    Each of them provided options for the company to

8    redeem at various prices, is my recollection.

9         Q.    And those prices were always at a premium to

10   100 percent of the principal balance, right?

11        A.    Not always.  There's periods where it -- there

12   are periods where it drops to -- where you can optionally

13   redeem at par, but...

14        Q.    But -- you were -- do you want to complete a

15   sentence, Mr. Moldovan?

16        A.    No, I'm sorry.

17        Q.    Other than circumstances in which you could

18   redeem at par -- let's back up.

19                    The circumstances in which the issuances

20   allowed for redemption at par were very close to stated

21   maturity, right?

22        A.    Closer to -- yes, closer to stated maturity.

23        Q.    Okay.  Other than in periods closer to stated

24   maturity, every one of the debt issuances for notes by

25   EFIH, EFH, TCEH, or every other company in the EFH family

*****CONFIDENTIAL*****

1              KRISTOPHER MOLDOVAN

2    included some form of call protection for the investors;

3    am I right?

4         A.   They each included optional redemption

5    provisions that had redemption prices that were above par.

6         Q.   Okay.  You mentioned that EFH negotiated to

7    obtain an optional redemption provision, and you

8    mentioned, earlier, there's always give and take.

9              What did the company have to give in

10   exchange for having a right of optional redemption?

11        A.   I can't point to anything specific.

12        Q.   Okay.  No one ever suggested to you or suggested

13   to the company that any investors would be interested in

14   purchasing EFH or EFIH debt if there was not a make whole

15   provision or a no-call provision; did they?

16        A.   Could you --

17        Q.   Sure.

18        A.   I want to make sure I understand your question

19   specifically.

20        Q.   Did any prospective investor, any dealer

21   manager, any indenture trustee, ever indicate to the

22   company that, We don't care about call protection; did

23   anyone ever indicate that in substance?

24        A.   I think that's a difficult -- I'm trying to

25   break down your question.

*****CONFIDENTIAL*****

Page 74

KRISTOPHER MOLDOVAN

1

2        Nobody said, We don't care about it, no.

3        Q.   Okay.  You're familiar with the term, "high

4   yield debt"?

5        A.   I am.

6        Q.   It's fair to say that the EFH 2007 offering was

7   a high yield debt offering?

8        A.   That's fair.

9        Q.   It's fair to say that each of the EFIH offerings

10  that followed subsequently were high yield debt offerings?

11       A.   That's fair.

12       Q.   Did the company seek to, as part of negotiating,

13  familiarize itself with what other issuers were offering

14  by way of terms for high yield debt offerings?

15       A.   In which case?

16       Q.   In 2007, with the respect to the EFH offering.

17       A.   Yes.

18       Q.   Okay.  And as part of that, did the company

19  reach any conclusion as to whether call protection was

20  common in offerings for high yield debt in 2007?

21       A.   I'm not aware of specific conclusions the

22  company reached at that time.

23       Q.   Were you aware, Mr. Moldovan, in 2007, of any

24  issuance by any company of high yield debt, at that time,

25  that did not include some form of call protection for

*****CONFIDENTIAL*****

Page 75

1                    KRISTOPHER MOLDOVAN

2    investors?

3         A.    I'm not -- I was not aware to my recollection.

4         Q.    It's fair to say, without -- I'm not going to

5    pin you 100.0 percent.

6                It's fair to say the call protection was,

7    in 2007, with respect to high yield debt standard, right?

8         A.    It's fair to say that there are provisions for

9    optional redemption that are at prices other than par at

10   that time.

11        Q.    Okay.  And, typically, above par until you get

12   to very close to state of maturity, right?

13        A.    You used the term, "very close to state," but at

14   the -- in the -- at the time of issuance, in the early

15   stages, yes --

16        Q.    Okay.

17        A.    -- it's typical to be above par.

18        Q.    Okay.  And I asked you that question about 2007.

19   Let me run you forward.

20                From 2007 through the last EFIH issuance of

21   first lien debt, January of 2013, throughout that whole

22   period, it's fair to say that it was standard for high

23   yield debt issuances to include some form of call

24   protection for investors; am I right?

25        A.    You keep saying, "Call protection."  And I just

1                    KRISTOPHER MOLDOVAN

2     want to keep being specific.    To my knowledge, it was

3     standard for high yield offer -- offerings to include

4     optional redemption provisions that, for some period of

5     time, were above par.

6          Q.    Okay.    And that period was typically five years

7     from date of issuance for at least a make whole premium,

8     right?

9          A.    That depends on the length of the note --

10         Q.    Okay.

11         A.    -- and it depends on many factors.

12         Q.    Okay.    Now, I'm using the term, "a make whole

13     premium," and you'll see that that's also used in Exhibit

14     Number 4.

15                Do you see that on page 2, sir, right

16     before equity clawback?

17         A.    Yes, I see the words, "applicable make whole

18     premium."

19         Q.    What do you understand that term to mean?

20         A.    Well, at the time, I understood that to mean

21     applicable premium as defined in the description of notes

22     and whether or not we had a draft indenture at this -- at

23     the time of this pricing supplement.    But I took "make

24     whole premium" to mean applicable premium, as defined in

25     the description of notes, that it's already been

*****CONFIDENTIAL*****

Page 77

1                    KRISTOPHER MOLDOVAN

2    delivered.

3         Q.   What did you understand the term, "make whole"

4    to mean?

5         A.   Applicable premium.

6         Q.   Now, did EFH ever float the idea of issuing debt

7    that would be freely callable without paying a premium

8    above par for any period of time?

9         A.   I don't recall that EFH did that.

10        Q.   Did EFIH?

11        A.   Not to my recollection.

12        Q.   And I assume that EFH and EFIH didn't agree to

13   include make whole provisions in their indentures just to

14   be nice to investors, right?

15                  MR. HOWELL:   Object to form.

16        A.   If EFIH would have been able to negotiate for

17   the applicable premium to be zero, and, therefore, call it

18   at par, it would have done so.

19        Q.   (BY MR. ANKER)   Okay.  I appreciate that

20   answer.  It -- it, frankly, is going to make this go more

21   rapidly.  But let me ask a couple of follow-up questions.

22                  I take it, therefore, that the company

23   believed the only way the 2007 EFH issuance would have

24   been successful was to offer the make whole premium,

25   right?

*****CONFIDENTIAL*****

Page 78

KRISTOPHER MOLDOVAN

1

2      A.    I think that's -- that is a leap that I am not

3  willing to take.

4      Q.    So you don't have a view on that one way or the

5  other?

6      A.    I do not have a view whether there was another

7  structure that would have been successful.

8      Q.    Okay.  EFH didn't think there was anything

9  unreasonable or inappropriate about the make whole

10 provision; did it?

11                MR. HOWELL:  Object to form.

12     A.    Not that I recall.

13     Q.    (BY MR. ANKER)  Okay.  You didn't think there

14 was anything unreasonable or inappropriate about the

15 provision; did you?

16     A.    Are we talking about 2007 transaction?

17     Q.    Yeah, yeah.

18     A.    I didn't have a basis for an opinion at that

19 time.

20     Q.    Okay.  Let's go to the 2010 EFIH offering.

21     A.    Okay.

22     Q.    Did you have a view then as to whether there was

23 anything unreasonable or inappropriate about the make

24 whole provision?

25     A.    I did not view the optional redemption

1                    KRISTOPHER MOLDOVAN

2    provision, which included applicable premium, to be

3    unreasonable, no.

4         Q.   Okay.  What was -- and, look, I'm going to ask

5    you this question about -- without putting a date.  If you

6    need me to break it down to 2007 versus 2010, let me know.

7              What was the company's understanding as to

8    why -- did the company -- let me start with a predicate

9    question.

10             Did the company have an understanding that

11   investors in these notes expected there to be a make whole

12   provision if the company was going to have a right of

13   redemption?

14        A.   I don't know.

15        Q.   Did you have an expectation?

16        A.   I didn't -- in 2007, I did not have any

17   expectation.

18        Q.   Okay.  By 2010, with respect to EFIH's

19   offerings, did you have an expectation -- or an

20   understanding, rather, as to whether investors expected

21   there to be a make whole provision if the company was to

22   have the right to redeem?

23        A.   I believe that we -- the -- the investors were

24   expecting us to structure it in the same way that we had

25   structured our previous offerings such that there was a

*****CONFIDENTIAL*****

Page 80

1                    KRISTOPHER MOLDOVAN

2    make whole premium in the initial stages of an optional

3    redemption.

4        Q.    Okay.  Did you -- did the company ever seek to

5    determine who the investors were in its notes?

6        A.    When you say, "Seek to determine" --

7        Q.    Did the company ever take any steps to learn who

8    was buying its notes?

9        A.    Yes.

10        Q.    What did it do?

11        A.    At what -- at the time of issuance, are you --

12        Q.    Yes.

13        A.    -- referring to?

14        Q.    At issuance or any other time.

15        A.    I don't recall what it did in 2007.  And in

16    2010, the issuance of the 10 percent notes was done by an

17    exchange with its existing issuers.  And the -- the 2012

18    10 percent was an exchange.  So I don't know that it was

19    applicable to the 10 percents that -- it did take steps to

20    ascertain who was exchanging and got reports.  The 2007, I

21    don't know whether it --

22        Q.    Did the company understand that, from time to

23    time, holders of its notes included pension funds --

24    pension plans; excuse me?

25        A.    I don't -- I don't know.

*****CONFIDENTIAL*****

1                        KRISTOPHER MOLDOVAN

2        Q.    Did it know that -- did it understand that the

3    holder of its notes included insurance companies?

4        A.    I don't know.

5        Q.    Did it understand that any potential investors

6    in its notes had obligations going forward like an

7    insurance company or pension plan might have, and needed

8    to match income coming in against future liabilities that

9    it had going out?

10                   MR. HOWELL:  Object to form.

11       A.    I'm not aware that it ever had that knowledge.

12       Q.    (BY MR. ANKER)   Okay.  If a note were freely

13   callable, without requiring the issuer to pay a make whole

14   or other premium, then if interest rates declined or the

15   issuer's credit improved, the issuer could simply

16   refinance, and the investor would lose its yield, right?

17                   MR. HOWELL:   Object to the form.

18       A.    I'm sorry; could you repeat?

19       Q.    (BY MR. ANKER)   Sure.

20                   I understand these are not the way the

21   notes were structured at EFH and EFIH, but am I right

22   that, if a note were freely callable by the company

23   without requiring the issuer to pay a make whole or other

24   premium, then, if interest rates declined or the issuer's

25   credit improved such that it could refinance at lower

*****CONFIDENTIAL*****

Page 82

KRISTOPHER MOLDOVAN

2    rates, then the company could simply refinance, and the

3    investor would lose its yield, right?

4        A.   I think that's oversimplification.   If interest

5    rates decline, then the company market conditions might

6    dictate the company's situation, might dictate whether it

7    could refinance.   If the company's credit improved, again,

8    interest rates -- again, those are -- there are a lot of

9    variables into when and how a company refinances its debt,

10   including its loans in which they are typically freely

11   callable.

12       Q.   Let me try to come at this in a different way.

13            What did you understand to be the reason

14   why investors expected that the terms of these offerings

15   include a make whole premium if EFH or EFIH were to redeem

16   the notes within some period after issuance?

17       A.   My understanding is that if the company, EFIH,

18   intended to optionally utilize the optional redemption

19   provisions to refinance them, their expectation was to

20   receive the prices that were in the document.

21       Q.   And did you have an understanding of why they

22   have that expectation; why, economically, did they care?

23       A.   So that they could avoid -- in the case that the

24   market conditions and the interest rates and all those

25   things came together, that the company could optionally

*****CONFIDENTIAL*****

Page 83

1                    KRISTOPHER MOLDOVAN

2    redeem and reduce their yield.

3        Q.    Okay.   What do you mean by the term, "yield"?

4        A.    Return on their investment.

5        Q.    Now, let's go back to Exhibit Number 4

6    Mr. Moldovan.   I will do my best not to butcher your name;

7    I apologize again in advance.

8                I don't see anything on that pricing

9    supplement that says that -- in substance, that if EFH

10   goes into bankruptcy, it may be able to refinance the

11   notes without paying the optional redemption premium.

12               Did I miss it?

13       A.    Well, I would say -- let me read the small

14   print.

15       Q.    Sure.

16       A.    (Witness reviews document.)

17               So there it says:   The information in this

18   term sheet supplements the issue as preliminary offering

19   memorandum as supplemented by the supplements to the

20   preliminary offering memorandum dated October 23rd, 2007,

21   and October --

22               THE REPORTER:   Please read slower.

23               THE WITNESS:   Okay.

24       A.    And October 24th, 2007, defines that to be the

25   preliminary offering memorandum, and supercedes it -- the

*****CONFIDENTIAL*****

Page 84

KRISTOPHER MOLDOVAN

1

2  information in the premium offering memorandum to the

3  extent inconsistent as so supplemented.

4              And then skipping ahead, it says:  This

5  term sheet is qualified in its entirety by reference to

6  the preliminary offering memorandum.

7              And then goes on to state where they could

8  get the preliminary offering memorandum.

9              So my view is this is right in conjunction

10  with that preliminary offering memorandum, and that

11  information is already included in the preliminary

12  offering memorandum.

13      Q.   (BY MR. ANKER)   The language you just

14  referenced is on page -- the last page of the document,

15  page 3, bearing the last three digits for the Bates stamp

16  812?

17      A.   That's correct.

18      Q.   Okay.  Let me ask my question again.

19              Other than referencing incorporating some

20  other document, you would agree with me, would you not,

21  Mr. Moldovan, that Exhibit Number 4 doesn't state, on its

22  face, that, in the event of a bankruptcy filing, the

23  company will be able to refinance the notes without paying

24  the make whole premium, right?

25      A.   Yes, but that's because Exhibit 4 is intended to

1                   KRISTOPHER MOLDOVAN

2   fill in the blanks of the preliminary offering memorandum,

3   and nothing further.

4       Q.   Let's turn, if we could, to the indenture for

5   this offering.

6                (Exhibit 5 marked.)

7       Q.   (BY MR. ANKER)   Mr. Moldovan, I'm going to hand

8   you what's been marked as Exhibit 5, exhibit which bears

9   the Bates stamps EFIHMW00254420 to 581.  And, again, it's

10  a very lengthy document, and I'm not going to ask you

11  about all of it.

12               But can you identify it?

13      A.   (Witness reviews document.)

14               This appears, without having flipped

15  through it, to be the executed version of the indenture

16  for the EFH senior notes due 2017 and the EFH senior

17  toggle notes due 2017, which were issued in October of

18  2007.

19      Q.   And that indenture contains the optional

20  redemption premium provision that had been described in

21  the pricing supplement; am I right?

22      A.   Yes.

23      Q.   And what section was that in, sir?

24      A.   It should be 3 point --

25      Q.   I believe it's 3.07.  I don't mean to give you a

*****CONFIDENTIAL*****

Page 86

KRISTOPHER MOLDOVAN

1  memory test.  Take a look at 3.07, which is on page 63.

2            Am I right that that's the optional

3  redemption provision?

4       A.   That is the optional redemption provision,

5  Section 3.07, yes.

6       Q.   Okay.  And there's both a -- you'll see there's

7  a 3.07(a) and a 3.07B, right?

8       A.   And a C and a D and E, yes.

9       Q.   And A is the make whole provision providing that

10  the company, if it wants to redeem the notes, the senior

11  cash pay notes, prior to November 1, 2012, must pay 100

12  percent of principal, plus accrued interest, plus the

13  applicable premium, right?

14       A.   That's a correct reading of the words, yes.

15       Q.   And that's what the company understood the

16  provision to mean, right?

17       A.   That if there was an optional redemption

18  provision of those cash pay notes, you have to pay that,

19  yes.

20       Q.   Okay.  And, similarly, there was a identical

21  optional redemption provision in 3.07B for the senior

22  toggle notes, right?

23       A.   Other than referring to senior toggle notes

24  and -- I mean, if you want me to say that it's identical,

*****CONFIDENTIAL*****

Page 87

1                    KRISTOPHER MOLDOVAN

2    I'd have to compare it word-for-word, if you want me to do

3    that, but...

4         Q.   You believe, in substance, they were identical,

5    right?

6         A.   In substance, they were identical.

7         Q.   And, in both instances, to redeem the notes

8    prior to November 1, 2012, in addition to paying principal

9    and interest, the company had to pay something called the

10   applicable premium, right?

11        A.   To optionally redeem them prior to

12   November 1st, 2012, yes, there was a requirement to pay a

13   defined term applicable premium.

14        Q.   And that defined term was defined in the

15   indenture, right?

16        A.   That's correct.

17        Q.   And it was defined -- and -- and, again, I'm not

18   trying to vary the words of the document.

19             But it was defined, in essence, to be the

20   future interest payments discounted back to present value

21   at a discount rate of treasury -- reflecting the treasury

22   rate, plus 50 basis points, right?

23             MR. HOWELL:  Object to form.

24        A.   Well, there's more to that than -- the

25   discounting of the interest is only one of the parts of

*****CONFIDENTIAL*****

Page 88

KRISTOPHER MOLDOVAN

1

2  that definition, but that is --

3       Q.   (BY MR. ANKER)   Okay.  Did the company

4  understand that that applicable premium provision, the way

5  applicable premium is defined, was standard or market, at

6  the time, for high yield offerings?

7       A.   I don't know.

8       Q.   Okay.  Did you have an understanding, at the

9  time, whether that definition of applicable premium was

10  standard or market?

11       A.   I did not.

12       Q.   Did you, in 2000 -- like 2010, with respect to

13  the EFIH offerings, obtain an understanding of whether the

14  definition of applicable premium in the EFIH indentures

15  was standard or market?

16            MR. HOWELL:  You mean the EFIH 10 percent

17  indenture?

18            MR. ANKER:  Yes.

19       A.   I don't recall.

20       Q.   (BY MR. ANKER)   Do you recall any discussion

21  or -- by any one at the company, at any time, that -- let

22  me back up.

23            This definition of applicable premium

24  remained essentially the same in the EFIH issuances,

25  right?

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2              MR. HOWELL:  Object to form.

3         A.   I -- I would need to compare them.

4         Q.   (BY MR. ANKER)  Okay.  Without comparing them,

5    did you ever hear any discussion, any suggestion by anyone

6    at the company that the definition of applicable premium

7    in any indenture for any issuance by EFH, EFIH, TCEH or

8    any other company within the EFH family of companies was

9    not standard or market?

10        A.   I don't recall any conversation like that taking

11   place, no.

12        Q.   No one ever said to you, We're paying more for

13   an optional redemption than other issuers are, right?

14        A.   Not to my recollection.

15        Q.   No one ever said to you, We're giving the

16   investors a freebie, something they don't expect and way

17   more than market, right?

18        A.   Nobody said that to me, no.

19        Q.   You smiled; why did you smile, Mr. Moldovan?

20        A.   That's a very specific quote.  You're asking me

21   if somebody --

22        Q.   In substance, without giving the exact words,

23   did anyone at the company ever suggest, in any

24   conversation you're aware of, that the company was

25   overpaying, was offering terms on the make whole that were

1                    KRISTOPHER MOLDOVAN

2    greater than what the market expected and other issuers of

3    high yield debt were offering?

4        A.    I do not recall.

5        Q.    Okay.  You don't recall there ever being such a

6    suggestion, right, sir?

7        A.    That's correct.

8        Q.    Okay.  Now, let's turn back to Section 3.07.

9    And why don't we focus on 3.07(a), although I think 3.07B

10   is substantively the same.

11                    As I read this, Mr. --

12                    MR. HOWELL:  Just a second, please.

13       Q.    (BY MR. ANKER)    Page 63, Mr. Moldovan.

14       A.    Okay.

15       Q.    Are you there?

16       A.    Yes.

17       Q.    Okay.  Let's focus on A.  As I read it,

18   there are two requirements to trigger the company's

19   obligation to pay the applicable premium.  One is there

20   has to be a redemption, and, two, it has to be prior to

21   November 1, 2012; am I right?

22                    MR. HOWELL:  I'll object to the form.

23                    Are you asking for his understanding?

24                    MR. ANKER:  Yes, throughout this, I will --

25   I will fail to use that term, but I'm always asking for

*****CONFIDENTIAL*****

Page 91

KRISTOPHER MOLDOVAN

1

2   his understanding and the company's understanding.

3       A.   I'm sorry; I'm just reading this section,

4   rereading it.

5               There -- it is -- the time period covered

6   by this section is prior to November 1st, 2012.  And it is

7   in connection with a redemption.  And I would say that

8   "may redeem" means an optional redemption by the company.

9       Q.   (BY MR. ANKER)   Okay.   So if there is an

10  optional redemption by the company that occurs before

11  November 1, 2012, it was the company's understanding,

12  under the EFH 2007 indenture, that it would have to pay

13  the make whole specified in Section 3.07; am I right?

14      A.   It's the company's understanding that it would

15  have to pay the applicable premium if it optionally

16  redeemed before November 1st, 2012.  I don't see the word,

17  "make whole," in there, other than the title, but --

18      Q.   Okay.

19      A.   -- it uses the defined term, "applicable

20  premium."

21      Q.   I'm happy to use the term, "applicable premium,"

22  if that's more convenient for you; and I will use that

23  term from now on.  Understand that every time I use "make

24  whole," if I -- if I erroneously or, by error, use it,

25  because I want to use your terminology, I mean the

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2    applicable premium, okay?

3         A.    Sure.

4         Q.    The indenture didn't define the term, "redeem"

5    or "redemption"; did it?

6         A.    Not to my knowledge, no.

7         Q.    Okay.  But did you have an understanding of what

8    an optional redemption was?

9         A.    Yes.

10        Q.    And did the company have an understanding of

11   what an optional redemption was?

12        A.    Yes.

13        Q.    And, again, if that understanding changed from

14   2007 to 2012, or 2013, please let me know.

15                    What was the company's understanding of

16   what the term, "redeem," meant or "redemption" meant

17   within the meaning of Section 3.07 of this indenture and

18   the EFIH indentures?

19        A.    I don't know that the company came up with a

20   synonym or definition.  It -- it means redemption or

21   redeem.

22        Q.    What -- can you help me understand what the

23   term, "redeem," was understood to mean by the company?

24        A.    So to give you a synonym or -- I -- I'm confused

25   as to what you're asking.

*****CONFIDENTIAL*****

KRISTOPHER MOLDOVAN

1

2    Q.   Did you understand that a refinancing by the
3  company of the notes would constitute a redemption?

4    A.   I understand this provision to apply if we
5  optionally -- I won't use redeem -- but optionally
6  purchased -- bought back the notes.

7    Q.   Okay.  And you could purchase them by
8  refinancing or, in theory, you could have $2-billion in
9  cash sitting in your treasury, and simply use the cash on
10  hand, right?

11              MR. HOWELL:  Object to form.

12    A.   What do you mean by "refinancing them"?

13    Q.   (BY MR. ANKER)  Going to the market and
14  borrowing new money at a lower interest rate to take out
15  these notes?

16    A.   In either case, you have cash.  Cash is
17  fungible, so I deem this to be -- to utilize cash to buy
18  back to redeem these notes.

19    Q.   Okay.  So let me pose a hypothetical to you, and
20  let's focus on this 2007 indenture.  Imagine that two
21  years later -- this was issued on October 31, 2007 --
22  October 31, 2009, interest rates had declined, EFH was
23  able to borrow cash at a lower interest rate sufficient to
24  pay off these notes, and it did so at its option.

25              That would have triggered the requirement

*****CONFIDENTIAL*****

Page 94

1                    KRISTOPHER MOLDOVAN

2    for EFH to pay the applicable premium to your and the

3    company's understanding, right?

4         A.    There are a number of situations in which the

5    company may have elected to redeem the notes under Section

6    3.07(a), and if it had followed that section, and agreed

7    to redeem the notes, it would have owed the applicable

8    premium.

9         Q.    And one of those situations would have been if

10   the company went to the market and borrowed new money for

11   the purpose -- at a lower interest rate for the purpose of

12   redeeming these notes, right?

13        A.    That could have been one of the ways the company

14   could have financed --

15        Q.    Okay.

16        A.    -- the payment.

17        Q.    Okay.  Can I direct you to Article 9 of this

18   indenture, Mr. Moldovan?  I think it starts on page 108;

19   bearing the last three digits of the Bates stamp 532.

20                   Are you there, sir?

21        A.    I am.

22        Q.    This is a section entitled, Amendment,

23   Supplement, and Waiver.

24                   Can you generally describe what the company

25   understood Article 9 to concern?

*****CONFIDENTIAL*****

1                     KRISTOPHER MOLDOVAN

2         A.    These are the provisions in which, if the

3    company wanted to amend, supplement, or seek a waiver,

4    that it would have to comply with.

5         Q.    Okay.   And you'll notice that Section 901 is

6    entitled, Without Consent of Holders of Senior Notes,

7    right?

8         A.    Correct.

9         Q.    And these are provisions that the issuer and the

10   trustee, even without the consent of any noteholder, can

11   agree to amend, right?

12        A.    That's correct.

13        Q.    And they're pretty much ministerial things or

14   changes that clearly benefit the holders, right?

15                    MR. HOWELL:   Object to form.

16        A.    I'd have to go down through each one, but...

17        Q.    (BY MR. ANKER)   Well, they don't include things

18   like reduce the interest rate payable to the noteholders,

19   right?

20        A.    That is -- that is not on the list, no.

21        Q.    The list includes things like, for example,

22   to -- look at six in the hole -- add covenants for the

23   benefit of holders or surrender any right or power

24   conferred upon the issuers.

25                    So that's a change that benefits the

*****CONFIDENTIAL*****

Page 96

1                    KRISTOPHER MOLDOVAN

2    holders, right?

3        A.    Correct.

4        Q.    Okay.   So without the consent of the holders,

5    the changes that can be made are changes that are

6    beneficial to the holders or otherwise not material,

7    right?

8              MR. HOWELL:   Object to form.

9        A.    I -- that is not true in all cases.   For

10   instance, I'll direct to number 11 in the hole that says:

11   To conform the text of the indenture, guarantees, or the

12   senior notes to any provision of the description of notes

13   section of the offering memorandum, to the extent such

14   provision was intended to be a verbatim recitation -- and

15   it goes on.

16              That could or may or may not be for the

17   benefit of the holders.

18        Q.   (BY MR. ANKER)   Okay.   Any other -- strike

19   that.

20              Let's turn to Section 9.02.   That allowed

21   for modifications with the consent of the holders, right?

22              MR. HOWELL:   Bless you.

23        A.    Correct.

24        Q.   (BY MR. ANKER)   And it allows certain

25   modifications to be made with the consent of 51 or a

*****CONFIDENTIAL*****

Page 97

1              KRISTOPHER MOLDOVAN

2    majority in dollar amount of the notes, right?

3         A.   Could you --

4         Q.   Sure.  It allows for certain changes with the

5    consent of a majority in dollar amount of the holders,

6    right?

7         A.   I just would need to read it to make sure that

8    it was 50 percent, but...

9         Q.   Take a look, Mr. Moldovan, in Section 9.02, the

10   very first sentence.

11              Except as provided below in this Section

12   9.02, the issuer, the guarantors, and the trustee may

13   amend or supplement this indenture, the senior notes, and

14   the guarantees with the consent of the holders of at least

15   a majority in aggregate principal amount of the senior

16   notes then outstanding voting as a single class.

17        A.   Thank you.

18        Q.   Do you see that?

19        A.   Thank you for directing me to the language.

20   Yes.

21        Q.   So I am right that this provision of the

22   indenture allows for certain terms to be amended with the

23   vote of a majority in dollar amount of the holders of the

24   notes?

25        A.   The principal amount, yes.

*****CONFIDENTIAL*****

Page 98

KRISTOPHER MOLDOVAN

1

2      Q.   Okay.  But then there is a third category, is

3   there not, of changes that can't occur, like in Section

4   9.01, just with the consent of the trustee or even with a

5   majority of the holders, but, instead, require the vote of

6   every single holder affected by the change, right?

7      A.   That's correct.

8      Q.   Okay.  And those are specified on page 110 and

9   111, right?

10     A.   Yes, that's correct.

11     Q.   And those are fairly stated, the most material

12   terms to the investors, right?

13             MR. HOWELL:  Object to form.

14     A.   Those are the provisions that we need their

15   consent to amend.

16     Q.   (BY MR. ANKER)  Okay.  Did you have an

17   understanding as to why these provisions couldn't be

18   amended over the objection of any particular holder?

19     A.   That the holders -- they affect each individual

20   holder, so, to that extent, they wanted -- we provided for

21   consent rights on -- for them.

22     Q.   Okay.  And they include things like, you can't

23   reduce or change the -- reduce the rate of interest,

24   right?

25     A.   Reduce the rate or change the time of payment of

*****CONFIDENTIAL*****

Page 99

KRISTOPHER MOLDOVAN

1

2    interest, yes.

3         Q.    Right.    You can't reduce the principal amount of

4    the senior notes, right?    That's one in the hole.

5    That's --

6         A.    That's correct.

7         Q.    I don't want to talk over you.

8              That's one of the things that can't occur.

9    Those were significant -- without the vote of each

10   affected holder.    Those are significant things to holders.

11             Reducing the principal balance, reducing

12   the interest rate; those are potentially material to

13   investors, right?

14             MR. HOWELL:    Object to foundation.

15        Q.    (BY MR. ANKER)    Can you answer that,

16   Mr. Moldovan?    What's your understanding?

17        A.    My understanding is that those would be viewed

18   as material to the holders.

19        Q.    Okay.    And another one of the changes that can't

20   be made without the vote of every single holder is to

21   waive the provisions with respect to the redemption of the

22   notes, right?

23             Take a look at two in the hole on page 110.

24        A.    (Witness reviews document.)

25             Other than certain sections, that's

*****CONFIDENTIAL*****

Page 100

KRISTOPHER MOLDOVAN

1

2    correct.

3         Q.   Okay.  And those other sections, Sections 3.09,

4    Section 4.10 and 4.14, all concern not voluntary

5    refinancings or redemptions by the company, but, rather,

6    situations where noteholders elect, on their own, to

7    tender their notes, right?

8         A.   I would need to --

9         Q.   Okay.  Let's spend a minute to go over that.

10         A.   Okay.

11         Q.   Let -- let's -- let's set the predicate,

12    Mr. Moldovan.

13                   You agree that, under this indenture, the

14    company cannot, quote, alter or waive the provisions with

15    respect to the redemption of such senior notes, parens,

16    other than provisions relating to Section 3.09, Section

17    4.10, and Section 4.14 hereof, right?

18         A.   You accurately read that clause.

19         Q.   Okay.  Let's look at what 3.09 was.  That's on

20    page 64.

21                   That describes a situation, does it not,

22    Mr. Moldovan, in which the company engages in an asset

23    sale?  It brings in cash, and it then has to make an offer

24    to the noteholders, who then have the right, but not the

25    obligation, to tender their notes, right?

*****CONFIDENTIAL*****

Page 101

1                    KRISTOPHER MOLDOVAN

2          A.    Yes, that's my understanding.

3          Q.    Okay.  Now, turn to page 83.  That's Section

4    4.10, which is the asset sales that are -- trigger Section

5    3.09, right?

6          A.    That's correct.

7          Q.    Okay.  And now the third section was -- turn to

8    page 86.

9                Are you with me?

10         A.    Yes.

11         Q.    I'm sorry; I turned you to the wrong section.

12   Look at page 89, Section 4.14.

13               Are you there?

14         A.    Yes.

15         Q.    Okay.  Section 4.14 involves a situation where

16   there's a change in control of the company; EFH is no

17   longer owned by Goldman and TPG and KKR.

18               And, in that circumstance, again, it --

19   noteholders need to be given the right, the option, to

20   tender their notes, right?

21               MR. HOWELL:  Object to form.

22         A.    Without agreeing to your characterization of

23   what a change of control is --

24         Q.    (BY MR. ANKER)  Okay.

25         A.    -- yes, it's referring to an optional.

*****CONFIDENTIAL*****

Page 102

1                    KRISTOPHER MOLDOVAN

2          Q.    Optional by the -- by the holder; not optional

3    by the company, right?

4          A.    That's correct.

5          Q.    Okay.  So none of Sections 3.09, 4.10, or 4.14

6    involves a situation where the company gets to call the

7    notes over the objection of the holders, right?

8          A.    That's correct.

9          Q.    So this indenture provided that, with respect to

10   every circumstance in which the company gets to call the

11   notes over the objection of the issuers, at the company's

12   option, note change could be made to the optional

13   redemption provision without the consent of each and every

14   holder of the notes, right?

15         A.    With respect to redemptions, that's correct.

16         Q.    Okay.  And there is no other provision in this

17   indenture.  You said, "With respect to redemptions."  I'm

18   going to ask you this question about the 2007, but I -- I

19   don't want to then take you through it in 2010 and 2014,

20   '13.  So if you think the indentures may differ, let me

21   know, and we'll spend the time.

22               The single provision, the only provision in

23   any of these indentures that ever allows the company, over

24   the objection of the holder, to call the notes before the

25   state of maturity, is the make whole provision or an

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2    equity clawback provision, if there is one, right?

3         A.    Are there provisions in the option -- for the

4    company -- and I'll use the word, "option," -- for the

5    company to exercise its option to redeem the notes?

6    That's correct.

7         Q.    I'm not sure your answer was responsive to my

8    question.

9         A.    Okay.

10         Q.    And I don't mean to be critical at all.  So let

11    me be clear, because this is an important question.

12                    Can you point me to any provision, other

13    than Section 3.07 of this indenture, that allowed the

14    company to -- to call the notes away from the investors,

15    the holders, prior to stated maturity?

16         A.    Not to call -- or not to exercise a right to

17    optionally call the notes, no.

18         Q.    Okay.  The only kind of redemption provided for

19    in this indenture is an optional redemption, right?

20         A.    That's my recollection.

21         Q.    There's no mandatory redemption, right?

22         A.    There's no mandatory redemption.  There's

23    provisions, as you just pointed out, that require the

24    company to make an offer that may or may not be accepted.

25         Q.    Okay.  Now, in drafting this indenture --

*****CONFIDENTIAL*****

Page 104

KRISTOPHER MOLDOVAN

1

2      A.   Can I -- and, again I'm using the word,

3   "redemption," there.  So I -- I don't recall what my

4   answer was, but, no, there's no mandatory redemption

5   provisions.

6      Q.   You used the term, "redemption."

7      A.   Okay.  Thank you.

8      Q.   EFH and the dealer managers -- I'll use the

9   term, "dealer managers," rather than dealer

10   managers/solicitation agents just to short end.

11          But you know what I'm talking about, right?

12      A.   Depending on the 2010 transaction, yes.

13      Q.   Okay.  Let's talk about the 2007.  EFH used, as

14   a model for this indenture -- let's back up.

15          This was an original issuance, the 2007

16   transaction, not an exchange, right?

17      A.   That's correct.

18      Q.   Okay.  And so there were purchasers, rather than

19   dealer managers; there were underwriters in effect, right?

20      A.   Initial purchasers, yes.

21      Q.   Who acted like underwriters, right?

22      A.   Correct.

23      Q.   Okay.  And they used, as a model for this

24   indenture -- this was -- let's back up.

25          This was the first indenture following the

                        KRISTOPHER MOLDOVAN

1  LBO, right?

2       A.   This for EFH?

3       Q.   Yes.

4       A.   It was done at the same time as TCEH, so, yes.

5       Q.   And the EFH and the underwriters used, as a

6  model for this indenture, an indenture for -- of a debt

7  issuance by a different company, right, First Data?

8       A.   That's my understanding, yes.

9       Q.   Okay.  And the First Data indenture included a

10 similar -- I keep calling it a make whole -- applicable

11 premium provision, right?

12      A.   I don't recall.

13      Q.   Okay.  Can we go to Tab -- let me get 13 and 14.

14             (Exhibit 6 marked.)

15             MR. HOWELL:  Phil, when you come to a spot

16 that's good for a break, I'd like a quick bathroom break.

17             MR. ANKER:  Why don't we take it right now?

18 I could use one, as well.

19             THE VIDEOGRAPHER:  We are now off the

20 record.  The time is 11:40 a.m.

21             (Recess in the proceedings from 11:40 to

22             11:52 a.m.)

23             THE VIDEOGRAPHER:  We are now back on the

24 record.  The time is 11:52 a.m.

1                    KRISTOPHER MOLDOVAN

2          Q.    (BY MR. ANKER)    Mr. Moldovan, when we broke, I

3    was asking you whether -- I was asking you about the

4    indenture that was used as a model for the 2007 EFH

5    offering, and I think you confirmed that it was a

6    indenture for an offering by a company by the name of

7    First Data, right?

8          A.    That's my understanding, yes.

9          Q.    Let me show you -- and I'm going to show you two

10   exhibits together.   The first is a one-page e-mail bearing

11   Bates stamp EFIHMW00293115.   The second is a multi-page

12   document bearing the Bates stamps EFIHMW00303415 to 598

13   inclusive.   The latter is Exhibit 7.   The former is

14   Exhibit 6.

15                    (Exhibit 7 marked.)

16         Q.    (BY MR. ANKER)    Mr. Moldovan --

17                    MR. HOWELL:   I'm sorry; just for

18   clarification, which is 6?

19                    MR. ANKER:   The -- the e-mail is 6.

20                    MR. HOWELL:   Thank you.

21         Q.    (BY MR. ANKER)    Mr. Moldovan, can you identify

22   these documents?

23         A.    Exhibit 6 appears to be an e-mail from somebody

24   at Sherman & Sterling, who were underwriters or initial

25   purchaser counsel at the time, to Ed Tolley, Kirsten

*****CONFIDENTIAL*****

Page 107

1                    KRISTOPHER MOLDOVAN

2    Davis, and Max Kirchner, and the cc to a bunch of people.

3                    It says:  Attached for your review, please

4    find initial drafts of the TXU Corp. and TCEH indentures

5    together with black lines against the First Data

6    precedent.  Best regards.

7                    And then Exhibit 7 appears to be the

8    attachment, which appears, on its face, to be a red

9    line of a draft -- Sherman Sterling draft, dated

10   October 25th, 2007, of the EFH indenture against the First

11   Data indenture.

12      Q.   Let's go to the e-mail one second.  You

13   mentioned that it was addressed to Mr. Tolley, Ms. Davis,

14   and Mr. Kirchner.

15                    Those are all lawyers or were, at the time,

16   at Simpson, Thatcher & Bartlett, counsel for EFH, right?

17      A.   At this time, I believe it was -- you know,

18   October 8th was before the merger.  They were counsel to

19   the sponsors, and had not become counsel to EFH on -- on

20   that date.

21      Q.   But even though they -- even though the LBO had

22   not yet closed as of October 8th, and even though they

23   were counsel for the sponsors with respect to this

24   issuance, they acted as counsel for the company, for EFH,

25   right?

*****CONFIDENTIAL*****

Page 108

KRISTOPHER MOLDOVAN

1

2      A.    Yes, I believe that they would have acted as

3  counsel for the benefit of the sponsors' investment, which

4  was the company.

5      Q.    Okay.  If I could direct you now to the second

6  document, Exhibit 7, and if I could ask you to turn to --

7  I'm going to have to give you Bates numbers.  The last

8  four digits are 494 at Section 3.07.

9      A.    Okay.

10     Q.    And the red lining here, Mr. Moldovan, is

11  perhaps a little more extensive than it is, because the --

12  I think you'll see that the prior precedent only had one

13  issuance of notes.  So you didn't have both the senior

14  cash pay notes and senior toggle.

15                But if you can look through it, it seems to

16  me -- and I just want to confirm that you have the same

17  understanding -- that the requirement, if there is a

18  redemption before a date certain, that the company pay 100

19  percent of the principal, plus all accrued interest, plus

20  applicable premium existed in the First Data precedent.

21     A.    Yes.  The First Data precedent said redemption

22  price equal to 100 percent of the principal amount of the

23  notes redeemed and accrued in unpaid interest and

24  additional interest, if any, to the date of redemption.

25                I do not see -- I'm sorry; I -- I do not

1                  KRISTOPHER MOLDOVAN

2    see where applicable premium was used in the First Data.

3         Q.    Take -- take a look at, in the black line,

4    Exhibit 7, 3.07B, as in boy, the second paragraph, where

5    the words, "make whole redemption" are crossed out.

6                 Do you see that, sir.

7         A.    Yes.

8         Q.    And now go down one, two, three, four, five

9    lines.

10                Do you see the words -- the first word on

11   that line is:  Of the senior toggle notes redeemed.  And

12   then it says:  Plus the applicable premium --

13        A.    It does.

14        Q.    -- as of an accrued and unpaid interest and

15   additional interest, if any, to the redemption date,

16   right?

17        A.    It does.

18        Q.    So the First Data precedent provided, as well,

19   for payment of a make whole premium that was calculated or

20   was phrased in terms of an applicable premium, right?

21        A.    Correct.

22        Q.    Okay.  And if you turn to the definition of

23   applicable premium, which is on Bates stamp 426, while,

24   again, there was some changes, because there's two

25   different types of notes now being issued by EFH, the

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2    First Data precedent also provided for an applicable

3    premium that was the future interest payments discounted

4    at a treasury rate as of the redemption date, plus 50

5    basis points, just like the EFH indenture, right?

6                    MR. HOWELL:  Object to form.

7         A.   I'm sorry; could you ---

8         Q.   (BY MR. ANKER)   Sure.

9                    The definition of applicable premium in the

10   First Data indenture also defined applicable premium as

11   the future interest payments discounted back to present

12   value at a treasury -- using a discount rate equal to the

13   treasury rate, plus 50 basis points?

14                   MR. HOWELL:  Object to form.

15        A.   It's a very long definition.  Included in there,

16   among other provisions, it says:  Required interest

17   payments due on such note through September 30th, 2011,

18   computed using the discount rates of treasury, plus 50.

19                   That is a piece of it, yes.

20        Q.   (BY MR. ANKER)   Okay.  And the treasury, plus

21   50 piece was simply picked up by EFH for its indenture,

22   right?

23        A.   They are the same.  I don't know -- I'm not

24   prepared to say that the EFH relied on this to come up

25   with that amount --

*****CONFIDENTIAL*****

Page 111

1                    KRISTOPHER MOLDOVAN

2        Q.    Okay.

3        A.    -- in that formulation.

4        Q.    But they are the same; are they not?

5        A.    They both say treasury rate, plus 50 basis

6    points.

7        Q.    Yeah.    Now, did EFH, at the time it entered into

8    this indenture in August of 2000 -- I'm sorry; in October

9    of 2007, have any discussions with First Data about its

10   understanding of the optional redemption provision,

11   Section 3.07?

12       A.    I am not personally aware of any discussions

13   with anybody that was employed by First Data Corporation.

14       Q.    Okay.    I think you're telling me the same thing,

15   and I don't mean to suggest you're being particular in

16   your language, but let me just make a clear record.

17             You used the term "employed by First Data."

18             Are you personally aware of any discussions

19   that EFH or its outside counsel or anyone else had with

20   First Data's counsel to determine what First Data's

21   understanding of Section 3.07 was?

22       A.    I am not aware of who First Data's counsel is,

23   so I can't answer that question.

24       Q.    Did EFH or its counsel have any discussion with

25   any investor in the First Data notes as to what their

*****CONFIDENTIAL*****

Page 112

KRISTOPHER MOLDOVAN

understanding of the optional redemption provision was in
the First Data indenture?

    A.    I am personally not aware of any such
discussion.

    Q.    Did anyone from EFH or its counsel have any
discussion with the indenture trustee for the First Data
issuance as to what its understanding was of Section 3.07
of the First Data indenture?

    A.    I'm not personally aware of any such
conversation.

    Q.    I take it, therefore, to your knowledge, no one
at the company, no one at EFH or representing EFH, took
any steps to ascertain whether the parties to the First
Data indenture had any belief that, in the event of
bankruptcy, First Data could refinance the EFH -- the
First Data notes without paying the make whole, right?

                MR. HOWELL:  Object to form.

    A.    I'm sorry; could you --

    Q.    (BY MR. ANKER)   Sure.

    A.    -- rephrase --

    Q.    Sure.

    A.    -- or re-ask the question?

    Q.    Sure.  Did -- I'll ask it in a non-leading way.

                Did anyone representing EFH take any steps

*****CONFIDENTIAL*****

Page 113

1                    KRISTOPHER MOLDOVAN

2    to ascertain whether any party to the First Data indenture

3    or any of the First Data noteholders believed that, in the

4    event of a bankruptcy filing by First Data, First Data

5    could repay the notes without paying the applicable

6    premium, if the repayment was before the specified date in

7    Section 3.07?

8                    MR. HOWELL:   Object to form.

9         A.    I -- I don't know.

10        Q.    (BY MR. ANKER)   Okay.

11        A.    Although, I will state that the sponsors, I

12   believe, were the same in -- or at least KKR was the same

13   in both.   But I'm not aware of any.

14        Q.    Okay.  With respect to this issuance, the 2007

15   issuance, the securities firms, including Goldman, acted

16   as initial purchasers or underwriters, right?

17        A.    That's correct.

18        Q.    Okay.  And in connection with that role, the

19   company entered into an agreement with those firms, right?

20        A.    Yes.

21        Q.    Okay.  And in that agreement, the company made

22   various representations to the -- to the underwriters,

23   right?

24        A.    Yes.

25        Q.    It represented, among other things, that the

1                    KRISTOPHER MOLDOVAN

2    offering memorandum for the notes did not contain any

3    untrue statements of material fact, right?

4         A.    I would need to refer to the document.

5         Q.    Sure.  Let's mark this as Exhibit 8,

6    EFIHMW00303787- -- or through 823.

7                   (Exhibit 8 marked.)

8         Q.    (BY MR. ANKER)    Do you recognize this document,

9    Mr. Moldovan?

10        A.    Yes.

11        Q.    What is it, sir?

12        A.    It is a -- it is entitled, A Placement Agreement

13   Among Energy Future Holdings Corp. and Goldman -- Morgan

14   Stanley & Company, Incorporated, and Goldman Sachs & Co.

15   as Representatives of the Several Placement Agents Named

16   on Schedule 1.

17        Q.    And this is the agreement that you were

18   referencing earlier; is it not?

19        A.    Yes.

20        Q.    Okay.  Turn, if you would, to page -- well,

21   first, if you would, turn to page 12.

22               Are you there, sir?

23        A.    I am.

24        Q.    You'll see, at paragraph 8B, that there were

25   requirements for the placement agents to have any

*****CONFIDENTIAL*****

1              KRISTOPHER MOLDOVAN

2    obligation, that there be opinion letters issued by five

3    different sets of lawyers for the company.

4              Do you see that in 8B, as in boy?

5         A.   I do.

6         Q.   And so, earlier, I had asked you whether

7    Covington & Burling and Hunton & Williams, at least with

8    respect to some issues -- I'm sorry; the word "issues" in

9    connection with debt has double meaning; I don't mean it

10   that way.

11             It is accurate -- does this document

12   refresh your recollection that, in fact, in connection

13   with this issuance, the company, EFH, was represented by

14   all of Simpson Thatcher, Vincent & Elkins, Covington &

15   Burling, and Hunton & Williams?

16        A.   EFH, the company, yes, was represented by those

17   firms in this issuance.

18        Q.   Okay.  And then --

19             MR. ANKER:  Let's go off the record one

20   second.

21             THE VIDEOGRAPHER:  We are now off the

22   record.  The time is 12:07 p.m.

23             (Recess in the proceedings from 12:07 to

24             12:08 p.m.)

25             THE VIDEOGRAPHER:  We are now back on the

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2    record.   The time is 12:08 p.m.

3         Q.   (BY MR. ANKER)   Okay.  Can I turn your

4    attention to page 1 of the document that is Exhibit 8?

5    Are you there, Mr. Moldovan?

6         A.   Yes.

7         Q.   And do you see paragraph number 1 that begins on

8    the bottom of the first page?

9         A.   I do.

10        Q.   And it states that the issuer -- the issuer is

11   EFH -- and the guarantors jointly and severally represent

12   a warranty to and agree with each of the placement agents.

13             Do you see that language?

14        A.   Yes.

15        Q.   And turn to flip the page, but stay within 1A,

16   as in apple.  If you go to the last sentence, it says, am

17   I right -- I'm not going to read you the entirety of it --

18   the preliminary offering memorandum or the offering

19   memorandum in any amendments or supplements thereto did

20   not and will not, as of the respective dates, contain any

21   untrue statement of material fact or omit the state of

22   material fact necessary in order to make the statements

23   therein, in light of the circumstances under which they

24   were made, not misleading.

25             Do you see that?

1                    KRISTOPHER MOLDOVAN

2        A.    I see that language.

3        Q.    Okay.  So I asked you earlier:  Am I right that,

4   in connection with the agreement, the company made

5   representations to the underwriters that the offering

6   memorandum and preliminary offering memorandum would not

7   contain any material misrepresentations or material

8   omissions?

9                    MR. HOWELL:  Object to form.

10       Q.    (BY MR. ANKER)   Does this refresh your

11  recollection?

12       A.    Can I read the rest of the --

13       Q.    Of course.

14       A.    -- paragraph?

15             Yes, there is a carveout that it does not

16  apply to statements made in reliance or in conformity with

17  the information furnished in writing by a placement agent

18  through the representatives expressly for use therein.

19  But, yes.

20       Q.    Subject to that caveat, my statement is

21  accurate, right?

22       A.    You'd have -- could you repeat your statement?

23       Q.    The company represented to the underwriters

24  that, in the offering memorandum and the preliminary

25  offering memoranda, it would make no material

*****CONFIDENTIAL*****

Page 118

1                    KRISTOPHER MOLDOVAN

2    misrepresentations or material omissions.

3        A.    It would not contain an untrue statement of

4    material fact or omit to state a material fact under which

5    they were made not misleading.

6        Q.    And the description of the redemption provisions

7    in the offering memorandum was not a statement made in

8    reliance on information furnished to the issuer by a

9    placement agent or its representative; was it?

10                    MR. HOWELL:  Object to form.

11        A.    Sorry; could you ask the question --

12        Q.    (BY MR. ANKER)   Sure.  You pointed out,

13    Mr. Moldovan, that there's a proviso to the sentence I

14    read.  And the proviso says that this representation or

15    warranty shall not apply to any statements or omissions

16    made in reliance upon and in conformity with information

17    furnished in writing to the issuer by a placement agent

18    through the representatives expressly for use therein.

19                    I read that correctly, right?

20        A.    That's correct.

21        Q.    That proviso didn't extend to the information in

22    the offering memoranda regarding the optional redemption,

23    right?

24        A.    I don't know.

25        Q.    You don't know one way or the other?

*****CONFIDENTIAL*****

Page 119

1                    KRISTOPHER MOLDOVAN

2        A.    I do know that the placement agents' counsel

3    provided the language in the description of notes, and

4    also typically provides the language for the risk factors

5    relating to the notes.    Whether or not this caveat would

6    apply to that, I don't know.

7        Q.    Okay.   You would agree with me, would you not,

8    that the terms of the optional redemption were material to

9    investors, right?

10       A.    I don't know which terms that the investors --

11       Q.    Okay.

12       A.    -- that bought these notes were deemed to be

13   material.

14       Q.    Did the company -- we -- we went through how the

15   indenture provided that the redemption provisions couldn't

16   be changed, even with a majority vote of the holders;

17   every single holder had to approve them.

18             Does that cause you to reach the conclusion

19   that the terms of the redemption provisions were material?

20       A.    No.   It causes me to reach the conclusion that

21   that may be material to a specific holder, and that, if

22   you want to change that provision for that specific

23   holder, you need his approval.

24       Q.    Okay.   Let's look at the offering memo for this

25   issuance, the October 2007 issuance.

*****CONFIDENTIAL*****

Page 120

1              KRISTOPHER MOLDOVAN

2         (Exhibit 9 marked.)

3      Q.    (BY MR. ANKER)    I'm going to mark a document.

4  It starts with a cover e-mail, EFIHMW00208122, and then it

5  attaches a document, EFIHMW00208123 to 8622 inclusive.

6  And, again, Mr. Moldovan, I'm not going to ask you about

7  the whole thing.

8              But can you identify this document?

9      A.    Both documents?

10     Q.    Sure.

11     A.    The first -- the first is an e-mail from an

12  individual at stblaw.com that purports to attach the final

13  printed offering memorandum for the EFH notes, and

14  indicates that the final offering memorandum for the EFCH

15  or TCEH notes would be -- follow.   And the second document

16  is the -- is the attachment to that e-mail, which is,

17  again, described as the final as-printed offering

18  memorandum for the EFH Corp. notes.

19     Q.    And it says the cover e-mail is coming from

20  Simpson Thatcher, counsel for the company, right?

21     A.    That's correct.

22     Q.    And it's attaching the final of the offering

23  memorandum as to which -- strike that.

24              It's attaching the final to the offering

25  memorandum, right?

*****CONFIDENTIAL*****

Page 121

1                    KRISTOPHER MOLDOVAN

2        A.    That's what the e-mail says.  Without -- I can't

3    confirm that this is the final, but the e-mail indicates

4    it is such.

5        Q.    Okay.  What was the purpose of the offering

6    memorandum; what did the company understand the purpose of

7    the offering memorandum was?

8        A.    Describe what securities were being offered, and

9    to provide the disclosure that it deemed necessary to make

10   the offer.

11       Q.    And it's a very long document, right?

12       A.    It is very long.

13       Q.    Okay.  And the company understood that not every

14   investor is going to read every word in this very long

15   document, right?

16             MR. HOWELL:  Object to form.

17       A.    I don't think -- I don't recall the company ever

18   coming to that conclusion.

19       Q.    (BY MR. ANKER)  Okay.  The first page of the

20   document, you'll see, has a whole bunch of language in

21   bold and italics.

22             Do you see that?

23             Page -- page bearing the Bates stamp 8123,

24   right?

25       A.    Yes.

KRISTOPHER MOLDOVAN

Q.   And that's the cover page, right?

A.   That's correct.

Q.   And it highlights some of the material -- most
of the material terms of the offering, right?

MR. HOWELL:  Object to form.

Q.   (BY MR. ANKER)   To your understanding, it
highlighted many of the most important terms of the
underwriters -- of the issuance?

A.   To my understanding, it describes what is
required to be put on the cover page of a prospectus.

Q.   And what's required to be put on the cover page,
to your understanding, includes some of the most
significant terms for the offering, right?

A.   Principal, interest, I would say that those are,
yes, some of the more important terms.

Q.   Okay.  And one of the terms that was highlighted
on the very cover page was the redemption provision and
the requirement that, if the company redeemed prior to
November 1, 2012, it would have to pay a, quote, make
whole, end quote, premium, right?

Let me direct you, Mr. Moldovan, to the
fifth paragraph, which says -- are you with me?

A.   Yes.

Q.   Do you see the language?

1                    KRISTOPHER MOLDOVAN

2        A.    Yes.

3        Q.    So my -- let me ask my question again.  One of

4   the terms that was highlighted on the very cover page was

5   the redemption provision and the requirement that, if the

6   company redeemed the notes prior to November 1, 2012, it

7   would have to pay a, quote, make whole, end quote,

8   premium, right?

9        A.    Yes, it says that on the cover.

10       Q.    And another thing it says on the cover is that

11   investing in the notes involves risk:  See risk factors

12   beginning on page 29.

13              Do you see that?

14       A.    Yes, I do.

15       Q.    Okay.  And what did the company mean when it

16   said investing in the notes involves risk?

17       A.    That investing in the notes involves risks.

18       Q.    Risk that you may not get paid everything you're

19   hoping to get -- you're expecting to get paid, right?

20       A.    That is one potential risk.

21       Q.    And what was the company's goal in drafting --

22   working on and drafting the risk factor section of the

23   notes?

24              MR. HOWELL:  Object to form.

25       Q.    (BY MR. ANKER)   Let -- I -- I asked you a

*****CONFIDENTIAL*****

Page 124

1                    KRISTOPHER MOLDOVAN

2    non-leading question.  Let me ask some leading questions;

3    maybe it'll help, although I wouldn't -- actually, let me

4    stick with my question.

5                    What did you understand the company's goals

6    to be?

7        A.    To describe the material risks of investing in

8    these notes.

9        Q.    Okay.  It certainly wasn't the company's goal to

10   hide any material risks, right?

11       A.    No, that was not the company's goal.

12       Q.    And you've already said, to your knowledge, the

13   company didn't hide a single material risk, right?

14       A.    To my knowledge, the company has not hidden any

15   risks.

16       Q.    Okay.  And it was not only risks relating to the

17   business; maybe the business EFH is in has a negative

18   turn, has a downturn.

19                    Those were one sets of risks that were

20   sought to be described by the company in the risk factors,

21   right?

22       A.    That's correct.

23       Q.    Another side of risk were risks having to do not

24   with the business, but with the notes themselves, right?

25       A.    That's correct.

*****CONFIDENTIAL*****

Page 125

1                     KRISTOPHER MOLDOVAN

2          Q.    Okay.   And, indeed, the risk relating to the

3    notes and the indebtedness went on for nine pages.   Let --

4    let me turn you there.   You don't have to, obviously,

5    remember this.

6                          The risk factors start on page 29; do they

7    not, sir?

8          A.    They do.

9          Q.    And they continue, the entirety of the risk

10   factors, all the way to page 50, right?

11         A.    Tes.   To the top of page 50, yes.

12         Q.    Right.   So that's 22 pages, single spaced, of

13   risk factors, right?

14         A.    Single spaced with some breaks, but, yes.

15         Q.    Fair enough.   I'll stipulate to the breaks in a

16   few places.

17                     And let's go back to where I was asking you

18   earlier.   If you turn to page 29, the very first page of

19   the risk factors -- are you there, Mr. Moldovan?

20         A.    I am.

21         Q.    It says at the very top:   You should carefully

22   consider the risk factors as set forth below, as well as

23   all the other information containing -- contained in this

24   offering memorandum before purchasing the notes, right?

25         A.    That's the first sentence, yes.

*****CONFIDENTIAL*****

Page 126

1                    KRISTOPHER MOLDOVAN

2          Q.    And the company said that because it expected
3     and wanted investors to read all of the -- and carefully
4     consider the risk factors, right?

5          A.    The company wanted and expected the investors to
6     read the entire document.

7          Q.    Including the risk factors, right.

8          A.    Including the risk factors.

9          Q.    Okay.    And the very first set of risk described,
10    starting on page 29, are risks relating to the
11    indebtedness in the notes, right?

12         A.    That's correct.

13         Q.    And those risk factors go on for nine pages, all
14    the way to page -- the bottom of page 37, right?

15         A.    That's correct.

16         Q.    Okay.    Now, I've read -- reviewed the 22 pages
17    of risk factor disclosures in this offering memorandum,
18    and I don't see any disclosure of any risk of any kind
19    relating to a possible EFH bankruptcy.    I'm not going to
20    ask you to read 22 pages, but as you -- the document will
21    speak for itself.

22               Do you have any recollection, in the risk
23    factor section of this prospectus, of any disclosure of
24    any kind about any risk associated with a potential
25    bankruptcy filing?

*****CONFIDENTIAL*****

Page 127

1          KRISTOPHER MOLDOVAN

2      A.   With the caveat that I have not read this 22

3   pages as recently as you have, I do not recall that we

4   referred to a bankruptcy filing.

5      Q.   And that's because the company didn't

6   contemplate that a bankruptcy filing might occur; it

7   wasn't even on the horizon for EFH, right, in October of

8   2007?

9      A.   I would say -- I wouldn't go that far and say

10  that the company determined that -- at that time, to not

11  be a material risk that rose to the level of requiring to

12  be described in this offering memorandum.

13     Q.   Did the company, EFH, at the time of this

14  offering, consider the question, if we go into bankruptcy,

15  will we be able to repay the notes before five years had

16  expired from the issuance without paying the make whole

17  premium?

18     A.   I think the -- the company would have understood

19  the language to say that, if -- in the description of

20  notes and in the indenture, that if there was a bankruptcy

21  filing, that the applicable premium was not in there and,

22  therefore, not due.

23     Q.   Mr. Moldovan, I'm going to move to strike that

24  answer.  I want you to try to answer my question.  Let me

25  rephrase it.

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2              Do you recall any discussion that you had

3    with anyone at EFH or at Simpson Thatcher, at the time of

4    this issuance, about whether, if the company went into

5    bankruptcy, it could repay the notes prior to five years

6    from the date of issuance without paying the make whole?

7         A.   I do not recall a discussion, no.

8         Q.   Okay.  Did -- I asked you whether you recalled a

9    discussion that you had.  Let me expand the question,

10   because maybe someone told you about a discussion they had

11   with someone else.

12             Are you aware, through personal knowledge,

13   hearsay, in any way, shape, or form, of any discussion

14   that anyone at EFH or EFH's counsel had, in connection

15   with this issuance, as to whether the company could file

16   for bankruptcy and then pay off the notes prior to five

17   years from issuance without paying the make whole premium?

18        A.   I am not personally aware that any such

19   discussion occurred.

20        Q.   Okay.  Are you aware of any person representing

21   EFH or employed by EFH who considered the issue; it hit

22   their consciousness, and they considered the issue in

23   connection with this issuance in October 2007?

24        A.   I am unable to determine what they considered.

25        Q.   Okay.  Let me -- let me -- I didn't mean to ask

*****CONFIDENTIAL*****

Page 129

KRISTOPHER MOLDOVAN

1

2  you to be able to be a mind reader.  I take it, no one has

3  said to you, you know, Kris, in October 2007, this very

4  question occurred to me.  I thought about it, and I

5  reached a conclusion that, under the terms of this

6  indenture, no make whole premium would be due if we, EFH,

7  went into bankruptcy and sought to pay off the notes prior

8  to five years from issuance, right?

9        A.   Nobody expressed that to me.

10       Q.   In substance, right?  I don't mean to say it was

11  the exact words.  In substance, no one expressed that to

12  you, right?

13       A.   No one expressed that, that they specifically

14  thought about it in 2007.

15       Q.   Did you, as in connection with your preparation

16  to testify today as a 30(b)(6) witness for the company,

17  take any steps to ascertain whether, in fact, there were

18  any such discussions or any such consideration by anyone

19  employed by or representing EFH?

20       A.   I spoke to -- I don't recall if it was that

21  exact topic.  Again, I spoke on various topics with the

22  people that I thought would have knowledge if that had

23  occurred, and that would be Mr. Wright and Mr. Santos from

24  our internal legal department.

25       Q.   And none of them said to you that, in fact, they

1              KRISTOPHER MOLDOVAN

2    had any discussions or gave any consideration to the

3    question whether, if EFH filed for bankruptcy, it would be

4    able to pay off the notes prior to five years from

5    issuance without paying the make whole, right?

6         A.   Nobody that I consulted with indicated that they

7    had a conversation of that substance.

8         Q.   Either with someone else or with themselves in

9    their head, considered the issue, right?

10        A.   That's -- I don't -- when you say, "In your

11   head, considered the issue," I -- again, I read the

12   indenture at that time, and would have --

13        Q.   With all due respect, Mr. Moldovan, I'm not

14   interested in what you would have concluded if you had

15   actually thought about it.

16             Did you consider this issue specifically --

17        A.   I can't --

18        Q.   -- in October of 2007, in connection with this

19   issuance; yes or no?

20        A.   I can't recall.

21        Q.   Okay.  Did anyone indicate to you that they

22   considered the issue in connection with this issuance?

23        A.   Not the people that I consulted.

24        Q.   Okay.  Did the company, in connection with the

25   October 2007 issuance, speak to any investor or potential

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2     investor and say -- ask them, What is your understanding

3     as to whether, if we file for Chapter 11 or Chapter 7, we

4     can repay these notes prior to five years from issuance

5     without paying the make whole?

6          A.    I don't know.

7          Q.    To your knowledge, there was no such

8     conversation, right?

9          A.    To my knowledge, there was no such conversation

10    with an investor.

11         Q.    I asked that question with respect to any

12    investor or potential investor; would you give me the same

13    answer with respect to the indenture trustee?

14         A.    I'm sorry; could you --

15         Q.    Sure.

16         A.    -- re-ask it with the indenture trustee?

17         Q.    Did the company, in connection with the October

18    2007 offering, to your knowledge, have any discussions

19    with the indenture trustee to determine what the indenture

20    trustee's understanding was as to whether, if the company

21    went into bankruptcy, it could repay the notes prior to

22    five years from issuance without paying the make whole?

23         A.    I'm not personally aware of any such

24    conversation.

25         Q.    Okay.  What about with respect to the sponsors;

*****CONFIDENTIAL*****

Page 132

1                    KRISTOPHER MOLDOVAN

2   are you aware of any communication by someone at the

3   company with any of the sponsors about whether, in

4   connection with this issuance, the company could go into

5   bankruptcy and repay the notes without paying the make

6   whole?

7        A.   I'm sorry, could you --

8        Q.   Sure.

9        A.   -- re-ask it?

10       Q.   I think the question became -- I think it got

11  garbled.

12                 Are you aware of any discussions that

13  anyone at the company had with any of the sponsors in

14  connection with this October 2007 issuance as to whether,

15  if the company filed for bankruptcy, it could pay off the

16  notes prior to five years from the date of issuance

17  without paying the make whole?

18       A.   I'm not aware of any such discussions between

19  people at the company and the sponsors.

20       Q.   Okay.

21       A.   In 2007.

22       Q.   Okay.

23                 MR. ANKER:  Let's go off the record a

24  second.

25                 THE VIDEOGRAPHER:  We are now off the

*****CONFIDENTIAL*****

Page 133

1                    KRISTOPHER MOLDOVAN

2    record.  The time is 12:31 p.m.

3                    (Recess in the proceedings from 12:31 to

4                    1:07 p.m.)

5                    THE VIDEOGRAPHER:  We are now back on the

6    record.  The time is 1:07 p.m.

7        Q.  (BY MR. ANKER)   Mr. Moldovan -- Moldovan, did

8    you have, during the lunch break, any discussions with

9    your counsel about the substance of the testimony you have

10   given or you will be giving today?

11       A.  No.

12       Q.  Let me turn to the August 2010 EFIH exchange;

13   that is, the exchange for the notes that had been issued

14   by EFH in 2007.

15                    You're familiar generally with that

16   issuance, right?

17       A.  I am.

18       Q.  Okay.  And the notes issued in August 2010 -- I

19   think we said earlier, they were 2-billion some odd in

20   change -- were notes that remained outstanding as of the

21   bankruptcy filing date, right?

22       A.  Yes.

23       Q.  Okay.  Are you familiar with a liability

24   management program that the Debtors undertook?

25       A.  I'm aware of that term.

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2          Q.    Okay.   When was it put in place?

3          A.    I would say the very latter stages of 2008 or

4    the early stages of 2009.

5          Q.    And can you describe what it was?

6          A.    On a very general basis, it was to seek

7    opportunities to reduce principal, extend maturities, and,

8    where possible, reduce interest expense.

9          Q.    Okay.   So it was an effort by the EFH companies

10   to obtain more favorable terms, to the extent they could,

11   on their outstanding debt financing; is that fair?

12                    MR. HOWELL:   Object to form.

13         A.    It was an attempt to reduce principal, extend

14   maturities, and, where possible --

15         Q.    (BY MR. ANKER)   Okay.

16         A.    -- reduce overall interest expense; not

17   necessarily interest rate, but overall cumulative interest

18   expense.

19         Q.    Fair enough.   Was the exchange of the notes, the

20   notes issued in 2007 by EFH for the EFIH first lien notes

21   in August 2010, part of the liability management program?

22         A.    I would say -- I, Kris Moldovan, would say yes,

23   it was part of that program.

24         Q.    Okay.   And, in fact the -- I mean, this is going

25   to state almost an obvious fact, but I'll ask it as a

*****CONFIDENTIAL*****

Page 135

KRISTOPHER MOLDOVAN

1

2    question.

3              But EFH and EFIH entered into that exchange

4    because they thought net-net the exchange was good for the

5    companies, right?

6         A.    It -- it accomplished the goals that the company

7    set out to accomplish.

8         Q.    Okay.  One of the things it did is, it reduced,

9    in fact, in this case, the interest rate, right?  The new

10   notes were at 10 percent per annum, and the notes that had

11   been issued in 2007 were at 11-and-seven-eights, 11.875 or

12   11.25 or 12 percent, right?

13        A.    The first one, I think you meant to say 10.875,

14   were the senior notes at EFH, and 11-and-a-quarter were,

15   if in PIK mode, 12 percent.  Yes, became -- when those

16   were exchanged, they received notes with a stated rate of

17   10 percent, yes.

18        Q.    So a reduced rate of interest, right?

19        A.    Yes.

20        Q.    And another benefit from the companies', plural,

21   standpoint, apropos of what you said about the liability

22   management program, was that the principal amount of the

23   debt went down, right?

24        A.    From a consolidated basis, yes.

25        Q.    Okay.  For every -- not every dollar of EFH

*****CONFIDENTIAL*****

Page 136

KRISTOPHER MOLDOVAN

notes was -- could be tendered in exchange for EFIH notes,
right?

A.   There could --

Q.   My impression --

A.   Re -- could you restate that question?

Q.   Sure.

My impression, Mr. Moldovan, and I could be
mistaken, is that some dollar amount of EFH notes were
left behind at EFH.

A.   The exchange offer was for -- was capped in the
amount of first lien notes that could be issued and cash
that -- that could be utilized.  So, yes, if that is your
question, yes, there was a limit on the number of notes to
be issued.

Q.   And -- but of the notes that could be exchanged,
for every dollar, every 1,000 -- for -- let me start
again.

For every dollar of EFH notes that was
exchanged, the holder didn't receive a full dollar face
amount of EFIH notes, right?

A.   That's my recollection, yes.

Q.   And it didn't receive -- it received both cash
and notes, but it didn't receive cash and notes equal to
one dollar, right?

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2          A.    That's my recollection, yes.

3          Q.    In fact, the -- and tell me if this is you or

4     generally your recollection.

5                     The documents will ultimately speak for

6     themselves, but it received only in the range of 72 to

7     78.5 cents on the dollar, right?

8          A.    I -- I don't recall.   That -- as you said, the

9     documents will speak for themselves, but that --

10         Q.    That sounds about right to you?

11         A.    Sounds about right, yes.

12         Q.    And another benefit for the -- from the

13    companies', plural, standpoint is that the notes that were

14    left behind, were stripped of all covenants, right?

15         A.    That was an outcome of it, yes.

16         Q.    Well, that's a benefit; it's good for a company

17    not to have to comply with affirmative or negative

18    covenants, right.   Gives you more freedom as an issuer,

19    right?

20         A.    Well, we had -- I think that's, again, an

21    overgeneralization.   We had other securities that had

22    similar covenants, and so that did not -- by stripping

23    those in that particular indenture, did not allow us to do

24    things -- you know, may or may not have directly

25    benefitted what the company was able to do.

*****CONFIDENTIAL*****

Page 138

1                     KRISTOPHER MOLDOVAN

2          Q.    The companies stripped them for a reason, right?

3          A.    Yes.

4          Q.    And what was the reason?

5          A.    Well, my understanding was the primary reason

6    was to incentivize a higher participation.

7          Q.    In the exchange?

8          A.    That's correct.

9          Q.    Because the exchange benefitted the companies?

10         A.    The exchange was deemed to be a benefit to the

11   companies.

12         Q.    Right.    Another benefit was that -- and it goes

13   to what you talked about in the liability management

14   program -- the maturity date was extended, right?

15         A.    That's correct.

16         Q.    Under the old EFH notes, those notes matured in

17   2017, right?

18         A.    That's correct.

19         Q.    And under the new 10 percent EFIH notes, they

20   matured three years later, 2020, right?

21         A.    That's correct.

22         Q.    Okay.    Indeed, the company thought that the

23   benefits of this exchange were sufficiently good that they

24   sought to lockup, if I can use that term, certain major

25   investors in the notes prior to the completion of the

1                     KRISTOPHER MOLDOVAN

2    exchange, right?

3                    MR. HOWELL:   Object to form.

4         A.    I don't know what -- I don't know -- lockup, I

5    wouldn't use that term.   The company -- I'd -- I'd have to

6    look at how we described it.   The company reached

7    agreements in advance with certain lenders.

8         Q.    (BY MR. ANKER)   With Franklin Advisors?

9         A.    That sounds correct.   I'd need to look at the

10   disclosure.

11        Q.    Okay.   I'll represent to you that I -- and I'm

12   trying to move things along.

13        A.    Sure.

14        Q.    If we had unlimited time, I'd show you every

15   document.   I'll represent that I've seen exchange

16   agreements with Franklin Advisers, WamCo, and Avenue

17   Capital.

18        A.    That sounds --

19        Q.    Does that sound right?

20        A.    That sounds correct.

21        Q.    Okay.   Did you or anyone else from the company,

22   in connection with those agreements -- well, I won't call

23   them a lockup agreement; I'll just call them agreements.

24                    Did you or anyone else from the company

25   have a discussion with representatives of any of those

1                    KRISTOPHER MOLDOVAN

2    three issuers -- I'm sorry; they're not issuers.  Let me

3    restart the question.

4                    In connection with the agreements under

5    which those three holders agreed to participate in the

6    exchange, did you or anyone else from EFIH or any other

7    Debtors have discussions with any of those three holders

8    about the optional redemption provisions in the

9    indentures?

10        A.   I don't recall.

11        Q.   Okay.  You don't recall having had any such

12    discussion, right?

13        A.   I don't recall whether any such discussion, yes,

14    occurred.

15        Q.   Did you have -- do you recall whether -- let me

16    start again.

17                    Did you or anyone else from the company

18    have any discussion with representatives of any of those

19    three investors as to whether, were EFIH following the

20    exchange to go into bankruptcy, it could redeem the notes

21    -- it -- it could repay the notes prior to five years from

22    issuance without paying the make whole?

23                    MR. HOWELL:  Object to form.

24        A.   I'm sorry; I -- could you please --

25        Q.   (BY MR. ANKER)   Let's start -- let's lay some

*****CONFIDENTIAL*****

Page 141

1                    KRISTOPHER MOLDOVAN

2    predicates.

3                    The -- the new indenture, the indenture for

4    10 percent notes, had a similar optional redemption

5    provision to the one in the EFH notes, right?

6         A.   That's correct.

7         Q.   And it provided that, if, in fact, the company

8    sought to redeem the notes prior to December 1 of 2015, it

9    would have to pay a 100 percent of principal, all accrued

10   interest, and the applicable premium, right?

11        A.   Without reading it, that sounds -- there was an

12   option redemption provision in the notes.

13        Q.   Okay.

14        A.   And what you've just said sounds correct --

15        Q.   Okay.

16        A.   -- but I would need to confirm.

17        Q.   Did you or anyone else for the company, either

18   an employee or counsel or anyone else, have any

19   discussions with representative of Franklin Advisors,

20   WamCo, or Avenue Capital as to whether, if the company

21   filed for bankruptcy, it could repay the notes before

22   December 1, 2015, without paying the applicable premium?

23        A.   I do not recall any such discussion.

24        Q.   Okay.  Now, Mr. Moldovan -- I -- I really

25   apologize; I do not mean to butcher your name.  I'm

*****CONFIDENTIAL*****

Page 142

1                    KRISTOPHER MOLDOVAN

2    terrible at it.  Mr. Moldovan, if you change your name to

3    Smith, I'd do better.

4                    You received and reviewed drafts of the

5    indenture prior for the 2010 issuance?

6         A.    Yes.

7         Q.    Okay.  And you had an opportunity to comment on

8    it?

9         A.    Yes, I believe so.

10        Q.    And other EFIH executives had an opportunity to

11   comment on it?

12        A.    Define "executive."

13        Q.    Sure.

14                    Did Mr. Horton have an opportunity to

15   review the document and comment on it?

16        A.    I believe so, yes.

17        Q.    Did Mr. Keglevic have an opportunity to review

18   the document and comment on it?

19        A.    I don't recall if he -- I don't know whether he

20   reviewed the document.  I don't --

21        Q.    But he had an opportunity to do so, right?

22        A.    Yes.

23        Q.    No one hid this provision from Mr. -- hid the

24   indenture from Mr. Keglevic, right?

25        A.    No.

*****CONFIDENTIAL*****

Page 143

1                     KRISTOPHER MOLDOVAN

2          Q.   In fact, every one in senior management at EFIH

3     and EFH had the opportunity, if they wanted, to review the

4     indenture, right?

5          A.   They would have had the opportunity to review it

6     if they wanted to, yes.

7          Q.   And same is true of the board of EFH, right; all

8     the directors had the opportunity, if they wanted to, to

9     review it, right?

10         A.   I would believe so.

11         Q.   Okay.   And the indenture used, as a model, the

12    2009 EFIH 9.75 percent note indenture, right?

13         A.   That's my recollection, yes.

14         Q.   And the EFIH 2009 indenture, in turn, used the

15    2007 EFH indenture as a model, right?

16         A.   That's my recollection.

17         Q.   And that EFH indenture, I think you've already

18    testified, from 2007, used the First Data indenture as its

19    model, right?

20         A.   That's correct.

21         Q.   Okay.   Now, with respect to the 2010 indenture,

22    did any investor, holder of the notes that were exchanged,

23    draft any provision in the indenture?

24         A.   Any actual holder?

25         Q.   Yeah.

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2        A.    Not to my recollection.

3        Q.    Did the indenture trustee draft any provision in

4   the indenture?

5        A.    I don't know.  I would -- I am confident that

6   the trustee and counsel had an opportunity to comment on

7   it.  I don't know whether they actually drafted any of the

8   provisions.

9        Q.    Okay.  Now, let's take a look at the indenture.

10                    MR. HOWELL:  This is 10.

11                    (Exhibits 10 and 11 marked.)

12        Q.   (BY MR. ANKER)   Mr. Moldovan, I'm going to hand

13   you a document -- it's really two documents.  The first is

14   an e-mail from Shriram Bhashyam at Sherman & Sterling.  It

15   bears Bates stamp EFIHMW00144188, and it's followed by an

16   indenture bearing the Bates stamp EFIHMW00144189 through

17   335 inclusive.

18                    Do you recognize that document,

19   Mr. Moldovan?

20                    MR. HOWELL:  Are we marking the e-mail as

21   10 and the indenture as 11?

22                    MR. ANKER:  If you want to do it that

23   way -- why don't we do it that way?  I mean, they're --

24   they're in -- they're in consecutive Bates numbers and

25   were produced to us that way.  We didn't Bates stamp them,

Page 145

1                        KRISTOPHER MOLDOVAN

2    so -- but why don't we do that?

3                    MR. HOWELL:  So just for the ease of the

4    record, let's do that.

5        Q.    (BY MR. ANKER)   Mr. Moldovan, can I get the

6    second doc -- can I get documents back from you?

7        A.    (Witness hands attorney document.)

8        Q.    We're going to have, as Exhibit 10, be the

9    one-page e-mail, bearing Bates stamp EFIHMW00144188.  And

10   Exhibit 11 will be EFIHMW00144189 through 335 inclusive.

11                    Can you identify these documents?

12       A.    It appears that I wasn't copied on Exhibit 10,

13   so I -- I don't recall seeing this before.  But it is an

14   e-mail from somebody at Sherman & Sterling to -- to

15   various parties, including our internal and external

16   counsel that says:  Please find attached the executed

17   indenture.  Please note that the version earlier

18   distributed was based off a prior version, and the one

19   attached hereto reflects the execution version that was

20   signed off upon the circulated -- upon and circulated this

21   afternoon.

22                    And then Exhibit 11 is the attachment to

23   that e-mail.  And, again, let's see if it's -- it appears

24   to be a signed copy of what's, again, purported to be the

25   final indenture, dated August 17th, 2010, for the

*****CONFIDENTIAL*****

Page 146

1          KRISTOPHER MOLDOVAN

2    10 percent senior secured notes due 2020.

3         Q.    Okay.   And this indenture, like the 2007

4    indenture, has an optional redemption make whole

5    provision, right?

6         A.    Hum.

7         Q.    Take a look at Section 3.07, and confirm for

8    me whether this indenture, like the 2007 EFH indenture,

9    has a optional redemption make whole provision?

10        A.    It does.

11        Q.    And that provision, in substance -- the

12   document speaks for itself.   But, in substance,

13   Mr. Moldovan, it says that if EFIH redeems the notes

14   prior to December 1, 2015, it has to pay principal, plus

15   interest, plus the applicable premium, right?

16             MR. HOWELL:   Object to form.

17        A.    Prior to December 1st, 2015, the issuer may

18   redeem the notes at principal -- 100 percent of the

19   principal, plus accrued and unpaid interest, plus the

20   applicable premium.

21        Q.   (BY MR. ANKER)   And applicable premium is

22   defined in this indenture, as well, right?

23        A.   It is defined in this indenture, yes.

24        Q.   And it's defined substantially the same way,

25   right; the future interest payments that will not be

*****CONFIDENTIAL*****

Page 147

1                      KRISTOPHER MOLDOVAN

2    received discounted back to present value at treasury

3    rate, plus 50 basis points?

4         A.   That is --

5                   MR. HOWELL:  Object to form.

6                   You can answer.

7         A.   That is one of the -- that is a portion of that

8    definition.

9         Q.   (BY MR. ANKER)   Okay.

10        A.   Yes.

11        Q.   Now, under this provision, under 3.07(a), the

12   company understood that, if it redeemed the notes prior to

13   December 1, 2015, it would have to pay the applicable

14   premium, right?

15        A.   The company understood that, if it exercised its

16   rights under Section 3.07, it would have to pay the

17   applicable premium.

18        Q.   Now, do you remember -- and an approximation

19   would work for me.

20                   Do you remember the date when the company,

21   in fact, repaid the first lien notes in bankruptcy?

22        A.   I would approximate sometime in June 2014.

23        Q.   Why don't we, for the sake of this question,

24   stipulate it was June 15, 2014?  If it's not

25   June 15, 2014, I'm not going to hold you to having made an

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2    admission that it was June 15, 2014, okay?

3         A.   Okay.

4         Q.   We'll just assume it was June 15, 2014.

5                    The company doesn't dispute, does it, that,

6    had EFIH not been in bankruptcy on June 15, 2014, and had

7    it, on that date.  Repaid the notes, it would have had to

8    pay the optional redemption premium, the applicable

9    premium, right?

10                   MR. HOWELL:  Object to form.

11        A.   If it had redeemed the notes pursuant to the

12   optional redemption in Section 3.07, it would have had to

13   pay, among other things, the applicable premium.

14        Q.   (BY MR. ANKER)  You say that it redeemed them

15   pursuant to Section 3.07.  I think we established, with

16   respect to the 2007 indenture, the following, which is

17   that there was no provision in that indenture that allowed

18   the company to pay off the notes prior to their stated

19   maturity at its option, other than the optional redemption

20   provision.

21                   Is there anything in this indenture that

22   allowed the company to pay the notes off at its option

23   prior to December 1, 2015, other than the optional

24   redemption provision set forth in Section 3.07?

25        A.   The company did not have a right to redeem the

*****CONFIDENTIAL*****

Page 149

KRISTOPHER MOLDOVAN

notes, other than prior to maturity, other than the

various provisions set forth in Section 3.07.

Q.    Okay.  Indeed, the make whole provision -- I

call it the make whole provision.  The optional redemption

provision in this indenture, the 2010 indenture, was in

the very same provision as the 2007 EFH indenture, right?

A.    I'm sorry; I distracted.  I didn't --

Q.    Let me go back to the prior question, because I

think I didn't focus on your answer clearly enough.

With respect to the 2010 EFIH indenture,

the only provision that allows the company to repay the

notes at its request prior to stated maturity, is 3.07; is

it not?

A.    I would, again, use the word, to redeem the

notes at its option prior to stated maturity, is set forth

in Section 3.07.

Q.    And my next question was -- let's back up.

The optional redemption provision in the

2010 indenture is set forth in Section 3.07, right?

A.    That's correct.

Q.    And it was set forth in 3.07 in the 2007

indenture, right?

A.    That's my recollection.

Q.    And it was set forth in Section 3.07 in the 2009

1                     KRISTOPHER MOLDOVAN

2    EFIH indenture, right?

3         A.    I believe so, but I'd need to look at it.  But

4    I --

5         Q.    And it was set forth in Section 3.07 in the

6    First Data indenture, right?

7         A.    I don't recall.

8         Q.    I'll represent to you it was, okay?

9         A.    Okay.

10        Q.    What the company did is, it just cut and pasted

11   the provision from the prior indenture, right?

12        A.    I think that there have been changes to the

13   provision throughout -- I mean, we saw in the First Data

14   that, while it was also Section 3.07, there were

15   significant changes made.  But it's -- yes, they both fall

16   in the same section of the indenture.

17        Q.    Do you know of any significant change in the

18   2010 version of Section 3.07 compared to the 2007 version

19   of Section 3.07?

20        A.    Without comparing the two, I don't recall any

21   significant difference.

22        Q.    Okay.  Now, you testified, with respect to the

23   2007, that the company wasn't contemplating and wasn't

24   thinking about bankruptcy at the time of the 2007 EFH

25   offer; do you recall that?

Page 151

1              KRISTOPHER MOLDOVAN

2         MR. HOWELL:  Object to form.

3    A.   I don't.  I don't recall how I answered that.  I

4 believe I answered that it didn't include -- deem that to

5 be a material risk that needed to be included in the risk

6 factors, but I couldn't speak to what was being

7 contemplated by the company at that time.

8    Q.   (BY MR. ANKER)  Okay.  Fair enough.

9         Do you recall any discussion, at the time

10 of this 2010 exchange offer, of any possibility that EFIH

11 might go into bankruptcy?

12    A.   By this time, it was a -- my recollection is

13 that it was considered a possibility.

14    Q.   Okay.  And, indeed, there were risk factor

15 disclosures about bankruptcy, and we'll get to that in a

16 minute or two.  So I don't mean to mislead you with my

17 questions.

18         But let me ask you this:  Was there any

19 discussion within the company, in connection with this

20 exchange offering, the 2010 exchange offering, of whether

21 the company would be able to file for bankruptcy and repay

22 the notes prior to December 1, 2015, without paying the

23 applicable premium?

24    A.   I don't remember any discussion on that --

25    Q.   Okay.

*****CONFIDENTIAL*****

Page 152

1              KRISTOPHER MOLDOVAN

2      A.    -- topic.

3      Q.    I just need to create an exhaustive record, if I

4  can.

5              I asked you a question about discussions

6  within the company.

7              Do you recall any discussion between a

8  representative of the company, be it an employee or

9  outside counsel, and any holder of the notes as to whether

10  the company would be able to file for the bankruptcy and

11  repay the notes prior to December 1, 2015, without paying

12  the applicable premium?

13      A.    That's with respect to this indenture?

14      Q.    Yes, with respect to the 2010 EFIH indenture,

15  which is Exhibit 11.

16      A.    And then can you repeat your question, please?

17      Q.    Sure.

18              With respect to the EFIH 2010 indenture --

19  let me strike that.

20              With respect to the EFIH first lien

21  exchange that closed in August of 2010, are you aware of

22  any discussions that any employee or counsel or other

23  representative for any of the Debtors had with any holder

24  of the notes, with any indenture trustee, with any dealer

25  manager, regarding whether the company would be able to

*****CONFIDENTIAL*****

Page 153

1                    KRISTOPHER MOLDOVAN

2    repay the notes prior to December 1, 2015, in bankruptcy,

3    without paying the applicable premium?

4         A.    I do not recall any of those conversations

5    taking place in connection with the 2010 indenture --

6         Q.    Okay.

7         A.    -- as Exhibit 11.

8         Q.    Okay.  I've asked you now about discussions.

9              Do you recall anyone -- are you able to

10   testify today -- let me start again.

11              To your knowledge, did anyone at EFIH

12   consider the question, in connection with this exchange

13   offer, whether the company would be able to file for

14   bankruptcy and repay the notes prior to December 1, 2015,

15   without paying the applicable premium?

16        A.    I'm sorry; could you repeat?

17        Q.    Sure.

18              My prior two discussions -- my prior two

19   questions, Mr. Moldovan, were about discussions.

20              Now I'm asking you, to your knowledge, even

21   if there was no discussion, did anyone at EFIH think

22   about, consider the question, in connection with this

23   exchange offer, could EFIH subsequently file for

24   bankruptcy and repay the notes without paying the make

25   whole prior to December 1, 2015?

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2        A.    I would say, given discussions that -- based on

3   discussions that happened subsequently in connection with

4   the additional indentures, I -- I believe that -- that

5   people -- that either at the company or represented the

6   company understood that you could -- that you would not

7   owe applicable premium in connection with a bankruptcy.

8        Q.    You -- you say, I would say that; I believe

9   that.

10             Do you have any basis in fact,

11   Mr. Moldovan?  Do you have any knowledge of anyone in the

12   company, in connection with this issuance, the August 2010

13   one, considering that question?

14        A.    Based on subsequent discussions with subsequent

15   indentures, I believe that that's their understanding.

16        Q.    That was their understanding in August of 2010,

17   Mr. Moldovan?

18        A.    Yes.

19        Q.    And who were those individuals?

20        A.    Our -- primarily, our outside counsel, our

21   representatives.

22        Q.    Okay.  But -- so are you now telling me about

23   conversations you had with outside counsel?

24        A.    No.

25             MR. ANKER:  Mr. Howell, are you going to

*****CONFIDENTIAL*****

Page 155

KRISTOPHER MOLDOVAN

1
2    waive the privilege?

3              MR. HOWELL:  No, we're not waiving any

4    privilege, and I don't believe he's testified about any

5    discussions with outside counsel.

6              MR. ANKER:  I move to strike any --

7       Q.   (BY MR. ANKER)   Did your prior testimony that

8    said that you believed that people representing the

9    company had an understanding, in August 2010, that the

10   company would be able to file for bankruptcy and repay the

11   notes prior to December 1, 2015, without paying the make

12   whole, was that testimony based on communications you had

13   with counsel?

14      A.   I'm sorry; you're -- that's a very -- you're

15   asking very long questions.  So could you repeat it?

16      Q.   You testified a few minutes ago, did you not,

17   sir, that you believe that people representing the

18   company, in August of 2007, believed that the company

19   could repay their notes -- repay these EFIH first lien

20   notes prior to December 1, 2015, in bankruptcy, without

21   paying the make whole, right?

22              MR. HOWELL:  Object to form.

23      A.   I'm sorry.

24      Q.   (BY MR. ANKER)   Do you believe that individuals

25   representing the company thought, in August 2010, that the

KRISTOPHER MOLDOVAN

2  company could file for bankruptcy and repay the notes

3  prior to December 1, 2015, without paying the make whole?

4      A.    Based on the request to put applicable premium

5  into the acceleration provision later in 2010, and the

6  company's decision to not do that, I believe that people

7  understood that provision to mean that, upon an

8  acceleration of bankruptcy, it would not have to pay

9  applicable premium.

10     Q.    And that's the basis of your testimony, sir?

11     A.    Yes.

12     Q.    Okay.  And the discussions you just described

13  were about a TCEH indenture, right?

14     A.    TCEH and an -- subsequently, an EFIH indenture.

15  But starting at TCEH, yes.

16     Q.    Okay.  Those -- but there were no discussions,

17  in connection with the EFIH August 10 indenture, with any

18  holder about the -- whether the company could file for

19  bankruptcy and repay the notes prior to December 1, 2015,

20  without paying the make whole, right?

21          MR. HOWELL:  Object to foundation.

22     A.    I'm not aware.

23     Q.    (BY MR. ANKER)  Of any?

24     A.    Of any discussions, as I think I --

25     Q.    Okay.

*****CONFIDENTIAL*****

Page 157

1                    KRISTOPHER MOLDOVAN

2        A.    -- you've asked and I answered before.

3        Q.    Okay.  Now, you testified earlier that outside

4   counsel had an understanding of this provision; is that

5   right?

6        A.    Among others.

7        Q.    Okay.  And do you understand outside counsel --

8   how do you know what outside counsel's understanding was?

9              MR. HOWELL:  And I'm just going to caution

10  you not to give any information that is based on, you

11  know, attorney/client privilege communications in your

12  answer.  Otherwise, answer.

13       Q.    (BY MR. ANKER)  Can you answer my question?

14       A.    Could you repeat your question?

15       Q.    How do you know what outside counsel's

16  understanding was; is it based on a conversation you had

17  with outside counsel?

18       A.    It was based on advice that they gave about

19  whether applicable premium, including -- including

20  applicable premium in a -- in the acceleration provision

21  was market.

22              MR. ANKER:  Mr. Howell, I'm either going to

23  be -- will you let me ask him about that advice, the

24  substance of it?

25              MR. HOWELL:  No, I'm going to instruct him

*****CONFIDENTIAL*****

Page 158

1                     KRISTOPHER MOLDOVAN

2    not to divulge any privileged information.

3              MR. ANKER:  Let me -- let me be clear to

4    you so there's no confusion on the record.  I will take

5    the position -- you have a right to instruct him not to

6    answer about the substance of those communications.  I

7    will tell that I am -- will move and I am moving to strike

8    all testimony about any communications he had with counsel

9    and any understanding of counsel, if you're not going to

10   let me inquire into it.

11             MR. HOWELL:  I understand your statement,

12   and you can ask the questions that you want to ask.  But

13   I'm going to instruct him to maintain -- to not divulge

14   any attorney/client privilege material in the answers to

15   those question.

16             MR. ANKER:  So if you -- if I ask him about

17   his communications with counsel about the potential

18   addition of the term, "applicable" -- the term,

19   "applicable premium," you will instruct him not to answer?

20             MR. HOWELL:  I will instruct him not to

21   provide any information that's based on attorney/client

22   privilege there.  If -- if my understanding becomes that

23   he cannot answer the question without getting -- without

24   providing attorney/client privilege information, then,

25   yes, I will instruct him not to answer.

*****CONFIDENTIAL*****

Page 159

1                    KRISTOPHER MOLDOVAN

2        Q.   (BY MR. ANKER)   Mr. Moldovan, please tell me

3   what you were told, the advice you were given by outside

4   counsel regarding the potential effect or -- of adding the

5   term, "applicable premium," somewhere in the indenture?

6                    MR. HOWELL:  Okay.  Object.

7                    Instruct you not to answer based on

8   privilege.

9                    MR. ANKER:  Okay.  I'll move to strike all

10  the testimony about communications with counsel.  You

11  can't let a witness begin to testify, and then stop it,

12  and then rely on it.

13       Q.   (BY MR. ANKER)   Are you relying on -- in this

14  litigation, with respect to whether the make whole premium

15  is due, are you relying on advice of counsel?

16       A.   No.

17       Q.   Okay.

18                   MR. ANKER:  One second.  Let's go off the

19  record one second.

20                   THE VIDEOGRAPHER:  We are now off the

21  record.  The time is 1:45.

22                   (Recess in the proceedings from 1:45 to

23                   1:51 p.m.)

24                   THE VIDEOGRAPHER:  We are now back on the

25  record.  The time is 1:51 p.m.

*****CONFIDENTIAL*****

Page 160

KRISTOPHER MOLDOVAN

1

2      Q.   (BY MR. ANKER)   Mr. Moldovan, the subject

3  matter of your discussions with counsel that you were

4  relaying -- relating a moment ago, were whether the

5  addition of the term, "applicable premium," in

6  Section 6.02 of the indenture would be market?

7            MR. HOWELL:  Object to form.

8      A.   That is a portion of the subject matter.

9      Q.   (BY MR. ANKER)   Did you have discussions with

10  your counsel about what the legal -- what the import was

11  of the -- let me start over.

12            Did you have discussions with your counsel,

13  in 2010, regarding whether the company could file for

14  bankruptcy and repay the notes without paying the make

15  whole?

16            MR. HOWELL:  You can answer that with a yes

17  or no.

18      A.   Could you -- are we -- are you referring to

19  August?

20      Q.   (BY MR. ANKER)   Let me be clear.

21            The discussions you've been describing with

22  counsel, occurred after this issuance, right?

23      A.   That's correct.

24      Q.   And they were in connection with this issuance,

25  right?

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2        A.    That's correct.

3        Q.    Okay.  They were in September or October of

4   2010, right?

5        A.    That sounds correct.

6        Q.    And they were in connection with an issuance by

7   TCEH, right?

8        A.    That's correct.

9        Q.    Okay.  And who was the counsel you were speaking

10   with?

11       A.    Internal counsel and Simpson, Thatcher &

12   Bartlett.

13       Q.    Who -- who was the internal counsel you spoke

14   with?

15       A.    I don't recall.

16       Q.    Okay.  Who was the lawyer at Simpson, Thatcher

17   you spoke with?

18       A.    I don't recall.

19       Q.    Okay.  Do you have notes of that meeting or

20   conversation?

21       A.    Not that I am aware of.

22       Q.    Okay.  Was -- were there any communications you

23   had with counsel in writing, in September/October 2010,

24   about this subject?

25       A.    I don't know.

*****CONFIDENTIAL*****

Page 162

1                     KRISTOPHER MOLDOVAN

2        Q.    Okay.  Did the substance -- what was the subject

3    matter of your communications with counsel?

4               MR. HOWELL:  Object.

5               Instruct you not to answer.

6               MR. ANKER:  A privilege log entitles me to

7    the subject matter, Mr. Howell.

8               MR. HOWELL:  Can you -- can you read the

9    question back?

10       Q.    (BY MR. ANKER)   What was the subject matter of

11   your communications with counsel in the September/October

12   2010 period?

13              MR. HOWELL:  You can answer, but limit it

14   only to the topics that were discussed.

15       A.    The effect on adding applicable premium into the

16   acceleration provisions of the indenture.

17       Q.    (BY MR. ANKER)   What did counsel advise you?

18              MR. HOWELL:  Object, privileged.

19              Don't answer that question.

20       Q.    (BY MR. ANKER)   Okay.  Did you take any steps,

21   Mr. Moldovan, to inform any holders of the EFIH 1L notes

22   that had been issued in August 2010 of the discussions you

23   had had with counsel?

24       A.    Not to my recollection.

25       Q.    Did you take any steps, Mr. Moldovan, to inform

*****CONFIDENTIAL*****

Page 163

1                        KRISTOPHER MOLDOVAN

2    holders of EFH 1L notes of what the company's position was

3    as to whether it could file for bankruptcy and repay the

4    notes prior to December 1, 2015, without paying the

5    applicable premium?

6          A.    I'm sorry; you said, EFH 1L notes.  Are you --

7          Q.    EFIH 1L notes.

8          A.    Can you repeat the question?

9          Q.    Sure.

10               Did you take any steps, Mr. Moldovan, to

11   inform holders of EFIH 1L notes of what the company's

12   position was, after September 2010, as to whether it could

13   file for bankruptcy and repay the notes prior to

14   December 1, 2015, without paying the applicable premium?

15         A.    We did not take any steps to interpret the terms

16   of the indenture for them, no.

17         Q.    You didn't issue an 8-K, right, about the

18   subject, right?

19         A.    No.

20         Q.    You didn't issue a press release, right?

21         A.    No.

22         Q.    You didn't take any steps to determine whether

23   the holders of those notes had the same understanding as

24   whatever understanding you formed after speaking to

25   counsel, right?

*****CONFIDENTIAL*****

Page 164

1                    KRISTOPHER MOLDOVAN

2           MR. HOWELL:  Object to form.

3       A.   I don't recall taking any steps to clarify any

4  interpretations of the indenture.

5       Q.   (BY MR. ANKER)   And you use the term, "we," and

6  I asked some questions about you personally.

7                The company didn't take any steps to

8  clarify the meaning of the indenture, the EFIH 1L

9  indenture, with respect to applicable premium following

10  the discussions you had with counsel in September or

11  October of 2010, right?

12       A.   That's correct.

13       Q.   Okay.  Now, let's look back at the indenture.

14  Let's look back at the indenture.  And let me point you to

15  Section 3.07E, as in Earl.

16                Do you see that section, sir?

17       A.   I do.

18       Q.   And that section is entitled -- it's not

19  entitled.  I'm sorry; I don't mean E.  I direct you to C.

20  That section reads, 3.07C:  Except pursuant to clause A or

21  B of this Section 3.07, the note shall not be redeemable

22  at the issuer's option prior to December 1, 2015.

23                Do you see that?

24       A.   I see that, yes.

25       Q.   And that's effectively a no-call provision,

KRISTOPHER MOLDOVAN

1

2  except with respect to a redemption pursuant to clauses A

3  or B of Section 3.07, right?

4           MR. HOWELL:  Object to form.

5      A.   I don't -- it is a clarification that the

6  company does not have any rights to exercise optional

7  redemption before that date, other than as set forth in A

8  and B.

9      Q.   (BY MR. ANKER)   Okay.  Now, the Debtors

10  refinanced these notes sometime in June of 2014, right?

11      A.   The Debtors settled these notes in 2014.

12      Q.   Repaid these notes in 2014, repaid principal and

13  interest, right?

14      A.   Yes, paid principal and interest.

15      Q.   And the company did so because it was able to

16  find new financing at a lower interest rate, right?

17           MR. HOWELL:  Object to foundation.

18      A.   The company did so because it had a court order

19  allowing it to do so.

20      Q.   (BY MR. ANKER)   Okay.  And why did the company

21  seek that court order?

22      A.   It was required to pay the EFIH first lien

23  notes, because they had automatically accelerated upon the

24  filing of the bankruptcy.

25      Q.   It was required to; I see.

*****CONFIDENTIAL*****

Page 166

1                    KRISTOPHER MOLDOVAN

2              And so you're aware that there were EFIH

3     two lien -- second lien notes?

4         A.   I am.

5         Q.   Okay.   You're aware that there were EFIH

6     unsecured notes, PIK notes, right?

7         A.   I am.

8         Q.   Did the EFIH second lien notes have a

9     acceleration provision upon the event of bankruptcy?

10        A.   I believe they do.

11        Q.   Did the PIK notes have an acceleration provision

12    upon the filing for bankruptcy?

13        A.   They do.

14        Q.   Okay.   So you told me a minute ago that the

15    company was required to repay the first lien notes because

16    of the filing for bankruptcy.

17              What was the date when the company repaid

18    the second lien notes?

19              MR. HOWELL:   Object to form.

20        A.   The company has yet to --

21        Q.   (BY MR. ANKER)   I see.

22        A.   -- fulfill on its obligation to pay the second

23    lien notes.

24        Q.   And the company hasn't fulfilled its obligation

25    to repay the PIK notes either, right, sir?

*****CONFIDENTIAL*****

Page 167

1                    KRISTOPHER MOLDOVAN

2          A.    Not yet.    The bankruptcy, as I understand it --

3    I'm not a bankruptcy expert.    As I understand it, the

4    bankruptcy laws provide the company with some breathing

5    room to determine the appropriate time to fulfill that

6    obligation that occurred on April 29th.

7          Q.    And I understand you're not a bankruptcy lawyer.

8                    To your understanding, the company had that

9    same breathing room, did it not, with respect to the first

10   lien debt?

11         A.    To my understanding, if it needed that breathing

12   room or if the company had decided that that was

13   appropriate, it could have taken it.

14         Q.    So the company could have, to your

15   understanding, not repaid principal and interest on the

16   first lien notes at the outset of the bankruptcy, right?

17                    MR. HOWELL:    Object to form.

18         A.    I'd have to check with bankruptcy counsel given

19   that there was a transaction available that the company

20   believed was value maximizing.    I -- I don't know that --

21   I'd have to ask bankruptcy counsel whether the company

22   could have delayed, given that.

23         Q.    (BY MR. ANKER)    Well, the company didn't have

24   to enter into that transaction; did it?

25         A.    I don't -- I don't know if it had to or not.

*****CONFIDENTIAL*****

Page 168

1          KRISTOPHER MOLDOVAN

2      Q.   Okay.  Independent -- I'm not -- I know you're

3  not a lawyer.

4          Do you have any understanding that the

5  company was under any legal compulsion to repay the first

6  lien debt at the outset of this bankruptcy?

7      A.   Under the indenture it is, I believe.

8      Q.   Well, you just said that, under the indenture,

9  it read the same for the second lien debt, right?

10     A.   That's correct.

11     Q.   And it read the same for the PIK notes, right?

12     A.   That's correct.

13     Q.   But it didn't repay those, right?

14     A.   There are other -- different facts for those.

15     Q.   Okay.  There was a bankruptcy law that you

16  understood gave the company breathing room, right?

17     A.   There are -- if -- there's a bankruptcy law

18  that, under certain circumstances, you could delay that

19  repayment.

20     Q.   Okay.  And do you have any understanding that

21  the circumstances were different for the PIKs and the

22  second liens is a legal matter than for the first lien

23  debt?

24          MR. HOWELL:  Object to form.

25     Q.   (BY MR. ANKER)   Your understanding,

*****CONFIDENTIAL*****

Page 169

1                          KRISTOPHER MOLDOVAN

2     Mr. Moldovan?

3          A.    I'd have to consult with our bankruptcy counsel.

4          Q.    So -- so independent of advice of counsel,

5     you're unable to point to any difference in the

6     circumstances, right?

7          A.    I think it's the company's decision of what is

8     the value maximizing in each case, and --

9          Q.    And so the company made the decision that the

10    value maximizing way to proceed, as to the first lien

11    debt, was to pay it off, pay off principal and interest at

12    the outset of the bankruptcy, right?

13         A.    The company --

14                MR. HOWELL:   Object to foundation.

15         A.    The indenture required it to be paid off, and

16    the company -- that's what our board determined to do.

17         Q.    (BY MR. ANKER)   Because it determined that it

18    was value maximizing, right?

19                MR. HOWELL:   Object to foundation.

20         A.    I don't know; I wasn't in the board meeting.

21         Q.    (BY MR. ANKER)   Okay.   Now, Mr. Moldovan, I

22    think you testified earlier that, had the company not been

23    in bankruptcy, and refinanced or repaid the notes, EFIH

24    first lien notes, in June of 2014, it would have had to

25    pay the make whole premium, right?

*****CONFIDENTIAL*****

Page 170

KRISTOPHER MOLDOVAN

1

2          MR. HOWELL:  Object to form.  Compound.

3          A.   In the -- that counter factual situation, if the

4    company had not been in bankruptcy, and it had elected to

5    utilize one of the optional redemption provisions that it

6    was afforded under the indenture, the one that required

7    the payment of an applicable premium, then it -- that

8    would have been one of the payments required.

9          Q.   (BY MR. ANKER)  Right.  And that's 3 -- Section

10   3.07(a), right?

11         A.   That's correct.

12         Q.   And the other provision was an equity clawback,

13   right?

14         A.   That's correct.

15         Q.   Which didn't allow the company to clawback

16   100 percent of the notes, right?

17         A.   No, it does not.

18         Q.   Okay.  So the only way, outside bankruptcy, the

19   company could have repaid 100 percent of principal and

20   interest would have been through the optional redemption

21   provision in Section 3.07(a), right?

22         A.   The only way that the company could have forced

23   -- or required a redemption or forced the redemption would

24   have been, yes, the optional redemption in 3.07(a).

25         Q.   Okay.  But it's the company's position that it

*****CONFIDENTIAL*****

Page 171

1                    KRISTOPHER MOLDOVAN

2    does not have to pay the make whole, having filed for

3    bankruptcy and having repaid the notes in the same month

4    as this hypothetical June of 2014, right?

5        A.    The company did not optionally redeem the notes;

6    they accelerated them, settled them.

7        Q.    Okay.  I just asked you whether it was the

8    company's position that it does not have to pay the make

9    whole, even though it repaid the notes in June 2014?

10       A.    Given the bankruptcy and the acceleration, it is

11   the company's position that it does not owe applicable

12   premium, which is only used in Section 3.07(a), and is not

13   used in the acceleration provisions.

14       Q.    Okay.  And so it's fair to say that the basis

15   for the company's position that it does not have to pay

16   the make whole, is that the debt accelerated under

17   Section 6.02 of the indenture?

18                    MR. HOWELL:  Object to form.

19       A.    Because the debt accelerated under Section 6.02,

20   it became due and payable.  And nowhere in that section

21   does it contemplate that applicable premium would be due.

22       Q.    (BY MR. ANKER)   That's the company's position?

23       A.    Yes.

24       Q.    Okay.  And it's -- I just want to make sure

25   there's not some other provision that I'm missing; that's

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2    all I'm trying to get to.

3                    It's because of Section 6.02 in the

4    acceleration that the company believes it does not owe the

5    make whole premium, right?

6         A.    The company looks to that provision as to what

7    it owes, and applicable premium is not in that section,

8    yes.

9         Q.    So the answer to my question is yes?

10        A.    Do you want to rephrase your question --

11        Q.    Sure.

12        A.    -- or restate your question, please?

13        Q.    I want to just make sure there's not some other

14   provision I'm missing.

15                   It is because of Section 6.02 in the

16   acceleration of the debt that the company takes the

17   position that it doesn't owe the make whole premium,

18   right?

19        A.    The company takes that position because this was

20   not an optional redemption.  I -- whether you want to

21   limit that to Section 6.02, it is not an optional

22   redemption.  Applicable premium is only due in an optional

23   redemption context.  This was an acceleration, and

24   applicable premium is not due in connection with an

25   acceleration.

*****CONFIDENTIAL*****

Page 173

KRISTOPHER MOLDOVAN

1

2     Q.    Okay.  Let's take a look at -- well, first off,

3  did the company -- let's back up.

4          You're aware that, in the fall of 2013, I

5  believe it's November of 2013, the company issued an 8-K

6  in which it described the proposed restructuring of the

7  FIH?

8     A.    I don't recall the 8-K or --

9     Q.    Let me -- let me make a representation to you.

10  I believe it's November 1, 2013, the company issued an 8-K

11  in which it indicated that it planned to put the EFIH or

12  might put EFIH into bankruptcy and do a restructuring in

13  which it would not pay the make whole on the EFIH first

14  lien debt.  Let me represent that to you.

15          MR. HOWELL:  There's no question pending.

16          THE WITNESS:  Okay.

17     Q.    (BY MR. ANKER)  Okay.  Prior to that date, are

18  you aware of any public disclosure by EFIH that it took

19  the position that it could repay the first lien notes

20  without paying a make whole prior to the date specified

21  for payment of a make whole in the applicable indenture?

22     A.    I'm -- I'm sorry; could you please repeat your

23  question?

24     Q.    Sure.  I'll limit the question to the 2000 -- to

25  the 10 percent notes.

*****CONFIDENTIAL*****

Page 174

1                    KRISTOPHER MOLDOVAN

2       A.   Okay.

3       Q.   The 10 percent notes provided for the payment of

4  a make whole in the event that the notes were redeemed

5  prior to December 1, 2015, right?

6            MR. HOWELL:  Object to form.

7       A.   There's an optional redemption provision that,

8  if exercised under 3.07(a), and that the applicable

9  premium would be due under that indenture.

10      Q.   (BY MR. ANKER)   Prior to the fall of 2013, did

11 EFIH or EFH make any public disclosure to holders of the

12 EFIH notes that the company's position was that it could

13 file for bankruptcy, repay the first lien notes prior to

14 December 1, 2015, without paying a make whole premium?

15      A.   Not --

16            MR. HOWELL:  Object to foundation.

17            You can answer.

18      A.   Not to my knowledge.

19      Q.   (BY MR. ANKER)  Okay.  Let's turn to Section

20 6.02, which you referenced.

21            Are you there, sir?

22      A.   Not yet.  Yes.

23      Q.   Now, you would -- I'm not there.  Let me turn to

24 it.

25            MR. HOWELL:  93.

*****CONFIDENTIAL*****

1                KRISTOPHER MOLDOVAN

2            MR. ANKER:   Thank you.

3       Q.   (BY MR. ANKER)   6.02, in its first paragraph,

4   refers to events of default, other than a

5   bankruptcy-related default, right?

6       A.   That's correct.

7       Q.   Okay.  And with respect to events of default,

8   other than a bankruptcy default, it says that the trustee

9   or the holders of at least 30 percent in aggregate

10  principal amount of the notes may declare the principal

11  premium and interest due, right?

12           MR. HOWELL:   Object to form.

13      A.   I'm sorry; that is what you've read.  I think

14  the words are on the page, yes.

15      Q.   (BY MR. ANKER)   Okay.  And so the company

16  understood that, as to a nonbankruptcy default, there was

17  an acceleration if, but only if, the trustee or the

18  requisite number of holders exercised the right to declare

19  -- to accelerate the debt, right?

20      A.   I'm sorry; could you repeat the question?

21      Q.   As to a nonbankruptcy event of default, the

22  company understood that there would be an acceleration if,

23  but only if, the trustee or the requisite number of

24  holders declared the debt accelerated, right?

25      A.   That's correct.

*****CONFIDENTIAL*****

Page 176

1                    KRISTOPHER MOLDOVAN

2        Q.   Okay.  And in that event -- strike that.

3                   Now let's go to bankruptcy in the event of

4    default.

5                   There it says that all outstanding notes

6    shall be due and payable immediately without further

7    action, right?

8        A.   All outstanding notes shall be due and payable

9    immediately without further action or notice, yes.

10       Q.   Right.  But it goes on, in the next paragraph,

11   does it not, Mr. Moldovan, to say that the holders of at

12   least a majority in aggregate principal amount of the

13   notes, by written notice to the trustee, may, on behalf of

14   all the holders, waive any existing default and its

15   consequences under this indenture, except a continuing

16   default and payment of interest on premium, if any, or the

17   principal of any note, and rescind any acceleration with

18   respect to the notes and its consequences.

19                  Did I read that correctly?

20       A.   Well, you skipped over some --

21       Q.   I did to try to make it --

22       A.   -- words.  But until you -- without -- with the

23   acknowledgement that you skipped over some words, you were

24   reading from that paragraph.

25       Q.   Okay.  And so the company understood that, under

*****CONFIDENTIAL*****

Page 177

1          KRISTOPHER MOLDOVAN

2    this indenture, the 2010 indenture, the holders of the

3    notes had the right to waive any default and rescind any

4    acceleration, right?

5         A.    Yes.

6         Q.    Okay.   And you're aware that the holders in

7    such -- the holders of -- the majority of the holders --

8    let me start again.

9              You're aware, are you not, that a majority

10   in dollar amount of holders of the EFIH first lien debts

11   and notes, in fact, sent a de-acceleration notice?

12        A.    I am aware that they sent a notice attempting to

13   decelerate the notes.

14        Q.    And I don't want your -- you're not here as a

15   legal expert.   We will argue to the Court whether that

16   notice is effective.

17              Does the company have any basis, that

18   you're aware of, to contend that, if that notice is

19   effective, it can avoid paying the make whole?

20              MR. HOWELL:   Object to form.   Foundation --

21   I'm sorry; object to form.

22        A.    I'm -- I'm sorry; could --

23        Q.    (BY MR. ANKER)   Sure.

24              Assume with me that that notice is held to

25   be effective.

1                       KRISTOPHER MOLDOVAN

2                  Are you aware of any basis, if

3    Judge Chancery holds that that notice was effective, why

4    the make whole would then not be due and payable?

5                  MR. HOWELL:  Object to form.

6         A.   I'm only aware that there was a court order

7    allowing us to pay what was paid.  I don't know what the

8    effect would be if he declares that notice to be

9    effective.  I don't know what claims you will assert, and

10   what the outcome of those might be.

11        Q.   (BY MR. ANKER)   Okay.  So, as you sit here

12   today, you're not able to tell me any basis on which, as

13   you understand this agreement, the make -- the make whole

14   would not be due and payable if the acceleration is

15   rescinded?

16        A.   If it's a -- if the acceleration is rescinded

17   and -- and upheld by Judge Chancery?

18        Q.   Yes.

19        A.   I am not aware of the legal arguments that we

20   would make or that would be made.

21        Q.   Okay.  Putting aside the legal arguments, you're

22   here to testify on the interpretation -- on the Debtor's

23   position as to the interpretation of these documents.

24                  Are you aware of any basis, as a

25   representative of the Debtor, why the make whole will not

*****CONFIDENTIAL*****

Page 179

1                      KRISTOPHER MOLDOVAN

2  be due and payable if Judge Chancery upholds --

3        A.    I'm neither --

4        Q.    -- the decision?

5        A.    I'm sorry.  I am neither aware of why it would

6  be due and payable or why it may not be this -- obviously,

7  there was a court order allowing a repayment upon the

8  acceleration.  I don't know -- the applicable premium is

9  in the context of a provision that was not utilized to

10  repay the notes.  So...

11        Q.    And you say that the applicable premium was not

12  -- strike that.

13        A.    We did not -- if I can clarify; we did not

14  utilize Section 3.07(a), and that's the section that

15  requires applicable premium.  Therefore, if this is given

16  -- if -- if the recision is -- if the recision is upheld,

17  I do not know an argument, either way, under the document,

18  whether applicable premium would be paid, as we did not

19  exercise rights under 3.07(a).

20        Q.    And the basis for your statement that you did

21  not exercise rights under 3.07 was that the debt was

22  accelerated, right?

23        A.    That we have a court order saying that we could

24  pay that amount.

25        Q.    Which court order you -- the company sought?

*****CONFIDENTIAL*****

Page 180

1                     KRISTOPHER MOLDOVAN

2          A.    The court order that, I believe, was agreed.

3     But, yes.

4          Q.    That the company sought, right?

5          A.    And then negotiated and agreed with the trustee,

6     yes.

7          Q.    You're not aware that holders -- or that the

8     trustee objected to the entry of that order?

9          A.    I'm aware that they -- there were some

10    negotiations around exactly what was paid.

11         Q.    Okay.   Now, this indenture doesn't define the

12    term, "redemption," either, right?

13         A.    Not to my knowledge.

14         Q.    Did the company have any discussions, at any

15    point, with holders of EFIH first lien notes about what

16    the term, "optional redemption," within the meaning of

17    Section 3.07 meant?

18         A.    I'm not aware of any discussions.

19         Q.    Are you aware of any disclosure by the company

20    as to what the terms, "optional redemption," -- disclosure

21    by the company to EFIH -- EFIH first lien holders about

22    what the term means?

23                    MR. HOWELL:   Object to form.

24         A.    I'm not aware of any disclosure defining

25    optional redemption.

*****CONFIDENTIAL*****

Page 181

1                    KRISTOPHER MOLDOVAN

2        Q.   (BY MR. ANKER)   Now, let's go back to

3   Section 6.02, if you would, with me.  And let me start

4   again with the nonbankruptcy event of default.  As you've

5   testified, that gives holders the option to accelerate.

6              And if they exercise that option, then what

7   becomes due is principal, premium, if any, and interest,

8   right?

9        A.   I'm sorry; what that allowed -- they can declare

10  principal, premium, if any, and interest.

11       Q.   And any --

12       A.   And then it says:  Upon such effectiveness of

13  such declaration, such principal and interest shall be due

14  and payable immediately.

15       Q.   Okay.  So they can declare the principal

16  premium, if any, interest, and any other monetary

17  obligations on all of the outstanding notes to be due and

18  payable, right?

19       A.   They can declare principal premium, if any,

20  interest, and any other monetary obligations on all the

21  then-outstanding notes to be due and payable immediately.

22       Q.   And you would acknowledge that one such premium

23  or other monetary obligation potentially is the applicable

24  premium defined in Section 3.07(a) of the indenture,

25  right?

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2        A.    No.

3        Q.    That's not a monetary obligation?

4        A.    It's not intended to be picked up here, no.

5        Q.    Okay.  And why is not intended to be picked up

6   here?

7        A.    It's a defined term in the indenture; and, if it

8   was intended to be picked up, it would have been utilized

9   here.

10       Q.    Okay.  And that view point that you just

11   articulated to me, Mr. Moldovan, tell me every time the

12   company communicated it to any holder of the EFIH first

13   lien notes.

14       A.    Just what --

15             MR. HOWELL:  Object to form.

16       A.    Just what the terms of the -- just the face of

17   the indenture.

18       Q.    (BY MR. ANKER)   Other than providing people a

19   copy of the indenture, there were no such communications

20   made by EFIH, at any time, indicating that their view was

21   that applicable premium did not get covered by -- did not

22   come within the amounts to be paid under Section 6.02, the

23   first paragraph, right?

24       A.    We did not communicate an interpretation -- we

25   did not communicate the words were not in that paragraph,

*****CONFIDENTIAL*****

Page 183

1                    KRISTOPHER MOLDOVAN

2    no.

3        Q.   Okay.  Let's turn to the third paragraph, which

4    is the one dealing with what happens if -- I'm sorry, the

5    second paragraph, what happens if there's a bankruptcy of

6    added default.

7                     It says, then, that all outstanding notes

8    shall be due and payable, right?

9        A.   All outstanding notes shall be due and payable

10   immediately without further action or notice, yes.

11       Q.   Okay.  And, I take it, it's your position that

12   the principal was due and payable immediately?

13       A.   Reading the definitions, yes, the principal

14   is -- our -- my position is that the principal is due and

15   payable immediately.

16       Q.   And what about accrued interest?

17       A.   It's not -- that's not included in that

18   language.

19       Q.   I see.  So when the company paid accrued

20   interest to the holders of EFIH first lien notes, in June

21   of 2014, it made a voluntary payment it didn't have to?

22       A.   No, the Court required us to.  The court order

23   said that we had to pay accrued interest.

24       Q.   And why didn't the company object to that

25   provision, since the -- since you're telling me the

*****CONFIDENTIAL*****

Page 184

1                    KRISTOPHER MOLDOVAN

2  indenture didn't require it?

3      A.   I didn't -- I disagree that I told you the

4  indenture didn't require it.  I said it wasn't in that

5  section.  What I can tell you is -- I don't -- we

6  consulted with counsel on whether or not interest was

7  payable.  The general understanding -- my general

8  understanding of bankruptcy was, for a secured creditor,

9  who's way oversecured, under bankruptcy law, they're

10 entitled to accrued interest.  And upon conferring with

11 counsel, they indicated that --

12              MR. HOWELL:  Well, don't disclose the

13 substance of any communications with counsel that involved

14 legal advice.  Otherwise, you can --

15      A.   We communicated with counsel.  And based on

16 those communications and the -- and negotiations as to

17 what was to be paid at the time, we paid the accrued

18 interest at the time.  I also think I recall that there's

19 a reservation of rights with respect to that accrued

20 interest that was paid.

21      Q.   (BY MR. ANKER)  Mr. Moldovan, I think my

22 question may have confused you.

23              The language in Section 6.02 says that all

24 outstanding notes shall be due and payable immediately

25 upon a bankruptcy default, right?

*****CONFIDENTIAL*****

                    KRISTOPHER MOLDOVAN

1
2       A.   That's -- upon a bankruptcy, yes, all

3   outstanding notes.

4       Q.   Okay.  And, I take it, your position is that the

5   term, "outstanding notes," doesn't include the make whole

6   premium, right?

7       A.   It does not.

8       Q.   How did you conclude that the term, "all

9   outstanding notes," included principal; how do you

10  conclude that it included interest?

11      A.   Well, if you look at the definition of "notes,"

12  "notes" means initial notes and, more particularly, means

13  any note authenticated and delivered under this indenture.

14  And then --

15           MR. HOWELL:  I'm sorry; for the record, can

16  you point us to where you are?

17           THE WITNESS:  I'm sorry; I'm on page 27.

18           MR. HOWELL:  I'm sorry to interpret.

19           THE WITNESS:  Of the EFIH 10 percent

20  indenture.

21      A.   "Notes" means the initial notes.  And skipping

22  forward, "notes" also means additional notes subsequently

23  issued.  And when you go look at the definition of

24  "initial note," it describes them as 2.18-billion

25  aggregate principal amount of 10 percent senior secured

*****CONFIDENTIAL*****

Page 186

1                        KRISTOPHER MOLDOVAN

2    notes due 2020.  Similarly, with additional notes in the

3    supplement indenture, my recollection is those are defined

4    to be a principal amount.

5                        Also, go to the section that talks about

6    what is an outstanding note, which, I believe, is in

7    Section 2 -- 2.08.  And I think the read into that is that

8    the principal amount that still remains outstanding shall

9    be due and payable immediately.

10        Q.   (BY MR. ANKER)   Which section are you referring

11   me to?  2 point --

12        A.   I'm sorry; outstanding is 2 -- the term as to

13   what is outstanding note -- to determine what is still

14   outstanding is in Section 2.08.

15        Q.   Okay.  Given the definition of "notes" -- I'm

16   sorry; given that Section 6.02 says that, upon a

17   bankruptcy default, the notes come due, isn't it the

18   company's understanding that one has to look at the notes

19   themselves to see what amounts are then owed?

20        A.   I think the company looked through the

21   definitions.

22        Q.   The notes are incorporated into the indenture;

23   are they not?

24        A.   That's true.

25        Q.   And they set forth terms, right?

*****CONFIDENTIAL*****

Page 187

                    KRISTOPHER MOLDOVAN

1

2       A.    They do.

3       Q.    And so if the notes themselves provided for

4  payment of the applicable premium under the circumstances,

5  you wouldn't dispute that Section 6.02, then, calls for

6  payment of the applicable premium, right?

7            MR. HOWELL:  Object to form.

8       A.    That calls for a conclusion as to whether those

9  terms would be deemed to be conflicting, because the

10  indenture controls if the terms are conflicting.

11       Q.    (BY MR. ANKER)  Did -- did the company review

12  the notes themselves informing of you as to what amounts

13  were owed upon acceleration of the debt?

14       A.    Yes.

15       Q.    Okay.  And it reviewed it because it thought the

16  notes were relevant to a determination of what was owed in

17  the event of a acceleration, right?

18       A.    Yes.

19       Q.    Okay.  Mr. Moldovan, this exchange, in 2010,

20  involved a registered offering by EFIH securities, right?

21       A.    Yes.

22       Q.    And those securities were offered on the New

23  York stock exchange, right?

24       A.    I don't recall.

25       Q.    Okay.  EFH filed a registration statement with

KRISTOPHER MOLDOVAN

1  the FCC and issued a prospectus for the offering, right?

2      A.   That's my recollection.

3      Q.   And you've already testified it made

4  representations to the dealer managers there would be no

5  misrepresentations or material omissions, right?

6      A.   I testified about that subject.  I --

7      Q.   Well, let me ask the question directly.

8          I -- the company did make those

9  representations; did it not?

10     A.   Again, I'd have to go back to that section

11 and -- it -- it made representations on that subject

12 matter.  I would say the document -- you know, whether it

13 made the exact ones you just read, I'd either have to go

14 confirm it or let the document speak for itself.

15     Q.   And EFIH drafted the prospectus, right, with --

16 with the advice -- with counsel, right?

17     A.   It drafted most of the -- many of the sections

18 of it.  Some of them were drafted by underwriters,

19 counsel.

20         MR. ANKER:  Let's mark as -- what is the

21 next exhibit number?

22         MR. HOWELL:  12, I believe.

23         MR. ANKER:  12.

24         THE WITNESS:  Are we at a place -- at a

1                     KRISTOPHER MOLDOVAN

2    place for a break?

3                     MR. ANKER:  Sure.  You want to take a

4    break?

5                     THE WITNESS:  Yeah, that'd be great.

6                     THE VIDEOGRAPHER:  We are now off the

7    record.  The time is 2:31 p.m.

8                     (Recess in the proceedings from 2:31 to

9                     2:42 p.m.)

10                    THE VIDEOGRAPHER:  We are now back on the

11   record.  The time is 2:42 p.m.

12   Q.   (BY MR. ANKER)  Mr. Moldovan, you provided some

13   reasons why you submit or why the committee submits the

14   make whole is not due.  You pointed me to the fact that

15   the debt was accelerated by the bankruptcy filing.  And

16   you said that we didn't exercise an optional redemption

17   under Section 3.07(a).

18                    Any other reasons that you haven't covered

19   as to why the company submits the make whole is not due on

20   any of the first lien debt?

21   A.   The company's view is the applicable premium is

22   only due in the limited circumstance set forth in 3.07(a).

23   Q.   Any other circumstance that you haven't

24   testified to as to why the company takes the position the

25   make whole isn't due?

1                        KRISTOPHER MOLDOVAN

2          A.    The company's position is that it's only due if

3    you exercise a right under Section 3.07(a).

4          Q.    And this wasn't an exercise under 3.07(a)

5    because the debt accelerated; that's the company's

6    position, right?

7          A.    That's correct.

8          Q.    Okay.  And there's no other -- nothing else I'm

9    going to hear at trial of any other explanation for why

10   the make whole isn't due, right; coming from the company,

11   right?

12              MR. HOWELL:  Object to form.

13         A.    The company's position is that the applicable

14   premium is only due under Section 3.07(a) and under no

15   other provision.

16         Q.    (BY MR. ANKER)    Okay.  When did the company

17   first form that position?

18         A.    I believe that the company did not -- was aware

19   that, under a default scenario, applicable premium was not

20   due from the first indenture.

21         Q.    Well, Mr. Moldovan, you testified to me there

22   were no discussions in connection with the first

23   indenture, and you told me that you had no information

24   that anyone considered the issued in connection with the

25   first indenture.  So let me rephrase -- let me ask my

1                          KRISTOPHER MOLDOVAN

2    question again.

3                          When did the company first consciously form

4    that view?

5                          MR. HOWELL:  Object to form.

6        A.    As I read that provision, I think I testified I

7    don't recall anything -- conscious decision in my head,

8    and I don't -- you know, I'd have to go back to your exact

9    question.  But it is clear from the words on the page that

10   applicable premium is due only in an optional redemption

11   provision.  And I believe the company, in reading the

12   indenture, had that reading from 2007.

13       Q.    (BY MR. ANKER)  Mr. Moldovan, that's total

14   speculation, right?  You can't refer me to a single

15   discussion in 2007, right, on the subject?

16       A.    I cannot refer you to a discussion.

17       Q.    Okay.  And you can't refer me to a discussion,

18   in 2010, in connection with the EFIH indenture, right?

19       A.    No discussion.

20       Q.    Okay.  And you can't point me to a discussion at

21   any time subsequent to the EFIH first lien indenture

22   issuance, in 2010, with any EFIH holder or indenture

23   trustee regard -- for EFIH regarding this issue, right?

24       A.    No discussion with holders or indenture trustee.

25                          MR. ANKER:  What's the next number?

*****CONFIDENTIAL*****

Page 192

1              KRISTOPHER MOLDOVAN

2          (Exhibit 12 marked.)

3      Q.    (BY MR. ANKER)    Mr. Moldovan, let me show you

4  an exhibit, Exhibit 12.    It's the -- I believe it's the

5  prospectus for this 2010 offering; EFIHMW00051935 through

6  2667 inclusive.

7              Do you recognize this document?

8      A.    (Witness reviews document.)

9              It appears to be the Edgar version of the

10 prospectus with respect to the exchange of notes into

11 $2.18-billion of 10 percent notes and $500-million in

12 cash.

13     Q.    Okay.  And if you turn to the first page of

14 text, which is -- bears the Bates stamp 936, second page

15 of the document; are you there?

16     A.    Yes.

17     Q.    And you'll notice that this indenture also

18 directed prospective investors to carefully consider all

19 the information in this prospectus, including the annexes

20 hereto, in particular, risk factors beginning on page 38.

21              Is that right; did I read it correctly?

22     A.    You -- you skipped over "in its entirety."  But,

23 yes, it also says:  In particular, risk factors beginning

24 on page 38.

25     Q.    Why did the company encourage investors to read

1                    KRISTOPHER MOLDOVAN

2    the risk factors in particular?

3         A.   My understanding is that's a -- is a reference

4    to risk factors is a requirement for prospectuses.

5         Q.   Okay.  But certainly it's fair to say that the

6    company, whether it was required to or not, was

7    encouraging investors to look at the risk factors, right?

8         A.   Encouraging them to read the entire document,

9    yes, including --

10        Q.   In particular, the risk factors, right?

11        A.   In particular, the risk factors.

12        Q.   Okay.  And those risk factors begin to page 38

13   of the indenture, correct -- I'm sorry; I said "of the

14   indenture"; of the prospectus, right?

15        A.   The risk factors do begin on page 38, yes.

16        Q.   And they continue all the way through page 78,

17   right; 41 pages, single spaced?

18        A.   Yes, they continue through page 78.

19        Q.   A lot of disclosures and a lot of potential

20   risks, right?

21             MR. HOWELL:  Object to form.

22        A.   Risk factors are on page 38 to 78.

23        Q.   (BY MR. ANKER)   You can't stipulate with me

24   that it's a lot of disclosure of a lot of risk?

25             MR. HOWELL:  Object to form.

Page 194

KRISTOPHER MOLDOVAN

1

2    A.   I -- I'd have to compare to other risk factor

3    sections, but -- it's 41 pages.

4    Q.   (BY MR. ANKER)   41 pages, single spaced.

5            And what the company was seeking to do was

6    to disclose all material risks, right?

7    A.   That's correct.

8    Q.   And let's talk about the word, "material," for a

9    moment.

10           Does the company, with respect to its own

11   financial standard -- statements, have a rule of thumb on

12   materiality?

13           MR. HOWELL:   Object to the foundation.

14   A.   I'm not involved in that.

15   Q.   (BY MR. ANKER)   Okay.   If the company -- have

16   you ever heard the statement -- have you ever seen the

17   statement or heard the statement, that a financial result

18   -- a -- a -- that affects -- I'm sorry; let me start

19   again.

20           Have you ever heard the suggestion that a

21   event that affects financial results by 5 percent were

22   more presumptively material?

23   A.   No, that's not my area of expertise.

24   Q.   Okay.   Did the company have any view -- strike

25   that.

1                    KRISTOPHER MOLDOVAN

2              The make whole here -- strike that.

3              The total amount of debt was -- of EFIH

4    first lien debt, all of it, was about $4-billion, right?

5         A.   Not at this time.

6         Q.   It was 2-billion at this time, right?

7         A.   2.18-billion, yes.

8         Q.   And the indenture -- the make whole was

9    potentially at, certainly in the early stages, 20 percent

10   or more beyond that principal amount, right?

11        A.   I don't know.

12        Q.   You never did the math?

13        A.   I don't recall doing it at this time, no.

14        Q.   Okay.  Do you recall doing it at the time of the

15   bankruptcy?

16        A.   I have not done the math, no.

17        Q.   Okay.  Okay.  Let's go back to the risk factors.

18              In this indenture, like the 2007 one, there

19   were disclosures not only relating to the business, but

20   disclosures relating to the terms of the indenture and the

21   notes, right?

22        A.   That's correct.

23        Q.   And there were a series of disclosures -- let me

24   back up.

25              Did the company review with counsel -- I'm

*****CONFIDENTIAL*****

KRISTOPHER MOLDOVAN

1  not asking you to go into the substance -- the risk factor

3  disclosures here?

4         A.    Yes.

5         Q.    And the company took seriously its obligation to

6  provide full and complete disclosure, right?

7         A.    Yes.

8         Q.    And it recognized that these disclosures were

9  important to investors, right?

10                   MR. HOWELL:   Object to form.

11        Q.    (BY MR. ANKER)    It understood they were, right?

12        A.    I don't know what sections investors read.

13  Again, the company encouraged people to read the entire

14  document, including the risk factors.

15        Q.    Now, the risk factors on the exchange offer in

16  the notes begin on page 40, am I right?

17        A.    That's correct.

18        Q.    And they continue for 11 pages -- actually 12,

19  through page 51, right -- I'm sorry, through page 54, 15

20  pages; am I right?

21        A.    That appears to be correct.

22        Q.    Okay.   And as we said earlier, they included

23  risks that simply involved the way the terms of the

24  indenture worked, right?

25        A.    That's my recollection.

*****CONFIDENTIAL*****

Page 197

1        KRISTOPHER MOLDOVAN

2        Q.    Okay.    Well, let's look at one.

3        A.    Okay.

4        Q.    Page 47.    One of the disclosures made was that,

5   under the terms of the indenture, holders were agreeing

6   not to file a bankruptcy proceeding against Encore or

7   against any of its subsidiaries, right?

8        A.    Under the terms of the indenture, they agreed

9   not to file a bankruptcy proceeding against Encore

10  Holdings or its subsidiaries, correct.

11       Q.    The company made that disclosure as a risk

12  factor, right?

13       A.    That's correct.

14       Q.    And the -- it was simply the wording of the

15  indenture barred holders of the notes from filing a

16  bankruptcy proceeding against Encore, right?

17       A.    It was the -- says it was part of the exchange

18  offers and consent solicitation acknowledge they won't do

19  that.    So, in -- in that one, I -- I believe this was

20  referring to what -- when somebody submits their notes

21  that they're agreeing in that case.

22       Q.    But it was the terms of an offering document,

23  right?

24       A.    It was in a document that they would need to

25  submit to execute the exchange.

*****CONFIDENTIAL*****

Page 198

1                    KRISTOPHER MOLDOVAN

2          Q.    Okay.   And the risk factors that were disclosed

3    included risks relating to a possible bankruptcy filing by

4    EFIH, right?

5          A.    If you can point me to one?

6          Q.    Sure.   Well, I'll point you to one.   Take a look

7    at page 45.

8          A.    Okay.

9          Q.    Do you see the heading, The new EFIH senior

10   secured notes will be secured only to the extent of the

11   value of the assets that have been granted as security for

12   the new EFIH senior secured notes?

13         A.    I do.

14         Q.    That states, basically, a term of the indenture,

15   right; you get whatever security the indenture says you

16   got, right?

17                    MR. HOWELL:   Object to form.

18         A.    It purports to explain their rights under the

19   documents.

20         Q.    (BY MR. ANKER)   Okay.   And if you look at the

21   third paragraph under that disclosure -- I don't want to

22   use up a lot of time reading it, but it begins:   In the

23   event that a bankruptcy or similar proceeding is commenced

24   by or against the offeror -- am I reading that correctly?

25         A.    Commenced by or against the offeror, yes.

*****CONFIDENTIAL*****

Page 199

KRISTOPHER MOLDOVAN

1

2      Q.   So this is a disclosure, in part, about a risk

3   associated with a possible bankruptcy filing by EFIH,

4   right?

5      A.   That's correct.

6      Q.   Okay.  And it goes on in this disclosure -- and,

7   again, I understand -- I'm not trying to put words in the

8   document; it speaks for itself.  But it goes on to

9   basically say, in the event that there's a bankruptcy

10  involving EFIH, if, at the time of that bankruptcy filing,

11  the value of the collateral is less than the amount of

12  principal and accrued and unpaid interest, then interest

13  may cease to accrue on the notes thereafter, right?

14            MR. HOWELL:  Object to form.

15     Q.   (BY MR. ANKER)   Correct?

16     A.   With the document speaking for itself and the

17  fact that you skipped over some words.

18     Q.   Okay.  The answer is yes?

19     A.   Yes.

20     Q.   Okay.  So this is a disclosure, in part, about a

21  risk associated with a potential bankruptcy of EFIH,

22  right?

23     A.   That's correct.

24     Q.   Okay.  Any since the company made a disclosure

25  about the possible risk associated with a bankruptcy of

*****CONFIDENTIAL*****

Page 200

1                    KRISTOPHER MOLDOVAN

2       EFIH, did it just decide, Well, there's a bunch of

3       material risks relating to a bankruptcy of EFIH; let's

4       disclose some, but not all of them?

5                    MR. HOWELL:   Object to form.

6          A.    I -- I -- I don't -- I don't know how to answer

7       that statement.

8          Q.    (BY MR. ANKER)   Let me try to put it

9       affirmatively.

10                   The company, I think, sought to disclose

11      all material risk associated with a potential bankruptcy

12      filing.

13                   I don't think it tried to hide anything;

14      did it?

15         A.    The goal of the company would to -- would have

16      been to set forth the material risks, including, in this

17      case, related to a potential bankruptcy filing.

18         Q.    Okay.   And, in fact, the company did make other

19      disclosures of bankruptcy risks, Mr. Moldovan.   Let's take

20      a look, for example, at the next page, page 46.

21                   Tell me when you're there.

22         A.    I'm there.

23         Q.    Do you see the heading at the bottom of the page

24      that begins in bold and italics:   In the event of the

25      offeror's bankruptcy, your ability to realize upon the

*****CONFIDENTIAL*****

Page 201

KRISTOPHER MOLDOVAN

1

2    collateral securing the new EFIH senior secured notes will

3    be subject to certain bankruptcy law limitations.

4         A.    That's correct.

5         Q.    And so then, it follows with a long paragraph

6    about what those limitations in bankruptcy might be,

7    right?

8         A.    That's correct.

9         Q.    And then there's a next disclosure is also about

10   bankruptcy, although, frankly, it's not about a bankruptcy

11   of EFIH; it's the one we talked about earlier, that you --

12   the holders have agreed not to file an involuntary

13   petition against Encore, right?

14        A.    That's correct.

15        Q.    And then the next disclosure thereafter on page

16   47 is also about bankruptcy; is it not?

17        A.    Yes.

18        Q.    And what it says, in the bold and all italics,

19   is, in the event that EFIH becomes the subject of a

20   bankruptcy proceeding, you only have a claim for repayment

21   of your new EFIH senior secured notes against EFIH's

22   assets, including the membership interest of Encore

23   Holdings and any other collateral.

24                   Did I read that correctly?

25        A.    You did read that correctly.

*****CONFIDENTIAL*****

Page 202

1                    KRISTOPHER MOLDOVAN

2        Q.   So that's another bankruptcy-related disclosure,

3   right?

4        A.   Yes.

5        Q.   I think we're up to four, if I'm counting right,

6   but we'll see what it is.

7                    Turn to page 50.   Tell me when you're

8   there.

9        A.   I'm there.

10        Q.   Look at the bottom of the page, the last

11   heading:   The issuance by EFIH of new EFIH senior secured

12   notes or the grant of the pledge of collateral by EFIH to

13   secure the new EFIH senior secured notes could be wholly

14   or partially voided as a preferential transfer.

15                    And then you see there's a long paragraph

16   that begins:   If EFA -- if EFIH becomes the subject of a

17   bankruptcy proceeding within 90 days -- do you see that?

18        A.   I do.

19        Q.   So there's another disclosure about a risk to

20   investors on the recovery on their notes in the event of

21   bankruptcy, right?

22        A.   There is.

23        Q.   And then let's look at the next one on page 51.

24   This, too, is a bankruptcy-related disclosure, right?

25                    If a Court were to find that EFIH was

*****CONFIDENTIAL*****

Page 203

KRISTOPHER MOLDOVAN

1

2  insolvent before or after giving effect to the exchange
3  offer and did not receive reasonably equivalent value or
4  fair consideration in the exchange offers, the Court may
5  void all or a portion of the obligations represented by
6  the new EFIH senior secured notes where the pledge of the
7  collateral granted by EFIH for such notes as a fraudulent
8  conveyance.

9            I read that correctly, right?

10      A.   You did.

11      Q.   And the text that is under it, which goes on for

12  about eight paragraphs, begins:   In a bankruptcy

13  proceeding -- does it not?

14      A.   It does.

15      Q.   So that's another disclosure that's

16  bankruptcy-related, right?

17      A.   Yes.

18      Q.   Now let's go to pages 53 to 54.   And you'll see

19  at the bottom of 53, carrying over to 54, another

20  disclosure that's bankruptcy-related, right?

21      A.   Yes.

22      Q.   It says:   If the bankruptcy petition were filed

23  by or against the offeror, holder to the new EFIH senior

24  secured notes, issued in consideration for the old notes,

25  may have their claims allowed in a lesser amount than the

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2    face amount of their claims under the indenture governing

3    the new EFIH senior secured notes, right?

4         A.   Correct.

5         Q.   And that was a disclosure about how perhaps a

6    portion of the principal amount of the notes might be

7    deemed to be OID, or original issued discount, as a tax

8    matter, right?

9              MR. HOWELL:   Object to form.

10        A.   The paragraph -- the paragraphs underneath it do

11   refer to OID.

12        Q.   (BY MR. ANKER)   Okay.   Now, let's go back to

13   page 47.   I think I accidentally skipped one -- I'm sorry;

14   I take that back.   I don't know whether I covered this

15   one, Mr. Moldovan, or not.

16              You'll see it says that, in the event that

17   EFIH becomes the subject of a bankruptcy, you will only

18   have a claim for repayment of your notes against EFIH as

19   assets, including the membership interest of Encore

20   Holdings or any other collateral, right?

21        A.   Yes, I believe you covered it.   But, yes.

22        Q.   Okay.   Well, let's just look at the language,

23   though, below it.   It says:   You will not benefit from a

24   guarantee of EFH Corp. or any of EFH Corp.'s other

25   subsidiaries.

*****CONFIDENTIAL*****

Page 205

1                    KRISTOPHER MOLDOVAN

2               I read the first sentence correctly; did I

3    not?

4         A.    You did.

5         Q.    And then it goes on to say:    Therefore, in the

6    event that EFIH becomes the subject of a bankruptcy

7    proceeding, you will only have a claim against EFIH's

8    assets, including the membership interest of Encore

9    Holdings and any other collateral, to satisfy any

10   outstanding principal premium and interest on the new EFIH

11   senior secured notes, and will have no claim against the

12   assets of EFIH Corp. or any of its subsidiary, other than

13   EFIH, including EFCH and TCEH.

14               Did I read that correctly?

15        A.    You read the words correctly, yes.

16        Q.    So the company was advising, to your

17   understanding, prospective investors that, in the event

18   that EFH -- EFIH became the subject of a bankruptcy, they

19   would only be able to look to the assets of EFIH to

20   satisfy their claims for principal, premium, and interest,

21   right?

22        A.    I don't know that this was advising.    The risk

23   factors states that -- what you said it states.

24        Q.    Okay.    And so notwithstanding your statement

25   earlier that the company concluded, by some point in time,

*****CONFIDENTIAL*****

Page 206

1                    KRISTOPHER MOLDOVAN

2    that no premium would be due in bankruptcy, there were no

3    communications with any holders of EFIH notes telling them

4    that -- you've already told me that.  But, in addition,

5    there was a risk factor disclosure that said you could

6    look to your collateral for payment of principal, premium,

7    and interest, right?

8                    MR. HOWELL:  Object to form.

9         A.    I think you left out a very key word.

10        Q.    (BY MR. ANKER)   What was that key word?

11        A.    Any.

12        Q.    You're right.  It says, any outstanding

13   principal, premium, and interest, right?

14                    So if there's no principal due outstanding,

15   if there's no premium outstanding, or there's no interest

16   outstanding, then you would not be able to look to any of

17   the collateral for payment of anything, right?

18        A.    That's what these words say.

19        Q.    Right.  But these words don't say, do they,

20   Mr. Moldovan, Provided, however, even though we referred

21   to premium a moment ago, there will never be premium due

22   in bankruptcy, right?

23        A.    It does not say that there.

24        Q.    Doesn't say that, does it?  No.

25                    Now, let's go back to all of these

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2   bankruptcy-related disclosures.  With all of these

3   bankruptcy-related disclosures, I'm not aware of any --

4   and I wouldn't make a misrepresentation to you, I assure

5   you.

6              I've read these risk factor disclosures

7   word-for-word from beginning to end.  I'm not -- I don't

8   see a single disclosure that says, in substance, the

9   company may be able to go into bankruptcy, and, if it

10  does, it may be able to repay the notes without payment of

11  any applicable premium.

12             Are you aware of any risk factor disclosure

13  to that effect in this indenture?

14             MR. HOWELL:  Object to form.

15       A.   I'd have to sit and read the risk factors

16  word-for-word.  I'm not aware that there's anything

17  that -- in this section that -- although, I believe the

18  description of notes has a provision that says what is due

19  upon a bankruptcy, and does not include the words,

20  "applicable premium."

21       Q.   (BY MR. ANKER)   Mr. Moldovan, I think your

22  answer may have gotten cut off at one point.  The document

23  will speak for itself.

24             But, as you sit here today, you're not

25  aware any of disclosure in the 40-some odd pages of risk

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2    factor disclosures, in substance, that says, if the

3    company files for bankruptcy, you may lose your right to a

4    make whole, right?

5         A.    I'm not aware of that.  I believe the company's

6    view is that was clear by the language in the description

7    of notes.

8         Q.    Right.  But it wasn't clear from the description

9    of the notes that you lost -- that you couldn't file an

10   involuntary for Encore; that wasn't clear in the offering

11   materials, in -- in the underlying documents?

12        A.    I -- I would need to go read the description of

13   notes.

14        Q.    Okay.  It wasn't clear that your collateral was

15   simply EFIH's assets and not the assets of other Debtors

16   that didn't -- that were not obligors or guarantors?

17        A.    These risk factors are what was determined to be

18   the material -- what was material to -- what was material

19   at the time.

20        Q.    Right.  And I want to go back to an answer you

21   gave me earlier that it was the company's position that it

22   was clear from the deposition of the notes.

23              You didn't have any discussion and, to your

24   knowledge, no one else at EFIH had any discussion with

25   anyone, including counsel, as to whether it was

*****CONFIDENTIAL*****

1          KRISTOPHER MOLDOVAN

2    appropriate to make a disclosure in this prospectus, in

3    the risk factors, as to whether, if EFIH filed for

4    bankruptcy, it could avoid paying the make whole, right?

5              MR. HOWELL:  Object to form and foundation.

6        A.   Could you repeat your question?

7        Q.   (BY MR. ANKER)   Sure.

8              Are you aware of any discussion that anyone

9    at EFIH had about whether to disclose, in the risk

10   factors, that EFIH might go into bankruptcy, and then take

11   the position it didn't have to pay the make whole?

12       A.   I'm not aware of any such discussion.

13       Q.   And you wouldn't dispute, would you, that the

14   amount of money at issue for holders, if they lose their

15   make whole, would almost surely be greater than

16   postpetition interest, right?

17             MR. HOWELL:  Object to form.

18       A.   That would depend on when the potential

19   bankruptcy occurred and how long you were in bankruptcy

20   and --

21       Q.   (BY MR. ANKER)   Right.  But the company thought

22   it was important enough to disclosure that if -- let's

23   back up.

24             One of the disclosures here in the risk

25   factors was that, if the company files for bankruptcy and

*****CONFIDENTIAL*****

Page 210

1        KRISTOPHER MOLDOVAN

2    if the creditors are undersecured, then they may lose the

3    right to postpetition interest, right?

4        A.   That was my recollection of one of the risk

5    factors you read.

6        Q.   And at the time of this issuance, the company

7    thought the holders were over -- the first lien holders

8    were oversecured, right?

9        A.   Yes.

10       Q.   In fact, the company has admitted that their

11   first lien holders are oversecured today, right?

12       A.   That's correct.

13       Q.   So that was a disclosure about a loss of

14   potential postpetition interest that was only triggered by

15   an event that -- by a set of circumstances that wasn't

16   applicable then, and that the company had no expectation

17   would become applicable, right?

18            MR. HOWELL:  Object to form.

19       A.   I'm sorry; can you repeat the question?

20       Q.   (BY MR. ANKER)   Sure.

21            The disclosure that holders might lose the

22   right to postpetition interest turned -- would only come

23   to play if the holders turned out to be undersecured,

24   right?

25       A.   That's my recollection of what you read.

Page 211

1            KRISTOPHER MOLDOVAN

2        Q.    Okay.  And the company didn't think the holders

3    were undersecured, and it didn't expect them to become

4    undersecured, right?

5                MR. HOWELL:  Object to foundation.

6        A.    I'm -- I'm not aware of the company making a

7    determination that they could never become undersecured.

8        Q.    (BY MR. ANKER)    Okay.  But the company

9    certainly didn't think they were undersecured at the time,

10   right?

11       A.    That's correct.

12       Q.    And so, even though the company thought they

13   were fully secured at the time, the company thought it was

14   important enough to advise holders that, if it turns out

15   you're undersecured, you may lose postpetition interest,

16   right?

17       A.    The company determined to clarify that that

18   could be the outcome on a -- on a legal question, yes.

19       Q.    Right.  And it decided that it might have to set

20   that -- it decided to make that disclosure, even though

21   the dollar amount of lost postpetition interest could have

22   been far less than the loss of the applicable premium to

23   the first lien holders, right?

24                MR. HOWELL:  Object to form.

25       A.    I don't know what anybody's assumption is for

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2    the length --

3         Q.   (BY MR. ANKER)   Okay.

4         A.   -- of this bankruptcy.

5         Q.   Okay.  Let's -- the loss of the applicable

6    premium to just the holders of the 10 percent notes is in

7    excess of $400-million, or around 400-million, right?

8                    MR. HOWELL:  Object to form.

9         A.   Because we -- the company's view is applicable

10   premium is not due, there is -- we would say there is no

11   loss.  I understand there is no loss.

12        Q.   (BY MR. ANKER)   Okay.  But you understand the

13   claim, if you're wrong, is about $400-million, right?

14        A.   I've read that in your --

15        Q.   Okay.

16        A.   -- brief.

17        Q.   Okay.  And these are 10 percent notes, right?

18        A.   Yes.

19        Q.   10 percent notes, and let's -- let's not --

20   let's not limit them to this issue; let's do the whole

21   thing.

22              10 percent notes on $2-billion, right?

23        A.   On those particular notes, yes.

24        Q.   Right.  So that would be 200-million -- I'm

25   sorry; on the 10 percent notes, it's three-and-a-half

*****CONFIDENTIAL*****

Page 213

1                      KRISTOPHER MOLDOVAN

2    billion dollars in principal amount, right?

3         A.    In total amount, yes.

4         Q.    So 10 percent over a year would be 350-million?

5         A.    That's correct.

6         Q.    So you'd have to have more than a year of loss

7    of postpetition interest before you'd have the same

8    economic effect as the -- as the nonpayment of the make

9    whole premium, right?

10                    MR. HOWELL:    Object to form.

11         A.    You would need more than a year to exceed the

12    claim that you have made.

13         Q.    (BY MR. ANKER)    Okay.    Mr. Moldovan, I think

14    you testified this morning -- and I don't -- I don't want

15    to put words in your mouth, but I also don't want to

16    repeat the same questions.

17                    I think you testified that you understood

18    that noteholders expected a make whole provision if the

19    company were to redeem before whatever the date is, in

20    order to protect their yield; is that -- whether you

21    testified that way or not, is that your understanding?

22         A.    I -- they expect a -- the applicable premium to

23    be paid if we optionally redeem them.

24         Q.    To protect their yield, right?

25         A.    Why they expect that, I don't know.

*****CONFIDENTIAL*****

Page 214

KRISTOPHER MOLDOVAN

1

2      Q.    It never crossed your mind that this was

3  designed to protect the bargain that they thought they

4  were achieving, the yield they were trying to achieve;

5  that really never crossed your mind?

6      A.    I just don't know that I would put it that exact

7  way.

8      Q.    How would you put it?

9      A.    They negotiated that, if we were going to redeem

10  their notes, that their exercise option redemptions, they

11  negotiated certain prices that they would expect to

12  receive.

13      Q.    Okay.  And one of the reasons for that, is it

14  not, is that, if the notes get redeemed -- I think you

15  said this earlier -- the investor may not be able to

16  reinvest and receive the same rate of return for a

17  comparable credit, right?

18      A.    I certainly did not say that.

19      Q.    I thought, in substance, you did.

20            But do you have that understanding?

21      A.    They have an expectation that these notes will

22  -- they have an expectation that, if they're redeemed on

23  or before certain dates, that they will receive a certain

24  return.

25      Q.    Okay.  And if the notes are redeemed -- let me

*****CONFIDENTIAL*****

Page 215

1                  KRISTOPHER MOLDOVAN

2    phrase the question differently.

3                     Imagine that, in June of 2014, EFIH had not

4    been in bankruptcy, and it optionally redeemed.

5                     The investors would be losing the future

6    income stream, the 10 percent coupon they would otherwise

7    be getting, but they'd get a make whole payment to make

8    them whole for the loss of that future income stream,

9    right?

10        A.    They'd get an applicable premium.   What that's

11   intended --

12        Q.    Okay.

13        A.    -- to be is, they -- they get the negotiated

14   applicable premium as defined.

15        Q.    Let's put the applicable premium aside.

16                     They're losing the future income stream,

17   the 10 percent payment year after year, right?

18        A.    In this situation where we're -- we're not in

19   bankruptcy and we actually redeem them, yes, they are

20   losing that income stream going forward.

21        Q.    But you are in bankruptcy, and the notes

22   accelerated, in your view, and you paid the holders out.

23                     They're losing their 10 percent future

24   income stream, as well, right; they're not getting

25   10 percent, right?

*****CONFIDENTIAL*****

Page 216

KRISTOPHER MOLDOVAN

2    A.    They are not getting 10 percent.

3    Q.    Right.  Did you ever consider why it is, if

4  investors insisted on getting this protection, payment of

5  an applicable premium, in the event that the company took

6  them out before December 1, 2015, they would be

7  indifferent and agree to give that up if the company files

8  for bankruptcy?

9              MR. HOWELL:  Object to form.

10    Q.    (BY MR. ANKER)   Did it ever -- you ever

11  consider it, Mr. Moldovan?

12              MR. HOWELL:  Same objection.

13    A.    I'm sorry; repeat the question.

14    Q.    (BY MR. ANKER)   Sure.

15              Did you, Kristopher Moldovan, ever consider

16  how it could be -- why it would be that investors that

17  insisted on obtaining this make whole provision to

18  compensate them for the loss of the future 10 percent

19  interest payments, would be indifferent and would agree to

20  not obtain the make whole premium simply because the

21  company filed for bankruptcy?

22              MR. HOWELL:  Object to form.

23    A.    I can't answer what they were thinking.  I do

24  believe there is an argument that there is a difference

25  between a company making a payment based on an optional

1                    KRISTOPHER MOLDOVAN

2    redemption under Section 3.07(a), and a company being

3    forced, pursuant to the terms that they -- that are in the

4    document, to redeem them upon an acceleration -- or not

5    redeem them; settle them -- let me clarify -- to settle --

6    to settle their notes upon an acceleration.

7         Q.   (BY MR. ANKER)   Mr. Moldovan, I'll stipulate to

8    you, the company can take it down.  We're not forcing --

9    we didn't force the company to pay us one penny.

10        A.   I think the terms of the --

11             MR. HOWELL:  There is no question.

12        Q.   (BY MR. ANKER)   There's no question.  There is

13   no questions.  But I wanted to clarify something for you.

14   Let me ask the question again.

15             Did you ever consider whether an investor,

16   who insisted on a make whole premium to compensate it for

17   the loss of future revenue when the notes are called,

18   would agree to give up that make whole provision simply

19   because the company took it out in bankruptcy, rather than

20   outside of bankruptcy?

21             The answer is, you never considered it,

22   right, sir?

23             MR. HOWELL:  Object.

24        A.   I dis -- I disagree with that.  I told you

25   before, the document is full of puts and takes, and

*****CONFIDENTIAL*****

Page 218

1                    KRISTOPHER MOLDOVAN

2    there's a difference between what they're asking us to pay

3    in an optional redemption, and the fact that the document

4    requires an automatic acceleration on the -- on the

5    bankruptcy, and requires you to pay them immediately, if I

6    remember correctly.

7                    MR. ANKER:  Move to strike the answer as

8    nonresponsive.

9         Q.   (BY MR. ANKER)  Did you ever consider -- that's

10   my only question.  It calls for a yes or no answer.

11                  Did you ever consider whether investors

12   would knowingly agree to give up the right to a make whole

13   simply because the company filed for bankruptcy?

14                  MR. HOWELL:  Object to form.

15        Q.   (BY MR. ANKER)  Did you ever consider the

16   question, yes or no?

17                  MR. HOWELL:  Object to form.

18        A.   I have considered why an applicable premium

19   would be required in an optional redemption and not

20   required in an acceleration, yes.

21        Q.   (BY MR. ANKER)  Have you ever spoken to a

22   single investor to ask them whether -- an investor in EFIH

23   first lien notes, to ask them what their understanding was

24   of this indenture?

25        A.   Not that I can recall.

*****CONFIDENTIAL*****

Page 219

KRISTOPHER MOLDOVAN

1

2      Q.    Did you ever speak to a single EFIH first lien

3   investor with respect to their understanding of the

4   optional redemption provision in any other EFIHL (sic)

5   first lien notes for any other EFIHL -- EFIH -- EFIH first

6   lien notes?

7      A.    I'm sorry; could you please repeat that?

8      Q.    Sure.

9            My prior question was limited to this

10   indenture and holders of these notes.  So I'm now just

11   trying to expand it.

12            With respect to any issuance of EFIH first

13   lean notes, did you speak to any holder to obtain their

14   understanding of whether they would be entitled to the

15   applicable premium in the event of a bankruptcy filing?

16      A.    I don't recall any specific discussions.

17      Q.    And if I asked you the same question not about

18   you personally, but about anyone else at the company or

19   representing them, your testimony would be the same; you

20   have no knowledge of any discussion by any -- involving

21   any person at the company, or representing them, with any

22   holder of any EFIH -- EFIH first lien notes as to whether

23   they thought they would be entitled to a make whole

24   premium if the company filed for bankruptcy and then paid

25   off the notes?

*****CONFIDENTIAL*****

Page 220

1                    KRISTOPHER MOLDOVAN

2        A.   I can't recall any specific discussions.

3        Q.   Okay.

4              MR. ANKER:  Can we go off the record a

5    second?

6              THE VIDEOGRAPHER:  We are now off the

7    record.  The time is 3:24 p.m.

8              (Recess in the proceedings from 3:24 to

9              3:34 p.m.)

10             THE VIDEOGRAPHER:  We are now back on the

11   record.  The time is 3:34 p.m.

12       Q.   (BY MR. ANKER)  Mr. Moldovan -- Moldovan, can I

13   ask you to turn to page 29 of the indenture that you have

14   in front of you, the 2010 offering, which is Exhibit

15   Number 11 -- I'm sorry; I said, "the indenture."  I

16   meant the -- I meant the -- the prospectus; my apologies,

17   which is Exhibit 12.

18             Turn to page 29, sir.

19             Are you there?

20       A.   I am.

21       Q.   Now, this section is entitled, Summary of New

22   EFIH Senior Secured Notes.

23             Do you see that?

24       A.   I do.

25       Q.   And I think this was a common section in the

1                        KRISTOPHER MOLDOVAN

2    offering memoranda or prospectuses for all of the EFH

3    family of company issuances, right?

4        A.   Yes.

5        Q.   Okay.  And I think that the first sentence read

6    the same in each.  It says:  The summary below describes

7    the principal terms of the new EFIH senior secured notes

8    and the related indenture.

9                    Obviously, the reference to new EFIH senior

10   secured notes change from issuance to issuance, but it

11   said:  The summary below describes the principal terms.

12                    Is that consistent with your recollection?

13       A.   I don't recall.

14       Q.   Okay.  Let's then focus on this one.

15                    Is it your understanding, and the company's

16   understanding, that what follows in this section is

17   intended to be the principal terms of the notes offering?

18       A.   A summary of the principal terms.

19       Q.   Right.  And by "principal terms" -- I mean, I

20   think of "principal" meaning most important, most

21   significant.

22                    Did the company have a different

23   understanding of that provision?

24       A.   I don't know that it feels that those are --

25   necessarily would agree that those are definitely the most

*****CONFIDENTIAL*****

Page 222

KRISTOPHER MOLDOVAN

1

2  important, but they are -- they are the provisions that

3  were determined to bring up into the summary section

4  and -- so that somebody could read those and then

5  determine if they wanted to go back and read the more

6  specific detailed provisions in the back.

7      Q.    Okay.   And one of the provisions that it was

8  determined should be in this summary of principal terms

9  was the optional redemption provision, right?   If you turn

10 to page 30 --

11     A.    Yes.

12     Q.    -- third one down.

13            And that describes -- in fact, it uses the

14 word, "make whole premium," right?   Fourth line, last

15 three words.

16     A.    Quote, unquote, make whole premium, yes.

17     Q.    Right.  And you would -- well, I'll represent to

18 you -- I'm not going to ask you to spend the time to read

19 these two-and-a-half pages or three pages.

20            I'll represent to you there's nothing in

21 here about acceleration; is there?  Are you aware of

22 anything in the -- in this section on summary of new EFIH

23 senior secured terms of acceleration?

24     A.    Just on a very cursory glance, I'm not aware,

25 no.

*****CONFIDENTIAL*****

Page 223

1                      KRISTOPHER MOLDOVAN

2        Q.    Okay.   And another provision in this summary of

3   principal terms that the company highlighted, was the risk

4   factors, right?

5                      At the very end in bold type, it says:

6   Risk factors, you should carefully consider the

7   information set forth in the section entitled, Risk

8   Factors, beginning on page 38.

9                      I skipped a few words, but it says that,

10  right, sir?

11       A.    Yes.

12       Q.    Okay.   Now, in the -- the prospectus also has a

13  section entitled, Description of Notes, right?

14       A.    That's correct.

15       Q.    And -- do you know what page that begins on,

16  Mr. Moldovan?   I thought it was -- I'm sorry; here it is.

17  Take a look at page 113.

18       A.    I'm there.

19       Q.    That's the beginning of the description of the

20  notes, right?

21       A.    It is.

22       Q.    Okay.   And that, too, if you turn to page 116,

23  has a section called, Optional Redemption, right?

24       A.    It does.

25       Q.    And it begins with a paragraph that says:

*****CONFIDENTIAL*****

Page 224

1                KRISTOPHER MOLDOVAN

2   Except as set forth below, the issuer will not be entitled

3   to redeem notes at its option prior to December 1, 2015,

4   right?

5        A.   It does say that.

6        Q.   Okay.  And nothing in this page on par -- on --

7   I'm sorry; nothing under Optional Redemption, on page 116,

8   says that a payment in bankruptcy is not an optional

9   redemption; does it?

10                  MR. HOWELL:  Object to form.

11       Q.   (BY MR. ANKER)  To your understanding.

12       A.   Page 116 describes optional redemption; it does

13  not specifically say that a bankruptcy -- does not -- I

14  don't believe -- again, if I could read the whole thing --

15  does not refer to the term, "bankruptcy."

16       Q.   But later, -- and then also in this same

17  section, Description of the Notes, there's further

18  expanding on the various bankruptcy risks, right?

19                  Take a look, for example, Mr. Moldovan, on

20  page 122, under the heading, Insolvency or Liquidation

21  Proceedings.

22                  That's a bankruptcy risk, right?

23       A.   Insolvency and liquidation is talking about

24  bankruptcy.  I don't know what the context of that is.

25       Q.   And there's a discussion on page 118 of

*****CONFIDENTIAL*****

Page 225

1              KRISTOPHER MOLDOVAN

2   bankruptcy limitations, right?

3        A.   Seems to be a discussion entitled, Certain

4   Bankruptcy Limitations, yes.

5        Q.   Okay.  And then you have to turn -- then,

6   ultimately, there is a section in here on events of

7   default, right?

8        A.   Yes.

9        Q.   And I'm searching for it myself.

10            Do you know what page it begins?

11       A.   I do not.

12       Q.   Why don't you turn to page 155?

13       A.   (Witness complies.)

14       Q.   Are you there, sir?

15       A.   I am.

16       Q.   Okay.  And you see it says:  Event of defaults

17   and remedies?

18       A.   Yes.

19       Q.   Okay.  And now turn to page 156.

20            Are you there?

21       A.   Yes, I am.

22       Q.   And look at the next-to-the-last paragraph on

23   that page.  If an event of default -- I'm sorry.

24            Take a look at the last paragraph on that

25   page, and look at the second sentence:  Not withstanding

*****CONFIDENTIAL*****

KRISTOPHER MOLDOVAN

1  the foregoing in the case of an event of default arising

2  under clause 6 of the first paragraph in this section, all

3  outstanding notes will become due and payable without

4  further action or notice.

5          Do you see that sentence?

6      A.    I do.

7      Q.    Okay.  And that's the sentence you rely on in

8  the indenture to say that no make whole is due and payable

9  to the holders of the first lien notes, right?

10          MR. HOWELL:  Object to form.

11     A.    That is the sentence -- I believe the same

12  sentence in the acceleration provision; no applicable

13  premium is due because it is -- only applies to optional

14  redemption under 3.07(a).

15     Q.    (BY MR. ANKER)  Okay.  I was going to -- is

16  there any sentence anywhere in this prospectus, that

17  you're aware of, that says that, in substance, if the

18  company files for bankruptcy, it may, notwithstanding the

19  protections of the bankruptcy laws, decide to pay off the

20  notes, and if does so, that will not be an optional

21  redemption within the meaning of Section 3.07?

22          MR. HOWELL:  I'm sorry; can you read that

23  back, please?

24          MR. ANKER:  Sure.  Do you want me to, or do

*****CONFIDENTIAL*****

Page 227

KRISTOPHER MOLDOVAN

2  you want the court reporter to?  Why don't I do it?

3      Q.   (BY MR. ANKER)   Is there any sentence anywhere

4  in this prospectus, that you're aware of, that says, in

5  substance, if the company files for bankruptcy, it may,

6  notwithstanding the protection of the bankruptcy laws,

7  decide to pay off the notes, and, if it does so, that will

8  not be an optional redemption within the meaning of

9  Section 3.07?

10      A.   I believe this sentence says that, in the event

11  of the bankruptcy, the notes are accelerated; and going

12  through the definitions, means the principal amount is due

13  and payable.

14      Q.   So is there anything else, other than this one

15  sentence on page 156 of this prospectus, that you believe

16  advised noteholders that, if the company filed for

17  bankruptcy, it could decide, notwithstanding the

18  protections of the bankruptcy laws, to pay off the notes,

19  and, if it did, it wouldn't have to pay the make whole, as

20  you sit here today?

21      A.   I assume you do not want me to read the entire

22  prospectus.  I cannot, at this point, point you to a

23  specific sentence that you described.

24      Q.   Okay.  And your argument or your -- the

25  company's position is that this one sentence, on page 156,

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2    so advised holders because it said that the notes would

3    become due and payable, and, if they then turn to the

4    definition of all the notes, they would be able to

5    understand that no applicable premium would be due if the

6    company went into bankruptcy and made the voluntary

7    decision, notwithstanding the protections of the

8    bankruptcy law, to pay off the debt?

9                    MR. HOWELL:   Object to form.

10        A.    I believe that the only place -- my recollection

11   is, the only place that the term, "applicable premium," is

12   used is in connection with an optional redemption, and no

13   where else.   And, therefore, it -- there would be no

14   occasion to conclude that an applicable premium would be

15   available in connection with anything other than an

16   optional redemption under that section.

17        Q.    (BY MR. ANKER)   Okay.   Let's turn to page 200,

18   if you would, of this prospectus.

19        A.    (Witness complies.)

20        Q.    Tell me when you're there.

21        A.    I'm there.

22        Q.    There's another section -- there's a -- there's

23   a section that begins on page 199, comparing the old notes

24   and the new notes, right?

25        A.    That's correct.

*****CONFIDENTIAL*****

Page 229

KRISTOPHER MOLDOVAN

1

2    Q.    And there's a section that has the heading,

3 Ranking, right -- I'm sorry; there's a heading that has

4 the -- has the word, "redemption," right?

5    A.    There is a heading, "Redemption," yes.

6    Q.    Right.    And both in this, with the respect to

7 the old notes and with respect to the new notes, nothing

8 in the description under "redemption," on page 200, states

9 that that, in the event that the company goes into

10 bankruptcy, it can avoid -- it can repay the notes prior

11 to December 1, 2015, without paying the make whole; is

12 there?

13    A.    There is no reference to bankruptcy in that

14 summary.

15    Q.    Okay.    Okay.    One other question about the

16 indenture, if I could take you back to it.

17    A.    Can I put this away (indicating)?

18    Q.    You may.

19                MR. HOWELL:    Exhibit 11?

20                MR. ANKER:    Yeah, yeah.

21    Q.    (BY MR. ANKER)    Tell me when you're there,

22 Mr. Moldovan.

23    A.    I have the indenture in front of me.

24    Q.    Okay.    Can you turn to Section 9.02, page 106

25 and then to 107.

1                    KRISTOPHER MOLDOVAN

2              Are you there, sir?

3        A.    I am.

4        Q.    And remember we discussed this section, but with

5   respect to the 2007 EFH offering.   And one of the

6   provisions that cannot, in this indenture, like the 2.07

7   indenture, be changed without -- without the consent of

8   each and every holder, is the provisions with respect to

9   the redemption of the notes.

10              Do you see that on page 107, two in the

11   hole?

12        A.    Without an amendment or waiver from the --

13   without the amendment or waiver by the effected holder, it

14   says:   You may not alter or waive the provisions with

15   respect to the redemption of the notes.   For the avoidance

16   of that, the provisions contained in and relating to

17   Section 3.09, Section 4.10, and Section 4.14 hereof are

18   not redemptions of notes.

19        Q.    Great.   In Sections -- Section 3.09 and 4.10 in

20   this indenture, as in the indenture for the 2007 EFH

21   offering, is the provision dealing with an asset sale and

22   the right of holders to tender their notes, right?

23        A.    In certain asset sale situations, yes.

24        Q.    And Section 4.14 deals with the change of

25   control, right?

*****CONFIDENTIAL*****

Page 231

1        KRISTOPHER MOLDOVAN

2        A.    Do you have a page number?

3        Q.    Yeah, it's page 83.

4        A.    That's correct; offer to repurchase upon change

5   and control.

6        Q.    So none of 3.09, 4.10, or 4.14 deals with a

7   payment in bankruptcy upon acceleration of the debt,

8   right?

9        A.    That's -- none of those sections deal with that,

10  no.

11       Q.    Right.  And when the company repaid the

12  principal and interest on the first lien notes at the

13  beginning of this bankruptcy, it was not acting under

14  Section 3.09, 4.10, or 4.14; was it?

15       A.    Not to -- I don't -- not to my knowledge.

16       Q.    Okay.  Now, here you have language for the

17  avoidance of doubt clarifying that certain provisions are

18  not redemptions.  And the three carveouts are Sections

19  3.09, 4.10, and 4.14.

20            Are you aware of any provision in this

21  indenture that explicitly provides that a payment made by

22  the company, under Section 6.02, upon acceleration of the

23  notes in bankruptcy, is not a redemption?

24       A.    I'm not aware that there is a "for avoidance of

25  doubt" sentence that's stating that.

*****CONFIDENTIAL*****

1          KRISTOPHER MOLDOVAN

2      Q.   Let's move on, Mr. Moldovan, to the discussions,

3   I think, you alluded to earlier involving a TCEH offering.

4              There came a time, in 2010, when the

5   Debtors had discussions with an investor, Oak Tree, about

6   the terms for payment of a make whole under an indenture

7   for an exchange offer by TCEH, right?

8      A.   I'm sorry; could you repeat --

9      Q.   Sure.  I'm trying to set the stage, and it's

10  late in the day; I realize that.  Try to bear with me.

11              There came a point in time, in 2010, when

12  the Debtors had discussions with a particular investor,

13  Oak Tree, about the terms for payment of a make whole

14  under an indenture for an exchange offer involving TCEH.

15              MR. HOWELL:  Object to form.

16      A.   There came a time, in 2010, where we had

17  discussions with an investor, Oak Tree, about the terms of

18  a new note to be issued to that investor.  Included in

19  those discussions were several provisions including what

20  -- including a request by that investor to include a

21  applicable premium as one of the things that is paid under

22  an acceleration.

23      Q.   (BY MR. ANKER)  Okay.  And I think you've

24  already testified to this.

25              But that discussion occurs, in 2010, after

*****CONFIDENTIAL*****

Page 233

1                     KRISTOPHER MOLDOVAN

2    the completion of the EFIH first lien exchange, right?

3         A.   That's correct.

4         Q.   Okay.  And it didn't concern the EFIH first lien

5    exchange; it concerned a TCEH exchange, right?

6         A.   When you say, "Concern," --

7         Q.   The subject matter of the discussion.

8         A.   We were discussing terms for the TCEH second

9    lien indenture.

10        Q.   And the Debtors didn't speak with the indenture

11   trustee for the EFIH first lien notes about the

12   discussions with Oak Tree; did it?

13        A.   Not to my recollection.

14        Q.   And the company didn't -- the companies, the

15   Debtors, didn't speak with any holders of first lien debt

16   about the discussions that it had with Oak Tree; did it?

17        A.   Discounting the fact that Oak Tree may very well

18   have been a holder of first lien debt, I'm not aware of

19   any other discussions.

20        Q.   I take it -- do you know whether Oak Tree was a

21   holder of first lien EFIH debt at that point?

22        A.   Not -- not sitting here.

23        Q.   Okay.  So other than the possibility that maybe

24   EF -- Oak Tree was, itself, a holder, the company didn't

25   have any discussions with anyone else it knew to be a

1          KRISTOPHER MOLDOVAN

2    holder of EFIH first lien debt about its discussions with

3    Oak Tree, right?

4          A.    Not to my knowledge.

5          Q.    And it didn't issue any sort of press release or

6    pud or 8-K or otherwise publicly make any disclosure about

7    those discussions, right?

8          A.    Other than an 8-K with the final indenture,

9    which would be the results -- obviously, the changes

10   resulting from those discussions, no, it did not describe

11   the discussions in a publicly-available document.

12         Q.    And I assume the reason for that is not that the

13   company -- and I mean this seriously -- not that the

14   company was seeking to hide anything material; the company

15   formed the judgment that those discussions were not

16   material to disclose to EFIH first lien holders, right?

17                MR. HOWELL:  Object to form.

18         A.    I don't -- I don't -- I wouldn't characterize it

19   like that.  I think, in negotiations, what was material --

20   I mean, the discussions were material to the company and

21   to the holder.  But what's material to -- what's material

22   to -- to disclose was the final negotiated terms.

23         Q.    (BY MR. ANKER)   Okay.  The company didn't think

24   the back and forth -- the drafts and the back and forth

25   discussions with Oak Tree were sufficiently material to

1                    KRISTOPHER MOLDOVAN

2    warrant disclosure to the holders of EFIH first lien

3    notes, right?

4         A.   It did not believe it had an 8-K obligation.

5         Q.   Now, the exchange there involved a 2007

6    indenture.

7              That was what -- the notes that were being

8    exchanged for the new notes had been issued pursuant to a

9    2007 indenture, right?

10        A.   That's correct.

11        Q.   And that indenture had -- I'm happy to show it

12   to you, if you want.

13        A.   Please.

14        Q.   Okay.

15             MR. ANKER:  What is our next exhibit

16   number?

17             MR. HOWELL:  13.

18             (Exhibit 13 marked.)

19        Q.  (BY MR. ANKER)   I'm handing the witness

20   Plaintiff's Exhibit 13, EFIHMW00206856 to 7009.

21        A.   Thank you.

22        Q.   And can I turn your attention -- can you

23   identify this document, Mr. Moldovan?

24        A.   It appears, on its face, to be the final signed

25   indenture for TCEH and TCEH Finance, related to senior

*****CONFIDENTIAL*****

Page 236

KRISTOPHER MOLDOVAN

1   notes due 2015.  It's the indenture dated as of

2   October 31st, 2007.

3       Q.   Okay.  So when the discussions are ongoing with

4   Oak Tree in the fall of 2010, it is about an exchange

5   offer.

6            The old notes that will be exchanged for

7   the new notes had been issued pursuant to the indenture

8   that has been marked as Exhibit 13, correct?

9       A.   That's my recollection.

10      Q.   Okay.  And if you could take a look at Section

11  6.02, that had the same language about automatic

12  acceleration upon a bankruptcy filing as exists in the

13  EFIH first lien indentures, right?

14      A.   That's correct.

15      Q.   Okay.  Let's go through some of the documents

16  about relating to this exchange.  And let me show them to

17  you.  I certainly don't expect you to have memorized them.

18      A.   Do you want --

19      Q.   This will be Exhibit --

20      A.   Would you like me to keep this out (indicating)?

21      Q.   Yeah, if you would.

22      A.   Okay.

23      Q.   Let's start with Exhibit Number 35 -- I'm sorry;

24  Exhibit Number 14.

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2              (Exhibit 14 marked.)

3      Q.   (BY MR. ANKER)   This is a two-page document,

4  the first page has Bates stamp EFIHMW00038671.  The second

5  page does not have a Bates stamp; it was produced to us

6  this way.  If -- if, Mr. Moldovan, your understanding is

7  this is not one document, please let me know.

8              But I -- I will represent to you it was

9  produced this way to us, and you'll -- do you recognize

10 this document?

11     A.   I do.

12     Q.   What is it, sir?

13     A.   Well, the exhibit is an e-mail.  The bottom is

14 an e-mail from Armen to Paul Keglevic and Tony Horton,

15 cc'ing a bunch of his colleagues at Oak Tree and his

16 outside counsel, Debevoise, describing what is attached:

17 Marked-up versions of three key documents that relate to

18 the exchange of our unsecured TCEH notes and second lien

19 security TCEH notes.

20             I understand that the negotiation of the

21 intercredit agreement must taken up by the agent of the

22 first lien credit agreement.  So I just wanted to make

23 sure you understand that a successful execution of the

24 exchange will also depend on how that process goes.

25     Q.   And you referred to Armen.  Armen was a Oak Tree

*****CONFIDENTIAL*****

Page 238

                    KRISTOPHER MOLDOVAN

1

2   executive of some kind, right?

3       A.   That's correct.

4       Q.   Okay.

5       A.   And attached are seven documents.  You have

6   included what appears to be --

7       Q.   The very first --

8       A.   -- summary of key terms listed as number one on

9   his e-mail.

10      Q.   And I said that this was, in total, a two-page

11  document, the e-mail, and then one-page attachment.

12               The attachment actually goes two pages,

13  right, sir?

14      A.   That's correct.

15      Q.   Okay.  Who created this document; was this

16  document that is the attachment, was it created by Oak

17  Tree?

18               MR. HOWELL:  Object to the foundation.

19      Q.   (BY MR. ANKER)  To your knowledge?

20      A.   It was not created by anyone at the company.

21      Q.   Okay.  All right.  And you mentioned that one of

22  the cc's on Armen's e-mail was -- I'm sorry; were several

23  Debevoise lawyers.  You understood Debevoise was counsel

24  to Oak Tree?

25      A.   Yes, I did.

*****CONFIDENTIAL*****

Page 239

1                          KRISTOPHER MOLDOVAN

2        Q.    And you were kind enough, earlier, to describe

3    the various counsel for the company in positive terms, as

4    being leading sophisticated law firms; Simpson Thatcher,

5    your old firm, Gibson Dunn, and others.

6              You would agree with me the company

7    understood that Debevoise was a leading law firm, right?

8        A.    My understanding is that Debevoise is a

9    reputable law firm.

10       Q.    Okay.  I'll take reputable.

11             Let me -- had there been any prior

12   communications with Oak Tree, before you received the

13   document that has been marked as Exhibit 14, about the

14   make whole provision in particular?

15             MR. HOWELL:  Object to form.

16       A.    To my knowledge -- I don't recall.

17       Q.    (BY MR. ANKER)   Okay.  The Debtors -- you'll

18   note there's a provision on the attachment concerning make

19   whole.

20             Do you see that?

21       A.    I do.

22       Q.    And the Debtors' initial reaction was to be

23   uncertain about what the implications of that provision

24   might be, right?

25             MR. HOWELL:  Object to form.

*****CONFIDENTIAL*****

Page 240

                        KRISTOPHER MOLDOVAN

1

2      A.   I don't understand -- I don't understand that

3  question.

4      Q.   (BY MR. ANKER)   Okay.  Let me try to help you.

5              MR. ANKER:  Can we get exhibit --

6  (indicating)?

7              (Exhibit 15 marked.)

8      Q.   (BY MR. ANKER)   I'm going to show the witness a

9  document marked as Plaintiff's Exhibit 15, EFIHMW00036448.

10             Can you identify this document?

11     A.   This is a copy of the summary of terms that has

12  handwritten notes on it.

13     Q.   Okay.  Whose handwriting is this?

14             MR. HOWELL:  Object to foundation.

15     Q.   (BY MR. ANKER)   Okay.  To the extent you

16  know -- you're here as a 30(b)(6) witness with respect to

17  the negotiations of the indenture, so I would hope you do

18  know.  But let me just ask the question directly.

19             Whose note -- whose handwriting is this?

20     A.   I don't know for sure.  I believe it is somebody

21  who is no longer with the company.

22     Q.   Okay.  And by "the company," you mean EFIH?

23     A.   Or EFH or TCEH; anybody at the company --

24     Q.   Okay.

25     A.   -- at the Debtors.

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2       Q.   Can you give me the name of that person who you

3  believe these -- this handwriting is?

4       A.   My -- I believe it is from Jeff Ley.

5       Q.   L-E-Y?

6       A.   L-E-Y.

7       Q.   Okay.  And what was Mr. Ley's position at the

8  time?

9       A.   He was director of finance.

10      Q.   So he -- well, let me ask the question.

11           Did -- did Mr. Horton or Mr. Keglevic

12  report to Mr. Ley?

13      A.   No, they did not.

14      Q.   Did he report to them, or is it simply a

15  different reporting chain?

16      A.   Mr. Ley reported to Mr. Horton.

17      Q.   Okay.  So was Mr. Ley -- you also reported to

18  Mr. Horton, right?

19      A.   That's correct.

20      Q.   Were you and Mr. Ley at roughly the same level

21  within the corporate hierarchy at the time?

22      A.   No, he was a director level; I was vice

23  president level.  He -- we would not be considered the

24  same level, no.

25      Q.   I don't mean to be presumptuous; I assume a

*****CONFIDENTIAL*****

Page 242

1                        KRISTOPHER MOLDOVAN

2    director level would have been considered a higher level

3    than a -- than the position you held?

4         A.   No.

5         Q.   Oh, the opposite?

6         A.   Yes.

7         Q.   Okay.  Where does Mr. Ley work now?

8         A.   He works for one of the Hunt affiliates.

9         Q.   Okay.  You'll notice that Mr. Ley, or whoever's

10   handwriting this is next to the make whole provision,

11   wrote in the right hand:  What does this do to them in the

12   latter case.

13                  Do you see that?

14        A.   Well, it says -- I read it to say, the later

15   case.  But --

16        Q.   You're right.  You're absolutely right.  I read

17   it the same way.

18                  Do you have any understanding of what

19   Mr. Ley meant by that comment?

20        A.   No, I do not.

21        Q.   You see the comment on the left:  Could be a

22   precedent to sponsors?

23        A.   I do.

24        Q.   Do you have any understanding what he meant by

25   that?

*****CONFIDENTIAL*****

Page 243

1                    KRISTOPHER MOLDOVAN

2        A.    I do not.

3        Q.    Was there any discussion within the company, of

4   which you are aware of, about whether this provision might

5   be a precedent to the sponsors?

6        A.    We viewed this request to be a significant

7   change, and we -- there were discussions about whether

8   this was something that the company should set as

9   precedent or whether -- and including whether a company

10  owned by the sponsors would want to set that as precedent.

11       Q.    Okay.  And the precedent was to have explicit

12  language in the indenture that, upon a bankruptcy filing,

13  the applicable premium automatically became due, whether

14  or not the company ended up taking out the notes

15  immediately?

16            MR. HOWELL:  Object to form.

17       A.    The discussion was whether we wanted to set the

18  precedent to include applicable premium anywhere in the

19  document, other than the optional redemption section.

20       Q.    (BY MR. ANKER)  Okay.  And at least initially,

21  the company, from a business level, thought that that

22  change might be appropriate, right?

23       A.    I don't recall -- I don't recall anybody

24  thinking that it might be -- when you say, "Might be

25  appropriate," I don't recall that.

*****CONFIDENTIAL*****

Page 244

KRISTOPHER MOLDOVAN

1

2      Q.    Okay.

3            (Exhibits 16 and  17 marked.)

4      Q.   (BY MR. ANKER)   Let me show you two documents.

5  The first one we've marked as Plaintiff's Exhibit 16.   It

6  bears the Bates stamps EFIHMW00087752.   The second is --

7  begins with very next Bates number, EFIHMW00087753 through

8  841 inclusive.

9            Can you identify those documents for me?

10     A.    The first is an e-mail from Andy Wright to

11 Mr. Panossian at Oak Tree, cc'ing several members from our

12 internal team, as well as his external lawyer,

13 distributing to him the -- a draft, clean and black line

14 drafts of the description of notes.

15           And the second exhibit appears to be what

16 was one of the attachments.   It appears -- I don't know if

17 it's the red line or the -- or the clean version, but it's

18 one of the two attachments to his e-mail.

19     Q.    Okay.  And Mr. Wright was an in-house lawyer, I

20 think you testified previously, at EFH, right?

21     A.    He was vice president and associate general

22 counsel, yes.

23     Q.    Well-respected lawyer?

24     A.    Yes.

25     Q.    And he says in the cover e-mail, which is the

Page 245

KRISTOPHER MOLDOVAN

1

2    first of the two exhibits -- 16; is that right?

3        A.    Yes.

4        Q.    Okay.  Within Exhibit 16:  Attached are revised

5    drafts, clean and black lined, of the description of notes

6    that we believe reflects the business discussions to date.

7                 Did I read that correctly?

8        A.    You did.

9        Q.    And you have no reason to believe that

10   Mr. Wright then attached a document that didn't reflect

11   the business discussions to date; do you?

12       A.    I do not have any reason to believe that, no.

13       Q.    Okay.  So let's look at page -- and, again,

14   there's no page number, so I'm going to give you Bates

15   numbers.

16       A.    Okay.

17       Q.    Bates number 795 is the last three digits.

18   It's, I'd say, two-thirds of the way through the document.

19       A.    Okay.

20       Q.    Are you there?

21       A.    I am.

22       Q.    And look at the paragraph at the very bottom.

23                 Upon the effectiveness of such declaration,

24   such principal, bracket, applicable premium, if any,

25   closed bracket, and interest will be due and payable

*****CONFIDENTIAL*****

Page 246

1                    KRISTOPHER MOLDOVAN

2    immediately.

3              Now, let me stop there.  That sentence is

4    referencing a declaration in the event of a -- event -- a

5    declaration -- I'm sorry; let me start again.

6              That sentence concerns a declaration by the

7    holders that principal and premium will come due in the

8    event of a nonbankruptcy event of default, right?

9              MR. HOWELL:  Object to form.

10        A.    The sentence that you're reading is -- relates

11   to nonbankruptcy defaults in the previous paragraph.

12        Q.    (BY MR. ANKER)   And then the next sentence --

13   let's go back to the document -- says, and I'll read it:

14   Notwithstanding the foregoing in the case of an event of

15   default arising under clause 6 of the first paragraph of

16   this section, the principal applicable premium, if any,

17   interest, and any other monetary obligations on all

18   outstanding notes will become due and payable without

19   further action or notice.

20              Did I read that accurately?

21        A.    You did.

22        Q.    And clause 6 is in a bankruptcy event of

23   default, right?

24        A.    That's correct.

25        Q.    So Mr. Wright's draft of the description and

*****CONFIDENTIAL*****

Page 247

1                    KRISTOPHER MOLDOVAN

2    notes reflecting the business discussions to date, was

3    that the applicable premium would come due upon a

4    bankruptcy filing; is that right?

5         A.   My view, and by reading this, is there are

6    brackets around insertions that Oak Tree had made other

7    than there, and that was an -- likely an oversight by

8    Mr. Wright.

9         Q.   Did you talk to Mr. Wright to try to determine

10   that in preparation for your deposition today?

11        A.   Not that particular issue.

12        Q.   So other than your speculation, you have no

13   reason to believe that was an oversight by Mr. Wright,

14   correct?

15        A.   Other than the speculation that every other

16   place it's listed, it's in brackets, no.

17        Q.   And he is a careful lawyer; I think you told me

18   that a minute ago, right?

19             MR. HOWELL:   Object to form.

20        A.   I believe I told you that he is -- I think your

21   question was, is he well-respected?

22        Q.   (BY MR. ANKER)   If he wasn't careful, he

23   wouldn't be well-respected; would he be, sir?

24        A.   I can't even tell whether he was the one -- he

25   distributed it, but that may or may not have been that he

Page 248

KRISTOPHER MOLDOVAN

1    was the one putting the brackets around these provisions.

2        Q.   So you have -- as you sit here today as a

3    30(b)(6) representative of the company, you cannot tell me

4    who drafted this document, right?

5        A.   I would have -- I can tell you that it would

6    have been Mr. -- well --

7        Q.   It would have been Mr. Wright, you were going to

8    say.

9        A.   No.  Mr. Wright and Mr. Santos, together with

10   our outside counsel.

11       Q.   And Mr. Santos, who is in this room, is also a

12   careful, well-respected lawyer, correct?

13       MR. HOWELL:  Be careful on that one.

14       A.   Yes.

15       Q.   (BY MR. ANKER)  And your outside counsel, in

16   connection with Simpson, Thatcher, & Bartlett, are

17   well-respected, careful lawyers; are they not?

18       A.   They're well-respected, and they endeavor to be

19   careful.

20       Q.   Okay.  Now, thereafter, on September 20,

21   Mr. Keglevic expressed some concern about this change; did

22   he not?

23       A.   Could --

24       Q.   Sure.

*****CONFIDENTIAL*****

                    KRISTOPHER MOLDOVAN

1
2       A.    Do you have document I could look at?

3       Q.    Yep, yep, yep.

4             Let me show you what's been marked as

5    Plaintiff's Exhibit 18, an e-mail chain, one page,

6    EFIHMW00038664.

7             (Exhibit 18 marked.)

8       Q.    (BY MR. ANKER)    Do you have that, sir?

9             MR. ANKER:    Can we go off the record?

10            (Pause in the proceedings.)

11            MR. ANKER:    Okay.  We can go back on.

12      Q.    (BY MR. ANKER)    Do you recognize this document,

13    Mr. -- sir?

14      A.    It's an e-mail from -- it's an e-mail exchange

15    between Mr. Horton and Mr. Keglevic.

16      Q.    And the e-mail exchange begins at 11:11 in the

17    morning on September 20; is that right?

18            Look at the first e-mail on the bottom of

19    the page.

20      A.    I assume that's the morning, but -- yes.

21      Q.    Either 11:11 in the morning or 11:11 at night?

22      A.    Yes.

23      Q.    I think you'll see further up, the date doesn't

24    change, and you get the after 12:00.

25            So it must have been in the morning, right?

*****CONFIDENTIAL*****

Page 250

KRISTOPHER MOLDOVAN

1

2     A.    Okay.  I agree.

3     Q.    Okay.  And Mr. Keglevic writes:  Call Jack and

4  get his thoughts on make whole.  I'm in this BOD session.

5              "BOD" is board of directors?

6     A.    That would be my belief.

7     Q.    Okay.  Who was Jack?

8     A.    Jack Weingart.

9     Q.    Who was with TPG?

10    A.    Yes.

11    Q.    Okay.  And Mr. Horton writes back:  I called,

12  and he's in a -- he is in a meeting now.  Let you know as

13  soon as I speak to him.

14              And then Mr. Keglevic wrote back:  We need

15  to send message that we can't introduce bankruptcy

16  protections acceleration clauses.  Horrible precedent, et

17  cetera.  Jack will agree, I'm sure.  Need to get list of

18  four or five well-written reasons this doesn't work.

19              Did I read that correctly?

20    A.    You -- and then he finishes with another

21  statement in his e-mail, but, yes, you read those.

22    Q.    MFN we can work, right?

23    A.    Yes.

24    Q.    "MFN" meaning most favored nation?

25    A.    That's correct.

*****CONFIDENTIAL*****

Page 251

1                    KRISTOPHER MOLDOVAN

2       Q.   Okay.  And then Mr. Keglevic writes back again:

3   Just introducing the B word in a public instrument is a

4   nonstarter.

5                 Did I read that right?

6       A.   You did.

7       Q.   What did you understand the term, "B word," to

8   mean; what's B?

9       A.   I don't know.

10      Q.   Do you think B might be bankruptcy?  Look at the

11  prior e-mail:  Introduce bankruptcy protections.

12                Do you think B might be bankruptcy?

13      A.   It could be.

14      Q.   You didn't speak with Mr. Keglevic in

15  preparation for your deposition today about this document

16  to ask him what he meant by, "introducing the B word"?

17      A.   I did not speak with Mr. Keglevic about what he

18  meant by "B word."

19      Q.   Okay.  And then Mr. Horton writes back:  Hear

20  you, but it is really discrete and applies to default

21  language.  I don't think B is mentioned, but I will

22  double-check.

23                Do you see that?

24      A.   I do.

25      Q.   What did you understand Mr. Horton to be

*****CONFIDENTIAL*****

Page 252

KRISTOPHER MOLDOVAN

1    communicating with that e-mail?

2         A.    I don't know.

3         Q.    You didn't speak to Mr. Horton in preparation

4    for your deposition today about this e-mail exchange; did

5    you?

6         A.    I didn't speak to him about this sentence, no.

7         Q.    It's fair to say, though -- I -- I read this to

8    suggest that Mr. Horton was pushing back a little bit

9    saying, I hear you, but it's really discrete and applies

10   to the default language.

11              Do you read it the same way as pushing back

12   a bit?

13        A.    I -- I think he -- I don't think he's pushing

14   back that it should be -- anything should be accepted.  I

15   think he's clarifying for Mr. -- something for

16   Mr. Keglevic.

17        Q.    Okay.  And then you sent, to Mr. Horton, the

18   proposed language that day, right?

19        A.    Can I see what you're referring to?

20        Q.    Sure.  Yep.

21              (Exhibit 19 marked.)

22        Q.    (BY MR. ANKER)   Plaintiff's Exhibit 19 is a

23   one-page e-mail, EFIHMW00037076.

24        A.    (Witness reviews document.)

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2        Q.    This is your e-mail, right, sir?

3        A.    It is.

4        Q.    And you are taking the language in the

5    description and notes that will appear in the TCEH

6    offering if the change requested by Oak Tree is made, and

7    you cut and pasted it into an e-mail so that Mr. Horton

8    could see it, right?

9        A.    I guess I would say that a little differently.

10   But, yes, I took their proposed language that would have

11   been in there had we not made any further changes, but --

12   so I took their proposed language and pasted it in there

13   so he could see what the language would look like.

14       Q.    Now, Mr. Horton wrote back to Jack Weingart

15   later that day, and Mr. Weingart responded.  Let me show

16   you these documents.

17            (Exhibit 20 marked.)

18       Q.    (BY MR. ANKER)   This is a one-page document,

19   EFIHMW00037075; it's Plaintiff's Exhibit 20.

20       A.    (Witness reviews document.)

21       Q.    Do you recognize this e-mail exchange?

22       A.    Yes, it's an e-mail exchange between Tony and

23   Jack with Mr. Keglevic and Mr. Wright; and later, in the

24   second one, Mr. McDougal added.

25       Q.    Okay.  And in the initial e-mail, on Exhibit 20,

*****CONFIDENTIAL*****

Page 254

KRISTOPHER MOLDOVAN

1  from Mr. Horton to Mr. Weingart, at 1:52 p.m., on

2  September 20, 2010, Mr. Horton notes:  In response to your

3  question regarding including applicable premium for the

4  make whole in the OT indenture only, the answer is yes.

5  However, these notes would be not fungible with other

6  second lien notes at TCEH, and the drafting of the

7  language may draw attention to the provision.

8          What did you understand Mr. Horton to be

9  trying to convey by saying the drafting of the language

10 may draw attention to the provision?

11     A.   I didn't -- I don't know.

12     Q.   Now, the rationale Mr. Horton gave -- I'm sorry.

13          Mr. Weingart, at the top of this document,

14 says:  I think our position for now should be to say no to

15 Oak Tree on this point altogether.  I'm not any -- I'm not

16 aware of any precedent that includes this language, and I

17 don't see why this case should be treated differently from

18 every other exchange that's been done.

19          Did I read that correctly?

20     A.   You did.

21     Q.   So his concern was that it was creating a

22 precedent, and there was no precedent for this language in

23 any other indentures, right?

24     A.   His concern was that he didn't see why we should

*****CONFIDENTIAL*****

Page 255

1                    KRISTOPHER MOLDOVAN

2   be treated different from any other exchange.  I can't

3   make any supposition past what the words on the page are.

4        Q.   And Mr. Keglevic, later on the same day, also

5   expressed a view that we should say no on the change

6   requested by Oak Tree, because there's no precedent in the

7   market, and it sets a precedent for us; right?

8                    Let me show you what's been marked as

9   Exhibit 21.  It might help you answer that question.

10  EFIHMW00037074.

11                   (Exhibit 21 marked.)

12       A.   Mr. Keglevic is responding to Mr. Horton's

13  e-mail, where Mr. Horton says he's going to say, no, on

14  any make whole acceleration, and asking him if he agrees.

15  And Mr. Keglevic says, yep, no precedent in market, sets

16  precedent for us.

17       Q.   (BY MR. ANKER)   Right.  Mr. Keglevic didn't

18  say, in any of the e-mails I've shown you -- and if you're

19  aware of any others, please let me know.

20                   He didn't say, We need to reserve, in

21  substance, the right to file for bankruptcy and not pay

22  the make whole; did he?

23       A.   I have not -- you've not shown me an e-mail

24  where he wrote that.

25       Q.   And are you aware of anywhere he said that?

*****CONFIDENTIAL*****

1                       KRISTOPHER MOLDOVAN

2          A.   No, I'm not.

3          Q.   Are you aware of Mr. Horton ever expressing that

4     view in writing or orally?

5          A.   I'm sorry; repeat the --

6          Q.   In connection with these negotiations, are you

7     aware of Mr. Horton ever excessing the view, We can't

8     agree to this, because, in substance, we need to reserve

9     the right to go into bankruptcy -- and put TCEH in

10    bankruptcy and not pay a make whole?

11         A.   That question, no, I don't recall him saying we

12    need to reserve the right to -- it -- it suggests that we

13    need to reserve the right to go into bankruptcy solely to

14    avoid the make whole.  I -- I do believe there have been

15    discussions that I've had with Mr. Horton that adding the

16    language requested by Oak Tree would be a material change

17    to the -- what would be due upon an acceleration under a

18    bankruptcy filing.

19         Q.   Because under the language that Oak Tree was

20    proposing, the mere filing for bankruptcy would have

21    caused the make whole to be due, right?

22              MR. HOWELL:  Object to form.

23         A.   Under the language that they were proposing,

24    they were adding applicable premium into the acceleration

25    provisions, and that would have been the first time it

*****CONFIDENTIAL*****

Page 257

1                    KRISTOPHER MOLDOVAN

2    ever came -- showed up anywhere in the document, other

3    than the optional redemption provisions.

4        Q.   (BY MR. ANKER)   Let me -- let me -- my question

5    may not be clear to you; it's late in the day.

6                    If the acceleration provision provided

7    that, upon a filing for bankruptcy, then all the debt

8    accelerated and not only what was due as principal and

9    interest, but also the make whole premium, then it was the

10   company's understanding that the premium would be due,

11   even if the company wanted to simply let the debt ride

12   through the bankruptcy and not take it out, right?

13                    MR. HOWELL:  Object to form.

14       A.   I don't -- that is a -- that is a conversation

15   or an analysis that I don't think the company completed,

16   because it wasn't the fact -- or you recited facts that

17   did not -- are not -- did not happen.

18       Q.   (BY MR. ANKER)   Well, you understood that,

19   under the language proposed by Oak Tree, that would have

20   been the effect, right; the make whole would have been due

21   immediately upon the filing for bankruptcy?

22       A.   We understood that they were trying to introduce

23   applicable premium somewhere other than optional

24   redemption, and did not believe that that was appropriate.

25       Q.   Okay.  You believed the make whole was only

Page 258

1                        KRISTOPHER MOLDOVAN

2   appropriate in the event of an optional redemption, right?

3        A.    That's correct.

4        Q.    But it was appropriate about -- in the event of

5   an optional redemption, right?

6        A.    An optional redemption under 3.07(a), make whole

7   -- the applicable premium is one of the things that would

8   be required to be paid.

9        Q.    And when did you have the discussions with

10  Mr. Horton that you just referenced?

11       A.    I don't recall that.

12       Q.    Did you have them at the time of this, in

13  September 2010, October 2010?

14       A.    October 2010 when these discussions are going

15  on?

16       Q.    Yes, sir.

17       A.    I don't recall.

18       Q.    Okay.  In fact, the Debtors did agree to change

19  the language in the indenture for these new TCEH notes in

20  the acceleration provision; didn't they?

21       A.    They did.

22       Q.    And the new language was that, upon acceleration

23  -- upon a bankruptcy acceleration, principal, interest,

24  and premium, if any, would be due and payable, right?

25       A.    Can I --

*****CONFIDENTIAL*****

Page 259

1                    KRISTOPHER MOLDOVAN

2       Q.    Sure.

3       A.    -- look at the language?

4       Q.    Yep.

5             Do you want the descriptions of notes, or

6  do you want the indenture?  I'm happy to show you either

7  one, whichever you prefer.

8       A.    The indenture, please.

9       Q.    Okay.

10            MR. ANKER:  While we have a minute, let's

11 go off the record.

12            THE VIDEOGRAPHER:  We are now off the

13 record.  The time is 4:31 p.m.

14            (Recess in the proceedings from 4:31 to

15            4:41 p.m.)

16            THE VIDEOGRAPHER:  We are now back on the

17 record.  The time is 4:41 p.m.

18            (Exhibit 22 marked.)

19      Q.   (BY MR. ANKER)  When we broke, I was asking

20 you, isn't it true that the company agreed to a change in

21 the acceleration provision for the TCEH indenture that Oak

22 Tree was discussing with you.  And you asked to see the

23 relevant indenture.

24            Let me hand you a document that's been

25 marked as Plaintiff's Exhibit 22, EFIHMW00139970 to

1                          KRISTOPHER MOLDOVAN

2    EFIHMW00140140.

3                    THE VIDEOGRAPHER:  Counsel (indicating).

4         Q.   (BY MR. ANKER)   Do you recognize that document,

5    Mr. Moldovan?

6         A.   Yes, this appears to be the final signed copy of

7    the TCEH and TCEH Finance indenture with respect to the

8    senior secured second lien notes due 2021, dated as of

9    October 6, 2010.

10        Q.   Can I ask you to turn to the page that ends with

11   the Bates stamp 0078?

12        A.   Okay.

13        Q.   Are you there?

14        A.   I am.

15        Q.   And this is -- you'll see the acceleration

16   provision in Section 6.02, right?

17        A.   Yes.

18        Q.   And do you see the paragraph that begins:

19   Notwithstanding?

20        A.   Yes.

21        Q.   Notwithstanding the foregoing in the case of an

22   event of default arising under Section 6.01 A6 or 7

23   hereof, the principal -- principal premium, if any, and

24   interest on all outstanding notes shall be due and payable

25   immediately without further action or notice.

*****CONFIDENTIAL*****

Page 261

KRISTOPHER MOLDOVAN

2          Did I read that correctly?

3     A.    You did.

4     Q.    And that reflected a change, did it not, the

5 adding of the words, "premium, if any," right?

6     A.    Among other changes.  It added principal and

7 interest, so...

8     Q.    Right.

9     A.    Yes, there is a difference between this one and

10 the predecessor indenture.

11     Q.    How did that change come about?

12     A.    Mr. -- or Oak Tree -- Mr. Panossian, on behalf

13 of Oak Tree, requested that applicable premium be put into

14 this section.  The company said no; in a conversation,

15 told him that we could not make that change; deemed it to

16 be immaterial change that we are not willing to make.

17 Mr. Panossian asked -- asked for some time to think about

18 it, if I remember correctly.

19              And my recollection is, subsequently, in

20 the conversation, asked for this same formula -- this

21 formulation.  And the company discussed it internally and

22 with its counsel, and this is what was the result of those

23 discussions.

24     Q.    Did the company -- were you personally involved

25 in the conversations that you just described?

1                    KRISTOPHER MOLDOVAN

2         A.    My recollection is yes.

3         Q.    Okay.  Did the company indicate to Oak Tree

4    whether it believed this language would or would not make

5    the applicable premium payable in the event of a

6    bankruptcy filing?

7         A.    This language?

8         Q.    Yes.

9               Did the company express a view to Oak Tree?

10        A.    My recollection is that our view expressed to

11   Oak Tree is that this did not include applicable premium.

12        Q.    And you personally expressed that view to Oak

13   Tree?

14        A.    I was -- the conversation, in my recollection,

15   was Mr. Horton and myself.  I couldn't tell you which of

16   us expressed that.  It was a conversation four years ago.

17        Q.    Did Oak Tree express a different view?

18        A.    I don't recall their reaction.

19        Q.    In fact, that ended up being the language in the

20   second lien indenture, as well, "premium, if any," right,

21   for the EFIH first -- for the EFIH debt?

22        A.    Yes, this language -- the second lien indenture

23   was also negotiated with Oak Tree, and this language

24   mirrors substantially.  I'd have to check it, but I -- my

25   recollection is the language in the EFIH second lien

*****CONFIDENTIAL*****

Page 263

KRISTOPHER MOLDOVAN

1

2 indenture is in this format and not in the format of the

3 EFIH first lien indenture.

4     Q.   The company agreed to settle, at the outset of

5 this case, second lien indenture make whole claims for 50

6 cents on the dollar, right?

7          MR. HOWELL:  Object to form and foundation.

8     A.   No.

9     Q.   (BY MR. ANKER)   The company offered; did it

10 not?

11     A.   The company offered to settle it for 50 percent

12 of the amount due.

13     Q.   But the company didn't believe that this

14 language provided for the payment of the applicable

15 premium in bankruptcy any more than the language in the

16 first lien indenture, right?

17     A.   That's correct.

18     Q.   Now, let me ask you a couple of questions about

19 documents we've already covered just --

20     A.   Can I add --

21     Q.   Sure.

22     A.   Sorry; I'd like to clarify.

23          When you say, "Any more," it didn't believe

24 it owed applicable premium in either.  It believes that it

25 does not owe applicable premium in either the first lien

*****CONFIDENTIAL*****

KRISTOPHER MOLDOVAN

1

or the second lien indenture.

2

Q.   Okay.  If you can go back to Exhibit Number 18,

3

sir?

4

Are you there?

5

A.   Not yet.

6

I'm there.

7

Q.   Okay.  You'll see that Mr. Keglevic, in his

8

e-mail, at 11:56 a.m., on the 20th, says:  Need to get

9

list of four or five well-written reasons this doesn't

10

work.

11

Were such reasons created; was such a

12

document generated?

13

A.   Not to my recollection.

14

Q.   Were four or five reasons thought of orally,

15

even if not a document created?

16

A.   I don't recall.

17

Q.   Okay.  Can you turn to Exhibit Number 20?

18

A.   (Witness complies.)

19

Q.   Are you there, sir?

20

A.   Yes.

21

Q.   In -- I want to direct you to the original

22

e-mail from Mr. Horton and Mr. Weingart in the second

23

paragraph:  It is questionable whether such as

24

provision -- I think he means such a provision -- for the

25

*****CONFIDENTIAL*****

Page 265

KRISTOPHER MOLDOVAN

1

make whole premium is enforceable.

3          Do you see that, sir?

4     A.   I do.

5     Q.   What was Mr. Horton's basis for thinking that

6 such a provision would not be -- might not be enforceable?

7     A.   I don't know.

8     Q.   You didn't take any steps to determine that in

9 preparation for your deposition as a 30(b)(6) witness?

10    A.   Not this sentence, no.

11    Q.   Okay.  In fact, isn't it right that Oak Tree

12 took the view that, even under the original indenture, the

13 2007 indenture, it was entitled to payment of the make

14 whole if the company filed for bankruptcy and the debt was

15 oversecured?

16    A.   That's not my recollection, no.

17    Q.   Okay.  Let me show you --

18          (Exhibit 23 marked.)

19    Q.   (BY MR. ANKER)  Let me show you a document

20 that's been marked as Exhibit 23.  It's an e-mail chain

21 that begins on page EFIHMW00084711 to 15.

22          Do you have the document in front of you,

23 Mr. Moldovan?

24    A.   I do.

25    Q.   Do you recognize this exchange of e-mails?

*****CONFIDENTIAL*****

Page 266

1                     KRISTOPHER MOLDOVAN

2       A.    (Witness reviews document.)

3                 Not the entire exchange.

4       Q.    Okay.  But this e-mail bears a Bates stamp,

5    EFIHMW00084711 through 15.

6                 It was produced out of your company's

7    files, correct?

8       A.    That's my understanding.

9       Q.    Okay.  You don't have any reason to believe this

10   document -- set of e-mail exchanges was in your company's

11   files; do you, sir?

12                MR. HOWELL:  Can you read the question

13   back, please?

14      Q.    (BY MR. ANKER)   Sure.  Let me ask it

15   differently.

16                As far as you know, this document was in

17   the files of the EFH and EFIH, right?

18      A.    As far as I know, that's correct.

19      Q.    And you mentioned earlier that -- let's back up.

20                You'll see that there are a series of

21   e-mails if you go back to the beginning, some of which are

22   internal to Oak Tree; that is, Oak Tree with its counsel.

23                Do you see, for example, the e-mail from

24   Mr. Maguire to Mr. Panossian and Ms. To, dated

25   September 12, at 6:07 p.m., the bottom of page Bates stamp

1                    KRISTOPHER MOLDOVAN

2    714?

3         A.    I do.

4         Q.    Okay.  And you'll see that there are a series of

5    other e-mails that internal to Oak Tree and its counsel,

6    right?

7         A.    Yes.

8         Q.    But, ultimately, on September 16, Mr. Panossian

9    forwards the e-mail outside of Oak Tree and its counsel,

10   right?  He forwards the e-mail chain, I should say, right?

11        A.    Which e-mail are you referring to?

12        Q.    Well, ultimately, there's an e-mail that goes --

13   maybe I'm referring to the wrong e-mail.

14              Take a look at the e-mail on

15   October 7, 2010, maybe a better e-mail, from Victoria Park

16   at Oak Tree to BNYMellon, Julia -- Julie Hoffman-Ramos.

17              Do you see that one?

18        A.    That's correct.

19        Q.    Okay.  So this e-mail chain leaves the confines

20   of Oak Tree and its counsel, right?

21        A.    Yes.

22        Q.    And then it gets forwarded to EFH, right?

23        A.    Yes.

24        Q.    It gets forwarded to Mr. Wright; to a bunch of

25   people at Simpson Thatcher, including Mr. Tolley; to a

*****CONFIDENTIAL*****

Page 268

KRISTOPHER MOLDOVAN

1
2    bunch of people, including Mr. Santos; and Ms. Davis at

3    Simpson Thatcher; Ms. Jimenez at Simpson Thatcher;

4    Mr. Steinhardt at Simpson Thatcher; Brock Degeyter at EFH,

5    right?  All these people who are either at EFH or its

6    counsel get this e-mail chain, right?

7         A.    That's correct.

8         Q.    And that's right before the offering is to

9    close, right?

10        A.    I don't recall the date of the closing.  This

11   is --

12        Q.    October 7th, 2010, is when the e-mail gets --

13   it's sent to all of you?

14        A.    Right.

15        Q.    If you look back at the indenture, I think it's

16   dated -- when is it dated, sir?

17        A.    October 6th.

18        Q.    So it's right after, I should say, the offering?

19        A.    That's correct.

20        Q.    And if you go to page bearing the Bates stamp

21   713, do you see an e-mail there from My Chi To at

22   Debevoise?

23        A.    I do.

24        Q.    And you'll see:  I reviewed the docs quickly

25   tonight and will give them a more careful read in the

*****CONFIDENTIAL*****

Page 269

                    KRISTOPHER MOLDOVAN

1

2   morning.  How about speaking at 12:15 p.m. ET, on two

3   quick points, right to receive make whole in bankruptcy --

4       A.    I'm sorry; on two key points.  You said,

5   "Quick."  I'm sorry.

6       Q.    Two key points previously discussed with Armen.

7             And then do you see the paragraph below

8   that?

9       A.    Yes.

10      Q.    And let me read it; tell me if I'm reading it

11  right:  Right to receive make whole in bankruptcy.  Based

12  on the description of notes, the make whole provisions in

13  the new second lien indenture mirror those in the existing

14  TCEH bond indenture.  As noted in my e-mail to Armen,

15  attached for your reference, second lien noteholders will

16  only be entitled to receive a make whole in the event of a

17  financing in bankruptcy to the extent that they are

18  oversecured.

19             Did I read that correctly?

20      A.    You did.

21      Q.    And you confirmed that the Debtors obtained

22  possession of this e-mail on or about October 7, 2010,

23  right?

24      A.    They did.

25      Q.    Did the Debtors instruct -- did the Debtors

1                    KRISTOPHER MOLDOVAN

2    themselves or instruct their counsel to inform -- well,

3    let's back up.

4              Did the Debtors reach out, either through

5    themselves or did they instruct their counsel to reach

6    out, to Debevoise or to Oak Tree, and say, We have a

7    different understanding of the documents?

8         A.   I'm not aware that that conversation took place.

9         Q.   Did the Debtors, in possession of this e-mail,

10   take any steps to inform other investors beyond Oak Tree,

11   in substance, We want to clarify, because it appears that

12   some investors have a different understanding of these

13   documents than we do.  This is how we interpret these

14   documents.  No make whole will be due if there's a

15   bankruptcy filing, whether or not the issuer -- whether or

16   not the holders are oversecured?

17        A.   I think, as I testified earlier, that we, in a

18   discussion with Mr. Panossian, expressed our view that the

19   addition of applicable premium was unacceptable, as we did

20   not believe that applicable premium would be due in the

21   event of an acceleration of bankruptcy.  And I also

22   believe that we expressed the view that -- to him that the

23   changes he requested would not -- were not another way to

24   get at that -- not another way to make applicable premium

25   due in an acceleration of bankruptcy.  So he was aware, in

*****CONFIDENTIAL*****

1                         KRISTOPHER MOLDOVAN

2   my recollection, of our position on this matter.

3        Q.   But you knew Oak Tree was a sophisticated

4   investor, right?

5        A.   We understood them to be a sophisticated

6   investor.

7        Q.   And you've already testified you knew Debevoise

8   was a reputable firm, right?

9        A.   Debevoise was, as I understand it, a reputable

10  firm.

11       Q.   And so for all you knew, lots of other

12  sophisticated investors represented by reputable firms had

13  the same view, which is under the old language, the same

14  language that's in every one of the EFIH indentures; as

15  long as the holders are oversecured, they get their make

16  whole.

17            MR. ANKER:   Object to form.

18       Q.   (BY MR. ANKER)   Right?

19            MR. HOWELL:   Object to form.

20       A.   Could you repeat the question?

21       Q.   (BY MR. ANKER)   Sure.

22            You're in possession of this document.   You

23  have no reason, do you, to think that -- you have no

24  reason to -- let me start it again.

25            For all the company knew, lots of other

*****CONFIDENTIAL*****

Page 272

KRISTOPHER MOLDOVAN

1  holders of EFIH -- lots of holders of EFIH first lien

2  notes and their counsel took the same view that Debevoise

3  did, that, upon a bankruptcy filing, as long as the

4  holders were oversecured, they'd be entitled to the make

5  whole, even under the original language going back to

6  2007?

7              MR. HOWELL:  Objection to form and

8  foundation.

9      A.   I don't recall us leaping to that conclusion.

10     Q.   (BY MR. ANKER)  You don't recall providing --

11 you don't recall, do you, sir, the company considering

12 whether it should go to the market and inform investors

13 what the company's view was of this provision of the

14 indenture, right?

15     A.   The company believed that the indenture speaks

16 for itself and applicable premium is due under an optional

17 redemption, under Section 3.07(a), and sought no need to

18 go clarify that those words do not exist in Section 6.02.

19     Q.   Okay.  The -- okay.  Let's turn to the

20 subsequent issuance of 10 percent notes by EFIH.

21              That occurred in December of 2000 -- an

22 exchange that got completed in January of 2013, right?

23     A.   Yes, that's my recollection.

24     Q.   And that was in an exchange for three different

*****CONFIDENTIAL*****

1                          KRISTOPHER MOLDOVAN

2    issues of notes, right, the 9.75 senior secured notes, due

3    2019, issued by EFH; the 10 percent senior secured notes,

4    due 2020, issued by -- I'm sorry; due 2020, issued by EFH;

5    and the 9.7 senior secured notes, due 2019, issued by

6    EFIH, right?

7         A.   9.75, I think you left off the 5.  But, yes,

8    that was the exchange into the 10 percent notes, yes.

9         Q.   And was this exchange also a part of the

10   liability management program?

11        A.   I don't -- I don't know that I can classify it

12   as liability management.

13        Q.   Well, it reduced the principal balance on it,

14   did it not, on the issuance?

15        A.   It did.

16        Q.   And it extended the maturity on at least some of

17   the notes; did it not?

18        A.   It did.

19        Q.   Had Kirkland & Ellis been retained to advise

20   about a potential restructuring of one or more of the EFH

21   companies by the time of this exchange?

22        A.   I -- I believe we had retained Kirkland & Ellis

23   by that time.

24        Q.   Had you retained Evercore by that time?

25        A.   I believe that we had, but I'm -- I would need

*****CONFIDENTIAL*****

Page 274

                    KRISTOPHER MOLDOVAN

1

2    to -- I don't -- I don't recall for sure.

3        Q.    Okay.    And certainly the discussions with Oak

4    Tree that occurred in 2010, had occurred by the time of

5    this exchange in January of 2013, correct?

6        A.    Correct.

7        Q.    Now, let me ask you a question.  I'm going to

8    try to speed things up.

9                    With respect to the three different issues

10   of notes that were exchanged for the new EFIH notes, did,

11   to your knowledge, the company have any discussions with

12   any investors about whether a make whole premium would be

13   payable if the company filed for bankruptcy and determined

14   to pay off the notes prior to the deadline or prior to the

15   end date for the make whole premium in the optional

16   redemption for the -- of the relevant indenture?

17       A.    I'm not aware of any such discussions.

18       Q.    And you're not aware of any such discussions

19   with the indenture trustee on any of those issues; are

20   you?

21       A.    No.

22       Q.    And are you aware of any discussions with anyone

23   else, in connection with any of those issues, of whether

24   the make whole -- the applicable premium would be payable

25   in the event the company filed for bankruptcy and,

*****CONFIDENTIAL*****

Page 275

KRISTOPHER MOLDOVAN

1  KRISTOPHER MOLDOVAN

2  notwithstanding the protections of the bankruptcy code,

3  sought relief to pay off the notes?

4          MR. HOWELL:  Object to form.

5      A.   When you say, "Anyone else" --

6      Q.   (BY MR. ANKER)   Anyone.  Did you -- did you --

7  maybe you spoke to your wife about this subject, someone

8  maybe you spoke to a newspaper reporter, maybe you spoke

9  to one of the sponsors, maybe you -- or someone else did.

10          Can you tell me about any discussions, in

11  connection with any of those three issuances, as to

12  whether the make whole premium would be payable if the

13  company filed for bankruptcy and sought -- notwithstanding

14  the protection of the bankruptcy code, sought to repay the

15  notes before the date specified in the indenture for

16  payment of the make whole premium?

17      A.   In connection with those other issuances at the

18  time that those were issued or at the time of the

19  exchange?

20      Q.   At the time they were issued.

21      A.   No, I don't recall those discussions.

22      Q.   At the time of the exchange -- let's fast

23  forward now to the exchange.  I thought you told me a

24  moment ago, but maybe I misunderstood, so let me ask it

25  again.

*****CONFIDENTIAL*****

Page 276

                    KRISTOPHER MOLDOVAN

1

2              Let me stop, and let me get a little bit of

3    clarity.

4              The -- the notes issued in the 2012 -- in

5    the -- in the January 2013 exchange were subject to the

6    same prospectus as the EFIH 2010 notes, right?

7         A.   Not the same prospectus, no.

8         Q.   I'm sorry; the same indenture?  It's getting

9    late in the day for me, as well.

10        A.   They are subject to the same indenture, as

11   modified by the supplemental indenture.

12        Q.   And the company issued a supplemental indenture;

13   did it not?

14        A.   It did.

15        Q.   And that supplemental indenture was drafted

16   principally by Gibson, Dunn & Crutcher, counsel for the

17   company?

18        A.   I don't recall who drafted the supplemental

19   indenture.

20        Q.   Okay.  Why did the company issue a supplemental

21   indenture?

22        A.   When you issue additional notes under an

23   indenture, you lay out the terms -- you put the terms of

24   those notes in a supplemental indenture.

25              (Exhibit 24 marked.)

*****CONFIDENTIAL*****

Page 277

1                    KRISTOPHER MOLDOVAN

2        Q.   (BY MR. ANKER)   This is Exhibit Number 24; it's

3    EFIHMW00270288 to 328.

4             Can you identify what has been marked as

5    Exhibit Number 24, sir?

6        A.   It appears to be a version -- our final --

7    the first supplemental indenture, dated as of

8    January 29th, 2013, to the August 17th, 2010, indenture of

9    EFIH, with respect to the -- the first lien notes

10   indenture.  And it appears to have been pulled from the

11   SEC Web site or a --

12       Q.   And this was --

13       A.   -- Web site that makes SEC documents available.

14       Q.   And can I ask you to turn to page number 1,

15   Bates stamp 289?

16       A.   (Witness complies.)

17       Q.   Are you there, sir?

18       A.   Yes.

19       Q.   And if you look, there's a bunch of whereas

20   clauses, right?

21       A.   Yes.

22       Q.   And the third from the bottom on page 1, it

23   says:  Whereas the issuer desires to amend the indenture

24   to provide for the issuance of the new notes to make

25   certain amendments to the provisions of the indenture

*****CONFIDENTIAL*****

1            KRISTOPHER MOLDOVAN

2   relating to the transfer and legending of notes and the

3   pure and ambiguity, omission, mistake, defect, or

4   inconsistency in accordance with clauses 1, 9, and 12 of

5   Section 9.01 of the indenture.

6            Did I read that correctly?

7        A.   Yes, you read that whereas correctly.

8        Q.   So the company, pursuant to this supplement,

9   sought to correct any ambiguities, omissions, mistakes,

10  defects, or inconsistencies in the prior indenture, right?

11       A.   I would need to read the indenture.  I'm sure

12  there's a specific ambiguity that the company -- that we

13  intended to correct in this supplemental indenture.

14       Q.   Well, what the company didn't correct in this

15  supplemental -- or change in this supplemental indenture,

16  in any way, was the language either of the optional --

17  describing the optional redemption provision or the

18  acceleration provision, correct?

19            MR. HOWELL:  Object to form.

20       A.   (Witness reviews document.)

21       Q.   (BY MR. ANKER)   Let me try to help you.

22            Can you turn to Section Number 2.3?

23       A.   What page?

24       Q.   Page 19.

25       A.   Yes.

*****CONFIDENTIAL*****

Page 279

KRISTOPHER MOLDOVAN

1

2    Q.    And you'll see that there is an amendment in

3    Section 2.3 to Article 4, correct?

4    A.    That's correct.

5    Q.    And then in Section 2.4, there's an amendment to

6    Article 5, right?

7    A.    That's correct.

8    Q.    And then in Section 2.5, there's amendments to

9    certain exhibits, right?

10    A.    That's correct.

11    Q.    But there were no amendments to Article -- to

12    Section 3.07 or Section 6.02, right?

13    A.    Let me look at Section 2.2, if I may?

14    Q.    Sure.    2.2 begins on page 5.    It's entitled --

15    A.    Yes, that's correct --

16    Q.    -- Amendments to Articles.

17    A.    -- there do not appear to be any amendments to

18    Section 3.07 or sections -- I -- I don't --

19    Q.    Or Section 6.02, right?

20    A.    Was that your question?

21    Q.    Yes.

22    A.    Or Section 6.02.

23    Q.    Okay.    And in connection with this exchange, did

24    the company or any of its representatives, to your

25    knowledge, have any discussion with the indenture trustee

*****CONFIDENTIAL*****

Page 280

1          KRISTOPHER MOLDOVAN

2    or any investors about Sections 3.07 or 6.02 of the

3    indenture?

4         A.    No, not to my knowledge.

5         Q.    No discussions, to the best of your knowledge --

6    the company had no discussions, to the best of your

7    knowledge, with any investor or the indenture trustee as

8    to whether, if EFIH filed for bankruptcy, it would be

9    able to, in bankruptcy, pay off the notes before

10   December 1, 2015, without paying the applicable premium,

11   right?

12        A.    To the best of my knowledge, I can't -- I can't

13   speak for the company.  But the best of my personal

14   knowledge, no, those conversations did not take place.

15        Q.    Okay.  And I think I asked you -- or I think I

16   suggested to you earlier that Gibson Dunn may have drafted

17   the indenture.  I actually meant the offering --

18   supplemental offering memorandum -- or the offering

19   memorandum for those notes.

20             Did it -- was it the principal drafter of

21   the offering memorandum?

22        A.    Portion of it, yes.

23        Q.    Including the portions dealing with optional

24   redemption and acceleration, right?

25        A.    No, I don't know that to be true.  I would --

*****CONFIDENTIAL*****

KRISTOPHER MOLDOVAN

1

2  again, typically, that would come from a dealer manager

3  counsel.  I don't recall, in that transaction -- I

4  actually don't recall, in that transaction, if a dealer

5  manager -- who the dealer managers were or the counsel.

6                (Exhibit 25 marked.)

7       Q.   (BY MR. ANKER)   Let me show you what's been

8  marked as Plaintiff Exhibit 25.  Do you recognize -- this

9  Bates stamp EFIHMW00053082.

10      A.   Yes.

11      Q.   Do you recognize this e-mail exchange?

12      A.   It appears to be an e-mail from Mr. Whalen at

13 Gibson, Dunn, attaching a draft offering memorandum for

14 the first lien exchange offer to a host of people,

15 including Sherman & Sterling, and then there's a forward

16 of that by Mr. Wright to Ms. Dore and Mr. Keglevic.

17      Q.   Okay.  Mr. Whalen was one of the lawyers who

18 represented the company in connection with this issuance?

19      A.   He was.

20      Q.   Okay.  And does this e-mail exchange, coming

21 from Mr. Whalen, sent not only to the company, but the

22 lawyers at Sherman & Sterling, refresh your recollection

23 that, in fact, Gibson Dunn prepared the draft of the

24 offering memorandum in this exchange?

25                MR. HOWELL:  Object to form.

*****CONFIDENTIAL*****

Page 282

KRISTOPHER MOLDOVAN

1

2      A.    Typically -- and I don't -- I don't recall in

3   this instance, but, typically, the company would prepare a

4   draft to the offering memorandum, but not include the

5   description of notes or the provisions relating to the

6   notes.  That draft would typically come from Sherman &

7   Sterling.  Sometimes they would be -- oftentimes, they

8   would be -- those drafts would be kept separate until the

9   very end, where the description of notes would be inserted

10  into the offering memorandum.

11          This e-mail circulating the draft offering

12  memorandum does not indicate, to me, that Gibson Dunn

13  prepared the description of notes or any provisions

14  relating to the optional redemption.

15      Q.    (BY MR. ANKER)   Okay.  Let me mark, as Exhibit

16  26, a document bearing Bates stamp EFIHMW00053083 through

17  28 -- I'm sorry; versus EFIHMW00053285.

18              (Exhibit 26 marked.)

19      Q.    (BY MR. ANKER)   Can you identify this document,

20  Exhibit Number 26?

21      A.    It is a draft of the offering memorandum, and it

22  says, at the top, GDC draft, December 13th, 2012.

23      Q.    And GDC are the initials for Gibson, Dunn &

24  Cutcher, sir?

25      A.    Yes.

*****CONFIDENTIAL*****

Page 283

KRISTOPHER MOLDOVAN

1

2    Q.    Now, you don't -- you have no information, do

3    you, sir, that any actual holder of the notes drafted any

4    provision in the offering memorandum; do you?

5    A.    I have no knowledge that a holder of the notes

6    drafted any of the provisions.

7    Q.    In fact, that's sort of an odd concept; isn't

8    it?  The offering memorandum is intended to be a

9    disclosure document from the company to prospective

10   investors in connection with their decision whether or not

11   to invest, right?

12   A.    It is a disclosure document to potential

13   investors, yes.

14   Q.    So you have no reason to believe that, in

15   connection with any issuance or any of the EFIH first lien

16   debt, any holder drafted any provision in any of the

17   offering memoranda or prospectuses, right?

18   A.    Right.

19               MR. HOWELL:  Object to form.

20        Q.    (BY MR. ANKER)  I'm sorry?  I didn't hear your

21   answer, sir.

22        A.    I'm personally not aware that any holder drafted

23   any of the provisions.

24        Q.    (BY MR. ANKER)  Okay.  Now --

25        A.    If I could clarify the fact that that's

*****CONFIDENTIAL*****

Page 284

KRISTOPHER MOLDOVAN

1 discounting the fact that initial purchasers do hold for a

2 moment in time, and they do draft many provisions in -- in

3 a -- in some case -- you know, and are susceptible for

4 holding more than a moment in time, but they do draft

5 several provisions in the offering memorandum.

6      Q.   But the offering memorandum we're talking about

7 now was in respect of an exchange offer, right?

8      A.   That's true.

9      Q.   And there were no initial purchasers therefore,

10 right, sir?

11      A.   There were no initial purchasers, no.

12      Q.   Right.  And you have no reason, as you sit here

13 today, to believe that any of the dealer managers held any

14 of the notes of the EFIH notes that were issued pursuant

15 to this exchange; do you?

16      A.   I don't know.

17      Q.   And, in fact, even when they are initial

18 purchasers, your understanding, in general, is that

19 they're buying with a view to reselling those notes,

20 right?

21      A.   That is their -- that is typically their

22 intention.

23      Q.   Okay.  Now, the EFIH first lien notes that were

24 outstanding as of the petition date, not only included the

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2    10 percent notes we've talked about, but two issues of

3    6.875 percent notes, right?

4         A.    That's correct.

5         Q.    Okay.  With -- one of those issues was about

6    250-million in the summer of 2012, right?

7         A.    That sounds correct.

8         Q.    And another was a private placement in the fall

9    of 2012, about $253-million?

10        A.    They're -- my recollection is they're both

11   private placements --

12        Q.    Okay.

13        A.    -- for securities purposes.  But, yes, there was

14   a subsequent offering of 253-million.

15        Q.    In connection with either of those two

16   issuances, did the company, to your knowledge, have any

17   discussions with any investors or the indenture trustee,

18   to the extent there was a indenture trustee, regarding

19   Section 3.07 or Section 6.02 of the applicable indentures?

20        A.    There was an indenture trustee.  I don't recall

21   having any discussions with respect to those provisions

22   with any holders.  I can't recall any specific

23   conversations with the indenture trustee, who was -- who

24   would have received copies of our offering memoranda and

25   the indenture, and provided comments.

KRISTOPHER MOLDOVAN

Q.    I think I asked a question as to whether there were any communications or discussions by the company, and you answered it personally.  So let me ask it -- the question again.

To your knowledge, did any employee or legal counsel or other representative of the company have any discussions with any indenture trustee or any holder in connection with the two 6.875 percent issuances regarding Sections 3.07 or 6.02 of the relevant indentures?

A.    Not to my personal knowledge.

Q.    Okay.  Now, these were exchange offerings; were they not?

A.    Which ones?

Q.    The -- the EFIH 6.875 notes.

A.    No, they were not.

Q.    That's right.

MR. HOWELL:  Kris, I'm sorry; I'm just having a bit of trouble hearing you.  I know it's getting late.  But if I am, I imagine some other people might be, too.

Q.    (BY MR. ANKER)  You mentioned that -- you've testified that you had a discussion or the company had a discussion with Oak Tree regarding language for Section

1                    KRISTOPHER MOLDOVAN

2  6.02 of the indenture, and you've testified about that.

3              You also mentioned, I think, that you had a

4  subsequent discussion with Oak Tree about an EFIH second

5  lien issuance; am I right?

6      A.   I have to -- on your question, we did have a

7  discussion with Oak Tree regarding Section 6.02 of the

8  TCEH second lien indenture.  I don't recall having a

9  specific discussion with Oak Tree regarding the EFIH

10  section lien indenture.

11      Q.   I may have misheard you earlier.

12              I'm going to use a legal term.  Have I

13  exhausted your recollection of any discussion that the

14  company, its employees, its officers, its directors, its

15  sponsors, its lawyers, anyone acting for the company, had

16  with any investor about whether, if the company, whichever

17  company it is, filed for bankruptcy -- let me start again.

18  That may have been a garbled question.  Let me start

19  again.

20              Other than the conversation with --

21  conversations with Oak Tree about the TCEH second lien

22  exchange offering, about which you've testified, did

23  anyone on behalf of the company, to your knowledge, have

24  any discussion with any investor or indenture trustee for

25  any issuance by any EFH company concerning whether any

*****CONFIDENTIAL*****

Page 288

1                    KRISTOPHER MOLDOVAN

2    applicable premium would be payable if the issuer filed

3    for bankruptcy and sought to repay the notes prior to

4    whatever date was specified in the indenture for payment

5    of an optional redemption premium?

6                    MR. HOWELL:   Object to form.

7         A.    Sorry; what time period are you talking about?

8         Q.    (BY MR. ANKER)   From 2007 until the final --

9    until the fall of 2013?

10        A.    I have no personal knowledge of any other one

11   on -- or conversations directly with holders on --

12   regarding the provisions of Sections 6.02 and 3.07.

13        Q.    Or with any indenture trustee?

14        A.    I have no recollection.

15        Q.    Okay.

16                    MR. ANKER:   Can we go off the record for a

17   second?

18                    THE VIDEOGRAPHER:   We are now off the

19   record.   The time is 5:26 p.m.

20                    (Recess in the proceedings from 5:26 to

21                    5:35 p.m.)

22                    THE VIDEOGRAPHER:   We are now back on the

23   record.   The time is 5:35 p.m.

24        Q.    (BY MR. ANKER)   Mr. Moldovan, in the last

25   question and answer we had back and forth, you said that

*****CONFIDENTIAL*****

Page 289

KRISTOPHER MOLDOVAN

1

2    -- and I'll read you your answer.  Quote:  I have no

3    personal knowledge -- that one there -- I have no personal

4    knowledge of any other -- of any conversations directly

5    with holders regarding Sections 6.02 and 3.07.

6                  You're here not just testifying in your

7    personal capacity, but as a 30(b)(6) witness.

8                  Are you aware of any conversations, other

9    than the conversations with Oak Tree, about what you've

10   testified that anyone for the company had with any holder

11   of EF -- of any debt issued by any of the EFH companies

12   regarding Sections 3.07 or 6.02 of the applicable

13   indenture?

14                  MR. HOWELL:  Object to form.

15       A.    What time period again?

16       Q.    (BY MR. ANKER)    2007 up until the fall of 2013.

17       A.    Fall of -- fall of 2013, I -- no, I don't recall

18   any conversation.

19       Q.    Do you recall any discussions, up until today,

20   with any holders of any of the debt regarding Sections

21   6.02 or 3.07 of the indenture?

22       A.    I believe that conversations have taken place

23   regarding the companies and with investors about whether

24   an applicable premium is due under these indentures at

25   some period -- I couldn't tell you exactly when.

*****CONFIDENTIAL*****

Page 290

1                        KRISTOPHER MOLDOVAN

2          Q.    Those discussions were with holders of the PIK

3     notes?

4          A.    I don't recall what notes those holders held.

5          Q.    Who were the holders?

6          A.    I don't know.

7          Q.    Can you tell me anything about the substance of

8     those conversations?

9          A.    No.

10         Q.    Okay.  So other than knowing that, at some

11    point, some conversations occurred with some holders, the

12    substance of which you don't know; the identity of the

13    holders, you don't know; when the conversations occurred,

14    you don't know; you're not able to tell me anything about

15    those conversations, right?

16         A.    I don't recall those conversations.

17         Q.    Okay.  You testified that there were

18    conversations that you or Mr. Horton had with the

19    gentleman from Oak Tree, whose name I really would

20    butcher, about the -- in connection with the TCEH

21    exchange, right?

22         A.    I believe I testified earlier, it was Mr. Horton

23    and myself, with Mr. Panossian, in connection with the

24    issuance of notes related to the TCEH second lien

25    exchange, on or about October 2010, I believe.

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2        Q.    Were those conversations by telephone or in

3   person?

4        A.    By telephone.

5        Q.    Did you or Mr. Horton or anyone else, to your

6   knowledge, take any notes regarding those conversations?

7        A.    Sorry; could you repeat that?

8        Q.    Did you or Mr. Horton or anyone else, to your

9   knowledge, create any notes or take any notes regarding

10  those conversations?

11       A.    Not to my knowledge.

12       Q.    Did you draft any memoranda or e-mails or any

13  other form of documents memorizing those conversations?

14       A.    Not to my knowledge, no.

15       Q.    Okay.  Let me mark, as the next exhibit -- I'm

16  sorry -- a document bearing the Bates stamp EFIHMW00272272

17  to 95.

18                    (Exhibit 27 marked.)

19       Q.    (BY MR. ANKER)    Do you recognize this document,

20  sir?

21       A.    It appears to be the investor presentation that

22  would have been presented by the company to potential

23  investors with respect -- EFIH first lien notes and second

24  lien notes, made in August of 2012.

25       Q.    Now, I have not seen, in the files that have

*****CONFIDENTIAL*****

1                    KRISTOPHER MOLDOVAN

2   been produced to us, similar investor presentations for

3   each of the other EFIH first lien issuances.

4            To your knowledge, were there comparable

5   documents created, investor presentations made with

6   respect to each of those issuances?

7   A.   Since those -- I don't recall.  My belief is

8   those issuances were both done in exchanges.  It wouldn't

9   surprise me if there was not an investor presentation, but

10  I do not recall.

11  Q.   And certainly this is -- although, not a

12  prospectus, you understood and the company understood it

13  had an obligation to be truthful in the investor

14  presentation, right?

15            MR. HOWELL:  Object to form.

16  Q.   (BY MR. ANKER)  Was it the company's

17  understanding that it had to be truthful in the investor

18  presentation?

19  A.   The company intended for everything in this to

20  be accurate.

21  Q.   Okay.  And there is a document, if you turn to

22  page 4, called, Offering Summary.

23            Are you there, sir?

24  A.   I am.

25  Q.   And this summarizes key terms in the offering,

*****CONFIDENTIAL*****

Page 293

KRISTOPHER MOLDOVAN

1

2    right?

3        A.    Correct.

4        Q.    And you'll see something called "call

5    protection," right?  Do you see that?

6        A.    I do.

7        Q.    What do you understand "call protection" to

8    mean?

9        A.    It's a -- this is a summary of the optional

10    redemption provisions, the provisions that protect us from

11    being able to -- or protect the -- I'm sorry; protect the

12    holders from us being able to call them for no

13    consideration.

14        Q.    Okay.  And it then says, NC.

15              Does "NC" stand for no call?

16        A.    "NC" stands for no call.

17        Q.    And it says:  NC, hyphen, this is for the

18    250-million senior secured first lien notes, 2.5.

19              Is that 2.5 years?

20        A.    Yes.

21        Q.    Subject to T plus 50 make whole call.

22              Do you see that?

23        A.    I do.

24        Q.    T plus 50 is treasury rate, plus 50 basis

25    points, right?

*****CONFIDENTIAL*****

Page 294

1                     KRISTOPHER MOLDOVAN

2          A.    Yes.

3          Q.    And then it says:    Callable thereafter at a

4    premium declining the par.

5                     Did I read that correctly?

6          A.    You did read it correctly.

7          Q.    And there's nothing on this summary page, is

8    there, indicating anything about -- to the effect that, if

9    the company files for bankruptcy, it can pay off the notes

10   before two-and-a-half years without paying the make whole;

11   is there?

12         A.    There does not appear to be anything on this

13   page relating to bankruptcy.

14         Q.    Okay.  And you're not aware, as you sit here

15   today, of anything in the entirety of the document about

16   the possibility that the company could file for bankruptcy

17   and pay off the notes prior to the expiration of

18   two-and-a-half years without paying the make whole, right?

19                MR. HOWELL:  Object to form.

20         A.    (Witness reviews document.)

21                Could you repeat your question?

22         Q.    (BY MR. ANKER)    Sure.

23                There is nothing in the document that has

24   been marked as Exhibit Number 27 indicating, in substance,

25   that it's the company's position that it can -- that if it

Page 295

1                    KRISTOPHER MOLDOVAN

2     files for bankruptcy prior to the expiration of that 2 --

3     two-and-a-half year no call period, it can pay off the

4     notes, in bankruptcy, without paying the applicable

5     premium; is there?

6         A.    Upon my cursory review, sitting here, I do not

7     see a specific reference to bankruptcy anywhere in the

8     document.

9         Q.    Sitting here today, at the end of a long day,

10    you can't testify, can you, sir, on personal knowledge or

11    on behalf of the company, as a 30(b)(6) witness, that any

12    first lien noteholder shared what you've described as the

13    company's view, that, if it filed for bankruptcy, it could

14    pay off the notes without paying the make whole premium,

15    even if that payoff occurred prior to or during the make

16    whole period specified in the indenture, right?

17        A.    I am unaware of how they interpreted the

18    language, but applicable premium is not in the redemption

19    section, and is only in the optional -- is not in the

20    acceleration provision, and is only included in the

21    optional redemption section.  But I -- I cannot tell you

22    how they interpret that.

23                MR. ANKER:   I'll pass the witness -- let

24    me -- let me back up.

25                I think that -- I think, earlier in the

*****CONFIDENTIAL*****

Page 296

KRISTOPHER MOLDOVAN

1    deposition, the witness referred to certain documents that

2    have not been produced to us.  I assume, Mr. Howell, you

3    don't have them today now to give to us; do you?

4             MR. HOWELL:  I don't know what documents

5    you're referring to.

6             MR. ANKER:  Okay.  I actually don't

7    remember myself, but I am confident that, earlier in this

8    deposition, I did ask for the production of -- I'm sorry;

9    he took notes of conversations he had to prepare for this

10   deposition --

11            MR. HOWELL:  Oh, right.

12            MR. ANKER:  -- with Mr. Horton, Mr. Wright,

13   Mr. Santos, Mr. Chen, and Mr. Carter.  You don't have

14   copies of those notes to produce to us as we sit today; do

15   you, sir?

16            MR. HOWELL:  I do not have copies of those

17   notes, if those notes --

18            MR. ANKER:  We reiterate our request that

19   those notes be produced, and we will leave this -- we

20   reserve the right to re-notice this deposition to question

21   the witness about those notes.  We also think the witness

22   was not prepared on all 30(b)(6) topics that he said he

23   would be, and we reserve all rights in that regard, as

24   well.  But with that, I will pass the witness.

*****CONFIDENTIAL*****

Page 297

1                      KRISTOPHER MOLDOVAN

2              MR. HOWELL:  Well, I'll just make a quick

3    response that we, of course, disagree with your position

4    that the witness was not adequately prepared or was unable

5    to answer questions within the scope of the 30(b)(6)

6    topics as listed and negotiated by the parties through

7    various meet and confer arrangements.  And it's our

8    position that we will oppose any attempts to reopen the

9    deposition or any argument that the deposition was never

10   closed based on that assertion or based on the failure to

11   produce these notes that are at issue.

12             MR. ANKER:  I'm not going to debate it any

13   longer.  I think we've stated our position for the record.

14   But I actually am going to ask another question.

15        Q.   (BY MR. ANKER)   Is there any question I didn't

16   ask you, sir, that you sort of sit here and say, Well, I'm

17   happy he didn't ask me that?

18             MR. HOWELL:  Object to the form.

19        A.   No.

20        Q.   (BY MR. ANKER)   With respect to the topics on

21   which you were designated as a 30(b)(6) witness, has this

22   deposition exhausted your recollection and understanding

23   as the company representative?

24        A.   I'm sorry; can you please restate that?

25        Q.   Sure.  You were designated --

*****CONFIDENTIAL*****

KRISTOPHER MOLDOVAN

1

2      A.    And -- and may I ask you to actually -- I'm

3  sorry.  It's such an odd question.  Can I ask you to go

4  back one as well?

5      Q.    Sure.  Sometimes lawyers forget to ask the

6  witness the key question.

7            And so I'm simply asking:  Is there any

8  question that I didn't ask that you think I should have

9  asked you?

10            MR. HOWELL:  Object to form.  Objection to

11  foundation.

12      A.    I've never taken a deposition or been in a

13  deposition, so I have no -- I'm sorry; I have no response

14  to that.

15      Q.    (BY MR. ANKER)   Okay.  Let me ask the second

16  question.

17            You were designated as the company's

18  30(b)(6) witness with respect to topics 1 and 2 and on any

19  documents that related to topics 1 and 2, right?

20      A.    That's my understanding, yes.

21      Q.    Have I exhausted the company's knowledge of all

22  information regarding topics 1 and 2 and documents

23  relating to topics 1 and 2?

24            MR. HOWELL:  Object to form.

25      A.    I can't -- I'm sorry; I can't -- I can't speak

*****CONFIDENTIAL*****

1                        KRISTOPHER MOLDOVAN

2     to -- those are very, very broad topics, and if you asked

3     me everything that I could possibly know about those

4     topics, I can't answer that affirmatively.

5          Q.   (BY MR. ANKER)   Can you -- as you sit here

6     today, is there anything you know about those topics or

7     you think the company knows about those topics that you

8     have not testified to during the course of this

9     deposition?

10               MR. HOWELL:  Object to form.  He's only

11    required to answer the questions that he's asked over the

12    course of the deposition.

13               MR. ANKER:  No speech.  Let him answer the

14    question.  You've objected before.  Your objection stands.

15         A.   My -- sorry; my response was going to be, I feel

16    like I've answered all of your questions to the best of my

17    ability.

18         Q.   (BY MR. ANKER)   Okay.  Is there any information

19    about the negotiation drafting of any of the indentures or

20    any of the prospectuses or any of the other offering

21    material for any of the issuances covered by topics 1 and

22    2 that you have not testified to?

23               MR. HOWELL:  Object to form.

24         A.   I feel like I've given you as complete answer to

25    each of the questions you've asked the best I can.

*****CONFIDENTIAL*****

Page 300

KRISTOPHER MOLDOVAN

1

2          MR. ANKER:  Okay.  No further questions.

3   I'll pass the witness.

4          THE VIDEOGRAPHER:  We're now off the

5   record.  The time is --

6          MR. HOWELL:  Hold it.  Does anyone on the

7   phone have any questions; anyone else in the room have any

8   questions?

9          (No response.)

10          THE VIDEOGRAPHER:  We are now off the

11   record.  The time is 5:52 p.m.

12          (Deposition concluded at 5:52 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25          CHANGES AND SIGNATURE

*****CONFIDENTIAL*****

1              KRISTOPHER MOLDOVAN

2    WITNESS NAME:  KRISTOPHER MOLDOVAN

3    DATE OF DEPOSITION:  NOVEMBER 20, 2014

4    PAGE        LINE        CHANGE              REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25        I, KRISTOPHER MOLDOVAN, have read the foregoing

1          KRISTOPHER MOLDOVAN

2   deposition and hereby affix my signature that same is true

3   and correct, except as noted above.

4

5          _____

6                    KRISTOPHER MOLDOVAN

7

8

9   THE STATE OF _____        )

10  COUNTY OF _____       )

11

12          Before me, _____, on this day personally

13  appeared KRISTOPHER MOLDOVAN, known to me (or proved to me

14  under oath or through _____) (description of

15  identity card or other document) to be the person whose

16  name is subscribed to the foregoing instrument and

17  acknowledged to me that they executed the same for the

18  purposes and consideration therein expressed.

19          Given under my hand and seal of office this _____

20  day of _____, 2014.

21

22          _____

23                    NOTARY PUBLIC IN AND FOR

24                    THE STATE OF _____

25

*****CONFIDENTIAL*****

Page 303

1                    KRISTOPHER MOLDOVAN

2    STATE OF TEXAS          X

3    COUNTY OF TARRANT       X

4         I, Kathryn R. Baker, a Certified Shorthand

5    Reporter duly commissioned and qualified in and for the

6    State of Texas, do hereby certify that there came before

7    me on the 20th of November, 2014, in the offices of Haynes

8    and Boone, located at 2323 Victory Avenue, in the City of

9    Dallas, County of Dallas and State of Texas, the following

10   named person, to-wit:  KRISTOPHER MOLDOVAN, who was duly

11   sworn to testify the truth, the whole truth and nothing

12   but the truth of his knowledge touching and concerning the

13   matters in controversy in this cause; and that he was

14   thereupon examined upon his oath and his examination

15   reduced to typewriting under my supervision; that the

16   deposition is a true record of the testimony given by the

17   witness, and signature of witness is to be before any

18   notary public.

19        I further certify that I am neither attorney or

20   counsel for, nor related to or employed by any of the

21   parties to the action in which this deposition is taken,

22   and further that I am not a relative or employee of any

23   attorney or counsel employed by the parties hereto, or

24   financially interested in the action.

25

*****CONFIDENTIAL*****

Page 304

1                    KRISTOPHER MOLDOVAN

2            IN WITNESS WHEREOF, I have hereunto set my hand

3    and affixed my notarial seal this the 25th day of

4    November, 2014.

5

                        _____

6                        KATHRYN R. BAKER, RPR, CSR 6955

                         Expiration Date:  12/31/14

7                        Firm Registration No. 615

                         TSG Reporting

8                        747 Third Avenue, 10th Floor

                         New York, New York 10017

9                        877-702-9580

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25