1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                          :

                                     :    Chapter 11

6    ENERGY FUTURE HOLDINGS          :

     CORP., et al.,                  :    Case No. 14-10979(CSS)

7                                    :

             Debtors.                :    (Jointly Administered)

8    _____ :

9

10

11

12                                   United States Bankruptcy Court

13                                   824 North Market Street

14                                   Wilmington, Delaware

15

16

17                                   August 18, 2015

18                                   9:10 AM

19

20   B E F O R E :

21   HON CHRISTOPHER S. SONTCHI

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECR OPERATOR:  LESLIE MURIN

1    HEARING re Motion of Energy Future Holdings Corp., et al.,

2    for Entry of an Order Amending Certain Hearing Dates and

3    Deadlines in Connection with the Confirmation of Debtors'

4    Plan of Reorganization [D.I. 5269; filed August 11, 2015]

5

6    HEARING re Disclosure Statement for the Third Amended Joint

7    Plan of Reorganization of Energy Future Holdings Corp., et

8    al., Pursuant to Chapter 11 of the Bankruptcy Code [D.I.

9    5246; filed August 10, 2015] (as may be further amended,

10    modified, or supplemented, the "Disclosure Statement")

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South

1   A P P E A R A N C E S :

2   KIRKLAND & ELLIS

3         Attorney for the Debtors

4

5   BY:   CHAD HUSNICK, ESQ.

6         STEVEN N. SERAJEDDINI, ESQ.

7         EDWARD SASSOWER, ESQ.

8

9   RICHARDS, LAYTON & FINGER

10        Attorneys for the Debtors

11

12  BY:   DAN DEFRANCESCHI, ESQ.

13        JASON MADRON, ESQ.

14

15  BAYARD

16        Attorney for Delaware Trust Co. as Indenture

17        Trustee

18

19  BY:   GIANCLAUDIO FINIZIO, ESQ.

20

21  POTTER ANDERSON CARROON LLP

22        Attorney for Deutsche Bank New York

23

24  BY:   R. STEPHEN MCNEILL, ESQ.

25

1   ASHBY & GEDDES

2        Attorney for WSFS, Trustee

3

4   BY:  STACY NEWMAN, ESQ.

5

6   VENABLE, LLP

7        Attorneys for Pimco

8

9   BY:  JEFFREY S. SABIN, ESQ.

10        JAMIE EDMONSON, ESQ.

11

12   UNITED STATES DEPARTMENT OF JUSTICE

13        Attorney for the U.S. Trustee

14

15   BY:  RICHARD L. SCHEPACARTER, ESQ.

16

17   POLSINELLI

18        Attorneys for TCEH Committee

19

20   BY:  JUSTIN EDELSON, ESQ.

21        CHRIS WARD, ESQ.

22

23

24

25

1    MORRISON & FOESTER

2         Attorney for TCEH Committee

3

4    BY:  CHARLES KERR, ESQ.

5

6    WHITE & CASE

7         Attorneys for TCEH Ad Hoc Group

8

9    BY:  CHRISTOPHER SHORE, ESQ.

10        TOM LAURIA, ESQ.

11

12   PAUL, WEISS, RIFKIND, WHARTON & GARRISON

13        Attorneys for the Ad Hoc Committee of TCEH First Lien

14        Creditors

15

16   BY:  ALAN W. KORNBERG, ESQ.

17        JACOB A. ADLERSTEIN, ESQ.

18        BRIAN HERMANN, ESQ.

19

20   YOUNG CONAWAY STARGATT & TAYLOR, LLP

21        Attorney for the Ad Hoc Committee of TCEH First Lien

22        Creditors

23

24   BY:  PAULINE MORGAN, ESQ.

25

Page 6

1   PACHULSKI STANG ZIEHL & JONES

2        Attorney for EFIH Second Lien Indenture Trustee

3

4   BY:  LAURA DAVIS JONES, ESQ.

5

6   BROWN RUDNICK LLP

7        Attorney for WSFS

8

9   BY:  JEFFREY JONAS, ESQ.

10

11  KRAMER LEVIN

12       Attorney for Second Lien Indenture Trustee

13

14  BY:  JOSHUA BRODY, ESQ.

15

16  ROPES & GRAY

17       Attorney for EFIH Second Lien Indenture Trustee

18

19  BY:  ROSS MARTIN, ESQ.

20

21  PATTERSON BELKNAP WEBB & TYLER

22       Attorney for Law Debenture Trust Co.

23

24  BY:  DANIEL A. LOWENTHAL III, ESQ.

25

1    SULLIVAN & CROMWELL

2         Attorney for E Side Committee

3

4    BY:  BRIAN GLUECKSTEIN, ESQ.

5

6    NIXON PEABODY

7         Attorney for AST as EFH Indenture Trustee

8

9    BY:  RICHARD PEDONE, ESQ.

10

11   FOX ROTHSCHILD

12        Attorney for the Ad Hoc TCEH Noteholders

13

14   BY:  JEFFREY M. SCHLERF, ESQ.

15

16   MCELROY DEUTSCH MULVANEY & CARPENTER LLP

17        Attorney for TCEH

18

19   BY:  DAVID A. PRIMACK, ESQ.

20

21   KOBRE & KIM

22        Attorneys for TCEH

23

24   B:  JEREMY HOLLENBECK, ESQ.

25        BENJAMIN SAUTER, ESQ.

1

2  SHERMAN & STERLING LLP

3       Attorney for Deutsche

4

5  BY:  NED S. SCHODEK, ESQ.

6

7  MONTGOMERY MCCRACKEN

8       Attorney for E Side Committee

9

10  BY:  NATALIE RAMSEY, ESQ.

11

12  WILMER CUTLER PICKERING HALE AND DOOR LLP

13       Attorney for Delaware Trust

14

15  BY:  PHILIP ANKER, ESQ.

16

17  MOFO

18       Attorneys for TCEH Committee

19

20  BY:  BRETT MILLER, ESQ.

21       TODD GOREN, ESQ.

22

23

24

25

1  GODFREY & KAHN

2       Attorney for the Fee Committee

3

4  BY:  RICHARD GITLIN, ESQ.

5

6  PHILLIPS, GOLDMAN & SPENCE

7       Attorney for the Fee Committee

8

9  BY:  STEPHEN A. SPENCE, ESQ.

10

11  MORRIS JAMES

12       Attorney for Law Debenture

13

14  BY:  STEPHEN MILLER, ESQ.

15

16  REED SMITH LLP

17       Attorney for BNYM and BNYMTC

18

19  BY:  KURT E. GWYNNE, ESQ.

20       KIMBERLY E.C. LAWSON, ESQ.

21

22  COLE SCHULTE

23       Attorney for Delaware Trust

24

25  BY:  NORMAN PERNICK, ESQ.

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning.

4              MR. HUSNICK:  Good morning, Your Honor.  Chad

5    Husnick with Kirkland & Ellis appearing on behalf of the

6    debtors.

7              Your Honor, today we only have one item on the

8    agenda, and that is the status conference on the debtors'

9    disclosure statement, and we're holding that status

10   conference in light of yesterday's objection deadline for

11   the disclosure statement.

12             Your Honor, as you know there's $42 billion of

13   debt in these complex and what of to date have been

14   extraordinarily contentious and litigious Chapter 11 cases,

15   yet, Your Honor, as of last night we've only received 11,

16   that's 11 objections to the disclosure statement.

17             THE COURT:  Congratulations.

18        (Laughter)

19             MR. HUSNICK:  Half of those 11 objections, Your

20   Honor, are coming from creditors who are unimpaired under

21   the proposed plan of reorganization, and I'll discuss the

22   remainder of those objections at a higher level as we go

23   forward.

24             But, Your Honor, what we'd like the use today for,

25   with your indulgence, is to try and provide you with an

1    overview of the objections that we've received, perhaps

2    clear some of the underbrush to get some guidance from Your

3    Honor on what you will or will not hear at the disclosure

4    statement hearing stage in getting, for example, guidance on

5    potentially eliminating objections that go straight to

6    confirmation as opposed to the adequacy of disclosure.

7              Your Honor, we won't address today any of the

8    scheduling issues that have been continued to August 25th in

9    connection with the debtors' motion to modify the existing

10   confirmation schedule.

11             Importantly, Your Honor, none of the parties in

12   the 11 objections raised a request for additional time in

13   connection with the disclosure statement.  Some made passing

14   references to the scheduling of the disclosure statement

15   hearing and that it should be heard after the PSA motion is

16   heard.  As you know, Your Honor, both of those -- the

17   disclosure statement and the PSA and the plan support

18   agreement are scheduled to be heard on September 17th.

19             Your Honor, in light of the fact that none of the

20   parties that were objecting to the disclosure statement

21   asked for more time we would submit that setting a

22   supplemental objection deadline for the disclosure statement

23   is neither necessary nor appropriate in the circumstances.

24             With that, Your Honor, unless you have any other

25   questions I'll just flip into a quick overview of the

1     objections that we've received.

2           THE COURT:  I don't have any questions, I have

3     some very high level comments I'd like to make, but I think

4     I'll withhold them until I hear more from you and from what

5     other people might want to say.

6           Except I will, since you touched on scheduling, I

7     will just say -- first of all, I took them home and I did

8     read all of the disclosure statement objections last night,

9     so I have reviewed them so people know that I did take that

10    opportunity.

11          You know what, I'll withhold my comments until I

12    hear more.

13          MR. HUSNICK:  Okay, Your Honor.  Thank you.

14          Your Honor, the objections that we received, the

15    11 objections, fall into three basic categories.

16          The first category are objections from classes

17    that are unimpaired, the other -- second category are

18    objections that relate to the true adequacy of the

19    disclosure, and finally our category of objections that we

20    believe at their root are confirmation objections and

21    they're not appropriate at the disclosure statement stage.

22          In the first bucket, Your Honor, as I said in my

23    -- or at the very beginning, of the 11, 5 of the objections

24    come from parties who are unimpaired under the plan of

25    reorganization and therefore are not entitled to vote.

1           Your Honor, the adequate information standard in

2     Section 1125(b) explicitly limits the applicability of the

3     adequacy of disclosure objections to parties who are

4     actually entitled to vote, and therefore are interested

5     parties in the contents of the disclosure statement.

6           There's ample support in the law -- in the case

7     law to support the notion that parties who are unimpaired

8     under the plan have limited standing.

9           In fact I thought the EFH creditors' committee's

10    very short and pointed brief hit the nail on the head when

11    it said, since -- quote:

12           "Since no E side creditor will be solicited to

13        approve the amended plan or the T bid transaction

14        documents, the EFH committee has no reason to comment

15        on the adequacy of the disclosure with respect to the

16        amended plan."

17           Your Honor, they could have stopped there and all

18    of the other similar objections could have stopped there.

19           Numerous courts in and out -- or outside of this

20    jurisdiction have in fact limited the standing of unimpaired

21    parties in disclosure statement context.

22           Your Honor, we heard from various parties in the

23    pleadings, including UMB, the indenture trustee to the EFIH

24    PIC noteholders and the EFIH second lien indenture trustee,

25    that the disallowance of their post-petition interest,

1    whether inside or outside of the plan, constitutes

2    impairment under the plan.

3            This has been unequivocally rejected by the Third

4    Circuit in the PPI Enterprises cases, and not one of those

5    parties engaged on that particular fact.

6            You may remember it, Your Honor, from that case

7    where the landlord cap was at issue, the landlord claim cap,

8    and in fact the bankruptcy -- or the Third Circuit held that

9    impairment of a claim or the capping of a claim is not

10   impairment under a plan in so long as the plan provides for

11   payment in full in cash of the allowed amount of the claim,

12   that claim is in fact unimpaired.

13           Put simply, whatever these parties can show the

14   allowed amount of their claim is that claim will be paid in

15   full in cash under this plan and that is the essence of

16   unimpairment.

17           We'll brief this further in the reply, Your Honor,

18   but a substantial portion of the objections will turn on

19   this very critical concept of unimpairment.

20           In particular the E side objections filed by the

21   EFIH first lien indenture trustee, the EFIH second lien

22   indenture trustee, the EFH indenture trustee, the EFH

23   creditors' committee's objection, and the Knife River

24   Corporation objection, which was an objection filed on the

25   T side by a creditor purporting to be an other secured

1    claim, one claim that under this plan is unimpaired.

2              Your Honor, when you strip away those six

3    objections you're left with two remaining buckets.  One are

4    true adequacy of disclosure objections, and Your Honor,

5    there we see five particular objections that were not filed

6    by unimpaired creditors, and we are working with these

7    parties already to try and develop additional disclosure

8    language to be included in the disclosure statement, and we

9    hope to file, along with our reply, a revised version of the

10   disclosure statement that resolves all, if not as close to

11   all of these objections as we can.

12             Your Honor, the final bucket that I want to

13   address this morning are objections that go to the heart of

14   confirmation.  And while oftentimes in the pleadings these

15   objections were disguised as adequacy of disclosure

16   objections, to that end the debtors are happy to articulate

17   the confirmation position or confirmation objection in a

18   paragraph in the disclosure statement and simply say that

19   the debtors will reserve all rights for the confirmation

20   hearing, and hopefully that resolves these issues.

21             But to the extent that it does not this is one

22   area where we think it would be helpful, Your Honor, to get

23   some guidance today as to whether the Court will be

24   entertaining these types of objections at the disclosure

25   statement hearing.

1          In particular, while I can walk through each of

2     them I just want to highlight a few of this category.

3          The first is the objection from the TCEH first

4     lien noteholders regarding the intercreditor fight between

5     the TCEH first lien creditor agreement lenders and the TCEH

6     first lien noteholders.

7          Your Honor, you saw a preview of this

8     intercreditor fight in connection with the cash collateral

9     order back on the very first days of this case.  Since that

10    time there was an action filed in New York State Court, that

11    action has been removed to the New York Federal Court, and

12    venue has been transferred to this court, and ultimately I

13    suspect will land on Your Honor's desk some time in the near

14    future, if it hasn't already.

15         Your Honor, the debtors would submit that the

16    resolution of this intercreditor fight is certainly

17    something to the extent that the plan treatment of the TCEH

18    intercreditor fight is inconsistent with the underlying

19    rights of the parties would be something that would block

20    confirmation and therefore would be heard in connection with

21    confirmation to the extent that the TCEH first lien

22    noteholders are asking for additional disclosure about the

23    existence of this dispute.

24         We did reference it and describe it in the

25    disclosure statement and we're happy to include more

1    information.  But the litigation of the intercreditor fight

2    at this stage and at the disclosure statement in particular

3    -- or at the disclosure statement hearing on the 17th in

4    particular is inappropriate.

5              Your Honor, the same issue exists for the

6    objection from the PCRB indenture trustee.  Those are the

7    pollution control revenue bonds.

8              Your Honor may remember that there's approximately

9    $800 million of outstanding pollution control revenue bonds

10   at TCEH.  Under the plan of reorganization those bonds

11   receive the same treatment as the TCEH unsecured creditors;

12   however, there is a waiver, as Your Honor may know, from

13   earlier summaries of the deal between the debtors, the TCEH

14   first lien lenders, and the TCEH unsecured creditors that

15   relates to the waiver of the TCEH first lien's deficiency

16   claim.

17             Suffice to say how that deficiency claim is

18   treated under the plan and whether the PCRBs ultimately

19   should or should not be the recipient of or the beneficiary

20   of any portion of that waiver is an issue that should be

21   left for confirmation.

22             Your Honor, there also are several -- or a couple

23   of objections notably from the Department of Justice on

24   behalf of the Environmental Protection Agency as well as the

25   EFH indenture trustee that go to the heart of the releases

1    that are contained in the plan of reorganization.

2              Once again, Your Honor, I can't think of an

3    objection that is more appropriately addressed at

4    confirmation.

5              And finally the last bucket I wanted to flag for

6    the Court is an objection from two members of the EFH

7    creditors' committee who actually have appeared in front of

8    Your Honor in connection with the asbestos claims bar date.

9              Those parties are arguing that the plan cannot be

10   confirmed for those particular debtor entities where those

11   parties are creditors unless the debtors pursue a 524(g)

12   injunction.  I'm not going to belabor the record, I'm here,

13   I think Your Honor has heard from me on that in the past.

14   I'm happy to be here on something besides a bar date by the

15   way.

16              Your Honor, that is the sum and substance of the

17   objections, and you know, with $42 billion of debt and only

18   11 objections we think that's speaks volumes about the deal

19   that's been cut, and it really does set the course for a

20   streamline disclosure statement hearing.

21              We would of course like to hear from Your Honor,

22   your views on the confirmation issues and the unimpaired

23   creditor issues if at all possible to try and further

24   streamline that hearing on the 17th.

25              Unless Your Honor has anymore questions I'll yield

1    the podium at this time.

2              THE COURT:  Okay.  Nobody?

3              MR. GLUECKSTEIN:  Good morning, Your Honor.  Brian

4    Glueckstein from Sullivan & Cromwell on behalf of the

5    official EFH and EFIH committee.

6              As debtors' counsel referenced in his remarks the

7    committee did not comment on the adequacy of the disclosure

8    and the disclosure statement specifically because the

9    debtors developed a plan specifically to avoid a vote by any

10   E side creditor, and no E side creditor will be solicited to

11   approve the plan.

12             That should not be confused in any way with the

13   substantive issues underlying the transactions and this plan

14   and the supporting transactions that underlie it for which

15   we believe there are significant and fatal flaws that will

16   be addressed at the appropriate time.

17             With respect to scheduling on the narrow issue of

18   the disclosure statement, as indicated in our papers, I only

19   would note that we submit that no hearing with respect to

20   the disclosure statement should go forward in advance of

21   consideration of the plan support agreement, which we

22   believe raises a number of threshold issues that are raised

23   by that motion.

24             And we recognize, Your Honor, that those

25   scheduling of the PSA or any other scheduling matters are

1    not before the Court today and we will address those at the

2    appropriate time as well.

3              Thank you.

4              THE COURT:  Thank you.

5              MR. BRODY:  Good morning, Your Honor.  Josh Brody

6    of Kramer Levin Naftalis & Frankel on behalf of the EFIH

7    second lien indenture trustee.  I only rise just for really

8    two points.

9              Number one, contrary to what the debtors' counsel

10   said we did raise in our objection one small issue with

11   respect to the disclosure statement scheduling, and it's

12   really something that we intended to raise with respect to

13   the plan scheduling motion that Your Honor will see when

14   that objection is going Friday, but that is just generally

15   speaking the schedule the debtors had asked for we think is

16   okay, we don't really have an issues with it.

17             The one issue being that at the last hearing there

18   was an issue raised by counsel to the T side unsecureds that

19   they may take the position that EFIH is in fact insolvent.

20             Now while that doesn't really direct my clients'

21   claims, which is in front of Your Honor on the make-whole

22   generally speaking, it does in that EFH is insolvent with

23   respect to issues like for example relief from the automatic

24   stay, which you know, Your Honor has already ruled on with

25   respect to the first liens, but that issue is on appeal, it

1    could ultimately have an impact on us.

2            And to the extent they plan on going forward with

3    either a disclosure statement or a plan, that is going to

4    take the position that EFIH is insolvent, there are

5    implication to that, and from the scheduling perspective

6    it's not quite clear to me standing here today that the

7    schedule they want to go forward with in that rubric versus

8    one where they're basically saying, you know, EFIH is

9    insolvent, they're paying everyone in full, is the same.

10   That's first.

11           Second of all the other issue I just wanted to

12   raise, and it's not for today, I'm not arguing our

13   disclosure statement objection other than to note that I

14   believe that all of the issues we raised in our objection

15   are pure disclosure issues.  And so I would expect that as

16   these things normally happen we would give the debtor

17   specific language we'd like to include.  We may haggle over

18   it a little bit, they'd say, yes, they include it and our

19   objection would go away.  I'm a little surprised to hear

20   that they want to be so aggressive and say that they won't

21   even include any disclosure items that we would like them to

22   include, but again, that's not for today, just to put it on

23   your radar screen.

24           And the other issue being that -- and again, I

25   just want to sort of let Your Honor understand where we're

1    coming from.  It's unclear to me that -- and certainly I'm

2    standing here today again do not necessarily agree that we

3    are truly unimpaired.  If we are then that's a confirmation

4    issue, but I want Your Honor to understand you're constantly

5    hearing I think from, you know, this side of the room, which

6    has become much more heavily weighted, that oh, it's an

7    unimpairment plan, the E side is totally unimpaired, don't

8    listen to them, it's fine.  I think as Your Honor is going

9    see we laid this out in our disclosure statement objection.

10    I'm not really sure that's true.

11              Again, not for today, I want Your Honor to

12    appreciate how we're looking at this.

13              Thank you.

14              THE COURT:  You're welcome.

15              Mr. Anker, good morning.

16              MR. ANKER:  Good morning, Your Honor.  Philip

17    Anker, Wilmer Cutler Pickering Hale and Dorr for Delaware

18    Trust as EFIH first lien trustee.

19              I'll be very brief, because today is obviously not

20    the disclosure statement objection.

21              It seems to me the height of disclosure, and it

22    goes to the standing issue, is to tell a creditor what its

23    treatment really is so that it can, for example, determine

24    whether it is in fact unimpaired, and if it's unimpaired I

25    understand the law that counsel has cited.

1         The -- we have put specific language we have

2    proposed, it is purely disclosure, and it goes to a

3    fundamental question, which is, as Mr. Brody noted, we have,

4    Your Honor, filed a notice of appeal from Your Honor's

5    decision.  Frankly we'd like that appeal expedited, we are

6    going to file a motion to have that appeal certified for

7    direct appeal to the Third Circuit.  That motion will be in

8    the District Court.  We asked the debtors if they would

9    join.  They respectfully declined to join.  Not -- so

10   they're not seeking to expedite it and get a final

11   resolution.

12        But we want to know in plain English what the

13   proposed treatment is of us, because obviously our make-

14   whole claims may or may not be ultimately allowed on appeal,

15   and we have additional claims that have not been adjudicated

16   by Your Honor yet at all, claims for fees, claims for

17   interest and other claims.

18        I think I read the plan to say we're unimpaired,

19   meaning -- and if our claims are ultimately allowed they

20   will be paid in full and we will get all of our entitlements

21   of law, including interest on those claims.

22        On the other hand there are statements in the

23   disclosure statement, including an explicit statement at the

24   outset of the disclosure statement that the plan is

25   conditioned on disallowance of those claims that is

1    fundamentally contrary, I think, to the statement that we

2    will be unimpaired.  I mean it'd be contrary to the plan,

3    which says it's a condition precedent that as of the

4    effective date, not later in time, the make-whole claims

5    have not been allowed.

6            I -- you know, I don't think you can get a plan

7    confirmed if you purport to treat us as unimpaired and then

8    say that if our claims are ultimately allowed they don't get

9    paid.

10           I will note this issue came up in AMR and the

11   debtor took it off the table by simply stating unequivocally

12   on the record in the plan in the confirmation order if the

13   claim, in that case the make-whole claim, is ultimately

14   allowed on appeal it will be paid in full.  No ifs, no ands,

15   no buts.

16           But I rise only because of the standing issue.  I

17   have standing to understand the treatment that I am being

18   given under the plan and to make sure that all other

19   creditors, including the T side creditors, the people who

20   are the proponents of this plan, understand that treatment

21   as well so that they don't stand up later some day on appeal

22   and say, oh, we didn't understand that the E side guys might

23   have appeal rights.  That is sandbagging.  And I don't think

24   it's being done by the debtor here, I don't think that's

25   their intent, but what we are seeking is nothing more than

1    clear, unequivocal, no if, ands, or buts disclosure.

2            Thank you, Your Honor.

3            MR. PEDONE:  Your Honor, Richard Pedone on behalf

4    of the EFH indenture trustee.

5            And we join the committees' comments with regard

6    to the underlying issue with the PSA being determined.

7            And I note that we also did in fact in our papers

8    ask that the hearing on the disclosure statement be

9    continued.

10           Thank you.

11           THE COURT:  Thank you, Mr. Pedone.

12           Mr. Gwynne, good morning

13           MR. GWYNNE:  Good morning, Your Honor.  Kurt

14   Gwynne from Reed Smith on behalf of Bank of New York Mellon

15   as indenture trustee for the pollution control revenue bonds

16   and Bank of New York Mellon Trust Company as indenture

17   trustee for the EFCH 2037 notes.

18           Your Honor, notwithstanding debtors'

19   characterization of our objection, we very much tried to

20   keep any confirmation issue out of our objection and limit

21   it solely to a request for adequate information.

22   Section 1125 requires the debtor to provide adequate

23   information such that a hypothetical, reasonable investor

24   could make an informed judgment about the plan.

25           When your plan on page 54 has blanks in it for the

1   percentage distribution that -- of both equity in the

2   reorganized debtor, as well as the rights that are being

3   offered to the pollution control revenue bonds, it seems

4   that there's a dearth of the most important information

5   required for pollution control revenue bondholder to make an

6   informed decision about its treatment in Class C-4 of the

7   plan.

8         In addition the plan incorporates a settlement,

9   the plan provides, as does the settlement, that the

10  pollution control revenue bondholders will receive only 45.2

11  percent of the distribution that they would otherwise

12  receive if they were sharing in the first lien deficiency

13  claim, quote, waiver.

14        I'm not going to quibble right now about whether

15  that's appropriate treatment or not, that's a confirmation

16  issue.

17        What's a disclosure statement issue however is how

18  did you calculate precisely that discount, the 54.8 percent?

19  How did you determine based on the settlement of estate

20  causes of action against the first lien claimants?  How did

21  you conclude that the pollution control revenue bondholders

22  shouldn't be able to share in that distribution?  Where is

23  the economic analysis?  The financial analysis for that

24  conclusion?  That is what we would like to see in the plan.

25  We can deal with the legal issue at the confirmation hearing

1    as to whether that's appropriate treatment or not.

2           Counsel indicated that the disclosure statement

3    and the law relating to a disclosure statement requires only

4    adequate information to be provided to people that may --

5    that vote on a plan.

6           The bankruptcy rules do provide that a class of

7    claims that is unimpaired can receive different disclosure

8    than what other creditors may receive, but with respect to

9    the EFCH 2037 notes they are completely impaired because

10   they are receiving nothing, they are extinguished, they are

11   deemed to reject, there's no authority for saying that the

12   disclosure statement does not have to provide some

13   explanation for the debtors' decision as to why that is and

14   the economic analysis of why no money flows down to the 2037

15   notes as well.

16          Yes, the EFCH 2037 notes are subordinate to the

17   TCEH first lien debt, so too is the TCEH second lien's debt,

18   which is really unsecured as they're on the TCEH unsecured

19   creditors' committee.  What is the explanation for treating

20   them different?  Just put it in the plan, tell us what it

21   is, provide the economic analysis so holders of those claims

22   can determine whether or not they should object to the plan.

23          All we're looking for, Your Honor, is more

24   information, meaningful information, whether it's knowing

25   what you're actually getting under the plan, and even if

1   those percentages are filled in on page 54, there's no

2   indication of what the dollar amount is of those

3   percentages.

4           So there's a complete lack of -- notwithstanding

5   1400 pages of documents that were filed and served last

6   week, there's a real dearth of the most important

7   information that somebody needs to analyze the plan, and

8   that's what we're looking for, Your Honor.

9           Unless you have any questions I have nothing

10  further.

11          THE COURT:  No.  Thank you, Mr. Gwynne.

12          MR. GWYNNE:  Thank you.

13          MR. SAUTER:  Good morning, Your Honor.  Benjamin

14  Sauter from Kobre & Kim, we represent Delaware Trust Company

15  as the indenture trustee for certain first line notes issued

16  by TCEH.

17          I want to be clear from the start about two

18  things.

19          The first is our dispute is not a debtor issue.

20  It doesn't impact the size of the estate, it doesn't affect

21  the distributions coming out of the estate, it doesn't even

22  affect who receives those distributions.  It affects how

23  they're shared among creditors, three groups of first lien

24  creditors, after they're distributed from the estate

25  pursuant to an intercreditor agreement.

1          The second issue I want to be very clear about is

2    that we're not suggesting that this dispute needs to be

3    heard in the context of the disclosure statement objections

4    or in the context of the plan confirmation.  In fact we

5    think that this dispute should be carved out and decided

6    outside of the plan confirmation process.

7          Now this could become a plan confirmation issue if

8    the other groups, the first lien creditors are allowed to

9    proceed in the way that they have and proceed in amending --

10   or trying to amend the plan in a way that the bankruptcy

11   laws prohibit, but we don't think it needs to become a plan

12   issue if it's carved out.

13         The Court may recall dealing with similar issues

14   in the context of the cash collateral order back in June

15   2014.  At that time the Court recognized that these were not

16   debtor issues.  The Court tried to carve them out and even

17   suggested that the parties seek resolution in New York State

18   Court because the intercreditor agreement at issue is

19   governed by New York law.  And that's exactly what Delaware

20   Trust tried to do, file the State Court declaratory judgment

21   action in New York State Court to try to get resolution of

22   these issues so that we wouldn't be dealing with them now.

23   And what happened was the other groups of creditors removed

24   that State Court action to the Southern District of New

25   York, had it transferred back to the District of Delaware

1    arguing that it was an issue that the Bankruptcy Court

2    should decide.  So here we are.

3                I bring that up because Delaware Trust is not

4    trying to hold up the confirmation process, and it's not

5    trying to be an impediment to this process, we bring it up

6    because the other groups of creditors have essentially

7    hijacked the plan confirmation process to resolve this

8    dispute in their favor and are forcing the issue here, but

9    we don't think it needs to be resolved here.

10               As it was last time, we think it should be carved

11   out of the bankruptcy process and decided on the side.

12               We've requested in our papers, Your Honor, and

13   we'll reiterate that request now, that a status conference

14   be set for the week of September 8th to the 11th so that the

15   parties interested in this dispute can set an appropriate

16   briefing and hearing schedule so that it can be resolved,

17   and we respectfully submit that it could be helpful to all

18   parties and the Court if that dispute is resolved sooner

19   rather than later.

20               But the critical point from our perspective is

21   that the dispute is carve out and dealt with aside from the

22   plan confirmation process, because it's an intercreditor

23   dispute that shouldn't implicate plan confirmation.

24               Your Honor, I just want to briefly address one

25   other issue, which is the status of the State Court action

1    that began in New York and has found its way back here.  We

2    understand from the docket in that case that it may be

3    referred to Your Honor any day now, and I just bring that up

4    because I don't want Your Honor to be surprised when there's

5    an adversary proceeding wrapped up into this bankruptcy case

6    right now.

7              I would just say that given is genesis of that

8    case the issues substantially overlap with what the issues

9    are now, but they differ currently to some extent.

10             So I just wanted the Court to be aware of that so

11   that there's no surprise when that happens.

12             That's -- those are the points that I wanted to

13   emphasize, Your Honor.  So unless you have questions I'll

14   cede the podium.

15             THE COURT:  I don't.  I do appreciate the heads

16   up.  Generally speaking I would not be aware that that was

17   going on, but I was made aware by my clerk that the decision

18   has been issued by the Southern District, so I've read it,

19   and so I'm up to date on what's going on, although I don't

20   know what's going on at the District Court with actual

21   reference, that's outside my knowledge.

22             MR. SAUTER:  Understood.

23             THE COURT:  What I expect to do is when I actually

24   get assigned the case my intent has been to do exactly what

25   you've requested, which is schedule a status conference in

1   that case sooner rather than later in order to figure out

2   where the parties are, and if nothing else a straight

3   adversary scheduling conference so we can get a schedule in

4   place and figure out where to go, and to the extent it

5   coincides with confirmation I think that that would be a

6   good time to discuss it.

7          MR. SAUTER:  And we think that there probably are

8   different opportunities that Your Honor would have to

9   resolve this dispute so that it doesn't become a plan

10  confirmation issue.  And again, that's kind of what we think

11  would be the ideal way for this to be resolved.

12          Thank you, Your Honor.

13          THE COURT:  Thank you.

14          Mr. Shore, good morning.

15          MR. SHORE:  Good morning, Your Honor.

16          There have been a lot of shots taken in the papers

17  at us, plan sponsors, the debtors, management, and everybody

18  else.  If Your Honor has questions I'll respond to them.

19  I'm not going to use this time to defend the deal.

20          I want to respond to two things though.

21          First with respect to the solvency and make clear

22  the issue that's coming up in the PIC objection doesn't

23  affect the seconds.  The question is whether or not the

24  solvent debtor exception will apply to allow for post-

25  petition interest.  I said we're going to file an objection

1   and contest that, that under the facts and circumstances of

2   this case the solvent debtor exception shouldn't apply.

3            With respect to the PCRBs we're happy to work with

4   them to get an appropriate disclosure into the document.

5   There are very good reasons as to why the settlement was

6   structured this way.  But to be clear, they are getting

7   exactly what they are entitled to get.  Their only objection

8   is they want more than they're entitled to get.  So we'll

9   address that at a later time, but I'm happy to work with

10  Mr. Gwynne to work out more disclosure on that.

11           THE COURT:  Okay.  Thank you.

12           Anyone else?  Yes.

13           MR. GITLIN:  Good morning, Your Honor.

14           THE COURT:  I saw you signed in and I panicked.  I

15  thought I had missed something.

16           MR. GITLIN:  No.  Richard Gitlin, chairman of the

17  fee committee.

18           Your Honor, the fee committee is meeting tomorrow

19  to discuss some concerns they have about the way fees are

20  dealt with in the plan, and given the tight schedule for the

21  plan to be achieved we thought it might be useful both to

22  the Court and the constituents to highlight those concerns

23  briefly today.

24           They fall into two categories, Your Honor.  The

25  first is pre-confirmation fees.

1              As I understand the plan and the documents the

2     retained professionals will continue to be subject to this

3     Court and the fee committee in the review process of those

4     fees, but all the other professionals and others will

5     neither be subject to the Court nor the fee committee for

6     review.

7              I have a list of those, Your Honor, it may be

8     worthwhile to go through it.  It's the settling interest

9     holders Wachtell, Lipton; it's the settling tech first lien

10    creditors ad hoc committee Paul Weiss; it's the settling

11    individual members in the tech first lien creditors'

12    committee and the ad hoc committee; it's the tech first lien

13    agent Seward & Kissel; it's the settling TCEH unsecured

14    noteholders ad hoc White & Case; it's individual members of

15    the tech unsecured ad hoc committee; it's tech unsecured

16    note trustee Patterson; it's settling tech second lien

17    noteholders Brown Rudnick; it's tech second lien note

18    trustee Brown Rudnick; it's tech second lien note collateral

19    agent; it's tech official committee.  I'm not sure that

20    belongs there, Your Honor, we'll have to ask that question.

21    It's tech DIP lender; it's EFIH first lien DIP lender; it's

22    the fees under the merger and purchase agreements.  And then

23    the transaction fees, as defined, which is the purchasers

24    and others, which as I understand it even date back to

25    before the agreement was signed when they were talking about

1    the agreement.  Backstop agreement and the cash collateral

2    order fees.

3            It seems grossly unfair, Your Honor, that the fee

4    committee and the Court has scrutinized so carefully the

5    fees to date by all the professionals.  That scrutiny has

6    resulted in settlements constructively with those

7    professionals, reducing fees very significantly, Your Honor.

8            It just seems odd and unfair that those not

9    retained would not be subject to a similar or comparable

10   review process, Your Honor.

11           And then there's also the question of 503(b).

12   Your Honor, post-confirmation, as best I can tell by looking

13   at the plan, whether or not the transaction becomes

14   effective it seems none of the fees would be subject to the

15   fee committee or this Court's review.  That seems quite

16   extraordinary to me.

17           There seem to be provisions that deem them to be

18   effective under the bankruptcy law and 503(b), which I find

19   to be quite extraordinary provisions.

20           And the last thing the fee committee wants in any

21   way to do is be an impediment to what has been a very

22   constructive process of these players to move this case

23   along, but at the same time it's very important we highlight

24   issues that may well be quite contentious and litigious.

25           And we will be discussing those issues tomorrow at

1    our committee, we will be in consultation with the U.S.

2    Trustee, and I encourage any of the parties to talk with us

3    about the fees.  We would like to join the constructive

4    nature of this effort, but do want to highlight our concerns

5    to the Court.

6              THE COURT:  Thank you.

7              MR. HUSNICK:  Your Honor, just very briefly.

8              Just to the extent I was not clear in any opening,

9    the debtors will and are engaging in discussions with all of

10   the objection parties about additional disclosure.  We're

11   not going to be willing to resolve confirmation issues

12   through language in the disclosure statement, but we will of

13   course be willing to include additional disclosure about the

14   positions of those objecting parties on confirmation issues.

15             So we will work with them, and hopefully that will

16   resolve as more of the disclosure statement objections as

17   possible.

18             With that, Your Honor, we'll rest.

19             THE COURT:  Okay.  Thank you.

20             Well let me make -- let me say a few things.  I

21   was glad to hear Mr. Shore mention that he's willing to work

22   with Mr. Gwynne on some language on the pollution control

23   revenue bonds.  I don't think it's unreasonable to expect

24   blanks not to exist in a plan for disclosure purposes, and I

25   think, you know, the bulk of Mr. Gwynne's comments, at least

1   all of the comments Mr. Gwynne made today on the record, as

2   did a couple other creditors, even though, you know, their

3   objections might deal with confirmation issues to a certain

4   extent, what I heard were disclosure concerns, and obviously

5   disclosure issues are ripe for a disclosure statement

6   hearing.

7           That said, it is a disclosure statement hearing

8   and not a confirmation hearing, and while the idea of a

9   patently unconfirmable plan can be raised at a disclosure

10  statement hearing, I can say that based on my experience I

11  look with a very skeptical eye at patently unconfirmable

12  plan objections to disclosure statement.  I think the vast

13  majority of those issues, when raised, really don't rise to

14  that kind of level where it's appropriate to deal with at a

15  disclosure statement hearing, and obviously confirmation

16  issues will be fully reserved for the confirmation hearing.

17  But it's a disclosure statement hearing, not a confirmation

18  hearing.

19          I have some sort of basically prepared remarks I'd

20  like to go through with some observations that I have made

21  given the amount of time I've had to review the documents.

22  I certainly haven't looked at all 1500 pages.

23          I know that any time I say something like this I

24  have to be very careful, and I am trying very hard to be

25  careful, and I am offering these comments really in a desire

1    to be helpful and not guide negotiations.  I'm not trying to

2    guide negotiations, but give you an idea where I am.

3              So what I'd like to talk about really quickly are

4    just some comments about the settlement, impairment, what's

5    been called the free option, and scheduling.  I'm going to

6    start with scheduling since we've discussed it.

7              First of all, I don't see any need to delay the

8    hearing on either the PSA or the disclosure statement past

9    where it's already scheduled for September 17th.

10             Now, I struggle to see how we can do a hearing on

11   the PSA and the disclosure statement in one day, so if

12   necessary I will clear my calendar on the 18th so that we

13   can continue onto the next day.  The 18th is a Friday, and

14   hopefully finish.  Again, it's a disclosure statement

15   hearing, but it's also the PSA, so there might be a number

16   of issues to deal with.

17             Unfortunately the next week is tricky both because

18   of my personal schedule and Yom Kippur, so we're not going

19   to in any way interfere with that religious holiday in

20   connection with our scheduling.

21             The issues that have been identified in the

22   objections are I think fairly discreet, and many of them are

23   easily remedied with additional disclosure, and hopefully

24   the debtors will work with all objectors to try to resolve

25   those objections.

```
1              To a certain extent disclosure statement
2     objections are the easiest kind of objections to resolve,
3     just put the disclosure in and everybody reserves their
4     rights, and the document is already incredibly long and
5     thick, and a couple more pages isn't going to hurt.  It may
6     not help, but it's not going to hurt.
7              Now on how we handle that hearing on the 17th,
8     this goes to the point raised by the E side committee.  I do
9     think we need to deal with the PSA first and the disclosure
10    statement second.  The PSA is obviously conditioned to
11    confirmation, and there's no point in having the disclosure
12    statement hearing until we know what the decision will be on
13    the PSA.  So just for internal scheduling that's how we'll
14    proceed.
15             Okay.  The settlement.  Obviously it is a
16    standalone settlement that's not linked to the plan so we
17    can't moot the settlement arguments with the unimpairment
18    arguments of the E side committee.  If it was linked one
19    could say, look, we can only -- only need to look at the
20    settlement at the highest level because the E side is
21    unimpaired -- I'm going to talk about that in a second --
22    but assuming the E side is unimpaired they're getting what
23    they're entitled to, and whether the settlement is a good
24    settlement or a bad settlement for the E side it wouldn't
25    matter because they're getting what they're entitled to.
```

1    But since the settlement is a standalone settlement I think

2    it will need to be addressed on the merits at the same time

3    as confirmation, and we'll need to litigate the merits, and

4    that'll probably include evidence, and evidence means

5    discovery.

6            But I would note that a settlement hearing is a

7    summary proceeding and not a trial on the merits.

8    Nonetheless, I raise this issue, obviously we'll need to

9    consider it next week when we meet in connection with

10   confirmation scheduling, but we'll need to consider the time

11   for appropriate discovery regarding the settlement hearing

12   at the scheduling hearing next week.

13           Impairment.  What's pretty clear to me that the

14   crux of the confirmation hearing, other than the settlement,

15   is going to be whether the E side creditors are truly

16   unimpaired.

17           If the E side creditors are impaired the plan as

18   it exists today is almost certainly going to fail if for no

19   other reason than those creditors' votes are going to be

20   solicited.

21           So even though the E side creditors are not voting

22   though, I think the disclosure statement needs to be very

23   detailed and specific as to the exact treatment the E side

24   creditors are receiving so that all parties in interest will

25   be fully informed on the issue of impairment.

1        Also, given the significance of the issue and the

2    adverse consequences to the plan if the E side creditors are

3    in fact impaired, I urge the debtors and the plan proponents

4    not to be too cute on the impairment issue.

5        The free option.  I hesitate to raise this issue

6    frankly because I haven't had an opportunity to think

7    carefully about it, but I'm mentioning it because it's been

8    raised by a number of creditors.

9        I think this is a significant issue.  I don't

10   think whether it makes the plan patently unconfirmable, I

11   don't even know if it affects confirmation at all, but it's

12   clear it will need to be addressed and can't be swept under

13   the rug.

14       At the very least the disclosure statement should

15   identify it as a significant risk factor.

16       As I said earlier, I look at any argument that a

17   disclosure statement should not be approved because the plan

18   is patently unconfirmable with a very skeptical eye, but it

19   may be that the free option issue needs to be addressed at

20   the disclosure statement hearing.  I can't say now, I may

21   not be able to say until we're actually at the hearing, and

22   we'll see how the hearing and issues develop.

23       That was it for my comments.

24       In connection with the fee committee issues I'm

25   not going comment on the specifics of them, although I think

1    that -- I'm trying to come up with the exact word -- I want

2    to say clarity, but that's not the word I'm looking for.  I

3    think openness as to the fees that are getting paid in this

4    case, including fees of non-estate professionals, is

5    important and significant.  The numbers are staggering, the

6    issues have been incredibly complex and litigious, and

7    that's not in any way pejorative on the litigious comment,

8    and the amount of debt being dealt with is humongous.  But I

9    think that openness and opportunity for people to comment on

10   fees is incredibly important.

11          I don't know whether that means non-estate

12   professionals need to be reviewed with the same rigor as

13   estate paid professionals or retained professionals, but I

14   would note that it is often the case in other cases it's

15   often the instance that, you know, secured creditor lawyers

16   who are getting paid out of the DIP, that those fees are

17   nonetheless provided at the very at least to the Office of

18   the U.S. Trustee for review, and it may be that some sort of

19   review by the fee committee, even if those fees albeit not

20   necessarily in the same level of detail that you do with the

21   estate retained professionals, would be appropriate.

22          I would certainly expect all estate retained

23   professionals to continue -- by estate retained

24   professionals I mean professionals being paid out of the

25   estate and whose retentions have been approved by the Court

```
 1    -- I would expect all those professionals to continue to be
 2    subject to fee committee review through at least the
 3    effective date of any plan, which might take some time
 4    between confirmation and going effective, because of course
 5    there are significant conditions subsequent to confirmation
 6    that are -- that have to be filled in order for the plan to
 7    go effective, and of course not the least of which are the
 8    regulatory approvals and the tax approvals that are
 9    required.
10            That's it for hopefully my very carefully scripted
11    comments.  Is there anything never else would like to say
12    before we adjourn?  There's a person in the back.
13            MR. STEWART:  Is Gary Sights (ph)?
14            THE COURT:  Can you identify yourself for the
15    record, please.
16            MR. STEWART:  My name is Kenneth Stewart.  My
17    mother is K-E-K-J-A Stewart.
18            We made a claim and I hired two lawyers.  Charles
19    Montemari (ph) out of Dallas, Texas, and Gary Sights.  I
20    figured he would be here, I gave him his fee.  We're at
21    claim number 5739.
22            THE COURT:  Okay.
23            MR. STEWART:  And, you know, we want full
24    disclosure of leases and the properties that are under 5739.
25            THE COURT:  Can you tell me a little bit about
```

1    your claim?

2            MR. STEWART:  It's going to transmission lines

3    from Dallas, Texas to the Gulf of Mexico.

4            THE COURT:  And they go over your property?

5            MR. STEWART:  It goes over --

6            THE COURT:  Your mother's property.

7            MR. STEWART:  Yeah.  Yes.  It's my mother's and my

8    father's.  I actually get a -- I'm pro se for my father, he

9    passed away, he's the one that actually, you know, took care

10   of all the business.

11           THE COURT:  Okay.

12           MR. STEWART:  But in the divorce he got stocks,

13   bonds, and the mineral rights, she got the property.  And

14   it's a lot of acreage from Dallas to the Gulf of Mexico.

15           We've asked Mr. Shenkin (ph) with THU Energy for

16   disclosure, we haven't got anywhere.  Namon (ph), Brown,

17   Dean & Wiseman was my father's attorneys.  We've asked him

18   for full disclosure of the businesses that he had with them,

19   which were left in my name.  We haven't got anywhere with

20   them neither.

21           THE COURT:  Okay.

22           MR. STEWART:  So, you know, the debtors'

23   concealment of property with intent to hinder and delay to

24   the creditors -- defraud the creditors, which is going to be

25   -- I think we're going to be a major player in that.

1           THE COURT:  Okay.

2           MR. STEWART:  And I've hired a lawyer to be here

3    and he's not here.

4           THE COURT:  Okay.  I can't help you on that.

5           MR. STEWART:  Okay.

6           THE COURT:  I will do this.  You --

7           MR. STEWART:  You know, I'm not a lawyer.

8           THE COURT:  No, no, no, of course not, sir, and

9    the issues that we've been talking about are very sort of

10   big money issues, but issues of regular creditors matter as

11   well, issues of regular --

12          MR. STEWART:  I actually --

13          THE COURT:  -- creditors matter in connection with

14   the disclosure statement, and we have -- you have the --

15          MR. STEWART:  I think we're going to be one of the

16   big ones.

17          THE COURT:  Okay.  Well what we have here today

18   for you is I have a whole table over there of lawyers who

19   have got nothing else to do --

20          MR. STEWART:  Okay.

21          THE COURT:  -- than spent a few minutes at least

22   discussing with you what your issues might be in connection

23   with the disclosure statement --

24          MR. STEWART:  Okay.

25          THE COURT:  -- which is the document that goes out

1    to creditors so that they have an opportunity to figure out

2    how they want to vote.  Not dealing with, you know, the

3    merits of the claim, but --

4              MR. STEWART:  Yes, we --

5              THE COURT:  -- you know, the information people

6    need to know, so.

7              MR. STEWART:  We actually got a letter stating

8    that we're a stakeholder in the company.  I called the 1-800

9    number and I couldn't get anywhere with them.

10             THE COURT:  Okay.  Well you may not get answers

11   today, because --

12             MR. STEWART:  Okay.

13             THE COURT:  -- these guys may not know --

14             MR. STEWART:  Okay.

15             THE COURT:  -- enough about the details, but

16   they're here, so don't go running off after the hearing.

17             MR. STEWART:  Okay.

18             THE COURT:  Take a few moments at least to discuss

19   your issues with Mr. Husnick or whoever, Mr. Madron,

20   whoever, Mr. DeFranceschi, whoever the appropriate person

21   is, and hopefully you'll be put in contact with them and

22   they'll be able to talk to Mr. Sights or your Dallas

23   attorneys about those issues.

24             MR. STEWART:  Okay.

25             THE COURT:  But thank you for being heard.

1           MR. STEWART:  Okay.  All right.  Thank you.

2           THE COURT:  You're welcome.

3           Okay.  Anything else?

4           MR. HUSNICK:  Thank you, Your Honor.

5           We'll definitely reach out to Mr. Sights and

6    Mr. Stewart to discuss with them the disclosure.

7           We truly appreciate Your Honor's guidance on these

8    issues, and we look forward to speaking with you next week.

9           THE COURT:  All right.  Very good.  We're

10   adjourned.

11        (Whereupon these proceedings were concluded at 10:06

12   AM)

13                        *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

Page 48

1                       C E R T I F I C A T I O N

2

3      I, Dawn South, certify that the foregoing transcript is a

4      true and accurate record of the proceedings.

5      Dawn South

Digitally signed by Dawn South
DN: cn=Dawn South, o, ou,
email=digital1@veritext.com, c=US
Date: 2015.08.18 17:48:39 -04'00'

6      _____

7      Dawn South

8      AAERT Certified Electronic Transcriber CET**D-408

9

10

11

12

13     Date:  August 18, 2015

14

15

16

17

18

19

20

21

22     Veritext Legal Solutions

23     330 Old Country Road

24     Suite 300

25     Mineola, NY 11501