# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ENERGY FUTURE HOLDINGS CORP., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 14-10979 (CSS)<br><br>(Jointly Administered)<br><br>**Re: Docket Nos. 5269**<br>**Hearing Date: August 25, 2015 at 10:00 a.m.**<br>**Objection Deadline: August 21, 2015 at 4:00 p.m.** |

## OBJECTION OF UMB BANK, N.A. TO MOTION OF ENERGY FUTURE HOLDINGS CORP., ET AL., FOR ENTRY OF AN ORDER AMENDING CERTAIN HEARING DATES AND DEADLINES IN CONNECTION WITH THE CONFIRMATION OF DEBTORS' PLAN OF REORGANIZATION

UMB Bank, N.A., as Indenture Trustee (the "Trustee") for the unsecured 11.25%/12.25% Senior Toggle Notes Due 2018 and the 9.75% Senior Notes due 2019, by and through its undersigned counsel, hereby submits its objection (the "Objection") to the *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Amending Certain Hearing Dates and Deadlines in Connection with the Confirmation of Debtors' Plan of Reorganization* [D.I. 5269] (the "Scheduling Motion").[1] In support of the Objection, the Trustee respectfully submits as follows:

### PRELIMINARY STATEMENT

1. The Debtors' Proposed Amended Schedule is unworkable, inappropriate, and tantamount to a denial of due process. It contains deadlines that would be appropriate only for a consensual plan, seeks to silence objectors by limiting their ability to conduct full and fair discovery, and is premised upon a fundamental misconception: that the proposed Plan, which the

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Scheduling Motion.

Debtors allege will provide payment in full for all allowed claims of EFH and EFIH creditors, "dramatically narrows the scope of potential Plan objections from those creditors." Scheduling Motion ¶ 2. The Plan does no such thing.

2. The complex series of interrelated Restructuring Transactions contemplated by the Plan, along with the related Plan Support Agreement and Settlement Agreement, together raise a host of issues that the Trustee is entitled to explore in discovery *irrespective of whether EFIH Creditors are impaired* (which they are). For example, despite this Plan (and its "promise of full payment" to E-side creditors) being contingent on a successful REIT Reorganization and receipt of related tax and regulatory approvals, the Plan Sponsors[2] have a blanket, unlimited right to walk away at any time and for any reason, with no recourse by the Debtors. Whether the "free option" nature of the Plan ought to be its death knell under Bankruptcy Code section 1129(a)(11)'s feasibility requirement may depend on issues of fact that necessitate discovery, including but not limited to the expectations of the Debtors and the Plan Sponsors concerning whether, and under what circumstances, the free option might be exercised.

3. Moreover, in the event that the requisite regulatory approvals are not obtained following confirmation, or the Plan Sponsors simply decide that the Plan is no longer economically attractive and exercise their "free option" to walk away, the Plan will not become effective and, in turn, EFIH creditors will likely face delay and a dramatic reduction in any future recoveries. By contrast, EFH's current equity interest holders, as well as the E-side Debtors' directors, officers and representatives, will have received releases that became effective *at confirmation*. This structure directly implicates good faith issues under Bankruptcy Code section 1129(a)(3) that must also be explored in discovery.

---

[2] As defined in the Plan.

4.  In addition to these feasibility and good faith issues, the Trustee is also entitled to discovery in connection with the Settlement Agreement which, although being heard together with Plan confirmation, must independently satisfy the Third Circuit's test for determining whether it is fair and equitable. Given the size and complexity of these various transactions, discovery necessarily will be a substantial undertaking that cannot be completed in the timeframe contemplated by the Proposed Amended Schedule.

5.  Beyond being unworkable, the Proposed Amended Schedule is also entirely unnecessary because the Participating Parties already agreed to a timetable for a contested confirmation hearing in the Initial Confirmation Scheduling Order. At that time, the Debtors were pursuing a Plan that had the support of the E-side creditors, but which was likely to face substantial resistance from the T-side creditors. The Participating Parties agreed to a schedule for fact discovery, expert discovery, and pre-trial proceedings culminating in a confirmation hearing beginning in January 2016. That schedule also contemplated a streamlined October confirmation hearing in the event that the parties were able to negotiate an amended and consensual plan that was supported by the T-side creditors and paid the EFIH and EFH creditors "in full in cash."

6.  In the Scheduling Motion, the Debtors and Plan proponents rely heavily on this fallback option to argue that an October confirmation hearing remains appropriate. Such reliance is misplaced. First, the October confirmation hearing was premised upon a consensual plan, which this Plan is most certainly not. *See* June 25, 2015 Hearing Transcript at 46:13-16 ("[Mr. Miller:] We look at paragraph 9 as nirvana. I mean what better way to end this case than have it done consensually in October . . . ."). Second, whether or not EFIH creditors are in fact unimpaired for purposes of Bankruptcy Code section 1124(1) is itself a contested issue. Third,

irrespective of the outcome of that dispute, substantial issues remain regarding feasibility, good faith, and the Settlement Agreement.

7. Finally, the Plan's supposed exigency is a problem entirely of the Debtors' own making. The Debtors elected to negotiate this Plan in secret and to keep their E-side creditor constituencies entirely in the dark until, without any advance notice, filing 1,800 pages of complex transactional documents on August 10, one day before requesting this accelerated schedule and a shortened notice period. As the Debtors themselves state, it was "by design" that they have proposed a schedule with "little room for delay." Scheduling Motion ¶ 28. The Court should not permit the Debtors' contrived need to comply with milestones in the Plan Support Agreement to deprive their E-side constituents of basic due process rights. The Court should reject the Proposed Amended Schedule, and instead endorse the previously ordered schedule agreed to by the Participating Parties for use in a contested confirmation process.

## BACKGROUND

8. On July 2, 2015, the Court entered the *Order (A) Scheduling Certain Hearing Dates and Deadlines, (B) Establishing Certain Protocols in Connection with the Confirmation of Debtors' Plan of Reorganization, and (C) Revising Certain Dates in the Disclosure Statement Scheduling Order* [D.I. 4916] (the "Initial Confirmation Scheduling Order").

9. On August 10, 2015, the Debtors filed more than 1,800 pages of documents related to multiple, complex transactions, including an amended Plan, an amended Disclosure Statement, a Plan Support Agreement, the Settlement Agreement, and related transaction documents. Many more related documents have yet to be filed, including, importantly, the debt commitment documents.

10. On August 11, 2015, the Debtors filed the Scheduling Motion setting forth certain amended dates related to confirmation of the Plan and the *Motion of Energy Future Holdings Corp., et al., to Shorten Notice Period in Connection with "Motion of Energy Future Holdings Corp., et al., for Entry of an Order Amending Certain Hearing Dates and Deadlines in Connection with the Confirmation of Debtors' Plan of Reorganization* [D.I. 5270] (the "Motion to Shorten Notice").

11. On August 13, 2015, the EFH Committee filed the *Objection of the EFH Official Committee to Motion of Energy Future Holdings Corp., et al., to Shorten Notice Period in Connection with "Motion of Energy Future Holdings Corp., et al., for Entry of an Order Amending Certain Hearing Dates and Deadlines in Connection with the Confirmation of Debtors' Plan of Reorganization"* [D.I. 5283] (the "EFH Committee Objection"). The Trustee joined in the EFH Committee Objection [D.I. 5293] (the "Joinder"), supporting the EFH Committee's contention that there is "no exigency warranting a compressed time frame . . . ." Joinder ¶ 3.

**OBJECTION**

**I.  THE PLAN AND RELATED TRANSACTIONS RAISE SIGNIFICANT ISSUES THAT CANNOT PROPERLY BE EXAMINED ON THE PROPOSED AMENDED SCHEDULE[3]**

12. The Debtors rely heavily on the contingent schedule for streamlined confirmation in the Initial Confirmation Scheduling Order and the purported narrowing of complex confirmation issues to try to persuade the Court that the Proposed Amended Schedule is adequate. But by agreeing to a deal with the T-side creditors that in its present form is

---

[3] The Trustee has detailed these issues to show the scope of discovery necessary and the inadequacy of the Proposed Amended Schedule, but expressly reserves all rights to raise additional objections to the Plan and the Settlement Agreement.

unacceptable to the E-side creditors, the Debtors have merely traded one set of objectors for another. Indeed, the issues have not been narrowed, merely changed. Even if the E-side creditors are found to be unimpaired, they have standing to object to confirmation and, therefore, are entitled to discovery related to a potential objection. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 891 (Bankr. W.D. Mo. 2003) (noting that "[e]ven so-called unimpaired creditors should be allowed to raise objections to a plan on the basis of good faith, feasibility, and other generalized confirmation requirements"); *In re Scott Cable Commc'ns, Inc.*, 232 B.R. 558, 564 (Bankr. D. Conn. 1999) (holding that an unimpaired creditor would have "standing to object to confirmation"). The Proposed Amended Schedule is woefully insufficient and fails to provide for a full and fair confirmation hearing.

### A. The E-Side Creditors are Entitled to Explore Whether the Plan was Proposed in Good Faith

13. The Trustee is entitled to explore whether this Plan comports with the requirements of Bankruptcy Code section 1129(a)(3). The Plan is extraordinary, and perhaps unprecedented, insofar as it purports to grant broad releases to, among others, EFH's current equity interest holders, as well as the E-side Debtors' directors, officers, and representatives, which would become effective at confirmation *even if the Plan in which the releases are contained never goes effective.* In that eventuality, E-side creditors risk being left with an estate that has dramatically diminished in value and faces a taxable deconsolidation, but with no recourse against the fiduciaries and other parties who secretly negotiated a transaction saddling the E-side with 100% of the risk of providing the T-side with a "free option."

14. Although the Bankruptcy Code does not define "good faith," in this Circuit "a determination of good faith associated with a Chapter 11 reorganization plan requires a factual inquiry into a totality of the circumstances surrounding the plan's proposal." *In re W.R. Grace &*

*Co.*, 475 B.R. 34, 87 (D. Del. 2012). Here, all of the circumstances surrounding how this Plan came into being must be subjected to the rigor of discovery, including but not limited to discovery regarding any alternative transactions that may have been considered and rejected, why the Debtors abandoned the Oncor auction, whether there was any inappropriate collusion among previously competing bidders, how the granting of broad and unprecedented releases impacted negotiations, and why the EFH Committee was precluded from exercising its oversight role. This discovery is not limited to the Debtors, and necessarily will implicate third parties, including the Plan Sponsors. For example, EFIH creditors are entitled to explore the Plan Sponsors' conduct in connection with the Oncor auction and to understand the Plan Sponsors' expectations regarding the Plan and why they insisted upon—and why the Debtors agreed to—a "free option" to walk away from the Plan at any time, and for any reason, without any recourse for the Debtors.

15. While it would be premature to speculate just how much discovery, including any party and third-party depositions, may be necessary to explore all of the issues related to good faith, it is clear that an October confirmation hearing will deprive creditors of any ability to fully and fairly explore these issues.

**B.    The E-Side Creditors Are Entitled To Explore Whether the Plan Satisfies the Third Circuit's Standards for Feasibility**

16. Bankruptcy Code section 1129(a)(11) requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." 11 U.S.C. § 1129(a)(11). While a plan's guaranteed success is not required, it must provide "a realistic and workable framework." *In re Am. Capital Equip., LLC*, 688 F.3d at 156 (internal citations omitted). "The purpose of the feasibility test is to protect against visionary or speculative plans." *In re Indianapolis Downs,*

*LLC*, 486 B.R. 286, 298 (Bankr. D. Del. 2013). In *Indianapolis Downs*, this Court held that when a plan is conditioned on the ability to obtain certain regulatory approvals, "the plan proponent bears the burden of demonstrating that achieving the necessary approvals is ***not subject to 'material hurdles' or readily anticipated, significant obstacles.***" 486 B.R. at 298 (emphasis added).

17. This Plan raises numerous and complex issues related to feasibility, foremost among them the so-called "free option." A detailed factual analysis will be necessary in order to determine whether a Plan that permits its Sponsors to walk away at any time, and for any reason, without any recourse by the Debtors, can satisfy the requirements of Bankruptcy Code section 1129(a)(11). Even if the Debtors succeed in gaining the necessary regulatory approvals for the complex REIT structure—itself the subject of significant risk that must be explored in the course of fact and expert discovery—the Plan Sponsors could simply walk away because they have a better investment alternative elsewhere, or in the intervening months their projected returns from this transaction decline, or for no reason at all. The expectations of the Debtors and the Plan Sponsors concerning whether the free option might be exercised, or the circumstances in which it might be exercised, must be explored for this Court to assess the feasibility of the Plan. Numerous experts likely will need to opine on the timeline and risks related to IRS and PUC approvals, the likelihood of additional conditions or costs being imposed by the regulators, the extent to which the terms and conditions in this transaction are "market", and related tax and valuation issues.

### C. The E-Side Creditors Are Entitled to Discovery Related to the Settlement Agreement

18. Although the Settlement Agreement will stand even if the Plan is never consummated, the Debtors have chosen to make approval of the Settlement Agreement a

condition to confirmation of the Plan, and now propose to have their motion to approve the Settlement Agreement heard together with Plan confirmation. The Debtors will, of course, bear the burden of complying with the so-called *Martin* factors set forth by the Third Circuit in order to demonstrate whether this settlement is in the best interests of the estate. Those factors, each of which must be the subject of discovery, include (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. *Myers v. Martin (In Re Martin),* 91 F.3d 389, 393 (3d Cir. 1996).

19. The Debtors argue that the prepetition Legacy Discovery is somehow sufficient to satisfy their discovery obligations in connection with the Settlement Agreement. It is not. First, the Trustee and the other E-side creditors are entitled to serve their own discovery and should not be forced to rely solely upon documents produced by the Debtors in response to separate requests that were propounded by different parties (the Debtors' new T-side allies) in a different context and which relate to issues separate and apart from those being explored by E-side creditors. Second, the Legacy Discovery documents are wholly related to prepetition issues and do not speak to the Debtors' and their directors' postpetition negotiations or analyses. And third, ***not a single witness has been deposed.***

20. While a trial on the Settlement Agreement is not meant to be a trial on the merits of the underlying issues being settled, the Debtors' proposed schedule would preclude even a superficial canvassing of the issues. Rule 26 of the Federal Rules of Civil Procedure, which applies to the Court's consideration of the Settlement Motion, has long been recognized by the Third Circuit to allow "broad and liberal discovery." *Pacitti v. Macy's,* 193 F.3d 766, 777 (3d Cir. 1999). Given the amounts at stake here, and the material impact that the Settlement

Agreement will have on creditor recoveries, regardless of whether the Plan is consummated, the Debtors' attempt to effectively eviscerate the E-side creditors' right to explore the myriad issues involved should be denied.

### D. Additional Issues May Require Discovery

21. There are several other issues that may also require discovery. For example, the Plan proposes a rights offering for certain, but not all, E-side creditors. Bankruptcy Code section 1123(a)(4) requires the same treatment for each claim or interest of a particular class. The Trustee is entitled to take discovery in order to understand whether this constitutes impermissible disparate treatment for certain holders of EFIH Unsecured Note Claims.

22. The Plan also leaves open the question of whether the holders of EFIH Unsecured Note Claims will in fact be paid "in cash." By providing that each holder of an unsecured EFIH claim will receive "up to the Allowed amount of its Claim, payment in full in Cash *or other treatment rendering such Claim Unimpaired*," the Plan contemplates the possibility of non-cash payments to holders of EFIH Unsecured Notes. *See* Plan III.B.21.c (emphasis added); *see also* Plan III.B.16 – III.B.20 (claims of other EFIH creditors also may receive "other treatment"). The Trustee is entitled to discovery concerning the alternative payment methods considered for the EFIH Unsecured Note Claims.

## II. THE PROPOSED AMENDED SCHEDULE IS FACIALLY UNTENABLE

23. The EFH Committee's Objection to the Proposed Amended Schedule, which the Trustee supports, sets forth in detail the material deficiencies in the sequencing of events and unworkable interim deadlines. Those deadlines are unworkable *even if* the Debtors were to be cooperative and move swiftly to produce documents in an organized and coordinated fashion. Instead, the Debtors took three weeks (from July 28 to August 18) to object to 100 out of 100

document requests in the EFH Committee's Initial Consolidated Discovery Requests. The Debtors' objections do not state whether any responsive materials will be withheld on the basis of those objections, nor has a meet and confer been scheduled, despite a proposed schedule calling for document production to be <u>completed</u> by September 10.

24. Even a cursory review of the proposed interim deadlines and sequencing of events demonstrates the absurdity of the Proposed Amended Schedule. Among the obvious deficiencies are:

(a) The schedule leaves no room for the resolution of any discovery disputes that may arise. Even if the Debtors are able to complete their document production by September 10, and even if the Trustee were able to review that production and file a motion to compel by the Debtors' proposed September 17 deadline, the Proposed Scheduling Order calls for a response from the Debtors, a ruling from the Court, and the completion of any subsequent production by September 25—the close of fact discovery. Common sense dictates that this is simply not possible. Worse still would be a dispute involving privileged documents, because under the Proposed Amended Schedule the Debtors' privilege log would not be due until September 29, four days after the close of fact discovery. These deadlines are obviously insufficient to comply with the Trustee's right to receive any nonprivileged documents relevant to any party's claim or defense under Rules 26 and 34 of the Federal Rules of Civil Procedure.

(b) The schedule contemplates that fact depositions should begin on September 1–ten days *before* the completion of document production. If one makes the reasonable assumption that fact depositions can only begin after document production is complete, the Debtors propose to leave a two week period that spans the Jewish holidays to complete all fact depositions.[4]

(c) Expert reports are due just two days after the close of fact discovery (and a day before privilege logs are due), thereby depriving the experts of a reasonable amount of time to review and digest the factual record on which their expert opinions will necessarily rely.

(d) The schedule does not contemplate any rebuttal expert reports, thereby depriving this Court of expert critiques of each other's opinions until they take the stand at trial.

---

[4] Rosh Hashanah is on September 14-15; Yom Kippur falls on September 23.

25. The Debtors also attempt to limit the number of fact depositions to just ten. While it is impossible at this early stage to identify every fact witness that will need to be deposed, ten most certainly is insufficient. In order to explore all of the issues related to good faith, feasibility, and the Settlement Agreement, the Trustee will, at a minimum, need to depose: (a) the disinterested directors; (b) certain of the Debtors' officers and other directors; (c) certain of the Plan Sponsors; (d) the Hunt-Investors; (e) representatives of Oncor; (f) existing equity holders of EFH; and (g) advisors to certain of the above parties.

26. The complex set of transactions contemplated by the Plan also raises numerous issues that will need to be addressed by experts, including but not limited to: (a) issues related to REIT approval; (b) issues related to PUC approval; (c) valuation issues; and (d) tax issues. The Proposed Amended Schedule effectively precludes the Trustee from being able to offer such expert testimony to the Court.

## CONCLUSION

27. The Trustee has an unquestioned right to take reasonable and fair discovery in connection with the myriad issues raised by this Plan and Settlement Agreement. The Proposed Amended Schedule eviscerates that right and makes the conduct of a full and fair contested Plan confirmation and Settlement Agreement hearing impossible. The parties have previously negotiated, and this Court has already approved, a schedule that was designed for precisely this set of circumstances: a contested Plan confirmation process. There is no justification whatsoever to abridge that schedule.

Dated: August 21, 2015
Wilmington, Delaware

By: /s/ *Raymond H. Lemisch*
**KLEHR HARRISON HARVEY BRANZBURG LLP**
Raymond H. Lemisch (No. 4204)
919 Market Street, Suite 1000
Wilmington, DE 19801
Tel: (302) 426-1189
Fax: (302) 426-9193
E-mail: rlemisch@klehr.com

*-and-*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira S. Dizengoff (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone:   (212) 872-1000
Facsimile:   (212) 872-1002
Email:   idizengoff@akingump.com
    aqureshi@akingump.com

Scott L. Alberino (admitted *pro hac vice*)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone:   (202) 887-4000
Facsimile:   (202) 887-4288
Email:   salberino@akingump.com

**FOLEY & LARDNER LLP**
Harold L. Kaplan (admitted *pro hac vice*)
Mark F. Hebbeln (admitted *pro hac vice*)
Lars A. Peterson (admitted *pro hac vice*)
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Tel: (312) 832-4500
Fax: (312) 832-4700
Email: hkaplan@foley.com
    mhebbeln@foley.com
    lapeterson@foley.com

Barry G. Felder (admitted *pro hac vice*)
Jonathan H. Friedman (admitted *pro hac vice*)
90 Park Avenue
New York, NY 10016
Tel: (212) 682-7474
Fax: (212) 687-2329
E-mail: bgfelder@foley.com
    jfriedman@foley.com

*Co-Counsel for UMB BANK, N.A., as Trustee*