## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: D.I. 5269, 5618, 5622, 5629, 5641, 5649,** |
|  | ) | **5658, 5659** |
|  | ) |  |

**DEBTORS' REPLY IN SUPPORT OF THEIR MOTION FOR ENTRY OF AN ORDER
AMENDING CERTAIN HEARING DATES AND DEADLINES IN CONNECTION
WITH THE CONFIRMATION OF DEBTORS' PLAN OF REORGANIZATION**

1.    The Debtors' proposed amended schedule is a critical element of the carefully assembled consensus around the Plan and Settlement Agreement.  The schedule affords all parties eleven-and-a-half weeks between the filing of the Plan and the Settlement Agreement on August 10, 2015 and the hearing on October 28, 2015, which is more than sufficient time and opportunity for creditors to prepare for a hearing on any contested Settlement and Plan confirmation issues.

2.    Notably fact discovery is already well underway, with the Debtors alone having already responded to 164 document requests and produced more than 41,000 documents comprising more than 230,000 pages a week ago, on August 17, 2015, just a week after filing the Plan and Settlement Agreement (not to mention the 5.6 million pages produced months ago through the legacy discovery and in other contested matters).  In addition, the Debtors'

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

disinterested directors and managers have produced tens of thousands of pages of documents in response to such requests, and their productions will be complete in advance of the current deadline. Nevertheless, five parties (the "<u>Objectors</u>") have objected to the proposed schedule alleging that they need *two-and-a-half additional months* to prepare for the hearing on Plan confirmation and approval of the Settlement Agreement.[2]  While the Plan proposes to pay all E-side creditors in full in cash, and while the Settlement Agreement resolves all of the litigation that threatened to delay confirmation of any plan, the Objectors insist that this Court should maintain a confirmation hearing schedule that was predicated on litigating dual cram-down fights on the E-side and T-side, including two valuation trials, and potential trials on the merits of the now-resolved inter-Debtor and inter-creditor claims.

3.     The Objectors' attacks on approval of the Plan and Settlement Agreement fail to address the narrow relief the Debtors are requesting—an amended schedule that satisfies the notice requirements of the Bankruptcy Code and Bankruptcy Rules and better reflects the limited remaining issues with the Plan and Settlement Agreement—and should be overruled for at least three reasons:

- *First*, the Objectors mischaracterize the key elements of the Plan and Settlement Agreement—the subjects of the proposed amended schedule—and claim that they are somehow new or surprising. In fact, those elements have long been public and known to the Objectors, and are not the "free option" that the Objectors claim.

- *Second*, the Objectors refuse to acknowledge that the Plan and the Settlement Agreement have substantially narrowed the issues that must be resolved at the confirmation hearing. The Objectors compound this failure by largely ignoring the standard for approval of the

---

[2]  The Debtors received objections to an October 28, 2015 hearing on Plan confirmation and approval of the Settlement Agreement from the EFH Committee [D.I. 5649] (the "<u>EFH Committee Objection</u>"), the EFH Indenture Trustee [D.I. 5659] (the "<u>EFH Indenture Trustee Objection</u>"), UMB Bank [D.I. 5659] (the "<u>UMB Objection</u>"), Alcoa, Inc. [D.I. 5629] (the "<u>Alcoa Objection</u>"), and the United States Trustee [D.I. 5618] (the "<u>UST Objection</u>"). Two parties filed reservation of rights statements, DTC [D.I. 5622] and Computershare [D.I. 5641]. The PCRB Trustee objected to certain procedures and interim deadlines, but did not object to the proposed October hearing [D.I. 5658].

Settlement Agreement, which does not require a mini-trial of the merits, and by overstating the complexity of the issues that must be resolved at the hearing on that agreement. As discussed below, the only remaining issues raised by the Objectors for confirmation are good faith and feasibility, but these straightforward issues pale in comparison to the complex ones resolved by the Plan and Settlement Agreement.

- *Third*, the Objectors mistakenly dismiss the importance of the schedule to confirmation of the Plan. The proposed amended schedule, which has garnered support from both T-side and E-side creditors, is critical to maintain the consensus that has developed around the Plan. In particular, the January 15, 2015 deadline for confirmation was a material deal point that was key to bringing the TCEH First Lien Creditors to the table.

4.    This Court should overrule the objections and enter the proposed amended scheduling order, which will keep the Debtors on track for confirmation in 2015 and emergence by mid-2016.

### Argument

I.    **THE KEY ELEMENTS OF THE PLAN AND SETTLEMENT AGREEMENT ARE NEITHER SURPRISING NOR A "FREE OPTION."**

5.    On August 10, 2015, the Debtors reached a comprehensive agreement with the TCEH creditors that was built around a merger transaction, a PSA, and settlement of inter-Debtor and inter-creditor claims. Many of the Objectors use the proposed amended scheduling order as an opportunity to claim outrage over the deal itself that they incorrectly characterize as a "free option" for the TCEH creditors. (*See, e.g.*, EFH Committee Objection at 11; UMB Objection at 2.) Indeed, the EFH Committee brazenly asserts that "the current Plan was developed in secret through collusion among previously competing bidders in the auction, to the exclusion of the EFH Committee and its constituents." (EFH Committee Objection at 11.)[3]

6.    Nothing could be further from the truth. Regardless of whether the Objectors expected that a comprehensive agreement could be reached, it has been a long time coming, its

---

[3] The EFH Committee does not explain how there was collusion by T-Side creditors, who never submitted a bid and never participated in the bidding.

fundamental elements have been openly discussed and vetted for months, and its terms include hard-fought concessions granted by the TCEH creditors and other parties in interest.

**A.    The merger transaction and accompanying REIT conversion have been topics of intense public and private discussion for months.**

7.    The notion that "[t]he Debtors elected to negotiate this Plan in secret and to keep their E-side creditor constituencies entirely in the dark," (UMB Objection at 4), is demonstrably false. The public record, not to mention private discussions with E-side creditors, is replete with discussion of the key deal terms.

8.    At a hearing on April 14, 2015, the day they filed their initial plan, the Debtors announced in open court that they were engaged in talks with the TCEH Ad Hoc Unsecured Group concerning a potential REIT transaction. Hr'g Tr. Apr. 14, 2015, at 37:18-25. Around the time of that public announcement, the Debtors provided REIT projections, cash flow models, and other diligence materials to professionals who signed NDAs, including many of the Objectors.

9.    Then, at a May 4 hearing, the Debtors again discussed the REIT-based alternative plan that the Debtors were negotiating with TCEH creditors. Hr'g Tr. May 4, 2015, at 29:12-31:1. Indeed, the Debtors noted that they were speaking with counsel for the TCEH Ad Hoc Unsecured Group about a REIT structure on an almost daily basis. *Id.* At that same hearing, the TCEH Ad Hoc Unsecured Group confirmed that discussions were substantially underway, and briefly discussed the regulatory approval process that would be part and parcel of a REIT deal. *Id.* at 74:7-75:14. Also on May 4, there was a chambers conference, in which the EFH Committee participated, and at which the REIT structure, conditionality, and the so-called "toggle" in the event that the REIT transaction did not close were all discussed at length.

RLF1 12878629v.1

10.     At the June 1 omnibus hearing, the Debtors stressed the importance of ensuring that any REIT deal with the TCEH creditors would provide finality and closure to these chapter 11 cases, irrespective of whether the transaction actually closed. Hr'g Tr. June 1, 2015, at 16:8-17:6, 22:17-23:4.

11.     At the June 25 scheduling status conference, the Debtors again discussed progress on the REIT deal on the record, returning to the issue of REIT conditionality. Hr'g Tr. June 25, at 19:14-20:9. At that same hearing, the TCEH Ad Hoc Unsecured Group took the opportunity to explain the merger transaction and REIT conversion at some length:

- they described the $12.1 billion cash contribution and the debt and equity financing that had been arranged to facilitate that cash contribution;

- they explained the transaction documents that were being negotiated with the Debtors;

- they announced the participation of Hunt Consolidated;

- they explained the regulatory process; and

- they explained the REIT structure and the REIT conversion at some length.

*Id.* at 54:2-66:18.

12.     On July 23, the Debtors filed the so-called "dual-path" plan, which included both a merger scenario and a standalone scenario [D.I. 5078]. The merger scenario included nearly all the terms and mechanics of the Plan. And in a statement that the Debtors filed together with the dual-path plan, they disclosed that they were nearing agreement with Hunt and the TCEH unsecured group and felt the merger scenario contained in the dual-path plan was the most attractive path to exit [D.I. 5082]. That statement noted that the Debtors would drop the standalone scenario if a deal were reached. The Debtors also filed a disclosure statement with the dual-path plan that included significant REIT descriptions and disclosures [D.I. 5080].

13.    As previewed in the statement filed with the dual-path plan, the process of revising the current Plan was a simple one.  Using the dual-path plan as a baseline, all that was required was removal of the standalone scenario, leaving the merger scenario that was already part of the dual-path plan, and other minor changes that resulted from the final stages of the negotiations.  Thus, the transactions contemplated in the Plan have been openly discussed for several months and on file for more than a month.

14.    Supplementing this lengthy public record are numerous private meetings that the Debtors have had with E-side stakeholders at which the merger transaction, including its conditionality, has been discussed in detail.  The EFH committee, in particular, has had special access to merger and REIT information.  Indeed, the merger transaction in the Plan is the lineal descendant of a transaction the Debtors were negotiating with Hunt through the formal bidding procedures.  Hunt's proposal, from the outset, contemplated the REIT structure set forth in the Merger Agreement and other transaction documents the Debtors filed along with the Plan.

15.    As part of the bidding process, the official committees' advisors reviewed the Hunt documents and the REIT and regulatory structure that those documents contemplated and provided detailed comments on these documents.  The EFH committee was fully informed and involved in the Court-approved process.  Throughout, the Debtors supplied financial analyses, issues lists, and other summary materials to the EFH committee's advisors.  In addition, the EFIH PIK group participated in the Hunt bid.  Thus, like the EFH committee, the EFIH PIK Group is intimately familiar with the merger and REIT conversion structure.

**B.    The settlement and its origin have long been known to creditors.**

16.    Late last year, each of EFH, EFIH and EFCH/TCEH each retained independent counsel and financial advisors (the "Conflict Advisors") to advise each company on conflict matters, at the direction of its respective disinterested directors or managers (the "Disinterested

Directors"). The Disinterested Directors were authorized by the respective boards to, among other things, handle potential inter-Debtor claims, including, if they determined it was appropriate, by settling any such claims.

17.    The Disinterested Directors, in consultation with the Conflict Advisors, negotiated a settlement, which resolved and released numerous claims among the EFH, EFIH, and EFCH/TCEH, and any of their subsidiaries, against their affiliates and resulted in a $700 million unsecured claim by TCEH against EFH and additional recovery increasing the total to as much as $805 million (the "DD Settlement") [*See* D.I. 4145, 4146, and 4147]. The DD Settlement was incorporated into the April 14th plan.

18.    The underlying facts that give rise to the alleged claims resolved under the DD Settlement are well-known to all the major stakeholders in the case and were the subject of substantial discovery and diligence:

- in the course of eight months of legacy discovery regarding the settled claims, the Debtors produced over 800,000 documents totaling more than 5.6 million pages, in a process that began over a year ago and was essentially complete in February 2015;

- in connection with the announcement of the DD Settlement as part of the April 14 plan, the Disinterested Directors themselves filed extensive materials detailing the settlement and the bases for the settlement; and

- since April, the Disinterested Directors have provided additional information about their negotiations in the disclosure statement, have met with and discussed the proposed settlement with virtually all parties in interest, and have produced additional documents further evidencing their negotiations.

19.    Like the DD Settlement filed months ago, the Settlement Agreement that the Debtors now seek to schedule for approval provides TCEH with a $700 million unsecured claim against EFH. The information necessary to evaluate the reasonableness of the inter-Debtor settlement in the Plan and the Settlement Agreement, and the underlying vetted claims, has been available to interested parties for many months.

RLF1 12878629v.1

20.    In sum, the path to the Plan that was filed on August 10 has been long and very public. Its core components—the merger, the REIT conversion, and the settlement—and their key terms have been the subject of documentation, discussion, and due diligence for at least five months.

### C.    The Plan is not a "free option."

21.    Some Objectors continue to insist that the Plan grants TCEH creditors the equivalent of a "free option" to acquire Oncor. (*See, e.g.*, EFH Committee Objection at 1.) Not so. Whether or not it is appropriately characterized an "option," it is certainly not "free."

22.    An element of conditionality has always been a key issue surrounding a REIT deal. For months, the Debtors refused to accept the conditionality of such a deal without some protection should it become necessary to pursue an alternative path. This conditionality is directly related to restructuring Oncor to permit EFH to convert to a REIT, which is what also makes it possible to repay E-side clams in full in cash. Initially the Debtors insisted on the so-called "toggle" construct. To account for this conditionality, the toggle was a concept that would have allowed the Debtors to seek confirmation of a "Plan A" at the same time as a "Plan B." If the REIT did not succeed, the plan would automatically flip to Plan B.

23.    But a key problem with the toggle was that the E-side has never been able to agree to or raise the financing for a plan, whether as Plan A or Plan B. Although the E-side restructuring could be resolved through a standalone equitization, major E-side stakeholders have been stuck in a persistent stalemate, unable to reach an agreement on the proposed allocation of reorganized EFH equity among them.

24.    Another issue with the toggle construct was that the proposed plan sponsor group was wary of pursuing the merger in a competing plan environment because of the potential effect on regulatory outcomes. Instead, the parties developed the construct in the PSA that allows the

8

Debtors and other PSA parties to continue to negotiate the terms of Plan B with the E-side at any time (PSA § 4.3(a)(Z)), as well as a commitment to a 90-day fallback schedule in that alternative scenario.(PSA § 10(j)).

25.     More importantly, given that no Plan B had manifested itself, and in lieu of the toggle, the Debtors negotiated for the TCEH junior creditors to give up, or "disarm," their pursuit of litigation claims.  This disarmament is a key sacrifice on the part of the TCEH junior creditors that signed up to this deal that makes it anything but "free."  Nor is disarmament "optional."

26.     The disarmament concept is embodied primarily in the Settlement Agreement. Disarmament is, first and foremost, an agreement of the TCEH creditors to support a comprehensive settlement of legacy inter-Debtor and inter-creditor litigation claims, including an inter-Debtor settlement similar to that negotiated by the disinterested directors, come what may. Disarmament will avoid litigation of over $21 billion dollars in claims that could have dragged on for months, if not years, at substantial expense to all estates and their stakeholders (including the E-side creditors).   The benefits of the disarmament provision far surpass a liquidated damages provision, for instance.   While liquidated damages might pay for some additional administrative expenses, they would not facilitate an earlier emergence, as disarmament does.

27.     Relatedly, the PSA provides clarity on the terms on which the parties must support an alternative restructuring, which the Debtors colloquially refer to as the "drag."  Under the drag, TCEH junior creditors have agreed to refrain from objecting to an alternative plan that provides them a $550 million cash recovery, paid from the TCEH estate as a carveout from the TCEH first lien collateral, such that its cost would not be felt by E-side stakeholders. PSA §§ 5.1(a)(i), 6.1(a)(i).  In addition, as part of disarmament, the TCEH first lien creditors have

waived their deficiency claim, which would have been in excess of $8 billion. *See* PSA § 6.1(a)(ii). Thus, it is simply incorrect for the Objectors to describe the Plan as a "free option."

28.     Additionally, the Debtors were careful to ensure that the agreed timeline to pursue the merger was reasonable. To that end, the drop-dead date for closing the merger—assuming the Plan has been confirmed in accordance with the other PSA deadlines—is April 30, 2016. PSA § 11(g). Unless the deal is almost certain to close, the two 30-day extensions for E-side regulatory approvals are unlikely to be invoked because each extension reduces the TCEH unsecured alternative plan recovery by $50 million. *See* PSA § 11(g)(ii). If anything, when combined with the proposed amended scheduling order, the agreed 90-day fallback schedule, and the settlement of inter-Debtor and inter-creditor legacy litigation, the deal is as likely to save time as it is to consume additional time. On the other hand, proceeding on the former schedule with a double cram-down plan, the trial would likely have lasted through early March, nearing or surpassing the April 30 drop-dead date after post-trial proceedings.

29.     Together, these interrelated provisions—the disarmament, the drag, the proposed amended scheduling order, the drop-dead date, and the 90-day fallback schedule—provide the Debtors and the estates with assurance that any time spent pursuing the merger transaction will not be "lost" time. These provisions are a distinct and costly sacrifice on the part of the TCEH unsecured group that the Debtors fought hard to obtain for the benefit of the estates as a whole, including the E-side. These provisions were also critical to obtaining the consent of the TCEH first lien group, which likewise has a strong interest in seeing an early end to all legacy litigation.

## II.    THE PLAN AND SETTLEMENT AGREEMENT HAVE SUBSTANTIALLY NARROWED THE ISSUES TO BE DECIDED.

30.     The current scheduling order provides for an October 2015 hearing on any plan that garners broad T-side support while proposing to pay E-side creditors in full in cash. The

rationale behind the October 2015 confirmation hearing was that a qualifying plan—with T-side creditor support and unimpaired E-side creditors—would resolve and eliminate many of the complex and fact-sensitive issues that stood to be decided at a cram-down confirmation hearing in January 2016.  The Plan, PSA, and Settlement Agreement do just that, rendering any delay in proceedings unnecessary and wasteful.  In light of this reality, it is unsurprising that the Debtors have not received objections to the proposed schedule from many EFIH creditors, including Fidelity, a significant creditor at many points across the Debtors' capital structure.

31.     Nevertheless, the Objectors refuse to acknowledge these circumstances, instead insisting that the issues have shifted rather than narrowed.  (*See, e.g.*, UMB Objection at 5-6 (arguing that "the issues have not been narrowed, merely changed").)  At least one goes so far as to say that the issues under the current Plan have *expanded*.  (EFH Committee Objection at 4 (arguing that the Plan and Settlement Agreement "present *more* complex issues than the prior plan of reorganization").)  That is simply not true.

32.     The value of the current Plan and Settlement Agreement is most evident when they are compared to the most likely alternative scenario (which the Objectors flatly ignore). With a non-consensual E-side equitization plan, rather than pursuing the existing Plan and Settlement Agreement hearing in late October and November, the Debtors would have faced a massive double cram-down fight in late January, in which the E-side creditors would be litigating equity allocations, valuation, and inter-Debtor and inter-creditor legacy claims as well as makewhole and postpetition interest claims, and the T-side creditors would be litigating legacy claims, the value of avoidance actions, and the allocation of any proceeds of those claims and actions.

**A.     The deal avoids a double cram-down fight.**

33.     Under every alternative proposal the Debtors have received to date, the E-side creditors likely would be required to equitize some or all of their debt. Yet the E-side creditors have been unable to reach an agreement on E-side equity allocation or secure the financing necessary to obviate an agreed allocation. Contrary to implications that the Debtors have shunned E-side creditors or somehow appropriated their opportunity to sell Oncor, the Debtors have made every effort to reach a deal with E-side stakeholders, and at one point came close enough to warrant an announcement that an E-side deal was the tentative path forward.[4]

34.     Absent the current deal, the Debtors would be required to convert one or more classes of E-side debt nonconsensually to equity, necessitating a fight over valuation and equity allocations—a fight that would require litigation of the ability to convert EFH into a REIT and whether such value should be included in the TEV for purposes of determining allocations among the E-side creditors. That valuation and cram-down litigation, which would have been extremely time-consuming, was a driver of the January 2016 schedule. This E-side cram-down fight has been eliminated by the current deal, in which E-side creditors will be paid in full in cash under the Plan.

35.     The Plan avoids a cram-down fight on the T-side as well. The T-side junior creditors undoubtedly would have argued that the TCEH first lien creditors did not have valid liens. Absent a settlement, there would have been massive litigation on the T-side as to the

---

[4] At the June 25 scheduling conference, the Debtors stated that "the path we are now embarking on" had the support of the EFIH second lien group and Fidelity, "would equitize the E side in large part," and envisioned "cashing out the PIKs and potentially cramming down the unsecureds on the T side." Hr'g Tr. June 25, 2015, at 11:12-18. The Debtors noted, however, that there was "work to be done on that plan," including developing "the terms under which the new money would come in to pay off the PIKs." *Id.* at 18:1-3. Ultimately, efforts to raise that financing on the E-side did not progress, and efforts to agree instead on allocations for a full equitization likewise stalled.

validity of the TCEH first liens and appropriate allocation of value between the TCEH first lien creditors and the TCEH unsecured creditors, including litigation over who was entitled to the proceeds of TCEH's litigation against EFH.  These potential issues have long been on the Court's radar, were discussed in detail in the Standing Motions and Settlement Motion, and have now been resolved (pending Court approval) through the Plan and Settlement Agreement filed approximately two weeks ago.  The agreed allocation embodied in the Settlement Agreement came about with the assistance of a Court-approved mediator.  That mediation was designed to reduce confirmation litigation, and its success has paved the way for the proposed schedule.

**B.      The deal resolves potentially massive inter-Debtor claims.**

36.      As this Court is well aware, the potential for protracted, costly litigation over inter-Debtor and inter-creditor legacy claims has been present in these chapter 11 cases from the outset.  The agreements embodied in the Plan, PSA, and Settlement Agreement lay to rest any concern that this litigation would materially delay the Debtors' emergence from bankruptcy.

37.      While the Objectors argue that the number and complexity of the litigation claims resolved in Settlement Agreement is a reason to delay proceedings, just the opposite is true.  Absent the Settlement Agreement, the now-resolved claims—including inter-creditor claims involving the T-side and also inter-Debtor claims—would be the subject of long, hotly contested trials on the merits.  By contrast, as recognized by UMB, "a trial on the Settlement Agreement is not meant to be a trial on the merits of the underlying issues being settled." (UMB Objection at 9).  Indeed, in considering the Debtors' motion to approve the Settlement Agreement, the Court will not conduct a "mini-trial" on the merits of each claim.  Instead, the Court will simply canvass the issues to see that the agreement falls above the lowest point in the range of reasonableness. *See, e.g., In re Key3Media Grp., Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005) *aff'd*, No. 03-10323 (MFW), 2006 WL 2842462 (D. Del. Oct. 2, 2006) ("In determining whether

13

to approve a settlement, '[t]he court is not supposed to have a 'mini-trial' on the merits, but should 'canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness.'") (quoting *In re Jasmine, Ltd.,* 258 B.R. 119, 123 (D.N.J. 2000); *In re W.R. Grace & Co.,* 475 B.R. 34, 77-78 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.,* 729 F.3d 332 (3d Cir. 2013) ("In analyzing the compromise or settlement agreement under the *Martin* factors, courts should not have a 'mini-trial' on the merits") (internal citation omitted).

38.    The Objectors are already well-positioned to assess the reasonableness of the Settlement Agreement.  Through Legacy Discovery, the Objectors have received 5.6 million pages of discovery pertaining to the claims resolved in the Settlement Agreement, and further discovery is already underway.  Indeed, the additional 41,000-plus documents the Debtors produced a week ago include, among other things, Board of Directors materials from January through July 2015, including materials relating to the Boards' approvals of the Settlement Agreement.  In light of the substantially narrowed confirmation issues and summary nature of the Court's review of the Settlement Agreement under Rule 9019, the proposed schedule provides creditors with a full and fair opportunity to investigate and raise all appropriate objections to the Settlement Agreement.  As indicated in the Debtors' Motion, if any party suffers under the slightly abbreviated discovery schedule, it is the Debtors, who have committed to produce all responsive documents by mid-September.

39.    Likewise, through the Settlement Motion and evidence presented at the hearing, the Court will have all the information it requires to determine whether the Settlement Agreement is reasonable.  *In re Key3Media Grp., Inc.,* 336 B.R. at 92-93 (noting that "it is not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so

doing, there would be no need of settlement") (quoting *In re Martin*, 212 B.R. 316, 319 (8th Cir. BAP 1997)).

40.    Given the standard for approval of a settlement under Rule 9019 and the parties' familiarity with the issues, the Debtors' request to be heard on the Settlement Agreement at a late October 2015 confirmation hearing is hardly ambitious or surprising, and the Objectors' arguments to the contrary rest on mischaracterization of the scope of the required hearing and their refusal to acknowledge that the pertinent documents have been available for review.

**C.    The remaining issues highlighted by the Objectors are limited and straightforward.**

41.    *Good faith.* Some Objectors imply that the Debtors' good faith in proposing the Plan may be disputed. (*See, e.g.* EFH Committee Objection at 9-11; UMB Objection at 6-7.) As a preliminary matter, that suggestion appears to be based on the flawed premises that the Plan and Settlement Agreement were negotiated in secret, which is wrong for the reasons explained above. Regardless, such an argument adds little incremental complexity to a hearing that would likely already include a full discussion of the circumstances leading to the deal and consideration of the Settlement Agreement. In effect, consideration of good faith is no different than consideration of the Settlement Agreement, for which there is ample time in the schedule for the reasons discussed above.

42.    *Feasibility.* Some Objectors imply that the feasibility of the Plan will be disputed. (*See, e.g.* EFH Committee Objection at 9, 11; EFH Indenture Trustee Objection at 3; UMB Objection at 7-8.) But contrary to the EFH Committee's and EFIH PIKs' assertions, the conditionality of the merger agreement does not make the plan infeasible. It is well-established that the success of the plan need only be "reasonably likely," not "guaranteed." *In re WR Grace & Co.*, 729 F.3d 332, 348 (3d Cir. 2013). Although courts sometimes refer to feasibility as a

"material hurdle" standard in the regulatory context, the substance of the feasibility standard is the same: the "necessary approvals" must be "reasonably likely to be obtained." *In re Indianapolis Downs, LLC*, 486 B.R. 286, 298 (Bankr. D. Del. 2013).

43.    Given that Oncor is the largest rate-regulated utility in Texas, any plan in these cases will require key state regulatory approvals. As a court in this district recently noted, "[i]t is not at all unusual for consummation of a Chapter 11 plan to be conditioned upon the expectation of approval by regulatory authorities." *Id.* If certain E-side creditors wish to pursue a feasibility objection on this basis, the proposed schedule provides ample time to investigate and raise such issues with the Court.

44.    At the appropriate time, the Debtors will demonstrate that the necessary approvals are, at the minimum, reasonably likely to be obtained. It should not, however, be surprising that a plan transaction that proposes to repay all allowed E-side claims in full in cash has conditionality associated with these approvals and other factors.

45.    *Fees and Releases.* The U.S. Trustee argues that the Court should extend the schedule because of anticipated objections to fee and release provisions. (*See* UST Objection at 4-7.) Both types of provisions are, of course, permissible under appropriate circumstances. *See, e.g., In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013). Regarding the fee provisions, the Debtors have already initiated discussions between relevant professionals and the Fee Committee, and will promptly do the same with the U.S. Trustee, in an attempt to resolve concerns over this issue. However, to the extent that they cannot be resolved, any such objections pose discrete and principally legal issues that do not warrant delay. As to the release provisions, this is a straightforward confirmation issue that the Office of the U.S. Trustee

routinely raises in large chapter 11 cases and is far from a unique or unanticipated objection that might warrant extension of the schedule.

46.    *Alcoa Contract Issues.*    Finally, Alcoa Inc. ("Alcoa") asserts that an October confirmation date is a "re-trade" of its stipulations with the Debtors and would hinder its ability to prepare its response to the Debtors' disposition of its contracts.  (Alcoa Objection ¶¶ 1, 5.) Alcoa's objection is meritless.  Alcoa has already negotiated its own scheduling deal, separate from the current scheduling proposal.  Pursuant to its scheduling stipulations, Alcoa agreed that it would withdraw its notice of intent and discovery requests related to the confirmation hearing, and the Debtors agreed to provide Alcoa with twenty-eight days' notice of the Debtors' decision about the disposition of Alcoa's contracts prior to the deadline to object to the Plan.  Given that there are currently fifty-two days before the proposed plan objection deadline, the proposed schedule, including an October confirmation, does nothing to preclude the full and fair execution of that agreement.  To avoid any possible doubt, the Debtors have revised the proposed amended scheduling order to address expressly the Alcoa stipulation.

## III.    THE PROPOSED AMENDED SCHEDULE IS REASONABLE.

47.    In light of the substantially narrowed scope of the confirmation hearing, the notion, common to the objections, that "there is significant additional discovery that needs to be conducted" is simply wrong.  (*See, e.g.* EFH Indenture Trustee Objection at 7.)  That false premise underlies the vast majority of the specific objections to the proposed amended scheduling order.  In any event, the proposed schedule provides ample time for discovery and is entirely consistent with the time allotted in comparable cases.[5]  Further, the proposed schedule

---

[5] The Debtors' proposal provides 64 days between the scheduling order and the confirmation hearing. That is comparable to cases such as *In re Capmark Financial Group, Inc.* (Bankr. D. Del. 2010) (42 days from scheduling order to confirmation hearing), *In re Visteon Corp.* (58 days from scheduling order to confirmation hearing), *In re Calpine Corp.* (Bankr. S.D.N.Y. 2007) (66 days from discovery

for hearing on the Settlement Agreement goes well beyond the 21 days' notice required for 9019

motions under Bankruptcy Rule 2002.

### A.    Additional document discovery would be unnecessary and inappropriate.

48.    Several Objectors note that the proposed amended schedule would not permit

them to serve additional document discovery. (*See, e.g.* EFH Committee Objection at 8; EFH

Indenture Trustee Objection at 3.)   That is true, because additional document discovery is not

appropriate, necessary, or constructive.

> 1.    *The Settlement Agreement has already been the subject of exhaustive document discovery.*

49.    The EFH Committee complains that the proposed amended schedule "seeks to

shoehorn all discovery related to the Settlement Motion into the same expedited schedule" as

plan confirmation. (EFH Committee Objection at 2.) But in fact, nearly all discovery relevant to

the Settlement Agreement was completed months ago when the Debtors produced millions of

pages of legacy discovery.

50.    Moreover, to the extent that post-petition events are relevant to the Settlement

Agreement, the Objectors have already issued several document requests pertaining to, for

example, the manner in which the DD Settlement was negotiated,[6] such as the EFH Committee's

---

served to close of discovery), and *In re Lehman Brothers Holding, Inc.* (Bankr. S.D.N.Y. 2011) (96 days from scheduling order to confirmation hearing).   Notably, this calculation does not account for the massive volume of discovery that has already been completed through the unique legacy discovery process, nor does it account for the fact that additional confirmation discovery was propounded nearly a month ago and that the Debtors have already produced more than 41,000 responsive documents a week ago.

[6] For instance, attached hereto as **Exhibit B** is a subpoena the EFH Committee served on a disinterested director that exhibits the breadth of the discovery sought, and being produced, by the disinterested directors regarding the settlement.

broad request for "[a]ll Documents and Communications relating to the Settlement Agreement[7] and the settlement contained therein." The Debtors and Disinterested Directors have already made substantial productions responsive to such requests. For example, the 41,000 documents the Debtors have already produced include Board of Directors materials covering the critical period from January to July 2015, and the Debtors will soon produce Board materials from early August.

51.     Notably, in the more than two weeks since the Settlement Agreement was filed, not a single Objector has identified any specific additional discovery it needs on the Settlement Agreement that has not already been covered by existing discovery requests.

2.     *Plan document discovery has already been issued.*

52.     Confirmation discovery began nearly a month ago, when creditors served over 927 written document requests—including 252 directed at the Debtors—on July 28, 2015. Those requests, while targeted to the dual-path plan, covered the waterfront of documents potentially relevant to the Plan and the Settlement Agreement. Since the Debtors have filed the Plan, the issues have only narrowed, and many creditors have agreed to stand down on requests that are no longer relevant, leaving the Debtors to respond to "only" 164 requests on August 17. While various Objectors insist that they may need additional document discovery on various Plan-related issues, none has identified a single category of documents that they need to evaluate the Plan and that they have not already requested.

---

[7] The EFH Committee defined "Settlement Agreement" in their July 28 requests to mean, in essence, the DD settlement. In responding, the Debtors made clear that they would interpret "Settlement Agreement" to include the Settlement Agreement filed on August 10.

**B.    The deadlines and protocols set forth in the proposed amended schedule are reasonable.**

53.    *Time for discovery*.    Several Objectors misrepresent the time provided for discovery in the proposed amended Plan.    (*See, e.g.* EFH Committee Objection at 5, 7 (incorrectly claiming that the Debtors seek to "reduce the time to complete fact discovery to a mere 30 days).)    Creditors began serving written document requests for confirmation discovery on July 28, 2015.    Those requests, while targeted to the dual-path plan, covered documents potentially relevant to the Plan and the Settlement Agreement.

54.    *Debtor cooperation.*    UMB oddly insinuates that the Debtors have somehow been slow or uncooperative in responding to additional confirmation discovery, noting that "the Debtors took three weeks (from July 28 to August 18)" to respond to the EFH Committee's document requests. (UMB Objection at 10-11.)    What UMB fails to mention is that August 18 was the date set, by consensus, for responses to document requests in the operative scheduling order, making Debtors' responses timely.    UMB also ignores that even *before responding* to the requests, the Debtors produced 41,000 responsive documents.    Finally, while UMB observes that no meet-and-confer on the Debtors' responses has yet been scheduled, the fact is that none has been requested by any party propounding discovery.

55.    *Limit on depositions.*    Some Objectors note that the proposed amended scheduling order limits Plan objectors to ten depositions, and complain that they must show "good cause" to obtain more.    (EFH Committee Objection at 9; UMB Objection at 12.)    First, the ten deposition limit is already in the existing scheduling order and none of the objectors opposed that limit at the June 25 scheduling conference or before that order was entered.    Second, ten depositions (which happens to be the presumptive limit for civil litigation under the Federal Rules of Civil

Procedure) is more than enough to cover the narrowed issues in play.  Third, if the Objectors truly need more depositions, they can get them unless they fail to show good cause.

56.    *Discovery disputes.*  Some Objectors imply that there are discovery disputes to be resolved, and that there is insufficient time to do so.  (EFH Committee Objection at 15; UMB Objection at 11.)  To be sure, the proposed amended schedule requires prompt action to resolve discovery disputes, as is its intent.  If any Objector has disputes to raise, they should do so immediately, rather than sitting on their rights.  During an initial meet-and-confer session on Friday, the EFH Committee did not identify any discovery disputes with the Debtors, and the Debtors proactively proposed that the EFH Committee meet with the TCEH Ad Hoc Unsecured Group as quickly as possible, including after Tuesday's hearing, to resolve a potential discovery dispute with them.[8]

## IV.    THE PROPOSED AMENDED SCHEDULE IS CRITICAL TO KEEP THE PLAN ON TRACK.

57.    Along with the Plan, the PSA and Settlement Agreement are key elements of the comprehensive agreement among the Debtors, TCEH creditors, and other settling parties.  The Settlement Agreement gave the Debtors critical assurance that they would not be dragged into a quagmire of contentious litigation if the Plan cannot be consummated.  Accordingly, the Settlement Agreement has been made a condition of confirmation of the Plan, and must be confirmed, along with the Plan, by January 15, 2016.

58.    Only the proposed schedule ensures that the Court will have ample time to consider and rule on the Settlement Agreement and Plan before that PSA deadline.  Even a hearing in the second week of November, for example, would push post-trial briefing to the end

---

[8] UMB argues that it will not have time to dispute the Debtors' privilege log. (UMB Objection at 11.) Notably, the Debtors produced a privilege log in legacy discovery spanning thousands of pages, and not a single dispute over that log has arisen.

of November and the Court's consideration of the issues presented at confirmation into the winter holiday season. The proposed schedule avoids that prospect, while also allowing sufficient time for the parties to complete the limited discovery required for confirmation well in advance of the hearing.

59.    The Objectors insinuate that the milestones in the PSA were "manufactured" to create a "self-serving exigency" that this Court need not heed in considering the proposed amended schedule. (EFH Indenture Trustee at 3; EFH Committee at 3, 16.) The fact is, however, that those deadlines were negotiated terms without which the deal—including the Plan and the Settlement Agreement—may not have been reached in the first place. If the Plan and Settlement Agreement are to succeed, it is only because of the give and take negotiation process that resulted in the inclusion of the PSA milestones, which were a key initial commitment in the negotiating process that ultimately resulted in both agreements. If the PSA deadlines are not satisfied, the PSA may be terminated, and support for the Plan may dissolve.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Amended

Confirmation Scheduling Order, substantially in the form attached hereto as **Exhibit A**, granting

the relief requested in the Motion and granting such other and further relief as is appropriate

under the circumstances.

Dated:  August 24, 2015
        Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:          collins@rlf.com
                defranceschi@rlf.com
                madron@rlf.com

        -and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                brian.schartz@kirkland.com

        -and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                marc.kieselstein@kirkland.com
                chad.husnick@kirkland.com
                steven.serajeddini@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

RLF1 12878629v.1