**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br>ENERGY FUTURE HOLDINGS CORP., et al.,<br>                       Debtors. | Chapter 11<br>Case No. 14-10979 (CSS)<br>(Jointly Administered)<br>**Re: Docket No. 5248** |

**OBJECTION OF THE BANK OF NEW YORK MELLON AND
THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.
TO THE MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*,
TO AUTHORIZE THE DEBTORS TO ENTER INTO AND PERFORM
UNDER THE PLAN SUPPORT AGREEMENT AND HEARING THEREON**

The Bank of New York Mellon ("BNYM"), in its capacity as the PCRB Trustee, and The Bank of New York Mellon Trust Company, N.A. ("BNYMTC" and, together with BNYM, "BNY"), in its capacity as the EFCH 2037 Notes Trustee, object to the *Motion of Energy Future Holdings Corp., et al. to Authorize the Debtors to Enter into and Perform under the Plan Support Agreement and Hearing Thereon* (Docket No. 5248) (the "Motion"). In support of the objection, BNY respectfully states as follows.[1]

**I. PRELIMINARY STATEMENT**

1. On August 9, 2015, the above-captioned debtors (the "Debtors"), the Investor Parties, the Consenting Interest Holdings, the Consenting TCEH First Lien Creditors, the Consenting TCEH Unsecured Noteholders, the Consenting TCEH Second Lien Noteholders, the TCEH Official Committee, and the TCEH First Lien Agent (collectively, the "PSA Parties") entered into the Plan Support Agreement ("PSA").[2]

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Plan Support Agreement or Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., *et al.*, Pursuant to Chapter 11 of the Bankruptcy Code, as applicable.

[2] The TCEH First Lien Agent entered into the PSA solely with respect to Section 6.1 and 12.4 of the PSA. *See* PSA at p. 4.

2. As explained below, pursuant to the PSA, the Debtors "locked-up"[3] the votes of the other PSA Parties. *See* PSA at § 4.1(a). Thus, the PSA constitutes an improper post-petition solicitation in violation of section 1125(b) of title 11 of the United States Code (the "Bankruptcy Code"), and this Court should deny the Motion.

## II. FACTUAL BACKGROUND

### A. The PCRBs

3. BNYM serves as the PCRB Trustee with respect to multiple series of pollution control revenue bonds or pollution control revenue refunding bonds (the "PCRBs"). As of the Petition Date, principal amounts outstanding under the PCRBs totaled approximately $875 million in the aggregate, with interest rates generally ranging from 0.29% to 8.25%, and original maturities ranging from June 1, 2021, to March 1, 2041. The PCRBs are unsecured obligations of TCEH.

4. The PCRB Trustee timely filed unsecured proofs of claim relating to the PCRBs (excluding any PCRBs that have been repurchased by TCEH and held in a custody account (the "Repurchased PCRBs")) in the aggregate amount of $1.087 billion, including principal, plus interest and fees.

### B. EFCH 2037 Notes

5. BNYMTC serves as the EFCH 2037 Notes Trustee under that certain indenture, dated as of December 1, 1995, for the EFCH 2037 Notes originally due January 30, 2037, by and among EFCH, as issuer, and BNYMTC, as EFCH 2037 Notes Trustee. As of the Petition Date,

---

[3] "A 'lock-up' refers to an agreement between a creditor and a debtor (or [if pre-petition] prospective debtor) in which the creditor becomes legally bound to vote for a plan of reorganization so long as certain key plan provisions are included." *Official Committee of Unsecured Creditors v. New World Pasta Co.*, 322 B.R. 560, 569 (M.D. Pa. 2005). The Debtors essentially describe the PSA as a lock-up agreement. *See* Motion at ¶ 64, p. 25 (stating that "the Debtors have determined to lock up with the Hunt/TCEH Unsecured Group's proposal pursuant to the PSA"); and ¶ 78, p. 32 ("Because of its attractiveness, the Debtors would be remiss if they were not able to 'lock-up' the support of these creditor groups to move forward with the Plan . . . .").

approximately $9 million in principal amount of the EFCH 2037 Notes were outstanding, including approximately $1 million of floating-rate notes and $8 million of 8.175% notes. The EFCH 2037 Notes are unsecured obligations of EFCH and are subordinate to EFCH's other prepetition funded indebtedness.

6.  The EFCH 2037 Notes Trustee timely filed unsecured proofs of claim relating to the EFCH 2037 Notes in the aggregate amount of $9.0 million, plus interest and fees.

### C. The Plan Support Agreement

7.  On August 9, 2015, the PSA Parties entered into the PSA. The PSA became effective and binding on the PSA Parties as of August 9, 2015, the Agreement Effective Date. *See* PSA at p. 1.

8.  The PSA requires many commitments of the Investor Parties, Consenting Interest Holders, and Consenting TCEH Creditor Parties. *See* PSA at § 4.1. Certain of those commitments relate to voting in favor of the Third Amended Plan (as defined below). *See* Motion at ¶ 66, p. 26 ("The PSA requires certain commitments of the Investor Parties, Consenting Interest Holders, and Consenting TCEH Creditor Parties" including "subject to receipt of an approved Disclosure Statement, to vote in favor of the Plan"). Specifically, the PSA provides that:

> During the period beginning on the Agreement Effective Date and ending on the earlier to occur of the Plan Support Termination Date (as defined in Section 11 hereof) and the Agreement Termination Date (as defined in Section 12 hereof) applicable to the Party (such period, the "Plan Support Effective Period"), each Investor Party, Consenting Interest Holder, and Consenting TCEH Creditor Party agrees that:
>
> (a) subject to receipt of the Disclosure Statement approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code, and the other Solicitation Materials approved by the Bankruptcy Court, it shall:

3

>    (i) to the extent a class of claims or interests against or in the Debtors (the "Debtor Claims/Interests") is permitted to vote to accept or reject the Plan, **vote each such claim or interest it holds in such class to accept the Plan** by delivering its duly executed and completed ballot(s) accepting the Plan on a timely basis following the commencement of the solicitation;
>
>    . . . ; and
>
>    (iii) **not change or withdraw (or cause to be changed or withdrawn) any such vote** or election[.]

PSA at § 4.1(a)(i) and (iii) (emphases added).

9.  Accordingly, upon execution of the PSA, the Investor Parties, Consenting Interest Holders, and Consenting TCEH Creditor Parties are contractually obligated **to vote** to accept the Plan as long as the Disclosure Statement and the other Solicitation Materials thereafter are approved by the Court. *See* PSA at § 4.1(a).

10. The PSA prohibits the Definitive Documents (which include the Plan, *see* PSA at § 3.1(d)) from being "further amended, supplemented or modified" without the consent of the PSA Parties. *See* PSA at § 3.1, p. 9.

11. The PSA also provides for the remedy of specific performance if any PSA Party fails to comply with the PSA's terms. *See* PSA § 14.11.

12. After the PSA was executed and became effective, the Debtors filed on August 10, 2015, the *Disclosure Statement for the Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* (D.I. 5246) (the "Disclosure Statement") and the *Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* (D.I. 5244) (the "Third Amended Plan"),

13. The Disclosure Statement has not been approved by this Court.

14. On August 10, 2015, the Debtors filed the Motion to approve the PSA, and a motion to approve a settlement agreement (D.I. 5249) (the "<u>Settlement Agreement</u>").

### III. OBJECTIONS

**A. The PSA is an Improper Solicitation of Votes in Violation of the Plain and Unambiguous Language of Section 1125(b) of the Bankruptcy Code.**

15. The plain language of section 1125(b) of the Bankruptcy Code prohibits a party from using a post-petition plan support agreement to solicit the acceptance or rejection of a plan prior to court approval of a disclosure statement:

> An **acceptance or rejection of a plan may not be solicited** after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, **unless, at the time of or before such solicitation**, there is transmitted to such holder the plan or summary of the plan, and a written **disclosure statement approved**, after notice and hearing, **by the court** as containing adequate information.

11 U.S.C. § 1125(b) (emphasis added); *see also* Fed. R. Bankr. P. 3017 and 3018; *In re Clamp-All Corp.*, 233 B.R. 198 (Bankr. D. Mass. 1999) ("Under section 1125(b), neither acceptances nor rejections of a Chapter 11 plan of reorganization may be solicited after the filing of the petition unless a disclosure statement has been approved by the court."); *In re Rook Broadcasting of Idaho, Inc.*, 154 B.R. 970, 976 (Bankr. D. Idaho 1993) ("Until such a disclosure statement is approved by the court and distributed to the creditors, there can be no solicitation of an acceptance or a rejection of the plan. 11 U.S.C. § 1125(b).").[4]

16. "'[S]olicitation' must be read narrowly." *See Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 101 (3d Cir. 1988). "Solicitations with respect to a plan do not involve just mere requests for opinions." S.Rep. No. 95-989, 95th Cong., 2d Sess. 121 (1978).

---

[4] An order determining whether section 1125 has been violated is a final, appealable order. *See Century Glove*, 860 F.2d at 99.

"[A] party **does not solicit acceptances when** it presents a draft plan for the consideration of another creditor, but **does not request that creditor's vote**." *Century Glove,* 860 F.2d at 102 (emphasis added).

17. Solicitation refers to the process through which plan acceptance or rejection is sought. *Century Glove*, 860 F.2d at 102. "Solicitation, then, is the process of seeking votes for or against a plan." *In re Dow Corning Corp.*, 227 B.R. 111, 118 (Bankr. E.D. Mich. 1998). Courts "recognize that there is a spectrum of communication in bankruptcy ranging from a neutral, factual statement to an actual request to accept or reject a plan. Somewhere on that spectrum a communication crosses the line to become a solicitation." *See id.* at 125.[5]

18. As the Third Circuit declared, section 1125(b) of the Bankruptcy Code

> bars certain solicitation activities, regardless of the intent of the actor. **Whether that provision is violated is not a matter left to the discretion of the bankruptcy court, but is a matter of fact and law**.

*Century Glove*, 860 F.2d at 97 (emphasis added).

19. In *Century Glove*, the Third Circuit held that a party "did not solicit acceptances of its plan" when it was undisputed that such party "**never asked for a vote**." *Century Glove,* 860 F.2d at 102   The Third Circuit approvingly cited *In re Synder*, 51 B.R. 432 (Bankr. D. Utah 1984), upon which the District Court relied in *Century Glove*. In *Snyder*, the court held that "solicitation" does not encompass "discussions, exchanges of information, negotiations, or tentative arrangements" that "may lead to the development of a disclosure statement or plan of reorganization or information to be included therein." *See id.* at 437. "It follows that an unauthorized 'solicitation' would include a specific request for an official vote for or against plan

---

[5] In this case, the Court need not consider where in the spectrum a communication crosses the line to become a solicitation. Here, the Debtors have crossed the line and are at the far end of the spectrum because they expressly solicited votes in favor of the Plan.

of reorganization" that "is made before dissemination to parties in interest of an approved disclosure statement." *Id.*

20. "Solicitation," in relevant part, means "asking" or "enticing." *See* Black's Law Dictionary (Rev. 4th ed. 1968) at 1564.[6] "Solicit," in relevant part, means "to appeal for something", "to ask for the purpose of receiving", "to endeavor to obtain by asking or pleading." Black's Law Dictionary (Rev. 4th ed. 1968) at 1564. As Judge Walrath recognized in *In re Stations Holding Co.*, under "the plain language" of section 1125, "the term 'solicitation' means asking for a vote. Requesting a vote. I don't think it even includes getting a vote. Solicit a vote means ask for a vote. You ask for a vote." *See* Hr'g Tr. at 46:2-5, *In re Stations Holding Co.*, No. 02-10882 (Bankr. D. Del. Sept. 25, 2002) (D.I. 190, 196), which is attached as <u>Exhibit A</u>.[7]

21. "[W]here, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *U.S. v. Ron Pair Enterp., Inc.*, 498 U.S. 235, 241 (1989).

22. Here, the Debtors indisputably "ask[ed] for", "appeal[ed] for" or "endeavor[ed] to obtain by asking", the votes of the parties to the PSA.[8]

23. The PSA specifically provides that each creditor-party "agrees", to the extent a class of claims or interests against or in the Debtors is permitted to vote on the Plan, to "**vote each such claim or interest it holds in such class to accept the Plan** by delivering its duly executed and completed ballot(s) accepting the Plan on a timely basis following the

---

[6] The dictionaries at the time a statute was enacted, and not dictionaries published thereafter, are the relevant sources for defining terms. *See MCI Telecom. Corp. v. AT&T Co.*, 512 U.S. 218, 228 (1994). Black's Law Dictionary was still in its fourth edition (revised) when the Bankruptcy Code was enacted in 1978.

[7] *See generally* Fed. R. Bankr. P. 2006 ("Solicitation," as it applies to proxies, means "any communication . . . by which a creditor is asked, directly or indirectly, to give a proxy . . . .").

[8] The PSA's assertion that "the Agreement is not . . . solicitation of votes for the acceptance of a plan of reorganization", *see* PSA at § 9, p. 37, is comical considering that the PSA (in the Debtors' words) "locked-up" the creditor parties, *see* Motion, ¶ 64, p. 25 (stating that "the Debtors have determined to lock up with the Hunt/TCEH Unsecured Group's proposal pursuant to the PSA"); ¶ 78, p. 32 ("Because of its attractiveness, the Debtors would be remiss if they were not able to "lock-up" the support of these creditor groups to move forward with the Plan . . . .").

7

commencement of the solicitation" and "**not change or withdraw (or cause to be changed or withdrawn) any such vote** or election[.]"  PSA at § 4.1(a)(i) and (iii) (emphases added).

24. The Debtors admit that the PSA "not only lays the groundwork for the *terms* of the Plan," which is permissible negotiation, "it also gives the Debtors the *votes* of a significant group of creditors (subject to their receipt of an approved Disclosure Statement)" or a "large block of 'yes' votes," which is impermissible solicitation.  *See* Motion at ¶ 79, p. 32.

25. Judge Walrath invalidated a postpetition lock-up agreement in which creditors agreed to accept the debtor's plan prior to the approval of a disclosure statement and recognized that, "if this is not soliciting a vote in favor of the debtor's plan, I don't know what is."  *See* Hr'g Tr. at 60:22-23, *In re NII Holdings, Inc.*, No. 02-11505 (Bankr. D. Del. Oct. 22, 2002) (D.I. 394), which is attached as Exhibit B.

26. Like Judge Walrath, this Court should enforce the plain language of section 1125.  To hold otherwise "would mean eviscerating" completely the section 1125(b) prohibition against soliciting votes prior to disclosure statement approval.  *See* Hr'g Tr. at 60:19-22, *In re NII Holdings, Inc.*, No. 02-11505 (Bankr. D. Del. Oct. 22, 2002) (D.I. 394) (Exhibit B).

27. The Debtors apparently believe that their improper solicitation of votes in the PSA is somehow cleansed by the fact that the PSA Parties' agreement to vote in favor of the Third Amended Plan is conditioned on the Court's *subsequent* approval of a Disclosure Statement and Solicitation Materials.  Surprisingly, a few courts have accepted that analysis, *see In re Residential Capital, LLC,* No. 12-12020, 2013 WL 3286198, at *5 (Bankr. S.D.N.Y. Jun. 27, 2013) ("[N]one of the Parties have agreed to vote in favor of the Plan unless and until the Court approves the disclosure statement and their votes have been properly solicited pursuant to section 1125.  As such, the Agreement does not constitute an improper 'solicitation' under

section 1125.").[9] That interpretation would render Section 1125(b) mere surplusage. Nothing in Section 1125 distinguishes between such conditional and unconditional solicitations. In any event, the PSA provides that it is "immediately effective and binding on each Party, other than the Debtors." *See* PSA at § 1, p. 7.

28. The Debtors also fail to appreciate that section 1125(b) restricts the "the *time* when a creditor may be solicited". *See Century Glove*, 860 F.2d at 100 (emphasis in original). Specifically, section 1125(b) prohibits solicitation unless, "**at the time of or before such solicitation**," a court-approved disclosure statement has been transmitted. *See* 11 U.S.C. § 1125(b). "At the time of or before" the Debtors' solicited the creditors' votes in the PSA, this Court had not approved any disclosure statement. Purporting to make the solicitation contingent upon the future approval of a disclosure statement does not change that fact. Thus, the PSA violates section 1125(b).

29. Although the Debtors now argue that the PSA does not violate section 1125, their prior statements to this Court support the opposite conclusion. The Debtors previously conceded that "solicitation under section 1125 of the Bankruptcy Code 'occurs only when a party in interest makes a specific request for an official vote either accepting or rejecting a plan of reorganization.'" "Solicitation under section 1125 of the Bankruptcy Code 'occurs only when a party in interest makes a specific request for an official vote either accepting or rejecting a plan of reorganization.'" *See* Debtors' Reply to Objection of CSC Trust Company of Delaware, as Indenture Trustee, to the EFIH Debtors' Motion to Approve Proposed First Lien Settlement (D.I. 737) at ¶ 30, p. 14 (quoting *Dow Corning*, 227 B.R. at 118). The Debtors made such requests for

---

[9] Concluding that there was no violation of Section 1125, the *ResCap* court added that, "[p]erhaps most importantly, if the PSA is approved by the Court, it is an interlocutory order that provides no assurance that the Court will approve a reorganization plan on the terms provided in the PSA." *See ResCap*, 2013 WL 3286198, at *5. Conversely, in the Third Circuit, an order determining whether section 1125 has been violated is a final, appealable order. *See Century Glove*, 860 F.2d at 99.

official votes in the PSA and therefore engaged in solicitation as they previously (and accurately) described it.

30. In short, the PSA violates the plain and unambiguous language of section 1125, is contrary to *Century Glove*, and should not be approved.[10]

### B. The Debtors' Reliance Upon "Later Decisions" Is Misplaced.

31. The Debtors acknowledge that courts in this district "have declined to approve postpetition plan support agreements with specific enforcement provisions based on the rationale that these agreements improperly bind parties to a single reorganization structure in violation section 1125(b) of the Bankruptcy Code." *See* Motion at ¶ 8, p. 34. (citing *Stations Holding* and *NII Holdings*). According to the Debtors, "[l]ater decisions in this district, however, have approved postpetition plan support agreements as compliant with section 1125 of the Bankruptcy Code." Motion at ¶ 84, p. 34.

32. In *In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013), the Court rejected the contention that votes cast by the parties to a post-petition restructuring support agreement were invalid because such votes were solicited impermissibly without a court-approved disclosure statement.

33. First of all, to the extent that *Indianapolis Downs* is contrary to the holding of *Century Glove* and the plain and unambiguous language of section 1125(b), BNY respectfully submits that this Court should reject it.

34. Secondly, *Indianapolis Downs* is distinguishable because the restructuring support agreement at issue in *Indianapolis Downs* differs materially from those at issue in *Stations Holding*, *NII Holdings*, and this case.[11]

---

[10] The Court need not reach the issue of the "designation" of votes under section 1126(e) of the Bankruptcy Code.

10

35. *Indianapolis Downs* relied heavily on the bankruptcy court's analysis in *In re The Heritage Org., L.L.C.*, 376 B.R. 783 (Bankr. N.D. Tex. 2007), declaring that analysis to be "dispositive." *See Indianapolis Downs*, 486 B.R. at 295.

36. In *Heritage*, the court distinguished *Stations Holding* and *NII Holdings* on the basis that the lock-up agreements in those cases were impermissible because they contained specific performance provisions that precluded stakeholders from later reconsidering their voting decisions. *See Heritage*, 376 B.R. at 794 n.13; *see also ResCap*, 2013 WL 3286198, at *20 (noting that *NII Holdings and Stations Holding* have been distinguished "on the grounds that the agreements at issue included specific performance provisions, expressly providing that monetary damages could not compensate a breach of the agreement, meaning the creditors could not later reconsider their preliminary decision after receiving adequate information").

37. Here, the PSA also provides for the remedy of specific performance if any PSA Party fails to comply with the PSA's terms. *See* PSA at § 14.11.

38. According to the Court in *Indianapolis Downs*, the *Heritage* Court also "placed special emphasis" on the fact that the creditors executing the plan support agreement were co-proponents of the plan. *See Indianapolis Downs,* 486 B.R. at 295; *Heritage*, 376 B.R. at 791.

39. Here, the creditor parties to the PSA are not co-proponents of the Plan.

40. The reasoning of *Heritage* was "dispositive" to the Court in *Indianapolis Downs*, 486 B.R. at 295. As the PSA does not survive scrutiny under *Heritage* (let alone the plain language of section 1125(b)), it follows that the PSA violates section 1125 under *Indianapolis Downs*.

---

[11] The *Indianapolis Downs* Court noted that the two-page orders in *Stations Holding* and *NII Holdings* "did not contain any legal analysis." *Indianapolis Downs*, 486 B.R. at 295. Judge Walrath's well-reasoned analyses of the section 1125(b)'s plain language were set forth in the hearing transcripts, not Judge Walrath's orders.

### C. No Stay Pending Appeal Should Be Waived.

41. Although there is no possibility that the Plan will be effective before sometime well into 2016, the Debtor seeks a waiver of the ten day stay provided in Federal Rule of Bankruptcy Procedure 6004(h), which provides that "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The purpose of this rule is to "'provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.'" *In re Filene's Basement, LLC*, No. 11-13511, 2014 Bankr. LEXIS 2000, *43-44 (Bankr. D. Del. Apr. 29, 2014) (quoting 10 Collier On Bankruptcy ¶6004.11, ¶6006.04 (16th ed. 2014)). An objecting party should have time to appeal and seek a stay to avoid arguments that the appeal may well be moot. *Id.* *But see In re One2One Commc'ns, LLC*, No. 13-3410, 2015 WL 4430302 (3d Cir. July 21, 2015) (questioning equitable mootness doctrine).

42. "[I]f an objection has been filed and is being overruled, the court should eliminate or reduce the 14-day stay period only upon a showing that there is a sufficient business need to close the transaction within the 14-day period and that the interests of the objecting party, taking into account the likelihood of success on appeal, are sufficiently protected." *Filene's Basement*, 2014 Bankr. LEXIS 2000, at *43-44. Furthermore, "[i]f the objecting party informs the court that it intends to appeal and seek a stay, then the stay period should not be reduced to less than an amount of time sufficient to allow the objecting party to seek a stay, unless the court determines that the need to proceed sooner outweighs the objecting party's interests." *Id.*

43. BNY plans to appeal any order (if any) that would approve the PSA, which order would be appealable as of right as a "final" order. *See Century Glove*, 860 F.2d at 99. The

fourteen-day stay of Bankruptcy Rule 6004(h) is necessary to preserve the right of appellants to seek a stay of any order approving the PSA pending appeal. The Debtors have made no showing whatsoever that there is a need to close the transaction within the 14-day period. The Debtors' unsupported request to waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) must be denied.

**IV.  CONCLUSION**

44. The PSA Parties crossed the line between permissible plan negotiation and an impermissible solicitation of a vote. *See Century Glove*, 860 F.2d at 102; *Dow Corning*, 227 B.R. at 125; *see also, e.g., Duff v. U.S. Trustee (In re California Fidelity, Inc.)*, 198 B.R. 567 (B.A.P. 9th Cir. 1996) (solicitation means a specific request for an official vote). Therefore, the Court must disapprove of the PSA.

45. The Court is not required at this time to address the designation of votes under section 1126(e) of the Bankruptcy Code. The obligation to support the Plan will be eliminated when the PSA is disapproved. Of course, the Court may consider whether to designate votes at confirmation.

WHEREFORE, BNY respectfully requests that the Court (a) deny the Motion, and (b) grant such further relief to BNY as is appropriate.

Dated: August 24, 2015
Wilmington, Delaware

Respectfully submitted,

REED SMITH LLP

By: */s Kurt F. Gwynne*
Kurt F. Gwynne (No. 3951)
Kimberly E.C. Lawson (No. 3966)
1201 Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 778-7500
Facsimile: (302) 778-7575
Email: kgwynne@reedsmith.com
klawson@reedsmith.com

Counsel to The Bank of New York Mellon, in its capacity as the PCRB Trustee, and The Bank of New York Mellon Trust Company, N.A., in its capacity as the EFCH 2037 Notes Trustee