# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No.  02-10882(MFW)
                                . Motion No. (if provided)
                                .
STATIONS HOLDING COMPANY,       .
  INC.,                         . 824 Market Street
                                . Wilmington, Delaware 19801
                    Debtor.     .
                                . September 25, 2002
. . . . . . . . . . . . . . . . 1:13 p.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:              Kirkland & Ellis
                             By:  JAMES SPRAYREGEN, ESQ.
                                  GEOFFREY RICHARDS, ESQ.
                             200 East Randolph Drive
                             Chicago, II 60601

                             Pachulski, Stang, Ziehl, Young
                               & Jones
                             By:  LAURA DAVIS JONES, ESQ.
                             919 North Market Street
                             16th Floor, PO Box 8705
                             Wilmington, DE 19899

For Gray Communications:     Proskauer Rose, LLP
                             By:  MICHAEL FOREMAN, ESQ.
                             1585 Broadway
                             New York, NY 10036

Audio Operator:              Jennifer M. Patone

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-Mail:  jjcourt@jjcourt.com**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES:   (Cont'd)

For Gray Communications:          Young, Conaway, Stargett &
                                    Taylor, LLP
                                  By:  JOEL A. WAITE, ESQ.
                                  The Brandywine Building
                                  1000 West Street, 17th Floor
                                  Wilmington, DE 19899

For Indenture Trustee:            Dechert, Price & Rhoads
                                  By:  GLENN SIEGEL, ESQ.
                                  30 Rockefeller Plaza
                                  New York, NY 10112

                                  The Bayard Firm
                                  By:  CHRISTOPHER A. WARD, ESQ.
                                  222 Delaware Avenue, Suite 900
                                  P.O. Box 25130
                                  Wilmington, DE 19899

For the U.S. Trustee:             Office of the United States
                                    Trustee
                                  By:  FRANK J. PERCH, III, ESQ.
                                       MARGARET HARRISON, ESQ.
                                  844 King Street
                                  Suite 2313
                                  Wilmington, DE 19801

For the Lenders:                  Klehr, Harrison, Harvey,
                                    Branzburg & Ellers, LLP
                                  By:  STEVEN K. KORTANEK, ESQ.
                                  Mellon Bank Center
                                  919 Market Street, Suite 1000
                                  Wilmington, DE 19801

                                  Mayer, Brown, Rowe & Maw
                                  By:  JOSH LEFKOWITZ, ESQ.
                                  190 South La Salle Street
                                  Chicago, IL 60603

For the Creditors                 Richards, Layton & Finger, PA
Committee:                        By:  JOHN H. KNIGHT, ESQ.
                                  One Rodney Square, PO Box 551
                                  Wilmington, DE 19899

                                  Kasowitz, Benson, Torres &
                                    Friedman, LLP
                                  By:  ADAM L. SHIFF, ESQ.
                                  1633 Broadway
                                  New York, NY 10019

1          THE COURT:  Good afternoon.

2          MR. SPRAYREGEN:  Good afternoon, Judge Walrath.

3 James Sprayregan of Kirkland & Ellis and Geoff Richards also of

4 Kirkland & Ellis on behalf of the debtors.

5          MR. RICHARDS:  Good afternoon, Your Honor.

6          THE COURT:  Good afternoon.

7          MR. SPRAYREGEN:  Your Honor, we're here for several

8 matters this afternoon.  Obviously chief amongst them is the

9 hearing on the confirmation of the debtor's plan which is

10 listed as item one on the agenda.  It's obviously difficult to

11 consider item one without considering the potential impact of

12 item two which is the U.S. Trustee's motion to designate votes

13 of those parties who are bound by lockup agreements.

14          THE COURT:  Right.

15          MR. SPRAYREGEN:  If the Court recalls, when we were

16 here for the disclosure statement hearing there was an

17 objection to the approval of the disclosure statement on the

18 same basis in essence that's articulated in the designation

19 motion that the disclosure statement should not be approved.

20 That objection was resolved by reserving all of the U.S.

21 Trustee's rights to object in essence as now articulated in the

22 designation motion and describing in the disclosure statement

23 the U.S. Trustee's objection on the basis therefore and the

24 fact that the debtor and others disputed that characterization.

25          We at the time, Your Honor, said we thought it would

1  be best to proceed to confirmation, get the votes in and see

2  where all the facts are and put them before the Court and at

3  that point in time to consider the issues in that context.

4         Your Honor, we think that was a highly relevant

5  decision because we still are before you today with respect to

6  this confirmation hearing in an interesting factual posture

7  based upon the votes that came in and the votes that were

8  submitted in the ballot report that was submitted to the Court

9  attached to the declaration of Paula Galbraith, the tabulation

10 agent.

11        What happened, Your Honor, as a factual matter, is

12 there were three classes voting; the bondholder class, the

13 senior preferred and the junior preferred.  The common was

14 deemed to reject because they were receiving nothing under the

15 plan.

16        As articulated in the ballot report, Your Honor,

17 there were parties not subject to lockup agreements in both the

18 bondholder class and the senior preferred class that voted yes

19 on the plan.  Your Honor, what is set forth in the ballot

20 report as a result of that is if you take the issue of the

21 lockup agreements and you assume the lockups are valid, those

22 three voting classes voted to accept the plan.  If you assume

23 that the U.S. Trustee's motion is granted, the designation

24 motion, and the locked-up parties' votes on the plan of

25 reorganization are designated and thus not counted for purposes

1 of confirmation, the factual situation we would have is the

2 bondholder class has accepted, the senior preferred class has

3 accepted and the junior preferred class has rejected.  There

4 was one rejecting vote at the junior preferred class.  We would

5 then obviously be in a cram-down mode with respect to the

6 junior preferred class.

7        I go through all of that at the threshold of this

8 hearing, Your Honor, because our suggestion, subject to how the

9 Court desires to proceed and obviously subject to Mr. Perch's

10 position on behalf of the U.S. Trustee's Office, is that due to

11 this factual situation the issue of the validity of the lockups

12 with respect to this particular case is not ripe and doesn't

13 need to be determined in order to address confirmation of the

14 plan because --

15        THE COURT:  So you're not asking me to consider those

16 who voted pursuant to the lockup?

17        MR. SPRAYREGEN:  What we're saying is you don't need

18 to consider those for purposes of confirmation.  That is

19 assuming arguendo you were to grant the designation motion,

20 then if you just count the votes in that guise, we have

21 sufficient votes to confirm the plan.  We don't think that you

22 need to determine that motion or need to determine the lockup

23 issue --

24        THE COURT:  Well, I need to determine who voted to

25 determine whether or not the plan should be confirmed.  So I

6

1 don't think it's not ripe or moot --

2          MR. SPRAYREGEN:  With --

3          THE COURT:  -- and I think you have to decide whether

4 you want to proceed with the second motion.

5          MR. SPRAYREGEN:  Your Honor, what we're raising, and

6 we'll proceed any way the Court desires, is if we proceed on

7 the designation motion and the Court grants the designation

8 motion, we would then ask to continue to proceed with the

9 confirmation hearing --

10          THE COURT:  Well, I understand.

11          MR. SPRAYREGEN:  -- and all I'm suggesting is in

12 terms of efficiency and resources and in terms of not reaching

13 issues that actually candidly are important issues in many

14 other cases that don't need to be determined in this particular

15 case to address confirmation, that there is a method by which

16 to not address the issue and address the confirmation.  We're

17 happy to proceed however the Court desires, but we're also not

18 asking to burden the Court with decisions that aren't actually

19 relevant to the issue of whether the plan ought to be

20 confirmed.

21          So that was where we were coming from on that.  But

22 as we said at the disclosure statement hearing and as I went

23 through in part at that point in time --

24          THE COURT:  Well, let me cut to the chase.  I think I

25 have to decide the motion and I'm prepared to decide the

1  motion.  So let me hear from the United States Trustee.

2         MR. PERCH:  Thank you, Your Honor.  May it please the

3  Court, Frank Perch for the United States Trustee.

4         Your Honor, before I begin my argument on this

5  matter, I would like to introduce to the Court the person

6  sitting to my left at counsel table who is Margaret Harrison,

7  who is a new staff attorney who has joined our office as of

8  this week.

9         THE COURT:  All right, thank you.  Welcome.

10        MR. PERCH:  Thank you very much, Your Honor.

11        Your Honor, this is the U.S. Trustee's motion to

12 designate the parties who executed certain post-petition lockup

13 agreements and therefore to direct that those votes not be

14 counted with respect to confirmation of the plan of

15 reorganization.  And, of course, as Mr. Sprayregen indicated,

16 the issue would then have to be determined whether the plan

17 could be confirmed notwithstanding not counting those parties'

18 votes.

19        Your Honor, in this case I think it is now factually

20 beyond dispute what occurred.  I don't think the facts are in

21 dispute here.  I think that there is no dispute.  That what

22 occurred is that the debtor in part at the behest of the

23 proposed purchaser, Gray Communications, obtained the signature

24 of very large percentages of the bondholder and senior

25 preferred shareholder and junior preferred shareholder

1  constituencies, classes four, five and six, all three of the

2  voting classes under the plan.  Obtained signatures of a large

3  percentage of these parties after the filing of the petition

4  but prior to the dissemination of any disclosure statement to

5  certain lockup agreements.  And the plan supplement that was

6  filed on approximately August 6th by the debtors contains what

7  I believe are all of the lockup agreements.  There are four

8  agreements, if I recall correctly, and some of them were signed

9  by multiple parties.  In relevant part they are all the same.

10 And the key features of the lockup agreements for purposes of

11 this issue, Your Honor, were outlined in the United States

12 Trustee's motion and the most important feature and the one I'm

13 going to spend the most time on is the injunctive relief and

14 specific performance features, and that is the provision of the

15 lockup agreement that states that the various covenants that

16 the signatories have entered into with respect to this

17 agreement are enforceable by specific performance.  And, in

18 fact, the signatories are stipulating to that.  They're

19 stipulating that money damages would not be a sufficient remedy

20 for any breach of this agreement and each non-breaching party

21 shall be entitled to the sole and exclusive remedy of specific

22 performance and injunctive or other equitable relief.

23         So one of the things that the parties have stipulated

24 that the debtor may obtain injunctive relief on, they may

25 obtain injunctive relief on the covenant of each signatory that

1  it shall timely vote its claim to accept the plan and shall not

2  elect on its ballot to preserve any claims that may be affected

3  by the releases provided for under the plan.  Each of the

4  signatories has agreed -- first of all, they've agreed to vote.

5  They're not permitted to abstain.  They've agreed -- they have

6  committed to vote in favor of the plan.  They have committed

7  not to preserve any rights against third parties where there

8  may be a ballot election as there was here whether or not to

9  enter into certain releases.  And all of those provisions may

10  be specifically enforced.

11         The language of the agreement would suggest that the

12  signatories have waived any objection to the specific

13  enforcement, the injunctive enforcement of those provisions.

14         As a result, Your Honor, we believe that the lockup

15  agreement is a vote.  The opponents, the debtor and the

16  Official Committee of Unsecured Creditors, the opponents have

17  cited to the governing 3rd Circuit case on solicitation which

18  is Century Glove and they've also cited to the case that's

19  referred to in Century Glove which is the older case of Snyder.

20  And the language in the Snyder case I think that's used that

21  the debtor clearly relies on is the statement that solicitation

22  should be viewed narrowly in order to foster negotiation among

23  creditors and should be deemed to refer only to requests for an

24  official vote.

25         And as a result, Your Honor, the question presented

1 by this motion and the question that's before Your Honor is

2 whether the disclaimer in these documents that says this is not

3 an official vote is enough to make it not an official vote when

4 you look at what the real effect of the agreement is.  And the

5 Court certainly has power to do that and I just want to spend a

6 moment to make that clear because the debtor in its opposition

7 papers spends a lot of time on saying this agreement was

8 heavily negotiated and it was carefully written to be

9 contingent on compliance with the Bankruptcy Code and

10 contingent on compliance with 1125(b) and so on.

11          I've been in this courtroom many times when the issue

12 has been placed before the Court in various contexts.  Their

13 document is not necessarily what it says it is, that saying it

14 does not make it so.  You may say the document is a lease,

15 nonetheless the Court may find that it's a financing agreement.

16 So they may say this document is not a vote, nonetheless the

17 Court may find that it's a vote.

18          As a result of having obtained the stipulation to the

19 injunctive specific performance agreement, what the debtor has

20 done is the debtor has rendered the rest of the process a sham

21 and a mere formality.  Because what the debtor is saying is

22 that I present to you a ballot.  I present to you a disclosure

23 statement.  And that ballot says -- it has two boxes, it says

24 accept, it says reject.  What happens if one of these creditors

25 who signs this agreement took that ballot and checked reject

1 and sent that ballot back to the voting agent?  The debtor's

2 position is that they have the power under the agreement to

3 come here, to come to the Court and say, Your Honor, take that

4 ballot, rip it up, shred it, throw it in the trash.  That is

5 not their vote.  What is their vote?  Their vote is an

6 acceptance.  Why is their vote an acceptance?  Because of this

7 thing that they signed back here before the disclosure

8 statement was even drafted and so therefore the debtor's

9 position is that the vote has already occurred and that, in

10 fact, if the creditor takes any action that is inconsistent

11 with the vote, the acceptance having already occurred back

12 then, the debtor can come to court and render that subsequent

13 act of the creditor a nullity.  So that, in fact, when the

14 optical process of voting is occurring, there is not voting.

15 There is no choice.  This isn't a real vote.  This isn't a real

16 choice.  Voting involves choice.  At least maybe outside of the

17 Soviet Union, which is gone.

18                 THE COURT:  You'll need to find another analogy.

19                             (Laughter)

20            MR. PERCH:  I suppose so.

21            The purpose of a disclosure statement -- let me state

22 it this way, Your Honor.  The purpose of a disclosure statement

23 is to provide creditors with information to utilize in making a

24 choice.  But what's occurred here is that a disclosure

25 statement has been disseminated but the choice has already been

1  foreclosed.  And it's our position, Your Honor, that the

2  injunctive provision of the agreement makes it a vote.

3       There actually is, Your Honor, a fairly small body of

4  case law about this it turns out, and I think you may have

5  noticed that both the U.S. Trustee's motion and the debtor's

6  and the Committee's responses really argue about the impact of

7  the same three or four cases.  I think the case that the

8  respondents rely on most heavily is the case out of the

9  District of Minnesota, the Bankruptcy Court of the District of

10 Minnesota called Kellogg Square in which the debtor entered

11 into a rather complicated settlement with the Utility that

12 involved the rejection of the Utility's contract thereby

13 creating an unsecured claim that the Utility would vote, a

14 rather large unsecured claim, that the Utility would be

15 entitled to vote and an element of the settlement with the

16 Utility was therefore that the Utility would agree to vote that

17 unsecured claim in favor of the plan.  And the debtor and the

18 Committee -- and I think also argue, that Kellogg Square should

19 be read by Your Honor as standing for the proposition that

20 basically the Court there has endorsed the concept of a lockup

21 agreement and has endorsed the concept that the vote can be

22 fixed prior to the dissemination of the disclosure statement.

23       If the Kellogg Square case bears some careful

24 examination, there's nothing in the Kellogg Square opinion that

25 in any way indicates that the agreement entered into with

1   respect to the Utility's claim in that case contained an

2   injunctive relief specific performance stipulation on behalf of

3   that creditor.

4        The terms of the agreement are described in several

5   paragraphs on Page 338 of the Court's opinion and with respect

6   to the plan all the agreement as recited in the opinion says

7   that District Energy, which was the name of the creditor, will

8   cast a ballot in favor of debtor's plan.

9        The Court then states after reciting the five

10   elements of the agreement that all the parties to that, the

11   relevant parties to that case agreed that those provisions

12   accurately set forth the understanding and agreement that the

13   debtor negotiated with District Energy, that was apparently

14   subsequently reduced to writing.

15        So in the absence of anything further, I think we

16   have to take the Court's description as being a description of

17   what the agreement is and it doesn't contain this injunctive

18   specifically enforced provision.  In fact, it seems like the

19   Court really didn't view the agreement as containing a

20   provision under which the debtor could force a vote if the

21   creditor didn't take some action.

22        Turning forward to Pages 339 and 340 of the opinion,

23   the Court says that District Energy's agreement to accept the

24   debtor's plan made post-petition but before approval of a

25   disclosure statement remained executory until District Energy

1  actually filed its accepting ballot with the clerk of this

2  court.

3        In other words, for whatever reason, clearly what the

4  Court in the _Kellogg_ case understood was happening was a

5  circumstance where the creditor had entered into a contractual

6  commitment but that further action by the creditor was required

7  in order to make the creditor's vote count.  That's just simply

8  not true here and I don't think the Court can make that finding

9  here.  The Court has to look at this agreement and see that

10 here the debtor has the ability to make the vote count in the

11 absence of action by the creditor or even notwithstanding

12 contrary action by the creditor.

13       The responses, I should say, also refer to the _Texaco_

14 case and the _Texaco_ case is a situation that I think is

15 factually distinguishable on additional grounds, including

16 grounds that were specifically set forth by the Court in its

17 opinion.  The Court noted in its opinion, notwithstanding the

18 fact that the respondent's attempt to downplay this I think the

19 Court found it to be significant in its opinion that the Court

20 felt the agreement there could not be determined to be a

21 solicitation because it did not, in fact, obligate the party to

22 vote.  They could abstain.  Once again, a situation where

23 further action by the creditor was found by the Court to be

24 required in order to have a vote occur, which is simply not

25 true here.

1          Also, in the <u>Texaco</u> case, ultimately what happened
2    was the creditor and the debtor were joint proponents of the
3    plan and I think the Court just has to factually distinguish
4    that situation from this one because the concept of a co-
5    proponent of a plan objecting to their own plan or voting to
6    reject their own plan is a little bit Alice in Wonderland.  I
7    suppose one could ultimately say I changed my mind and I don't
8    like the plan that I've proposed, but this is not a
9    circumstance where we're talking about whether a co-proponent
10   would, absent some other actions, support its own plan.

11          So those two cases really which are the principal
12   cases that are relied on here are both legally and factually
13   distinguishable.  They involve complicated settlements.  Really
14   both of them are factually distinguishable because they involve
15   complicated settlements, including settlements of claims that
16   were unliquidated as to liability.  But the most important
17   feature is that in both of those cases the Court found that
18   further action by the creditor was required in order for there
19   to be a vote.  Here what we have is a situation where the
20   debtor drafted an agreement very carefully, using its own
21   words, that was intended to foreclose the possibility that any
22   further action by the creditor was either necessary or would be
23   sufficient in order to provide for a vote to be counted that
24   would be different from the vote that the debtor sought to lock
25   in at the time that the agreement was signed.

1           I really think, Your Honor, the only other argument,

2    if one can call it that, that the debtor places before Your

3    Honor in support of the agreements is they are something that

4    customarily happens and there are some exhibits attached to the

5    debtor's response to the motion that are somewhat similiar

6    looking agreements from the <u>Goss Graphic</u> case, the <u>United</u>

7    <u>Artists</u> case and I believe one other case, <u>Global Ocean</u>.

8           Your Honor, if one looks at all those agreements, you

9    can see those were all pre-petitioned lockup agreements.

10   They're agreements that specifically recite.  They are things

11   that were signed pre-petition with respect to a case to be

12   commenced in the future.

13          The issue of a pre-petition lockup agreement is a

14   different issue that's not before the Court today.  A pre-

15   petition -- a pre-petition vote, if there is such a thing,

16   implements Section 1126(b), not 1125(b), Section 1126(b)

17   dealing with how you present a pre-packaged plan or present

18   pre-packaged votes at least from certain creditors or certain

19   classes.

20          THE COURT:  And isn't it fundamentally different?

21   1125 does not apply to solicitation of votes before a

22   bankruptcy case is filed.

23          MR. PERCH:  Absolutely.  Absolutely.  But --

24          THE COURT:  It can't.

25          MR. PERCH:  -- but the issue -- the issue may exist

1    in such a case.  The issue could theoretically come up in such

2    a case that if any attempt were made to enforce the lockup

3    agreements without seeking approval of the lockup, voting

4    process under 1126(b), but we don't need to talk about that

5    today because that's not this case.  This is an 1125 case.

6    This is a post-petition act of the debtor and of the creditors

7    in question.

8           Your Honor, certainly regardless of whether Your

9    Honor ultimately determines that the plan could be confirmed if

10   -- even if the votes are designated.  Certainly it's important

11   for a number of purposes on the record of this confirmation

12   hearing to be clear as to what the votes are and I think Mr.

13   Sprayregen's argument to the Court seem to want to straddle the

14   fence of saying that -- asking the Court to confirm the plan

15   but not really wanting to take the position as to whether the

16   votes are counted or not.  There are a number of reasons why we

17   need to know for the future whether the votes are counted or

18   not.  I'll just pick one which is that in the event that there

19   were to be any further need to seek a modification of the plan

20   under Section 1127, Section 1127(d) provides that votes that

21   were counted for the previous plan are votes that count for the

22   modification unless those creditors change them.  So there's

23   just one example, we only need one, of why we need to know

24   exactly which votes are counted for this plan.  Why this record

25   has to be very clear and for that reason, Your Honor, I think

1  the motion does need to be considered and for the reasons that

2  I have set forth, I think that the Court needs to find that

3  what occurred here was determination of these creditors'

4  official votes.  No way around it, determination of these

5  creditors' official votes.  I think you might hear from the

6  debtor or from the Committee that well, it was contingent upon

7  filing a plan that was consistent with the term sheet.  Once

8  again, Your Honor doesn't need to engage in hypothetical

9  inquiries.  Your Honor doesn't need to decide whether the

10  creditor may have been bound under the agreement or should have

11  been bound under the agreement if some different plan had been

12  filed.  We only need to decide whether the votes count with

13  respect to the plan that is before Your Honor today.

14          It is somewhat interesting in that there is one

15  objection filed that suggests that the plan at least in one

16  measure does not comply with the term sheet.  That being the

17  objection of the Bank of New York.  I'm not rising in support

18  of the Bank of New York's position because the Bank of New York

19  has a position about sort of automatic payment of indenture

20  trustee fees that disagrees with objections that we've made in

21  other cases.  But without belaboring the Court any further,

22  Your Honor, what may happen -- what may happen if some other

23  plan had been filed, if the debtor had done something else, is

24  totally irrelevant.  Let's just assume for purposes of this

25  argument that outside of whatever Your Honor may ultimately

1  decide with respect to Bony's objection, that the plan is at

2  least within the number of the term sheet.  It's hard to say in

3  compliance because the whole point is the term sheet is the

4  three-page outline, does not comply with any of the disclosure

5  requirements as was explained in our motion.  But let's assume

6  it does, the point is that with respect to that plan, to the

7  plan -- with respect to the plan that the parties are seeking

8  confirmation of today, certainly it's my understanding that the

9  debtor's position is that that plan conforms to the term sheet.

10 It's my understanding that the debtor's position is that as a

11 result the creditors are bound to vote and therefore I think

12 the Court has to just work with that and not get distracted by

13 any hypothetical issues about what other plan might exist.  The

14 point is that the debtor believes that it has precluded -- the

15 debtor believes that these agreements can be used to preclude

16 anything other than acceptance by these creditors and for the

17 reasons set forth in our motion and in this argument, Your

18 Honor, we believe that that violates 1125 as a result of which

19 these parties need to be designated and their votes not

20 counted.  And that I think really sets forth the U.S. Trustee's

21 position, unless the Court has any questions.

22          THE COURT:  No, thank you.

23          MR. PERCH:  Thank you.

24          MR. SPRAYREGEN:  Your Honor, we, on behalf of the

25 debtor, actually endorse the U.S. Trustee's suggestion that we

1   focus on the precise facts of this case in this situation.  And

2   it seems to us that what that means it's focusing on a piece of

3   paper that was signed up between and among the debtors and

4   various creditors who became locked-up parties.

5           The U.S. Trustee focuses extensively on this

6   injunctive relief point.  Your Honor, we would submit that that

7   is a red herring.  And, in fact, the point is used as a method

8   by which to distinguish the situation  of the creditor in the

9   Kellogg case that I'll go through in a minute.  But the

10  injunctive relief section is just a -- is a remedy, it has

11  nothing to do with whether there is a contractual obligation at

12  the front end.  And in the Kellogg case whether there was or

13  wasn't an agreed-upon provision for specific performance, there

14  was a contractual obligation subject to whatever it was subject

15  to in that case.  And had that obligation been breached by the

16  creditor, the debtor would have had whatever rights it would

17  have had and in this case was the rights if the lockup was

18  enforceable would be injunctive relief in that case because

19  it's not specified, at least in the written opinion, would have

20  been a creature of state contract law.  May have been specific

21  performance.  May have been injunctive relief.  May have been

22  monetary damages.  Who knows what it could have been?

23          But I start with that because I'm attempting to

24  illustrate that that's not the issue.  The issue --

25          THE COURT:  Well, let's talk about the issue which is

1  1125 --

2          MR. SPRAYREGEN:  Yes.

3          THE COURT:  -- (b).

4          MR. SPRAYREGEN:  I was just turning to that.

5          Your Honor, 1125(b) --

6          THE COURT:  By asking the creditors to sign the

7  lockup, is there any definition of solicit that that does not

8  fall within?

9          MR. SPRAYREGEN:  Yes, Your Honor.

10          THE COURT:  What?

11          MR. SPRAYREGEN:  Your Honor, in the lockup agreements

12  themselves, we have enshrined several provisions that go to

13  exactly that point.  This is not something that the debtor and

14  the creditors didn't think about at the time these lockup

15  agreements were entered into.  The debtor, the creditors the

16  Creditors Committee, had every desire and continues to have

17  every desire and belief actually, to comply with all of the

18  provisions of the Bankruptcy Code, including the solicitation

19  provisions.  So what does the lockup agreement say?  It says

20  the lockup agreement isn't going to be enforceable if it

21  provides for any different treatment, and if in the plan of

22  reorganization there's any different treatment than is set

23  forth in the term sheet.  That's one point.

24          The second point.  The enforceability of the lockups,

25  that is the obligation under the lockup agreements to do

1 anything.

2          THE COURT:  Isn't the lockup -- the request to sign

3 the lockup is a request for the commitment to vote for the

4 plan?  You will vote in favor of the plan.

5          MR. SPRAYREGEN:  Only if certain things happen.

6          THE COURT:  Well, if certain things -- let's ignore

7 that because the question is whether this is a solicitation of

8 a vote on the plan.

9          MR. SPRAYREGEN:  Exactly, Your Honor.  And our point

10 is that can't be ignored when you say let's ignore that.

11 There's an incredibly important and relevant and applicable

12 condition subsequent to any obligation.  What is that?  The

13 enforceability of a lockup is subject to the provisions of

14 Section 1125 and 1126 of the Bankruptcy Code.  It is also

15 specifically stated that these are not a solicitation under the

16 Code.

17          THE COURT:  Well, either it is or isn't, you know, is

18 for me to determine, not for you to say whether it is or it

19 isn't.

20          MR. SPRAYREGEN:  Your Honor, we understand that, but

21 it is important, Your Honor, and the previous sentence is

22 critically important, that's the operative language of the

23 lockup agreement.  And what is says is there's zero obligation.

24 No obligation whatsoever to vote on this plan or to vote yes on

25 this plan unless and until this Court approves a disclosure

1  statement.

2          THE COURT:  Yes.

3          MR. SPRAYREGEN:  And once a disclosure statement is

4  approved, Your Honor, from that moment in time on under

5  1125(b), we're permitted to solicit the vote.

6          So you have in essence --

7          THE COURT:  You solicited the vote before.  You got

8  their commitment to vote for a plan, not inconsistent with the

9  plan summary, a three-page document, conditioned only on a

10 disclosure statement being approved.  You didn't say hey, if

11 the disclosure statement reveals information that causes you to

12 want to change your vote, you can change your vote.  It doesn't

13 say that.

14         MR. SPRAYREGEN:  Your Honor, that's actually a

15 critical and important point.

16         THE COURT:  Yes.

17         MR. SPRAYREGEN:  The point is if there was

18 information in the disclosure statement that the creditors were

19 uncomfortable with, there was no prohibition on objecting to

20 the disclosure statement.  And unless and until the disclosure

21 statement is approved, there's not obligation to vote.

22         THE COURT:  Objecting to a fact is different from

23 objecting to a plan that requires my vote or nothing in here

24 says that if the disclosure statement reveals that I'm not

25 aware of because you only gave me a three-page summary, I can

1  change my vote.

2           MR. SPRAYREGEN:  Yes --

3           THE COURT:  It allows you to object to the disclosure

4  statement.

5           MR. SPRAYREGEN:  With respect, Your Honor, I --

6           THE COURT:  And objections to the disclosure

7  statement are non-substantive.

8           MR. SPRAYREGEN:  With respect, Your Honor, I very

9  much disagree.

10          THE COURT:  Where?

11          MR. SPRAYREGEN:  This is a --

12          THE COURT:  Where does it say that?

13          MR. SPRAYREGEN:  Let me get to that.  This is

14  actually -- this factual situation is highly relevant.  The

15  reason this is a three-page term sheet is because this is a

16  very simple point.  We are paying the creditors, the

17  bondholders, in full.

18          THE COURT:  But you're talking about preferred

19  shareholders and you're not paying them in full.

20          MR. SPRAYREGEN:  We're not paying them in full,

21  that's correct.  But it says right in the term sheet what they

22  get under the plan.

23          THE COURT:  Yes.

24          MR. SPRAYREGEN:  And --

25          THE COURT:  And let's posit the disclosure statement

1  revealed that the company is worth ten times what Gray is

2  paying for the debtor.

3       MR. SPRAYREGEN:  Yes.

4       THE COURT:  Do you think the preferred shareholders

5  could change their votes?

6       MR. SPRAYREGEN:  Do I think -- I don't think the

7  disclosure statement could get approved.  That would be

8  inconsistent --

9       THE COURT:  Wait a minute.  The disclosure statement,

10 the only possible objection to a disclosure statement is it

11 lacks adequate information or the information is factually

12 inaccurate.  You can't object to it on substantive grounds that

13 it differs from what I was told previously.

14      MR. SPRAYREGEN:  No, that's not my point.  My point

15 is then they wouldn't be getting that which they bargained for

16 under the term sheet --

17      THE COURT:  Oh, yes, would.  I could see that your

18 plan would say, hey, you know, we bargained to give them $60

19 million.  That's all they're getting but gosh, the true

20 valuation of the company reveals it's worth 300 million.

21      MR. SPRAYREGEN:  Okay.  If that's --

22      THE COURT:  They could object to the disclosure

23 statement.  I'd overrule that objection.

24      MR. SPRAYREGEN:  Hold on, Your Honor.  Because we're

25 now into the equity level.

1        THE COURT:  Yes.

2        MR. SPRAYREGEN:  We're paying the banks in full under

3   this plan.

4        THE COURT:  Yes.

5        MR. SPRAYREGEN:  We're paying the bonds in full.

6   Under your factual scenario, the senior preferred creditors

7   just would have received more.  That's exactly the point.

8   That's why it's so simple.  If --

9        THE COURT:  No.  The senior preferred shareholders

10  would not if they're getting what Gray is paying for the

11  debtor, not what the valuation of the debtor is.

12       MR. SPRAYREGEN:  Your Honor, again, we would submit

13  that is the fair market valuation.

14       THE COURT:  Well, I know you're submitting that.  I'm

15  positing an objection to a disclosure statement which reveals

16  facts different from what they were told at the time they

17  agreed to vote in favor of the plan.  It would not relieve them

18  of their obligation to vote for this plan.

19       MR. SPRAYREGEN:  Your Honor, the terms of the plan

20  provide that the senior preferred receive everything that

21  doesn't go to the people above them until they're paid in full

22  under their preferred stock certificate.

23       THE COURT:  No.  It says they get the consideration

24  paid by Gray.  It doesn't say that they get the fair market

25  value of the company.

1          MR. SPRAYREGEN:  I have to admit, Your Honor, I'm not

2     quite following that in the sense of unless we posit that the

3     market did not operate here what -- and again, we're prepared

4     to at the right time present our evidence and confirmation.

5     But the evidence will be that through a process this was and

6     produced the fair market value.  So --

7          THE COURT:  I'm talking about the terms of the lockup

8     and at the time that they signed the lockup.

9          MR. SPRAYREGEN:  Um-um-hum.

10         THE COURT:  And what rights they had.  The fact that

11    it was conditioned on the debtor filing a disclosure statement

12    is irrelevant because it does not say that they have the right

13    to change their vote if the disclosure statement I approve

14    causes them to want to change their vote.

15         MR. SPRAYREGEN:  But, Your Honor, obviously --

16         THE COURT:  Isn't that the point of the disclosure

17    statement?

18         MR. SPRAYREGEN:  That's exactly the point of the

19    disclosure statement, Your Honor, and what we're submitting and

20    it may be that we disagree, obviously your view is more

21    important than mine, but what we're saying is they were not

22    obligated unless and until their rights -- excuse me, their

23    obligations in essence spun into existence after the time that

24    this Court approved the disclosure statement.

25         THE COURT:  An approval of a disclosure statement is

1  nothing more than approving a document that contains adequate

2  information.  Your lockup agreement did not say that after

3  reviewing that they had the right to change their mind.  So how

4  does it comply with 1125 which says nobody has to vote on a

5  plan until they get adequate information.

6      MR. SPRAYREGEN:  We agree with that.  Your Honor,

7  what you're positing is that they were obligated to vote prior

8  to the time that the Court approved the disclosure statement.

9      THE COURT:  No.  Prior to them getting, considering

10  and having the right then to decide how to vote after they get

11  the adequate disclosure.

12      MR. SPRAYREGEN:  And, Your Honor, what we are saying,

13  and again, it appears the Court disagrees, but what we're

14  saying is their obligation to vote did not exist, did not come

15  into being.

16      THE COURT:  Until I approved the disclosure

17  statement, but not that contained information substantially

18  similar to the information they had already gotten.

19      MR. SPRAYREGEN:  But, Your Honor, this is where --

20      THE COURT:  And isn't that -- even a pre-bankruptcy

21  lockup agreement has that protection.

22      MR. SHIFF:  Adam Shiff.  Your Honor, if I may

23  interrupt.  I think there's a point though that there's a step

24  in here that's still missing.  The point is the Court did

25  approve a disclosure statement.  Ballots then went out to

1  everyone who's entitled to vote and each one of those people

2  had an independent decision to make at that point.  They could

3  vote or not vote.  They may have believed this agreement was

4  binding on them.  They may have agreed it was not binding on

5  them.  But they all made a decision to vote.  If we had a

6  situation here, which we don't have, where someone got that

7  document and said, you know what, I don't like this plan

8  anymore.  I want to vote against.  And then someone came in and

9  said oh, no, you can't, you're bound -- you're bound to vote on

10  this and then you'd have this issue to decide --

11       THE COURT:  No, I have the issue to decide whether

12  these votes should be counted, i.e., whether I think they're

13  bound by it whether or not they think they are or not.  Whether

14  they, because of the language in here saying they only have --

15       MR. SHIFF:  But the only real relevant facts here are

16  people all received a disclosure statement.  That's a fact.

17  There was a disclosure statement approved by you.   Those

18  people then all voted in favor.  So the only thing you really

19  have before you is the fact that every single creditor and all

20  shareholders, with the exception of one, received documents and

21  not only that, those documents specifically said there are

22  people out there who believe these things are unenforceable.

23  The U.S. Trustee's statements were included in there.  People

24  had a road map where they could turn and said we don't have to

25  vote --

1          THE COURT:  And it also said 98 percent have already
2  voted in favor of a plan under lockup agreements.
3          MR. SHIFF:  It's really -- but everyone was free to
4  do that.  Your Honor, someone referred to <u>Global Ocean</u> before,
5  it's a similar situation.  We had lockups with 98 percent of
6  the people.
7          THE COURT:  And they were all signed pre-petition.
8  That is a completely --
9          MR. SHIFF:  They were but --
10          THE COURT:  -- different situation.
11          MR. SHIFF:  -- that didn't stop -- that didn't stop
12  this person who thought it was inappropriate from coming in
13  here and complaining about it and getting that plan thrown out.
14          THE COURT:  Because 1126(b) has a different standard.
15  You're not even complying with that standard.
16          MR. SHIFF:  I'm not discussing the ultimate standard
17  as to what they should have given us or not given us when we
18  signed the agreement.  I'm focusing on the action that happened
19  here.  The action that happened was people file -- submitted
20  ballots in accordance with the balloting procedure following
21  receipt of the disclosure statement.  People had the --
22  people had independent counsel they could have consulted
23  whether it's binding on me or not.  Now, it may have been
24  people were saying oh, we received 100 cents on the dollar,
25  we're so happy we're not going to think about it.  But the fact

1  is all those people received ballots following the disclosure

2  statement.  They openly submitted the ballot and there's no

3  evidence, there's no evidence that's been offered, that, you

4  know, votes certainly weren't coerced in any way.  Simply, like

5  in any case, people got ballots, they voted yes or no.  And if

6  someone came in here and said -- voted no and they tried to

7  challenge it, we'd have an interesting issue.

8         At the disclosure statement hearing I posited that

9  these agreements may not be enforceable -- who signed them

10 because there are certain, you know, subjects and caveats

11 there.  But the point is I don't think that's germane to what

12 we're here before.  That would be interesting if we were on

13 issue with enforcing this lockup agreement.  If one of the

14 parties --

15         THE COURT:  You are enforcing the lockup agreement.

16 You want the votes to count and they were votes --

17         MR. SHIFF:  No, I am not --

18         THE COURT:  -- obtained pursuant to a lockup

19 agreement submitted and signed before any disclosure statement

20 approved by this Court was given to them.

21         MR. SHIFF:  Respectfully, Your Honor, I don't think

22 anyone is seeking to enforce the lockup agreement.  I think the

23 only thing people are seeking to enforce is to have the votes

24 that were timely submitted count.  That's what --

25         THE COURT:  I can't ignore that those parties signed

1  a document before they got the disclosure statement that bound

2  them to vote in favor of the plan.

3          MR. SHIFF:  Well, I'm not sure if -- we don't know if

4  they're necessarily bound because we're not here in an issue of

5  contract interpretation about that.  It may or may not have

6  because it may be that these agreements are on their face

7  they're just invalid, they're just no good.

8          THE COURT:  Yes.

9          MR. SHIFF:  In which case nobody is bound.  But the

10  point is everyone got ballots.  Everyone had a disclosure

11  statement.  Everyone voted yes.  And nobody has objected to the

12  plan.

13          THE COURT:  Well, the U.S. Trustee has objected to

14  counting these votes and I have to consider whether these votes

15  were solicited in accordance with Section 1125.

16          MR. SHIFF:  I understand that, Your Honor.  And I

17  think we need to focus on in making that determination it's not

18  necessarily a long line of history that led up to this that may

19  or may not have triggered some contingent obligations, but the

20  fact that -- because the only thing people did is they agreed

21  that if we get all this stuff we'll vote.  They weren't --

22          THE COURT:  No, they agreed if we --

23          MR. SHIFF:  -- there weren't -- attached, hold them

24  in escrow --

25          THE COURT:  No.  They stated if we get all the stuff

1  we'll vote yes and we'll agree to the releases.

2          MR. SHIFF:  And that may or may not have been a

3  binding agreement.

4          THE COURT:  Well, if it's not binding, why did you

5  send it out?

6          MR. SHIFF:  Why did people send it out?

7          THE COURT:  Yes.  Why did Gray insist on it if it's

8  not binding?

9          MR. SHIFF:  We can ask -- we certainly -- we can

10 certainly ask Gray, they're here.

11         THE COURT:  Yes.

12         MR. SHIFF:  Because there was -- there was -- Gray

13 had issues with respect -- and I'm speaking secondhand, with

14 respect to their financing which made them comfortable knowing

15 that, you know, they could start their road shows knowing hey,

16 there are people out there who generally support this plan.

17 But whatever people's intentions were, whatever they were

18 thinking I don't think is relevant to the real inquiry here

19 which is simply that ballots were timely voted in favor of a

20 plan.  There were not ballots that were voted early.  There's

21 no evidence there were any votes that were coerced.  There's no

22 evidence there are any --

23         THE COURT:  Well, there's evidence --

24         MR. SHIFF:  -- votes filed because of the lockup

25 agreement.

1          THE COURT:  Well, do you want me to ignore that the

2    lockup agreements even went out before the disclosure

3    statement?  Is that what you're asking me to do?  Nobody is

4    saying that it's valid or invalid.  Nobody is seeking to

5    enforce it or to get out of it so therefore ignore it?

6          MR. SHIFF:  Respectfully, Your Honor, I don't think

7    it's relevant for counting these ballots --

8          THE COURT:  Yes, it is.

9          MR. SHIFF:  -- that have been cast.

10         THE COURT:  I disagree.  Of course it's relevant.

11         MR. SPRAYREGEN:  Your Honor, if I might address a

12   couple of other points.  And I understand the Court's

13   position, but again if we look at the terms of the lockup

14   agreement, the hypothetical that the Court posited which

15   obviously is not necessarily the only possible hypothetical,

16   but what if the fair market value was a lot more than the --

17   what the terms of the plan provided?  Well, Your Honor, the

18   lockup agreements actually specifically contemplated that and

19   provided the locked-up parties with the exact out that the

20   Court is raising here.  And I don't know if the Court has the

21   lockup agreement --

22         THE COURT:  I have it.

23         MR. SPRAYREGEN:  If you look at Section 2, Sub 3,

24   there's a provision -- because this isn't a 363 --

25         THE COURT:  Where's Sub 3 of Section 2?

1          MR. SPRAYREGEN:  Oh, you may not be in the preferred

2     stockholder.  There's two different forms of lockup.

3          MR. RICHARDS:  Your Honor, that's attached as an

4     exhibit to the plan supplement which has been filed which is

5     identified as item 1A on the agenda.

6          THE COURT:  Well, which lockup agreement did you

7     attach to your response?

8          MR. RICHARDS:  We attached the lockup agreement for

9     the senior notes as an example of the form of the lockup

10    agreement.

11         THE COURT:  Where is the preferred shareholders?

12         MR. RICHARDS:  It's behind 1A.  I believe it's

13    Exhibit C.  Tab B, actually, Your Honor.  My apology.

14         THE COURT:  I'm looking at Exhibit C as junior

15    preferred stock.  Again, there's no Section 2, 3.

16         MR. SPRAYREGEN:  I have the senior preferred stock.

17    Hold on.  We will find an extra copy for the Court

18         THE COURT:  Exhibit B.

19         MR. SPRAYREGEN:  I'm sorry?

20         MR. RICHARDS:  Your Honor, if I may approach?

21         THE COURT:  No, I have it.  Exhibit B.  If another

22    proposal is received?

23         MR. SPRAYREGEN:  Yes, Your Honor.  This was --

24         THE COURT:  And approved by the Court?  Okay.

25         MR. SPRAYREGEN:  Yeah.  It says -- yes.

1 Notwithstanding this Subsection 2, all of these things happen,

2 it does provide for Gray to get a break-up fee, again subject

3 to the approval of the Court.  But it specifically contemplates

4 the possibility that notwithstanding the Gray transaction that

5 something better could come along.  And if it did, this lockup

6 agreement covered and protected the senior preferred holders

7 for exactly the type of harm and risk that the Court is

8 positing.  So for example --

9         THE COURT:  No.  What I'm positing is you don't get

10 somebody else in and Gray gets the company for the price it's

11 paying the company is worth six times what it's paying for it.

12         MR. SPRAYREGEN:  And, Your Honor, what I'm saying is

13 this Section 3 --

14         THE COURT:  How does that help?

15         MR. SPRAYREGEN:  It specifically addresses it.

16 There's a transaction --

17         THE COURT:  There has to be another proposal.

18         MR. SPRAYREGEN:  Exactly.  There's a transaction in

19 the market, Your Honor, publicly announced for Gray to buy

20 these assets for this amount of money.  Spread of record this

21 company had sophisticated advisors and as a company, again, we

22 can present the evidence at the appropriate time, that this was

23 what the market produced and not only that, after all of that,

24 that notwithstanding taking the Gray proposal in order to

25 protect against the fact that it's possible something better

1  comes along, the lockup agreement specifically contemplated

2  that in that scenario the senior preferred holders, and if

3  there was an up value, it could flow all the way down the

4  junior preferred holders and if lightening should strike, it

5  could go down to the common, that value and the order of

6  absolute priority would flow down to that.  This in no way

7  prevented a better deal than --

8          THE COURT:  Well, I'm not sure that that says it.

9  What 3 says is if another deal comes along that the debtor

10  accepts that's better --

11          MR. SPRAYREGEN:  Um-um-hum.

12          THE COURT:  -- the senior preferred shareholders

13  agree to pay Gray a break-up fee of $15 million.

14          MR. SPRAYREGEN:  Yes.

15          THE COURT:  He doesn't say you're no longer bound to

16  vote in favor of the original plan.

17          MR. SPRAYREGEN:  Yes, Your Honor, but that's the

18  point.

19          THE COURT:  Where does it say that?  That they don't

20  have to vote in favor of the debtor's original plan to sell to

21  Gray.

22          MR. SPRAYREGEN:  Your Honor, that's the point, is the

23  original plan is not only to sell to Gray, it's to sell to Gray

24  or a better offer that comes along pursuant to this Subsection

25  3.  It's the functional equivalent of a 363 auction process

1  contained within a plan process.  And the senior preferred

2  holders are highly sophisticated people.  They have no reason

3  to give away their value.  They protected exactly the points

4  you're raising and they didn't want to be --

5       THE COURT:  They protected by paying a break-up fee.

6  Okay.

7       MR. SPRAYREGEN:  Exactly.  They -- what Gray said is

8  I want to know that people are onboard with this deal.  Well,

9  the senior preferred holders say okay, I'll be on board with

10 the deal unless a better one comes along.  Gray says okay, I

11 can live with that as long as if that happens I get some

12 compensation.  Your typical O'Brien factors.

13      THE COURT:  Where in the plan does it talk about

14 another potential deal?

15      MR. SPRAYREGEN:  But, Your Honor, again, the facts

16 are important.  And again, we can put on the evidence --

17      THE COURT:  Where in the plan does it specifically

18 say that can happen?

19      MR. SPRAYREGEN:  I don't believe it does say that

20 anymore because, this is important, Your Honor, the facts are

21 important.  We can put on the evidence, by the time we got to

22 that point in time, nothing better did come along.  We're not

23 required to wait even until this hearing.  I don't think if

24 somebody stepped up today and said I possibly could offer more

25 money whether you have lockups or not or whether all the votes

1  were in, there comes a point in time where the process needs to

2  end.  And so the senior preferred holders protected themselves

3  and were protected by the debtor or protected by the terms of

4  the lockup agreement that something better could come along.

5        So, Your Honor, the idea that the plan could only be

6  the Gray deal per the lockup agreement is not correct.  It

7  could be whatever was the best deal that came along.  That's

8  exactly what was supposed to both as an economic matter and as

9  a legal matter be protected against.

10        And, Your Honor, I would -- again, I think it's

11  important to look at the case law, sparse as it may be, in this

12  area.  Mr. Perch, I'll give him credit, struggled mightily to

13  distinguish the Kellogg case.  I would submit that is not a

14  distinguishable case.  In that case the only difference that's

15  cited is the injunction provision, but in that case the Court

16  held that that was not a solicitation even though that was even

17  a stronger contractual agreement because it didn't have the

18  outs that our document had, a stronger contractual agreement to

19  vote for a plan because it didn't purport to exempt the debtor

20  from the statutory obligations, 1125, which is explicitly

21  provided for in our lockup agreement, and the Court there

22  states that what 1125(b) protects creditors, hypothetical

23  reasonable investors, is by mandating a minimum quantum of

24  disclosure, not a maximum, and that's what this disclosure

25  statement is protecting and that's exactly what was protected

1  for in this lockup agreement.

2         THE COURT:  It was not protected in this lockup

3  agreement because getting the information was not what allowed

4  the creditors to vote.  The purpose of a disclosure statement

5  to give adequate information sufficient to permit a creditor or

6  shareholder to vote on a plan.  And you're providing that you

7  agree to vote yes subject to the Court approving a disclosure

8  statement, period, does not satisfy that purpose.

9         MR. SPRAYREGEN:  But, Your Honor, I don't want to

10  take up the Court's time --

11         THE COURT:  Well again, the disclosure statement

12  could have said anything.

13         MR. SPRAYREGEN:  Well --

14         THE COURT:  Could have completely been different

15  completely from the three-page plan summary they had.

16  Completely different from other information provided to these

17  creditors at the time they committed to vote in favor of this

18  plan.

19         MR. SPRAYREGEN:  Well, Your Honor, then with respect

20  we disagree with that characterization and I would suggest very

21  strongly that this Section 2, Sub 3 provision addresses exactly

22  your point.  If there was different information and this thing

23  was more valuable, that's what Sub 3 of Section 2 is exactly

24  intended to flush out and is their contractual protection that

25  the debtor needs to continue to act in good faith with input

1    from its advisors in dealing with anything that may be in

2    essence a higher and better offer.  That's exactly what it

3    covered for.  And --

4            THE COURT:  Well, would the merger agreement allow

5    the debtor to file a plan in support of any other proposal?

6            MR. SPRAYREGEN:  Your Honor, the merger agreement is

7    ineffective until this Court confirms the plan and yes, it did

8    permit us because of this Section 2.

9            THE COURT:  Where?

10           MR. SPRAYREGEN:  Well, we can get the document out

11   but Gray's counsel is standing here, maybe he can address it

12   better than me.

13           MR. FOREMAN:  Your Honor, I don't have the agreement

14   with me to point to the provision.  But if I could be heard on

15   other points.

16           Michael Foreman; Proskauer Rose for Gray Television.

17           Two points I wanted to make that I don't think have

18   been made, Judge, and perhaps they may start -- they may shed

19   some different light on this.

20           I think it's important to note that in these

21   agreements there's a real benefit that every signatory to the

22   agreement is getting.  They're getting the commitment of the

23   debtor to expeditiously file and proceed to confirmation with a

24   plan that gives them a certain value.  And what this plan did

25   in a very real sense was get the major constituencies in this

1 case to agree on what their economic recovery was going to be.

2 Very similar to a settlement as if they were going to be

3 settling out recoveries that they're going to be getting on

4 claims.  The exact remedy they have in this agreement if the

5 either the disclosure statement contains information that was

6 contrary to the information upon which they entered into this

7 agreement and as a due diligence provision --

8            THE COURT:  Where is that?

9            MR. FOREMAN:  I'm looking at the preferred -- Section

10 16, there's a section independent -- some decision-making which

11 where the signatory notes that they have done their own due

12 diligence --

13            THE COURT:  That's different from a disclosure

14 statement.

15            MR. FOREMAN:  I understand that, Your Honor, but

16 there is a remedy if, in fact, they want to get to get out of

17 this --

18            THE COURT:  Where?

19            MR. FOREMAN:  And the remedy is that this agreement

20 in Section 10-6, subject to the provisions of Sections 1125 and

21 1126 of the Bankruptcy Code, this agreement is a legally valid

22 and binding obligation enforceable in accordance with its

23 terms.  If a party to this signatory who got the benefit of the

24 debtor with Gray moving very quickly to get a plan done which

25 gives the note-holders par plus interest which gives

1  significant value to the senior preferred and it gives value to

2  the junior preferred, and the debtor abided by its obligation

3  under this agreement by moving forward expeditiously to achieve

4  confirmation of this plan.  But if they believed that there was

5  a basis -- that there was a faulty basis upon which they

6  entered this agreement, they would have come into court here

7  and said, Judge, this agreement isn't binding on me, they

8  violated 1125 and 1126.  They didn't provide adequate

9  information.  They improperly got out vote.  And they would

10  have come in and as Mr. Shiff said you would have had a very

11  interesting issue and I think it's very clear how Your Honor

12  would have decided.  But there is a remedy here to get out of

13  this lockup.  But perhaps Mr. --

14         THE COURT:  It's conceded that the debtor has

15  violated 1125 because no disclosure statement was given to them

16  before they signed the lockup agreement.

17         MR. FOREMAN:  Your Honor, I would submit and Mr.

18  Sprayregan has also, I would submit, Your Honor, that what

19  happened with this merger agreement was a negotiation of the

20  consideration Gray was to pay for this debtor for the stock of

21  the operating companies.  That was a negotiated process.   What

22  happened with respect to these agreements is that then the

23  note-holders were brought into the fold as were the senior

24  preferred and the junior preferred to say this is the price we

25  got, are you onboard with this price?  Because if you're not

1  onboard with this price, Gray is not going to start getting its

2  financing on the efforts and the debtor isn't going to go

3  forward with the confirmation process.  So before we start down

4  that path, are you onboard?  And what you have in these

5  agreements are the note-holders saying yes, we're onboard.  And

6  the senior preferred is saying yes, we're not getting our full

7  liquidation preference, but we're onboard.  And you have the --

8  and you have the, by a large majority of the junior preferred

9  shareholders saying I recognize I'm not getting anywhere near

10  my liquidation preference, but I also recognize this is a great

11  deal.  I'm signing onto it also and I want you to move forward

12  as quickly as you can to get this done.  That's what these

13  lockups are.

14          THE COURT:  They're a little bit more, respectfully.

15  This is a little bit more than negotiating on a plan.  I think

16  it's clear.  I think <u>Century Glove</u>, respectfully, I don't know

17  how I can ever interpret solicit narrowly enough to not include

18  this.  A lockup agreement, certainly the ones signed in this

19  case, constitute the solicitation of a vote on a plan and must

20  be designated, I think, while I have discretion,  I think it's

21  clear that this process does not pass muster under 1125.  I

22  question whether it even passes muster under 1126, but I don't

23  have to go there.  And I do note that all of the precedents

24  cited by the debtor again convinces me why I don't refer to

25  precedent other than a written opinion by another Court because

1  it was clear to me that every single lockup agreement noted or

2  cash by the debtor to their response is a lockup agreement that

3  was obtained pre-petition.  That's a completely different

4  situation.  The Bankruptcy Code protects those by requiring

5  that a disclosure statement be sent and that they have the

6  right to change their votes essentially if the disclosure

7  statement is different, contains information different from

8  what the information they got was.

9          MR. FOREMAN:  Well --

10          THE COURT:  In this case the lockup agreements do not

11 so provide.

12          MR. SPRAYREGEN:  Your Honor, I understand your

13 position although you did skip over the -- and I don't want to

14 reargue, but you did skip over the last point I was going to

15 make which you noted that in 1126(e) it's a discretionary

16 section, it's not a mandatory section, and you noted that while

17 it's not mandatory you think it's necessary to designate in

18 this particular case.

19          THE COURT:  I think it is.  I think for this reason.

20 I never want to see another lockup agreement like this cited to

21 me as being appropriate and it would be easy to listen to the

22 debtor saying well, in this case it doesn't make any difference

23 because they're getting 100 percent and, of course, they'd vote

24 in favor of the plan.  The next time I see it they'll be

25 getting ten percent and the disclosure statement will contain

1 material disclosures that were not made at the time the vote

2 was solicited.  I think the plain language of 1125l, the term

3 "solicitation" means asking for a vote.  Requesting a vote.  I

4 don't think it even includes getting a vote.  Solicit a vote

5 means ask for a vote.  You ask for a vote.  You got them to

6 agree to vote and I don't think it's appropriate without a

7 disclosure statement.

8        MR. SPRAYREGEN:  Your Honor, we obviously understand

9 your position.  The only point I was going to make with respect

10 to the discretionary nature of it, and I don't want to belabor

11 it because the Court appears to have a position already, but

12 this is a situation where the parties completely believed that

13 notwithstanding the Court's ruling, that they were complying

14 with all of the provisions of the Bankruptcy Code, including

15 Section 1125, and at least they thought carefully drafted the

16 document, apparently not carefully enough to address the

17 Court's concerns, but carefully drafted the documents and not

18 just the document, not form over substance, but the deal that

19 they thought they reached, we're not talking subjective as

20 opposed to the Court's interpretation of that, but thought that

21 what they had entered into was completely in compliance with

22 the Bankruptcy Code.

23        THE COURT:  Well, and it turned out not to be.

24        MR. SPRAYREGEN:  Exactly.  And what my point on that,

25 Your Honor, is in that type of a situation that doesn't mandate

1 designation.

2          THE COURT:  No.  But the discretion is mine and I

3 don't think it's appropriate to approve votes cast by somebody

4 bound by the lockup agreements at issue here.

5          MR. SPRAYREGEN:  Your Honor, with that I think we've

6 done --

7          THE COURT:  Go back to confirmation.

8          MR. SPRAYREGEN:  -- as we started out, I would go

9 back to a confirmation then and as I noted without those votes,

10 there are non -- parties that were never bound by any lockup

11 agreement who voted yes in favor of the plan and we are

12 prepared to proceed with confirmation with respect to

13 demonstrating that the debtor, again notwithstanding the ruling

14 on the motion, satisfies all confirmation standards.  And I

15 would note that Mr. Perch's motion was a motion that certainly

16 the designation of votes the U.S. Trustee has not objected to

17 the confirmation of a plan of reorganization.

18          So with that, Your Honor, if it pleases the Court,

19 I'd ask Mr. Richards to proceed forward with the confirmation

20 standards.

21          THE COURT:  Okay.  Thank you.

22          Do we want to take a short break?  I have a two

23 o'clock that will be very short.

24          MR. SPRAYREGEN:  If it pleases the Court.

25          THE COURT:  All right.  Let's take a short break and

1   come back to confirmation.

2                        (RECESS)

3              THE COURT:  Confirmation.

4              MR. RICHARDS:  Your Honor, good afternoon again.

5              THE COURT:  Good afternoon.

6              MR. SPRAYREGEN:  Excuse me.  Your Honor, James

7   Sprayregen for the debtor.

8              We -- during the break we actually used the time

9   profitably.  The one objection that we do have to confirmation

10  we did resolve.  I'm not sure how the Court wants to proceed. I

11  can articulate that resolution and then Mr. Richards could get

12  into the standards.

13             THE COURT:  All right, that's fine.

14             MR. SPRAYREGEN:  Okay.  The indenture trustee for the

15  bonds had objected.  I'm not sure if the Court had seen the

16  objection.  There was a timeliness issue with respect to it,

17  but we think we've resolved it by the final -- by the following

18  construct.

19             The indenture trustee has some amount of fees right

20  now, but we've agreed to put as part of the closing $150,000 in

21  escrow to cover potential indenture trustee fees and they'll be

22  subject to any objection being filed on the earlier of 30 days

23  from a confirmation date, assuming if the Court was to confirm

24  today, or the effective date.  That is if the effective date is

25  less 30 days from the confirmation date.  The objection to the

1  indenture trustee fees would have to come in before that.

2         THE COURT:  The earlier of the effective date or 30

3  days from the confirmation order?

4         MR. SPRAYREGEN:  Yes.  So the indenture trustee was

5  asking for some certainty as to the position of the indenture

6  trustee fees and most of what their billing has already been

7  done, obviously there's some cleanup work which is part of the

8  reason for the escrow in a greater than the estimated amount of

9  their fees.

10         One other piece of it, Your Honor, the plan does have

11  a current provision that says there will be an estimate for

12  administrative expenses, in essence mostly professional fees,

13  indenture trustee fees, to be put in a different escrow account

14  at 125 percent of the estimated amount.  To the extent there

15  was a shortfall on the 150,000, the 25 percent excess or

16  whatever that turns out to be based on whatever this Court's

17  final allowances are and final numbers, would also be available

18  to cover the indenture trustee fees to the extent the Court

19  allowed them and they were permitted under the indenture and

20  they were more than $150,000.

21         Other than that, the parties would all reserve their

22  rights as to what the standard is and the potential allowance

23  of these fees.

24         THE COURT:  All right.

25         MR. SPRAYREGEN:  I wanted to make sure that I

1  articulated that correctly.

2          MR. SIEGEL:  Okay.  Just a couple of points just so

3  Your Honor understands.

4          The Trustee's fees and expenses now are significantly

5  less than $150,000.  In fact, they are -- and don't hold me to

6  this, they're somewhere between 70 and $80,000.  The major

7  concern the Trustee has right now going forward is protection

8  on the cost of defending itself in any litigation involving

9  objections to its claims.  It's the Trustee's view that under

10 the indenture it would be entitled to the reasonable costs and

11 expenses of defending itself from any objection to claim.

12         I would note that obviously the Trustee reserves the

13 right to the extent that it views the fees and expenses

14 incurred in the estate as unreasonable in the prosecution of an

15 objection to claim, it reserves the right to object to those as

16 well.  I don't think that's here or there.  But the Trustee's

17 only concern is to have certainty on this issue.  To have a

18 number agreed upon and to be protected in the event that there

19 is a litigation brought with respect to its own fees and

20 expenses and costs.

21         That's really what this settlement ultimately is

22 about.  Hopefully we can resolve this prior to the effective

23 date or prior to any objection date.  But in the event we

24 can't, the Trustee wants to make sure that it's protected with

25 respect to its costs.

1         THE COURT:  All right.

2         MR. SPRAYREGEN:  That was an important point, Your

3  Honor.  We obviously hope that we're not objecting and we can

4  ultimately resolve --

5         MR. PERCH:  Your Honor, Frank Perch for the U.S.

6  Trustee.

7         The only observation I'll make about this, in trying

8  to follow all of what's being provided for here is that is that

9  the U.S. Trustee would reserve his rights with respect to

10  whether indenture trustee fees can be paid other than pursuant

11  to the standards established under Section 503(b)(3), (b)(4) or

12  (b)(5).  It sounded like all rights to object are being

13  preserved in the time frame that Mr. Sprayregen described, so I

14  think that that's not a problem if I understood that correctly.

15         THE COURT:  All right.

16         MR. SIEGEL:  Your Honor, I would only note that to

17  the extent to which the U.S. Trustee has concerns, and I know

18  another argument started this way today that didn't necessarily

19  go how people would hope, but I think it's somewhat of a moot

20  issue.  When you're dealing with a solvent estate, whether the

21  Trustee's entitlement to fees comes from some administrative

22  theory or just from its general unsecured claim is somewhat

23  beside the point because I don't think anybody is suggesting

24  that there's a claim.

25         THE COURT:  Well, I'm not here to hear any claim

1 objection or --

2       MR. SIEGEL:  I understand that and just consider this

3 then another gratuitous comment on the record.

4       THE COURT:  Thank you.

5                    (Laughter)

6       THE COURT:  Responding to prior --

7       MR. SIEGEL:  Yes, exactly.

8       MR. RICHARDS:  Again, Your Honor, Geoffrey Richards

9 for the debtors -- for the debtor.

10       We'd like to proceed now on confirmation and briefly,

11 Your Honor, I point out some background.  First is that on

12 August 16th the debtor sent out or filed rather its Affidavit

13 of Mailing.  In the Affidavit of Mailing we identified that all

14 parties identified in the disclosure statement order entitled

15 to receive solicitation packages did so.  That included the

16 disclosure statement order of ballots to the extent the parties

17 were voting on the plan and also the plan and the disclosure

18 statement and the exhibits to the disclosure statement as well

19 as the plan.  And this is also disclosed in the balloting

20 affidavit in Paragraph A.

21       Your Honor, we filed a brief in support of plan

22 confirmation.  We filed that on the 20th.  The brief in support

23 sets forth the 1129 standards and, Your Honor, we explained in

24 that brief that even if the parties to the lockup agreements

25 have their votes designated by this Court, that we can still

1 confirm the plan under Section 1129.

2          Briefly, Your Honor, as we set forth in the brief,

3 there are four impaired classes; Class 4, 5, 6 and 7.

4 Excluding the votes covered by the lockup agreements we still

5 have consenting -- rather parties that have voted to accept the

6 plan in Classes 4 and Classes 5.  Class 7 is the common equity

7 interest and Class 7 is not receiving or retaining anything on

8 account of it's interest in the debtor and is deemed to reject,

9 therefore they did not vote.  The only other class is Class 6,

10 that is the junior preferred stockholders.  There was one

11 ballot that was received that is not covered by a lockup

12 agreement and that vote-holder voted -- or stockholder, rather,

13 voted to reject the plan.  So Class 6 is a not accepting class,

14 but again we believe under 1129 we can very simply satisfy the

15 standard.  Because again, junior to Class 6 no one is receiving

16 or retaining anything on account of their interest and we have

17 two impaired non-insider classes senior to Class 6 who have

18 accepted a plan, specifically Class 4 and Class 5.  And in

19 neither Class 4 or Class 5 are those creditors or stockholders

20 receiving more than 100 percent of their allowed claim or their

21 allowed interest.

22          Furthermore, Your Honor, we submitted a balloting

23 affidavit.  That was also submitted on the 20th.  And the

24 balloting affidavit also explains the votes that were received

25 even excluding the votes covered by the lockup agreements that

1  we have.  The only other people who voted in Class 4 and Class

2  5 voted to accept the plan.

3         In addition, Your Honor, we submitted on the 20th of

4  the month affidavits from James Yager.  He is the president and

5  chief operating officer of the debtor and we also submitted an

6  affidavit from Mary Flodin.  Mary Flodin is the chief financial

7  officer of the debtor and both of those affidavits go to

8  support the satisfaction of the 1129 standards.  Both of those

9  individuals, Your Honor, are in court today and available to

10 testify if the Court deems that necessary or appropriate.

11        Briefly, Your Honor, we believe the pleadings that we

12 filed in the case and the affidavits that we have submitted

13 satisfy the 1129 standards.  We're willing to proceed however

14 the Court would like us to if the Court feels that a proffer or

15 testimony is necessary.  But again, we believe on the facts in

16 this case and the pleadings we've submitted that we satisfy the

17 1129 standards.

18        THE COURT:  All right.  Does anybody else wish to be

19 heard on the confirmation?

20        MR. PERCH:  Your Honor, Frank Perch for the U.S.

21 Trustee.

22        The U.S. Trustee did not file a separate objection to

23 confirmation.  The Court does certainly have the ability to

24 determine under Section 1129 that confirmation would be

25 appropriate with respect to the plan as submitted with the

1  votes that were not designated as a result of the Court's prior

2  ruling.  Obviously Your Honor has an independent duty to

3  determine that the plan has been proposed in good faith and in

4  compliance with the law and otherwise that all of the

5  requirements of Section 1129 have been met, notwithstanding the

6  irregularities of the voting process.

7          THE COURT:  You're not going to give me a hint as to

8  which way you think I should decide on that point?

9          MR. PERCH:  Well, Your Honor, the difficulty -- let

10  me -- let me state the difficulty the U.S. Trustee has in this

11  situation which is that this is -- this is a deal that renders

12  obviously very significant compensation to these various

13  classes of creditors and equity holders.  The difficulty that

14  we have is that the Court is being put in the situation of

15  being asked to determine effectively that the voting process of

16  the, I guess, three or four ballots that were submitted that

17  were not governed by the lockup agreements were not somehow

18  tainted by the fact that they were submitted in the process

19  where everybody else, where they were told that everybody else

20  was already locked in.  I am not -- I am not going to be

21  standing here and saying -- I don't have a witness in the back

22  of the courtroom.  I don't have any of these -- any of these

23  voters here to explain why they voted.  I don't know that the

24  debtor does either.  So I'm not -- what I want to be very clear

25  about, Your Honor, is I'm not going to go out on a limb and

56

1 then suggest that I have a factual basis to make and -- I'm not

2 here prepared to make a factually-based objection to what it

3 was that motivated any of the accepting voters to vote to

4 accept the plan.  I don't have -- I don't have them.  I don't

5 have their affidavits.  I don't have a witness to present any

6 factual evidence on.

7         Basically what I'm saying, Your Honor, is is it is

8 what it is.  It's a somewhat -- what it is is a somewhat

9 unusual situation where the Court would be confirming a plan

10 based on a very small number of votes that were cast under the

11 circumstances that they were cast with the debtor asserting

12 that all the other votes were locked up.  There was evidently

13 at least one party who decided that notwithstanding whatever --

14         THE COURT:  Everyone else thought.

15         MR. PERCH:  Whatever everybody else thought that he

16 would vote to reject.  But as I said, Your Honor, it is what it

17 is and I rise only to note that that is what the Court is

18 confronted with and that's what we're all confronted with here.

19 I don't think either of us have the evidence here as to the

20 other parties that voted.

21         THE COURT:  All right, thank you.  Anybody else?

22         MR. RICHARDS:  Your Honor, I would simply say in

23 response to the U.S. Trustee's position, I think what's

24 important here is what's absent which is, you know, that

25 everything -- let me say that differently, Your Honor.  And

1  that is that there is -- the votes that have been received that

2  are not covered by the lockups, there's no question as to the

3  validity or the effectiveness of those votes.  That Your Honor

4  has decided on the 1126(e) issue that certain votes should be

5  designated and, Your Honor, we respectfully accept the Court's

6  decision on that point.  But even casting aside those votes,

7  Your Honor, the other parties who voted have voted to accept

8  the plan and under the standards set forth in 1129 and 1126, we

9  still satisfy those standards.  We're happy to go through the

10  different components of 1129, Your Honor, and demonstrate good

11  faith, and the other components as we've said we've submitted

12  affidavits from Mr. Yager and Ms. Flodin and those individuals

13  are in the courtroom available and ready to testify if

14  necessary.  But I think what's important, Your Honor, is what's

15  absent and that is that there is no challenges to good faith or

16  any of the issues or compliance as the Code says complies with

17  applicable law.  Well, we believe the plan does currently

18  comply with applicable law and the provisions of the Code.  And

19  so we believe that under 1129 we still continue to satisfy

20  those standards even if the votes that have been covered by the

21  lockups agreements are designated by this Court.

22          THE COURT:  All right.  Well, let me say this.  I

23  think that it's clear that there is no evidence here that the

24  plan itself is not proposed in good faith.  The fact that I

25  have concluded that the locked-up votes were solicited in

1 violation of Section 1125 does not mean that the plan itself

2 cannot be confirmed.  I agree that the remedy provided by 1125

3 and 1126 is sufficient under the facts of this case that is

4 simply designating those votes as not being counted.  Rather

5 than go any further and find that the entire process has been

6 tainted or that the plan solicitation and efforts towards

7 confirmation of a plan were not done in good faith or in

8 compliance with the -- otherwise in compliance with the

9 Bankruptcy Code.

10         I think that counsel just tried to be a little too

11 clever in this case.  I don't know why.  I don't think it was

12 necessary.  But I'm satisfied with the designation of the votes

13 that the plan can be confirmed and that there won't be any

14 improper use of this case as a precedent in other cases where,

15 in fact, the improper solicitation might have tainted other

16 voters or otherwise tainted the entire process.  But I don't

17 find it in this case.  And I do believe the plan otherwise

18 complies with Section 1129 and can be confirmed.

19         MR. RICHARDS:  Thank you, Your Honor.

20         One minor matter that I would ask is that the

21 affidavits be accepted into evidence as well as all documents

22 of record.

23         THE COURT:  Yes.  I didn't say that.  Since there was

24 no objection to the declarations, I don't think it's necessary

25 that there be any proffer.  I'll accept the declarations in

1  support of confirmation.

2        MR. RICHARDS:  Thank you, Your Honor.

3        As a result of some of the events of today, we don't

4  have a form of order that we have circulated to the parties.

5  What we'd like to do, Your Honor, is prepare a confirmation

6  order that's obviously different from the one that we had

7  submitted to Your Honor on Monday, circulate it to the U.S.

8  Trustee and Gray and the Committee and to the other parties who

9  are in the courtroom here today to get an agreed order that we

10 will submit to chambers under cover letter from counsel.

11       THE COURT:  All right.

12       MR. PERCH:  Your Honor, just as a housekeeping point.

13 Would Your Honor also like a form of order on the designation

14 issue?

15       THE COURT:  Yes.

16       MR.  PERCH:  I will likewise circulate the order

17 amongst the parties.

18       THE COURT:  All right.

19       MR. RICHARDS:  One other thing, Your Honor, and I

20 apologize.  I know it's getting a little late this afternoon.

21 Wondering if -- how late Your Honor is going to be here today.

22 Maybe we can ask the parties to convene back with us at our co-

23 counsel's office so that we might be able to formulate that

24 order this afternoon and still submit it to Your Honor.

25       THE COURT:  I have a 3:00 and a 4:00 so I'm here till

1  they're done.

2          MR. RICHARDS:  We will work as expeditiously as we

3  can with the parties to prepare that form of order.

4          THE COURT:  All right.  The 4:00 might be extended --

5  excuse me, the 4:00 won't be extended, but the 3:00 may be.  So

6  I'm here at least till 5:00 I think.

7          MR. RICHARDS:  Very well.

8          THE COURT:  All right.  We'll stand adjourned then.

9          COUNSEL:  Thank you, Your Honor.

10                         *  *  *  *  *

11                      **CERTIFICATION**

12          I, Patricia A. Kontura, certify that the foregoing is

13  a correct transcript to the best of my ability from the

14  electronic sound recording of the proceedings in the above-

15  entitled matter.

16

17  /s/ Patricia A. Kontura          Date:  October 2, 2002

18  J&J COURT TRANSCRIBERS, INC.

19

20

21

22

23

24

25