# EXHIBIT B

192

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              . Case No. 02-11505 (MFW)
                                    .
                                    .
NII HOLDINGS, INC. and              . 824 Market Street
NII HOLDINGS (DELAWARE), INC.       . Wilmington, DE  19801
                                    .
          Debtors,                  . October 22, 2002
. . . . . . . . . . . . . . . . . . . 12:30 P.M.

TRANSCRIPT OF MOTIONS
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:             Richards, Layton & Finger, P.A.
                             By:  DANIEL DeFRANCESCHI, ESQ.
                                  PAUL N. HEATH, ESQ.
                                  REBECCA L. SCALIO, ESQ.
                             One Rodney Square
                             P.O. Box 551
                             Wilmington, DE  19899

                             Bingham, McCutcheon, LLP
                             By:  PATRICK J. TROSTLE, ESQ.
                                  WILLIAM F. GOVIER, ESQ.

For Nextel Communications,
Inc.,:                       Jones, Day, Reavis & Pogue
                             By:  PAUL E. HARNER, ESQ.
                                  JOHN W. EDWARDS, II, ESQ.
                             1900 Huntington Center
                             41 South High Street
                             Columbus, OH  43215-6113

                             Morris, James, Hitchens &
                             Williams, LLP
                             By:  BRETT D. FALLON, ESQ.

Proceedings recorded by electronic sound
recording, transcript produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey  08619
E-mail:  jjcourt@optonline.net

(609)586-2311      Fax No.  (609)587-3599

2

APPEARANCES:   (continued)

For U.S. Trustee:                    U.S. Department of Justice
                                        Office of U.S. Trustee
                                     By:  JOSEPH J. McMAHON, ESQ.

For Cordillera Communications
Corp.:                               Davis, Graham & Stubbs, LLP
                                     By:  CHRISTOPHER RICHARDSON, ESQ.
                                          GLEN E. KRELLER, JR., ESQ.

                                     CHARLES J. BROWN, ESQ.

For Chase:                           Millbank, Tweed, Hadley &
                                     McCloy, LLP
                                     By:  DEIDRE ANN SULLIVAN, ESQ.

                                     Ashby & Geddes, P.A.
                                     By:  WILLIAM P. BOWDEN, ESQ.

For Bank of New York:                Emmet, Marvin & Martin
                                     By:  EDWARD ZUJKOWSKI, ESQ.

                                     Walsh, Monzack & Monaco
                                     By:  FRANCIS A. MONACO, ESQ.

For Motorola:                        Prickett, Jones & Elliott, P.A.
                                     By:  BRUCE E. JAMESON, ESQ.

For the Committee of
Unsecured Creditors:                 Saul Ewing, LLP
                                     By:  MARK MINUTI, ESQ.

                                     Kilpatrick, Stockton, LLP
                                     By:  DENNIS S. MEIR, ESQ.
                                          TODD C. MEYERS, ESQ.

For Ad Hoc Committee:                Milbank, Tweed, Hadley & McCloy
                                     By:  THOMAS R. KRELLER, ESQ.

Audio Operator:                      Jennifer M. Patone

3

I N D E X

WITNESSES FOR THE DEBTOR                                    Page

STEPHEN SHINDLER

    Direct Examination by Mr. DeFranceschi          132
    Cross Examination by Mr. Richardson             137
    Cross Examination by Mr. McMahon                140
    Redirect Examination by Mr. DeFranceschi        142

WITNESSES FOR CORDILLERA

VINCENT MICHAEL FITZGERALD

    Direct Examination by Mr. Richardson            155
    Cross Examination by Mr. DeFranceschi      170, 176
    Cross Examination by Mr. Edwards                175
    Redirect Examination by Mr. Richardson          178

| EXHIBITS | | I.D. | EVD. |
|---|---|---|---|
| Cordillera 1 | NII 10K | | 77 |
| Cordillera 2 | Nextel 10K | | 77 |
| Cordillera 3 | Nextel 8K | | 77 |
| Debtor's A | Affidavit | | 97 |
| Debtor's B | Affidavit | | 97 |
| Debtor's C | Affidavit | | 97 |
| Nextel 1 | NII Holdings, Inc. Proof of Claim | 175 | 180 |
| Nextel 2 | NII Holdings Delaware Inc. Proof of Claim | 175 | 180 |

MOTIONS

2    Motion of the Acting U.S. Trustee pursuant to
    11U.S.C. Secs. 1125(b), 1126(b), 1126(d) and
    1126(e) for an Order (1)Designating Persons Who
    Executed Lock-Up Agreements, (2) Directing That
    the Ballots Cast by Such Persons Not be Counted,
    (3) Imposing Sanctions and/or (4) Granting Other
    Relief                                              6

3    Motion to Subordinate Claim of Nextel Communications
    Inc. filed by Cordillera Communications Corp.       66

4

MOTIONS                                                          Page

4      Revised Third Amended Joint Plan of Reorganization
       of NII Holdings, Inc. and NII Holdings (Delaware),
       Inc.                                                        95

5

1          THE COURT:  Good morning.

2          MR. DeFRANCESCHI:  Good morning, Your Honor.

3          THE COURT:  Afternoon.

4          MR. DeFRANCESCHI:  Correct. Good afternoon, Your

5  Honor.  Dan DeFranceschi from Richards, Layton & Finger on

6  behalf of the debtors.

7          Your Honor, we have a very aggressive agenda today.

8  The first item on that agenda is the motion of the United

9  States Trustee seeking to designate votes pursuant to the lock-

10  up agreements and directing that those votes not be counted.

11         Your Honor, by the motion, the U.S. Trustee actually

12  also seeks to impose sanctions against the debtors with respect

13  to those agreements, a fact that's of particular importance

14  here, because I think as the hearing progresses Your Honor will

15  see there was no improper conduct here but rather --

16         THE COURT:  Well, should I hear from the U.S. Trustee

17  whose motion it is?

18         MR. DeFRANCESCHI:  Yes, Your Honor, I just wanted to

19  introduce that and let Your Honor know that the ad hoc

20  noteholder committee council will be her today as well, as will

21  -- as is Motorola and NCI, the other parties to the lock-up

22  agreements.

23         And with that, Your Honor, certainly Mr. McMahon

24  should present his motion.

25         THE COURT:  Thank you.

1      MR. McMAHON:  Your Honor, good afternoon. Joseph

2  McMahon for Donald Walton, the acting United States Trustee for

3  Region 3.

4      I'm going to be dividing my presentation into two

5  sections.  The first section is what I call the

6  characterization problem, which involves the question of

7  whether the consents to the lock-up agreements are temporally

8  characterized as pre-petition or post petition consents.

9      And then the second issue is whether or not there was

10  a solicitation of an acceptance of a plan under Section 1125B.

11      THE COURT:  Okay.

12      MR. McMAHON:  I'll start with the first section and

13  address that issue first.  The debtors take the position in

14  their objection to the U.S. Trustee's motion that to the extent

15  that consents to the lock-up agreements, which are attached to

16  Mr. Gilker's affidavit can be construed as acceptances.  They

17  were pre-petition acceptances.

18      Why is this argument important?  Well, under Section

19  1125(b) of the Bankruptcy Code solicitation is prohibited

20  during the post petition period prior to court approval of the

21  disclosure statement.

22      THE COURT:  Um-hum.

23      MR. McMAHON:  And under Section 1126(b) and Rule 3018

24  there is no prohibition per se on pre-petition solicitation,

25  and the plan proponent seeking to pre-pack a case as to

7

1  validate the pre-petition acceptances or rejections.

2          Based on the facts contained in the debtors and ad

3  hoc committee's objections and the accompanying Gilker

4  affidavit, the U.S. Trustee disagrees with the debtor's

5  position as to the timing of the acceptances by Motorola and

6  the noteholders.

7          The Gilker affidavit makes it clear that the debtors

8  extended a post petition offer to Motorola and the noteholders

9  to enter into the lock-up agreements.  The noteholder and

10 Motorola signatures were not delivered until May 29th, 2002,

11 which was five days after the debtor's bankruptcy petitions

12 were filed.

13          Moreover, the effectiveness of the lock-up

14 agreements, if you look at the provision, Your Honor, they were

15 cross conditional upon the noteholders and Motorola entering

16 into the lock-up agreements on or before a certain date.  They

17 contain that provision.

18          The noteholder Motorola agreements are made effective

19 as of May 29th.  There were post petition communications

20 between the parties related to changes made to the lock-up

21 agreements.  That's identified in Paragraph 14 of the debtor's

22 objection and Paragraph 19 of the ad hoc committee objection.

23          Further, the lock-up agreements contain a prior

24 negotiations provision which indicates that the lock-up

25 agreement and the term sheet supersedes all prior negotiations

8

1 with respect to the subject matter of the lock-up.

2          Mr. Gilker, Paragraph 12 of his affidavit, states

3 that it was, quote, "of paramount importance to the debtors,"

4 parens, "and to all the key creditors, including NCI, Motorola

5 and the noteholders," end parens, "that all the key parties

6 contractually agree to support this transaction," period, end

7 quote.

8          Ironically the contractual agreement becomes much

9 less important to the debtors after the U.S. Trustee files a

10 motion to designate certain votes.  There was no post petition

11 solicitation, the debtors maintained, beginning at Page 18 of

12 their objection, however, the facts indicate that there was a

13 post petition solicitation.

14          Motorola's and the noteholders' contractual

15 agreements were of paramount importance.  Mr. Gilker's own

16 words.  To the extent that this Court disagrees with the U.S.

17 Trustee's position and permits the debtors to advance their

18 argument that the consents to the lock-up agreement should be

19 validated as pre-petition acceptances, the U.S. Trustee

20 believes that the debtors have not properly brought this issue

21 before the Court.

22          In any pre-package case the debtor moves to approve

23 the pre-petition disclosure and the votes cast pre-petition.

24 In this case  no such motion has been filed.

25          The U.S. Trustee was put on notice for the first time

1  this past week that the debtors were asserting a safe harbor

2  defense under 11 U.S.C. Section 1126(b).  Accordingly, the

3  debtors' factual defense, to the extent that it has merits,

4  warrants further examination.

5          Under 11 U.S. Section 1126(b) there's the threshold

6  issue of whether the solicitation was in compliance with

7  applicable non-bankrupt C regulation.  And Your Honor's

8  confirmation opinion in Zenith, this Court suggested that non-

9  bankruptcy regulation for Section 1126(b)(1) purposes include

10  securities regulation.

11          If there is no such non-bankruptcy regulation then

12  under 11 U.S.C. Section 1126(b)(2) the voter must have been

13  supplied with adequate information as defined in Section

14  1125(a) of the code.  In In Re:  The Southland Corp., that's a

15  Northern District of Texas case that was cited in the Zenith

16  opinion, the court ruled that a debtor seeking to approve pre-

17  petition acceptances under Section 1126(b)(2) had to initially

18  prove that there was no applicable non-bankruptcy regulation

19  relevant to the disclosure before making the adequate

20  information showing.

21          Regardless of the debtor's safe harbor defense, there

22  is a basis as a matter of law for designating the votes of NCI

23  and the noteholders today, accepting the debtor's arguments

24  that the acceptances of NCI and the noteholders were pre-

25  petition acceptances.

1     First, Federal Rule of Bankruptcy Procedure 3018(b)

2 states that a holder of a claim or interest who has accepted or

3 rejected a plan before the commencement of a case under the

4 Code shall not be deemed to have accepted or rejected the plan

5 if the Court finds, after notice and a hearing, that the plan

6 was not transmitted to substantially all creditors and equity

7 security holders of the same class, that an unreasonably short

8 time was prescribed for such creditors and equity security

9 holders to accept or reject the plan or that the solicitation

10 was not in compliance with 11 U.S.C. Section 1126(b).

11     In other words, Your Honor, under Rule 3018(b) the

12 debtors have the initial burden of demonstrating that

13 substantially all creditors in Class 6 had a copy of the plan

14 transmitted to them before attempting to pre-pack that class.

15     Under the facts contained in their own lock-up

16 agreements, the Gilker First Day affidavit and the Bloom

17 affidavit certifying the ballots, the debtors did not transmit

18 a plan to substantially all creditors in Class 6 pre-petition.

19 And that's with regard -- regardless of whether we measure the

20 -- substantially all creditors by the number of holders of a

21 dollar value of the holdings themselves.

22     If you take a look at the Bloom affidavit it contains

23 information which indicates that at least 480 entities voted on

24 the plan.  NCI and the noteholders represent a tiny fraction of

25 that total creditor class.

1    Further, if you do the analysis -- remember the $2.2

2  billion worth of bonds were lumped into Class 6.

3    THE COURT:  Um-hum.

4    MR. McMAHON:  And if you were to break out NCI's and

5  the noteholders' holdings on a dollar value amount it's my

6  estimate that approximately 800 million to a billion dollars of

7  value is still there after we take them out.  Therefore, under

8  either test, Your Honor, we believe that the debtors can't pre-

9  pack Class 6.

10    We further note that, Your Honor, if the Court adopts

11  the U.S. Trustee's position and characterizes the debtor's

'12  efforts to obtain the Motorola lock-up agreements as an

13  improper post petition solicitation and designates the Motorola

14  votes on that basis, then the debtors are going to need Class 6

15  in order to confirm the plan under 11 U.S.C. Section

16  1129(a)(10).

17    THE COURT:  Um-hum.

18    MR. McMAHON:  There's only three impaired classes in

19  the plan, 2, 3 and 6.  If this Court designates 2 and 3 as

20  improper post petition solicitation, then they're going to need

21  6.  The post petition votes of Class 6, that is, in order to

22  confirm their plan.

23    Let me move to the second issue, Your Honor, which is

24  the solicitation under 11 U.S.C. Section 1125(b).

25    The debtors --

12

1        THE COURT:  Before you do --

2        MR. McMAHON:  -- sought to enter into lock-up.

3        THE COURT:  Before you do, are you asserting that the

4   NCI vote came in post petition, or are you acknowledging that

5   that came in before the petition was filed?

6        MR. McMAHON:  Your Honor, I am acknowledging that

7   that came in before the petition was filed.  I concede that.

8        THE COURT:  All right.  Thank you.  All right.

9        I'm sorry to interrupt.

10        MR. McMAHON:  No, thank you.

11        Moving to the second section of my argument, which is

12   the solicitation under 11 U.S.C. Section 1125(b), the debtor

13   sought to enter into lock-up agreements with NCI, certain

14   noteholders and Motorola Credit Corporation.  That's in

15   Paragraph 4 of the Gilker designation affidavit.

16        And the debtors did, in fact, enter into lock-up

17   agreements with those entities.  They're attached as Exhibit C

18   to that Gilker designation affidavit.

19        The lock-up agreements bind the signatory creditors

20   to vote in favor of a plan of reorganization which is

21   consistent with the provisions of the term sheet attached as

22   Exhibit B to the Gilker designation affidavit.

23        Each of the lock-up agreements contain a provision

24   entitled specific performance.  That provision states that,

25   quote, "It is understood and agreed by each of the parties

13

1 hereto that money damages would not be a sufficient remedy for

2 any breach of this agreement by any party, and each non-

3 breaching party shall be entitled to specific performance and

4 injunctive or other equitable relief as a remedy of such

5 breach," period, end quote.

6          The acting United States Trustee's position, Your

7 Honor, here today is that the debtors, by seeking creditor

8 consents to the lock-up agreements, were making a quote,

9 "specific request for an official vote," period, end quote.

10 That's the language from In Re: Snyder, the Utah case.

11          The lock-up agreements bind the signatory creditors

12 to vote in favor of a plan.  The agreement obligated the

13 signatories to vote.  Abstention was not an option.  When each

14 of the signatory creditors received ballots that were mailed to

15 them with the solicitation package the debtors believed and

16 maintain today the creditor had no option but to perform their

17 obligations under the terms of the lock-up agreement.

18          Thus, in reality, the creditors had cast their votes

19 at the time they signed the lock-up agreements.  Had any

20 creditor sought to do anything else, for example reject the

21 plan, the debtors assert that they would have been able to come

22 into this court and request an order that the rejecting ballot

23 was in breach of the lock-up agreement and should not be

24 counted as the creditors' vote.  Rather, the official vote is

25 the acceptance they agreed to when they signed the lock-up

1  agreement.

2         The debtors challenge the United States Trustee's

3  position that there was a solicitation of an acceptance post

4  petition and cite three cases in support of their position.

5         The first of the three cases is In Re: Pioneer

6  Finance Corp. That's 246 Bankruptcy Reporter 626 out of the

7  District of Nevada.  The Pioneer Finance case involved the

8  question of whether the pre-petition consents of bondholders

9  obtained pursuant to an exchange offer and consent to

10  solicitation constituted an acceptance of the plan under 11

11  U.S.C. Section 1126(b).

12         Thus, it is totally irrelevant to the question of

13  what constituted an improper solicitation in violation of

14  1125(b).

15         Pioneer Finance is factually distinguishable from the

16  instant case.  First, in Footnote number 6 to the opinion, the

17  Court specifically refused to determine whether the agreement,

18  embodied in the consent form, constituted a contract or to

19  consider the remedies, if any, that would be available if a

20  consenting noteholder failed to vote in favor of a plan.

21         The existence of that footnote suggests that the

22  consent form did not specifically identify any remedies that

23  might be available if a consenting noteholder failed to vote in

24  favor of the Pioneer Finance plan.

25         In this case we have an executed agreement where the

1 parties have identified specific performance and injunctive

2 relief as available remedies in the event of a breach.

3      In other words, the lock-up agreements on their face

4 suggest that the parties entered into a contract with the

5 intent of making the agreement enforceable by injunction among

6 other remedies in the event of non-performance.

7      The <u>Pioneer</u> case supports the U.S. Trustee's

8 position.  The plan proponent did the same thing the debtors

9 are trying to do here today, which is changing their mind and

10 belatedly trying to get approval of an offering as a pre-pack.

11      The <u>Pioneer</u> Court found that the pre-petition

12 disclosure process was inadequate.

13      The second case cited by the debtors is <u>In Re:</u>

14 <u>Kellogg Square Partnership</u>, 160 <u>Bankruptcy Reporter</u> 336.

15 That's out of the District of Minnesota.  What is interesting

16 about <u>Kellogg Square</u> is that part of the opinion which appears

17 immediately after the part cited by the debtors in Paragraph 23

18 of their objection to the Acting United States Trustee's

19 motion, which addresses the signatory creditors' rights under

20 the agreement in question.  Quote, "The result and status of

21 the agreement then is crucial.  Had the final Court approved

22 disclosure statement revealed information that materially bore

23 on District Energy's interest and had the debtor previously

24 failed to disclose that information to District Energy,

25 District Energy would have a right under general non-bankruptcy

16

1  law to repudiate the agreement via recission, then to cast a

2  rejecting ballot, period, end quote.

3        The Kellogg opinion indicates that the Court believed

4  that some further action was necessary for the creditors' vote

5  to count.  That's not the case here.

6        In the instant case we have lock-up agreements which

7  provide no such express out for non-disclosure to the signatory

8  creditors.  Again, nothing in the Kellogg Square opinion

9  appears to suggest that the agreement that is the subject of

10 that opinion contained a provision which entitled the debtor to

11 injunctive relief.

12       Finally, the debtors cite the Third Circuit's ruling

13 in Century Glove First American Bank.  In Century Glove the

14 Third Circuit held that, quote, "A party does not solicit

15 acceptances when it presents a draft plan for the consideration

16 of another creditor, but does not request that creditor's vote.

17       That's precisely the point, however, in this case,

18 Your Honor.  By seeking to lock up the signatory creditors'

19 votes the debtors made a specific request for an official vote.

20 There's nothing in the future about the lock-up agreement.  The

21 signatory creditors pledged their official vote at the time the

22 lock-up agreements were entered into.

23       Your Honor, we submit that the relief granted in --

24 sought in the United States Trustee's motion, and we would cede

25 the podium at this time to the debtor unless you have further

1 questions.

2          THE COURT:  No, thank you.

3          MR. DeFRANCESCHI:  Thank you, Your Honor.  I think it

4 was very carefully done that Mr. McMahon attempted to put the

5 cart behind the horse here.  The position of the debtors in

6 this case is before you determine whether there was a

7 solicitation, you have to make sure you satisfy the

8 requirements of 1125 or 1126.  And with respect to both

9 provisions of the code, it must be an acceptance of rejection

10 of a plan that would -- that was in fact solicited in order for

11 those sections to apply.

12          The U.S. Trustee has offered no facts to support that

13 there was any improper solicitation of an acceptance of plan

14 here, save one fact.  And that one fact is that the Motorola

15 and the noteholder agreements, the two lock-up agreements that

16 he was discussing, are dated as of May 29th.

17          The debtors submit that that fact alone, in light of

18 the facts which I will present to Your Honor in a moment, lead

19 to several conclusions that I think are inescapable here, but

20 first and foremost that there was no acceptance of a plan that

21 was solicited by the particular documents.

22          Your Honor, I -- the debtors filed --

23          THE COURT:  Doesn't the lock-up agreement require

24 that they vote for the plan?

25          MR. DeFRANCESCHI:  Your Honor, what this lock-up

18

1  agreement provides for, and I think it's interesting that the

2  Pioneer case was mentioned in the U.S.T.'s argument.  What this

3  plan provides for, and I think it's very important that we walk

4  through the entirety of the lock-up agreements.  It is improper

5  in this situation to focus just on that one provision and

6  ignore the rest of the agreement.

7          This agreement, if it is read in total, is entirely

8  consistent with Century Glove, which the Court is well aware

9  provided that the Third Circuit in construing this section of

10  the Code, 1125, construed it in a manner to favor settlements,

11  to favor creditor negotiations, found no principle difference

'12  between negotiations and solicitation of future acceptances.

13  It's right there in the case.

14          The Pioneer decision is, although from another

15  circuit, entirely consistent with that, and its telling, the

16  language in that situation.  And what was attempted to be done

17  there -- it's telling how it supports us.

18          The language -- Pioneer --

19          THE COURT:  Well, wait a minute.  Let's go to the

20  Third Circuit.

21          MR. DeFRANCESCHI:  Yes.

22          THE COURT:  Century Glove dealt with a creditor that

23  sent a draft plan.

24          MR. DeFRANCESCHI:  Yup.

25          THE COURT:  It didn't say, "Sign on the dotted line

19

1  that you agree to support my plan."

2          MS.  SCALA:  Absolutely.

3          THE COURT:  Let's start with the Bankruptcy Code.

4          MR. DeFRANCESCHI:  Yes.

5          THE COURT:  It says you cannot solicit an acceptance

6  or rejection of a plan.

7          MR. DeFRANCESCHI:  Yes.

8          THE COURT:  If the lock-up agreement isn't a

9  solicitation of an acceptance or a rejection of the plan, what

10 is?

11         MR. DeFRANCESCHI:  What is?  A perfect example, Your

12 Honor.  If I were to take this document, which happens to be

13 the plan and disclosure statement, hand it to Motorola, hand it

14 to NCI, hand it to the noteholders, and say, "I want you to

15 vote on this.  This is the plan.  This document here is the

16 plan."

17         I get their vote.  I haven't gotten an approved

18 disclosure statement.  I haven't done anything.  I just -- this

19 is the plan.  Then I come to the Court and I say, "Your Honor,

20 we had a --" you know, then I go through the regular process.

21 I put in a motion to --

22         THE COURT:  Um-hum.

23         MR. DeFRANCESCHI:  -- prove solicitation procedures.

24         THE COURT:  Um-hum.

25         MR. DeFRANCESCHI:  I get the disclosure statement.

20

1  Same disclosure statement to prove this having adequate

2  information we solicited.

3          And then I come in and say, "Your Honor, we didn't

4  send ballots to these folks here.  They had no way out of this.

5  We just -- before anything was approved here we told them this

6  is the plan that they're going to vote on, and we're holding

7  them to that."

8          THE COURT:  Well, isn't that what the lock-up

9  agreement is?

10         MR. DeFRANCESCHI:  Absolutely not, Your Honor.

11 Absolutely not.

12         THE COURT:  The lock-up agreement says, "We're going

13 to hold you to it.  In fact, we can get specific performance."

14         MR. DeFRANCESCHI:  It says a lot more than that, Your

15 Honor, a lot more that's very important here.

16         THE COURT:  Well --

17         MR. DeFRANCESCHI:  And I'm going to tell you what it

18 says that's important.

19         THE COURT:  Let's talk about whether it's

20 solicitation.   The other things may or may not be relevant.

21         MR. DeFRANCESCHI:  Well, Your Honor --

22         THE COURT:  But you solicited -- post petition they

23 signed it.  The fact that it says effective as of May 29th,

24 didn't they sign it post petition?

25         MR. DeFRANCESCHI:  Well, as a matter of fact, Your

1  Honor --

2          THE COURT:  Motorola?

3          MR. DeFRANCESCHI:  -- they actually signed the lock-

4  up agreement, the noteholders signed it pre-petition.  They

5  just didn't have authority to release it.

6          THE COURT:  Mr. Gilker doesn't say that.

7          MR. DeFRANCESCHI:  Didn't have authority to release

8  the signatures until the post petition -- we received it --

9          THE COURT:  Well, Mr. Gilker's affidavit says there

10 were modifications to the lock-up --

11         MR. DeFRANCESCHI:  There were modifications.

12         THE COURT:  -- agreement post petition.

13         MR. DeFRANCESCHI:  Yes.

14         THE COURT:  And that that --

15         MR. DeFRANCESCHI:  What his affidavit says is there

16 were ministerial, non-material changes to the lock-up

17 agreement.

18         THE COURT:  To make it conform to the NCI, which was

19 signed --

20         MR. DeFRANCESCHI:  To make it conform.

21         THE COURT:  -- an hour before the petition.

22         MR. DeFRANCESCHI:  Yes, it was, Your Honor.  Yes, it

23 was.  What is also true here -- Your Honor asked a specific

24 question, whether it was signed.  There were signature pages.

25 The facts of the case are very important.

1        It was a Friday afternoon --

2        THE COURT:  Um-hum.

3        MR. DeFRANCESCHI:  -- just prior to the Memorial Day

4 holiday.  Counsel for the noteholders had all the signature

5 pages, had authority to release them, save one signature page.

6 They couldn't get in touch with that particular noteholder to

7 release it.  And as a result of the intervening holiday

8 weekend, basically what happened, Your Honor, is very simple.

9 Two business days later when they came back to the office they

10 gave them final authority to release the signature pages.

11        But I really do want Your Honor to understand our

12 position, and perhaps Your Honor understands it very well that

13 -- and disagrees with us that this was not an acceptance of a

14 plan and that just because --

15        THE COURT:  Well --

16        MR. DeFRANCESCHI:  -- I'm sorry.

17        THE COURT:  No, it was solicitation for an acceptance

18 of the plan.

19        MR. DeFRANCESCHI:  Your Honor, Century Glove

20 specifically, specifically sanctions the procedure we did here.

21 It says --

22        THE COURT:  No, it does not.

23        MR. DeFRANCESCHI:  Yes, it --

24        THE COURT:  There was not a lock-up agreement --

25        MR. DeFRANCESCHI:  Your Honor, respectfully --

23

1          THE COURT:  -- sent with that plan, and it wasn't

2    signed.

3          MR. DeFRANCESCHI:  Your Honor --

4          THE COURT:  The plan was sent.

5          MR. DeFRANCESCHI:  Respectfully.

6          THE COURT:  The Court said you can negotiate.

7          MR. DeFRANCESCHI:  Respectfully.

8          THE COURT:  But you got to stop.

9          MR. DeFRANCESCHI:  It said more than you can

10   negotiate.  It says you can solicit future acceptances.  Future

11   acceptances of what?  Of agreements to a plan, that was the

12   context of this particular case.

13          It was 1125(b) --

14          THE COURT:  It didn't say you can --

15          MR. DeFRANCESCHI:  -- that was being considered.

16          THE COURT:  -- sign.  It did not say you can sign a

17   lock-up agreement that binds you to vote in favor of the plan.

18          MR. DeFRANCESCHI:  Your Honor --

19          THE COURT:  That -- there's got to be a line.

20          MR. DeFRANCESCHI:  Your Honor, there is a line.

21   There is a way that this Court can harmonize the provisions of

22   1125(b) and --

23          THE COURT:  Okay.

24          MR. DeFRANCESCHI:  -- 1126 by analogy, because it's

25   similar language, but --

24

1          THE COURT:  Well --

2          MR. DeFRANCESCHI:  -- focusing on 1125(b) for the

3   moment.  There's a way to harmonize that provision together

4   with the Century Glove decision, which is really the only Third

5   Circuit decision that addresses this general issue of

6   solicitation under 1125 --

7          THE COURT:  How?

8          MR. DeFRANCESCHI:  Here's how you do it.  First of

9   all, if you -- if you see what the Third Circuit was looking at

10  in that case, it is just a given in this practice, in the

11  bankruptcy practice, that negotiations which would ultimately

12  reach a consensual plan of reorganization is encouraged.

13         I don't think there would be any dispute, even from

14  the United States Trustee's Office, that that's encouraged.

15         Number two, in that particular case, in the Century

16  Glove case, the Court made very clear that it sees no

17  principled distinction between creditor negotiations and

18  soliciting future acceptances of a plan, no principle

19  distinction.  It's right there in black and white.

20         Now --

21         MR. DeFRANCESCHI:  No, it talked about negotiating

22  regarding a consensual plan.  It didn't say, "soliciting future

23  acceptances, i.e., sign a ballot."

24         MR. DeFRANCESCHI:  It absolutely was giving this

25  Court guidance when it said that that section of the code must

1  be read narrowly, because if you don't read it narrowly, what's

2  going to happen?  And I'm going to tell Your Honor how you

3  could very easily read it narrowly and not to apply it in this

4  case.

5       THE COURT:  Well, how can it be read narrowly

6  consistent with your enforcement of these lock-up agreements?

7       MR. DeFRANCESCHI:  Well, first of all Your Honor,

8  there is a major factual premise that is entirely erroneous

9  here.  We've assumed that we're seeking to enforce a lock-up

10  agreement.

11       Where is there any evidence that these debtors have

12  ever sought to enforce this lock-up agreement?  There is none,

13  and we are not seeking to enforce it.

14       Isn't that important?  I think the answer to that

15  question is absolutely yes.

16       THE COURT:  No, it would be important in the 1126

17  context, but not in the 1125.  1125 prohibits solicitation of a

18  vote.  It does not prohibit enforcement of a post petition pre-

19  disclosure statement vote.

20       MR. DeFRANCESCHI:  Section --

21       THE COURT:  It prohibits solicitation.

22       MR. DeFRANCESCHI:  Section 1125(b) prohibits -- says

23  that the acceptance or rejection of a plan may not be

24  solicited.

25       THE COURT:  Right.

1    MR. DeFRANCESCHI:  That's what it says, unless you

2  follow --

3    THE COURT:  Right.

4    MR. DeFRANCESCHI:  -- you know, 11256(a) and (c) and

5  those requirements.

6    Number one, there should also be no dispute that we,

7  in fact, followed and are relying on the solicitation

8  procedures this Court approved consistent with general

9  practice, that we received the votes, and it's those votes of

10  the lock-up noteholders and MCI -- MCI and Motorola that we are

11  counting here.

'12    I think we can lay that to rest.

13    THE COURT:  Right.

14    MR. DeFRANCESCHI:  That happened.  But to say that

15  because there's a specific performance provision in this

16  agreement coupled with the language in the prior paragraph of

17  the agreement somehow makes that the official vote or makes

18  that --

19    THE COURT:  Well --

20    MR. DeFRANCESCHI:  -- makes that the acceptance of

21  the plan.

22    THE COURT:  No, it doesn't.  Does it constitute the

23  solicitation of a vote that's prohibited by 1125?  The U.S.

24  Trustee is not saying this is the vote.  It's saying this was a

25  solicitation for a vote on the plan.

1        MR. DeFRANCESCHI:  It doesn't say a vote, with all

2  due respect, narrowly reading the express language --

3        THE COURT:  Accepting or rejecting.

4        MR. DeFRANCESCHI:  -- it says -- well, I --

5        THE COURT:  How is that different?

6        MR. DeFRANCESCHI:  Your Honor, I take exception to

7  that, because the Third Circuit has stated very clearly we

8  should read this section narrowly, and to say that the

9  acceptance or rejection of a plan is the same as a vote, I

10 think -- I think that misses the mark.

11       What I think it is saying here is this -- in this

12 case we did not solicit the acceptance of a plan.  What we said

13 in this case is --

14       THE COURT:  What did you solicit in the lock-up

15 agreement then?

16       MR. DeFRANCESCHI:  It's very -- we should go through

17 -- to the terms of the lock-up agreement.  I think it's

18 instructive if we do that rather than dance around the issue as

19 I know the United States Trustee would have us do.  We've

20 attached copies of the lock-up agreements to the affidavit.

21       THE COURT:  I have it.

22       MR. DeFRANCESCHI:  And I think that there are

23 significant provisions in here that make very clear -- and I

24 should add, Your Honor -- I know I'm stepping away from the

25 podium, but I think it's picking it up.

1          I should add, Your Honor, and this is another

2   predicate piece of information I think is very important here,

3   these agreements were negotiated by parties who -- and I think

4   this is very important -- very sophisticated business people,

5   very sophisticated legal and financial advisers.

6          What that means, of necessity, Your Honor, is that

7   when they draft an agreement like this they mean what they're

8   saying.  It's not a situation where we just put these wink and

9   a not provisions in this agreement.  This is a situation where

10  the parties, sophisticated parties at arm's length with the

11  life of this company on the line, negotiated an agreement.

'12        So, what does the agreement say?  We provide

13  provisions of the agreement, we outline them in our -- in our

14  papers.

15         We outline them in our papers, and I think among the

16  provisions you need to consider -- and if the Court will

17  indulge me, I do -- this is very important and I do want to

18  rely on my outline for the hearing.  I usually don't do that,

19  but it's very important.  I want to make the points.

20         First, Your Honor, the agreement to vote all of the

21  claims in favor of the plan, which is in Paragraph 3, were

22  expressly conditions on, again, the terms of the plan and the

23  restructuring documents.

24         By the way, Your Honor, so the Court's aware, these

25  are the restructuring documents.

1        THE COURT:  Um-hum.

2        MR. DeFRANCESCHI:  These were not done.  These are

3    the restructuring documents.  Keep that in mind as I continue.

4        Expressly conditioned on the terms of the plan and

5    the restructuring documents being consistent with and no less

6    favorable to the lock-up party than the terms set forth in the

7    term sheet and the terms and conditions of the plan in all

8    respects not specifically addressed by the term sheet are

9    acceptable to each lock-up party in its sole and exclusive

10    discretion.

11        When the parties drafted that they meant what the

12    said, in their sole and exclusive discretion.  There's no

13    evidence nor could there be, 'cause it's not the case, that the

14    term sheet comprised all the terms in this plan that we're

15    seeking confirmation of today.  Out number one.

16        Number two, Your Honor.  The lock-up agreements

17    expressly provided that nothing in the lock-up agreements, and

18    this is in Paragraph 5 or Section 5, shall require the debtors,

19    my client, to breach its fiduciary duties as a Chapter 11

20    debtor in possession and exercise -- and any exercise of such

21    fiduciary duties by the debtor shall not be deemed to

22    constitute a breach of the terms of this agreement.

23        By its own terms -- this is important, Your Honor --

24    and the agreement of these parties the debtors did not have to

25    prepare, finalize, propose, solicit, seek confirmation of or

1  even go effective on a plan if to do so would violate my

2  client's fiduciary duties.

3         Certainly this is consistent with our duties as a

4  Chapter 11 debtor in possession.

5         It bears mentioning on this point, Your Honor, that

6  the debtors considered numerous other financial restructuring

7  possibilities.  We've outlined them before for the Court, and

8  they're in our affidavits, but suffice it to say we determined

9  in the exercise of those duties that this plan that we're

10  seeking confirmation of is the best plan for these estates.

11         Moreover, Your Honor, the creditors committee

'12  represented by legal counsel and financial advisers spent

13  considerable time and effort trying to come up with another

14  plan.  They couldn't do that, either, Your Honor.

15         This is the plan.

16         Next point, Your Honor.  The agreement expressly

17  stated that the lock-up parties could, quote, "terminate the

18  obligations under the agreement and rescind any vote on the

19  plan which vote shall be null and void and have no further

20  force and effect upon the occurrence of certain events,

21  including --" and I'll get into those in a minute, Your Honor,

22  but the very fact that it said, "if the agreement isn't

23  followed they can rescind any vote on the plan, it'll be null

24  and void," suggests that there was no vote on this plan at the

25  time the agreement was entered into.

1       That's -- how can they get out of the agreement?
2  Okay.

3       If the restructuring documents, Your Honor -- that's
4  these documents right here, several hundred pages of
5  sophisticated contractual and legal documents.  If they are
6  inconsistent with the term sheet, unless those documents are
7  consented to, something in the future that yet has to happen,
8  lock-up parties can terminate.

9       If the debtors breach the agreement, lock-up parties
10  can terminate.

11       If other parties to the lock-up -- other lock-up
12  agreements breach their agreements or have not entered into
13  lock-up agreements, can terminate.

14       Significantly -- and I don't think this issue has
15  come up before this Court to my knowledge, the provision also
16  allowed for termination -- this is 8H -- if there was any
17  material adverse change with respect to the debtor, its assets,
18  its liabilities or operations, the Chapter 11 proceedings or
19  the ability of the debtor to confirm the plan on a consensual
20  basis.

21       For the United States Trustee's Office to suggest
22  that that isn't a huge potential out for these parties -- if,
23  for example, the disclosure statement wasn't to their liking,
24  if the plan wasn't to their liking, if the debtor's business
25  changed to some significant degree such that the mac (phonetic)

1 clause came into effect, I don't know what is.  But there's

2 more.

3          THE COURT:  Well, it doesn't say if it's not to their

4 liking.

5          MR. DeFRANCESCHI:  Well, Your Honor, with --

6          THE COURT:  If it's consistent with the term sheet --

7          MR. DeFRANCESCHI:  They're -- I've already given you

8 --

9          THE COURT:  -- they're bound.

10          MR. DeFRANCESCHI:  -- I've already given you the

11 provision.  It says that they have sole and exclusive

12 discretion with respect to any provision of the plan that --

13 and that's in Paragraph --

14          THE COURT:  I see.  I see it.

15          MR. DeFRANCESCHI:  Yeah, okay.

16          Each of these provisions demonstrate that the lock-u

17 parties had not definitively accepted a plan.  Rather there was

18 an agreement to vote in favor of a plan in the future, subject

19 to these substantial conditions.

20          But there is more in the agreement that compels this

21 reading, Your Honor.  The lock-ups provide, quote, "The

22 agreement is not and shall not be deemed to be a solicitation

23 for consents to a plan.  The acceptances of the lock-up party

24 --" I paraphrased -- will not be solicited until such parties

25 have received a disclosure statement and related ballot as

1  approved by the Bankruptcy Court.  It's Paragraph 7.

2          The United States Trustee, Your Honor, would ask the

3  Court to ignore the provision arguing that the U.S. Trustee

4  knows better what the parties actually agreed to, suggesting

5  that this is somehow a sort of wink and a nod provision.

6          THE COURT:  Well, you can't call something --

7          MR. DeFRANCESCHI:  Your Honor, this --

8          THE COURT:  -- black if it's white.

9          MR. DeFRANCESCHI:  We're not doing that, Your Honor.

10 There is a reason for this provision.

11         THE COURT:  Okay.

12         MR. DeFRANCESCHI:  There is a very significant reason

13 why the sophisticated parties to this agreement wanted that in

14 there.

15         THE COURT:  Other than to avoid Section 1125.

16         MR. DeFRANCESCHI:  Well, Your Honor, phrasing it that

17 way suggests that there was something untoward here, and I

18 suggest there's not.

19         But here's the reason.  That provision is in there to

20 protect against the very thing, the very thing that the debtors

21 tried to do with the bondholders in the <u>Pioneer</u> case.

22 Remember, in the <u>Pioneer</u> case there was a pre-petition exchange

23 offer, and as part of the exchange offer there was a box where

24 they could check off that said if the exchange doesn't have

25 unanimous consent, then you're -- pre-petition, if there wasn't

1 unanimous consent, then you will consent to vote in favor of a

2 plan on substantially similar terms of the exchange offer, a

3 copy of which was provided.

4       The debtors tried to use that pre-petition consent --

5       THE COURT:   Um-hum.

6       MR. DeFRANCESCHI:   -- from some seventy-some odd

7 percent of the bondholders post petition as a vote on a plan to

8 satisfy the various confirmation requirements.   The Court said

9 no.   No.

10       What the parties in this case did was, is they

11 precluded the debtors from trying to do that.   And in fact the

'12 debtors have not done that.   We have not -- we have not taken

13 the lock-up agreements and said to Your Honor, "This agreement

14 right here?   This is the vote."   And the parties contractually

15 protected themselves with that provision.   It's not a wink and

16 a nod provision.   It's an important provision.   It's there for

17 a reason.

18       Your Honor, on this point we think that in light of

19 the facts of this case, which may or may not be the same.   The

20 United States Trustee makes suggestions that in some of these

21 cases there may or may not have been a specific performance

22 provision.   There may or may not have been these other

23 provisions, the mac clause, the clause -- the provision that

24 the parties bargained for that said if the plan is different

25 from the expressed terms of the term sheet they have their

1 absolute and exclusive discretion to get out of the deal.

2 Under the facts of this case --

3      THE COURT:  Now, you're going too far in your

4 absolute discretion to get out of the deal.  It's only if --

5      MR. DeFRANCESCHI:  As I said, if the plan has

6 provisions beyond what's in the terms sheet, which it most

7 certainly does, then the language -- I'll read it for Your

8 Honor again.

9      It says they have absolute and exclusive discretion.

10      THE COURT:  No, it says if they're inconsistent.

11      MR. DeFRANCESCHI:  Exactly.  Well --

12      THE COURT:  Not beyond.  I mea, the fact that there's

13 --

14      MR. DeFRANCESCHI:  -- presumably --

15      THE COURT:  The fact that the plan contains a

16 definitional section which is not contained in the term sheet,

17 I would submit, you would not concede means that the parties to

18 the lock-up agreement are not bound to vote in favor of the

19 plan.

20      MR. DeFRANCESCHI:  Your Honor, we're not here to

21 decide that issue, because no one has suggested one way or the

22 other on that.

23      The provision says what it says.

24      THE COURT:  Um-hum.

25      MR. DeFRANCESCHI:  The argument here, remember, is

36

1  that we -- that there was an acceptance of plan that was

2  solicited by these documents.

3          THE COURT:  Yes.

4          MR. DeFRANCESCHI:  That's what the code requires in

5  order for that section to apply.

6          THE COURT:  Um-hum.

7          MR. DeFRANCESCHI:  There -- these provisions make

8  very clear, and Your Honor, we must look at the entire

9  agreement.  These provisions make very clear that there was not

10 an acceptance of a plan that was solicited.  There couldn't

11 have been.

12         There couldn't have been.  There were too many outs

13 in this agreement, and these -- again, Your Honor, I have to

14 emphasize.

15         MR. KRELLER:  Your Honor, Thomas Kreller of Millbank,

16 Tweed, Hadley and McCoy (phonetic) on behalf of the Ad Hoc

17 Bondholder group.  I apologize for interrupting Mr.

18 DeFranceschi, and I'll cede the podium back to him.

19         Just on this point, Your Honor, I would like to

20 advise you that from the bondholder perspective, and we are the

21 counsel who represented the bondholder group in negotiating the

22 plan support agreement, in negotiating the term sheet that

23 underlied that plan support agreement and in negotiating

24 ultimately these restructuring documents and the plan itself,

25 the bondholder group believed in fact that by virtue of the

1  lock-up agreement and the various provisions that gave us

2  discretion, we believed and we asserted throughout that we had

3  very broad discretion to terminate our obligations under the

4  plan support agreement.

5       We believe that we agreed to proceed towards an

6  attempt to consummation of the -- to consummate the transaction

7  that was outlined in the term sheet, but it was always subject

8  to our discretion and our approval of all of the various

9  restructuring documents.

10      Your Honor, I can also tell you that on a number of

11  occasions over the course of the case, and in the context of

12  negotiating some of the restructuring documents, some of the

13  terms of the plan and some issues that came up during the

14  course of the approval of the disclosure statement and the

15  solicitation of votes, we advised the company that we believed

16  we had the right to terminate the plan support agreements

17  because of things that had happened or because of drafts of

18  documents that were circulated, and that if those issues

19  weren't cleared up in a way satisfactory to us that in fact we

20  would very seriously consider terminating the plan support

21  agreements.

22      Your Honor, I -- just one example.  We insisted with

23  the company that there be additional disclosure when the

24  company filed its 10Q.  We insisted that that go out to

25  creditors as part of the voting process, and the company

1   concurred with that, and we did so.  But had that not happened,

2   I guarantee you that the bondholders would have seriously

3   considered terminating the support agreement.

4          And I can tell you, trust me, that if the bondholders

5   didn't want to vote for this -- yes for this plan, they

6   wouldn't have voted because they thought they could be

7   compelled to under the support agreement.  And we would be here

8   having a very different discussion about whether this agreement

9   is enforceable or not.

10          That's not the discussion for today.  We -- no one's

11   attempting to enforce the agreement.  In fact, the agreement's

12   probably lapsed by its terms several weeks ago.  And so, Your

13   Honor, just on that particular point, just so you know the

14   bondholders' perspective, and presumably the bondholders who

15   signed support agreements are the purported victims of this

16   improper solicitation.  I think our opinion is relevant.  We

17   did not believe that we were obligated to vote on any

18   particular plan until this plan came out, under the underlying

19   restructuring documents were done to our satisfaction.

20          And at the time our votes were cast, that's what our

21   votes were cast on, not based on a term sheet or not based on

22   the existence of the plan support agreement, Your Honor.

23          And I'll -- would like some time to address some of

24   our other issues later, but I did want to weigh in on that

25   particular point.

1     MR. DeFRANCESCHI:  Your Honor, apologize for getting

2  a little too animated here, but this is a very important issue.

3     THE COURT:  Um-hum.

4     MR. DeFRANCESCHI:  Very important issue, and I think,

5  putting aside whether I personally, as a member of the Delaware

6  bar, agree with the policy decision made by the United States

7  Trustee, it's irrelevant.

8     What is relevant here though is the facts and

9  circumstances presented to Your Honor today.  And based on

10  those facts and circumstances and the direction from the Third

11  Circuit to narrowly read this section, because we want to

12  encourage negotiations, and the fact that the only document

13  that was attached to the lock-up agreement was the term sheet

14  which admittedly was a pre-petition agreement.  There's no

15  dispute on that.  It was done May 21st.  Compels a decision

16  that there was no acceptance -- or obviously rejection -- but

17  no acceptance of a plan that was solicited here.

18     Your Honor, I could -- I could continue with the rest

19  of my arguments, but I do think that on this point I don't know

20  if Mr. Kreller or the other parties want to weigh in on it.  I

21  do think that this is the threshold issue.  I think it's the

22  significant issue.  I think it's -- I think here, under the

23  facts of this case, it is -- it is the critical issue, it is

24  the turning issue.

25     And I don't know how Your Honor wishes me to proceed.

1          THE COURT:  All right, let me hear from any other

2  party.

3          MR. HARNER:  Good afternoon, Your Honor, Paul Harner

4  of Jones, Day, Reavis and Pogue in Chicago on behalf of Nextel

5  Communications.

6          We field a joinder in the debtor's objection, and

7  obviously we join in the arguments that Mr. DeFranceschi's made

8  this afternoon, but it strikes me that there's a very important

9  distinction here that has not yet been drawn, and that is that

10  Section 1125(b) speaks to the improper post petition

11  solicitation of acceptances of a plan.

12          Your Honor, I believe, focused on that issue

13  immediately by asking a question during Mr. McMahon's argument,

14  and that was, do you now concede that my client, Nextel

15  Communications, Inc., in fact signed its lock-up agreement

16  prior to the petition date, and he agreed that we had signed

17  the agreement at that time, concededly only an hour before, but

18  during the pre-petition period.

19          I think what that also suggests is that we would not

20  even be having this discussion if these agreements had all been

21  signed, say an hour before the petition date, or a minute

22  before the petitions were filed in this court, much less a day

23  or a week or a month.

24          What that suggests is that the important distinction

25  here is whether or not the solicitation is this document

1  itself.  If there was a solicitation here, and there may very

2  well have been, it was a solicitation to agree, as the parties

3  ultimately did in these documents, as a contractual matter to

4  support a plan under certain circumstances.  And Mr.

5  DeFranceschi's reviewed for you at great length what the

6  exceptions to those circumstances were, what the parties outs

7  were, and as Mr. Kreller just pointed out, these agreements

8  have now expired by their terms, pursuant to a temporal

9  termination clause.

10         But what's relevant about all of this is that if

11  there was a solicitation, it was only for that contractual

12  agreement, and that solicitation by definition must have

13  occurred during the pre-petition period, whether these

14  agreements were signed or as is more technically correct, the

15  signatures were released from escrow a day, a business day or

16  two business days subsequent to the filing of the petition.

17         There was months of negotiations that occurred prior

18  to the petition date, active, good faith, arm's length,

19  extensive, sometimes vigorous and contentious negotiations

20  between highly sophisticated parties that led to this

21  agreement.

22         This agreement to support a certain plan under

23  certain contractual circumstances subject to certain outs had

24  been reached before the petition was filed here.  And the fact

25  that the signatures were executed or released from escrow

1  subsequent to the petition date is irrelevant.   What Section

2  1125(b) speaks to is the improper post petition solicitation of

3  acceptances of a plan.

4          This document, these documents, these lock-up

5  agreements, are not themselves the solicitation activity that's

6  at issue here.   The solicitation activity were those

7  discussions that occurred beforehand.   Now, that leads me --

8          THE COURT:   Well, but you can't say the first time I

9  talked to you about the plan was the solicitation but the last

10  time I did, and you actually signed something that bound you to

11  the plan was not a solicitation.

12          MR. HARNER:   I don't disagree, Your Honor, and it

13  requires a case by case determination, but that leads to a

14  suggestion Nextel would posit with respect to how in a

15  principled way the Court can resolve this, exercising its own

16  discretion to examine these cases on an individual case-

17  specific basis.

18          THE COURT:   Um-hum.

19          MR. HARNER:   We're on very dangerous ground here, and

20  I'm not going to presume to question the U.S. Trustee's policy

21  judgment with respect to these matters, either, but it's become

22  abundantly clear that the United States Trustee has generally

23  become hostile to lock-up agreements.

24          THE COURT:   Post petition lock-up agreements.

25          MR. HARNER:   Post petition lock-up agreements, that's

43

1  correct --

2            THE COURT:  Uh-huh.

3            MR. HARNER:  -- and that obviously was an issue in

4  this case early on, when we talked about the proper composition

5  of the unsecured creditors committee.

6            But the fact of the matter is that these agreements

7  are a very, very common practice, and they save people a lot of

8  time and a lot of money, and the bankruptcy process that we've

9  all gotten used to -- by the way, Mr. McMahon kept talking

10  about pre-package cases.  This isn't a pre-packaged plan of

11  reorganization.  It was never intended to be.

12            What the parties were always trying to achieve here

13  was a pre-negotiated plan of reorganization.

14            THE COURT:  Um-hum.

15            MR. HARNER:  What they tried to do is what prudent

16  business people try to do in exactly these circumstances, which

17  is stay out of bankruptcy court as long as possible so that

18  both the system and the parties' resources are not burdened

19  until they can reach an agreement, if that's possible.  That's

20  exactly what happened here.

21            If we adopt the U.S. Trustee's approach we're going

22  to discourage that kind of approach in future cases.  And it

23  seems to me the way to reconcile that or avoid that result --

24            THE COURT:  How are we going to -- how are we going

25  to discourage that?  We're going to say pre-petition you can do

1  what you want.

2        MR. HARNER:  Well, that --

3        THE COURT:  But post petition you do have to follow

4  the rules.

5        MR. HARNER:  And it strikes me that it's not at all

6  inconsistent with the rules if a signature gets released

7  afterwards, but the agreement's made -- and more importantly,

8  and this is the point I was making earlier, Your Honor, the

9  solicitation, to the extent that you characterize any of these

10  activities as solicitation, is done pre-petition.

11        So, here's the principled way to reconcile the

12  problem.  The Court, on a case by case basis, in this or any

13  other similar or dissimilar case, can make a determination

14  whether on the facts -- and you have those facts before you by

15  affidavit and otherwise -- there were, in fact, solicitation

16  activities occurring post petition or whether or not, as Mr.

17  Gilker's affidavit points out, what was going on here was post

18  petition ministerial activities.

19        THE COURT:  Um-hum.

20        MR. HARNER:  The solicitation activities here you

21  absolutely, in our view, have the discretion to find occurred,

22  to the extent that any did, in the pre petition period here.

23  If there's ever a case for the Court to exercise that

24  discretion and not designate votes based on this highly

25  technical reading of what occurred here, this is the one.  We

1  urge you to exercise that discretion and to adopt a rule that

2  allows you to make that determination on a case by cases basis

3  of when solicitation activities occurred for selection --

4  Section 1125(b) purposes in this case.

5          Thank you, Your Honor.

6          THE COURT:  Thank you.

7          MR. KRELLER:  Your Honor, Thomas Kreller again on

8  behalf of the Ad Hoc Bondholder group.  I'll be brief.  I'll

9  reiterate Mr. Harner's statements regarding the timing of the

10  execution of the lock-up agreements, Your Honor.

11          The term sheet was in place well before the filing of

12  the bankruptcy case.  The lock-up agreements were substantially

13  final, and in fact signed by NCI prior to the filing of the

14  case.

15          What occurred in the post petition period were minor

16  revisions to the plan support agreement to conform the forms of

17  agreement to reflect the fact that we had three parties with

18  very different interests who were attempting to move forward on

19  a consensual basis, I think a very productive effort on their

20  part.

21          There were no activities with respect to the

22  solicitation of the terms of the term sheet, which is the only

23  thing at this point that could be viewed as the plan, since the

24  plan didn't exist at the time of the lock-up agreements.

25          The term sheet simply did not move during the time

1  period that -- to the extent anyone's concerned about a time

2  period.

3        There are a couple of other basic points, basic

4  facts.  I -- what the U.S. Trustee appears to be concerned

5  about is the ability of a debtor to compel a creditor to accept

6  a plan over that creditor's subsequent objection.

7        I missed --

8        THE COURT:  No, not necessarily, and we're missing

9  the insidious effect of having signed a lock-up agreement,

10  whether the creditor felt compelled to vote in favor of the

11  plan to avoid litigation over whether or not, you know, this

12  out would be applicable or not.

13        I mean, I don't think I have to decide this issue.

14  Only in the event that your clients feel you were misled or

15  want to get out of the lock-up agreement.

16        MR. KRELLER:  I'm not suggesting that you do, Your

17  Honor.  Number one, I am missing any insidious effect of

18  anything here, quite frankly.  But I -- what I -- what this

19  goes to, Your Honor, is the policy behind what's being asserted

20  here, and there -- you can't make the -- if a debtor was able

21  to enforce a lock- up agreement pursuant to a specific

22  performance clause, it would be you, Your Honor, who would have

23  to enforce that lock-up and order specific performance.

24        THE COURT:  Um-hum.

25        MR. KRELLER:  Under what circumstances would you

1  compel specific performance of a lock-up agreement if you found

2  that lock-up agreement, which you would have to in order to

3  find specific performance, if you found that lock-up agreement

4  was tantamount to an improper solicitation?

5       If the creditor was bound to vote for the plan under

6  the terms of the lock-up --

7       THE COURT:  Um-hum.

8       MR. KRELLER:  -- and you were put in a position of

9  being asked to enforce that lock-up -- if there was an improper

10  solicitation you simply wouldn't order specific performance on

11  that lock-up agreement, would you?

12       THE COURT:  Course not.  But I don't know, again,

13  what the effect of the lock-up agreement is where your clients

14  have not asked me to let them out of it.

15       The fact that it was signed had some effect.

16       MR. KRELLER:  Your Honor, the fact that it --

17       THE COURT:  Or it would not have been signed or the

18  debtor would not have asked you to sign it.

19       MR. KRELLER:  The effect of signing the lock-up

20  agreement was that we knew, NCI knew, Motorola knew, and the

21  debtor knew that we were all proceeding forward --

22       THE COURT:  Um-hum.

23       MR. KRELLER:  -- in lockstep manner on a consensual

24  basis.  That was the effect of the signing.  We've been through

25  this, and I won't belabor it, we had plenty of discretion.  Did

1  we have absolute discretion to terminate these agreements?  I

2  don't say we had absolute discretion.  We had plenty of

3  discretion.    In a situation where we had plenty of discretion,

4  what does specific performance mean?. How vulnerable are we to

5  a specific performance argument?  I don't think very.

6         And again, Your Honor, to get back to it, if the fear

7  is the creditors are somehow disadvantaged here or taken

8  advantage of by a debtor, whether through threats of litigation

9  and a creditor believing it was going to somehow avoid

10 litigation and the associated costs, whatever the fear is, you

11 wouldn't find yourself in a situation where you were ordering

12 specific performance under a lock-up agreement like this,

13 unless you were prepared to order specific performance and then

14 turn around and designate the vote and have the whole thing be

15 moot.

16         THE COURT:  Well, that may, in fact, be exactly what

17 the result is.

18         MR. KRELLER:  Well, Your Honor --

19         THE COURT:  The -- 1125 doesn't deal with whether or

20 not, you know, a contract between you and the debtor to vote in

21 favor of a plan is enforceable or not.

22         MR. KRELLER:  I agree, Your Honor.

23         THE COURT:  The may -- you may be subject to other

24 damages by the debtor for your failure to comply with the

25 agreement.

1      MR. KRELLER:  That's -- that may well be, Your Honor.

2  And I agree, but if the fear behind this is somehow the

3  compulsion of creditors through a solicitation on less than

4  adequate information, which is certainly not the case here, and

5  I'm sure Mr. DeFranceschi will take you through that, and I'm

6  happy to as well.  That simply is not the case and could almost

7  never be the case, quite frankly, under these circumstances,

8  Your Honor.

9      And I guess the last point, Your Honor, that I would

10 raise is the -- even if you conclude that there was an improper

11 solicitation, and even if you conclude that somehow my clients

12 were bound to this agreement and voted for the plan as a result

13 of signing this lock-up agreement, which I don't concede, and I

14 wouldn't believe would be the appropriate ruling, the question

15 then turns to what is the appropriate remedy?

16     There's been no wrongdoing here, Your Honor.  There's

17 been the intervention of a holiday weekend at the very tail end

18 of what was a very difficult and hard-fought process.  And a

19 decision by a debtor that it, as a business matter, wanted to

20 have a long holiday weekend in Latin America to approach people

21 and deal with vendor issues and other matters critical to the

22 business, and that the filing of the case, knowing that things

23 had progressed to term sheet stage, and in fact to lock-up

24 agreement stage, gave them the comfort that they could make

25 that filing, do what they needed to do on the business side and

1 collect signatures later.

2       There's no wrongdoing here, Your Honor.  There's no

3 evidence of that, nor do I know that there's any suggestion,

4 quite frankly, and nothing in the record would support that.

5       And the question then turns to remedy.  And

6 designation, Your Honor, is a rather dramatic remedy here.  An

7 appropriate remedy in the face of such a ruling might be to

8 allow creditors who were locked up to the agreements the

9 opportunity to change their votes, if they so decided to do.

10       We -- had we thought that was appropriate, my clients

11 would have already done so.  And I can tell you that my clients

12 do not wish to change their votes, and at no point in this

13 process had any intention of changing their votes once cast and

14 once these documents were done.

15       And so, Your Honor, I think -- even if we get to the

16 point where you've concluded on these other issues and you're

17 looking to the designation as a remedy, I would suggest that

18 that remedy is inappropriate here, particularly under these

19 facts and circumstances, and that, you know, to the extent

20 there is a remedy needed, it would be to reach out to the

21 creditors who were parties to these support agreements, and I

22 believe you probably have at least their counsel and perhaps

23 representatives of all of them here and available to you at

24 some level, or we could make that happen.

25       To the extent you would like to implement that

1  remedy, that would seem to me to be much more appropriate than

2  designation as a result of some of these other issues that

3  we've raised.

4          THE COURT:  Well, the debtor has asserted that

5  designation makes no difference, confirmation.

6          MR. KRELLER:  Your Honor, I believe the debtor has

7  submitted, and the ad hoc group would concur, that if you were

8  to designate the votes, the requisite acceptances by far would

9  still have come in under Class 6.

10          And if by meaning it has no effect on confirmation,

11  you mean the plan is still confirmable and should be confirmed,

12  I would agree with that.  Whether it has no effect, Your Honor,

13  I -- as professionals who deal in these kinds of cases every

14  day, Your Honor, these lock-up agreements are very important to

15  the process and --

16          THE COURT:  Yeah, but not post petition.

17          MR. KRELLER:  Your Honor, the activities that -- Your

18  Honor, we -- I guess we -- I won't go down that path, because

19  we don't need to debate how one gets to a consensual plan

20  without talking to people about what it is they propose to do.

21          THE COURT:  There's nothing wrong with the talking,

22  and Century Glove said that, but there's a big difference

23  between talking and signing a contract such a lock-up

24  agreement.

25          MR. KRELLER:  Well, Your Honor, I would just -- I

52

1   would submit then that the signing of a lock-up with a specific

2   performance clause which seems to be creating some problems, a

3   specific performance clause of questionable enforceability, I

4   think, is well within the bounds.  But nonetheless, Your Honor,

5   you have my points.  And I'll rest.

6          THE COURT:  I do.

7          MR. DeFRANCESCHI:  Your Honor, I too might concede

8   that in certain situations, in lock-up agreements, unlike the

9   one before Your Honor, there may be something wrong with that.

10  I will -- I would not concede that there was anything improper

11  here with this lock-up agreement.

12         Your Honor had raised a couple questions about

13  whether designation matters here or not.  And I believe we

14  would have the evidence to show that Class 6 would carry even

15  without these votes, and it would be an overwhelming support

16  for the plan.

17         But beyond that, Classes 2 and 3 had one party in

18  each class which was Motorola entities.  And the anomaly here,

19  Your Honor, is that they full support the treatment that

20  they're getting under the plan and actually voted in favor of

21  the plan.  If you were to designate and determine that their

22  votes don't count and then come to the conclusion that those

23  two classes have rejected, I would submit that we certainly

24  have the case for a consensual cram-down on those two classes.

25         THE COURT:  Um-hum.

1        MR. DeFRANCESCHI:  I mean, they're here and they

2   consent to the treatment, so, in some respect it doesn't

3   matter, but in another respect, Your Honor, it really matter,

4   because -- and I don't want to go on forever on this point, but

5   the parties that are here today, and word will certainly

6   spread, need to have guidance as to what they can do in

7   connection with agreements.

8        You want to -- if you want to -- this is a lock-up

9   agreement, but it's sort of -- to say that it's a lock-up

10  agreement does not -- does not mean there's anything wrong with

11  that.  I mean, we could have called this the NII agreement.

12  And the fact of the matter is we need to be bound by what it

13  says, because the parties specifically negotiated protections

14  in it to allow them the ability to vote in the future in favor

15  of the plan or not vote in favor of the plan or get out of this

16  agreement if a whole series of complex actions didn't occur.

17        I'm sorry, Your Honor -- okay.  I don't know if Your

18  Honor wants me to go forward with -- I really didn't get into

19  the 1125(b) issue, because it was my view that that

20  solicitation issue doesn't get raised until we make a

21  determination if this document was the acceptance -- was the

22  post petition acceptance of a plan, because the section

23  requires a finding that that is the case, and that's what my

24  arguments have gone to so far.  Others have sort of argued

25  additional points.

1            But if we were to go to whether there was a post

2    petition solicitation of this agreement, assuming it is an

3    acceptance of plan, which as I said we disagree with, we would

4    echo the thoughts that Mr. Harner raised, that there was no

5    post petition solicitation of this document.

6            The solicitation, to the extent there was, which was

7    a solicitation seeking future acceptances of a plan, occurred

8    pre-petition.  That's what the evidence actually says, save one

9    fact, the fact that some of these agreements were dated the

10   29th of May.

11           But other than that, there is no fact that supports a

'12  finding that there was a post petition solicitation, putting

13   aside again whether there was an acceptance of a plan that was

14   solicited and --

15           THE COURT:  Well --

16           MR. DeFRANCESCHI:  -- we spent a long time on that

17   issue, Your Honor.

18           THE COURT:  -- even Mr. Gilker acknowledges that

19   there were discussions post petition and there were changes,

20   and must I not conclude that somebody asked them to sign it?

21           MR. DeFRANCESCHI:  Well, as we said, there --

22           THE COURT:  It was already signed.  Somebody asked

23   them to release the signatures.

24           MR. DeFRANCESCHI:  Yeah, I think that the types of

25   changes, Your Honor, they were referred to as ministerial

1  changes, and the point was argued that they weren't changes

2  that said, you know, "You're going to vote for this plan."

3  They were -- for example, NCI did the first lock-up agreement,

4  and we needed to conform the lock-up agreements to rep -- to

5  reference that, for example, the Motorola entities had three

6  separate lock-up agreements.  They needed to be conformed to

7  provide for those three separate entities.

8          They're all slightly different in who they refer to.

9  The noteholder lock-up agreement provides provisions in it for

10  the ad hock committee and the backstopping noteholders.  Those

11  types of changes certainly -- certainly don't give rise to the

'12  level of a solicitation of an acceptance of a plan.  What those

13  are, those are just basically what we would call conforming

14  changes so that the lock-up agreements -- and again, I just --

15  the agreements were consistent.

16          THE COURT:  Well, the ministerial changes may have

17  been -- the changes may have been ministerial, but --

18          MR. DeFRANCESCHI:  And since the changes were

19  ministerial, and all that counsel was waiting for was final

20  authority to release the signatures --

21          THE COURT:  Can't you see --

22          MR. DeFRANCESCHI:  I'm sorry.

23          THE COURT:  Can't you see the danger in that?  We all

24  work out a pre-petition deal.  The petition's filed, and I

25  don't ask you to hand me the signature page until the minute

1 after bankruptcy.  Then I've just avoided any scrutiny of the

2 lock-up agreement, because I didn't solicit it post petition.

3 So, therefore, it comes in, and you're bound by it, but I don't

4 have to go through really complying with the disclosure

5 statement or any of the 1125 issues.

6        MR. DeFRANCESCHI:  Your Honor, a couple points on

7 that.  I mean, I see where you're going, I think, but it sort

8 of has as a premise that if there was some need to scrutinize

9 these agreements under this section of the code, which I -- my

10 position, based on the language, the express language of the

11 document, it's not an acceptance of a plan.

12        THE COURT:  Well, I disagree with you on that point.

13        MR. DeFRANCESCHI:  Your Honor --

14        THE COURT:  The solicitation of an acceptance.

15        MR. DeFRANCESCHI:  Your Honor has ruled on it.  That

16 -- but the point though in terms of whether there's any need to

17 scrutinize it, certainly Your Honor can always scrutinize this

18 if someone raises the issue, party in interest raises the

19 issue, but it's where should that scrutiny be focused?  Should

20 it be focused on a narrow interpretation of the section that

21 says that there must be a solicita -- that the acceptance or

22 rejection of a plan was solicited post petition?

23        And obviously the answer to that is yes.  And then

24 Your Honor -- what Your Honor has to do is look at these facts

25 and say, because there were ministerial edits made and because

1 the signature pages weren't released, it was a post petition

2 solicitation, despite the fact that there's no evidence that we

3 asked them to do anything other than make those ministerial

4 changes post petition.

5         THE COURT:  And deliver the signatures.

6         MR. DeFRANCESCHI:  I don't know that there was really

7 any evidence to that effect, either.  I mean, the signatures

8 were forthcoming once the ministerial changes were made.  But

9 the other -- so the next step, Your Honor is --

10         THE COURT:  Well, if you didn't think --

11         MR. DeFRANCESCHI:  -- even if --

12         THE COURT:  -- if you didn't think you were going to

13 get the signatures, you wouldn't even have told them what the

14 changes were.

15         MR. DeFRANCESCHI:  We knew the signatures were

16 coming.  That was the point.

17         THE COURT:  Right.

18         MR. DeFRANCESCHI:  They had agreed to do that prior

19 to filing the case.  We knew the signatures were coming.  But

20 what's the next step?  Is the next case when there are no

21 ministerial changes at all, and the agreement --

22         THE COURT:  Right.

23         MR. DeFRANCESCHI:  -- the agreement got caught up in

24 the mail?  Now, all of a sudden that somehow is a solicitation?

25         THE COURT:  Um-hum.

1          MR. DeFRANCESCHI:  I know that case isn't before the

2    Court, but that is going down the very slippery slope that --

3          THE COURT:  That's what I'm saying.

4          MR. DeFRANCESCHI:  That's going down a very slippery

5    slope that the Third Circuit said we shouldn't go down, the way

6    I read Century Glove.  And you know, there's another important

7    point that I think needs to be brought out here.  Because in

8    this case -- this case takes on added significance, because in

9    this case at the end of the day if Your Honor decides to

10   exercise her discretion to designate these entities and not

11   count the votes, we'll still have a sufficient number and

12   amount and claim.  There won't be an appeal here.

13         THE COURT:  Um-hum.

14         MR. DeFRANCESCHI:  And so the state of flux is

15   parties still don't really know what to do in this situation,

16   'cause --

17         THE COURT:  Don't use lock-ups post petition.

18         MR. DeFRANCESCHI:  Well, again --

19         THE COURT:  It's as simple as that.

20         MR. DeFRANCESCHI:  Again --

21         THE COURT:  And if you want a lock-up agreement to be

22   effective, you make darn sure you get the signature before you

23   file the petition.

24         MR. DeFRANCESCHI:  With all due respect, Your Honor,

25   I -- I don't know that that really answers the question,

59

1  because I think that what that is doing is sort of imposing

2  some sort of a -- perhaps it's a policy argument.

3          THE COURT:  There is a policy in the bankruptcy code,

4  and that is contained in 1125.

5          MR. DeFRANCESCHI:  Absolutely.

6          THE COURT:  You don't vote until there's disclosure

7  in accordance with the code and the Court has approved that

8  disclosure.

9          MR. DeFRANCESCHI:  Right.

10         THE COURT:  The Court is not involved in pre-petition

11 negotiations towards a plan.

'12         MR. DeFRANCESCHI:  That's right.

13         THE COURT:  So, I have no jurisdiction over pre-

14 petition lock-up agreements unless you're seeking to have them

15 designated a vote.

16         MR. DeFRANCESCHI:  Which we're not.

17         THE COURT:  So -- but I do have --

18         MR. DeFRANCESCHI:  But --

19         THE COURT:  -- jurisdiction over post petition

20 activities.

21         MR. DeFRANCESCHI:  I think I understand where Your

22 Honor's coming out on this, and --

23         THE COURT:  Well, let me make it clear then.

24         MR. DeFRANCESCHI:  Yeah.

25         THE COURT:  There is no room for a post petition

1  disclosure statement.

2          MR. DeFRANCESCHI:  I'm sorry, Your Honor, a post

3  petition --

4          THE COURT:  Excuse me, post petition lock-up

5  agreement, thank you.  And I think I must designate the votes

6  of these entities who had executed a post -- executed a lock-up

7  agreement which became effective post petition on delivery to

8  the debtors.

9          I think the 1126 isn't even -- other than 1126(e) by

10  which I designate it, the whole concept -- the debtor's not

11  seeking to present these as pre-petition votes that I have to

'12  determine whether they must be counted or not.  This is purely

13  an 1126(e) issue where these votes were solicited contrary to

14  the provisions of the code, because these were obtained before

15  the approval of the disclosure statement under 1125.

16          I think solicitation, while respectfully Century

17  Glove says it cannot be read --

18          MR. DeFRANCESCHI:  Broadly.

19          THE COURT:  -- broadly, I think to find that

20  obtaining a lock-up agreement in this form is not a

21  solicitation of a vote, would mean eviscerating that from the

22  bankruptcy code completely.  Because if this is not soliciting

23  a vote is favor of the debtor's plan, I don't know what is.

24          And although it has conditions to actually signing

25  the ballot, those conditions, in my opinion, are not -- are not

61

1  significant, and I think that rather than have creditors

2  uncertain about whether or not they are bound by such

3  agreements, given post petition action -- activities, I think

4  the better procedure is simply to state that post petition

5  lock-up agreements have no role in a bankruptcy case.

6       I do not -- I disagree with counsel that it will

7  inhibit negotiations for a consensual plan, but I think that

8  the code does contemplate that all parties can continue to

9  negotiate and receive full access to information under the

10 bankruptcy code about the debtor and get to exercise their free

11 will up until the moment they cast that ballot.  And I think

12 this would inhibit that.

13      MR. DeFRANCESCHI:  Your Honor, as a clarification,

14 did Your Honor also rule that with respect to the fact that the

15 debtors are not seeking to count the pre-petition vote of NCI,

16 that essentially following up on what Your Honor said, that

17 removes it from the Court's consideration?

18      THE COURT:  Well, I am only designating the Motorola

19 and the signing noteholders or bondholders, which was, I think,

20 Exhibit C to the Gilker -- Exhibit D to the Gilker affidavit.

21      MR. DeFRANCESCHI:  There were a total of four

22 agreements.  I know which ones you mean, Your Honor.

23      THE COURT:  Yeah, Nextel, which signed its lock-up

24 agreement and delivered it pre-petition.  That lock-up

25 agreement in and of itself does not cause me to designate their

1  vote.

2          MR. DeFRANCESCHI:  So, in terms of a bright line

3  ruling to take from this, if I could, Your Honor, post petition

4  lock-up agreements that are similar to this one are -- and who

5  knows what other types, are just prohibited under 1125(b).

6          THE COURT:  Correct.

7          MR. DeFRANCESCHI:  And with respect to this type of

8  agreement pre-petition, before you file the petition, as long

9  as you're not seeking to rely on that to vote as a vote --

10          THE COURT:  As the vote.  That's a different

11  standard, and you're not -- so I need not --

12          THE COURT:  You're not ruling on that.

13          THE COURT:  -- deal with that standard.

14          MR. DeFRANCESCHI:  Right.

15          MR. DENNY:  Your Honor, Robert Denny from Morris

16  Nichols on behalf of the ad hock bondholders, whose votes have

17  now, I guess, just been designated.

18          The question we have -- ane Mr. Kreller raises on

19  remedy, your concern is that somehow we were coerced into

20  voting by designating.  You're saying that we don't have any

21  voter voice on the vote at all?

22          We just want to understand the implication, 'cause

23  designating means that our vote --

24          THE COURT:  Not for today.

25          MR. DeFRANCESCHI:  Your Honor, to that point I did

1  not under -- I do not understand Your Honor to be passing on

2  any other contractual agreement contained in the lock-up

3  agreement or any obligations that any of the parties may have

4  to follow through with the term sheets or any of the other

5  provisions.  It's just specifically as to the vote; is that

6  correct?

7          THE COURT:  I'm only exercising 1126(e) and

8  designating the votes as not being counted.

9          MR. DeFRANCESCHI:  So that with respect to meeting

10  the two-thirds and one -- more than one-half voting

11  requirements with the class, these do not count.

12          THE COURT:  These do not count.

13          MR. DeFRANCESCHI:  Yes.

14          MR. DENNY:  And on the never you're talking about

15  this specific vote on this plan.  In other words, if there was

16  something to happen three months from now --

17          THE COURT:  I don't know what will happen, 'cause I'm

18  not making any ruling.

19          MR. DeFRANCESCHI:  With that, Your Honor, I suppose

20  the only issue left is what I believe in all the time I've been

21  practicing -- I don't know that anyone has ever sought

22  sanctions against me for activities like this.  This motion was

23  filed as a motion for sanctions by the United States Trustee.

24  I do not -- and he specifically mentions that money damages may

25  be appropriate here.  I just do not see that they've made any