# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) Case No. 14-10979 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: D.I. 5248** |

**OBJECTION OF THE EFH OFFICIAL COMMITTEE TO THE MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, TO AUTHORIZE THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE PLAN SUPPORT AGREEMENT**

---

[1] The last four digits of Energy Future Holdings Corp.'s taxpayer identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## TABLE OF CONTENTS

Preliminary Statement..................................................................................................... 1

Relevant Background ...................................................................................................... 5

Objection ....................................................................................................................... 13

   I.   The PSA Grants Property of the Estates of the Oncor Debtors to the T-Side Junior
       Creditors and Must Be Approved under Section 363(b) of the Bankruptcy Code. .......... 13

   II.   The Debtors Have Failed to Satisfy Their Burden to Demonstrate that Entry into
       the PSA Should Be Approved under Section 363 ......................................................... 15

      A.   The Debtors Have Not Demonstrated That a Sound Business Purpose Exists
          for the Entry Into the PSA. ........................................................................................ 15

      B.   The Debtors Have Not Demonstrated That They Provided Adequate and
          Reasonable Notice of Entry into the PSA. ................................................................ 18

   III.  The PSA and Order Include a Litany of Inappropriate Provisions. ................................ 20

      A.   The Proposed Order Cannot Make Findings That Will Be Litigated at
          the Confirmation Hearing........................................................................................... 20

      B.   Insider Releases and Compensation Arrangements Cannot Be Required
          Terms for Every Alternative Restructuring. ............................................................... 22

      C.   Potentially Anti-Competitive Deal Protection Should Not Be Approved
          Before Confirmation................................................................................................... 24

      D.   Provisions of the PSA *De Facto* Implementing the Settlement Agreement
          Should Not Be Effective Until the Settlement Agreement Is Approved...................... 25

      E.   Potentially Harmful Preparations for the Restructuring Transactions
          Should Not Begin Prior to Confirmation and Receipt of a Purchase Deposit. ............ 25

      F.   The Order Cannot Approve Provisions of the PSA That the Court
          Does Not Have the Authority to Approve.................................................................... 27

      G.   Drafting Errors and Clarifications. ............................................................................ 28

Reservation of Rights.................................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*In re Decora Indus., Inc.*,
  No. 00-4459 JJF, 2002 WL 32332749 (D. Del. May 20, 2002) ............................................ 15

*In re Delaware & Hudson Ry. Co.*,
  124 B.R. 169 (D. Del.1991) .................................................................................................... 15, 18

*In re Exaeris, Inc.*,
  380 B.R. 741 (Bankr. D. Del. 2008) ...................................................................................... 15

*In re Montgomery Ward Holding Corp.*,
  242 B.R. 147 (D. Del. 1999) .................................................................................................. 15

*In re Washington Mut., Inc.*,
  442 B.R. 314 (Bankr. D. Del. 2011) ...................................................................................... 22

*In re Waterfront Cos., Inc.*,
  56 B.R. 31 (Bankr. D. Minn. 1985) ........................................................................................ 14

*In re Zenith Electronics Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) ...................................................................................... 22, 23

## Statutes

11 U.S.C. § 363 .......................................................................................................... passim

11 U.S.C. § 365 ................................................................................................................ 23

11 U.S.C. § 503 ................................................................................................................ 23

11 U.S.C. § 1121 .............................................................................................................. 27

11 U.S.C. § 1129 .............................................................................................................. 23

Fed. R. Bankr. P. 2002 ...................................................................................................... 18

Fed. R. Bankr. P. 9019 ...................................................................................................... 2

Fed. R. Evid. 408 .............................................................................................................. 27

Securities Exchange Act of 1934 § 12 ............................................................................ 27

## Other Authorities

Fischer Black & Myron Scholes, *The Pricing of Options and Corporate Liabilities*,
  81 J. Pol. Econ. 637 (1973) .................................................................................................. 14

The official committee of unsecured creditors (the "**EFH Committee**") of Energy Future Holdings Corporation ("**EFH**"), Energy Future Intermediate Holding Company LLC ("**EFIH**"), EFIH Finance Inc., and EECI, Inc. ("**EECI**") hereby submits this objection (this "**Objection**") to the motion (the "**PSA Motion**") of EFH and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") for an order approving and authorizing the Debtors to enter into and perform under the Plan Support Agreement attached as Exhibit 1 to Exhibit A to the PSA Motion [D.I. 5248] (the "**PSA**")[1] and respectfully represents as follows:

## Preliminary Statement

1.      The manner in which conflicts of interest have been addressed by the Debtors in these cases renders further pursuit of the transactions contemplated by the PSA pointless.  Rather than run a restructuring process designed to maximize the value of the Debtors' estates, the conflicted officers, directors and professionals for the Debtors have squandered their exclusivity in blind pursuit of a single objective:  prevent litigation by an out-of-the-money group of unsecured creditors (the "**T-Side Junior Creditors**") of Texas Competitive Electric Holdings Company LLC ("**TCEH**") at any cost.  Why?  First, because that litigation was aimed not only at the Debtors, but also at non-Debtor insiders with the power to hire and fire and control these cases.  Second, because the Debtors failed to develop any viable schedule for resolving the merits of this litigation prior to the expiration of their exclusivity, and now have no other means to protect insiders against the risk of a disorganized case.

2.      Unwilling to actually litigate with the T-Side Junior Creditors, the Debtors have decided to pay whatever it takes to get them on their side of the courtroom.  Of course,

---

[1]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the PSA Motion.

TCEH has nothing to give its out-of-the-money creditors, and if the EFH equity owners offered anything it would open Pandora's box.  So, like Willy Sutton, the Debtors are going where the money is:  EFH and EFIH (the "**Oncor Debtors**").  The Debtors propose to cross over what were supposed to be inviolable credit silos and take what they need to pay the T-side Junior Creditors from the Oncor Debtors.

3.     The pursuit of a plausibly deniable means to have the Oncor Debtors pay for general releases from the T-Side Junior Creditors has occupied the Debtors for months.  In April, when valuations of Oncor Electric Delivery Holdings Company LLC ("**Oncor**") were more rosy, the Debtors' plan was to jam through a lopsided inter-silo settlement on terms grossly unfair to the Oncor Debtors and then defend a Rule 9019 challenge by the T-side Junior Creditors.  The terms of this settlement had to be truly lopsided in TCEH's favor, because the same settlement, or its associated plan, released non-Debtor insiders against whom TCEH had claims.

4.     However, the plan backfired.  The T-Side Junior Creditors learned the potential value of converting Oncor into a real estate investment trust (the "**REIT Conversion**").  And the inter-silo settlement was no longer lopsided enough to buy peace, especially because the flawed inclusion of insiders in what should have been a bilateral, inter-Debtor negotiation made that settlement extra-difficult to defend.  Instead, the T-Side Junior Creditors had a new ask:  an option to purchase Oncor outright.  Constrained by the unwillingness of their insiders to litigate, the Debtors agreed to the terms the T-Side Junior Creditors asked for so long as the T-Side Junior Creditors released their litigation claims.  The result is the PSA and the transactions it contemplates: the Debtors' Rube Goldberg solution to a settlement challenge by out-of-the-money creditors.

-2-

5.      The Debtors assuredly hoped that the EFH Committee and the E-Side Creditors[2] (who at EFH face dilution by case expenses) would be pressured to come on board. However, the lack of meaningful involvement by E-Side Creditors—and *any* involvement by the EFH Committee—led to a new mistake.  The PSA is a disaster for the Oncor Debtors in ways that the Debtors themselves did not appear to understand (in part because they failed to consult with E-Side Creditors when the PSA was being designed).  At its very worst, the inter-silo settlement at least permitted a competitive process to maximize the value of the estates of the Oncor Debtors.  The E-Side Creditors benefitted from that competitive process.  Since the inter-silo settlement required Court approval, the EFH Committee knew that if it was successful in defeating the settlement, the proceeds of that competitive process would be allocated to E-Side Creditors appropriately.  First sell, then allocate.  If there were litigation claims by TCEH against EFH, EFH could defend those on their merits (and pursue EFH's own very valuable claims against TCEH), or the claims could be resolved in a truly fair settlement that involved the statutory committees of both silos.  In any event, the process would be fair, even if it risked some litigation.  However, the cancellation of the competitive process in favor of the T-Side Junior Creditors causes more insidious harm.  If there is no competitive auction process, there is no remedy the Court will be able to craft later to protect the E-Side Creditors.  Starting again from scratch in 2016 will mean great delay and expense, and the forfeiture of current market opportunities for selling the highly volatile equity of Oncor.  If there are losses to creditors, the only remedy available to the estates of the Oncor Debtors will be litigation against insiders of the very sort the Debtors are trying so diligently to avoid.

---

[2]    The "**E-Side Creditors**" are creditors of EFH, EFIH, EFIH Finance Inc., and EECI.

-3-

6.       In light of this, the EFH Committee respectfully submits that the Debtors'
motion to approve the PSA should be denied in its entirety.  The PSA should not be denied
because the settlement it contemplates is not reasonable (which it is not), or because the plan it
contemplates cannot be confirmed (which it cannot).  Those questions are not currently before
the Court.  The PSA should be denied for the simple reason that there is no business purpose to
bind the Oncor Debtors—from now until they lose a highly-contentious confirmation and
settlement hearing—to pursue *this* deal with *these* out-of-the-money creditors at the expense of a
truly competitive process that explores all available alternatives in consultation with the EFH
Committee.  The harm to the estates of the Oncor Debtors upon entry of the PSA is significant,
and any benefits (such as mitigating the tactical litigation threats of the T-Side Junior Creditors)
are the phantom constructions of conflicted insiders.

7.       If the Court nevertheless were inclined to permit the Debtors their
dangerous gamble with the property of the estates of the Oncor Debtors until the confirmation
hearing, numerous changes would still have to be made to the PSA and/or proposed Order,
which are loaded with inappropriate and poorly-disclosed 'pork-barrel' requests of everyone
around the T-side negotiating table.  Specifically the proposed Order would have to be modified
to:

    a.  remove any findings with respect to matters properly reserved for the
confirmation hearing, such as the 'good faith' of all Plan negotiations;

    b.  strike the premature approval of *case-long* restrictions on discussing any plan that
does not include rewards to insiders involved in the negotiation of the Plan and
Settlement Agreement, including (1) releases of the Debtors' officers and
directors and controlling equity owners (the "**Insider Releases**") and (2) an
undisclosed package of contracts, parachutes, severance, cash bonuses and
incentive compensation for officers (the "**Management Compensation
Arrangements**") (PSA §§ 10(l)-(o));

-4-

    c.   delay anti-competitive deal protections for the Plan (which has not been market-tested) until confirmation;

    d.   delay restrictions on discussing alternative plans that do not include the Settlement Agreement until the approval of the Settlement Agreement;

    e.   delay preparations for the consummation of the Plan (including the regulatory approval process) until after the Plan is confirmed to ensure that those preparations do not prejudice alternative plans of reorganization; and

    f.   decline approval of other provisions that the Court does not have authority to approve.

**<u>Relevant Background</u>**

8.    Since its appointment, the EFH Committee has played an active role in these cases to defend the interests of the E-Side Creditors, presenting a perspective that had been absent for the first six months of these chapter 11 cases.  The EFH Committee serves as a fiduciary for at least 2,700 creditors holding over $3 billion of unsecured claims against the Oncor Debtors, plus an unknown number of asbestos claimants.

9.    In its capacity as an estate fiduciary, the EFH Committee repeatedly requested an opportunity to participate in the development and negotiation of the Plan and related transactions but was expressly excluded from all negotiations by the Oncor Debtors.  The EFH Committee, despite requests, did not have the opportunity to review or comment on any provision of any document signed by the Oncor Debtors prior to execution of the documents by the many parties or the public announcement and submission of the transaction to this Court.  As such, the Oncor Debtors were not informed—and did not seek to be informed—of the view of the EFH Committee on behalf of E-Side Creditors.

10.    The EFH Committee was open-minded about the Plan filed by the Debtors

on August 10, 2015.[3]  The EFH Committee was prepared to give a plan that supposedly pays E-Side Creditors in full the benefit of the doubt even though the unusual circumstances from which the Plan emerged—circumvention of the bidding procedures approved by this Court and the exclusion of the EFH Committee from negotiations—raised concerns that the Plan, the transactions contemplated by the Plan (the "**Restructuring Transactions**"), and the agreements documenting the Restructuring Transactions, including the PSA and the Settlement Agreement,[4] had been negotiated in bad faith by the parties to the PSA.

11.     The EFH Committee's concerns were justified.  The Plan and Settlement Agreement are fatally defective in substance, as well as process.  The Plan contemplates a sale of Oncor that is conditioned upon the issuance of numerous regulatory approvals and rulings from government agencies such as the Internal Revenue Service (the "**IRS**") and the Public Utility Commission of Texas (the "**PUCT**"), including many approvals and rulings that are unprecedented and not routinely granted.[5]  But more importantly, regardless of whether the regulatory conditions are satisfied, "the [T-Side Junior Creditor Consortium] may determine not to close the [Oncor transaction] or contribute the cash necessary to fund payments under the Plan," and the Debtors will have no recourse against the T-Side Junior Creditor Consortium: no entitlement to damages, and no right to seek specific performance of the obligations under the

---

[3]    The "**Plan**" is attached as Exhibit A to the PSA.

[4]    The "**Settlement Agreement**" is attached as Exhibit 1 to Exhibit A to the *Motion of Energy Future Holdings Corp., et al, to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter into and Perform under the Settlement Agreement* [D.I. 5249].

[5]    Even "routine" utility transactions often encounter significant regulatory resistance.  For example, in June of this year, the Connecticut-equivalent of the PUCT issued a draft order signaling its intention to reject a major utility transaction—Iberdrola's acquisition of UIL Holdings.  The parties have amended the terms of that transaction and resubmitted their application for approval.

Oncor sale documents.[6] (Disclosure Statement for the Third Amended Joint Plan of
Reorganization of Energy Future Holdings Corp., *et al*., Pursuant to Chapter 11 of the
Bankruptcy Code (the "**Disclosure Statement**") at 160; Merger Agreement § 9.9; Equity
Commitment Letter ¶¶ 5, 7(b) and 7(c); Backstop Agreement §§ 11.7 and 11.8.[7]) Accordingly,
the Plan is nothing more than the grant of a free option to the T-Side Junior Creditor Consortium
and is not confirmable on that basis alone.

12.    The Settlement Agreement is also troubling. It is a "condition" to the
Plan, yet applies only if the Plan fails. It applies on exactly the same supposedly reasonable
terms regardless of whether the estates of the Oncor Debtors are then worth $20 billion or $1.00.
The Settlement Agreement implements the proposed "Disinterested Director Settlement," on
essentially its original terms, despite changes in circumstance—and application—that eliminate
the originally stated grounds for the decision of the Oncor Debtors to agree to the settlement in
the first place. Moreover, the Settlement Agreement—borne on the T-side—is conditioned on
releases of valuable claims by the Oncor Debtors against Oncor Debtor insiders. Finally, as if it
were some sort of victory achieved, the Settlement Agreement exacerbates the injury of the free
option granted to the T-Side Junior Creditors in the Plan by paying their classes a 'perverse break
fee' of $550 million if they elect not to exercise the option. (PSA Motion ¶ 61.)

---

[6]    Remarkably, if a member of the T-Side Junior Creditor Consortium fails to fund its commitment, not only are
the Debtors left with no Plan and no recourse, the Debtors are obligated to delay the effective date of the Plan
by up to 50 days to permit the T-Side Junior Creditor Consortium to secure replacement financing. (Backstop
Agreement § 3.3(c).) If the T-Side Junior Creditor Consortium cannot find a replacement, the Debtors are *still*
left without any recourse.

[7]    The "**Merger Agreement**," "**Equity Commitment Letter**" and "**Backstop Agreement**" are attached as
Exhibits B, C and D, respectively, to the PSA Motion.

SC1:3928372.6

13.     If the PSA is approved by the Court and the Debtors proceed, the EFH

Committee will address the numerous flaws with the Plan and Settlement Agreement at the

confirmation hearing, after it has had the opportunity to obtain full discovery.

14.     As to the PSA itself, it neither confirms a plan nor settles claims.  Its harm

is procedural, but nevertheless real.  The PSA includes two central sets of promises.  The first

obligates all parties to the PSA—including the Oncor Debtors, the other Debtors, a majority of

the holders of first lien claims against TCEH (the "**T-Side First Lien Creditors**") and a majority

of the T-Side Junior Creditors—to ratify the cancellation of the competitive process for Oncor

and support the Oncor Debtors granting an exclusive option (the "**Purchase Option**") to the T-

Side Junior Creditors to purchase Oncor through June 30, 2016.  (The T-Side Junior Creditors

must pay to extend this option past April 30, 2016, but tellingly they pay the TCEH First Lien

Creditors, not the Oncor Debtors.)  The Purchase Option created by the PSA is not yet an

agreement to sell, which requires separate Court approval, but as discussed below it is the *de

facto* equivalent during its term because it effectively prohibits the pursuit of other alternatives.

The Purchase Option binds the Oncor Debtors in this sense immediately upon approval of the

PSA by the Court, and lasts until it is terminated as provided in Section 11 of the PSA.[8]

15.     The second set of promises is even longer-lived.  This set constrains the

---

[8]     Astoundingly, Section 11 of the PSA does not permit the Oncor Debtors themselves to terminate the exclusive option *even after* the June 30, 2016 milestone.  The termination notice must be provided by all "the Debtors," including the adverse party TCEH, in continued conflation of the rights and privileges of the T- and E-side estates.  (PSA § 11.)  This is one of dozens of apparent drafting mistakes—prejudicial despite being mistakes—in thousands of pages of "fully baked" documents that do not appear to have been reviewed by M&A, tax or other professionals acting in the best interests of the E-Side Creditors.  Only creditors of TCEH had the opportunity to review, including the TCEH Official Committee, the T-Side First Lien Creditors and the T-Side Junior Creditors.  The only representative of the Oncor Debtors appears to have been the representatives for 'disinterested' directors, who have a limited mandate and, of course, no money at risk.  A more lopsided way to negotiate complex papers—or more flagrant failure of the adversary plan negotiation process contemplated by the Bankruptcy Code—would be difficult to envision.

ability of the Oncor Debtors and the other parties to the PSA to discuss alternative plans of reorganization unless they include certain provisions referred to as the "Ten Commandments" (the "**Alternative Plan Restrictions**"), including the Insider Releases, the Management Compensation Arrangements and the Debtors' proposed (but not approved) inter-silo settlement. (PSA § 6.1.)  The Alternative Plan Restrictions last for the duration of the Bankruptcy Cases unless terminated pursuant to Section 12 of the PSA.  To be clear, the Alternative Plan Restrictions are not a settlement by the Oncor Debtors.  The "settlement" itself requires separate Court approval.  But the Alternative Plan Restrictions are the equivalent of a settlement for the Oncor Debtors, just as the PSA is the equivalent to the grant of an exclusive purchase option until June 30, 2016, because even the mere discussion (let alone prosecution) of plan alternatives that do not include the Ten Commandments is prohibited.  In terms of duration, the Alternative Plan Restrictions are effectively permanent: the proposed PSA states that the Alternative Plan Restrictions apply even if the Court strikes down the very same provisions of the Settlement Agreement as improper at the confirmation hearing.  (PSA §§ 5.1(b), 5.3(a), 5.4(a) and 5.5(a).) In other words, if the Court approves the PSA now, the Oncor Debtors can never again even discuss a plan of reorganization that does not include all the terms of the Settlement Agreement and the other Ten Commandments (Commandment One: "Thou Shalt Release Insiders Regardless of Case Results"[9]) unless the entire PSA is terminated in the narrow circumstances contemplated by Section 12.[10]

---

[9]   The Insider Releases are literally the first "Required EFH Alternative Term" under the PSA.  *See* PSA § 6.1(b)(i).

[10]   Technically, a Debtor can terminate the Alternative Plan Restrictions if there is a "Final Order" prohibiting one of the Ten Commandments from *all* possible plans of reorganization.  (PSA § 12.6(e).)  However, such an order from the Court seems an impossibility, and an appeal likely were it entered.  Meanwhile, until that chimerical "Final Order," no discussions about plans that violate the Ten Commandments can occur.  The Alternative Plan

16.     With respect to the Purchase Option, the Debtors have pled that the Oncor Debtors are free to pursue an "Alternative Restructuring" as a back-up to the Purchase Option. But the ability to discuss an "Alternative Restructuring" is of little consolation in the short term.  A back-up bid is impossible as a practical matter given the constraints in the PSA, which prohibit the Debtors and potentially important parties such as the TCEH First Lien Lenders (if a bidder is interested in a tax-free structure) from even discussing back-up plans that do not comply with the strict ground rules of the PSA.  These ground rules are:

a.   Any alternative bidder must agree that the Purchase Option has first dibs for as long as ten months (until June 30, 2016).  (PSA § 4.3(a).)

b.   Any alternative bidder must not make any filings with any regulatory agency, including filings with the IRS or the PUCT in connection with a REIT Conversion, until the Plan fails.  (PSA § 4.3(a).)

c.   Any Alternative Plan must accept every term of the existing Settlement Agreement, including releases of non-Debtor insiders, even if the alternative bidder believes the same are not appropriate or legally achievable in these troubled cases.  (PSA § 6.1(b).)

d.   Any Alternative Plan must include the Management Compensation Arrangements.  (PSA § 6.1(a)(vi).)

17.     An assessment of the mud in which these rules would strand an alternative bidder illustrates the immediate harm to the Oncor Debtors if the Court approves the PSA.  *First*, any bidder contemplating an Alternative Restructuring must factor in that the T-Side Junior Creditors have first dibs on Oncor for as long as June 30, 2016—ten months from today.  No alternative bidder is going to commit now to be a back-up bidder for such a long period of time without being paid economic compensation EFH and EFIH cannot afford.

---

Requirements, at heart, are an attempt by the Debtors to have this Court enshrine for the duration of these bankruptcy cases the operating principle of "protect insiders at all costs" —something the Debtors hoped they could use exclusivity to achieve but now, with exclusivity expiring, must ask the Court to do for them in the guise of the PSA.

-10-

18.    *Second*, the price of a back-up bid is especially high because of the nature of the T-Side Junior Creditor arrangement as an 'option.' Any alternative bidder is taking wrong-way economic risk. Rather than considering a contingent bid that it knows will be accepted if regulatory approval is not obtained (an exogenous variable to price), the back-up bidder would be considering a contingent bid that applies when T-Side Junior Creditors decide the business is not worth the purchase price. No back-up bidder would commit to take the business under those circumstances ten months forward. (In economic terms, EFH and EFIH are writing an option to the T-Side Junior Creditors, and to get a back-up bid they would effectively need to purchase a put on the exact same risk.)

19.    *Third*, no back-up bidder can compete on price. Presumably, a back-up bid would need to have real conditions to be valuable to the EFH and EFIH estates. But that would require the bidder—unlike the T-Side Junior Creditors—to make a meaningful promise that exposes them to remedies. The Purchase Option costs the T-Side Junior Creditors nothing (other than, we are told, the settlement of litigation claims). There is no meaningful way for a binding bid to compete with a free option.

20.    *Fourth*, the back-up bidder likely has no litigation claims of its own to tender, and the Debtors continue to insist that the T-Side Junior Creditors litigation claims against Debtors and non-Debtor insiders must be settled at any cost as a precondition to any alternative to be considered by the Debtors. Effectively, alternative bidders have been told—and the PSA would legislate—that support of the Settlement Agreement is required to bid. Settlement first, Oncor value second. The combination of the auction process with a mandatory settlement process requires an alternative bidder to offer not only higher value for Oncor, but also an equal or better deal to each party to the Settlement Agreement, including T-

-11-

side creditors as well as non-Debtor insiders ranking junior to E-side creditors.

21.      For these reasons, among others, the PSA, so long as it applies, prevents any meaningful process to secure a back-up bid.

22.      Nor is the "fiduciary out"—a ubiquitous tactic by these Debtors when they request very un-fiduciary relief—any aid to EFH and EFIH creditors.  The fiduciary out in Section 12.6(h) of the PSA is all-or-nothing, meaning that the Oncor Debtors must give up the entire benefit of the PSA transactions (which if the PSA is approved will reflect significant sunk costs) in order to terminate to pursue an alternative.  How such an alternative is to be developed when the Oncor Debtors and other parties cannot even discuss it under the PSA is unclear.  It certainly would be impossible for an alternative plan of reorganization for these complicated cases to appear fully-formed without negotiation.  Moreover, exercise of the fiduciary out is firmly in the hands of the board of directors of the Oncor Debtors, rather than their estates, and the board of directors is directly interested in the preservation of the commitment to the Alternative Plan Requirements.  The board of directors realistically cannot be expected to terminate the PSA and lose the protections of those Alternative Plan Requirements once approved by this Court.  The fiduciary out is ineffective to mitigate the harm to the Oncor Debtors for the Purchase Option and the Alternative Plan Requirements because it does not allow the development and creation of alternatives, and because it is in the hands of conflicted fiduciaries.

23.      At the end of the day, the Debtors' case for the PSA will certainly be some version of "this is the only deal we have and approval of the PSA is a milestone in it."  They will say the Court should not act to jeopardize the potential Plan and Settlement Agreement.  But the PSA cannot be self-justifying.  When it is proposed for approval, the existence of a milestone in

-12-

the un-approved agreement is not sufficient grounds for approval.  The PSA clearly harms the

Oncor Debtors.  There is no corresponding benefit.  It is not credible that the T-Side Junior

Creditors will suddenly lose interest in Oncor if the PSA is not approved, and if they do, the

Oncor Debtors lose nothing because there is no commitment to buy Oncor in the first place.

### Objection

I.      **The PSA Grants Property of the Estates of the Oncor Debtors to the T-Side Junior
        Creditors and Must Be Approved under Section 363(b) of the Bankruptcy Code.**

24.     The Oncor Debtors' "crown jewel" asset is their interest in Oncor.  Indeed,

under the proposed Plan, Oncor is the *only* source of recovery for E-Side Creditors.  The

Settlement Agreement purports to settle all intercompany claims and release "nearly all claims"

against the Oncor Debtors' directors and officers and the Sponsors, precluding other potentially

valuable sources of recovery.  (PSA Motion ¶ 4.)

25.     While the Oncor Debtors do not agree to sell Oncor to the T-Side Junior

Creditors under the PSA, the PSA is the *de facto* equivalent of an agreement to sell because, until

the Purchase Option expires, the PSA prohibits the pursuit of any plan of reorganization other

than the Plan that implements the Purchase Option.  Section 4.3 of the PSA provides that, "the

Debtors will not propose, file, support, or take any other action in furtherance of any

restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors other than

the Plan."  (PSA § 4.3(a)(xii).)  The PSA thus binds the Oncor Debtors to the Purchase Option

immediately upon approval of the PSA by the Court, and the obligation lasts until it is terminated

as provided in Section 11 of the PSA.

26.     An option to purchase an asset, such as the Purchase Option, has value to

the party holding the option based on, among other things, the (1) relationship of the value of the

underlying asset at the time the option is granted to the strike price of the option, (2) the length of

-13-

the option and (3) the volatility of the value of the underlying asset.  Fischer Black & Myron

Scholes, *The Pricing of Options and Corporate Liabilities*, 81 J. POL. ECON. 637 (1973).  It

follows from these inputs that the Purchase Option—an option (that the Debtors assert is very

likely to be exercised) to purchase the Oncor Debtors' volatile interest in Oncor for $19.1

billion—is extremely valuable.

27.    The PSA also obligates each Debtor to expend estate resources in

furtherance of the Restructuring Transactions, including by requiring the Debtors to:

a.    prepare for the registered equity offering contemplated by the Backstop
Agreement (PSA § 4.3(a)(v));

b.    commence the regulatory approval process for the Restructuring Transactions,
including the REIT Conversion (PSA § 4.3(a)(vii)); and

c.    take all other steps necessary to consummate the Restructuring Transactions "as
soon as possible."  These could include preparations for the multi-billion dollar
debt offerings necessary to finance the Restructuring Transactions.  (PSA §
4.3(a)(vi) and (ix).)

28.    Accordingly, there is no question that each Debtor seeks to "use, sell or

lease, other than in the ordinary course of business, property of the estate" by entering into the

PSA.  11 U.S.C. § 363(b)(1); *see also In re Waterfront Cos., Inc.*, 56 B.R. 31, 35 (Bankr. D.

Minn. 1985) ("some transactions either by their size, nature or both are not within the day-to-day

operations of a business and are therefore extraordinary").  The Debtors acknowledge as much in

the PSA Motion.  (PSA Motion ¶¶ 74-75.)  Indeed, several months ago, when these Debtors

sought to bind themselves to a proscribed path for the marketing of Oncor through the failed

bidding procedures, the Court held that Section 363(b) of the Bankruptcy Code ("**Section 363**")

governed approval of the bidding procedures because the Debtors were seeking approval for "a

transaction that would serve as the basis for a reorganization plan."  (November 3, 2014 Hr'g. Tr.

15:9-21.)  The PSA is no different.

II.    **The Debtors Have Failed to Satisfy Their Burden to Demonstrate that Entry into the PSA Should Be Approved under Section 363**

29.    When determining whether to authorize the use, sale or lease of property of the estate outside of the ordinary course of business pursuant to Section 363(b), courts require a debtor to demonstrate both that a sound business purpose justifies such action and that they have provided adequate and reasonable notice to all parties-in-interest.  *See*, *e.g.*, *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del.1991); *In re Decora Indus., Inc.*, No. 00-4459 JJF, 2002 WL 32332749, at *2-*6 (D. Del. May 20, 2002).

A.    The Debtors Have Not Demonstrated That a Sound Business Purpose Exists for the Entry Into the PSA.

30.    Courts evaluate whether a sound business purpose exists through the application of the "business judgment test."  *In re Montgomery Ward Holding Corp.*, 242 B.R. at 153.  While, under the business judgement standard, a court generally will defer to a debtor's justifications for a proposed transaction, the burden still falls on a debtor to affirmatively demonstrate that a sound business purpose for the transaction exists and was used by its directors as a basis for determining to enter into such transaction.  *See*, *e.g.*, *In re Exaeris, Inc.*, 380 B.R. 741, 744-5 (Bankr. D. Del. 2008) (holding that the Court could not find that a sound business purpose existed because the Debtors had provided the court "no evidence upon which the Court can make an informed decision on the relationship of the sale price to the value of the assets being sold").[11]

---

[11]    The Settlement Agreement is an insider transaction that will require a heightened standard of scrutiny at the confirmation hearing.  Given that the PSA is a gating issue to the Settlement Agreement itself, a heightened standard of review could apply to the PSA.  In any event, the Debtors cannot satisfy their burden even under a "sound business judgment" standard.

-15-

31.    Here, the Debtors have failed to present a sound business purpose for entering into the PSA.  The Debtors' stated rationales for entering the PSA, as set forth in the PSA Motion, are illusory.  *First*, the Debtors offer that the PSA "is finalized and actionable right now."  (PSA Motion ¶ 77.)  This is true.  It is also a tautology—*any* executed agreement presented to a court for approval is necessarily "finalized."  The Debtors further argue that the failure to obtain approval of the PSA "would mean further uncertainty, delay, and administrative costs."  (*Id*.)  But there is no evidence in the record to support this conclusory statement and, regardless, these all would be problems of the Debtors' own creation.  A transaction under Section 363 must have a sound business purpose based on the transaction's substance, not merely based on the cost a debtor incurred in negotiating the transaction and presenting the transaction to the court for approval.  If the cost of negotiating a transaction were sufficient to satisfy the Debtors' burden under Section 363, a debtor could pull any decision to sell any asset, for any price, within the ambit of Section 363 by its own bootstraps.

32.    *Second*, the Debtors argue that "the Plan offers the best overall value of any proposal the Debtors have received," touting "repayment in full in cash of all allowed claims" against EFH and EFIH.  (PSA Motion ¶ 78.)  While this might be a legitimate rationale to agree to support a plan that contained a binding commitment, it is a facially impossible statement here.  The Purchase Option, like any option, has *negative value* for the Oncor Debtors regardless of the option's strike price—it is a transfer of value from the Oncor Debtors to the T-Side Junior Creditors.  The strike price could be $19.1 billion or $100 billion: an option only has value to the holder of the option.  The Oncor Debtors would have more value if the PSA were not entered into and the transaction remained what it is today: not binding on either side.

33.    *Third*, the Debtors ascribe value to the commitment by certain creditors

-16-

under the PSA to vote in favor of the Plan.  As discussed above, the Plan is tantamount to the grant of an option, and the grant of an option has negative value to the Oncor Debtors. Accordingly, the commitments to support the Plan are worthless—they cannot be worth more than the Plan itself.

34.     *Fourth*, and finally, the Debtors ascribe value to the commitment by certain creditors to support alternative plans that include the Alternative Plan Restrictions.  These promises by creditors have no place in a conventional plan support agreement, as the Alternative Plan Restrictions do little other than to attempt to lock in the key terms of the Settlement Agreement without Court approval of the merits of the settlement.  These Alternative Plan Restrictions would render it impossible to negotiate and confirm a Plan that does not include the Settlement Agreement—even if the Court strikes down the Settlement Agreement as improper at the confirmation hearing.  (PSA §§ 5.1(b), 5.3(a), 5.4(a) and 5.5(a).)

35.     This "back-door" approval of the Settlement Agreement is contrary to the schedule proposed by the Debtors and approved by the Court, which contemplated presentation of the Settlement Agreement to the Court at the confirmation hearing.  *See* Aug. 18, 2015 Hr'g. Tr. 40:2-3 (the Court determining that "[the Settlement Agreement] will need to be addressed on the merits at the same time as confirmation.")  By implementing the Settlement Agreement through stealth, the Debtors would deprive dissenting parties-in-interest the opportunity "to litigate the merits, and that'll probably include evidence, and evidence means discovery."  *Id*. at 5.  The Debtors may ascribe value to provisions of the PSA that provide the Debtors with a tactical litigation advantage against their own creditors, but that is not the kind of "value" that is cognizable when determining if a sound business purpose exists for a transaction under Section 363.

-17-

36.     The EFH Committee respectfully submits that since (1) the Purchase Option has no value to the Debtors and (2) the only other purpose of the non-Debtor commitments under the PSA prior to the confirmation hearing is to provide the Debtors with a tactical litigation advantage over their creditors, there is no sound business purpose for the PSA and it should not be approved by the Court.

B.      <u>The Debtors Have Not Demonstrated That They Provided Adequate and Reasonable Notice of Entry into the PSA</u>.

37.     When seeking approval for a significant transaction under Section 363, a debtor must provide parties-in-interest with more than the bare minimum notice required under Bankruptcy Rule 2002 and Rule 2002-1 of the Local Rules For The United States Bankruptcy Court of the District Of Delaware. *See*, *e.g.*, *In re Delaware & Hudson Ry. Co.,* 124 B.R. at 180 (a debtor should "disclose accurately the full terms" of the proposed transaction and "explain why the proposed price is reasonable and why the [transaction] is in the best interest of the estate.)"

38.     Regrettably, the Debtors have chosen a less transparent path.  For example, the Debtors have redacted the signature pages of the as-filed copy of the PSA without filing a motion to seal.  In other words, the Debtors are seeking authorization to enter into a binding contract without disclosing who they are contracting with to all parties-in-interest.  There is no reason why the identities of the PSA parties would be commercially sensitive to the Debtors, and even if the identities were commercially sensitive, the Debtors are obligated to disclose such information in the absence of an order of the Court granting a request to seal.  The

SC1:3928372.6

signature pages promptly must be disclosed.[12]  *Cf.* 11 U.S.C. § 107(b)(1).  In addition, the

Debtors have failed to publicly file numerous material documents related to the Plan, the

Settlement Agreement, the disposition of Oncor and the Management Compensation

Arrangements.  It is essential that these documents are promptly filed with the Court so that all

creditors have an opportunity to review them.[13]

39.     *Finally*, the Debtors have provided no evidence to support their

determination to enter into the PSA, even though the Debtors acknowledge in their motion that

the Court should review the Debtors' entry into the PSA under Section 363, and accordingly

each Debtor carries the burden of affirmatively demonstrating, among other things, a sound

business purpose to enter into the PSA.  The Debtors must provide evidence in support of the

PSA Motion and the EFH Committee is entitled to test that evidence, or the motion must be

denied.  The EFH Committee reserves its right to update this Objection or file additional

responses to the PSA Motion following review of any declarations in support of the PSA Motion

filed by the Debtors in the future.

---

[12]   The Debtors have made similar redactions from the Settlement Agreement and other transaction documents
attached to the PSA Motion.  Without authorization from the Court to seal the redacted information, such
redactions are inappropriate, and unredacted documents should be filed by the Debtors immediately.  The EFH
Committee reserves its right to contest the adequacy of notice to all parties-in-interest with respect to redacted
documents that will be considered at the confirmation hearing.

[13]   The missing documents include the following, each of which contains material transaction terms relevant to
assessing the conditionality of the Plan: (1) the Parent Disclosure Letter and Company Disclosure Letter, each
of which qualify the representations and warranties under the Merger Agreement; (2) the Oncor Letter
Agreement, which sets forth the scope of Oncor's cooperation with the Restructuring Transactions; (3) a
complete copy of the Tax Matters Agreement, including all exhibits thereto, which is essential for determining
the allocation of tax risk between E-Side Creditors and creditors of TCEH; and (4) the debt commitment papers
for the financing for the Plan, which contain additional conditions to the consummation of the Plan.  Each of
these documents should be filed with the Court immediately.  The EFH Committee reserves its rights with
respect to this issue.

**III.      The PSA and Order Include a Litany of Inappropriate Provisions.**

40.     If the Court were inclined to grant the Debtors any 'plan support' relief at this time, the proposed PSA and Order are not a viable way to do so without numerous modifications.  Many of these modifications are necessary because the Settlement Agreement and the Plan include insider transactions that are not ratified by fulcrum creditor approval and will require a heightened standard of scrutiny as to process and fairness under bankruptcy and non-bankruptcy law.  Given the need for heightened scrutiny, the Debtors' attempt to circumvent the confirmation hearing through the entry of relief in connection with the PSA is particularly inappropriate.

A.      <u>The Proposed Order Cannot Make Findings That Will Be Litigated at the Confirmation Hearing</u>.

41.     The proposed Order approving the PSA includes findings that are unnecessarily broad, should be appropriately considered at the confirmation hearing on a full evidentiary record after discovery, and cannot be made now.  These findings should be struck from the Order.

42.     Specifically, Paragraph A of the Order currently includes findings by the Court that the Plan and Settlement Agreement were negotiated in good faith and at arms-length:

> The Parties have been engaged in extensive arm's-length negotiations with each other in good faith, through mediation and otherwise, regarding the terms of an alternative transaction to be implemented through the Plan, which would amend and replace the Initial Plan.  In connection with such Plan negotiations, and as a critical part thereof, certain of the Parties have also engaged in extensive arm's-length negotiations with each other in good faith, through mediation and otherwise, regarding settlement of the litigation in connection with the Standing Motions and the Litigation Letters, including the inter-Debtor and affiliate claims and causes of action and the claims and causes of action against the holders of TCEH First Lien Claims sought to be brought thereunder.  (Order ¶ A.)

-20-

43.    The EFH Committee has a reasonable basis for concern that the Plan and the Settlement Agreement may have been negotiated collusively and in bad faith,[14] and these will be important issues to be considered at confirmation.  The EFH Committee and other E-Side Creditors are entitled to the opportunity to obtain discovery and investigate these issues prior to their consideration by the Court at the confirmation hearing.  Such an important issue cannot be decided in connection with the PSA on an incomplete factual record, and the proposed finding must be stricken from the Order.

44.    Similarly, paragraph D of the Order should not affirm that each of the Debtors has determined to enter into the Settlement Agreement "in the valid exercise of their business judgment" or that each Debtor's review of the Settlement Agreement and the settlements and releases contained therein was "thorough" or "independent."  (Order ¶ D.)  The Settlement Agreement is not before the Court for approval at this time, and such findings are not appropriate in advance of consideration of the evidence on a complete factual record about the Settlement Agreement at the confirmation hearing.

45.    Finally, the Debtors have provided the Court no evidence to support the recitals, representations and acknowledgements contained in the PSA, many of which are

---

[14]    The EFH Committee is particularly concerned about irregularities with the Oncor bidding process.  During the Oncor bidding process conducted pursuant to the court-ordered bidding procedures, at least three competitive bidders were reported by the media as submitting bids for Oncor; two of those bidders were (1) a group led by Hunt and (2) a group comprised of members of the Ad Hoc Group of Creditors of TCEH.  After multiple rounds of bidding, unexpectedly, the Debtors cancelled the Oncor auction, claiming that they were "not able to reach a sufficiently attractive bid."  (June 25, 2015 Hr'g. Tr. 15:1-2.)  Two suspicious events immediately followed the cancellation of the auction: (1) two of the three publically reported bidders—Hunt and the Ad Hoc Group of Creditors of TCEH—joined into a single bid, and (2) the Debtors recharacterized the new, combined Oncor bid as a "plan proposal" which was therefore not within the scope of the Oncor bidding procedures and not subject to the various review and consultation rights of the EFH Committee thereunder.

SC1:3928372.6

attempts to estop parties in interest from contesting good faith and other confirmation issues.

Accordingly, the Order should contain the following provisions:

    a.   "No Recital, representation or acknowledgement by EFH or EFIH in the PSA shall bind, estop or create any liability of EFH or EFIH, or their respective estates or creditors unless and until the Court shall have made a finding that such Recital, representation or acknowledgement is true."

    b.   "In the case of any conflict between this Order and the PSA, this Order shall govern and the rights and obligations of the parties under this Agreement shall be construed in accordance herewith."

    B.   <u>Insider Releases and Compensation Arrangements Cannot Be Required Terms for Every Alternative Restructuring</u>.

46.    The PSA forbids the parties thereto from pursuing or negotiating any plan of reorganization that does not include the Alternative Plan Restrictions.  (PSA §§ 5.1(b), 5.3(a), 5.4(a) and 5.5(a).)  These include the Insider Releases and Management Compensation Arrangements.  (PSA §§ 6.1(a)(iii), 6.1(a)(vi) and 6.1(b)(i).)  The Court should not approve the Debtors' request to require Insider Releases and Management Compensation Arrangements to be included in any possible plan of reorganization, especially prior to the confirmation hearing.

47.    Debtor releases are generally analyzed by courts in this jurisdiction under the five-factor "*Zenith* test," and the EFH Committee expects that the Debtors will present evidence to the Court during the confirmation hearing to demonstrate that the *Zenith* test is satisfied with respect to the Insider Releases.  *See, e.g., In re Washington Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011); *In re Zenith Electronics Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999).  However, the Debtors have not yet provided any such evidence, and the back-door implementation of Insider Releases through the PSA is premature, especially given concerns about conflicts and self-dealing with respect to the Debtors' directors and officers who

negotiated the Insider Releases for themselves and the Sponsors into the Settlement Agreement
and the PSA.

48.     Furthermore, the EFH Committee believes that the Insider Releases are
patently unapprovable *now* to the extent granted in connection with *future* Alternative
Restructurings, because if the Plan fails and the Debtors are seeking to confirm a "plan B"
Alternative Restructuring, there is no assurance that the *Zenith* factors will be satisfied.  There
may be no identity of interest between the Debtors and many of the insiders proposed to be
released; the Debtors may not be able to make a showing that insiders provided a substantial
contribution; the Insider Releases may not be essential to the reorganization (except insofar as
the Debtors' directors and officers continue to insist that Insider Releases are included in all plan
proposals); and the Alternative Restructurings may be likely to deeply impair at least some
creditors of the Oncor Debtors.  The Insider Releases will be litigated at the confirmation
hearing, but the Court certainly should not prospectively approve them without a confirmed plan
in place and a fully-developed record.

49.     Similarly, the Management Compensation Arrangements include new
employment agreements and severance and change of control payments that raise complex issues
under sections 363(b), 365, 503(c) and 1129(a)(4) of the Bankruptcy Code.  For example, the
provisions of the PSA that require any Alternative Restructuring to include the Management
Compensation Arrangements are arguably "obligation[s] incurred for the benefit of . . . an insider
of the debtor" subject to review under section 503(c).  11 U.S.C. § 503(c)(1).  Regardless, the
PSA is the *de facto* equivalent of an agreement to make severance payments and change of
control payments because it effectively prohibits the pursuit of plans that do not contemplate
such payments.  Since the Debtors have neither disclosed the Management Compensation

-23-

Arrangements nor pled the appropriate relief in the PSA Motion, provisions of the PSA

pertaining to the Management Compensation Arrangements should be rejected by the Court

pending consideration of those issues at a future hearing with appropriate notice.

       C.    <u>Potentially Anti-Competitive Deal Protection Should Not Be Approved Before Confirmation</u>.

       50.    As discussed above, the PSA forbids the parties thereto, including the

Oncor Debtors, from pursuing or negotiating any plan of reorganization other than the Plan.

(PSA §§ 4.1-4.3.)  The Oncor Debtors may not solicit alternative proposals and, if they receive

an alternative proposal, the PSA requires the Oncor Debtors to provide copies of that proposal to

the T-Side Junior Creditor Consortium, chilling unsolicited bids.  (PSA § 4.3(b).)  The Oncor

Debtors' all-or-nothing 'fiduciary out' does not permit them to assist in the development of an

alternative proposal; and creditors whose support may be necessary to  develop an alternative

proposal (such as the TCEH First Lien Creditors in the case of tax-free transaction) have no

fiduciary out at all.  If these provisions are approved now, competing bids for Oncor will be

effectively prohibited until June 30, 2016, even though the current Plan was developed through a

noncompetitive process (in which litigation threats rather than price determined outcome) and

has never been subject to a market test.  There has been no showing that such exclusivity is

necessary, or even helpful, to obtain the highest and best (*i.e.*, binding) bid for Oncor.  Until the

Plan is confirmed, the Debtors and the other parties to the PSA should be permitted to solicit and

negotiate higher and better offers for Oncor, unfettered by preclusive obligations in the PSA.

       51.    In addition, the PSA includes certain anti-competitive provisions that

unjustifiably preclude meaningful negotiation of backup Alternative Restructurings.  For

example, the PSA provides that while the Plan is still being pursued, all parties thereto must

"keep confidential any solicitation, negotiation, facilitation, and documentation . . . of an

-24-

Alternative Restructuring." (PSA §§ 4.1(c), 4.2(b) and 4.3(a).) The PSA Motion provides no justification for this provision, which significantly limits the ability of the Debtors to quickly turn to an Alternative Restructuring if the Plan fails—an ability that the Debtors have trumpeted as one of the key features of the PSA. (August 11, 2015 Hr'g. Tr. 24:1-24.) Similarly, given the potential collusion among members of the T-Side Junior Creditor Consortium during the Oncor bidding process, the Court should not ratify past or bless future bidding agreements absent a showing as to their reasonableness. Section 4.4 of the PSA, an agreement among the T-Side Junior Creditor Consortium not to discuss alternatives without the consent of each member of the bidding group, should be struck or its effectiveness delayed until confirmation. (PSA § 4.4.)

      D.      <u>Provisions of the PSA *De Facto* Implementing the Settlement Agreement Should Not Be Effective Until the Settlement Agreement Is Approved</u>.

      52.      The PSA ostensibly forbids the parties thereto, including the Debtors, from pursuing or negotiating any backup Alternative Restructuring other than a plan that implements the Settlement Agreement. (PSA §§ 4.1-4.3.) As discussed above, these provisions effectively implement the Settlement Agreement without a hearing on the merits and should not be approved until the confirmation hearing scheduled by the Court. A "settlement support agreement" is just a settlement. For now, the Debtors and other parties to the PSA must permitted to solicit and negotiate plan proposals that do not implement the Debtors' proposed Settlement Agreement.

      E.      <u>Potentially Harmful Preparations for the Restructuring Transactions Should Not Begin Prior to Confirmation and Receipt of a Purchase Deposit</u>.

      53.      The PSA contemplates the Debtors making submissions to the IRS, PUCT and potentially other regulatory and government authorities prior to confirmation of the Plan. (PSA §§ 4.3(a) and 10(a)-(h).) It is highly unusual to have such submissions made without a

binding purchase contract and, for bankruptcy sales, Court approval.  The reason is because such submissions often prejudice the authorities' consideration of alternative transactions, creating a sloped playing field in favor of the bidder for whom the early submissions have been made.  This injury is particularly meaningful where a bid is highly contingent (or, in this case, completely contingent) because it permits the bidder the opportunity to *renegotiate* the terms of its transaction if the regulatory discussions reach a point where alternatives are, as a practical matter, excluded.  This is why arm's-length sellers in the regulated M&A context do not permit bidders a regulatory head-start in the absence of a binding bid backed by a purchase money deposit, a reverse break-fee and/or meaningful recourse against a credit-worthy party to compensate the seller for the harm caused if the buyer renegotiates or walks away.

       54.     Given the fact that the Plan is not confirmed and the related promises not meaningfully binding on the bidder, the Debtors should not be allowed or "directed" by the Order to commence preparations for consummation of the Plan (including applications to or communications with the IRS or PUCT and the other obligations set forth in sections 4.3(a) of the PSA) prior to confirmation.  (PSA §§ 4.3(a)(v)-(ix).)  In addition to the prejudice discussed above, prosecuting regulatory proceedings and preparing for securities offerings and a debt financing will be time-consuming and expensive for the Oncor Debtors.  If the Plan documents were enforceable by the Oncor Debtors, the Oncor Debtors might fairly regard these sunk costs as creating an asset of their estates in the form of a sale contract they can enforce.  However, with Plan documents that are only enforceable by the bidders, all the value of any spent transaction costs will belong to the bidders (who can renegotiate price at will) and the Oncor Debtors will retain no meaningful benefit.

-26-

F.    The Order Cannot Approve Provisions of the PSA That the Court Does Not Have the Authority to Approve.

55.    The PSA contains several provisions that the Court does not have the authority to approve.  The Order should be modified to exclude these provisions from any approval of the PSA as a whole.

56.    For example, the PSA defines "Alternative Restructuring" to include only plans of reorganization proposed by the Debtors and the T-Side First Lien Creditors.[15]  (PSA recitals.)  Every party to the PSA is prohibited from discussing and negotiating plans of reorganization for the Oncor Debtors proposed by any other party, even if such plans contain the Required Alternative Terms.  This is a *de facto* extension of exclusivity beyond 18 months after the commencement of these chapter 11 cases, as it limits plan negotiations to plans either proposed by the Debtors or authorized to be proposed by the Debtors.  There is no statutory basis for the Court entering any order that has the effect of limiting who may file a plan in a chapter 11 case beyond the limits set forth in section 1121(d).  *See* 11 U.S.C. § 1121(d)(2).

57.    Similarly, the Court cannot approve (a) the unproven legal assertions in the final sentence of Section 14.10 of the PSA purporting to exclude materials from evidence beyond the scope of Federal Rule of Evidence 408, and (b) the last two sentences of Section 14.14 of the PSA, which purport to create a finding that the parties to the PSA do not—and will not—constitute a "group" within the meaning of the within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934.  The PSA hearing is not the appropriate proceeding to seek such determinations.

---

[15]    The Debtors have provided no commercial reason why the commitments by the parties to the PSA to support any plan of reorganization that contains the Required Alternative Terms should not also apply to plans proposed by the EFH Committee or E-Side Creditors.

G.    <u>Drafting Errors and Clarifications</u>.

58.    The PSA contains numerous drafting errors—some material—that will be identified to the Debtors by the EFH Committee.  The EFH Committee expects that these errors can be resolved without the intervention of the Court.  However, one clarification is highly significant and must be addressed in the proposed Order.  The PSA frequently refers to "the Debtors" as having rights and obligations where those rights and obligations might apply solely to the Oncor Debtors, or where the interests of the Oncor Debtors and TCEH may be in conflict.  Accordingly, the following provision should be added to the Order:

> "Where the PSA states that a right belongs to the Debtors or an action may be taken by the Debtors, each of EFH and EFIH shall separately have the authority to exercise such right or take such action as applicable to it without the consent or approval of any other Debtor."

**<u>Reservation of Rights</u>**

59.    The Debtors set an objection deadline for the PSA Motion prior to submission of any evidence in support of the PSA or the opportunity for the EFH Committee to conduct any discovery.  As a result, the EFH Committee reserves the right to supplement and/or revise this Objection prior to or during the hearing to approve the PSA to assert any and all additional objections with respect thereto.  In addition, the EFH Committee reserves its right to amend this Objection or interpose additional objections in response to further amendments to the PSA or any evidence submitted in support thereof.  The EFH Committee also reserves all rights with respect to (1) confirmation of the Amended Plan, or any other plan proposed in these chapter 11 cases, and (2) approval of the Settlement Agreement, in each case, on any and all grounds.

WHEREFORE, the EFH Committee respectfully requests that the Court deny approval of the PSA.

-28-

Dated:    Wilmington, Delaware
        August 24, 2015

**MONTGOMERY McCRACKEN WALKER & RHOADS, LLP**

*/s/ Mark A. Fink*        
Natalie D. Ramsey (DE Bar No. 5378)
Mark B. Sheppard
Mark A. Fink (DE Bar No. 3946)
1105 North Market Street, 15th Floor
Wilmington, DE  19801
Telephone: (302) 504-7800
Facsimile: (302) 504 -7820
E-mail:      nramsey@mmwr.com
            msheppard@mmwr.com
            mfink@mmwr.com

– and –

**SULLIVAN & CROMWELL LLP[16]**

Andrew G. Dietderich
Steven L. Holley
Robert J. Giuffra, Jr.
Brian D. Glueckstein
125 Broad Street
New York, New York  10004
Telephone:    (212) 558-4000
Facsimile:    (212) 558-3588
E-mail:      dietdericha@sullcrom.com
            holleys@sullcrom.com
            giuffrar@sullcrom.com
            gluecksteinb@sullcrom.com

*Counsel for The Official Committee of Unsecured Creditors of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, EFIH Finance Inc., and EECI, Inc.*

---

[16]    Sullivan & Cromwell LLP is advising the EFH Committee in connection with the assessment and prosecution of claims against the so-called 'disinterested' directors and other insiders, excluding the equity sponsors and those directors who are employees of the equity sponsors.  Montgomery McCracken Walker & Rhoads LLP is advising the EFH Committee in connection with the assessment and prosecution of claims against the equity sponsors and those directors who are employees of the equity sponsors.

-29-