## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 14-10979 (CSS) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | (Jointly Administered) |
| Debtors. | **Re: D.I. 5248** |
| | <u>**Hearing Date**</u>: **September 17, 2015 at 9:00 a.m.** |
| | <u>**Objection Deadline**</u>: **August 24, 2015 at 4:00 p.m.** |

## OBJECTION OF UMB BANK, N.A. TO MOTION OF ENERGY FUTURE HOLDINGS CORP., ET AL., TO AUTHORIZE THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE PLAN SUPPORT AGREEMENT

UMB Bank, N.A., as Indenture Trustee (the "<u>Trustee</u>") for the unsecured 11.25%/12.25% Senior Toggle Notes Due 2018 and the 9.75% Senior Notes due 2019, by and through its undersigned counsel, files this objection (the "<u>Objection</u>") to the *Motion of Energy Future Holdings Corp., et al., to Authorize the Debtors to Enter Into and Perform Under the Plan Support Agreement* [D.I. 5248] (the "<u>Motion</u>" and such agreement, the "<u>PSA</u>").[1]  In support of this Objection, the Trustee respectfully submits as follows:

### PRELIMINARY STATEMENT

The Trustee would not object to the relief requested in the Motion to the extent that EFH and EFIH (the "<u>E-Side Debtors</u>") were merely seeking comfort that their entry into the PSA does not violate Bankruptcy Code section 1125(b).  Nor would the Trustee object if the E-Side Debtors were merely seeking to bind T-side creditors to support the Plan and adhere to a schedule of restructuring milestones.  The Motion, however, seeks wide-ranging relief which is both unnecessary and inappropriate for a purported procedural motion and a transaction premised

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion, the PSA or the Plan, as applicable.

upon high-risk conditions and illusory investment commitments.  By overreaching to such a

significant degree, the Debtors are unable to demonstrate that the PSA represents a sound

exercise of the Debtors' business judgment, and, therefore, the Motion should not be approved.

Even if the Court believes that the Debtors can satisfy the evidentiary burden for approval

of the PSA, as the Court has previously noted, the relief sought in the Motion should be

"extremely limited" given that the Plan and Settlement Agreement that are embodied in the PSA

are not now – but soon will be – before the Court.  Omnibus Hr'g Tr. 65:22 (June 6, 2014).  In

order to ensure that the status quo is preserved and that all parties' substantive rights are not

affected, the Trustee submits that the Court should require the following modifications to the

PSA and Proposed Order.

First, the proposed order attached to the Motion (the "Proposed Order") should be

stripped of unnecessary and self-serving factual findings that have bearing on the merits of the

Plan and Settlement Agreement.  The Proposed Order contains findings which address (i) the

"good faith of the Debtors" in negotiating the Plan, and (ii) the diligence and independence of

the Debtors and Disinterested Directors in negotiating the Settlement Agreement.  Findings such

as these may be contested in connection with confirmation of the Plan and should not be, and are

not required to be, addressed in connection with the Motion.  At a minimum, the Proposed Order

should clarify that any findings in respect of the PSA are without prejudice to the Court's

consideration of any objections to the Plan and Settlement Agreement.

Second, the E-Side Debtors seek authorization through the PSA to take substantive

actions in furtherance of the Restructuring Transactions which are premature, should be the

subject of a separate motion and hearing, and may expose E-Side Unsecured Creditors[2] to

---

[2]   "E-Side Unsecured Creditors" means the unsecured creditors of the EFH Debtors and the EFIH Debtors.

2

irreparable harm. Specifically, the E-Side Debtors are obligated under section 4.3 of the PSA to file the Supplemental Ruling Request with the IRS as well as take "all steps reasonably necessary to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions as soon as possible . . . ." PSA § 4.3(a)(iii) and (vii). Given the illusory obligations of the Investor Parties, the Court should require the E-Side Debtors (and affiliates thereof) to refrain from taking any direct or indirect action with critical regulatory agencies like the IRS and PUCT unless and until the Plan is confirmed by this Court. In addition, the Proposed Order should clarify that approval of the PSA does not authorize the Debtors to take actions in furtherance of the Plan or the PSA that require separate Court approval under Bankruptcy Code section 363.

Third, the Alternative Restructuring safety valve touted by the E-Side Debtors is anything but, as it: (i) discourages alternative plans from being negotiated while the Investor Parties are in front of the PUCT; (ii) locks in the key terms of the Settlement Agreement for insiders of the Debtors pursuant to a backup alternative deal with the TCEH First Lien Creditors, TCEH Unsecured Notes Trustee, TCEH Second Lien Notes Trustee, TCEH Second Lien Notes Collateral Agent, members of the TCEH Unsecured Ad Hoc Group, and members of the TCEH Second Lien Consortium (collectively, the "TCEH Creditor Parties") whether the Settlement Agreement is approved or not; and (iii) is intended to coerce E-Side Unsecured Creditors into accepting the key terms of the Settlement Agreement even if the proposed REIT Reorganization fails by enabling the TCEH First Lien Creditors to pursue a taxable deconsolidation plan. Given the substantial risks faced by E-Side Unsecured Creditors in the event of a failed Plan, the Alternative Restructuring concept should not be approved or should be modified to enable the

Debtors and TCEH First Lien Creditors to pursue negotiations with EFH and EFIH creditors without artificial conditions and limitations designed to stymie sensible plan discussions.

## BACKGROUND

1.      On April 29, 2014, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

2.      On April 14, 2015, the Debtors filed the *Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 4142] (the "Original Plan") and the disclosure statement related thereto [D.I. 4143]. On July 23, 2015, after the Debtors found that they were unable to effectuate the Original Plan, they filed the *Debtors' Amended Joint Chapter 11 Plan of Reorganization* [D.I. 5078] and the *Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization* [D.I. 5080]. On August 3, 2015, the Debtors filed the *Debtors' Second Amended Joint Chapter 11 Plan of Reorganization* [D.I. 5197]. On August 10, 2015, the Debtors filed the *Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 5244] (the "Plan") and the *Disclosure Statement for the Third Amended Joint Chapter 11 Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 5246] (the "Disclosure Statement").

3.      On August 10, 2015, the Debtors also filed a number of agreements related to the implementation of the Plan (collectively, the "Plan Documents"), including the Motion[3] and the *Motion of Energy Future Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter Into and Perform Under the Settlement Agreement* (the "Settlement Motion" and such settlement, the "Settlement Agreement") [D.I. 5249].

---

[3]     The Motion includes, as exhibits, the Purchase Agreement and Agreement and Plan of Merger (the "Merger Agreement"), the Equity Commitment Letter, the Backstop Agreement and the Tax Matters Agreement.

4.      On August 17, 2015, numerous parties, including the Trustee [D.I. 5358], filed objections to the Disclosure Statement (collectively, the "Disclosure Statement Objections").

5.      On August 18, 2015, the Court held a status conference on the Disclosure Statement Objections. The hearing on approval of the Disclosure Statement and the PSA is currently scheduled for September 17, 2015.

## I.      THE DEBTORS' RIGHTS UNDER THE MERGER AGREEMENT AND BACKSTOP AGREEMENT ARE ILLUSORY AND UNENFORCEABLE

6.      The Debtors' assertion that they have obtained commitments from investors to purchase more than $7 billion in new equity is misleading because they have no ability to enforce such commitments *even if* the stars aligned (in the words of Debtors' counsel) and they were able to satisfy each and every high-risk closing condition in the Plan Documents. Omnibus Hr'g Tr. 20:8-9 (June 22, 2015). In fact, the Debtors have deliberately bargained away any right to seek specific performance or damages against their contract counterparties in exchange for "full disarmament" with the TCEH unsecured creditors. *See* Motion at 6. Specifically, the E-Side Debtors have waived their rights under the Merger Agreement to seek specific performance against the Purchasers:

> Notwithstanding anything in this Agreement or any other Transaction Agreement to the contrary, except with respect to any Purchaser's obligation to pay any amount guaranteed pursuant to the Guarantee, *none of the Company, EFIH or any of their Affiliates or stakeholders shall be entitled to seek or obtain specific performance of any Purchaser's* obligations under this Agreement, including to consummate the Equity Draw-Down (or to cause it to be consummated) or complete (or cause to be completed) any other action or transaction to be completed at the First Closing.

Merger Agreement § 9.9(a) (emphasis added).

7.      The E-Side Debtors have also waived their rights under the Merger Agreement to pursue claims and causes of actions or seek monetary damages against the Purchasers or their respective Affiliates in respect of the Merger Agreement:

5

Except with respect to any Purchaser's obligation to pay any amount guaranteed pursuant to the Guarantee, *the Company and EFIH* hereby (i) waive, on behalf of themselves and their Affiliates, any and all common law, statutory or other remedies (including the remedy of specific performance) under any legal theory that such Person or any of their Affiliates may have against the Purchasers or their respective Affiliates in respect of any claims or causes of action under this Agreement and (ii) *agree that,* to the extent they or any of their Affiliates incur losses arising from or in connection with a breach by any other party hereto or any of their respective Affiliates of its representations, warranties, covenants or agreements contained in this Agreement, *in no event shall the Company or EFIH or their Affiliates seek to recover any money damages from (or seek any other remedy, including specific performance, based on any legal, contractual or equitable theory against) the Purchasers or any of their respective Affiliates.*

Merger Agreement § 9.9(b) (emphasis added).

       8.     Furthermore, the Debtors have waived their rights to seek monetary damages or specific performance under the Backstop Agreement:

EFH and EFIH agree that, notwithstanding anything to the contrary contained in this Agreement, *none of EFH or EFIH* or their Affiliates *shall be entitled to seek or obtain specific performance* of any Investor's obligations under this Agreement.

Backstop Agreement § 11.8(a) (emphasis added).

EFH and EFIH hereby agree that, to the extent they or any of their Affiliates incur losses arising from or in connection with a breach by any Investor of its representations, warranties, covenants or agreements contained in this letter agreement, *in no event shall EFH or EFIH or their Affiliates seek to recover any money damages from (or seek any other remedy, including specific performance, based on any legal, contractual or equitable theory against) such Investor or any of its Related Parties.*

Backstop Agreement § 11.8(b) (emphasis added).

9. Accordingly, even if each and every closing condition is satisfied,[4] a closing may never occur. The Debtors concede as much in the Disclosure Statement under the heading "The Merger May Not Close":

> [w]hether or not such conditions are satisfied, the Equity Investors or the Backstop Purchasers may determine not to close the Merger or contribute the cash necessary to fund payments under the Plan. In such case, the Debtors will lack the ability to pursue specific performance or damages with respect to the failure of the Merger or the debt or equity financing to close.

Disclosure Statement, Art. VIII.B.9.

## II.    INSIDERS HAVE A DIRECT INTEREST IN THIS TRANSACTION

10. The Plan and Settlement Agreement confer direct benefits to the Debtors' directors, officers, and equity sponsors and certainly represent the best deal on the table for those in control of the reorganization process. First and foremost are the comprehensive estate releases sought by the Debtors in connection with approval of the Settlement Agreement, which are designed to go effective upon approval of the Settlement Agreement, not consummation of the Plan. The release provisions absolve the Debtors' shareholders, directors and officers, as well as countless others, from their prepetition and postpetition conduct regardless of the outcome of these cases on E-Side Unsecured Creditors. Furthermore, the Debtors' officers (who will become employees of the reorganized TCEH Debtors) have struck agreements to be supported through the PSA and the Plan which require the reorganized TCEH Debtors to: (i) assume certain Employment Agreements (PSA § 10(l)); (ii) acknowledge that the transactions constitute

---

[4]   Restoring the Debtors' enforcement rights under the Merger Agreement and Backstop Agreement is merely a first step in transforming the Plan Documents into something that resembles a "finalized and actionable" deal. The Merger Agreement is replete with off-market closing conditions and the documents memorializing the equity commitments and backstops include numerous off ramps that allow counterparties to skirt their obligations (*e.g.*, investors may assign obligations to affiliated shell entities with the Debtor having no recourse against the original signatories). The point is that the Plan Documents, which were drafted purportedly over many months of complex negotiations, represent a rickety foundation upon which to build a plan of reorganization.

a "change of control" – an acknowledgement which may result in significant undisclosed

payments to those employees who may be entitled to change of control payments (PSA § 10(m));

(iii) enter into severance and change of control agreements with employees currently party to

similar agreements (PSA § 10(n)); and (iv) provide an additional $11 million cash pool to be

paid out after the effective date to certain key employees of the Debtors (PSA § 10(o)).

## OBJECTION

### I.    THE DEBTORS HAVE FAILED TO SATISFY THEIR BURDEN OF PROOF FOR APPROVAL OF THE MOTION

11.    Bankruptcy Code section 363(b) provides that a debtor "after notice and a

hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b)(1). Under Bankruptcy Code section 363(b), courts require that a

debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward*

*Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted). In order to justify

their entry into the PSA under Bankruptcy Code Section 363(b), the Debtors must show that the

PSA: (i) is supported by a sound business purpose; (ii) provides fair and reasonable

consideration; (iii) was requested in good faith; and (iv) was preceded by adequate and

reasonable notice to all interested parties. *See In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D.

Del. 2008); *In re Decora Indus.*, Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20,

2002); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Phoenix Steel*

*Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).

12.    Here, the Debtors have not satisfied, and will not be able to satisfy, their burden

of proof for the following reasons. First, the Debtors cannot support their contention that the

deal is "finalized and actionable right now." Motion at 31. The deal is premised upon an

illusory commitment with counterparties who will fund in their sole discretion after, among other

8

things, the PUCT has identified the conditions it will attach to the approval of an Oncor change of control application premised upon a REIT Reorganization.[5] In addition, the Debtors have knowingly waived rights and remedies against prospective equity investors that are customary and common place in complex chapter 11 cases.[6] Second, the Debtors cannot support their contention that the Plan "offers the best overall value" to E-Side Unsecured Creditors and that they "would be remiss" to not lock up this deal. *See* Motion at 32. Once again, the Debtors present this deal as an opportunity to maximize value for E-Side Unsecured Creditors despite the fact that not one E-Side creditor group supports the deal. In fact, numerous E-Side creditor constituencies are actively contesting the deal in an effort to protect their economic interests and prevent the Debtors from handing control of the restructuring of the E-Side Debtors to creditors of other estates. Third, the Debtors have given up their ability to mitigate risk by agreeing to (i) a "fiduciary out" which will never be exercised and (ii) an alternative plan framework which is designed to discourage alternative plans from being realized. The E-Side Debtors have made a decision to support this transaction, and the inclusion of a "fiduciary out" will neither function as an effective safety valve to protect creditors of the E-Side Debtors nor provide any consolation to the deal's opponents.

---

[5]   The PUCT approval process for the Plan is not a perfunctory process. To the contrary, it is expected to be a fact-intensive, litigious proceeding, just like it was in 2007, in which economic concessions will be negotiated between the change in control applicants, the PUCT and other stakeholders in the process. The existence of legacy debt from the 2007 LBO and the contemplated REIT Reorganization is expected to add greater complexity to the proceedings this time around.

[6]   In large and complex chapter 11 cases considered by this and other jurisdictions, it is customary for debtors to enter into equity commitment and/or backstop commitment agreements that provide for specific performance and that retain the debtors' rights to seek direct monetary damages against investor parties who commit to purchase equity in connection with a plan. *See, e.g.*, *In re Overseas Shipholding Grp., Inc.*, No. 12-20000 (MFW), (Bankr. D. Del. Feb. 28, 2014) [D.I. 2540] (specific performance rights and right to seek monetary damages preserved against investors); *In re Exide Techs.*, No. 13-11482 (KJC), (Bankr. D. Del. Jan. 7, 2015) [D.I. 2893] (same); *In re MPM Silicones, LLC*, No. 14-22503 (RDD), (Bankr. S.D.N.Y. May 9, 2014) [D.I. 147] (same); *In re Eastman Kodak Co.*, No. 12-10202 (MEW), (Bankr. S.D.N.Y. June 18, 2013) [D.I. 4070] (same).

9

13.     To state the obvious, the Debtors are free to pursue confirmation of the Plan and

approval of the Settlement Agreement without Court approval of the PSA.  Furthermore, the

TCEH First Lien Creditors are free to resolve their intercreditor disputes with the TCEH

unsecured creditors with or without a PSA.  Whether the PSA is approved or not, the Debtors

remain at the risk of the Investor Parties walking from the deal in their sole discretion, at any

time, and without any recourse.  The Court should not add insult to injury by approving a PSA

which handcuffs the Debtors, with the Court's imprimatur, to pursue a process over the next 12

months which: (i) is opposed by its purported beneficiaries; (ii) may never be consummated; and

(iii) unreasonably limits the Debtors and TCEH First Lien Creditors from pursuit of reasonable

plan alternatives with E-Side Unsecured Creditors.

14.     Furthermore, the Court should not approve a PSA which goes beyond the limited

relief typically sought in a PSA hearing.  As the Court noted in hearings in June 2014 regarding

discovery in connection with the Terminated Restructuring Support Agreement:

> "I think it's important to start from my perspective on what it is that I'm being asked to
> do in connection with approving a restructuring support agreement, especially one that's
> drafted as loosely or as neutrally as possible in connection with committing the debtor to
> a certain course of conduct.  I understand the utility of restructuring support agreements
> and I understand why they make sense.  ***When you look at it from a strictly legal
> perspective it really is extremely limited relief that the Court is granting.***  I'm not
> confirming a plan, I'm not approving a disclosure statement, I'm not making a valuation,
> I'm not saying that, you know, the debtors if they continue down this road and ultimately
> come to a point where I make a decision that there's going to be some sort of presumption
> of reasonableness or anything along those lines.  I'm approving the assumption of
> agreement that really more than nailing down the debtor nails down the creditors and
> allows the debtor to take a picture of where -- where they are and where the creditors are
> and to if not lock in, make it much more difficult for creditors who are signatories to the
> RSA to back out at a later time for whatever changed circumstances, while at the same
> time preserving their option and -- the debtors' option on whether it makes sense to
> continue down the road."

Omnibus Hr'g Tr. 65:16-25, 66:1-15 (June 6, 2014) (emphasis added).

10

15.    Here, and as set forth more fully below, the Debtors overreach by seeking more

relief than is typical by: (i) seeking findings which are prejudicial to objectors to the Plan and

Settlement Agreement; (ii) requesting authorization to take outside the ordinary course actions to

facilitate Plan *consummation* prior to Plan *confirmation*, without adequate disclosure concerning

such action and a notice and opportunity for objecting creditors to be heard; and (iii) by agreeing

to alternative restructuring terms with the TCEH Creditor Parties which are designed to

discourage alternative plans and lock in insider benefits in the event the Settlement Agreement is

not approved by this Court. The PSA goes well beyond nailing down creditor support for the

Plan – it is designed to make the Plan a *fait accompli* notwithstanding the substantial costs it will

impose upon E-Side Unsecured Creditors should it fail.

## II.    THE COURT SHOULD NOT APPROVE THE PSA OR ENTER THE PROPOSED ORDER WITHOUT ORDERING REASONABLE MODIFICATIONS

16.    The Court should not enter the Proposed Order in its current form. The Trustee

submits that the PSA and Proposed Order should be modified as set forth below.

### A.    *Certain Rulings Requested in the Proposed Order Cannot be Granted Without Prejudicing the Rights of the Holders of EFIH Unsecured Note Claims To Raise Objections in Connection with Plan Confirmation and the Settlement Agreement*

17.    The Proposed Order contains findings that, if entered in its current form, may

preclude the Trustee from examining (and potentially objecting to) issues that will not properly

be before the Court until confirmation of the Plan and approval of the Settlement Agreement.

Specifically, the Proposed Order contains findings which address the "good faith of the Debtors"

in negotiating the Plan. Proposed Order at 3. The introductory paragraph states the Court has

determined that the relief sought in the Motion is "in the best interests of the Debtors' estates,

their creditors and other parties in interest." Furthermore, paragraph A of the Proposed Order

contains a finding by the Court that:

> The Parties have been engaged in extensive arm's-length negotiations with each other in good faith, through mediation and otherwise, regarding the terms of an alternative transaction to be implemented through the Plan, which would amend and replace the Initial Plan. In connection with such Plan negotiations, and as a critical part thereof, certain of the Parties have also engaged in extensive arm's-length negotiations with each other in good faith, through mediation and otherwise, regarding settlement of the litigation in connection with the Standing Motions and the Litigation Letters, including the inter-Debtor and affiliate claims and causes of action and the claims and causes of action against the holders of TCEH First Lien Claims sought to be brought thereunder.

Proposed Order at 3.

18. The Debtors also seek, in paragraph D of the Proposed Order, findings which bear on the Settlement Agreement:

> Each of the Debtors, including the Disinterested Directors with respect to actual conflicts matters, have undertaken a thorough, independent review of (1) the settlements and compromises contained in the Settlement Agreement, including the settlements and compromises between the Debtors with respect to inter-Debtor claims, and the settlements and compromises between the Consenting Parties with respect to estate claims and causes of action alleged against the Consenting Interest Holders and the holders of TCEH First Lien Claims, and (2) the Parties' respective rights and obligations under the PSA, and they have determined, in the valid exercise of their business judgment, that entry into the Settlement Agreement and the PSA is in the best interests of the Debtors' estates and their creditors.

Proposed Order at 4.

19. Any language that pre-determines factual findings in respect of the Plan, the Settlement Motion and the Settlement Agreement should be struck from the Proposed Order. The Motion does not seek confirmation of the Plan or approval of the Settlement Motion and the Court cannot be asked to make findings now that could foreclose the ability of creditors to raise objections to the Plan or Settlement Agreement. Therefore, if the Court grants the Motion, it should: (i) strike any findings that the PSA and/or the contemplated transactions are in the best interest of the estates, their creditors and other parties in interest; (ii) strike any findings that address the "good faith" of the Debtors in negotiating the Plan; and (iii) remove all references

that could be viewed as approving the Settlement Motion and the related Settlement Agreement.

The Proposed Order should also clarify that any findings in respect of the PSA are without

prejudice to the Court's consideration of any objections to the Plan (and related transactions) and

the Settlement Agreement.

> **B.     *Certain Provisions of the PSA Prematurely Authorize the Debtors to Take Substantive Actions in Furtherance of the Plan and the Restructuring Transactions[7]***

20.     Various provisions in the PSA require the Debtors (and other Parties) to take

certain actions that are directly related to consummating the Restructuring Transactions

contemplated in the Plan.  Furthermore, the Proposed Order directs the Debtors to perform all of

its obligations under the PSA.  Paragraph 3 of the Proposed Order provides:

> The Debtors and each of the Parties are ***authorized and directed*** to execute,
> deliver, implement, and fully perform any and all obligations, instruments,
> documents, and papers and ***to take any and all actions reasonably necessary or
> appropriate to consummate, complete, execute, and implement the PSA*** in
> accordance with the terms and conditions thereof, including amending the PSA in
> accordance with the terms thereof.

Proposed Order at 5 (emphasis added).

21.     This paragraph is extremely prejudicial to the interests of the holders of EFIH

Unsecured Note Claims because the PSA obligates the Debtors to use commercially reasonable

efforts to take actions outside the ordinary course of business, with significant economic

implications for the holders of EFIH Unsecured Note Claims, without adequate disclosure or

notice to creditors of the E-Side Debtors.  For example, the Debtors are obligated under section

4.3 of the PSA to use commercially reasonable efforts to do the following:

---

[7]     "Restructuring Transactions" is defined in the Plan to mean "those mergers, amalgamations, consolidations,
arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or
other corporate transactions that the Debtors, the Investor Parties and the TCEH Supporting First Lien Creditors
reasonably determine to be necessary or desirable to implement the Plan, including the Equity Investment, the
transactions described in the Backstop Agreement, the Merger, the incurrence of the New Reorganized EFIH
Debt, the Minority Buy-Out, the REIT Reorganization, the Rights Offering, the Spin-Off, and the deemed
contribution of the Assigned C5 Equity to Reorganized TCEH, as applicable."  Plan at 28.

- take all steps reasonably necessary to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions as soon as possible, and in any event no later than April 30, 2016 (subject to extension in accordance with Section 11(g)) (PSA § 4.3(a)(vii));

- file on or before 28 days after the Debtors' execution of this Agreement, the Supplemental Ruling Request pursuant to Section 10(e) hereof (PSA § 4.3(a)(iii));

- take all steps reasonably necessary to consummate the Rights Offering and the registration of common equity of Parent in connection therewith as soon as practicable (PSA § 4.3(a)(v)); and

- support and take all steps reasonably necessary or desirable to consummate as soon as possible, and in any event no later than April 30, 2016 (subject to extension in accordance with Section 11(g)), the Plan and Restructuring Transactions in accordance with this Agreement (PSA § 4.3(a)(vi)).

22.     The Debtors should not be granted authority, in the Proposed Order, to pursue these actions unless the Plan is confirmed, or a separate order of the Court is entered authorizing such actions and the Plan Sponsors are committed to consummate the Plan. Confirmation of the Plan is not yet before the Court (nor may it ever be). As such, the Court should not authorize the Parties to take material actions designed to facilitate consummation of the Plan absent entry of a confirmation order or separate court order.

23.     Given the illusory obligations of the Investor Parties, the Court should require the Debtors to refrain, and to cause Oncor to refrain, from taking any action with critical regulatory agencies like the IRS and PUCT until the Plan is confirmed by this Court. The PUCT process is particularly concerning given (i) the litigious nature of these proceedings which will involve numerous stakeholder groups, and (ii) the ratepayer concessions that Oncor and the Plan Sponsors will likely have to offer to address concerns regarding the proposed REIT Reorganization. The PUCT may impose fiscal and operational conditions on companies seeking approval of merger transactions. For example, in connection with approving Oncor's 2007 acquisition in connection with the 2007 leveraged buyout, the PUCT imposed substantial

14

conditions and required material modifications to the deal. In fact, Oncor and Texas Holdings (the non-debtor parent company of EFH) entered into a stipulation memorializing a host of commitments necessary to meet the requirements set forth in the Texas Public Utility Regulatory Act ("PURA") § 14.101 and obtain PUCT approval of the 2007 Acquisition. *See* Order Approving Application, Public Utility Commission of Texas, Docket No. 34077, Feb. 28, 2008 (the "PUCT Order").[8] Based on the PUCT's past practices, it is highly likely that when Oncor seeks PUCT approval of the REIT Reorganization, the PUCT will again require a variety of commitments and modifications in order to satisfy the requirements of PURA and obtain PUCT approval. This time, however, the PUCT will have to deal with the added complexity of the REIT Reorganization and the legacy debt obligations from the failed 2007 leveraged buyout. Clearly, if the Plan Sponsors fail to exercise the option and the Plan is not consummated, E-Side Unsecured Creditors, who are the residual owners of the Oncor asset, will have to pick up the pieces in front of the PUCT and cope with the fallout from the initial unsuccessful proceeding influenced by the Plan Sponsors. Accordingly, the E-Side Unsecured Creditors face tangible harm and prejudice if the Debtors and the Court, prior to confirmation of the Plan, permit the Plan Sponsors to "kick the tires" at the Debtors' primary regulators to evaluate whether the option is worth exercising.

24. Accordingly, the Proposed Order should clarify that Court approval of the PSA does not authorize the Debtors to take actions in furtherance of the Plan or the PSA referenced herein or that require separate Court approval under Bankruptcy Code section 363.

---

[8] Oncor and Texas Holdings entered into no less than fifty-two commitments spanning nineteen pages of the PUCT Order to obtain PUCT approval of the 2007 Acquisition. PUCT Order at 7-26.

**C.    *The Alternative Restructuring Concept is Designed to Discourage an E-Side Alternative Plan and Lock in Insider Benefits Under the Settlement Agreement***

25.    The "Alternative Restructuring" concept embedded in the PSA is unnecessary and improper to the extent it locks in place conditions of any alternative plan proposal between the TCEH First Lien Creditors and E-Side Unsecured Creditors. In an interesting twist, the Debtors present this as a benefit to the estates that was a "carefully negotiated right," such that if the Plan is not confirmed or consummated they will not be back at "square one." *See* Motion at 27. The Debtors assert that this feature will allow them to put in place a "backup plan" that protects them from losing precious time if, months down the road (which could be up to 12 months from now), the Plan is not consummated. *See id.* What the Debtors cannot assert in the Motion, however, is that the Alternative Restructuring was designed to benefit the E-Side Debtors and their creditors. In fact, the point of the Alternative Restructuring and the Required Alternative Terms is to (i) discourage alternative plans from being formulated and (ii) lock in the benefits of the Settlement Agreement, for the benefit of the parties to the PSA, without regard to whether the Settlement Agreement is ever approved by this Court or if the E-Side Debtors are part of an Alternative Plan. Furthermore, this fact is not even disclosed to the Court in the Motion.

26.    The Alternative Plan provisions make it impossible to negotiate and confirm a Plan that does not include the material provisions of the Settlement Agreement. Even if the Court does not approve the Settlement Agreement at the confirmation hearing, the Debtors and the other parties to the PSA remain bound to support a plan that implements the material provisions of the Settlement Agreement, including the requirement that any E-Side plan grant the TCEH estate a $700 million unsecured claim against EFH. PSA §§ 5.1(b), 5.3(a), 5.4(a), 5.5(a) and 6.1(b)(ii). The Debtors also raise the stakes by failing to lock the TCEH First Lien Creditors into a non-taxable Alternative Restructuring (even for a limited period of time). By failing to do

16

so and exposing E-Side Unsecured Creditors to taxable deconsolidation risk, the Debtors are exposing E-Side Unsecured Creditors to significant harm.

27.    Even if the Required Alternative Terms were acceptable, the Debtors have agreed to conditions which will discourage any counterparties on the E-Side from engaging in such discussions. First, the Debtors are not explicitly permitted to seek court approval of any support agreement associated with an Alternative Restructuring. *See* PSA § 4.3(a). The Debtors can take negotiations to the one yard line but then may be required to wait until next summer to seek approval of any Alternative Restructuring. Second, the Debtors are not permitted to publicly disclose the terms of an Alternative Restructuring. *Id.* Third, the Debtors are required to have counterparties to the Alternative Restructuring negotiations enter into confidentiality agreements under which they are required to keep the existence and the material terms of such negotiations confidential. While this is not unexpected, the Debtors have left up in the air how they intend to reconcile customary cleansing provisions with the general prohibition on disclosing terms. *Id.* These provisions are intentional and designed to head off any competitive alternative plans while the Investor Parties are in front of the PUCT. The Debtors are giving the Investor Parties the first shot at approval of a REIT Reorganization and the existence of an alternative deal with less conditionality may undermine the "only solution available" posture the Investor Parties presumably intend to take in front of the PUCT. By discouraging other plans from coming into existence while the Investor Parties are in front of the PUCT, the Debtors are once again serving the interests of the Investor Parties at the expense of the E-Side Unsecured Creditors.

28.    This issue is critical given the free option that the Investor Parties have under the PSA and related documents. The PSA includes various triggers that allow certain Parties to extend the Plan Support Outside Date to August 31, 2016. *See* PSA § 11. For example, upon

17

receiving all required approvals from the PUCT (and subject to receiving certain approvals

associated with the Spin-Off or from the FERC or the NRC), the Plan Support Outside Date

could be extended to August 31, 2016. *See id.* § 11(g)(iii). As such, it is entirely possible that,

*one year from now,* there will be no assurance that the Plan will actually be consummated, even

if all of the necessary regulatory approvals are obtained, since the Investor Parties could

nevertheless determine not to close critical funding transactions, without any recourse to such

parties. *See* Disclosure Statement at VIII.B(9). Given the significant "outs" that are granted to

the Investor Parties under the Plan, the Debtors cannot forgo the ability to negotiate with every

other creditor regarding the terms of backup restructuring proposal. While the Investor Parties

can walk from the deal with impunity, the RSA restricts the Debtors' ability to walk and could

result in irreparable harm to the E-Side Debtors and their creditors. In order to counter-balance

this free-option, the PSA should be amended to permit the Debtors and TCEH First Lien

Creditors with the ability not just to negotiate, but also to enter into a court-approved binding

agreement to support, an Alternative Restructuring Transaction in the event the Plan is not

consummated.

## RESERVATION OF RIGHTS

29.    This Objection is submitted without prejudice to, and with a full reservation of,

the Trustee's right to supplement this Objection in advance of or in connection with the hearing

on the Motion. Nothing herein shall be deemed to waive the Trustee's right to assert any

arguments in connection with approval of the Disclosure Statement, confirmation of the Plan,

and the Settlement Motion.

18

## CONCLUSION

**WHEREFORE**, for the reasons set forth in this Objection, the Trustee respectfully

requests that the Court deny approval of the Motion unless the PSA and the Proposed Order are

modified to address the concerns set forth in this Objection.

Dated:  August 24, 2015
Wilmington, Delaware

**AKIN GUMP STRAUSS HAUER & FELD
LLP**
Ira S. Dizengoff (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone:      (212) 872-1000
Facsimile:      (212) 872-1002
Email:           idizengoff@akingump.com
                 aqureshi@akingump.com


Scott L. Alberino (admitted *pro hac vice*)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone:      (202) 887-4000
Facsimile:      (202) 887-4288
Email:           salberino@akingump.com

By:   ___/s/ Raymond H. Lemisch___
**KLEHR HARRISON HARVEY
BRANZBURG LLP**
Raymond H. Lemisch (No. 4204)919 Market
Street, Suite 1000
Wilmington, DE 19801
Telephone: (302) 426-1189
Facsimile: (302) 426-9193
E-mail: rlemisch@klehr.com

**FOLEY & LARDNER LLP**
Harold L. Kaplan (admitted *pro hac vice*)
Mark F. Hebbeln (admitted *pro hac vice*)
Lars A. Peterson (admitted *pro hac vice*)
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone: (312) 832-4500
Facsimile: (312) 832-4700
Email: hkaplan@foley.com
          mhebbeln@foley.com
          lapeterson@foley.com


Barry G. Felder (admitted *pro hac vice*)
Jonathan H. Friedman (admitted *pro hac vice*)
90 Park Avenue
New York, NY 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-2329
E-mail: bgfelder@foley.com
          jfriedman@foley.com

*Co-Counsel for UMB BANK, N.A., as Trustee*