1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                        :

                                    :    Chapter 11

6    ENERGY FUTURE HOLDINGS         :

     CORP., et al.,                 :    Case No. 14-10979(CSS)

7                                   :

              Debtors.             :    (Jointly Administered)

8    _____ :

9

10

11

12                           United States Bankruptcy Court

13                           824 North Market Street

14                           Wilmington, Delaware

15

16

17                           August 25, 2015

18                           9:58 AM

19

20    B E F O R E :

21    HON CHRISTOPHER S. SONTCHI

22    U.S. BANKRUPTCY JUDGE

23

24

25    ECR OPERATOR:  BRANDON MCCARTHY

1    HEARING re Motion of Energy Future Holdings Corp., et al.,

2    for Entry of an Order Amending Certain Hearing Dates and

3    Deadlines in Connection with the Confirmation of Debtors'

4    Plan of Reorganization [D.I. 5269; filed August 11, 2015]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Sherri L. Breach, Dawn South, Tracey

25                     Williams & Sheila Orms

1    A P P E A R A N C E S :

2    KIRKLAND & ELLIS

3         Attorney for the Debtors

4

5    BY:  CHAD HUSNICK, ESQ.

6         EDWARD SASSOWER, ESQ.

7         ANDREW MCGAAN, ESQ.

8         MARK MCKANE, ESQ.

9         BRIAN SCHARTZ, ESQ.

10

11   RICHARDS, LAYTON & FINGER

12        Attorneys for the Debtors

13

14   BY:  DAN DEFRANCESCHI, ESQ.

15        JASON MADRON, ESQ.

16

17   MONTGOMERY MCCRACKEN

18        Attorney for EFH Committee

19

20   BY:  NATALIE RAMSEY, ESQ.

21

22   MCELROY DEUTSCH MULVANEY & CARPENTER LLP

23        Attorney for TCEH Debtors

24

25   BY:  DAVID A. PRIMACK, ESQ.

```
                                              Page 4
 1   PAUL, WEISS, RIFKIND, WHARTON & GARRISON

 2        Attorneys for the Ad Hoc Committee of TCEH First Lien

 3        Creditors

 4

 5   BY:  ALAN W. KORNBERG, ESQ.

 6        JACOB A. ADLERSTEIN, ESQ.

 7        ADAM J. BERNSTEIN, ESQ.

 8        MOSES SILVERMAN, ESQ.

 9

10   YOUNG CONAWAY STARGATT & TAYLOR, LLP

11        Attorney for the Ad Hoc Committee of TCEH First Lien

12        Creditors

13

14   BY:  PAULINE MORGAN, ESQ.

15

16   VENABLE, LLP

17        Attorneys for Pimco

18

19   BY:  JEFFREY S. SABIN, ESQ.

20        JAMIE EDMONSON, ESQ.

21

22   KLEHR HARRISON HARVEY BRANZBURG, LLP

23        Attorney for UMB Bank, N.A.

24

25   BY:  RAYMOND H. LEMISCH, ESQ.
```

1  UNITED STATES DEPARTMENT OF JUSTICE

2      Attorney for the U.S. Trustee

3

4  BY:  RICHARD L. SCHEPACARTER, ESQ.

5

6  BROWN RUDNICK LLP

7      Attorney for WSFS

8

9  BY:  JEFFREY L. JONAS, ESQ.

10

11  BAYARD

12      Attorney for Delaware Trust Co. as Indenture

13      Trustee

14

15  BY:  JUSTIN ALBERTO, ESQ.

16

17  REED SMITH LLP

18      Attorney for BNYM and BNYMTC

19

20  BY:  KURT E. GWYNNE, ESQ.

21      KIMBERLY E.C. LAWSON, ESQ.

22

23

24

25

```
                                                   Page 6
 1   PROSKAUER ROSE, LLP

 2         Attorney for EFIH

 3

 4   BY:  MARK THOMAS, ESQ.

 5

 6   JENNER & BLOCK

 7         Attorney for EFIH

 8

 9   BY:  VINCENT LAZAR, ESQ.

10

11   KRAMER LEVIN NAFTALIS & FRANKEL, LLP

12         Attorney for Second Lien Indenture Trustee

13

14   BY:  JOSHUA BRODY, ESQ.

15         RACHAEL RINGER, ESQ.

16

17   PACHULSKI STANG ZIEHL & JONES

18         Attorney for EFIH Second Lien Indenture Trustee

19

20   BY:  COLIN R. ROBINSON, ESQ.

21

22   LANDIS, ROTH & COBB

23         Attorney for Alcoa, Inc.

24

25   BY:  JOSEPH WRIGHT, ESQ.
```

1    MCKOOL SMITH, PC

2         Attorney for Alcoa, Inc.

3

4    BY:  PETER S. GOODMAN, ESQ.

5

6    SHEARMAN & STERLING

7         Attorneys for Deutsche Bank New York

8

9    BY:  NED S. SCHODEK, ESQ.

10

11   POTTER ANDERSON CARROON LLP

12        Attorney for Deutsche Bank New York

13

14   BY:  R. STEPHEN MCNEILL, ESQ.

15

16   SULLIVAN & CROMWELL

17        Attorney for EFH Committee

18

19   BY:  BRIAN GLUECKSTEIN, ESQ.

20        STEVEN L. HOLLEY, ESQ.

21

22   NIXON PEABODY

23        Attorney for AST as EFH Indenture Trustee

24

25   BY:  RICHARD PEDONE, ESQ.

1    DRINKER, BIDDLE & REATH

2         Attorney for Citibank, DIP Agent

3

4    BY:  HOWARD COHEN, ESQ.

5

6    POLSINELLI

7         Attorneys for TCEH Committee

8

9    BY:  JUSTIN EDELSON, ESQ.

10        CHRIS WARD, ESQ.

11

12   MOFO

13        Attorneys for TCEH Committee

14

15   BY:  BRETT MILLER, ESQ.

16        CHET KERR, ESQ.

17        DAN HARRIS, ESQ.

18

19   MORRIS JAMES, LLP

20        Attorney for Law Debenture

21

22   BY:  STEPHEN MILLER, ESQ.

23

24

25

1   PATTERSON BELKNAP WEBB & TYLER

2       Attorney for Law Debenture Trust Co.

3

4   BY:  DANIEL A. LOWENTHAL III, ESQ.

5

6   WILMER CUTLER PICKERING HALE AND DOOR LLP

7       Attorney for Delaware Trust

8

9   BY:  PHILIP ANKER, ESQ.

10

11  O'KELLY, ERNST & BIELLI, LLC

12      Attorneys for Debtor

13

14  BY:  SHANNNON J. DOUGHERTY, ESQ.

15

16  COLE SCHOTZ, PC

17      Attorney for Delaware Trust

18

19  BY:  KATE STICKLES, ESQ.

20

21  MUNGER TOLLES & OLSON, LLP

22      Attorney for TCEH, EFCH

23

24  BY: THOMAS WALPER, ESQ.

25

1    ASHBY & GEDDES

2         Attorney for WSFS, Trustee

3

4    BY:  BILL BOWDEN, ESQ.

5

6    STEVENS & LEE

7         Attorney for EFIH

8

9    BY:  JOSEPH H. HUSTON, JR., ESQ.

10

11   WHITE & CASE

12        Attorney for TCEH Ad Hoc Group

13

14   BY:  J. CHRISTOPHER SHORE, ESQ.

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S

2           THE CLERK:  All rise.

3           THE COURT:  Please be seated.

4           Good morning.

5           MR. SASSOWER:  Good morning, Your Honor.  Edward

6    Sassower of Kirkland & Ellis on behalf of the debtors.

7           THE COURT:  You may --

8           MR. SASSOWER:  May I proceed?

9           THE COURT:  -- proceed.  Yes.

10          MR. SASSOWER:  Thank you.

11          Your Honor, the only item on the agenda today is

12   the scheduling motion.  My partner, Mark McKane, will

13   address that motion and the objections in detail.  But

14   before he does that I would like to provide a brief progress

15   report and after that I will briefly discuss the importance

16   of setting a confirmation schedule to continue to encourage

17   the parties in plan negotiations.  And after that, lastly,

18   Your Honor, I would like to address three misconceptions

19   that have been apparent in discussions on the record about

20   the merger transaction.

21          The first is that the merger transaction and the

22   settlement agreement were a surprise and, therefore, merit

23   additional litigation time.

24          The second is that the debtors have been ignoring

25   the E Side and that is why there's not a readily available
```

1    alternative.

2            And the third is that the merger transaction is a

3    "free option."

4            Each of these three issues is addressed in detail

5    in the debtors' reply so I'll try to be brief this morning.

6            Beginning with the progress update, the debtors

7    continue to work with the Hunt & TCH unsecured ad hoc Group

8    to push forward on various aspects of the transaction.  This

9    includes engaging with various third parties who will be

10   integral to implementation of the merger transaction in the

11   event the Court confirms the plan and approves this -- the

12   transaction.

13           Importantly, Your Honor, Encore informed the

14   debtors yesterday that its board has approved the Encore

15   side letter between Encore and the entities that will own

16   reorganized EFH subject to the written consent of EFH and

17   EFIH.  The debtors' boards will take that consent under

18   consideration later this week.

19           As Your Honor may remember, execution of the side

20   letter is an important milestone under the merger agreement

21   and the PSA.

22           In addition, the debtors are preparing to file a

23   motion to approve the merger and backstop agreement that

24   will be heard in connection with confirmation.

25           With regard to the matter at hand, Your Honor, as

1    we've said in the past we believe court-approved deadlines

2    are key drivers to progress in a case this large and this

3    complex.  Virtually all of the real progress in this case

4    has occurred when people are bucking up against a court-

5    ordered deadline.  Without dates that parties are working

6    towards, stakeholders tend to lose focus and negotiations

7    tend to meander.  We think we've made a lot of progress to

8    date, but the best way to keep making progress is to keep

9    people on a tight schedule.

10           Your Honor, now I'll turn to the three

11   misconceptions that I would like to address this morning.

12           The first point is probably the most germane to

13   the scheduling motion.  Parties have tried to characterize

14   the plan, the settlement, the merger transaction as some

15   great surprise.  But the basic structure of the deal has

16   actually been part of the public record for quite some time

17   now.

18           As we explain in detail in our reply brief, the

19   debtors filed an initial plan that contemplated a merger

20   transaction and the DBA settlement on April 14th of this

21   year and supplemented that with extensive discussion on the

22   record at the hearings on May 4th, June 1st, June 25th and

23   July 23rd.

24           In addition, as I'll discuss in more detail in a

25   minute, for the duration of the merger negotiations the

1   debtors were simultaneously negotiating a parallel

2   transaction with various E Side stakeholders, and these

3   parallel negotiations were no secret to most, if not all

4   creditors.

5           In fact, not only would E Side credit advisors and

6   T Side credit advisors sometimes pass each other on the 50th

7   floor conference center at Kirkland's New York office, but

8   there were at least a couple of meetings attended by

9   advisors for key constituents to both sides, not to mention

10  numerous one on one calls to keep parties apprised of the

11  general state of play.

12          The DD settlement, which is incorporated in large

13  part in the settlement agreement has a similar history.  The

14  underlying facts that give rise to the alleged claims

15  resolved under the DD settlement are well known to all major

16  stakeholders in this case.  To that end, the debtors have

17  produced over 800,000 totaling more than 5.6 million pages

18  in an eight-month discovery process.

19          In connection with the filing of the DD settlement

20  last April, the DBAs themselves filed extensive materials

21  detailing the settlement and the bases for the settlement.

22          Your Honor, I should note after I yield the

23  podium, each of the DBAs are here and would like to address

24  the Court.

25          Since April, the DBAs have provided additional

1   information about their negotiations in the disclosure

2   statement and have produced additional documents further

3   evidencing their negotiations.  Five months later the

4   debtors' third amended plan and settlement agreement

5   incorporate the DD settlement in substantially similar form.

6            All this is to say, Your Honor, is that the path

7   to this deal has been long and it has been transparent to

8   the various creditor groups and the official committees in

9   this case.  Some stakeholders are seeing some of the details

10  for the first time, but as core components the merger, the

11  tax-free spinoff of reorganized TCH, the DD settlement have

12  been the subject of documentation, discussion and due

13  diligence for at least five months.  And the issues they

14  resolved in this deal have been the subject of eight months

15  of discovery.

16           Moreover, the deal that we've struck substantially

17  narrows the confirmation issues despite some of the

18  objectors trying to argue the contrary.  The deal resolves

19  what would have been a valuation and equity allocation fight

20  on the E Side, a cram-down on the T Side, litigation from

21  both sides around the DD settlement and litigation on the T

22  Side regarding the allocation of value.

23           Moreover, the deal resolves the T Side's standing

24  litigation and provides an agreed cash collateral extension

25  avoiding a fight on those fronts as well.

1                    Of course the parties have raised potential

2        confirmation issues that are present and still outstanding.

3        And it's our goal to resolve as many, if not all of those

4        issues by the time we get to confirmation.

5                    And to that end the debtors are in connect -- are

6        in conversations with the objecting stakeholders.  But to

7        the extent that we're not able to get there, to the extent

8        we're not able to resolve all of those objections, we think

9        the confirmation hearing will nevertheless be far simpler

10        than it would have been absent this deal.

11                    Your Honor, let me pause here for a moment as it

12        relates to the objecting stakeholders.  In paragraph 30 of

13        the reply brief that we filed the debtors noted that a

14        number of the E Side creditors, including Fidelity, have not

15        filed objections with this Court.  Fidelity was upset by

16        this comment, and so the debtors have agreed to correct the

17        record with the following statement which has been

18        coordinated with Fidelity.  That statement is as follows:

19                    "While this observation is factual, neither the

20        Court nor the constituents should interpret the debtors'

21        observation as commentary about or by Fidelity.  The debtors

22        did not intend to characterize why Fidelity did not file

23        written objections, ascribe any motivation as to why

24        Fidelity did not file written objections, or profess any

25        specific insights into Fidelity's decision-making on why it

1    did not file written objections."

2            Moving on, Your Honor, to the second

3    misconception.  It's also important to consider the

4    available alternatives to the merger transaction.  Parties

5    have alleged that we've ignored the E Side and the

6    implication is that there would have been some better

7    alternative had we not done that.  Yet the fact is we tried

8    incredibly hard to pull something together on the E Side and

9    it ultimately didn't happen.

10           These negotiations advanced to the point that the

11   debtors announced at the June 25th hearing, but the E Side

12   equitization -- that the E Side equitization combined with a

13   new money investment was the tentative path forward.  But

14   we noted at that hearing that the equity financing still had

15   a ways to go and, in the end, it did not come to fruition.

16           Despite these setbacks, we have every intention of

17   continuing to negotiate an alternative plan in case the

18   proposed plan is not consummated.  The PSA allows us to do

19   this which, again, was a key sacrifice made by the investor

20   group.  And as I stated just a minute ago, the debtors are

21   engaged in ongoing negotiations with the non-consenting

22   stakeholders and are hopeful that we'll be able to generate

23   consensus around the primary plan.

24           As to the free option point, Your Honor, we will

25   provide a full briefing on this issue in connection with

1    confirmation and we can introduce evidence to the extent

2    it's necessary.  But before this concept starts to snowball,

3    and given that Your Honor mentioned it at the last hearing,

4    I wanted to briefly touch on it this morning.

5              I think the free option narrative started at the

6    hearing a couple of weeks ago when we first announced a

7    deal.  After I provided an update at that hearing, Mr.

8    Diederich (ph) got up and said that a "free option"  is "how

9    the debtors' counsel described the deal" to him.

10             And then later Mr. Kireshi (ph) of Akin Gump on

11   behalf of the PIC trustee said the deal is "a free option as

12   characterized by the debtors."  I do love that.  Mr.

13   Diederich says the debtors says something and then Mr.

14   Kireshi says, as the debtors have conceded, Your Honor.

15             We're here to tell you today that we have -- we

16   have not conceded that point.  At that hearing two weeks ago

17   we had already yielded the podium and we didn't think those

18   comments rose to the level that needed to be corrected at

19   that hearing.  But to be clear from the debtors' perspective

20   this is not a free option.

21             The free option argument is based primarily on the

22   conditionality and lack of remedies if the deal doesn't

23   close.  But every agreement governing complex mergers like

24   this one has a measure of conditionality for the purchaser

25   because of the extensive conditions to closing.

1           This merger agreement in particular has a

2    significant degree of conditionality as made clear on the

3    record at the various hearings leading up to signing and

4    later in the disclosure statement and other filings.  But

5    this conditionality did not come free to the investor group.

6           Instead, the proposed new equity owners of

7    reorganized EFH made a key concession in exchange for the

8    deal's conditionality, which is disarmament.  Disarmament is

9    a key sacrifice on the part of the TCH junior creditors that

10   signed up to this deal and makes the transaction anything

11   but free.

12          Disarmament is first and foremost an agreement of

13   the TCH creditors to support a comprehensive settlement of

14   any and all alleged causes of action, including the DBA

15   settlement come what may.  The disarmament concept is

16   embodied primarily in the settlement agreement.  However,

17   the PSA also requires that the parties support an

18   alternative restructuring under certain circumstances, which

19   is what we call the drag.

20          Under the drag the TCH junior creditors have

21   agreed to refrain from objecting to an alternative plan that

22   provides them at least $550 million in cash recovery, paid

23   from the TCH estate as a carve-out from TCH's first lien

24   collateral.  Together, disarmament and the drag provide

25   assurance that the time spent pursuing the merger

Page 20

1    transaction will not be lost time.

2          The disarmament concept can be thought of like a

3    non-refundable deposit.  Instead of cash, however, the

4    currency is the permanent waiver of any and all alleged

5    causes of action.  These claims have the significant

6    potential to involve significant litigation costs and

7    massive delay, and the TCH unsecured creditors have alleged

8    that these causes of action, alleged causes of action have

9    significant value.

10          With that context we think it's difficult for any

11   party to characterize the rights of the ad hoc TCH unsecured

12   creditors in the proposed transactions as something that was

13   obtained free of cost.

14          With that, Your Honor, unless you have any

15   questions I will yield the podium to the DBAs.

16          THE COURT:  No questions.  Thank you.

17          MR. SASSOWER:  Thank you, Your Honor.  I think

18   we're going to start with Mark Thomas of Proskauer on behalf

19   of the EFH DBs.

20          MR. THOMAS:  Morning, Your Honor.

21          THE COURT:  Morning.

22          MR. THOMAS:  Mark Thomas of Proskauer representing

23   EFH and acting on behalf of and at the direction of Billy

24   Williamson and Don Evans, the disinterested directors of

25   EFH.

1           And, Your Honor, we have been retained and

2     resolutions were passed so that the disinterested directors

3     of EFH would resolve inter-debtor conflict matters.  And

4     notwithstanding ad hominem attacks and disparaging remarks

5     regarding the good faith of the work of the disinterested

6     directors and their advisors, we are here.  We have been

7     here since November and we have been actively involved in

8     all aspects of these cases.

9           Since our retention in November on behalf of the

10    disinterested directors of EFH we have reviewed, analyzed

11    and considered many things, including all the legacy

12    discovery.  And that legacy discovery, in addition to the

13    interlinks database, has been available to all the objectors

14    and they have had full and unfettered access to that trough

15    of documents and factual information.

16          And those documents and factual information gave

17    rise in February to the filing of standing motions and

18    litigation letters by various parties in interest, including

19    the official EFH committee.

20          Your Honor, we have also reviewed and considered

21    financial information and valuation information.  We, along

22    with the EFH committee, were intimately involved in the

23    bidding procedures and the bid process that Your Honor

24    approved with respect to the potential sale of Encore.  And

25    we, like the professionals as the EFH committee who were

1    aware of that process, know why no stalking horse bid was

2    presented to Your Honor for approval.

3              Your Honor, we have reviewed and considered all

4    proposals and all term sheets put forth by E Side

5    constituents and stakeholders with respect to alternative

6    plans of reorganization.  Those included proposals from the

7    EFIH PICs, the EFIH second liens, and the EFH creditors,

8    principally Fidelity.  We have not received any proposals or

9    any term sheets at any time from the EFH official committee.

10             We have considered the inertia that presently

11   exists with the E Side creditors.  That inertia is

12   unfortunate.  They're having a difficult time coming to

13   consensus on an E Side restructuring.  We believe that

14   difficult time is driven by the fact that they all want to

15   recover par plus accrued, and when everyone wants much

16   greater than 100 cents on the dollar for their claims in

17   Chapter 11 it's difficult to come to consensus.

18             We have considered the merits of the various

19   inter-debtor claims which gave rise to the DD settlement

20   that was announced in April.  And the gist of those claims

21   are avoidance actions that would be very complex, very time-

22   consuming and extremely expensive to litigate.  And most of

23   those types of claims were set forth in the standing

24   motions.  They were also discussed at length in the proposed

25   -- in the submissions of the disinterested directors in

Page 23

1    April.

2            We've also considered the merits of the inter-

3    creditor claims that were also set forth in those standing

4    motions.

5            And at the appropriate time, Your Honor, we will

6    support the re-plan sponsored by the T unsecured that is

7    presently on file and the plan support agreement and the

8    9019 settlement agreement.  Now is not the time, but we will

9    be here at -- when those matters are up for hearing.

10   Today, we support the scheduling motion.

11           Your Honor, we've considered carefully the

12   regulatory risks and issues involved in the plan.  And these

13   regulatory risks will exist in any plan.  These are

14   regulated businesses.  Any change of control will require

15   consent and approval from the nuclear regulatory commission,

16   from FERK (ph), from the Public Utility Commission of Texas,

17   and we are also seeking rulings from the Internal Revenue

18   Service and that is a fact of life in these cases.

19           Your Honor, we've carefully considered the

20   disarmament provisions and the drag-along provisions that

21   Mr. Sassower mentioned, and the extraordinary benefits that

22   will occur to this estate in the event that the effective

23   date of the plan, assuming the plan is confirmed, does not

24   occur.  And we've considered the costs and the savings and

25   the time that will be paired off of the case based upon

1     disarmament and drag.

2              Your Honor, we have met with and discussed the

3     disinterested directors' settlement as modified by the 9019

4     motion.  We have discussed the various proposals from the E

5     Side with E Side constituents and stakeholders.

6              Your Honor, if I may?

7              THE COURT:  Yes.  OF course.  Sorry.

8              MR. THOMAS:  Just briefly --

9              THE COURT:  Taking some notes.

10             MR. THOMAS:  That's -- thank you.

11             Briefly, with respect to the 9019 settlement, it's

12    extraordinarily complex and it's incredibly easy.  The gist

13    of the settlement is each of the three major debtors, EFIH,

14    EFH who I represent, and TCEH grant each other releases of

15    all claims and all causes of action except that the TCEH

16    estate, for the benefit of its creditors, will receive an

17    allowed unsecured claim of $700 million against EFH.  That

18    allowed claim is not a gift.  It was carefully considered an

19    analyzed.

20             And one of the things that the 9019 settlement

21    does is there is an agreement between the T first liens,

22    first lien creditors, and the T unsecured creditors that

23    provides that that $700 million allowed claim constitute

24    prepetition collateral of the T first lien creditors.

25             And in the absence of that kind of settlement, and

1    in the absence of the 9019 settlement, Your Honor, here's

2    what the EFH estate would be faced with.

3           Number one, we would be faced with the T estate

4    asserting claims against EFIH, and that's disclosed in the

5    April disclosures from the disinterested directors.  Those

6    claims would be structurally senior to the claims of

7    creditors at EFH.  We don't want structurally senior claims,

8    and that release was bargained for.

9           The other thing the EFH estate would be subjected

10   to is over $4 billion of claims from both TCEH and EFIH.

11   And the time and expense and delay, as Your Honor knows from

12   the make-whole (sic) litigation, these types of claims if

13   they're litigated will cost tens if not hundreds of millions

14   of dollars, will take months if not years to get to final

15   adjudication, and will severely diminish the pot of assets

16   available at EFH for its creditors.

17          Your Honor, before I turn over the podium just

18   briefly, in terms of the inter-debtor discovery, and as we

19   get into the scheduling, most of the facts and documents

20   underlying the claims have long been available to everybody.

21   In July the disinterested directors were served with

22   subpoenas.  One of the subpoenas directed to Mr. Evans of

23   EFH is attached as an exhibit to the debtors' reply that was

24   filed yesterday.

25          There are over 60 categories of requested

1   documents including 17 categories regarding plan

2   negotiations, ten categories regarding federal tax matters,

3   five categories regarding conflicts of interest, seven

4   categories regarding releases and 20 categories regarding

5   the inter-debtor settlement.

6           That discovery we've -- we, the EFH disinterested

7   directors to date have produced over 25,000 documents in

8   response to that discovery.  We anticipate we will conclude

9   our document production this week.

10          So we believe, Your Honor, that the 9019

11  settlement which will be tried as part of confirmation and

12  the plan confirmation hearing and the related discovery,

13  there is more than ample time in the schedule proposed for

14  parties in interest to review the documents that have been

15  at their doorstep for months and months and months, and

16  conduct discovery.

17          Thank you, Your Honor.

18          THE COURT:  You're welcome.

19          MR. WALPER:  Good morning, Your Honor.  Thomas

20  Walper, Munger, Tolles & Olson on behalf of TCEH and EFCH as

21  directed by the disinterested manager at those companies,

22  Mr. Hugh Sawyer.

23          I will not restate the words of my colleague, Mr.

24  Thomas, because I think there's a number that want to take

25  the podium.  But to allay any doubt that this Court may have

1   whatsoever we have done extensive due diligence with and on

2   behalf of Mr. Sawyer in connection with the settlements that

3   have been achieved.

4          And I might note for those naysayers on the left

5   side here, or your right side, that the $700 million claim

6   that has been entered into settlement in connection with the

7   amended plan is actually $105 million less than the amount

8   that the disinterested directors negotiated on behalf of the

9   T Side and, you know, lest they protest too much, $805

10  million is actually the claim that was negotiated.

11         We, on behalf of TCEH and EFCH have considered all

12  of the options that have been presented for joint and

13  individual reorganization of the debtors.  We have met on

14  numerous times with the T Side constituents, but also in

15  groups and individually with some E Side constituents.

16         We have met with a mediator on a number of

17  occasions.  We have separately reviewed and commented on

18  each and every one of the documents that has been prepared

19  in connection with the plans of reorganization.  We have

20  advised Mr. Stoier (ph) with respect to actually conflicts

21  and matters that might lead to actual conflicts.  He has

22  approved an individual session and independently all of the

23  documents that have been filed and approved the transactions

24  for presentation to this Court.

25         And we strongly believe that this is absolutely in

1    the best interest of all the parties going forward; that the

2    timeline is a reasonable timeline, and as both Mr. Sassower

3    and Mr. Thomas have said that this is not in any respect a

4    free option.  I'm sure we'll hear from Mr. Kornberg (ph) and

5    Mr. Shore today about how this is a painfully expensive

6    option for them, but it's an option to attempt to maximize

7    the value of these estates and exit from bankruptcy within a

8    reasonable period of time.

9              Thank you, Your Honor.

10             THE COURT:  You're welcome.

11             MR. LAZAR:  Morning, Your Honor.  Vince Lazar,

12   Jenner & Block on behalf of Energy Future Intermediate

13   Holding Company acting at the direction of Charles Clemens

14   (ph), the disinterested director.

15             Your Honor, I don't want to belabor any of the

16   points made by Mr. Thomas or Mr. Walper.  Briefly, the

17   disinterested directors and/or advisors have been involved

18   in all aspects of the plan negotiations.  They have taken

19   their fiduciary obligations very seriously and heavily

20   negotiated the terms of the settlement and the plan.

21             Like any good compromise, this plan and settlement

22   involve significant give and take on the part of all

23   parties, but we are very satisfied that the end result here,

24   the plan and the settlement agreement, represent a fair deal

25   for all parties in this case.

1          We, therefore, support them and support the

2   schedule proposed by the debtors to move this case forward

3   to confirmation.

4          Thank you, Your Honor.

5          THE COURT:  Thank you.

6          MR. MCKANE:  Good morning, Your Honor.  Mark

7   McKane of Kirkland & Ellis on behalf of the debtors for the

8   motion that is before the Court today.

9          Your Honor, the debtors' proposed schedule is and

10  provides a reasonable path forward for the late October

11  hearing because it balances the interest of the debtors, the

12  plan supporters, the plan sponsors and the potential plan

13  opponents.

14         The schedule is a key element of a carefully

15  assembled consensus between the debtors and plan supporters

16  about the plan and the settlement agreement, and it provides

17  more than sufficient time and opportunity for creditors to

18  prepare for a hearing on any contested remaining issues.

19         The debtors' schedule is the most sensible path

20  forward when considered in the overall context of these

21  cases.  First, the potentially contested issues for October

22  are far fewer than those anticipated for the January

23  hearing.

24         Second, the objectors are already well positioned

25  to address those issues based on the debtors' restructuring

1    and diligence efforts to date.

2              And, third, the remaining issues are relatively

3    confined and straightforward especially when compared to

4    what was -- may have been presented to you in January.

5              In light of those substantially narrowed

6    confirmation issues and the summary nature of the Court's

7    review of the settlement under Rule 9019 the debtors believe

8    the proposed settlement provides creditors with a full and

9    fair opportunity to investigate and raise all potential

10   objections.

11             First, Your Honor, turning to the issues to be

12   litigated and how they are far fewer than before.  The

13   current scheduling order already provides for an October

14   2015 hearing for any plan that garners broad T Side support

15   while proposing to pay E Side creditors full and in cash.

16             The rationale for that date and for that hearing

17   was that a qualifying plan would resolve and eliminate many

18   of the complex and factually sensitive issues that were to

19   be decided in a cram-down confirmation hearing in January.

20   The plan, the plan support agreement and the settlement

21   agreement do just that.

22             So when evaluating the proposed schedule for a

23   late October hearing, the Court should consider all of the

24   issues that would have been litigated and presented in

25   January.  Specifically with that non-consensual E Side

1    equitization plan the debtors would have faced a massive

2    double cram-down fight in late January.

3              Based on all of the debtors' efforts with the E

4    Side creditors to assemble a plan --  and you've heard them

5    already at length as addressed by Mr. Thomas as well as Mr.

6    Sassower.  Absent the current deal the debtors would be

7    required to convert one or more classes of E Side debt non-

8    consensually to equity.  That fight would have required

9    litigation about the ability to convert EFH into a

10   (indiscernible) and whether such value would have been

11   included in the total enterprise value for the purposes of

12   determining allocation between the E Side creditors.

13             The E Side creditors would be litigating equity

14   allocations, valuation, the inter-debtor issues, the inter-

15   creditor legacy issues as well as make-whole and post-

16   petition interest claims.

17             On the T Side, the T Side junior creditors

18   undoubtedly would have argued that the TCH first lien

19   creditors did not have a valid enforceable lien.  Absent a

20   settlement there would have been massive litigation about

21   the validity of the T Side first liens' claims, the

22   appropriate allocation of value between the T Side first

23   lien creditors and unsecured creditors, including the

24   proceeds of the T Side litigation against EFH.

25             The agreements embodied in the plan, the plan

1   support agreement and the settlement agreement later rest

2   any concern that the inter-debtor and inter-creditor

3   litigation would materially delay the debtors' emergence

4   from bankruptcy.  Absent those agreements, those claims

5   would have been the subject of long contested proceedings

6   that everyone acknowledges would take months if -- to

7   present to Your Honor.

8           All parties agree now that no trial or even a

9   mini-trial on these issues is necessary as a result of the

10  settlement agreement.  And instead the Court will have to

11  canvas the issues to see that the agreement is reasonable.

12  This is a material reduction in the scope of the proceeding

13  that would be presented to Your Honor.

14          Your Honor, the other -- the second reason the

15  schedule is reasonable is that based on all of the diligence

16  and the discovery that has gone forth to date, the plan

17  objectors are already well prepared to address the issues.

18  Your Honor, through the legacy discovery protocol and all of

19  the contested proceedings that have happened to date, the

20  debtors have produced over 5.6 million pages of discovery

21  pertaining to the claims resolved in the settlement

22  agreement.

23          The E Side official committee was so sufficiently

24  well informed about some of those legacy claims that they

25  are -- they were in a position to file a motion for standing

1    to address those issues as it relates to the T Side first

2    lien claims and the enforceability of those liens.

3            Your Honor, but it's beyond just the settlement

4    agreement and the legacy issues.  Confirmation discovery is

5    already well underway.  The debtors alone have responded to

6    164 document requests and last -- and produced more than

7    41,000 documents comprising over 230,000 pages just a week

8    ago on August 17th.  That's one week after the filing of the

9    latest plan and the settlement agreement.

10           Your Honor, included in that production, among

11   other things, were the board of director materials from

12   January through July of this year, including materials

13   relating to the board's approval of the settlement

14   agreement.

15           Your Honor, the debtors are also preparing another

16   substantial reduction for as early as this Friday and

17   believe that they are well on their way to hitting all the

18   deadlines proposed in the schedule.

19           In addition, Your Honor, you've heard the

20   disinterested directors report about their efforts to date.

21   I -- I believe they have produced 25,000 pages so far and

22   they have reported, I believe in the reply brief, that they

23   are going to exceed and beat the deadlines in the current

24   schedule as it relates to any productions that were targeted

25   towards the disinterested directors.

1          And as Your Honor noted back on May 5th at the

2     earlier scheduling conference, the objectors must take into

3     account all the debtors' formal and informal diligence

4     efforts in evaluating how much additional discovery and time

5     is needed for confirmation.

6          Your Honor, the third reason that the schedule is

7     reason -- the third reason that the schedule is reasonable

8     is that the remaining issues are relatively confined and

9     straightforward.

10          You know, if we look at the large ones that have

11     been identified by the objectors to date, starting with good

12     faith.  Your Honor, the objectors imply that -- and will

13     address and challenge the debtors' good faith in filing the

14     plan.  That is their prerogative.  But the argument adds

15     little incremental complexity to the hearing because the

16     debtors were already prepared to provide a full discussion

17     of the circumstances leading to the deal and the

18     consideration of the settlement agreement, and will do so

19     and have already provided much of these materials in

20     discovery.

21          Second, as it relates to impairment, some

22     objectors have challenged whether they are truly impaired.

23     Impairment is a legal issue that doesn't add factual

24     complexity or require significant discovery.

25          As it relates to feasibility, contrary to the EFH

1    committee and the EFIH PICs' concerns, the conditionality of

2    the merger agreement does not make the plan infeasible.

3    It's well established that success of the plan need only be

4    reasonably likely, not guaranteed.  And given that Encore is

5    the largest regulated utility in Texas, any plan in these

6    cases would require key state regulatory approvals and

7    federal approvals.

8              It should also be note -- not surprising that a

9    plan transaction that proposed to repay all allowed E Side

10   claims in full and in cash would have conditionality

11   associated with these approvals and other factors.

12             But if E Side creditors wish to pursue a

13   feasibility objection on this basis, the proposed schedule

14   provides ample time for investigation and raising these

15   issues with the Court.

16             Your Honor, as it relates to the United States

17   Trustee's objection, they have focused on certain fees to be

18   paid as well as the exculpation and release provisions in

19   the plan.  Regarding the fee provisions, the debtors have

20   already initiated discussions with relevant professionals

21   and the fee committee and it has reached out to the United

22   States Trustee as well in an effort to resolve concerns

23   about that issue.

24             But to the extent that these issues cannot be

25   resolved, the debtors have worked well with the United

1    States Trustee's Office in this case and in others, and we

2    will do so here.  And we will make certain that the United

3    States Trustee's Office has the information it needs to make

4    any objection it wishes to make.  We do not believe these

5    objections, however, are material grounds for delay because

6    they, frankly, pose relatively discreet issues in the case

7    as a whole.

8         Regarding the Alcoa contract, Your Honor, Alcoa

9    asserts that an October confirmation date is a re-trade of

10   its stipulation with the debtors and would hinder its

11   ability to prepare its response to the debtors' disposition

12   of its contract.  Your Honor, we believe the Alcoa objection

13   should be rejected.

14        Regarding the scheduling stipulations, Alcoa

15   agreed it would withdraw its notice of intent and discovery

16   requests as relating to confirmation and the debtors agreed

17   to provide Alcoa with 28 days' notice of the debtors'

18   decision about the disposition of the Alcoa contracts before

19   the date to object to the plan.

20        Your Honor, the October date that was in the

21   scheduling order right now was in effect at the time that

22   that stipulation was struck.  The debtors did not agree to

23   an extended discovery schedule, simply 28 days' notice.

24   Given that we are currently 52 days before the proposed plan

25   objection deadline, the proposed schedule including the

1    October confirmation date does nothing to preclude the full

2    and fair execution of the stipulation.

3           Moreover, Your Honor, the debtors are actively

4    evaluating whether it is more appropriate to file a separate

5    motion to assume the Alcoa contract and have a separate

6    proceeding on this stand-alone issue apart from

7    confirmation.  That motion, if it were to be filed, would

8    absolutely provide Alcoa with the agreed 28 days' notice.

9    And, therefore, whatever path we go forward, whether it

10   stays in confirmation or, frankly, what is more likely that

11   we file a motion and remove this issue from confirmation,

12   there's no reason for the Alcoa dispute to impact the

13   overall scheduling on confirmation.

14          And to the extent that there is a separate motion

15   filed and we are unable to work out a schedule with Alcoa,

16   we will be back -- we will ask this Court for a separate

17   conference to address conferencing and scheduling as it

18   relates to that motion.

19          Your Honor, my partner, Mr. Schartz, has been

20   handling the negotiations on these issues and he's in the

21   courtroom today to the extent you have any additional

22   questions as it relates to the Alcoa contract or that live

23   dispute.

24          Your Honor, as I wrap up, the objectors' concerns

25   over the schedule and protocol we believe are significantly

1    overstated and should be overruled.  And this is where we

2    get a little more discreet about the timing of the order.

3              Regarding the overall timing, the proposed

4    schedule is 64 days from the entry of the scheduling order

5    to confirmation.  And we believe that provides ample time

6    for discovery and it's entirely consistent with the

7    discovery provided in comparable cases including the timing

8    in Capmark (ph) and in Vistion (ph).

9              Your Honor, as it relates to additional discovery,

10   at this stage, Your Honor, of the proceedings we are

11   convinced that all conceivable document discovery has

12   already been covered by the exhaustive requests that have

13   been filed both as it relates to the plan and before that

14   during the legacy protocol process.

15             When confirmation discovery began in July those

16   requests were targeted at a dual path plan that covered the

17   waterfront of all documents potentially relevant.  And since

18   the debtors have filed the plan, the issues have only

19   narrowed.  And while various objectors insist that they may

20   need additional materials based on plan-related issues, none

21   have come forward and specifically identified a category of

22   materials that was not previously covered.

23             Similarly, as it relates to the settlement

24   agreement, nearly all discovery relevant was completed

25   months ago through the legacy discovery.  To the extent that

1    there are post-petition materials that are relevant, they

2    have been requested because the DD settlement was baked into

3    an earlier version of the plan since April.

4           But to the extent -- even with all of this, if

5    there are one off discreet issues that plan objectors

6    believe that they need that they have not identified, we

7    have worked cooperatively with creditors in the past and we

8    will do so here.

9           Regarding the number of depositions,  some

10   objectors have noted that the proposed amended schedule

11   limits them to ten depositions and argue that it's -- it's

12   insufficient or improper for them to have to show good cause

13   to obtain more.

14          Your Honor, on this issue we do want to clarify

15   one point.  Earlier versions of the scheduling order

16   including the one that's currently in place contemplate 30

17   depositions for objectors.  And when we talked about a dual

18   cram-down plan we believed after extensive negotiations with

19   creditors that 30 was appropriate.  That was reduced to ten

20   based on the significantly narrowing of the issues that are

21   now before Your Honor.

22          Your Honor, the ten depositions is the presumptive

23   limit under the Rules of Civil Procedure and we believe that

24   should be more than enough.  But if the objectors truly need

25   more depositions all they have to do is show good cause if

1    they even come to Your Honor.  We would expect the first

2    step is for them to come to us, articulate a basis, and if

3    there is a basis we will go forward, Your Honor, without

4    additional leave of court or need for court.  We'll work

5    with the creditors.  But ten is appropriate given the

6    overall scope of the proceedings that we have vis-à-vis what

7    we had before.

8         Your Honor, during -- regarding issues about the

9    duration of the depositions and some other issues that were

10   raised on Monday, the Bank of New York Mellon filed a

11   proposed order on Monday that was -- and I don't mean to be

12   (indiscernible).  It was a re-negotiation of discovery

13   obligations and sequencing that had -- that have been

14   previously addressed by all the parties in interest in May

15   and June and approved by the Court in the existing order.

16        Let me give you an example.  The existing order

17   provides for depositions to last no more than eight hours,

18   and that for witnesses to be deposed only once without leave

19   of court or find the parties who want to take the deposition

20   to work amongst themselves to allocate time.  The proposed

21   revisions and the issues in front of Your Honor today do not

22   alter this existing part of the order.

23        Similarly, the existing order provide for separate

24   fact and expert discovery, period, and avoids immaterial

25   overlap in those periods.  And that was consistent with Your

1    Honor's direction based on our scheduling conference in May;

2    that you thought it was appropriate to sequence the

3    hearings.    And, again, the -- our proposed revisions do not

4    alter that structure.

5            Your Honor, we believe that that overall effort to

6    try to narrow and cabin discovery was critically important

7    to moving the case forward, and we do not believe it's

8    appropriate at this time to revisit those parts of the order

9    that were heavily negotiated and addressed before Your Honor

10   in May and then again in June.

11           Therefore, we ask that you overrule the Bank of

12   New York Mellon's revisiting of those issues.

13           Your Honor, regarding discovery disputes, some

14   objectors imply that there is inadequate time to resolve

15   discovery disputes.  We recognize the proposed schedule

16   requires prompt action to resolve discovery disputes.  That

17   is its intent.  And if objectors have issues to raise, they

18   should do so.

19           Your Honor, we had a meet and confer conference

20   with the EFH committee on Friday.  During that meet and

21   confer we asked if there were any issues at this time that

22   they needed to raise.  We also affirmatively engaged with

23   them on the issue of the EFH committee's efforts to take

24   discovery of plan supporters.  We're having a meet and

25   confer on those issues after today's proceedings.  And will

1    continue to work with the committee and any others on issues

2    as they arise, including as it relates to the plan support

3    agreement for which we received a few objections last night.

4              Finally, Your Honor, the milestones are not

5    manufactured exigencies.  The proposed schedule ensures that

6    the Court will have ample time to consider and rule on the

7    plan and the support agreement before the PSA deadline of

8    January 15th.  The objectors have asserted that the

9    milestones in the PSA were manufactured and that this Court

10   need not heed or consider that milestone in evaluating the

11   proposed schedule.

12             Your Honor, the fact is that those deadlines,

13   those milestones were heavily negotiated terms without which

14   the deal, including the plan and the settlement agreement

15   may not have been reached in the first place.  If the plan

16   and the settlement agreement are to succeed it is only

17   because of the give and take negotiations and that process

18   that resulted in the inclusion of these milestones.  They

19   were a key initial commitment in the negotiating process,

20   especially for the TCH first lien creditors that ultimately

21   resulted in these agreements.  And the debtors would only --

22   only agreed to those milestones after careful consideration

23   that the date was reasonable and achievable.

24             The debtors whole-heartedly believe that this

25   schedule is reasonable and achievable, and we ask the Court

1    to enter the revised proposed order that was attached with

2    our reply brief.

3              Your Honor, if you have any questions I'm happy to

4    answer them at this time.

5              THE COURT:  No.

6              MR. MCKANE:  If not I understand Mr. Shore will be

7    the first of the plan sponsors to address the Court.

8              MR. SHORE:  Good morning, Your Honor.  Chris Shore

9    from White & Case on behalf of the ad hoc group of unsecured

10   noteholders.

11             It's a narrow question before the Court today from

12   the debtors, you know, what's an appropriate confirmation

13   schedule to be entered given the facts and circumstances of

14   the case and the objections that we have on file.  Simply

15   put, it's 110 days or so from the filing of the plan to the

16   start of the confirmation hearing, enough time to address

17   the concerns that have been raised by the parties to date.

18             Let me make four points in dealing with that.

19             First, I would like to level-set the debate a

20   little bit and have the Court recognize that the plan is a

21   huge win for all of the objecting parties in front of you,

22   all of whom in fairness should be rushing to an exit to see

23   if they can get paid in full or get any distribution at all.

24             Two, explain the need for speed here and why we

25   can't step materially out of the timelines established in

Page 44

1    the code and the rules for both the conducting of a

2    confirmation hearing and the conducting of discovery.

3           Three, assure the Court that we can get it done in

4    the timeframes that have been set forth, in particular since

5    all of the -- all of the burden is on the parties who are

6    also simultaneously trying to get this deal consummated.

7           And, four, address the particular solvency

8    objection and points that were made by the EFIH secured

9    creditors and deal with the free option point as necessary.

10          Let me talk first about what's really going on

11   here.  I have an org chart on my wall with all of the

12   debtors.  I'm sure Your Honor has some form of that.  It --

13   mine is two feet by four feet.

14        (Laughter)

15          MR. SHORE:  The plan on file deals with every

16   single one of the boxes there.  All of the debtors, all of

17   that E Side stack that sits out with EFH Finance, all of the

18   T Side, all of the E Side all the way down to the ring-

19   fenced entities.  You have objections from four boxes,

20   creditors in four boxes.  You have the TCEH EFCH objection.

21   I really think about that as one group.  You have objections

22   from EFH creditors and you have objections from EFIH

23   creditors.

24          Every other box has the full support of all of the

25   creditors existing in those boxes for confirmable plans that

1    come out.  The only issue before the Court today is whether

2    the schedule for those four other boxes is appropriate.

3    Those top four boxes, EFH, EFIH, EFCH, TCEH, are -- don't

4    really have any assets other than claims against each other

5    and residual equity interest in the entities which actually

6    hold the assets.  The Encore assets and the ring-fence and

7    all of the power plants, power marketing, power sales,

8    business on the T Side.

9              In rough terms the -- let's start with the TCEH

10   and EFCH.  In rough terms they have about $30 billion of

11   debt, those two entities, all allowed claims except for the

12   first liens which are subject to the challenge which is

13   being resolved by the parties who actually objected to the

14   claims, the committee and us.

15             All of that debt or more than -- I'm sorry -- more

16   than half of that debt is tied up in a PSA right now.  TCEH

17   and EFCH each virtually -- have virtually no assets except

18   for the investments in the (indiscernible) litigation and

19   only one party has objected in each case; that is, the

20   holders of about $80 million of EFCH legacy bonds and $800

21   million in PCRBs.

22             In the absence of this plan they would get nothing

23   anytime soon and could always, given their place in the

24   capital structure, be dragged along into any deal by the

25   majority of both unsecured and secured debt.  So they don't

1    really have anything other than best interest objections or

2    unfair discrimination objections.  And I'll come to that.

3           Under the plan at both EFCH and TCEH, they get

4    Perry treatment with all other unsecured claims.  They share

5    in the recoveries with the TCEH notes, the unsecured notes,

6    the second lien notes, which are all deficiency claims under

7    the valuation that's in the plan, and the first lien

8    deficiency which is being allowed because the parties who

9    brought the litigation are settling it with the first liens.

10          This plan for the TCEH and EFCH creditors, the

11   PCRBs and the EFCH legacy notes should be a Rod Tidwell

12   moment for them and they should be dancing in the end zone,

13   not coming in and objecting to a plan on a objection that is

14   not that we're not getting paid enough and not that we would

15   -- don't want this plan to go forward, but other creditors

16   are getting paid too much because under the plan all of the

17   subsidiary creditors or creditors who have claims at the

18   subsidiaries pursuant to guarantees get to share in the

19   deficiency of the first liens.  It's not, I'm not getting

20   paid enough.  It's others are getting paid too much.

21          When we get to the plan there will be an

22   explanation and we'll put in the disclosure statement if

23   they're still pressing the objection, the reason why they're

24   not getting more, but they are certainly getting enough.

25          With respect to EFIH, the first liens and the

1    second liens are getting their legal entitlements.  Both

2    have just filed an objection regarding -- or a reservation

3    of rights regarding solvency.  And they're trying awfully

4    hard to stay relevant in the plan that they have right now.

5            Last week counsel for both approached me

6    expressing concerns that the Court -- we would be asking the

7    Court to rule on solvency of the E stack at confirmation.  I

8    explained again, as I did on the record, that the plan does

9    no such thing.  What I said is there will be an objection to

10   the PIC claims saying to the Court that under the facts and

11   circumstances of the case solvent debtor exception should

12   not apply to the PIC claims.  That's it.

13           I offered that both the first lien and second

14   liens could intervene in that objection if they thought the

15   Court needed to hear about their scheduling concerns about

16   when that issue would be addressed.  And I offered that no

17   objection or no findings made in that contested matter would

18   be binding in any way on either the first liens or the

19   second liens in their own litigations.

20           So given that it's entirely unclear why the

21   estate, EFIH, is paying for the objections to be filed for

22   things that really go to a PIC claim objection and have

23   nothing to do with the plan at all.

24           As for the PICs, this plan is an outstanding

25   result for them as well.  Every plan to date has had the PIC

1    class impaired and either being equitized consensually or

2    non-consensually.  They are getting cash in full at

3    confirmation.  That's why about a third of the PIC holders

4    are signed up to the PSA.  Two-thirds of the PIC holders

5    still are outstanding, but when they say they don't want to

6    run the risk of seeing whether they're going to get paid in

7    full, it bears noting they have no alternative, none.

8         The debtors were right about one thing in this

9    case, at least one I'll concede that; that regardless of

10   where one sat in the capital structure, whether you held

11   EFIH debt or TCEH debt, even though there was no basis to

12   substantively consolidate, there was the tax problem.  And

13   such that the solution to ever monetizing your claim on the

14   either the T Side or the E Side is resolving that tax issue.

15        What it did is it set up a dynamic where the T

16   Side creditors had consent over a plan and the E Side

17   creditors had consent over a plan, any plan that dealt with

18   the taxes.  That's why we got into the conflict problem in

19   the first place and why the DBAs came on board.  It's why

20   there was never an Olympus solution that could be done.

21        Our solution only and very simply takes the

22   consent out of the hands of the creditors who couldn't ever

23   get out of their own way to come up with a deal, puts the

24   consent in the hands of the sponsors since we clear the

25   whole E Side stack, and we have reached a deal with the

1    sponsors for the allocation of the overflow of Encore value.

2            In the absence of that solution any E Side

3    recovery, anything they want is subject to resolution on the

4    T Side and the T Side first and we and the second liens and

5    the committee have all agreed to the plan we want to see.

6    So they can say, I want an auction, I want more, I want less

7    contingency.  But at the end of the day they can't deliver

8    anything at all, no solution.  We are -- all they can posit

9    is no confirmation, let's come back sometime in the future.

10           So when you read their objections that say, let's

11   just delay out, move out confirmation.  Let's not even

12   schedule confirmation.  Let's not do this.  At the end of

13   the day all they're saying is I want chaos because when

14   there's chaos I'll -- I think I'll get a better opportunity

15   to define what payment in full means or remove contingencies

16   from the deal.  They're not positing any solution.

17           We digress on the free option.  We filed our

18   papers yesterday and as I said in those papers and I'll

19   commit to you now, we're going to deal with it at the PSA

20   and you're going to have evidence on how this deal was

21   structured, why it was structured and what it means to go

22   forward.

23           But let me make two points.  One, a free option is

24   better than no option, so however they want to characterize

25   the level of our commitment, their only -- the only thing

1    they can say is we shouldn't go forward, not that they have

2    something that they want to go forward with.

3              And two, it's not a free option.  Like any other

4    backstop deal that we've done in front of Your Honor there's

5    a merger agreement, there's a backstop commitment agreement,

6    there are equity commitment letters, there are debt

7    commitment letter, and it's all signed up in contracts.

8    They're not options, they are obligations.

9              The only debate that the other side has raised is

10   they don't believe the remedies for breach are sufficiently

11   penal to compel our performance or not sufficiently

12   beneficial to the debtors.

13             I'm not going to get into it too far, but there

14   are only two options in this deal where the debtors maintain

15   a fiduciary out.  As I said before, you're not going to get

16   specific performance if the debtors been bought for any

17   reason if a new deal appeals.

18             So the question is one of limitations on damages

19   in the liquidated damage provision or the drag and

20   disarmament.

21             Liquidated damages don't do this debtor any good,

22   getting a couple hundred million dollars if all of the

23   conditions are met and the funding parties walk doesn't get

24   them out of bankruptcy, it works out to a couple of months

25   of admin burn in these cases.  We'd have to pay it in order

1    to continue to litigate.  So that's one option.

2              The other option that the debtors came up with,

3    and that is extremely penal in our view, is the notion that

4    everything we've worked for in this case goes away, we are

5    dragged into releases and dragged into a plan for 400 --

6    everything this case, $400 million more than what the

7    debtors were giving us on day one, which is the $150 million

8    in unencumbered cash that's sitting there.

9              There is no circumstance under which T side

10   creditors, and you can hear from the UCC as well, would ever

11   agree to disarm for that amount of money given all the work

12   that's been done and all that we found.  The willingness of

13   the T side first lien creditors to walk away from a

14   deficiency clean, the willingness of the sponsors to give up

15   any recovery out of Oncor, all of that is consideration that

16   we give up if we don't confirm this plan and all the

17   conditions are met.

18             Then we move up to the E side stack and talk -- I

19   have no idea what the EFH committee is doing here and what

20   they think they're doing in getting in front of this deal

21   and getting in the way of the possibility of having their

22   creditors paid in full.  Their constituents only asset is

23   equity value in EFIH and indirectly down to Oncor.  Their

24   recoveries are behind the Oncor debt in the ring fence, the

25   EFIH first lien DIP, the first lien stub piece on their make

1    wholes, the second lien, which is running $18 million a

2    month in interest, the PICs, and all admin expense of the

3    bankruptcy case.

4              In the absence of this deal the most likely

5    scenario is that the first liens on the T side stop waiting,

6    they foreclose, you get that $6 billion or $8 billion tax,

7    that the debtors have been arguing about since the beginning

8    of this case, and that dilutes -- sorry, dilutes -- it wipes

9    out EFH creditor recoveries.  That's the most likely option

10   if we don't get this deal done.  And if they can forestall

11   that they still sit behind all of the expense that's running

12   in these cases, which ultimately is going to eat into any

13   recovery they want.

14             So let's be clear, the Oncor auction failed to

15   produce a single bid.  So they can say that we'd like to

16   monotize these assets, we'd like to do a better deal, but at

17   the end of the day they don't have a way to do it.

18             So in assessing whether or not 110 days is enough

19   to get to confirmation from the filing of the plan the Court

20   should necessarily take into consideration the quality of

21   the objections is in front of it and the legitimate interest

22   in any of the E side creditors or the PCRBs asking to slow

23   that process down.

24             We turn to the need for speed and the ability to

25   get it done.  I have, and I get them every week, an action

1    list of everything that needs to get done.  We've got -- and

2    it's broken down into work streams.  There are work streams

3    on spin off, E side and T side going public documents, the

4    -- all the regulatory approvals, benefits, the minority

5    drag, exit debt and equity finance, and we go through it all

6    the time, and it's a monumental work.  I dare say this is

7    the biggest deal anybody in this courtroom and most complex

8    deal anybody in this courtroom has ever done in the context

9    of a bankruptcy M&A transaction.

10            If we miss any of the milestones the TCEH

11   creditors get basically nothing.  We get dragged into what

12   everybody likes to call the booby prize.  That's it.  So we

13   are the ones who are most interested in making sure all the

14   milestones are hit.

15            We've got a January 15th ruling date on

16   confirmation, we cannot run anywhere near that date, because

17   the first liens, and appropriately so, see their

18   consideration out of this deal as being speed, the ability

19   to get their assets before they could ever in the context of

20   a contested confirmation over all the issue that is

21   Mr. McKane laid out.

22            In addition, holding together a 40 plus billion

23   dollar restructuring is no easy feet with all the work that

24   needs to get done.

25            Every day that we move out from 110 days from plan

1    filing increases the risk that we end up either back into

2    the full mode where everyone is back on this side of the

3    courtroom and they're all litigating, or the TCEH creditors

4    get effectively the booby prize.  So why -- so that's why we

5    need the 110 days.

6         Why more time?  I haven't seen in any of the

7    objections a concrete explanation of these are the

8    depositions I need.  One, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,

9    12, 15, 35.  Here are the documents I need that I'm not

10   getting.  Lay it all out and say, therefore, I can't

11   possibly get it done within the time frames established by

12   the Code, rules, and the scheduling order.

13        If we can get the list done on a weekly basis

14   these people can come forward and get the discovery done.

15   They haven't had any explanation that the debtors are being

16   non-cooperative in getting them the documents they need or

17   will be able to produce the witnesses they need.

18        But discovery in support of what?  The E side has

19   only two objections to this plan, which is why the original

20   discovery order was entered saying we could have

21   October 4th, 5th, and 6th, they've got a feasibility

22   argument.  Either that we're going to walk from the plan if

23   we get there, or that we won't get regulatory approvals.

24   Okay.  What discovery do you need on that point?  Get the

25   discovery and go forward, but it is a narrow issue that the

1    Court is going to weigh on more likely than not standard as

2    to whether or not we're going to get to consummation of the

3    plan and stay out of Chapter 11.

4            And there's an impairment argument.  It's not a

5    discoverable issue, it's a pure legal issue for the Court to

6    determine whether given the requirements of the treatment of

7    the E side claims, whether that impairs the creditors or

8    not.  There is no discovery I can possibly think of going to

9    the impairment issue.

10           The PCRBs, I still don't know what their plan

11   objection is.  It can't possibly be best interest.  There is

12   no circumstance under which they do better than under this

13   plan, which is why there's such overwhelming support out of

14   the T side unsecured constituencies.  I suppose it's an

15   unfair discrimination point, but again, I think they misread

16   the recoveries of EFCH and TCEH creditors.  They are exactly

17   pari with all allowed unsecured claims in both of those

18   estates.

19           Again, their only argument is that they want to

20   share in the allowed unsecured claims of the first liens in

21   their deficiency, but they never objected to them, and under

22   the cash collateral order those claims are allowed unsecured

23   claims as to the PCRBs.

24           And I'd add that I don't think they have even

25   served discovery yet.  So, I don't understand the notion

1    that what we need to do is in any way delay the schedule any

2    further.

3            I'll leave it to Mr. McKane to work out ticking

4    and tying all the number of depositions and all of that, but

5    from the perspective of the T side unsecured creditors it is

6    critical that we maintain a very tight time frame to that

7    end of October confirmation, because anything else puts at

8    peril everything that's been worked for and what is and

9    should be amongst all people in this courtroom a great

10   success.

11           THE COURT:  Thank you.

12           MR. KORNBERG:  Good morning, Your Honor, Alan

13   Kornberg of Paul, Weiss, Rifkind, Wharton & Garrison.

14           Your Honor, the ad hoc committee of TCEH first

15   lien debt holders fully supports the debtors' motion and the

16   proposed schedule.

17           Yesterday we filed a joinder to the debtors'

18   reply, which is at document 5706, and we join in their

19   request to overrule the objections that have been filed.

20           Time is not the T side creditors' friend in these

21   cases.  As we have said at multiple hearings and in multiple

22   pleadings, the TCEH first lien debt holders are very focused

23   on the delay and expense of these cases and the strategic

24   disadvantage that TCEH must contend with while in Chapter 11

25   as it faces very challenging market conditions.  These

1    concerns are not imaginary, they translate into hundreds of

2    millions if not billions of dollars of lost value.

3            As a result an essential element of the deal that

4    was struck here, as reflected in the PSA, is agreement on

5    the timeline for resolution of these cases.  And you don't

6    have to take just my word for it, I think you heard

7    Mr. McKane say it, you heard Mr. Shore say it, this timeline

8    was a critical element of the bargain.

9            Proceeding with confirmation at the end of October

10   has been and remains a critical deal term, and obtaining a

11   confirmation order as soon as possible is the same.

12           The timing here, Your Honor, is neither

13   manufactured nor arbitrary, but driven by very real concerns

14   over dwindling value.

15           Based on prior court orders everyone in this

16   courtroom knew that there would be a confirmation hearing in

17   October if the plan were supported by the principal T side

18   creditor groups and the plan provided for payment in full of

19   all allowed claims on the E side in cash, and that's exactly

20   what is on the table, and that's why October is the

21   appropriate date for this confirmation trial.

22           As we've seen from the various objections to the

23   disclosure statement and otherwise for a case of this

24   magnitude, there really are very few issues which require

25   resolution.  Some are legal issues, none of them surprises,

1    they've been on the table for a long time.

2              As a result the proposed schedule is neither

3    unreasonable nor unrealistic, particularly given the

4    enormous amount of discovery that's taken someplace to date.

5              There simply is no legitimate reason to delay

6    confirmation from the proposed October trial date and we

7    urge the Court not to do so.  Again, proceeding in October

8    is of critical portion for the TCEH first lien creditors,

9    it's something that we bargained for very hard, and we want

10   to see this case proceed to resolution based on that October

11   confirmation date.

12             Thank you, Your Honor.

13             THE COURT:  Mr. Miller?

14             MR. MILLER:  Good morning, Your Honor, Brett

15   Miller, Morrison & Foerster, on behalf of the official T

16   side creditors' committee.

17             As the gatekeeper of the Legacy discovery we

18   concur with what Mr. McKane said, as well as what

19   Mr. Sassower said regarding the breadth and depth of the

20   discovery that has taken place to date.  The data room has

21   millions of pages of documents related to the DDA

22   settlement, and since the plan has been filed the plan

23   discovery has been immense.

24             Mr. Shore's point that there are two points for

25   objection, feasibility, and impairment, I'm not sure what

1    the other side, what the E side creditors would add to that,

2    but again, they are not -- they either are covered in the

3    existing discovery or they're not really discoverable

4    issues, they're legal issues, not factual issues.

5            For these reasons the T side creditors' committee

6    joined in the response of the debtors and strongly supports

7    this motion.  For all the points said by the parties before

8    me.  It's time to move on.  Yes, we've come full circle with

9    the T side creditors on this side of the room as opposed to

10   on that side of the room, because we've seen through the

11   haze and we've come to a deal.

12           We were -- the T side creditors' committee was

13   part of the Oncor auction process.  We were under the tent

14   along with the E side committee.  We saw the bids, we had

15   twice weekly calls, we saw everything that went on.  There

16   was no alternative plan available that included any E side

17   equitization of Oncor.

18           This is the deal, it can be confirmed, and it

19   should move forward on the time scheduled that's been

20   proposed.

21           Thank you.

22           THE COURT:  Anyone else in favor of the debtors'

23   motion?

24           Okay.  Before I hear the objectors we're going to

25   take a short recess.

1          (Recessed at 11:22 p.m.; reconvened at 11:36 a.m.)

2               THE CLERK:  All rise.

3               THE COURT:  Please be seated.  Thank you for your

4     patience.  Let's just give a motion for people to settle.

5               All right, you may proceed.

6               MR. GLUECKSTEIN:  Good morning, Your Honor, Brian

7     Gluckstein, along with Steven Holley, from Sullivan &

8     Cromwell, on behalf of the EFH and EFIH official committee

9     of unsecured creditors.

10              We heard this morning many views of why this plan

11    is great or in other ways the best that could be achieved

12    under the circumstances, but the rhetoric we heard this

13    morning needs to be turned into evidence to be put before

14    Your Honor, and that is the narrow issue on which we are

15    here today.  It is the schedule for which these cases will

16    proceed to a confirmation hearing not only of the plan but

17    of the conditioned settlement agreement that settles all

18    types of claims prior to and even if this plan becomes

19    effective.

20              While Mr. Store wants to tell the E side creditors

21    what they should think, we, and other creditors who might

22    not feel the way he does about this plan, have the right to

23    develop that evidence and form their own view.

24              And there is, Your Honor, today in place a

25    confirmation schedule that was ordered by this Court on

1   July 2nd.  That schedule followed two hearings and

2   substantial debate and negotiations.  Mr. McKane referenced

3   at various points in his remarks the negotiations with

4   respect to particular points contained in that schedule.

5          To be clear, the EFH committee then, as now, wants

6   to see these Chapter 11 cases successfully concluded as soon

7   as possible without any unnecessary delay.  Delay is not at

8   all in the interest of EFH creditors, especially when we

9   start talking about scenarios that rely on the settlement

10  agreement where it is clear that EFH creditors are the full

11  creditor in that situation.

12         Notwithstanding debtors' attempts to rewrite

13  history with respect to the scheduling order, this July 2nd

14  order achieves a balance between proceeding expeditiously

15  with a contested confirmation hearing for permitting plan

16  objectors, whoever they are, to conduct discovery and

17  prepare for that hearing on a full record.

18         The current schedule that is in place today

19  proceeds, as the Court requested, sequentially from document

20  discovery, to fact depositions, to expert discovery, to

21  pretrial matters without overlap.  That is both sensible and

22  appropriate.  The debtors are now asking the Court to throw

23  all of this out the window.  They're requesting by this

24  motion that the Court modify its existing order to

25  drastically shorten and compress the plan confirmation

1    litigation schedule without any justifiable cause to do so.

2                Now, I want to address the arguments put forth by

3    Mr. McKane and the schedule itself, but I'll note initially

4    just because it was raised both by Mr. McKane and some of

5    the joining parties, the reference to the October condition

6    that's in the current confirmation order -- scheduling

7    order.

8                I believe this only merits brief argument, because

9    it is clear from the record at the time that that condition

10   was put into the order to deal with a specific set of

11   circumstances where there was a plan that would pay

12   creditors in full in cash and we could proceed on an

13   essentially consensual basis, notwithstanding potential make

14   whole or other issues that were not central to the plan

15   confirmation dispute that were being addressed separately.

16               What the package, and it's been referred to as a

17   global package, repeated, the plan support agreement, the

18   settlement agreement and this plan do anything but what was

19   contemplated by that provision that was put into the order

20   back in June, and it was because of that and the agreement

21   amongst everybody, that if somebody actually showed up with

22   a real bid that would pay E side creditors in full in cash

23   these cases would clearly be much simpler and we could

24   essentially go home a lot earlier.  That made sense and

25   that's why there were no objections to the inclusion of that

1     provision.  This is anything but.

2          And so, I would submit, Your Honor, that that

3     provision --

4          THE COURT:  Well, wait a minute, what do you mean

5     it's anything but?  I understand you have a fight over

6     impairment, and we can talk about whether you're impaired --

7     you -- but whether E side creditors are impaired or not

8     impaired, but if they're not impaired it delivers just that,

9     they're paid in full what they're owed.

10         MR. GLUECKSTEIN:  It delivers that, Your Honor,

11    but for the fact that we are now talking about a schedule to

12    deal with both that plan and the settlement agreement.

13         THE COURT:  I understand that point.  All right.

14         MR. GLUECKSTEIN:  And so the issues are not nicely

15    compartmentalized as suggested.  Then we have a plan that

16    pays us in cash, therefore the issues are significantly

17    narrowed and we can move forward.

18         THE COURT:  Of course -- all right.  Okay.

19         So your beef isn't with -- your beef isn't that

20    the plan doesn't deliver what was promised when we were

21    talking about an October confirmation hearing, your beef is

22    that it includes a settlement agreement that wasn't

23    contemplated.

24         MR. GLUECKSTEIN:  Well beyond that, Your Honor, we

25    do believe that the -- and I'll talk about it in a moment --

1    the extreme nature of the conditionality that exists in this

2    plan raising questions that go beyond what would normally be

3    considered with respect to a plan where we're offering to

4    pay you in full in cash.  But certainly, Your Honor, to the

5    extent that this plan is consummated it does do that.  But

6    the set of documents and issues that are before the Court

7    now and for which the debtors are asking to proceed on a

8    single schedule is far more broad than was contemplated when

9    that language was added to the order.

10            And for that reason, Your Honor, we think we have

11   to go back -- you know, we would submit that the operative

12   schedule that's in place today is the schedule that takes us

13   out to January, the contested confirmation hearing, whomever

14   those objectors would be.

15            And Mr. McKane spoke quite a bit about -- and it's

16   detailed in the debtors' reply -- about the narrowing of the

17   issues, and their view that the confirmation issues are

18   somehow much more narrow today than they would have been

19   when that confirmation scheduling order was entered in early

20   July.  And we simply do not agree on that point, Your Honor.

21            The premise that which we learned of yesterday in

22   their papers apparently was that this schedule was

23   predicated on litigating this idea of a dual cram down claim

24   on both the E side and the T side, and many of the issues

25   that we're now hearing were contemplated to be litigated

1    under that order simply were not going to be litigated under

2    the debtors' view of the world back in June.

3           The plan on file, when a scheduling order was

4    entered, contemplated the disinterested directors'

5    settlement, the settling of the inter silo claims for which

6    at this point we are objecting to and now the T side has

7    foregone their objection as part of this deal, but it was

8    the same objection to whether or not the settlement would be

9    approved, and everybody recognized at this time,

10   notwithstanding the fact that Mr. Shore and his colleagues

11   have now moved to this side of the courtroom, but everybody

12   recognized at the time that while it was a settlement it

13   presented complex issues that we take some time and have

14   discovery.

15          Beyond that there's a lot made in the debtors'

16   reply about the fact that there would be -- that the current

17   package contemplates a settlement of the lien challenge and

18   the inter T side estate claims.

19          But under the debtors' plan that was on file when

20   this scheduling order was entered in July they were

21   purporting to settle those claims through a plan settlement.

22   If the plan had been confirmed they were taking the position

23   that the standing motion in that litigation was not going to

24   go forward because they were resolving those claims through

25   the plan, and there unquestionably would have been

1    litigation about the reasonableness of that settlement, of

2    the disinterested directors' settlement, as well as other

3    issues that were raised by the plan at the time, depending

4    on what sort of consensus they could have amassed prior to

5    confirmation.  And the debtors were clear at the time that

6    they were out working trying to obtain consensus, they

7    announced that day that they thought they were close with

8    certain E side creditor groups if they had moved forward

9    with that plan.  Some of the issues we heard about today

10   with respect to evaluation on the E side and distribution of

11   equity would have been resolved.

12          The schedule was meant to deal with whatever plan

13   incorporating the disinterested directors' settlement was

14   put forward with whomever the dissenting objectors were and

15   to deal with that in an orderly fashion to January.  And

16   that schedule didn't make everybody happy at the time.

17          The schedule was commented on by folks in court at

18   the hearing that it was somewhat an aggressive schedule for

19   the nature of the litigation, nonetheless it was agreed to

20   on a consensual basis in June and entered in early July.

21          And so we don't agree that suddenly there's been

22   this massive piece of litigation taken off the table that

23   was not -- that was contemplated before that's not at issue

24   now.

25          Beyond that, despite the attempts to minimize the

1    scope of the issues that are currently at issue, we do

2    believe that the committee and other stakeholders have,

3    regardless of the impairment issue, which certainly as Your

4    Honor noted is going to be an issue at the confirmation

5    hearing, have a number of arguments and issues that they

6    intend to pursue regardless of impairment or unimpairment.

7              And some of the issues that were kind of glossed

8    over today, substantively they're obviously not before the

9    Court and they will be in due course, but that's precisely

10   why we need discovery.  For example, this question of good

11   faith and the bidding process, and we've heard a lot about,

12   well, there weren't particular --

13             THE COURT:  Let me ask you about that.  What are

14   your damages?  Again, let's assume the gating issue of

15   unimpairment.  If there were things you're not happy with

16   that happened in connection with the Oncor bid what's your

17   damages?  You're getting paid -- I keep saying you -- I mean

18   -- when I say that I mean your constituency --

19             MR. GLUECKSTEIN:  Sure.

20             THE COURT:  -- is getting paid in full what

21   they're owed.  Who cares?

22             MR. GLUECKSTEIN:  Again, Your Honor, that comes

23   with if the plan is consummated, which we view as a --

24             THE COURT:  Yeah, but you're going to --

25             MR. GLUECKSTEIN:  But again --

1            THE COURT:  Yeah.  But again, that's a feasibility

2     issue, that's not a good faith issue.

3            MR. GLUECKSTEIN:  There is --

4            THE COURT:  You can't argue that you get to argue

5     good faith because the plan might not be feasible.

6            MR. GLUECKSTEIN:  No, we can't, but we can argue a

7     good faith issue, Your Honor, because again, this plan is

8     expressly conditioned on all of these other things that

9     happen, including the settlement agreement, the pre-

10    effective date releases that are contained in the settlement

11    agreement, the lock in to certain terms and negotiation deal

12    points, you know, alternative plans that contain the PSA,

13    all of this is being --

14            THE COURT:  And how does that have anything to do

15    with the Oncor deal?

16            MR. GLUECKSTEIN:  Because, Your Honor, it does go

17    to the question of whether or not this plan and the process

18    of how we got to this plan was appropriate both under the

19    Court's bidding procedures and under, you know, a strict

20    good faith standard as to whether this plan is being

21    promulgated by the debtors and the plan supporters in good

22    faith.  There's unquestionably a good faith question there.

23    And we think that the investigation of this can't be glossed

24    over.

25            The questions will certainly involve -- the

1    debtors have represented that they intend to produce

2    documents with respect to the negotiation of the plan, as we

3    expect they would, the devil will be in the details of that,

4    there are other components of this in the Oncor process that

5    we do view as highly not only relevant but material to that

6    question.

7           And the feasibility point that Your Honor touched

8    on, it was touched on today, the conditionality, this is --

9    we didn't hear anything this morning that took issue with

10   the fact that this is an option.  We heard a bit about that

11   the option that the plan supporters are being granted here

12   is an option at their disposal as to whether or not to

13   purchase, you know, the interest in Oncor.  And while the

14   debtors are saying and intend to put they say at

15   confirmation come forward with evidence, and we agree that's

16   the time to deal with the evidentiary portion of it, that

17   they believe there was consideration given in return through

18   the settlement agreement, there is no question that this is

19   in our view that this is an option, some would say free, we

20   think free, they think there's consideration, but again,

21   that's a question for the confirmation hearing and for which

22   we're entitled to take discovery and learn the facts.

23          Because again, while we hear a lot about the

24   effort of the T side group working with the debtors to

25   negotiate this plan --

1             THE COURT:  Well wait a minute, isn't that a legal

2     argument?  Isn't your argument that this is a quote/unquote

3     free option because the plan is conditioned on among other

4     things regulatory approval?  I know everything I need to

5     know about that.  What discovery is going to be relevant to

6     regulatory approval?  It's not like I'm going to let you

7     take the deposition of the PUC in Texas about whether or not

8     they're going to grant the approvals that are sought.

9             MR. GLUECKSTEIN:  The optionality here, and this

10    all will come out, the optionality here goes beyond

11    regulatory approval, that's one piece of it.

12            THE COURT:  Right.

13            MR. GLUECKSTEIN:  But certainly the question as to

14    if we're talking about feasibility, the likelihood that this

15    transaction would be consummated, that raises all sorts of

16    questions that do go to issues like valuation and other --

17            THE COURT:  Oh, I can tell you right now we're not

18    having a valuation trial.  I can't imagine a circumstance in

19    which valuation of Oncor is relevant to the plan that's

20    before the Court.  Why is enterprise value relevant?  You're

21    getting paid in full, you're unimpaired.

22            Again, if they're wrong if you're impaired this

23    plan is DOA any way, but if you're unimpaired why does it

24    matter whether Oncor is worth 5 cents or $50 billion?  It

25    doesn't matter a wit to your constituency.

1           MR. GLUECKSTEIN:  Again, that assumes -- it

2    assumes unimpairment.  We certainly think that you have to

3    get to that point.  It assumes unimpairment and it assumes

4    that the conditions here make this a transaction that's a

5    real deal that, you know, has any reasonable likelihood of

6    closing, which goes to feasibility.

7           THE COURT:  So the enterprise valuation of Oncor

8    is relevant to feasibility?

9           MR. GLUCKSTEIN:  There are valuation issues that

10   we believe are relevant to the question of whether or not

11   this free option will ever be exercised.  Because again, if

12   we look at the totality of the package that's going to be

13   presented before Your Honor on whatever date we move

14   forward, we do have the terms of this settlement agreement

15   that include a consolation prize.  Mr. Shore characterized

16   it as a huge give on their part, we view it as a consolation

17   prize.  And so the question of whether or not they're going

18   close on this transaction and where we are at that period of

19   time is relevant.

20          THE COURT:  You think they're going to -- you

21   think they're putting a deal together that puts $12 billion

22   of money on the table, requires them to go seek approval

23   from four different government entities, you think that

24   they'd prefer -- that they're setting this up so they can

25   walk away from all the time, effort, and commitment there to

1    take a $400 million cash prize at the end of the day?

2           MR. GLUECKSTEIN:  If they make an economic

3    determination that the value is not there for them at the

4    time this comes it's a decision that could be made.

5           But, Your Honor, all of these issues, and to the

6    extent rulings will be made on whether or not things will be

7    heard, will not be relevant, does not go to the question of

8    whether or not we're entitled to take discovery to develop

9    theories of objections.  That's what we're here to talk

10   about today, is the question for the schedule --

11          THE COURT:  Yeah.

12          MR. GLUECKSTEIN:  -- that allows us to get there.

13          THE COURT:  Yeah.  But you're not allowed to --

14   no, I disagree.  The facts and circumstances about the plan

15   in front of the Court guides what discovery is appropriate.

16   I'm not going to give you a fishing expedition because

17   somebody has filed a plan --

18          MR. GLUECKSTEIN:  Correct.

19          THE COURT:  -- that allows you to look into every

20   little nook and cranny.  I would never allow that.

21          So the issues that are pertinent to the plan guide

22   the Court's determination about what discovery, as you say,

23   you're entitled to as under the facts and circumstances of

24   the case.

25          MR. GLUECKSTEIN:  Absolutely true, Your Honor.

1              But again, the other piece of the schedule here is

2      the settlement agreement, and we've had --

3              THE COURT:  Fair enough.

4              MR. GLUECKSTEIN:  -- quite a bit of -- you know,

5      we're debating and we've heard this morning quite a bit

6      about the plan and what rights we may or may not have under

7      the plan.

8              THE COURT:  Uh-huh.

9              MR. GLUECKSTEIN:  But let's -- let me turn to

10     that, because if we were only talking about the plan we

11     think there are significant issues there but we'd be having

12     a slightly different debate.

13             The settlement agreement itself has been presented

14     as a stand-alone motion to approve the settlement.  The

15     settlement agreement exists, the terms of the settlement

16     agreement, if approved by Your Honor, will exist if this

17     plan is never consummated.

18             THE COURT:  Yes.

19             MR. GLUECKSTEIN:  And it provides some fairly

20     extraordinary relief, including pre-effective date not only

21     the locking in of the claim, the $700 million claim against

22     EFH, which EFH creditors bear the burden of unquestionably

23     for all time, whether this ends up being a 1 cent case or a

24     99 or a 100 cents case, as well as locking in -- purportedly

25     seeking to lock in releases of insiders and all sorts of

1    provisions that normally would be found in a plan that goes

2    effective.  They want to lock that into the settlement

3    agreement.

4            Now, Your Honor ruled at the hearing last week

5    that the settlement agreement would be heard in connection

6    with confirmation, that makes sense because it was a

7    condition of the plan.  The debtors have chose to make it a

8    condition of the plan.  But the issues raised by the

9    settlement agreement exist independently, and those issues

10   need to be litigated whether we're impaired, unimpaired, or

11   have anything to do with the plan.

12           And while we certainly understand that there is a

13   difference between what the Court is going to undertake with

14   respect to evaluating the settlement agreement and a trial

15   of each of those individual claims on the merits, we should

16   not give short shrift to what needs to be done in connection

17   with this settlement while both the process and the

18   substance of the settlement are going to be highly

19   irrelevant in our view.

20           And while it's true that Legacy discovery has

21   provided documents relating to many of the underlying

22   claims, there have been no depositions taken on any of these

23   issues yet.

24           In addition the -- in addition, Your Honor, the

25   settlement process that we've -- you know, we've now heard

1    that disinterested directors, you know, have agreed that

2    they're going to start producing some documents, and

3    certainly while that is welcome, that is certainly not by

4    any means the end of the inquiry.  And there's a lot to be

5    done there both on the document and the -- and the

6    deposition trial.

7             THE COURT:  Again, I certainly get your point that

8    the settlement agreement is a complicating factor and raises

9    issues that will have to be dealt with at confirmation that

10   would not otherwise be relevant if the settlement/releases

11   were plan specific, but when I think about what discovery

12   may or may not be appropriate to get us to there I'm struck

13   by the fact that we had massive production of documents

14   dealing with all aspects of prepetition causes of action.

15             I had hundreds of pages of briefing that I read

16   over a weekend, it certainly took you guys longer to write

17   them, so I'm not really complaining that much, that

18   thoroughly vetted those issues, and I've heard today, and

19   this is something that you soon I think fairly need to

20   actually have an opportunity to figure out whether what I'm

21   being told is true, but I've heard today that quote/unquote

22   process points are being provided from the disinterested

23   directors.

24             So, I'm trying to figure out what else there is

25   that possibly could have anything to do with the claims that

1    will being released that you would need additional discovery

2    for.

3              MR. GLUECKSTEIN:  Well we do think certainly, Your

4    Honor, the fact that we're starting to move forward on the

5    production of those documents is good, but we have had no

6    insight as to yet what they contain, they need to be looked

7    at, we need to proceed and have to have depositions on the

8    settlement piece of it.

9              There's another element of the discovery which we

10   haven't yet gotten to, because the debtors talk a lot about

11   -- talked this morning, Mr. McKane talked quite a bit about

12   the fact that they're moving forward with discovery, the

13   cash into plan, anything we've asked for relating to the

14   plan or the settlement that we saw back under the current

15   schedule a couple weeks ago in July before we saw what the

16   plan actually currently reflects, which is certainly an

17   issue where we do think there are some additional materials

18   specifically surrounding the auction that are needed to be

19   requested.  But that the -- none of the comments have

20   addressed the fact that no documents nor any discovery has

21   moved forward in any way with respect to non-debtor

22   entities.

23             We have served initial discovery again before we

24   saw the plan on the creditor groups we knew were involved in

25   the negotiations for things like the negotiating history and

1    the like that go to some of the points that are quite

2    relevant both with respect to the plan, how the settlement

3    agreement has been tied to the plan, this package of

4    documents which we've all heard about, and based on the

5    written responses and objections that we've received it

6    appears that the position of the creditor groups, who so

7    desperately want to move forward on an expedited schedule,

8    is to say that we would get no discovery at all.

9            And so while that issue still is subject to a meet

10   and confer, and we hope to make progress on that front,

11   there is an element that goes beyond simply what the debtors

12   are producing here that's going to be relevant to the

13   discovery effort, and that -- you know, there has to be some

14   time in the schedule for that as well.

15           And if I could just, Your Honor, then segway to

16   turn to the schedule itself just to highlight a couple of

17   points, because we set this out at length in our papers as

18   to the problems we see with how the debtors have reformatted

19   the schedule.  And they are candid that they've reformatted

20   the schedule to fit the time that they have, because you

21   know, there's a commitment to move forward on this expedited

22   schedule and they have these milestones that I'll come to in

23   a moment.

24           But the schedule itself purports to end fact

25   discovery, all fact discovery, including any depositions

1    that we need, whether it be 10 or 30, 30 days from today.

2    And so the fact that the debtors started to push hundreds of

3    thousands of pages apparently of documents out the door in

4    the past few days and the disinterested directors are

5    following suit, does not account for the fact that those

6    documents need to be digested and then moved to an orderly

7    schedule of depositions.  And to accomplish that 30 days

8    from today, which really 30 days from today of a document

9    production even under the debtors' schedule is only to be

10   complete on September 10th.  So what we're really talking

11   about, assuming we actually want to see all of the documents

12   produced before we move onto depositions, is we're talking

13   about two weeks that include other events in this case,

14   including the PSA hearing, as well as religious holidays and

15   other things, to take all of the depositions in connection

16   with confirmation and that we need with respect to the

17   settlement agreement.  And the debtors submit that it is

18   reasonable and we submit that it is not.

19            I mention the fact that we have outstanding --

20   well it certainly appears we're going to have outstanding

21   issues with respect to non-debtor entities in both the

22   production of documents and presumably depositions.

23            We also have an issue that under the debtors'

24   schedule that makes clear that privilege logs are only going

25   to be produced days after fact discovery is completely

1    closed.

2            And the question as to not only the debtors but to

3    third parties or withholding a privilege and the types of

4    assertions that are being made with respect to this plan and

5    the lengthy negotiation process we think is an issue that is

6    going to be of critical importance that certainly we should

7    be able to understand what their position is on these

8    matters before fact discovery is closed and then we get the

9    privilege days later.

10           So there's a lot about just the details of this,

11    and we set out in our papers additional details about the

12    expert process, that simply there aren't enough days on the

13    calendar to achieve what would need to be done prior to an

14    October 28th schedule.  And that was how we got to in the

15    first place.  The somewhat aggressive but accepted schedule

16    of moving forward with the confirmation hearing in January.

17           And really the last point, Your Honor, that the

18    debtors rely on and is discussed by various of the joinders

19    in their papers is the piece about the milestones.

20           You know, everybody very conveniently tries to

21    justify the schedule by saying we have these drop-dead

22    dates, they're in -- they exist in the PSA, that they're a

23    part of this package, they were negotiated termed.  The

24    debtors admit in their papers that they put these in by

25    design.  But they did that without getting approval of the

1    Court to modify the schedule or to talk to us about

2    modifying the schedule.  They put these in for strategic

3    purposes.

4            And we actually saw yesterday in the joinder filed

5    by the T side unsecured noteholders they write in their

6    papers that they certainly would have appreciated more time

7    I guess to accomplish the list that Mr. Shore was going

8    through with respect to the deal terms, and unquestionably

9    there's a lot to be done on that front.

10           But it raises the question then, you know, the

11   debtors agree to these milestones, the debtors maybe asked

12   for these milestones, we'll find all that out, but the

13   milestones exist because they put them into the document.

14   And the suggestion that we need to move forward, we need to

15   hold peoples' feet to the fire we agree with that.

16           As I said at the outset, from the position of the

17   committee, not as to any individual creditor, but from the

18   position of the official committee it is in our interest and

19   our constituents' interest to have these cases successfully

20   concluded as soon as human by possible.  But in order to do

21   that if we're going move forward with the current set of

22   transactions it needs to be done on a schedule that affords

23   us the opportunity to take discovery, prepare our case, and

24   present it and hear the evidence that the debtor is going to

25   put on in support of confirmation, have us test that, and

1    have Your Honor consider it all on a full record.

2            So we would request, Your Honor, that the motion

3    be denied and that the current schedule that Your Honor has

4    entered with respect to discovery and the confirmation

5    hearing proceeding in January be adhered to.

6            I would like to just note one other point for the

7    record on scheduling if I may, Your Honor.

8            With respect to the plan support agreement itself

9    we understand that Your Honor has scheduled the hearing for

10   September 17th with respect to the plan support agreement

11   and the disclosure statement.  We have been talking to the

12   debtors, because we think the most efficient manner to deal

13   with discovery on that front to not put undue burden on

14   anyone, is for the debtors to disclose their list of

15   witnesses and evidence that they intend to put on in

16   connection with the plan support agreement to carry their

17   burden so that that can be, you know, reviewed and

18   challenged, if necessary, by the objectors.  And we had

19   preliminary discussions about them doing that by Monday of

20   next week, which, you know, we think would be appropriate.

21   And we did hear this morning that Mr. Shore might intend to

22   also be putting on evidence, we think that they should make

23   a similar disclosure in order to avoid us serving wider

24   ranging discovery that might be necessary in that motion.

25            THE COURT:  Okay.

1            MR. GLUECKSTEIN:  Thank you.

2            MR. QUERESHI:  Good afternoon, Your Honor, for the

3     record, Abid Quereshi, Akin Gump Strauss Hauer & Feld, on

4     behalf of UMB Bank as the trustee for the PIC noteholders.

5            Your Honor, I'm going to respond briefly to some,

6     but only some of the speeches that Your Honor heard from the

7     right side of the courtroom this morning, and then get to

8     the merits of the scheduling motion itself.

9            I first want to respond to Mr. Sassower's comments

10    about the free option.  To the extent that wasn't his phrase

11    I certainly didn't mean to tag him with it, Your Honor, but

12    I happen to think that free option is an appropriate

13    characterization and it's a term I'm happy to own myself,

14    and the reason, Your Honor, that I think that is an

15    appropriate characterization here is that this agreement

16    goes well beyond what I would describe as ordinary

17    regulatory as.

18            Yes, it's true that any transaction of this sort

19    would require a host of regulatory approvals, and yes, it's

20    true that there will always be some level of conditionality

21    in terms of what level of regulatory conditions would be

22    acceptable to a buyer, but here it goes well beyond that,

23    Your Honor, because what they're effectively saying is, we

24    reserve the right to walk away for any reason.

25            So, for example, economic conditions change, six

1   months from now whether it's because of increased interest

2   rates or because of any other macro economic factors that

3   might impact the valuation of regulated utilities, they

4   don't like it anymore.  And so even if regulatory approval

5   might be obtainable they decide to walk.  That's unique,

6   that's something that I certainly have not encountered

7   before.

8           The free option point absolutely goes to

9   impairment.  So let's assume, and of course Your Honor knows

10  that we contest this, but let's assume for the minute that

11  we are unimpaired under their plan.  Well if we are

12  unimpaired under their plan then we have a very real

13  interest, Your Honor, in insuring that they can deliver on

14  unimpairing us, and if they are unable to demonstrate to the

15  Court that there is some reasonable prospect of actually

16  being able to deliver on that and actually going effective

17  with this plan and actually unimpairing us, that is very

18  significant, particularly, Your Honor, where should they

19  fail, should what I have characterized as the free option be

20  exercised for whatever reason, and we, the E side creditors,

21  be left in a worse position in that set of circumstances,

22  that goes to certainly the feasibility of the plan, and I

23  think it also goes to the good faith of the plan.

24          Briefly, Your Honor, I want to comment on some of

25  what Your Honor heard from Mr. Shore this morning, and in

1    particular his description of this plan as constituting a

2    huge win for the E side of the house, and I think I will

3    leave my comments there, Your Honor, at the fact that our

4    holders, the PIC noteholders are certainly more than capable

5    on their own of deciding what's in their economic interest

6    or not.  If it were the case that they believed they would

7    be unimpaired under this plan I most certainly wouldn't be

8    standing here today.

9              Mr. Shore also attacks the legitimacy of our plan

10   objections.  But, Your Honor, he's not the one that gets to

11   rule on the legitimacy of our objections, that of course is

12   Your Honor's role.  And nor is it appropriate for his

13   attacks on the legitimacy of our objections to serve as a

14   justification for running over our due process rights and

15   running over our ability to put our case on.  And I will get

16   to the specifics, Your Honor, including with respect to

17   valuation testimony.

18             Third point with respect to the earlier speeches,

19   and that relates to the disinterested directors.  The

20   counsel for the disinterested directors did a great job of

21   patting themselves on the back and telling Your Honor what a

22   wonderful job they did, and to that my response is simply

23   let's see what the evidence shows.  That's why we have

24   discovery, it's not the speeches of counsel that matter,

25   it's the evidence that goes into the record on that point,

1    and that will speak for itself when we get there.

2              Last point, Your Honor.  There was a lot of

3    discussion about alternatives and whether the E side

4    creditors are able to get out of their own way and put a

5    feasible alternative on the table.  And now is certainly not

6    the time to address whether there in fact were feasible

7    alternatives that were in the mix here, Your Honor.  That

8    too, to the extent that it's relevant to the confirmation of

9    this plan, to the extent that it is relevant to the good

10   faith of this plan, and we believe that it is, will itself

11   be the subject of evidence.  Were there other viable

12   alternatives that the debtors rejected?  Did the debtors

13   reject those alternatives because of the releases that were

14   being given to the insiders, to the existing equity

15   sponsors, to the directors and officers?  Those are all

16   things, Your Honor, that are going to be the subject of

17   evidence.  Those are issues that are not for today.

18             So now, Your Honor, let me turn to the scheduling

19   motion itself and see if I can address some of the Court's

20   concerns.

21             And first I want to start and just step back a

22   bit, and Your Honor, this is certainly an argument that Your

23   Honor is not hearing for the first time.  There is always a

24   tension in Chapter 11 cases between on the one hand the

25   debtors, their management team, the investors that are

1    backing their deal, they will always tell a court they need

2    to get out, it's urgent.  And much as they have done in this

3    case they will often agree to a set of milestones that

4    certainly a point of that is to urge the Court to set a

5    schedule that respects those milestones and that gets them

6    out on their schedule.

7              But there's a countervailing consideration, Your

8    Honor, that is also present in almost every case and that

9    creates that tension, and that is the unquestionable need to

10   get to the right answer.  That's ultimately the job of the

11   Court.  The right of the objectors to this plan to put on a

12   case, to develop the evidence for their case, that is a

13   right that's protected by due process.

14             And here there are a bunch of very complex issues

15   that Your Honor is going to need to get to the right answer

16   to.  And as Your Honor as heard they fall generally into

17   three buckets.  Good faith, feasibility, and of course the

18   settlement agreement, but there's a host of sub issues with

19   respect to each of those categories.

20             And here what due process means is that we're

21   entitled to find out what went on behind the curtain, and

22   there was a curtain, Your Honor.  Your Honor heard from

23   Mr. Sassower that there was lots of discussion about

24   generally what was going on about the fact that a REIT

25   structure was under consideration, and we're not objecting

1    to the fact that a REIT structure was under consideration

2    nor that that's necessarily inappropriate, and nor, Your

3    Honor, are we suggesting that we didn't know that those

4    types of discussions were under way, but what we didn't see

5    and what we didn't know about were the specifics of the

6    merger agreement, of the plan support agreement, of the

7    settlement agreement, of the equity commitment letters, of

8    the debt commitment letters, none of that was shared with

9    us.  We learned about all of those details at the same time

10   as Your Honor did.

11             And so how those terms and conditions, which

12   ultimately, Your Honor, is what drives feasibility and what

13   drives good faith, how those terms and conditions came into

14   being.  How it happened.  When it happened.  Why it

15   happened.  What the consequences are going to be for

16   creditors on the E side in particular of all of that.  Those

17   are facts and circumstances that we are entitled to explore

18   in discovery.

19             Now we don't just need the facts, Your Honor, we

20   need the facts in a form that they can be presented to the

21   Court as evidence.  That means document production, that

22   means depositions.  It takes time.  And, Your Honor, it

23   simply is one of the costs of a Chapter 11 case.  Debtors

24   might not like that, their plan sponsors certainly don't

25   like that, but it's well recognized, Your Honor, all the way

1   from the highest court in our land that the federal rules

2   allow for broad and liberal discovery.

3         Here their effort to cut off that right through a

4   very truncated schedule I think stems from two fundamental

5   misconceptions.

6         The first is that fact discovery has, quote,

7   largely been muted by the filing of the plan and the

8   settlement agreement, and the second is that they say that

9   it's the debtors that are going to bear the brunt and their

10  plan support parties that are going to bear the brunt of

11  what they themselves refer to as a truncated schedule.  And

12  nothing could be further from the truth on that front, Your

13  Honor.

14        So among the issues that the filing of this plan

15  and this settlement creates, and I'll actually skip the

16  settlement, because I think Your Honor has heard enough

17  about that, but how did the Hunt Group that bid at a

18  competitive auction, how did that morph into the T side

19  plan?  Why did the debtors and the facts and circumstances

20  here agree to the ability of the plan sponsors here to

21  effectively walk away, including for reasons unrelated to

22  regulatory approvals?  Why did the plan supporters demand

23  the free option?  What role did the granting of releases to

24  the equity sponsors play in their approval of this plan in

25  their consideration of alternative plans?  How did the E

1    side disinterested directors conclude in the exercise of

2    their fiduciary duties that this deal makes sense to E side

3    creditors?  Did the granting of releases to any of these

4    parties influence that outcome?  And if so, appropriately so

5    or not?

6              The truncated schedule, Your Honor, and the

7    suggestion that it only harms the debtors.  Again, let's

8    focus for a moment on a couple of the details of that

9    schedule.

10             So after all of the discovery is complete, the

11   document production, including resolution by Your Honor of

12   any disputes that may exist, and let's assume for the minute

13   that we have time under their schedule to get to a

14   resolution of those disputes, which I'm not sure that we do,

15   that would leave two weeks, by my count, to conduct all fact

16   depositions, and that is if you assume, which I think is

17   certainly a rational and reasonable assumption, that you

18   would not want to start depositions until document

19   production is complete, because nobody wants to have to

20   recall a witness because of a subsequently produced

21   document.

22             So they leave two weeks during which there are two

23   Jewish holidays that take out of consideration four business

24   days of ten in that period.  So we're left with six business

25   days on which there is no religious holiday to complete all

1    fact depositions.  Even if ten were appropriate, and we

2    don't think it is, that's a schedule that doesn't make

3    sense.

4           As far as the experts go, and I'm going to come

5    back, Your Honor, to what I think are some of the

6    appropriate subjects for expert testimony, but we have a

7    schedule here where expert reports are due before the

8    completion of fact discovery.  Well that doesn't make sense.

9           As Your Honor well knows the experts need to rely

10   on the factual record, that factual record should be

11   complete.  The distinct phases of discovery should not step

12   on one another in the way that this schedule does.

13          It's a schedule that also does not provide for

14   rebuttal expert reports.  Now, I would submit that rebuttal

15   expert reports are generally speaking very helpful to the

16   Court and that it allows the experts to comment on one

17   another's opinion and to really define the issues among them

18   before we put those experts on the stand at trial.

19          Now a number of depositions, I want to talk about

20   that for a minute.  While it was premature, Your Honor, to

21   address by name the specific deponents that we think might

22   be necessary, I think our papers and the E side committees'

23   papers go into the categories, the institutions that we

24   think are appropriate for fact discovery, that certainly

25   includes Mr. Shore's clients, who are supporting this deal.

1             We don't know, Your Honor, if they're going to

2     offer up those witnesses or if that's going to be a dispute.

3     The suggestions I've heard so far is that may well be the

4     subject of a dispute.

5             And, Your Honor, just by way of context, I want to

6     mention the proceedings that took place in the Tribune case

7     before Judge Carey a few years ago.  Like this plan, Your

8     Honor, the Tribune plan involved a 9019 settlement.  There

9     were competing plans in that case and the key point in

10    dispute was a proposed settlement of fraudulent conveyance

11    claims.  And in that case the opponents of the plan were

12    permitted to take 40 depositions and the proponents of the

13    plan were permitted to notice an additional 20 depositions,

14    in a fact setting that is arguably less complex than in this

15    case.  So the suggestion that ten fact depositions should be

16    the default minimum with the burden of us here to prove that

17    we need more than that I think is misplaced.

18            Now, Your Honor, let me turn to some expert issues

19    and, to start with, valuation.  I think, Your Honor, there

20    are valuation issues that are very relevant to both the

21    feasibility and to the good faith of this plan, and there

22    are several of them.  So the first is the value of the E

23    side debtors in the event that the free option to not close

24    this deal is exercised for any reason.  If they decide they

25    don't like the deal anymore because interest rates go up or

1    because utility values fall for some other reason and they

2    walk, what are we left with?  And I think that's relevant,

3    Your Honor, squarely to feasibility.

4              In the Indianapolis Downs case, Your Honor, and we

5    cited in our pleadings, Judge Shannon talked about the

6    purpose of feasibility and he said that it's to protect

7    against visionary and speculative plans.  And he said just

8    as speculative prospects of success cannot sustain

9    feasibility, so too speculative prospects of failure will

10   not defeat it.  Well, that's why we need the valuation

11   testimony, because we need Your Honor to understand what are

12   the risks of this plan actually going effective and, if it

13   doesn't, where are we left?  We who are supposedly

14   unimpaired under their plan, are we going to be materially

15   worse off?  Are we going to be at risk of having our

16   recovery wiped or substantially wiped out if they go down

17   the path of a six-month or an eight-month or a ten-month

18   process from which they can walk away at any time?  That is

19   absolutely relevant, Your Honor.

20             One of the other considerations that Judge Shannon

21   talked about is he said in the Indy Downs decision, he puts

22   much more weight on a creditor putting their money where

23   their mouth is than on the words of an expert.  And I'm sure

24   every judge in the land agrees with that, Your Honor, but

25   they're not doing that here because of the free option,

1    that's the problem, because they have the ability to walk

2    away because there's no commitment.  And so a valuation that

3    gets into what are we left with if this plan fails is

4    relevant.

5            Secondly, Your Honor, I think there needs to be

6    valuation testimony with respect to conditions that might be

7    imposed by the regulators, including the PUC, in order to

8    assess the likelihood of the plan sponsors walking away.  It

9    goes to feasibility, Your Honor.  If the economics of this

10   deal in order to make sense for the plan sponsors, in order

11   for the plan sponsors to stick to this deal and not walk

12   away are such that the imposition of a condition by the

13   regulator that would increase the costs by five percent, I'm

14   making up a number, if that were to tip the balance and

15   cause them to walk, that's a relevant consideration, it goes

16   directly to the speculative nature of the plan.  So

17   valuation testimony with respect to that is absolutely

18   relevant.

19           Intervening events likewise, Your Honor.  Because

20   of the free option, because these investors can go away if

21   some other investment opportunity presents itself that they

22   prefer, if the economics are no longer attractive, we will

23   potentially need testimony with respect to intervening

24   market conditions that might change between now and when we

25   get to confirmation and what the likelihood is that they

1    will walk.  I mean --

2              THE COURT:  You've got to be kidding.

3              MR. QURESHI:  Well --

4              THE COURT:  You've got to be kidding.

5              MR. QURESHI:  -- Your Honor may laugh at it, but

6    I'm absolutely not kidding, Your Honor, because --

7              THE COURT:  What competent expert is going to be

8    able to come in here and tell me what the utility market is

9    going to be in April of 2016, what the Chinese stock market

10   is going to be in April of 2016, what oil prices are going

11   to be in April of 2016, that I would remotely consider

12   relevant to making a factual determination based on

13   evidence?  It is pure speculation.

14             MR. QURESHI:  Your Honor --

15             THE COURT:  If there's an expert out there that

16   knows that, he's not spending his time --

17        (Laughter)

18             THE COURT:  -- for more than a thousand bucks an

19   hour.  He's got a really nice place in Dubai, okay?

20        (Laughter)

21             MR. QURESHI:  Well, Your Honor, that's --

22             THE COURT:  I know I'm being facetious and

23   aggressive, but there's a limit to what I'm going to allow

24   you to explore.

25             MR. QURESHI:  And what Your Honor is hypothesizing

1     is not at all what I'm suggesting.  What I'm suggesting,

2     Your Honor, is what happens if we get to a confirmation

3     hearing at the end of October, the end of November, whenever

4     it's going to be, and between now and then interest rates

5     have gone up 50 basis points, let's just suppose that

6     happens.  None of us knows whether it's going to and we're

7     certainly not going to put on an expert that says it might

8     happen, but let's say it does and let's say that materially

9     impacts the likelihood that these investors are going to

10    want to close.  I don't find that funny, Your Honor, because

11    if they don't close the E side creditors are very seriously

12    likely to be harmed --

13              THE COURT:  Yeah, but what's the --

14              MR. QURESHI:  -- and that is a relevant

15    consideration.

16              THE COURT:  Let's talk a little bit about what Mr.

17    Shore said.  What's the alternative?  What's your

18    alternative, what's the debtors' alternative?  Because even

19    under an Oncor sale, if it had gone forward in July, we were

20    talking about closing in April or May or June of 2016, which

21    is exactly what's contemplated here.  And if that deal had

22    fallen through -- and I don't know what that deal would have

23    had in the way of liquidated damages or some other reason --

24    you know, some other impediment to just simply walking away,

25    we'd be in the exact same position.  You can't -- this isn't

1   a company that you can sell in 20 days, it's a company that

2   takes a year to sell -- or an asset.

3          MR. QURESHI:  Your Honor is absolutely right that

4   every transaction for this company, any change of control is

5   going to trigger a host of regulatory requirements.  But,

6   Your Honor, we're not here on any transaction, we're here on

7   their transaction.  That's what's proposed, that's what's

8   before the Court.  And what's unique about their transaction

9   is it's not limited to what I would call a traditional

10  regulatory out or a traditional market MAC provision, it's

11  much, much broader than that.  It's broader than that

12  because, again, the plan sponsors can walk if they don't

13  like the deal anymore, for any reason, at any time and

14  without recourse.  And that is not a market condition, that

15  is something that I believe is unique and that is something

16  that I believe goes directly to feasibility.

17         And so, Your Honor, for us to ask for the ability

18  to put on evidence that goes to the economic likelihood that

19  it will be in the interest of the sponsors of this plan to

20  walk away I think is absolutely relevant and it goes to good

21  faith.  And, likewise, evidence with respect to what will we

22  on the E side be left with if they elect their free option

23  and decide not to consummate the plan is also very relevant,

24  because it goes to whether the risk that is borne

25  exclusively by the E side in order to give the plan sponsors

1    the option of consummating this deal or not is a reasonable

2    risk to be taken in the circumstances given the possible

3    outcome to creditors on the E side.

4             So I don't take these issues lightly, Your Honor,

5    I don't think they're something that should be laughed at.

6    I think they're very serious concerns and I think we ought

7    to have the ability to put on evidence with respect to them.

8    It will not be speculative evidence --

9             THE COURT:  Well, okay.  So why do you need any

10   additional discovery or more time for discovery to develop

11   evidence about the economic risks associated?  I mean, you

12   can have an expert come in with the information that's

13   already available in the public market and make those kind

14   of calls, could make a valuation of Oncor, can talk about

15   risks that would be involved in the re, can talk about

16   market risks in connection with energy prices.  All of that

17   is readily available, you don't need extra discovery from

18   the debtors for that.

19             MR. QURESHI:  Well, Your Honor, I think it's

20   certainly reasonable with respect to a valuation exercise of

21   any debtor to have access to the debtor's documents, to have

22   access to the debtor's business people to be able to

23   question them on the economics of the business.

24             THE COURT:  You've had that -- that access has

25   been available for months, years -- over a year.

1          MR. QURESHI:  In what context?  Were we supposed

2     to take valuation depositions six months ago?

3          THE COURT:  I'm sorry, I don't know as I sit here

4     today whether you had a nose under the tent in connection

5     with the Oncor sale, so I don't know if you have access to

6     that data.  Did you have access to that data?

7          MR. QURESHI:  Frankly, Your Honor, I'm not sure.

8     I'm not sure exactly what we had access to and at what

9     point.

10          THE COURT:  And I don't know.

11          MR. QURESHI:  And we can certainly find that out,

12     I just don't happen to know right now.  But I certainly

13     don't think it's unreasonable, Your Honor, in connection

14     with those types of valuation issues to have access to the

15     management of the debtors, to have access to the directors

16     to understand what they considered, to understand what they

17     understand to be the circumstances in which the equity

18     sponsors here, the plan sponsors might exercise their option

19     to walk away.  And that is also why depositions of the plan

20     sponsors themselves are appropriate, so we can understand

21     why did they insist upon a free option.  What circumstances

22     did they have in mind that they needed that free option?

23     Under what circumstances do they think they might exercise

24     that free option?  And that is the corpus, if you will, of

25     testimony on which the expert will ultimately opine and base

1    his opinion.

2            So if out of that testimony, for example, we learn

3    what the assumption is behind the plan sponsors in terms of

4    the economics of this deal and the circumstances under which

5    it works, then we will have an understanding of what change

6    in circumstances might lead to them walking away.

7            And in a similar vein, Your Honor, I think there

8    is relevant expert testimony here related to the regulatory

9    approvals.  And I'm not talking about an expert of some sort

10   getting on the stand and saying, gee, I think they're going

11   to approve, or I think they're going to approve with X

12   conditions or Y conditions.  We all understand that to some

13   degree that would be speculative.  But instead to talk about

14   the types of conditions based on past transactions that are

15   typically imposed by regulators and then in turn to deal

16   with the valuation impact of those types of conditions.

17   Because again it all goes to the extent to which this is a

18   completely speculative plan that cannot satisfy the

19   feasibility requirements or instead is based on something

20   more than that and, ultimately, that's what the evidence

21   will show.

22           So, Your Honor, I think when all of that is taken

23   together, plus what Your Honor heard from Mr. Gluckstein

24   with respect to the settlement agreement and the discovery

25   there, which I don't need to repeat, we think that an

1   October 29th start date, it's not even close, Your Honor, to

2   give us a fair shot to gather the evidence and put a case on

3   before Your Honor as to why we think this plan doesn't work.

4           Thank you.

5           THE COURT:  Thank you.

6           Mr. Pedone?

7           MR. PEDONE:  Good afternoon, Your Honor, Richard

8   Pedone on behalf of the EFH indenture trustee.

9           Our client filed a series of proofs of claim at

10  EFH, none of which have been objected to so far today, all

11  of which sought contract rate of interest, prepayment

12  premiums in certain cases, but significant amounts in

13  trustee fees and expenses, none of those are allowed.  Our

14  claims have not been objected to.  Those claims are

15  unquestionably, as a matter of law, impaired under the plan.

16  So in our view, as we sit here today, we're outside of

17  whether or not the earlier order requires to go forward with

18  it and it was provided for.  So we're within your discretion

19  on what you set for a scheduling order.

20          Your Honor, I was struck by a couple of Mr.

21  Shore's remarks.  First, the Oreck chart I too have on my

22  wall, and what's missing from the Oreck chart on my wall and

23  from all of the debtors' earlier SEC filings are any

24  statements by the directors that these intercompany claims

25  existed, that these claims had merit.  If you look at the

1    debtors' first-day affidavit, you don't have statements that

2    we may have to pay a significant amount of claims and you

3    don't -- certainly don't find them in earlier SEC filings.

4           So we come into these cases and holders came into

5    these cases believing that the silos would be observed.

6    We're here today with two things before you that discuss

7    scheduling, plan confirmation and a monumental settlement

8    that is an incredible reversal of course from SEC filings

9    ahead of the case saying we don't know anything, earlier

10   statements in the case when the debtors showed up and said

11   we don't have to pay anything to the T side, we're going to

12   litigate it, we'll go ahead and give them their discovery,

13   to today we're giving them $700 million plus.

14          THE COURT:  No, the settlement has been in play

15   since April and was in play in the context of the plan,

16   because the plan incorporated the settlement and plan

17   discovery has been going on since July.  So there's no

18   change there.

19          MR. PEDONE:  Your Honor, what is changed is the

20   settlement is a separate motion and discovery on that motion

21   that then walks it.

22          THE COURT:  Yeah, but I'm talking about discovery.

23   And since an identical settlement virtually was already

24   baked in the plan where plan discovery is already occurring

25   and basically occurred, there's no need for additional

1    discovery simply because it's a stand-alone settlement now.

2    The settlement terms itself are the same whether it stands

3    alone or whether it's baked into a plan.  Now, it makes the

4    hearing more complicated, I absolutely agree, because you

5    could -- if the settlement were tied specifically to this

6    plan, you could have -- you could basically in effect

7    bifurcate and deal with the plan issues first, which might

8    moot out the settlement agreement issues.  Here you're going

9    to have to hear both no matter what.  You're going to have

10   to hear evidence about settlement and evidence about the

11   plan.  But the settlement is not new, what's new is it's a

12   stand-alone, but the fact that it's a stand-alone doesn't

13   affect what discovery is needed in connection with the

14   settlement.

15          MR. PEDONE:  That's correct, Your Honor.  And we

16   all agreed on discovery going through January on that

17   settlement, that was agreed and it was ordered and parties

18   until two weeks acted in reliance on it.  And now we have a

19   settlement with an afterlife separated from the plan that

20   the holders at EFH will have to live with that could

21   represent more than 50 percent of their recoveries if we

22   have to go to that afterlife.  I hope Mr. Shore is correct

23   that his arrangement comes together, we reach an arrangement

24   with the debtors where they in fact they come up with a plan

25   that leaves us unimpaired and that happens, but this

1    settlement has a really bad afterlife that will live on if

2    things don't come together.

3             And let's talk for a second about what has to come

4    together.  So that settlement, the 21 billion in alleged

5    claims, that's complicated, yes, millions of pages of paper

6    discovery have been put out there.  But what hasn't been

7    digested yet is the 40,000 pages produced two weeks ago that

8    I haven't gotten through yet that may or may not relate to

9    the directors -- the interested directors' reasons for

10   entering into that, the directors who in the days and years

11   leading up to these cases said in their SEC filings there

12   are no intercompany claims, don't be worried about it, we

13   don't have to disclose anything, and then they do this flip.

14            So we have discovery related to those issues that

15   has to start from scratch or relatively from scratch on why

16   they entered into the settlement.  So that's one piece of

17   it, but then feasibility.  Mr. Shore has a complicated work

18   stream that he had here in his hands, that goes to the

19   feasibility of the plan, what is the likelihood it actually

20   comes together, and that -- the odds of that coming together

21   may or may not relate to actually the settlement, but it

22   will certainly relate to feasibility when we get to trying

23   whether or not this case can actually get wrapped up in this

24   plan.  And it is undisputed, in his words, that this is the

25   most complicated transaction he needs to close on that any

1    party in this courtroom has heard of, that is what he said

2    today and that is what you're determining.  Feasibility on

3    the most complicated transaction ever is what we're setting

4    a schedule for discovery.  And we believe that the discovery

5    schedule that has been previously ordered should stand in

6    those complicated factual circumstances.

7            And so when you go to what is the burden on the

8    debtors of sticking with that plan -- original discovery

9    schedule, well, the burden is a January 15th date.  And when

10   was that arrived at and who wanted it?  Apparently it was

11   wanted by the T firsts.  The debtors say they had to give

12   that date because the T firsts want to get out.  You had no

13   specific evidence or even argument before you on why January

14   15th as opposed to February 15th, nor a quantification of

15   the difference that those number of days would cost the

16   estates.

17           The EFH creditors are balancing, do we want to get

18   out more quickly and take some risk on discovery and whether

19   this closes and the settlement and get an earlier plan,

20   which would be the greatest thing.  We bear enormous costs

21   as this goes forward and we as creditors at EFH, as you

22   heard from the Committee, have balanced all of this and we

23   have determined that the best thing for EFH creditors is to

24   have sufficient time to test the feasibility and to test the

25   settlement and stick with the January date.  You need to

1    balance that and our statements concerning that against what

2    you've heard, that the T firsts wanted this date for no

3    reason.

4              And, Your Honor, going to another piece of the

5    discovery that will have to take place, Mr. Shore spoke of

6    the apocalypse that may occur if the T firsts foreclose.  No

7    one has ever foreclosed on a nuclear power plant, Your

8    Honor.  I can't even find an instance where somebody has

9    foreclosed on a single operating gas-powered plan.

10   Foreclosure is unlikely here.  The implications of it are

11   not described in the current disclosure statement, as they

12   should be, and those are issues that need to be worked out.

13             Your Honor, we believe that the January date that

14   you previously ordered should stay.

15             Thank you.

16             THE COURT:  Thank you, Mr. Pedone.

17             Mr. Anker?

18             MR. ANKER:  For the record, Philip Anker, Wilmer

19   Cutler Pickering Hale and Door for Delaware Trust Company as

20   first lien indenture trustee.

21             Your Honor, I hope what I'm about to say will both

22   be true and please you, and that is I'm going to do my

23   darndest to be the shortest speaker here today, I recognize

24   it's been a long day.

25             I rise for two reasons and two reasons only.

1   First, Mr. Sassower began today's hearing by saying, among

2   other things, that the debtors are in discussions with those

3   who have raised potential objections to the disclosure

4   statement or the like, including those who are to be

5   unimpaired under the plan, to give them assurances that they

6   really be unimpaired, what their treatment is.  I know he's

7   obviously had discussions with some folks, he wouldn't make

8   that statement otherwise.  There have been no discussions

9   with us, we would be happy to have them.

10          Nothing -- I want to put this the right way, Your

11  Honor -- I very much enjoyed all my time in this courtroom

12  with Your Honor, but nothing would please me more and I'm

13  certain it would please you even more if I simply were not

14  here on confirmation because we were comfortable that we

15  will truly be unimpaired and that all of our claims, our

16  claims for the make-whole, if allowed on appeal, are claimed

17  for the fees we've incurred, are claims for the nonpaid

18  interest, which by the way, under the plan, under as I

19  understand identical language, is being paid to the seconds,

20  but there's no provision for payment to us unless it's

21  allowed through litigation.  If all of those -- if allowed,

22  ultimately, they reserve their rights to litigate, if

23  allowed are paid, I won't be here, and that is our principal

24  issue.

25          The only other thing I rise -- and I think I

1    understand in part Mr. Shore -- we said with respect to

2    scheduling, if we're really unimpaired, we're probably not

3    going to be here and, if we're going to have a fight about

4    impairment, it will largely be a legal issue.  I think there

5    are some facts.  So we understand the schedule from our

6    perspective.

7             On the other hand, when I heard Mr. Shore a few

8    weeks ago say that in connection with confirmation he wants

9    to litigation, I thought what I heard him say then was

10   EFIH's solvency, I said to myself that could affect us

11   potentially and, gee, I thought I was at a make-whole trial

12   a few weeks ago where the Court bifurcated precisely because

13   it knew how complicated and how time consuming that issue

14   would be.  You said today you're not having a valuation

15   hearing at confirmation.  I understand Mr. Shore to have

16   said he is going to litigate EFIH's solvency, be that

17   balance sheet solvency, cash-flow solvency, ability to pay

18   all of its debts in full at confirmation, and that in any

19   event, as a matter of belt-and-suspenders, whatever findings

20   the Court may make will not be binding upon or preclude us

21   in any way were we, for example, to prevail on appeal and

22   were the appellate decision on the make-whole to turn on

23   solvency in some notion.

24             If that's right and we're not going to litigate

25   those issues at confirmation, then I don't need to say Your

Page 108

1   Honor, boy, that's going to take another six months.  But we

2   did want to put that in as an objection, because if we were

3   going to litigate it, yes, I think that could take some

4   material additional amount of time beyond the schedule

5   that's proposed.

6            I thought I was going to take less than five

7   minutes, I think I took eight, but I still think I'm the

8   shortest at the podium today.

9            THE COURT:  All right.

10           MR. ANKER:  Thank you, Your Honor.

11           THE COURT:  Thank you, Mr. Anker.

12           Mr. Brody?

13           MR. BRODY:  Good afternoon, Your Honor, Josh

14  Brody, Kramer Levin, on behalf of (indiscernible) EFIH

15  second lien indenture trustee.  I can be even shorter than

16  Mr. Anker, because I'm just going to say me too on what Mr.

17  Anker said with respect to the solvency points.

18           The other issue I just wanted to raise, which we

19  raised in our pleading and it partially goes to the question

20  of impairment, it somehow goes to the scheduling, and it's

21  not a big issue, but I just want to make sure that people

22  understand.  We've heard today, debtors have said in their

23  pleading that the cornerstone of their plan with respect to

24  EFIH's creditors to pay in full in cash.  That would be

25  great, but that's not what the plan actually says.  It says,

1    "Paid in full in cash or such other treatment that has

2    rendered them unimpaired."  Without knowing what that is,

3    it's kind of hard to know whether or not an October 28th

4    confirmation hearing and all the things that go along with

5    it leading up to that are really feasible.  We've raised

6    this with the debtors, they haven't really told us they're

7    going to take that language out.  Until we know really what

8    we're talking about as far as what our plan treatment is

9    going to be, it's a little bit hard for me to stand here and

10   say the schedule is okay or is not okay.

11           Thank you.

12           THE COURT:  Thank you.

13           MR. GOODMAN:  Good afternoon, Your Honor, Peter

14   Goodman from Alcoa.  Because I'm bringing up the rear of

15   objections, I'd first like to dispel the perception of some

16   that I'm the tail wagging the dog here, because I know our

17   issues are different from what you've heard today.

18           As we said in our papers, we understand the

19   importance of resolving the capital structure and that's

20   been a huge undertaking, but Alcoa is an important creditor

21   too.  It's a contract creditor, it's a regular creditor, it

22   is a co-owner with the debtors Luminant and Sandow Power of

23   a massive power-generation and coal production facility in

24   Rockdale, Texas.  The relationships between the parties are

25   governed by more than two dozen very complex contracts and

1   leases.

2          Just to put us in perspective -- and this is

3   according to the debtors' disclosure statement -- ten

4   percent of its lignite-generation capacity, in my view

5   likely more, is generated through Rockdale.  Lignite

6   generation represents 72 percent of the debtors' generation

7   capacity.

8          Now, with respect to these contracts, the debtors

9   have already assumed the real property leases, the

10  underlying real property leases underlying the facilities

11  that they own.  It is clear to us that the debtors are going

12  to assume the Rockdale facility contracts, but the debtors

13  have not told us that fact, whether officially or

14  unofficially.  And Alcoa believes that it has substantial

15  contract claims against the debtors which could impact plan

16  feasibility.

17         We believe and we've agreed with the debtors to

18  limit our objection to the plan of reorganization to

19  enumerated items in a stipulation and one of them was plan

20  feasibility.  We believe that there will be significant

21  discovery concerning those claims, not in the magnitude of

22  what you've heard today, but still significant discovery.

23  And so we've been trying to work with the debtors with

24  respect to the discovery and at the same time we've been

25  trying to meet with the debtors to work out our issues to

Page 111

1    see if they can be resolved.

2              As Your Honor may recall, we objected to the

3    exclusivity motion on February 3rd and, as a quid pro quo

4    for withdrawing our objections, the debtor agreed to meet

5    with us so we could learn a little bit more about their

6    intentions with respect to the Rockdale facility, which I

7    thought was appropriate at that time.

8              Now, on Friday, August 7th, we entered into a

9    discovery stipulation which we believed resolved the

10   outstanding discovery issues between Alcoa and the debtors.

11   And it was done so in the context of a January confirmation

12   hearing and it said that discovery would commence no later

13   than October 15th, which I think is an important date in

14   terms of the discussions and the facts.

15             On Monday, August 10th, the debtors announced the

16   plan hearing would be moved up to October 28th.  To say we

17   were blindsided was an understatement.  The stipulation that

18   we agreed to said discovery will begin no later than October

19   15th.  And then it goes on to say that the parties agree not

20   to object that such discovery is untimely under the

21   confirmation scheduling order, that's the order Your Honor

22   entered with respect to the participating parties, which we

23   were at one point, or, B, not permitted after October 15th

24   because the debtors have not in connection with the plan

25   provided Alcoa notice of the debtors' request to assume or

1    reject the contracts.

2           So what that meant really was the outside kickoff

3    date was going to be October 15th and if we served discovery

4    too soon they would object and we would be back to Your

5    Honor, because they would say, hey, we haven't told you what

6    we're doing, even though they obviously know what they're

7    doing.  I think they've pretty much conceded they want to

8    make a motion to assume, which would be interesting to see

9    considering I was told yesterday that they still don't know

10   what they're doing.

11          One question is very troubling and this is in the

12   context of a meet-and-confer on discovery.  While

13   negotiating discovery stipulation for several days leading

14   up to the August 7th stipulation, which we inked at 6:00

15   p.m. that evening and affects Alcoa's discovery right, and

16   knowing that we were operating under a January 20th

17   confirmation hearing date, we were counting back the days

18   with them.  I was arguing with them why it made sense to

19   commence discovery sometime in October given a January 20th

20   confirmation hearing date.  Why did the debtors not tell us

21   that they would be moving confirmation forward to October

22   28th?

23          Now, we relied on the fact that there would be a

24   January 20th confirmation hearing when we withdrew our

25   notice as a participating party.  We never discussed

1    anything other than the January 20th confirmation hearing

2    date.  In fact, we asked the debtors several times why at

3    the last minute they wanted to change the discovery cutoff

4    date from October 15th to no later than October 15th.  In

5    fact, this was 5:30 in the evening on Friday, we signed this

6    at 6:00 p.m.  They were saying you've got to sign it or

7    we're going to object to your right to be a participating

8    party if you don't it sign now.  We kept saying, well,

9    what's the meaning of this?  At no time did Counsel advise

10   us that they intended to move up confirmation by three

11   months.

12          Now, I told you were stunned on Monday when we

13   heard the reports.  And we called Kirkland and asked them

14   for an explanation and to enter into a discussion over a

15   discovery plan, this was August 13th, given what they were

16   proposing and our calls were completely ignored, they never

17   got back to us on that.

18          Now, I agree with what I'll characterize as the E

19   side objectors.  I'm not really up to speed on all the

20   nomenclature of the case and who the parties are, but my

21   belief is that it was a push just to get to January, be

22   prepared, given the discovery we would need to get to

23   January 20th if the kickoff was October 15th, but we were

24   willing to work within that schedule.  Now the debtors

25   propose to cut more than 50 percent of our trial and

1    preparation time.

2              And just a plain reading of the agreement, it

3    makes no sense to have negotiated an October 15th kickoff

4    date if the confirmation hearing was going to be held on

5    October 28th.  I mean, that would leave less than six days

6    before the objection deadline, I believe, under

7    confirmation.

8              So I think what's missing from the debtors' "we're

9    giving them what they agreed to" is the background, and the

10   background is always key and crucial to a meet-and-confer

11   and a discovery stipulation.  And we would respectfully

12   request that Your Honor keep the existing schedule as is.  I

13   mean, if they intend to file a notice to assume, which they

14   say they do, it's really irrelevant to our objection to

15   feasibility and, therefore, we ask that Your Honor keep the

16   existing schedule.

17             Does Your Honor have any further questions of me?

18             THE COURT:  Nope.

19             MR. GOODMAN:  Thank you, Your Honor.

20             THE COURT:  Thank you.

21             Mr. Gwynne.

22             MR. GWYNNE:  Good afternoon, Your Honor, Kurt

23   Gwynne from Reed Smith on behalf of Bank of New York Mellon

24   as indenture trustee for the PCRBs, the Pollution Control

25   Revenue and Revenue Refunding Bonds, and on behalf of Bank

1    of New York Mellon Trust Company as the indenture trustee

2    for the EFCH 2037 notes.

3             Before I start today, Your Honor, I want to make

4    sure a few facts are very clear regarding the Pollution

5    Control Bonds and the status of the plan and the settlement

6    agreement, and when that changed and how that affects

7    discovery from the perspective of the Pollution Control

8    Bondholders.

9             The debtor filed its original plan on April 14th

10   of 2015.  In that plan, there was no distinction between the

11   treatment of the Pollution Control Bonds and the other

12   unsecured creditors, with the other unsecured noteholders on

13   the T side, everyone was in essence being treated the same.

14   That remained true when the debtor filed its first amended

15   plan on July 23rd, it remained true when the debtor

16   thereafter filed the second amended plan, that did not

17   change until August 10th when the debtor filed the third

18   amended plan.  The third amended plan is the first time

19   where under any of the debtors' plans or under any other

20   agent of the settlement agreement that the Pollution Control

21   Bondholders were treated less favorably than the ad hoc TCEH

22   unsecured creditors or the second lien unsecured creditors

23   on the TCEH side.  And in fact in that third amended plan,

24   not only are those noteholders participating in the waiver

25   of the first lien deficiency claim, but so are the trade

1    creditors, it's only the Pollution Control Bondholders that

2    are not.  It did not happen again until August 10th.

3            Now, prior to August 10th there was mediation, as

4    Your Honor knows, with Mr. -- or Attorney Borowitz as the

5    mediator.  That's a process that we wanted to get into.  The

6    debtor did not agree to let the Pollution Control

7    Bondholders trustee participate formally in the mediation.

8    The mediator was courteous enough to nevertheless speak to

9    us if we signed up an NDA, but my point is we were not among

10   the parties that were under the tent and negotiating the

11   treatment that they decided was appropriate for the

12   Pollution Control Bondholders.

13           It's also important, Your Honor, because during

14   the time of this prior discovery the Pollution Control

15   Bondholders were not taking discovery, we were not an

16   adversary to the debtor, the TCEH debtors or the plan.  It

17   was in a form that was acceptable from the indenture

18   trustee's perspective because it treated us equally.

19           So that, Your Honor, is important to realize why

20   the indenture trustee was not -- we don't take discovery

21   just for fun of course or to generate attorneys' fees, we

22   only do so if and when there's an issue, and we didn't have

23   one until August 10th.

24           I have a color copy of the redline that we filed

25   yesterday, Your Honor, Docket Item 5687-2.  May approach

1    with a copy of it?

2            THE COURT:  Yes.

3            MR. GWYNNE:   Thank you.

4            THE COURT:  Thank you.

5        (Pause)

6            MR. GWYNNE:  Your Honor, one thing I want to point

7    out is from a religious observance schedule, the Bank of New

8    York Mellon proposed schedule is more friendly than the

9    debtors, we don't have any deadlines set for Rosh Hashanah

10   or Yom Kippur.  I believe the debtor had a deadline on Rosh

11   Hashanah for filing deposition notices on September 14th.

12           Your Honor, I'm going to address Bank of New York

13   Mellon's objections and issues with the schedule by topic

14   rather than just flipping through the pages of the proposed

15   revised order, but I will talk about in what provision of

16   the revised order the changes or comments are.

17           There are 12 topics to discuss, the first is with

18   respect to participation.  The debtors' order excluded Bank

19   of New York as one of the parties that would be considered a

20   participating party automatically under this amended order.

21   There are 17 parties that were listed, Bank of New York was

22   not among them, although Bank of New York was a

23   participating party and did file a notice of intent under

24   the existing scheduling order.  There's no reason of course

25   Bank of New York should have to file another notice of

1    intent to be a producing party.

2            Now, I want to point out we filed our notice of

3    intent late in July, I think it was in the last week of

4    July, we did so because we had heard some rumblings that

5    maybe things were going to change for the Pollution Control

6    Bondholders and we wanted to make sure that we were a

7    participating party when we saw something like what we did

8    ultimately see, the third amended plan negatively affecting

9    our holders.

10           In addition, paragraph 5 of the debtors' proposed

11   order provides that if someone files a notice of intent the

12   debtors have ten days to object to it and the parties not

13   entitled to participate is not considered a participating

14   party until the Court rules on it.  Well, Your Honor, when

15   the debtors are trying to get a lot done in a short period

16   of time, that's the type of provision that frankly, whether

17   it's designed to or not, the effect of it is to preclude

18   creditors from having an opportunity to participate in

19   discovery.

20           In the order as Bank of New York Mellon revised

21   it, the debtors would have two days to object to any notice

22   of intent, and the creditor would be considered a

23   participating party unless and until Your Honor ruled

24   otherwise, so someone is not sitting on the sideline as time

25   goes by.  With respect to Bank of New York, in our proposed

1    order we're added as a participating party in both

2    capacities on behalf of the Pollution Control Bondholders

3    and the EFCH 2037 notes.

4            The next issue, Your Honor, the second issue is

5    the initial consolidated discovery requests.  In paragraph

6    7A of the debtors' proposed order they provide that a

7    participating party must identify within one day of Your

8    Honor entering an amended scheduling order whether any of

9    the previously served initial consolidated discovery

10   requests were still relevant.  While not looking for a long

11   time, Your Honor, I thought two days made more sense because

12   some folks may not know right away if the order has been

13   entered.

14           In paragraph 7B, we also moved up by three days

15   from what the debtor proposed from September 7th -- sorry,

16   from September 10th to September 7th the debtors' deadline

17   for producing documents in response to those initial

18   consolidated discovery requests.  The debtor has known of

19   them for a while and it shouldn't be a burden on the debtor

20   to produce documents by September 7th rather than the 10th.

21           The third topic is additional discovery requests.

22   Interestingly here, Your Honor, as I indicated, this plan --

23   there are four iterations of this plan, the original plan,

24   three amended plans, only in the third amended plan does the

25   treatment of the Pollution Control Bondholders change.

1    Notwithstanding that, in this proposed order the debtors do

2    not want to allow for the serving of any other document

3    requests, notwithstanding the material changes to the

4    treatment of the Pollution Control Bondholders.

5            The prior order that was entered, Docket Item

6    4916, on page 8 of 17, had a provision that provided for

7    additional discovery requests based on material amendments

8    to the plan.  For some reason, unknown reason, but certainly

9    again the effect of not having such a provision in this

10   order is only to preclude creditors from taking discovery

11   that is relevant.

12           One of Counsel for the debtor that spoke today

13   specifically asked Your Honor not to let Bank of New York

14   Mellon, quote, "revisit issues," close quote.  Your Honor,

15   we haven't visited issues in the first place because we

16   didn't have any until August 10th.  We're not asking to

17   revisit issues, we're asking for an opportunity to take

18   appropriate discovery based on the changes to the plan that

19   the debtor made on August 10th.

20           So there needs to be a procedure for serving new

21   discovery requests relating to the new plan and the new

22   terms of the settlement agreement, which also is where the

23   treatment of the Pollution Control Bondholders originates.

24   So we've added a new section 7B in the Bank of New York

25   Mellon order to provide for the service of these new

Page 121

1    additional discovery requests and provide it for the

2    production of documents in response thereto within 17 days.

3              The fourth topic, Your Honor, is deduplication.

4    The debtors' e-discovery protocol attached to the order in

5    paragraph 10 says that producing parties may de-duplicate

6    documents.  Well, Your Honor, I realize what's been produced

7    is already produced, it's there, but with respect to any

8    future productions we think de-duping should be mandatory.

9    It's not a particularly difficult process, it doesn't take

10   the lawyer time to do it, a discovery consultant can do it,

11   but there's no reason people should be getting 20 copies of

12   the same email when we have a truncated discovery process.

13             The fifth topic is depositions generally.  In

14   paragraph 7F, as I indicated, the debtors propose the first

15   day of Rosh Hashanah as the deadline for service of the

16   deposition notices.  Besides being on a religious holiday,

17   it's also unworkable because it's only four days after the

18   production of the documents in relation to initial

19   consolidated discovery requests.  That's four days after the

20   debtors' proposed production of those documents.  It's also

21   unreasonable to require deposition notices on September 14th

22   when we don't have the trial starting if it's going to be on

23   this procedure until later in October.

24             There's no reason to force people to send

25   deposition notices before they've had a chance to go through

1    the documents with respect to the new discovery requests

2    that I indicated we had to add a procedure for.  If you use

3    the debtors' deadline of the 14th as providing deposition

4    notices, there will be almost no time, a day or two to

5    review documents before having to issue deposition notices.

6    Bank of New York Mellon's proposed procedure is to allow

7    folks to serve deposition notices on or before September

8    25th, which is still plenty of time.  People can do it

9    earlier if they want and certainly should be encouraged to,

10   so hopefully we don't have as many depositions back-to-back

11   as possible.

12         The third issue with respect to the depositions

13   themselves is that the debtors want to limit the plan

14   objectors to an aggregate of ten depositions, and then they

15   further want to disadvantage the objectors in two other

16   ways, one of which is by saying that a Rule 30(b)(6)

17   deposition is automatically considered to be another

18   deposition.  So even if it's Mary Smith testifying in

19   response to a deposition notice relating to her

20   specifically, but the debtors also designate her as a

21   30(b)(6) designee on certain topics, they would count that

22   as two depositions, not one.

23         The debtors also provide that a witness could not

24   be deposed more than once.  Well, Your Honor, we have a lot

25   of different debtors here, in fact this is really like two

1    bankruptcy cases, right?  We have the E side and the T side.

2    I don't care generally about the E side's issues, I don't

3    think they generally care about the Pollution Control

4    Bondholders' issues, which are T side issues, so witnesses

5    are going to have to be deposed more than once if they have

6    information that is relevant with respect to both an E side

7    issue and a T side Pollution Control Bondholder issue.

8             Lastly, the debtors propose in paragraph 15 of

9    their order that the creditors' committees and the secured

10   creditors will negotiate in good faith regarding allocation

11   of fact depos.  Well, that's wonderful, Your Honor, for the

12   Pollution Control Bondholders that we're on the other side

13   of our committee here.  Our committee signed the plan

14   support agreement, we're not a secured creditor, so who is

15   going to be negotiating the allocation of depositions for

16   the Pollution Control Bondholders?  Nobody under the

17   debtors' procedure.  So obviously we've changed those

18   untenable procedures.

19            And with respect to the number of depositions, we

20   think it's appropriate to say each objector should be able

21   to take five depositions.  If the debtor thinks that someone

22   is taking depositions unnecessarily or to harass them, then

23   the debtor can certainly file a motion for a protective

24   order.  But in light of the time of discovery here, which is

25   relatively short for the issues that need to be addressed,

1   the erring ought to be on the side of letting discovery go

2   forward, not holding it up and making people file motions to

3   take depositions.

4        Deposition -- or designation of deposition

5   testimony is the sixth topic.  In paragraph 7O of the order,

6   we provided for October 16th as the deadline for initial

7   designation of depo excerpts.  That's just a four-day

8   extension from what the debtor had.  And then in paragraph

9   7Q, we extend the October 20th deadline for counter

10  designations or objections to the initial designations,

11  which is only a five-day extension beyond what the debtors

12  had proposed.

13       The seventh topic is requests for admissions.  In

14  paragraph 14, the debtors' order provides that there will be

15  no requests for admissions other than with respect to

16  document authenticity.  And I realize why, Your Honor,

17  earlier in the case when there were a lot more issues that

18  maybe limiting requests for admissions made sense.  Now, as

19  Your Honor can tell from the court today, while there are a

20  number of parties objecting, it's certainly less than all

21  parties, which was the case earlier.  And if we're trying to

22  limit issues before Your Honor and avoid unnecessarily

23  putting on evidence, then some requests for admissions seem

24  appropriate and Bank of New York proposes the parties be

25  able to submit 40 requests for admissions, excluding any

1    relating to authenticity, which wouldn't count towards that

2    topic.

3              The eighth -- I'm sorry, wouldn't count towards

4    that total.  The eighth topic, Your Honor, is witnesses and

5    exhibit lists.  In paragraph 7A, the debtors require

6    participating parties to identify as fact witnesses any fact

7    witnesses that may possess knowledge relative to the

8    confirmation proceedings and to do that relatively promptly

9    after Your Honor enters an order.  Well, we already heard

10   the debtor talking about evidence today, we heard Counsel

11   for the ad hoc TCEH unsecureds talking about evidence and

12   the wonderful things they're going to do at confirmation, so

13   they already have some idea presumably who their fact

14   witnesses and expert witnesses are.  So we have revised the

15   order to provide people to provide this initial disclosure,

16   not just of the identity of your fact witnesses, but also

17   who your expert witnesses will be.

18             And in order to make that disclosure meaningful,

19   also added that the parties should provide a meaningful

20   description of the subjects on which each witness allegedly

21   possesses knowledge.  And that's also important and

22   relevant, Your Honor, because if we're limiting the number

23   of depositions and we're also requiring deposition notices

24   to be, you know, issued by a date certain that's not too far

25   in the future, nobody wants to issue a deposition notice to

1    the wrong party.  Just having somebody's name listed as

2    maybe they potentially know something about the confirmation

3    and the confirmation proceedings when there's a wide array

4    of issues isn't meaningful.  To make that meaningful, there

5    should be more disclosure for all producing parties, so we

6    have revised that as well.  And that obviously is not

7    something that should be burdensome.

8            In paragraph 7R -- and this is now -- what we just

9    talked about was sort of an initial disclosure provision in

10   the order, 7R really deals with the final list of witnesses

11   and exhibits, we just moved it from October 14th to the

12   19th, consistent with the way we were moving out some of the

13   other proposed dates.

14           The ninth topic is coordination by the TCEH

15   Official Committee of Unsecured Creditors.  In paragraph 9,

16   as in the prior order, the debtor provides that unsecured

17   creditors' committees on both the T side and the E side will

18   coordinate discovery requests.  You have to funnel your

19   requests through the committee and either the committee will

20   issue them on a consolidated basis or maybe, if you begged

21   and plead if you can send your own, that's a possibility.

22   Here that doesn't work.  Maybe it works on the E side, so we

23   didn't change it with respect to the E side, but we changed

24   it with respect to the T side.  Our committee has signed the

25   plan support agreement.  Our committee is now part of the

1    axis of evil, they're not somebody we should be giving our -

2    - running our discovery requests through for their

3    permission or for their consent or to have them serve it for

4    us.  With respect to the T side, we're the objecting

5    creditor and should be able to serve our discovery on our

6    own.

7              Overlap with prior discovery is the tenth topic.

8    In paragraph 3 of their reply, as one of debtors' lawyers

9    said today, they produced over 5.6 million pages.  They also

10   say in that paragraph of the reply, 230,000 pages last week.

11   And then in paragraph 16 of the debtors' proposed order they

12   say that "a participating party shall not serve discovery

13   seeking documents that were already produced by another

14   party."

15             Well, Your Honor, as indicated, we haven't been

16   participating in discovery, we had no reason to.  So rather

17   than us trying to look through 5.6 million pages and see if

18   someone else requested something that we want or if

19   something that we want is there, what a more sensible

20   procedure would be is for a participating party that

21   receives a discovery request that believes it's duplicative

22   of discovery that's already been served to simply say we

23   produced Bates pages, you know, 10 through 20 that are

24   relevant to this document request.  That's the way it should

25   be handled, not by putting parties through the burden of

1    figuring out what might have been produced to other parties

2    and that were participating in a dispute earlier that we had

3    no part of.  It's also I think more efficient and will

4    enable people to get through the discovery quicker and in a

5    more meaningful way.  So Bank of New York Mellon amended

6    paragraph 16 to so provide.

7         Discovery disputes are the 11th topic.  Paragraph

8    19, the debtor said that if any party submits a letter to

9    the Court, the other side would have five days to respond.

10   We think that should be two days just because, again, we

11   don't want to have a lot of delay in getting any discovery

12   issues decided.

13        Trial time is the 12th topic.  The debtors

14   provided in this order, which the prior didn't address,

15   saying that it should be divided equally between plan

16   supporters and objectors.  And to the extent that Your Honor

17   chooses to do it, we think it should also be divided equally

18   between objectors on the T side and objectors on the E side.

19        Just a couple miscellaneous matters.  In

20   paragraphs 7B and D, Bank of New York Mellon proposes that

21   privilege logs actually be produced prior to, not after the

22   end of fact discovery, which is when the debtors had them

23   being produced.  If that's frankly when you get a privilege

24   log, Your Honor, it doesn't do you much good in terms of

25   challenging things and unless you have to -- you're doing so

1    and then seeking an extension of discovery, it doesn't seem

2    to be the most sensible way to do that.

3              Lastly, the e-discovery protocol.  Paragraph 11,

4    the debtors provide that if somebody asks them for a

5    document like an Excel document in native format that

6    they'll have 14 days to respond to the request.  You know,

7    that's ridiculous, especially, again, when we're moving

8    forward with a lot of discovery in a short time period.  So

9    Bank of New York Mellon revised that provision to be three

10   days, which is frankly generous for something that should be

11   that easy to decide.

12             I'm not going to address the confirmation issues.

13   I understand that some people who are getting different

14   treatment under the plan think that this is a wonderful

15   thing for the Pollution Control Bondholders who are

16   receiving less favorable treatment.  I'll save those issues

17   for the appropriate time, which I think is the confirmation

18   hearing.  So unless Your Honor has any questions, that's all

19   I have.

20             THE COURT:  Nope, thank you.

21             MR. GWYNNE:  Thank you, Your Honor.

22             THE COURT:  Mr. Schepacarter?

23             MR. SCHEPACARTER:  Good afternoon, Your Honor,

24   Richard Schepacarter for the United States Trustee.  I know

25   Your Honor has heard a lot today and I'll try to be as brief

1    as I can.

2              I did want to note that with respect to comments

3    that were made, I thought that Mr. Qureshi's comments with

4    respect to some of the discovery issues are actually some of

5    the same issues that we would raise as well.

6              I did also want to note that Your Honor has not

7    seen any plan support agreement objection or disclosure

8    statement objection from our office.  The debtors have

9    graciously agreed to give us an extension until September

10   4th for objections to both those documents.  So we're still

11   looking at those documents and may file objections and, if

12   we do, they'll be filed by that time.

13             I did want to raise three things that we had put

14   into our objection and those three points are -- and

15   debtors' counsel tried to address some of that today, but

16   the three issues that we had raised -- actually, two of our

17   issues and then one that I had seen over the weekend -- one

18   was with respect to the fees, there's a number of fees that

19   are being paid in the case.  Also with respect to the

20   releases and exculpations, we had raised those also as

21   issues to be addressed.

22             Now, with respect to the fees, the issue that we

23   have with respect to that is those fees will be under the

24   plans and that's a new provision that we've only seen as of

25   August 10th.  That new provision will require us to take

1    some discovery on that.  I know that the debtors have

2    indicated that, well, it's really a legal issue and it's not

3    one that discovery needs to be taken, but it is one that

4    discovery needs to be taken, because we need to understand

5    exactly what these fees are.

6           We have no idea what the number of fees and we set

7    them forth in our objection, but a number of those fees,

8    what they are, what -- who they would be payable to, which

9    professionals, what's the basis for that, what is the

10   debtors -- whether they've exercised their fiduciary duties.

11   And when I mean the debtors, I'm talking about the

12   independent directors as well as the debtors, whether

13   they've exercised their fiduciary duties in approving these

14   fees to be paid that is either part of the settlement

15   agreement, or as part of the plan.

16          With respect to the releases and exculpations,

17   there's a number of parties that are being either released

18   or exculpated.  I know the law is fairly clear on the

19   exculpation.  And it looks like those parties that are

20   included in there wouldn't otherwise be required to be --

21   actually wouldn't be available to have exculpation given to

22   them.

23          So we want to understand those issues as well, as

24   well as the released parties which is even a deeper list.

25   What's the rationale for making those releases, what's the

1    rationale for allowing any of that relief period.

2            And there's also a third issue that we hadn't put

3    into our objection, but it's one that I noticed over the

4    weekend, which is there's a plan provision with respect to

5    the management incentive, the management incentive plan.

6            As far as I know, that management incentive plan

7    has not been approved by this Court.  It's one to be paid I

8    believe as part of confirmation, so we need to understand,

9    one what that management incentive plan is, who's part of

10   it, all of the issues that otherwise would be part of a

11   503(b) or a 503(c) type application.  We would have to

12   understand that as well.

13           The debtors have indicated and I think they've

14   made part of the point is that, well, we're going to work

15   with the U.S. Trustee.  We're going to work with respect to

16   these fees.

17           One, as far as I know, the fees have not been --

18   have not been resolved, and that's an issue that I think is

19   probably going to go to confirmation.  And as I said, we'll

20   probably need discovery on that.

21           I have no trepidation that debtor's counsel will

22   work with us, with respect to that.  They've done that

23   throughout the case, and I can see them doing that on this

24   issue.  But I think it's an issue that we really need

25   discovery on.

1          With respect to depositions, I can see at least

2     initially taking at least, or participating at least in four

3     or five depositions, those being the four independent

4     directors, and possibly somebody from the debtor itself.  So

5     I could see that that is at least five depositions to be

6     taken.

7          With respect to Mr. Gwynne's comments on the

8     respect of the discovery schedule going forward, there

9     shouldn't be any hampering or any type of caveating in of

10    the discovery.  Because the plan that was filed on the 10th

11    is a new plan, it had some very new provisions in it.

12          Along with that was the plan settlement agreement,

13    as well as the settlement agreement, the 9019 settlement

14    agreement, all part of basically a new confirmation process.

15    It would be my understanding, and I want to get to another

16    point, but it would be my understanding that there was

17    already sort of a track that confirmation was already on.

18    And it seems to me that you would just take that plan, the

19    new plan, and all those new terms and all those new

20    contracts that are now part of the -- now basically I'll

21    call it the third amended plan process, and allow that to go

22    forward to confirmation.

23          Much has been made of the fact that the milestones

24    in the case have been -- I think they've been -- the

25    terminology was heavily negotiated.  And I don't doubt that

1    that was heavily negotiated.  But it's heavily negotiated

2    among parties that other parties may not be involved with.

3              I know that our office isn't part of those plan

4    negotiations, so a lot of the things that we saw were for

5    the first time when the plan was filed.

6              I just wanted to close, I just want to mention one

7    thing that much has been sort of made of Mr. Shore's

8    comments with respect to this is the most complicated deal

9    that parties and probably a lot of lawyers have seen in

10   their careers.  A lot of the lawyers here have longer

11   careers than I have.  Having said that, I don't think the

12   Court should lose sight of the fact that given this deal is

13   probably the most complicated deal in at least in Delaware

14   that parties should not be afforded at least not just a fair

15   opportunity for discovery, but a fulsome opportunity for

16   discovery, so that all of the issues can be brought forth

17   and can be tried at the time of confirmation.

18             Because a lot of the issues, even for -- with

19   respect to the releases and you need to show consideration

20   and all of those things, the master mortgage factors.  All

21   of those factors have evidence that has to be supported --

22   have to support them to be allowed.

23             So I think that allowing the record to be

24   developed fully so that this Court and so that the

25   confirmation process, whatever it may be, will be fully

1    developed and be fulsome.  Thank you, Your Honor.

2                THE COURT:  Thank you.

3                MR. WILLIAMSON:  Your Honor, Brady Williamson,

4    Godfrey and Kahn for the fee committee, and Richard Gitlan

5    (ph) it's independent chairman.

6                Last week Mr. Gitlan was one of the, if not the

7    concluding speaker, and after this morning and this

8    afternoon it's probably appropriate that the fee committee's

9    very brief remarks, hopefully one of the concluding points,

10   it's not appropriate for the fee committee to take a

11   position on the pending motion or the objections for the

12   motion.

13               I simply rise to reiterate Mr. Gitlan's points

14   from last week, the concerns expressed by the fee committee,

15   but as well, it's willingness to work on any schedule with

16   any parties to resolve -- to address and resolve the issues

17   surrounding professional fees, whether it's under 330 or

18   1129(a)(4).  Thank you.

19               THE COURT:  Thank you.  All right.  Mr. McKane, do

20   you want to reply?

21               Does anyone else want to reply?

22               MR. MCKANE:  Yeah, I think Mr. Shore --

23               MR. SHORE:  Very short.

24               MR. MCKANE:  We can soldier on or we could take a

25   short break for lunch, it's up to you, Your Honor.

1            THE COURT:  No, we're not breaking for lunch.

2            MR. MCKANE:  Very good.

3            THE COURT:  I don't have to.  We'll take a short -

4     - who wants to be heard with that?

5            UNIDENTIFIED:  (indiscernible)

6            THE COURT:  Oh, I know -- all right.  Well, you

7     didn't file an objection to the motion in front of the

8     Court, so I want to deal with the specific issues that are

9     in front of me.  I know I heard from your client last week,

10    so I'm not going to allow you to be heard on the motion in

11    front of the Court.

12           So Mr. McKane, Mr. Shore, anyone else?

13           All right.  We're going to take a very short

14    recess then I'll hear replies.

15           MR. MCKANE:  Thank you, Your Honor.

16       (Recessed at 1:29 p.m.; reconvened at 1:40 p.m.)

17           THE CLERK:  All rise.

18           THE COURT:  Please be seated.  All right.  You may

19    proceed.

20           MR. MCKANE:  Thank you, Your Honor.  For the

21    record, Mark McKane of Kirkland & Ellis on behalf of the

22    debtors in rebuttal.

23           Your Honor, with regards to Mr. Gluckstein's

24    comments and the E Committee more generally, it is simply

25    not credible to suggest that we are proceeding forward with

1    the same triable issues, as was before the Court back in

2    June when you scheduling conference on July 2nd when you

3    entered the order.

4            We have materially narrowed the issues, and

5    instead of putting both the looming double cram down, yes,

6    there's a settlement agreement that must be approved, that

7    is a 9019 standard that the Court knows all too well, that

8    under the rules provides for typically 20 days and a

9    surveying of the issues, and a feasibility -- and a plan for

10   people who have been paid in full, is an unimpaired legal

11   argument, and the feasibility, maybe good faith.

12           There's no question that that is a subset of the

13   issues before you, that would've been before you in January.

14           Your Honor, as it relates to the time that they

15   have in the process, the E Committee has been in this case,

16   well up to speed, able to file motions for standing.  They

17   know the issues, they know the players.  We haven't received

18   a deposition notice, we haven't even received any

19   indication.

20           We're prepared to move forward.  We will move

21   forward with them, we'll help coordinate it, but we need to

22   move forward with due pace here.  There's no reason to wait

23   any longer to kick start this process.

24           As it relates to discovery of non-debtor entities,

25   I know Mr. Shore's going to address that, but it's -- we

1    wanted to emphasize we're trying to meet and confer on this,

2    this afternoon after engaging on the issue.  And the debtors

3    proactively bringing that issue forward to have -- to move

4    that process forward.

5            Then as it relates, Your Honor, to plan support

6    agreement discovery, I think we're largely in agreement with

7    the E Committee, but I want to clarify.  We agree that any

8    party intending to call witnesses in support of the plan

9    support agreement should disclose those witnesses to

10   objecting parties by Monday, August 31st, we can do that.

11           All right.  And we will work together with them

12   this week to obtain a more complete agreement with the

13   objecting parties, we received objections last night, on

14   other helpful and as needed pre-hearing activities,

15   including the disclosure of any witnesses by the objecting

16   parties, and the exchange of exhibits that both parties

17   intend to offer.

18           So we'll move forward on that to get a further

19   agreement, and if it's a stipulation, we'll submit it to

20   Your Honor.  But the start of that, our witnesses,

21   supporting witnesses, next Monday.

22           Turning to UMB's comments, Your Honor, the theme

23   of Mr. Qureshi's presentation was, we will be in a worst

24   position because of the free option.  Now, the entire

25   analysis of that must (indiscernible) and stop with as

1    compared to what.

2            And at the confirmation hearing, to the extent

3    necessary, we will put on the evidence to show that the

4    debtors selected this path forward, in large part, as

5    compared to what, and what was not available to the E side.

6    And so when you hear E Side creditors saying, we will be

7    worse off, every time you hear that, Your Honor, the

8    question should always be, as compared to what.

9            Specifically with regards to the experts that Mr.

10   Qureshi may be bringing forward.  We heard some very telling

11   comments, Your Honor, from the PICs (ph).

12           At what point during his argument, he referred to

13   making up a number.  We can just make up a number, so we can

14   show the economic impact.  Your Honor, we have serious

15   reservations about the experts that he may put forward, as

16   it refers to whether they would satisfy Daubert, but there's

17   a process for that.  It's built into the schedule already.

18           Identify your experts, even in an event of filing

19   a report, give us a very precise statement as to what

20   they're going to say, and then we can properly evaluate

21   whether they come forward, appropriate with the Rules of

22   Civil Procedure -- Rules of Evidence, and address whether

23   they can provide anything as potentially relevant to Your

24   Honor.

25           But, Your Honor, the notion, we've heard free

1    option, we've heard the mantra, but the notion that if this

2    plan were to fail, and they would be in the same position,

3    that everyone would come back to the same position as they

4    were before, and that the T side creditors would be in the

5    same position it simply ignoring the other provisions of the

6    agreement.

7            It ignores what we've highlighted as disarmament,

8    it ignores the drag, it ignores all the efforts of the

9    debtors going forward, to build in protections in the event

10   that the transaction does not close.  You cannot shade the

11   presentation that much.

12           Your Honor, I don't believe I have anything to

13   respond to Mr. Pedone, Mr. Ankor, Mr. Brody.  As it relates

14   to ALCOA, I'll be brief.

15           Your Honor, that agreement at the time the

16   stipulation was entered, fully contemplated that there's an

17   October opportunity on the schedule.  The agreement was that

18   ALCOA would have 28 days, at least 28 days of discovery

19   before their objection would be due under feasibility, we're

20   absolutely providing that.

21           This he said/she said about what was negotiated,

22   Your Honor, I was not part of those negotiations, but it

23   doesn't sound true.  It doesn't ring right by us that that

24   is accurate.

25           As it relates to someone hemorrhaging out to a

1    Kirkland attorney and not responding to that call, I'm

2    unaware of that conversation until just now.  I understand

3    the person he contacted is out on maternity leave, if there

4    was any issue he wanted to engage I'm certain he would pick

5    up the phone and call Mr. Schartz (ph) as a fellow-on, Mr.

6    Schartz is here and has been leading those negotiations.

7           But, Your Honor, they will absolutely get the

8    length of the discovery that was negotiated, at least that

9    28 day runway under this proposal, and by moving to assume,

10   which we are actively evaluating whether to do, we're trying

11   to take that motion out of this process so it can be

12   addressed on its own merits, with its own schedule, and with

13   its own process.

14          With regard to the PCRBs.  Your Honor, first of

15   all, and let me just say privately I am embarrassed by my

16   lack of knowledge of Jewish holidays.  I did -- you know, to

17   the extent that I did put in those dates, I meant no

18   disrespect to anyone, as we negotiated those dates.

19   Obviously we can move dates a day here or there, we do not

20   intend to cause any disrespect.

21          With regards to the PRCBs, Your Honor, the process

22   in this case has been and the negotiation of the schedule

23   has been going on for months since April, when we filed a

24   motion with the proposed scheduling order.  We've engaged

25   with numerous creditors.  If they want to be a participating

1    creditor, there's no objection to that.  We can bring them

2    into that process.

3             But what I don't think you get to do as a

4    creditor, is I don't think you get to sit back, wait,

5    evaluate the process with the -- free riding behind someone

6    else, and when things break away different than what you

7    want, you get a wholesale renegotiation of every issue in

8    there.

9             Mr. -- I'm sorry, I apologize.  The PCRBs

10   position, the ten items, eight of those not at issue today.

11   Already negotiated at length with members of the official

12   committees and unofficial committees.  And if you have an

13   issue with those, you can bring -- you don't get to bring

14   them up in the eleventh hour.  We'll try to work with dates,

15   to the extent the Court directs us to do so, but this notion

16   that a creditor gets to do a complete reworking and submit

17   it the day before the hearing I think is inappropriate.

18            With regard to the United States Trustee, we fully

19   respect and are grateful for Mr. Schepacarter's presentation

20   today in part because he told us what he needs.  He's the

21   only one who told us what he needs.

22            He's going to want some time with the four

23   independents and possibly somebody at the company, no

24   problem.  We fully expected the four independents will be

25   deposed.

1           If you were to ask me write my own list of ten,

2      those would be four of the ten, quite possible, maybe three

3      of the ten, but if everyone thinks we need all four, that's

4      understood.  So that's not a surprise.  But we were -- and

5      so we fully respect what Mr. Schepacarter is saying, and we

6      understand he may need some additional information.  I'm

7      fully confident that in 165 document requests that we

8      received it's picked up in one of those, but we'll get it to

9      him separately and move forward with him.

10          With that, Your Honor, unless there are any other

11     questions, I'll yield the podium to Mr. Shore.

12          THE COURT:  Okay.

13          MR. SHORE:  Your Honor, I'll be very brief.  Let

14     me just respond to three points.  One, the statement that

15     was made that the E Side is bearing enormous costs here.  In

16     fact, they're not.

17          Under the plan as the new equity, the TCH

18     unsecured creditors are paying all the costs.  Essentially

19     all the costs of the E Side bankruptcy, and for the

20     statement these people to come in and say that they can't

21     even tell you the names of the witnesses or the documents

22     they need, they have been appearing in every hearing both in

23     person and on the phone.  They can't be that flat footed.

24          Mr. Gwynne on the T Side, can't be that flat

25     footed, that they can't even articulate to you now what Mr.

1   Schepacarter did of five witnesses he needs and documents he

2   needs.  This isn't about discovery they want, this is about

3   delaying the process.

4          Two, as part of the delay in adding in the point,

5   we need more time for the settlement.  The settlement can be

6   noticed on 20 days.  They're getting 110 days to litigate a

7   settlement agreement.  It is complicated, but all of the

8   underlying documents have been produced in the legacy

9   discovery, and to clarify one point, the process around the

10  settlement was disclosed with the statement put the DBs on

11  the record which set forth the decs that they reviewed in

12  coming up.

13         The only process they don't have is going to be

14  around the board minutes, which hopefully will be typed up

15  and distributed out.  So they've had all of that stuff.

16         Two, Sullivan & Cromwell has, based upon the

17  record, been paid millions for the work in doing this.  By

18  our count, they have 1,400 hours through July on dealing

19  with intercompany claims and 1,300 hours for tax issues.

20  They're not flat footed, they don't need more than 110 days

21  to deal with a settlement of the claims that they've already

22  objected to, which ends up being less than the amount that

23  is scheduled, TCEH into EFH on the debtor's schedules which

24  were published more than a year ago.

25         Third point, there's been no -- despite the

1    statements about how we have to move and how we need more

2    time, there has still been no discovery served on any of the

3    plan sponsors, none.  There was discovery served on the TCEH

4    committee as a plan sponsor.  We responded, consistent with

5    the law of this case, that you're not, absent a Court order,

6    getting discovery from a plan sponsor merely for -- sorry,

7    from an RSA party merely for being a RSA party.

8            We established that law of the case when we sought

9    that discovery from the Paul Weiss Group at the beginning of

10   the case.  That was denied, which had the benefit to the

11   pics which were plan support parties, and Fidelity, the

12   largest EFH creditor which was a plan support party of not

13   having to give any discovery at that time.

14           Nonetheless, I had Mr. McKane reach out to

15   schedule a meet and confer for yesterday.  Not one Sullivan

16   & Cromwell attorney was available all day so that we could

17   bring the issue up and address it with the Court.

18           So we'll have our meet and confer.  If we can't

19   get to resolution on that, we'll come back to the Court.

20   But I don't think the notion that they're getting broad

21   discovery from plan support parties merely for having signed

22   a plan support agreement is going to hold up.

23           Finally, we're back to the free option.  Mr.

24   Qureshi talked about evidence in the record.  At Docket No.

25   52482 is the merger agreement.  Starting at page 73, and

1    running to page 77 are the conditions to close, like you

2    would see in any merger agreement.

3              Following that are the termination provisions,

4    which says what can you terminate properly for, what can you

5    not properly terminate for, all of that would be available

6    to any funding party under any backstop agreement or debt

7    funding commitment.

8              If you can't get me a plan that's confirmed, I'm

9    not funding.  The only thing he's complaining about, there's

10   -- by the way, to be clear, there is no sponsors may walk

11   for any reason at any time in that document.

12             If the conditions are met, there are termination

13   rights, and not termination rights.  What he's complaining

14   about is he doesn't like the remedies.  And he posited what

15   about a rampant rise in interest rates.  We're sensitive to

16   a rise in interest rates.  Well, if that's really his

17   concern, we should be getting this case out quicker, not

18   later.

19             He should not be allowing his clients who are

20   unsecured creditors, not entitled to adequate protection to

21   run the risk that there is a loss in the value of the asset,

22   and they don't get back to payment in full.  And to be

23   clear, how the drag and the disarmament works, our claims,

24   claims against the sponsors, claims against the firsts,

25   claims against Encore are not interest rate sensitive.

1        Those are claims that could have been pursued long

2   into the future, and you're absolutely right, we're not

3   doing all of this so we can get $400 million for it.

4        So the notion that what's going to happen is we're

5   going to get to an interest rate rise, and we're going to

6   not go forward, we lose everything.  We're tied, just as

7   they are to the success of this plan and getting it done.

8        We have -- we gave people 110 days to get it done,

9   we haven't heard -- I haven't heard anything today that says

10  anything about why it can't get done in that period.  There

11  may be tics and ties that have to be done to harmonize

12  different things, but again, we ask that you set the

13  confirmation hearing beginning on the 28th of October.

14  Thank you, Your Honor.

15        THE COURT:  All right.  I'm going to take a short

16  recess, then I'm going to come out and rule.

17      (Recessed at 1:56 p.m.; reconvened at 2:13 p.m.)

18        THE CLERK:  All rise.

19        THE COURT:  Please be seated.  All right.  I'm

20  going to overrule the objections and grant the motion and

21  approve the schedule with some modification to deal with

22  some of the sequencing, but not to bury the lead.

23        We will commence the confirmation hearing on

24  November 3rd at 11 a.m.  So a little later than requested.

25  And I'll go through the dates in just a minute, but I'll

1    talk about the objections first.

2              First of all, I do believe that we need to focus

3    on what we're actually talking about, which is what

4    discovery is necessary, in order to prepare for a

5    confirmation hearing on the plan of reorganization in front

6    of the Court.

7              What the end game is informs how we get there, and

8    what discovery is appropriate, and what discovery is

9    unnecessary.  Also, we need to focus on the fact that we are

10   even with a truncated schedule from what was originally put

11   in place beyond the normal default rules about how much time

12   is usually provided in connection with confirmation, in

13   connection with approving a settlement agreement.

14             Third, truncating the schedule was specifically

15   contemplated by the order the Court entered in July, and as

16   presented, and I know there's going to be a fight whether

17   it's true or not, but as presented with an unimpaired E side

18   and consent on the T side, except for Mr. Gwynne's client, I

19   believe that we are materially in compliance with the

20   proviso under the order that was entered previously by the

21   Court, where we would shorten the process.  And indeed, I

22   think we had initially contemplated early October, October

23   5th or so would've been the hearing.  And we're already

24   pushing that out another month.

25             The issues here have been sufficiently narrowed

1   from what was initially contemplated to be sort of the

2   mother of all confirmation hearings starting in January of

3   2016.

4          They have been narrowed by the unimpairment of the

5   E side of the balance sheet.  And they have been

6   significantly narrowed by -- well, actually I'm not going to

7   say they've been significantly narrowed because the

8   settlement agreement was always part of the plan that was in

9   front of the Court.

10         So that is -- remained unchanged, and that is

11  something that will have to be dealt with.  And maybe

12  frankly take more time -- well, I don't know if it's going

13  to take more time or not, but it's going to be a significant

14  piece of whatever the confirmation hearing is.

15         We're going to have to deal with the plan, we're

16  also going to deal with the settlement agreement on the

17  merits because it survives the plan if the plan does not go

18  effective or isn't confirmed.

19         So we're really talking about some fairly discreet

20  issues.  We're talking about whether, in fact, the E side's

21  impaired.  I think that's a mixed question of law, in fact,

22  but I think it's heavy on the law.

23         We're talking about feasibility.  I don't believe

24  that the scope of feasibility is as broad as Mr. Qureshi has

25  argued.  We're talking about good faith, and while good

1    faith is important, I think good faith needs to be focused

2    in the context of the plan that's in front of the Court, and

3    I think impairment, or lack of impairment more specifically

4    informs the Court's consideration of the good faith

5    requirement.

6              We're talking about releases, exculpation, payment

7    of fees, all of those are really frankly legal issues as far

8    as I'm concerned.  We're talking about possibly some factual

9    issues in connection with the ALCOA deal.

10             These are really the universe of issues as I

11   identify them, and I may be missing some, but I don't think

12   so.  And when I think about them, and I think, okay, how do

13   we prep for that, when I think how much discovery is needed

14   to prep for that it doesn't really overwhelm me.  It doesn't

15   overwhelm me.

16             In the settlement agreement, man, if we don't know

17   where we are on the legacy litigation and the intercompany

18   issues in this case, you've been asleep for the last 16

19   months, and there's only so much the Court can do for you.

20             There has been thorough discovery, there has -- on

21   intercompany claims.  There has been thorough briefing on

22   intercompany claims.  There have been standing motions filed

23   on intercompany claims.  There has been a what's called a DD

24   settlement that's been part of the plan since April of this

25   year, and there has already been disclosure quite some time

1    ago when there was the filing of the statements, which may

2    have even been in March.  But the statements were filed I

3    think in April, and of course, there's been -- there's

4    ongoing production of documents, in connection with the

5    discovery that's already been approved by the Court has been

6    ongoing by the disinterested directors.

7            So all that discovery in connection with the

8    settlement is well along, and does not require a lengthy

9    additional amount of time for people to be in a position to

10   prepare.

11           Remember discovery is designed to lead to the

12   admission of relevant evidence to the Court, but there's a

13   reason for it.  There's a focus for it.  This is all about

14   getting ready for the confirmation and the settlement

15   hearing, and what people need in order to be prepared to

16   make their presentation to the Court in a way that gives

17   them a fair opportunity to advocate their position.  And I

18   think that the amount of time in the truncated schedule is

19   sufficient.

20           Now, it's not generous and I understand that.  It

21   is a very tight schedule.  Just given the number of people

22   involved in this case, the number of players, it almost

23   exponentially increases the amount of time it takes to get

24   anything done.  I'm not involved in the day-to-day aspect of

25   running this case, but I'm sure just getting a phone call

1    together with you people is probably difficult to do, and of

2    course, it's difficult to do.

3            You're very busy, very successful professionals,

4    and you know, there are just so many different pieces in

5    this case.  It's complicated.

6            So, yes, it's going to be an effort.  But the

7    burden of not fulfilling that effort is really going to lie

8    at the feet of the parties who have the burden of responding

9    to all the discovery that's going to be propounded, and

10   that's the debtors and the plan proponents.

11           You know, if you ask for an expedited schedule in

12   bankruptcy court, you better meet it, because you've got

13   nobody to blame but yourself if you don't.  And if you lose

14   your schedule because you haven't responded to fair

15   discovery, so be it.  I'm not saying that's going to happen

16   here.  That's just a general comment that I've said before.

17           And I think the debtors have acknowledged and the

18   disinterested directors have acknowledged and Mr. Shore has

19   acknowledged that they are well aware that there's a lot to

20   do, and there's a need for speed, but they say they can get

21   it done, and if they don't, really they're hurting no one

22   but themselves.

23           With regard to sort of some of the specific issues

24   that have been raised, I'm not really going to address them.

25   I don't believe ALCOA has been put in a disadvantaged

1   position.  Certainly I wouldn't be surprised if the left

2   hand didn't know what the right hand was doing on August

3   7th.  It's quite possible.

4          I don't believe there was any kind of purposeful

5   -- defraud is the wrong word, but you know, there was no

6   purposeful purpose to -- purposeful purpose, how's that for

7   articulate?

8          People weren't out to put ALCOA in a bad situation

9   on purpose.  And I don't think they have been put in any

10  worse a situation than what they negotiated.  So I'm okay

11  with the ALCOA situation.

12         Mr. Gwynne's going to be -- his clients I guess

13  more precisely are going to be a participating party.  I

14  think that's sufficient.  I think Mr. Gwynne's issues with

15  this plan are narrow, and specific.  I think reworking the

16  entire schedule because of those narrow issues that have

17  been raised has been appropriate, not helpful.

18         And there may be a lot of catch-up that needs to

19  be done on behalf of his client, but that's sort of is where

20  it is and he'll have to deal with it the best he can.

21         It sounds to me like Mr. Schepacarter's comments

22  are -- and requests are being honored or going to be honored

23  as much as possible by the debtors.  And other than granting

24  the -- I'm overruling the request that the initial schedules

25  stay in place, but nonetheless, I urge the debtors to

1    provide that information to Mr. Schepacarter as he's

2    requested.

3              All right.  I don't think anyone's due process

4    rights are being disadvantaged here.  I believe that the

5    procedure that has been in place for months and the

6    procedure that is going to be put in place for the next

7    several months is adequate to protect parties' ability to

8    protect their rights and advocate their positions at the

9    confirmation hearing and the settlement hearing.

10             And were it the case that I thought that was not

11   true, I wouldn't approve the settlement -- excuse me, the

12   schedule.  I take this very seriously.  There is a lot of

13   money at stake to say the very least, and I don't make this

14   decision lightly, but I do believe that at the end of the

15   day, the Court has an obligation to look at the plan that's

16   on file, respect the process by which it was reached, and

17   presented to the Court.

18             And to the extent possible, respect the economic

19   realities and honor the milestones that have been heavily

20   negotiated.  At the same time balancing as much as possible

21   the due process rights of the parties.  And I think this

22   schedule accomplishes that.

23             So if we could go through, I've tweaked the dates

24   here a little bit.  Basically I'm worried about the --

25   mostly because I'm worried about the sequencing, which we

1    had discussions about back in June and July, about how the

2    sequencing had to work, and also to provide a little more

3    time on the deposition front, which I think is too tight,

4    and all the dates kind of flow from there.

5            So I have the debtor's proposed order in front of

6    me, paragraph 7 which starts at page 5.  I think I have the

7    most recent version.  This is what was filed as an exhibit

8    to the reply.  So hopefully, this is the current version.

9            So I'm just going to change some dates here.

10   Subparagraph D, I think I'm going to bail you out, Mr.

11   McKane, because I think you did this by accident, because

12   you say Thursday, September 14th here, and it's Monday,

13   September 14th.  So I'm assuming you really meant Thursday,

14   September 17th.

15           But just to accommodate that, I think that an

16   appropriate deadline nonetheless would be Tuesday the 15th.

17   So we'll make Tuesday, September 15th the deadline for

18   service of deposition notices.

19           The next page, starting at paragraph F, we're

20   going to move the fact discovery deadline to Friday, October

21   2nd.  Expert discovery subparagraph H, that deadline will be

22   October 5th.  Deadline for subparagraph I will be October

23   12th, and the completion of expert discovery under J will be

24   October 19th.

25           So the 5th, 12th and 19th.  The next date that

1    moves is in subparagraph O on page 7.  This final list of

2    witnesses will be October 21.  P will be also October 21.  Q

3    which is the deadline to file objections to the settlement

4    motion of the plan will be October 23rd.  And objection to

5    the final witness list, subparagraph R will be also October

6    23rd.  S will also be October 23rd.  And T will be October

7    23rd.

8              U which is oppositions to any motion in limine

9    will be October 26th.  The pre -- the final pretrial will be

10   October 28th at 10 a.m.  Actually I'm sorry, not at 10 a.m.,

11   11 a.m.  Replies will be due October 30th and confirmation

12   will start November 3rd at 11 a.m.  I'm not going to, as we

13   sit here today, provide any other dates for confirmation,

14   you know, continue dates.  We'll deal with those at the

15   pretrial conferences, as appropriate, where we'll have a

16   better idea of how many trial dates we're talking about.

17             I've instructed my staff to withhold granting any

18   other dates to anybody else, as much as possible in the

19   month of November to allow as much time as appropriate to

20   get this done.  It would certainly be my expectation that

21   this would end before Thanksgiving.  At least the

22   presentation of evidence would end before Thanksgiving.

23             That's it.  Can you submit an order under

24   certification?

25             MR. MCKANE:  Will do, Your Honor.

1          THE COURT:  Mr. Gwynne

2          MR. GWYNNE:  Kirk Gwynne again for the record,

3     thank you, Your Honor.

4          I just wanted to -- a point of clarification.  I

5     understand Your Honor said that Bank of New York can be --

6     will be a participating party, but as I indicated earlier

7     since our issues didn't arise until the filing of the

8     amended plan, we have to serve document requests relating to

9     that issue, which is not, you know, heretofore been an issue

10    in the case, which is, you know, why we're receiving less

11    than some of the other parties, and how the percentage, the

12    54.8 was calculated, what the economic analysis is for that.

13         THE COURT:  All right.

14         MR. GWYNNE:  And there's nothing in here that

15    technically allows that yet.

16         THE COURT:  All right.  I will allow you to

17    present very focused discovery on those specific issues, and

18    I'll give you until Friday to serve that.  If you go

19    overbroad and they come and object, I'm not going to allow

20    it.  So -- and direct the debtors as much as possible to

21    respond to that within the context of the other deadlines.

22         And I'm only doing that just for you, for a very

23    specific reason, and that's the issue you've raised in

24    connection with how the third amended plan is different than

25    the treatment that you had previously been receiving under

Page 158

1    the previous iterations of the plan.

2              MR. GWYNNE:  Thank you, Your Honor.

3              THE COURT:  You're welcome.  Okay?  All right.

4    Thank you very much.  We're adjourned.  I'll wait for that

5    order under certification.  Otherwise, I'm so ordering the

6    clock has started, get busy.

7    (Proceedings concluded at 2:33 p.m.)

8                              *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 159

1                         I N D E X

2

3                       R U L I N G S

4   IDENTIFICATION                                    PAGE

5   Motion of Energy Future Holdings Corp., et al,    147

6   for Entry of an Order Amending Certain Hearing

7   Dates and Deadlines in Connection with the

8   Confirmation of Debtors' Plan of Reorganization

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 160

1               C E R T I F I C A T I O N S

2

3    We, Sherri L. Breach, Dawn South, Tracey Williams & Sheila

4    Orms, certify that the foregoing transcript is a true and

5    accurate record of the proceedings.

6    *Sherri Breach*
     Digitally signed by Sherri Breach
     DN: cn=Sherri Breach, o=Veritext, ou,
     email=digital@veritext.com, c=US
7    Date: 2015.08.26 10:48:12 -04'00'
     _____

8    SHERRI L. BREACH

9    AAERT Certified Electronic Reporter & Transcriber CERT*D-397

10   *Sherri Breach*
     Digitally signed by Sherri Breach
     DN: cn=Sherri Breach, o=Veritext, ou,
     email=digital@veritext.com, c=US
11   Date: 2015.08.26 10:50:54 -04'00'
     _____

12   Dawn South

13   AAERT Certified Electronic Transcriber CET**D-408

14   *Dawn South*
     Digitally signed by Dawn South
     DN: cn=Dawn South, o=Veritext, ou,
     email=digital@veritext.com, c=US
15   Date: 2015.08.26 10:51:23 -04'00'
     _____

16   Tracey Williams

17   AAERT Certified Electronic Transcriber CET**00152

18   *Shelia G. Orms*
     Digitally signed by Shelia G. Orms
     DN: cn=Shelia G. Orms, o=Veritext, ou,
     email=digital@veritext.com, c=US
19   Date: 2015.08.26 10:52:00 -04'00'
     _____

20   Sheila Orms

21   Date:  August 25, 2015

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501