# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Hearing Date: October 2, 2015 at 10:00 a.m.** |
|  | ) | **Objection Deadline: September 25, 2015 at 4:00 p.m.** |

## MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN ORDER APPROVING THE ASSUMPTION OF ALL EXECUTORY CONTRACTS BY AND AMONG LUMINANT GENERATION COMPANY LLC, LUMINANT MINING COMPANY LLC, SANDOW POWER COMPANY LLC, TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC, AND ALCOA INC.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), authorizing Luminant Generation Company LLC ("Luminant Generation"), Luminant Mining Company LLC ("Luminant Mining"), Sandow Power Company LLC ("Sandow Power"), and Texas Competitive Electric Holdings Company LLC ("TCEH" and, together with Luminant Generation, Luminant Mining, and Sandow Power, the "Debtor Parties") to assume all prepetition agreements, arrangements, and/or leases with Alcoa Inc. ("Alcoa") that the Debtors have not previously assumed in these chapter 11 cases pursuant to the Lease Assumption Order (as herein defined), including, but not limited to, the agreements identified on **Exhibit 1** attached to the Order (each such agreement, an "Alcoa Contract" and, collectively, the "Alcoa Contracts"). In support of this Motion, the Debtors submit the

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

*Declaration of Robert Frenzel, Senior Vice President and Chief Financial Officer of Luminant Holding Company LLC in Support of the Motion of Energy Future Holdings Corp.,* et al.*, for Entry of an Order Approving the Assumption of All Executory Contracts By and Among Luminant Generation Company LLC, Luminant Mining Company LLC, Sandow Power Company LLC, Texas Competitive Electric Holdings Company LLC, and Alcoa Inc.* (the "<u>Frenzel Declaration</u>"); the *Declaration of Todd W. Filsinger in Support of the Motion of Energy Future Holdings Corp.,* et al.*, for Entry of an Order Approving the Assumption of All Executory Contracts By and Among Luminant Generation Company LLC, Luminant Mining Company LLC, Sandow Power Company LLC, Texas Competitive Electric Holdings Company LLC, and Alcoa Inc.* (the "<u>Filsinger Declaration</u>"); and the *Declaration of Alexander G. Davis in Support of the Motion of Energy Future Holdings Corp.,* et al.*, for Entry of an Order Approving the Assumption of All Executory Contracts By and Among Luminant Generation Company LLC, Luminant Mining Company LLC, Sandow Power Company LLC, Texas Competitive Electric Holdings Company LLC, and Alcoa Inc.* (the "<u>Davis Declaration</u>" and, together with the Frenzel Declaration and the Filsinger Declaration, the "<u>Supporting Declarations</u>").  In further support of this Motion, the Debtors respectfully state as follows.

<u>**Preliminary Statement**</u>

1.     The Debtor Parties and Alcoa have a longstanding contractual relationship centered around power generation and lignite mining facilities and a now-shuttered aluminum smelter located near the town of Rockdale, in Milam County, Texas.  Due to current and projected power prices, that contractual relationship is extremely valuable to the Debtor Parties.  Based on the Debtor Parties' forward price curve as of December 31, 2014, the Alcoa Contracts add approximately $300 million to the net present value of the Debtor Parties' estates and using forecast prices as of July, the Alcoa Contracts are even more valuable to the Debtor Parties.

Moreover, there is no default under the Alcoa Contracts, so the Debtors owe no cure amounts. For those reasons, the Debtors have determined, in their business judgment, to assume the Alcoa Contracts.

2.      The Alcoa Contracts are effectively "cost-plus" contracts whereby the respective parties pay their portions of the current period operating costs and Alcoa remits to Luminant Generation (via the contract power price) a return on, and return of, Alcoa's portion of plant and mine capital that has previously been spent by Luminant Generation.  Generally, in times of high power prices, the Alcoa Contracts benefit Alcoa, but when wholesale power prices decline, the Alcoa Contracts benefit Luminant Generation.  For many years Alcoa had been on the favorable side of the various arrangements; but now, with the current and forecasted longer-term power prices being lower than historical forecasts, Alcoa is out of the money.  For this reason, the Debtor Parties anticipate that Alcoa will object to the Debtor Parties' assumption of the Alcoa Contracts.

3.      While the Debtor Parties will continue to seek consensual resolution, as they have throughout these chapter 11 cases and, as well, throughout their decades-long contractual relationship with Alcoa, the Debtors firmly believe that it is prudent to be prepared to litigate any objection to this Motion.  To that end, contemporaneously with the filing of this Motion, the Debtor Parties have responded to Alcoa's previously-withdrawn discovery requests, provided Alcoa's counsel with a proposed discovery plan regarding this Motion, and have agreed to make the Debtor Parties' declarants for this Motion available for deposition.  Nevertheless, given the clear and sizable benefit the Alcoa Contracts provide to the Debtor Parties' estates and their creditors, the Debtor Parties are confident that they have reasonably and judiciously exercised their business judgment in determining to assume the Alcoa Contracts.

## Jurisdiction and Venue

4.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested in this Motion are section 365 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rule 9013-1.

## Relief Requested

7.      By this Motion, the Debtors seek entry of the Order authorizing the Debtor Parties to assume the Alcoa Contracts in accordance with section 365 of the Bankruptcy Code.

## Background

### I.      General Background of the Restructuring.

8.      On April 29, 2014, each of the Debtors filed a voluntary petition with the Court under the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Court has entered a final order for joint administration of these chapter 11 cases

4

[D.I. 849].  The Court has not appointed a trustee.  The Office of the United States Trustee for the District of Delaware formed an official committee of unsecured creditors of Energy Future Competitive Holdings Company LLC ("EFCH"), TCEH, the direct and indirect Debtor subsidiaries of EFCH and TCEH, and EFH Corporate Services Company (the "TCEH Creditors' Committee") on May 13, 2014 [D.I. 420] and an official committee of unsecured creditors of Energy Future Holdings Corp., Energy Future Intermediate Holding Company, LLC, EFIH Finance, Inc., and EECI, Inc. (the "EFH Creditors' Committee") on October 27, 2014 [D.I. 2570].  Further information regarding the Debtors' business operations and capital structure is set forth in the declaration of Paul Keglevic in support of the Debtors' first day motions [D.I. 98].

9.      After months of negotiations with stakeholders regarding a consensual, value-maximizing plan of reorganization, the Debtors filed their *Third Amended Joint Plan of Reorganization* [D.I. 5244] (the "Plan") and related disclosure statement [D.I. 5246] (the "Disclosure Statement") on August 10, 2015.  Concurrently, the Debtors, financial sponsors of the Plan, and certain creditor constituencies, including the TCEH Creditors' Committee, entered into a plan support agreement that requires, among other things, the parties to support the Plan and seek prompt confirmation and consummation of the restructuring transactions contemplated therein, and subject to the conditions set forth therein.  The Debtors have already begun to fulfill this commitment by moving for a swift confirmation process.  The hearing to approve the Disclosure Statement will begin on September 17, 2015, and on August 25, 2015, the Court approved a robust discovery schedule designed to allow the confirmation hearing on the Plan to commence on November 3, 2015.

**II.    Overview of the Rockdale Facility, the Debtors' Related Operations, and the Alcoa Contracts.**

10.    The contractual relationship between Alcoa and the Debtor Parties (and their predecessors)[2] is complex and has existed for over 60 years.  That relationship is connected to an Alcoa aluminum smelter facility and the mine and power plants developed to supply the smelter with power.  Alcoa and the Debtor Parties entered into long-term contracts regarding the operation, maintenance, fueling, and generation and supply of electricity at the smelter site that, based on current and projected power prices, benefit the Debtor Parties significantly.  As set forth *infra*, the Alcoa Contracts at issue in this Motion cover a variety of aspects defining the parties' contractual relationship.

11.    In the 1950s, Alcoa built a primary aluminum smelter in Rockdale, Texas (the "Rockdale Facility").  To ensure a reliable supply of electricity to the Rockdale Facility, Alcoa constructed three electric generating units at the Rockdale Facility ("Sandow Units 1-3").  In 1951, Alcoa and the Debtor Parties entered into two contracts under which the Debtor Parties operated and maintained Sandow Units 1-3 until 1989, at which time Alcoa took over the operation of Sandow Units 1-3 and operated them as it saw fit.  In 1976, Alcoa and the Debtor Parties entered into an agreement for the Debtor Parties to supply "firm" power to Alcoa from a new generating unit ("Sandow Unit 4"), that was constructed and is owned by Luminant Generation.  By that same agreement, Alcoa agreed to furnish fuel to Sandow Unit 4.  Sandow Unit 4 began commercial operation in 1981.

12.    In 2001, private citizens groups filed a lawsuit against Alcoa alleging violations of the Clean Air Act based on work performed by Alcoa on Sandow Units 1-3 subsequent to

---

[2]    For ease of reference, the Debtor Parties and their predecessor entities are referred to collectively as the "Debtor Parties" throughout this Motion.

1989, for which Alcoa did not obtain permits and which, the lawsuit alleged, unlawfully increased emissions from Sandow Units 1-3. That lawsuit was joined by the United States and, in 2003, Alcoa entered into a consent decree with the citizens groups and the United States to resolve the lawsuit (the "Consent Decree"). Pursuant to the Consent Decree, Sandow Units 1-3 were permanently retired in December 2006.

13.    Also pursuant to the Consent Decree, Alcoa elected to construct a replacement unit ("Sandow Unit 5"), which the Consent Decree required to be operational by April 2007. Alcoa tried, unsuccessfully, to find a third party to construct Sandow Unit 5 from 2003 to 2005. In 2006, with multiple construction-related deadlines looming, Alcoa and the Debtor Parties entered into an agreement for the Debtor Parties to obtain the rights to build Sandow Unit 5. However, because Alcoa was unable to meet the requirement to begin operating Sandow Unit 5 by April 2007 or several other construction-related deadlines, it was necessary to seek an amendment to the Consent Decree to resolve Alcoa's violations of those requirements in the Consent Decree. In those settlement negotiations with the citizens groups and the United States, the Debtor Parties agreed to become a party to the Consent Decree and to add a selective catalytic reduction ("SCR") device at Sandow Unit 4—which was not previously involved in the Consent Decree proceeding—to reduce nitrogen oxide (NOx) emissions. In 2007, the United States District Court for the Western District of Texas approved the amendments to the Consent Decree via a series of orders, which included a finding that Alcoa was in contempt of the original Consent Decree and had been willfully indifferent to the Consent Decree deadlines. The Debtor Parties proceeded to construct Sandow Unit 5, which began commercial operation in 2010.

14.    Sandow Units 1-3 and Sandow Unit 4 were initially fueled by lignite from Alcoa's Sandow Mine. In the 1990s, as the Sandow Mine neared depletion, Alcoa identified

other sources of lignite and chose a site known as the Three Oaks Mine in Elgin, Texas (the "Three Oaks Mine"), which Alcoa opened in 2005.  In 2007, Alcoa and the Debtor Parties entered into a purchase and sale agreement providing for Alcoa's sale of the Three Oaks Mine—excluding Alcoa's lignite reserves—to the Debtor Parties and a contract mining agreement (both further described below) that provided for Luminant Mining to operate the Three Oaks Mine on behalf of the lignite reserve owners, which, following these and related transactions, are Alcoa and Sandow Power Company.  Figure 1 provides an aerial overview of the Rockdale Facility and the Sandow units.



*FIGURE 1: Aerial Overview of the Rockdale Facility and Sandow Plants*

15.    Over the years, the Debtor Parties and Alcoa have entered into various contracts and leases (including, but not limited to, those described herein) memorializing terms relating to, among other things: (a) the purchase of power generated by Sandow Unit 4; (b) the ownership,

mining, and payment as between the parties for the lignite at Three Oaks Mine; (c) ownership, leases, and other interests in the real property at the Rockdale Facility; and (d) the use, operation, improvement, and maintenance of certain common facilities and water supply in connection with the operations at the Rockdale Facility (collectively, the "Alcoa Agreements").  As described herein, certain leases have already been assumed by the Debtor Parties (each, an "Alcoa Lease"), and the Debtor Parties now seek to assume all remaining agreements comprising the Alcoa Agreements—the Alcoa Contracts.

### III.    Key Elements of the Alcoa Agreements.

16.     The following provides a summary of the primary Alcoa Contracts and the key terms thereof; a more comprehensive list is attached hereto as **Exhibit 1** to **Exhibit A**. Additionally, copies of each of the key Alcoa Contracts listed below are attached as exhibits to the Davis Declaration, filed contemporaneously herewith.[3]

17.     ***Operating Contract and Power Contract.***  Signed in 1951, collectively, these contracts provide for Luminant Generation (a successor to Texas Power & Light) to assume operations of Sandow Units 1-3 from Alcoa and for Alcoa to pay Luminant Generation certain fees and provide the power necessary to operate the mine supporting Sandow Units 1-3 (the "Mine Load Obligation").[4]  In 1989, Alcoa took over operating Sandow Units 1-3 until they were shut down and replaced by Sandow Unit 5 in accordance with the terms of the Consent Decree, as discussed above.  These contracts are referenced by almost all subsequent agreements, and Alcoa's obligation to provide the power necessary to operate the mine supporting Sandow

---

[3]    Due to the voluminous nature of the Alcoa Contracts, only key agreements are being filed with the Davis Declaration.  Other Alcoa Contracts, which the Debtors expect are already accessible to Alcoa, are available upon request to counsel to the Debtors.

[4]    In 1976, the parties amended the Mine Load Obligation through the Unit 4 Agreement (described herein) to account for Sandow Unit 4.

Unit 4 (currently the Three Oaks Mine) persists.  The contracts are effective for sixty years following the initial operation of the "generating plant" (which initially referred to Sandow Units 1-3, but Alcoa and the Debtor Parties have subsequently amended these contracts to include Sandow Unit 4) and continue in effect thereafter unless terminated in writing by either party upon three years' notice.

18.    *Unit 4 Agreement.*  This agreement, which has been materially amended several times in the past thirty years, currently obligates Alcoa to provide 100% of the fuel to Sandow Unit 4 and for Luminant Generation to provide Alcoa with approximately 83% of the total generation output of Sandow Unit 4.  Of that 83%, 398 megawatts is "firm" energy, meaning that if Alcoa needs energy for purposes of operating its smelter facility when Sandow Unit 4 is not running, that power must be obtained elsewhere by Luminant Generation and provided to Alcoa at the contract price.  The 398 megawatts of "firm" energy was determined because that constituted a significant portion of the smelter's load requirements when it was operating.  If Alcoa does not consume its share of the generation output of Sandow Unit 4 at the Rockdale Facility (or in satisfaction of the Mine Load Obligation), that "excess energy" is transferred to an energy reserve account ("ERA") and repurchased monthly by Luminant Generation—half at an agreed market rate (the ERCOT Real Time Settlement Point Price), and half at the contract rate (as defined in the agreement).  Simply put, each party pays for its respective share of the current period operating costs and over time a return on and of the invested capital of Sandow Unit 4.  Today, nearly all of Alcoa's share of the output of Sandow Unit 4 goes into the ERA because Alcoa voluntarily shut down its smelting operations.  As mentioned above, Alcoa is obligated to deliver the lignite that fuels Sandow Unit 4.  The costs to mine and deliver the lignite for Sandow Unit 4 are split in accordance with the generation split, with Alcoa paying for 83% and Luminant

10

Generation paying for 17% of those costs.  The Unit 4 Agreement is effective through December 31, 2038, and continues in effect thereafter unless terminated in writing by either party upon three years' notice.

19.    ***Unit 5 Agreement.***    Originally, this agreement set forth terms governing the design, construction, ownership, and operation of Sandow Unit 5 and provided for Alcoa to supply the lignite that powers Sandow Unit 5.  The Unit 5 Agreement has since been amended, in conjunction with the Lignite Ownership Agreement and the Contract Mining Agreement (as described below), to transfer to Sandow Power the responsibility for supplying lignite to Sandow Unit 5.  Pursuant to a related ground lease, Luminant Generation leases from Alcoa the real property upon which Sandow Unit 5 is located (the "Unit 5 Premises Lease").  In connection with the Consent Decree, TCEH indemnifies Alcoa for certain claims and damages relating to certain obligations of Sandow Power with respect to Sandow Unit 5.   The Unit 5 Agreement is effective through December 31, 2038, and continues in effect thereafter unless terminated in writing by either party upon one year' notice.

20.    ***Agreement Regarding Ownership of Lignite Interests.***    This agreement establishes the ownership of the interests in the lignite reserves in the Three Oaks Mine—Alcoa owns the lignite supplied to Sandow Unit 4 pursuant to the terms of the Unit 4 Agreement, and Sandow Power owns the lignite supplied to Sandow Unit 5 pursuant to the terms of the Unit 5 Agreement.  Each party bears responsibility for the payment of royalties attributable to their respective ownership and leasehold interests in the lignite reserves in Three Oaks Mine.

21.    ***Contract Mining Agreement.***  Under this agreement, Luminant Mining acts as a contract miner to mine the lignite reserves at Three Oaks Mine, which are owned by Alcoa and Sandow Power as described above, in order to satisfy Alcoa's obligation to supply 100% of the

KE 37231712.16RLF1 12901744v.1

lignite for Sandow Unit 4 and Sandow Power's obligation to supply the lignite for Sandow

Unit 5 pursuant to the Unit 4 Agreement and the Unit 5 Agreement, respectively. The Contract

Mining Agreement requires that the lignite be provided to Alcoa and Sandow Power on a "cost-

plus" basis. Alcoa and Sandow Power are obligated to pay certain specified costs, including cost

of capital and depreciation. Additionally, the agreement provides for Alcoa to transfer to

Luminant Mining certain permits, licenses, government consents, and other approvals necessary

to operate the Three Oaks Mine.[5] The Contract Mining Agreement terminates on the earlier of

the life of the Three Oaks Mine or December 31, 2038 (the end date of the initial terms of the

Unit 4 Agreement and the Unit 5 Agreement).

    22.    ***Amended and Restated Common Facilities Agreement.*** This agreement clarifies

the ownership interests and duties of Alcoa, Luminant Generation, and Sandow Power with

respect to various common areas at the Rockdale Facility used in connection with the operations

of Sandow Unit 4 and Sandow Unit 5. The duties provided for include the operation,

maintenance, and repair of the common facilities, which are defined, in part, by reference to the

Unit 4 Agreement. These facilities include, but are not limited to, access roads, potable water,

access to Alcoa Lake (which provides cooling water to the power stations), security facilities,

cell phone service towers, piping system, and power cable switch yards. In addition, Luminant

Generation and Sandow Power are obligated to pay Alcoa certain amounts for use of those

common areas. While the Common Facilities Agreement terminates on the date that the Unit 4

Agreement terminates or expires in accordance with its terms, it is important to note that Sandow

Unit 5 directly benefits from the Common Facilities Agreement.

---

[5]    A purchase and sale agreement executed on the same day as the Contract Mining Agreement provides for the
purchase of the surface real estate of Three Oaks Mine, the lease of certain equipment used at Three Oaks Mine,
and the transfer of certain employees at Three Oaks Mine from Alcoa to Luminant Mining.

23.    *The Alcoa Leases.*  The Alcoa Leases, already assumed by the Debtors, further support the operation of Sandow Unit 4, Sandow Unit 5, and Three Oaks Mine.[6]  The Alcoa Leases include, but are not limited to, the Unit 5 Premises Lease, the long-term lease by Luminant Generation and Sandow Power of other real property used in connection with the operation of Sandow Unit 4 and Sandow Unit 5, the lease of an office building owned by Alcoa and used by Sandow Power in connection with the operation of Sandow Unit 5, and the lease by Sandow Power of a portion of Alcoa's mining rights to certain lignite reserves at Three Oaks Mine.[7]

## IV.    The Alcoa Contracts Provide a Significant Source of Value to the Debtor Parties.

24.    As detailed in the Frenzel Declaration and the Filsinger Declaration, the Debtor Parties anticipate that, given the forward curves of market power prices through December 31, 2016, and projected prices for the life of the contracts thereafter—an additional twenty-two years—operating Sandow Unit 4, Sandow Unit 5, and the Three Oaks Mine pursuant to the Alcoa Contracts will continue to render a substantial benefit to the Debtor Parties.

25.    The Debtor Parties have projected various aspects of the performance and value of the Alcoa Contracts and the related facilities for years.  Specifically, and as detailed in the Frenzel Declaration, the Debtor Parties have developed projections that incorporate a number of terms pulled directly from the language of the Alcoa Contracts themselves, and also consider factors that include, but are not limited to: fuel prices; power prices; inflation; projected outage days; operating and maintenance expenditures; plant reliability over time; invested capital and

---

[6]    The Debtors assumed the Alcoa Leases in the fall of 2014 in order to comply with the deadline to assume unexpired leases of nonresidential real property provided in section 365(d)(4) of the Bankruptcy Code.

[7]    For more detail regarding the Alcoa Leases, see the *Motion of Energy Future Holdings Corp.*, et al.*, for Entry of an Order Approving the Assumption of Certain Unexpired Leases By and Among Luminant Generation Company LLC, Luminant Mining Company LLC, Sandow Power Company LLC, and Alcoa Inc.* [D.I. 2534].

projected capital expenditures; and other contractual items, including whether Alcoa has declared a smelter closing event.  The primary driver of the Sandow Unit 4 projections is the expected market price of electric power, derived from the Debtors' official forward price curve ("OFPC"), relative to the projected contracted price of power.

26.    In addition to the Debtor Parties' projections, as set forth in the Filsinger Declaration, independent validation of the projections confirms that the Alcoa Contracts yield substantial benefit to the Debtor Parties.  Among other things, Mr. Filsinger evaluated the functional construction of the projections to validate that the mathematical processes and calculations are materially consistent with the contractual attributes of the Alcoa Contracts and the operating parameters of the plant.

27.    Mr. Filsinger also evaluated the operational efficiency of Sandow Unit 4 itself, considering the "operational heat rate"—a standard calculation used to measure thermodynamic efficiency—and "capacity factor"—a measure of how often a plant is utilized.  Mr. Filsinger concluded that Sandow Unit 4 has operated with a capacity factor at or above its peers over each of the past five years and Sandow Unit 4's historical operational heat rates are close to the averages of each of its peer groups.  Sandow Unit 4 is therefore operated efficiently, consistent with peers in the field.

28.    The Debtor Parties' projections show that, based on the Debtor Parties' OFPC as of December 31, 2014, Sandow Unit 4 is expected to remain profitable, and has a net present value of approximately $450 million, presuming the Alcoa Contracts remain in effect. Conversely, the Debtor Parties believe that the net present value of Sandow Unit 4 without the benefit of the Alcoa Contracts is approximately $150 million.  Therefore, the Debtor Parties believe that the implied value of the Alcoa Contracts is therefore approximately $300 million.

29.     The Alcoa Contracts enable the Debtor Parties to profitably operate two electric generating units at the Rockdale Facility.  Furthermore, the Alcoa Contracts currently render Sandow Unit 4 particularly valuable predominantly because, pursuant to the terms of several of the Alcoa Contracts, Alcoa pays its portion of the operating expenses for Sandow Unit 4, Three Oaks Mine, and certain common facilities, plus a depreciation expense on asset value of Sandow Unit 4, and a contractual return on Alcoa's portion of the invested capital of Sandow Unit 4 and Three Oaks Mine.  Specifically, under the Unit 4 Agreement, Alcoa is eligible to receive approximately 83% of the power generated by Sandow Unit 4 and, accordingly, Alcoa pays approximately 83% of that unit's current period operating costs.  In times of higher market prices, this "cost-plus" construct yields a contract price that is generally lower than the market price, and in times of low market prices—like the present—the construct yields a contract price generally higher than the market price.  Accordingly, under the Unit 4 Agreement, Alcoa's obligations currently total approximately $125 million per year—an amount that is projected to remain constant over the next few years—of which approximately $80 million constitutes Alcoa's portion of a return of and on previously invested capital.  The Contract Mining Agreement has a similar construct and value as the Unit 4 Agreement.

30.     The Unit 4 Agreement incorporates a mechanism whereby any volume of power that exceeds the load required by the Rockdale Facility is purchased by Luminant Generation at the Unit 4 Agreement's stipulated price (50% at market price; 50% at contract price) and then resold.  Currently, that contract purchase price exceeds market prices, predominantly due to the return on and return of capital from Sandow Unit 4, which value accrues to Luminant Generation.  In addition, similar to the Unit 4 Agreement, under the Contract Mining Agreement, Alcoa pays its portion of operating expenses, as well as its return on and of previously invested

capital.  In short, Luminant Generation currently earns more by providing power and contract mining services to Alcoa under the Alcoa Contracts than it would on the open market.

31.    In fact, were Luminant Generation and Sandow Power to attempt to operate the power stations at the Rockdale Facility absent the Alcoa Contracts, they would potentially have to lease the real property on which the units stand, purchase lignite royalty interests, obtain access to the common facilities, obtain necessary water and water permits—all at full cost. Conversely, the initial term of several significant Alcoa Contracts does not end until 2038, and that long time horizon creates valuable continuity and stability in the operation of Sandow Unit 4 and Sandow Unit 5.

**V.    There Are No Cure Claims Associated with Assumption of the Alcoa Contracts, Which the Debtors Are Prepared to Prove at the Hearing on the Motion If Needed.**

32.    As with most contracts, when one party is in the money, the other party is generally out of the money.  This is the case with the Debtor Parties and Alcoa.  And, because the Alcoa Agreements are currently out of the money for Alcoa, the Debtors anticipate that Alcoa will object to the Debtor Parties' proposed assumption—and Alcoa has effectively said as much.[8]    Additionally, Alcoa has made several efforts to modify or terminate the Alcoa Agreements in recent years, including failed litigation aimed at avoiding several of Alcoa's obligations under the Alcoa Agreements.  Alcoa has also repeatedly attempted to buy out the Debtors' interests in the Alcoa Agreements; however, the Debtor Parties determined that those offers significantly undervalued the Alcoa Agreements.

33.    The Debtors will refrain from characterizing Alcoa's previous litigation efforts and attempts to terminate or modify the Alcoa Agreements.  However, the Debtors believe any

---

[8]    *See Objection of Alcoa Inc. to the Motion of Energy Future Holdings Corp.,* et al*., for Entry of an Order Amending Certain Hearing Dates and Deadlines in Connection with the Confirmation of Debtors' Plan of Reorganization* ¶¶ 10–13 [D.I. 5629].

KE 37231712.16RLF1 12901744v.1

objection based on the same or similar claims or assertions will be without merit and, specifically, that there are no existing defaults under the Alcoa Contracts because the Debtor Parties have continued operating their power generation and electricity sale businesses in the course of these chapter 11 cases as debtors in possession, and have performed their ongoing post-petition obligations under all of the Alcoa Agreements.[9]

34.    With the confirmation proceedings now underway, the Debtors believe that it is appropriate to begin the process of seeking approval of assumption of the Alcoa Contracts.  In doing so, the Debtors are hopeful that they will once again be able to achieve consensus with Alcoa, much like they have throughout these chapter 11 cases.  If, however, the Debtors are unable to reach an agreement, they must be allowed to move forward quickly with the assumption of the Alcoa Contracts.  Therefore, concurrently with the filing of this Motion, the Debtors responded to Alcoa's previously-withdrawn written discovery, including responses to 36 requests for production and 25 interrogatories and has offered to make its declarants, Robert Frenzel and Todd W. Filsinger available for deposition.  Furthermore, the debtors are prepared to produce more than 100,000 pages of documents as soon as Alcoa agrees to the standard Confidentiality Agreement used by the Debtors throughout these chapter 11 cases, and which the Debtors first requested of Alcoa on August 25, 2015.    In addition, concurrently with the filing of this Motion, the Debtors have served Alcoa with the Debtors' own limited discovery requests

---

[9]    In fact, the Debtor Parties are *owed* money under the Alcoa Contracts as Alcoa has improperly withheld approximately $11 million owed to Luminant Mining.  In 2013, Alcoa unilaterally wrote-off from its books the value of a large sum of its lignite reserves in Three Oaks Mine, and invoiced Luminant Generation for a portion thereof.  Luminant Generation disputed those charges on the grounds that the Unit 4 Agreement expressly provides that Alcoa cannot invoice the Debtor Parties for any costs associated with lignite before its actual consumption at Sandow Unit 4.  Alcoa proceeded to offset payments due to Luminant Mining under the Contract Mining Agreement, thereby inappropriately retaining $11 million.  To date, Alcoa has yet to reimburse the Debtor Parties for those improper withholdings.  The Debtor Parties reserve any and all rights with respect to such claim and any other claim that may exist under the Alcoa Contracts.

KE 37231712.16RLF1 12901744v.1

in connection with this Motion and offered to meet and confer with counsel for Alcoa about a proposed discovery schedule.

**Basis for Relief**

**I.      Assumption of the Alcoa Contracts Will Benefit the Debtor Parties' Estates.**

35.      Section 365 of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract."  11 U.S.C. 365(a).  In evaluating a debtor's decision to assume or reject an executory contract, Courts apply the business judgment test, which asks "whether rejection would benefit the estate."  *In re Bildisco*, 682 F.2d 72, 79 (3d Cir. 1982) *aff'd sub nom. N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513 (1984); *see also In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *8 (D. Del. May 20, 2002) ("A debtor satisfies the 'business judgment' test when it determines, in good faith, that assumption of an executory contract will benefit the estate and unsecured creditors [generally].").  The business judgment presumption underlying this inquiry assumes that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Freedman v. Redstone*, 753 F.3d 416, 427 (3d Cir. 2014).  Once the debtor demonstrates that its decision with regard to an executory contract will benefit the estate, that decision "must be summarily affirmed unless it is the product of bad faith, or whim or caprice."  *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) (internal quotation marks omitted) *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task," requiring a showing that the decision was "so far beyond the bounds of reasonable business judgment that its only explanation is bad faith").

36.      As detailed in the Frenzel Declaration and the Filsinger Declaration, the Debtors have decided to assume the Alcoa Contracts on an informed basis, in good faith, and in honest

18

belief that doing so is in the best interests of the Debtor Parties.  Specifically, the Debtor Parties have estimated the profitability of the Alcoa Contracts by projecting the long-term financial performance of Sandow Unit 4 and mining operations at Three Oaks Mine, assuming in one scenario that the Alcoa Contracts remain in place and assuming in another scenario that the company did not have the benefit of the Alcoa Contracts.  The difference in performance under these assumptions yields the value of the Alcoa Contracts to the Debtors:  approximately $300 million in additional net present value to the Debtor Parties' estates on account of assuming the Alcoa Contracts rather than rejecting them.  This informed conclusion has been validated by the Debtors' independent energy advisor, Mr. Filsinger.  The Debtors' decision to assume the Alcoa Contracts is therefore made in good faith.

37.    Moreover, the operation of Sandow Unit 4, Sandow Unit 5, and Three Oaks Mine constitutes a significant source of long-term value for the Debtors, made all the more profitable by the terms of the Alcoa Contracts, which currently inure to the benefit of the Debtors Parties' estates.  Put simply, the Debtor Parties project generating significantly more revenue by providing power to Alcoa under the Unit 4 Agreement than they would on the open market.

38.    Furthermore, other Alcoa Agreements benefit the Debtor Parties' estates as well. For example, the operation of Sandow Unit 5 is made possible by the maintenance, access, and use of various vital common facilities, including sources of potable and cooling water, and Luminant Mining is engaged to provide contract mining services at Three Oaks Mine.

39.    The Debtor Parties' business operations at the Rockdale Facility also benefit from the long-term continuity and stability—a prized asset in the operation of electric generating units—provided by various Alcoa Contracts.  Indeed, one of the principal purposes of entering into this multi-decade contractual "cost-plus" relationship was to attain protection against

volatility in fuel and power prices, even at the risk of sometimes being "upside down" on the contract.  While for many years Alcoa enjoyed being in the money under the Alcoa Agreements, the Debtor Parties currently enjoy that benefit as a result of current and projected power prices. Assumption of the Alcoa Contracts will allow the Debtor Parties and their estates to continue to benefit.

## II.    There Are No Defaults to Be Cured.

40.     There are no existing defaults under the Alcoa Contracts.  As stated *supra*, the Debtor Parties have continued operating their power generation and electricity sale businesses in the course of these chapter 11 cases as debtors in possession, and have performed their ongoing post-petition obligations under their agreements with Alcoa, including the Alcoa Contracts. Therefore, section 365(b)—which requires a debtor, upon assumption of a contract where there has been a default by the debtor, to (a) cure the default, (b) compensate for any pecuniary loss arising from the default, and (c) provide adequate assurance of future performance under the contract—is inapplicable.  11 U.S.C. 365(b)(1).

41.     To the extent the Court determines that a default has occurred or that the Debtors are required to provide adequate assurance of future performance in any event, the Debtors submit that the Debtor Parties' Plan, which will reduce their prepetition debt by an estimated $23 billion, will provide more than enough adequate assurance to Alcoa that the Debtor Parties are able to satisfy their contractual obligations going forward.  Additionally, the Debtor Parties submit that Alcoa is adequately assured of the Debtors' future performance under the Alcoa Contracts due to the Debtors' (a) funding under the $3.375 billion debtor-in-possession financing facility, (b) continued access to cash collateral, (c) ongoing power generation and electricity sale operations, and (d) diligence in remaining current on postpetition obligations to Alcoa.

**Reservation of Rights**

42.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Order is intended or should be construed as a waiver of claims with respect to the writedowns identified in those certain letters of John P. Holsinger of Alcoa to Tiffany L. Silvey of Luminant dated March 17, 2014, and Tiffany L. Silvey of Luminant to John P. Holsinger of Alcoa on January 16, 2014 and March 4, 2014.  For the avoidance of doubt, the Debtors hereby reserve any and all rights to object to any proofs of claim filed by Alcoa.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Notice**

43.     The Debtors shall provide notice of this Motion[10] on the date hereof via first class mail to:  (a) the U.S. Trustee; (b) counsel to the TCEH Creditors' Committee; (c) counsel to the EFH Creditors' Committee; (d) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (e) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (f) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under:  (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle

---

[10]     Due to the voluminous nature of the exhibits to the Davis Declaration, the Debtors will not be serving the Davis Declaration upon the parties listed in this paragraph 44.  The Davis Declaration and exhibits thereto are available for review free of charge at http://dm.epiq11.com/EFH/Project.

KE 37231712.16RLF1 12901744v.1

notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (g) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (h) UMB Bank, N.A. in its capacity as indenture trustee under:  (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (i) Delaware Trust Company of Delaware in its capacity as indenture trustee under:  (i) the 6.875% EFIH senior secured notes due 2017; (ii) the 10.0% EFIH senior secured notes due 2020; and (iii), the 11.50% TCEH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under:  (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (j); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (q) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (r) Oncor Electric Delivery Holdings Company LLC and counsel thereto; (s) Oncor Electric Delivery Company LLC and counsel thereto; (t) the Securities and Exchange Commission; (u) the Internal Revenue Service; (v) the Office of the United States

KE 37231712.16RLF1 12901744v.1

Attorney for the District of Delaware; (w) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (x) counsel to the Electric Reliability Council of Texas; (y) those parties that have requested notice pursuant to Bankruptcy Rule 2002; and (z) counsel to Alcoa.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

44.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

KE 37231712.16RLF1 12901744v.1

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Wilmington, Delaware
Dated:   August 28, 2015

/s/ *Joseph C. Barsalona II*
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
Joseph C. Barsalona II (No. 6102)
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:          collins@rlf.com
                defranceschi@rlf.com
                madron@rlf.com
                barsalona@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                marc.kieselstein@kirkland.com
                chad.husnick@kirkland.com
                steven.serajeddini@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*