**EXHIBIT 2**

**Power Contract**

POWER CONTRACT

THIS CONTRACT dated as of the 29ᵗʰ day of _August_

_____, 1951, and made and entered into by and between

ALUMINUM COMPANY OF AMERICA, a Pennsylvania corporation, having its

principal office in Pittsburgh, Pennsylvania (herein called Alcoa),

and TEXAS POWER & LIGHT COMPANY, a Texas corporation, having its

principal office in Dallas, Texas (herein called Texas),

W I T N E S S E T H :

WHEREAS Alcoa is engaged in the business of producing

aluminum and aluminum products and it is anticipated that the

Secretary of the Interior will approve certification, pursuant to

the Defense Production Act of 1950 as amended by Defense Production

Act amendments of 1951, and Executive Order No. 10161 as amended,

of a location for an aluminum smelting plant, having an initial

capacity of approximately 85,000 tons of aluminum per year, to

be constructed and operated by Alcoa, such location being in

Milam County, Texas, in the vicinity of Sandow; and

WHEREAS Alcoa proposes to construct such an aluminum

smelting plant (herein called the Alcoa plant) with four pot lines

at such location, and the operation of the Alcoa plant will re-

quire approximately 180,000 kw of firm electric power; and

-1-

WHEREAS, in order to insure continuous delivery of the electric power required for the operation of the Alcoa plant, Alcoa, itself, or through one or more of its subsidiaries, as defined herein, proposes to construct adjacent thereto, a steam electric generating station of an initial net capability of approximately 240,000 kw adapted to the use of lignite as a fuel, and to acquire and construct, or cause to be constructed, related property and facilities, including lignite leases and lignite mining, transportation, crushing, drying and carbonization facilities (including crude tar recovery facilities), a 13.8/132 kilovolt substation of not less than 100,000 kva capacity (herein called the Alcoa substation) and one or more dams and water reservoirs (but excluding the transmission lines and related facilities referred to in Sections 3.2 and 3.3 of Article III hereof), such electric generating station and related facilities as the same may exist from time to time being referred to herein as the generating plant; and

WHEREAS a plant adequate for the generation of firm electric power and energy for the requirements of the Alcoa plant would necessarily have surplus production in excess of that consumed in the Alcoa plant; and

WHEREAS Texas is a public utility engaged in the generation, transmission and sale of electric power and energy to the public and desires to take such excess power and energy, either in interchange or by purchase, upon the terms and conditions herein set forth; and

-2-

WHEREAS, by agreement between Alcoa and Texas of even
date herewith, Texas has agreed, upon request of Alcoa, to ac-
quire and transfer to Alcoa, or to cause to be transferred direct
to Alcoa, upon the terms and conditions therein provided,
certain leases covering deposits of lignite in and in the
vicinity of Milam County, such deposits and all additional de-
posits owned by Texas within twelve (12) miles from the generat-
ing station of the generating plant which Alcoa shall in the
future have the right to mine being referred to herein as the
lignite reserves, certain mining equipment and all the
capital stock and bonds of the Rockdale, Sandow & Southern Rail-
road;

NOW, THEREFORE, the parties hereto mutually agree as
follows:

### ARTICLE I - Term of Contract

Subject to the other provisions contained herein, this
contract shall be effective until the expiration of a period of
sixty (60) years from the initial operation of the generating
plant, as defined herein, and shall continue in effect thereafter
unless and until terminated by either party by written notice
given three (3) years in advance of the intended date of termi-
nation; but, if, pursuant to the agreement between Alcoa and
Texas of even date herewith with reference to exercising the lignite
option granted by McAlester Fuel Company, Alcoa shall not

-3-

request Texas, on or before October 1, 1951, to acquire and
transfer the said leases and mining equipment, this contract
thereupon shall be of no force or effect.

### ARTICLE II - Definitions

In addition to the other definitions contained herein,
the following terms as used in this contract shall have the fol-
lowing meanings:

(a) ▓▓▓▓▓▓ as used herein with respect to any
electric power and energy or other products, facilities or op-
erations, shall mean the operating cost plus interest at
three (3%) per cent per annum computed on the original cost of
the facilities and depreciation at the rate of two (2%) per cent
per annum computed on the original cost of the depreciable
elements of the facilities, except when a different rate is
mutually agreed upon by the parties hereto with respect to any
specific facilities and depletion, all as determined in accord-
ance with generally accepted accounting principles, which, in
respect to electric power or energy, shall mean the Uniform System
of Accounts promulgated by the National Association of Railroad
and Utilities Commissioners (hereinafter referred to as NARUC),
and plus any operating fee or fees as provided in Section 5 of
the Operating Contract between the parties hereto of even date
herewith.  If requested by any party to this contract, the costs

-4-

shall be substantiated by reasonable evidence, and, if so re-
quested, certified by an independent public accountant or ac-
countants who may be the independent public accountants regular-
ly employed by the party furnishing such evidence.  Total cost
shall exclude all intercompany profits between Alcoa and its
subsidiaries.

(b) ████████████, as used herein with respect to
any electric energy or other products, facilities or operations,
shall mean the full cost of ██████████████████████████
████, including but not limited to the cost of labor, materials,
liability for injuries and damages to employees or others, safety
measures and service, insurance of all kinds normally carried, wel-
fare costs, retirement plan costs as normally provided for em-
ployees, special services (such as the service of independent
accountants, expert tax and insurance service and legal service),
all taxes assessed against the facilities or the operations there-
of whether paid by Texas or directly by Alcoa, all costs incident
to mining, transportation, treating and processing lignite,
royalties on lignite mined, and every other operating cost and
operating revenue deduction (as itemized for Electric Generation –
Steam Power in the Uniform System of Accounts promulgated by
NARUC), but not including ████████████████████████████
depreciation, amortization, depletion, ████████████████████
based on income.  The net receipts from the sale of lignite and

-5-

by-products of lignite shall be included as a reduction in the
determination of operating costs.

*ASH SALES, etc.*

(c) ████████████████████████████████ shall
mean the date when the first generating unit in the generating
plant is ready for commercial operation, with an adequate source
of lignite available.

(d) ████████████████████████ shall mean the require-
ments of Alcoa for electric power or energy at the Alcoa plant
and at any other aluminum smelting or fabricating plant which
may be operated by Alcoa or any of its subsidiaries in the
vicinity of the Alcoa plant, and ███████████ the electric
████████████████████████████████████ used in

*NOTE*

such plant or plants.  This shall be deemed to include the energy
requirements of offices and other administrative and incidental
facilities of Alcoa at or adjacent to such plant or plants, but
shall be deemed not to include the energy requirements of any
housing or town-site development, whether for Alcoa's employees
or others.

(e) ████████████████████ shall mean the points of attach-
ment of the conductors in the terminal span of the 132 kilovolt
transmission lines to the structures of the Alcoa substation.

(f) ████████████████ or any period shall mean the total
number of kilowatt hours generated at the generating plant during
such period minus the number of kilowatt hours used for power plant
auxiliaries at the generating station during such period.

*NOTE: MINE
LOAD NOT
CONSIDERED
PART OF
PLANT AUX.*

(g) ████████████ shall mean the number of tons of lignite reasonably established by methods generally accepted in the industry (and mutually agreed upon) to be in the lignite reserves which are recoverable on a commercially practical basis.

(h) ████████████████ of Alcoa shall mean a corporation or corporations of which over fifty (50%) per cent of the voting stock shall be owned by Alcoa or jointly by Alcoa and one or more other subsidiaries of Alcoa, except corporations which are common carriers subject to the jurisdiction of the Interstate Commerce Commission. For the purposes of this paragraph, voting stock shall mean stock which under all normal circumstances entitles the holders thereof to vote for the election of directors, otherwise than upon the happening of a contingency such as a default in the payment of dividends whether or not such contingency has occurred.

## ARTICLE III – Construction

3.1. Alcoa shall proceed to construct or acquire and complete the generating plant or cause the same to be constructed or acquired and completed; provided, however, that the construction and acquisition of the facilities for the carbonization of lignite may be deferred until the parties agree that they should be installed.

3.2. Texas shall proceed to construct and comple te for its own account and at its own expense, the following trans-

-7-

mission lines and related equipment which with the transmission facilities provided for in Section 3.3 hereof and Texas' Lake Creek generating station when completed will be sufficient to supply 100,000 kw of electric power and energy at the <u>point of delivery</u>; (i) 132 kilovolt transmission line from Texas' 132 kilovolt transmission line at Whitney Dam to Texas' Lake Creek generating station, and (ii) 132 kilovolt transmission line from Texas' Lake Creek generating station to Texas' proposed substation site east of Temple.

3.3. Texas, as agent and for the account of a <u>subsidiary</u> of Alcoa to be organized by Alcoa, shall acquire necessary easements and rights-of-way and proceed to construct and complete an extension of the aforementioned transmission line and related equipment and facilities, as follows: (i) 132 kilovolt transmission line from Texas' proposed Temple substation site to the <u>Alcoa substation</u>, (ii) suitable 132 kilovolt switching facilities at Texas' proposed Temple substation made necessary by the aforementioned transmission line specified in (i) above, and (iii) a double circuit 132 kilovolt transmission line from the <u>Alcoa substation</u> to Lower Colorado River Authority's 132 kilovolt transmission line, subject to approval by said Authority. The aforementioned construction work to be done by Texas for a <u>subsidiary</u> of Alcoa shall be done at the net cost of the work to Texas, without fee or profit to Texas.

3.4. Alcoa shall cause its <u>subsidiary</u> to lease the transmission lines and related equipment specified in Section 3.3 of Article III to Texas for a period of five (5) years from the completion of construction and installation of the said transmission lines and related equipment at an annual rental of One Hundred ($100) Dollars a year; and Texas will maintain and operate and pay all taxes and other charges imposed on said transmission lines and related equipment during the term of the lease.

3.5  At the end of the five (5) year period specified in Section 3.4 of this Article III Alcoa will cause its said <u>subsidiary</u> to convey and transfer to Texas the transmission lines and related equipment together with the easements and rights-of-way referred to in Section 3.3 of this Article III, and Texas will accept a transfer thereof and pay to said Alcoa <u>subsidiary</u> One Hundred Thousand ($100,000) Dollars, representing the purchase price of same.

3.6  Insofar as the 132 kilovolt transmission lines and related equipment referred to in Section 3.3 of this Article III, or any other electric lines or facilities owned by Texas connected to said transmission lines, are to be located upon Alcoa's property, Alcoa will grant to Texas as a part of the purchase of said facilities to be made by Texas under Section 3.5 of this Article III a permit and easement to install (at locations to be mutually agreed upon), test, maintain, inspect, relocate, replace, and repair such facilities during the term of this contract, together with the right of ingress and egress at all reasonable times, and at the expiration of said term to remove such transmission lines and equipment. Upon expiration of said term, if requested by Alcoa, such transmission lines and equipment shall be relocated by Texas (at locations to be mutually agreed upon) within six (6) months at its own expense.

*(handwritten annotation: ONLY IF RELOCATED TO OTHER ALCOA PROPERTY - -)*

3.7  The ownership of any and all transmission lines and equipment installed or hereafter acquired by Texas on the property of Alcoa shall be and remain in Texas, and Texas may identify all such lines and equipment by affixing thereto suitable tags or other markers indicating Texas' ownership.

3.8  All work required by this Article III shall be prosecuted with reasonable diligence and completed as soon as practicable.

- 9 -

ARTICLE IV - Electric Power and Energy

4.1.  To the extent that electric power is available from the generating plant after supplying Alcoa's power requirements for a four pot line aluminum smelting plant and related facilities, as hereinbefore defined in Paragraph (d) of Article II, and ▓▓▓▓▓ ▓ ▓▓▓▓▓▓▓▓▓when all generating units of the ▓▓▓▓▓▓▓▓▓▓▓▓ are operating under normal conditions, Alcoa shall ▓▓▓ available to Texas at the point of delivery during the term hereof 60,000 kw of electric power decreased by an adjustment for losses of transformation from the 13.8 kilovolt bus of the Alcoa substation. The electric power to be made available to Texas under this section is referred to herein as ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ or ▓▓▓▓▓▓▓▓▓▓▓▓▓.

4.2.  Interchange power or interchange energy shall be taken by Texas into its operations or elsewhere during periods of availability of such power to the maximum extent that Texas, in its opinion, may economically do so without jeopardizing the operation of Texas' system or service to its customers; and Texas will use reasonable judgment and foresight in its operations so as to create a maximum load factor for such power. When additional interchange power or interchange energy is available and not taken by Texas pursuant to the foregoing, Texas will use its best efforts to sell such power to others for the account of Alcoa on the same basis as ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ is sold under ▓▓▓▓▓▓▓▓▓hereof.

-10-

4.3.  In order to make up, or partially make up, for any
failure of the generating plant to generate Alcoa's power requirements,
interchange power or interchange energy taken by Texas shall be re-
turned by Texas to Alcoa at the point of delivery as required by Alcoa
(to the extent Texas in its opinion has such power available with-
out jeopardizing the operation of its system or service to its
customers), but at a rate at any time not in excess of 60,000 kw,
plus losses from the point of delivery to the 13.8 kilovolt bus
of the Alcoa substation, and the number of kilowatt hours of inter-
change power or interchange energy so returned shall constitute a
credit, on an equal kilowatt hour basis, against the interchange
power or interchange energy taken by Texas.



*kWh BANKING ARRANGEMEN[?]*

4.4.  Interchange power or interchange energy taken by
Texas during any year, less the interchange power or interchange
energy returned by Texas to Alcoa under Section 4.3 hereof during
such year, shall be paid for by Texas at a rate per kilowatt hour
determined by dividing the operating cost of the generating plant
during such year by the net generation in kilowatt hours for such
year and increasing the result so obtained to adjust for losses
between the 13.8 kilovolt bus of the Alcoa substation and the
point of delivery.

4.5.  Prior to the beginning of each calendar quarter
of operation of the generating plant, Texas and Alcoa shall deter-
mine a preliminary billing rate per kilowatt hour for interchange

power or interchange energy for the ensuing calendar quarter.
Interchange power or interchange energy taken by Texas during any
month, less any interchange power or interchange energy returned
by Texas to Alcoa under Section 4.3 hereof and not previously used
as a credit under Section 4.4 hereof, shall be paid for by Texas
on or before the 15th day of the succeeding month at the appli-
cable preliminary billing rate. As soon as practicable, and in
any event within ninety (90) days after the end of each calendar
year, the billing rate for interchange power or interchange energy
shall be determined in accordance with Section 4.4 hereof. There-
upon, the preliminary billings shall be adjusted between the parties
within fifteen (15) days after such determination.

    4.6. The output of electric energy of the generating
plant in excess of (i) Alcoa's power requirements and (ii) the
amount to be made available to Texas under Section 4.1 hereof
is herein referred to as ▓▓▓▓▓▓▓▓▓▓▓▓▓ Such addi-
tional surplus energy shall be made available to Texas at the
point of delivery. Texas shall use its best efforts either (a)
to sell the same to others at prices and upon terms approved by
Texas and Alcoa, or (b) to use all or a portion of it in its
system, in lieu of energy which would otherwise have been generated
by Texas or purchased by it from others, where such use would re-
sult in operating cost savings to Texas. Unless the parties shall
otherwise agree, additional surplus energy so used by Texas shall

*PMT. FOR ADDITIONAL SURPLUS ENERGY USED BY TEXAS*

be purchased by Texas from Alcoa at a price equal to the operating cost at the generating plant plus fifty (50%) per cent of any operating cost savings to Texas, decreased by an adjustment for losses attributable to its use. Additional surplus energy sold by Texas to others shall be purchased by Texas from Alcoa at the price at which it is sold by Texas minus a proper adjustment applicable to losses and costs attributable to its delivery to such other purchasers (the remainder being called ███████████) and also minus ten (10%) per cent of the excess of Texas net sales price over the total cost at the generating plant. Insofar as any price payable by Texas to Alcoa for additional surplus energy is based upon operating cost at the generating plant or total cost at the generating plant under the provisions of this section, payment shall be made for any month, within fifteen (15) days thereafter, on the basis of estimated costs, subject to final adjustment as soon as such costs for the calendar year have been determined.

*[handwritten margin note: PMT. FOR ADDITIONAL SURPLUS ENERGY SOLD BY TEXAS TO OTHERS]*

4.7. If after the generating plant has been completed the output of same and the interchange power or interchange energy returned to Alcoa by Texas under Section 4.3 hereof shall be insufficient to supply the electric power needed by Alcoa during any period of temporary shutdown or failure of the generating plant, then to the extent Texas in its opinion has electric power available without jeopardizing the operation of its system or service to its customers, Texas will supply such deficiency to Alcoa at the point

of delivery. In the event Texas should supply Alcoa power and
energy in excess of 60,000 kw, for such additional electric
power and energy over and above 60,000 kw, Alcoa shall pay
Texas at a price per kilowatt hour to be determined as follows:
(a) If the increment source of the power supply be in one of
Texas' generating stations, the price shall be the incremental
fuel cost per kilowatt hour of such source plus the average
operation and maintenance costs (as determined in accordance
with the Uniform System of Accounts promulgated by NARUC)
other than fuel per kilowatt hour of all of Texas' generating
stations for the month during which the power was supplied,
or (b) if the incremental source be a purchase by Texas, the
price shall be the cost thereof to Texas. In all cases in
determining such price there shall be included an allowance
for losses from the point of generation or purchase to the
point of delivery.

    4.8.  If prior to the initial operation of the generat-
ing plant one of the pot lines in the Alcoa plant shall be completed
and ready for initial operation and Texas and Alcoa shall have com-
pleted the transmission lines and related equipment referred to

in Sections 3.2 and 3.3 of Article III hereof, then until the initial operation of the generating plant, and at the request of Alcoa and to the extent Texas has electric power and energy available without curtailing service to its other customers, Texas shall supply to Alcoa at the point of delivery electric power and energy required for the operation of such pot line, up to 45,000 kw of power and energy plus losses from the point of delivery to the 13.8 kilovolt bus of the Alcoa substation.  Such power and energy shall be supplied at a demand charge of $1.15 per kw per month, based upon the maximum one-half hour registered demand computed to have been applicable at the point of delivery during any billing period (but ▓▓▓▓▓▓ ▓▓ a ▓▓▓▓ly basis until the end of the sixth month after the initial operation of said pot line and, except for causes within the scope of Article IX hereof, the demand charge for any such week to be no less than the maximum demand charge established in any preceding week) plus an energy charge of 3 mills per ▓▓▓▓▓▓ ▓▓▓, computed for billing purposes as above, and shall be paid for monthly by Alcoa within fifteen (15) days after the receipt of a bill therefor.

    4.9.  Electric power and energy made available by either party to the other hereunder shall be in the form of three phase alternating current at a frequency of approximately sixty cycles per second, and the parties shall use all reasonable efforts to ▓▓▓▓▓▓▓▓▓▓▓▓▓ at the point of delivery within a range of

-15-

five (5%) per cent above or below normal operating voltage. Each party
will take all reasonable measures to maintain a ███████████ for all
electric power and energy hereunder in excess of eighty-five (85%)
per cent at the point of delivery.

4.10. The amount of electric power and energy delivered
hereunder by either party to the other at any time shall be deter-
mined as of the point of delivery from registrations by ████████ {
}watt-hour meters located at the 1██ ████████ ██ of ██ 13.0/13ⁿ
,kilovolt transformers in the Al██████████, and the amount of
electric power and energy used by Alcoa at any time shall be
measured by demand and watt-hour meters between the 13.8 kilovolt
bus of the Alcoa substation and the rectifier station at the
Alcoa plant as near as practicable to said bus. Such metering
equipment shall be mutually agreed upon by the parties and shall
be installed by Texas for the account of Alcoa.

4.11. Alcoa shall at its expense test its metering
equipment mentioned in this contract at least once each six (6)
months and, if requested to do so by Texas, will make additional
tests or inspections of such metering equipment, the expense of
which will be paid for by Texas, unless such additional tests
or inspections show such metering equipment to be inaccurate by
at least one (1%) per cent, in which event such tests will be
paid for by Alcoa. Alcoa will give reasonable notice to Texas
of the time when any such test or inspection is to be made and

-16-

Texas may have representatives present at such test or inspection.
Texas shall have the right to read at all reasonable times any and
all meters mentioned in this contract.

4.12. If upon test any meter upon the registrations
of which settlements are to be made hereunder is found to be
inaccurate by more than one (1%) per cent, adjustment shall be
made to previous registrations and settlements to correct for
such inaccuracy over whichever of the following periods of time
be the shorter, (a) the actual period during which the inaccuracy
existed if determinable, or (b) the period immediately preceding
such test which is equal to one-half the time from the date of
the last preceding test; provided, however, that the period during
which such correction is to be made shall not exceed three (3)
months. If any meter fails to register or if its registration
proves to be so erratic as to be meaningless, the amount of power
or energy for which such meter was intended to measure shall be
estimated from the best available data. Such corrected measure-
ment shall be used to recompute amounts due hereunder for such
period and any difference shall be paid by the party chargeable
therefor within fifteen (15) days after the recomputation is made.

4.13. All the output of electric power at the generat-
ing plant shall be used, or sold for use, within the State of Texas
or outside the State of Texas only during such period as there may
be in effect an exemption order granted by the Federal Power

-17-

Commission permitting the generation, sale and transmission of
such power to points outside the State of Texas without either
party thereby becoming subject to the jurisdiction of the Federal
Power Commission.

## ARTICLE V - Lignite

5.1.  Any and all leases and mining rights hereafter
owned by Texas covering lignite deposits within twelve (12) miles
from the generating station of the generating plant shall upon
acquisition by Texas be offered in writing to Alcoa and if such
offer is accepted in writing by Alcoa within sixty (60) days after
the date of such offer the same shall be transferred by Texas to
Alcoa at the cost thereof to Texas.

5.2.  As promptly after the execution of this contract
as may be done with reasonable accuracy, Alcoa and Texas shall
determine (i) the number of tons of recoverable lignite at that
time, and such determination shall be made separately for the
lignite recoverable by open pit mining methods and that recover-
able by underground mining methods, the ratio between the number
of tons of such lignite recoverable by open pit mining methods at
any time to the total number of tons of recoverable lignite at
that time being referred to herein as the open pit mining ratio,
and (ii) the number of tons of recoverable lignite required for
the operation of the generating plant using carbonized lignite

-18-

fuel at its initial capacity for a period of sixty (60) years
from the initial operation of the generating plant, the number
of tons required at any time for such operation for the unexpired
portion of such sixty-year period being referred to herein as the
generating plant lignite requirements.  The determination of recov-
erable lignite under Clause (i) of this section shall be revised
from time to time upon acquisition by Alcoa or a subsidiary of
Alcoa of leases or mining rights covering additional lignite deposits
within twelve (12) miles from the generating station of the generat-
ing plant.  If the parties are unable to agree upon any determina-
tion under this section, such determination shall be made by an
independent expert mutually agreed upon by Alcoa and Texas.

     5.3.  At the request of Texas, Alcoa shall mine lignite,
or cause lignite to be mined, from the lignite reserves and from
time to time sell the same to Texas for use in an electric generat-
ing station owned by Texas, said sales to be made f.o.b. cars at
the lignite mines, at the total cost therefor, subject, however,
to the following conditions, each of which is for the benefit of
and may be waived by Alcoa:

     (a)  That such lignite can be mined, in addition to the
lignite required for the generating plant, with the mining facili-
ties then owned by Alcoa and its subsidiaries, and any mining
facilities that Texas shall furnish without rental cost to Alcoa;

(b)  That such lignite shall not exceed in any calendar year during the term of this contract the amount required to supply fuel for an electric generating station of Texas of a capacity of 100,000 kw using carbonized lignite as fuel operating at ninety (90%) per cent annual load factor;

(c)  That such lignite shall be mined by open pit mining methods and underground mining methods, respectively, in such quantities as not to reduce over a twelve (12) months' period the open pit mining ratio then existing;

(d)  That the mining of such lignite shall not reduce the number of tons of recoverable lignite below an amount equal to the then remaining generating plant lignite requirements plus ten (10%) per cent thereof;

(e)  That the mining and sale of such lignite shall not increase the cost of lignite for the generating plant.

5.4.  In the event of the installation of a generator or generators by Texas in the generating station of the generating plant, or the construction by Texas of a separate generating station pursuant to Section 6.1 hereof, then the parties shall determine the number of tons of lignite required for the operation thereof at ninety (90%) per cent annual load factor during the remainder of the period of sixty (60) years after the initial operation of the generating plant (the number of tons required at any time for the unexpired portion of such sixty-year period being referred to

UNIT #4
CONSIDERATION

-20-

herein as the Texas plant lignite requirements), and thereupon
Alcoa shall dedicate to the performance of its obligation under
Section 5.3 hereof an amount of the recoverable lignite equal to
the then remaining Texas plant lignite requirements, plus ten (10%)
per cent thereof, but only if, or to the extent that the amount of
recoverable lignite then exceeds the then remaining generating
plant lignite requirements plus ten (10%) per cent thereof; pro-
vided, however, that at no time thereafter shall the amount of
recoverable lignite remaining dedicated to that purpose exceed
either (i) the amount of recoverable lignite minus one hundred
and ten (110%) per cent of the then remaining generating plant
lignite requirements or (ii) one hundred and ten (110%) per cent
of the then remaining Texas plant lignite requirements.

### ARTICLE VI - Texas Plant

6.1.  Upon request of Texas, the parties shall endeavor
to arrive at a mutually satisfactory arrangement for the installa-
tion by Texas in the generating station of the generating plant of
an additional generator or generators of an aggregate capacity not
in excess of 100,000 kw and for the joint use at the proportionate
part of total cost thereof to Alcoa of all necessary and available
facilities of the generating plant, but in the absence of such
arrangement Texas shall have the right during the period mentioned
in Section 8.3 hereof to purchase from Alcoa a site and appropriate

-21-

easements or rights-of-way near the <u>generating plant</u> for a separate
electric generating station and related facilities, having a capa-
city up to 100,000 kw and adapted to the use of lignite as a fuel,
such site and easements or rights-of-way to be located at mutually
satisfactory locations in such a manner as not to interfere with or
increase the cost of the operation of the <u>generating plant</u>. The
price to be paid by Texas for such site and easements or rights-of-way
shall be the average cost paid by Alcoa for such property. In such
event, similar arrangements, as above, shall be made for the joint
use of certain facilities at the <u>generating plant</u>.

      6.2.  In the event of the construction by Texas of a sepa-
rate generating station pursuant to Section 6.1 hereof, then Texas
shall have the right during the remainder of the term of this contract
to purchase water from Alcoa for use in such station at a rate equi-
valent to the <u>total cost</u> thereof per thousand (1,000) gallons, but
only to the extent that Alcoa has such water available after supplying
its own water requirements.

<u>ARTICLE VII - Operation if Aluminum Plant
Temporarily Shut Down</u>

      In the event Alcoa for any reason temporarily ceases
operations at the <u>Alcoa plant</u> at any time and from time to time,
Alcoa shall give Texas written notice, as long in advance as it

-22-

may reasonably do so, of its intentions and program in such respect, in which event Texas may continue to operate the generating plant and shall use its best efforts to sell for the account of Alcoa surplus energy, as provided in Article IV of this contract.

### ARTICLE VIII - Option

8.1.  In the event that ████████████████████████ shall have no further need for any ██████████████████████████ of electric power and energy at the ████████████████████████ tion of aluminum or other industrial ████████████ in ██████████ of the generating █████████████████ (subject, however, to the right of disposal by Alcoa, as limited by Section 8.2 hereof), █████████ shall immediately so notify Texas.

(a)  Upon receipt of such notice, ██████████████ the option to purchase the generating plant (excluding, however, such items of property as are primarily for the operation of the aluminum reduction plant) and Alcoa's remaining interest in the lignite reserves, exercisable by notice to Alcoa within three (3) months after the giving of such notice by Alcoa to Texas, but not after the expiration of the period specified in Section 8.3 hereof, upon the following terms and conditions:

(1)  If Texas exercises its option to purchase during the sixteen (16) year period commencing with the completion of the generating plant, it shall complete the purchase and make payment therefor at the end of said sixteen (16) year period or within two (2) years after receipt of notice from Alcoa, whichever is later, but shall have the right by giving another notice to Alcoa to specify an earlier date for such acquisition and completion of the purchase, provided that such acquisition and purchase shall not without Alcoa's consent be made on less than three (3) years' written notice to Alcoa. If Texas exercises its option to

-23-

purchase, pursuant to notice given to Texas by Alcoa after said sixteen (16) year period, Texas shall complete the purchase and make payment therefor within two (2) years of the receipt by Texas of the notice from Alcoa provided for in Section 8.1 of this Article VIII.  The parties hereto will endeavor to agree upon the terms of a lease to Texas covering said generating plant for the period intervening between the giving of the notice of exercise of option to purchase and the completion of such purchase.

(2)  If at any time prior to twenty-one (21) months of the date designated by Texas for the purchase of the generating plant and Alcoa's remaining rights to mine lignite from the lignite reserves, Alcoa shall again have need for any part of the output of electric power of the generating plant in its industrial operations, Alcoa shall have the right, by notice to Texas, to terminate the right of Texas previously exercised by it under Paragraph (a) of this Section 8.1 of Article VIII, whereupon this contract shall continue in full force and effect.  If Alcoa should later give another notice to Texas under Section 8.1 hereof, the rights of Texas to purchase shall be as defined in Paragraph (a) of Section 8.1.

(3)  The price to be paid by Texas to Alcoa for the generating plant in exercise of the option to purchase given to Texas hereunder shall be the cost of said generating plant to Alcoa at the time of said exercise of such option to purchase (excluding, however, such items of property as are primarily for the operation of the aluminum reduction plant), depreciated at the rate of five (5%) per cent per annum during the first twelve (12) years after completion of the generating plant and thereafter at the rate of three (3%) per cent per annum, on all depreciable items then included in the generating plant from the initial dates upon which Alcoa was first permitted to take depreciation upon said items until

-24-

the time of purchase by Texas, but in no event shall the amount payable under this Subparagraph (3) be less than fifteen (15%) per cent of the original cost of the generating plant to Alcoa.

(4) The price to be paid to Alcoa by Texas for Alcoa's interest in the lignite reserves shall be the cost to Alcoa of its interest at that time in the lignite reserves, less normal depletion.

It is intended that the covenants set forth in this section shall be covenants running with the land and effective as to Alcoa and all subsequent owners of the generating plant and, upon request of Texas, Alcoa will enter into a separate contract with Texas incorporating said covenants in a form which may be recorded on the real estate records of Milam County.

8.2. During the period specified in Section 8.3 hereof, neither Alcoa nor any subsidiary of Alcoa shall sell, lease or dispose of the generating plant to any person other than a subsidiary of Alcoa unless the person acquiring or leasing the generating plant shall have agreed to be bound by the provisions of Section 8.1 hereof and not to sell, lease or dispose of the generating plant except to a person who shall so agree; provided, however, that nothing in this section shall prevent the owner of the generating plant, without compliance with the provisions of this section, from mortgaging or otherwise transferring the generating plant as security for indebtedness.

8.3. The rights of Texas under Section 8.1 hereof (and under Section 6.1 hereof) shall terminate upon the expiration of

-25-

twenty-one (21) years after the death of the survivor of the follow-
ing persons:

| Name | Address |
|------|---------|
| Frank Edward Scofield | Austin, Texas |
| Frank Stuart Ryburn | Dallas, Texas |
| Herbert W. Hickman | Mt. Lebanon, Pennsylvania |
| Hoyt L. Hickman | New Haven, Connecticut |
| Carol Triplett | Fort Worth, Texas |
| William W. Lynch, Jr. | Dallas, Texas |
| Harry H. Lynch | Dallas, Texas |
| Richard Bullwinkle, III | Dallas, Texas |
| David Bullwinkle | Dallas, Texas |
| Betty Button | Dallas, Texas |
| John Ray Keller, Jr. | Dallas, Texas |
| Gordon Donop, Jr. | Llano, Texas |
| Charles Francis Guittard | Dallas, Texas |
| Robert E. Burns, Jr. | Dallas, Texas |
| Richard L. Stuart | Beaumont, Texas |
| Jesse Weed Stuart, Jr. | Beaumont, Texas |
| Gregory Eric Jensen | Dallas, Texas |

### ARTICLE IX - Force Majeure

Neither party shall be liable to the other on account of
any failure to perform or on account of delay in the performance of
any obligation under this contract if and to the extent that such
failure or delay shall be due to a cause beyond the control of such
party and which by the exercise of reasonable diligence such party
could not reasonably have been expected to avoid, and each party shall
be relieved from paying for electric power and energy hereunder if
and to the extent that due to any such cause it shall be prevented
from taking or using same.  Each party shall notify the other promptly
of any such cause, and, insofar as known, of the probable extent to
which it will be unable to perform or be delayed in performing its

obligations hereunder and shall exercise due diligence to eliminate
such cause.

### ARTICLE X - Patent License

Texas (subject to the terms of its cooperative agreement
with the United States of America - Bureau of Mines dated February 1,
1950, and supplements thereto, copies of which agreement and supple-
ments are attached hereto as Exhibit "A") hereby grants to Alcoa and
each of its subsidiaries (so long as it shall continue to be a sub-
sidiary of Alcoa) and Alcoa and each of its subsidiaries hereby
grants to Texas and its affiliates a non-exclusive, non-transferable,
royalty-free license in the fields of utilization of lignite as a
fuel and utilization or further processing of by-products thereof
under any and all United States patents which either may now or here-
after own or control, or under which it may have the right to grant
royalty-free licenses or sublicenses, relating to such fields, such
license to extend for the life of the respective patents; provided,
however, that the grant of such licenses with respect to the carboni-
zation of lignite shall not be effective unless and until the facili-
ties for the carbonization of lignite shall have been installed in
the generating plant.

### ARTICLE XI - Termination

11.1.  This contract may be terminated in its entirety
(except for Article X hereof) by either party, by notice to the
other party upon the happening of either of the following events:

-27-

(a)  If the other party shall fail, except for a cause within the scope of Article IX hereof, to perform its obligations under Article III hereof, and such failure shall continue unremedied for a period of at least three (3) months after notice thereof from the party not in default; or

(b)  The generating plant shall be sold to Texas pursuant to the provisions of Section 8.1 hereof.

11.2.  This contract may be terminated in its entirety (except for Articles VIII and X hereof) by either party by notice to the other party upon the happening of any of the following events:

(a)  The other party shall fail to pay to such party when due any sums required by this contract to be so paid, and such failure shall continue unremedied for a period of sixty (60) days after notice thereof from the party not in default.

(b)  The other party shall fail, except for a cause within the scope of Article IX hereof, to perform its obligations to supply electric energy at the price and in accordance with the terms hereof and such failure shall continue unremedied for a period of sixty (60) days after notice thereof from the party not in default.

(c)  By reason of any statute or judicial or administrative order or decree, either party shall have been deprived substantially of the control of its operations contemplated hereunder or shall be required to do any act or refrain from doing any act which shall prevent substantial compliance by such party with its obligations hereunder,

-28-

provided that no such event shall be deemed to have occurred so long as such party shall in good faith contest the validity or applicability to it of any such law, order or decree.

11.3. For purposes of this Article, neither party shall be deemed to have failed to perform any obligation if and to the extent that there shall be a bona fide dispute between the parties as to the existence of such obligation.

11.4. No termination of this contract pursuant to this Article shall terminate any rights, whether for the payment of money, damages, or otherwise, accrued prior to such termination.

### ARTICLE XII - Notices

All notices, requests, consents, approvals, or other communications required or permitted to be given under this contract shall be in writing and any such notice, request or other communication to Alcoa hereunder shall be deemed to be properly given if mailed, postage prepaid, to "Aluminum Company of America, Gulf Building, Pittsburgh, Pennsylvania, Attention: Vice President in Charge of Production", and any such notice, request or other communication to Texas hereunder shall be deemed to be properly given if mailed, postage prepaid, to "Texas Power & Light Company, Interurban Building, Dallas, Texas, Attention: President and General Manager". The designation of the person to be so notified or the address of such person may be changed at any time and from time to time by either party by similar notice.

-29-

## ARTICLE XIII - Successors and Assigns

This contract shall bind and inure to the benefit of Alcoa and Texas and their respective successors and assigns, but this contract shall not be assigned by either party without the prior consent of the other, except to a successor to all or substantially all of its business (or, in the case of Alcoa, to its aluminum smelting operations in Milam County), whether by merger, consolidation or otherwise; provided, however, that Alcoa may delegate the performance of any of its obligations hereunder, and may assign any of its rights hereunder, to a subsidiary of Alcoa and may transfer the generating plant or any part thereof to such a subsidiary, but no such delegation, assignment or transfer shall relieve Alcoa of any of its obligations hereunder.

IN WITNESS WHEREOF the parties hereto have executed this agreement in duplicate as of the day and year first above written.

ALUMINUM COMPANY OF AMERICA

By _____
        Vice President

ATTEST:

_____
        Secretary

TEXAS POWER & LIGHT COMPANY

By _____
        President

ATTEST:

_____
        Secretary

-30-