## EXHIBIT 3

**Sandow Unit 4 Agreement**

1.    SANDOW UNIT FOUR AGREEMENT

1

SANDOW UNIT FOUR AGREEMENT
TABLE OF CONTENTS

| Section | Title | Page |
|---------|-------|------|
| Section 1. | Effect of this Agreement | 3 |
| Section 2. | Definitions | 4 |
| Section 3. | Ownership | 6 |
| Section 4. | Construction and Financing of Unit Four, Additional Common Facilities and Additional Lignite Facilities | 8 |
| Section 5. | Power and Energy | 12 |
| Section 6. | Texas Plant | 16 |
| Section 7. | Lignite | 17 |
| Section 8. | Operation of the Station | 22 |
| Section 9. | Price of Power | 26 |
| Section 10. | Term | 29 |
| Section 11. | Assignment | 29 |
| Section 12. | Notices | 30 |
| Section 13. | Waiver | 30 |
| Section 14. | Prior Agreements | 31 |
| Section 15. | Headings | 31 |
| Exhibit A. | Unit Four Schedule of Alcoa Expenditures/Obligations | 32 |

2

## SANDOW UNIT FOUR

### AGREEMENT

ALUMINUM COMPANY OF AMERICA, a Pennsylvania corporation
(herein called "Alcoa") owns a three unit, 345 MW gross (325 MW
net) generating plant in Milam County, Texas established pur-
suant to a Power Contract dated as of August 29, 1951, as amended
(herein called "the Power Contract"), with TEXAS POWER & LIGHT
COMPANY, a Texas corporation (herein called "TP&L") and which
is operated by TP&L, acting through its affiliate Texas Utilities
Generating Company, (Industrial Generating Co., Sandow Division)
as agent for Alcoa under an Operating Contract dated as of
August 29, 1951, as amended (herein called "the Operating Contract")
TP&L and Alcoa have been engaged in discussions concerning the
construction and operation by TP&L of a generating unit at
Sandow (herein called "Unit Four") of 545 MW net generating
capacity and the sale to Alcoa of electric power and energy
and the provision by Alcoa of fuel for such generating unit
from its existing reserves in Lee and Milam Counties, Texas.
The discussions have reached a point where it appears that
such a project is likely to be of mutual benefit, and Alcoa
and TP&L wish to set down now the points on which they are
already in agreement and as to which it now appears that
further agreements are necessary.

Section 1.  Effect of this Agreement.  The parties
intend to be legally bound hereby, and, while they recog-
nize that this Agreement is not definitive in that it
leaves yet unsettled a number of important points,

3

the parties hereby commit themselves to the principles set forth herein and will use every effort, in the same spirit of mutual trust and goodwill that has characterized their relationship over several decades, to carry out and implement such principles and to conclude and execute all necessary and appropriate supplemental or superseding agreements.

Section 2.  Definitions.  The terms defined in the Power Contract and the Operating Contract are used in the same sense herein.  As used in the Operating Contract and the Power Contract, as amended, the term the generating plant means Units One-Three plus related property and facilities, including lignite properties and lignite leases, mining, transportation crushing and drying facilities.  To avoid confusion, the term the "Sandow Station" is used herein to mean the totality consisting of:

(a)  "Units One-Three" by which is meant the three steam electric power generating units presently installed in Milam County, Texas, in the vicinity of Sandow.  The term "Units One-Three" does not include Common Facilities.  Each unit of Units One-Three is composed of principally a steam generator, turbine-generator, condenser, boiler feed pumps, feed water heating equipment, electrostatic precipitator, lignite drying units, as well as auxiliary and related equipment necessary for the generation of electricity and the control of emissions.

(b)  "Unit Four" by which is meant the proposed steam electric generating unit of 545 MW net generating capacity whose components shall be more particularly described in a

4

Section 2

supplemental or superseding agreement.  Unit Four does not include Common Facilities.

(c)  "Sandow Station Real Estate" by which is meant the land owned by Alcoa on which the generating plant is presently located, excluding, however, real property containing lignite or used in connection with the mining and transportation of lignite.  Sandow Station Real Estate includes "Unit Four Real Estate" by which is meant the land which Alcoa shall designate, with the concurrence of TP&L, for the construction and installation of Unit Four.

(d)  "Common Facilities" by which is meant facilities (including equipment and structures) needed or used for the operation or maintenance both (i) of any one or more of Units One-Three and (ii) for the operation or maintenance of Unit Four, as well as capital improvements, additions and replacements to such facilities which may have to be made in connection with the construction of Unit Four or which are made thereafter. A detailed list of items included in Common Facilities shall be included in a supplemental or superseding agreement.  Common Facilities shall not include Lignite Facilities.

(e)  "Lignite Facilities" by which is meant lignite properties and leases now or hereafter owned by Alcoa within twelve miles of Units One-Three and all land, structures and equipment used in the mining, transportation, crushing, handling and delivery of lignite to Units One-Three and Unit Four.  A detailed list of the additions and replacements to Lignite

5

Facilities contemplated by this Agreement shall be in-
cluded in a supplemental or superseding agreement.

Section 3.  Ownership.

(a)  Alcoa shall convey the Unit Four Real Estate to
TP&L by a deed of conveyance containing the convenants set
forth in (d) and (e) below, appropriately restated in such a way
that all successors and assigns of TP&L shall be bound thereby.
TP&L  shall pay Alcoa for such conveyance in accordance with
Section 6.1 of the Power Contract.  Alcoa will also grant a
non-exclusive license to use such of the Sandow Station Real
Estate as reasonably required for construction, maintenance
and operations of additions and improvements to Common Facilities
as per Section 4(d) below.

(b)  Conveyance of Unit Four Real Estate shall include
the right of ingress and egress for TP&L, its contractors and
their employees and equipment to and from Unit Four Real Estate.

(c)  TP&L shall have the right, from time to time, to
purchase land and easements for electric lines and facilities
for Unit Four, as provided in Section 6.1 of the Power Contract.

(d)  For the period specified in Section 3(f) hereof,
Alcoa shall have the right and option to purchase Unit Four,
Unit Four Real Estate and all improvements thereon, including
Common Facilities, on terms similar to those provided in
Article VIII of the Power Contract with appropriate modifications
and at a price determined in a manner as set forth in Section 7(f)
hereof, in case TP&L seeks, or attempts, to sell or otherwise

6

Section 3

transfer any portion of Unit Four or Unit Four Real Estate,
except that TP&L may transfer such property to any corporation
owning all of its voting stock or to any corporation wholly-
owned by TP&L or by such corporation owning all of TP&L's voting
stock, provided that the transferor shall remain liable as
guarantor of the performance of its transferee.

(e)  For the period provided in Section 3(f) hereof,
Alcoa shall have the right and option to purchase Unit Four
Real Estate from TP&L upon the expiration of the useful life of
Unit Four as mutually determined by the parties.  The price
to be paid by Alcoa for such real estate shall be the cost
paid by TP&L for such properties.

(f)  The rights of Alcoa under Sections 3(d) and 3(e)
hereof shall terminate upon the expiration of twenty-one (21)
years after the death of the survivor of the following persons:

Carolyn Amy Kelson and Melinda Anne Kelson, daughters of Richard
D. Kelson and Ellen S. Kelson of the Township of Mt. Lebanon,
Allegheny County, Pennsylvania;
Kenneth Dale Cockrell and Phillip Lee Cockrell, sons, and Deborah
Jean Cockrell, daughter of Buford D. Cockrell and Jewell M.
Cockrell of Upper St. Clair Township, Allegheny County, Pennsyl-
vania;
Donna Stacy Campbell, daughter, and Mark Robert Campbell and
Ricky Lee Campbell, sons of Robert K. Campbell and Donna J.
Campbell of Dallas, Dallas County, Texas;
Halsell S. Davis, III, Bruce M. Davis, Thomas L. Davis, and
Joseph L. Davis, sons of H. Sam Davis, Jr. and Laura Ann Davis
of Dallas, Dallas County, Texas;

(g)  Unit Four, together with the provisions hereof and
of further agreements incident hereto, shall be the "Texas
Plant" referred to in Article VI of the Power Contract.

<u>Section 4</u>.    <u>Construction and Financing of Unit Four</u>,
<u>Additional Common Facilities and Additional Lignite Facilities</u>.

(a)   TP&L, in coordination with a Construction
Committee composed of representatives of both parties, will,
at its cost and expense, design and construct Unit Four and
will provide all necessary and desirable engineering, purchasing,
accounting, insurance, construction supervision and manage-
ment therefor.   Taxes as applicable to the performance of
this Agreement shall be for TP&L's account.   The cost of
design and construction shall include general and adminis-
trative expenses in accordance with TP&L's standard account-
ing procedures as they exist from time to time.
The TP&L representatives on the Construction Committee shall give
full hearing to the views of the Alcoa representatives, but the
latter shall function only in an advisory capacity.

(b)   TP&L shall reimburse Alcoa for all sums expended by
it to date in connection with Unit Four and shall assume all of
Alcoa's contractual obligations with respect thereto.   In this
regard Alcoa has incurred various internal expenditures and has
contracted with various vendors including Brown & Root, Inc.
for engineering and procurement services related to Unit Four;
Combustion Engineering, Inc. for the Unit Four steam generator;
and General Electric Company for the Unit Four turbine-generator.
Alcoa will assign its interest in such agreements to TP&L, and

8

Section 4

TP&L will reimburse Alcoa for its internal expenditures and all sums paid to such vendors by reason of such agreements, upon Alcoa furnishing such documentation as TP&L may reasonably require. Exhibit A, attached hereto, is a listing of all such expenditures and obligations to be paid or assumed by TP&L.

(c) Alcoa will assign to TP&L its rights and obligations in an agreement dated October 14, 1974 among Alcoa, TP&L and the County of Milam, Texas, whereby TP&L may finance certain "control facilities" included in Unit Four and having an estimated cost not to exceed Forty-Five Million Dollars ($45,000,000) from the proceeds of certain County of Milam bonds and, in connection therewith, to sell such pollution control facilities to the County of Milam and to purchase or lease the same back.

(d) TP&L will be primarily responsible for design, engineering, purchasing, accounting, insurance, construction supervision and management of improvements, additions and replacements to Common Facilities in connection with the construction of Unit Four, subject to direction and control of a Common Facilities Construction Committee composed of representatives of both parties. Depending on the nature of such an improvement, addition or replacement to Common Facilities title will be retained by either Alcoa or TP&L. Generally, improvements, additions or replacements to Common Facilities to be constructed within the Unit Four power island will be owned by TP&L. Ownership of a given improvement, addition or replacement will be delineated in the supplemental or superseding agreement contemplated in Section 2(d) hereof. The

9

Section 4

cost and expense for the design, engineering, purchasing, account-
ing, insurance, construction supervision and management of a
particular improvement, addition or replacement will be borne by
the party retaining title to the same.  Said costs and expenses
shall include taxes as applicable and general and administrative
expenses of Alcoa and TP&L in accordance with their respective
standard accounting procedures as they exist from time to time.
Subsequent improvements, additions and replacements to Common
Facilities for the purpose of serving Unit Four will be made by
TP&L or Alcoa from time to time, upon approval by the other party.
If either party does not consent, the other may, at its expense,
construct, erect and operate such additions, improvements and re-
placements as its own separate property.  If Alcoa does not consent
to a TP&L improvement or addition, Alcoa will make land available
therefor as per Section 3(a) and (c).

    (e)  Alcoa, in coordination with a Lignite Facilities
Construction Committee composed of representatives of both parties,
will, at its cost and expense, design, construct and provide all
engineering, purchasing, accounting, insurance, construction super-
vision and management necessary and desirable in order to procure
all improvements, additions and replacements of Lignite Facilities
necessary or desirable in connection with mining, transportation,
crushing, handling and delivery of lignite to Units One-Three and
Unit Four.  Such cost shall include applicable taxes and general
and administrative expenses in accordance with Alcoa's standard
accounting procedures as they exist from time to time.

10

Section 4

The Alcoa representatives on the Lignite Facilities Con-
struction Committee shall give full hearing to the views of the
TP&L representatives, but the latter shall function only in an
advisory capacity.

(f) Detailed provisions for the handling of Section 4
disbursements, statements and accounting will be set forth in a
supplemental or superseding agreement.

(g) It is presently estimated that Unit Four shall be
put into commercial operation in April, 1981. The parties
acknowledge that it is to their mutual advantage to advance the
date that Unit Four is put into commercial operation and hereby
agree to endeavor so to do.

11

Section 5.    Power and Energy.

(a)    TP&L shall be entitled to the power and energy output of Unit Four.

(b)    Except as otherwise provided herein, from and after completion and commercial operation of Unit Four, TP&L will supply and sell to Alcoa, and Alcoa agrees to purchase 380 MW of firm power and related energy during the term of this Agreement at the price herein provided.

(c)    Unit Four will be connected through the Alcoa substation (point of delivery), with the TP&L System.  Alcoa shall take delivery of power and energy purchased by it hereunder at the point of delivery. However, at the request of Alcoa, to the extent that TP&L has available transmission capacity, TP&L shall transmit and deliver to Alcoa the power and energy purchased by Alcoa hereunder to any other point on the TP&L System designated by Alcoa, and Alcoa shall reimburse TP&L for the cost of such transmission and delivery from the point of delivery;  any transmission losses being deducted from the metered amount at the point of delivery to Alcoa.  Any difference between the desired (scheduled) kwh delivery and the metered amount received by Alcoa shall be debited or credited, as the case may be, to the Energy Reserve Account.  Said account is further defined in Section 5(g).  Anything to the contrary contained herein notwithstanding, unless the parties otherwise agree in writing, all electric power and energy generated by Unit Four and all electric power and energy delivered under this Agreement and all agreements supplemental hereto shall be transported and consumed wholly within the State of Texas, and each party agrees that it will not connect its facilities or permit its facilities to be connected

12

Section 5

during the term of this agreement to any other generation,
transmission and/or distribution facilities having interstate
connections except during emergencies exempted under the terms
of the Federal Power Act.  In the event either party violates
or is about to violate this provision and as a result thereof
power and energy delivered hereunder, or any part thereof, is
transmitted, could be, or is about to be transmitted outside
the State of Texas, such violating party shall be immediately
in default and shall receive no delivery of power and energy
hereunder until such default shall have been cured to the sat-
isfaction of the other party.

(d)  Alcoa shall continue to make interchange power or
interchange energy available to TP&L pursuant to Article IV of
the Power Contract, but, upon completion of Unit Four, such inter-
change power or interchange energy when available pursuant to Article
IV of the Power Contract, will be furnished from Unit Four and
charged to the power and energy purchased by Alcoa hereunder.
Except for such interchange power and interchange energy being
furnished from Unit Four, the provisions of the Power Contract and
Letter Agreement dated March 17, 1967 and accepted by Alcoa March
27, 1967 (hereinafter referred to as the "March 17, 1967 Letter
Agreement") relating to such interchange power and interchange
energy, shall remain in full force and effect.

(e)  Alcoa may, at its election, from time to time designate
part or all of the power and energy it is obligated to purchase
hereunder to be surplus energy within the meaning of Article VII
and Section 4.6 of the Power Contract with appropriate modifications.

13

Section 5

(f)  TP&L shall discontinue supplying Alcoa with "interruptible power and energy" pursuant to the March 17, 1967 Letter Agreement, upon completion and commercial operation of Unit Four.

(g)  During periods of scheduled and unscheduled outages of Unit Four, TP&L will, subject to 5(h) below, use its best efforts to supply power and energy to meet its obligations under 5(b) above.  There shall be established an Energy Reserve Account which shall be debited with the excess of the annual energy output of Unit Four, after providing for the energy to meet the obligation under 5(b) above and the energy produced as a result of lignite furnished to TP&L under 7(a) below.  This account shall be credited for the energy furnished by TP&L to Alcoa during Unit Four outages or curtailments throughout the same year.  If at the end of the year the said account is not balanced, the parties shall estimate whether the debit or credit is likely to be made up during the coming year and, in case of a negative estimate, Alcoa shall reimburse TP&L for the cost of KWH credit in the said account or TP&L shall reimburse Alcoa for the cost of the KWH debit in the said account.  The exact method of handling the said account and of determining the relevant KWH costs shall be set forth in a supplemental or superseding agreement.  The intent of the parties is that the Energy Reserve Account be balanced annually and, if necessary, the parties shall agree to adjust the annual output to be debited to the Energy Reserve Account in order that such account will more likely be balanced in future years.

Section 5

(h)  TP&L will use its best efforts to supply the power
and energy due Alcoa per (b) above, but TP&L does not guarantee
service against irregularities or interruptions.  TP&L will not
be liable for damages caused by irregularities, interruptions
or failure to commence service because of shortage, allocation
or curtailment of fuel, governmental action or other cause
reasonably beyond control of TP&L.  However, if TP&L fails to
supply the amount of power and energy due Alcoa per (b) above,
Alcoa shall have the right to further reduce the power and energy
to be supplied in order to make efficient use of the power and
energy which is supplied during such failure.

(i)  Section 4.13 of the Power Contract shall apply to all
power and energy sold Alcoa hereunder.

(j)  TP&L's obligation under Section 5(b) hereof shall
be suspended upon Alcoa's failure to provide lignite or other
fuel acceptable to TP&L in accordance with Section 7 hereof,
unless Alcoa is excused therefrom pursuant to the provisions of
Section 7(f) hereof.  TP&L's obligation under Section 5(b) hereof
and Alcoa's obligation under Section 9(b) hereof shall terminate
on purchase by Alcoa pursuant to Sections 3(d), 3(e) or 7(f)
hereof.

Section 6.   Texas Plant.

(a)   Unit Four fulfills Alcoa's obligations under Section 6.1 of the Power Contract.

(b)   Alcoa shall be responsible for supplying water, from the Alcoa Lake and from purchased water, for the operation of Unit Four. Delivery of such water to TP&L shall be at Alcoa Lake.  To the extent Alcoa is unable to provide a sufficient amount of water for the operation of Units One-Three and Unit Four, the water available shall be supplied to Units One-Three and Unit Four on a proportional basis with Unit Four receiving 545/870ths of the available water. The cost of such water is included in Operating Costs under Section 8(d) below.

(c)   Section 6(b) hereof notwithstanding, if TP&L fails to sell and furnish power and energy to Alcoa pursuant to Section 5(b) hereof and in the amount therein stated, other than temporary or intermittent or other short-lived curtailments, for any reason not attributable to actions by Alcoa, Alcoa may suspend the furnishing of water for Unit Four to the extent of such curtailment or interruption.  The preceding sentence not-withstanding, in the event of such curtailment or interruption, to the extent available, pursuant to Section 6(b) hereof, Alcoa will continue to furnish TP&L an amount of water sufficient for the minimum operation of Unit Four estimated to be 200 MW.

16

### Section 7.  Lignite

(a)   Alcoa shall furnish lignite to the Sandow Station
in quantities sufficient to assure TP&L a continuous supply of
power and energy at ninety percent (90%) annual load factor equal
to 95/545ths of the capacity of Unit Four over the economic life
of the lignite deposits included in Lignite Facilities.  The
said economic life is presently estimated to be not less than
twenty-five (25) years.  TP&L's rights under Article V of the
Power Contract shall be satisfied upon the signing of this
Agreement.

(b)   For the lignite furnished by Alcoa pursuant to (a)
above, TP&L shall pay Alcoa a price, as mined, which is the sum
of the following:

(i)    TP&L shall pay a monthly acquisition charge
equal to a fraction of Alcoa's monthly cost of lignite
consisting of, but not limited to, cost depletion
and royalty expense (not including Lignite Production Costs) where
the numerator  is 95/545ths of the total net KWH output
of Unit Four during such month multiplied by the net
heat rate of Unit Four and the denominator is the total
quantity of BTU's consumed in the Sandow Station during
such period, and

(ii) TP&L shall also pay a monthly carrying charge equal
to 1/12th of 95/870ths of Alcoa's cost of capital at 23.2% on
Alcoa's Lignite Investment Account comprised of the original
cost of lignite properties not subject to depreciation.  The
dollar amount so computed will be adjusted per Section 9(c)(i)
hereof.

17

Section 7

  (iii) TP&L shall pay a fraction, determined as set
forth in subsection (b)(i) of this Section, of Alcoa's
monthly "Lignite Production Costs" by which is meant
all costs of operating the Lignite Facilities, excluding
fees paid to TP&L under the Operating Contract, depre-
ciation, amortization, depletion, cost of capital and
taxes based on income, and

  (iv) TP&L shall pay monthly:

  (A) 95/870ths of depreciation as calculated
by Alcoa, using its standard rates, on
the original cost of additions to Lignite
Facilities referred to in Section 4 above
and future additions and improvements
thereto until such facilities are fully
depreciated; and

  (B) 95/870ths of the depreciation as calculated
by Alcoa, using its standard rates, on
the net book value at startup of Unit Four
on the balance of Lignite Facilities,
including future additions and improvements
thereto until such facilities are fully
depreciated; and

  (C) 1/12th of Alcoa's cost of capital at
23.2% on 95/870ths of the net book value
of additions referred to in (A) above, and
the net book value of the balance referred
to in (B) above.  The dollar amount so com-
puted will be adjusted per Section 9(c)(i)
hereof.

18

Section 7

The exact methods and accounts involved in determining the said charges shall be set forth in a supplemental agreement.

(c)  TP&L shall be entitled to a credit against its share of Lignite Production Costs as defined above of a share of the net proceeds of products (lignite and lignite by-products) determined by multiplying such proceeds by a fraction the numerator of which is TP&L's share of Lignite Production Costs as determined in accordance with Section 7(b)(iii) for the relevant period before such credit and the denominator of which is total Lignite Production Costs for the relevant period before any credit for proceeds or products.

(d)  Alcoa shall also furnish, at no cost to TP&L, a quantity of lignite to Unit Four sufficient to generate the following:

(i)  the power and energy purchased by Alcoa per Section 5(b) above,

(ii) surplus power and energy as per Section 5(e) above.

(e)  Since TP&L's obligation to furnish and sell power under Section 5(b) above is not limited to the output of Unit Four, Alcoa shall also furnish at no cost to TP&L a quantity of lignite to Unit Four sufficient to generate the annual power and energy output of Unit Four debited to the Energy Reserve Account provided for in 5(g) above.

(f)  If TP&L fails to sell and furnish power and energy to Alcoa pursuant to Section 5(b) hereof and in the amount therein stated, other than temporary, intermittent or other short-lived

19

Section 7

curtailments or interruptions for any reason not attributable to
actions by Alcoa, Alcoa may suspend the furnishing of lignite in
the amounts required by Section 7(d)(i) to the extent of such
curtailment, interruptions or further reduction requested by Alcoa
pursuant to Section 5(h) and, in addition, Alcoa may purchase
450/545ths of Unit Four and Unit Four Real Estate from TP&L
at its then current fair market value but such purchase price
shall not be less than 450/545ths of original cost of Unit Four,
all additions thereto, and all additions to Common Facilities
owned by TP&L as per Section 4(d) hereof, less retirements as
reflected by TP&L's books and records and computed accumulated
reserve for depreciation at four percent (4%) per annum. Such
sale and purchase shall be consummated within six months after
written notice by Alcoa to TP&L that it intends to make such
purchase. From and after any such purchase, Alcoa will continue
to furnish interchange power or interchange energy pursuant to
Article IV of the Power Contract.

(g)  Even though the amounts of power specified in
Section 5(b) above are not furnished by reason of Alcoa's
failure to accept delivery thereof or by reason of governmental
action or other curtailment described in Section 7(f), Alcoa
will, nevertheless, furnish to TP&L quantities of lignite sufficient
to satisfy TP&L's entitlement per Section 7(a) or minimum
operation of Unit Four estimated to be 200 MW, whichever is greater.
To the extent that such quantities of lignite exceed those specified
in Section 7(a), TP&L will pay Alcoa therefor in accordance with

20

Section 7

the procedures set forth in Section 7 with fractions in Sections 7
(b)(i) and 7(b)(iii) appropriately changed to reflect the new
ratio of TP&L's kwh consumption to total net kwh output of Unit
Four during said period(s).  At Alcoa's option, rather than
receive payment for the quantities of lignite supplied in excess
of those specified in Section 7(a), the power and energy gener-
ated from said excess lignite may be debited to the Energy
Reserve Account provided for in Section 5(g).

21

Section 8.   Operation of the Sandow Station.

TP&L shall continue to operate Sandow Station pursuant to the Operating Contract, subject to the following modifications:

(a)   An Operating Committee composed of representatives of each party shall provide general supervision for such operation.   With respect to matters concerning Units One-Three, Common Facilities (excluding TP&L-owned improvements, additions, or replacements thereto) and Lignite Facilities, the Alcoa representatives shall give full hearing to the views of the TP&L representatives but the latter shall function only in an advisory capacity.   With respect to matters concerning Unit Four and TP&L-owned improvements, additions and replacements to Common Facilities, TP&L representatives shall give full hearing to the views of Alcoa representatives, but the latter shall function only in an advisory capacity.   The proviso to Section 4 of the Operating Contract dealing with the cost of interchange energy shall no longer be applicable.

(b)   TP&L shall receive no incentive fee under Section 7 of the Operating Contract for years after 1978.   For years after 1978 Alcoa shall pay TP&L monthly as an "Additional Operating Fee" an amount determined as follows:   Total incentive fees paid TP&L for the years 1957 through 1978, both inclusive, shall be divided by twenty-two (22); ninety-five percent (95%) of the quotient so obtained shall be divided by twelve (12) and the monthly result shall be rounded down to the nearest five hundred dollars ($500.00).

22

(c)   Unit Four shall be included for purposes of determining TP&L's operating fee under Section 6 of the Operating Contract; however, TP&L's share of Unit Four Operating Costs per Sections 8(d), 8(e) and 8(f) hereof and Lignite Production Costs per Section 7(b) hereof shall be subtracted from Operating Costs in making such determination.

(d)   Unit Four operating costs, as used herein, shall be a portion of Operating Costs as defined in Article II of the Power Contract, substituting Sandow Station for the generating plant, but excluding Lignite Production Costs; but Lignite Production Costs shall not be excluded in computing the fee mentioned in Section 8(c) above except to the extent therein provided.

(e)   Operating Costs of the Sandow Station shall be subdivided into those costs, such as maintenance expense which should logically be assigned on a direct-use basis between Units One-Three and Unit Four and those costs which should not be so assigned.  As to the former, Unit Four Operating Costs shall include all Operating Costs assigned to Unit Four.  As to the latter, Unit Four Operating Costs shall include 545/870ths Operating Costs not directly assigned to Units One-Three and Unit Four.

(f)   Alcoa shall bear and pay each month 450/545ths, and TP&L shall pay and bear each month 95/545ths of Unit Four Operating Costs.

(g)   In addition to its share of Unit Four Operating Costs per (f) above, TP&L shall pay a monthly "Common Facilities Charge" which for this purpose shall consist of a sum equal to:

(i)   1/12th of 95/545ths of the cost of capital at 23.2% per annum on original cost of improvements, additions or replacements to Common Facilities

22

Section 9

including future additions and improvements
thereto, excluding those owned by TP&L as
referred to in Section 4(d) above, less from
time to time accumulated reserve for
depreciation, as adjusted per Section 9(c)(i)
hereof; and

(ii)   1/12th of 95/870ths of the cost of capital
at 23.2% per annum on the net book value at
startup of Unit Four on the balance of present
Common Facilities including future additions
and improvements thereto, excluding those
improvements, additions or replacements
owned by TP&L as referred to in Section 4(d),
less from time to time accumulated reserve
for depreciation, as adjusted per Section 9(c)(i)
hereof; and

(iii)  1/12th of 95/545ths of depreciation as calculated
by Alcoa, using its standard rates, on the original
cost of improvements, additions or replacements
to Common Facilities including future additions
and improvements thereto until such facilities
are fully depreciated, excluding those owned
by TP&L as referred to in Section 4(d) above, and

(iv)   1/12th of 95/870ths of depreciation as calculated
by Alcoa, using its standard rates, on the net
book value at startup of Unit Four on the balance
of present Common Facilities including future
additions and improvements thereto until such

24

Section 8

facilities are fully depreciated, excluding
those improvements, additions, or replacement
owned by TP&L as referred to in Section 4(d).
TP&L's said share of Common Facilities Charge shall be deducted
from the amounts payable by Alcoa hereunder.

25

Section 9.  Price of Power.

Alcoa shall pay TP&L as follows:

(a)  For the period beginning September 1, 1976 and ending
on the earlier of commercial operation of Unit Four or April 1,
1981, Alcoa will pay TP&L, as an inducement fee for building
Unit Four, the sum of $980,000 per month.  In the event TP&L
is prohibited from completing or decides for any reason not to
complete the construction of Unit Four during the period of time
referred to in this section (a), Alcoa's obligation to pay said
inducement fee shall cease as of the date of such prohibition
or determination.

(b)  Upon commercial operation of Unit Four, Alcoa will
pay monthly to TP&L for providing Alcoa power and energy as set
forth in Section 5(b) hereof, but only to the extent that the
same is actually made available to Alcoa or TP&L is excused
therefrom pursuant to the first sentence of Section 5(j), the
following:

(i)  A sum equal to 1/12th of 450/545ths of TP&L's cost
of capital at 21% per annum on original cost of Unit Four
including additions to Common Facilities owned by TP&L
and additions and improvements to Unit Four, less the
from time to time accumulated reserve for depreciation; and

(ii)  1/12th of 450/545ths of depreciation at 4% per
annum on a straight-line basis until Unit Four is fully
depreciated on the original cost of Unit Four including
additions to Common Facilities owned by TP&L and
improvements and additions to Unit Four; provided, however,
that the cost of additions and improvements completed
after the twentieth (20th) year of operation will be

26

Section 9

depreciated over the useful life of such addition or
improvement or the remainder of the contract, whichever.
is shorter; and

(c)   The dollar amount payable by Alcoa pursuant to 9(b)
hereof shall be adjusted up or down due to (i) and (ii) below.
The dollar amounts payable by TP&L pursuant to Sections 7(b)(ii),
7(b)(iv)(C), 8(g)(i) and 8(g)(ii) shall be adjusted up or down
due to (i) below.

(i)   any increase or decrease in the Federal
corporate income tax rate pursuant to Section 11  of
the Internal Revenue Code of 1954 or any successor
thereof from that which is in effect as of the effective
date of this Agreement.  For purposes of this Section
9(c)(i). and Section 9(c)(ii), it is assumed that TP&L
and Alcoa pay tax at the Federal corporate income tax
rate referred to in the preceding sentence; and/or

(ii)   any net increase or net decrease in the
State corporate income tax rate or additional tax rates
or assessments levied on gross income of TP&L from that
which is in effect as of the effective date of this agree-
ment under the terms hereof.  Any net adjustment pursuant
to this Section 9(c)(ii) will be calculated by multiplying
the gross amount of any increase or decrease to any such
tax or assessment by the Federal corporate income tax rate
with the resultant product then being substracted from
such gross increase or decrease.

Section 9

(d)   The amount to be paid to TP&L by Alcoa pursuant to Section 9(b) hereof shall be reduced on a proportionate basis to the extent that TP&L does not make available 380 MW of power and energy to Alcoa as provided herein.  Said reduction, if any, will be calculated on a calendar year basis, or portion thereof, from the date of commercial operation of Unit Four.  The amount of said reduction shall be the difference between the total amount otherwise payable by Alcoa pursuant to Section 9(b) and an amount equal to said total amount multiplied by a fraction wherein the numerator is the average annual MW's actually made available to Alcoa by TP&L (Less any MW's not taken by Alcoa pursuant to Section 5(h) hereof) and the denominator is 380.

Section 10.   Term.   This Agreement shall be effective from execution hereof until expiration of the sixty (60) year period set forth in Article I of the Power Contract and shall continue in effect thereafter unless and until terminated by either party by written notice given three (3) years in advance of the intended date of termination.   The preceding sentence notwithstanding, this Agreement shall terminate upon the expiration of the economic life of the lignite deposits referred to in Section 7(a) as mutually determined by the parties unless Alcoa is able to supply another fuel acceptable to TP&L in quantities sufficient to meet the requirements of Section 7.   In addition, Alcoa's right to purchase Unit Four and Unit Four Real Estate and all additions and improvements thereto pursuant to Section 3 hereof shall survive any termination of this Agreement.   During the terms of this Agreement, TP&L shall have the use of Common Facilities for operation and maintenance of Unit Four as herein provided.

Section 11.   Assignment.   This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and assigns, but neither party shall assign this Agreement nor any right or obligation hereunder without the prior written consent of the other, except that

(1)   Either party may assign this Agreement or any right or obligation hereunder, without the other's consent, to a wholly-owned subsidiary of the assignor; or

(2)   TP&L may delegate, assign or subcontract to or otherwise cause any or all of its duties hereunder to be discharged by any subsidiary of TP&L or any subsidiary of Texas Utilities Company without consent of Alcoa; provided that the assignor, in the case of assignment per (1) above, or TP&L, in case of delegation

29

Section 11. (Cont'd.)

or other action per (2) above, shall remain liable to the other party as guarantor of the performance of such subsidiary, assignee, subcontractor, or designee.

Section 12. Notices. Except as otherwise provided herein, all notices required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been properly given upon dispatch by registered or certified air mail, postage prepaid, addressed to the party to whom it was sent at the address of such party set forth below or at such other address as the party shall subsequently designate to the other by notice given in accordance with this Section 12:

```
            Alcoa:    Aluminum Company of America
                      1501 Alcoa Building
                      Pittsburgh, Pennsylvania 15219

                      Attention:  Vice President-Operating,
                                  Primary Metals

            TP&L:     Texas Power & Light Company
                      P.O. Box 6331
                      Dallas, Texas 75222

                      Attention:  President
```

Section 13. Waiver. The failure of either party hereto to enforce at any time any of the provisions of this Agreement or to exercise any right which is herein provided shall in no way be construed to be a waiver of such provision nor in any way to affect the validity of this Agreement or any part thereof or the right of either party to enforce thereafter each and every such provision and to exercise any such right. No waiver of any breach of this Agreement shall be held to be a waiver of any

Section 13. (Cont'd.)

other or subsequent breach. Nothing shall constitute, or have the effect of, a waiver except an instrument in writing signed by a duly authorized officer or representative of the party against whom such waiver is sought to be enforced which expressly, and not impliedly, waives a right or rights under this Agreement.

Section 14. **Prior Agreements.** The parties intend for the Power Contract and the Operating Contract, as heretofore and hereby amended, to remain in full force and effect.

Section 15. **Headings.** The article and section headings herein are for convenience of reference only and shall in no way affect the interpretation of this Agreement or any part hereof.

EXECUTED this 13th day of *August* , 1976.

ATTEST:

<u>_____</u>
|SECRETARY

Charles V. McCarter

ATTEST:

<u>_____</u>
ASST. SECRETARY

F. I. Thomas

TEXAS POWER & LIGHT COMPANY

By <u>_____</u>
Vice President

R. K. Campbell

ALUMINUM COMPANY OF AMERICA

By <u>_____</u>
Vice President

S. Alfred Jones

31

Exhibit A

EXHIBIT A
UNIT FOUR SCHEDULE OF ALCOA EXPENDITURES/OBLIGATIONS

To be Paid or Assumed by TPAL
Section 4.(b)

| Pur. Order No. | Vendor/Description | ALCOA OBLIGATIONS | | | | Total | Alcoa Expenditures | Open Obligation Balance |
|---|---|---|---|---|---|---|---|---|
| | | P.O. Price | Freight (1) | Escalation (1) | Sales Tax (1) | | | |
| **A. ALUMINUM COMPANY OF AMERICA** | | | | | | | | |
| CS50113TRK | Brown & Root, Inc. Engr. & Procurement Serv. | $ 4,800,000(1) | - | $ - | $ - | $ 4,800,000 | $ 894,228 | $ 3,905,772 |
| EE939411RC | Combustion Engr., Inc. Boiler | 22,478,000 | F/A | 8,317,000 | 1,231,800 | 32,026,800 | - | 32,026,800 |
| CS862695RC | Commercial Contr. Co. Locate Underground Water Lines | 174 | - | - | - | 174 | 174 | - |
| CS940701RC | Commercial Contr. Co. Clear Area for Soil Borings | 2,685 | - | - | - | 2,685 | 2,685 | - |
| EE938734RC | General Electric Turbine Generator | 13,039,722 | F/A | 1,560,278 | 584,000 | 15,184,000 | - | (2) 15,184,000 |
| RC266370 | Harco Rent Earth Resistance Testor | 71 | - | - | 3 | 74 | 74 | - |
| RC953296 | NFS/National Soil Soil Borings | 10,487 | - | - | - | 10,487 | 10,487 | - |
| - | Industrial Generating Co. Services associated with lignite samplings provided to Combustion Engr. | 74,297 | - | - | - | 74,297 | 74,297 | - |
| - | Alcoa Main Office Services | 56,143 | - | - | - | 56,143 | 56,143 | - |
| | TOTAL "A" | $40,461,579 | | $9,877,278 | $1,815,803 | $52,154,660 | $1,038,088 | $57,116,572 |

32

EXHIBIT A
UNIT FOUR SCHEDULE OF ALCOA EXPENDITURES/OBLIGATIONS

To be paid or Assumed by TP&L
Section 4.(b)

| Pur. Order No. | Vendor/Description | ALCOA OBLIGATIONS | | | | | Alcoa Expenditures | Open Obligation Balance |
|---|---|---|---|---|---|---|---|---|
| | | P.O. Price | Freight (1) | Escalation (1) | Sales Tax (1) | Total | | |
| B. BROWN & ROOT, INC. (PROCUREMENT) #02-4044 | | | | | | | | |
| 0001 | Chicago Mfr. Co., Inc. Deaerator & Storage Tank | $ 198,085 | $5,200 | $ 42,000 | $ 9,600 | $ 254,885 | $ - | $ 254,885 |
| 0002 | Babcock & Wilcox Condensate Pumps (Order Cancelled) | 7,856 | - | - | - | 7,856 | 7,856 | - |
| 0003 | Westinghouse Electric Closed Feedwater Heaters | 1,119,500 | F/A | 227,000 | 53,900 | 1,400,400 | - | 1,400,400 |
| 0004 | Westinghouse Electric Main Surface Condensor | 599,540 | F/A | 146,000 | 30,000 | 775,540 | - | 775,540 |
| 0006 | Delaval Boiler Feed Pumps & Feedwater Booster Tanks | 819,500 | 4,230 | 214,000 | 41,350 | 1,079,080 | - | 1,079,080 |
| 0007 | Nash Engr. Co. Condenser Vacuum Pumps | 118,552 | 3,144 | 23,700 | 5,700 | 151,096 | - | 151,096 |
| | TOTAL "B" | $ 2,863,033 | $12,574 | $652,700 | $140,550 | $3,668,857 | $7,856 | $3,661,001 |
| | GRAND TOTAL | $43,324,612 | $12,574 | $10,529,878 | $1,956,353 | $55,823,517 | $1,045,944 | $54,777,573 |

(1) Estimated
(2) Upon General Electric's acceptance of this assigned obligation to TP&L, Alcoa is to receive refund of previous payment made for $880,000. If said refund is not made by General Electric, Alcoa expenditure total to be increased by $880,000 accordingly.

F/A Freight Allowed

# Amendment to Contracts

This Amendment to Contracts (this "Amendment") dated June 30, 1997, is between **Aluminum Company of America** ("Alcoa"), a Pennsylvania corporation, with offices in Rockdale, Milam County, Texas, and **Texas Utilities Electric Company** ("TU Electric"), a Texas corporation with offices in Dallas, Dallas County, Texas, which is the successor by merger to Texas Power & Light Company.

## Recitals

There is a dispute between the parties to this Amendment concerning the interpretation and application of several written contracts (the "Sandow Contracts") between the parties concerning four lignite-fueled electric generating units located near Rockdale, Texas. These Sandow Contracts include, without limitation, the following:

Power Contract dated August 29, 1951 (the "Power Contract");

Operating Contract dated August 29, 1951 (the "Operating Contract");

Sandow Unit Four Agreement dated August 13, 1976 (the "Sandow Unit Four Agreement"); and

Supplemental Agreement to Sandow Unit Four Agreement dated March 2, 1981 (the "Supplemental Sandow Unit Four Agreement").

## Agreements

In consideration of the mutual promises and agreements contained in this Amendment, including the recitals set forth above, the parties agree as follows:

**Amendments on Cost Adjustment Payments**

1.    A new Section 16 is hereby added to the Sandow Unit Four Agreement to read as follows:

### Section 16. Cost Adjustment Payments

Beginning with the date of this Agreement, each party shall pay a monthly Cost Adjustment Payment to the other party based upon the difference between the cost of capital in the Sandow Unit Four Agreement and the cost of capital calculated using an Alternate Cost of Capital Rate, defined below.

(a)    The initial value of the Alternate Cost of Capital Rate for each party is 15.4%, but it may change from year to year based upon changes in the U.S. Treasuries

Rate, changes in the Federal corporate Income Tax and changes in the State corporate Income Tax, as defined further below.

(b)    "Income Tax" means the Federal corporate income tax pursuant to Section 11 of the Internal Revenue Code of 1986 or any successor thereof, any State corporate income tax, or any additional taxes or assessments levied on the gross income of a party.

(c)    The "U.S. Treasuries Rate" for a Calendar Period is the average of all published month-end Thirty-Year Average Yields for each month within the Calendar Period, as published weekly by the Federal Reserve Board in *Federal Reserve Statistical Release H-15*, "Selected Interest Rates." "Calendar Period" means a period from January 1 to December 31. If the Federal Reserve Board does not publish such a monthly Thirty-Year Average Yield, the average shall be computed using the month-end Thirty-Year Yields for each month in the Calendar Period as reported by the Federal Reserve Board. If Thirty-Year Yields are not published by the Federal Reserve Board, then the yields must be obtained from any Federal Reserve Bank or from any U.S. Government department or agency mutually selected by Alcoa and TU Electric. If Thirty-Year Yields are not published by the Federal Reserve Board or by any Federal Reserve Bank or by any U.S. Government department or agency, then the U.S. Treasuries Rate must be determined by taking the average of the month-end closing bids for U.S. Treasury fixed-interest-rate securities with a final maturity date of thirty years as provided by four recognized U.S. Government securities dealers. Two U.S. Government securities dealers must be selected by TU Electric and two must be selected by Alcoa. Each bid used must be supported by written documentation from the dealer who uses it. The term "U.S. Treasury fixed-interest-rate securities" does not include "Special Securities."

(i)    "Special Securities" means securities which can, at the option of the holder, be surrendered at face value in payment of any Federal estate tax or which provide tax benefits to the holder and are priced to reflect such tax benefits or which were originally issued at a deep or substantial discount.

(ii)    The Alternate Cost of Capital Rate for each party must be adjusted before each February 1, effective on each January 1, according to this table and formula:

| U.S. Treasuries Rate for Previous Year | Alternate Cost of Capital Rate for Current Year |
|---|---|
| Less than 5.00% | 13.4% minus 1% for each whole 1% that the US Treasuries Rate is less than 5.00% |
| Equal to or greater than 5.00% and less than 6.00% | 14.4% |
| Equal to or greater than 7.00% and less than 9.00% | 15.4% |
| Equal to or greater than 9.00% and less than 10.00% | 16.4% |
| Equal to or greater than 10.00% and less than 11.00% | 17.4% |
| Equal to or greater than 11.00% | 17.5% |

(iii)    The Alternate Cost of Capital Rate from the table above must be adjusted before each February 1, effective on each January 1, for changes in the sum of State and Federal Income Tax rates applicable to Alcoa by adding 0.2% for each increase of 1% from the sum of the Federal and State Income Tax rates effective as of April 1, 1997 and by subtracting 0.2% for each decrease of 1% from the sum of the Federal and State Income Tax rates effective as of April 1, 1997. The resulting adjusted cost of capital rate is called the Alcoa Alternate Cost of Capital Rate.

(iv)    The Alternate Cost of Capital Rate from the table above must be adjusted before each February 1, effective on each January 1, for changes in the sum of State and Federal Income Tax rates applicable to TU Electric by adding 0.2% for each increase of 1% from the sum of the Federal and State Income Tax rates effective as of April 1, 1997 and by subtracting 0.2% for each decrease of 1% from the sum of the Federal and State Income Tax rates effective as of April 1, 1997. The resulting adjusted cost of capital rate is called the TU Electric Alternate Cost of Capital Rate.

(d)    The amount of the Cost Adjustment Payment that Alcoa pays to TU Electric is the difference between (i) the cost of capital that TU Electric pays Alcoa under Sections 7(b)(iv), 8(g)(i), and 8(g)(ii) of the Sandow Unit Four Agreement (all as adjusted under Section 9(c) of the Sandow Unit Four Agreement) and Section IV.B of Exhibit VIII-A to the Supplemental Sandow Unit Four Agreement, and (ii) the cost of capital under Sections 7(b)(iv), 8(g)(i), and 8(g)(ii) the Sandow Unit Four Agreement and Section IV.B of Exhibit VIII-A to the Supplemental Sandow Unit Four Agreement, but calculated using

3

the Alcoa Alternate Cost of Capital Rate instead of the cost of capital rate stated in Sections 7(b)(iv), 8(g)(i), and 8(g)(ii) of the Sandow Unit Four Agreement and Section IV.B of Exhibit VIII-A to the Supplemental Sandow Unit Four Agreement. This payment is to be made monthly at the same time as the other payments of costs of capital and may be offset against amounts due from TU Electric to Alcoa.

(e)    The amount of the Cost Adjustment Payment that TU Electric pays to Alcoa is the difference between (i) the cost of capital that Alcoa pays to TU Electric under Section 9(b) of the Sandow Unit Four Agreement (as adjusted under Section 9(c) of the Sandow Unit Four Agreement), and (ii) the cost of capital under Section 9(b) but calculated using the TU Electric Alternate Cost of Capital Rate instead of the cost of capital rate stated in Section 9(b). This payment is to be made monthly at the same time as the other payments of costs of capital and may be offset against amounts due from Alcoa to TU Electric.

(f)    Exhibit XVI-A attached hereto illustrates the calculations under Section 16(d), and Exhibit XVI-B attached hereto illustrates the calculations under Section 16(e).

**Amendments on Surplus Energy**

2.    Section 5.2 of the Supplemental Sandow Unit Four Agreement is deleted in its entirety and the following is substituted therefor:

The modifications contemplated in Section 5(e) of the Sandow Unit Four Agreement with respect to surplus energy within the meaning of Article VII and Section 4.6 of the Power Contract are as follows:

(a)    If Alcoa designates part or all of the power and energy it is obligated to purchase as surplus energy under Section 5(e) of the Sandow Unit Four Agreement, it shall give TU Electric written notice of that election as long in advance as practical. TU Electric shall use that surplus energy in its system.

(b)    Surplus energy designated under Section 5.2(a) above is deemed to have been supplied to Alcoa for purposes of Section 5(b) of the Sandow Unit Four Agreement.

(c)    Unless the parties otherwise agree, sums due to TU Electric from Alcoa shall be credited for all surplus energy used in the TU Electric system in a credit amount equal to the "Cost of Energy" (defined in Section II of Exhibit V-A, as amended) times the quantity of surplus energy (in kWh) used.

3.    Section II of Exhibit V-A of the Supplemental Sandow Unit Four Agreement is deleted in its entirety and the following is substituted therefor:

(a)    The "Cost of Energy" for a month means a cents per kWh number determined by the following formula:

$$C = [(F \times E) + (\frac{1}{2} \times D)] / E$$
but if $E=0$, then C is deemed to be 0

where:    "C" means the Cost of Energy for that month

"F" means the Floor Price defined below for that month divided by 10 to convert $/MWh to ¢/kWh

"E" means the total of surplus energy for that month under Section 4.6 of the Power Contract or under Section 5(e) of the Sandow Unit Four Agreement plus any net kWh debit for the month to the Energy Reserve Account under Section I of Exhibit V-A

"D" means a credit balance, if any for that month, in the Market Price Balance Account defined below multiplied by 100 to convert dollars to cents

(b)    Each month, the parties prepare a "Sandow Station Operating Report and Contract Summary." A part of that Report is the "Production Expense Report" for the "Current Month." The "Floor Price" for a month means the number given in the Production Expense Report for "Dollars per MWh" under the column entitled "Current Month." An example of such a Production Expense Report is attached hereto as Exhibit V-A-1. This Floor Price is subject to restatement at the end of the year based upon the "Dollars per MWh" under the column entitled "YTD" in the Production Expense Report under subsection (e) below of this Section II of Exhibit V-A.

(c)    (i)    The "Market Price" for a month means 8.5 (the heat rate) times the arithmetic average of all index prices listed in all regular editions of *Natural Gas Week* published during that month that are identified as (A) in the table entitled "Gas Price Report" under the column entitled "Delivered to Pipeline, This Week," as the price for "TEXAS West" and (B) in the table entitled "Major Market Prices" under the column entitled "This Week," as the price for "Houston Ship Channel." A representative copy of *Natural Gas Week* is attached hereto as Exhibit V-A-2.

(ii)    After April 30, 1998, either party may, by written notice, commence a 30-day good-faith negotiation with the other party about changing the definition of "Market Price." Such changes may include, without limitation, changing the heat rate, changing the gas indices, or changing the methodology to track an electricity price index. The party commencing the good-faith negotiation cannot commence another good-faith negotiation for three years after the date of the written notice commencing the good-faith negotiation. Any agreed modification of the definition of "Market Price" must be memorialized in a written amendment to this Exhibit V-A. It is the intent of Alcoa and TU Electric to adopt an electricity price index to determine the Market Price as soon after April 30, 1998 as such an index becomes available. For an electricity price index to be adopted, it must be ERCOT-specific, hourly, and based upon enough transactions to represent a "liquid" market.

(d)    A Market Price Balance Account is hereby established. If the Floor Price for a month is greater than the Market Price for that month, then an amount of money must be debited (debit = negative, credit = positive) to the Market Price Balance Account in an amount equal to the difference between those two prices times the total of surplus energy for the month under Section 4.6 of the Power Contract or under Section 5(e) of the Sandow Unit Four Agreement plus any net kWh debit for the month to the Energy Reserve Account under Section I of Exhibit V-A. Any debit balance in the account earns interest at the interest rate then in effect that is set by the Public Utility Commission of Texas under Section 23.45(h) of its Substantive Rules. If the Floor Price for a month is less than the Market Price for that month, then an amount of money must be credited to the Market Price Balance Account equal to the difference between those two prices times the total of surplus energy for the month under Section 4.6 of the Power Contract or under Section 5(e) of the Sandow Unit Four Agreement plus any net kWh debit for the month to the Energy Reserve Account under Section I of Exhibit V-A. A credit balance in the Market Price Balance Account will be used in determining the Cost of Energy for that month in subsection (a) above, and the balance in the Market Price Balance Account must be reset to zero. This Market Price Balance Account is subject to recalculation at the end of the year under subsection (e) below of this Section II of Exhibit V-A, but Alcoa is never obligated to pay TU Electric to reduce any negative balances in the Market Price Balance Account to zero. A sample calculation of this Market Price Balance Account is attached hereto as Exhibit V-A-3.

(e)    At the end of each calendar year, the Floor Price for each month during the year must be restated based upon the number given in the Production Expense Report for the last month of the year for "Dollars per MWh" under the column entitled "YTD." For 1997, however, the "year" for the purposes of this calculation only includes the nine months from April 1997 through December 1997, inclusive. The monthly calculations of the debits and credits to the Market Price Balance Account (but not the accruals of interest) must then be recalculated using the restated annual Floor Price. The monthly calculations of the Cost of Energy must then be recalculated using the recalculated monthly Market Price Balance Account balances. The monthly payments from Alcoa to TU Electric must then be recalculated based upon the recalculated monthly Cost of Energy. If the net effect of the recalculated monthly payments is that Alcoa owes more money than paid, then the net difference must be added to Alcoa's payment for the next month. If the net effect of the recalculated monthly payments is that Alcoa owes less money than paid, then the net difference must be credited to Alcoa's payment for the next month. A sample calculation under this Section II(e) is attached hereto as Exhibit V-A-4.

**Amendment on Energy Reserve Account**
4.    The last sentence of Section III of Exhibit V-A of the Supplemental Sandow Unit Four Agreement, as added by the Amendment to Supplemental Sandow Unit Four Agreement, is deleted in its entirety and the following is substituted therefor:

In addition, Alcoa may declare any or all of any debit for each month (net of that required to reduce an existing credit balance in the Energy Reserve Account) and all or any part of a debit balance in the Energy Reserve Account (but not to exceed the sum of the net debit and the debit balance) as excess energy and dispose of such energy by sale to TU Electric; TU Electric shall first purchase the net debit for the month at the Cost of Energy as defined in Section II of this Exhibit V-A, as amended, and shall next purchase the energy from the debit balance in the Energy Reserve Account declared to be excess energy at the average value of the debit balance of the Energy Reserve Account.

## Amendments on Wheeling

5.   The third sentence of Section 5(c) of the Sandow Unit Four Agreement reads as follows:

> However, at the request of Alcoa, to the extent that TP&L has available transmission capacity, TP&L shall transmit and deliver to Alcoa the power and energy purchased by Alcoa hereunder to any other point on the TP&L System designated by Alcoa, and Alcoa shall reimburse TP&L for the cost of such transmission and delivery from the point of delivery; any transmission losses being deducted from the metered amount at the point of delivery to Alcoa.

That sentence is hereby deleted.

6.   The fourth sentence of Section III of Exhibit V-A of the Supplemental Sandow Unit Four Agreement is deleted in its entirety and the following is substituted therefor:

> Likewise, Alcoa may declare all or a portion of the power and energy to be debited to the Energy Reserve Account (but not to exceed 380 MW without concurrence of TU Electric) to be Surplus Energy.

## Amendments on Resale or Other Purchases by Alcoa

7.   The second sentence of Section 5(g) of the Sandow Unit Four Agreement is deleted in its entirety and the following is substituted therefor:

> There shall be established an Energy Reserve Account which shall be debited with the excess of the annual energy output of Unit Four, after providing for the energy to meet the obligation under 5(b) above, the energy produced as a result of lignite furnished to TU Electric under 7(a) below, and the amount of energy, if any, exempted by Alcoa under Section 5(k) below.

8.   Section 5 of the Sandow Unit Four Agreement is hereby amended by adding new subsections (k) and (l) to read as follows:

> (k)   (i)    Alcoa is prohibited from reselling, redelivering, assigning, or otherwise transferring any of the power and energy that it purchases from TU

Electric under the Sandow Unit Four Agreement to any entity other than TU Electric, except as provided in this Section 5(k).

(ii)    Alcoa may exempt up to 33 megawatts of power and energy from the restrictions of Section 5(k)(i) above. Alcoa may exercise this exemption at any time by giving TU Electric not less than 90 days written notice, stating the effective date and the amount exempted. Alcoa may exercise this exemption up to three times, but the total amount exempted under all such exemptions cannot exceed 33 megawatts. All megawatts so exempted must be exempted for 24 hours per day (*i.e.*, at a 100% capacity factor).

(iii)    After an exemption under this Section 5(k) is exercised and the exemption takes effect, TU Electric is no longer obligated to take, pay for, or bank that portion of the power and energy. If in any hour Alcoa is not delivering all of the exempted power and energy to another party (including locations of Alcoa, its subsidiaries, or its affiliates, other than Rockdale), then Alcoa may not declare any surplus energy for that hour. If in any hour Alcoa is not delivering all of the exempted power and energy to another party (including locations of Alcoa, its subsidiaries, or its affiliates, other than Rockdale), then the energy that would otherwise be credited to the Energy Reserve Account for that hour under the other provisions of the Sandow Unit Four Agreement and under provisions of other agreements must be reduced by the amount of the exempted power and energy that is not being delivered to another party (including locations of Alcoa, its subsidiaries, or its affiliates, other than Rockdale).

(l)    Alcoa may not purchase, accept delivery from, take an assignment of, or otherwise receive, power and energy from any person or entity other than TU Electric for the existing Alcoa facilities at Rockdale, Texas, unless the existing Alcoa facilities at Rockdale, Texas are consuming all of the power and energy to which Alcoa is entitled under the Sandow Unit Four Agreement.

**9. Effective Date.**    This Amendment is effective as of April 1, 1997.

**10. Effect on Other Agreement.**    The parties have previously entered into a letter agreement dated June 26, 1996, that referred to Section 5.2(d) of the Supplemental Sandow Unit Four Agreement. This Amendment deletes that section. Nevertheless, for purposes of that letter agreement, the parties intend that its references to Section 5.2(d) mean Section 5.2(d) as it existed on June 26, 1996.

**11. Exhibits.**    The new Exhibits V-A-1, V-A-2, V-A-3, and V-A-4 referred to in this Amendment are all attached hereto and made a part of the Supplemental Sandow Unit Four Agreement. The new Exhibits XVI-A and XVI-B referred to in this Amendment are both attached hereto and made a part of the Sandow Unit Four Agreement.

8

**12. Successors and Assigns.** This Amendment is binding on and inures to the benefit of the parties and their respective successors and permitted assigns.

**13. Execution in Counterparts.** This Amendment may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes.

**14. Alcoa's General Representations and Warranties.** Alcoa now represents and warrants unconditionally to TU Electric that:

a. Alcoa is a corporation duly organized, validly existing, in good standing under the laws of the Commonwealth of Pennsylvania, and is authorized to do business in the State of Texas.

b. Alcoa has full corporate power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Amendment.

c. The making and performance by Alcoa of this Amendment have been duly authorized by the necessary corporate action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to Alcoa, violate any provision of Alcoa's Articles of Incorporation or Bylaws, or result in a breach of, or constitute a default under, any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which Alcoa is a party or by which it or its property is bound or affected.

**15. TU Electric's General Representations and Warranties.** TU Electric now represents and warrants unconditionally to Alcoa that:

a. TU Electric is a corporation duly organized, validly existing, and in good standing under the laws of the State of Texas.

b. TU Electric has full corporate power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Amendment.

c. The making and performance by TU Electric of this Amendment have been duly authorized by all necessary corporate action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to TU Electric, violate any provision of TU Electric's Articles of Incorporation or Bylaws, or result in a breach of or constitute a default under any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which TU Electric is a party or by which it or its property is bound or affected.

9

**16. No Rights of Third Parties.** This Amendment is intended only for the parties' benefit. Nothing in this Amendment may be construed to create any duty to, any standard of care concerning, or any liability to, any person not a party to this Amendment.

**17. Subject to Applicable Laws.** This Amendment is subject to applicable federal, state, and local laws, ordinances, rules, and regulations. Nothing in this Amendment may be construed as a waiver of any right to question or contest any law, ordinance, rule, regulation, or asserted regulatory jurisdiction.

**18. Amendment.** This Amendment may be amended at any time, but only upon the parties' written agreement.

**19. No Waiver.** The waiver of a breach of any provision of this Amendment does not waive any other breach of that provision or of any other provision.

**20. Complete Amendment.** This Amendment, together with the documents attached as Exhibits to this Amendment, represents the parties' final and mutual understanding with respect to the settlement of claims and injuries under the Sandow Contracts. No representations, inducements, promises, or agreements, oral or otherwise, have been relied upon or made by any party, or anyone on behalf of a party, that are not fully expressed in this Amendment and in its Exhibits. An agreement, statement, or promise not contained in this Amendment and its Exhibits is not valid or binding.

**21. Choice of Law.** This Amendment must be construed, and its performance enforced, under Texas law.

**22. Severability.** If any provision of this Amendment is found to be invalid or unenforceable, that provision is severed from the remainder of this Amendment, and the parties shall immediately negotiate in good faith and agree to a replacement provision that is valid and enforceable and that puts each party in substantially the same position that the party was in before the original provision was found to be invalid or unenforceable. This Amendment, as so modified, continues in full force and effect. If the application of any provision of this Amendment to any person or circumstance is found to be invalid or unenforceable, then that provision remains valid and enforceable as applied to other persons and circumstances.

Signed as of the date first mentioned above.

**Aluminum Company of America**

By: _____

Title: _____

**Texas Utilities Electric Company**

By: _____

Title: _____



EXHIBIT V-A-1

SAMPLE OF "FLOOR PRICE"

Sample of "Floor Price" from the pages of the Sandow Station Operating Report and Contract Summary in the "Production Expense Report" section for the "Current Month" in the "Dollars per MWh under the column entitled "Current Month".

**TU ELECTRIC**
**SANDOW STATION**
**PRODUCTION EXPENSE REPORT**
**APRIL 1997**

|  | Current Month | YTD |
|---|---|---|
| **Unit 4 Generation Cost:** | | |
| Billable Expense - invoice | $2,107,077.76 | $7,846,777.65 |
| Depreciation on Common Facilities | 95,081.00 | 380,324.00 |
| **TOTAL UNIT 4 O&M** | $2,202,158.76 | $8,227,101.65 |
| | | |
| **ALCOA's Share Unit 4 O&M** | $1,818,296.22 | $6,793,019.71 |
| Inducement Fee | 140,179.00 | 560,716.00 |
| Operating Fee - Unit 4 | 77,916.68 | 293,062.20 |
| Operating Fee - Unit 1-3 | (607.74) | (2,865.70) |
| Cost of Capital - TU | 1,390,867.38 | 5,624,562.62 |
| Depreciation - TU | 750,292.49 | 3,000,300.22 |
| Common Facility Fee | (2,578.00) | (9,075.00) |
| Cost of Capital - Common Facilities | (23,510.00) | (95,662.00) |
| Cost of Capital - Lignite | (116,052.00) | (453,036.00) |
| **TOTAL UNIT 4 GENERATION COSTS** | $4,034,804.04 | $15,711,022.05 |
| | | |
| **Unit 4 Fuel Cost to ALCOA:** | | |
| Lignite Cost | $2,997,703.00 | $11,726,155.00 |
| Reclamation Fee | 31,526.00 | 125,741.00 |
| Byproduct Sale | (3,821.00) | (23,836.00) |
| 100% Unit 4 | $3,025,408.00 | $11,828,060.00 |
| ALCOA's Share Unit 4 | 2,498,043.30 | 9,766,288.07 |
| 5% Lignite Fee | (35,040.00) | (109,724.00) |
| **TOTAL FUEL COSTS** | $2,463,003.30 | $9,656,564.07 |
| | | |
| **TOTAL ALCOA UNIT 4 COST** | $6,497,807.34 | $25,367,586.13 |
| | | |
| **ALCOA MWH** | 317,346 | 1,281,864 |
| | | |
| **DOLLARS PER MWH** | $20.4755 | $19.7896 |



EXHIBIT V-A-2

EXAMPLE OF GAS INDICES FROM NATURAL GAS WEEK

The attached pages show examples of Natural Gas Week used in determining the Market Price. The first page shows Major Market Prices, Houston Ship Channel, This Week. The second page shows Gas Price Report, Texas, West, Delivered to Pipeline.



## Gas Stock...

(continued from page 7)
may tend to support these stocks and help them do a little bit better than the market" as a whole.

### LDCs Fare Well in Period

Gas utilities are expected to come through a correction better than most stocks, if history is a predictor. In general, utility stocks have outperformed other stocks during market corrections. Utility stocks tend to behave more like bonds than stocks because of their guaranteed rate of return.

As of trading on Thursday, local distribution company (LDC) stocks were mostly stable relative to the overall market.

Washington Gas Light Co., for example, the Washington, D.C.-based utility, was down one-quarter of a point. Pacific Enterprises, holding company for Southern California Gas Co., was down to 30-1/8 from 30-3/4.

LDC stocks, traditionally a favorite of conservative investors, have in general been hovering somewhere between their 12-month highs and 12-month lows.

Subash Chandra, an analyst with Edward Jones in St. Louis who covers utilities, said he expects most to ride out a correction better than other stocks.

"In the last six corrections of the Standard and Poor's of 10% or greater, utilities outperformed the market by an average of 19% during the period of correction," he said.

One wild card, Chandra noted, is that LDCs are changing and becoming more market-oriented. He expects that over time that will mean gas utility stocks more closely follow the market.

"It doesn't appear that any of that is happening, but I think over time some differences will emerge," he said. "We'll definitely see winners and losers emerge with the winners being companies that can really ramp up growth."

"We're very positive [about gas stocks] because the fundamentals are strong," said Donato J. Eassey, an analyst with Merrill Lynch & Co. in Houston.

"Fundamentally speaking, the industry is growing," Eassey said. "It's a very positive environment. You have clean air issues that are very positive ...and you have a cheaper commodity across the board compared to electricity."

Parry, of John S. Herold, also remains bullish.

"I think as stocks get down to a better value, some of your bigger names have probably wrung out most of the decline," he said. "What you had was just the idea that investors were going to start to look at value now...and because of cash earnings the comparisons are not going to look as strong."

—Howard Buskirk, Sam Fletcher

### MAJOR MARKET PRICES
#### April 7, 1997
($/MMBtu)

|  | This Week | Weekly Change | Bid Week for Apr. |
| --- | --- | --- | --- |
| Chicago City Gate | 1.94 | 0.00 | 1.95 |
| New York City Gate | 2.19 | -0.01 | 2.16 |
| Houston Ship Channel | 1.83 | -0.07 | 1.83 |

NOTES: (1) Chicago City Gate prices are for gas delivered via interstate pipelines to Chicago's local distribution companies. (2) New York City Gate prices are for gas delivered to local distribution companies in New York City via interstate pipelines. (3) Houston Ship Channel prices are for gas delivered to the Houston Ship Channel. All prices are volume-weighted.

## Columbia...

(continued from page 1)
• ANR Pipeline Co. and Transcontinental Gas Pipe Line Corp. proposed the Independence Pipeline, which would flow gas from Chicago to a growing gas trading hub at Leidy, Pa.

• TransCanada PipeLines Ltd. (TCPL) said it plans to build an 800-mile pipeline to flow 1.2 Bcfd of gas from the Manitoba border to Chicago. TCPL's partner in the Viking Voyageur Gas Transmission project is Northern States Power Co.

Columbia is to own about 40% of the Millennium project and would operate the 36-inch diameter pipeline. Partners are CMS Energy Corp., MCN Energy Group Inc. and Westcoast Energy Inc.

The line would interconnect with the Great Lakes Gas Transmission L.P. and TCPL pipeline systems and also bring gas from Chicago through various links.

In making the announcement, Columbia officials stressed two advantages they say the project has over competitors.

First, the pipeline largely will follow existing right of way from a new TCPL delivery point at Lake Erie to Westchester County, N.Y. That factor should ease the process of obtaining regulatory approval. The pipeline is to run along existing right of way for 85% of its total length.

Second, Columbia said it will offer "the lowest rates available" of any of the proposed projects for getting gas to the New York market.

Columbia also already operates in the area and has experience working with state regulatory officials, whose approval will be needed.

Oliver G. (Rick) Richard III, chairman, CEO and president of Columbia, told *Natural Gas Week* the odds are "very good" that the project will be built.

"When you look at the rates of the competing projects, our rates are better than theirs'," Richard said. "And going along the existing right of way is a plus." During a press conference, Richard termed the project a "new, more efficient Northeast Passage for Canadian and U.S. gas."

Analysts say the Columbia proposal appears solid, although which projects will be built still remains to be seen.

### Playing Field Getting Crowded

"These guys probably have as good of a chance as any, but the playing field is getting a little crowded," said John F. Olson, an analyst with Merrill Lynch & Co. in Houston. "We have heard a lot of proposals. Let's see where the chips fall."

Ronald J. Barone, an analyst at PaineWebber Inc., rated the project's chances as "very good."

Barone sees as key the access the pipe would have to storage fields in Michigan and southern Ontario and the fact that it would follow existing lines.

"They already have the right of way," Barone said. "The line makes a lot of sense and we're not talking about a large dollar amount."

Analysts note that the current differential between the price of gas in western Canada and the price of gas at the New York city gate guarantees that at least one and probably several of the projects will be completed.

Columbia hopes to file for approval of the project with the Federal Energy Regulatory Commission this summer. The company plans to hold a 45-day open season starting May 1.
(continued on page 9)

# NorAm Subsidiary Wins Contract To Locate Underground Systems

NorAm Energy Corp. last week announced deals that would expand a trend of natural gas distribution companies focusing more resources on their nonregulated businesses.

NorAm subsidiary NorAm Damage Prevention was awarded five, two-year contracts to locate underground utility lines for Illinois utilities representing the natural gas, electric, telephone and cable television industries. The agreements, valued at $5.6 million, cover more than 10% of all utility lines in Illinois, NorAm said.

Nipsco Industries Inc., a utility holding company, recently purchased IWC Resources Corp. (NGW, 3-31-97, p.20), which owns the largest underground utility locating and marking service businesses in the United States.

NorAm Damage Prevention, which began operations in 1996, said that the line locating service helps utility companies prevent damage to underground delivery systems.

\* \* \*

Subsidiaries of Brooklyn Union Gas Co. (BUG) and Metrocom Inc. announced a joint venture to build and market Metrocom's Ricochet wireless network services in large metropolitan areas in 16 midwestern and northeastern states.

Through KeySpan Energy Services Inc. and Keyspan Energy Management Inc., BUG and Metrocom will invest as much as $25 million each over the first two years to build wireless modem and Internet infrastructure in areas including New York City, Chicago, Boston, Detroit and Philadelphia. The total investment could reach $300 million, the companies said.

"The market for energy and energy-management services brought on by the deregulation of the gas and electric industries has added to the demand for low-cost, mobile data communication," BUG said. "While building the data infrastructure for the converging energy market, the joint-venture company will also appeal to millions of consumers' interest in the latest generation of on-line service."

William K. Feraudo, BUG's senior vice president in charge of the KeySpan companies, said "Customers can read the morning news online, pay bills electronically or manage their offices from wherever they are within a Ricochet coverage area, whenever they want.

"In addition, our KeySpan energy-marketing companies can remotely control energy consumption, monitor equipment and read meters for customers," he said.

\* \* \*

Transcontinental Gas Pipe Line Corp. announced that it will hold an open season for its previously announced MarketLink Expansion Project — which will expand Transco's Leidy Line and market-area mainline facilities — from April 2 to May 30 for interested shippers.

\* \* \*

The *Natural Gas Week* composite spot wellhead price this week is $1.70/MMBtu, 5¢ less than last week's average price and 44¢ less than the April 8, 1996, average.

The spot delivered-to-pipeline price is $1.79, 5¢ less than last week's average and 42¢ less than last year's corresponding average.

—Scott C. Speaker

## GAS PRICE REPORT
($/MMBtu—Spot)
April 7, 1997

| | Interstate Wellhead | | Intrastate Wellhead | | Delivered To Pipeline | | Delivered To Utility | |
|---|---|---|---|---|---|---|---|---|
| | This Week | Bid Week for Apr | This Week | Bid Week for Apr | This Week | Bid Week for Apr | This Week | Bid Week for Apr |
| CALIFORNIA[1] | | | | | | | | |
| South | — | | 1.55 | 1.54 | 1.75 | 1.74 | 1.75 | 1.74 |
| North | — | | | 1.55 | 1.47 | 1.67 | 1.67 | |
| ROCKY MOUNTAINS | 1.33 | 1.32 | 1.30 | 1.29 | 1.45 | 1.44 | 1.78 | 1.77 |
| NEW MEXICO | 1.44 | 1.40 | — | | 1.61 | 1.57 | 1.76 | 1.72 |
| TEXAS | | | | | | | | |
| Gulf Coast, Offshore | 1.68 | 1.59 | 1.69 | 1.60 | 1.75 | 1.68 | — | |
| Gulf Coast, Onshore | 1.68 | 1.66 | 1.70 | 1.68 | 1.76 | 1.74 | 1.91 | 1.89 |
| Central | 1.55 | 1.51 | 1.55 | 1.51 | 1.64 | 1.60 | 1.81 | 1.77 |
| West | 1.61 | 1.56 | 1.61 | 1.56 | 1.68 | 1.63 | 1.76 | 1.71 |
| MID-CONTINENT | 1.63 | 1.62 | 1.61 | 1.60 | 1.73 | 1.72 | 1.95 | 1.83 |
| LOUISIANA | | | | | | | | |
| Gulf Coast, Offshore | 1.72 | 1.69 | 1.72 | 1.69 | 1.79 | 1.76 | — | |
| Gulf Coast, Onshore | 1.74 | 1.71 | 1.74 | 1.71 | 1.81 | 1.78 | 1.92 | 1.93 |
| North | 1.76 | 1.73 | 1.75 | 1.72 | 1.83 | 1.80 | 1.97 | 1.94 |
| MIDWEST | — | | — | | 1.73 | 1.73 | 1.94 | 1.95 |
| APPALACHIA | 1.93 | 1.90 | — | | 2.04 | 2.01 | 2.12 | 2.10 |
| SOUTHEAST | 1.71 | 1.63 | — | | 1.86 | 1.80 | 2.23 | 2.25 |
| NEW ENGLAND | — | | — | | 2.19 | 2.16 | 2.24 | 2.22 |

NOTES: *Spot* refers to contract durations of less than 12 months. All prices are volume-weighted averages of the most recently reported gas sales contracts and price renegotiations within periods of less than 12 months. (1) *California South* delivered-to-pipeline and delivered-to-utility prices represent gas delivered to the southern California border and to Wheeler Ridge, Calif., a gate station for Southern California Gas Co. *California North* delivered-to-pipeline prices represent gas that was delivered on Pacific Gas Transmission Co.'s system to Pacific Gas & Electric Co.'s (PG&E) Line 400 at Malin, Ore. *California North* delivered-to-utility prices represent gas delivered to PG&E's system at both northern and southern points, including Malin, Ore.; Daggett, Calif.; and Topock, Ariz., and can include prices for gas produced in California. Re-Revised. Due to a computer error, this figure was incorrectly reported in earlier editions.

☐ *I'd like to join the growing list of subscribers to Natural Gas Week:*

☐ Please sign me up for a subscription to *Natural Gas Week* at the following rate*:

☐ 1 year at $995 (Overseas Rate $1,105).
☐ 6 months at $575 (Overseas Rate $630).
☐ 2 years at $1,790 (Overseas Rate $1,990).

*New subscribers only, please. Offer expires 12/31/97.
Group discount rates, fax and online service rates available on request.

NAME _____
TITLE _____
COMPANY _____
STREET ADDRESS _____
CITY/STATE _____ ZIP _____
SIGNATURE _____

Mail to: *Natural Gas Week*, Circulation Dept., 1401 New York Ave., N.W., Suite 500, Washington, D.C. 20005-2150.
Telephone: 1-800-621-0050 or (202) 662-0700; for faster service, FAX this coupon to: (202) 347-8089.

CIEC47



Exhibit V-A-3

SAMPLE CALCULATION OF MARKET PRICE BALANCE ACCOUNT

This is an example of the monthly calculations of the "Cost of Energy", the Market Price Balance Account, and the Energy Reserve Account at the end of the month. This example has only 6 months for the sake of simplicity. The Annual True-Up is shown in Exhibit V-A-4.

INPUT DATA:

1. <u>Alcoa's Cost, $/MWh</u> is the "Floor Price" as defined in subsection (b) of Section II of Exhibit V-A of the Supplemental Agreement to Sandow Unit Four Agreement and shown in Exhibit V-A-1 as an example.

2. <u>Market Price, $/MWh</u> is in subsection (c) of Section II of Exhibit V-A of the Supplemental Agreement to Sandow Unit Four Agreement.

3. <u>Alcoa's Net Generation, MWh</u> is calculated in the monthly ALCOA Energy Billing Memorandum as "Alcoa Share of Net Generation".

4. <u>MWh Used by Alcoa</u> is reported in the monthly ALCOA Energy Billing Memorandum as the "Calculated Deliveries from Unit #4" which includes the effect of interchange accounting, Alcoa load, allowed sales to NG&E, if any, and the Mwh exempted by Alcoa, if any, under Section 5(k) of the Sandow Unit Four Agreement.

5. <u>MWh Sold to TU</u> is the Mwh elected by Alcoa to sell to TU Electric under Section 5.2 (a) of the Supplemental Agreement to Sandow Unit Four Agreement or Section III of Exhibit V-A of the Supplemental Agreement to Sandow Unit Four Agreement.

In addition, the "Balance Beginning of Month, $" (line 8) will be zero in the April 1997. The Energy Reserve Account (lines 23 and 24) in April 1997 will be equal to the end-of-the-month account totals for March 1997.

The following page of this example is a spreadsheet showing the monthly calculations with inputs defined above shown on lines 1 through 5. The calculations for lines 6 through 29 are defined in parentheses on the line after the name. All numbers in the parentheses refer to line numbers in this Exhibit.

EXHIBIT V-A-4

# MONTHLY ACCOUNTING

| Line Number | Calculations (Indicates Line Numbers) | Month A | Month B | Month C | Month D | Month E | Month F | ANNUAL |
|---|---|---|---|---|---|---|---|---|
| | **INPUT DATA** | | | | | | | |
| 1 | Alcoa's Cost, $/MWh (Input) | $20.00 | $22.00 | $24.00 | $20.00 | $50.00 | $20.00 | |
| 2 | Market Price, $/MWh (Input) | $22.00 | $20.00 | $26.00 | $26.00 | $28.00 | $24.00 | $28.00 |
| 3 | Alcoa's Net Generation, MWh (Input) | 400 | 400 | 300 | 400 | 0 | 230 | |
| 4 | MWh Used by Alcoa (Input) | 80 | 150 | 80 | 80 | 80 | 0 | |
| 5 | MWh Sold to TU (Input) | 320 | 250 | 220 | 220 | 10 | 250 | |
| | **MONTHLY PRICING** | | | | | | | |
| | *Floor Price* | | | | | | | |
| 6 | MWh Remaining Generation (3-4) | 320 | 250 | 220 | 320 | -80 | 230 | |
| 7 | Floor Price, $ (If 6<zero, y=zero, n=6*1) | $6,400.00 | $5,500.00 | $5,280.00 | $6,400.00 | $0.00 | $4,600.00 | |
| | *Market Price Balance Account* | | | | | | | |
| 8 | Balance Beginning of Month, $ (13 from previous month) | $0.00 | $0.00 | ($500.00) | ($62.20) | $0.00 | $0.00 | |
| 9 | Account Activity, $ (If 6<zero, y=zero, n=(2-1)*6) | $640.00 | ($500.00) | $440.00 | $1,920.00 | $0.00 | $920.00 | |
| 10 | Interest on Previous Month, $ (Interest rate *8) | $0.00 | $0.00 | ($2.20) | ($0.27) | $0.00 | $0.00 | |
| 11 | Account Bal before Pricing (8+9+10) | $640.00 | ($500.00) | ($62.20) | $1,857.53 | $0.00 | $920.00 | |
| 12 | Amount Added to Price (If 11<zero, y=zero, n=11/two) | $320.00 | $0.00 | $0.00 | $928.76 | $0.00 | $460.00 | |
| 13 | Account Bal E.O.M. $ (If 12>zero, y=zero, n=11) | $0.00 | ($500.00) | ($62.20) | $0.00 | $0.00 | $0.00 | |
| 14 | Total $ (Floor + Market) (12+7) | $6,720.00 | $5,500.00 | $5,280.00 | $7,328.76 | $0.00 | $5,060.00 | |
| 15 | Total Price, $/MWh (If 6=zero, y=zero, n=14/6) | $21.00 | $22.00 | $24.00 | $22.90 | $0.00 | $22.00 | |
| | **ENERGY SOLD TO TU** | | | | | | | |
| 16 | This Month Gen to TU, MWh (If 5>8, y=(If 6>zero, y=6, n=zero), n=5) | 320 | 250 | 220 | 220 | 0 | 230 | |
| 17 | This Month Gen to TU, $ (15*16) | $6,720.00 | $5,500.00 | $5,280.00 | $5,038.52 | $0.00 | $5,060.00 | |
| 18 | ERA to TU, MWh (If 6<5, y=(If 6<zero, y=5, n=(5-6)), n=zero) | 0 | 0 | 0 | 0 | 10 | 20 | |
| 19 | ERA to TU, $ (18*25) | $0.00 | $0.00 | $0.00 | $0.00 | $190.08 | $380.16 | |
| 20 | Total MWh to TU (16 + 18) | 320 | 250 | 220 | 220 | 10 | 250 | 1,270 |
| 21 | Total $ paid by TU (17 + 19) | $6,720.00 | $5,500.00 | $5,280.00 | $5,038.52 | $190.08 | $5,440.16 | $28,168.78 |
| 22 | Total $/MWh Paid by TU (If 20>zero, y=21/20, n=zero) | $21.00 | $22.00 | $24.00 | $22.90 | $19.01 | $21.76 | $22.18 |
| | **ENERGY RESERVE ACCOUNT** | | | | | | | |
| 23 | ERA Beginning Balance, MWh (28 from previous month) | 50,000 | 50,000 | 50,000 | 50,000 | 50,100 | 50,010 | |
| 24 | ERA Beginning Balance, $ (29 from previous month) | $950,000.00 | $950,000.00 | $950,000.00 | $950,000.00 | $952,280.24 | $950,579.54 | |
| 25 | ERA Average Price (24/23) | $19.00 | $19.00 | $19.00 | $19.00 | $19.01 | $19.01 | |
| 26 | MWh to/(from) ERA (6-5) | 0 | 0 | 0 | 100 | -90 | -20 | |
| 27 | Dollars to/(from) ERA (If 26>zero, y=26*15, n=26*25) | $0.00 | $0.00 | $0.00 | $2,280.24 | ($1,700.70) | ($380.16) | |
| 28 | ERA Balance E.O.M. MWh (23+26) | 50,000 | 50,000 | 50,000 | 50,100 | 50,010 | 49,990 | 49,990 |
| 29 | ERA Balance E.O.M. $ (24+27) | $950,000.00 | $950,000.00 | $950,000.00 | $952,280.24 | $950,579.54 | $950,199.38 | $950,199.38 |

Exhibit V-A-4

SAMPLE CALCULATION OF ANNUAL TRUE-UP

This is an example of the Annual True-Up of monthly calculations of the "Cost of Energy", the Market Price Balance Account, and the Energy Reserve Account at the end of the month. This example has only 6 months (the same 6 months as Exhibit V-A-3) for the sake of simplicity.

The definitions in this Exhibit V-A-4 are identical to Exhibit V-A-3 except for "Alcoa's Cost, $/Mwh" and the "Interest on Previous Month, $." The Annual True-Up recalculates the monthly accounting with the same inputs except substitutes the annual "Floor Price" for each of the monthly "Floor Price". In addition, the original calculated values of "Interest on Previous Month, $" are used in the True-Up calculations.

INPUT DATA:

1. Alcoa's Cost, $/MWh is the "Floor Price" as defined in subsection (b) of Section II of Exhibit V-A of the Supplemental Agreement to Sandow Unit Four Agreement using the "Year-to-Date" Production Expense Report.
2. Market Price, $/MWh is in subsection (c) of Section II of Exhibit V-A of the Supplemental Agreement to Sandow Unit Four Agreement.
3. Alcoa's Net Generation, MWh is calculated in the monthly ALCOA Energy Billing Memorandum as "Alcoa Share of Net Generation".
4. MWh Used by Alcoa is reported in the monthly ALCOA Energy Billing Memorandum as the "Calculated Deliveries from Unit #4" which includes the effect of interchange accounting, Alcoa load, allowed sales to NG&E, if any, and the MWh exempted by Alcoa, if any, under Section 5(k) of the Sandow Unit Four Agreement.
5. MWh Sold to TU is the Mwh elected by Alcoa to sell to TU under Section 5.2 (a) of the Supplemental Agreement to Sandow Unit Four Agreement or Section III of Exhibit V-A of the Supplemental Agreement to Sandow Unit Four Agreement.
6. Interest on MPBA is the monthly interest calculated on line 10 of Exhibit V-A-3 Supplemental Agreement to Sandow Unit Four Agreement.

In addition, the "Balance Beginning of Month, $" (line 38) will be zero in the April 1997. The Energy Reserve Account (lines 53 and 54) in April 1997 will be equal to the end-of-the-month account totals for March 1997.

The following page of this example is a spreadsheet showing the monthly calculations with inputs defined above shown on lines 30 through 35. The calculations for lines 36 through 59 are defined in parentheses on the line after the name. All numbers in the parentheses refer to line numbers in either this Exhibit or in Exhibit V-A-3 except in line 42 in which the /2.0 means divided by 2 or one-half, and except for the number "0".

EXHIBIT V-A-5

# ANNUAL TRUE-UP

| Line Number | Calculations (Indicates Line Numbers) | Month A | Month B | Month C | Month D | Month E | Month F | ANNUAL |
|---|---|---|---|---|---|---|---|---|
| **INPUT DATA** | | | | | | | | |
| 30 | Alcoa's Cost, $/MWh (Input) | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 |
| 31 | Market Price, $/MWh (Input same as 2) | $22.00 | $20.00 | $26.00 | $26.00 | $28.00 | $24.00 | |
| 32 | Alcoa's Net Generation, MWh (Input same as 3) | 400 | 400 | 400 | 400 | 0 | 350 | |
| 33 | MWh Used by Alcoa (Input same as 4) | 80 | 150 | 180 | 80 | 80 | 120 | |
| 34 | MWh Sold to TIU (Input same as 5) | 320 | 250 | 220 | 220 | 10 | 250 | |
| 35 | Interest on MPBA (Input from monthly calculations 10) | $0.00 | $0.00 | ($2.20) | ($0.27) | $0.00 | $0.00 | |
| **MONTHLY PRICING** | | | | | | | | |
| | **Floor Price** | | | | | | | |
| 36 | MWh Remaining Generation (32-33) | 320 | 250 | 220 | 320 | -80 | 230 | |
| 37 | Floor Price, $ (if 36<zero, y=zero, n=30*36) | $8,960.00 | $7,000.00 | $6,160.00 | $8,960.00 | $0.00 | $6,440.00 | |
| | **Market Price Balance Account** | | | | | | | |
| 38 | Balance Beginning of Month, $ (43 from previous month) | $0.00 | ($1,920.00) | ($3,920.00) | ($4,362.20) | ($5,002.47) | ($5,002.47) | |
| 39 | Account Activity, $ (if 36<zero, y=zero, n=(31-30)*36) | ($1,920.00) | ($2,000.00) | ($440.00) | ($640.00) | $0.00 | ($920.00) | |
| 40 | Interest on Previous Month, $ (35) | $0.00 | $0.00 | ($2.20) | ($0.27) | $0.00 | $0.00 | |
| 41 | Account Bal before Pricing (38+39+40) | ($1,920.00) | ($3,920.00) | ($4,362.20) | ($5,002.47) | ($5,002.47) | ($5,922.47) | |
| 42 | Amount Added to Price (if 41<zero, y=zero, n=41)(two) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| 43 | Account Bal E-O-M, $ (if 42<zero, y=zero, n=41) | ($1,920.00) | ($3,920.00) | ($4,362.20) | ($5,002.47) | ($5,002.47) | ($5,922.47) | |
| 44 | Total $ (Floor + Market) (37+42) | $8,960.00 | $7,000.00 | $6,160.00 | $8,960.00 | $0.00 | $6,440.00 | |
| 45 | Total Price, $/MWh (if 36<zero, y=zero, n=44/36) | $28.00 | $28.00 | $28.00 | $28.00 | $0.00 | $28.00 | |
| **ENERGY SOLD TO TIU** | | | | | | | | |
| 46 | This Month Gen to TIU, MWh (if 34>38,y=(if 36<zero,y=zero,n=38),n=34 | 320 | 250 | 220 | 220 | 0 | 230 | |
| 47 | This Month Gen to TIU, $ (45*46) | $8,960.00 | $7,000.00 | $6,160.00 | $6,160.00 | $0.00 | $6,440.00 | |
| 48 | ERA to TIU, MWh (if 36<34, y=(if 36<zero, y=34, n=(34-38)), n=zero) | 0 | 0 | 0 | 0 | 10 | 20 | |
| 49 | ERA to TIU, $ (48*(55 from previous month)) | $0.00 | $0.00 | $0.00 | $0.00 | $190.18 | $380.36 | |
| 50 | Total MWh to TIU (46+48) | 320 | 250 | 220 | 220 | 10 | 250 | 1,270 |
| 51 | Total $ paid by TIU (47+49) | $8,960.00 | $7,000.00 | $6,160.00 | $6,160.00 | $190.18 | $6,820.36 | $35,290.54 |
| 52 | Total $/MWh Paid by TIU (if 50>zero, y=51/50, n=zero) | $28.00 | $28.00 | $28.00 | $28.00 | $19.02 | $27.28 | $27.79 |
| **ENERGY RESERVE ACCOUNT** | | | | | | | | |
| 53 | ERA Beginning Balance, MWh (58 from previous month) | 50,000 | 50,000 | 50,000 | 50,000 | 50,100 | 50,010 | |
| 54 | ERA Beginning Balance, $ (59 from previous month) | $950,000.00 | $950,000.00 | $950,000.00 | $950,000.00 | $952,800.00 | $951,088.38 | |
| 55 | ERA Average Price ($54/53) | 19 | 19 | 19 | 19 | 19.017984 | 19.017984 | |
| 56 | MWh to/(From) ERA (36-34) | 0 | 0 | 0 | 100 | -90 | -20 | |
| 57 | Dollars to/(From) ERA (if 56<zero, y=56*55, n=56*45) | $0.00 | $0.00 | $0.00 | $2,800.00 | ($1,711.62) | ($380.36) | |
| 58 | ERA Balance E-O-M, MWh (53+56) | 50,000 | 50,000 | 50,000 | 50,100 | 50,010 | 49,990 | 49,990 |
| 59 | ERA Balance E-O-M, $ (54+57) | $950,000.00 | $950,000.00 | $950,000.00 | $952,800.00 | $951,088.38 | $950,708.02 | $950,708.02 |

Exhibit V-A-4 cont.

After all of the months applicable for that year are recalculated, the new calculated value of "Account Balance E-O-M, $" and "ERA Balance E-O-M, $" are used as the end-of-the-month (and end-of-the-year) values to begin the next year. If the difference in the "Total $ paid by TU" (Annual True-Up minus the original calculation) is positive, TU Electric will pay Alcoa the difference. If the difference is negative, Alcoa will pay TU Electric the difference.

In this example, the original payments from TU Electric for purchased power ("Total $ paid by TU") and the resulting Market Price Balance Account and Energy Reserve Account in Exhibit V-A-3 are as follows:

Payment : $28,168.76
Market Price Balance Account: $0
Energy Reserve Account: 49,990 MWh and $950,199.38

The Annual True-Up calculations show the following values from this example:

Payment : $35,290.54
Market Price Balance Account: ($5,922.47)
Energy Reserve Account: 49,990 MWh and $950,708.02

The final results are :

TU owes Alcoa ($35,290.54 - $28,168.76) = $7,121.78
The end-of-year Market Price Balance Account will be changed to ($5,922.47) and the Energy Reserve Account will be 49,990 MWh and the dollar value will be changed to $950,708.02.

EXHIBIT XVI-A

SAMPLE CALCULATION OF COST ADJUSTMENT PAYMENT

Example of the calculation of the Cost Adjustment Payment that TU Electric pays Alcoa as described in Section 16 of the Sandow Unit Four Agreement. Using April 1997 for example purposes only, the Cost of Capital charge is shown on page 16 of the Sandow Station Operating Report and Contract Summary as $1,390,867.38 (attached). The Cost Adjustment Payment is calculated by multiplying the Net Book Value at the end of the previous month by 450/545 and multiplying that product by .154/12 (as adjusted), the interest rate divided by 12. The difference between this result and the Cost of Capital is the Cost Adjustment

Calculation per Section 16 : $115,508,224.68  x  450/545 x  0.154/12  =  $1,223,963.30

TU's Cost Adjustment Payment to Alcoa        $ 166,904.09

**TU ELECTRIC**

| | |
|---|---|
| INVOICE # | TG - 568 |
| DATE: | April 30, 1997 |
| OUR NUMBER: | SASES 4 AGREEMENT |
| TERMS: | Net 15 days |

SOLD TO:   **ALUMINUM COMPANY OF AMERICA**
ADDRESS:   **ROCKDALE, TEXAS  76567**

Please wire transfer funds to:
 NCNB Texas
 ABA # 111000025
 For credit to TU ELECTRIC
 Account # 1254814525
 Reference:  Cost of Capital and Depreciation

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

To charge Alcoa for April 1997
Cost of Capital and Depreciation under
Section 9 (b) of the Sandow Unit 4 Agreement.

| | | |
|---|---|---|
| Cost of Capital charge at 17.5% per annum on Net Book Value at 03/31/97 of | $115,508,224.68 | |
| (1/12 of 450/545) | | $1,390,867.38 |
| Depreciation at 4% per annum on depreciable assets at 03/31/97 of | $272,606,270.07 | |
| (1/12 of 450/545) | | 750,292.49 |
| Retirements 450/545 of net book value | | 0.00 |
| | | $2,141,159.87 |

16

EXHIBIT XVI-B

SAMPLE CALCULATION OF COST ADJUSTMENT PAYMENT

Example of the calculation of the Cost Adjustment Payment that Alcoa pays TU Electric as described in Section 16 of the Sandow Unit Four Agreement. Using April 1997 for example purposes only, the Cost of Capital charge is shown on a new page 25a of the Sandow Station Operating Report and Contract Summary as $116,051.87 for Section 7 and $23,509.88 for Section 8 (attached). The Cost Adjustment Payment is calculated by multiplying the Net Book Value at the end of the previous month by the percentage shown below (95/870 or 95/545) and multiplying that product by .154/12 (as adjusted), the interest rate divided by 12. The difference between this result and the Cost of Capital is the Cost Adjustment Payment.

Calculation per Section 16 for Section 7 (95/870) :

$$\$65,402,510 \text{ x } 95/870 \text{ x } 0.154/12 = \$91,651.22$$

Calculation per Section 16 for Section 8(g)(i) (95/545):

$$\$8,299,845 \text{ x } 95/545 \text{ x } 0.154/12 = \$18566.78$$

Calculation per Section 16 for Section 8(g)(ii) (95/870)

$$\$0 \text{ x } 95/870 \text{ x } 0.154/12 = \$0$$

Calculation per Section 16 for Section IV B of Exhibit VIII-A (95/870)

$$\$0 \text{ x } 95/870 \text{ x } 0.154/12 = \$0$$

Alcoa's Cost Adjustment Payment to TU      $24,400.65 + $4,943.10 + $0 + $0  = $29,343.75



New page 25a for the Sandow Station Operating Report and Contract Summary:

**To charge TU Electric for April 1997**
Cost of Capital under Section 7
of the Sandow Unit Four Agreement

\* Cost of Capital charge at 19.5% per
   annum on Net Book Value at
   03/31/97 of                     $65,402,510

   (1/12 of 95/870)                             $116,051.87


**To charge TU Electric for April 1997**
Cost of Capital under Section 8(g)(i)
of the Sandow Unit Four Agreement

\* Cost of Capital charge at 19.5% per
   annum on Net Book Value at
   03/31/97 of                     $8,299,845

   (1/12 of 95/545)                             $23,509.88


**To charge TU Electric for April 1997**
Cost of Capital under Section 8(g)(ii)
of the Sandow Unit Four Agreement

\* Cost of Capital charge at 19.5% per
   annum on Net Book Value at
   03/31/97 of                     $0

   (1/12 of 95/870)                             $0


**To charge TU Electric for April 1997**
Cost of Capital under Section IV B of Exhibit VIII-A
of the Supplemental Agreement to Sandow Unit Four Agreement

\* Cost of Capital charge at 19.5% per
   annum on Net Book Value at
   03/31/97 of                     $0

   (1/12 of 95/870)                             $0

Compromise Settlement Agreement

Attachment C: Transition Agreement

# 2nd Amendment to Contracts

This 2nd Amendment to Contracts (this "2nd Amendment") dated *May 4*, 1998, is between **Aluminum Company of America** ("Alcoa"), a Pennsylvania corporation, with offices in Rockdale, Milam County, Texas, and **Texas Utilities Electric Company** ("TU Electric"), a Texas corporation with offices in Dallas, Dallas County, Texas, which is the successor by merger to Texas Power & Light Company.

## Recitals

On June 30, 1997, the parties executed an "Amendment to Contracts," after this called the "1st Amendment." A table in the 1st Amendment was in error, and the purpose of this 2nd Amendment is to correctly state that table.

## Agreements

In consideration of the mutual promises and agreements contained in this 2nd Amendment, including the recitals set forth above, the parties agree as follows:

1. **Corrected Table.** Section 1 of the 1st Amendment added a new Section 16 to the Sandow Unit Four Agreement dated August 13, 1976. Subsection (c)(ii) of that new Section 16 contained a table. The table below hereby replaces the table that was in Subsection (c)(ii) of that new Section 16:

| U.S. Treasuries Rate for Previous Year | Alternate Cost of Capital Rate for Current Year |
|---|---|
| Less than 5.00% | 13.4% minus 1% for each whole 1% that the US Treasuries Rate is less than 5.00% |
| Equal to or greater than 5.00% and less than 6.00% | 14.4% |
| Equal to or greater than 6.00% and less than 9.00% | 15.4% |
| Equal to or greater than 9.00% and less than 10.00% | 16.4% |
| Equal to or greater than 10.00% and less than 11.00% | 17.4% |
| Equal to or greater than 11.00% | 17.5% |

1

**2. Effective Date.** This 2nd Amendment is effective as of April 1, 1997.

**3. Successors and Assigns.** This 2nd Amendment is binding on and inures to the benefit of the parties and their respective successors and permitted assigns.

**4. Execution in Counterparts.** This 2nd Amendment may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes.

**5. Alcoa's General Representations and Warranties.** Alcoa now represents and warrants unconditionally to TU Electric that:

a.    Alcoa is a corporation duly organized, validly existing, in good standing under the laws of the Commonwealth of Pennsylvania, and is authorized to do business in the State of Texas.

b.    Alcoa has full corporate power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this 2nd Amendment.

c.    The making and performance by Alcoa of this 2nd Amendment have been duly authorized by the necessary corporate action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to Alcoa, violate any provision of Alcoa's Articles of Incorporation or Bylaws, or result in a breach of, or constitute a default under, any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which Alcoa is a party or by which it or its property is bound or affected.

**6. TU Electric's General Representations and Warranties.** TU Electric now represents and warrants unconditionally to Alcoa that:

a.    TU Electric is a corporation duly organized, validly existing, and in good standing under the laws of the State of Texas.

b.    TU Electric has full corporate power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this 2nd Amendment.

c.    The making and performance by TU Electric of this 2nd Amendment have been duly authorized by all necessary corporate action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to TU Electric, violate any provision of TU Electric's Articles of Incorporation or Bylaws, or result in a breach of or constitute a default under any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which TU Electric is a party or by which it or its property is bound or affected.

2

**7. No Rights of Third Parties.** This 2nd Amendment is intended only for the parties' benefit. Nothing in this 2nd Amendment may be construed to create any duty to, any standard of care concerning, or any liability to, any person not a party to this 2nd Amendment.

**8. Subject to Applicable Laws.** This 2nd Amendment is subject to applicable federal, state, and local laws, ordinances, rules, and regulations. Nothing in this 2nd Amendment may be construed as a waiver of any right to question or contest any law, ordinance, rule, regulation, or asserted regulatory jurisdiction.

**9. Amendment.** This 2nd Amendment may be amended at any time, but only upon the parties' written agreement.

**10. No Waiver.** The waiver of a breach of any provision of this 2nd Amendment does not waive any other breach of that provision or of any other provision.

**11. Complete Amendment.** This 2nd Amendment represents the parties' final and mutual understanding with respect to its subject matter. No representations, inducements, promises, or agreements, oral or otherwise, have been relied upon or made by any party, or anyone on behalf of a party, that are not fully expressed in this 2nd Amendment. An agreement, statement, or promise not contained in this 2nd Amendment is not valid or binding.

**12. Choice of Law.** This 2nd Amendment must be construed, and its performance enforced, under Texas law.

**13. Severability.** If any provision of this 2nd Amendment is found to be invalid or unenforceable, that provision is severed from the remainder of this 2nd Amendment, and the parties shall immediately negotiate in good faith and agree to a replacement provision that is valid and enforceable and that puts each party in substantially the same position that the party was in before the original provision was found to be invalid or unenforceable. This 2nd Amendment, as so modified, continues in full force and effect. If the application of any provision of this 2nd Amendment to any person or circumstance is found to be invalid or unenforceable, then that provision remains valid and enforceable as applied to other persons and circumstances.

Signed as of the date first mentioned above.

**Aluminum Company of America**

By: _Al Chula_

Title: _President, Primary Metals_

**Texas Utilities Electric Company**

By: _S. M. Phille_

Title: _VICE PRESIDENT_

3

# 3rd Amendment to Contracts

This 3rd Amendment to Contracts (this "3rd Amendment") dated November 6, 1998, is between **Aluminum Company of America** ("Alcoa"), a Pennsylvania corporation, with offices in Rockdale, Milam County, Texas, and **Texas Utilities Electric Company** ("TU Electric"), a Texas corporation with offices in Dallas, Dallas County, Texas, which is the successor by merger to Texas Power & Light Company.

## Recitals

On June 30, 1997, the parties executed an "Amendment to Contracts," after this called the "1st Amendment." On May 4, 1998, the parties executed a "2nd Amendment to Contracts," after this called the "2nd Amendment." The Sandow Unit Four Agreement dated August 13, 1976, as amended by the 1st Amendment and the 2nd Amendment and by any other applicable amendments, is after this called the "Amended Sandow Unit Four Agreement". Alcoa has notified TU Electric that Alcoa was considering whether to exercise its option under Section 5(k) of the Amended Sandow Unit Four Agreement to exempt 33 MW from the restrictions of Section 5(k) that prohibit Alcoa from selling electricity to anyone other than TU Electric. After discussions, the parties agreed that Alcoa would sell that 33 MW to TU Electric for five years rather than to any third party and that Alcoa's right to later exempt and sell up to 33 MW to third parties would be preserved. This 3rd Amendment is to carry out that agreement.

## Agreements

In consideration of the mutual promises and agreements contained in this 3rd Amendment, including the recitals set forth above, the parties agree as follows:

1.     **Amendment to Section 5(k).**  Section 8 of the 1st Amendment added new subsections (k) and (l) to Section 5 of the Amended Sandow Unit Four Agreement dated August 13, 1976. That subsection (k) is hereby amended to read as follows:

(k)     (i)     Alcoa is prohibited from reselling, redelivering, assigning, or otherwise transferring any of the power and energy that it purchases from TU Electric under the Amended Sandow Unit Four Agreement to any entity other than TU Electric, except as provided in this Section 5(k).

(ii)     On and after January 1, 2004, Alcoa may exempt up to 33 megawatts of power and energy from the restrictions of Section 5(k)(i) above. Alcoa may exercise this exemption at any time by giving TU Electric not less than 90 days written notice, stating the effective date and the amount exempted. Alcoa may exercise this exemption up to three times, but the total amount exempted under all such exemptions cannot exceed 33 megawatts. All megawatts so exempted must be exempted for 24 hours per day (*i.e.*, at a 100% capacity factor).

1

(iii)    After an exemption under this Section 5(k) is exercised and the exemption takes effect, TU Electric is no longer obligated to take, pay for, or bank that portion of the power and energy. If in any hour Alcoa is not delivering all of the exempted power and energy to another party (including locations of Alcoa, its subsidiaries, or its affiliates, other than Rockdale), then Alcoa may not declare any surplus energy for that hour. If in any hour Alcoa is not delivering all of the exempted power and energy to another party (including locations of Alcoa, its subsidiaries, or its affiliates, other than Rockdale), then the energy that would otherwise be credited to the Energy Reserve Account for that hour under the other provisions of the Amended Sandow Unit Four Agreement and under provisions of other agreements must be reduced by the amount of the exempted power and energy that is not being delivered to another party (including locations of Alcoa, its subsidiaries, or its affiliates, other than Rockdale).

(iv)    From the beginning of January 1, 1999 until the end of December 31, 2003, Alcoa shall sell and deliver firm electric energy to TU Electric out of the firm electric energy that Alcoa is purchasing under the Amended Sandow Unit Four Agreement at a constant rate of 33 MW with a 100% capacity factor, and TU Electric shall purchase, receive, and pay for that firm electric energy. Firm electric energy sold under this subsection is called "Exemption Energy." The sale of the Exemption Energy does not change the calculation of costs and prices under the Amended Sandow Unit Four Agreement, but the sale of the Exemption Energy is treated as Alcoa load for purposes of determining how much firm electric energy Alcoa has taken under the Amended Sandow Unit Four Agreement. TU Electric shall pay Alcoa for the Exemption Energy at the following rates:

| Year | Rate (per MWh) |
|------|----------------|
| 1999 | $30.00 |
| 2000 | $30.90 |
| 2001 | $31.83 |
| 2002 | $32.78 |
| 2003 | $33.77 |

2. **Effective Date.** This 3ʳᵈ Amendment is effective as of November 6, 1998.

3. **Successors and Assigns.** This 3ʳᵈ Amendment is binding on and inures to the benefit of the parties and their respective successors and permitted assigns.

4. **Execution in Counterparts.** This 3ʳᵈ Amendment may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes.

5. **Alcoa's General Representations and Warranties.** Alcoa now represents and warrants unconditionally to TU Electric that:

a.  Alcoa is a corporation duly organized, validly existing, in good standing under the laws of the Commonwealth of Pennsylvania, and is authorized to do business in the State of Texas.

b.  Alcoa has full corporate power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this 3rd Amendment.

c.  The making and performance by Alcoa of this 3rd Amendment have been duly authorized by the necessary corporate action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to Alcoa, violate any provision of Alcoa's Articles of Incorporation or Bylaws, or result in a breach of, or constitute a default under, any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which Alcoa is a party or by which it or its property is bound or affected.

**6. TU Electric's General Representations and Warranties.** TU Electric now represents and warrants unconditionally to Alcoa that:

a.  TU Electric is a corporation duly organized, validly existing, and in good standing under the laws of the State of Texas.

b.  TU Electric has full corporate power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this 3rd Amendment.

c.  The making and performance by TU Electric of this 3rd Amendment have been duly authorized by all necessary corporate action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to TU Electric, violate any provision of TU Electric's Articles of Incorporation or Bylaws, or result in a breach of or constitute a default under any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which TU Electric is a party or by which it or its property is bound or affected.

**7. No Rights of Third Parties.** This 3rd Amendment is intended only for the parties' benefit. Nothing in this 3rd Amendment may be construed to create any duty to, any standard of care concerning, or any liability to, any person not a party to this 3rd Amendment.

**8. Subject to Applicable Laws.** This 3rd Amendment is subject to applicable federal, state, and local laws, ordinances, rules, and regulations. Nothing in this 3rd Amendment may be construed as a waiver of any right to question or contest any law, ordinance, rule, regulation, or asserted regulatory jurisdiction.

**9. Amendment.** This 3rd Amendment may be amended at any time, but only upon the parties' written agreement.

3

**10. No Waiver.** The waiver of a breach of any provision of this 3rd Amendment does not waive any other breach of that provision or of any other provision.

**11. Complete Amendment.** This 3rd Amendment, the 1st Amendment, the 2nd Amendment, and the contracts that they respectively amend, represents the parties' final and mutual understanding with respect to its subject matter. No representations, inducements, promises, or agreements, oral or otherwise, have been relied upon or made by any party, or anyone on behalf of a party, that are not fully expressed in this 3rd Amendment, the 1st Amendment, the 2nd Amendment, and the contracts that they respectively amend. An agreement, statement, or promise not contained in this 3rd Amendment, the 1st Amendment, the 2nd Amendment, and the contracts that they respectively amend, is not valid or binding.

**12. Choice of Law.** This 3rd Amendment must be construed, and its performance enforced, under Texas law.

**13. Severability.** If any provision of this 3rd Amendment is found to be invalid or unenforceable, that provision is severed from the remainder of this 3rd Amendment, and the parties shall immediately negotiate in good faith and agree to a replacement provision that is valid and enforceable and that puts each party in substantially the same position that the party was in before the original provision was found to be invalid or unenforceable. This 3rd Amendment, as so modified, continues in full force and effect. If the application of any provision of this 3rd Amendment to any person or circumstance is found to be invalid or unenforceable, then that provision remains valid and enforceable as applied to other persons and circumstances.

Signed as of the date first mentioned above.

**Aluminum Company of America**

By: _Au C Renton_

Title: _President, Primary Metals_
_Vice President, Alcoa_

**Texas Utilities Electric Company**

By: _S H Miller_

Title: _____

4

**Proprietary and Confidential**

# 4th Amendment to Contracts

This 4th Amendment to Contracts (this "Amendment") dated as of October 31, 2000, is between **Alcoa Inc.** ("Alcoa"), a Pennsylvania corporation with offices in Rockdale, Milam County, Texas, which was formerly known as "Aluminum Company of America," and **TXU Electric Company** ("TXU Electric"), a Texas corporation with offices in Dallas, Dallas County, Texas, which was formerly known as "Texas Utilities Electric Company" and which is the successor by merger to Texas Power & Light Company.

## Recitals

The parties have entered into several written contracts (the "Sandow Contracts") concerning four lignite-fueled electric generating units located near Rockdale, Texas. These Sandow Contracts include, without limitation, the following:

- Power Contract dated August 29, 1951 (the "Power Contract");

- Operating Contract dated August 29, 1951 (the "Operating Contract");

- Sandow Unit Four Agreement dated August 13, 1976 (the "Sandow Unit Four Agreement");

- Supplemental Agreement to Sandow Unit Four Agreement dated March 2, 1981 (the "Supplemental Sandow Unit Four Agreement"); and

- a Letter Agreement from Pitt Pittman of TU Electric to R.C. Rawe of Alcoa dated June 11, 1991 (the "Payback Agreement").

On June 30, 1997, Alcoa and TXU Electric entered into an "Amendment to Contracts." On May 4, 1998, Alcoa and TXU Electric entered into a "2nd Amendment to Contracts." On November 6, 1998, Alcoa and TXU Electric entered into a "3rd Amendment to Contracts." The Sandow Unit Four Agreement dated August 13, 1976, as amended by the Amendment to Contracts, the 2nd Amendment to Contracts, and the 3rd Amendment to Contracts, and by any other applicable amendments, is after this called the "Amended Sandow Unit Four Agreement."

During the summer of 2000, the Sandow Unit Four that is the subject of the Amended Sandow Unit Four Agreement was tested to establish the increase in capacity caused by the modifications made during its 2000 overhaul. The parties have agreed that the 380 MW that TXU Electric is obligated to furnish to Alcoa under the Amended Sandow Unit Four Agreement dated August 13, 1976, will be increased by 18 MW, and that the 33 MW that Alcoa is permitted to exempt from certain restrictions under Section 5(k) of the Amended Sandow Unit Four Agreement will also be increased by 18 MW.

Pursuant to Section II(c)(ii) of Exhibit V-A of the Supplemental Sandow Unit Four Agreement, as amended by the Amendment to Contracts, either party may commence a 30-day good-faith negotiation with the other party about changing the definition of "Market Price."

**Proprietary and Confidential**

Alcoa has delivered such a written notice to TXU Electric, the parties have completed their negotiations on that subject, and this Amendment is intended, as a written amendment of Exhibit V-A of the Supplemental Sandow Unit Four Agreement, to change the definition of "Market Price" and to make changes related to the increase in Sandow Unit Four capacity. The parties have been informally negotiating on the subject of "Market Price" for much longer than 30 days, and they have therefore agreed to make the changes related to the change in that definition effective as of August 1, 1999.

## Agreements

In consideration of the mutual promises and agreements contained in this Amendment, including the recitals set forth above, Alcoa and TXU Electric agree as follows:

1.  **Change of Amount of Firm Power Sale.** All of the changes in this Section 1 are effective as of November 1, 2000.

    (a)    Section 5(b) of the Amended Sandow Unit Four Agreement is hereby amended to read as follows:

        (b)    Except as otherwise provided herein, from and after completion and commercial operation of Unit Four through October 31, 2000, TXU Electric will supply and sell to Alcoa, and Alcoa agrees to purchase 380 MW of firm power and related energy at the price herein provided. Except as otherwise provided herein, on and after November 1, 2000, TXU Electric will supply and sell to Alcoa, and Alcoa agrees to purchase 398 MW of firm power and related energy during the term of this Agreement at the price herein provided.

    (b)    Section 9(d) of the Amended Sandow Unit Four Agreement is hereby amended to read as follows:

        (d)    The amount to be paid to TXU Electric by Alcoa pursuant to Section 9(b) hereof shall be reduced on a proportionate basis to the extent that TXU Electric does not make available 398 MW of power and energy to Alcoa as provided herein. Said reduction, if any, will be calculated on a calendar year basis, or portion thereof, from the date of commercial operation of Unit Four. The amount of said reduction shall be the difference between the total amount otherwise payable by Alcoa pursuant to Section 9(b) and an amount equal to said total amount multiplied by a fraction wherein the numerator is the average annual MW actually made available to Alcoa by TXU Electric (less any MW not taken by Alcoa pursuant to Section 5(h) hereof) and the denominator is 398.

    (c)    The second sentence of Section I of Exhibit V-A to the Amended Sandow Unit Four Agreement is hereby amended to read as follows:

**Proprietary and Confidential**

After allocating 95/545ths of such net generation to TXU Electric and after allocating the amount of energy delivered by TXU Electric to Alcoa under the provisions of the Sandow Unit Four Agreement but not to exceed 398,000 kWh (except as provided in Section 5.3(b) of the Supplemental Sandow Unit Four Agreement), the remainder of such net generation shall be debited to the Energy Reserve Account.

(d)     The third and fourth sentences of Section III of Exhibit V-A to the Amended Sandow Unit Four Agreement are hereby amended to read as follows:

To eliminate a debit balance in such account, TXU Electric may, from time to time, in its discretion and with the concurrence of Alcoa, deliver power and energy to Alcoa, on an interruptible basis, in excess of 398 MW. Likewise, Alcoa may declare all or a portion of the power and energy to be debited to the Energy Reserve Account (but not to exceed 398 MW without concurrence of TXU Electric) to be Surplus Energy.

(e)     Section 1 of the Payback Agreement is hereby amended to read as follows:

1.     Subject to the terms, provisions and limitations herein set forth and in the Sandow Unit Four Agreement, TXU Electric will, during the term hereof, supply Alcoa with power and energy (herein called "PAYBACK") in excess of 398 megawatts as follows:

(a)     During periods when Unit Four is generating power and energy, PAYBACK will be supplied up to a maximum of 450/545 of Unit Four generation OR

(b)     When Unit Four is generating less than 545 megawatts, PAYBACK will be supplied at a rate not to exceed 73 megawatts per hour, if at the beginning of the month in which PAYBACK is requested, there is a debit balance in the Energy Reserve Account equal to or greater than the sum of (i) the product of 73 megawatts and the number of hours in the month for which PAYBACK is requested, and (ii) the product of 398 megawatts and the number of hours anticipated for planned outages of Unit Four during the month for which PAYBACK is requested. Conversely, TXU Electric will cease providing PAYBACK to Alcoa during the month if the Debit balance of the Energy Reserve Account is depleted.

(f)     The first sentence of Section 4 of the Payback Agreement is hereby amended to read as follows:

4. Any energy delivered on an integrated hourly basis to Alcoa under the Sandow Unit Four Agreement in excess of 398 megawatts but

**Proprietary and Confidential**

no greater than the PAYBACK requested by Alcoa and agreed to by TXU Electric will be recorded as PAYBACK.

2.    **Change in Amount of Exemption Amount.** All of the changes in this Section 2 are effective as of November 1, 2000. To further account for the increase in generating capacity of the Sandow Unit Four caused by its 2000 overhaul, Section 5(k) of the Amended Sandow Unit Four Agreement is hereby amended to read as follows.

(k)    (i)    Alcoa is prohibited from reselling, redelivering, assigning, or otherwise transferring any of the power and energy that it purchases from TXU Electric under the Amended Sandow Unit Four Agreement to any entity other than TXU Electric, except as provided in this Section 5(k).

(ii)    When the sale and purchase of Additional Exemption Energy under Section 5(k)(vi) below ends, then Alcoa may exempt up to 18 megawatts of power and energy from the restrictions of Section 5(k)(i) above. When the sale and purchase of Exemption Energy under Section 5(k)(v) below ends, then Alcoa may exempt up to an additional 33 megawatts of power and energy from the restrictions of Section 5(k)(i) above. Alcoa may exercise these exemptions at any time by giving TXU Electric not less than 90 days written notice, stating the effective date and the amount exempted. Alcoa may exercise these exemptions up to three times, but the total amount exempted under all such exemptions cannot exceed 51 megawatts. All megawatts so exempted must be exempted for 24 hours per day (*i.e.*, at a 100% capacity factor).

(iii)    If Alcoa has sent a notice of exemption under Section 5(k)(ii) above, and if TXU Electric enters into an agreement, under Section 5(k)(vii) below, before that exemption takes effect, to purchase the power and energy proposed to be exempted, then that notice of exemption is automatically rescinded and does not take effect.

(iv)    After an exemption under Section 5(k)(ii) above is exercised and the exemption takes effect, TXU Electric is no longer obligated to take, pay for, or bank that portion of the power and energy. If in any hour Alcoa is not delivering all of the exempted power and energy to another party (including locations of Alcoa, its subsidiaries, or its affiliates, other than Rockdale, and including a sale of the exempted power and energy to TXU Electric under an agreement separate from this Amended Sandow Unit Four Agreement), then Alcoa may not declare any surplus energy for that hour. If in any hour Alcoa is not delivering all of the exempted power and energy to another party (including locations of Alcoa, its subsidiaries, or its affiliates, other than Rockdale and including a sale of the exempted power and energy to TXU Electric under an agreement separate from this Amended Sandow Unit Four Agreement), then the energy that would otherwise be credited to the Energy Reserve Account for that hour under

4

**Proprietary and Confidential**

the other provisions of the Amended Sandow Unit Four Agreement and under provisions of other agreements must be reduced by the amount of the exempted power and energy that is not being delivered to another party (including locations of Alcoa, its subsidiaries, or its affiliates, other than Rockdale and including a sale of the exempted power and energy to TXU Electric under an agreement separate from this Amended Sandow Unit Four Agreement).

(v)     From the beginning of January 1, 1999 until the end of December 31, 2003, Alcoa shall sell and deliver firm electric energy to TXU Electric out of the firm electric energy that Alcoa is purchasing under the Amended Sandow Unit Four Agreement at a constant rate of 33 MW with a 100% capacity factor, and TXU Electric shall purchase, receive, and pay for that firm electric energy. Firm electric energy sold under this subsection is called "Exemption Energy." The sale of the Exemption Energy does not change the calculation of costs and prices under the Amended Sandow Unit Four Agreement, but the sale of the Exemption Energy will be treated as Alcoa load for purposes of determining how much firm electric energy Alcoa has taken under the Amended Sandow Unit Four Agreement. TU Electric shall pay Alcoa for the Exemption Energy at the following rates:

| Delivery Year | Exemption Energy Rate (per MWh) |
|---|---|
| 1999 | $30.00 |
| 2000 | $30.90 |
| 2001 | $31.83 |
| 2002 | $32.78 |
| 2003 | $33.77 |

(vi)    In addition to the sale of Exemption Energy under Section 5(k)(v) above, from the beginning of November 1, 2000 until the end of December 31, 2002, Alcoa shall sell and deliver firm electric energy to TXU Electric out of the firm electric energy that Alcoa is purchasing under the Amended Sandow Unit Four Agreement at a constant rate of 18 MW with a 100% capacity factor, and TXU Electric shall purchase, receive, and pay for that firm electric energy. Firm electric energy sold under this subsection is called "Additional Exemption Energy." The sale of the Additional Exemption Energy does not change the calculation of costs and prices under the Amended Sandow Unit Four Agreement, but the sale of the Additional Exemption Energy will be treated as Alcoa load for purposes of determining how much firm electric energy Alcoa has taken under the Amended Sandow Unit Four Agreement. TU Electric shall pay Alcoa for the Additional Exemption Energy at the following rates:

**Proprietary and Confidential**

| Delivery Year | Additional Exemption Energy Rate (per MWh) |
|---|---|
| 2000 | $42.00 |
| 2001 | $42.00 |
| 2002 | $28.70 |

    (vii)    If Alcoa receives an offer from a third party during the term of this Agreement to purchase any power and energy exempted, or that could be exempted, under Section 5(k)(ii) above for a term equal to or greater than thirty (30) days, then TXU Electric shall have thirty (30) days from TXU Electric's receipt of notification of such offer to enter into a written agreement with Alcoa upon terms no less favorable than those offered to Alcoa by such third party. If Alcoa receives an offer from a third party during the term of this Agreement to purchase any power and energy exempted under Section 5(k)(ii) above for a term of less than thirty (30) days, then TXU Electric shall have two (2) business days ("business days" being a day that is not a Saturday, a Sunday, or a holiday observed by TXU Electric's Dallas office) from TXU Electric's receipt of notification of such offer to enter into a written agreement with Alcoa upon terms at least as favorable as those offered to Alcoa by such third party. If TXU Electric fails to enter into such written agreement within the applicable period, and Alcoa does not agree in writing to extend such period, then Alcoa may complete the sale to the third party, but TXU Electric continues to have a first right of refusal to purchase any exempted power and energy during the remaining term of this Agreement.

3.    **Time of Designation of Surplus Energy.** Subsection (a) of Section 5.2 of the Supplemental Sandow Unit Four Agreement is deleted in its entirety and the following is substituted therefor:

    (a)    If Alcoa designates part or all of the power and energy it is obligated to purchase as surplus energy under Section 5(e) of the Sandow Unit Four Agreement, it shall give TXU Electric written notice of that election no later than 9:00 a.m., local Dallas, Texas time on the day before delivery. Alcoa's designation must be at the same MW level for each hour of the day of delivery. Alcoa shall take all actions within its control to make that quantity of surplus energy available to TXU Electric.

4.    **Amended Definition of Market Price.** Subsection (c)(i) of Section II of Exhibit V-A of the Supplemental Sandow Unit Four Agreement is deleted in its entirety and the following is substituted therefor:

    (c)    (i)    The "Market Price" is determined by Method A below from midnight at the beginning of August 1, 1999 through midnight at the end of April 30, 2002, unless the parties agree in writing to a different methodology before May 1, 2002. If the parties do not agree on a different methodology of

**Proprietary and Confidential**

determining Market Price before May 1, 2002, then, beginning on May 1, 2002, Market Price is determined by Method B. Method A defines an average monthly "Market Price" that is composed of four different possible hourly prices: one for surplus energy on-peak, a second for surplus energy off-peak, a third for any on-peak net kWh debit for the month to the Energy Reserve Account under Section I of Exhibit V-A ("Excess Energy"), and a fourth for any off-peak Excess Energy. Method B defines a monthly average "Market Price" that is composed of four different possible hourly prices, each of which is a 50-50 blend of one of the Method A hourly prices and an average ERCOT zonal balancing market clearing price for each hour.

(A)     **Method A.** Effective as of August 1, 1999, "Market Price" for a month is the quotient determined by dividing (x) the sum of all the Hourly Surplus Energy Dollar Amounts and all of the Hourly Excess Energy Dollar Amounts for each hour in the month, by (y) the sum of all of the Surplus Energy and all of the Excess Energy for each hour in that month.

   (1)     **Hourly Surplus Energy Dollar Amount.**

        a)     The "Hourly Surplus Energy Price" during on-peak hours (as defined by *Power Markets Week* (electronic version)) is equal to the daily index price published in *Power Markets Week* (electronic version) for those on-peak hours. If *Power Markets Week* (electronic version) does not publish an index price for a day, then the "Hourly Surplus Energy Price" will be determined under Subsection (4) below.

        b)     The "Hourly Surplus Energy Price" during off-peak hours (as defined by *Power Markets Week* (electronic version)) is equal to the daily index price, as those index prices are published in *Power Markets Week* (electronic version) for those off-peak hours. If *Power Markets Week* (electronic version) does not publish an index price for a day, then the "Hourly Surplus Energy Price" will be determined under Subsection (4) below.

        c)     The "Hourly Surplus Energy Dollar Amount" for an hour is the MWh of Surplus Energy in the hour multiplied times the Hourly Surplus Energy Price for that hour.

**Proprietary and Confidential**

(2)    **Hourly Excess Energy Dollar Amount.**

    a)    The Hourly Excess Energy Price during on-peak hours (as defined by *Power Markets Week* (electronic version)) is equal to the sum of i) 20% of daily index price and ii) 80% of the daily low price, as those index prices published in *Power Markets Week* (electronic version) for those on-peak hours. If *Power Markets Week* (electronic version) does not publish an index price or a low price for a day, then the "Hourly Excess Energy Price" will be determined under Subsection (4) below.

    b)    The Hourly Excess Energy Price during off-peak hours (as defined by *Power Markets Week* (electronic version)) is equal to the sum of i) 20% of daily index price and ii) 80% of the daily low price, as those index prices are published in *Power Markets Week* (electronic version) for those off-peak hours. If *Power Markets Week* (electronic version) does not publish an index price or a low price for a day, then the "Hourly Excess Energy Price" will be determined under Subsection (4) below.

    c)    The "Hourly Excess Energy Dollar Amount" for an hour is the MWh of Excess Energy in the hour multiplied times the Hourly Excess Energy Price for that hour.

(3)    *Power Markets Week* (electronic version) did not publish a "daily index price" from August 1999 through the first part of January 2000. For that time, the calculation of Hourly Surplus Energy Price and Hourly Excess Energy Price will use the average of a day's daily high price and daily low price instead of a daily index price.

(4)    Except as provided in subsection (c)(i)(A)(3), above, for days for which *Power Markets Week* (electronic version) does not publish a price for an hour or series of hours, the Hourly Surplus Energy Price and Hourly Excess Energy Price for that hour or hours are determined as follows:

    a)    For on-peak hours, the Hourly Surplus Energy Price and the Hourly Excess Energy Price is equal to lowest daily low price for on-peak hours published

8

**Proprietary and Confidential**

in *Power Markets Week* (electronic version) for on-peak hours during the calendar week (Sunday through Saturday) that includes the day. If the daily low price for on-peak hours was not published in *Power Markets Week* (electronic version) for on-peak hours during the calendar week (Sunday through Saturday), then the Hourly Surplus Energy Price and the Hourly Excess Energy Price for those on-peak hours is $10 per MWh.

b)    For off-peak hours, the Hourly Surplus Energy Price and the Hourly Excess Energy Price is equal to lowest daily low price for off-peak hours published during the calendar week (Sunday through Saturday) that includes the day. If the daily low price for off-peak hours was not published in *Power Markets Week* (electronic version) for on-peak hours during the calendar week (Sunday through Saturday), then the Hourly Surplus Energy Price and the Hourly Excess Energy Price for those off-peak hours is $10 per MWh.

(5)    The references in this Amendment to prices and indices published in *Power Markets Week* (electronic version) are to those published for the ERCOT Region.

(B)    **Method B.** Unless Alcoa and TXU Electric agree in writing otherwise before May 1, 2002, then beginning on May 1, 2002, the "Market Price" is the quotient determined by dividing:

(1)    the sum of a) 50% of the sum of all the Hourly Surplus Energy Dollar Amounts and Hourly Excess Energy Dollar Amounts for each hour in the month, and b) 50% of the ERCOT Zonal Balancing Market Clearing Price Dollar Amounts for each hour in the month, by

(2)    the sum, in MWh, of all of the Surplus Energy and all of the Excess Energy for each hour in that month.

The "ERCOT Zonal Balancing Market Clearing Price Dollar Amount" for an hour is the product of (x) the sum of the MWh of Surplus Energy for the hour and the MWh of Excess Energy for the hour times (y) the average of the applicable four ERCOT zonal balancing market clearing prices for that hour.

**Proprietary and Confidential**

(C)    Beginning on October 1, 2001, Alcoa and TXU Electric shall begin a period of good-faith negotiations during which they will review the ERCOT zonal balancing energy price history and other available index and published data concerning market prices in the ERCOT power region and shall attempt in good-faith to reach a written agreement, before May 1, 2002, on a definition of "Market Price" that is most reflective of market prices in the ERCOT power region.

(D)    *Power Markets Week* **(electronic version).** If *Power Markets Week* (electronic version) no longer publishes the prices used to determine "Market Price" pursuant to this subsection (c), then the parties will negotiate in good faith to establish an alternative pricing mechanism that most closely reflects the price of power and energy in the ERCOT market.

The parties acknowledge that Alcoa triggered its right to good-faith negotiations under Section (c)(ii) of Section II of Exhibit V-A of the Supplemental Sandow Unit Four Agreement by Alcoa's notice dated October 31, 2000, and that Alcoa will not be eligible to trigger another good-faith negotiation under that subsection until October 31, 2003, except for the good-faith negotiations contemplated in subsection (c)(i)(C), above.

5.    **Effective Dates.** The provisions of Sections 1 and 2 above are effective as of November 1, 2000, and all other provisions of this Amendment are effective as of August 1, 1999.

6.    **Successors and Assigns.** This Amendment is binding on and inures to the benefit of the parties and their respective successors and permitted assigns.

7.    **Execution in Counterparts.** This Amendment may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes.

8.    **Alcoa's General Representations and Warranties.** Alcoa now represents and warrants unconditionally to TXU Electric that:

(a)    Alcoa is a corporation duly organized, validly existing, in good standing under the laws of the Commonwealth of Pennsylvania, and is authorized to do business in the State of Texas.

(b)    Alcoa has full corporate power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Amendment.

(c)    The making and performance by Alcoa of this Amendment have been duly authorized by the necessary corporate action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to Alcoa, violate any provision of Alcoa's Articles of

**Proprietary and Confidential**

Incorporation or Bylaws, or result in a breach of, or constitute a default under, any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which Alcoa is a party or by which it or its property is bound or affected.

9. **TXU Electric's General Representations and Warranties.** TXU Electric now represents and warrants unconditionally to Alcoa that:

    (a)    TXU Electric is a corporation duly organized, validly existing, and in good standing under the laws of the State of Texas.

    (b)    TXU Electric has full corporate power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Amendment.

    (c)    The making and performance by TXU Electric of this Amendment have been duly authorized by all necessary corporate action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to TXU Electric, violate any provision of TXU Electric's Articles of Incorporation or Bylaws, or result in a breach of or constitute a default under any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which TXU Electric is a party or by which it or its property is bound or affected.

10. **No Rights of Third Parties.** This Amendment is intended only for the parties' benefit. Nothing in this Amendment may be construed to create any duty to, any standard of care concerning, or any liability to, any person not a party to this Amendment.

11. **Subject to Applicable Laws.** This Amendment is subject to applicable federal, state, and local laws, ordinances, rules, and regulations. Nothing in this Amendment may be construed as a waiver of any right to question or contest any law, ordinance, rule, regulation, or asserted regulatory jurisdiction.

12. **Amendment.** This Amendment may be amended at any time, but only upon the parties' written agreement.

13. **No Waiver.** The waiver of a breach of any provision of this Amendment does not waive any other breach of that provision or of any other provision.

14. **Complete Amendment.** This Amendment, together with the documents attached as Exhibits to this Amendment, represents the parties' final and mutual understanding with respect to renegotiation of the definition of Market Price and with respect to the increase in capacity of the Sandow Unit Four as a result of its 2000 overhaul. No representations, inducements, promises, or agreements, oral or otherwise, have been relied upon or made by any party, or anyone on behalf of a party, that are not fully expressed in this Amendment and in its Exhibits. An agreement, statement, or promise not contained in this Amendment and its Exhibits is not valid or binding.

11

**Proprietary and Confidential**

15.    **Choice of Law.** This Amendment must be construed, and its performance enforced, under Texas law.

16.    **Severability.** If any provision of this Amendment is found to be invalid or unenforceable, that provision is severed from the remainder of this Amendment, and the parties shall immediately negotiate in good faith and agree to a replacement provision that is valid and enforceable and that puts each party in substantially the same position that the party was in before the original provision was found to be invalid or unenforceable. This Amendment, as so modified, continues in full force and effect. If the application of any provision of this Amendment to any person or circumstance is found to be invalid or unenforceable, then that provision remains valid and enforceable as applied to other persons and circumstances.

Signed as of the date first mentioned above.

Alcoa Inc.                                          TXU Electric Company

By: _____          By: _____

Title: _____          Title: Director of Energy Supply

12

## 5th Amendment to Contracts

This 5th Amendment to Contracts (this "Amendment") dated as of February 1, 2003, is between **Alcoa Inc.** ("Alcoa"), a Pennsylvania corporation with offices in Rockdale, Milam County, Texas, which was formerly known as "Aluminum Company of America," and **TXU Generation Company LP** ("TXU generation"), a Texas limited partnership with offices in Dallas, Dallas County, Texas, which is the successor-in-interest of TXU US Holdings Company (f/k/a TXU Electric Company, f/k/a Texas Utilities Electric Company) which is the successor by merger to Texas Power & Light Company.

### Recitals

The parties have entered into several written contracts (the "Sandow Contracts") concerning four lignite-fueled electric generating units located near Rockdale, Texas. These Sandow Contracts include, without limitation, the following:

• Power Contract dated August 29, 1951 (the "Power Contract");

• Operating Contract dated August 29, 1951 (the "Operating Contract");

• Sandow Unit Four Agreement dated August 13, 1976 (the "Sandow Unit Four Agreement");

• Supplemental Agreement to Sandow Unit Four Agreement dated March 2, 1981 (the "Supplemental Sandow Unit Four Agreement"); and

• Letter Agreement from Pitt Pittman of TU Electric to R.C. Rawe of Alcoa dated June 11, 1991 (the "Payback Agreement").

On June 30, 1997, Alcoa and TXU Generation entered into an "Amendment to Contracts." On May 4, 1998, Alcoa and TXU Generation entered into a "2nd Amendment to Contracts." On November 6, 1998, Alcoa and TXU Generation entered into a "3rd Amendment to Contracts." On October 31, 2000, Alcoa and TXU Generation entered into a "4th Amendment to Contracts." The Sandow Unit Four Agreement dated August 13, 1976, as amended by the Amendment to Contracts, the 2nd Amendment to Contracts, the Amendment to Contracts, and the 4th Amendment to Contracts, and by any other applicable amendments, is after this called the "Amended Sandow Unit Four Agreement."

In the 4th Amendment to Contracts, the parties agreed to increase by 18 MW the amount of electric energy that Alcoa could sell to third parties, and they also agreed that TXU Generation would purchase that additional 18 MW from Alcoa through the end of 2002. The purpose of this 5th Amendment to Contracts is for TXU Generation to purchase that 18 MW from February 1, 2003 through December 31, 2003.

### Agreements

In consideration of the mutual promises and agreements contained in this Amendment, including the recitals set forth above, Alcoa and TXU Generation agree as follows:

1. Section 5(k)(vi) of the Amended Sandow Unit Four Agreement is hereby amended to read as follows.

(vi) In addition to the sale of Exemption Energy under Section 5(k)(v) above, from the beginning of February 1, 2003 until the end of December 31, 2003, Alcoa shall sell and deliver firm electric energy to TXU Generation out of the firm electric energy that Alcoa is purchasing under the Amended Sandow Unit Four Agreement at a constant rate of 18 MW with a 100% capacity factor, and TXU Generation shall purchase, receive, and pay for that firm electric energy. Firm electric energy sold under this subsection is called "Additional Exemption Energy." The sale of the Additional Exemption Energy does not change the calculation of costs and prices under the Amended Sandow Unit Four Agreement, but the sale of the Additional Exemption Energy will be treated as Alcoa load for purposes of determining how much firm electric energy Alcoa has taken under the Amended Sandow Unit Four Agreement. TXU Generation shall pay Alcoa for the Additional Exemption Energy at the rate of $36.00 per MWh.

**2. Effective Date. This Amendment is effective as of February 1, 2003.**

**3. Successors and Assigns.** This Amendment is binding on and inures to the benefit of the parties and their respective successors and permitted assigns.

4. **Execution in Counterparts.** This Amendment may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes.

5. **Alcoa's General Representations and Warranties.** Alcoa now represents and warrants unconditionally to TXU Generation that:

(a) Alcoa is a corporation duly organized, validly existing, in good standing under the laws of the Commonwealth of Pennsylvania, and is authorized to do business in the State of Texas.

(b) Alcoa has full corporate power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Amendment.

(c) The making and performance by Alcoa of this Amendment have been duly authorized by the necessary corporate action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to Alcoa, violate any provision of Alcoa's Articles of Incorporation or Bylaws, or result in a breach of, or constitute a default under, any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which Alcoa is a party or by which it or its property is bound or affected.

**6. TXU Generation's General Representations and Warranties.** TXU Generation now represents and warrants unconditionally to Alcoa that:

(a) TXU Generation is a limited partnership duly organized, validly existing, and in good standing under the laws of the State of Texas.

(b) TXU Generation has full power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Amendment.

(c) The making and performance by TXU Generation of this Amendment have been duly authorized by all necessary partnership action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to TXU Generation, violate any provision of TXU Generation's organizational documents, or result in a breach of or constitute a default under any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which TXU Generation is a party or by which it or its property is bound or affected.

**7. No Rights of Third Parties.** This Amendment is intended only for the parties' benefit. Nothing in this Amendment may be construed to create any duty to, any standard of care concerning, or any liability to, any person not a party to this Amendment.

**8. Subject to Applicable Laws.** This Amendment is subject to applicable federal, state, and local laws, ordinances, rules, and regulations. Nothing in this Amendment may be construed as a waiver of any right to question or contest any law, ordinance, rule, regulation, or asserted regulatory jurisdiction.

**9. Amendment.** This Amendment may be amended at any time, but only upon the parties' written agreement.

**10. No Waiver.** The waiver of a breach of any provision of this Amendment does not waive any other breach of that provision or of any other provision.

**11. Complete Amendment.** This Amendment, together with the documents attached as Exhibits to this Amendment, represents the parties' final and mutual understanding with respect to extending the purchase of the 18 MW. No representations, inducements, promises, or agreements, oral or otherwise, have been relied upon or made by any party, or anyone on behalf of a party, that are not fully expressed in this Amendment and in its Exhibits. An agreement, statement, or promise not contained in this Amendment and its Exhibits is not valid or binding.

**12. Choice of Law.** This Amendment must be construed, and its performance enforced, under Texas law.

**13. Severability.** If any provision of this Amendment is found to be invalid or unenforceable, that provision is severed from the remainder of this Amendment, and the parties shall immediately negotiate in good faith and agree to a replacement provision that is valid and enforceable and that puts each party in substantially the same position that the party was in before the original provision was found to be invalid or unenforceable. This Amendment, as so modified, continues in full force and effect. If the application of any provision of this Amendment to any person or circumstance is found to be invalid or unenforceable, then that provision remains valid and enforceable as applied to other persons and circumstances.

Signed as of the date first mentioned above.

**Alcoa Inc.**
By: _____
Title: _____

**TXU Generation Company LP**
By: TXU Generation Management Company LLC, its general partner
By: _____
Title: _____

# 6th Amendment to Contracts

This 6th Amendment to Contracts (this "Amendment") dated as of August 22, 2003, is between **Alcoa Inc.** ("Alcoa"), a Pennsylvania corporation with offices in Rockdale, Milam County, Texas, which was formerly known as "Aluminum Company of America," and **TXU Generation Company LP** ("TXU Generation"), a Texas limited partnership with offices in Dallas, Dallas County, Texas, which is the successor-in-interest of TXU US Holdings Company (f/k/a TXU Electric Company, f/k/a Texas Utilities Electric Company) which itself was the successor by merger to Texas Power & Light Company.

## Recitals

The parties have entered into several written contracts (the "Sandow Contracts") concerning four lignite-fueled electric generating units located near Rockdale, Texas. These Sandow Contracts include, without limitation, the following:

- Power Contract dated August 29, 1951 (the "Power Contract");

- Operating Contract dated August 29, 1951 (the "Operating Contract");

- Sandow Unit Four Agreement dated August 13, 1976 (the "Sandow Unit Four Agreement");

- Supplemental Agreement to Sandow Unit Four Agreement dated March 2, 1981 (the "Supplemental Sandow Unit Four Agreement");

- Agreement for Back-Up Power and Energy dated February 4, 1991 (the "Backup Agreement"); and

- Letter Agreement from Pitt Pittman of TU Electric to R.C. Rawe of Alcoa dated June 11, 1991 (the "Payback Agreement").

In addition, the parties have entered into the following amendments:

| Date | Title |
|---|---|
| June 30, 1997 | Amendment to Contracts; |
| May 4, 1998 | 2nd Amendment to Contracts; |
| November 6, 1998 | 3rd Amendment to Contracts; |
| October 31, 2000 | 4th Amendment to Contracts; and |
| February 1, 2003 | 5th Amendment to Contracts. |

All references to one or more of the Sandow Contracts means the contract or contracts as amended by the other Sandow Contracts, unless expressly stated otherwise.

The contract changes in this Amendment are the result of several factors:

- The Texas electricity market has been restructured, and TXU Electric Company was required to unbundle itself into separate companies. One of those successor companies, Oncor Electric Company, is a transmission/distribution wires company and is the only TXU affiliate that can perform some of the duties of TXU Electric Company under the Sandow Contracts. One purpose of this Amendment is to identify which obligations are the responsibility of Oncor and not the responsibility of TXU Generation. The parties contemplate that Alcoa and Oncor will enter into new agreements that will take the place of those obligations and release TXU Generation from the Oncor obligations in the Sandow Contracts and that the Sandow Contracts will only address the business relationship between Alcoa and TXU Generation.

- Under the current Texas market structure, TXU Generation must arrange for a "load serving entity" to provide electric power and energy to Alcoa at times when Unit Four and Units One-Three are not producing enough output to serve all of Alcoa's electrical load. This load serving entity, in turn, must pay a per MWh fee to ERCOT and must pay transmission charges to the transmission/distribution wires company providing wires service to the Alcoa plant site.

- Alcoa is considering a change in or cessation of the operation of Units One-Three.

- The original lignite reserves in the Sandow Mine will be exhausted in the near future and Alcoa has the opportunity to open a new lignite mine that the parties expect will provide enough lignite to sustain Sandow operations for many more years.

- Besides the restructuring of the Texas electricity market discussed above, even broader changes have occurred both in the energy industry and in the metals industry.

As a result of these and other factors, the parties have agreed to extend the term of the Sandow Contracts and to make other changes to the Sandow Contracts, some of which are significant, to enable the parties to continue and extend the business relationship that has benefited both parties, their employees, and their customers for many years.

## Agreements

In consideration of the mutual promises and agreements contained in this Amendment and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Alcoa and TXU Generation agree as follows:

**Term Extension**

1.    Section 9 of the Operating Contract is hereby amended to read as follows.

9.    Term.  Subject to the provisions contained in Section 10 hereof, this contract shall be effective until the end of December 31, 2038, and shall continue in effect after such date unless and until terminated by either party by written notice given three (3) years in advance of the intended date of termination.

-2-

2.      Article I of the Power Contract is hereby amended to read as follows:

ARTICLE I—Term of Contract

Subject to the other provisions contained herein, this contract shall be effective until the end of December 31, 2038 and shall continue in effect thereafter unless and until terminated by either party by written notice given three (3) years in advance of the intended date of termination.

3.      Section 10 of the Sandow Unit Four Agreement is hereby amended to read as follows:

Section 10.   Term.   This Agreement shall be effective from execution hereof until the end of December 31, 2038 and shall continue in effect thereafter unless and until terminated by either party by written notice given three (3) years in advance of the intended date of termination.   In addition, Alcoa's right to purchase Unit Four and Unit Four Real Estate and all additions and improvements thereto pursuant to Section 3 hereof shall survive any termination of this Agreement. During the terms of this Agreement, TXU Generation shall have the use of Common Facilities for operation and maintenance of Unit Four as herein provided.

**Elimination of TXU Generation's Option to Purchase Units One-Three**

4.      Article VIII of the Power Contract is hereby deleted.

5.      Section 10, subsection (a) of the Operating Contract is hereby amended to read as follows:

(a)      This contract may be terminated by either party upon notice to the other in the event that provisions of the Power Contract between the parties hereto of even date herewith (other than Article X thereof) shall cease to be in effect under Article I or XI thereof or otherwise.

6.      Section 3(d) of the Sandow Unit Four Agreement is hereby amended to read as follows:

(d)      For the period specified in Section 3(f) hereof, Alcoa shall have the right and option to purchase Unit Four, Unit Four Real Estate and all improvements thereon, including Common Facilities, on terms set out below and at a price determined in a manner as set forth in Section 7(f) hereof, in case TXU Generation seeks, or attempts, to sell or otherwise transfer any portion of Unit Four or Unit Four Real Estate, except that TXU Generation may transfer such property to any entity owning all of its voting interests or to any entity wholly-owned by TXU Generation or by such entity owning all of TXU Generation's voting interests, provided that the transferor shall remain liable as guarantor of the performance of its transferee. The terms of the option to purchase are as stated in paragraph number 1 of the "Reservations" in that certain Warranty Deed dated March 14, 1978 from Aluminum Company of America to Texas Power &

-3-

Light Company of record at Vol. 444, page 29 of the Real Property Records of Milam County, Texas.

7.    TXU Generation and Alcoa shall, no later than five (5) business days after September 15, 2003, execute the Amendment to Warranty Deed attached to this Amendment as Amendment Exhibit A-1, TXU Generation shall cause the executed and acknowledged Amendment to Warranty Deed to be filed in the Real Property Records of Milam County, Texas, and a copy of that Amendment to Warranty Deed is hereby added to Exhibit III-A to the Supplemental Sandow Unit Four Agreement as "Instrument #7." TXU Generation and Alcoa shall, no later than five (5) business days after September 15, 2003, execute the Amendment to Warranty Deed attached to this Amendment as Amendment Exhibit A-2, TXU Generation shall cause the executed and acknowledged Amendment to Warranty Deed to be filed in the Real Property Records of Milam County, Texas, and a copy of that Amendment to Warranty Deed is hereby added to Exhibit III-A to the Supplemental Sandow Unit Four Agreement as "Instrument #8."

**Early Termination**

8.    A new Section 17 is hereby added to the Sandow Unit Four Agreement to read as follows:

Section 17.  Review of Agreement.

(a)    "Applicable Law" means any federal, state, or local statute, law, municipal charter provision, regulation, ordinance, rule, mandate, judgment, order, decree, permit, code, or license requirement or other governmental requirement, standard, or restriction, or any interpretation or administration of any of the foregoing by any agency, court, or other governmental authority, that applies to the rights or obligations of either party under this Agreement.

(b)    "Change in Law" means the enactment, adoption, promulgation, amendment, modification, repeal, or change after September 1, 2003 of any Applicable Law that would reasonably likely be the major cause for the total cost of production of energy from Unit Four under this Agreement being higher than the estimated Market Price for at least the subsequent two-year period.

(c)    Post 2013.

(i)    At any time after December 31, 2013, if a party believes that a Change in Law has occurred, then such party shall provide written notice thereof to the other party.

(ii)    After receiving that notice, the parties shall meet at their earliest convenience to negotiate in good faith whether in fact a Change in Law has occurred. If the parties do not reach an agreement within thirty (30) days after the written notice of a Change in Law, then either party may ask a court of competent jurisdiction to determine whether or not a Change of Law has occurred.

-4-

(iii)    If the parties agree, or if a court of competent jurisdiction rules, that a Change of Law has occurred, then the parties shall negotiate in good faith about amendments to this Agreement (and to the Power Contract and Operating Contract, if necessary or appropriate) to resolve or mitigate the impact of the Change in Law. Both TXU Generation and Alcoa must cooperate, and deal reasonably and in good faith, with each other in negotiating, documenting, and effecting any amendment arising out of the provisions of this Section 17(c).

(iv)    If the parties do not reach agreement on a mutually satisfactory amendment within sixty (60) days after the later of: (A) the parties having mutually agreed that a Change in Law has occurred, or (B) a court having entered a judgment that a Change of Law has occurred, then TXU Generation may elect to (X) continue to operate Unit Four, in which case it shall terminate this Agreement, the Power Contract, and the Operating Contract by sending written notice of termination to Alcoa at least one (1) year before the effective date of termination, (Y) temporarily shut down Unit Four, in which case the obligations of Alcoa to deliver lignite to TXU Generation and to accept and pay for the Firm Power Amount and of TXU Generation to accept and pay for the lignite and to provide the Firm Power Amount to Alcoa, respectively, will be suspended, by sending written notice of temporary shutdown to the other party at least one (1) year before the effective date of the temporary shutdown, or (Z) permanently retire Unit Four, in which case it shall terminate this Agreement, the Power Contract, and the Operating Contract by sending written notice of termination to Alcoa at least one (1) year before the effective date of the permanent retirement of Unit Four.

(v)    Under a temporary shutdown, this Agreement and the Power Contract and Operating Contract will not terminate unless and until either this Agreement, the Power Contract and the Operating Contract terminate pursuant to their terms or the parties agree to end the temporary shutdown upon mutually agreeable terms that reflect the current economics of the relationship between the parties pursuant to this Agreement, the Power Contract and the Operating Contract. If the parties cannot agree upon terms for ending a temporary shutdown, TXU may terminate this Agreement, the Power Contract and the Operating Contract upon sixty (60) days prior written notice to Alcoa.

(d)    Post 2025.    At any time after December 31, 2025, if TXU Generation reasonably determines that the estimated total costs of production of energy from Unit Four under this Agreement are higher than the estimated Market Price for at least the next two-year period, it shall provide written notice thereof to Alcoa, which notice shall include the rationale for TXU Generation's determination. After receiving that notice, the parties shall negotiate in good faith about determining whether this Agreement (and to the Power Contract and Operating Contract, if necessary or appropriate) can be modified to the mutual

satisfaction of the parties. Both TXU Generation and Alcoa must cooperate, and deal reasonably and in good faith, with each other in negotiating, documenting, and effecting any amendment arising out of the provisions of this Section 17(d). If the parties do not reach agreement on a mutually satisfactory amendment within sixty (60) days after TXU Generation's written notice, then TXU Generation may terminate this Agreement, the Power Contract, and the Operating Contract by sending written notice of termination to Alcoa at least one (1) year before the effective date of termination.

**Cost of Capital Rates**

9.      Section 7(b)(iv)(A) of the Sandow Unit Four Agreement is hereby amended to read as follows:

(A)     Alcoa shall accrue monthly 1/12th of Alcoa's cost of capital at the Alcoa cost of capital rate as defined in Section 16(c) below on 95/870ths of the following items:

10.     The last sentence of Subsection (b) of Section IV, Stores Inventories, of the Supplemental Sandow Unit Four Agreement is hereby amended to read as follows:

TXU Generation's related monthly payment to Alcoa for this item shall be determined by applying 95/870ths of the value as of the first day of the month of this referenced inventory and multiplying this amount by 1/12th of the Alcoa cost of capital rate as defined in Section 16(c) below to arrive at TXU Generation's Cost of Capital monthly payment amount.

11.     Sections 8(g)(i) and 8(g)(ii) of the Sandow Unit Four Agreement are hereby amended to read as follows:

(i)     1/12th of 95/545ths of the cost of capital at the Alcoa cost of capital rate as defined in Section 16(c) below on original cost of improvements, additions or replacements to Common Facilities including future additions and improvements thereto, excluding those owned by TXU Generation as referred to in Section 4(d) above, less from time to time accumulated reserve for depreciation, as adjusted per Section 9(c)(i) hereof; and

(ii)    1/12th of 95/870ths of the cost of capital at the Alcoa cost of capital rate as defined in Section 16(c) below on the net book value at startup of Unit Four on the balance of present Common Facilities including future additions and improvements thereto, excluding those improvements, additions or replacements owned by TXU Generation as referred to in Section 4(d), less from time to time accumulated reserve for depreciation, as adjusted per Section 9(c)(i) hereof; and

-6-

12.   Section 9(b)(i) of the Sandow Unit Four Agreement is hereby amended to read as follows:

> (i)   A sum equal to 1/12th of 450/545ths of TXU Generation's cost of capital at the TXU Generation cost of capital rate as defined in Section 16(c) below on original cost of Unit Four including additions to Common Facilities owned by TXU Generation and additions and improvements to Unit Four, less the from time to time accumulated reserve for depreciation; and

13.   Section 16 of the Sandow Unit Four Agreement is hereby amended to read as follows:

> Section 16. Cost of Capital Rates.

> (a)   The Cost of Capital Rate for each party as of September 1, 2003 is 14.4%, but it may change from year to year based upon changes in the U.S. Treasuries Rate, changes in the Federal corporate Income Tax and changes in the State corporate Income Tax, as defined further below.

> (b)   "Income Tax" means the Federal corporate income tax pursuant to Section 11 of the Internal Revenue Code of 1986 or any successor thereof, any State corporate income tax, or any additional taxes or assessments levied on the gross income of a party.

> (c)   The "Adjusted U.S. Treasuries Rate" for a Calendar Period is the sum of:

> > (A)   the average of all published month-end Ten-Year Average Yields for each month within the Calendar Period, as published weekly by the Federal Reserve Board in Federal Reserve Statistical Release H-15, "Selected Interest Rates"; plus

> > (B)   100 basis points.

"Calendar Period" means a period from January 1 to December 31. If the Federal Reserve Board does not publish such a monthly Ten-Year Average Yield, the average under Section 16(c)(A) above shall be computed using the month-end Ten-Year Yields for each month in the Calendar Period as reported by the Federal Reserve Board. If Ten-Year Yields are not published by the Federal Reserve Board, then the yields under Section 16(c)(A) above must be obtained from any Federal Reserve Bank or from any U.S. Government department or agency mutually selected by Alcoa and TXU Generation. If Ten-Year Yields are not published by the Federal Reserve Board or by any Federal Reserve Bank or by any U.S. Government department or agency, then the portion of the U.S. Treasuries Rate under Section 16(c)(A) above must be determined by taking the average of the month-end closing bids for U.S. Treasury fixed-interest-rate securities with a final maturity date of ten years as provided by four recognized U.S. Government securities dealers. Two U.S. Government securities dealers must be selected by TXU Generation and two must be selected by Alcoa. If either

party fails to select its two dealers within thirty (30) days after receiving written notice from the other party of the need to select dealers, then the dealers chosen by the party sending the notice must be used. Each bid used must be supported by written documentation from the dealer who uses it. The term "U.S. Treasury fixed-interest-rate securities" does not include "Special Securities."

(i)    "Special Securities" means securities which can, at the option of the holder, be surrendered at face value in payment of any Federal estate tax or which provide tax benefits to the holder and are priced to reflect such tax benefits or which were originally issued at a deep or substantial discount.

(ii)    The Cost of Capital Rate is the same for each party as of September 1, 2003, but after that each party's rate must be adjusted before each February 1, effective on each January 1, according to this table and formula:

| Adjusted U.S. Treasuries Rate for Previous Year | Cost of Capital Rate for Current Year |
|---|---|
| Less than 6.00% | 14.4% |
| Equal to or greater than 6.00% and less than 9.00% | 15.4% |
| Equal to or greater than 9.00% and less than 10.00% | 16.4% |
| Equal to or greater than 10.00% and less than 11.00% | 17.4% |
| Equal to or greater than 11.00% | 17.5% |

(iii)    The Cost of Capital Rate from the table above must be adjusted before each February 1, effective on each January 1, for changes in the sum of State and Federal Income Tax rates applicable to Alcoa by adding 0.2% for each increase of 1% from the sum of the Federal and State Income Tax rates effective as of September 1, 2003 and by subtracting 0.2% for each decrease of 1% from the sum of the Federal and State Income Tax rates effective as of September 1, 2003. The resulting adjusted cost of capital rate is called the Alcoa Cost of Capital Rate.

(iv)    The Cost of Capital Rate from the table above must be adjusted before each February 1, effective on each January 1, for changes in the sum of State and Federal Income Tax rates applicable to TXU Generation by adding 0.2% for each increase of 1% from the sum of the Federal and State Income Tax rates effective as of September 1, 2003 and by subtracting 0.2% for each decrease of 1% from the sum of the Federal and State Income Tax rates effective as of September 1, 2003. The resulting adjusted cost of capital rate is called the TXU Generation Cost of Capital Rate.

14.    Exhibits XVI-A and XVI-B to the Sandow Unit Four Agreement are hereby deleted.

**Depreciation Rates**

15.    Section 9(b)(ii) of the Sandow Unit Four Agreement is hereby amended to read as follows:

(ii)    1/12th of 450/545ths of depreciation at 4% per annum on a straight-line basis until Unit Four is fully depreciated on the original cost of Unit Four including additions to Common Facilities owned by TXU Generation and improvements and additions to Unit Four; and

**Recovery of Undepreciated Investment**

16.    A new Section 18 is hereby added to the Sandow Unit Four Agreement to read as follows:

Section 18. Payment of Unrecovered Investment upon Termination.

(a)    Subject to the limitation of Section 18(c) below, upon any termination of this Agreement, except as specified otherwise in Section 21 below, TXU Generation shall pay to Alcoa 95/870 of the net book value, which means the original cost, less depreciation, of the Lignite Facilities and of additions to Lignite Facilities referred to in Section 4 above and future additions and improvements thereto.

(b)    Subject to the limitation of Section 18(c) below, upon any termination of this Agreement, except as specified otherwise in Section 21 below, Alcoa shall pay to TXU Generation 450/545 of the net book value, which means the original cost, less depreciation, of Unit Four including additions to Common Facilities owned by TXU Generation and improvements and additions to Unit Four.

(c)    The limitations referred to in Sections 18(a) and 18(b) above are that the calculation of any payment under Sections 18(a) and 18(b) above must not include the cost of any facilities, improvements, or additions made after the terminating party delivers a valid written notice of termination to the other party, if the termination is made in accordance with the provisions of this Agreement.

**Effects of Termination**

17.    A new Section 21 is hereby added to the Sandow Unit Four Agreement to read as follows:

21.    Effects of Termination. Upon a termination of this Agreement under any of the termination provisions described in the table below, the various rights of a party under the various end-of-term rights

provisions described in the table either apply or do not apply as specified in the table:

| Termination Rights Under ▶<br><br>Applicable Termination Payment or End-of-Term Provisions ▼ | § 10 (Post 2038 termination) | § 17(c)(iv)(X) (Change in Law – TXU terminates and continues to operate Unit Four, whether immediately or after a temporary shutdown under § 17(c)(iv)(Y)) | § 17(c)(iv)(Z) (Change in Law – TXU terminates and retires Unit Four, whether immediately or after a temporary shutdown under § 17(c)(iv)(Y)) | § 17(d) (Post 2025 termination) |
|---|---|---|---|---|
| § 18 – Payment of Unrecovered Investment | § 18 applies to both parties' rights | § 18 applies to Alcoa's rights but not to TXU's rights | § 18 applies to both parties' rights | § 18 applies to Alcoa's rights but not to TXU's rights |
| Subsection (d) of Section II of Exhibit V-A – settle Market Price Balance Account | Subsection (d) applies | Subsection (d) applies | Subsection (d) applies | Subsection (d) applies |
| Section III of Exhibit V-A – settle Energy Reserve Account | Section III applies | Section III applies | Section III applies | Section III applies |
| § 20 – End-of-Term Rights | § 20 applies | § 20 applies | § 20 does not apply | § 20 applies |

**Price of Surplus Power**

18.      Subsection (c)(i) of Section II of Exhibit V-A of the Supplemental Sandow Unit Four Agreement is hereby amended to read as follows:

          (c)      (i)      The "Market Price" is the ERCOT balancing market clearing price at the Sandow buss for each hour, on a zonal or other basis as determined by ERCOT.

19.    Subsection (c)(ii) of Section II of Exhibit V-A of the Supplemental Sandow Unit Four Agreement is hereby amended to read as follows:

(ii)    Either party may, by written notice, commence a 30-day good-faith negotiation with the other party about changing the definition of "Market Price." Such changes may include, without limitation, changing the methodology to track an electricity price index. The party commencing the good-faith negotiation cannot commence another good-faith negotiation for three years after the date of the written notice commencing the good-faith negotiation. Any agreed modification of the definition of "Market Price" must be memorialized in a written amendment to this Exhibit V-A. It is the intent of Alcoa and TXU Generation to adopt an electricity price index to determine the Market Price as soon as such an index becomes available. For an electricity price index to be adopted, it must be ERCOT-specific, hourly, and based upon enough transactions to represent a "liquid" market.

20.    Effective on the first day of the first month after the Effective Date of this Amendment that the Market Price Balance Account reaches a zero balance, subsection (a) of Section II of Exhibit V-A of the Supplemental Sandow Unit Four Agreement is hereby amended to read as follows:

(a)    The "Cost of Energy" for a month means a cents per kWh number determined by the following formula:

$$C = F + [\tfrac{1}{2} \times (M\text{-}F)]$$

where:

"C" means the Cost of Energy for that month;

"F" means the Floor Price defined below for that month divided by 10 to convert $/MWh to ¢/kWh; and

"M" means the Market Price for the month defined below.

21.    Effective on the first day of the first month after the Effective Date of this Amendment that the Market Price Balance Account reaches a zero balance, subsection (b) of Section II of Exhibit V-A of the Supplemental Sandow Unit Four Agreement is hereby amended to read as follows:

(b)    Each month, the parties prepare a "Sandow Station Operating Report and Contract Summary." A part of that Report is the "Production Expense Report" for the "Current Month." The "Floor Price" for a month means the number given in the Production Expense Report for the Current Month for "Dollars per MWh" under the column entitled "Alcoa Gross Up." An example of such a Production Expense Report is attached hereto as Exhibit V-A-1. This Floor Price is subject to restatement at the end of the year based upon the "Year to

-11-

Date" Production Expense Report under subsection (d) below of this Section II of Exhibit V-A.

22.     The Production Expense Report that is attached to the Supplemental Sandow Unit Four Agreement as Exhibit V-A-1 is hereby amended to read as set out in the amended Exhibit V-A-1 that is attached to this Amendment.

23.     Effective on the first day of the first month after the Effective Date of this Amendment that the Market Price Balance Account reaches a zero balance, subsection (d) of Section II of Exhibit V-A of the Supplemental Sandow Unit Four Agreement is hereby deleted and subsection (e) of Section II of Exhibit V-A of the Supplemental Sandow Unit Four Agreement is hereby renumbered as subsection (d) and amended to read as follows:

         (d)     At the end of each calendar year, the Floor Price for each month during the year must be restated based upon the number given in the "Year to Date" Production Expense Report for the last month of the year for "Dollars per MWh" under the column entitled "Alcoa Gross Up." The monthly calculations of the Cost of Energy must then be recalculated using the restated annual Floor Price. The monthly payments from Alcoa to TXU Generation must then be recalculated based upon the recalculated monthly Cost of Energy. If the net effect of the recalculated monthly payments is that Alcoa owes more money than paid, then the net difference must be added to Alcoa's payment for the next month. If the net effect of the recalculated monthly payments is that Alcoa owes less money than paid, then the net difference must be credited to Alcoa's payment for the next month. A sample calculation under this Section II(d) is attached hereto as Exhibit V-A-4.

**Alcoa Right to Close Smelter and Still Receive Firm Power**

24.     The opening phrase of Section 3(f) of the Sandow Unit Four Agreement is hereby amended to read as follows:

         (f)     The rights of Alcoa under Sections 3(d) and 3(e) hereof shall terminate upon the earlier of:

                 (i)     the later of the termination of this Agreement or the occurrence of a Smelter Closing Event; or

                 (ii)     the expiration of twenty-one (21) years after the death of the survivor of the following persons:

25.     Section 5(b) of the Sandow Unit Four Agreement is hereby amended to read as follows:

         (b)     Except as otherwise provided herein, TXU Generation will supply and sell to Alcoa, and Alcoa agrees to purchase from TXU Generation, the Firm Power Amount [as defined in Section 5(m) below] of firm power and related energy during the term of this Agreement at the price herein provided.

-12-

26.    New Sections 5(m), 5(n), and 5(o) are hereby added to the Sandow Unit Four Agreement to read as follows:

(m)    The "Firm Power Amount" is 398 MW until a Smelter Closing Event [as defined in Section 5(o) below] occurs. Except as provided otherwise in Section 5(o) below, on and after the date that a Smelter Closing Event occurs, the "Firm Power Amount" for each calendar year is the lesser of:

(i)    398 MW;

(ii)    450/545 of the MWh output of Unit Four for the twelve (12) calendar months ending on June 30 of the immediately preceding calendar year divided by the number of hours in that twelve (12) months.

(n)    If the Firm Power Amount would be set by Section 5(m)(ii) above instead of by Section 5(m)(i) above, Alcoa, at its option may request in writing that TXU Generation quote a price to Alcoa for Alcoa to purchase a specified amount of additional MWh for specified months to bring the Firm Power Amount back up to 398 MW. TXU Generation must respond in writing to Alcoa's request within five (5) days after receipt. If Alcoa accepts the price, it may so notify TXU Generation in writing within 48 hours after receiving the written price quote, in which event that sale must be completed by both parties and, upon completion, the Firm Power Amount will be set by Section 5(m)(i) above instead of by Section 5(m)(ii) above for the months for which the sale is made.

(o)    A "Smelter Closing Event" occurs on the first day of the first calendar month after the later of:

(i)    December 31, 2013;

(ii)    ninety (90) days after TXU Generation receives written notice from Alcoa that Alcoa has, or will, permanently cease smelting aluminum on the plant site; and

(iii)    the date that Alcoa does, in fact, permanently cease smelting aluminum on the plant site.

27.    Section 9(d) of the Sandow Unit Four Agreement is hereby amended to read as follows:

(d)    The amount to be paid to TXU Generation by Alcoa pursuant to Section 9(b) hereof shall be reduced on a proportionate basis to the extent that TXU Generation does not make available the Firm Power Amount to Alcoa as provided herein. Said reduction, if any, will be calculated on a calendar year basis, or portion thereof, from the date of commercial operation of Unit Four. The amount of said reduction shall be the difference between the total amount otherwise payable by Alcoa pursuant to Section 9(b) and an amount equal to said total amount multiplied by a fraction wherein the numerator is the average annual MW actually made available to Alcoa by TXU Generation (less any MW not

taken by Alcoa pursuant to Section 5(h) hereof) and the denominator is the number of megawatts of the Firm Power Amount.

28.    The second sentence of Section I of Exhibit V-A to the Sandow Unit Four Agreement is hereby amended to read as follows:

> After allocating 95/545ths of such net generation (or if, at any time after December 31, 2013, Unit 4 is derated due to the quality of fuel being less than that required to operate Unit Four at its full capability for more than one hour and for non-weather related fuel events, after allocating 95/545ths of what the net generation would have been without that derating) to TXU Generation and after allocating the amount of energy delivered by TXU Generation to Alcoa under the provisions of the Sandow Unit Four Agreement but not to exceed the Firm Power Amount measured in kWh per hour (except as provided in Section 5.3(b) of the Supplemental Sandow Unit Four Agreement), the remainder of such net generation shall be debited to the Energy Reserve Account.

29.    The third and fourth sentences of Section III of Exhibit V-A to the Sandow Unit Four Agreement are hereby amended to read as follows:

> To eliminate a debit balance in such account, TXU Generation may, from time to time, with the concurrence of Alcoa, deliver power and energy to Alcoa, on an interruptible basis, in excess of the Firm Power Amount. Likewise, Alcoa may declare all or a portion of the power and energy to be debited to the Energy Reserve Account (but not to exceed the Firm Power Amount without concurrence of TXU Generation) to be Surplus Energy.

30.    Section 4(c) of the Backup Agreement is hereby amended to read as follows:

> (c)    TXU Generation may request interruption of no more than a total of the Firm Power Amount [as defined in Section 5(m) of the Sandow Unit Four Agreement dated August 13, 1976, as amended] of load during any rolling 24 hour period. The load resources to be interrupted during the rolling 24 hour period will be selected from two blocks of 95 MW and two or more blocks of 65 MW. For interruptions extending beyond the initial 30 minutes, TXU Generation may request no more than 95 MWh per hour of such power and energy during the rolling 24 hour period. The entire Firm Power Amount in MWh or such portion thereof not satisfied by interruption of the two blocks of 95 MW will be provided by interruption to as many of the blocks of 65 MW as necessary during the rolling 24 hour period. TXU Generation will request load interruption in load blocks within the parameters described above and Alcoa will provide such interruption in quantities equal to or greater than the quantities of load interruption so requested depending on Alcoa's operating conditions. The TXU Generation request as to load quantity and interruption time will be accumulated against the Firm Power Amount rolling 24 hour limitation for that period.

-14-

31.    Section 1 of the Payback Agreement is hereby amended to read as follows:

       1.    Subject to the terms, provisions and limitations herein set forth and in the Sandow Unit Four Agreement, TXU Generation will, during the term hereof, supply Alcoa with power and energy (herein called "PAYBACK") in excess of the Firm Power Amount [as defined in Section 5(m) of the Sandow Unit Four Agreement dated August 13, 1976, as amended] as follows:

       (a)    During periods when Unit Four is generating power and energy, PAYBACK will be supplied up to a maximum of 450/545 of Unit Four generation OR

       (b)    When Unit Four is generating less than 545 megawatts, PAYBACK will be supplied at a rate not to exceed 73 megawatts per hour, if at the beginning of the month in which PAYBACK is requested, there is a debit balance in the Energy Reserve Account equal to or greater than the sum of (i) the product of 73 megawatts and the number of hours in the month for which PAYBACK is requested, and (ii) the product of the Firm Power Amount and the number of hours anticipated for planned outages of Unit Four during the month for which PAYBACK is requested. Conversely, TXU Generation will cease providing PAYBACK to Alcoa during the month if the Debit balance of the Energy Reserve Account is depleted.

32.    The first sentence of Section 4 of the Payback Agreement is hereby amended to read as follows:

       4. Any energy delivered on an integrated hourly basis to Alcoa under the Sandow Unit Four Agreement in excess of the Firm Power Amount, but no greater than the PAYBACK requested by Alcoa and agreed to by TXU Generation, will be recorded as PAYBACK.

33.    Section 5(k) of the Sandow Unit Four Agreement is hereby amended to read as follows:

       (k)    (i)    Alcoa is prohibited from reselling, redelivering, assigning, or otherwise transferring any of the power and energy that it purchases from TXU Generation under this Agreement to any entity other than TXU Generation, except as provided in this Section 5(k).

       (ii)    All of the provisions of this Section 5(k)(ii) are subject to Section 5(k)(viii) below. When the sale and purchase of Additional Exemption Energy under Section 5(k)(vi) below ends, then Alcoa may exempt up to 18 megawatts of power and energy from the restrictions of Section 5(k)(i) above. When the sale and purchase of Exemption Energy under Section 5(k)(v) below ends, then Alcoa may exempt up to an additional 33 megawatts of power and energy from the restrictions of Section 5(k)(i) above. Alcoa may exercise these exemptions at any time by giving TXU Generation not less than 90 days written notice, stating the

effective date and the amount exempted. Alcoa may exercise these exemptions up to three times, but the total amount exempted under all such exemptions cannot exceed 51 megawatts. All megawatts so exempted must be exempted for 24 hours per day (*i.e.*, at a 100% capacity factor).

(iii)    All of the provisions of this Section 5(k)(iii) are subject to Section 5(k)(viii) below. If Alcoa has sent a notice of exemption under Section 5(k)(ii) above, and if TXU Generation enters into an agreement with Alcoa, under Section 5(k)(vii) below, before that exemption takes effect, to purchase the power and energy proposed to be exempted, then that notice of exemption is automatically rescinded and does not take effect.

(iv)    After an exemption under Section 5(k)(ii) above is exercised and the exemption takes effect, or if an exemption under Section 5(k)(viii) below is in effect, then TXU Generation is no longer obligated to take, pay for, or bank that exempted portion of the power and energy. If in any hour Alcoa is not delivering all of the exempted power and energy to another party (including locations of Alcoa, its subsidiaries, or its affiliates, other than Rockdale, and including a sale of the exempted power and energy to TXU Generation under an agreement separate from this Agreement), then:

(A)    Alcoa may not declare any surplus energy for that hour; and

(B)    the energy that would otherwise be credited to the Energy Reserve Account for that hour under the other provisions of this Agreement and under provisions of other agreements must be reduced by the amount of the exempted power and energy that is not being delivered to another party (including locations of Alcoa, its subsidiaries, or its affiliates, other than Rockdale and including a sale of the exempted power and energy to TXU Generation under an agreement separate from this Agreement).

(v)    From the beginning of January 1, 1999 until the end of December 31, 2003, Alcoa shall sell and deliver firm electric energy to TXU Generation out of the firm electric energy that Alcoa is purchasing under this Agreement at a constant rate of 33 MW with a 100% capacity factor, and TXU Generation shall purchase, receive, and pay for that firm electric energy. Firm electric energy sold under this subsection is called "Exemption Energy." The sale of the Exemption Energy does not change the calculation of costs and prices under this Agreement, but the sale of the Exemption Energy will be treated as "Alcoa load" for purposes of determining how much firm electric energy Alcoa has taken under this Agreement. TXU Generation shall pay Alcoa for the Exemption Energy at the following rates:

-16-

| Delivery Year | Exemption Energy Rate (per MWh) |
|---------------|--------------------------------|
| 1999          | $30.00                         |
| 2000          | $30.90                         |
| 2001          | $31.83                         |
| 2002          | $32.78                         |
| 2003          | $33.77                         |

(vi)    In addition to the sale of Exemption Energy under Section 5(k)(v) above, from the beginning of February 1, 2003 until the end of December 31, 2003, Alcoa shall sell and deliver firm electric energy to TXU Generation out of the firm electric energy that Alcoa is purchasing under this Agreement at a constant rate of 18 MW with a 100% capacity factor, and TXU Generation shall purchase, receive, and pay for that firm electric energy. Firm electric energy sold under this subsection is called "Additional Exemption Energy." The sale of the Additional Exemption Energy does not change the calculation of costs and prices under this Agreement, but the sale of the Additional Exemption Energy will be treated as "Alcoa load" for purposes of determining how much firm electric energy Alcoa has taken under this Agreement. TXU Generation shall pay Alcoa for the Additional Exemption Energy at the rate of $36.00 per MWh.

(vii)    If Alcoa receives an offer from a third party during the term of this Agreement to purchase any power and energy exempted, or that could be exempted, under Section 5(k)(ii) above or Section 5(k)(viii) for a term equal to or greater than thirty (30) days, then TXU Generation shall have thirty (30) days from TXU Generation's receipt of notification of such offer to enter into a written agreement with Alcoa upon terms no less favorable than those offered to Alcoa by such third party. If Alcoa receives an offer from a third party during the term of this Agreement to purchase any power and energy exempted under Section 5(k)(ii) above or Section 5(k)(viii) for a term of less than thirty (30) days, then TXU Generation shall have two (2) business days ("business days" being a day that is not a Saturday, a Sunday, or a holiday observed by TXU Generation's Dallas office) from TXU Generation's receipt of notification of such offer to enter into a written agreement with Alcoa upon terms at least as favorable as those offered to Alcoa by such third party. If TXU Generation fails to enter into such written agreement within the applicable period, and Alcoa does not agree in writing to extend such period, then Alcoa may complete the sale to the third party, but TXU Generation continues to have a first right of refusal to purchase any exempted power and energy during the remaining term of this Agreement.

(viii)    Beginning on the occurrence of a Smelter Closing Event:

(A)    The provisions of Sections 5(k)(ii) and 5(k)(iii) no longer apply;

(B)    On or before a Smelter Closing Event, Alcoa shall notify TXU Generation in writing of the portion of the Firm Power Amount that Alcoa reasonably estimates that it will use on the plant site, including without limitation for the Lignite Facilities for the remainder of that calendar year, and on or before each January 1 after the Smelter Closing Event, Alcoa shall notify TXU Generation in writing of the portion of the Firm Power Amount, in MW per year, that Alcoa reasonably estimates that it will use on the plant site, including without limitation for the Lignite Facilities for the following calendar year. The amount so designated by Alcoa is the "Designated Amount." Alcoa must make its estimate of the Designated Amount in good faith.

(1)    The MWh of the Designated Amount that are not used by Alcoa on the plant site automatically become surplus energy and are credited to the Energy Reserve Account.

(2)    To the extent that Alcoa's energy usage on the plant site exceeds the Designated Amount, Alcoa must purchase the excess from a resource other than this Agreement.

(C)    The difference between the Firm Power Amount and the Designated Amount for a calendar year (the "Exempted Firm Power Amount") is automatically exempted from the restrictions of Section 5(k)(i) above. All megawatts so exempted are exempted for twenty-four (24) hours per day (*i.e.*, at a 100% capacity factor). An example of the calculation of the Exempted Firm Power Amount is attached to this Agreement as Exhibit C.

34.    A new Exhibit C is hereby added to the Sandow Unit Four Agreement in the form attached to this Amendment.

**Assignment**

35.    Section 12 of the Operating Contract is hereby amended to read as follows:

12.    Successors and Assigns. This contract shall bind and inure to the benefit of Alcoa and TXU Generation and their respective successors and assigns, but this contract shall not be assigned by either party without the prior consent of the other, which consent may not be unreasonably withheld or delayed, except to a successor to all or substantially all of its business, or, in the case of Alcoa, to its aluminum smelting operations in Milam County, whether by merger, consolidation or otherwise; provided, however, that either party may delegate the performance of any of its obligations hereunder, and may assign any of its rights hereunder, to a subsidiary, or, in the case of TXU Generation, to a subsidiary of

-18-

TXU Corp. and Alcoa may transfer the generating plant or any part thereof to a subsidiary of Alcoa, but no such delegation, assignment or transfer shall relieve the assigning party of any of its obligations hereunder.

36.   Article XIII of the Power Contract is hereby amended to read as follows:

Article XIII – Successors and Assigns

This contract shall bind and inure to the benefit of Alcoa and TXU Generation and their respective successors and assigns, but this contract shall not be assigned by either party without the prior consent of the other, which consent may not be unreasonably withheld or delayed, except to a successor to all or substantially all of its business (or, in the case of Alcoa, to its aluminum smelting operations in Milam County, whether by merger, consolidation or otherwise); provided, however, that either party may delegate the performance of any of its obligations hereunder, and may assign any of its rights hereunder, to its subsidiary, or, in the case of TXU Generation, to a subsidiary of TXU Corp. and Alcoa may transfer the generating plant or any part thereof to such a subsidiary, but no such delegation, assignment or transfer shall relieve the assigning party of any of its obligations hereunder.

37.   Section 11 of the Sandow Unit Four Agreement is hereby amended to read as follows:

Section 11.  Assignment.

(a)   This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and assigns, but neither party shall assign this Agreement nor any right or obligation hereunder without the prior written consent of the other, which consent may not be unreasonably withheld or delayed, except that:

(1)   Either party may assign this Agreement or any right or obligation hereunder, without the other's consent, to a wholly-owned subsidiary of the assignor; or

(2)   TXU Generation may delegate, assign or subcontract to or otherwise cause any or all of its duties hereunder to be discharged by any subsidiary of TXU Generation or any subsidiary of TXU Corp. without consent of Alcoa;

(b)   The assignor, in the case of assignment per (1) above, or TXU Generation, in case of delegation or other action per (2) above, shall remain liable to the other party as guarantor of the performance of such subsidiary, assignee, subcontractor, or designee.

**Settlement of Market Price Balance Account**

38.   Subsection (d) of Section II of Exhibit V-A of the Supplemental Sandow Unit Four Agreement is hereby amended to read as follows:

> (d)   A Market Price Balance Account is hereby established. If the Floor Price for a month is greater than the Market Price for that month, then an amount of money must be debited to the Market Price Balance Account in an amount equal to the difference between those two prices times the total of surplus energy for the month under Section 4.6 of the Power Contract or under Section 5(e) of the Sandow Unit Four Agreement plus any net kWh debit for the month to the Energy Reserve Account under Section I of Exhibit V-A. Any debit balance in the account earns interest at the interest rate then in effect that is set by the Public Utility Commission of Texas under Section 25.24(g) of its Substantive Rules. If the Floor Price for a month is less than the Market Price for that month, then an amount must be credited to the Market Price Balance Account equal to the difference between those two prices times the total of surplus energy for the month under Section 4.6 of the Power Contract or under Section 5(e) of the Sandow Unit Four Agreement plus any net kWh debit for the month to the Energy Reserve Account under Section I of Exhibit V-A. A credit balance in the Market Price Balance Account will be used in determining the Cost of Energy for that month in subsection (a) above, and the balance in the Market Price Balance Account must be reset to zero. A sample calculation of this Market Price Balance Account is attached hereto as Exhibit V-A-3. This Market Price Balance Account is subject to recalculation at the end of the year under subsection (e) below of this Section II of Exhibit V-A, but Alcoa is not obligated to pay TXU Generation to reduce any negative balances in the Market Price Balance Account to zero except that parties will make any payments necessary to reduce the Market Price Balance Account to zero upon the occurrence of either of these events:

> > (i)   Upon the occurrence of a Smelter Closing Event, if the Market Price Balance Account still has a balance on that date; or

> > (ii)   Upon the termination or expiration of this Agreement, if the Market Price Balance Account still has a balance on that date.

**Impact of External Events**

39.   A new Section 19 is hereby added to the Sandow Unit Four Agreement to read as follows:

> Section 19.   Impact of External Events. Before (a) committing either to build, or to allow to be built, any future power or fuel facilities on the existing Alcoa plant site, (b) permanently shutting down Units One-Three, or (c) transferring all or any rights to the Common Facilities or Lignite Facilities to a third party, Alcoa shall notify TXU Generation in writing of such proposed events. For sixty (60) days after receiving that written notice, the parties shall

-20-

negotiate in good faith about amendments to this Agreement and other agreements between the parties that are necessary or appropriate in connection with such proposed events, including without limitation the respective share of the costs that each party or third party will bear with regard to the Common Facilities and Lignite Facilities. Both TXU Generation and Alcoa must cooperate, and deal reasonably and in good faith, with each other in negotiating, documenting, and effecting any amendment arising out of the provisions of this Section 19. The intent of the parties is that the addition of such future facilities, the shutdown of Units One-Three, or the transfer of all or any portion of the rights to the Common Facilities or Lignite Facilities to a third party will not degrade or unreasonably interfere with TXU Generation's rights in Unit Four and the output therefrom, or in the Common Facilities, or in the use of fuel and services then provided by Alcoa.

## Settlement of Energy Reserve Account

40.     Section III of Exhibit V-A of the Supplemental Sandow Unit Four Agreement is hereby amended by adding a sentence at the end of that section to read as follows:

If a credit balance in the Energy Reserve Account at the end of a calendar year is so large that it cannot be recovered in the following calendar year, even if the Firm Power Amount is set at zero, then Alcoa shall pay TXU Generation for the costs recorded as herein provided with respect to such balance so that the resulting balance is zero. If the balance in the Energy Reserve Account is not zero at the termination or expiration of this Agreement, then Alcoa shall pay TXU Generation, in the case of a credit balance, and TXU Generation shall pay Alcoa, in the case of a debit balance, for the costs recorded as herein provided with respect to such balance so that the resulting balance is zero.

## Termination Rights

41.     A new Section 20 is hereby added to the Sandow Unit Four Agreement to read as follows:

Section 20. End-of-Term Rights.

(a)     In addition to all other remedies set forth in this Agreement or in the Power Contract, the Operating Contract, or any of the other agreements between the parties concerning the Alcoa site (the "Sandow Contracts"), if this Agreement or any of the Sandow Contracts are terminated or have expired for any reason whatsoever, except as specified otherwise in Section 21 below:

(1)     TXU Generation may require Alcoa or its successor to transfer title to and immediate possession of any part or all of the Common Facilities to TXU Generation in exchange for the amount equal to the fair market value of each Common Facility;

(2)    TXU Generation may require Alcoa or its successor in ownership to continue to provide cooling water to TXU Generation in amounts necessary to operate Unit Four at its full capability for so long as TXU Generation or an affiliate of TXU Generation operates Unit Four at a price deemed to equal the fair market value of such cooling water;

(3)    TXU Generation may require Alcoa or its successor, if possible, to transfer ownership of any permits or licenses issued by any governmental authority or regulatory agency, which permit or license is deemed by TXU Generation to be beneficial or material to the ownership or operation of Unit Four in compliance with all applicable laws, rules or regulations, at no cost to Alcoa;

(4)    TXU Generation may purchase Alcoa's, or its successor's, rail facilities for transportation in support of Unit Four in exchange for the amount equal to the fair market value if Alcoa or its successor has no further need of such rail facilities but, if Alcoa or its successor does continue to have a need for the rail facilities, it will grant TXU Generation the right to use the rail facilities at a price deemed to equal the fair market value of the use of such rail facilities so long as TXU Generation's use will not unreasonably interfere with Alcoa's, its successor's or a third parties' use of the rail facilities; and

(5)    TXU Generation may purchase or take assignment of, at the price set forth in Section 6.1 of the Power Contract, any real property interests from Alcoa (including, but not limited to, any easements, fee property, or leases relating to the Unit Four Real Estate or any other property adjoining or utilized in connection with Unit Four) that TXU Generation deems to be beneficial or material to the ownership or operation of Unit Four.

(6)    The parties will negotiate in good faith the terms pursuant to which TXU Generation may use other Common Facilities not specifically mentioned in this Section 20, above (*e.g.*, potable water, sewer, or the like).  The intent of the parties is that the cost of such Common Facilities to TXU Generation will be based upon its usage vis-à-vis other users of such Common Facilities.

(7)    Alcoa covenants that the transfer of any Common Facilities and the property adjoining the Unit Four Real Estate under this Section 20 will be free and clear of all liens and encumbrances of any kind or nature, fixed or contingent.

(8)    The rights of TXU Generation under this Section 20(a) terminate upon the expiration of twenty-one (21) years after the death of the survivor of the following persons:

-22-

Stephen W. Smith and Scott M. Smith, children of William Smith and Kay E. Smith of Round Rock, Williamson County, Texas;

Elizabeth L. Loveless, Emily K. Loveless, and William A. Loveless, children of S. Jeb Loveless and Martha E. Kinard of Arlington, Tarrant County, Texas; and

Andrew Strahan and Nathan Strahan, children of James Strahan and Christina Ward Strahan, of Ranger, Eastland County, Texas.

(b)     TXU Generation's rights and obligations under this Section 20 are subject to the rights and obligations of Alcoa or third parties with regard to the Common Facilities, cooling water, permits and licenses, rail facilities, and any real property interests, and TXU Generation's use or ownership of such will not unreasonably interfere with Alcoa's or third parties' rights.    If after this Agreement is terminated Alcoa desires to use the Common Facilities, permits and licenses, rail facilities, and any real property interests transferred to TXU Generation under this Section 20, then the parties will negotiate in good faith the terms pursuant to which Alcoa may use the Common Facilities, permits and licenses, rail facilities, and any real property interests, it being the intent of the parties that the cost of such to Alcoa will be based upon Alcoa's usage vis-à-vis other users of such Common Facilities, including TXU Generation.

(c)     Alcoa agrees to indemnify TXU Generation against, and hold it harmless from any costs, expenses or liabilities of any kind, which arise out of or in connection with TXU Generation having to bring the Common Facilities or any other property that TXU Generation acquires in accordance with this Section 20 into compliance with Applicable Law (as that term is defined in Section 17(a)) as a result of acts or omissions that occurred any time prior to the acquisition of such Common Facilities or other property by TXU Generation; provided, however, if, within 90 days of the acquisition by TXU Generation, each of the following occurs: (1) Alcoa proposes in writing, and names a consultant to perform, at Alcoa's expense, a Phase 2 Environmental Assessment ("EA") on the Common Facilities and any other property that TXU Generation will purchase or assume, or has purchased or assumed, in accordance with this Section 20, which consultant is reasonably agreeable to TXU Generation; and (2) the consultant completes to the satisfaction of both Alcoa and TXU Generation said EA and has identified each environmental issue applicable to said facilities and property; then, as of such time as both Alcoa and TXU Generation have advised in writing that said EA is satisfactory, Alcoa's liability and indemnity obligations as stated above shall be limited to those conditions, issues, and liabilities which the consultant identifies as being extant at the time when the acquisition occurred; and provided further that this Section 20(c) does not apply to costs, expenses or liabilities for which TXU Generation was responsible at the time of the acquisition of the Common Facilities or other property.    TXU Generation agrees to indemnify Alcoa against, and hold it harmless from any costs, expenses or liabilities of any kind, which arise out of or in connection with Alcoa having to bring the Common Facilities or

-23-

any other property that TXU Generation acquires in accordance with this Section 20 into compliance with Applicable Law as a result of acts or omissions that occurred any time after the acquisition of such Common Facilities or other property by TXU Generation.

(d)    Alcoa acknowledges and agrees that TXU Generation will incur irreparable harm as a result of failing to obtain the full power output from Unit Four, or failing to obtain use of all or any part of the Common Facilities and properties and permits which are associated or utilized in connection with the Common Facilities or Unit Four; and, therefore, Alcoa hereby agrees to cooperate fully with TXU Generation's exercise of its rights under this Section 20, including, without limitation, the execution and delivery of all necessary assignments, documents, licenses and rights required in connection therewith, and Alcoa hereby irrevocably waives any right to claim that TXU Generation has an adequate remedy at law for failing to obtain the full power output from Unit Four, or failing to obtain use of all or any part of the Common Facilities and properties and permits which are associated or utilized in connection with the Common Facilities or Unit Four.

(e)    Alcoa agrees to incorporate into its corporate documentation, financing agreements, service agreements, supply agreements, interconnection and transmission agreements, together with all other instruments, permits, licenses and agreements beneficial or material to the ownership or operation of the Common Facilities, Unit Four, the Unit Four Real Estate, and properties that are associated or utilized in connection with the Common Facilities or the property adjoining the Unit Four Real Estate, all terms, provisions, and conditions required to implement, and empower TXU Generation to exercise, all of the rights and remedies provided to TXU Generation in this Agreement; and Alcoa agrees and covenants to take no subsequent actions, or make any subsequent amendments or agreements, that will contravene or impair any of TXU Generation's rights hereunder and Alcoa further covenants that its rights to dispose of, sell, lease, pledge or otherwise transfer any of the property, equipment, or facilities constituting the Common Facilities or associated or utilized in connection with the Common Facilities or the property adjoining the Unit Four Real Estate is subject to the provisions of Section 19 above.

(f)    Alcoa agrees to have executed and recorded in Milam County a Memorandum of Option in the form attached hereto as Exhibit B, which shall serve as notice of TXU Generation's rights with respect to the Common Facilities and the properties on which same are located, or properties which are associated or utilized therewith; and Alcoa shall, from time to time, at TXU Generation's expense, promptly execute and deliver all such other and future documents and instruments, and take all such further action, as may be necessary or desired by TXU Generation in order to confirm, continue or give notice of the rights granted to TXU Generation herein, all of which rights of TXU Generation shall also extend to any after-acquired rights or properties of Alcoa in or with respect to the Common Facilities or Unit Four.

-24-

42.    A new Exhibit B is hereby added to the Sandow Unit Four Agreement to read as set out in the Exhibit B attached to this Amendment.

**Operating Fee Minimum**

43.    Section 8 of the Sandow Unit Four Agreement is hereby amended by adding a new subsection (h) to read as follows:

(h)    (i)    At the end of each calendar year, Alcoa shall pay to TXU Generation a Supplemental Operating Fee, which is the amount, if any, by which the Minimum Fee Amount exceeds the sum of:

(A)    the Operating Fees for the calendar year;

(B)    the Additional Operating Fees for the calendar year; and

(C)    one-third of the cost of capital payments that Alcoa paid to TXU Generation under this Agreement for the calendar year.

(ii)    The Minimum Fee Amount for calendar year 2003 is $2,000,000. The Minimum Fee Amount for each subsequent calendar year will be the Change In The Implicit Price Deflator for that calendar year multiplied by the Minimum Fee Amount for the immediately previous calendar year.

(iii)    The term "Change In The Implicit Price Deflator" means, for a calendar year, the smaller of (A) a fraction the numerator of which is the GDP Implicit Price Deflator for the immediately preceding calendar year and the denominator of which is the GDP Implicit Price Deflator for second preceding calendar year, and (B) 1.025.

(iv)    The term "GDP Implicit Price Deflator" means, for a calendar year, the most recent revision of the gross domestic product implicit price deflator as computed and published by the United States Department of Commerce Bureau of Economic Analysis before July 15 of the calendar year. For a given calendar year, the GDP Implicit Price Deflator is the ratio of the current-dollar value of GDP to its corresponding chained-dollar value, multiplied by 100.

(v)    If the GDP Implicit Price Deflator is discontinued during the term of this Agreement, the remaining adjustments called for in this subsection (h) must be made using the statistics of the United States Department of Commerce that are most nearly comparable to the GDP Implicit Price Deflator. If the United States Department of Commerce ceases to exist or ceases to publish statistics concerning the purchasing power of the dollar during the term of this Agreement, the remaining

adjustments called for in this subsection shall be made using the most nearly comparable statistics published by a recognized financial authority mutually selected by TXU Generation and Alcoa.

**Charges for Transmitting Power**

44.    A new subsection (e) is hereby added to Section 9 of the Sandow Unit Four Agreement to read as follows:

(e)    Alcoa shall pay the ERCOT charges that TXU Generation incurs, directly or indirectly, when power is delivered from the system instead of from Unit Four.

**Separate Oncor Agreements**

45.    TXU Generation, Oncor Electric Delivery Company, and TXU US Holdings Company shall, no later than five (5) business days after September 15, 2003, enter into an Assignment and Assumption Agreement, in the form attached to this Amendment as Amendment Exhibit B, that restates the division of the rights and obligations of TXU US Holdings Company (f/k/a TXU Electric Company) under the Sandow Contracts between TXU Generation and Oncor, and Alcoa shall, no later than five (5) business days after September 15, 2003, also sign that Assignment and Assumption Agreement for the limited purpose of consenting to the assignment and assumption. The parties contemplate that Alcoa and Oncor will subsequently enter into new agreements that govern the relationship between those two parties.

**Fuel Supply**

46.    Section 2(e) of the Sandow Unit Four Agreement is hereby amended to read as follows:

(e)    "Lignite Facilities" by which is meant lignite properties and leases now or hereafter controlled, operated, possessed, or owned by Alcoa in support of Units One-Three and Unit Four, including but not limited to lignite properties in Milam County, Lee County, and Bastrop County, and all land, structures and equipment used in the mining, transportation, crushing, handling and delivery of lignite to Units One-Three and Unit Four. A detailed list of the additions and replacements to Lignite Facilities contemplated by this Agreement is included in a supplemental exhibit hereto, signed by both parties.

47.    Section 7(a) of the Sandow Unit Four Agreement is hereby amended to read as follows:

(a)    Alcoa shall furnish lignite, or, at Alcoa's option, an alternate fuel acceptable to TXU Generation, to the Sandow Station in quantities sufficient to assure TXU Generation a continuous ability to generate power and energy at ninety percent (90%) annual load factor equal to 95/545ths of the capacity of Unit Four over the term of this Agreement. TXU Generation's rights under Article V of the Power Contract shall be satisfied upon the signing of this Agreement.

-26-

**Fuel Quality**

48.    New subsection (i) is hereby added to Section 7 of the Sandow Unit Four Agreement to read as follows:

> (i)    To the extent that Alcoa furnishes fuel from resources other than those defined as "Lignite Facilities" under Section 2(e) above, then the parties shall amend this Agreement to provide for Alcoa's recovery from TXU Generation of a share of the costs of that alternate fuel in a manner similar to that provided for the recovery of the costs of "Lignite Facilities" in this Agreement, but the intent of the parties is that the amendment must be designed, as far as possible, to preserve the current relative economics of the parties under this Agreement.

**Revisions of References to Tariffs**

49.    The last sentence of the second paragraph of the letter agreement dated October 7, 1977, as heretofore amended, is amended to read as follows:

> If energy is to Alcoa, then Alcoa shall pay for it at a rate equal to the sum of:

>> (i)    the energy charges (but not the customer or demand charges) in the then-current Rate HV in the Price to Beat Tariff of TXU Energy Retail Company LP multiplied by 1.2, plus

>> (ii)    the then-current fuel cost under Rider FC and the then-current purchased power cost under Rider PCR, both under the Price to Beat Tariff of TXU Energy Retail Company LP

50.    Item (b) of the fourth paragraph of the letter agreement of October 7, 1977, as heretofore amended, is amended to read as follows:

> (b)    If to Alcoa, at the sum of

>> (i)    the energy charges (but not the customer or demand charges) in the then-current Rate HV in the Price to Beat Tariff of TXU Energy Retail Company LP multiplied by 1.2 plus

>> (ii)    the then-current fuel cost under Rider FC and the then-current purchased power cost under Rider PCR, both in the Price to Beat Tariff of TXU Energy Retail Company LP.

**Revisions of References to Tariffs**

51.     A new paragraph is added after the fourth paragraph of the letter agreement of October 7, 1977, as heretofore amended, to read as follows:

> References to tariffs include all tariffs consolidating, amending, or replacing the tariff referred to. If the Price to Beat Tariff of TXU Energy Retail Company LP expires or is terminated without replacement, then Alcoa and TXU Generation shall implement a replacement pricing mechanism, which replacement pricing shall be a multiple of the ERCOT market clearing price of energy at the Sandow buss, with the amount of the multiple being based upon the historical relationship of the ERCOT market clearing price of energy at the Sandow buss to the Price to Beat Tariff of TXU Energy Retail Company LP.

52.     **Cooperation**. At any time or from time to time, Alcoa and TXU Generation shall each, as reasonably requested and at the expense of the requesting party, execute and deliver any further instruments or documents and take all further action as such requesting party may reasonably request in order to effect the provisions of this Amendment.

53.     **Effective Date**. This Amendment is being executed by both parties as of September 1, 2003 but it is not effective until each party has given the other written notice that the executive management or board, as applicable, of the sending party has approved the Amendment. To be effective, that notice must be received by the other party on or before September 15, 2003. If both Alcoa and TXU Generation have received such notices on or before September 15, 2003, then this Amendment is effective as of September 1, 2003 (the "Effective Date"). If either party has not received notice of approval from the other party on or before September 15, 2003, then this Amendment is void and deemed to have never gone into effect.

54.     **Effect of Amendment**. This Amendment controls any conflicts between the terms of this Amendment and the terms of any of the other Sandow Contracts. The portions of the Sandow Contracts, as previously amended, that are not modified by this Amendment are still effective, but all provisions of the Sandow Contracts shall be subject to and governed by the terms hereof, and such Sandow Contracts shall be consistently integrated in a manner consistent with the terms and intent evinced by this Amendment.

55.     **Successors and Assigns**. This Amendment is binding on and inures to the benefit of the parties and their respective successors and permitted assigns.

56.     **Execution in Counterparts**. This Amendment may be executed in a number of identical counterparts, each of which is deemed an original for all purposes.

57.     **Alcoa's General Representations and Warranties**. Alcoa now represents and warrants unconditionally to TXU Generation that:

        (a)     Alcoa is a corporation duly organized, validly existing, in good standing under the laws of the Commonwealth of Pennsylvania, and is authorized to do business in the State of Texas.

(b)    Alcoa has full corporate power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Amendment.

(c)    The making and performance by Alcoa of this Amendment have been duly authorized by the necessary corporate action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to Alcoa, violate any provision of Alcoa's Articles of Incorporation or Bylaws, or result in a breach of, or constitute a default under, any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which Alcoa is a party or by which it or its property is bound or affected.

58.    **TXU Generation's General Representations and Warranties.** TXU Generation now represents and warrants unconditionally to Alcoa that:

(a)    TXU Generation is a limited partnership duly organized, validly existing, and in good standing under the laws of the State of Texas.

(b)    TXU Generation has full power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Amendment.

(c)    The making and performance by TXU Generation of this Amendment have been duly authorized by all necessary partnership action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to TXU Generation, violate any provision of TXU Generation's organizational documents, or result in a breach of or constitute a default under any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which TXU Generation is a party or by which it or its property is bound or affected.

59.    **No Rights of Third Parties.** This Amendment is intended only for the parties' benefit. Nothing in this Amendment may be construed to create any duty to, any standard of care concerning, or any liability to, any person not a party to this Amendment.

60.    **Subject to Applicable Laws.** This Amendment is subject to applicable federal, state, and local laws, ordinances, rules, and regulations. Nothing in this Amendment may be construed as a waiver of any right to question or contest any law, ordinance, rule, regulation, or asserted regulatory jurisdiction, but each party must perform under this Agreement during the time that it is questioning or contesting any law, ordinance, rule, regulation, or asserted regulatory jurisdiction.

61.    **Amendment.** This Amendment may be amended at any time, but only upon the parties' written agreement that explicitly states the parties' intent to amend this Amendment.

62.    **No Waiver.** The waiver of a breach of any provision of this Amendment does not waive any other breach of that provision or of any other provision.

-29-

63.    **Complete Amendment.** This Amendment, together with the documents attached as Exhibits to this Amendment, represents the parties' final and mutual understanding with respect to the subject matters covered by this Amendment. No representations, inducements, promises, or other agreements, oral or otherwise, have been relied upon or made by any party, or anyone on behalf of a party, that are not fully expressed in this Amendment and in its Exhibits. An agreement, statement, or promise not contained in this Amendment and its Exhibits is not valid or binding on the parties hereto.

64.    **Choice of Law.** This Amendment must be construed, and its performance enforced, under Texas law.

65.    **Severability.** If any provision of this Amendment is found to be invalid or unenforceable, that provision is severed from the remainder of this Amendment, and the parties shall immediately negotiate in good faith and agree to a replacement provision that is valid and enforceable and that puts each party in substantially the same position that the party was in before the original provision was found to be invalid or unenforceable. This Amendment, as so modified, continues in full force and effect. Additionally, if the application of any provision of this Amendment to any person or circumstance is found to be invalid or unenforceable, then that provision remains valid and enforceable as applied to all other persons and circumstances.


**[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]**

Signed as of the date first mentioned above.

**Alcoa Inc.**

By: _Thomas J. Cormany_

Title: _PRESIDENT - Primary Metals Development_

**TXU Generation Company LP**

By: TXU Generation Management Company
LLC, its general partner

By: _Richard R Wistrand_

Title: _Sr. Vice President_

-31-

# Exhibit V-A-1
## to Sandow Unit Four Agreement
### (As amended by the 6th Amendment to Contracts)

TXU ELECTRIC
SANDOW UNIT 4
COST PER MEGAWATT
June-03 (hypothetical)

|  | Current Month | YTD |
|---|---|---|
| Unit 4 Generation Cost: |  |  |
| Billable Expense – invoice | $3,082,168.17 | $12,813,398.68 |
| Depreciation on Common Facilities | 37,784.00 | 227,451.00 |
| TOTAL UNIT 4 O&M | $3,119,952.17 | $13,040,849.68 |
|  |  |  |
| ALCOA's Share Unit 4 O&M | $2,576,107.30 | $10,767,674.05 |
| Inducement Fee | 140,179.00 | 841,074.00 |
| Operating Fee - Unit 4 | 112,659.70 | 450,821.86 |
| Cost of Capital - TXU | 1,038,640.60 | 6,403,892.93 |
| Depreciation - TXU | 845,257.73 | 5,019,973.16 |
| TOTAL UNIT 4 GENERATION COSTS | $4,712,844.33 | $23,483,436.00 |
|  |  |  |
| Unit 4 Fuel Cost to ALCOA: |  |  |
| Lignite Cost | $2,779,458.00 | $22,162,641.00 |
| Fuel Oil * | 66,314.00 | 254,643.00 |
| Reclamation Fee | 25,493.00 | 192,019.00 |
| Byproduct Sale | (10,438.00) | (56,863.00) |
| 100% Unit 4 | $2,860,827.00 | $22,552,440.00 |
|  |  |  |
| ALCOA's Share Unit 4 | 2,362,150.73 | 18,621,280.73 |
| TOTAL FUEL COSTS | $2,362,150.73 | $18,621,280.73 |
|  |  |  |
| TOTAL ALCOA UNIT 4 COST | $7,074,995.06 | $42,104,716.73 |
|  |  |  |
| ALCOA MWH | 249,431 | 1,882,714 |
|  |  |  |
| DOLLARS PER MWH | $28.3645 | $22.3638 |

-32-

# Amendment Exhibit A-1
## to 6th Amendment to Contracts

## Amendment to Warranty Deed

**Date:** _____, 2003

**Grantor:**    Alcoa Inc., a Pennsylvania corporation (f/k/a Aluminum Company of America)

**Grantor's Mailing Address:**

>    Alcoa Inc.
>    Alcoa Corporate Center
>    201 Isabella Street
>    Pittsburgh, PA 15212-5858

**Grantee:**    TXU Generation Company LP, a Texas limited partnership, acting by and through TXU Generation Management Company LLC, its general partner, as successor-in-interest to Texas Power & Light Company

**Grantee's Mailing Address:**

>    TXU Generation Company LP
>    1601 Bryan Street
>    16th Floor
>    Dallas, TX 75201

**Consideration:**

>    Cash and other good and valuable consideration.

**Original Warranty Deed:** A Warranty Deed dated March 14, 1978 from Aluminum Company of America to Texas Power & Light Company of record at Vol. 444, page 29 of the Real Property Records of Milam County, Texas.

In the Original Warranty Deed, a paragraph number "3" under the reservation of rights to Aluminum Company of America reads as follows:

>    3.    The rights of Aluminum Company of America under Paragraphs 1 and 2 hereof shall terminate upon the expiration of twenty-one (21) years after the death of the survivor of the following persons:

1

Carolyn Amy Kelson and Melinda Anne Kelson, daughters of Richard B. Kelson and Ellen S. Kelson of the Township of Mt. Lebanon, Allegheny County, Pennsylvania;

Kenneth Dale Cockrell and Phillip Lee Cockrell, sons and Deborah Jean Cockrell, daughter of Buford D. Cockrell and Jewell M. Cockrell of Upper St. Clair Township, Allegheny County, Pennsylvania;

Dona Stacy Campbell, daughter, and Mark Robert Campbell and Ricky Lee Campbell, sons of Robert K. Campbell and Donna J. Campbell of Dallas, Dallas County, Texas;

Halsell S. Davis, III, Bruce M. Davis, Thomas L. Davis, and Joseph L. Davis, sons of H. Sam Davis, Jr. and Laura Ann Davis of Dallas, Dallas County, Texas.

Grantor, for the Consideration, and Grantee, for the Consideration, hereby agree to amend the Original Warranty Deed by revising that paragraph number "3" to read as follows:

3.     The rights of Aluminum Company of America under Paragraphs 1 and 2 hereof shall terminate upon the earlier of:

(a)     the later of the termination of the unrecorded agreement dated August 13, 1976, as amended from time to time or the occurrence of a Smelter Closing Event as defined in that unrecorded agreement, as amended from time to time; or

(b)     expiration of twenty-one (21) years after the death of the survivor of the following persons:

Carolyn Amy Kelson and Melinda Anne Kelson, daughters of Richard B. Kelson and Ellen S. Kelson of the Township of Mt. Lebanon, Allegheny County, Pennsylvania;

Kenneth Dale Cockrell and Phillip Lee Cockrell, sons and Deborah Jean Cockrell, daughter of Buford D. Cockrell and Jewell M. Cockrell of Upper St. Clair Township, Allegheny County, Pennsylvania;

Dona Stacy Campbell, daughter, and Mark Robert Campbell and Ricky Lee Campbell, sons of Robert K. Campbell and Donna J. Campbell of Dallas, Dallas County, Texas;

2

Halsell S. Davis, III, Bruce M. Davis, Thomas L. Davis,
and Joseph L. Davis, sons of H. Sam Davis, Jr. and
Laura Ann Davis of Dallas, Dallas County, Texas.

Except as amended in this amendment to warranty deed, the Original Warranty Deed is still in full effect.

This amendment to warranty deed is entered into in connection with an unrecorded amendment to contracts between Grantor and Grantee dated August ___, 2003.

When the context requires, singular nouns and pronouns include the plural.

| **Alcoa Inc.** | **TXU Generation Company LP** |
|---|---|
| By: _____ | By: TXU Generation Management Company LLC, its general partner |
| Name: _____ | By: _____ |
| Title: _____ | Title: _____ |

STATE OF _____           )
COUNTY OF _____          )

This instrument was acknowledged before me on _____, 2003, by
_____ as _____ of Alcoa Inc.

_____
Notary Public, State of _____

STATE OF _____           )
COUNTY OF _____          )

This instrument was acknowledged before me on _____, 2003, by
_____ as _____ of TXU Generation Management Company
LLC, as general partner of TXU Generation Company LP.

_____
Notary Public, State of _____

3

AFTER RECORDING RETURN TO:

Burford & Ryburn, L.L.P.
500 N. Akard
3100 Lincoln Plaza
Dallas, TX 75201-6697
Tel: (214) 740-3100
Fax: (214) 740-3125

# Amendment Exhibit A-2
## to 6th Amendment to Contracts

## Amendment to Warranty Deed

**Date:** _____, 2003

**Grantor:**       Alcoa Inc., a Pennsylvania corporation (f/k/a Aluminum Company of America)

**Grantor's Mailing Address:**

        Alcoa Inc.
        Alcoa Corporate Center
        201 Isabella Street
        Pittsburgh, PA 15212-5858

**Grantee:**       TXU Generation Company LP, a Texas limited partnership, acting by and through TXU Generation Management Company LLC, its general partner, as successor-in-interest to Texas Power & Light Company

**Grantee's Mailing Address:**

        TXU Generation Company LP
        1601 Bryan Street
        16th Floor
        Dallas, TX 75201

**Consideration:**

        Cash and other good and valuable consideration.

**Original Warranty Deed:** A Warranty Deed dated July 21, 1980 from Aluminum Company of America to Texas Power & Light Company of record at Vol. 465, page 139 of the Real Property Records of Milam County, Texas.

        In the Original Warranty Deed, a paragraph number "3" under the reservation of rights to Aluminum Company of America reads as follows:

                3.    The rights of Aluminum Company of America under Paragraphs 1 and 2 hereof shall terminate upon the expiration of twenty-one (21) years after the death of the survivor of the following persons:

1

Carolyn Amy Kelson and Melinda Anne Kelson, daughters of Richard B. Kelson and Ellen S. Kelson of the Township of Mt. Lebanon, Allegheny County, Pennsylvania;

Kenneth Dale Cockrell and Phillip Lee Cockrell, sons and Deborah Jean Cockrell, daughter of Buford D. Cockrell and Jewell M. Cockrell of Upper St. Clair Township, Allegheny County, Pennsylvania;

Dona Stacy Campbell, daughter, and Mark Robert Campbell and Ricky Lee Campbell, sons of Robert K. Campbell and Donna J. Campbell of Dallas, Dallas County, Texas;

Halsell S. Davis, III, Bruce M. Davis, Thomas L. Davis, and Joseph L. Davis, sons of H. Sam Davis, Jr. and Laura Ann Davis of Dallas, Dallas County, Texas.

Grantor, for the Consideration, and Grantee, for the Consideration, hereby agree to amend the Original Warranty Deed by revising that paragraph number "3" to read as follows:

3.    The rights of Aluminum Company of America under Paragraphs 1 and 2 hereof shall terminate upon the earlier of:

(a)    the later of the termination of the unrecorded agreement dated August 13, 1976, as amended from time to time or the occurrence of a Smelter Closing Event as defined in that unrecorded agreement, as amended from time to time; or

(b)    expiration of twenty-one (21) years after the death of the survivor of the following persons:

Carolyn Amy Kelson and Melinda Anne Kelson, daughters of Richard B. Kelson and Ellen S. Kelson of the Township of Mt. Lebanon, Allegheny County, Pennsylvania;

Kenneth Dale Cockrell and Phillip Lee Cockrell, sons and Deborah Jean Cockrell, daughter of Buford D. Cockrell and Jewell M. Cockrell of Upper St. Clair Township, Allegheny County, Pennsylvania;

Dona Stacy Campbell, daughter, and Mark Robert Campbell and Ricky Lee Campbell, sons of Robert K. Campbell and Donna J. Campbell of Dallas, Dallas County, Texas;

2

Halsell S. Davis, III, Bruce M. Davis, Thomas L. Davis,
and Joseph L. Davis, sons of H. Sam Davis, Jr. and
Laura Ann Davis of Dallas, Dallas County, Texas.

Except as amended in this amendment to warranty deed, the Original Warranty Deed is still in full effect.

This amendment to warranty deed is entered into in connection with an unrecorded amendment to contracts between Grantor and Grantee dated August ___, 2003.

When the context requires, singular nouns and pronouns include the plural.

| Alcoa Inc. | TXU Generation Company LP |
|---|---|
| By: _____ | By: TXU Generation Management Company LLC, its general partner |
| Name: _____ | By: _____ |
| Title: _____ | Title: _____ |

STATE OF _____          )
COUNTY OF _____        )

This instrument was acknowledged before me on _____, 2003, by _____ as _____ of Alcoa Inc.

_____
Notary Public, State of _____

STATE OF _____          )
COUNTY OF _____        )

This instrument was acknowledged before me on _____, 2003, by _____ as _____ of TXU Generation Management Company LLC, as general partner of TXU Generation Company LP.

_____
Notary Public, State of _____

3

AFTER RECORDING RETURN TO:

Burford & Ryburn, L.L.P.
500 N. Akard
3100 Lincoln Plaza
Dallas, TX 75201-6697
Tel: (214) 740-3100
Fax: (214) 740-3125

4

# Amendment Exhibit B
## to 6th Amendment to Contracts

# Assignment and Assumption Agreement
## (Alcoa)

This Assignment and Assumption Agreement ("Assignment") dated as of September 1, 2003, to be effective as of January 1, 2002, is between TXU US Holdings Company, a Texas corporation, formerly known as TXU Electric Company ("Electric Company"), as assignor, and TXU Generation Company LP, a Texas limited partnership ("Generation Company") and Oncor Electric Delivery Company, a Texas corporation ("Electric Delivery Company"), as assignees. Electric Company, Generation Company, and Electric Delivery Company are after this sometimes called "Party" individually or "Parties" jointly.

## Background

Electric Company is a party to several written contracts (the "Sandow Contracts") with Alcoa Inc., a Pennsylvania corporation, concerning four lignite-fueled electric generating units located near Rockdale, Texas. These Sandow Contracts include, without limitation, the following:

- Power Contract dated August 29, 1951;

- Operating Contract dated August 29, 1951;

- Sandow Unit Four Agreement dated August 13, 1976; and

- Supplemental Agreement to Sandow Unit Four Agreement dated March 2, 1981.

Under the Texas Utilities Code, as amended by Senate Bill 7 in the 1999 Texas Legislature, Electric Company must, by January 1, 2002, unbundle its operations into different entities. As part of this unbundling process, Electric Company must transfer the Sandow Contracts, along with its other purchased-power agreements and generation assets, to one or more of its unregulated affiliates. All Parties are affiliates of each other, in that they are all entities that are wholly owned and controlled, either directly or indirectly, by TXU Corp., a Texas corporation.

Some of rights and obligations of Electric Company under the Sandow Contracts, however, cannot legally be held, exercised, or performed by Generation Company and must instead be held, exercised, or performed by Electric Delivery Company.

The purpose of this Assignment is to assign all of Electric Company's interest in the Sandow Contracts, partially to Electric Delivery Company with the remainder to Generation Company, to be effective at 12:00 midnight at the beginning of January 1, 2002 (the "Effective Time").

1

# Agreements

Therefore, in consideration of the mutual promises made in this Assignment and Assumption Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Electric Company, Generation Company, and Electric Delivery Company agree as follows:

1. **Assignment.**

    (a)  With the exceptions set out in Section 1(b) below, Electric Company assigns all of its interest in, and rights and obligations under, the Sandow Contracts, effective at the Effective Time, to Generation Company. This assignment includes Electric Company's interest in, and rights and obligations under, all amendments to the Sandow Contracts and all related consents.

    (b)  The exception to the assignment in Section 1(a) above is that Electric Company assigns to Electric Delivery Company, and does not assign to Generation Company, the rights and obligations that Generation Company cannot legally hold, exercise, or perform, which in general are those that pertain to interconnection of the generating plant with the transmission grid, operation and maintenance of the transmission grid, and transmission of the electric energy generated by the generating plant through the transmission grid. In particular, Electric Company assigns to Electric Delivery Company, and does not assign to Generation Company, the rights and obligations under these two Agreements:

    - Agreement for Maintenance By and Between Texas Utilities Electric Company and Aluminum Company of America No: 6K9-00268 dated August 13, 1990; and

    - Agreement for Maintenance By and Between Texas Utilities Electric Company and Aluminum Company of America No: 6K9-00279 dated August 13, 1990.

    In addition, the parts of the Sandow Contracts that may include rights and obligations of Electric Delivery Company may include, without limitation, the following:

    - Sections II(e), 3.2, 3.3, 3.4, 3.5, 3.6, 3.7, and 4.13 of the Power Contract;

    - Sections 3 and 5 of a letter agreement dated December 20, 1963, between Texas Power & Light Company and Aluminum Company of America;

    - A letter agreement dated December 18, 1968, between Texas Power & Light Company and Aluminum Company of America; and

    - Sections 9 and 12 of a letter agreement between Texas Utilities Electric Company and Aluminum Company of America dated June 30, 1997 regarding "Transition Agreements."

2

Electric Delivery Company will not, however, acquire by this Assignment any right or obligation to purchase electric energy or capacity under the Sandow Contracts.

2.    **Assumption.**

   (a)    Except for the interest, rights and obligations assigned to Electric Delivery Company as described in Section 1(b) above, Generation Company accepts the assignment by Electric Company of all of Electric Company's interest in, and, with the same exception, assumes and agrees to perform all of Electric Company's rights and obligations under, the Sandow Contracts, effective at the Effective Time.

   (b)    Effective at the Effective Time, Electric Delivery Company accepts the assignment by Electric Company of the interest, rights and obligations assigned to Electric Delivery Company as described in Section 1(b) above and assumes and agrees to perform all of those rights and obligations.

3.    **Effectiveness of Assignment and Assumption Agreement.** This Assignment and Assumption Agreement is effective on the date first stated above, even though the assignments and assumptions under Section 1 and Section 2 above are not effective until the Effective Time.

4.    **Operation of Sandow Contracts.** Before the Effective Time, Electric Company retains all rights and obligations under the Sandow Contracts and may take, or fail to take, any action that it deems necessary or appropriate in connection with the Sandow Contracts, including but not limited to termination, renegotiation, or amendment, without incurring any obligation or liability to Generation Company or Electric Delivery Company whatsoever. Generation Company and Electric Delivery Company must accept the Sandow Contracts in whatever state that it exists at the Effective Time.

5.    **Accounting.** Electric Company must pay any amounts due, and may accept any amounts received, under the Sandow Contracts that accrued, or are attributable to operations before, the Effective Time. If either Generation Company or Electric Delivery Company is required to pay, or receives, any amounts that are the responsibility or right of Electric Company under this Assignment and Assumption Agreement, then the Parties shall transfer that payment or receipt to the appropriate Party. If any billing statements are partially for operations before the Effective Time and partially for operations at and after the Effective Time, then the Parties must equitably split the billing statement, and each Party must pay, and may receive, its equitable share of that billing statement.

6.    **No Warranties.** Company makes the assignment of the Sandow Contracts under this Assignment and Assumption Agreement without, and it expressly disclaims, any warranty, whether express, implied, or statutory, including but not limited to any warranty of title.

7.    **Further Assurances.** Each of the Parties must sign any documents and take any other action that any of them reasonably considers necessary or appropriate to carry out the purpose and intent of this Assignment and Assumption Agreement.

8.  **Notice of Assignment and Assumption**. Electric Company must promptly give written notice of this Assignment and Assumption Agreement to Seller.

9.  **Binding Effect**. This Assignment and Assumption Agreement is binding upon, and inures to the benefit of, the Parties and their respective successors and permitted assigns that have agreed in writing to be bound by all terms and conditions of this Assignment and Assumption Agreement.

10. **Duly Authorized**. Each Party represents to the each of the other Parties:

    (a)   that the Party has the necessary legal authority to enter into this Assignment and Assumption Agreement and to perform each and every duty and obligation imposed by this Assignment and Assumption Agreement on the Party; and

    (b)   that this Assignment and Assumption Agreement, when executed by the duly authorized representatives of the Party, represents a valid, binding and enforceable legal obligation of the Party.

11. **Signers Authorized**. Each individual affixing a signature to this Assignment and Assumption Agreement represents and warrants that he or she has been duly authorized to execute this Assignment and Assumption Agreement on behalf of the Party he or she represents and that by signing the Assignment and Assumption Agreement a valid, binding, and enforceable legal obligation of that Party has been created.

12. **Amendments**. This Assignment and Assumption Agreement may be amended at any time, but only upon the written agreement of all Parties.

13. **Waiver**. The waiver of a breach of any provision of this Assignment and Assumption Agreement does not waive any other breach of that provision or of any other provision.

14. **Headings**. The captions and numbers of the various articles and sections of this Assignment and Assumption Agreement are for convenience and reference only and do not limit or define any provisions of this Assignment and Assumption Agreement.

15. **Entire Agreement**. This Assignment and Assumption Agreement (with its Exhibit) represents the Parties' final and mutual understanding with respect to its subject matter. It replaces and supersedes any prior agreements or understandings, whether written or oral. No representations, inducements, promises, or agreements, oral or otherwise, have been relied upon or made by any Party, or anyone on behalf of a Party, that are not fully expressed in this Assignment and Assumption Agreement. An agreement, statement, or promise not contained in this Assignment and Assumption Agreement is not valid or binding.

16. **Applicable Law**. This Assignment and Assumption Agreement must be governed and construed, and its performance enforced, under Texas law.

17. **Venue**. Venue for any disputes arising under this Assignment and Assumption Agreement lies exclusively in Dallas County, Texas.

18.   **Notices.**

(a)   All notices required under this Assignment and Assumption Agreement may be sent by facsimile or mutually acceptable electronic means, a nationally recognized overnight courier service, first class mail, or hand-delivered. Notice is deemed to have been given when received on a business day by the addressee. In the absence of proof of the actual receipt date, the following presumptions apply:

(i)    Notices sent by facsimile are deemed to have been received upon the sending party's receipt of its facsimile machine's confirmation of successful transmission, except that if the day on which such facsimile is received is not a Business Day or is after 4:30 p.m. on a Business Day, then that facsimile is deemed to have been received on the next following Business Day.

(ii)   Notice by overnight mail or courier is deemed to have been received on the next Business Day after it was sent or at any earlier time that is confirmed in writing by the receiving party.

(iii)  Notice by first class mail is deemed delivered two Business Days after mailing.

(b)   Notices shall be given to the addresses or facsimile numbers set forth below, or at another address or telephone number that the receiving Party has specified in a written notice to the other Party:

**TXU Generation Company LP**
Attn: Richard Wistrand
1601 Bryan Street
16th Floor
Dallas, TX 75201
Facsimile: (214) 812-5651

**Oncor Electric Delivery Company**
Attn: Thomas L. Baker
1601 Bryan Street
41st Floor
Dallas, TX 75201
Facsimile: (214) 812-1313

**TXU US Holdings Company**
Attn: Thomas L. Baker
1601 Bryan Street
41st Floor
Dallas, Texas 75201
Facsimile: (214) 812-1313

20    **Severability.** If any provision of this Assignment and Assumption Agreement is found to be invalid or unenforceable, that provision is severed from the remainder of the Assignment and replaced automatically by a provision containing terms as nearly like the invalid or unenforceable provision as possible while remaining valid and enforceable; and the Agreement, as so modified, continues in full force and effect. If the application of any provision of this Assignment and Assumption Agreement to any person or circumstance is found to be invalid or unenforceable, then that provision remains valid and enforceable as applied to other persons and circumstances.

Signed as of the date first stated above.


**TXU US Holdings Company**                    **TXU Generation Company LP**

                                               By: TXU Generation Management Company
By: _____                   LLC, its general partner


Title: _____                  By: _____

                                               Title: _____
**Oncor Electric Delivery Company**


By: _____


Title: _____


## Consent and Release

Alcoa Inc. hereby consents to the foregoing Assignment and Assumption Agreement. Alcoa Inc. further agrees to release TXU Generation Company LP from any liability arising on or after the Effective Date (as defined in the foregoing Assignment and Assumption Agreement) out of any of the rights or obligations assigned to, and assumed by, Oncor Electric Delivery Company under the foregoing Assignment and Assumption Agreement.

**Alcoa Inc.**

By: _____

Title: _____

Date: _____

6

# Exhibit B
## to Sandow Unit Four Agreement
### (As added by the 6ᵗʰ Amendment to Contracts)

## Memorandum of Option

State of Texas            )
County of Milam           )

This Memorandum of Option ("Memorandum") is executed concurrently with an unrecorded 6ᵗʰ Amendment to Contracts ("Agreement") between Alcoa Inc., a Pennsylvania corporation ("Alcoa") and TXU Generation Company LP, a Texas limited partnership ("TXU Generation"), and both this Memorandum and the Agreement constitute an Agreement between Alcoa and TXU Generation relating to an electric generation facility owned by TXU Generation ("Unit Four"), with a total nameplate electrical generating capacity of 545,000 kilowatts ("kW") located in Milam County, Texas, the real property owned by TXU Generation upon which Unit Four is located ("Unit Four Real Estate"), and the real property owned by Alcoa that is adjacent to the Unit Four Real Estate (the "Alcoa Plant Site"). The Unit Four Real Estate is described in two Warranty Deeds from Aluminum Company of America to Texas Power & Light Company, one of which is dated March 14, 1978 and is of record at Vol. 444, page 29 of the Real Property Records of Milam County, Texas, and the other of which is dated July 21, 1980 and is of record at Vol. 465, page 139 of the Real Property Records of Milam County, Texas. The Alcoa Plant Site adjacent to and surrounding the Unit Four Real Estate and is described in several Warranty Deeds, including but not limited to a Warranty Deed to a 274.953 acre tract dated October 16, 1951 to Aluminum Company of America of record at Vol. 274, page 365 of the Real Property Records of Milam County, Texas.

Alcoa has granted, for valuable consideration described in the Agreement, to TXU Generation the exclusive right and option to buy all or part of the Plant Site, including all or some of the improvements on it (called "Common Facilities" in the Agreement), which may or may not be fixtures, by paying the price specified in the Agreement, under other terms and conditions described in the Agreement. This right and option expires not later than the expiration of twenty-one (21) years after the death of the survivor of the following persons:

Stephen W. Smith and Scott M. Smith, children of William Smith and Kay E. Smith of Round Rock, Williamson County, Texas;

Elizabeth L. Loveless, Emily K. Loveless, and William A. Loveless, children of S. Jeb Loveless and Martha E. Kinard of Arlington, Tarrant County, Texas; and

Andrew Strahan and Nathan Strahan, children of James Strahan and Christina Ward Strahan, of Ranger, Eastland County, Texas.

When the context requires, singular nouns and pronouns include the plural.

1

| Alcoa Inc. | TXU Generation Company LP |
|---|---|
| By: _____ | By: TXU Generation Management Company LLC, its general partner |
| Name: _____ | |
| Title: _____ | By: _____ |
| | Title: _____ |

STATE OF _____                )

COUNTY OF _____              )

      This instrument was acknowledged before me on _____, 2003, by
_____ as _____ of Alcoa Inc.

                                      _____

                                        Notary Public, State of _____

STATE OF _____                )

COUNTY OF _____              )

      This instrument was acknowledged before me on _____, 2003, by
_____ as _____ of TXU Generation Management Company
LLC, as general partner of TXU Generation Company LP.

                                        _____

                                        Notary Public, State of _____

AFTER RECORDING RETURN TO:

Burford & Ryburn, L.L.P.
500 N. Akard
3100 Lincoln Plaza
Dallas, TX 75201-6697
Tel: (214) 740-3100
Fax: (214) 740-3125

2

# Exhibit C to Sandow Unit Four Agreement
### (As added by the 6th Amendment to Contracts)

Assuming Unit 4 is online

**TXU / ALCOA**
**TU Electric Energy Deliveries Accounting Date**

| Hour | Firm Power Amount | Designated Amount for Alcoa Load | Amount Available to Sell Delivered | Alcoa Metered Delivered | All Deliveries Plus Sales | Alcoa Excess | Unit 4 Net Gen. | Back-down | TXU Share | Alcoa Share | Debit | Credit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 398 | 28 | 370 | 25 | 395 | 3 | 587 | 0 | 102 | 485 | 87 | 0 |
| 2 | 398 | 28 | 370 | 28 | 396 | 2 | 582 | 0 | 101 | 481 | 83 | 0 |
| 3 | 398 | 28 | 370 | 27 | 397 | 1 | 579 | 0 | 101 | 478 | 80 | 0 |
| 4 | 398 | 28 | 370 | 24 | 394 | 4 | 577 | 0 | 101 | 476 | 78 | 0 |
| 5 | 398 | 28 | 370 | 25 | 395 | 3 | 575 | 0 | 100 | 475 | 77 | 0 |
| 6 | 398 | 28 | 370 | 26 | 396 | 2 | 578 | 0 | 101 | 477 | 79 | 0 |
| 7 | 398 | 28 | 370 | 25 | 395 | 3 | 584 | 0 | 102 | 482 | 84 | 0 |
| 8 | 398 | 28 | 370 | 24 | 394 | 4 | 582 | 0 | 101 | 481 | 83 | 0 |
| 9 | 398 | 28 | 370 | 25 | 395 | 3 | 582 | 0 | 101 | 481 | 83 | 0 |
| 10 | 398 | 28 | 370 | 26 | 396 | 2 | 583 | 0 | 102 | 481 | 83 | 0 |
| 11 | 398 | 28 | 370 | 27 | 397 | 1 | 584 | 0 | 102 | 482 | 84 | 0 |
| 12 | 398 | 28 | 370 | 24 | 394 | 3 | 584 | 0 | 102 | 482 | 84 | 0 |
| 13 | 398 | 28 | 370 | 25 | 395 | 3 | 584 | 0 | 102 | 482 | 84 | 0 |
| 14 | 398 | 28 | 370 | 26 | 396 | 3 | 583 | 0 | 102 | 481 | 83 | 0 |
| 15 | 398 | 28 | 370 | 25 | 395 | 3 | 584 | 0 | 102 | 482 | 84 | 0 |
| 16 | 398 | 28 | 370 | 24 | 394 | 4 | 585 | 0 | 102 | 483 | 85 | 0 |
| 17 | 398 | 28 | 370 | 25 | 395 | 3 | 586 | 0 | 102 | 484 | 86 | 0 |
| 18 | 398 | 28 | 370 | 26 | 396 | 2 | 585 | 0 | 102 | 483 | 85 | 0 |
| 19 | 398 | 28 | 370 | 27 | 397 | 1 | 586 | 0 | 102 | 484 | 86 | 0 |
| 20 | 398 | 28 | 370 | 24 | 394 | 4 | 587 | 0 | 102 | 485 | 87 | 0 |
| 21 | 398 | 28 | 370 | 25 | 395 | 3 | 589 | 0 | 103 | 486 | 88 | 0 |
| 22 | 398 | 28 | 370 | 26 | 396 | 2 | 587 | 0 | 102 | 485 | 87 | 0 |
| 23 | 398 | 28 | 370 | 25 | 395 | 3 | 589 | 0 | 103 | 486 | 88 | 0 |
| 24 | 398 | 28 | 370 | 24 | 394 | 4 | 590 | 0 | 103 | 487 | 89 | 0 |
| Total | 9,552 | 672 | 8,880 | 606 | 9,486 | 66 | 14,012 | 0 | 2,443 | 11,569 | 2,017 | 0 |

**TXU**
**Energy Reserve Account Summary Date**

**INPUT**

| Hour | Total | Excess | Debit | Credit | Surplus Energy Account Activity  −= in  += out |
|---|---|---|---|---|---|
| 1 | 90 | 3 | 87 | 0 | (90) |
| 2 | 85 | 2 | 83 | 0 | (85) |
| 3 | 81 | 1 | 80 | 0 | (81) |
| 4 | 82 | 4 | 78 | 0 | (82) |
| 5 | 80 | 3 | 77 | 0 | (80) |
| 6 | 81 | 2 | 79 | 0 | (81) |
| 7 | 87 | 3 | 84 | 0 | (87) |
| 8 | 87 | 4 | 83 | 0 | (87) |
| 9 | 86 | 3 | 83 | 0 | (86) |
| 10 | 85 | 2 | 83 | 0 | (85) |
| 11 | 85 | 1 | 84 | 0 | (85) |
| 12 | 88 | 4 | 84 | 0 | (88) |
| 13 | 87 | 3 | 84 | 0 | (87) |
| 14 | 85 | 2 | 83 | 0 | (85) |
| 15 | 87 | 3 | 84 | 0 | (87) |
| 16 | 89 | 4 | 85 | 0 | (89) |
| 17 | 89 | 3 | 86 | 0 | (89) |
| 18 | 87 | 2 | 85 | 0 | (87) |
| 19 | 87 | 1 | 86 | 0 | (87) |
| 20 | 91 | 4 | 87 | 0 | (91) |
| 21 | 91 | 3 | 88 | 0 | (91) |
| 22 | 89 | 2 | 87 | 0 | (89) |
| 23 | 91 | 3 | 88 | 0 | (91) |
| 24 | 93 | 4 | 89 | 0 | (93) |
| Total | 2,083 | 66 | 2,017 | 0 | (2,083) |

# Exhibit C to Sandow Unit Four Agreement

(As added by the 6th Amendment to Contracts)

Assuming Unit 4 is offline or not running at full Capicity, non Fuel related derates

**TXU / ALCOA**
**TU Electric Energy Deliveries Accounting**
Date

| Hour | Firm Power Amount Alcoa Load | Designated Amount for Available Alcoa Load | Amount Available to Sell Delivered | Alcoa Metered Delivered | All Deliveries Plus Sales | Alcoa Excess | Unit 4 Net Gen. | Back-down | TXU Share | Alcoa Share | Debit | Credit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 398 | 28 | 370 | 25 | 395 | 3 | 587 | 0 | 102 | 485 | 87 | 0 |
| 2 | 398 | 28 | 370 | 26 | 396 | 2 | 582 | 0 | 101 | 481 | 83 | 0 |
| 3 | 398 | 28 | 370 | 27 | 397 | 1 | 579 | 0 | 101 | 478 | 80 | 0 |
| 4 | 398 | 28 | 370 | 24 | 394 | 4 | 577 | 0 | 101 | 476 | 78 | 0 |
| 5 | 398 | 28 | 370 | 25 | 395 | 3 | 475 | 0 | 83 | 392 | 0 | 6 |
| 6 | 398 | 28 | 370 | 26 | 396 | 2 | 375 | 0 | 65 | 310 | 0 | 88 |
| 7 | 398 | 28 | 370 | 25 | 395 | 3 | 275 | 0 | 48 | 227 | 0 | 171 |
| 8 | 398 | 28 | 370 | 24 | 394 | 4 | 75 | 0 | 13 | 62 | 0 | 336 |
| 9 | 398 | 28 | 370 | 25 | 395 | 3 | 0 | 0 | 0 | 0 | 0 | 398 |
| 10 | 398 | 28 | 370 | 26 | 396 | 2 | 0 | 0 | 0 | 0 | 0 | 398 |
| 11 | 398 | 28 | 370 | 27 | 397 | 1 | 0 | 0 | 0 | 0 | 0 | 398 |
| 12 | 398 | 28 | 370 | 24 | 394 | 4 | 0 | 0 | 0 | 0 | 0 | 398 |
| 13 | 398 | 28 | 370 | 25 | 395 | 3 | 0 | 0 | 0 | 0 | 0 | 398 |
| 14 | 398 | 28 | 370 | 26 | 396 | 2 | 0 | 0 | 0 | 0 | 0 | 398 |
| 15 | 398 | 28 | 370 | 25 | 395 | 3 | 0 | 0 | 0 | 0 | 0 | 398 |
| 16 | 398 | 28 | 370 | 24 | 394 | 4 | 0 | 0 | 0 | 0 | 0 | 398 |
| 17 | 398 | 28 | 370 | 25 | 395 | 3 | 0 | 0 | 0 | 0 | 0 | 398 |
| 18 | 398 | 28 | 370 | 26 | 396 | 2 | 0 | 0 | 0 | 0 | 0 | 398 |
| 19 | 398 | 28 | 370 | 27 | 397 | 1 | 0 | 0 | 0 | 0 | 0 | 398 |
| 20 | 398 | 28 | 370 | 24 | 394 | 4 | 0 | 0 | 0 | 0 | 0 | 398 |
| 21 | 398 | 28 | 370 | 25 | 395 | 3 | 0 | 0 | 0 | 0 | 0 | 398 |
| 22 | 398 | 28 | 370 | 26 | 396 | 2 | 0 | 0 | 0 | 0 | 0 | 398 |
| 23 | 398 | 28 | 370 | 25 | 395 | 3 | 0 | 0 | 0 | 0 | 0 | 398 |
| 24 | 398 | 28 | 370 | 24 | 394 | 4 | 0 | 0 | 0 | 0 | 0 | 398 |
| Total | 9,552 | 672 | 8,880 | 606 | 9,486 | 66 | 3,525 | 0 | 614 | 2,911 | 328 | 6,969 |

**TXU**
**Energy Reserve Account Summary**
Date

INPUT

| Hour | Total | Excess | Debit | Credit | r = out | Surplus Energy Account Activity (= in) |
|---|---|---|---|---|---|---|
| 1 | 90 | 3 | 87 | 0 | | (90) |
| 2 | 85 | 2 | 83 | 0 | | (85) |
| 3 | 81 | 1 | 80 | 0 | | (81) |
| 4 | 82 | 4 | 78 | 0 | | (82) |
| 5 | (3) | 3 | 0 | 6 | | 3 |
| 6 | (86) | 2 | 0 | 88 | | 86 |
| 7 | (168) | 3 | 0 | 171 | | 168 |
| 8 | (332) | 4 | 0 | 336 | | 332 |
| 9 | (395) | 3 | 0 | 398 | | 395 |
| 10 | (396) | 2 | 0 | 398 | | 396 |
| 11 | (397) | 1 | 0 | 398 | | 397 |
| 12 | (394) | 4 | 0 | 398 | | 394 |
| 13 | (395) | 3 | 0 | 398 | | 395 |
| 14 | (396) | 2 | 0 | 398 | | 396 |
| 15 | (395) | 3 | 0 | 398 | | 395 |
| 16 | (394) | 4 | 0 | 398 | | 394 |
| 17 | (395) | 3 | 0 | 398 | | 395 |
| 18 | (396) | 2 | 0 | 398 | | 396 |
| 19 | (397) | 1 | 0 | 398 | | 397 |
| 20 | (394) | 4 | 0 | 398 | | 394 |
| 21 | (395) | 3 | 0 | 398 | | 395 |
| 22 | (396) | 2 | 0 | 398 | | 396 |
| 23 | (395) | 3 | 0 | 398 | | 395 |
| 24 | (394) | 4 | 0 | 398 | | 394 |
| Total | (6,575) | 66 | 328 | 6,969 | | 6,575 |

# Exhibit C to Sandow Unit Four Agreement
### (As added by the 6th Amendment to Contracts)

Assuming Unit 4 is online and has Fuel related derates after December 31, 2013

**TXU / ALCOA**
TU Electric Energy Deliveries Accounting
Date

| Hour | Firm Power Amount | Designated Amount for Alcoa Load | Amount Available to Sell | Alcoa Metered Delivered | All Deliveries Plus Sales | Alcoa Excess | Unit 4 Net Gen. | Back-down | TXU Share | Alcoa Share | Debit | Credit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 398 | 28 | 370 | 25 | 395 | 3 | 587 | 0 | 102 | 485 | 87 | 0 |
| 2 | 398 | 28 | 370 | 26 | 396 | 2 | 582 | 0 | 101 | 481 | 83 | 0 |
| 3 | 398 | 28 | 370 | 27 | 397 | 1 | 579 | 0 | 101 | 478 | 80 | 0 |
| 4 | 398 | 28 | 370 | 24 | 394 | 4 | 577 | 0 | 101 | 476 | 78 | 0 |
| 5 | 398 | 28 | 370 | 25 | 395 | 3 | 585 | 0 | 102 | 483 | 85 | 0 |
| 6 | 398 | 28 | 370 | 28 | 396 | 2 | 540 | 45 | 94 | 446 | 48 | 0 |
| 7 | 398 | 28 | 370 | 25 | 395 | 3 | 540 | 45 | 102 | 438 | 40 | 0 |
| 8 | 398 | 28 | 370 | 24 | 394 | 4 | 540 | 45 | 102 | 438 | 40 | 0 |
| 9 | 398 | 28 | 370 | 25 | 395 | 3 | 540 | 45 | 102 | 438 | 40 | 0 |
| 10 | 396 | 28 | 370 | 26 | 396 | 2 | 540 | 45 | 102 | 438 | 40 | 0 |
| 11 | 398 | 28 | 370 | 27 | 397 | 1 | 540 | 45 | 102 | 438 | 40 | 0 |
| 12 | 398 | 28 | 370 | 24 | 394 | 4 | 540 | 45 | 102 | 438 | 40 | 0 |
| 13 | 398 | 28 | 370 | 25 | 395 | 3 | 540 | 45 | 102 | 438 | 40 | 0 |
| 14 | 396 | 28 | 370 | 26 | 396 | 2 | 540 | 45 | 102 | 438 | 40 | 0 |
| 15 | 398 | 28 | 370 | 25 | 395 | 3 | 540 | 45 | 102 | 438 | 40 | 0 |
| 16 | 398 | 28 | 370 | 24 | 394 | 4 | 540 | 45 | 102 | 438 | 40 | 0 |
| 17 | 398 | 28 | 370 | 25 | 395 | 3 | 540 | 45 | 102 | 438 | 40 | 0 |
| 18 | 398 | 28 | 370 | 26 | 396 | 2 | 540 | 45 | 102 | 438 | 40 | 0 |
| 19 | 398 | 28 | 370 | 27 | 397 | 1 | 540 | 45 | 102 | 438 | 40 | 0 |
| 20 | 398 | 28 | 370 | 24 | 394 | 4 | 540 | 45 | 102 | 438 | 40 | 0 |
| 21 | 398 | 28 | 370 | 25 | 395 | 3 | 565 | 20 | 102 | 463 | 65 | 0 |
| 22 | 398 | 28 | 370 | 26 | 396 | 2 | 587 | 0 | 102 | 485 | 87 | 0 |
| 23 | 398 | 28 | 370 | 25 | 395 | 3 | 589 | 0 | 103 | 486 | 88 | 0 |
| 24 | 398 | 28 | 370 | 24 | 394 | 4 | 590 | 0 | 103 | 487 | 89 | 0 |
| Total | 9,552 | 672 | 8,880 | 606 | 9,486 | 66 | 13,341 | 695 | 2,439 | 10,902 | 1,350 | 0 |

**TXU**
Energy Reserve Account Summary
Date

INPUT

| Hour | Total | Excess | Debit | Credit | Surplus Energy Account Activity += in -= out |
|---|---|---|---|---|---|
| 1 | 90 | 3 | 87 | 0 | (90) |
| 2 | 85 | 2 | 83 | 0 | (85) |
| 3 | 81 | 1 | 80 | 0 | (81) |
| 4 | 82 | 4 | 78 | 0 | (82) |
| 5 | 88 | 3 | 85 | 0 | (88) |
| 6 | 50 | 2 | 48 | 0 | (50) |
| 7 | 43 | 3 | 40 | 0 | (43) |
| 8 | 44 | 4 | 40 | 0 | (44) |
| 9 | 43 | 3 | 40 | 0 | (43) |
| 10 | 42 | 2 | 40 | 0 | (42) |
| 11 | 41 | 1 | 40 | 0 | (41) |
| 12 | 44 | 4 | 40 | 0 | (44) |
| 13 | 43 | 3 | 40 | 0 | (43) |
| 14 | 42 | 2 | 40 | 0 | (42) |
| 15 | 43 | 3 | 40 | 0 | (43) |
| 16 | 44 | 4 | 40 | 0 | (44) |
| 17 | 43 | 3 | 40 | 0 | (43) |
| 18 | 42 | 2 | 40 | 0 | (42) |
| 19 | 41 | 1 | 40 | 0 | (41) |
| 20 | 44 | 4 | 40 | 0 | (44) |
| 21 | 68 | 3 | 65 | 0 | (68) |
| 22 | 89 | 2 | 87 | 0 | (89) |
| 23 | 91 | 3 | 88 | 0 | (91) |
| 24 | 93 | 4 | 89 | 0 | (93) |
| Total | 1,416 | 66 | 1,350 | 0 | (1,416) |

 **TXU**

TXU Electric
Sandow Station
P.O. Box 1111
Rockdale, TX 76567
Fax: 512 446 8638

## FACSIMILE COVER SHEET

### SANDOW

> TXU Power • P O Box 1111 • 3986 Charles Martin Hall
> Road, #4 Whse, Rockdale, TX   76567 •
> FAX (512) 446-8638

DATE: 8/24/04

TO: JEB Lawless

FROM: William Smith

FAX #: 214-740-2816

PAGE 1 of 5

This communication (including any attachments) contains or may contain confidential information intended only for the addressee, and is subject to copyright protection. If you are not the intended recipient of this communication, or the employee or agent responsible for delivering it to the intended recipient, please be advised that any reading, dissemination, distribution, copying or use of this communication or its attachments is strictly prohibited. If you have received this communication in error, please notify the sender immediately by telephone at the direct dial number noted above, and return the original message to us at the above address via the U.S. postal service.

08/24/2004   15:59    5124468638                TXU ENERGY                              PAGE  02/05

PROPRIETARY AND CONFIDENTIAL

# 7th Amendment to Contracts

This 7th Amendment to Contracts (this "Amendment") dated as of December __, 2003, is between **Alcoa Inc.** ("Alcoa"), a Pennsylvania corporation with offices in Rockdale, Milam County, Texas, which was formerly known as "Aluminum Company of America," and **TXU Generation Company LP** ("TXU Generation"), a Texas limited partnership with offices in Dallas, Dallas County, Texas, which is the successor-in-interest of TXU US Holdings Company (f/k/a TXU Electric Company, f/k/a Texas Utilities Electric Company) which itself was the successor by merger to Texas Power & Light Company.

## Recitals

The parties have entered into several written contracts (the "Sandow Contracts") concerning four lignite-fueled electric generating units located near Rockdale, Texas. These Sandow Contracts include, without limitation, the following:

- Power Contract dated August 29, 1951 (the "Power Contract");

- Operating Contract dated August 29, 1951 (the "Operating Contract");

- Sandow Unit Four Agreement dated August 13, 1976 (the "Sandow Unit Four Agreement");

- Supplemental Agreement to Sandow Unit Four Agreement dated March 2, 1981 (the "Supplemental Sandow Unit Four Agreement");

- Agreement for Back-Up Power and Energy dated February 4, 1991 (the "Backup Agreement"); and

- Letter Agreement from Pitt Pittman of TU Electric to R.C. Rawe of Alcoa dated June 11, 1991 (the "Payback Agreement").

In addition, the parties have entered into the following amendments:

| Date | Title |
|---|---|
| June 30, 1997 | Amendment to Contracts; |
| May 4, 1998 | 2nd Amendment to Contracts; |
| November 6, 1998 | 3rd Amendment to Contracts; |
| October 31, 2000 | 4th Amendment to Contracts; |
| February 1, 2003 | 5th Amendment to Contracts; and |
| September 1, 2003 | 6th Amendment to Contracts. |

All references to one or more of the Sandow Contracts means the contract or contracts as amended by the other Sandow Contracts, unless expressly stated otherwise.

298248.1 305-1019

**PROPRIETARY AND CONFIDENTIAL**

### Agreements

In consideration of the mutual promises and agreements contained in this Amendment, including the recitals set forth above, Alcoa and TXU Generation agree as follows:

1.      Sections 5(k)(v) and 5(k)(vi) of the Sandow Unit Four Agreement are hereby amended to read as follows.

(v)      From the beginning of January 1, 2004 until the end of December 31, 2004, Alcoa shall sell and deliver firm electric energy to TXU Generation out of the firm electric energy that Alcoa is purchasing under this Agreement at a constant rate of 33 MW with a 100% capacity factor, and TXU Generation shall purchase, receive, and pay for that firm electric energy. Firm electric energy sold under this subsection is called "Exemption Energy." The sale of the Exemption Energy does not change the calculation of costs and prices under this Agreement, but the sale of the Exemption Energy will be treated as "Alcoa load" for purposes of determining how much firm electric energy Alcoa has taken under this Agreement. TXU Generation shall pay Alcoa for the Exemption Energy at the rate of $35.00 per MWh.

(vi)      In addition to the sale of Exemption Energy under Section 5(k)(v) above, from the beginning of January 1, 2004 until the end of December 31, 2004, Alcoa shall sell and deliver firm electric energy to TXU Generation out of the firm electric energy that Alcoa is purchasing under this Agreement at a constant rate of 18 MW with a 100% capacity factor, and TXU Generation shall purchase, receive, and pay for that firm electric energy. Firm electric energy sold under this subsection is called "Additional Exemption Energy." The sale of the Additional Exemption Energy does not change the calculation of costs and prices under this Agreement, but the sale of the Additional Exemption Energy will be treated as "Alcoa load" for purposes of determining how much firm electric energy Alcoa has taken under this Agreement. TXU Generation shall pay Alcoa for the Additional Exemption Energy at the rate of $35.00 per MWh.

2.      **Effective Date**. This Amendment is effective on the date first stated above.

3.      **Effect of Amendment**. This Amendment controls any conflicts between the terms of this Amendment and the terms of any of the other Sandow Contracts. The portions of the Sandow Contracts, as previously amended, that are not modified by this Amendment are still effective, but all provisions of the Sandow Contracts are subject to and governed by the terms of this Amendment, and the Sandow Contracts must be consistently integrated in a manner consistent with the terms and intent evinced by this Amendment.

-2-

298248.1 305-1019

**PROPRIETARY AND CONFIDENTIAL**

4.    **Successors and Assigns**. This Amendment is binding on and inures to the benefit of the parties and their respective successors and permitted assigns.

5.    **Execution in Counterparts**. This Amendment may be executed in a number of identical counterparts, each of which is deemed an original for all purposes.

6.    **Alcoa's General Representations and Warranties**. Alcoa now represents and warrants unconditionally to TXU Generation that:

    (a)    Alcoa is a corporation duly organized, validly existing, in good standing under the laws of the Commonwealth of Pennsylvania, and is authorized to do business in the State of Texas.

    (b)    Alcoa has full corporate power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Amendment.

    (c)    The making and performance by Alcoa of this Amendment have been duly authorized by the necessary corporate action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to Alcoa, violate any provision of Alcoa's Articles of Incorporation or Bylaws, or result in a breach of, or constitute a default under, any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which Alcoa is a party or by which it or its property is bound or affected.

7.    **TXU Generation's General Representations and Warranties**. TXU Generation now represents and warrants unconditionally to Alcoa that:

    (a)    TXU Generation is a limited partnership duly organized, validly existing, and in good standing under the laws of the State of Texas.

    (b)    TXU Generation has full power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Amendment.

    (c)    The making and performance by TXU Generation of this Amendment have been duly authorized by all necessary partnership action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to TXU Generation, violate any provision of TXU Generation's organizational documents, or result in a breach of or constitute a default under any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which TXU Generation is a party or by which it or its property is bound or affected.

8.    **No Rights of Third Parties**. This Amendment is intended only for the parties' benefit. Nothing in this Amendment may be construed to create any duty to, any standard of care concerning, or any liability to, any person not a party to this Amendment.

-3-

298248.1 305-1019

**PROPRIETARY AND CONFIDENTIAL**

9.    **Subject to Applicable Laws.** This Amendment is subject to applicable federal, state, and local laws, ordinances, rules, and regulations. Nothing in this Amendment may be construed as a waiver of any right to question or contest any law, ordinance, rule, regulation, or asserted regulatory jurisdiction, but each party must perform under this Agreement during the time that it is questioning or contesting any law, ordinance, rule, regulation, or asserted regulatory jurisdiction.

10.    **Amendment.** This Amendment may be amended at any time, but only upon the parties' written agreement that explicitly states the parties' intent to amend this Amendment.

11.    **No Waiver.** The waiver of a breach of any provision of this Amendment does not waive any other breach of that provision or of any other provision.

12.    **Complete Amendment.** This Amendment, together with the documents attached as Exhibits to this Amendment, represents the parties' final and mutual understanding with respect to the subject matters covered by this Amendment. No representations, inducements, promises, or other agreements, oral or otherwise, have been relied upon or made by any party, or anyone on behalf of a party, that are not fully expressed in this Amendment and in its Exhibits. An agreement, statement, or promise not contained in this Amendment and its Exhibits is not valid or binding on the parties hereto.

13.    **Choice of Law.** This Amendment must be construed, and its performance enforced, under Texas law.

14.    **Severability.** If any provision of this Amendment is found to be invalid or unenforceable, that provision is severed from the remainder of this Amendment, and the parties shall immediately negotiate in good faith and agree to a replacement provision that is valid and enforceable and that puts each party in substantially the same position that the party was in before the original provision was found to be invalid or unenforceable. This Amendment, as so modified, continues in full force and effect. Additionally, if the application of any provision of this Amendment to any person or circumstance is found to be invalid or unenforceable, then that provision remains valid and enforceable as applied to all other persons and circumstances.

Signed as of the date first mentioned above.

Alcoa Inc.

By: _____

Title: _Executive Vice President_, Alcoa
      & President, Primary Group


TXU Generation Company LP

By: TXU Generation Management Company
LLC, its general partner

By: _____
      Tom Baker
Title: _Vice Chairman_ _____

-4-

PROPRIETARY AND CONFIDENTIAL

$\beta E L$  1143c

# 8th Amendment to Contracts

This 8th Amendment to Contracts (this "Amendment") dated as of June 30, 2004, is between **Alcoa Inc.** ("Alcoa"), a Pennsylvania corporation with offices in Rockdale, Milam County, Texas, which was formerly known as "Aluminum Company of America," and **TXU Generation Company LP** ("TXU Generation"), a Texas limited partnership with offices in Dallas, Dallas County, Texas, which is the successor-in-interest of TXU US Holdings Company (f/k/a TXU Electric Company, f/k/a Texas Utilities Electric Company) which itself was the successor by merger to Texas Power & Light Company.

## Recitals

The parties have entered into several written contracts (the "Sandow Contracts") concerning four lignite-fueled electric generating units located near Rockdale, Texas. These Sandow Contracts include, without limitation, the following:

- Power Contract dated August 29, 1951 (the "Power Contract");

- Operating Contract dated August 29, 1951 (the "Operating Contract");

- Sandow Unit Four Agreement dated August 13, 1976 (the "Sandow Unit Four Agreement");

- Supplemental Agreement to Sandow Unit Four Agreement dated March 2, 1981 (the "Supplemental Sandow Unit Four Agreement");

- Agreement for Back-Up Power and Energy dated February 4, 1991 (the "Backup Agreement"); and

- Letter Agreement from Pitt Pittman of TU Electric to R.C. Rawe of Alcoa dated June 11, 1991 (the "Payback Agreement").

In addition, the parties have entered into the following amendments:

| Date | Title |
| --- | --- |
| June 30, 1997 | Amendment to Contracts; |
| May 4, 1998 | 2nd Amendment to Contracts; |
| November 6, 1998 | 3rd Amendment to Contracts; |
| October 31, 2000 | 4th Amendment to Contracts; |
| February 1, 2003 | 5th Amendment to Contracts; |
| September 1, 2003 | 6th Amendment to Contracts; and |
| January 1, 2004 | 7th Amendment to Contracts. |

All references to one or more of the Sandow Contracts means the contract or contracts as amended by the other Sandow Contracts, unless expressly stated otherwise.

-1-

311632.3.305-1019

PROPRIETARY AND CONFIDENTIAL

## Agreements

In consideration of the mutual promises and agreements contained in this Amendment, including the recitals set forth above, Alcoa and TXU Generation agree as follows:

1.    **2005 Sale of Exemption Energy and Additional Exemption Energy.** Sections 5(k)(v) and 5(k)(vi) of the Sandow Unit Four Agreement are amended, effective on January 1, 2005, to read as follows.

> (v)    From the beginning of January 1, 2005 until the end of December 31, 2005, Alcoa shall sell and deliver firm electric energy to TXU Generation out of the firm electric energy that Alcoa is purchasing under this Agreement at a constant rate of 33 MW with a 100% capacity factor, and TXU Generation shall purchase, receive, and pay for that firm electric energy. Firm electric energy sold under this subsection is called "Exemption Energy." The sale of the Exemption Energy does not change the calculation of costs and prices under this Agreement, but the sale of the Exemption Energy will be treated as "Alcoa load" for purposes of determining how much firm electric energy Alcoa has taken under this Agreement. TXU Generation shall pay Alcoa for the Exemption Energy at the rate of $45.85 per MWh.

> (vi)    In addition to the sale of Exemption Energy under Section 5(k)(v) above, from the beginning of January 1, 2005 until the end of December 31, 2005, Alcoa shall sell and deliver firm electric energy to TXU Generation out of the firm electric energy that Alcoa is purchasing under this Agreement at a constant rate of 18 MW with a 100% capacity factor, and TXU Generation shall purchase, receive, and pay for that firm electric energy. Firm electric energy sold under this subsection is called "Additional Exemption Energy." The sale of the Additional Exemption Energy does not change the calculation of costs and prices under this Agreement, but the sale of the Additional Exemption Energy will be treated as "Alcoa load" for purposes of determining how much firm electric energy Alcoa has taken under this Agreement. TXU Generation shall pay Alcoa for the Additional Exemption Energy at the rate of $45.85 per MWh.

2.    **Assignment.** Section 12 of the Operating Contract, Article XIII of the Power Contract, and Section 11 of the Sandow Unit Four Agreement are amended by adding the following sentence [in the case of Section 11 of the Sandow Unit Four Agreement, adding it as a new subsection (c)]:

> Notwithstanding the foregoing provisions, TXU Generation may, without Alcoa's consent, assign the rights and obligations of TXU Generation to purchase, receive, and accept firm electric energy under Sections 5(k)(v) and 5(k)(vi) of the Sandow Unit Four

-2-

PROPRIETARY AND CONFIDENTIAL

Agreement to TXU Portfolio Management Company LP and, upon such assignment, TXU Generation is released from liability for those rights and obligations to purchase, receive, and accept firm electric energy.

3.    **Effective Date.** This Amendment is effective on the date first stated above.

4.    **Effect of Amendment.** Sections 5(k)(v) and 5(k)(vi) of the Sandow Unit Four Agreement as they were amended in the 7th Amendment to Contracts, remain effective through December 31, 2004, and Sections 5(k)(v) and 5(k)(vi) of the Sandow Unit Four Agreement as amended by this 8th Amendment to Contracts become effective on January 1, 2005. This Amendment controls any conflicts between the terms of this Amendment and the terms of any of the other Sandow Contracts. The portions of the Sandow Contracts, as previously amended, that are not modified by this Amendment are still effective, but all provisions of the Sandow Contracts are subject to and governed by the terms of this Amendment, and the Sandow Contracts must be consistently integrated in a manner consistent with the terms and intent evinced by this Amendment.

5.    **Successors and Assigns.** This Amendment is binding on and inures to the benefit of the parties and their respective successors and permitted assigns.

6.    **Execution in Counterparts.** This Amendment may be executed in a number of identical counterparts, each of which is deemed an original for all purposes.

7.    **Alcoa's General Representations and Warranties.** Alcoa now represents and warrants unconditionally to TXU Generation that:

   (a)    Alcoa is a corporation duly organized, validly existing, in good standing under the laws of the Commonwealth of Pennsylvania, and is authorized to do business in the State of Texas.

   (b)    Alcoa has full corporate power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Amendment.

   (c)    The making and performance by Alcoa of this Amendment have been duly authorized by the necessary corporate action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to Alcoa, violate any provision of Alcoa's Articles of Incorporation or Bylaws, or result in a breach of, or constitute a default under, any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which Alcoa is a party or by which it or its property is bound or affected.

8.    **TXU Generation's General Representations and Warranties.** TXU Generation now represents and warrants unconditionally to Alcoa that:

-3-

311632.3 305-1019

PROPRIETARY AND CONFIDENTIAL

(a) TXU Generation is a limited partnership duly organized, validly existing, and in good standing under the laws of the State of Texas.

(b) TXU Generation has full power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Amendment.

(c) The making and performance by TXU Generation of this Amendment have been duly authorized by all necessary partnership action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to TXU Generation, violate any provision of TXU Generation's organizational documents, or result in a breach of or constitute a default under any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which TXU Generation is a party or by which it or its property is bound or affected.

9.    **No Rights of Third Parties**. This Amendment is intended only for the parties' benefit. Nothing in this Amendment may be construed to create any duty to, any standard of care concerning, or any liability to, any person not a party to this Amendment.

10.    **Subject to Applicable Laws**. This Amendment is subject to applicable federal, state, and local laws, ordinances, rules, and regulations. Nothing in this Amendment may be construed as a waiver of any right to question or contest any law, ordinance, rule, regulation, or asserted regulatory jurisdiction, but each party must perform under this Agreement during the time that it is questioning or contesting any law, ordinance, rule, regulation, or asserted regulatory jurisdiction.

11.    **Amendment**. This Amendment may be amended at any time, but only upon the parties' written agreement that explicitly states the parties' intent to amend this Amendment.

12.    **No Waiver**. The waiver of a breach of any provision of this Amendment does not waive any other breach of that provision or of any other provision.

13.    **Complete Amendment**. This Amendment, together with the documents attached as Exhibits to this Amendment, represents the parties' final and mutual understanding with respect to the subject matters covered by this Amendment. No representations, inducements, promises, or other agreements, oral or otherwise, have been relied upon or made by any party, or anyone on behalf of a party, that are not fully expressed in this Amendment and in its Exhibits. An agreement, statement, or promise not contained in this Amendment and its Exhibits is not valid or binding on the parties hereto.

14.    **Choice of Law**. This Amendment must be construed, and its performance enforced, under Texas law.

15.    **Severability**. If any provision of this Amendment is found to be invalid or unenforceable, that provision is severed from the remainder of this Amendment, and the parties shall immediately negotiate in good faith and agree to a replacement provision that is valid and

-4-

PROPRIETARY AND CONFIDENTIAL

enforceable and that puts each party in substantially the same position that the party was in before the original provision was found to be invalid or unenforceable. This Amendment, as so modified, continues in full force and effect. Additionally, if the application of any provision of this Amendment to any person or circumstance is found to be invalid or unenforceable, then that provision remains valid and enforceable as applied to all other persons and circumstances.

Signed as of the date first mentioned above.

**Alcoa Inc.**

By:

Title: _____

**TXU Generation Company LP**

By: TXU Generation Management Company LLC, its general partner

By: _____

Title: _____

-5-

31 1632.3 305-1019

## 9th Amendment to Contracts

This 9th Amendment to Contracts (this "Amendment") dated as of October 27, 2005, is between **Alcoa Inc.** ("Alcoa"), a Pennsylvania corporation with offices in Rockdale, Milam County, Texas, which was formerly known as "Aluminum Company of America," and **TXU Generation Company LP** ("TXU Generation"), a Texas limited partnership with offices in Dallas, Dallas County, Texas, which is the successor-in-interest of TXU US Holdings Company (f/k/a TXU Electric Company, f/k/a Texas Utilities Electric Company) which itself was the successor by merger to Texas Power & Light Company.

### Recitals

The parties have entered into several written contracts (the "Sandow Contracts") concerning four lignite-fueled electric generating units located near Rockdale, Texas. These Sandow Contracts include, without limitation, the following:

- Power Contract dated August 29, 1951 (the "Power Contract");

- Operating Contract dated August 29, 1951 (the "Operating Contract");

- Sandow Unit Four Agreement dated August 13, 1976 (the "Sandow Unit Four Agreement");

- Supplemental Agreement to Sandow Unit Four Agreement dated March 2, 1981 (the "Supplemental Sandow Unit Four Agreement");

- Agreement for Back-Up Power and Energy dated February 4, 1991 (the "Backup Agreement"); and

- Letter Agreement from Pitt Pittman of TU Electric to R.C. Rawe of Alcoa dated June 11, 1991 (the "Payback Agreement").

In addition, the parties have entered into the following amendments:

| Date | Title |
|---|---|
| June 30, 1997 | Amendment to Contracts; |
| May 4, 1998 | 2nd Amendment to Contracts; |
| November 6, 1998 | 3rd Amendment to Contracts; |
| October 31, 2000 | 4th Amendment to Contracts; |
| February 1, 2003 | 5th Amendment to Contracts; |
| September 1, 2003 | 6th Amendment to Contracts; |
| January 1, 2004 | 7th Amendment to Contracts; and |
| August 23, 2004 | 8th Amendment to Contracts |

All references to one or more of the Sandow Contracts means the contract or contracts as amended by the other Sandow Contracts, unless expressly stated otherwise.

**Agreements**

In consideration of the mutual promises and agreements contained in this Amendment, including the recitals set forth above, Alcoa and TXU Generation agree as follows:

1.     **2006 Sale of Exemption Energy and Additional Exemption Energy.** Sections 5(k)(v) and 5(k)(vi) of the Sandow Unit Four Agreement are amended, effective on January 1, 2006, to read as follows.

(v) From the beginning of January 1, 2006 until the end of December 31, 2006, Alcoa shall sell and deliver firm electric energy to TXU Generation out of the firm electric energy that Alcoa is purchasing under this Agreement at a constant rate of 33 MW with a 100% capacity factor, and TXU Generation shall purchase, receive, and pay for that firm electric energy. Firm electric energy sold under this subsection is called "Exemption Energy." The sale of the Exemption Energy does not change the calculation of costs and prices under this Agreement, but the sale of the Exemption Energy will be treated as "Alcoa load" for purposes of determining how much firm electric energy Alcoa has taken under this Agreement. TXU Generation shall pay Alcoa for the Exemption Energy at the rate of $82.20 per MWh.

(vi) In addition to the sale of Exemption Energy under Section 5(k)(v) above, from the beginning of January 1, 2006 until the end of December 31, 2006, Alcoa shall sell and deliver firm electric energy to TXU Generation out of the firm electric energy that Alcoa is purchasing under this Agreement at a constant rate of 18 MW with a 100% capacity factor, and TXU Generation shall purchase, receive, and pay for that firm electric energy. Firm electric energy sold under this subsection is called "Additional Exemption Energy." The sale of the Additional Exemption Energy does not change the calculation of costs and prices under this Agreement, but the sale of the Additional Exemption Energy will be treated as "Alcoa load" for purposes of determining how much firm electric energy Alcoa has taken under this Agreement. TXU Generation shall pay Alcoa for the Additional Exemption Energy at the rate of $82.20 per MWh.

2.     **Assignment.** Section 12 of the Operating Contract, Article XIII of the Power Contract, and Section 11 of the Sandow Unit Four Agreement are amended by adding the following sentence [in the case of Section 11 of the Sandow Unit Four Agreement, adding it as a new subsection (c)]:

Notwithstanding the foregoing provisions, TXU Generation may, without Alcoa's consent, assign the rights and obligations of TXU Generation to purchase, receive, and accept firm electric energy under Sections 5(k)(v) and 5(k)(vi) of the Sandow Unit Four Agreement to TXU Portfolio Management Company LP and, upon such assignment, TXU Generation is released from liability for those rights and obligations to purchase, receive, and accept firm electric energy.

3.     **Effective Date.** This Amendment is effective on the date first stated above.

4.     **Effect of Amendment.** Sections *5(k)(v)* and 5(k)(vi) of the Sandow Unit Four Agreement as they were amended in the 8th Amendment to Contracts, remain effective through December 31, 2005, and Sections 5(k)(v) and 5(k)(vi) of the Sandow Unit Four Agreement as amended by this 9th Amendment to Contracts become effective on January 1, 2006. This Amendment controls any conflicts between the terms of this Amendment and the terms of any of the other Sandow

Contracts. The portions of the Sandow Contracts, as previously amended, that are not modified by this Amendment are still effective, but all provisions of the Sandow Contracts are subject to and governed by the terms of this Amendment, and the Sandow Contracts must be consistently integrated in a manner consistent with the terms and intent evinced by this Amendment.

5.    **Successors and Assigns.** This Amendment is binding on and inures to the benefit of the parties and their respective successors and permitted assigns.

6.    **Execution in Counterparts.** This Amendment may be executed in a number of identical counterparts, each of which is deemed an original for all purposes.

7.    **Alcoa's General Representations and Warranties.** Alcoa now represents and warrants unconditionally to TXU Generation that:

    (a)    Alcoa is a corporation duly organized, validly existing, in good standing under the laws of the Commonwealth of Pennsylvania, and is authorized to do business in the State of Texas.

    (b)    Alcoa has full corporate power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Amendment.

    (c)    The making and performance by Alcoa of this Amendment have been duly authorized by the necessary corporate action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to Alcoa, violate any provision of Alcoa's Articles of Incorporation or Bylaws, or result in a breach of, or constitute a default under, any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which Alcoa is a party or by which it or its property is bound or affected.

8.    **TXU Generation's General Representations and Warranties.** TXU Generation now represents and warrants unconditionally to Alcoa that:

    (a)    TXU Generation is a limited partnership duly organized, validly existing, and in good standing under the laws of the State of Texas.

    (b)    TXU Generation has full power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Amendment.

    (c)    The making and performance by TXU Generation of this Amendment have been duly authorized by all necessary partnership action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to TXU Generation, violate any provision of TXU Generation's organizational documents, or result in a breach of or constitute a default under any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which TXU Generation is a party or by which it or its property is bound or affected.

9.    **No Rights of Third Parties.** This Amendment is intended only for the parties' benefit. Nothing in this Amendment may be construed to create any duty to, any standard of care concerning, or any liability to, any person not a party to this Amendment.

10.    **Subject to Applicable Laws.** This Amendment is subject to applicable federal, state, and local laws, ordinances, rules, and regulations. Nothing in this Amendment may be construed as a waiver of any right to question or contest any law, ordinance, rule, regulation, or asserted regulatory jurisdiction, but each party must perform under this Agreement during the time that it is questioning or contesting any law, ordinance, rule, regulation, or asserted regulatory jurisdiction.

11.    **Amendment.** This Amendment may be amended at any time, but only upon the parties' written agreement that explicitly states the parties' intent to amend this Amendment.

12.    **No Waiver.** The waiver of a breach of any provision of this Amendment does not waive any other breach of that provision or of any other provision.

13.    **Complete Amendment.** This Amendment, together with the documents attached as Exhibits to this Amendment, represents the parties' final and mutual understanding with respect to the subject matters covered by this Amendment. No representations, inducements, promises, or other agreements, oral or otherwise, have been relied upon or made by any party, or anyone on behalf of a party, that are not fully expressed in this Amendment and in its Exhibits. An agreement, statement, or promise not contained in this Amendment and its Exhibits is not valid or binding on the parties hereto.

14.    **Choice of Law.** This Amendment must be construed, and its performance enforced, under Texas law.

15.    **Severability.** If any provision of this Amendment is found to be invalid or unenforceable, that provision is severed from the remainder of this Amendment, and the parties shall immediately negotiate in good faith and agree to a replacement provision that is valid and enforceable and that puts each party in substantially the same position that the party was in before the original provision was found to be invalid or unenforceable. This Amendment, as so modified, continues in full force and effect. Additionally, if the application of any provision of this Amendment to any person or circumstance is found to be invalid or unenforceable, then that provision remains valid and enforceable as applied to all other persons and circumstances.

Signed as of the date first mentioned above.

**Alcoa Inc.**

By: _Dad Kal_

Title: _Executive V. a. President_

Title: _____

**TXU Generation Company LP**

By: TXU Generation Management Company LLC, its general partner

By: _____

Title: _____

Title: _____

**Execution Copy**

# 10th Amendment to Contracts
## (Common Facilities)

This 10th Amendment to Contracts (this "Amendment") dated as of February 15, 2007, is between **Alcoa, Inc.** ("Alcoa"), a Pennsylvania corporation with offices in Rockdale, Milam County, Texas, which was formerly known as "Aluminum Company of America," and **TXU Generation Company LP** ("TXU Generation"), a Texas limited partnership with offices in Dallas, Dallas County, Texas, which is the successor-in-interest of TXU US Holdings Company (f/k/a TXU Electric Company, f/k/a Texas Utilities Electric Company) which itself was the successor by merger to Texas Power & Light Company.

## Recitals

The parties have entered into several written contracts (the "Sandow Contracts") concerning four lignite-fueled electric generating units located near Rockdale, Texas. These Sandow Contracts include, without limitation, the following:

- Power Contract dated August 29, 1951 (the "Power Contract");

- Operating Contract dated August 29, 1951 (the "Operating Contract");

- Sandow Unit Four Agreement dated August 13, 1976 (the "Sandow Unit Four Agreement");

- Supplemental Agreement to Sandow Unit Four Agreement dated March 2, 1981 (the "Supplemental Sandow Unit Four Agreement");

- Agreement for Back-Up Power and Energy dated February 4, 1991 (the "Backup Agreement"); and

- Letter Agreement from Pitt Pittman of TU Electric to R.C. Rawe of Alcoa dated June 11, 1991 (the "Payback Agreement").

In addition, the parties have entered into the following amendments:

| Date | Title |
|---|---|
| June 30, 1997 | Amendment to Contracts; |
| June 30, 1997 | Transition Agreement; |
| May 4, 1998 | 2nd Amendment to Contracts; |
| November 6, 1998 | 3rd Amendment to Contracts; |
| October 31, 2000 | 4th Amendment to Contracts; |
| February 1, 2003 | 5th Amendment to Contracts; |
| September 1, 2003 | 6th Amendment to Contracts; |
| January 1, 2004 | 7th Amendment to Contracts; |
| August 23, 2004 | 8th Amendment to Contracts |
| October 27, 2005 | 9th Amendment to Contracts |

-1-

All references to one or more of the Sandow Contracts means the contract or contracts as amended by the other Sandow Contracts, unless expressly stated otherwise.

Alcoa has permanently shut down operation of its three electric generating units commonly referred to as Sandow Units 1, 2, and 3. The purpose of this Amendment is to adjust the ownership, operation, and maintenance of various Common Facilities used in the operation of Sandow Unit 4, in light of the closing of Sandow Units 1, 2, and 3. "Common Facilities" is defined in Section 2(d) of the Sandow Unit Four Agreement, and the Common Facilities were listed in Exhibit II-B to the Supplemental Sandow Unit Four Agreement. Common Facilities were listed again as Attachment A to the Transition Agreement. The Transition Agreement also addressed the operation of certain Common Facilities.

## Agreements

In consideration of the mutual promises and agreements contained in this Amendment, including the recitals set forth above, Alcoa and TXU Generation agree as follows:

1.     **Operation and Maintenance of Common Facilities.** Beginning on February 15, 2007, the following new Section 22 is added to the Sandow Unit Four Agreement:

Section 22. Adjustments to Ownership and Operation of Common Facilities Due to Retirement of Sandow Units 1-3.

(a)     Because Alcoa has retired Sandow Units 1-3, adjustments and clarifications need to be made to the ownership, operation, and maintenance of some Common Facilities. Effective beginning on February 15, 2007, the following provisions apply:

(1)     **Telephone System** - Alcoa shall own, operate and maintain the Telephone System, including all telephone lines from the Alcoa Plant to Sandow Unit 4.   Alcoa shall provide telephone service to TXU Generation and Sandow Unit 4.

(2)     **Potable Water System and Sanitary Sewer System** - Alcoa shall own, operate and maintain the Potable Water System and the Sanitary Sewer System. Alcoa shall be responsible for supplying potable water to the Alcoa Plant and Sandow Unit 4.

(3)     **Access Roads** - Alcoa shall own, operate and maintain all Access Roads.

(4)     **Relay House/SCADA** - Alcoa shall own, operate and maintain the Relay House and SCADA System.

(5)     **Fuel Oil Storage Tank** - TXU Generation shall own, operate and maintain the Fuel Oil Storage Tank.

(6)     **Disposal Area Roads** - Alcoa shall own the Disposal Area Roads.  TXU Generation shall operate and maintain the Disposal Area Roads.

(7)     **#1 Mine Belt and Transfer Tower #1** - TXU Generation shall operate and maintain the #1 Mine Belt and Transfer Tower #1.  # 1 Mine Belt is the first flight of a belt conveyor which conveys lignite from the mine to Sandow Unit 4.  # 1 Mine Belt feeds Transfer Tower # 1.

(8)     **Lignite Stockpile Site** - TXU Generation shall operate and maintain the Lignite Stockpile Site.

(9)     **Ash Water System** - Alcoa shall own, and TXU Generation shall operate and maintain, the Ash Water System.

(10)    **138 kV Switchyard** - Alcoa shall own the 138 kV Switchyard.  Alcoa shall operate and maintain the 138 kV Switchyard.

(11)    **Security** - TXU Generation shall operate Security.

(12)    **River Intake Pump and Pipeline, Alcoa Treatment System, 33 kV Pump Power Line and Mine Depressurization Water System** - Alcoa shall own, and TXU Generation shall operate and maintain, the River Intake Pump and Pipeline, Alcoa Treatment System, 33 kV Pump Power Line, and Mine Depressurization Water System.  The Alcoa Treatment System is a closed-loop recycle system designed as a treatment pond for temperature and a holding pond for reuse of wastewaters.  It is also used to recirculate cooling water and makeup water within various areas of Alcoa's aluminum smelting facility.

(b)     For any and all additional Common Facilities not addressed in this Section 22 but that are provided by one Party to the other Party under this Agreement, the Parties agree to negotiate in good faith who will own, operate and maintain such Common Facilities. If any other provision of the Sandow Contracts conflicts with this Section 22, then this Section 22 controls the conflict.

2.     **Pro Rata Shares.** Beginning on January 1, 2007, the following changes are made to the parties' respective pro rata shares under the Sandow Unit Four Agreement:

Section 6(b). Water.  The fraction "545/870ths" is deleted and replaced with "545/545ths unless and until Sandow Unit 5 begins operation and thereafter "569/1133rds".

Section 7. Lignite.  Wherever appearing in this Section, the fraction "95/870ths" is deleted and replaced with "95/545ths" unless and until Sandow Unit 5 begins operation and thereafter "99/1133rds".

Section 8. Operation of Sandow Station.  Wherever appearing in this Section, the fraction "95/870ths" is deleted and replaced with "95/545ths" unless and until Sandow Unit 5

begins operation and thereafter "99/1133rds".

3.    **Changes to Section 1.II of the Transition Agreement.** Subsections B and C of Section 1. II. Water, of the Transition Agreement are hereby changed to read as follows:

      B.    With the two exceptions noted in the following sentence, Alcoa will be responsible for the Alcoa Treatment System Monitoring Program, including but not limited to: sediment sampling, fish tissue sampling, and Brazos River Authority contact for water management. The exceptions are that TXU Generation will be responsible for lake water releases and river pumping station operation and management.

      C.    TXU Generation will be responsible for the Spill Prevention Control and Countermeasure (SPCC) plan for Sandow Unit 4 and related TXU Generation-operated Common Facilities.

4.    **Changes to Section 1.IV of the Transition Agreement.** Section 1. IV, SARA/CERCLA of the Transition Agreement is hereby changed to read as follows:

    IV.    SARA/CERCLA

      A.    Alcoa is responsible for all SARA/CERCLA-related reporting activities for Common Facilities under Alcoa operation and maintenance control.

      B.    TXU Generation is responsible for all SARA/CERCLA-related reporting activities for Sandow Unit 4 and for Common Facilities under TXU Generation operation and maintenance control.

5.    **Changes to Section 2 of the Transition Agreement.** Section 2, Assets and Facilities, of the Transition Agreement is hereby changed to read as follows:

    Section 2. <u>Assets and Facilities.</u>

    Exhibit A attached hereto lists those Common Facilities as of October 10, 1989 , being Common Facilities (Shared) used for operation and maintenance of both Alcoa-owned facilities and for Sandow Unit 4, and those use solely for operation and maintenance of Sandow Unit 4 (100%). The allocation in Exhibit A must be used in connection with billing Costs of Capital and Depreciation as provided in the Sandow Unit Four Agreement, as amended, and the Agreement dated December 26, 1990. Billing for monthly O&M expense (except as modified by Section 9) will be split as shown below:

    Common Facilities (Shared):

| | |
|---|---|
| 138 kV substation | Mine Depressurization Water System |
| 33 kV system/transformer | Access Roads |

-4-

Execution Copy

| | |
|---|---|
| River pumps and lines | Relay House/SCADA |
| Disposal area roads | Potable Water System |
| Plant bldgs./structures | Environmental – Water |
| Plant utilities | Environmental - Solid Waste |
| Plant water supply (lake) | B pit |
| Telephone System | Storm water lift stations A, C, and D |

TXU Generation (100% Sandow Unit 4):

| | |
|---|---|
| 90 day ponds and lines | Ash Water System |
| Dry fly ash system | Ash Management |
| Conveyor 1 | Clear Lake |
| Sandow Unit 4 bottom ash pond | Sales to Boral |
| Stockpile management | Lignite Stockpile |
| Sandow Unit 4 oil tank maintenance | Ad valorem taxes - Com Facilities |
| Sandow Unit 4 trash removal | Stores issued to Sandow Unit 4 |
| Scrubber sludge ponds & lines | Spare parts issued to Sandow Unit 4 |
| Sandow Unit 4 pipe lines – other | Sandow Unit 4 special projects |
| Sandow Unit 4 loader maintenance | Brazos River Authority Chgs |
| Fuel Oil | Security |
| Sandow Unit 4 bottom ash hauling | Property insurance |
| #1 Mine Belt and Transfer Tower #1 | |

6.    **Changes to Section 3 of the Transition Agreement.** Section 3, Ash and Scrubber Systems, of the Transition Agreement is hereby changed to read as follows:

Section 3. Ash and Scrubber Systems.

TXU Generation will operate and maintain lines, pumps, ponds, etc. associated with Sandow Unit 4 systems whether located on property owned by Alcoa or on property owned by TXU Generation. TXU Generation will operate and maintain the Low Pressure Ash Jet Station for Sandow Unit 4.

-5-

7.    **Changes to Section 4 of the Transition Agreement.** Section 4, Lignite Fuel Handling, of the Transition Agreement is hereby changed to read as follows:

Section 4. Lignite Fuel Handling.

TXU Generation will operate and maintain Transfer Tower No. 1 and its dust suppression equipment. TXU Generation will operate Belt No. 1 from the road to the transfer tower. TXU Generation will also operate and maintain the No. 1 Belt. TXU Generation will coordinate fuel deliveries to Sandow Unit 4 and will handle all normal communication activities with the mines. TXU Generation will coordinate all operating stockpile dozer activities, including yard maintenance and drainage.

8.    **Changes to Section 5 of the Transition Agreement.** Section 5, Trash Hauling, of the Transition Agreement is hereby changed to read as follows:

Section 5. Sandow Unit 4 Trash Hauling.

TXU Generation will furnish trash removal for Sandow Unit 4.

9.    **Changes to Section 6 of the Transition Agreement.** Subsections I and II of Section 6, Sandow Unit 4 Fuel Oil, of the Transition Agreement is hereby changed to read as follows:

I.      TXU Generation will operate and maintain fuel oil facilities for Sandow Unit 4. Additionally, Sandow Unit 4's fuel oil requirements will be purchased by TXU Generation and the inventory will be maintained as an asset on TXU Generation's books.

II.     Oil consumed by Sandow Unit 4 will be billed using the weighted average cost for the month.

10.    **Changes to Section 8 of the Transition Agreement.** Section 8, TU Electric Laboratory Analysis for Alcoa, of the Transition Agreement is hereby retitled and changed to read as follows:

Section 8. TXU Generation Laboratory Analysis for Alcoa.

TXU Generation will be responsible for testing (not necessarily on-site testing) lignite and oil samples delivered to TXU Generation by Alcoa. It is understood and agreed by both parties that the cost of analytical work should be reviewed and modified from time to time as appropriate. TXU Generation is responsible for testing for boiler water, lake water treatment, asbestos, site lubricant and air ingress.

11.    **Changes to Section 9 of the Transition Agreement.** Section 9, Alcoa Substation and 345/138/13.8 kV Substation Operation/Maintenance, of the Transition Agreement is hereby retitled and changed to read as follows:

   Section 9. Alcoa Substation Operation/Maintenance.

   Alcoa is responsible for all maintenance of the Alcoa Substation with the exception of breakers 5300 and 5310 and switch 5298 (and their associated disconnect switches) which are the responsibility of TXU Generation. Alcoa will schedule all maintenance activities with the appropriate TXUED transmission dispatcher. This scheduling is to include planned and unplanned switching requirements for maintenance or production support involving 138 kV or higher voltage switchgear.

12.    **Deletion of Section 11 of the Transition Agreement.** Section 11, Alcoa Contact with TUSOC & Appropriate Transmission Dispatcher, of the Transition Agreement is hereby deleted.

13.    **Deletion of Section 13 of the Transition Agreement.** Section 13, Warehouse Issues, of the Transition Agreement is hereby deleted.

14.    **Transition of Work.** Alcoa and TXU Generation shall work in good faith to expeditiously transition contract services related to the common facilities provided herein. Notwithstanding the foregoing, Alcoa shall not be obligated to provide such transition services after April 30, 2007.

15.    **Fuel Oil Inventory.** Upon execution of this Amendment, TXU Generation shall purchase from Alcoa, and Alcoa shall sell to TXU Generation, the existing inventory of fuel oil owned by Alcoa and stored in the Sandow Unit 4 oil storage tank at its then book value on Alcoa's books. Alcoa shall execute and deliver to TXU Generation, at the time that Alcoa receives the purchase price, a Bill of Sale to evidence the purchase and sale.

16.    **Effective Date.** This Amendment is effective on the date first stated above.

17.    **Effect of Amendment.** The portions of the Sandow Contracts, as previously amended, that are not modified by this Amendment are still effective, but all provisions of the Sandow Contracts are subject to and governed by the terms of this Amendment, and the Sandow Contracts must be consistently integrated in a manner consistent with the terms and intent evinced by this Amendment.

18.    **Successors and Assigns.** This Amendment is binding on and inures to the benefit of the parties and their respective successors and permitted assigns.

19.    **Execution in Counterparts.** This Amendment may be executed in a number of identical counterparts, each of which is deemed an original for all purposes.

20.    **Alcoa's General Representations and Warranties.** Alcoa now represents and warrants unconditionally to TXU Generation that:

Execution Copy

    (a)    Alcoa is a corporation duly organized, validly existing, in good standing under the laws of the Commonwealth of Pennsylvania, and is authorized to do business in the State of Texas.

    (b)    Alcoa has full corporate power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Amendment.

    (c)    The making and performance by Alcoa of this Amendment have been duly authorized by the necessary corporate action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to Alcoa, violate any provision of Alcoa's Articles of Incorporation or Bylaws, or result in a breach of, or constitute a default under, any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which Alcoa is a party or by which it or its property is bound or affected.

21.    **TXU Generation's General Representations and Warranties**. TXU Generation now represents and warrants unconditionally to Alcoa that:

    (a)    TXU Generation is a limited partnership duly organized, validly existing, and in good standing under the laws of the State of Texas.

    (b)    TXU Generation has full power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Amendment.

    (c)    The making and performance by TXU Generation of this Amendment have been duly authorized by all necessary partnership action and do not: violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination, or award presently in effect applying to TXU Generation, violate any provision of TXU Generation's organizational documents, or result in a breach of or constitute a default under any mortgage, indenture, loan, credit agreement, or any other material agreement or instrument to which TXU Generation is a party or by which it or its property is bound or affected.

22.    **No Rights of Third Parties**. This Amendment is intended only for the parties' benefit. Nothing in this Amendment may be construed to create any duty to, any standard of care concerning, or any liability to, any person not a party to this Amendment.

23.    **Subject to Applicable Laws**. This Amendment is subject to applicable federal, state, and local laws, ordinances, rules, and regulations. Nothing in this Amendment may be construed as a waiver of any right to question or contest any law, ordinance, rule, regulation, or asserted regulatory jurisdiction, but each party must perform under this Agreement during the time that it is questioning or contesting any law, ordinance, rule, regulation, or asserted regulatory jurisdiction.

24.     **Amendment.** This Amendment may be amended at any time, but only upon the parties' written agreement that explicitly states the parties' intent to amend this Amendment.

25.     **No Waiver.** The waiver of a breach of any provision of this Amendment does not waive any other breach of that provision or of any other provision.

26.     **Complete Amendment.** This Amendment, together with the documents attached as Exhibits to this Amendment, represents the parties' final and mutual understanding with respect to the subject matters covered by this Amendment. No representations, inducements, promises, or other agreements, oral or otherwise, have been relied upon or made by any party, or anyone on behalf of a party, that are not fully expressed in this Amendment and in its Exhibits. An agreement, statement, or promise not contained in this Amendment and its Exhibits is not valid or binding on the parties hereto.

27.     **Choice of Law.** This Amendment must be construed, and its performance enforced, under Texas law.

28.     **Severability.** If any provision of this Amendment is found to be invalid or unenforceable, that provision is severed from the remainder of this Amendment, and the parties shall immediately negotiate in good faith and agree to a replacement provision that is valid and enforceable and that puts each party in substantially the same position that the party was in before the original provision was found to be invalid or unenforceable. This Amendment, as so modified, continues in full force and effect. Additionally, if the application of any provision of this Amendment to any person or circumstance is found to be invalid or unenforceable, then that provision remains valid and enforceable as applied to all other persons and circumstances.

Signed as of the date first mentioned above.

Alcoa, Inc.

By: _____

Title: PRESIDENT - GLOBAL MANUFACTURING ALCOA PRIMARY PRODUCTS

**TXU Generation Company LP**

By: TXU Generation Management Company LLC, its general partner

By: _____

Title: EVP, Chief Legal Officer

-9-