**EXHIBIT 4**

**Supplemental Agreement to Sandow Unit 4 Agreement**

2.  SUPPLEMENTAL AGREEMENT TO

SANDOW UNIT FOUR AGREEMENT

SUPPLEMENTAL AGREEMENT

TO

SANDOW UNIT FOUR AGREEMENT

INDEX

Article                                                                Page

   I

Section 1.1------------------------------------------------------- 40
   Term

   II

Section 2.1------------------------------------------------------- 40
   Identifies Exhibit II-A - List of Components-Unit Four
Section 2.2------------------------------------------------------- 40
   Identifies Exhibit II-B - List of Common Facilities
Section 2.3------------------------------------------------------- 40
   Identifies Exhibit II-C - List of Lignite Facilities
Section 2.4------------------------------------------------------- 41
   Future Additions

   III

Section 3.1------------------------------------------------------- 41
   Identifies Exhibit III-A - Real Estate Transactions

   IV

Section 4.1------------------------------------------------------- 41
   Correction to Exhibit A of Sandow Unit Four Agreement
Section 4.2------------------------------------------------------- 42
   Identifies Exhibit IV-A - Termination of Pollution Contro
   Financing with County of Milam, Texas
Section 4.3------------------------------------------------------- 42
   Construction Committees
Section 4.4------------------------------------------------------- 42
   Construction of Common Facilities by Alcoa
Section 4.5------------------------------------------------------- 43
   Identifies Exhibit IV-B - Disbursements, Statements and
   Accounting (Section 4)

   V

Section 5.1------------------------------------------------------- 44
   Amendment to Intrastate Provisions of Section 5(c)
Section 5.2------------------------------------------------------- 44
   Amendment to Section 5(e) - Surplus Power

35

SUPPLEMENTAL AGREEMENT

TO

SANDOW UNIT FOUR AGREEMENT

INDEX

**Article**                                                                 **Page**

   V    (Cont'd)

Section 5.3-------------------------------------------------------50
     Energy Reserve Account - Identifies Exhibit V-A

   VI

Section 6.1-------------------------------------------------------52
     Identifies Exhibit VI-A - Securing Additional Water Supply

   VII

Section 7.1-------------------------------------------------------52
     Deletion of Subsection 7(b)(i) and 7(b)(ii)
Section 7.2-------------------------------------------------------52
     Amendment of Subsection 7(b)(iii)
Section 7.3-------------------------------------------------------52
     Amendment of Subsection 7(b)(iv) - Cost of Capital
Section 7.4-------------------------------------------------------54
     Identifies Exhibit VII-A; Definitions, Policies and
          Procedures - Supplement to Section 7
Section 7.5-------------------------------------------------------54
     Amendment of Section 7(c)
Section 7.6-------------------------------------------------------54
     Reclamation Fee
Section 7.7-------------------------------------------------------55
     Amendment of Section 7(g)

   VIII

Section 8.1-------------------------------------------------------55
     Amendment of Sections 8(c) and 8(d)
Section 8.2-------------------------------------------------------55
     Identifies Exhibit VIII-A - Supplement to Section 8

36

SUPPLEMENTAL AGREEMENT

TO

SANDOW UNIT FOUR AGREEMENT

INDEX

<u>Article</u>

IX

Section 9.1----------------------------------------------------- 56
    Identifies Exhibit IX-A - Supplement to Section 9
Section 9.2----------------------------------------------------- 56
    Amendment of Section 9(c)

    X

Section 10.1----------------------------------------------------56
    Identifies Exhibit X-A - Miscellaneous Supplement
Section 10.2----------------------------------------------------56
    Audit
Section 10.3----------------------------------------------------56
    Integration

Exhibit II-A ---------------------------------------------------60
    Supplemental Provision - Section 2(b) - Unit Four Components
Exhibit II-B ---------------------------------------------------68
    Supplemental Provision - Section 2(d) - Common Facilities
Exhibit II-C ---------------------------------------------------79
    Supplemental Provision - Section 2(e) - Lignite Facilities
Exhibit III-A --------------------------------------------------91
    Real Estate Transactions Pursuant to Section 3 of
    Sandow Unit Four Agreement
Exhibit IV-A --------------------------------------------------144
    Termination of IDB Financing with Milam County
Exhibit IV-B --------------------------------------------------147
    Supplemental Provision - Sections 4(a), 4(d), 4(e) & 4(f)
    Construction/Purchasing/Accounting/Warehouse
Exhibit V-A ---------------------------------------------------171
    Supplemental Provisions-Section 5(g)-Energy Reserve Account.
Exhibit VI-A --------------------------------------------------176
    Supplemental Provision - Section 6 - Water Supply



SUPPLEMENTAL AGREEMENT

TO

SANDOW UNIT FOUR AGREEMENT

INDEX

Page

Exhibit VII-A ------------------------------------------------------------177
    Supplemental Provision - Section 7 Lignite
Exhibit VIII-A -----------------------------------------------------------185
    Supplemental Provisions - Section 8
    Operation of the Sandow Station
Exhibit IX-A -------------------------------------------------------------195
    Supplemental Provisions - Section 9
    Price of Power
Exhibit X-A --------------------------------------------------------------198
    Supplemental Provisions - Miscellaneous

38

SUPPLEMENTAL AGREEMENT

TO

SANDOW UNIT FOUR AGREEMENT

This Supplemental Agreement to the Sandow Unit Four Agreement (herein called "Supplemental Agreement") is made between Aluminum Company of America, a Pennsylvania corporation (herein called "Alcoa") and Texas Power & Light Company, a Texas corporation (herein called "TP&L").

W I T N E S S E T H

WHEREAS, the parties hereto entered into the Sandow Unit Four Agreement dated August 13, 1976 (herein called "Sandow Unit Four Agreement");

WHEREAS, certain sections of Sandow Unit Four Agreement contemplate that the parties will enter into one or more supplemental agreements; and

WHEREAS, the parties are desirous of amending and supplementing the Sandow Unit Four Agreement;

NOW THEREFORE, in consideration of the undertakings of each to the other contained herein, and intending to be legally bound, the parties hereby amend and supplement the Sandow Unit Four Agreement as follows:

39

Supplemental Agreement

ARTICLE I

Section 1.1.    The term of this Supplemental Agreement shall commence on the date hereof and shall terminate upon termination of the Sandow Unit Four Agreement.

ARTICLE II

Section 2.1.    Exhibit II-A, attached hereto and made a part hereof by reference thereto, contains the listing of the components of Unit Four to be provided pursuant to Section 2(b) of the Sandow Unit Four Agreement.

Section 2.2.    Exhibit II-B, attached hereto and made a part hereof by reference thereto, contains the detailed list of Common Facilities to be provided pursuant to Section 2(d) of the Sandow Unit Four Agreement.  Pursuant to Section 4(d) of the Sandow Unit Four Agreement the ownership of such facilities is also indicated on Exhibit II-B.

Section 2.3.    Exhibit II-C, attached hereto and made a part hereof by reference thereto, contains the detailed list of existing Lignite Facilities and additions/replacements to Lignite Facilities to be provided pursuant to Section 2(e) of the Sandow Unit Four Agreement.

40

Supplemental Agreement

Section 2.4.   Additions and deletions to the lists contained in Exhibits II-A, II-B and II-C to this Supplemental Agreement may be made by the appropriate construction committee in accordance with the procedure provided in Section 4 of the Sandow Unit Four Agreement.   Subsequent to the commercial operation of Unit Four such additions or deletions shall be made by the Operating Committee in accordance with the procedure provided in Section 8(a) of the Sandow Unit Four Agreement.

ARTICLE III

Section 3.1.   Copies of the deeds, easements, and non-exclusive license contemplated by Sections 3(a) and 3(c) of the Sandow Unit Four Agreement are contained in Exhibit III-A which is attached hereto and made a part hereof by reference thereto.   The preceding sentence notwithstanding, nothing contained herein shall limit any rights TP&L may have pursuant to Section 3(c) of the Sandow Unit Four Agreement.

ARTICLE IV

Section 4.1.   The number $57,116,572, listed under "Total 'A', open obligation balance" on page 1 of "Exhibit A, Unit

41

Supplemental Agreement

Four Schedule of Alcoa Expenditures/Obligations" to the Sandow
Unit Four Agreement is hereby deleted and the number
$51,116,572 substituted therefor.

Section 4.2.   The assignment contemplated by Section 4(c)
of the Sandow Unit Four Agreement by Alcoa to TP&L of its
rights and obligations under an agreement dated October 14,
1974 among Alcoa, TP&L and the County of Milam, Texas with
respect to the financing of certain "control facilities" was
not consummated.   In lieu thereof, the parties agreed to
terminate said agreement.   A copy of the termination agreement
with respect to said agreement is attached hereto as Exhibit
IV-A.

Section 4.3.   Pursuant to Sections 4(a), 4(d) and 4(e) of
the Sandow Unit Four Agreement, TP&L and Alcoa have designated
representatives for the Unit Four, the Common Facilities and
the Lignite Facilities Construction Committees of which each
shall be comprised of four (4) persons.   Each party shall have
two (2) member representatives on each respective Construction
Committee.   There shall also be a designated alternate for each
committee member.

Section 4.4.   Section 4(d) of the Sandow Unit Four Agree-
ment provides that TP&L shall be generally responsible for the

42

Supplemental Agreement

construction of additions to existing Common Facilities and new Common Facilities necessitated by the installation of Unit Four. The preceding notwithstanding, the parties have mutually agreed that Alcoa shall be responsible for the design/ construction functions for certain Alcoa-owned additional Common Facilities. Such related functional responsibilities to be coordinated by Alcoa shall be as follows:

(1) Engineering and design of all Alcoa-owned Building Structures and Building Service Systems.

(2) Engineering, design and construction modifi- cations/additions to be made to Alcoa Lake Facilities, including the Storm Lake.

(3) Engineering, design and construction of Ash Handling Facilities including ponds, dis- posal pits, etc.

Section 4.5.  Exhibit IV-B, attached hereto and made a part hereof by reference thereto, contains the provisions for handling disbursements, statements and accounting with respect to Section 4 of the Sandow Unit Four Agreement as provided for in Section 4(f) of the Sandow Unit Four Agreement. Inasmuch as Alcoa has engaged TP&L to perform certain of its obligations under Section 4(e) of the Sandow Unit Four Agreement, Exhibit IV-B also applies to these activities. The preceding notwith- standing, nothing contained in Exhibit IV-B shall be construed to limit TP&L's or Alcoa's right to use its own standard

43

Supplemental Agreement

accounting and purchasing procedures with respect to Unit Four
and Lignite Facilities respectively.

## ARTICLE V

Section 5.1     Section 5(c) of the Sandow Unit Four
Agreement is amended by striking the period at the end of the
sixth sentence thereof, substituting a comma therefor, and
adding the following:

"and except as provided under Sections 210 or 211 of the
Federal Power Act.  If either party plans to transmit,
directly or indirectly, power and energy in interstate
commerce or make interconnections therefor, it will give
adequate notice thereof to the other party hereto so as to
permit it to arrange its affairs in such a manner as to
avoid regulation under the Federal Power Act, and the party
giving such notice shall engage in such transmission or
interconnection only if the same is exempt under the
provisions of Sections 202(d), 210 or 211 of the Federal
Power Act."

Section 5.2.     The modifications contemplated in Section
5(e) of the Sandow Unit Four Agreement with respect to surplus
energy are as follows:

(a)  If Alcoa shall designate part or all of the power
and energy it is obligated to purchase as surplus
energy as per Section 5(e) of the Sandow Unit Four
Agreement, it shall give TP&L written notice of such
election as long in advance as practical.  TP&L shall

44

Supplemental Agreement

use its best efforts to use all or part of such
surplus energy in the TP&L System in lieu of energy
which would otherwise have been generated or purchased
by TP&L but TP&L shall not be so obligated unless such
use would result in savings in TP&L's System Operating
Costs.  To the extent TP&L does not use surplus energy
in its System, it will use its best efforts to sell
such surplus energy to others, at prices and upon
terms approved by TP&L and Alcoa.

(b)  Surplus energy used in the TP&L System or sold to
others shall be deemed to have been supplied to Alcoa
for purposes of Section 5(b) of the Sandow Unit Four
Agreement.

(c)  Unless the parties shall otherwise agree, sums
due TP&L from Alcoa under the Sandow Unit Four Agree-
ment shall be credited for surplus energy used in the
TP&L System in an amount equal to the sum of the
following:

(1)  a fraction of operating costs where the
numerator is the surplus energy (in kwh) used in
the TP&L System and the denominator is the

45

Supplemental Agreement

product of 545,000 multiplied by the number of
hours that surplus energy is supplied to TP&L.
For such purposes, "operating costs" shall be the
sum of (i) the Lignite Operation Costs as per
Section 7(b)(iii) of the Sandow Unit Four
Agreement, per Btu, multiplied by the number of
Btu's consumed in Unit Four, less any applicable
credits under Section 7(c) of the Sandow Unit
Four Agreement as such Sections are amended by
Sections 7.2 and 7.5, respectively, of this
Agreement, and (ii) Unit Four Operating Costs as
per Section 8(d) of the Sandow Unit Four
Agreement as amended by Section 8.1 of this
agreement, excluding fees paid to TP&L.

(2)   fifty percent (50%) of any TP&L System
operating cost savings, decreased by an adjust-
ment for losses attributable to use of such
surplus energy.   TP&L System operating cost
savings may be calculated for the same TP&L load
over any prescribed period of time by calculating
total energy cost under (i) TP&L System
generating conditions without surplus energy and
(ii) TP&L System generation supplemented by
surplus energy, as follows:

46

Supplemental Agreement

energy costs of TP&L System without surplus
energy = sum of energy costs at TP&L plants
adjusted by net purchases.

energy costs of TP&L System supplemented by
surplus energy = sum of energy costs at TP&L
plants adjusted by net purchases plus estimated
costs of surplus energy as per (c)(1) of this
section.

energy cost = fuel cost x heat rate x Kilowatt-hours
$        =    $/Btu      Btu/kwh        kwh

(d)  Unless the parties otherwise agree, sums due TP&L
from Alcoa under the Sandow Unit Four Agreement shall
be credited for surplus energy sold to others in an
amount equal to the price at which it is sold by TP&L
less a proper adjustment applicable to losses and
costs (to be determined by agreement at the time of
sale) attributable to its delivery to others (the
remainder being called TP&L net sales price) and minus
ten percent (10%) of the excess of the TP&L net sales
price over the total cost of such surplus energy.
Such total cost of surplus energy shall be the sum of:

47

Supplemental Agreement

(1)  a fractional part of the Lignite Operation
Costs  as per Section 7(b) of the Sandow Unit
Four Agreement, as amended by this agreement, per
Btu, multiplied by the number of Btu's consumed
in Unit Four, decreased by any applicable net
proceeds of products as per Section 7(c) of the
Sandow Unit Four Agreement, as amended by Section
7.5 of this agreement;

(2)  a fractional part of the capital costs as
set forth in Section 7(b)(iv) of the Sandow Unit
Four Agreement as amended by Section 7.3 of this
Agreement, but substituting the fraction 545/870
for 95/870, per Btu, multiplied by the number of
Btu's consumed in Unit Four;

(3)  a fractional part of Unit Four operating
costs as per Section 8(d) of the Sandow Unit Four
Agreement;

(4)  the Common Facilities Charge as per Section
8(g) of the Sandow Unit Four Agreement but sub-
stituting the fraction hereinafter mentioned for
95/545 or 95/870, as applicable;

48

Supplemental Agreement

(5)   the Price of Power as per Section 9(b) of
the Sandow Unit Four Agreement but substituting
the hereinafter mentioned fraction for 450/545.

As used in this subsection (d), the fraction, or frac-
tional part, shall have a numerator equal to surplus
energy sold to others (in kwh) and the denominator is
the product of 545,000 multiplied by the number of
hours surplus energy is supplied to others.

(e)   If surplus energy is used in the TP&L System or
sold to others for a period of less than a full
calendar month, then the fractional part of operating
costs as per Section 5.2(c)(1) or the total costs as
per Section 5.2(d) of this Supplemental Agreement, as
the case may be, shall be further reduced in propor-
tion to the portion of such month in which surplus
energy is so used or sold.

(f)   Amounts due Alcoa under this Article during any
calendar month shall be credited against amounts due
TP&L from Alcoa and any excess of the amount so
credited over the amount so due shall be credited
against future amounts due TP&L from Alcoa.  Such
credits may be made on the basis of estimated costs,

49

Supplemental Agreement

subject to final adjustment when actual costs have
been determined. The amount of surplus energy used in
the TP&L System or sold to others during any period of
time that TP&L has been able to use or sell the same
shall be an amount mutually agreed to by the parties
or shall be determined by subtracting the sum of (1)
the quantity of energy delivered to Alcoa at the point
of delivery, (2) losses in the case of sale to others
as per Section 5(c) of the Sandow Unit Four Agreement
and (3) the quantity of energy, if any, being debited
to the Energy Reserve Account above the quantity which
would normally be debited to said account pursuant to
Section 5(g) of Sandow Unit Four Agreement, from the
quantity of energy set forth in Section 5(b) of the
Sandow Unit Four Agreement.

Section 5.3.   Energy Reserve Account.

(a)  Exhibit V-A, attached hereto and made a part
hereof by reference thereto, sets forth procedures for
handling the Energy Reserve Account pursuant to
Section 5(g) of the Sandow Unit Four Agreement.

(b)  Recognizing that the obligations of TP&L to
deliver power and energy is not limited to the output
of Unit Four but that Alcoa's payments therefor are,

50

Supplemental Agreement

in large part, based upon costs associated with such
unit and further recognizing that the provisions of
Exhibit V-A for monetary payments with respect to
imbalances in the Energy Reserve Account are
inappropriate for large or persistent imbalances, the
parties are committed as provided in Exhibit V-A and
Section 5(g) of the Sandow Unit Four Agreement to
taking such actions as may be necessary to bring such
account substantially into a zero kwh balance.  For
such purposes and without limitation on other
appropriate remedies, the parties may, by agreement,
vary the amount of energy to be debited or credited to
the Energy Reserve Account or engage in other energy
transactions.  To eliminate or reduce a credit balance
in such account, Alcoa may, at its option, (i) reduce
the amount of firm power and energy to be delivered
pursuant to Section 5(b) of the Sandow Unit Four
Agreement, or (ii) for pricing purposes only, reduce
the amount of firm power and energy to be delivered
pursuant to Section 5(b) of the Sandow Unit Four
Agreement and pay TP&L, at its from time to time
prevailing rates, for the amount of such reduction.

Supplemental Agreement

## ARTICLE VI

Section 6.1.    TP&L hereby agrees to reimburse Alcoa for sums expended by Alcoa prior to commencement of commercial operation of Sandow Unit Four in order to secure an additional water supply for Sandow Unit Four.  The basis for said reimbursement is set forth in Exhibit VI-A which is attached hereto and made a part hereof by reference thereto.

## ARTICLE VII

Section 7.1.    Subsections 7(b)(i) and 7(b)(ii) of the Sandow Unit Four Agreement are hereby deleted in their entirety.

Section 7.2.    Subsection 7(b)(iii) of the Sandow Unit Four Agreement is hereby deleted in its entirety and a new subsection 7(b)(iii) substituted therefor which reads as follows:

> "(b)(iii)  TP&L shall pay a fraction of Alcoa's monthly 'Lignite Operation Costs' by which is meant all costs of operating the Lignite Facilities, excluding fees paid to TP&L under the Operating Contract, and taxes based on income.  Lignite Operation Costs is further defined in Exhibit VII-A of the Supplemental Agreement.  The numerator of the fraction is 95/545ths of the total BTU's consumed by Unit Four during such month and the denominator is the total quantity of BTU's consumed in the Sandow Station during such period."

Section 7.3.    Subsection 7(b)(iv) of the Sandow Unit Four Agreement is hereby deleted in its entirety and a new Subsection 7(b)(iv) substituted therefor which reads as follows:

52

Supplemental Agreement

"7(b)(iv)

(A)  Alcoa shall accrue monthly 1/12th of Alcoa's cost of capital at 23.2% on 95/870ths of the following items:

(i)  The net book value of Alcoa's Unmined Mineral Account - This account includes the acquisition cost of lignite 'fee' property purchased by Alcoa as well as acquisition and exploration costs on leased lignite properties.

(ii) The net book value of additions to Lignite Facilities referred to in Section 4 of the Sandow Four Agreement and future additions and improvements thereto until such facilities are fully depreciated.

(iii) The net book value at start-up of Unit Four on the balance of Lignite Facilities, referred to in Section 4 of the Sandow Agreement, including future improvements and additions thereto until such facilities are fully depreciated.

(iv) Lignite Inventories as described in Exhibit VII-A to the Supplemental Agreement.

(v)  The net book value of Alcoa's inventories of supplies, spare parts, etc. associated with the Lignite Facilities.

(vi) The net book value of Lignite Authorization Expenses as determined in Exhibit X-A to the Supplemental Agreement.

(vii) The net book value of Prepaid Bonus and Delay Rentals paid by Alcoa prior to start of commercial operation as determined in Exhibit X-A to the Supplemental Agreement.

(B)  Each year Alcoa shall estimate the annual cost of capital which shall be accrued pursuant to (A) above, which annual estimate when divided by the estimated annual consumption of BTU in Unit Four (which estimate will be provided by TP&L) shall be the estimated cost per BTU to be charged to TP&L pursuant to (C) below. The "estimated cost per BTU" shall be reviewed at least quarterly and adjusted accordingly for use in calculating prospective monthly charges so as to minimize the year end adjustment provided for in (D) below.

53

Supplemental Agreement

(C)  TP&L shall pay a monthly cost of capital charge based on the actual number of BTU's consumed in Unit Four during such month multiplied by the estimated cost per BTU derived in (B) above.

(D)  Annually, at year end, there shall be an adjustment which shall charge or credit TP&L for the difference between TP&L's payments for the year pursuant to (C) above and the cost of capital accrued by Alcoa pursuant to (A) above."

Section 7.4.    Exhibit VII-A, attached hereto and made a part hereof by reference thereto, contains definitions, policies and procedures which supplement Section 7 of the Sandow Unit Four Agreement.

Section 7.5.    Subsection 7(c) of the Sandow Unit Four Agreement is hereby deleted in its entirety and a new subsection 7(c) substituted therefor which reads as follows:

"TP&L shall be entitled to a credit against its share of Lignite Operation Costs as defined above of a share of the net proceeds from the sale of combustion by-products (fly ash and bottom ash) from Unit 4 determined by multiplying such proceeds by 95/545ths.  Alcoa shall have the responsibility for marketing such products."

Section 7.6.    Section 7 of the Sandow Unit Four Agreement is hereby amended by adding a subsection, Subsection 7(h), thereto, which reads as follows:

"(h) TP&L shall pay Alcoa a monthly charge equal to 95/545ths of all Lignite Reclamation Fees paid by Alcoa on lignite consumed by Unit Four during such month."

54

Supplemental Agreement

Section 7.7.    The references to Sections "7(b)(i) and 7(b)(iii)" found on lines 10 and 11 of Section 7(g) of the Sandow Unit Four Agreement are hereby deleted and references to Sections "7(b)(iii), 7(b)(iv) and 7(h) as amended or provided in the Supplement" substituted therefor.

ARTICLE VIII

Section 8.1.

(a)  The words "Lignite Production Costs" found on line 4 of Section 8(c) and lines 4 and 5 of Section 8(d) of the Sandow Unit Four Agreement are hereby deleted and the words "Lignite Operation Costs" substituted therefor.

(b)  Section 8(c) of the Sandow Unit Four Agreement is hereby amended by adding the following sentence thereto:

"For purposes of determining TP&L's operating fee, Lignite Operation Costs shall not include depreciation and obsolescence, ad valorem taxes or other taxes assessed against the Lignite Facilities and Lignite Properties or the operation thereof, royalties, cost depletion, mining permits or sums paid to any person other than TP&L for supervising or managing lignite operations."

Section 8.2.    Exhibit VIII-A, attached hereto and made a part hereof by reference thereto, supplements Section 8 of the Sandow Unit Four Agreement.

55

Supplemental Agreement

ARTICLE IX

Section 9.1.  Exhibit IX-A, attached hereto and made a
part hereof by reference thereto, supplements Section 9 of the
Sandow Unit Four Agreement.

Section 9.2.  The reference to Sections "7(b)(ii),
7(b)(iv)(C)" found on lines 3 and 4 of Section 9(c) of the
Sandow Unit Four Agreement is hereby deleted and reference to
"7(b)(iv) substituted therefor.

ARTICLE X

Section 10.1.  Exhibit X-A, attached hereto and made a part
hereof by reference thereto, contains miscellaneous supple-
mental provisions to the Sandow Unit Four Agreement.

Section 10.2.  All costs, expenditures, charges and other
accounting items referred to in the Sandow Unit Four Agreement,
this Supplemental Agreement and the exhibits to said agreements
shall be determined from the books and records of the party
responsible for making such expenditure or calculating such
charge (including the books and records of affiliated or
subsidiary companies when appropriate so to do) in accordance
with generally accepted accounting principles and with the

56

Supplemental Agreement

procedures set forth in the Sandow Unit Four Agreement, this
Supplemental Agreement and the exhibits to said agreements.
Such determinations shall be made by the responsible party
subject to audit by its regular public accounting firm, which
firm, upon request of the other party and in conjunction with
its next regular audit of the responsible party, shall certify
to the other party the amount of all items in question and that
the books and records and methods of allocation upon which such
determinations were made were kept and were made in accordance
with generally accepted accounting principles and with the
procedures set forth in the Sandow Unit Four Agreement, this
Supplemental Agreement and the exhibits to said agreements
consistently applied.  In addition, upon reasonable notice,
each party shall have access to the other party's said books
and records.

57

Supplemental Agreement

Section 10.3. The parties intend for the Power Contract, the Operating Contract and Sandow Unit Four Agreement, as heretofore and hereby amended, to remain in full force and effect.

EXECUTED this __2nd__ day of __March__; 1981.

ATTEST:                                          TEXAS POWER & LIGHT COMPANY

_____                          _____
Secretary                                          President
Charles V. McCarter                                R. K. Campbell

ATTEST:                                          ALUMINUM COMPANY OF AMERICA

_____                          _____
Asst. Secretary                                    Vice President
H. E. Meeks                                        S. Alfred Jones

58

EXHIBIT II-A

SANDOW UNIT FOUR AGREEMENT
SUPPLEMENTAL PROVISION - SECTION 2(b) - UNIT FOUR COMPONENTS

INDEX

Section                                                                    Page

A.    CIVIL EQUIPMENT------------------------------------------------------- 60

B.    MECHANICAL EQUIPMENT------------------------------------------------- 60

C.    INSTRUMENTATION & CONTROLS---------------------------------------- 66

D.    ELECTRICAL EQUIPMENT------------------------------------------------- 66

E.    SPARE PARTS------------------------------------------------------------- 67

59

EXHIBIT II-A

SANDOW UNIT FOUR AGREEMENT
SUPPLEMENTAL PROVISION - SECTION 2(b) - UNIT FOUR COMPONENTS

The major components of Unit Four are listed below:

A.  CIVIL EQUIPMENT

    *1.  Circulating Water Intake Structure

    *2.  Circulating Water Discharge Structure

    *3.  Circulating Water Pipes

    4.  Chimney

    5.  Cranes

        A.  Gantry

       *B.  Intake Structure

        C.  $SO_2$ Area

        D.  Pulverizer Area

    6.  Buildings

        A.  Turbine - Generator

        B.  Water Treatment

        C.  Precipitator & Ash Handling Control

      *D.  Chlorination

      *E.  Fire Pump

        F.  Auxiliary Boiler Control

      *G.  Fuel Handling Electrical Equipment

        H.  $SO_2$ Control.

        I.  Additive System Control, A-413.1

        J.  Limestone Receiving Hopper

    7.  Station Elevator

    8.  $SO_2$ Area Elevator

  * 9.  Plant Roads

B.  MECHANICAL EQUIPMENT

    1.  Turbine - Generator

60

*Denotes Equipment not wholly on TP&L fee property.

EXHIBIT II-A

B.  MECHANICAL EQUIPMENT (CONT'D)

   2.  Steam Generator

   3.  Pulverizers (8)

   4.  Forced Draft Fans (2)

   5.  Primary Air Fans (2)

   6.  Gravimetric Feeders (8)

   7.  Air Preheaters (2)

   8.  Glycol-Water Air Heating System

   9.  Retractable Soot Blowers (34)

  10.  Wall Blowers (192)

  11.  Condenser

  12.  Condensate Pumps (3)

  13.  Condenser Vacuum Pumps (2)

  14.  Condensate Storage Tanks (2)

  15.  Condensate Transfer Pump

  16.  Feedwater Heaters (6)

  17.  Deaerator,

  18.  Boiler Feed Pumps (2)

  19.  Boiler Feed Booster Pumps (2)

  20.  Boiler Feed Pump Drive Turbines (2)

  21.  Boiler Feed Pump Seal Water Pump

*22.  Circulating Water Pumps (3)

*23.  Traveling Water Screens (3)

  24.  Cooling Water Booster Pumps (2)

  25.  Fuel Handling System

     *A.  Conveyor No. 41

     *B.  Conveyor No. 42

*Denotes Equipment not wholly on TP&L Fee property.    61

EXHIBIT II-A

B.  MECHANICAL EQUIPMENT (CONT'D)

    *C.  Telescopic Chutes (2)

    *D.  Reclaim Tunnel Structure

    *E.  Metal Detector

    *F.  Storage Pile Reclaim Feeders (8)

    *G.  Conveyors No. 43 A&B

    *H.  Reclaim Rate Indicators (2)

    *I.  Magnetic Separators (2)

    *J.  Transfer Tower No. 2

    *K.  Crusher Surge Bin

    *L.  Crusher Surge Bin Feeders (2)

    *M.  Crushers (2)

    *N.  Conveyors 44 A&B

    O.  Fuel Sampling System

    P.  Boiler Surge Bin

    Q.  Boiler Surge Bin Feeders

    R.  Conveyor No. 45

    S.  Conveyor No. 46

    *T.  Belt Scales (2)

    U.  Conveyor No. 47

    V.  Trippers (2)

    *W.  Dust Collection System

    *X.  Dust Suppression System

    Y.  Vacuum Cleaning System

    *Z.  Fire Protection System

    AA.  Transfer Tower No. 3

    BB.  Transfer Tower No. 4

*Denotes Equipment not wholly on TP&L Fee property.

EXHIBIT II-A

B. MECHANICAL EQUIPMENT (CONT'D)

26. Boiler Fuel Silos (8)

*27. Fuel Oil Storage Tank

*28. Fuel Oil Supply Pumps (2)

*29. Fuel Oil Supply Strainers (2)

30. Electrostatic Precipitators

31. Induced Draft Fans (3)

32. $SO_2$ Removal System

    A. Absorber Modules (3)

    B. Spray Pumps (12)

    C. Absorber Bleed Pumps (6)

    D. Mist Eliminator Wash Pumps (2)

    E. Reaction Tanks (3)

    F. Reaction Tank Mixers (12)

    G. Flue Gas Reheat Fan

    H. Flue Gas Reheat Coils (2)

    I. $SO_2$ Sump Pumps

33. Forced Oxidation Air Compressors (4)

34. Sludge Transfer Tank

35. Sludge Transfer Tank Mixer

36. Sludge Transfer Pumps (2)

37. Limestone Handling System

    A. Receiving Hopper

    B. Car Puller

    C. Rail Car Shaker

    D. Receiving Hopper Feeders (2)

    E. Conveyor LS-1

*Denotes Equipment not wholly on TP&L fee property.    63

EXHIBIT II-A

B.  MECHANICAL EQUIPMENT (CONT'D)

        F.  Conveyor LS-2

        G.  Radial Stacker

        H.  Mobil Front End Loader

        I.  Reclaim Hopper

        J.  Reclaim Hopper Feeder

        K.  Conveyor LS-3

        L.  Surge Bins (3)

        M.  Surge Bin Tower

38.  Additive System

        A.  Ball Mills (3)

        B.  Feeders (3)

        C.  Additive Storage Tanks (2)

        D.  Additive Storage Tank Mixers (2)

        E.  Additive Feed Pumps (2)

39.  Bulk Hydrogen Storage Tanks

40.  Bulk $CO_2$ Storage Tank

41.  Bulk Nitrogen Storage Tanks

42.  Condensate Polishing Demineralizer

43.  Polishing Demineralizer Backwash Pump

44.  Polishing Demineralizer Backwash Blower

45.  Makeup Demineralizer System

46.  Demineralizer Sump Pumps (2)

47.  Auxiliary Steam Generators (2)

48.  Auxiliary Steam Generator Feedwater Pumps (2)

49.  Soot Blower Air Compressors (3)

50.  Instrument Air Compressors (2)

*Denotes Equipment not wholly on TP&L fee property.     64

EXHIBIT II-A

B. **MECHANICAL EQUIPMENT (CONT'D)**

    51.  Instrument Air Receiver

    52.  Service Air Receiver

    53.  Instrument Air Dryer

  *54.  Service Water Pumps

  *55.  Firewater Pump

    56.  Bottom Ash Handling System

        A.  Bottom Ash Hopper

        B.  Clinker Grinders (6)

        C.  Bottom Ash Pumps (2)

        D.  Pyrites Hoppers (8)

        E.  Pyrites Transfer Tank

        F.  Pyrites Transfer Pumps (2)

    57.  Fly Ash Removal System

    58.  Fly Ash Sample Silo

    59.  High Pressure Ash Water Pumps (2)

    60.  Emergency Diesel Generator

  *61.  Chlorination System

    62.  Portable Lube Oil Centrifuge

    63.  Lube Oil Storage Tank

    64.  Lube Oil Transfer Pump

    65.  Chemical Feed Systems

        A.  Ammonia

        B.  Hydrazine

        C.  Auxiliary Boiler

    66.  Ammonia Storage Tank

    67.  Gland Water Return Tank

*Denotes Equipment not wholly on TP&L fee property.    65

B.  MECHANICAL EQUIPMENT (CONT'D)

    68.  Station Sump Pumps (2)

  *69.  Service Water Pumps

    70.  Boiler Circ. Pump Emergency Cooling Water Pump

    71.  Raw Water Storage Tank

    72.  Raw Water Booster Pumps (3)

    73.  Heating, Ventilating and Air Conditioning Equipment

C.  INSTRUMENTATION & CONTROLS

    1.  BTG Board

    2.  Combustion, Feedwater, and Steam Temperature Control System

    3.  Burner Control System

    4.  Steam & Water Analysis Systems

    5.  Fuel Handling System Control Panel

    6.  Data Acquisition System

    7.  Flue Gas Analysis System

    8.  $SO_2$ Removal System Control Panel

D.  ELECTRICAL EQUIPMENT

    1.  Main Power Transformers

    2.  Auxiliary Transformers (2)

    3.  Start-up/Standby Transformers (2)

    4.  Isolated Phase Bus

    5.  6900 Volt Switchgear

    6.  4160 Volt Switchgear

  *7.  480 Volt Power Centers

  *8.  480 Volt Motor Control Centers

    9.  120/208 Volt AC Distribution Panels

*Denotes Equipment not wholly on TP&L fee property.

EXHIBIT II-A

D. ELECTRICAL EQUIPMENT (CONT'D)

    10. 120/208 Volt AC Vital Services Panel

    11. 125 Volt DC Distribution Panels (2)

    12. 125 Volt DC Station Battery & Chargers

    13. Lighting Equipment

    14. Page-Party System

    15. Protective relaying

    16. Metering

    17. Line Control Panel

E. SPARE PARTS

    1. Mechanical Equipment Spare Parts

    2. Electrical Equipment Spare Parts

    3. Instrument and Control Equipment Spare Parts

EXHIBIT II-B

SANDOW UNIT FOUR AGREEMENT
SUPPLEMENTAL PROVISION - SECTION 2(d) - COMMON FACILITIES

INDEX

| Section | Page |
|---|---|
| A. ALCOA-OWNED NEW COMMON FACILITIES............... | 69 |
| B. ALCOA-OWNED MODIFICATIONS - EXISTING COMMON..... FACILITIES | 71 |
| C. ALCOA-OWNED COMMON FACILITIES - GENERAL......... | 73 |
| D. ALCOA-OWNED EXISTING COMMON FACILITIES.......... | 74 |
| E. TP&L OWNED COMMON FACILITIES.................... | 78 |

68

EXHIBIT II-B

SANDOW UNIT FOUR AGREEMENT
SUPPLEMENTAL PROVISION - SECTION 2(d) - COMMON FACILITIES

Alcoa
Account #                Description

A.  ALCOA-OWNED NEW COMMON FACILITIES

070              BUILDING 70 SANITARY TREATMENT PLANT
                     Provide Clarifier For Sanitary Treatment
                     Plant (15% only)

200A             ADMINISTRATION OFFICE BLDG.
                     New bldg.

213              COMBUSTIBLES STORAGE BLDG.

217              BUILDING 217 - MECHANICAL MAINTENANCE
                     Provide New 26,000 S.F. Mechanical
                     Maintenance Shop

217-510          PORTABLE EQUIPMENT
                     Miscellaneous Portable Equipment As Required
                     by Mechanical and Electrical Maintenance

217-520          CRANES & HOISTS
                     1 Ea. 18 Ton Crane
                     1 Ea. 15 Ton Overhead Crane
                     1 Ea. 5 Ton "A" Frame Gantry Crane
                     .5 Ton Jib Cranes

217-530          SHOP EQUIPMENT
                     1 Ea. Engine Lathe
                     1 Ea. Radial Drill
                     1 Ea. Power Reciprocating Saw
                     1 Ea. Pipe & Bolt Threading Machine
                     1 Ea. Power Hack Saw
                     3 Ea. 300 AMP DC Welding Machine
                     1 Lot Miscellaneous Equipment

69

Exhibit II-B

| Alcoa Account # | Description |
|---|---|

**219**  BUILDING 219 – CLEANING STATION
Provide New Cleaning Station

**278**  ASH HANDLING FACILITIES
Provide Ash Handling Facilities (Bottom Ash, Fly Ash, & $SO_2$) Including Feed & Return Lines, Disposal Pits, Return Water & Pump Station.

**280**  138KV SUBSTATION
Provide 138KV Generator Breakers & Transmission
Facilities Between Sandow #4 & 138KV Switchyard

**282**  LIGHT OIL UNLOADING FACILITIES
Provide Fuel Oil Unloading Facilities

**285**  SAMPLING & WEIGHING SYSTEM
Provide Sampling & Weighing System For Units 1-3 (Raw Lignite At North Junction House)

**299**  BROWN & ROOT BUILDINGS
Acquire Brown & Root Buildings Warehouse A, B & C, Elect. Shop, Pipe Shop, Carpenter Shop, Mega Warehouse, Storage Vault and Office Building

70

Exhibit II-B

Alcoa
Account #      Description

B.  ALCOA-OWNED MODIFICATIONS - EXISTING COMMON FACILITIES

201A            BUILDING 201 - LUNCH ROOM
                    Upgrade Lunch Room

204A            BUILDING 204A - LOCKER ROOM
                    Upgrade Locker Room

205A            BUILDING 205A - REST ROOMS
                    Upgrade Rest Rooms

270-500         COOLING PONDS - ALCOA LAKE
                    Modify Alcoa Lake To Accommodate Additional
                    Thermal Load

982Y200         PLANT RAILROADS
                    Railroad Spur To Serve $SO_2$ Area and
                    restoration of track to turbine - generator
                    bldg.

982Y310         PLANT ROADS
                    Provide New Or Modified Plant Roads

982Y340         PLANT SIDEWALKS

982Y410         PERMANENT PARKING LOTS

982Y610         PLANT FENCES

983Y210         POTABLE WATER DISTRIBUTION

983Y220         MAKE-UP WATER DISTRIBUTION

984Y110         STORM SEWER SYSTEM

984Y210         SANITARY SEWER SYSTEM

987Y230         LOW VOLTAGE DISTRIBUTION SYSTEM

987Y250         YARD LIGHTING

987Y260         CATHODIC PROTECTION

987Y310         TELEPHONE SYSTEM

71

Exhibit II-B

987Y320          PUBLIC ADDRESS SYSTEM

987Y325          PLANT PAGING SYSTEM

988Y             YARD PORTABLE EQUIPMENT

998E310          RELOCATE MAINTENANCE SHOP EQUIPMENT BUILDING 201 TO
                 217

998E410          RELOCATE MISCELLANEOUS YARD FACILITIES

998E430          RELOCATE LAKE CONCESSION FACILITIES

998E910          MISCELLANEOUS EXPENSE

Exhibit II-B

Alcoa
Account #        Description

C. ALCOA-OWNED COMMON FACILITIES - GENERAL

991X410 and    ALCOA SITE GENERAL CONSTRUCTION OVERHEAD

991X710            TP&L & T.U.S.I. Site Overhead Applicable
                   To Scope Of Work Requirements For Facilities
                   Covered By Alcoa/TP&L Agreement Section 4(d).

992X100/300   ENGINEERING, DESIGN & CONSULTING
                   Costs Applicable To Design Services Provided
                   By Alcoa, TP&L, Brown & Root, Inc. and
                   Outside Engineering Firms.

73

Exhibit II-B

Alcoa
Account #                Description

D. ALCOA-OWNED EXISTING COMMON FACILITIES (3)

BLDG. 200 ADMINISTRATION OFFICE:

| | |
|---|---|
| 311309 | One Story Brick Building |
| 311311 | Potable Water Lines |
| 311312 | Plumbing Fixtures |
| 311313 | Sanitary Sewer Lines |
| 311310 | Lighting System |
| 311027 | Air Conditioning System (10 ton) |
| 311028 | Air Conditioning System (5 ton) |

BLDG. 201 MAINTENANCE SHOP:

| | |
|---|---|
| 311049 | Maintenance Service Bldg. 201 |
| 311050 | Wash Room and Locker Room |
| 311174 | Foreman's Office |
| 311071 | Hot Water Tank |
| 311341 | Potable Water System |
| 311347 | Sanitary Sewer System |
| 311348 | Plumbing Fixtures |
| 311342 | Lighting System |
| 311067 & 311543 | Kennard Heating & Ventilating System |
| 311175 | Steam Lines |
| 311386 | Gas Fired Steam Boiler |
| 316445 | Radial Drill |
| 316447 | LeBlond Lathe |
| 3161264 | LeBlond Lathe |
| 3161365 | Milling Machine |
| 3161466 | Two(2) Monarch Lathes |

BLDG. 204 WAREHOUSE & STOREROOM #1:

| | |
|---|---|
| 311307 | 50' x 100' Warehouse Steel |
| 311079 | Office Enclosure Warehouse |
| 311308 | Toilet and Locker Room |
| 311091 | 415 Gallon Hot Water Heater |
| 311362 | Plumbing Fixtures |
| 311363 | Sanitary Sewer System |
| 311364 | Potable Water System |
| 311365 | Automatic Sprinkler System |
| 311087 | Heating & Ventilating System |
| 311030 | Lighting & Small Power |

Exhibit II-B

D.  ALCOA-OWNED EXISTING COMMON FACILITIES CONTINUED

### BLDG. 205 WAREHOUSE & STOREROOM #2:

| | |
|---|---|
| 311304 | 50' x 100' Warehouse Building |
| 311305 | Sanitary Sewer System |
| 311366 | Automatic Sprinkler System |
| 311031 | Lighting & Small Power |
| 316401 | One (1) 5-Ton Crane |
| Various | Storage Racks |

### BLDG. 206 OIL STORAGE:

| | |
|---|---|
| 311349 | Oil Storage Building Steel 1-Story |
| 311379 | Sprinkler System |

### BLDG. 239 GUARD OFFICE

| | |
|---|---|
| 311357 | 1-Story Haydite Block & Brick |
| 311376 | Lighting System |

### BLDG. 240 FIRE HOUSE:

| | |
|---|---|
| 311358 | 1-Story Haydite Block & Brick |
| 311374 | Lighting System |
| 316408 | Blitz Buggy Fire Fighter |

### PLANT SERVICE SYSTEMS:

| | |
|---|---|
| 311196 | Potable Water 2" Line |
| 311330 | Potable Water Supply System |
| 311301 | Sanitary Sewer System |
| 311303 | Storm Sewer System |
| 315914 | Plant Telephone System |

Exhibit II-B

D.  ALCOA-OWNED EXISTING COMMON FACILITIES CONTINUED

ALCOA LAKE FACILITIES
(Includes Canals, Spillways, Dams & Dikes):

| | |
|---|---|
| 311005 | Gate Hoist at Spillway |
| 311314 | Cold Lake |
| 311315 | Hot Lake |
| 311316 | Earthen Dam East Side Cold Lake |
| 311317 | Southwest Dike where road is located |
| 311318 | Hot and Cold Lake dividing Dike |
| 311319 | North Dike where 36" line enters from L.R. |
| 311320 | Canal connecting Hot & Cold Lake |
| 311321 | Cold Lake Spillway |

LITTLE RIVER WATER FACILITIES:

| | |
|---|---|
| 311329 | 36" Water Line |
| 311007 & | |
| 311009 & | |
| 311011 | Three (3) 2,000 H.P. Motors for Pumps |
| 311008 & | |
| 311010 & | |
| 311012 | Three (3) 12,500 GPM Pumps |
| 311013-015 | Three (3) 30" Rotovalves |
| 311016 | 5000/6250 KVA Transformer |
| 311023 | 4160 Volt Switchgear |
| 311024 | 480 Volt Service System |
| 311034 | 20-Ton Overhead Crane |
| 311081 | 150 KVA Transformer |
| 311322 | Pumping Station Structure |
| 311323 | Lighting System |
| 311327 | 33 KV Substation |
| 311328 | 33 KV Powerline |
| 311324 | Access Road to Little River Pump Station |

YARD AND SURROUNDING FACILITIES:

| | |
|---|---|
| 311377 & 390 | Plant Power Fence |
| 311158 | Road System |
| 311159 | Asphalt Road Paving |
| 311160 | Concrete Sidewalks |
| 311199 & 378 | Parking Lot |
| 311306 | Railroad System Serving Power Plant |
| 311302 | Grading only for Permanent Lignite Storage Area |
| 311359 | Street Lighting System |

Exhibit II-B

D.   ALCOA OWNED EXISTING COMMON FACILITIES CONTINUED

SPECIAL (1)

| | |
|---|---|
| 3161029 | Air (100 psi) piping system |
| 315905 | Underground Duct System |
| 315906 | Plant Grounding System |
| | 2400 Volt Power System |
| | 480 Volt Power System |

33KV SYSTEM (2)

| | |
|---|---|
| 315903 | 33 KV System in Switchyard |
| 315002-003 | Two (2) 5000/6250 KVA Transformers |
| Various | Office Furniture (All locations)-Power Operations |
| Various | Office Equipment (All locations)-Power Operations |
| Various | Testing & Laboratory Equipment (all locations) |

NOTES:

(1) That part of the facilities used by Unit 4 is insignificant and therefore will not be used in calculation of Common Facilities charge as per Section 8(g).  If however, any capital improvements or conditions are made to these facilities for the purpose of operations or maintenance of Units 1-3 & 4 such expenditures shall be considered as Common Facilities (Section 2(d)).

(2) 50% of the 33KV system is considered to be Common Facilities.

(3) Automotive equipment has been excluded from Common Facilities listing.  Depreciation applicable to be included in operating costs.

77

Exhibit II-B

E.   TP&L OWNED COMMON FACILITIES

Chemical Laboratory
Includes equipment for water and lignite
analysis

Instrument Shop
Includes equipment and facilities to
maintain and repair instrument and control
equipment

78

EXHIBIT II-C

SANDOW UNIT FOUR AGREEMENT
SUPPLEMENTAL PROVISION – SECTION 2(e) – LIGNITE FACILITIES

INDEX

Section                                                    Page

A.   ADDITIONS/REPLACEMENTS – ALCOA-OWNED............. 80
     LIGNITE FACILITIES

B.   EXISTING--ALCOA-OWNED LIGNITE FACILITIES........ 88

79

EXHIBIT II-C

SANDOW UNIT FOUR AGREEMENT
SUPPLEMENTAL PROVISION - SECTION 2(e) - LIGNITE FACILITIES

A.    Additions/Replacements - Alcoa-Owned Lignite Facilities

Alcoa
Account #        Description

                 DRAGLINES

988Y530-5(0      Dragline Unit 79 - 95 C.Y.

988Y630-660      Dragline Unit 80 - 95 C.Y.

989Y120          Spare Parts - Mech. Draglines

989Y140          Spare Parts - Elect. Draglines

302              BUILDING 302 - WAREHOUSE EXTENSION
                     Provide approx. 7,200 S.F. extension on the
                     north side of Fuel Dept. Warehouse.

302-510          PORTABLE EQUIPMENT
                     Storage Racks, Pallets and other Portable
                     Equipment.

303              BUILDING 303 - MAINTENANCE SHOP EXT.
                     Provide approx. 12,000 S.F. extension on the
                     west side of Fuel Dept. Maintenance Shop.

303-510          PORTABLE EQUIPMENT
                     Tire Changer
                     Vulcanizer                Equipment Racks
                     Compressor (Portable)     Fire Extinguishers
                     Fork Lift

Exhibit II-C

Additions/Replacements - Alcoa-Owned Lignite Facilities (Cont'd)

| Alcoa Account # | Description |
|---|---|
| 303-520 | CRANES AND HOISTS<br>Overhead Cranes<br>20 Ton, 1 ea.; 10 Ton, 1 ea.; 5 Ton, 1 ea. |
| 303-530 | SHOP EQUIPMENT<br>Compressor & Enclosure<br>Welding Machine, 5 ea.<br>Drill Press<br>Bolt and Pipe Threader<br>Band Saw<br>Hydraulic Press<br>Grinders |
| 303A530 | STEAM CLEANING & PREWASH FACILITIES<br>Provide steam cleaning & prewash facilities<br>for heavy equipment. |
| 303B530 | WATER CAN WASH FACILITY |
| 303C | DART WELDING SHOP |
| 303D | CABLE REPAIR BUILDING |
| 308-530 | SOUTH PRIMARY CRUSHER NO. 1<br>Stamler feeder breaker, 1200 Ton/Hr.<br>including Chem Jet suppression system. |
| 309 | CENTRAL PRIMARY CRUSHER |
| 309-530/540 | Single Roll Crusher, 1500 Ton/Hr. |
| 309A530 | Dump Hopper & Transfer Station Including Feeders |
| 309B530 | Crusher Feed Conveyor From Hopper to Crusher |
| 309C530 | Tramp Iron Removal Station |
| 309D530 | Electric Controls - Crusher, Dump Hopper,<br>Conveyor & Tramp Iron Removal Station |
| 309E530 | Dust Suppression System |
| 310 | BUILDING 310 - ENGINEERING OFFICE<br>Provide new 4,480 S.F. Engineering Office in<br>Fuel Dept., located east of Fuel Dept. Main<br>Office. |

31

Exhibit II-C

Additions/Replacements - Alcoa-Owned Lignite Facilities (Cont'd)

| Alcoa Account # | Description |
|---|---|
| 310-510 | PORTABLE EQUIPMENT<br>Furniture and other Portable Equipment. |
| 311-530 | DIESEL FUEL STATION NO. 1 - SOUTH<br>Provide tanks and pumps for refueling mobile mining equipment. |
| 313-530 | LIGNITE CONVEYOR SYSTEM - SOUTH<br>Upgrade Flights #2, #3, #4, #7 & #8 of South conveyor from 2.1 to 5.6M TPY. |
| 313-540 | Install 42" Conveyor 1A from Central Crusher to Conveyor No. 1. |
| 313-550 | LIGNITE CONVEYOR SYSTEM - NO. 1<br>Upgrade Conveyor #1-1A to 5.6M TPY Capacity from Central Crusher to the Split Hopper at Transfer Tower including revisions to Split Hopper & Transfer Tower. |
| 313-580 | NEW SOUTH CONVEYOR<br>Install 48" South Conveyor to include Flights #5, #6, #9 & #10. |
| 314 | BUILDING 314, AMENITIES BUILDING<br>Provide approx. 5,120 S.F. Amenities Building South of Fuel Dept. Main Office. |
| 314-510 | PORTABLE EQUIPMENT<br>Lockers and other Portable Equipment. |
| 315 | SUPERVISORS & FOREMAN OFFICE |
| 330-530 | WASH WATER POND<br>Provide wash water pond to supply cleaning & prewash facilities. |
| 982Y300 | ROADS & SIDEWALKS |
| 982Y312 | Shop & Office Area & Dump Hopper Roads |
| 982Y319 | Haul Road "F", 36,000 L.F. |
| 982Y329 | Haul Road "A", 5,000 L.F. |

Exhibit II-C

Additions/Replacements - Alcoa-Owned Lignite Facilities (Cont'd)

| Alcoa Account # | Description |
|---|---|
| 982Y322 | Haul Roads "C" & "D" Areas |
| 982Y323 | Haul Road "G" |
| 982Y324 | Haul Road "H" |
| 982Y342 | Curbs & Sidewalks - Shop & Office Area |
| 982Y400 | PERMANENT PARKING LOTS |
| 982Y412 | Shop & Office Area Parking Lots |
| 982Y500 | COURTYARD & AREA PAVING |
| 982Y532 | Shop, Fuel & Office Area Paving |
| 982Y600 | FENCES |
| 982Y612 | Shop Area Fences |
| 983Y200 | SITE WATER FACILITIES |
| 983Y216 | Potable Water Distribution System - Shop & Office Area |
| 984Y100 | SITE WASTE DISPOSAL FACILITIES |
| 984Y116 | Storm Sewer Lines - Shop Area |
| 984Y132 | Walleye Creek Retention Pond |
| 984Y216 | Sanitary Sewer Lines - Shop Area |
|  | SITE ELECTRICAL |
| 987Y110 | HIGH VOLTAGE POWER LINES |

138 KV Line
Provide 44,000 L.F. of lines to North and South Mine areas for 95 C.Y. Draglines and related equipment.

33 KV Line
Extend present lines in South Mine area for existing 35 C.Y. Dragline and related equipment.

83

Exhibit II-C

Additions/Replacements - Alcoa-Owned Lignite Facilities (Cont'd)

Alcoa
Account #        Description

987Y120          SUBSTATIONS
                     138/25 KV, 3 ea.
                     25/6.9 KV, 6 ea.
                     25/4.16 KV, 2 ea.
                     6.9 KV/.480 KV, 6 ea.
                     Breakers, 6 ea.

                 ELECTRICAL DIST. SYSTEM
                     4.16 KV Connecting Boxes, 5 ea.
                     25 KV Connecting Boxes, 30 ea.
                     6.9 KV Connecting Boxes, 14 ea.
                     25 KV Switch Boxes, 5 ea.
                     4160 V Dist. Sys., 12,500 L.F.
                     25 KV Trail Cable, 28,000 L.F.
                     6.9 KV Trail Cable, 15,000 L.F.
                     4.16 KV Trail Cable, 6,000 L.F.
                     Misc. Purchases

987Y240          GROUNDING SYSTEM - SHOP & OFFICES

987Y250          YARD LIGHTING SYSTEM

987Y260          CATHODIC PROTECTION

987Y310          PLANT OWNED TELEPHONE SYSTEM

                 YARD PORTABLE EQUIPMENT

988Y110          1-16 YD LIGNITE LOADING SHOVEL AND 1-19 YD BACKHOE

988Y120          120 TON LIGNITE HAULERS, 8 EA.

988Y130          AUXILIARY MINING EQUIPMENT
                     D-9 Bulldozers, 6 ea.
                     12 C.Y. Front End Loader, 1 ea.
                     35 C.Y. Scraper, 1 ea.
                     Graders, 2 ea.

84

Exhibit II-C

Additions/Replacements - Alcoa-Owned Lignite Facilities (Cont'd)

| Alcoa Account # | Description |
|---|---|
| 988Y130 | AUXILIARY MINING EQUIPMENT (Cont'd) |

6" Pumps, 3 ea.
4" Pumps, 10 ea.
Compactor, 1 ea.
Core Drilling Rig, 1 ea.
Reel Transporter
Bucket Shed, 2 ea.
Vehicles:
    Pick-ups, 4 ea.
    Grease Trucks, 1 ea.
    Electrical Truck, 1 ea.
    Pumper Truck, 1 ea.
    Shuttle Trucks, 2 ea.
    Mechanical Trucks, 3 ea.
    H.D. Winch Truck, 1 ea.
    Surveyors Truck, 1 ea.
    Drilling Rig Truck, 1 ea.
    Water Truck, 1 ea.
Misc. Equipment:
    Aluminum Barges
    1 1/2" Pumps, 11 ea.
    3" Wheel Pumps, 6 ea.
    4" Gas Barge Pumps, 4 ea.

988Y140    DRAGLINE ERECTION & MAINT. EQUIP.
    150 Ton Crawler Crane, 1 ea.
    35 Ton Crane, 1 ea.
    Fork Lifts, 2 ea.
    Welding Machine, 25 ea.
    Lowboy Trailer, 1 ea.
    Lowboy Trailer Dolly, 1 ea.

988Y150    A-26 TREATMENT FACILITIES

989Y120    MECHANICAL SPARE PARTS

OVERHEAD

991X400    Alcoa Site General Overhead includes costs
    allocable to Rockdale Construction Office
    Overhead.

Exhibit II-C

Additions/Replacements - Alcoa-Owned Lignite Facilities (Cont'd)

| Alcoa Account # | Description |
|---|---|
| | OVERHEAD (Cont'd) |
| 991X700 | TP&L and IGC site overhead applicable to scope of work requirements for facilities covered by Sandow Unit Four Agreement, Section 4(e). |
| 992X000 | ENGINEERING & DESIGN |
| | Cost applicable to design services provided by Alcoa, TP&L, and IGC, and outside engineering firms and/or consultants. |
| 998E | MISCELLANEOUS |
| 998E100 | Sales & Use Tax |
| 998E200 | Relocation & Removal - Buildings |
| 998E300 | Relocation & Removal - Equipment |
| 998E311 | Change Out 1A Conveyor |
| 998E319 | Misc. Equipment |
| 998E411 | Relocate County Road "A", 9,500 L.F. |
| 998E412 | Relocate County Road "B", 6,600 L.F. |
| 998E413 | Relocate Service Lines |
| 998E414 | Upgrade Haul Roads C & D |
| 998E415 | Box Pit Development "F" Area |
| 998E416 | Walkway for Dragline to South |
| 998E417 | Relocate Walleye Creek |
| 998E418 | Quality Control Drilling - Lignite |
| 998E419 | Convert 1 Lignite Hauler to Low Boy Puller, Revise (2) Haulers to Water Trucks, and Revise (1) Hauler to Wench Truck |
| 998E421 | Relocate Fence - Shop Area |

86

Exhibit II-C

Additions/Replacements - Alcoa-Owned Lignite Facilities (Cont'd)

| Alcoa Account # | Description |
|---|---|
| | MISCELLANEOUS (Cont'd) |
| 998E422 | Remove South Conveyor Equipment |
| 998E911 | Miscellaneous Expense |
| 998E924 | Relocate 33KV Power Line |
| 998E925 | Relocate 480 Volt Power Line |

87

Exhibit II-C

B. Existing--Alcoa-Owned Lignite Facilities

| Alcoa Account # | Description |
|---|---|
| | BUILDING 301 - OFFICE BUILDING |
| 2110006 | One story brick office building |
| 2430047 | Plumbing System |
| 4250077 | Lighting System |
| 8310654 | Noise Monitor |
| 8710442 | Lockers |
| 911A--- | Full complement of office furniture |
| 911B---, | |
| 921---- & | |
| 922---- | Full complement of office equipment |
| 9410025 | 2 Audiometers and Booths |
| | BUILDING 302 - WAREHOUSE |
| 2220005 | Warehouse Building |
| 2420043 | Toilet Enclosure |
| 4130008 | Sprinkler System |
| 4250081 | Lighting System |
| 5410136 & | |
| 5410137 | Heaters |
| 7420357 | Diesel Engine |
| 8520129 | Jack |
| 8710057 | Shelving |
| 8710540 | Lockers |
| | BUILDING 303 - MAINTENANCE BUILDING |
| 2220006 | Maintenance Building |
| 2430045 | Plumbing System |
| 4250080 | Lighting System |
| 541034 & | |
| 541035 | Heaters |
| 5520681 | Motor |
| 5640510 | Battery Charger |
| 5670125 & | |
| 5670145 | Welders |
| 5670198 | Cutting & Welding Rig |
| 6430017 | Belt Vulcanizer |
| 6430018 | Cable Vulcanizer |
| 6510027 | Lathe |
| 6510042 | Drill Press |
| 6510066 | Radial Drill |
| 6630048 | Washer |
| 6630053 | Cleaner Unit |
| 6630063 | Vacuum Cleaner |
| 7120525 & | |
| 7120620 | Hoists |
| 7420381 | Truck |

88

Exhibit II-C

Existing--Alcoa-Owned Lignite Facilities

Alcoa
Account #        Description

BUILDING 303 - MAINTENANCE BUILDING (Cont'd)

| Account # | Description |
|---|---|
| 851---- & | |
| 852---- | Full complement of hand and bench tools |
| 871---- | Cabinets and Lockers |
| 911A--- | Full complement of office furniture |
| 911B--- | Full complement of office equipment |

MISCELLANEOUS BUILDINGS

| Account # | Description |
|---|---|
| 2220018 | Change House |
| 2220029 | Building 303A Lunchroom |
| 2240046 | Building 304 Stores |
| 2330037 | Portable Building |
| 2330040 & | |
| 2330049 | Toilets |
| 2430065 | Plumbing Fixtures |
| 8710421 | Lockers |

YARD FACILITIES

| Account # | Description |
|---|---|
| 3410003 | Mine Road |
| 3410017 | Dump Road |
| 3420014 | Parking Lot |
| 3420044 | Yard Paving |
| 3510004 | Mine Overpass |
| 3630006 | Pond |
| 3640011 & | |
| 3640012 | Water Wells |
| 3710002 | Wash Rack |
| 411---- | General Service Water Lines |
| 4130007, | |
| 4130008 & | |
| 4130009 | Sprinkler Systems |
| 4220006, | |
| 4220022 & | |
| 4220023 | 33 KV Power Distributions |
| 4260003 | Telephone System |
| 4720015 & | |
| 4720032 | Sanitary Sewers |

YARD EQUIPMENT

| Account # | Description |
|---|---|
| 532---- | Full Complement of air compressors |
| 533---- | Full Complement of pumps |
| 552---- | Full Complement of motors |
| 562---- | Full Complement of control panels |
| 563---- | Full Complement of transformers |
| 564---- | Full Complement of switch gear units |

89

Exhibit II-C

## Existing--Alcoa-Owned Lignite Facilities

Alcoa
Account #          Description

YARD EQUIPMENT (Cont'd)

| Account # | Description |
|---|---|
| 5410291 & | |
| 5410292 | 2 - Heaters |
| 5510029 | Electric Generator |
| 5670162 | Welder |
| 6610011 & | |
| 6610012 | Shovels |
| 6610015 | Dragline |
| 6610022 | Dragline |
| 661---- | Buckets as required for shovels and draglines |
| 661---- | Bulldozers - 8 Ea. |
| 6610039 | Sheep's Foot Roller (Used) |
| 6610048 | Drill Rig |
| 6610049 | Disc Plow |
| 6610055 | Disc Plow |
| 6610057 | Stub Shaft - Spare for Draglines |
| 6610067 | Graders - 2 Ea. |
| 661---- | Scrapers - 4 Ea. |
| 662---- | Crusher Facilities (6620088, 6620089, 6620091, 6620092, 6620093, 6620095, 6620096, 6620097, 6620172 & 6620206) |
| 7120714 | Crane |
| 712---- | Miscellaneous mining equipment |
| 713---- | Conveyor Systems (7130235, 7130253, 7130254, 7130255, 7130256, 7130257, 7130258, 7130261 & 7130333) |
| 732---- | Barges |
| 741---- | Coal Haulers |
| 742---- | Full complement of trucks |
| 7430111 | Fork Truck |
| 7430321 | Tractor |
| 7430375 | Backhoe |
| 7530216 | Trailer |
| 8130025 | Belt Scale |
| 821---- | Full complement of tanks |
| 822008 | Fuel Tank |
| 831---- | Full complement of measuring and recording instruments |
| 851---- | Full complement of hand and bench tools |
| 922---- | Full complement of radios |
| 9610072 | Irrigation Equipment |

90

EXHIBIT III-A
Real Estate Transactions
Pursuant to Section 3 of
Sandow Unit Four Agreement
INDEX

Instrument                                                              Page

1.  License and Amendment                                                92

2.  Deed from Alcoa to TP&L dated March 14, 1978
        Recording information: Vol. 444, Page 29                         98
        of Milam County Deed Records

3.  Deed from TP&L to Alcoa dated August 27, 1980.
        Recording Information: Vol. 465, Page 843 of Milam              105
        County Deed Records.

    Partial Release by Republic National Bank of Dallas as
    Trustee to TP&L from lien of Mortgage and Deed of Trust
    dated September 16, 1980.
        Recording Information: Vol. 465, page 838 of Milam
        County Deed Records.

4.  Deed from Alcoa to TP&L dated July 21, 1980.
        Recording information: Vol. 465, Page 139 of Milam             115
        County Deed Records.

5.  Easement from Alcoa to TP&L dated July 21, 1980.
        Recording information: Vol. 465, Page 125 of Milam             124
        County Deed Records.

6.  Easement from TP&L to Alcoa dated September 25, 1980.              138
        Recording information: Vol. 466, page 477 of Milam
        County Deed Records.



EXHIBIT III-A
Instrument #1

## TEXAS POWER & LIGHT COMPANY
1511 Bryan Street • P.O. Box 6331 • Dallas, Texas 75222

H. N. CAMPELL
PRESIDENT

Aluminum Company of America
1501 ALCOA Building
Pittsburgh, Pennsylvania  15219

Gentlemen:

Section 3(a) of the Sandow Unit Four Agreement dated August 13, 1976, provides that Aluminum Company of America (ALCOA) will convey to Texas Power & Light Co. (TP&L) Unit Four Real Estate and will also grant a non-exclusive license to use such of the Sandow Station Real Estate as reasonably required for construction, maintenance and operation of additions and improvements to Common Facilities.

Design and engineering of Unit Four is progressing and we anticipate that it will have progressed by about September 30, 1977 to the stage that Unit Four Real Estate may be designated. In the meantime, the contractor is scheduled to move onto the site about June 1 and construction will begin shortly thereafter.

Pending a more precise designation of Unit Four Real Estate, TP&L hereby requests permission to begin construction of Unit Four at the location shown on the preliminary plat attached hereto, being an area generally south of Unit Three.

TP&L also requests:

(a)  A License for construction offices, assembly areas, material storage, parking and other purposes in connection with the proposed construction on those portions of the Sandow Station Real Estate designated by ALCOA near the proposed location of Unit Four;

(b)  A license to conduct construction activities on that part of the Sandow Station Real Estate shown on the attached plat as necessary for construction of Unit Four and additions and improvements to Common Facilities.  Such license will include the right to conduct such activities in or about existing facilities; and

92

Aluminum Company of America
age 2

EXHIBIT III-
Instrument #

(c)  A license to use such ALCOA private roads, streets,
ways and rail facilities as ALCOA may from time to
time designate, for ingress and egress to and from
the aforesaid areas.

The permission and license herein requested:

(1)  will be for TP&L, Texas Utilities Services, Inc.,
Brown & Root, Inc., their suppliers, subcontractors
and their agents, servants and employees, herein-
after called licensees;

(2)  will be exercised so as to minimize interference
with ALCOA's activities;

(3)  will be non-exclusive, with ALCOA retaining the
right of ingress and egress and the right to use
the aforesaid areas for itself and its designees.
Such license will, however, include the right to
fence and enclose construction, assembly and
storage areas and to limit access thereto.

Upon completion of construction or other termination of this
license, TP&L will restore Sandow Station Real Estate, other than
designated Unit Four Real Estate, to its original condition.

TP&L will indemnify, defend and save ALCOA harmless from and
against all liability, claims and demands of third parties (including,
without limitation, TP&L's employees) caused by or arising out of any
act or omission of licensees in connection with the license herein
granted which was not expressly consented to or approved by ALCOA in
writing or approved by ALCOA representatives in a meeting of the
Lignite Facilities Construction Committee or the Common Facilities
Construction Committee.

While the requested license is in effect, TP&L will maintain
for itself, Texas Utilities Services, Inc. and Brown & Root, Inc.
comprehensive general liability insurance, including contractual
liability coverage, with limits of not less than $1,000,000, wherein
ALCOA will be named as an additional insured.  In addition, TP&L
will require Texas Utilities Services, Inc. and contractors and sub-
contractors exercising such requested license to carry workmen's
compensation insurance, public liability and property damage insur-
ance, and automobile personal injury and property damage liability
insurance.

93

EXHIBIT III-A
Instrument #1

Aluminum Company of America
Page 3

    ALCOA may modify or terminate the license herein granted but any such termination or modification will be exercised with due regard for the rights and obligations of the parties hereto pursuant to the aforesaid agreement of August 13, 1976 and all agreements amendatory and supplemental thereto.

    TP&L covenants that it will not file this agreement for recording in the Records of Milam County, Texas.

    If you agree to the aforesaid license, please sign and return a copy of this letter.

Yours truly,

TEXAS POWER & LIGHT COMPANY

Date _____May 27, 1977_____

By _____

                    R. K. Campbell

Title _____President_____

APPROVED this __2nd__ day of June, 1977, effective June 1, 1977.

ALUMINUM COMPANY OF AMERICA

Date _____June 2, 1977_____

By _____

                H. E. Meeks

Title __Vice President__

94



EXHIBIT III-A
Instrument #1



# TEXAS POWER & LIGHT COMPANY

1511 Bryan Street • P.O. Box 6331 • Dallas, Texas 75222

R. K. CAMPBELL
PRESIDENT

July 12, 1977

Aluminum Company of America
1501 ALCOA Building
Pittsburgh, Pennsylvania   15219

Gentlemen:

By acceptance of our letter of May 27, 1977, ALCOA granted TP&L
a license for use of certain properties in Milam County, Texas in con-
nection with the construction of Sandow Unit Four. Subsequent conver-
sations have indicated that it would be appropriate to locate certain
facilities on other lands of ALCOA. Consequently, TP&L hereby requests
a license to locate, construct and operate a concrete batch plant on
that portion of Sandow Station Real Estate shown on the plat attached
hereto. The license will include, without limitation, the right to
drill a water well in connection with operation of the concrete batch
plant.

A license is also requested for use of such ALCOA private roads,
streets, ways and rail facilities as may from time to time be designated
by ALCOA to provide ingress and egress to the area shown on the attached
plat.

Any license granted pursuant to this request will be for the use
and benefit of the licensees named in the aforesaid letter dated May 27,
1977, and will be on the terms and provisions and subject to the cove-
nants contained in said letter.

If you agree to the license herein requested, please sign and
return a copy of this letter.

06

EXHIBIT III-A
Instrument #1

Aluminum Company of America
Page 2

Yours truly,

TEXAS POWER & LIGHT COMPANY

Date ___JUL 13 1977___

By _____

Title ___PRESIDENT___    R. K. Campbell

APPROVED this 25$\frac{d}{}$ day of

_July___, 1977.

ALUMINUM COMPANY OF AMERICA

Date _1977-July-25_

By _____

S. Alfred Jones
Title _Vice President_

EXHIBIT III-A
Instrument #2

WARRANTY DEED

THE STATE OF TEXAS   I
                      I    KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF MILAM    I

That ALUMINUM COMPANY OF AMERICA, a Pennsylvania corpo-
ration, for and in consideration of Three Hundred Sixty-
Seven Dollars and Eighty-Five Cents ($367.85) and other good
and valuable considerations in hand paid by TEXAS POWER &
LIGHT COMPANY, a Texas corporation of Dallas, Dallas County,
Texas, receipt of which is hereby acknowledged, has granted,
sold and conveyed, and by these presents does grant, sell
and convey unto the said TEXAS POWER & LIGHT COMPANY all
that certain tract of land in Milam County, Texas, shown on
the map attached hereto as Exhibit "A", said tract being
more particularly described as follows:

> A 10.925 acre tract of land out of a 274.953
> acre tract out of the George Miller survey,
> abstract No. 265 and the S. L. Johnson survey,
> abstract No. 228, Milam County, Texas; said
> 274.953 acre tract conveyed to the Aluminum
> Company of America by deed dated October 16,
> 1951 and recorded in Volume 274, Page 265 of
> the Milam County deed records; said 10.925
> acre tract being more particularly described
> as follows:
>
> BEGINNING at an iron pin set at the eastern-
> most corner of this tract; said pin being
> S68°53'39"W, 2274.96 feet from a concrete
> monument marking the easternmost corner of
> said George Miller Survey; said pin being
> further identified as having the following
> Texas State Coordinates, Central Zone: X =
> 3,029,384.352 and Y = 341,544,090.
>
> THENCE, S39°07'21"W, 419.28 feet to an iron
> pin set at the southernmost corner of this
> tract;
>
> THENCE, N22°23'13"W, 635.00 feet to an iron
> pin set;
>
> THENCE, S67°36'47"W, 396.50 feet to a point;
>
> THENCE, N22°23'13"W, 380.00 feet to a point
> being the westernmost corner of this tract,
> said point being N54°48'55"E, 112.85 feet
> from a concrete monument identified as having
> the following Texas State Coordinates:  X =
> 3,028,274.373 and Y = 341,941.279 and local
> plant grid coordinates: N33+90 and E17+40;

EXHIBIT III-A
Instrument #2

THENCE, N67°36'47"E, 366.50 feet to an iron
pin set;

THENCE, S22°23'13"E, 30.00 feet to an iron
pin set;

THENCE, N67°36'47"E, 396.50 feet to an iron
pin set at the northernmost corner of this
tract; said pin being S64°14'40"W, 85.10 feet
from a concrete monument identified as having
the following Texas State Coordinates: X =
3,029,162.020 and Y = 342,306.904 and local
plant grid coordinates: N33+90 and E27+00;

THENCE, S22°23'13"E, 785.00 feet to the
POINT OF BEGINNING, containing 10.925 acres
of land.

TOGETHER WITH the right of ingress and egress
using such routes, private roads, streets, ways
and real facilities as Alcoa may from time
to time designate.

SUBJECT TO all easements, reservations, incum-
brances, rights of way and any other such
rights for any purpose which are all recorded
in the county or state where such land is
situated or are visible on the said land,
including particularly: the rights reserved
to J. G. Puterbaugh in the deed from J. G.
Puterbaugh to Aluminum Company of America dated
October 16, 1951 and recorded in Volume 274, Page
265 of the Milam County deed records; and the
Assignment of Lignite Mining Lease from
Texas Power and Light Company to Aluminum
Company of America, dated October 5, 1951
and recorded in Volume 274, Page 181 of the
Milam County deed records.

RESERVING, however, to Aluminum Company of America, its
successors and assigns, pursuant to the unrecorded agreement
dated August 13, 1976 between Aluminum Company of America
and Texas Power & Light Company:

1.  The right to purchase or otherwise acquire the
property hereby conveyed including any improvements thereon
(i.e., Unit Four, Unit Four Real Estate and all improvements
thereon, including Texas Power & Light Company's owned
Common Facilities, as those terms are defined in the unrecorded
agreement dated August 13, 1976 referred to above) or any
part thereof in the event Texas Power & Light Company, its
successors or assigns, shall desire or elect to sell, lease
or otherwise transfer the same or any part thereof to any
third party at any time during the period provided in
Paragraph 3 below (provided, however, Texas Power & Light
Company may transfer such property to any corporation owning
all of its voting stock or to any corporation wholly owned
by Texas Power & Light Company or by such corporation owning
all of Texas Power & Light Company's voting stock in accord-
ance with said unrecorded agreement dated August 13, 1976),
said right to acquire and the exercise thereof to be in
accordance with the following provisions (all references
therein to Texas Power & Light Company shall be deemed to
include Texas Power & Light Company's successors and assigns,
and all references therein to Aluminum Company of America
shall be deemed to include Aluminum Company of America's

EXHIBIT III-A
Instrument #2

successors and assigns), all of which Texas Power & Light Company, for itself, its successors and assigns, by the acceptance of this Deed, hereby agrees to and covenants to observe, perform and comply with:

(a)   Prior to any sale, lease or other transfer by Texas Power & Light Company of all or any portion or portions of the real property hereby conveyed or any improvements thereto to any third party, Texas Power & Light Company shall give written notice to Aluminum Company of America by registered mail setting forth the description of that part of such real property or improvements which is proposed to be transferred, the consideration proposed to be received by Texas Power & Light Company pursuant to such offer, which Texas Power & Light Company shall warrant as bona fide, and the name of the proposed transferee.

(b)   Aluminum Company of America shall have the right to purchase or otherwise acquire that part of the real property hereby conveyed together with any improvements thereon which is proposed to be transferred by Texas Power & Light Company as described in Texas Power & Light Company's notice, in the manner and for the consideration set forth in said notice or appraised fair market value of the same, whichever is less.

(c)   In the event that Aluminum Company of America elects to exercise such right to purchase or otherwise acquire, it shall give written notice of such election to Texas Power & Light Company by registered mail sent within ninety (90) days after receipt of Texas Power & Light Company's notice of the proposed transaction; Aluminum Company of America's notice shall designate a closing date for acquisition as aforesaid which date shall not be later than one hundred eighty (180) days after the date of Texas Power & Light Company's notice to Aluminum Company of America.

(d)   In the event that Aluminum Company of America does not give such notice of its election to exercise the aforesaid right to acquire, or, having given such notice does not substantially tender its required performance within the applicable time period set forth in the preceding paragraph (c) then Texas Power & Light Company shall be free to transfer to the transferee named in Texas Power & Light Company's notice, the property described in said notice, for the consideration and in the manner set forth in said notice.

(e)   No failure by Aluminum Company of America to exercise the right to purchase as herein provided and no sale, transfer or other disposal of the property permitted as a result of such failure shall extinguish the rights and obligations under this Paragraph 1, and no grantee, transferee, or successor in title, immediate or remote, of Texas Power & Light Company's interest in said property or improvements shall have the right to sell, transfer or otherwise dispose of same except as herein permitted.

(f)   Aluminum Company of America's right to acquire set forth herein shall be specifically enforceable by Aluminum Company of America, with respect to each and every election or proposal by Texas Power & Light Company to transfer all or any portion or portions of the real property hereby conveyed.

100

EXHIBIT III-A.
Instrument #2

2.  For the period provided in Paragraph 3 hereof,
Aluminum Company of America shall have the right and option
to purchase Unit Four Real Estate from Texas Power & Light
Company upon the expiration of the useful life of Unit Four
(as those terms are defined in said unrecorded agreement
dated August 13, 1976 between Aluminum Company of America
and Texas Power & Light Company) as mutually determined by
Texas Power & Light Company and Aluminum Company of America.
The price to be paid by Aluminum Company of America for such
real estate shall be the price originally paid to Aluminum
Company of America by Texas Power & Light Company for such
real estate.

3.  The rights of Aluminum Company of America under
Paragraphs 1 and 2 hereof shall terminate upon the expiration
of twenty-one (21) years after the death of the survivor of
the following persons:

Carolyn Amy Kelson and Melinda Anne Kelson, daughters
of Richard B. Kelson and Ellen S. Kelson of the Township
of Mt. Lebanon, Allegheny County, Pennsylvania;

Kenneth Dale Cockrell and Phillip Lee Cockrell, sons
and Deborah Jean Cockrell, daughter of Buford D. Cockrell
and Jewell M. Cockrell of Upper St. Clair Township,
Allegheny County, Pennsylvania;

Dona Stacy Campbell, daughter, and Mark Robert Campbell
and Ricky Lee Campbell, sons of Robert K. Campbell and
Donna J. Campbell of Dallas, Dallas County, Texas;

Halsell S. Davis, III, Bruce M. Davis, Thomas L. Davis,
and Joseph L. Davis, sons of H. Sam Davis, Jr. and
Laura Ann Davis of Dallas, Dallas County, Texas.

AND FURTHER RESERVING to Aluminum Company of America,
its successors and assigns, pursuant to Section 7(f) of the
unrecorded agreement dated August 13, 1976 for the term of
said agreement, the right to purchase or otherwise acquire
450/545ths of Unit Four and Unit Four Real Estate including
Texas Power & Light Company owned Common Facilities (as
those terms are defined in the unrecorded agreement dated
August 13, 1976) from Texas Power & Light Company at the
then current fair market value of same as limited by the
terms of Section 7(f) of said unrecorded agreement such sale
and purchase.

The provisions of the foregoing reservations and covenants
shall be severable, and the invalidity of any one or more of
such provisions shall not be deemed to invalidate any lawful
provisions of the affected or any other reservation or
covenant.  Furthermore, the agreement dated August 13, 1976
between Aluminum Company of America and Texas Power & Light
Company referred to herein shall not be merged herewith and
shall remain in full force and effect.

TO HAVE AND TO HOLD the above described premises,

together with all and singular, the rights and appurtenances

thereto in any wise belonging unto the said TEXAS POWER &

LIGHT COMPANY, its successors and assigns forever; and

ALUMINUM COMPANY OF AMERICA does hereby bind itself, its

101

EXHIBIT III-A
Instrument #2

successors and assigns, to warrant and forever defend all
and singular the said premises unto the said TEXAS POWER &
LIGHT COMPANY, its successors and assigns, against every
person whomsoever lawfully claiming, or to claim the same or
any part thereof.

EXECUTED this ___14th___ day of ___March___, 1978.

ALUMINUM COMPANY OF AMERICA

By _/s/ S. Alfred Jones_
                    Vice President          JEP
ATTEST:                                     RBK
                                            RWW

_/s/ H. E. Meeks_
      Assistant Secretary

EXHIBIT III-A
Instrument #2

COMMONWEALTH OF PENNSYLVANIA )
                                                        )
COUNTY OF ALLEGHENY               )

    BEFORE ME, the undersigned authority, on this day personally

appeared _____ S. Alfred Jones _____,

known to me to be the person and officer whose name is subscribed

to the foregoing instrument and acknowledged to me that the same

was the act of the said ALUMINUM COMPANY OF AMERICA, a corporation,

and that he executed the same as the act of such corporation

for the purposes and consideration therein expressed, and in

the capacity therein stated.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this __14th__ day

of _____March_____, 1978.


                             ____/s/ Joyce E. Duda____
                             Notary Public in and for
                             Allegheny County, Pennsylvania

103



EXHIBIT A
EXHIBIT III-A
Instrument #2

SCALE: 1" = 200'

10.925 AC.

SURVEY PLAT OF
A 10.925 ACRE TRACT OUT OF A 274.963
ACRE TRACT OUT OF THE GEORGE MILLER
SURVEY, ABSTRACT NO. 265 AND THE S. L.
JOHNSON SURVEY, ABSTRACT NO. 228,
MILAM COUNTY, TEXAS.

GEORGE MILLER SURVEY
S. L. JOHNSON SURVEY

LEGEND
IRON PIN SET
CONCRETE MONUMENT FOUND

I HEREBY CERTIFY THAT THIS SURVEY WAS MADE ON THE
GROUND UNDER MY SUPERVISION AND ALL CORNERS
ARE MARKED AS SHOWN.

HENRY A. DUREAU
REGISTERED PUBLIC SURVEYOR

LOCKWOOD, ANDREWS & NEWNAM, INC.
ENGINEERS & PLANNERS

ALUMINUM COMPANY
OF AMERICA

104

EXHIBIT III-A
Installment #3

## WARRANTY DEED

THE STATE OF TEXAS :
                    :            KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF MILAM    :

That TEXAS POWER & LIGHT COMPANY, a Texas corporation, for and in consideration of Twenty Dollars and Two Cents ($20.02) and other good and valuable considerations in hand paid by ALUMINUM COMPANY OF AMERICA, a Pennsylvania corporation of Pittsburgh, Allegheny County, Pennsylvania, receipt of which is hereby acknowledged, has granted, sold and conveyed, and by these presents does grant, sell and convey unto the said ALUMINUM COMPANY OF AMERICA all that certain tract of land in Milam County, Texas, shown on the map attached hereto as Exhibit "A", said tract being more particularly described as follows:

A tract of land containing 0.5946 acre situated in the George Miller survey, abstract No. 265, Milam County, Texas, being a part of a 10.925 acre tract of land conveyed to Texas Power & Light Company from Aluminum Company of America by deed dated March 14, 1978 and recorded in Volume 444, Page 29 of the Milam County deed records. The 0.5946 acre tract is more particularly described by metes and bounds as follows:

BEGINNING at a 5/8" iron rod set for the southeast corner of this tract being described and of a 10.925 acre tract of land conveyed to Texas Power & Light Company from Aluminum Company of America by deed dated March 14, 1978 and recorded in Volume 444, Page 29 of the aforementioned deed records. Said 5/8" iron rod bears S68°53'38"W, 2275.01 feet from the most easterly corner of the George Miller Survey, and S11°02'27"W, 397.76 feet from a concrete monument identified as having the following Texas state coordinates, central zone: X=3,029,460.481, Y=341,934.472, and local plant grid coordinates N29+31.964, E28+34.112;

THENCE, S39°07'21"W, along the south line of the 10.925 acre tract at 65.33 feet pass a 5/8" iron rod set on line, and for a total distance of 85.33 feet to a point for corner;

THENCE, N22°23'13"W, leaving the said south line for a distance of 365.71 feet to a 5/8" iron rod set for corner;

EXHIBIT III-A
Instrument #3

THENCE, N67°36'47"E, 75.00 feet to a 5/8" iron rod set
for the northeast corner of this tract being
described, in the east line of the above mentioned
10.925 acre tract;

THENCE, S22°23'13"E, 325.00 feet along the east line
of the 10.925 acre tract to the PLACE OF BEGINNING,
containing within these metes and bounds 0.5946 acres
(25,901 square feet) of land area.

SUBJECT TO all easements, reservations, incumbrances,
rights of way and any other such rights for any
purpose which are all recorded in the county or state
where such land is situated or are visible on the said
land, including particularly: the rights reserved to
J. G. Puterbaugh in the deed from J. G. Puterbaugh to
Aluminum Company of America, dated October 5, 1951 and
recorded in Volume 274, Page 265 of the Milam County
deed records; and the Assignment of Lignite Mining
Lease from Texas Power & Light Company to Aluminum
Company of America, dated October 5, 1951 and recorded
in Volume 274, Page 181 of the Milam County deed
records.

TO HAVE AND TO HOLD the above described premises, together

with all and singular, the rights and appurtenances thereto in

any wise belonging unto the said ALUMINUM COMPANY OF AMERICA,

its successors and assigns forever; and TEXAS POWER & LIGHT

COMPANY does hereby bind itself, its successors and assigns, to

warrant and forever defend all and singular the said premises

unto the said ALUMINUM COMPANY OF AMERICA, its successors and

assigns, against every person whomsoever lawfully claiming, or

to claim the same or any part thereof.

EXECUTED this ___2 7___ day of ___August___, 1980.

TEXAS POWER & LIGHT COMPANY

By _____
                  Vice President—G. BERMAN,

ATTEST:

_____
~~Assistant~~ Secretary

Charles V. McCarter

106

EXHIBIT III-A
Instrument #5

```
STATE OF TEXAS      :
                    :
            DALLAS
COUNTY OF MILAM     :
```

BEFORE ME, the undersigned authority, on this day
personally appeared _____ G. BERMAN, _____,
known to me to be the person and officer whose name is
subscribed to the foregoing instrument and acknowledged to me
that the same was the act of the said TEXAS POWER & LIGHT
COMPANY, a corporation, and that he executed the same as the
act of such corporation for the purposes and consideration
therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this ___27___ day
of _August_ , 1980.

_R. V. Perry_
Notary Public in and for
Milam County, Texas
Dallas

R. V. PERRY Notary Public
Dallas County, Texas

107

instrument #3

EXHIBIT "A"

108



EXHIBIT III-A
Instrument #3

PARTIAL RELEASE BY
REPUBLIC NATIONAL BANK OF DALLAS
AS TRUSTEE TO
TEXAS POWER & LIGHT COMPANY
FROM LIEN OF MORTGAGE AND DEED OF TRUST

KNOW ALL MEN BY THESE PRESENTS:  That

WHEREAS, Texas Power & Light Company, (hereinafter called the

Company); a corporation of the State of Texas, executed and delivered to

Republic National Bank of Dallas, (hereinafter called the Trustee),

national banking association organized and existing under the laws of the

United States of America, as Trustee, a certain Mortgage and Deed of Trust,

dated as of May 1, 1945, and has from time to time executed supplemental

indentures thereto, which Mortgage and Deed of Trust and supplemental

indentures have been recorded in various Counties in the State of Texas,

and the property hereinafter described heretofore owned by the Company is

subject to the lien of said Mortgage and Deed of Trust, as supplemented;

and

WHEREAS, the Company is not in default in the payment of the

interest of any bonds now Outstanding under said Mortgage and Deed of Trust,

as supplemented, and none of the Defaults defined in Section 65 of said

Mortgage and Deed of Trust, has occurred and is continuing; and

WHEREAS, an application of the Company for the release of the

hereinafter described property from the lien of said Mortgage and Deed of

Trust, as supplemented, pursuant to the provisions of Section 59 thereof

has been made, and Republic National Bank of Dallas, as Trustee under

said Mortgage and Deed of Trust, as supplemented, is in receipt of the

Certified Copy of Resolutions, Officers' Certificate, Engineer's Certificate,

Further Engineer's Certificate and Opinion of Counsel, all as required by

the provisions of said Section 59:

110

EXHIBIT III-A
Instrument #3

NOW THEREFORE, Republic National Bank of Dallas in consideration of the premises and pursuant to the authority vested in it as Trustee under said Mortgage and Deed of Trust, as supplemented, does hereby release, remise and quit-claim unto the Company all its rights, title and interest as such Trustee in and to the following described property in Milam County, Texas to wit:

A tract of land containing 0.5946 acre situated in the George Miller survey, abstract No. 265, Milam County, Texas, being a part of a 10.925 acre tract of land conveyed to Texas Power & Light Company from Aluminum Company of America by deed dated March 14, 1978 and recorded in Volume 444, Page 29 of the Milam County deed records. The 0.5946 acre tract is more particularly described by metes and bounds as follows:

BEGINNING at a 5/8" iron rod set for the southeast corner of this tract being described and of a 10.925 acre tract of land conveyed to Texas Power & Light Company from Aluminum Company of America by deed dated March 14, 1978 and recorded in Volume 444, Page 29 of the aforementioned deed records. Said 5/8" iron rod bears S68°53'38"W, 2275.01 feet from the most easterly corner of the George Miller Survey, and S11°02'27"W, 397.76 feet from a concrete monument identified as having the following Texas state coordinates, central zone: X=3,029,460.481, Y=341,934.472, and local plant grid coordinates N29+31.964, E28+34.112;

THENCE, S39°07'21"W, along the south line of the 10.925 acre tract at 65.33 feet pass a 5/8" iron rod set on line, and for a total distance of 85.33 feet to a point for corner;

THENCE, N22°23'13"W, leaving the said south line for a distance of 365.71 feet to a 5/8" iron rod set for corner;

THENCE, N67°36'47"E, 75.00 feet to a 5/8" iron rod set for the northeast corner of this tract being described, in the east line of the above mentioned 10.925 acre tract;

EXHIBIT III-A
Instrument #3

THENCE, S22°23'13"E, 325.00 feet along the east
line of the 10.925 acre tract to the PLACE OF
BEGINNING, containing within these metes and bounds
0.5946 acres (25,901 square feet) of land area.

SUBJECT TO all easements, reservations, incumbrances,
rights of way and any other such rights for any
purpose which are all recorded in the county or
state where such land is situated or are visible on
the said land, including particularly:  the rights
reserved to J. G. Puterbaugh in the deed from J. G.
Puterbaugh to Aluminum Company of America, dated
October 5, 1951 and recorded in Volume 274, Page 265
of the Milam County deed records; and the Assignment
of Lignite Mining Lease from Texas Power & Light
Company to Aluminum Company of America, dated
October 5, 1951 and recorded in Volume 274, Page 181
of the Milam County deed records;

TO HAVE AND TO HOLD the property hereby released and remised to the

Company its successor and assigns to its and their own proper use, benefit and

behoof forever, free, clear and discharged of and from any and all liens and

claims under and by virture of said Mortgage and Deed of Trust, as supplemented.

PROVIDED, HOWEVER, that nothing herein contained shall be constructed

to affect the residue of the security held by the Trustee and aforesaid, by

virtue of said Mortgage and Deed of Trust, as supplemented, or to release the

payment of any part of the moneys, principal or interest, thereby secured, and

that may now remain unpaid.

The recitals herein contained are based on representation made by

the Company, and the Trustee assumes no responsibility in respect thereto.

IN WITNESS WHEREOF, on this 16th  day of September 1980 Republic

National Bank of Dallas has caused its corporate name to be hereunto affixed

and this instrument to be signed and sealed by one of its VICE PRESIDENT & TRUST OFFICER

and its Corporate Seal to be attested by one of its Officers, all in the

112

EXHIBIT III-A
Instrument #3

City of Dallas, Texas.

ATTEST:                                    REPUBLIC NATIONAL BANK OF DALLAS, as Trustee

*Linda McNeil*                        By: *E. F. Knight*

In the Presence of    Linda McNeil          E. F. KNIGHT
                                             VICE PRESIDENT & TRUST OFFICER

*Colleen A. Sims*

                                          Colleen A. Sims
                                          C. D. Smith

113

EXHIBIT III-A
Instrument #3

STATE OF TEXAS    )
                  ) ss:
COUNTY OF DALLAS  )

BEFORE ME, *Gurtha E. Collins* , a Notary Public in and for said County and State, on this day personally appeared R. F. KNIGHT known to me to be the person whose name is subscribed to the foregoing instrument and known to me to be a VICE PRESIDENT & TRUST OFFICER                    of Republic National Bank of Dallas, and acknowledged to me that he executed said instrument for the purpose and consideration therein expressed and as the act and deed of said corporation, as Trustee.

GIVEN UNDER MY HAND AND SEAL OF OFFICE THIS 16ᵗʰ day of September, 1981.

*Gurtha E. Collins*
Notary Public

GURTHA E. COLLINS
Notary Public, Dallas County, Texas
My Commission Expires 11-4-60

114

EXHIBIT III-A
Instrument #4

## WARRANTY DEED

THE STATE OF TEXAS :
              :       KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF MILAM   :

That ALUMINUM COMPANY OF AMERICA, a Pennsylvania corporation, for and in consideration of Sixty Four Dollars and Forty Eight Cents ($64.48) and other good and valuable considerations in hand paid by TEXAS POWER & LIGHT COMPANY, a Texas corporation of Dallas, Dallas County, Texas, receipt of which is hereby acknowledged, has granted, sold and conveyed, and by these presents does grant, sell and convey unto the said TEXAS POWER & LIGHT COMPANY two tracts of land in Milam County, Texas, shown on the maps attached hereto as Exhibit "A", said tracts being more particularly described as follows:

### TRACT 1

A 0.6864 acre tract of land out of a 274.953 acre tract out of the George Miller Survey Abstract No. 265, Milam County, Texas, being a part of a 274.953 acre tract conveyed to Aluminum Company of America by deed dated October 16, 1951 and recorded in Volume 274, Page 265 of the Milam County deed records and is more particularly described by metes and bounds as follows:

BEGINNING at a 5/8" iron rod set for the northwest corner of this tract being described and the northeast corner of the 10.925 acre tract of land conveyed to Texas Power & Light Company from Aluminum Company of America by deed dated March 14, 1978 and recorded in Volume 444, Page 29 of the said deed records.

THENCE, N67°36'47"E, 65.00 feet to a 5/8" iron rod set for corner;

THENCE, S22°23'13"E, 460.00 feet to a 5/8" iron rod set for the southeast corner of the herein described tract, said corner bears S65°01'33"W, 154.28 feet from a concrete monument identified as having the following Texas state coordinates, central zone: X=3,029,460.481, Y=341,934.472, and local plant grid coordinates: N29+31.964, E28+34.112; said corner also bears S77°16'03"W, 2241.18 feet from the most easterly corner of the George Miller Survey;

THENCE, S67°36'47"W, 65.00 feet to a 5/8" iron rod set for a corner in the east line of the 10.925 acre tract;

THENCE, N22°23'13"W, with the above said east line 460.00 feet to the PLACE OF BEGINNING, containing within these metes and bounds 0.6864 acres (29,900 square feet) of land area.

115

EXHIBIT III-A
Instrument #4

TOGETHER WITH the right of ingress and egress using such routes, private roads, streets, ways and real facilities as Alcoa may from time to time designate.

SUBJECT TO all easements, reservations, incumbrances, rights of way and any other such rights for any purpose which are all recorded in the county or state where such land is situated or are visible on the said land, including particularly: the rights reserved to J. G. Puterbaugh in the deed from J. G. Puterbaugh to Aluminum Company of America, dated October 5, 1951 and recorded in Volume 274, Page 265 of the Milam County deed records; and the Assignment of Lignite Mining Lease from Texas Power & Light Company to Aluminum Company of America, dated October 5, 1951 and recorded in Volume 274, Page 181 of the Milam County deed records.

### TRACT 2

A tract of land containing 1.2288 acres situated in the George Miller Survey Abstract No. 265, Milam County, Texas, and is out of a 274.955 acre tract conveyed to Aluminum Company of America by deed dated October 16, 1951 and recorded in Volume 274, Page 265 of the Milam County deed records.  The 1.2288 acre tract is more particularly described by metes and bounds as follows:

BEGINNING at a 5/8" iron rod set at the most westerly southwest corner of a 10.925 acre tract of land conveyed to Texas Power and Light Company from Aluminum Company of America by deed dated March 14, 1978 and recorded in Volume 444, Page 29, of the said deed records;

THENCE, N67°36'47"E, at 90.00 feet pass a 5/8" iron rod set on line, and for a total distance of 396.50 feet to a 5/8" iron rod set for the northeast corner of this tract being described and is an interior corner of the 10.925 acre tract;

THENCE, S22°23'13"E, 135.00 feet to a 5/8" iron rod set in a westerly line of the 10.925 acre tract;

THENCE, S67°36'47"W, at 306.50 feet pass a 5/8" iron rod set on line, and for a total distance of 396.50 feet to a 5/8" iron rod set for a corner, bearing N67°21'46"W, 141.73 feet from a concrete monument identified as having Texas state coordinates: X=3,028,693.512, Y=341,475.553, and local plant grid coordinates N27+99.41, E19+50.174;

THENCE, N22°23'13"W, 135.00 feet to the PLACE OF BEGINNING, containing within these metes and bounds 1.2288 acres (53,527 square feet) of land area.

TOGETHER WITH the right of ingress and egress using such routes, private roads, streets, ways and real facilities as Alcoa may from time to time designate.

SUBJECT TO all easements, reservations, incumbrances, rights of way and any other such rights for any purpose which are all recorded in the county or state where such land is situated or are visible on the said land, including particularly: the rights reserved to J. G. Puterbaugh in the deed from J. G. Puterbaugh to

EXHIBIT III-A
Instrument #4

Aluminum Company of America, dated October 5, 1951 and recorded in Volume 274, Page 265 of the Milam County deed records; and the Assignment of Lignite Mining Lease from Texas Power & Light Company to Aluminum Company of America, dated October 5, 1951 and recorded in Volume 274, Page 181 of the Milam County deed records.

RESERVING, however, to Aluminum Company of America, its successors and assigns, pursuant to the unrecorded agreement dated August 13, 1976 between Aluminum Company of America and Texas Power & Light Company:

1.   The right to purchase or otherwise acquire the property hereby conveyed including any improvements thereon (i.e., Unit Four, Unit Four Real Estate and all improvements thereon, including Texas Power & Light Company's owned Common Facilities, as those terms are defined in the unrecorded agreement dated August 13, 1976 referred to above) or any part thereof in the event Texas Power & Light Company, its successors or assigns, shall desire or elect to sell, lease or otherwise transfer the same or any part thereof to any third party at any time during the period provided in Paragraph 3 below (provided, however, Texas Power & Light Company may transfer such property to any corporation owning all of its voting stock or to any corporation wholly owned by Texas Power & Light Company or by such corporation owning all of Texas Power & Light Company's voting stock in accordance with said unrecorded agreement dated August 13, 1976), said right to acquire and the exercise thereof to be in accordance with the following provisions (all references therein to Texas Power & Light Company shall be deemed to include Texas Power & Light Company's successors and assigns, all references therein to Aluminum Company of America shall be deemed to include Aluminum Company of America's successors and assigns), all of which Texas Power & Light Company, for itself, its successors and assigns, by the acceptance of this Deed, hereby agrees to and covenants to observe, perform and comply with:

(a)   Prior to any sale, lease or other transfer by Texas Power & Light Company of all or any portion or portions of the real property hereby conveyed or any improvements thereto to any third party, Texas Power & Light Company shall give written notice to Aluminum Company of America by registered mail setting forth the description of that part of such real property or improvements which is proposed to be transferred, the consideration proposed to be received by Texas Power & Light Company pursuant to such offer, which Texas Power & Light Company shall warrant as bona fide, and the name of the proposed transferee.

(b)   Aluminum Company of America shall have the right to purchase or otherwise acquire that part of the real property hereby conveyed together with any improvements thereon which is proposed to be transferred by Texas Power & Light Company as described in Texas Power & Light Company's notice, in the manner and for the consideration set forth in said notice or appraised fair market value of the same, whichever is less.

(c)   In the event that Aluminum Company of America elects to exercise such right to purchase or otherwise acquire, it shall give written notice of such election to Texas Power & Light Company by registered mail sent within ninety (90) days after receipt of Texas Power & Light's notice of the proposed transaction; Aluminum Company of America's notice shall

117

EXHIBIT III-A
Instrument #4

designate a closing date for acquisition as aforesaid which date shall not be later than one hundred eighty (180) days after the date of Texas Power & Light Company's notice to Aluminum Company of America.

(d)   In the event that Aluminum Company of America does not give such notice of its election to exercise the aforesaid right to acquire, or, having given such notice does not substantially tender its required performance within the applicable time period set forth in the preceding paragraph (c) then Texas Power & Light Company shall be free to transfer to the transferee named in Texas Power & Light Company's notice, the property described in said notice, for the consideration and in the manner set forth in said notice.

(e)   No failure by Aluminum Company of America to exercise the right to purchase as herein provided and no sale, transfer or other disposal of the property permitted as a result of such failure shall extinguish the rights and obligations under this Paragraph 1, and no grantee, transferee, or successor in title, immediate or remote, of Texas Power & Light Company's interest in said property or improvements shall have the right to sell, transfer or otherwise dispose of same except as herein permitted.

(f)   Aluminum Company of America's right to acquire set forth herein shall be specifically enforceable by Aluminum Company of America, with respect to each and every election or proposal by Texas Power & Light Company to transfer all or any portion or portions of the real property hereby conveyed.

2.   For the period provided in Paragraph 3 hereof, Aluminum Company of America shall have the right and option to purchase Unit Four Real Estate from Texas Power & Light Company upon the expiration of the useful life of Unit Four (as those terms are defined in said unrecorded agreement dated August 13, 1976 between Aluminum Company of America and Texas Power & Light Company) as mutually determined by Texas Power & Light Company and Aluminum Company of America.  The price to be paid by Aluminum Company of America for such real estate shall be the price originally paid to Aluminum Company of America by Texas Power & Light Company for such real estate.

3.   The rights of Aluminum Company of America under Paragraphs 1 and 2 hereof shall terminate upon the expiration of twenty-one (21) years after the death of the survivor of the following persons:

Carolyn Amy Kelson and Melinda Anne Kelson, daughters of Richard B. Kelson and Ellen S. Kelson of the Township of Mt. Lebanon, Allegheny County, Pennsylvania;

Kenneth Dale Cockrell and Phillip Lee Cockrell, sons and Deborah Jean Cockrell, daughter of Buford D. Cockrell and Jewell M. Cockrell of Upper St. Clair Township, Allegheny County, Pennsylvania;

Dona Stacy Campbell, daughter and Mark Robert Campbell and Ricky Lee Campbell, sons of Robert K. Campbell and Donna J. Campbell of Dallas, Dallas County, Texas;

Halsell S. Davis, III, Bruce M. Davis, Thomas L. Davis, and Joseph L. Davis, sons of H. Sam Davis, Jr. and Laura Ann Davis of Dallas, Dallas County, Texas.

118

EXHIBIT III-A
Instrument #4

AND FURTHER RESERVING to Aluminum Company of America, its
~uccessors and assigns, pursuant to Section 7(f) of the
unrecorded agreement dated August 13, 1976 for the term of said
agreement, the right to purchase or otherwise acquire
450/545ths of Unit Four and Unit Four Real Estate including
Texas Power & Light Company owned Common Facilities (as those
terms are defined in the unrecorded agreement dated August 13,
1976) from Texas Power & Light Company at the then current fair
market value of same as limited by the terms of Section 7(f) of
said unrecorded agreement such sale and purchase.

The provisions of the foregoing reservations and covenants
shall be severable, and the invalidity of any one or more of
such provisions shall not be deemed to invalidate any lawful
provisons of the affected or any other reservation or
covenant.  Furthermore, the agreement dated August 13, 1976
between Aluminum Company of America and Texas Power & Light
Company referred to herein shall not be merged herewith and
shall remain in full force and effect.

TO HAVE AND TO HOLD the above described premises, together
with all and singular, the rights and appurtenances thereto in
any wise belonging unto the said TEXAS POWER & LIGHT COMPANY,
its successors and assigns forever; and ALUMINUM COMPANY OF
AMERICA does hereby bind itself, its successors and assigns, to
warrant and forever defend all and singular the said premises
unto the said TEXAS POWER & LIGHT COMPANY, its successors and
assigns, against every person whomsoever lawfully claiming, or
to claim the same or any part thereof.

EXECUTED this ___21st___ day of ___July___, 1980.

ALUMINUM COMPANY OF AMERICA

By _____
         Vice President
         S. Alfred Jones

ATTEST:

_____
Assistant Secretary

H. E. Meeks

119

EXHIBIT III-A
Instrument #4

COMMONWEALTH OF PENNSYLVANIA :
                                     :
COUNTY OF ALLEGHENY              :

    BEFORE ME, the undersigned authority, on this day personally appeared   S. Alfred Jones, Vice President    , known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said ALUMINUM COMPANY OF AMERICA, a corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this   21st   day of   July  , 1980.

*Joyce E. Duda*
Notary Public in and for
Allegheny County, Pennsylvania
JOYCE E. DUDA, Notary Public
PITTSBURGH, ALLEGHENY COUNTY, PENNA.
MY COMMISSION EXPIRES
JUNE 22, 1981

120

EXHIBIT III-A
Instrument #4

EXHIBIT "A"

121





123

EXHIBIT III-A
Instrument #5

EASEMENTS AND RIGHTS-OF-WAY

THE STATE OF TEXAS )
                )     KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF MILAM )

    THAT ALUMINUM COMPANY OF AMERICA, hereinafter referred to
as "Grantor", for the sum of Ten Dollars ($10) and other good
and valuable considerations paid to it in cash by TEXAS POWER
AND LIGHT COMPANY, hereinafter referred to as "Grantee", the
receipt of which is hereby acknowledged, has granted, sold and
conveyed and by these presents does grant, sell and convey unto
Grantee easements and rights-of-way over three tracts of land
as hereinbelow described for the purposes as set forth for each
tract.  Said easements and rights-of-way are hereby intended as
being in furtherance, and for the implementation, of an
unrecorded agreement dated August 13, 1976, as amended, between
the parties set forth hereinabove.

    Grantor hereby grants unto Grantee, its successors and
assigns, the right, privilege and authority, subject to the
conditions and covenants hereinafter set forth, (1) to
construct, maintain, operate, repair and improve an oil storage
tank, underground piping, and all necessary and desirable
appurtenances and attachments upon, under, over, along and
across such of the property herein described as Tract 1 as is
owned by Grantor; (2) to construct, maintain, operate, repair
and improve intake structures, intake circulating water pipes,
various lignite handling facilities, and all necessary and
desirable appurtenances and attachments upon, under, over,
along and across such of the property herein described as Tract
2 as is owned by Grantor; and (3) to construct, maintain,
operate, repair and improve discharge structures, discharge
circulating water pipes, and all necessary and desirable
appurtenances and attachments upon, under, over, along and
across such of the property herein described as Tract 3 as is
owned by Grantor.  Said tracts of land are shown on the maps
attached hereto as Exhibit "A", and are more particularly
described as follows:

124

EXHIBIT III-A
Instrument #5

## TRACT 1

A tract of land containing 1.7829 acres situated in
the George Miller Survey Abstract No. 265, Milam
County, Texas, and being part of that 274.953 acre
tract conveyed to the Aluminum Company of America by
deed dated October 16, 1951, and recorded in Volume
274, Page 265 of the Milam County deed records.  The
1.7829 acre tract is more particularly described by
metes and bounds as follows;

COMMENCING at a 5/8" iron rod set for the northeast
corner of a 10.925 acre tract conveyed from the
Aluminum Company of America to Texas Power and Light
Company by deed dated March 14, 1978 and recorded in
Volume 444, Page 29 of the said deed records.  This
rod bears S87°47'29"W, 2423.17 feet from the most
easterly corner of the George Miller Survey and bears
N67°56'26"E, 875.01 feet from a concrete monument
identified as having the following Texas state plane
coordinates, central zone: X=3,028,274.373,
Y=341,941.279 and local plant grid coordinates:
N33+90, E17+40.  Said 5/8" iron rod is further
identified as having the following Texas state plane
coordinates, central zone, X=3,029,085.331,
Y=342,269.908 and local plant grid coordinates N33+85,
E26+15;

THENCE, N67°36'47"E, with the north line of a proposed
0.6864 acre tract 30.00 feet to the POINT OF BEGINNING
of the herein described tract;

THENCE, N22°23'13"W, 635.00 feet to a point for corner;

THENCE, N67°36'47"E, 35.00 feet to a point for corner;

THENCE, N22°23'13"W, 190.00 feet to a point for corner;

THENCE, N67°36'47"E, 250.00 feet to a point for corner;

THENCE, S22°23'13"E, 210.00 feet to a point for corner;

THENCE, S67°36'47"W, 132.50 feet to a point for corner;

THENCE, N22°23'13"W, 19.00 feet to a point for corner;

THENCE, S67°36'47"W, 27.00 feet to a point for corner;

THENCE, S22°23'13"E, 19.00 feet to a point for corner;

THENCE, S67°36'47"W, 90.50 feet to a point for corner;

THENCE, S22°23'13"E, 55.00 feet to a point for corner;

THENCE, N67°36'47"E, 97.50 feet to a point for corner;

THENCE, N22°23'13"W, 55.00 feet to a point for corner;

THENCE, N67°36'47"E, 20.00 feet to a point for corner;

THENCE, S22°23'13"E, 75.00 feet to a point for corner;

THENCE, S67°36'47"W, 117.50 feet to a point for corner;

THENCE, S22°23'13"E, 540.00 feet to a 5/8" iron rod set for
the northeast corner of the proposed 0.6864 acre tract,
described above;

EXHIBIT III-A
Instrument #5

THENCE, S67°36'47"W, 35.00 feet along the north line of the above described 0.6864 acre tract to the PLACE OF BEGINNING, containing within these metes and bounds 1.7829 acres (77,662 square feet) of land area.

## TRACT 2

A tract or parcel of land containing 4.5783 acres situated in the George Miller Survey Abstract No. 265, Milam County, Texas, a portion of which is out of a 274.953 acre tract conveyed to the Aluminum Company of America by deed dated October 16, 1951 and recorded in Volume 274, Page 265 of the Milam County deed records, and a portion of which is out of a 108.967 acre tract conveyed to the Aluminum Company of America by deed dated May 5, 1953 and recorded in Volume 282, Page 543 of the said deed records. The 4.5783 acre tract is more particularly described by metes and bounds as follows;

COMMENCING, at a 5/8" iron rod set for the southeast corner of a 10.925 acre tract of land conveyed to Texas Power and Light Company from the Aluminum Company of America by deed dated March 14, 1978 and recorded in Volume 444, Page 29 of the aforementioned deed records. Said 5/8" iron rod bears S68°53'38"W, 2275.01 feet from the most easterly corner of the George Miller Survey, and S70°18'34"E, 1178.87 feet from a concrete monument identified as having the following Texas state coordinates, central zone: X=3,028,274.373, Y=341,941.279, and local plant grid coordinates N33+90, E17+40;

THENCE, N22°23'13"W, 325.00 feet along the east line of the 10.925 acre tract to a 5/8" iron rod set for the southwest corner of a proposed 0.6864 acre tract;

THENCE, N67°36'47"E, 65.00 feet to a 5/8" iron rod set for the southeast corner of the proposed 0.6864 acre tract and the POINT OF BEGINNING, of the herein described tract,

THENCE, N22°23'13"W, 155.00 feet along the east line of the proposed 0.6864 acre tract to a point for corner;

THENCE, N67°36'47"E, 135.00 feet to a point for corner;

THENCE, S22°23'13"E, 90.00 feet to a point for corner;

THENCE, N67°36'47"E, 410.00 feet to a point for corner;

THENCE, N22°23'13"W, 15.00 feet to a point for corner;

THENCE, N67°36'47"E, 510.00 feet to a point for corner;

THENCE, S22°23'13"E, 70.00 feet to a point for corner;

THENCE, S67°36'47"W, 364.00 feet to a point for corner;

THENCE, S63°21'47"W, 472.30 feet to a point for corner;

THENCE, S88°57'30"E, 163.48 feet to a point for corner;

THENCE N67°36'47"E, 550.00 feet to a point for corner;

126

EXHIBIT III-A
Instrument #5

THENCE, N59°04'56"E, 202.24 feet to a point for corner;

THENCE, N32°02'54"E, 245.86 feet to a point for corner;

THENCE, N67°36'47"E, 80.00 feet to a point for corner;

THENCE, S22°23'13"E, 193.00 feet to a point for corner;

THENCE, S67°36'47"W, 280.00 feet to a point for corner;

THENCE, S22°23'13"E, 35.00 feet to a point for corner;

THENCE, S67°36'47"W, 873.74 feet to a point for corner;

THENCE, N81°53'49"W, 285.78 feet to the PLACE OF BEGINNING, containing within these metes and bounds 4.5783 acres (199,429 square feet) of land area.

## TRACT 3

An easement being 20 feet wide along the south 1664.41 feet of its length, and 40 feet wide along the north 161.73 feet of its length, situated in the J.M. Matlock Survey Abstract No. 261, and the George Miller Survey Abstract No. 265, Milam County, Texas. Said centerline of easement is the centerline of an existing 108" water pipe, a portion of which is across a 274.953 acre tract of land conveyed to the Aluminum Company of America by deed dated October 16, 1951 and recorded in Volume 274, Page 265 of the Milam County, deed records, and a portion of which is across a 64 acre tract described as the "second tract" conveyed to the Aluminum Company of America by deed dated September 26, 1951 and record in Volume 274, Page 67 of the said deed records. The centerline of this easement is more particularly described by metes and bounds as follows;

COMMENCING at a 5/8" iron rod set for the northwest corner of a 10.925 acre tract conveyed to Texas Power and Light Company by deed dated March 14, 1978 and recorded in Volume 444, Page 29 of the above mentioned deed records. Said iron rod bears S83°30'50"W, 3160.37 feet from the easternmost corner of the said George Miller Survey and bears N54°48'32"E, 112.81 feet from a concrete monument identified as having Texas state plan coordinates X=3,028,274.373, Y=341,941.279 and local plant grid coordinates N33+90, E17+40.

THENCE, S22°23'13"E for a distance of 139.83 feet along the west line of the 10.925 acre tract to the POINT OF BEGINNING of the herein described 20 foot wide easement.

THENCE, S67°36'47"W along the centerline of this easement being described 162.08 feet to the point of curvature of a curve to the right;

THENCE, continuing along the centerline with the curve to the right, having a central angle of 45°00'00", a radius of 301.04 feet, a long chord of 230.41 feet (bears N89°53'13"W) for an arc length of 236.44 feet to the point of tangency;

THENCE, continuing with said centerline N67°23'13"W, 69.24 feet to an angle point;

EXHIBIT III-A
Instrument #5

THENCE, N22°23'13"W, 212.28 feet to the point of curvature of a curve to the left;

THENCE, with said curve to the left, having a central angle of 24°00'00", a radius of 301.04 feet, a long chord of 125.18 feet (bears N34°23'13"W), for an arc length of 126.10 feet to a point of reverse curve to the right;

THENCE, with said curve to the right, having a central angle of 24°00'00", a radius of 301.04 feet, a long chord of 125.18 feet (bears N34°23'13"W), for an arc length of 126.10 feet to the point of tangency;

THENCE, N22°23'13"W, 211.03 feet to an angle point in the herein described centerline;

THENCE, N00°06'47"E, 3.10 feet to the point of curvature of a curve to the right;

THENCE, with said curve to the right having a central angle of 67°30'00", a radius of 301.04 feet, a long chord of 334.50 feet (bears N33°51'47"E), for an arc length of 354.65 feet to the point of tangency;

THENCE, N67°36'47"E, 163.39 feet to an angle point in the herein described centerline, said point marks the end of the 20 foot width and the beginning of a 40 foot width for this easement being described;

THENCE, with the centerline of the said 40 foot wide easement, N22°23'13"W, 161.73 feet, to its terminus, having a total length, 1664.41 feet, 20 feet wide, and 163.39 feet, 40 feet wide, giving an aggregate length of 1826.14 feet.

TO HAVE AND TO HOLD said easements and rights-of-way unto Grantee, its successors and assigns, as long as the same shall be used by Grantee for the purposes herein stated, unless sooner terminated as hereinafter provided; SUBJECT, however, to all existing easements, rights-of-way, mineral reservations and other encumbrances of whatsoever kind as may exist in, over, under, upon, along or across the lands described in Exhibit "A", whether of record or not, which affect said properties, and FURTHER SUBJECT to the following provisions, all of which Grantee agrees and covenants to observe and comply with:

1.   Grantor reserves unto itself, its successors and assigns, the right to use the lands described in Exhibit "A" for any lawful purpose provided that such use does not unreasonably interfere with the exercise by Grantee of the rights hereby granted.

128

EXHIBIT III-A
Instrument #5

2.   The Grantee shall have the right of ingress and egress
to and from said rights-of-way for the purpose of exercising
the rights hereby granted to it; provided, however, that in the
exercise of such rights of ingress and egress the Grantee will
use either public roads or routes designated by Grantor.

3.   Grantee shall assume the payment of the expenses of
maintenance and repair of said easements and rights-of-way
arising out of or connected with Grantee's use of same.

4.   Grantee shall have the right to trim or cut down
trees, shrubbery and brush in and on said easements and
rights-of-way as Grantee, in its sole judgment, deems necessary
to prevent possible interference with its facilities thereon or
to prevent possible hazard thereto.

5.   No buildings, structures or other obstructions (other
than Grantee's facilities) shall be constructed, erected or
maintained on the lands described in Exhibit "A" hereto;
provided, however, that Grantor may construct, maintain, use
and operate roads, streets, parking areas, railroad tracks and
utility facilities along, over, across and under said tracts
described in Exhibit "A", provided that such roads, streets,
parking areas, railroad tracks and utility facilities do not
interfere with any tower or other facility of Grantee thereon,
and that all such roads, streets, parking areas, railroad
tracks and utility facilities provide, with respect to the
Grantee's facilities, the clearances recognized as standard in
the electric utility industry.

6.   Grantor reserves the rights to all quarries, deposits
and minerals of any kind whatsoever, and to take and get the
same, found in, on or under the properties described in Exhibit
"A" and no rights therein are hereby granted to Grantee,
provided that in so taking and getting, Grantor shall not
unreasonably interfere with the exercise by Grantee of the
rights hereby granted.

129

EXHIBIT III-A
Instrument #5

7.    In the event Grantor at any time shall require the
exclusive use of the herein described real estate or a portion
thereof for any purpose, Grantor shall so notify Grantee in
writing and Grantee will, within twelve (12) months from the
receipt of such notice, remove all of its facilities from the
area designated by Grantor, provided, however, that Grantor, in
such event at the time of the giving of such notice shall grant
or cause to be granted to Grantee, at Grantor's expense, an
easement over other real estate for the purpose of relocating
such facilities, which easement shall grant to Grantee rights
with respect to the use and maintenance of such relocated
facilities which are substantially the same as the rights
herein granted, and which easement shall be so located as to
enable Grantee to use such relocated facilities for the same
function or purpose as had been served by the facilities
required to be relocated, and provided further, that Grantor
shall reimburse Grantee for its actual cost and expense of
relocating such facilities and the actual cost and expense of
providing temporary service during such relocation.

8.    Grantee agrees to indemnify and save harmless Grantor
from and against all claims for damage or injury to the
property or person of all parties  whomsoever arising out of
the exercise by Grantee of the rights hereby granted to it.
Further, Grantee covenants and agrees that it will pay to the
owner of the land, or if leased to its tenants, as they may be
respectively entitled, actual damages done to roads, fences,
grass, livestock, growing crops or improvements now or
hereafter placed, erected or planted by reason of the
construction by Grantee of the facilities contemplated by this
Agreement or by its exercise of any rights herein granted to it.

9.    The easements and rights-of-way hereby granted shall
be perpetual, provided, however, that said easements and

130

EXHIBIT III-A
Instrument #5

...nts-of-way shall terminate upon: (a) abandonment of the use
...eof for the purposes herein provided during a continuous
...iod of twelve (12) months, or (b) the surrender and release
...riting at any time by Grantee.  Upon termination of said
...ments and rights-of-way, whether by abandonment, nonuse or
...erwise, Grantee, at its sole cost, risk and expense, shall,
upon request of Grantor, promptly remove its facilities and
restore the surface of the land on which the easements and
rights-of-way herein are granted to a condition satisfactory to
Grantor; and if Grantee fails to do so, Grantor may remove such
facilities and restore said surface at the expense of Grantee.

10.  The rights contemplated by this Agreement for the
benefit of Grantee, shall not be assignable by Grantee, other
than to a wholly-owned subsidiary of Grantee.  This Agreement
shall inure to the benefit of and be binding upon the parties,
their successors and assigns.

11.  The agreement dated August 13, 1976 between Aluminum
Company of America and Texas Power & Light Company referred to
herein shall not be merged herewith and shall remain in full
force and effect.  This Agreement is made without warranty by
Grantor, either express or implied.

Executed in duplicate this 21st day of __July__ ,
1980.

ATTEST:                            ALUMINUM COMPANY OF AMERICA

_____           By _____
    Assistant Secretary                   Vice President
    H. E. Meeks                         S. Alfred Jones

ATTEST:                            TEXAS POWER AND LIGHT COMPANY

_____           By _____
    Assistant Secretary                 Vice President— G. BERMAN.
    Charles V. McCarter

131

EXHIBIT III-A
·Instrument #5

COMMONWEALTH OF PENNSYLVANIA :
                                                      :
COUNTY OF ALLEGHENY                  :

    BEFORE ME, the undersigned authority, on this day
personally appeared ___S. Alfred Jones, Vice President_____,
known to me to be the person and officer whose name is
subscribed to the foregoing instrument and acknowledged to me
that the same was the act of the said ALUMINUM COMPANY OF
AMERICA, a corporation, and that he executed the same as the
act of such corporation for the purposes and consideration
therein expressed, and in the capacity therein stated.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this ___21st___ day
of _____July_____, 1980.

                            _____Joyce E. Duda_____
                            Notary Public in and for
                            Allegheny County, Pennsylvania
                            JOYCE E. DUDA, Notary Public
                            PITTSBURGH, ALLEGHENY COUNTY, PENNA.
                            MY COMMISSION EXPIRES
                            JUNE 22, 1981

132

EXHIBIT III-A
Instrument #5

STATE OF TEXAS           :

COUNTY OF DALLAS         :
~~MILAM~~

BEFORE ME, the undersigned authority, on this day personally appeared _____ E. BERMAN, _____,
known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said TEXAS POWER & LIGHT COMPANY, a corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this ___ 27 ___ day of _____, 1980.

_R. V. Perry_
Notary Public in and for
~~Milam~~ County, Texas
Dallas

R. V. PERRY Notary Public
Dallas County, Texas

133

EXHIBIT III-A
Instrument #5

EXHIBIT "A"



SURVEY PLAT OF

A 1.7829 ACRE TRACT OUT OF THE
GEORGE MILLER SURVEY A-265,
MILAM COUNTY, TEXAS

I, JERRY FULTS
A REGISTERED PUBLIC SURVEYOR, DO HERE-
BY CERTIFY THAT THE PLAT SHOWN HEREON
REPRESENTS THE RESULTS OF AN ON THE
GROUND SURVEY MADE UNDER MY DIRECTION
AND SUPERVISION ON THE    5th    DAY
OF MARCH , 1980 AND THAT ALL CORNERS
ARE AS SHOWN HEREON.

REG. PUBLIC SURVEYOR NO. 1999        DATE    3/5/80

ALUMINUM COMPANY
OF AMERICA

135



EXHIBIT III-A, Instrument #5

TRACT 2

SURVEY PLAT OF
A 4.5783 ACRE TRACT OUT OF THE
GEORGE MILLER SURVEY A-265, AND
THE S.L. JOHNSON SURVEY A-228,
MILAM COUNTY, TEXAS

I, JERRY FULTS
A REGISTERED PUBLIC SURVEYOR, DO HERE-
BY CERTIFY THAT THE PLAT SHOWN HEREON
REPRESENTS THE RESULTS OF AN ON THE
GROUND SURVEY MADE UNDER MY DIRECTION
AND SUPERVISION ON THE 6th DAY
OF MARCH , 1980 AND THAT ALL CORNERS
ARE AS SHOWN HEREON.

REG. PUBLIC SURVEYOR NO. 1999     DATE

ALUMINUM COMPANY
OF AMERICA

136



EXHIBIT III-A, Instrument #5

J. M. MATLOCK          A-261          TRACT 3

64 ACRES
ALUMINUM CO OF AMERICA
(VOL. 274 PG. 667)

¢ PROPOSED 40'
WIDE EASEMENT
(1617.5 IN LENGTH)

POINT OF BEGINNING
40' WIDE EASEMENT

| NO | CENTRAL ANGLE | RADIUS | ARC | CHORD | BEARING |
|---|---|---|---|---|---|
| C1 | 45°00'00" | 301.04' | 236.44' | 230.41' | N89°53'13"W |
| C2 | 24°00'00" | 301.04' | 126.10' | 125.18' | N34°23'13"W |
| C3 | 24°00'00" | 301.04' | 126.10' | 125.18' | N34°23'13"W |
| C4 | 67°30'00" | 301.04' | 354.65' | 334.50' | N33°6'47"E |

¢ PROPOSED 20'
WIDE EASEMENT
(1664.41 IN LENGTH)

GEORGE MILLER SURVEY

FOUND CONCRETE
MONUMENT
(X=3,028,274.373)
(Y= 341,941.279)
PLANT (N=33+90.44)
GRID (E=117+42)

REFERENCE POINT
N.E. CORNER 10.925 ACRE TRACT
DESTROYED, RESET 5/8" IRON ROD
(X=3,026,365.561) (PLANT N=34+15)
(Y= 342,000.289) (GRID E=118+50)

(CALCULATED) I.C. S.E. CORNER
GEORGE MILLER SURVEY
AND THE 274.953 ACRE TRACT

POINT OF BEGINNING
20' WIDE EASEMENT
(X=3,028,419.817)
(Y= 341,675.998)

162.08'
S67°36'47"W

10.925 ACRES, ALUMINUM
COMPANY OF AMERICA TO
TEXAS POWER & LIGHT CO.
JULY, 1978, VOL. 444 -
PG. 29, MILAM COUNTY D.R.

DESTROYED, RESET
5/8" IRON ROD W/CAP

NOTES

1. THE ¢ OF THE PROPOSED EASEMENT IS
THE ¢ OF AN EXISTING 108" WATER PIPE
THE LOCATION OF THE EXISTING PIPE
IS BASED ON RECORD INFORMATION
SUPPLIED TO THIS OFFICE BY THE
CLIENT

2. ALL COORDINATES AND BEARINGS
ARE BASED ON THE TEXAS STATE
PLANE COORDINATE SYSTEM,
CENTRAL ZONE, EXCEPT THOSE
SHOWN AS LOCAL PLANT GRID *
COORDINATES

A SURVEY PLAT
OF THE ¢ OF A PROPOSED 20' WIDE
EASEMENT OUT OF THE GEORGE MILLER
SURVEY A-265, AND THE J.M MATLOCK
SURVEY A-261, MILAM COUNTY, TEXAS

I, JERRY FULTS
A REGISTERED PUBLIC SURVEYOR, DO HERE-
BY CERTIFY THAT THE PLAT SHOWN HEREON
REPRESENTS THE RESULTS OF AN ON THE
GROUND SURVEY MADE UNDER MY DIRECTION
AND SUPERVISION ON THE    5th    DAY
OF MARCH   1980 AND THAT ALL CORNERS
ARE AS SHOWN HEREON.

_Jerry Fults_                    3/5/80
REG. PUBLIC SURVEYOR NO. 1999    DATE

STATE OF TEXAS
JERRY FULTS
1999
REGISTERED PUBLIC SURVEYOR

LOCKWOOD, ANDREWS & NEWNAM INC
ENGINEERS & PLANNERS

ALUMINUM COMPANY
OF AMERICA

| DWG BY C.D.K | APP'D BY H.A.D | DATE MAR 5, 80 | SCALE N.T.S | JOB NO 55-5-0031 |

137

EASEMENT AND RIGHT-OF-WAY  935

THE STATE OF TEXAS    §
                      §    KNOW ALL MEN BY THESE PRESENTS:
COUNTY  OF  MILAM     §

   That TEXAS POWER & LIGHT COMPANY, a Texas corporation, herein-
after called "Grantor," for and in consideration of Ten Dollars ($10.00)
and other good and valuable considerations to it in hand paid by
ALUMINUM COMPANY OF AMERICA, a corporation doing business in Texas,
hereinafter called "Grantee," has granted, sold and conveyed, and by
these presents does grant, sell and convey unto Grantee an easement and
right-of-way to construct, maintain, operate, repair and improve an
overhead crane, together with rails, supports and all other necessary
or desirable related facilities, upon and along all that certain tract
of land more specifically described in Exhibit "A" and shown on the plat
attached hereto as Exhibit "B," both attached hereto and made a part
hereof for all purposes.

   TO HAVE AND TO HOLD said easement and right-of-way unto Grantee,
its successors and assigns, as long as the same shall be used by Grantee
for the purposes herein stated, unless sooner terminated as hereinafter
provided; SUBJECT, however, to all existing easements, rights-of-way,
mineral reservations and other encumbrances of whatsoever kind as may
exist in, over, under, upon, along or across the land described in
Exhibit "A," whether of record or not, which affect said property, and
FURTHER SUBJECT to the following provisions, all of which Grantee agrees
and covenants to observe and comply with:

   1.  Grantor reserves unto itself, its successors and assigns, the
right to use the land described in Exhibit "A" for any lawful purpose
provided that such use does not unreasonably interfere with the exercise
by Grantee of the rights hereby granted.

   2.  The Grantee shall have the right of ingress and egress to and
from said right-of-way for the purpose of exercising the rights hereby
granted to it; provided, however, that in the exercise of such rights
of ingress and egress the Grantee will use either public roads or routes
designated by Grantor.

                                 138

EXHIBIT III-A
Instrument #6

3.    Grantee shall assume the payment of the expenses of mainte-
nance and repair of said easement and right-of-way arising out of or
connected with Grantee's use of same.

4.    Grantee shall have the right to trim or cut down trees,
shrubbery and brush in and on said easement and right-of-way as Grantee,
in its sole judgment, deems necessary to prevent possible interference
with its facilities thereon or to prevent possible hazard thereto.

5.    No buildings, structures or other obstructions (other than
Grantee's facilities) shall be constructed, erected or maintained on
the lands described in Exhibit "A" hereto, except any such structures,
roads, streets, railroad tracks and utility facilities as will not
interfere with Grantee's facilities on said property or its right to
utilize the same.

6.    Grantee agrees to indemnify and save harmless Grantor from
and against all claims for damage or injury to the property or person
of all parties whomsoever arising out of the exercise by Grantee of the
rights hereby granted to it.  Further, Grantee covenants and agrees that
it will pay to the owner of the land, or if leased to its tenants, as
they may be respectively entitled, actual damages done to roads, fences,
grass, livestock, growing crops or improvements now or hereafter
placed, erected or planted by reason of the construction by Grantee of
the facilities contemplated by this agreement or by its exercise of any
rights herein granted to it.

7.    The easement and right-of-way hereby granted shall be
perpetual, provided, however, that said easement and right-of-way shall
terminate upon:  (a) abandonment of the use thereof for the purposes
herein provided during a continuous period of twelve (12) months, or (b)
the surrender and release in writing at any time by Grantee.  Upon
termination of said easement and right-of-way, whether by abandonment,
nonuse or otherwise, Grantee, at its sole cost, risk and expense, shall,
upon request of Grantor, promptly remove its facilities and restore the
surface of the land on which the easement and right-of-way herein is
granted to a condition satisfactory to Grantor; and if Grantee fails to
do so, Grantor may remove such facilities and restore said surface at
the expense of Grantee.

EXHIBIT III-A
Instrument #6

8.    This agreement is without warranty.

EXECUTED in duplicate this _25_ day of _September_, 1980.

TEXAS POWER & LIGHT COMPANY

By _G. Berman_
G. BERMAN, VICE PRESIDENT

ATTEST:

_Charles V. McCarter_
~~Assistant~~ Secretary
Charles V. McCarter

GRANTOR

ALUMINUM COMPANY OF AMERICA

By _S. Alfred Jones_
Vice President  S.A.W.

R.W.  P.H.K.

S. Alfred Jones

ATTEST:

_H. E. Meeks_
Assistant Secretary
H. E. Meeks

GRANTEE

THE STATE OF TEXAS      §
                        §
COUNTY   OF   DALLAS     §

BEFORE ME, the undersigned authority, on this day personally appeared ___G. BERMAN___, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said TEXAS POWER & LIGHT COMPANY, a corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _25_ day of _September_, 1980.

_R. V. Perry_
Notary Public, Dallas County, Texas

My commission expires: _1-31-81_
R. V. PERRY Notary Public
Dallas County, Texas

COMMONWEALTH OF PENNSYLVANIA    §
                                §
COUNTY   OF   ALLEGHENY          §

BEFORE ME, the undersigned authority, on this day personally appeared ___S. Alfred Jones___, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said ALUMINUM COMPANY OF AMERICA, a corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _16th_ day of _October_, 1980.

_Nancy J. Gravett_
Notary Public, Allegheny County, Pennsylvania

My commission expires: April 21, 1983
NANCY J. GRAVETT, Notary Public
PITTSBURGH, ALLEGHENY COUNTY, PA
MY COMMISSION EXPIRES
APRIL 21, 1983

140

EXHIBIT III-A
Instrument #6

A parcel or tract of land out of a 274.953 acre tract
out of the George Miller survey, abstract No. 265 and
the S. L. Johnson survey, abstract No. 228, Milam County,
Texas; said 274.953 acre tract conveyed to the Aluminum
Company of America by deed dated October 16, 1951 and
recorded in Volume 274, Page 265 of the Milam County deed
records; said tract being more particularly described
as follows:

BEGINNING at an iron pin set at the easternmost corner
of this tract; said pin being S68°53'39"W, 2274.96 feet
from a concrete monument marking the easternmost corner
of said George Miller Survey; said pin being further
identified as having the following Texas State Coordinates,
Central Zone:  X = 3,029,384.352 and Y = 341,544,090.

THENCE, S39°07'21"W 419.28 feet to an iron pin set at the
southernmost corner of this tract;

THENCE, N22°23'13"W, 635.00 feet to an iron pin set;

THENCE, S67°36'47"W, 396.50 feet to a point;

THENCE, N22°23'13"W, 380.00 feet to a point being the
westernmost corner of this tract, said point being
N54°48'55"E, 112.85 feet from a concrete monument iden-
tified as having the following Texas State Coordinates:
X = 3,028,274.373 and Y = 341,941,279 and local plant
grid coordinates:  N33+90 and E17+40;

THENCE, N67°36'47"E, 75.00 feet to the true point of
beginning of the description for this parcel or tract
of land;

THENCE, continuing N67°36'47"E a distance of 50.00
feet to a point;

THENCE, S22°23'13"E a distance of 25.00 feet to a
point;

THENCE, S67°36'47"W a distance of 50.00 feet to a
point;

THENCE, N22°23'13"W a distance of 25.00 feet to the
true point of beginning.



EXHIBIT III-A, Instrument #6

Exhibit "B"

ALUMINUM COMPANY
OF AMERICA
(274.953 ACRES)
(VOL. 274 PG. 265)

PROPOSED
0.6864
ACRE TRACT

10.925 ACRES ALUMINUM
COMPANY OF AMERICA TO
TEXAS POWER & LIGHT CO.
JULY 1, 1978, VOL. 444
PG. 25, MILAM COUNTY O.R.

POINT OF
BEGINNING

PROPOSED
1.2288 AC.
53,527
SQUARE FEET

PROPOSED
0.5946
ACRE TRACT

FOUND CONCRETE MONUMENT

COMMON LINE
BETWEEN THE
274.953 AC. &
108.967 AC.

GEORGE MILLER SURVEY          A-265
S. L. JOHNSON SURVEY          A-225

LEGEND
• = 5/8" IRON ROD SET

NOTES:
1. ALL COORDINATES AND BEARINGS
   ARE BASED ON THE TEXAS STATE
   PLANE COORDINATE SYSTEM,
   CENTRAL ZONE; EXCEPT THOSE
   SHOWN AS LOCAL PLANT GRID
   COORDINATES.
2. ALL CORNERS OF THE ORIGINAL
   10.925 ACRE TRACT WERE FOUND
   DESTROYED AND WERE RESET
   WITH 5/8" IRON RODS.

SURVEY PLAT OF
A 1.2288 ACRE TRACT OUT OF THE
GEORGE MILLER SURVEY A-265
MILAM COUNTY, TEXAS

108.967 ACRES
TO ALUMINUM
COMPANY OF AMERICA
JUNE 12, 1953
(VOL. 282 PG. 543)

I, JERRY FULTS
A REGISTERED PUBLIC SURVEYOR, DO HERE-
BY CERTIFY THAT THE PLAT SHOWN HEREON
REPRESENTS THE RESULTS OF AN ON THE
GROUND SURVEY MADE UNDER MY DIRECTION
AND SUPERVISION ON THE      6th . DAY
OF MARCH , 1980 AND THAT ALL CORNERS
ARE AS SHOWN HEREON.

REG. PUBLIC SURVEYOR NO. 1999       DATE

STATE OF TEXAS
JERRY FULTS
1999
PUBLIC SURVEYOR

LOCKWOOD, ANDREWS & NEWNAM, INC.
ENGINEERS - PLANNERS

ALUMINUM COMPANY
OF AMERICA

142

EXHIBIT III-A
Instrument #6

143

EXHIBIT IV-



# TEXAS POWER & LIGHT COMPANY

1511 Bryan Street • P.O. Box 6331 • Dallas, Texas 75222

R. K. CAMPBELL
VICE PRESIDENT

October 25, 1976

County of Milam
c/o The Honorable O. B. Harden,
County Judge, Milam County
Cameron, Texas

Re:  Sandow Unit 4 - Termination of IDB Financing with
       Milam County

Gentlemen:

Enclosed is signed letter of notice to the County of Milam
cancelling the referenced financing arrangements.

We appreciate the time and effort given by Judge Harden and
the County of Milam regarding this matter.

Very truly yours,

R. K. Campbell

jm
Enclosure
cc - Messrs. B. D. Cockrell, ALCOA, Pittsburgh
            F. P. Bergeron, ALCOA, Rockdale

EXHIBIT IV-A

ALUMINUM COMPANY OF AMERICA

ALCOA BUILDING · PITTSBURGH, PENNSYLVANIA 15219


ALCOA

October 25, 1976

County of Milam
c/o The Honorable O.B. Harden,
County Judge, Milam County
Cameron, Texas

Gentlemen:

Pursuant to Section 7 of the "Agreement to Issue Bonds" dated
as of October 14, 1974, among the County of Milam (herein-
after called "Issuer"), Aluminum Company of America (herein-
after called "Alcoa") and Texas Power and Light Company (here-
inafter called "TP&L")(Alcoa and TP&L are herein collectively
called "User"), User hereby notifies Issuer that it hereby
terminates, effective as of the date hereof, said Agreement
to Issue Bonds.  In this regard, Alcoa and TP&L fully recognize
their liability for amounts due and owing by User to Issuer
arising out of transactions occurring on or before the time
of this termination.

Thank you for your cooperation in this matter.

Very truly yours,

ALUMINUM COMPANY OF AMERICA

By _____
        Vice President

                S. Alfred Jones

TEXAS POWER & LIGHT

By _____
        Vice President

                R. K. Campbell

145

EXHIBIT IV-B

SANDOW UNIT FOUR AGREEMENT
SUPPLEMENTAL PROVISION – SECTIONS 4(a), 4(d), 4(e) & 4(f)
CONSTRUCTION/PURCHASING/ACCOUNTING/WAREHOUSE

INDEX

**Section**                                                        **Page**

I. GENERAL INTRODUCTION

    (a)  Purpose......................................148
    (b)  Communication Distribution Listing..........148

II. CONSTRUCTION RESPONSIBILITIES

    (a)  Responsibilities of TP&L....................149
    (b)  Responsibilities of Alcoa...................149
    (c)  Alcoa discharge of responsibilities.........149
    (d)  Scope.......................................150

III. CONSTRUCTION OF ALCOA-OWNED COMMON FACILITIES AND LIGNITE
     FACILITIES

    (a)  Project Control System (PCS)................149
    (b)  Cost Estimating Information..................151
    (c)  IGC Construction Activity Report............153

IV. PURCHASING

    (a)  Lignite Facilities..........................153
    (b)  Common Facilities...........................154
    (c)  Unit Four...................................154

V. ACCOUNTING - ALCOA-OWNED COMMON FACILITIES AND LIGNITE
    FACILITIES

    (a)  Purpose.....................................154
    (b)  Alcoa Financial Status Report...............155
    (c)  Alcoa Project Chart of Accounts.............155
    (d)  Cash Advancements to TP&L...................157
    (e)  TP&L Monthly Invoice Statements.............157
    (f)  Cost Definitions/TP&L Services..............158
        (i)   Direct Labor..........................158
        (ii)  Employee Fringe Benefits, Insurance...158
            & Taxes
        (iii)Materials and Supplies................159
        (iv)  Equipment Cost........................159
        (v)   Site Management.......................161
        (vi)  IGC's Indirect Cost...................161
        (vii)TP&L Outside Engineering/Contractors..162
        (viii) Miscellaneous Expenses..............162

146

EXHIBIT IV-B

SANDOW UNIT FOUR AGREEMENT
SUPPLEMENTAL PROVISION ~ SECTIONS 4(a), 4(d), 4(e) & 4(f)
CONSTRUCTION/PURCHASING/ACCOUNTING/WAREHOUSE

INDEX

Section                                                          Page

V.   ACCOUNTING - ALCOA-OWNED COMMON FACILITIES AND LIGNITE
     FACILITIES (Cont'd)

     (g)  Construction Fee.............................. 162
     (h)  Alcoa Construction Equipment Depreciation.. 163
     (i)  Freight & Invoice Approval................... 163
     (j)  Texas Sales and Use Tax...................... 164

VI.  ACCOUNTING - UNIT FOUR

     (a)  Purpose...................................... 164
     (b)  TP&L Unit Four Investment Report............ 164
     (c)  TP&L Project Chart of Accounts.............. 165
          (i)   Cost account structure................. 165
          (ii)  Overhead costs......................... 167
     (d)  Cost Definitions/TP&L Construction.......... 167
     (e)  Alcoa Services/TP&L Unit Four.............. 168

VII. WAREHOUSE

     (a)  General...................................... 168

147

EXHIBIT IV-B

SANDOW UNIT FOUR AGREEMENT
SUPPLEMENTAL PROVISION – SECTIONS 4(a), 4(d), 4(e) & 4(f)
CONSTRUCTION/PURCHASING/ACCOUNTING/WAREHOUSE

<u>Section I – General Introduction</u>

(a) <u>Purpose</u>

This Exhibit is a supplement to the provisions covered in the following Sandow Unit Four Agreement Sections:

<u>Section</u>

| | |
|---|---|
| 4(a) – | Unit Four |
| 4(d) – | Additional Common Facilities |
| 4(e) – | Additional Lignite Facilities |
| 4(f) – | Handling of Section 4 Disbursements |

The policies and related procedures as described herein for the above referenced Agreement Sections shall apply as they concern construction administration, procurement and accounting matters.

(b) <u>Communication Distribution Listing</u>

A communication distribution listing shall be maintained on a current basis reflecting the recipients who are to receive copies of various type periodic reports, correspondence, purchasing documents, etc. This communication distribution listing shall be maintained by Alcoa's Project Manager (Sandow Mining & Power Expansion) and revised listings shall be published when appropriate.

148

Exhibit IV-B

## Section II - Construction Responsibilities

(a) TP&L has responsibility to design and construct Unit Four
and improvements, additions and Replacements to Common
Facilities, including Common Facilities owned and to be owned
by both TP&L and Alcoa except as provided in Paragraph (b) of
this Section.  TP&L has contracted with its affiliate, Texas
Utilities Services Inc. (TUSI), to act as its agent to manage
design and construction of Unit Four and additions,
improvements and replacements to Common Facilities described in
this paragraph other than design and construction of certain
electrical and substation facilities.  TUSI has engaged Brown &
Root, Inc. to provide design and engineering services and to
act as general contractor.

(b) Alcoa is responsible for design and construction of
Additions to Lignite Facilities, and for the Common Facilities
described in Section 4.4 of the Supplemental Agreement.

(c) Alcoa has elected to discharge its design and construction
responsibilities hereunder, in part by utilization of its
employees and employment of contractors including Brown & Root,
Inc. and, in part, by utilization of the services of Industrial
Generating Co., a division of TP&L (IGC) pursuant to the
Operating Agreement and related agreements of August 29, 1951.

149

Exhibit IV-B

as amended, between Alcoa and TP&L.  The Industrial Generating
Co. division of TP&L was formerly a division of Texas Utilities
Generating Company known as the Industrial Generating Co. and
later as the Sandow Division.

(d) Responsibility for design and construction includes
responsibility for all aspects thereof including engineering,
purchasing, accounting, construction supervision and management
and is subject to coordination through the Construction
Committee, Common Facilities Construction Committee or Lignite
Facilities Construction Committee, as applicable under
Section 4 of the Sandow Unit Four Agreement.

### Section III - Construction of Alcoa-owned
### Common Facilities & Lignite Facilities

(a) Project Control System (PCS)

Alcoa shall use its computer-based module information sys-
tem titled "Project Control System" (PCS).  Primary function of
PCS is for the planning and control of a construction project
through the utilization of cost, schedule, and project scope
data.  This data then provides the basic data base which is
routinely monitored through the issuance of various reports and
updated on a scheduled periodic basis to provide the over-all
project control.  Information for the data base originates from

Exhibit IV-B

the Accounting, Construction, Engineering and Purchasing
Departments of both Industrial Generating Co. and Alcoa.  The
Alcoa Construction Accounting Department shall be responsible
for gathering this source data and shall also, in turn, be
responsible for controlling input and output of the information
through the use of an on-line terminal to the Alcoa Pittsburgh-
based computer.  To monitor the project several pre-programmed
reports are available.  Information, as reflected on these
reports, corresponds directly to the Construction Chart of
Accounts.


(b) Cost Estimating Information

    Basically, two types of cost estimating information are
required.  The first relates to the over-all Project Current
Estimate and the second concerns cost estimates for work per-
formed by Industrial Generating Co. (IGC) and/or by TP&L
affiliated companies or TP&L outside contractors.

    Current Estimates - The Project Current Estimate is uti-
lized to reflect in cost the most accurate and current
information available.  Initially, these estimates are
prepared by the Alcoa Design and/or Engineering Department
or the IGC Project Coordinator responsible for each parti-
cular item within the scope.  Revisions to the initial
estimates shall be prepared by the individual responsible
for the initial estimate.  All cost estimates shall be

151

Exhibit IV-B

directed to the Alcoa Construction Manager for review.
Copies should be made available to the Alcoa Construction
Accounting Manager and the IGC Project Coordinator.  After
the Alcoa Project Manager reviews the estimates, they shall
be input into the PCS Program where they will be identi-
fied as the open requirement estimates at the detailed
level.

Cost Estimates for Work Performed by IGC and/or TP&L
Outside Contractors - IGC/TP&L shall prepare a detailed
breakdown of estimated labor, equipment, and material cost
for each job to be performed through or by IGC/TP&L.  These
cost estimates shall be submitted by IGC/TP&L through
Alcoa's Construction Manager for his review and signature.
Alcoa shall use the estimated IGC labor and equipment
operating and maintenenace costs for committing purposes
into PCS.  Direct materials and rental cost of leased
equipment shall be put into the PCS program as an open
requirement estimate and will not be committed until
purchase orders are written.

The Alcoa Accounting Department shall be responsible
to notify all concerned parties when any specific job,
based on the actual costs incurred, indicates a cost over-
run is likely.  These estimates will then be reviewed by
Alcoa and IGC/TP&L personnel and appropriate changes made
if required.

Exhibit IV-B

(c) <u>IGC Construction Activity Report</u>

IGC shall provide to the Alcoa Construction Manager perti-
nent information concerning construction activities and
manhours expended per week as per the format mutually agreed
upon.

### Section IV - Purchasing

(a) <u>Lignite Facilities</u>

As to the purchasing responsibilities associated with addi-
tions/replacements of Lignite Facilities, both Alcoa and TP&L
and/or its related affiliated company and IGC shall be involved
in a coordinated joint procurement program for materials,
supplies, equipment, machinery, facilities and service require-
ments.  A related Procurement Schedule of Responsibilities has
been prepared by the Alcoa Purchasing Agent, Construction and
Environmental.  Such schedule reflects by Alcoa Lignite
Facilities Account Number Item the corresponding individual
responsibilities for preparation of purchase requisitions,
processing of the purchase requisition, quotation and issuance
of purchase order, and date the specific item is required.
This schedule may be revised or expanded from time to time by
Alcoa through the Project Control System as needed to clarify
responsibilities and insure our obtaining the most economical
arrangements practical.

153

Exhibit IV-B

(b) Common Facilities

Except as provided in Section 4.4 of the Supplemental Agreement, TP&L and/or its affiliated company shall be responsible for all procurement requirements with respect to Common Facilities. After design and scope requirements have been approved by the Common Facilities Construction Committee, TP&L, and/or its affiliated company shall proceed with the procurement and construction of those Common Facilities.

(c) Unit Four

TP&L shall have full responsibility for all procurement requirements with respect to Unit Four.

Section V – Accounting – Alcoa-owned
Common Facilities and Lignite Facilities

(a) Purpose

Pursuant to Section 4(f) of the Sandow Unit Four Agreement, this Section V provides the applicable accounting policies and related procedural guidelines to be utilized for the construction of Alcoa-owned Common Facilities and Lignite Facilities. Costs incurred for same by Alcoa shall, in turn, establish the initial investment basis to be used for calculating the cost of capital and depreciation as defined in Sections 7 and 8 of the Agreement.

154

Exhibit IV-B

(b) Alcoa Financial Status Report

A financial status report which includes a cover letter and a financial status recap and cost report shall be issued on or about the 6th working day each month reflecting the status of additions/replacements for Alcoa-owned Common Facilities and Lignite Facilities, as of the end of the preceding month. Distribution of this report shall be to the concerned personnel reflected in Section I, paragraph (b), "Communication Distribution List" of this Exhibit.

(c) Alcoa Project Chart of Accounts

The Alcoa Project Chart of Accounts system shall be used for controlling and reporting costs for additions or replacements of Alcoa-owned Common Facilities and Lignite Facilities. Applicable Project Chart of Accounts control numbers to apply are covered in Exhibits II-B and II-C to the Supplemental Agreement. The Chart of Accounts system is designed to identify by account number all major items of equipment, buildings, and systems that relate to a specific project. A seven-position alphanumeric account number is utilized to detail the various areas of work included in the project. The first three positions and last three positions of the account number are always numeric. The fourth or middle position is either a letter or a hyphen. For Building Structures, Service Systems and Equipment accounts, the first three positions are

155

Exhibit IV-B

the building number and the fourth position is either a letter
denoting the building suffix, or a hyphen when there is no
building suffix.  The fourth position for Yard Facilities,
Overhead Inventory, Clearing, Suspense, Expense and Contingency
accounts are letters designated as follows:

   Y - Yard Facilities

   X - Overhead

   S - Inventory (Stores & Surplus), (Suspense &
     Clearing)

   E - Expense

   Z - Contingencies

The last three positions of all account numbers are utilized
for the control and detail account positions of the account
number.  The sections on Building & Service System, Equipment,
Yard Facilities, Overhead, and Stores, Suspense & Clearing will
identify these positions.  The following will illustrate the
development of an account number.

## BUILDING & EQUIPMENT ACCOUNTS



## YARD FACILITIES, OVERHEAD, INVENTORY, CLEARING AND EXPENSE ACCOUNTS



Exhibit IV-B

(d) Cash Advancements to TP&L

TP&L and/or its related affiliated company shall submit a written request for advancement of funds which they estimate will be required during the succeeding calendar month for reimbursable costs associated with the additions/ replacements of Alcoa-owned Common Facilities and Lignite Facilities.  Such requests shall be submitted at monthly intervals (or at more frequent intervals if approved by Alcoa) to Alcoa on or before the thirtieth (30th) calendar day each month.  TP&L and/or its related affiliated company shall maintain adequate schedules which project anticipated monthly cash reimbursements which shall be required throughout this development phase of the project.  These advancements are to be cleared by the issuance of detailed invoices as outlined in Section V(e) of this procedure section.

(e) TP&L Monthly Invoice Statements

TP&L and/or its related affiliated company shall submit monthly invoice statements to cover their services rendered during the calendar month for additions/replacements of Alcoa-owned Common Facilities and Lignite Facilities.  These monthly invoice statements shall be submitted to Alcoa on or before the third (3rd) working day of each month.  A related follow-up supplemental detailed schedule shall be submitted to Alcoa on or before the tenth (10th) working day of each month

157

Exhibit IV-B

that provides underlying cost details which support the monthly invoice statements.  Format of invoices and underlying supplemental schedules shall be as mutually agreed upon between Alcoa & TP&L.

(f) Cost Definitions/TP&L Services

Reimbursable costs applicable to services rendered by TP&L and/or its related affiliated company and IGC shall consist of the following:

(i) Direct Labor - Actual payroll costs for those hourly personnel performing work directly associated with a specific construction job and/or construction account number.  It should be noted that for classification labor distribution purposes, this does not include personnel operating equipment which is to be covered under the cost distribution captioned "Equipment Cost".

(ii) Employee Fringe Benefits, Insurance & Taxes - For costing distribution purposes, a composite rate per hour (TP&L and/or its related affiliated company) shall be predicated on the actual total cost of such benefits paid during the previous calendar year.  This billable composite rate shall be adjusted periodically and to actual cost after the end of each calendar year.  Make-up of this account shall consist of but not be limited to items such as applicable employer mandatory payroll taxes, workmen's compensation insurance, employee insurance

158

Exhibit IV-B

benefits, vacations, holidays, savings plan, sick leave, and
retirements.

(iii) <u>Materials and Supplies</u> - Materials and supplies shall
be categorized on the invoice statement as follows:

      A.  Direct Charge

      B.  Stores Issues

Make-up of direct charge total "A" shall be limited to those
items purchased through the petty cash fund (purchases under
$25). All purchase order transactions involving items charge-
able direct to a specific Alcoa account shall not be recognized
on this statement since Alcoa in all cases shall make payment
direct to the concerned vendor of TP&L and/or its related
affiliated company. Stores issues total "B" shall represent
aggregate of items withdrawn from the TP&L and/or its related
affiliated company storeroom inventories.

(iv) <u>Equipment Cost</u> - Equipment cost shall consist of all
associated expenses necessary to operate and maintain both
Alcoa's and contract leased equipment except for the equipment
depreciation as detailed in paragraph IV(i) of this procedure
section. Alcoa shall incur <u>no</u> cost for operating or main-
taining leased equipment if the purchase order states the
lessee provides these services on a manned and maintained
basis. Each item of equipment whether it is leased or owned by
Alcoa shall carry an equipment number. All equipment costs
shall be accumulated by this equipment number. The equipment

Exhibit IV-B

numbers consist of three (3) digits - the first digit signifies the classification of equipment as detailed below and the last two digits are progressively assigned to the equipment within the classification.

| Equipment Number | Classification of Equipment |
|---|---|
| 1XX | Dozers |
| 2XX | Euclid Haulers |
| 3XX | Scrapers & Maintainers |
| 4XX | Maintenance & Other Light Vehicles (Fuel Dept.) |
| 7XX | Heavy Equipment (Leased) |

The monthly supplemental schedule shall show the equipment number, hours worked on construction projects, operating cost, maintenance hours and cost, and total cost.

The operating cost includes the equipment operator's direct labor, fuel, oil, and miscellaneous consumable items. The fuel costs shall be first allocated by the classification of equipment (see classification above) based on a study of historical costs to determine unit rates and then distributed to the individual items of equipment based on the hours worked.

The repair and maintenance costs shall include the Maintenance Department direct labor and the cost of all materials used to repair and maintain the equipment. A detailed list of these materials is to be maintained by IGC.

All operating and repair and maintenance costs shall be accumulated by the equipment number and distributed to the individual projects for which they are assigned.

160

Exhibit IV-B

The fringe benefits, insurance and taxes shall be applicable to the equipment operator's direct labor and the maintenance department direct labor and shall be calculated as defined for "Employee Fringe Benefits, Insurance and Taxes."

(v) Site Management - IGC salaried personnel assigned on a full-time basis to the construction projects, who cannot be charged directly to an item of work, shall be charged to Site Management. There shall be no proration made for personnel working on both construction and operation projects, except for the engineering and design applicable to construction. Charges for construction design and engineering shall be based on actual hours worked. Site management includes the project coordinator, general foreman, engineering, accounting, purchasing, storeroom, and security personnel assigned on a full-time basis.

The monthly supplemental schedule shall show the employee's name, job title, hours worked and a total dollar amount for all employees. The applicable fringe benefits, insurance and taxes shall be calculated as defined for "Employee Fringe Benefits, Insurance and Taxes."

(vi) IGC's Indirect Cost - All indirect costs incurred by IGC, which cannot be charged directly to an item of work, will be charged to Alcoa's suspense account - 996S700. IGC shall furnish Alcoa with an estimate for each item of indirect cost applicable to the current year.

161

Exhibit IV-B

(vii) <u>TP&L Outside Engineering/Contractors</u> - Costs incurred by TP&L through outside engineering and contractor firms for work performance related directly to additions/replacements of Alcoa-owned Common Facilities and Lignite Facilities. All direct associated scope of work items chargeable to the Alcoa account must be clearly identified. As to any general cost distributions covering engineering/contractor fees and/or project overhead, TP&L and Alcoa shall mutually establish for each concerned outside TP&L contract the basis of such general cost distributions to be made between TP&L and Alcoa.

(viii) <u>Miscellaneous Expenses</u> - Any other miscellaneous overhead expenses not enumerated above such as travel expenses, expense accounts, cash vouchers, etc. The applicable supplemental schedule shall show a brief description, reference and corresponding cost for each such item.

(g) <u>Construction Fee</u>

TP&L shall be paid a 3% construction fee on all reimbursable costs as defined in above paragraph (f) except for related item (vii) "TP&L Outside Engineering/Contractors." This fee application does not apply to those TP&L and/or its related affiliated company purchase orders for materials and equipment which are invoiced direct to Alcoa by the concerned vendor. TP&L shall submit a separate invoice monthly when applicable for the construction fee.

162

Exhibit IV-B

(h) Alcoa Construction Equipment Depreciation

A construction equipment usage report shall be submitted by TP&L and/or its related affiliated company to Alcoa on a monthly basis due on the tenth (10th) working day of the following month.  The report shall list all equipment assigned to construction of Alcoa-owned Common Facilities and Lignite Facilities including all Alcoa construction equipment, leased equipment, and existing Alcoa operations equipment used on construction projects.

Alcoa Construction Accounting shall calculate the applicable depreciation each month to be charged to the appropriate detailed Construction Work in Progress accounts.  If the equipment is used entirely on construction projects, 100% of the depreciation shall be charged to construction.  If the equipment, however, is used both for construction and operations, the proration shall be based on the total working hours per month.  The division (construction or operations) assigned with the equipment will stand the depreciation cost for downtime or hours not worked.

(i) Freight & Invoice Approval

The Alcoa Construction Accounting Department shall initiate the payment of all vendors' invoices and freight bills for all receipts on both Alcoa's and TP&L's and/or its related affiliated company's purchase orders for the construction of Alcoa-owned Common Facilities and Lignite Facilities.

163

Exhibit IV-B

TP&L and/or its related affiliated company shall follow Alcoa's established procedure for freight and invoice approval.

(j) <u>Texas Sales and Use Tax</u>

The Alcoa Construction Accounting Department shall ultimately be responsible for the accruing and payment of the Texas State Sales and Use Tax liability on all applicable goods and services that relates to Alcoa and TP&L and/or its related affiliated company purchase orders for the construction of Alcoa-owned Common Facilities and Lignite Facilities.

## Section VI - Accounting - Unit Four

(a) <u>Purpose</u>

Pursuant to Section 4(f) of the Sandow Unit Four Agreement, this Section VI provides the applicable accounting policies and related procedural guidelines to be utilized for the construction of Unit Four and TP&L-owned Common Facilities. Costs incurred for same by TP&L shall, in turn, establish the initial investment basis to be used for calculating the cost of capital and depreciation as defined in section 9 of the Agreement.

(b) <u>TP&L Unit Four Investment Report</u>

TP&L shall provide to Alcoa periodic progress reports on its investment in Unit Four up to the time it becomes commer-

164

Exhibit IV-B

cially operable.  Financial information contained therein shall
be that normally prepared by TP&L for its own internal usage.
Final financial report should reflect investment basis to be
used for calculating the cost of capital and depreciation as
defined in Section 9 of the Agreement.

(c) TP&L Project Chart of Accounts

Accounting procedures by TP&L for Unit Four and its Common
Facilities shall be in accordance with the Federal Energy
Regulatory Commission System of Accounts and will employ Brown
and Root Procedures.  The standard Brown & Root Power Division
procedure for handling Common Facilities on a multi-unit power
plant is to include all common costs in the unit under
construction that is designated as the first to be declared
commercial.  Under standard procedure, Common Facilities for
the Sandow Project would be included with Unit Four.  Due to
the fact that certain Common Facilities will be owned by TP&L
and others owned by Alcoa, the need arises to isolate the cost
of Common Facilities.  To accomodate this need, the Brown &
Root Power Division Unit Cost System will segregate Common
Facility categories into separate units.

          (i)  By applying separate unit indicators, costs
               charged to each Common Facility can be fully
               detailed in the cost account structure:

165

Exhibit IV-B

## Sample Code

$\frac{X}{5}$  $\frac{X}{2}$  $\frac{XXXX}{9815}$  $\frac{XXXXXX}{078120}$  $\frac{XXXX}{0000}$  $\frac{XXX}{078}$

B&R Cost Classification — B&R Engineering

Equipment Number — Not Needed

B&R Engineering Suffix Number — To be assigned

Major Activity Account — B&R Engineering

Area Account — Design Engineering

Cost Indicator — Indirect Costs

Unit Designation — TP&L Co. Owned Facilities — Common

Cost Code Unit Number designations for the power plant and common facilities have been assigned as follows:

Unit 4 — TP&L Co. Owned Facilities — Not Common

Unit 5 — TP&L Co. Owned Facilities — Common

Unit 6 — Alcoa Owned Facilities — Not Common

Unit 7 — Alcoa Owned Facilities — Common

Cost Indicator Number designations for power plant and Common Facilities have been assigned as follows:

0 — Direct Cost
1 — Equipment Cost
2 — Indirect Cost
3 — Extra Work
4 — Back Charges
5 — Spare Parts
8 — Pollution Control Facilities

166

Exhibit IV-B

(ii) Overhead Costs for Engineering will be coded to the respective unit number designation; however, all other Overhead & Indirect Costs (including Fixed Sum) will be accumulated in Unit Four during the course of construction. Prorations of these Overhead Costs to each unit designation (based upon a percentage of Direct Cost) will be furnished as needed.

(d) Cost Definitions/TP&L Construction

Costs incurred by TP&L in constructing Unit Four and improvements, replacements and additions to Common Facilities owned by it shall include pursuant to Section 4 of the Sandow Unit Four Agreement all costs attributable and associated therewith including, without limitation, costs of:

materials, supplies and equipment;

engineers, designers, attorneys, accountants, technical and other consultants;

contractors;

payroll and fringe benefits, relocation and moving expenses, travel and recruiting costs;

construction supervision;

insurance;

temporary construction facilities, offices, utility and other services;

sales, use and other like taxes;

general overhead and administrative expenses.

167

Exhibit IV-B

(e) Alcoa Services/TP&L Unit Four

TP&L may elect from time to time to have Alcoa perform certain work on Common Facilities to be owned by TP&L. Whenever this occurs, TP&L and Alcoa shall determine the manner in which these scope of work items are to be set out in the respective Alcoa contracts. Actual cost incurred for same would be charged to the account of TP&L by Alcoa. An appropriate Alcoa construction overhead application would be applied to TP&L-owned Common Facilities installed by Alcoa in the same manner applied by Alcoa to their own facilities. When such charges are incurred by Alcoa for the account of TP&L, Alcoa shall submit to TP&L a monthly invoice on or before the third (3rd) working day of each month. Format of invoice and underlying supplemental schedules shall be as mutually determined between TP&L and Alcoa.

## Section VII - Warehouse

(a) General

Alcoa has delegated to Industrial Generating Co. (IGC) the responsibilities of operating the necessary construction warehouse facilities that are required in conjunction with the construction of additions/replacements of Alcoa-owned Common Facilities and Lignite Facilities. These construction ware-

Exhibit IV-B

house facilities are to be operated in such a manner to handle all receipts and disbursements of items purchased by Alcoa and IGC for the Alcoa-owned Common Facilities and Lignite Facilities. Alcoa shall provide IGC with the procedures and any subsequent changes thereto to be followed with respect to this warehouse function.

EXHIBIT V-A

SANDOW UNIT FOUR AGREEMENT
SUPPLEMENTAL PROVISIONS-SECTION 5(g)-ENERGY RESERVE ACCOUNT

INDEX

Section                                                              Page

    I  Energy Accounting........................................... 171

   II  Cost of Energy.............................................. 172

  III  Account Balancing and Payments............................. 174

   IV  Definitions................................................ 175

EXHIBIT V-A

SANDOW UNIT FOUR AGREEMENT
SUPPLEMENTAL PROVISIONS—SECTION 5(g)—ENERGY RESERVE ACCOUNT

### Section I – Energy Accounting

Commencing with commercial operation of Unit Four, TP&L
will determine, each hour, the net amount of power and energy
generated by Unit Four.  After allocating 95/545ths of such net
generation to TP&L and after allocating the amount of energy
delivered by TP&L to Alcoa under the provisions of the Sandow
Unit Four Agreement but not to exceed 380,000 kwh [except as
provided in Section 5.3(b) of the Supplemental Agreement], the
remainder of such net generation shall be debited to the Energy
Reserve Account.  If, during any hour, the amount of energy
delivered to Alcoa by TP&L pursuant to the Sandow Unit Four
Agreement shall exceed the amount of energy allocable to Alcoa
from the net generation of Unit Four, the amount of such excess
shall be credited to the Energy Reserve Account.  Such account
shall also be debited or credited, as appropriate, pursuant to
Sections 5(c) and 7(g) of the Sandow Unit Four Agreement.  At
the end of each month, the hourly debits and credits shall be
netted to determine the kwh debit or credit for the month.

171

Exhibit V-A

## Section II - Cost of Energy

(a) Commencing with commercial operation of Unit Four, TP&L will determine:

(i) for each hour that energy is credited to the Energy Reserve Account, the incremental fuel (gas/oil, lignite, etc.) consumed by TP&L in its generating units, other than Unit Four, to generate the amount of energy so credited, with the most expensive fuel or fuels being allocated to the generation of such energy.

(ii) for each hour that energy is debited to such account, the incremental fuel that would have been consumed by TP&L in its generating units, other than Unit Four, to generate the amount of energy so debited, with the most expensive fuel or fuels that would have been so used being allocated to such energy.

(b) If, at the beginning of any calendar month, there is a debit or credit kwh balance in the Energy Reserve Account, such balance will be reduced as provided in Section II(c) hereof or increased as provided herein:

(i) Using the last in-first out method, sufficient hourly debits or credits shall be aggregated to equal the net debit or credit for the month and the incremental fuel associated with such hourly debits or credits shall be aggregated by type of fuel.

172

Exhibit V-A

(ii) The cost of energy with oil or gas as the incremental fuel shall be determined by multiplying such amount of energy (kwh) by cost of fuel (in $/BTU) multiplied by heat rate (BTU/kwh), where:

the cost of gas is the highest cost paid therefor by TP&L during such month;

the cost of oil is the store's cost to TP&L for such month;

the heat rate is the average gas/oil heat rate of TP&L's gas/oil generating units during such month.

(iii) The cost of energy with fuels other than oil or gas as the incremental fuel shall be determined by multiplying such amount of energy (kwh) by the fuel cost (per kwh) for TP&L's highest cost unit for such fuel during such month.

(c) If, for any calendar month, there is a net debit, then such net debit shall be used to offset any net credit balance in the Energy Reserve Account as of the beginning of such month with the net debit being priced at the average cost per kwh of the balance at the beginning of the calendar month. Likewise, a net credit for any month shall be used to offset any net debit balance as of the beginning of such month with the net credit being priced at the average cost per kwh of the balance at the beginning of the month.

173

Exhibit V-A

## Section III - Account Balancing and Payments

The parties will attempt to operate so that the Energy Reserve Account will have a zero kwh balance at the end of each calendar year.  The Operating Committee will review the Energy Reserve Account from time to time and make recommendations for changes in operations of the parties so as to bring such account into a zero kwh balance.  To eliminate a debit balance in such account, TP&L may, from time to time, in its discretion and with the concurrence of Alcoa, deliver power and energy to Alcoa, on an interruptible basis, in excess of 380 MW. Likewise, Alcoa may declare all or a portion of the power and energy to be debited to the Energy Reserve Account (but not to exceed 380 MW without concurrence of TP&L) to be Surplus Energy or request the same to be delivered at other points of delivery pursuant to Section 5(c) of the Sandow Unit Four Agreement. If, however, there is a debit or credit balance at the end of any calendar year, the parties will attempt to bring the account to a zero balance in the next year, but if it appears that such imbalance cannot be corrected in the next year, then, unless the parties otherwise agree, Alcoa shall pay TP&L in the case of a credit balance and TP&L shall pay Alcoa in the case of a debit balance, for the fuel costs recorded as herein provided with respect to such balance.

174

Exhibit V-A

## Section IV - Definitions

"Net generation" as used in this Article shall be gross
generation of Unit Four less station use.  Station use shall
not include power and energy for mining and associated lignite
handling nor for pumping makeup water to the Sandow Station
Lake.

175

EXHIBIT VI-A

SANDOW UNIT FOUR AGREEMENT
SUPPLEMENTAL PROVISION - SECTION 6 - WATER SUPPLY

(a) Contract Terms

Alcoa signed a contract on 1976 August 02 with the Brazos River
Authority to Reserve 5,000 acre-feet of water per year for use
in Sandow Unit Four.

(b) TP&L Payments

At start up of commercial operation of Sandow Unit Four, TP&L
shall reimburse Alcoa for 95/545ths of all sums paid to the
Brazos River Authority under provisions of the above contract.

176

EXHIBIT VII-A

SANDOW UNIT FOUR AGREEMENT
SUPPLEMENTAL PROVISION - SECTION 7 LIGNITE

INDEX

Section                                                    Page

I.   DEFINITIONS

     (a)  Lignite Operations.............................178
          (i).....................................................178
          (ii)....................................................178

     (b)  Lignite Operation Costs......................179
          (i)        Operating Expense.................179
          (ii)       Taxes..............................179
          (iii)      Lignite Royalties.................179
          (iv)       Permit Fees and Expenses.........179
          (v)        Depreciation & Obsolescence.......180
                     of Lignite Facilities
          (vi)       Cost Depletion...................180

     (c)  Lignite Inventories..........................180
          (i)        Power Plant Operating Stockpiles..180
          (ii)       Mine Stockpile...................181
          (iii)      Power Plant Reserve Stockpile.....181

II.  COST OF LIGNITE CONSUMED

     (a).....................................................182
     (b).....................................................182
     (c).....................................................183
     (d).....................................................183

III. OPERATIONS

     (a)  Commencement Date...........................184
     (b)  Operating Report............................185

177

EXHIBIT VII-A

SANDOW UNIT FOUR AGREEMENT
SUPPLEMENTAL PROVISION - SECTION 7 LIGNITE

Section I - Definitions

(a)  <u>Lignite Operations</u>.  "Lignite Operations" include any
and all mining activities including unmined minerals, land,
structures and equipment, prior to and including the
termination point of Lignite Operations, which shall be
defined as the Split Hopper (Building 313) which is fed by
the Number 1 Mine Belt.  The preceding notwithstanding,
Lignite Operations shall also include the stockpiles
defined in subsection (c) below.

Lignite production tonnage shall be determined as follows:

(i)  Lignite delivered to the primary crusher and
weighed on the No. 1 belt Weightometer.  In the event
the No. 1 Belt Weightometer is inoperative, lignite
production weight shall be determined by counting
loads delivered to the crusher and multiplying this by
the average weight per load from the previous month.

(ii) Lignite delivered direct via coal haulers to the
stockpiles .  By using as a basis an agreed upon
average weight per load, this applicable average shall

178

Exhibit VII-A

be multiplied by the number of loads delivered to the stockpiles to arrive at the lignite tonnage that is to be charged to the appropriate lignite inventory account.

(b)  <u>Lignite Operation Costs</u>. "Lignite Operation Costs" shall include but not necessarily be limited to:

(i)  Operating Expense – Operating and maintenance salaries and labor, materials, supplies, services and administrative and general expenses for all Lignite Operations.

Due to the early closing of the records each month, an estimate of the operating expenses to be incurred for the balance of the month shall be made and included in "Lignite Operation Costs."

(ii) Taxes – All taxes other than taxes on income.

(iii) Lignite Royalties – Prepaid Bonus and Annual Delay Rentals.

(iv) Permit fees and expenses.

179

Exhibit VII-A

(v)  Depreciation & Obsolescence of Lignite Facilities
- Depreciation shall be based on the straight line
depreciation methods used by Alcoa for "financial"
purposes.

(vi) Cost Depletion - This account includes the
acquisition cost of lignite "fee" property purchased
by Alcoa as well as acquisition and exploration costs
on leased lignite properties.  A detailed record is
maintained by property tract showing acquisition and
exploration costs and estimated tons of recoverable
lignite.  The acquisition and exploration costs by
tract divided by estimated tons of recoverable lignite
equals cost depletion per ton of lignite.  Lignite
production in tons by tract as reported by the fuel
department, multiplied by cost depletion per ton,
equals the monthly charge to depletion.

(c)  Lignite Inventories.  Alcoa will maintain three
inventory accounts in connection with its fuel production
and accounting procedures.  These inventories are defined
as:

(i)  Power Plant Operating Stockpiles - These are the
operating stockpiles for Units 1-3 and Unit 4 located

Exhibit VII-A

north of the No. 1 Belt Weightometer on the Power
Plant Island.  The inventory value will be a moving
average of the beginning inventory plus lignite
delivered direct to Sandow Units 1-3 and to the
operating stockpiles in a given month, less
consumption in the boilers.

(ii) Mine Stockpile(s) - This is the operating
stockpile located south of the No. 1 Belt Weightometer
and in the mining area.  The mine stockpile inventory
value will be a moving average of the beginning
inventory plus deliveries to the mine stockpile and
less deliveries from the mine stockpile in a given
month.

(iii) Power Plant Reserve Stockpile - There is a
reserve stockpile of lignite located on the Power
Plant Island.  The inventory value shall be a moving
average of the beginning inventory plus any deliveries
to the stockpile in a given month less any lignite
transferred to the Power Plant Operating Stockpiles.

There is another stockpile of lignite beneath the
layer of the Power Plant Reserve Stockpile referred to
above.  This layer is lignite recovered when the

181

Exhibit VII-A

cooling lake was excavated and is of questionable
value. Subsequent to commercial operation of Sandow
Unit Four, the Sandow Operating Committee shall make a
decision with respect to the feasibility of burning in
Sandow Unit Four, the lignite originally mined from
Alcoa Lake. If it is determined feasible to burn said
lignite, its value shall be determined by comparing
BTU content to that of current lignite production,
equating its value to current production costs and for
purposes of charges pursuant to Section 7 of the
Sandow Unit Four Agreement, such quantity and value
shall be deemed to be included in inventory with the
Power Plant Reserve Stockpile.

Section II Cost of Lignite Consumed

(a) "Lignite Operation Costs" as described in Section I(b)
of this Exhibit VII-A will flow through the lignite
inventory accounts. Tons and dollars will be carried in
the lignite inventory accounts.

(b) The reduction of the inventory accounts for lignite
consumed each month will be at a moving average as
determined by the beginning inventory account plus the cost
of mined lignite for the month.

Exhibit VII-A

(c)  Based on laboratory tests, the total BTU's consumed in
Sandow 1-3 and Sandow 4 will be determined for the month.
The cost per BTU will be determined by dividing the total
dollars deducted from the lignite inventory accounts by the
total BTU's consumed.  This unit cost multiplied by the
BTU's consumed in Sandow 1-3 and Sandow 4 will become the
charge to the respective power plants for lignite.

(d)  Due to the fluctuation of costs each month, and to
equalize the charge to the various units, a year-end
adjustment will be made.  An average yearly cost per BTU
will be determined by dividing the total cost of lignite
consumed in Sandow Station by the total BTU's consumed.
This unit cost will then be used to determine what Sandow
1-3 and Sandow 4 lignite costs will be under this method.
The average yearly cost shall be reviewed at least
quarterly and adjusted accordingly for use in calculating
prospective monthly charges so as to minimize the year end
adjustment.  At the close of business each year an
appropriate cost adjustment will be made to Sandow 1-3 and
Sandow 4 respectively.

183

Exhibit VII-A

Section III - Operations

(a)  Commencement Date. In the event the commencement date
for commercial operation of Sandow Unit Four, as defined by
the Operating Committee, does not occur on the first
calendar day of a month, it will be necessary to make a
special one-time calculation of charges to TP&L as provided
in Section 7 of the Sandow Unit Four Agreement.  The
procedure for this special calculation shall be to multiply
the sum of all charges as provided in Section 7(b) of the
Sandow Unit Four Agreement and this Exhibit VII-A, pursuant
to the fraction basis covered in Exhibit IX-A II(b)(1).
The adjusted sums so determined shall be used for
subsequent calculation of charges to TP&L for the
commencement month.

(b)  Operating Report. Lignite Operations (Mine Department)
shall be reflected as a separate cost center in the monthly
Sandow Station Operating Report prepared by TP&L.
Sufficient detailing of the applicable "Lignite Operation
Costs" shall be provided therein.

Exhibit VIII-A

**EXHIBIT VIII-A**
**SANDOW UNIT FOUR AGREEMENT**
**SUPPLEMENTAL PROVISIONS - SECTION 8**
**OPERATION OF THE SANDOW STATION**

## INDEX

SECTION                                                                    PAGE

I.   ADDITIONAL OPERATING FEE

     (a) Definition.............................................. 186
     (b) Incentive Fee - Years 1957-78.......................... 186

II.  OPERATING COSTS

     (a) Direct Assigned........................................ 187
     (b) Administrative and General Expense..................... 188
     (c) Operating Report....................................... 189

III. COMMON FACILITIES

     (a) Definition - Alcoa-Owned Common Facilities............. 189
     (b) Depreciation........................................... 189

IV.  STORES INVENTORIES

     (a) Levels................................................. 190
     (b) Classified Stores Supplies............................. 190
     (c) Direct Charge Stores................................... 191
     (d) Spare Parts............................................ 191

V.   TAXES

     (a) Sales and Use Taxes.................................... 192
     (b) Ad Valorem Taxes - Real and Personal Property.......... 192

VI.  INITIAL OPERATION PERIOD

     (a) Commencement Date...................................... 193
     (b) Operating Costs........................................ 193
     (c) Common Facilities Charge............................... 194

Exhibit VIII-A

EXHIBIT VIII-A
SANDOW UNIT FOUR AGREEMENT
SUPPLEMENTAL PROVISIONS – SECTION 8
OPERATION OF THE SANDOW STATION

## SECTION I.  ADDITIONAL OPERATING FEE

### (a) Definition

Section 8(b) states that Alcoa shall pay TP&L monthly an "Additional Operating Fee" for years after 1978, rather than the annual incentive fee as provided under Section 7 of the 1951 August 29 Operation Contract.  Total incentive fees paid TP&L for the years 1957 through 1978 are listed in Paragraph (b) of this section, and will be used to calculate the "Additional Operating Fee."

### (b) Incentive Fee – Years 1957 – 1978

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1957 | $  85,926.00 | 1968 | $ 133,718.92 |
| 1958 | 165,545.00 | 1969 | 67,038.54 |
| 1959 | 247,494.72 | 1970 | 97,215.70 |
| 1960 | 154,275.97 | 1971 | 197,515.37 |
| 1961 | 198,047.15 | 1972 | 202,297.75 |
| 1962 | 112,509.77 | 1973 | 157,450.00 |

186

Exhibit VIII-A

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1963 | 226,796.38 | 1974 | 76,506.47 |
| 1964 | 251,790.58 | 1975 | -0- |
| 1965 | 285,948.13 | 1976 | -0- |
| 1966 | 219,466.93 | 1977 | -0- |
| 1967 | 10,963.24 | 1978 | |

Average incentive fee x 95% divided by 12 = $10,401.44

Additional operating fee per month (rounded down to the nearest $500.00) = $10,000.00

## SECTION II.   Operating Costs

### (a) Direct Assigned

A separate series of accounts shall be established to accumulate those operating costs such as operating and maintenance labor, salaries and materials that can be logically assigned on a direct use basis.  Those operating expenses that cannot be assigned direct such as plant protection, lab and potable water treatment, janitors, etc. shall be assigned 545/870ths to Sandow Unit Four.

Exhibit VIII-A

## (b) Administrative and General Expenses

Sandow Unit Four Administrative and General Expenses shall include salaries and expenses directly associated with the Unit Four, as well as allocations of general administrative expenses.  Those expenses such as supervisors and engineering are charged direct to the department served.  Applicable employee taxes and related benefits shall be charged to the Unit Four based on payroll dollars.

Salaries and expenses for general administrative services shall be allocated to the various departments on the basis of services rendered.  Prior to January 1 of each year TP&L and Alcoa shall review administrative services and develop an equitable percentage allocation for these services that shall be used to distribute costs during the subsequent year.  This distribution shall include salaries and expenses incurred by Alcoa or by any other party on behalf of Alcoa for the following:

Superintendent and Secretary

Accounting and Warehouse

Purchasing

Personnel

Office Supplies and Expenses

Legal and Outside Services

Property Insurance

Transportation Expense

Miscellaneous Expense

188

Exhibit VIII-A

## (c) Operating Report

Sandow Unit Four shall be shown as a separate department in the monthly Operating Report prepared by TP&L. This referenced report shall be sufficiently detailed to reflect TP&L's and Alcoa's respective shares of Operating Costs due pursuant to the terms of Section 8 of the Sandow Unit Four Agreement and related supplements issued thereto.

## SECTION III.    COMMON FACILITIES

### (a) Definition — Alcoa-Owned Common Facilities

The list of Common Facilities as described in Exhibit II-B to the Supplemental Agreement and as amended from time to time, shall be the basis of calculations that apply to Sections 8 (g) of the Sandow Unit Four Agreement.

### (b) Depreciation

The straight line basis of depreciation used by Alcoa for "financial" purposes shall be used to calculate depreciation on Common Facilities as provided in Section 8 (g)(iii) and (iv) of the Sandow Unit Four Agreement. The depreciation calculations shall be against the facilities specified in (a) above.

Exhibit VIII-A

## SECTION IV.   STORES INVENTORIES

### (a) Levels

Stores inventories are to be maintained at levels consistent with economic procurement and storage practices, while at the same time adequately fulfilling production and maintenance needs for the "Sandow Station." Inventory accounts maintained generally consist of the following:

1. Classified Stores Supplies
2. Direct Charge Stores
3. Spare Parts

### (b) Classified Stores Supplies

Material make-up of this particular "Classified Stores Supplies" inventory account consists of commonly used items such as electrical wire & cable, lubricants, lumber, paint & paint supplies, etc. Since these common type materials maintained in this referenced inventory account are generally used for operation or maintenance both (i) of any one or more of Units One-Three and (ii) for the operation or maintenance of Unit Four, as well as capital improvements to such facilities, title to this inventory investment shall be in the name of Alcoa. The value as of the first day of the current month of the "Classified Stores Supplies" inventory shall be included and reflected

190

Exhibit VIII-A

as a separate item subject to a Cost of Capital calculation under Section 8 of the Sandow Unit Four Agreement.  TP&L's related monthly payment to Alcoa for this item shall be determined by applying 95/870ths of the value as of the first day of the month of this referenced inventory and multiplying this amount by 1.934% to arrive at TP&L's Cost of Capital monthly payment amount.

## (c) Direct Charge Stores

Materials purchased for a specific job (Units One-Three or Unit Four) shall be charged direct to the appropriate operating account number.  A physical inventory account shall be maintained on these direct charge materials until such time as they are physically withdrawn from the storeroom.

## (d) Spare Parts

(1) Spare part requirements for Sandow Unit Four and TP&L owned Common Facilities shall be owned by TP&L.  The net value less depreciation of this spare part inventory shall be included in the cost of capital calculations as provided in Section 9 (b)(i) of the Sandow Unit Four Agreement.

(2) Spare part requirements for Lignite Facilities, Sandow Units One-Three and Alcoa owned Common Facilities shall be owned by Alcoa.  The net inventory value less depreciation of spare parts maintained for Lignite Facilities and Alcoa owned Common Facilities shall be included in cost of capital calculations as respectively provided in Section 7(b)(iv) and Section 8 (g) of the Sandow Unit Four Agreement.

191

Exhibit VIII-A

## SECTION V. TAXES

### (a) Sales and Use Taxes

Sales and use tax accruals covering classified stores supplies, direct charge materials and/or services and spare parts shall be allocated directly to Units One-Three or Four where possible.  The balance of such taxes shall be charged 545/870ths to Unit Four, and 325/870ths to Units One-Three.

The taxes which are charged to Unit Four should subsequently be included in total Unit Four operating costs as provided in Section 8 (f) of the Sandow Unit Four Agreement.

### (b) Ad Valorem Taxes – Real and Personal Property

(1) Ad valorem taxes applicable to Sandow Four and TP&L owned Common Facilities, shall be the responsibility of TP&L and included in the Unit Four operating costs as provided in Section 8 (e) of the Sandow Unit Four Agreement.  Allocation of these costs between Alcoa and TP&L shall be as provided in Section 8 (f) of the Sandow Unit Four Agreement.

(2) Ad valorem taxes applicable to Alcoa-owned Common Facilities shall be Alcoa's responsibility and charged 545/870ths to Unit Four operating costs.

192

Exhibit VIII-A

## SECTION VI. INITIAL OPERATING PERIOD

### (a) Commencement Date

In the event the commencement date for the commercial operation of Sandow Unit Four, as defined by the Operating Committee, does not occur on the first calendar day of a month, it shall be necessary to make a special one-time calculation of charges as provided in Section 8 of the Sandow Unit Four Agreement.

### (b) Operating Costs

Operating wages, maintenance, materials and supplies shall be charged direct to Unit Four effective with date of commercial operation.  Prior to this date, these expenses shall be accumulated as trial operations expenses as defined in Exhibit X-A.  Salaries, administrative and general expenses shall be allocated between trial operations and commercial operations of Unit Four based on the pro rata number of calendar days in the month subsequent to the commercial operation of Unit Four.  The sum of direct and allocated expenses for operation of Unit Four shall be paid as provided in Section 8 (f) of the Sandow Unit Four Agreement.

193

Exhibit VIII-A

## (c) Common Facilities Charge

The Common Facilities charge to TP&L as provided in Section 8 (g) of the
Sandow Unit Four Agreement, shall be adjusted by the fraction determined in
(b) above during the month of commercial operation.

Exhibit IX-A

EXHIBIT IX-A
SANDOW UNIT FOUR AGREEMENT
SUPPLEMENTAL PROVISIONS – SECTION 9
PRICE OF POWER

## INDEX

SECTION                                                                  PAGE

I.   COMMERCIAL OPERATIONS – UNIT FOUR

     (a) Definition.................................................... 196

II.  COMMENCEMENT COMMERCIAL OPERATIONS – PARTIAL MONTH

     (a) Special Calculations........................................ 196
     (b) Fraction Adjustment......................................... 197

Exhibit IX-A

EXHIBIT IX-A

SANDOW UNIT FOUR AGREEMENT

SUPPLEMENTAL PROVISIONS - SECTION 9

PRICE OF POWER

## 1. COMMERCIAL OPERATIONS - UNIT FOUR

### (a) Definition

The Operating Committee has defined start of commercial operations for Unit Four as follows:  "It should be mutually agreed upon by the Operating and Construction Committees as to the specific date at which time the trial operation and testing have been completed.  When the Unit is declared in 'Commercial Operation,' it is to be released to the system dispatcher to be operated at his direction as needed."

## SECTION II.  COMMENCEMENT COMMERCIAL OPERATIONS - PARTIAL MONTH

### (a) Special Calculations

In the event commercial operation of Unit Four as defined by the Operating Committee in Section 1 (a) above commences at any time other than the first calendar day of the month, it will be necessary to make one-time special

Exhibit IX-A

calculations for Alcoa payments to TP&L under Section 9 (a) and (b) of the
Sandow Unit Four Agreement covering:

(1) Inducement fees (If prior to April 1, 1981)

(2) Cost of capital

(3) Depreciation

(b) <u>Fraction Adjustment</u>

(1) The amount to be paid by Alcoa to TP&L shall be determined as follows:
    (Hours remaining in month from start of Commercial Operation divided
    by hours in month) x (Cost of Capital and Depreciation per month) = $.

(2) The amount to be refunded by TP&L to Alcoa shall be determined as
    follows:
    (Hours remaining in month from start of Commercial Operations divided by
    hours in month) x ($980,000 Monthly Inducement Fee) = $.

EXHIBIT X-A
SANDOW UNIT FOUR AGREEMENT
SUPPLEMENTAL PROVISIONS - MISCELLANEOUS

SECTION                          INDEX                        PAGE

I.    TRIAL OPERATIONS

      (a)  Definition...................................199
      (b)  Power Generation.............................199
      (c)  Sale of Power................................200

II.  SPECIAL EXPENDITURES

      (a)  Cost of Capital..............................200
      (b)  Authorization Expenses.......................201
      (c)  Authorization Expense Write-Off by Alcoa..202
      (d)  Subsequent Authorizations...................204
      (e)  Training Expense.............................204
      (f)  Special Lignite Expenses....................205
      (g)  Lignite Authorization Expenses.............206
      (h)  TP&L Election With Respect to Certain
           Capital Expenditures........................207

III.  REPORTS AND ACCESS

      (a)  Unit Four Operating Costs..................208
      (b)  Lignite Costs...............................209

IV.  PAYMENTS

      (a)  Alcoa Payments for Power Purchases.......209
      (b)  TP&L Payments for Lignite Purchases......210
      (c)  One-Time Payments..........................211

## SECTION I.    TRIAL OPERATIONS

(a) Definition

The Operating Committee has defined Trial Operations for Unit Four as follows:

"Trial Operations shall commence when Unit Four is first synchronized with the TP&L transmission system and shall continue until Unit Four is declared 'Commercial'".

It is agreed that all costs, including fuel consumed by Unit Four during trial operations shall be borne by TP&L.  During trial operations the cost of fuel shall be Lignite Operation Costs as defined in Section 7(b)(iii) of the Sandow Unit Four Agreement, as amended by Section 7.2 of the Supplemental Agreement, and costs of Unit Four shall be Unit Four Operating Costs as defined in Section 8(d) of the Sandow Unit Four Agreement.  The costs of trial operations will be charged to the construction costs of Sandow Unit Four.

(b) Power Generation

In the event power generated from Unit Four during Trial Operations is delivered to Alcoa, Alcoa shall pay TP&L for such

199

Exhibit X-A

power based on provisions of the March 17, 1967 Letter
Agreement, as amended, with respect to "Interruptible Power and
Energy".

(c) <u>Sales of Power - Trial Operations</u>

Revenues from the sales of power generated during Trial
Operations to Alcoa pursuant to (b) above shall be credited to
the construction costs of Unit Four.  With respect to sales to
other than Alcoa of power generated during trial operations, a
portion of the revenues equal to the normal costs of
generation, being costs associated with generation at another
generating plant of TP&L using the same fuel, will be credited
to the construction costs of Unit Four.

## SECTION II.  SPECIAL EXPENDITURES

(a) <u>Cost of Capital</u>

The respective Construction Work in Progress account balances
for all completed construction projects of TP&L Common and Unit
Four Facilities and Alcoa's Common and Lignite Facilities
shall, at commercial operation of Unit Four, be added to the
Cost of Capital calculations respectively covered by Sections

Exhibit X-A

7(b)(iv), 8(g) and 9(b).  For construction projects initiated after commercial operation, the respective Construction Work in Progress account balances for a particular project shall be added to the cost of capital calculations as the construction costs are expended.

(b) Authorization Expenses

Alcoa's financial accounting policy differs from TP&L in that certain type expenditures directly associated with construction projects are charged to current expense rather than capitalized.  Such items are identified in (c)(i) and (ii) below.  It is agreed that such items recognized as "Expense" by Alcoa, as identified in (c)(ii) below and any additional authorizations concerning Common Facilities that would be expensed by Alcoa prior to Commercial Operation of Unit Four, shall for purposes of the Sandow Unit Four Agreement be deemed to be capital expenditures and subject to the charges covered in Section 8(g) of the Sandow Unit Four Agreement.  Items recognized as "Expense" by Alcoa and identified in (c)(i) below and any additional authorizations concerning Lignite Facilities that would be expensed by Alcoa prior to Commercial Operation of Unit Four shall be handled as set forth in (g) below.

201

Exhibit X-A

(c) Authorization Expense Write-Off by Alcoa

The authorization expenses recognized by Alcoa are as shown below. Related actual costs as incurred by Alcoa shall be used as the basis for all amortization and cost of capital calculations. In lieu of TP&L reimbursing Alcoa on an amortization basis for the authorization expenses described in (ii), TP&L may, at its election, reimburse Alcoa on a one-time payment basis at the start of commercial operation for its respective share of such authorization expenses and for any such subsequent Alcoa authorizations issued, reimburse Alcoa at the time of physical completion of each such authorization.

In the event TP&L makes a one-time payment as a reimbursement for these authorization expenses, such payment[s] shall be excluded from the TP&L Cost of Capital calculation based under Section 9(b) of the Sandow Unit Four Agreement.

    (i) Lignite Facilities

        Authorization SN-740827 - Two (2) 95 Cu. YD. Draglines

        Expense Items
        Alcoa Account No.
        998E100    Sales and Use Tax

        (Composite book life - 20 years - 240 Months)

Exhibit X-A

Authorization SN-760614 Additional Mining and
Equipment Facilities

| | |
|---|---|
| 998E100 | Sales and Use Tax |
| 200 | Relocation and Removal - Buildings |
| 300 | Relocation and Removal - Equipment |
| 411 | Relocate County Road "A" |
| 412 | Relocate County Road "B" |
| 413 | Relocate Service Lines |
| 414 | Upgrade Haul Roads "C" and "D" |
| 415 | Box Pit Development "F" Area |
| 416 | Walkway for Dragline to South |
| 417 | Relocate Walleye Creek |
| 418 | Quality Control Drillings |
| 419 | Miscellaneous Yard Facilities |
| 421 | Relocate Fence Shop Area |
| 422 | Remove South Conveyor Equipment |
| 900 | Miscellaneous Expense Items |

(Composite book life - 16 years - 192 months)


(ii) Common Facilities


Authorization SO-770211 Sandow Common Facilities


Alcoa Account No.


| | |
|---|---|
| 998E100 | Sales and Use Tax |

203

Exhibit X-A

| 200 | Relocation and Removal – Buildings |
| 300 | Relocation and Removal – Equipment |
| 310 | Relocate Maintenance Shop Building 201 to 217 |
| 400 | Relocation and Removal – Yard Facilities |
| 410 | Relocate Miscellaneous Yard Facilities |
| 430 | Relocate Lake Concession Facilities |
| 900 | Miscellaneous Expense Items |

(Composite book life – 22 years – 264 months)

(d) Subsequent Authorizations

Authorization recognized expenses by Alcoa subsequent to the commencement of the Commercial Operation of Unit Four may be added to the lists found in c(i) and (ii) above by agreement of the Operating Committee.

(e) Training Expense

It is agreed that training expense items recognized as "Expense" by TP&L that would be expensed by TP&L prior to Commercial Operation of Unit Four, shall for purposes of this Agreement be deemed to be capital expenditures and subject to the charges covered in Section 9(b) of the Sandow Unit Four Agreement.

204

Exhibit X-A

Related actual costs as incurred by TP&L shall be used as the basis for all amortization and cost of capital calculations. Such costs shall be amortized on a composite book life over 25 years (300 months) from Commercial Operation. In lieu of Alcoa reimbursing TP&L on an amortization basis for such training expenses, Alcoa may, at its election, reimburse TP&L on a one-time payment basis at the start of commercial operation for its respective share of such training expenses.

In the event Alcoa makes a one-time payment as a reimbursement for these training expenses, such expenses shall be excluded from the TP&L Cost of Capital calculation based under Section 9(b) of the Sandow Unit Four Agreement.

(f) Special Lignite Expenses

(i) Uncovered Lignite in Place

It is recognized that it will be necessary to maintain a larger in-pit inventory of lignite to sustain the operation of Sandow Unit Four. Both parties shall agree to the quantities and costs of additional in-pit lignite inventories. The charge to TP&L shall be 95/545 of the agreed to additional costs.

205

Exhibit X-A

(ii) <u>Prepaid Bonus and Delay Rental</u>

Alcoa has acquired mining leases on various tracts of lignite
properties prior to start of commercial operations — Sandow
Four. It is agreed that TP&L will reimburse Alcoa 95/870 for
all prepaid bonus and delay rental payments made by Alcoa to
acquire these properties.

(iii) <u>Pre-Operating Expense</u>

Alcoa has incurred expenses for employing, equipping and
training an increased work force to sustain lignite operations
for Sandow Unit Four.  The charge to TP&L will be 95/870 of the
agreed additional costs.

(g) <u>Lignite Authorization Expenses</u>

TP&L's share of authorization expenses described in Paragraph
(c)(i) and costs described in Paragraphs (f)(i), (ii) and (iii)
above, together with Alcoa's cost of capital (as set forth in
Section 7(b)(iv), as amended by Section 9(c) of the Sandow Unit
Four Agreement, on the from time to time balance of such costs,
shall be accumulated and amortized over a period of two (2)
years from Commercial Operation of Unit Four.  Each year Alcoa
will estimate the amount necessary to amortize such costs, or

206

Exhibit X-A

the remainder thereof, including the cost of capital, which annual estimate, when divided by the estimated annual consumption of BTU's in Unit Four (which estimate shall be provided by TP&L), shall be an estimated additional cost per BTU to be charged TP&L.  Such estimated cost per BTU shall be reviewed at least quarterly and adjusted accordingly for use in calculating prospective monthly charges so as to minimize adjustments at the end of the period.  At the end of the two-year amortization period, there shall be an adjustment which will charge or credit TP&L for the difference between TP&L's payments for such period and the amount necessary to pay Alcoa for such costs, together with its cost of capital thereon.  Unless otherwise agreed subsequent authorization expenses for Lignite Facilities will be handled similarly over a two-year period after completion of the items to which such costs relate.

(h) TP&L Election With Respect to Certain Capital Expenditures

It is hereby agreed that TP&L may, at its election, reimburse Alcoa on a one-time payment basis at the start of commercial operation for its respective share of the capital expenditures listed below.

207

Exhibit X-A

In the event TP&L does not elect to make such one-time payment said expenditures shall be subject to the Cost of Capital calculation found in Section 8(g) of the Sandow Unit Four Agreement.

In the event TP&L makes a one-time payment for these capital expenditures, such payment shall be excluded from the TP&L Cost of Capital calculation based under Section 9(b) of the Sandow Unit Four Agreement.

The capital expenditures covered by this section are as follows:

| Alcoa Account # | Description |
|---|---|
| 272 | STORM LAKE<br>Provide Storm Lake For Flood Protection Of Potlines #7 and #8 |
| 271 | CONCESSION AREA - ALCOA LAKE<br>Modify & Upgrade Alcoa Lake Concession Area |
| 275 | CONVEYOR NO. 3 EXTENSION & MODIFICATION<br>Extend Conveyor 44 Ft. From South Junction To New Lignite Delivery Point. |
| 268956 | C. L. ROBERTS PROPERTY<br>Purchased land for fuse plug flood corridor |

SECTION III.   REPORTS AND ACCESS

(a) Unit Four Operating Costs

TP&L shall submit monthly to Alcoa such reasonable financial reports of the operation of Sandow Unit Four as Alcoa may from

208

Exhibit X-A

time to time request.  Alcoa shall have access to such records
and other documents relating thereto upon reasonable notice
made by Alcoa.

**(b) Lignite Costs**

Alcoa shall submit monthly to TP&L such reasonable financial
reports of Alcoa's lignite costs including cost depletion,
royalty expense and lignite operation costs as TP&L may from
time to time request.  TP&L shall have access to such records
and other documents relating thereto upon reasonable notice
made by TP&L.

### SECTION IV.  PAYMENTS

**(a) Alcoa Payments for Power Purchases**

   **(i)  Advance Payments - Operating Costs**

   Alcoa shall, upon request, provide TP&L with advance
   payments during the calendar month for Alcoa's share
   of Section 8 Unit Four Operating Costs.  These Alcoa
   advance payments, when made, shall be deducted from
   the total monthly payment due TP&L for Alcoa purchases
   of generated power from Unit Four.

209

Exhibit X-A

## (ii) Payment Due Date

The net balance due TP&L from (a)(i) above plus the applicable amounts from Section 8(b) "Additional Operating Fee" and Section 9(b) "Cost of Capital/Depreciation" shall become due and payable to TP&L within fifteen (15) days after receipt of such statement by Alcoa from TP&L.

## (b) TP&L Payments for Lignite Purchases

## (i) Advance Payments – Lignite Operation Costs

TP&L shall, upon request, provide Alcoa with advance payments during the calendar month for TP&L's share of Section 7 lignite operation costs. Such applicable make-up of costs are as defined in Section 7 of Sandow Unit Four Agreement and Exhibit VII-A to the Supplemental Agreement. These TP&L advance payments, when made, shall be deducted from the monthly payment due Alcoa for TP&L purchases of lignite consumed by Unit Four.

Exhibit X-A

### (ii) Payment Due Date

TP&L's fractional monthly cost of lignite less such
cash advancements made from (b)(i) above plus the
applicable amounts from Section 7(b)(iv) "Cost of
Capital - Lignite Facilities" and Section 8(g) "Cost
of Capital/Depreciation - Alcoa Common Facilities"
shall become due and payable to Alcoa within fifteen
(15) days after receipt of such statement by TP&L from
Alcoa.

### (c) One-Time Payments

In the Sandow Unit Four Agreement, the Supplemental Agreement
and the Exhibits to said agreements, there are specific
provisions concerning one-time payments. Where applicable, any
such one-time payments shall become due and payable within
fifteen (15) days after receipt of the invoice.

211

*28*

# AMENDMENT
## OF
## SUPPLEMENTAL AGREEMENT
### TO
## SANDOW UNIT FOUR AGREEMENT


This Agreement of Amendment is made between Aluminum Company of America, a Pennsylvania corporation (herein called "Alcoa") and Texas Utilities Electric Company, a Texas corporation (herein called "TU Electric"), successor by merger to Texas Power & Light Company,

## W I T N E S S E T H :

Whereas, the parties entered into the Sandow Unit Four Agreement dated August 13, 1976, and the Supplemental Agreement to The Sandow Unit Four Agreement dated March 2, 1981 (herein called the "Supplemental Agreement"); and

Whereas, the parties are desirous of amending the Supplemental Agreement;

NOW THEREFORE, for and in consideration of the undertakings of each to the other herein contained, and intending to be legally bound, the parties hereby amend the Supplemental Agreement as follows:

1.

The first sentence of Section 5.2 (f) is hereby deleted and a new sentence is substituted therefor which reads as follows:

"Amounts due Alcoa under this Article during any calendar month shall be credited against amounts due TU Electric from Alcoa and any excess of the amount so credited over the amount so due shall be paid on the invoice due date. "

2.

Section III of Exhibit V-A is amended by adding, after the fourth sentence thereof, a new sentence which reads as follows:

"In addition, Alcoa may declare any or all of any debit for each month (net of that required to reduce an existing credit balance in the Energy Reserve Account) and all or any part of a debit balance in the Account (but not to exceed the sum of the net debit and the debit balance) as excess energy and dispose of such energy by sale to TU Electric; TU Electric shall first purchase the net debit for the month at the cost of energy as set forth in subparagraph (iv), paragraph (b), Section II of Exhibit V-A, as herein amended, and shall next purchase the energy from the debit balance in the Account declared to be excess energy at the average value of the debit balance of the Account."

3.

Section II, paragraph (b) of Exhibit V-A is amended by deleting subparagraphs (ii) and (iii) thereof and substituting new subparagraphs (ii) and (iii) which read as follows:

"(ii)    The cost of energy credited to the Account with oil or gas as the incremental fuel shall be determined by multiplying such amount of energy (kWh) by the cost of fuel (in $/BTU) multiplied by heat rate (BTU/kWh), where:

the cost of gas is the highest cost paid therefor by TU Electric during such month;

the cost of oil is the store's cost to TU Electric for such month;

the heat rate is the average gas/oil heat rate of TU Electric's gas/oil generating units during such month.

"(iii)    The cost of energy credited to the Account with fuels other than oil or gas as the incremental fuel shall be determined by multiplying such amount of energy (kWh) by the fuel cost (per kWh) for TU Electric's highest cost unit for such fuel during such month ."

4.

Section II, paragraph (b) of Exhibit V-A is amended by addition of a new subparagraph (iv) which reads as follows:

"(iv)    The cost of energy debited to the Account shall be the sum of the following:

(1)    a fraction of operating costs where the numerator is the net debit (in kWh) each month and the denominator is the product of 545,000 multiplied by the number of hours that month.  For such purposes, "operating costs" shall be as defined in Section 5.2 (c) (1) of the Supplemental Agreement.

(2)    fifty percent (50%) of the difference between a fraction of the operating costs as determined under (1) above and the energy costs of the net debit for the month; such costs are:

(A)    the cost of energy with oil or gas as the incremental fuel shall be determined by multiplying such amount of energy (kWh) by the cost of fuel (in $/BTU) multiplied by heat rate (BTU/kWh) where:

the cost of gas is the highest cost paid therefor by TU Electric during such month; the cost of oil is the store's cost to TU Electric for such month;

the heat rate is the average gas/oil heat rate of TU Electric's gas/oil generating units during such month.

(B)    The cost of energy with fuels other than oil or gas as the incremental fuel shall be determined by multiplying such amount of energy (kWh) by the fuel cost (per kWh) for TU Electric's highest cost unit for such fuel during such month."

5.

The parties intend the Supplemental Agreement, as heretofore and hereby amended, to remain in full force and effect.

EXECUTED this __6__ day of __September__ , 1994.

TEXAS UTILITIES ELECTRIC COMPANY

By: __signed by T. L. Baker_____
                                            President

ALUMINUM COMPANY OF AMERICA

By: __signed by Michael Goza_____
                                            President

77833.1 305 1019                          - 3 -

AMENDMENT
OF
SUPPLEMENTAL AGREEMENT
TO
SANDOW UNIT FOUR AGREEMENT

This Agreement of Amendment is made between Aluminum Company of America, a Pennsylvania corporation (herein called "Alcoa") and Texas Utilities Electric Company, a Texas corporation (herein called "TU Electric"), successor by merger to Texas Power & Light Company,

W I T N E S S E T H :

Whereas, the parties entered into the Sandow Unit Four Agreement dated August 13, 1976, and the Supplemental Agreement to The Sandow Unit Four Agreement dated March 2, 1981 (herein called the "Supplemental Agreement"); and

Whereas, the parties are desirous of amending the Supplemental Agreement;

NOW THEREFORE, for and in consideration of the undertakings of each to the other herein contained, and intending to be legally bound, the parties hereby amend the Supplemental Agreement as follows:

1.

The first sentence of Section 5.2 (f) is hereby deleted and a new sentence is substituted therefor which reads as follows:

"Amounts due Alcoa under this Article during any calendar month shall be credited against amounts due TU Electric from Alcoa and any excess of the amount so credited over the amount so due shall be paid on the invoice due date."

2.

Section III of Exhibit V-A is amended by adding, after the fourth sentence thereof, a new sentence which reads as follows:

"In addition, Alcoa may declare any or all of any debit for each month (net of that required to reduce an existing credit balance in the Energy Reserve Account) and all or any part of a debit balance in the Account (but not to exceed the sum of the net debit and the debit balance) as excess energy and dispose of such energy by sale to TU Electric; TU Electric shall first purchase the net debit for the month at the cost of energy as set forth in subparagraph (iv), paragraph (b), Section II of Exhibit V-A, as herein amended, and shall

next purchase the energy from the debit balance in the Account declared to be excess energy at the average value of the debit balance of the Account."

3.

Section II, paragraph (b) of Exhibit V-A is amended by deleting subparagraphs (ii) and (iii) thereof and substituting new subparagraphs (ii) and (iii) which read as follows:

"(ii)    The cost of energy credited to the Account with oil or gas as the incremental fuel shall be determined by multiplying such amount of energy (kWh) by the cost of fuel (in $/BTU) multiplied by heat rate (BTU/kWh), where:

the cost of gas is the highest cost paid therefor by TU Electric during such month;

the cost of oil is the store's cost to TU Electric for such month;

the heat rate is the average gas/oil heat rate of TU Electric's gas/oil generating units during such month.

"(iii)    The cost of energy credited to the Account with fuels other than oil or gas as the incremental fuel shall be determined by multiplying such amount of energy (kWh) by the fuel cost (per kWh) for TU Electric's highest cost unit for such fuel during such month ."

4.

Section II, paragraph (b) of Exhibit V-A is amended by addition of a new subparagraph (iv) which reads as follows:

"(iv)    The cost of energy debited to the Account shall be the sum of the following:

(1)    a fraction of operating costs where the numerator is the net debit (in kWh) each month and the denominator is the product of 545,000 multiplied by the number of hours that month.  For such purposes, "operating costs" shall be as defined in Section 5.2 (c) (1) of the Supplemental Agreement.

(2)    fifty percent (50%) of the difference between a fraction of the operating costs as determined under (1) above and the energy costs of the net debit for the month; such costs are:

(A)    the cost of energy with oil or gas as the incremental fuel shall be determined by multiplying such amount of energy (kWh) by the cost of fuel (in $/BTU) multiplied by heat rate (BTU/kWh) where:

the cost of gas is the highest cost paid therefor by TU Electric during such month; the cost of oil is the store's cost to TU Electric for such month;

the heat rate is the average gas/oil heat rate of TU Electric's gas/oil generating units during such month.

(B)    The cost of energy with fuels other than oil or gas as the incremental fuel shall be determined by multiplying such amount of energy (kWh) by the fuel cost (per kWh) for TU Electric's highest cost unit for such fuel during such month."

5.

The parties intend the Supplemental Agreement, as heretofore and hereby amended, to remain in full force and effect.

EXECUTED this 6 day of September, 1994.

TEXAS UTILITIES ELECTRIC COMPANY

By: _____

Executive Vice  President

ALUMINUM COMPANY OF AMERICA

By: _____

President

40344.1  305  1019                          - 3 -