## EXHIBIT 5

**Amended and Restated Sandow Unit 5 Agreement**

*EXECUTION COPY*

AMENDED AND RESTATED

SANDOW UNIT FIVE AGREEMENT

by and among

TXU SANDOW DEVELOPMENT COMPANY LP

TXU GENERATION COMPANY LP

and

ALCOA INC.

AUGUST 31, 2007

1-LA/942202.4

## TABLE OF CONTENTS

Page

1.  Definitions ................................................................................................................... 3
2.  Transaction ................................................................................................................. 10
3.  Closing ....................................................................................................................... 10
4.  Representations and Warranties ................................................................................ 12
5.  Pre-Closing Covenants of Alcoa ............................................................................... 14
6.  Pre-Closing Covenants of TXU ................................................................................ 14
7.  Conditions to TXU's Obligation To Close ............................................................... 15
8.  Conditions to Alcoa's Obligation To Close ............................................................. 16
9.  Shut Down of Units 1-3 ........................................................................................... 17
10. Design and Construction of Unit 5 ........................................................................... 17
11. Lignite Supply ........................................................................................................... 18
12. [Intentionally Omitted.] ............................................................................................ 18
13. Other Post-Closing Covenants .................................................................................. 18
14. Breach of the Agreement, Events of Default, Remedies, and Limitations on
    Damages. .................................................................................................................... 18
15. Term ........................................................................................................................... 21
16. [Intentionally Omitted.] ............................................................................................ 23
17. Force Majeure and Limitation of Liability ............................................................... 23
18. Change in Law ........................................................................................................... 24
19. Taxes .......................................................................................................................... 25
20. Confidentiality ........................................................................................................... 25
21. Books and Records .................................................................................................... 26
22. Assignment ................................................................................................................ 26
23. Financing .................................................................................................................... 27
24. Notices ........................................................................................................................ 28
25. Waiver ........................................................................................................................ 28
26. Prior Agreements; Merger ......................................................................................... 29
27. Headings ..................................................................................................................... 29
28. Modification ............................................................................................................... 29
29. Severability ................................................................................................................ 29

## TABLE OF CONTENTS
(continued)

30.  Governing Law.................................................................................................29

31.  Winding Up Arrangements ...............................................................................30

32.  No Third Party Beneficiaries............................................................................30

33.  Relationships of Parties....................................................................................30

34.  Counterparts .....................................................................................................30

35.  Back-Up Power Agreement ..............................................................................30

Exhibits

A    Consent Decree Approvals

B    Form of Site Lease

C    Form of Bill of Sale

D    Form of Operating Agreement

E    Form of Common Facilities Agreement

F    Stand-In Power Agreement

G    Form of CPS Agreement

H    Alcoa Operating Permit

I.    Form of Power Purchase Agreement

J.    Energy Holdings Unit 5 Guaranty

1-LA/942302.4

-ii-

## AMENDED AND RESTATED SANDOW UNIT FIVE AGREEMENT

**THIS AMENDED AND RESTATED SANDOW UNIT FIVE AGREEMENT** ("Agreement") is made as of the 31st day of August, 2007 and is effective as of 12:01 AM, local time in Rockdale, Texas, on September 1, 2007, by and among **ALCOA INC.**, a corporation organized under the laws of the Commonwealth of Pennsylvania ("Alcoa"), **TXU SANDOW DEVELOPMENT COMPANY LP**, a Texas limited partnership ("TXU Sandow") and, solely for purposes of <u>Sections 3(c)</u>, <u>3(e)</u>, <u>10</u> and <u>35</u> hereof, **TXU GENERATION COMPANY LP**, a Texas limited partnership ("TXU"). Alcoa, TXU and TXU Sandow are jointly referred to as the "Parties" and individually as a "Party." As the context requires references to "Parties" shall mean Alcoa, on the one hand and TXU and/or TXU Sandow on the other hand.

## BACKGROUND

TXU and Alcoa are parties to that certain Sandow Unit Five Agreement, dated as of December 28, 2006 (the "Original Agreement").

TXU and Alcoa recited the following in the Original Agreement:

"Alcoa owns and operates a smelter complex in Milam County, near Rockdale, Texas and generates some of the electricity for its smelter facility (the "Smelter Facility"), located within such smelter complex, by means of three generating units at the Rockdale facility known as the Sandow Units 1, 2 and 3 ("Units 1-3"). Units 1-3 are a 345 MW gross (325 MW net) generating plant established pursuant to a power contract, dated as of August 29, 1951, as amended (the "Power Contract"), with Texas Power & Light Company ("TP&L").

Units 1-3 were operated by TP&L, acting through its affiliate Texas Utilities Generating Company (Industrial Generating Co., Sandow Division), a predecessor company of TXU, from their construction until 1989, as agent for Alcoa under an operating contract, dated as of August 29, 1951, as amended (the "Operating Contract"). Since 1989, Alcoa has operated Units 1-3.

Alcoa and TP&L entered into the Sandow Unit Four Agreement, dated August 13, 1976 (as amended to date, the "Sandow Unit Four Agreement"), and the Supplemental Agreement to Sandow Unit Four Agreement, dated March 2, 1981 (as amended to date, the "Supplemental Sandow Unit Four Agreement" and together with the Sandow Unit Four Agreement, as each such agreement is amended to date, the "Sandow Unit Four Agreements"). Under the Sandow Unit Four Agreements, TXU owns and operates a 569 net MW generating unit commonly known as Unit 4, within Alcoa's smelter complex in Milam County, Texas ("Unit 4").

In accordance with the terms of the Consent Decree (as defined herein), Alcoa intends to cease operation of Units 1-3.

Alcoa has identified a solid-fuel fired project development opportunity to be situated on additional lands it owns in Milam County, Texas adjacent to its Smelter Facility.

TXU is an Affiliate of TXU Energy Company LLC ("Energy Holdings").

The Parties have been engaged in discussions concerning such project development opportunity and the Parties desire to enter into an agreement for the construction and operation by TXU of a circulating fluidized bed electric generating unit to be known as Unit 5 ("Unit 5" or the "Project"). Unit 5 is anticipated to be a 564 net MW electric generating station, comprised of two boilers and one generator and associated common facilities to be developed, constructed, owned, operated and maintained on a site adjacent to Unit 4.

The Parties desire to enter into this agreement setting forth the terms and conditions pursuant to which, among other things, (i) TXU would develop, construct and own Unit 5, (ii) Alcoa would grant certain easements and lease to TXU certain real property and convey to TXU certain permits and other assets for use in the development, construction and operation of Unit 5, (iii) Alcoa would supply to TXU lignite fuel for use at Unit 5, (iv) Alcoa would purchase from TXU certain power and energy, (v) the Parties would use, operate and maintain certain common facilities in connection with the operation of Unit 4 and/or Unit 5 and (vi) prior to the Commercial Operation of Unit 5, TXU would sell to Alcoa certain power and energy for use at the Smelter Facility."

Concurrent with the execution of the Original Agreement, Energy Holdings executed and delivered to Alcoa a guaranty of TXU's obligations thereunder and such other obligations as set forth therein, a copy of which is attached hereto as Exhibit J (the "Energy Holdings Unit 5 Guaranty").

Concurrent with the execution of the Original Agreement, TXU and Alcoa executed the Stand-In Power Agreement.

Subsequent to the execution of the Original Agreement, TXU Sandow entered into that certain Purchase and Sale Contract, dated April 13, 2007, as amended, with CPS pursuant to which TXU Sandow agreed to purchase CPS' surface, lignite and leasehold interests in the Three Oaks Mine, as defined in Alcoa's operating permits, attached hereto as Exhibit H.

By separate agreements, (i) Alcoa has agreed to sell, and TXU Mining Company LP ("TXU Mining") has agreed to purchase, all assets of the Three Oaks Mine other than the lignite reserves (the "Purchase and Sale Agreement"), (ii) Alcoa and TXU Sandow have agreed to contract mining, reclamation and related activities of the Three Oaks Mine to TXU Mining as set forth in a contract mining agreement (the "Contract Mining Agreement") and (iii) Alcoa and TXU Sandow have entered in an agreement (the "Agreement Regarding Ownership of Lignite Interests"), to establish ownership of the lignite interests in the Three Oaks Mine so that (a) Alcoa would own the lignite reserves for, and pursuant to the Sandow Unit Four Agreement supply lignite to, Unit 4, and (b) TXU Sandow would own lignite reserves for, and pursuant to this Agreement supply lignite to, Unit 5 upon its commissioning.

The Parties desire to amend and restate the Original Agreement to, among other things, provide that Alcoa will be released of its obligation to supply fuel to Unit 5 and that TXU Sandow will be responsible for supplying lignite to Unit 5.

In consideration of the premises and the representations, warranties, covenants and agreements contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows.

## THE AGREEMENT

1.   **Definitions**.  For purposes of this Agreement, in addition to the terms defined elsewhere herein, the following capitalized terms shall have the meanings indicated.

"Action" shall have the meaning set forth in Section 4(c)(ii).

"Affiliate" of any referenced Person means any Person controlled by, any Person that controls, or any Person under common control with, the referenced Person.

"Agreement" shall have the meaning set forth in the preamble hereto.

"Agreement Regarding Ownership of Lignite Interests" shall have the meaning set forth in the Background Section.

"Alcoa" shall have the meaning set forth in the preamble hereto.

"Alcoa Board Approvals" shall have the meaning set forth in Section 8(h).

"Ancillary Agreements" means the Stand-In Power Agreement, the Power Purchase Agreement, the Operating Agreement, the Bill of Sale, the Common Facilities Agreement and the Site Lease.

"Applicable Law" means any federal, state, or local statute, law, municipal charter provision, regulation, ordinance, rule, mandate, judgment, order, decree, permit, code, or license requirement or other governmental requirement, standard, or restriction, or any interpretation or administration of any of the foregoing by any agency, court, or other governmental authority, that applies to the rights or obligations of any Party under this Agreement.

"Back-Up Power Agreement" means that certain Agreement for Back-Up Power and Energy, dated February 9, 1991, between predecessors-in-interest of Alcoa and TXU, as amended to date.

"Basket" shall have the meaning set forth in Section 14(g).

"Basket Claims" shall have the meaning set forth in Section 14(g).

"Bill of Sale" means the Bill of Sale between TXU and Alcoa (or their respective permitted assigns hereunder), substantially in the form of Exhibit C hereto.

"Business Day" means a day on which Federal Reserve member banks in Dallas, Texas are open for business; and a Business Day shall open at 8:00 a.m. and close at 5:00 p.m. local time for each Party's principal place of business.

"Cap Amounts" shall have the meaning set forth in Section 14(h).

"Change in Law" means the enactment, adoption, promulgation, amendment, modification, repeal, or change after the Effective Date of any Applicable Law that would reasonably likely be the major cause of the total cost of production of energy from Unit 5 under this Agreement being higher than the estimated market price for at least the subsequent two-year period.

"Claiming Party" shall have the meaning set forth in the definition of the term "Force Majeure."

"Closing" shall have the meaning set forth in Section 3.

"Commercial Operation" means that, for each day during a continuous three day period, Unit 5 has (a) successfully started, (b) operated for at least six hours at no less than 540 MW hours per hour, and (c) shut down at least once, without resorting to unusual practices or procedures to ensure Unit 5 keeps operating.

"Commercial Operation Date" means the date when Unit 5 has achieved Commercial Operation or such earlier date as specified in writing by TXU.

"Common Facilities" are the facilities (including equipment and structures) needed or used for the operation or maintenance of (1) Unit 5 and any one or more of the Smelter Facility, Units 1-3 and/or Unit 4 and (2) capital improvements, additions and replacements to such facilities which may be made in connection with the construction of Unit 5 or which are made thereafter subject to and in accordance with the terms of the Common Facilities Agreement. A detailed list of items included in Common Facilities is set forth in the Common Facilities Agreement. The term "Common Facilities" does not include Lignite Facilities.

"Common Facilities Agreement" means the Common Facilities Agreement by and among Alcoa and TXU (or their respective permitted assigns hereunder), substantially in the form of Exhibit E hereto.

"Confidential Information" of a designated Person means all information concerning the business and affairs of the Person that has been or hereafter is provided to, disclosed to, or otherwise learned by another designated Person in connection with the transactions contemplated by this Agreement; provided, however, that "Confidential Information" shall not include:

(i)    information that is now or hereafter becomes generally known or available to the public without breach of this Agreement;

(ii)    information that is shown to have been in the recipient's possession prior to the date of this Agreement, and was not subject to a prior agreement of confidence of which the recipient had Knowledge;

(iii)    information which, subsequent to disclosure by the Person, is lawfully obtained or received by the recipient from a third party, without a breach of this Agreement, and without a breach by the third party of another agreement of confidentiality of which the recipient had Knowledge; and

(iv)    information which is developed by the recipient or a third party having no access to and making no use of such Confidential Information.

"Consent Decree" means that certain Consent Decree entered into by, between and among Alcoa Inc., the United States of America, Neighbors for Neighbors, Inc., Environmental Defense, and Public Citizen, Inc., which was entered by the United States District Court for the Western District of Texas, Austin Division on July 28, 2003.

"Consent Decree Approvals" means such modifications to the Consent Decree as set forth in the motion to modify and clarify the Consent Decree in the form filed by Alcoa on June 30, 2006 and attached hereto as Exhibit A.

"Construction Committee" shall have the meaning set forth in Section 10(b).

"Contract Mining Agreement" shall have the meaning set forth in the Background Section.

"Contract Term" shall have the meaning set forth in Section 15.

"CPS" means City Public Service of San Antonio, Texas.

"CPS/TXU Negotiations" means the negotiations between TXU and CPS regarding the potential acquisition by TXU from CPS of the lignite reserves constituting a part of the Lignite Facilities.

"CPS Agreement" means the written amendment to the Lignite Mining Lease and Assignment Agreement between Alcoa and CPS dated as of the 28th day of December, 1998 (the "CPS Lease") that subordinates CPS's rights to lignite under the CPS Lease to any prior commitments previously entered into by Alcoa and incorporated into mining plans by Alcoa for the supply of lignite to itself or third parties, substantially in the form attached hereto as Exhibit G.

"Custody Transfer Point" means the point at which the Lignite is delivered by Alcoa to TXU pursuant to the terms of this Agreement at the transfer tower #1 at the Site.

"Damages" means all losses, damages and expenses incurred by a Non-Defaulting Party as a result of a breach by the Defaulting Party hereunder.

"Defaulting Party" shall have the meaning set forth in Section 14(b).

"Early Termination Date" shall have the meaning set forth in Section 14(c)(ii).

"Effective Date" means December 28, 2006.

"Endorsements" means the usual and customary title policy endorsements available within Milam County, Texas as agreed upon by the Parties.

"Energy" means electric energy of the character commonly known as three-phase, sixty-hertz electric energy.

"Energy Holdings" shall have the meaning set forth in the Background Section.

"Energy Holdings Unit 5 Guaranty" shall have the meaning set forth in the Background Section.

"Environment" means all indoor or outdoor air, surface water, groundwater, surface or subsurface land, including all fish, wildlife, biota and all other natural resources.

"Environmental Action" means any claim, proceeding or other Action brought or threatened in writing under any Environmental Law.

"Environmental Laws" means any and all applicable laws and authorizations issued, promulgated or entered into by any governmental entity relating to the Environment, preservation or reclamation of natural resources, or to the management, handling, use, generation, treatment, storage, transportation, disposal, manufacture, distribution, formulation, packaging, labeling, Release or threatened Release of or exposure to Hazardous Substances, whether now existing or subsequently amended or enacted, including but not limited to: the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. Section 9601 et seq. ("CERCLA"); the Federal Water Pollution Control Act, 33 U.S.C. Section 1251 et seq.; the Clean Air Act, 42 U.S.C. Section 7401 et seq.; the Toxic Substances Control Act, 15 U.S.C. Section 2601 et seq.; the Emergency Planning and Community Right to Know Act of 1986, 42 U.S.C. Section 11001 et seq.; the Safe Drinking Water Act, 42 U.S.C. Section 300(f) et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act 7 U.S.C. Section 136 et seq.; the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. Section 6901 et seq.; the Toxic Substances Control Act, 15 U.S.C. Section 2601 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. Section 2701 et seq.; and any similar or implementing state or local law, and all amendments or regulations promulgated thereunder; and any common law doctrine, including but not limited to, negligence, nuisance, trespass, personal injury, or property damage related to or arising out of the presence, Release, or exposure to Hazardous Substances.

"Environmental Studies" means Phase I and Phase II environmental audits of the Site prepared by BBA, LLC, on behalf of Alcoa and for the benefit of Alcoa and TXU.

"Event of Default" shall have the meaning set forth in Section 14(b).

"Excluded Obligations" shall have the meaning set forth in Section 22(iii).

"Force Majeure" means an event not anticipated as of the Effective Date, which is not within the reasonable control of the Party (or in the case of third party obligations or facilities, the third party) claiming suspension (the "Claiming Party"), and which by the exercise of due diligence the Claiming Party, or third party, is unable to overcome or obtain or cause to be obtained a commercially reasonable substitute therefor. Events of Force Majeure may include, but are not restricted to: acts of God; excessive rain; flood; drought; fire; lightning; explosion; civil disturbance; labor dispute; labor or material shortage; sabotage; action or restraint by court order or public or governmental authority (so long as the Claiming Party has not applied for or assisted in the application for, and has opposed where and to the extent reasonable, such governmental action); damage to or breakdown of necessary facilities or equipment; and reductions or interruptions in service which are mandated by ERCOT. An event of Force Majeure shall not include (a) a change in market conditions or governmental action which affect the cost of TXU's supply of fuel hereunder or which affect TXU's cost of operating Unit 5, (b) any event caused by or resulting from TXU's failure to operate and maintain Unit 5 in accordance with Good

Engineering and Operating Practices, or (c) any event that was caused by the Claiming Party's failure to comply with any Applicable Law. Notwithstanding the foregoing, nothing contained herein shall be construed so as to require either Party to settle any strike or labor dispute in which it may be involved.

"Geotechnical Survey" means the geotechnical survey of the Site prepared by consultants retained by, paid for by, and directed by TXU in its sole discretion.

"Good Engineering and Operating Practices" means the practices, methods and acts generally engaged in or approved by a significant portion of the independent power industry in the United States for similarly situated facilities in the United States that at a particular time, in the exercise of reasonable judgment in light of the facts known or that reasonably should be known at the time a decision is made, would be expected to accomplish the desired result in a manner consistent with law, regulation, reliability, safety, environmental protection, economy and expedition, and taking into consideration the requirements of this Agreement. Good Engineering and Operating Practice is not intended to be limited to optimum practice, method or act, to the exclusion of all others, but rather to include a spectrum of possible practices, methods or acts generally acceptable in the region in light of the circumstances.

"Hazardous Substances" means all explosive or regulated radioactive materials or substances, hazardous or toxic materials, wastes or chemicals, petroleum and petroleum products (including crude oil or any fraction thereof), asbestos or asbestos containing materials, and all other materials, chemicals or substances which are regulated by, form the basis of liability or are defined as hazardous, extremely hazardous, toxic or words of similar import, under any Environmental Law.

"Interest Rate" means, for any date, one percent (1%) over the per annum rate of interest equal to the prime lending rate as may from time to time be published in the Wall Street Journal under "Money Rates"; provided, the Interest Rate shall never exceed the maximum lawful rate permitted by Applicable Law.

"Knowledge" of a natural person means actual (not imputed) knowledge, and "Knowledge" of an organization means actual (not imputed) knowledge of the executive officers (or equivalent) of the organization.

"Lender" means any bank, lender or other financing source that may be used by TXU, directly or indirectly, to finance Unit 5 in connection with, or following, the Closing.

"Lien" means any mortgage, pledge, lien, encumbrance, charge, security interest, restriction (including restrictions on transfer other than general restrictions on transfer imposed by the Securities Act of 1933, as amended and analogous blue sky laws), option, purchase right, contract commitment, claim (legal or equitable) and/or demand, other than (a) mechanic's, materialmen's, and similar statutory liens incurred in the ordinary course of business, with respect to which payment is not delinquent, and (b) liens for taxes not yet due and payable.

"Lignite Facilities" are the lignite properties and leases now or hereafter included within the Three Oaks Mine, as defined in Alcoa's operating permit, attached hereto as Exhibit H, and all

land, structures and equipment used in the mining, transportation, crushing, handling and delivery of lignite exclusively to Unit 4 and Unit 5.

"Non-Defaulting Party" shall have the meaning set forth in Section 14(b)(i).

"Operating Agreement" means the Operating Agreement between Energy Holdings and Alcoa, substantially in the form of Exhibit D hereto, as amended to date.

"Operating Contract" shall have the meaning set forth in the Background Section.

"Original Agreement" shall have the meaning set forth in the Background Section.

"Owner's Title Policy" means a CLTA Extended Coverage Leasehold Owner's Policy, together with any Endorsements thereto requested by TXU.

"Parties" or "Party" shall have the meaning set forth in the preamble hereto.

"Permits" shall have the meaning set forth in Section 3.

"Person" means an individual, a partnership (general or limited), a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a governmental entity (or any department, agency, or political subdivision thereof), or other entity (public or private).

"Power Contract" shall have the meaning set forth in the Background Section.

"Power Purchase Agreement" means the Power Purchase Agreement between TXU and Alcoa, substantially in the form of Exhibit I attached hereto.

"Project" shall have the meaning set forth in the Background Section.

"Project Assets" shall have the meaning set forth in Section 3(a).

"Providing Party" shall have the meaning set forth in Section 20.

"Purchase and Sale Agreement" shall have the meaning set forth in the Background Section.

"Receiving Party" shall have the meaning set forth in Section 20.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of Hazardous Substances into the Environment.

"Remediation Plan" shall have the meaning set forth in Section 7(k).

"Sandow Unit Four Agreement" shall have the meaning set forth in the Background Section.

"Sandow Unit Four Agreements" shall have the meaning set forth in the Background Section.

I-LA/942202.4                                8

"Site" means the real property described in the Site Lease.

"Site Lease" means the Site Lease between Alcoa and TXU (or their respective permitted assigns hereunder) and Energy Holdings (solely for the purposes of Section 14.A of the Site Lease) substantially in the form attached hereto as Exhibit B.

"Smelter Facility" shall have the meaning set forth in the Background Section.

"Stand-In Power Agreement" means the Stand-In Power Agreement between TXU and Alcoa, a copy of which is attached hereto as Exhibit F.

"Step-In Rights" shall have the meaning set forth in Section 14(e).

"Step-In Rights Losses" shall have the meaning set forth in Section 14(e).

"Supplemental Sandow Unit Four Agreement" shall have the meaning set forth in the Background Section.

"Survey" means the surveys for the Site prepared by a licensed Texas surveyor to the most current Minimum Standard Detail Requirements for an ALTA/ACSM Land Title Survey.

"Taxes" means any or all ad valorem, property, occupation, severance, generation, first use, conservation, BTU or energy, transmission, utility, gross receipts, privilege, sales, use, consumption, excise, lease, transaction, and other taxes, governmental charges, licenses, fees, permits and assessments, or increases therein, other than taxes based on net income or net worth.

"Title Company" means American Title Company or any other title insurance company approved by TXU.

"TP&L" shall have the meaning set forth in the Background Section.

"TXU" shall have the meaning set forth in the preamble hereto.

"TXU Board Approvals" shall have the meaning set forth in Section 7(h).

"TXU Capital Investment" shall have the meaning set forth in Section 8(g).

"TXU Mining" shall have the meaning set forth in the Background Section.

"TXU Sandow" shall have the meaning set forth in the preamble hereto.

"Uncapped Claims" shall have the meaning set forth in Section 14(h).

"Unit 4" shall have the meaning set forth in the Background Section and is composed of principally a steam generator, turbine-generator, condenser, boiler feed pumps, feed water heating equipment, electrostatic precipitator, wet limestone scrubber, as well as auxiliary and related equipment necessary for the generation of electricity and the control of emissions. The term "Unit 4" does not include Common Facilities.

"Unit 5" shall have the meaning set forth in the Background Section and will be composed of a steam electric generating unit of approximately 564 MW and related equipment. The term "Unit 5" does not include Common Facilities.

"Units 1-3" shall have the meaning set forth in the Background Section and is composed of three steam electric power generating units and related equipment presently installed in Milam County, Texas and owned by Alcoa. The term "Units 1-3" does not include Common Facilities.

2.    **Transaction.** This Agreement contemplates a transaction in which, among other things and subject to the terms and conditions set forth herein, at Closing, TXU and Alcoa shall enter into (or as applicable, cause their respective Affiliates to enter into) the Bill of Sale, the Common Facilities Agreement, the Site Lease and the Power Purchase Agreement. Prior to the execution of this Agreement, Energy Holdings and Alcoa have entered into the Operating Agreement.

3.    **Closing.** Subject to the provisions of Section 7 and Section 8 below, the closing of the transactions contemplated by this Agreement (the "Closing") shall occur at a mutually agreed to location as soon as practicable and in any event not more than five Business Days following (i) satisfaction or waiver by TXU of the conditions to Closing set forth in Section 7 below, and (ii) satisfaction or waiver by Alcoa of the conditions to Closing set forth in Section 8 below. Closing shall be deemed effective as of 11:59 p.m. on the day immediately prior to the date of the Closing. At Closing:

    (a)    Alcoa and TXU shall execute and deliver the Bill of Sale and take such other necessary action to effect the conveying to TXU, in consideration of TXU entering into the Stand-In Power Agreement and the Power Purchase Agreement and for additional consideration of $1,585,750.00, all of its interest, free and clear of all Liens, in:

        (i)    the existing air permit and any other existing permits and consents for Unit 5, including, without limitation, the Texas Commission for Environmental Quality Amended Permit No. 48437 governing the air emissions from the proposed Project (collectively, the "Permits");

        (ii)    all rights in previous construction work done on the Project, including, without limitation, all of Alcoa's interest in work performed under the Operating Agreement; and

        (iii)    any other existing assets, contracts and rights necessary for the construction, ownership and operation of Unit 5, as mutually agreed upon by the Parties.

All of the items listed in (i), (ii) and (iii) above are collectively referred to as the "Project Assets;"

    (b)    Alcoa and TXU shall execute, deliver and record the Site Lease providing to TXU the land (including easements, rights-of-way, rights of ingress and egress and temporary construction areas but excluding all other Liens) necessary for the construction, ownership and operation of Unit 5;

    (c)    Alcoa and TXU shall execute and deliver and record the Common Facilities Agreement;

1-LA/942302.4                                    10

(d)     Alcoa and TXU Sandow shall execute and deliver, as applicable, the Consent Decree Approvals and, prior to February 2, 2007, Alcoa and Energy Holdings shall have delivered to each other a mutual indemnity, indemnifying and holding harmless each other (and their respective Affiliates) for any and all liabilities each party thereto (and their respective Affiliates) may incur as a result of a breach of the Consent Decree as modified by the Consent Decree Approvals by the actions of the other party thereto (and their respective Affiliates) and providing that, subject to applicable governmental and court approval, either party thereto may assign its obligations and liabilities under the Consent Decree Approvals and such mutual indemnity, and be relieved of all of their obligations and liabilities thereunder, to any Person that assumes all of such obligations and liabilities and has or obtains an investment grade rating on its senior unsecured bonds as determined by at least two (2) rating agencies, one of which must either be Standard & Poor's (at least BBB- (or equivalent)) or Moody's (at least Baa3 (or equivalent)) (or if either one or both are not available, equivalent ratings from alternate rating sources acceptable to the non-assigning party);

(e)     Alcoa shall execute and deliver, and TXU shall execute and deliver, the Power Purchase Agreement;

(f)     Alcoa shall deliver to TXU a closing certificate duly executed by an officer of Alcoa confirming (i) the continued accuracy, as of the Closing, of all of Alcoa's representations and warranties set forth in Section 4 herein, (ii) the performance of all of Alcoa's pre-closing covenants set forth in Section 5 herein, and (iii) the incumbency and authority of the officer(s) executing closing documents on behalf of Alcoa;

(g)     TXU shall deliver to Alcoa a closing certificate duly executed by an officer of TXU confirming (i) the continued accuracy, as of Closing, of all of TXU's representations and warranties set forth in Section 4 herein, (ii) the performance of all of TXU's pre-closing covenants set forth in Section 6 herein, and (iii) the incumbency and authority of the officer(s) executing closing documents on behalf of TXU; and

(h)     Energy Holdings shall deliver to Alcoa a closing certificate duly executed by an officer of Energy Holdings confirming the incumbency and authority of the officer(s) executing the closing documents on behalf of Energy Holdings.

4.     Representations and Warranties.

(a)     Each Party represents and warrants to the other as follows:

(i)     it is duly organized, validly existing and qualified and empowered to conduct its business, and has full corporate or limited liability power and authority to enter into and fully perform and comply with the terms of this Agreement and to the extent a party thereto, the Ancillary Agreements;

(ii)     except as set forth on Schedule 4(a)(ii) hereto, neither the execution and delivery of this Agreement or any Ancillary Agreement to which it is a party, nor the consummation of the transactions contemplated hereby or thereby will materially conflict with or result in the material breach of any contract, agreement, license, instrument or other

arrangement, Applicable Law, or other restriction of any government, governmental agency, or court to which such Party is subject or bound;

(iii)    except as required by the Consent Decree or as set forth on Schedule 4(a)(iii) hereto, it is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order for the Parties to consummate the transactions contemplated by this Agreement;

(iv)    there are no actions or proceedings pending or threatened to liquidate, reorganize, place in bankruptcy or dissolve such Party;

(v)    this Agreement, each Ancillary Agreement to which it is a party, and all other documents required to be executed by such Party in connection with this Agreement, are the valid, legally binding obligations of such Party, enforceable in accordance with their terms, except as such enforceability may be limited by (a) bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting or relating to creditors' rights generally, and (b) the availability of injunctive relief and other equitable remedies; and

(vi)    it has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement or the Ancillary Agreements for which the other Party could become liable or obligated.

(b)    DISCLAIMER. EXCEPT AS AND TO THE EXTENT SET FORTH IN THIS SECTION 4, THE ANCILLARY AGREEMENTS AND IN THE OTHER DOCUMENTS, AGREEMENTS AND INSTRUMENTS DELIVERED IN CONNECTION WITH THIS AGREEMENT OR THE ANCILLARY AGREEMENTS, EACH PARTY MAKES NO OTHER REPRESENTATIONS OR WARRANTIES, AND DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO THE OTHER PARTY.

(c)    Alcoa represents and warrants to TXU as follows:

(i)    Project Assets. (A) Alcoa has good and marketable title to all of the Project Assets, and (B) the Project Assets are free and clear of any Liens, except as set forth on Schedule 4(c)(i)(B) hereto, all of which shall be released prior to the Closing Date.

(ii)    Litigation. There is no action, suit or proceeding, claim, arbitration, litigation or investigation (each, an "Action") pending or threatened in writing to Alcoa, against or affecting Alcoa or its Affiliates that challenges, seeks to prevent, enjoin or otherwise delay, or otherwise could reasonably be expected to have a material adverse effect on, the transactions contemplated by this Agreement or the Ancillary Agreements, including, without limitation, Alcoa's operation of the Lignite Facilities and TXU's design, construction and operation of Unit 5.

(iii)    Permits. Schedule 4(c)(iii) sets forth a list of all Permits to be transferred by Alcoa under this Agreement. The Permits constitute all of the material permits, franchises, approvals and authorizations obtained by Alcoa or its Affiliates in connection with Alcoa's

development of the Project. Except as set forth on Schedule 4(c)(iii), each Permit is in full force and effect, Alcoa and its Affiliates are in compliance in all material respects with all its obligations with respect thereto, and, to the Knowledge of Alcoa, no event has occurred which permits, or with or without the giving of notice or the passage of time or both would permit, the revocation or termination of any Permit. Alcoa has delivered to TXU true, correct and complete copies of all of the Permits, all agreements between Alcoa and CPS relating to the delivery of lignite to CPS from the Lignite Facilities, and the Consent Decree.

(iv)    Environmental. Except as set forth on Schedule 4(c)(iv), to Alcoa's Knowledge, Alcoa and its Affiliates have been, and are currently, in compliance with all Environmental Laws and neither Alcoa nor its Affiliates has received notice alleging that any of Alcoa or its Affiliates is not in such compliance with Environmental Laws, in each case in connection with the Site. Except as set forth on Schedule 4(c)(iv), to Alcoa's Knowledge, there are no past, pending or threatened in writing Environmental Actions against or affecting Alcoa or its Affiliates in connection with the Site. Alcoa has delivered to TXU true, correct and complete copies of the Environmental Studies.

(v)    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, TXU SPECIFICALLY ACKNOWLEDGES THAT ALCOA IS SELLING AND TXU IS PURCHASING THE PROJECT ASSETS ON AN "AS IS, WITH ALL FAULTS" BASIS AND THAT TXU WILL HAVE AND HAS HAD AN OPPORTUNITY TO INSPECT THE PROJECT ASSETS AND IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM ALCOA, ITS AGENTS, OR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE PROJECT ASSETS, INCLUDING BUT NOT LIMITED TO THE DEVELOPMENT POTENTIAL OF THE PROJECT OR THE ECONOMICS OF OPERATING THE PROJECT.

5.    Pre-Closing Covenants of Alcoa. Alcoa shall perform the following covenants between the date of this Agreement and Closing:

(a)    General. Alcoa shall use its commercially reasonable efforts (i) to keep its representations and warranties set forth in Section 4 accurate and complete in all material respects, and (ii) to take all actions and do all other things necessary, proper or advisable in order to satisfy the Closing conditions set forth herein and to consummate the Closing as soon as practicable, including, without limitation, all necessary third party and governmental consents and approvals required in connection with Alcoa's execution, delivery and performance of this Agreement and the Ancillary Agreements, including, without limitation, the Consent Decree Approvals. Alcoa shall use its commercially reasonable efforts to enter into the CPS Agreement with CPS as soon as reasonably practicable after TXU delivers written notice to Alcoa that TXU has ceased the CPS/TXU Negotiations.

(b)    Access; Cooperation. On reasonable prior notice, Alcoa shall permit representatives of TXU to have (i) access to the Site at all reasonable times and (ii) access to the Lignite Facilities at all reasonable times for purposes of TXU's monitoring of the quality and level of lignite reserves therein, in each such case, subject only to Alcoa's standard environmental, health, security and safety procedures. Alcoa shall cooperate with and assist

TXU in obtaining the Geotechnical Survey, the Survey and the Owner's Title Policy, as reasonably requested by TXU. The reasonable third party costs and expenses of obtaining the Survey shall be borne by Alcoa. The third party costs and expenses of the Owner's Title Policy and the Geotechnical Survey shall be borne by TXU;

(c)    Environmental Studies. As soon as reasonably practicable, but in no event later than thirty (30) days after the Effective Date, Alcoa shall, as directed by TXU, cause the Environmental Studies to be completed. The reasonable third party costs and expenses incurred by Alcoa after the Effective Date in respect of completing the Environmental Studies shall be borne by TXU;

(d)    Permits and Consent Decree. Without limiting any other provision of this Section 5, Alcoa shall permit representatives of Energy Holdings to fully participate in all discussions, whether in person, telephonic conferences, via written correspondence or otherwise (collectively, "Discussions") between Alcoa and (i) the Texas Commission for Environmental Quality as such Discussions relate to the Permits, including, without limitation, the transfer and/or modification thereof, and (ii) the Department of Justice and/or other parties to the Consent Decree as such Discussions relate to the Consent Decree. Without limiting the foregoing, Alcoa shall provide Energy Holdings with reasonable advanced notice, but in no event less than two (2) Business Day's prior notice, of any such Discussions concerning the Permits or the Consent Decree.

6.    **Pre-Closing Covenants of TXU**. Between the date of this Agreement and the Closing, TXU shall use its commercially reasonable efforts (i) to keep its representations and warranties set forth in Section 4 accurate and complete in all material respects, and (ii) to take all actions and do all other things necessary, proper or advisable in order to satisfy the Closing conditions set forth herein and to consummate Closing as soon as practicable. In addition, as set forth in the Operating Agreement, TXU shall perform the site preparation work. The reasonable costs and expenses (other than costs and expenses associated with any remediation of any Environmental conditions at the Site) incurred by Alcoa, if any, in connection with such Site preparation work shall be borne or reimbursed by TXU.

7.    **Conditions to TXU's Obligation To Close**. The obligation of TXU to consummate the Closing is subject to satisfaction or, at TXU's sole option, waiver of each of the following conditions precedent:

(a)    The representations and warranties of Alcoa set forth in Section 4 above shall remain accurate and complete at and as of the Closing in all respects material to the transactions contemplated by this Agreement and the Ancillary Agreements, as though made on and as of that date;

(b)    Alcoa shall have performed and complied with all of its pre-closing covenants set forth in Section 5 above;

(c)    There shall not have occurred any material adverse change affecting the Lignite Facilities and/or Alcoa, which would be reasonably likely to materially and adversely affect Alcoa's, TXU's or Energy Holdings' ability to perform its obligations under this Agreement and

1-LA/942202.4                                       14

the Ancillary Agreements to which it will be a party and the transactions contemplated hereby and thereby;

(d)    There shall not be in effect any injunction, judgment, order, decree or administrative ruling preventing consummation or imposing any material adverse consequences upon TXU or any of its Affiliates as a result of the Closing;

(e)    There shall not have been filed by any governmental authority any litigation or administrative proceeding (i) seeking to enjoin the Closing, (ii) seeking to impose any material adverse consequences on TXU or Energy Holdings as a result of the Closing, or (iii) seeking to prevent or materially impair the rights of TXU in its ownership and operation of Unit 5;

(f)    The Survey shall not disclose (i) that the Site is not of sufficient size, location and/or configuration to allow operation and maintenance of Unit 5, (ii) any encroachment of Alcoa's buildings and/or fixtures onto the Site in any manner that would materially and adversely affect the development, construction, ownership or operation of Unit 5, (iii) the location of any road, ditch, right-of-way, superior easement or other encumbrance affecting the Site that, in any case, would materially and adversely affect the development, construction, ownership or operation of Unit 5, or (iv) any other matter that would materially and adversely affect development, construction, ownership or operation of Unit 5;

(g)    The Title Company shall have issued or shall have irrevocably committed itself to issue an Owner's Title Policy in an amount and in form reasonably satisfactory to TXU, dated as of the Closing, insuring TXU as the lessee under the Site Lease and valid easements under the Site Lease and Common Facilities Agreement;

(h)    TXU and its Affiliates shall have obtained all corporate or similar approvals that are necessary or appropriate, as determined by TXU in its sole discretion, in connection with the performance of TXU's obligations under this Agreement and the Ancillary Agreements (collectively, the "TXU Board Approvals");

(i)    TXU and Alcoa shall have obtained the consent and approval of all third parties and governmental authorities required for the execution, delivery and performance of this Agreement and the Ancillary Agreements and for the development, construction, ownership and operation of Unit 5;

(j)    Alcoa shall have received the Consent Decree Approvals;

(k)    The results of the Environmental Studies shall be satisfactory to TXU, in its sole discretion, and Alcoa shall have caused, or set forth a remediation plan (the "Remediation Plan") requiring Alcoa to remediate any Environmental conditions at the Site required under Environmental Law;

(l)    The results of the Geotechnical Survey shall be satisfactory to TXU, in its sole, reasonable discretion;

(m)    Alcoa has performed all of its obligations under the Operating Agreement in all material respects; and

1-LA/942202.4                          15

(n)    The CPS Agreement shall be in full force and effect as of the Closing.

**8.    Conditions to Alcoa's Obligation To Close.** The obligation of Alcoa to consummate the Closing is subject to satisfaction or, at Alcoa's sole option, waiver of each of the following conditions precedent:

(a)    The representations and warranties of TXU set forth in Section 4 above shall remain accurate and complete at and as of the Closing in all respects material to the transactions contemplated by this Agreement and the Ancillary Agreements to which it will be a party, as though made on and as of that date;

(b)    TXU shall have performed and complied with all of its pre-closing covenants set forth in Section 6 above;

(c)    There shall not have occurred any material adverse change affecting TXU or Energy Holdings which would be reasonably likely to materially and adversely affect their ability to perform their obligations under this Agreement, the Ancillary Agreements or the Energy Holdings Unit 5 Guaranty to which they will be a party and the transactions contemplated hereby and thereby;

(d)    There shall not be in effect any injunction, judgment, order, decree or administrative ruling preventing consummation or imposing any material adverse consequences upon Alcoa or any of its Affiliates as a result of the Closing;

(e)    There shall not have been filed by any governmental authority any litigation or administrative proceeding (i) seeking to enjoin the Closing, or (ii) seeking to impose any material adverse consequences on Alcoa as a result of the Closing;

(f)    Alcoa and TXU shall have obtained the consent and approval of all third parties and governmental authorities required for the execution, delivery and performance of this Agreement and the Ancillary Agreements; and

(g)    Energy Holdings has performed all of its obligations under the Operating Agreement in all material respects.

(h)    Alcoa shall have obtained (i) all necessary corporate board approvals (if any) with respect to capital investments in the Lignite Facilities necessary or appropriate in connection with the performance of Alcoa's obligations under this Agreement and the Ancillary Agreements or (ii) all necessary corporate board approvals necessary (if any) for the sale of its interests in the Lignite Facilities to TXU, on mutually agreeable terms and conditions (collectively, the "Alcoa Board Approvals"). Notwithstanding the foregoing, in the event Alcoa shall have obtained neither of the Alcoa Board Approvals prior to February 21, 2007, it shall immediately notify TXU thereof and TXU may in its sole and absolute discretion elect to make such capital investments in the Lignite Facilities as are necessary for Alcoa's performance of its obligations under this Agreement and the Ancillary Agreements (the "TXU Capital Investment"). Any such TXU Capital Investment, if made, shall be for the economic benefit of the Lignite Facilities, Unit 4 and Unit 5 in a manner consistent with the other capital investments of the Parties in connection therewith, and upon TXU's election to make such TXU Capital Investment, if any,

the parties shall cooperate and deal reasonably and in good faith with each other in negotiating, documenting and effecting an amendment to this Agreement to provide the Lignite Facilities, Unit 4 and Unit 5 with the economic benefit of any such TXU Capital Investment in a manner consistent with the other capital investments of the Parties in connection therewith. In the event TXU elects to make the TXU Capital Investment, the conditions precedent set forth in this Section 8(h) shall be deemed to be waived by Alcoa.

9.    **Shut Down of Units 1-3**.  On the earlier of (i) the cessation of operations of Units 1-3 or (ii) August 31, 2007, Alcoa shall convey to TXU, the assets set forth on Schedule 9 and TXU shall deliver to Alcoa the net book value (determined as if Alcoa had continued to use straight-line depreciation over the life of the asset rather than an accelerated depreciation schedule) thereof in consideration therefor. To the extent TXU identifies additional assets used in the operation of Units 1-3 that TXU deems necessary or advisable, in its reasonable judgment, for the operation of Unit 5 the Parties agree to negotiate in good faith the sale and transfer by Alcoa to TXU of such additional assets upon the cessation of operations of Units 1-3 for such consideration as may be mutually agreed upon by the Parties.

10.    **Design and Construction of Unit 5**.

(a)    TXU will, at its cost and expense, design and construct Unit 5 and will provide all necessary and desirable engineering, purchasing, accounting, insurance, construction supervision and management therefor. Taxes as applicable to the performance of this Section 10 will be for TXU's account.

(b)    TXU and Alcoa shall form a construction committee (the "Construction Committee"), comprised of two (2) representatives designated by TXU and two (2) representatives designated by Alcoa. The initial members of the Construction Committee shall be William Lutyies and Alvin Goodman as TXU's representatives and William Smith and Tommy Hodges as Alcoa's representatives. TXU shall provide to the Alcoa representatives on the Construction Committee information relating to the operational characteristics of Unit 5 for such representatives' review prior to finalizing design of Unit 5 and before commencing construction work, provided that such information shall be for informational purposes only and, while Alcoa's input shall be reasonably considered, in no event shall Alcoa or the Alcoa's representatives on the Construction Committee have any approval rights whatsoever regarding the design and construction of Unit 5.

(c)    Prior to the Commercial Operation Date, TXU shall provide the Alcoa representatives on the Construction Committee with periodic progress reports on the design and construction of the Project. TXU shall use commercially reasonable efforts to cause the Commercial Operation of the Project to occur on or prior to December 31, 2008; provided, however, TXU shall not be responsible for any failure of performance by any contractor performing the engineering, procurement and construction of the Project, provided that any delay damages (liquidated or other), net of expenses, actually received by TXU from such EPC contractor shall be shared 79.6% by TXU and 20.4% by Alcoa.

11.  <u>Lignite Supply</u>.

    (a)  All lignite and fuel used in the operation of Unit 5 shall be supplied by TXU Sandow.  Alcoa shall have no obligation to supply any lignite or other fuel for the operation of Unit 5.

    (b)  <u>Weighing, Sampling and Analysis</u>.  TXU will install, own, operate, and maintain a belt scale and sampler system that will be located immediately after the Custody Transfer Point.  Belt scale measurement and laboratory analysis will be used to determine the total BTUs and tons of Lignite delivered to Unit 5.  Belt scale, sampler system, and laboratory analysis methods will adhere to ASTM or NIST standards.  Both Parties agree to make appropriate adjustments if inaccuracies are discovered.  In the event that TXU is no longer the owner or operator of Unit 5, TXU agrees to negotiate in good faith to sell the belt scale and sampler system to Alcoa rather than selling it or assigning it to the new owner and/or operator.

12.  [Intentionally Omitted.]

13.  <u>Other Post-Closing Covenants</u>.

    (a)  <u>Remaking of Representations and Warranties</u>.  Each Party covenants that it will cause its respective representations and warranties in <u>Section 4</u> to remain true and correct throughout the Contract Term.

    (b)  <u>Compliance with Governmental Regulations</u>.  In connection with its performance of its obligations under this Agreement and the Ancillary Agreements, each Party shall use its commercially reasonable efforts to comply with all Applicable Laws, of federal, state and local governmental agencies having regulatory jurisdiction.

    (c)  [Intentionally Omitted.]

    (d)  <u>Remediation Plan</u>.  All remediation to be performed under any Remediation Plan shall be performed by Alcoa, at its sole cost and expense, so as to not materially delay or materially interfere with the Project.

14.  <u>Breach of the Agreement, Events of Default, Remedies, and Limitations on Damages</u>.

    (a)  <u>General</u>.  Neither Party shall hold the other Party (including its corporate Affiliates, parents, subsidiaries, directors, officers, partners, members, managers, employees and agents) liable for any Damages, losses, costs or expenses of any kind or character (including, without limitation, loss of earnings or attorneys' fees) or for damages to property of either Party in any way occurring incident to, arising out of, or in connection with a Party's performance under this Agreement, except as provided in this <u>Section 14</u>.

(b)     Event of Default.  An "Event of Default" shall mean, with respect to a Party alleged to have taken or been affected by any of the actions set forth below in this Section 14(b) (the "Defaulting Party"):

(i)     the failure by the Defaulting Party to make, when due, any payment required under this Agreement if such failure is not remedied within five (5) Business Days after written notice of such failure is given to the Defaulting Party by the other Party ("Non-Defaulting Party"); or

(ii)     any representation or warranty made by the Defaulting Party in this Agreement shall prove to have been false or misleading in any material respect when made and such default is not cured by the Defaulting Party within thirty (30) days after the Defaulting Party is made aware of such default; or

(iii)     [Intentionally Omitted.]

(iv)     the failure by the Defaulting Party to perform any covenant set forth in this Agreement (other than the events that are otherwise specifically covered in this Section 14(b) as a separate Event of Default), and such failure is not excused by Force Majeure or cured within thirty (30) Business Days after written notice thereof to the Defaulting Party; provided, however, if such breach is not capable of being cured within such thirty (30) Business Days and the Defaulting Party is diligently pursuing such cure, such cure period shall be extended up to an additional fifteen (15) Business Days; or

(v)     the Defaulting Party shall:

(A)     make an assignment or any general arrangement for the benefit of creditors;

(B)     file a petition or otherwise commence, authorize or acquiesce in the commencement of a proceeding or cause of action under any bankruptcy or similar law for the protection of creditors, or have such petition filed against it and such petition is not withdrawn or dismissed for thirty (30) days after such filing;

(C)     otherwise become bankrupt or insolvent (however evidenced); or

(D)     be unable to pay its debtors as they fall due.

(c)     Remedies Upon an Event of Default.

(i)     [Intentionally Omitted.]

(ii)     If an Event of Default occurs with respect to a Defaulting Party at any time during the Contract Term, (x) the Defaulting Party shall be liable for any Damages to the Non-Defaulting Party in respect of such Event of Default and (y) the Non-Defaulting Party may, for so long as the Event of Default is continuing, establish a date (which date shall be between thirty (30) and forty (40) Business Days after the Non-Defaulting Party delivers notice) ("Early

Termination Date") on which this Agreement shall terminate if the Event of Default is not cured by such Early Termination Date.

(d)    <u>Notice of Default</u>. Upon the occurrence of any event specified in Sections <u>14(b)(ii)</u>, <u>14(b)(iv)</u> or <u>14(b)(v)</u> which, with the lapse of time would constitute an Event of Default, the Defaulting Party shall promptly, and in no event later than two (2) Business Days after the Defaulting Party becomes or is made aware of such event, notify the other Party, which notice shall specify the nature of the event and the Defaulting Party's plans to cure such event. Upon the occurrence of any event specified in <u>Section 14(b)(i)</u> which, with the lapse of time would constitute an Event of Default, the Non-Defaulting Party shall promptly after such Party becomes or is made aware of such event, notify the Defaulting Party of such event; provided, however, in no event shall a Non-Defaulting Party's failure to so notify have any effect on the provisions set forth in <u>Section 14(b)</u> and <u>Section 14(c)</u>.

(e)    <u>Alcoa Event of Default</u>. In the event Alcoa is the Defaulting Party, then immediately upon Alcoa becoming or being made aware of the occurrence of an Event of Default, Alcoa shall attempt in good faith to cure such Event of Default as promptly as possible. Notwithstanding anything to the contrary contained in this Agreement, (i) if following any Event of Default relating to the Common Facilities, but only with respect to an Event of Default under the Common Facilities Agreement relating to the items set forth on <u>Schedule 14(e)</u>, Alcoa ceases exercising good faith efforts to cure such Event of Default or, in any event fails to cure such Event of Default within forty-five (45) days, or (ii) upon the occurrence of an Event of Default by Alcoa pursuant to <u>Section 14(b)(v)</u> hereof; then, subject to any restrictions imposed by Applicable Law and/or any agreements to which Alcoa is party or is bound, and without relieving Alcoa of any of its obligations hereunder, TXU shall have the right, but not the obligation, to take any and all actions and exercise any and all rights of Alcoa relating to such Common Facilities (such rights, the "Step-In Rights") including, without limitation, access to and control of operations thereof and contractual rights with respect thereto. Upon TXU's exercise of its Step-In Rights hereunder, Alcoa agrees to cooperate with TXU and assist TXU in obtaining any and all governmental and third party approvals and consents, access and information, in each such case necessary or appropriate to permit TXU to fully exercise Alcoa's rights with respect to the operation of such Common Facilities. For purposes of this <u>Section 14(e)</u>, references to Defaulting Party and Event of Default shall be without regard to any cure period otherwise applicable-thereto pursuant to <u>Section 14(b)</u>. Upon exercise of the Step-In Rights, TXU will indemnify, hold harmless and defend Alcoa, its Affiliates, directors, officers, partners, agents and employees from and against any and all loss, liability, damage, cost or expense, including damage and liability for bodily injury to or death of Persons or damage to property of Persons (collectively, "Step-In Rights Losses"), caused by TXU, an Affiliate of TXU or any representative of TXU during its or their exercise of the Step-In Rights, including but not limited to violation of Applicable Laws or for any failure to perform the Step-in Rights in compliance with Applicable Laws or breach or violation of Alcoa's existing contractual obligations to the extent made known to TXU.

(f)    <u>Acknowledgment of Parties</u>. Each Party hereby stipulates that the payment obligations set forth in this <u>Section 14</u> are reasonable in light of the anticipated harm and the difficulty of estimation or calculation of actual damages and each Party hereby waives the right to contest such payments as an unreasonable penalty. In the event that either TXU or Alcoa fails

to pay amounts in accordance with this Section 14 when due, the aggrieved Party shall have the right to exercise its rights under any remedy available at law or in equity to enforce payment of such amount plus interest at the Interest Rate.

(g)    Damages Deductible.  Notwithstanding anything to the contrary contained herein, if the total amount of all claims for Damages which a Non-Defaulting Party has the right to assert against the Defaulting Party under this Agreement, any of the Ancillary Agreements and/or the Energy Holdings Unit 5 Guaranty ("Basket Claims") does not exceed $1,000,000 in a calendar year (the "Basket"), then the Defaulting Party will have no obligation under this Agreement with respect to any such Damages.  If the total amount of all such Basket Claims arising in any calendar year exceeds the Basket then the Defaulting Party's obligations under this Section 14 with respect to such Basket Claims will be limited to the amount by which the aggregate amount of all such Basket Claims exceeds the Basket.

(h)    Limitations on Damages.  Except as provided in this Section 14(h) or as otherwise specifically set forth in any of the Ancillary Agreements or the Energy Holdings Unit 5 Guaranty and notwithstanding any other provision to the contrary contained in this Agreement, any of the Ancillary Agreements or the Energy Holdings Unit 5 Guaranty, each Party's obligations to the other Party with respect to any Damages (except Damages arising from the gross negligence, intentional non-performance of this Agreement, willful misconduct and/or fraud on the part of the Defaulting Party (collectively, the "Uncapped Claims")) shall be limited as follows:  (i) the amount of a Party's obligations with respect to any individual Claim shall in no event exceed Twenty Million Dollars ($20,000,000) and (ii) the aggregate amount of a Party's obligations with respect to all Damages during the Contract Term of this Agreement as well as during the term of any of the Ancillary Agreements or the Energy Holdings Unit 5 Guaranty, except for obligations arising under Sections 14.A(x), 14.A(y), 14.B(v) and 14.B(vii) of the Site Lease, shall in no event exceed Forty-Five Million Dollars ($45,000,000).  The maximum obligations set forth in clauses (i) and (ii) of the preceding sentence are collectively referred to as the "Cap Amounts."  In no event shall a Party's obligations in respect of Uncapped Claims be subject to, or applied against, the Basket or the Cap Amounts.  It is expressly agreed by the Parties that any Damages arising from a failure of Alcoa to comply with the provisions of the first sentence of Section 14(e) of this Agreement shall be deemed to be Uncapped Claims.

15.    Term.  This Agreement will be effective from the date of execution until December 31, 2038 (the "Contract Term") and will continue in effect thereafter unless and until terminated by either Party by written notice given one (1) year in advance of the intended date of termination. The preceding sentence notwithstanding, this Agreement will terminate:

(a)    prior to Closing as follows:

(i)    TXU and Alcoa may terminate this Agreement by mutual written consent at any time;

(ii)    TXU may terminate this Agreement by notice to Alcoa at any time in the event that Alcoa has committed a material breach hereof, and has not cured such breach within five (5) Business Days following notice of such breach by TXU, or if such breach is not capable of being cured within such five (5) Business Days, such cure period shall be extended so long as

Alcoa commences to cure such breach within such five (5) Business Day period and diligently pursues such cure after such five (5) Business Day period; provided that such cure period shall not be extended beyond ten (10) Business Days following notice of such breach;

(iii)    Alcoa may terminate this Agreement by notice to TXU at any time in the event that TXU has committed a material breach hereof, and has not cured such breach within five (5) Business Days following notice of such breach by Alcoa, or if such breach is not capable of being cured within such five (5) Business Days, such cure period shall be extended so long as TXU commences to cure such breach within such five (5) Business Day period and diligently pursues such cure after such five (5) Business Day period; provided that such cure period shall not be extended beyond ten (10) Business Days following notice of such breach;

(iv)    Either Party may terminate this Agreement on February 28, 2007 in the event TXU shall not have obtained the TXU Board Approvals prior to such date;

(v)    Either Party may terminate this Agreement if the Closing has not occurred on or prior to August 31, 2007;

(vi)    TXU may terminate this Agreement in the event Alcoa and CPS shall not have executed the CPS Agreement prior to the date that is sixty (60) days after the date that TXU delivers written notice to Alcoa that TXU has ceased the CPS/TXU Negotiations;

(vii)    TXU may terminate this Agreement in the event Alcoa shall not have received the Consent Decree Approvals on or before March 31, 2007; or

(viii)    Either Party may terminate this Agreement on February 28, 2007, in the event Alcoa shall have obtained neither of the Alcoa Board Approvals prior to February 21, 2007 and, if so, TXU shall not have elected to make the TXU Capital Investment.

(b)    after the Closing as follows:

(i)    TXU may terminate this Agreement at any time in the event TXU determines to cease construction of Unit 5;

(ii)    as otherwise specifically provided in this Agreement; or

(iii)    TXU and Alcoa may terminate this Agreement by mutual written consent at any time.

In the event this Agreement is terminated pursuant to Section 15(a) above, TXU agrees to promptly reconvey to Alcoa all assets previously conveyed by Alcoa to TXU pursuant to Section 9 of this Agreement.

In the event that TXU elects to terminate this Agreement pursuant to Section 15(b)(i) above, TXU agrees to reimburse Alcoa for any costs, expenses or liabilities incurred by Alcoa relating to Alcoa's execution and performance of the CPS Agreement prior to the date of such termination and TXU agrees to reimburse Alcoa, each year thereafter, for any continuing costs, expenses or liabilities incurred by Alcoa, net of any tax benefits realized therefrom, relating to

Alcoa's performance of the CPS Agreement after such termination of this Agreement by TXU. Alcoa agrees to use its good faith efforts to minimize such costs, expenses and/or liabilities.

No termination of this Agreement in accordance with this Section 15 shall relieve a Party of its rights to recover damages (subject to the limitations set forth in Sections 14 and 17 hereof) sustained by such Party as a result of any breach by the other Party of this Agreement or failure to perform hereunder prior to the date of such termination. The provisions set forth in Section 14(a) and Sections 17(b) and 17(c) hereof shall survive any termination of this Agreement.

16.    [Intentionally Omitted.]

17.    Force Majeure and Limitation of Liability.

     (a)    Force Majeure. Except as provided in the following sentence, if either Party is rendered unable by Force Majeure to carry out, in whole or part, its obligations under this Agreement and such Party gives notice and full details of the event to the other Party as soon as practicable after the occurrence of the event, then during the pendency of such Force Majeure but for no longer period, the obligations of the Party affected by the event (other than the obligation to make payments then due or becoming due with respect to performance prior to the event) shall be suspended to the extent required. The Party affected by the Force Majeure shall remedy the Force Majeure with all reasonable dispatch.

     (b)    Limitation of Remedies, Liability and Damages. THE PARTIES CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS AGREEMENT SATISFY THE ESSENTIAL PURPOSES HEREOF. FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS HEREIN PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, THE OBLIGOR'S LIABILITY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. EXCEPT AS PROVIDED IN SECTION 14(f) AND/OR SECTION 20 HEREOF, THE OBLIGOR'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY, SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING, WITHOUT LIMITATION, THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE, TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE LIQUIDATED DAMAGES CONSTITUTE A

REASONABLE APPROXIMATION OF THE HARM OR LOSS. NOTWITHSTANDING THE FOREGOING, THE LIMITATIONS SET FORTH IN THIS <u>SECTION 17(b)</u> SHALL NOT APPLY TO ANY BREACHES OR LIABILITIES OF A PARTY RESULTING FROM SUCH PARTY'S FRAUD OR WILLFUL MISCONDUCT.

(c)    <u>Duty To Mitigate</u>. Each Party agrees that it has a duty to mitigate Damages and covenants that it will use commercially reasonable efforts to minimize any Damages it may incur as a result of the other Party's performance or non-performance of this Agreement.

## 18.    <u>Change in Law</u>.

(a)    <u>Post January 1, 2020</u>.

(i)    At any time after January 1, 2020, if a Party believes that a Change in Law has occurred, then such Party shall provide written notice thereof to the other Party.

(ii)    After receiving such notice, the Parties shall meet at their earliest convenience to negotiate in good faith whether in fact a Change in Law has occurred. If the Parties do not reach an agreement within thirty (30) days after the written notice of a Change in Law, then either Party may ask a court of competent jurisdiction to determine whether or not a Change in Law has occurred.

(iii)    If the Parties agree, or if a court of competent jurisdiction rules, that a Change in Law has occurred, then the Parties shall negotiate in good faith about amendments to this Agreement (and to the Ancillary Agreements, if necessary or appropriate) to resolve or mitigate the impact of the Change in Law. Both TXU and Alcoa must cooperate, and deal reasonably and in good faith, with each other in negotiating, documenting and effecting any amendment arising out of the provisions of this <u>Section 18(a)</u>.

(iv)    If the Parties do not reach agreement on a mutually satisfactory amendment within sixty (60) days after the later of: (A) the Parties having mutually agreed that a Change in Law has occurred, or (B) a court having entered a judgment that a Change in Law has occurred, then (I) TXU may elect to (x) continue to operate Unit 5, in which case it shall terminate this Agreement and the Ancillary Agreements by sending written notice of termination to Alcoa at least one (1) year before the effective date of termination, (y) temporarily shut down Unit 5, in which case the Party's respective obligations under the Ancillary Agreements, will be suspended, by sending written notice of temporary shutdown to the other Party at least one (1) year before the effective date of the temporary shutdown, or (z) permanently retire Unit 5, in which case it shall terminate this Agreement and the Ancillary Agreements by sending written notice of termination to Alcoa at least one (1) year before the effective date of the permanent retirement of Unit 5; or (II) Alcoa may elect to terminate this Agreement and the Ancillary Agreements (other than the Site Lease and the Common Facilities Agreement) by sending written notice of termination to TXU at least one (1) year before the effective date of termination.

(v)    Following a temporary shutdown of Unit 5 as set forth in Section 18(a)(iv), this Agreement and the Ancillary Agreements will not terminate unless and until either this Agreement and the Ancillary Agreements terminate pursuant to their terms or the

Parties agree to end the temporary shutdown upon mutually agreeable terms that reflect the current economics of the relationship between the Parties pursuant to this Agreement and the Ancillary Agreements. If the Parties cannot agree upon terms for ending a temporary shutdown, in the case of a temporary shutdown of Unit 5, TXU may terminate this Agreement and the Ancillary Agreements upon sixty (60) days prior written notice to Alcoa, but in no event earlier than the date that is one (1) year following TXU's delivery of written notice to Alcoa of such temporary shutdown.

(b)     Post 2025. At any time after December 31, 2025, if TXU reasonably determines that the estimated total costs of production of Energy from Unit 5 are higher than the estimated market price therefor for at least the next two-year period, it shall provide written notice thereof to Alcoa, which notice shall include the rationale for TXU's determination. After receiving such notice, the Parties shall negotiate in good faith about determining whether this Agreement (and to the Ancillary Agreements, if necessary or appropriate) can be modified to the mutual satisfaction of the Parties. Both TXU and Alcoa must cooperate, and deal reasonably and in good faith, with each other in negotiating, documenting and effecting any amendment arising out of the provisions of this Section 18(b). If the Parties do not reach agreement on a mutually satisfactory amendment within sixty (60) days after TXU's written notice, then TXU may terminate this Agreement and the Ancillary Agreements by sending written notice of termination to Alcoa at least one (1) year before the effective date of termination.

19.     Taxes. TXU and Alcoa shall each use reasonable efforts to implement the provisions of and to administer this Agreement in accordance with their intent to minimize Taxes, so long as neither Party is materially adversely affected by such efforts. Either Party, upon written request of the other, shall provide a certificate of exemption or other reasonably satisfactory evidence of exemption if either Party is exempt from Taxes, and shall use reasonable efforts to obtain and cooperate with obtaining any exemption from or reduction of Tax.

20.     Confidentiality. Each Party (the "Receiving Party") (i) shall treat and hold as such any Confidential Information regarding the other Party (the "Providing Party") or any of its Affiliates which the Receiving Party receives or has received during the negotiation and performance of this Agreement from the Providing Party, (ii) shall not disclose any such Confidential Information to any third parties (other than to the Receiving Party's employees, attorneys, accountants, Lenders and other representatives who have a need-to-know in connection with this Agreement and the transactions contemplated hereby, and who are under a corresponding duty of confidence to the Receiving Party), and (iii) shall not use such Confidential Information except in connection with this Agreement. Notwithstanding anything to the contrary in the foregoing, the Receiving Party may disclose Confidential Information it is legally required to furnish by subpoena or other legal process or by Applicable Law, including disclosure required by regulatory or other governmental authorities, in which case the Receiving Party will notify the Providing Party prior to making the disclosure, shall use reasonable efforts to limit disclosure and obtain confidential treatment of such Confidential Information from the regulatory or governmental authority. Each Party shall treat the terms of this Agreement, the Ancillary Agreements and the Energy Holdings Unit 5 Guaranty as Confidential Information of the other Party. The Parties agree that monetary damages would not be a sufficient remedy for any breach of this Section 20, and that in addition to all other remedies available to the Providing Party, the

Providing Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach.

21.   <u>Books and Records</u>.  All costs, expenditures, charges and other accounting items referred to in this Agreement, and the schedules, attachments and exhibits to this Agreement will be determined from the books and records of the Party responsible for making such expenditure or calculating such charge (including the books and records of affiliated or subsidiary companies when appropriate so to do) in accordance with U.S. generally accepted accounting principles and with the procedures set forth in this Agreement.  Such determinations will be made by the responsible Party subject to audit by its regular public accounting firm.  In addition, upon reasonable notice, each Party will have access to the other Party's said books and records solely related to the performance of this Agreement.

22.   <u>Assignment</u>.  This Agreement inures to the benefit of and is binding upon the Parties hereto, their successors and assigns, but neither Party may assign this Agreement nor any right or obligation hereunder without the prior written consent of the other, not to be unreasonably withheld, conditioned or delayed, except that without the consent of the other Party:

(i)   Either Party may (A) assign this Agreement or any right or obligation hereunder to a wholly-owned subsidiary of the assignor; (B) transfer, sell, pledge, encumber or assign this Agreement or the accounts, revenues or proceeds hereof in connection with any financing or other financial arrangements provided the assigning Party notifies the other Party of any such assignment at least thirty (30) days prior to such assignment; (C) transfer or assign this Agreement to any Person succeeding to the ownership of Unit 5, in the case of TXU, or to the ownership of the Lignite Facilities (and the Project Assets, if such assignment occurs prior to the Closing), in the case of Alcoa; (D) transfer or assign this Agreement to any Person succeeding to all or substantially all of the assets of such Party, or (E) transfer or assign this Agreement to any Person that has or obtains an investment grade rating on its senior unsecured bonds as determined by at least two (2) rating agencies, one of which must either be Standard & Poor's (at least BBB- (or equivalent)) or Moody's (at least Baa3 (or equivalent)) (or if either one or both are not available, equivalent ratings from alternate rating sources acceptable to the non-assigning Party); provided in the case of (C), (D) and (E) above, the assignee is not principally engaged in the same activities or businesses as the activities or businesses in which the non-assigning Party is principally engaged on the Effective Date.  No such transfer or assignment shall relieve the assigning Party of its obligations and/or liabilities hereunder; provided, however, (x) that an assignment in accordance with clause (C) above shall relieve the assigning Party of all of its obligations and liabilities hereunder, (y) that an assignment in accordance with clause (D) above shall relieve the assigning Party of all of its obligations and liabilities hereunder and (z) that an assignment in accordance with clause (E) above shall relieve the assigning Party of all of its obligations and liabilities hereunder, if, in each such case, the following terms and conditions are met and the assignee thereunder assumes all of the assigning Party's obligations and liabilities hereunder.  The assignments referenced in (x), (y) and (z) above shall relieve the assigning Party of all of its obligations and liabilities hereunder if (i) with respect to (x) and (y), the assignee has or obtains an investment grade rating on its senior unsecured bonds as determined by at least two (2) rating agencies, one of which must either be Standard & Poor's (at least BBB- (or equivalent)) or Moody's (at least Baa3 (or equivalent)) (or if either one or both are not available, equivalent ratings from alternate rating sources acceptable to the non-assigning

Party), and (ii) with respect to (x), (y) and (z), with respect to an assignment by TXU, TXU remains the operator of the Facility, or the assignee or a controlled Affiliate of the assignee (a) operates not less than 2000 MW of electric generating facilities; (b) has a compliance history rating of less than or equal to 3.01 as calculated pursuant to 30 TAC 60; and (c) meets, as an entire organization, the following safety metrics: an Experience Modification Rate (EMR) of less than 1.2; a Lost Work Day Frequency Rate (LWDFR) of less than 2.0; and a Total Recordable Injury Rate of less than 4.5.

        (ii)    TXU may assign this Agreement to Energy Holdings and be relieved of all of its obligations and liabilities hereunder in the event Energy Holdings agrees to assume all of TXU's obligations and liabilities hereunder.

        (iii)    Immediately following the Closing, TXU shall assign this Agreement (except its obligations to enter into and under the Stand-In Power Agreement and the Power Purchase Agreement, its obligations to enter into and under the Common Facilities Agreement (other than the obligations of "TXU Sandow" thereunder) and its obligations under Section 35 of this Agreement (collectively, the "Excluded Obligations") to TXU Sandow and be relieved of all of its obligations and liabilities hereunder (except the Excluded Obligations) in the event TXU Sandow agrees to assume all of TXU's obligations and liabilities hereunder (except the Excluded Obligations).

        (iv)    Either Party may delegate or subcontract to or otherwise cause any or all of its duties hereunder to be discharged by any Affiliate of such Party without consent of the other Party; provided that the delegating or subcontracting Party will remain liable to the other Party as guarantor of the performance of such designee.

**23.**    <u>Financing</u>.  TXU agrees to develop and start construction on the Project without any project-specific financing for this Project.  Each Party (and its Affiliates) will reasonably cooperate with the other Party and its Lenders in connection with any financing arrangements for the Project.  Without limiting the foregoing, Alcoa and TXU acknowledge that this Agreement may be an integral part of the documentation securing the long-term non-recourse financing of the design, construction and operation of Unit 5.  At TXU's request, Alcoa shall agree to amend this Agreement to include any provision which may reasonably be requested by a proposed Lender; provided, however, that such amendment does not impair any of Alcoa's rights under this Agreement, any of the Ancillary Agreements or the Energy Holdings Unit 5 Guaranty or increase the burdens or obligations of Alcoa hereunder or under any of the Ancillary Agreements, including, but not limited to, the price and delivery obligations set forth herein. Upon the request of a proposed Lender, Alcoa agrees to negotiate in good faith and shall execute additional documents, opinions and instruments reasonably requested by a proposed Lender including (i) a consent and agreement that provides an additional reasonable period of time to remedy any TXU Event of Default, and (ii) a legal opinion of counsel for Alcoa affirming the enforceability of this Agreement against Alcoa and other matters reasonably requested, subject to customary exceptions and qualifications.  TXU agrees to pay for or reimburse Alcoa for all of Alcoa's reasonable and documented costs and expenses incurred in cooperating with TXU in accordance with this Section 23, including without limitation, the reasonable costs and expenses of internal or external counsel reviewing any documents that Alcoa is requested to execute.

24.   Notices.  Except as otherwise provided herein, all notices required or permitted to be given under this Agreement must be in writing and addressed to the Party to whom it was sent at the address of such Party set forth below or at such other address as the Party may subsequently designate to the other by notice given in accordance with this Section 24.  Notices shall be delivered by letter, facsimile or other documentary form.  Notice by facsimile or hand delivery shall be deemed to have been received by the close of the Business Day on which it was transmitted or hand delivered (unless transmitted or hand delivered after close in which case it shall be deemed received at the close of the next Business Day).  Notice by overnight mail or courier shall be deemed to have been received one (1) Business Day after it was sent.

        **ALCOA INC.**
        Attention:  Primary Metals
        1200 Riverview Tower
        Knoxville, TN  37902
        Attention: President, Primary Metals
        Facsimile No.:  (865) 594-4754

        with a copy to:

        Alcoa Inc.
        Attention:  Legal Department – Power and Energy Practice Area Leader
        201 Isabella Street
        Pittsburgh, PA 15212
        Facsimile No.:  (412) 553-4064

        **TXU GENERATION COMPANY LP**
        Attention:  General Counsel
        1601 Bryan Street
        Dallas, Texas 75201
        Facsimile No.: (214) 812-6032

        **TXU SANDOW DEVELOPMENT COMPANY LP**
        Attention:  General Counsel
        1601 Bryan Street
        Dallas, Texas 75201
        Facsimile No.: (214) 812-6032

25.   Waiver.  The failure of either Party hereto to enforce at any time any of the provisions of this Agreement or to exercise any right which is herein provided will in no way be construed to be a waiver of such provision in any way to affect the validity of this Agreement or any part thereof or the right of either Party to enforce thereafter each and every such provision and to exercise any such right.  No waiver of any breach of this Agreement will be held to be a waiver of any other or subsequent breach.  Nothing will constitute, or have the effect of, a waiver except an instrument in writing signed by a duly authorized officer or representative of the Party against

whom such waiver is sought to be enforced which expressly, and not impliedly, waives a right or rights under this Agreement.

26.    **Prior Agreements; Merger**.  Except as expressly set forth in Section 35 regarding the Back-Up Power Agreement, the Parties intend for all previous agreements related to Units 1-3 and Unit 4, including but not limited to the Power Contract, the Operating Contract, and the Sandow Unit Four Agreements, all as amended, to remain in full force and effect.  Except for the Purchase and Sale Agreement, the Contract Mining Agreement, the Agreement Regarding Ownership of Lignite Facilities and the agreements contemplated thereby, all understandings and agreements between the Parties regarding Unit 5, whether oral or written, are merged into this Agreement, the Ancillary Agreements and the Energy Holdings Unit 5 Guaranty, which alone fully and completely expresses their understanding and supersedes all prior understandings, agreements, arrangements and representations between the Parties with respect to the Project, including, without limitation, the Original Agreement.  The Parties acknowledge that each Party and its counsel have reviewed and revised this Agreement and that any rule of construction which provides that ambiguities are to be resolved against the drafting party shall not apply to the interpretation of this Agreement.

27.    **Headings**.  The section headings herein are for convenience of reference only and will in no way affect the interpretation of this Agreement or any part hereof.

28.    **Modification**.  This Agreement may not be modified or amended except by a written instrument duly executed by the Parties.

29.    **Severability**.  If any provision of this Agreement or its application to any person or circumstance is adjudged invalid or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement or the application of such provision to other persons or circumstances will not be affected by such adjudication.  If any provision or application of this Agreement is invalid or unenforceable, then a suitable and equitable provision will be substituted for such provision in order to carry out, so far as may be valid and enforceable, the intent and purpose of this Agreement, including the invalid or unenforceable provision.

30.    **Governing Law**.  This Agreement will be construed and governed in accordance with the substantive laws of the State of Texas without giving effect to principles of conflicts of law or choice of law.  The Parties mutually consent to the non-exclusive jurisdiction of the federal and state courts in Dallas County, Texas and Allegheny County, Pennsylvania and agree that any action, suit or proceeding concerning, related to or arising out of this Agreement and the negotiation of this Agreement may be brought in a federal or state court in Dallas County, Texas or Allegheny County, Pennsylvania and the Parties agree that they will not raise any defense or objection or file any motion based on lack of personal jurisdiction, improper venue, inconvenience of the forum or the like in any case filed in a federal or state court in Dallas County, Texas or Allegheny County, Pennsylvania.

31.    **Winding Up Arrangements**.  All confidentiality, indemnity and audit rights shall survive the termination of this Agreement.  All obligations provided in this Agreement shall remain in effect for the purpose of complying herewith.

32.    No Third Party Beneficiaries. Nothing in this Agreement shall provide any benefit to any third party or entitle any third party (other than a third party that is an Indemnified Party hereunder) to any claim, cause of action, remedy or right of any kind, it being the intent of the Parties that this Agreement shall not be construed as a third party beneficiary contract.

33.    Relationships of Parties. The Parties shall not be deemed in a relationship of partners or joint venturers by virtue of this Agreement, nor shall either Party be an agent, representative, trustee or fiduciary of the other. Neither Party shall have any authority to bind the other to any agreement. This Agreement is intended to secure and provide for the services of each Party as an independent contractor.

34.    Counterparts. This Agreement may be executed by TXU, TXU Sandow, and Alcoa in counterparts, each of which will be deemed an original, and all of which together will constitute one and the same instrument.

35.    Back-Up Power Agreement. TXU and Alcoa agree that the Back-Up Power Agreement will terminate upon the shutdown of Units 1-3 (the "Back-Up Power Agreement Termination Date"). The parties agree that, effective on the Back-Up Power Agreement Termination Date, the quantity of PAYBACK under that certain Pay Back Agreement, dated June 11, 1991, between predecessors-in-interest of Alcoa and TXU, as amended to date, shall thereafter be zero.

After the Back-Up Power Agreement terminates until the occurrence of a Smelter Closing Event (as defined in the Power Purchase Agreement), TXU shall have the right, from time to time, to interrupt delivery of power and energy to be furnished to Alcoa pursuant to the Sandow Unit Four Agreements, as set forth in this Section 35. Interruptions of such power and energy may be at the direction of the TXU system dispatcher or by operation of high-set underfrequency relays that will automatically cause an interruption of 75 MWs of Alcoa's Smelter Facility load at a frequency of 59.8 hertz.

TXU may request interruption of no more than a total of the Firm Power Amount (as defined in Section 5(m) of the Sandow Unit Four Agreement dated August 13, 1976, as amended) of load during any rolling 24 hour period. The load resources to be interrupted during the rolling 24 hour period will be selected from two or more blocks of 75 MW. TXU will request load interruption in load blocks within the parameters described above and Alcoa will provide such interruption in quantities equal to or greater than the quantities of load interruption so requested depending on Alcoa's operating conditions. The TXU request as to load quantity and interruption time will be accumulated against the Firm Power Amount rolling 24 hour limitation for that period.

Notwithstanding the foregoing, when Alcoa is operating four (4) or four and one-half (4 ½) potlines, TXU shall have the right, from time to time, to interrupt delivery of power and energy to be furnished Alcoa pursuant to the Sandow Unit Four Agreements, whereby, (a) such interruptions shall not, in any rolling 24 hour period, exceed a total of 190 MWh of load or exceed 75 MWh per hour of power and energy, and (b) the load resources to be interrupted during the rolling 24 hour period will be from two (2) blocks of 75 MW.

At Alcoa's request when it is operating less than four (4) potlines at the Smelter Facility, the Parties will seek to negotiate any necessary changes in this <u>Section 35</u>.

ACCEPTED AND AGREED:

ALCOA INC.

By: _____
Name: James M. Dwyer
Title: Attorney in Fact
Date: August 31, 2007

TXU GENERATION COMPANY LP

By:   TXU Generation Management Company LLC,
      a Delaware limited liability company,
      its general partner

      By: _____
      Name: STEVE KOPENITZ
      Title: SR VICE PRESIDENT
      Date: August 31, 2007

TXU SANDOW DEVELOPMENT COMPANY LP

By:   TXU Sandow Management Company LLC,
      a Delaware limited liability company,
      its general partner

      By: _____
      Name: Michael P. Childers
      Title: President and Chief Executive of Generation Development
      Date: August 31, 2007

[Signature Page to Amended and Restated Sandow Unit Five Agreement]