# EXHIBIT 6

**Agreement Regarding Ownership of Lignite Interests**

*EXECUTION COPY*

## AGREEMENT REGARDING OWNERSHIP OF LIGNITE INTERESTS

This AGREEMENT REGARDING OWNERSHIP OF LIGNITE INTERESTS ("Agreement") is entered into between Alcoa Inc., a corporation organized under the laws of the Commonwealth of Pennsylvania ("Alcoa"), and TXU Sandow Development Company LP, a Texas limited partnership ("TXU Sandow"), as of August 15, 2007.

### RECITALS

Alcoa currently owns or controls 100% of the lignite reserves in the lignite mine located in Lee and Bastrop Counties, Texas, known as the Three Oaks Mine (the "Mine") and more particularly described in Railroad Commission of Texas, Surface Mining and Reclamation Division, Permit No. 48 (the "Mine Permit"), through fee ownership, a lease (the "CPS Lease") with the City of San Antonio, acting through the City Public Service Board of San Antonio, Texas ("CPS Energy"), and other third-party lignite leases.

TXU Sandow, the developer of an electric generating unit called Sandow Unit 5 ("Sandow Unit 5"), has entered into an agreement with CPS Energy to purchase CPS Energy's surface, lignite and leasehold interests in the Mine, subject to the CPS Lease (the "CPS Transaction").

Alcoa is obligated to supply fuel to an electric generating unit called Sandow Unit 4 ("Sandow Unit 4") through its agreements with TXU Generation Company LP ("TXU Generation"), dated August 13, 1976 and March 2, 1981, each as amended (collectively, the "Sandow Unit 4 Agreement").

Alcoa and TXU Generation have entered into that certain Sandow Unit Five Agreement, dated December 28, 2006 ("Sandow Unit 5 Agreement") that provides, among other things, for Alcoa to supply fuel to Sandow Unit 5 when the transaction contemplated by such agreement is consummated.

TXU Sandow desires to undertake and Alcoa desires to be released from its obligation to supply fuel to Sandow Unit 5.

Alcoa and TXU Sandow desire to establish ownership of the lignite interests in the Mine so that (i) Alcoa owns the lignite reserves for, and pursuant to the Sandow Unit 4 Agreement supplies lignite to, Sandow Unit 4, and (ii) TXU Sandow owns lignite reserves for, and pursuant to the Sandow Unit 5 Agreement, will supply lignite to, Sandow Unit 5 upon its commissioning.

By separate agreements, Alcoa has agreed to sell, and TXU Mining Company LP ("TXU Mining") has agreed to purchase, all assets of the Mine other than the lignite reserves as set forth in a purchase and sale agreement (the "Purchase and Sale Agreement"), and Alcoa and TXU Sandow have agreed to contract mining, reclamation and related activities of the Mine to TXU Mining as set forth in a contract mining agreement (the "Contract Mining Agreement").

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements contained in this Agreement, Alcoa and TXU Sandow agree as follows:

## ARTICLE 1
## AGREEMENTS REGARDING OWNERSHIP OF LIGNITE INTERESTS, FUEL SUPPLY AND ROYALTIES

1.1  CPS Lease Assignment. At Closing, Alcoa will assign to TXU Sandow an undivided interest in the lignite subject to the CPS Lease in the form attached hereto as Exhibit A (the "CPS Assignment"). The terms of the CPS Assignment shall provide that TXU Sandow is vested with ownership of an undivided interest in certain lignite in the lands and lignite leases subject to the CPS Lease (such lignite, the "CPS Lignite"), including the right to mine such CPS Lignite pursuant to the CPS Lease. The remaining undivided interest in the CPS Lignite, including, without limitation, the surface rights in such lands (subject to TXU Sandow's right to use the surface for mining its undivided interest in CPS Lignite pursuant to the CPS Lease), will be owned exclusively by Alcoa subject to the CPS Lease. The CPS Assignment will provide that the undivided interest in the CPS Lignite assigned to TXU Sandow will be adjusted annually so that: (i) TXU Sandow's undivided interest in such lands and lignite leases equals the percentage of: (A) the quantity of lignite (expressed in MMBtus) from the Mine that is consumed by Sandow Unit 5 in such year, divided by (B) the aggregate quantity of lignite (expressed in MMBtus) from the Mine that is consumed by both Sandow Unit 4 and Sandow Unit 5 in such year, and (ii) Alcoa's undivided interest in such lands and lignite leases equals the percentage of: (A) the quantity of lignite (expressed in MMBtus) from the Mine that is consumed by Sandow Unit 4 in such year, divided by (B) the aggregate quantity of lignite (expressed in MMBtus) from the Mine that is consumed by both Sandow Unit 4 and Sandow Unit 5 in such year. Under the terms of the CPS Assignment, TXU Sandow will assume a proportional share of the obligations under the CPS Lease in an amount equal to its proportional share of the CPS Lignite (as adjusted from time to time).

1.2  Assignment. At Closing, Alcoa will assign to TXU Sandow an undivided interest in certain third-party lignite leases held or acquired by Alcoa in connection with the Mine in the form attached hereto as Exhibit B (the "Lease Assignment"). The Lease Assignment will assign to TXU Sandow an undivided interest in certain third-party lignite leases held or acquired by Alcoa in connection with the Mine ("Third Party Leases") and will provide that the undivided interest in the Third Party Leases will be adjusted annually so that: (i) TXU Sandow's undivided interest in the lignite under the Third Party Leases equals the percentage of: (A) the quantity of lignite (expressed in MMBtus) from the Mine that is consumed by Sandow Unit 5 in such year, divided by (B) the aggregate quantity of lignite (expressed in MMBtus) from the Mine that is consumed by both Sandow Unit 4 and Sandow Unit 5 in such year, and (ii) Alcoa's undivided interest in the lignite under the Third Party Leases equals the percentage of: (A) the quantity of lignite (expressed in MMBtus) from the Mine that is consumed by Sandow Unit 4 in such year, divided by (B) the aggregate quantity of lignite (expressed in MMBtus) from the Mine that is consumed by both Sandow Unit 4 and Sandow Unit 5 in such year. Under the terms of the Lease Assignment, TXU Sandow will assume a proportional share of the obligations under the Third Party Leases in an amount equal to its proportional share of the lignite in each Third Party Lease (as adjusted from time to time).

1.3  Lignite Lease. At Closing, (x) TXU Sandow and Alcoa will enter into a lignite lease conveying to TXU Sandow all of the lignite in the Mine owned by Alcoa in fee ("Alcoa Fee Lignite") in the form attached hereto as Exhibit C (the "Lignite Lease") and (y) TXU

2

Sandow will assign to Alcoa an undivided interest in the Alcoa Fee Lignite in the form attached hereto as Exhibit D (the "Alcoa Assignment"). The terms of the Alcoa Assignment shall provide that Alcoa is vested with ownership of an undivided interest in certain Alcoa Fee Lignite, including the right to mine such undivided interest in lignite pursuant to the Lignite Lease. The remaining undivided interest in such Alcoa Fee Lignite, including, without limitation, the surface rights in such lands (subject to Alcoa's right to use the surface for mining its undivided interest in lignite pursuant to the Lignite Lease), will be owned exclusively by TXU Sandow subject to the Alcoa Lease. The Alcoa Assignment will provide that the undivided interest in Alcoa Fee Lignite assigned to Alcoa will be adjusted annually so that: (i) TXU Sandow's undivided interest in such lignite equals the percentage of: (A) the quantity of lignite (expressed in MMBtus) from the Mine that is consumed by Sandow Unit 5 in such year, divided by (B) the aggregate quantity of lignite (expressed in MMBtus) from the Mine that is consumed by both Sandow Unit 4 and Sandow Unit 5 in such year, and (ii) Alcoa's undivided interest in such lignite equals the percentage of: (A) the quantity of lignite (expressed in MMBtus) from the Mine that is consumed by Sandow Unit 4 in such year, divided by (B) the aggregate quantity of lignite (expressed in MMBtus) from the Mine that is consumed by both Sandow Unit 4 and Sandow Unit 5 in such year. Under the terms of the Alcoa Assignment, Alcoa will assume a proportional share of the obligations under the Lignite Lease in an amount equal to its proportional share of the Alcoa Fee Lignite (as adjusted from time to time).

**1.4** Amendment to Sandow Unit 5 Agreement. At Closing, the Sandow Unit 5 Agreement, and the agreements executed upon final closing of the transaction contemplated by the Sandow Unit 5 Agreement, will be amended and restated to provide that TXU Generation will be responsible for supplying lignite to Sandow Unit 5. The amendment and restatement will be in the form attached hereto as Exhibit E (the "Sandow 5 Amendment"). If the closing of the transactions contemplated by the Sandow Unit 5 Agreement have not closed on or before the Closing, TXU Sandow and Alcoa will negotiate in good faith any necessary change to the form of Related Agreements to reflect that such transactions have not yet been consummated.

**1.5** Lignite Inventory Agreement. At the Closing, TXU Sandow and Alcoa will enter into an agreement with respect to certain inventory of lignite locate at the Mine. Such agreement will be in the form attached hereto as Exhibit F (the "Lignite Inventory Agreement").

**1.6** Alcoa Fuel Payment. From and following the Closing, TXU Sandow will pay Alcoa $0.0325 per MMBtu for each MMBtu of fuel from the Mine consumed by Sandow Unit 5 (such payments the "Fuel Payments"). Fuel Payments for each month will be paid by TXU Sandow to TXU Mining as a credit to Alcoa's payment obligations under the Contract Mining Agreement. TXU Sandow's obligation to pay Fuel Payments will terminate upon the earlier of (i) the enactment, adoption, promulgation, modification (including written change in interpretation by a governmental entity), or repeal after the date of this Agreement of any applicable law or regulation that completely eliminates the allowance for percentage depletion of lignite or (ii) when lignite is no longer supplied from the Mine to TXU Sandow or its successor for Sandow Unit 5. The amount of the Fuel Payment shall be equitably modified upon the enactment, adoption, promulgation, modification (including written change in interpretation by a governmental entity) or partial repeal after the date of this Agreement of any applicable law or regulation that materially changes, whether positively or negatively, the allowance for percentage depletion of lignite.

1.7     Royalties. TXU Sandow and Alcoa will each bear responsibility for the payment of royalties attributable to their respective lignite ownership in the Mine. Anything to the contrary notwithstanding in the CPS Lease or the CPS Assignment, the Lease Assignment, the Lignite Lease, the Alcoa Assignment, the Sandow 5 Amendment and the Lignite Inventory Agreement (collectively, the "Related Agreements"), so long as TXU Mining is the Contract Miner under the Contract Mining Agreement, TXU Sandow and Alcoa will provide for the payment of the royalties attributable to their respective lignite ownership payable under the CPS Lease or the Related Agreements in the manner specified in the Contract Mining Agreement.

1.8     Inconsistencies. The parties hereto agree that if any inconsistency, ambiguity or conflict exists between the terms set forth in each of Sections 1.1 through 1.7 and the actual terms of any of the Related Agreements, the actual terms and conditions set forth in such amendments, assignments or agreements shall control.

1.9     SAWS Consent. After the execution of this Agreement and prior to Closing, TXU Sandow and Alcoa will mutually agree whether to seek the consent of the San Antonio Water System ("SAWS") with respect to the assignment of the CPS Lease. If TXU Mining incurs any costs related to the failure to obtain the consent of SAWS to assignment of the CPS Lease, then such costs will be passed through the Contract Mining Agreement as Mining Services Costs (as defined therein).

## ARTICLE 2
## CLOSING

2.1     Closing. The closing of the transactions contemplated by this Agreement (the "Closing") will take place at the offices of Hunton & Williams LLP, 1601 Bryan Street, 30th Floor, Dallas, Texas, contemporaneously with and contingent upon the closing of the transactions contemplated by the Purchase and Sale Agreement.

2.2     Documents to be Delivered at Closing. Alcoa and TXU Sandow (or in the case of clause (e) TXU Generation) shall execute and deliver the following documents at Closing:

(a)     The CPS Assignment;

(b)     The Lease Assignment;

(c)     The Lignite Lease;

(d)     The Alcoa Assignment;

(e)     The Sandow 5 Amendment; and

(f)     The Lignite Inventory Agreement.

## ARTICLE 3
## REPRESENTATIONS, WARRANTIES AND COVENANTS

3.1 <u>Representations, Warranties and Covenants of Alcoa</u>. Alcoa represents and warrants and convenants to TXU Sandow as follows:

(a) Alcoa is, and at Closing will be, authorized and permitted to enter into this Agreement and each of the Related Agreements and to perform all covenants and obligations of Alcoa hereunder and thereunder, and Alcoa's right to execute this Agreement and each of the Related Agreements is not limited by any other agreements; (b) the person signing this Agreement and each of the Related Agreements has been authorized by Alcoa to do so; and (c) the execution and delivery of this Agreement and each of the Related Agreements, the consummation of the transactions described therein and compliance with the terms of this Agreement and all of the Related Agreements will not conflict with, or constitute a default under, any agreement to which Alcoa is a party or by which Alcoa is bound, or violate any regulation, law, court order, judgment, or decree applicable to Alcoa.

(b) Alcoa has furnished to TXU Sandow, prior to the date of this Agreement, true, correct and complete copies of the CPS Lease and the Third Party Leases, and each of the CPS Lease and the Third Party Leases is in full force and effect and there exists no material default or circumstance which, with the giving of notice or the passage of time, would constitute a default thereunder. Alcoa agrees not to enter into any amendment, waiver or modification of the CPS Lease or any Third Party Lease prior to Closing.

(c) No consent or approval of, filing with or notice to any third party is required to be obtained or made by Alcoa in connection with any of the transactions contemplated in this Agreement or any of the Related Agreements.

3.2 <u>Representations and Warranties of TXU Sandow</u>. TXU Sandow represents and warrants to Alcoa that: (a) TXU Sandow is, and at Closing will be, authorized and permitted to enter into this Agreement and each of the Related Agreements and to perform all covenants and obligations of TXU Sandow hereunder and thereunder, and TXU Sandow's right to execute this Agreement and each of the Related Agreements is not limited by any other agreements; (b) the person signing this Agreement and each of the Related Agreements has been authorized by TXU Sandow to do so; and (c) the execution and delivery of this Agreement and each of the Related Agreements, the consummation of the transactions described therein and compliance with the terms of this Agreement and all of the Related Agreements will not conflict with, or constitute a default under, any agreement to which TXU Sandow is a party or by which TXU Sandow is bound, or violate any regulation, law, court order, judgment, or decree applicable to TXU Sandow.

## ARTICLE 4
## MISCELLANEOUS AGREEMENTS AND ACKNOWLEDGMENTS

4.1 <u>Expenses</u>. Except as otherwise provided herein, each party hereto is responsible for its own costs and expenses (including attorneys' and consultants' fees, costs and expenses)

incurred in connection with this Agreement and the Related Agreements and the consummation of the transactions contemplated by this Agreement and the Related Agreements.

4.2     Entire Document. This Agreement (including the Exhibits to this Agreement) and the Related Agreements contain the entire agreement between the parties hereto with respect to the transactions contemplated hereby, and supersede all writings and written or oral negotiations, representations, warranties, commitments, offers, contracts and agreements prior to the execution date of this Agreement, written or oral. No waiver and no modification or amendment of any provision of this Agreement is effective unless made in writing and duly signed by the parties hereto.

4.3     Counterparts. This Agreement may be executed in one or more counterparts, each of which is an original, but all of which together constitute one and the same instrument.

4.4     Severability. If any provision of this Agreement is held invalid or unenforceable by any court or as a result of future legislative action, this holding or action will be strictly construed and will not affect the validity or effect of any other provision hereof. Upon such determination that any provision of this Agreement is invalid or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner to the end that the economic effects of the transaction contemplated hereby are preserved to the extent possible.

4.5     Successors and Assigns. The rights and obligations of either party hereto provided by this Agreement, in whole or in part, may not be assigned or delegated by such party without the prior written consent of the other party, which consent shall be not unreasonably withheld, delayed or conditioned. Any assignment or obligation in violation of this Section 4.5 shall be void and of no effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns. A party may withhold its consent to an assignment of any of the rights or obligations of this Agreement if, *inter alia*, the proposed assignee is reasonably unlikely to be able to meet its obligations under this Agreement.

4.6     Governing Law; Waiver of Jury Trial. This Agreement will be construed and governed in accordance with the substantive laws of the State of Texas without giving effect to principles of conflicts of law or choice of law. Each party hereto hereby waives its rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement or the Related Agreements.

4.7     Notices. All notices, requests, demands and other communications under this Agreement must be in writing and must be delivered in person, by facsimile or sent by certified mail, postage prepaid, or by overnight delivery, and properly addressed as follows:

If to Alcoa:

>Alcoa Inc.
>Rockdale Operations
>Post Office Box 472
>4069 Charles Martin Hall Road
>Rockdale, Texas 76567
>Attn: Location Manager
>Facsimile No.: (512) 446-8200

With a copy to:

>Alcoa Inc.
>390 Park Avenue
>New York, New York 10022-4608
>Attn: General Counsel
>Facsimile No.:(212) 836-2844

If to TXU Sandow:

>TXU Sandow Development Company LP
>Energy Plaza
>1601 Bryan Street
>Dallas, Texas 75201
>Attn: Chief Legal Officer
>Facsimile No.: (214) 812-6032

With a copy to:

>Hunton & Williams LLP
>Energy Plaza, 30th Floor
>1601 Bryan Street
>Dallas, Texas 75201
>Attn: Scott H. Matheson
>Facsimile No.: (214) 979-3937

Any party hereto may from time to time change its address for the purpose of notices by written notice specifying a new address, but no change of address is effective until it is actually received by the party sought to be charged with its contents. All notices and other communications required or permitted under this Agreement that are addressed as provided in this Section 4.7 are effective upon delivery, if delivered before 5:00 p.m. at the place of delivery on a Business Day (as such term is defined in the Purchase and Sale Agreement), or on the following Business Day if delivered after 5:00 p.m. or on a day other than a Business Day.

    4.8    Rights of Third Parties. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any person other than the parties hereto, their respective successors and permitted assigns, nor is anything in

this Agreement intended to relieve or discharge the obligation or liability of any third party to either party.

4.9  No Public Announcement. From the date of this Agreement until the Closing, neither TXU Sandow nor Alcoa may, without the approval of the other, make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as and to the extent that as required by any applicable law, as necessary to implement the provisions of this Agreement, or to comply with Securities and Exchange Commission, stock exchange or the Railroad Commission of Texas disclosure obligations, in which case and to the extent practicable the other party shall be advised prior to such release or announcement to be issued.

4.10  Dispute Resolution. The parties hereto shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement. Either party hereto may give notice to the other party of any dispute arising out of or relating to this Agreement that is not resolved in the normal course of business (the "Dispute Notice"). Within 30 days after delivery of the Dispute Notice, the receiving party shall submit to the other party a written response. Within 60 days after delivery of the Dispute Notice, an authorized representative of each of TXU Sandow and Alcoa shall meet, and thereafter as often as they deem reasonably necessary, to attempt to resolve the dispute. All reasonable requests for information made by one party to the other shall be complied with. All negotiations pursuant to this clause are confidential. This provision shall in no way limit a party's right to, at any time, pursue any legal or equitable remedies available to it (i) at any time on or after 90 days after delivery of a Dispute Notice, and (ii) at any time prior to 90 days after delivery of a Dispute Notice that such party reasonably considers to be necessary to prevent it suffering any adverse consequences as a result of such dispute.

4.11  Amendments. This Agreement may only be amended in writing singed by TXU Sandow and Alcoa.

4.12  Waivers. The delay or failure of a party hereto to exercise any right or to insist on performance of any obligation is not a waiver of that right or obligation, or any similar right or obligation. Waivers are only effective if in writing

4.13  Not to be Construed Against Drafter. The parties hereto acknowledge that they have had an adequate opportunity to review each and every provision contained in this Agreement and the Related Agreements and to submit the same to legal counsel for review and comment. Based on the foregoing, the rule of construction that a contract be construed against the drafter, if any, will not be applied in the interpretation and construction of this Agreement and the Related Agreements.

IN WITNESS WHEREOF, Alcoa and TXU Sandow have executed this Agreement as of the date first above written.

Alcoa:

**ALCOA INC.**

By: /s/ Kevin J. Anton

Kevin J. Anton

Vice President


**TXU SANDOW:**

**TXU SANDOW DEVELOPMENT COMPANY LP**

**BY: TXU SANDOW MANAGEMENT COMPANY LLC, its general partner**

By: _____

Michael P. Childers

Chief Executive Officer

IN WITNESS WHEREOF, Alcoa and TXU Sandow have executed this Agreement as of the date first above written.

    Alcoa:

    **ALCOA INC.**

    By:_____

    Kevin J. Anton

    Vice President

    **TXU SANDOW:**

    **TXU SANDOW DEVELOPMENT COMPANY LP**

    BY: TXU SANDOW MANAGEMENT COMPANY LLC, its general partner

    By: _____

    Michael P. Childers

    Chief Executive Officer

IN WITNESS WHEREOF, Alcoa and TXU Sandow have executed this Agreement as of the date first above written.

**Alcoa:**

**ALCOA INC.**

By:_____

Kevin J. Anton

Vice President


**TXU SANDOW:**

**TXU SANDOW DEVELOPMENT COMPANY LP**

**BY: TXU SANDOW MANAGEMENT COMPANY LLC, its general partner**

By: _____

Michael P. Childers

Chief Executive Officer