**EXHIBIT 7**

**Contract Mining Agreement**

*EXECUTION COPY*

CONTRACT MINING AGREEMENT

BY AND AMONG

TXU MINING COMPANY LP,

ALCOA INC.

AND

TXU SANDOW DEVELOPMENT COMPANY LP

DATED AS OF AUGUST 31, 2007

(EFFECTIVE AS OF SEPTEMBER 1, 2007)

## TABLE OF CONTENTS

ARTICLE I AGREEMENT ........................................................................................................ 2
  1.1 Agreement .......................................................................................................................... 2
  1.2 Relationship of the Parties ................................................................................................ 2
  1.3 Entire Agreement .............................................................................................................. 2
ARTICLE II DEFINITIONS ....................................................................................................... 2
  2.1 Rules of Construction ........................................................................................................ 2
  2.2 Certain Defined Terms ...................................................................................................... 3
ARTICLE III RESPONSIBILITIES OF CONTRACT MINER ............................................... 10
  3.1 Scope of Services ............................................................................................................ 10
  3.2 Standard of Performance ................................................................................................. 11
  3.3 Contract Miner Regulatory Permits ................................................................................ 11
  3.4 Operating Records and Reports ....................................................................................... 11
  3.5 Royalties .......................................................................................................................... 11
  3.6 Fee for Alcoa Provided Services ..................................................................................... 11
  3.7 Grant of Mining Rights ................................................................................................... 11
  3.8 Interim Period .................................................................................................................. 12
ARTICLE IV TRANSFER OF ALCOA PERMITS ................................................................. 12
  4.1 Alcoa Permits .................................................................................................................. 12
  4.2 Transfer of Alcoa Permits ............................................................................................... 12
ARTICLE V PROCEDURES, PLANS AND REPORTING ..................................................... 14
  5.1 Mine Plan ........................................................................................................................ 14
  5.2 Consumption Schedule Plans .......................................................................................... 14
  5.3 Forecasts .......................................................................................................................... 14
  5.4 Forecast Response ........................................................................................................... 15
  5.5 Reports ............................................................................................................................. 15
  5.6 Production Planning Meetings ......................................................................................... 16
  5.7 Notification of Certain Events ......................................................................................... 16
  5.8 Audit Rights .................................................................................................................... 16
ARTICLE VI COMPENSATION AND PAYMENT ............................................................... 16
  6.1 Owner Payments ............................................................................................................. 16
  6.2 Sandow Mine Services .................................................................................................... 21
  6.3 Payment for Services ....................................................................................................... 21
  6.4 Disputed Amounts ........................................................................................................... 21
  6.5 Late Payment ................................................................................................................... 21
  6.6 Offsets ............................................................................................................................. 22
  6.7 Other Arrangements ........................................................................................................ 22
ARTICLE VII TERM ................................................................................................................ 22
  7.1 Term ................................................................................................................................ 22
ARTICLE VIII INSURANCE .................................................................................................... 22
  8.1 Contract Miner Insurance ................................................................................................ 22
  8.2 Form and Content ............................................................................................................ 23
  8.3 Self-Insurance ................................................................................................................. 23
  8.4 Deductibles ...................................................................................................................... 23

8.5 Change in Scope..................................................................................................23
8.6 Certificates of Insurance...................................................................................23
ARTICLE IX  INDEMNIFICATION.................................................................................24
9.1 General Indemnification....................................................................................24
ARTICLE X  LIABILITIES OF THE PARTIES................................................................27
10.1 Limitations of Liability ...................................................................................27
10.2 Contract Miner's Total Aggregate Liability....................................................27
10.3 No Warranties or Guarantees ..........................................................................27
10.4 Exclusive Remedies .........................................................................................28
10.5 Delivery Default; Remedies.............................................................................28
10.6 No Alteration of Other Agreements.................................................................28
ARTICLE XI  CONFIDENTIALITY..................................................................................29
11.1 Confidential Information..................................................................................29
ARTICLE XII  MISCELLANEOUS PROVISIONS ..........................................................29
12.1 Assignment......................................................................................................29
12.2 Access...............................................................................................................29
12.3 Not for Benefit of Third Parties ......................................................................30
12.4 Force Majeure. .................................................................................................30
12.5 Change in Law .................................................................................................30
12.6 Dispute Resolution ..........................................................................................30
12.7 Amendments.....................................................................................................31
12.8 Survival ............................................................................................................31
12.9 No Waiver ........................................................................................................31
12.10 Notices............................................................................................................31
12.11 Representations and Warranties.....................................................................32
12.12 Counterparts ..................................................................................................32
12.13 Governing Law; Waiver of Jury Trial...........................................................33
12.14 Exhibits and Appendices................................................................................33
12.15 Severability.....................................................................................................33
12.16 Not to be Construed Against Drafter.............................................................33

EXHIBITS

Exhibit A - Alcoa Permits
Exhibit B - [Reserved]
Exhibit C - Form of Consumption Schedule Report
Exhibit D - Transition Services Agreement


SCHEDULES

Schedule 1 - Total Capex Guidelines
Schedule 2 - Mine Plan

## CONTRACT MINING AGREEMENT

This CONTRACT MINING AGREEMENT is made and entered into as of August 31, 2007, effective as of 12:01 AM, local time in Rockdale, Texas, on September 1, 2007, (the "Effective Date"), by and between TXU MINING COMPANY LP, a Texas limited partnership ("TXU Mining" or "Contract Miner"), ALCOA INC., a corporation organized under the laws of the Commonwealth of Pennsylvania ("Alcoa"), and TXU SANDOW DEVELOPMENT COMPANY LP, a Texas limited partnership ("TXU Sandow," which together with Alcoa may be individually referred to as an "Owner" and collectively referred to as the "Owners").

## RECITALS

Alcoa owns and operates an aluminum smelter complex in Rockdale, Texas.

TXU Generation Company LP ("TXU Generation") owns and, pursuant to the Sandow Unit Four Agreements (as defined herein), operates an electric generating unit within Alcoa's Rockdale, Texas smelter complex commonly known as Unit 4 ("Sandow Unit 4").

TXU Generation is currently constructing, and TXU Sandow plans to operate, pursuant to the Sandow Unit Five Agreement (as defined herein), an electric generating unit adjacent to Sandow Unit 4 that is referred to as Unit 5 ("Sandow Unit 5").

Alcoa and TXU Sandow each own lignite reserves in the Mine (as defined herein) that supply lignite fuel for Sandow Unit 4 and Sandow Unit 5, respectively. Alcoa currently operates the Mine, Alcoa's only lignite mining facility in Texas.

Alcoa, pursuant to the Sandow Unit Four Agreements, and TXU Sandow, pursuant to the Sandow Unit Five Agreement, are beneficiaries of the lignite in the Mine through their respective consumption at Sandow Unit 4 and Sandow Unit 5.

TXU Mining, an Affiliate of TXU Generation and TXU Sandow, currently owns and/or operates six lignite mines in Texas.

Contemporaneously with the execution of this Agreement, Alcoa is selling to TXU Mining, and TXU Mining is purchasing or leasing from Alcoa, certain assets, equipment, supplies, inventory, equipment leases, rights-of-way, easements and real property interests (other than lignite or "royalty-bearing" real property interests) in or associated with the Mine in accordance with the terms of a Purchase and Sale Agreement between Alcoa and TXU Mining, dated August 15, 2007 ("Purchase Agreement") and related agreements, including an Agreement Regarding Ownership of Lignite Interests.

From and after the Effective Date until the Transition Date, Alcoa and TXU Sandow desire that TXU Mining perform contract mining services to mine and deliver lignite from the Mine under the oversight, supervision and direction of the Transition Mine Manager (as defined herein).

From and after the Transition Date, Alcoa and TXU Sandow desire that TXU Mining operate the Mine and perform contract mining services to mine and deliver lignite from the Mine.

To date, lignite from the Mine and the Sandow Mine has been supplied to Sandow Unit 4 on a cost-based basis. After the Effective Date, it is the intent of Alcoa and TXU Sandow to extract lignite from the Mine at the lowest reasonably practical cost and that such lignite continues to be supplied to Sandow Unit 4 and Sandow Unit 5 on a cost-based basis, as opposed to a market-based basis. TXU Mining, TXU Sandow and Alcoa desire to enter into this Agreement, in part, to take advantage of TXU Mining's expertise and potential to operate the Mine more efficiently and economically than Alcoa because of the scaled benefit of operating the Mine with TXU Mining's other mining operations in Texas.

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements contained in this Agreement, Alcoa, TXU Sandow and TXU Mining agree as follows:

## ARTICLE I
## AGREEMENT

1.1     Agreement. This Agreement consists of the terms and conditions set forth herein, as well as the schedules and appendices attached to this Agreement, which are incorporated by reference and made part of this Agreement. In the event of a conflict, variation or inconsistency between the schedules or appendices and the terms and conditions of the body of this Agreement, the latter shall control and be given priority.

1.2     Relationship of the Parties. Contract Miner has been retained by Owners as an independent contractor to perform the Mining Services on behalf of Owners. Owners have delegated to Contract Miner the overall responsibility of mining and delivering lignite from the Mine to Sandow Unit 4 and Sandow Unit 5 to the extent specifically provided in this Agreement.

1.3     Entire Agreement. This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior negotiations, memoranda, undertakings, agreements and business term sheets with respect to the subject matter hereof, including the Mining Services.

## ARTICLE II
## DEFINITIONS

2.1     Rules of Construction. For all purposes of this Agreement (including the preceding sections and recitals) unless otherwise required by the context in which any term appears, the following rules of construction shall apply. The singular shall include the plural and the masculine shall include the feminine and neuter, as the context requires. "Includes" or "including" shall mean "including, but not limited to." The terms "ensure" and "best efforts" shall not be construed as a guarantee, but shall imply only a duty to use reasonable effort and care, consistent with Prudent Operating Practices, as defined herein. References to "Articles," "Sections," "Exhibits" and "Appendices" shall mean the articles and sections of, and exhibits and appendices to, this Agreement, except where the context indicates otherwise. Headings,

2

titles and subtitles in any article, section or subsection of this Agreement are included for convenience only and do not affect, and will not be used in, the interpretation of this Agreement. The term "gross negligence" shall not be construed as simple or ordinary negligence, it being the intent of the Parties to preserve the distinction between such degrees of due care for purposes of this Agreement, notwithstanding whether a court would otherwise apply such distinction at common law. "Day" or "days" (regardless of capitalization) shall mean calendar day(s), unless specifically designated as Business Day(s). The words "herein," "hereof," "herewith" and "hereunder" shall refer to this Agreement as a whole and not to any particular section or subsection of this Agreement. Any accounting terms used herein and not specifically defined herein shall be construed in accordance with generally accepted accounting principles in the United States of America, consistently applied. All references to a particular entity shall include such entity's successors and permitted assigns.

2.2    Certain Defined Terms. For all purposes of this Agreement (including the preceding sections and recitals) unless otherwise required by the context in which any defined term appears, the following defined terms shall have the meanings specified in this Section 2.2:

"AAA" has the meaning assigned to such term in Appendix A.

"Affiliate" means, with respect to any Person, any other Person that: (i) directly or indirectly controls the specified Person, or (ii) is controlled directly or indirectly by, or is under direct or indirect common control with, the specified Person. For purposes of this definition, "control" when used with respect to any particular Person shall mean the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement" means this Contract Mining Agreement (including all schedules and appendices attached to this Contract Mining Agreement), as the same may be modified or amended from time to time in accordance with the provisions hereof.

"Alcoa Indemnitees" has the meaning assigned to such term in Section 4.2.5.

"Alcoa Permits" has the meaning assigned to such term in Section 4.1.1.

"Alcoa Service Fee" has the meaning assigned to such term in Section 3.6.

"Annual Mine Plan" means the information provided to Owners by Contract Miner regarding the expected area(s) to be mined and the estimated quality and quantity of lignite to be mined by Contract Miner in the following Operating Year, taking into account the Mine Plan and the expected generation plans of Sandow Unit 4 and Sandow Unit 5 as set forth in the Consumption Schedule Plans. Contract Miner will make all estimates included in the Annual Mine Plan in good faith and in accordance with Prudent Operating Practices, the Mine Plan and the Mine Permit and, subject to changes from time to time based on Prudent Operating Practices, guided by Contract Miner's good faith estimates of the Total Capex Amount as of the date of this Agreement, as set out in Schedule 1.

3

"Annual Operating Forecast" means a schedule to be prepared by Contract Miner setting forth in reasonable detail on an annual basis for such year an estimate of costs to provide the Mining Services, including estimated capital expenditures. Contract Miner will make all estimates included in each Annual Operating Forecast in good faith and in accordance with Prudent Operating Practices, the Mine Plan and the Mine Permit, and, subject to charges from time to time based on Prudent Operating Practices, guided by Contract Miner's good faith estimates of the Total Capex Amount as of the date of this Agreement, as set out in Schedule 1.

"Applicable Law" means any federal, state or local laws, regulations, codes, judgments, orders, permits, licenses or government approvals as may be applicable to the Mine, Owners, Contract Miner or the Mining Services.

"Arbitration Rules" has the meaning assigned to such term in Appendix A.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in Dallas, Texas, are required to be closed.

"Claim Notice" has the meaning assigned to such term in Section 9.1.4.

"Change In Law" means the enactment, adoption, promulgation, modification (including written change in interpretation by a Governmental Authority), or repeal after the date of this Agreement of any Applicable Law, or the issuance or modification (including written change in interpretation by a Governmental Authority) after the date of this Agreement, except to the extent that such issuance or modification is requested by Contract Miner, of any Contract Miner Permit or Alcoa Permit issued or promulgated by any Governmental Authority that establishes requirements that materially increases or decreases Contract Miner's costs in performing the Mining Services. For the purposes of this Agreement, a "Change in Law" includes the refusal of the RCT to grant Alcoa's pending request for a modification of the acceptable slope topography for mine remediation purposes currently contained in the Mine Permit.

"Confidential Information" of a designated Person means all information concerning the business and affairs of the Person that has been or hereafter is provided to, disclosed to, or otherwise learned by another designated Person in connection with the transactions contemplated by this Agreement; provided, however, that "Confidential Information" shall not include (i) information that is now or hereafter becomes generally known or available to the public without breach of this Agreement; (ii) information that is shown to have been in the recipient's possession prior to the date of this Agreement, and was not subject to a prior agreement of confidence of which the recipient had knowledge; (iii) information which, subsequent to disclosure by the Person, is lawfully obtained or received by the recipient from a third party, without a breach of this Agreement, and without a breach by the third party of another agreement of confidentiality of which the recipient had knowledge; and (iv) information which is developed by the recipient or a third party having no access to and making no use of such Confidential Information.

"Consumption Schedule Plans" has the meaning assigned to such term in Section 5.2

4

"Contract Miner" or "TXU Mining" has the meaning set forth in the Preamble and shall include Contract Miner's successors and permitted assigns hereunder.

"Contract Miner Indemnitees" has the meaning assigned to such term in Section 9.1.2.

"Contract Miner Permits" has the meaning assigned to such term in Section 3.3.

"Contract Miner's Expert" has the meaning assigned to such term in Section 5.4.

"Depreciation Factor" shall mean 4% per annum.

"Dispute Notice" has the meaning assigned to such term in Section 12.6.

"Due Date" has the meaning assigned to such term in Section 6.3.

"Effective Date" has the meaning set forth in the first paragraph of this Agreement.

"Five Year Forecast" means a rolling forecast of Mine operations to be prepared by Contract Miner on an annual basis for each year in such five-year period.  Contract Miner will make all estimates in a Five-Year Forecast in good faith and consistent with Prudent Operating Practices, the prior Five Year Forecast, the Mine Plan and the Mine Permit.

"Force Majeure Event" has the meaning assigned to such term in Section 12.4.1.

"GADS" means the database of electric generating equipment performance data collected and recorded by the North American Electric Reliability Corporation, or if such data is no longer published, such other similar data as mutually agreed upon.

"Governmental Authority" shall mean any federal, state, local or foreign governmental department, commission, board, bureau, authority, agency, court, instrumentality or judicial or regulatory body or entity.

"Interest Rate" means the per annum rate of interest equal to the prime lending rate as may from time to time be published in *The Wall Street Journal* under "Money Rates" on a particular day (or if not published on such day on the most recent preceding day on which published).

"Late Payment Rate" means the lesser of (i) the per annum rate of interest equal to the prime lending rate as may from time to time be published in *The Wall Street Journal* under "Money Rates" on a particular day (or if not published on such day on the most recent preceding day on which published), plus one percent (1%), or (ii) the maximum rate of interest permitted by Applicable Law.

"Liabilities" has the meaning assigned to such term in Section 4.2.5.

"Mine" means the lignite mine located in Lee and Bastrop Counties, Texas, referred to as the Three Oaks Mine and that is described in the Mine Permit.

"Mine Permit" means that certain surface mining and reclamation permit for the Three Oaks Mine issued to Alcoa in RCT SMRD Docket No. C1-0004-SC-00-A, and assigned the RCT designation "Permit 48."

"Mine Personnel" means all individuals employed by Contract Miner in the performance of the Mining Services.

"Mine Plan" means the plan regarding the expected areas to be mined and the estimated quality and quantity of lignite to be mined by Contract Miner over the life of the Mine as set forth in Schedule 2, as amended by Contract Miner from time to time in accordance with this Agreement.

"Mining Services" means all those services to be performed by Contract Miner as described in Section 3.1 or otherwise expressly required by this Agreement.

"Mining Services No Load Costs" means those certain Mining Services Costs consisting of ad valorem taxes, costs of mining permits and, to the extent applicable, Royalties.

"Mining Services Costs" shall mean all direct and indirect costs reasonably incurred by Contract Miner to perform the Mining Services in all material respects in accordance with the standard of performance set forth in Section 3.2. Mining Services Costs shall include, but not necessarily be limited to: (A) operating and maintenance salaries and labor, materials, supplies, equipment, consumables, spare parts and lease expenses, (B) payroll services and benefits administration, record keeping, training, safety and environmental services, insurance premiums and deductibles, costs and expenses of litigation and resolution of employee, landowner and regulatory disputes, (C) technical support, administrative and general expenses of the Mine, (D) a pro rata portion of Contract Miner's general and administrative expenses allocated to the Mine on the same basis Contract Miner allocates such expenses across all of the mines it operates, (E) a pro rata portion of Contract Miner's Affiliates' general and administrative expenses (including overhead) allocated to the Mine on the same basis Contract Miner's appropriate Affiliate allocates such expenses across all of the business units of Contract Miner's ultimate corporate parent's business enterprise ("Overhead"), (F) taxes, other than taxes on income, (G) lignite royalties, bonus, delay rentals and other lease costs, (H) permit fees, bonding and expenses (I) expenses incurred in connection with the closure of the Mine. All Overhead shall be allocated pursuant to written accounting procedures of Contract Miner or its appropriate Affiliate. All costs for goods and services (other than Overhead) provided by an affiliate of TXU Mining shall be provided to TXU Mining at actual cost of such Affiliate plus 5%.

"Net Capex Amount" means as of any date, the difference between (i) the total of Contract Miner's capital expenditures for the Mine or the Mining Services including so much of the Purchase Price (as such term is defined in the Purchase Agreement) as has been paid as of such date and all other capital expenditures incurred by Contract Miner in accordance with

6

Prudent Operating Practices (such clause (i), the "Total Capex Amount"), and (ii) accumulated depreciation on the Total Capex Amount using the Depreciation Factor.

"Operating Year" means with respect to the first Operating Year the period beginning on the Effective Date and ending on December 31, 2007, and for each successive year, the Operating Year will commence on January 1 and end on December 31, or such earlier date that this Agreement is terminated during any such Operating Year.

"Owner" and "Owners" have the meanings set forth in the Preamble and shall include each Owner's successors and permitted assigns hereunder.

"Owner Indemnitees" has the meaning assigned to such term in Section 9.1.1.

"Owners' Expert" has the meaning assigned to such term in Section 5.4.

"Party" means a party to this Agreement and "Parties" means, collectively, all Parties to this Agreement, unless the context clearly requires a different construction.

"Person" means any individual, partnership, corporation, association, limited liability company, business trust, Governmental Authority or other entity.

"Providing Party" has the meaning assigned to such term in Section 11.1.

"Prudent Operating Practices" means those practices, methods and acts generally employed in the lignite surface mining industry in Texas that at a particular time, in the exercise of reasonable and prudent judgment in light of the facts known or which should have reasonably been known to Contract Miner at the time a decision was made, and Contract Miner's expertise and experience in the lignite mining industry, would have been expected to accomplish the desired result of such decision consistent with Applicable Law.  With respect to Contract Miner, Prudent Operating Practices is not limited to the optimum practice, method or act to the exclusion of all others, but rather it includes a spectrum of practices, methods or acts commonly employed in the lignite surface mining industry in Texas.  Prudent Operating Practices include Contract Miner using commercially reasonable skill and efforts implemented in good faith to (A) conduct the Mining Services as efficiently and economically as commercially reasonable under the prevailing circumstances, (B) facilitate the prudent and efficient operation of both Sandow Unit 4 and Sandow Unit 5 at the lowest reasonable practical cost under the prevailing circumstances (including consideration of the quality of the lignite in the Mine and the generation plans of Sandow Unit 4 and Sandow Unit 5, the differing fuel parameters providing optimal generation for Sandow Unit 4 and Sandow Unit 5, as well as all other relevant factors), and (C) treat both Owners in a manner that is equitable and not discriminatory in all material respects.

"Purchase Agreement" has the meaning set forth in the Recitals of this Agreement.

"RCT" means the Railroad Commission of Texas and its successors.

"Receiving Party" has the meaning assigned to such term in Section 11.1.

7

"Reporting Period" means, for each of Sandow Unit 4 or Sandow Unit 5, as applicable, the period beginning January 1, 2010 and ending on December 31, 2012.

"Return on Capital" means for each calendar year, or portion thereof, twelve percent (12%) per annum.

"Royalties" has the meaning assigned to such term in Section 3.5.

"Sandow Mine" means the lignite mine located in Milam and Lee Counties, referred to as the Sandow Mine and that is described in the Sandow Mine Permit.

"Sandow Mine Permit" means that certain surface mining and reclamation permit for the Sandow Mine issued to Alcoa, and assigned the RCT designation "Permit No. 1E."

"Sandow Services" has the meaning set forth in Section 6.2.

"Sandow Unit 4" has the meaning assigned to such term in the Recitals to this Agreement.

"Sandow Unit 4 Capacity" means Primary (lignite) Btus (adjusted to MMBtus) divided by Net Actual Generation (MWhs) times Net Maximum Capacity (MWs) of Sandow Unit 4 for the period from January 1, 2011 through December 31, 2011 as such terms are defined in the applicable GADS data; provided that the Sandow Unit 4 Capacity may be modified by the mutual agreement of Contract Miner and Owners, acting in good faith, as warranted if Sandow Unit 4 does not operate as expected.

"Sandow Unit 4 Capacity Factor" means a fraction, the numerator of which is the Sandow Unit 4 Capacity, and the denominator of which is the sum of (i) the Sandow Unit 4 Capacity plus (ii) the Sandow Unit 5 Capacity; except as otherwise agreed in writing by Contract Miner and Owners.

"Sandow Unit 4 Delivery Default" has the meaning assigned to such term in Section 10.5.1.

"Sandow Unit 5 Capacity" means Primary (lignite) Btus (adjusted to MMBtus) divided by Net Actual Generation (MWhs) times Net Maximum Capacity (MWs) of Sandow Unit 5 for the period from January 1, 2011 through December 31, 2011, as such terms are used in the applicable GADS data; provided that the Sandow Unit 5 Capacity may be modified by the mutual agreement of Contract Miner and Owners, acting in good faith, as warranted if Sandow Unit 5 does not operate as expected.

"Sandow Unit 5 Capacity Factor" means a fraction, the numerator of which is the Sandow Unit 5 Capacity, and the denominator of which is the sum of (i) the Sandow Unit 4 Capacity plus (ii) the Sandow Unit 5 Capacity; except as otherwise agreed in writing by Contract Miner and Owners.

"Sandow Unit 5 Commercial Operation Date" means the date when Sandow Unit 5, for each day during a continuous three-day period, has (a) successfully started, (b) operated for

8

at least six hours at no less than 540 MW hours per hour, and (c) shut down at least once, without resorting to unusual practices or procedures to ensure Sandow Unit 5 keeps operating.

"Sandow Unit 5 Consumption Date" means the first date on which the Sandow Unit 5 takes delivery of lignite for start-up and testing of the Sandow Unit 5 boiler prior to its commercial operation.

"Sandow Unit 5 Delivery Default" has the meaning assigned to such term in Section 10.5.2.

"Sandow Unit 5" has the meaning assigned to such term in the Recitals to this Agreement.

"Sandow Unit Four Agreements" means, collectively, the Sandow Unit Four Agreement, dated August 13, 1976 (as amended up to the Effective Date), between Alcoa and TXU Generation, and the Supplemental Agreement to Sandow Unit Four Agreement, dated March 2, 1981 (as amended up to the Effective Date), between Alcoa and TXU Generation.

"Sandow Unit Five Agreement" means that certain Sandow Unit Five Agreement, dated December 28, 2006, between TXU Generation and Alcoa (as amended up to the Effective Date).

"Term" has the meaning assigned to such term in Section 7.1.

"Total Capex Amount" has the meaning assigned to such term in the definition of Net Capex Amount.

"Transition Date" means the date of transfer of the Mine Permit from Alcoa to TXU Mining as approved by final order of the RCT.

"Transition Mine Management Services" has the meaning assigned to such term in Section 4.2.3.

"Transition Mine Manager" has the meaning assigned to such term in Section 4.2.3.5.

"Transition Services Agreement" has the meaning assigned to such term in Section 4.2.4.

"TXU Generation" has the meaning set forth in the Recitals of this Agreement and shall include its successors and permitted assigns.

"TXU Sandow" has the meaning set forth in the Preamble of this Agreement and shall include its successors and permitted assigns.

"Unit 4 MMBtu" means the Primary Btu (adjusted to MMBtus) consumption of lignite by Sandow Unit 4 in the applicable period, as such term is defined in the applicable GADS data.

9

"Unit 4 Minimum MMBtu" means the MMBtus of lignite that would have been consumed by Sandow Unit 4 in such month had Sandow Unit 4 operated during such month at 75% (or 80%, if more than six (6) months after the earlier of (i) October 1, 2009 or (ii) the Sandow Unit 5 Commercial Operation Date) of its Net Maximum Capacity (MWs) and Primary Btus (adjusted to MMBtus) divided by Net Actual Generation (MWhs), as such terms are defined in the applicable GADS data.

"Unit 5 MMBtu" means the Primary Btu (adjusted to MMBtus) consumption of lignite by Sandow Unit 5 in the applicable period, as such term is defined in the applicable GADS data.

"Unit 5 Minimum MMBtu" means the MMBtus of lignite that would have been consumed by Sandow Unit 5 in such month had Sandow Unit 5 operated during such month at 75% (or 80%, if more than six (6) months after the earlier of (i) October 1, 2009 or (ii) the Sandow Unit 5 Commercial Operation Date) of such unit's nameplate capacity of 564.5 MW and a heat rate of 9.94.

"Unit 4 Stand-By Fee" means an amount equal to the difference between (a) the fee that would have been due pursuant to Section 6.1.1(A) had the MMBtu consumption of lignite by Sandow Unit 4 in such month been if such unit had been operating in accordance with the current Consumption Schedule Plan for such unit and (b) the sum of the amount paid pursuant to Section 6.1.1 and the actual cost savings Contract Miner is able to achieve to mitigate the effects of such Unplanned Outage.

"Unit 5 Stand-By Fee" means an amount equal to the difference between (a) the fee that would have been due pursuant to Section 6.1.2(A) had the MMBtu consumption of lignite by Sandow Unit 5 in such month been if such unit had been operating in accordance with the current Consumption Schedule Plan for such unit and (b) the sum of the amount paid pursuant to Section 6.1.2 and the actual cost savings Contract Miner is able to achieve to mitigate the effects of such Unplanned Outage.

"Unplanned Outage" means a failure or other unforeseen outage of Sandow Unit 4 or Sandow Unit 5 (as the case may be) extending or that Contract Miner reasonably expects to extend for a period of 60 consecutive days or more (other than scheduled routine maintenance outages as reflected in the latest Consumption Schedule Plans).

"US Dollars" means U.S. dollars, the lawful currency of the United States of America.

## ARTICLE III
## RESPONSIBILITIES OF CONTRACT MINER

3.1    Scope of Services.  Commencing on the Effective Date and during the Term, Contract Miner will, in each case in accordance with Prudent Operating Practices, (a) mine lignite from the Mine; (b) blend or treat the mined lignite as necessary; (c) deliver end lignite to the respective custody transfer points at Sandow Unit 4 and Sandow Unit 5, (d) maintain appropriate levels of lignite inventory for Sandow Unit 4 and Sandow Unit 5, (e) obtain and maintain sufficient assets and qualified employees and other contract resources to achieve the

Annual Mine Plan in all material respects, (f) administer the real property that is part of the Mine, and (g) to the extent reasonably practical, mitigate costs as requested by an Owner if there is a planned or unplanned outage of Sandow Unit 4 or Sandow Unit 5 or a material delay in commercial operation of Sandow Unit 5, as applicable, (h) arrange for appropriate insurance for the Mine in accordance with Article VIII, (i) upon transfer of the Mine Permit on the Transition Date, provide any reclamation performance bond required by the Contract Miner Permits, (k) otherwise provide all services necessary for the operation of the Mine; (l) use commercially reasonable efforts to use the lignite inventory in existence at the Mine as of the Effective Date in either Sandow Unit 5 or Sandow Unit 4 within three (3) years of commercial operation of Sandow Unit 5 and (m) provide for closure of the Mine and reclamation of land associated with the Mine.

3.2     Standard of Performance.  Contract Miner will perform the Mining Services in accordance with (a) Prudent Operating Practices, (b) Applicable Law (including the Mine Permit), and (c) reasonably consistent in all material respects, the then current Annual Plan and Forecast, the Mine Plan and Mine Permit.  Contract Miner will not be responsible for (and Owners shall reimburse Contract Miner for) any costs incurred above the then current Annual Plan and Forecast unless such excess costs were due to a failure by Contract Miner to employ Prudent Operating Practices.

3.3     Contract Miner Regulatory Permits.  Contract Miner shall have responsibility to obtain and maintain all permits, licenses and other governmental consents, authorizations or approvals required by Applicable Law to be maintained by Contract Miner or any of its employees, in its or their own name, to perform the Mining Services ("Contract Miner Permits").

3.4     Operating Records and Reports.  Contract Miner shall prepare and maintain monthly and annual reports detailing lignite extracted from the Mine as more specifically described in Section 5.5.

3.5     Royalties.  Unless otherwise agreed, each Owner shall administer all of each Owner's royalty obligations ("Royalties") due on lignite produced from the lands and leases owned by Owners in the Mine based on information supplied by Contract Miner that is reasonably necessary in order for each Owner to be able to determine its Royalty obligations, including the amount of lignite extracted or delivered to the respective custody transfer points for Sandow Unit 4 and Sandow Unit 5

3.6     Fee for Alcoa Provided Services.  Alcoa may from time to time provide services to Contract Miner (including without limitation providing a bond with the RCT for the Mine Site until the Transition Date) or allow Contract Miner to utilize certain of Alcoa's assets in the performance of the Mine Services.  Contract Miner shall reimburse Alcoa for its provision of such services or assets in an amount equal to Alcoa's costs plus five percent (5%) (the "Alcoa Services Fee") in accordance with the terms of the Transition Services Agreement.

3.7     Grant of Mining Rights.  Each Owner is responsible for providing, and hereby grants to Contract Miner, all of its rights (from time to time) to mine lignite in the Mine in accordance with the Mine Permit and, following the Transition Date, the Contract Miner Permits.

11

3.8    Interim Period. During the period between the Effective Date and the Transition Date Contract Miner shall operate the Mine and provide the Mining Services in accordance with the Mine Permit and Applicable Law under the oversight, supervision and direction of the Transition Mine Manager.

## ARTICLE IV
## TRANSFER OF ALCOA PERMITS

4.1    Alcoa Permits.

4.1.1    Alcoa Representations. Exhibit A describes certain permits, licenses and other governmental consents, authorizations or approvals required by Applicable Law for the operation and maintenance of the Mine and which are held by Alcoa ("Alcoa Permits"). Alcoa represents and warrants to TXU Mining that, as of the Effective Date, Alcoa has provided to TXU Mining access prior to the date hereof to true, correct and complete copies of each of the Alcoa Permits, all Alcoa Permits are in full force and effect, Alcoa has materially complied with all terms and conditions of the Alcoa Permits, Alcoa has not received any notice or claim from any Governmental Authority (or other Person) that any terms or conditions of the Alcoa Permits have been violated, and Alcoa has not received any notice (and has no reason to believe) that any Alcoa Permit will not be renewed when required.

4.1.2    Alcoa Permit Administration. From and after the Effective Date through the Transition Date, Alcoa will take all actions required of it to comply with the terms and conditions of the Alcoa Permits and to maintain the Alcoa Permits (including any renewals or modifications) in full force and effect; provided that, Contract Miner will:  (A) provide administrative support (to the extent allowed under the Alcoa Permits) with respect to the Alcoa Permits, including the preparation of any reports, applications or other regulatory filings associated with the Alcoa Permits; and (B) perform all Mining Services in compliance with the Alcoa Permits.

4.2    Transfer of Alcoa Permits.

4.2.1    As soon as practicable after the Effective Date, Alcoa and Contract Miner will each use commercially reasonable efforts to effect the transfer of the Alcoa Permits (or, if required, the issuance of a new permit in lieu of a transfer) to Contract Miner. Alcoa will cooperate with and assist Contract Miner in the acquisition of data and information, and the preparation and filing with appropriate Governmental Authorities, of any notices, plans, submissions (including modification of the Alcoa Permits to the extent requested by Contract Miner and consented to by Alcoa (which consent will not be unreasonably withheld, delayed or conditioned) or other materials or information necessary with respect to any Contract Miner Permits or the Alcoa Permits (whether before or after the transfer thereof). Contract Miner will reimburse Alcoa, as a Mining Services Cost, for all its documented, reasonable out-of-pocket costs incurred in connection with such efforts.

4.2.2    Mine Permit Transfer. Without limiting the generality of the preceding subsection, Alcoa will assist Contract Miner's efforts to transfer the Mine Permit from Alcoa to Contract Miner in accordance with Section 5.2(d) of the Purchase Agreement.

12

4.2.3    <u>Transition Mine Management Services</u>.  Alcoa will remain as the holder of the Mine Permit until the Transition Date.  Alcoa, as permitee and operator of the Mine until the Transition Date, will retain operation and control of mining operations at the Mine under the Mine Permit as follows (the "<u>Transition Mine Management Services</u>"):

4.2.3.1    Alcoa will continue, as the permitee, to be responsible for compliance with the terms and conditions of the Mine Permit, including providing the reclamation performance bond as required therein;

4.2.3.2    Alcoa will continue to be responsible for regulatory compliance, reporting and fee obligations with respect to the Mine and the Mine Permit, which may include contracting with Contract Miner to maintain appropriate staff and other necessary resources to provide for such matters;

4.2.3.3    Alcoa will continue to be responsible for maintaining insurance with respect to the Mine; provided that Alcoa will subcontract with Contract Miner to provide such insurance coverage in accordance with standard mining industry practice;

4.2.3.4    Alcoa will continue to be responsible, in consultation with TXU Mining, for submitting and prosecuting any revision and renewal Mine Permit applications;

4.2.3.5    Alcoa will designate an Alcoa employee as "<u>Transition Mine Manager</u>" who will have the primary operational oversight responsibility for the Mine prior to the Transition Date and for TXU Mining as Contract Miner.  The Transition Mine Manager will also serve as the primary contact for matters related to the Mine with the RCT; and

4.2.3.6    Contract Miner will conduct its activities under the oversight of the Transition Mine Manager in order to comply with the terms and conditions of the Mine Permit.

4.2.4    <u>Transition Services Agreement</u>.  Contemporaneously with the execution of this Agreement, Owners and Contract Miner will enter into an agreement with respect to the terms pursuant to which Alcoa will provide the Transition Services, including the compensation to be paid to Alcoa for the performance of the Transition Mine Management Services.  Such agreement will be in the form attached hereto as Exhibit D (the "<u>Transition Services Agreement</u>").

4.2.5    <u>General Indemnity for Transition Services by Contract Miner</u>.  Contract Miner shall indemnify and hold harmless Alcoa and its Affiliates, and their respective officers, directors, managers, employees, agents and representatives (the "<u>Alcoa Indemnitees</u>") from and against, and no Alcoa Indemnitee shall be responsible hereunder for, any and all claims, assertions, demands, suits, damages, judgments, losses, obligations, liabilities, actions and causes of action, fees (including reasonable attorneys fees and disbursements), costs (including court costs), expenses, investigations, inquiries, administrative proceedings, penalties, fines and sanctions (collectively, "<u>Liabilities</u>") sustained or suffered by any Alcoa Indemnitee in connection with any third party claims for injury or death to individuals or loss of or damage to property, to the extent caused by Contract Miner's gross negligence, willful misconduct, or willful violation of Applicable Law in the performance of the Mining Services prior to the

13

Transition Date, but excluding (i) any Liabilities to the extent caused by the gross negligence, willful misconduct, or willful violation of any Applicable Law by any Alcoa Indemnitee; and (ii) any Liabilities to the extent caused by the design, construction, or condition of the Mine beyond the reasonable control of Contract Miner (including failure or inadequacy of materials, corrosion, degradation, wear and tear, and damages caused by third parties not working under the supervision of Contract Miner); (iii) Liabilities to the extent caused by Alcoa's operation of the Mine prior to the Effective Date; and (iv) any Liabilities to the extent caused by an act or omission taken by Contract Miner at the direction of the Transition Mine Manager, Alcoa or any Alcoa Affiliate. NOTWITHSTANDING THE FOREGOING, UNDER NO CIRCUMSTANCES SHALL CONTRACT MINER INDEMNIFY AND HOLD HARMLESS ANY OWNER INDEMNITEE FROM AND AGAINST ANY THIRD-PARTY CLAIMS FOR LIABILITIES SUSTAINED OR SUFFERED BY ANY OWNER INDEMNITEE IN CONNECTION WITH ANY INJURY OR DEATH TO INDIVIDUALS OR LOSS OF OR DAMAGE TO PROPERTY, TO THE EXTENT CAUSED BY CONTRACT MINER'S NEGLIGENCE (AS OPPOSED TO GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR WILLFUL VIOLATION OF APPLICABLE LAW), IT BEING AGREED THAT EACH OWNER'S AGREEMENT TO BEAR SUCH LIABILITIES, AS APPLICABLE, IS A BARGAINED-FOR ELEMENT OF THE COMPENSATION OF CONTRACT MINER UNDER THIS AGREEMENT, AND THE APPLICABLE OWNER HEREBY AGREES TO INDEMNIFY CONTRACT MINER FROM ANY AND ALL SUCH LIABILITIES.

**ARTICLE V**
**PROCEDURES, PLANS AND REPORTING**

5.1    <u>Mine Plan</u>. Attached hereto as Schedule 2 is the Mine Plan.

5.2    <u>Consumption Schedule Plans</u>. TXU Generation (on behalf of Sandow Unit 4) and TXU Sandow (on behalf of Sandow Unit 5) will provide Contract Miner, on behalf of Owners and with their reasonable consent, an annual forecast of anticipated monthly MMBtu consumption and fuel quality requirements and any scheduled outages for Sandow Unit 4 and Sandow Unit 5 on or before September 1 for each Operating Year in the form attached hereto as Exhibit C (each a "<u>Consumption Schedule Plan</u>"). TXU Sandow and TXU Generation shall update and revise the Consumption Schedule Plans as required during any annual period and with the reasonable consent of Owners so that Contract Miner is able to make such adjustments to the Annual Plan and Forecast as are necessary; provided that such adjustments shall not diminish Owner's obligation for the Unit 4 Stand-by Fee or the Unit 5 Stand-by Fee, as applicable, for an Operating Year based on the Consumption Schedule Plan in effect at the commencement of the Operating Year.

5.3    <u>Forecasts</u>. Commencing in 2007 and each subsequent year during the Term of this Agreement, Contract Miner will prepare and deliver to Owners an Annual Mine Plan and an Annual Operating Forecast (together, the "<u>Annual Plan and Forecast</u>"), including such back up documentation as reasonably requested by an Owner, and a Five-Year Forecast. The Annual Plan and Forecast and Five-Year Forecast for the following year will be delivered by October 1 of each year.

14

5.4    Forecast Response.  Within 15 Business Days after receipt by Owners of an Annual Plan and Forecast, including back up documentation supporting the reasonableness thereof, Contract Miner, Alcoa and TXU Sandow will meet to discuss in good faith the terms of the Annual Plan and Forecast and may agree upon revisions to the Annual Plan and Forecast as the parties may mutually agree.  Within 30 days after receipt by Alcoa and TXU Sandow of an Annual Plan and Forecast, Alcoa and TXU Sandow shall advise Contract Miner in writing of their decision to either:  (A) accept Contract Miner's Annual Plan and Forecast, in which case such Contract Miner shall be guided by such Annual Plan and Forecast in performing the Mining Services subject to such adjustments as Contract Miner determines are necessary in accordance with Prudent Mining Practices, or (B) elect to submit the Annual Plan and Forecast for review to a non-Affiliate third party with expertise and experience in the lignite mining industry selected by Alcoa ("Owners' Expert") who shall meet and discuss the Annual Plan and Forecast with a non-Affiliate third party with expertise and experience in the lignite mining industry selected by Contract Miner ("Contract Miner's Expert") to determine an Annual Plan and Forecast that is reasonable under Prudent Operating Practices and prevailing facts and circumstances, including, without limitation, the most recent Annual Plan and Forecast and any changes to Prudent Operating Practices that are required due to Contract Miner's unexcused failure to deliver lignite to Alcoa for Sandow Unit 4 in accordance with the Sandow Unit Four Agreements and to TXU Sandow for Sandow Unit 5 in accordance with the Sandow Unit Five Agreement.  Any Annual Plan and Forecast mutually agreed upon by Owners and Contract Miner or by Owner's Expert and Contract Miner's Expert shall be implemented by Contract Miner subject to such adjustments as Contract Miner determines are necessary in accordance with Prudent Mining Practices.  In the absence of mutual agreement by Owners Contract Miner or Owner's Expert and Contract Miner's Expert prior to December 1, then any Party may refer the dispute regarding the Annual Plan and Forecast to binding arbitration in accordance with the provisions of Appendix A.  The arbitrator will determine the appropriate Annual Plan and Forecast, in light of the prevailing facts and circumstances, including the most recent Five-Year Forecast, Annual Mine Plan, and Mine Plan.  Any determination by mutual agreement of the Owners' Expert and Contract Miner's Expert or by arbitration shall be final and binding as an arbitral award on all Parties as the Annual Plan and Forecast for that period.  If a dispute as to the Annual Plan and Forecast is not resolved prior to the commencement of the applicable Operating Year, Contract Miner may implement the Annual Plan and Forecast as initially proposed, provided that Owners shall retain all of their rights and remedies under this Agreement against Contract Miner with respect to disputed amounts that are incurred due to a failure by Contract Miner to employ Prudent Operating Practices prior to the resolution of such dispute.

5.5    Reports.  Within five (5) days after the end of each month during the Term of this Agreement, Contract Miner shall submit to Owners a monthly report setting forth with respect to each month (and on a cumulative calendar year basis) lignite production and cost information relating to the Mining Services, including such information as is reasonably requested by Owners to calculate royalty, overriding royalty, and similar payments to owners.  In addition, Contract Miner shall comply with Owners' reporting requirements and shall furnish or cause to be furnished to Owners certain reports as may be necessary for Owners to meet their reporting requirements to Governmental Authorities, in each case as may be reasonably requested by an Owner.

5.6    Production Planning Meetings.  During the Term of this Agreement, the Parties shall meet periodically as necessary, but no less frequently than monthly (unless otherwise agreed by the Parties), to review the current production of lignite and the Annual Mine Plan for the forthcoming month or months, as applicable.  Any changes to the Mine Plan or Annual Mine Plan mutually agreed to by Contract Miner and Owners will be documented in a writing signed by all of the Parties.

5.7    Notification of Certain Events.  Upon obtaining actual knowledge thereof, each Party shall submit prompt written notice to the other Parties of the following, to the extent relating to the Mine or the Mining Services:  (i) any litigation, claims, disputes, or actions filed with any Governmental Authority; (ii) any actual refusal to grant, renew or extend, or any action filed with respect to the granting, renewal or extension of, any license, permit, approval, authorization or consent; (iii) all penalties or notices of violation issued by any Governmental Authority; (iv) any dispute with any Governmental Authority, which may have an adverse effect on the operation of the Mine; and (v) with respect to the matters identified in clauses (i), (ii), (iii) or (iv), any threats of such matters, which matters may have an adverse effect on the operation of the Mine

5.8    Audit Rights.  All costs, expenditures, charges and other accounting items referred to in this Agreement, and the schedules, attachments and exhibits to this Agreement will be determined from the books and records of the Party responsible for making such expenditure or calculating such charge (including the books and records of affiliated or subsidiary companies when appropriate so to do) in accordance with U.S. generally accepted accounting principles and with the procedures set forth in this Agreement.  Such determinations shall be made by the responsible Party subject to audit by its regular public accounting firm, which firm, upon request of any other Party and in conjunction with its next regular audit of the responsible Party, shall certify to the other Parties the amount of all items in question and that the books and records and methods of allocation upon which such determinations were made were kept and were made in accordance with generally accepted accounting principles consistently applied.  In addition, upon reasonable notice, each Party will have access to each other Party's said books and records solely for the purpose of verifying performance of the other Party's obligations under this Agreement.

**ARTICLE VI**
**COMPENSATION AND PAYMENT**

6.1    Owner Payments.  As compensation to Contract Miner for the performance of the Mining Services, Owners shall pay Contract Miner, in the manner and at the times specified in this Article VI, the following:

6.1.1    Alcoa Charges.  Alcoa will pay to Contract Miner on a monthly basis (using, where applicable, MMBtus for such monthly period), the following:

(A)(i)  for each month until the Sandow Unit 5 Consumption Date, an amount equal to the product of (x) 1.05, multiplied by (y) all Mining Service Costs, and (ii) for each month commencing on the Sandow Unit 5 Consumption Date, an amount equal to the product of (x) 1.05,

16

multiplied by (y) all Mining Services Costs, multiplied by (z) a fraction, the numerator of which is the Unit 4 MMBtu, and the denominator of which is the sum of the Unit 4 MMBtu and the Unit 5 MMBtu; plus

(B)

| | |
|---|---|
| until the Sandow 5 Consumption Date | Depreciation Factor x Total Capex Amount<br><br>plus<br><br>Return on Capital x Net Capex Amount |
| from the Sandow 5 Consumption Date until the earlier of (i) Sandow 5 Commercial Operation Date or (ii) 10/01/2009 | Depreciation Factor x Total Capex Amount<br><br>x  $\dfrac{\text{Unit 4 MMBtu}}{\text{Unit 4 MMBtu plus Unit 5 MMBtu}}$<br><br>plus<br><br>Return on Capital x Net Capex Amount<br><br>x  $\dfrac{\text{Unit 4 MMBtu}}{\text{Unit 4 MMBtu plus Unit 5 MMBtu}}$ |
| from the earlier of (i) Sandow 5 Commercial Operation Date or (ii) 10/01/2009 through 12/31/2011 | Depreciation Factor x Total Capex Amount<br><br>x  $\dfrac{\text{Greater of (i)Unit 4 MMBtu or (ii) Unit 4 Minimum MMBtu}}{\text{Greater of (i) Unit 4 MMBtu or (ii) Unit 4 Minimum MMBtu plus greater of (i) Unit 5 MMBtu or (ii) Unit 5 Minimum MMBtu}}$<br><br>plus<br><br>Return on Capital x Net Capex Amount<br><br>x  $\dfrac{\text{Greater of (i)Unit 4 MMBtu or (ii) Unit 4 Minimum Btu}}{\text{Greater of (i)Unit 4 MMBtu or (ii) Unit 4 Minimum MMBtu plus greater of (i) Unit 5 MMBtu or (ii) Unit 5 Minimum MMBtu}}$ |
| beginning 1/1/2012 | Depreciation Factor x Total Capex Amount x Sandow Unit 4 Capacity Factor<br>plus<br>Return on Capital x Net Capex Amount x Sandow Unit 4 Capacity Factor |

(C) following the Sandow Unit 5 Consumption Date, in the event of an Unplanned Outage for Sandow Unit 4, an Unit 4 Stand-By Fee; plus or minus (as applicable)

(D) to the extent applicable, an amount necessary to true-up any overage (i.e., a credit to Alcoa) or underage (i.e., an additional payment to Contract Miner) of previous payments by Alcoa under this Section 6.1.1 from prior periods.

6.1.2    <u>TXU Sandow Charges</u>.  TXU Sandow will pay to Contract Miner on a monthly basis (using, where applicable, MMBtus for such monthly period), the following:

(A) (i) for each month until the Sandow Unit 5 Consumption Date, $0 and (ii) for each month commencing on the Sandow Unit 5 Consumption Date, an amount equal to the product of (x) 1.05, multiplied by (y) all Mining Services Costs, multiplied by (z) a fraction, the numerator of which is the Unit 5 MMBtu, and the denominator of which is the sum of the Unit 4 MMBtu and the Unit 5 MMBtu; plus

(B)

| | |
|---|---|
| until the Sandow 5 Consumption Date | $0 |
| from the Sandow 5 Consumption Date until the earlier of (i) Sandow 5 Commercial Operation Date or (ii) 10/01/2009 | Depreciation Factor x Total Capex Amount<br><br>x  $\dfrac{\text{Unit 5 MMBtu}}{\text{Unit 4 MMBtu plus Unit 5 MMBtu}}$<br><br>plus<br><br>Return on Capital x Net Capex Amount<br><br>x  $\dfrac{\text{Unit 5 MMBtu}}{\text{Unit 4 MMBtu plus Unit 5 MMBtu}}$ |
| from earlier of (i) Sandow 5 Commercial Operation Date or (ii) 10/01/2009 through 12/31/2011 | Depreciation Factor x Total Capex Amount<br><br>x  $\dfrac{\text{Greater of (i) Unit 5 MMBtu or (ii) Unit 5 Minimum MMBtu}}{\text{Greater of (i) Unit 4 MMBtu or (ii) Unit 4 Minimum MMBtu plus greater of (i) Unit 5 MMBtu or (ii) Unit 5 Minimum MMBtu}}$<br><br>plus<br><br>Return on Capital x Net Capex Amount<br><br>x  Greater of (i) Unit 5 MMBtu or |

18

| | (ii) Unit 5 Minimum MMBtu<br>Greater of (i) Unit 4 MMBtu  or (ii)<br>Unit 4 Minimum MMBtu plus greater of<br>(i) Unit 5 MMBtu or (ii) Unit 5 Minimum<br>MMBtu |
|---|---|
| beginning 1/1/2012 | Depreciation Factor x Total Capex Amount x<br>Sandow Unit 5 Capacity Factor<br><br>plus<br><br>Return on Capital x Net Capex Amount x<br>Sandow Unit 5 Capacity Factor |

(C) following the Sandow Unit 5 Consumption Date, in the event of an Unplanned Outage for Sandow Unit 5, a Unit 5 Stand By Fee; plus or minus (as applicable)

(D) to the extent applicable, an amount necessary to true-up any overage (i.e., a credit to TXU Sandow) or underage (i.e., an additional payment to Contract Miner) of previous payments by TXU Sandow under this Section 6.1.2 from prior periods.

6.1.3    Collective Effect. It is the intent of the parties that through the foregoing allocations, Contract Miner shall be entitled to receive as aggregate compensation for its service to Owners (a) its Mining Services No Load Costs, (b) its Mining Services Costs plus 5%, (c) the Return on Capital on the Net Capex Amount and (d) the Depreciation Factor applied to the Total Capex Amount. Accordingly, at the end of the Term, Contract Miner shall be entitled to any remaining Capex Amount, not previously recovered through application of the Depreciation Factor, net of any gain or loss that Contract Miner realizes on sale of capital assets associated with the Mine.

6.1.4    Dual Outage Allocations and Special True-Up.

6.1.4.1    Dual Outage. Beginning on the Sandow 5 Consumption Date through the end of the Term, in the event that neither Sandow Unit 4 nor Sandow Unit 5 consumes any MMBtus of lignite from the Mine in any given month, the Mining Services Costs under Section 6.1.1 (A) and Section 6.1.2 (A) that would otherwise have been allocated on an MMBtu basis shall instead be allocated for such month 54% to Alcoa and 46% to TXU Sandow; provided that in such event, Contract Miner will use commercially reasonable efforts to mitigate the Mining Services Costs for such month to the  extent practicable. During the period from the Sandow Unit 5 Consumption Date through the Sandow Unit 5 Commercial Operation Date, in the event that neither Sandow Unit 4 nor Sandow Unit 5 consumes any lignite from the Mine in any given  month, the amounts that would otherwise would have been allocated on an MMBtu basis pursuant to Section 6.1.1(B) and Section 6.1.2(B) shall instead be allocated  for such month 54% to Alcoa and 46% to TXU Sandow.

6.1.4.2 Special True-Up. In the first month following the end of any Operating Year, in the event the cumulative Mining Services Costs paid by Alcoa for such Operating Year divided by the Unit 4 MMBtu for such Operating Year ($/MMBtu) does not equal the cumulative Mining Services Costs paid by TXU Sandow for such Operating Year divided by the Unit 5 MMBtu for such Operating Year ($/MMBtu), then a true-up between the Owners with respect to each unit will be determined as follows:

Alcoa Calculation:

Cumulative Mining Services Costs paid for such Operating Year

*divided by* the sum of (i) Unit 4 MMBtu for such Operating Year, (ii) Unit 4 MMBtu deemed consumption used to calculate the Unit 4 Stand-by Fee (if applicable), (iii)Unit 5 MMBtu for such Operating Year and (iv) Unit 5 MMBtu deemed consumption used to calculate the Unit 5 Stand-by Fee (if applicable),

*multiplied by* the sum of (i) Unit 4 MMBtu for such Operating Year and (ii) the Unit 4 MMBtu deemed consumption used to calculate the Unit 4 Stand-by Fee (if applicable)

*minus* the cumulative Mining Services Costs paid by Alcoa for such Operating Year.

TXU Sandow Calculation:

Cumulative Mining Services Costs paid for such Operating Year

*divided by* the sum of (i) Unit 4 MMBtu for such Operating Year, (ii) Unit 4 MMBtu deemed consumption used to calculate the Unit 4 Stand-by Fee (if applicable), (iii)Unit 5 MMBtu for such Operating Year and (iv) Unit 5 MMBtu deemed consumption used to calculate the Unit 5 Stand-by Fee (if applicable),

*multiplied by* the sum of (i) Unit 5 MMBtu for such Operating Year and (ii) the Unit 5 MMBtu deemed consumption used to calculate the Unit 5 Stand-by Fee (if applicable)

*minus* the cumulative Mining Services Costs paid by TXU Sandow for such Operating Year.

The Owner whose dollar amount derived from the foregoing calculation is a positive amount, shall make payment to the other Owner of the calculated amount derived from the foregoing calculation within fifteen (15) days.

If, at the end of any month in an Operating Year, the absolute value of the amount derived from operation of the foregoing calculation exceeds $2,500,000, the foregoing true-up shall be performed at such time.

6.1.5    Mining Services No-Load Costs. Notwithstanding the provisions of Section 6.1.1(A) and Section 6.1.2(A), when calculating the charges under Section 6.1.1 (A) and Section 6.1.2(A), Mining Services No Load Costs shall be multiplied by 1.00 instead of 1.05.

6.1.6    <u>Return on Capital and Depreciation Calculations</u>.  For any monthly invoice, the Depreciation Factor shall be applied to the beginning monthly balance of the Total Capex Amount until fully depreciated and the Return on Capital on the Net Capex Amount shall be applied to the beginning monthly balance of the Net Capex Amount.

6.2    <u>Sandow Mine Services</u>.  Mining Services, and the associated fees provided for Mining Services in this Agreement, do not include any services that Alcoa may request Contract Miner to provide from time-to-time with respect to the Sandow Mine.  Contract Miner, upon reasonable request, will provide services to, or procure from a third party for, Alcoa with respect to the Sandow Mine (such services, the "<u>Sandow Services</u>") at cost plus 5%.  Contract Miner will invoice any fees for Sandow Services on a monthly basis, and payment will be due from Alcoa on or before the Due Date for such invoice.  Notwithstanding anything to the contrary herein, neither Contract Miner nor any of its Affiliates assumes under this Agreement any liabilities or obligations of Alcoa with respect to the Sandow Mine (including liabilities or obligations associated with the closing of the Sandow Mine) which Alcoa retains in all respects.

6.3    <u>Payment for Services</u>.  On the first Business Day of each month, Contract Miner shall provide each Owner an estimate of the fees each will owe to Contract Miner for such month pursuant to this Agreement.  On the fourth Business Day of each month (such date, the "<u>Due Date</u>") Owners shall make payment by wire transfer to such account designated by Contract Miner funds in the amount of Contract Miner's estimate of the applicable amounts due to Contract Miner pursuant to this Agreement for the previous month.

6.4    <u>Disputed Amounts</u>.  A Party may, in good faith, dispute the correctness of any invoice, or any adjustment to an invoice rendered under this Agreement or adjust any invoice for any arithmetic or computational error, within 12 months of the date of invoice or adjustment.  Any dispute with respect to an invoice is waived unless the other Party receives notice under this Section 6.4 within 12 months after the invoice is rendered or any specific adjustment to the invoice is made.  In the event an invoice or portion thereof, or any other claim or adjustment arising hereunder, is disputed, payment of the invoice shall be required to be made when due, with notice of the objection given to the other Party.  Any invoice dispute or invoice adjustment shall be in writing and shall state the basis for the dispute or adjustment.  The Parties shall negotiate in good faith to resolve any such disputed invoice.  In the event the Parties are unable to resolve such dispute within thirty (30) days of the disputing Party's delivery of its objection notice to the invoicing Party, such dispute shall be conclusively resolved by a nationally recognized independent accounting firm mutually agreed to by the Parties, which resolution shall be final and binding between the Parties.  Upon resolution of the dispute, any required payment shall be made within two Business Days of such resolution along with interest accrued at the Interest Rate from and including the due date to but excluding the date paid.  Inadvertent overpayments shall be returned upon request or deducted by the Party receiving such overpayment from subsequent payments, with interest accrued at the Interest Rate from and including the date of such overpayment to but excluding the date repaid or deducted by the Party receiving such overpayment.

6.5    <u>Late Payment</u>.  To the extent an Owner fails to pay any amount required under this Article VI by the Due Date, such unpaid amount shall accrue interest each day at the Late Payment Rate from the Due Date until such amount (plus accrued interest) is paid in full.

6.6    Offsets. Notwithstanding anything to the contrary contained herein, to the extent Contract Miner uses the Mine Property or the Mine Personnel for any of its other mines or for any third party, including an affiliate of Contract Miner or any Owner, during any month, the Mining Services Costs shall exclude charges for such Mine Property or Mine Personnel to the extent of such use.

6.7    Other Arrangements. The Parties acknowledge that pursuant to the provisions of Section 5.18 of the Purchase Agreement, certain amounts that otherwise would be Mining Services Costs or Capex Amounts within this Agreement shall be allocated in accordance with such Section 5.18.

## ARTICLE VII
## TERM

7.1    Term. The "Term" of this Agreement shall be from and including the Effective Date to and including the earlier of the life of the Mine or December 31, 2038, unless terminated earlier as provided in this Agreement. Notwithstanding the foregoing, this Agreement will terminate (i) with respect to Alcoa, upon the termination of the Sandow Unit Four Agreement and (ii) with respect to TXU Sandow, upon the termination of the Sandow Unit Five Agreement.

## ARTICLE VIII
## INSURANCE

8.1    Contract Miner Insurance. Contract Miner shall throughout the Term hereof maintain the insurance as set forth below:

8.1.1    Automobile bodily injury and property damage liability insurance covering automobiles owned, hired or leased by Contract Miner with a limit for bodily injury and property damage of not less than $5,000,000 per accident;

8.1.2    Workers' compensation insurance covering Contract Miner's employees and employer's liability insurance with a limit of not less than $5,000,000 bodily injury each accident, $5,000,000 each employee bodily injury by disease, $5,000,000 policy limit bodily injury by disease (such insurance shall be endorsed to include an Alternate Employer Endorsement issued in favor of Owners on form WC 00 03 01 A, or its equivalent, along with coverage under the Federal Coal Mine Health and Safety Act and United States Longshore & Harbor Workers' Act, if applicable); and

8.1.3    Commercial general liability insurance covering bodily injury and property damage (such policy shall have a limit of not less than $5,000,000 per occurrence and $5,000,000 in the aggregate, including personal and advertising injury, contractual liability, products and completed operations and shall not include exclusions for explosion, collapse and underground exposures. Further, such policy shall state each insured is provided coverage as though a separate policy had been issued to each, except with respects to limits of insurance).

The required limits on insurance in this Section 8.1 may be satisfied by Contract Miner through any combination of primary and excess coverage. Contract Miner may not utilize occupational

accident or health insurance policies, or the equivalent, in lieu of Workers' Compensation Insurance, or otherwise attempt to opt out of the Texas Workers' Compensation system.

8.2     Form and Content. All policies, binders or interim insurance contracts with respect to insurance maintained by Contract Miner pursuant to this Article VIII shall:

8.2.1     With respect to the insurance described in Sections 8.1.1 and 8.1.3, include as additional insureds each Owner and its Affiliates, and officers, directors and employees thereof; and

8.2.2     With respect to all general liability and workers' compensation policies procured by Contract Miner related to the Mine, require the insurer to waive subrogation against each Owner and its Affiliates, and the officers, directors and employees thereof.

8.3     Self-Insurance. Subject to annual review and authorization from Owners with respect to retentions, Contract Miner may self-insure any or all of the insurance required in this Article VIII. Any and all liabilities that would otherwise, in accordance with the provisions of this Agreement, be covered by Contract Miner's insurance will be covered as if Contract Miner elected not to include self-insurance for such claim. Any self-insurance program will be deemed to contain terms and conditions applicable to ISO policy forms, or their equivalent, including a provision which names Owners as an additional insured for general liability and auto liability and entitles Owners to defense and indemnification under the self-insurance program. If Contract Miner elects to self-insure, then with respect to any claims, incidents or occurrences during the term of this Agreement, such self-insurance obligation shall survive the expiration or earlier termination of this Agreement, to the same extent as the insurance required hereunder would survive.

8.4     Deductibles. All deductibles paid on insurance policies obtained by Contract Miner pursuant to this Agreement shall be payable by Owners as a Mining Services Cost in accordance with Section 6.1. In the event of any claims covered under the insurance policies specified in Section 8.1 or 8.2 hereof, Owners shall look solely to such policies as recourse for such claims, irrespective of the cause; provided, however, that if and to the extent any deductible liability under any such policies is attributable solely to Liabilities resulting from Contract Miner's gross negligence, willful misconduct, or willful violation of any Applicable Law, Contract Miner shall be liable for the payment of the deductible, subject to Contract Miner's aggregate limitation of liability in Section 10.2.

8.5     Change in Scope. Contract Miner shall advise Owners and obtain prior approval (such approval not to be unreasonably withheld, conditioned or delayed) of any material changes to the scope of coverage provided on Contract Miner's insurance policy forms or to material changes with respect to deductibles or self-insurance elections.

8.6     Certificates of Insurance. Contract Miner will provide Owners with certificate(s) of insurance, reasonably acceptable to Owners in form and content, evidencing that all of Contract Miner's insurance is in compliance with the requirements listed herein. The certificate(s) must contain a provision that obligates the insurance company(ies) issuing such

policy(ies) to notify Owners in writing at least thirty (30) days prior to any cancellation or non-renewal of coverage.

## ARTICLE IX
## INDEMNIFICATION

9.1   General Indemnification.

9.1.1   By Contract Miner. Subject to the limitations of liability in Sections 10.1 and 10.2, Contract Miner shall indemnify and hold harmless each Owner and its Affiliates, and its respective officers, directors, managers, employees, agents and representatives (the "Owners Indemnitees") from and against, and no Owners Indemnitee shall be responsible hereunder for, any Liabilities sustained or suffered by any Owners Indemnitee in connection with any third party claims for injury or death to individuals or loss of or damage to property, to the extent caused by Contract Miner's gross negligence, willful misconduct, or willful violation of Applicable Law in the performance of the Mining Services, but excluding (i) any Liabilities to the extent caused by the gross negligence, willful misconduct, or willful violation of any Applicable Law by any Owners Indemnitee; and (ii) any Liabilities to the extent caused by the design, construction, or condition of the Mine beyond the reasonable control of Contract Miner (including failure or inadequacy of materials, corrosion, degradation, wear and tear, and damages caused by third parties not working under the supervision of Contract Miner); and (iii) Liabilities to the extent caused by Alcoa's operation of the Mine prior to the Effective Date. NOTWITHSTANDING THE FOREGOING, UNDER NO CIRCUMSTANCES SHALL CONTRACT MINER INDEMNIFY AND HOLD HARMLESS ANY OWNERS INDEMNITEE FROM AND AGAINST ANY THIRD-PARTY CLAIMS FOR LIABILITIES SUSTAINED OR SUFFERED BY AN OWNERS INDEMNITEE IN CONNECTION WITH ANY INJURY OR DEATH TO INDIVIDUALS OR LOSS OF OR DAMAGE TO PROPERTY, TO THE EXTENT CAUSED BY CONTRACT MINER'S NEGLIGENCE (AS OPPOSED TO GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR WILLFUL VIOLATION OF APPLICABLE LAW), IT BEING AGREED THAT EACH OWNER'S AGREEMENT TO BEAR SUCH LIABILITIES, AS APPLICABLE, IS A BARGAINED-FOR ELEMENT OF THE COMPENSATION OF CONTRACT MINER UNDER THIS AGREEMENT, AND THE APPLICABLE OWNER HEREBY AGREES TO INDEMNIFY CONTRACT MINER FROM ANY AND ALL SUCH LIABILITIES. Notwithstanding the indemnification obligations set forth in this Section 9.1.1, Contract Miner shall not be obligated to indemnify any Alcoa Indemnitee under this Section 9.1.1 to the extent that Contract Miner indemnifies such Alcoa Indemnitee pursuant to Section 4.2.5.

9.1.2   By TXU Sandow. Subject to the limitations of liability in Section 10.1, TXU Sandow releases, and agrees to indemnify and hold harmless, Contract Miner and its Affiliates, and their respective officers, directors, managers, employees, agents and representatives (the "Contract Miner Indemnitees"), from and against, and no Contract Miner Indemnitee shall have responsibility for the following:

9.1.2.1   any and all Liabilities related to the payment of Royalties, production payments or similar payments related to lignite extracted from the Mine in providing Mining Services under this Agreement;

9.1.2.2     any and all Liabilities to TXU Sandow or any other Person (other than Alcoa or its Affiliates) that own any interest in the properties included in the geographical boundaries of the Mine that relate to Contract Miner's performance of Mining Services, except to the extent arising as a result of Contract Miner's failure to use Prudent Operating Practices or to comply with the Mine Permit in its performance of Mining Services; and

9.1.2.3     without limiting Sections 9.1.2.1 and 9.1.2.2, any and all Liabilities sustained or suffered by any Contract Miner Indemnitee in connection with any third party claim for injury or death to individuals or loss of or damage to property, to the extent caused by TXU Sandow's gross negligence, willful misconduct, or willful violation of any Applicable Law, but excluding any Liabilities to the extent caused by the gross negligence, willful misconduct, or willful violation of the Mining Permit or failure to adhere to Prudent Operating Practices with respect to the Mining Services by any Contract Miner Indemnitee.

9.1.3     By Alcoa.  Subject to the limitations of liability in Section 10.1, Alcoa releases, and agrees to indemnify and hold harmless Contract Miner Indemnitees from and against, and no Contract Miner Indemnitee shall have responsibility for, the following:

9.1.3.1     any and all Liabilities associated with the Mine or otherwise associated with activities at the Mine prior to the Effective Date and any and all Liabilities associated with the Sandow Services or activities at the Sandow Mine (whether prior to or following the Effective Date);

9.1.3.2     any and all Liabilities related to the payment of Royalties, production payments or similar payments related to lignite extracted from the Mine in providing Mining Services under this Agreement;

9.1.3.3     any and all Liabilities to Alcoa or any other Person (other than TXU Sandow or its Affiliates) that own any interest in the properties included in the geographical boundaries of the Mine that relate to Contract Miner's performance of Mining Services, except to the extent arising as a result of Contract Miner's failure to use Prudent Operating Practices or to comply with the Mine Permit in its performance of Mining Services; and

9.1.3.4     without limiting Sections 9.1.3.1, 9.1.3.2 and 9.1.3.3, any and all Liabilities sustained or suffered by any Contract Miner Indemnitee in connection with Alcoa's prior operation of the Mine and any third party claims for injury or death to individuals or loss of or damage to property, to the extent caused by Alcoa's gross negligence, willful misconduct, or willful violation of any Applicable Law, but excluding any Liabilities to the extent caused by the gross negligence, willful misconduct, or willful violation of the Mining Permit or failure to adhere to Prudent Operating Practices with respect to the Mining Services by any Contract Miner Indemnitee.

9.1.3.5     any and all liabilities to the extent caused by an act or omission taken by Contract Miner at the direction of the Transition Mine Manager, Alcoa or any Alcoa Affiliate;

For purposes of this Section 9.1.3, the definition of "Contract Miner Indemnitee" does not include TXU Sandow acting in its role as Owner.

        9.1.4     Claim Notice. An indemnitee hereunder shall provide notice to the indemnifying Party hereunder, within thirty (30) Business Days after receiving written notice of the commencement of any claims or threatened claims against such indemnitee in respect of which indemnification may be sought pursuant to this Agreement (such notice, a "Claim Notice"). The indemnitee's failure to give, or tardiness in giving, such Claim Notice will reduce the liability of the indemnifying Party only by the amount of Liabilities proven to be attributable to such failure or tardiness, but shall not otherwise relieve the indemnifying Party from any liability that it may have under this Agreement. In case any such claim shall be made or brought against an indemnitee and such indemnitee shall notify (by sending a Claim Notice) the indemnifying Party thereof, and the indemnitee may by such Claim Notice require the indemnifying Party to assume and control the defense of the claim that is the subject of such Claim Notice, in which case the indemnifying Party may select counsel after consultation with the indemnitee, and the indemnifying Party shall pay all expenses of the conduct of such defense. The indemnitee shall have the right to employ separate counsel in any such proceeding and to participate in (but not control) the defense of such claim, but the fees and expenses of such counsel shall be borne by the indemnitee unless the indemnifying Party shall agree otherwise; provided, however, if the named parties to any such proceeding (including any impleaded parties) include both the indemnitee and the indemnifying Party, the indemnifying Party requires that the same counsel represent both the indemnitee and the indemnifying Party, and representation of both Parties by the same counsel would be inappropriate due to actual or potential differing interests or legal conflicts between them, then the indemnitee shall have the right to retain its own counsel at the cost and expense of the indemnifying Party. If the indemnifying Party shall have failed to assume or diligently prosecute the defense of any claim in accordance with the provisions of this Section 9.1.4, then the indemnitee shall have the absolute right to control the defense of such claim and to settle, compromise, consent to entry of judgment or otherwise seek to terminate such claim and the fees and expenses of such defense, settlement, compromise or consent, including reasonable attorneys' fees of the indemnitee's counsel and any Liabilities determined to be owed by indemnitee pursuant to such claim, shall be borne by the indemnifying Party, provided that the indemnifying Party shall be entitled, at its expense, to participate in (but not control) such defense. Subject to all of the foregoing provisions of this Section 9.1.4, (a) the indemnifying Party shall control the settlement of all claims; provided, however, that (i) such settlement shall include a dismissal with prejudice of the claim and an explicit and unconditional release from the Person bringing such claim of all indemnitees; (ii) such settlement shall not provide for any relief other than the payment of monetary damages; and (iii) the indemnifying Party shall not conclude any settlement without the prior approval of the indemnitee, which approval shall not be unreasonably withheld, conditioned or delayed; and (b) except as provided in the preceding sentence concerning the indemnifying Party's failure to assume or to diligently prosecute the defense of any claim (in which case such indemnitees shall have the right to control the defense, settlement and any compromise of such claim in accordance with the previous sentence), no indemnitee seeking reimbursement pursuant to the foregoing indemnity shall, without the prior written consent of the indemnifying Party, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any claim for which indemnity is afforded hereunder unless such indemnitee reasonably believes that the matter in question involves potential criminal liability against such

indemnitee. The indemnitee shall provide reasonable assistance to the indemnifying Party when the indemnifying Party so requests, at the indemnifying Party's expense, in connection with such claim.

      9.1.5    Joint Causation.  To the extent any indemnitor hereunder is obligated under this Section 9.1 to indemnify or hold harmless any indemnitee hereunder for Liabilities in any situation where there is joint or concurring causation by such indemnitee, such indemnity obligation shall be construed as providing for the application of comparative negligence/fault principles to allocate liability as between the applicable indemnitor and indemnitees.

ARTICLE X
LIABILITIES OF THE PARTIES

      10.1    Limitations of Liability.  Notwithstanding any provision in this Agreement to the contrary, absent fraud none of the Parties nor any of their respective partners, principals, officers, managers, members, shareholders, directors, agents, contractors, subcontractors, vendors or employees shall be liable hereunder for consequential, indirect, punitive or exemplary loss or damage, including loss of profit, cost of capital, loss of goodwill, increased operating costs or any other special or incidental damages. The Parties further agree that the waivers and disclaimers of liability, indemnities, releases from liability, and limitations on liability expressed in this Agreement shall survive termination or expiration of this Agreement, and shall apply at all times, whether in contract, equity, tort or otherwise, regardless of the fault, negligence (in whole or in part), strict liability, breach of contract or breach of warranty of the Party indemnified, released or whose liabilities are limited, and shall extend to the partners, principals, directors, managers, members, shareholders, officers and employees, agents and Affiliates of such Party, and their partners, principals, directors, managers, members, shareholders, officers and employees.

      10.2    Contract Miner's Total Aggregate Liability.  Notwithstanding anything to the contrary in this Agreement, absent fraud, gross negligence or willful misconduct, the total aggregate liability of Contract Miner to Owners hereunder for all costs, deductibles and other Liabilities arising out of any events occurring or claims made in connection with the performance or the unexcused nonperformance of the Mining Services under this Agreement, including amounts credited to Alcoa on account of a Sandow Unit 4 Delivery Default under Section 10.5, shall not exceed $20,000,000 in any Operating Year or $45,000,000 in the aggregate. It is expressly understood and agreed that (i) the aggregate liability limitation expressed in this Section 10.2 is separate from, and shall not be construed as limiting, the limits of insurance and coverages described in Article VIII, and (ii) Owners shall indemnify and hold harmless the Contract Miner Indemnitees from and against any Liabilities sustained or suffered by any Contract Miner Indemnitee (excluding Liabilities to the extent caused by the gross negligence, willful misconduct or willful violation of Applicable Law of or by any Contract Miner Indemnitee) arising out of events occurring or third party claims made in any Operating Year that are in excess of the aggregate liability limitation expressed in this Section 10.2.

      10.3    No Warranties or Guarantees.  EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, NO PARTY MAKES ANY WARRANTIES OR GUARANTEES TO THE OTHER PARTIES, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE SUBJECT

MATTER OF THIS AGREEMENT, AND EACH PARTY DISCLAIMS AND WAIVES ANY IMPLIED WARRANTIES OR WARRANTIES IMPOSED BY LAW, INCLUDING MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

    10.4    <u>Exclusive Remedies</u>. The remedies under this Agreement in respect of or in consequence of (a) any breach of contract; (b) any negligent act or omission; (c) death or personal injury; or (d) loss of or damage to any property, shall be to the exclusion of any other remedy that any Party may have against the other Parties under Applicable Law or otherwise.

    10.5    <u>Delivery Default; Remedies</u>.

    10.5.1    A "<u>Sandow Unit 4 Delivery Default</u>" shall mean, unless excused by Force Majeure or a breach of this Agreement by Alcoa, Contract Miner's failure to deliver lignite to Alcoa for Sandow Unit 4 in accordance with the terms of the Sandow Unit Four Agreements. If a Sandow Unit 4 Delivery Default occurs and is continuing, (a) Contract Miner, upon written notice from Alcoa of a Sandow Unit 4 Delivery Default, shall attempt in good faith to cure such Sandow Unit 4 Delivery Default as promptly as possible and (b) if Contract Miner shall fail to have cured such Sandow Unit 4 Delivery Default within 30 days, Alcoa, subject to its obligations to mitigate damages, may avail itself of the remedies provided in Section 12.6. Notwithstanding anything to the contrary in this Agreement, the remedy specified in this Section 10.5.1 shall be the exclusive remedy of Alcoa for the unexcused failure of Contract Miner to deliver lignite to Alcoa for Sandow Unit 4 in accordance with the Sandow Unit Four Agreements.

    10.5.2    A "<u>Sandow Unit 5 Delivery Default</u>" shall mean, unless excused by Force Majeure or a breach of this Agreement by TXU Sandow, Contract Miner's failure to deliver lignite to TXU Sandow for Sandow Unit 5 in accordance with the Sandow Unit Five Agreement. If a Sandow Unit 5 Delivery Default occurs and is continuing, (a) Contract Miner, upon written notice from TXU Sandow of such Sandow Unit 5 Delivery Default, shall attempt in good faith to cure such Sandow Unit 5 Delivery Default as promptly as possible and (b) if Contract Miner shall fail to have cured such Sandow Unit 5 Delivery Default within 30 days, TXU Sandow, subject to its obligations to mitigate damages, may avail itself of the remedies provided in Section 12.6. Notwithstanding anything to the contrary in this Agreement, the remedy specified in this Section 10.5.2 shall be the exclusive remedy of TXU Sandow for the unexcused failure of Contract Miner to deliver lignite to TXU Sandow for Sandow Unit 5 in accordance with the Sandow Unit Five Agreement.

    10.6    <u>No Alteration of Other Agreements</u>. This Agreement in no way: (a) alters, amends or otherwise affects the Parties' rights and obligations as expressly provided in writing under the Sandow Unit Four Agreements, the Sandow Unit Five Agreement or any other agreements ancillary to the Sandow Unit Four Agreements and the Sandow Unit Five Agreement, or (b) limits an Indemnitor's right to make claims for contribution or otherwise to the extent provided in writing in the Sandow Unit Four Agreements, the Sandow Unit Five Agreement or any other agreements ancillary to the Sandow Unit Four Agreements and the Sandow Unit Five Agreement.

## ARTICLE XI
## CONFIDENTIALITY

11.1    <u>Confidential Information</u>. Each Party (the "<u>Receiving Party</u>") (i) shall treat and hold as such any Confidential Information regarding the other Party (the "<u>Providing Party</u>") or any of its Affiliates which the Receiving Party receives or has received during the negotiation and performance of this Agreement from the Providing Party, (ii) shall not disclose any such Confidential Information to any third parties (other than to the Receiving Party's employees, attorneys, accountants, lenders and other representatives who have a need-to-know in connection with this Agreement and the transactions contemplated hereby, and who are under a corresponding duty of confidence to the Receiving Party), and (iii) shall not use such Confidential Information except in connection with this Agreement. Notwithstanding anything to the contrary in the foregoing, the Receiving Party may disclose Confidential Information it is legally required to furnish by subpoena or other legal process or by Applicable Law, including disclosure required by Governmental Authorities, in which case the Receiving Party will notify the Providing Party prior to making the disclosure, shall use reasonable efforts to limit disclosure and obtain confidential treatment of such Confidential Information from the Governmental Authority. Each Party shall treat the terms of this Agreement as Confidential Information of the other Party. The Parties agree that monetary damages would not be a sufficient remedy for any breach of this Section 11.1, and that in addition to all other remedies available to the Providing Party, the Providing Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

12.1    <u>Assignment</u>. The rights and obligations provided by this Agreement, in whole or in part (including without limitation subcontracting any or all of its rights), may not be assigned by a Party without the prior written consent of the other Parties hereto, which consent may not be unreasonably withheld, conditioned or delayed. This Agreement shall be binding upon and shall inure to the benefit of the successors and permitted assigns of the Parties. A Party may withhold its consent to an assignment of any of the rights or obligations of this Agreement if, *inter alia*, the proposed assignee is reasonably unlikely to be able to meet its obligations under this Agreement, including, with respect to Contract Miner, the standard of performance required of Contract Miner.

12.2    <u>Access</u>.

12.2.1    <u>Owners' Access</u>. Owners and their agents and representatives shall have reasonable access to the Mine upon reasonable advance notice to Contract Miner.

12.2.2    <u>Compliance with Contract Miner's Procedures</u>. During any inspection or review of the Mine, Owners, and their agents and representatives shall comply with all of Contract Miner's safety and security procedures, and Owners, and their agents and representatives shall conduct such inspection and reviews in such a manner as to cause minimum interference with Contract Miner's activities.

29

12.3    <u>Not for Benefit of Third Parties</u>.  Except as otherwise expressly provided herein (including Article IX and Section 12.1), this Agreement and each and every provision hereof is for the exclusive benefit of the Parties that executed this Agreement and not for the benefit of any third party.

12.4    <u>Force Majeure</u>.

12.4.1    <u>Events Constituting Force Majeure</u>.  A "<u>Force Majeure Event</u>" is any event that (a) restricts or prevents performance under this Agreement, (b) is not reasonably within the control of the Party affected or caused by the default or negligence of the affected Party and (c) could not be overcome or avoided by the exercise of commercially reasonable efforts.  Force Majeure Events include failure of equipment or facilities or inability to perform the Mining Services or deliver fuel to Sandow Unit 4 or Sandow Unit 5 due to drought, flood, earthquake, storm, fire, lightening, epidemic, war, riot, acts of Governmental Authorities, civil disturbance, sabotage, accident or curtailment of supply, unavailability of construction materials or replacement equipment beyond the affected Party's reasonable control,  inability after reasonable effort to obtain and maintain rights-of-way, permits, licenses and other required authorizations from any Governmental Authority or Person for any of the facilities or equipment necessary to provide Mining Services hereunder and restraint by court, and changes in law or regulations that materially affect performance under this Agreement.  Notwithstanding anything else to the contrary, except for the obligations of a Party to make payments of amounts then due hereunder to another Party, such Party shall be excused from performance of a Party's obligations hereunder and shall not be considered to be in default in respect to any obligation hereunder if failure of performance shall be due to a Force Majeure Event.  No Party, however,' shall be relieved of its obligations pursuant to this Section 12.4.1 solely because of general market or economic conditions.

12.4.2    <u>Notice</u>.  If any Party's ability to perform its obligations under this Agreement is affected by a Force Majeure Event, such Party claiming such inability shall (i) promptly notify the other Parties of such event and its cause and confirm the same in writing within ten (10) Business Days of its discovery, (ii) promptly supply such available information about the Force Majeure Event and its cause as may be reasonably requested by the other Parties and (iii) initiate reasonable efforts to remove the cause of the Force Majeure Event or to lessen its effect.

12.4.3    <u>Scope</u>.  The suspension of performance shall be of no greater scope and no longer duration than that which is necessary.  The excused Party shall use its commercially reasonable efforts to remedy its inability to perform due to a Force Majeure Event.

12.5    <u>Change in Law</u>.  In the event of a Change in Law, an equitable adjustment in the terms of this Agreement to mitigate the impact of such Change in Law shall me made and this Agreement shall be modified by written amendments executed by authorized representatives of each Party to reflect such equitable adjustment.  Each of the Parties hereto agree to negotiate in good faith such equitable adjustment.

12.6    <u>Dispute Resolution</u>.  The Parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement.  Any Party may give notice to the other Parties of

any dispute arising out of or relating to this Agreement that is not resolved in the normal course of business (the "Dispute Notice"). Within 30 days after delivery of the Dispute Notice, the receiving Parties shall submit to the other Parties a written response. Within 60 days after delivery of the Dispute Notice, an authorized representative of each Party shall meet, and thereafter as often as they deem reasonably necessary, to attempt to resolve the dispute. All reasonable requests for information made by one Party to the others shall be complied with. All negotiations pursuant to this clause shall be confidential. This provision shall in no way limit a Party's right to pursue any legal or equitable remedies available to it (i) at any time on or after 90 days after delivery of a Dispute Notice and (ii) at any time prior to 90 days after delivery of a Dispute Notice if such Party reasonably considers it to be necessary to prevent it suffering any adverse consequences as a result of such dispute.

12.7    Amendments. No amendments or modifications of this Agreement shall be valid unless evidenced in writing and signed by duly authorized representatives of each Party.

12.8    Survival. Notwithstanding any provisions herein to the contrary, the rights and obligations set forth in Articles VI (with respect to any compensation earned or incurred by Contract Miner during the Term), IX, X, XI and XII (including the limitations on liabilities set forth therein) shall survive, in full force, the expiration or termination of this Agreement.

12.9    No Waiver. It is understood and agreed that any delay, waiver or omission by any Owner or Contract Miner to exercise any right or power arising from any breach or default by any Owner or Contract Miner with respect to any of the terms, provisions, or covenants of this Agreement shall not be construed to be a waiver by such Owner or Contract Miner of any subsequent breach or default of the same or other terms, provisions or covenants on the part of the applicable Owner or Contract Miner.

12.10    Notices. Any written notice required or permitted under this Agreement shall be in writing, deemed to have been duly given on the date of receipt, and shall be either delivered personally to the Party to whom notice is given, or mailed to the Party to whom notice is to be given, by facsimile or first class registered or certified mail, return receipt requested, postage prepaid, and addressed to the addressee at the address indicated in this Section 12.10, or if different, at the most recent address specified by written notice given to the other Parties in the manner provided in this Section 12.10.

If to Alcoa:

Alcoa Inc.
Rockdale Operations
Post Office Box 472
4069 Charles Martin Hall Road
Rockdale, Texas 76567
Attn: Location Manager
Facsimile No.: (512) 446-8200

With a copy to:

Alcoa Inc.

31

390 Park Avenue
New York, New York 10022-4608
Attn:   General Counsel
Facsimile No.:(212) 836-2844

If to TXU Sandow:

TXU Sandow Development Company LP
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201
Attn:  Chief Legal Officer
Fax:  (214) 812-6032

With a copy to:

Hunton & Williams LLP
Energy Plaza, 30th Floor
1601 Bryan Street
Dallas, Texas 75201
Attn:  Scott H. Matheson
Fax:  (214) 979-3016

If to TXU Mining:

TXU Mining Company LP
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201
Attn:  Chief Legal Officer
Fax:  (214) 812-6032

With a copy to:

Hunton & Williams LLP
Energy Plaza, 30th Floor
1601 Bryan Street
Dallas, Texas 75201
Attn:  Scott H. Matheson
Fax:  (214) 979-3016

12.11  Representations and Warranties.  Each Party represents and warrants to the other Parties that as of the Effective Date such Party has the full power and authority to execute, deliver and perform this Agreement and to carry out the transactions contemplated hereby.

12.12  Counterparts.  The Parties may execute this Agreement in counterparts, which shall, in the aggregate, when signed by each Party constitute one and the same instrument; and,

32

thereafter, each counterpart shall be deemed an original instrument as against any Party who has signed it.

12.13  Governing Law; Waiver of Jury Trial.  This Agreement will be construed in accordance with the substantive laws of the State of Texas without giving effect to principles of conflicts of law or choice of law.  Each Party hereby waives its rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement.

12.14  Exhibits and Appendices.  All exhibits and appendices attached hereto shall be considered a part hereof as though fully set forth herein.

12.15  Severability.  If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid by any court or other forum of competent jurisdiction, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid, shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

12.16  Not to be Construed Against Drafter.  The Parties acknowledge that they have had an adequate opportunity to review each and every provision contained in this Agreement and to submit the same to legal counsel for review and comments.  Based on the foregoing, the rule of construction that a contract be construed against the drafter, if any, will not be applied in the interpretation and construction of this Agreement.

[THE REMAINDER OF THIS PAGE IS BLANK INTENTIONALLY;
THE SIGNATURE PAGE(S) IMMEDIATELY FOLLOW]

IN WITNESS WHEREOF, the Parties have executed this Agreement through their duly authorized officers as of the date set forth in the preamble to this Agreement, effective as of the Effective Date.

**TXU MINING COMPANY LP**

By: TXU MINING MANAGEMENT COMPANY
    LLC, its general Partner

By: _____
Name: _Gerry Pearson_____
Title: _Vice President, Mine Operations_

**ALCOA INC.**

By: _____
Name: James M. Dwyer
Title: Attorney in Fact

**TXU SANDOW DEVELOPMENT COMPANY LP**

By: TXU SANDOW MANAGEMENT
    COMPANY LLC, its general Partner

By: _____
Name: _Michael P. Childers_____
Title: _President and Chief Executive of Generation Development_

Signature Page