## EXHIBIT 8

**Amended and Restated Common Facilities Agreement**

<u>Amended and Restated Common Facilities Agreement</u>

**THIS AMENDED AND RESTATED COMMON FACILITIES AGREEMENT** (this "<u>Restated Agreement</u>") is made and entered into as of this 10th day of August, 2012 (the "<u>Effective Date</u>") by and between **ALCOA INC.,** a Pennsylvania corporation ("<u>Alcoa</u>"), and **LUMINANT GENERATION COMPANY LLC,** a Texas limited liability company ("<u>Luminant Generation</u>"), and Sandow Power Company LLC ("<u>Sandow Power</u>"), a Texas limited liability company (f/k/a TXU Sandow Development Company LP) (each a "<u>Party</u>" and collectively the "<u>Parties</u>"). Capitalized terms used but not defined herein shall have the meanings given them in this Restated Agreement.

<u>RECITALS</u>

**WHEREAS,** Alcoa owns and operates (i) an aluminum smelting facility in Rockdale, Texas (the "<u>Alcoa Plant</u>") located on certain real property owned by Alcoa (the "Alcoa Land"), (ii) certain lignite properties and leases in Bastrop, Lee and Milam Counties, Texas owned by Alcoa that include the Railroad Commission of Texas ("<u>RCT</u>") mining permit 1F and Buffer lands (the "<u>Sandow Mine Facilities</u>" and together with the Alcoa Plant, the "<u>Alcoa Facilities</u>") and (iii) surviving equipment from a decommissioned and demobilized three unit steam electric power generating plant in Rockdale, Texas, commonly known as Sandow Units 1-3 (collectively, "<u>Sandow 1-3</u>"); and

**WHEREAS,** Luminant Generation owns and operates a steam electric generating station commonly known as Sandow Unit 4 ("<u>Sandow 4</u>") that is located in the vicinity of Sandow 1-3, and Alcoa and Luminant Generation are party to various agreements relating to, among other things, (i) Alcoa's purchase from Luminant Generation of a portion of the power and energy produced by Sandow 4, (ii) Luminant Generation's purchase from Alcoa of lignite fuel for use at Sandow 4 and (iii) the use, operation and maintenance of certain common facilities in connection with the operation of the Alcoa Plant, Sandow 1-3, and Sandow 4 (such agreements, as amended, and as further defined below in the definitions section, collectively, the "<u>Sandow 4 Agreements</u>"); and

**WHEREAS,** Sandow Power owns and operates a steam electric generating station commonly known as Sandow Unit 5 ("<u>Sandow 5</u>") that is located in the vicinity of Sandow 1-3 and Sandow 4, and Alcoa and Sandow Power are or were party to various agreements relating to, among other things, (i) the lease by Sandow Power of certain real property owned by Alcoa pursuant to certain premises leases between Alcoa and Sandow Power and (ii) the use, operation and maintenance of certain common facilities in connection with the operation of Sandow 5 (such agreements, as amended, collectively, the "<u>Sandow 5 Agreements</u>," and together with the Sandow 4 Agreements, the "<u>Sandow Contracts</u>"); and

**WHEREAS,** effective November 30, 2010, Alcoa terminated the Sandow 5 Power Purchase Agreement dated August 28, 2007 between Luminant Generation and Alcoa, which consequently and concurrently terminated that certain Common Facilities Agreement dated August 28, 2007 (the "<u>2007 CFA</u>"); and

**WHEREAS,** Alcoa ceased operation of Sandow 1-3 effective December 31, 2006 and has demobilized much of the generation equipment and Luminant Generation desires to lease certain real property formerly the footprint of Sandow 1-3 and other tracts located in such footprint, as further described by Appendix 1 (the "<u>Sandow 1-3 Land</u>"); and

**WHEREAS,** Alcoa and Luminant Generation have entered into that certain Common Facilities Agreement dated as of June 19, 2009 (the "2009 CFA"), pursuant to which, among other things, Alcoa and Luminant Generation identify facilities common for both Alcoa and Luminant Generation and were parties, along with Sandow Power, to the now terminated 2007 CFA; and

**WHEREAS,** Alcoa and Luminant Generation desire to amend the 2009 CFA to incorporate certain provisions from the 2007 CFA as hereinafter provided; and

**WHEREAS,** Alcoa and Luminant desire to replace the 2009 CFA and further to incorporate provisions under the 2007 CFA with and into this Restated Agreement.

**NOW THEREFORE,** in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1.  The Parties agree that this Restated Agreement is effective as of the Effective Date and acknowledge and agree that all activities between November 30, 2010 through and including the Effective Date shall be governed by the 2009 CFA and the 2007 CFA as if the 2007 CFA had not terminated on November 30, 2010, and that all activities after the Effective Date shall be governed by this Restated Agreement.

2.  This Restated Agreement is hereby amended to add Sandow Power as a party and all references to "Party" or "Parties" shall include Sandow Power.

3.  The Parties agree that, from and after the Effective Date, in the event of conflict between Schedule 5.1 of this Restated Agreement and any other agreements related to Common Facilities, Schedule 5.1 of this Restated Agreement shall take precedence.

4.  The Parties agree to the terms and conditions set forth in the following Articles:

## ARTICLE 1
## DEFINITIONS

1.1    Definitions. As used in this Restated Agreement, the following terms shall have the respective meanings set forth below. Certain other capitalized terms are defined where they appear in this Restated Agreement.

"2007 CFA" has the meaning set forth in the Recitals to this Restated Agreement.

"2009 CFA" has the meaning set forth in the Recitals to this Restated Agreement.

"Access Roads" means the privately owned sections of FM 1786 (Charles Martin Hall Road) and FM 2116 (John D. Harper Road) from the Alcoa property line to the intersection of FM 1786 and FM 2116 and driveways from such entering and exiting the Power Island.

"Additional Little River Makeup Water" has the meaning as set forth in Section 5.2 of this Restated Agreement.

"Additional Sandow Mine Makeup Water" has the meaning as set forth in Section 5.2 of this Restated Agreement.

"Affiliate" means any person that directly or indirectly Controls, is Controlled by, or is under common Control with the person in question.

"Aggregate Personnel" shall have the meaning set forth in the definition of "Allocable Head Count Share".

"Alcoa" has the meaning set forth in the initial paragraph of this Restated Agreement.

"Alcoa Facilities" has the meaning set forth in the Recitals to this Restated Agreement.

"Alcoa Land" has the meaning set forth in the Recitals to this Restated Agreement. For clarity, the term Alcoa Land as used herein does not include land owned by Alcoa that is leased to Luminant Generation or Sandow Power under the Existing Lease.

"Alcoa Plant" has the meaning set forth in the Recitals to this Restated Agreement.

"Alcoa Lake Treatment System" or "ALTS" means the closed loop recycle system designed as a treatment pond for temperature and a holding pond for reuse of wastewaters. It is also used to recirculate cooling water and makeup water within various areas of the Alcoa Plant, Sandow 4 and Sandow 5. Various internal outfalls from the Alcoa Plant discharge into the Alcoa Lake Treatment System for treatment and reuse.

"Allocable O&M Costs" means the costs and expenses for the operation and maintenance of (exclusive of Capital Repairs and Additions to) a Common Facility or an Equipment Easement and the Improvements thereon, including, without limitation, power and energy, cost of labor, materials, liability for injuries and damages to employees or others, safety measures and service, insurance of all kinds normally carried, welfare costs, retirement plan costs as normally provided for employees, special services (such as the service of independent accountants, expert tax and insurance service and legal services, all taxes assessed against the facilities or the operations thereof whether paid by Luminant or Alcoa, but not including any depreciation, amortization, depletion, interest charges or taxes based on income).

"Allocable Generation Share" means (a) for Sandow 4, 569/1133rds and (b) for Sandow 5, 564/1133rds.

"Allocable Head Count Share" shall mean each of Alcoa's, Sandow 4's and Sandow 5's respective share of Allocable O&M Costs based on the respective number of full time equivalent personnel utilized on site (collectively, "Personnel") at the Alcoa Plant, Sandow 4 and Sandow 5, respectively, as of January 1 of each year. The Alcoa Allocable Head Count Share shall be equal to the quotient of the number of Personnel at the Alcoa Plant divided by the aggregate number of Personnel at the Alcoa Plant, Sandow 4 and Sandow 5 (the "Aggregate Personnel"). The Sandow 4 Allocable Head Count Share shall be equal to the quotient of the number of Personnel at Sandow 4 divided by the Aggregate Personnel. The Sandow 5 Allocable Head Count Share shall be equal to the quotient of the number of Personnel at Sandow 5 divided by the Aggregate Personnel.

"Applicable Law" means any federal, state or local statute, law, municipal charter provision, regulation, ordinance, rule, mandate, judgment, order, decree, permit, code, or license requirement or other governmental requirement, standard or restriction, or any interpretation or administration of any of the foregoing by any agency, court or other governmental authority, that applies to the rights or obligations of any Party under this Restated Agreement.

"Base Makeup Water Supply" has the meaning set forth in Section 5.2 of this Restated Agreement.

"Business Day" means a day on which Federal Reserve member banks are open for business in Dallas, Texas; and a Business Day shall open at 8:00 a.m. and close at 5:00 p.m. local time for each Party's principal place of business.

"Capital Repairs and Additions" means all work (including labor, supplies, materials and equipment), other than maintenance work, (a) reasonably necessary to repair, restore, refurbish or replace any Easement Equipment necessitated by (i) any material defects in design, construction or installation of the Easement Equipment, (ii) physical or functional obsolescence or (iii) modifications required by Applicable Law or (b) other capital additions or modifications to the Easement Equipment agreed upon by the Parties utilizing Easement Equipment.

"Claiming Party" has the meaning set forth in the definition of the term "Force Majeure."

"Common Facilities" has the meaning as that term is defined in the Sandow 4 Agreements, the Sandow 5 Agreements and the Prior Common Facilities Agreements, as more fully described and defined in Schedule 5.1 to this Restated Agreement.

"Control," "Controls" and "Controlled" means the possession, directly or indirectly, through one or more intermediaries, of the following: (a) in the case of a corporation, fifty percent (50%) or more of the outstanding voting securities thereof; (b) in the case of a limited liability company, partnership, limited partnership or venture, the right to fifty percent (50%) or more of the distributions there from (including liquidating distributions); (c) in the case of a trust or estate, fifty percent (50%) or more of the beneficial interest therein; (d) in the case of any other entity, fifty percent (50%) or more of the economic or beneficial interest therein; or ( e) in the case of any entity, the power or authority, through the ownership of voting securities, by contract or otherwise, to direct the management, activities or policies of the entity.

"Cost of Capital and Depreciation Expenses" means with respect to the Easement Equipment owned by a Party, the sum of (a) 1/12 of such Party's cost of capital (at 9.5% for Sandow 5 and as provided in Section 16 of the Sandow Unit 4 Agreement) of the net book value of such Easement Equipment, including Capital Additions and Repairs to such Easement Equipment, and (b) the monthly depreciation, as calculated by such Party, using its standard rates, on the net book value of such Easement Equipment, including Capital Additions and Repairs to such Easement Equipment.

"CPI Percentage Increase" has the meaning set forth in Section 5.2(g) of this Restated Agreement.

"Damages" means all losses, damages and expenses incurred by a Non-Defaulting Party as a result of a breach by the Defaulting Party hereunder.

"Defaulting Party" has the meaning set forth in Article 9.2.

"Disposal Area Roads" means roads used in support of coal combustion waste product landfill and storage areas, as detailed in Schedule 5.1. For clarity, as delineated in Schedule 5.1, certain of the Disposal Area Roads are used for the benefit only of Sandow 4 or Sandow 5, and certain of the Disposal Area Roads are used for the benefit of both Sandow 4 and Sandow 5. Those used to benefit both Units are referred to as "Common Disposal Area Roads".

"Easement" means an easement granted pursuant to the terms in any of the Sandow Contracts.

"Easement Equipment" means all structures, improvements, facilities, systems, fixtures and equipment, whether above or below the surface of the Alcoa Land or the Luminant Land, whether real or personal property, and whether

permanent or temporary, including without limitation, all buildings, sheds, tanks, pipelines (including meters, connections, valves and other associated equipment), cables, wires, conduits, cable trays, trenches, mains, lines, ducts, fences, towers, antennae, located at, on, under or above the Alcoa Land or the Luminant Land and collectively described on Schedule 5.1 attached to this Restated Agreement and incorporated herein by reference.   The Easement Equipment shall also include all future upgrades, modifications, alterations or replacements to or of such Easement Equipment.

"Effective Date" has the meaning set forth in the initial paragraph to this Restated Agreement.

"Event of Default" has the meaning set forth in Article 9.2.

"Existing Lease" means that certain Premises Lease by and between Alcoa and Sandow Power dated August 28, 2007.

"Facility" means Sandow 1-3, Sandow 4, Sandow 5, the Alcoa Plant, and/or the Sandow Mine Facilities, as applicable.

"Facility Agreements" means the Sandow 4 Agreements and the Sandow 5 Agreements.

"Force Majeure" means an event not anticipated as of the Effective Date, which is not within the reasonable control of the Party (or in the case of third party obligations or facilities, the third party) claiming suspension (the "Claiming Party"), and which by the exercise of due diligence the Claiming Party, or third party, is unable to overcome or obtain or cause to be obtained a commercially reasonable substitute therefore.  Events of Force Majeure may include, but are not restricted to: acts of God; excessive rain; flood; drought; fire; lightning; explosion; civil disturbance; labor dispute; labor or material shortage; sabotage; action or restraint by court order or public or governmental authority (so long as the Claiming Party has not applied for or assisted in the application for, and has opposed where and to the extent reasonable, such government action); and damage to or breakdown of necessary facilities or equipment; and reductions or interruptions in service which are mandated by any state or federal agency (for clarity, the Parties acknowledge and agree that "reductions or interruptions in service" shall not include the application of any rules, laws or regulations that result in reduced generation at Sandow 4 or Sandow 5 for any period of time).  An event of Force Majeure shall not include (a) a change in market conditions or governmental action which affect Alcoa's cost of operating the Alcoa Plant or which affect Luminant Generation's cost of operating Sandow 4, and/or Sandow Power's cost of operating Sandow 5; (b) any event caused by or resulting from Luminant Generation's failure to operate and maintain Sandow 4 and/or Sandow Power's failure to operate and maintain Sandow 5, in each case in accordance with Good Engineering and Operating Practices, or (c) any event that was caused by the Claiming Party's failure to comply with any Applicable Law.  Notwithstanding the foregoing, nothing contained herein shall be construed so as to require any Party to settle any strike or labor dispute in which it may be involved.

"Fuel Oil Storage Tank" means the Sandow 4 fuel oil storage tank subject to an easement under the Sandow 4 Agreements.

"Good Engineering and Operating Practices" means the practices, methods and acts generally engaged in or approved by a significant portion of the independent power industry in the United States for similarly situated facilities in the United States that at a particular time, in the exercise of reasonable judgment in light of the facts known or that reasonably should be known at the time a decision is made, would be expected to accomplish the desired result in a manner consistent with Applicable Law, reliability, safety, environmental protection, economy

and expedition, and taking into consideration the requirements of this Restated Agreement. Good Engineering and Operating Practice is not intended to be limited to optimum practice, method or act, to the exclusion of all others, but rather to include a spectrum of possible practices, methods or acts generally acceptable in the United States in light of the circumstances.

"Improvement" means all structures, improvements, facilities, systems, fixtures and equipment of any kind now or hereafter located on the Alcoa Land or Luminant Land, whether above or below the land surface, whether real or personal property, and whether permanent or temporary, including, without limitation, all Easement Equipment, all Utility Facilities and all buildings, sheds, tanks, pipelines (including meters, connections, valves and other associated equipment), cables, wires, conduits, cable trays, trenches, mains, lines, ducts, fences, towers, antennae, tunnels, driveways, streets, alleys, paved parking areas, pathways, screening walls, awnings, retaining walls, plantings, shrubs and other landscaping, irrigation and drainage pipes and facilities, lighting fixtures and signs.

"Interest Rate" means, for any date, one percent (1%) over the per annum rate of interest equal to the prime lending rate as may from time to time be published in the Wall Street Journal under "Money Rates"; provided, the Interest Rate shall never exceed the maximum lawful rate permitted by Applicable Law.

"Lignite Stockpile Site" means the lignite stockpiles for Sandow 4 and Sandow 5.

"Luminant Generation" has the meaning set forth in the initial paragraph of this Restated Agreement.

"Luminant Land" means any real property owned by Luminant that in any way relates to the Common Facilities discussed in and covered by this Restated Agreement.

"Market Price" has the meaning as set forth in Section 5.2(g) of this Restated Agreement.

"Mine Groundwater System" means the water pumping and delivery system located in the Sandow Mine Facilities (formerly referred to as Mine Depressurization System) consisting of certain wells, pumps, barges, lateral lines, settling pond, lift station and transmission lines to the power plant and/or the Alcoa Lake Treatment System.

"Month" means a calendar month.

"Non-Defaulting Party" has the meaning set forth in Article 9.2(a).

"#1 Mine Belt" means the first flight of a belt conveyor which conveys lignite from the mine to the power plant. #1 Mine Belt feeds Transfer Tower #1.

"138 kV Switchyard" means the 138kV switchyard on the Alcoa Land.

"138 kV Switchyard (Sandow 5 Portion)" means the Sandow 5-owned portion of the 138kV switchyard.

"Party" and "Parties" each have the meaning set forth in the initial paragraph of this Restated Agreement.

"Personnel" shall have the meaning set forth in the definition of "Allocable Head Count Share".

"Potable Water System" means the Alcoa-owned and operated potable water system used to supply certified potable water to Sandow 4, Sandow 5, and the Alcoa Plant.

"Power Island" means the general property area on which Sandow 1-3 were formerly situated, as specifically described in Appendix 1, Exhibit D.

"Premises Lease" means the Premises Lease between Luminant Generation and Alcoa that is attached hereto as Appendix 1.

"Prior Common Facilities Agreements" means the 2007 CFA and the 2009 CFA.

"Relay House" means the Alcoa relay house associated with the Sandow Station 138kV and 13.8kV switchyards and the Supervisory Control and Data Acquisition (SCADA) system associated with that yard.

"River Intake Pump and Pipeline" means the pumping system consisting of the intake structure at the Little River and pipeline from the intake structure to Alcoa Lake Treatment System.

"Sandow 1-3" has the meaning set forth in the Recitals to this Restated Agreement.

"Sandow 1-3 Land" has the meaning set forth in the Recitals to this Restated Agreement.

"Sandow 4" has the meaning set forth in the Recitals to this Restated Agreement.

"Sandow 4 Agreements" has the meaning set forth in the Recitals to this Restated Agreement, and specifically includes the following agreements:

- Power Contract dated August 29, 1951 (the "Power Contract");

- Operating Contract dated August 29, 1951 (the "Operating Contract");

- Sandow Unit Four Agreement dated August 13, 1976 (the "Sandow Unit 4 Agreement");

- Supplemental Agreement to Sandow Unit Four Agreement dated March 2,1981 (the "Supplemental Sandow Unit 4 Agreement");

- Agreement for Back-Up Power and Energy dated February 4, 1991 (the "Backup Agreement");

- Letter Agreement from Pitt Pittman of TU Electric to R.C. Rawe of Alcoa dated June 11, 1991 (the "Payback Agreement").

- In addition, Alcoa and Luminant Generation are parties to the following amendments to the foregoing Sandow 4 Agreements:

  | Date | Title |
  |---|---|
  | June 30, 1997 | Amendment to Contracts |
  | June 30,1997 | Transition Agreement |
  | May 4, 1998 | 2nd Amendment to Contracts |
  | November 6, 1998 | 3rd Amendment to Contracts |
  | October 31, 2000 | 4th Amendment to Contracts |
  | February 1,2003 | 5th Amendment to Contracts |
  | August 22, 2003 | 6th Amendment to Contracts |
  | January 1, 2004 | 7th Amendment to Contracts |
  | June 30, 2004 | 8th Amendment to Contracts |

October 27, 2005                   9th Amendment to Contracts
February 15, 2007                  10th Amendment to Contracts

"Sandow 5" has the meaning set forth in the Recitals to this Restated Agreement.

"Sandow 5 Agreements" has the meaning set forth in the Recitals to this Restated Agreement, and specifically includes the following agreements:

- Sandow Unit 5 Agreement dated December 28, 2006 (the "Sandow Unit 5 Agreement"); and

- Existing Lease.

"Sandow Contracts" has the meaning set forth in the Recitals to this Restated Agreement.

"Sandow Mine Facilities" has the meaning set forth in the Recitals to this Restated Agreement.

"Sandow Power" has the meaning set forth in the initial paragraph of this Restated Agreement.

"Sanitary Sewer System" means the Alcoa-owned and operated sanitary sewer system that treats all sanitary waste water to meet applicable standards.

"Step-In Rights" has the meaning set forth in Article 9.4(a) to this Restated Agreement.

"Taxes" means any or all ad valorem, property, occupation, severance, generation, first use, conservation, Btu or energy, transmission, utility, gross receipts, privilege, sales, use, consumption, excise, lease, transaction, and other taxes, governmental charges, licenses, fees, permits and assessments, or increases therein, other than taxes based on net income or net worth.

"Telephone System" means the Alcoa telephone system consisting of all handsets, lines, and PBX.

"Term" has the meaning set forth in Article 2.

"Transfer Tower #1" means the "flop-gate" that is used to distribute Lignite between Sandow 4 and Sandow 5.

"33 kV Pump Power Line" means the 33kV power line from the Alcoa 13.8 kV switchyard to the river pump station on the Little River.

"Unmined Mineral Account Fee" means the amount paid by Luminant Generation to Alcoa pursuant to Section 7(b)(iv)(A)(i) of the Sandow Unit 4 Agreement.

"Utility Facilities" mean those improvements utilized for the delivery of utility services to the Alcoa Land.


ARTICLE 2
TERM AND END-OF-TERM RIGHTS

2.1      The term of this Restated Agreement shall begin as of the Effective Date and shall continue until the date on which the Sandow Unit 4 Agreement terminates or expires in accordance with its terms (the "Term"), on which date this Restated Agreement shall terminate.  Luminant Generation shall have the right upon termination or expiration

of the Sandow Unit 4 Agreement to purchase all or any part of the Common Facilities at the fair market value for each Common Facility in accordance with Section 20(a)(1) of the Sandow Unit 4 Agreement.

ARTICLE 3
NO REPRESENTATION OR WARRANTIES

3.1    DISCLAIMER.  EACH PARTY MAKES NO REPRESENTATIONS OR WARRANTIES, AND DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO THE OTHER PARTY WITH RESPECT TO ANY OF THE FACILITIES, FIXTURES, PROCESS EQUIPMENT OR AREAS COMPRISING THE COMMON FACILITIES.  WITHOUT LIMITING THE FOREGOING, NEITHER PARTY MAKES ANY REPRESENTATION OR WARRANTY AS TO THE PHYSICAL CONDITION OR SUITABILITY FOR USE OF ANY SUCH FACILITY, FIXTURE, PROCESS EQUIPMENT OR AREA AS OF THE EFFECTIVE DATE, INCLUDING BUT NOT LIMITED TO ANY QUANTITY OR FIRMNESS GUARANTEES OR QUALITY SPECIFICATION GUARANTEES REGARDING THE POTABLE WATER SYSTEM, THE RIVER INTAKE PUMP AND PIPELINE, THE ALCOA LAKE TREATMENT SYSTEM, THE 33 KV PUMP POWER LINE AND THE MINE GROUNDWATER SYSTEM, OR THE WATER TO BE SUPPLIED OR RECEIVED FROM THE SAME.  NOTWITHSTANDING THE FOREGOING, THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS SECTION 3.1 IS NOT IN ANY WAY INTENDED TO AND SHALL NOT ALTER OR REDUCE ANY EXPRESS OBLIGATIONS OF A PARTY AS SET FORTH IN THIS RESTATED AGREEMENT.

ARTICLE 4
POWER ISLAND PREMISES LEASE

4.1    The Parties agree to enter into the **AMENDMENT TO PREMISES LEASE** attached to this Restated Agreement as Appendix 1.

ARTICLE 5
OPERATION, MAINTENANCE AND REPAIR

5.1    Operation, Maintenance and Repair of Improvements.  Any and all Common Facilities and Improvements which are used in common by two or more of the Parties in connection with this Restated Agreement shall be operated, maintained and repaired in accordance with Good Engineering and Operating Practices, as follows:

(a) The Common Facilities and Easement Equipment listed on Schedule 5.1 to this Restated Agreement shall be operated, maintained and repaired (subject to Article 6.2 hereof) by the Party designated at that Party's expense, provided that the other Parties to this Restated Agreement shall each be responsible for their respective allocable share of such costs and expenses as set forth in this Restated Agreement;

(b) The Party responsible for its respective allocable share of costs (as opposed to the Party that is funding such costs in accordance with subsection (a) above) shall pay for its share of the costs using the then current method of invoicing and payment for charges between the Parties as provided by the Sandow Contracts.

(c) Except as otherwise provided herein, the Utility Facilities installed in connection with utility services to a Party shall be maintained and repaired: (i) by the Party benefiting from the installation of said facilities or (ii) by the utility provider pursuant to the terms of any utility easement agreements.

5.2.    ALTS Makeup Water Supply:

(a) The Parties agree that "Base Makeup Water Supply" to Alcoa Lake Treatment System ("ALTS") is that amount of water required to be added as makeup water to ALTS in order to maintain a water level in ALTS at a constant elevation of 468.8 feet Mean Sea Level ("MSL"). The parties agree that, for simplicity, the Base Makeup Water Supply is 15,000 acre-feet for any calendar year. The water supplied by Alcoa for the Base Makeup Water Supply shall come from the following sources, together with any other specific sources that Alcoa in its absolute discretion may designate:

   (i)    Runoff and other natural inflows to ALTS, as calculated in accordance with Alcoa's Sandy Creek diversion formula as shown in EXHIBIT C, or as such diversion formula may be amended or changed by agreement between Alcoa and TCEQ during the Term.

   (ii)   Run-of-river flows of Little River diverted at the Little River pump station and stored in ALTS, under Alcoa's senior water right.

   (iii)  Stored water delivered by the Brazos River Authority ("BRA") via the Little River to the Little River pump station under that certain contract with BRA dated August 2, 1976, such water then diverted at the Little River pump station and stored in ALTS. This contract is set to expire in 2017.

   (iv)   Up to 9,000 acre-feet of groundwater in any year produced within Milam County and stored in ALTS, such production currently authorized under Alcoa's Post Oak Savannah Groundwater Conservation District (POSGCD) Historic Use Permit. This permit is set to expire in 2039.

   (v)    Any water that originates from one of the sources described in subsection (a)(ii), (a)(iii) or (a)(iv) above that has been stored in any reservoir located on Alcoa Land, other than ALTS, or the Existing Leased Premises and that is subsequently pumped or otherwise diverted into ALTS.

(b) The parties agree that any water added to ALTS over 15,000 acre-feet per year shall be designated as either "Additional Little River Makeup Water" or "Additional Sandow Mine Makeup Water," in accordance with the provisions of this Section 5.2.

(c) All maintenance, operations, transportation, treatment, pumping and delivery charges  associated with delivering the Base Makeup Water Supply, Additional Little River Makeup Water, or Additional Sandow Mine Makeup Water to ALTS will be billed at cost plus 5%, plus the Cost of Capital and Depreciation Expenses on the transportation, pumping and delivery assets (collectively, the "Delivery Costs"), with Sandow 4 bearing 569/1133rds of such costs and Sandow 5 bearing 564/1133rds of such Delivery Costs. Any fees or taxes will be billed at cost with no percentage markup.

(d) In addition to the charges defined in Section 5.2.(c), the parties agree that Luminant Generation shall continue to pay Alcoa for the cost of capital associated with the net book value of the fee property in the Unmined Mineral Account (as defined in the Sandow Unit 4 Agreement) under the terms that it is currently paying such fee (i.e., as provided in Section 7(b)(iv)(A)(i) of the Sandow 4 Agreement) as compensation for

the (a)iv. component of Base Makeup Water Supply. For clarity, the parties agree that this payment serves as a capacity reservation fee for the groundwater identified in (a)(iv) above.

(e) Additional Littler River Makeup Water shall be any water supplied directly from the sources described in subsection (a)(i), (a)(ii) or (a)(iii) above and any water supplied from the source described in subsection (a)(v) above that originated from the sources described in subsection (a)(ii) or (a)(iii) above, in each case that exceeds the Base Makeup Water Supply of 15,000 acre-feet per year. Additional Little River Makeup Water has no additional charges other than those described in Section 5.2.(c) above. Additional Little River Makeup Water shall have priority over Additional Sandow Mine Makeup Water, if available at the required demand rate.

(f) Additional Sandow Mine Makeup Water shall be any water supplied directly from the source described in subsection (a)(iv) above, any water supplied from the source described in subsection (a)(v) above that originated from the source described in subsection (a)(iv) above, and surface water delivered from any of Alcoa's reservoirs (other than ALTS) for which Alcoa holds a state diversion right for water originating from the Brazos River Basin and such water did not originate from the sources described in subsection (a)(i), (a)(ii), (a)(iii), (a)(iv) or (a)(v) above over the Base Makeup Supply of 15,000 acre-feet per year. In addition to the charges defined in Section 5.2(c) above, all Additional Sandow Mine Makeup Water will be charged at the Market Price (as defined below) per acre foot. Sandow 5 shall bear 60% and Sandow 4 shall bear 40% of this Market Price. Alcoa will commence invoicing monthly for Additional Sandow Mine Makeup Water anytime during the year when the Base Makeup Water Supply amount of 15,000 acre-feet has been reached and Alcoa is supplying Additional Sandow Mine Makeup Water. The Parties agree that Additional Sandow Mine Makeup Water will be supplied during any year only when the Base Makeup Water Supply has exceeded 15,000 acre feet and ALTS is at an elevation of 468.5 MSL or lower and Additional Littler River Makeup Water is not available or is not available at the required demand rate.

(g) "Market Price" shall mean $85 per acre foot as increased by the CPI Percentage Increase on January 1 of each year during the Term.  "CPI Percentage Increase" shall mean a percentage equal to the positive difference resulting from: (i) the seasonally unadjusted Consumer Price Index for All Urban Consumers (all items), U.S. City Average (1982-84 = 100), as published by the U.S. Department of Labor, Bureau of Labor Statistics ("CPI-U") for the month of January of the calculation year, minus (ii) the seasonally unadjusted CPI-U for the month of January in the calendar year prior to the calculation year. If the U.S. Department of Labor ceases to publish the CPI-U then the replacement index shall be used and if no replacement index is designated then the Parties will negotiate in good faith to select a substitute index that most nearly approximates the CPI-U.

(h) If at any time ALTS falls to a level that is below 464 feet MSL or if the pumps in ALTS for Sandow 4 lose suction regardless of the MSL of ALTS, then Luminant Generation and Sandow Power shall take mitigating action which may include but shall not be limited to, implementing water conservation measures at Sandow 5, reducing generation at Sandow 5, procuring water or water rights from third parties, procuring water from other sources that Luminant has access to within its system of operations, and/or lowering the intake pumps for Sandow 4. If the intake pumps at Sandow 4 are lowered, the level required for Luminant Generation and Sandow Power to take mitigating action shall be correspondingly lowered to reflect such lower intake pump levels.  In advance of scheduled expiration dates of existing Alcoa water contracts with

third parties for Base Makeup Water Supply, Alcoa shall use good faith efforts to renew such existing water contracts, including exercising any existing options to extend existing water contracts.

(i) If (i) after all mitigating actions have been exhausted by Luminant Generation and Sandow Power and such efforts are unsuccessful in restoring the level at the ALTS; (ii) Alcoa is supplying, at a minimum, the Base Makeup Water Supply and using commercially reasonable efforts to exhaust all options to supply Additional Makeup Water to ALTS (provided, that Alcoa shall not be required to breach any contractual obligations to third parties that exist as of the Effective Date or thereafter in order to satisfy its obligations under this clause (ii) to supply Additional Makeup Water to ALTS); and (iii) Sandow 4 is not capable of operating at maximum generation due to the level of ALTS, then Sandow 5 shall immediately be removed from service and shall remain removed from service until such time as the level of ALTS is restored to 464 feet MSL.

(j) All water supplied by Alcoa to ALTS shall be in compliance and in accordance with its Texas Commission on Environmental Quality, POSGCD and Railroad Commission of Texas permits (including measurement and reporting requirements). Alcoa shall provide to Luminant duplicate copies of reports provided to regulatory agencies at the time such reports are submitted. The parties agree that the Sandow 4 Operating Committee will review the status of Base Makeup Water Supply, Additional Sandow Mine Makeup Water and Additional Sandow Mine Makeup Water monthly.

(k) Notwithstanding anything to the contrary contained herein, if, after the Term expires, Alcoa receives an offer from a third party to purchase all or any portion of the water supplied from the source described in subsection (a)(iii) above or the August 2, 1976 contract with BRA (the "ROFR Water or Contracts"), then Luminant Generation shall have thirty (30) days from its receipt of notification of such offer to enter into a written agreement with Alcoa upon terms no less favorable than those offered to Alcoa by such third party to purchase such ROFR Water or Contracts. If Luminant Generation fails to enter into such written agreement within the applicable period, and Alcoa does not agree in writing to extend such period, then Alcoa may complete the sale of the ROFR Water or Contracts to the third party, but Luminant Generation shall continue to have a right of first refusal to purchase any remaining ROFR Water or Contracts that are not sold to the third party at the greater of (i) $65 per acre foot or (ii) the then current BRA system rate. From the date on which the Term ends until the date on which Alcoa has sold to a third party all of the ROFR Water or Contracts after complying with this Section 5.2(k), Luminant Generation and Sandow Power shall have the right to purchase all or any portion of the water supplied from a source described in subsection (a)(iii) above for continued supply into ALTS at a price equal to the greater of (i) $65 per acre foot or (ii) the then current BRA system rate. If Alcoa sells a portion (but not all) of the ROFR Water or Contracts to a third party after complying with this Section 5.2(k), Luminant Generation and Sandow Power shall have a continuing right to purchase all or any portion of the remaining water supplied from a source described in subsection (a)(iii) above on the terms set forth above.

5.3    Additional Agreements.

(a) All costs and expenses (exclusive of the 5% fee imposed on Allocable O&M Costs and the 5% fee imposed on fuel oil costs) payable by Luminant Generation to Sandow Power for Sandow 4 pursuant to Article 5 and Article 6 of this Restated Agreement shall be deemed to be "Unit Four Operating Costs" for purposes of the

Sandow 4 Agreements.  For the avoidance of doubt, Alcoa will not be charged duplicative charges in respect of such 5% fees.

(b) For the avoidance of doubt, all 5% fees imposed on Allocable O&M Costs payable to an operating Party shall be for the sole benefit of such operating Party.

(c) Luminant Generation shall be entitled to a credit against its share of Lignite Operation Costs as defined above for a share of the net proceeds from the sale of combustion by-products (fly ash, bottom ash and FGD scrubber sludge – the "By-Products") from Sandow 4 determined by multiplying such proceeds by 95/545ths.  Luminant Generation shall have the right to and responsibility for marketing such products. Alcoa grants to Luminant Generation the right to convey title to By-Products to a third-party purchaser of such By-Products in order to allow Luminant Generation to fulfill its obligation for marketing such By-Products as set forth in this Section.  Alcoa further agrees that third party purchasers of By-Products shall be given reasonable access to the Alcoa facilities to the extent necessary to fulfill such marketing obligations.

(d) Luminant Generation will be responsible for the Spill Prevention Control and Countermeasure (SPCC) plan for Sandow 4, Sandow 5 and related Luminant Generation-operated Common Facilities.

(e) The owner of a Common Facility, as designated in Schedule 5.1, shall be responsible for any reporting requirements to a governmental authority or regulatory body associated with such Common Facility or the output of such Common Facility.

## ARTICLE 6
### NEW IMPROVEMENTS, ALTERATIONS, RELOCATION

6.1    New Improvements or Alterations in an area covered by an Easement.  Subject to the provisions of Article 7 below, each Party shall have the right to alter, modify, demolish or replace the Improvements owned by such Party pursuant to the terms hereof and to construct new Improvements, provided that (i) such Party shall submit detailed plans for the proposed Improvements including, among other information, the location thereof and the specifications therefore, (ii) such Party shall not commence such alteration, modification, demolition, replacement or new construction until it has received written approval of such plans from the other Parties hereto, which approval shall not be unreasonably withheld, conditioned or delayed, and (iii) such alteration, modification, demolition, replacement or new construction shall not unreasonably interfere with the use and enjoyment by the other Parties of their Facility or the Common Facilities or the Improvements, except for temporary interference occasioned by construction work performed in compliance with the provisions of Article 7 below.

6.2    Capital Repairs and Additions to Easement Equipment.  Capital Repairs and Additions to the Easement Equipment shall be performed by the Party owning such Easement Equipment as set forth on Schedule 5.1 hereto. Such Capital Repairs and Additions shall be at such owner's expense, provided that the other Parties hereto shall each be responsible for their allocable share of such owner's Cost of Capital and Depreciation Expenses as set forth on Schedule 5.1.

## ARTICLE 7
### REGULATIONS REGARDING MAINTENANCE AND CONSTRUCTION WORK

All construction, demolition and maintenance work or activities on the Alcoa Land or Luminant Land (i) performed by or on behalf of a Party in connection with an Easement or (ii) performed by or on behalf of the owner or tenant of

the Alcoa Land or the Luminant Land in an instance in which such work or activities have been sub-contracted or assigned, shall be performed in accordance with the following requirements:

7.1    No Unreasonable Interference.   No such work or activity shall unreasonably interfere with the use, occupancy or enjoyment of the Alcoa Land or the Luminant Land by the owner or tenant thereof, or with (a) the Parties' rights and obligations under the Sandow 4 Agreements or the Sandow 5 Agreement and (b) the Parties' use and enjoyment of such Party's Facility, except in each case for temporary minor inconveniences, the scope and duration of which are minimized to the extent reasonably possible.

7.2    Compliance with Requirements of Law.   All work or activity shall be performed in accordance with Applicable Law.  No such work or activity shall cause any other Party to be in violation of any Applicable Law, regulations or permits.

7.3    Repair of Defects.  All work shall be performed in a manner that will not damage the Luminant Land or the Alcoa Land or Improvements of or under the control of any other Party, other than minor damage which shall be promptly and diligently repaired by the Party by or on behalf of whom the work is performed. The Party responsible for the work shall promptly remedy any defects in the work which have an adverse effect on any other Party's Land or Improvements, or its use or operations, or subject such other Party to risk of liability.

7.4    Standard of Work.  All such work shall be performed by the Parties in accordance with Good Engineering and Operating Practices.

7.5    Safety Measures.  Each Party responsible for any work or activity shall take all safety measures reasonably necessary to protect the other Party and its Affiliates and representatives and their respective employees and representatives and the property of each from injury or damage caused by or resulting from the performance of such work or activity.

7.6    Notice of Work.  Except for normal and periodic maintenance work performed in the ordinary course, no construction, alteration, installation, upgrade or restoration work shall be performed on the Alcoa Land or the Luminant Land without the Party by or on behalf of whom the work is to be performed first providing the other Parties with reasonable prior notice of such work.

## ARTICLE 8
## INSURANCE

8.1    Each Party shall, during the Contract Term of this Restated Agreement, maintain policies of general liability insurance, worker's compensation, employer's liability insurance and other customary insurance for projects of the type and size of Sandow 5 and the Alcoa Plant, respectively.

## ARTICLE 9
## BREACH OF RESTATED AGREEMENT, INDEMNIFICATION, EVENT OF DEFAULT

9.1    General.   No Party shall hold another (including its corporate Affiliates, parents, subsidiaries, directors, officers, partners, members, managers, employees and agents) liable for any Damages, losses, costs or expenses of any kind or character (including, without limitation, loss of earnings or attorneys' fees) for damages to property of any Party in any way occurring incident to, arising out of, or in connection with a Party's performance under this Restated Agreement, except as provided in this Article 9.

9.2    Events of Default. An "Event of Default" means, with respect to a Party alleged to have taken or been affected by any of the actions set forth below in this Article 9.2 (the "Defaulting Party"):

(a) The failure by the Defaulting Party to make, when due, any payment required under this Restated Agreement if such failure is not remedied within five (5) Business Days after written notice of such failure is given to the Defaulting Party by the other Party ("Non Defaulting Party"); or

(b) The failure by the Defaulting Party to perform any covenant set forth in this Restated Agreement (other than the events that are otherwise specifically covered in Article 9.2 as a separate Event of Default), and such failure is not excused by Force Majeure or cured within thirty (30) Business Days after written notice thereof to the Defaulting Party; provided, however, if such breach is not capable of being cured within such thirty (30) Business Days and the Defaulting Party is diligently pursuing such cure, such cure period shall be extended up to an additional fifteen (15) Business Days.

An Event of Default shall not be grounds on which this Restated Agreement may be terminated, except for the failure to make payments as set forth in Article 9.2(a) above. In addition, under this Restated Agreement, the only circumstances with respect to Alcoa that will be considered an Event of Default will be if Alcoa fails to maintain, and fails to cure such breach after receiving the notice referenced in Article 9.2(b) above, the Common Facilities it is responsible for maintaining under this Restated Agreement in accordance with Good Engineering and Operating Practices or, if otherwise maintained in accordance with Good Engineering and Operating Practices, Alcoa fails to provide access to, use of and/or deliver output from such Common Facilities as required herein. In addition, under this Restated Agreement, Alcoa's only responsibility to pay Damages will result from its failure to maintain the Common Facilities it is responsible for maintaining under this Restated Agreement in accordance with Good Engineering and Operating Practices or, otherwise if maintained in accordance with Good Engineering and Operating Practices, Alcoa's failure to provide access to, use of and/or deliver output from such Common Facilities as required herein, and any such Damages shall be limited to the extent that it has failed to maintain such Common Facilities in accordance with Good Engineering and Operating Practices or if otherwise maintained in accordance with Good Engineering and Operating Practices, Alcoa fails to provide access to, use of and/or deliver output from such Common Facilities as required herein. Both Parties agree to use good faith efforts to resolve any dispute arising under this Restated Agreement and shall participate in reasonable negotiations to resolve such disputes.

9.3     Notice of Default. Upon the occurrence of any event specified in Article 9.2(b) which, with the lapse of time would constitute an Event of Default, the Defaulting Party shall promptly, and in no event later than two (2) Business Days after the Defaulting Party becomes or is made aware of such event, notify the other Parties, which notice shall specify the nature of the event and the Defaulting Party's plans to cure such event. Upon the occurrence of any event specified in Article 9.2(a) which, with the lapse of time would constitute an Event of Default, each Non-Defaulting Party shall promptly after such Party becomes or is made aware of such event, notify the Defaulting Party and the other Party of such event; provided, however, in no event shall a Non-Defaulting Party's failure to so notify have any effect on the provisions set forth in Article 9.2.

9.4     Step-In Rights.

(a) Upon the occurrence of an Alcoa Event of Default with respect to the items set forth in Schedule 9.4(a), then immediately upon Alcoa becoming or being made aware of the occurrence of an Event of Default, Alcoa shall attempt in good faith to cure such Event of Default as promptly as possible. Notwithstanding anything to the contrary contained in this Restated Agreement, if following such Event of Default Alcoa ceases exercising good faith efforts to cure such Event of Default or, in any event fails to cure such Event of Default within forty-five (45) days, then, subject to any restrictions imposed by applicable law and/or any agreements to which Alcoa is party or is bound, and without relieving Alcoa of any of its obligations hereunder, Luminant shall have the right, but not the obligation, to take any and all actions and exercise any and all rights of Alcoa relating to such Common Facilities, as applicable (such rights, the "Step-In Rights") including, without limitation, access to and control of operations thereof and contractual rights with respect thereto. Upon Luminant's exercise of its Step-In Rights hereunder, Alcoa agrees to cooperate with Luminant

and assist Luminant in obtaining any and all governmental and third party approvals and consents, access and information, in each such case necessary or appropriate to permit Luminant to fully exercise Alcoa's rights with respect to the operation of such Common Facilities pursuant to the terms of this Restated Agreement. Upon exercise of the Step-In Rights, Luminant will indemnify, hold harmless and defend Alcoa, its Affiliates, directors, officers, partners, agents and employees from and against any and all loss, liability, damage, cost or expense, including damage and liability for bodily injury to or death of persons or damage to property of persons caused by Luminant, an Affiliate of Luminant or any representative of Luminant during its or their exercise of the Step-In Rights, including but not limited to violation of applicable laws or for any failure to perform the Step-In Rights in compliance with applicable laws or breach or violation of Alcoa's existing contractual obligations to the extent made known to Luminant.

(b) Upon the occurrence of a Luminant Event of Default with respect to the items set forth in Schedule 9.4(b), then immediately upon Luminant becoming or being made aware of the occurrence of an Event of Default, Sandow Power shall attempt in good faith to cure such Event of Default as promptly as possible. Notwithstanding anything to the contrary contained in this Restated Agreement, if following such Event of Default Sandow Power ceases exercising good faith efforts to cure such Event of Default or, in any event fails to cure such Event of Default within forty-five (45) days, then, subject to any restrictions imposed by applicable law and/or any agreements to which Luminant is party or is bound and without relieving Luminant of any of its obligations hereunder, Alcoa shall have the right, but not the obligation, to take any and all actions and exercise any and all rights of Luminant relating to such Common Facilities, as applicable (such rights, the "Step-In Rights") including, without limitation, access to and control of operations thereof and contractual rights with respect thereto. Upon Alcoa's exercise of its Step-In Rights hereunder, Luminant agrees to cooperate with Alcoa and assist Alcoa in obtaining any and all governmental and third party approvals and consents, access and information, in each such case necessary or appropriate to permit Alcoa to fully exercise Luminant's rights with respect to the operation of such Common Facilities pursuant to the terms of this Restated Agreement. Upon exercise of the Step-In Rights, Alcoa will indemnify, hold harmless and defend Luminant, its Affiliates, directors, officers, partners, agents and employees from and against any and all loss, liability, damage, cost or expense, including damage and liability for bodily injury to or death of persons or damage to property of persons caused by Alcoa, an Affiliate of Alcoa or any representative of Alcoa during its or their exercise of the Step-In Rights, including but not limited to violation of applicable laws or for any failure to perform the Step-in Rights in compliance with applicable laws or breach or violation of Luminant existing contractual obligations to the extent made known to Alcoa.

(c) In the event that a Party exercises its Step-In Rights as a result of the occurrence of an Event of Default under Article 9.4(a) or 9.4(b) above, any such Step-In Rights will expire upon the Defaulting Party's cure of the Event of Default; provided that if more than 12 months pass without the Defaulting Party having cured the Event of Default, then the Step-In Rights shall not be subject to expiration even if the Event of Default is subsequently cured.

(d) No Party may enter into any agreement that affects or limits the Step-In Rights of another Party.

9.5    <u>Remedies</u>.  Subject to Articles 9.6 and 12.2, any remedies provided herein to a Party are cumulative and in addition to any other remedies provided in law or equity or by statute.

9.6    <u>Acknowledgement of the Parties</u>. Each Party hereby stipulates that the payment obligations set forth in this Article 9 are reasonable in light of the anticipated harm and the difficulty of estimation or calculation of actual damages and each Party hereby waives the right to contest such payments as an unreasonable penalty. In the event that any Party fails to pay amounts in accordance with this Article 9 when due, the aggrieved Party shall have the right to exercise its rights under any remedy available at law or in equity to enforce payment of such amount plus interest at the Interest Rate.

9.7    Limitation on Damages.  Notwithstanding anything to the contrary contained herein as between Luminant and Alcoa, all Damages which a Non-Defaulting Party has the right to assert against a Defaulting Party under this Restated Agreement shall be subject to and be applied against the limitation on Damages set forth in the Sandow Contracts.

ARTICLE 10<br/>BILLING AND PAYMENT

10.1    Billing and Payment.  Each Month each Party shall render by wire transfer to such account designated by the invoicing Party, funds in the amount of the total payment obligation due to such invoicing Party for the previous Month.  Such payments shall be made on the later of the fourth (4th) calendar day of each Month or the first (1st) Business Day following receipt of an invoice from the invoicing Party in respect thereof.

10.2    Audit.  All costs, expenditures, charges and other accounting items referred to in this Restated Agreement shall be determined from the books and records of the Party responsible for making such expenditure or calculating such charge (including the books and records of affiliated or subsidiary companies when appropriate so to do) in accordance with U.S. generally accepted accounting principles and with the procedures set forth herein.  Such determinations shall be made by the responsible Party subject to audit by its regular public accounting firm.  In addition, upon reasonable notice, each Party shall have access to the other Party's said books and records, related to the performance of this Restated Agreement.

10.3    Disputes and Adjustments of Invoices.  Any Party may, in good faith, dispute the correctness of any invoice or any adjustment to an invoice rendered under this Restated Agreement for any arithmetic or computational error, within twelve (12) months of the date of invoice or adjustment.  Any dispute with respect to an invoice is waived unless the invoicing Party receives notice under this Article 10.3 within twelve (12) months after the invoice is rendered or any specific adjustment to the invoice is made.  In the event an invoice or portion thereof, or any other claim arising hereunder, is disputed, payment of the invoice shall be required to be made when due, with notice of the objection given to the invoicing Party.  Any invoice dispute shall be in writing and shall state the basis for the dispute.  The Parties shall negotiate in good faith to resolve any such disputed invoice.  In the event the Parties are unable to resolve such dispute within thirty (30) days of the objecting Party's delivery of its objection notice to the invoicing Party, such dispute shall be conclusively resolved by a nationally recognized independent accounting firm mutually agreed to by the Parties, which resolution shall be final and binding among the Parties.  Upon resolution of the dispute, any required payment shall be made within two (2) Business Days of such resolution along with interest accrued at the Interest Rate from and including the due date to but excluding the date paid.  Inadvertent overpayments shall be returned upon request or deducted by the invoicing Party from subsequent payments, with interest accrued at the Interest Rate from and including the date of such overpayment to but excluding the date repaid or deducted by the invoicing Party.

ARTICLE 11<br/>ASSIGNMENT; BINDING EFFECT

11.1    This Restated Agreement inures to the benefit of and is binding upon the Parties, their successors and assigns, but no Party may assign this Restated Agreement nor any right or obligation hereunder without the prior written consent of the others, not to be unreasonably withheld, conditioned or delayed, except that without the consent of the other Parties:

(a)  Any Party may (i) assign this Restated Agreement or any right or obligation hereunder to a wholly-owned subsidiary of the assignor; (ii) transfer, sell, pledge, encumber or assign this Restated Agreement or the accounts, revenues or proceeds hereof in connection with any financing or other financial arrangements provided the assigning Party notifies the other Party of any such assignment at least thirty

(30) days prior to such assignment; (iii) transfer or assign this Restated Agreement to any Person succeeding to the ownership of Sandow 4, in the case of Luminant Generation, the ownership of Sandow 5, in the case of Sandow Power, the ownership of the Three Oaks Mine Facilities, in the case of Luminant Mining, or to the ownership of the Alcoa Plant and the Sandow Mine Facilities, in the case of Alcoa; (iv) transfer or assign this Restated Agreement to any Person succeeding to all or substantially all of the assets of such Party; or (v) transfer or assign this Restated Agreement to any Person that has or obtains an investment grade rating on its senior unsecured bonds as determined by at least two (2) rating agencies, one of which must either be Standard & Poor's (at least BBB-[or equivalent]) or Moody's (at least Baa3 [or equivalent]) (or if either one or both are not available, equivalent ratings from alternate rating sources acceptable to the non-assigning Party), provided in the case of (iii), (iv) and (v) above, the assignee is not principally engaged in the same activities or businesses as the activities or businesses in which any of the non-assigning Parties is principally engaged on the Effective Date. No such transfer or assignment shall relieve the assigning Party of its obligations and/or liabilities hereunder; provided, however, (x) that an assignment in accordance with clause (iii) above shall relieve the assigning Party of all of its obligations and liabilities hereunder, (y) that an assignment in accordance with clause (iv) above shall relieve the assigning Party of all of its obligations and liabilities hereunder and (z) that an assignment in accordance with clause (v) above shall relieve the assigning Party of all of its obligations and liabilities hereunder, if, in each such case, the following terms and conditions are met and the assignee thereunder assumes all of the assigning Party's obligations and liabilities hereunder. The assignments referenced in (x), (y) and (z) above shall relieve the assigning Party of all of its obligations and liabilities hereunder if (i) with respect to (x) and (y), the assignee has or obtains an investment grade rating on its senior unsecured bonds as determined by at least two (2) rating agencies, one of which must either be Standard & Poor's (at least BBB-[or equivalent]) or Moody's (at least Baa3 [or equivalent]) (or if either one or both are not available, equivalent ratings from alternate rating sources acceptable to the non-assigning Party), or (ii) with respect to (x), (y) and (z), with respect to an assignment by Sandow Power, Luminant Generation remains the operator of Sandow 5, or (a) the assignee or a controlled Affiliate of the assignee operates not less than 2000 MW of electric generating facilities; (b) has a compliance history rating of less than or equal to 3.01 as calculated pursuant to 30 TAC 60; and (c) meets, as an entire organization, the following safety metrics: an Experience Modification Rate (EMR) of less than 1.2; a Lost Work Day Frequency Rate (LWDFR) of less than 2.0; and a Total Recordable Injury Rate (TRIR) of less than 4.5.

(b) Sandow Power may assign this Restated Agreement to Texas Competitive Electric Holdings Company LLC and be relieved of all of its obligations and liabilities hereunder in the event Texas Competitive Electric Holdings Company LLC agrees to assume all of Sandow Power's obligations and liabilities hereunder.

(c) Any Party may assign this Restated Agreement to an affiliate or parent entity and be relieved of all of the obligations and liabilities of that Party; provided that the party to whom this Restated Agreement is to be assigned agrees to assume all of the assigning Party's obligations and liabilities hereunder and the assigning Party obtains the prior written consent of the other Parties, such consent not to be unreasonably withheld, conditioned or delayed.

(d) Any Party may delegate or subcontract to or otherwise cause any or all of its duties hereunder to be discharged by any Affiliate of such Party without consent of the other Parties; provided that the delegating or subcontracting Party will remain liable to the other Parties as guarantor of the performance of such designee.

## ARTICLE 12
## FORCE MAJEURE AND LIMITATION OF LIABILITY

12.1    Force Majeure.  Except as provided in the following sentence, if any Party is rendered unable by Force Majeure to carry out, in whole or part, its obligations under this Restated Agreement and such Party gives notice and full details of the event to the other Parties as soon as practicable after the occurrence of the event, then during the pendency of such Force Majeure but for no longer period, the obligations of the Party affected by the event (other than the obligation to make payments then due or becoming due with respect to performance prior to the event) shall be suspended to the extent required.  The Party affected by the Force Majeure shall remedy the Force Majeure with all reasonable dispatch.

12.2    Limitation of Remedies, Liability and Damages.  THE PARTIES CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS RESTATED AGREEMENT SATISFY THE ESSENTIAL PURPOSES HEREOF. FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS HEREIN PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, THE OBLIGOR'S LIABILITY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED.  IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY HEREIN PROVIDED, THE OBLIGOR'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY, SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED.  UNLESS EXPRESSLY PROVIDED IN THIS RESTATED AGREEMENT, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE.  IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING, WITHOUT LIMITATION, THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE, TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE LIQUIDATED DAMAGES CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.  NOTWITHSTANDING THE FOREGOING, THE LIMITATIONS SET FORTH IN THIS ARTICLE 12.2 SHALL NOT APPLY TO ANY BREACHES OR LIABILITIES OF A PARTY RESULTING FROM SUCH PARTY'S INTENTIONAL NONPERFORMANCE OF THIS RESTATED AGREEMENT, FRAUD OR WILLFUL MISCONDUCT.

12.3    Duty To Mitigate.  Each Party agrees that it has a duty to mitigate Damages and covenants that it will use commercially reasonable efforts to minimize any Damages it may incur as a result of the other Parties' performance or non-performance of this Restated Agreement.

## ARTICLE 13
## TAXES

13.1    The Parties shall each use reasonable efforts to implement the provisions of and to administer this Restated Agreement in accordance with their intent to minimize Taxes, so long as no Party is materially adversely affected by such efforts.  Each Party, upon written request of another Party, shall provide a certificate of exemption or other reasonably satisfactory evidence of exemption if such Party is exempt from Taxes, and shall use reasonable efforts to obtain and cooperate with obtaining any exemption from or reduction of Tax.

## ARTICLE 14
## NOTICES

14.1    All notices, requests, statements or payments shall be made as specified in Schedule 14.1. Notices required to be in writing shall be delivered by letter, email or other documentary form. Notice by hand delivery shall be deemed to have been received by the close of the Business Day on which it was hand delivered (unless hand delivered after close in which case it shall be deemed received at the close of the next Business Day). Notice by overnight mail or courier shall be deemed to have been received one (1) Business Day after it was sent. A Party may change its address by providing notice of same in accordance herewith.

**ARTICLE 15**
**FINANCING**

15.1    The Parties acknowledge that this Restated Agreement may be an integral part of the documentation securing the long-term non-recourse financing or refinancing of the Alcoa Facilities, Sandow 4, Sandow 5 and/or the Three Oaks Facilities, and that in order to obtain such financing, modifications and amendments to this Restated Agreement may be sought by a Party on behalf of its lenders. At a Party's request, the other parties shall agree to amend this Restated Agreement to include any provision which may reasonably be requested by a proposed lender; provided, however, that such amendment does not impair any of rights of a Party under this Restated Agreement or increase the burdens or obligations of a Party hereunder. Upon the request of a proposed lender, the Parties agree to negotiate in good faith and shall execute additional documents, opinions and instruments reasonably requested by a proposed lender including (a) a consent and Restated Agreement that provides an additional reasonable period of time to remedy any Event of Default, and (b) a legal opinion of counsel for a Party affirming the enforceability of this Restated Agreement against such Party and other matters reasonably requested, subject to customary exceptions and qualifications. A Party seeking financing or refinancing agrees to pay for or reimburse the other Parties for all of such Parties' reasonable and documented costs and expenses incurred in cooperating with such Party in accordance with this Article 15.1, including without limitation, the reasonable costs and expenses of internal or external counsel reviewing any documents that a Party is requested to execute.

**ARTICLE 16**
**MISCELLANEOUS**

16.1    Entirety; Construction. The Parties intend for all previous agreements related to Sandow 1-3 and Sandow 4, including but not limited to the Power Contract, the Operating Contract, and the Sandow 4 Agreements, all as amended, to remain in full force and effect; provided, however (a) this Restated Agreement shall replace all terms and provisions of previous agreements between Alcoa and any of the other Parties with regard to the definition of Common Facilities, the operation and maintenance of Common Facilities, and other matters addressed in this Restated Agreement; (b) this Restated Agreement shall govern all matters addressed herein related to the Common Facilities; and (c) if and to the extent that there is any conflict between the terms and provisions of this Restated Agreement and those of any previous agreement, the terms and provisions of this Restated Agreement shall control. This Restated Agreement, including the Exhibits and Schedules, constitutes the entire agreement among the Parties and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof. There are no prior or contemporaneous agreements or representations affecting the same subject matter other than those herein expressed. Except for any matters which, in accordance with the express provisions of this Restated Agreement, may be resolved by verbal agreement among the Parties, no amendment, modification or change herein shall be enforceable unless reduced to writing and executed by the Parties. The Parties acknowledge that each Party and its counsel have reviewed and revised this Restated Agreement and that any rule of construction which provides that ambiguities are to be resolved against the drafting Party shall not apply to the interpretation of this Restated Agreement.

16.2    Governing Law; Consent to Personal Jurisdiction. THIS RESTATED AGREEMENT AND THE RIGHTS AND DUTIES OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED, ENFORCED AND PERFORMED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAWS. THE PARTIES MUTUALLY CONSENT TO THE NONEXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS IN DALLAS COUNTY, TEXAS AND ALLEGHENY COUNTY, PENNSYLVANIA AND AGREE THAT ANY ACTION, SUIT OR PROCEEDING CONCERNING, RELATED TO OR ARISING OUT OF THIS RESTATED AGREEMENT AND THE NEGOTIATION OF THIS RESTATED AGREEMENT MAY BE BROUGHT IN A FEDERAL OR STATE COURT IN DALLAS COUNTY, TEXAS OR ALLEGHENY COUNTY, PENNSYLVANIA, AND THE PARTIES AGREE THAT THEY WILL NOT RAISE ANY DEFENSE OR OBJECTION OR FILE ANY MOTION BASED ON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE, INCONVENIENCE OF THE FORUM OR THE LIKE IN ANY CASE FILED IN A FEDERAL OR STATE COURT IN DALLAS COUNTY, TEXAS OR ALLEGHENY COUNTY, PENNSYLVANIA.

16.3    Recordation of Restated Agreement. Each Party hereby consents to the recordation of a memorandum of this Restated Agreement in the official records of Milam County, Texas.

16.4    Non-Waiver. The failure of any Party to enforce at any time any of the provisions of this Restated Agreement or to exercise any right which is herein provided will in no way be construed to be a waiver of such provision nor in any way to affect the validity of this Restated Agreement or any part thereof or the right of any Party to enforce thereafter each and every such provision and to exercise any such right. No waiver of any breach of this Restated Agreement will be held to be a waiver of any other or subsequent breach. Nothing will constitute, or have the effect of, a waiver except an instrument in writing signed by a duly authorized officer or representative of the Party against whom such waiver is sought to be enforced which expressly, and not impliedly, waives a right or rights under this Restated Agreement.

16.5    Severability. If any provision of this Restated Agreement or its application to any person or circumstance is adjudged invalid or unenforceable by a court of competent jurisdiction, then the remainder of this Restated Agreement or the application of such provision to other persons or circumstances will not be affected by such adjudication. If any provision or application of this Restated Agreement is invalid or unenforceable, then a suitable and equitable provision will be substituted for such provision in order to carry out, so far as may be valid and enforceable, the intent and purpose of this Restated Agreement, including the invalid or unenforceable provision.

16.6    Headings & Exhibits. The headings used for the articles herein are for convenience and reference purposes only and shall in no way affect the meaning or interpretation of the provisions of this Restated Agreement. Any and all Exhibits, Schedules and Appendices referred to in this Restated Agreement are, by such reference, incorporated herein and made a part hereof for all purposes.

16.7    Winding Up Arrangements; Survival. All indemnity and audit rights contained herein shall survive the termination of this Restated Agreement. All obligations provided in this Restated Agreement shall remain in effect for the purpose of complying herewith. Section 5.2(k) shall survive any termination of this Restated Agreement for a period of twelve months.

16.8    No Third Party Beneficiaries. Nothing in this Restated Agreement shall provide any benefit to any third party or entitle any third party to any claim, cause of action, remedy or right of any kind, it being the intent of the Parties that this Restated Agreement shall not be construed as a third party beneficiary contract.

16.9    Relationships of Parties. The Parties shall not be deemed in a relationship of partners or joint ventures by virtue of this Restated Agreement, nor shall any Party be an agent, representative, trustee or fiduciary of the other. No Party shall have any authority to bind another to any agreement. This Restated Agreement is intended to secure and provide for the services of each Party as an independent contractor.

16.10  Counterparts.  This Restated Agreement may be executed in several counterparts, each of which is an original and all of which constitute one and the same instrument.

The remainder of this page is intentional left blank.

**IN WITNESS WHEREOF,** the Parties have executed this Restated Agreement effective as of the Effective Date.  This Restated Agreement shall not become effective as to either Party unless and until executed by both Parties.

**LUMINANT GENERATION COMPANY LLC**

By: _____

Name: Robert C. Frenzel

Title: SVP, CFO

Date: 8/10/12

**SANDOW POWER COMPANY LLC**

By: _____

Name: Robert C. Frenzel

Title: SVP, CFO

Date: 8/10/12

**ALCOA INC.**

By: _____

Name: Dick A. Bowen

Title: President - Energy

Date: 8/9/2012

[Signature Page to Amended and Restated Common Facilities Agreement]

**EXHIBIT A**
**to the**
**Amended and Restated Common Facilities Agreement**


**RESERVED**

**Alcoa Facilities**

**EXHIBIT B**
to the
**Amended and Restated Common Facilities Agreement**

**RESERVED**

**Luminant Facilities**

EXHIBIT C
to the
Amended and Restated Common Facilities Agreement

**Calculation of Rainfall Runoff**

Rainfall runoff diverted from Sandy Creek is calculated by assuming Alcoa Lake Treatment System does not exist. The runoff area is assumed to be 8 square miles (5,120 acres) including the area of the lake. Once a rain event begins the first one inch is absorbed and no runoff occurs. 50 percent of the rain after the first inch is assumed to be runoff. Rain events lasting multiple days tend to saturate the ground after the first one inch and 50 percent of the multiple-day rain event runs off.

| Example 1 Day of Month | Rainfall at Bldg 80 | Rainfall Contributing to Runoff | Runoff Volume |
|---|---|---|---|
| 9 | 0.75" | 0" | 0 acre-feet |
| 10 | 0.10" | 0" | 0 acre-feet |
| 11 | 0.00" | 0" | 0 acre-feet |

| Example 2 Day of Month | Rainfall at Bldg 80 | Rainfall Contributing to Runoff | Runoff Volume |
|---|---|---|---|
| 9 | 1.25" | 0.125" | 53 acre-feet |
| 10 | 0.00" | 0" | 0 acre-feet |

| Example 3 Day of Month | Rainfall at Bldg 80 | Rainfall Contributing to Runoff | Runoff Volume |
|---|---|---|---|
| 9 | 1.00" | 0.00" | 0 acre-feet |
| 10 | 0.20" | 0.10" | 43 acre-feet |

| Example 4 Day of Month | Rainfall at Bldg 80 | Rainfall Contributing to Runoff | Runoff Volume |
|---|---|---|---|
| 7 | 0.60" | 0.00" | 0 acre-feet |
| 8 | 0.35" | 0.00" | 0 acre-feet |
| 9 | 0.45" | 0.20" | 85 acre-feet |
| 10 | 1.00" | 0.50" | 213 acre-feet |
| 11 | 0.10" | 0.05" | 21 acre-feet |

Schedule 5.1 (page 1)

Common Facilities and Easement Equipment

| | Common Facility | Own | Operate | Maintain | Notes |
|---|---|---|---|---|---|
| 1.0 | Alcoa Lake Treatment System | | | | |
| 1.1 | Lake | Alcoa | Alcoa | Alcoa | Note A |
| 1.2 | Earthen Impoundment | Alcoa | Alcoa | Alcoa | |
| 1.3 | Flood Gates and Flood Control Structures | Alcoa | Alcoa | Alcoa | |
| 1.4 | Little River Intake Structure | Alcoa | Alcoa | Alcoa | |
| 1.5 | Little River Pumps | Alcoa | Alcoa | Alcoa | |
| 1.6 | Little River Auxiliary Equipment and Electrical | Alcoa | Alcoa | Alcoa | |
| 1.7 | Pipeline | Alcoa | Alcoa | Alcoa | |
| 1.8 | 33 kV Power Line | Alcoa | Alcoa | Alcoa | |
| 1.9 | Permitting, Fees and Testing | Alcoa | Alcoa | Alcoa | |
| 2.0 | Mine Groundwater System | | | | |
| 2.1 | Wells | Alcoa | Alcoa | Alcoa | Note B |
| 2.2 | Well Field | Alcoa | Alcoa | Alcoa | |
| 2.3 | Piping - Upstream of Lift Station | Alcoa | Alcoa | Alcoa | |
| 2.4 | Piping - Downstream of Lift Station | Alcoa | Alcoa | Alcoa | |
| 2.5 | Lift Station | Alcoa | Alcoa | Alcoa | |
| 2.6 | Pumps and Barges | Alcoa | Alcoa | Alcoa | |
| 2.7 | Permitting, Fees and Testing | Alcoa | Alcoa | Alcoa | |
| 3.0 | Service / Mill / Fire Protection Water System | | | | |
| 3.1 | Alcoa Service Water Intake and Pumps | Alcoa | Alcoa | Alcoa | Note C |
| 3.2 | Alcoa Piping Systems External to Power Island | Alcoa | Alcoa | Alcoa | |
| 3.3 | Alcoa Piping Systems Internal to Power Island | Alcoa | Luminant Generation | Luminant Generation | |
| 3.4 | Service Water Elevated Storage Tank | Alcoa | Alcoa | Alcoa | |
| 3.5 | Alcoa / Luminant Interconnection | Joint | Luminant Generation | Luminant Generation | |
| 3.6 | Luminant Piping Systems | Luminant Generation | Luminant Generation | Luminant Generation | |
| 4.0 | Sanitary Sewer System | | | | |
| 4.1 | Treatment Plant | Alcoa | Alcoa | Alcoa | Note D |
| 4.2 | Power Island Lift Stations | Luminant Generation | Luminant Generation | Luminant Generation | |
| 4.3 | Power Island Sewer Drains and Piping | Luminant Generation | Luminant Generation | Luminant Generation | |
| 5.0 | Storm Water System | | | | |
| 5.1 | Power Island Lift Stations A, B and C | Alcoa | Luminant Generation | Luminant Generation | Note E |
| 5.2 | Unit 4 Drains and Piping | Luminant Generation | Luminant Generation | Luminant Generation | |
| 5.3 | Units 1-3 Drains and Piping | Alcoa | Luminant Generation | Luminant Generation | |
| 6.0 | 138 kV Yard | | | | |
| 6.1 | OCB 5330 SW 5329 / 5331 | Luminant Generation | Luminant Generation | Luminant Generation | Note F |
| 6.2 | OCB 5320 SW 5319 / 5321 | Luminant Generation | Luminant Generation | Luminant Generation | |
| 6.3 | CB-0100 SW 0099 | Alcoa | Luminant Generation | Luminant Generation | |
| 6.4 | OCB 5300 SW 5299 / 5301 | Luminant Generation | Luminant Generation | Luminant Generation | |
| 6.5 | OCB 5310 SW 5309 / 5311 | Luminant Generation | Luminant Generation | Luminant Generation | |
| 6.6 | All of the East Bus Work North of MOS 3855 | Luminant Generation | Luminant Generation | Luminant Generation | |
| 6.7 | All of the West Bus Work North of MOS 3874 | Luminant Generation | Luminant Generation | Luminant Generation | |
| 6.8 | OCB 3880 SW 3881 / 3879 | Luminant Generation | Luminant Generation | Luminant Generation | |
| 6.9 | OCB 3875 SW 3876 / 3874 | Alcoa | Alcoa | Alcoa | |
| 6.10 | OCB 3870 SW 3871 / 3869 | Alcoa | Alcoa | Alcoa | |
| 6.11 | OCB 3860 SW 3862 / 3861 / 3859 | Alcoa | Alcoa | Alcoa | |
| 6.12 | OCB 3850 SW 3852 / 3851 / 3849 | Alcoa | Alcoa | Alcoa | |
| 6.13 | OCB 3840 SW 3939 / 3841 | Alcoa | Alcoa | Alcoa | |
| 6.14 | OCB 3830 SW 3832 / 3831 / 3829 | Alcoa | Alcoa | Alcoa | |
| 6.15 | OCB 3820 SW 3822 / 3821 / 3819 | Alcoa | Alcoa | Alcoa | |
| 6.16 | OCB 3810 SW 3812 / 3811 / 3809 | Alcoa | Alcoa | Alcoa | |
| 6.17 | All Alcoa PT's, CT's, Bus and Relaying | Alcoa | Alcoa | Alcoa | |
| 6.18 | All Luminant PT's, CT's, Bus and Relaying | Luminant Generation | Luminant Generation | Luminant Generation | |
| 6.19 | Elgin Line Dead End Tower | Alcoa | Alcoa | Alcoa | |

Schedule 5.1 (page 2)
## Common Facilities and Easement Equipment

| | Common Facility | Own | Operate | Maintain | Notes |
|---|---|---|---|---|---|
| 6.20 | 138 kV Mine Line | Joint | Luminant Generation | Luminant Generation | |
| 6.21 | Pecan Orchard Substation | Luminant Generation | Luminant Generation | Luminant Generation | |
| 6.22 | Sandow Mine Power Distribution System | Alcoa | Alcoa | Alcoa | |
| 6.23 | SW 3855 | Alcoa | Alcoa | Alcoa | |
| 6.24 | OCB 1480 | Alcoa | Alcoa | Alcoa | |
| 6.25 | 33kV Sandow 5 Construction/Aux Power | Alcoa | Alcoa | Luminant | |
| 6.26 | CB SS340 SW S5339 / S5341 | Luminant Generation | Luminant Generation | Luminant Generation | |
| 6.27 | CB SS350 SW S5349 / S5351 | Luminant Generation | Luminant Generation | Luminant Generation | |
| 6.28 | CB SS360 SW S5359 / S5361 | Luminant Generation | Luminant Generation | Luminant Generation | |
| | | | | | |
| 7.0 | 13.8 kV and 33kV Yards | | | | |
| 7.1 | 13.8 kV Transformers/OCBs/Switches/Bus | Alcoa | Alcoa | Alcoa | Note G |
| 7.2 | 33 kV Transformers/OCBs/Switches/Bus | Alcoa | Alcoa | Alcoa | |
| 8.0 | Telephone System | | | | |
| 8.1 | PBX and Telecommunications Switch & Usage | Alcoa | Alcoa | Alcoa | Note H |
| 8.2 | Phone Lines and Instruments | Alcoa | Alcoa | Alcoa | |
| 9.0 | Potable Water | | | | |
| 9.1 | Treatment Plant | Alcoa | Alcoa | Alcoa | Note I |
| 9.2 | Sandow 1-3 Piping and Distribution | Alcoa | Luminant Generation | Luminant Generation | |
| 9.3 | Sandow 4 Supply Piping and Distribution | Alcoa | Luminant Generation | Luminant Generation | |
| 9.4 | Sandow 5 Supply Piping and Distribution | Alcoa | Luminant Generation | Luminant Generation | |
| 9.5 | Permitting, Fees and Testing | Alcoa | Alcoa | Alcoa | |
| 10.0 | Plant and Power Island Access Roads | | | | |
| 10.1 | Private Sections of FM 2116 | Alcoa | Alcoa | Alcoa | Note J |
| 10.2 | Private Sections FM 1786 | Alcoa | Alcoa | Alcoa | |
| 10.3 | Power Plant Driveway and Roads | Alcoa | Luminant Generation | Luminant Generation | |
| 10.4 | FM 2116 Hauler Crossing North Gate | Alcoa | Luminant Generation | Luminant Generation | |
| 10.5 | FM 2116 Hauler Crossing South Gate | Alcoa | Alcoa | Alcoa | |
| 11.0 | Relay House | | | | Note K |
| 11.1 | 13.8 kV | Alcoa | Alcoa | Alcoa | |
| 11.2 | 33 kV / 138 kV Switchyard | Alcoa | Alcoa | Alcoa | |
| 12.0 | SCADA System | | | | |
| 12.1 | 13.8 kV | Alcoa | Alcoa | Alcoa | Note L |
| 12.2 | 33kV Yard / 138 kV Yard | Alcoa | Alcoa | Alcoa | |
| 12.3 | Sandow 5 SCADA Inputs to Alcoa SCADA | Alcoa | Luminant Generation | Luminant Generation | |
| 13.0 | Sandow 4 Fly Ash Sales and Disposal | | | | |
| 13.1 | "C" Pit | Alcoa | Alcoa | Alcoa | Note M |
| 13.2 | "B" Pit | Alcoa | Alcoa | Alcoa | |
| 14.0 | Sandow 4 Bottom Ash Handling | | | | |
| 14.1 | Pit Bottom Ash Hauling | Alcoa | Alcoa | Alcoa | Note N |
| 14.2 | Bottom Ash Disposal | Alcoa | Alcoa | Alcoa | |
| 15.0 | Sandow 4 Ash and Process Water Systems | | | | |
| 15.1 | Water and Ash Piping | Alcoa | Alcoa | Alcoa | Note O |
| 15.2 | 90 Day Ponds | Alcoa | Alcoa | Alcoa | |
| 15.3 | Clear Lake | Alcoa | Alcoa | Alcoa | |
| 15.4 | Supernate | Alcoa | Alcoa | Alcoa | |
| 15.5 | SO2 | Alcoa | Alcoa | Alcoa | |
| 16.0 | Sandow 5 Ash Handling and Disposal | | | | |
| 16.1 | Access Roads | Alcoa | Luminant Generation | Luminant Generation | Note P |
| 16.2 | Lease Properties | Alcoa | Luminant Generation | Luminant Generation | |
| 16.3 | Ash Water Makeup and Supply | Alcoa | Luminant Generation | Luminant Generation | |

Schedule 5.1 (page 3)
Common Facilities and Easement Equipment

|  | Common Facility | Own | Operate | Maintain | Notes |
|---|---|---|---|---|---|
| 17.0 | Common Disposal Area Roads | | | | |
| 17.1 | Haul Road | Alcoa | Luminant Generation | Luminant Generation | Note Q |
| 17.2 | Service Roads | Alcoa | Luminant Generation | Luminant Generation | |
| 18.0 | Sandow 4 Industrial Waste | | | | |
| 18.1 | Waste Water | Alcoa | Alcoa | Alcoa | Note R |
| 18.2 | RCRA Waste | Alcoa | Luminant Generation | Luminant Generation | |
| 18.3 | Plant Trash | Luminant Generation | Luminant Generation | Luminant Generation | |
| 19.0 | Sandow 5 Industrial Waste | | | | |
| 19.1 | Waste Water | Alcoa | Alcoa | Alcoa | Note S |

Schedule 5.1 Notes:

A.  Alcoa Lake Treatment System -- Alcoa owns the Alcoa Lake Treatment System and shall operate and maintain ALTS structures and components. Alcoa has the right, but not the obligation, to expand ALTS as it deems necessary or appropriate. Each month during the Term, Sandow Power shall pay to Alcoa (i) 105% of the Sandow 5 Allocable Generation Share of Allocable O&M Costs related to ALTS and (ii) the Sandow 5 Allocable Generation Share of Alcoa's Cost of Capital and Depreciation Expenses related to ALTS. Sandow 4's portion of costs related to the ALTS shall be allocated between Alcoa and Luminant Generation as provided in the Sandow 4 Agreements. Any water supplied to ALTS is governed by Section 5.2 of this Restated Agreement.

B.  Mine Groundwater System – Alcoa owns the Mine Groundwater System and shall operate and maintain the Mine Groundwater System. Alcoa has the right, but not the obligation, to expand the Mine Groundwater System, designate additional wells to be part of the Mine Groundwater System, and/or to abandon or plug any wells as it deems necessary or appropriate. Each month during the Term, Sandow Power shall pay to Alcoa (i) 105% of the Sandow 5 Allocable Generation Share of Allocable O&M Costs related to the Mine Groundwater System and (ii) the Sandow 5 Allocable Generation Share of Alcoa's Cost of Capital and Depreciation Expenses related to the Mine Groundwater System. Sandow 4's portion of costs related to the Mine Groundwater System shall be allocated between Alcoa and Luminant Generation as provided in the Sandow 4 Agreements. Any water supplied to ALTS from the Mine Groundwater System is governed by Section 5.2 of this Restated Agreement.

C.  Service/Mill/Fire Protection Water System – Alcoa and Luminant Generation shall own, operate and maintain the Service/Mill/Fire Protection Water System as set forth in Schedule 5.1, Sections 3.1 through 3.6. Each month during the Term, Sandow Power shall pay to Alcoa (i) 105% of the Sandow 5 Allocable Generation Share of Allocable O&M Costs related to the items set forth in Schedule 5.1, Sections 3.1, 3.3, 3.4 and 3.5 and (ii) the Sandow 5 Allocable Generation Share of Alcoa's Cost of Capital and Depreciation Expenses related to the items set forth in Schedule 5.1, Sections 3.1, 3.3, 3.4 and 3.5. Sandow 4's portion of costs related to the items set forth in Schedule 5.1, Sections 3.1, 3.3, 3.4 and 3.5 shall be allocated between Alcoa and Luminant Generation in accordance with the Sandow 4 Agreements. The Parties agree that there are no charges allocable to Sandow 4, Luminant Generation or Sandow Power regarding the items set forth in Schedule 5.1, Sections 3.2.

D.  Sanitary Sewer System – Alcoa and Luminant Generation shall own, operate and maintain the Sanitary Sewer System as set forth in Schedule 5.1, Sections 4.1 through 4.3. Alcoa shall be responsible for supplying potable water to the Alcoa Plant, Sandow 4 and Sandow 5. Sandow Power shall pay monthly to Alcoa (i) 105% of the Sandow 5 Allocable Head Count Share of the Sanitary Sewer System Allocable O&M Costs and (ii) the Sandow 5 Allocable Head Count Share of Alcoa's Cost of Capital and Depreciation Expenses relating to the Sanitary Sewer

System. The Sandow 4 Allocable Head Count Share of the Sanitary Sewer System Allocable O&M Costs shall be allocated between Alcoa and Luminant Generation in accordance with the Sandow 4 Agreements.

E.   <u>Storm Water System</u> – Alcoa and Luminant Generation shall own, operate and maintain the Storm Water System as set forth in Schedule 5.1, Sections 5.1 through 5.3. Each month during the Term, Sandow Power shall pay to Alcoa (i) 105% of the Sandow 5 Allocable Generation Share of Allocable O&M Costs related to the items set forth in Schedule 5.1, Sections 5.1 through 5.3 and (ii) the Sandow 5 Allocable Generation Share of Alcoa's Cost of Capital and Depreciation Expenses related to the items set forth in Schedule 5.1, Sections 5.1 through 5.3. Sandow 4's portion of costs related to the items set forth in Schedule 5.1, Sections 5.1 through 5.3 shall be allocated between Alcoa and Luminant Generation in accordance with the Sandow 4 Agreements.

F.   <u>138 kV Switchyard</u> - Alcoa and Luminant Generation shall own, operate and maintain the 138kV Switchyard as set forth in Schedule 5.1, Sections 6.1 through 6.29. Each Party will coordinate all of its maintenance activities with the appropriate Luminant Generation or ERCOT transmission dispatcher. This coordination is to include planned and unplanned switching requirements for maintenance or production support involving 138 kV or higher voltage switchgear. In addition, each Party or its designated affiliate shall also own, operate and maintain any Potential Transformers (PTs) and/or Current Transformers (CTs), and protective relaying associated with the equipment owned by that Party or its designated affiliate. Sandow Power will own and operate the Sandow 5 Portion 138 kV Switchyard and will coordinate switchyard activities with Alcoa.

Costs incurred by a Party to maintain portions of the 138kV Switchyard that are used for the benefit of both Sandow 4 and Sandow 5 shall be considered Allocable O&M Costs. Each month during the Term, Sandow Power shall pay to Party responsible for operating and maintaining such portions of the 138kV Switchyard (i) 105% of the Sandow 5 Allocable Generation Share of Allocable O&M Costs related to portions of the 138kV Switchyard that are used for the benefit of both Sandow 4 and Sandow 5 and (ii) the Sandow 5 Allocable Generation Share of such Party's Cost of Capital and Depreciation Expenses related to portions of the 138kV Switchyard that are used for the benefit of both Sandow 4 and Sandow 5. Sandow 4's portion of costs related to the portions of the 138kV Switchyard that are used for the benefit of both Sandow 4 and Sandow 5 and any Party's costs incurred related to portions of the 138kV Switchyard that are used solely for the benefit of Sandow 4 shall be allocated between Alcoa and Luminant Generation in accordance with the Sandow 4 Agreements. Costs incurred by Sandow Power to maintain portions of the 138kV Switchyard that are used solely for the benefit of Sandow 5 and costs incurred by Alcoa to maintain portions of the 138kV Switchyard that are used solely for the benefit of the Alcoa Plant shall not be considered Allocable O&M Costs.

For clarity: (1) the portions of the 138kV Switchyard that are used for both Sandow 4 and Sandow 5 are the items described in Schedule 5.1, Sections 6.1, 6.2, 6.3, 6.6, 6.7, 6.8, 6.9, 6.11, 6.12, 6.13, 6.15, 6.17, 6.18, 6.19, 6.20, 6.21, 6.22, 6.23, 6.24, and 6.28, (2) the portions of the 138kV Switchyard that are used solely for Sandow 4 are the items described in Schedule 5.1, Sections 6.4 and 6.5, (3) the portions of the 138kV Switchyard that are used solely for Sandow 5 are the items described in Schedule 5.1, Sections 6.25, 6.26 and 6.27, and (4) the portions of the 138kV Switchyard that are used solely for the Alcoa Plant are the items described in Schedule 5.1, Sections 6.10, 6.14, 6.16 and 6.29.

G.   <u>13.8 kV AND 33 kV Switchyards</u> – Alcoa shall own, operate and maintain the 13.8kV and 33kV Switchyards. Each month during the Term, Sandow Power shall pay to Alcoa (i) 105% of the Sandow 5 Allocable Generation Share of Allocable O&M Costs related to the item set forth in Schedule 5.1, Section 7.2 and (ii) the Sandow 5 Allocable Generation Share of Alcoa's Cost of Capital and Depreciation Expenses related to the item set forth in Schedule 5.1, Section 7.2. Sandow 4's portion of costs related to the item set forth in Schedule 5.1, Section 7.2 shall be allocated between Alcoa and Luminant Generation in accordance with the Sandow 4 Agreements.

H.  Telephone System - Alcoa shall own, operate and maintain the Telephone System, including all telephone lines from the Alcoa Plant to Sandow 4 and Sandow 5. Each of Luminant Generation and Sandow Power shall pay monthly to Alcoa at 105% of its cost per line served in Sandow 4 and Sandow 5, respectively. Due to expiring obsolete leased equipment, Alcoa will no longer offer or be obligated to provide telephone system service to any Party effective 2359 hours on May 01, 2013, at which time all Parties and their contractors will be required to have in place their own respective telecommunications/telephone systems.

I.  Potable Water System - Alcoa and Luminant Generation shall own, operate and maintain the Potable Water System as set forth in Schedule 5.1 Sections 9.1 through 9.5. Alcoa shall be responsible for supplying potable water to the Alcoa Plant, Sandow 4 and Sandow 5. Sandow Power shall pay monthly to Alcoa (i) 105% of the Sandow 5 Allocable Head Count Share of the Potable Water System Allocable O&M Costs and (ii) the Sandow 5 Allocable Head Count Share of Alcoa's Cost of Capital and Depreciation Expenses relating to the Potable Water System. The Sandow 4 Allocable Head Count Share of the Potable Water System Allocable O&M Costs shall be allocated between Alcoa and Luminant Generation as set forth in the Sandow 4 Agreements.

J.  Plant and Power Island Access Roads - Alcoa and Luminant Generation shall own, operate and maintain the Plant and Power Island Access Roads as set forth in Schedule 5.1, Section 10.1 through 10.5. Sandow Power shall pay monthly to Alcoa (i) 105% of the Sandow 5 allocable share (based upon planned usage for the benefit of Sandow 5 as determined by the traffic survey that was previously performed) of Access Roads Allocable O&M Costs and (ii) the Sandow 5 share of Alcoa's Cost of Capital and Depreciation Expenses relating to the Access Roads. The Sandow 4 allocable share of the Access Roads Allocable O&M Costs and Cost of Capital and Depreciation Expenses shall be allocated between Alcoa and Luminant Generation as set forth in the Sandow 4 Agreements. Any Party may, at its own expense, perform a new traffic survey to determine the allocable shares.

K.  Relay House - Alcoa shall own, operate and maintain the Relay House. Each month during the Term, Sandow Power shall pay to Alcoa (i) 105% of the Sandow 5 Allocable Generation Share of Allocable O&M Costs related to the Relay House and (ii) the Sandow 5 Allocable Generation Share of Alcoa's Cost of Capital and Depreciation Expenses related to the Relay House. Sandow 4's portion of costs related to the Relay House shall be allocated between Alcoa and Luminant Generation in accordance with the Sandow 4 Agreements.

L.  SCADA System - Alcoa shall operate and maintain the SCADA equipment owned by Alcoa and Luminant Generation shall operate and maintain the SCADA equipment owned by Luminant Generation. Each Party ("X") shall allow the other Party ("Y") access to any SCADA equipment owned by Y that is located on X's property. If Y desires access to SCADA equipment owned by Y that is located on X's property for any purpose, including, but not limited to, installing new equipment, Y shall provide reasonable advance notice to X and X shall provide Y with reasonable access over X's property to access Y's equipment.

M.  Sandow 4 Fly Ash Sales and Disposal - Alcoa shall own the fly ash and shall own, operate and maintain the "B" and "C" pit located on the Alcoa Land. The Parties understand that Alcoa may subcontract the operation and maintenance of the "B" and "C" pit and that Alcoa will initially subcontract the operation and maintenance of the "B" and "C" pit to Luminant Generation under mutually agreeable terms. Alcoa shall obtain Luminant Generation's consent, which consent shall not be unreasonably withheld, conditioned or delayed, prior to subcontracting the operation and maintenance of the "B" and "C" pit to a third party.

N.  Sandow 4 Bottom Ash Handling - Alcoa shall own the bottom ash and shall own, operate and maintain the bottom ash disposal areas. The Parties understand that Alcoa may subcontract the operation and maintenance of the bottom ash disposal areas and that Alcoa will initially subcontract the operation and maintenance of these areas to Luminant Generation under mutually agreeable terms. Alcoa shall obtain Luminant Generation's consent, which consent shall not be unreasonably withheld, conditioned or delayed, prior to subcontracting the operation and maintenance of the bottom ash disposal areas to a third party.

O. <u>Sandow 4 Ash and Process Water Systems</u> - Alcoa shall own, operate and maintain the Sandow 4 Ash and Process Water Systems. The Parties understand that Alcoa may subcontract the operation and maintenance of the Sandow 4 Ash and Process Water Systems and that Alcoa will initially subcontract the operation and maintenance of the Sandow 4 Ash and Process Water Systems to Luminant Generation under mutually agreeable terms. Alcoa shall obtain Luminant Generation's consent, which consent shall not be unreasonably withheld, conditioned or delayed, prior to subcontracting the operation and maintenance of the Sandow 4 Ash and Process Water Systems to a third party.

P. <u>Sandow 5 Disposal Area Roads</u> - Alcoa shall own the Sandow 5 Disposal Area Roads and ancillary facilities. Luminant Generation shall operate and maintain the Sandow 5 Disposal Area Roads. Sandow Power shall pay monthly to Luminant Generation 105% of the Sandow 5 Allocable Generation Share of Disposal Area Roads Allocable O&M Costs. Sandow Power shall pay monthly to Alcoa the Sandow 5 Allocable Generation Share of Alcoa's Cost of Capital and Depreciation Expenses relating to the Sandow 5 Disposal Area Roads.

Q. <u>Common Disposal Area Roads</u> - Alcoa shall own, operate and maintain the Common Disposal Area Roads. The Parties understand that Alcoa may subcontract the operation and maintenance of the Common Disposal Area Roads and that Alcoa will initially subcontract the operation and maintenance of the Common Disposal Area Roads to Luminant Generation under mutually agreeable terms. Alcoa shall obtain Luminant Generation's consent, which consent shall not be unreasonably withheld, conditioned or delayed, prior to subcontracting the operation and maintenance of the Common Disposal Area Roads to a third party.

R. <u>Sandow 4 Industrial Waste</u> - Alcoa and Luminant Generation shall process Sandow 4 Industrial Waste as set forth in Schedule 5.1, Sections 18.1 through 18.3. The costs related to processing Sandow 4 Industrial Waste shall be allocated between Alcoa and Luminant Generation in accordance with the Sandow 4 Agreements.

S. <u>Sandow 5 Industrial Waste</u> Water - Alcoa shall process Sandow 5 industrial waste water as set forth in Schedule 5.1, Section 19.1.

T. <u>Taxes</u> – Allocable O&M Costs consisting of Taxes shall be allocated on the basis of 100% of such Taxes (not 105%).

**Schedule 9.4(a)**
**to the Common Facilities Restated Agreement**

LUMINANT GENERATION STEP-IN RIGHTS

Alcoa's failure to provide access to and use by Luminant of the following in accordance with the terms of the Common Facilities Restated Agreement:

1. River Intake Pump and Pipeline, Alcoa Lake Treatment System, 33 kV Pump Power Line and Mine Groundwater Lift Station.

2. 138 kV Switchyard.

3. Access to Access Roads and Disposal Area Roads.

**Schedule 9.4(b)**
**to the Common Facilities Restated Agreement**

ALCOA STEP-IN RIGHTS

Sandow Power's failure to provide access to and use by Alcoa of the following in accordance with the terms of the Common Facilities Restated Agreement:

1.  River Intake Pump and Pipeline, Alcoa Lake Treatment System, 33 kV Pump Power Line and Mine Groundwater Station.

2.  138 kV Switchyard.

3.  Access to Access Roads and Disposal Area Roads.

**SCHEDULE 14.1**
**to the**
**Common Facilities Restated Agreement**

NOTICES AND PAYMENT

NOTICES:

If to Luminant Generation:

Luminant Generation Company LLC
1601 Bryan St., 22nd Floor
Dallas, Texas 75201
Attention: General Counsel
Facsimile No.: (214) 875-9478

PAYMENT:

JPM Chase
Acct    08806324297
ABA    021000021 (Wire)
        111000614(ACH)


If to Sandow Power:

Sandow Power Company LLC
1601 Bryan St., 22nd Floor
Dallas, Texas 75201
Attention: General Counsel
Facsimile No.: (214) 875-9478

PAYMENT:

JPM Chase
Acct    08806324297
ABA    021 000021 (Wire)
        111000614 (ACH)


If to Alcoa:

Alcoa Rockdale Operations
P.O. Box 1491
Rockdale, Texas  76567
Attention:  Energy Manager
Facsimile No.  (512) 446-8614

With a copy to:

Alcoa Inc.
5600 N. River Road, Suite 620
Rosemont, Illinois 60018
Attention:     Alcoa Legal - John Holsinger
Facsimile No.    (773) 380-7254

PAYMENT:

| Beneficiary: | Alcoa Inc. |
| Account: | 118-3208 |
| | Mellon Bank, N.A. |
| | Pittsburgh, PA |
| ABA No.: | 043000261 |
| Reference: | Purchase of power plant assets |

### Appendix 1
### AMENDMENT TO PREMISES LEASE

**THIS AMENDMENT TO PREMISES LEASE** (this "Amendment") amends the Premises Lease dated June 30, 2009, by and between **Alcoa Inc.**, a corporation organized under the laws of the Commonwealth of Pennsylvania ("Landlord") and **Luminant Generation Company LLC,** a limited liability company organized under the laws of the State of Texas, and **Sandow Power Company** a limited liability company organized under the laws of the State of Texas (collectively "Tenant"), and is made this 10th day of August, 2012.  Landlord and Tenant are jointly referred to as the "Parties" and individually as a "Party."

### W I T N E S S E T H

**WHEREAS,** Tenant desires to lease from Landlord and Landlord desires to lease to Tenant certain property owned by Landlord known as the power island (the "Power Island Leased Premises") as described on Exhibit D attached to this Restated Agreement and made a part hereof.

**WHEREAS,** the Parties desire to amend the Premises Lease so that the Power Island Leased Premises will be subject to the terms of the Premises Lease.

**NOW, THEREFORE,** the Parties intending to be bound hereby and in consideration of the foregoing premises and the mutual representations, warranties and agreements set forth herein, and for other good and valuable consideration, the receipt of which is hereby acknowledged, hereby agree as follows:

1.  Terms

    A.  Subject to the terms of the Premises Lease, in addition to the Long-Term Leased Premises currently leased by Tenant from Landlord, Tenant will lease from Landlord the Power Island Leased Premises.

    B.  Tenant will pay Landlord rent of $7,000 per month (Sandow Unit 4 bearing 569/1133rds of such costs and Sandow Unit 5 bearing 564/1133rds of such costs), on the first calendar day of each month, during the term of this Amendment as rent for the Power Island Leased Premises.  The Power Island Leased Premises rent will increase by the CPI Percentage Increase on January 1 of each calendar year during the term of the Premises Lease.  "CPI Percentage Increase" shall mean a percentage equal to the positive difference resulting from: (i) the seasonally unadjusted Consumer Price Index for All Urban Consumers (all items), U.S. City Average (1982-84 = 100), as published by the U.S. Department of Labor, Bureau of Labor Statistics ("CPI-U") for the month of January of the calculation year, minus (b) the seasonally unadjusted CPI-U for the month of January in the calendar year prior to the calculation year.  If the U.S. Department of Labor ceases to publish the CPI-U then the replacement index shall be used and if no replacement index is designated then the Parties will negotiate in good faith to select a substitute index that most nearly approximates the CPI-U.

    C.  The Truck Tie Down Area and the Truck Staging and Scales Area portion of the Power Island Leased Premises is a joint use area to be utilized jointly by the Parties, provided however Alcoa's requirements for this area take precedence.

D.  The Bechtel Laydown Area, which is located outside the Power Island Leased Premises, will be made available to Tenant by Landlord to the extent that the footprint of former Units 1-3 is not available for Tenant's needs due to Landlord removing the Units 1-3 stacks.

E.  Tenant will maintain all above ground and below ground infrastructure within the Power Island Leased Premises.  For clarity, this excludes any infrastructure located above ground or below ground on the Excluded Property.  With regard to the Sandow Units 1-3 Stacks, if Landlord removes the above ground portions of the Sandow Units 1-3 Stacks during the Term, then such property shall no longer be Excluded Property and shall become part of the Power Island Leased Premises upon the land footprint for Units 1-3 being released for Tenant's use.  At such time, Tenant will become responsible for infrastructure located below ground in such areas.  While the Sandow Units 1-3 Stacks remain Excluded Property, Tenant shall afford Landlord such reasonable ingress and egress over the Power Island Leased Premises for Landlord to maintain the infrastructure related thereto.

F.  The lease for Building 200 offices by Tenant is covered under a separate lease agreement and is not included in this Amendment.

G.  Included in the Power Island Leased Premises is the possible Luminant Fire Station Area as described in the metes and bound description included in Exhibit E of this Amendment.

H.  Except as provided otherwise herein, all of the terms of the Premises Lease fully apply to the Power Island Leased Premises and this Amendment.

I.  Section 32 of the Premises Lease dated June 30, 2009 does not apply to the Truck Tie Down Area or the Truck Staging Areas (as described in Exhibit D), but shall apply in full force and effect to the balance of the Power Island Leased Premises.

2.  **Nature of this Amendment**

Except as expressly modified by this Amendment, the Premises Lease will remain in full force and effect.

3.  **Counterparts**

This Amendment may be executed in any number of counterparts, which together shall constitute one and the same document.

Signature Page:

**IN WITNESS WHEREOF,** the Parties, intending to be legally bound, have caused this Amendment to be executed by their duly authorized officers and to be effective as of the day and year first above written.

**LUMINANT GENERATION COMPANY LLC**          **SANDOW POWER COMPANY LLC**

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date:_____          Date:_____


**ALCOA INC.**

By: _____

Name: _____

Title: _____

Date: _____

**Exhibit D**

**METES AND BOUNDS DESCRIPTIONS**

**Power Island**

A certain piece of property located in the George Miller A-265, James M. Matlock A-261 and S.L. Johnson A-228 surveys and being described as 109.12 acres and defined as the Power Island. Said property is described as beginning at a point defined by Texas State Plane, NAD-27 coordinate North 342,406.06 and East 3,030,749.10, thence proceeding 199.64 feet at a bearing of N 54°21'10" W to a point on a line, thence 188.34 feet at a bearing of N 39°40'31" W to a point on a line, thence 132.59 feet at a bearing of S 83°26'50" W to a point on a line, thence 194.03 feet at a bearing of N 24°49'42" W to a point on a line, thence 150.25 feet at a bearing of N 32°34'1" W to a point on a line, thence 133.88 feet at a bearing of N 40°07'10" W to a point on a line, thence 296.63 feet at a bearing of N 43°45'07" W to a point on a line, thence 345.37 feet at a bearing of N 47°51'55" W to a point on a line, thence 608.22 feet at a bearing of S 67°52'54" W to a point on a line, thence 324.40 feet at a bearing of S 64°56'24" W to a point on a line, thence 131.45 feet at a bearing of S 61°52'26" W to a point on a line, thence 54.52 feet at a bearing of N 81°28'29" W to a point on a line, thence 61.59 feet at a bearing of N 66°48'54" W to a point on a line, thence 59.31 feet at a bearing of 0° West to a point on a line, thence 173.86 feet at a bearing of S 60°16'17" W to a point on a line, thence 132.14 feet at a bearing of S 20°17'42" E to a point on a line, thence 121.50 feet at a bearing of S 68°22'42" W to a point on a line, thence 5.59 feet at a bearing of S 68°59'55" W to a point on a line, thence 42.29 feet at a bearing of N 21°18'14" W to a point on a line, thence 6.88 feet at a bearing of N 65°08'30" E to a point on a line, thence 4.39 feet at a bearing of N 20°29'31" W to a point on a line, thence 6.59 feet at a bearing of S 66°29'48" W to a point on a line, thence 3.68 feet at a bearing of N 38°09'51" W to a point on a line, thence 76.45 feet at a bearing of S 68°48'55" W to a point on a line, thence 47.19 feet at a bearing of S 61°49'28" W to a point on a line, thence 33.41 feet at a bearing of S 67°47'54" W to a point on a line, thence 13.05 feet at a bearing of N 09°01'39" W to a point on a line, thence 16.85 feet at a bearing of N 46°31'33" W to a point on a line, thence 28.57 feet at a bearing of N 15°32'02" W to a point on a line, thence 21.32 feet at a bearing of N 07°07'42" W to a point on a line, thence 21.16 feet at a bearing of S 84°05'16" W to a point on a line, thence 17.43 feet at a bearing of S 86°36'53" W to a point on a line, thence 66.09 feet at a bearing of S 68°39'03" W to a point on a line, thence 98.11 feet at a bearing of N 52°49'59" W to a point on a line, thence 156.97 feet at a bearing of N 34°31'34" W to a point on a line, thence 183.17 feet at a bearing of N 26°12'11" W to a point on a line, thence 354.01 feet at a bearing of S 69°30'26" W to a point on a line, thence 1,563.23 feet at a bearing of S 22°51'07" E to a point on a line, thence 1,161.14 feet at a bearing of S 22°03'50" E to a point on a line, thence 26.66 feet at a bearing of S 22°55'19" E to a point on a line, thence 28.99 feet at a bearing of S 25°42'11" E to a point on a line, thence 25.74 feet at a bearing of S 30°27'15" E to a point on a line, thence 17.79 feet at a bearing of S 41°30'29" E to a point on a line, thence 21.71 feet at a bearing of S 55°30'17" E to a point on a line, thence 22.84 feet at a bearing of S 67°36'22" E to a point on a line, thence 20.77 feet at a bearing of S 88°03'09" E to a point on a line, thence 19.70 feet at a bearing of N 72°55'41" E to a point on a line, thence 14.07 feet at a bearing of N 60°41'04" E to a point on a line, thence 13.59 feet at a bearing of N 52°42'39" E to a point on a line, thence 28.66 feet at a bearing of N 39°48'25" E to a point on a line, thence 51.04 feet at a bearing of N 39°51'01" E to a point on a line, thence 60.75 feet at a bearing of N 39°21'40" E to a point on a line, thence 56.07 feet at a bearing of N 39°46'25" E to a point on a line, thence 49.02

feet at a bearing of N 38°16'29" E to a point on a line, thence 41.56 feet at a bearing of N 39°36'08" E to a point on a line, thence 41.60 feet at a bearing of N 39°30'39" E to a point on a line, thence 45.29 feet at a bearing of N 39°02'41" E to a point on a line, thence 51.28 feet at a bearing of N 39°08'32" E to a point on a line, thence 310.04 feet at a bearing of N 37°19'37" E to a point on a line, thence 101.99 feet at a bearing of N 12°12'29" E to a point on a line, thence 163.92 feet at a bearing of N 25°18'57" E to a point on a line, thence 100.13 feet at a bearing of N 23°49'12" E to a point on a line, thence 116.03 feet at a bearing of N 59°16'51" E to a point on a line, thence 94.34 feet at a bearing of N 53°08'52" E to a point on a line, thence 268.87 feet at a bearing of N 42°59'16" E to a point on a line, thence 100.07 feet at a bearing of N 62°45'36" E to a point on a line, thence 399.26 feet at a bearing of N 63°19'58" E to a point on a line, thence 571.30 feet at a bearing of N 66°57'25" E to a point on a line, thence 138.96 feet at a bearing of N 71°55'40" E to a point on a line, thence 38.30 feet at a bearing of N 39°18'28" W to a point on a line, thence 204.16 feet at a bearing of N 41°30'53" E to a point on a line, thence 2.19 feet at a bearing of S 54°21'10" E, ending at the point of beginning.

Truck Tie Down Area

A certain piece of property being located in the George Miller, A-265 and being described as 2.27 acres and defined as the Truck Tie Down. Said property being described as beginning at a point defined by Texas State Plane Coordinate System, NAD27, US Survey Foot as being located at N 341,815.1878, E 3,027,937.3774, thence traveling a distance of 289.46 feet at a bearing of S 20° 59' 47.54" E to a point on a line, thence 346.70 feet at a bearing of N 67° 21' 30.81" E to a point on a line, thence 285.96 feet at a bearing of N 22° 13' 05.31" W to a point on a line, thence 340.52 feet at a bearing of S 67° 55' 44.89" W, returning to the point of beginning.

Truck Staging and Scales Area

A certain piece of property being located in the S. L. Johnson Survey, A-228 and being described as 3.32 acres and defined as the Truck Staging Area. Said property being described as beginning at a point defined by Texas State Plane Coordinate System, NAD27, US Survey Foot as being located at N 341,128.6076, E 3,028,683.3708, thence proceeding 431.00 feet at a bearing of S 66° 47' 19.36" W to a point on a line, thence 491.44 feet at a bearing of S 22° 52' 01.69" E to a point on a line, thence 124.58 feet at a bearing of N 39° 37' 10.81" E to a point on a line, thence 113.96 feet at a bearing of N 27° 04' 06.12" E to a point on a line, thence 309.57 feet at a bearing of N 24° 11' 50.37" E to a point on a line, thence 152.40 feet at a bearing of N 20° 22' 16.49" W returning to the point of beginning.

Bechtel Laydown Area

A certain piece of property located in the S.L. Johnson Survey, A-228 and James H. Smith Survey, A-331, being described as a 38.975 acre tract of land defined as the Bechtel Laydown Area. Said property being described as beginning at a point defined by Texas State Plane Coordinate System, NAD27, US Survey Foot as being located at N 341,546.6127, E 3,030,690.1424, thence proceeding 137.93 feet at a bearing of S 24° 37'49.51" E, to a point on a line, thence 265.25' at a bearing of S 22° 30' 54.03" E to a point on a line, thence 358.73 feet at a bearing of S 40°

31' 11.03" E to a point on a line, thence 23.21 feet at a bearing of S 82° 14' 15.41" E to a point on a line, thence 911.13 feet at a bearing of S 23° 36' 52.05" E to a point on a line, thence 91.50 feet at a bearing of S 6° 33' 32.57" W to a point on a line, thence 140.10 feet at a bearing of S 2° 08' 15.14" E to a point on a line, thence 89.86 feet at a bearing of S 56° 52' 21.50" E to a point on a line, thence 114.20 feet at a bearing of N 60° 23' 34.62" E to a point on a line, thence 278.86 feet at a bearing of N 15° 39' 18.89" E to a point on a line, thence 242.62 feet at a bearing of N 7° 55' 23.64" W to a point on a line, thence 279.87 feet at a bearing of N 72° 31' 16.06" E to a point on a line, thence 903.63 feet at a bearing of N 13° 51' 30.47" W to a point on a line, thence 689.31 feet at a bearing of N 21° 20' 22.48" E to a point on a line, thence 288.92 feet at a bearing of N 69° 07' 33.00" W  to a point on a line, thence 187.50 feet at a bearing of N 86° 09' 57.31" W to a point on a line, thence 30.73 feet at a bearing of N 17° 49' 26.30" W to a point on a line, thence 550.44 feet at a bearing of S 74° 42' 06.50" W to a point on a line, thence 26.25 feet at a bearing of S 68° 56' 33.51" W to a point on a line, thence 77.81 feet at a bearing of N 22° 05' 35.94" W to a point on a line, thence 397.07 feet at a bearing of S 69° 59' 49.03 W to a point on a line, thence 38.26 feet at a bearing of S 68° 10' 47.85" W to a point on a line, thence 360.81 feet at a bearing of S 27° 36' 41.16 E returning to the point of beginning.

**Excluded Property – Sandow 5 Leased Premises**

See Attachment 1 to this Exhibit D.

**Excluded Property – Sandow Units 1-3 Stacks**

<u>Units 1-3 Stacks</u>

A certain piece of property being located in the George Miller Survey, A-265 and being described as three tracts totaling 0.37 acres and defined as the Units 1-3 Stacks. Said property is divided into three sections with Property 1 being described as beginning at a point defined by Texas State Plane Coordinate System, NAD27, US Survey Foot as being located at N 342,377.2993, E 3,028,719.7642 thence proceeding through a curve defined as having a length of 173.90 feet with a chord direction of N 74°35'59"W, having a chord length of 27.71 feet at a delta of 309.07 and a radius of 32.22 feet, thence proceeding along a curve defined as having a length of 225.14 feet with a chord direction of S 74°35'59"E, having a chord length of 27.71 feet at a delta of 319.83 and a radius of 40.33 feet, returning to the point of beginning, with said property comprising 0.19 acres.

Property 2 is defined as beginning at a point defined by Texas State Plane Coordinate System, NAD27, US Survey Foot as being located at N 342,208.2226, E 3,028,667.3334, being more or less describe as following a curve having a length of 109.96 feet with a chord direction of S 0°00'00"E, having a chord length of 70 feet at a delta of 180.0 and a radius of 35.00 feet, thence following along a curve having a length of 109.96 feet at a chord direction of N 0°00'00" E, having a chord length of 109.96 feet at a delta of 180.00 and radius of 35.00 feet, returning to the point of beginning, with said property more or less defined as a circle with said property comprising 0.09 acres.

Property 3 is defined as beginning at a point defined by Texas State Plane Coordinate System, NAD27, US Survey Foot as being located at N 342,491.7435, E 3,028,550.332, being more or less describe as following a curve having a length of 109.96 feet with a chord direction of S 0°00'00"E, having a chord length of 70 feet at a delta of 180.0 and a radius of 35.00 feet, thence following along a curve having a length of 109.96 feet at a chord direction of N 0°00'00" E, having a chord length of 109.96 feet at a delta of 180.00 and radius of 35.00 feet, returning to the point of beginning, with said property more or less defined as a circle with said property comprising 0.09 acres.

**Excluded Property – Sandow Units 1-3 Fuel Oil Tank Area**

Certain portions of property located within the parcel of land defined as the Power Island are excluded. One such property is located within the George Miller A-265 Survey, being described as a 0.86 acre tract and defined as the Units 1, 2 and 3 Fuel Oil Tanks and Containment, is described as beginning at Texas State Plane NAD27 Coordinate North 342,741.20, East 3,028,729.67, thence proceeding 28.75 feet at a bearing of N 71°03'50" E to a point on a line, thence 12.00 feet at a bearing of S 22°55'17" E to a point on a line, thence 14.49 feet at a bearing of N 66°06'31" E to a point on a line, thence 25.42 feet at a bearing of N 67°59'21" E to a point on a line, thence 105.47 feet at a bearing of N 62°05'51" E to a point on a line, thence 20.10 feet at a bearing of N 20°05'49" E to a point on a line, thence 123.81 feet at a bearing of N 20°44'09"W to a point on a line, thence 19.61 feet at a bearing of S 87°18'38" W to a point on a line, thence 16.46 feet at a bearing of N 29°23'05" W to a point on a line, thence 17.98 feet at a bearing of S 77°02'34" W to a point on a line, thence 30.28 feet at a bearing of S 67°35'11" W to a point on a line, thence 69.16 feet at a bearing of N 69°34'35" W to a point on a line, thence 22.70 feet at a bearing of N 69°40'50" W to a point on a line, thence 22.08 feet at a bearing of N 87°28'57" W to a point on a line, thence 33.88 feet at a bearing of S 68°54'41" W to a point on a line, thence 233.54 feet at a bearing of S 22°08'09" E, ending at the point of beginning.

**Excluded Property – Process Water Intake Structure**

A second such property located within the parcel of land defined as the Power Island is located within the George Miller A-265 Survey, being described as a 0.44 acre tract and defined as the Process Water Intake Structure, is described as beginning at Texas State Plane NAD27 Coordinate North 342,747.40, East 3,028,136.58, thence proceeding 63.36 feet at a bearing of N 83°28'17" E to a point on a line, thence 95.79 feet at a bearing of N 66°40'17" E to a point on a line, thence 64.32 feet at a bearing of N 21°34'35" W to a point on a line, thence 5.59 feet at a bearing of S 68°59'55" W to a point on a line, thence 42.29 feet at a bearing of N 21°18'14" W to a point on a line, thence 6.88 feet at a bearing of N 65°08'30" E to a point on a line, thence 4.39 feet at a bearing of N 20°29'31" W to a point on a line, thence 6.59 feet at a bearing of S 66°29'31" W to a point on a line, thence 3.68 feet at a bearing of N 38°09'51" W to a point on a line, thence 76.45 feet at a bearing of S 68°48'55" W to a point on a line, thence 47.19 feet at a bearing of S 61°49'28" W to a point on a line, thence 33.41 feet at a bearing of S 67°47'54" W to a point on a line, thence 27.91 feet at a bearing of S 22°50'38" E to a point on a line, thence 10.08 feet at a bearing of S 20°00'49" E to a point on a line, thence 24.66 feet at a bearing of S 68°01'25" W to a point on a line, thence 47.39 feet at a bearing of S 22°35'50" E to a point on a line, thence 31.15 feet at a bearing of N 87°59'40" E, ending at the point of beginning.

**Excluded Property – Little River 1291 Switch**

A third such property located within the Power Island parcel within the George Miller A-265 and James M. Matlock A-261 surveys, being described as a 0.063 acre tract and defined as the Little River 1291 Switch, is described as beginning at Texas State Plane NAD27 Coordinate North 342,907.64, East 3,028,071.25, thence proceeding 21.32 feet at a bearing of S 07°07'42" E to a point on a line, thence 28.57 feet at a bearing of S 15°32'02" E to a point on a line, thence 16.85 feet at a bearing of S 46°31'33" E to a point on a line, thence 13.16 feet at a bearing of S 03°57'06" E to a point on a line, thence 46.88 feet at a bearing of S 71°42'42" W to a point on a line, thence 60.14 feet at a bearing of N 04°10'28" W to a point on a line, thence 26.33 feet at a bearing of N 09°38'04" E to a point on a line, thence 21.16 feet at a bearing of N 84°05'16" E, ending at the point of beginning.

**Excluded Property – Alcoa Switchyard**

A fourth parcel located within the Power Island parcel within the George Miller A-265 survey, being described as a 5.40 acre tract and defined as the Alcoa Switchyard, is described as beginning at Texas State Plane NAD27 Coordinate North 342,494.51, East 3,028,073.26, thence proceeding 3.97 feet at a bearing of S 20°07'40" E to a point on a line, thence 22.49 feet at a bearing of S 68°35'10" W to a point on a line, thence 3.97 feet at a bearing of N 22°56'40" W to a point on a line, thence 322.28 feet at a bearing of S 68°34'25" W to a point on a line, thence 18.98 feet at a bearing of S 61°31'08" W to a point on a line, thence 286.18 feet at a bearing of S 22°32'10" E to a point on a line, thence 293.36 feet at a bearing of S 22°26'39" E to a point on a line, thence 401.06 feet at a bearing of N 67°34'52" E to a point on a line, thence 14.50 feet at a bearing of N 66°25'53" E to a point on a line, thence 473.32 feet at a bearing of N 24°14'58" W to a point on a line, thence 101.58 feet N 23°19'20" W to a point on a line, thence 35.77 feet at S 68°34'25" W, ending at the point of beginning.

**Excluded Property – Process Water Storage Tower**

A fifth parcel located within the Power Island parcel within the George Miller A-265 survey, being described as a 0.058 acre tract and defined as the Process Water Storage Tower, is described as beginning at Texas State Plane NAD27 Coordinate North 342,149.48, East 3,028,324.77, thence proceeding 49.23 feet at a bearing of N 64°53'11" E to a point on a line, thence 50.38 feet at a bearing of N 24°28'13" W to a point on a line, thence 48.85 feet at a bearing of S 66°35'50" W to a point on a line, thence 51.85 feet at a bearing of S 24°03'00" E, ending at the point of beginning.

**Excluded Property – Sandow 4 SCR Fabrication Yard**

A sixth parcel located within the Power Island parcel within the S. L. Johnson A-228 survey, being described as 2.26 acres and defined as the Unit 4 SCR Fabrication Yard, is described as beginning at Texas State Plane NAD27 Coordinate North 340,619.51, East 3,028,438.03, thence proceeding 8.96 feet at a bearing of N 31°37'27" E to a point on a line, thence 282.79 feet at a bearing of N 32°26'24" E to a point on a line, thence 15.16 feet at a bearing of N 30°45'34" E to a point on a line, thence 16.97 feet at a bearing of N 29°25'42" E to a point on a line, thence 13.73 feet at a bearing of N 25°04'26" E to a point on a line, thence 16.67 feet at a bearing of N 08°13'30" E to a point on a line, thence 18.84 feet at a bearing of N 00°15'20" W to a point on a line, thence 11.58 feet at a bearing of N 05°28'42" W to a point on a line, thence 12.93 feet at a bearing of N 73°44'26" E to a point on a line, thence 18.15 feet at a bearing of N 72°24'35" E to a point on a line, thence 70.70 feet at a bearing of N 66°56'40" E to a point on a line, thence 23.37 feet at a bearing of S 57°30'27" E to a point on a line, thence 25.42 feet at a bearing of S 09°00'28" E to a point on a line, thence 55.32 feet at a bearing of S 21°24'21" E to a point on a line, thence 30.15 feet at a bearing of S 18°49'30" E to a point on a line, thence 19.54 feet at a bearing of S 21°49'16" E to a point on a line, thence 32.42 feet at a bearing of S 28°24'31" E to a point on a line, thence 12.22 feet at a bearing of N 77°22'45" E to a point on a line, thence 11.86 feet at a bearing of N 59°38'10" E to a point on a line, thence 10.76 feet at a bearing of N 50°21'41" E to a point on a line, thence 9.55 feet at a bearing of N 44°27'55" E to a point on a line, thence 9.70 feet at a bearing of N 53°00'35" E to a point on a line, thence 27.96 feet at a bearing of S 47°18'48" E to a point on a line, thence 51.28 feet at a bearing of S 39°08'32" W to a point on a line, thence 45.29 feet at a bearing of S 39°02'41" W to a point on a line, thence 41.60 feet at a bearing of S 39°30'39" W to a point on a line, thence 41.56 feet at a bearing of S 39°36'08" W to a point on a line, thence 49.02 feet at a bearing of S 38°16'29" W to a point on a line, thence 56.07 feet at a bearing of S 39°46'25" W to a point on a line, thence 60.75 feet at a bearing of S 39°21'40" W to a point on a line, thence 51.04 feet at a bearing of S 39°51'01" W to a point on a line, thence 28.66 feet at a bearing of S 39°48'25" W to a point on a line, thence 13.59 feet at a bearing of S 52°42'39" W to a point on a line, thence 14.07 feet at a bearing of S 60°41'04" to a point on a line, thence 19.70 feet at a bearing of S 72°55'41" W to a point on a line, thence 20.77 feet at a bearing of N 88°03'09" W to a point on a line, thence 22.84 feet at a bearing of N 67°36'22" W to a point on a line, thence 21.71 feet at a bearing of N 55°30'17" W to a point on a line, thence 17.79 feet at a bearing of N 41°30'29" W to a point on a line, thence 25.74 feet at a bearing of N 30°27'15" W to a point on a line, thence 28.99 feet at a bearing of N 25°, 42'11" W to a point on a line, thence 26.66 feet at a bearing of N 22°55'19" W to a point on a line, thence 26.96 feet at a bearing of N 06°44'04" E, ending at the point of beginning.

**Map of Power Island**



## Map of Truck Tie Down Area



**Map of Truck Staging Area**



## Map of Bechtel Laydown Area



Map of Excluded Property – Sandow 5 Leased Premises



## Map of Excluded Property – Sandow Units 1-3 Stacks



Map of Excluded Property – Sandow Units 1-3 Fuel Oil Tank Area



Map of Excluded Property – Process Water Intake Structure



Map of Excluded Property – Little River 1291 Switch



**Map of Excluded Property – Alcoa Switchyard**



Map of Excluded Property – Process Water Storage Tower



Map of Excluded Property -- Sandow 4 SCR Fabrication Yard



**Exhibit E**

**METES AND BOUNDS DESCRIPTION - Luminant Fire Station Location**

STATE OF TEXAS

COUNTY OF MILAM

LAND DESCRIPTION

Being 0.324 acres of land, a part of the George Miller Survey, Abstract 265, Milam County, Texas and being a part of the residue from a 302.063 acre tract conveyed to Aluminum Company of America by deed recorded in volume 274, page 265 of the Deed Records of Milam County, Texas. Said 0.324 acre tract being more particularly described as follows:

BEGINNING at a 60d nail with washer marked "4428" set in said 302.063 acre Aluminum Company of America tract, for the Northwest corner hereof; said 60d nail set bears South 06 deg. 37 min. 17 sec. West – 372.15 feet from a brass monument in concrete found for reference hereof; said 60d nail set having NAD 27 Central Zone coordinates of Northing: 341573.71, Easting: 3028231.01;

THENCE across said 302.063 acre Aluminum Company of America tract as follows:

North 67 deg. 44 min. 00 sec. East – 161.75 feet to a 60d nail with washer marked "4428" set for the Northeast corner hereof;

South 22 deg. 16 min. 14 sec. East – 87.22 feet to a 60d nail with washer marked "4428" set for the Southeast corner hereof; said 60d nail set bears North 64 deg. 42 min. 58 sec. West – 780.26 feet from a 5/8 inch rebar found for the Southerly Southwest corner of a10.925 acre tract conveyed to Texas Power & Light Company by deed recorded in volume 444, page 29, and reference hereof;

South 67 deg. 43 min. 47 sec. West – 161.75 feet to a 60d nail with washer marked "4428" set for the Southwest corner hereof; and

North 22 deg. 16 min. 13 sec. West – 87.23 feet to the PLACE OF BEGINNING and containing 0.324 acres of land.

Bearings are Grid NAD 27, Texas Coordinate System Central Zone. Reference is hereby made to a plat attached hereto and made a part hereof.

William E. Weiser
Professional Land Surveyor
Number 4428
Date of signature: 7-16-10

I:\Dwgs-500\5365\5365365.doc

**Attachment 1**

STATE OF TEXAS

COUNTY OF MILAM

## LAND DESCRIPTION
### Unit 5

Being 37.356 acres of land, a part of the George Miller Survey, Abstract 265, Milam County, Texas, and being part of the residue from a 302.063 acre tract conveyed to Aluminum Company of America by deed recorded in volume 274, page 365 and part of a 108.967 acre tract conveyed to Aluminum Company of America by deed recorded in volume 282, page 543, all of the Deed Records of Milam County, Texas; said 37.356 acre tract being more particularly described as follows:

BEGINNING at a 5/8 inch rebar with cap marked "4428" set in said 302.063 acre Aluminum Company tract, for the East corner hereof, said 5/8 inch rebar with cap marked "4428" set bears North 50 deg. 16 min. 10 sec. East 1499.73 feet from a 5/8 inch rebar found having Grid NAD 27 Texas Coordinate System Central Zone coordinates of Northing: 341546.20 feet and Easting: 3029383.90 feet for the Southeast corner of a 0.5946 acre tract conveyed to Aluminum Company of America by deed recorded in volume 465, page 843 and reference hereof;  said 5/8 inch rebar with cap marked "4428" set having Grid NAD 27, Texas Coordinate System Central Zone coordinates of Northing: 342506.80 and Easting: 3030537.28;

THENCE across said 302.063 acre Aluminum Company tract, said 108.967 acre Aluminum Company tract, and across a 4.5783 acre Tract 2 easement conveyed to Texas Power and Light Company by deed recorded in volume 465, page 125 as follows:

South 25 deg. 47 min. 02 sec. West 194.18 feet to a 5/8 inch rebar with cap marked "4428" set,

North 84 deg. 43 min. 52 sec. West 188.37 feet to a 5/8 inch rebar with cap marked "4428" set,

South 67 deg. 36 min. 45 sec. West 510.00 feet to a 5/8 inch rebar with cap marked "4428" set,

South 22 deg. 23 min. 15 sec. East 15.00 feet to a 5/8 inch rebar with cap marked "4428" set,

South 67 deg. 36 min. 45 sec. West 410.00 feet to a "X" in concrete found which bears North 04 deg. 45 min. 47 sec. East ~438.39 feet from a 5/8 inch rebar found having Grid NAD 27 Texas Coordinate System Central Zone coordinates of Northing: 341546.20 feet and Easting: 3029383.90 feet for the Southeast corner of said 0.5946 acre Aluminum Company of America tract and for reference hereof; said "X" in concrete found having Grid NAD 27 Texas Coordinate System Central Zone coordinates of Northing: 341982.98 feet and Easting: 3029420.29 feet;

North 22 deg. 23 min. 15 sec. West 90.00 feet to a "X" in concrete found,

South 67 deg. 36 min. 45 sec. West 135.00 feet to a pk nail with washer marked "4428" set in the East line of a 0.6864 acre Tract 1 conveyed to Texas Power and Light Company by deed recorded in volume 465, page 139, for a Southwest corner hereof;

THENCE continuing across said 302.063 acre Aluminum Company tract, with the East line of said 0.6864 acre Texas Power tract, North 22 deg. 23 min. 15 sec. West 305.00 feet to a 5/8 inch rebar with cap marked "4428" set for the Northerly Southeast corner of a 1.7829 acre Tract 1 conveyed to Texas Power and Light Company by deed recorded in volume 465, page 125, the Northeast corner of said 0.6864 acre Texas Power tract, and an interior corner hereof;

THENCE continuing across said 302.063 acre Aluminum Company tract, with the North line of said 0.6864 acre Texas Power tract, the South line of said 1.7829 acre Texas Power tract, South 67 deg. 36 min. 45 sec. West 35.00 feet to a "X" in concrete found for the Southwest corner of said 1.7829 acre Texas Power tract, and a Southwest corner hereof;

THENCE continuing across said 302.063 acre Aluminum Company tract, with the Southerly West line of said 1.7829 acre Texas Power tract, North 22 deg. 23 min. 15

*\\Maps-100\3729\3729\3737\unit 5.doc*