**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| ENERGY FUTURE HOLDINGS | : | Case No. 14-10979 (CSS) |
| CORP., *et al.,* | : | |
| | : | Jointly Administered |
| | : | |
| Debtors. | : | **Hearing Date: September 17, 2015 at 10:00 a.m.** |
| | : | **Objections Due: August 24, 2015 by 4:00 p.m.** |
| | | **Extended by consent for U.S. Trustee to** |
| | | **September 4, 2015 by 4:00 p.m.** |

**ACTING UNITED STATES TRUSTEE'S OBJECTION TO**
**DEBTORS' MOTION TO ENTER INTO AND PERFORM UNDER**
**PLAN SUPPORT AGREEMENT (D.I. 5248)**

In support of his Objection to the Motion of Energy Future Holdings Corp., *et al.,* to Authorize the Debtors to Enter into and Perform under the Plan Support Agreement (D.I. 5248),[1] Andrew R. Vara, the Acting United States Trustee for Region 3, by and through his counsel, respectfully states as follows:

**PRELIMINARY STATEMENT**

The Bankruptcy Code is a statute that is meant to be a comprehensive federal scheme to govern the entirety of the bankruptcy process. The U.S. Trustee objects to the PSA Motion because it is an improper, post-petition solicitation of votes that violates express provisions of the Bankruptcy Code. The relief sought is expressly prohibited by section 1125(b) which provides that "[a]n acceptance or rejection of a plan may not be solicited after the commencement of a case . . . unless, at the time of or before such solicitation there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved,

---

[1] Unless otherwise defined herein, capitalized terms shall have the same meaning and context as those capitalized terms included in the referenced or cited document or pleading.

after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b). For this reason alone, the Court should deny the motion.

The PSA, however, goes much further than improper. post-petition solicitation. Among other things, the PSA obligates parties to vote in a favor a plan that provides for millions of dollars (and possibly billions) to be paid to not fewer than 45 non-estate retained professionals in undisclosed amounts and to undisclosed parties, much of which is required to be disclosed under the Bankruptcy Code and/or reviewed and approved by the Court. The scant information provided in the disclosure statement reveals only that there will be a cap of up to $65 million paid to a small group of these unretained professionals without any oversight. There are no reasons for the payments or any authority set forth in the disclosure statement that informs potential voters why they should vote for a play that requires the Debtors to pay all these fees, in addition to the millions the Debtors are paying to their no fewer than 35 existing retained professionals.

Further, the plan contains other illegal provisions, including the payment of a management incentive plan contrary to Section 503(c) and releases and exculpations that are overly broad, extend to a universe of people who are not entitled to these protections and most importantly, do not comply with the law of the Third Circuit.

Although the bankruptcy process is inherently flexible, that elasticity is not without bounds and the structure of the Bankruptcy Code and its many provisions cannot give way to creative interpretation that eviscerates the principals and procedures underlying it; no matter how large the case, no matter how much is at stake and no matter how many professionals are involved.

For all of these reasons, the U.S. Trustee respectfully requests that the Court deny the PSA Motion.

## I. JURISDICTION AND PROCEDURAL HISTORY

1.      The Court has jurisdiction to hear this Objection.

2.      Pursuant to Section 586 of title 28, U.S. Code, the U.S. Trustee is charged with overseeing the administration of Chapter 11 cases filed in this District. 11 U.S.C. § 586. Under Section 586 and Section 307 of the Bankruptcy Code, Congress charged the U.S. Trustee with broad responsibilities in Chapter 11 cases and the standing to rise and be heard on any issue in any case or proceeding. 11 U.S.C. § 307; *see also United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

3.      Specifically, in accordance with 28 U.S.C. § 586(a)(3) and more specifically 28 U.S.C. § 586(a)(a)(3)(B), the U.S. Trustee is charged with the duties and obligations to supervise the administration of cases and trustees in Chapter 11 cases, monitoring plans and disclosure statements filed in Chapter 11 cases and filing with the court, in connection with hearings under sections 1125 and 1128, comments with respect to such plans and disclosure statements.

4.      Pursuant to 11 U.S.C. § 307, the U. S. Trustee has standing to be heard with regard to the above-referenced Objection.

## II. BACKGROUND AND FACTS

5.      On April 29, 2014, the Debtors commenced these Chapter 11 cases.

6.      On April 14, 2015, the Debtors filed their first plan of reorganization and disclosure statement. (D.I. 4142 & 4143).

7.      On May 18, 2015 the Court entered an order approving a schedule for approval of the disclosure statement, but did not enter a scheduling order for plan confirmation schedule (D.I. 4497).

8.      On July 2, 2015, the Court entered the Initial Confirmation Scheduling Order which, among other things set a deadline of Friday, November 6, 2015, when all fact discovery would be completed and a confirmation hearing date of January 20, 2016 (D.I. 4916).

9.      On July 23, 2015, the Debtors filed an Amended Joint Plan of Reorganization (D.I. 4142).

10.     On August 3, 2015, the Debtors filed a Second Amended Joint Plan of Reorganization (D.I. 5197).

11.     On August 9, 2015, the Debtors, the Investor Parties, the Consenting Interest Holdings, the Consenting TCEH First Lien Creditors, the Consenting TCEH Unsecured Noteholders, the Consenting TCEH Second Lien Noteholders, the TCEH Official Committee, and the TCEH First Lien Agent (collectively, the "PSA Parties") entered into the Plan Support Agreement ("PSA").

12.     By the terms of the PSA, the PSA became effective and binding on the PSA Parties as of August 9, 2015. *See* PSA at p. 1.

13.     The PSA obligates and binds the PSA Parties to several matters, including supporting and voting in favor of the Plan, *See* PSA at § 4.1. Motion at ¶ 66, p. 26. Specifically, upon execution of the PSA, the Investor Parties, Consenting Interest Holders, and Consenting TCEH Creditor Parties are obligated to vote to accept the Plan as long as the Disclosure Statement and the other materials are approved by the Court. *See* PSA at § 4.1(a).

14.     On August 10, 2015, the Debtors filed the PSA Motion, a Third Amended Joint Plan of Reorganization (the "Plan") (D.I. 5244), a Disclosure Statement for the Third Amended Plan (the "Disclosure Statement") (D.I. 5246), and a Motion to Approve Compromise under Rule 9019 and Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter into and Perform Under the Settlement Agreement ("Settlement Agreement") (D.I. 5249).

15.     On August 27, this Court entered the Amended Order (A) Revising Certain Hearing Dates and Deadlines, and (B) Establishing Certain Protocols in Connection with the Confirmation of Debtors' Plan of Reorganization providing for, among other things, the hearing on plan confirmation commencing on November 3, 2015. (D.I. 5771).

### III. OBJECTIONS – LAW AND ANALYSIS

**A.     The PSA Is An Improper Solicitation under Section 1125(b) and Contains Many Objectionable Provisions Rendering it an Ineffective Pre-confirmation Creditor Negotiation under Applicable Law Insert the PDF here with each lettered heading as noted and numbering each paragraph as follows here**

16.     The PSA runs afoul of 11 U.S.C. § 1125(b). *See, In re Century Glove*, 860 F.2d 94 (3d Cir. 1988), *See, also In re Stations Holdings Co., Inc*., Case No. 02-10882, 2002 WL 31947022 (Bankr. D. Del. 2002) (Order dated September 30, 2002) (D.I. 177); *In re NII Holdings., Inc.,* Case No. 02-11505, 288 B.R. 356 (Bankr. D. Del. 2002) (Order dated October 25, 2002) (D.I. 367), *cf., In re Indianapolis Downs*, 486 B.R. 286 (Bankr. D. Del. 2013).

17.     Section 1125(b) of the Bankruptcy Code provides that:

An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or summary of the plan, and a written disclosure statement approved, after notice and hearing, by the court as containing adequate information. 11 U.S.C. § 1125(b).

18.     The term "solicitation" must be read narrowly as a broad reading of Section 1125 might inhibit free creditor negotiations. *Century Glove, Inc.,* 860 F.2d at 101. The mere presentation of a draft plan for the consideration of creditors, without any request that creditor's vote, does not violate Section 1125(b) prohibition against the solicitation of plan acceptances. *Century Glove, Inc.,*860 F.2d at 102.

19.     In support of their request for approval of the PSA the Debtors assert that entry into the PSA is appropriate under applicable Delaware law citing *In re Indianapolis Downs, LLC*.  486 B.R. 286 (Bankr. D. Del. 2013) for such authority. PSA Motion at Paragraph 84. However, in *Indianapolis Downs* the restructuring support agreement was considered by the Court in the context of the Debtors' plan confirmation process. In contrast, the Debtors in these cases are seeking approval of the PSA prior to and despite confirmation of the Amended Plan. (See Paragraph 73 of the PSA Motion which states that "[a]bsent termination of the PSA, the PSA Parties' contractual obligations under the PSA will remain effective whether or not the Court enters the Settlement Order or confirms the Plan").

20.     Additionally, the PSA contains numerous provisions which are objectionable, improperly act in favor certain creditors over other creditors of the estate and violate certain Bankruptcy Code provisions. Specifically, the specific performance provisions, the agreement to pay certain transaction expenses, professional fees, management incentive plan payments and the survival of certain terms and conditions even if the Plan and/or the Settlement Agreement are not approved are all objectionable.

21.     When a Debtor seeks approval of a plan support agreement, where the non-debtor parties are insiders or interested parties, courts have applied a heightened scrutiny standard of review upon the agreement as opposed to the business judgment rule.  In *In re Innkeepers Trust,*

6

442 B.R. 227 (Bankr. S.D.N.Y. 2010), a prepetition plan support agreement proposed that the lender would receive one-hundred percent of the debtor's reorganization equity by converting its $220 million prepetition secured debt to equity. *Id.* at 230. A significant shareholder would receive equity in the reorganized debtor through a side-deal with the lender and an insider would receive reorganization stock. *Id.* at 231. The agreement also granted the lender lien rights in numerous assets which it did not have as collateral on the petition date, contained termination provisions not within the control of the debtors, and was negotiated with no other constituency, even those who desired to do so. *Id.* at 233. On such facts, the court found that the proposed agreement could not pass muster under either a heightened scrutiny or business judgment standard, stating "in a case with multiple debtors, the debtors, as fiduciaries, have duties to refrain from favoring or appearing to favor one or another of their estates and creditors over another." *Innkeepers*, 442 B.R. at 235, citations omitted.

22.    In *In re Residential Capital, LLC ("ResCap")*, 2013 WL 3286198 (Bankr. S.D.N.Y. June 27, 2013), the court approved a post-petition plan support agreement negotiated by and between all constituencies and which set the stage to resolve a protracted and litigious Chapter 11, but preserved the rights of all parties to object to the Plan rather than locking the parties into a predetermined outcome. In particular, in *ResCap,* Judge Glenn, stated that:

> "Plan support agreements, or "lock-up agreements," have generally been approved by courts in this and other districts. But in 2002, Judge Walrath entered orders in two cases, *In re Stations Holding Co., Inc.* and *In re NII Holdings, Inc.*, finding votes of creditors cast pursuant to post-petition plan support agreements could not be counted because such agreements violate the disclosure and solicitation requirements of section 1125. These cases have generally been distinguished "on the grounds that the agreements at issue included specific performance provisions, expressly providing that monetary damages could not compensate a breach of the agreement, meaning the creditors could not later reconsider their preliminary decision after receiving adequate information." 7 COLLIER ON BANKRUPTCY 1125[1][b] (*citing In re The Heritage Org., LLC,*

7

376 B.R. 783, 794 n.13 (Bankr.N.D.Tex.2007)). Accordingly, courts have reasoned that the plan support agreements in *Stations Holding* and *NII Holdings* were impermissible "only because the locked-up creditors could be forced to vote in favor of the plan regardless of the circumstances, which effectively rendered the agreements into votes, and the creditors were thereby stripped of the Bankruptcy Code's protection against the harm caused by solicitation without court-approved, adequate information.' " 7 COLLIER ON BANKRUPTCY 1125[1][b] (citing *In re The Heritage,* 376 B.R. at 793).

*In re ResCap*, at 20. (footnote omitted).

23.    A pre-petition plan support agreement between a debtor, lenders and unsecured bondholders was approved in the case of *In re Genco*, 509 B.R. 455 (Bankr. S.D.N.Y. 2014) where the agreements supported a pre-packaged plan of reorganization which provided returns to all constituents, including unimpaired trade debt and some recovery for pre-petition equity. Because this was a prepackaged plan, creditors and parties-in-interest had the benefit of the plan and disclosure statement beforehand. Noting the problematic aspect of plan support agreements when the transaction is with an insider, the court observed that the process was at arms-length, the RSA was publicly disclosed several weeks prior to the petition date, the process was entirely transparent and all parties rights to object to the plan were preserved. *Genco*, 509 B.R. at 468.

24.    In these cases, the PSA was negotiated between and among the Debtors and a number of creditor, investor and insider parties to the apparent exclusion of other important constituencies. The Plan, along with the Settlement Agreement, is a course of action does that does not need the PSA. The PSA appears to favors a select group of creditors, many of whom are significant T-Side creditors and insiders, at the expense of the E-Side creditors.

25.    For example, Section 14.11 of the PSA provides that the sole remedy for a breach of performance is specific performance. However, as stated earlier, In *ResCap, supra,* the Court observed that plan support agreements containing specific performance remedies were rejected in *In re Stations Holding Co., Inc.* and *In re NII Holdings, Inc.,* two Delaware cases, because

"courts have reasoned the plan support agreements in *Stations Holding* and *NII Holdings* were impermissible 'only because the locked-up creditors could be forced to vote in favor of the plan regardless of the circumstances, which effectively rendered the agreements into votes . . . ." *ResCap*, 2013 WL 3286198 at 20. Here the PSA provides for the remedy of specific performance if any PSA Party fails to comply with the PSA's terms. *See* PSA § 14.11. Moreover, even if the Plan is not approved, the consenting creditors and other parties are bound by many of the provisions of the PSA, the Plan and the Settlement Agreement. *See,* PSA Sections 5.1(b); 5.3(a); 5.4(a); 5.5(a); 6.1(a)(iii); 6.1(a)(vi); 6.1(b) and 6.1(b)(i).

26.     In particular, the PSA effectively ties the hands of the TCEH Official Committee since the PSA lacks an effective or "robust" fiduciary-out for the TCEH Official Committee. Without conceding the effectiveness of the Debtors' fiduciary-out, there is a striking difference between the Debtors' fiduciary-out [See PSA Section 12.6(h)] and the TCEH Official Committee's fiduciary-out [See PSA Section 5.3(b)]. Accordingly, the TCEH Official Committee is prevented from effectively representing its constituents and, as such, doubt is cast upon the good faith behind the PSA.

27.     Additionally, there are termination events not within the Debtors' control as set forth in Section 11 and 12 of the PSA, including the failure to consummate the Plan, termination of the Merger Agreement and the failure to secure IRS and PUCT approval. Notwithstanding the many termination provisions, the obligation by the Debtors' to, among other things, to pay the Transaction Expenses, including the professional fees of the Reimbursement Parties, continue regardless. *See,* Section 6.25(b) of the Purchase Agreement and Agreement and Plan of Merger.

28.     Negotiated between the Debtors and a number of investors, creditors and the TCEH Official Committee, the effect of the PSA is to give certain parties and unsecured

9

creditors almost complete control over the conduct of these cases to the exclusion of the remaining creditor body.  In *Innkeepers, supra,* on similar facts, the court disapproved the plan support agreement.

**B.      Subsequent Successful Challenges to the Plan and Settlement Agreement Are Rendered Ineffective and Futile If the PSA Is Approved.**

29.      In the event that the Plan is not consummated, certain creditor and insider parties have agreed under the PSA to support an alternative plan of reorganization or other form of restructuring, liquidation, sale, or structured dismissal consistent with and that incorporates the terms of the Settlement Agreement (the "Alternative Restructuring"). PSA Motion at pp. 3-4, *see, e.g.*, Section 3.2 of the PSA.

30.      Specifically, if the Plan and/or the Settlement Agreement are not approved, the Consenting Interest Holders, Consenting TCEH Unsecured Noteholders, Consenting TCEH Second Lien Noteholders, TCEH Official Committee and the Consenting TCEH First Lien Creditors agree, among other things (i) to not object to, delay, impede, or take any other action or any inaction to interfere with  the acceptance, implementation, consummation, or amendment of any Alternative Plan or other Alternative Restructuring; propose, (ii) to not file, support, vote for, or take any other action in furtherance of any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors other than an Alternative Restructuring and (iii) to not exercise any right or remedy inconsistent with or as otherwise than as permitted by the Alternative Plan, any other Alternative  Restructuring, and the Settlement Agreement. See PSA Sections 5.1, 5.3 and 5.4.

31.      Accordingly, if objectors are successful in challenging the Plan and/or the Settlement Agreement, such as the payment of certain fees, the payment of management

incentive compensation and the release and exculpation provisions are ultimately not approved, these provisions must be integrated into an Alternative Restructuring regardless.

32.     What the Debtors, the Plan Sponsors, the TCEH Supporting First Lien Creditors, the TCEH Supporting Second Lien Creditors, the TCEH Official Committee, and other parties cannot receive through the front door they seek to take through the back door.

33.     Once the PSA is approved, valid challenges to the Plan and the Settlement Agreement may not be effective. Despite successful challenges to the Plan's release and exculpation provisions (Plan at Article VIII, Sections C, D, E and F), management incentive compensation provisions (Plan at Article IV, Section O), and the payment of certain fees (Plan at Article IV, Section R), such improper provisions would be part of an Alternative Restructuring. To the extent that the PSA is approved and an order approving the PSA is entered, such approval and order should not affect any party, including the U.S. Trustee's, rights and abilities to, among other things, take discovery, lodge, litigate and prosecute an objection to or otherwise challenge the Plan and /or the Settlement Agreement.

**C.     The PSA Provides for the Improper Payment of Professional Fees and Other Fees and Avoids Section 503(b) of the Bankruptcy Code Under an Alternative Restructuring.**

34.     Section 6.1(a)(i) of the PSA provides for the payment of the fees, expenses, and reimbursements, including professional fees, of the TCEH Unsecured Notes Indenture Trustee and the TCEH Second Lien Notes Indenture Trustee not subject to or covered by the Indenture Trustee's "charging lien," and which have not been paid or otherwise reimbursed by the Debtors.

35.     Section 6.25 of the Purchase Agreement and Agreement and Plan of Merger (Exhibit B to the PSA), requires EFH and EFIH to pay numerous fees and expenses, including professional fees of certain parties (the "Reimbursement Parties"). Section 2.7 of the Settlement

11

Agreement provides that TCEH shall pay the reasonable and documented out-of-pocket fees, expenses, and reimbursements of (i) the members of the ad hoc committee of TCEH First Lien Creditors and (ii)(A) the TCEH Unsecured Group (but not the individual members thereof), (B) the TCEH Unsecured Notes Trustee, (C) the TCEH Second Lien Group (but not the individual members thereof), (D) the TCEH Second Lien Trustee, and (E) The Bank of New York Mellon Trust Company, N.A., as collateral agent under the TCEH Second Lien Notes Indenture which aggregate fees, expenses, and reimbursements for the period from the Petition Date through June 30, 2015, shall not exceed $49,750,000.00.

36.    Section 6(a)(i) of the PSA provides that in the event of Alternative Restructuring, where the Settlement Agreement is not approved and the Plan is not consummated, the TECH Unsecured Group, the TCEH Unsecured Notes Indenture Trustee and the TCEH Second Lien Notes Indenture Trustee shall be paid their reasonable and documented out-of-pocket expenses.

37.    The provisions of Chapters 1, 3, and 5 of the Bankruptcy Code apply in chapter 11 cases. 11 U.S.C. § 103(a). One such provision is section 503(b), which imposes requirements on the payment of a creditor's expenses as an administrative expense of the estate.

38.    In particular, section 503(b) provides in pertinent part that:

After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including-

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by-

a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title;

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A),

(B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant;

11 U.S.C. Sections 503(b)(3)(d) and 503(b)(4).

39.    Recent cases make it clear that a specific provision of the Bankruptcy Code takes precedence over more general provisions. For example, in the case of *In re AMR Corp.*, 497 B.R. 690 (Bankr. S.D.N.Y. 2013), the court rejected a plan provision proposing to pay a departing CEO amounts in excess of Section 503(c)(2), holding: "If Section 1129(a)(1)'s instruction that a plan must comply with all applicable provisions of the Bankruptcy Code means anything, the Court cannot approve a payment that is clearly prohibited by another, more specific part of the Bankruptcy Code." *AMR*, at 696-7.

40.    The *AMR* court also noted the effect of the Supreme Court's ruling in *RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* --- U.S. --- , 132 S. Ct. 2065 (2012) that a specific prohibition or permission trumps a more general provision. *AMR*, at 697. This same principle was restated by the Supreme Court in the case of *Law v. Siegel*, --- U.S. ---, 134 S. Ct. 1188 (2014). In discussing the principle that Section 105(a) of the Bankruptcy Code may not be used to override explicit mandates of the Bankruptcy Code, the Supreme Court noted "[t]hat is simply an application of the axiom that a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere."    134 S. Ct. at 1194. This rule "is particularly true where … Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *Id.* (internal quotation and citation omitted). So too here, where Congress has enacted Section 503(b) to govern administrative expense payments from the bankruptcy estate, the broader business judgment rule of Section 363(b)

should not apply. *See also*, *In re Lehman Bros. Holdings, Inc.*, 508 B.R. 283, 289 (S.D.N.Y. 2014) (Section 503(b) is the exclusive avenue for payment of administrative expenses).

41.     The professional fee provisions in the PSA appear to be, among other things, an inappropriate attempt to circumvent sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code.  At the beginning of the case it is not possible to determine if a creditor or an *ad hoc* committee has made a substantial contribution meriting reimbursement of professional fees. Denial of the PSA Motion will not prevent these parties from seeking compensation pursuant to Section 503(b) at a later stage in the case when it will be more appropriate to determine if they have made a substantial contribution.

**D.     The PSA Improperly Provides for the Payment of Certain Management Compensation Outside of Section 503(c) in any Alternative Restructuring.**

42.     Additionally, the Section 6.1(a)(iv) of the PSA provides that each Consenting TCEH Creditor Party, the TCEH First Lien Agent, and the TCEH Official Committee agrees that it will not propose, file, support, vote for, or take any other action in furtherance of, and will vote against (if entitled to vote) any Alternative Restructuring that does not contain or otherwise implement the same terms, treatment, and conditions set forth in the Plan and in the PSA regarding the 2015 Compensation Order, the 2016 Compensation Order, the Reorganized Debtor Management Incentive Plans, the New Employee Agreements/Arrangements, and the Employment Agreements in existence as of the date of such Alternative Restructuring. *See also,* Paragraphs 10(l) through (o) of the PSA.

43.     The payment of such management incentive and insider compensation is specifically governed by Section 503(c) of the Bankruptcy Code. The fact that in the event of an

Alternative Restructuring, the Debtors authority to pay management incentive compensation is subject to consideration under such specific Bankruptcy Code sections.

44.    In particular, section 503(b)(1)(A)(i) provides in relevant part that after notice and a hearing, the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case shall be allowed as an administrative expense.  Administrative expenses are given priority status and paid ahead of other unsecured claims. See 11 U.S.C. § 507. *In re Insilco Technologies, Inc.*, 309 B.R. 111,114 (Bankr. D. Del. 2004). In order to hold administrative expenses to a minimum and to maximize the value of an estate, Section 503(b) is narrowly construed.  *See, e.g., In re N.P. Min. Co., Inc.*, 963 F.2d 1449, 1454 (11th Cir. 1992); *In re Philadelphia Mortgage Trust,* 117 B.R. 820, 828 (Bankr. E.D. Pa. 1990).  To qualify for administrative priority status, an expense must arise from a transaction that accorded the estate an actual benefit.  *Insilco Technologies, supra, citing Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 532-533 (3d Cir.1999) and *In re Unidigital, Inc.*, 262 B.R. 283, 288 (Bankr. D. Del. 2001). The Debtors would have to otherwise satisfy Section 503(c) and the holding of *O'Brien Envtl. Energy, Inc., supra*, that the allowability of administrative expenses "depends upon the requesting party's ability to show that [were] actually necessary to preserve the value of the estate. 181 F.3d at 535 (emphasis added).  The proposed incentive compensation would be administrative expenses and their allowance must be determined under administrative expense jurisprudence.

45.    No information is presented or made available concerning any such management incentive plans, the number of the participants or whether the participants are insiders. This relief

should not be considered now as part of the PSA nor should it be considered prior to hearing on the confirmation of the Plan.

46.     Moreover, the bankruptcy court cannot rely upon Section 1129(a)(4) for any independent authority to award such compensation under a plan of reorganization as Section 1129(a)(4) general provisions do not abrogate or negate section 503(c)(1)-(3)'s specific prohibition against such payments.

**E.     The PSA Provides for Improper Insider and Third Party Releases.**

47.     Section 6.1(a)(iii) of the PSA provides that upon consummation of an Alternative Restructuring, the TCEH Debtors' current and former officers, directors, and managers, the Consenting Interest Holders (including affiliates thereof), Holders of TCEH First Lien Claims, Holders of TCEH Unsecured Note Claims, Holders of TCEH Second Lien Claims, Holders of PCRB Claims, Holders of Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH, and the TCEH Official Committee and its members, each such Entity's respective current and former affiliates, and each such Entity's and  its current and former affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and their current and former officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (each in their capacities as such) shall be exculpated and released of certain claims and causes of action including all claims and causes of action proposed to be released under the Plan or the Settlement Agreement whether or not the Plan is consummated or the Settlement Agreement is approved. See also, Section 6.1(b)(i) for similar relief granted to the

EFH and EFIH Debtors' current and former officers, directors, and managers and the Consenting Interest Holders.

48.     As with the aforementioned objectionable PSA provisions, such relief is governed by applicable law. A Chapter 11 plan may not be confirmed unless the Court can find that the plan complies with the provisions of 11 U.S.C. § 1129(a).  The plan proponent bears the burden of proof with respect to each and every element of 11 U.S.C. § 1129 (a). *See In re Genesis Health Ventures, Inc.*, 266 B. R. 591 (Bankr. D. Del. 2001). If such provisions cannot be part of the Plan and the Settlement Agreement, they should not be pre-approved in the PSA.

49.     Parties receiving exculpation are limited to only those parties who served in the capacity of estate fiduciaries. *See, In re PWS Holding Corp*, 228 F.3d 224 (3d Cir. 2000), *In re PTL Holdings, LLC*, 2011 WL 5509031 *12 (Bankr. D. Del. Nov. 10, 2011); *In re Washington Mutual Inc.*, 442 B.R. 314, 350 (Bankr. D. Del. 2011); *In re Tribune Co*., 464 B.R. 126 (Bankr. D. Del. 2011); *In re Indianapolis Downs, LLC*, 486 B. R. 286, 306 (Bankr. D. Del. 2013), See also, *In re Coram Healthcare Corp.*, 315 B.R. 321, 337 (Bankr. D. Del. 2004) (stating that "[third party release provisions against Trustee, Equity Committee and their respective agents and professionals] are not permissible except to the extent they are limited to post-petition activity which does not constitute gross negligence or willful misconduct").

50.     Third party releases are only permitted in a plan where the plan proponents produce credible evidence and valid reasons supporting the propriety of the third-party non-debtor releases granted to each of the sought-to-be protected parties and how these third-party non-debtor releases are appropriate and comply with applicable law. *See, e.g., In re Washington Mutual, Inc*., 442 B.R. at 349-350. (J. Walrath) (holding that, *inter alia*, under applicable law, there was no basis whatsoever for the debtors to grant releases to the debtors' directors and

officers or any professionals, current or former, because no evidence was presented with respect to, among other things, a substantial contribution" having been made to the case by the parties seeking such releases); *In re Zenith Electronics Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (J. Walrath) (court adopted and cited the five factors set forth in *In re Master Mortgage Inv. Fund, Inc*., 168 B.R. 930, 935, 937 (Bankr.W.D.Mo.1994); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606-609 (Bankr. D. Del. 2001) (discussing *Zenith*).

51.     In *In re Continental Airlines*, 203 F.3d 203 (2d Cir. 2000), the Third Circuit noted that a permanent injunction in favor of non-debtors is a "rare thing" that should not be considered absent a showing of exceptional circumstances in which certain key factors are present.     The Third Circuit determined that fairness requires a showing that sufficient consideration was given to creditors whose claims were to be released and that such consideration renders the plan feasible.   *Id*. at 213-214.   The Third Circuit noted that the success of the plan must be based on the releases, and that there be an identity of interest between the debtor and the non-debtor so that the debtor would likely bear the cost of the litigation against the non-debtor.   *Id* at 216. See also, *In re Genesis Health Ventures, Inc*., 266 B.R. 591 (Bankr. D. Del. 2001).

52.     Accordingly, in the context of any such Chapter 11 plan that might be considered an Alternative Transaction, such releases and exculpations should be considered *de novo* and in accordance with applicable law.

## IV. RESERVATION OF RIGHTS

53.    The U. S. Trustee reserves and any all rights, remedies and obligations found at law, equity or otherwise to, *inter alia*, take discovery, further object to the PSA, object to the Plan and/or the Settlement Agreement, to supplement, augment, modify or amend this Objection, including orally at any hearing, and to assert such other and further grounds for objection as may be deemed necessary.

WHEREFORE, the U.S. Trustee respectfully requests that the PSA Motion be denied and for such other and further relief deemed fair, just and appropriate.

Respectfully submitted,

**ANDREW R. VARA**
**ACTING UNITED STATES TRUSTEE**

By: */s/Richard L. Schepacarter*
     Richard L. Schepacarter
     Andrea B. Schwartz
     Trial Attorneys
     U.S. Department of Justice
     Office of the U.S. Trustee
     J. Caleb Boggs Federal Building
     844 N. King Street, Room 2207, Lockbox 35
     Wilmington, DE 19801
     (302) 573-6491 (Tel.)
Dated: September 4, 2015     (302) 573-6497 (Fax)
     Email: Richard.Schepacarter@usdoj.gov
     Email: Andrea.B.Schwartz@usdoj.gov