## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
|  | ) Case No. 14-10979 (CSS) |
|  | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) (Jointly Administered) |
|  | ) |
| Debtors. | ) **Re: D.I. 4964** |
|  | ) <u>Hearing Date</u>: TBD |
|  | ) <u>Response Deadline</u>: September 4, 2015 |

## RESPONSE OF UMB BANK, N.A. TO THE EFIH DEBTORS'
## PARTIAL OBJECTION TO PROOF OF CLAIM NO. 6347 FILED
## <u>BY THE INDENTURE TRUSTEE FOR THE EFIH UNSECURED NOTES</u>

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira S. Dizengoff (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000

Scott L. Alberino (admitted *pro hac vice*)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Raymond H. Lemisch (DE Bar No. 4204)
919 Market Street, Suite 1000
Wilmington, DE 19801
Telephone: (302) 426-1189

**FOLEY & LARDNER LLP**
Harold L. Kaplan (admitted *pro hac vice*)
Mark F. Hebbeln (admitted *pro hac vice*)
Lars A. Peterson (admitted *pro hac vice*)
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone: (312) 832-4500

Barry G. Felder (admitted *pro hac vice*)
Jonathan H. Friedman (admitted *pro hac vice*)
90 Park Avenue
New York, NY 10016
Telephone: (212) 682-7474

*Co-Counsel for UMB BANK, N.A., as Trustee*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

I.    PROCEDURAL BACKGROUND ........................................................................ 4

    A.    Proof of Claim and Bar Date Order ............................................................ 4

    B.    The Objection ............................................................................................. 5

RESPONSE TO OBJECTION ................................................................................................... 7

I.    THE OBJECTION FAILS AS A MATTER OF LAW BECAUSE THE
DEBTORS MISAPPLY SECTIONS 502(b)(2) AND 726(a)(5) ............................ 8

II.    THE PIK NOTEHOLDERS MUST RECEIVE POSTPETITION
INTEREST AT THE CONTRACT RATE IN ORDER FOR THE PIK
NOTEHOLDERS TO BE UNIMPAIRED UNDER THE PLAN AND
SECTION 1124(1) ............................................................................................... 12

    A.    The Plain Meaning of Section 1124(1) Requires that an
"Unimpaired" Creditor Receive its Full "Legal, Equitable, and
Contractual Rights" ................................................................................. 13

    B.    Case Law and Legislative History Support the Conclusion that the
PIK Noteholders Must Receive Postpetition Interest at the Contract
Rate in Order to be Deemed Unimpaired under Section 1124(1) ............. 16

III.    THE FAIR AND EQUITABLE TEST REQUIRES THAT THE PIK
NOTEHOLDERS RECEIVE POSTPETITION INTEREST AT THE
CONTRACT RATE ............................................................................................. 20

    A.    Pre-Code Case Law Recognizes that in Order for a Plan to Be Fair
and Equitable Unsecured Creditors Must Receive Postpetition
Interest at the Contract Rate Before Equity Can Receive Any
Recovery ................................................................................................. 22

    B.    Post-Code Case Law Recognizes that in Order for a Plan to Be Fair
and Equitable Unsecured Creditors Must Receive Postpetition
Interest at the Contract Rate Before Equity Can Receive Any
Recovery ................................................................................................. 24

    C.    Congress Did not Intend to Abrogate Pre-Code Case Law ....................... 29

IV.    *WASHINGTON MUTUAL* IS NOT APPLICABLE AND SHOULD NOT
BE FOLLOWED ................................................................................................. 30

V.    A FLEXIBLE APPROACH TO APPLYING THE PHRASE "LEGAL RATE" IS CONSISTENT WITH THE PLAIN MEANING OF THE STATUTE AND LEADS TO MORE EQUITABLE RESULTS ...........................35

    A.    The Phrase "Legal Rate" Should Not Be Limited to the Federal Judgment Rate ........................................................................................35

    B.    In This Case, The Legal Rate Should Mean the Contract Rate ................38

        1.    There is No Administrative Convenience Created by Using the Federal Judgment Rate and There Exists No Risk of Disparate Treatment Among EFIH Unsecured Creditors ..............38

        2.    Applying the Federal Judgment Rate Would Deny the PIK Noteholders Their Bargained For Contract Rights and Would Violate the Absolute Priority Rule .....................................39

VI.    RESERVATION OF RIGHTS ...............................................................................40

CONCLUSION ........................................................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999) .................................................................................. 16

*Cohen v. De La Cruz*,
523 U.S. 213 (1998) .................................................................................. 22

*Consol. Rock Prods. Co. v. Dubois*,
312 U.S. 510 (1941) ............................................................................ 18, 23

*Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.*,
679 F.2d 264 (1st Cir. 1982) ........................................................ 11, 18, 24

*Dewsnup v Timm*,
502 U.S. 410 (1992) .................................................................................. 22

*Empire Trust Co. v. Equitable Office Bldg. Corp.*,
167 F.2d 346 (2d Cir. 1948) .................................................................. 23-4

*Energy Future Intermediate Holding Co. LLC v. UMB Bank, N.A.*,
531 B.R. 499 (Bankr. D. Del. 2015) ........................................................... 5

*In re 431 Ponce de Leon, LLC*,
515 B.R. 660 (Bankr. N.D. Ga. Aug. 11, 2014) ...................................... 34

*In re Allegheny Int'l, Inc.*,
118 B.R. 282 (Bankr. W.D. Pa. 1990) ...................................................... 28

*In re A&L Props.*,
96 B.R. 287 (C.D. Cal. 1988) .................................................................. 39

*In re AMR Corp.*,
No. 11-15463 (SHL) (Bankr. S.D.N.Y. June 5, 2013) ............................ 14

*In re Beck*,
128 B.R. 571 (Bankr. E.D. Okla. 1991) ................................................... 39

*In re Calpine Corp.*,
No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 19, 2007) ........................... 14

*In re Cardelucci*,
285 F.3d 1231 (9th Cir. 2002) ........................................................... 34-5, 38

*In re Carter*,
220 B.R. 411 (Bankr. D.N.M. 1998) ................................................ *passim*

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ................................................................ 12

*In re Chemtura Corp.*,
    No. 09-11233 (REG) (Bankr. S.D.N.Y. Nov. 3, 2010) ......................................... 14

*In re Chicago, Milwaukee, St. Paul, and Pacific R.R. Co.*,
    791 F.2d (1986) ................................................................................................... 24

*In re Dow Corning Corp.* (*"Dow I"*),
    237 B.R. 678 (Bankr. E.D. Mich. 1999) .............................................................. 25

*In re Dow Corning Corp.* (*"Dow II"*),
    244 B.R. 678 (Bankr. E.D. Mich. 1999) ........................................................ *passim*

*In re Dow Corning Corp.* (*"Dow III"*),
    456 F.3d 668 (6th Cir. 2006) ......................................................................... *passim*

*In re Energy Future Holdings Corp.*,
    513 B.R. 651 (Bankr. D. Del. 2014) ............................................................... 11, 22

*In re Fast*,
    318 B.R. 183 (Bankr. D. Colo. 2004) ................................................... 28, 34, 38-9

*In re Fed.-Mogul Global Inc.*,
    684 F.3d 355 (3d Cir. 2012) ............................................................................... 22

*In re Gen. Growth Props., Inc.*,
    451 B.R. 323 (Bankr. S.D.N.Y. 2011) ................................................................ 12

*In re Gen. Growth Props., Inc.*,
    No. 09-11977 (ALG) (Bankr. S.D.N.Y. Oct. 21, 2010) ....................................... 13

*In re Glawson*,
    No. 13-50055-JDW, 2013 WL 4777194 (Bankr. N.D. Ga. Sept. 3, 2013) ............ 10

*In re GSC, Inc.*,
    453 B.R. 132 (Bankr. S.D.N.Y. 2011) .............................................................. 16-7

*In re Hyatt*,
    509 B.R. 707 (Bankr. D.N.M. 2014) ................................................................... 10

*In re Liberty Warehouse Assocs. Ltd. P'ship*,
    220 B.R. 546 (Bankr. S.D.N.Y. 1998) ................................................................ 15

*In re Loral Space and Commc'ns Ltd.*,
    No. 03-41470 (Bankr. S.D.N.Y. July 25, 2005) ................................................... 28

*In re Los Angeles Dodgers LLC*,
465 B.R. 18 (D. Del. 2011)............................................................................12

*In re Mackinder-Manous*,
No. 13-21211, 2015 WL 790883 (Bankr. E.D. Ky. Feb. 24, 2015) ......................................10

*In re Moody Nat'l SHS Houston H, LLC*,
426 B.R. 667 (Bankr. S.D. Tex. 2010) ...................................................................15

*In re New Midland Plaza Assocs.*,
247 B.R. 877 (Bankr. S.D. Fla. 2000) ....................................................................15

*In re New Valley Corp.*,
168 B.R. 73 (Bankr. D.N.J. 1994) .........................................................................17

*In re Overseas Shipholding Grp., Inc.*,
No. 12-20000 (PJW) (Bankr. D. Del. Jul. 16, 2014) .........................................................13

*In re Polysat, Inc.*,
152 B.R. 886 (Bankr. E.D. Pa. 1993) .....................................................................22

*In re PPI Enters. (U.S.), Inc.*,
228 B.R. 339 (Bankr. D. Del. 1998)..................................................................13, 18

*In re PPI Enters. (U.S.) Inc.*,
324 F.3d 197 (3d Cir. 2003) .........................................................................13, 16

*In re Premier Int'l Holdings, Inc.*,
No. 09-12019 (CSS) (Bankr. D. Del. Apr. 1, 2010) ...........................................................14

*In re Realty Assocs. Sec. Corp.*,
163 F.2d 387 (2d Cir. 1947) ............................................................................23

*In re Schoeneberg*,
156 B.R. 963 (Bankr. W.D. Tex. 1993) .............................................................27, 35, 40

*In re In re Sovereign Grp. 1985-27, Ltd.*,
142 B.R. 702 (Bankr. E.D. Pa. 1992) .................................................................22-3

*In re Taddeo*,
685 F.2d 24 (2d. Cir. 1982) ............................................................................16

*In re Trevarrow Lanes, Inc.*,
183 B.R. 475 (Bankr. E.D. Mich. 1995).....................................................................21

*In re Tribune Co.*,
506 B.R. 613 (Bankr. D. Del. 2013)...................................................................10-11

*In re W.R. Grace & Co.,*
   475 B.R. 34 (D. Del 2012)........................................................................21

*In re Washington Mut. Inc.,*
   461 B.R. 200 (Bankr. D. Del. 2011)....................................................*passim*

*In re Xpedior Inc.,*
   354 B.R. 210 (Bankr. N.D. Ill. 2006) ...................................................10

*Kitrosser v. CIT Grp./Factoring, Inc.,*
   177 B.R. 458 (S.D.N.Y. 1995) ...............................................................9

*Matter of Greenig,*
   152 F.3d 631 (7th Cir. 1998) ................................................................10

*Northrop Corp. v. Triad Int'l Mktg., S.A.,*
   842 F.2d 1154 (9th Cir. 1988) ..............................................................37

*Rosello v. United States,*
   464 U.S. 16 (1983) ..............................................................................36

*Ruskin v. Griffiths,*
   269 F.2d 827 (2d Cir. 1959) ..............................................................11-2

*UPS Capital Bus. Credit v. Louis A. Gencarelli (In re Gencarelli),*
   501 F.3d 1 (1st Cir. 2007)....................................................................11

## STATUTES

11 U.S.C.
   § 102(3) ...........................................................................................21
   § 103(b) ...........................................................................................10
   § 726(a)(5) .........................................................................................9
   § 1124(1) and (2) .............................................................................13
   § 1126(f) ...........................................................................................12
   § 1129(b)(1) ......................................................................................20
   § 1129(b)(2)(B) .................................................................................21

15 U.S.C.
   § 636(4)(A) .......................................................................................37
   § 697(c)(2) .........................................................................................37
   § 4303(a) ...........................................................................................36
   § 4303(b) ...........................................................................................36
   § 4303(c) ...........................................................................................36

21 U.S.C.
   § 844a(h)............................................................................................36

iv

22 U.S.C.

    § 2151t(b) .................................................................................................................. 37
    § 6082(a)(1)(B) ........................................................................................................... 36

26 U.S.C.

    § 501(c)(16) .............................................................................................................. 37
    § 521(b)(2) ................................................................................................................ 37

28 U.S.C.

    § 1961(a) .................................................................................................................. 36
    § 2412(f) ................................................................................................................... 36

28 U.S.C.A.

    § 2465(b)(1)(B) ........................................................................................................ 36

**OTHER AUTHORITIES**

Bankruptcy Amendment & Federal Judgeship Act of 1984,
    PL 98–353 (HR 5174), July 10, 1984 ..................................................................... 19

H.R. Rep. No. 103-835 (1994) ............................................................................... 17-9

Fortgang & King, *Some Wrong Policy Decisions*,
    56 N.Y.U. L. Rev. 1148 (1981) .......................................................................... 29-30

UMB Bank, N.A., as Indenture Trustee (the "Trustee") for the unsecured 11.25%/12.25% Senior Toggle Notes Due 2018 (the "PIK Notes" and such holders, the "PIK Noteholders") and the 9.75% Senior Notes due 2019 (the "Unexchanged Senior Notes" and, together with the PIK Notes, the "EFIH Unsecured Notes"), by and through its undersigned counsel, files this response (the "Response") to the *EFIH Debtors' Partial Objection to Proof of Claim No. 6347 Filed by the Indenture Trustee for the EFIH Unsecured Notes* [D.I. 4964] (the "Objection").[1]

## PRELIMINARY STATEMENT[2]

The EFIH Debtors, through the filing of a claim objection under Section 502(b), ask this Court to limit—as a matter of law—the PIK Noteholders' entitlement to postpetition interest to interest at the Federal Judgment Rate. That sweeping and categorical request ignores key provisions of the Bankruptcy Code and contradicts long-standing bankruptcy principles articulated in Supreme Court precedent. By contrast, the Trustee's position—that contract rate interest should be paid to the PIK Noteholders under the Plan—finds strong support in Sections 1124(1) and 1129(b), and comports fully with Congressional intent and case law, including Supreme Court precedent and the only federal court of appeals decision to have addressed the issue. The cases on which the EFIH Debtors rely stand, at most, for the limited proposition (on which courts are split) that the undefined term "legal rate" in Section 726(a)(5) means the Federal Judgment Rate. Because those cases arise in materially different circumstances, however, they fail to consider that an unsecured creditor's entitlement to postpetition interest in a chapter 11 reorganization is based on, *inter alia*, the interplay of other critical Bankruptcy Code

---

[1] The arguments made herein apply equally to the holders of the Unexchanged Senior Notes. Upon information and belief, the holders of the EFIH Unsecured Notes are the only creditors that hold General Unsecured Claims Against the EFIH Debtors.

[2] Capitalized terms used but not defined in the Preliminary Statement shall have the meanings ascribed to such terms below. Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Objection or the Plan (as defined herein), as applicable.

provisions—notably Sections 1124(1), 1129(a)(7) and 1129(b)—that render a reflexive application of Section 726(a)(5)'s "legal rate" inappropriate in a case like this one.

As outlined below, the Objection should be overruled for the following reasons:

First, the EFIH Debtors misapply Sections 502(b)(2) and 726(a)(5) and mistakenly consider the operation of those Sections in isolation. As the EFIH Debtors acknowledge, courts uniformly recognize the availability of postpetition interest notwithstanding the terms of Section 502(b)(2). Moreover, Section 726(a)(5) has direct application in chapter 7 cases only; it is relevant in chapter 11 cases solely in connection with application of the best-interests-of-creditors test (the "Best Interests Test") under Section 1129(a)(7) as to dissenting creditors in impaired classes. Here, the Plan proposed by the EFIH Debtors does not permit, let alone require, the Court to apply the Best Interests Test because the Plan is premised upon the unimpairment of all EFIH and EFH creditors. Accordingly, Section 726(a)(5) simply does not come into play in this case and, therefore, cannot support the EFIH Debtors' position that, as a matter of law, the Federal Judgment Rate is the one and only rate at which postpetition interest can be awarded to the PIK Noteholders.

Second, to the extent the PIK Claim is treated as unimpaired, Section 1124(1) entitles the PIK Noteholders to payment of postpetition interest at the contract rate. As a result of the Plan's treatment of the PIK Claim as unimpaired, the EFIH Debtors have the burden of establishing that the legal, equitable, and contractual rights of the PIK Noteholders have not been altered by the Plan. The EFIH Debtors cannot satisfy that burden by substituting interest at the Federal Judgment Rate for the rate specified in the PIK Indenture. Rather, in order to satisfy the requirements of Section 1124(1) and avoid solicitation of votes from the PIK Noteholders, the

2

Debtors are required to pay the PIK Claim in full, in cash, with postpetition interest calculated at the ***contract*** rate.

<u>Third</u>, to the extent the PIK Claim is impaired and the PIK Noteholders vote as a class to reject the Plan, Section 1129(b) entitles the PIK Noteholders to payment of postpetition interest at the contract rate.  Section 1129(b)'s "fair and equitable" test (the "<u>Fair and Equitable Test</u>") is ultimately dispositive of the question regarding the appropriate rate of postpetition interest if the Court determines that the PIK Claim is impaired under the current Plan or if the Debtor modifies the Plan so as to impair the PIK Claim.  In either scenario, Section 1129(a)(7)'s Best Interests Test (and thus Section 726(a)(5)) does not end the interest-rate analysis.  In a solvent debtor reorganization, the Supreme Court has ruled that a plan under which equity retains its interests is not fair and equitable to unsecured creditors unless the plan provides for payment in full of all undisputed contractual obligations, including postpetition interest at the rate specified in any agreement.  This long-standing principle of bankruptcy law—derived from the "absolute priority" rule as initially established under the Bankruptcy Act of 1898 and maintained in the modern Bankruptcy Code by Section 1129(b)—recognizes that in solvent debtor reorganizations, the undisputed contractual rights of unsecured creditors cannot be disregarded for the benefit of equity interest holders.

<u>Fourth</u>, to the extent the Court nevertheless determines that the phrase "legal rate" in Section 726(a)(5) has any bearing on the interest rate determinations under Sections 1124(1) or 1129(b)(2), the Court is not bound to apply the Federal Judgment Rate and should not in this case.  The sharp divergence and competing considerations in the case law on the meaning of "legal rate" counsel, at a minimum, in favor of applying a flexible approach based upon the specific facts and circumstances of this case.  Elsewhere in the U.S. Code, Congress has

expressly referenced the Federal Judgment Rate when it intended for such rate to apply and has used the term "legal rate" to mean something other than the Federal Judgment Rate.  Moreover, none of the factors cited by bankruptcy courts in applying the Federal Judgment Rate— administrative efficiency, divergent interest rates amongst creditors, and fairness amongst similarly situated creditors—is at issue here.  Indeed, there is no administrative or equitable justification for denying the PIK Noteholders the benefit of their bargain with the EFIH Debtors.

Finally, a blanket ruling from this Court that unsecured creditors are *never* entitled to postpetition interest at the contract rate in a case under chapter 11 of the Bankruptcy Code would be unprecedented.  The EFIH Debtors' position would:  (i) sanction massive transfers of reorganization value from unsecured creditors (who will not have been paid contractual interest during the chapter 11 case) to equity interest owners (who retain their interests in the reorganized debtor yet avoid paying months if not years of contractual interest on their unsecured debt), and (ii) represent a dramatic departure from the fundamental presumption that in solvent debtor reorganizations, the court must enforce valid contractual obligations against the debtor.

## PROCEDURAL BACKGROUND

### A.    *Proof of Claim and Bar Date Order*

1.    Pursuant to an indenture dated December 5, 2012 (as amended and supplemented, the "PIK Indenture"), between December 5, 2012 and January 30, 2013, the EFIH Debtors issued $1,392,445,000 in aggregate principal amount of the PIK Notes due 2018.  *See* PIK Indenture at 71.  The PIK Indenture provides for, among other things, the payment of postpetition interest on

overdue principal, including postposition interest in a chapter 11 case at the contract rate. *See* PIK Indenture at § 4.01.[3]

2.      On August 18, 2014, the Court entered an order establishing October 27, 2014 as the final date and time for all persons and entities holding or asserting a claim against the Debtors arising on or before the Petition Date [D.I. 1866]. On October 23, 2014, the Trustee filed Proof of Claim No. 6347 with an accompanying addendum (the "PIK Claim"). The PIK Claim seeks $1,566,234,000.00 in principal, $81,030,856.25 in prepetition accrued interest and $109,431.96 in prepetition accrued fees and expenses based on the PIK Notes. *See* PIK Claim at ¶ 4. The PIK Claim also included a reservation of rights regarding the Trustee's right to amend or supplement the PIK Claim for the purpose of changing the basis or amount of the PIK Claim. *See* PIK Claim at ¶ 12.

### B.      *The Objection*

3.      On July 9, 2015, Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (together, the "EFIH Debtors") filed the Objection.[4] By the Objection, the EFIH Debtors first argue that the PIK Indenture does not provide for the payment of a "call premium" to the PIK Noteholders. On August 28, 2015, the Trustee filed a partial response to the EFIH

---

[3]    Section 4.01 of the PIK Indenture reads: "The issuer shall pay interest (***including post-petition interest in any proceeding under any*** Bankruptcy ***Law***) on overdue principal ***at the rate equal to the then applicable interest rate on the Notes*** to the extent lawful; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (including Additional Interest, if any) (without regard to any applicable grace period) at the same rate to the extent lawful." PIK Indenture at § 4.01 (emphasis added).

[4]    The EFIH Debtors filed the Objection following the Court's dismissal of the EFIH Debtors' adversary complaint, which sought, among other things, a declaration that the PIK Noteholders are only entitled to postpetition interest at the ***Federal*** Judgment Rate if ***the*** EFIH Debtors are solvent. *See Adversary Complaint for Declaratory Judgment of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc.* (Dec. 16, 2014) [No. 14-51002, Adv. D.I. 1]. The Court dismissed the adversary complaint for lack of subject matter jurisdiction. *See Energy Future Intermediate Holding Co. LLC v. UMB Bank, N.A.*, 531 B.R. 499 (Bankr. D. Del. 2015).

Debtors' argument that the PIK Noteholders are not entitled to a call premium pursuant to the PIK Indenture [D.I. 5788] (the "Call Premium Response").

4.     By the Objection, the EFIH Debtors also argue that while courts award postpetition interest to unsecured creditors of a solvent debtor, postpetition interest should be limited to the "legal rate," which they interpret as the federal judgment rate of interest (the "Federal Judgment Rate").[5]  *See* Objection at 17.  The Objection requests that the Court partially disallow the PIK Claim on the basis that the PIK Noteholders are not entitled to receive postpetition interest at a rate greater than the Federal Judgment Rate.

5.     Following the filing of the Objection, the EFIH Debtors and the Trustee engaged in negotiations regarding the scheduling of discovery and briefing with respect to the Objection. The EFIH Debtors and the Trustee reached an agreement on the scheduling specific to the call premium issue, and on August 28, 2015, the Trustee filed the Call Premium Response.  However, the Trustee and the EFIH Debtors were unable to reach agreement as to the scheduling of the Objection.  The EFIH Debtors argued that the Objection should be heard on September 17, 2015. The Trustee asserted that the Objection should not be heard until confirmation of the Plan because the Court cannot determine the appropriate meaning of the phrase "legal rate" in Bankruptcy Code section ("Section") 726(a)(5) without the benefit of a full factual record developed at confirmation.  Both the EFIH Debtors [D.I. 5238] and the Trustee [D.I. 5239] (the "Trustee's Letter Brief") filed letter briefs with the Court to this effect on August 7, 2015.

6.     At a hearing held on August 11, 2015 (the "August 11 Hearing"), the Court ordered briefing on the Objection in advance of confirmation.  The Court noted that, after it

---

[5]    Assuming an April 30, 2016 emergence, the postpetition interest due to the PIK Noteholders under the terms of the PIK Indenture will be approximately $463 million; the Debtors assert that the Federal Judgment Rate for purposes of calculating postpetition interest is .11% (*see* Plan at I.168), which equates to a difference of approximately $460 million.  If necessary, the Trustee reserves the right to object to the Federal Judgment Rate proposed by the Debtors.

reviewed the briefing, it would be able to determine whether the Objection could be resolved as a pure legal issue before confirmation.  Omnibus Hr'g Tr. at 144:17-21, 145:4-8 (Aug. 11, 2015).  Further, at the August 11 Hearing, the Court stated that it expected the Trustee to raise issues akin to arguments made at summary judgment, including:  (i) no court has ever decided whether to award postpetition interest at the contract rate in the context of a claim objection; (ii) ruling that the "legal rate" is the Federal Judgment Rate would be "an incredibly large blanket ruling with huge consequences"; and (iii) material disputed facts preclude the Court from determining whether the  PIK Noteholders are entitled to postpetition interest without a trial.  *Id.* at 143:5-6, 17-23.

## RESPONSE TO OBJECTION

7.    The EFIH Debtors request that the Court rule that, as a matter of law, the PIK Noteholders are not entitled to postpetition interest at the rate specified in the PIK Indenture.  *See* Objection at 17.  Their request is premised on the argument that Section 726(a)(5) limits postpetition interest to the "legal rate" (and that the undefined "legal rate" can only mean the Federal Judgment Rate).  As the EFIH Debtors acknowledge, in a chapter 11 case, Section 726(a)(5) applies solely through the application of the Best Interests Test in Section 1129(a)(7).  But the EFIH Debtors fail to acknowledge that Section 1129(a)(7) (and thus Section 726(a)(5)) does not control in this case, for two reasons.  First, because the Plan treats all EFIH creditors (including the PIK Noteholders) as unimpaired, Section 1129(a)(7)'s Best Interests Test, which applies only to impaired claims, is inapplicable here; Section 1124(1) governs instead.  Second, to the extent the PIK Noteholder claims are deemed impaired, Section 1129(a)(7)'s Best Interests Test is only the first half of the inquiry; application of Section 1129(b)'s Fair and Equitable Test would compel an award of contract rate interest here.  Notably, the brief conclusory statements in the cases on which the EFIH Debtors rely—principally, *Washington Mutual*—do not address

7

either Section 1124(1) or Section 1129(b).  Thus, those cases are materially distinguishable from the *Dow Corning* cases and this case.

8.      Part I of the Response explains how the EFIH Debtors improperly apply Sections 502(b)(2) and 726(a)(5) in support of their position.  Part II illustrates why the PIK Noteholders are entitled to receive postpetition interest at the contract rate pursuant to Section 1124(1) to the extent the EFIH Debtors seek to unimpair their claims in the Plan.  Part III explains why the PIK Noteholders are entitled to receive postpetition interest at the contract rate to the extent the Debtors impair their claims and resort to cramdown under Section 1129(b)(2)(B).  Part IV explains why the *Washington Mutual* decision should not govern this case.  Part V explains that if the Court determines (which it should not) that the phrase "legal rate" in Section 726(a)(5) has any bearing on the interest rate determinations under Sections 1124(1) or 1129(b)(2)(B), the court is not bound to apply the Federal Judgment Rate but rather should apply the contract rate of interest.[6]

## I.      THE OBJECTION FAILS AS A MATTER OF LAW BECAUSE THE DEBTORS MISAPPLY SECTIONS 502(b)(2) AND 726(a)(5)

9.      The EFIH Debtors argue that, as a matter of law:  (i) Section 502(b)(2) operates to disallow claims for interest that matures after the Petition Date; (ii) Section 726(a)(5) is the only statute under which an unsecured creditor may ever be entitled to receive postpetition interest in a solvent debtor chapter 11 case; and (iii) the "legal rate" referenced in Section 726(a)(5) is the

---

[6]      The EFIH Debtors' request to "disallow" the PIK Noteholders' entitlement to postpetition interest at the contract rate, and their argument in support thereof, is laid out in less than two pages in the Objection.  It is unclear what additional arguments the EFIH Debtors may make in support of the relief requested in the Objection, but the statements at the August 11, 2015 hearing by Debtors' counsel make clear that the EFIH Debtors' position is that "the law does not entitled [the PIK Noteholders] to post-petition interest in excess of the federal judgment rate period . . . we're not narrowing this to one particular theory."  Omnibus Hr'g Tr. at 147-148:19-25, 1 (Aug. 11, 2015).  Accordingly, the Trustee is compelled to set forth a full response supporting why the PIK Noteholders must be paid postpetition interest at the contract rate.  The Trustee reserves all rights to request leave of the Court to file a sur-reply.

Federal Judgment Rate. *See* Objection at 17. The Objection should be denied because the EFIH Debtors rely on rigid and incorrect interpretations of Sections 502(b)(2) and 726(a)(5).

10. <u>First</u>, despite their initial invocation of the "plain text" of Section 502(b)(2) (disallowing claims for "unmatured interest"), the EFIH Debtors acknowledge that courts uniformly have permitted claims for postpetition interest on unsecured debt where, like here, debtors are solvent. *See* Objection at 17 (citing *In re Washington Mutual Inc.*, 461 B.R. 200, 242 (Bankr. D. Del. 2011); s*ee also, e.g., Kitrosser v. CIT Grp./Factoring, Inc.,* 177 B.R. 458, 469 (S.D.N.Y. 1995) ("The solvency exception to section 502 appears to mandate a finding that interest continues to accrue during the pendency of a bankruptcy proceeding, and will be imposed if appropriate.").

11. <u>Second</u>, the Court cannot apply Section 726(a)(5) to "disallow" the PIK Noteholders' entitlement to postpetition interest at the contract rate because Section 726(a)(5) does not control in cases outside of chapter 7, nor is it an allowance provision under the Bankruptcy Code. Section 726 provides a distribution waterfall to be applied by a chapter 7 trustee in connection with distributing the proceeds of a chapter 7 estate. Before any surplus proceeds may be distributed to the debtor after payment of allowed creditor claims, Section 726(a)(5) provides for the payment of interest on allowed claims "at the legal rate from the date of the filing of the petition." 11 U.S.C. § 726(a)(5). Congress did not make Section 726(a)(5) a statute of general applicability across all chapters but, to the contrary, confined its direct

application to chapter 7 cases only. *See* 11 U.S.C. § 103(b);[7] *see also In re Tribune Co.*, 506 B.R. 613, 617 (Bankr. D. Del. 2013) (discussing the interplay between Sections 726 and 1129(a)(7), and agreeing that "generally, § 726, found in subchapter II of chapter 7, applies only in chapter 7 cases.").

12.     The EFIH Debtors' argument that Section 726(a)(5) limits the rate of postpetition interest in a solvent chapter 11 reorganization is flawed.   Prior to the enactment of the Bankruptcy Code, a majority of courts in such cases awarded postpetition interest at the contract rate. *See infra* ¶ 35.   Any argument that Congress intended Section 726(a)(5) to replace pre-Code practice finds no support in the text of the Bankruptcy Code, the statutory framework in chapter 11, or the legislative history.   Section 726(a)(5)'s direct application ensures that creditors in chapter 7 liquidation proceedings are entitled to receive postpetition interest on their allowed claims before surplus estate proceeds are distributed to the debtor.   That makes sense in the chapter 7 context: creditors in chapter 7 liquidations have no other means to recover postpetition interest given the fact that chapter 7 creditors do not enjoy the same protections that chapter 11 creditors enjoy under Sections 1124 and 1129.

13.     Furthermore, Section 726(a)(5) is not a basis to allow or disallow postpetition interest in a chapter 11 case.   Section 726(a)(5) factors in chapter 11 cases only to the extent a court is required to analyze the Best Interests Test under Section 1129(a)(7).   As discussed below, the Best Interests Test is not applied in every case, but is applied only with respect to classes of impaired claims and interests on a case-by-case basis. *See infra* ¶ 26.   Moreover, the

---

[7]     Courts agree that Section 103(b) renders Section 726 inapplicable to cases that are not filed under chapter 7. *See, e.g.*, *Matter of Greenig*, 152 F.3d 631, 633 n.3 (7th Cir. 1998) (holding that Section 726 is inapplicable to cases under chapter 12); *In re Mackinder-Manous*, No. 13-21211, 2015 WL 790883 at *2 (Bankr. E.D. Ky. Feb. 24, 2015) (holding that Section 726 is inapplicable to a chapter 13 case); *In re Hyatt*, 509 B.R. 707, 719 n.14 (Bankr. D.N.M. 2014) (noting that "without question, § 726 is inapplicable in chapter 11 cases" (internal quotations omitted)); *In re Glawson*, No. 13-50055-JDW, 2013 WL 4777194 at *1 (Bankr. N.D. Ga. Sept. 3, 2013) (holding that Section 726 is inapplicable to chapter 13 cases); *In re Xpedior Inc.*, 354 B.R. 210, 225 (Bankr. N.D. Ill. 2006) (holding that Section 726 "should only be applied to cases under Chapter 7").

Best Interests Test is evaluated only in connection with plan confirmation.  As the bankruptcy court noted in *Tribune*, "reference to § 726 for the best interests of creditors test does not constitute an incorporation of § 726 into chapter 11."  *In re Tribune Co.*, 506 B.R. at 617. Rather, "the best interests of creditors test is applied in chapter 11 when considering a plan's treatment of **allowed** claims, but ***this does not answer the question of whether a claim should be allowed***."  *Id.* at 618 (emphasis added).

14.    Finally, the proposition that the "legal rate" in Section 726(a)(5) must be applied in all chapters as an allowance provision disregards fundamental bankruptcy principles regarding the importance of contractual rights in chapter 11 proceedings.  This Court itself has recognized the importance of respecting contract rights in a solvent debtor case.  *In re Energy Future Holdings Corp.*, 513 B.R. 651, 660 (Bankr. D. Del. 2014).  Multiple other courts similarly have stressed the importance of honoring a creditor's contractual entitlements in solvent debtor cases. *See, e.g., UPS Capital Bus. Credit v. Louis A. Gencarelli (In re Gencarelli)*, 501 F.3d 1, 7 (1st Cir. 2007) ("When the debtor is solvent, the bankruptcy rule is that where there is a contractual provision, valid under state law, . . . the bankruptcy court will enforce the contractual provision.") (internal quotations omitted); *In re Dow Corning Corp. ("Dow III")*, 456 F.3d 668, 679 (6th Cir. 2006) ("When a debtor is solvent, then, the presumption is that a bankruptcy court's role is merely to enforce the contractual rights of the parties . . . ."); *Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.*, 679 F.2d 264, 269 (1st Cir. 1982) ("But with respect to post-petition interest on . . . the unpaid installments which fell due after the petition, the legal situation is different when the supposed bankrupt proves to be solvent.  [T]he bankruptcy court will enforce the contractual provision with respect to both instalments [sic] due before and instalments [sic] due after the petition was filed."); *Ruskin v. Griffiths*, 269 F.2d 827,

832 (2d Cir. 1959) (reversing lower court's decision not to award default contract rate of interest where debtor was solvent and noting that in a solvent debtor case, "it seems to us the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act"); *In re Los Angeles Dodgers LLC*, 465 B.R. 18, 32 (D. Del. 2011) (holding that in a solvent debtor case, "the equities strongly favor holding the debtor to his contractual obligations so long as those obligations are legally enforceable under applicable non-bankruptcy law" (internal quotations omitted)); *In re Gen. Growth Props., Inc.*, 451 B.R. 323, 327 (Bankr. S.D.N.Y. 2011) (holding that a solvent debtor was required to pay default contract rate of interest to effect a cure and reinstatement of debt); *In re Chemtura Corp.*, 439 B.R. 561, 605 (Bankr. S.D.N.Y. 2010) (noting that in the case of a solvent debtor, "assumptions predicated on the Bankruptcy Court's equitable discretion over the distribution of estate property" are not applicable in solvent debtor cases); *In re Dow Corning Corp. ("Dow II")*, 244 B.R. 678, 695-96 (Bankr. E.D. Mich. 1999) ("Where the debtor is solvent, the bankruptcy rule is that where there is a contractual provision, valid under state law, providing for interest on unpaid installments of interest, the bankruptcy court will enforce the contract contractual provision . . . .").

## II.  THE PIK NOTEHOLDERS MUST RECEIVE POSTPETITION INTEREST AT THE CONTRACT RATE IN ORDER FOR THE PIK NOTEHOLDERS TO BE UNIMPAIRED UNDER THE PLAN AND SECTION 1124(1)

15.    To the extent the Debtors intend to proceed with a Plan that unimpairs the PIK Noteholders, Section 1124(1) entitles the PIK Noteholders to payment of postpetition interest at the contract rate on their allowed claims.[8]  This position is supported not only by the plain meaning of Section 1124(1), but also by:  (i) the 1994 amendment to the Bankruptcy Code,

---

[8]    The concept of impairment is integral to the chapter 11 process in that it determines if a creditor is permitted to vote to accept or reject the plan or is, instead, deemed to accept the plan. 11 U.S.C. § 1126(f) (stating that an unimpaired class of creditors under a plan is conclusively deemed to have accepted the plan and need not be solicited to vote).

12

which deleted former Section 1124(3); (ii) the Third Circuit's decision analyzing that revision in *In re PPI Enterprises (U.S.), Inc.*, 228 B.R. 339, 351 (Bankr. D. Del. 1998); and (iii) other solvent debtor chapter 11 reorganization cases.[9]  Section 1129(a)(7), the only chapter 11 hook for applying Section 726(a)(5), is inapplicable with respect to unimpaired creditors.

     **A.**     ***The Plain Meaning of Section 1124(1) Requires that an "Unimpaired" Creditor Receive its Full "Legal, Equitable, and Contractual Rights"***

     16.     Section 1124 provides that a class of claims or interests is impaired under a chapter 11 plan unless the plan either:  (i) "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest;" or (ii) notwithstanding any contractual right to accelerated payment, reinstates the original maturity date of the obligation, cures outstanding defaults (with certain exceptions), compensates the claimant or interest holder for damages suffered in reasonably relying on the default provision, and otherwise leaves unaltered the legal, equitable, or contractual rights of the claimant or interest holder.  11 U.S.C. § 1124(1) and (2).  Since the Plan does not seek to reinstate the PIK Notes pursuant to Section 1124(2), Section 1124(1) requires the Debtors to demonstrate that the Plan leaves the PIK Noteholders' contractual rights unaltered.  *See In re PPI Enters. (U.S.) Inc.*, 324 F.3d 197, 203 (3d Cir. 2003).

     17.     The Plan provides that each holder of General Unsecured Claims Against the EFIH Debtors (which includes the PIK Noteholders) will receive "up to the Allowed amount of its Claim, payment in full in Cash or other treatment rendering such Claim Unimpaired" while taking the position that such Allowed Claims will be limited to payment of "accrued postpetition

---

[9]    *See, e.g., In re Overseas Shipholding Grp., Inc.*, No. 12-20000 (PJW) (Bankr. D. Del. July 16, 2014) [D.I. 3663] (unsecured claims were paid postpetition interest at contract rate, including any default interest (if applicable); deemed unimpaired); *In re Gen. Growth Props., Inc.*, No. 09-11977 (ALG) (Bankr. S.D.N.Y. Oct. 21, 2010) [D.I. 6232] (general unsecured creditors received postpetition interest at applicable contract interest rate, unless no contract interest rate, then received FJR; deemed unimpaired).

interest at the Federal Judgment Rate." *See* Plan at IV.B(21). While the EFIH Debtors attempt to "unimpair" the PIK Noteholders by paying them postpetition interest at the Federal Judgment Rate, this position is inconsistent with Section 1124(1)'s clear requirement that a creditor must receive its full "legal, equitable and contractual rights" to be deemed unimpaired. Unless the EFIH Debtors provide the PIK Noteholders with payment of postpetition interest at the contract rate, they cannot, under the plain language of Section 1124(1), treat the PIK Noteholders as unimpaired.

18.     Satisfaction of 1124(1) also requires that the postpetition contractual rate of interest be paid in cash. In other large solvent debtor chapter 11 cases, even unsecured creditors being paid in full plus their postpetition interest at the contract rate have been treated as impaired under the relevant plans because their recovery was a mix of equity and cash. *See Dow II*, 244 B.R. 678, 696 (Bankr. E.D. Mich. 1999); *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. June 5, 2013) [D.I. 8590] (unsecured creditors received postpetition interest at contract rate); *In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS) (Bankr. D. Del. Apr. 1, 2010) [D.I. 1928] (plan provided for postpetition interest at contract rate for holders of unsecured claims); *In re Chemtura Corp.*, No. 09-11233 (REG) (Bankr. S.D.N.Y. Nov. 3, 2010) [D.I. 4409-1] (unsecured claims received postpetition interest at contract rate); *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 19, 2007) [D.I. 7237] (senior note claims, general note claims, subordinated note claims (all unsecured issuances) received postpetition interest at contract rate as determined by bankruptcy court). Beyond substantiating that unsecured creditors in solvent debtor reorganizations are entitled to postpetition interest at the contract rate regardless of impairment status, these cases buttress the Trustee's argument that payment in full *in cash* of the PIK Noteholders' full contractual rights—including postpetition interest at the

14

contract rate—is the only way that the PIK Noteholders can be treated as unimpaired under the Plan.

19.     Whether the Debtors choose to pay off a creditor in full in cash under Section 1124(1) or cure and reinstate a pre-default debt and interest obligation under Section 1124(2), the treatment of postpetition interest claims should be no different.   Just like Section 1124(2), Section 1124(1) requires payment at the contract rate.  This is because both prongs require that a creditor's contractual, legal and equitable rights remain unaltered.  *See, e.g., In re Moody Nat'l SHS Houston H, LLC*, 426 B.R. 667, 670-73 (Bankr. S.D. Tex. 2010) (finding that reinstatement under the definitional provisions of Section 1124(2) does not relieve a debtor from requirement to pay secured creditor interest at the default contractual rate); *In re New Midland Plaza Assocs.*, 247 B.R. 877, 896 (Bankr. S.D. Fla. 2000) (finding a class impaired pursuant to Section 1124 generally when recovery on account of claims would be paid over time and without interest, thus altering the terms of the contract); *In re Liberty Warehouse Assocs. Ltd. P'ship*, 220 B.R. 546, 548-52 (Bankr. S.D.N.Y. 1998) (drawing on various precedents to conclude that even though a debtor's default on an agreement with a secured creditor is "cured" pursuant to Section 1124(2), the debtor had previously defaulted under the terms of the contract, and thus, when the debtor is solvent, the contractual default rate of interest is appropriate).

20.     The following example illustrates the point.   Suppose a debtor issued $100 million of 10% unsecured notes due 2020 and filed a plan under which it would emerge from chapter 11 one year after filing.  To unimpair the holders of the $100 million note issuance, the debtor would have the option under Section 1124(1) to pay the noteholders their contractual entitlement of $100 million in principal plus $10 million of accrued and unpaid postpetition interest as of the effective date.  This money could be raised by selling new securities in the

15

reorganized debtor or by obtaining exit financing at a lower interest rate.  Alternatively, if available outside interest rates were higher than 10%, the debtor could seek to cure and reinstate the notes under Section 1124(2) by, among other things, curing monetary defaults (which would include paying the $10 million of accrued and unpaid interest) and reinstating the maturity of the notes.  While Section 1124 gives the debtor the flexibility to unimpair creditors by either paying off their claims in full, as required under the relevant contract, or through curing and reinstating the debt obligations (to take advantage of more advantageous debt terms), the end result for the affected unimpaired creditor should be the same from a recovery perspective.  There is nothing in the legislative history that evidences Congressional intent to treat creditors differently depending on which Section 1124 unimpairment prong a debtor proceeds under.

21.      Accordingly, to the extent that the Debtors classify the PIK Noteholders' claims as unimpaired under the Plan, the plain meaning of Section 1124(1) entitles the PIK Noteholders to postpetition interest at the contract rate.

**B.      Case Law and Legislative History Support the Conclusion that the PIK Noteholders Must Receive Postpetition Interest at the Contract Rate in Order to be Deemed Unimpaired under Section 1124(1)**

22.      As the Supreme Court has noted, "[c]laims are unimpaired if they retain all of their prepetition . . . contractual rights against the debtor." *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 442 n.14 (1999); *see also In re PPI Enters. (U.S.), Inc.*, 324 F.3d at 202 ("If the debtor's Chapter 11 reorganization plan does not leave the creditor's rights entirely 'unaltered,' the creditor's claim will be labeled as impaired under § 1124(1) of the Bankruptcy Code."); *In re Taddeo*, 685 F.2d. 24, 28 (2d. Cir. 1982) ("[Congress] defined impairment in the broadest possible terms."); *In re GSC, Inc.*, 453 B.R. 132, 177 (Bankr.

S.D.N.Y. 2011) ("Any alteration to the claimant's legal, equitable or contractual rights under a plan would make that claim impaired.").

23.     In 1994, Congress reaffirmed this principle specifically with respect to postpetition interest when it amended Section 1124 to prevent debtors from using the unimpairment provisions to pay creditors the full "allowed" amount of their claims *without* postpetition interest.  Prior to the 1994 Amendments, courts had relied upon the now-deleted clause (3) of Section 1124 [10] to deprive unsecured creditors of their contractual right to postpetition interest.  *See In re New Valley Corp.*, 168 B.R. 73 (Bankr. D.N.J. 1994) (holding that the pre-amendment language of Section 1124(3) authorized a solvent debtor not to pay postpetition interest on claims of unsecured creditors deemed unimpaired under the plan).

24.     In recognition of the unfairness of the *New Valley* outcome, Congress amended the Bankruptcy Code to eliminate Section 1124(3).  The legislative history of the 1994 Amendment makes clear that the deletion of subsection (3) was designed to fix the *New Valley* problem under which solvent debtors would unimpair creditors by paying them merely the "allowed" amount of their claims in cash without postpetition interest (which was not "allowed" under Section 502(b)(2)):

> The principal change in this section is set forth in subsection (d) and relates to the award of postpetition interest.  In a recent Bankruptcy Court decision in *In re New Valley Corp.*, 168 B.R. 73 (Bankr. D.N.J. 1994), unsecured creditors were denied the right to receive postpetition interest on their allowed claims even though the debtor was liquidation and reorganization solvent. The *New Valley* decision applied section 1124(3) of the Bankruptcy Code literally by asserting, in a decision granting a declaratory judgment, that a class that is paid the allowed amount of its claims in cash on the effective date of a plan is unimpaired under

---

[10] Before the Amendment, Section 1124(3) read as follows:

Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—

(3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to—

(A) with respect to a claim, the allowed amount of such claim.

section 1124(3), therefore is not entitled to vote, and is not entitled to receive postpetition interest. . . .  In order to preclude this unfair result in the future, the Committee finds it appropriate to delete section 1124(3) from the Bankruptcy Code.

As a result of this change, if a plan proposed to pay a class of claims in cash in the full allowed amount of the claims, the class would be impaired entitling creditors to vote for or against the plan of reorganization. If creditors vote for the plan of reorganization, it can be confirmed over the vote of a dissenting class of creditors only if it complies with the "fair and equitable" test under section 1129(b)(2) of the Bankruptcy code and it can be confirmed over the vote of dissenting individual creditors only if it complies with the "best interests of creditors'" test under section 1129(a)(7) of the Bankruptcy Code. ***The words "fair and equitable" are terms of art that have a well established meaning under the case law of the Bankruptcy Act as well as under the Bankruptcy Code. Specifically, courts have held that where an estate is solvent, in order for a plan to be fair and equitable, unsecured and undersecured creditors' claims must be paid in full, including postpetition interest, before equity holders may participate in any recovery.*** *See, e.g., Consolidated Rock Products Co. v. Dubois*, 312 U.S. 510, 527, 61 S.Ct. 675, 685 (1941); *Debentureholders Protective Committee of Continental Inv. Corp.*, 679 F.2d 264 (1st Cir.), cert. denied, 459 U.S. 894 (1982) and cases cited therein.

H.R. Rep. No. 103-835, at 47-48, n.15 (1994) (emphasis added).

25.     In *PPI Enterprises*, Judge Walsh examined this legislative history and highlighted the perverse outcome Congress sought to avoid through the 1994 Amendment:

The result in *New Valley* stood in contrast with a line of cases holding that where a debtor is solvent, unsecured creditors must be paid in full, including postpetition interest, pursuant to the "fair and equitable" test of § 1129(b)(2) when the debtor is cramming down that creditor's claim. Thus, solvent debtors could avoid paying "unimpaired" unsecured creditors postpetition interest by paying them in full in cash, yet the same solvent debtor would be required to pay postpetition interest to an "impaired" dissenting class of unsecured creditors.

*In re PPI Enters. (U.S.), Inc.*, 228 B.R. at 351.  Notably, the legislative history cites favorably to *Consolidated Rock*—a Bankruptcy Act case that, as discussed *infra* at ¶ 35-36, compels the conclusion that unsecured creditors in solvent debtor reorganizations are entitled to postpetition interest at the contract rate.

26.     Furthermore, when Congress deleted Section 1124(3) to ensure that unsecured creditors of solvent debtors would not lose their right to receive postpetition interest as it existed under both pre- and post-Code practices under the Fair and Equitable Test, it considered whether the repeal would come into conflict with the 1984 Code amendment limiting application of the Best Interests Test of Section 1129(a)(7) to impaired classes.   Congress concluded that no conflict existed:

> With respect to section 1124(1) and (2), [the deletion of section 1124(3)] would not change the beneficial 1984 amendment to section 1129(a)(7) of the Bankruptcy code, which excluded from application of the best interests of creditors test classes that are unimpaired under section 1124.

H.R. Rep. No. 103-835, at 48 (1994).[11] That Congress made the considered decision to decline to apply Section 1129(a)(7), and by extension, Section 726(a)(5), to unimpaired classes evidences its intent to determine the appropriate unimpairment interest rate by reference to *Consolidated Rock* and its progeny.

27.     Accordingly, the excising of Section 1124(3) reinforces the notion that while a debtor still has the option of paying a creditor in full to "unimpair" such creditor, a solvent debtor can do so under Section 1124(1) only if all contractual rights—including payment of postpetition interest at the contract rate—are satisfied.   Only when a creditor's full contractual entitlements are left in place or satisfied in full is that creditor's claim properly unimpaired.   This is significant because an unsecured creditor who is unimpaired and is deemed to accept a plan is not entitled to vote on a plan and is not afforded the protections under, among other provisions, the Fair and Equitable Test.   The EFIH Debtors' statutory interpretation would lead to the absurd situation where an unimpaired unsecured creditor would have less protection against alteration of

---

[11]   When the Bankruptcy Code was originally enacted, the best interest of creditors test applied to all classes of claims irrespective of whether the class was impaired or unimpaired.   In 1984, Section 1129(a)(7) was amended to limit its application to impaired classes of claims and interests.   Bankruptcy Amendment & Federal Judgeship Act of 1984, PL 98–353 (HR 5174), July 10, 1984.

its contractual rights in the chapter 11 case than an impaired unsecured creditor.  Congress could

not have intended such a result.

### III.    THE FAIR AND EQUITABLE TEST REQUIRES THAT THE PIK NOTEHOLDERS RECEIVE POSTPETITION INTEREST AT THE CONTRACT RATE

28.    To the extent the PIK Noteholders' claims are deemed impaired, the Fair and

Equitable Test of Section 1129(b) entitles the PIK Noteholders to payment of postpetition

interest at the contract rate.[12]

29.    The Fair and Equitable Test is codified in Sections 1129(b)(1) and 1129(b)(2) and

provides as follows:

> (1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1).

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class ***includes*** the following requirements:

> (B) With respect to a class of unsecured claims—

> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may

---

[12]    The Trustee recognizes that this provision is only applicable in connection with Plan confirmation.  If the Court elects to assume, for purposes of adjudicating the Objection, that Class B6 (which includes the PIK Noteholders) are impaired and will vote to reject the Plan, the Trustee submits that the Court may determine now that the Fair and Equitable Test requires that the PIK Noteholders receive postpetition interest at the contract rate.  Notwithstanding the foregoing, the Trustee reserves all rights to raise objections to confirmation of the Plan, including the right to raise other cramdown objections.

retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

11 U.S.C. § 1129(b)(2)(B) (emphasis added).

30.    Section 1129(b)(2)(B) enumerates two mutually exclusive requirements for a plan to be fair and equitable with respect to unsecured claims.    Given the provision's use of "includes," however, those are not the only relevant considerations.    *See* 11 U.S.C. § 102(3) (providing that references in the Code to "includes" not to be construed as "limiting").    For a plan to be fair and equitable with respect to unsecured claims, the plan must satisfy ***either*** clause (i) or clause (ii) of Section 1129(b), ***plus*** any other unenumerated requirements that may be applicable.    *See, e.g., In re W.R. Grace & Co.*, 475 B.R. 34, 174 (D. Del. 2012) ("Subsection (b)(2) of [Section 1129] goes on to set forth the ***nonexclusive*** requirements for meeting the fair and equitable test.") (emphasis added); *Dow II*, 244 B.R. at 692 ("Congress explicitly provided that references in the Code to the term 'includes' are not to be construed as limiting [and s]ince that term is used in § 1129(b)(2)(B)'s preamble, it is clear that the statute's list of requirements is nonexhaustive.") (internal citations omitted); *In re Trevarrow Lanes, Inc.*, 183 B.R. 475, 492 (Bankr. E.D. Mich. 1995) ("The list of requirements set forth in § 1129(b)(2) which are essential for a finding that the plan is 'fair and equitable' is not exhaustive [and] thus courts have discretion under that statute to impose additional requirements, either case-specific or generic, before making such a finding.") (internal citations omitted).

31.    In the context of solvent debtor reorganizations, payment to unsecured creditors of postpetition interest at the contract rate is one of the additional requirements that must be satisfied in order to confirm a plan under Section 1129(b).    A fundamental underpinning of the Fair and Equitable Test is that a debtor, which has induced creditors to enter into a contract to,

*inter alia*, provide the debtor with capital necessary to fund its going business operations, must satisfy those contractual obligations in full before its equity holders can receive any recovery.

32.      As discussed above, this Court itself, as well as other courts have recognized already that "[w]hile solvent debtor cases are somewhat of a rarity, the available precedent consistently defers to previously contracted bargains and provisions when dealing with solvent debtors in varying situations."  *In re Energy Future Holdings Corp.*, 513 B.R. at 660.  Indeed, this recognition dates back to pre-Code precedent which courts have continued to follow to the present day.

**A.      Pre-Code Case Law Recognizes that in Order for a Plan to Be Fair and Equitable Unsecured Creditors Must Receive Postpetition Interest at the Contract Rate Before Equity Can Receive Any Recovery**

33.      The Supreme Court has held that pre-Code precedent must be respected in interpreting the Bankruptcy Code unless Congress was clear in its intent to change past practice. *See Cohen v. De La Cruz*, 523 U.S. 213, 221 (1998) (determining that the Bankruptcy Code should not be interpreted to erode past bankruptcy practice absent "a clear indication that Congress intended such a departure"); *Dewsnup v. Timm*, 502 U.S. 410, 410 (1992) (stating that the Court is "reluctant to accept arguments that would interpret the Bankruptcy Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history."); *see also In re Fed.-Mogul Global Inc*., 684 F.3d 355, 375 (3d Cir. 2012) ("Courts will not presume a departure from pre-Code bankruptcy practice in the absence of clear congressional intent."); *In re Polysat, Inc.,* 152 B.R. 886, 890 (Bankr. E.D. Pa. 1993) ("Where Congress has not evidenced an intent to change established pre-Code law, courts should interpret the Code as continuing that legal principle."); *In re Sovereign Grp. 1985-27, Ltd.*, 142 B.R. 702, 707 (Bankr. E.D. Pa. 1992) ("Based on the pre-Code establishment and use of the new value exception and the absence of

Congressional intent to alter pre-Code practice, the court concludes that the new value exception remains valid law.").

34.     There is no Congressional intent, let alone a "clear indication," in the Bankruptcy Code to change the courts' past practice of providing for the payment of postpetition interest at the contract rate.  To the contrary, as described above, the 1994 Amendment indicates that Congress intended to protect the ability of creditors to recover postpetition interest at the contract rate before distributions are made to equity.  *See supra* ¶¶ 24-26.

35.     The Fair and Equitable Test has roots extending far back in case law.  Prior to the enactment of Bankruptcy Code, courts routinely awarded creditors of a solvent estate postpetition interest on their bankruptcy claims at the rate in the applicable contract.  In 1941, the Supreme Court in *Consolidated Rock* recognized this solvency exception, undergirded by the idea that *fairness and equity* require that a reorganization respect a creditor's contract entitlements before allowing for recovery to a debtor's shareholders.  In particular, the Supreme Court held that in the case of a solvent reorganizing debtor, a plan of reorganization runs afoul of the absolute priority rule if equity receives value before bondholders are paid their full contract rate of interest.  *Consol. Rock Prods. Co. v. Dubois*, 312 U.S. 510, 527-529 (1941); *see also In re Realty Assocs. Sec. Corp.*, 163 F.2d 387, 390 (2d Cir. 1947) (holding that contract rate is the proper rate for calculation of postpetition interest); *Empire Trust Co. v. Equitable Office Bldg. Corp.*, 167 F.2d 346, 347 (2d Cir. 1948) (same, citing *Realty Assocs.*).  Any other arrangement

by which the rights of a shareholder are secured at the expense of a creditor's contract rights, the

Supreme Court noted, "comes within judicial denunciation." *Id.* at 527.[13]

36.    *Consolidated Rock* and other pre-Code precedents therefore stand for the

proposition that principles of fairness and equity demand the determination that a creditor's right

to recover the full amount owed under a prepetition contract, including postpetition interest, must

be honored before any recovery may be recognized by the debtor or its shareholders.

**B.    Post-Code Case Law Recognizes that in Order for a Plan to Be Fair and Equitable Unsecured Creditors Must Receive Postpetition Interest at the Contract Rate Before Equity Can Receive Any Recovery**

37.    Consistent with pre-Code "fair and equitable" considerations, courts have

continued to recognize that, in most cases where a debtor is solvent, bankruptcy courts should

determine and enforce whatever prepetition rights a creditor has against the debtor.   In other

words, solvent debtors and their equity holders should not receive a windfall simply because they

sought bankruptcy protection.  *See In re Carter*, 220 B.R. 411, 416-17 (Bankr. D.N.M. 1998)

(noting that awarding postpetition interest at the contract rate is consistent with the underlying

policy of the Bankruptcy Code of preventing the debtor from receiving a windfall at the expense

of creditors if there is a surplus after the payment of claims).   So too here:  the terms of the

applicable Indentures must be enforced and the PIK Noteholders must be paid their contract rate

of interest, so as to avoid a windfall to the EFIH Debtors' shareholders.

---

[13]    S*ee also Debentureholders Protective Comm. of Cont'l Inv. Corp. vs. Cont'l Inv. Corp.*, 679 F.2d at 269 (holding that a plan that failed to honor contract provisions regarding the payment of compounding postpetition interest was not "fair and equitable" to unsecured creditors because "[w]here the debtor is solvent, the bankruptcy rule is that where there is a contractual provision, valid under state law . . . the bankruptcy court will enforce the contractual provision. . . ."); *In re Chicago, Milwaukee, St. Paul, and Pacific R.R. Co.,* 791 F.2d, 524, 529-30 (1986) ("when the debtor is solvent the judicial task is to give each creditor the measure of his contractual claim, no more and no less."); *Dow II*, 244 B.R. at  689-90 ("*Dubois* makes clear that under pre-Code law, the 'fair and equitable' standard precluded shareholders of a solvent debtor from retaining ownership unless they recognized, or 'fully compensated for,' a creditor's right to interest at the contract rate.").

38.     The *Dow Corning* line of cases is one of the few complex solvent debtor reorganizations in which the courts have thoroughly examined whether the Fair and Equitable Test requires payment of postpetition interest and at what rate.  In short, the bankruptcy court and the Sixth Circuit analyzed the rate of postpetition interest to which unsecured creditors were entitled in the context of plan confirmation and found that contract rate was required in order to satisfy the Fair and Equitable Test.

39.     Dow Corning Corporation and certain of its affiliates filed for chapter 11 bankruptcy protection on May 15, 1995.  Four and a half years after filing for bankruptcy, after overruling various confirmation objections, the bankruptcy court confirmed the debtors' plan of reorganization.  As relevant here, the official creditors' committee and other unsecured creditors objected on the grounds that the plan, which provided that unsecured creditors holding commercial claims in "class 4" would receive postpetition interest at a rate equal to the Federal Judgment Rate, failed to satisfy the Fair and Equitable Test.  *Dow II*, 244 B.R. at 689.  The objectors sought the contract rate.

40.     The bankruptcy court noted, preliminary, that "a plan which would pay the dissenting creditors pendency interest at the minimum rate pursuant to [Sections 1129(a)(7)(ii) and 726(a)(5)] is not necessarily "fair and equitable" for the purposes of Section 1129(b).[14]  *Dow II*, 244 B.R. at 680 (citing *Consolidated Rock, supra*).  The court reasoned that, irrespective of whatever rate a creditor may be entitled to under the Best Interests Test, the plan proponents

---

[14]    In an earlier decision, the bankruptcy court addressed a Best Interests Test objection and found that the "legal rate" under Section 726(a)(5) means the Federal Judgment Rate.  S*ee generally In re Dow Corning Corp. ("Dow I"),* 237 B.R. 380 (Bankr. E.D. Mich. 1999).  The court subsequently emphasized in *Dow II* that "what must be remembered is that by its own terms, the best-interests test simply establishes a minimum payment requirement . . . .  Thus the upshot of the best-interests test is that the creditor of a solvent chapter 11 estate must receive postpetition interest at a rate which is *at least* equal to the federal statutory rate.  *We are unwilling to infer from this that Congress intended to preclude creditors from being paid at a higher rate*."  *Dow II* at 696 (emphasis added).   For the reasons discussed herein, the Trustee submits that even under Section 726(a)(5) the equities of the case must be considered in determining the appropriate rate of postpetition interest.

must also "reckon with those contract rights.  And if a cramdown is attempted . . . the proponent must also reckon with the requirement that the plan's payment provision be 'fair and equitable.'" *Id.* at 687.

41.     In addressing the requirements of the Fair and Equitable Test, the *Dow II* court noted that, under pre-Code law, the right to interest at the applicable contract rate was a legitimate consideration in solvent debtor cases when assessing whether a plan was "fair and equitable."  Since Section 1129(b) continues to use the phrase "fair and equitable," the court found that it followed that the contract rate remains relevant.  The court expressly rejected the debtors' argument that it was impermissible for the court to require payment of postpetition interest under the "fair and equitable" test in Section 1129(b), because the statute's list of "requirements" was non-exhaustive.  *Id.* at 690-91.  The court similarly rejected the argument that Section 1129(b) forecloses the court's ability to consider whether creditors can receive amounts beyond the allowed amount of their claim.  Because postpetition interest is an amount that must be paid in addition to the "allowed claim," the court held that Section 1129(b)(2)(B)(i), which sets forth the specific requirement that a creditor must receive property of a value equal to the allowed amount of its claim for a plan to be "fair and equitable," does not limit its consideration of postpetition interest.  *Id.* at 692-93.

42.     Ultimately, the *Dow II* court held that the plan provision fixing postpetition interest at the Federal Judgment Rate was not "fair and equitable" and that the contract rate of interest should be awarded for the simple reason that "[a] debtor with the financial wherewithal to honor its contractual commitments should be required to do so."  *Id.* at 695.  The Sixth Circuit

agreed, and largely accepted the creditors' arguments in favor of an even higher contract rate.[15] As the court of appeals explained, "equitable considerations operate differently when the debtor is solvent:  '[C]ourts have held that where an estate is solvent, in order for a plan to be fair and equitable, unsecured and undersecured creditors' claims must be paid in full, including postpetition interest, before equity holders participate in any recovery.'"  *Dow III*, 456 F.3d at 678 (quoting Bankruptcy Code's legislative history).  The Sixth Circuit concluded that "absent compelling equitable considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights."  *Id.* at 679; *see also, e.g., In re Schoeneberg*, 156 B.R. 963, 972 (Bankr. W.D. Tex. 1993) (looking to equitable principles in an individual chapter 11 case and holding that when the estate is solvent, postpetition interest should be paid at the contract rate).

43.     *Dow II* and *Dow III* provide a well-reasoned analysis as to why unsecured creditors, in a solvent debtor chapter 11 case, should be entitled to receive postpetition interest at the contract rate under the Fair and Equitable Test.  Similar to the facts of *Dow Corning*, this is a solvent debtor chapter 11 reorganization and the EFIH Debtors have the financial wherewithal to satisfy the PIK Noteholders' postpetition interest at the rate provided for under the PIK Indenture.  The Debtors have agreed to pay the contract rate if it is so ordered and the Plan provides for a Postpetition Interest Reserve that purportedly will be fully funded and able to satisfy the PIK Holders' claim for contract rate interest.  Further, no equitable considerations exist that weigh against granting the PIK Noteholders postpetition interest at the contract rate; in

---

[15] In *Dow II*, the court amended the plan to provide the unsecured creditors with the rate of interest provided for under the applicable contracts, at the ***non-default*** rate.  In *Dow III*, the Sixth Circuit recognized the presumption that the unsecured creditors ***would*** receive postpetition interest at the higher ***default*** rate provided for in the contract.  456 F.3d at 680.  The only question left for remand, based on further equitable considerations, was ***which*** contract rate the creditors would receive.  *Id.*

fact, as discussed below (*see* ¶¶ 49-67), equitable considerations weigh in favor of granting the PIK Noteholder postpetition interest at the contract rate.

44.     Although the Sixth Circuit remains the only post-Code federal court of appeals to have resolved the interest rate question in a case (like this one) involving the Fair and Equitable Test, the *Dow Corning* decisions are by no means outliers.  In *Allegheny*, for example, the Bankruptcy Court for the Western District of Pennsylvania followed the Sixth Circuit's lead, finding that a plan that incorporated a settlement of claims with certain unsecured institutional lenders met the "fair and equitable" standard of Section 1129(b) where the settlement provided for payment of postpetition interest at the contract rate. *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 314-15 (Bankr. W.D. Pa. 1990).  In that case, an equity committee argued that the plan settlement violated the Code on the grounds that, among other things, the unsecured claimants were receiving postpetition interest at the contract rate instead of a (lower) statutory rate under Pennsylvania state law.  *See id.* at 314.  The court disagreed with the equity holders, instead finding that "the contractual provision for interest applies post-petition where the estate proves to be solvent." *Id.* at 315.  Similarly, in the chapter 11 *Loral* case, the Bankruptcy Court for the Southern District of New York observed that the fair and equitable standard must be considered and stated, in *dicta*, that had the debtors been found to be solvent, the creditors would have been entitled to postpetition interest at the non-default contract rate. *See* Bench Ruling, at 38-41, *In re Loral Space and Commc'ns Ltd.*, No. 03-41470 (Bankr. S.D.N.Y. July 25, 2005), attached hereto as Exhibit A; *see also In re Fast*, 318 B.R. at 191-92 (in a chapter 7 case, awarding unsecured creditor with postpetition interest at the contract rate under the Fair and Equitable Test); *In re Carter*, 220 B.R. at 415-17 (in chapter 11 solvent debtor case, without specifically referencing the Fair and Equitable Test or other "confirmation" related Bankruptcy Code provisions, finding

that the equities of the case required unsecured creditor was entitled to postpetition interest on its claim at the rate specified in its contract with the debtor).

### C.    *Congress Did Not Intend to Abrogate Pre-Code Case Law*

45.    The EFIH Debtors assert that enactment of Section 726(a)(5) eliminated any other means under the Bankruptcy Code for an unsecured creditor to claim entitlement to postpetition interest under *any* chapter (including chapter 11) and under *all* circumstances (*i.e.*, a solvent debtor reorganization).  But that sweeping position—requiring courts to discard over a half-century of pre-Code precedents—finds no support in the Code itself or in the legislative history. As noted above, the Bankruptcy Code should not be interpreted to erode past bankruptcy practice absent "a clear indication that Congress intended such a departure."  *See supra* ¶¶ 33-36 (collecting cases).  No such indication exists here; to the contrary, Congress contemplated the opposite.

46.    Courts have recognized that the Bankruptcy Code did not expressly modify the pre-Code practice of awarding unsecured creditors of a solvent estate postpetition interest at their contract rate.  *See Dow II*, 244 B.R. at 690 (noting that "[s]ince § 1129(b) continues to use the phrase 'fair and equitable' [as it did when *Consolidated Rock* was decided], it would seem that the contract interest rate would likewise continue to be of relevance."); *see also id.* at 686 ("If Congress had intended to supplant the contractual right to interest with the rate specified by 28 U.S.C. § 1961(a), one would expect that intention to be plainly expressed.  But no such expression exists.").  The EFIH Debtors point to no countervailing Bankruptcy Code language.

47.    All other indications of Congressional intent point in the same direction. Lawrence P. King, the respected bankruptcy law expert and consultant to the Commission of the Bankruptcy Laws of the United States (which led to the Bankruptcy Code), explained that Congress intended Section 1129(b) to carry forward the chapter X standards for fairness and

29

equitability and continue the "absolute priority rule" as it was widely understood and applied pre-Code:

> Most probably, if the drafters of the Code had intended to modify the absolute priority rule as it had developed prior to the adoption of the Code and to change the general rule requiring payment of postpetition interest in full at the contract rate before permitting participation by the debtor or by shareholder interests in the debtor, they would have said so explicitly.  Such modification constitutes a significant change from the prior law that would have warranted some explicit commentary in the committee report.  The omission of any such explicit discussion is further evidence that this drastic departure from clearly established precedent was not intended.

Fortgang & King, *The 1978 Bankruptcy Code: Some Wrong Policy Decisions*, 56 N.Y.U. L. REV. 1148, at 1160 (1981); *see also Dow III*, 456 F.3d at 678 (quoting Code's legislative history). Accordingly, given the absence of any indication in the Bankruptcy Code or the legislative history of an intent to modify the pre-Code practice of permitting unsecured creditors of a solvent estate to recover postpetition interest at their contract rate, the Trustee submits that this Court must respect the pre-Code precedent.

48.     In sum, failure to satisfy the claim of the PIK Noteholders in full, including postpetition interest at the contract rate, before allowing holders of EFIH equity to retain their equity violates the absolute priority rule and fails to satisfy the Fair and Equitable Test.

## IV.     *WASHINGTON MUTUAL* IS NOT APPLICABLE AND SHOULD NOT BE FOLLOWED

49.     The EFIH Debtors rely on *Washington Mutual* and a handful of other cases to support their argument that the PIK Noteholders are entitled to no more than the Federal Judgment Rate under any circumstances.  But those cases stand (even if correctly decided), at most, for the limited proposition that the "legal rate" under Section 726(a)(5) means the Federal

Judgment Rate.[16]  Here, however, in light of the operation of other provisions of chapter 11 discussed above, Section 726(a)(5) does not govern, nor is relevant to, this Court's analysis. *Washington Mutual,* which arises under materially different circumstances, does not even cite Section 1124(1) or 1129(b), and the few other cases cited in the Objection are also readily distinguishable.  The EFIH Debtors' mistaken reliance on these cases overlooks one simple but crucial fact: those courts were not confronted with, nor did they address, unimpairment or the Fair and Equitable Test.

50.     *Washington Mutual* is easily distinguished from the case at hand.  The debtor in *Washington Mutual* was a publicly held bank holding company that filed for chapter 11 following massive customer withdrawals in September 2008 and the seizure of its banking operations by federal regulators.  The ensuing chapter 11 case focused on monetizing remaining assets, resolving complex litigation and other disputes, and negotiating a chapter 11 plan centered around a liquidating trust with the various stakeholders in the debtor's highly complex capital structure.  As described below, the facts here differ markedly.

51.     <u>First</u>, *Washington Mutual* involved a chapter 11 plan centered on a liquidating trust.  Unlike the instant case where the parent company of the EFIH Debtors is retaining its equity interests in EFIH, there was no business to reorganize in *Washington Mutual* (with the exception of a small reinsurance business owned by the debtors).  Rather, the case was focused on negotiating a plan, premised on a liquidating trust, under which billions of dollars of cash and litigation rights would be allocated to creditors, preferred stock holders, and common stock holders who all suffered injury due to the bank run and subsequent seizure of the debtor's banking operations.  Given the liquidation of the majority of the debtors' assets, it is hardly

---

[16]     As discussed below in section V, the Trustee submits that the correct interpretation of the "legal rate" in this case is the contract rate, not the Federal Judgment Rate.

surprising that the Court was inclined, in determining the appropriate postpetition rate, to balance

the equities by applying the Federal Judgment Rate to all unsecured creditors.

52.    Second, it is important to recognize that the *Washington Mutual* decision was

predicated upon a Best Interests Test objection lodged by impaired equity interest holders who

complained that payment of contract rate interest to unsecured creditors violated Section

726(a)(5) because the equity interest holders were receiving less than they would have received

in a chapter 7 liquidation.  *See In re Washington Mut. Inc.,* 461 B.R. 200, 241 (Bankr. D. Del.

2011) (analyzing the objections based on Section 1129(a)(7) which "requires that a plan of

reorganization provide non-consenting impaired creditors (and shareholders) with at least as

much as they would receive if the debtor was liquidating in chapter 7.").  Here, under the Plan on

file, the Best Interests Test does not apply due to the lack of impaired classes of claims or

interests at EFIH.  It is also notable that in *Washington Mutual* Judge Walrath was *not* asked to

address the postpetition interest rate issue in connection with a Fair and Equitable Test objection

raised by the senior unsecured creditors.  In fact, there was no basis to analyze the Fair and

Equitable Test since the unsecured creditors had supported and accepted the plan (which

proposed to pay their claims at the contract rate of interest).  *Id.* at 212-13.  Therefore, the

debtors were not required to cramdown the unsecured classes.[17]

53.    Third, Judge Walrath clearly considered the equities of the case before reaching

her conclusion that the Federal Judgment Rate was the appropriate rate to apply under Section

726(a)(5).  *In re Washington Mut. Inc.*, 461 B.R. at 242.  In fact, Judge Walrath delayed making

a determination on the appropriate rate of postpetition interest because "the Court believed it

---

[17]    After the *Washington Mutual* decision, those same unsecured creditors supported and accepted the debtors' next proposed plan, which proposed to pay their claims at the Federal Judgment Rate.  The *Washington Mutual* court thus never had occasion to address the rate of postpetition interest in connection with an analysis of the Fair and Equitable Test.

needed more time to consider the equities of the case." *Id.* at 242. After "all the issues had been presented to the Court," the Court determined that the equities were no longer relevant, it no longer had discretion with respect to selecting a rate under Section 726(a)(5), and that the Federal Judgment Rate was the appropriate rate to be applied under Section 726(a)(5) as a matter of law. *Id.* This ruling was unnecessary, however, because Judge Walrath went out of her way to hold that even if consideration of the equities were required, she ***still*** would have used the Federal Judgment Rate rather than the contract rate. The Court explicitly referenced the alleged bad acts of the creditors seeking postpetition interest at the contract rate as a reason for only allowing postpetition interest at the Federal Judgment Rate. *Id.* at 243-44 (noting the unsecured creditors' alleged insider trading and domination of the settlement process, and stating that "after considering the evidence in this case, the Court does not find that the equities support the use of anything other than the federal judgment rate"). Plain and simple, the Court was not going to penalize equity holders by awarding contract rate interest to creditors that the Court believed had behaved inequitably during the chapter 11 case.

54.     Here, by contrast, the PIK Noteholders, and particularly the ad hoc group of PIK Noteholders (the "Ad Hoc Group"), have benefitted the estates in connection with their participation in the original restructuring support agreement. As a party to the original restructuring support agreement, the Ad Hoc Group's support for the Debtors' restructuring allowed the Debtors to file these cases in an orderly fashion rather than be forced into a freefall. The Debtors have conceded that the Ad Hoc Group, as the proposed providers of second-lien debtor-in-possession financing, provided the impetus for other parties to submit to the Debtors' competing financing proposals and led to the Debtors' conclusion that a different process would maximize value for the Debtors' estates. *See* Disclosure Statement at 75. In addition, entry into

the original restructuring support agreement facilitated not just an orderly chapter 11 filing but also garnered support, and court approval of, the EFIH First Lien DIP. The Debtors sought to repay the EFIH First Lien Notes and the EFIH Second Lien Notes using the lower-cost EFIH First Lien DIP Facility, resulting in significant savings for the Debtors' estates. *Id.* at 73. Thus, unlike in *Washington Mutual*, in evaluating the actions of the PIK Noteholders, the equities weigh strongly in favor of awarding the PIK Noteholders postpetition interest at the contract rate.

55. The other cases cited by the EFIH Debtors—for the limited proposition that a majority of courts have found that "legal rate" under Section 726(a)(5) means the Federal Judgment Rate—are similarly inapt. S*ee* Objection at 17. The court in *In re Fast* (an individual chapter 7 case) actually awarded unsecured creditors postpetition interest at the contract rate and thus (if anything) supports the Trustee's position. *See In re Fast,* 318 B.R. at 192. The courts in *Cardelucci* and *431 Ponce de Leon* recognize that courts are split on this issue. *See In re Cardelucci*, 285 F.3d 1231, 1234 (9th Cir. 2002); *In re 431 Ponce de Leon, LLC*, 515 B.R. 660, 675 (Bankr. N.D. Ga. Aug. 11, 2014).

56. More importantly, like the court in *Washington Mutual*, the Ninth Circuit in *Cardelucci* had no occasion to cite, let alone analyze, the effect of the other chapter 11 provisions relevant here. *Cardelucci* involved an unsecured creditor that had a prepetition claim against the debtor resulting from a state court judgment; no contract was at issue. The parties agreed that the creditor was entitled to postpetition interest, and after the bankruptcy court's ruling, the creditor withdrew its confirmation objection while reserving the right to appeal the determination of the "legal rate" under Section 726(a)(5). *See In re Cardelucci*, 285 F.3d at 1234. Accordingly, the narrow dispute on appeal was limited to "whether 'interest at the legal rate' means a rate fixed by federal statute or a rate determined either by the parties' contract rate

34

or state law." *Id.* at 1234.  That posture explains the decision's lack of any mention of any

provision of chapter 11, including Section 1129(b).

## V.    A FLEXIBLE APPROACH TO APPLYING THE PHRASE "LEGAL RATE" IS CONSISTENT WITH THE PLAIN MEANING OF THE STATUTE AND LEADS TO MORE EQUITABLE RESULTS

57.    Even if this Court finds that the definition of the "legal rate" as used in Section

726(a)(5) is outcome-determinative of the PIK Noteholders' entitlement to postpetition interest,

the Trustee submits that the correct application of the phrase "legal rate" in this case is to apply

the contract rate, not the Federal Judgment Rate.

### A.    *The Phrase "Legal Rate" Should Not Be Limited to the Federal Judgment Rate*

58.    The Bankruptcy Code does not define the "legal rate."  Admittedly, the phrase

"legal rate" lends itself to more than one reasonable interpretation.  *See Dow II*, 244 B.R. at 691

(inferring that Congress refrained from imposing "a hard-and-fast rule" with respect to

postpetition interest, and that it "may well be that postpetition contractual interest is a matter

which the Code leaves to the discretion of the courts … [as] "such flexibility was legislated into

the Code by the very fact that terms such as 'fair and equitable' resist precise definition."); *In re*

*Schoeneberg,* 156 B.R. at 969-71 (holding that the term "legal rate" under Section 726(a)(5) can

be interpreted to mean the contract interest rate or a federal or state judgment rate, and that

neither the text of Section 726, nor the legislative history, provide clear guidance); *see also In re*

*Carter*, 220 B.R. at 416-17 (holding that where there is a solvent debtor, the contract rate should

be applied for postpetition interest, but when there is no such surplus, it is possible that the

Federal Judgment Rate would apply, and citing examples).

59.    A broader examination of the U.S. Code, however, counsels in favor of an

interpretation other than the Federal Judgment Rate.  Congress's express inclusion of references

to the Federal Judgment Rate in other parts of the U.S. Code and ***exclusion of that same language in the Bankruptcy Code*** should be given meaning.  *Cf. Rosello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation omitted).   For example, Congress expressly referenced the Federal Judgment Rate in the following statutes:[18]

- 15 U.S.C. § 4303(a):  "[A]ny person who is entitled to recovery on a claim under such section shall recover the actual damages sustained by such person, ***interest at the rate specified in section 1961 of Title 28*** on such actual damages . . . ."

- 15 U.S.C. § 4303(b):  "[A]ny State that is entitled to monetary relief on a claim under such section shall recover the total damage sustained as described in subsection (a)(1) of such section, ***interest calculated at the rate specified in section 1961 of Title 28*** on such total damage."

- 15 U.S.C. § 4303(c):  "[A]ny person who is entitled to recovery on a claim under such provision shall not recover in excess of the actual damages sustained by such person, ***interest calculated at the rate specified in section 1961 of Title 28*** on such actual damages . . . ."

- 21 U.S.C. § 844a(h):  The Attorney General may institute a civil action to recover "the amount assessed and an amount representing ***interest at a rate computed in accordance with section 1961 of Title 28***."

- 22 U.S.C. § 6082(a)(1)(B):  With respect to the amount of civil liability for trafficking in confiscated property claimed by U.S. nationals, "***Interest under subparagraph (A)(i) shall be at the rate set forth in section 1961 of Title 28*** . . . ."

- 28 U.S.C. § 2412(f):  "[I]nterest shall be paid on the amount of the award as affirmed.  ***Such interest shall be computed at the rate determined under section 1961(a) of this title*** . . . ."

- 28 U.S.C.A. § 2465(b)(1)(B):  "Except as provided in paragraph (2), in any civil proceeding to forfeit property under any provision of Federal law in which the claimant substantially prevails, the United States shall be liable for- . . . ***post-judgment interest, as set forth in section 1961 of this title***."

---

[18]  Emphasis added in each of the following citations.

60.    Moreover, Congress has used the term "legal rate" in numerous places in the U.S. Code to mean something *other than* the Federal Judgment Rate.  Specifically, Congress has used the "legal rate" of interest in the U.S. Code as follows:

- 15 U.S.C. § 636(4)(A):  "[T]he maximum *legal rate of interest* on any financing made on a deferred basis pursuant to this subsection . . . ."  In this section, "legal rate" means "a rate [up to a maximum] prescribed by the Administration."

- 15 U.S.C. § 697(c)(2):  "[T]he maximum *legal rate of interest* on any commercial loan which funds any portion of the cost of the project financed pursuant to this section . . . ."  In this section, the "legal rate" means "a rate which is established by the Administrator of the Small Business Administration."

- 22 U.S.C. § 2151t(b):  Interest shall be no "higher than the applicable *legal rate of interest* of the country in which the loan is made."  In this section, the "legal rate" is a rate to be determined by a foreign country.

- 26 U.S.C. § 501(c)(16) and 26 U.S.C. § 521(b)(2):  Tax exemption will not be denied if dividend rate does not "exceed the *legal rate of interest* in the State of incorporation or 8 percent per annum, whichever is greater . . . ."  In these sections, the "legal rate" is a rate determined by state law.

61.    Finally, Congress has *never* used the phrase "legal rate" to mean the Federal Judgment Rate.  Any attempt to force such meaning, and only such meaning, on the phrase now lacks any support in Congressional practice or history.  In fact, when Congress enacted the Bankruptcy Code, it could not have intended "legal rate" to mean the Federal Judgment Rate because no uniform Federal Judgment Rate existed.  *See Northrop Corp. v. Triad Int'l Mktg., S.A.*, 842 F.2d 1154, 1156 (9th Cir. 1988).  Therefore, at the time that Congress drafted Section 726(a)(5), the "legal rate" necessarily meant either a state statutory rate or the applicable contract rate.  Following the enactment of the Bankruptcy Code, "the majority of cases follow[ed] a state law approach by providing that when a creditor seeks interest on a claim, the bankruptcy courts apply the [credit] agreement's interest rate."  *In re Carter*, 220 B.R. at 415.

### B.    *In This Case, The Legal Rate Should Mean the Contract Rate*

62.    The determination of some other courts to limit the "legal rate" under Section 726(a) to the Federal Judgment Rate does not apply in the context of these chapter 11 cases. Those courts have concluded that such an interpretation is appropriate in light of:  (i) the administrative efficiency of applying a single rate of interest to all creditors; (ii) divergent interest rates amongst unsecured creditors; and (iii) fairness amongst similarly situated unsecured creditors.  *See, e.g., Cardelucci*, 285 F.3d at 1235-36 (considering these factors); *In re Washington Mutual, Inc.*, 461 B.R. at 243 (noting that the use of the federal judgment promotes "fairness among creditors and administrative efficiency. . .") (internal citations omitted).  None of those considerations supports the application of the Federal Judgment Rate in these cases. Moreover, applying the Federal Judgment Rate here would be inequitable under the circumstances and contrary to the absolute priority rule.

### 1.    There is No Administrative Convenience Created by Using the Federal Judgment Rate and There Exists No Risk of Disparate Treatment Among EFIH Unsecured Creditors

63.    Relying solely upon principles of judicial efficiency and administrative convenience to conclude that the Federal Judgment Rate should apply will lead to inequitable results.  As recognized by the bankruptcy court in *Dow II* and other courts, there is a price to pay for administrative simplicity – the disregard of a creditor's validly bargained-for rights in a scenario where the estate is able to pay prepetition claims in full.  *See Dow II*, 244 B.R. at 685; s*ee also In re Fast*, 318 B.R. at 191-92 (awarding interest at the contract rate and noting that while "matters such as administrative efficiency and convenience must factor into resolution of the issue of the 'legal rate' of interest . . . the Court must also consider and balance the equities in determining that rate of interest"); *In re Carter*, 220 B.R. at 416-17 (overruling an objection to a settlement that awarded postpetition interest at the contract rate and distinguishing cases

38

applying the Federal Judgment Rate in favor of a uniform and efficient solution by noting that those cases had overlooked the underlying policy of the Bankruptcy Code).  Moreover, upon information and belief, because the EFIH Debtors' unsecured creditor population, classified in Class B6 under the Plan, consists of the holders of EFIH Unsecured Notes only, applying the contract rate does not create a risk of disparate treatment.  Rather, all of the creditors in Class B6 should receive their contractual rate of postposition interest, and there will be no unfairness amongst the EFIH Debtors' unsecured creditors.[19]

> **2.     Applying the Federal Judgment Rate Would Deny the PIK Noteholders Their Bargained For Contract Rights and Would Violate the Absolute Priority Rule**

64.     The equities do not support a finding that the Federal Judgment Rate should apply in instances in which there are bargained for contractual rights.  Numerous courts, even in chapter 7 liquidations, have rejected the argument that the term the "legal rate" always and only means the Federal Judgment Rate.  Those courts have held that equitable and/or policy considerations justify the payment of postpetition interest at the bargained-for contract rate.  *See, e.g., In re Fast*, 318 B.R. at 192; *In re Beck*, 128 B.R. 571, 573 (Bankr. E.D. Okla. 1991) (balancing the equities in a chapter 7 case and awarding contract rate of interest where estate was solvent and where equities "overwhelmingly tilted toward restoring the creditor" to its position absent the bankruptcy proceeding); *In re A&L Props*., 96 B.R. 287, 289-90 (C.D. Cal. 1988) (holding in a chapter 7 case that policy considerations require that where a debtor's estate is solvent, a creditor is entitled to postpetition interest at the contract rate); *see also Dow III*, 456 F.3d at 679 (affirming district court's award of postpetition interest at the contract rate and, in

---

[19]    Class B6 General Unsecured Claims Against the EFIH Debtors also includes the EFIH Unexchanged Notes.  If this Court determines that the PIK Noteholders are entitled to postpetition interest at the contract rate, the holders of the EFIH Unexchanged Notes should also receive postpetition interest at the rate provided for under the applicable indenture.

considering whether a plan is fair and equitable, holding that "absent compelling equitable considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights"); *In re Carter*, 220 B.R. at 417 (holding, in an individual chapter 11 case, that the underlying policy of the Bankruptcy Code is to avoid producing a windfall for a debtor and requiring a solvent estate to pay interest at the contract rate); *In re Schoeneberg*, 156 B.R. at 972 (looking to equitable principles in an individual chapter 11 case and holding that when the estate is solvent, postpetition interest should be paid at the contract rate).

65.     No equitable considerations in this case permit the Court to curtail the valid contractual rights of the PIK Noteholders.  The most important term of any agreement to extend credit, whether it by bond indenture, purchase order, statute or extension of trade credit, is the interest rate charged to the borrower or customer for the extension of such credit.  Contractually bargained-for interest rates must be respected by the bankruptcy court where a debtor estate is reorganizing and able to pay its creditors in full.

66.     Further, as discussed above, interpreting the "legal rate" to mean the Federal Judgment Rate and allowing EFH to retain its interests in EFIH under the Plan while the PIK Noteholders receive less than the contract amounts violates the absolute priority rule.  Where, as here, a debtor is reorganizing, is able to pay its claims in full, and equity is retaining its interests in the debtor, the Court's role is to enforce and protect the creditor's contractually bargained-for rights before any amounts are returned to equity.  *See Dow III*, 456 F.3d at 679.

## VI.     RESERVATION OF RIGHTS

67.     Notwithstanding anything to the foregoing herein, the Trustee reserves the right to object to confirmation of the Plan on all grounds.  Further, to the extent that the EFIH Debtors raise arguments in their reply to this Response that were not raised in the Objection, the Trustee reserves all rights to seek leave from the Court to file a sur-reply to address these new issues.

## CONCLUSION

**WHEREFORE**, for the reasons set forth in this Response, the Trustee respectfully requests that the Court find that (a) if the Plan treats the PIK Noteholders as unimpaired, the PIK Noteholders are entitled to their full contractual rights, including payment of postpetition interest at the contract rate, (b) if the PIK Noteholders are deemed impaired under the current Plan, the PIK Noteholders must receive postpetition interest at the contract rate for the Plan to satisfy the Fair and Equitable Test, or (c) in the alternative, that the "legal rate" means the contract rate in this case.  The Trustee also requests such other and further relief as this Court deems just and proper.

Dated:  September 4, 2015
Wilmington, Delaware

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira S. Dizengoff (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000

Scott L. Alberino (admitted *pro hac vice*)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000

By:   */s/ Raymond H. Lemisch*
**KLEHR HARRISON HARVEY BRANZBURG LLP**
Raymond H. Lemisch (DE Bar No. 4204)
919 Market Street, Suite 1000
Wilmington, DE 19801
Telephone: (302) 426-1189

**FOLEY & LARDNER LLP**
Harold L. Kaplan (admitted *pro hac vice*)
Mark F. Hebbeln (admitted *pro hac vice*)
Lars A. Peterson (admitted *pro hac vice*)
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone: (312) 832-4500

Barry G. Felder (admitted *pro hac vice*)
Jonathan H. Friedman (admitted *pro hac vice*)
90 Park Avenue
New York, NY 10016
Telephone: (212) 682-7474

*Co-Counsel for UMB BANK, N.A., as Trustee*