## EXHIBIT A

**Bench Ruling from *In re Loral Space & Communications Ltd.***

1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   - - - - - - - - - - - - - - - -x

5   In the Matter of

6        LORAL SPACE & COMMUNICATIONS      03-41710 (RDD)
         LTD., et al.,                     03-41709 to

7                                          03-41728

                         Debtors.

8   - - - - - - - - - - - - - - - -x

9                            July 25, 2005
                             3:00 p.m.

10

                             United States Custom House

11                           One Bowling Green
                             New York, New York 10004

12

13

14

                    CONFIDENTIAL TRANSCRIPT

15

16

17        BENCH RULING in the Matter of Loral Space &

18   Communications Ltd. and Space Systems/Loral, Inc.

19

20

21

22   B E F O R E:

23               HON. ROBERT D. DRAIN,

24                          U.S. Bankruptcy Judge.

25

```
 1
 2    A P P E A R A N C E S:
 3
 4
           WEIL GOTSHAL & MANGES LLP
 5
                  Attorneys for the Debtors
 6                767 Fifth Avenue
                  New York, New York 10153
 7
           BY:    STEPHEN KAROTKIN, ESQ.
 8                THEODORE E. TSEKERIDES, ESQ.,
                  SHAI Y. WAISMAN, ESQ.,
 9              BRUCE MEYER, ESQ.,
                  LORI R. FIFE, ESQ.
10
11
12         AKIN GUMP STRAUSS HAUER & FELD LLP
13                Attorneys for the Official
                  Committee of Unsecured Creditors
14                590 Madison Avenue
                  New York, New York 10022
15
           BY:    DANIEL M. GOLDEN, ESQ.,
16                DAVID H. BOTTER, ESQ.,
                ANDREW ROSSMAN, ESQ.
17                JOHN W. BERRY, ESQ.
18
19
           SONNENSCHEIN, NATH & ROSENTHAL, ESQS.
20
                Attorneys for the Official
21                Committee of Equity and Security
                  Note Holders
22                1221 Avenue of the Americas
                  New York, New York 10020
23
           BY:    JOHN A. BICKS, ESQ.,
24                PETER WOLFSON, ESQ.,
                  ARTHUR H. RUEGGOR, ESQ.
25
```

3

```
 1
 2   A P P E A R A N C E S  -  continued
 3
 4
         LOWENSTEIN SANDLER
 5
 6
         BY:  MICHAEL ETKIN, ESQ.
 7
 8
 9       CAROLYN S. SCHWARTZ
         UNITED STATES DEPARTMENT OF JUSTICE
10       OFFICE OF THE UNITED STATES TRUSTEE
                   33 Whitehall Street
11                 New York, New York 10004
12       BY:     PAMELA J. LUSTRIN, ESQ.,
                           of Counsel
13
14
15   A L S O   P R E S E N T:
16
     TONY CHRIST - Loral Stockholders Protective
17   Committee
18
19
20
21
22
23
24
25
```

1      **LORAL SPACE AND COMMUNICATIONS, LTD.**

2    P.R O C E E D I N G S:

3             THE COURT:  Please be seated.

4             All right.  First, in looking at the

5    audience, I assume there are people here who have

6    not signed a confidentiality agreement with Loral;

7    is that correct?

8             Because of that and because of the

9    fact that a small but important part of the record

10   was prepared under seal and a part of my ruling

11   relates to that part of the record, I'm going to go

12   a little bit out of order and give that part of my

13   ruling first.  So, therefore, those of you who are

14   not bound by a confidentiality agreement with Loral

15   should leave now.  That part of my ruling will only

16   last five or ten minutes, and then someone will

17   come back and get you for the bulk of my ruling.

18   So anyone who has not signed a confidentiality

19   agreement with Loral needs to leave the courtroom

20   now, and someone will come and get you.

21

22

23

24

25

5

1           CONFIDENTIAL

2                THE COURT:  All right, as I just

3   noted, I'm going to address two parts of my ruling

4   now somewhat out of order because of the need to

5   keep them confidential, for Loral's business

6   reasons and for the benefit of the estates, and

7   then go to the bulk of my opinion and call the

8   audience back.

9                As with all of my bench rulings, I

10  will review the transcript after it's prepared and

11  reserve the right and discretion to correct it for

12  errors, and my own errors, and make sure the

13  citations are correct.  The following constitutes a

14  part of my ruling on Loral's request for

15  confirmation of its fourth amended joint plan, as

16  well as the motion by the equity committee for

17  leave to pursue fraudulent transfer litigation in

18  respect of the Orion notes or, more properly, the

19  guarantee of those notes issued by Ltd.

    PAGE 5 LINE 20 THROUGH PAGE 19 LINE 21

    ARE FILED UNDER SEAL

    PER JUDGE DRAIN'S ORDER AT THE HEARING

22               Okay, could someone let the folks

23  in?  And that ends the sealed portion of the

24  transcript.

25

1        **LORAL SPACE AND COMMUNICATIONS, LTD.**

2                    THE COURT:  All right.  Let me

3    continue with my ruling on the request by Ltd. and

4    its subsidiary debtors for confirmation of their

5    joint Chapter 11 plan.

6                    Based on my review of the plan and

7    disclosure statement, several days of testimony,

8    the briefs, and the exhibits, I find that the

9    debtors have satisfied the requirements of Sections

10   1129(a) and (b) of the Bankruptcy Code, and that

11   the plan should and will be confirmed.

12                   I will discuss primarily those

13   sections or elements of Sections 1129(a) and (b) as

14   to which objections were raised, but I should note,

15   before I get to those objections, that Loral has

16   satisfied all of its burdens under 1129(a),

17   including in respect of feasibility under

18   Bankruptcy Code Section 1129(a)(11) and best

19   interests under Bankruptcy Code 1129(a)(7), which

20   were not objected to.

21                   The primary objections to the plan

22   go to the plan's proposed cramdown of the preferred

23   and common shareholder classes, who would receive

24   no recovery under the plan.  In addition, there is

25   an objection as to whether the plan is in good

 1          LORAL SPACE AND COMMUNICATIONS, LTD.

 2    faith, as required under Section 1129(a)(3) of the

 3    Bankruptcy Code.

 4              Let me address the cramdown

 5    objections first.  They hinge obviously on the

 6    assertion that Ltd., the parent and issuer of the

 7    preferred and common stock, is solvent, and that

 8    therefore the unsecured creditors of Ltd., and

 9    potentially creditors of the subsidiary debtors, as

10    well, are receiving more than full recovery on

11    their claims under the plan and thus that the plan

12    improperly deprives the shareholders of their

13    rightful recovery.

14              I conclude, based on my review of

15    the expert reports and testimony of the three

16    investment banking firms retained in the case, as

17    well as the testimony of Mr. Schwartz and the

18    arguments and exhibits raised and introduced by the

19    informal Loral Stockholders Protective Committee,

20    or "LSPC," that in fact Ltd. is insolvent.  Let me

21    summarize those findings first, and then I will go

22    into some detail as to my reasons for them.

23              I base my conclusion primarily upon

24    my review of the analyses done by the three

25    experts: Greenhill, Jeffries and Chanin, retained

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2  respectively by the debtors, the creditors'

3  committee, and the official equity committee.

4  Those experts employed traditional and well

5  recognized methodologies for valuing companies of

6  this kind.  Each expert considered a going concern

7  valuation of Ltd. based on its two core business

8  segments, as well as other miscellaneous assets.

9  Each expert considered whether to apply a

10  discounted cash flow method, a comparable

11  transaction method, and a comparable companies

12  method, in placing a value on those assets together

13  as a going concern.  The first segment, if you

14  will, of Ltd.'s value is SS/L.  There, as a

15  midpoint, minus the EBITDA attributable to its

16  projection for government contracts, Chanin came to

17  a value of approximately $275 million, Jeffries

18  came to a value of approximately $202 million, and

19  Greenhill came to a value of approximately $97

20  million.

21          In considering what would be a

22  proper valuation of SS/L, I, of course, noted the

23  large difference between Greenhill and the other

24  two experts.  That difference is largely

25  attributable to Greenhill's method for ascertaining

```
 1              LORAL SPACE AND COMMUNICATIONS, LTD.
 2    the terminal value on a DCF basis of SS/L.  Unlike
 3    the other two investment bankers, Mr. Robins of
 4    Greenhill applied a perpetual growth methodology to
 5    determine that terminal value.  The equity
 6    committee pointed out potential flaws with that
 7    choice, including its assertion that the percentage
 8    of 1 to 3 percent applied by Greenhill in that
 9    methodology was too low.  Frankly, I don't accept
10    that it was too low as a matter of gauging
11    inflation, given the last 25 years or so of
12    inflation trends introduced into evidence.
13    However, I did, in the end, rule out the Greenhill
14    valuation for SS/L, because, to me, it appeared to
15    be simply too low in comparison to the liquidation
16    value of the company, and everyone's desire in this
17    case is to keep SS/L in business.
18                     Instead I focused on the valuations
19    of SS/L prepared by Chanin and Jeffries.  And
20    basically on my review of those two valuations and
21    the differences between them, I determined that a
22    reasonable value for SS/L was 230 million dollars.
23    The main difference between Chanin's and Jeffries'
24    valuation of SS/L stemmed from the fact that
25    Chanin, like Greenhill, weighted it's valuation one
```

1           LORAL SPACE AND COMMUNICATIONS, LTD.

2   hundred percent on the discounted cash flow

3   methodology, whereas, Jeffries gave 30 percent of

4   its weighting to a comparable companies

5   methodology. All of the investment bankers, by the

6   way, determined that there were no relevant

7   comparable transactions upon which to do a

8   valuation of SS/L, except for one that was somewhat

9   dated and for which information was not

10   particularly reliable, the Hughes/Boeing

11   transaction.

12           Jeffries acknowledged that there was

13   no clear comparable company to SS/L; however, I

14   gave some weight to Mr. Derrough's testimony that

15   based upon, first, the similarities between Orbital

16   Sciences and SS/L, as well as his own and one of

17   his colleague's experience with Orbital Sciences,

18   its stock price could be used as a comparable

19   measure for determining SS/L's value. Particularly

20   since, according to Mr. Derrough, he gave SS/L a

21   better multiple, notwithstanding Orbital Sciences'

22   more steady, or regular, government business as its

23   main source of revenue. I also discounted Chanin's

24   evaluation of SS/L because so much of the value, in

25   fact all of the value for the company, was placed

1           LORAL SPACE AND COMMUNICATIONS, LTD.

2      on the final projected year, 2008, to determine the

3      DCF terminal value.  While I accept that the

4      projections underlying the current going concern

5      valuations of the debtors are reasonable, I note

6      that it is only in that last year that there is

7      positive EBITDA for SS/L.  And given the

8      uncertainties of the contracts in this business

9      and, for want of a better word, the lumpiness of

10     its cash flow projections given the nature of that

11     business in which very substantial contracts

12     require very substantial outlays of expense, I

13     thought that the Chanin midpoint valuation should

14     be discounted accordingly.

15           The second segment, if you will, of

16     Ltd. for valuation purposes is the FSS business.

17     There, the three investment bankers' valuations

18     were much more comparable.  Each investment banker

19     recognized that each of the three traditional

20     valuation methodologies could be applied.  That is,

21     there were comparable transactions as well as

22     comparable companies with which to measure FSS's

23     value, and, therefore, those two methodologies

24     could be added to a DCF valuation.  The mid ranges

25     on FSS for Chanin, Greenhill and Jeffries were

```
 1              LORAL SPACE AND COMMUNICATIONS, LTD.
 2    $470.6 million, $392 million, and $442.3 million
 3    respectively.  The main difference among the
 4    investment bankers with regard to their valuations
 5    was the weighting of the three methodologies.
 6    Chanin placed considerably more weight on the DCF
 7    valuation, weighting the other two at 20 percent
 8    each, with a DCF weighting 60 percent.  Greenhill's
 9    valuation weighted each of the three methodologies
10    equally, and Jeffries had a slight preference for
11    the DCF valuation, going 30, 30 and 40 percent,
12    with 40 percent being accorded to its DCF
13    methodology.
14              I chose a valuation for FSS of $440
15    million, which is slightly over the average of all
16    three.  It seemed to me that this was justified for
17    a couple of reasons.  First, I did not accept
18    Chanin's giving 60 percent of the weight to DCF,
19    which it did, according to Mr. Belinsky, to reflect
20    the growth in the business that is being projected.
21    It seemed to me that this was somewhat skewing the
22    value toward a more risky valuation.  I did this
23    also noting that Chanin nevertheless had a somewhat
24    higher EBITDA multiple for its DCF valuation than
25    either of the other two bankers.
```

1        LORAL SPACE AND COMMUNICATIONS, LTD.

2               There are two other elements of the

3    valuation.  The first is a projection of available

4    cash at confirmation, and here there was roughly a

5    70 million dollar swing between the experts.  That

6    was largely attributable to the view of Mr.

7    Derrough and his colleagues at Jeffries that, given

8    the nature of SS/L's business and its cash needs,

9    it would need to retain a hundred million as

10   opposed to 50 million dollars of cash to be

11   comfortable about conducting that business.  Chanin

12   projected $180 million of cash for SS/L and FSS and

13   other sources being available for creditors,

14   Jeffries $117 million, and Greenhill $190.35

15   million.  I saw some merit in Jeffries' argument

16   about SS/L's cash needs, particularly given the

17   testimony about the lumpiness of SS/L's cash flow,

18   and therefore I chose an exit cash figure of 150

19   million dollars.

20               The parties dropped into a basket

21   labeled "other assets" three main assets that they

22   ascribed -- or some of them ascribed -- value to:

23   Loral's interest in XTAR, unused orbital slots, and

24   SS/L's and other debtors' interests in real estate,

25   but primarily, if not exclusively, SS/L's

1   LORAL SPACE AND COMMUNICATIONS, LTD.

2   headquarters in Palo Alto, California.  The spread

3   between the experts here was fairly large.  Chanin

4   projected $217 million dollars of value in the

5   other assets category, Jeffries $114 million, and

6   Greenhill $143 million.  The main differences were

7   primarily in respect of unused orbital slots, which

8   Chanin valued at a midpoint range of $50 million

9   dollars, as compared to Jeffries' $5 million, and

10  Greenhill's $13 million.

11          Frankly, based upon Loral's past

12  history of being unable to sell unused orbital

13  slots alone, as opposed to in connection with a

14  satellite order, I was originally prepared to put

15  zero dollars weight on this asset.  However,

16  Greenhill itself gives some value to them, and Mr.

17  Christ introduced some basis for ascribing value to

18  them, although indirectly connected to related

19  satellite orders.  I ascribed therefore 10 million

20  dollars value to them in the end.

21          As to the XTAR interest, the spread

22  is between $152 million, as valued by Chanin at its

23  mid point, $108 million by Jeffries, and $130

24  million by Greenhill.  The main difference with

25  respect to the experts' valuation of this asset is

29

1              LORAL SPACE AND COMMUNICATIONS, LTD.

2     the percentage that they applied to the weighted

3     average cost of capital used in their DCF

4     valuation.  Jeffries' low valuation of $108 million

5     was attributable to a relatively high WACC, which

6     is attributable, in turn, to its view that XTAR

7     would likely be financed only through equity

8     financing, and is still a risky and uncertain

9     investment that has not fulfilled yet, or even come

10    close to, its projections or potential occupancy.

11    On the other hand Chanin chooses a WACC that treats

12    it much more like any other proven satellite asset

13    of FSS and financeable with debt.  Greenhill is

14    closer to Chanin, but in the middle.

15              There was no particular reason given

16    for Chanin's confidence in the XTAR asset, and its

17    criticism of Jeffries was misplaced, in that it

18    does appear that Jeffries revised its valuation

19    upwards once XTAR went into service.  In light of,

20    however, the aggressiveness of Jeffries' discount,

21    I took Greenhill's DCF number and added to it a

22    little bit, but not much, and came up with a total

23    value of $135 million.  Therefore, for the other

24    assets generally, I ascribed a value of 150

25    million.  This leads to a total enterprise value of

30

LORAL SPACE AND COMMUNICATIONS, LTD.

970 million dollars for Ltd. as a going concern.

I've given an explanation of how I
got to most of those numbers, but let me add a
little bit more on points raised by the LSPC.  It
points out that Mr. Schwartz, and the LSPC are in
agreement about one thing, which is the value of
SS/L.  In October of 2003, when the parties and the
court were focused almost exclusively on the
proposed sale of Loral Skynet, or Loral's North
American satellites, to Intelsat, Mr. Schwartz did
his own not much more than back of the envelope
valuation of the assets that would survive the
Intelsat transaction.  He subsequently testified
that his valuation of SS/L, then and now, is
driven, in his mind, by a different methodology
than any of the three investment banker experts
recognized, which is by simply multiplying SS/L's
revenue by a factor of one.  And when pressed by
Mr. Christ, Mr. Schwartz acknowledged that he still
believes that SS/L could or should be worth roughly
one times revenue or something close to 450 to 500
million dollars.

By the way, Mr. Schwartz's back of
the envelope pro forma valuation of Loral after the

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2    Intelsat sale was approximately 1.48 billion

3    dollars and included the type of valuation of SS/L

4    that I just discussed.  Mr. Robins, on behalf of

5    Greenhill, pointed out that he disagreed with Mr.

6    Schwartz's revenue multiple valuation approach for

7    SS/L, noting in particular that such an approach

8    doesn't make a lot of sense for SS/L, especially

9    with its lumpy revenue projections, which are

10   driven by the type of project cash flow that it

11   tends to experience in connection with its

12   business.  Mr. Schwartz acknowledges his difference

13   with the experts, and also acknowledges that, but

14   for the Boeing-Hughes transaction, there are really

15   no meaningful transaction comparables.  Mr. Robins

16   also pointed out that there are or have been

17   significant changes in Loral since October of 2003.

18   Many of those would appear to be for the better;

19   however, in October of 2003, he testified FSS's

20   projected EBITDA was considerably higher than it is

21   now, SS/L's projected revenue was higher, and there

22   was a projection of a hundred million dollars value

23   for SatMex, which is currently in a bankruptcy case

24   here as well as in Mexico.  But more importantly, I

25   conclude that Mr. Schwartz's valuation, which the

32

1    **LORAL SPACE AND COMMUNICATIONS, LTD.**

2    LSPC has adopted, may be a legitimate valuation by

3    a businessman who has, throughout his career, taken

4    risks both for the good and the bad, but is not a

5    reliable measure of valuation for purposes of the

6    Section 1129(b) valuation that I must conduct.

7              The Federal Rules of Evidence permit

8    a lay person to give an opinion as to value when he

9    is the owner of the property, but instructs the

10   judge to give that valuation whatever weight he or

11   she thinks is appropriate.  In this case, I relied

12   on the three experts for each of the contending

13   parties over Mr. Schwartz's valuation.

14              I also should address briefly the

15   so-called expert report prepared in draft form by

16   Jeffries in October of 2003, which was not used as

17   a basis for expert testimony in connection with the

18   Intelsat hearing or for any other expert testimony.

19   And according to Mr. Derrough's testimony, it was

20   not based on any sort of valuation conducted in any

21   meaningful way of the non-Intelsat assets.  I

22   accept Mr. Derrough's testimony, which included a

23   fairly credible reference to his learning at the

24   time, or shortly thereafter, of real concerns about

25   SS/L's future, which, fortunately, since then have

1            LORAL SPACE AND COMMUNICATIONS, LTD.

2 been alleviated as a result of, among other things,

3 the new satellite orders that I referred to

4 earlier. That testimony leads me to accept Mr.

5 Derrough's assertion that this draft report was not

6 a real valuation of a the non-Skynet assets or one

7 that I should rely on.

8                   I have not discussed yet my reason

9 for placing a low valuation on Loral's real estate,

10 which again, is primarily SS/L's Palo Alto

11 headquarters. While it may be the case that that

12 real estate is worth a considerable amount of money

13 on a liquidation basis, I don't see much of a

14 prospect of realizing any value from it as long as

15 SS/L remains an ongoing business. And as I said

16 earlier, I believe that my valuation of SS/L is

17 driven primarily by that assumption. I ascribed a

18 5 million dollar value to the real estate. And

19 frankly, even that I believe was generous, because

20 it was based solely on an assertion by Mr. Belinsky

21 that he had talked with a leveraged-leasing expert

22 who argued that a sale/leaseback of the real estate

23 was feasible, although I saw no real underpinnings

24 of that analysis. Chanin's midpoint for the real

25 estate was $15 million; the other experts ascribed

BENJAMIN REPORTING (212)374-1138   DOYLE REPORTING (212)867-8220
A VERITEXT COMPANY

34

1        **LORAL SPACE AND COMMUNICATIONS, LTD.**

2    no value to it. And again, that valuation is on a

3    going concern basis. As Mr. Dewitt very credibly

4    testified, SS/L could not move out of its

5    headquarters without seriously jeopardizing the

6    performance of ongoing contracts because of the

7    very special equipment that is maintained there.

8    In addition, it is obviously a preferred location

9    attractive to the very special and highly qualified

10   engineers and scientists and others that SS/L

11   employs in building satellites. One cannot assume

12   SS/L could maintain its business while selling and

13   moving its headquarters.

14              The equity committee and the LSPC

15   raised other sources of potential value without

16   ascribing any particular dollar amount to them.

17   These included patents and patent litigation,

18   potential new developments in technology, and

19   tangentially, potential new markets such as in

20   China and elsewhere. With regard to the patents, I

21   have already discussed that matter: Loral has not

22   been able to sell them, and although Chanin notes

23   that there has not been a formal investment banker

24   process for selling them, someone at Chanin also

25   noted that the one offer received, for roughly $300

35

                LORAL SPACE AND COMMUNICATIONS, LTD.

1

2    thousand was at arms length.  As far as the patent

3    litigation is concerned, it appears to be a long

4    shot to me, particularly given the nature of the

5    patents at issue.  But what I did not say generally

6    about the patents is that the uncontroverted

7    testimony appears to be that the patents are useful

8    only for Loral's technology and that its

9    competitors use their own developed designs and

10   patents, thus reducing the sale value of the

11   patents considerably.

12                As far as potential new technologies

13   and new markets are concerned, I believe that those

14   possibilities, not being concrete enough to be

15   projected at this time, are not properly in the

16   valuations, except as they may appear in a

17   comparable company or precedent transaction

18   valuation, and that, beyond that measure, I cannot

19   give any particular dollar value to them, noting

20   that the experts have not either.

21                Mr. Christ raised one final point

22   which deserved careful consideration.  It is that,

23   in his view of what SS/L's expenses should be and

24   what they could be, the projected expenses for SS/L

25   that underlie the business plan are too high, in

36

1                LORAL SPACE AND COMMUNICATIONS, LTD.

2    his view, by approximately 20 million dollars.

3    Obviously if that were the case, the valuation of

4    SS/L would increase considerably, because that 20

5    million dollars would go right to increasing SS/L's

6    EBITDA, which serves as the primary basis for each

7    expert's DCF valuation of SS/L.  Mr. Dewitt

8    provided some corroboration of that view for SS/L's

9    expenses in his testimony, in which he, as SS/L's

10   president, said that in his view he thought SS/L's

11   SG&A expense was approximately 21 million dollars.

12   However, he acknowledged that that figure did not

13   include any corporate allocation to SS/L and was

14   not otherwise a complete figure.

15                I've reviewed Debtors' Exhibit 24,

16   including Bates-stamped pages 050276 and 050282,

17   and it does appear to me that there are additional

18   categories of expenses that would not be included

19   in Mr. Dewitt's 21 million dollar number.  I also

20   note that the roughly 43 million dollars of SS/L

21   expenses in the projection was vetted by Greenhill,

22   Jeffries and Chanin in their due diligence on the

23   debtors' business plan, and I find it unlikely that

24   those parties would have overlooked or obfuscated

25   such a conspicuous discrepancy.  Therefore I feel

1    LORAL SPACE AND COMMUNICATIONS, LTD.

2    constrained to accept that expense number as the

3    actual number that should be in the projections,

4    and, therefore, do not adjust the core valuation of

5    SS/L that I alluded to earlier.

6                Based on a 970 million dollar

7    enterprise value for Ltd., the debtors at the

8    parent company level are insolvent, whether one

9    applies a contract rate of interest or a Federal

10   judgement rate of interest to the unsecured claims.

11   Nevertheless, let me briefly address that issue,

12   because it has been addressed by the parties and is

13   one of the two additional factors that the equity

14   committee contends ultimately renders the debtors

15   insolvent.

16                Section 502(b)(2) of the Bankruptcy

17   Code disallows claims for unmatured interest.

18   Notwithstanding that fact, the courts have long

19   recognized that where a debtor is solvent, it is

20   inequitable and improper for shareholders to

21   recover before the debtors' unsecured creditors

22   receive postpetition interest.  To permit such a

23   recovery by shareholders would give them a windfall

24   at the expense of the unsecured creditors who have

25   had to wait through the course of the case to

38

| | |
|---|---|
| 1 | LORAL SPACE AND COMMUNICATIONS, LTD. |
| 2 | receive their distributions.  This "solvent debtor |
| 3 | rule" has two bases recognized by the courts.  The |
| 4 | first is in Section 726 of the Bankruptcy Code, |
| 5 | which flows through Section 1129(a)(7)'s best |
| 6 | interests test.  Section 726(a)(5) provides for |
| 7 | payment of postpetition interest at the "legal |
| 8 | rate" to unsecured creditors before recovery by the |
| 9 | debtor or its shareholders.  In addition, the |
| 10 | courts have long recognized the right of unsecured |
| 11 | creditors to receive postpetition interest under |
| 12 | the fair and equitable rule as part of the cramdown |
| 13 | standard.  The equity committee really does not |
| 14 | dispute that fact, but argues that, under the |
| 15 | circumstances as it's fair and equitable that |
| 16 | unsecured creditors receive postpetition interest |
| 17 | at the Federal judgment rate |
| 18 | of 1.1 percent rather than at their contract rate. |
| 19 | The fair and equitable basis for |
| 20 | postpetition interest goes back at least to the |
| 21 | Supreme Court's decision in Vanston Bondholders |
| 22 | Protective Committee versus Green at 329 U.S. 156 |
| 23 | (1946), although it reaches back to cases before |
| 24 | the turn of the century.  That basis was referred |
| 25 | to by Congress in the legislative history in |

BENJAMIN REPORTING   (212)374-1138    DOYLE REPORTING   (212)867-8220
A VERITEXT COMPANY

1             LORAL SPACE AND COMMUNICATIONS, LTD.
2    connection with its amendment of Section 1124(3) of
3    the Bankruptcy Code a few years ago, which further
4    confirmed a fair and equitable basis for the
5    solvent debtor rule.  See 140 Cong. Rec. H 10,768
6    (October 4, 1994) ("Specifically, courts have held
7    that where an estate is solvent, in order for a
8    plan to be fair and equitable, unsecured and under
9    secured creditors' claims must be paid in full,
10   including postpetition interest, before equity
11   holders may participate in any recovery.  See, e.g.
12   Consolidated Rock Products Co. v. Dubois, 312 U.S.
13   510, 527, 61 S.Ct. 675, 685 (1941);
14   Debentureholders Protective Committee of
15   Continental Inv. Corp., 679 F.2d 264 (1st Cir.),
16   cert. denied, 459 U.S. 894 (1982) and cases cited
17   therein").
18              In my view, given that fair and
19   equitable basis, and going back to the Vanston
20   Bondholders case, which expressly noted that "It is
21   manifest that the touchstone of each decision on
22   allowance of interest in bankruptcy, receivership
23   and reorganization has been a balance of equities
24   between creditor and creditor or between creditors
25   and the debtor," 329 U.S. at 165, the court has a

```
 1              LORAL SPACE AND COMMUNICATIONS, LTD.
 2     large amount of discretion in deciding what the
 3     appropriate rate of interest should be under a
 4     Chapter 11 plan for a solvent debtor.  This is
 5     confirmed by the more recent cases dealing with the
 6     issue.  When it decided the postpetition interest
 7     rate in a vacuum, as a declaratory judgement
 8     matter, in In re Dow-Corning Corporation 237 B.R.
 9     38 Bankruptcy Court Eastern District of Michigan,
10     1991, and considered only the right to postpetition
11     interest under 726(a)(5), the court applied the
12     Federal judgment rate.  However, later in that
13     case, when faced with a specific plan, both the
14     Bankruptcy Court and the District Court determined
15     that the contract rate was the appropriate rate of
16     interest.  See In re Dow-Corning Corporation 244
17     B.R. 678 Bankruptcy Court Eastern District of
18     Michigan 1999, as well as the District Court
19     opinion in a different aspect of the postpetition
20     interest litigation in that case, which declined to
21     apply the default rate, but made it clear that it
22     was comfortable with the plain contract rate, which
23     appears at 2004 US District Lexis 27989 Eastern
24     District of Michigan 2002.  Fairly recently Judge
25     Walrath in the In re Coram Healthcare Corporation
```

|     |
| --- |
| 1      **LORAL SPACE AND COMMUNICATIONS, LTD.** |
| 2    case at 315 B.R. 321, 346 Bankruptcy Court District |
| 3    of Delaware 2004 also confirmed this rule when she |
| 4    said, "we are not persuaded that Section 1129(b) |
| 5    requires the use of the Federal judgment rate for |
| 6    postpetition interest under a Chapter 11 plan of |
| 7    reorganization.  Instead we conclude that the |
| 8    specific facts of each case will determine what |
| 9    rate of interest is fair and equitable."  In that |
| 10   case the creditors, in her view, unduly delayed the |
| 11   case and otherwise engaged in conduct that she did |
| 12   not believe was appropriate and, therefore, she |
| 13   applied the lower rate.  See also In re Anderson |
| 14   Carter 220 B.R. 411 Bankruptcy District New Mexico, |
| 15   1998.  The highest level of contrary authority that |
| 16   I could find, In re Cardalucci 285 F3d 1231 Ninth |
| 17   Circuit 2002, relied exclusively on Section |
| 18   726(a)(5) and focused on intercreditor fairness, |
| 19   not creditor/shareholder issues, which again, is |
| 20   contrary to the basis for interest here, which is |
| 21   the fair and equitable rule.  So, therefore, I |
| 22   believe that if it were important, postpetition |
| 23   interest here should be awarded at the contract |
| 24   rate, the non-default contract rate.  I note, |
| 25   further, that in the so-called waterfall recovery |

42

1      **LORAL SPACE AND COMMUNICATIONS, LTD.**
2    analyses of both Jeffries and Chanin, the term
3    "contract rate" is somewhat of a misnomer, in that
4    a 6 percent rate is given for the SS/L debt, which,
5    in fact, was not a contract rate but rather a
6    compromise rate agreed upon by the SS/L creditors
7    and the other unsecured creditors. According to
8    the SS/L creditors, the rate they were entitled to
9    was much higher than 6 percent, which is a fair
10   compromise rate here.
11             Again, at a 970 million dollar
12   enterprise valuation, I believe that the second
13   issue raised by the equity committee as a basis for
14   the shareholders being entitled to a recovery here
15   also is moot. That is, even if Ltd.'s guarantee of
16   the Orion bonds issued in December of 2001 were
17   avoided, I believe that at a 970 million dollar
18   valuation, there would be little to no recovery by
19   the shareholders, and there would be no recovery
20   assuming postpetition interest at the contract
21   rate, and, if my math is right, no recovery at the
22   Federal judgment rate either, although just barely.
23             But again, let me address this
24   argument in more detail, particularly since the
25   equity committee has made a separate motion for

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2     leave to bring litigation avoiding the 2001 Ltd.

3     guarantee of the Orion bonds as a fraudulent

4     transfer under Section 544 of the Bankruptcy Code,

5     incorporating applicable state fraudulent transfer

6     law.

7                    The first question to ask,

8     obviously, in this area is does the equity

9     committee have standing to bring a fraudulent

10    transfer claim?  Clearly it does not unless in the

11    exercise of the bankruptcy court's discretionary

12    authority, it is granted standing to do so on

13    behalf of Ltd.'s estate.  As recognized by the

14    Second Circuit, although not all circuits, official

15    committees, at least official creditors'

16    committees, as well as in some instances individual

17    creditors, can be granted standing to pursue debtor

18    causes of action if, after review by the court,

19    they have shown that the debtor has unjustifiably

20    refused to bring the action.  See generally In re

21    STN Enterprises 779 F2d 901, 904 Second Circuit

22    1985, as well as In re Housecraft Industries, USA,

23    Inc., 310 F3d 64, 71 Second Circuit 2002, which

24    noted that individual creditors might also receive

25    standing, and further noted that the standard for

44

1          LORAL SPACE AND COMMUNICATIONS, LTD.
2    granting standing was basically met if three
3    factors are satisfied.  First, there needs to be a
4    colorable claim that would provide for a recovery.
5    Second, it needs to be shown that the action is
6    likely to benefit the debtor's estate.  And, third,
7    that granting standing is in the best interests of
8    the estate.  See also In re America's Hobby Center,
9    Inc., 223 B.R. 275 282 Bankruptcy Court Southern
10   District New York 1998.
11              At least as regard to the two latter
12   determinations, the court should reach its
13   conclusions after holding an evidentiary hearing.
14   See STN, 779 F2d at 905.
15              As stated by the STN court, the
16   bankruptcy court "should assure itself that there
17   is a sufficient likelihood of success to justify
18   the anticipated delay and expense to the bankruptcy
19   estate that the continuation of litigation is
20   likely to produce."  Id. at 906.  Here I considered
21   both the merits of litigation, and had the
22   advantage of hearing a significant amount of
23   evidence on that issue, as well as the benefits of
24   the litigation to the estate and whether its
25   pursuit is in the best interest of the estate.

45

1              **LORAL SPACE AND COMMUNICATIONS, LTD.**

2                         Before turning to those issues, I

3     should address a second-tier standing issue that

4     has been raised by the debtor, the creditors'

5     committee, and the relevant indenture trustee,

6     which is the standing of an equity committee to

7     bring fraudulent transfer litigation on behalf of

8     the estate, as opposed to creditors.  Here there is

9     apparently a direct conflict in the case law

10    between a bankruptcy court on the one hand, and a

11    district court on the other.  In In re Revco DS

12    Inc., 118 B.R. 468 at 475 Bankruptcy Court in the

13    Northern District of Ohio 1990, the court refused

14    to give the shareholders standing to pursue

15    fraudulent transfer claims, taking the view that

16    fraudulent transfer recoveries are only for the

17    benefit of creditors, not for shareholders.  And

18    that is in contrast with 9281 Shore Road Owners

19    Corporation versus Seminole Realty Company 187 B.R.

20    837 851 Eastern District New York 1995, in which

21    the court noted the difference between the fact

22    that outside of bankruptcy only creditors can bring

23    fraudulent transfer litigation and its view that in

24    bankruptcy fraudulent transfer litigation can be

25    brought for the benefit of all parties, including

46

1              LORAL SPACE AND COMMUNICATIONS, LTD.

2      shareholders, because it's brought on behalf of the

3      estate as opposed to creditors.  That view, in my

4      mind, comports with the plain language of Section

5      550 of the Code which refers to recoveries from

6      avoidance litigation, including litigation under

7      Section 544, as being for the benefit of the

8      estate, and since recoveries here are generally

9      fungible, given that the secured debt was paid off

10     long ago, I believe that, in this situation, the

11     equity committee would have standing or would not

12     be barred from pursuing a cause of action if I

13     permitted it to do so, because it was an equity

14     committee as opposed to a creditors' committee.

15     There may be situations where that conclusion would

16     be changed by the equities of the case, but here,

17     where the committee is representing largely public

18     shareholders, the committee, if given standing,

19     would not be prevented from pursuing a claim, I

20     believe, because of its status as an equity

21     committee.

22              That however, does not answer the

23     question, because, based on my evaluation of the

24     merits, and my weighing of the benefits to the

25     estate as against the potential harm to the estate

47

                    LORAL SPACE AND COMMUNICATIONS, LTD.

of bringing the litigation, I conclude that the

litigation would not be in the estate's best

interests and the committee's motion should be

denied.  The only valuation prepared in connection

with the proposed challenge to the 2001 exchange

offer and the guarantee given by Ltd. in connection

therewith was prepared by Mr. Robins at Greenhill.

He based it on the debtors' projections at the

time, which Mr. Townsend, who was very involved

with those projections at the time, testified were

reasonable and achievable based on historic trends

of EBITDA and revenue, and which Mr. Robins,

perhaps not with the care with which he

professionally vetted the current projections, but

nevertheless professionally, vetted in discussions

with management, by looking at the companies'

projections and performance, and by reviewing

analysts' reports.  In particular, Mr. Townsend

testified that notwithstanding 27 percent growth of

EBITDA between 2000 and 2001 for Orion, Orion and

Loral projected 15 percent growth for EBITDA in

2001 to 2002, going down to 11 percent in the next

year, and generally flattening out thereafter.  He

testified that he as the companies' chief financial

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2    officer had no concern regarding the ability of

3    Orion to make its debt payments after the exchange

4    offer, which were substantially reduced; and he

5    also did not have any concern also that Ltd. could

6    not pay its debts when due.

7              Based on the company's projections,

8    Mr. Robins did a DCF analysis of Orion which showed

9    it to be quite solvent.  And he similarly did an

10   analysis of Ltd. which also showed it to be solvent

11   on an enterprise basis as of the time of the

12   exchange offer.  Based on Mr. Robins' analysis,

13   Orion was solvent by 111 million to 328 million

14   dollars on a going concern basis with $217 million

15   of solvency as the mid point.  Based on the DCF

16   analysis, Ltd. was solvent between 530 and a

17   billion 40 million dollars, which was also

18   considerably below the market capitalization at the

19   time of the exchange offer.  Mr. Townsend had also

20   testified as to the benefits of the exchange offer.

21   And he testified the guarantee by Ltd. was a

22   necessary and integral part of that exchange.  He

23   noted that Orion, before the exchange offer, was

24   facing the fact that in the next year it would have

25   to pay a considerable amount of interest that it

49

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2     previously had been paying in kind, and although

3     the company believed it had measures to ensure the

4     payment of Orion's debts, there was considerable

5     uncertainty about being able to meet them given

6     their increase in 2002.

7               In addition, a default on the

8     pre-exchange Orion debt would trigger cross

9     acceleration provisions in the bank debt that was

10    secured by Loral's satellite assets, and therefore

11    trigger the acceleration of over 500 million

12    dollars of secured bank debt.  Moreover, the

13    exchange offer cannot be viewed in a vacuum, it was

14    part of an integrated strategy of delevering Loral,

15    which included extending the maturity of bank debt

16    which was coming due in respect of 535 million

17    dollars in 2002.  Because of the exchange offer,

18    again of which the Ltd. guarantee was an integral

19    part, the next day that bank debt was extended to a

20    new date coterminous with the Orion bonds.  In

21    addition, following the completion of the exchange

22    offer, Orion's debt was reduced by approximately

23    230 million dollars, and its annual interest burden

24    was reduced by approximately 39 million dollars.

25               These changes not only benefited

BENJAMIN REPORTING  (212)374-1138   DOYLE REPORTING  (212)867-8220
A VERITEXT COMPANY

50

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2    Orion, but also Ltd. As Mr. Townsend testified,

3    although obviously Ltd. itself, before the issuance

4    of the guarantee, was not legally obligated for

5    Orion's debt, that fact was "interesting but not

6    persuasive" to lenders and the rating agencies who

7    viewed the enterprise on a consolidated business,

8    noting that their businesses were interrelated, not

9    only by the cross-acceleration and default

10   provisions I alluded to earlier, but also by the

11   fact that, as a business matter, they were

12   interrelated.

13               It appears that the exchange offer,

14   including the Ltd. guarantee of the new Orion

15   bonds, was discussed over many months and at length

16   by both Orion's board and Ltd.'s board.  Those

17   discussions as memorialized in the minutes

18   introduced into evidence, contain two somewhat

19   troubling remarks by Mr. Schwartz that pertain to

20   my evaluation of the transaction.  First, and I

21   believe this was in a July 2001 meeting, he noted

22   some competition and a general downturn in the

23   satellite business, as well as some softening, at

24   least in the data business, at Orion.  However, it

25   appears that Orion's primary business continued to

1        LORAL SPACE AND COMMUNICATIONS, LTD.

2   meet or come close to meeting its projections for

3   2001, absent the data business, which was

4   transferred out of Orion in connection with the

5   exchange offer.  The equity committee has also made

6   or tried to make much of a reference to a solvency

7   discussion found in the board minutes; however, I

8   do not believe that the reference to a solvency

9   discussion at all indicates anything more than a

10  reasonable question raised by the board, which any

11  board should raise with regard to a transaction of

12  this nature.  It appears to have been addressed by

13  a discussion led by the treasurer, who was

14  primarily focused on how to pay ongoing

15  obligations, as well as by counsel.

16        There was not much inquiry by either

17  party, by the equity committee or the company in

18  the trial, with regard to whether Orion was

19  adequately capitalized after the exchange offer.

20  However, in the light of particular concerns that

21  were raised by the LSPC, I find as follows:  First,

22  having purchased its satellites that underlay the

23  projections before the exchange offer, Orion did

24  not have significant projected capital expense

25  obligations.  Second, it was aware of the so-called

52

1          **LORAL SPACE AND COMMUNICATIONS, LTD.**

2      "solar array problem" with regard to some or all of

3      its satellites; however, there is no showing that

4      that problem was not already factored into the

5      projections.  And based on my review of the 10(k)s,

6      I believe it was factored into them.  Additionally,

7      I believe that the lack of a complete range of

8      transponders for Telstar 12 was also factored into

9      the projections.  And finally I believe that the

10     problem with Telstar 11 having one year less life

11     than anticipated, arose after the exchange offer

12     and was not reasonably anticipated at the time.

13     Given all the foregoing, it appears to me that

14     Orion did not have material capital expenditures

15     and therefore was not inadequately capitalized at

16     the time of the exchange offer.

17                  I've been focusing on the time of

18     the exchange offer and particularly immediately

19     after the exchange offer and Ltd.'s issuance of the

20     guarantee, because that is the time that one must

21     consider solvency in connection with a fraudulent

22     transfer claim.  In particular, one should be

23     careful not to be caught up in hindsight in

24     conducting a solvency analysis, although it is

25     appropriate to do some comparison between

Case 14-10239-CSS   Doc 15924-5   Filed 08/04/15   Page 40 of 74

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2    projections and actual results to see if the

3    projections were unreasonable.  See generally In re

4    RML Inc. 92 F3d 139, 155 Third Circuit 1996 and

5    Lippe versus Bairnco, 249 F.Supp. 2d 357 380

6    S.D.N.Y. 2003.

7               Here it seems to me, although we did

8    not have a full trial on the fraudulent transfer

9    issue, that Mr. Robins' valuation was quite

10   credible and that it would be difficult for the

11   equity committee to overcome it.  In trying to meet

12   its burden in respect to the STN factors, the

13   committee offered up Mr. Belinsky's critique of Mr.

14   Robins' 2001 analysis; however, that critique was

15   flawed in a number of respects.  First, the

16   critique merely involved applying a 33 percent

17   discount to EBITDA, as used by Mr. Robins, and

18   otherwise followed his valuation to the letter.

19   Mr. Belinsky adopted the 33 percent discount

20   approach to the projections upon which Mr. Robins'

21   2001 valuation was based because he believed that

22   such projections were highly flawed.

23               Mr. Belinsky did not do his own due

24   diligence on the projections however, but relied

25   only on two things: one, his recollection or

1              LORAL SPACE AND COMMUNICATIONS, LTD.
2    someone at Chanin's recollection that Mr. Townsend
3    had told them during their due diligence that the
4    company was very aggressive in its projections at
5    the time and historically before then.  Mr.
6    Townsend's testimony before me, however, did not go
7    nearly that far in reference to the projections
8    either on direct or cross, as noted above.   In
9    addition, Mr. Belinsky compared the November 2001
10   projections versus actual results for 2001, 2002
11   and 2003.  However, this comparison, as well as his
12   33 percent methodology was itself flawed in two
13   respects.  First of all, he applied his 33 percent
14   discount not only to the projected numbers, but
15   also to Orion's actual EBITDA for 2001, minus the
16   negative EBITDA for the data business.  This
17   discounting of an actual number resulted in a
18   significant understatement of Orion's value.  The
19   equity committee tried to overcome this flaw at
20   oral argument by suggesting that the actual number
21   was only a projection and therefore should be
22   appropriately discounted as a projection, which
23   logically didn't make sense, but even if one were
24   to take that approach, one should have then taken
25   the original projection, which was considerably

1          **LORAL SPACE AND COMMUNICATIONS, LTD.**

2   higher than the 105 million dollar actual amount

3   that Mr. Belinsky applied a 33 percent discount to.

4          In addition, in showing variations

5   from projected performance, Mr. Belinsky added in

6   the data business, which had a 20 million dollar

7   negative EBITDA in 2001, whereas the data business

8   was actually transferred out of Orion as part of

9   the exchange offer. Finally, even the actual

10  versus projected variances for the key measures of

11  EBITDA and revenue as shown on Committee Exhibit

12  45, were lower than 33 percent for 2001 and 2002.

13         Given all the foregoing, I do not

14  accept that a 33 percent automatic discount of the

15  projections, let alone any discount as against

16  actual 2001 EBITDA, was reasonable; moreover, it

17  does appear to me that there is a logical

18  explanation for why Ltd. and Orion's performance

19  sharply declined in mid 2002, which is, as

20  testified to by the business people for Loral, the

21  severe downturn in the industry and the lack of

22  orders for satellites. Therefore, again, while I

23  accept that it may be appropriate to compare

24  projections at the time of the allegedly fraudulent

25  transfer with actual results to see if those

1        LORAL SPACE AND COMMUNICATIONS, LTD.

2   projections were unreasonable and therefore that

3   the actual value was much lower as of the time of

4   the transfer than the value based on the

5   projections, I believe that it was here an

6   intervening and uncontemplated set of events that

7   lead to the ultimate failure of the business plan

8   and Loral's going into bankruptcy.

9        Because Orion appears to have been

10  solvent, I believe it was proper for all the

11  parties, including Chanin, not to double count the

12  Ltd. guarantee, that is to treat it as one

13  liability on a consolidated basis.  See In re

14  Xonics, 841 F2d 198 Seventh Circuit 1998.

15       I should also note that what is at

16  issue here is a "downstream" guarantee, which

17  traditionally is viewed as immune to fraudulent

18  transfer attack because of the parent's interest in

19  its subsidiary.  There is a recognized exception to

20  that rule, although the cases applying it are very

21  few.  And they are basically In re Rodriguez 895

22  F2d 725 11th Circuit 1990 and Commerce Bank of

23  Kansas City versus Achtenberg 1993 US District

24  Lexis 16136 District Court Western District of

25  Missouri 1993.  Both of those cases point out that

57

1              LORAL SPACE AND COMMUNICATIONS, LTD.
2    where a subsidiary is insolvent or clearly
3    insolvent at the time, the parent's incurrence of
4    an obligation, or a transfer by it on behalf of a
5    subsidiary does not confer any direct benefit on
6    the parent, and therefore, could be a fraudulent
7    transfer.  However, in both of those cases, the
8    insolvency of the subsidiary was stipulated.
9    That's clearly not the case here.
10             In addition, there appears to have
11   been both direct and indirect value afforded to the
12   parent, Ltd., as a result of and in conjunction
13   with its granting of the guarantee.  The direct
14   value is the value to its equity in Orion -- a 229
15   million dollar debt reduction and annual interest
16   expense reduced by a $39 million annually.  The
17   indirect benefit, which is well recognized under
18   the case law, including in the Second Circuit, see
19   HBE Leasing Company versus Frank 48 F3d 623 638
20   Second Circuit 1995, was also considerable.  I've
21   already discussed that the facts that the markets
22   and the rating agencies and lenders viewed Loral on
23   a consolidated basis, and the cross-defaults and
24   cross-acceleration provisions and the related bank
25   loan extension transaction that occurred a day

58

1      **LORAL SPACE AND COMMUNICATIONS, LTD.**

2      after the exchange offer and Ltd.'s guarantee all

3      meant that the exchange offer and guarantee

4      provided considerable value and indirect benefit to

5      Ltd., which in my mind clearly exceeded the

6      negative impact of the Ltd. guarantee at the time.

7      Because of the unusual nature of a "downstream"

8      guarantee being the subject of a fraudulent

9      transfer attack, I gave little weight to the

10     argument by the equity committee that the absence

11     of a contemporaneous solvency opinion is a bad fact

12     here.  Mr. Belinsky acknowledged that his firm, to

13     his knowledge, had never rendered a downstream

14     guarantee solvency opinion, and he had never seen

15     one.

16                 I do not give much weight either to

17     the other so-called indicia of insolvency that Mr.

18     Belinsky referred to in his testimony.  I note

19     that, again, Chanin's views are not backed up by

20     any sort of written work product or any market

21     value or going concern enterprise analyses of Ltd.

22     or Orion in the relevant time range.  Instead, in

23     addition to pointing to Orion's post 2001

24     performance versus its projections, Mr. Belinsky

25     pointed to book value indicia that were indeed

59

| 1 | LORAL SPACE AND COMMUNICATIONS, LTD. |

1         LORAL SPACE AND COMMUNICATIONS, LTD.

2  concededly negative, including the write-off, for

3  GAAP purposes, of approximately 500 million dollars

4  to comply with a new accounting standard applied

5  industry-wide in 2002, and a history since well

6  before the exchange offer of negative book income.

7  Neither of those facts appear to have resulted in

8  any reduced interest by customers in doing business

9  with Loral or reduced borrowing prospects, which is

10  not surprising, given that they had very little

11  bearing on the company's actual ability to pay

12  their debts when they come due.  Those factors as

13  well as the book accounting "liquidity" factors

14  referred to in his exhibit, Mr. Belinsky

15  acknowledged, had never appeared in a solvency

16  opinion that he or his firm had written, and

17  wouldn't appear in a solvency opinion if one were

18  to be prepared in connection with this matter.  It

19  wasn't clear to me, therefore, how they would

20  "inform the opinion," as he testified, except as

21  some sort of nebulous confirmation of whatever else

22  the opinion contained.

23         Of similar relevance, or

24  irrelevance, is the trading value of Orion's and

25  Ltd.'s debt and equity securities before and after

| | |
|---|---|
| 1 | LORAL SPACE AND COMMUNICATIONS, LTD. |
| 2 | the exchange offers. In my view, the negative |
| 3 | trading value before the exchange, the spike in the |
| 4 | trading value of the bonds after the exchange and |
| 5 | the subsequent decrease in the trading value in the |
| 6 | summer of 2002 is not particularly telling, |
| 7 | particularly given the fact that prices lowered in |
| 8 | 2002 after a revised forecast by Ltd. in light of |
| 9 | its realization that satellite orders were not |
| 10 | coming in as they had previously been expected. |
| 11 | Similarly, the very positive market cap on the |
| 12 | equity securities is not particularly telling, |
| 13 | either. Although it's often taken as gospel that |
| 14 | market pricing levels of debt and equity trading |
| 15 | are indicia of value, the very fact that people are |
| 16 | in the market to make substantial profits suggests |
| 17 | that, on a trading basis, those trading values are |
| 18 | not to be particularly relied upon, at least for |
| 19 | short term valuations. And Mr. Belinsky |
| 20 | acknowledged as much by noting that, again, at most |
| 21 | such information would be informative of or |
| 22 | colorable to a solvency opinion if he were to |
| 23 | render one. |
| 24 | All things considered then, although |
| 25 | there wasn't obviously a full trial on the issue of |

61

1          LORAL SPACE AND COMMUNICATIONS, LTD.
2   solvency, or of fair consideration or reasonably
3   equivalent value, it's clear to me that the equity
4   committee would have a very difficult row to hoe if
5   it were to pursue this litigation.  I note that
6   even if I were somewhat off in my 2005 valuation,
7   it would also be pursuing litigation largely for
8   the benefit of the unsecured creditors, who very
9   much do not want it to be pursued.  Therefore, even
10  if the equity committee would have standing,
11  notwithstanding it being an equity committee, I
12  can't ignore the fact that based on my $970 million
13  valuation of Ltd. in 2005, or as of June 30, 2005,
14  most, if not all, the recovery would go to the
15  benefit of the unsecureds.

16          In addition to the unsecureds not
17  wanting the litigation to be pursued, as I said at
18  the beginning of this opinion in the portion of it
19  which is under seal, the company has given very
20  good reasons why the pursuit of litigation and the
21  delay of Ltd.'s emergence from Chapter 11 would be
22  a real determent to the debtors' business.  And
23  consequently I believe that the pursuit of the
24  litigation is not in the best interest of the
25  estate and creditors and does not meet a

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2     cost/benefit analysis, as required by STN and its

3     progeny. Therefore I will deny the motion by the

4     equity committee for leave to have standing to

5     pursue the fraudulent transfer litigation.

6                I do that without additionally

7     considering factors going to the cost of

8     litigation, which would not only include out of

9     pocket costs, but also the additional postpetition

10    interest that would accrue during the time the

11    litigation was pursued. The equity committee has

12    not quantified those costs, nor have the debtors,

13    but I believe they would both be quite significant.

14    And given, again, the unlikelihood of the

15    shareholders seeing any benefit from a recovery,

16    even if they were to obtain a settlement or some

17    victory on the merits, those costs would just eat

18    into the gap further.

19                Let me then address the final

20    objection made by the shareholders to confirmation

21    of the plan, which is the allegation that's long

22    been made in this case, that there has been some

23    form of unholy bargain between the debtors'

24    management and the creditors' committee or the

25    chairman of the creditors' committee. Mr. Schwartz

1            LORAL SPACE AND COMMUNICATIONS, LTD.

2   was really the only witness on this point, and he

3   testified that he has basically been involved in

4   all of the substantive negotiations in this case,

5   or kept very closely apprised of them when they

6   were done by financial advisers or lawyers in the

7   first instance.  He stated that he negotiated the

8   basic terms of the stock options granted to certain

9   members of management, although not to Mr. Schwartz

10  himself, in July of 2004, including the strike

11  price at an estimated midpoint valuation of 700

12  million for the debtors.

13           It is my belief, based on the

14  formulation of the plan as originally filed in

15  connection with the creditors' committee

16  negotiations, that the negotiation of the New

17  Skynet notes did not occur until substantially

18  thereafter.  A major element, if not the only

19  element of the "unholy bargain" argument is

20  premised upon a presumed linkage between the New

21  Skynet notes and the management contracts and stock

22  options.  But the timing doesn't seem to work.  In

23  fact, the New Skynet notes were still being

24  negotiated up until shortly before the commencement

25  of this hearing.

64

1        LORAL SPACE AND COMMUNICATIONS, LTD.

2        .... .... ....  .... In addition, Mr. Schwartz testified

3    that the management contracts and the stock option

4    package, in his view, (a), closely followed the

5    form of those agreements that are in existence

6    today as far as the management contracts are

7    concerned, and, (b), were comparable to, and

8    necessary to compete against, similar packages of

9    executive compensation offered by the company's

10   competitors and necessary to retain key employees.

11   There was no real rebuttal of those points.  It's

12   obvious to me that the stock option grant is

13   generous given my valuation finding.  However, I

14   note the following: first, it does not kick in

15   immediately but spreads out in 25 percent segments,

16   therefore in effect binding key employees to the

17   debtor over time.  Secondly, largely at my

18   instigation, the Key Employee Retention Plan

19   originally proposed by these debtors has not been

20   revised as far as the senior management is

21   concerned.  I took Mr. Schwartz's testimony as to

22   the need for these contracts and stock options, in

23   part to be to fulfill, the commitment, which had

24   not heretofore been fulfilled, to retain key

25   employees.  And in effect management has been

65

LORAL SPACE AND COMMUNICATIONS, LTD.

1

2    waiting for this for about a year and a half.

3                    So in that sense, while normally one

4    would see stock options tied to the future

5    appreciation of the company's value after emergence

6    from Chapter 11 and thereafter, I view the stock

7    option program here as part of fulfilling an

8    unfulfilled promise to the employees for sticking

9    around during the case.

10                   I certainly understand the LSPC's

11   dislike of such compensation, particularly the

12   stock options, given the treatment that

13   shareholders are receiving under the plan; however,

14   as a technical legal matter, I believe that

15   management is receiving this compensation here not

16   because they are shareholders but because they are

17   managers.  And I note that they are receiving it

18   with the agreement or lack of objection by the

19   future owners of the company, its unsecured

20   creditors, who I do not believe received any

21   improper quid pro quo for that agreement, but,

22   rather, had reached the view that they were willing

23   to have such compensation be paid to management

24   because they wanted that management in there

25   working for Loral and believed it was necessary to

66

2    keep them.

3                    I note that given the renegotiation

4    of the plan in light of the settlement with the

5    SS/L creditors, the creditors as a whole had the

6    opportunity, if they wanted to, to renegotiate the

7    management arrangements, and they chose not to do

8    so.  Again in my view that means that they are

9    doing it for their own business purposes and not

10   for any other sort of quid pro quo.  As far as the

11   New Skynet Notes are concerned, there is very

12   little, if any, testimony by Chanin as to whether

13   and why, particularly as revised, they were still

14   clearly not at market as alleged by Chanin.  And

15   while it is clear that the interest rate was not in

16   and of itself negotiated, the terms of the notes,

17   including the basket for other secured debt and

18   other features that took it into the high yield

19   range, occurred before the confirmation hearing

20   began.  In any event, it is appears to me that to

21   the extent that those notes are not market priced,

22   and we will see if that's the case or not when

23   they're issued, because there is really very little

24   evidence in the record to show whether they're at

25   or over the market price, it appears to me that the

1    LORAL SPACE AND COMMUNICATIONS, LTD.

2    difference in the grand scheme of things in the

3    overall valuation of these companies is not

4    material.

5    So, based on that analyses and there

6    being no other allegation of any other sort of an

7    unholy bargain, other than some ambiguous language,

8    in my view, in the disclosure statement pertaining

9    to the revision of the debtors' business plan after

10    discussion with the creditors' committee, I find

11    that the plan meets the good faith requirement

12    under Section 1129(a)(3) of the Bankruptcy Code and

13    therefore should be confirmed.

14    So, Mr. Karotkin, to continue, I

15    don't know if I've seen a proposed confirmation

16    order.

17    MR. KAROTKIN:  No, sir.

18    THE COURT:  You should circulate

19    one.

20    MR. KAROTKIN:  Yes, sir.  We didn't

21    want to be presumptuous.

22    THE COURT:  And as I recall from

23    your remarks at the start of the trial, you had

24    resolved the other plan objections except for some

25    language you were still working out with the U.S.

68

```
 1          LORAL SPACE AND COMMUNICATIONS, LTD.
 2   Trustee and the creditors' committee.
 3                MR. KAROTKIN:  Yes.  Actually as to
 4   the U.S. Trustee, we had resolved that language and
 5   I believe that was reflected on the record and we
 6   had also resolved the language as to the creditors'
 7   committee on the record I just wanted to point out
 8   as to the objection filed by the ERISA plaintiffs.
 9                THE COURT:  Yes.
10                MR. KAROTKIN:  What we have agreed
11   is that that objection will be addressed as part of
12   the claims resolution process and we have agreed
13   that it will be withdrawn as an objection to
14   confirmation without any prejudice to any of their
15   rights, and we have no problem with that.
16                THE COURT:  So what does that mean
17   with regard to Section 510, that language?  Is that
18   still open for argument?
19                MR. KAROTKIN:  Yes.  That won't
20   impact the ability to go effective or not go
21   effective.
22                THE COURT:  Is that correct, Mr.
23   Etkin?
24                MR. ETKIN:  Yes, your Honor.  All
25   issues as to classification and subordination are
```

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2   reserved for the claims resolution process.

3          THE COURT:  All right.

4          MR. KAROTKIN:  So we'll be happy to

5   circulate a revised order to each of the

6   committees, we'll hopefully get that out tonight.

7          THE COURT:  Okay very well thank

8   you.

9          MR. GOLDEN:  Your Honor --

10          MR. KAROTKIN:  The only other matter

11   I guess, your Honor, is the order that you entered

12   permitting the complaint to be filed.

13          THE COURT:  Well, that I think by

14   its terms is of no effect at this point except that

15   it reserves an issue, in effect, on appeal.

16          MR. KAROTKIN:  That's fine.  Thank

17   you, sir.

18          THE COURT:  So once the order is

19   entered, the parties can go and argue in the

20   District Court about what that means.

21          MR. KAROTKIN:  Very well.  Thank

22   you, your Honor.

23          THE COURT:  Okay.

24          MR. WOLFSON:  Your Honor.

25          THE COURT:  I guess you owe me two

70

1    LORAL SPACE AND COMMUNICATIONS, LTD.

2   orders then.

3                MR. KAROTKIN:  Yes, sir.

4                THE COURT:  Okay.

5                MR. GOLDEN:  Your Honor, I'm sorry.

6   I don't mean to prolong this, but I'm looking at

7   the order that Mr. Karotkin referred to, and the

8   ordered paragraph in question is that the court's

9   denial of the motion to prosecute may result in the

10  immediate dismissal of the complaint.  When we

11  talked about it that day, I think you left open the

12  possibility that you would rule on the automatic

13  dismissal.

14               THE COURT:  Well, someone is going

15  to have to ask me for a stay, otherwise it will be

16  dismissed.

17               MR. GOLDEN:  So absent a stay, the

18  complaint -- by virtue of the denial of the motion,

19  the complaint will be dismissed.

20               THE COURT:  Right.

21               MR. GOLDEN:  Thank you.

22               THE COURT:  But that's subject to

23  the equity committee's request for a stay.

24               MR. GOLDEN:  I understand.  Thank

25  you for your time and patience.

1            LORAL SPACE AND COMMUNICATIONS, LTD.

2                THE COURT:  All right.  Thank you.

3               MR. WOLFSON:  Thank you, your Honor.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

72

```
 1
 2                       C E R T I F I C A T E
 3    STATE OF NEW YORK      }
                             }     ss.:
 4    COUNTY OF WESTCHESTER  }
 5                I, Denise Nowak, a Shorthand
 6          Reporter and Notary Public within and for
 7          the State of New York, do hereby certify:
 8                That I reported the proceedings in
 9          the within entitled matter, and that the
10          within transcript is a true record of such
11          proceedings.
12                I further certify that I am not
13          related, by blood or marriage, to any of
14          the parties in this matter and that I am
15          in no way interested in the outcome of
16          this matter.
17                IN WITNESS WHEREOF, I have
18          hereunto set my hand this _____ day of
19          _____, 2005.
20
21                         _____
                                   DENISE NOWAK
22
23
24
25
```

**A**

ability 48:2 59:11
68:20
able 34:22 49:5
absence 58:10
absent 51:3 70:17
acceleration 49:9,11
accept 23:9 25:3
26:17 32:22 33:4
37:2 55:14,23
accorded 26:12
accounting 59:4,13
accrue 62:10
achievable 47:12
Achtenberg 56:23
acknowledged 24:12
30:20 36:12 58:12
59:15 60:20
acknowledges 31:12
31:13
action 43:18,20 44:5
46:12
actual 37:3 53:2
54:10,15,17,20
55:2,9,16,25 56:3
59:11
add 30:4
added 25:24 29:21
55:5
addition 20:24 34:8
38:9 49:7,21 54:9
55:4 57:10 58:23
61:16 64:2
additional 36:17
37:13 62:9
additionally 52:6
62:6
address 5:3 21:4
32:14 37:11 42:23
45:3 62:19
addressed 37:12
51:12 68:11
adequately 51:19
adjust 37:4
adopted 32:2 53:19

advantage 44:22
advisers 63:6
afforded 57:11
agencies 50:6 57:22
aggressive 54:4
aggressiveness
29:20
ago 39:3 46:10
agreed 42:6 68:10
68:12
agreement 4:6,14,19
30:7 65:18,21
agreements 64:5
AKIN 2:12
al 1:6
allegation 62:21
67:6
alleged 66:14
allegedly 55:24
alleviated 33:2
allocation 36:13
allowance 39:22
alluded 37:5 50:10
Alto 28:2 33:10
ambiguous 67:7
amended 5:15
amendment 39:2
American 30:11
Americas 2:22
America's 44:8
amount 33:12 34:16
40:2 44:22 48:25
55:2
analyses 21:24 42:2
58:21 67:5
analysis 33:24 48:8
48:10,12,16 52:24
53:14 62:2
analysts 47:19
Anderson 41:13
ANDREW 2:16
annual 49:23 57:15
annually 57:16
answer 46:22
anticipated 44:18
52:11,12

apparently 45:9
appeal 69:15
appear 29:18 31:18
35:16 36:17 55:17
59:7,17
appeared 23:14
59:15
appears 35:3,7
40:23 50:13,25
51:12 52:13 56:9
57:10 66:20,25
applicable 43:5
applied 23:4,8 25:20
29:2 40:11 41:13
54:13 55:3 59:4
applies 37:9
apply 22:9 40:21
applying 53:16
56:20
appreciation 65:5
apprised 63:5
approach 31:6,7
53:20 54:24
appropriate 32:11
40:3,15 41:12
52:25 55:23
appropriately 54:22
approximately
22:17,18,19 31:2
36:2,11 49:22,24
59:3
area 43:8
argue 69:19
argued 33:22
argues 38:14
argument 27:15
42:24 54:20 58:10
63:19 68:18
arguments 21:18
arms 35:2
arose 52:11
array 52:2
ARTHUR 2:24
ascertaining 22:25
ascribed 27:22,22

28:19 29:24 33:17
33:25
ascribing 28:17
34:16
aspect 40:19
assertion 21:6 23:7
33:5,20
asset 28:15,25 29:12
29:16
assets 22:8,12 27:21
27:21 28:5 29:24
30:13 32:21 33:6
49:10
assume 4:5 34:11
assuming 42:20
assumption 33:17
assure 44:16
attack 56:18 58:9
Attorneys 2:5,13,20
attractive 34:9
attributable 22:15
22:25 27:6 29:5,6
audience 4:5 5:8
authority 41:15
43:12
automatic 55:14
70:12
available 27:3,13
Avenue 2:6,14,22
average 26:15 29:3
avoidance 46:6
avoided 42:17
avoiding 43:2
awarded 41:23
aware 51:25

**B**

b 1:22 20:10,13 64:7
back 4:17 5:8 30:12
30:24 38:20,23
39:19
backed 58:19
bad 32:4 58:11
Bairnco 53:5
balance 39:23
bank 49:9,12,15,19

2

56:22 57:24
**banker** 25:18 30:17
34:23
**bankers** 23:3 24:5
25:17 26:4,25
**banking** 21:16
**bankruptcy** 1:2,24
20:10,18,19 21:3
31:23 37:16 38:4
39:3,22 40:9,14,17
41:2,14 43:4,11
44:9,16,18 45:10
45:12,22,24 56:8
67:12
**barely** 42:22
**bargain** 62:23 63:19
67:7
**barred** 46:12
**base** 21:23
**based** 20:6 21:14
22:7 24:15 28:11
32:20 33:20 37:6
46:23 47:9,12 48:7
48:12,15 52:5
53:21 56:4 61:12
63:13 67:5
**bases** 38:3
**basic** 63:8
**basically** 23:20 44:2
56:21 63:3
**basis** 23:2 28:17
32:17 33:13 34:3
36:6 38:19,24 39:4
39:19 41:20 42:13
48:11,14 56:13
57:23 60:17
**basket** 27:20 66:17
**Bates-stamped**
36:16
**bearing** 59:11
**began** 66:20
**beginning** 61:18
**behalf** 31:4 43:13
45:7 46:2 57:4
**belief** 63:13
**believe** 33:16,19

35:13 41:12,22
42:12,17 46:10,20
50:21 51:8 52:6,7
52:9 56:5,10 61:23
62:13 65:14,20
68:5
**believed** 49:3 53:21
65:25
**believes** 30:21
**Belinsky** 26:19
33:20 53:19,23
54:9 55:3,5 58:12
58:18,24 59:14
60:19
**Belinsky's** 53:13
**bench** 1:17 5:9
**benefit** 5:6 44:6
45:17,25 46:7 57:5
57:17 58:4 61:8,15
62:15
**benefited** 49:25
**benefits** 44:23 46:24
48:20
**BERRY** 2:17
**best** 20:18 38:5 44:7
44:25 47:3 61:24
**better** 24:21 25:9
31:18
**beyond** 35:18
**BICKS** 2:23
**billion** 31:2 48:17
**binding** 64:16
**bit** 4:12 29:22 30:5
**blood** 72:13
**board** 50:16,16 51:7
51:10,11
**Boeing-Hughes**
31:14
**Bondholders** 38:21
39:20
**bonds** 42:16 43:3
49:20 50:15 60:4
**book** 58:25 59:6,13
**borrowing** 59:9
**BOTTER** 2:16
**bound** 4:14

**Bowling** 1:11
**briefly** 32:14 37:11
**briefs** 20:8
**bring** 43:2,9,20 45:7
45:22
**bringing** 47:2
**brought** 45:25 46:2
**BRUCE** 2:9
**building** 34:11
**bulk** 4:17 5:7
**burden** 49:23 53:12
**burdens** 20:16
**business** 5:5 22:7
23:17 24:22 25:8
25:11,16 26:20
27:8,11 31:12
33:15 34:12 35:25
36:23 50:7,11,23
50:24,25 51:3
54:16 55:6,7,20
56:7 59:8 61:22
66:9 67:9
**businesses** 50:8
**businessman** 32:3
**B.R** 40:8,17 41:2,14
44:9 45:12,19

—————————
**C**
**C** 2:2 3:2 4:2 72:2,2
**California** 28:2
**call** 5:7
**cap** 60:11
**capital** 29:3 51:24
52:14
**capitalization** 48:18
**capitalized** 51:19
52:15
**Cardalucci** 41:16
**care** 47:14
**career** 32:3
**careful** 35:22 52:23
**CAROLYN** 3:9
**Carter** 41:14
**case** 21:16 23:17
31:23 32:11 33:11
36:3 37:25 39:20

40:13,20 41:2,8,10
41:11 45:9 46:16
57:9,18 62:22 63:4
65:9 66:22
**cases** 38:23 39:16
40:5 56:20,25 57:7
**cash** 22:10 24:2
25:10 27:4,8,10,12
27:16,17,18 31:10
**categories** 36:18
**category** 28:5
**caught** 52:23
**cause** 46:12
**causes** 43:18
**Center** 44:8
**century** 38:24
**cert** 39:16
**certain** 63:8
**certainly** 65:10
**certify** 72:7,12
**chairman** 62:25
**challenge** 47:6
**changed** 46:16
**changes** 31:17 49:25
**Chanin** 21:25 22:16
23:19,25 25:13,25
26:6,23 27:11 28:3
28:8,22 29:11,14
34:22,24 36:22
42:2 56:11 66:12
66:14
**Chanin's** 23:23
24:23 26:18 29:16
33:24 54:2 58:19
**Chapter** 20:5 40:4
41:6 61:21 65:6
**chief** 47:25
**China** 34:20
**choice** 23:7
**chooses** 29:11
**chose** 26:14 27:18
66:7
**Christ** 3:16 28:17
30:20 35:21
**Cir** 39:15
**Circuit** 41:17 43:14

3

43:21,23 53:4
56:14,22 57:18,20
**circuits** 43:14
**circulate** 67:18 69:5
**circumstances**
38:15
**citations** 5:13
**cited** 39:16
**City** 56:23
**claim** 43:10 44:4
46:19 52:22
**claims** 21:11 37:10
37:17 39:9 45:15
68:12 69:2
**classes** 20:23
**classification** 68:25
**clear** 24:13 40:21
59:19 61:3 66:15
**clearly** 43:10 57:2,9
58:5 66:14
**close** 29:10 30:22
51:2
**closely** 63:5 64:4
**closer** 29:14
**Code** 20:10,18,19
21:3 37:17 38:4
39:3 43:4 46:5
67:12
**colleagues** 27:7
**colleague's** 24:17
**colorable** 44:4 60:22
**come** 4:17,20 29:9
51:2 59:12
**comfortable** 27:11
40:22
**coming** 49:16 60:10
**commencement**
63:24
**Commerce** 56:22
**commitment** 64:23
**committee** 2:13,21
3:17 5:16 21:19
22:3,3 23:6 34:14
37:14 38:13,22
39:14 42:13,25
43:9 45:5,6 46:11

46:14,14,17,18,21
51:5,17 53:11,13
54:19 55:11 58:10
61:4,10,11 62:4,11
62:24,25 63:15
67:10 68:2,7
**committees** 43:15
43:16 69:6
**committee's** 47:4
70:23
**common** 20:23 21:7
**Communications**
1:6,18 4:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
**companies** 22:5,11
24:4 25:22 47:17
47:25 67:3
**company** 23:16
24:13,25 35:17
37:8 45:19 49:3
51:17 54:4 57:19
61:19 65:19
**company's** 48:7
59:11 64:9 65:5
**comparable** 22:10
22:11 24:4,7,13,18
25:18,21,22 35:17
64:7
**comparables** 31:15
**compare** 55:23

**compared** 28:9 54:9
**comparison** 23:15
52:25 54:11
**compensation** 64:9
65:11,15,23
**compete** 64:8
**competition** 50:22
**competitors** 35:9
64:10
**complaint** 69:12
70:10,18,19
**complete** 36:14 52:7
**completion** 49:21
**comply** 59:4
**comports** 46:4
**compromise** 42:6,10
**concededly** 59:2
**concern** 22:6,13
25:4 30:2 34:3
48:2,5,14 58:21
**concerned** 35:3,13
64:7,21 66:11
**concerns** 32:24
51:20
**conclude** 21:14
31:25 41:7 47:2
**conclusion** 21:23
46:15
**conclusions** 44:13
**concrete** 35:14
**conduct** 32:6 41:11
**conducted** 32:20
**conducting** 27:11
52:24
**confer** 57:5
**confidence** 29:16
**confidential** 1:14
5:1,5
**confidentiality** 4:6
4:14,18
**confirmation** 5:15
20:4 27:4 59:21
62:20 66:19 67:15
68:14
**confirmed** 20:11
39:4 40:5 41:3

67:13
**conflict** 45:9
**Cong** 39:5
**Congress** 38:25
**conjunction** 57:12
**connected** 28:18
**connection** 28:13
31:11 32:17 39:2
47:5,7 51:4 52:21
59:18 63:15
**consequently** 61:23
**consider** 52:21
**considerable** 33:12
48:25 49:4 57:20
58:4
**considerably** 26:6
31:20 35:11 36:4
48:18 54:25
**consideration** 35:22
61:2
**considered** 22:6,9
40:10 44:20 60:24
**considering** 22:21
62:7
**consolidated** 39:12
50:7 56:13 57:23
**conspicuous** 36:25
**constitutes** 5:13
**constrained** 37:2
**contain** 50:18
**contained** 59:22
**contemporaneous**
58:11
**contending** 32:12
**contends** 37:14
**Continental** 39:15
**continuation** 44:19
**continue** 20:3 67:14
**continued** 3:2 50:25
**contract** 37:9 38:18
40:15,22 41:23,24
42:3,5,20
**contracts** 22:16 25:8
25:11 34:6 63:21
64:3,6,22
**contrary** 41:15,20

4

contrast 45:18
Coram 40:25
core 22:7 37:4
Corp 39:15
corporate 36:13
Corporation 40:8
  40:16,25 45:19
correct 4:7 5:11,13
  68:22
corroboration 36:8
cost 29:3 62:7
costs 62:9,12,17
cost/benefit 62:2
coterminous 49:20
counsel 3:12 51:15
count 56:11
COUNTY 72:4
couple 26:17
course 22:22 37:25
court 1:2 4:3 5:2
  20:2 30:9 39:25
  40:9,11,14,14,17
  40:18 41:2 43:18
  44:9,12,15,16
  45:10,11,12,13,21
  56:24 67:18,22
  68:9,16,22 69:3,7
  69:13,18,20,23,25
  70:4,14,20,22 71:2
courtroom 4:19
courts 37:18 38:3,10
  39:6
court's 38:21 43:11
  70:8
cramdown 20:22
  21:4 38:12
credible 32:23 53:10
credibly 34:3
creditor 39:24,24
creditors 2:13 21:8
  21:9 22:2 27:13
  37:21,24 38:8,11
  38:16 39:9,24
  41:10 42:6,7,8
  43:15,17,24 45:4,8
  45:17,22 46:3,14

61:8,25 62:24,25
  63:15 65:20 66:5,5
  67:10 68:2,6
creditor/sharehol...
  41:19
criticism 29:17
critique 53:13,14,16
cross 49:8 54:8
cross-acceleration
  50:9 57:24
cross-defaults 57:23
current 25:4 47:15
currently 31:23
Custom 1:10
customers 59:8

                D
D 1:23 4:2
DANIEL 2:15
data 50:24 51:3
  54:16 55:6,7
date 49:20
dated 24:9
DAVID 2:16
day 49:19 57:25
  70:11 72:18
days 20:7
DCF 23:2 25:3,24
  26:6,8,11,12,18,24
  29:3,21 36:7 48:8
  48:15
dealing 40:5
Debentureholders
  39:14
debt 29:13 42:4 46:9
  48:3 49:8,9,12,15
  49:19,22 50:5
  57:15 59:25 60:14
  66:17
debtor 37:19 38:2,9
  39:5,25 40:4 43:17
  43:19 45:4 64:17
debtors 1:7 2:5 20:4
  20:9 21:9 22:2
  25:5 27:24 36:15
  36:23 37:7,14,21

47:9 61:22 62:12
  62:23 63:12 64:19
  67:9
debtor's 44:6
debts 48:6 49:4
  59:12
December 42:16
decided 40:6
deciding 40:2
decision 38:21 39:21
declaratory 40:7
declined 40:20
  55:19
decrease 60:5
default 40:21 49:7
  50:9
Delaware 41:3
delay 44:18 61:21
delayed 41:10
delevering 49:14
denial 70:9,18
denied 39:16 47:5
Denise 72:5,21
deny 62:3
DEPARTMENT
  3:9
deprives 21:12
Derrough 24:20
  27:7
Derrough's 24:14
  32:19,22 33:5
deserved 35:22
designs 35:9
desire 23:16
detail 21:22 42:24
determent 61:22
determinations
  44:12
determine 23:5 25:2
  41:8
determined 23:21
  24:6 40:14
determining 24:19
developed 35:9
developments 34:18
Dewitt 34:3 36:7

Dewitt's 36:19
difference 22:23,24
  23:23 26:3 28:24
  31:12 45:21 67:2
differences 23:21
  28:6
different 30:16
  40:19
difficult 53:10 61:4
diligence 36:22
  53:24 54:3
direct 45:9 54:8
  57:5,11,13
disagreed 31:5
disallows 37:17
disclosure 20:7 67:8
discount 29:20
  53:17,19 54:14
  55:3,14,15
discounted 22:10
  24:2,23 25:14
  54:22
discounting 54:17
discrepancy 36:25
discretion 5:11 40:2
discretionary 43:11
discuss 20:12
discussed 31:4 33:8
  34:21 50:15 57:21
discussion 51:7,9,13
  67:10
discussions 47:16
  50:17
dislike 65:11
dismissal 70:10,13
dismissed 70:16,19
dispute 38:14
distributions 38:2
district 1:3 40:9,14
  40:17,18,23,24
  41:2,14 44:10
  45:11,13,20 56:23
  56:24,24 69:20
doing 59:8 66:9
dollar 27:5 33:18
  34:16 35:19 36:19

5

37:6 42:11,17 55:2
55:6 57:15
**dollars** 23:22 27:10
27:19 28:4,9,15,20
30:2,23 31:3,22
36:2,5,11,20 48:14
48:17 49:12,17,23
49:24 59:3
**double** 56:11
**downstream** 56:16
58:7,13
**downturn** 50:22
55:21
**Dow-Corning** 40:8
40:16
**draft** 32:15 33:5
**DRAIN** 1:23
**DRAIN'S** 5:19
**driven** 30:16 31:10
33:17
**dropped** 27:20
**DS** 45:11
**Dubois** 39:12
**due** 36:22 48:6
49:16 53:23 54:3
59:12

**E**

**E** 1:22,22 2:2,2,8 3:2
3:2,15,15 4:2,2
72:2,2
**earlier** 33:4,16 37:5
50:10
**Eastern** 40:9,17,23
45:20
**eat** 62:17
**EBITDA** 22:15 25:7
26:24 31:20 36:6
47:13,21,22 53:17
54:15,16 55:7,11
55:16
**effect** 64:16,25
69:14,15
**effective** 68:20,21
**either** 26:25 35:20
42:22 51:16 54:8

58:16 60:13
**element** 63:18,19
**elements** 20:13 27:2
**emergence** 61:21
65:5
**employed** 22:4
**Employee** 64:18
**employees** 64:10,16
64:25 65:8
**employs** 34:11
**ends** 5:23
**engaged** 41:11
**engineers** 34:10
**ensure** 49:3
**entered** 69:11,19
**enterprise** 29:25
37:7 42:12 48:11
50:7 58:21
**Enterprises** 43:21
**entitled** 42:8,14 72:9
**envelope** 30:12,25
**equally** 26:10
**equipment** 34:7
**equitable** 38:12,15
38:19 39:4,8,19
41:9,21
**equities** 39:23 46:16
**equity** 2:21 5:16
22:3 23:5 29:7
34:14 37:13 38:13
39:10 42:13,25
43:8 45:6 46:11,13
46:20 51:5,17
53:11 54:19 57:14
58:10 59:25 60:12
60:14 61:3,10,11
62:4,11 70:23
**equivalent** 61:3
**ERISA** 68:8
**errors** 5:12,12
**especially** 31:8
**ESQ** 2:7,8,8,9,9,15
2:16,16,17,23,24
2:24 3:6,12
**ESQS** 2:19
**estate** 27:24 33:9,12

33:18,22,25 39:7
43:13 44:6,8,19,24
44:25 45:8 46:3,8
46:25,25 61:25
**estates** 5:6
**estate's** 47:3
**estimated** 63:11
**et** 1:6
**Etkin** 3:6 68:23,24
**evaluation** 24:24
46:23 50:20
**event** 66:20
**events** 56:6
**everyone's** 23:16
**evidence** 23:12 32:7
44:23 50:18 66:24
**evidentiary** 44:13
**exceeded** 58:5
**exception** 56:19
**exchange** 47:6 48:3
48:12,19,20,22,23
49:13,17,21 50:13
51:5,19,23 52:11
52:16,18,19 55:9
58:2,3 59:6 60:2,3
60:4
**exclusively** 27:25
30:9 41:17
**executive** 64:9
**exercise** 43:11
**exhibit** 36:15 55:11
59:14
**exhibits** 20:8 21:18
**existence** 64:5
**exit** 27:18
**expected** 60:10
**expenditures** 52:14
**expense** 25:12 36:11
37:2,24 44:18
51:24 57:16
**expenses** 35:23,24
36:9,18,21
**experience** 24:17
31:11
**expert** 21:15 22:6,9
32:15,17,18 33:21

**experts** 21:25 22:4
22:24 27:5 28:3,25
30:17 31:13 32:12
33:25 35:20
**expert's** 36:7
**explanation** 30:3
55:18
**expressly** 39:20
**extended** 49:19
**extending** 49:15
**extension** 57:25
**extent** 66:21
**e.g** 39:11

**F**

**F** 1:22 72:2
**faced** 40:13
**facing** 48:24
**fact** 4:9 21:20 23:24
24:25 37:18 38:14
42:5 45:21 48:24
50:5,11 58:11 60:7
60:15 61:12 63:23
**factor** 30:19
**factored** 52:4,6,8
**factors** 37:13 44:3
53:12 59:12,13
62:7
**facts** 41:8 57:21
59:7
**failure** 56:7
**fair** 38:12,15,19
39:4,8,18 41:9,21
42:9 61:2
**fairly** 28:3 32:23
40:24
**fairness** 41:18
**faith** 21:2 67:11
**far** 35:2,12 54:7
64:6,20 66:10
**feasibility** 20:17
**feasible** 33:23
**features** 66:18
**Federal** 32:7 37:9
38:17 40:12 41:5
42:22

feel 36:25
FELD 2:12
FIFE 2:9
Fifth 2:6
figure 27:18 36:12
  36:14
filed 5:19 63:14 68:8
  69:12
final 25:2 35:21
  62:19
finally 52:9 55:9
financeable 29:13
financed 29:7
financial 47:25 63:6
financing 29:8
find 20:8 36:23
  41:16 51:21 67:10
finding 64:13
findings 21:21
fine 69:16
firm 58:12 59:16
firms 21:16
first 4:4,13 21:5,21
  22:13 24:15 26:17
  27:3 38:4 43:7
  44:3 50:20 51:21
  53:15 54:13 63:7
  64:14
five 4:16
flattening 47:24
flaw 54:19
flawed 53:15,22
  54:12
flaws 23:6
flow 22:10 24:2
  25:10 27:17 31:10
flows 38:5
focused 23:18 30:9
  41:18 51:14
focusing 52:17
folks 5:22
followed 53:18 64:4
following 5:13 49:21
  64:14
follows 51:21
forecast 60:8

foregoing 52:13
  55:13
form 32:15 62:23
  64:5
forma 30:25
formal 34:23
formulation 63:14
fortunately 32:25
found 51:7
fourth 5:15
Frank 57:19
frankly 23:9 28:11
  33:19
fraudulent 5:17
  43:3,5,9 45:7,15
  45:16,23,24 52:21
  53:8 55:24 56:17
  57:6 58:8 62:5
FSS 25:16,25 26:14
  27:12 29:13
FSS's 25:22 31:19
fulfill 64:23
fulfilled 29:9 64:24
fulfilling 65:7
full 21:10 39:9 53:8
  60:25
fungible 46:9
further 39:3 41:25
  43:25 62:18 72:12
future 32:25 65:4,19
F.Supp 53:5
F.2d 39:15
F2d 43:21 44:14
  56:14,22
F3d 41:16 43:23
  53:4 57:19

____ G ____

G 4:2
GAAP 59:3
gap 62:18
gauging 23:10
general 50:22
generally 29:24 35:5
  43:20 46:8 47:24
  53:3

generous 33:19
  64:13
give 4:12 32:8,10
  35:19 37:23 45:14
  58:16
given 23:11 25:7,10
  27:7,16 29:15 30:3
  35:4 39:18 42:4
  46:9,18 47:7 49:5
  52:13 55:13 59:10
  60:7 61:19 62:14
  64:13 65:12 66:3
gives 28:16
giving 26:18
go 4:11 5:7 20:22
  21:21 36:5 54:6
  61:14 68:20,20
  69:19
goes 38:20
going 4:11 5:3 22:6
  22:13 25:14 26:11
  30:2 34:3 39:19
  47:23 48:14 56:8
  58:21 62:7 70:14
GOLDEN 2:15 69:9
  70:5,17,21,24
good 20:25 32:4
  61:20 67:11
gospel 60:13
GOTSHAL 2:4
government 22:16
  24:22
grand 67:2
grant 64:12
granted 43:12,17
  63:8
granting 44:2,7
  57:13
Green 1:11 38:22
Greenhill 21:25
  22:19,23 23:4,8,13
  23:25 25:25 27:14
  28:6,16,24 29:13
  31:5 36:21 47:8
Greenhill's 22:25
  26:8 28:10 29:21

growth 23:4 26:20
  47:20,22
guarantee 5:19
  42:15 43:3 47:7
  48:21 49:18 50:4
  50:14 52:20 56:12
  56:16 57:13 58:2,3
  58:6,8,14
guess 69:11,25
GUMP 2:12

____ H ____

H 2:16,24 39:5
half 65:2
hand 29:11 45:10
  72:18
happy 69:4
harm 46:25
HAUER 2:12
HBE 57:19
headquarters 28:2
  33:11 34:5,13
Healthcare 40:25
hearing 5:19 32:18
  44:13,22 63:25
  66:19
held 39:6
heretofore 64:24
hereunto 72:18
high 29:5 35:25
  66:18
higher 26:24 31:20
  31:21 42:9 55:2
highest 41:15
highly 34:9 53:22
hindsight 52:23
hinge 21:5
historic 47:12
historically 54:5
history 28:12 38:25
  59:5
Hobby 44:8
hoe 61:4
holders 2:21 39:11
holding 44:13
HON 1:23

7

**Honor** 68:24 69:9,11
  69:22,24 70:5 71:3
**hopefully** 69:6
**House** 1:10
**Housecraft** 43:22
**Hughes/Boeing**
  24:10
**hundred** 24:2 27:9
  31:22

**I**

**Id** 44:20
**ignore** 61:12
**immediate** 70:10
**immediately** 52:18
  64:15
**immune** 56:17
**impact** 58:6 68:20
**important** 4:9 41:22
**importantly** 31:24
**improper** 37:20
  65:21
**improperly** 21:12
**inadequately** 52:15
**include** 36:13 62:8
**included** 31:3 32:22
  34:17 36:18 49:15
**including** 20:17 23:7
  36:16 39:10 45:25
  46:6 50:14 56:11
  57:18 59:2 63:10
  66:17
**income** 59:6
**incorporating** 43:5
**increase** 36:4 49:6
**increasing** 36:5
**incurrence** 57:3
**indenture** 45:5
**indicates** 51:9
**indicia** 58:17,25
  60:15
**indirect** 57:11,17
  58:4
**indirectly** 28:18
**individual** 43:16,24
**Industries** 43:22

**industry** 55:21
**industry-wide** 59:5
**inequitable** 37:20
**inflation** 23:11,12
**inform** 59:20
**informal** 21:19
**information** 24:9
  60:21
**informative** 60:21
**inquiry** 51:16
**insolvency** 57:8
  58:17
**insolvent** 21:20 37:8
  37:15 57:2,3
**instance** 63:7
**instances** 43:16
**instigation** 64:18
**instructs** 32:9
**integral** 48:22 49:18
**integrated** 49:14
**Intelsat** 30:11,14
  31:2 32:18
**intercreditor** 41:18
**interest** 27:23 28:21
  37:9,10,17,22 38:7
  38:11,16,20 39:10
  39:22 40:3,6,11,16
  40:20 41:6,9,20,23
  42:20 44:25 48:25
  49:23 56:18 57:15
  59:8 61:24 62:10
  66:15
**interested** 72:15
**interesting** 50:5
**interests** 20:19
  27:24 38:6 44:7
  47:4
**interrelated** 50:8,12
**intervening** 56:6
**introduced** 21:18
  23:12 28:17 50:18
**Inv** 39:15
**investment** 21:16
  23:3 24:5 25:17,18
  26:4 29:9 30:17
  34:23

**involved** 47:10
  53:16 63:3
**irrelevance** 59:24
**issuance** 50:3 52:19
**issue** 35:5 37:11
  40:6 42:13 44:23
  45:3 53:9 56:16
  60:25 69:15
**issued** 5:19 42:16
  66:23
**issuer** 21:6
**issues** 41:19 45:2
  68:25

**J**

**J** 3:12
**Jeffries** 21:25 22:17
  23:19,23 24:3,12
  25:25 26:10 27:7
  27:14,15 28:5,9,23
  29:4,17,18,20
  32:16 36:22 42:2
**jeopardizing** 34:5
**JOHN** 2:17,23
**joint** 5:15 20:5
**judge** 1:24 5:19
  32:10 40:24
**judgement** 37:10
  40:7
**judgment** 38:17
  40:12 41:5 42:22
**July** 1:9 50:21 63:10
**June** 61:13
**JUSTICE** 3:9
**justified** 26:16
**justify** 44:17

**K**

**Kansas** 56:23
**Karotkin** 2:7 67:14
  67:17,20 68:3,10
  68:19 69:4,10,16
  69:21 70:3,7
**keep** 5:5 23:17 66:2
**kept** 63:5
**key** 55:10 64:10,16

  64:18,24
**kick** 64:14
**kind** 22:6 49:2
**know** 67:15
**knowledge** 58:13

**L**

**L** 3:15
**labeled** 27:21
**lack** 52:7 55:21
  65:18
**language** 46:4 67:7
  67:25 68:4,6,17
**large** 22:23 28:3
  40:2
**largely** 22:24 27:6
  46:17 61:7 64:17
**law** 43:6 45:9 57:18
**lawyers** 63:6
**lay** 32:8
**lead** 56:7
**leads** 29:25 33:4
**learning** 32:23
**Leasing** 57:19
**leave** 4:15,19 5:17
  43:2 62:4
**led** 51:13
**left** 70:11
**legal** 38:7 65:14
**legally** 50:4
**legislative** 38:25
**legitimate** 32:2
**lenders** 50:6 57:22
**length** 35:2 50:15
**letter** 53:18
**level** 37:8 41:15
**levels** 60:14
**leveraged-leasing**
  33:21
**Lexis** 40:23 56:24
**liability** 56:13
**life** 52:10
**light** 29:19 51:20
  60:8 66:4
**likelihood** 44:17
**LINE** 5:19,19

linkage 63:20
Lippe 53:5
liquidation 23:15
  33:13
liquidity 59:13
litigation 5:17 34:17
  35:3 40:20 43:2
  44:19,21,24 45:7
  45:23,24 46:6,6
  47:2,3 61:5,7,17
  61:20,24 62:5,8,11
little 4:12 29:22 30:5
  42:18 58:9 59:10
  66:12,23
LLP 2:4,12
loan 57:25
location 34:8
logical 55:17
logically 54:23
long 33:14 35:3
  37:18 38:10 46:10
  62:21
looking 4:4 47:17
  70:6
Loral 1:6,17 3:16
  4:1,6,14,19 20:1
  20:15 21:1,19 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  29:1 30:1,10,25
  31:1,17 32:1 33:1
  34:1,21 35:1 36:1
  37:1 38:1 39:1
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1,22 48:1
  49:1,14 50:1 51:1
  52:1 53:1 54:1
  55:1,20 56:1 57:1
  57:22 58:1 59:1,9
  60:1 61:1 62:1
  63:1 64:1 65:1,25
  66:1 67:1 68:1
  69:1 70:1 71:1
Loral's 5:5,14 27:23
  28:11 30:10 33:9

35:8 49:10 56:8
LORI 2:9
lot 31:8
low 23:9,10,15 29:4
  33:9
LOWENSTEIN 3:4
lower 41:13 55:12
  56:3
lowered 60:7
LSPC 21:20 30:5,6
  32:2 34:14 51:21
LSPC's 65:10
lumpiness 25:9
  27:17
lumpy 31:9
LUSTRIN 3:12

___ M ___

M 2:15
Madison 2:14
main 23:23 24:23
  26:3 27:21 28:6,24
maintain 34:12
maintained 34:7
major 63:18
management 47:17
  62:24 63:9,21 64:3
  64:6,20,25 65:15
  65:23,24 66:7
managers 65:17
MANGES 2:4
manifest 39:21
market 48:18 58:20
  60:11,14,16 66:14
  66:21,25
markets 34:19 35:13
  57:21
marriage 72:13
material 52:14 67:4
math 42:21
matter 1:5,17 23:10
  34:21 40:8 50:11
  59:18 65:14 69:10
  72:9,14,16
maturity 49:15
mean 68:16 70:6

meaningful 31:15
  32:21
means 66:8 69:20
meant 58:3
measure 24:19
  25:22 32:5 35:18
measures 49:3 55:10
meet 49:5 51:2
  53:11 61:25
meeting 50:21 51:2
meets 67:11
members 63:9
memorialized 50:17
merely 53:16
merit 27:15
merits 44:21 46:24
  62:17
met 44:2
method 22:10,11,12
  22:25
methodologies 22:5
  25:20,23 26:5,9
methodology 23:4,9
  24:3,5 26:13 30:16
  54:12
Mexico 31:24 41:14
MEYER 2:9
MICHAEL 3:6
Michigan 40:9,18,24
mid 25:24 28:23
  48:15 55:19
middle 29:14
midpoint 22:15
  25:13 28:8 33:24
  63:11
million 22:17,18,20
  23:22 26:2,2,2,15
  27:5,9,10,12,14,15
  27:19 28:4,5,6,8,9
  28:10,19,22,23,24
  29:4,23,25 30:2,23
  31:22 33:18,25
  36:2,5,11,19,20
  37:6 42:11,17
  48:13,13,14,17
  49:11,16,23,24

55:2,6 57:15,16
  59:3 61:12 63:12
mind 30:16 46:4
  58:5
minus 22:15 54:15
minutes 4:16 50:17
  51:7
miscellaneous 22:8
misnomer 42:3
misplaced 29:17
Missouri 56:25
money 33:12
months 50:15
moot 42:15
motion 5:16 42:25
  47:4 62:3 70:9,18
move 34:4
moving 34:13
multiple 24:21
  26:24 31:6
multiplying 30:18

___ N ___

N 2:2 3:2,15 4:2
NATH 2:19
nature 25:10 27:8
  35:4 51:12 58:7
nearly 54:7
nebulous 59:21
necessary 48:22
  64:8,10 65:25
need 5:4 27:9 64:22
needs 4:19 27:8,16
  44:3,5
negative 54:16 55:7
  58:6 59:2,6 60:2
negotiated 63:7,24
  66:16
negotiation 63:16
negotiations 63:4,16
Neither 59:7
never 58:13,14
  59:15
nevertheless 26:23
  37:11 47:16
new 1:3,11,11 2:6,6

2:14,14,22,22 3:11
3:11 33:3 34:18,19
35:12,13 41:14
44:10 45:20 49:20
50:14 59:4 63:16
63:20,23 66:11
72:3,7
**Ninth** 41:16
**non-default** 41:24
**non-Intelsat** 32:21
**non-Skynet** 33:6
**normally** 65:3
**North** 30:10
**Northern** 45:13
**Notary** 72:6
**note** 2:21 20:14 25:5
36:20 41:24 56:15
58:18 61:5 64:14
65:17 66:3
**noted** 5:3 22:22
34:25 39:20 43:24
43:25 45:21 48:23
50:21 54:8
**notes** 5:18,19 34:22
63:17,21,23 66:11
66:16,21
**noting** 26:23 31:7
35:19 50:8 60:20
**notwithstanding**
24:21 37:18 47:20
61:11
**November** 54:9
**Nowak** 72:5,21
**number** 29:21 36:19
37:2,3 53:15 54:17
54:20
**numbers** 30:4 54:14

**O**

**O** 1:22 3:15 4:2
**obfuscated** 36:24
**objected** 20:20
**objection** 20:25
62:20 65:18 68:8
68:11,13
**objections** 20:14,15

20:21 21:5 67:24
**obligated** 50:4
**obligation** 57:4
**obligations** 51:15,25
**obtain** 62:16
**obvious** 64:12
**obviously** 21:5 34:8
36:3 43:8 50:3
60:25
**occupancy** 29:10
**occur** 63:17
**occurred** 57:25
66:19
**October** 30:8 31:17
31:19 32:16 39:6
**offer** 34:25 47:7
48:4,12,19,20,23
49:13,17,22 50:13
51:5,19,23 52:11
52:16,18,19 55:9
58:2,3 59:6
**offered** 53:13 64:9
**offers** 60:2
**OFFICE** 3:10
**officer** 48:2
**official** 2:13,20 22:3
43:14,15
**Ohio** 45:13
**Okay** 5:22 69:7,23
70:4
**once** 29:19 69:18
**ongoing** 33:15 34:6
51:14
**open** 68:18 70:11
**opinion** 5:7 32:8
40:19 58:11,14
59:16,17,20,22
60:22 61:18
**opportunity** 66:6
**opposed** 27:10 28:13
45:8 46:3,14
**option** 64:3,12 65:7
**options** 63:8,22
64:22 65:4,12
**oral** 54:20
**orbital** 24:15,17,21

27:23 28:7,12
**order** 4:12 5:4,19
28:14 39:7 67:16
69:5,11,18 70:7
**ordered** 70:8
**orders** 28:19 33:3
55:22 60:9 70:2
**original** 54:25
**originally** 28:14
63:14 64:19
**Orion** 5:18 42:16
43:3 47:21,21 48:3
48:8,13,23 49:8,20
50:2,14,24 51:4,18
51:23 52:14 55:8
56:9 57:14 58:22
**Orion's** 49:4,22 50:5
50:16,25 54:15,18
55:18 58:23 59:24
**outcome** 72:15
**outlays** 25:12
**outside** 45:22
**overall** 67:3
**overcome** 53:11
54:19
**overlooked** 36:24
**owe** 69:25
**owner** 32:9
**owners** 45:18 65:19

**P**

**P** 2:2,2 3:2,2,15 4:2
**package** 64:4
**packages** 64:8
**PAGE** 5:19,19
**pages** 36:16
**paid** 39:9 46:9 65:23
**Palo** 28:2 33:10
**PAMELA** 3:12
**paragraph** 70:8
**parent** 21:6 37:8
57:6,12
**parent's** 56:18 57:3
**part** 4:9,10,11,12,15
5:14 38:12 48:22
49:14,19 55:8

64:23 65:7 68:11
**participate** 39:11
**particular** 29:15
┌ 31:7 34:16 35:19
47:19 51:20 52:22
**particularly** 24:10
24:19 27:16 35:4
42:24 52:18 60:6,7
60:12,18 65:11
66:13
**parties** 27:20 30:8
32:13 36:24 37:12
45:25 56:11 69:19
72:14
**parts** 5:3
**party** 51:17
**patent** 34:17 35:2
**patents** 34:17,20
35:5,6,7,10,11
**patience** 70:25
**pay** 48:6,25 51:14
59:11
**paying** 49:2
**payment** 38:7 49:4
**payments** 48:3
**people** 4:5 55:20
60:15
**percent** 23:8 24:2,3
26:7,8,11,12,18
38:18 42:4,9 47:20
47:22,23 53:16,19
54:12,13 55:3,12
55:14 64:15
**percentage** 23:7
29:2
**performance** 34:6
47:18 55:5,18
58:24
**permit** 32:7 37:22
**permitted** 46:13
**permitting** 69:12
**perpetual** 23:4
**person** 32:8
**persuaded** 41:4
**persuasive** 50:6
**pertain** 50:19

pertaining 67:8
**PETER** 2:24
placed 24:25 26:6
placing 22:12 33:9
plain 40:22 46:4
plaintiffs 68:8
plan 5:15 20:5,6,11
  20:21,24,25 21:11
  21:11 35:25 36:23
  39:8 40:4,13 41:6
  56:7 62:21 63:14
  64:18 65:13 66:4
  67:9,11,24
plan's 20:22
**Please** 4:3
pocket 62:9
point 28:23 35:21
  48:15 56:25 63:2
  68:7 69:14
pointed 23:6 31:5,16
  58:25
pointing 58:23
points 30:5,6 64:11
portion 5:23 61:18
positive 25:7 60:11
possibilities 35:14
possibility 70:12
post 58:23
postpetition 37:22
  38:7,11,16,20
  39:10 40:6,10,19
  41:6,22 42:10 62:9
potential 23:6 29:10
  34:15,18,19 35:12
  46:25
potentially 21:9
precedent 35:17
preference 26:10
preferred 20:22
  21:7 34:8
prejudice 68:14
premised 63:20
prepared 4:10 5:10
  23:19 28:14 32:15
  47:5,8 59:18
president 36:10

pressed 30:19
presumed 63:20
presumptuous
  67:21
prevented 46:19
previously 49:2
  60:10
pre-exchange 49:8
price 24:18 63:11
  66:25
priced 66:21
prices 60:7
pricing 60:14
primarily 20:12
  21:23 27:25 28:7
  33:10,17 51:14
primary 20:21 36:6
  50:25
pro 30:25 65:21
  66:10
problem 52:2,4,10
  68:15
proceedings 72:8,11
process 34:24 68:12
  69:2
produce 44:20
product 58:20
Products 39:12
professionally 47:15
  47:16
profits 60:16
progeny 62:3
program 65:7
project 31:10
projected 25:2
  26:20 27:12 28:4
  31:20,21 35:15,24
  47:22 51:24 54:14
  55:5,10
projection 22:16
  27:3 31:22 36:21
  54:21,22,25
projections 25:4,10
  29:10 31:9 37:3
  47:9,11,15,18 48:7
  51:2,23 52:5,9

53:2,3,20,22,24
  54:4,7,10 55:15,24
  56:2,5 58:24
prolong 70:6
promise 65:8
proper 22:22 56:10
properly 5:18 35:15
property 32:9
proposed 20:22
  30:10 47:6 64:19
  67:15
prosecute 70:9
prospect 33:14
prospects 59:9
Protective 3:16
  21:19 38:22 39:14
proven 29:12
provide 44:4
provided 36:8 58:4
provides 38:6
provisions 49:9
  50:10 57:24
public 46:17 72:6
purchased 51:22
purposes 25:16 32:5
  59:3 66:9
pursue 5:17 43:17
  45:14 61:5 62:5
pursued 61:9,17
  62:11
pursuing 46:12,19
  61:7
pursuit 44:25 61:20
  61:23
put 28:14
p.m 1:9

**Q**
qualified 34:9
quantified 62:12
question 43:7 46:23
  51:10 70:8
quid 65:21 66:10
quite 48:9 53:9
  62:13
quo 65:21 66:10

**R**
**R** 1:22 2:2,9 3:2,15
  4:2 72:2
raise 51:11
raised 20:14 21:18
  30:5 34:15 35:21
  42:13 45:4 51:10
  51:21
range 28:8 52:7
  58:22 66:19
ranges 25:24
rate 37:9,10 38:8,17
  38:18 40:3,7,12,15
  40:15,21,22 41:5,9
  41:13,24,24 42:3,4
  42:5,6,8,10,21,22
  66:15
rating 50:6 57:22
**RDD** 1:6
reach 44:12
reached 65:22
reaches 38:23
real 27:24 32:24
  33:6,9,12,18,22,23
  33:24 61:22 64:11
realization 60:9
realizing 33:14
really 31:14 38:13
  63:2 66:23
**Realty** 45:19
reason 29:15 33:8
reasonable 23:22
  25:5 47:12 51:10
  55:16
reasonably 52:12
  61:2
reasons 5:6 21:22
  26:17 61:20
rebuttal 64:11
**Rec** 39:5
recall 67:22
receive 20:23 37:22
  38:2,11,16 43:24
received 34:25
  65:20

receivership 39:22
receiving 21:10
 65:13,15,17
recognized 22:5
 25:19 30:18 37:19
 38:3,10 43:13
 56:19 57:17
recollection 53:25
 54:2
record 4:9,11 66:24
 68:5,7 72:10
recover 37:21
recoveries 45:16
 46:5,8
recovery 20:24
 21:10,13 37:23
 38:8 39:11 41:25
 42:14,18,19,21
 44:4 61:14 62:15
reduced 48:4 49:22
 49:24 57:16 59:8,9
reducing 35:10
reduction 57:15
reference 32:23 51:6
 51:8 54:7
referred 33:3 38:24
 58:18 59:14 70:7
refers 46:5
reflect 26:19
reflected 68:5
refused 43:20 45:13
regard 26:4 34:20
 44:11 51:11,18
 52:2 68:17
regarding 48:2
regular 24:22
related 28:18 57:24
 72:13
relates 4:11
relatively 29:5
relevance 59:23
relevant 24:6 45:5
 58:22
reliable 24:10 32:5
relied 32:11 41:17
 53:24 60:18

rely 33:7
remains 33:15
remarks 50:19
 67:23
render 60:23
rendered 58:13
renders 37:14
renegotiate 66:6
renegotiation 66:3
reorganization
 39:23 41:7
report 32:15 33:5
reported 72:8
Reporter 72:6
reports 21:15 47:19
representing 46:17
request 5:14 20:3
 70:23
require 25:12
required 21:2 62:2
requirement 67:11
requirements 20:9
requires 41:5
reserve 5:11
reserved 69:2
reserves 69:15
resolution 68:12
 69:2
resolved 67:24 68:4
 68:6
respect 5:18 20:17
 28:7,25 49:16
 53:12
respectively 22:2
 26:3
respects 53:15 54:13
result 33:2 57:12
 70:9
resulted 54:17 59:7
results 53:2 54:10
 55:25
retain 27:9 64:10,24
retained 21:16,25
Retention 64:18
Revco 45:11
revenue 24:23 30:19

30:22 31:6,9,21
 47:13 55:11
review 5:10 20:6
 21:14,24 23:20
 43:18 52:5
reviewed 36:15
reviewing 47:18
revised 29:18 60:8
 64:20 66:13 69:5
revision 67:9
right 4:4 5:2,11 20:2
 36:5 38:10 40:10
 42:21 69:3 70:20
 71:2
rightful 21:13
rights 68:15
risks 32:4
risky 26:22 29:8
RML 53:4
Road 45:18
ROBERT 1:23
Robins 23:3 31:4,15
 47:8,13 48:8,12
 53:9,14,17,20
Rock 39:12
Rodriguez 56:21
ROSENTHAL 2:19
ROSSMAN 2:16
roughly 27:4 30:21
 34:25 36:20
row 61:4
RUEGGOR 2:24
rule 23:13 38:3,12
 39:5 41:3,21 56:20
 70:12
Rules 32:7
ruling 1:17 4:10,13
 4:15,17 5:3,14
 20:3
rulings 5:9

S
s 2:2 3:2,9,15,15 4:2
 22:14 42:15 43:13
 50:16 52:19 58:2
 59:25 61:21

sale 30:10 31:2
 35:10
sale/leaseback 33:22
SANDLER 3:4
satellite 28:14,19
 29:12 33:3 49:10
 50:23 60:9
satellites 30:11
 34:11 51:22 52:3
 55:22
satisfied 20:9,16
 44:3
SatMex 31:23
saw 27:15 33:23
scheme 67:2
Schwartz 3:9 21:17
 30:6,11,20 31:12
 50:19 62:25 63:9
 64:2
Schwartz's 30:24
 31:6,25 32:13
 64:21
Sciences 24:16,17,21
scientists 34:10
seal 4:10 5:19 61:19
sealed 5:23
seated 4:3
second 25:15 42:12
 43:14,21,23 44:5
 51:25 57:18,20
Secondly 64:17
second-tier 45:3
Section 20:18 21:2
 32:6 37:16 38:4,5
 38:6 39:2 41:4,17
 43:4 46:4,7 67:12
 68:17
sections 20:9,13,13
secured 39:9 46:9
 49:10,12 66:17
securities 59:25
 60:12
Security 2:21
see 33:13 39:5,11
 40:16 41:13 43:20
 44:8,14 53:2,3

12

55:25 56:13 57:18
65:4 66:22
seeing 62:15
seen 58:14 67:15
segment 22:13 25:15
segments 22:8 64:15
sell 28:12 34:22
selling 34:12,24
Seminole 45:19
senior 64:20
sense 31:8 54:23
65:3
separate 42:25
seriously 34:5
serves 36:6
service 29:19
set 56:6 72:18
settlement 62:16
66:4
Seventh 56:14
severe 55:21
SG&A 36:11
SHAI 2:8
shareholder 20:23
shareholders 21:12
37:20,23 38:9
42:14,19 45:14,17
46:2,18 62:15,20
65:13,16
sharply 55:19
Shore 45:18
short 60:19
Shorthand 72:5
shortly 32:24 63:24
shot 35:4
show 66:24
showed 48:8,10
showing 52:3 55:4
shown 43:19 44:5
55:11
signed 4:6,18
significant 31:17
44:22 51:24 54:18
62:13
similar 59:23 64:8
similarities 24:15

similarly 48:9 60:11
simply 23:15 30:18
sir 67:17,20 69:17
70:3
situation 46:10
situations 46:15
skewing 26:21
Skynet 30:10 63:17
63:21,23 66:11
slight 26:10
slightly 26:15
slots 27:23 28:7,13
small 4:9
softening 50:23
solar 52:2
solely 33:20
solvency 48:15 51:6
51:8 52:21,24
58:11,14 59:15,17
60:22 61:2
solvent 21:7 37:19
38:2 39:5,7 40:4
48:9,10,13,16
56:10
somewhat 5:4 24:8
26:21,23 42:3
50:18 61:6
SONNENSCHEIN
2:19
sorry 70:5
sort 32:20 58:20
59:21 66:10 67:6
source 24:23
sources 27:13 34:15
Southern 1:3 44:9
so-called 32:15
41:25 51:25 58:17
Space 1:6,17,18 4:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1

44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1
special 34:7,9
specific 40:13 41:8
Specifically 39:6
spike 60:3
spread 28:2,21
spreads 64:15
ss 72:3
SS/L 22:14,22 23:2
23:14,17,19,22,24
24:8,13,16,20,24
25:7 27:12 30:8,15
30:21 31:3,7,8
33:15,16 34:4,10
34:12 35:24 36:4,7
36:13,20 37:5 42:4
42:6,8 66:5
SS/L's 24:19 27:8,16
27:17,24,25 30:18
31:21 32:25 33:10
35:23 36:5,8,9,10
standard 38:13
43:25 59:4
standing 43:9,12,17
43:25 44:2,7 45:3
45:6,14 46:11,18
61:10 62:4
start 67:23
state 43:5 72:3,7
stated 44:15 63:7
statement 20:7 67:8
States 1:2,10 3:9,10
status 46:20
stay 70:15,17,23
steady 24:22
stemmed 23:24
STEPHEN 2:7

sticking 65:8
stipulated 57:8
STN 43:21 44:14,15
53:12 62:2
stock 21:7 24:18
63:8,21 64:3,12,22
65:4,6,12
Stockholders 3:16
21:19
strategy 49:14
STRAUSS 2:12
Street 3:10
strike 63:10
subject 58:8 70:22
subordination 68:25
subsequent 60:5
subsequently 30:14
subsidiary 20:4 21:9
56:19 57:2,5,8
substantial 25:11,12
60:16
substantially 48:4
63:17
substantive 63:4
success 44:17
sufficient 44:17
suggesting 54:20
suggests 60:16
summarize 21:21
summer 60:6
Supreme 38:21
sure 5:12
surprising 59:10
survive 30:13
swing 27:5
Systems/Loral 1:18
S.Ct 39:13
S.D.N.Y 53:6

_____ T _____

T 3:15 72:2,2
take 54:24
taken 32:3 54:24
60:13
talked 33:21 70:11
tangentially 34:19

technical 65:14
technologies 35:12
technology 34:18
  35:8
telling 60:6,12
Telstar 52:8,10
ten 4:16
tends 31:11
term 42:2 60:19
terminal 23:2,5 25:3
terms 63:8 66:16
  69:14
test 38:6
testified 30:14 31:19
  34:4 47:11,20,25
  48:20,21 50:2
  55:20 59:20 63:3
  64:2
testimony 20:7
  21:15,17 24:14
  27:17 32:17,18,19
  32:22 33:4 35:7
  36:9 54:6 58:18
  64:21 66:12
thank 69:7,16,21
  70:21,24 71:2,3
THEODORE 2:8
therewith 47:8
thing 30:7
things 33:2 53:25
  60:24 67:2
think 69:13 70:11
thinks 32:11
third 44:6 53:4
thought 25:13 36:10
thousand 35:2
three 21:15,24 25:17
  25:19 26:5,9,16
  27:21 30:17 32:12
  44:2
tied 65:4
time 32:24 35:15
  47:10,11 48:11,19
  52:12,16,17,20
  54:5 55:24 56:3
  57:3 58:6,22 62:10

64:17 70:25
times 30:22
timing 63:22
today 64:6
told 54:3
tonight 69:6
TONY 3:16
total 29:22,25
touchstone 39:21
Townsend 47:10,19
  48:19 50:2 54:2
Townsend's 54:6
trading 59:24 60:3,4
  60:5,14,17,17
traditional 22:4
  25:19
traditionally 56:17
transaction 22:11
  24:11 30:14 31:14
  31:15 35:17 50:20
  51:11 57:25
transactions 24:7
  25:21
transcript 1:14 5:10
  5:24 72:10
transfer 5:17 43:4,5
  43:10 45:7,15,16
  45:23,24 52:22
  53:8 55:25 56:4,18
  57:4,7 58:9 62:5
transferred 51:4
  55:8
transponders 52:8
treasurer 51:13
treat 56:12
treatment 65:12
treats 29:11
trends 23:12 47:12
trial 51:18 53:8
  60:25 67:23
tried 51:6 54:19
trigger 49:8,11
troubling 50:19
true 72:10
trustee 3:10 45:5
  68:2,4

trying 53:11
TSEKERIDES 2:8
turn 29:6 38:24
turning 45:2
two 5:3 22:7,24 23:3
  23:20 25:23 26:7
  26:25 27:2 37:13
  38:3 44:11 50:18
  53:25 54:12 69:25
type 31:3,10

U

ultimate 56:7
ultimately 37:14
unable 28:12
uncertain 29:8
uncertainties 25:8
uncertainty 49:5
uncontemplated
  56:6
uncontroverted
  35:6
underlay 51:22
underlie 35:25
underlying 25:4
underpinnings
  33:23
understand 65:10
  70:24
understatement
  54:18
unduly 41:10
unfulfilled 65:8
unholy 62:23 63:19
  67:7
United 1:2,10 3:9,10
unjustifiably 43:19
unlikelihood 62:14
unmatured 37:17
unreasonable 53:3
  56:2
unsecured 2:13 21:8
  37:10,21,24 38:8
  38:10,16 39:8 42:7
  61:8 65:19
unsecureds 61:15,16

unused 27:23 28:7
  28:12
unusual 58:7
upwards 29:19
USA 43:22
use 35:9 41:5
useful 35:7
U.S 1:24 38:22
  39:12,16,25 67:25
  68:4

V

v 39:12
vacuum 40:7 49:13
valuation 22:7,22
  23:14,24,25 24:8
  25:13,16,20,24
  26:7,9,11,14,22,24
  27:3 28:25 29:4,4
  29:18 30:13,15,25
  31:3,6,25 32:2,5,6
  32:10,13,20 33:6,9
  33:16 34:2 35:18
  36:3,7 37:4 42:12
  42:18 47:5 53:9,18
  53:21 61:6,13
  63:11 64:13 67:3
valuations 23:18,20
  25:5,17 26:4 35:16
  60:19
value 22:12,14,17,18
  22:19 23:2,5,16,22
  24:19,24,25 25:3
  25:23 26:22 27:22
  28:4,16,17,20
  29:23,24,25 30:7
  31:22 32:8 33:14
  33:18 34:2,15
  35:10,19 37:7
  54:18 56:3,4 57:11
  57:14,14 58:4,21
  58:25 59:24 60:3,4
  60:5,15 61:3 65:5
valued 28:8,22
values 60:17
valuing 22:5

14

| | | | |
|---|---|---|---|
| **Vanston** 38:21 39:19 | **WESTCHESTER** 72:4 | **$130** 28:23 | **1124(3)** 39:2 |
| **variances** 55:10 | **Western** 56:24 | **$135** 29:23 | **1129(a)** 20:10,13,16 |
| **variations** 55:4 | **we'll** 69:4,6 | **$143** 28:6 | **1129(a)(11)** 20:18 |
| **versus** 38:22 45:19 53:5 54:10 55:10 56:23 57:19 58:24 | **WHEREOF** 72:17 **Whitehall** 3:10 **willing** 65:22 | **$15** 33:25 **$152** 28:22 **$180** 27:12 | **1129(a)(3)** 21:2 67:12 **1129(a)(7)** 20:19 |
| **vetted** 36:21 47:15 47:16 | **windfall** 37:23 **withdrawn** 68:13 | **$190.35** 27:14 **$202** 22:18 | **1129(a)(7)'s** 38:5 **1129(b)** 32:6 41:4 |
| **victory** 62:17 | **witness** 63:2 72:17 | **$217** 28:4 48:14 | **118** 45:12 |
| **view** 27:6 29:6 35:23 36:2,8,10 39:18 41:10 45:15,23 46:3 60:2 64:4 65:6,22 66:8 67:8 | **WOLFSON** 2:24 69:24 71:3 **word** 25:9 **work** 58:20 63:22 **working** 65:25 | **$275** 22:17 **$300** 34:25 **$39** 57:16 **$392** 26:2 **$440** 26:14 | **12** 52:8 **1221** 2:22 **1231** 41:16 **139** 53:4 **140** 39:5 |
| **viewed** 49:13 50:7 56:17 57:22 | 67:25 **worth** 30:21 33:12 | **$442.3** 26:2 **$470.6** 26:2 | **15** 47:22 **150** 27:18 29:24 |
| **views** 58:19 **virtue** 70:18 | **wouldn't** 59:17 **write-off** 59:2 **written** 58:20 59:16 | **$5** 28:9 **$50** 28:8 **$97** 22:19 | **155** 53:4 **156** 38:22 **16136** 56:24 |
| **W** | | **$970** 61:12 | **165** 39:25 **187** 45:19 |
| **W** 2:17 | **X** | **0** | **19** 5:19 |
| **WACC** 29:5,11 | **x** 1:4,8 | **03-41709** 1:6 | **1941** 39:13 |
| **WAISMAN** 2:8 | **Xonics** 56:14 | **03-41710** 1:6 | **1946** 38:23 |
| **wait** 37:25 | **XTAR** 27:23 28:21 | **03-41728** 1:7 | **198** 56:14 |
| **waiting** 65:2 | 29:6,16,19 | **050276** 36:16 | **1982** 39:16 |
| **Walrath** 40:25 | | **050282** 36:16 | **1985** 43:22 |
| **want** 25:9 61:9 67:21 | **Y** **Y** 2:8 | **1** | **1990** 45:13 56:22 **1991** 40:10 |
| **wanted** 65:24 66:6 68:7 | **year** 25:2,6 47:24 48:24 52:10 65:2 | **1** 23:8 **1st** 39:15 | **1993** 56:23,25 **1994** 39:6 |
| **wanting** 61:17 | **years** 23:11 39:3 | **1.1** 38:18 | **1995** 45:20 57:20 |
| **wasn't** 59:19 60:25 | **yield** 66:18 | **1.48** 31:2 | **1996** 53:4 |
| **waterfall** 41:25 | **York** 1:3,11,11 2:6,6 | **10** 28:19 | **1998** 41:15 44:10 |
| **way** 24:6 30:24 32:21 72:15 | 2:14,14,22,22 3:11 3:11 44:10 45:20 | **10(k)s** 52:5 **10,768** 39:5 | 56:14 **1999** 40:18 |
| **weighing** 46:24 | 72:3,7 | **10004** 1:11 3:11 | |
| **weight** 24:14 26:6 26:18 28:15 32:10 58:9,16 | **Z** **zero** 28:15 | **10020** 2:22 **10022** 2:14 **10153** 2:6 | **2** **2d** 53:5 **20** 5:19 26:7 36:2,4 |
| **weighted** 23:25 26:9 29:2 | **$** | **105** 55:2 **11** 20:5 40:4 41:6 | 55:6 **2000** 47:21 |
| **weighting** 24:4 26:5 26:7,8 | **$108** 28:23 29:4 **$114** 28:5 | 47:23 52:10 61:21 65:6 | **2001** 42:16 43:2 47:6 47:21,23 50:21 |
| **WEIL** 2:4 | **$117** 27:14 | **11th** 56:22 | 51:3 53:14,21 54:9 |
| **went** 29:19 | **$13** 28:10 | **111** 48:13 | 54:10,15 55:7,12 |

15

| | | |
|---|---|---|
| 55:16 58:23 | **380** 53:5 | **726(a)(5)** 38:6 40:11 |
| **2002** 40:24 41:17 | **39** 49:24 | 41:18 |
| 43:23 47:23 49:6 | | **767** 2:6 |
| 49:17 54:10 55:12 | **4** | **779** 43:21 44:14 |
| 55:19 59:5 60:6,8 | **4** 39:6 | |
| **2003** 30:8 31:17,19 | **40** 26:11,12 48:17 | **8** |
| 32:16 53:6 54:11 | **411** 41:14 | **837** 45:20 |
| **2004** 40:23 41:3 | **43** 36:20 | **841** 56:14 |
| 63:10 | **45** 55:12 | **851** 45:20 |
| **2005** 1:9 61:6,13,13 | **450** 30:22 | **894** 39:16 |
| 72:19 | **459** 39:16 | **895** 56:21 |
| **2008** 25:2 | **468** 45:12 | |
| **21** 5:19 36:11,19 | **475** 45:12 | **9** |
| **220** 41:14 | **48** 57:19 | **901** 43:21 |
| **223** 44:9 | | **904** 43:21 |
| **229** 57:14 | **5** | **905** 44:14 |
| **230** 23:22 49:23 | **5** 5:19 33:18 | **906** 44:20 |
| **237** 40:8 | **50** 27:10 | **92** 53:4 |
| **24** 36:15 | **500** 30:22 49:11 59:3 | **9281** 45:18 |
| **244** 40:16 | **502(b)(2)** 37:16 | **970** 30:2 37:6 42:11 |
| **249** 53:5 | **510** 39:13 68:17 | 42:17 |
| **25** 1:9 23:11 64:15 | **527** 39:13 | |
| **264** 39:15 | **530** 48:16 | |
| **27** 47:20 | **535** 49:16 | |
| **275** 44:9 | **544** 43:4 46:7 | |
| **27989** 40:23 | **550** 46:5 | |
| **282** 44:9 | **590** 2:14 | |
| **285** 41:16 | | |
| | **6** | |
| **3** | **6** 42:4,9 | |
| **3** 23:8 | **60** 26:8,18 | |
| **3:00** 1:9 | **61** 39:13 | |
| **30** 24:3 26:11,11 | **623** 57:19 | |
| 61:13 | **638** 57:19 | |
| **310** 43:23 | **64** 43:23 | |
| **312** 39:12 | **675** 39:13 | |
| **315** 41:2 | **678** 40:17 | |
| **321** 41:2 | **679** 39:15 | |
| **328** 48:13 | **685** 39:13 | |
| **329** 38:22 39:25 | | |
| **33** 3:10 53:16,19 | **7** | |
| 54:12,13 55:3,12 | **70** 27:5 | |
| 55:14 | **700** 63:11 | |
| **346** 41:2 | **71** 43:23 | |
| **357** 53:5 | **725** 56:22 | |
| **38** 40:9 | **726** 38:4 | |

BENJAMIN REPORTING  (212)374-1138   DOYLE REPORTING  (212)867-8220
A VERITEXT COMPANY