Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                         :

                                     :    Chapter 11

6    ENERGY FUTURE HOLDINGS          :

     CORP., et al.,                  :    Case No. 14-10979(CSS)

7                                    :

              Debtors.              :    (Jointly Administered)

8    _____ :

9

10

11

12                                   United States Bankruptcy Court

13                                   824 North Market Street

14                                   Wilmington, Delaware

15

16

17                                   September 9, 2015

18                                   2:02 PM

19

20   B E F O R E :

21   HON. CHRISTOPHER S. SONTCHI

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECR OPERATOR:  LESLIE MURIN

Page 2

1    HEARING Re Motion of Energy Future Holdings Corp., et al.,

2    for an Order Approving the Assumption of all Executory

3    Contracts by and Among Luminant Generation Company LLC,

4    Luminant Mining Company LLC, Sandow Power Company LLC, Texas

5    Competitive Electric Holdings Company LLC and Alcoa, Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sheila Orms and Sherri Breach

1    A P P E A R A N C E S :

2    KIRKLAND & ELLIS

3         Attorney for the Debtors

4         601 Lexington Avenue

5         New York, NY  10022

6

7    BY:  REBECCA CHAIKIN, ESQ. (TELEPHONICALLY)

8         NATASHA HWANGPO, ESQ. (TELEPHONICALLY)

9         ANDY MCGAAN, ESQ. (TELEPHONICALLY)

10         MARK E. MCKANE, ESQ. (TELEPHONICALLY)

11         BRENTON ROGERS, ESQ. (TELEPHONICALLY)

12         BRIAN SCHARTZ, ESQ. (TELEPHONICALLY)

13         APARNA YENAMANDRA, ESQ. (TELEPHONICALLY)

14         CHRISTOPHER W. KEEGAN, ESQ. (TELEPHONICALLY)

15

16    RICHARDS, LAYTON & FINGER

17         Attorneys for the Debtors

18         920 North King Street

19         Wilmington, DE  19801

20

21    BY:  DANIEL DEFRANCESCHI, ESQ. (TELEPHONICALLY)

22         JASON MADRON, ESQ. (TELEPHONICALLY)

23

24

25

1   MONTGOMERY MCCRACKEN

2       Attorney for EFH Committee

3

4   BY:  MARK A. FINK, ESQ. (TELEPHONICALLY)

5

6   MCELROY DEUTSCH MULVANEY & CARPENTER LLP

7       Attorney for TCEH Debtors

8

9   BY:  DAVID A. PRIMACK, ESQ. (TELEPHONICALLY)

10

11  PAUL, WEISS, RIFKIND, WHARTON & GARRISON

12      Attorneys for the Ad Hoc Committee of TCEH First Lien

13      Creditors

14

15  BY:  JACOB A. ADLERSTEIN, ESQ. (TELEPHONICALLY)

16      ADAM M. DENHOFF, ESQ.  (TELEPHONICALLY)

17      ALAN KORNBERG, ESQ. (TELEPHONICALLY)

18      ADAM BERNSTEIN, ESQ. (TELEPHONICALLY)

19

20  YOUNG CONAWAY STARGATT & TAYLOR, LLP

21      Attorney for the Ad Hoc Committee of TCEH First Lien

22      Creditors

23

24  BY:  PAULINE MORGAN, ESQ. (TELEPHONICALLY)

25

1   VENABLE, LLP

2        Attorneys for Pimco

3

4   BY:   JEFFREY S. SABIN, ESQ. (TELEPHONICALLY)

5        JAMIE EDMONSON, ESQ. (TELEPHONICALLY)

6

7   KLEHR HARRISON HARVEY BRANZBURG, LLP

8        Attorney for UMB Bank, N.A.

9

10  BY:   RAYMOND H. LEMISCH, ESQ. (TELEPHONICALLY)

11

12  UNITED STATES DEPARTMENT OF JUSTICE

13        Attorney for the U.S. Trustee

14

15  BY:   ANDREA B. SCHWARTZ, ESQ. (TELEPHONICALLY)

16

17  UNITED STATES DEPARTMENT OF JUSTICE

18        Attorney for Creditor, United States of America

19

20  BY:   WARD BENSON, ESQ. (TELEPHONICALLY)

21

22

23

24

25

1   BROWN RUDNICK LLP

2        Attorney for WSFS

3

4   BY:  JEFFREY L. JONAS, ESQ. (TELEPHONICALLY)

5        EDWARD WEISFELNER, ESQ. (TELEPHONICALLY)

6

7   REED SMITH LLP

8        Attorney for BNYM and BNYMTC

9

10  BY:  KURT E. GWYNNE, ESQ. (TELEPHONICALLY)

11       KIMBERLY E.C. LAWSON, ESQ. (TELEPHONICALLY)

12

13  PROSKAUER ROSE, LLP

14       Attorney for EFIH

15

16  BY:  JEFF MARWIL, ESQ. (TELEPHONICALLY)

17       LARY A. RAPPAPORT, ESQ. (TELEPHONICALLY)

18       MARK K. THOMAS, ESQ. (TELEPHONICALLY)

19

20  KRAMER LEVIN NAFTALIS & FRANKEL, LLP

21       Attorney for Second Lien Indenture Trustee

22

23  BY:  TUVIA PERETZ, ESQ. (TELEPHONICALLY)

24       GREGORY HOROWITZ, ESQ. (TELEPHONICALLY)

25

1    PACHULSKI STANG ZIEHL & JONES

2         Attorney for EFIH Second Lien Indenture Trustee

3

4    BY:  LAURA DAVIS JONES, ESQ. (TELEPHONICALLY)

5

6    LANDIS, ROTH & COBB

7         Attorney for Alcoa, Inc.

8

9    BY:  MATTHEW B. MCGUIRE, ESQ. (TELEPHONICALLY)

10

11   MCKOOL SMITH, PC

12        Attorney for Alcoa, Inc.

13

14   BY:  ROBERT ELKIN, ESQ. (TELEPHONICALLY)

15        PETER GOODMAN, ESQ. (TELEPHONICALLY)

16        BILL M. WILSON, ESQ. (TELEPHONICALLY)

17

18   SHEARMAN & STERLING

19        Attorneys for Deutsche Bank New York

20

21   BY:  NED S. SCHODEK, ESQ. (TELEPHONICALLY)

22

23

24

25

1    POTTER ANDERSON CARROON LLP

2        Attorney for Deutsche Bank New York

3

4    BY:  R. STEPHEN MCNEILL, ESQ. (TELEPHONICALLY)

5

6    SULLIVAN & CROMWELL

7        Attorney for EFH Committee

8

9    BY:  ANDREW DIETDERICH, ESQ. (TELEPHONICALLY)

10        BRIAN GLUECKSTEIN, ESQ. (TELEPHONICALLY)

11

12    NIXON PEABODY

13        Attorney for AST as EFH Indenture Trustee

14

15    BY:  RICHARD PEDONE, ESQ. (TELEPHONICALLY)

16

17    DRINKER, BIDDLE & REATH

18        Attorney for Citibank, DIP Agent

19

20    BY:  HOWARD COHEN, ESQ. (TELEPHONICALLY)

21

22

23

24

25

1    POLSINELLI

2         Attorneys for TCEH Committee

3

4    BY:  JUSTIN EDELSON, ESQ. (TELEPHONICALLY)

5         CHRIS WARD, ESQ. (TELEPHONICALLY)

6

7    MORRISON & FOERSTER

8         Attorneys for Creditor's Committee

9

10   BY:  DANIEL J. HARRIS, ESQ. (TELEPHONICALLY)

11

12   MORRIS JAMES, LLP

13        Attorney for Law Debenture

14

15   BY:  STEPHEN MILLER, ESQ. (TELEPHONICALLY)

16

17   PATTERSON BELKNAP WEBB & TYLER

18        Attorney for Law Debenture Trust Co.

19

20   BY:  DANIEL A. LOWENTHAL III, ESQ. (TELEPHONICALLY)

21

22

23

24

25

1  WILMER CUTLER PICKERING HALE AND DOOR LLP

2       Attorney for Delaware Trust

3

4  BY:  ISLEY M. GOSTIN, ESQ. (TELEPHONICALLY)

5

6  O'KELLY, ERNST & BIELLI, LLC

7       Attorneys for Debtor

8

9  BY:  DAVID KLAUDER, ESQ. (TELEPHONICALLY)

10

11 MUNGER TOLLES & OLSON, LLP

12       Attorney for TCEH, EFCH

13

14 BY:  THOMAS WALPER, ESQ. (TELEPHONICALLY)

15       EMILY A. BUSSIGEL, ESQ. (TELEPHONICALLY)

16       SETH GOLDMAN, ESQ. (TELEPHONICALLY)

17

18 ASHBY & GEDDES

19       Attorney for WSFS, Trustee

20

21 BY:  BILL BOWDEN, ESQ. (TELEPHONICALLY)

22

23

24

25

1    WHITE & CASE

2         Attorney for TCEH Ad Hoc Group

3

4    BY:  CHARLES KOSTER, ESQ. (TELEPHONICALLY)

5         J. CHRISTOPHER SHORE, ESQ. (TELEPHONICALLY)

6

7    OTHERS APPEARING TELEPHONICALLY:

8    DEREK C. ABBOTT, MORRIS NICHOLS ARSHT & TUNNELL FOR TEFCH &

9    TEFH

10   SCOTT L. ALBERINO, AKIN GUMP, FOR EFIH UNSECURED NOTEHOLDERS

11   ARLENE R. ALVES, SEWARD & KISSELL LLP, FOR WILMINGTON TRUST

12   PEG A. BRICKLEY, DOW JONES & CO

13   MATTHEW BROD, MILBANK, TWEED FOR CITIBANK

14   PHILIP E. BROWN, PSAM, LP

15   STEPHEN BURNAZIAN, AVENUE CAPITAL GROUP

16   CHRISTOPHER L. CARTER, MORGAN LEWIS & BOCKIUS, LLP FOR

17   PACIFIC INVESTMENT MANAGEMENT COMPANY

18   JAE SEON CHOI, NOMURA SECURITIES INTERNATIONAL

19   STEVEN H. CHURCH, BLOOMBERG LP

20   KENT COLLIER, REORG RESEARCH, INC.

21   MICHAEL L. DAVITT, JONES DAY FOR ONCOR ELECTRONIC DELIVERY

22   HOLDINGS CO.

23   MICHAEL D. DEBAECKE, BLANK ROME FOR WILMINGTON TRUST

24   STACEY DORE, ENERGY FUTURE HOLDINGS CORP.

25   ERIN FAY, MORRIS NICHOLS ARSHT & RUNNELL LLP, FOR TEFCH AND

1   TEFH

2   BRADLEY FEINGERTS, GSO CAPITAL PARTNERS

3   MOSHE FINK, KOSOWITZ BENSON TORRES & FIREDMAN LLP FOR AD HOC

4   GROUP OF EFH LEGACY NOTEHOLDERS

5   MICHAEL FIRESTEIN, PROSKAUER ROSE LLP FOR EFHC

6   MARK FLANNAGAN

7   PATRICK FLEURY, GSO CAPITAL PARTNERS

8   SIMON FRASER, COZEN O'CONNOR FOR J. ARON

9   JONATHAN FRIEDMAN, FOLEY & OARDNER, FOR UMB BANK, N.A.

10  STEVEN W. GOLDEN, LOCKE LORD LLP FOR FLOUR CORPORATION

11  MARK W. HANCOCK, GODFREY & KAHN, S.C.

12  PAUL HEALTH, VISON & ELKINS LLP, FOR AVENUE CAPITAL

13  MARK F. HEBBEIN, FOLEY & LARDNER LLP FOR UMB BANK N.A.

14  ANGELA K. HERRING, WACHTELL, LIPTON, ROSEN & KATZ FOR EQUITY

15  SPONSORS

16  GARY L. KAPLAN, FRED FRANK FOR FIDELITY MANAGEMENT &

17  RESEARCH COMPANY

18  HAROLD KAPLAN, FOLEY & LARDNER LLP FOR UMB BANK N.A.

19  MICHAEL J. KELLY, MONARCH ALTERNATIVE CAPITAL LP

20  MATTHEW KIMBLE, AVENUE CAPITAL GROUP

21  MATTHEW W. KINDSKEY, SKIN GUMP FOR AD HOC COMMITTEE OF EFIH

22  UNSECURED NOTEHOLDERS

23  STUART KOVENSKY, ONEX CREDIT PARTNERS

24  JAMES J. LEE, VINSON & ELKINS LLP FOR AVENUE CAPITAL

25  JASON NEW, GSO CAPITAL PARTNERS

1   THOMAS E. O'BRIEN, BAKER BOTTS LLP FOR HUNT UTILITY SERVICES

2   BRIAN PFEIFFER, SCHULTE ROTH & ZABEL LLP FOR DENBERBRIDGE

3   ABID QURESHI, AKIN GUMP

4   MARC B. ROITMAN, CHADBOURNE & PARKE LLP FOR NEXTERA ENERGY

5   JEFF ROSENBAUM, YORK CAPITAL MANAGEMENT

6   JEFFREY M. SCHLERF, FOX ROTHSCHILD LLP FOR AD HOC GROUP OF

7   TCEH UNSECURED NOTEHOLDERS

8   ANDREW M. THAU, CANTOR FITZGERALD

9   AMER TIWANA, CRT CAPITAL GROUP, LLC

10  BRIAN TONG, SCHULTE ROTH & ZABEL LLP

11  MATTHEW UNDERWOOD, HBK CAPITAL

12  JULIE M. WINTERS, BLOOMBERG LP

13  AUSTIN WITT, WACHTELL LIPTON ROSEN & KATZ FOR EQUITY

14  SPONSORS

15  JUDITH P. YOUNGMAN, MCKOOL SMITH FOR ALCOA, INC.

16  JOSEPH ZALEWSKI, THIRD AVENUE MANAGEMENT

17

18

19

20

21

22

23

24

25

1                      P R O C E E D I N G S

2              THE COURT:  Good afternoon, everybody.  This is

3      Judge Sontchi.  We have a lot of people on the phone today,

4      and two separate matters we're going to deal with.  This is

5      obviously in connection with the EFH case.

6              So it's particularly important that you mute your

7      phones unless you're speaking to the Court, and also for the

8      purposes of the record, if you could make sure that you

9      identify yourself every time you speak at least by name,

10     once you introduce yourself for the record, that would be

11     helpful.

12             Unless the parties have agreed otherwise, I was

13     inclined to hear the Alcoa issue first, so I would ask --

14     first of all I'd ask the debtors if it's okay that we hear

15     the Alcoa matter first.  Then I don't know, I think it's Mr.

16     McKane who wrote the letter, I may be wrong -- no, it

17     wasn't, it was Mr. Keegan.  So is it all right if we proceed

18     with Alcoa first?

19             UNIDENTIFIED:  Your Honor, this is Peter --

20             MR. KEEGAN:  Your Honor, Chris Keegan here from

21     Kirkland.  Brian Schartz is on with me as well on the Alcoa

22     matter.

23             I'm not sure if there's been discussion with

24     others with the debtor about a preference as to who goes

25     first.  I'll let Mr. Schartz speak for that.

1          MR. SHARTZ:  Your Honor, Brian Shartz from

2     Kirkland.  I think given the number of people on line, the

3     bulk of whom are here to hear the discovery issues in

4     connection with the (indiscernible) tort agreement and

5     discovery issues related to that.  I would be fine having

6     actually Alcoa go second, so that the whole word doesn't

7     have to listen to us spew.  And hopefully it'll save some

8     time and money.

9          THE COURT:  All right.  I think that's a fair

10    point, which I had not thought of.  So we will take the

11    discovery dispute in connection with the plan support

12    agreement first, and since the debtors wrote the first

13    letter, I guess I'll turn it over to the debtors.

14         MR. MCKANE:  Thank you, Your Honor.  This is Mark

15    McKane of Kirkland & Ellis on behalf of the debtors.

16         We did send in the first letter in an effort to

17    frame the issues, but I'd ask that my partner, Brent Rogers

18    handle the argument today.

19         THE COURT:  That's fine.

20         MR. ROGERS:  Thank you, Mark.  This is Brent

21    Rogers on behalf of the debtors, Your Honor.  I've not yet

22    had the opportunity to appear in person before the Court,

23    but I hope to do so sooner than later.

24         We are here today to seek some clarity on the

25    scope of the hearing on our motion to approve the PSA, and

1    in particular, on the discovery related to that motion as

2    well.  We very much appreciate the Court's willingness to

3    hear the issue today, as depositions will begin tomorrow

4    morning.  So time is of the essence.

5         Before diving into the argument, I'd like to give

6    the Court a brief overview on where things stand on this

7    issue, and the scope of the remaining dispute and how we got

8    to where we are today.

9         And that history starts with the filing of the PSA

10   motion itself.  The PSA motion was filed on August 10th

11   along with a number of other documents, including the plan

12   and our motion to approve the settlement agreement.

13        There were no formal discovery requests issued in

14   connection with that motion with the PSA motion.

15   Nevertheless, the debtors voluntarily agreed to prioritize

16   the production of certain confirmation related documents

17   that we believe bear on the issues and the PSA hearing.

18        So, for instance, we have produced all board

19   materials relating to the decision to enter into the PSA

20   agreement.  We also voluntarily disclosed the three

21   witnesses that we intend to call at the PSA hearing, and

22   reached out to the objectors to the PSA motion, to offer

23   those three witnesses for deposition in advance of the

24   hearing.  And as I mentioned, the first of those will be Mr.

25   Keglevich (ph) sorry, tomorrow morning.

1            This was all in an effort to take care of

2     discovery issues without burdening the Court.  And this

3     letter that we filed is our one and only shot at the Court's

4     time to make sure that everyone is on the same page and we

5     have the Court's guidance on the scope of the hearing and

6     the discovery.

7            The request that we've made to the Court about the

8     scope of the hearing, comes only after we've made efforts to

9     narrow the issues, with respect to discovery and the scope

10    of the hearing with the PSA objectors.  And I think we've

11    made substantial progress there, and I'll run through where

12    we are now.

13           So before even filing our letter with the Court,

14    it became apparent to us that some of the objectors may seek

15    to argue issues pertaining to what we see as the merits of

16    the plan, and the settlement agreement.

17           We reached out to the creditors, who are objecting

18    to the PSA, explained our view that there are a handful of

19    narrow issues in play in the PSA hearing, and that those

20    narrow issues do not include the merits of the plan, or the

21    merits of the settlement agreement.  We ask for the

22    objectors to agree to those limitations.

23           In connection with our meet and confer, and our

24    continuing discussions with the objectors, we proposed a

25    revised proposed order on the PSA motion, that would excise

1     any mention or any findings with respect to the plan or the

2     settlement agreement, and we, in fact, filed that order

3     shortly before this hearing.  And if Your Honor takes a look

4     at the proposal that we've made, you'll see that we have

5     excised and eliminated all reference to the plan and the

6     settlement agreement, and the merits of the plan of the

7     settlement agreement from the factual findings in the later

8     paragraphs A and B and have substantially revised the

9     references in the remaining paragraphs.

10            I believe that this -- that these revisions

11    dispose of one of the main objections that the EFH committee

12    had raised in their response to their letter, which was that

13    the PSA order as originally filed could be read to seek

14    findings on the merits of the plan of the settlement

15    agreement.  So we've now eliminated, I think, that dispute.

16            After filing our letter, we continued to discuss

17    with the EFH committee and the EFH indentured trustee and

18    other objectors in an attempt to narrow the disputes over

19    the scope of the hearing and discovery.  Those discussions

20    have led to certain additional modifications that are

21    included in the proposed order that we filed today.

22            So those additional modifications are in paragraph

23    3, we have amended to say that the PSA -- to the extent that

24    the PSA materially and adversely affects the E side debtors,

25    or to the extent that an amendment to the PSA I should say

1    materially and adversely affect the E side debtors, we're

2    required to give five business days' notice to the committee

3    or seek prior court approval of that amendment.

4           There's also the inclusion of a new paragraph 4

5    making express what I believe was implied already, which is

6    that the order is without prejudice to the objector's rights

7    to certain arguments with respect to the plan or the

8    settlement agreement when those issues become ripe.

9           So what is left?  I think we're left with three

10   objections varied or baked into the letters that we receive

11   from the indentured trustee and from the committee.

12          The first is that the factual background included

13   in the PSA motion requires or opens up the hearing to

14   additional discovery and evidence.  The second is that in

15   order to test the merits of the PSA, the objectors need to

16   be able to test the merits of the plan and the settlement

17   agreement that are contemplated by the PSA.

18          And the third is that the inclusion of a framework

19   for an alternative restructuring in the event that the plan

20   fails in the PSA somehow expands the scope of the inquiry.

21          So I'll take those three points in order, and

22   explain why they do expand the scope of the PSA hearing.

23          The first, there's an argument in the indentured

24   trustee's letter that the factual background in the PSA

25   motion requires further discovery and evidence.  Just to be

1    clear, the factual background that was included in the PSA

2    motion and was also included, for that matter, in our motion

3    to approve the settlement agreement, was for the Court's

4    information we had just filed a number of documents all at

5    once, and we wanted to give the Court a roadmap for what was

6    on file and where things were headed.

7              It was not intended to suggest that these were

8    facts that we need or intend to prove to support the PSA

9    motion.  And I think that since filing the PSA motion and

10   hearing initially from the objectors, about the inclusion of

11   those facts, we've been very clear with them that we do not

12   intend to get into the merits of the plan or the settlement

13   agreement in the PSA hearing.

14             And to the extent, that the background facts and

15   the motion could be understood to relate to those issues,

16   we're not going to get into those at the PSA hearing.

17             So we think the hearing, the scope of the hearing

18   should be limited, and that the background facts and the

19   motion itself don't expand that at all.

20             The second argument is again, in the indentured

21   trustee's letter to the effect that in order to test whether

22   the PSA has a sound business purpose, they need to be able

23   to interrogate our witnesses on the merits of the plan and

24   the settlement agreement.

25             They're quite explicit about this in their letter

1    and give three examples of lines of inquiry that they intend

2    to pursue.  The first is impairments, and whether the E side

3    creditors are impaired.  The second is the feasibility of

4    the plan, and whether the investors are really locked in.

5    And the third is the inclusion of releases.

6              These are all, Your Honor, confirmation related

7    issues.  We think that they are reserved for the hearing on

8    November 3rd.  This is not an issue, not a new issue, it's a

9    well-trod ground in the law.  Your Honor addressed it as far

10   back as June of 2014 in this very case.

11             The point being that when you are before the Court

12   on a motion to assume a support agreement, you don't dig

13   into the underlying substantive issues.  The -- and I think

14   that it's true in spades here.

15             The indentured trustee has a corollary arguments

16   that the PSA is somehow subject to a heightened standard of

17   review because it's an insider transaction and that that

18   opens up the scope of the hearing.  The fact is that the PSA

19   was negotiated at arm's length among adversarial parties,

20   and the quote/unquote insiders that the indentured trustee

21   mentioned specifically, the directors, are not parties to

22   the PSA.  So it's not just the case that there's going to be

23   some heightened standard.

24             This again was argued back in June of 2014 with

25   regard to the RSA and Your Honor rightly overruled that

1    argument.

2            So the issue for the hearing next week is not

3    whether the plan impairs the E side creditors or is feasible

4    or whether the releases are valid.  The issue is simply

5    whether the debtors had a sound business purpose for

6    entering the PSA and obtaining the commitment and support of

7    creditors to and in order to put on evidence in support of

8    that, we are not intending to put on evidence about the

9    merits of the plan and the support agreement, and we don't

10   believe that the objectors are entitled to dig into that

11   either.

12           So that brings us to the third and final argument

13   that it's most clear in the EFH Committee's objection, or

14   the response to our letter.  And that is that the inclusion

15   of a framework for an alternative restructuring in the event

16   that the plan failed, expands the scope of the PSA hearing.

17           So the EFH Committee I think paid lip service to

18   the exclusion of merits of the plan and the settlement

19   agreement from the hearing, but then turned around and

20   argued that the merits of the settlement agreement at least,

21   or put at issue by the PSA's provisions relating to the

22   alternative restructuring.

23           Just to level set us on what the alternative

24   restructuring is all about, the -- as Your Honor well knows,

25   the conditionality of the plan has long been an issue on

1   which the debtors have sought some sort of protection, in

2   the event that the plan cannot be consummated.

3          And the way the PSA handled that and provides the

4   protection is that it includes terms to the effect that in

5   the event that the plan failed, the creditors are committed

6   to support an alternative framework that contains certain

7   required terms.

8          And those required terms, which are very favorable

9   to the debtors, include the disarmament provisions, the

10  creditor's agreement not to litigate, and the drag

11  provisions that creditors will agree to vote in favor of a

12  plan that has the support of the T side first lien

13  creditors.

14          These two provisions and the alternative framework

15  itself, ensure that if the plan fails, the debtors aren't

16  going to lose the benefit of the hard fought concessions

17  that they've achieved from the creditors.

18          They set a baseline for an alternative

19  restructuring.  And I would just note as a side note that

20  the alternative provision to the PSA order that was

21  submitted by the EFH committee as an attachment to its

22  letter, would negate these key downside protections by

23  eliminating the disarmament provision from the PSA.  It's

24  essentially a rewrite of the PSA and is not acceptable.

25          In exchange for the alternative plan framework,

1    the debtors are really not giving up much if at all, if

2    anything.  As we've laid out in our letter, our robust

3    provisions in the PSA protecting the debtor's rights to

4    exercise those fiduciary duties, those provisions are found

5    in 4.3(c) of the PSA, which permits the debtors to take any

6    action to the extent necessary to comply with their

7    fiduciary duties.

8            And in 12.6(h) which is the fiduciary out

9    provision that permits debtors to terminate the PSA as to

10   them if necessary to comply with fiduciary duties.

11           There are also -- there's also a go shop provision

12   in 4.3(a) that permits debtors to pursue an alternative

13   restructuring, even while the plan support period is in

14   effect.  And there's a topping bid provision that -- in

15   4.3(b) that permits the debtors to entertain proposals,

16   superior proposals without violating the PSA, given

17   appropriate notice.

18           I'd like to very briefly address the EFH

19   committee's attacks on fiduciary out provisions, because I

20   think they fail and just illustrate how the fiduciary out

21   here is pretty vanilla.

22           First, they argue that the debtors have not cited

23   a case that a settlement or a use of property can avoid the

24   review of the merits, or at least lower the standard of

25   review through a fiduciary out.

1          And I think here we have a fundamental

2    misunderstanding of what the PSA is.  The debtors are not

3    asking for approval of the settlement agreement through the

4    PSA, anymore than they're asking for confirmation of the

5    plan.

6          There is a footnote in the EFH committee's letter

7    that uses some out of context quotes and ellipsis to suggest

8    that we have a contrary position.  But the fact is that

9    regardless how you characterize the PSA, its impact is

10   simply to bind the creditors to a framework that includes

11   the terms of the settlement agreement among other things.

12   It does not seek a Court order approving the settlement

13   agreement.

14          Whether the terms of the settlement agreement meet

15   the appropriate legal requirements is an issue that will be

16   heard later, and it's reserved, the EFH committee has the

17   right to object when the time comes.

18          Nothing in the PSA order, for instance, would

19   grant any kind of injunctive relief whatsoever with respect

20   to the settlement terms or otherwise.

21          So, in short, this is not a settlement.  It is a

22   contractual agreement to support the settlement terms.  And

23   we have cited substantial authority for the proposition that

24   a support agreement like this is subject to a very high

25   level of review that does not involve digging into the

1    merits of the underlying document.

2           The second, the EFH committee argues that there

3    will be no Court review of any failure to exercise the

4    fiduciary out in the future, and that's just not the case.

5           If the EFH committee or any other objector doesn't

6    like the way that the debtors are proceeding, they're free

7    to challenge that, and nothing in the PSA order would

8    prevent them from doing so.

9           Third, they argue that the fiduciary out is in the

10   hands of insiders that benefit personally from the releases,

11   without accepting the factual premise of that argument, it

12   simply proves too much, and would apply to every support

13   agreement contemplating insider releases, and that's just

14   not the law.

15          Fourth, they argue that we are seeking Court

16   approval of the rights of equity owners against other

17   creditors.  That's again not correct.  We are seeking

18   approval of the debtor's entry into a performance under the

19   PSA.  We are not asking for anything with respect to

20   contractual arrangements among non-debtor third parties.

21          So the long and the short of it is, Your Honor,

22   there's nothing at all exotic about this aspect of the

23   support agreement, the inclusion of a framework for an

24   alternative restructuring.  And just as these debtors may

25   obtain creditor support for a plan that's on file, they can

1    obtain creditor support for an alternative framework in the

2    event that the plan fails.

3           The creditors' commitment to support this

4    alternative framework does not make the merits of the

5    elements of that framework an issue for the PSA hearing.

6           If the creditors and the objectors of the PSA want

7    to explore why committing creditors to these minimum

8    requirements is a good idea, they're free to do so, but

9    they're not entitled to parse through the terms of the

10   settlement agreement or the plan at the hearing, or with

11   witnesses.

12          So to sum up, Your Honor, the court should

13   overrule the three objections.  The factual background and

14   the PSA motion does not open up irrelevant issues, there's

15   substantial authority for the proposition that the PSA

16   hearing on the support agreement is the summary proceeding

17   that does not require inquiry into the merits of the

18   underlying plan.

19          And finally, the inclusion of the alternative

20   framework in the event the plan fails doesn't change the

21   analysis.

22          So that's where I think we are, Your Honor.  This

23   issue I believe is ripe for a ruling by the Court that would

24   bind both the PSA supporters and the objectors from

25   introducing any evidence or inquiring in depositions into

1    the merits of the plan or the settlement agreement.

2              So unless Your Honor has any further questions,

3    that's all I've got.

4              THE COURT:  Thank you.  I'll turn it over now to

5    anyone who wishes to be heard in support of the debtor's

6    position.

7              UNIDENTIFIED:  Your Honor --

8              THE COURT:  We'll go to Mr. Shore first, I

9    recognized his voice.

10             MR. SHORE:  Well, that wasn't (indiscernible).

11             THE COURT:  It wasn't you.

12             MR. SHORE:  No, I don't -- look, we support the

13   debtor's attempts to keep this release narrow.  As far as

14   we're concerned, the PSA does one simple thing.  It provides

15   a basis upon which the debtors can start the process that is

16   extremely detailed and time consuming of getting the plan

17   ready for confirmation, including solicitation, and dealing

18   with regulators, and dealing with the many things that need

19   to get done to get this plan ready to be not only confirmed

20   but then consummated.

21             And it locks the debtors into doing that provided

22   that the conditions to the PSA are met and it locks in all

23   the parties who are supporting the debtors doing that so we

24   don't have a situation in which a whole bunch of people

25   traded out of their positions, and the debtors left with a

1    plan structure and a plan process that wasn't supported by

2    anybody.

3             Everybody will have their opportunity to litigate

4    at confirmation.  The issues around their particular

5    position within the capital structure and the objections

6    that they filed, but we just can't use every hearing as a

7    platform in which to have all those issues aired,

8    particularly with witnesses who are on the stand, because we

9    could just get bogged down for days, and the Court doesn't

10   have time, and none of the supporting parties have time to

11   get into those kind of issues at this point.

12             THE COURT:  Thank you and my apologies to whoever

13   I misidentified as Mr. Shore.  Would anyone else like to be

14   heard?

15             MR. KORNBERG:  Yes, Your Honor --

16             THE COURT:  Go ahead.

17             MR. KORNBERG:  It's Alan Kornberg, Paul Weiss

18   Rifkind Wharton and Garrison on behalf of the TCEH first

19   lien ad hoc committee.

20             We are fully supportive of the debtor's position

21   concerning the scope of the upcoming hearing.  We think

22   they've correctly described the standards for approval of

23   the PSA, and what the scope of the hearing should be.

24             Your Honor has tread this ground many times

25   before, including in this case.  And for the reasons that

1   Mr. Shore mentioned, we shouldn't permit the PSA hearing to

2   morph into a confirmation hearing or a settlement approval

3   hearing.  I think having one hearing on those topics will be

4   enough and it would be inappropriate and wasteful of the

5   Court's resources and the parties' resources to have

6   multiple hearings on the same issues which are more properly

7   heard at the time of confirmation.

8           THE COURT:  Thank you, Mr. Kornberg.

9           Anyone else?

10          MR. KOMIS:  Your Honor, if I may?

11          THE COURT:  Yes.

12          MR. KOMIS:  This is Mark Komis of Proskauer,

13   counsel to Energy Future Holdings Corp. acting on behalf of

14   and at the direction of the disinterested directors, Don

15   Evans and Billie Williamson.

16          Your Honor, Ms. Billie Williamson is a

17   disinterested director of EFH, and has been offered up for

18   deposition and as a witness at the PSA hearing.  We support

19   the debtor's position on behalf of the EFH estate.  And we

20   believe the question before Your Honor will be whether the

21   EFH Board properly exercised its business judgment in

22   executing the PSA.

23          The issues regarding approval of the plan or

24   approval of the settlement agreement are not properly before

25   Your Honor we believe at the PSA hearing on September 17th.

1    And the issue as we see it is the EFH Board is now 17 months

2    after the petition date, not faced with any other feasible

3    actionable alternative EFH plan, let alone one that proposes

4    to pay EFH creditors in full with the support of substantial

5    creditors and provides a path for EFH to exit Chapter 11.

6            And finally, Your Honor, as noted by counsel for

7    the debtors, the EFH Board has a very strong fiduciary out,

8    including Section 12.6(h) of the PSA in the event it wishes

9    to pursue any type of alternative restructuring.  Thank you,

10   Your Honor.

11           THE COURT:  Thank you.

12           MR. JONAS:  Your Honor, Jeff Jonas at Brown

13   Rudnick.

14           THE COURT:  Yes.

15           MR. JONAS:  Your Honor, on behalf of WISFS and the

16   ad hoc group of second lien creditors on the T side, for all

17   the reasons stated, and I won't belabor them, we're

18   similarly supportive of the debtor's position on this issue,

19   Your Honor.

20           THE COURT:  Thank you.

21           MR. KERR:  Your Honor, it's Charles Kerr of

22   Morrison and Forester on behalf of the Official Committee.

23   I second Mr. Jonas' comments.  We fully support the debtor's

24   position on this.

25           THE COURT:  Thank you.  Okay.  Thank you very

1    much.  I now turn it over to the parties and I guess we'll

2    start with the E side committee who opposed the debtor's

3    position.

4              MR. DIETDERICH:  Good afternoon, Your Honor, it's

5    Andy Dietderich, Sullivan & Cromwell for the committee.

6              After hearing the remarks of the debtors and their

7    contractually obligated supporters, I still am a little

8    perplexed on why we're having the call today.  We have been

9    trying to work with the debtors to make sure the front end

10   of the motion, the one that makes findings and conclusions

11   about the plan and the settlement agreement is modified to

12   remove those findings and conclusions.

13             We sent a mark-up to that effect.  Well, they sent

14   a mark-up initially (indiscernible) work, we sent a reply,

15   we finally got 15 minutes before this hearing a version that

16   upon my very quick review does seem to eliminate the front

17   end stuff that we were complaining about.  So it looks like

18   the relief the debtor is requesting is limited to the PSA

19   itself, and that's a big step forward.

20             With respect to the three points raised by my

21   colleague at Kirkland, there were three I think pieces; the

22   factual background, the idea that some of the opponents want

23   to test the merits of the plan, and the settlement, and

24   finally this alternative plan prohibition as to going to the

25   scope of the hearing.

1          But again, the purpose of this call is only to

2     talk about the debtor's request to narrow the scope of the

3     hearing in advance.  It's not to talk about the merits of

4     any of that.  You'll hear that on the 17th.

5          With respect to the scope of the hearing, we did

6     not raise the issue on the factual background, and we have

7     no intention of testing the merits of the plans and the

8     merits of the settlement.  But we also think it's a little

9     artificial to talk about a plan support agreement without

10    talking about the plan.

11         The difference to us, is not the topic, what's in

12    the plan.  The difference is there are business by prudent

13    business purpose for pursuing the plan and if the plan being

14    proposed pursued in good faith.  And we intend to limit our

15    own work to those topics.

16         Some substantive issues might be relevant for

17    those topics, some might not.  It depends entirely upon the

18    debtor who carries the burden of proof and can define its

19    own affirmative case.  And our role here is responsive to

20    rebut that affirmative case to the extent we disagree with

21    it.

22         We've asked the debtor for more detail about

23    whether (indiscernible) case will be.  We have not received

24    it.  We don't think it's appropriate to artificially limit

25    topics, but we can commit to the Court, that at issue is not

1    the abstract merits of confirmation or the abstract merits

2    of settlement.  At issue is business, you know, prudent

3    business purpose and good faith, and whether the debtor

4    carries the burdens on the 17th, nothing more, nothing less.

5         Now, in our view, the only novel element to this

6    conversation are the alternative -- is the alternative plan

7    prohibition.  And that's the point of this conversation to

8    have a view on whether that's a good idea or a bad idea, or

9    consistent with fiduciary duties or not consistent with

10   fiduciary duties, we are very interested in why that has

11   been included.  Not just the elements that relate to the T

12   side, but the elements that relate to the inter silo claims,

13   and then finally, the elements that relate to claims between

14   EFH and EFH's own stakeholders.

15        You've heard a lot about that already today, I

16   didn't think that was the purpose of the call, but I will

17   note, because I think it is highly relevant for the call,

18   that those provisions do nothing about that alternative plan

19   other than implement the settlement agreement.

20        And unlike plan support agreements, or plan

21   support undertakings, they survive.  They survive

22   (indiscernible) confirmation, and they do not -- and they

23   survive the denial of the settlement.  That makes them

24   different.

25        What they are?  I don't know.  I've never seen

1    anything like it before, the idea that the settlement is

2    locked in by a prohibition on discussing plans, without any

3    detail about what those plans might otherwise look like.  I

4    don't know what that is.

5          But I do know that it's different and unusual and

6    we need to have a legal conversation about it at the 17th.

7    And if what the debtor is saying today is this is not

8    special, there's nothing unusual about this, we can just

9    throw it into a plan support agreement on the low level of

10   scrutiny that's relevant for something that is temporary,

11   then the debtors can try to make that case on the 17th.

12         Our view is, that will fail, because this has a

13   real adverse effect on our ability as the committee for the

14   rest of the case to have conversations about alternatives.

15         It's not just the insider -- you know, the insider

16   releases, but it's everything and the settlement will be

17   locked down, including the really nefarious conditions that

18   the only kinds of plans that can be discussed, even after

19   the termination of exclusivity, Your Honor, are plans that

20   the debtors themselves propose.

21         So there's a lot in here, and it's permanent

22   relief.  We think it heightens the standard, but again, this

23   is purely a question of what case the debtor wants to put

24   forward.  The debtor is not giving us anymore detail about

25   it than what we see.  That case has already changed

Page 36

1   significantly 15 minutes before this call, when they

2   submitted their revised order, and will continue to be

3   responsive to the debtor's affirmative case as it adapts.

4   But we're not really in a position today that we can say

5   much more.

6            THE COURT:  Thank you.  Mr. Pedone.

7            MR. BAILEY:  Your Honor, Richard Bailey for the

8   EFH indentured trustee.

9            I'd like to begin by pointing out that the issue

10  as Mr. Dietderich outlined is what will the debtors put in

11  for a case, and when this hearing was scheduled for the

12  17th, we asked the debtor to actually put their case into a

13  declaration, so we could see the specific facts they would

14  put forward, we can take discovery related to those facts,

15  and our request was denied.  The debtors did not want to

16  discuss narrowing what they would put in for evidence.

17           So we were left with preparing for discovery based

18  upon the allegations in the motion.  And now we hear some of

19  the allegations in the motion laid out in extraordinary

20  detail, running 60, 70 paragraphs may not be part of the

21  debtor's case.  But we're still here, still here today

22  questioning the debtor's business judgment to enter into the

23  PSA including extraordinary provisions that Mr. Dietderich

24  outlined, with a motion that alleges facts that relate to

25  those, but the debtors are attempting to bar inquiry to at

1    deposition.

2           I think the preferential way to proceed is for the

3    debtors to put their case into a declaration and we proceed

4    in that manner.  But that may be too late for us now at this

5    hearing.  So I don't believe that any limitation on the

6    discovery is, as long as it relates to topics alleged, or

7    the debtor's business judgment should be put into an order.

8           I'd note on one issue which is with regard to

9    impairment, we think it's patently obvious when you leave it

10   out fees and expenses and you leave out make whole premiums

11   and there's the plain language of the indenture on claims

12   that have not been objected to.  And to this date, that the

13   plan impairs the EFH bondholders.

14          The debtors continue to ignore that, and we

15   believe inquiry into why that is taking place, why they're

16   proceeding in that way, a way that will require

17   resolicitation of this plan, what's the business sense in

18   committing to do that.

19          I'd also note that the plan releases in the plan

20   support agreement explicitly live on long after the plan

21   rises or falls, that's extraordinary relief (indiscernible)

22   and the debtor's business reasons for going into that should

23   be subject to full discovery.

24          But most importantly what we need coming out of

25   this call is a practical set of rulings that establish what

1    the inquiry can be, and then a parallel set of rulings that

2    say, debtors if you succeed, should the Court grant any

3    relief in limiting discovery, you're going to live with not

4    being able to introduce any evidence related to those

5    topics, because we don't want to end up in a situation at

6    the hearing where the parties have been (indiscernible) are

7    prejudiced by the debtors then seeking to introduce

8    evidence.

9            And the debtor's letter is not really specific

10   with regard to what they're (indiscernible) inquiry into,

11   and I don't think that they can deny that inquiry into their

12   business reasons for entering into the PSA seeking

13   provisions that live on in certain provisions in the PSA is

14   appropriate.

15           So I'd ask that any relief balance those two

16   concerns and protect our rights in that regard, and we

17   believe the depositions should just proceed.  Thank you.

18           THE COURT:  Anyone else?  Those are the only two

19   letters I received, I didn't know if anyone else wanted to

20   be heard.

21           MR. SCHEPACARTER:  Your Honor, this is Richard

22   Schepacarter from the United States Trustee.  We did not

23   submit a letter.  We haven't sought any discovery with

24   respect to the PSA.  However, we did file an objection on

25   Friday to the PSA and would be willing, you know, ready to

1    go forward on the 17th.

2            I think counsel have indicated a couple of things,

3    one of which a willingness to reach out to parties, since we

4    filed our objection, no one's reached out to us, so we do

5    invite that inquiry.

6            Also, it sounded like counsel initially began to

7    argue some of the merits of the PSA and I'm not sure how

8    this ties into either with respect to discovery or with the

9    issues that are going to be raised at the time that the PSA

10   is going to be considered, but it seems to me that there

11   should be no limiting with respect to arguing or endeavoring

12   into how the PSA dovetails into either the settlement

13   agreement or the plan.  Because the way, at least we -- at

14   least I read the PSA was that with respect to the specially

15   alternative restructuring, that a lot of the provisions that

16   are set forth in the plan and the settlement agreement

17   continue on or that a plan that would have to be -- an

18   alternative plan would have to include a lot of those

19   provisions, even if those provisions or the plan itself or

20   the settlement agreement are denied implementation.

21           So that perhaps there should be some definition or

22   some parameters given with respect to what's going to be

23   either argued or considered on the 17th, which respect to

24   the PSA, especially how it may tie into confirmation and

25   approval of the settlement agreement on November 3rd.  Thank

1    you.

2              MS. LAWSON:  And, Your Honor, this is Kim Lawson

3    from Reed Smith on behalf of Bank of New York Mellon.  We

4    also did not file a written objection, however, we did

5    participate in a call with the debtor.

6              Our issues are much more limited, and I think we

7    were somehow lumped into this letter.  We did not have an

8    issue of the scope of what was going to be set forth in the

9    hearing.  We just wanted to be clear that good faith was

10   fair game for the hearing on the issues related to the PSA.

11             So we just wanted to clarify that that is an

12   issue.  And again, based on some of the conversations that

13   have been argued today, it is a little unclear as to how far

14   the debtors are going to go into the argument in relating to

15   the settlement agreement or the plan, or how tied in they

16   are.

17             But we do think that good faith in terms of the

18   PSA and what they're proposing (indiscernible) PSA -- that

19   the PSA -- you know, their good faith in entering into that,

20   whether they all tied together or not, is a proper issue to

21   be argued before the Court in hearing this PSA motion.

22             THE COURT:  Thank you.  Sorry about that echo, I'm

23   not sure why that came in.

24             Anyone else?

25        (No response)

1          THE COURT:  All right.  Let me ask the debtors to

2     reply, and specifically I'd like you to focus on the

3     alternative transaction elements of the PSA that would

4     survive the plan not being confirmed or not going effective

5     and/or settlement agreement not being approved.

6          My question there really is if people -- you know,

7     when will that, the merits of those provisions, the merits

8     of entering into that agreement be put before the Court

9     other than at the hearing on the PSA.  And how is it that

10    discovery related to the aspects of that element can't be

11    taken at this time.

12         MR. ROGERS:  Thank you, Your Honor.  This is Brent

13    Rogers again for the debtors.

14         And the answer to your question is that the merits

15    of the terms of the alternative restructuring framework will

16    be heard upon a motion to confirm a plan that includes those

17    terms.

18         So if the plan were to fail and the debtors and

19    the other PSA parties were to pursue an alternative plan

20    that included the terms outlined in the PSA, at some point

21    the Court would be asked to confirm that plan.  And at that

22    point, the EFH Committee, or the EFH Indentured Trustee or

23    anyone would be free to object to the inclusion of those

24    terms in the plan, for which we're seeking confirmation.

25         To be clear, we are not asking the Court for a

Page 42

1    ruling that the objectors cannot inquire into the business

2    purpose of including this alternative framework in the PSA.

3    What we are asking for is a ruling that the merits of those

4    terms not be addressed until they are ripe at a confirmation

5    hearing.

6           I hope that answers Your Honor's question and I'd

7    like to just briefly respond to a few points that were made

8    in response.

9           THE COURT:  Well, if I can interrupt for just a

10   moment.

11          MR. ROGERS:  Certainly.

12          THE COURT:  So let me ask it this way, who is

13   bound by the alternative -- I'm going to say alternative

14   transaction just because it's a shortcut for me, that's

15   probably not specifically quite an accurate description, but

16   I think we all know what I'm talking about.  So who's bound

17   by the alternative transaction?  Whose rights are being

18   infringed, if anyone, in connection with the alternative

19   transaction?

20          I think it is the creditor parties that have

21   signed the PSA, and it's an indication of the debtor's

22   desire to proceed along that path where i.e., the

23   alternative transaction path if that's the way they decide

24   to go, but it's in no way affecting a post-expiration of

25   exclusivity to a non-signatory party's right to file a plan.

1          MR. ROGERS:  That's absolutely correct, Your

2    Honor.

3          THE COURT:  Okay.  And the debtors had indicated

4    what they will or won't support in the alternative

5    transaction, but they have a fiduciary out in connection

6    with that, and were they to determine it was inconsistent

7    with their fiduciary duties to continue to pursue the course

8    laid out in the alternative transaction provisions, they

9    have the ability to terminate.

10          MR. ROGERS:  Absolutely right.

11          MR. DIETDERICH:  Your Honor, this is Andy

12    Dietderich, could I be heard on that point?

13          THE COURT:  Yes.

14          MR. DIETDERICH:  There is one -- I think that

15    statement is correct.  But there's another problem related

16    to it because the parties bound by the alternative plan

17    prohibitions include all of the parties on the T side, but E

18    debtors.  Now, we had asked for the fiduciary out of the E

19    debtors to be the fiduciary out that allows them to take any

20    action that their fiduciary duties so require, which is the

21    measure of their fiduciary out for supporting the Hunt

22    merger plan in Phase 1 of the agreement.

23          They have declined to make that change.  So the

24    only fiduciary out available to the E side debtors, at least

25    in the draft order I received 15 minutes before, is they

1    have to give up the entire transaction to exercise the

2    fiduciary out.  So if there's any benefit to the E estate,

3    in order for any piece -- for any of the piece of the

4    settlement agreement to be preserved in an alternative plan,

5    everything has to be abandoned.  That's problem one.

6            Problem two is that the T side creditors that are

7    bound include, for example, the T side first lien creditors.

8    Now, we've gone back and forth about this in the case, but

9    certainly a tax free reorganization is easier, perhaps

10   significantly easier with a consent to the T first lien

11   creditors.

12           The agreement allows the equity owners of the

13   company to enforce against the T first lien lenders the

14   alternative plan prohibition.  So that if a party wanted to

15   propose an alternative plan that did not, for example,

16   release insiders at EFH, not only would the debtor need to

17   give up the entire benefit of, you know, the alternative

18   plan prohibitions in order to proceed along those lines, but

19   then the party proposing the plan would not be able to even

20   talk with, you know, even talk with first lien creditors or

21   junior creditors or others that might be necessary to put

22   together that kind of a plan.

23           And so I think that although the -- although

24   technically correct, these two other elements constitute at

25   least as a practical matter an effective prohibition on

1    these discussions.

2              THE COURT:  All right.  Let me ask you a focused

3    question then.  Given what you just said, what kind of

4    discovery, if any, do you think you need in order to develop

5    the argument you just made?

6              MR. DIETDERICH:  I think that I appreciate the

7    debtor's statement that we will be entitled to look into the

8    business judgment, and I assume good faith, linking the

9    transactions in this matter at the PSA hearing.  And that's

10   a big part of it.

11             But if we were to regard this as de facto

12   permanent relief, that has a significant effect for the rest

13   of the case on pursuing plans that have claims against

14   insiders.  Then I think it requires fairly some evidence of

15   the merits of the claims against insiders, and why the

16   debtor has chosen to effectively release them.

17             Now, what we've asked for is to have that delayed

18   until the settlement hearing, when exactly the same facts

19   and circumstances will be reviewed by the Court.  And if the

20   Court may remember, initially the PSA and the settlement

21   agreement were scheduled for the same date.  I don't know

22   why.  I would presume for that reason.

23             And so in our mind, given the incredibly tight

24   time schedule from our end, it makes sense that the PSA

25   hearing be a PSA hearing and for the alternative plan

1    prohibitions which again, in our view, to the extent

2    they're, if not permanent, almost permanent, certainly more

3    than temporary, to have those discussed so that the merits

4    of the settlement would be fully in front of the Court,

5    where the Court can reach a decision about whether or not

6    these restrictions should last for the rest of the case.

7              THE COURT:  Okay.

8              MR. PEDONE:  Your Honor, this is Richard Pedone,

9    may I be heard on one point?

10             THE COURT:  If it's related to what we just talked

11   about, yes.

12             MR. PEDONE:  It is, Your Honor.  There are

13   provisions of the plan support agreement that

14   (indiscernible) parties significance in the settlement

15   agreement and the settlement going forward, and so that

16   would be one issue why those provisions are there.

17             It's unusual for a plan support agreement to

18   require parties to comply with a settlement agreement, which

19   will live out to the plan, perhaps (indiscernible).

20             THE COURT:  All right.

21             MR. ROGERS:  Your Honor, this is Brent Rogers from

22   the debtors.  May I respond?

23             THE COURT:  Of course.

24             MR. ROGERS:  The issue that Mr. Dietderich just

25   raised that he characterizes as the also permanent nature of

1    the settlement provisions in the PSA is an issue that

2    concerns the creditors agreement amongst themselves to

3    support the settlement terms beyond the expiration of

4    whatever period that -- whether it's the plan support period

5    or otherwise.

6            Those are agreements among the creditors, they are

7    not agreements that are before the Court on the motion to

8    assume the PSA.  The business judgment of the creditors in

9    agreeing to those provisions is not an issue that Your Honor

10   needs to decide.

11           We agree that the business judgment and the

12   business purpose of the PSA from the debtor's perspective is

13   something that needs to be decided, and as Your Honor has

14   correctly pointed out, the only thing that we are doing is

15   binding the creditors to support the settlement agreement

16   unless we -- or the settlement terms in an alternative

17   restructuring, unless and until the debtors determine that

18   in their fiduciary duties, it is no longer to their benefit

19   to continue to support that and to require that as a

20   condition of any plan.

21           So it's just a -- it's a non-separator for the PSA

22   hearing, and it does not require any discovery into the

23   debtor's business judgment.

24           MR. KORNBERG:  Your Honor, it's Alan Kornberg.  I

25   just want to say very briefly, just as it would be

1    inappropriate to turn the PSA hearing into a hearing of

2    confirmation on the plan that's been filed, it would really

3    be inappropriate to go into a potential alternative

4    restructuring, which may or may not ever be filed with the

5    Court.

6              So it's really not a topic that should properly be

7    before the Court when we're there on the PSA hearing.  Yes,

8    there are provisions that bind the creditors and going

9    forward, if the plan isn't confirmed, but you know, what

10   happens and how it happens and when it happens is a complete

11   unknowable today, and you know, should not be something that

12   is explored in depth in connection with this PSA.

13             It would be announcing essentially a confirmation

14   hearing hypothetical plan, and that just can't be the right

15   scope for the hearing.

16             UNIDENTIFIED:  Your Honor --

17             MR. THOMAS:  If I may briefly, Your Honor, Mark

18   Thomas, Proskauer on behalf of the EFH disinterested

19   directors.  The alternative transactions are described in

20   Section 6.1(b) of the PSA as they relate to EFH.  Those

21   include insider releases and a settlement, intercompany

22   settlement claim and 12.6(h) is absolutely clear that the

23   EFH Board, after consultation with outside counsel, may

24   terminate the PSA if it believes that proceeding with the

25   plan or with the hypothetical alternative restructuring in

1    the future if the plan failed would be inconsistent with its

2    fiduciary duties.

3            So the EFH Board has an absolute walk right at any

4    time prior to seeking approval or confirmation of an

5    alternative restructuring.

6            THE COURT:  Well, I guess the answer to that would

7    be -- the E side committee's response to that would be is

8    that's actually too much because it's a black or white

9    scenario that if you don't -- if you have a problem with

10   element A of elements A, B and C, you have to throw away

11   elements A, B and C and their question is I think, at least

12   theoretically, whether it's reasonable to have such a, you

13   know, all in or all out choice as opposed to more

14   flexibility in being able to say, well, I have a problem

15   with A, but I still want to stick with B and C and I'm going

16   to continue to hold you to B and C.

17           MR. SHORE:  Your Honor, this is Chris Shore, may I

18   respond to that, just from the business perspective?

19           THE COURT:  Yes.

20           MR. SHORE:  What Mr. Dietderich is complaining of,

21   it seems to me, is that he wants the opportunity to propose

22   an alternative plan.  And he wants B, C and D, he wasn't A

23   in there.  The fact is, that he represents a couple hundred

24   million dollars of interest within the case.  And as we've

25   seen, all of it is tied together, the whole 40 billion is

1    tied together in one comprehensive restructuring that's got

2    to be done with everything else.

3            You heard on the phone the plan support parties

4    who represent tens of billions of dollars of interest

5    saying, we want B, C and D, and the debtors say they want A,

6    so we're all going to agree right now, as long as the plan

7    support agreement is, we're all going to live with A, B, C

8    and D and the creditors are saying, we won't do that.  And

9    that's okay with us.

10           There's nothing wrong with the debtors being put

11   to the choice like anybody else and saying, well, I can't do

12   this so I'm going to terminate the PSA.  It just returns

13   parties to the status quo ante.  And Mr. Dietderich will be

14   back in the exact same position he is before this plan or

15   was before this plan was announced, that he represents a

16   couple of hundred million dollars of interest within a large

17   capital structure, that he has to put a deal together on.

18           So there's nothing -- we're certainly not

19   supporting a plan that says, okay, we'll accept everything

20   else except we're not giving you your 500 or -- and Mr.

21   Kornberg's not going to be heard to say, we're going to

22   accept everything except the first liens don't get their

23   collateral any time soon.

24           It is a unitary deal and this -- if what happens

25   is, we don't get a plan done and the debtors decide to

1    terminate the PSA, which they can do, we're all returned to

2    the status quo ante.  It just means that everybody's got to

3    think long and hard about whether or not they want to throw

4    it all back to where we were a couple of months ago.

5            But nothing that's being done right now is locking

6    into anybody into a worse position than before the plan was

7    filed, we just go back there.

8            THE COURT:  Okay.  Thank you.

9            MR. DIETDERICH:  Your Honor, can I -- Your Honor,

10   this is Mr. Dietderich, I just wanted to emphasize one

11   technical point.

12           THE COURT:  Okay.

13           MR. DIETDERICH:  I'm going to try my best to

14   ignore Mr. Shore's comments.  I think Your Honor has it

15   exactly right, that the question on the fiduciary out is all

16   or nothing.  And that has a price to it.  But with respect

17   to this idea of the third party contract, right, the ability

18   of say the equity owners to enforce against the first lien

19   creditors, the alternative plan prohibition.

20           Do please keep in mind that the debtors are not

21   just -- have not just had the parties sign that contract as

22   part of this package, but the relief requested by the Court

23   is an order of this Court binding that promise with respect

24   to all future plans is enforceable, and directing with the

25   power of the Court the parties to perform it.

1          So there is relief that is being requested in

2     respect to that purely third party non-debtor/non-debtor

3     contract, that I think elevates it, you know, elevates the

4     importance of it.  For example, we would be passing on the

5     enforceability on that.  And passing on the enforceability

6     of it, putting aside the abstract question is it enforceable

7     or not, which I think is interesting, but if the Court were

8     to conclude it's enforceable, that argues again, you know, a

9     step toward permanence.

10          Is it temporary, is it permanent, I don't know,

11    it's somewhere in the middle, but it's clearly different

12    than an ordinary plan support undertaking.

13          THE COURT:  Okay.  Thank you.  We're kind of

14    spinning a little bit here, not out of control, but --

15    because it's a very important issue, but I now want to turn

16    it back to Mr. Rogers and allow him to continue his reply.

17          MR. ROGERS:  Thank you, Your Honor.  I just have a

18    few issues to address from the remainder of the arguments

19    that we heard.

20          I want to be absolutely clear on the record about

21    when we offer to remove any factual findings relating to the

22    settlement agreement or the plan from the PSA order.  That

23    offer was made at the outset of discussions, and Mr.

24    Dietderich had seen versions of the order that removed those

25    factual findings well in advance of 15 minutes before

1    today's hearing.

2           I just wanted to be clear that the debtors have

3    always -- have from the outset been clear that we are going

4    to remove those provisions, and we do not intend to put on

5    evidence at the hearing regarding the merits of the

6    settlement agreement or the plan.

7           Everyone knows the case that we are going to put

8    on, at least at a high level.  We've had extensive

9    discussions regarding the scope of the hearing, we've

10   disclosed our witnesses, it's Mr. Keglevich, it's two of the

11   disinterested directors.  We have explained that we intend

12   to put on evidence about the decision-making process that

13   went into the debtor's decision to enter into the PSA

14   agreement.

15          We have produced all of the documents that we

16   believe are relevant to that decision-making process.  We

17   are not going to give a detailed preview to the objectors of

18   what the evidence that we will put on will be, because we're

19   not required to.  And because from -- as a strategic matter,

20   it doesn't make sense, but they know what the case is going

21   to be.

22          It is not going to be putting on evidence about

23   Bankruptcy Code Provision 1129 or Rule 9019.  Those are not

24   going to be our elements of our affirmative case.  We are

25   seeking this order and this clarification from the Court for

1   that very reason.

2              The Court's ruling obviously will be mutual, and

3   we will abide by it, and not put on evidence that is

4   excluded.

5              That's all I had to say, other than in response to

6   Your Honor's questions, so I appreciate your time and if you

7   have any further questions, I'm happy to answer them.

8              THE COURT:  I do not.  Thank you, everybody, for

9   your input on this, and I think it's important in making my

10  comments here to level set us back to what is and what isn't

11  before the Court at the PSA hearing.  What's before the

12  Court is the motion to approve the debtor's entry into the

13  PSA and to direct the debtors and the parties to execute the

14  PSA.

15             Obviously once Court approval of the PSA happens,

16  it will be an enforceable contract that the debtors can

17  enforced, and that can be enforced against the debtors,

18  subject of course to whatever provisions are in it,

19  including I think a very clearly defined fiduciary out for

20  the debtors.

21             So I view I think it was Judge Lane in the Genco

22  cases' approach to something like a PSA and I think it's

23  consistent with what I previously ruled in this case in

24  connection with the RSA with a whole different -- with the

25  tables switched and a whole different set of characters on

1      either side making very similar arguments, that what we're

2      talking about is a summary proceeding about the merits of

3      the PSA and not confirmation of the plan and not the

4      settlement agreement, and not the releases contained in the

5      plan in the settlement agreement.

6                  The question is the contract before the Court, and

7      we're not going to have a mini-confirmation hearing or a

8      mini-settlement agreement hearing.

9                  Now, what I've heard from the other side,

10     especially the E side committee is that's not what we're

11     asking for, Judge, we understand that.  I think the

12     indentured trustee, frankly, their position ignores that

13     limitation, for example, I have no idea why I would consider

14     whether or not the plan is proposed in pairs E side

15     creditors that's a confirmation issue.

16                 But there's in effect -- I'm going to use the term

17     lip service, but I don't mean it in a pejorative manner.

18     There's an acknowledgement that that's the rule but then

19     there's sort of the caveat that leads us to the same place,

20     which is getting into the merits of the plan provisions and

21     the settlement agreement.

22                 The fact that this isn't the plan, this isn't the

23     settlement agreement, it's just the PSA limits the inquiry

24     into discovery to the issues around exercise of the debtor's

25     business judgment to enter into the PSA.  That includes

1    whether they're proceeding in good faith.

2             It is, I think fair to say, that it's impossible

3    to draw a hard line distinction between, you know, where the

4    inquiry begins and ends and where getting into the merits of

5    the settlement agreement and the plan confirmation issues

6    begin.

7             It might be a difficult line to define, and if

8    necessary, I'll be in the office, and if at deposition you

9    have trouble drawing that line, you can reach out to the

10   Court and I'll make every effort to respond quickly and

11   hopefully resolve any issues.

12            But the focus should be on the plan support

13   agreement.  The focus should be on whether the debtors have

14   reasonably exercised their business judgment in entering

15   into the plan support agreement.  The focus should not be on

16   confirmation.  The focus should not be on the releases.  The

17   focus should not be on the settlement agreement.

18            I think that the debtor's position on this is

19   correct, and it should be limited as much as possible to the

20   position they've taken in their letter.  I think that having

21   red very briefly the e-mail I got with the revised order, I

22   believe it is correct that the offensive provisions i.e.,

23   the sort of overreaching factual findings have been excised

24   from the proposed order, so I don't think that's an issue

25   that needs to be explored.

1          I want to make it very clear in making my ruling

2     that, you know, when I say we're not getting into the

3     settlement agreement, not getting into confirmation, that

4     means my perspective is I'm not getting into it.  I'm not

5     making a decision about plan confirmation or the settlement

6     agreement.

7          I may approve the PSA, and we may come to plan

8     confirmation, and I may not confirm the plan.  That is

9     perfectly possible.  And I will decide that at the time, so

10    I think they really are very different issues, albeit they

11    sort of -- you know, it's kind of the distinction in law

12    school when you talk about contracts and you talk about

13    torts being very different areas of the law until you think

14    -- start to think hard about it where contracts and torts

15    meet, we're trying to do that a little bit here.

16          We're talking about the PSA in one side and the

17    plan and the settlement agreement on the other side.  I

18    think they're distinct, but it might be hard to draw that

19    line.  But in drawing that line, I would err on the side of

20    not getting into confirmation issues and not getting into

21    the merits of settlement issues, and sticking as closely as

22    possible to the PSA.

23          There's not much more that I can say.  I don't

24    have, you know, specific discovery requests in front of me

25    that I can rule on, I don't have specific questions that I

1    can rule on, so I'm trying to speak broadly to define the

2    scope of the inquiry as best I can in a bit of a vacuum.  I

3    hope I've done that.

4           In connection with the alternative transaction

5    provisions, I think that I would exercise a little more

6    liberality in an inquiry into those provisions that would

7    quote/unquote survive failure to confirm or failure for the

8    plan to go effective and/or failure to approve the

9    settlement agreement.

10          I don't want it to be a mini-confirmation hearing

11   on a hypothetical plan that would only exist if X, Y and Z

12   don't occur.  However, questions that delve into the factual

13   background that might be relevant to the discussions we had

14   with the E side committee on, you know, the problems, the --

15   as Mr. Shore sort of took up my analogy, you know, I want A,

16   but not B, C, D.  Those broad issues I think are fair game.

17          You know, whether A is a good idea or B is a good

18   idea or C is a good idea or D is a good idea I don't think,

19   getting into that isn't helpful, but if we talk about sort

20   of the all or nothing nature of the PSA, again to use --

21   paraphrase other people's arguments, I think that's a decent

22   and fair question in connection with the debtor's exercise

23   of their business judgment to enter into the PSA.

24          Was it a reasonable exercise of the debtor's

25   business judgment to enter into sort of a unitary or a

1       global type deal here.  I think that's fair game.

2               So I've done the best I can to articulate where I

3       stand.  I think narrower is better than broader.  I would

4       exercise discretion in the nature of more narrow discovery

5       than broad discovery.  But I understand that it might be a

6       difficult line to draw and I'm available if there are

7       specific inquiries where you can't agree that something is

8       relevant or not or discoverable or not, and I can rule on

9       specific issues and give you up or downs.  I can't give you

10      much more than I've just given you in this kind of context.

11              Are there any questions?

12          (No response)

13              THE COURT:  Wow.  I can't believe there are no

14      questions.  I'm not going to press you.  Hopefully everybody

15      understands where I come down on this.  Is there anything

16      else anyone would like to say in connection with the PSA

17      discovery dispute before we turn to Alcoa?

18          (No response)

19              THE COURT:  Okay.  I don't hear --

20              UNIDENTIFIED:  Your Honor (indiscernible) thank

21      you very much.

22              MR. ROGERS:  Your Honor, this is Brent Rogers from

23      the debtors.  Thank you for your time, and I hope and expect

24      we will not have to trouble you with any of these issues.

25              THE COURT:  All right.  At this point --

1                MR. SHORE:  Your Honor?

2                THE COURT:  Yes.

3                MR. SHORE:  Sorry, this is Chris Shore.  If we can

4     do one thing, my suspicion is that maybe a few people will

5     drop before Alcoa gets taken up.  There is a dispute that

6     has been framed between the EFH Committee and the non-debtor

7     PSA parties.  The EFH Committee and the PICs (ph) have

8     sought be either together or separately discovery from all

9     the major PSA parties and the investor parties.

10               We've narrowed the issues to be addressed.  There

11    was a proposal by the EFH Committee which is fine by us,

12    that they submit a letter to the Court today, we respond

13    either tomorrow or Friday, and that we address the issue

14    with the Court.

15               The question is, would you have time on Friday to

16    hear that dispute, would you have time on Monday, we'd just

17    need to kind of get a date, and then we can work back as to

18    when we're going to get letters in.

19               THE COURT:  Okay.

20               MR. SHORE:  We'd obviously like to resolve it

21    sooner rather than later.

22               THE COURT:  All right.  Give me just a second to

23    look at my calendar.  Oh, boy.  Well, the problem with

24    Monday is it's the religious holiday.  So -- and the problem

25    with Tuesday is it's awfully close to Thursday.

1          I have limited time available Friday let's say 1

2    o'clock, but I turn into a pumpkin at 3.  I can't imagine

3    what they --

4          MR. SHORE:  I don't think --

5          THE COURT:  I can't imagine we'll take two hours,

6    but I just want to make everybody, you know, understand

7    that's where I'm coming from.

8          So we will tentatively schedule a call on that for

9    Friday at 1, and I'd ask you to pow wow amongst yourselves,

10   and if there's an issue about that scheduling that doesn't

11   work, to reach out to Ms. Gatson tomorrow.  She's out today

12   and we'll try to come up with another time that works, but

13   with the religious holiday on Monday and my tight schedule

14   on Friday, that's really pretty much everything I have that

15   meets the criteria.

16         MR. SHORE:  We can certainly work with that.

17   We'll caucus after the call today and come up with a

18   schedule and we'll have letters in advance of that

19   conference.

20         THE COURT:  Yeah, please.  And I am on the bench

21   Friday morning, so you know, I'll look at stuff when I get

22   it obviously, but hopefully it'll make its way over here a

23   little sooner than the debtor's order did this afternoon.

24         MR. SHORE:  Very well, Your Honor.

25         THE COURT:  Now, if you're not interested in

1    Alcoa, you're more than welcome to sign off.

2              UNIDENTIFIED:  Thank you, Your Honor.

3              UNIDENTIFIED:  Thank you, Your Honor.

4              THE COURT:  You're welcome.  So, Mr. Keegan.

5              MR. SHARTZ:  This is Brian Shartz from Kirkland.

6              THE COURT:  Oh, yeah.

7              MR. SHARTZ:  Mr. Keegan actually ended up having a

8    conflict with another hearing, so I'll be handling it from

9    our side.

10             THE COURT:  Okay.

11             MR. GOODMAN:  And, Your Honor, it's Peter Goodman

12   on behalf of Alcoa, and I'm joined by two of my colleagues,

13   Robert Elkin and Bill Wilson, this is our letter.

14             THE COURT:  Yeah.  Let's -- we'll start with

15   Alcoa, let them speak first.  I did receive and have read

16   your reply dated today.

17             MR. GOODMAN:  Uh-huh.

18             THE COURT:  So I did receive that.  I kind of have

19   a question because I just don't understand what you mean

20   when you say you don't object to assumption per se.  What

21   does that mean?  Does it mean, loaded question, does it mean

22   that you're truly focusing in on pure and adequate assurance

23   issues which mean the contract can be assumed no matter

24   what, and then you're putting yourself at the mercy of the

25   Court, and includes the appellate court to determine what

```
1    cure is and what adequate assurance of future performance is

2    and once that's decided, the contract is assumed.  Or are

3    you sort of reserving the right to say if the cure isn't --

4    if the default isn't curable, the contract can't be assumed.

5              MR. GOODMAN:  It's the former rather than the

6    latter.

7              THE COURT:  Okay.

8              MR. GOODMAN:  And the reason for that, Your Honor,

9    is that we're -- we've been told or -- and the Court's been

10   told through the debtors' motion to assume, I believe it's

11   paragraph 41, that with all the financial accommodations

12   they're receiving as part of confirmation they have

13   sufficient funds to satisfy our cure claim.

14             So that was the basis of the proposal that we

15   created and gave to them and submitted to the Court.  And we

16   think it's a very workable proposal.  It obviates the need

17   for this forced march on what is essentially just a cure

18   claim.

19             You know, the issue is here that in a very

20   compressed and tight time frame, including over the Jewish

21   holidays, the debtor has kind of unilaterally come up with a

22   discovery plan that forces discovery on a very complicated

23   contractual breach into a very small finite period of time,

24   which we believe really affects fairness and due process.

25             Now one issue that we raise is that we're also not
```

1     going to object to plan feasibility.  Again, based upon the

2     debtors' representation that they have sufficient funds to

3     not only cure the claim, but perform their obligations under

4     the Rock Tail (ph) facility contracts.

5               Now for point of clarification, and we say this in

6     your -- in both our letters to the Court, we've said this to

7     the debtors, is that assumption will not prohibit Alcoa from

8     -- down the road from enforcing its rights under the Rock

9     Tail contracts, whatever they be.  We have, as we pointed

10    out, by way of example rights with respect to change in law

11    which allow the parties to reform the contracts down the

12    road.  But that is something that does not, you know, come

13    into effect for us until the contracts are assumed.  It's a

14    right.  It's not a claim.  And we just, you know, want to

15    make sure that nothing in the assumption order, that there's

16    no language in the assumption order or the plan that would

17    affect our rights going forward after the contracts are

18    assumed.

19              Now we made this offer and we think it's a very

20    practical offer.  It takes pressure off not only the

21    debtors, the Court and us at a time when every party in this

22    case seems to be grappling, as we heard on the phone just

23    earlier, with, you know, significant litigation to get to

24    confirmation.  And it puts the cure claim back where it --

25    it's supposed to be and -- which is where I believe the

1    debtor wanted it, which is following the confirmation

2    hearing and allows reasonable discovery in fairness and due

3    process.

4              Now the debtor has never rejected this offer.  It

5    -- it's never rejected the offer and it's never told the

6    Court  that it's not interested in the offer.  It's never

7    said anything.  It's never even given a reason for why it

8    needs expedited discovery on such a rushed basis on a cure

9    claim.

10             And, in fact, the debtors made a counterproposal

11   to us, which was similar to our offer, and we accepted and

12   subject to getting some clarification on how it might work

13   and the process.  But that got pulled yesterday morning to

14   our surprise.  It's something that we had worked on over the

15   weekend.

16             So, you know, I can tell the Court that the breach

17   claims that we're discussed here are complicated.  I think

18   that's pretty obvious based upon the nature of the debtors'

19   business and the fact that these are two very significant

20   power generation facilities with common ownership and

21   separate ownership interests.

22             With respect to that, we said to them, look, our

23   claim -- this is what our claim is about.  We met with them

24   and we said to them, hey, the claim is based on a -- Alcoa's

25   assertion that the debtors have not operated the plant

1    efficiently and economically and have harmed Alcoa for a

2    number of years.

3              Proof of that claim is largely going to come, not

4    entirely, but will come from the debtors' documents and it

5    will require detailed expert analysis on the source and

6    nature of the investment in Unit 4 and the economics of the

7    plan and the electricity market over an extended period of

8    time.  But it is not -- it is not solely dependent upon the

9    current price of power.  I just want to dispel that.

10             And Alcoa has never objected to the commencement

11   of discovery.  I think when we were before Your Honor, you

12   know, two weeks ago I said on the record, let them serve the

13   notice.  Let's start discovery now on their cure claim.

14   Instead, they served the motion.  We have never objected so

15   long as we have a reasonable and realistic discovery plan

16   and hearing date, and a protective order that permits Alcoa

17   to build its case.  And we've informed the debtors of that

18   on several occasions.

19   We've provided the debtors with a discovery schedule which

20   would permit that and we've had discussions on that

21   discovery schedule beforehand.

22             We really have one -- besides these other issues,

23   if we're going down to the nitty  gritty, if we want to

24   talk about the protective order, we only had one issue with

25   the protective order.  We want this thing to get moving.  We

1    had one issue and that is we're not -- this is -- they --

2    the debtors would like to kind of put on us a protective

3    order one size fits all.  If it's good for the committee and

4    it's good for the ad hoc creditors, it's got to be good for

5    Alcoa.

6              But it doesn't work that way.  Alcoa employees are

7    absolutely critical, critical here to understanding the

8    documents, understanding -- helping us build our case and

9    establish our claims.  And we said to them, look, we need

10   these people to examine the highly confidential documents,

11   which, you know, just as a caveat that's 50 percent of the

12   documents they're going to produce to us.  And what they've

13   explained -- how they've explained those documents is they

14   seem like they are the most important documents to helping

15   us on our case.

16             And we said, look, we need Alcoa employees to help

17   review and understand these documents.  And we said we'll

18   limit it to a specific group of people, a small group of

19   people.  Alcoa is not a competitor here.  And -- excuse me,

20   Your Honor -- and let these people see these documents.  And

21   we were told, that's a deal-breaker.  That's a non-starter.

22   You've got to take what the committee has and what the ad

23   hoc committee has, even though we're not a competitor, we're

24   not trading in the debt, we're not looking to be

25   unrestricted.

1              So I think they've got to come up with an

2     explanation of why this hand -- you know, a handful of

3     people that we've given to them are -- who are very familiar

4     with this situation can't review the documents.

5              Now what -- with respect to assumption, Your

6     Honor, one issue we've raised -- and I just want to discuss

7     it a little further.  The only interest Alcoa would have in

8     the confirmation hearing, now that it's willing to drop the

9     feasibility plan, is as I said to make sure that nothing in

10    the plan now or down the road, meaning something that comes

11    up at the confirmation hearing is going to affect the Rock

12    Tail contracts after they are assumed.

13             The Rock Tail agreement has a change in law

14    provision, which I've mentioned.  It's a mutual

15    renegotiation provision by the parties where the parties

16    agree that a certain economic conditions exist for an

17    extended period of time at various points in time in the

18    past, present or future have changed.  The legal

19    requirements for the parties has changed.  The parties would

20    then attempt to renegotiate the contract.  And failing that,

21    it could be terminated, both parties, both Luminant and

22    Alpower (ph) and Alcoa have that right.

23             And we just want to make sure down the road, we

24    don't think anything will, but if something comes up that

25    the assumption and confirmation orders don't affect this

1    right or any other rights that Alcoa has going with respect

2    to the contracts once they're assumed.  This is not -- it's

3    not a claim.  It's a contractual right.

4            Now as a -- as we've mentioned in our letter, and

5    I'm not going to get into it in any great detail unless Your

6    Honor wants to hear more, but we believe that we entered

7    into a stipulation with the debtors providing that

8    assumption would happen at confirmation.  We quoted the

9    language in our letter and the stipulation itself was a quid

10   pro quo whereby Alcoa limited its objection to the plan,

11   limited just to the assumption issue and plan feasibility

12   which was related to the assumption issue.

13           And that's something we bargained for and we

14   bargained for that occurring, you know, two months down the

15   road at confirmation.  And we would get 28 days' notice.

16   The debtors are now proposing to pull all this forward by

17   several months so that we have to cure the claim -- we have

18   to try to cure claim immediately.  So we effectively got

19   more notice than any other executory contract party, 28

20   days.  They only get two weeks.  We got 28 days.

21           But now they have -- the -- all the other parties

22   effectively have more notice and more rights than us because

23   their cure claims are going to get settled post-confirmation

24   hearing when Your Honor takes up whatever disputes and

25   trials that will occur with respect to cure claims on

1    executory contracts.

2            So, you know, in conclusion, Your Honor, we want

3    to know where we stand with the hearing date.  Are we going

4    to be forced on this death march to October 2nd.  It's a

5    date we never picked, a date we never agreed to, to litigate

6    and liquidate these cure claims.  And it -- you know, is

7    expedited discovery necessary.  The parties haven't -- we

8    haven't been able to even sit down with them and talk about

9    a discovery plan because they're just locked into this

10   October 2nd hearing date.  And then, you know, what's the

11   status of our offer, where are they with our offer.

12           So I think if the debtors are trying to force us

13   to go forward and force the Court to go forward with a cure

14   hearing on a very short notice on a complicated situation

15   like this, at the very least they have to answer these

16   questions and they have to work with us in good faith.

17           THE COURT:  Thank you, Mr. Goodman.

18           MR. SCHARTZ:  Your Honor, it's Brian Schartz with

19   Kirkland.

20           You're probably not surprised to hear that I have

21   a very, very, very different view of the world here.  And

22   I'm going to try to address all of Mr. Goodman's points in

23   the order in which he addressed them.

24           But I think the first one, the most important is

25   that our assumption motion is premised on a view that there

1      are no cure claims.  So what was said in our motion at

2      paragraph 41 is that the debtors believe, to the extent the

3      Court determines that default has occurred or whether it is

4      required to provide adequate assurance of future

5      performance, that we can do so.

6              It says nothing about a cure claim and, in fact,

7      the paragraph before it says, first sentence, there are no

8      are -- there are no existing defaults under the Alcoa

9      contract.

10             THE COURT:  All right.  So you're --

11             MR. SCHARTZ:  And so --

12             THE COURT:  So -- wait a minute.  So your position

13     is you don't want to make -- you can't make a decision about

14     whether to assume or reject this contract until you know

15     what any cure claim or adequate assurance future performance

16     claim is going to be allowed?

17             MR. SCHARTZ:  That's exactly right, Your Honor.

18     So when you --

19             THE COURT:  Well, then --

20             MR. SCHARTZ:  -- look at --

21             THE COURT:  -- then how do we -- how do I have a

22     substantive hearing on the merits of whether or not a

23     contract as complicated as this one is in default or not in

24     four weeks?

25             MR. SCHARTZ:  I'll get to that in a second, Your

1    Honor --

2            THE COURT:  Okay.

3            MR. SCHARTZ:  -- on timing.  But let me -- and I

4    don't mean to defer your question, but I will get to that

5    timing because I do think it merits a significant

6    conversation.  But I want to get out how I view the world

7    and how my client views the world because what's really

8    important here is we want the assumption and the cure claim,

9    and whether there's any breach, heard at the same time.

10           And to Your Honor's point, the issue is -- if Your

11   Honor rules, for example, just picking a number, there's X

12   million dollars, $100 million of -- to our view on those

13   contracts, or one or two contracts and it's probably linked

14   to a specific contract, if it exists, then that may change

15   the business decision, right?  The debtors may make a

16   decision, okay, we don't want to pay $100 million, or maybe

17   we do want to pay $100 million, whatever the figure the

18   Judge rules.  We may want to assume some contracts and try

19   to assume others.

20           But the point is being locked into assumption

21   right now on those contracts and having a cure litigation

22   later is a very difficult business proposition from that

23   perspective.

24           And there's another issue, too, which is -- and

25   you see some of this in Mr. Goodman's last letter they sent

1    to you.  I think it's on the last page, second paragraph,

2    which is, you know, he says this case is about the prudence

3    of the investments in a power plant.  And that's an

4    important point because the type of breach claim that Alcoa

5    is asserting is really tied to business judgment, right?

6           So in our mind what we struggle with on

7    bifurcation, which essentially is what they're proposing,

8    what we struggle with is this concept that we're going to

9    have an assumption order that's linked to the debtors'

10   business judgment to assume all these contracts, and then

11   we're later going to have a litigation in the context of

12   cure where, again, we're going to be looking at the debtors'

13   business judgment in running these contracts and how they

14   operate the -- their related facility.

15          I don't know if you can do that conceptually,

16   right?  We submitted two declarations with the motion, one

17   from the chief financial officer at Luminant whose named Bob

18   Francel (ph) and Mr. Todd Wilsinger (ph) at Energy Partners.

19   You know, that supports the debtors' business decision.

20          If, for example, you know, McKool Smith and Alcoa

21   are going to allow the judge to rely on the declarations in

22   support of the business decisions to assume the contract,

23   but then subsequently have a litigation over what those

24   declarations say because they somehow impact the business

25   decision on how the plants are run, that seems very

1     complicated from our perspective.

2            So it's not that we don't want to find a

3     resolution.  We do.  That's why we pick up the phone and

4     talk to Alcoa's counsel when they call.  We will always do

5     that because, you know, that's how we've operated in the

6     past.  But we are at somewhat of an impasse as to whether or

7     not bifurcation is a viable alternative.

8            And what happened over the weekend, just so we're

9     really clear, is that a concept was raised regarding

10    bifurcation a week before.  We didn't get back to Alcoa till

11    the end of the week, and then on Labor Day what we heard

12    from Mr. Goodman was -- and we got it in writing was, you

13    know, nine, ten points, significant points in our mind of

14    what it would take to actually make, you know, some aspects

15    of bifurcation work.

16           So, look, I don't want to get too much into

17    settlement discussions.  I'm trying to lay out what our view

18    of the world is regarding assumption.  And to put it simply

19    it's -- you know, we think that the assumption and cure

20    should be heard together, and then we think it can be done

21    quick.

22           So let me turn to the timing aspect.  We've heard

23    on the debtors' side sort of various points about what it

24    would take to litigate this alleged breach and, you know,

25    how that could work.  And you saw -- I don't know if you

1    noticed this, but in McKool's last letter that they filed

2    today, you know, it said the debtors only have one

3    confidential presentation around what our claims are, but

4    they're really no different than what Mr. Goodman laid out

5    to you.   It's one legal theory that would tie to a

6    consensual breach.

7              And we think that's a potentially discreet issue.

8    We think that, one, it could be decided almost on the

9    language of the contract itself and, two, no one has raised

10   this -- I'll raise it now -- there was actually a similar

11   litigation in 2010 that Alcoa brought against my client

12   alleging a very similar type of claim.   So once we actually

13   see what they're claiming, part of this, we may argue, is

14   that it's already been decided by another court, right?

15   It's already been resolved.

16             But we don't know what we don't know.   And what we

17   want to do is set a schedule, get everything moving, have a

18   real discussion about when the hearing's going to be held on

19   a reasonable basis and then, you know, hopefully we can work

20   it out with opposing counsel consensually.   If we can't,

21   then, you know, we'll come back to you.

22             But I think that's -- that's the state of play

23   here.   And I think the only real issue, Your Honor, for you

24   to decide today is whether or not the prior stipulations

25   that were entered into in May and August, you know, prevent

1   us from filing the motion.  And I think that's the only

2   issue that's  -- you know, I don't know what the right word

3   is.  I guess I'll use ripe.  That's the only issue that's

4   ripe today because, you know, that's what precipitated the

5   hearing and then other letters have been filed that create

6   discovery issues.  Mr. Goodman highlighted those.

7           But, you know, there haven't -- we haven't seen a

8   letter of breach.  We haven't actually even had a full

9   conversation with McKool Smith about it because we just got

10  at 9:00 last night their comments to the confidentiality

11  agreement and their proposed schedule.  But we haven't had

12  an opportunity to discuss it, given that we had a hearing

13  today.

14          So I think really the only issue that's ripe for

15  today is, you know, this view or this argument that keeps

16  being made that the stipulation prevented us or barred us

17  from filing the motion.  We, for the reasons we put forth in

18  our letter yesterday, feel very strongly that that's not the

19  case, right?  The stipulations say nothing about a motion.

20  They say nothing about what would happen in the context of

21  the motion.  It was all done in the context of a scheduling

22  order that only discussed confirmation.

23          And even if Your Honor did rule that they did

24  apply to a motion, we think we've complied with it.  We gave

25  Alcoa 28 days' notice from the filing of the motion and our

1    proposed objection deadline on that motion.  And we provided

2    a discovery plan.  They hate the discovery plan.  That's

3    okay.  They're allowed to hate the discovery plan.  And --

4    but that's how the process was designed (indiscernible), and

5    the context of the plan or the context of the motion is kind

6    of neither here nor there.

7           So what I would propose is let us, on the company

8    side, get an understanding of what it is exactly McKool has

9    proposed in terms of timing.  We obviously have a huge

10   spread in the bid ask and that we may not be able to resolve

11   it.  But we just got it last night late and for the first

12   time.  We haven't had a chance to discuss it today.  And

13   let's do the same thing on the confidentiality agreement so

14   we can get the discovery process moving.

15          And if we don't have agreement on that, what I

16   would propose is we come back to Your Honor, you know, late

17   in the week, Friday or whenever you want, frankly, and we'll

18   file letters and we can talk again once it's sort of

19   properly flushed out and we've had the discussions that we

20   really should have around timing and discovery that we've

21   been trying to have for the last, you know, ten days or so.

22          But I think we do need just to resolve this from a

23   motion perspective.  I think we do need, you know, a finding

24   from Your Honor regarding whether or not the stipulations

25   prevented us, the debtors, from filing a motion.

1            THE COURT:  Okay.  I don't think actually that's

2    the question.  I think that question is neither here nor

3    there.  Even if the stipulations were to allow you to file

4    the motion, and I think, you know, they clearly -- in my

5    mind they would allow you to file a motion.  Timing is what

6    this is really about.

7            You asked for, through a call to Ms. Gatsen (ph),

8    a hearing date of October 2nd.  I never ruled on the merits

9    as to whether that was appropriate or not.  You're certainly

10   entitled to ask for a hearing date.  And it satisfies the

11   minimum notice deadlines under the Bankruptcy Code.  But

12   that's not the end all, be all.  Just because it's the

13   minimum notice doesn't mean it's the appropriate notice.

14           So in my mind the question in front of me is when

15   do I give you a hearing and what will be decided at that

16   hearing.  Now I thought I was hearing -- well, I was hearing

17   the argument from Alcoa that what was really appropriate

18   here was bifurcation and you could decide assumption, for

19   example, on October 2nd and we could have a cure adequate

20   assurance hearing sometime in January and that would make

21   them happy.  And the only thing that would be discussed at

22   plan confirmation by then would not be feasibility, but this

23   narrow issue about changing the contract.

24           And what I'm hearing from you is, that's nice.

25   Bifurcation doesn't work.  Let's be heard on October 2nd.

1          I'm not going to have a hearing on October 2nd on

2     a non-bifurcated basis.  There's no reason to have a

3     disputed hearing on the substance of assumption, which

4     includes a fight over whether there's a default under the

5     contract and what would cure that default and what adequate

6     assurance of future performance would be.  All of that in

7     addition to whether assumption is a reasonable exercise of

8     the debtors' business judgment on that kind of time frame.

9     So I have my ideas about what an appropriate time frame

10    would be.

11         But I haven't given you -- you haven't really had

12    an opportunity to address that, which is you've asked for

13    October 2nd and I'm telling you you're not getting that.

14    They've asked for January 20th.  I'm telling you that I

15    think that's too long.  And what I would be inclined to do

16    is give you a date somewhere in the middle, unless you can

17    articulate for me a real reason this needs to be decided

18    prior to confirmation.

19         MR. SCHARTZ:  The only -- I take it that was

20    directed at debtors' counsel --

21         THE COURT:  Yes, it was.

22         MR. SCHARTZ:  -- Your Honor.

23         THE COURT:  Yes it was.

24         MR. SCHARTZ:  My only issue with that, as long as

25    it's not -- the fact that it's heard both together,

1  assumption and cure claim at the same time after

2  confirmation, as long as it doesn't somehow preclude the

3  debtors from making a different decision if, you know, it

4  doesn't turn out the way they would like.  And I think

5  that's -- you know, that is a remote fear given the way the

6  365 is structured.  But it is a concern.

7            I don't think Alcoa wants to do that because they

8  wouldn't have said as much, but, you know, one concern about

9  having it after confirmation is just that legal issue that's

10  just tied to the way that 365 works.

11           Now there is -- this isn't -- we didn't put this

12  in our brief because it didn't come up, but as I understand

13  it there is case law that says if the motion is on file and

14  confirmations happen, Your Honor obviously can hear that

15  motion after the confirmation date.  And I think that's

16  really potentially the right approach in this case because

17  it looks like there's going to be such a lag between the

18  confirmation date, entry of the confirmation order and the

19  potential effective date in this -- on this structure.

20           So that -- that's a primary concern that we have.

21  But other than that, you know, I think it's more important

22  to us to just get this underway, you know, stop a letter-

23  writing campaign and start talking about brass tacks and get

24  started.

25           THE COURT:  Mr. Goodman --

1          MR. GOODMAN:  I --

2          THE COURT:  -- go ahead.

3          MR. GOODMAN:  I'm sorry.  I didn't meant to

4   interrupt, Your Honor.

5          THE COURT:  No.  It's okay.

6          MR. GOODMAN:  Okay.  Your Honor, you know,

7   obviously I would have to talk to my client, but I -- you

8   know, from sitting here today I don't have a problem, you

9   know, with having this heard after confirmation, whether

10  it's assumption and a cure or just cure.  I mean, I think it

11  was contemplated that cure place -- cure would take place

12  after confirmation, the cure hearing.

13         I'm a little confused about the debtors' position

14  on these contracts that they've made a business decision to

15  assume in full light and knowledge of the claims that we've

16  asserted because we have met with them and given them a

17  detailed analysis of our claims.  And the fact that in their

18  motion they represented, "To the extent the Court determines

19  that a default is" -- and this is in paragraph 41:

20         "To the extent the Court determines that a default

21  has cure or that the debtors are required to provide

22  adequate assurance of future performance in any event, the

23  debtors submit that the  -- that the debtors' plan, which

24  will reduce debt by an estimated 23 billion, will provide

25  more than enough adequate assurance to Alcoa; that the

1    debtors are able to satisfy their contractual obligations

2    going forward."

3            So to me that's a representation.  Apparently,

4    they've now changed that position.

5            The other thing is with respect to the business

6    judgment, Your Honor, the business judgment to assume is

7    quite different than a determination on a single contractual

8    provision which we say they're in breach of because the

9    debtors have to assume the contract as is.  They can't

10   modify it.  It's a contractual provision that they are aware

11   that was in there and we've notified them of that.

12           But I think Your Honor has given us some guidance.

13   I take that as a suggestion that maybe the parties get

14   together and see if they could reach an agreement on timing,

15   and I think given Your Honor's guidance we should be able to

16   do it.

17           THE COURT:  Yeah.  I mean, I'm perfectly happy to

18   bifurcate the issue and hear assumption issues only on

19   October 2nd, with a reservation for a later date for cure

20   and adequate assurance issues.

21           However, if the parties -- and by the parties I

22   mean if the debtors are not agreeable to bifurcation and

23   want it all heard at the same time, that's fine as well.

24   I'll schedule that sometime between early December and early

25   January.  And that's the time frame I have in mind.  That

1    would also be the time frame for a cure hearing if we were

2    bifurcating.

3              So I have time to schedule for that.  I -- out of

4    an abundance of caution I think I would give you a full

5    week.  We would go Monday through Friday.  So let me do

6    this.  Let me direct you to have a discussion with each

7    other about an appropriate date in that time frame, the

8    December to January time frame, and working back on a

9    schedule from that date.  And you can also discuss whether

10   you want to bifurcate or not.  I'll hold the October 2nd

11   date for now.  That's a special hearing just for this matter

12   --

13             MR. GOODMAN:  Thank you, Your Honor.

14             THE COURT:  -- and you can inform me how you want

15   to proceed.  And it sounds like you're going to be able to

16   reach agreement on things like confidentiality agreements

17   and whatnot without me getting involved.  But if you do need

18   me to resolve any technical disputes or specific disputes in

19   connection with discovery, of course that's what I'm here

20   for and you can get me on the phone and we'll deal with

21   those issues directly.

22             I think no matter what a scheduling order would be

23   appropriate so that we have set in stone, you know, exactly

24   what dates we're talking about and what will be decided

25   when.

1           So I'll hold the October 2nd date.  That would

2    only be a date on assumption.  It would not include cure.

3    It would not include adequate assurance issues.  Those would

4    be done at a separate date, in effect bifurcation, but only

5    if all parties agree.  If the parties can't agree, we'll

6    hear it all at one time.  And the hearing on cure/adequate

7    assurance or the hearing on the matter as a whole can occur

8    somewhere in the December to January time frame, early

9    January time frame.  For example, the week -- I think the

10   20th was proposed.  I can't do it then and that seems a

11   little late for me.  But we'll want to do it right after the

12   new year or sometime in December.  That's fine.

13           Okay.  Is that helpful?

14           MR. GOODMAN:  Thank you, Your Honor.  Yes.  Thank

15   you, Your Honor.

16           THE COURT:  All right.  Thank you very much.

17   We're adjourned.

18           MR. SCHARTZ:  Thank you.

19   (Proceedings concluded at 3:49 p.m.)

20                     * * * * *

21

22

23

24

25

Page 85

1                C E R T I F I C A T I O N S

2

3     I, Sheila Orms, certify that the foregoing transcript is a

4     true and accurate record of the proceedings.

5

6     **Shelia G. Orms**    Digitally signed by Shelia G. Orms
                            DN: cn=Shelia G. Orms, o=Veritext, ou,
                            email=digital@veritext.com, c=US
7     _____    Date: 2015.09.10 14:59:40 -04'00'

8     SHEILA ORMS, Approved Transcriptionist

9     **Sherri Breach**    Digitally signed by Sherri Breach
                            DN: cn=Sherri Breach, o=Veritext, ou,
                            email=digital@veritext.com, c=US
10    _____    Date: 2015.09.10 15:00:29 -04'00'

11    Sherri L. Breach

12    AAERT Certified Electronic Reporter & Transcriber CERT*D-397

13

14    DATED:  September 10, 2015

15

16

17

18

19

20

21

22    Veritext Legal Solutions

23    330 Old Country Road

24    Suite 300

25    Mineola, NY 11501