**<u>Exhibit A</u>**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# Form 8- K

## Current Report
**Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934
Date of Report (date of earliest event reported)  December 5, 2012**

# Energy Future Holdings Corp.
**(Exact name of registrant as specified in its charter)**

| Texas | 1- 12833 | 75- 2669310 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

# Energy Future Intermediate Holding Company LLC
**(Exact name of registrant as specified in its charter)**

| Delaware | 1- 34544 | 26- 1191638 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**Energy Plaza, 1601 Bryan Street, Dallas, Texas 75201**
**(Address of principal executive offices, including zip code)**
**214- 812- 4600**
**(Registrants' telephone number, including Area Code)**

Check the appropriate box below if the Form 8- K filing is intended to simultaneously satisfy the filing obligation of the registrants under any of the following provisions (see General Instruction A.2. below):

❏   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

❏   Soliciting material pursuant to Rule 14a- 12 under the Exchange Act (17 CFR 240.14a- 12)

❏   Pre- commencement communications pursuant to Rule 14d- 2(b) under the Exchange Act (17 CFR 240.14d- 2(b))

❏   Pre- commencement communications pursuant to Rule 13e- 4(c) under the Exchange Act (17 CFR 240.13e- 4(c))

---

## Introductory Note

On December 5, 2012, Energy Future Intermediate Holding Company LLC ("EFIH"), a wholly- owned subsidiary of Energy Future Holdings Corp. ("EFH Corp."), and EFIH Finance Inc. ("EFIH Finance" and, collectively with EFIH, the "Issuer"), a direct, wholly- owned subsidiary of EFIH, completed a private debt exchange transaction (the "Exchange") pursuant to an Exchange Agreement (the "Exchange Agreement") among the Issuer and certain funds and accounts managed by institutional investors (collectively, the "Exchange Holders"). Pursuant to the Exchange Agreement, the Issuer issued approximately $1.145 billion aggregate principal amount of its 11.25%/12.25% Senior Toggle Notes due 2018 (the "New Notes") in exchange for the surrender by the Exchange Holders of approximately $234 million aggregate principal amount of 5.55% Series P Senior Notes due November 15, 2014 of EFH Corp. (the "Series P Notes"), approximately $510 million aggregate principal amount of 6.50% Series Q Senior Notes due November 15, 2024 of EFH Corp. (the "Series Q Notes"), approximately $453 million aggregate principal amount of 6.55% Series R Senior Notes due November 15, 2034 of EFH Corp. (the "Series R Notes"), approximately $94 million aggregate principal amount of 10.875% Senior Notes due 2017 of EFH Corp. (the "2017 Senior Notes") and approximately $313 million aggregate principal amount of 11.250%/12.000% Senior Toggle Notes due 2017 of EFH Corp. (the "2017 Toggle Notes" and, together with the Series P Notes, the Series Q Notes, the Series R Notes and the 2017 Senior Notes, the "Old Notes"), including any accrued but unpaid interest on the Old Notes. The Old Notes have been deposited in a custody account of EFIH and remain outstanding.

### Item 1.01. Entry into a Material Definitive Agreement.

### Indenture

On December 5, 2012, the Issuer entered into an indenture (the "Indenture") among the Issuer and The Bank of New York Mellon Trust Company, N.A. ("BNYM"), as trustee. Pursuant to the Indenture, the Issuer issued $1.145 billion aggregate principal amount of New Notes. The New Notes will mature on December 1, 2018. Interest on the New Notes is payable semiannually in arrears on June 1 and December 1, beginning on June 1, 2013. Until June 1, 2016, the Issuer may elect to pay interest on the New Notes (i) entirely in cash; (ii) by increasing the principal amount of the New Notes or by issuing additional New Notes ("PIK Interest"); or (iii) 50% in cash and 50% in PIK interest. Interest on the New Notes is payable at a fixed rate of 11.25% per annum for cash interest and a fixed rate of 12.25% per annum for PIK interest. The interest payment due on June 1, 2013 will be paid 100% in PIK interest.

The New Notes are senior unsecured obligations of the Issuer and rank equally in right of payment with all other senior indebtedness of the Issuer. The New Notes will be effectively subordinated to indebtedness of the Issuer that is secured by assets of the Issuer, to the extent of the value of the assets securing such indebtedness. Furthermore, the New Notes will be structurally subordinated to all indebtedness and other liabilities of EFIH's subsidiaries (other than EFIH Finance), including Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings") and its subsidiaries, any of EFIH's future foreign subsidiaries and any other unrestricted subsidiaries and senior in right of payment to any future subordinated indebtedness of the Issuer.

The New Notes and the Indenture restrict the Issuer's and EFIH's restricted subsidiaries' ability to, among other things, make restricted payments, incur debt and issue preferred stock, incur liens, permit dividend and other payment restrictions on restricted subsidiaries, merge, consolidate or sell assets and engage in transactions with affiliates. These covenants are subject to a number of important limitations and exceptions. The New Notes and the Indenture also contain customary events of default, including, among others, failure to pay principal or interest on the New Notes when due. If an event of default occurs under the New Notes and the Indenture, the trustee or the holders of at least 30% in principal amount outstanding of the New Notes may declare the principal amount on the New Notes to be due and payable immediately. There will initially be no restricted subsidiaries under the Indenture (other than EFIH Finance, which has no assets). Oncor Holdings, the immediate parent of Oncor Electric Delivery Company LLC ("Oncor"), and its subsidiaries will be unrestricted subsidiaries under the Indenture and, accordingly, will not be subject to any of the restrictive covenants in the Indenture.

The Issuer may redeem the New Notes, in whole or in part, at any time on or after December 1, 2014, at specified redemption prices, plus accrued and unpaid interest, if any. In addition, before December 1, 2014, the Issuer may redeem up to 35% of the aggregate principal amount of the New Notes from time to time at a redemption price of 111.25% of the aggregate principal amount of the New Notes, plus accrued and unpaid interest, if any, with the net

2

cash proceeds of certain equity offerings. The Issuer may also redeem the New Notes at any time prior to December 1, 2014 at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make- whole" premium. Upon the occurrence of a change in control, the Issuer must offer to repurchase the New Notes at 101% of their principal amount, plus accrued and unpaid interest, if any.

The New Notes have not been registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state or other jurisdiction, and may not be offered or sold in the United States without registration or an applicable exemption from the Securities Act.

A copy of the Indenture is attached hereto as Exhibit 4.1 and is incorporated herein by reference. The above description of the Indenture is qualified in its entirety by reference to the Indenture.

**Registration Rights Agreement**

On December 5, 2012, the Issuer also entered into a registration rights agreement (the "Registration Rights Agreement") among the Issuer and the Exchange Holders. Pursuant to the Registration Rights Agreement, the Issuer has agreed to register with the U.S. Securities and Exchange Commission notes having substantially identical terms as the New Notes (except for provisions relating to transfer restrictions and payment of additional interest) as part of an offer to exchange such registered notes for the New Notes and to complete such exchange offer no later than 365 days after December 5, 2012. The Issuer has also agreed to file a "shelf" registration statement under certain circumstances to cover resales of the New Notes. If such obligations are not satisfied (a "Registration Default"), the annual interest rate on the New Notes will increase by 25 basis points for the first 90- day period during which a Registration Default continues, and thereafter the annual interest rate on the Additional Notes will increase by 50 basis points over the original interest rate for the remaining period during which the Registration Default continues. If the Registration Default is corrected, the interest rate on the Additional Notes will revert to the original level.

A copy of the Registration Rights Agreement is attached hereto as Exhibit 4.2 and is incorporated herein by reference. The above description of the Registration Rights Agreement is qualified in its entirety by reference to the Registration Rights Agreement.

**Series Q Supplemental Indenture**

Prior to the Exchange, certain of the Exchange Holders who held a majority of the outstanding aggregate principal amount of the Series Q Notes gave their consent to certain amendments to the Indenture (For Unsecured Debt Securities Series Q), dated as of November 1, 2004, between EFH Corp. and BNYM, and related documents (collectively, the "Series Q Indenture"). The Series Q Indenture governs the Series Q Notes. As a result of the consent, EFH Corp. and BNYM, as trustee under the Series Q Indenture, entered into a Supplemental Indenture, dated as of December 5, 2012 (the "Series Q Supplemental Indenture"), that amended and supplemented the Series Q Indenture. The amendments to the Series Q Indenture, among other things, modify or eliminate substantially all of the restrictive covenants contained in the Series Q Indenture, modify or eliminate certain events of default, modify covenants regarding mergers and consolidations and modify or eliminate certain other provisions of the Series Q Indenture, including the limitation on the incurrence of secured indebtedness. A copy of the Series Q Supplemental Indenture is being filed as Exhibit 4.3 to this Form 8-K. The above description of the Series Q Supplemental Indenture is qualified in its entirety by reference to the Series Q Supplemental Indenture.

**Series R Supplemental Indenture**

Prior to the Exchange, certain of the Exchange Holders who held a majority of the outstanding aggregate principal amount of the Series R Notes gave their consent to certain amendments to the Indenture (For Unsecured Debt Securities Series R), dated as of November 1, 2004, between EFH Corp. and BNYM, and related documents (collectively, the "Series R Indenture"). The Series R Indenture governs the Series R Notes. As a result of the consent, EFH Corp and BNYM, as trustee under the Series R Indenture, entered into a Supplemental Indenture, dated as of December 5, 2012 (the "Series R Supplemental Indenture"), that amended and supplemented the Series R Indenture. The amendments to the Series R Indenture, among other things, modify or eliminate substantially all of the restrictive covenants contained in the Series R Indenture, modify or eliminate certain events of default, modify covenants regarding mergers and consolidations and modify or eliminate certain other provisions of the Series R

Indenture, including the limitation on the incurrence of secured indebtedness. A copy of the Series R Supplemental Indenture is being filed as Exhibit 4.4 to this Form 8- K. The above description of the Series R Supplemental Indenture is qualified in its entirety by reference to the Series R Supplemental Indenture.

**Item 2.03. Creation of a Direct Financial Obligation or an Obligation Under an Off- Balance Sheet Arrangement of a Registrant.**

The information relating to the Indenture and the New Notes set forth under Item 1.01 of this Current Report on Form 8- K is incorporated by reference in this Item 2.03.

**Item 8.01. Other Events.**

The information regarding the Exchange set forth under "Introductory Note" in this Current Report on Form 8- K is incorporated by reference in this Item 8.01.

At December 5, 2012, after taking into account the Exchange, EFH Corp. and its subsidiaries (excluding Oncor Holdings and Oncor and its subsidiary) are permitted under their applicable debt agreements to issue additional senior secured debt (in each case, subject to certain exceptions and conditions set forth in their applicable debt documents) as follows:

EFH Corp. and EFIH collectively are permitted to issue up to $250 million of additional aggregate principal amount of debt secured by EFIH's equity interest in Oncor Holdings on a second- priority basis;

Texas Competitive Electric Holdings Company LLC, an indirect wholly- owned subsidiary of EFH Corp. ("TCEH"), is permitted to issue approximately $1.5 billion of additional aggregate principal amount of debt secured by substantially all of the assets of TCEH and certain of its subsidiaries (of which $750 million can be on a first- priority basis and the remainder on a second- priority basis), and

TCEH is permitted to issue an unlimited amount of additional first- priority debt in order to refinance the first- priority debt outstanding under its senior secured credit facilities.

In addition, at December 5, 2012, after taking into account the Exchange, EFIH is permitted under its applicable debt agreements to issue up to $400 million of additional aggregate principal amount of senior unsecured debt (subject to certain exceptions and conditions set forth in its applicable debt documents). Such unsecured debt may be incurred for, among other things, exchanges of EFH Corp. unsecured debt.

These amounts are estimates based on EFH Corp. and its applicable subsidiaries' current interpretation of the covenants set forth in their debt agreements and do not take into account exceptions in the debt agreements that may allow for the incurrence of additional secured or unsecured debt, including, but not limited to, acquisition debt, refinancing debt, capital leases and hedging obligations. Moreover, such amounts could change from time to time as a result of, among other things, the termination of any debt agreement (or specific terms therein) or amendments to the debt agreements that result from negotiations with new or existing lenders. In addition, covenants included in agreements governing additional future debt may impose greater restrictions on EFH Corp. and its applicable subsidiaries' incurrence of secured or unsecured debt. Consequently, the actual amount of senior secured or unsecured debt that EFH Corp. and its applicable subsidiaries are permitted to incur under their debt agreements could be materially different than the amounts provided above.

This Current Report on Form 8- K shall not constitute an offer to sell or a solicitation of an offer to buy the New Notes.

4

**Item 9.01. Financial Statements and Exhibits.**
(d) Exhibits

| Exhibit No. | Description |
| --- | --- |
| 4.1 | Indenture, dated as of December 5, 2012, among the Issuer and BNYM, as trustee, relating to the 11.25%/12.25% Senior Toggle Notes due 2018. |
| 4.2 | Registration Rights Agreement, dated as of December 5, 2012, among the Issuer and the Exchange Holders. |
| 4.3 | Supplemental Indenture, dated as of December 5, 2012, between EFH Corp. and BNYM, as trustee, relating to the Series Q Notes |
| 4.4 | Supplemental Indenture, dated as of December 5, 2012, between EFH Corp. and BNYM, as trustee, relating to the Series R Notes |

5

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, each registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**ENERGY FUTURE HOLDINGS CORP.**

/s/ Stan J. Szlauderbach
Name: Stan J. Szlauderbach
Title: Senior Vice President & Controller

**ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC**

/s/ Stan J. Szlauderbach
Name: Stan J. Szlauderbach
Title: Senior Vice President & Controller

Dated: December 5, 2012

**Exhibit 4.2**

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**
**EFIH FINANCE INC.**
**11.25%/12.25% Senior Toggle Notes due 2018**
*Registration Rights Agreement*

December 5, 2012

Holders named in Appendix A
to the Exchange Agreement (the "<u>Initial Holders</u>")
Ladies and Gentlemen:

Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("<u>EFIH</u>"), and EFIH Finance Inc., a Delaware corporation ("<u>EFIH Finance</u>" and, together with EFIH, the "<u>Issuers</u>"), propose to issue to the Initial Holders upon the terms set forth in the Exchange Agreement (as defined herein) up to $1,144,770,000 in aggregate principal amount of their 11.25%/12.25% Senior Toggle Notes due 2018 (the "<u>Notes</u>") in exchange for the notes listed under the heading "Exchange Securities" in Appendix A to the Exchange Agreement. In order to induce the Initial Holders to enter into the Exchange Agreement, the Issuers have agreed to provide the registration rights set forth in this Agreement for the benefit of the Initial Holders and any subsequent holder or holders of the Registrable Securities (as defined herein). The execution and delivery of this Agreement is a condition to the Initial Holders' obligations under the Exchange Agreement.

1.  *Certain Definitions.* For purposes of this Registration Rights Agreement (this "<u>Agreement</u>"), the following terms shall have the following respective meanings:

"<u>Additional Interest</u>" shall have the meaning assigned thereto in Section 2(c).

"<u>Base Interest</u>" shall mean the interest that would otherwise accrue on the Securities under the terms thereof and the Indenture, without giving effect to the provisions of this Agreement.

"<u>broker- dealer</u>" shall mean any broker or dealer registered with the Commission under the Exchange Act.

"<u>Business Day</u>" shall have the meaning set forth in Rule 13e- 4(a)(3) promulgated by the Commission under the Exchange Act, as the same may be amended or succeeded from time to time.

"<u>Commission</u>" shall mean the United States Securities and Exchange Commission, or any other federal agency at the time administering the Exchange Act or the Securities Act, whichever is the relevant statute for the particular purpose.

"<u>EDGAR System</u>" shall mean the EDGAR filing system of the Commission and the rules and regulations pertaining thereto promulgated by the Commission in Regulation S- T under the Securities Act and the Exchange Act, in each case as the same may be amended or succeeded from time to time (and without regard to format).

"<u>Effective Time,</u>" in the case of (i) an Exchange Registration, shall mean the time and date as of which the Commission declares the Exchange Registration Statement effective or as of which the Exchange Registration Statement otherwise becomes effective pursuant to the Securities Act and (ii) a Shelf Registration, shall mean the time and date as of which the Commission declares the Shelf Registration Statement effective or as of which the Shelf Registration Statement otherwise becomes effective pursuant to the Securities Act.

"<u>Electing Holder</u>" shall mean any holder of Registrable Securities that has returned a completed and signed Notice and Questionnaire to the Issuers in accordance with Section 3(d)(ii) or Section 3(d)(iii) and the instructions set forth in the Notice and Questionnaire.

"<u>Exchange Act</u>" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Commission thereunder, as the same may be amended or succeeded from time to time.

"<u>Exchange Agreement</u>" shall mean the Exchange Agreement, dated November 27, 2012, among the Issuers and the Initial Holders relating to the Securities.

"<u>Exchange Date</u>" shall have the meaning assigned thereto in Section 2(a).

"<u>Exchange Offer</u>" shall have the meaning assigned thereto in Section 2(a).

"<u>Exchange Registration</u>" shall have the meaning assigned thereto in Section 3(c).

"<u>Exchange Registration Statement</u>" shall have the meaning assigned thereto in Section 2(a).

"<u>Exchange Securities</u>" shall have the meaning assigned thereto in Section 2(a).

"<u>holder</u>" shall mean each of the Initial Holders and other persons who acquire Registrable Securities from time to time (including any successors or assigns), in each case for so long as such person owns any Registrable Securities.

"<u>Indenture</u>" shall mean the Indenture, dated as of December 5, 2012, among the Issuers and The Bank of New York Mellon Trust Company, N.A., as Trustee, governing the Notes, as the same may be amended from time to time.

"<u>Issue Date</u>" shall mean December 5, 2012, the date of original issuance of the Securities.

"<u>Notice and Questionnaire</u>" means a Notice of Registration Statement and Selling Securityholder Questionnaire substantially in the form of <u>Exhibit A</u> hereto.

2

"person" shall mean a corporation, limited liability company, association, partnership, organization, business, individual, government or political subdivision thereof or governmental agency.

"Registrable Securities" shall mean the Securities; *provided, however,* that a Security shall cease to be a Registrable Security upon the earliest to occur of the following: (i) in the circumstances contemplated by Section 2(a), the Security has been exchanged for an Exchange Security in an Exchange Offer as contemplated in Section 2(a) *(provided,* that any Exchange Security that, pursuant to the last two sentences of Section 2(a), is included in a prospectus for use in connection with resales by broker- dealers shall be deemed to be a Registrable Security with respect to Sections 5 and 7 until resale of such Registrable Security has been effected within the 90- day period referred to in Section 2(a)); (ii) in the circumstances contemplated by Section 2(b), a Shelf Registration Statement registering such Security under the Securities Act has been declared or becomes effective and such Security has been sold or otherwise transferred by the holder thereof pursuant to and in a manner contemplated by such effective Shelf Registration Statement; or (iii) such Security shall cease to be outstanding.

"Registration Default" shall have the meaning assigned thereto in Section 2(c).

"Registration Default Period" shall have the meaning assigned thereto in Section 2(c).

"Registration Expenses" shall have the meaning assigned thereto in Section 4.

"Resale Period" shall have the meaning assigned thereto in Section 2(a).

"Restricted Holder" shall mean (i) a holder that is an affiliate of either Issuer within the meaning of Rule 405, (ii) a holder who acquired the Registrable Securities outside the ordinary course of such holder's business, (iii) a holder who has arrangements or understandings with any person to participate in the Exchange Offer for the purpose of distributing Exchange Securities and (iv) a holder that is a broker- dealer, but only with respect to Exchange Securities received by such broker- dealer pursuant to an Exchange Offer in exchange for Registrable Securities acquired by the broker- dealer directly from the Issuers.

"Rule 144," "Rule 405," "Rule 415," "Rule 424," "Rule 430B" and "Rule 433" shall mean, in each case, such rule promulgated by the Commission under the Securities Act (or any successor provision), as the same may be amended or succeeded from time to time.

"Securities" shall mean, collectively, the Notes to be issued and sold to the Initial Holders, and securities issued in exchange therefor or in lieu thereof pursuant to the Indenture.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated by the Commission thereunder, as the same may be amended or succeeded from time to time.

"Shelf Registration" shall have the meaning assigned thereto in Section 2(b).

"Shelf Registration Statement" shall have the meaning assigned thereto in Section 2(b).

"Suspension Period" shall have the meaning assigned thereto in Section 2(b).

"Trust Indenture Act" shall mean the Trust Indenture Act of 1939, as amended, and the rules and regulations promulgated by the Commission thereunder, as the same may be amended or succeeded from time to time.

"Trustee" shall mean The Bank of New York Mellon Trust Company, N.A., as trustee under the Indenture, together with any successors thereto in such capacity.

Unless the context otherwise requires, any reference herein to a "Section" or "clause" refers to a Section or clause, as the case may be, of this Agreement, and the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section or other subdivision.


2.    *Registration Under the Securities Act.*

(a) Except as set forth in Section 2(b) below, the Issuers agree to file under the Securities Act one or more registration statements relating to an offer to exchange (such registration statements, together, the "Exchange Registration Statement," and such offer, the "Exchange Offer") any and all of the Securities for a like aggregate principal amount of debt securities issued by the Issuers, which debt securities are substantially identical to the Securities (and are entitled to the benefits of a trust indenture which is substantially identical to the Indenture or is the Indenture and which has been qualified under the Trust Indenture Act), except that they have been registered pursuant to an effective registration statement under the Securities Act and do not contain provisions for Additional Interest contemplated in Section 2(c) below (such new debt securities hereinafter called "Exchange Securities"). The Issuers agree to use all commercially reasonable efforts to complete the Exchange Offer no later than 365 days after the Issue Date (the "Exchange Date"). The Exchange Offer will be registered under the Securities Act on the appropriate form and will comply with all applicable tender offer rules and regulations under the Exchange Act. Unless the Exchange Offer would not be permitted by applicable law or Commission policy, the Issuers further agree to use all commercially reasonable efforts to (i) commence the Exchange Offer promptly following the Effective Time of such Exchange Registration Statement, (ii) hold the Exchange Offer open for at least 20 Business Days in accordance with Regulation 14E promulgated by the Commission under the Exchange Act, or longer, if required by the federal securities laws and (iii) exchange Exchange Securities for all Registrable Securities that have been properly tendered and not withdrawn promptly following the expiration of the Exchange Offer. The Exchange Offer will be deemed to have been "completed" only: (i) if the Exchange Securities received by holders, other than Restricted Holders, in the Exchange Offer for Registrable Securities are, upon receipt, transferable by each such holder without restriction under the Securities Act and the Exchange Act and without material restrictions under the blue sky or securities laws of a substantial majority of the States of the United States of America and (ii) upon the Issuers having exchanged, pursuant to the Exchange Offer, Exchange Securities for all Registrable Securities that have been properly tendered and not withdrawn before the expiration of the Exchange Offer, which shall be on a date that is at least 20 Business Days following the commencement of the Exchange Offer. The Issuers agree (x) to include in the Exchange Registration Statement a prospectus for use in any resales by any holder of Exchange Securities that is a broker- dealer and (y) to keep such

4

Exchange Registration Statement effective for a period (the "Resale Period") beginning when Exchange Securities are first issued in the Exchange Offer and ending upon the earlier of the expiration of the 90th day after the Exchange Offer has been completed or such time as such broker- dealers no longer own any Registrable Securities. With respect to such Exchange Registration Statement, such holders shall have the benefit of the rights of indemnification and contribution set forth in Subsections 5(a), (c), (d) and (e).

(b) If (i) on or prior to the time the Exchange Offer is completed, existing law or Commission interpretations are changed such that the debt securities received by holders other than Restricted Holders in the Exchange Offer for Registrable Securities are not or would not be, upon receipt, transferable by each such holder without restriction under the Securities Act, (ii) the Exchange Offer has not been completed by the Exchange Date *(provided,* that the Issuers' failure to complete the Exchange Offer by the Exchange Date shall be considered a Registration Default for which Additional Interest shall be payable pursuant to Section 2(c) hereof until such time as a Shelf Registration Statement covering resales of the Registrable Securities has become or is declared effective) or (iii) any holder of Registrable Securities notifies the Issuers prior to the 20th Business Day following the completion of the Exchange Offer that: (A) it is prohibited by law or Commission policy from participating in the Exchange Offer, (B) it may not resell the Exchange Securities to the public without delivering a prospectus and the prospectus supplement contained in the Exchange Registration Statement is not appropriate or available for such resales or (C) it is a broker- dealer and owns Securities acquired directly from the Issuers or an affiliate of the Issuers, then the Issuers shall, in lieu of (or, in the case of clause (iii), in addition to) conducting the Exchange Offer contemplated by Section 2(a), file under the Securities Act no later than 30 days after the time such obligation to file arises (but no earlier than the Exchange Date) one or more "shelf" registration statements providing for the registration of, and the sale on a continuous or delayed basis by the holders of, all of the Registrable Securities, pursuant to Rule 415 or any similar Rule that may be adopted by the Commission (such filing, the "Shelf Registration", and such registration statements, the "Shelf Registration Statement"). The Issuers agree to use all commercially reasonable efforts to cause the Shelf Registration Statement to become or be declared effective no later than 90 days after such Shelf Registration Statement filing obligation arises (but no earlier than the Exchange Date); *provided* that if at any time the Issuers are or become "well- known seasoned issuers" (as defined in Rule 405) and are eligible to file an "automatic shelf registration statement" (as defined in Rule 405), then the Issuers shall file the Shelf Registration Statement in the form of an automatic shelf registration statement as provided in Rule 405. The Issuers agree to use all commercially reasonable efforts to keep such Shelf Registration Statement continuously effective until the earlier of six months following the Effective Time or such time as there are no longer any Registrable Securities outstanding. No holder shall be entitled to be named as a selling securityholder in the Shelf Registration Statement or to use the prospectus forming a part thereof for resales of Registrable Securities unless such holder is an Electing Holder. The Issuers agree, after the Effective Time of the Shelf Registration Statement and promptly upon the request of any holder of Registrable Securities that is not then an Electing Holder, to use all commercially reasonable efforts to enable such holder to use the prospectus forming a part thereof for resales of Registrable Securities, including, without limitation, any action necessary to identify such holder as a selling securityholder in the Shelf Registration Statement (whether by post- effective amendment thereto or by filing a prospectus pursuant to Rules 430B and 424(b) under the Securities Act identifying such holder); *provided, however,* that nothing in this sentence shall (A) relieve any such holder

5

of the obligation to return a completed and signed Notice and Questionnaire to the Issuers in accordance with Section 3(d)(iii) or (B) require the Issuers to file more than one post- effective amendment to the Shelf Registration Statement in any 45- day period; *provided, however,* this clause (B) shall not be applicable for the last 60 days that the Shelf Registration Statement is effective. Notwithstanding anything to the contrary in this Section 2(b), upon notice to the Electing Holders, the Issuers may suspend the use or the effectiveness of such Shelf Registration Statement, or extend the time period in which it is required to file the Shelf Registration Statement for one or more periods up to 90 days in the aggregate in any 12- month period (each, a "Suspension Period") if the Issuers deliver a written certificate to the Electing Holders signed by either the Chief Executive Officer of each of the Issuers or the Chief Financial Officer of each of the Issuers, certifying that each Issuer has determined that there is a valid business purpose for suspension of the Shelf Registration Statement; *provided,* that the Issuers shall promptly notify the Electing Holders when the Shelf Registration Statement may once again be used or is effective and, *provided further,* that the period during which the Issuers are required to maintain the effectiveness of the Shelf Registration Statement shall be extended by the length of the Suspension Period.

(c) In the event that (i) the Issuers have not filed the Shelf Registration Statement on or before the date on which such registration statement is required to be filed pursuant to Section 2(b), or (ii) the Shelf Registration Statement has not become effective or been declared effective by the Commission on or before the date on which such registration statement is required to become or be declared effective pursuant to Section 2(b), or (iii) the Exchange Offer has not been completed by the Exchange Date (if the Exchange Offer is then required to be made) or (iv) any Exchange Registration Statement or Shelf Registration Statement required by Section 2(a) or Section 2(b) is filed and declared effective but shall thereafter either be withdrawn by the Issuers or shall become subject to an effective stop order issued pursuant to Section 8(d) of the Securities Act suspending the effectiveness of such registration statement (except as specifically permitted herein, including with respect to any Shelf Registration Statement, during any applicable Suspension Period in accordance with the last sentence of Section 2(b)) without being succeeded immediately by an additional registration statement filed and declared effective (each such event referred to in clauses (i) through (iv), a "Registration Default" and each period during which a Registration Default has occurred and is continuing, a "Registration Default Period"), then, as liquidated damages for such Registration Default, subject to the provisions of Section 8(b), additional interest ("Additional Interest"), in addition to the Base Interest, shall accrue on the outstanding principal amount of the Registrable Securities at a per annum rate of 0.25% for the first 90 days of the Registration Default Period and at a per annum rate of 0.50% thereafter for the remaining portion of the Registration Default Period. Additional Interest shall accrue and be payable only with respect to a single Registration Default at any given time, notwithstanding the fact that multiple Registration Defaults may exist at such time. The accrual of Additional Interest shall be the exclusive monetary remedy available to the holders of Registrable Securities for any Registration Default.

(d) The Issuers shall take all actions necessary or advisable to be taken by them to ensure that the transactions contemplated herein are effected as so contemplated.

(e) Any reference herein to a registration statement as of any time shall be deemed to include any document incorporated, or deemed to be incorporated, therein by reference as of such time and any reference herein to any post- effective amendment to a registration statement as of any time shall be deemed to include any document incorporated, or deemed to be incorporated, therein by reference as of such time.

6

3. *Registration Procedures.*

If the Issuers file a registration statement pursuant to Section 2(a) or Section 2(b) the following provisions shall apply:

(a) At or before the Effective Time of the Exchange Registration or the Shelf Registration, whichever may be first, the Issuers shall qualify the Indenture under the Trust Indenture Act.

(b) In the event that such qualification would require the appointment of a new trustee under the Indenture, the Issuers shall appoint a new trustee thereunder pursuant to the applicable provisions of the Indenture.

(c) In connection with the Issuers' obligations with respect to the registration of Exchange Securities as contemplated by Section 2(a) (the "Exchange Registration"), if applicable, the Issuers shall:

(i) prepare and file with the Commission an Exchange Registration Statement on any form that may be utilized by the Issuers and which shall permit the Exchange Offer and resales of Exchange Securities by broker- dealers during the Resale Period to be effected as contemplated by Section 2(a), and use all commercially reasonable efforts to cause such Exchange Registration Statement to become effective no later than the Exchange Date;

(ii) promptly prepare and file with the Commission such amendments and supplements to such Exchange Registration Statement and the prospectus included therein as may be necessary to effect and maintain the effectiveness of such Exchange Registration Statement for the periods and purposes contemplated in Section 2(a) and as may be required by the applicable rules and regulations of the Commission and the instructions applicable to the form of such Exchange Registration Statement, and promptly provide each broker- dealer holding Exchange Securities with such number of copies of the prospectus included therein (as then amended or supplemented), in conformity in all material respects with the requirements of the Securities Act and the Trust Indenture Act, as such broker- dealer reasonably may request prior to the expiration of the Resale Period, for use in connection with resales of Exchange Securities;

(iii) promptly notify each broker- dealer that has requested or received copies of the prospectus included in such Exchange Registration Statement, and confirm such advice in writing, (A) when such Exchange Registration Statement or the prospectus included therein or any prospectus amendment or supplement or post- effective amendment has been filed, and, with respect to such Exchange Registration Statement or any post- effective amendment, when the same has become effective, (B) of any comments by the Commission and by the blue sky or securities commissioner or regulator of any state with respect thereto or any request by the Commission for amendments or supplements to such Exchange Registration Statement or prospectus or for additional information relating to such Exchange Registration Statement or prospectus, (C) of the issuance by the Commission of any stop order suspending the

7

effectiveness of such Exchange Registration Statement or the initiation or threatening of any proceedings for that purpose, (D) of the receipt by the Issuers of any notification with respect to the suspension of the qualification of the Exchange Securities for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose, (E) the occurrence of any event that causes either Issuer to become an "ineligible issuer" as defined in Rule 405, or (F) if at any time during the Resale Period when a prospectus is required to be delivered under the Securities Act, that such Exchange Registration Statement, prospectus, prospectus amendment or supplement or post- effective amendment does not conform in all material respects to the applicable requirements of the Securities Act or the Trust Indenture Act or contains an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing;

(iv) in the event that the Issuers would be required, pursuant to Section 3(c)(iii)(F), to notify any broker- dealers holding Exchange Securities, promptly prepare and furnish to each such holder a reasonable number of copies of a prospectus supplemented or amended so that, as thereafter delivered to purchasers of such Exchange Securities during the Resale Period, such prospectus shall conform in all material respects to the applicable requirements of the Securities Act and the Trust Indenture Act and shall not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing;

(v) use all commercially reasonable efforts to obtain the withdrawal of any order suspending the effectiveness of such Exchange Registration Statement or any post- effective amendment thereto at the earliest practicable date;

(vi) use all commercially reasonable efforts to (A) register or qualify the Exchange Securities under the securities laws or blue sky laws of such jurisdictions as are contemplated by Section 2(a) no later than the commencement of the Exchange Offer, to the extent required by such laws, (B) keep such registrations or qualifications in effect and comply with such laws so as to permit the continuance of offers, sales and dealings therein in such jurisdictions until the expiration of the Resale Period, (C) take any and all other actions as may be reasonably necessary or advisable to enable each broker- dealer holding Exchange Securities to consummate the disposition thereof in such jurisdictions and (D) obtain the consent or approval of each governmental agency or authority, whether federal, state or local, which may be required to effect the Exchange Registration, the Exchange Offer and the offering and sale of Exchange Securities by broker- dealers during the Resale Period; *provided, however,* that the Issuers shall not be required for any such purpose to (1) qualify as a foreign corporation in any jurisdiction wherein it would not otherwise be required to qualify but for the requirements of this Section 3(c)(vi), (2) consent to general service of process in any such jurisdiction or become subject to taxation in any such jurisdiction or (3) make any changes to its certificate of incorporation or by- laws or other governing documents or any agreement between it and its stockholders;

(vii) provide a CUSIP number for all Exchange Securities, not later than the applicable Effective Time; and

8

(viii) comply with all applicable rules and regulations of the Commission, and make generally available to their securityholders no later than eighteen months after the Effective Time of such Exchange Registration Statement, an earnings statement of the Issuers and their subsidiaries complying with Section 11(a) of the Securities Act (including, at the option of the Issuers, Rule 158 thereunder); *provided, however,* that this requirement shall be deemed satisfied by the Issuers' compliance with Section 4.03 of the Indenture.

(d) In connection with the Issuers' obligations with respect to any Shelf Registration, if applicable, the Issuers shall use all commercially reasonable efforts to cause the applicable Shelf Registration Statement to permit the disposition of Registrable Securities by the holders thereof (subject to any applicable Suspension Period), in accordance with the intended method or methods of disposition thereof provided for in the applicable Shelf Registration Statement. In connection therewith, the Issuers shall:

(i)  (A) prepare and file with the Commission, within the time periods specified in Section 2(b) hereof, a Shelf Registration Statement on any form which may be utilized by the Issuers, which shall register all of the Registrable Securities for resale by the holders thereof in accordance with such method or methods of disposition as may be specified by the holders of the Registrable Securities as, from time to time, may be Electing Holders, and (B) use all commercially reasonable efforts to cause each such Shelf Registration Statement to become effective within the time periods specified in Section 2(b) hereof;

(ii) mail the Notice and Questionnaire to the holders of Registrable Securities (A) not less than 30 calendar days prior to the anticipated Effective Time of the Shelf Registration Statement or (B) in the case of an "automatic shelf registration statement" (as defined in Rule 405), mail the Notice and Questionnaire to the holders of Registrable Securities not later than the Effective Time of such Shelf Registration Statement, and in any such case no holder shall be entitled to be named as a selling securityholder in the Shelf Registration Statement, and no holder shall be entitled to use the prospectus forming a part thereof for resales of Registrable Securities at any time, unless and until such holder has returned a completed and signed Notice and Questionnaire to the Issuers; *provided, however,* that holders of Registrable Securities shall have at least 28 calendar days from the date on which the Notice and Questionnaire is first mailed to such holder to return a completed and signed Notice and Questionnaire to the Issuers;

(iii) after the Effective Time of the Shelf Registration Statement, upon the request of any holder of Registrable Securities that is not then an Electing Holder, promptly send a Notice and Questionnaire to such holder; *provided* that the Issuers shall not be required to (A) take any action to name such holder as a selling securityholder in the Shelf Registration Statement or to enable such holder to use the prospectus forming a part thereof for resales of Registrable Securities until such holder has returned a completed and signed Notice and Questionnaire to the Issuers and (B) nothing in this clause (iii) shall require the Issuers to file a post- effective amendment to the Shelf Registration Statement more than once in any 45- day period; *provided, however,* that this clause (B) shall not be applicable for the last 60 days that the Shelf Registration Statement is effective;

9

(iv) as soon as practicable (A) prepare and file with the Commission such amendments and supplements to the Shelf Registration Statement and the prospectus included therein as may be necessary to effect and maintain the effectiveness of such Shelf Registration Statement for the period specified in Section 2(b) hereof, and as may be required by the applicable rules and regulations of the Commission and the instructions applicable to the form of such Shelf Registration Statement, and (B) furnish to the Electing Holders copies of any such supplement or amendment simultaneously with or prior to its being used or filed with the Commission to the extent such documents are not publicly available on the EDGAR System;

(v) comply with the provisions of the Securities Act with respect to the disposition of all of the Registrable Securities, Securities or Exchange Securities, as applicable, covered by such Shelf Registration Statement in accordance with the intended methods of disposition provided for therein by the Electing Holders;

(vi) provide with respect to a Shelf Registration, a representative of the Electing Holders and not more than one counsel for all the Electing Holders in each case designated by the holders of at least a majority in aggregate principal amount of the Registrable Securities held by the Electing Holders (which counsel shall be reasonably satisfactory to the Issuers), the opportunity to participate in the preparation of such Shelf Registration Statement, each prospectus included therein or filed with the Commission and each amendment or supplement thereto;

(vii) for a reasonable period prior to the filing of such Shelf Registration Statement, and throughout the periods specified in Section 2(b), make available at reasonable times at the Issuers' principal place of business or such other reasonable place for inspection by the persons referred to in Section 3(d)(vi) who shall certify to the Issuers that they have a current intention to sell the Registrable Securities pursuant to the Shelf Registration, such financial and other information and books and records of the Issuers, and cause the officers, employees, counsel and independent certified public accountants of the Issuers to respond to such inquiries, as shall be reasonably necessary (and in the case of counsel, not violate an attorney- client privilege, in such counsel's reasonable belief), in the judgment of the respective counsel referred to in Section 3(d)(vi), to conduct a reasonable investigation within the meaning of Section 11 of the Securities Act; *provided, however,* that the foregoing inspection and information gathering on behalf of the Electing Holders shall be conducted by the representative of the Electing Holders and the one counsel designated by the holders of at least a majority in aggregate principal amount of the Registrable Securities held by the Electing Holders at the time outstanding and any managing underwriter participating in the distribution of the Registrable Securities being sold; and *provided further* that each such party shall be required to maintain in confidence and not to disclose to any other person (other than each other and the Electing Holders represented by such party) any information or records reasonably designated by the Issuers as being confidential, until such time as (A) such information becomes a matter of public record (whether by virtue of its inclusion in such Shelf Registration Statement or otherwise), or (B) such person shall be required to disclose such information pursuant to a subpoena or order of any court or other governmental agency or body having jurisdiction over the matter (and, subject to the requirements of such subpoena or order, only after such person shall have given the Issuers prompt prior written notice of such requirement), or (C) such information is required to be set forth in such Shelf Registration Statement or the prospectus included therein or in an amendment

10

to such Shelf Registration Statement or an amendment or supplement to such prospectus in order that such Shelf Registration Statement, prospectus, amendment or supplement, as the case may be, complies with applicable requirements of the federal securities laws and the rules and regulations of the Commission and does not contain an untrue statement of a material fact or omit to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing;

(viii) promptly notify each of the Electing Holders or any managing underwriter, as applicable, and confirm such advice in writing, (A) when such Shelf Registration Statement or the prospectus included therein or any prospectus amendment or supplement or post- effective amendment has been filed, and, with respect to such Shelf Registration Statement or any post- effective amendment, when the same has become effective, (B) of any comments by the Commission and by the blue sky or securities commissioner or regulator of any state with respect thereto which are relevant to the Electing Holders or any managing underwriter, as applicable, or any request by the Commission for amendments or supplements to such Shelf Registration Statement or prospectus or for additional information, (C) of the issuance by the Commission of any stop order suspending the effectiveness of such Shelf Registration Statement or the initiation or threatening of any proceedings for that purpose, (D) of the receipt by the Issuers of any notification with respect to the suspension of the qualification of the Registrable Securities or the Securities or Exchange Securities, as applicable, for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose, (E) the occurrence of any event that causes either Issuer to become an "ineligible issuer" as defined in Rule 405, or (F) if at any time when a prospectus is required to be delivered under the Securities Act, that such Shelf Registration Statement, prospectus, prospectus amendment or supplement or post- effective amendment does not conform in all material respects to the applicable requirements of the Securities Act or the Trust Indenture Act or contains an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing;

(ix) use all commercially reasonable efforts to obtain the withdrawal of any order suspending the effectiveness of such Shelf Registration Statement or any post- effective amendment thereto at the earliest practicable date;

(x) if requested by any managing underwriter or Electing Holder, promptly incorporate in a prospectus supplement or post- effective amendment such information as is required by the applicable rules and regulations of the Commission and as such managing underwriter or Electing Holder specifies should be included therein relating to the terms of the sale of such Registrable Securities or such Securities or Exchange Securities, as applicable, including information with respect to the principal amount of Registrable Securities or Securities or Exchange Securities, as applicable, being sold by such Electing Holder or managing underwriter, the name and description of such managing underwriter or Electing Holder, the offering price of such Registrable Securities or such Securities or Exchange Securities, as applicable, and any discount, commission or other compensation payable in respect thereof and with respect to any other terms of the offering of the Registrable Securities or the Securities or Exchange Securities, as applicable, to be sold by such Electing Holder or managing underwriter; and make all required filings of such prospectus supplement or post- effective amendment promptly after notification of the matters to be incorporated in such prospectus supplement or post- effective amendment;

11

(xi) furnish upon request to each managing underwriter and each Electing Holder and the respective counsel referred to in Section 3(d)(vi) an executed copy (or, in the case of an Electing Holder, a conformed copy) of such Shelf Registration Statement, each such amendment and supplement thereto (in each case including all exhibits thereto (in the case of an Electing Holder of Registrable Securities, upon request) and documents incorporated by reference therein) and such number of copies of such Shelf Registration Statement (excluding exhibits thereto and documents incorporated by reference therein unless specifically so requested by such managing underwriter or Electing Holder) and of the prospectus included in such Shelf Registration Statement (including each preliminary prospectus and any summary prospectus), in conformity in all material respects with the applicable requirements of the Securities Act and the Trust Indenture Act to the extent such documents are not available through the EDGAR System, and such other documents, as such managing underwriter or Electing Holder may reasonably request in order to facilitate the offering and disposition of the Registrable Securities owned by such Electing Holder or underwritten by such managing underwriter, as applicable, and to permit such Electing Holder and managing underwriter, if any, to satisfy the prospectus delivery requirements of the Securities Act; and subject to Section 3(e), the Issuers hereby consent to the use of such prospectus (including such preliminary and summary prospectus) and any amendment or supplement thereto by each such Electing Holder and managing underwriter (in each case subject to any applicable Suspension Period), in each case in the form most recently provided to such person by the Issuers, in connection with the offering and sale of the Registrable Securities, Securities or Exchange Securities covered by the prospectus (including such preliminary and summary prospectus) or any supplement or amendment thereto;

(xii) use all commercially reasonable efforts to (A) register or qualify the Registrable Securities to be included in such Shelf Registration Statement under such securities laws or blue sky laws of such jurisdictions as any Electing Holder or managing underwriter shall reasonably request, (B) keep such registrations or qualifications in effect and comply with such laws so as to permit the continuance of offers, sales and dealings therein in such jurisdictions during the period the Shelf Registration is required to remain effective under Section 2(b), and for so long as may be necessary to enable any such Electing Holder or underwriter to complete its distribution of Registrable Securities pursuant to such Shelf Registration Statement, (C) take any and all other actions as may be reasonably necessary or advisable to enable each such Electing Holder to consummate the disposition in such jurisdictions of such Registrable Securities, and (D) obtain the consent or approval of each governmental agency or authority, whether federal, state or local, which may be required to effect such Shelf Registration Statement or the offering or sale in connection therewith or to enable the selling holder or holders to offer, or to consummate the disposition of, their Registrable Securities; *provided, however,* that the Issuers shall not be required for any such purpose to (1) qualify as a foreign corporation in any jurisdiction wherein it would not otherwise be required to qualify but for the requirements of this Section 3(d)(xii), (2) consent to general service of process in any such jurisdiction or become subject to taxation in any such jurisdiction or (3) make any changes to its certificate of incorporation or by- laws or other governing documents or any agreement between it and its stockholders;

12

(xiii) unless any Registrable Securities shall be in book- entry only form, cooperate with the Electing Holders and managing underwriters to facilitate the timely preparation and delivery of certificates representing Registrable Securities, to be sold, which certificates, if so required by any securities exchange upon which any Registrable Securities are listed, shall be printed, penned, lithographed, engraved or otherwise produced by any combination of such methods, on steel engraved borders, and which certificates shall not bear any restrictive legends;

(xiv) provide a CUSIP number for all Registrable Securities, Securities or Exchange Securities, as applicable, not later than the applicable Effective Time;

(xv) notify in writing each holder of Registrable Securities of any proposal by the Issuers to amend or waive any provision of this Agreement pursuant to Section 8(h) and of any amendment or waiver effected pursuant thereto, each of which notices shall contain the text of the amendment or waiver proposed or effected, as the case may be;

(xvi) comply with all applicable rules and regulations of the Commission, and make generally available to their securityholders no later than eighteen months after the Effective Time of such Shelf Registration Statement an earnings statement of the Issuers and their subsidiaries complying with Section 11(a) of the Securities Act (including, at the option of the Issuers, Rule 158 thereunder); *provided, however,* that this requirement shall be deemed satisfied by the Issuers' compliance with Section 4.03 of the Indenture; and

(e) In the event that the Issuers would be required, pursuant to Section 3(d)(viii)(F), to notify the Electing Holders or managing underwriters, the Issuers shall promptly prepare and furnish to each Electing Holder and managing underwriter a reasonable number of copies of a prospectus supplemented or amended so that, as thereafter delivered to purchasers of Registrable Securities, Securities or Exchange Securities, as applicable, such prospectus shall conform in all material respects to the applicable requirements of the Securities Act and the Trust Indenture Act and shall not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing. Each Electing Holder and managing underwriter agrees that upon receipt of any notice from the Issuers pursuant to Section 3(d)(viii)(F), such Electing Holder and managing underwriter shall forthwith discontinue the disposition of Registrable Securities, Securities or Exchange Securities, as applicable, pursuant to the Shelf Registration Statement applicable to such Registrable Securities, Securities or Exchange Securities until such Electing Holder or managing underwriter shall have received copies of such amended or supplemented prospectus, and if so directed by the Issuers, such Electing Holder or managing underwriter shall deliver to the Issuers (at the Issuers' expense) all copies, other than permanent file copies, then in such Electing Holder's or managing underwriter's possession of the prospectus covering such Registrable Securities, Securities or Exchange Securities, as applicable, at the time of receipt of such notice.

(f) In the event of a Shelf Registration, in addition to the information required to be provided by each Electing Holder in its Notice and Questionnaire as to which any Shelf Registration pursuant to Section 2(b) is being effected, the Issuers may require such Electing Holder to furnish to the Issuers such additional information regarding such Electing Holder and

13

such Electing Holder's intended method of distribution of Registrable Securities as may be required in order to comply with the Securities Act. Each such Electing Holder agrees to notify the Issuers as promptly as practicable of any inaccuracy or change in information previously furnished by such Electing Holder to the Issuers or of the occurrence of any event in either case as a result of which any prospectus relating to such Shelf Registration contains or would contain an untrue statement of a material fact regarding such Electing Holder or such Electing Holder's intended method of disposition of such Registrable Securities or omits to state any material fact regarding such Electing Holder or such Electing Holder's intended method of disposition of such Registrable Securities, Securities or Exchange Securities, as applicable, required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing, and promptly to furnish to the Issuers any additional information required to correct and update any previously furnished information or required so that such prospectus shall not contain, with respect to such Electing Holder, or the disposition of such Registrable Securities, Securities, or Exchange Securities, as applicable, an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing.

(g) Until the issuance of the Exchange Securities or the effectiveness of the Shelf Registration Statement, the Issuers will not, and will not permit any of their affiliates (as defined in Rule 144) controlled by the Issuers to, resell any of the Notes which constitute "restricted securities" under Rule 144 that have been reacquired by any of them.

(h) As a condition to its participation in the Exchange Offer, each holder of Registrable Securities shall furnish, upon the request of the Issuers, a written representation to the Issuers (which may be contained in the letter of transmittal or "agent's message" transmitted via The Depository Trust Company's Automated Tender Offer Procedures, in either case contemplated by the Exchange Registration Statement) to the effect that (A) it is not an "affiliate" of either Issuer, as defined in Rule 405 of the Securities Act, or if it is such an "affiliate," it will comply with the registration and prospectus delivery requirements of the Securities Act to the extent applicable, (B) it is not engaged in and does not intend to engage in, and has no arrangement or understanding with any person to participate in, a distribution of the Exchange Securities to be issued in the Exchange Offer, (C) it acquired the Registrable Securities in its ordinary course of business, (D) if it is a broker- dealer that holds Securities that were acquired for its own account as a result of market- making activities or other trading activities (other than Securities acquired directly from the Issuers or any of their affiliates), it will deliver a prospectus meeting the requirements of the Securities Act in connection with any resales of the Exchange Securities received by it in the Exchange Offer, (E) if it is a broker- dealer, that it did not purchase the Securities to be exchanged in the Exchange Offer from the Issuers or any of their affiliates, and (F) it is not acting on behalf of any person who could not truthfully and completely make the representations contained in the foregoing subclauses (A) through (E).

4. *Registration Expenses.*

The Issuers, jointly and severally, agree to bear and to pay or cause to be paid promptly all expenses incident to the Issuers' performance of or compliance with this Agreement, including (a) all Commission and any Financial Industry Regulatory Authority registration, filing

14

and review fees and expenses including reasonable fees and disbursements of counsel for the Electing Holders and underwriters in connection with such registration, filing and review, (b) all fees and expenses in connection with the qualification of the Registrable Securities, Securities or Exchange Securities, as applicable, for offering and sale under the state securities and blue sky laws referred to in Section 3(d)(xii) and determination of their eligibility for investment under the laws of such jurisdictions as the Electing Holders or any underwriters may designate, including any reasonable fees and disbursements of counsel for the Electing Holders or any underwriters in connection with such qualification and determination, (c) all expenses relating to the preparation, printing, production, distribution and reproduction of each registration statement required to be filed hereunder, each prospectus included therein or prepared for distribution pursuant hereto, each amendment or supplement to the foregoing, the expenses of preparing the Registrable Securities or Exchange Securities, as applicable, for delivery and the expenses of printing or producing any selling agreements and blue sky or legal investment memoranda and all other documents in connection with the offering, sale or delivery of Registrable Securities, Securities or Exchange Securities, as applicable, to be disposed of (including certificates representing the Registrable Securities or Exchange Securities, as applicable), (d) messenger, telephone and delivery expenses relating to the offering, sale or delivery of Registrable Securities or Exchange Securities, as applicable, and the preparation of documents referred in clause (c) above, (e) fees and expenses of the Trustee under the Indenture, any agent of the Trustee and any counsel for the Trustee and of any custodian, (f) the Issuers' internal expenses (including all salaries and expenses of the Issuers' officers and employees performing legal or accounting duties), (g) reasonable fees, disbursements and expenses of counsel and independent certified public accountants of the Issuers, (h) reasonable fees, disbursements and expenses of one counsel for the Electing Holders retained in connection with a Shelf Registration, as selected by the Electing Holders of at least a majority in aggregate principal amount of the Registrable Securities held by Electing Holders (which counsel shall be reasonably satisfactory to the Issuers), (i) any fees charged by securities rating services for rating the Registrable Securities or Exchange Securities, as applicable, and (j) fees, expenses and disbursements of any other persons, including special experts, retained by the Issuers in connection with such registration (collectively, the "<u>Registration Expenses</u>"). To the extent that any Registration Expenses are incurred, assumed or paid by any holder of Registrable Securities, the Issuers shall reimburse such person for the full amount of the Registration Expenses so incurred, assumed or paid promptly after receipt of a request therefor. Notwithstanding the foregoing, the holders of the Registrable Securities being registered shall pay all placement or agency fees and commissions and underwriting discounts and commissions, if any, and transfer taxes, if any, attributable to the sale of such Registrable Securities or Exchange Securities, as applicable, and the fees and disbursements of any counsel or other advisors or experts retained by such holders (severally or jointly), other than the counsel and experts specifically referred to above.

5. *Indemnification and Contribution.*

(a) *Indemnification by the Issuers.* The Issuers, jointly and severally, will indemnify and hold harmless each of the holders of Registrable Securities included in an Exchange Registration Statement and each of the Electing Holders of Registrable Securities included in a Shelf Registration Statement against any losses, claims, damages or liabilities, joint or several, to which such holder or such Electing Holder may become subject under the Securities Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof)

15

arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in any Exchange Registration Statement or Shelf Registration Statement, as the case may be, under which such series of Registrable Securities or Exchange Securities, as applicable, were registered under the Securities Act, or any preliminary, final or summary prospectus (including, without limitation, any "issuer free writing prospectus" as defined in Rule 433) contained therein or furnished by the Issuers to any such holder or such Electing Holder or any amendment or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse any such holder or such Electing Holder for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such action or claim as such expenses are incurred; *provided, however,* that the Issuers shall not be liable to any such person in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in such registration statement, or preliminary, final or summary prospectus (including, without limitation, any "issuer free writing prospectus" as defined in Rule 433), or amendment or supplement thereto, in reliance upon and in conformity with written information furnished to the Issuers by such person expressly for use therein.

(b) *Indemnification by the Holders.* Each holder of Registrable Securities, severally and not jointly, will (i) indemnify and hold harmless the Issuers and all other holders of Registrable Securities, against any losses, claims, damages or liabilities to which the Issuers or such other holders of Registrable Securities may become subject, under the Securities Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in such registration statement, or any preliminary, final or summary prospectus (including, without limitation, any "issuer free writing prospectus" as defined in Rule 433) contained therein or furnished by the Issuers to any such Electing Holder, or any amendment or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with written information furnished to the Issuers by such Electing Holder expressly for use therein, and (ii) reimburse the Issuers for any legal or other expenses reasonably incurred by the Issuers in connection with investigating or defending any such action or claim as such expenses are incurred; *provided, however,* that no such Electing Holder shall be required to undertake liability to any person under this Section 5(b) for any amounts in excess of the dollar amount of the proceeds to be received by such Electing Holder from the sale of such Electing Holder's Registrable Securities pursuant to such registration (after deducting any fees, discounts and commissions applicable thereto).

(c) *Notices of Claims, Etc.* Promptly after receipt by an indemnified party under subsection (a) or (b) above of written notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against an indemnifying party pursuant to the indemnification provisions of or contemplated by this Section 5, notify such indemnifying party in writing of the commencement of such action; but the omission so to notify the indemnifying party shall not relieve it from any liability which it may then otherwise have to any indemnified party under the indemnification provisions of or contemplated by Section 5(a)

16

or 5(b). In case any such action shall be brought against any indemnified party and it shall notify an indemnifying party of the commencement thereof, such indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel reasonably satisfactory to such indemnified party (who shall not, except with the consent of the indemnified party, be counsel to the indemnifying party), and, after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, such indemnifying party shall not be liable to such indemnified party for any legal expenses of other counsel or any other expenses, in each case subsequently incurred by such indemnified party, in connection with the defense thereof other than reasonable costs of investigation. No indemnifying party will, without the prior written consent of the indemnified parties, settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (with respect to which the indemnified parties (i) are actual parties, or (ii) would reasonably be expected to become parties, to such claim, action, suit or proceeding) unless such settlement, compromise or consent includes an unconditional release of each indemnified party from all liability arising out of such claim, action, suit or proceeding and does not include any statement as to or any admission of fault, culpability or failure to act, by or on behalf of any indemnified party.

(d) *Contribution.* If for any reason the indemnification provisions contemplated by Section 5(a) or 5(b) are unavailable to or insufficient to hold harmless an indemnified party in respect of any losses, claims, damages or liabilities (or actions in respect thereof) referred to therein, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (or actions in respect thereof) in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities (or actions in respect thereof), as well as any other relevant equitable considerations. The relative fault of such indemnifying party and indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by such indemnifying party or by such indemnified party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The parties hereto agree that it would not be just and equitable if contributions pursuant to this Section 5(d) were determined by pro rata allocation (even if the holders were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to in this Section 5(d). The amount paid or payable by an indemnified party as a result of the losses, claims, damages, or liabilities (or actions in respect thereof) referred to above shall be deemed to include any legal or other fees or expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 5(d), no holder shall be required to contribute any amount in excess of the amount by which the dollar amount of the proceeds received by such holder from the sale of any Registrable Securities (after deducting any fees, discounts and commissions applicable thereto) exceeds the amount of any damages which such holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 1 1 (f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The holders' obligations in this Section 5(d) to contribute shall be several in proportion to the principal amount of Registrable Securities registered by them and not joint.

17

(e) The obligations of the Issuers under this Section 5 shall be in addition to any liability which the Issuers may otherwise have and shall extend, upon the same terms and conditions, to each officer, director and partner of each holder and Electing Holder, and each person, if any, who controls any holder or Electing Holder within the meaning of the Securities Act; and the obligations of the holders and the Electing Holders contemplated by this Section 5 shall be in addition to any liability which the respective holder may otherwise have and shall extend, upon the same terms and conditions, to each officer and director of the Issuers (including any person who, with his consent, is named in any registration statement as about to become a director of the Issuers) and to each person, if any, who controls the Issuers within the meaning of the Securities Act.

6. *Underwritten Offerings.*

Each holder of Registrable Securities hereby agrees with the Issuers and each other such holder that no holder of Registrable Securities may participate in any underwritten offering hereunder unless (a) the Issuers give their prior written consent to such underwritten offering, (b) the managing underwriter or underwriters thereof shall be designated by Electing Holders holding at least a majority in aggregate principal amount of the Registrable Securities to be included in such offering, *provided* that such designated managing underwriter or underwriters is or are reasonably acceptable to the Issuers, (c) each holder of Registrable Securities participating in such underwritten offering agrees to sell such holder's Registrable Securities on the basis provided in any underwriting arrangements approved by the persons entitled hereunder to approve such arrangements and (d) each holder of Registrable Securities participating in such underwritten offering completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements.

7. *Rule 144.*

The Issuers covenant to the holders of Registrable Securities that to the extent they shall be required to do so under the Exchange Act, the Issuers shall timely file the reports required to be filed by them under the Exchange Act or the Securities Act (including the reports under Sections 13 and 15(d) of the Exchange Act referred to in subparagraph (c)(1) of Rule 144), and shall take such further action as any holder of Registrable Securities may reasonably request, all to the extent required from time to time to enable such holder to sell Registrable Securities or Exchange Securities without registration under the Securities Act within the limitations of the exemption provided by Rule 144. Upon the request of any holder of Registrable Securities in connection with that holder's sale pursuant to Rule 144, the Issuers shall deliver to such holder a written statement as to whether they have complied with such requirements.

8. *Miscellaneous.*

(a) *No Inconsistent Agreements.* The Issuers represent, warrant, covenant and agree that they have not granted, and shall not grant, registration rights with respect to Registrable Securities, Securities or Exchange Securities, as applicable, or any other securities which would be inconsistent with the terms contained in this Agreement.

18

(b) *Specific Performance.* The parties hereto acknowledge that there would be no adequate remedy at law if the Issuers fail to perform any of their respective obligations hereunder and that the Initial Holders and the holders from time to time of the Registrable Securities may be irreparably harmed by any such failure, and accordingly agree that the Initial Holders and such holders, in addition to any other remedy to which they may be entitled at law or in equity, shall be entitled to compel specific performance of the obligations of the Issuers under this Agreement in accordance with the terms and conditions of this Agreement, in any court of the United States or any State thereof having jurisdiction. Time shall be of the essence in this Agreement.

(c) *Notices.* All notices, requests, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered by hand, if delivered personally, by facsimile or by courier, or three days after being deposited in the mail (registered or certified mail, postage prepaid, return receipt requested) as follows: If to the Issuers, to them at Energy Plaza, 1601 Bryan Street, Dallas, Texas 75201- 3411, Attention: General Counsel and if to a holder, to the address of such holder set forth in the security register or other records of the Issuers, or to such other address as the Issuers or any such holder may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

(d) *Parties in Interest.* All the terms and provisions of this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the parties hereto and the holders from time to time of the Registrable Securities and the respective successors and assigns of the parties hereto and such holders. In the event that any transferee of any holder of Registrable Securities shall acquire Registrable Securities, in any manner, whether by gift, bequest, purchase, operation of law or otherwise, such transferee shall, without any further writing or action of any kind, be deemed a beneficiary hereof for all purposes and such Registrable Securities shall be held subject to all of the terms of this Agreement, and by taking and holding such Registrable Securities such transferee shall be entitled to receive the benefits of, and be conclusively deemed to have agreed to be bound by all of the applicable terms and provisions of this Agreement. If the Issuers shall so request, any such successor, assign or transferee shall agree in writing to acquire and hold the Registrable Securities subject to all of the applicable terms hereof.

(e) *Survival.* The respective indemnities, agreements, representations, warranties and each other provision set forth in this Agreement or made pursuant hereto shall remain in full force and effect regardless of any investigation (or statement as to the results thereof) made by or on behalf any holder of Registrable Securities, any director, officer or partner of such holder, or any controlling person of any of the foregoing, and shall survive delivery of and payment for the Registrable Securities pursuant to the Exchange Agreements and the transfer and registration of Registrable Securities by such holder and the consummation of an Exchange Offer.

(f) *Governing Law.* This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

19

(g) *Headings.* The descriptive headings of the several Sections and paragraphs of this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

(h) *Entire Agreement; Amendments.* This Agreement and the other writings referred to herein (including the Indenture and the form of Securities) or delivered pursuant hereto which form a part hereof contain the entire understanding of the parties with respect to its subject matter. This Agreement supersedes all prior agreements and understandings between the parties with respect to its subject matter. This Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a written instrument duly executed by the Issuers and the holders of at least a majority in aggregate principal amount of the Registrable Securities at the time outstanding. Each holder of any Registrable Securities at the time or thereafter outstanding shall be bound by any amendment or waiver effected pursuant to this Section 8(h), whether or not any notice, writing or marking indicating such amendment or waiver appears on such Registrable Securities or is delivered to such holder.

(i) *Inspection.* For so long as this Agreement shall be in effect, this Agreement and a complete list of the names and addresses of all the holders of Registrable Securities shall be made available for inspection and copying on any Business Day by any holder of Registrable Securities for proper purposes only (which shall include any purpose related to the rights of the holders of Registrable Securities under the Securities, the Indenture and this Agreement) at the offices of the Issuers at the address thereof set forth in Section 8(c) and at the office of the Trustee under the Indenture.

(j) *Counterparts.* This Agreement may be executed by the parties in counterparts, each of which shall be deemed to be an original, but all such respective counterparts shall together constitute one and the same instrument.

(k) *Severability.* If any provision of this Agreement, or the application thereof in any circumstance, is held to be invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of such provision in every other respect and of the remaining provisions contained in this Agreement shall not be affected or impaired thereby.

If the foregoing is in accordance with your understanding, please sign and return to us counterparts hereof, and upon the acceptance hereof by all the Initial Holders, this letter and such acceptance hereof shall constitute a binding agreement between each of the Initial Holders and the Issuers.

[SIGNATURE PAGE FOLLOWS]

20

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**

By:             /s/ Anthony R. Horton
                                   **Name: Anthony R. Horton**
                                   **Title:  Senior Vice President and Treasurer**

**EFIH FINANCE INC.**

By:             /s/ Anthony R. Horton
                                   **Name: Anthony R. Horton**
                                   **Title:  Senior Vice President and Treasurer**

[Signature Page to Registration Rights Agreement]

**Exhibit A**

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**
**EFIH FINANCE INC.**
<u>INSTRUCTION TO DTC PARTICIPANTS</u>
*(Date of Mailing)*
**URGENT- IMMEDIATE ATTENTION REQUESTED**
<u>***DEADLINE FOR RESPONSE: [DATE]*** *</u>

The Depository Trust Company ("***DTC***") has identified you as a DTC Participant through which beneficial interests in the Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("***EFIH***"), and EFIH Finance Inc., a Delaware corporation ("***EFIH Finance***" and, together with EFIH, the "***Issuers***") 11.25%/12.25% Senior Toggle Notes due 2018 (the "***Securities***") are held.

The Issuers are in the process of registering the Securities under the Securities Act of 1933 for resale by the beneficial owners thereof. In order to have their Securities included in the registration statement, beneficial owners must complete and return the enclosed Notice of Registration Statement and Selling Securityholder Questionnaire.

<u>It is important that beneficial owners of the Securities receive a copy of the enclosed materials as soon as possible</u> as their rights to have the Securities included in the registration statement depend upon their returning the Notice and Questionnaire by **[Deadline For Response]**. Please forward a copy of the enclosed documents to each beneficial owner that holds interests in the Securities through you. If you require more copies of the enclosed materials or have any questions pertaining to this matter, please contact the Issuers, Energy Plaza, 1601 Bryan Street, Dallas, Texas 75201- 3411, (214) 812- 4600.

\*      Not less than 28 calendar days from date of mailing.

A- 1

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**
**EFIH FINANCE INC.**
Notice of Registration Statement
and
Selling Securityholder Questionnaire
(Date)

Reference is hereby made to the Registration Rights Agreement (the "***Registration Rights Agreement***") among Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("***EFIH***"), and EFIH Finance Inc., a Delaware corporation ("***EFIH Finance***" and, together with EFIH, the "***Issuers***") named therein and the Initial Holders named therein. Pursuant to the Registration Rights Agreement, the Issuers have filed or will file with the United States Securities and Exchange Commission (the "***Commission***") a registration statement on Form **[    ]** (the "***Shelf Registration Statement***") for the registration and resale under Rule 415 of the Securities Act of 1933, as amended (the "***Securities Act***"), of the Issuers' 11.25%/12.25% Senior Toggle Notes due 2018 (the "***Securities***"). A copy of the Registration Rights Agreement has been filed as an exhibit to the Shelf Registration Statement and can be obtained from the Commission's website at www.sec.gov. All capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Registration Rights Agreement.

Each beneficial owner of Registrable Securities (as defined below) is entitled to have the Registrable Securities beneficially owned by it included in the Shelf Registration Statement. In order to have Registrable Securities included in the Shelf Registration Statement, this Notice of Registration Statement and Selling Securityholder Questionnaire ("***Notice and Questionnaire***") must be completed, executed and delivered to the Issuers' counsel at the address set forth herein for receipt ON OR BEFORE **[Deadline for Response]**. Beneficial owners of Registrable Securities who do not properly complete, execute and return this Notice and Questionnaire by such date (i) will not be named as selling securityholders in the Shelf Registration Statement and (ii) may not use the Prospectus forming a part thereof for resales of Registrable Securities.

Certain legal consequences arise from being named as a selling securityholder in the Shelf Registration Statement and related Prospectus. Accordingly, holders and beneficial owners of Registrable Securities are advised to consult their own securities law counsel regarding the consequences of being named or not being named as a selling securityholder in the Shelf Registration Statement and related Prospectus.

The term "*Registrable Securities*" is defined in the Registration Rights Agreement.

A- 2

ELECTION

The undersigned holder (the "***Selling Securityholder***") of Registrable Securities hereby elects to include in the Shelf Registration Statement the Registrable Securities beneficially owned by it and listed below in Item (3). The undersigned, by signing and returning this Notice and Questionnaire, agrees to be bound with respect to such Registrable Securities by the terms and conditions of this Notice and Questionnaire and the Registration Rights Agreement, including, without limitation, Section 5 of the Registration Rights Agreement, as if the undersigned Selling Securityholder were an original party thereto. In addition, the undersigned, by signing and returning this Notice and Questionnaire, represents and warrants that the representation set forth in Section 3(h) of the Registration Rights Agreement is true and correct as of the date hereof.

Pursuant to the Registration Rights Agreement, the undersigned has agreed to indemnify and hold harmless the Issuers, their officers who sign any Shelf Registration Statement, and each person, if any, who controls the Issuers within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act of 1934, as amended (the "***Exchange Act***"), against certain losses arising out of an untrue statement, or the alleged untrue statement, of a material fact in the Shelf Registration Statement or the related prospectus or the omission, or alleged omission, to state a material fact required to be stated in such Shelf Registration Statement or the related prospectus, but only to the extent such untrue statement or omission, or alleged untrue statement or omission, was made in reliance on and in conformity with the information provided in this Notice and Questionnaire.

Upon any sale of Registrable Securities pursuant to the Shelf Registration Statement, the Selling Securityholder will be required to deliver to the Issuers and Trustee the Notice of Transfer set forth in Appendix A to the Prospectus and as Exhibit B to the Registration Rights Agreement.

The Selling Securityholder hereby provides the following information to the Issuers and represents and warrants that such information is accurate and complete:

A- 3

QUESTIONNAIRE

(1)    (a) Full legal name of Selling Securityholder:

(b)    Full legal name of registered Holder (if not the same as in (a) above) of Registrable Securities listed in Item (3) below:

(c)    Full legal name of DTC Participant (if applicable and if not the same as (b) above) through which Registrable Securities listed in Item (3) below are held:

(2)    Address for notices to Selling Securityholder:

Telephone:_____
Fax: _____
Contact Person: _____
E- mail for Contact Person: _____

(3)    Beneficial Ownership of Securities:
*Except as set forth below in this Item (3), the undersigned does not beneficially own any Securities.*

(a)    Principal amount of Registrable Securities beneficially owned: _____
CUSIP No(s). of such Registrable Securities: _____

(b)    Principal amount of Securities other than Registrable Securities beneficially owned:
_____        CUSIP No(s). of such other Securities: _____

(c)    Principal amount of Registrable Securities that the undersigned wishes to be included in the Shelf Registration Statement: _____
CUSIP No(s). of such Registrable Securities to be included in the Shelf Registration Statement: _____

A- 4

(4)    Individuals who exercise dispositive powers with respect to the Securities:

*If the Selling Securityholder is not an entity that is required to file reports with the Commission pursuant to Section 13 or 15(d) of the Exchange Act (a "**Reporting Company**"), then the Selling Securityholder must disclose the name of the natural person(s) who exercise sole or shared dispositive powers with respect to the Securities. Selling Securityholders should disclose the beneficial holders, not nominee holders or other such others of record. In addition, the Commission has provided guidance that Rule 13d- 3 of the Securities Exchange Act of 1934 should be used by analogy when determining the person or persons sharing voting and/or dispositive powers with respect to the Securities.*

      (a)    Is the holder a Reporting Company?

Yes   _____       No _____

*If "No", please answer Item (5)(b).*

      (b)    List below the individual or individuals who exercise dispositive powers with respect to the Securities:

_____      _____

_____

_____

***Please note that the names of the persons listed in (b) above will be included in the Shelf Registration Statement and related Prospectus.***

A- 5

(5)    Relationships with the Issuers:

*Except as set forth below, neither the Selling Securityholder nor any of its affiliates, officers, directors or principal equity holders (5% or more) has held any position or office or has had any other material relationship with the Issuers (or its predecessors or affiliates) during the past three years.*
State any exceptions here:

_____

_____

_____

(6)    Plan of Distribution:

*Except as set forth below, the undersigned Selling Securityholder intends to distribute the Registrable Securities listed above in Item (3) only as follows (if at all): Such Registrable Securities may be sold from time to time directly by the undersigned Selling Securityholder. Such Registrable Securities may be sold in one or more transactions at fixed prices, at prevailing market prices at the time of sale, at varying prices determined at the time of sale, or at negotiated prices. Such sales may be effected in transactions (which may involve crosses or block transactions) (i) on any national securities exchange or quotation service on which the Registered Securities may be listed or quoted at the time of sale, (ii) in the over- the- counter market, (iii) in transactions otherwise than on such exchanges or services or in the over- the- counter market, or (iv) through the writing of options. In connection with sales of the Registrable Securities or otherwise, the Selling Securityholder may enter into hedging transactions with broker- dealers, which may in turn engage in short sales of the Registrable Securities in the course of hedging the positions they assume. The Selling Securityholder may also sell Registrable Securities short and deliver Registrable Securities to close out such short positions, or loan or pledge Registrable Securities to broker- dealers that in turn may sell such securities.*
State any exceptions here:

_____

_____

*Note: In no event may such method(s) of distribution take the form of an underwritten offering of Registrable Securities without the prior written agreement of the Issuers.*

(7)    Broker- Dealers:

*The Commission requires that all Selling Securityholders that are registered broker- dealers or affiliates of registered broker- dealers be so identified in the Shelf Registration Statement. In addition, the Commission requires that all*

A- 6

*Selling Securityholders that are registered broker- dealers be named as underwriters in the Shelf Registration Statement and related Prospectus, even if they did not receive the Registrable Securities as compensation for underwriting activities.*

    (a)    State whether the undersigned Selling Securityholder is a registered broker- dealer:

Yes   **_____**          No **_____**

    (b)    If the answer to (a) is "*Yes*", you must answer (i) and (ii) below, and (iii) below if applicable. ***Your answers to (i) and (ii) below, and (iii) below if applicable, will be included in the Shelf Registration Statement and related Prospectus.***

(i) Were the Securities acquired as compensation for underwriting activities?

Yes   **_____**          No **_____**

If you answered "Yes", please provide a brief description of the transaction(s) in which the Securities were acquired as compensation:

_____

_____

_____

(ii) Were the Securities acquired for investment purposes?

Yes   **_____**          No **_____**

(iii) If you answered "No" to both (i) and (ii), please explain the Selling Securityholder's reason for acquiring the Securities:

_____

_____

_____

A- 7

(c)    State whether the undersigned Selling Securityholder is an affiliate of a registered broker- dealer and, if so, list the name(s) of the broker-dealer affiliate(s):

Yes    _____    No _____

_____

_____

_____

(d)    If you answered "*Yes*" to question (c) above:

(i) Did the undersigned Selling Securityholder purchase Registrable Securities in the ordinary course of business?

Yes    _____    No _____

If the answer is "No" to question (d)(i), provide a brief explanation of the circumstances in which the Selling Securityholder acquired the Registrable Securities:

_____

_____

(ii) At the time of the purchase of the Registrable Securities, did the undersigned Selling Securityholder have any agreements, understandings or arrangements, directly or indirectly, with any person to dispose of or distribute the Registrable Securities?

Yes    _____    No _____

If the answer is "*Yes*" to question (d)(ii), provide a brief explanation of such agreements, understandings or arrangements:

_____

_____

***If the answer is "No" to Item (8)(d)(i) or "Yes" to Item (8)(d)(ii), you will be named as an underwriter in the Shelf Registration Statement and the related Prospectus.***

(8)    Hedging and short sales:

(a)    State whether the undersigned Selling Securityholder has or will enter into "hedging transactions" with respect to the Registrable Securities:

Yes    _____    No _____

A- 8

If "Yes", provide below a complete description of the hedging transactions into which the undersigned Selling Securityholder has entered or will enter and the purpose of such hedging transactions, including the extent to which such hedging transactions remain in place:

_____

_____

_____

(b)    Set forth below is Interpretation A.65 of the Commission's July 1997 Manual of Publicly Available Interpretations regarding short selling:

*"An issuer filed a Form S- 3 registration statement for a secondary offering of common stock which is not yet effective. One of the selling shareholders wanted to do a short sale of common stock "against the box" and cover the short sale with registered shares after the effective date. The issuer was advised that the short sale could not be made before the registration statement becomes effective, because the shares underlying the short sale are deemed to be sold at the time such sale is made. There would, therefore, be a violation of Section 5 if the shares were effectively sold prior to the effective date."*

By returning this Notice and Questionnaire, the undersigned Selling Securityholder will be deemed to be aware of the foregoing interpretation.

*        *        *        *        *

By signing below, the Selling Securityholder acknowledges that it understands its obligation to comply, and agrees that it will comply, with the provisions of the Exchange Act, particularly Regulation M (or any successor rule or regulation).

The Selling Securityholder hereby acknowledges its obligations under the Registration Rights Agreement to indemnify and hold harmless the Issuers and certain other persons as set forth in the Registration Rights Agreement.

In the event that the Selling Securityholder transfers all or any portion of the Registrable Securities listed in Item (3) above after the date on which such information is provided to the Issuers, the Selling Securityholder agrees to notify the transferee(s) at the time of the transfer of its rights and obligations under this Notice and Questionnaire and the Registration Rights Agreement.

By signing below, the Selling Securityholder consents to the disclosure of the information contained herein in its answers to Items (1) through (9) above and the inclusion of such information in the Shelf Registration Statement and related Prospectus. The Selling Securityholder understands that such information will be relied upon by the Issuers in connection with the preparation of the Shelf Registration Statement and related Prospectus. In accordance with the Selling Securityholder's obligation under Section 3(d) of the Registration Rights Agreement to provide such information as may be

A- 9

required by law for inclusion in the Shelf Registration Statement, the Selling Securityholder agrees to promptly notify the Issuers of any inaccuracies or changes in the information provided herein which may occur subsequent to the date hereof at any time while the Shelf Registration Statement remains in effect and to provide such additional information that the Issuers may reasonably request regarding such Selling Securityholder and the intended method of distribution of Registrable Securities in order to comply with the Securities Act. Except as otherwise provided in the Registration Rights Agreement, all notices hereunder and pursuant to the Registration Rights Agreement shall be made in writing, by hand- delivery, first- class mail, or air courier guaranteeing overnight delivery as follows:

    (i) To the Issuers:

        Energy Future Intermediate Holding Company LLC
        EFIH Finance Inc.

        Energy Plaza
        1601 Bryan Street
        Dallas, Texas 75201- 3411
        Attention: General Counsel

    (ii) With a copy to:

        Gibson, Dunn & Crutcher LLP
        2100 McKinney Avenue
        Dallas, Texas 75201
        Attention: Robert B. Little, Esq.

Once this Notice and Questionnaire is executed by the Selling Securityholder and received by the Issuers' counsel, the terms of this Notice and Questionnaire, and the representations and warranties contained herein, shall be binding on, shall inure to the benefit of and shall be enforceable by the respective successors, heirs, personal representatives, and assigns of the Issuers and the Selling Securityholder (with respect to the Registrable Securities beneficially owned by such Selling Securityholder and listed in Item (3) above). This Notice and Questionnaire shall be governed in all respects by the laws of the State of New York.

A- 10

IN WITNESS WHEREOF, the undersigned, by authority duly given, has caused this Notice and Questionnaire to be executed and delivered either in person or by its duly authorized agent.

Dated:_____

_____
Selling Securityholder
(Print/type full legal name of beneficial owner of Registrable Securities)

By:                                                       _____
Name:
Title:

PLEASE RETURN THE COMPLETED AND EXECUTED NOTICE AND QUESTIONNAIRE FOR RECEIPT ON OR BEFORE **[DEADLINE FOR RESPONSE]** TO THE ISSUERS' COUNSEL AT:

Gibson, Dunn & Crutcher LLP
2100 McKinney Avenue
Dallas, Texas 75201
Attention: Robert B. Little, Esq.

A- 11

**Exhibit B**

NOTICE OF TRANSFER PURSUANT TO REGISTRATION STATEMENT

The Bank of New York

Energy Future Intermediate Holding Company LLC

EFIH Finance Inc.

c/o The Bank of New York Mellon Trust Company, N.A.

Corporate Trust Division

101 Barclay Street

Floor 8W

New York, NY 10286

Attention: Trust Officer

Re: Energy Future Intermediate Holding Company LLC and EFIH Finance

Inc. (the "*Issuers*")

　　11.25%/12.25% Senior Toggle Notes due 2018

Dear Sirs:

Please be advised that　　　　　　　has transferred $　　　　　　　aggregate principal amount of the above- referenced Notes pursuant to an effective Registration Statement on Form [　　　　] (File No. 333-　　　　) filed by the Issuers.

We hereby certify that the prospectus delivery requirements, if any, of the Securities Act of 1933, as amended, have been satisfied and that the above-named beneficial owner of the Notes is named as a "Selling Holder" in the Prospectus dated **[date]** or in supplements thereto, and that the aggregate principal amount of the Notes transferred are the Notes listed in such Prospectus opposite such owner's name.

Dated:

Very truly yours,

_____

(Name)

By:

_____

(Authorized Signature)

B- 1