# EXHIBIT A

# KIRKLAND & ELLIS LLP
### *Fax Transmittal*

601 Lexington Avenue
New York, New York 10022
Telephone  (212) 446-4800
Facsimile  (212) 446-4900

---

**Please notify us Immediately if any pages are not received.**

THE INFORMATION CONTAINED IN THIS COMMUNICATION IS CONFIDENTIAL, MAY
BE ATTORNEY-CLIENT PRIVILEGED, MAY CONSTITUTE INSIDE INFORMATION,
AND IS INTENDED ONLY FOR THE USE OF THE ADDRESSEE.  UNAUTHORIZED
USE, DISCLOSURE OR COPYING IS STRICTLY PROHIBITED AND MAY BE
UNLAWFUL.

**IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR,
PLEASE NOTIFY US IMMEDIATELY AT:
(212) 446-4800.**

---

| *To:* | *Company:* | | *Fax #:* | *Direct #:* |
|---|---|---|---|---|
| Krista F. Hill | Torys LLP | | 416-865-7380 | |

| *From:* | *Date:* | *Pages w/cover:* | *Fax #:* | *Direct #:* |
|---|---|---|---|---|
| Warren Haskel | September 4, 2015 | Part 1 of 5 | (212) 446-6460 | (212) 446-5927 |

---

*Message:*

Please see attached for Required Sale Notice

*Confidential*

**Energy Future Holdings Corp.**
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201

September 4, 2015

Texas Transmission Investment LLC

c/o Borealis Infrastructure Corporation
c/o Borealis Infrastructure Management Inc.
Royal Bank Plaza, South Tower
200 Bay Street
Suite 2100, P.O. Box 56
Toronto, Ontario M5J 2J2, Canada
Attention: Steven Zucchet

c/o Cheyne Walk Investment Pte Ltd.
c/o GIC Special Investments Pte Ltd.
1st Floor, York House
45 Seymour Street
London W1H 7LX, United Kingdom
Attention: Head, Global Infrastructure Group and Stuart Baldwin

Required Sale Notice

Ladies and Gentlemen:

Reference is made to (i) the Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery Company LLC, dated as of November 5, 2008 (as amended, the "Oncor LLC Agreement"), among Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings"), Oncor Management Investment LLC ("Oncor Management") and Texas Transmission Investment LLC ("TTI") and (ii) the Investor Rights Agreement, dated as of November 5, 2008 (the "Investor Rights Agreement"), among Oncor Electric Delivery Company LLC ("Oncor"), Oncor Holdings, TTI and Energy Future Holdings Corp. ("EFH"). Capitalized terms used herein without definition have the respective meanings set forth in the Investor Rights Agreement.

As you are aware, on August 9, 2015, (i) EFH, Energy Future Intermediate Holding Company LLC ("EFIH"), Ovation Acquisition I, L.L.C. ("OV1") and Ovation Acquisition II, L.L.C. entered into a Purchase Agreement and Agreement and Plan of Merger, dated as of such date (the "Merger Agreement"), which agreement provides for, among other things, the merger of reorganized EFH with and into OV1 (the "Merger") and an initial public offering by OV1, which will be the successor to reorganized EFH as a result of the Merger, of shares of its common stock (collectively, the "Initial Public Offering"), and (ii) certain investors (the "Investors") entered into an Equity Commitment Letter and a Backstop Agreement (each as

defined in the Merger Agreement) pursuant to which they are committed to purchase substantially all of the outstanding equity interests in OV1 at the closing (the "Closing") of the Merger, the Initial Public Offering and the other transactions contemplated by the Merger Agreement.

In addition, on August 10, 2015, EFH, EFIH and the other debtors in the pending chapter 11 cases jointly administered for procedural purposes only under Case No. 14-10979 (the "Chapter 11 Cases") filed an amended Plan of Reorganization (the "Plan of Reorganization") that contemplates certain restructuring transactions, including the Merger and the Initial Public Offering. The Plan of Reorganization, which is an integral element of the Merger transaction, is an exhibit to and incorporated as a part of the Merger Agreement. Copies of the Merger Agreement, the Equity Commitment Letter, the Backstop Agreement, the Plan of Reorganization and other related documents (the "Transaction Documents") are included as exhibits to the Current Report on Form 8-K, as amended, filed by EFH with the Securities and Exchange Commission on August 10, 2015 or have been filed with the United States Bankruptcy Court for the District of Delaware.

OV1 is a Delaware limited liability company that will be converted into a corporation prior to the consummation of the Initial Public Offering. OV1 was formed for the express purpose of carrying out the transactions contemplated by the Merger Agreement, including the Initial Public Offering. In order to facilitate the Initial Public Offering, EFH has developed and will implement an IPO Conversion plan, which is described in the Merger Agreement. At the Closing, OV1 will be the successor to reorganized EFH and it is a suitable vehicle for conducting the Initial Public Offering, which will involve the issuance of equity securities to the public pursuant to an effective registration statement under the Securities Act of 1933, as amended, and will result in an active trading market in such securities. For purposes of this letter, OV1 (as successor to reorganized EFH as a result of transactions contemplated by the Merger Agreement and the Plan of Reorganization) is referred to, in relation to the Initial Public Offering, as the "IPO Corporation." Similarly, shares of the common stock of the IPO Corporation (which are its only class of common equity interests) are referred to as "IPO Units."

On August 9, 2015, EFH received from OV1 an offer (the "Offer") to purchase (i) substantially all of the IPO Units in the IPO Corporation or, alternatively, substantially all of the LLC Units in Oncor held indirectly by EFH, which transactions will be implemented through, among other things, the purchase by the Investors of shares of common stock in the IPO Corporation, the payment in full of all debt obligations of EFH and EFIH that are allowed in the Chapter 11 Cases and the cancellation and retirement of all of the existing equity interests in EFH (which are integral elements of the proposed transactions contemplated by the Transaction Documents), and (ii) all of the LLC Units in Oncor that are owned by members of Oncor other than Oncor Holdings. A copy of the Offer is attached as Exhibit A hereto.

The transactions contemplated by the Offer (the "Required Sale") would constitute a Change of Control. In particular, the proposed purchase in accordance with the Offer of (i) IPO Units or, alternatively, LLC Units in Oncor held indirectly by EFH and (ii) LLC Units in Oncor that are owned by members of Oncor other than Oncor Holdings is a part of a merger, recapitalization and sale transaction that, when consummated at the Closing, will result in the Investors (who are a group of Persons acting in concert with respect to the acquisition of IPO

Units and LLC Units referred to above) owning more of the equity interests in Oncor (or any resulting entity after a merger) than the relevant Related Entity or its Affiliates.

This letter constitutes a Required Sale Notice delivered by EFH to TTI pursuant to Section 3.3 of the Investor Rights Agreement. Accordingly, TTI is required to sell or otherwise Transfer all of the LLC Units owned by it to OV1 on the date of the Closing (the "Closing Date") for consideration in the form of cash in an amount equal to the purchase price for such LLC Units that is required to be paid pursuant to Section 3.3 of the Investor Rights Agreement. The material terms and conditions of the Required Sale (including the required sale of LLC Units by TTI) are set forth in (i) the Transaction Documents and (ii) the form of Interest Purchase Agreement (the "Minority Interest Purchase Agreement") prepared by OV1 to be entered into between OV1 and TTI and (if approved and executed by Oncor Management) Oncor Management, which is attached as Exhibit B hereto. The Closing is expected to occur promptly after the receipt of the regulatory approvals required under the terms of the Merger Agreement, which are expected to be obtained in 2016. EFH will keep TTI informed as to the progress of the transactions contemplated by the Merger Agreement and the anticipated Closing Date.

You will note that the Minority Interest Purchase Agreement prepared by OV1 provides that the price to be paid by OV1 to TTI in consideration of the LLC Units held by TTI will be in the form of cash and will be in an amount that OV1 has indicated represents the same per unit equivalent price as is being paid by the Investors for the indirect ownership interests in Oncor to be acquired by them in connection with the transactions contemplated by the Merger Agreement. Based on certain assumptions made by OV1, the aggregate purchase price being offered by OV1 for the LLC Units held by TTI is expected to be $2,190,867,500.00 (the "Expected Purchase Price"). OV1's calculation of the Expected Purchase Price is attached as Exhibit C hereto.

In addition, this letter will serve as notice that TTI is obligated under Section 3.3(c) of the Investor Rights Agreement to (i) vote, if its vote is required by the Investor Rights Agreement, the Oncor LLC Agreement or otherwise, its LLC Units in favor of the Required Sale at any meeting of Members called to vote on or approve the Required Sale and/or to consent in writing to the Required Sale, (ii) use its reasonable efforts to cause any individuals designated or nominated by TTI to the Board of Oncor to vote in favor of the Required Sale in a vote of the Board called to vote on or approve the Required Sale and/or consent in writing to the Required Sale, (iii) enter into agreements relating to the Required Sale and to agree (as to itself) to make to OV1 the representations, warranties, covenants, indemnities and agreements contained in the Minority Interest Purchase Agreement and (iv) take or cause to be taken all other actions as may be reasonably necessary to consummate the Required Sale.

As described above, to prepare for the contemplated Initial Public Offering, EFH intends to exercise its right to develop and implement an IPO Conversion under Section 3.7 of the Investor Rights Agreement by taking steps that EFH deems necessary, advisable or convenient with respect to the Initial Public Offering to be conducted by OV1, as the successor to reorganized EFH and a suitable vehicle for such offering. Such measures, which include the IPO Conversion plan described in Exhibit B to the Merger Agreement and other actions that EFH may specify in the future in accordance with the Investor Rights Agreement, are an IPO Conversion as defined in

the Merger Agreement. As you know, TTI is obligated to cooperate in good faith in order to effectuate the IPO Conversion, including by (i) taking all actions reasonably required by EFH in connection with consummating the IPO Conversion, (ii) voting its LLC Units in favor of any matters relating to or giving any consents required for the IPO Conversion and (iii) using its reasonable efforts to cause any individuals designated or nominated by it to the Board of Oncor to vote in favor of the IPO Conversion. Consummation of the IPO Conversion is expected to occur contemporaneously with the Closing.

Notwithstanding this Required Sale Notice or anything contained herein, EFH expressly reserves, and does not waive, any and all rights under the applicable agreements, including but not limited to the Investor Rights Agreement and the Transaction Documents. Without limiting the foregoing, consistent with Section 3.3(c) of the Investor Rights Agreement, EFH further reserves the right to amend, revise, restate, reissue, and/or rescind this Required Sale Notice in its sole discretion.

In order to ensure that the transactions contemplated by the Merger Agreement proceed smoothly and expeditiously, we would like to obtain your assurance that you will comply with your contractual obligations under Sections 3.3 and 3.7 of the Investor Rights Agreement, as outlined in this letter. Please confirm by written response no later than September 11, 2015 that you agree to comply with such obligations. Should you have any questions, we are available to discuss your questions at your earliest convenience. We look forward to working with you to facilitate and consummate the Required Sale.

Respectfully yours,

ENERGY FUTURE HOLDINGS CORP.

By:

Name:  Michael Carter

Title:  Sr. Vice President

cc:  Oncor Electric Delivery Holdings Company LLC
1616 Woodall Rodgers Freeway
Dallas, Texas 75202
Attention: General Counsel

Texas Energy Future Holdings Limited Partnership
c/o Energy Future Holdings Corp.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201
Attention: General Counsel

Oncor Management Investment LLC
c/o Oncor Electric Delivery Company LLC
1616 Woodall Rodgers Freeway
Dallas, Texas 75202
Attention: General Counsel

Ovation Acquisition I, L.L.C.
1900 North Akard Street
Dallas, Texas 75201
Attention: David Hernandez

**Exhibit A**

**Offer**

(See attached)

**Ovation Acquisition I, L.L.C.**
1900 North Akard Street
Dallas, Texas 75201


August 9, 2015


Energy Future Holdings Corp.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201
Attention: Board of Directors


<u>Offer to Purchase IPO Units and LLC Units</u>

Ladies and Gentlemen:

Reference is made to (i) the Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery Company LLC, dated as of November 5, 2008 (as amended, the "<u>Oncor LLC Agreement</u>"), among Oncor Electric Delivery Holdings Company LLC ("<u>Oncor Holdings</u>"), Oncor Management Investment LLC ("<u>Oncor Management</u>") and Texas Transmission Investment LLC ("<u>TTI</u>") and (ii) the Investor Rights Agreement, dated as of November 5, 2008 (the "<u>Investor Rights Agreement</u>"), among Oncor Electric Delivery Company LLC ("<u>Oncor</u>"), Oncor Holdings, TTI and Energy Future Holdings Corp. ("<u>EFH</u>"). Capitalized terms used herein without definition have the respective meanings set forth in the Investor Rights Agreement.

As you are aware, as of the date hereof, (i) EFH, Energy Future Intermediate Holding Company LLC ("<u>EFIH</u>"), Ovation Acquisition I, L.L.C. ("<u>OV1</u>") and Ovation Acquisition II, L.L.C. ("<u>OV2</u>") are entering into a Purchase Agreement and Agreement and Plan of Merger, dated as of the date hereof (the "<u>Merger Agreement</u>"), a copy of which is attached as <u>Exhibit A</u> hereto, and (ii) EFH, EFIH and the other debtors in the pending chapter 11 cases jointly administered for procedural purposes only under Case No. 14-10979 (collectively, the "<u>Debtors</u>") are filing an amended Plan of Reorganization (the "<u>Plan of Reorganization</u>") that contemplates certain restructuring transactions that include, among other things, (a) the merger of reorganized EFH with and into OV1 (the "<u>Merger</u>") and (b) an initial public offering by OV1, which will be the successor to reorganized EFH as a result of the Merger, of shares of common stock (collectively, the "<u>Initial Public Offering</u>"). The Plan of Reorganization, which is an integral element of the Merger transaction, is an exhibit to and incorporated as a part of the Merger Agreement. In addition, as of the date hereof, certain investors (the "<u>Investors</u>") are entering into an Equity Commitment Letter and a Backstop Agreement (each as defined in the Merger Agreement) pursuant to which they are committing to purchase substantially all of the outstanding equity interests in OV1 at the closing (the "<u>Closing</u>") of the Merger, the Initial Public Offering and the other transactions contemplated by the Merger Agreement. The Equity Commitment Letter and Backstop Agreement are exhibits to and are incorporated as part of the Merger Agreement.

OV1 is a Delaware limited liability company that will be converted into a corporation and will be the successor to EFH at the Closing. OV1 has been formed for the express purpose of carrying out the transactions contemplated by the Merger Agreement, including the Initial Public Offering. In order to facilitate the Initial Public Offering, EFH has developed and will implement an IPO Conversion, which is described in the Merger Agreement. OV1, as the successor to reorganized EFH, is a suitable vehicle for conducting the Initial Public Offering, which will involve the issuance of

-2-

equity securities of OV1 (and ultimately of the surviving entity in the Merger) to the public pursuant to an effective registration statement under the Securities Act of 1933, as amended, and will result in an active trading market in such securities. For purposes of this offer, OV1 (as successor to reorganized EFH as a result of transactions contemplated by the Merger Agreement and the Plan of Reorganization) is referred to, in relation to the initial public offering of IPO Units to be carried out as described above, as the "IPO Corporation." As set forth in the Plan of Reorganization and the Merger Agreement, all of the existing equity interests in EFH will be cancelled and retired.

This letter constitutes an EFH Sale Proposal and represents an offer to purchase (i) substantially all of the IPO Units in the IPO Corporation or, alternatively, the acquisition of substantially all of the LLC Units in Oncor held indirectly by EFH, which transactions will be implemented through, among other things, the purchase by the Investors of equity interests in the IPO Corporation and the cancellation and retirement of all of the existing equity interests in EFH (which is an integral element of the proposed transactions contemplated by the Merger Agreement and the Plan of Reorganization), and (ii) all of the LLC Units in Oncor that are owned by members of Oncor other than Oncor Holdings. The consummation of the transaction(s) as contemplated by this EFH Sale Proposal will result in a Change of Control.

The form of the purchase agreement to be entered into in order to provide for the purchase and sale of the LLC Units will be provided to TTI and Oncor Management prior to or concurrently with the delivery by EFH of a Required Sale Notice as contemplated by Section 3.3(a) of the Investor Rights Agreement. Such purchase agreement will contain provisions that satisfy the conditions of Section 3.3(d) of the Investor Rights Agreement. Among other things, the form of consideration to be paid to holders of LLC Units other than Oncor Holdings will be cash, and the amount of such consideration will be at least equal to the amount of the purchase price for the LLC Units held by TTI that is required pursuant to Section 3.3 of the Investor Rights Agreement. Such purchase price will, among other things, be sufficient so that TTI will achieve an IRR on its initial investment in the LLC Units which exceeds the IRR Hurdle.

The purchase of IPO Units and LLC Units in accordance with this offer is a part of a merger, recapitalization and sale transaction that, when consummated at the Closing, will result in the Investors (who are a group of Persons acting in concert with respect to the acquisition of EFH and Oncor) owning more of the equity interests in Oncor (or any resulting entity after a merger) than the relevant Related Entity or its Affiliates.

We are available at your earliest convenience to address any questions that you may have about our offer. We look forward to working with you to complete the purchase contemplated hereby.

Respectfully yours,

OVATION ACQUISITION I, L.L.C.

By: _____

Name: Hunt L. Hunt
Title:   President

*[cc's follow]*

*[Signature Page to OV1 Offer]*

cc:     Oncor Electric Delivery Holdings Company LLC
        1616 Woodall Rodgers Freeway
        Dallas, Texas  75202
        Attention:  General Counsel

        Texas Energy Future Holdings Limited Partnership
        c/o Energy Future Holdings Corp.
        Energy Plaza
        1601 Bryan Street
        Dallas, Texas  75201

## **Exhibit B**

**Form of Interest Purchase Agreement**

(See attached)

**INTEREST PURCHASE AGREEMENT**

dated as of [_____], 2015

between

**OVATION ACQUISITION I, L.L.C.,**
**as Purchaser**

and

**TEXAS TRANSMISSION INVESTMENT LLC**
**and**
**ONCOR MANAGEMENT INVESTMENT LLC,**
**as Sellers**

Active 20343570

**Table of Contents**

Page

ARTICLE I PURCHASE AND SALE.................................................................................3
    SECTION 1.1. *Purchase and Sale*...........................................................................3
    SECTION 1.2. *Purchase Price*.................................................................................3

ARTICLE II THE CLOSING...........................................................................................3
    SECTION 2.1. *Closing*..............................................................................................3
    SECTION 2.2. *Closing Deliveries by the Sellers* ....................................................4
    SECTION 2.3. *Closing Deliveries by the Purchaser* ..............................................4
    SECTION 2.4. *Proceedings at Closing*....................................................................5

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLERS.............5
    SECTION 3.1. *Organization; Power and Authority* ................................................5
    SECTION 3.2. *Authorizations; Execution and Validity*..........................................5
    SECTION 3.3. *Regulatory Approvals and Filings*...................................................5
    SECTION 3.4. *No Conflicts* .....................................................................................6
    SECTION 3.5. *Title to Minority Interest*..................................................................6
    SECTION 3.6. *Litigation*..........................................................................................6
    SECTION 3.7. *Affiliate Transactions*.......................................................................6
    SECTION 3.8. *Sophisticated Party; Access to Information*....................................7
    SECTION 3.9. *Fees*..................................................................................................7

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.....7
    SECTION 4.1. *Organization; Power and Authority* ...............................................7
    SECTION 4.2. *Authorizations; Execution and Validity*..........................................7
    SECTION 4.3. *Regulatory Approvals and Filings* ..................................................8
    SECTION 4.4. *No Conflicts* .....................................................................................8
    SECTION 4.5. *Litigation*..........................................................................................8
    SECTION 4.6. *Sophisticated Purchaser; Investment Intent* ..................................8
    SECTION 4.7. *Financing*..........................................................................................9
    SECTION 4.8. *Fees*..................................................................................................9

ARTICLE V COVENANTS...............................................................................................9
    SECTION 5.1. *Interim Actions*................................................................................9
    SECTION 5.2. *Reasonable Best Efforts* ................................................................10
    SECTION 5.3. *Transfer Taxes* ...............................................................................10
    SECTION 5.4. *Confidential Information* ................................................................10
    SECTION 5.5. *Notice of Current Events*................................................................11
    SECTION 5.6. *Publicity* .........................................................................................11
    SECTION 5.7. *Further Assurances* ........................................................................12

ARTICLE VI CONDITIONS TO CLOSING ...................................................................12
    SECTION 6.1. *Conditions to the Obligations of the Parties*.................................12
    SECTION 6.2. *Conditions to the Obligations of the Purchaser* ...........................12
    SECTION 6.3. *Conditions to the Obligations of the Sellers* .................................12

ARTICLE VII DEFINITIONS ........................................................................................13

SECTION 7.1. *Definitions* ........................................................................................13
SECTION 7.2. *Additional Definitions* ......................................................................16

ARTICLE VIII GENERAL ..........................................................................................17
SECTION 8.1. *Modification or Amendment* .............................................................17
SECTION 8.2. GOVERNING LAW AND VENUE; WAIVER OF JURY TRIAL ....17
SECTION 8.3. *Notices*................................................................................................18
SECTION 8.4. *Termination* ........................................................................................21
SECTION 8.5. *Entire Agreement* ...............................................................................21
SECTION 8.6. *Severability* .........................................................................................21
SECTION 8.7. *Assignment* .........................................................................................22
SECTION 8.8. *No Third Party Beneficiaries* .............................................................22
SECTION 8.9. *Remedies* .............................................................................................22
SECTION 8.10. *Interpretation; Construction*............................................................22
SECTION 8.11. *Counterparts; Electronic Execution and Delivery* ...........................22

**Exhibits**

Exhibit A — Form of Assignment
Exhibit B — Form of Seller Release

## INTEREST PURCHASE AGREEMENT

This INTEREST PURCHASE AGREEMENT (this "Agreement") is made and entered into as of [_____], 2015, by and between Ovation Acquisition I, L.L.C., a Delaware limited liability company (the "Purchaser"), and Texas Transmission Investment LLC, a Delaware limited liability company ("TTI"), and Oncor Management Investment LLC, a Delaware limited liability company ("Oncor Management" and, together with TTI, the "Sellers"). Capitalized terms used herein without definition have the respective meanings assigned to them in Article VII.

## WITNESSETH:

WHEREAS, each of the Sellers and Oncor Electric Delivery Holdings Company LLC, a Delaware limited liability company ("Oncor Holdings"), is a member of Oncor Electric Delivery Company LLC, a Delaware limited liability company (the "Company"), and a party to the Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery Company LLC, dated as of November 5, 2008 (as amended, the "Oncor LLC Agreement"), among the Company and its members;

WHEREAS, as of the date hereof, (i) TTI owns 125,412,500 LLC Units (the "TTI Interest"), representing approximately 19.75% of the outstanding Interests (as defined in the Oncor LLC Agreement) in the Company, (ii) Oncor Management owns 1,396,008 LLC Units (the "Oncor Management Interest"), representing approximately 0.22% of the outstanding Interests in the Company, and (iii) Oncor Holdings owns 508,264,860 LLC Units, representing approximately 80.03% of the outstanding Interests in the Company;

WHEREAS, Oncor Holdings is a wholly owned subsidiary of Energy Future Intermediate Holdings Company LLC, a Delaware limited liability company ("EFIH"), which is in turn a wholly owned subsidiary of Energy Future Holdings Corp., a Texas corporation ("EFH");

WHEREAS, the Company, Oncor Holdings, TTI and EFH are parties to the Investor Rights Agreement, dated as of November 5, 2008 (the "Investor Rights Agreement"), which agreement establishes certain rights and obligations arising out of, or in connection with, the ownership of LLC Units and certain other matters addressed therein;

WHEREAS, on April 29, 2014, EFH, EFIH and certain entities in which EFH, directly or indirectly, holds an Equity Interest (collectively, the "Debtors") commenced voluntary cases under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes only under Case No. 14-10979 (collectively, together with any proceedings relating thereto, the "Chapter 11 Cases");

WHEREAS, on August 9, 2015, (i) EFH, EFIH, the Purchaser and Ovation Acquisition II, L.L.C. ("OV2") entered into a Purchase Agreement and Agreement and Plan of Merger, dated as of such date (the "Merger Agreement"), which agreement provides for, among other things, the merger of reorganized EFH with and into the Purchaser (the "Merger") and an initial public offering by the Purchaser, which will be the successor to

-1-

reorganized EFH as a result of the Merger, of shares of its common stock (collectively, the "Initial Public Offering"), and (ii) certain investors (the "Investors") entered into an Equity Commitment Letter and a Backstop Agreement pursuant to which they have committed to purchase substantially all of the outstanding Equity Interests in the Purchaser at the First Closing contemplated by the Merger Agreement (the "Merger Closing"), at which the Merger, the Initial Public Offering and certain other transactions contemplated by the Merger Agreement are to be consummated;

WHEREAS, on August 10, 2015, EFH, EFIH and the other Debtors in the Chapter 11 Cases filed an amended Plan of Reorganization (the "Plan of Reorganization") that contemplates certain restructuring transactions that include the Merger and the Initial Public Offering;

WHEREAS, in order to facilitate the Initial Public Offering, EFH has developed and will implement an IPO Conversion plan (the "IPO Conversion Plan"), which is described in the Merger Agreement and pursuant to which the Purchaser (i) will be the successor to reorganized EFH as of the Merger Closing and (ii) has been selected as a suitable vehicle for conducting the Initial Public Offering (such vehicle being referred to, in connection with the IPO Conversion Plan and the Initial Public Offering, as the "IPO Corporation"), which will involve the issuance of equity securities of the IPO Corporation to the public pursuant to an effective registration statement under the Securities Act and will result in an active trading market in such securities (such equity securities being referred to herein as the "IPO Units");

WHEREAS, on August 9, 2015, EFH received from the Purchaser an offer to purchase (the "Offer") (i) substantially all of the IPO Units in the IPO Corporation or, alternatively, substantially all of the LLC Units held indirectly by EFH, which transactions will be implemented through, among other things, the purchase by the Investors of Equity Interests in the IPO Corporation and the cancellation and retirement of all of the existing Equity Interests in EFH (which is an integral element of the proposed transactions contemplated by the Merger Agreement and the Plan of Reorganization), and (ii) all of the LLC Units in Oncor that are owned by the Sellers;

WHEREAS, the transactions contemplated by the Offer (the "Required Sale") would result in a Change of Control;

WHEREAS, EFH has delivered to the Sellers a Required Sale Notice (as defined in the Investor Rights Agreement) with respect to the Required Sale pursuant to Section 3.3 of the Investor Rights Agreement; and

WHEREAS, (i) TTI is willing to sell the TTI Interest to the Purchaser, and the Purchaser is willing to acquire the TTI Interest from TTI, and (ii) Oncor Management is willing to sell the Oncor Management Interest to the Purchaser, and the Purchaser is willing to acquire the Oncor Management Interest from Oncor Management, in each case upon the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises, the terms and provisions set forth herein, the mutual benefits to be gained by the performance thereof and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## PURCHASE AND SALE

SECTION 1.1. *Purchase and Sale.* Upon the terms and subject to the conditions set forth herein, at the Closing:

(a)    TTI shall sell, transfer and deliver the TTI Interest to the Purchaser, and the Purchaser shall acquire and accept the TTI Interest from TTI; and

(b)    Oncor Management shall sell, transfer and deliver the Oncor Management Interest to the Purchaser, and the Purchaser shall acquire and accept the Oncor Management Interest from Oncor Management.

In the case of each of Section 1.1(a) and (b) above, the sale, transfer and delivery to the Purchaser of the Interests specified therein (collectively, the "Minority Interest") shall be free and clear of all Liens and Claims, other than restrictions on transfer arising under applicable federal or state securities laws or under the express terms of the Oncor LLC Agreement.

SECTION 1.2. *Purchase Price.* In consideration of the sale, transfer and delivery by the Sellers of the portion of the Minority Interest owned by each Seller, at the Closing:

(a)    The Purchaser shall pay to TTI an amount in cash equal to $_____ (the "TTI Purchase Price"); and

(b)    The Purchaser shall pay to Oncor Management an amount in cash equal to $_____ (the "Oncor Management Purchase Price").

## ARTICLE II
## THE CLOSING

SECTION 2.1. *Closing.* The closing of the purchase and sale of the Minority Interest pursuant to this Agreement (the "Closing") shall take place at the offices of Baker Botts L.L.P., 2001 Ross Avenue, Dallas, Texas 75201 on the date of the First Closing pursuant to the Merger Agreement, at such time on such date as shall be specified by the Purchaser (consistent with the condition set forth in Section 6.1(a)), or if the conditions to the obligations of the parties set forth in Article VI (other than those conditions which by their terms are to be satisfied or waived through the execution and delivery of agreements or other documents or the payment of funds at the Closing) are not satisfied (or, to the extent permitted, waived) as of such date and time, on the date that is two Business Days after the satisfaction (or to the extent permitted, waiver) of such conditions, or at such other time and date as shall be mutually agreed upon by the parties. The date on which the Closing occurs in accordance with this Section 2.1 is referred to in this Agreement as the "Closing Date." The parties acknowledge and agree that neither the parties nor their Representatives shall be

-3-

required to be physically present at the Closing, it being expected that, to the maximum extent practicable, all steps required to be taken at the Closing may be taken through the delivery of documents by Electronic Transmission or by any other reasonable means.

SECTION 2.2. *Closing Deliveries by the Sellers.* At the Closing, each Seller shall deliver, or shall cause to be delivered, to the Purchaser each of the following:

(a)    an Assignment, duly executed by such Seller, pursuant to which such Seller shall assign and transfer the portion of the Minority Interest owned by it to the Purchaser and withdraw as a member of Oncor;

(b)    a certificate, dated as of the Closing Date, of a duly authorized officer of such Seller to the effect set forth in Section 6.2(a) and Section 6.2(b);

(c)    evidence reasonably satisfactory to the Purchaser that this Agreement and the transactions contemplated hereby have been duly authorized by such Seller by all necessary limited liability company action and all necessary action on the part of its members, including the delivery of a certificate of an appropriate officer of such Seller certifying (i) that the resolutions of the managers and members of such Seller authorizing and approving the execution, delivery and performance of this Agreement by such Seller have been duly adopted and are in full force and effect and as of the Closing Date have not been amended, modified or rescinded and (ii) that the authorized officers of such Seller executing this Agreement are duly authorized to execute the same;

(d)    a Seller Release, duly executed by such Seller, pursuant to which such Seller shall release certain Claims against the Company and its Affiliates; and

(e)    a certificate from the Secretary of State of the State of Delaware as to the existence and good standing of such Seller as of a date no later than three days prior to the Closing Date.

SECTION 2.3. *Closing Deliveries by the Purchaser.* At the Closing, the Purchaser shall deliver, or cause to be delivered, to each Seller each of the following:

(a)    the TTI Purchase Price (in the case of TTI) or the Oncor Management Purchase Price (in the case of Oncor Management), in each case by wire transfer of immediately available funds to such account or accounts as the applicable Seller shall have specified to the Purchaser in writing at least 48 hours prior to the Closing;

(b)    a certificate, dated as of the Closing Date, executed by a duly authorized officer of the Purchaser to the effect set forth in Section 6.3(a) and Section 6.3(b);

(c)    a countersigned Assignment with respect to each portion of the Minority Interest;

(d)    evidence reasonably satisfactory to such Seller that this Agreement and the transactions contemplated hereby have been duly authorized by the Purchaser by all necessary limited liability company or corporate action, as applicable, and all necessary

action on the part of its members or shareholders, as applicable, including the delivery of a certificate of an appropriate officer of the Purchaser certifying (i) that the resolutions of the applicable management committee or board of directors of the Purchaser authorizing and approving the execution, delivery and performance of this Agreement by the Purchaser have been duly adopted and are in full force and effect as of the Closing Date and have not been amended, modified or rescinded and (ii) that the authorized officers of the Purchaser executing this Agreement are duly authorized to execute the same; and

      (e)    a certificate from the Secretary of State of the State of [Delaware/Maryland] as to the existence and good standing of the Purchaser as of a date no later than three days prior to the Closing Date.

      SECTION 2.4. *Proceedings at Closing.* All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously, and no proceedings shall be deemed taken nor any documents executed or delivered until all have been taken, executed and delivered.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES
## OF THE SELLERS

      Each Seller, severally and not jointly, hereby represents and warrants to the Purchaser (as to itself only and not as to the other Seller) that, on and as of the date of this Agreement and the Closing Date:

      SECTION 3.1. *Organization; Power and Authority.* Such Seller is a limited liability company duly organized, validly existing and in good standing under the Delaware Limited Liability Company Act. Such Seller has all requisite limited liability company power and authority to own the portion of the Minority Interest owned by it, to enter into this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.

      SECTION 3.2. *Authorizations; Execution and Validity.* The execution and delivery by such Seller of this Agreement, the performance by such Seller of its obligations hereunder and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary limited liability company action on the part of such Seller and all necessary action, if any, on the part of its members. This Agreement has been, and at the Closing, the Assignment and Seller Release will be, duly and validly executed and delivered by such Seller and constitutes or will constitute a valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, subject to the Enforceability Exceptions.

      SECTION 3.3. *Regulatory Approvals and Filings.* Except for (i) the Company Approvals or (ii) as set forth in Section 3.3 of the Seller Disclosure Schedule delivered by such Seller to the Purchaser on the date hereof (the "<u>Applicable Seller Disclosure Schedule</u>"), no notices, reports or other filings are required to be made by such Seller with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by such Seller from, any federal, state or local, domestic or foreign governmental or regulatory

authority, agency, commission, body, arbitrator, court, regional reliability entity or any other legislative, executive or judicial governmental entity (each, a "Governmental Entity") in connection with the execution, delivery and performance by such Seller of this Agreement or the consummation by such Seller of the transactions contemplated hereby, except for any such notices, reports, filings, consents, registrations, approvals, permits or authorizations which, if not made or obtained, would not reasonably be expected to prevent, materially restrict or impair or otherwise adversely affect in any material respect the ability of such Seller to perform its obligations under and consummate the transactions contemplated by this Agreement.

SECTION 3.4.   *No Conflicts.*   Except as set forth in Section 3.4 of the Applicable Seller Disclosure Schedule, the execution, delivery and performance by such Seller of this Agreement does not or, in the case of the Assignment and the Seller Release, will not, and the consummation of the transactions contemplated hereby will not, constitute or result in (i) a breach or violation of, or a default under, or other conflict with, the certificate of formation or limited liability company agreement or other Organizational Documents of such Seller, (ii) the creation of, or imposition on such Seller of any obligation to create or enforce, any Lien upon the portion of the Minority Interest owned by it, (iii) a violation or breach of, or a default under any Contract of such Seller, or (iv) a violation of any Law or Order to which such Seller or its properties or assets are subject, except, in the case of clauses (iii) and (iv) above, for any breach, violation, default or other matter that would not reasonably be expected to prevent, materially restrict or impair or otherwise adversely affect in any material respect the ability of such Seller to perform its obligations under and consummate the transactions contemplated by this Agreement.

SECTION 3.5.   *Title to Minority Interest.*   The portion of the Minority Interest owned by such Seller is owned beneficially and of record by such Seller, free and clear of any Liens and Claims, other than (i) restrictions on transfer under federal and state securities laws and (ii) restrictions under the express terms of the Oncor LLC Agreement.  Upon the sale, transfer and delivery of the portion of the Minority Interest owned by such Seller in accordance with the terms of this Agreement, such Seller shall not have any Equity Interest of any kind in the Company, it being understood that good and valid title to any Equity Interests formerly held by it shall pass exclusively to the Purchaser pursuant to this Agreement.

SECTION 3.6.   *Litigation.*   There are no Proceedings pending or, to such Seller's knowledge, threatened against such Seller (i) that question the validity of this Agreement or any action taken or to be taken by such Seller in connection with, or which seek to enjoin or to obtain monetary damages in respect of, this Agreement or the consummation of the transactions contemplated hereby or (ii) that would reasonably be expected to prevent, materially restrict or impair or otherwise adversely affect in any material respect the ability of such Seller to perform its obligations under and consummate the transactions contemplated by this Agreement.

SECTION 3.7.   *Affiliate Transactions.*   There are no Contracts, arrangements, liabilities or obligations between such Seller, on the one hand, or the Company or any of its Subsidiaries, on the one hand, that will continue in effect or give rise to any material obligation on the part of the Company or any of its Subsidiaries after the Closing Date.  After

giving effect to the Closing, neither such Seller nor any of its Affiliates will have any interest in any properties, assets, rights or entitlements held or used by the Company or any of its Subsidiaries in connection with their respective businesses or operations.

SECTION 3.8. *Sophisticated Party; Access to Information.*

(a)    Such Seller is an informed sophisticated investor with sufficient knowledge and experience in investment and financial matters to be capable of evaluating the risks and merits associated with the sale of the portion of the Minority Interest owned by it and the other transactions contemplated hereby.

(b)    Such Seller has read and understands the provisions of this Agreement, which it acknowledges have been negotiated among sophisticated parties on an arm's-length basis, and has obtained appropriate professional assistance with respect to all legal, Tax and accounting consequences relating to the transactions contemplated hereby.

(c)    Such Seller acknowledges that the Tax consequences of the sale of the portion of Minority Interest owned by it will depend on such Seller's particular circumstances, and neither the Purchaser nor any of its Affiliates or Representatives, or any other Person, will be responsible or liable for the Tax consequences to such Seller arising from the sale of such portion of the Minority Interest and the other transactions contemplated hereby, and such Seller will rely upon its own advisers with respect to the Tax consequences of such transactions.

SECTION 3.9. *Fees.* Such Seller has not paid and has not and will not become obligated to pay any fee or commission to any broker, finder or other intermediary in connection with the transactions contemplated by this Agreement for which the Purchaser, the Company or any of their Affiliates will have any liability or responsibility whatsoever.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to each Seller as follows:

SECTION 4.1. *Organization; Power and Authority.* As of the date hereof, the Purchaser is a limited liability company duly formed, validly existing and in good standing under the Delaware Limited Liability Company Act and has all requisite limited liability company power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted. As of the Closing Date, the Purchaser will be a corporation duly incorporated, validly existing and in good standing under [the General Corporation Law of the State of Maryland/the Delaware General Corporation Law], and will have all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted.

SECTION 4.2. *Authorizations; Execution and Validity.* As of the date hereof, the Purchaser has taken all limited liability company action necessary in order to execute, deliver and perform its obligations under this Agreement. As of the Closing Date, the Purchaser will have taken all corporate action necessary in order to execute, deliver and perform its

-7-

obligations under this Agreement. This Agreement has been duly and validly executed and delivered by the Purchaser and constitutes a valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to the Enforceability Exceptions.

SECTION 4.3. *Regulatory Approvals and Filings.* Except for the Parent Approvals, no notices, reports or other filings are required to be made by the Purchaser with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by the Purchaser from, any Governmental Entity in connection with the execution, delivery and performance of this Agreement and the consummation by the Purchaser of the transactions contemplated hereby, except for any such notices, reports, filings, consents, registrations, approvals, permits or authorizations which, if not made or obtained, would not reasonably be expected to prevent, materially restrict or impair or otherwise adversely affect in any material respect the ability of the Purchaser to perform its obligations under and consummate the transactions contemplated by this Agreement.

SECTION 4.4. *No Conflicts.* The execution, delivery and performance by the Purchaser of this Agreement does not, and the consummation of the transactions contemplated hereby will not, constitute or result in (i) a breach or violation of, or a default under, its Organizational Documents; (ii) a violation or breach of, or a default under, any Contract to which the Purchaser is a party; or (iii) assuming the receipt of the Parent Approvals, a violation of any Law or any Order applicable to the Purchaser or its properties or assets, except, in the case of clauses (ii) and (iii) above, for any breach, violation, default or other matter that would not reasonably be expected to prevent, materially restrict or impair or otherwise adversely affect in any material respect the ability of the Purchaser to perform its obligations under and consummate the transactions contemplated by this Agreement.

SECTION 4.5. *Litigation.* There are no Proceedings pending or, to the knowledge of the Purchaser, threatened against the Purchaser (i) that question the validity of this Agreement or any action taken or to be taken by the Purchaser in connection with, or that seek to enjoin or obtain monetary damages in respect of, this Agreement or the consummation by the Purchaser of the transactions contemplated hereby or (ii) that would reasonably be expected to prevent, materially restrict or impair or otherwise adversely affect in any material respect the ability of the Purchaser to perform its obligations under and consummate the transactions contemplated by this Agreement.

SECTION 4.6. *Sophisticated Purchaser; Investment Intent.*

(a)     The Purchaser is an informed sophisticated investor with sufficient knowledge and experience in investment and financial matters to be capable of evaluating the risks and merits associated with the acquisition of the Minority Interest and the other transactions contemplated hereby.

(b)     The Purchaser has read and understands the provisions of this Agreement, which it acknowledges have been negotiated between sophisticated parties on an arm's-length basis, and has obtained appropriate professional assistance with respect to all legal, Tax and accounting consequences relating to the transactions contemplated hereby.

-8-

(c)     The Purchaser is not acquiring the Minority Interests with a view toward any distribution thereof that would violate the registration requirements of the Securities Act or any applicable provisions of state securities or "blue sky" laws.

SECTION 4.7.   *Financing.*  At the Closing, assuming that the conditions to the obligations of the Purchaser to consummate the transactions provided for in this Agreement have been satisfied, the Purchaser will have sufficient funds to pay the TTI Purchase Price and the Oncor Management Purchase Price and all related fees and expenses payable by the Purchaser.

SECTION 4.8.   *Fees.*  The Purchaser has not paid and has not and will not become obligated to pay any fee or commission to any broker, finder or other intermediary in connection with the transactions contemplated by this Agreement for which the Sellers or any of their respective Affiliates will have any liability or responsibility whatsoever.

## ARTICLE V
## COVENANTS

SECTION 5.1.   *Interim Actions.*  During the period (the "Interim Period") commencing on the date hereof and ending upon the earlier of the Termination Date or the Closing Date, except (i) as otherwise specifically permitted by the terms of this Agreement, (ii) as the Purchaser may approve in writing or (iii) as is required by any applicable Law or any Order of any Governmental Entity, each Seller shall not take any action to authorize, approve or facilitate:

(a)     an amendment to or change in the Organizational Documents of the Company or any of its Subsidiaries;

(b)     any merger or consolidation between the Company or any of its Subsidiaries, on the one hand, and any other Person, on the other hand;

(c)     the adoption or implementation of a plan of complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization with respect to the Company or any of its Subsidiaries;

(d)     the issuance, sale, pledge, disposition of, grant, transfer, lease, license, guarantee or encumbrance of any Equity Interests in the Company or its Subsidiaries;

(e)     any action that constitutes or results in a violation by EFH or EFIH of its covenants with respect to Oncor Holdings or the Company in the Merger Agreement;

(f)     any action that constitutes or results in a violation by the Company of its covenants under the Oncor Letter Agreement; or

(g)     any agreement to do any of the foregoing.

SECTION 5.2. *Reasonable Best Efforts.*

(a)      Upon the terms and subject to the conditions of this Agreement, each of the parties shall use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable in connection with the preparation for or consummation of the transactions contemplated by this Agreement, including the preparation and filing of all forms, registrations and notices required to be filed with Governmental Entities or other Persons in connection with the consummation of the transactions contemplated hereby, and the taking of such actions as are necessary to obtain any requisite consents, Orders, Permits, qualifications, exemptions or waivers from any Governmental Entity or other Person. In addition, no party shall take any action (other than any action required to be taken under the terms of this Agreement or to which the other parties shall have granted their consent) that could reasonably be expected to materially delay the obtaining of, or result in not obtaining, any consent, Order, Permit, qualification, exemption or waiver from any Governmental Entity or other Person necessary, proper or advisable to consummate the transactions contemplated by this Agreement.

(b)      Without limiting the generality of Section 5.2(a), (i) no Seller shall intentionally take or permit any of its controlled Affiliates to take any action that is reasonably likely to prevent in any material respect the consummation of the transactions contemplated by the Merger Agreement or the transactions contemplated by the Oncor Letter Agreement (the "Oncor Transactions"), including, in each case, the IPO Conversion Plan, and (ii) each Seller shall exercise its rights, if any, that it has as an equityholder of the Company or as a party to the Oncor LLC Agreement or the Investor Rights Agreement (including its right to consent and vote), if any, and take other actions within its reasonable control so as to cause the Company to comply with its covenants and agreements set forth in the Oncor Letter Agreement and to take other such actions as are necessary, proper or advisable to facilitate the consummation by the Company or its members of the Oncor Transactions.

SECTION 5.3. *Transfer Taxes.* The Sellers and the Purchaser shall cooperate with each other and take any reasonable actions that are required to ensure that no documentary, stamp, sales and excise or other similar Taxes are payable in respect of the purchase and sale of the Minority Interest. To the extent that, notwithstanding the immediately preceding sentence, any documentary, stamp, sales and excise or other similar Taxes are required to be paid in respect of the purchase and sale of any portion of the Minority Interest, such Taxes shall be borne by the Purchaser.

SECTION 5.4. *Confidential Information.*

(a)      Each Seller hereby acknowledges that, by reason of its ownership of equity interests in the Company, it has acquired, and may acquire after the date of this Agreement in the ordinary course of business or in connection with the transactions contemplated hereby, confidential or proprietary information relating to the affairs, operations, assets, liabilities, personnel, results of operations and financial condition of the Company and its Subsidiaries ("Oncor Confidential Information"). Each Seller further acknowledges that the Purchaser and the Company would be irreparably damaged if at any time after the Closing any Oncor Confidential Information possessed by such Seller or any of its Affiliates or their respective

-10-

Representatives were disclosed to or used by any Person other than the Purchaser or the Company or their respective Affiliates.

(b)     From and after the Closing, each Seller covenants and agrees that it shall not, and shall cause its Affiliates not to, and that it shall use reasonable efforts to cause its officers, directors, employees, representatives and agents not to, use or disclose any Oncor Confidential Information, except with the prior written consent of the Purchaser. Furthermore, each Seller shall not disclose the terms of this Agreement to any third party (other than its Representatives who need such information in connection with the consummation or implementation of the transactions contemplated hereby and who are subject to similar obligations of confidentiality and restrictions on use as are applicable to the Seller under this Section 5.3).

(c)     If a Seller is requested or required by any Governmental Entity to disclose any Oncor Confidential Information, then such Seller shall provide the Purchaser with prompt written notice of such request or requirement to the extent such notice is not prohibited by applicable Law. The parties shall cooperate in attempting to obtain any reasonable protective relief that the Purchaser chooses to seek with respect to any Oncor Confidential Information. If, after the parties have had a reasonable opportunity to seek such relief, such Seller is compelled to disclose any Oncor Confidential Information, such Seller may nonetheless disclose only the portion of such Oncor Confidential Information which its legal counsel advises it is compelled to disclose.

SECTION 5.5.  *Notice of Current Events.*  At all times during the period from and after the date of this Agreement until Closing Date, the Sellers and the Purchaser shall promptly notify each other orally and in writing upon (i) receipt of any written communication from any Person alleging that the consent of such Person (or another Person) is required in connection with the transactions contemplated by this Agreement or the Oncor Transactions; (ii) becoming aware of any occurrence, or non-occurrence, of any event that, individually or in the aggregate, would cause any of the representations or warranties of such party or parties contained in this Agreement to be or to become untrue or inaccurate; (iii) receipt of any material notice or other communication from any Governmental Entity in connection with the sale of Interests under this Agreement and (iv) the commencement of any Action that, if pending on the date of this Agreement, would have been required to be disclosed pursuant to, in the case of either Seller, Section 3.3, or, in the case of the Purchaser, Section 4.3.

SECTION 5.6.  *Publicity.*  The parties shall consult with each other prior to issuing any press releases or making any public announcements with respect to the sale of Interests under this Agreement (including any initial press release regarding this Agreement); *provided,* that the Purchaser and its legal counsel, agents, and representatives shall not be required to consult with the Sellers prior to making filings on the docket of, or statements on the record before, the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby; *provided, further,* that Purchaser, on the one hand, and the Sellers, on the other hand, may, without the prior consent of the other party or parties, but only following consultation with the other party or parties to the extent reasonably practicable, issue such public disclosure as may be required by applicable Law to which the disclosing party is subject.

SECTION 5.7. *Further Assurances.* Each party shall execute and deliver both before and after the Closing such further certificates, agreements and other documents and take such other actions as the other parties may reasonably request which are necessary or appropriate to consummate or implement the transactions contemplated hereby.

## ARTICLE VI
## CONDITIONS TO CLOSING

SECTION 6.1. *Conditions to the Obligations of the Parties.* The obligations of each of the parties to consummate the transactions contemplated hereby at the Closing are subject to the satisfaction (or the waiver in writing by all of the parties, to the extent permitted by Law) of the following conditions:

(a)     *Merger Closing.* The Equity Draw-Down to be completed at the First Closing pursuant to the Merger Agreement shall have occurred prior to or concurrently with the Closing.

(b)     *No Order.* No Law or Order shall be in effect prohibiting, enjoining or restraining the consummation of the sale of Interests under this Agreement.

SECTION 6.2. *Conditions to the Obligations of the Purchaser.* The obligations of the Purchaser to consummate the transactions contemplated hereby are subject to the satisfaction (or the waiver in writing by the Purchaser) at or prior to the Closing of the following conditions:

(a)     *Accuracy of Representations.* The representations and warranties of each Seller made in this Agreement shall be true and correct in all material respects on and as of the Closing Date (other than representations and warranties that address matters only as of a specific date, which shall be true and correct in all material respects as of such date). In addition, the Purchaser shall have received a certificate, dated as of the Closing Date, of a duly authorized officer of each of the Sellers, affirming that the condition set forth in this Section 6.2(a) (as it relates to the representations and warranties of the applicable Seller) has been satisfied.

(b)     *Performance of Covenants.* Each Seller shall have performed and complied with, in all material respects, all covenants and agreements contained in this Agreement which are required to be performed or complied with by it at or prior to the Closing. In addition, the Purchaser shall have received a certificate, dated as of the Closing Date, of a duly authorized officer of each of the Sellers, affirming that the condition set forth in this Section 6.2(b) (as it relates to the covenants and agreements of the applicable Seller) has been satisfied.

(c)     *Closing Deliveries.* The Purchaser shall have received each of the documents and other items to be delivered by the Sellers pursuant to Section 2.2.

SECTION 6.3. *Conditions to the Obligations of the Sellers.* The obligations of each Seller to consummate the transactions contemplated hereby are subject to the satisfaction (or waiver in writing by each Seller) at or prior to the Closing of the following conditions:

-12-

(a)      *Accuracy of Representations.* The representations and warranties of the Purchaser made in this Agreement shall be true and correct in all material respects on and as of the Closing Date (other than representations and warranties that address matters only as of a specific date, which shall be true and correct in all material respects as of such date). In addition, each Seller shall have received a certificate, dated as of the Closing Date, of a duly authorized officer of the Purchaser, affirming that the condition set forth in this Section 6.3(a) has been satisfied.

(b)      *Performance of Covenants.* The Purchaser shall have performed and complied with, in all material respects, all covenants and agreements contained in this Agreement that are required to be performed or complied with by it at or prior to the Closing. In addition, each Seller shall have received a certificate, dated as of the Closing Date, of a duly authorized officer of the Purchaser, affirming that the condition set forth in this Section 6.3(b) has been satisfied.

(c)      *Closing Deliveries.* Such Seller shall have received the documents and other items to be delivered by the Purchaser pursuant to Section 2.3.

## ARTICLE VII
## DEFINITIONS

SECTION 7.1. *Definitions.* As used in this Agreement, the terms set forth below shall have the following respective meanings:

"Affiliate" means, with respect to a Person, another Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. For the purposes of this definition, the term "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"Assignment" means an Assignment of Interest, in the form attached hereto as Exhibit A, to be executed at the Closing by each of the Sellers in favor of the Purchaser.

"Backstop Agreement" has the meaning set forth in the Merger Agreement.

"Business Day" shall mean any day other than a Saturday or Sunday or a day on which banks are required or authorized to close in New York, New York.

"Change of Control" has the meaning set forth in the Investor Rights Agreement.

"Claim" means any demand, claim, cause of action or chose in action, right of recovery or right of set-off of any kind of character.

"Company Approvals" has the meaning set forth in the Merger Agreement.

"Contract" means any loan or credit agreement, bond, debenture, note, mortgage, indenture, guarantee, lease, purchase order or other contract, commitment, agreement,

-13-

instrument, arrangement, understanding, obligation, undertaking, permit, concession, franchise or license, whether oral or written, together with all amendments thereto.

"Electronic Transmission" means any form of electronic communication (such as facsimile transmission or email) that is generally accepted as a means of communication and that (i) creates a record that may be retained, retrieved, and reviewed by the recipient and (ii) may be directly reproduced in paper form by the recipient through an automated process.

"Enforceability Exceptions" means, with reference to the enforcement of the terms and provisions of this Agreement, that the enforcement thereof is or may be subject to the effect of (i) applicable bankruptcy, receivership, insolvency, reorganization, moratorium, fraudulent conveyance, fraudulent transfer and other similar Laws relating to or affecting the enforcement of the rights and remedies of creditors; and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity) and the exercise of equitable powers by a court of competent jurisdiction.

"Entity" means any corporation, partnership (whether general or limited), limited liability company, trust (including a common law trust, statutory trust, voting trust or any other form of trust), estate, association (including any group, organization, co-tenancy, plan, board, council or committee), Governmental Entity or other entity or body whatsoever, excluding only an individual.

"Equity Commitment Letter" has the meaning set forth in the Merger Agreement.

"Equity Draw-Down" has the meaning set forth in the Merger Agreement.

"Equity Interests" means (i) with respect to any corporation, all shares, interests, participations or other equivalents of capital stock of such corporation, however designated, and any warrants, options or other rights to purchase or acquire any such capital stock and any securities convertible into or exchangeable or exercisable for any such capital stock, (ii) with respect to any partnership, all partnership interests, participations or other equivalents of partnership interests of such partnership, however designated, and any warrants, options or other rights to purchase or acquire any such partnership interests and any securities convertible into or exchangeable or exercisable for any such partnership interests, and (iii) with respect to any limited liability company, all units, interests, participations or other equivalents of membership interests of such limited liability company, however designated, and any warrants, options or other rights to purchase or acquire any such membership interests and any securities convertible into or exchangeable or exercisable for any such membership interests.

"First Closing" has the meaning set forth in the Merger Agreement.

"IPO Conversion" has the meaning set forth in the Investor Rights Agreement.

"Law" means any applicable constitutional provision, statute, act, code, law, regulation, rule, ordinance, order, decree, ruling, proclamation, resolution, judgment, decision, declaration, or interpretative or advisory opinion or letter of a Governmental Entity.

"Lien" means, with respect to any properties or assets, any mortgage, pledge, hypothecation, assignment, security interest, lien or encumbrance or security agreement or arrangement on or with respect to, or affecting title to, such properties or assets.

"LLC Units" has the meaning set forth in the Oncor LLC Agreement.

"Losses" means any and all Claims, judgments, settlements, liabilities, obligations, damages, losses, deficiencies, costs, penalties, interest, costs and expenses.

"Oncor Letter Agreement" means that certain Letter Agreement, dated as of August August 28, 2015, by and among Oncor, Oncor Holdings, the Purchaser and OV2.

"Order" means any order, judgment, injunction, ruling or decree of any court or Governmental Entity.

"Organizational Documents" means (i) in the case of any Entity organized as a corporation, the certificate or articles of incorporation of such corporation (or, if applicable, the memorandum and articles of association of such corporation), (ii) in the case of any Entity organized as a limited partnership, the certificate of limited partnership and partnership agreement of such limited partnership, (iii) in the case of any Entity organized as a limited liability company, the certificate of formation or organization and the limited liability company agreement, operating agreement or regulations of such limited liability company and (iv) in the case of any other Entity, all constitutive or organizational documents of such Entity which address all matters relating to the business and affairs of such Entity similar to the matters addressed by the documents referred to in clauses (i) through (iii) above.

"Parent Approvals" has the meaning set forth in the Merger Agreement.

"Permit" means any permit, license, registration, or authorization issued by a Governmental Entity.

"Person" means an Entity or an individual.

"Proceeding" means any judicial, administrative or arbitral action, suit or proceeding (whether civil or criminal, public or private) by or before any court or Governmental Entity or arbitrator or arbitration tribunal.

"Representatives" means, with respect to any party or other Person, the directors, officers, managers, members, shareholders, advisors, independent accountants, agents or other representatives of such party or other Person.

"Securities Act" means the Securities Act of 1933, as amended, or any successor statute.

"Seller Release" means the Release, in the form attached as Exhibit B hereto, to be executed at the Closing by each Seller in favor of the Company and its Affiliates.

"Subsidiary" means, with respect to any Person, (i) any corporation, partnership, limited liability company or other Entity of which Equity Interests having ordinary voting power to elect a majority of the board of directors or other similar managing body of such corporation, partnership, limited liability company or other Entity or having the right to receive more than 50% of the distributions to be made by such corporation, partnership, limited liability company or other Entity (either generally or upon liquidation of such corporation, partnership, limited liability company or other Entity) are at the time owned by such Person or (ii) any corporation, partnership, limited liability company or other Entity directly or indirectly "controlled" (as such term is defined for purposes of the definition of the term "Affiliate") by such Person.

"Tax" or "Taxes" means any taxes, assessments, and similar governmental charges imposed by any Governmental Entity, including all income, profits, franchise, withholding, *ad valorem*, personal property (tangible and intangible), employment, payroll, sales and use, social security, disability, occupation, property, severance and excise taxes, including any interest, penalty or addition thereto.

"Tax Return" means any return, report or similar statement required to be filed with respect to any Taxes, including any information return, claim or refund, amended return and declaration of estimated Tax.

"Termination Date" means the date on which the Merger Agreement is validly terminated in accordance with its terms.

SECTION 7.2. *Additional Definitions.* Each of the terms set forth below has the meaning set forth in the provision set forth opposite such term in the following table:

| Term | Provision |
| --- | --- |
| Agreement | Preamble |
| Applicable Seller Disclosure Schedule | Section 3.3 |
| Bankruptcy Court | Recitals |
| Chapter 11 Cases | Recitals |
| Closing | Section 2.1 |
| Closing Date | Section 2.1 |
| Company | Recitals |
| Debtors | Recitals |
| EFH | Recitals |
| EFIH | Recitals |
| Governmental Entity | Section 3.3 |
| Initial Public Offering | Recitals |
| Interim Period | Section 5.1 |
| Investor Rights Agreement | Recitals |
| Investors | Recitals |
| IPO Conversion Plan | Recitals |
| IPO Corporation | Recitals |
| IPO Units | Recitals |
| Merger | Recitals |

-16-

| Term | Provision |
|---|---|
| Merger Agreement | Recitals |
| Merger Closing | Recitals |
| Minority Interest | Section 1.1 |
| Offer | Recitals |
| Oncor Confidential Information | Section 5.4(a) |
| Oncor Holdings | Recitals |
| Oncor LLC Agreement | Recitals |
| Oncor Management | Preamble |
| Oncor Management Interest | Recitals |
| Oncor Management Purchase Price | Section 1.2(a) |
| Oncor Transactions | Section 5.2(b) |
| OV2 | Recitals |
| Plan of Reorganization | Recitals |
| Purchaser | Preamble |
| Required Sale | Recitals |
| Sellers | Preamble |
| TTI | Preamble |
| TTI Interest | Recitals |
| TTI Purchase Price | Section 1.2(b) |

## ARTICLE VIII
## GENERAL

SECTION 8.1. *Modification or Amendment.* At any time prior to or after the Closing Date, the parties hereto may modify or amend this Agreement by written agreement executed and delivered by duly authorized officers of each of the parties.

SECTION 8.2. GOVERNING LAW AND VENUE; WAIVER OF JURY TRIAL.

(a)   THIS AGREEMENT, TOGETHER WITH ANY CLAIM, DISPUTE, REMEDY OR LEGAL PROCEEDING ARISING FROM OR RELATING TO THIS AGREEMENT OR ANY RELIEF OR REMEDIES SOUGHT BY ANY PARTY HERETO, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. Each of the parties hereto (i) submits to the exclusive jurisdiction of the Chancery Court of the State of Delaware, and if the Chancery Court of the State of Delaware declines jurisdiction, then any state or federal court sitting in Delaware, in any action or proceeding arising out of or relating to this Agreement, (ii) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court and (iii) agrees not to bring any action or proceeding arising out of or relating to this Agreement (whether on the basis of a claim sounding in contract, equity, tort or otherwise) in any other court. Each of the parties hereto agrees that a final judgment (subject to any

-17-

appeals therefrom) in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby in any court specified in accordance with the provisions of this Section 8.2(a). Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each of the parties hereto hereby irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 8.3. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by Law.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (W) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (X) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (Y) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (Z) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 8.2(B).

SECTION 8.3. *Notices.* Any notice, request, instruction or other document to be given hereunder by any party to the other parties shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, by email or overnight courier:

If to TTI:

Texas Transmission Investment LLC
c/o Borealis Infrastructure Corporation
c/o Borealis Infrastructure Management Inc.
Royal Bank Plaza, South Tower
200 Bay Street
Suite 2100, P.O. Box 56
Toronto, Ontario M5J 2J2, Canada

Attention:

Email:

-18-

and

    c/o Cheyne Walk Investment Pte Ltd.
    c/o GIC Special Investment Pte Ltd.
    1st Floor, York House
    45 Seymour Street
    London W1H 7LX
    United Kingdom

Attention:
Email:

with copies (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP

Attention:
Email:

If to Oncor Management:

Oncor Management Investment LLC
    c/o Oncor Electric Delivery Company LLC
    Energy Plaza
    1601 Bryan Street
    Dallas, Texas 75201-3411

Attention:
Email:

with copies (which shall not constitute notice) to:

Jones Day
222 East 41st Street
New York, New York 10017

Attention:          Corinne Ball
Email:             cball@jonesday.com

and

Jones Day
2727 North Harwood Street
Dallas, Texas 75201

-19-

Attention:                    Patricia J. Villareal
Michael L. Davitt

Email:                        pjvillareal@jonesday.com
mldavitt@jonesday.com

If to the Purchaser:

Hunt Consolidated, Inc.
1900 North Akard Street
Dallas, Texas  75201
Attention:
Email:                   David Hernandez
DHernandez@huntconsolidated.com

with copies (which shall not constitute notice) to:

Baker Botts L.L.P.
2001 Ross Ave., Suite 600
Dallas, Texas 75201
Attention:                    Geoffrey L. Newton
Luckey McDowell
Preston Bernhisel
Email:                     geoffrey.newton@bakerbotts.com
luckey.mcdowell@bakerbotts.com
preston.bernhisel@bakerbotts.com

and

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131

Attention:                    Thomas E. Lauria
Email:                     tlauria@whitecase.com

and

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036

Attention:                    Gregory Pryor
Email:                     gpryor@whitecase.com

or to such other persons or addresses as may be designated in writing by the party to receive such notice as provided above. Any notice, request, instruction or other document given as provided above shall be deemed given to the receiving party (i) upon actual receipt, if delivered personally; (ii) three (3) Business Days after deposit in the mail, if sent by registered or certified mail; (iii) upon receipt if sent by email and received by 5:00 pm (Eastern Time), on a Business Day (otherwise the next Business Day) *(provided,* that if given by email such notice, request, instruction or other document shall be followed up within one (1) Business Day by dispatch pursuant to one of the other methods described herein); or on the next Business Day after deposit with an overnight courier, if sent by an overnight courier.

SECTION 8.4. *Termination.* This Agreement may be terminated at any time prior to the closing of the Transactions, by mutual written consent of the parties hereto. In addition, this Agreement shall terminate, automatically and without any action of any of the parties hereto, upon the Termination Date.

SECTION 8.5. *Entire Agreement.* This Agreement embodies the entire agreement and understanding of the parties in respect of the subject matter hereof and supersedes all prior agreements and understandings between the parties with respect to such subject matter. EACH PARTY HERETO AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, NEITHER OF THE SELLERS NOR THE PURCHASER MAKES ANY OTHER REPRESENTATIONS OR WARRANTIES, AND EACH PARTY HEREBY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OR AS TO THE ACCURACY OR COMPLETENESS OF ANY OTHER INFORMATION, MADE BY, OR MADE AVAILABLE BY, ITSELF OR ANY OF ITS REPRESENTATIVES, WITH RESPECT TO, OR IN CONNECTION WITH, THE NEGOTIATION, EXECUTION OR DELIVERY OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO THE OTHER OR THE OTHER'S REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING. The parties hereby further represent that, in entering into this Agreement (i) they have been represented and advised by counsel in connection with this Agreement, which they have entered into voluntarily and of their own choice, and not under coercion or duress; (ii) they are relying upon their own knowledge and the advice of counsel; (iii) they knowingly waive any claim that this Agreement was induced by any misrepresentation or nondisclosure which could have been or was discovered before signing this Agreement; and (iv) they knowingly waive any right to rescind or avoid this Agreement based upon presently existing facts, known or unknown.

SECTION 8.6. *Severability.* The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (i) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability,

-21-

nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

SECTION 8.7. *Assignment.* This Agreement shall not be assignable by operation of law or otherwise without the written consent of the non-assigning parties hereto. Any purported assignment in violation of this Agreement is void.

SECTION 8.8. *No Third Party Beneficiaries.* Each Seller and the Purchaser hereby agree that their respective covenants set forth herein are solely for the benefit of the other parties hereto, in accordance with and subject to the terms of this Agreement, and this Agreement is not intended to, and does not, confer upon any Person other than the parties hereto any rights or remedies hereunder, including the right to rely upon the covenants set forth herein.

SECTION 8.9. *Remedies.* The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, each of the parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement, without the proof of irreparable damage or any actual damages or losses whatsoever, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches. Each party irrevocably agrees to waive any requirement for the security or posting of any bond in connection with such equitable remedy.

SECTION 8.10. *Interpretation; Construction.*

(a)     The table of contents and headings herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof. Where a reference in this Agreement is made to a section, exhibit or schedule, such reference shall be to a section of or exhibit or schedule to this Agreement unless otherwise indicated. Such exhibits and schedules are an integral part of this Agreement and shall be treated as if fully set forth herein. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not any particular provision of this Agreement.

(b)     The parties have participated jointly in negotiating and drafting this Agreement. In the event that an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

SECTION 8.11. *Counterparts; Electronic Execution and Delivery.* This Agreement may be executed in any number of counterparts (including by Electronic Transmission), each such counterpart being deemed to be an original instrument, with all such counterparts taken together constituting one and the same agreement. A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto, and an executed copy of this Agreement may be delivered by one or more parties hereto by

Electronic Transmission pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first above written.

TTI:

TEXAS TRANSMISSION INVESTMENT LLC,
a Delaware limited liability company

By: Texas Transmission Holdings Corporation,
its sole member

By:_____
Name:
Title:

(Signature Page to Interest Purchase Agreement)

**ONCOR MANAGEMENT:**

ONCOR MANAGEMENT INVESTMENT LLC,
a Delaware limited liability company

By: _____
Name:
Title:

**PURCHASER:**

OVATION ACQUISITION I, L.L.C.,
a Delaware limited liability company


By:_____
Name:
Title:

**Exhibit A**
**Form of Assignment**

[See attached.]

A-1

### EXHIBIT A

### FORM OF
### ASSIGNMENT
### OF
### LIMITED LIABILITY COMPANY INTEREST

This ASSIGNMENT OF LIMITED LIABILITY COMPANY INTEREST (this "Assignment") is executed as of [_____ ___], 2016 by [_____][1], a Delaware limited liability company ("Assignor"), in favor of [_____][2], a [Maryland/Delaware] corporation ("Assignee").

### W I T N E S S E T H:

WHEREAS, Assignor is a member of Oncor Electric Delivery Company LLC, a Delaware limited liability company (the "Company"), and is a party to the Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery Company LLC, dated as of November 5, 2008 (as amended, the "Oncor LLC Agreement");

WHEREAS, Assignor owns beneficially and of record [_____][3] LLC Units (as defined in the Oncor LLC Agreement), representing approximately [____]% of the outstanding Interests (as defined in the Oncor LLC Agreement) in the Company and constituting the entire Equity Interest in the Company owned or held by Assignor;

WHEREAS, Assignor, Assignee and [_____] have entered into that certain Interest Purchase Agreement, dated as of [●], 2015 (the "Interest Purchase Agreement"); and

WHEREAS, Assignor desires to sell, assign, transfer and deliver to Assignee all right, title and interest in and to the [_____][4] LLC Units in the Company owned by it and all rights, interests and privileges appurtenant thereto or derived therefrom (collectively, the "Assigned Interest"), and Assignee is willing to acquire and accept the Assigned Interest from Assignor, in each case accordance with the terms and conditions of this Assignment;

WHEREAS, capitalized terms used in this Assignment without definition have the respective meanings set forth in the Interest Purchase Agreement;

NOW, THEREFORE, in consideration of the premises, the terms and conditions set forth herein and in the Interest Purchase Agreement, the mutual benefits to be gained from the performance thereof and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

---

[1] Note: To be completed with the full name of TTI or Oncor Management, as the case may be.
[2] Note: To be completed with the full name of the Purchaser after giving effect to its conversion to a corporation.
[3] Note: To be completed to reflect 125,412,500 LLC Units, in the case of TTI, and 1,396,008 LLC Units, in the case of Oncor Management.
[4] Note: To be completed in the same manner as indicated in note 3 above.

1.    *Sale and Assignment.* Effective as of _____ [a.m./p.m.][5] on the date hereof, Assignor does hereby irrevocably sell, assign, transfer and deliver the Assigned Interests, free and clear of all Liens and Claims, other than restrictions on transfer arising under applicable federal or state securities laws or under the express terms of the Oncor LLC Agreement, to Assignee and its successors, TO HAVE AND TO HOLD the same for its and their own use forever, and Assignee hereby accepts the sale, assignment, transfer and delivery of the Assigned Interests on the terms and conditions set forth herein.

2.    *Withdrawal.* Effective immediately after giving effect to the sale, assignment, transfer and delivery of the Assigned Interests pursuant to paragraph 1 above, Assignor does hereby withdraw as a member of the Company and acknowledges and agrees that it does not own or hold any Equity Interests in the Company or any rights, interests or privileges appurtenant thereto or derived therefrom (including, without limitation, any rights, interests or privileges with respect to income, distributions, value, voting, granting consents, designating directors or exercising any other right specified in the LLC Agreement), all of which are being sold, assigned, transferred and delivered to the Assignor pursuant to this Assignment.

3.    *Incorporation of Terms.* The following terms and provisions of the Interest Purchase Agreement are hereby incorporated into and specifically made applicable to this Assignment as between the Assignor and Assignee (*provided,* that, in construing such incorporated provisions, (i) any reference to the "parties" shall be deemed to refer to the parties to this Assignment (and references to other parties to the Interest Purchase Agreement shall be disregarded) and (ii) any reference to "this Agreement" shall be deemed to refer to this Assignment) as fully and to the same extent as if set forth herein:

| Section 8.2 | GOVERNING LAW AND VENUE; WAIVER OF JURY TRIAL |
| Section 8.6 | Severability |
| Section 8.9 | Remedies |
| Section 8.10 | Interpretation; Construction |
| Section 8.11 | Counterparts; Electronic Execution |

In the event there is any inconsistency or conflict between a term or provision of this Assignment and any incorporated term or provision of the Interest Purchase Agreement, the terms and provisions of this Assignment shall control.

4.    *Amendment.* No supplement, amendment, alteration or modification of this Assignment shall be binding unless executed in writing by each of the parties hereto and such writing expressly states that it is intended to supplement, amend, alter or modify this Assignment.

5.    *Parties in Interest.* The provisions of this Assignment shall be binding upon the Assignor and its successors and assigns, and shall inure to the benefit of Assignee and its successors and assigns.

---

[5]    Note: To be completed with the relevant time specified pursuant to Section 2.1 of the Interest Purchase Agreement.

A-2

6.    *Further Assurances.* Assignor and Assignee agree, from time to time on and after the date hereof, to execute, deliver, acknowledge, file and record, or cause to be executed, delivered, acknowledged, filed and recorded, such further instruments of sale, transfer, assignment or delivery and such further consents, certifications, affidavits and assurances as the other party may reasonably request in order to vest in the Assignee and its successors and assigns all right, title and interest in and to the Assigned Interest and otherwise to complete and perfect the transactions provided for in this Assignment.

*[Signature pages follow]*

A-3

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the date first above written.

**ASSIGNOR:**

[_____]$^6$

By:      _____
Name:  _____
Title:   _____

.

---

$^6$    Note: To be completed in the same manner as indicated in note 1 above.

(Signature Page to Assignment)

**ASSIGNEE:**

[_____]


By: _____

Name: _____

Title: _____

**Exhibit B**
**Form of Seller Release**


[See attached.]

**EXHIBIT B**

**FORM OF
SELLER RELEASE**

This SELLER RELEASE (the "Release"), is executed as of [_____], 2016, by (a) Texas Transmission Investment LLC, a Delaware limited liability company, and Oncor Management Investment LLC, a Delaware limited liability company (collectively, the "Releasing Parties"), in favor of (b) Oncor Electric Delivery Company LLC, a Delaware limited liability company (the "Company"), and the Released Persons (as defined below).

**WITNESSETH:**

WHEREAS, the Releasing Parties and Ovation Acquisition I, L.LC., a Delaware limited liability company (the "Purchaser"), have entered into that certain Interest Purchase Agreement, dated as of [●], 2015 (the "Interest Purchase Agreement"), pursuant to which, concurrently with the execution and delivery of this Release, the Releasing Parties are selling, assigning, transferring and delivering the Minority Interest to the Purchaser;

WHEREAS, Section 2.2(d) of the Interest Purchase Agreement provides that, at the Closing of the transactions contemplated thereby, the Releasing Parties will deliver this Release to the Purchaser; and

WHEREAS, capitalized terms used in this Release without definition have the respective meanings set forth in the Interest Purchase Agreement;

NOW, THEREFORE, in consideration of the premises, the terms and conditions set forth herein and in the Interest Purchase Agreement, the mutual benefits to be gained from the performance thereof and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      *Release.*  To the fullest extent permitted by Law, each Releasing Party acknowledges and agrees that, effective as of the Closing, any and all Claims that it or any of its Affiliates may have or be entitled to assert against the Company or any of its Affiliates or their respective directors, officers, employees, managers and equityholders (collectively, the "Released Persons"), whether arising under, or based upon, any Law or otherwise (including any Claims in respect of any right, whether arising at law or in equity, to collect or recover in respect of any debts, liabilities and obligations, of any nature, or to seek indemnification, contribution, cost recovery, damages or any other recourse or remedy, including as may arise under common Law), excluding only Claims in respect of the Assigned Interests that are being assigned to the Purchaser pursuant to the Assignments (the "Released Claims"), are hereby forever fully and irrevocably waived, released and discharged and, following the Closing, no claim shall be brought or maintained by, or on behalf of, such Releasing Party or any of its Affiliates against any Released Person, and no recourse shall be sought or granted against any of them, by virtue of, or based upon any Released Claims. Each of the Releasing Parties expressly acknowledges and agrees that the release provided for in this paragraph 1 shall cover and extend to any Released Claims, **regardless of whether any such Released Claims arise from the negligence or other fault of any Released Person** and whether or

not any acts on the part of the Released Persons that may constitute negligence or other fault are known to the Releasing Parties.

2.      *No Assignment of Released Claims.* Each Releasing Party hereby represents and warrants that it has not assigned to any Person any of the Released Claims or any interests therein.

3.      *Amendment.* No supplement, amendment, alteration or modification of this Release shall be binding unless executed in writing by the Purchaser and each of the parties hereto and such writing expressly states that it is intended to supplement, amend, alter or modify this Release.

4.      *Parties in Interest.* This Release shall be binding upon each Releasing Party and its successors and assigns and shall inure to the benefit of the Purchaser and Released Persons and their respective successors and assigns. It is expressly understood and agreed that the Purchaser is a third party beneficiary of this Release, and shall be entitled to enforce this release against the Releasing Parties as fully and to the same extent as if it were a party hereto.

5.      *Entire Agreement.* This Release, together with the Interest Purchase Agreement and the Assignments, embodies the entire agreement and understanding of the parties in respect of the subject matter hereof and supersedes all prior agreements and understandings between the parties with respect to such subject matter. EACH PARTY HERETO AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS RELEASE, THE INTEREST PURCHASE AGREEMENT AND THE ASSIGNMENTS, NEITHER OF THE RELEASING PARTIES NOR THE PURCHASER MAKES ANY REPRESENTATIONS OR WARRANTIES IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THE INTEREST PURCHASE AGREEMENT, AND EACH PARTY HEREBY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OR AS TO THE ACCURACY OR COMPLETENESS OF ANY OTHER INFORMATION, MADE BY, OR MADE AVAILABLE BY, ITSELF OR ANY OF ITS REPRESENTATIVES, WITH RESPECT TO, OR IN CONNECTION WITH, THE NEGOTIATION, EXECUTION OR DELIVERY OF THIS RELEASE OR THE TRANSACTIONS CONTEMPLATED HEREBY, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO THE OTHER OR THE OTHER'S REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING. The parties hereby further represent that, in entering into this Release, (i) they have been represented and advised by counsel in connection with this Release, which they have entered into voluntarily and of their own choice, and not under coercion or duress; (ii) they are relying upon their own knowledge and the advice of counsel; (iii) they knowingly waive any claim that this Release was induced by any misrepresentation or nondisclosure which could have been or was discovered before signing this Release; and (iv) they knowingly waive any right to rescind or avoid this Release based upon presently existing facts, known or unknown.

6.      *Incorporation of Terms.* The following terms and provisions of the Interest Purchase Agreement are hereby incorporated into and specifically made applicable to this Release as between each Releasing Party and the Released Parties (*provided,* that, in

construing such incorporated provisions, (i) any reference to the "parties" shall be deemed to refer to the parties to this Release (and references to other parties to the Interest Purchase Agreement shall be disregarded) and (ii) any reference to "this Agreement" shall be deemed to refer to this Release) as fully and to the same extent as if set forth herein:

| | |
|---|---|
| Section 8.2 | GOVERNING LAW AND VENUE; WAIVER OF JURY TRIAL |
| Section 8.6 | Severability |
| Section 8.9 | Remedies |
| Section 8.10 | Interpretation; Construction |
| Section 8.11 | Counterparts; Electronic Execution |

In the event there is any inconsistency or conflict between a term or provision of this Release and any incorporated term or provision of the Interest Purchase Agreement, the terms and provisions of this Release shall control.

*[Signature pages follow]*

B-3

**RELEASING PARTIES:**

TEXAS TRANSMISSION INVESTMENT LLC

By:  Texas Transmission Holdings Corporation,
     its sole member


By:_____
Name:
Title:

(Signature Page to Seller Release)

ONCOR MANAGEMENT INVESTMENT LLC

By: _____
Name:
Title:

**COMPANY:**

ONCOR ELECTRIC DELIVERY COMPANY LLC

By:_____
Name:
Title:

**Exhibit C**

**Calculation of Purchase Price**

(See attached)

## Illustrative Oncor Minority Interest Purchase Price Analysis

| Minority Interest Purchase Price (S in millions)[1] | |
|---|---|
| EFIH First Lien DIP | $5,400 |
| EFIH Second Lien Notes[2][3] | 1,936 |
| EFIH Unsecured Notes[4] | 1,653 |
| Less: OID Disallowed | -108 |
| EFH LBO Notes[4] | 64 |
| EFH Legacy Notes[4] | 606 |
| Other Creditor Claims | 48 |
| Less: EFH Cash | -720 |
| Total E-Side Debt | $8,878 |
| EFIH Ownership Percentage | 80.03% |
| Oncor Equity Value | $11,093 |
| Minority Interest Ownership Percentage | 19.97% |
| Minority Interest Purchase Price | $2,215 |
| *Implied Minority Interest IRR* [1] | *11%* |

| Oncor Equity Value Per Unit | |
|---|---|
| Oncor Equity Value | $11,093,000,000.00 |
| LLC Units | 635,000,000 |
| Oncor Equity Value Per Unit | $17.47 |
| | |
| LLC Units Held by Texas Transmission Investment LLC | 125,412,500 |
| Oncor Equity Value Per Unit | $17.47 |
| Proceeds to Texas Transmission Investment LLC | $2,190,867,500.00 |
| | |
| LLC Units Held by Oncor Management Investment LLC | 1,396,008 |
| Oncor Equity Value Per Unit | $17.47 |
| Proceeds to Oncor Management Investment LLC | $24,387,270.46 |

*(1) Assumes a March 31, 2016 emergence date*
*(2) Includes post-petition interest at contract rate and assumes no make-wholes*
*(3) Pro forma for $735 million pay down*
*(4) Includes post-petition interest at federal judgement rate*