## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re:  5248, 5696, 5700, 5703, 5705, 5858** |

### DEBTORS' OMNIBUS REPLY TO
### OBJECTIONS TO PLAN SUPPORT AGREEMENT MOTION

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") file this omnibus reply (this "<u>Reply</u>") to the objections to the motion [D.I. 5248] (the "<u>Motion</u>") for approval of the Plan Support Agreement (the "<u>PSA</u>") filed by (a) the official committee of unsecured creditors of EFH Corp., EFIH, EFIH Finance Inc., and EECI, Inc. [D.I. 5700] (the "<u>EFH Committee</u>");[2] (b) the indenture trustee for the EFIH senior toggle notes [D.I. 5705] (the "<u>EFIH PIK Trustee</u>"); (c) the indenture trustees for the PCRB notes and certain EFCH notes [D.I. 5696] (the "<u>PCRB Trustee</u>"); and (d) the Acting United States Trustee [D.I. 5858] (the "<u>U.S. Trustee</u>") (collectively, such parties, the "<u>Objectors</u>" and, such objections, the "<u>Objections</u>").  In support of this Reply, the Debtors respectfully state as follows.

---

[1]   The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]   The indenture trustee for certain EFH unsecured notes filed a joinder to the EFH Committee's objection [D.I. 5703].

**Table of Contents**

Preliminary Statement................................................................................................1

Argument ...................................................................................................................6

I.      Entry Into the PSA Is a Valid Exercise of the Debtors' Business Judgment......................6

        A.      The Motion Seeks Limited Relief That Is Subject to the Business
                Judgment Standard.........................................................................6

        B.      The PSA Is Supported by Sound Business Justifications and Costs Little to
                the Estates. ....................................................................................7

II.     All Provisions of the PSA Are Appropriate and Consistent With the Limited
        Scope of the Relief Requested. .........................................................................11

        A.      The PSA's "Go Shop" Provision Is Remarkably Favorable to the Debtors,
                Especially in Light of the Robust and Unqualified Fiduciary Out. ......................11

        B.      There Is No "Free Option" for the Parties to the PSA or the Merger
                Documents. ....................................................................................13

        C.      The Required Plan Terms and the Required Alternative Terms Are Not
                Objectionable. ................................................................................16

        D.      The Other Terms of the PSA Are Appropriate and the Debtors Have
                Revised the Proposed PSA Order to Address Certain Objections.........................20

III.    The PSA Is Not an Improper Solicitation of Plan Votes. ..................................................23

IV.     The Court Should Overrule the Other Objections. ..........................................................25

        A.      The Debtors Have Provided Sufficient Notice of the Documents
                Necessary to Evaluate and Formulate Objections. ................................................25

        B.      Waiver of the 14-Day Stay Is Justified Under Bankruptcy Rule 6004(h). ............27

Conclusion ...............................................................................................................28

## Table of Authorities

**Cases**

*Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94 (3d Cir. 1988) ........................ 23

*In re Am. Roads LLC*, 496 B.R. 727 (Bankr. S.D.N.Y. 2013) ................................................... 7, 21

*In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416 (Bankr. D. Del. Apr. 29, 2014) ....................................................................................................................... 28

*In re Fisker Auto. Holdings, Inc.*, No. 14-CV-99, 2014 WL 546036 (D. Del. Feb. 7, 2014) ....... 28

*In re Genco Shipping & Trading Ltd.*, 509 B.R. 455 (Bankr. S.D.N.Y. 2014) .............. 7, 8, 12, 20

*In re Heritage Org., L.L.C.*, 376 B.R. 783 (Bankr. N.D. Tex. 2007) ..................................... 23, 24

*In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013) .................................. 23, 24

*In re Innkeepers USA Trust*, 442 B.R. 227 (Bankr. S.D.N.Y. 2010) ............................................ 18

*In re Merck & Co., Inc.*, No. Civ. A. 05-1151 SRC, 2008 WL 2788400 (D.N.J. June 17, 2008) 19

*In re Montgomery Ward Holding Corp.*, 242 B.R. 147 (D. Del. 1999) .......................................... 6

*In re NII Holdings, Inc.*, No. 02-11505 (Bankr. D. Del. Oct. 22, 2002) [D.I. 394] ...................... 23

*In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198 (Bankr. S.D.N.Y. June 27, 2013) ............................................................................................................... passim

*In re Spansion, Inc.*, 426 B.R. 114 (Bankr. D. Del. 2010) ........................................................... 19

*In re Stations Holding Co.*, No. 02-10882 (Bankr. D. Del. Sept. 25, 2002) [D.I. 190, 196] ........ 23

**Statutes**

11 U.S.C. § 363(b) ........................................................................................................................... 6

**Other Authorities**

James Osborne, *Hunt's Play for Oncor Gets New Life in Energy Future Bankruptcy*, The Dallas Morning News (July 23, 2015), http://bizbeatblog.dallasnews.com/2015/07/hunts-play-for-oncor-gets-new-life.html/ ............................................................................................ 15

**Preliminary Statement**

1.      The PSA is a watershed in these chapter 11 cases.  From the outset, these cases were among the largest, most complex, and—not surprisingly, given the tremendous value at stake—most litigious ever.  But, after years of negotiation, process, and litigation, the Debtors and the other parties to the PSA stand before the Court with an across-the-board solution to all of the major issues that have defined these cases to date.  The Debtors respectfully request that the Court grant the Motion to approve the PSA and overrule the Objections.

2.      Fundamentally, the Objections are not to the PSA as a whole.  Indeed, even the most recalcitrant of the EFH and EFIH objecting creditors see the massive and unique benefits of the PSA—which provides substantial creditor support for a plan that would pay all EFH and EFIH allowed claims in full in cash.  Rather, when the Objectors address the PSA itself rather than substantive Plan and settlement terms, they seek to selectively edit the PSA in ways that purport to benefit their own narrow interests or they challenge the entitlement of creditor parties to the PSA to limit their own rights.  Unfortunately for these parties, that is not the governing standard for the Court's approval.  The PSA must be evaluated as it was negotiated—as an integrated whole agreed to among consenting parties—and under the rubric of the Debtors' business judgment.

3.      Under this standard, the analysis is straightforward.  The Motion requests narrow relief:  the approval of the Debtors' entry into the PSA, subject to an unlimited and unqualified fiduciary out.   This approval will keep the consenting creditor parties—and, importantly, their successors and assigns—bound to the PSA, securing the support of every major TCEH creditor class for the Plan, the Settlement Agreement, and an Alternative Restructuring.  Given the value

of these binding creditor commitments contrasted with the inconsequential cost to the Debtors of obtaining them at this time, the Court should approve the PSA.

4.      In the face of this straightforward business-judgment analysis, the Objectors adopt a kitchen-sink approach that is long on rhetoric and short on law.  To resolve Objections to the scope of certain proposed findings in the proposed order approving the Motion, the Debtors filed a revised version of the proposed order.  Otherwise, the Objectors spill ink attacking each of the significant transactions underlying the PSA, which are not yet before the Court:  the Plan, the Settlement Agreement, and the Alternative Restructuring.  But, as the Court has already stated, approval of the PSA is not approval of the Plan or Settlement Agreement.[3]  It is approval of a contract among consenting parties that has no legal effect on non-parties and for which the Debtors have an unqualified fiduciary out—this should end the inquiry as a legal matter. Nonetheless, the record must be clarified.

5.      The crux of the Objections to the Plan is that it is too conditional and lacks remedies against the Plan sponsors—a so-called "free option."  This is a false narrative.  Indeed, a purchaser's decision whether to close *any* transaction is an "option"—purchasers consider the cost of consummating the transaction against the remedies (if any) if they fail to consummate.  In so doing, they presumably determine whether breach would be efficient from their perspective. The question therefore comes down to conditions and remedies.

6.      And, here, the unique package of conditions and remedies is highly favorable to the Debtors.  The Objectors are correct—and the Debtors have never disputed—that the Plan and its constituent documents are subject to a substantial number of conditions.  But this misses the

---

[3]    Hr'g Tr. Sept. 9, 2015, at 55:1-5 (Court:  "[W]hat we're talking about is a summary proceeding about the merits of the PSA and not confirmation of the plan and not the settlement agreement, and not the releases contained in the plan [and] the settlement agreement.").

point.  Instead of the typical remedies for a financial buyer—a reverse breakup fee or liquidated damages clause—the PSA mandates a complete disarmament through implementation of the Alternative Restructuring.   Importantly, this remedy applies whether or not the closing conditions are satisfied.  Put differently, because the remedy always applies, and not just in the case of the purchasers' breach, the conditions themselves are of minimal relevance.

7.    Moreover, the disarmament remedy itself is of far greater value to the Debtors than a reverse breakup fee.  The purchasers, the Debtors' junior stakeholders, are the greatest potential beneficiaries of claims based on the Debtors' legacy transactions, which they have pursued vigorously.   By negotiating and obtaining in the PSA their binding commitment to accept the Alternative Restructuring arrangement, the Debtors have, for the benefit of each estate and senior stakeholders, disarmed these junior stakeholders.  No longer can they leverage the threat of lengthy and complex litigation to delay the chapter 11 cases and delay recoveries by more senior stakeholders; nor will the uncertainties of potentially great litigation recoveries complicate this restructuring.  As a result, disarmament is both *more punitive* than a reverse breakup fee and, from the Debtors' perspective, *superior* to one.

8.    Unlike a reverse breakup fee, disarmament eliminates a major cause of the massive run rate in these cases by providing an expedited path to emergence.   That run rate includes substantial professional fees and expenses, adequate protection payments, and interest accruing on EFIH debt, not to mention the ongoing effect on the Debtors' businesses from an extended bankruptcy.  These costs would swiftly consume any reasonably-sized reverse breakup fee and leave the Debtors facing the same issues they faced before signing the PSA.  Instead, disarmament would resolve many of the substantive issues that contribute to these administrative costs while at the same time providing an agreed 90-day alternative confirmation schedule.

3

9.      The Debtors were the first to state that a full, complete, and minimally-conditioned alternative plan was their goal.  Before signing the PSA, the Debtors ran a robust and thorough auction process for Oncor to achieve that goal, but it did not yield a sufficiently attractive bid.  The Debtors also worked tirelessly with major EFH and EFIH creditors to develop such a plan, whether as part of the PSA or in its place.  The parties, however, were unable to reach such an agreement.  So, instead, the Debtors secured the support of the PSA parties for an alternative framework that both maximizes value for E-side creditors and streamlines the path to emergence, including by allowing the Debtors to finalize Alternative Restructuring negotiations with non-parties.  The result was the structured parameters contained in the PSA.

10.     It is difficult to overstate the value of this consensus around the Alternative Restructuring.  The Required Alternative Terms resolve all significant issues regarding a restructuring of the TCEH Debtors, including standing litigation filed by TCEH junior stakeholders, that threatened the Debtors' control over the legacy litigation.  And the Required Alternative Terms secure the support of all major TCEH stakeholders for a global resolution consistent with the Debtors' disinterested director settlement that has been contained in all plans of reorganization filed to date.  In connection with any Alternative Restructuring, the PSA parties also agreed to a 90-day confirmation schedule to allow for expedited implementation of the Alternative Restructuring.

11.     The Objectors target the Required Alternative Terms, arguing that it is somehow perverse or unusual for a PSA to contain support for anything short of a full plan, attacking the business judgment of parties other than the Debtors, and alleging unsubstantiated conflicts.  The first argument is plainly wrong—plan support agreements more often than not contain less than

the full terms of a proposed restructuring, as is the case here with the Alternative Restructuring provisions. The second is irrelevant—non-Debtors' business judgments or agreements to only pursue a restructuring with certain bedrock provisions are theirs alone and not before the Court. The third is baseless—the EFH Committee relies exclusively on wild inferences to support an argument that a plan that provides for releases or insider compensation, as plans almost universally do, demonstrates debilitating conflicts.

12.     The Required Alternative Terms are consistent with the purpose of a plan support agreement: to build consensus on a restructuring by finding a coalition of the willing and a set of agreed terms. The Debtors believe that in due time they should be able to achieve a fully consensual Alternative Restructuring, in the unlikely event it should ever prove relevant, and the unique and broad go-shop provisions of the PSA permit this to occur in a time-efficient manner. Indeed, had the E-side Objectors agreed on plan terms during the many months of plan negotiations, that plan could have served as the fully-agreed alternative plan today. But they never came to that agreement. As a result, the Debtors made a valid business judgment to enter into the PSA before the Court today. But that does not change the undisputed fact that the Objectors' rights, along with those of all other non-parties, to object to the Plan, the Settlement Agreement, or an Alternative Restructuring are fully reserved.

13.     In sum, the PSA is a massive victory for the Debtors and their estates. The benefits are vast, whether the commitments it contains are ultimately realized in the form of a Plan that offers full payment to EFH and EFIH creditors and material recoveries to junior TCEH creditors or the streamlined Alternative Restructuring. The relative costs are inconsequential, and the relief requested is modest, given that the Debtors have exclusivity, the PSA contains a robust, unqualified fiduciary out, and only the consenting parties to the agreement are bound.

For these reasons, and as more fully detailed in this Reply, the Objections should be overruled and the Motion should be granted.

**Argument**

**I.      Entry Into the PSA Is a Valid Exercise of the Debtors' Business Judgment.**

14.      The PSA seeks extremely limited relief:  it does not seek approval of the Plan, the Settlement Agreement, or an Alternative Restructuring.  Non-parties are free to object to any of the relief related to these transactions when they are properly before the Court, and the revised proposed PSA order makes abundantly clear that approval of the PSA does not prejudice those rights.   Revised Proposed Order ¶ 5 [D.I. 5895].   The Debtors also possess an unfettered fiduciary out with respect to each of these transactions, further limiting the Debtors' obligations.  PSA § 12.6(h).  Thus, the narrow issue before the Court is whether this agreement to pursue a transaction that provides payment in full in cash for EFH and EFIH creditors, while providing near-complete consensus among TCEH creditors and a full fiduciary out for the Debtors, is a valid exercise of the Debtors' business judgment under section 363(b) of the Bankruptcy Code.  The answer is "yes."

**A.      The Motion Seeks Limited Relief That Is Subject to the Business Judgment Standard.**

15.      Upon court approval, a debtor "may use, sell, or lease . . . property of the estate" outside the ordinary course of business.  11 U.S.C. § 363(b)(1).  In the Third Circuit, courts authorize a debtor's use of property of the estate outside the ordinary course of business when such use has a "sound business purpose."  *See, e.g.*, *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999).  The same business judgment standard governs approval of postpetition plan support agreements.  *See In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198, at *19 (Bankr. S.D.N.Y. June 27, 2013).  The inquiry is whether "*the debtor's*

6

decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment." *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 462 (Bankr. S.D.N.Y. 2014) (emphasis added). Sophisticated and informed creditors, on the other hand, are free to limit their own bankruptcy rights. *See In re Am. Roads LLC*, 496 B.R. 727, 732 (Bankr. S.D.N.Y. 2013).

16.     Importantly, approval of a plan support agreement—which is merely a contract between consenting parties—is not approval of any plan or settlement. *See Residential Capital*, 2013 WL 3286198, at *21 ("The Court's findings in the context of the approval of the PSA do not preclude a challenge to a plan that includes the proposed settlements embodied in the PSA and term sheets."); *see also Genco*, 509 B.R. at 468 ("The Court today has not been asked to approve the terms of the Plan itself."). As this Court recognized, approval of a plan support agreement merely allows a debtor "to pay certain professional fees and go forward until they change their mind with a plan of attack," which "from a strictly legal perspective . . . is extremely limited relief." Hr'g Tr. June 6, 2014, at 51:21-24, 65:24-25.[4] As a result, the Court can dispense with many of the Objections as straw-man arguments against relief the Motion does not request or against business judgments made by parties other than the Debtors.

**B.      The PSA Is Supported by Sound Business Justifications and Costs Little to the Estates.**

17.     The PSA provides each estate with valuable consideration at little cost. This includes an opportunity for payment in full of all EFH and EFIH claims and greater recoveries for all TCEH creditors, where no even remotely comparable opportunity otherwise currently exists. And it includes the support of each major TCEH creditor group.

---

[4]     Here, the PSA does not even provide for periodic payment of professional fees. The Debtors respond to the U.S. Trustee's assertions to the contrary in Section II.D of this Reply.

18.     The EFH Committee's assertion that this support has no value is not credible. The Plan either has the consent of, or provides payment in full to, every major stakeholder in the chapter 11 cases.   The support obligations for an Alternative Restructuring provide a solid framework to build consensus for a failsafe.   The value of consensus in a chapter 11 case as complex and contentious as this one is beyond dispute.   *See, e.g.*, *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 468 (Bankr. S.D.N.Y. 2014) ("[A] key goal of a bankruptcy in a mega Chapter 11 such as this is for creditors to negotiate to reach a consensus. . . .").

19.     Moreover, the PSA will drastically reduce the estates' fees and expenses and the time spent administering these cases.   Under the PSA, the near future will be devoted to pursuing the Plan, which leaves an extremely limited subset of potential confirmation issues.   Indeed, it was for this reason that parties agreed on, and the Court approved, a shorter confirmation schedule with respect to full-pay plans of reorganization, such as the Plan.[5]

20.     The alternative to the Plan was an unsupported standalone plan that would have been far more speculative than the merger transaction—a factor that courts consider when evaluating the decision to enter into a support agreement.   *See Genco*, 509 B.R. at 469 ("[T]he logical consequence of the objectors' position would be to destroy the Prepack Plan now in favor of the unknown.").   Although the Debtors worked throughout with major E-side creditors that are in a position to equitize large tranches of debt, the parties were unable to reach an agreement. *See, e.g.*, Hr'g Tr. June 25, 2015, at 11:12-18 (Debtors' counsel announces substantial progress on E-side deal but with work yet to be done).   The standalone plan likely would have required or at least contemplated the same REIT restructuring required by the Plan, coupled with a near six-

---

[5]     *See* Hr'g Tr. Aug. 25, 2015, at 148:17-21 (Court:  "[A]s presented with an unimpaired E side and consent on the T side, except for Mr. Gwynne's client, I believe that we are materially in compliance with the proviso under the order that was entered previously by the Court, where we would shorten the process.").

month confirmation process involving massive standing, intercreditor, and inter-Debtor legacy litigation and hotly-contested "triple cramdown" proceedings against EFH, EFIH, and TCEH creditor classes.

21.     Meanwhile, the PSA's parameters for support of an Alternative Restructuring provide a backstop to any risks associated with a REIT restructuring.  Under the PSA, after any termination of the parties' obligation to support the Plan, the parties are still obligated to refrain from objecting to an Alternative Restructuring filed by the Debtors or the TCEH first lien parties that contains the Required Alternative Terms.  PSA § 5.  The Required Alternative Terms for a TCEH Alternative Restructuring include the agreed cash recovery to the TCEH unsecured creditors—sourced entirely from the TCEH first lien collateral and at no cost to the Objectors— and the employee compensation arrangements agreed to by the future owners of reorganized TCEH.   *Id.*  § 6.1(a)(i), (vi).   The Required Alternative Terms for an EFH Alternative Restructuring include the $700 million allowed claim by TCEH against EFH in settlement of all inter-Debtor claims and causes of action.  *Id.* § 6.1(b)(ii).  And the Required Alternative Terms for all Debtors include the full legacy litigation and inter-Debtor settlement as presently contemplated by the Plan.  *Id.* § 6.1(a)(iii)-(v), (b).  Although the TCEH first lien parties generally retain their right to object to a plan filed by the Debtors that includes the Required Alternative Terms, they must refrain from objecting to an Alternative Restructuring proposed by EFH and EFIH that does not adversely affect a TCEH Alternative Restructuring.  *Id.* § 5.4.  And, under the "drag," the TCEH junior creditor parties must vote in the same manner as the TCEH first lien parties on any plan that includes the Required Alternative Terms.  *Id.* § 5.1(a)(i).

22.     The Required Alternative Terms thus represent consensus among the PSA parties around certain baseline terms of an Alternative Restructuring.  Together with the Settlement

Agreement, this ensures that legacy litigation issues—which are not subject to changing facts or circumstances and which do not turn on the terms of any plan of reorganization—are resolved with finality and that the reorganized Debtors are not embroiled in post-effective date litigation. If the merger does not close, the appropriate economic stakeholders may move quickly to negotiating economic terms of a restructuring without hindrance from the single largest challenge of the chapter 11 cases. Therefore, the PSA spares the estates significant costs and expenses. And, in the case of any objections to the settlements (which are not the subject of the PSA hearing), the Settlement Agreement ensures that these issues, to the extent they remain contested at confirmation, are only heard once.

23.     Although the Objections strain to paint the Alternative Restructuring provisions in a negative light, these provisions are an important component of the PSA and valuable to the estates. Even if the Required Alternative Terms stood alone, without the merger transaction, the resulting plan support agreement would be a significant accomplishment in the chapter 11 cases and a massive benefit to the estates. As this Court has stated, plan support agreements often serve as a starting point, a concept that seems lost on the E-side Objectors. The Alternative Restructuring provisions allow the Debtors to build consensus among stakeholders with full fiduciary flexibility to adopt another approach.

24.     Yet, for all these benefits, which are in addition to the benefits of the Plan, the PSA's costs to the Debtors are negligible. The PSA secures commitments for a restructuring strategy that the Debtors intended to pursue *anyway*: working to consummate a full-pay Plan while at the same time seeking to build consensus where possible around the terms of a "backup plan." If the Debtors determine that, notwithstanding the benefits of the Plan, it is in the best interests of the estates at any time to change course, the PSA has a fiduciary out provision that is

as broad as the art of drafting permits.  *See* PSA § 12.6(h) (any Debtor may terminate if transactions inconsistent with fiduciary duties).  Furthermore, unlike most plan support agreements, the PSA does not provide for periodic payment of creditors' professional fees.[6]

25.    The net effect of the PSA is that it exponentially reduces execution risk around these transactions by precluding the Debtors' counterparties and their successors and assigns from changing course and putting the Debtors back to square one.  This extremely limited and effectively one-sided relief makes the PSA a pure benefit to the estates.  Thus, entry into the PSA is a sound exercise of the Debtors' business judgment.

## II.    All Provisions of the PSA Are Appropriate and Consistent With the Limited Scope of the Relief Requested.

### A.    The PSA's "Go Shop" Provision Is Remarkably Favorable to the Debtors, Especially in Light of the Robust and Unqualified Fiduciary Out.

26.    The E-side Objections misinterpret the provisions of the PSA governing alternative proposals, going so far as to characterize them as "anti-competitive" (EFH Committee Objection ¶ 51) and "intentional and designed to head off any competitive alternative" (EFIH PIK Trustee Objection ¶ 27).  The reality is that the Debtors fought hard to obtain unusually favorable provisions for alternative proposals in the PSA—and succeeded.

27.    Extraordinarily, the Debtors have a full "go shop" right with respect to backup proposals that contain the Required Alternative Terms.  To that end, the PSA expressly states that the Debtors can solicit, negotiate, and facilitate such proposals.  PSA § 4.3(a).  As to access rights, should the Debtors receive *any* alternative proposal, including those not containing the Required Alternative Terms, the Debtors must simply provide the PSA parties with notice of the

---

[6]    The most significant alleged cost of the PSA, the allowance of a $700 million claim by TCEH against EFH in consideration of the global resolution of intercompany claims, is not before the Court at this time.  Moreover, it is $105 million less than the claim in the original proposed disinterested director settlement, is subject to the Debtors' fiduciary out, and can be modified by agreement of the Debtors and the TCEH first lien parties. *See* PSA § 6.1(b)(ii).

terms of any such backup or topping proposal and reasonable updates regarding negotiations. *Id.* § 4.3(b).  If the Debtors determine that an unsolicited topping proposal is superior to the Plan, they can terminate the PSA under their fiduciary out.  *Id.* § 12.6(h).

28.    Until the PSA's primary Plan support obligations terminate, the Debtors cannot take the near-final step of filing a plan or disclosure statement or a motion seeking approval of a support agreement for a backup proposal.  But this is a minimal sacrifice, given that two distinct regulatory applications cannot be before state regulators at the same time.  And, again, if an alternative proposal is superior to the Plan, the Debtors could terminate the PSA and seek the necessary approvals consistent with their fiduciary duties.   Indeed, courts have looked favorably on far more restrictive provisions governing alternative proposals.  *See Genco*, 509 B.R. at 464 (debtors could consider, but not solicit, alternative proposals).

29.    Nonetheless, the E-side Objectors make two additional arguments that actually cut against their position:  they assert that no party will agree to a backup proposal while the Debtors pursue consummation of the Plan and that the structure puts "wrong-way" risk on creditors.  The Debtors agree that consensus around an alternative restructuring will be challenging—despite the Debtors' best efforts, the EFH and EFIH creditors were not able to agree to a restructuring even in the absence of the Plan.  Yet the fundamental reason for this was uncertainty around the REIT regulatory outcome.   And the Debtors believe that the Plan transaction, even if it is not consummated, will provide EFH and EFIH creditors important visibility into this process.  Risk is not "wrong-way" where the best case outcome is payment in full and the worst case is a more certain transaction with multiple contingencies resolved.

**B.     There Is No "Free Option" for the Parties to the PSA or the Merger Documents.**

30.     The Objectors' continued complaints about the "free option" are complaints about the merger documents and the Plan, not the PSA.  In any event, the deal embodied in the PSA, Plan, Settlement Agreement, and merger documents is not a free option.

31.     The merger documents contemplate that the purchasers will fund repayment of all allowed EFH and EFIH claims in cash.  Those documents obligate the purchasers to use reasonable best efforts to consummate the merger.  Merger Agreement § 6.1(a).  As the Debtors have made clear from the outset, this obligation is subject to a substantial number of conditions. *See* Merger Agreement §§ 7.1-7.2.  Moreover, the Debtors do not have the right to seek specific performance or money damages under the merger documents.  The investors, however, do have certain rights to seek specific performance from one another.  *See* Equity Commitment Letter § 7(c); Backstop Agreement § 11.8(a).  And, if the purchasers breach their obligations under the merger agreement, they are still liable to EFH and EFIH for certain costs associated with the transaction, including costs of arranging debt financing, the IPO conversion plan, and various pre-closing steps.  *See* Merger Agreement §§ 6.17(g), 6.19(b), 6.20(c), 6.22(g).

32.     Acquisition contracts for financial buyers frequently provide for a reverse breakup fee as a *sole remedy* or in tandem with a conditional specific performance right against a shell entity (which has little value).  Here, a market-standard reverse breakup fee—for example, in the range of 2-3% of the approximately $7 billion of committed equity capital, or $140-210 million—would be of limited utility.  At best, a reverse breakup fee could only partially offset the increased costs associated with the legacy litigation fallout, the added time in chapter 11, and the resulting interest expense with respect to the Debtors' secured debt.  It would not provide a

direct path out of bankruptcy; rather, it would relegate the Debtors to a path beset by the same obstacles they faced before entry into the PSA.

33.     Thus, in place of a traditional remedies package, the Debtors negotiated for two greater benefits.  The first is a robust and unqualified fiduciary out under both the merger documents and the PSA that has no time limitation and is not subject to *any form* of breakup or topping fee.  *See* Merger Agreement § 8.3(e)-(f); PSA § 12.6(h).  The second is disarmament and the drag, which are effectuated through the Settlement Agreement and the Alternative Restructuring provisions of the PSA.

34.     The disarmament and drag embodied in the Alternative Restructuring provisions are far more attractive remedies for a number of reasons.  Here, the TCEH unsecured parties have asserted billions of dollars in derivative claims on behalf of TCEH against the TCEH first liens, EFH, and EFIH.  *See, e.g.*, TCEH Creditors' Committee Standing Motion [D.I. 3593]; TCEH Unsecured Group Standing Motion [D.I. 3603].  In advance of mediation and the Debtors' initial plan filing, the Debtors' chief restructuring officers circulated plan term sheets that resolved the claims of these TCEH general unsecured creditors for amounts in excess of the $550 million provided for under the Alternative Restructuring.  And the TCEH general unsecured creditors unequivocally rejected the settlement embodied in the original plan.  *See, e.g.*, TCEH Unsecured Group Scheduling Objection [D.I. 4327].

35.     Yet the Required Alternative Terms of the PSA, as well as the Settlement Agreement, provide a resolution of the litigation and objections asserted by the TCEH unsecured creditors, whether or not the merger closes, for a maximum $550 million, less the professional fees of the TCEH unsecured parties.  *See* Settlement Agreement § 2.2(a).  This is not the result that the TCEH unsecured creditor constituency spent years fighting for in this restructuring.  And

14

no one could seriously contend that the TCEH unsecured parties have expended all of the time and energy necessary to develop the merger transaction as a diversionary measure to secure an additional $400 million beyond the approximately $150 million offered to them under the original restructuring support agreement.  Therefore, from the perspective of the TCEH unsecured creditors, the PSA and the Settlement Agreement sacrifice recoveries they likely believed would have been far greater in amount than a standard reverse breakup fee.

36.     From the Debtors' perspective, regardless of the merits of the claims, the disarmament and the drag avoid the significant cost and risk of legacy litigation with the TCEH unsecured creditors.  Given the dollar amount of claims at issue, this is far more valuable than a modest reverse breakup fee that would otherwise have put these parties back at square one.  Moreover, these remedies apply if the Plan fails to consummate *for any reason*, including a termination of the merger agreement by the *Debtors*, absent a knowing and willful breach rising to the level of a material adverse effect, an injunction preventing any Alternative Restructuring, or a failure of the TCEH first lien class to accept the Plan.  PSA § 12.  This is far broader than a typical remedies package that would only apply if the purchaser breached the acquisition agreement.

37.     Last, the sophisticated institutions that comprise the investor group did not spend six months researching and negotiating this complex transaction on a lark.  Hunt Consolidated, Inc., a highly-reputable Texas institution that will receive no part of the $550 million alternative recovery, has been seeking to acquire Oncor for the better part of a decade.  *See* James Osborne, *Hunt's Play for Oncor Gets New Life in Energy Future Bankruptcy*, The Dallas Morning News (July 23, 2015), http://bizbeatblog.dallasnews.com/2015/07/hunts-play-for-oncor-gets-new-life.html/.  And the other investors are well-known financial institutions that have done a

significant amount of work, incurred significant fees, and secured extensive commitments that provide them the financial wherewithal to do the same.  In light of all this, the "free-option" rhetoric of the E-side Objectors is unavailing.

   C.   **The Required Plan Terms and the Required Alternative Terms Are Not Objectionable.**

38.     The Objectors also take issue with certain of the substantive plan and settlement terms contemplated by the PSA, in particular the inclusion of insider release and compensation provisions in the Required Alternative Terms.  But the Motion does not request approval of these provisions or any other provisions of the Plan, Settlement Agreement, or Required Alternative Terms, and thus these provisions have no legal effect on any entity other than the consenting parties to the PSA.  *See In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198, at *21 (Bankr. S.D.N.Y. June 27, 2013) (approval of a plan support agreement is not approval of a plan, settlement, or releases and parties may object to such provisions in the future).  This legal reality, standing alone, dispenses with a substantial portion of the Objections.

39.     Perhaps in recognition that the release and compensation provisions of the PSA are unremarkable with respect to the Plan, the EFH Committee focuses on their corresponding inclusion in the Required Alterative Terms.  But as a legal matter, the terms required by the PSA to be included in the Plan and the Alternative Restructuring are no different.  They both reflect an agreement between consenting parties regarding terms of a restructuring that will be put before the Court for approval at a future date.  With respect to the Required Alternative Terms, that future date would be, for example, a subsequent confirmation hearing on an Alternative Restructuring.  In the meantime, the Debtors have the right in all circumstances to terminate the PSA under their fiduciary out and pursue a restructuring that does not include the Required Alternative Terms.

16

40.     The EFH Committee and the U.S. Trustee, however, simply refuse to acknowledge that approving a plan support agreement is different than approving a settlement. The EFH Committee goes so far as to say that "a 'settlement support agreement' is just a settlement." EFH Committee Objection ¶ 52. This concept, which is the core theory of many of the Objections, represents a fundamental misunderstanding of the difference between court approval of a settlement agreement and court approval of a support agreement:  the former results in the release of claims, and the latter does not.  *Residential Capital*, 2013 WL 3286198, at *21 ("[T]he findings of fact made in connection with approval of the PSA *do not constitute a release of any claims.*" (emphasis added)).  The PSA parties' agreement to support later Court approval of a settlement—subject, of course, to the Debtors' fiduciary out—simply has no effect on the legal rights of any non-party.

41.     The EFH Committee also argues that including the director-and-officer releases among the Required Alternative Terms will inhibit negotiation of an Alternative Restructuring. Yet the Debtors have received dozens of written plan proposals in these cases, and not a single one contained provisions inconsistent with the releases contained in the Required Alternative Terms—so there is no support for the proposition that these terms will inhibit economic proposals for an Alternative Restructuring.  Rather, this demonstrates that the releases are a source of agreement among major stakeholders and supported by a factual record that has been developed over eight months and millions of pages of discovery—which resulted in virtually no mention of claims against directors and officers in pleadings or elsewhere.  For this same reason, these releases were included in the Debtors' original plan filed in April and the disinterested director settlement incorporated in that plan.  The PSA and the Settlement Agreement reflect the same careful balance of interests struck by this earlier agreement.

42.     Similarly, the EFH Committee and the U.S. Trustee attack the compensation provisions that are a component of the Required Alternative Terms.  Not only are these arrangements a typical component of chapter 11 plans and plan support agreements, but the arrangements here would be obligations of *TCEH* alone, subject to subsequent Court approval. In light of the relatively long period between confirmation and consummation of the Plan, the TCEH first lien creditors, as the future owners of TCEH, agreed on certain aspects of the compensation arrangements for their future management team to preserve the value of their future assets.  This has *nothing* to do with the EFH Committee and would cost E-side stakeholders not a penny.

43.     Moreover, the fact that a plan support agreement contemplates insider releases and compensation arrangements does not turn it into the type of "interested party transaction" that warrants any heighted scrutiny.  *See Residential Capital*, 2013 WL 3286198, at *20 (postpetition plan support agreement was "far from the type of interested party transactions" that may warrant heightened scrutiny).  The opinion that the U.S. Trustee relies on for this proposition expressly declined to decide whether heightened scrutiny applied—and it does not even mention releases or compensation.  *See In re Innkeepers USA Trust*, 442 B.R. 227 (Bankr. S.D.N.Y. 2010).  Importantly, approval of these releases is not before the Court, and all parties rights are reserved.  That issue will be heard at the confirmation and settlement hearing in November or at a future hearing on an Alternative Restructuring.

44.     Ultimately, the Debtors' rigorous conflicts matters protocol provides ample support for each of these provisions and reinforces the appropriateness of business judgment review.  Each of EFH, EFIH, and TCEH has a disinterested fiduciary appointed after substantially all of the legacy transactions occurred.  The boards of each of those Debtors

18

delegated to their respective disinterested fiduciaries the sole authority to determine and address actual conflicts matters between the Debtors, and the Court authorized the estates to retain three sets of additional legal and financial advisors for such matters.  Consistent with this protocol, these fiduciaries reviewed and approved the PSA, and all the other documents and transactions, to the extent of any actual conflicts matters.  The Debtors also established special committees to consider the treatment of the prepetition equity sponsors.  In the face of this history and this robust procedure, the EFH Committee's effort to cast doubt on the disinterestedness of these fiduciaries and the propriety of the governance process is not colorable.  *See In re Merck & Co., Sec., Derivative & "ERISA" Litig.*, No. 05-2368, 2008 WL 2788400, at *7 (D.N.J. June 17, 2008) ("[A]llegations . . . without specific averments about individual Directors' direct involvement in the challenged wrongdoing[] do not cast doubt on the Directors' disinterestedness.").

45.    It simply strains credulity to imply that commonplace releases and post-emergence compensation arrangements were somehow the motivating factor behind a $12 billion merger, the spin-off of the largest competitive electricity generator and retailer in Texas, and a settlement of multibillion dollar inter-Debtor and intercreditor litigation negotiated by independent fiduciaries.  At the hearing on confirmation of the Plan and approval of the Settlement Agreement, the Debtors will demonstrate that the releases and compensation provisions in the Plan are appropriate—and they will do the same at any hearing on the Alternative Restructuring.  *See, e.g.*, *In re Spansion, Inc.*, 426 B.R. 114, 139, 142-43 (Bankr. D. Del. 2010) (insider releases and compensation arrangements permissible under appropriate circumstances).  In the meantime, the insistence that these release and compensation provisions draw into question the entire PSA and all of the related transactions is unavailing.

**D.    The Other Terms of the PSA Are Appropriate and the Debtors Have Revised the Proposed PSA Order to Address Certain Objections.**

46.    The E-side Objectors' other attempts to cherry-pick miscellaneous provisions of the PSA that they happen to disagree with are also not a basis to deny the Motion.  By its terms, the PSA, along with its constituent and support documents, is an integrated transaction, and, regardless, the supposedly offending provisions are not objectionable in the least.

47.    ***Breadth of Fiduciary Out.***    The EFH Committee characterizes the Debtors' fiduciary out as "all-or-nothing," as if this somehow makes it ineffectual.  EFH Committee Objection ¶ 22.   But this is precisely what a fiduciary *out* is—counterparties with billions of dollar at stake do not agree to commitments that let Debtors unilaterally amend terms but keep the counterparties bound.  And there is nothing ineffectual about the right of any Debtor, at any time, to terminate the PSA if it determines that proceeding with either the Plan or the Alternative Restructuring is inconsistent with its fiduciary duties.  *See* PSA § 12.6(h).  This is the type of fiduciary-out provision that the court in *Genco*, for example, highlighted when it set forth the framework for approval of plan support agreements that this Court has endorsed.  *See In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 460-61, 464, 465 (Bankr. S.D.N.Y. 2014).  Moreover, the Debtors have the flexibility under the PSA to develop superior "Alternative Proposals" before actually exercising any out.  PSA § 4.3(b).  The EFH Committee's position is thus both unrealistic and misguided.

48.    ***Contractual Exclusivity.***    Contrary to the EFH Committee's assertion, the Debtors are not requesting an extension of statutory exclusivity.  The EFH Committee again fails to understand that the PSA is merely a contract between consenting parties, and its approval will have no legal effect on non-parties.  The EFH Committee, for example, may freely file a plan after expiration of the Debtors' statutory exclusivity.

49.     The EFH Committee also seems to assert that the non-Debtor parties to the PSA should not be permitted to forego their right to file or negotiate alternative plans.   But non-Debtors are obviously free to agree by contract not to file a plan, including after expiration of the Debtors' exclusive periods.  *See, e.g.*, Stipulation and Agreed Order Regarding Certain Confirmation Scheduling Matters ¶ 3 [D.I. 4918]; *see also In re Am. Roads LLC*, 496 B.R. 727, 732 (Bankr. S.D.N.Y. 2013) (sophisticated and informed creditors free to give up bankruptcy rights).

50.     Indeed, nearly any post-exclusivity plan support agreement would yield the same result.  The ability of sophisticated creditors to agree by contract to forego bankruptcy rights is a key bargaining tool and a standard feature of bankruptcy practice.   And, of course, this is *precisely* the value of the PSA to the Debtors:  to know that their counterparties are committed to the Plan and an Alternative Restructuring.   Thus, it is in no way improper or contrary to bankruptcy policy for the TCEH first lien group or other PSA parties to agree to restrictions on the negotiation and filing of plans.

51.     ***Regulatory Applications.***  The E-side Objectors also assert that provisions of the PSA requiring the Debtors to file regulatory applications before confirmation are inappropriate. But they assert no legal basis to prohibit the Debtors from doing so.  Indeed, the irony is that, at the outset of the chapter 11 cases, the Debtors made certain regulatory filings at the request, and insistence, of certain of the Objectors that were party to the original restructuring support agreement.  *See* Restructuring Support and Lock-Up Agreement § 8.01(d) [D.I. 98] (requiring submission of IRS ruling requests by the same deadline that applied to filing of the plan and disclosure statement); § 8.01(i) (requiring plan effective date to occur no more than 60 days after confirmation on assumption that the up to 180-day period for consideration of a change of

control application by the PUCT under section 7.02 would begin in advance of confirmation). Should the Court deny confirmation, the Debtors can withdraw and resubmit any regulatory applications (as they did in this earlier instance).  This is obviously not the desired outcome, but this limited risk is undoubtedly outweighed by the benefit of promptly commencing the regulatory process, which is critical to the overall case timeline.  Moreover, the earlier the regulatory submissions are made, the earlier the approvals can be obtained and the sooner the E-side creditors can be paid in full, in cash.  It is a strange new world where that is the basis of an objection rather than an endorsement.

52.     ***Professional Fees.***   The U.S. Trustee argues that the PSA provides for the improper payment of professional fees.   But the PSA does not provide for payment of professional fees at all, and the Motion thus does not request authority to pay professional fees from the estates.  The one provision of the PSA that the U.S. Trustee cites is an agreement of the PSA parties to include a particular professional-fee provision in any Alternative Restructuring, which would be subject to subsequent Court approval.   *See* PSA § 6.1(a)(i).   The other provisions that the U.S. Trustee cites are provisions of the merger documents and Settlement Agreement, which are likewise subject to subsequent Court approval.   *See* U.S. Trustee Objection ¶ 35.

53.     ***PSA Order Provisions.***   Certain Objectors requested that findings in the proposed order related to good faith plan and settlement negotiations be removed, including former paragraphs A and B.  On September 9, 2015, the Debtors filed a revised proposed form of order removing these paragraphs and striking related references [D.I. 5895].  The Debtors believe these revisions resolve the issues associated with these proposed findings.

**III.    The PSA Is Not an Improper Solicitation of Plan Votes.**

54.    The PCRB Trustee and the U.S. Trustee also argue that the PSA is an improper solicitation of votes for a plan of reorganization.  But there is nothing improper about entering into a promptly-disclosed postpetition plan support agreement with sophisticated creditor groups.

55.    The Bankruptcy Code provides that an "acceptance or rejection of a plan may not be solicited" without "a written disclosure statement approved . . . by the court."  11 U.S.C. § 1125(b).  This prohibition refers to the process of making a "specific request for an official vote."  *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 97 (3d Cir. 1988).  Indeed, under Third Circuit law, the term "solicitation" must be "read narrowly" because a "broad reading of § 1125 can seriously inhibit free creditor negotiations."  *Id.* at 101.  Contemporary case law rejects the notion that postpetition plan support agreements are improper solicitations.  *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286, 295 (Bankr. D. Del. 2013); *In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198, at *20 (Bankr. S.D.N.Y. June 27, 2013); *In re Heritage Org., L.L.C.*, 376 B.R. 783, 791 (Bankr. N.D. Tex. 2007).

56.    Nonetheless, the PCRB Trustee and the U.S. Trustee cite two bankruptcy court orders that provide to the contrary.  *See In re NII Holdings, Inc.*, No. 02-11505 (Bankr. D. Del. Oct. 22, 2002) [D.I. 394]; *In re Stations Holding Co.*, No. 02-10882 (Bankr. D. Del. Sept. 25, 2002) [D.I. 190, 196].  Of course, courts in this district and others have since entered at least a dozen orders approving postpetition plan support agreements and likely many more.[7]  Referring

---

[7]    *See, e.g.*, *In re Exide Techs*, Case No. 13 11482 (KJC) (Bankr. D. Del Feb. 4, 2015) [D.I. 3087] (order approving postpetition plan support agreement); *In re Overseas Shipholding Grp., Inc.*, Case No. 12-20000 (PJW) (Bankr. D. Del. Apr. 7, 2014) [D.I. 2878] (same); *In re Global Aviation Holdings Inc.*, Case No. 13-12945 (MFW) (Bankr. D. Del. Feb. 25, 2014) [D.I. 361] (same); *In re Indianapolis Downs, LLC.*, Case No. 11-11046 (BLS) (Bankr. D. Del. June 21, 2102) [D.I. 1170] (same); *In re Nebraska Book Co., Inc.*, Case No. 11-12005 (PJW) (Bankr. D. Del. Mar. 26, 2012) [D.I. 1039] (same); *In re Visteon Corp.*, Case No. 09-11786 (CSS) (Bankr. D. Del. June 17, 2010) [D.I. 3427] (same); *In re Intermet Corp.*, Case No. 08 11859 (KG) (Bankr. D. Del. June 5, 2009) [D.I. 1066] (same); *In re Owens Corning*, Case No. 00-03837 (KG) (Bankr. D. Del. June 29, 2006) [D.I. 18208] (same); *see also In re AMR Corp.*, Case No. 11–15463 (SHL) (Bankr. S.D.N.Y. June 4,

specifically to the orders in *NII* and *Stations*, a Delaware bankruptcy court recently stated that "the two-page orders entered in those cases do not contain any legal analysis and, consistent with this Court's practice, are of only the most limited (if any) precedential value." *Indianapolis Down*, 486 B.R. at 295; *see also Residential Capital*, 2013 WL 3286198, at *20 (citing but declining to follow *NII* and *Stations*); *Heritage Org.*, 376 B.R. at 788 (same).

57.     In an attempt to dismiss this weight of authority, the PCRB Trustee asserts that postpetition plan support agreements are contrary to the Third Circuit's opinion in *Century Glove*. But recent cases have uniformly viewed *Century Glove* as counseling in favor of a rule that would permit postpetition plan support agreements. *See Indianapolis Downs*, 486 B.R. at 297; *Residential Capital*, 2013 WL 3286198, at *19; *Heritage Org.*, 376 B.R. at 792.

58.     Moreover, it is not impermissible for a postpetition plan support agreement to contain a specific performance clause, and the parties to the agreement need not be formal co-proponents of the Debtors' plan. The problem with the PCRB Trustee's arguments to the contrary is that the plan support agreement approved in *Indianapolis Downs* also had a specific performance clause and the parties to the agreement were not formal co-proponents. 486 B.R. at 295, 298. Nonetheless, the court held that an agreement is not an improper solicitation when the "deal is negotiated in good faith between a debtor and sophisticated parties, and that arrangement is memorialized [in] a written commitment and promptly disclosed." *Id.* at 297. And, again,

---

2013) [D.I. 8577] (same); *In re Great Atl. & Pac. Tea Co.*, No. 10–24549 (RDD) (Bankr. S.D.N.Y. Dec. 19, 2011) [D.I. 3060] (same); *In re Chemtura Corp.*, Case No. 09-11233 (REG) (Bankr. S.D.N.Y. Aug. 9, 2010) [D.I. 3527] (same); *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 17, 2010) [D.I. 3820] (same); *In re Tronox Inc.*, Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Dec. 23, 2009) [D.I. 1030] (same); *In re Bally Total Fitness of Greater New York*, Case No. 08-14818 (BRL) (Bankr. S.D.N.Y. July 9, 2009) [D.I. 1231] (same).

numerous postpetition plan support agreements have been approved in recent years with specific performance clauses and with the Debtors as the sole plan proponents.[8]

59.    Like the parties to the agreement in *Indianapolis Downs*, the parties to the PSA are sophisticated financial institutions represented by experienced legal and financial professionals, have been provided extensive information to enable them to evaluate the various issues, and have been deeply engaged in discussions and negotiations with the Debtors regarding the Plan.  They cannot seriously be characterized as ill-informed.  It would grossly elevate form over substance to hold that they should have been afforded the chance to review a Court-approved disclosure prior to making or supporting a deal with the Debtors, given that they had extensively reviewed and revised portions of the Disclosure Statement before they executed the PSA.  Thus, the improper solicitation argument fails.

## IV.    The Court Should Overrule the Other Objections.

### A.    The Debtors Have Provided Sufficient Notice of the Documents Necessary to Evaluate and Formulate Objections.

60.    The EFH Committee asserts that, to understand the transaction, there are "material documents" to which it needs immediate access.  EFH Committee Objection ¶ 38.  There is no factual or legal basis for these complaints.

61.    As an initial matter, the Debtors are not requesting approval of the merger transaction at this time.  Parties do not need access to ancillary merger documents—which in many cases are either filed as part of a plan supplement or not at all—to formulate their objections to the PSA.

---

[8]    Of the 14 postpetition plan support agreements approved in the cases cited in note 7 above, 12 expressly allowed specific performance as a remedy (the other two were silent) and 11 involved plans for which the debtor was the sole proponent.

62. Regardless, the Debtors have supplied the EFH Committee with substantially all the documents it has requested. Specifically, in its Objection, the EFH Committee demands the following four documents (*see id.* ¶ 19 n.13):

- **Oncor Side Letter.** The Oncor side letter, to which the Debtors are not a party, was not yet executed when the Debtors filed the Motion. The Debtors sent the EFH Committee advisors a draft on August 25. Oncor executed the side letter on August 28 and publicly filed the document as part of a securities law disclosure. *See* Oncor Electric Delivery Company LLC, Current Report, SEC Form 8-K (Aug. 31, 2015).

- **Tax Matters Agreement.** The Debtors filed the form of tax matters agreement (which has not yet been executed) with the Motion [D.I. 5248-4, at 113]. The exhibits the EFH Committee complains of do not yet exist.

- **Debt Commitment Documents.** The EFH Committee advisors received a draft of the debt commitment letter on August 22.

- **Disclosure Letters.** The Debtors sent the parent and company disclosure letters to the EFH Committee advisors on August 22.

63. The EFH Committee also loudly protests the redaction of the PSA signature pages. EFH Committee Objection ¶ 38. Of course, sufficient information to allow a reasonable person to understand who the Debtors are contracting with was included on the face of the PSA.[9] The Debtors redacted the PSA signature pages, at the request of the counterparties, because they contain confidential fund-level holdings information. In any event, the Debtors sent all of the signature pages to the Committee advisors on a professional-eyes-only basis on August 22.

64. Finally, as the Debtors have previously explained on the record, there was no element of "surprise" to EFH and EFIH creditors regarding the PSA and the transactions it contains. The EFH Committee had significant access and actual involvement in the EFH sale

---

[9] The key parties to the agreement are disclosed in the PSA's preamble, including: (a) the names of the 11 funds and entities that comprise the "Creditor-Investor Parties"; (b) the names of the four entities that comprise the "Hunt-Investor Parties"; (c) the names of the three entities that comprise the "Sponsor Managers"; (d) the TCEH creditors' committee; and (e) certain members of the ad hoc groups of TCEH first lien, second lien, and unsecured creditors. *See* PSA, Preamble. The fact that the names of the ad hoc group members were not publicly disclosed hardly warrants the EFH Committees' outsized response.

process for months and previously reviewed earlier forms of transactional documents that the Debtors ultimately signed in connection with the Plan. Meanwhile, the EFIH PIK Trustee is represented by advisors to the EFH PIK group, members of which participated in a previous Hunt bid, and in fact certain of the members of the EFIH PIK group are party to the current investor consortium. The merger transaction was also discussed at length in open court and in a chambers conference at which advisors to the EFH Committee were present. *See* Hr'g Tr. May 4, 2015, at 47:4-10; Hr'g Tr. June 25, 2015, at 54:2-66:18.

65.    Although the PSA was agreed to and negotiated outside of the formal auction process and obviously after the Hunt group allied with the TCEH unsecured group, these stakeholders are highly facile with the elements and transaction undergirding the Plan. And, after entering into the PSA, the Debtors held separate group telephone conferences, and many individual telephone conferences, with each of the significant EFH and EFIH creditor constituents to address remaining questions and, more importantly, attempt to generate further support for the PSA. Ultimately, these creditor constituencies are unduly modest and do themselves disservice—they have more than adequate comprehension of the PSA and the transactions it contemplates and are therefore capable of articulating any objections they may have.

### B.    Waiver of the 14-Day Stay Is Justified Under Bankruptcy Rule 6004(h).

66.    Although the PCRB Trustee argues that the stay period of Bankruptcy Rule 6004(h) should not be waived, the waiver is appropriate—and harmless—under the circumstances. The PCRB Trustee attacks a straw man, citing case law regarding the need to "close the transaction." *In re Filene's Basement, LLC*, No. 11-13511, 2014 WL 1713416, at *14 (Bankr. D. Del. Apr. 29, 2014). The merger will, of course, not close within 14 days of approval of the PSA. But the PSA is not the merger agreement.

67.     Waiver of the fourteen-day period is warranted simply to avoid assertions that the Debtors or the counterparties must wait two weeks to begin complying with the PSA.    No significant "transaction" will close during this period, making this a modest request for relief that is harmless to parties in interest, especially given that the Third Circuit would likely treat the Court's order as interlocutory pending confirmation.    *See In re Fisker Auto. Holdings, Inc.*, No. 14-CV-99, 2014 WL 546036, at *2 (D. Del. Feb. 7, 2014) (courts in the Third Circuit take a pragmatic approach to finality).    But waiving the fourteen-day period will benefit the estates by avoiding delay in implementation of the PSA in the relatively short period before the confirmation hearing.

## Conclusion

68.     For the reasons set forth above and in the Motion, the Debtors respectfully request that the Court deny the Objections and grant the relief requested in the Motion.

*[Remainder of page intentionally left blank.]*

Dated:  September 14, 2015
        Wilmington, Delaware

*/s/ Jason M. Madron*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:         collins@rlf.com
               defranceschi@rlf.com
               madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         edward.sassower@kirkland.com
               stephen.hessler@kirkland.com
               brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         james.sprayregen@kirkland.com
               marc.kieselstein@kirkland.com
               chad.husnick@kirkland.com
               steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession