Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                          :

6                                   :      Chapter 11

7   ENERGY FUTURE HOLDINGS          :     Case No. 14-10979(CSS)

8   CORP., et al.,                  :

9                                   :

10          Debtors.                :    (Joint Administration

11   _____:   Requested)

12

13                               United States Bankruptcy Court

14                               824 North Market Street

15                               Wilmington, Delaware

16

17                               September 16, 2015

18                               2:15 PM – 3:36 PM

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECR OPERATOR:  LESLIE MURIN

1    HEARING RE:   Discovery Disputes in Connection with

2    Confirmation of the Plan and Approval of the Settlement

3    Agreement -- Discovery Being Sought by Bank of NY-Mellon in

4    Connection with the Pollution Bonds and Revenue Bonds.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   SULLIVAN & CROMWELL LLP

4        Attorney for Official Committee of Unsecured Creditors

5

6   BY:  BRIAN GLUECKSTEIN (TELEPHONICALLY)

7

8   REED SMITH LLP

9        Attorneys for creditor Bank of New York Mellon

10

11   BY:  KURT GWYNNE

12

13   WHITE & CASE

14        Attorney for The Ad Hoc Group of TCEH Unsecured Note

15        Holders

16

17   BY:  J. CHRISTOPHER SHORE (TELEPHONICALLY)

18

19   KIRKLAND & ELLIS LLP

20        Attorney for Debtors

21

22   BY:  MARK E. MCKANE (TELEPHONICALLY)

23        BRENTON ROGERS (TELEPHONICALLY)

24

25

1   ALSO PRESENT TELEPHONICALLY:

2   DEREK C. ABBOTT

3   SCOTT L. ALBERINO

4   ARLENE R. ALVES

5   NII-AMAR AMAMOO

6   ASHLEY F. BARTRAM

7   VAN BECKWITH

8   WILLIAM BOWDEN

9   PEG A. BRICKLEY

10  CHRISTOPHER L. CARTER

11  HOWARD A. COHEN

12  KEN COLLIER

13  LAURA DAVIS JONES

14  MICHAEL L. DAVITT

15  MICHAEL D. DEBAECKE

16  DANIEL DEFRACHESCHI

17  STACEY DORE

18  JUSTIN K. EDELSON

19  JAMIE EDMONSON

20  ANDREW EHRLICH

21  ERIN FAY

22  MARK A. FINK

23  MICHAEL FIRESTEIN

24  SIMON FRASER

25  MEGGIE GILSTRAP

1    SETH GOLDMAN

2    TODD M. GOREN

3    ISLEY M. GOSLIN

4    ANNA E. GRACE

5    PAUL HEATH

6    MARK F. HEBBEIN

7    ANGELA K. HERRING

8    NATASHA HWANGPO

9    GARY L. KAPLAN

10   HAROLD KAPLAN

11   MATTHEW W. KINSKEY

12   DAVID KLAUDER

13   ALAN KORNBERG

14   CHARLES KOSTER

15   STUART KOVENSKY

16   ALEXANDER LAWRENCE

17   KIMBERLY LAWSON

18   RAYMOND LEMISCH

19   DANIEL A. LOWENTHAL

20   JASON M. MADRON

21   JONATHAN D. MARSHALL

22   ANDY MCGAAN

23   R. STEPHEN MCNEILL

24   STEPHEN MILLER

25   PAULINE K. MORGAN

```
 1   MORGAN NIGHAN

 2   THOMAS E. OBRRIEN

 3   RICHARD PEDONE

 4   DAVID PRIMACK

 5   ABID QUERESHI

 6   LARRY A. RAPPAPORT

 7   RACHAEL RINGER

 8   MARC B. ROITMAN

 9   MATTHEW ROOSE

10   JEFFREY S. SABIN

11   RICHARD SCHEPACARTER

12   JEFFREY M. SCHLERF

13   NED S. SCHODEK

14   ANDREA B. SCHWARTZ

15   MARK SHEPPARD

16   RICHARD A. STIEGLITZ

17   GREGORY TAYLOR

18   MARK K. THOMAS

19   THOMAS WALPER

20   CHRISTOPHER A. WARD

21   EDWARD WEISFELNER

22

23

24

25
```

1                    P R O C E E D I N G S

2            THE COURT:  Good afternoon, counsel, this is Judge

3    Sontchi.  Thank you for your patience.  This is the time set

4    for a telephone conference call regarding discovery disputes

5    in connection with confirmation of the plan and approval of

6    the settlement agreement.  And I believe that the live

7    dispute in front of the court this afternoon deals with the

8    discovery being sought by Bank of NY Mellon in connection

9    with the pollution bonds and if I -- there's also some

10   revenue bonds.  I can't remember, frankly, the exact

11   description of the debt but I think we all know what we're

12   talking about.  If not, we've got bigger problems.  But I'll

13   turn it over to the debtors?

14           MR. MCKANE:  Thank you, Your Honor.  For the

15   record, Mar, McKane of Kirkland and Ellis on behalf of the -

16   - for the debtors.  Your Honor, before we begin with the

17   discovery conference, if we could, I'd like to give you an

18   update on the status of our efforts to narrow the hearing

19   for tomorrow.

20           THE COURT:  Okay.

21           MR. MCKANE:  Specifically, Your Honor, we'd like

22   to report that we -- the debtors believe they have resolved

23   all of their outstanding issues with the EFH Committee, with

24   the EFH Indentured Trustees and with the EFIH PIC Indentured

25   Trustees.  We will be -- we're working with them on filing a

1   revised form of order and hope to do so this afternoon.

2            We have also, Your Honor, resolved all evidentiary

3   issues for tomorrow's hearing and such that we will be

4   providing an agreed-to declaration of Mr. Keglevic.  Mr.

5   Keglevic will be in the courtroom available to answer any

6   questions Your Honor may have and as a result of these

7   efforts over the last few hours is really the only

8   outstanding is the legal argument for those objections that

9   remain outstanding and which are from the United States

10  Trustee and the pollution control revenue bonds, the PCRBs,

11  that I have in the discovery for you today.

12           THE COURT:  That's -- no wonder you wanted to

13  start with that.  That's --

14           MR. MCKANE:  We thought that would be welcome news

15  to all involved.

16           THE COURT:  Very good.

17           MR. MCKANE:  (indiscernible).

18           THE COURT:  Well, thank you.

19           MR. MCKANE:  Your Honor, with --

20           THE COURT:  Go ahead.

21           MR. MCKANE:  No, I was going to say, Your Honor,

22  with that, I would ask that my partner, Mr. Brent Rogers,

23  handle today's discovery conference for the debtors.  He has

24  been leading the efforts in trying to resolve issues with

25  the PCRB.

1          THE COURT:  Okay.

2          MR. ROGERS:  Thank you, Your Honor.  Good

3    afternoon.  This is Brent Rogers for the debtors.  As Your

4    Honor observed, we're here before the court today on related

5    issues concerning Bank of NY Mellon or Bank of NY's recent

6    confirmation discovery issued in its capacity as the trustee

7    for the pollution control revenue bonds.

8          The two issues that we're here today on are some

9    document requests that Bank of NY issued in August and

10   deposition notices that it served in September.

11          Some issues that were raised in the letters prior

12   to this hearing that have been resolved or deferred, we also

13   raised an objection with respect to the EFH Committee

14   30(b)(6) notice.  That has been withdrawn.  So that issue is

15   resolved and we have agreed to deal with the allocation of

16   depositions and the number of depositions at a later hearing

17   on Friday.

18          So the core issue before the court today is the

19   Bank of NY discovery and the core problem with that

20   discovery is that although the PCRBs are a small sliver of

21   the T-side unsecured creditors with a narrow objection to

22   the plan, they continue to pursue overbroad and irrelevant

23   discovery requests that are not related to the plan

24   objection and that the court frankly has said should not be

25   served and will not be tolerated.

1          The real risk here is that the broad discovery

2     that the PCRBs and Bank of NY have issued are going to

3     interfere with the hard-fought discovery schedule that

4     applies to all participating parties, including the debtors

5     and much larger stakeholders than the PCRBs leading up to

6     the November hearing.

7          Your Honor, this issue goes back to the August

8     25th hearing on the revised amended scheduling motion of the

9     debtors.  The deadline for service of confirmation related

10    discovery had already passed at the time of that hearing.

11    The TCH first lien creditors, TCH unsecureds and the TCH

12    Committee had all filed discovery requests but, of course,

13    those parties are now overwhelming in support of the plan

14    and so have stood down on that discovery.

15         The PCRBs by contrast have not filed any discovery

16    of their own as of August 25th but rose at the hearing to

17    request the court's permission to serve discovery beyond the

18    deadline.

19         The PCRBs, as I said, have a very narrow objection

20    to the plan and it is based on their treatment under the

21    plan as compared to the old second amended plan.

22    Nevertheless, at the hearing, they proposed a host of

23    revisions to the discovery procedures that really would have

24    opened up a much broader discovery, even after the deadline

25    had passed.

1            Most importantly, they asked for the ability to

2    issue a fresh round of very broad discovery on both the plan

3    and the settlement agreement essentially asking for a second

4    bite at the discovery deadline apple.  And they also asked

5    for several revisions to the limits that had been imposed or

6    were to be imposed under the scheduling order on depositions

7    including asking the court to list the 10 deposition limit

8    without a showing a good cause and asking the court to

9    eliminate the provisions that stated that 30(b)(6)

10   deposition count towards the deposition limit.

11           In arguing for those revisions before the court,

12   the Bank of NY made a lot of the same arguments to the court

13   that they now make in their filing with regard to the issues

14   in dispute today.  And the court, quite obviously, rejected

15   those arguments.

16           It ruled that PCRBs' issues with the plan being as

17   narrow and specific as they are did not justify reworking

18   the schedule or the protocol even though the PCRBs may need

19   to play a little bit of catchup in the summary.  The court

20   spoke specifically to the issue of additional document

21   request discovery and in order that the PCRBs would be

22   permitted to issue a very focused discovery on specific

23   issues relating to the treatment of the PCRBs under the

24   plan.  And that provision was written into the order at

25   Paragraph 7B of the scheduling order.

1            And the court cautioned Bank of NY, if you go

2    overbroad and they come and object, I'm not going to allow

3    it.   They have come overbroad and the debtors do object and

4    why we're here today is to ask the court not to allow the

5    dispute of discovery here.

6            The first thing the Bank of NY did was on August

7    28th, they served 61 written discovery requests, most of

8    which had little to nothing to do with the treatment of the

9    PCRB.   27 of those were directed at the debtors and I won't

10   belabor the point in the letter but let me make a few

11   overarching points as to why we think that the nine

12   additional requests that the PCRBs or the Bank of NY Mellon

13   is now pursuing should not be counted.

14           We have responded to those requests that do seek

15   information relating to the change in PCRB's treatment under

16   the plan.   Those three requests that they have issued that

17   deal with that issue are very broad.   They concern revisions

18   for the plan regarding the PCRB.   They concern and cover

19   communications about the treatment of the PCRB and they

20   cover correspondence about the justification for treating

21   the PCRBs as they have been treated.

22           We ran very broad search terms to find those

23   documents.   We ran terms like 'PCRB' and derivations of the

24   words 'waive' and 'deficiency', which is a technical way of

25   saying that we found everything there is to find relating to

1   those issues.  We even agreed recently to expand the number

2   of custodians that we run those terms over to make sure

3   we're getting everything.

4            We've already produced nearly 2500 documents

5   identified by the searches and we expect that we'll have a

6   small additional production forthcoming.

7            We believe that this should satisfy the PCRB's

8   request in so far as it rightly relates to their treatment

9   under the plan.  It is hard to imagine a relevant document

10  that would not be picked up by our terms and our production.

11           The rest of the requests that the PCRB, that the

12  Bank of NY issued were overbroad and not compliant with the

13  court's order.  Bank of NY, when we first raised this issue

14  quickly retreated on some of those and it has recently

15  abandoned others but still continues to press on nine.  And

16  those nine we laid out in our letters.  The court need only

17  read them to see that they are not narrowly tailored to the

18  issue of the PCRB's treatment.  They don't even mention the

19  PCRBs and only one mentions the T-side unsecured creditors.

20  Rather, eight of the nine have to do with settlements in the

21  settlement agreement and the plan.

22           The PCRBs and Bank of NY raised arguments at the

23  hearing on August 25th that they should get discovery into

24  those issues.  Those arguments were rejected then and should

25  be rejected now.

1              We want to be very clear about what the PCRBs and

2      Bank of NY are getting.  First, as I already said. To the

3      extent the documents fall within the justifiable scope of

4      the PCRB's objection to the plan, they're getting everything

5      we could find on that that is not privileged, I should say.

6              Second, to the extent that there are documents

7      that fall within the overbroad and objectionable categories

8      that Bank of NY Mellon has asked for, if those do pertain to

9      the PCRBs, we're producing them in response to the other

10     requests.

11             Third, to the extent that documents falling within

12     the overbroad categories are responsive to requests that

13     were properly issued by other parties, we're also producing

14     those.  So, for example, Your Honor, the creditors have

15     asked to see, as you might imagine, every document

16     pertaining to the settlement agreement.  We have run

17     extraordinarily broad search terms to find documents

18     relating to the settlement agreement and the settlement and

19     those terms appear to be satisfactory to every party except

20     apparently Bank of NY.

21             We have a database of hundreds of thousands of

22     documents, many of which pertain to the settlement that Bank

23     of NY has full access to.  Again, it's hard to imagine a

24     responsive document even to those objectionable nine

25     requests that Bank of NY does not have.

1           So in our view, Your Honor, Bank of NY is not only

2    getting what it's entitled to, the documents responsive to

3    its narrow issue, but is also getting documents it's not

4    entitled to simply by virtue of its access to the database.

5    And with that, the court should overrule Bank of NY's

6    request and instead issue a protective order enforcing the

7    limits of Paragraph 7B of the revised amended scheduling

8    order in denying their discovery request.  So that is the

9    document issue, Your Honor.

10          The second issue relates to Bank of NY's

11   deposition notices.  And this issue was crystalized with the

12   issuance of Bank of NY and the EFH Committee's discovery or

13   deposition notices, which were the first two steps, the

14   deposition notices entered or served on the debtors.

15          As Your Honor knows, there is a provision in the

16   revised amended scheduling order that sets a 10 deposition

17   limit on all plan objectors.  It is a cap.

18          As of Monday when we filed our letter raising this

19   issue, we had already received 11 deposition notices from

20   Bank of NY and the E-Committee and two of those notices were

21   Rule 30(b)(6) notices covering 30 topics that just on their

22   face would require multiple witnesses to testify to.

23          We filed our letter with the court asking for a

24   ruling requiring withdrawal or striking the 30(b)(6) notices

25   for a meet and confirm on the proper scope of the 30(b)(6)

1    notices and for coordination among the parties, especially

2    on the E-side to comply with the 10 deposition limit.

3              Shortly thereafter the E-Committee did agree to

4    withdraw its 30(b)(6) notice entirely and not reissue it and

5    to replace that notice with notices to individuals, some of

6    which were identified by the debtors as individuals with

7    knowledge relevant to the plan and settlement agreement.  So

8    we consider the scope of the E-Committee's notice to be a

9    resolved issue.

10             Bank of NY's 30(b)(6) notice had 14 topics and

11   only one of the Bank of NY's notices was served on any of

12   the 12 individuals that were identified by the debtors as

13   having knowledge relevant to the plan or settlement

14   agreement.

15             The topics in Bank of NY's notice were overbroad.

16   They were not limited to the treatment of the PCRBs and most

17   saw testimony on many of the same topics related to the

18   settlement agreement and the underlying claims that Bank of

19   NY seeks discovery of in documents as well.

20             This, to us, Your Honor, is a transparent attempt

21   to do an end run around the 10 deposition requirement.

22   Instead of noticing up the individuals with knowledge, Bank

23   of NY chose to notice a single 30(b)(6) that requires many

24   witnesses.  That attempt fails precisely because there is a

25   provision in the amended scheduling order that counts the

1    number of witnesses produced in response to a 30(b)(6)

2    notice against the 10 deposition limit.  That provision

3    exists precisely to prevent this kind of end run around the

4    deposition limit.

5              The Rule 30(b)(6) notice issued by Bank of NY is

6    also a violation, we think, of the sphere of the court's

7    guidance about the scope of the PCRB discovery in so far as

8    these issues do not relate to the narrow issue of the

9    treatment of the PCRBs under the new plan.

10             After we objected to the notice on September 10th,

11   that is to say we reached out informally to the Bank of NY

12   to tell them that we consider the topics overbroad and

13   asking them to narrow and to confer with the E-Committee to

14   issue new narrower topics that would require 10 depositions

15   or fewer.  We told them on September the 12th that if we

16   didn't hear from them we were going to file our letter on

17   September 14th and that's exactly what we did.

18             Since our letter was filed, the Bank of NY has

19   responded to Your Honor and the court and has withdrawn a

20   few of the topics and revised a few others but we still

21   think that there is a live dispute here.  The topics that

22   remain are still overbroad and irrelevant.  And in

23   particular, I would point Your Honor to topics three through

24   10 of the notice, which even as revised still pertain to the

25   settlement and are irrelevant to the plan objection.

1           Topic 14 also, although it does deal with what I

2     would consider the size of the unsecured tie, it's not

3     relevant to the PCRB's objection, really pertains to how

4     that pie should be sliced.

5           We can work with Bank of NY on the remaining

6     topics, which at least mention the PCRBs but we think that

7     that discussion should be held in the context of a global

8     negotiation over how to allocate the limited number of

9     depositions that we have time for and resources for and that

10    are permitted under the revised scheduling order.

11          We're happy to participate and develop a proposal

12    on which witnesses can testify to the various topics issued

13    in response to the many Rule 30(b)(6) notices we've gotten

14    and just to give Your Honor and update, since we filed our

15    letter on Monday we have received additional deposition

16    notices covering approximately 30 more depositions or 30

17    more deposition topics from the US Trustee, the EFIH first

18    lien and EFIH second lien.

19          So this is an issue that we're going to have to

20    resolve and we're going to try to resolve by Friday and we

21    think that Bank of NY Mellon needs to be part of that

22    discussion.

23          They seem to be taking the view that because they

24    issued their deposition notices first they're first in line

25    and that everyone else should line up to fill in whatever's

1    left over after they get their shot and we just don't think

2    that makes sense under the order and it's certainly not a

3    practical solution.  It needs to be a rational negotiation

4    process involving the debtors and all of the participants

5    who are seeking deposition.

6              So we think the solution here is to strike the

7    30(b)(6) notice issued by the Bank of NY and order the PCRBs

8    to participate in that meet and confer process regarding the

9    number of allocation of deposition and, of course, the

10   debtors commit to do that in good faith.

11             That's all I have unless the court has any

12   questions for the debtors.

13             THE COURT:  Thank you.  Should we -- should I hear

14   from Mr. Shore at this point or would it -- or should we

15   divide and conquer on that and hear from Mr. Gwynne?

16             MR. GWYNNE:  Your Honor -- Your Honor, this is

17   Kurt Gwynne from Reed Smith at the Bank of NY Mellon.  I

18   think it might make sense to do the TCH separate.

19             THE COURT:  Okay.  That's fine.

20             MR. GWYNNE:  Because some of the -- okay.  May I

21   respond then, Your Honor?

22             THE COURT:  Yes, you may.

23             MR. GWYNNE:  Thank you.  First of all, Your Honor,

24   I want to talk about what the change in treatment of the

25   PCRBs was between the second amended and the third amended

1    plan because that is obviously relevant to determining what

2    the permissible scope is of discovery the Bank of NY Mellon

3    can take under Paragraph 7B of the order.

4            We're not trying to end run the order.  And, by

5    the way, contrary to counsel's assertion, we didn't ask for

6    more time and, you know, we didn't ask to extend the

7    litigation period.  We knew we might have to do some catch

8    up.  That was fine.  We did not object prior to the filing

9    of the third amended plan or take discovery because there

10   was no reason to.

11           And, Your Honor, I can't -- this is the third or

12   fourth time I've heard someone saying I should have been

13   taking discovery when I had no issue, I had no objection, my

14   client had not objection to the plan.  It would have been

15   ridiculous for us to be taking discovery and asking the

16   debtors to produce documents when we didn't have an issue to

17   even determine the scope of discovery.

18           So after the third amended plan was filed and we

19   saw for the first time the debtor had changed the treatment

20   of the pollution control bonds and was treating us

21   differently than the other funded debt including the TC

22   unsecured note claims, the ad hoc, you know, represented by

23   Mr. Shore, the TCE second lien note claims which are really

24   unsecured represented by Mr. Weisfelner as well as allowed

25   general unsecured claims against the TCEH debtors other than

1    EFCH.  And how were they treating us different for the first

2    time in the third amended claim?

3         In that third amended claim, in conference to the

4    terms of the settlement with the first, the TCEH first lien

5    lenders where the TCEH first lien lenders were agreeing to

6    waive their deficiency claim for the benefit of a certain

7    group, which is defined under the claims of the TCEH

8    deficiency (indiscernible) claim.

9         So in exchange for a release of all of the

10   estate's claims, the TCEH first lien lenders waive their

11   deficiency claims for the benefit of Mr. Shore's clients,

12   Mr. Weisfelner's clients and their larger creditor groups

13   and the allowed general unsecured claims but not the

14   pollution control revenue bonds.

15        So of course, naturally we said, well, why are you

16   excluding us from the share in the waiver of the first lien

17   deficiency claim?  And we were told to use Mr. Shore's

18   words, just rough justice.  You're sharing pro rata in the

19   distribution of equity that comes from the intercompany

20   claims.  So the distribution based on the fact that the TCEH

21   debtors have claims against the E-side, the pollution

22   control bonds are going to share a pro rata in that, so

23   you're not getting anything at all, no share of any waiver

24   of the TCEH first lien renders deficiency claim.

25        And we were told that we were being excluded for a

1    couple reasons.  One was that the pollution control revenue

2    bonds held claims only against TCEH and not the other TCEH

3    debtors.  So looking at that first reason, Your Honor, we

4    know that TCEH held some portion of that $700 million

5    intercompany claim that is settled under the plan.  We also

6    know that TCEH held some of the claims against the first

7    lien lenders.

8              So even though claims of the TCEH estate were

9    being settled, we were being excluded from sharing in the

10   distribution on the, what I call the distribution, the

11   waiver -- the consideration for releasing claims against the

12   first lien lenders.  And because we were told, well, since

13   you're sharing pro rata on the intercompany claim

14   distribution, we don't have to give you anything on the --

15   any share in the waiver of the first lien lenders' claims,

16   even though those claims, many of those claims were held by

17   TCEH against which the pollution control bond holders have

18   claims.

19             So we needed to do two things to address that

20   first reason.  One is we needed to take discovery as to the,

21   you know, what claims were held by TCEH against the other

22   debtors and what claims were held by TCEH against the first

23   lien lenders, so we knew that we could demonstrate to the

24   court a confirmation that TCEH claims are being settled and

25   we're not getting a fair share of the consideration for

1    settling them.  And in addition to identifying which claims

2    were owned by TCEH as opposed to the other debtors, we

3    needed to look at the value of those claims.

4            Now, we are not looking -- and I want to be very

5    clear about this.  We're not looking to litigate those

6    claims and we're not looking for a mini trial, nothing like

7    that.  I don't want a ton of discovery, Your Honor.  I don't

8    want thousands and thousands of documents.  I would like to

9    have much more targeted responses, frankly, than what we've

10   gotten so far.  But we do need to be able to say that, look,

11   in the negotiations, when the directors or the debtors were

12   either talking with the E-side or talking with the ad hocs

13   or talking with the first lien claimants, people said this

14   tax allocation claim, for example, that TCEH holds against

15   other entities, the E-side entity, that we figured that

16   claim had a value of X.

17           And, Your Honor, again, I'm not looking to

18   litigate the claim or the value of it.  I just want to know

19   what people considered the claim -- what value the claims

20   were considered to have in the settlement because if there's

21   a settlement of $1 million intercompany claim do people

22   consider $500 of that to be held by TCEH?  And that's with

23   respect to the claims against the first lien lenders.  Did

24   people consider those claims to be worth, you know, X

25   dollars and 50% of X is claims that were considered to be

1    held by TCEH?

2              That is critical discovery, Your Honor, because

3    that, that's what the difference in the treatment for the

4    pollution control bond holders is about.  I don't know how

5    the debtor can assert that our discovery doesn't relate to

6    the change in treatment of the pollution control bond

7    holders when the significant amount of our discovery relates

8    to those claims and what was -- and the value of the claims

9    that was given up in exchange for the consideration that

10   goes to unsecured creditors.  You have to look at the

11   consideration of unsecured creditors and then the portion we

12   get and compare that to what we should get.  And the only

13   way that we'll get what we should get is by looking at what

14   TCEH owns and the value of it and, again, Your Honor -- I

15   just want to be clear -- the value that people consider it

16   to have in the settlement process.  That's not litigating

17   the merits in the defense.  It's just -- if, you know,

18   Director A, for example, thought that claim was worth $40

19   million, that's relevant to me.  That's what I want to know,

20   not whether anyone was going to litigate it or whether it

21   was really worth $40 million, but that's what it was

22   considered in the negotiations.

23             So that's the difference in the treatment and

24   that's why discovery relating to not just changing words in

25   a plan, which is what the debtor's willing to give us and

1    our document request number one asked for and very

2    specifically "revisions to the plan made after a certain

3    date and that show changes to the treatment of the PCRB," so

4    it like redlines the plan.  I think we even use red lines or

5    black lines in that first request.  And then the other two

6    requests the debtor are willing to respond to are

7    communications between the debtor and the other plan support

8    parties regarding the change in the treatment of the

9    pollution control bond.

10            So, yes, you know, that's helpful because we'll

11   see the changes in the plans.  We'll see the drafts under

12   request number one.

13            Under request number two and request number nine,

14   we'll see communications between the plan support parties.

15   If anybody says, hey, that's too much of a discount, you

16   know, 50%, jeez, that's not fair, how can you do that to

17   pollution control bonds have claims against TCEH that are

18   worth X, we still need the documents regarding the claims

19   themselves.  So that, Your Honor, I want to start with that

20   background and now I'd like to talk about the document

21   request.

22            The ones that the debtor has objected to, they

23   deal with things like the calculation of the net amount of

24   the TCEH settlement claim and that, Your Honor, couldn't be

25   any narrower.  We just want to know the calculation.  How'd

1    you come up with the $700 million?  Which debtors have what

2    portion of that?  Very narrow, very specific.  The

3    presentations, requestion number four, presentations

4    exchanged by the disinterested directors, which the debtors

5    refer to in Paragraph 43 of the PSA motion.

6           Unredacted copies of the standing motion's another

7    one, document request number eight, which, by the way, these

8    are things that couldn't be much narrower or require

9    production of fewer documents.  The reason we want to see

10   unredacted copies of the standing motion is the standing

11   motion has certain amounts that they ascribe to each claim

12   but those were redacted.  So by looking at the redacted

13   versions, we can add up, okay, the claims that were --

14   people wanted to assert on (indiscernible) TCEH totaled X

15   dollars.

16          The debtors say in their letter to Your Honor that

17   on their faith, those types of requests have nothing to do

18   with the treatment of Bank of NY Mellon or the pollution

19   control bonds.  You know, we think the opposite is true.

20   Those are critical to us to be able to put on our case as to

21   what we're entitled to and what we're getting.

22          Now the search terms and the search terms, Your

23   Honor, that were sent to me yesterday by debtor's counsel, I

24   looked at them.  We had some discussion and this morning I

25   said, look, I you're telling me that -- I tried to

1    understand what the debtor was saying.  I feel like they

2    were being coy with me.  I said are you telling me that

3    notwithstanding that you're making objections to my document

4    request that if there is a document that's relevant, you

5    know, based on someone else's -- if there's a document

6    that's relevant to my request that you will produce it to

7    me?  And they said, no, we stand on our objection to your

8    document request.  All we're saying is if in responding to

9    other people's document requests we come across something

10   that is, in fact, responsive to your document request that

11   they'll give it to me.

12            And I said, well, what if there's a document

13   that's responsive to my document requests and you catch it

14   in your search terms?  You run your search terms, you find a

15   document, you say, for example, that's responsive to Bank of

16   NY Mellon's document request number six but it's not

17   relevant to anyone else's document request.  Are you going

18   to give me the document?  And they said no.

19            So what the debtor is saying with the search terms

20   is we will likely get most of what we want based on other

21   people's document requests.  Well, I don't know that, Your

22   Honor.  And when they say in bold faith that they've already

23   produced documents responsive to those requests and provided

24   us access to them even though the requests are

25   objectionable, I agree.  They produced certain documents

1    that are relevant to them and responsive to those requests.

2    But that doesn't mean that they've given me, you know,

3    things that are responsive to my requests that specifically

4    relate to the things relevant to the pollution control bond

5    holders that's not responsive to someone else's.

6              So I can't just get documents because they're

7    responsive to what someone else asks.  If they told me that

8    they would run those search terms, that they went to the

9    court and give me whatever responsive documents came up

10   based on those search terms, that would be acceptable to

11   Bank of NY Mellon.  It's not the search terms that are

12   objectionable to us, as debtor's counsel said.  It's the

13   fact that debtor's counsel said that if they get a hit on a

14   document because they ran those search terms and it's

15   responsive to our document request but no one else's that we

16   don't get it.  That's what's objectionable.

17             With respect to the debtors said that they did

18   agree to run some searches on some other custodians, namely

19   K&E folks that were involved in the negotiation of the

20   change in the PCRB treatment, if -- and as we said, I said

21   this morning, if they did that, if they ran the PCRB-

22   specific searches on the K&E custodians that were involved

23   in the settlement negotiations or, you know, and the

24   revisions to the claim and if they ran the search terms like

25   they're running for everybody else and just agreed to give

1    us whatever documents were hit that were relevant to our

2    search, to our document request, that that would resolve our

3    dispute and we wouldn't have any issue.  But the debtor,

4    notwithstanding their implication in the letter, the

5    debtor's not willing to do that.  They're standing by their

6    objection to our document request.

7         If we cannot get documents relevant to the value

8    of claims that were held by TCEH, Your Honor, then we really

9    can't put on the case at confirmation because we won't be

10   able to show what we're getting compared to what we should

11   get if you gave us everything -- distribution based on

12   everything the TCEH estate was entitled to.

13        With respect to the deposition notices, we don't

14   believe it's first come first served.  But what I said to

15   debtor's counsel is when they sent the letter to Your Honor,

16   they said we violated the 10 deposition limit, that we

17   exceeded 10 depositions along with EFH.  What we said is,

18   no, we served the first three deposition notices, one to the

19   debtor, the 30(b)(6), one to Mr. (indiscernible) and one to

20   the TCEH unsecured ad hoc group.  That was it, three

21   deposition notices.  We didn't think that was exceeding the

22   10 depositions and if you look at that Paragraph 15 of the

23   amended scheduling order, what it says is if a deposition

24   would result in more than 10 then you need to leave the

25   court.  So we didn't feel like we were putting it over 10.

1    There was only three at that point.

2            We do understand that because now there are more

3    than 10 depositions there needs to be some allocation.  We

4    don't think that that requires the, you know, protective

5    order disallowing our 30(b)(6) deposition notice because our

6    deposition notice is accurate with what it is that we need

7    testimony on.

8            Now, prior to the debtor filing its motion, they

9    said to us your deposition notices are too broad.  They

10   don't relate to the PCRB treatment.  We said, yes, they do.

11   They never gave us any specifics.  After they filed their

12   letter, I looked at the debtor's letter and I saw there were

13   the things I thought were, you know, valid concerns that

14   they hadn't raised before that we agreed to waive deposition

15   topic number 12, other deposition topics based on further

16   discussions with Mr. Rogers.  I agreed to revise, as

17   indicated in our response to the debtor's motion.  But, you

18   know, we have to be able to take depositions.

19           This is the second largest case I think ever filed

20   in Delaware.  We represent, you know, almost $900 million in

21   pollution control bonds.  That may seem small and

22   insignificant to the debtors or Mr. Shore.  It's very

23   significant to my client and we had one 30(b)(6) as a

24   debtor, one of the ad hoc and one of the disinterested

25   director.  We could not have, by the way, noticed particular

1    individuals because what Mr. Rogers didn't say to the court

2    is that the debtors did not serve us with the list of

3    witnesses until yesterday, that they didn't add us to their

4    list of folks who were being served until September 1st and

5    apparently it was on August 28th when they sent the witness

6    list.  So we didn't get that in a timely basis and they've

7    never said to me to this day it will take two or three or

8    four or one witness to respond to your 30(b)(6) and to give

9    you the testimony you're looking for.

10               I'm happy to discuss it with the debtors.  Again,

11   I don't want to take five depositions of the debtors if it

12   can be avoided.  I'm happy to talk about narrowing it and I

13   think generally if there were people that were involved in

14   the negotiation of these claims and the settlement of them,

15   then that one or two people would probably be the right

16   folks.

17               Just a few other minor points, the debtor talks

18   about (indiscernible) request.  Well, Your Honor, there's

19   denying requests be sent to the debtor, denying

20   (indiscernible) and denying that we sent to the ad hocs or,

21   sorry, saying we sent to the ad hocs were all substantially

22   similar.  These are all generally related to the same

23   topics.  So you ask, well, it may be we sent a similar

24   request to a different party.  It's not like it was 61

25   different requests that needed to be responded to, so.

1          Your Honor, that's all I have responding to the

2   debtor's position unless Your Honor has any questions for

3   me?

4          THE COURT:  Thank you, Mr. Gwynne.  Mr. Rogers?

5          MR. ROGERS:  Thank you, Your Honor.  Brent Rogers

6   for the debtors.  I'll try to be brief.  I want to correct

7   one thing about the depositions.

8          Mr. Gwynne said that we didn't serve him the list

9   until yesterday.  The fact is that there were technical

10  issues with the discovery lists served that go beyond my

11  understanding and we were getting bounce back notices every

12  time we sent something to them.

13         I would note that the witness lists were due, as

14  everyone knew, shortly after the amended revised scheduling

15  order and we never got any requests from Bank of NY to

16  forward that list if they hadn't gotten it.  And as soon as

17  they did notify us that they didn't have the list, we sent

18  it to them.

19         On the depositions, the only other thing I would

20  say is that although Mr. Gwynne highlights the fact that

21  they've only issued one notice, the fact is that notice

22  includes a variety of topics that would require several

23  witnesses and, again, we think not witnesses that are

24  relevant to the PCRBs.  All we're asking is that the PCRBs

25  and Bank of NY be required to participate in the global

1   conferral over the allocation of those witnesses.

2          With regard to the documents, I still haven't

3   heard anything about what Bank of NY thinks that they're

4   getting that they're not getting.  The fact is we have

5   produced everything that we've got subject to very minor

6   deprivileged production regarding the legacy production and

7   also regarding the debtor's negotiations over the plan and

8   over the settlement agreement.

9          And specifically to the settlement agreement, we

10   have produced anything that we could find relating to the

11   settlement agreement responsive to that list of two and a

12   half pages of search terms.  I cannot imagine that there is

13   a document that is not picked up by those terms and that has

14   not been produced, you know, subject to the very small human

15   error that would be responsive to Mr. Gwynne's request.

16   They just never explained to us what they're not going to

17   get that they think that they're entitled to.

18          Beyond that, as to the relevance of their request,

19   I don't think there's anything new in Mr. Gwynne's argument

20   that wasn't raised in August when the court allowed them a

21   narrow window of discovery.  The Bank of NY is trying to

22   drive a truck through that narrow opening.

23          The court's order or the court's statements at the

24   August 25th hearing used words like 'very focused',

25   'specific issues', 'very specific'.  Those are words that

1    would by no means describe the multi-step argument that Mr.

2    Gwynne has leveled in support of his discovery request and

3    how they might possible relate to the treatment of the

4    PCRBs.  Thank you, Your Honor.

5              THE COURT:  Thank you.  All right.  In connection

6    with the document requests, I agree completely with the

7    debtor's position and the amount discovery and

8    identification of discovery that they identified in their

9    reply letter earlier today that they've agreed to provide to

10   Mr. Gwynne's client is more than sufficient.

11             Look, this is a big case with big issues that's

12   been active for a long time.  Delving into discovery about

13   the value of the litigation claims is something that's been

14   going on for well over a year and the production of

15   documents --

16             [OFF MIC SPEAKING]

17             THE COURT:  Whoever is speaking, I can hear you.

18   Please mute your phone.  Getting into -- I've lost my train

19   of thought.  I apologize.  Getting into the merits of the

20   discovery in connection with the intercompany litigation

21   claims is a colossal undertaking and it's a colossal

22   undertaking that's already occurred.

23             I'm not going to require the debtors to redo all

24   of that discovery just for the benefit of Bank of NY Mellon.

25   Those documents are available.  It's hundreds of thousands

1    of pages.  It would be hundreds of thousands of pages if I

2    made them reissue it in any event.  Who's going to have to

3    bear the cost of delving through that?  Bank of NY Mellon.

4    That's the way discovery works.  That's the discovery that's

5    been produced in this case.

6           In addition, why it would be relevant what

7    individual persons thought litigation claims were worth in

8    the posture of negotiating those claims is beyond me.  The

9    issue is what are they worth?  If Mr. Gwynne's client wishes

10   to put evidence before the court as to what the litigation

11   claims were worth and compare it to what's being provided or

12   divvyed up in connection with the settlement, that's how we

13   get to whether it's fair, not whether parties had a

14   subjective belief as to what the claims were worth for

15   individual entities when they were negotiating them.  That's

16   neither here nor there.

17          Now, coming up with a valuation of what those

18   litigation claims are worth on a debtor-by-debtor basis is,

19   again, a huge undertaking but it's one that has to lie at

20   the feet of Mr. Gwynne's clients in connection with making

21   up their case.  And the point for today's purposes is

22   they're getting all the documents they need in order to do

23   that exercise.  Those documents have either already been

24   produced and are being provided access to or they're being

25   covered by what's being provided specifically or what's

1    being captured and what's being provided now in connection

2    with other people's requests.

3            So everything that Mr. Gwynne could possibly want

4    or need -- well, let's put it this way.  Everything that Mr.

5    Gwynne's clients need is being provided and there simply is

6    nothing else that he's asking for that isn't either being

7    provided or is irrelevant.  So I don't even think it gets

8    into this idea of, you know, requiring Bank of NY Mellon to

9    propound narrow discovery based on the changes between the

10   second amended plan and the third amended plan.  That's

11   really shorthand for treatment of the pollution control

12   revenue bonds, narrow discovery in connection with treatment

13   of the pollution control revenue bonds under the third

14   amended plan.  That was the point.

15           And to that point, Bank of NY Mellon is getting,

16   based on what the debtors have agreed to produce, including

17   copies of what's being produced in response to other

18   people's requests and access to what's already been produced

19   in the litigation throughout the history of this case,

20   everything that could possibly be relevant to their case.

21           Now, are the debtors going to say here are the

22   1432 documents that are completely and utterly relevant just

23   to you and your request, so I'm giving you these and don't

24   bother to look through the other 100,000 pages?  I'm not

25   going to make the debtors do that.  That's on Bank of NY

1    Mellon.  $900 million is a lot of money and if it justifies

2    spending it to go through the documents in order to make a

3    case, it does.  And if it doesn't, it doesn't and that's a

4    cost benefit analysis that Bank of NY Mellon's going to have

5    to make.

6            In connection with the deposition notice, I'm not

7    going to strike the 30(b)(6) notice because I think it is

8    appropriate that Bank of NY Mellon be given an opportunity

9    to take a 30(b)(6) deposition of the debtors on the

10   treatment of the pollution control revenue bonds under the

11   third amended plan.

12           Now, Mr. Gwynne was sort of -- you know, that

13   might take three, four, five people.  You're not getting

14   three, four, five people.  You're just not.  I'm not going

15   to allow the pollution control revenue bond issue to swallow

16   up all the other discovery going on in this case.  I'm just

17   not going to allow it.  You're going to need to focus.

18   You're going to need to focus on what you need and you're

19   going to need to prioritize the topics that are most

20   relevant to you and take the debtor's depositions of the

21   limited number of people that you're going to be permitted

22   to take as best you can to develop your case.

23           I'm going to do what the rules tell me to do and

24   balance the cost and benefits associated with discovery and

25   I've already made a decision in this case that I stand by

1    that that discovery should be narrowly tailored to the

2    issues actually in the plan and that 10 depositions or so is

3    going to be sufficient.

4          So while I'm not going to strike the 30(b)(6)

5    notice because I think it is appropriate for a 30(b)(6)

6    deposition to occur, I am going to require Mr. Gwynne to do

7    what I'm sure he was wanting to do in any event which was to

8    participate in this meet and confer on allocating and

9    prioritizing depositions.

10          Am I going to say you only get 10, not 11?  No.

11    Am I going to say you don't just get 10, you get 25?  No.

12    That's what you guys are going to talk about.  That's what

13    we've deferred till Friday at noon I think is when we're

14    getting together again on the issue.  You know, if we're

15    talking about 10, 11, 12 depositions, that's one thing.  If

16    people are going to, you know, come in and say they need 20,

17    21, 22, they're not going to get them and I'll decide if I

18    have to decide on Friday who gets what and on what topics.

19          So a 30(b)(6) is appropriate.  However, it's

20    limited to the issues actually relevant to the pollution

21    control revenue bond objection and the treatment of the

22    PCRBs under the plan.  Issues of subjective knowledge,

23    belief, et cetera, about the value of litigation claims are

24    off base completely and would not be a proper subject for

25    deposition and I think that's sufficient, I hope, to deal

1    with the issues that have been raised.  Just so we're clear,

2    in connection with document production, again, what the

3    debtors have offered in their reply letter today is I think

4    adequate and specifically I think its document request three

5    through 10 and 14 that were objected to by the debtors.  I

6    sustain those objections.

7              MR. ROGERS:  Thank you, Your Honor.

8              MR. GWYNNE:  Your Honor, this is Kurt Gwynne, if I

9    may ask Your Honor for clarification.  When you say with

10   respect to the deposition that a subjective valuation is not

11   a topic for deposition, I just want to take -- five an

12   example, make sure, understand what Your Honor's ruling is.

13             Let's say, for example, when we're deposing

14   somebody and when you say, well, why did you agree to settle

15   intercompany claim for $700 million, how much of that did

16   you believe was held by the TCEH estate, is that okay?

17             THE COURT:  Well, if we're talking -- now you've

18   changed my understanding of the breadth of discovery.  If

19   you're talking about asking Mr. Sawyer what was going

20   through his head when he decided to make the settlements

21   that he made and direct it in a specific negotiation of the

22   settlement, that's one thing.  If you're talking about what

23   each and every client at various levels going into the

24   negotiation thought the allocation was, et cetera, that's a

25   completely different issue.

1          So if you're talking about the process of coming

2     up with the settlement, I suppose it might be relevant.  I

3     still don't -- actually, as I'm talking and responding, I'm

4     talking myself into changing the focus of my comment.  No,

5     that isn't relevant.  Why is that relevant?

6          The issue is what do you think it was really

7     worth?  That's an objective issue.  What was it settled for?

8     Not what did you personally think it was worth and what did

9     you settle for?  That, to me that's neither here nor there,

10    what somebody believed or didn't believe and what they

11    settled for.  The question is what was it worth on an

12    objective basis as best as can be determined and then you

13    look at the settlement and you decide whether or not that's

14    a reasonable settlement.  So, no, I don't think that's fair

15    game.

16          MR. GWYNNE:  Okay.  So it would be okay to ask the

17    witness what this claim was settled for but not what they

18    valued it as?

19          THE COURT:  Yes.

20          MR. GWYNNE:  Okay.  Thank you for that, Your

21    Honor.  I appreciate that.  Hopefully that'll help with

22    issues down the road, so thank you.

23          THE JUDGE: You're welcome.  Mr. Shore?

24          MR. SHORE:  Yes, Your Honor.  I won't retread

25    where you (indiscernible) on your ruling.  I think I

1        understand it.  I want to make two points that are germane

2        just to the ad hoc group because I think it kind of goes to

3        this last issue that you raised.

4                And let me start with that the confusion you had

5        at the beginning over the funded debt.  BNY Mellon actually

6        represents two indentured trustees.

7                THE COURT:  Right.

8                MR. SHORE:  The indentured trustees for EFCH

9        legacy notes, there're about $80 million of legacy notes in

10       EFCH and the $900 million of PCRBs at TCEH.  Both the EFCH

11       trustee and the PCRB trustee sought discovery.  We filed the

12       letter seeking the quash the discovery of both the EFCH

13       trustee and the PCRB trustee and only the PCRB trustee has

14       appeared to be heard.

15               So I think we can get just from a procedural

16       perspective that any discovery sought by the EFCH trustee

17       should just be quashed.  Let's be clear about what that

18       trustee is.  That is -- they're representing $80 million of

19       interest in an estate with $30 billion of funded debt claims

20       because the TCH first liens, the TCH second liens and the

21       TCH unsecureds all have claims at that estate.  So you can

22       see why they might not even want to spend money pursuing

23       discovery in a case in which they represent a tiny, tiny

24       fraction of the overall claims pool.

25               With respect to the PCRB trustee, let me focus on

1    what their plan objections are, which is that, you said

2    today and you said in the past with respect to keeping your

3    discovery tied to your plan objection.  TCH also has all of

4    that funded debt, $24 billion in first liens, $1.5 billion

5    in second liens, $5 billion in unsecured bonds.  All three

6    of those (inaudible) as the bank and bond debt have

7    guarantees against substantially all of the TCH stuff.  And

8    then there's $900 million of PCRBs.

9              Now, given that they're -- let's just focus just

10   on TCEH.  Given that there's almost no collateral at that

11   estate, all of those claims are going to be unsecured

12   claims.  In other words, the PCRBs are 3% of a $32 billion

13   unsecured claims pool.

14             Now, assuming TCH -- and we go for the -- we got

15   so far the requisite sign ups on the PSA.  Let's assume we

16   do get the class, which will be impaired of TCH unsecured

17   claims and will be consenting.  The PCRBs are going to be an

18   objecting creditor in a impaired consenting class, which

19   gives them really only three objections here.

20             They have objection to the settlement agreement,

21   which is a question of the debtor's business judgment.  What

22   -- I think Your Honor has already ruled on this in

23   connection with the EFH Committee request.  What the TCEH

24   creditors think about the debtor's business judgment in

25   agreeing to that settlement is completely irrelevant.  They

1    have a good faith objection.  Again, this was raised with

2    the EFH Committee.  What the TCEH ad hoc group thinks about

3    the reasons why and the good faith of the debtors in

4    proposing the plan is completely irrelevant.

5             The only objection they have in which we might

6    have relevant discovery is the best interest test, right,

7    that the PCRBs believe they would be better off in a Chapter

8    7 liquidation than -- Chapter 7 liquidation that just set up

9    a hypothetical TCEH litigation, which goes to your point

10   about, you know, what are we effecting here in the

11   litigation?

12            THE COURT:  Can I interrupt for a moment?  I'm

13   sorry.

14            MR. SHORE:  Yes.

15            THE COURT:  Don't they also have an unfair

16   discrimination or absolute priority rule objection?

17            MR. SHORE:  Well, that -- no, for the following

18   reasons, right?  The TCEH unsecured pool is -- well, I'm

19   going to come to that but, no, because they actually share a

20   pro rata with all allowed TCEH claims.  There's just

21   plumbing mechanics in the (indiscernible) ball in which the

22   creditors with subsidiary guarantor claims get the benefit

23   of the deficiency waiver.

24            THE COURT:  Okay.

25            MR. SHORE:  What it does roll into is a best

1    interest objection and I'm going to get to that in one

2    second.

3           The -- what they've asked for and what Mr. Gwynne

4    says he wants is he wants the analysis of the TCEH group

5    into the value of the claims against the first liens and the

6    claims against the E-side that would land into the TCEH box

7    and then get distributed out to TCEH creditors, his argument

8    being that if we did that, if we did the E-side settlement,

9    or if we did the E-side litigation and we did the litigation

10   against the first, we'd do better.

11          Let's be clear about this.  In litigating against

12   the first, as you know -- I think you said you read the

13   standing motions -- the big claim in there are the LBO-

14   related claims and the requests that the court void the

15   liens of the first lien.  At TCEH it puts them back in

16   exactly the same place.  It puts them in a position of

17   sitting (indiscernible) then with $24 billion of what was

18   secured claims and is not unsecured claims.  That doesn't

19   change their treatment at all.

20          Mr. Gwynne said repeatedly and vociferously, Your

21   Honor, that he had no problem with the prior plan.  The

22   prior plan had the DEA settlement in it.  So let's put all

23   of that settlement, the $700 million into the TCEH box.

24          His Chapter 7 liquidation analysis, the

25   hypothetical win by the trustee, is his client's 3% of $700

1    million, or $21 million.  So when I'm fighting discovery

2    that's causing me to do -- defend any money and to respond

3    to this and run more searches, I'm looking at a creditor

4    whose best interest objection would say he gets $21 million

5    saying that he would do better -- that's not discounted for

6    any kind of litigation risk.  He'd rather do that than take

7    his 6% of the rights which are being made available to

8    unsecured creditors.

9          So how does this work?  He says, well, my problem

10   is I'm getting discriminated against because I don't get to

11   share in the deficiency of the firsts, right?  That claim

12   has put me in a worst position and I'm being discriminated

13   against.

14          Well, technically, he's sitting in the unsecured

15   pool but what he continuously overlooked when he says I

16   don't get the benefit of the deficiency is he's getting the

17   benefit of getting rid of all the secured claims in the TCEH

18   box.

19          The recovery pool, right, will be $5 billion in

20   TCEH unsecured, $1.5 billion of TCEH seconds, $900 million

21   of PCRBs and only $8.1 to $9.5 billion of deficiency claims.

22   That is $15 billion to $16 billion of allowed first lien

23   claims are coming out of the TCEH box.  So if he wants to be

24   treated ratably, what ends up happening is he gets diluted

25   further than what he is.

1          What he gets in this settlement is that the TCEH

2     first non-deficiency claim, that is what they are covering

3     out of the collateral with the subs, gets taken out of that.

4     So instead of getting diluted, he actually gets an increase

5     where now he is sharing not in 3% but in 6% of the pool at

6     TCEH.

7          So I'm having a very hard time understanding why

8     the trustee is saying he wants to go ahead, vote this plan

9     down and push forward with a litigation strategy that other

10    people are going to have to pay for that at the end of the

11    day the other people are going to both control the

12    litigation and control the settlement of since he's a

13    fraction of the group and say I want to push that to the end

14    for $21 million of value in my up scenario.

15         So, you know, he's gotten discovery from the

16    debtors.  I get it.  But I don't understand why he keeps

17    pressing for documents and depositions from us with respect

18    to his best interest objection.  Your Honor had it exactly

19    right.  If he wants to press and he wants to convince Your

20    Honor actually that the $700 million should have been $7

21    billion and that all of that would get pushed into TCEH,

22    fine.  It does run counter to his statement that he was fine

23    with the plan before his plans were even laid out.  And if

24    he wants to say, no, I have a -- I would push forward with

25    the T-firsts and even though nobody requested it, I would

1    actually seek to have the court disallow any claims of the

2    firsts at TCEH, I suppose he could make that but he's going

3    to run into the problem that we repeatedly brought to his

4    attention that he didn't challenge the claims of the first

5    liens, that he did not bring a standing motion, that the

6    order specifically said that everybody other than the

7    claimants were locked into that settlement, were locked into

8    the stipulation.

9            And so I -- he's going to have a very hard time it

10   seems to me to be arguing for more better treatment than

11   exactly what the plan provides which is that those claims

12   actually get reduced by the amount of the non-deficiency

13   claim.

14           The only other thing I would add is in a footnote

15   to their papers filed last night, they actually then tried

16   to impose upon the TCEH ad hoc group a responsibility in not

17   agreeing, a responsibility to not agree, to withdraw the

18   standing motion as part of the settlement unless the PCRBs

19   were treated fairly.  We'll get to it because I'm sure it'll

20   come up in the context of a plan objection.  The cases they

21   cite are completely (indiscernible), particularly given the

22   procedural posture of where we were on the standing motion.

23           But this is not a situation in which the

24   settlement was conducted in the dark.  This was all done

25   with the debtors.  It was all done with the first liens.  It

1     was all done under the (indiscernible) of the mediator and

2     will all be put up for the court to address.  And

3     fundamentally the question will be is what they are getting

4     under this plan essentially 6% of the rights better than how

5     they would do in their hypothetical nuclear war in which

6     they seek to, as a 3% holder, dictate the course of a

7     litigation with both the E-side and the T-side firsts so

8     that they can get something better than what the

9     overwhelming majority of T-sides, unsecured --

10              [INTERRUPTION]

11              MR. SHORE:  Whoops.

12              THE COURT:  Go ahead.

13              MR. SHORE:  So I mean, I don't have -- if Your

14    Honor has questions and you want to ask further about the

15    discrimination point, I'm happy to elaborate further but

16    other than that, I just ask that with, you know, that the

17    PCRBs be held to the discovery they're going to get from the

18    debtors and that you both quash the EFCH discovery and the

19    PCRB trustee discovery.

20              THE COURT:  Okay.  Thank you.  Mr. Gwynne.

21              MR. GWYNNE:  Thank you, Your Honor.  With respect

22    to, first of all, the plan objections that we have, Mr.

23    Shore doesn't determine the scope of what those objections

24    are.  We think we have, among others, the ones that Your

25    Honor mentioned and when we file our plan objection, Mr.

1    Shore will see what they are.

2           But with respect to discovery, which is what this

3    is supposed to be about, document requests one through three

4    that the TCEH unsecureds refuse to answer are ones that the

5    debtors even agreed to answer.  Those were asking for drafts

6    of the third amended plan, including revisions that show a

7    change in the treatment of the PCRBs.  That's -- request

8    one, request two and three are emails and correspondence

9    among the PSA parties regarding the treatment of the PCRBs.

10          And why is that relevant that we think that

11   discovery from the TCH unsecureds ad hoc group?  And the

12   answer, Your Honor, is because they are the ones who propose

13   that (indiscernible) for the pollution control revenue

14   bonds.  It wasn't anybody else.  It was them.

15          So, you know, however they came up with the

16   discounter, their, you know, process for the discount is

17   relevant and it also is relevant because they asked for

18   authority to assert claims to revenue on behalf of the

19   estate.  So does the TCEH Committee.  And our belief is that

20   when those claims are then settled that, you know, there's

21   still claims of the estate.

22          So the fact that, you know, those two parties

23   asked to bring them derivatively doesn't mean they can

24   settle them and then take an unfair benefit of the

25   settlement for themselves.  They are still estate claims and

1    the settlement should go to, you know, creditors of the

2    estates the way they would otherwise.  I think the cases

3    like (indiscernible) that we cited and others stand for that

4    proposition.

5           But the, you know, ad hocs here, while not the

6    plan proponent, as Your Honor knows, they're largely the

7    architects of the plan and they were involved in the

8    specific change in the treatment to the PCRBs, the drafting

9    and the changes in the plan and those things that are in

10   document requests one through three.

11          The other documents requests, four, five, six and

12   seven, Your Honor, I would say admittedly are similar to the

13   ones that you agreed with the debtor on, so I assume you

14   would do the same thing here with respect to the TCEH

15   unsecureds.  With respect to the interrogatory which we, you

16   know, address in Page 4 of our letter regarding TCEH, we're

17   just asking for witnesses with knowledge of the facts

18   regarding the basis for the treatment of the PCRBs compared

19   to other funded debt.  That was interrogatory two.

20          Interrogatory four dealt with knowledge regarding

21   the particular debtors that hold the TCEH first lien

22   investigation claims, not the value of them.  And then

23   interrogatory five is, again, witness familiar with the

24   facts underlying the basis for not committing the PCRBs to

25   share in the waiver of the first lien deficiency claim.

1           So we think that those are pretty, you know,

2     narrowly tailored and relevant and we think we should be

3     entitled to that discovery.  We served the 30(b)(6)

4     deposition notice on the ad hoc unsecureds that we, you

5     know, also believe the same reasons as the debtor to be

6     appropriate and would ask that Your Honor permit that

7     discovery to go forward.

8           With respect to the EFCH notice, Mr. Shore is

9     wrong about the amount but that's neither here nor there.

10    He's off by multiples of 10, but nonetheless I think there

11    was only I think one request related to that institute that

12    we withdrew, so and that was I think in the debtor's TCEH

13    (indiscernible), so that's -- you know, we're not taking

14    discovery for Bank of NY in its capacity as EFCH 2037 notes

15    trustee.  And that's all I have, Your Honor, unless you have

16    any other questions.

17           THE COURT:  Okay.  A reply, Mr. Shore?

18           MR. SHORE:  May I respond briefly, Your Honor?

19           THE COURT:  Yes.  Yes.  I'm sorry, yes.

20           MR. SHORE:  Oh, sorry.

21           THE COURT:  That's okay.  I said it three times

22    but you didn't hear me the first two.

23           MR. SHORE:  Oh, I didn't hear.  Sorry.  First, I

24    don't think it's proper for Mr. Gwynne to say you'll see my

25    objections when I make my objections.  When a request has

1    been made that they proffer the relevance so that the court

2    can assess the scope, proper scope of discovery, he has to

3    proffer it.  So the only things we have out there are

4    business judgment in the settlement, good faith, unfair

5    discrimination and best interest.  All of those are with

6    respect to a plan that the debtors have proposed.  All

7    right?

8            So he's got to -- I don't see that he said

9    anything that would implicate the views of the individual

10   creditors of the estate.  There were communications with the

11   debtors.  There were requests made for those debtors and,

12   consistent with how we've handled discovery in the past,

13   they'll get those communications from the debtors.  The, you

14   know ,Rule 26 expressly provides and if they can get it from

15   another source, they should get it from another source

16   before they start coming to us for those documents.

17           Finally, and hasty, he keeps saying we settled the

18   claim.  We didn't settle any claims.  We signed, the ad hoc

19   group signed a PSA that obligates the group and the

20   individual signatory members to support a settlement

21   proposed by the debtors.  We haven't done anything.

22           As part of that settlement, we committed to put

23   the standing motions on adjournment (indiscernible) and to

24   the extent that all of this is approved, the standing

25   motions will be withdrawn with prejudice.  So to criticize

1    us for having done that, particularly when the settlement

2    that the debtors have proposed and have sent out for

3    solicitation provides the PCRBs with a recovery that is

4    lightyears ahead of any other recovery they could receive

5    and does treat them the same as every other creditor of

6    TCEH, I don't quite understand the criticism.

7              So other than that, I have nothing further.

8              THE COURT:  All right.  Thank you.

9              MR. GWYNNE:  Your Honor, may I respond very

10   briefly?

11             THE COURT:  Yes.  Yes.

12             MR. GWYNNE:  Thank you.  I don't criticize the

13   TCEH ad hocs.  What the TCEH ad hocs have said previous is

14   that because they brought a motion for standing to assert

15   derivative claims that somehow they were entitled as a

16   result of that to better treatment than the pollution

17   control revenue bonds.

18             Our position was, look, these are estate claims.

19   And as Mr. Shore just said, the debtor settled the estate

20   claims, so we should be entitled to fair treatment of them

21   with other creditors of the TCEH debtor regardless of

22   whether we assert a standing claim or not.  That was my

23   point, Your Honor.  Thank you.

24             THE COURT:  You're welcome.  All right.  I am

25   going to not allow the discovery being sought against the ad

1    hoc committee, either the document request interrogatories

2    or deposition.  On the topics that are relevant to the PCRB

3    trustee, those -- that information is going to be provided

4    by the debtors.

5              Anything that I would allow to be collected

6    against the ad hoc group was squarely within the confines of

7    what the debtors are going to produce.  And the added

8    expense on a non-debtor party to respond to that discovery

9    with the marginal, at best, thought or hope that something

10   will be captured that's not going to be produced by the

11   debtors isn't justified on the cost benefit analysis.

12             In addition, I don't believe that the testimony of

13   the ad hoc group regarding the issues raised by the PCRB

14   trustee is going to be helpful to their position.  I'm not

15   going to get into, you know, what objections do they have to

16   confirmation or not, although I would note that one of the

17   things I stated previously was, you know, you don't get

18   discovery just because you want it.  It needs to be tied to

19   something real.

20             And Mr. Shore makes some very good points about,

21   you know, what the ad hoc group is and what the ad hoc group

22   isn't in connection with the plan and settlement agreement

23   and I believe that getting the information and proceeding

24   against the debtors is more than adequate for the PCRB

25   trustee to be able to make their case.

1            So I will strike the document request

2    interrogatory and deposition notice as it applies to the ad

3    hoc group.  All right?  And I hope that takes care of the

4    issues for today and that I will next see you at 9:30

5    tomorrow morning in connection with the PSA motion.  Is

6    there anything before we sign off?

7            I hear --

8            MR. SHORE:  No on the debtor's side.

9            THE COURT:  Okay.  I hear nothing, so we're

10   adjourned.  Thank you.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 56

1                              I N D E X

2

3                              RULINGS

4                                               Page       Line

5    Discovery Dispute Ruling                    53         25

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya Ledanski Hyde
     Digitally signed by Sonya Ledanski
     Hyde
     DN: cn=Sonya Ledanski Hyde, o,
     ou, email=digital1@veritext.com,
     c=US
7    Date: 2015.09.17 14:28:50 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 18, 2015