UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re: :
: Chapter 11
ENERGY FUTURE HOLDINGS : Case No. 14-10979(CSS)
CORP., et al., :
:
Debtors. :
______________________________:

United States Bankruptcy Court
824 North Market Street
Wilmington, Delaware

September 18, 2015
12:05 PM - 12:55 PM

B E F O R E :
HON CHRISTOPHER S. SONTCHI
U.S. BANKRUPTCY JUDGE

ECR OPERATOR: LESLIE MURIN

HEARING RE: Discovery Disputes in Connection with Confirmation of the Plan and Approval of the Settlement.

Transcribed by: Sonya Ledanski Hyde

A P P E A R A N C E S :

SULLIVAN & CROMWELL LLP

Attorney for Official Committee of Unsecured Creditors

BY: BRIAN GLUECKSTEIN (TELEPHONICALLY)

KRAMER LEVIN NAFTALIS

Attorney for Indenture Trustee Senior Second Lien

BY: GREGORY HOROWITZ (TELEPHONICALLY)

OFFICE OF THE UNITED STATES TRUSTEE

BY: RICHARD L. SCHEPACARTER, ESQ. (TELEPHONICALLY)

REED SMITH LLP

Attorneys for creditor Bank of New York Mellon

BY: KURT GWYNNE (TELEPHONICALLY)

WHITE & CASE

Attorney for The Ad Hoc Group of TCEH Unsecured Note Holders

BY: J. CHRISTOPHER SHORE (TELEPHONICALLY)

KIRKLAND & ELLIS LLP

Attorney for Debtors

BY: MARK E. MCKANE (TELEPHONICALLY)

BRENTON ROGERS (TELEPHONICALLY)

ALSO PRESENT TELEPHONICALLY:

DEREK C. ABBOTT

SCOTT L. ALBERINO

ARLENE R. ALVES

VAN BECKWITH

ADAM BERNSTEIN

WILLIAM BOWDEN

PEG A. BRICKLEY

TREVOR BROAD

EMILY A. BUSSIGEL

MARIA CHUTCHIAN

HOWARD A. COHEN

KEN COLLIER

MICHAEL L. DAVITT
MICHAEL D. DEBAECKE
DANIEL DEFRACHESCHI
STACEY DORE
DAVID M. DUNN
JUSTIN K. EDELSON
JAMIE EDMONSON
ALISON EGGERS
ANDREW EHRLICH
ERIN FAY
MARK A. FINK
MOSHE FINK
MICHAEL FIRESTEIN
SIMON FRASER
MEGGIE GILSTRAP
SETH GOLDMAN
TODD M. GOREN
ISLEY M. GOSLIN
ANNA E. GRACE
STEPHEN C. HARRIS
ANGELA K. HERRING
NATASHA HWANGPO
GARY L. KAPLAN
HAROLD KAPLAN
MICHAEL J. KELLY

MATTHEW W. KINSKEY
DAVID KLAUDER
EMIL KLEINHAUS
KIMBERLY LAWSON
RAYMOND LEMISCH
DANIEL A. LOWENTHAL
JASON M. MADRON
JONATHAN D. MARSHALL
ANDY MCGAAN
R. STEPHEN MCNEILL
STEPHEN MILLER
PAULINE K. MORGAN
HAL F. MORRIS
THOMAS E. OBRRIEN
MEREDITH S. PARKINSON
DARSHAN PATEL
RICHARD PEDONE
DAVID PRIMACK
ABID QUERESHI
NATALIE D. RANSEY
LARRY A. RAPPAPORT
RACHAEL RINGER
MARC B. ROITMAN
JEFFREY S. SABIN
JEFFREY M. SCHLERF

NED S. SCHODEK

ANDREA B. SCHWARTZ

MARK SHEPPARD

ANDREW M. THAU

MATTHEW UNDERWOOD

TAMARA VAN HEEL

THOMAS WALPER

JULIA M. WINTERS

P R O C E E D I N G S

THE COURT: Good afternoon, counsel. This is Judge Sontchi. This is a teleconference on a couple -- continued teleconference on discovery issues in connection with fact depositions and I'll turn it over to the debtors.

MR. MCKANE: Thank you, Your Honor. It's Mark McKane of Kirkland & Ellis on behalf of the debtors and we appreciate Your Honor's willingness to continue this aspect of the discovery conference from our last visit on Wednesday.

We have used that time very effectively to narrow down the issues. I believe that as it relates to the debtors there are only two remaining outstanding issues and with that I'd ask that my partner, Brent Rogers, articulate to those two issues.

THE COURT: That’s fine. Just so the parties know, I did read Mr. Anker's letter which I received and I also read the debtor's letter from this morning.

MR. ROGERS: Thank you, Your Honor. This is Brent Rogers on behalf of the debtors. I want to emphasize what Mr. McKane just said, and that's the great progress we've made in just the last couple of days in putting together a consensual deposition schedule under somewhat challenging circumstances.

I don't want to overstate the issue, but we've

been juggling the demands and schedules of multiple parties and witnesses and I think we've done so in a very successful way. I figured the Court was not particularly keen to wade into a fifth discovery dispute regarding two weeks of depositions. I'm happy to report that we are down to what we think is two remaining issues to be resolved.

The way we got there, Your Honor, is a day or two ago we, the debtors, put forward a comprehensive proposal for the deposition schedule that included 14 witnesses. We took into account the Court's guidance that we'd have 10 or so, but not 20 depositions and we came up with what we thought was a reasonable 14 deposition proposal.

For instance, we agreed to all of the individual depositions that have been requested and also identified witnesses who could testify to the topics in the 30(b)(6) depositions notices that are still outstanding. We also coordinated with the witnesses to come up with what we think is a rational schedule. We provided dates for most of those witnesses. There are still a few to hash out. Those dates are mostly for non-debtor witnesses and third parties but I think we are -- we've come a long way.

The general consensus and the general response that we got to our proposal was that it was very constructive. There's been some negotiations around the margins of that proposal and in the context of those

negotiations we've made some concessions and adjustments in an effort to be as accommodating as possible.

Apart from the two issues, which I'll get to shortly, there's really not much left requiring the Court's attention. Just to give you a brief rundown of the state of play, as Your Honor knows, the Bank of NY Mellon PCRB representative requested a 30(b)(6) deposition. After the Court's guidance earlier this week we've reached agreement with Bank of NY on the scope and identity of the witness who will give that testimony.

The EFH Committee requested 10 depositions and their request was joined by the EFH indentured trustee. Those depositions are all now on the calendar. We've added, in fact, another witness as a compromise in exchange for a commitment from the EFH Committee that they will not seek the deposition of any other of the witnesses that we've disclosed as having knowledge.

There have been compromises on the location of some of those depositions and we think we've narrowed any dispute with the EFH Committee to a very small issue regarding overlap of depositions on one day. Those dates do, or that overlap issue does require the Court's guidance and I'll explain it briefly shortly.

The US Trustee requested the individual depositions of the disinterested directors and also a

30(b)(6) deposition of the debtors. We've scheduled all of those. We scheduled all of the disinterested directors and we've identified witnesses on the 30(b)(6) topics.

The US Trustee raised a concern, as did the E Committee about some of depositions being outside of New York. I understand as of this morning we've resolved that and the relevant witness, who is Chairman Don Evans will appear in New York.

We've juggled the schedule a bit to minimize any conflicts on the UST's request. There's only one day I believe in which witnesses requested by the UST will be appearing on the same day and that includes the 30(b)(6) designees.

That brings us to the EFH first liens and second liens who both served 30(b)(6) deposition notices. We believe those notices are overbroad and irrelevant and contain topics that are outside the scope of relevant inquiry. Nevertheless, find the Court's ruling regarding Bank of NY and picking up on some language that the first liens had suggested, we did offer a fact witness regarding the treatment of those creditors' claims. We have not been able to reach agreement on that and that's the second issue that requires the Court's assistance.

So in short, I think we're very, very close to finishing the job here, at least with respect to the

debtor's witnesses. There may be some skirmishes among the third parties. I'll let them speak to that but we're down to the two issues of the first and second lien depositions and the minor overlap of depositions. So I'll start with the EFIH first and second lien deposition notices.

The -- as we have pointed in our letter, the EFIH first and second liens have a very small set of claims and we think the Court has already addressed how to deal with a 30(b)(6) deposition notice issued by one of the smaller creditors and that was in the context of the Bank of NY request for a 30(b)(6).

And there, the Court said that the proper scope of inquiry should be limited to the issues actually relevant to the objection that the creditor is raising and to the treatment of the creditors under the plan. That's exactly what we offer to the first and second liens. We offered a fact witness to testify to the facts of those creditors' treatment under the plan. We don't think that there's much that falls within that category, which is very narrow, but that's mainly because there isn't much for a fact witness to say here.

The first and second liens don't appear to be satisfied with that offer and, instead, want testimony that crosses over into legal interpretations of the plan and how it works in certain hypothetical circumstances. For

example, if the ruling -- Your Honor's ruling denying their make whole claims is reversed on appeal, they've explained to us that they have some confusion about how the plan treats them and we've responded that if they have that confusion, they ought to address that in the context of discussions over the disclosure statement. My understanding, Your Honor, is that they largely resolved their objection to the disclosure statement, so I'm not quite sure what they're looking for testimony on here.

They also want testimony on some broad topics like feasibility without any real limitation on those topics. It's not clear to me how the debtors would even prepare a lay witness to testify to something like that.

So what we're asking the Court to do, Your Honor, is simply apply the ruling that it made in the context of the Bank of NY 30(b)(6) deposition here to the first and second liens. And the way to do that is to strike the topics and the notice that they exist, nevertheless permit the first and second liens to take a narrow 30(b)(6) deposition regarding the facts of their treatment under the plan.

One other issue relating to those notices is that the first liens have taken the position in discussions that regardless of the scope of the appropriate topics, the debtors are helpless to prevent questions that may stray

into inappropriate territory. We think we need a court order that they are not to inquire into topics including legal positions, speculative matters like the treatment of their claims under hypothetical circumstances and the subjective intent of the witnesses, which Your Honor has already ruled is irrelevant to legal questions.

So that's the issue with regard to the first and second lien notices. The other issue that we think could use the Court's guidance is the question of overlapping depositions.

To some extent, it's just unavoidable that we're going to have some overlap. There are more witnesses than there are dates on the calendar. We've tried to minimize the conflicts and divide up those depositions in some reasonable way but the fact is that there are some dates that can't be moved. The witnesses have unavoidable conflicts that preclude any movement of their dates.

We tried to work with the witnesses that can move their dates to avoid the conflicts. For instance, we've -- there was a conflict between the depositions of co-CRO Paul Keglevic and one of the disinterested directors -- excuse me, disinterested directors, Billie Williamson. So we have moved Mr. Keglevic's deposition to avoid that particular conflict.

We think the remaining conflicts are not

substantial. There is -- let me give an example -- an overlap between the depositions of EFH Chairman Don Evans and one of the sponsor witnesses on September 25th. We understand that Chairman Evans' date cannot be moved. We've already -- he has already accommodated a request that the venue of his deposition be moved to New York but he's not able to move that date. Although we don't control the sponsors, obviously, we do understand that they have tried to move their deposition to 8:00 a.m. in the morning to partially help alleviate the conflict and we think at the end of the day there's no real prejudice to anyone given this particular overlap.

We understand that the deposition of Mr. Evans by the EFH Committee, for instance, will be handled by Sullivan & Cromwell while the sponsors will be handled by their conflicts counsel, so they should be able to divide and conquer there.

The reality is that the parties, including the debtors, are going to have to stretch to cover all of these depositions and the minor inconvenience, we think, is worth it to keep this thing on track. So with that, Your Honor, we're not looking for a pat on the back for successfully scheduling two weeks of depositions but, nevertheless, wanted to make clear that the progress has been substantial. With the Court's guidance, we think we can wrap up the few

remaining issues regarding the debtors. That’s all I have unless Your Honor has any questions.

THE COURT: No, I have no questions. Thank you.

MR. GLUECKSTEIN: Your Honor, if I may just very briefly, this is Brian Glueckstein from Sullivan & Cromwell on behalf of EFH Committee. Just before we go any further into the hearing just based on some of the comments Mr. Rogers made to focus the Court on what actually requires the Court's attention, we have worked constructively with the debtors over the past 48 hours on the schedule. The remaining overlap scheduling issue at least as far as the EFH Committee is concerned was resolved shortly before this hearing and we've agreed to compromise with the debtors further on that, so there's no live dispute with respect to the EFH Committee today as far as the debtors go.

As Mr. Rogers alluded to, there's still some scheduling issue to work out with other parties but we're working through that and there's nothing that requires the Court's attention today.

THE COURT: Thank you, Mr. Glueckstein.

MR. ANKER: Your Honor, this is Philip Anker, Wilmer Cutler Pickering Hale and Dorr for the EFIH first lien trustee. I also want to thank the Court for making itself available.

Let me just start -- and I only want to say a few

words on this but I really don't want the well poisoned. I think the remarks both in writing and now orally about the positions we took are really over the top misleading and, to put it bluntly, false. We, without going into a lot of detail, we shot repeatedly to the debtors to say we're willing to cooperate on scheduling, on talking about the topics and we were told by the debtors in a something we got two nights ago for the first time without any prior conversation, that they were objecting to putting out the 30(b)(6) on anything relating to us and it was only after while on a plan I sent four emails to Mr. McKane that we got them to agree to at least have a discussion with us.

I say that again not because I expect the Court to make findings but there is a flavor that we've acted unprofessionally but that just isn't right. And I will also say it never occurred to me that when I get an email from Kirkland's marked 408 privilege that the responses back and forth would end up getting attached as they were by Mr. Rogers in his letter. There's certainly things I would have wanted to put in before the Court that took the admonition that this was 408 discussion seriously. Enough said on that sideshow.

On the merits, I'm not sure how much dispute there frankly is. We are seeking a deposition and only one deposition. We're not seeking to take 10 like the EFH

Committee, nor do I think frankly it's an all-day deposition. We're bargaining exactly what Mr. Rogers was saying, our treatment under the plan.

It is true that some of that might arguably be legal. How do you interpret a contract is, in part, a question of law, albeit with a factual background. And it is also true that some of that can be resolved in the disclosure statement context. And it's right that we work long and hard with the bankruptcy lawyers at Kirkland who have been, I would say, quite helpful in getting disclosure in there regarding our positions and with clarifying some of the debtor's positions. But there remains, and I understood from the Court, although I wasn't on the conference the other day, so this is second hand, that the Court was suggesting it would like -- not sure there's even much of a need for a disclosure statement here and that we proceed the confirmation. I, too, am happy to address these issues in the context of confirmation, not in the context of the disclosure statement.

But there remain issues. The plan says, by way of example, that if our make whole claim is allowed on appeal prior to the effective date, then either it will be paid in the condition precedent that there be no allowed claim as of the effective date will be waived or the debtors may pull the plank. There is no equivalent sentence answering the

very simple straightforward question what happens if there is a reversal on appeal? Do the debtors acknowledge, as many plans provided, that in that circumstance the liability will continue to exist and be paid by the real value debtor in this case I believe (indiscernible) the successor.

We certainly are entitled in one form or another, whether it's deposition or otherwise, to get straightforward, simple, direct answer to that question, which I think the debtors don't want to provide because they all are, to use your words of a few weeks ago trying to be cute.

We're also entitled to explore underlying facts. If the (indiscernible) the claim is allowed and the Court says we are going -- EFIH owes it or new EFH, has any analysis been done of its ability to cover that liability? That's a fact. The answer can be we've done no analysis. That shuts down the inquiry. But I'm entitled to know what inquiry, what analysis, if any, has been done objectively and what the objective facts on the ground are that because that may affect our ultimately view on whether we are impaired or not.

As I said before, my hope -- frankly, I'm not terribly optimistic -- but my hope is if we don't end up putting (indiscernible) claim junctions because we really get to a point where we are comfortable where all of our

rights are being preserved, contractual, legal and equitable. But I submit that we're entitled to a simple deposition.

If at the end of the day during that deposition there is a view that we're asking legal questions, we'll have a concrete record and if I disagree, we can come to the Court. I'm not (indiscernible) just like my adversaries are not. I understand what the bounds of legitimate questions are and not and I can pretty well predict how the Court comes out if I simply am asking for legal opinions on a fact witness. I'm not going to do that. I'm not going to waste the witness' time. I'm not going to waste my adversary's time and I'm not going to waste this Court's time. But we are entitled, I submit, to a deposition. I think, frankly, at this point this differences are modest and what really is going on is an effort by Mr. Rogers and my adversaries to poison the well and limit what we can do and we'll be responsible in a deposition. I'm happy to answer any questions the Court may have but that's what I wanted to say.

THE COURT: Thank you.

MR. HOROWITZ: Your Honor, this is Gregory Horowitz from Kramer Levin on behalf of the EFIH second lien note trustees. We join in Mr. Anker's comments. We are similarly not identically, as the Court knows, situated with

regard to make whole claims. Our make whole claims are still before Your Honor, but we share the first lien note holders in concerns about preserving the meaningful right to appeal even if that appeal is pending on the effective date of the plan and we have the same interests and needs for a clear statement as to what the plan provides with regard to how a claim that is a make whole claim is allowed on appeal after the effective date would be treated.

We served a 30(b)(6) notice that sought much the same information that the first lien trustee sought. We agree with Mr. Anker in all of those respects.

I do want to separately highlight something Mr. Rogers did not (indiscernible) either in his letter or his oral comments, which is that I had a conversation with Mr. Rogers yesterday about our Item 7 on our 30(b)(6), which is our request for testimony with regard to feasibility. We do not think, as Mr. Rogers I think very conclusory stated, that that is an ambiguous or overbroad request. And the way we worded it, we actually amplified that we want information concerning projections as to the financial results of new EFIH after the effective date and its ability to satisfy its obligations as they come due and whether the debtors have projected whether the new EFIH -- EFH, excuse me, could satisfy make whole obligations that are allowed on appeal after the effective date.

The debtors are undoubtedly preparing to satisfy their obligation to demonstrate the feasibility of the plan and the ability to the new company to satisfy its obligations. That’s a fact issue. And it's a fact issue that is going to require information from the business people as the debtors. It will likely -- I can't conceive of how else the debtors will satisfy their obligation in this regard -- be presented to the Court by way of expert testimonies but the expert is going to be relying on projections that are provided by the business people. And I suggested to Mr. Rogers yesterday, as I tried to clarify any potential confusion that the debtors had as to what we were seeking that we could be satisfied on this issue by an agreement from the debtors that they will provide to us at the same time that they provided to their experts with all the projection material and underlying material that they provide to their testifying experts. That information will have to be disclosed eventually anyway under the federal rule.

And my problem in this regard is that the scheduling order, confirmation scheduling order requires simultaneous exchange of expert reports. So if I want to, as I might, put in evidence regarding the ability of the reorganized entity to satisfy potential make whole claims, which, Your Honor, doesn't just go to feasibility but it

goes to the issue of whether we're impaired, even if the debtors, as think they should, unambiguously state that if a court of appeals a make whole claim after the effective date, it will be -- that claim will be paid by reorganized -- by new EFH. That could still be impairment if new EFH could not satisfy that claim. We think that they can but we think we need to have evidence on that. And I may need to present expert testimony on that myself but my expert needs access to the same projections that the debtor's expert will have.

So I explained all of this to Mr. Rogers and I offered a reasonable compromise and haven't heard back from him. And instead what we hear in the lettering today is his conclusory assertion, A, that it's an issue of law, which it clearly is not. It's a factual issue. And, B, that it's overbroad or hypothetical. All projections for reorganized companies are hypothetical and speculative and they all have to take into account potential developments in the post-effective date world and they undoubtedly have.

As Mr. Anker says, if the answer is, no, we haven't even considered what would happen if make whole claims were allowed on appeal after the effective date, that's an important data point that we need. But we're entitled to it.

So certainly, as I say, I share with Mr. Anker's

comments with regard to the issues on treatment, make whole claims after the effective date. But in addition, I'm amplifying that we do need either 30(b)(6) testimony or a reasonable compromise, which I tried to float with the debtors yesterday and haven't heard anything back on.

MR. ROGERS: Your Honor, this is Brent Rogers for the debtors. May I respond?

THE COURT: Yes. Yes.

MR. ROGERS: Thank you. First, let me address Mr. Anker's comments. I've been accused of making false statements and definitely want to correct that.

First, Mr. Anker suggested that we somehow waited to lodge our objection to his Rule 30(b)(6) notice. I would just point out that we lodged that objection, as he said, two days ago. It was only four days ago that the first lien served their notice, so we think we came back to them in short order and very shortly after we received the Court's guidance on the Bank of NY's 30(b)(6).

We've also been accused of mischaracterizing conversations that have been held between the debtors and the first lien noteholders. The fact is, Your Honor, after we objected on the 16th, we offered and told all parties that we stood willing to meet and confer and to negotiation over the scope and number of depositions and we did exactly that. We met and conferred with Mr. Anker. Mr. Anker

himself characterized the substance of those meet and confer conversations in his letter. I did the same except that I wanted to make sure that I was using Mr. Anker's words and that’s why we attached the correspondence. So that's enough about that.

As to the substance, I think there seems to be an agreement that the EFIH trustee is -- first lien trustee is entitled to explore the facts of their treatment under the plan. But that's not the kind of question that Mr. Anker used as his example. His characterization of those as factual questions is just not correct. They were hypotheticals based on what happens to their claims if the make whole issue is reversed on appeal. That is not the subject of that fact testimony, nor is the debtor's interpretation of a plan a factual issue.

THE COURT: Wait a minute. Wait a minute.

MR. ROGERS: Mr. Anker suggested that he can predict how things will go if he asks for legal opinions and how the Court will rule on that. What we're asking the Court to do today is instruct the parties not to ask those questions in the first instance so that there is clear guidance and we don’t have to keep running to the Court in the middle of depositions to resolve disputes over questions that call for legal opinions.

We should not be required to prepare a witness on

topics that we think are irrelevant and we should not be required to sit and object and instruct a witness not to answer every time they are asked questions that go beyond the boundaries of a court order.

As for Mr. Horowitz's comments, it is true and correct that we had a discussion yesterday about one of the many topics in their 30(b)(6) notice. I asked for a more global discussion about the entire notice and was told that Mr. Horowitz needed to consult with Mr. Anker first.

As to the first -- as to the one topic that they were willing to discuss, feasibility, to the extent that projections are what he is looking for, if those projections have been sought in discovery and we have found responsive material, we have produced those projections. And so it seems to me that they don’t need a witness if that's all they wanted was the documents.

Unless Your Honor has any questions, that's all I have to say in response.

THE COURT: Well, I do have a question. How is it that it's not factually relevant how you're going to treat a claim if that claim exists? And one of the ways that claim could exist is if my ruling on the make whole claim is reversed and they have an allowed claim for $400 million? You have a plan that says they're unimpaired. If that happens, how is it not relevant what the treatment of that

claim would be as a factual matter in that instance? That's not hypothetical. That's not something somebody's just sort of spinning ideas about. That's a very real possibility. And you say the claim is unimpaired. Why can't they explore that?

MR. ROGERS: Your Honor, with respect, we do not believe that it's irrelevant. We just simply believe that it's not a fact question. That is a question about how the plan works and how the plan works is defined by the terms of the plan.

The plan is a legal document and the interpretation of that document is a legal question. We don't think it's relevant to have a fact witness or the debtors testify to their interpretation of how the plan would work under that hypothetical circumstance --

THE COURT: Do the debtors --

MR. ROGERS: -- not -- I'm sorry, Your Honor. Go ahead.

THE COURT: Do the debtors have a position? What's the debtor's position? If the third circuit reverses and says they have a make whole claim of $400 million, what's the debtor's position on whether or not that claim will be paid under this plan? Do you have a position?

MR. ROGERS: Your Honor, I apologize. I would have to defer that question to our restructuring colleague.

I am not sure what the position that we have taken on that would be.

MR. SHORE: Your Honor, this is Chris Shore. May I be heard on that?

THE COURT: Yes. Yes.

MR. SHORE: This is an issue that will actually come up Monday in the context of the disclosure statement and what the first and second lien trustees want in the way of disclosure on that issue. And it comes down simply as this. What the first liens and second liens want is a statement that their claims will be paid no matter what, no matter how long it takes, no matter how many courts they run to, no matter how many times it gets remanded, sent back up and back down. They want that statement because when this plan is consummated, they're going to take the position that there's no way that they can equitably move, that the company, no matter how long they litigate, there will always be an overhang on the public company because their treatment under the plan was going to be paid in full.

They're not being frank with you, Your Honor, about what their intents are. That's what they want. They want a statement no matter how long it takes, how many appeals they take, if an appellate court takes the position that their claim -- or finds, ultimately, in a final order that their claim was allowable, that, therefore, that blows

up or that they cannot be equitably muted.

I would suggest that rather than address this issue now we do it more on a full record with everybody able to speak on it on Monday because my view is -- and I will walk you through it -- that the fact that they might get paid under certain circumstances in the future, in a future time does not mean that they are impaired now. Impaired does not mean guarantee of payment under all circumstances. In fact, what they would have to do is show not only on appeal that they were entitled to the make whole but also have the Court's finding of non-impairment, with the extent the Court finds that, was erroneous under the circumstances. In other words, they want to go into a wild hypothetical.

The Court must -- and they're going to say the Court must, in order to find that they are unimpaired, run through all permutations of how they might ultimately be entitled the money before you can find that they're not impaired. I don't think that's correct. So I would suggest that rather than resolve this issue now with the first and second lien trustees, we kick it to Monday and we do it on a more full record.

MR. ANKER: Your Honor, this is Philip Anker. Actually, I think what whether or not we are or would be impaired if the plan says effectively that even if Your Honor's decision is reversed we would not be paid, I

(indiscernible) take seriously process and I'd go further than Mr. Shore. I think that's a confirmation issue, not a disclosure statement issue for Monday.

What I think is relevant today is that we're entitled -- I think Your Honor put it exactly right -- to know what the plan does and does not do visa vie our treatment. And while Mr. Shore may call that a wild hypothetical, look, appellate courts reverse all the time. There is a recent second circuit case, Chesapeake, different facts, but with a -- not a bankruptcy but with a distinguished district judge -- I say that because he's one of my former partners -- who found for the company that the make whole was not owed and outside bankruptcy, the bond holders took it up and was second circuit reversed and those bonds are now being paid and I think it is somewhere on the order of $400 -- it may even more -- million.

So we all know that sometimes appellate courts disagree with trial courts. I don't think Monday would be (indiscernible) and I'm not prepared Monday to have a full argument on what is or is not important. I'll go further than Mr. Shore and suggest that we save that for confirmation where I think it's appropriate.

But what we are entitled to know, everyone's entitled to know is the facts so when we end up reaching that, assuming, you know, we're not satisfied -- and I hope

we will be satisfied -- that we all are not ships passing in the night but rather we know what the facts are on the ground and what the plan provides. That's not a hard question to answer if people are not trying to be cute. And that's all we're asking for now. Thank you, Your Honor.

MR. HOROWITZ: Your Honor, this is Greg Horowitz. We agree with Mr. Anker that we don't see why this is a big disclosure statement issue. This is a confirmation issue. We're having a conference call -- a call today with Your Honor on a discovery dispute relating to confirmation.

The debtors, I think, could take one of two potential positions with regard to the treatment of potential make wholes allowed on appeal after the effective date. One would be to simply -- to state right out that the plan does not provide any recovery, for any recovery for make whole claims that are allowed after the effective date. I can understand why they would prefer not to have to say that because I think it's hard to say that and continue to maintain that we are unimpaired. That's clearly depriving us of our appeal rights.

Alternatively, they could say, well, the debtors intend to seek to dismiss appeals that are pending after the effective date on equitable movements grounds. If the Court of Appeals does allow make wholes after the effective date, the reorganized entity can and will satisfy those claims.

Again, I can understand why they prefer not to say that because saying that would largely eviscerate their ability, I think, to maintain an equitable movements argument. But they can't have it both ways and we are entitled to discovery to get them to, just to flush out that decision in anticipation of arguing it at confirmation and that's what this is all about.

I do take a little bit of issue with Mr. Shore's comment that we're not being candid. He's absolutely right. We would love to be unimpaired under this plan and we would love to be unimpaired through an unequivocal statement that our appeal rights will not be impaired by the plan, that any make whole that's allowed before or after the effective date will be paid in accordance with our legal rights. I don’t think that's -- there's anything unusual about that and I don't think that it adds anything to the strength or weakness of the argument to point out, as Mr. Shore does, that sometimes appeals go on a long time. And that's all I have to say, Your Honor.

MR. SCHEPACARTER: Your Honor, this is Richard Schepacarter from the United States Trustee's Office. Good afternoon. I just wanted to highlight the fact that given the short amount of time that the parties have had to meet and confer, that the debtors were very accommodating and have taken care of all of our issues, considering the fact

that, you know, the discovery schedule and the like have been sort of sprinkled over the Jewish High Holy Days, but I also wanted to note that with respect to the conflict that the one deposition, it is sort of an accommodation for us as well because it allows Ms. Schwartz to cover one of the depositions while I'll be covering the other one. So I just wanted to highlight that to the Court. Thank you.

THE COURT: Thank you, Mr. Schepacarter. Does anyone wish to be heard further on the dispute in connection with the first and second lien trustee? Okay.

MR. SHORE: Your Honor, this is Chris Shore, only to say that we are going to address -- we're going to address this on Monday because one of the objections that I don't believe is resolved yet is the request for the first and second liens for disclosure on that point. If they are in agreed with the disclosure right now, okay, but if we're not, then we're going to have to address that issue.

THE COURT: All right. Well, we'll deal with that Monday. Let me just say in connection with the disclosure statement and my comments the other day that, you know, one wasn't sort of necessary, I was referring to the PSA parties and whether additional, you know, disclosure was significant in connection with the argument that they had been solicited and my point was, you know, as a PSA party and the information they've been provided, you know, I couldn't

imagine there being very much more in a disclosure statement, if anything, that would have been relevant to them making that decision.

That comment, a little bit off the cuff, but the point of that comment dealt with the fact that they were PSA parties and I didn't mean to imply that for parties who are not PSA parties, such as the first and second lien trustees here, that disclosure wasn't required or helpful in connection with confirmation. So I just wanted to clarify my position on the record.

I think that the legal basis -- or excuse me, I think that the factual basis for the treatment under the plan of the first and second lien notes is something that is subject to discovery and I think that includes inquiry into what that treatment will be in the event that the claim is somehow resurrected -- and by the claim, I mean the make whole claim -- is somehow resurrected on appeal. And it may be that -- I think Mr. Horowitz put it well -- the debtors don't want to answer that question but I think that you can ask a factual question along those lines and the debtors are going to need to go on the record as to what their factual position is in the event that happens.

The treatment under the plan, including the, you know, payment in cash or other treatment, what that means has a factual component and it's fair game for discovery and

deposition. Now, it is true if Mr. Anker clarified or, not clarified. It is true that Mr. Anker acknowledged that we have partly a legal question, partly a factual question. We start to get into that treatment under the plan and whether or not it's impaired. Obviously fact witnesses can't testify to legal positions and I don't expect the fact witness to provide or be asked to provide his or her interpretation of what the legal documents mean.

Perhaps it's a fine distinction to draw but I think it's one that the lawyers in the room and on the phone are capable of drawing. I'm not going to allow inquiry into legal questions. I am going to allow inquiry into factual questions and where the two sort of blend together, I would err on the side of protecting the legal issue as opposed to having it treated as a factual issue.

But I think as clarified and limited by Mr. Anker and Mr. Horowitz today in what they're actually seeking deposition of, I think that is fair game and I'll allow the deposition on those topics.

With regard to feasibility, that's a bit of a rabbit hole to go down and I think to say you want discovery into feasibility of the plan, that is an incredibly broad question and, as we discussed and will discuss at length throughout this case, could deal with a number of things.

If we're talking about the issue as narrowed by

Mr. Horowitz, I guess in discussions with the debtors but at least as articulated on the phone this afternoon, I think it's a discrete, factual question. You know, assuming that the Court requires that claim to be payable in order for us to be unimpaired, will there be money under the projections, or however you want to define it, to pay that claim.? I think that's a fair, factual question that can be explored. I think that's the limit of what I would explore on feasibility but I think that opens up the door.

If you think you've disclosed already sufficient documentation to answer that question, I think you need to direct Mr. Horowitz to where that is and he can decide whether he needs further questioning. But as I heard it today, regardless of whether those documents exist or don't exist, I think that's a fair area of inquiry, again, as limited.

So I will allow factual discovery by the 30(b)(6) witness on the treatment of the first and second lien notes under the plan including what would happen or what that treatment is, excuse me, in the event that the make whole claim is ultimately allowed for whatever reason and also the feasibility, i.e. factual basis for whether that claim, if allowed, and necessary to be paid in order for the claims to be unimpaired, you know, where that money will come from or is there money to pay that claim? I'll allow inquiry into

those areas, otherwise I think I agree with the debtors on limiting the scope.

And it sounds, and appreciate very much because I know the Office of the United States Trustee does not have the legions of attorneys to throw at these types of matters than private parties do, it sounds like there's been an accommodation on the dual tracking and I very much appreciate the parties being able to reach an accommodation on that. It doesn't sound like I need to make a ruling in that connection.

I'm glad that the debtors have agreed to produce Mr. Evans in New York. They were going to be required to. This takes us back to May 2014. I think I made it pretty clear then. I'll make it clear again. The debtors could have filed this case in Texas. Mr. Evans could have been deposed in Dallas. They chose to file it in the Northeast.

One of the reasons we have venue here and one of the reasons I didn't transfer venue was the convenience of the attorneys, all of whom were located in New York and I expect the debtors to continue to follow through with that ruling back in May of 2014 and make witnesses available where the lawyers are and it sounds like they're doing that, which is terrific. I'm glad to hear it.

And unless anybody has anything further for me, I think that's it. I have some things to read to prepare for

a hearing at 3:00, so hopefully I can get off the phone rather quickly but I'll open it back up if there are any further questions or inquiries of the Court.

MR. GWYNNE: Your Honor, this is Kurt Gwynne from Reed Smith on behalf of Bank of NY Mellon as indentured trustee. As counsel for the debtor indicated, in light of the scope of discovery that Your Honor permitted us to take and the limitations thereon, we are (indiscernible) work out with the debtor, the depositions that Bank of NY Mellon could take and understanding also that this is a continuation of the hearing that we had on those debtor's deposition notices I just wanted to point out that one of the things that is listed, the last deposition listed, number 14, is a Bank of NY Mellon 30(b)(6) witness no the date to be determined for no more than four hours. That was something that the debtor put on the list but we have, you know, not agreed to that. In fact, I sent a letter to Mr. Shore this morning who I talked to after the hearing on the plan support agreement about that deposition.

In light of Your Honor's discovery rulings with respect to Bank of NY Mellon and what it is that we can and can't take discovery of, we think that deposition is inappropriate. I don't think that's before Your Honor today because Your Honor doesn't even have the deposition notice or correspondence from Mr. Shore or Reed Smith to address

that. But I did just want to point that out that that is an open issue, although we are fine with the deposition of the debtor's representatives.

THE COURT: All right. I'll await being contacted if my intervention in that issue is necessary and don't hesitate -- well, you can hesitate but don't feel constrained not to raise that issue with the Court and we'll do the best we can to accommodate you with a prompt teleconference and hopefully deal with any open issue as quickly as possible.

MR. GWYNNE: Thank you, Your Honor.

THE COURT: Anything else? Okay.

MR. MCKANE: Your Honor, it's Mark McKane for the debtor. We just want to say thank you for all of your help over the last two weeks with these discovery disputes. We're hoping to bring these to a conclusion.

THE COURT: Okay. Well, thank you. And again, I know you people are working very, very hard and putting out fires and trying to coordinate schedules and I appreciate everyone's professionalism and cooperation and the issues that have had to come before the Court have been very discrete and have been professionally and competently put in front of me and I've been able to make decisions and I do truly appreciate that. No judge likes to hear discovery disputes but if they continue to be as relatively innocuous

as these, it's a sign that people are doing their jobs as professionals and I appreciate that.

All right. Enough of that. Thank you very much. See you Monday at 9:30? See you then. Very good. We're adjourned.

(Whereupon, these proceedings concluded at 12:55 p.m.)

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certified that the foregoing transcript is a true and accurate record of the proceedings.

Sonya Ledanski Hyde

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde, o, ou, email=digital1@veritext.com, c=US
Date: 2015.09.21 10:52:52 -04'00'

Sonya Ledanski Hyde

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: September 18, 2015