Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                        :

                                   :    Chapter 11

6    ENERGY FUTURE HOLDINGS         :

     CORP.,                         :    Case No. 14-10979(CSS)

7                                   :

              Debtors.             :

8    _____ :

9

10

11

12                              United States Bankruptcy Court

13                              824 North Market Street

14                              Wilmington, Delaware

15

16

17                              September 21, 2015

18                              9:38 AM

19

20   B E F O R E :

21   HON CHRISTOPHER S. SONTCHI

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECR OPERATOR:  GINGER MACE

1   HEARING re Omnibus

2

3   HEARING re Disclosure Statement

4

5   HEARING re Motion to Approve PSA

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Dawn South

1    A P P E A R A N C E S :

2    KIRKLAND & ELLIS

3         Attorney for the Debtor

4

5    BY:  CHAD HUSNICK, ESQ.

6

7    BAYARD

8         Attorney for Delaware Trust Co. as Indenture

9         Trustee

10

11   BY:  GIANCLAUDIO FINIZIO, ESQ.

12

13   ASHBY & GEDDES

14        Attorney for WSFS, Trustee

15

16   BY:  REG TAYLOR, ESQ.

17

18   VENABLE, LLP

19        Attorney for PIMCO

20

21   BY:  JAMIE EDMONSON, ESQ.

22

23

24

25

1   UNITED STATES DEPARTMENT OF JUSTICE

2        Attorney for the U.S. Trustee

3

4   BY:  RICHARD L. SCHEPACARTER, ESQ.

5

6   POLSINELLI

7        Attorneys for TCEH Committee

8

9   BY:  CHRIS WARD, ESQ.

10

11  MORRISON & FOESTER

12       Attorneys for TCEH Committee

13

14  BY:  BRETT MILLER, ESQ.

15       TODD GOREN, ESQ.

16       ERICA RICHARDS, ESQ.

17

18  WHITE & CASE

19       Attorneys for TCEH Ad Hoc Group

20

21  BY:  CHRISTOPHER SHORE, ESQ.

22       TOM LAURIA, ESQ.

23

24

25

1   PAUL, WEISS, RIFKIND, WHARTON & GARRISON

2        Attorneys for the Ad Hoc Committee of TCEH First Lien

3        Creditors

4

5   BY:  JACOB A. ADLERSTEIN, ESQ.

6        BRIAN HERMANN, ESQ.

7

8   YOUNG CONAWAY STARGATT & TAYLOR, LLP

9        Attorney for the Ad Hoc Committee of TCEH First Lien

10       Creditors

11

12  BY:  PAULINE MORGAN, ESQ.

13

14  PACHULSKI STANG ZIEHL & JONES

15       Attorney for EFIH Second Lien Indenture Trustee

16

17  BY:  LAURA DAVIS JONES, ESQ.

18

19  BROWN RUDNICK LLP

20       Attorney for WSFS

21

22  BY:  JEFFREY JONAS, ESQ.

23

24

25

1   KRAMER LEVIN

2        Attorneys for Second Lien Indenture Trustee

3

4   BY:  GREGORY A. HOROWITZ, ESQ.

5        RACHAEL RINGER, ESQ.

6

7   PATTERSON BELKNAP WEBB & TYLER

8        Attorney for Law Debenture Trust Co.

9

10  BY:  DANIEL A. LOWENTHAL III, ESQ.

11

12  SULLIVAN & CROMWELL

13       Attorney for E Side Committee

14

15  BY:  ANDREW G. DIETDERICH, ESQ.

16

17  NIXON PEABODY

18       Attorney American Stock Transfer & Trust

19

20  BY:  RICHARD PEDONE, ESQ.

21

22  FOX ROTHSCHILD

23       Attorney for the Ad Hoc TCEH Noteholders

24

25  BY:  JEFFREY M. SCHLERF, ESQ.

1   MCELROY DEUTSCH MULVANEY & CARPENTER LLP

2        Attorney for TCEH

3

4   BY:  DAVID A. PRIMACK, ESQ.

5

6   KOBRE & KIM

7        Attorneys for TCEH

8

9   BY:  BENJAMIN SAUTER, ESQ.

10

11  SHERMAN & STERLING LLP

12        Attorney for Deutsche

13

14  BY:  NED S. SCHODEK, ESQ.

15

16  WILMER CUTLER PICKERING HALE AND DOOR LLP

17        Attorney for Delaware Trust

18

19  BY:  PHILIP ANKER, ESQ.

20

21  MORRIS JAMES

22        Attorney for Law Debenture

23

24  BY:  STEPHEN MILLER, ESQ.

25

1    CROSS & SIMON

2          Attorney for Stock Transfer & Trust

3

4    BY:   DAVID HOLMES, ESQ.

5

6    O'MELVENY & MYERS

7          Attorney for Apollo

8

9    BY:   DANIEL S. SHAMAH, ESQ.

10

11   HOGAN MCDANIEL

12          Attorney for Fehy and Fenicle

13

14   BY:   DANIEL K. HOGAN, ESQ.

15

16   O'KELLY ERNST & BIELLI, LLC

17          Attorney for EFH Corp.

18

19   BY:   CORY STEPHENSON, ESQ.

20

21   MORGAN LEWIS

22          Attorney for PIMCO

23

24   BY:   CHRIS CARTER, ESQ,

25

Page 9

1    DRINKER BIDDLE & REATH

2         Attorney for Citibank, DIP Agent

3

4    BY:  HOWARD A. COHEN, ESQ.

5

6    MCKOOL SMITH

7

8    BY:  MICHAEL R. CARNEY, ESQ.

9

10   SEWARD & KISSEL

11        Attorney for Wilmington Trust, at TCEH First Lien

12        Agent

13

14   BY:  ARLENE ALVES, ESQ.

15

16   KLEHR HARRISON

17        Attorney for UMB Bank, Indenture Trustee

18

19   BY:  RAYMOND H. LEMISCH, ESQ.

20

21   POTTER ANDERSON & CARROON

22        Attorney for Deutsche Bank New York

23

24   BY:  R. STEPHEN  MCNEILL, ESQ.

25

1    MMWR

2         Attorney for EFH Committee

3

4    BY:  NATALIE RAMSEY, ESQ.

5

6    PERKINS COIE

7         Attorney for DTC

8

9    BY:  TINA MOSS, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.

4              MR. HUSNICK:  Good morning, Your Honor, Chad

5     Husnick of Kirkland & Ellis appearing on behalf of the

6     debtors.

7              Your Honor, we're here today on the debtor's

8     motion to approve a disclosure statement and related

9     solicitation procedures.

10             I fortunately expect that today's hearing will be

11    shorter than originally anticipated, as we've been able to

12    significantly narrow the objections.

13             THE COURT:  Okay.

14             MR. HUSNICK:  Your Honor, in fact we've been able

15    to resolve all but one objection going into today, but

16    unfortunately on the way out of the elevator this morning I

17    heard that there might be another objection that I'll

18    preview for Your Honor at the end of my statement.

19             THE COURT:  Okay.

20             MR. HUSNICK:  Your Honor, I'd like to begin with a

21    short overview of how we got here and then I'll turn to the

22    disclosure statement objections specifically.

23             Your Honor, the debtors filed the disclosure

24    statement and related motion on April 14th.  That original

25    disclosure statement, Your Honor, contains a significant

1    amount of flexibility as to the appropriate path for

2    restructuring the companies, including three in particular

3    paths.  The sale and merger path, the backstop plan, and a

4    potential stand-alone plan.  All three of those paths, Your

5    Honor, contemplated a tax-free spin of reorganized TCEH.

6              As Your Honor knows the debtors engaged since the

7    April filing with both sides of the stakeholders, both the

8    E side creditors as well as the T side creditors, on

9    potential consensual resolution of these chapter 11 cases.

10             Your Honor, those discussions resulted on July

11   23rd in the filing of a modified plan and disclosure

12   statement that contemplated not three paths but instead two.

13   That dual path plan contemplated either an E side stand-

14   alone equitization plan or a transaction with the Hunt

15   Consortium and the unsecured TCEH creditors that would have

16   a merger transaction.

17             Both of those paths, Your Honor, as I said, were

18   set forth in detail in the disclosure statement filed on

19   July 23rd.

20             Your Honor, the debtors then continued to

21   negotiate with both sides of the parties, and as you know

22   ultimately reached a deal with Hunt Consortium and the TCEH

23   unsecured creditors.  That deal, Your Honor, was

24   memorialized in the plan support agreement that Your Honor

25   approved on Friday by order entered on the docket.

1          Ultimately, Your Honor, at the same time as

2    executing the plan support agreement the debtors filed an

3    agreed upon plan of reorganization and revised disclosure

4    statement.

5          The deal, as you know, provides that the E side

6    creditors will be left unimpaired receiving a 100 percent

7    recovery and generate significant consensus amongst nearly

8    all of the T side creditors, including the TCEH first lien

9    creditors, the TCEH unsecured creditors, and the TCEH second

10   lien creditors.

11         Your Honor, we filed on August 10th the third

12   amended disclosure statement and plan that reflected that

13   deal and dropped the E side stand-alone equitization plan.

14         Your Honor, we believe that the 200-plus page

15   disclosure statement, and I tried to weigh it this morning

16   to give Your Honor exactly how much of a weigh, but I didn't

17   have a scale --

18         THE COURT:  Uh-huh.

19         MR. HUSNICK:  -- nevertheless we believe that 200-

20   plus pages provides all of the information required under

21   Section 1125 of the Bankruptcy Code for adequate information

22   standard, and certainly is enough information to allow

23   creditors who are voting on the plan to make an informed

24   judgment as to whether to accept or reject that plan.

25         Among other things, the disclosure statement

1    provides a very detailed history, sometimes sorted, about

2    these Chapter 11 cases.  Your Honor, it also summarizes the

3    proposed transactions, and I'm not going to go through in

4    detail like I normally would at a disclosure statement

5    essence of the deal, because I think Your Honor has heard

6    enough about it, unless you'd like more.

7             THE COURT:  No.

8             MR. HUSNICK:  But, Your Honor, it also summarizes

9    the proposed treatment for classes of claims and interests

10   under the plan, it describes at length risk factors

11   associated with these restructuring transactions, and last,

12   but certainly not least, it provides and make very clear

13   that all rights of all parties are reserved as to

14   confirmation issues and the debtor's motion to approve the

15   global settlement agreement.

16            Your Honor, at bottom I think it's undeniable that

17   the disclosure statement contains adequate information.

18            Your Honor, we received as I previewed at the

19   status conference in August 12 -- or it was 11 at the time

20   objections.  We did receive one additional objection from

21   the Office of the United States Trustee.

22            As to the 12 objections we worked very hard with

23   all of the various parties, including those who are

24   unimpaired under the plan, to resolve their select

25   disclosure statement objections, and I'm happy to report

1    that on Friday we filed a fourth amended disclosure

2    statement and plan that reflected many of those changes, and

3    that can be found at docket number 6111.

4            Your Honor, we then continued to work through the

5    weekend, and I believe as we've informed chambers by filing

6    a revised objection summary chart, that we've narrowed those

7    objections to one and now two.

8            Your Honor, before I begin to address the two

9    pending objections I want to make just a few statements on

10   the record related to resolved objections, and these are

11   generally statements that were agreed upon or were

12   requested.

13           First, Your Honor, I'd like to address the

14   reservation of rights.  Contained both in the disclosure

15   statement and in the order approving the disclosure

16   statement the debtors have agreed to include a reservation

17   of rights that makes clear that the rights of all parties to

18   object to either the plan on confirmation related basis or

19   the global settlement agreement that's the subject of the

20   motion I mentioned earlier, will be preserved and will be

21   heard at the hearings on those respective matters.

22           Second, Your Honor, based on Your Honor's

23   statements at the Friday discovery conference we wanted to

24   make a clear and concise -- as concise as possible statement

25   about the proposed treatment of make-whole claims under the

1    plan.  And pardon my reading, Your Honor, I don't want to

2    get this wrong.

3         The plan does not contemplate payment of make-

4    whole claims under any of the EFIH or EFH Corporation

5    indentures.  It is a precedent to consummation of the plan,

6    but the make-whole claims have been disallowed by the

7    bankruptcy court as of the effective date.

8         If the bankruptcy court or an appellate court

9    determines prior to the effective date that any of the make-

10   whole claims are allowed claims the debtors will not have

11   satisfied a condition precedent to consummation of the plan

12   and the debtors and the plan sponsors will need to either

13   amend the plan or waive the condition precedent.

14        If (a), the bankruptcy court has disallowed the

15   make-whole claims prior to the effective date, and (b),

16   subject to all appellate rights, including the right to

17   assert equitable mootness, any of those make-whole claims

18   are subsequently determined by an appellate court to be

19   allowed claims that must be paid by either reorganized EFIH

20   or new EFH, then such allowed claims will become obligations

21   of reorganized EFIH or new EFH, as applicable.

22        The debtors certainly do not believe that they are

23   legally required to establish an escrow for claims that have

24   been disallowed by the bankruptcy court.  The debtors

25   believe this would reverse the legal standard required for

1    an appellant seeking a stay pending appeal by effectively

2    requiring the debtors to bond over that appeal.  And we cite

3    in support of that In re: Chateaugay Corp. 10 F.3d 944.

4           While holders of make-whole claims may challenge

5    the feasibility of the plan, the debtors believe that in

6    reviewing any such challenge the bankruptcy court would have

7    to adjust the risk of liability for make-whole claims based

8    on the likelihood of success on appeal.

9           The debtors believe that the bankruptcy court in

10   determining feasibility at the confirmation hearing will

11   take into consideration its views as to the relative merits

12   of the appeal when considering the effect that a potential

13   reversal of the make-whole claims decisions would have on

14   the feasibility of the plan as well as the projected

15   financial wherewithal of reorganized EFIH and new EFH.

16          Ultimately, Your Honor, the debtors believe that

17   any challenge to the feasibility of the plan based on an

18   assertion that reorganized EFIH or new EFH will be unable to

19   satisfy subsequently allowed make-whole claims will fail

20   given the bankruptcy court's prior rulings on make-whole

21   claims and given that reorganized EFIH and/or new EFH are

22   anticipated to be investment grade issuers.

23          Your Honor, the third statement related to

24   resolved objections that I'd like to make relates to the

25   objection filed by the Department of Justice on behalf of

1    the Environmental Protection Agency.

2           Your Honor, the debtors included significant

3    additional disclosure related to environmental liabilities

4    and included in the revised plan that was filed on Friday,

5    modifications to the plan regarding the treatment of the

6    effect of the plan on any such environmental liabilities.

7    And with that inclusion we were able to resolve the EPA's

8    objection to the disclosure statement.

9           To be clear, Your Honor, though the debtors have

10   also agreed to disclose in the plan supplement or upon the

11   filing of a motion on notice and opportunity for a hearing

12   that if pursuant to the plan or the restructuring

13   transactions approved under the plan the Martin Lake Power

14   Plant will be directly owned by any entity other than

15   reorganized Luminant Generation Company LLC after the

16   effective date or the Big Brown Power Plant will be directly

17   owned by an entity other than reorganized Big Brown Power

18   Company LLC after the effective date.  They will disclose as

19   such in the plan supplement or in a motion filed on the

20   docket.  United States of course reserves its right to

21   object to any such change in direct ownership over the

22   plant.

23          With that, Your Honor, I did not plan to summarize

24   all of the other changes we made in the disclosure statement

25   filed on Friday unless Your Honor would like me to walk

1    through each of those, but suffice to say those changes,

2    while significant, were able to resolve most --

3                THE COURT:  Yeah.

4                MR. HUSNICK:  -- of the objections, and I'll just

5    now be ready to turn to the remaining two objections.

6                THE COURT:  That's fine.  It's not necessary to go

7    through the -- I reviewed the blackline over the weekend.

8                MR. HUSNICK:  Thank you, Your Honor.

9                Turning to the first objection is the objection of

10   the two asbestos plaintiffs.

11               Your Honor, in effect the asbestos plaintiffs

12   raise two points in their disclosure statement objection.

13               The first I agree goes directly to the heart of

14   adequacy of disclosure, and that is a lack of disclosure --

15   an alleged lack of disclosure regarding the assets and

16   liabilities of certain of the debtor entities that have

17   asbestos liabilities, including EEC Holdings, EECI, Inc.,

18   and LSGT Gas.

19               Your Honor, the second objection is in effect a

20   disguised patently unconfirmable objection, perhaps not

21   disguised, but it's a patently unconfirmable objection and

22   I'll discuss that second.

23               As to the disclosure statement objection, Your

24   Honor, and the lack of disclosure.  Your Honor, the first

25   piece of information that was requested was more detail on

1     the specific assets and liabilities of these entities, and

2     as I went back, Your Honor, and looked at the SOFAs and

3     schedules I determined, and it came back to me, that we did

4     file separate SOFAs and schedules for each of the 70 plus

5     debtor entities in this case, including the 3 or 4 entities

6     that have asbestos liabilities.  Your Honor, those SOFAs and

7     schedules detail the assets and liabilities, including the

8     insurance policies that were mentioned in the asbestos

9     plaintiffs' objection.

10            Since that time, and to rebut any argument that

11    the SOFAs and schedules might be outdated, the debtors have

12    been required on a monthly basis, after an agreement with

13    the Office of the United States Trustee, to file separate

14    monthly operating reports for each entity, and those monthly

15    operates reports include income statements and balance

16    sheets for every single debtor entity.

17            As a result, Your Honor, there can be no assertion

18    that throughout the entirety of the case that the debtors

19    haven't been publicly -- very publicly tracking exactly what

20    happens, vis-à-vis, intercompany claims and other assets and

21    liabilities of these entities.  And we highlight just

22    examples of that in the additional disclosure statement

23    language that we provided.

24            Your Honor, we also included in the revised

25    disclosure statement a summary of the insurance policies

1    that are available.  Your Honor, the assertion was that the

2    debtor should disclose the existence and application of

3    insurance policy policies that would or could potentially

4    cover asbestos claims, and I submit, Your Honor, the list

5    and the schedules and statements as well as the statements

6    that we've added to the disclosure statement about the

7    potential availability and the limits on that availability

8    is more than sufficient to satisfy the request for

9    additional disclosure related to the insurance policies.

10            Finally, Your Honor, the asbestos plaintiffs

11   requested a separate statement to voting asbestos creditors.

12   We drafted an entire page single spaced of language that

13   laid out the pieces of information I've already summarized

14   for you.  In addition laid out in detail the position of the

15   plaintiffs' attorney -- I'm sorry -- of the plaintiffs

16   regarding their treatment under the plan and their objection

17   to the plan on the basis of non-confirmability that I'll

18   address in a moment.

19            Notwithstanding our repeated request for

20   additional disclosure we have been rebuffed and told that no

21   amount of disclosure would ever resolve the disclosure

22   statement objection of the asbestos plaintiffs.

23            That takes me to what I then understand to a

24   patently unconfirmable objection.  The sum and substance of

25   that objection, Your Honor, is that the debtors cannot

1    confirm a plan for the asbestos debtors unless the debtors

2    include in that plan a channeling injunction under 524(g) of

3    the Bankruptcy Code.

4              Your Honor, I think this is clearly a confirmation

5    objection and certainly not a patently unconfirmable

6    objection given your prior rulings in this case about the

7    applicability of 524(g), nevertheless I just briefly address

8    it.

9              The debtors are not seeking a channeling

10   injunction here and therefore 524(g) is not applicable.  The

11   January opinion from Your Honor regarding the ability to

12   implement an asbestos bar date for unmanifested claims

13   rejected a very similar argument and held that 524(g) is not

14   mandatory.

15             Accordingly, Your Honor, the debtors believe at a

16   minimum we can get past the disclosure statement phase on

17   such an objection and would respectfully request that that

18   objection be overruled.

19             That takes me, Your Honor, to the last objection

20   that we heard about recently.  The objection here, Your

21   Honor, is from Fidelity in its capacity as a holder of the

22   EFH unsecured notes.

23             Your Honor, Fidelity did not file an objection to

24   the disclosure statement in the first instance.  We did

25   however receive an objection from the EFH indenture trustee,

1    that is American Stock Transfer represented by Mr. Pedone.

2              Your Honor, heard at prior hearings from

3    Mr. Pedone and as well as indenture trustee's pleading that

4    the plan did not contain sufficient detail about what the

5    debtors intended with the language that said the EFH

6    unsecured notes will be left otherwise unimpaired under

7    Section 1124 of the Bankruptcy Code.

8              Your Honor, the issue here comes down to

9    countervailing positions between the trustee and a major

10   holder of those bonds represented by the trustee, neither of

11   whom is voting on this plan.

12             The dispute is whether the treatment should be

13   specific, which the debtors have entertained the indenture

14   trustee's objection, I'll speak to that in a second, or

15   generic, which is what the plan in the disclosure statement

16   originally provided.  So let's dissect that a bit.

17             As I said, the plan originally said that the EFH

18   noteholders will either be paid in full in cash or otherwise

19   left unimpaired.  Objection from the EFH indenture trustee

20   says otherwise unimpaired is too generic, not enough detail,

21   need more disclosure about what you meant.

22             The debtors went back to the drawing table with

23   the plan sponsors and we clarified in very specific detail

24   the treatment that we meant, which is reinstatement pursuant

25   to the terms of 1124 as well as the terms of the indenture.

1    The indenture contains provisions that allow that debt to be

2    reinstated at TCEH -- reorganized TCEH.  So we made clear

3    that what we meant by otherwise unimpaired is reinstatement,

4    and we spelled that out in detail.

5              Now the major holder of the EFH debt, Fidelity, is

6    coming forward and saying that that is a -- or a significant

7    or material change to their treatment.  Your Honor, it is

8    not.  Last I checked 1124(2) I believe contemplates

9    reinstatement.  The plan said that they will otherwise be

10   left unimpaired under 1124, which left use either (1),

11   leaving their rights otherwise unaltered under 1124(1), or

12   (2), 1124(2) is reinstatement.  We picked 1124(2) and we

13   made that clear in the disclosure statement and in the plan.

14   As such, Your Honor, this is not a change.

15             All that said the debtors are perfectly happy to

16   do it whichever way the parties want, in fact we'd go so far

17   as to send one disclosure statement to the indenture trustee

18   and another disclosure statement to the holder.

19             The fact is that neither of them is going to be

20   voting and it's simply immaterial.

21             On complaints about disclosure, because you're

22   going to hear I suspect from Fidelity that the debtors first

23   explained this on Friday when they filed their fourth

24   amended disclosure statement and plan.  Those complaints

25   should ring hallow.

1          There's an abundance of disclosure regarding the

2   reorganized TCEH, including its financial wherewithal on a

3   post-reorganization basis, including projections and a

4   valuation analysis.

5          Your Honor, I doubt anyone in this case could say

6   that they don't know enough about reorganized TCEH after the

7   last two years.

8          We also discussed on multiple occasions with

9   counsel to Fidelity the potential for reinstatement under

10  this term of the indenture, so again, it's not a surprise.

11         For all of the foregoing reasons, Your Honor, we'd

12  respectfully request that you overrule any request -- any

13  objection of Fidelity or any request for delay approval of

14  the debtor's disclosure statement.

15         And unless Your Honor has any questions that's all

16  I have for this morning.

17         THE COURT:  Thank you.

18         Yes, Mr. Dietderich.

19         THE DIETDERICH:  Good morning, Your Honor, Andy

20  Dietderich, Sullivan & Cromwell for Alexa Cransley (ph) for

21  the official committee of EFH.

22         Today's hearing is simultaneously a non-event and

23  a water shed.  There's a lot of smart lawyers on the T side

24  sitting to my right and a lot of money involved.  And you

25  put brains and money in a room interesting things happen,

1    and they've dreamed up something entirely new in bankruptcy

2    I've never seen before, the unimpaired fulcrum.

3            We've informed the debtors that many of our

4    objections at confirmation and the settlement can be cured

5    by creditor approval on the E side.  We asked for

6    provisional ballots and we were declined.

7            It's our position that regardless of the merits of

8    confirmation of settlement the Bankruptcy Code and

9    applicable law do not permit this level of creditor

10   disfranchisement.  Full stop.  The debtors disagree.

11           Settlement appears, you know, in advance of

12   confirmation unlikely because now the PSA wraps everybody

13   together and in pursuit of the plan.  Mediation wasn't

14   available to us.  An objection today unhelpful.  If we're

15   not being solicited no amount of disclosure is adequate for

16   someone whose vote isn't sought.

17           So the trace left to us is to prove our case at

18   confirmation, which we intend to do.

19           We would like to reserve rights today on fees,

20   it's the only thing we need to reserve rights on.  Our

21   position is they should be allocated to the T side only in

22   the event this doesn't work.  We've told them it won't work,

23   we've informed the debtors of that, we've informed others,

24   our views are not secret.  We believe it's unfair if we're

25   proven right and we're back here in two months for a real

Page 27

1    disclosure statement hearing for the E side.

2             And that's all I have.

3             THE COURT:  Thank you.

4             MR, KAPLAN:  Good morning, Your Honor, Gary Kaplan

5    from Fried, Frank, Harris, Shriver & Jacobson on behalf of

6    Fidelity.

7             You know, Your Honor, I find it amazing sitting

8    here and saying the debtors made a non-material change and

9    we didn't object and they're shocked that I'm standing up

10   here today.

11            As the debtors know and as Your Honor knows

12   Fidelity is the largest holder of the EFH notes.  We've been

13   in this courtroom, we've been reading all of the pleadings,

14   and for the last couple of months all we have heard

15   repeatedly is the mantra of EFH creditors are being paid in

16   full in cash and so why are they complaining?  That's been

17   said over and over and over again by every single person

18   who's been at this table.  And in fact Your Honor has relied

19   on that in numerous decisions that were made about

20   discovery.

21            For example, when the official committee was

22   seeking valuation information at a hearing Your Honor asked

23   them, why do you need any -- why is valuation relevant when

24   the E side creditors are getting paid in full?  That is what

25   they have said over and over and over again.

1           And no statements came as recently as this past

2    week.  On Thursday when they were in font of Your Honor

3    seeking approval of the PSA they again made statements that

4    the E side creditors are getting paid in full in cash.

5           Mr. Shore's joinder, which I know Your Honor read

6    and said, you know, was were well written, specifically

7    said, the E side creditors are all getting paid in full in

8    cash, and no matter how much they battle this plan and make

9    us spend money they're all at the end of the day getting

10   cashed out and so they should have nothing to say.

11          That is what Fidelity has been reading throughout

12   this case for the last six to eight weeks as the debtors

13   have been pursuing to.

14          So Fidelity shares a lot of the concerns that the

15   UCC has been raising, a lot of the concerns that the

16   indenture trustee has been raising, but determined that

17   given that ultimately they're a creditor if they're paid par

18   plus accrued in cash that's all they're entitled to under

19   the Bankruptcy Code, they'll let their fiduciaries do the

20   job of dealing with the free option and all of the other

21   significant concerns that we have about the plan.

22          It was only this Friday night at 8:30 p.m. for the

23   first time that we say that the debtors were now saying we

24   didn't mean it and when we kept telling Your Honor and when

25   we were there before you on Thursday and we were there

1    frankly five hours earlier on the phone on Friday saying

2    payment in full in cash we didn't mean that with respect to

3    EFH.  Instead what we meant was not only are we going to

4    reinstate the bonds but we're now going to move you over to

5    reorganized TCEH.

6            So all of that stuff about it's not relevant to

7    look at TCEH's capital structure, we don't care about TCEH's

8    valuation, whether feasibility of TCEH's plan is relevant,

9    all of that before was completely irrelevant to the E side,

10   now that becomes a critical and fundamental issue to us.

11           And for that to come on a Friday night for the

12   first time that there is now going to be -- we are now going

13   wake up the day after the effective date as parties on the T

14   side is a major fundamental and material change.

15           And the debtors are going to say, as Mr. Husnick

16   said, oh, well gee these guys don't vote so it doesn't

17   matter.  I think that's fundamentally wrong for a number of

18   reasons.

19           Number one, this change does not just effect EFH.

20   Okay?  This change effects every single person on the T side

21   who is voting.  And they're going to say, well gee whiz

22   they're not objecting.  Of course they're not objecting,

23   they snuck this in Friday night at 8:30 after sitting there,

24   all the newspapers, everything has been saying paid in cash,

25   paid in cash, people were able to look at the T side capital

1    structure for weeks and months, and all of a sudden you have

2    all these holders waking up possibly today realizing, gee

3    there may be $500 million more debt on our side than was

4    anticipated and that is currently set forth in the

5    disclosure statement.

6              So parties who are voting should have the 25 days

7    that the Bankruptcy Code and rules require for disclosure.

8              And in terms of the parties who they're saying are

9    unimpaired, those parties also are entitled to disclosure.

10   It can't be that all the debtor has to do is say you're

11   unimpaired and therefore I don't have to tell you anything.

12   And that's really what they're saying, is well we said

13   you're unimpaired, and therefore -- you know, and they try

14   to frame this as though we had some dispute with the

15   indenture trustee, is they're saying, well gee whiz we

16   weren't clear, we weren't specific and therefore as long as

17   we use the words unimpaired we don't have to give you any

18   disclosure.

19             There no differentiation or distinction between us

20   and the indenture trustee.  The indenture trustee

21   appropriately was saying what do those words mean?  What the

22   debtor is now saying is we were playing fast and lose.  We

23   kept telling Your Honor that we were paying in cash, we

24   didn't mean that, that's not what this really meant, and

25   everybody here should have been smart enough to ignore all

1    of their statements in their briefs and when they argued to

2    Your Honor and frankly in their testimony that they really

3    intended to pay in cash, because they're hiding behind it

4    said or otherwise unimpaired and clearly they had this

5    going.

6           And, Your Honor, going back to the timing.  I

7    think there's a critical question that needs to be asked,

8    which is when they were here on Thursday and Friday was this

9    change already done?  Was this change already approved by

10   the boards of directors and the disinterested directors?

11   And if it wasn't done by Friday at 3 o'clock or any time we

12   were before Your Honor, did they really negotiate these

13   changes, go back to their boards of directors, have their

14   disinterested directors approve this and then have it filed

15   by then?  Or maybe they haven't gone to the boards of

16   directors for approval.  We have no record on when these

17   changes were approved and if they were approved.

18          And what highlights that, Your Honor, is that --

19   and Mr. Thomas got to talk about how, you know, the

20   disinterested director had testified in her deposition and

21   he said specifically that, you know, she's very credible and

22   she testified about it.  She was specific -- she

23   specifically testified in her deposition -- and I'm happy to

24   hand up the transcript -- that from the EFH point of view

25   the reason that she approved the PSA was because we're

1   paying EFH creditors in full and in cash.

2         So that's what the testimony was, that's when he

3   stood up and said she is in court that day, had she really

4   approved a plan that didn't provide for payment in full and

5   cash but was actually providing for reinstatement at the TCH

6   level?  Those are questions that frankly we deserve an

7   answer to and that should be that I think Your Honor who

8   ruled on the many discovery disputes based on the

9   proposition that they were being cashed out I think that the

10  Court should demand these answers from the debtor.

11        And I eluded to just a few more points.  Number

12  one in terms of the specific disclosure.  There's been no

13  disclosure whatsoever as to how the debtors will make the

14  determination whether to reinstate or whether to pay in

15  cash.  All it says is at the debtor's option.  I don't think

16  that's adequate.  When the are they going to opt?  How are

17  they going to opt?  What is going make that determination?

18  Who is going to make that determination?

19        There is absolutely no disclosure whatsoever other

20  than the fact that they in the -- you know (indiscernible)

21  of one more free option, whenever they wake one day and

22  decide they have the ability to do it.

23        Second there is no disclosure.  As I said, the

24  TCEH projections and financial information attached to the

25  disclosure statement don't contemplate reinstatement of

1    this.  They don't have cash flows attached to the disclosure

2    statement that actually show this debt being included, and

3    the cash flow.  And when I raised that with debtor's counsel

4    they said, oh, well you guys can do the math.  I don't think

5    we need to run the debtor's projections, try to overlay the

6    debt, and then argue about it.  That's what the disclosure

7    statement is about.  They're supposed to put in the

8    projections, they're supposed to make the assessment of

9    feasibility and reasonableness, and they're supposed to run

10   those things.  Creditors aren't supposed to do it.

11           And lastly, Your Honor, they have now opened the

12   door to turning the confirmation hearing into simply -- and

13   not that it's a simple issue -- but issues of impairment on

14   the E side, the free option, and those others, to now it's

15   going to involve a complete and fundamental issue of

16   everything on the T side is now relevant to the E side.  The

17   E side now has to look at every issue of the plan,

18   feasibility, and all of the different issues on the T side

19   that until Friday our understanding, and I think Your

20   Honor's understanding based on prior rulings, were those

21   were somewhat irrelevant to the E side because you're

22   getting cash the out.  They have now fundamentally altered

23   this and the debtors have two choices as I see it, Your

24   Honor.  They can either go back to the plan and say you're

25   getting paid in cash, which again the UCC can fight about

1    the different issues with that, but they can have that we're

2    paid in cash, or the debtors could renotice the disclosure

3    statement and say we didn't mean cash, disregard everything

4    that we've said, because what we're actually going to do is

5    reinstate you and then move over to TCEH.

6              THE COURT:  Thank you.

7              MR, KAPLAN:  Thank you, Your Honor.

8              THE COURT:  Anybody else on this issue, because I

9    want to focus on this before we turn to the asbestos issue?

10             MR. PEDONE:  Yes, Your Honor.  Richard Pedone on

11   behalf of American Stock Transfer as indenture trustee for

12   the EFH notes and that is all of the EFH notes not just

13   those held by Fidelity.

14             Mr. Kaplan summarized the change to the plan.

15   It's on page 47 of the redline that the debtor submitted,

16   you can see the last minute change in the language.  I

17   actually heard this might happen on Wednesday, late

18   Wednesday, and the language was put in.

19             Your Honor, it is a material change.  The EF notes

20   trustee is strongly of the view that these claims are in

21   fact impaired and that the issue will need to be fully and

22   fairly litigated in connection with confirmation.

23             The impairment arises out of treatment related to

24   the make-whole amounts, fees, the settlement, and of course

25   now where the debt will be paid.  There's been no discussion

1    of debt, 500 million or more of debt being stuffed over on

2    the T side, and those issues were shut down at discovery

3    appropriately if the payment was in fact in cash.

4              We did object to the language otherwise unimpaired

5    as being vague.  That objection was made well over a month

6    ago at this point, and at the last minute we received the

7    specific language saying what would happen, and that

8    specific language has created a material problem as you

9    heard for Fidelity.

10             We view the problem as slightly different.  We

11   viewed it as putting a sharp focus on the fact that this

12   plan will be not confirmable, is on its face not

13   confirmable.  As taking your guidance we've elected not to

14   fight patently not confirmable here fully reserving our

15   right.  What I wanted to -- to do that at confirmation.

16             What I do want to emphasize though however is that

17   once we establish that we are impaired or the Court rules

18   that we are impaired sooner that then means we begin the

19   disclosure statement process from scratch.  We do not

20   believe that this disclosure statement is adequate

21   disclosure for a party entitled to vote.  It's wholly

22   deficient if a party is entitled to vote.

23             We've chosen not to litigate the issue of how much

24   disclosure needs to go into a disclosure statement in a case

25   like this for parties who are not voting, because the debtor

1    is gambling everything on not being -- the party not being

2    impaired.  So we're fully reserving for future disclosure

3    statements what is required for all holders.

4            And I just want to note that in our pleadings we

5    outline that there are in fact, in particular with regard to

6    the unexchanged notes, many small holders who probably are

7    not sophisticated parties by definition of the transactions

8    who would be entitled to a much higher level of disclosure,

9    but we reserve on those issues.

10           And, Your Honor, we specifically reverse on issues

11   related to disclosure should in fact the Court find that the

12   holders are somehow unimpaired being put over on the T side.

13           You can look at contradiction after contradiction

14   in this plan itself on how the mechanics will work on

15   releases, et cetera, if the debt is reinstated.  The plan on

16   its face just does not work, but now we're proceeding on

17   this process, and again, the debtors are gambling

18   everything.  And again, it is on one business -- less than

19   one business day's notice of the material change.

20           I think that it's worth stepping back and looking

21   at why the debtors have elected to become specific about

22   this change at the last minute instead of as Mr. Husnick

23   noted putting in the language concerning what they always

24   knew they would do -- going to do.

25           If the debtors were in fact intending to create

1    non-impairment by an attempt at reinstatement on the T side

2    months ago that just can't be right -- that intention can't

3    be reconciled with what has been stated at depositions and

4    it can't be reconciled with what was stated with regard to

5    discovery being relevant at hearing after hearing at this

6    case.

7            So why did they do that?  They do that because in

8    depositions and otherwise we began focusing on the need to

9    address the make-whole issue at EFH.  The make-wholes on the

10   legacy notes at EFH, which total approximately $200 million

11   have not been objected to.  There's not an objection on the

12   docket unless we accept the plan filed late Friday night as

13   an objection as the debtors ask us to.  We'll accept that

14   plan as the first of objection some 18 months into this case

15   to $200 million in make-whole payments.

16           Why is it that this special language is being put

17   in for series Q and R of the EFH legacy notes?  Because it

18   has a -- they have a remarkably different make-whole

19   provision.  They do not have an acceleration provision.

20   These are a completely different scenario, and that brought

21   the debtors crashing into the wall of condition precedent

22   number nine to the effective date of this plan.

23           They had a patently non-confirmable plan coming in

24   here on Friday morning because those make-whole claims are

25   likely to succeed.  Now to cure their problem they're now

1    latching on for the first time to a specific statement of

2    reinstatement, but they've gone over to the T side to that

3    do that and there's in a catch-22 in this issue now with

4    regard to how they keep these claims unimpaired given the

5    likelihood of success on the make-whole.

6              And again, these are the only make-whole claims in

7    this case that haven't been objected to until Friday.  It's

8    a very different kettle of fish.

9              So now what's going to happen going forward in

10   this case?  So the debtors have now said that they want to

11   reinstate on the T side.  I believe it's to solve the make-

12   whole problem, maybe at a deposition we'll hear further

13   about exactly why they did this this coming week.  So that's

14   going to bring them to condition number nine if we establish

15   the make-whole.

16             At condition number nine they're then going to

17   have to say, okay, we need to gather all these parties

18   together and we enter into -- we get a waiver from the

19   parties.  There's nothing in the disclosure statement about

20   that waiver.  Then if they don't get the -- and whether it's

21   likely to come.

22             Then if they don't get the waiver we're going to

23   end up dealing with perhaps they're going to put -- do the

24   reinstatement.  Or maybe they get to the reinstatement

25   otherwise.

1            But what this brings us to is months after the

2     discovery stipulation or perhaps just weeks after the

3     discovery order entered in this case we now have an entirely

4     wide open series of new discovery.  We have paper discovery

5     that is going to need to be taken concerning the potential

6     of the T side to pay.  What do those debt documents over

7     there that they're contemplating look like?  You have eight

8     pages, that's it, eight pages of descriptions of the current

9     disclosure statement concerning the post-confirmation

10    financial condition of the T side.  We have fuel price

11    issues.  We have this Court's guidance that this is not

12    going to be a valuation trial so we have keep the

13    confirmation hearing on November 3rd.

14            This is a massive series of power companies, coal

15    plants in a declining market where this Court has heard

16    testimony that in fact the value of these plants may be

17    declining during the pendency of the case, and now our

18    holders find that they may have to live over there for

19    another decade or so during -- 'til the bonds mature.

20            We have two nuclear plants over there.  This is

21    not going to be a simple issue to establish that you can

22    push this debt in on the T side under some five billion or

23    more of contemplated post-petition secured debt.  It's a

24    material change and it's going to raise massive issues for

25    keeping this case on track for the confirmation on

1    November 3rd.  We're going to be back to the debtors very

2    shortly with what we believe is the necessary discovery that

3    will be required so that we can proceed, and I anticipate

4    that we're going to probably end up coming before this Court

5    seeking some alteration of the schedule so that we can value

6    that multi-billion entity and attempt to keep this on track,

7    all because on Friday evening instead of just saying we're

8    going to pay you in full in cash they chose to add this new

9    provision.

10              We would rather go back to the words paid in full

11   in cash, that is what has been advertised and that's what

12   we'd like to see the disclosure statement limited to.

13   Barring that we'll come back to the Court with the discovery

14   that's required and work through the issues.  Come to the

15   Court if we need to after trying to work through the issues

16   with the debtors.

17              Thank you, Your Honor.

18              MR. HUSNICK:  Just on this issue, Your Honor.

19              I'm a little perplexed on the exchange with

20   Mr. Pedone here.  I have an email from him yesterday saying

21   in light of the additional disclosure his objection was

22   resolved.  Now the objection of Fidelity is being treated as

23   a -- you know, opening the door for an additional complaint

24   about an alleged material change that was made at

25   Mr. Pedone's request.  So let me just address it very

1    quickly.

2          Your Honor, every version of the plan that we

3    filed with the court has said payment in full in cash or

4    otherwise left unimpaired.  What did otherwise left

5    unimpaired mean if it didn't mean a potential for

6    reinstatement?

7          THE COURT:  Well no one has known.

8          MR. HUSNICK:  Well, Your Honor, that's exactly

9    why --

10         THE COURT:  I think --

11         MR. HUSNICK:  -- when we had the discussion --

12         THE COURT:  Yeah, we've had the discussion, and

13   it's been left open, but you've never specified what you

14   meant, and you haven't -- every time you've said paid in

15   full in cash you haven't added that little asterisk at the

16   end.  I've heard paid in full in cash until my nose bleeds,

17   but I haven't that little clarification every time.  Was

18   that conveniently forgotten?

19         MR. HUSNICK:  No, I think that there are times --

20         THE COURT:  And you never mention -- no one has

21   ever mentioned switching it to the T side.

22         MR. HUSNICK:  Well the terms of the indenture are

23   clear on that.  The terms of the indenture say that if the

24   debt is to be reinstated it can be pushed down to TCEH.

25   That's just expressed on the face of the indenture, it's not

1    a remedy that the debtors are coming up with, it just always

2    existed.

3              For the creditors to say today that it was the

4    first time they heard about it is very misleading.  Now is

5    it the first time that it was put in print?  Yes.  I think,

6    Your Honor, there certainly are times, and I can find

7    transcripts where people said payment in full in cash and

8    didn't give the -- I'm with you on that, Your Honor.  They

9    would say that the written product that we produced,

10   including the plans, was always clear that there was an

11   otherwise left unimpaired option.

12             We heard Your Honor very loud and clear at the

13   status conference that we were not to get cute on

14   unimpairment so we did get specific; we dropped it from the

15   EFIH seconds, the EFIH firsts, we dropped the language

16   entirely, but with respect to EFH, as we've consistently

17   told Fidelity in meetings, reinstatement was a possibility

18   and we were unwilling to drop that potential option at this

19   point in time, but we were willing, at the request of the

20   indenture trustee, to get more specific and specify so they

21   knew exactly what they were fighting at the confirmation

22   hearing.

23             We think, Your Honor, it's adequate disclosure for

24   purposes of getting the disclosure statement approved.

25   Certainly they will have whatever -- they being Fidelity and

1   the indenture trustee -- will have whatever rights they have

2   in connection with objecting to the treatment at

3   confirmation and will undoubtedly be participating in the

4   discovery process and the like to get whatever additional

5   detail they need to address the merits of the reinstatement

6   question.

7            If I may have one moment.

8            Thank you, Your Honor, that's all we have on that

9   point.

10           THE COURT:  Okay.

11           MR. MCCANN:  Your Honor, very briefly.  To be

12   clear I'm not going back on my agreement that I'm not

13   contested trying to try feasibility here today are patently

14   not confirmable.

15           We agreed we would state our reservation of rights

16   and that's what I'm doing and they're taking their gamble on

17   the disclosure statement.  I'm not trying to stop that

18   disclosure statement today, I agreed that we would reserve

19   on the issues.  I think they are material issues.

20           Thank you.

21           THE COURT:  You're welcome.

22           Mr. Kaplan?

23           MR, KAPLAN:  Your Honor, Kaplan from Fried, Frank,

24   just if I may respond.

25           You know, they're convenient then saying that well

1    it was always there.  I think, you know, there is a little

2    bit of judicial estoppel here.  There have been numerous

3    rulings on discovery and otherwise that have been because of

4    the premise where they have said over and over and over

5    again they're paid in full, and so that's limited discovery

6    in connection with the PSA, it is limited all of the

7    different things.  They've had testimony as to why they've

8    approved this.  And for them to come in now and say, oh, gee

9    oh, otherwise I'm impaired everybody should have known that

10   that's what it meant.  That just doesn't hold water.

11           And for them to -- I understand that they want to

12   get this process moving and they want to get to November 3rd

13   confirmation.  I think you've heard now what the discovery

14   is going to have to be, because frankly you're going to need

15   to understand what are their bonds going to look like on a

16   go forward basis?  Who is the obligor?

17           I'll be honest, I don't even know whether they

18   filed the T side debt documents yet or not because up until

19   Friday I didn't think that was at all relevant to our

20   client, and I'm sure neither did anybody else on EFH,

21   because what they negotiated on the T side was always their

22   problem and we don't need to understand what the debt

23   documents are.

24           They have now fundamentally altered the calculus

25   for the entire E side and certainly for the EFH creditors

Page 45

1    and they should not be able to spend, you know, a month and

2    a half getting all of the rulings that they wanted from Your

3    Honor and the schedule based on a fundamental premise of

4    payment in full in cash and then now turn around and say oh,

5    gee whiz people wanted more specificity so now we're going

6    to pull back the curtain and show you that that's not --

7    what we have been saying is not what we've meant.

8              THE COURT:  All right.  Thank you.

9              MR. KAPLAN:  Thank you, Your Honor.

10             THE COURT:  Mr. Dietderich?

11             MR. DIETDERICH:  Andy Dietderich for the

12   committee.

13             I have a practical point which picking up on a

14   point from Mr. Kaplan, which is we're in the middle of a

15   very aggressive deposition schedule and we're trying our

16   best to confine our questions in those depositions to what's

17   actually relevant for the debtor's affirmative case.

18             I do agree with Mr. Kaplan that it is a change

19   from what we've been hearing in the discovery effort if the

20   plan for the treatment of the EFH noteholder is not payment

21   in cash in full, putting aside the drafting and the clarity

22   of the drafting of the disclosure statement itself, and if

23   it's the debtor's position that this is an important part of

24   the case, in other words that the plan is going to be shown

25   to be feasible whether it's cash or payment with bonds from

1    the T side, I do think again, and I can speak to the people

2    who are doing discovery, we've had to break into teams, you

3    can understand, I do think that there will be the need to be

4    some additional attention and potentially additional time to

5    explore those issues.  It certainly isn't contemplated by

6    the deposition schedule we have currently.

7              THE COURT:  Okay.  Thank you.

8              MR. DIETDERICH:  Thank you.

9              THE COURT:  All right.  Well let me take a step

10   back and what's in front of me today, and what's in front of

11   me today is the adequacy of the disclosure statement.

12   What's not in front of me today is whether additional

13   information -- additional discovery might be needed,

14   schedules might need to change, all that stuff that might be

15   associated with the fact that there's been this change in

16   the disclosure statement and the plan, right?  It's

17   reflective in the plan on Friday.

18              I'm not making -- I am not making any ruling at

19   all in connection with what may or may not need to be done

20   to alter the schedule or to alter the discovery that's

21   already been put in place, although I will say the focus has

22   been, and I have specified it several times, that the

23   assumption was payment in full in cash.

24              I have known from day one, it's been told to me

25   and I've noted it myself, that there was an option always in

1    the documents that the otherwise unimpaired, to use

2    shorthand, might be the treatment.  What's that's meant has

3    never been specified to the Court, it may have been in

4    private conversations, I don't know, it's never been

5    specified to the Court, so I am operating in a somewhat

6    altered universe than the one I was living in when I took

7    the bench this morning.

8            Hold all that aside, what's in front of me today?

9    The disclosure statement under a plan which purports to

10   unimpair the EFH noteholders.  Whether that is truly what

11   the plan does is an issue for confirmation.  Whether they

12   are in fact impaired and they're not voting that would be

13   fatal to confirmation.

14           So the debtors are putting their -- all their

15   eggs, fine, in the basket, that yes, these creditors are in

16   fact unimpaired and we don't need to solicit their votes in

17   connection with that plan, and as a result the disclosure

18   statement need not go into the detail it would otherwise go

19   into if they were entitled to vote.  I agree on that point.

20           The point of the disclosure statement is to

21   provide information -- primarily to provide information for

22   creditors who are to vote under that plan.  The whole -- we

23   had a discussion about this at the plan support agreement

24   level about whether the PSA was a solicitation of votes, and

25   1125 specifies that you can't solicit votes without an

1    approved disclosure statement.  I think the implication

2    there is why do you have -- why does that matter?  Well you

3    have a disclosure statement so people know how to vote, and

4    they only need to know how to vote if they're being

5    solicited.  So, I think the focus is on voting or not

6    voting.

7              Now, I don't think that's the sole focus, I think

8    even the interests of non-voting, unimpaired, however you

9    want to do it, reinstated, paid in full creditors, I think

10   the disclosure statement is relevant to them.  I think it's

11   relevant to them because they need to understand the plan

12   and the treatment that they're getting under the plan, and

13   the best place they get that is from a disclosure statement.

14             So, I don't believe they lack standing.  I don't

15   think it's irrelevant what the non-voting creditors think

16   about a disclosure statement that's being sent out on a plan

17   that treats them as non-voting; however, I think that what's

18   happened today is a narrowing of what was a very open sort

19   of alternative to payment in full in cash, it may or may not

20   require additional discovery, but I don't think there's

21   anything in the disclosure statement -- I don't think

22   there's anything that needs to be added to the disclosure

23   statement in order to make it have adequate information for

24   purposes of 1125 based on this change.

25             The only thing that gives me pause in making that

1    statement deals with the effect that reinstatement might

2    have if it's done on the T side of the reorganized structure

3    and how that may affect the financial wherewithal of that

4    entity, feasibility, et cetera.

5              I think that the information is out there, I don't

6    think the debtors need to specify it any further in the

7    disclosure statement.  There's only so much that can be put

8    in the disclosure statement, and the reality is that the raw

9    data is there for purposes of being able to crunch the

10   numbers.  How that will play out will probably play out in

11   discovery, we'll have to see, but I don't think there's

12   anything here even given this change on Friday that requires

13   any additional disclosure otherwise than what's already in

14   the fourth amended disclosure statement.

15             So, I will overrule the objection of fidelity, I

16   will, to the extent it is, and I don't think it is, an

17   objection being put forth by Mr. Pedone on this issue I will

18   overrule it.  I think he had resolved his objection, I

19   didn't hear anything today otherwise other than to sort of

20   lay the ground work for a decision that's not in front of

21   me, which is what does this mean for discovery?  We'll

22   figure that out if and when -- not if -- we'll figure that

23   out when it comes in front of me at an appropriate time.

24   All right.  So that deals with that.

25             Let me hear from the asbestos plaintiffs.

1    Mr. Hogan.

2              MR. HOGAN:   Good morning, Your Honor, Daniel

3    Hogan, Hogan McDaniel on behalf of Fehy and Fenicle.

4              Your Honor, as our objection permitted we are

5    discussing four specific debtors who are defined as asbestos

6    debtors.  Those be EECI Inc., EEC Holdings, LSGT Gas

7    Company, and LSGT SACRO, Inc.

8              It's our position, Your Honor, that the disclosure

9    statement is inadequate.  As you've heard from the debtor

10   they make the point that they've disclosed requisite

11   information in the disclosure statement.  And again, they

12   made significant changes to the disclosure statement on

13   Friday.  Specifically they address certain information that

14   to that point we had not yet seen.  That being specifically,

15   Your Honor, the disclosure that certain of the insurance

16   companies that were providing insurance to the debtors were

17   in fact insolvent.  That is a material disclosure that prior

18   to Friday we were unaware of.

19             However, there is certain information that was

20   disclosed to the committee.  It was designated as

21   professional eyes only, that's information that hasn't been

22   shared with my co-counsel.  Had it been it might not have

23   been as big a disclosure to us as it was on Friday.

24             Your Honor, that's important again because we're

25   an unimpaired class, we're characterized as unimpaired by

1    the debtors; however, we need information to understand the

2    interplay between the claims of the various debtors.  There

3    are claims that were made -- or claims in between companies

4    as to intercompany claims and the utilization of their

5    assets that's not disclosed.

6         Your Honor, why is all this relevant?  EECI's

7    predecessor was a company called Evasco (ph), and they went

8    into business 100 years ago, and by the 1930s were a major

9    user of asbestos insulation.  They were used in

10   construction, maintenance, repair business, and continued

11   under a series of different ownerships until 1980.  They've

12   left a worldwide legacy of asbestos in place.

13        The amended disclosure statement is inadequate

14   because the debtors completely failed to discuss either the

15   assets of the extent of liabilities residing in EECI and the

16   related debtors for which the EFH companies likely share

17   responsibility as a result of corporate conduct over 40

18   years since Evasco was acquired.

19        Failing to provide this information about their

20   separate financial history and current status intercompany

21   claims against each other and the use of funds makes this

22   disclosure statement inadequate as it relates to these

23   claimants.

24        Your Honor, the disclosure statement implies that

25   all of the insurance policies contained in these asbestos

1    debtors are in their schedules and SOFAS, and that's not

2    entirely accurate, Your Honor, because it's our

3    understanding that there's insurance policies that relate

4    back to periods well before the leverage buyout.

5           The SOFAs and the statements and the schedules

6    apparently recite the current asbestos insurance coverage,

7    but that's not what our clients are driving at, they're

8    driving at the insurance that may have occurred or been in

9    place prior to the current levels of insurance.

10          The insolvency relates an issue, Your Honor, the

11   other company notes and the lack of interest being paid

12   between those notes and between various debtors, which the

13   U.S. Trustee agrees at one point remain issues, and

14   ultimately, Your Honor, it's our position that the

15   disclosure statement is not adequate as it relates to the

16   information that these creditors need in order to understand

17   their claims and how they're going to be treated.

18          The change was made Friday afternoon, Your Honor,

19   not unlike what happened with regard to the earlier

20   comments, and it's our position that the disclosure is

21   inadequate.

22          Thank you.

23          THE COURT:  All right.  Thank you.

24          Focus on the insurance issue, please.

25          MR. HUSNICK:  Sure.  Sorry, Your Honor.

1          Your Honor, on the insurance front as we included

2     in the statement that we put forward we set forth the limits

3     of the insurance, the total aggregate limits, that's exactly

4     the same aggregate limit disclosure that we made in

5     discovery to the official EFH committee.

6          As to the identity of the policies I was informed

7     very late last night by Ms. Ramsey that there may be a

8     discrepancy between the schedules and statements and a set

9     of policies that we sent, and I have a feeling it's one of

10    the old not current policies that's being referenced.  We've

11    been trying the track that down for the last 12 hours.  As

12    soon as I find out what the name of that policy is, if to

13    the extent it was not listed in the schedule, we're happy to

14    give the name of that policy the same information we've put

15    forward in the schedule to the asbestos plaintiffs.  So, I

16    don't see that as a material issue.

17         I don't think anyone is taking issue with the fact

18    that what we did provide to them in the supplemental

19    disclosure was the same information we provided to the

20    official committee in terms of dollar thresholds, the

21    identification of a potential insolvent insurer.

22         Overall, Your Honor, I would say that the identity

23    of the insurers is more -- the potential insolvency of that

24    insurer is more of a debtor issue than it is a plaintiff

25    issue, because the debtors have been paying this obligation,

1    it has not been paid from insurance.  These obligations,

2    liabilities, settlement costs, and litigation costs have

3    been funded by the debtors.

4         So the nature of the insurance policies to me is

5    not all that relevant, nevertheless we built it into the

6    disclosure statement and I think they've identified two

7    potential policies.  As I said, maybe more, I defer to them

8    because I saw the exchange as I said at about 11 o'clock

9    last night.  We will work through that, we will identify if

10   there was a policy that wasn't listed, and provide the name

11   of that policy to the plaintiffs.

12        The last thing I would say is it's just incredibly

13   misleading to say that they haven't seen the language 'til

14   Friday.  I've been exchanging drafts of this language.

15   Granted I did insert the insurance stuff later in the week

16   last week in response to a specific request for this type of

17   disclosure, but we've been trading language in drafts for

18   the better part of two weeks, and we've been building and

19   asking for whatever additional disclosure they need.

20        Quite frankly, Your Honor, we've done everything

21   we can do highlight for them, and I was actually surprised

22   to uncover that the monthly operating reports gave them

23   exactly what they were asking for on the assets and

24   liabilities on a month-to-month basis.

25        So, Your Honor, I would ask that the objection be

1    overruled, and we will provide the names of the insurance

2    policy though.

3            THE COURT:  Do we need to put those in the

4    disclosure statement?

5            MR. HUSNICK:  I don't believe so, we haven't

6    identified the names of any of the policies in the actual

7    disclosure statement.

8            THE COURT:  All right.

9            MR. HUSNICK:  We did reference the schedules and

10   statements, but -- and again, none of these creditors are

11   voting and they will have access to the names though through

12   this.

13           THE COURT:  Okay.  All right.

14           All right.  I'm going to overrule the objection

15   for a variety of reasons not really addressed here in court,

16   but to address it specifically since it was in the papers on

17   the 524(g) issue and that the plan is patently unconfirmable

18   because you can only operate under this plan and the

19   treatment of asbestos plaintiffs under this plan by

20   implicating 524(g).

21           And I've already ruled and I standby it that

22   524(g) is an option, you can only do certain things.  If you

23   implicate 524(g), if the debtors and I get to confirmation

24   and I decide they are trying to do what they can only do

25   under 524(g), well they don't have that information and I

1    think the plan would be DOA there, because I think you'd

2    have to start over with -- might have to start over -- well

3    you would have to start over with a lot of additional

4    information in the disclosure statement, et cetera.

5              I don't read that as what they're doing, that's

6    not how I read the plan.  They're not in any way trying to

7    channel future claimants, but I'll hear argument on that at

8    confirmation.

9              I would add as an aside that I'm pleased that so

10   many of these objections have been resolved, and I applaud

11   the efforts of counsel to the creditors, objectors, debtors,

12   plan sponsors, et cetera, for working to resolve disclosure

13   statement objections in a meaningful way.

14             I'm particularly pleased that the sort of patently

15   unconfirmable issues were reserved.  I will say frankly that

16   I'm not sure what patently unconfirmable means, I'm not a

17   big fan of that case law, I'm not even sure it's a valid

18   reason to object to a plan.  I didn't see anything in here

19   in any of the interjections that I felt rose to the level of

20   patently unconfirmable, whatever that means.

21             Now that doesn't mean that there's not stuff in

22   here that might be a problem for confirmation.  Without

23   endorsing anybody's position on releases, for example, it

24   may be that the releases that are contemplated in this plan

25   are too broad, and I make a ruling at confirmation on that.

```
1    Well we have two options, right?  We either don't confirm

2    the plan or we change the releases.

3              To say that releases is an issue for confirmation

4    doesn't make the plan patently unconfirmable.  It can either

5    be addressed in one of two ways and we'll figure that out

6    when we get to confirmation.  And I think that really goes

7    to the heart of all of the confirmation, certainly patently

8    unconfirmable confirmation objections.  Some of which won't

9    be able to be solved.  If I find that there's a class of

10   creditors that wasn't solicited because they are unimpaired

11   and they truly are impaired we've got a more serious problem

12   obviously.  We'll deal with that at confirmation if we have

13   to deal with it, which we probably will.

14             So, I don't think the patently unconfirmable issue

15   in connection with 524(g) is a valid objection.

16             As to the more detailed objections with regard to

17   there's not enough specific information -- excuse me -- for

18   the self-described asbestos debtors, intercompany claims,

19   insurance policies, et cetera, I disagree.  I think there's

20   more than enough information in the disclosure statement

21   about the debtors both on sort of an individual basis and a

22   collective basis.  And in the record you can't have a

23   10,000-page disclosure statement, at some point you have to

24   be able to provide people with a package that's readable and

25   doable.  We may be well beyond readable at this point, but
```

1    it is what it is, and I think the information, both the

2    information that's in there and the information that directs

3    you to get more information, if you need it to a specific

4    place, I think is adequate for purposes of a disclosure

5    statement.

6              And again, to the extent these creditors are

7    unimpaired, they're not entitled to vote, they have an

8    interest in the disclosure statement, but it certainly

9    doesn't rise to the level of what someone who is voting yea

10   or nay on a plan might have an interest in.  It is a

11   legitimate interest.  I think it's adequately taken care of.

12   I'll overrule the objection.  Do you have an order?

13             MR. HUSNICK:  I do, Your Honor.  May I approach?

14             THE COURT:  Yes.

15        (Pause)

16             THE COURT:  Okay.

17             MR. HUSNICK:  Thank you, Your Honor.  Chad

18   Husnick, Kirkland & Ellis again on behalf of the debtors.

19             Your Honor, what I handed up to you are two

20   things.  First is the disclosure statement, it's an

21   incremental change pages only redline.

22             What I would ask, Your Honor, and I'll walk you

23   through the changes to the -- to both the order and the

24   incremental redline for the disclosure statement, but I'm

25   told there are some things we need to change in the order

1    like the reference to the disclosure statement because the

2    solicitation version is going to the fifth amended because

3    of these incremental changes.  So if Your Honor wouldn't

4    mind we'll submit that under certification of counsel today.

5                THE COURT:  Okay.

6                MR. HUSNICK:  But just briefly for the record

7    starting with the disclosure statement itself.

8                This, Your Honor, will be the fifth amended as I

9    said.  The first set of changes is on page 2.  Your Honor,

10   just additional disclosure here and reservation of rights.

11   This is the reservation that I mentioned that will appear in

12   both the disclosure statement order and the disclosure

13   statement itself.  It makes clear that all rights are

14   reserved for the confirmation hearing and the hearing on the

15   motion to approve the settlement agreement.

16               THE COURT:  Okay.

17               MR. HUSNICK:  On page 9, Your Honor, the next page

18   in the incremental redline, there's some language here about

19   the first lien secured claims and their treatment under the

20   plan.  In particular the first lien secured claims may take

21   some of the new reorganized TCEH debt back as so-called take

22   back paper, so we've built in that potential that would be a

23   portion of the new reorganized TCEH debt that was always

24   contemplated, it's just that some of it may be issued in

25   lieu of cash.

1          Your Honor, that takes us to page 22, which is two

2     pages forward in your incremental.  Again, the same change.

3     This is in the now in the summary of the plan section in the

4     chart.

5          Flipping forward, Your Honor, to page 56, again,

6     additional disclosure related to the EFIH unsecured notes

7     and the EFH collateral trust agreement -- EFIH collateral

8     trust agreement.  Again changes included at the request of

9     parties between Friday and last night.  Actually, I'm sorry,

10    that's actually moving language from page 58 and 59.

11         THE COURT:  I was going ask why is it green, so

12    now I know.

13         MR. HUSNICK:  Yeah, it's moving it up a couple of

14    sections.

15         Your Honor, on page 105 again this is making clear

16    that there may be some of the reorganized TCEH debt issued

17    to the actual TCEH first lien creditors as opposed to just

18    cash.

19         On page 106 it again it's just a continuation of

20    the same theory.

21         Draw your attention on page 112, Your Honor, to

22    the professional compensation section.  This is a change

23    that's been -- has been and is being discussed with the fee

24    review committee.  One of the concerns of the debtors in

25    particular was streamlining the fee review process for so-

1     called ordinary course professionals.

2              As you can imagine, Your Honor, in a case of this

3     size some of the ordinary course professionals, for example,

4     corporate counsel and regular litigation counsel that do not

5     appear in a bankruptcy case can be significant and are often

6     over the cap.  What this seeks to do is streamline that

7     process and eliminate the overview for so-called 327(e) and

8     ordinary course professionals.  All other retained

9     professionals will of course continue to be subject to the

10    Court's overview and the fee review committee.

11             All rights as to this provision, just to be clear,

12    are reserved for confirmation and the discussions are

13    ongoing.

14             Same change, Your Honor, on page 113.

15             Moving to page -- I would say that changes on 125

16    are just more in the nature of clarification and clean up.

17             The same on page 127.

18             Page 130 again is the first lien secured kick back

19    paper issue.

20             And page 140 is a related issue related to the tax

21    receivable agreement.  Again, an issue with just the TCEH

22    first lien lenders for which they have consented to this

23    modification.

24             Your Honor, that's the sum and substance of the

25    changes from the fourth to the fifth, which will be the

1    solicitation version of the disclosure statement.

2              THE COURT:  Okay.  Just real -- just a typo on

3    185, the very last page you need a space between allowable

4    and under.

5              UNIDENTIFIED SPEAKER:  Heads will roll.

6              MR. HUSNICK:  Thank you, Your Honor.

7              THE COURT:  Heads will roll.  I heard that.

8         (Laughter)

9              MR. HUSNICK:  Unfortunately it's probably my head,

10   Your Honor.

11             But turning to the order, as I said we'll file

12   another order that will then reflect from third to the

13   fourth to the fifth, but just quickly walking through the

14   redline of the order.

15             On page 4 we're just starting to make conforming

16   changes, and I don't believe anything substantive there.

17             Page 7, this is making clear that we can

18   distribute a cover letter, which is attached to the order as

19   Exhibit 6-A.

20             THE COURT:  Uh-huh.

21             MR. HUSNICK:  Page 9.  Your Honor, this is the

22   reservation of rights, it carries over onto page 10, that

23   was negotiated with the parties.

24             THE COURT:  Okay.

25             MR. HUSNICK:  Page -- turning all the way into --

1    it's hard to describe this, the next changes.

2              THE COURT:  It's flagged, it's okay.

3              MR. HUSNICK:  Oh, okay.  Thank you.  This is just

4    adding some additional notations related to the cash out

5    election that's available to general unsecured creditors of

6    TCEH, and it's building that option in.

7              THE COURT:  Okay.

8              MR. HUSNICK:  You'll see that there's some more

9    green here, which is moving some of the opt out stuff from

10   page 6 of the ballot up.

11             THE COURT:  Okay.

12             MR. HUSNICK:  And that is the end of the changes

13   to the order, Your Honor.

14             THE COURT:  Well, I find for the --

15             MR. HUSNICK:  Sorry, does Suri have a question?

16             THE COURT:  I have -- okay.  I've overruled the

17   objections or they've been resolved.  I find that the

18   disclosure statement, fifth amended as it'll be presented,

19   is -- contains adequate information under 1125, and I

20   approved the solicitation procedures, and I will sign the

21   order when I receive it, provided of course that all the

22   changes are consistent with those that have been described

23   to the Court, which I expect they will be.

24             MR. HUSNICK:  Thank you, Your Honor.

25             We will submit that as soon as possible after the

1    hearing.  As you can imagine we are on a tight time frame

2    for solicitations --

3              THE COURT:  All right.

4              MR. HUSNICK:  -- so we will get it out.

5              THE COURT:  Unfortunately I'll just for purposes

6    of whether you want it signed today, I have to leave the

7    office at 2 p.m. for the day.  I'm in all day tomorrow, all

8    day Wednesday.

9              MR. HUSNICK:  Okay.

10             THE COURT:  I'll look at it when I get it.  It may

11   not get signed until tomorrow.

12             MR. HUSNICK:  Okay.  We will get it as soon as

13   possible.

14             THE COURT:  Okay.

15             MR. HUSNICK:  Thank you very much for your time.

16             THE COURT:  You're welcome.  When do I see you

17   next?  Probably tomorrow, right?

18        (Laughter)

19             THE COURT:  It's a daily event.

20             UNIDENTIFIED SPEAKER:  October 15th.

21             MR. HUSNICK:  I think the next omnibus is

22   October 15th.

23             THE COURT:  Okay.

24             MR. HUSNICK:  I'm --

25             THE COURT:  Do we have any conference calls

1    scheduled at this time on discovery issues?

2              UNIDENTIFIED SPEAKER:  I don't -- not yet.

3              MR. HUSNICK:  Not that I'm aware of, Your Honor.

4              THE COURT:  Okay.  Very good.

5              All right.  Well thank you very much, we'll see

6    you on October, probably hear you on the phone before that,

7    but we'll address that when it happened.  We're adjourned.

8              MR. HUSNICK:  Thank you, Your Honor.

9         (Whereupon these proceedings were concluded at 10:54

10   AM)

11                              * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2

3                              RULINGS

4                                                          PAGE

5    Disclosure Statement                                  46

6

7    Motion to Approve PSA                                 55

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 67

1                    C E R T I F I C A T I O N

2

3      I, Dawn South, certify that the foregoing transcript is a

4      true and accurate record of the proceedings.

5      Dawn South          Digitally signed by Dawn South
                            DN: cn=Dawn South, o, ou,
                            email=digital1@veritext.com, c=US
6      _____
                            Date: 2015.09.22 12:29:34 -04'00'

7      Dawn South

8      AAERT Certified Electronic Transcriber CET**D-408

9

10

11

12

13     Date:  September 22, 2015

14

15

16

17

18

19

20

21

22      Veritext Legal Solutions

23      330 Old Country Road

24      Suite 300

25      Mineola, NY 11501