# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

300 North LaSalle
Chicago, Illinois  60654

Marc Kieselstein, P.C.
To Call Writer Directly:
(312) 862-3029
marc.kieselstein@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

September 28, 2015

**By eFiling and Hand Delivery**

The Honorable Christopher S. Sontchi
United States Bankruptcy Judge
United States Bankruptcy Court
824 North Market Street, 5th Floor
Wilmington, Delaware 19801

Re:  *In re Energy Future Holdings Corp., et al.*, Case No. 14-10979 (Bankr. D. Del.)

Dear Judge Sontchi:

The Debtors write in response to the letters submitted to the Court on September 24, 2015 [D.I. 6158] by the official committee of unsecured creditors of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, EFIH Finance Inc., and EECI, Inc. (the "EFH Committee") and on September 28, 2015 [D.I. 6203] by the indenture trustee for certain EFH unsecured notes (the "EFH Indenture Trustee").  Through those letters, the EFH Committee requests that the Court modify the amended confirmation scheduling order such that the confirmation hearing would not begin until after the Thanksgiving holiday, and the EFH Indenture Trustee requests, among other things, a further extension to 45 days after the submission of certain expert reports.[1]  The Court should deny these requests.

## I.    NO EXTENSION OF THE CONFIRMATION SCHEDULE IS WARRANTED.

These requests for additional time are wholly unwarranted for several reasons.  ***First***, the possibility of unimpairment by means other than full cash payment on the plan effective date is not new:  it has been in every version of the plan since July.  On July 23, even before the Debtors executed the merger documents, the Debtors filed a proposed plan providing that the EFH legacy notes would receive, "in the Merger Scenario, payment in full in Cash or *other treatment rendering such Claim Unimpaired*."[2]  The plan's definition of "Unimpaired" expressly

---

[1] The scheduling order provides that the Court will only modify hearing dates for "good cause." Scheduling Order ¶ 7 [D.I. 5771].

[2] First Amended Plan, Art. III.B.4 (July 23, 2015) [D.I. 5078] (emphasis added).

# KIRKLAND & ELLIS LLP

The Honorable Christopher S. Sontchi
September 28, 2015
Page 2

referenced section 1124 of the Bankruptcy Code, which describes the reinstatement mechanism available to all chapter 11 debtors.[3]

Thus, there is no "change" in treatment or in "merger currency," only greater specificity as requested by the EFH Indenture Trustee.[4] Indeed, in its letter, the EFH Committee concedes as it must that it understood this language all along to "conventionally and broadly . . . reserve rights under the Bankruptcy Code"—and that is exactly what it does.[5] But despite this long-standing and well-understood reservation, the EFH objectors until now declined to assert potential reinstatement as a basis for delay, and the estates should not suffer for this last minute request.

**Second**, the Debtors' primary focus and principal intent is and has been to pay allowed E-side claims in full and in cash—and the Debtors and plan support parties have rightly emphasized that central feature. But, since July, the plan has plainly provided that allowance of any makewhole claims would cause the failure of a condition to full cash repayment.[6] Put another way, no E-side creditor can credibly claim that the promise of payment in full in cash extended to makewhole claims.

Yet the most likely circumstance in which reinstatement would be pursued is if this Court were to allow or not rule on the EFH makewhole claims as of emergence. In that unlikely event, reinstatement would act as a safety valve. The allowed makewhole claim, triggered by payment earlier than the original maturity date, would by definition be mooted out through reinstatement of the original tenor—and the ability to pay the balance of allowed E-side claims in full would be preserved. Thus, for the bulk of the E-side creditors, retention by the Debtors of the right of reinstatement under limited circumstances (and subject to the consent of the plan sponsors and TCEH first lien creditors) enhances rather than undermines the central premise of the plan and makes the plan more feasible, not less. If the standards for reinstatement are satisfied and the makewhole claims are disallowed before emergence, the Debtors would consider any other potential business rationales for reinstatement closer in time to emergence.

**Third**, it is no secret that the EFH legacy notes indentures provide that, in the event of a spinoff of TCEH, the liability for amounts owed under the legacy notes would travel from EFH

---

[3] *See id.*, Art. I.A.379 (incorporating by reference 11 U.S.C. § 1124).

[4] EFH Indenture Trustee, Disclosure Statement Objection ¶ 3 (Aug. 17, 2015) [D.I. 5355] (highlighting the "other treatment" language in bold and italic type).

[5] EFH Committee Letter 3.

[6] *Compare* Fifth Amended Plan, Art. IX.B.9 (Sept. 21, 2015) [D.I. 6122], *with* Third Amended Plan, Art. IX.B.7 (July 23, 2015) [D.I. 5078].

# KIRKLAND & ELLIS LLP

The Honorable Christopher S. Sontchi
September 28, 2015
Page 3

to TCEH.[7]  That is exactly how reinstatement would operate here.  The Debtors have had numerous discussions with E-side creditors about that possibility over the course of this restructuring.  And the holders of the EFH legacy notes and the EFH Indenture Trustee cannot credibly claim ignorance of their own documents or surprise that the Debtors would maintain—rather than unilaterally abandon—the flexibility those documents provide.  Indeed, as far back as May, counsel to the EFH Indenture Trustee sent a proposed fee stipulation to the Debtors, which cited the possibility of reinstatement of the EFH legacy notes as a basis for payment of those fees.  Put simply, keeping the exact same notes in place is not a change in "currency" or "securities."

*Fourth*, no decision has been made to reinstate the EFH legacy notes:  the plan provides the option to reinstate the notes "at the election of the Debtors, with the agreement of the Plan Sponsors and the TCEH Supporting First Lien Creditors."[8]  It is unremarkable that the Debtors' boards have not been asked separately to approve the insertion of more specific, but still entirely optional, treatment language.  This was one of a number of language changes made in the normal process of resolving disclosure statement objections to give creditors greater clarity where requested.  None rose to the level of requiring separate board approval.

What *would* require board approval would be an actual decision to reinstate the EFH legacy notes. To date, the CROs have not recommended actual reinstatement—and in all likelihood, given the Debtors' view as to the weakness of the EFH makewhole claims, will never have occasion to do so.  Not surprisingly, other than high-level presentations a number of months ago, the board has not been immersed in the pros and cons of reinstatement.  That issue is not ripe for board consideration.  All the plan does—both as originally filed and as amended—is preserve the status quo.

*Fifth*, preservation of the ability to pursue reinstatement beyond confirmation still requires the Debtors to meet their burden *at* confirmation.  As set forth above, the plain language of the plan and the indentures themselves—along with multiple discussions on this very topic with E-side stakeholders—have put those stakeholders on notice that the Debtors intend to meet that burden.

---

[7]  *See* EFH Legacy Notes Indentures § 1101(a) (the successor in various going-concern transactions will assume the EFH legacy notes); First Supplemental Indentures §§ 3.01, 6.01(b) (the "sale, transfer, disposition or spin-off" of TCEH constitutes such a going-concern transaction).

[8]  Fifth Amended Plan, Art. III.B.4(c)(ii) (Sept. 21, 2015) [D.I. 6122].

# KIRKLAND & ELLIS LLP

The Honorable Christopher S. Sontchi
September 28, 2015
Page 4

## II.    CONFIRMATION ISSUES ASSOCIATED WITH REINSTATEMENT OF THE EFH LEGACY NOTES ARE NARROW.

The question is whether the inattention of the E-side stakeholders to this very live issue justifies a departure from the heavily-negotiated, Court-approved confirmation schedule.[9]  For all the reasons stated above, it does not.

But even if the reinstatement option were a bolt from the blue, the narrow evidence relevant to a possible reinstatement can be accommodated easily within the existing schedule. To prove that reinstatement would be viable, the Debtors will need to demonstrate only an absence of defaults (other than bankruptcy-related defaults) and, as they must do even absent reinstatement, feasibility.

As to the absence of defaults, no evidence is required. The EFH legacy notes had minimal covenants—and no financial covenants—when issued, and a number of the covenants they did have were deleted by supplemental indentures, together with the event of default linked to covenant breaches.[10]  To the Debtors' knowledge, no prepetition defaults exist.  If there are any material defaults, surely the E-side stakeholders, and in particular the EFH Indenture Trustee, would know and could articulate those defaults.

As to feasibility, the narrow issue is whether the plan is "reasonably likely" not to require a subsequent liquidation or restructuring of reorganized TCEH if it assumes approximately $492 million of reinstated EFH legacy notes.[11]  This inquiry involves a "relatively low threshold of proof."[12]  To that end, all of the relevant financial information is either contained in the disclosure statement, has already been produced, or is available through examination of witnesses that have not yet been deposed.

---

[9] The EFH Committee's argument that E-side creditors bear the risk of delay because "the PSA effectively prohibits the pursuit of better alternatives" is a misstatement of the terms of the PSA that the Debtors have repeatedly corrected.  PSA § 4.3(a) (go shop with respect to Alternative Restructurings that contain the Required Alternative Terms); § 4.3(b) (right to facilitated unsolicited proposals likely to lead to Superior Proposal); § 4.3(c) (fiduciary compliance provision); § 12.6(h) (fiduciary out).

[10] *See* Indentures §§ 601-608; First Supplemental Indentures §§ 4.01, 5.01.

[11] *See, e.g.*, *In re WR Grace & Co.*, 729 F.3d 332, 348 (3d Cir. 2013).

[12] *In re Brice Rd. Developments, L.L.C.*, 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008); *see also In re Washington Mut., Inc.*, 461 B.R. 200, 252 (Bankr. D. Del. 2011) (quoting "low threshold of proof" standard); *In re Trenton Ridge Investors*, LLC, 461 B.R. 440, 479 (Bankr. S.D. Ohio 2011) (same).

# KIRKLAND & ELLIS LLP

The Honorable Christopher S. Sontchi
September 28, 2015
Page 5

Since it was first filed in April, the disclosure statement has included reorganized TCEH financial projections prepared by the Debtors' management and accompanied by extensive explanatory materials.[13]  Indeed, it is telling that in the full week following the Debtors' alleged about-face, the E-side stakeholders have not specifically asked for a single additional document. Simply put, they already have—and have had for a considerable amount of time—all the documents they need to put the Debtors to their proof.

Moreover, a number of remaining, scheduled depositions provide ample opportunity for the parties to explore feasibility-related issues.  The upcoming depositions of Mr. Keglevic (the Debtors' CFO and co-CRO), Mr. Filsinger (the Debtors' energy-industry consultant), and Mr. Millstein (the TCEH first lien group's financial advisor) provide full opportunity to inquire into this topic.  And, as an accommodation, the Debtors previously agreed to make Mr. Ying available on this subject again at his upcoming expert deposition.  He was deposed once already, on September 23.

Under the circumstances, however, the financial viability of reorganized TCEH will be very difficult to dispute.  The TCEH spinoff plan constitutes a monumental deleveraging, involving tens of billions of dollars in aggregate T-side debt reduction. The Debtors' projections for reorganized TCEH reflect over a billion dollars of EBITDA in each year post-emergence.[14] This billion dollars-plus of operating earnings is in comparison to annual debt service obligations of approximately $32 million on the applicable EFH legacy notes.  Even if the Debtors' projections were wildly overstated, reorganized TCEH could handle the interest expense with plenty of debt capacity and liquidity to spare.

In addition, the Debtors understand that, if the Debtors elect the reinstatement option, reorganized TCEH will be fully compensated by the investor group in the EFH acquisition—via an upfront cash payment—as a condition to taking on a liability not currently on its balance sheet.  Thus, in addition to ample internal resources to service the debt, reorganized TCEH will have an external source of cash that will substantially defray the cost of assuming the EFH legacy notes.

Finally, logic dictates that the future owners of TCEH—the TCEH first lien creditors— would not subordinate themselves through conversion of debt to equity if there was even the slightest risk of putting themselves in harm's way, and the Debtors anticipate that Mr. Millstein

---

[13] Disclosure Statement, Ex. E (Sept. 21, 2015) [D.I. 6124].  The Debtors produced revised reorganized TCEH projections as of September 10.  Bates No. EFH06212149.

[14] Id.

## KIRKLAND & ELLIS LLP

The Honorable Christopher S. Sontchi
September 28, 2015
Page 6

would so testify.  In sum, the notion that gauging feasibility will be a complex exercise or that material information is not available is simply not credible.

## III.    THE DEBTORS HAVE PROPOSED REASONABLE ACCOMMODATIONS.

Despite all this, after the EFH Committee filed its letter, the Debtors proposed further accommodations on top of the additional deposition of Mr. Ying already agreed to.  The EFH Committee refused this offer, insisting that the November 3 hearing be delayed.

Specifically, the Debtors proposed the following accommodations:

- **Document Production.**  Although the Debtors believe all relevant documents have been produced, the Debtors invited additional document requests over the weekend and offered to verify that responsive documents have been produced or produce additional documents on an expedited basis.

- **Expert Reports.**  The Debtors offered to extend the time for expert reports to allow the EFH Committee to submit by October 16 a single expert report on behalf of plan objectors regarding TCEH feasibility, so long as the Debtors can depose the expert by October 24.

- **Depositions.**  The Debtors have already committed to make Mr. Ying available for further examination on reinstatement issues at his expert deposition.  The Debtors proposed that, after the depositions of Mr. Keglevic, Mr. Filsinger, and Mr. Millstein, the parties would revisit whether additional deposition time is necessary consistent with the good cause requirement in the scheduling order.

These accommodations permit the November 3 confirmation hearing to remain on track while providing more than enough additional time and discovery to address the EFH Committee's concerns.

# KIRKLAND & ELLIS LLP

The Honorable Christopher S. Sontchi
September 28, 2015
Page 7

*       *       *

The Debtors thus respectfully request that the Court deny the requests for delay and at most approve the foregoing compromise proposal.

Respectfully submitted,

*/s/ Marc Kieselstein*

Marc Kieselstein, P.C.